IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, )
  a Delaware corporation, )
QUALCOMM TECHNOLOGIES, INC., )
  a Delaware corporation, ) C.A. No. 24-490 (UNA)
 )
           Plaintiffs, ) **JURY TRIAL DEMANDED**
 )
     v. ) **REDACTED – PUBLIC VERSION**
 )
ARM HOLDINGS PLC., f/k/a ARM LTD., )
  a U.K. corporation, )
 )
           Defendant. )

## COMPLAINT

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant ARM Holdings PLC, formerly known as ARM LTD. ("ARM").[1]

## NATURE OF THE ACTION

1.     Qualcomm is poised to release to the market innovative products enabled by Qualcomm's custom-designed, high-performance, low-power central processing units ("CPUs") utilizing a novel microarchitecture and related technologies that will deliver the next era of computing innovation. Qualcomm's first-in-line custom Oryon CPU, which is designed for the compute market, is contained within the Snapdragon X Elite System-On-a-Chip ("SOC"). It

---

[1]     On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims. (*Arm Ltd. v. Qualcomm Inc.*, No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.) This filing contains additional background on ARM's attempt to preclude Qualcomm's custom central processing units from competing with ARM's own central processing units. The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading. (Redacted Answer and Defenses to ARM's Complaint and Second Amended Counterclaims, *Arm Ltd.*, No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.)

delivers up to 52% faster performance than the latest x86-based competition offerings at the same power and matches the x86 competition's peak performance at 60% lower power. When compared to other competing ARM-based products, the Snapdragon X Elite delivers 28% faster multi-threaded CPU performance, making it the industry leader in CPU performance and power efficiency. While many in the industry see in this pivotal moment the opportunity for technological advancement, ARM sees an opportunity to attempt to strong-arm Qualcomm into renegotiating the financial terms of the parties' longstanding license agreements by any means necessary and to attempt to prevent Qualcomm's custom CPUs from competing with ARM's off-the-shelf CPUs.

2.      In furtherance of this effort, ARM has attempted to stifle Qualcomm's technological leaps in CPU design by intentionally withholding deliverables paid for and due to Qualcomm under Qualcomm's ARM architecture license agreement ("ALA"), misrepresenting the existence of those deliverables when Qualcomm provided written notice of ARM's failure to deliver, and threatening to terminate Qualcomm's licenses if it attempted to enforce its contractual right to obtain the deliverables in question.

3.      ARM's refusal to honor its contractual obligation to timely deliver bargained-for technology is a material breach of Qualcomm's ALA and forms the basis of this action.

4.      It is, however, only the latest in a series of tactics deployed by ARM to attempt to inflict commercial damage on Qualcomm in its effort to force Qualcomm to acquiesce to extraordinary financial demands that would undeservingly enrich ARM by hundreds of millions of dollars for technology that ARM did not invent nor has any rights to.

5.      *First*, ARM claimed, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA Inc. ("NUVIA") for $1.4 billion, Qualcomm needed ARM's consent

to transfer NUVIA's technology to Qualcomm.  ARM took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of Qualcomm's ALA.  ARM later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers— including in products that were started at Qualcomm after the NUVIA acquisition, such as the Snapdragon X-Elite—violated a license agreement between ARM and NUVIA that Qualcomm was not using and that ARM ultimately terminated.  This made no sense.  Qualcomm has its own license agreements for ARM technology and information that allowed it to develop and provide custom ARM-compliant cores and products incorporating such cores to its customers (including the Snapdragon X-Elite) for many years to come.  Therefore, it did not need ARM's consent.[2]

6.      *Second*, ARM filed a meritless lawsuit against Qualcomm, alleging that Qualcomm and NUVIA breached NUVIA's terminated agreements with ARM and infringed ARM's trademarks by marketing custom CPUs after the NUVIA acquisition.  In that action, ARM is demanding that Qualcomm destroy these ground-breaking CPU products that Qualcomm developed after the acquisition in accordance with the Qualcomm/ARM agreements—despite ARM admitting that ARM has suffered no actual harm as a result of the conduct allegedly forming the basis of ARM's claims.[3]

7.      *Third*, ARM promoted its lawsuit to Qualcomm's customers in order to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and

---

[2]      Complaint, *Arm Ltd.*, No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[3]      Redacted Answer and Defenses to ARM's Complaint and Second Amended Counterclaims ¶¶ 29, 31-37, *supra* note 1; Redacted March 5, 2024 Hearing Transcript at 38:20-39:8, *Arm Ltd.*, No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Joint Letter re Bench or Jury Trial, *Arm Ltd.*, No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308.

could be subject to retaliation by ARM if they did, including by misrepresenting the terms of Qualcomm's licenses with ARM to Qualcomm's customers.[4]

8.    *Fourth*, ARM misused confidential information belonging to Qualcomm by commercializing products containing such confidential information after repeatedly representing in letters and court filings that ARM had, in accordance with its legal obligations, ceased using that information.[5]

9.    *Finally*, as noted above and as is at issue in this case, ARM deliberately withheld deliverables to which Qualcomm is entitled under its ALA with ARM under the guise that Qualcomm's ALA does not entitle Qualcomm to support for "Nuvia-based technology." ARM's excuse is unjustified, and its breach could not be more clear.

10.   Qualcomm first suspected that ARM was withholding ALA deliverables in the fall of 2022. At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within ARM's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

11.   ARM capitalized on this lack of transparency, with its General Counsel stating definitively that "[n]o failure of delivery has occurred." ARM further stated that Qualcomm "████ ████████████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables. Here again, ARM was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

---

[4]    Redacted Answer and Defenses to ARM's Complaint and Second Amended Counterclaims ¶¶ 255-70, *supra* note 1.

[5]    *Id*. ¶¶ 234-45.

12.     ARM went on to state that Qualcomm's written notice was a "malicious effort" to cause ARM "economic duress" because "as much as ███████████" was at issue, which ARM purported was "inconsistent with the language, spirit, and purpose of the ALA and ████████ ████████████." Additionally, ARM threatened Qualcomm that, if Qualcomm availed itself ████████████████████████████████████████, ARM would harm Qualcomm, including by terminating Qualcomm's multiple licenses with ARM.

13.     ARM's statement that "[n]o failure of delivery has occurred" was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted as part of ARM's meritless lawsuit against Qualcomm revealed incontrovertible evidence that ARM not only had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, ARM was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the NUVIA acquisition.

14.     ARM never cured its failure to deliver, causing Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

15.     ARM's failure to deliver violated the Qualcomm ALA, which requires ARM to ████████████████████████████████████████████████████████████ ████████. Under the Qualcomm ALA, if ARM is found to be in breach of Section ████████ ████, it must ████████████████████████████████████████. If ARM fails ████████████████████████████████████████, pursuant to Section ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

16.     ARM's withholding of deliverables and deliberate decision not to cure the issue within the time prescribed by the contract is a material breach of the Qualcomm ALA. Accordingly, Qualcomm is entitled to financial damages, including but not limited to █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

17.     ARM's non-compliance with its contractual obligations to Qualcomm should be seen for what it is: the latest in a series of anti-competitive maneuvers intended to extract hundreds of millions of dollars from Qualcomm by renegotiating license agreements ARM's current management views as disadvantageous.  ARM's decision to weaponize its failure to provide technology as a negotiating tactic—against a decades-long partner, merely because it is expedient for ARM to do so—should be wholly rejected, particularly given the many licensees who expect ARM to uphold the terms of their agreements every day, not only when it benefits ARM to do so.

## THE PARTIES

18.     Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm is a leading technology innovator in mobile communication products and the driving force behind the development, launch, and expansion of 5G technology.  Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone.  Qualcomm brings the benefits of mobile to new industries, including automotive, the internet of things, and computing, where Qualcomm's technology has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

19.     Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm Technologies is a wholly-owned subsidiary

of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

20.     Defendant ARM Holdings PLC is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

22.     Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because ARM is "a defendant not resident in the United States" and therefore can be "sued in any judicial district."   ARM has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[6]

## FACTUAL ALLEGATIONS

### I.     ARM LICENSES AND THE CUSTOM CPU MARKET

23.     ARM is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars. ARM's licensing model is based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee.

24.     ARM's ALAs grant licensees the right under ARM's intellectual property █ ████████████████████████████████████████████████████████████ using specific

---

[6]     Complaint, *supra* note 2.

licensed technology and to manufacture, sell, and distribute ███████████████ ███████████████.[7]

25.    CPU Cores (also known simply as cores) are a particular component of SOCs, which are integrated circuits used in cellular phones, computers and other devices that combine several technologies used in such products into a single chip.  A core or CPU performs processing within the SOC.

26.    An ███████████████ is compatible with the ARM instruction set architecture ("ISA").  As a general matter, an ISA lists the instructions that allow hardware (like SOCs) to interact with software programs.  Application and software developers create their products to be compatible with particular ISAs.

27.    The ARM ISA allows for compatibility across all ARM-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.  The ARM ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

28.    To make a CPU that then can execute the ARM ISA and therefore run compatible applications and other software, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction

---

[7] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

29.     A CPU developer developing a custom CPU designs **how** the core is built, **how** it performs, and **how** it executes the CPU's instructions.  There are a virtually infinite number of ways to design and build CPUs that can implement the ARM instruction set.  Companies that design custom CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.

30.     Under an ALA license, ARM does not deliver any specific ARM design or tell the licensee how to make the CPU.  That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the market—is left to the licensee.  As ARM has publicly acknowledged, "the creation of an optimized CPU is very costly and time consuming," and ARM, therefore, "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the customization often does not provide a reasonable return on investment."[8]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by ARM.

31.     ARM competes directly against architecture licensees by offering its own "off-the-shelf" CPU designs that customers may license through a TLA.  When a licensee seeks to sell products incorporating ARM technology licensed under a TLA, ARM delivers complete processor

---

[8]     Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

core designs that a licensee can incorporate into a larger SOC design, saving the licensee the trouble and expense of designing its own CPU.  But this comes at the cost of being beholden to ARM and does not allow SOC developers to differentiate the CPU from other TLA licensees. Moreover, when ARM fails to keep up with the state of the art in CPU development, as recently has occurred in the compute market, any purchaser of off-the-shelf cores may offer SOCs that have difficulty competing against more technologically-advanced CPUs.

## II.     QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

32.     Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications."  Qualcomm is a world leader in the design and production of semiconductor microchips, including SOCs.  Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines.  Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

33.     Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates.  In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive industry designed to deliver connected experiences that are safer and customizable.

34.     Included among these products are custom CPUs and SOCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

35.     Qualcomm has held ARM licenses since 1997 and is today one of ARM's largest licensees—it "accounted for 11% of [ARM's] total revenue for [ARM's] fiscal year ended March 31, 2023."[9]

36.     On May 30, 2013, Qualcomm[10] and ARM entered into an ██████████████ ████████████████████ (the "QC ALA"), ████████████████, and Annex 1 to that agreement for ████████████████ deliverables.  On June 23, 2020, Qualcomm and ARM entered into an additional Annex 1 to the ALA for ████████████████ deliverables.

37.     Under the ALA and corresponding Annex 1s, Qualcomm has ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Since Qualcomm entered into its ALA, Qualcomm has developed and shipped custom ARM ISA-compatible CPUs.

38.     In recent years, as ARM's implementation cores have fallen behind custom cores developed by other ARM ALA licensees, it has become more challenging for Qualcomm to compete by relying on ARM-built cores.  In particular, ARM has been unable to provide an implementation core that is competitive in the compute market; thus, the need for developing custom CPUs has become more critical.

---

[9]     ARM Registration Statement, *supra* note 8, at 44.

[10]    The actual party to the ALA and TLA was ████████████████ ████████████████ The terms of the agreements ████████████████████████████████████████████

39.     Qualcomm's custom ARM ISA-compatible CPUs do not belong to ARM.  Instead, as ARM has publicly acknowledged, Qualcomm's custom CPUs "compete with" as well as "pose a threat to Arm's implementation IP business."[11]

40.     Since 2013, Qualcomm has paid ARM total license fees of ███████ and running royalties of ████████████ under its ALA.  Qualcomm has fully complied with its obligations under the Qualcomm ALA.

41.     In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SOC, both specifically for use in data centers and servers.

42.     At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs.  Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary product segments of "compute" (e.g., laptops/PCs), "mobile" (e.g., smartphones), and "automotive" (e.g., digital cockpit).  Qualcomm also planned to continue development of the server CPU and SOC for use in data centers and servers ("Server SOC") that NUVIA had originally intended to design.

43.     As planned, Qualcomm's custom CPUs will soon compete more effectively against CPUs designed not only by ARM and its other ALA licensees, but also by rival suppliers of CPUs compliant with other instruction set architectures (notably, Intel's x86).

44.     Qualcomm is not alone in its belief that its custom cores offering will transform and advance the industry.  Indeed, major industry participants—including Microsoft, Google,

---

[11]     Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

Samsung, GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[12]

### III. ARM UNFAIRLY AND UNLAWFULLY ATTEMPTED TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

45.     Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an even better product for customers and opening new product segments for ARM Compliant Cores, ARM has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

46.     Indeed, in an effort to limit competition posed by Qualcomm's custom CPU, ARM violated its contractual obligations to provide Qualcomm with deliverables paid for under the Qualcomm ALA.

47.     The two contract provisions at issue here—Sections ▆ and ▆—are clear and unambiguous.

48.     Section ▆ of the Qualcomm ALA requires ARM to ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ and to ▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆ ARM is also required to deliver ▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ is defined in the Qualcomm ALA as ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆ under that agreement.

---

[12]     *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

49.     Under Section ██ of the Qualcomm ALA, ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████



50.     Qualcomm first suspected that ARM was withholding ████████████ under the

Qualcomm ALA in the fall of 2022.  At that time, Qualcomm was embarking on its verification

process for its ████ SOC.  As is the customary practice between an ALA licensee and ARM,

Qualcomm provided ARM with details about its ████ CPU so that ARM would provide a formal

list of agreed ARM Compliance Kit ("ACK") tests for which ARM would expect to see

verification data.  But ARM withheld the formal list of tests (known as the "OOB") ████████

████████████████████████████████████████████████████████████████

████████████████████

51.     Qualcomm then attempted to resolve the issue without court intervention.

52.     On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug

fixes) from ARM.  ARM engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll

be able to share OOB and various patches after my management has given their approval."

### IV.     QUALCOMM PROVIDED WRITTEN NOTICE OF ARM'S FAILURE TO DELIVER—BUT ARM DID NOT CURE

53.     Almost one month later and after still not having received the deliverables under

the ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022,

Qualcomm notified ARM in writing of its failure to provide certain deliverables, including the

14

OOB, stating explicitly that ARM should take the letter as "Qualcomm's required notice under Section ▮ that ARM is not in compliance with its obligations under ▮▮▮, and that ARM must cure this breach in accordance with the time and procedures set forth therein."

54.     After not hearing from ARM, pursuant to Section ▮ of the Qualcomm ALA, Qualcomm sent a follow-up letter on December 5, 2022.  The letter was Qualcomm's "second written notice of non-compliance ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮" The letter stated that "ARM must ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ set forth" in the ALA "or ▮▮▮▮▮▮▮▮▮▮▮▮▮."

55.     Pursuant to Section ▮ of the Qualcomm ALA, ARM ▮▮▮▮▮ to remedy its failure to provide the deliverable.  ▮▮▮▮ passed without ARM remedying the issue.

56.     ARM responded on December 6, 2022.

57.     In its response, ARM disagreed that Section ▮ was at issue "or that provision of the OOB implicates Section ▮"  ARM additionally asserted that the ACK deliverables are governed by Section ▮ of the Qualcomm ALA, not Section ▮, and that remedies for a breach of that section do not include ▮▮▮▮▮▮▮▮▮.

58.     Notably, ARM additionally claimed that "[n]o failure of delivery has occurred," stating explicitly that ARM "provided Qualcomm with the ▮▮▮▮▮▮▮▮▮ ▮ long ago and has delivered ▮▮▮ to that kit."  As to the OOB specifically, ARM claimed that "the OOB is a subset of the tests Arm has already delivered to Qualcomm in the ▮▮▮▮▮▮ ▮▮▮▮"

59.     ARM was definitive in its assertions, stating that "[n]o additional delivery is required," and "[n]o breach of ▮▮▮▮ has occurred."  Qualcomm was unable to verify this assertion because the "patches" are created by ARM and provided solely by ARM.  Accordingly,

Qualcomm has no way of knowing definitively whether ARM has released patches for verification until they are delivered (or until someone from ARM tells Qualcomm they are available, which did not occur in this case).

60.     ARM's letter further stated that Qualcomm "does not have verification, delivery, or support rights under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  ARM additionally threatened Qualcomm that if it did not drop its invocation of Section ███, ARM would take steps that would harm Qualcomm.  ARM claimed that Qualcomm's invocation of Section ███ was "a new, material breach of the Qualcomm ALA" and that, to the extent Qualcomm exercised its ████████████████████████████ ████████████████████████████, ARM would "not hesitate to terminate" Qualcomm's licenses.  ARM further stated that Qualcomm's letter was a "malicious effort" to cause ARM "economic duress," which ARM purported was "inconsistent with the language, spirit, and purpose of the ALA and ████████████████████."

61.     But more than a year later, Qualcomm discovered that ARM's December 6, 2022 letter misrepresented the facts and concealed ARM's strategy of deliberately withholding the OOB and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm legal and economic duress.

62.     "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'"  In response to Qualcomm's requests for production, ARM produced an October 2022 email chain in which Richard Grisenthwaite, ARM's Executive Vice President and Chief Architect, explicitly instructed others at ARM not to provide Qualcomm with

the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[13]

63.     In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that ARM concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  ARM's multi-tiered deception was successful for more than a year.  "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section ██ of the Qualcomm ALA."[14]

64.     The applicable Annex 1 to the Qualcomm ALA includes ████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████████████

65.     Accordingly, when it was revealed through document and deposition testimony that, contrary to ARM's December 6, 2022 letter, ARM had deliberately withheld the ACK

---

[13]     On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include ARM's breach of Section ██ of the ALA.  These allegations and quotations taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order.  (Redacted March 5, 2024 Hearing Transcript, *supra* note 3; Redacted March 6 Order, *Arm Ltd.*, No. 22-01146-MN (D. Del. Mar. 20, 2024), D.I. 303-02.)  Notably, at that hearing, ARM advocated against adding this claim to the case in which this discovery was produced; and instead, ARM advocated for Qualcomm bringing a separate lawsuit.  (Redacted March 5, 2024 Hearing Transcript, *supra* note 3, at 39:13-20.)

[14]     Redacted March 6 Order, *supra* note 13, at 4; *see also* Redacted March 5, 2024 Hearing Transcript, *supra* note 3, at 17:18-19:9 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

deliverables to which Qualcomm was entitled, it became clear that ARM breached its obligations under Section ▮ of the Qualcomm ALA.

66.     ARM's General Counsel concealed the facts, explicitly (and definitively) stating in ARM's December 6, 2022 letter that it had provided Qualcomm with ▮ to the ACK and that "[n]o failure of delivery ha[d] occurred."  Qualcomm did not have a valid basis to dispute that factual representation without discovery.

67.     To date, ARM still has not provided the OOB and relevant patches to which Qualcomm is entitled, and ARM's failure to do so increased Qualcomm's burden in verification.

68.     By failing to deliver the OOB, ARM forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the ARM architecture, even in the absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the ALA.

69.     Similarly, by failing to deliver the patches, ARM forced Qualcomm to use its own engineers to address issues that would have been addressed by ARM's patches, which Qualcomm paid for and was entitled to receive under the ALA.  Qualcomm was damaged as a result.

70.     ██████████████████████████████.

71.     Pursuant to Section ▮ of the Qualcomm ALA:



72.     Accordingly, ██████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████.

73.     In addition, because Qualcomm ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

## V.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY AND TO ARM ITSELF

74.     ARM's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end.

75.     ARM's tactics violate basic contract principles and are directly contrary to the purpose of the ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ██████ they bargained for without fear that ARM will unilaterally decide to abdicate its contractual obligations in an effort to disrupt a licensee's innovation solely because ARM views the licensee as a competitor poised to reach new heights, including developing CPUs that are superior to ARM's offerings.

76.     ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

## COUNT I
### (Declaratory Judgment)

77.     Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

78.     Plaintiffs are entitled to a declaratory judgment that:

a.      ARM breached the Qualcomm ALA by withholding █████████ that ARM was obligated ███████████ to deliver under Section █ of the Qualcomm ALA, and by withholding ████ ARM was required to deliver ██ ███████████ under Section █ of the Qualcomm ALA;

b.      As a result of ARM's breach of Section █ of the Qualcomm ALA, Qualcomm is entitled to ███████████████████████ ; and

c.      Qualcomm's efforts ███████████ of the Qualcomm ALA do not entitle ARM to terminate Qualcomm's ARM licenses.

79.     A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that ████████████████████████████████████████████ ████████████████ .

80.     A valid and justiciable controversy exists between Qualcomm and ARM because ████████████████████ as ARM is threatening to terminate Qualcomm's ALA license if Qualcomm ███████████████ pursuant to Section █ of the ALA.

## COUNT II
### (Breach of Section █ of the Qualcomm ALA)

81.     Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

82.     The Qualcomm ALA is a valid, binding contract.

83.   ARM failed to fulfill its obligation under Section ▮ of the Qualcomm ALA because it intentionally withheld from Qualcomm certain ARM Technology to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

84.   Accordingly, ARM did not ███████████████████████████████ ████████████████████████████████████ or ████████████ ████████████████████████████████████████████████ ██████ or deliver ████████████████████████████████████ █████████████████████████ as is required by Section ▮ of the agreement.

85.   ARM's failure to comply with its contractual obligation ████████████ ███████████████████ was not only intentional, but it was also done with an intent to deceive Qualcomm.

86.   Qualcomm put ARM on written notice of this violation and ARM ██████████ ███████████, as is required under the contract.

87.   ARM's breach of Section ▮ of the Qualcomm ALA entitles Qualcomm ▮ ███████████████████████████████████████████████████.

88.   As a proximate result of ARM's breach of contract, Qualcomm has been damaged both (i) by delay that could have been avoided had ARM fulfilled its obligations, (ii) by costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK tests to verify that its products are compliant with the ARM architecture and use its own engineers to address issues that would have been addressed by ARM's patches, and (iii) by ████████████████ ████████████████████████████████████████████████ ████████████ had ARM not misrepresented its compliance with the parties' agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment and relief as follows:

a.      For the declaratory judgments set forth in Plaintiffs' claims;

b.      For an Order requiring ARM to comply with its obligations under Qualcomm's license agreement, including (but not limited to) by providing the ████████, OOB, Patches, and ██████ without discrimination or retaliation;

c.      For an Order that ████████████████████████████████ ███████████████;

d.      For recovery of all ████████████████████████████ ███████████████████;

e.      For cost and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief;

f.      For additional damages, in the alternative, that the Court deems appropriate;

g.      For an award of attorneys' fees and costs as allowed by law; and

h.      For such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Madalyn G. Vaughn
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Plaintiffs*

**Original Sealed Version Filed:**
April 18, 2024

**Redacted Version filed:**
April 18, 2024