## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUALCOMM INCORPORATION, a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,<br><br>       Plaintiffs,<br><br>  v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation,<br><br>       Defendants. | C.A. No. 24-490-MN |

## DECLARATION OF NICHOLAS R. FUNG IN SUPPORT OF DEFENDANTS MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)

I, Nicholas R. Fung, declare and state under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.  I am an attorney licensed to practice in California and admitted *pro hac vice* to practice before this Court. I am an attorney at Morrison & Foerster LLP, attorneys of record for Arm Holdings plc ("Arm").

2.  I make this declaration in support of Arm's Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6).

3.  The facts and matters testified to herein are true to the best of my knowledge and belief. I am over 18 years of age, and if called as a witness, I could, and would, competently testify thereto.

4.  Attached hereto as Exhibit 1 is a true and correct redacted copy of C.A. No.

22-1146-MN, D.I. 19, Defendants' Answer and Defenses to Plaintiff's Complaint and Jury

Demand and Defendants' Amended Counterclaim, filed October 26, 2022.

5.     Attached hereto as Exhibit 2 is a true and correct redacted copy of C.A. No.

22-1146-MN, D.I. 21, Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants

Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim,

filed November 15, 2022.

6.     Attached hereto as Exhibit 3 is a true and correct redacted copy of C.A. No.

22-1146-MN, D.I. 303, Plaintiff's Letter to the Honorable Laura D. Hatcher Regarding

Redactions to the March 6, 2024 Memorandum Order, filed March 20, 2024.

7.     Attached hereto as Exhibit 4 is a true and correct copy of C.A. No. 22-1146-

MN, D.I. 1, Plaintiff Arm Ltd.'s Complaint, filed August 31, 2022.

8.     Attached hereto as Exhibit 5 is a true and correct redacted copy of C.A. No.

22-1146-MN, D.I. 296, Plaintiff's Responsive Letter to the Honorable Laura D. Hatcher

Regarding Defendants' Leave to Amend Answer and Counterclaim, filed March 6, 2024.

9.     Attached hereto as Exhibit 6 is a true and correct redacted copy of C.A. No.

22-1146-MN, D.I 279, Defendants' Letter to the Honorable Laura D. Hatcher Requesting

Leave to Amend Answer and Counterclaim, filed February 29, 2024.

Dated: June 12, 2024
New York, NY                          */s/ Nicholas R. Fung*
                                       Nicholas R. Fung

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on June 12, 2024, a copy of the foregoing document

was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Ruby J. Garrett
Erin J. Morgan
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
rjgarrett@paulweis.com
ejmorgan@paulweiss.com

Catherine Nyarady
Madalyn G. Vaughn
Jacob A. Braly
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
mvaughn@paulweiss.com
jbraly@paulweiss.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

/s/ *Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Arm Holdings PLC f/k/a Arm Ltd.*

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARM LTD.,                                    )
                                             )
            Plaintiff,                       )
                                             )
      v.                                     )      C.A. No. 22-1146 (MN)
                                             )
QUALCOMM INC., QUALCOMM                      )      **REDACTED PUBLIC VERSION**
TECHNOLOGIES, INC. and NUVIA, INC.,          )      **Original Filing Date: October 26, 2022**
                                             )      **Redacted Filing Date: October 26, 2022**
            Defendants.                      )


**DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT AND
JURY DEMAND AND DEFENDANTS' AMENDED COUNTERCLAIM**

1.      Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") are poised to release to the market several innovative products enabled by custom-designed high-performance, low-power central processing units ("CPUs") containing a novel microarchitecture and related technologies that will deliver the next era of computing innovation. While many in the industry see in this pivotal moment the opportunity for technological advancement, ARM sees an opportunity to strongarm Qualcomm into renegotiating the financial terms of the parties' longstanding license agreements, using this baseless lawsuit as leverage. With this lawsuit, ARM makes clear to the marketplace that it will act recklessly and opportunistically, threatening the development of new and innovative products as a negotiating tactic, not because it has valid license and trademark claims.

2.      ARM claims, with no legal or contractual basis, that following Qualcomm's acquisition of NUVIA Inc. ("NUVIA") for $1.4 billion, Qualcomm's use of *any* technology acquired from NUVIA—including NUVIA technology that was further developed by Qualcomm

and has nothing to do with ARM—violates a previously-terminated license agreement between ARM and NUVIA.

3.    Qualcomm has its own license agreements with ARM, under which Qualcomm has licensed and paid for the same intellectual property that NUVIA licensed under its own separate agreements with ARM.  Therefore, even though ARM terminated the NUVIA licenses, Qualcomm owns independent licenses for the same ARM technology and information that allow it to provide ARM-compliant products to its customers for many years to come—a fact ARM glaringly omitted from its complaint, and which ARM has attempted to obfuscate through an aggressive misinformation campaign.  Thus, ARM has no right to demand any destruction of Qualcomm's CPU technology because Qualcomm's use of ARM technology and information is licensed under its overlapping license agreements.

4.    The notion that ARM has the right to control technology that is not ARM's—and worse yet, to ask Defendants to destroy their innovation and inventions unless substantial monetary tribute is paid to ARM—offends customary norms of technology ownership, as well as NUVIA's and Qualcomm's rights under their agreements with ARM.

5.    Even putting aside Qualcomm's broad license rights, ARM's reading of the termination obligations in the NUVIA Architecture License Agreement ("ALA") is wrong.  To the extent any destruction obligation exists, it explicitly applies only to ARM Confidential Information.[1]  But ARM again omits important facts: (1) under the NUVIA ALA, information in the public domain is not subject to confidentiality obligations, and (2) ARM publishes its instruction set without confidentiality restrictions.  Anyone is free to go to the ARM website and

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the relevant license agreements.

download the 10,000+ page ARM Architecture Reference Manual.[2]  In this case, Qualcomm's CPU cores are designed to be compatible with the publicly-available ARM Architecture version █████████.

6.      Seeking additional leverage it can use to attain royalties from Qualcomm to which it is not entitled under the contracts, ARM now demands that Qualcomm stop using *all* NUVIA technology, regardless of whether it contains ARM Confidential Information.  Qualcomm's license rights, and any reasonable reading of the termination provisions of the NUVIA ALA, demonstrate that ARM has no right to require Qualcomm to stop using or destroy Qualcomm or NUVIA technology.

7.      ARM's position is a threat to the industry generally.  Unless this Court rejects ARM's arguments, ARM's extreme position could be weaponized against all of its licensees, allowing ARM to claim ownership over all its licensees' innovations.

8.      As this litigation will show, Qualcomm and NUVIA have not violated NUVIA's ALA or any other license agreement.  Nor have they misused ARM's trademarks.

**Qualcomm Announced Its Acquisition Of NUVIA In January 2021**

9.      In January 2021, Qualcomm announced that it would acquire NUVIA, a start-up working on a custom CPU—the portion of a computer that retrieves and executes instructions—known as the Phoenix Core.  NUVIA was also working on a custom "System-on-a Chip" ("SoC") that incorporated multiple Phoenix Cores for use in data centers and servers.  SoCs are integrated circuits used in computers and other electronics that combine many elements of a computer system into a single chip.

---

[2]  ████████████████████████████████████████████████████████ (last visited Sept. 28, 2022).

10.     Although Qualcomm and NUVIA were focused on different market segments, the NUVIA CPU and SoC technologies comprised promising, innovative technology.  Because the NUVIA CPU cores were being designed to be ARM architecture-compatible, this technology was (and is) compatible with Qualcomm's existing computer and mobile device chipset technologies.

11.     Qualcomm's plan was to complete the development of the Phoenix Core after the acquisition and ultimately drive this technology into various SoCs, particularly for use in the "compute" (e.g., laptops/PCs), "mobile" (e.g., smartphones), and "automotive" (e.g., digital cockpit) markets.  Qualcomm also planned to continue the development of a SoC for use in data centers and servers ("Server SoC").  This would allow Qualcomm's custom CPUs to compete more effectively against CPUs designed not only by rival ARM licensees and ARM, but also rival suppliers of CPUs compliant with other instruction set architectures (notably, Intel's x86).

12.     Major industry participants—including Microsoft, Google, Samsung, GM, HP, and many others—praised the acquisition as benefitting their products and end-customers.[3]  News of this acquisition appeared in Forbes and in newspapers around the world.

**Qualcomm And NUVIA Had Individual
License Agreements With ARM With Common Provisions**

13.     At the time of the acquisition, NUVIA and Qualcomm had separate, but broadly overlapping, license agreements with ARM.  Qualcomm's ALA included all the rights granted to NUVIA, as well as additional rights.  Both ALAs granted rights to use version 8 of the ARM instruction set architecture, including the ARM ███ instruction set architecture ("ISA") with

---

[3]     *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021),
        https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

which the Phoenix Core was compatible. Qualcomm's ALA is also broader, granting Qualcomm rights to the next generation v9 ISA.

14.    ALAs grant licensees the right to design their own custom CPUs that can execute ARM's ISA, as well as the right to design and distribute products incorporating such CPUs. An ISA lists the instructions that a software program will see, but an ISA does not tell a designer about the logic to implement it, nor how to build a CPU core, nor any of the features that make a CPU competitive. Application and software developers create their products to be compatible with particular ISAs. Applications and software that are compatible with a specific ISA can be run on any CPU that is compatible with the ISA, regardless of who has designed or manufactured the hardware. The ARM ISA allows for compatibility, as all ARM-compatible products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.

15.    To make a CPU that then can execute the ARM ISA and therefore run compatible applications and other software, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors wired together into arrays that form larger, interconnected blocks. Building a CPU requires detailed micro-architectural know-how and expertise that is not related to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

16.    A CPU developer developing a custom CPU designs **how** the core is built, **how** it performs, and **how** it executes the CPU's instructions. There are virtually infinite number of ways to design and build CPUs that can run the ARM instruction set. Companies that compete against each other to make better products utilizing ARM instruction sets employ armies of engineers who

make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.

17.     Under an ALA license, ARM does not deliver any specific ARM design or tell the licensee how to make the CPU.  That technological development—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the market—is left to the licensee.  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, the ALA structure can and does allow for product differentiation, even from ARM's own CPUs.

18.     ARM competes against licensees designing custom cores under ALAs by offering its own "off-the-shelf" CPU designs that customers may license through a Technology License Agreement ("TLA").  When a licensee seeks to sell products licensed under a TLA—rather than under an ALA—ARM delivers complete processor core designs that a licensee can effectively drop into a larger SoC design.  ARM's off-the-shelf processor cores licensed under TLAs do not allow for the same kind of product differentiation among different TLA licensees because all classes of TLA-licensed processor cores are effectively the same.  However, there can still be considerable variety and differentiation among SoCs that incorporate TLA-licensed processor cores along with other functional blocks and circuits.  For example, Qualcomm's Snapdragon chip products that use stock ARM cores are very successful in large part because of Qualcomm's innovation in designing many of the other functional blocks and integrating them into the SoC as a whole.  Such functional blocks include graphic processing units (GPU), digital signal processors (DSP), artificial intelligence (AI) processors, image processors, modems, and other technologies.

19.     Some companies make use of both custom-designed ALA processor cores and off-the-shelf TLA-licensed cores in their products.  Royalty rates are generally lower under ALAs and

higher under TLAs, because the TLA royalties account for ARM's work in developing complete CPUs, whereas the licensees under an ALA make the significant investment to develop their own CPUs.

20.     With the Phoenix Core, Qualcomm will begin incorporating more of its own custom CPUs in its products.  Qualcomm is making this change because it believes its own innovation will generate better performing cores than ARM's cores.  This paradigm change will mean Qualcomm will in the future pay to ARM the lower royalty rate under its ALA for these custom CPUs, rather than the higher royalty rates under Qualcomm's TLA.

<b><ins>After ARM Learned Of The NUVIA Acquisition, ARM<br>Demanded Higher Royalties From Qualcomm</ins></b>

21.     Shortly after announcing the proposed acquisition of NUVIA in January 2021, Qualcomm informed ARM that the NUVIA engineers would be transferred to a Qualcomm subsidiary and would work under Qualcomm's set of license agreements with ARM.  Qualcomm also notified ARM that, to the extent NUVIA was utilizing any ARM Technology not currently covered under Qualcomm's then-current ALA and TLA, Qualcomm would work with the ARM team to complete any necessary license annexes to cover such items.

22.     Qualcomm believed that ARM would embrace the acquisition.  Even though Qualcomm would now be working on its own custom CPUs, the fact that Qualcomm is developing SoCs compatible with the ARM ISA for markets where ARM-based processors have traditionally struggled, such as the "compute" market (i.e., the market for personal computers such as laptops), represents a tremendous opportunity for ARM.  The combination of NUVIA's innovative CPU technology with Qualcomm's scale and engineering prowess provides the best opportunity for ARM to significantly increase its reach and associated royalty payments.

23. ARM, however, acted opportunistically. In February 2021, ARM contended that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent." ARM insisted, without basis, that Qualcomm needed ARM's consent to "any transfer of designs, rights or licenses under NUVIA's agreements" to Qualcomm. Later that month, ARM wrote that to secure its consent for the transfer of NUVIA's CPU design to Qualcomm, Qualcomm must: (i) incorporate the much higher royalty rates from NUVIA's licenses into Qualcomm's pre-existing licenses; (ii) restrict the ability of Qualcomm employees from working on Qualcomm's custom CPU designs such that "at a minimum" any individual with access to ARM Confidential Information wait three years before working on "any architecture CPU design" at Qualcomm; (iii) "discuss and decide on the design transfer fee associated with such CPU design transfer"; and (iv) enter into a separate license for implementation IP and software tools, which would include another undisclosed "design transfer fee."

24. ARM's demands were outrageous. First, it was attempting to secure supplemental payments and royalties for rights for which Qualcomm *had already paid or was continuing to pay under its own license agreements*. Qualcomm's license agreements, on their face, make clear that Qualcomm's use of ARM Technology in connection with the further development of the technology it acquired from NUVIA would be covered by Qualcomm's pre-existing license agreements. For example, ██████████████████████████████████████████████████ ████████████████████████████████████████ Therefore, Qualcomm's use of any ARM Technology utilized in NUVIA's technology was fully licensed under Qualcomm's license agreements as soon as Qualcomm acquired NUVIA. Nonetheless, and although not necessary, Qualcomm sought ARM's consent to assign NUVIA's ARM licenses to Qualcomm, even though

Qualcomm's position was that NUVIA's technology was licensed under Qualcomm's license agreements as soon as the acquisition closed.

25.     Second, ARM was claiming a right to control the transfer of NUVIA technology when NUVIA's ALA provided no such rights to ARM.

26.     Third, ARM was trying to interfere with Qualcomm's business by preventing Qualcomm engineers from working for three years with absolutely no basis for such a demand in NUVIA's or Qualcomm's license agreements.  ARM's demands for additional payments from Qualcomm made little sense and were inconsistent with Qualcomm's long-standing agreements. As ARM acknowledges in its complaint, NUVIA was focused on developing a CPU for use in low-volume, high-cost SoCs for the server market, whereas Qualcomm intended to use the technology NUVIA had started developing to build high-volume, lower cost SoCs for Qualcomm's traditional markets, such as the "mobile" and "compute" markets.  For its data center and server products—which would be of a lower volume and higher per-unit cost than, for example, Qualcomm's higher volume and lower cost mobile products—NUVIA and ARM had negotiated a royalty rate that was many multiples higher than Qualcomm's rate.  ARM's strategy, in light of Qualcomm's more favorable terms, has been to ignore Qualcomm's license rights and royalty rates and attempt to force upon Qualcomm NUVIA's substantially higher royalty rate established for its server product.

27.     If ARM could not get the benefit of forcing NUVIA's royalty rate on Qualcomm's custom CPU across Qualcomm's broad SoC portfolio, its alternative strategy was to seek to preclude Qualcomm from proceeding with developing its custom CPU and, in doing so, force the purchase of ARM's off-the-shelf CPU.  This is beneficial for ARM because the TLA has a higher

royalty rate than Qualcomm's ALA. When Qualcomm successfully replaces ARM-designed CPUs with its own designs, Qualcomm will pay ARM lower royalties under the ALA.

28.     Given ARM's unreasonable positions, which conflict with the terms of the parties' licenses, ARM and Qualcomm were unable to resolve this dispute prior to the close of the NUVIA acquisition on March 15, 2021. Even so, given the parties' long-standing relationship, Qualcomm reaffirmed its interest in finding a productive path forward in its discussions with ARM after the acquisition was complete.

29.     After the acquisition closed, ARM doubled down, asserting that Qualcomm needed to destroy NUVIA's engineering work and start over unless it agreed to ARM's demands, including tens of millions of dollars in both additional "transfer" payments and increased royalties. Qualcomm continued to try and reach a resolution with ARM even though ARM's attempt to control NUVIA's technology was unjustified.

30.     While the parties had intermittent discussions to resolve the dispute, in or about September 2021, ARM stopped communicating with Qualcomm about the dispute. Meanwhile, throughout 2021 to the present day and with full knowledge by ARM, Qualcomm continued development work on the Phoenix Core and SoCs incorporating the Phoenix Core, as was its right under Qualcomm's own license agreements with ARM.

**ARM Unexpectedly Terminated The NUVIA License Agreements And Qualcomm Went To Great Lengths To Insulate Itself From ARM's Unreasonable Positions**

31.     Without warning, in a letter dated February 1, 2022 (but not received by Qualcomm until February 4, 2022), ARM terminated, effective March 1, 2022, the NUVIA ALA and TLA license agreements and demanded that NUVIA and Qualcomm destroy all ARM Confidential Information, and certify by April 1, 2022 that they had complied with ARM's demands. Prior to the February 2022 letter, it had been over six months since ARM last suggested that NUVIA or

Qualcomm violated NUVIA's license agreements. ARM's demand came out of nowhere, especially as ARM had continued to support Qualcomm in the development of the technology acquired from NUVIA.

32. The timing of ARM's demand is telling on two fronts.

33. First, ARM waited until Qualcomm had expended a year of engineering effort and hundreds of millions of dollars to further develop and integrate Phoenix Core technology into multiple SoCs, in addition to the $1.4 billion Qualcomm spent to acquire NUVIA. ARM was seeking to maximize whatever leverage it had to threaten Qualcomm's investment and Qualcomm's SoC roadmap and extract exorbitant fees and royalty payments.

34. Second, ARM terminated the NUVIA agreements just three days before ARM publicly announced the failure of its merger transaction with NVIDIA—a deal that Qualcomm and many others in the industry had opposed. This timing suggests that, in part, ARM was seeking payback for Qualcomm's public opposition to the NVIDIA deal.

35. Qualcomm disagreed that it was required to stop any of its work—or that destruction was appropriate—because Qualcomm holds valid licenses to all relevant ARM Technology and ARM's interpretation of the termination obligations in the NUVIA agreement were inconsistent with the plain language of the license agreements.

36. Moreover, even though ARM demanded destruction of Confidential Information obtained under NUVIA's ALA, NUVIA had implemented ARM Architecture ▇, which had been publicly available on ARM's website for anyone to download since at least around January 2021—over a year before the destruction request. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Therefore, ARM Architecture

██ was not Confidential Information, not subject to any restrictions, and not subject to any destruction obligation. For the same reasons, the NUVIA core design did not contain ARM Confidential Information.

37. Nonetheless, on April 1, 2022, NUVIA certified that it had destroyed and quarantined all NUVIA-acquired ARM Confidential Information.

38. Then, on April 12, 2022, just a few weeks after NUVIA made its certification, ARM accepted test results verifying that the implementation of the Phoenix Core in the Server SoC complied with the requirements necessary to execute the ARM instruction set. ARM confirmed that "Qualcomm . . . has validated **their CPU core** in accordance with the Verification requirements set out in the Architecture agreement." ARM explicitly confirmed that the validation testing was conducted **under Qualcomm's ALA**. Therefore, ARM was not only well aware that Qualcomm was working on the Phoenix Core under Qualcomm's license agreements, but ARM also affirmed this work and understood that Qualcomm had implemented ██ of the ISA.

39. ARM's position in this litigation is not just unsupported by its verification in April 2022 and by the language of the license agreements, it is antithetical to the very nature of ARM's ALAs, which allow a licensee to design its own, proprietary ARM-compatible technology that belongs to the licensee and that can be used by the licensee to compete against other ARM-compatible products, including those designed by ARM itself.

40. Licensees depend on this, as do regulators. ARM explicitly told regulators in December 2021, in connection with the proposed NVIDIA acquisition, that technology created by its ALA licensees belongs to the licensees, not ARM, stating: "architectural licensees do **not** use ARM's CPU designs. Arm architectural licensees create their **own** proprietary CPU designs using

their ***own*** engineering teams."  ARM specifically referred regulators to Qualcomm's acquisition of NUVIA as an example of Qualcomm's efforts to create its own proprietary CPU.

### ARM's Claims Are Baseless

41.    In this lawsuit, ARM takes its baseless and extreme arguments public, claiming that technology that is not its own belongs to ARM, and that it is ARM's prerogative to decide whether Qualcomm can use or continue to develop NUVIA's technology.  The termination provisions in the NUVIA ALA do not require such a result.

42.    ARM ignores the broad license rights ARM has granted Qualcomm under its ALA and other license agreements.  Qualcomm *is* licensed to use ARM Technology in connection with Qualcomm's CPU core technology, even if any aspects trace back to NUVIA's work.  Moreover, ARM attempts to misappropriate NUVIA technologies that contain no ARM information, but it makes no sense to require Qualcomm to stop using its own intellectual property.

43.    Additionally, ARM's position effectively guts its own ALA, which is intended to encourage licensees to develop their own CPU core technology with their own innovations, at their own risk and expense and for their own benefit.  ARM's arguments would allow ARM to claim ownership over its licensees' innovations and inventions.  That is not what ARM licensees pay for under the ALA.

44.    ARM's trademark infringement and false-origin claims are also meritless.  ARM contends that Qualcomm and NUVIA's use of ARM's trademarks in connection with any products related to NUVIA technology—including, but not limited to the Phoenix Core and the upcoming SoCs—is improper.  But Qualcomm's license agreements with ARM give Qualcomm the right to utilize ARM's trademarks.  ███████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████ ARM's website also publicly grants "any . . . third party" the right to use ARM's trademarks pursuant to various guidelines.

45.     In any event, Defendants' use of ARM's trademarks constitutes fair use and therefore is permissible.  Qualcomm engages in limited use of the ARM Marks, such as in marketing materials, product specifications, and technical documentations, to convey accurately that Qualcomm's products are compatible with the ARM architecture.  These references are limited and truthful.

46.     Rather than litigate its case in court, ARM attempted to maximize the negative impact of its filing this lawsuit by campaigning with members of the media and customers to generate additional publicity for ARM's positions.

47.     This Court should reject ARM's claims and instead declare that Qualcomm and NUVIA's conduct—including use of Qualcomm-developed technology—was fully licensed.

Defendants, through their undersigned counsel, upon personal knowledge and/or upon information and belief, answer the Complaint dated August 31, 2022 (the "Complaint") as follows:

48.     **COMPLAINT PARAGRAPH 1:** Arm is the world's leading provider of microprocessor intellectual property. For decades, Arm has developed innovative processor architecture and implementation designs that balance performance with energy efficiency. Billions of electronic devices use Arm processor technologies pursuant to Arm licenses—from smartphones used to interact seamlessly with friends and family around the world to an increasing number of the servers that run the essential day-to-day operations of Fortune 500 companies.

**ANSWER: Defendants admit that ARM licenses microprocessor intellectual property, and that a significant number of electronic devices use processors that are based**

on ARM architecture and designs, such as smartphones and to a far more limited extent computers. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations set forth in Complaint Paragraph 1, and on that basis deny them.

49.    **COMPLAINT PARAGRAPH 2:** Qualcomm is a major semiconductor manufacturer. To accelerate its processor development efforts, Qualcomm spent over $1 billion to acquire Nuvia, a start-up led by senior engineers previously from Apple and Google that licensed Arm technologies to develop high-performance processor cores for semiconductor chips. In the process, Qualcomm caused Nuvia to breach its Arm licenses, leading Arm to terminate those licenses, in turn requiring Qualcomm and Nuvia to stop using and destroy any Arm-based technology developed under the licenses. Undeterred, Qualcomm and Nuvia have continued working on Nuvia's implementation of Arm architecture in violation of Arm's rights as the creator and licensor of its technology. Further, Qualcomm's conduct indicates that it has already and further intends to use Arm's trademarks to advertise and sell the resulting products in the United States, even though those products are unlicensed.

**ANSWER: Defendants admit that Qualcomm is a leading wireless technology innovator that designs numerous products, including semiconductors. Qualcomm further admits that, in 2021, Qualcomm Technologies, Inc. acquired NUVIA for approximately $1.4 billion before working capital and other adjustments. Defendants also admit that NUVIA had license agreements with ARM LTD., such as an ALA and TLA, and that, prior to Qualcomm's acquisition, NUVIA worked on CPUs and SoCs. Defendants further admit that in a letter dated February 1, 2022, ARM stated that it intended to terminate its ALA and TLA with NUVIA effective March 1, 2022, and requested that NUVIA destroy or return to**

ARM any ARM Confidential Information, including any copies thereof in its possession and any ARM Technology or derivatives. Defendants otherwise deny the allegations in Complaint Paragraph 2, except to the extent they purport to state legal conclusions as to which no response is required.

50. **COMPLAINT PARAGRAPH 3:** Arm now brings suit for specific performance of the Nuvia licenses' termination provisions to require Qualcomm and Nuvia to stop using and to destroy the relevant Nuvia technology and to stop their improper use of Arm's trademarks with their related products. Arm also seeks declaratory judgment, injunctive relief, and damages for the use of Arm's trademarks in connection with semiconductor chips incorporating the relevant Nuvia technology.

**ANSWER: Complaint Paragraph 3 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Complaint Paragraph 3, except admit that Plaintiff purports to assert the claims and seek the relief described in Complaint Paragraph 3.**

## PARTIES

51. **COMPLAINT PARAGRAPH 4:** Plaintiff Arm is a corporation organized under the laws of the United Kingdom, has its principal place of business in Cambridge, United Kingdom, and is a resident or domiciliary of the United Kingdom.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 4, and on that basis deny them.**

52. **COMPLAINT PARAGRAPH 5:** Defendant Qualcomm Inc. is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 5.**

53.     **COMPLAINT PARAGRAPH 6:** Defendant Qualcomm Technologies, Inc. is a subsidiary of Qualcomm Inc. and a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 6.**

54.     **COMPLAINT PARAGRAPH 7:** Defendant Nuvia is a subsidiary of Qualcomm and a Delaware corporation with its principal place of business at 2841 Mission College Blvd., Santa Clara, California 95054.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 7.**

**JURISDICTION AND VENUE**

55.     **COMPLAINT PARAGRAPH 8:** The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (trademarks), and 28 U.S.C. § 1367(a) (supplemental jurisdiction). The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties, and because the amount in controversy, based on the consideration that was anticipated under the Nuvia licenses, the volume of products expected under those licenses, and Defendants' potential loss from complying with the equitable relief requested here, exceeds $75,000, exclusive of interest and costs.

**ANSWER: Complaint Paragraph 8 purports to state legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations in Complaint Paragraph 8.**

56.     **COMPLAINT PARAGRAPH 9:** The Court has personal jurisdiction over Qualcomm and Nuvia because they are incorporated in Delaware. Qualcomm and Nuvia have purposely availed themselves of the privileges and benefits of the laws of Delaware.

17

**ANSWER: Complaint Paragraph 9 purports to state legal conclusions as to which no response is required.  To the extent a response is required, Defendants admit that Qualcomm Inc., Qualcomm Technologies, Inc., and NUVIA, Inc. are incorporated in Delaware.**

57.    **COMPLAINT PARAGRAPH 10:** Venue is proper in this judicial district under 28 U.S.C. § 1391 because Qualcomm and Nuvia are incorporated in Delaware. Venue is also proper because Qualcomm Inc. and Qualcomm Technologies, Inc. have purposefully availed themselves of the courts in the State of Delaware and this Judicial District.

**ANSWER: Complaint Paragraph 10 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants admit that Qualcomm Inc., Qualcomm Technologies, Inc., and NUVIA, Inc. are incorporated in Delaware.**

## FACTUAL ALLEGATIONS

*Arm's business model[4]*

58.    **COMPLAINT PARAGRAPH 11:** For decades, Arm has been a world leader in developing processor architectures, including instruction set architectures, and processor core designs implementing those architectures, all of which are covered by an extensive intellectual property portfolio.

**ANSWER: Defendants admit that ARM develops instruction set architectures for CPUs, and also designs CPUs that implement ARM's instruction set architecture. Defendants further admit that ARM owns some intellectual property.  Defendants otherwise**

---

[4]    Defendants have not specifically responded to the headings interspersed between the numbered paragraphs in ARM's complaint.  For the avoidance of doubt, and to the extent they require a response, Defendants deny any allegations made therein.

deny the allegations in Complaint Paragraph 11 except to the extent they purport to state legal conclusions as to which no response is required.

59.     **COMPLAINT PARAGRAPH 12:** Processor cores are the parts of a computer's Central Processing Unit or "CPU" that read and execute program instructions to perform specific actions. Modern CPUs often integrate multiple processor cores on a single semiconductor chip or integrated circuit ("IC").

**ANSWER:  Defendants admit the allegations in Complaint Paragraph 12.**

60.     **COMPLAINT PARAGRAPH 13:** Arm owns intellectual property relating to its processor architectures and designs, including, among other things, trademarks.

**ANSWER: Defendants admit that ARM may own some intellectual property, including trademarks.  Defendants otherwise deny the allegations in Complaint Paragraph 13 except to the extent they purport to state legal conclusions as to which no response is required.**

61.     **COMPLAINT PARAGRAPH 14:** Arm does not manufacture or sell chips. Instead, Arm licenses its technologies to hundreds of companies to use in developing their own chips or in their own electronic devices and works with these companies to ensure the success of Arm-based products.

**ANSWER: Defendants admit that ARM does not manufacture or sell semiconductor chips, and that ARM licenses intellectual property to various licensees.  Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 14, and on that basis deny them.**

62.     **COMPLAINT PARAGRAPH 15:** Arm's customers manufacture (or have manufactured for them) chips based on Arm's technologies. The chips may then be used in the

customer's own devices or sold to other device manufacturers. Arm earns revenue from licensing fees and royalties based on the number of Arm-based chips its customers sell.

**ANSWER: Defendants admit that ARM receives licensing fees and royalties from licensees, and that various licensees manufacture products that may include ARM Technology. Defendants otherwise deny the allegations in Complaint Paragraph 15.**

63. **COMPLAINT PARAGRAPH 16:** Arm's business model relies on Arm's ability to monetize its research and intellectual property by receiving both licensing fees and royalties for products incorporating Arm's technology and intellectual property. Arm therefore grows its revenues by increasing both the number of customers and the number of Arm-based products sold.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 16, and on that basis deny them.**

64. **COMPLAINT PARAGRAPH 17:** There are two main types of Arm licenses for Arm's technologies: Technology License Agreements ("TLAs"), which allow the use of specific "off-the-shelf" Arm processor core designs with only minor modifications, and Architecture License Agreements ("ALAs"), which allow for the design of custom processor cores that are based on particular architectures provided by Arm.

**ANSWER: Defendants admit that ARM enters into license agreements with licensees, including Technology License Agreements ("TLAs") and Architecture License Agreements ("ALAs"). Defendants otherwise deny the allegations in Paragraph 17.**

65. **COMPLAINT PARAGRAPH 18:** Arm grants few ALAs. Custom processor cores can take years to design, at great expense and requiring significant support from Arm, with no certainty of success. If successful, ALA licensees can sell custom processor cores for use in other companies' products.

ANSWER: Defendants admit that it requires significant expense and commitment to design custom CPUs. Defendants respectfully refer the Court to the Qualcomm and NUVIA ALAs for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 18.

66.   **COMPLAINT PARAGRAPH 19:** Arm ALAs typically authorize licensees only to develop processor cores based on specific Arm technology provided by Arm under the licenses, rather than granting broader licenses to use Arm-based technology generally.

ANSWER: Defendants respectfully refer the Court to the Qualcomm and NUVIA ALAs for their complete language and content. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 19, and on that basis deny them.

*Nuvia obtains Arm licenses*

67.   **COMPLAINT PARAGRAPH 20:** Nuvia was founded as a start-up in 2019 by chip engineers who left Apple and Google. Nuvia planned to design energy-efficient CPUs for data center servers based on a custom processor implementing the Arm architecture, which would have expanded the market for Arm's technology. Nuvia's business model was thus reliant on customizing processor core designs based on Arm's technology. As one of the founders explained to the press when launching Nuvia, the start-up's premise (and one of its attractions to investors) was that Nuvia intended to build "a custom clean sheet designed from the ground up" using Arm's architecture.[5]

---

[5]   Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TechCrunch (Nov. 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/.

**ANSWER: Defendants admit that NUVIA worked on custom CPUs that could be used in data center servers, that the custom CPU designs would expand the market for ARM technology, and that the custom CPUs that NUVIA worked on, prior to NUVIA's acquisition by Qualcomm, were intended to be compatible with ARM architecture. Defendants respectfully refer the Court to the cited publication for its complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 20.**

68.     **COMPLAINT PARAGRAPH 21:** In September 2019, Arm granted Nuvia an ALA and TLA, providing rights to design custom processor cores based on an Arm architecture and to modify certain off-the-shelf designs. The licenses granted in the ALA and TLA are necessary to use Arm's extensive intellectual property portfolio covering the Arm architecture. The ALA and TLA included rights to use Arm trademarks in connection with products developed by Nuvia under the licenses. Arm also provided substantial, crucial, and individualized support from Arm employees to assist Nuvia in its development of Arm-based processors for data center servers.

**ANSWER: Defendants admit that NUVIA had a TLA and ALA with ARM, and respectfully refer the Court to the referenced agreements for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 21, except to the extent they purport to state legal conclusions as to which no response is required.**

69.     **COMPLAINT PARAGRAPH 22:** The licenses provided Nuvia access to specific Arm architecture, designs, intellectual property, and support in exchange for payment of licensing fees and royalties on future server products that include processor cores based on Arm's architecture, designs, or related intellectual property. Nuvia's licensing fees and royalty rates reflected the anticipated scope and nature of Nuvia's use of the Arm architecture. The licenses

safeguarded Arm's rights and expectations by prohibiting assignment without Arm's consent, regardless of whether a contemplated assignee had its own Arm licenses.

**ANSWER: Defendants admit that NUVIA's TLA and ALA provided NUVIA with a license to certain ARM Technology. Defendants further admit that NUVIA and ARM intended the licensing fees and royalties set forth in the NUVIA ALA to apply to future server products, not products for other markets. Defendants respectfully refer the Court to the referenced agreements for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 22.**

70.     **COMPLAINT PARAGRAPH 23:** From September 2019 to early 2021, Nuvia used the technology it licensed from Arm to design and develop processor cores. Arm provided preferential support for Nuvia's development efforts, with Arm seeking to accelerate research and development in next-generation processors for data center servers to support that sector's transition to Arm technology.

**ANSWER:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Complaint Paragraph 23, and on that basis deny them.  Defendants otherwise deny the allegations of Complaint Paragraph 23.**

71.     **COMPLAINT PARAGRAPH 24:** In August 2020, Nuvia announced that its "first-generation CPU, code-named 'Phoenix'" would be "a custom core based on the ARM architecture."[6] It also publicized benchmark tests showing that Phoenix could double the

---

[6]     John Bruno & Sriram Dixit, *Performance Delivered a New Way*, Silicon Reimagined (Aug. 11, 2020), https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5.

performance of rival products from Apple, Intel, AMD, and Qualcomm. Based on these results, Nuvia claimed that the "Phoenix CPU core has the potential to reset the bar for the market."[7]

**ANSWER: Defendants respectfully refer the Court to the cited publication for its complete language and content. Defendants otherwise admit the allegations in Complaint Paragraph 24.**

*Qualcomm relies on designs created by Arm*

72. **COMPLAINT PARAGRAPH 25:** Qualcomm is one of the world's largest semiconductor companies, with a portfolio of intellectual property and products directed to wireless technologies, including cellular, Bluetooth, and Wi-Fi; CPUs and ICs; networking; mobile computers; cell phones; wearables; cameras; automobiles; and other electronic devices.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 25.**

73. **COMPLAINT PARAGRAPH 26:** Even though Qualcomm has an Arm ALA, its prior attempts to design custom processors have failed. Qualcomm invested in the development of a custom Arm-based processor for data center servers until 2018, when it cancelled the project and laid off hundreds of employees.[8]

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 26. The allegation that Qualcomm's "prior attempts to design custom processors**

---

[7] *Id.*

[8] *See, e.g.*, Andrei Frumusanu, *Qualcomm to Acquire NUVIA: A CPU Magnitude Shift*, AnandTech (Jan. 13, 2021), https://www.anandtech.com/show/16416/qualcomm-to-acquire-nuvia-a-cpu-magnitude-shift; Andy Patrizio, *Qualcomm makes it official; no more data center chip*, Network World (Dec. 12, 2018), https://www.networkworld.com/article/3327214/qualcomm-makes-it-official-no-more-data-center-chip.html.

have failed" is patently false.  Qualcomm has had great success in developing custom processors, to ARM's significant benefit.

74.    **COMPLAINT PARAGRAPH 27:** Qualcomm's commercial products thus have relied on processor designs prepared by Arm's engineers and licensed to Qualcomm under Arm TLAs. Discovery is likely to show that as of early 2021, Qualcomm had no custom processors in its development pipeline for the foreseeable future. To fill this gap, Qualcomm sought improperly to purchase and use Nuvia's custom designs without obtaining Arm's consent.

**ANSWER: Defendants deny the allegations of Complaint Paragraph 27.**

*Qualcomm acquires Nuvia*

75.    **COMPLAINT PARAGRAPH 28:** On January 13, 2021, Qualcomm announced that Qualcomm Technologies, Inc. was acquiring Nuvia for $1.4 billion. Neither Qualcomm nor Nuvia provided prior notice of this transaction to Arm. Nor did they obtain Arm's consent to the transfer or assignment of the Nuvia licenses.

**ANSWER: Defendants admit that on January 12, 2021, Qualcomm Incorporated announced that its subsidiary, Qualcomm Technologies, Inc., entered into a definitive agreement to acquire NUVIA for approximately $1.4 billion before working capital and other adjustments.  Defendants otherwise deny the allegations of Complaint Paragraph 28, except to the extent they purport to state legal conclusions as to which no response is required.**

76.    **COMPLAINT PARAGRAPH 29:** Qualcomm indicated in its announcement that "NUVIA CPUs"—that is, Nuvia's implementations of Arm technology developed under the Nuvia licenses with Arm—would be incorporated into a range of Qualcomm products. Qualcomm's press release declared its grand ambitions for Nuvia's implementation of Arm technology: "NUVIA CPUs are expected to be integrated across Qualcomm Technologies' broad portfolio of products,

powering flagship smartphones, next-generation laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality and infrastructure networking solutions."[9] The press release also indicated that Qualcomm's first target would be "integrating NUVIA CPUs with Snapdragon," its flagship suite of system on a chip ("SoC") semiconductor products for mobile devices.

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 29.**

77. **COMPLAINT PARAGRAPH 30:** As Qualcomm's CEO, Cristiano Amon, noted in a Reuters interview shortly after the acquisition closed in the first half of 2021, "Qualcomm will start selling Nuvia-based laptop chips next year."[10] Amon confirmed the negative impact this might have on Arm, saying: "If Arm . . . eventually develops a CPU that's better than what we can build ourselves, then we always have the option to license from Arm."

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 30.**

78. **COMPLAINT PARAGRAPH 31:** Qualcomm also confirmed its prior deficiencies in core design, reportedly promoting the Nuvia acquisition as "filling a gap" because "for several years now" the company "had been relying on external IP such as Arm's Cortex

---

[9]  *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 13, 2021), https://www.qualcomm.com/news/releases/2021/01/13/qualcomm-acquire-nuvia.

[10]  Stephen Nellis, *Qualcomm's new CEO eyes dominance in the laptop markets*, Reuters (July 2, 2021), https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/.

cores."[11] Qualcomm further explained that "the immediate goals for the NUVIA team will be implementing custom CPU cores" designed for laptops.[12]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 31.**

79. **COMPLAINT PARAGRAPH 32:** Analysts confirmed that the "Qualcomm acquisition [of] NUVIA is a huge move to scale up dramatically. It can reinvigorate current lines in smartphone, Windows PC and automotive SoCs, and make them more competitive with the competition. They have been lagging."[13]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 32.**

80. **COMPLAINT PARAGRAPH 33:** Providing further confirmation of the acquisition's importance to Qualcomm in filling the "gap" in its "lagging" IP design, analysts noted that the Nuvia acquisition was "extremely speedy in terms of timeline," and Qualcomm "went as far as [to] put out a concrete roadmap for . . . using the newly acquired IP from Nuvia,"

---

[11] Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia.

[12] *Id.*

[13] Trading Places Research, *Qualcomm's Acquisition of NUVIA is a Huge Move*, Seeking Alpha (Jan. 13, 2021), https://seekingalpha.com/article/4398808-qualcomms-acquisition-of-nuvia-is-huge-move.

announcing that Nuvia's processors would be finalized for use in high-end laptops "in the second half of 2022."[14]

**ANSWER: Defendants respectfully refer the Court to the referenced publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 33.**

81.    **COMPLAINT PARAGRAPH 34:** Based on standard industry scheduling, that timeline indicated a design for data center processors would be completed "essentially as soon as possible following the acquisition" of Nuvia.[15]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 34.**

82.    **COMPLAINT PARAGRAPH 35:** This timing indicates that the Arm-based cores that Nuvia designed using Arm's technology and intellectual property were, as of the acquisition date, effectively ready for the final stages of design for Qualcomm chips, leading promptly to product integration and manufacturing. Qualcomm's November 2021 10-K filing disclosed that the $1.4 billion acquisition encompassed Nuvia's team and "certain in-process technologies,"

---

[14]    Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia (quoting *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 15, 2021), https://www.qualcomm.com/news/releases/2021/03/16/qualcomm-completes-acquisition-nuvia).

[15]    *Id.*

reflecting the availability of existing cores such as the Phoenix CPU core developed under Nuvia's ALA.[16]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 35, except to the extent they purport to state legal conclusions as to which no response is required.**

83. **COMPLAINT PARAGRAPH 36:** By entering into the acquisition of Nuvia and transferring the rights and technology developed under the Nuvia licenses without Arm's consent, Qualcomm thus greatly accelerated its ability to bring to market custom-designed processor cores—a head start that Qualcomm was willing to pay over $1 billion to obtain.

**ANSWER: Defendants admit that on January 12, 2021, Qualcomm Incorporated announced that its subsidiary, Qualcomm Technologies, Inc., entered into a definitive agreement to acquire NUVIA for approximately $1.4 billion before working capital and other adjustments. Defendants otherwise deny the allegations of Complaint Paragraph 36.**

*Arm terminates the Nuvia licenses*

84. **COMPLAINT PARAGRAPH 37:** Soon after the announcement of the merger, Arm informed Qualcomm in writing that Nuvia could not assign its licenses and that Qualcomm could not use Nuvia's in-process designs developed under the Nuvia ALA without Arm's consent. For more than a year, Arm negotiated with Qualcomm, through Qualcomm Inc. and Qualcomm

---

[16] Qualcomm Inc., Annual Report (Form 10-K) (Nov. 3, 2021), https://investor.qualcomm.com/ financial-information/sec-filings/content/0001728949-21-000076/0001728949-21- 000076.pdf.

Technologies, Inc., in an effort to reach an agreement regarding Qualcomm's unauthorized acquisition of Nuvia's "in-process technologies" and license.

**ANSWER: Defendants admit that in a letter dated February 2, 2021, ARM wrote to Qualcomm Technologies, Inc. that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent." Defendants otherwise deny the allegations of Complaint Paragraph 37, except to the extent they purport to state legal conclusions as to which no response is required.**

85. **COMPLAINT PARAGRAPH 38:** All the while, Qualcomm continued to broadcast its intentions to rush Nuvia products to market. In November 2021, Qualcomm's Chief Technology Officer told investors that Qualcomm was "pretty far along at this point" in developing its first chip with Nuvia's implementation of Arm technology and would "sample a product at, let's say nine months from now"—which would be August 2022.[17] Then in January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO confirming that "[t]he future of the PC industry is modern Arm-based architectures" and boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[18] Elsewhere, Qualcomm's CEO reiterated that Qualcomm is "definitely in a hurry" to

---

[17] *Qualcomm Investor Day 2021 Livestream: CEO Cristiano Amon looks ahead*, YouTube (Nov. 16, 2021), https://www.youtube.com/watch?v=rUWPzROYn2E; *see also* Mark Hachman, *Qualcomm Prophesizes 2023 as the Rebirth of PC Snapdragon Chips*, PCWorld (Nov. 16, 2021), https://www.pcworld.com/article/552285/qualcomm-prophesies-2023-as-the-rebirth-of-its-snapdragon-chips.html.

[18] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

launch Nuvia's Arm-based chips "as fast as we can."[19] Based on these statements, discovery is likely to show that Qualcomm and Nuvia continued to use the relevant technology developed under Nuvia's Arm licenses.

**ANSWER: Defendants respectfully refer the Court to the referenced publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 38.**

86.     **COMPLAINT PARAGRAPH 39:** On February 1, 2022, Arm sent a letter to Nuvia and Qualcomm terminating the Nuvia licenses effective March 1, 2022. The letter terminated the licenses based on Nuvia's material breach of the assignment provisions of the Nuvia licenses by entering into the acquisition of Nuvia without Arm's consent. The letter also reminded Nuvia and Qualcomm of their obligations upon termination to stop using and destroy the Nuvia technology developed under the now-terminated licenses.

**ANSWER: Defendants admit that, on February 4, 2022, Qualcomm and Gerard Williams, NUVIA's former Chief Executive Officer, received a letter purporting to terminate NUVIA's ALA and TLA, with the termination effective as of March 1, 2022. Defendants otherwise deny the allegations of Complaint Paragraph 39, except to the extent they purport to state legal conclusions as to which no response is required.**

87.     **COMPLAINT PARAGRAPH 40:** In February 2022, pending termination of the Nuvia licenses, Nuvia sought Arm's verification that a Nuvia processor design satisfied the Arm architecture's specifications. On February 23, 2022, Qualcomm confirmed that it was still

---

[19]   Nilay Patel, *What Comes After the Smartphone, With Qualcomm CEO Cristiano Amon*, The Verge (Jan. 11, 2022), https://www.theverge.com/22876511/qualcomm-ceo-cristiano-amon-interview-decoder-podcast.

developing the relevant Nuvia technology by stating in a court filing that certain Nuvia documents were based on "years of research and work" and would "reveal secret design components of Qualcomm chips that are still in development." *Qualcomm Technologies, Inc. v. Hoang*, No. 3:22-cv-00248-CAB-BLM (S.D. Cal. Feb. 23, 2022), ECF No. 1 at 5-6.

**ANSWER: Defendants respectfully refer the Court to the cited court filing for its complete language and content. Defendants admit that Qualcomm began verification of a Qualcomm processor design in December 2021, that Qualcomm continued developing processor technology that it acquired from NUVIA beginning in March 2021 (doing so with ARM's knowledge that Qualcomm's design work was ongoing), and that ARM verified that the Qualcomm design satisfied ARM's architecture specification. Defendants otherwise deny the allegations of Complaint Paragraph 40.**

88. **COMPLAINT PARAGRAPH 41:** On March 1, 2022, the Nuvia licenses terminated, along with the corresponding rights to use or sell products based on or incorporating Nuvia technology developed under those licenses.

**ANSWER: Defendants deny the allegations of Complaint Paragraph 41, except to the extent they purport to state legal conclusions as to which no response is required.**

89. **COMPLAINT PARAGRAPH 42:** On April 1, 2022, Qualcomm's General Counsel sent Arm a letter enclosing a Nuvia representative's termination certification. The certification acknowledged—without objection—that the Nuvia licenses had been terminated. The certification recognized the obligations upon termination, and asserted that Nuvia was in compliance. Qualcomm and Nuvia thereby conceded that termination of the Nuvia licenses was appropriate, and that the termination provisions had been triggered, are binding, and are enforceable.

ANSWER: Defendants admit that, on April 1, 2022, Qualcomm Incorporated's General Counsel and Corporate Secretary transmitted a Certification from Gerard Williams stating that to the best of his knowledge, information and belief after due inquiry, NUVIA was in compliance with its obligations under ███████ with respect to any ARM Confidential Information. Defendants otherwise deny the allegations of Complaint Paragraph 42, except to the extent they purport to state legal conclusions as to which no response is required.

*Qualcomm keeps using Arm-based technology developed under the Nuvia licenses*

90. **COMPLAINT PARAGRAPH 43:** Qualcomm is subject to Nuvia's termination requirements as the acquirer of Nuvia. Qualcomm has publicly described Nuvia as a Qualcomm "team" that has been "very tight[ly] integrat[ed]" with and is "not separate" from Qualcomm.[20] Qualcomm has also acted on behalf of Nuvia publicly and in correspondence with Arm since the acquisition. Qualcomm further told Arm that it planned to "redeploy NUVIA employees" and "transfer NUVIA's work" to Qualcomm and, consistent with that plan, Qualcomm has on-boarded Nuvia's leadership and employees as Qualcomm employees.[21]

---

[20] Ian Cutress, *Interview with Alex Katouzian, Qualcomm SVP: Talking Snapdragon, Microsoft, Nuvia, and Discrete Graphics*, AnandTech (Jan. 31, 2022), https://www.anandtech.com/show/17233/interview-with-alex-katouzian-qualcomm-svp-talking-snapdragon-microsoft-nuvia-and-discrete-graphics; Ian Cutress, *AnandTech Interview with Miguel Nunes: VP for Windows and Chrome PCs, Qualcomm*, AnandTech (Feb. 14, 2022), https://www.anandtech.com/show/17253/anandtech-interview-with-miguel-nunes-senior-director-for-pcs-qualcomm.

[21] *See, e.g.*, *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 16, 2021), https://investor.qualcomm.com/news-events/press-releases/detail/1304/qualcomm-completes-acquisition-of-nuvia; *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants admit that, on January 27, 2021, Qualcomm wrote to ARM that Qualcomm had entered into a definitive agreement to acquire NUVIA and stating: "Following the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees continue their activities under the Qualcomm ALA and TLA, as that will be their current employer." Defendants further admit that, on February 3, 2021, Qualcomm stated in a letter to ARM that, after the NUVIA acquisition, NUVIA would "become a wholly owned subsidiary of Qualcomm and, post-closing, our plan is to redeploy NUVIA employees to currently existing Qualcomm entities." Defendants otherwise deny the allegations in Complaint Paragraph 43, except to the extent they purport to state legal conclusions as to which no response is required.**

91. **COMPLAINT PARAGRAPH 44:** On April 29, 2022, Arm wrote Qualcomm clarifying that neither Nuvia nor Qualcomm was authorized to continue working on technology that was developed under the Nuvia licenses.

**ANSWER: Defendants admit that ARM wrote a letter to Qualcomm dated April 29, 2022. Defendants otherwise deny the allegations in Complaint Paragraph 44 except to the extent they purport to state legal conclusions as to which no response is required.**

92. **COMPLAINT PARAGRAPH 45:** Two weeks later, on May 13, 2022, Qualcomm sought Arm's verification that a new Qualcomm processor core complied with Arm architecture so that it could be verified and incorporated into a product. Qualcomm did not explain whether this processor core design was based on Nuvia's designs under the terminated licenses.

**ANSWER:  Defendants admit that, on May 13, 2022, Qualcomm submitted to ARM a compliance report for a new Qualcomm CPU.  Defendants otherwise deny the allegations in Complaint Paragraph 45.**

93.    **COMPLAINT PARAGRAPH 46:** Based on the timing and circumstances surrounding Qualcomm's request, discovery is likely to show that Qualcomm's processor core design is based on or incorporates in whole or in part the processor core design developed under the prior Nuvia licenses.

**ANSWER:  Defendants admit that Qualcomm's Phoenix Core design incorporates intellectual property acquired from NUVIA, which is wholly independent of ARM. Defendants otherwise deny the allegations in Complaint Paragraph 46, except to the extent they purport to state legal conclusions to which no response is required.**

94.    **COMPLAINT PARAGRAPH 47:** Qualcomm's Arm licenses do not cover products based on or incorporating Arm-based technologies developed by third parties under different Arm licenses, such as the now-terminated Nuvia licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 47.**

95.    **COMPLAINT PARAGRAPH 48:** Despite Arm's termination of the Nuvia licenses, Qualcomm has continued to tell the public that its Nuvia chips will soon be joining the industry-wide "ecosystem transition to Arm."[22] Like Qualcomm's prior statements, this announcement was directed to readers throughout the United States, including to readers physically located in the State of Delaware and this Judicial District.

---

[22] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 48, except to the extent they purport to state legal conclusions to which no response is required.**

96. **COMPLAINT PARAGRAPH 49:** In June 2022, Qualcomm's CEO reiterated that it would soon begin "sampling" Nuvia chips to companies, allowing them to design electronic devices incorporating the chips in the "next year."[23] Based on that timeline, he explained, "[i]n late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon with a Nuvia-designed CPU."[24]

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 49.**

97. **COMPLAINT PARAGRAPH 50:** In the microprocessor industry, "sampling" means providing pre-production processors to original equipment manufacturers ("OEMs"), original device manufacturers ("ODMs"), or independent software vendors ("ISVs") for use in the product design cycle before product launch.

---

[23] *Id.*; *see also* Mark Tyson, *Qualcomm CEO Admits Nuvia Chip OEM Sampling is Delayed (Update)*, Tom's Hardware (June 10, 2022), https://www.tomshardware.com/news/qualcomm-nuvia-chip-sampling-delays (Qualcomm spokesperson clarifying: "We are on track to sample the first products with our next generation CPUs this year.").

[24] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

**ANSWER:  Defendants admit the allegations in Complaint Paragraph 50 generally describe sampling, but note that they fail to distinguish between precommercial engineering samples and commercial samples.**

98.     **COMPLAINT PARAGRAPH 51:** Based on Qualcomm's statements that Nuvia processors took "years" to develop and "are still in development," and Qualcomm's consistent statements that it is developing Nuvia's Arm chips, discovery is likely to show that the chips that Qualcomm intends to sample in the coming months will contain Nuvia technology that Qualcomm cannot use and instead must destroy.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 51, except to the extent they purport to state legal conclusions to which no response is required.**

99.     **COMPLAINT PARAGRAPH 52:** Further, based on Qualcomm's public announcements of its plans to use Nuvia technology, discovery is likely to show that Qualcomm has continued to retain and use Nuvia technology developed pursuant to the Nuvia licenses, thereby materially breaching the termination provisions of those licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 52, except to the extent they purport to state legal conclusions to which no response is required.**

100.     **COMPLAINT PARAGRAPH 53:** News reports indicate that Qualcomm is also developing Nuvia processors for data center servers, and "already has working silicon to at least demonstrate to potential customers,"[25] which discovery is likely to show is based on or incorporates Nuvia technology developed under the now-terminated Nuvia ALA.

---

[25]  Dan Robinson, *Qualcomm readying new Arm server chip based on Nuvia acquisition*, The Register          (Aug.          19,          2022), https://www.theregister.com/2022/08/19/qualcomm_arm_server_chip/  (citing  Ian  King,

**ANSWER:  Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 53, except to the extent they purport to state legal conclusions for which no response is required.**

101.    **COMPLAINT PARAGRAPH 54:** The failure of Nuvia and Qualcomm to comply with the post-termination obligations under the Nuvia ALA is causing, and will continue to cause, irreparable harm to Arm. Qualcomm effectively seeks to circumvent Arm's licensing model, which allocates use of the technology developed pursuant to a particular Arm license to a particular licensee.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 54, except to the extent they purport to state legal conclusions to which no response is required.**

102.    **COMPLAINT PARAGRAPH 55:** These breaches thus interfere with Arm's ability and right to control the use of its technology, negatively affecting Arm's relationships with existing and prospective licensees.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 55, except to the extent they purport to state legal conclusions to which no response is required.**

103.    **COMPLAINT PARAGRAPH 56:** The prospective monetary damages from Qualcomm's circumvention and interference with Arm's control over its technology are not readily ascertainable or calculable, given the resulting future impact on Arm's relationships with existing and prospective customers.

---

*Qualcomm Is Plotting a Return to Server Market With New Chip*, Bloomberg (Aug. 18, 2022), https://www.bloomberg.com/news/articles/2022-08-18/qualcomm-is-plotting-a-return-to-server-market-with-new-chip).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 56, except to the extent they purport to state legal conclusions to which no response is required.**

104. **COMPLAINT PARAGRAPH 57:** Qualcomm's improper acquisition of the relevant Nuvia technology in violation of Arm's standard provisions threatens to harm Arm's position in the ecosystem of Arm-based devices, harm Arm's reputation as an intellectual property owner and technology developer whose licenses must be respected, and embolden other companies to likewise harm Arm's reasonable business expectations in issuing its licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 57, except to the extent they purport to state legal conclusions to which no response is required.**

## COUNT I: BREACH OF CONTRACT – SPECIFIC PERFORMANCE
### (ALL DEFENDANTS)

105. **COMPLAINT PARAGRAPH 58:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER: Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-57 as if fully set forth herein.**

106. **COMPLAINT PARAGRAPH 59:** The termination obligations of the ALA between Nuvia and Arm survive termination and remain valid and enforceable contract provisions, as Qualcomm's correspondence and Nuvia's termination certification confirm.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 59, except to the extent they purport to state legal conclusions to which no response is required.**

107. **COMPLAINT PARAGRAPH 60:** Arm complied with and fulfilled all relevant duties, conditions, covenants, and obligations under the Nuvia ALA, including ceasing use of Nuvia confidential information in its possession.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 60, except to the extent they purport to state legal conclusions to which no response is required.**

108. **COMPLAINT PARAGRAPH 61:** The Nuvia ALA terms were just and reasonable, involving adequate consideration and reasonable obligations for Nuvia in the event of Arm's termination based on Nuvia's material breach. Those obligations served to restore the license holder to its position *ex ante*, protect Arm's business model and reasonable business expectations in issuing its licenses, and prevent the unjust enrichment of Qualcomm, the party that induced Nuvia's breach.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 61, except to the extent they purport to state legal conclusions to which no response is required.**

109. **COMPLAINT PARAGRAPH 62:** Upon termination, the Nuvia ALA requires Nuvia to cease using and destroy any technology developed under the Nuvia ALA, as well as cease using Arm's trademarks in connection with any technology developed under the Nuvia ALA.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 62, except to the extent they purport to state legal conclusions to which no response is required.**

110. **COMPLAINT PARAGRAPH 63:** Qualcomm shares Nuvia's obligations under the Nuvia ALA in its capacity as Nuvia's acquirer, and thus Qualcomm is likewise subject to the requirements of the Nuvia licenses' termination provisions.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 63, except to the extent they purport to state legal conclusions to which no response is required.**

111. **COMPLAINT PARAGRAPH 64:** Based on Defendants' correspondence with Arm, public statements, and processor verification requests, discovery is likely to show that

Defendants are still using and developing Nuvia technology developed under the now-terminated licenses, along with Arm trademarks, and intend to continue to do so.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 64, except to the extent they purport to state legal conclusions to which no response is required.**

112. **COMPLAINT PARAGRAPH 65:** Defendants therefore have breached and are breaching the Nuvia ALA's termination provisions.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 65, except to the extent they purport to state legal conclusions to which no response is required.**

113. **COMPLAINT PARAGRAPH 66:** As a direct and proximate result of Nuvia and Qualcomm's past and ongoing breaches, Arm has been irreparably injured and damaged in amounts not capable of determination, including, but not limited to, injury to Arm's global licensing program and misuse of Arm's technology.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 66, except to the extent they purport to state legal conclusions to which no response is required.**

114. **COMPLAINT PARAGRAPH 67:** Unless Defendants' breaches of the Nuvia ALA's termination provisions are enjoined and specific performance is granted, Arm will continue to suffer irreparable harm. As such, Arm has the right to enforcement of Nuvia and Qualcomm's compliance with the ALA's termination provisions, including via injunctive relief, specific performance, or any other measures necessary to avoid irreparable harm to Arm or to mitigate damages that have been caused by, and will continue to be caused by, Defendants' breach.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 67, except to the extent they purport to state legal conclusions to which no response is required.**

115.     **COMPLAINT PARAGRAPH 68:** Arm is entitled to specific performance requiring Defendants to comply with the Nuvia ALA's termination provisions, including ceasing all use of and destroying any technology developed under the Nuvia ALA, and ceasing all use of Arm trademarks in connection with any technology developed under the Nuvia ALA—including the relevant Nuvia technology.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 68, except to the extent they purport to state legal conclusions to which no response is required.**

116.     **COMPLAINT PARAGRAPH 69:** Arm is also entitled to monetary compensation incidental to specific performance of the Nuvia ALA's termination provisions to compensate Arm for the delay in Defendants' performance of their contractual obligations.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 69, except to the extent they purport to state legal conclusions to which no response is required.**

<u>COUNT II: DECLARATORY JUDGMENT AND</u>
<u>TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114</u>
<u>(ALL DEFENDANTS)</u>

117.     **COMPLAINT PARAGRAPH 70:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER:  Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-69 as if fully set forth herein.**

118.     **COMPLAINT PARAGRAPH 71:** Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower case letters (collectively, the "ARM Marks"), true and correct copies of which are attached as **Exhibits A and B**. These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with particular

microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services. The applications to register the marks were filed on July 31, 2017 and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

**ANSWER:  Defendants refer the Court to Exhibits A and B of the Complaint for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 71, except to the extent they purport to state legal conclusions to which no response is required.**

119.   **COMPLAINT PARAGRAPH 72:** The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.

**ANSWER: To the extent the allegations in Complaint Paragraph 72 purport to state legal conclusions, no response is required.  Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Complaint Paragraph 72, and on that basis deny them.**

120.   **COMPLAINT PARAGRAPH 73:** Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 73, except to the extent they purport to state legal conclusions to which no response is required.**

121. **COMPLAINT PARAGRAPH 74:** Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

**ANSWER: Qualcomm admits that its ALA and TLA with ARM permit the use of ARM Marks. Defendants otherwise deny the allegations in Complaint Paragraph 74, except to the extent they purport to state legal conclusions to which no response is required.**

122. **COMPLAINT PARAGRAPH 75:** Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 75, except to the extent they purport to state legal conclusions to which no response is required.**

123. **COMPLAINT PARAGRAPH 76:** Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to infringe Arm's trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® KryoTM 485 CPU built on ARM Cortex Technology."[26] In January 2022, Qualcomm issued a press release touting the "broad

---

[26] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[27] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

**ANSWER: Qualcomm admits to using certain ARM Marks as permitted by its licenses to accurately refer to ARM's technology, including, but not limited to, in marketing materials, product specifications, and technical documents. Defendants deny knowledge or information sufficient to form a belief as to how ARM's other licensees use ARM Marks. Defendants otherwise respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 76, except to the extent they purport to state legal conclusions to which no response is required.**

124. **COMPLAINT PARAGRAPH 77:** Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the

---

[27] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting trademark infringement in violation of 15 U.S.C. § 1114. Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 77, except to the extent they purport to state legal conclusions to which no response is required.**

125. **COMPLAINT PARAGRAPH 78:** An actual and justiciable controversy exists between Defendants and Arm regarding infringement of Arm's trademarks. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 78, except to the extent they purport to state legal conclusions to which no response is required.**

126. **COMPLAINT PARAGRAPH 79:** Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips

with the relevant Nuvia technology and the ARM Marks do and will infringe Arm's trademarks, directly and indirectly.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 79, except to the extent they purport to state legal conclusions to which no response is required.**

127. **COMPLAINT PARAGRAPH 80:** Defendants' acts of infringement have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 80, except to the extent they purport to state legal conclusions to which no response is required.**

128. **COMPLAINT PARAGRAPH 81:** Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 81, except to the extent they purport to state legal conclusions to which no response is required.**

129. **COMPLAINT PARAGRAPH 82:** Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' trademark infringement. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing infringement, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other

matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their infringing conduct.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 82, except to the extent they purport to state legal conclusions to which no response is required.**

<u>COUNT III: DECLARATORY JUDGMENT AND</u>
<u>FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125</u>
<u>(ALL DEFENDANTS)</u>

130.    **COMPLAINT PARAGRAPH 83:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER:  Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-82 as if fully set forth herein.**

131.    **COMPLAINT PARAGRAPH 84:** The acts of Qualcomm and Nuvia described above constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 84, except to the extent they purport to state legal conclusions to which no response is required.**

132.    **COMPLAINT PARAGRAPH 85:** Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 85, except to the extent they purport to state legal conclusions to which no response is required.**

133.    **COMPLAINT PARAGRAPH 86:** Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

**ANSWER: Qualcomm admits that its ALA and TLA permit use of the ARM Marks. Defendants otherwise deny the allegations in Complaint Paragraph 86, except to the extent they purport to state legal conclusions to which no response is required.**

134. **COMPLAINT PARAGRAPH 87:** Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 87, except to the extent they purport to state legal conclusions to which no response is required.**

135. **COMPLAINT PARAGRAPH 88:** Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to falsely designate the origin of their products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® KryoTM 485 CPU built on ARM Cortex Technology."[28] In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely

---

[28] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

positions Qualcomm Technologies to drive this industry wide transition."[29] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

**ANSWER: Qualcomm admits to using certain ARM Marks pursuant to its licenses to accurately refer to ARM's technology, including, but not limited to, in marketing materials, product specifications, and technical documents. Defendants deny knowledge or information sufficient to form a belief as to how ARM's other customers use ARM Marks. Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 88, except to the extent they purport to state legal conclusions to which no response is required.**

136. **COMPLAINT PARAGRAPH 89:** Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A). Given Arm's close

---

[29] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 89, except to the extent they purport to state legal conclusions to which no response is required.**

137.    **COMPLAINT PARAGRAPH 90:** An actual and justiciable controversy exists regarding Defendants' false designation of origin. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 90, except to the extent they purport to state legal conclusions to which no response is required.**

138.    **COMPLAINT PARAGRAPH 91:** Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will falsely designate the origin of their products, directly and indirectly.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 91, except to the extent they purport to state legal conclusions to which no response is required.**

139. **COMPLAINT PARAGRAPH 92:** Defendants' acts of false designation of origin have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 92, except to the extent they purport to state legal conclusions to which no response is required.**

140. **COMPLAINT PARAGRAPH 93:** Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 93, except to the extent they purport to state legal conclusions to which no response is required.**

141. **COMPLAINT PARAGRAPH 94:** Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' false designation of origin. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing false designation of origin, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the falsely designated matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their wrongful conduct.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 94, except to the extent they purport to state legal conclusions to which no response is required.**

## ARM'S PRAYER FOR RELIEF

WHEREFORE, Plaintiff Arm Ltd. requests that the Court grant the following relief:

**a.** A judgment in Arm's favor on all claims against Defendants;

**b.** An order requiring specific performance by Defendants of the Nuvia licenses' termination provisions;

**c.** An award of damages incidental to specific performance as a result of Defendants' breach of contract, in amounts to be proven at trial, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

**d.** A judgment and a declaration that advertising, distributing, offering for sale, or selling semiconductor chips with the relevant Nuvia technology and the ARM Marks infringes Arm's trademarks, directly and indirectly;

**e.** An order and judgment permanently enjoining Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns from (1) using in any manner in connection with the relevant Nuvia technology the ARM Marks, or any mark or logo that is confusingly similar to or a colorable imitation of the ARM Marks owned by Arm; (2) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology; or (3) assisting, aiding, or abetting any other person or business entity in performing any of the aforementioned activities;

f. An order and judgment directing Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Arm within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and ceased all offering of products with the relevant Nuvia technology under the ARM Marks, as set forth above;

g. An order and judgment directing Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays in any manner in connection with the relevant Nuvia technology the ARM Marks or any other mark that is confusingly similar to or a colorable imitation of the ARM Marks;

h. A judgment in the aggregate amount of (1) Defendants' profits, (2) Arm's actual damages, (3) the costs of this action pursuant to 15 U.S.C. § 1117, and (4) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants in connection with their semiconductor chips using the relevant Nuvia technology and the ARM Marks, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

i. A judgment trebling any damages to the extent permitted by law, including under 15 U.S.C. § 1117;

j. Exemplary or punitive damages to the extent permitted by law;

**k.**     Costs, expenses, and reasonable attorney fees under all applicable rules, statutes, and rules in common law that would be appropriate, with pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

**l.**     Equitable relief addressing any infringement occurring after entry of judgment; and

**m.**     Such other relief as the Court deems just and proper.

**ANSWER TO PLEA FOR RELIEF: ARM's characterization of the relief it seeks does not require a response. To the extent a response is required, Defendants deny the allegations in the prayer for relief and further deny that ARM is entitled to the requested relief, or any relief, against the Defendants, and the Defendants request that the Court dismiss all claims against them with prejudice and order such further relief as the Court deems just and proper.**

**JURY DEMAND**

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Arm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

**ANSWER TO JURY DEMAND:  ARM's jury demand states a legal conclusion to which no response is required, and Defendants otherwise reserve their right to contest ARM's jury demand.**

**DEFENSES**

142.     Without admitting that the Defendants engaged in the acts and conduct set forth in ARM's Complaint or that such acts or conduct would entitle ARM to the relief it seeks or that the allegation of an affirmative or other defense requires Defendants to prove affirmatively the circumstances as alleged, the Defendants assert the following defenses with respect to the claims alleged in the Complaint, without assuming the burden of proof or persuasion where the burden rests on ARM.  By designating the following defenses, the Defendants do not in any way waive or

55

limit any defenses which are or may be raised by their denials, allegations and averments set forth herein, and do not assume the burden of proof for any element of a claim to which the applicable law places the burden of proof on the Plaintiff. The defenses are pleaded in the alternative, are raised to preserve the Defendants' rights to assert such defenses, and are without prejudice to their ability to raise other and further defenses. The Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent at any time and hereby reserve all rights to amend and/or supplement any and all defenses set forth herein.

## FIRST DEFENSE

### (Failure To State A Claim)

143. The Complaint fails to state a claim against the Defendants upon which relief can be granted.

## SECOND DEFENSE

### (Defendants Did Not Breach The NUVIA ALA)

144. Defendants did not breach the termination provisions of NUVIA's ALA because Defendants complied with the termination provision.

145. Defendants did not breach the NUVIA ALA. Defendants' use of ARM technology and information was fully licensed under the Qualcomm ALA.

## THIRD DEFENSE

### (Defendants' Use Of ARM Marks Is Licensed And Therefore Permitted Under Qualcomm's License Agreements)

146. Defendants are licensed to use the ARM Marks at issue and therefore they are not in violation of 15 U.S.C. §§ 1114 and 1125.

147. For example, under ███████ of Qualcomm's ARM ALA, ARM ███████
████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████    ████████████████████

████

148.     The Qualcomm products at issue in ARM's complaint were ████████████

███████████ Qualcomm's license agreements.  Accordingly, Defendants are permitted to

use ARM's Marks licensed under that agreement.

## FOURTH DEFENSE

### (Fair Use)

149.     Defendants are not subject to liability for alleged trademark infringement because

Defendants' use of ARM Marks constitutes fair use.

150.     Defendants use the ARM Marks in marketing materials, product specifications and

technical documents to truthfully refer to ARM's technology and its relationship with Qualcomm's

products.  For example, Qualcomm's website describes the Kryo CPU as follows: "The

Qualcomm® Kryo™ CPU (built on ARM Cortex Technology) available in certain Snapdragon

processors is optimized for high-performance mobile computing."

151.     Use of the ARM Marks in this manner is necessary to accurately describe that

Qualcomm's products are compatible with ARM's technology.

152.     This use of the ARM Marks indicates that Qualcomm's products use an ARM ISA.

This is a true and accurate representation of the relationship between ARM and Qualcomm's

products.

153.     Defendants use only so much of the ARM Marks as necessary to describe ARM's

products.

## FIFTH DEFENSE

### (Ripeness)

154.     ARM's claims under 15 U.S.C. §§ 1114 and 1125 are premature and not ripe for adjudication.

## SIXTH DEFENSE

### (Plaintiff's Breach Of The NUVIA ALA Prevents It From Seeking To Enforce The ALA)

155.     ARM is barred from bringing or maintaining its breach of contract claim based on the NUVIA ALA, or recovering any remedy against the Defendants based on this claim, because ARM breached the NUVIA ALA, and such breach excuses any nonperformance by the answering Defendants.

156.     ARM's refusal to fulfill its responsibilities under the NUVIA ALA bars its own claims of breach of contract against the Defendants.

157.     Moreover, pursuant to ███████ of the ALA, ARM's ability to recover damages is limited.

## SEVENTH DEFENSE

### (Unclean Hands)

158.     ARM is barred from bringing or maintaining its claims by virtue of the equitable doctrine of unclean hands, including because ARM has refused to fulfill its contractual obligations to Defendants.

## EIGHTH DEFENSE

### (Waiver)

159.     By the statements, conduct, acts, or omissions attributable to ARM alone, ARM has waived all claims and causes of action and any recovery or remedy alleged in the complaint.  ARM

has been aware of Qualcomm's development of technology it acquired from NUVIA for over a year, and only now seeks to preclude Qualcomm from proceeding with its development.

## NINTH DEFENSE

### (Estoppel)

160.     By the statements, conduct, acts, or omissions attributable to ARM alone, ARM is estopped from seeking any recovery or remedy as alleged in the complaint.  ARM has been aware of Qualcomm's development of technology it acquired from NUVIA for over a year, and only now seeks to preclude Qualcomm from proceeding with its development.

## TENTH DEFENSE

### (No Damages)

161.     ARM's claims cannot be maintained because ARM cannot prove any cognizable loss, damage, or injury as a result of the conduct alleged in the Complaint.

162.     Moreover, to the extent ARM seeks damages, ARM's damages are limited pursuant to ▮▮▮▮▮ of the ALA.

## ELEVENTH DEFENSE

### (Failure To Mitigate Damages)

163.     ARM's claim for damages is barred in whole or in part due to ARM's failure to mitigate the alleged damages resulting from its claims.

164.     ARM knew in March of 2021 that Qualcomm had acquired NUVIA and that it intended to continue developing technology acquired from NUVIA.

165.     ARM waited until February 2022 to terminate the NUVIA ALA, allegedly because NUVIA violated assignments provisions in the NUVIA agreements.

166.     ARM's actions worked to maximize its alleged damages.

## TWELFTH DEFENSE

### (Equitable Defenses)

167.     The claims alleged and the relief sought in this action are barred in whole or in part by the equitable doctrines of laches, acquiescence, consent, ratification, and/or similar doctrines.

## THIRTEENTH DEFENSE

### (No Entitlement To Equitable Relief)

168.     To the extent the Complaint seeks equitable relief, such relief is barred because there is an adequate remedy at law.

## FOURTEENTH DEFENSE

### (Trademark Misuse)

169.     ARM has misused its marks inequitably, in order to harm Defendants.

170.     ARM has falsely claimed that Defendants are not entitled to utilize the ARM Marks.

171.     ARM falsely told customers, the media, and the public that Qualcomm cannot manufacture or sell products compatible with ARM's ISA that contain NUVIA technology.

172.     In so doing, ARM is indicating that Defendants are not entitled to utilize the ARM Marks.

173.     This is incorrect.  Defendants are fully licensed to the ARM Marks under Qualcomm's license agreements with ARM.

## FIFTEENTH DEFENSE

### (Other Defenses)

174.     Defendants hereby adopt and incorporate by reference any and all other defenses asserted, or that may hereafter be asserted, by any other defendant not expressly set forth herein to the extent such defense may be applicable to Defendants.

## COUNTERCLAIM

175.     Defendants, for their Counterclaim against ARM, seek a declaration that Defendants have not breached NUVIA's license agreements with ARM, and that Defendants' design, activities, and work on the Phoenix Core and associated SoCs are fully licensed pursuant to Qualcomm's license agreements with ARM.  Defendants set forth their counterclaim below, and incorporate by reference their introduction, set forth in paragraphs 1-47 above, as though set forth in full below.

## THE PARTIES

176.     Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm is the world's leading wireless technology innovator and the driving force behind the development, launch, and expansion of 5G technology. Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone.  Qualcomm brings the benefits of mobile to new industries, including automotive, the internet of things, and computing, where Qualcomm has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

177.     Qualcomm Technologies, Inc. is a Delaware corporation with a principal place of business in San Diego, California.  Qualcomm Technologies is a wholly-owned subsidiary of

Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

178.    NUVIA, Inc. was founded in February 2019 to design and develop ARM-compatible cores for use in server products.  NUVIA comprised a proven world-class CPU and technology design team, with industry-leading expertise in high-performance processors, SoCs, and power management for compute-intensive devices and applications.  Qualcomm acquired NUVIA in March 2021 for approximately $1.4 billion, before working capital and other adjustments.

179.    ARM is a corporation headquartered in Cambridge, United Kingdom and was founded in 1990.  ARM is planning to issue an IPO in the future, and ARM's positions will have a detrimental impact on this IPO unless this action is resolved beforehand.

## JURISDICTION AND VENUE

180.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

181.    Venue is proper in the District of Delaware under 28 U.S.C. § 1391 because ARM, through its Complaint dated August 31, 2022, has consented to jurisdiction and venue in the State of Delaware and this Judicial District.

## FACTUAL BACKGROUND

### I.     QUALCOMM AND NUVIA'S AGREEMENTS WITH ARM

182.    On May 30, 2013, Qualcomm[30] and ARM entered into an Amended and Restated Architecture License Agreement (the "QC ALA"), No. LES-TLA-20039, and Annex 1 to that agreement.   On May 31, 2013, Qualcomm and ARM entered into a Technology License Agreement (the "QC TLA"), No. LEC-TLA00550 and Annex 1 to that agreement.  On June 23, 2020, Qualcomm and ARM entered into an updated Annex 1 to the ALA and an Annex 1 to the QC TLA.

183.    

184.    Under the QC TLA, ARM licenses to Qualcomm fully designed and functional ARM Technology.  ARM provides this technology "off the shelf" to Qualcomm (i.e., the license is for a fully designed and functional piece of technology). .

185.    On September 27, 2019, NUVIA entered into both a TLA and an ALA through which it licensed certain ARM Technology.  The NUVIA ALA was later amended on October 17, 2019.

---

[30] ████████████████████████████████████████████████████████████

186.    Prior to ARM's termination of the NUVIA ALA and TLA, Qualcomm's and NUVIA's license agreements with ARM broadly overlapped.  At the time of termination of the NUVIA agreements, Qualcomm's ALA and TLA provided Qualcomm a license to the same technologies that were licensed under the NUVIA agreements.

187.    However, as discussed above, the royalty rates under NUVIA's license agreements were higher than those under Qualcomm's.

## II.    ARM TRIES TO TAKE ADVANTAGE OF QUALCOMM'S ACQUISITION OF NUVIA

### a.    Qualcomm Alerts ARM To Its Pending Acquisition Of NUVIA

188.    As discussed above in paragraphs 1-47, on January 13, 2021, Qualcomm announced its intent to acquire—for $1.4 billion before working capital and other adjustments—NUVIA, a start-up focused on developing a promising custom CPU compliant with the ARM ISA designed for data center servers.

189.    On January 27, 2021, Qualcomm wrote ARM a letter stating that it had entered into a definitive agreement to acquire NUVIA, and noting that Qualcomm and NUVIA had overlapping license agreements.  As Qualcomm notified ARM, "[f]ollowing the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees continue their activities under the Qualcomm ALA and TLA, as that will be their current employer."  In its letter, Qualcomm told ARM that it would be willing to "work with the ARM team to complete any necessary annexes" to Qualcomm's ALA and TLA "to the extent NUVIA was utilizing any ARM technology not currently covered under the current QTI ALA and TLA."  Given the timing of the acquisition, which was scheduled to close in March, Qualcomm requested that ARM respond by February 3, 2021.

190.    ARM did not respond until February 2, 2021, and said it would start reviewing "NUVIA's contracts with ARM" and would "aim to get in touch" regarding additional materials required to facilitate the review by February 17, 2021.  ARM further stated that it expected Qualcomm and NUVIA to "continue to follow the confidentiality obligations" in the parties' agreements and that the transfer of "designs, rights, or licenses" would be subject to "Arm's prior consent," which is "customarily documented in a three-way agreement between Arm, transferor, and transferee."

191.    Qualcomm replied the following day. Qualcomm confirmed that both "NUVIA and Qualcomm's existing agreements with ARM provide for the protection of ARM's confidential information," and that they "would abide by the confidentiality terms of those agreements." Qualcomm further requested that ARM provide its proposed "three-way agreement" for review.

192.    ARM never provided a draft of the "three-way agreement" or explained its concerns regarding protection of its confidential information.  Nor was any such "three-way agreement" necessary to transfer any designs or rights to the NUVIA technology that Qualcomm had acquired. Rather, by its terms, Qualcomm's agreements provided any rights necessary to continue the development of custom cores for the uses Qualcomm contemplated.

**b.    ARM's Baseless Threats**

193.    ARM waited nearly two weeks after Qualcomm's letter to provide any meaningful response.  On February 16, 2021, ARM gave Qualcomm a broad list of demands, claiming that ARM could only consent to the assignment of NUVIA's agreements to Qualcomm if Qualcomm agreed to several outrageous demands, set forth in Paragraph 23 above.

194.    Although assignment of the NUVIA agreement was unnecessary because of Qualcomm's own license agreements and nothing in the NUVIA agreement precluded Qualcomm from acquiring NUVIA or its technology, ARM's ploy in tying its consent to these demands was

to try and leverage the swiftly approaching closing date in a misguided attempt to disrupt Qualcomm's acquisition.

195. In correspondence sent February 18 and February 25, 2021, Qualcomm explained that ARM's demand that Qualcomm pay the NUVIA licensing rates was not appropriate because "ARM has not proposed giving Qualcomm any additional rights or benefits in exchange for" its demand for additional payments and because there was no contractual support for ARM's imposition of NUVIA's royalty rates on Qualcomm.

196. Qualcomm also explained that ARM's proposed restrictions on Qualcomm's engineers were inappropriate, as the proposed three-year restriction period would make it nearly impossible to develop products, thus endangering Qualcomm development work and would adversely impact ARM through the loss of licensing revenue.

197. During Qualcomm's February 2021 discussions with ARM, it became apparent that ARM's position was that NUVIA needed to assign its license agreements to Qualcomm, and that assignment could only be made with ARM's consent under ███████████████████████████████
███████████████████████

198. ████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████

199. ████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████

200.    These assignment provisions are inapplicable to Qualcomm's acquisition of NUVIA because Qualcomm has its own separate license agreements with ARM, which covered NUVIA and its technology as soon as the acquisition closed. ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

201.    In addition, the ALA gave Qualcomm broad license rights to design architecture compatible cores at all stages of implementation. ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████

202.    Therefore, NUVIA's technology would be covered by Qualcomm's ALA upon its acquisition.  It was not necessary to transfer NUVIA's licenses to effectuate the acquisition of NUVIA or its technology.

203.    Regardless, in an effort to compromise, on February 25, 2021, Qualcomm asked that ARM consent to the transfer of the NUVIA licenses to Qualcomm by March 2, 2021.

204.    By a letter dated March 2, 2021, ARM refused to consent.  Instead, ARM reiterated its demand that Qualcomm agree to the higher royalties of the NUVIA license agreement, including for what it alleged to be "derivative[]" products developed by Qualcomm.  ARM conditioned its consent to the assignment of the agreements by NUVIA to Qualcomm on Qualcomm agreeing to these demands.

205.     Qualcomm did not agree to these demands and Qualcomm's acquisition of NUVIA was completed as scheduled on March 16, 2021.

206.     Although the parties had intermittent discussions to resolve the dispute, they were unable to resolve these issues, and in September 2021, ARM went silent.

### d. With ARM's Knowledge And Assistance Owed To Qualcomm Under Its ALA, Qualcomm Continued Its Work Developing CPU Cores After The Acquisition Closed

207.     From March 16, 2021 through the present, Qualcomm engineers (including former NUVIA employees), operating under the Qualcomm license agreements, worked diligently to develop market-leading CPU cores and SoCs improving and further developing the technology it acquired from NUVIA.

208.     When Qualcomm acquired NUVIA, NUVIA had certain technology for a CPU core (i.e., the Phoenix Core) and the Server SoC that would use the Phoenix Core, but this technology was not fully developed.  Qualcomm continued to develop the Phoenix Core and Server SoC.

209.     Qualcomm also designed a SoC for use in the "compute" space (the "Compute SoC"), which would include aspects of the Phoenix Core.  Unlike the Server SoC, the Compute SoC was initially conceived of and innovated at Qualcomm after the NUVIA acquisition, including modifications of the Phoenix Core for this application.

210.     Throughout 2021 and 2022, Qualcomm received limited support from ARM as it developed the Phoenix Core and the two SoCs under Qualcomm's agreements, largely related to certain verification processes ARM is obligated to provide to ensure that the core design meets the architectural guidelines.  During the verification process, ARM knew that it was interacting with former NUVIA employees, and knew that Qualcomm was seeking to verify core designs that included technologies Qualcomm had acquired from NUVIA.

211. Beginning immediately after the acquisition, Qualcomm—including many Qualcomm team members who had previously worked at NUVIA—began having weekly calls with ARM engineers related to verification testing of the in-development Phoenix Core and the Server SoC.

212. The discussion between ARM and Qualcomm (which included the former NUVIA engineers) was open and transparent. ARM was aware that the discussions included Qualcomm engineers formerly at NUVIA related to Qualcomm's ongoing development of the technologies it had acquired from NUVIA.

213. ARM has also continued to license technology to Qualcomm, and Qualcomm has continued to pay ARM for those licenses.

214. For example, in July 2021, ARM delivered to Qualcomm four design-only licenses for Qualcomm internal testing. It also delivered to Qualcomm twelve single-use licenses, allowing the development of a single chipset design using the licensed ARM Technology. Subsequently, in October 2021, ARM delivered three perpetual licenses allowing for use of some of that same ARM Technology in unlimited designs. Like other licenses from ARM, Qualcomm paid for these licenses.

215. In or around late 2021, Qualcomm also introduced the Compute SoC into the parties' weekly discussions. Like the parties' discussions concerning the in-development Phoenix Core for the Server SoC, these discussions were transparent, and ARM was aware that these discussions included Qualcomm engineers formerly at NUVIA and related to Qualcomm's ongoing development of the technologies it had acquired from NUVIA.

216. Also in December 2021, Qualcomm submitted an interim compliance report to ARM for the Server SoC it had been developing since the NUVIA acquisition. This compliance

report stated that the Server SoC implemented ▮ of the ARM ISA, which was, at that time, publicly available on ARM's website and licensed under Qualcomm's ALA.

### III. ARM WAITED OVER A YEAR TO TERMINATE THE NUVIA LICENSES AND DEMAND QUALCOMM DESTROY TECHNOLOGY

#### a. On February 1, 2022, ARM Claimed NUVIA And Qualcomm Breached The NUVIA License Agreements And Terminated The Agreements

217.    As discussed above in paragraphs 31-40, in a letter dated February 1, 2022, after ARM had been interfacing with Qualcomm and its development efforts for months, ARM notified Gerard Williams III, the former CEO and President of NUVIA, that it intended to terminate both NUVIA's ALA and TLA for "material breach."

218.    ARM's February 2022 letter alleged that NUVIA had violated the assignment provisions in ▮ of both the NUVIA ALA and TLA when it was acquired by Qualcomm without ARM's consent.  ARM also alleged that NUVIA violated the confidentiality provisions of ▮ of both of the NUVIA license agreements by making unlicensed use of ARM's confidential information.  ARM's letter did not explain its assertions or define the purported breach.

219.    But NUVIA was not required to obtain consent from ARM to "transfer" its licenses or technology.  There are no provisions in the NUVIA-ARM agreements or the Qualcomm-ARM agreements that prohibited Qualcomm from purchasing NUVIA, nor are there any such provisions that required ARM's consent to purchase NUVIA.

220.    As a Qualcomm subsidiary, NUVIA was licensed under the Qualcomm ALA and TLA to use ARM Technology and Confidential Information.  And Qualcomm's licenses covered the further development of the technology acquired from NUVIA by Qualcomm.

221. ARM's argument under ███████ fails for the same reasons. At the time of the termination, both NUVIA and Qualcomm were licensed to use the ARM information in the Phoenix Core and related SoCs under the Qualcomm ALA and TLA, and any use of that information was fully authorized.

222. In addition, the Phoenix Core and the Server SoC implemented ████ of the ARM ISA, and did not utilize any ARM Confidential Information because ARM has published this specification and placed it in the public domain. ARM was well aware of this fact by the time it sent the February 1, 2022 termination letter.

223. Thus, contrary to ARM's assertions, neither NUVIA nor Qualcomm "committed a material breach of" the NUVIA ALA.

224. Moreover, ARM waited to terminate the NUVIA agreement until Qualcomm had already completed the design of the Phoenix Core for its Server SoC—and even after ARM had *accepted* Qualcomm's core design as ISA compatible.

225. ARM demanded, upon termination, that NUVIA:

    **a.** "discontinue any use and distribution of all Arm Technology, Arm Confidential Information and any products embodying such technology or information";

    **b.** "[a]t Arm's option, either destroy or return to Arm any Arm Confidential Information, including any copies thereof in its possession and any Arm Technology or derivatives . . . thereof in its possession"; and

    **c.** "[w]ithin one month after termination, furnish to Arm a certificate signed by a duly authorized representative that to the best of his or her knowledge, information and belief, after due enquiry, NUVIA has complied with these provisions."

226. ARM further claimed (wrongly) that these "obligations extend to Qualcomm and its widely publicized use of NUVIA's technology developed under NUVIA's ALA and TLA."

ARM contended in its termination notice that certification of the return or destruction of ARM Confidential Information should "extend to Qualcomm as well."

227.     ARM informed NUVIA that its unilateral termination would be effective as of March 1, 2022 and demanded the return or destruction of any ARM Confidential Information delivered to NUVIA by April 1, 2022.

228.     ARM's demand that NUVIA discontinue using and distributing ARM Technology, ARM Confidential Information, and any products embodying such technology or information was baseless.  NUVIA and the technology Qualcomm acquired from NUVIA was licensed under Qualcomm's license agreements.

229.     Likewise, ARM's demand that NUVIA destroy ARM Confidential Information was baseless because NUVIA was licensed to this information under Qualcomm's license agreements and Qualcomm's further development of this technology was also licensed under Qualcomm's license agreements.

230.     Nonetheless, Qualcomm and NUVIA acted swiftly, at great time and expense, to take additional measures to satisfy ARM's unreasonable demand to comply with the termination provisions in NUVIA's license agreements.

231.     Qualcomm and NUVIA removed NUVIA-acquired ARM Confidential Information from its designs and redesigned its products to replace it with information acquired under Qualcomm's license—even though it was the exact same information—then quarantined a copy. Qualcomm also removed NUVIA-acquired ARM Confidential Information from its design environment and systems and quarantined it.

232.   During this period, Qualcomm's engineers were not working on further development of products because their attention was focused on the removal of NUVIA-acquired ARM Confidential Information.

233.   NUVIA then provided ARM with its certification of its compliance with the termination provisions on April 1, 2022, as requested by ARM, even though the termination provisions were inapplicable.[31]

**b.   ARM Continued To Threaten Qualcomm**

234.   After NUVIA's certification, ARM responded by purporting to impose even more onerous demands than required by the termination provisions.  In an April 29, 2022 letter, ARM wrote to confirm that: "both Qualcomm and NUVIA . . . will not proceed with any further development of NUVIA technology that embodies or is derivative of Arm confidential information or technology."

235.   The termination provisions do not, by their plain language, require any such thing. They require only that NUVIA ████████████████████████████████████████

████████████████████████████████████████████████████

These provisions apply only to NUVIA, not Qualcomm.  And, of course, Qualcomm owns its own licenses to ARM Confidential Information and Technology.

236.    Moreover, in this April letter, ARM stated that "Arm does not believe that the NuVia [sic] technology discussed above constitutes or can form the basis of an Arm Compliant Product or Architecture Compliant Product for purposes of the relevant Qualcomm agreements with Arm."  This assertion was incorrect because of Qualcomm's own licenses, which do not

---

[31]   Meanwhile, ARM never certified its own compliance with the termination provisions, in violation of the NUVIA agreements.

restrict Qualcomm's ability to develop CPU cores using Qualcomm's technology, including technology it acquired from NUVIA.

237.   Then, on August 2, 2022, ARM told Qualcomm that "Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the NUVIA technology."  In other words, ARM contended—with absolutely no basis—that Qualcomm cannot use *any* of NUVIA's intellectual property, proprietary designs, or confidential information, which include technology that ARM did not own or develop.  ARM's demands go far afield of ARM Confidential Information or ARM Technology.  ARM is pretending that it has rights over NUVIA Technology and NUVIA Confidential Information, a position that is baseless in light of the actual provisions of the NUVIA agreements.  ARM also threatened Qualcomm's customers, asserting that "[n]either Qualcomm nor its customers are licensed to use any part of Arm's broad intellectual property portfolio with respect to such products.  Arm will use all necessary means to protect its legal rights."

238.   ARM's threats are baseless.  ARM apparently contends that it has rights over all technology, proprietary designs, and confidential information developed by NUVIA, including technology that had absolutely nothing to do with ARM.  But ARM has no right to demand destruction of that technology.  ARM does not own CPU and/or SoC designs of its licensees, as ARM's license agreements and its statements to regulators make clear.

239.   There are no provisions in either the NUVIA-ARM agreements or the Qualcomm-ARM agreements that:

   **a.**   prohibited Qualcomm from purchasing NUVIA or acquiring NUVIA's technology;

   **b.**   required Qualcomm to obtain ARM's consent to purchase NUVIA or access NUVIA's technology;

   **c.**   mandate that Qualcomm stop using any NUVIA technology it acquired;

74

    **d.**    mandate that Qualcomm destroy NUVIA's technology;

    **e.**    prohibit the transfer or disclosure of NUVIA's technology or confidential information to Qualcomm;

    **f.**    limit the use of NUVIA technology only to NUVIA; or

    **g.**    require Qualcomm to obtain ARM's consent to further develop any in-process designs or technology that Qualcomm acquired from NUVIA.

## IV.    ARM CONTINUES TO SUPPORT QUALCOMM'S DEVELOPMENT WORK

240.    Despite ARM's demands that Qualcomm destroy and stop using NUVIA technology, for approximately one year, ARM continued to provide verification support to Qualcomm in developing the Phoenix Core and related SoCs, and also continued to acknowledge the Defendants' rights under the Qualcomm ALA and TLA to that technology.

241.    For example, on April 12, 2022—after Qualcomm certified that it had destroyed all NUVIA-acquired ARM Confidential Information—ARM accepted test results verifying that the implementation of the Phoenix Core in the Server SoC complied with the requirements necessary to execute ARM's instruction set. ARM explicitly validated this testing under the Qualcomm ALA.

242.    Similarly, in May of 2022, Qualcomm received an email from ARM stating that the Compute SoC—which integrated technology acquired from NUVIA and was first developed after Qualcomm's acquisition of NUVIA—had passed all relevant tests and was ARM-compatible. Yet, ARM's engineering team noted that it could not yet send a formal compliance waiver because ARM's legal team was withholding it.

## V.    ARM IS ATTEMPTING TO DISRUPT QUALCOMM'S CUSTOMER RELATIONSHIPS BY MISREPRESENTING QUALCOMM'S ALA

243.    Since filing the Complaint in this case on August 31, 2022, ARM has persistently and wrongfully attempted to disrupt Qualcomm's business and customer relationships by

spreading misinformation about the nature of Qualcomm's ARM licenses to customers that purchase Qualcomm's ARM-compatible cores and chipsets.

244. ARM has engaged in this misinformation campaign directly through its leadership and through the leadership of its owner, SoftBank, acting on ARM's behalf, in an attempt to damage Qualcomm, disparage its products, disrupt Qualcomm's relationships with its customers, and create uncertainty where there is none.

245. At least as early as October 2022, ARM falsely stated to one or more of Qualcomm's longstanding original equipment manufacturer ("OEM") customers that unless they accept a new direct license from ARM on which they pay royalties based on the sales of the OEM's products, they will be unable to obtain ARM-compliant chips from 2025 forward. ARM has also threatened at least one OEM that, if the OEM does not do so, ARM will go on to license the OEM's large competitors instead—the implication being that the OEM would be excluded from the market and could not obtain any ARM-compliant chips from Qualcomm or any other supplier, including "off-the-shelf" chips from ARM under a TLA. ARM has done this despite already having approached the OEM's competitors with a direct licensing offer, while acting as if ARM would only approach the competing OEMs if the threatened OEM declined the license in the first instance.

246. ARM also told one or more Qualcomm customers that, when the existing TLA agreements expire, ARM will cease licensing CPUs to all semiconductor companies—including Qualcomm—under an ARM TLA. ARM claimed that it is changing its business model and will only provide licenses to the device-makers themselves. ARM has explained to the OEMs that a direct OEM license will be the only way for device-makers to get access to ARM-compliant chips.

247. ARM is trying to coerce such customers into accepting its direct license by falsely asserting that Qualcomm will not be able to provide them with ARM-compliant chips beginning in 2025 because Qualcomm's ARM license agreements terminate in 2024, that ARM will not extend its licenses with Qualcomm, and that ARM will not allow Qualcomm to ship products from 2025 forward.

248. These statements are unequivocally false and are intended to harm Qualcomm's relationships with its customers—and to secure lucrative contracts with those customers for ARM—by calling into question Qualcomm's ability to maintain its ARM licenses beyond 2024 and provide products to its customers, despite Qualcomm having a clear right to do so for years to come under its ARM licenses.

249. Qualcomm is licensed for several years past 2025 under its ALA, which provides Qualcomm with the unilateral right to extend the contract past the initial term for several more years. Specifically, the ALA states:

a. 

b.

250. Accordingly, because the Qualcomm ALA has not been terminated—and because no event has occurred that would give rise to a right to terminate—the initial term of the license will continue until ███████████ Qualcomm then has the right to extend the license until ███ ██████ Accordingly, ARM does not have the right to refuse to extend Qualcomm's license or stop Qualcomm from shipping its products in 2025.

251. Moreover, ARM has no right to require additional royalties from Qualcomm's customers. Qualcomm's ALA provides Qualcomm with an exhaustive license, meaning that ARM is not entitled to go and seek another royalty from Qualcomm's customers on the same products for which ARM has received a royalty from Qualcomm.

252. ARM's coercion efforts did not stop with these false statements about Qualcomm's license agreements. To apply more pressure, ARM further stated that Qualcomm and other semiconductor manufacturers will also not be able to provide OEM customers with other components of SoCs (such as graphics processing units ("GPU"), neural processing units ("NPU"), and image signal processor ("ISP")), because ARM plans to tie licensing of those components to the device-maker CPU license.

253. ARM also claimed that it had already informed Qualcomm about its new business model that requires a direct license with the OEMs. That statement is false. ARM has not notified Qualcomm that it will be requiring direct licenses from device-makers. ARM did not tell Qualcomm that it intends to stop licensing CPU technology as a standalone license, that it will no longer license CPU technology to semiconductor companies, or that it will require licensees to obtain other technologies (notably ARM's GPU and NPU technology) only from ARM. As noted above, these attempted or threatened changes in ARM's business model do not account for Qualcomm's existing agreements with ARM.

254. While ARM's statements about Qualcomm have no basis in fact, they cause significant reputational damage and harm Qualcomm's customer relationships. Moreover, while ARM's goal may be to harm Qualcomm—and to coerce contracts with Qualcomm's customers that are unnecessary in view of the fully exhaustive rights it has granted Qualcomm under its

contracts—its tactics will result in harm to ARM's customers and licensees throughout the industry.

## VI.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION ARE HARMFUL TO THE INDUSTRY AND TO ARM ITSELF

255.    ARM's mercenary desire to thwart innovation is nothing new.    Prior to Qualcomm's acquisition of NUVIA, in September 2020, NVIDIA announced that it was going to acquire ARM to "bring[] together NVIDIA's leading AI computing platform with Arm's vast ecosystem to create the premier computing company for the age of artificial intelligence."  The announcement led to immediate antitrust concerns, regulatory challenges, and public opposition from many companies, including Qualcomm.  The near universal concern was that an NVIDIA-controlled ARM would impede innovation and lead to higher prices.  On February 7, 2022, ARM and NVIDIA announced that the acquisition would be terminated.

256.    Only three days before that announcement—when it was no doubt clear to ARM that the acquisition would not close—ARM sent its termination letter to the Defendants, terminating NUVIA's license agreements and demanding that Qualcomm stop working on any of the NUVIA technology.  As Qualcomm was one of the more public opponents of the acquisition, ARM's actions appear to be retributive.

257.    Although ARM's efforts to destroy Qualcomm's innovation and prevent Qualcomm from expanding and advancing technology may in the short term, create the illusion of ARM achieving greater profitability—either by effectively strongarming Qualcomm into paying additional, unjustified royalties or through eliminating Qualcomm as a competitor in the custom CPU and server SoC space—in the long term it only harms ARM's interest and weakens the place in the market ARM hopes for after its IPO because it is injurious to ARM customers and licensees.  ARM's positions are directly contrary to the purpose of the ALA, which will have little

value if licensees are not assured that they can use it to develop their own CPU core technology, at their own risk and expense and for their own benefit.

## **COUNTERCLAIM**

### **(Declaratory Judgment)**

258.    Defendants incorporate by reference all allegations set forth in the preceding paragraphs 1-47 and 175-257 as though fully set forth herein.

259.    Defendants are entitled to declaratory judgment that:

**a.**    Defendants did not breach the NUVIA ALA and NUVIA TLA;

**b.**    After Qualcomm's acquisition of NUVIA, Qualcomm's architected cores (including all further developments, iterations, or instantiations of the technology acquired from NUVIA), Server SoC, and Compute SoC, are fully licensed under Qualcomm's ALA and TLA for the full terms of those licenses;

**c.**    ARM's statements that Qualcomm's ALA expires in 2024 are false;

**d.**    ARM's statements that Qualcomm will be unable to deliver ARM-compliant products after 2024 are false;

**e.**    ARM has no right to prevent Qualcomm from shipping its validly-licensed products.

260.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-2202 *et seq.*) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that it can continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA, the Qualcomm TLA, the NUVIA ALA, or the NUVIA TLA.

261.    A valid and justiciable controversy exists between ARM and Qualcomm because ARM is attempting to prevent Qualcomm from exercising its rights under its license agreements with ARM, including by bringing suit claiming that Defendants breached NUVIA's license agreements with ARM.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants request judgment and relief as follows:

**a.**     For the declaratory judgments set forth in Defendants' counterclaim;

**b.**     For an Order enjoining ARM from:

> **(i)**     making any claim that Qualcomm's CPU products, including products that contain technology acquired from NUVIA, are not licensed under Qualcomm's agreements with ARM, are not ARM-compatible, cannot be commercialized as ARM-compliant, or that Qualcomm is prohibited from using ARM's marks in the marketing of any such products;

> **(ii)**     misrepresenting the scope, terms, or rights granted to Qualcomm under its agreements with ARM; and

> **(iii)**     making false statements about Qualcomm's ability to sell its CPU products to its customers, the media, analysts, or others;

**c.**     For an Order requiring ARM to comply with its obligations under Qualcomm's

license agreements without discrimination or retaliation;

**d.**     For an award of attorney's fees and costs as allowed by law; and

**e.**     For such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

Erin J. Morgan
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

October 26, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 26, 2022, upon the following in the manner indicated:

| | |
|---|---|
| Anne Shea Gaza, Esquire<br>Robert M. Vrana, Esquire<br>Samantha G. Wilson, Esquire<br>YOUNG, CONAWAY, STARGATT & TAYLOR LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Michael A. Jacobs, Esquire<br>Joyce Liou, Esquire<br>Diek Van Nort, Esquire<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, CA 94105<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Erik J. Olson, Esquire<br>MORRISON & FOERSTER LLP<br>755 Page Mill Road<br>Palo Alto, CA 94304<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Scott F. Llewellyn, Esquire<br>MORRISON & FOERSTER LLP<br>4200 Republic Plaza<br>370 Seventeenth Street<br>Denver, CO 80202-5638<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,

        Plaintiff,

    v.

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation, and NUVIA, INC., a
Delaware corporation,

        Defendants.

C.A. No. 22-1146-MN

**JURY TRIAL DEMANDED**

**REDACTED - PUBLIC VERSION**

## PLAINTIFF ARM LTD.'S ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANTS QUALCOMM INC., QUALCOMM TECHNOLOGIES, INC., AND NUVIA, INC.'S AMENDED COUNTERCLAIM

Plaintiff Arm Ltd. ("Arm") hereby submits its Answer and Affirmative Defenses to the Amended Counterclaim of Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively "Qualcomm"), and NuVia, Inc. ("Nuvia").

## PRELIMINARY STATEMENT

Contrary to its allegations, Qualcomm cannot continue using Arm-based technology, including the Phoenix core, that Nuvia developed under its now-terminated Architecture License Agreement ("ALA") with Arm, for several independent reasons:

*First*, pursuant to an express, independent obligation under Nuvia's ALA, the relevant Nuvia technology, including the Phoenix core, can no longer be used and must be destroyed. This destruction obligation extends to all derivatives or embodiments of Arm technology generated at Nuvia based on Nuvia's ALA. The Nuvia ALA leaves no doubt that the destruction obligation extends to processor cores, such as Nuvia's Phoenix core, which is the basis for Qualcomm's proposed future products. Defendants must discontinue

1

any use of products derived from or embodying technology provided by Arm under the Nuvia ALA. These obligations were not amended, terminated, avoided, or affected in any way whatsoever by any provision in Qualcomm's ALA. In April and May 2022, Nuvia and Qualcomm expressly certified that they would comply with the obligation to destroy and not use the defined Arm technology and confidential information—which includes Defendants' products embodying and derivatives of the same—under the Nuvia ALA. Defendants belatedly seek to dispute whether Arm was entitled to terminate Nuvia's ALA, but they waived any such argument by conceding termination at the time and by purporting to certify compliance with the termination obligations shortly thereafter. Now they must actually abide by their very clear contractual obligations.

*Second*, Arm has no obligation to support Qualcomm's further attempts to continue developing unlicensed technology originally developed at Nuvia using Arm's architecture. Qualcomm's ALA with Arm expressly excludes any license to Arm technology that was not developed under that specific ALA. The Qualcomm ALA limits Qualcomm's design and manufacture rights, and Arm's verification, delivery, and support obligations, to chips (1) based on the technology Arm delivered *to Qualcomm* under that ALA, (2) created at Qualcomm, by Qualcomm engineers and Qualcomm subsidiaries during the period while those entities were subsidiaries of Qualcomm, and (3) licensed subject to the terms of that ALA. None of this is true of the Phoenix core or other designs developed by *Nuvia* engineers at *Nuvia* based on the technology and license granted to *Nuvia* by Arm when *Nuvia* was a standalone company. Thus, Qualcomm is not only trying to develop an unlicensed product, but is also materially breaching its ALA with Arm.

*Third,* there is no uncertainty that Arm's consent was required but not obtained for the transfer of Nuvia's rights, including through Qualcomm's acquisition of the company. Because the Nuvia ALA expressly required prior consent from Arm to any assignment of the ALA, and expressly defined assignment to include any other company's acquisition of Nuvia, Qualcomm's acquisition of Nuvia without Arm's prior consent breached the Nuvia ALA.

*Fourth*, Arm did not waive its rights (or prejudice Qualcomm) by exploring a business solution before bringing suit. Within days after Qualcomm first contacted Arm about its planned acquisition of Nuvia, Arm informed Qualcomm in writing that it would need to enter into a new agreement if it wished to continue using the designs and technology that had been created pursuant to the Nuvia ALA. Arm did not wait in the weeds; it openly and promptly identified and communicated Nuvia's and Qualcomm's obligations. And Qualcomm agreed in writing with Arm's position that, even if Arm continued to support the Nuvia team in the interim, Arm's "assistance does not expressly or impliedly waive any of Arm's rights." Arm notified Qualcomm again of its obligations in early August 2022 before it filed its Complaint. Qualcomm knew the risks, and willfully refused to heed Arm's warnings. Faced with Qualcomm's refusal to respect Arm's licenses, Arm brought this lawsuit to protect its rights under the Nuvia ALA and the Arm technology ecosystem by obtaining specific performance of Defendants' obligation to destroy and stop using the unlicensed Nuvia designs. These facts, not any misguided allegations about prior merger issues or purported changes in Arm's business model, are the reason and basis for Arm's claims.

## ANSWER

Arm further answers the Counterclaim as follows, and except as expressly admitted below, Arm denies each and every allegation of the Counterclaim:

1.       In answer to paragraph 1, Arm admits, as discovery is likely to show, that Qualcomm plans to market products that are based on or incorporate Arm-based technology developed under the now-terminated Nuvia ALA.  Arm lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in the first sentence of paragraph 1 and on that basis denies them.  Arm denies the allegation that "many in the industry see in this pivotal moment the opportunity for technological advancement," with industry commentators instead stating, for example: "Assuming that these Nuvia chips do not get side-tracked in terms of a launch, Qualcomm will effectively be behind Apple by three generations,"[1] "Qualcomm is still behind" and "is going to have some catching up to do,"[2] and "Qualcomm's predictions for the Nuvia processors have centered on it being a way to make Windows laptops that rival Apple's M1 chips in the MacBook Pro.  However, Apple has already said that it will be making no more versions of the M1, and the expectation is that by 2023 it will already be on to an M2, or even M3."[3]  Arm denies the remaining allegations in this paragraph.

---

[1] Omar Sohail, *Qualcomm Makes Progress With Nuvia Chips, Gets Design Wins, but Competing With Apple Still Not Possible for a Few Years*, WCCF Tech, (Nov. 5, 2022), https://wccftech.com/qualcomm-nuvia-chips-get-design-wins-but-launch-a-few-years-away/.

[2] Rich Woods, *Qualcomm's Custom Arm Processors for Windows PCs are Coming Late Next Year*, XDA Developers (Apr. 27, 2022), https://www.xda-developers.com/qualcomms-custom-arm-processors-for-windows-pcs-are-coming-late-next-year/.

[3] William Gallagher, *Qualcomm Says Its Apple Silicon Rival Chips Will Be in PCs by Late 2023*, AppleInsider (Apr. 29, 2022), https://appleinsider.com/articles/22/04/29/qualcomm-says-its-apple-silicon-rival-chips-will-be-in-pcs-by-late-2023.

2.      Paragraph 2 contains legal conclusions to which no response is required.  To the extent a response is required, Arm respectfully refers the Court to the Complaint for Arm's claim that Defendants must stop using and destroy any Arm-based technology developed under the Nuvia ALA.  Arm denies the remaining allegations in this paragraph.

3.      Paragraph 3 contains legal conclusions to which no response is required.  To the extent a response is required, Arm admits that Qualcomm has licensed and paid for its own ALA, which expressly excludes a license to ██████████████ such as Nuvia's implementation of Arm architecture—██████████████████████████████ ████████████████████████████ For purposes of the Qualcomm ALA, the relevant Nuvia technology embodies and was derived from Arm technology delivered by Arm to Nuvia under Nuvia's now-terminated ALA, and thus is expressly excluded from the Qualcomm ALA license.  Arm denies the remaining allegations in this paragraph.

4.      Paragraph 4 contains legal conclusions to which no response is required.  To the extent a response is required, Arm denies that the Nuvia ALA—which states ████████ ███████████████████████████████████████ ██████████████████████████████ ████████—provided any alleged rights of "technology ownership" surviving termination of the Nuvia ALA, and Arm denies the remaining allegations in this paragraph.

5.      Paragraph 5 contains legal conclusions to which no response is required.  To the extent a response is required, Arm admits that Qualcomm and Nuvia's destruction obligation applies to Arm Confidential Information, a contractual term defined to include ████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ Arm also admits that the Arm

Architecture Reference Manual is available online, but denies that the manual is in the

public domain; instead, the manual makes clear that "[n]o license, express or implied, by

estoppel or otherwise to any intellectual property rights is granted by this document unless

specifically stated."  Arm lacks sufficient knowledge or information to form a belief about

the truth of allegations in the last sentence of this paragraph and on that basis denies them.

Arm denies the remaining allegations in this paragraph.

6.      Paragraph 6 contains legal conclusions to which no response is required.  To

the extent a response is required, Arm respectfully refers the Court to the Complaint and

admits that it seeks specific performance of the Nuvia licenses' termination provisions to

require Qualcomm and Nuvia to stop using and to destroy any Arm-based technology

developed under the Nuvia ALA, which constitutes and embodies ██████████████████

████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

█████████████████████████ Arm denies the allegation that it is "[s]eeking additional

leverage it can use to attain royalties from Qualcomm to which it is not entitled under the

contracts" because even if it did not have to stop using and destroy the relevant Nuvia

technology, Qualcomm would have been subject to Nuvia's royalty rates under the Nuvia

ALA in its capacity as Nuvia's acquirer.  For example, Section 6.2 of the Nuvia ALA says:

███████████████████████████

██████████████████████████

███████████████████████████

This royalty obligation for products that are based on or incorporate Arm-based technology developed in whole or in part under the Nuvia ALA survives termination of the Nuvia ALA. In contrast, Qualcomm improperly sought to bring the Nuvia technology under its own ALA to avoid paying Nuvia's royalty rates, even though the Nuvia technology was not developed or licensed under Qualcomm's ALA. Arm denies the remaining allegations in this paragraph.

7.      In answer to paragraph 7, Arm admits that, in the event its licenses are terminated for material breach, its licensees may be subject to termination obligations. Arm denies the remaining allegations in this paragraph.

8.      Paragraph 8 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations contained in this paragraph.

9.      In answer to paragraph 9, Arm admits that Qualcomm made such an announcement, but Arm denies the suggestion that it knew all of the specific uses for which Nuvia intended the Phoenix core.

10.     In answer to paragraph 10, Arm denies the suggestion that processor cores based on Arm architecture are merely "compatible" with the architecture that they implement, embody, and are derived from, and Arm lacks sufficient knowledge or information to form a belief about the truth of the allegations regarding compatibility with Qualcomm technologies and on that basis denies them.

11.     In answer to paragraph 11, Arm admits that Qualcomm publicly announced plans to integrate Nuvia CPU cores into Qualcomm's flagship smartphones, next-generation laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality and infrastructure networking solutions.  Arm lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

12.     In answer to paragraph 12, Arm admits that Qualcomm published a press release quoting industry participants commenting on Qualcomm's acquisition of Nuvia. The website referenced in paragraph 12 and the contents thereof speak for themselves.  Arm denies the remaining allegations in this paragraph.

13.     Paragraph 13 contains legal conclusions to which no response is required.  To the extent a response is required, Arm admits that at the time of Nuvia's acquisition, Nuvia and Qualcomm had separate license agreements with Arm, each of which licensed separately defined Arm technology delivered to the relevant party.  Arm admits that Nuvia's and Qualcomm's separate license agreements with Arm provided certain rights to use version 8 of the Arm architecture, including version ██.  Arm admits that the Phoenix core embodied and was derived from version ██ of the Arm architecture.  Arm admits that Qualcomm has a license agreement with Arm that provides certain rights to use version 9 of the Arm architecture.  Arm denies the remaining allegations in this paragraph.

14.     Arm admits the allegations in the first and third sentences of paragraph 14 as to at least some Arm ALAs, while denying the suggestion that all Arm ALAs grant uniform rights.  Arm admits that an instruction set architecture ("ISA") is part of the abstract model of a computer that specifies how the CPU interacts with software.  Arm admits that

applications and software that conform to an ISA's specifications can generally be run on a CPU that is based on the ISA, regardless of who has designed or manufactured the hardware. Arm admits that the Arm ISA allows for compatibility of applications and software, as all Arm-based products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.

15. Arm admits the allegations in the first sentence of paragraph 15. Arm denies that micro-architectural know-how and expertise required to build a CPU is not related to the ISA. Arm lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

16. In answer to the first sentence of paragraph 16, Arm admits that a CPU developer developing a custom CPU generally designs the core to meet the requirements of the relevant architecture. Arm lacks sufficient knowledge or information to form a belief about the truth of the second and third sentences of this paragraph and on that basis denies them.

17. Arm admits the allegations in paragraph 17, but denies the suggestion that ALA licensees develop custom processor cores without significant support from Arm.

18. In answer to the first sentence of paragraph 18, Arm admits that Arm Technology License Agreements ("TLAs") allow the use of specific "off-the-shelf" Arm processor core designs with only minor modifications. Arm denies the remaining allegations in this sentence. Arm lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

19. In answer to the first sentence of paragraph 19, Arm admits that a limited number of companies make use of both Arm ALAs and TLAs. Arm denies the remaining allegations in this paragraph.

20. In answer to paragraph 20, Arm denies that Qualcomm products incorporating the relevant technology Nuvia developed under the Nuvia ALA would not be subject to the Nuvia ALA's royalty rates—setting aside that Qualcomm is not entitled to make such products using technology subject to discontinuance and destruction obligations. Arm lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

21. In answer to the first sentence of paragraph 21, Arm admits that on January 27, 2021, Qualcomm informed Arm that Qualcomm intended to transfer Nuvia's work and employees to Qualcomm and have those employees continue their activities under the Qualcomm ALA and TLA, leading Arm to provide prompt notice of Qualcomm's need for a new agreement to cover the technology transfer. Arm admits the allegations in the second sentence of this paragraph.

22. Arm lacks sufficient knowledge or information to form a belief about the truth of the allegations in the first sentence of paragraph 22 and on that basis denies them. Arm denies the remaining allegations in this paragraph.

23. Arm denies the allegations in the first sentence of paragraph 23. In answer to the second and third sentences of this paragraph, Arm admits that it made the quoted statements in a letter that Arm sent to Qualcomm dated February 2, 2021, to which Arm refers for a complete statement of its contents; but Arm denies that these statements were without basis, given that they were based on the Nuvia ALA's assignment provision. In

answer to the fourth sentence of this paragraph, Arm admits that it sent Qualcomm a letter dated February 16, 2021 with a "commercial proposal to facilitate NUVIA's design transfer to Qualcomm." Arm admits that its commercial proposal offered an amendment to Qualcomm's ALA to "(a) align the terms of that agreement with those in NUVIA's architecture license agreement including but not limited to the royalty rates and (b) address the implementation of appropriate safeguards with respect to Arm's confidential information which can be delivered under a confidentiality agreement or under Qualcomm's technology license agreement ('TLA'), or both (collective, 'ARM Confidential Information')," and subject to that understanding, Arm admits clause (ii) of the fourth sentence of this paragraph. Arm admits that its commercial proposal also offered to "discuss and decide on the design transfer fee associated with such CPU design transfer" and that, "[w]ith respect to NUVIA's design(s) using Arm implementation IP and software tools, Qualcomm will enter into a separate license for such implementation IP and software tools." Arm denies the remaining allegations in this paragraph.

  24. Paragraph 24 contains legal conclusions to which no response is required. To the extent a response is required, Arm admits that Annex 1 of the Qualcomm ALA licenses Qualcomm and its subsidiaries to ███████████████████ ███████████████████ ███████████ in Section B.1.1, but ████████ ███████████. Arm admits that on February 25, 2021, Qualcomm sought Arm's consent for Qualcomm to acquire—and thereby assign to itself—Nuvia's Arm license rights, without asserting that such consent was not necessary, and without obtaining such consent. Arm denies the remaining allegations in this paragraph.

25.     Arm denies the allegations in paragraph 25.

26.     In answer to paragraph 26, Arm admits that its February 16, 2021 commercial proposal offered a novation to provide appropriate safeguards with respect to Arm's confidential information.  Arm denies the allegation that the proposed payments made "little sense" when Qualcomm asserts that it will use processors developed under Nuvia's ALA for data center servers and other products subject to Nuvia's "much higher royalty rates" but "will in the future pay to ARM the lower royalty rate under [Qualcomm's] ALA."  Arm admits that Nuvia planned to design CPUs implementing Arm architecture for use in data center servers, for which Arm provided substantial, crucial, and individualized support, and which technologically could be (and Qualcomm now admits have been) re-purposed for use in other products.  Arm admits that the royalty rate in the Nuvia ALA—which Qualcomm improperly sought to avoid, even for data center server technology developed under the Nuvia ALA—is higher than the royalty rate in the Qualcomm ALA.  Arm denies the suggestion that the Nuvia ALA's royalty rates applied only to data center server products, given that Nuvia's ALA contained no field-of-use limitation that would have prevented it from repurposing its processor cores for use in other products subject to its same royalty rates.  Arm denies the remaining allegations in this paragraph.

27.     Arm denies the allegations in paragraph 27.

28.     In answer to paragraph 28, Arm admits that Qualcomm refused to discuss a novation and, as a result, Arm did not consent to Qualcomm's acquisition of (and thus Nuvia's assignment of) Nuvia's license rights to its implementation of Arm technology. Arm admits that Arm and Qualcomm continued to discuss a commercial resolution of the

assignment issue after the close of the Nuvia acquisition, until Qualcomm broke off communications in October 2021.  Arm denies the remaining allegations in this paragraph.

29.     In answer to paragraph 29, Arm admits that, after the acquisition closed, Arm informed Qualcomm that it would need to cease using and destroy any technology developed under the Nuvia ALA if the parties did not agree to a novation.  Arm admits that, in an effort to reach a compromise, Arm proposed that Qualcomm pay a design transfer fee and harmonize certain royalty rates with Nuvia's rates in lieu of the hundreds of millions of dollars Arm anticipated earning from Nuvia's products expanding the market for Arm-based chips.  Arm denies the remaining allegations in this paragraph.

30.     In answer to paragraph 30, Arm admits that before Arm sent its February 1, 2022 letter terminating the Nuvia ALA, Arm and Qualcomm discussed the assignment dispute from January 27, 2021, when Qualcomm first brought the issue to Arm's attention, through at least October 18, 2021.  Arm denies that it stopped communicating with Qualcomm in or about September 2021 given that Qualcomm did not respond to or otherwise acknowledge Arm's August 31, 2021 proposal prior to its expiration.  Further, Arm sent an October 18, 2021 request that Qualcomm put forward a proposal for Arm to consider, and Qualcomm failed to respond.  Arm denies the remaining allegations in this paragraph.

31.     In answer to paragraph 31, Arm admits that it sent a letter dated February 1, 2022 to Nuvia and Qualcomm terminating the Nuvia licenses effective March 1, 2022.  Arm admits that its letter reminded Nuvia and Qualcomm of their obligations upon termination to stop using and destroy the relevant Nuvia technology developed under the now-terminated licenses and to certify that they had complied with the termination provisions within one

month of the termination.  Arm lacks sufficient knowledge or information to form a belief about the truth of the allegations related to the date of Qualcomm's receipt of Arm's letter. Arm denies the second sentence of paragraph 31.  Arm admits that prior to termination of the Nuvia ALA, Arm supported the Nuvia team under the Nuvia ALA given that Qualcomm had expressly agreed to Arm's condition that "such interaction and/or assistance does not expressly or impliedly waive any of Arm's rights with respect to the novation."  Arm denies the remaining allegations in this paragraph.

32.  Arm denies the allegations in paragraph 32.

33.  In answer to paragraph 33, Arm denies that it waited to terminate the Nuvia ALA and TLA for material breach by continuing to negotiate with Qualcomm in good faith. Arm lacks sufficient knowledge or information to form a belief about the truth of the allegations related to Qualcomm's expenses or development efforts and on that basis denies them.  Arm denies the suggestion that the fees and royalty payments Nuvia agreed to pay for technology developed under its ALA were exorbitant.  Arm denies the remaining allegations in this paragraph.

34.  In answer to paragraph 34, Arm admits that it sent a letter to Nuvia and Qualcomm terminating the Nuvia agreements dated February 1, 2022.  Arm admits that the termination of NVIDIA's proposed acquisition of Arm was announced on February 7, 2022, and that Arm had been seeking regulatory approval for NVIDIA to acquire Arm while Qualcomm refused to respect Arm's licenses during the preceding year, the timing of which suggests that Qualcomm was acting in bad faith to take advantage of Arm's prioritization of this regulatory approval process.  Arm denies the remaining allegations in this paragraph.

35.     In answer to paragraph 35, Arm admits that Qualcomm sent Arm a letter dated May 23, 2022, asserting that Qualcomm's own Arm licenses would permit it to incorporate Nuvia technologies "that are not subject to any removal or quarantine obligations" into Qualcomm products, without specifying what, if any, Nuvia technology fit that description.  Arm admits that Qualcomm asserted that Nuvia had developed technologies that were not subject to the termination requirements without explaining whether these technologies were derived from Arm Technology delivered under the Nuvia licenses.  Arm admits that Qualcomm's letter indicated that Qualcomm would comply with the termination obligations to the same extent as would Nuvia, without objecting to Arm's termination of the Nuvia licenses.  Arm denies the remaining allegations in this paragraph.

36.     In answer to paragraph 36, Arm admits that Nuvia's Phoenix core embodied and was derived from version ███ of the Arm architecture, and that the Initial Arm ███ EAC release was added to the Arm Architecture Reference Manual for download on Arm's website in or around January 2021.  Arm admits that Section 3.9 of the Nuvia ALA excludes information that ████████████████████████████████████████████ ████████████ from the confidentiality obligations in Section 3 of the ALA, which are distinct from the termination obligations in Section 15.1 of the ALA.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Arm denies the remaining allegations in this paragraph.

37.     In answer to paragraph 37, Arm admits that by letter dated April 1, 2022, Nuvia certified that it had destroyed and quarantined all "ARM Confidential Information including ARM technology or derivatives," but Arm denies that Nuvia suggested, contrary

to the requirements of the Nuvia ALA, that its certification was limited only to "Nuvia-acquired" information, technology, or derivatives.

38.　　In answer to paragraph 38, Arm admits that, in reliance on Qualcomm's statement that Arm's assistance to Qualcomm would not waive any of Arm's rights, Arm released a Compliance Waiver dated April 12, 2022, which stated: "This compliance waiver forms the acceptance from Arm that Qualcomm Global Trading Pte Ltd has validated their CPU Core in accordance with the Verification requirements set out in the Architecture agreement." In the same month, Arm specifically reinforced Qualcomm's obligation to destroy the unlicensed materials. Arm denies the remaining allegations in this paragraph.

39.　　In answer to paragraph 39, Arm denies that its ALAs provide licensees an ownership interest in their implementations of Arm technology that would affect a licensee's destruction obligations upon termination, with Nuvia's ALA instead stating ████ ████████████████████████████████████████████████████ ████████████████████████████ Arm denies the remaining allegations in this paragraph.

40.　　In answer to paragraph 40, Arm admits that as part of efforts to seek regulatory approval for NVIDIA to acquire Arm, Arm and NVIDIA submitted to a United Kingdom regulator the cited document, to which Arm refers for a complete statement of its contents. Arm denies the remaining allegations in this paragraph.

41.　　Paragraph 41 contains legal conclusions to which no response is required. To the extent a response is required, Arm admits that Qualcomm and Nuvia must stop using and destroy any Arm-based technology developed under Nuvia's ALA, and that neither

Qualcomm nor Nuvia is licensed to continue developing this technology.  Arm denies the remaining allegations in this paragraph.

42.     Paragraph 42 contains legal conclusions to which no response is required.  To the extent a response is required, Arm admits that Qualcomm is licensed to develop certain Arm-based technology based on Arm technology delivered to Qualcomm under its ALA and licensed according to the terms of that ALA.  The Qualcomm ALA expressly excludes a license to any other Arm technology, such as the Nuvia technology.  Arm denies the remaining allegations in this paragraph.

43.     Paragraph 43 contains legal conclusions to which no response is required.  To the extent a response is required, Arm denies the allegations in this paragraph.

44.     The first and second sentences of paragraph 44 contain legal conclusions to which no response is required.  To the extent a response to the first sentence is required, Arm denies the allegations.  To the extent a response to the second sentence is required, Arm respectfully refers the Court to the Complaint for Arm's allegations and denies the allegations contained in this sentence.  Arm denies that Qualcomm's license agreements give Qualcomm the right to use Arm trademarks in connection with products developed in whole or in part under Nuvia's ALA because those products are not covered by the relevant licenses in the Qualcomm ALA.  Arm admits that Section 2.9 of the Qualcomm ALA states that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████  Arm admits that Arm's website publicly grants third parties the right to "use Arm's word trademarks, product names, service names, technology names and other names in text to refer to Arm's products

and services and related technology if [they] follow [Arm's] guidelines and [such] use is accurate, fair and not misleading." Arm denies the remaining allegations in this paragraph.

45. The first sentence of paragraph 45 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in the first sentence of this paragraph. Arm lacks sufficient knowledge or information to form a belief about the remaining allegations in this paragraph and on that basis denies them.

46. In answer to paragraph 46, Arm admits that, like Qualcomm, it has communicated with press regarding this action. Arm denies the remaining allegations in this paragraph.

47. Paragraph 47 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

175. Paragraph 175 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in the first sentence of this paragraph. In answer to the second sentence of this paragraph, Arm sets forth its responses below and repeats, re-alleges, and incorporates by reference its answers to paragraphs 1-47 as if fully set forth herein.

176. In answer to paragraph 176, Arm admits that Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California. Arm admits that Qualcomm has developed and commercialized products related to wireless technologies and has been involved in 3G, 4G, and 5G mobile communication standards. Arm lacks sufficient knowledge or information to form a belief about the remaining allegations in this paragraph and on that basis denies them.

177.    In answer to paragraph 177, Arm admits that Qualcomm Technologies, Inc. is a wholly owned subsidiary of Qualcomm Incorporated and a Delaware corporation with a principal place of business in San Diego, California.  Arm lacks sufficient knowledge or information to form a belief about the remaining allegations in this paragraph and on that basis denies them.

178.    In answer to paragraph 178, Arm admits that Nuvia was founded in 2019, but lacks knowledge as to the reason for its founding, and on that basis denies the relevant allegations.  Arm lacks sufficient knowledge or information to form a belief about the truth of the allegations in the second sentence of this paragraph and on that basis denies them. Arm admits the allegations in the third sentence of this paragraph.

179.    In answer to paragraph 179, Arm admits that it is a corporation headquartered in Cambridge, United Kingdom and was founded in 1990.  Arm admits that it is planning to issue an IPO in the future.  Arm denies the remaining allegations in this paragraph.

180.    Paragraph 180 contains legal conclusions to which no response is required. To the extent a response is required, Arm admits this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

181.    Paragraph 181 contains legal conclusions to which no response is required. To the extent a response is required, Arm admits that venue is proper in this Judicial District.

182.    In answer to paragraph 182, Arm admits that Qualcomm and Arm entered into an Amended and Restated Architecture License Agreement, No. LES-TLA-20039, and Annex 1 to that agreement, effective May 31, 2013.  Arm admits that Qualcomm and Arm

entered into a Technology License Agreement, No. LEC-TLA00550 and Annex 1 to that agreement, effective May 31, 2013. Arm admits that Qualcomm and Arm entered into an updated Annex 1 to the ALA, effective June 23, 2020, and an updated Annex 1 to the Qualcomm TLA, effective June 26, 2020. Arm denies the remaining allegations in this paragraph.

183.    Arm admits the allegations in the first sentence of paragraph 183. In answer to the second sentence of this paragraph, Arm admits that Qualcomm's ALA allows it to ████████████████████████████████████ that is, technology ████████████ ██████████████ under the Qualcomm ALA and in accordance with the Qualcomm ALA license terms ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ as set forth in Section B. In answer to the third sentence of this paragraph, Arm admits that Qualcomm's ALA provides this license to Qualcomm and its subsidiaries, but ████████████████████████████████████████████████ Arm denies the remaining allegations in this paragraph.

184.    In answer to paragraph 184, Arm admits that under Qualcomm's TLA, Arm licenses the use of specific "off-the-shelf" Arm processor core designs with only minor modifications. In answer to the third sentence of this paragraph, Arm admits that Qualcomm's TLA provides this license to Qualcomm and its subsidiaries, but ████████████ ████████████████████████████████████. Arm denies the remaining allegations in this paragraph.

185.    Arm admits the allegations in paragraph 185.

186.     Paragraph 186 contains legal conclusions to which no response is required. To the extent a response is required, Arm admits that prior to termination of the Nuvia ALA, Nuvia and Qualcomm had separate license agreements with Arm, each of which licensed separately defined Arm technology delivered to the relevant party.  Arm denies the remaining allegations in this paragraph.

187.     Arm admits the allegations in paragraph 187.

188.     In answer to paragraph 188, Arm repeats, re-alleges, and incorporates by reference its answers to paragraphs 1-47 as if fully set forth herein, and admits the remaining allegations in this paragraph.

189.     In answer to paragraph 189, Arm admits that Qualcomm sent Arm a letter dated January 27, 2021, stating that Qualcomm had "entered into a definitive agreement to acquire Nuvia, Inc." and "wr[o]te to address a potential overlap in licensing agreements." Arm admits the allegations in the second and third sentences of this paragraph.  Arm admits that after waiting nearly two weeks since publicly announcing its planned acquisition before contacting Arm, Qualcomm asked that Arm respond with "any concerns" within five business days.  Arm denies the remaining allegations in this paragraph.

190.     In answer to paragraph 190, Arm admits that it responded to Qualcomm on February 2, 2021, stating it expected Qualcomm and Nuvia "have followed and will continue to follow the confidentiality obligations."  Arm admits that the letter stated "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent (such consent, among other terms, is customarily documented in a three-way agreement between Arm, transferor, and transferee) and a separate commercial agreement between Arm and Qualcomm."  Arm admits that it

stated it would "aim to get in touch" by February 17, 2021. Arm denies the remaining allegations in this paragraph.

191.    Arm admits the allegations in paragraph 191.

192.    In answer to the first sentence of paragraph 192, Arm admits that it did not provide Qualcomm a formal draft of the "three-way agreement," because Qualcomm rejected the substance of Arm's proposal for the transfer of the designs, rights, and licenses under Nuvia's agreements with Arm. The second and third sentences of this paragraph contain legal conclusions to which no response is required. To the extent that a response is required, Arm denies the remaining allegations in this paragraph.

193.    In answer to paragraph 193, Arm admits that it sent Qualcomm a letter dated February 16, 2021, with proposed terms to permit the transfer of Nuvia's designs to Qualcomm. Arm further repeats, re-alleges, and incorporates by reference its answer to paragraph 23 as if fully set forth herein. Arm denies the remaining allegations in this paragraph.

194.    Arm denies the allegations in paragraph 194, and denies the suggestion that Arm was somehow responsible for Qualcomm and Nuvia's failure to contact Arm as required by Nuvia's licenses until less than seven weeks before Qualcomm's closing on the planned $1.4 billion acquisition, even though Qualcomm had publicly announced the planned acquisition weeks earlier and, as discovery is likely to show, began its due diligence months earlier.

195.    In answer to paragraph 195, Arm admits that Qualcomm sent Arm a letter dated February 18, 2021, rejecting the terms proposed by Arm to facilitate the transfer of Nuvia's design to Qualcomm, offering no proposal of its own, and erroneously asserting the

quoted statement even though Nuvia could not transfer Arm-based technology developed under the Nuvia ALA—which was based on Arm technology delivered to Nuvia, subject to the Nuvia ALA license terms—and Qualcomm was licensed to use only technology created by Qualcomm engineers using the Arm technology delivered to Qualcomm, subject to the Qualcomm ALA license terms.  Arm admits that Qualcomm sent Arm a letter dated February 25, 2021 falsely asserting that there was no contractual support for the imposition of Nuvia's royalty rates on Qualcomm, when Qualcomm would share Nuvia's obligations under the Nuvia ALA in its capacity as Nuvia's acquirer and thus would be subject to Nuvia's royalty rates for any licensed activity under the Nuvia ALA.  Arm denies the remaining allegations in this paragraph.

196.    In answer to paragraph 196, Arm admits that Qualcomm's February 18, 2021 letter asserted that Arm's proposed confidentiality safeguards "would make it impossible to develop products incorporating both a CPU designed under the ALA and a CPU licensed under the TLA, which would have an adverse impact on both ARM and Qualcomm."  Arm admits that Qualcomm's February 25, 2021 letter asserted that "[t]his new 36 month restriction would only prevent product development and impede innovation."  Arm denies the remaining allegations in this paragraph.

197.    In answer to paragraph 197, Arm admits that Arm promptly informed Qualcomm on February 2, 2021, that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent," consistent with the Nuvia ALA's and TLA's assignment provisions and Qualcomm's prior experience acquiring other companies that had their own TLAs.  Arm denies the remaining allegations in this paragraph.

198.    Arm admits the allegations in paragraph 198.

199.    Arm admits the allegations in paragraph 199.

200.    The first sentence of paragraph 200 contains legal conclusions to which no response is required.  To the extent a response is required, Arm admits that Qualcomm has its own ALA and TLA, but Arm denies that anything in Qualcomm's licenses with Arm authorized Qualcomm's use of Arm-based technology developed under the Nuvia ALA based on Arm technology delivered to Nuvia, subject to the license of the Nuvia ALA, or displaced or amended in any way the obligations of the Nuvia ALA's assignment and termination provisions.  In answer to the second sentence of paragraph 200, Arm admits that Section 1.15 of Qualcomm's ALA and TLA define ███████ as ████████████  In answer to the third sentence of paragraph 202, Arm admits that Qualcomm's ALA and TLA define ███████ as ███████████████  ████████████████████████ ████████████████████ ███████  Arm denies the remaining allegations in this paragraph.

201.    In answer to the first sentence of paragraph 201, Arm admits that Qualcomm's ALA provides the right to design Arm-based cores, but denies the suggestion that the ALA provides the right to continue designing Arm-based cores obtained from third parties based on Arm technology delivered to third parties, subject to licenses in a different ALA.  In answer to the second sentence of this paragraph, Arm admits that Section B.1.1 of Annex 1 to Qualcomm's ALA licenses Qualcomm to ██████████ ██████████████████████████

████████████████████████████████████████

██████████████████████████████████ as set forth in Section B.1.1.

202.    Paragraph 202 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

203.    In answer to paragraph 203, Arm admits that on February 25, 2021, one-and-a-half months after publicly announcing its acquisition of Nuvia, Qualcomm requested that Arm consent to the assignment of Nuvia's license agreements with Arm by March 2, 2021, confirming Arm's consent was required, to authorize "the transfer of certain information . . . from NUVIA to Qualcomm."  Arm denies that Qualcomm's demand for Arm's consent, while rejecting the terms Arm had offered, represented an effort by Qualcomm to compromise, instead reflecting the express terms of the Nuvia ALA requiring consent to any assignment of the Nuvia ALA, including assignment via acquisition.

204.    In answer to paragraph 204, Arm admits that it sent Qualcomm a letter dated March 2, 2021.  Arm denies the remaining allegations in this paragraph.

205.    In answer to paragraph 205, Arm admits that Qualcomm rejected Arm's proposal for consenting to Qualcomm's acquisition of Nuvia's Arm-based designs and made no counteroffer, but Qualcomm nevertheless proceeded with the acquisition as scheduled on or around March 16, 2021 without Arm's consent.

206.    In answer to paragraph 206, Arm admits that, before Arm sent its February 1, 2022 letter terminating the Nuvia ALA, Arm and Qualcomm discussed the assignment dispute from January 27, 2021, when Qualcomm first brought the issue to Arm's attention, through at least October 18, 2021.  Arm denies that it went silent in September 2021; even though Qualcomm did not respond to or otherwise acknowledge Arm's August

31, 2021 proposal prior to its expiration, Arm nonetheless followed up on October 18, 2021, requesting that Qualcomm put forward a proposal for Arm to consider, and Qualcomm failed to do so. Arm denies the remaining allegations in this paragraph.

207. In answer to paragraph 207, Arm admits that, as discovery is likely to show, and as the Counterclaim admits, Qualcomm continued developing the Arm Technology and using the Arm Confidential Information that had been developed by engineers at Nuvia before the acquisition and Qualcomm's improper transfer. Arm lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

208. In answer to paragraph 208, Arm admits, as discovery is likely to show, that Qualcomm continued to develop Nuvia's Phoenix core and Server SoC. Arm lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in paragraph 208 and on that basis denies them.

209. Arm lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 209 and on that basis denies them.

210. In answer to paragraph 210, Arm admits that in 2021 and 2022—before the Nuvia ALA's termination—Arm provided support to the Nuvia team under the Nuvia ALA. Arm denies any suggestion that this support waived Arm's rights, prejudiced Qualcomm, or otherwise constituted an acknowledgment of or conferred on Qualcomm any rights to technology developed under the Nuvia ALA, since Qualcomm agreed in March 2021 to Arm's condition that "such interaction and/or assistance does not expressly or impliedly waive any of Arm's rights with respect to the novation." Arm denies the remaining allegations in this paragraph.

211.    In answer to paragraph 211, Arm admits that shortly after Qualcomm acquired Nuvia—i.e., before the Nuvia ALA was terminated—Arm engineers began having weekly discussions with Qualcomm's Nuvia team members related to verification testing of the Phoenix core in reliance on Qualcomm's statement that Arm's assistance to Qualcomm would not waive any of Arm's rights.  Arm denies the remaining allegations in this paragraph.

212.    In answer to paragraph 212, Arm admits that its engineers had discussions with Nuvia team members following Qualcomm's acquisition of Nuvia in reliance on Qualcomm's statement that Arm's assistance to Qualcomm would not waive any of Arm's rights.  Arm denies the remaining allegations in this paragraph.

213.    In answer to paragraph 213, Arm admits that it has licensed technology to Qualcomm, unrelated to Qualcomm's development of the relevant Nuvia technology, for which Qualcomm does not have an applicable license, and Qualcomm has paid Arm for those licenses, since March 16, 2021.

214.    Arm admits the first, second, and third sentences of paragraph 214.  Arm admits that Qualcomm has paid for the licenses described in the first three sentences of paragraph 214 and other licenses Arm granted Qualcomm.

215.    In answer to paragraph 215, Arm admits that in or around late 2021—i.e., before the Nuvia ALA's termination—Arm engineers continued having weekly discussions with Qualcomm's Nuvia team members related to verification testing of the Phoenix core in reliance on Qualcomm's statement that Arm's assistance to Qualcomm would not waive any of Arm's rights.  Arm denies the remaining allegations in this paragraph.

216.    In answer to paragraph 216, Arm admits that in 2021, Qualcomm's Nuvia team submitted an interim compliance report to Arm for the Phoenix core.  Arm admits that the Arm Architecture Reference Manual that was publicly available on Arm's website in December 2021 included version ██.  Arm admits that Qualcomm was licensed to version ██ of the Arm architecture, but denies that Qualcomm's ALA licensed the Nuvia team's Server SoC, which was developed under Nuvia's ALA.  Arm denies the remaining allegations in this paragraph.

217.    In answer to paragraph 217, Arm repeats, re-alleges, and incorporates by reference its answers to paragraphs 31-40 as if fully set forth herein.  Arm admits that it sent a letter dated February 1, 2022 to Nuvia's representative (Gerard Williams III, the former CEO of Nuvia) and a Qualcomm representative terminating the Nuvia licenses for material breach, effective March 1.  Arm lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

218.    Arm admits the allegations in the first sentence of paragraph 218.  Arm admits that its February 2022 letter stated that Nuvia "also violated the confidentiality provisions under Section 3.1 of the Agreements and made unlicensed use of Arm's confidential information in violation of Section 3.8 of the Agreements."  Arm denies the remaining allegations in this paragraph.

219.    Paragraph 219 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph, as the Qualcomm ALA expressly excludes a license to ███████████ such as Nuvia's implementation of Arm architecture—██████████████████████████ ████████████████████████████████ and the

Nuvia ALA required the ███████████████████ before Nuvia could ████████

███████████████████████████████████ with the Nuvia

ALA deeming an assignment to include ████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████

220.    Paragraph 220 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

221.    Paragraph 221 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

222.    Paragraph 222 contains legal conclusions to which no response is required. To the extent a response is required, Arm admits that the Phoenix core and Server SoC embodied and were derived from version ███ of the Arm architecture.  Arm denies the remaining allegations in this paragraph.

223.    Paragraph 223 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

224.    In answer to paragraph 224, Arm admits that termination of the Nuvia agreements was effective March 1, 2022.  Arm lacks sufficient knowledge or information regarding the timing of Qualcomm's unauthorized development work on the Phoenix core for its Server SoC to form a belief about the truth of these allegations and on that basis denies them.  Arm denies the remaining allegations in this paragraph.

225.    Arm admits the allegations in paragraph 225.

226.    In answer to the first sentence of paragraph 226, Arm admits that it made the quoted statement in Arm's February 1, 2022 termination letter, to which Arm refers for a complete statement of its contents, but denies that this statement was wrong; Qualcomm acquired Nuvia even though the Nuvia ALA required Arm's consent prior to any assignment of the Nuvia ALA, which the ALA defined to include any other company's acquisition of Nuvia, and Arm did not consent to the assignment.  Arm admits the allegations in the second sentence of this paragraph.

227.    In answer to paragraph 227, Arm admits that its February 1, 2022 letter stated "termination" would be "effective as of March 1, 2022," and reminded Nuvia of its obligation to destroy or return Arm Confidential Information within one month of termination.  Arm denies the remaining allegations in this paragraph.

228.    Paragraph 228 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

229.    Paragraph 229 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

230.    Arm denies the allegations in paragraph 230.

231.    Arm lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 231 and on that basis denies them.

232.    Arm lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 232 and on that basis denies them.

233.    In answer to paragraph 233, Arm admits that on April 1, 2022, Nuvia provided Arm a certification purporting to certify that "Nuvia is in compliance with its obligations under Section 15.1" of the Nuvia ALA, even though Nuvia now admits that it

did not comply with its obligation to stop using and destroy the relevant Nuvia technology. Arm denies that it never certified its own compliance with the termination provisions; instead, Arm certified its own compliance with the Nuvia ALA and TLA's termination provisions on April 1, 2022, with the certification sent to Nuvia in the manner specified by the Nuvia agreements. Arm denies the remaining allegations in this paragraph.

234. Arm admits the allegations in the second sentence of paragraph 234. Arm denies the remaining allegations in this paragraph.

235. Paragraph 235 contains legal conclusions to which no response is required. To the extent a response is required, Arm admits that the Nuvia ALA requires upon termination that █████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ ████████████████████████████████ ███████████████████████ Arm denies that Qualcomm can tortiously interfere with the Nuvia ALA (by assigning the Nuvia ALA to Qualcomm via the acquisition without the requisite consent from Arm), obtain the benefits of the Nuvia ALA and the technology Nuvia developed under that ALA, and then circumvent the requirements of the Nuvia ALA's termination provision by purporting to limit those obligations to Nuvia alone, ignoring that the discontinuance and destruction obligations expressly extend not only to

Arm Confidential Information, but also to products embodying Arm technology and derivatives of Arm technology under Nuvia's ALA.  Arm admits that Qualcomm's ALA grants licenses to use Arm Confidential Information and Arm Technology delivered to Qualcomm, subject to the terms of Qualcomm's ALA as those terms are defined in the Qualcomm ALA, but expressly excludes a license to any other Arm technology, and limits design and manufacture rights to Arm Technology developed by Qualcomm under the Qualcomm ALA, and subject to the license terms of the Qualcomm ALA.  Arm denies the remaining allegations in this paragraph.

236.     Arm admits the allegations in the first sentence of paragraph 236.  The second sentence of this paragraph contains legal conclusions to which no response is required.  To the extent a response is required, Arm denies the remaining allegations in this paragraph.

237.     In answer to paragraph 237, Arm admits that it sent Qualcomm a letter dated August 2, 2022, noting that "[i]n March, Qualcomm and NuVia accepted the termination," and then stating: "after termination, Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the NuVia technology."  Arm denies that its reference to "the NuVia technology" meant Qualcomm could not use "*any*" Nuvia technology; Arm lacks sufficient knowledge or information to form a belief about whether Nuvia has intellectual property, proprietary designs, or confidential information that is not based on, derivative of, or embodying Arm technology delivered by Arm under the Nuvia ALA, and on that basis denies this allegation.  In answer to the fifth and sixth sentences of this paragraph, Arm admits that it made the quoted statement in Arm's August 2, 2022 letter, to which Arm refers for a complete statement of its contents.  Arm denies the remaining allegations in this paragraph.

238.    Paragraph 238 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies that ownership of the CPU or SoC designs of licensees is required for Arm to demand compliance with its licenses' termination provisions.  Arm denies the allegations in this paragraph.

239.    Paragraph 239 contains legal conclusions to which no response is required. To the extent a response is required, Arm:

a. denies sub-paragraph (a) because Section 16.3 of the Nuvia ALA required ███

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ and because Section 2.6 of the Qualcomm ALA expressly excludes from Qualcomm's license ███████████

███████████████████████████████████████████████

████████████████████████████████ ;

b. denies sub-paragraph (b) because Section 16.3 of the Nuvia ALA, as noted above, required ███████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████ and

because Section 2.6 of the Qualcomm ALA expressly excludes from Qualcomm's

license █████████████████████████████████████████████

███████████████████████████████████████████████████;

c. denies sub-paragraph (c) because Section 15.1 of the Nuvia ALA required ████

██████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████ and because Section 2.6 of the Qualcomm ALA expressly

excludes from Qualcomm's license ████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████;

d. denies sub-paragraph (d) because Section 15.1 of the Nuvia ALA required ████

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████;

e. denies sub-paragraph (e) because Section 16.3 of the Nuvia ALA required 

f. denies sub-paragraph (f) because Section 2.8 of the Nuvia ALA states

g. denies sub-paragraph (g) because Section 15.1 of the Nuvia ALA required

and because Section 2.6 of the Qualcomm ALA expressly

excludes from Qualcomm's license ██████████████████████

███████████████████████████████████████████████████

██████████████████

240.    Arm denies the allegations in paragraph 240.

241.    In answer to paragraph 241, Arm admits that it issued a Compliance Waiver dated April 12, 2022 stating: "This compliance waiver forms the acceptance from Arm that Qualcomm Global Trading Pte Ltd has validated their CPU Core in accordance with the Verification requirements set out in the Architecture agreement."  Arm denies any suggestion that this document waived Arm's rights, prejudiced Qualcomm, or otherwise constituted an acknowledgment of or conferred on Qualcomm any rights to technology developed under the Nuvia ALA, since Qualcomm agreed in March 2021 to Arm's condition that "such interaction and/or assistance does not expressly or impliedly waive any of Arm's rights with respect to the novation," and the Compliance Waiver was issued under the implementer ID corresponding with Nuvia's ALA rather than Qualcomm's ALA.  Arm denies the remaining allegations in this paragraph.

242.    Arm denies the allegations in paragraph 242.

243.    Arm denies the allegations in paragraph 243.

244.    Arm denies the allegations in paragraph 244.

245.    Arm denies the allegations in paragraph 245.

246.    Arm denies the allegations in paragraph 246.

247.    Arm denies the allegations in paragraph 247.

248.    Arm denies the allegations in paragraph 248.

249.    Paragraph 249 contains legal conclusions to which no response is required. To the extent a response is required, the agreements referenced in this paragraph and the contents thereof speak for themselves.

250.    Paragraph 250 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph because, among other things, Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology.

251.    Paragraph 251 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

252.    Arm denies the allegations in paragraph 252.

253.    Arm denies the allegations in paragraph 253.

254.    Arm denies the allegations in paragraph 254.

255.    In answer to paragraph 255, Defendants appear to be quoting a September 13, 2020 NVIDIA press release regarding its planned acquisition of Arm, the contents of which speak for themselves.  Arm admits that NVIDIA's planned acquisition of Arm led to antitrust regulatory challenges and opposition from Qualcomm, which reportedly sought to invest in Arm itself.[4]  Arm admits that on February 7, 2022, Arm and NVIDIA announced that the acquisition would be terminated.  Arm denies the remaining allegations in this paragraph.

---

[4] *See, e.g.*, Anna Gross & Tim Bradshaw, *Qualcomm wants to buy a stake in Arm alongside its rivals*, Financial Times (May 30, 2022), https://www.ft.com/content/eab1d19d-ab4c-45b7-88b4-f1f5e115d16e.

256.     In answer to paragraph 256, Arm admits that it sent a letter to Nuvia dated February 1, 2022, stating "Arm intends to terminate" both the TLA and ALA "for material breach" and requesting immediate discontinuation and destruction of "all Arm Technology, Arm Confidential Information and any products embodying such technology or information."  Arm denies the remaining allegations in this paragraph.

257.     Arm denies the allegations in paragraph 257.

## COUNTERCLAIM
### (Declaratory Judgment)

258.     In answer to paragraph 258, Arm repeats, re-alleges, and incorporates by reference its answers to paragraphs 1-47 and 175-257 as if fully set forth herein.

259.     In answer to paragraph 259, Arm:

a. denies sub-paragraph (a) because Defendants breached the Nuvia licenses by assigning the licenses to Qualcomm without Arm's consent and failing to comply with the termination provisions requiring discontinuance and destruction of the relevant Nuvia technology, as explained in the Complaint and in paragraphs 219 and 235 above, which Arm expressly incorporates herein;

b. denies sub-paragraph (b) because after Qualcomm's acquisition of Nuvia, Qualcomm's architected cores (including all further developments, iterations, or instantiations of the relevant technology that Qualcomm acquired from Nuvia), Server SoC, and Compute SoC are not fully licensed under Qualcomm's ALA or TLA; instead, they must be discontinued and destroyed (as explained in the Complaint and above, including Arm's answers to paragraphs 5 and 235, which Arm expressly incorporates herein), and are not licensed under Qualcomm's ALA or TLA, with those licenses instead expressly excluding any license to other Arm-based

technology, such as Nuvia's implementation of Arm architecture (as explained above, including in Arm's answer to paragraph 3, which Arm expressly incorporates herein);

c. denies sub-paragraph (c), including because Qualcomm is breaching its ALA by improperly seeking to use the Qualcomm ALA to continue development of the relevant Nuvia technology, entitling Arm to terminate that ALA based on Qualcomm's material breaches (as explained below in Arm's First Defense, which Arm expressly incorporates herein);

d. denies sub-paragraph (d), including because Arm is entitled to terminate Qualcomm's ALA based on Qualcomm's material breaches of the verification, delivery, and support and maintenance provisions, as well as the covenant of good faith and fair dealing (as explained below in Arm's First Defense, which Arm expressly incorporates herein); and

e. denies sub-paragraph (e) because Qualcomm has no right to develop, let alone ship, products based on unlicensed Nuvia technology and is breaching its ALA by seeking to do so (as explained below in Arm's First Defense, which Arm expressly incorporates herein).

260.    In answer to paragraph 260, Arm denies that Qualcomm can continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA, the Qualcomm TLA, the Nuvia ALA, or the Nuvia TLA, including because the relevant Nuvia technology is subject to destruction under the termination provisions of Nuvia's ALA (as explained in the Complaint and above, including Arm's answers to paragraphs 5 and 235, which Arm expressly incorporates herein), Qualcomm products

incorporating the same are not licensed under Qualcomm's ALA or TLA (as explained above, including in Arm's answer to paragraph 3, which Arm expressly incorporates herein), and Qualcomm is violating its ALA by seeking to continue its improper development of the unlicensed Nuvia technology via the Qualcomm ALA's provisions and procedures, even though the Qualcomm ALA does not apply to the Nuvia technology, which is based on Arm technology delivered under the now-terminated Nuvia ALA (as explained below in Arm's First Defense, which Arm expressly incorporates herein).

261.    In answer to paragraph 261, Arm denies the allegations in this paragraph, including because Arm is not preventing Qualcomm from exercising its rights under its license agreements with Arm; instead, Arm has no obligations under the Qualcomm ALA to provide verification, delivery, or support and maintenance for Qualcomm's improper attempts to continue development of unlicensed Nuvia technology developed under the now-terminated Nuvia ALA (as explained below in Arm's First Defense, which Arm expressly incorporates herein).

262.    Defendants' Prayer for Relief contains legal conclusions to which no response is required.  To the extent that a response is required, Arm denies that Defendants are entitled to any of the relief they seek in their prayer for relief, including because Defendants may not use a claim for declaratory judgment to obtain an order "enjoining" Arm or "requiring" Arm to do anything, let alone obtain an injunction imposing an impermissible prior restraint on hypothetical speech.

## **AFFIRMATIVE DEFENSES**

Without admitting or acknowledging that it bears the burden of proof as to any of them, Arm asserts the following affirmative and other defenses and reserves the right to amend its Answer as additional information becomes available.

## **FIRST DEFENSE**
## **(Failure to State a Claim)**

Defendants' Counterclaim fails to state a claim upon which relief can be granted.

Qualcomm's allegations that the relevant Nuvia technology is licensed under Qualcomm's ALA fail because the license granted under the Qualcomm ALA in Section 2.0, as clarified by Section 2.6, is limited to expressly defined ███████████ delivered by Arm to Qualcomm under the Qualcomm ALA, and expressly excludes a license to any other Arm technology, like the Nuvia technology based on Arm technology delivered by Arm to Nuvia under the now-terminated Nuvia ALA.

Qualcomm's allegations that it is exercising its rights with respect to the relevant Nuvia technology under Qualcomm's license agreements with Arm and is not in violation of those agreements fail because Arm has no such obligations with respect to the Nuvia technology, and Qualcomm is breaching the Qualcomm ALA by insisting otherwise. Under the Qualcomm ALA, Arm has no obligation to provide, and Qualcomm has no right to seek, verification, delivery, or support and maintenance in connection with technology developed under the now-terminated Nuvia ALA. The "verification" provisions of Section 4 of the Qualcomm ALA are limited to products manufactured ██████████████████ in the ALA. The delivery (Section 5) and support and maintenance (Section 7) obligations of the Qualcomm ALA are similarly limited to the defined █████████████ and therefore likewise do not extend to the relevant Nuvia technology, which embodies and was derived

from Arm technology delivered by Arm to Nuvia under Nuvia's now-terminated ALA. Qualcomm's unreasonable, bad-faith demands that Arm comply with purported obligations for verification, delivery, and support and maintenance with respect to technology delivered and developed outside the scope of the Qualcomm ALA are contrary to the parties' expectations and undermines the benefit to Arm from the Qualcomm ALA, thereby materially breaching that agreement's terms and implied covenant of good faith and fair dealing and entitling Arm to terminate the Qualcomm ALA under Section 14.2.

## SECOND DEFENSE
### (Waiver/Estoppel/Acquiescence)

Defendants' Counterclaim and affirmative defenses are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or acquiescence. Defendants have not previously contested Arm's termination of the Nuvia agreements. Nor have Defendants previously objected to Arm's own compliance with and certification under Section 15.1 of the Nuvia ALA. Further, Defendants represented that both Nuvia and Qualcomm were in compliance with Section 15.1.

## THIRD DEFENSE
### (Unclean Hands)

Defendants' Counterclaim and affirmative defenses are barred, in whole or in part, by the equitable doctrine of unclean hands. Qualcomm tortiously induced Nuvia to breach the Nuvia ALA by acquiring Nuvia's license rights to its implementation of Arm technology without Arm's consent in violation of the Nuvia ALA's assignment provision, thereby materially breaching the Nuvia ALA. Qualcomm continues to attempt to benefit from its improper acquisition of Nuvia's license rights to its implementation of Arm technology by wrongly insisting that the unlicensed Nuvia technology is licensed under the Qualcomm

ALA and by seeking to enforce obligations for verification, delivery, and support and maintenance that apply only to technology based on defined ███████████ delivered by Arm to Qualcomm under the Qualcomm ALA, subject to its license terms, unlike the Nuvia technology based on Arm technology delivered by Arm to Nuvia under the now-terminated Nuvia ALA, subject to its license terms.  Qualcomm has acted in bad faith by seeking to reap the benefits from the Nuvia ALA, transferring technology developed under the Nuvia ALA to Qualcomm and combining Nuvia and Qualcomm workstreams, while avoiding the Nuvia ALA's obligations.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Arm hereby demands a TRIAL BY JURY of all claims and issues presented in Defendants' Counterclaim that are so triable.

Dated: November 15, 2022

OF COUNSEL:

Michael A. Jacobs
Joyce Liou
Diek Van Nort
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
mjacobs@mofo.com
jliou@mofo.com
dvannort@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

_Anne Shea Gaza_

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

44

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 15, 2022, a copy of the foregoing

document was served on the persons listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com


YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,

Plaintiff,

v.

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation, and NUVIA, INC., a
Delaware corporation,

Defendants.

C.A. No. 22-1146-MN

REDACTED - PUBLIC VERSION
(Filed March 20, 2024)

## PLAINTIFF'S LETTER TO THE HONORABLE LAURA D. HATCHER
## REGARDING REDACTIONS TO THE MARCH 6, 2024 MEMORANDUM ORDER

OF COUNSEL:

Daralyn J. Durie
Joyce Liou
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
jliou@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-1500
sllewellyn@mofo.com

Dated:  March 13, 2024

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

Dear Judge Hatcher:

Arm submits this letter in response to the Court's March 6, 2024 Memorandum Order ("Order") instructing the parties to advise the Court whether they wish for any portions of the Order to remain under seal. (D.I. 295.) Arm seeks to redact certain information in the Order relating to Arm's Architecture License Agreements ("ALAs") with Qualcomm and Nuvia and Arm's Technology License Agreement ("TLA") with Nuvia. Arm has proposed a small number of narrow redactions highlighted in Exhibit A, which redact only specific confidential, non-public, and commercially sensitive competitive information. A proposed public version of the Order with redactions applied is attached hereto as Exhibit B. Arm requests that the Court maintain the highlighted portions of the Order in Exhibit A under seal, and that the redacted version of the Order in Exhibit B be placed on the public docket.

The parties have met and conferred, and counsel for Defendants Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc. (collectively, "Defendants") have advised Arm that they do not oppose Arm's redactions.

The public's access to judicial records is "not absolute." *Nixon v. Warner Comms., Inc.*, 435 U.S. 589, 598 (1978); *see also In re Avandia Mktg., Sales Practices and Products Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). A party may overcome the presumption of access to judicial records by showing "that the material [proposed to be redacted] is the kind of information that courts will protect," that "disclosure will work a clearly defined and serious injury to the party seeking closure," and that "the interest in secrecy outweighs the presumption [of public access]." *In re Avandia*, 924 F.3d at 672 (quotations and citations omitted). The Court may exercise inherent supervisory power to deny access to judicial proceedings and records, for example, "where they are sources of business information that might harm a litigant's competitive standing." *Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988).

The presumption of public access to Arm's redactions to the Order is rebutted here because the redactions concern confidential, non-public, and proprietary information relating to Arm's license agreements. As set forth in the accompanying Declaration of Robert Calico ("Calico Declaration"), Arm's redactions are to non-public information concerning Arm's confidential ALA with Qualcomm, and Arm's confidential ALA and TLA with Nuvia. (Calico Declaration at ¶¶ 3, 4.) Pages three to five of the Order refer to a specific provision in Qualcomm's ALA that concerns rights specific to Qualcomm, including a direct quote of that provision in the ALA. (*Id.* at ¶ 4.) Page three, as well as pages five to nine, of the Order, refer to a provision in both the Nuvia ALA and Nuvia TLA that concerns rights specific to Nuvia. (*Id.*) Pages five, seven, and eight include direct quotes of that provision in the Nuvia ALA and TLA. (*Id.*) Public disclosure of the terms of Arm's ALA with Qualcomm and Arm's ALA and TLA with Nuvia could cause competitive harm to Arm by providing information about the specific terms of these licenses to Arm's other TLA and ALA partners that they would otherwise not know, putting Arm at a disadvantage in subsequent licensing negotiations. (*Id.*) Public disclosure of the specific provisions in Arm's ALAs and TLA could also allow Arm's actual or potential competitors to use this information to gain a competitive advantage by knowing how Arm structures or organizes its license agreements. (*Id.*)

Information relating to Arm's license agreements is the kind of sensitive information that courts will protect. A movant's interest in the secrecy of confidential, non-public licensing information outweighs the presumption of public access. *See, e.g., Mosaid Technologies Inc. v. LSI Corp.*, 878 F.Supp.2d 503, 510 (D. Del. 2012) (permitting redaction of information regarding licensing agreements between the parties and market share information).

Arm respectfully requests that the Court maintain the highlighted portions of the Order in Exhibit A under seal, and that the redacted version of the Order in Exhibit B be placed on the public docket.

Dated: March 13, 2024

OF COUNSEL:

Daralyn J. Durie
Joyce Liou
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
jliou@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-1500
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# Exhibit A

# SEALED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD.,

                    Plaintiff,

          v.                                    C.A. No. 22-1146 (MN)

QUALCOMM INC., QUALCOMM                          **FILED UNDER SEAL**
TECHNOLOGIES, INC. and NUVIA, INC.,

                    Defendants.

## MEMORANDUM ORDER

Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively, "Qualcomm")

and Nuvia, Inc. ("Nuvia", and together with Qualcomm, "Defendants") seek leave to amend their

answer and counterclaims. (D.I. 260, the "Motion"). The Motion has been briefed (D.I. 272,

278) and I held argument on March 5, 2024 ("Tr. ___"). For the following reasons, the Motion is

GRANTED-IN-PART and DENIED-IN-PART.

### I.    BACKGROUND

Plaintiff Arm Ltd. ("Arm") entered into various Technology License Agreements

("TLA") and Architecture License Agreements ("ALA") with Nuvia and Qualcomm. (D.I. 1,

18). Qualcomm acquired Nuvia in January 2021. (D.I. 18 ¶ 9). As a result of the acquisition,

Arm terminated its ALA and TLA with Nuvia and demanded that Nuvia cease using and destroy

any technology developed under the Nuvia ALA. (D.I. 1 ¶¶ 28, 39, 62). On August 31, 2022,

Arm filed this action against Defendants alleging that Defendants breached the Nuvia ALA by

FILED

MAR - 6 2024

U.S. DISTRICT COURT DISTRICT OF DELAWARE

improperly continuing to use and develop Nuvia technology. (D.I. 1 ¶¶ 58-69).[1] On September 30, 2022, Defendants answered and counterclaimed, seeking a declaration that Nuvia did not breach the ALA and TLA with Arm, and that Nuvia, as a Qualcomm subsidiary, was licensed to Arm's technology under Qualcomm's ALA and TLA with Arm. (D.I. 12). Defendants later amended their counterclaim on October 26, 2022. (D.I. 18).

Under the operative Scheduling Order and its amendments, the deadline to amend pleadings was April 28, 2023. (D.I. 26 ¶ 2). Fact discovery closed on November 17, 2023. (D.I. 87). Dispositive motions are due on April 22, 2024 (*Id.*), and a five-day trial is scheduled for September 23, 2024. (D.I. 26 ¶ 14).

On January 23, 2024, Defendants moved to extend the case schedule and reschedule trial to December 9, 2024, arguing that their lead trial counsel have a conflict (D.I. 262, 273), that they need more time to depose expert witnesses, and that the counterclaims they seek to assert via the instant Motion will require supplemental discovery. (D.I. 254).[2] Defendants then filed the instant Motion seeking leave to amend on February 5, 2024. (D.I. 260).

## II.    LEGAL STANDARD

When seeking leave to amend after the deadline in a scheduling order, "[a] schedule may be modified only for good cause and with the judge's consent." *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, C.A. No. 17-1612-MN-CJB, 2022 WL 855518, at *2 (D. Del. Mar. 23, 2022) (quoting Fed. R. Civ. P. 16(b)(4)). "The good cause element requires the movant to demonstrate that, despite diligence, the proposed claims could not have been reasonably sought in a timely manner." *Roquette Freres v. SPI Pharma, Inc.*, C.A. No. 06-540-GMS, 2009 WL 1444835, at *4

---

[1]     Arm asserts breach of contract, trademark infringement, and false designation of origin claims. (D.I. 1 at 16-28).

[2]     Defendants' motion to extend the case schedule is pending before the Court.

(D. Del. May 21, 2009). "Courts have found that good cause is not shown when a party was aware of the facts that would lead it to amend and failed to act on [them]." *Glaxosmithkline LLC v. Glenmark Pharms. Inc.*, C.A. No. 14-877-LPS-CJB, 2016 WL 7319670, at *1 (D. Del. Dec. 15, 2016). "A party must meet [Rule 16(b)'s] standard before a district court considers whether the party also meets Rule 15(a)'s more liberal standard." *Premier Comp Sols. v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020).

Rule 15(a)(2) states that, apart from amendments as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Third Circuit has instructed that "absent undue or substantial prejudice, an amendment should be allowed under Rule 15(a) unless denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment." *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) (internal citation and quotation marks omitted).

## III. DISCUSSION

Defendants argue that they have satisfied Rule 16(b)(4) and Rule 15(a)(2) to assert counterclaims arising from Arm's alleged breach of ▮▮▮▮ of the Qualcomm ALA (Count II) and ▮▮▮▮ of the Nuvia ALA and Nuvia TLA (Counts III and IV). I disagree with respect to Defendants' ▮▮▮▮ counterclaim, but agree with respect to one aspect of their ▮▮▮▮ counterclaims.

### A. Defendants' ▮▮▮▮ Counterclaim under the Qualcomm ALA

▮▮▮▮ of the Qualcomm ALA provides that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3

███████ (D.I. 272, Ex. 10 at 11).

Defendants maintain they first became aware of Arm's purported violation on November 2, 2023 after Arm produced a document describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ("ACK") tests known as the "OOB." (D.I. 272 at 2). Defendants also explain that on December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK "patches." (*Id.*). According to Defendants, "[i]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of ███████ of the Qualcomm ALA." (*Id.*).

The facts show otherwise. Mr. Agrawal's testimony appears to corroborate a theory of liability that was evident to Defendants in late 2022—well before the April 28, 2023 deadline to amend. Defendants' own proposed amendment pleads that "Qualcomm first discovered that ARM was withholding ARM Technology under the Qualcomm ALA in the fall of 2022." (D.I. 272, Ex. 1 ¶ 274). Indeed, when Defendants requested the OOB and various patches from Arm on October 6, 2022, Mr. Agrawal responded on October 10, 2022, acknowledged the existence of the patches and wrote, "I'll be able to share OOB and patches after my management has given their approval." (D.I. 278, Ex. 4). On October 13, 2022, Mr. Agrawal explained to Arm that "Qualcomm's general counsel wrote to Arm's general counsel regarding the topic of support, maintenance, validation and verification" and that "Arm's legal department will be responding accordingly." (*Id.*). On November 3, 2022 and December 5, 2022, Qualcomm notified Arm that Arm's "failure to provide certain deliverables, including the OOB" rendered Arm "not in compliance with its obligations under ███████ (D.I. 278, Ex. 6 at 3). On December 6, 2022,

4

Arm confirmed that it would not provide the OOB for Qualcomm's unlicensed products. (D.I. 278, Ex. 5 at 1, Ex. 6 at 3).

Thus, because Defendants knew that Arm failed to provide support as of the "fall of 2022" (D.I. 272, Ex. 1 ¶ 274), Defendants possessed sufficient information to assert their ████ ██ counterclaim before the April 28, 2023 deadline for amendments.  Because they did not act diligently in seeking amendment, Defendants cannot show good cause under Rule 16(b)(4).  I therefore do not need to determine whether Defendants satisfy Rule 15(a).  *Premier Comp Sols. v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020).

**B.  Defendants'** ████████████ **Counterclaims Under the Nuvia ALA and Nuvia TLA**

████████████ of both the Nuvia ALA and the Nuvia TLA provide:



(D.I. 272, Ex. 7 at 14, Ex. 8 at 12).

Defendants maintain that they became aware of Arm's purported ████████████ violation on December 7, 2023 when Arm engineer Mark Werkheiser testified that he never destroyed Nuvia confidential information and that Arm incorporated certain Nuvia confidential information "into a product ARM is currently marketing to third parties." (D.I. 272 at 1 (citing D.I. 272, Ex. 4 at 52:4-54:17; 55:18-56:20; 60:22-25).  Defendants also explain that Mr. Agrawal testified at his December 14, 2023 deposition that he had possession of Nuvia confidential information in January 2023.  (D.I. 272, Ex. 5 at 95:22-99:8).

5

With respect to Arm's alleged failure to either "destroy or return" Nuvia confidential information, that theory of liability was evident to Defendants in 2022. In a letter dated April 29, 2022, Arm told Qualcomm that it would "quarantin[e]" rather than return or destroy Nuvia confidential information. (D.I. 272, Ex. 9) ("[W]e understand both Qualcomm and NuVia . . . will comply with the termination provisions of the relevant agreements (with the exception of quarantining Arm confidential information, as defined by the relevant agreements, rather than returning or destroying it) . . . Given [Defendants'] position that unspecified preservation obligations preclude returning or destroying Arm confidential information (as defined by the relevant agreements), Arm will proceed similarly with respect to any Nuvia confidential information (as defined) in its possession."). Thus, as of April of 2022, Qualcomm knew that Arm was not going to return or destroy the Nuvia confidential information.

With respect to Arm's alleged failure to provide the certification required by ▮▮▮▮▮ ▮▮▮▮ Defendants were aware of that claim at least as of October 2022 when they asserted in their amended counterclaim that "Arm never certified its own compliance with the termination provisions, in violation of the Nuvia agreements." (D.I. 18 at 73 n. 31). Thus, Arm's pre-deadline representation that it was neither returning nor destroying Nuvia confidential information coupled with Defendants' acknowledgement that Arm was in breach demonstrate that Defendants could have asserted a plausible ▮▮▮▮▮▮ claim prior to the amendment deadline. *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, C.A. No. 17-1612-MN-CJB, 2022 WL 855518, at *3 (D. Del. Mar. 23, 2022) (evaluating good cause by explaining that "the question here is only whether Defendants would have had a plausible claim prior to the amendment deadline").

With respect to Arm's alleged failure to "███████████████████" of Nuvia's confidential information as required by ███████████ however, this aspect of Defendants' claim is based on information learned in December 2023. Mr. Werkheiser's December 2023 deposition testimony suggesting that Arm's allegedly improper use did not actually cease (D.I. 272 at 2 (citing D.I. 272, Ex. 4 at 52:4-54:17; 55:18-56:20; 60:22-25)) departs from both Arm's April 2022 letter representation that it would "quarantine" Nuvia's confidential information and the assertion in Arm's November 15, 2022 Answer that it was in full compliance with the requirements of the Nuvia ALA and TLA. (D.I. 23 ¶ 233) ("Arm denies that it never certified its own compliance with the termination provisions; instead, Arm certified its own compliance with the Nuvia ALA and TLA's termination provisions on April 1, 2022, with the certification sent to Nuvia in the manner specified by the Nuvia agreements."). I find there is a "meaningful difference" between Arm agreeing to quarantine confidential information and certifying to nonuse, on the one hand, and an Arm witness admitting to such use, on the other, sufficient to give rise to a new, previously unavailable claim. *See TC Tech. LLC v. Sprint Corp.*, C.A. No. 16-153-RGA, 2019 WL 529678, at *2 (D. Del. Feb. 11, 2019) (finding that new deposition testimony contradicting earlier-served interrogatory response supported finding good cause).

Arm argues that Defendants were nevertheless on "notice" of Arm's potential misuse of Nuvia's confidential information in April 2022 when Arm did not certify its compliance with ████████████ (Tr. 29:9-13) and did not agree to return or destroy Nuvia's confidential information (Tr. 32:1-6). Even if Arm's noncompliance with ███████████ certification, destruction, and return requirements were somehow probative of Arm's alleged misuse, I do not agree that notice of Arm's noncompliance on those issues forecloses Defendants' ability to demonstrate good cause on continued use, particularly in view of Defendants' diligence since

7

Mr. Werkheiser's deposition. *See Compagnie des Grands Hotels d'Afrique SA v. Starwood Cap.*
*Grp. Glob. I LLC*, C.A. No. 18-654-SB-SRF, 2021 WL 6883231, at \*5 (D. Del. Feb. 10, 2021)
(noting that possessing predicate agreements prior to amendment deadline "is not automatically
determinative of good cause"); *Heritage Handoff Holdings, LLC v. Fontanella*, C.A. No. 16-691-
RGA, 2018 WL 3580288, at \*1 (D. Del. July 25, 2018) (finding good cause to amend under Rule
16(b) despite the fact that the movant "possessed at least some of the relevant facts and
documents prior to the expiration of the deadline to amend" because the movant had "acted
diligently once he became aware of the issues underlying his proposed amendments"). After
obtaining Mr. Werkheiser's December 7, 2023 testimony, Defendants promptly contacted Arm
to meet and confer, which occurred on January 19, 2024, and raised this dispute with the Court
on January 22, 2024. *See, e.g.*, *Home Semiconductor Corp. v. Samsung Elecs. Co.*, C.A. No. 13-
2033-RGA, 2019 WL 2135858, at \*5 (D. Del. May 16, 2019) (finding diligence when a party
sought leave to amend within three months of learning new information). And Arm does not
point me to any other record evidence that would suggest Defendants could have claimed Arm
had not "⬛⬛⬛⬛⬛⬛⬛" of Nuvia's confidential information prior to the
amendment deadline. (D.I. 272, Ex. 7 at 14, Ex. 8 at 12). Thus, I conclude that good cause
exists for Defendants to amend their answer and counterclaims with respect to this aspect of
Arm's purported ⬛⬛⬛⬛ violation.

Under Rule 15(a), the court considers "(1) whether the amendment has been unduly
delayed; (2) whether the amendment would unfairly prejudice the non-moving party; (3) whether
the amendment is brought for some improper purpose; and (4) whether the amendment is futile."
*Truinject Corp. v. Galderma, S.A.*, C.A. No. 19-592-LPS-JLH, 2021 WL 4355570, at \*2 (D. Del.
Sept. 24, 2021). Defendants have has shown diligence, "which means [their] amendment has not

8

been unduly delayed." *International Construction Products LLC v. Caterpillar Inc.*, C.A. No. 15-108-RGA, 2018 WL 4611216, at *4 (D. Del. Sept. 26, 2018). Arm does not argue improper purpose or futility.

Arm maintains that Defendants' proposed amendments would prejudice Arm "given the alleged magnitude of Qualcomm's new counterclaims and the resulting delay to Arm's claim for equitable relief." (D.I. 278 at 3). Although the parties agree that additional discovery would be necessary to litigate Defendants' counterclaims, they dispute the magnitude of such discovery. (Tr. 13:10-14:7; 32:20-34:3). Arm seems to maintain that reopening discovery alone gives rise to sufficient prejudice to deny Defendants' amendment. (Tr. 35:13-17). But Arm has not articulated the specific prejudice it will incur with any particularity and Defendants offered adequate explanation for the delay. Instead, Arm's principal concern appears to be that discovery necessitated by Defendants' amendment would threaten the parties' September 2024 trial date. (Tr. 33:7-35:7). But whether to extend the case schedule and move trial to December 2024 is not before me. That motion remains pending before the Court. (D.I. 254).

In sum, after finding good cause and weighing the Rule 15(a) factors, I am persuaded that Defendants' motion to amend with respect to their ▮▮▮▮▮▮ counterclaim on use should be permitted.

## IV.   CONCLUSION

For the forgoing reasons, Defendants' Motion is GRANTED-IN-PART and DENIED-IN-PART.

In an abundance of caution, this Order has been filed under seal because the parties' briefs and exhibits pertaining to the Motion were filed under seal. Within seven (7) days of the issuance of this Order, the parties are directed to meet and confer on appropriate redactions and

advise the Court by letter whether they wish any portions of the Order to remain under seal. Any request that portions of the Order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the Order.

Dated: March 6, 2024

Laura D. Hatcher
United States Magistrate Judge

# Exhibit B

# SEALED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD.,

        Plaintiff,

v.

QUALCOMM INC., QUALCOMM
TECHNOLOGIES, INC. and NUVIA, INC.,

        Defendants.

C.A. No. 22-1146 (MN)

**FILED UNDER SEAL**

## MEMORANDUM ORDER

Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively, "Qualcomm")
and Nuvia, Inc. ("Nuvia", and together with Qualcomm, "Defendants") seek leave to amend their
answer and counterclaims. (D.I. 260, the "Motion"). The Motion has been briefed (D.I. 272,
278) and I held argument on March 5, 2024 ("Tr. ___"). For the following reasons, the Motion is
GRANTED-IN-PART and DENIED-IN-PART.

### I.     BACKGROUND

Plaintiff Arm Ltd. ("Arm") entered into various Technology License Agreements
("TLA") and Architecture License Agreements ("ALA") with Nuvia and Qualcomm. (D.I. 1,
18). Qualcomm acquired Nuvia in January 2021. (D.I. 18 ¶ 9). As a result of the acquisition,
Arm terminated its ALA and TLA with Nuvia and demanded that Nuvia cease using and destroy
any technology developed under the Nuvia ALA. (D.I. 1 ¶¶ 28, 39, 62). On August 31, 2022,
Arm filed this action against Defendants alleging that Defendants breached the Nuvia ALA by

FILED

MAR − 6 2024

U.S. DISTRICT COURT DISTRICT OF DELAWARE

improperly continuing to use and develop Nuvia technology.  (D.I. 1 ¶¶ 58-69).[1]  On September 30, 2022, Defendants answered and counterclaimed, seeking a declaration that Nuvia did not breach the ALA and TLA with Arm, and that Nuvia, as a Qualcomm subsidiary, was licensed to Arm's technology under Qualcomm's ALA and TLA with Arm.  (D.I. 12).  Defendants later amended their counterclaim on October 26, 2022.  (D.I. 18).

Under the operative Scheduling Order and its amendments, the deadline to amend pleadings was April 28, 2023.  (D.I. 26 ¶ 2).  Fact discovery closed on November 17, 2023.  (D.I. 87).  Dispositive motions are due on April 22, 2024 (*Id.*), and a five-day trial is scheduled for September 23, 2024.  (D.I. 26 ¶ 14).

On January 23, 2024, Defendants moved to extend the case schedule and reschedule trial to December 9, 2024, arguing that their lead trial counsel have a conflict (D.I. 262, 273), that they need more time to depose expert witnesses, and that the counterclaims they seek to assert via the instant Motion will require supplemental discovery.  (D.I. 254).[2]  Defendants then filed the instant Motion seeking leave to amend on February 5, 2024.  (D.I. 260).

## II.    LEGAL STANDARD

When seeking leave to amend after the deadline in a scheduling order, "[a] schedule may be modified only for good cause and with the judge's consent." *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, C.A. No. 17-1612-MN-CJB, 2022 WL 855518, at *2 (D. Del. Mar. 23, 2022) (quoting Fed. R. Civ. P. 16(b)(4)).  "The good cause element requires the movant to demonstrate that, despite diligence, the proposed claims could not have been reasonably sought in a timely manner." *Roquette Freres v. SPI Pharma, Inc.*, C.A. No. 06-540-GMS, 2009 WL 1444835, at *4

---

[1]    Arm asserts breach of contract, trademark infringement, and false designation of origin claims. (D.I. 1 at 16-28).

[2]    Defendants' motion to extend the case schedule is pending before the Court.

(D. Del. May 21, 2009). "Courts have found that good cause is not shown when a party was aware of the facts that would lead it to amend and failed to act on [them]." *Glaxosmithkline LLC v. Glenmark Pharms. Inc.*, C.A. No. 14-877-LPS-CJB, 2016 WL 7319670, at *1 (D. Del. Dec. 15, 2016). "A party must meet [Rule 16(b)'s] standard before a district court considers whether the party also meets Rule 15(a)'s more liberal standard." *Premier Comp Sols. v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020).

Rule 15(a)(2) states that, apart from amendments as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Third Circuit has instructed that "absent undue or substantial prejudice, an amendment should be allowed under Rule 15(a) unless denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment." *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) (internal citation and quotation marks omitted).

## III. DISCUSSION

Defendants argue that they have satisfied Rule 16(b)(4) and Rule 15(a)(2) to assert counterclaims arising from Arm's alleged breach of ▮▮▮▮▮ of the Qualcomm ALA (Count II) and ▮▮▮▮▮ of the Nuvia ALA and Nuvia TLA (Counts III and IV). I disagree with respect to Defendants' ▮▮▮▮▮ counterclaim, but agree with respect to one aspect of their ▮▮▮▮▮ counterclaims.

**A. Defendants' ▮▮▮▮▮ Counterclaim under the Qualcomm ALA**

▮▮▮▮▮ of the Qualcomm ALA provides that ▮▮▮▮▮



3

▮▮▮▮▮ (D.I. 272, Ex. 10 at 11).

Defendants maintain they first became aware of Arm's purported violation on November 2, 2023 after Arm produced a document describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ("ACK") tests known as the "OOB." (D.I. 272 at 2). Defendants also explain that on December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK "patches." (*Id.*). According to Defendants, "[i]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of ▮▮▮▮ of the Qualcomm ALA." (*Id.*).

The facts show otherwise. Mr. Agrawal's testimony appears to corroborate a theory of liability that was evident to Defendants in late 2022—well before the April 28, 2023 deadline to amend. Defendants' own proposed amendment pleads that "Qualcomm first discovered that ARM was withholding ARM Technology under the Qualcomm ALA in the fall of 2022." (D.I. 272, Ex. 1 ¶ 274). Indeed, when Defendants requested the OOB and various patches from Arm on October 6, 2022, Mr. Agrawal responded on October 10, 2022, acknowledged the existence of the patches and wrote, "I'll be able to share OOB and patches after my management has given their approval." (D.I. 278, Ex. 4). On October 13, 2022, Mr. Agrawal explained to Arm that "Qualcomm's general counsel wrote to Arm's general counsel regarding the topic of support, maintenance, validation and verification" and that "Arm's legal department will be responding accordingly." (*Id.*). On November 3, 2022 and December 5, 2022, Qualcomm notified Arm that Arm's "failure to provide certain deliverables, including the OOB" rendered Arm "not in compliance with its obligations under ▮▮▮▮ (D.I. 278, Ex. 6 at 3). On December 6, 2022,

Arm confirmed that it would not provide the OOB for Qualcomm's unlicensed products.  (D.I. 278, Ex. 5 at 1, Ex. 6 at 3).

Thus, because Defendants knew that Arm failed to provide support as of the "fall of 2022" (D.I. 272, Ex. 1 ¶ 274), Defendants possessed sufficient information to assert their ███ ███ counterclaim before the April 28, 2023 deadline for amendments.  Because they did not act diligently in seeking amendment, Defendants cannot show good cause under Rule 16(b)(4).  I therefore do not need to determine whether Defendants satisfy Rule 15(a).  *Premier Comp Sols. v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020).

### B. Defendants' ███████████ Counterclaims Under the Nuvia ALA and Nuvia TLA

████████████ of both the Nuvia ALA and the Nuvia TLA provide:



(D.I. 272, Ex. 7 at 14, Ex. 8 at 12).

Defendants maintain that they became aware of Arm's purported ███████████ violation on December 7, 2023 when Arm engineer Mark Werkheiser testified that he never destroyed Nuvia confidential information and that Arm incorporated certain Nuvia confidential information "into a product ARM is currently marketing to third parties."  (D.I. 272 at 1 (citing D.I. 272, Ex. 4 at 52:4-54:17; 55:18-56:20; 60:22-25).  Defendants also explain that Mr. Agrawal testified at his December 14, 2023 deposition that he had possession of Nuvia confidential information in January 2023.  (D.I. 272, Ex. 5 at 95:22-99:8).

With respect to Arm's alleged failure to either "destroy or return" Nuvia confidential information, that theory of liability was evident to Defendants in 2022. In a letter dated April 29, 2022, Arm told Qualcomm that it would "quarantin[e]" rather than return or destroy Nuvia confidential information. (D.I. 272, Ex. 9) ("[W]e understand both Qualcomm and NuVia . . . will comply with the termination provisions of the relevant agreements (with the exception of quarantining Arm confidential information, as defined by the relevant agreements, rather than returning or destroying it) . . . Given [Defendants'] position that unspecified preservation obligations preclude returning or destroying Arm confidential information (as defined by the relevant agreements), Arm will proceed similarly with respect to any Nuvia confidential information (as defined) in its possession."). Thus, as of April of 2022, Qualcomm knew that Arm was not going to return or destroy the Nuvia confidential information.

With respect to Arm's alleged failure to provide the certification required by ▮▮▮▮▮ ▮▮▮▮ Defendants were aware of that claim at least as of October 2022 when they asserted in their amended counterclaim that "Arm never certified its own compliance with the termination provisions, in violation of the Nuvia agreements." (D.I. 18 at 73 n. 31). Thus, Arm's pre-deadline representation that it was neither returning nor destroying Nuvia confidential information coupled with Defendants' acknowledgement that Arm was in breach demonstrate that Defendants could have asserted a plausible ▮▮▮▮▮▮▮ claim prior to the amendment deadline. *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, C.A. No. 17-1612-MN-CJB, 2022 WL 855518, at *3 (D. Del. Mar. 23, 2022) (evaluating good cause by explaining that "the question here is only whether Defendants would have had a plausible claim prior to the amendment deadline").

6

With respect to Arm's alleged failure to "███████████████████" of Nuvia's confidential information as required by ███████ however, this aspect of Defendants' claim is based on information learned in December 2023. Mr. Werkheiser's December 2023 deposition testimony suggesting that Arm's allegedly improper use did not actually cease (D.I. 272 at 2 (citing D.I. 272, Ex. 4 at 52:4-54:17; 55:18-56:20; 60:22-25)) departs from both Arm's April 2022 letter representation that it would "quarantine" Nuvia's confidential information and the assertion in Arm's November 15, 2022 Answer that it was in full compliance with the requirements of the Nuvia ALA and TLA. (D.I. 23 ¶ 233) ("Arm denies that it never certified its own compliance with the termination provisions; instead, Arm certified its own compliance with the Nuvia ALA and TLA's termination provisions on April 1, 2022, with the certification sent to Nuvia in the manner specified by the Nuvia agreements."). I find there is a "meaningful difference" between Arm agreeing to quarantine confidential information and certifying to nonuse, on the one hand, and an Arm witness admitting to such use, on the other, sufficient to give rise to a new, previously unavailable claim. *See TC Tech. LLC v. Sprint Corp.*, C.A. No. 16-153-RGA, 2019 WL 529678, at *2 (D. Del. Feb. 11, 2019) (finding that new deposition testimony contradicting earlier-served interrogatory response supported finding good cause).

Arm argues that Defendants were nevertheless on "notice" of Arm's potential misuse of Nuvia's confidential information in April 2022 when Arm did not certify its compliance with ███████ (Tr. 29:9-13) and did not agree to return or destroy Nuvia's confidential information (Tr. 32:1-6). Even if Arm's noncompliance with ███████ certification, destruction, and return requirements were somehow probative of Arm's alleged misuse, I do not agree that notice of Arm's noncompliance on those issues forecloses Defendants' ability to demonstrate good cause on continued use, particularly in view of Defendants' diligence since

7

Mr. Werkheiser's deposition. *See Compagnie des Grands Hotels d'Afrique SA v. Starwood Cap. Grp. Glob. I LLC*, C.A. No. 18-654-SB-SRF, 2021 WL 6883231, at *5 (D. Del. Feb. 10, 2021) (noting that possessing predicate agreements prior to amendment deadline "is not automatically determinative of good cause"); *Heritage Handoff Holdings, LLC v. Fontanella*, C.A. No. 16-691-RGA, 2018 WL 3580288, at *1 (D. Del. July 25, 2018) (finding good cause to amend under Rule 16(b) despite the fact that the movant "possessed at least some of the relevant facts and documents prior to the expiration of the deadline to amend" because the movant had "acted diligently once he became aware of the issues underlying his proposed amendments"). After obtaining Mr. Werkheiser's December 7, 2023 testimony, Defendants promptly contacted Arm to meet and confer, which occurred on January 19, 2024, and raised this dispute with the Court on January 22, 2024. *See, e.g.*, *Home Semiconductor Corp. v. Samsung Elecs. Co.*, C.A. No. 13-2033-RGA, 2019 WL 2135858, at *5 (D. Del. May 16, 2019) (finding diligence when a party sought leave to amend within three months of learning new information). And Arm does not point me to any other record evidence that would suggest Defendants could have claimed Arm had not "████████████████████" of Nuvia's confidential information prior to the amendment deadline. (D.I. 272, Ex. 7 at 14, Ex. 8 at 12). Thus, I conclude that good cause exists for Defendants to amend their answer and counterclaims with respect to this aspect of Arm's purported ██████████ violation.

Under Rule 15(a), the court considers "(1) whether the amendment has been unduly delayed; (2) whether the amendment would unfairly prejudice the non-moving party; (3) whether the amendment is brought for some improper purpose; and (4) whether the amendment is futile." *Truinject Corp. v. Galderma, S.A.*, C.A. No. 19-592-LPS-JLH, 2021 WL 4355570, at *2 (D. Del. Sept. 24, 2021). Defendants have has shown diligence, "which means [their] amendment has not

8

been unduly delayed." *International Construction Products LLC v. Caterpillar Inc.*, C.A. No. 15-108-RGA, 2018 WL 4611216, at *4 (D. Del. Sept. 26, 2018). Arm does not argue improper purpose or futility.

Arm maintains that Defendants' proposed amendments would prejudice Arm "given the alleged magnitude of Qualcomm's new counterclaims and the resulting delay to Arm's claim for equitable relief." (D.I. 278 at 3). Although the parties agree that additional discovery would be necessary to litigate Defendants' counterclaims, they dispute the magnitude of such discovery. (Tr. 13:10-14:7; 32:20-34:3). Arm seems to maintain that reopening discovery alone gives rise to sufficient prejudice to deny Defendants' amendment. (Tr. 35:13-17). But Arm has not articulated the specific prejudice it will incur with any particularity and Defendants offered adequate explanation for the delay. Instead, Arm's principal concern appears to be that discovery necessitated by Defendants' amendment would threaten the parties' September 2024 trial date. (Tr. 33:7-35:7). But whether to extend the case schedule and move trial to December 2024 is not before me. That motion remains pending before the Court. (D.I. 254).

In sum, after finding good cause and weighing the Rule 15(a) factors, I am persuaded that Defendants' motion to amend with respect to their      counterclaim on use should be permitted.

## IV.    CONCLUSION

For the forgoing reasons, Defendants' Motion is GRANTED-IN-PART and DENIED-IN-PART.

In an abundance of caution, this Order has been filed under seal because the parties' briefs and exhibits pertaining to the Motion were filed under seal. Within seven (7) days of the issuance of this Order, the parties are directed to meet and confer on appropriate redactions and

advise the Court by letter whether they wish any portions of the Order to remain under seal.  Any request that portions of the Order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the Order.

Dated: March 6, 2024

Laura D. Hatcher
United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 13, 2024, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
mvaughn@paulweiss.com
jbraly@paulweiss.com
abutwin@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Brian Shiue
Anna P. Lipin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
bshiue@paulweiss.com
alipin@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARM LTD., a U.K. corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____ |
| QUALCOMM INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, and NUVIA, INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff Arm Ltd. ("Arm") complains and alleges as follows against Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively "Qualcomm"), and NuVia, Inc. ("Nuvia"):

## NATURE OF THE ACTION

1.      Arm is the world's leading provider of microprocessor intellectual property. For decades, Arm has developed innovative processor architecture and implementation designs that balance performance with energy efficiency.  Billions of electronic devices use Arm processor technologies pursuant to Arm licenses—from smartphones used to interact seamlessly with friends and family around the world to an increasing number of the servers that run the essential day-to-day operations of Fortune 500 companies.

2.      Qualcomm is a major semiconductor manufacturer.  To accelerate its processor development efforts, Qualcomm spent over $1 billion to acquire Nuvia, a start-up led by senior engineers previously from Apple and Google that licensed Arm technologies to develop high-performance processor cores for semiconductor chips.  In the process,

Qualcomm caused Nuvia to breach its Arm licenses, leading Arm to terminate those licenses, in turn requiring Qualcomm and Nuvia to stop using and destroy any Arm-based technology developed under the licenses. Undeterred, Qualcomm and Nuvia have continued working on Nuvia's implementation of Arm architecture in violation of Arm's rights as the creator and licensor of its technology. Further, Qualcomm's conduct indicates that it has already and further intends to use Arm's trademarks to advertise and sell the resulting products in the United States, even though those products are unlicensed.

3.      Arm now brings suit for specific performance of the Nuvia licenses' termination provisions to require Qualcomm and Nuvia to stop using and to destroy the relevant Nuvia technology and to stop their improper use of Arm's trademarks with their related products. Arm also seeks declaratory judgment, injunctive relief, and damages for the use of Arm's trademarks in connection with semiconductor chips incorporating the relevant Nuvia technology.

## PARTIES

4.      Plaintiff Arm is a corporation organized under the laws of the United Kingdom, has its principal place of business in Cambridge, United Kingdom, and is a resident or domiciliary of the United Kingdom.

5.      Defendant Qualcomm Inc. is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

6.      Defendant Qualcomm Technologies, Inc. is a subsidiary of Qualcomm Inc. and a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

7.     Defendant Nuvia is a subsidiary of Qualcomm and a Delaware corporation with its principal place of business at 2841 Mission College Blvd., Santa Clara, California 95054.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (trademarks), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).  The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties, and because the amount in controversy, based on the consideration that was anticipated under the Nuvia licenses, the volume of products expected under those licenses, and Defendants' potential loss from complying with the equitable relief requested here, exceeds $75,000, exclusive of interest and costs.

9.     The Court has personal jurisdiction over Qualcomm and Nuvia because they are incorporated in Delaware.  Qualcomm and Nuvia have purposely availed themselves of the privileges and benefits of the laws of Delaware.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Qualcomm and Nuvia are incorporated in Delaware.  Venue is also proper because Qualcomm Inc. and Qualcomm Technologies, Inc. have purposefully availed themselves of the courts in the State of Delaware and this Judicial District.

## FACTUAL ALLEGATIONS

### *Arm's business model*

11.     For decades, Arm has been a world leader in developing processor architectures, including instruction set architectures, and processor core designs

implementing those architectures, all of which are covered by an extensive intellectual property portfolio.

12.    Processor cores are the parts of a computer's Central Processing Unit or "CPU" that read and execute program instructions to perform specific actions.  Modern CPUs often integrate multiple processor cores on a single semiconductor chip or integrated circuit ("IC").

13.    Arm owns intellectual property relating to its processor architectures and designs, including, among other things, trademarks.

14.    Arm does not manufacture or sell chips.  Instead, Arm licenses its technologies to hundreds of companies to use in developing their own chips or in their own electronic devices and works with these companies to ensure the success of Arm-based products.

15.    Arm's customers manufacture (or have manufactured for them) chips based on Arm's technologies.  The chips may then be used in the customer's own devices or sold to other device manufacturers.  Arm earns revenue from licensing fees and royalties based on the number of Arm-based chips its customers sell.

16.    Arm's business model relies on Arm's ability to monetize its research and intellectual property by receiving both licensing fees and royalties for products incorporating Arm's technology and intellectual property.  Arm therefore grows its revenues by increasing both the number of customers and the number of Arm-based products sold.

17.    There are two main types of Arm licenses for Arm's technologies: Technology License Agreements ("TLAs"), which allow the use of specific "off-the-shelf" Arm processor core designs with only minor modifications, and Architecture License

4

Agreements ("ALAs"), which allow for the design of custom processor cores that are based on particular architectures provided by Arm.

18.    Arm grants few ALAs.  Custom processor cores can take years to design, at great expense and requiring significant support from Arm, with no certainty of success.  If successful, ALA licensees can sell custom processor cores for use in other companies' products.

19.    Arm ALAs typically authorize licensees only to develop processor cores based on specific Arm technology provided by Arm under the licenses, rather than granting broader licenses to use Arm-based technology generally.

***Nuvia obtains Arm licenses***

20.    Nuvia was founded as a start-up in 2019 by chip engineers who left Apple and Google.  Nuvia planned to design energy-efficient CPUs for data center servers based on a custom processor implementing the Arm architecture, which would have expanded the market for Arm's technology.  Nuvia's business model was thus reliant on customizing processor core designs based on Arm's technology.  As one of the founders explained to the press when launching Nuvia, the start-up's premise (and one of its attractions to investors) was that Nuvia intended to build "a custom clean sheet designed from the ground up" using Arm's architecture.[1]

21.    In September 2019, Arm granted Nuvia an ALA and TLA, providing rights to design custom processor cores based on an Arm architecture and to modify certain off-the-

---

[1] Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TechCrunch (Nov. 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/.

shelf designs. The licenses granted in the ALA and TLA are necessary to use Arm's extensive intellectual property portfolio covering the Arm architecture. The ALA and TLA included rights to use Arm trademarks in connection with products developed by Nuvia under the licenses. Arm also provided substantial, crucial, and individualized support from Arm employees to assist Nuvia in its development of Arm-based processors for data center servers.

22.     The licenses provided Nuvia access to specific Arm architecture, designs, intellectual property, and support in exchange for payment of licensing fees and royalties on future server products that include processor cores based on Arm's architecture, designs, or related intellectual property. Nuvia's licensing fees and royalty rates reflected the anticipated scope and nature of Nuvia's use of the Arm architecture. The licenses safeguarded Arm's rights and expectations by prohibiting assignment without Arm's consent, regardless of whether a contemplated assignee had its own Arm licenses.

23.     From September 2019 to early 2021, Nuvia used the technology it licensed from Arm to design and develop processor cores. Arm provided preferential support for Nuvia's development efforts, with Arm seeking to accelerate research and development in next-generation processors for data center servers to support that sector's transition to Arm technology.

24.     In August 2020, Nuvia announced that its "first-generation CPU, code-named 'Phoenix'" would be "a custom core based on the ARM architecture."[2] It also publicized benchmark tests showing that Phoenix could double the performance of rival products from

---

[2] John Bruno & Sriram Dixit, *Performance Delivered a New Way*, Silicon Reimagined (Aug. 11, 2020), https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5.

Apple, Intel, AMD, and Qualcomm.  Based on these results, Nuvia claimed that the "Phoenix CPU core has the potential to reset the bar for the market."[3]

***Qualcomm relies on designs created by Arm***

25.    Qualcomm is one of the world's largest semiconductor companies, with a portfolio of intellectual property and products directed to wireless technologies, including cellular, Bluetooth, and Wi-Fi; CPUs and ICs; networking; mobile computers; cell phones; wearables; cameras; automobiles; and other electronic devices.

26.    Even though Qualcomm has an Arm ALA, its prior attempts to design custom processors have failed.  Qualcomm invested in the development of a custom Arm-based processor for data center servers until 2018, when it cancelled the project and laid off hundreds of employees.[4]

27.    Qualcomm's commercial products thus have relied on processor designs prepared by Arm's engineers and licensed to Qualcomm under Arm TLAs.  Discovery is likely to show that as of early 2021, Qualcomm had no custom processors in its development pipeline for the foreseeable future.  To fill this gap, Qualcomm sought improperly to purchase and use Nuvia's custom designs without obtaining Arm's consent.

***Qualcomm acquires Nuvia***

28.    On January 13, 2021, Qualcomm announced that Qualcomm Technologies, Inc. was acquiring Nuvia for $1.4 billion.  Neither Qualcomm nor Nuvia provided prior

---

[3] *Id.*

[4] *See, e.g.*, Andrei Frumusanu, *Qualcomm to Acquire NUVIA: A CPU Magnitude Shift*, AnandTech (Jan. 13, 2021), https://www.anandtech.com/show/16416/qualcomm-to-acquire-nuvia-a-cpu-magnitude-shift; Andy Patrizio, *Qualcomm makes it official; no more data center chip*, Network World (Dec. 12, 2018), https://www.networkworld.com/article/3327214/qualcomm-makes-it-official-no-more-data-center-chip.html.

notice of this transaction to Arm.  Nor did they obtain Arm's consent to the transfer or assignment of the Nuvia licenses.

29.     Qualcomm indicated in its announcement that "NUVIA CPUs"—that is, Nuvia's implementations of Arm technology developed under the Nuvia licenses with Arm—would be incorporated into a range of Qualcomm products.  Qualcomm's press release declared its grand ambitions for Nuvia's implementation of Arm technology: "NUVIA CPUs are expected to be integrated across Qualcomm Technologies' broad portfolio of products, powering flagship smartphones, next-generation laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality and infrastructure networking solutions."[5]  The press release also indicated that Qualcomm's first target would be "integrating NUVIA CPUs with Snapdragon," its flagship suite of system on a chip ("SoC") semiconductor products for mobile devices.

30.     As Qualcomm's CEO, Cristiano Amon, noted in a Reuters interview shortly after the acquisition closed in the first half of 2021, "Qualcomm will start selling Nuvia-based laptop chips next year."[6]  Amon confirmed the negative impact this might have on Arm, saying: "If Arm . . . eventually develops a CPU that's better than what we can build ourselves, then we always have the option to license from Arm."

31.     Qualcomm also confirmed its prior deficiencies in core design, reportedly promoting the Nuvia acquisition as "filling a gap" because "for several years now" the

---

[5] *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 13, 2021), https://www.qualcomm.com/news/releases/2021/01/13/qualcomm-acquire-nuvia.

[6] Stephen Nellis, *Qualcomm's new CEO eyes dominance in the laptop markets*, Reuters (July 2, 2021), https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/.

company "had been relying on external IP such as Arm's Cortex cores."[7]  Qualcomm further

explained that "the immediate goals for the NUVIA team will be implementing custom CPU

cores" designed for laptops.[8]

32.    Analysts confirmed that the "Qualcomm acquisition [of] NUVIA is a huge

move to scale up dramatically.  It can reinvigorate current lines in smartphone, Windows PC

and automotive SoCs, and make them more competitive with the competition.  They have

been lagging."[9]

33.    Providing further confirmation of the acquisition's importance to Qualcomm

in filling the "gap" in its "lagging" IP design, analysts noted that the Nuvia acquisition was

"extremely speedy in terms of timeline," and Qualcomm "went as far as [to] put out a

concrete roadmap for . . . using the newly acquired IP from Nuvia," announcing that

Nuvia's processors would be finalized for use in high-end laptops "in the second half of

2022."[10]

---

[7] Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia.

[8] *Id.*

[9] Trading Places Research, *Qualcomm's Acquisition of NUVIA is a Huge Move*, Seeking Alpha (Jan. 13, 2021), https://seekingalpha.com/article/4398808-qualcomms-acquisition-of-nuvia-is-huge-move.

[10] Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia (quoting *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 15, 2021), https://www.qualcomm.com/news/releases/2021/03/16/qualcomm-completes-acquisition-nuvia).

34.     Based on standard industry scheduling, that timeline indicated a design for data center processors would be completed "essentially as soon as possible following the acquisition" of Nuvia.[11]

35.     This timing indicates that the Arm-based cores that Nuvia designed using Arm's technology and intellectual property were, as of the acquisition date, effectively ready for the final stages of design for Qualcomm chips, leading promptly to product integration and manufacturing.  Qualcomm's November 2021 10-K filing disclosed that the $1.4 billion acquisition encompassed Nuvia's team and "certain in-process technologies," reflecting the availability of existing cores such as the Phoenix CPU core developed under Nuvia's ALA.[12]

36.     By entering into the acquisition of Nuvia and transferring the rights and technology developed under the Nuvia licenses without Arm's consent, Qualcomm thus greatly accelerated its ability to bring to market custom-designed processor cores—a head start that Qualcomm was willing to pay over $1 billion to obtain.

***Arm terminates the Nuvia licenses***

37.     Soon after the announcement of the merger, Arm informed Qualcomm in writing that Nuvia could not assign its licenses and that Qualcomm could not use Nuvia's in-process designs developed under the Nuvia ALA without Arm's consent.  For more than a year, Arm negotiated with Qualcomm, through Qualcomm Inc. and Qualcomm

---

[11] *Id.*

[12] Qualcomm Inc., Annual Report (Form 10-K) (Nov. 3, 2021), https://investor.qualcomm.com/financial-information/sec-filings/content/0001728949-21-000076/0001728949-21-000076.pdf.

Technologies, Inc., in an effort to reach an agreement regarding Qualcomm's unauthorized acquisition of Nuvia's "in-process technologies" and license.

38.     All the while, Qualcomm continued to broadcast its intentions to rush Nuvia products to market.  In November 2021, Qualcomm's Chief Technology Officer told investors that Qualcomm was "pretty far along at this point" in developing its first chip with Nuvia's implementation of Arm technology and would "sample a product at, let's say nine months from now"—which would be August 2022.[13]  Then in January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO confirming that "[t]he future of the PC industry is modern Arm-based architectures" and boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[14]  Elsewhere, Qualcomm's CEO reiterated that Qualcomm is "definitely in a hurry" to launch Nuvia's Arm-based chips "as fast as we can."[15]  Based on these statements, discovery is likely to show that Qualcomm and Nuvia continued to use the relevant technology developed under Nuvia's Arm licenses.

---

[13] *Qualcomm Investor Day 2021 Livestream: CEO Cristiano Amon looks ahead*, YouTube (Nov. 16, 2021), https://www.youtube.com/watch?v=rUWPzROYn2E; *see also* Mark Hachman, *Qualcomm Prophesizes 2023 as the Rebirth of PC Snapdragon Chips*, PCWorld (Nov. 16, 2021), https://www.pcworld.com/article/552285/qualcomm-prophesies-2023-as-the-rebirth-of-its-snapdragon-chips.html.

[14] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

[15]  Nilay Patel, *What Comes After the Smartphone, With Qualcomm CEO Cristiano Amon*, The Verge (Jan. 11, 2022), https://www.theverge.com/22876511/qualcomm-ceo-cristiano-amon-interview-decoder-podcast.

39.     On February 1, 2022, Arm sent a letter to Nuvia and Qualcomm terminating the Nuvia licenses effective March 1, 2022.  The letter terminated the licenses based on Nuvia's material breach of the assignment provisions of the Nuvia licenses by entering into the acquisition of Nuvia without Arm's consent.  The letter also reminded Nuvia and Qualcomm of their obligations upon termination to stop using and destroy the Nuvia technology developed under the now-terminated licenses.

40.     In February 2022, pending termination of the Nuvia licenses, Nuvia sought Arm's verification that a Nuvia processor design satisfied the Arm architecture's specifications.  On February 23, 2022, Qualcomm confirmed that it was still developing the relevant Nuvia technology by stating in a court filing that certain Nuvia documents were based on "years of research and work" and would "reveal secret design components of Qualcomm chips that are still in development."  *Qualcomm Technologies, Inc. v. Hoang*, No. 3:22-cv-00248-CAB-BLM (S.D. Cal. Feb. 23, 2022), ECF No. 1 at 5-6.

41.     On March 1, 2022, the Nuvia licenses terminated, along with the corresponding rights to use or sell products based on or incorporating Nuvia technology developed under those licenses.

42.     On April 1, 2022, Qualcomm's General Counsel sent Arm a letter enclosing a Nuvia representative's termination certification.  The certification acknowledged—without objection—that the Nuvia licenses had been terminated.  The certification recognized the obligations upon termination, and asserted that Nuvia was in compliance.  Qualcomm and Nuvia thereby conceded that termination of the Nuvia licenses was appropriate, and that the termination provisions had been triggered, are binding, and are enforceable.

*Qualcomm keeps using Arm-based technology developed under the Nuvia licenses*

43.     Qualcomm is subject to Nuvia's termination requirements as the acquirer of Nuvia.  Qualcomm has publicly described Nuvia as a Qualcomm "team" that has been "very tight[ly] integrat[ed]" with and is "not separate" from Qualcomm.[16]  Qualcomm has also acted on behalf of Nuvia publicly and in correspondence with Arm since the acquisition.  Qualcomm further told Arm that it planned to "redeploy NUVIA employees" and "transfer NUVIA's work" to Qualcomm and, consistent with that plan, Qualcomm has on-boarded Nuvia's leadership and employees as Qualcomm employees.[17]

44.     On April 29, 2022, Arm wrote Qualcomm clarifying that neither Nuvia nor Qualcomm was authorized to continue working on technology that was developed under the Nuvia licenses.

45.     Two weeks later, on May 13, 2022, Qualcomm sought Arm's verification that a new Qualcomm processor core complied with Arm architecture so that it could be verified and incorporated into a product.  Qualcomm did not explain whether this processor core design was based on Nuvia's designs under the terminated licenses.

46.     Based on the timing and circumstances surrounding Qualcomm's request, discovery is likely to show that Qualcomm's processor core design is based on or

---

[16] Ian Cutress, *Interview with Alex Katouzian, Qualcomm SVP: Talking Snapdragon, Microsoft, Nuvia, and Discrete Graphics*, AnandTech (Jan. 31, 2022), https://www.anandtech.com/show/17233/interview-with-alex-katouzian-qualcomm-svp-talking-snapdragon-microsoft-nuvia-and-discrete-graphics; Ian Cutress, *AnandTech Interview with Miguel Nunes: VP for Windows and Chrome PCs, Qualcomm*, AnandTech (Feb. 14, 2022), https://www.anandtech.com/show/17253/anandtech-interview-with-miguel-nunes-senior-director-for-pcs-qualcomm.

[17] *See, e.g.*, *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 16, 2021), https://investor.qualcomm.com/news-events/press-releases/detail/1304/qualcomm-completes-acquisition-of-nuvia; *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

incorporates in whole or in part the processor core design developed under the prior Nuvia licenses.

47.     Qualcomm's Arm licenses do not cover products based on or incorporating Arm-based technologies developed by third parties under different Arm licenses, such as the now-terminated Nuvia licenses.

48.     Despite Arm's termination of the Nuvia licenses, Qualcomm has continued to tell the public that its Nuvia chips will soon be joining the industry-wide "ecosystem transition to Arm."[18]  Like Qualcomm's prior statements, this announcement was directed to readers throughout the United States, including to readers physically located in the State of Delaware and this Judicial District.

49.     In June 2022, Qualcomm's CEO reiterated that it would soon begin "sampling" Nuvia chips to companies, allowing them to design electronic devices incorporating the chips in the "next year."[19]  Based on that timeline, he explained, "[i]n late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon with a Nuvia-designed CPU."[20]

---

[18] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

[19] *Id.*; *see also* Mark Tyson, *Qualcomm CEO Admits Nuvia Chip OEM Sampling is Delayed (Update)*, Tom's Hardware (June 10, 2022), https://www.tomshardware.com/news/qualcomm-nuvia-chip-sampling-delays (Qualcomm spokesperson clarifying: "We are on track to sample the first products with our next generation CPUs this year.").

[20] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

50.     In the microprocessor industry, "sampling" means providing pre-production processors to original equipment manufacturers ("OEMs"), original device manufacturers ("ODMs"), or independent software vendors ("ISVs") for use in the product design cycle before product launch.

51.     Based on Qualcomm's statements that Nuvia processors took "years" to develop and "are still in development," and Qualcomm's consistent statements that it is developing Nuvia's Arm chips, discovery is likely to show that the chips that Qualcomm intends to sample in the coming months will contain Nuvia technology that Qualcomm cannot use and instead must destroy.

52.     Further, based on Qualcomm's public announcements of its plans to use Nuvia technology, discovery is likely to show that Qualcomm has continued to retain and use Nuvia technology developed pursuant to the Nuvia licenses, thereby materially breaching the termination provisions of those licenses.

53.     News reports indicate that Qualcomm is also developing Nuvia processors for data center servers, and "already has working silicon to at least demonstrate to potential customers,"[21] which discovery is likely to show is based on or incorporates Nuvia technology developed under the now-terminated Nuvia ALA.

54.     The failure of Nuvia and Qualcomm to comply with the post-termination obligations under the Nuvia ALA is causing, and will continue to cause, irreparable harm to Arm.  Qualcomm effectively seeks to circumvent Arm's licensing model, which allocates

---

[21] Dan Robinson, *Qualcomm readying new Arm server chip based on Nuvia acquisition*, The Register (Aug. 19, 2022), https://www.theregister.com/2022/08/19/qualcomm_arm_server_chip/ (citing Ian King, *Qualcomm Is Plotting a Return to Server Market With New Chip*, Bloomberg (Aug. 18, 2022), https://www.bloomberg.com/news/articles/2022-08-18/qualcomm-is-plotting-a-return-to-server-market-with-new-chip).

use of the technology developed pursuant to a particular Arm license to a particular licensee.

55.     These breaches thus interfere with Arm's ability and right to control the use of its technology, negatively affecting Arm's relationships with existing and prospective licensees.

56.     The prospective monetary damages from Qualcomm's circumvention and interference with Arm's control over its technology are not readily ascertainable or calculable, given the resulting future impact on Arm's relationships with existing and prospective customers.

57.     Qualcomm's improper acquisition of the relevant Nuvia technology in violation of Arm's standard provisions threatens to harm Arm's position in the ecosystem of Arm-based devices, harm Arm's reputation as an intellectual property owner and technology developer whose licenses must be respected, and embolden other companies to likewise harm Arm's reasonable business expectations in issuing its licenses.

## COUNT I: BREACH OF CONTRACT – SPECIFIC PERFORMANCE (ALL DEFENDANTS)

58.     Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

59.     The termination obligations of the ALA between Nuvia and Arm survive termination and remain valid and enforceable contract provisions, as Qualcomm's correspondence and Nuvia's termination certification confirm.

60.     Arm complied with and fulfilled all relevant duties, conditions, covenants, and obligations under the Nuvia ALA, including ceasing use of Nuvia confidential information in its possession.

61.     The Nuvia ALA terms were just and reasonable, involving adequate consideration and reasonable obligations for Nuvia in the event of Arm's termination based on Nuvia's material breach.  Those obligations served to restore the license holder to its position *ex ante*, protect Arm's business model and reasonable business expectations in issuing its licenses, and prevent the unjust enrichment of Qualcomm, the party that induced Nuvia's breach.

62.     Upon termination, the Nuvia ALA requires Nuvia to cease using and destroy any technology developed under the Nuvia ALA, as well as cease using Arm's trademarks in connection with any technology developed under the Nuvia ALA.

63.     Qualcomm shares Nuvia's obligations under the Nuvia ALA in its capacity as Nuvia's acquirer, and thus Qualcomm is likewise subject to the requirements of the Nuvia licenses' termination provisions.

64.     Based on Defendants' correspondence with Arm, public statements, and processor verification requests, discovery is likely to show that Defendants are still using and developing Nuvia technology developed under the now-terminated licenses, along with Arm trademarks, and intend to continue to do so.

65.     Defendants therefore have breached and are breaching the Nuvia ALA's termination provisions.

66.     As a direct and proximate result of Nuvia and Qualcomm's past and ongoing breaches, Arm has been irreparably injured and damaged in amounts not capable of determination, including, but not limited to, injury to Arm's global licensing program and misuse of Arm's technology.

67.     Unless Defendants' breaches of the Nuvia ALA's termination provisions are enjoined and specific performance is granted, Arm will continue to suffer irreparable harm. As such, Arm has the right to enforcement of Nuvia and Qualcomm's compliance with the ALA's termination provisions, including via injunctive relief, specific performance, or any other measures necessary to avoid irreparable harm to Arm or to mitigate damages that have been caused by, and will continue to be caused by, Defendants' breach.

68.     Arm is entitled to specific performance requiring Defendants to comply with the Nuvia ALA's termination provisions, including ceasing all use of and destroying any technology developed under the Nuvia ALA, and ceasing all use of Arm trademarks in connection with any technology developed under the Nuvia ALA—including the relevant Nuvia technology.

69.     Arm is also entitled to monetary compensation incidental to specific performance of the Nuvia ALA's termination provisions to compensate Arm for the delay in Defendants' performance of their contractual obligations.

## COUNT II: DECLARATORY JUDGMENT AND TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114 (ALL DEFENDANTS)

70.     Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

71.     Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower case letters (collectively, the "ARM Marks"), true and correct copies of which are attached as **Exhibits A and B**.  These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with

particular microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services. The applications to register the marks were filed on July 31, 2017 and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

72.     The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.

73.     Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

74.     Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

75.     Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

76.     Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to infringe Arm's trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die

packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District.  Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® Kryo™ 485 CPU built on ARM Cortex Technology."[22]  In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[23]  This press release remains online.  Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.  Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

77.     Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection,

---

[22] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

[23] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting trademark infringement in violation of 15 U.S.C. § 1114. Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

78. An actual and justiciable controversy exists between Defendants and Arm regarding infringement of Arm's trademarks. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

79. Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will infringe Arm's trademarks, directly and indirectly.

80.     Defendants' acts of infringement have injured Arm in an amount as yet unknown.  Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

81.     Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

82.     Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' trademark infringement.  Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing infringement, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology.  Unless enjoined, Defendants will continue their infringing conduct.

## COUNT III: DECLARATORY JUDGMENT AND
## FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125
## (ALL DEFENDANTS)

83.     Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

84.     The acts of Qualcomm and Nuvia described above constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85.     Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

86.     Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

87.     Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

88.     Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to falsely designate the origin of their products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® Kryo™ 485 CPU built on ARM Cortex Technology."[24]  In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent

_____

[24] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[25]  This press release remains online.  Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

89.     Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).  Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm.  Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the

---

[25] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

90.     An actual and justiciable controversy exists regarding Defendants' false designation of origin.  Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

91.     Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will falsely designate the origin of their products, directly and indirectly.

92.     Defendants' acts of false designation of origin have injured Arm in an amount as yet unknown.  Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

93.     Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

94.     Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' false designation of origin.  Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing false designation of

origin, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the falsely designated matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Arm Ltd. requests that the Court grant the following relief:

a.      A judgment in Arm's favor on all claims against Defendants;

b.      An order requiring specific performance by Defendants of the Nuvia licenses' termination provisions;

c.      An award of damages incidental to specific performance as a result of Defendants' breach of contract, in amounts to be proven at trial, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

d.      A judgment and a declaration that advertising, distributing, offering for sale, or selling semiconductor chips with the relevant Nuvia technology and the ARM Marks infringes Arm's trademarks, directly and indirectly;

e.      An order and judgment permanently enjoining Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns from (1) using in any manner in connection with the relevant Nuvia technology the ARM Marks, or any mark or logo that is confusingly similar to or a colorable imitation of the ARM Marks owned by

Arm; (2) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology; or (3) assisting, aiding, or abetting any other person or business entity in performing any of the aforementioned activities;

f.      An order and judgment directing Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Arm within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and ceased all offering of products with the relevant Nuvia technology under the ARM Marks, as set forth above;

g.      An order and judgment directing Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays in any manner in connection with the relevant Nuvia technology the ARM Marks or any other mark that is confusingly similar to or a colorable imitation of the ARM Marks;

h.      A judgment in the aggregate amount of (1) Defendants' profits, (2) Arm's actual damages, (3) the costs of this action pursuant to 15 U.S.C. § 1117, and (4) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may

have been obtained by Defendants in connection with their semiconductor chips using the relevant Nuvia technology and the ARM Marks, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

      i.     A judgment trebling any damages to the extent permitted by law, including under 15 U.S.C. § 1117;

      j.     Exemplary or punitive damages to the extent permitted by law;

      k.     Costs, expenses, and reasonable attorney fees under all applicable rules, statutes, and rules in common law that would be appropriate, with pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

      l.     Equitable relief addressing any infringement occurring after entry of judgment; and

      m.     Such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Arm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

Dated:  August 31, 2022

OF COUNSEL:

Michael A. Jacobs
Joyce Liou
Diek Van Nort
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
mjacobs@mofo.com
jliou@mofo.com
dvannort@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(415) 268-7000
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP

_____
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,

Plaintiff,

v.

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation, and NUVIA, INC., a
Delaware corporation,

Defendants.

REDACTED - PUBLIC VERSION
(Filed March 6, 2024)

C.A. No. 22-1146-MN



## PLAINTIFF'S RESPONSIVE LETTER TO THE HONORABLE LAURA D. HATCHER REGARDING DEFENDANTS' LEAVE TO AMEND ANSWER AND COUNTERCLAIM

OF COUNSEL:

Michael A. Jacobs
Joyce Liou
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
mjacobs@mofo.com
jliou@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-1500
sllewellyn@mofo.com

Dated:  February 28, 2024

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

Dear Judge Hatcher:

Qualcomm wrongly suggests that it had to wait until 45 days after the close of fact discovery to raise new counterclaims with Arm. That is false. The record makes clear that Qualcomm knew the purported bases for its counterclaims before the end of 2022, four months before the court ordered April 28, 2023 deadline to amend its counterclaims. Qualcomm did not diligently pursue what it had already alleged in pleadings and letters. Rather, Qualcomm delayed raising these assertions until fact discovery had closed and expert discovery had begun. Permitting amendment now would severely prejudice Arm, both due to the lack of time for discovery and a delay in the equitable relief that Arm seeks, while upending a trial date that is less than seven months away. Any of these circumstances alone justifies denial of this motion.

**Good cause does not exist for the delayed amendments.** Because of the earlier April 28, 2023 deadline, Qualcomm must show "good cause" to amend now. *See Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020) (good cause standard applies under Rule 16(b)(4) after amendment deadline has passed); *see also Sang Geoul Lee v. Won Il Park*, 720 F. App'x 663, 669 (3d Cir. 2017) (same); *E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000) (same). Qualcomm "must meet this standard before a district court considers whether the party also meets Rule 15(a)'s more liberal standard." *Premier Comp Sols.,* 970 F.3d at 319. The good cause inquiry "focuses on [the party's] diligence and requires consideration of whether [the party] could have reasonably sought the proposed amendments in a timely manner." *Barry v. Stryker Corp.*, C.A. No. 20-1787-RGA-SRF, D.I. 237 at 9 (D. Del. Mar. 20, 2023) (citing *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 618 (D. Del. 2008)) (Ex. 1), *report and recommendation adopted*, D.I. 263 (D. Del. May 3, 2023) (Ex. 2).

Qualcomm did not diligently pursue its claims. Despite knowing the purported bases for its counterclaims since fall 2022, it did not timely seek leave to amend. On September 26, 2022 (over 17 months ago), Arm informed Qualcomm in writing that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 3 [Sept. 26, 2022 Collins Ltr.] at 1.) Arm told Qualcomm on October 13, 2022 that Arm would not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 4 [ARM_01423338] at -338.) Arm reiterated to Qualcomm in writing on December 6, 2022 that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 5 [Dec. 6, 2022 Collins Ltr.] at 2.) Qualcomm has acknowledged in writing that Qualcomm "first discovered" that ARM was allegedly "withholding ARM Technology . . . in the fall of 2022." (*See* Ex. 6 [Jan. 8, 2024 Morgan Email] at 3; *see also* D.I. 272 at 2 ("Qualcomm first suspected ARM was withholding ARM Technology … in November 2022."); Ex. 11 to D.I. 272 (asserting on Nov. 3, 2022 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").)

In the months between fall 2022 and April 2023, Qualcomm failed to timely seek leave to amend. Qualcomm cannot argue that it could not raise the issue before the end of April 2023, and it points to no attempt to seek documents, interrogatory answers, or depositions on relevant topics at any time before December 2023. This is fatal to its motion. *See Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*, C.A. No. 19-1727-RGA, 2022 WL 11761898, at *3 (D. Del. Oct. 20, 2022) (no diligence where evidence for amendments was known at time of Answer); *Barry*, C.A. No. 20-1787-RGA-SRF, D.I. 237 at 11 (Ex. 1) (no diligence where plaintiff failed to pursue

relevant discovery); *Truinject Corp. v. Galderma S.A.*, C.A. No. 19-592-GBW, D.I. 780 at 5 (D. Del. Sept. 15, 2023) (no diligence where plaintiff failed to retain an expert to explore the new claims) (Ex. 7).

Qualcomm did not need Mr. Agrawal's deposition or any e-mail discovery to know that Arm was ███████████████████████████████. (D.I. 272 at 2.) Mr. Agrawal told Qualcomm on October 10, 2022 that Arm ███████████████████. (*See* Ex. 4 at -338.) Arm confirmed on December 6 that Qualcomm ███████████████████ (Ex. 5 at 2.) Qualcomm was aware of the ███████ more than a year before it took Mr. Agrawal's December 14, 2023 deposition.

Qualcomm's "concealment" allegations distort Arm's December 6, 2022 letter. Arm never said that it ███████████████████████. Arm's letter said it had ███

███ (*Compare* Ex. 5 at 1

███ *with id.* at 2

███ Arm expressly identified the existence of ███████. (*Id.* at 2 ███ Nothing was hidden from Qualcomm.

Qualcomm has also known of the purported bases for its alleged counterclaims regarding Arm's ███ since September 2022. Qualcomm's September 30, 2022 Answer alleged that "ARM never certified its own compliance with the termination provisions, *in violation of the NUVIA agreements*." (D.I. 18 at 73 n.31 (emphasis added).) Despite the allegation, Qualcomm did not assert a breach of these provisions with its initial counterclaims. Notably, Arm properly responded on November 15, 2022 that it had, in fact, certified compliance, (D.I. 23 at 31), but Qualcomm still did nothing to diligently investigate the dispute. Qualcomm's delay makes its current request improper. *See Allergan*, 2022 WL 11761898, at *3 (denying amendment when evidence was known at time of Answer); *Barry*, C.A. No. 20-1787-RGA-SRF, D.I. 237 at 11 (party failed to pursue discovery) (Ex. 1); *Truinject Corp.*, C.A. No. 19-592-GBW, D.I. 780 at 5 (party failed to explore new claims) (Ex. 7).

Qualcomm lastly contends that it "had no concrete evidence that ARM failed to comply with its ███" before depositions. (D.I. 272 at 2.) That also is wrong. The parties communicated in April 2022 that ███. (*See* Ex. 8 [Apr. 1, 2022 Chaplin Ltr.] at 2 ███ Ex. 9 [Apr. 29, 2022 Collins Ltr.] at 1 ("███

███").) If Qualcomm was concerned, it could have acted at any time after April 2022. But it failed to timely seek amendment or even serve any discovery requests directed to its Nuvia ALA and TLA claims. Because Qualcomm was aware of the purported bases for its

counterclaims before the end of 2022, the cases cited in its motion are inapplicable. *Compagnie des Grands Hotels d'Afrique SA v. Starwood Cap. Grp. Glob. I LLC*, C.A. 2021 WL 6883231, at *4 (D. Del. Feb. 10, 2021) (facts underlying new claims discovered after amendment deadline); *Home Semiconductor Corp. v. Samsung Elecs. Co.*, 2019 WL 2135858, at *5 (D. Del. May 16, 2019) (same).

**The delay in amendment is highly prejudicial to Arm.** Qualcomm's proposed amendments at this late stage would be highly prejudicial to Arm and fundamentally alter the proceedings. "[P]rejudice to the non-moving party is the touchstone for the denial of an amendment" under Rule 15(a). *Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978); *see also Miller Prods. Co. v. Veltek Assocs., Inc.*, 218 F.R.D. 425, 427 (D. Del. 2003) (denying amendment that "would require re-opening discovery, which not only prejudices [plaintiff], but also unduly delays this case proceeding to trial"); *Technographics, Inc. v. Mercer Corp.*, 142 F.R.D. 429, 431 (M.D. Pa. 1992) (denying amendment where new discovery likely).

Allowing Qualcomm's amendments would prejudice Arm, particularly given the alleged magnitude of Qualcomm's new counterclaims and the resulting delay to Arm's claim for equitable relief. First, Qualcomm alleges that it is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 2 to D.I. 272, ¶ 294.) This is not a claim that can be evaluated with "limited additional discovery." (D.I. 272 at 1.) In any event, fact discovery closed three months ago, only one fact witness deposition remains open[1], and the parties served opening expert reports months ago and served responsive reports yesterday. Prior discovery is inadequate to address the new claims because Qualcomm's amendments implicate contractual provisions and conduct not previously at issue. (*See, e.g.*, Ex. 10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Ex. 11 ▮▮▮▮▮▮▮▮▮▮▮▮▮.) Qualcomm's new counterclaims would require reopening both fact and expert discovery, wasting resources and delaying the case. Arm would then be prejudiced because Arm is seeking equitable relief to prevent the launch of products expected to be released in fall 2024. (*See* D.I. 267 ¶ 16.) Delay serves Qualcomm's interests because it enables Qualcomm to market unlicensed products using Arm's technology. The present trial should proceed as planned.

Judicial efficiency also warrants denial of Qualcomm's motion. Qualcomm's amendments would inject a myriad of new issues after fact discovery has closed and two rounds of expert reports have been served. Adjudication of claims currently in the case, moreover, will also resolve issues dispositive to the bulk of Qualcomm's new counterclaims. For instance, should Arm prevail on its claim that Qualcomm does not have a license to Nuvia-developed technology, the Qualcomm ALA counterclaim would be moot as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

**There is no good cause to amend the Protective Order.** Arm openly raised the issues that are the source of the alleged counterclaims more than a year ago. Qualcomm's lack of diligence and failure to timely assert its counterclaims or even seek relevant discovery for more than a year do not provide good cause to amend the Protective Order.

---

[1] Qualcomm, not Arm, indefinitely postponed the deposition of Nuvia co-founder John Bruno.

Dated: February 28, 2024

OF COUNSEL:

Michael A. Jacobs
Joyce Liou
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
mjacobs@mofo.com
jliou@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-1500
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DR. MARK A. BARRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1787-RGA-SRF |
| | ) | |
| STRYKER CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Presently before the court in this patent infringement action are the following motions

brought by plaintiff Dr. Mark A. Barry ("Plaintiff"): (1) a motion for leave to file a first amended

complaint against defendants SeaSpine Holdings Corporation, SeaSpine Orthopedics

Corporation, and SeaSpine, Inc. (collectively, "SeaSpine") under Federal Rules of Civil

Procedure 16(b) and 15(a), (D.I. 123);[1] (2) a motion to strike SeaSpine's third affirmative

defense of unclean hands under Federal Rule of Civil Procedure 12(f), (D.I. 125);[2] and (3) a

motion to strike defendant Stryker Corporation's ("Stryker") third affirmative defense of unclean

hands, (D.I. 128).[3] For the following reasons, Plaintiff's motion to amend is DENIED. I

recommend that the court DENY Plaintiff's motion to strike SeaSpine and Stryker's third

affirmative defenses as untimely under Fed. R. Civ. P. 12(f)(2), and I recommend that the court

STRIKE SeaSpine and Stryker's third affirmative defenses *sua sponte* under Fed. R. Civ. P.

---

[1] The briefing associated with the pending motion to amend is found at D.I. 124, D.I. 141, and
D.I. 149.
[2] The briefing associated with the pending motion to strike SeaSpine's third affirmative defense
of unclean hands is found at D.I. 126, D.I. 140, and D.I. 148.
[3] The briefing associated with the pending motion to strike Stryker's third affirmative defense of
unclean hands is found at D.I. 129, D.I. 150, and D.I. 162.

12(f)(1) to the extent that the theories underlying those affirmative defenses sound in fraud under Fed. R. Civ. P. 9(b).[4]

## I.    BACKGROUND

### A. Facts Regarding the Stryker Action

Plaintiff filed his case against Stryker on December 30, 2020 (the "Stryker Action"), alleging causes of action for infringement of five patents: U.S. Patent Nos. 7,670,358 ("the '358 patent"), 8,361,121 ("the '121 patent"), 9,339,301 ("the '301 patent"), 9,668,787 ("the '787 patent"); 9,668,788 ("the '788 patent;" collectively, the "patents-in-suit"). (D.I. 1 at ¶¶ 6-30) The patents-in-suit claim a method and system for aligning vertebrae that can be used in spinal surgeries. (*Id.* at ¶¶ 6, 11, 16, 21, 26) Stryker moved to dismiss Plaintiff's complaint, and the motion was denied on May 11, 2021. (D.I. 10; D.I. 15) Stryker filed its answer on May 25, 2021, asserting an affirmative defense of unclean hands but no counterclaim or affirmative defense alleging inequitable conduct. (D.I. 16)

In February of 2022, Stryker's counsel confirmed that it was not presently asserting allegations of inequitable conduct and did not include any allegations of inequitable conduct in its initial invalidity contentions. (D.I. 129, Ex. 2 at 1) Plaintiff served interrogatories in August seeking the legal and factual bases for Stryker's unclean hands defense. (*Id.*, Ex. 3 at 3) Stryker

---

[4] A motion to amend the complaint is a nondispositive matter within the purview of Fed. R. Civ. P. 72(a). *See Cornell Univ. v. Illumina, Inc.*, C.A. No. 10-433-LPS-MPT, 2017 WL 89165, at *8 (D. Del. Jan. 10, 2017). Consequently, the court's decision on Plaintiff's motion to amend the complaint is made as a Memorandum Opinion governed by the clearly erroneous or contrary to law standard set forth in 28 U.S.C. § 636(b)(1)(A). *Id.* Plaintiff's motions to strike affirmative defenses are dispositive, and the court's decision on the motions to strike takes the form of a Report and Recommendation governed by the *de novo* standard of Rule 72(b) and 28 U.S.C. § 636(b)(1)(B). *See Sonos, Inc. v. D&M Holdings Inc.*, C.A. No. 14-1330-RGA-MPT, 2016 WL 4249493, at *3 n.37 (D. Del. Aug. 10, 2016).

served its responses to the interrogatories on September 14, 2022, disclosing the basis for its

affirmative defense of unclean hands as follows:

> Plaintiff's infringement claims should be barred for the additional reason that Dr.
> Barry comes to the Court with unclean hands. Dr. Barry has engaged in
> misconduct, namely, inequitable conduct before the Patent Office, that has an
> immediate and necessary relation to the equity he seeks related to Stryker's
> alleged patent infringement in this case. His actions are in violation of conscience
> that affect the equitable relations between the parties. Dr. Barry engaged in
> inequitable conduct by knowingly and intentionally failing to properly disclose to
> the Patent Office information that was material to patentability during prosecution
> of each of the Asserted Patents. Dr. Barry and other persons associated with
> prosecution of the Asserted Patents failed to disclose each of Dr. Barry's three
> pre-critical date, paid, public surgeries, which were individually and collectively
> material to the patentability to each claim of the Asserted Patents. Dr. Barry's
> inequitable conduct before the Patent Office relates directly to his ability to obtain
> the patent rights he now asserts in this case against Stryker.

(*Id.*, Ex. 1 at 8) On October 20, 2022, Stryker confirmed that it did not intend to seek leave to

amend the answer to raise an inequitable conduct defense and maintained that its interrogatory

response explained only the basis for its unclean hands defense. (*Id.*, Ex. 5 at 1)

On December 2, 2022, Stryker supplemented this interrogatory response to provide

greater detail regarding Plaintiff's alleged misrepresentations to the U.S. Patent and Trademark

Office ("PTO") and to add allegations of litigation misconduct by Plaintiff in support of its

unclean hands defense. (D.I. 150, Ex. 1 at 17-23) In the supplementation, Stryker described the

dates and circumstances surrounding three allegedly non-experimental surgeries performed by

Plaintiff for profit before the critical date, which were not disclosed to the PTO. (*Id.*, Ex. 1 at 18,

20) Stryker's allegations of litigation misconduct stem from these same misrepresentations.

Specifically, Stryker maintains that Plaintiff engaged in litigation misconduct by filing and

maintaining lawsuits with knowledge that the patents-in-suit are invalid in view of the prior

surgeries, alternately taking the position that the prior surgeries were or were not experimental.

(*Id.*, Ex. 1 at 20-22)

3

## B. Facts Regarding the SeaSpine Action

On June 2, 2021, Plaintiff filed a civil action against SeaSpine for infringement of the same patents-in-suit brought against Stryker (the "SeaSpine Action"). (C.A. No. 21-806-RGA, D.I. 1) After the court denied SeaSpine's partial motion to dismiss the complaint, SeaSpine served its answer and counterclaims on February 9, 2022. (C.A. No. 21-806-RGA, D.I. 14; D.I. 17) Plaintiff moved to dismiss SeaSpine's counterclaims but did not file a corresponding motion to strike any of SeaSpine's affirmative defenses. (C.A. No. 21-806-RGA, D.I. 20) In response to Plaintiff's motion to dismiss, SeaSpine amended its counterclaims as a matter of right on March 16, 2022. (C.A. No. 21-806-RGA, D.I. 25)

The SeaSpine Action was subsequently consolidated with the Stryker Action in a scheduling order entered by the court on March 21, 2022. (D.I. 43) Under the consolidated scheduling order, the deadline for amended pleadings was June 3, 2022, and the fact discovery deadline was February 17, 2023. (*Id.* at ¶¶ 3, 4(e))

### 1. Facts relevant to the pending motion to amend

The complaint in the SeaSpine action defines the term "SeaSpine Products" to mean "the Daytona™ Deformity System, the Daytona® Small Stature Spinal System, and any other SeaSpine instruments manufactured, sold, distributed, loaned, consigned, or otherwise used to derotate *en bloc* multiple levels of vertebrae." (C.A. No. 21-806-RGA, D.I. 1 at ¶ 51) Consistent with this definition, Plaintiff's first set of requests for production served in March of 2022 define the term "Defendant Product" to mean any product "intended for or capable of being used in a medical procedure to correct a spinal deformity condition including, but not limited to, the *en bloc* derotation of multiple levels of vertebrae," including the Daytona™ Deformity System and the Daytona® Small Stature Spinal System (together, the "Daytona Systems"). (D.I.

4

141, Ex. 2 at 3)  The discovery requests distinguish these accused instruments from the "Associated Products," which cover "implants such as rods, pedicle screws, and set screws" and any product that is used or capable of being used with a Defendant Product.  (*Id.*)

On May 25, 2022, about a week before the deadline to amend pleadings, SeaSpine served its responses to Plaintiff's discovery requests, objecting to the production of any documents for implants or derotation systems that were not explicitly accused of infringement.  (D.I. 68, Ex. A)  Specifically, SeaSpine objected to requests that "seek[] materials related to products that Plaintiff has not accused of infringing any claims of the Asserted Patents, and which plainly do not infringe any claims of the Asserted Patents.  Defendants will not produce information about products that are not accused of infringing any of the claims of the Asserted Patents." (*See, e.g.*, *id.*, Ex. A at 9)

The parties participated in a discovery dispute hearing before the District Judge on July 21, 2022.  (D.I. 87)  The focus of Plaintiff's dispute was on SeaSpine's refusal "to provide discovery on any derotation systems other than the specifically accused Daytona products."  (D.I. 68 at 1)  Plaintiff stressed that information on other similar derotation systems was not publicly available, and SeaSpine should therefore be compelled to produce documents that would allow Plaintiff to assess whether additional derotation systems infringe.  (*Id.* at 2)  Plaintiff did not seek discovery on implant systems that could be combined with derotation systems from other product lines.

The District Judge denied Plaintiff's motion to compel and instead ordered SeaSpine to supplement its interrogatory response to provide Plaintiff with a list of the names of SeaSpine's product lines.  (D.I. 87 at 20:7-13)  From this list, the District Judge indicated that Plaintiff could perform research on additional product lines and determine whether to accuse additional

5

products. (*Id.*) On August 4, 2022, SeaSpine complied with the court's order by supplementing its interrogatory response to identify each of its product lines. (D.I. 79; D.I. 149, Ex. 4 at 8-10) Over the next two weeks, Plaintiff served his first and second amended identifications of accused products. (D.I. 80; D.I. 88; D.I. 109, Exs. B-C) In these identifications, Plaintiff identified the Mariner derotation system as well as the Malibu, NewPort, Atoll OCT, Sierra, and NorthStar pedicle screw systems. (D.I. 109, Ex. C)

SeaSpine refused to produce core technical documents in response to Plaintiff's second amended identification of accused products based on its position that the amended identification was inconsistent with the allegations in the complaint and Plaintiff's representations during the July 21 discovery dispute hearing. (D.I. 108, Ex. F at 1-2) SeaSpine indicated it would not produce the documents until Plaintiff amended the complaint and the infringement contentions to reflect the newly identified product lines. (*Id.*) A discovery dispute teleconference was held on October 26, 2022, and the court denied Plaintiff's motion to compel the production of core technical documents on the pedicle screw systems listed in Plaintiff's second amended identification of accused products. (D.I. 118 at 48:6-52:16) Plaintiff objected to the court's discovery ruling and moved to amend the complaint on November 9, 2022. (D.I. 123) Plaintiff's objections were subsequently overruled. (D.I. 206)

### 2. Facts relevant to the pending motion to strike

On March 16, 2022, SeaSpine served its answer and affirmative defenses, which included its third affirmative defense asserting equitable estoppel, waiver, unclean hands, and acquiescence. (C.A. No. 21-806-RGA, D.I. 25 at 14) SeaSpine served invalidity contentions setting forth an inequitable conduct claim on June 30, 2022. (D.I. 64) About a month later, SeaSpine notified Plaintiff that it intended to move to amend the answer to include allegations of

inequitable conduct. (D.I. 96, Ex. E) SeaSpine filed the motion to amend on August 19, 2022.
(D.I. 89; D.I. 89-1 at ¶¶ 47-316) The court denied the motion on November 15, 2022, finding
that SeaSpine lacked good cause to amend because it was aware of the facts underlying the
proposed amendment from a document production made by Plaintiff more than two months
before the expiration of the deadline to amend pleadings. (D.I. 130 at 5)

In September of 2022, Plaintiff served interrogatories seeking the legal and factual bases
underlying SeaSpine's affirmative defense of unclean hands. (D.I. 126, Ex. 2 at 3) SeaSpine
responded on October 20, 2022, citing its motion for leave to amend its pleading to add an
affirmative defense of inequitable conduct and representing that the same legal and factual bases
referenced in the motion to amend applied to SeaSpine's equitable defense of unclean hands.
(*Id.*, Ex. 1 at 6)

## II.   LEGAL STANDARDS

### A.  Motion to Amend under Rules 16(b)(4) and 15(a)(2)

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that after a responsive
pleading has been filed, a party may amend its pleading "only with the opposing party's written
consent or the court's leave," and "[t]he court should freely give leave when justice so requires."
Fed. R. Civ. P. 15(a)(2). The decision to grant or deny leave to amend lies within the discretion
of the court. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Secs.
Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). The Third Circuit has adopted a liberal approach to
the amendment of pleadings. *See Dole v. Arco*, 921 F.2d 484, 487 (3d Cir. 1990). In the absence
of undue delay, bad faith, or dilatory motives on the part of the moving party, the amendment
should be freely granted, unless it is futile or unfairly prejudicial to the non-moving party. *See
Foman*, 371 U.S. at 182; *In re Burlington*, 114 F.3d at 1434.

If a party seeks leave to amend after a deadline imposed by the scheduling order, the court must apply Rule 16 of the Federal Rules of Civil Procedure. *See WebXchange Inc. v. Dell Inc.*, C.A. No. 08-132-JJF, 2010 WL 256547, at *2 (D. Del. Jan. 20, 2010). A court-ordered schedule "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The good cause element requires the movant to demonstrate that, despite diligence, the proposed claims could not have been reasonably sought in a timely manner." *Venetec Int'l v. Nexus Med.*, 541 F. Supp. 2d 612, 618 (D. Del. 2010). The focus of the good cause inquiry is on diligence of the moving party, rather than on prejudice, futility, bad faith, or any of the other Rule 15 factors. *See Glaxosmithkline LLC v. Glenmark Pharms. Inc.*, C.A. No. 14-877-LPS-CJB, 2016 WL 7319670, at *1 (D. Del. Dec. 15, 2016). Only after having found the requisite showing of good cause will the court consider whether the proposed amended pleading meets the Rule 15(a) standard. *See E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000).

**B. Motions to Strike under Rule 12(f)**

Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions brought under Rule 12(f) are generally disfavored and should not be granted "unless the insufficiency of the defense is clearly apparent." *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 356 (D. Del. 2009) (internal quotation marks and citation omitted); *see also Fesnak & Assocs., LLP v. U.S. Bank Nat'l Ass'n*, 722 F. Supp. 2d 496, 502 (D. Del. 2010). Moreover, district courts have inherent, discretionary authority to manage their dockets and limit the number of asserted claims in the interests of economy for the court, counsel, and the litigants. *See VLSI Tech. LLC v. Intel Corp.*, C.A. No. 18-966-CFC, 2020 WL 4437401, at *1 (D. Del. Aug. 3, 2020).

## III.   DISCUSSION

### A. Motion to Amend the Complaint

Plaintiff moves for leave to amend the complaint to expand the realm of "SeaSpine Products" beyond the Daytona Systems and comparable derotation systems identified in the operative complaint. (*See, e.g.*, D.I. 123, Ex. 2 at ¶¶ 51-52) To that end, Plaintiff's proposed amended complaint articulates a theory of infringement based on a combination of derotation instruments from the Daytona Systems used with implants from numerous other SeaSpine product lines. (*Id.*) Because the deadline for amended pleadings passed on June 3, 2022, the issue before the court is whether Plaintiff has satisfied the good cause standard under Rule 16(b)(4). (D.I. 43 at ¶ 3) This inquiry focuses on Plaintiff's diligence and requires consideration of whether Plaintiff could have reasonably sought the proposed amendments in a timely manner. *Venetec Int'l*, 541 F. Supp. 2d at 618.

Plaintiff's motion to amend the complaint is denied because he has not made the requisite showing of diligence. The original complaint contained only one paragraph touching on the theory that Plaintiff seeks to broaden in the proposed amended complaint. (C.A. No. 21-806-RGA, D.I. 1 at ¶ 56) The paragraph alleges that the accused Daytona Systems "can be used with the Daytona and/or Malibu™ line of implantable products." (*Id.*) The operative complaint includes as an exhibit the Surgical Technique Guide for the accused Daytona Systems, which identifies the use of the Malibu implantable system. (*Id.*, Ex. F at 1, 18) Nothing in the original pleading indicates compatibility between instruments from the Daytona Systems and implant systems other than Malibu.

Plaintiff's present theory is that SeaSpine's Daytona Systems and Mariner Adult Deformity System can be used with other implantable systems which Plaintiff now identifies as

9

accused products in the proposed amended complaint. (D.I. 123, Ex. 2 at ¶¶ 51-52) There is no dispute that Plaintiff's proposed amendments rest on information that was publicly available to Plaintiff at the time the operative complaint was filed in 2021. Plaintiff's counsel confirmed at oral argument that the Malibu Instructions for Use ("IFU"), which was attached as an exhibit to the proposed amended pleading, was available at the time the original complaint was filed "and we could have found it." (3/7/2023 Tr. at 20:11-21:11) This exhibit states that "[t]he Daytona System contains various instruments specifically designed to work with the Malibu implants as well as various other implants in the NewPort System. Daytona sterilization trays contain Malibu implants." (D.I. 123, Ex. 1 at Ex. G at 1) This publicly available IFU provided notice that implant systems other than Daytona and Malibu may be compatible with instruments from the Daytona Systems. Nonetheless, Plaintiff did not seek leave to amend the complaint before the deadline for amended pleadings.

Plaintiff also failed to pursue his new theory during the July 21 hearing before the District Judge on Plaintiff's motion to compel discovery from SeaSpine. (D.I. 87) At the time, Plaintiff was on notice that SeaSpine objected to producing discovery on all unaccused products, including the SeaSpine implant systems. (D.I. 68, Ex. A) Nonetheless, Plaintiff focused exclusively on discovery relating to derotation systems during the hearing, without mentioning his outstanding document requests regarding SeaSpine's implant systems.

During the hearing, the court repeatedly described the Daytona Systems as the only accused systems and focused on the potential existence of other derotation systems, stating that "I don't think we're interested in screws right now[.]" (D.I. 87 at 13:12-13; *see also id.* at 6:1-10, 7:19-23, 20:3-5) The court emphasized that discovery on unaccused products would not be permitted, and Plaintiff bore the responsibility of identifying accused products: "[I]t's the

10

Plaintiff's job to name accused products and get discovery on accused products. If it's not an accused product, I'm not going to be [ordering] discovery on it[.]" (*Id.* at 20:14-21:1) To that end, the court ordered SeaSpine to supplement an interrogatory response to identify and briefly describe each SeaSpine product line so Plaintiff could investigate "what is or is not capable of derotation" and determine whether to accuse other derotation systems of infringement. (*Id.* at 21:6-22:4)

At no point during this exchange did Plaintiff explain that he was also accusing or intended to accuse SeaSpine's implant systems of infringement, or that he was pursuing discovery on implant systems that had not yet been produced. Even when SeaSpine expressed concern that Plaintiff's discovery requests were not limited to spinal derotation systems and described the broad scope of the requests as "the crux of our objection," Plaintiff remained silent on the matter of implant systems, other than to generally state "I'm aware of many of [SeaSpine's] product lines. I am not aware that there's any connection between anything other than Daytona and derotation." (*Id.* at 15:22-16:8, 18:1-4) Plaintiff's counsel's failure to provide context on the role of the implant systems, even after SeaSpine voiced concerns about producing discovery beyond derotation systems, cannot be squared with the conduct of Plaintiff's counsel during the October 26 discovery dispute. (D.I. 118 at 53:18-63:7)

Plaintiff's lack of diligence continued after the July 21 hearing. Despite being on notice from both SeaSpine and the court that he would not receive discovery on unaccused products, Plaintiff did not seek leave to amend the complaint. As a result, the realm of accused "SeaSpine Products" in the operative pleading remained circumscribed to "instruments," and not implants, and allegations of compatibility with Daytona instruments extended only to the Malibu line of implantable products. (*Compare* C.A. No. 21-806-RGA, D.I. 1 at ¶¶ 51, 56, *with* D.I. 123, Ex. 2

11

at ¶¶ 51-52 (expanding definition of "SeaSpine Products" to include combinations of instruments and implants)).  Instead of seeking leave to amend the pleading, Plaintiff used SeaSpine's supplemental interrogatory response to amend his identification of accused products, adding seven SeaSpine implant systems.  (D.I. 109, Ex. C)  This failed to remedy the pleading deficiency and violated the spirit of the court's July 21 ruling, which was expressly intended to allow Plaintiff to determine "what is or is not capable of derotation" and did not contemplate SeaSpine's implant systems.  (D.I. 87 at 21:20-22:4)

Here, it is undisputed that Plaintiff could have accused the implant systems it now seeks to add from the start of the litigation.  It is also undisputed that Plaintiff could have pleaded a theory of compatibility between instrument and implant systems from different product lines in the original complaint based on publicly available information.  Yet Plaintiff did not move to amend the complaint until nearly a year and a half after the operative complaint was filed, and more than five months after the deadline for amended pleadings had passed.  These facts establish Plaintiff's lack of diligence in seeking the proposed amendment.  *See Carrier Corp. v. Goodman Global, Inc.*, 49 F. Supp. 3d 430, 433 (D. Del. 2014).

Plaintiff argues that diligence should be measured from the time Plaintiff became aware of the need to amend the complaint.  (D.I. 124 at 7)  The authority Plaintiff cites does not support his position.  In *TC Technology LLC v. Sprint Corp.*, C.A. No. 16-153-RGA (D. Del. Feb. 11, 2019), the court found good cause to allow an amendment to add a willful infringement claim because the claim was based on new information obtained in a witness deposition that occurred only about a month before the proposed amendment was made.  (D.I. 124, Ex. 2 at 4)  In this regard, *TC Technology* supports the court's conclusion that diligence should be measured from the time the information underlying the proposed amendments became available.  Here, the

evidence cited in support of Plaintiff's proposed amendments was publicly available on SeaSpine's website since the inception of the case in 2021. (D.I. 123, Ex. 1 at Exs. G-J; 3/7/2023 Tr. at 21:1-14, 32:16-33:4)

The facts of *Enzo Life Sciences, Inc. v. Digene Corp.*, are distinguishable because the proposed amendment to add a claim of inequitable conduct was based on recent deposition testimony. 270 F. Supp. 2d 484, 489 (D. Del. 2003). Although the publicly available prosecution history also supported the inequitable conduct claim, the court concluded that the heightened Rule 9(b) standard for inequitable conduct justified the defendant's efforts to confirm the factual allegations through deposition discovery before bringing the claim. *Id.* In this case, Plaintiff's proposed amendments are not brought under the heightened Rule 9(b) standard. While the proposed amendments are based on documents recently uncovered by Plaintiff, there is no dispute that these documents have been publicly available since the operative complaint was filed. (3/7/2023 Tr. at 21:1-14; D.I. 123, Ex. 1 at Exs. G-J)

Plaintiff's reliance on the Sixth Circuit's decision in *Inge v. Rock Financial Corp.* is neither binding nor persuasive. 281 F.3d 613 (6th Cir. 2002). There, the plaintiff's motion to amend was made to cure deficiencies identified in the district court's order dismissing the case. *Id.* at 626. Here, in contrast, the proposed amendments are not made to salvage the case from dismissal. Instead, Plaintiff's proposed amendments are made to justify an expansion of discovery into multiple additional product lines of uncertain relevance that have many noninfringing uses and do not, by themselves, infringe. (3/7/2023 Tr. at 20:2-10, 23:2-11, 37:8-24)

In sum, Plaintiff has not established good cause for the proposed amendments under Rule 16(b)(4) because the record shows that the information underlying Plaintiff's proposed

13

amendments was available to Plaintiff prior to the expiration of the deadline for amended pleadings on June 3, 2022. (*Id.*) Because Plaintiff has not satisfied the good cause standard under Rule 16(b)(4), the court need not reach the merits of Plaintiff's arguments under Rule 15(a). *See Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020) ("A party must meet [the Rule 16(b)(4)] standard before a district court considers whether the party also meets Rule 15(a)'s more liberal standard.").

### B. Motion to Strike SeaSpine's Third Affirmative Defense of Unclean Hands

Plaintiff moves to strike SeaSpine's third affirmative defense of unclean hands. (D.I. 125) I recommend that the court deny Plaintiff's motion as untimely to the extent that it is brought under Rule 12(f)(2), which provides that "[t]he court may strike from a pleading an insufficient defense. . . (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Fed. R. Civ. P. 12(f)(2). It is undisputed that SeaSpine's affirmative defense of unclean hands was made on March 16, 2022, and Plaintiff's motion to strike was filed nearly eight months later, on November 10, 2022. (C.A. No. 21-806-RGA, D.I. 25; D.I. 125) Therefore, the motion to strike is untimely on its face.

Plaintiff maintains that his motion to strike is timely because it was brought within 21 days of SeaSpine's disclosure of its unclean hands theory in its interrogatory responses served on October 20, 2022. (D.I. 148 at 2) But Rule 12(f)(2) provides no such exception. The relevant event under Rule 12(f) is the filing of the answer, not a "representation through counsel" related to the defendant's defenses. *See Chervon (HK) Ltd. v. One World Techs., Inc.*, C.A. No. 19-1293-GBW, 2022 WL 14812531, at *2 (D. Del. Oct. 26, 2022) (denying a motion to strike inequitable conduct claims filed 314 days after the amended answer was filed).

14

Nonetheless, I recommend that the court strike SeaSpine's affirmative defense of unclean hands *sua sponte* under Rule 12(f)(1), to the extent that the affirmative defense sounds in fraud under Rule 9(b). Fed. R. Civ. P. 12(f)(1) ("The court may strike from a pleading an insufficient defense . . . (1) on its own[.]"). "The pleadings standard for unclean hands depends on the specific conduct alleged. A counterclaim or affirmative defense that alleges fraudulent conduct must be pled with particularity under Rule 9(b)." *Allergan USA, Inc. v. Sun Pharm. Indus. Ltd.*, C.A. No. 19-1727-RGA, 2022 WL 11819975, at *3 (D. Del. Oct. 20, 2022) *see Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, C.A. No. 20-464-RGA-CJB, 2020 WL 7264199, at *2 (D. Del. Dec. 10, 2020) (explaining that an affirmative defense of inequitable conduct must meet the heightened pleading requirements of Rule 9(b)). The factual allegations in SeaSpine's operative answer are insufficient to satisfy the heightened pleading standard for an affirmative defense of unclean hands based on allegations of inequitable conduct.

There is no meaningful dispute that SeaSpine relies on the factual allegations of inequitable conduct in its proposed amended answer to bolster its third affirmative defense. In its interrogatory responses, SeaSpine expressly alleges that the factual allegations in its proposed amended answer set forth the legal and factual bases to support the equitable defenses included in its third affirmative defense. (D.I. 126, Ex. 1 at 6) ("The proposed Amended Answer sets forth legal and factual bases that support Defendants' Equitable Defenses."). But SeaSpine's motion to amend its answer was subsequently denied as untimely. (D.I. 130) As a result, the operative answer is the one filed on March 16, 2022. (C.A. No. 21-806-RGA, D.I. 25) SeaSpine does not point to any allegations in the operative answer that are sufficient to withstand scrutiny under Rule 9(b), instead arguing that Plaintiff was on notice of the factual bases for the

affirmative defense and Plaintiff's motion to strike "elevates form over substance." (D.I. 140 at 5-7)

Because SeaSpine's operative answer does not satisfy the heightened pleading standard under Rule 9(b), and because allowing SeaSpine to proceed with its third affirmative defense would effectively allow it to circumvent the court's ruling on the motion for leave to amend the answer, I recommend that the court strike SeaSpine's unclean hands defense under Rule 12(f)(1) only to the extent that the affirmative defense sounds in fraud under Rule 9(b). The recommendation is made without prejudice to SeaSpine's ability to pursue an affirmative defense of unclean hands under the Rule 8 pleading standard.

### C. Motion to Strike Stryker's Third Affirmative Defense of Unclean Hands

Plaintiff moves to strike Stryker's third affirmative defense of unclean hands. (D.I. 128) I recommend that the court deny Plaintiff's motion as untimely to the extent that it is brought under Rule 12(f)(2). It is undisputed that Stryker's answer and affirmative defenses were filed on May 25, 2021, and Plaintiff's motion to strike Stryker's third affirmative defense was filed more than a year later, on November 11, 2022. (D.I. 16; D.I. 128) Stryker's subsequent disclosure of the basis for its unclean hands defense in interrogatory responses served on September 14, 2022 does not alter the analysis for the reasons set forth at § III.B, *supra*. (D.I. 129, Ex. 1 at 8; *see also* Ex. 5 at 1) Therefore, Plaintiff's motion to strike is untimely on its face.

Nonetheless, I recommend that the court strike Stryker's third affirmative defense of unclean hands *sua sponte* under Rule 12(f)(1), to the extent that the affirmative defense sounds in fraud under Rule 9(b). Fed. R. Civ. P. 12(f)(1). Stryker's answer and affirmative defenses do not contain sufficient factual allegations to support a defense of unclean hands based on a theory of misconduct before the United States Patent and Trademark Office ("PTO"). (D.I. 16)

16

Instead, the factual bases underlying Stryker's affirmative defense of unclean hands are set forth in its interrogatory responses, which describe Plaintiff's alleged misconduct before the PTO. (D.I. 129, Ex. 1 at 8; Ex. 5)  For the reasons explained at § III.B, *supra*, Stryker's discovery responses are insufficient to satisfy the heightened Rule 9(b) pleading standard.

Stryker's supplemental interrogatory responses, served several weeks after Plaintiff's motion to strike, set forth an additional theory that Plaintiff engaged in a pattern of litigation misconduct by initiating and maintaining lawsuits despite his knowledge of his misconduct before the PTO.  (D.I. 150, Ex. 1 at 20-22)  At oral argument, Stryker argued that these allegations of litigation misconduct are based on unconscionability and bad faith, as opposed to fraud, and they are therefore not subject to the heightened pleading standard.[5]  (3/7/2023 Tr. at 53:5-54:10, 55:16-25)

In this district, the law is well-established that "[t]he pleadings standard for unclean hands depends on the specific conduct alleged." *Allergan USA*, 2022 WL 11819975, at *3.  In *Allergan*, for instance, the court applied the Rule 8 standard to an affirmative defense of unclean hands based on litigation misconduct where the plaintiff allegedly used the defendant's confidential information obtained in the course of litigation to draft patent claims.  *See id.*  But an unclean hands defense that depends on proof of fraud falls within the scope of the heightened Rule 9(b) standard.  *See AbbVie Inc. v. Boehringer Ingelheim Int'l GmbH*, C.A. No. 17-1065-MSG-RL, 2018 WL 2604825, at *2 (D. Del. June 4, 2018).  And there is no dispute that an

---

[5] Stryker's counsel went on to argue that case law applying Rule 9(b) extends only to allegations of fraud, and not mistake. (*Id.* at 56:1-57:3)  Rule 9(b) of the Federal Rules of Civil Procedure, entitled "Fraud or Mistake; Conditions of Mind," provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  For clarity of the record, "mistake" is expressly included in the scope of Rule 9(b).

unclean hands defense based on allegations of inequitable conduct sounds in fraud. *See Senju Pharm. Co., Ltd. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 306 (D. Del. 2013).

Here, proof of Plaintiff's alleged "litigation misconduct" rises and falls with Stryker's allegations of misrepresentations before the PTO. Stryker's supplemental interrogatory responses allege that "Dr. Barry has engaged in a pattern of litigation misconduct before this Court and other District Courts by filing and maintaining lawsuits asserting patents with knowledge that they are invalid based on his own prior public use(s) and/or prior sale(s) that Dr. Barry *admits* were not experimental." (D.I. 150, Ex. 1 at 20) The interrogatory responses go on to explain that these prior uses were the same three surgeries performed on August 4, August 5, and October 14, 2003 that Plaintiff allegedly failed to disclose to the PTO during prosecution of the patents-in-suit. (*Id.*, Ex. 1 at 18, 20-21) Stryker cannot salvage an unclean hands defense based on inequitable conduct by renaming the allegations "litigation misconduct" in a transparent effort to invoke the Rule 8 standard a few weeks after Plaintiff moved to strike Stryker's unclean hands defense. *See Gilead Scis., Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (cautioning against "the potential for misuse of this necessarily flexible doctrine" of unclean hands).

For these reasons, I recommend that the court strike Stryker's unclean hands defense *sua sponte* under Rule 12(f)(1). The recommendation is made without prejudice to Stryker's ability to pursue an affirmative defense of unclean hands under the Rule 8 pleading standard. I further recommend that the court deny Stryker's alternative request for leave to amend its answer to conform to the evidence. (D.I. 150 at 9) As the court previously held in the Memorandum Opinion denying SeaSpine's motion for leave to amend the answer, Stryker's unclean hands defense is based on factual allegations of inequitable conduct that were not timely raised. (D.I.

130 at 4-7) (describing inequitable conduct allegations based on Plaintiff's filings with the PTO, the *Medtronic* and *DePuy* litigations, and a March 2022 document production).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion to amend the complaint is DENIED.  (D.I. 123)  I recommend that the court DENY Plaintiff's motions to strike SeaSpine and Stryker's third affirmative defenses of unclean hands.  (D.I. 125; D.I. 128)  Finally, I recommend that the court STRIKE SeaSpine and Stryker's third affirmative defenses of unclean hands *sua sponte*, only to the extent that those affirmative defenses sound in fraud under Fed. R. Civ. P. 9(b) as described herein.

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties.  In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than **March 27, 2023**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)).  If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within fourteen (14) days of the date the Report and Recommendation issued.

The portion of the court's decision on Plaintiff's motion to amend the complaint is filed pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a), and D. Del. LR 72.1(a)(2).  The

portion of the court's decision on Plaintiff's motions to strike the third affirmative defenses of Stryker and SeaSpine is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: March 20, 2023

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DR. MARK A. BARRY, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Civil Action No. 20-1787-RGA |
| | : |
| STRYKER CORPORATION, et al., | : |
| | : |
| Defendants. | : |

## **MEMORANDUM ORDER**

I review objections taken to an order of a magistrate judge denying a motion to amend a
complaint.

The scheduling order set a deadline for amended pleadings of June 3, 2022. (D.I. 43 at

2). Plaintiff Barry filed a motion for leave to file first amended complaint on November 9, 2022.

(D.I. 123). In order to succeed, Barry needed to show "good cause" to modify the schedule.

Fed. R. Civ. P. 16(b)(4). The focus of the "good cause" inquiry is the diligence of the moving

party. (D.I. 237 at 8). The Magistrate Judge recited the procedural history of the case and found

that Barry had not shown good cause. (*Id*. at 9-14). So she denied the motion.

Barry objected. (D.I. 247). Defendant Seaspine responded. (D.I 256).

The first question on review is, what is the standard of review? The Local Rules

recognize this: "Objections . . . shall identify the appropriate standard of review." D.Del. LR

72.1(b); *see also* D.Del. LR 7.1.5(b). I note that requiring the statement of a standard of review

is helpful to the reviewing court. It might also help the disappointed party to consider whether it

should even file objections. Barry does not identify a standard of review. He sprinkles

throughout his objections the words "errs" and "errors." But that is not the identification of a

Page 1 of 3

standard of review.  Barry did not comply with the Local Rule. His objections are thus overruled. *See Personal Audio, LLC v. Google LLC,* Civ. Act. No. 17-1751, D.I. 784 (D. Del. April 4, 2023); *Elm 3DS Innovations, LLC v. Samsung Electronics Co.*, 2021 WL 2070338, *2 (D. Del. May 24, 2021). I need proceed no further.

The Court has a standing order that states: "Any party filing objections . . . **must** include . . . a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and describing the good cause for failing to previously raise [them] before the Magistrate Judge." Standing Order for Objections Filed under Fed. R. Civ. P. 72 (D. Del. Oct. 9, 2013) (emphasis in original) (available on the Court's website). Barry did not file such a written statement with his objections. Seaspine pointed this out. (D.I. 256 at 1). Seaspine asserts that Barry has raised arguments that he did not raise before the Magistrate Judge. (*Id.* at 3-4, 6).[1] Had Barry filed the required statement, I would know what his position on Seaspine's assertion is. Even after Seaspine raised the issue, Barry did not seek leave to file a statement providing the required information. This is not some arcane requirement. It is a practical one, designed to make referrals to magistrate judges as efficient as the referral system can be. Barry's objections are thus overruled. *See Rogers v. Wilmington Trust Co.*, 2019 WL 4596650, *2 (D. Del. Sept. 23, 2019). I need proceed no further.

Seaspine states that the standard of review is "clearly erroneous or contrary to law." (D.I. 256 at 3). Nearly a direct quote from the rule. *See* Fed. R. Civ. P. 72(a). The only relevant law

---

[1] One of the arguments Seaspine says Barry makes for the first time before me (D.I. 256 at 4) relies upon a single case (*Philips v. ASUSTeK Comp.*, 2016 WL 6246763 (D. Del. Oct. 25, 2016)) discussing what is required in order to plead a claim upon which relief can be granted as support for what the scope of a case is. (D.I. 247 at 8, 9). Those are clearly two different things. The case is not cited in the briefing before the Magistrate Judge. (D.I. 124; D.I. 149). Thus, it seems likely that Barry has made at least one new argument.

is Rule 16(b)(4). Barry does not mention Rule 16, good cause or the "clearly erroneous" standard.[2] I do not think Barry raises any legal issues. Essentially, without ever actually articulating the relevant standard, he is asserting that various factual findings are clearly erroneous. I think he is wrong. His argument is largely predicated on a hypothetical amended complaint, not the actual amended complaint that he proposed. (D.I. 123-4). Were I to find it necessary to rule on the merits of Barry's objections, I would overrule them. But I do not need to reach the merits since Barry has not complied with the rules in making his objections.

The Order denying the motion for leave to file first amended complaint (D.I. 237) is

**AFFIRMED**.

IT IS SO ORDERED this ⸺ day of May 2023.

United States District Judge

---

[2] Barry does recognize that "diligence" is at issue.

# EXHIBIT 3



ARM_01241472

# EXHIBIT 4



CONFIDENTIAL

ARM_01423338



CONFIDENTIAL

ARM_01423339



CONFIDENTIAL

ARM_01423340

# EXHIBIT 5



ARM_01241565



CONFIDENTIAL

# EXHIBIT 6

| | |
|---|---|
| **From:** | Morgan, Erin J <ejmorgan@paulweiss.com> |
| **Sent:** | Monday, January 8, 2024 4:26 PM |
| **To:** | Fung, Nicholas Rylan; Vaughn, Madalyn; Olson, Erik J. (Palo Alto); Jacobs, Michael A.; Llewellyn, Scott F.; Muino, Daniel P.; Mooney, Kyle W.; Liou, Joyce; Patel, Fahd H.; Li, Jack; Brickey, Sarah E.; Davenport, Lydia; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM |
| **Cc:** | GRP-QC; Dunn, Karen L; Isaacson, William A; Nyarady, Catherine; Zappala, Melissa Felder; Gressel, Anna R; Braly, Jacob; jying@morrisnichols.com; Blumenfeld, Jack |
| **Subject:** | RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN |
| **Attachments:** | Proposed revised schedule(18888039.2).docx |
| **Categories:** | DM, #146330034 : 77822 : 0000011 : MXM80, #145068479 : 77822 : 0000011 : EKN1, #145070268 : 77822 : 0000011 : ZBQ1, #145059291 : 77822 : 0000011 : CMM9, #145055833 : 77822 : 0000011 : CDF1 |

**External Email**



**This message needs your attention**
• You've never replied to this person.

Report or Mark Safe                              Powered by Mimecast

Counsel—

Thank you for speaking Friday about a proposed extension of the schedule and Qualcomm's intention to amend its counterclaims.  As discussed, we are writing to provide further details on both issues.

On the schedule, as discussed, Qualcomm proposes asking the Court to move the trial date to the week of December 9.  This modest extension will allow the parties to create space in the schedule to wind up fact discovery disputes, depose the significant number of experts in this case, and brief Daubert and dispositive motions without cutting into the Court's time to decide those motions.   A proposed schedule is attached.

As to the amended counterclaims, Qualcomm intends to assert three counterclaims, which are summarized below, with references to the bases for each claim.

Please let us know when you are available to meet and confer further on these issues.

Best,
Erin

\*            \*            \*            \*            \*

1. ████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



**2.** ███████████████████████████████





**Erin J. Morgan** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3387 (Direct Phone) | +1 212 492 0387 (Direct Fax)
ejmorgan@paulweiss.com | www.paulweiss.com

---

**From:** Fung, Nicholas Rylan <NFung@mofo.com>
**Sent:** Thursday, January 4, 2024 1:12 PM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney,

Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Li, Jack <JackLi@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Madalyn,

We are available to meet and confer tomorrow at noon or 1 pm ET.

Best,

**NICHOLAS FUNG**
Partner | Morrison & Foerster LLP
707 Wilshire Boulevard | Los Angeles, CA 90017-3543
**P:** +1 (213) 892-5348
mofo.com | LinkedIn | Twitter

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Wednesday, January 3, 2024 12:36 PM
**To:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Li, Jack <JackLi@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

---

Counsel:

We would like to meet and confer at your earliest convenience regarding (a) seeking an extension to the case schedule, including by moving the trial date, and (b) Qualcomm's intention to amend its counterclaims in this case. Please let us know your availability tomorrow (Thursday, January 4) and Friday (January 5) for that discussion.

Best,

Madalyn


**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com


This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.


========================================================================


This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRUINJECT CORP,

               Plaintiff,

      v.

GALDERMA S.A.,
et al.,

               Defendants.

C. A. No. 19-00592-GBW

## **MEMORANDUM ORDER**

Pending before the Court is Plaintiff Truinject Corp.'s ("Truinject's") Objections to the Report and Recommendation on Plaintiff's Motion for Leave to Amend the Complaint. D.I. 360. On September 28th, 2021, Judge Hall issued a Memorandum Order granting-in-part and denying-in-part Truinject's motion for leave to file a third amended complaint. D.I. 358. Truinject objects to Judge Hall's ruling, which denied (1) leave to add breach of contract claims against new party Nestle Skin Health, S.A. ("NSH"), (2) leave to add antitrust claims against Nestle S.A., Nestle Skin Health, S.A., Nestle Skin Health, Inc., Galderma Laboratories L.P. ("Galderma,") and Galderma S.A. (collectively, "Defendants") and (3) production of employee files for sixteen individuals. For the following reasons, Truinject's objections to the Memorandum Order on Plaintiff's Motion for Leave to File a Third Amended Complaint are overruled and the Memorandum Order is adopted in its entirety. D.I. 358.

1

## I.     LEGAL STANDARD

The Court reviews rulings of a Magistrate Judge on non-dispositive motions under a clearly erroneous standard.  Dispositive recommendations are reviewed *de novo*.  Fed. R. Civ. P. 72; *Kenny v. United States*, 489 Fed. Appx. 628, 630 n.2 (3d Cir. 2012).  Motions for leave to amend are typically non-dispositive.  *Id.*  However, motions for leave to amend that, in practice, result in dismissal may be treated as dispositive motions.  *Id.*; *see also Paoli v. Stetser*, C.A. No. 12-66-GMS-CJB, 2013 WL 2154393 at *1 n.1 (D. Del. May 16, 2013), *report and recommendation adopted*, (D. Del. June 10, 2013).

The decision denying document production was non-dispositive.  Thus, the Court reviews that decision under a clearly erroneous standard.  For purposes of this motion, the Court will treat the recommendation denying leave to amend as dispositive.  Thus, the Court reviews that decision *de novo*.  The Court concludes that Judge Hall's Memorandum Order should be adopted in its entirety.

## II.     Truinject's Motion for Leave to Amend the Complaint

Truinject argues it should have been granted leave to amend and add claims against NSH.  D.I. 360 at 2.  A party seeking leave to amend its pleading or add new parties after the scheduling deadline must meet the "good cause" requirement in Rule 16(b)(4).  Fed. R. Civ. P. 16(b)(4).  "Good cause exists if the Schedule cannot reasonably be met despite the diligence of the party seeking the extension" and "hinges on diligence of the movant."  *Scott v. Vantage Corp.*, 336 F. Supp. 3d 366, 372 (D. Del. 2018) (internal citations omitted).  If good cause is shown, the court next considers whether leave to amend is appropriate under Rule 15(a)(2).  In doing so, courts consider (1) whether the amendment has been unduly delayed; (2) whether the amendment would

unfairly prejudice the non-moving party; (3) whether the amendment is brought for some improper purpose; and (4) whether the amendment is futile. Fed. R. Evid. 15(a)(2).

Truinject sought to amend its complaint after the deadline set forth in the scheduling order. D.I. 358 at 3. Truinject argues leave to amend should have been granted because it acted diligently with respect to asserting (1) personal jurisdiction over NSH, (2) contract claims against NSH, and (3) attempted monopolization and Cartwright Act claims against NSH.

### a. Truinject was not Diligent in Asserting Personal Jurisdiction over NSH

Truinject argues it was diligent in seeking leave to add claims against NSH because it informed the Court that it planned to file suit in Texas after learning facts suggesting the Court had personal jurisdiction over NSH. D.I. 360 at 4. Judge Hall initially held that the Court did not have personal jurisdiction over NSH because Galderma lacked apparent authority to bind NSH. *Id.* at 2. Truinject now argues Defendants misrepresented Galderma's apparent authority. *Id.* Truinject claims it first learned of this alleged misrepresentation through documents produced by Defendants on May 20, 2020. *Id.* at 3. Truinject contends these documents establish that a Galderma employee, Peter Nicholson, possessed authority to bind NSH because Mr. Nicholson was an NSH officer by March 11, 2015. *Id.*

Truinject lacks good cause to amend its complaint because Truinject was not diligent with pursuing its claims in this Court. Truinject alleges it learned this Court has jurisdiction over NSH on May 20, 2020. *Id.* Instead of filing a motion for reconsideration in this Court, Truinject filed a new action against NSH in Texas. Truinject argues it chose to file in Texas to preserve the statute of limitation on its antitrust case and to "keep all claims in one lawsuit." *Id.* at 3. Truinject contends that it acted diligently in this Court because Truinject informed the Court by letter on April 20, 2020 of its intention to file in Texas. *Id.* at 4. Filing an action in Texas did not preclude Truinject

3

from seeking reconsideration on the jurisdictional issue in this court. As such, Truinject did not pursue its claims against NSH in this Court diligently.

Accordingly, the Court finds Truinject did not pursue its claims against NSH in this Court diligently. Thus, Truinject lacks good cause to amend its pleading to add claims against NSH.

### b. Truinject was not Diligent in Asserting its Breach of Contract Claims Against NSH

Truinject further argues that it has good cause to amend the complaint to include breach of contract claims against NSH because of Defendants' alleged misrepresentations. D.I. 360 at 4. Truinject argues that the Court previously granted leave to amend and add claims against Galderma after Defendants misrepresented Galderma's role in the development of Defendant's allegedly infringing product. *Id.* Truinject argues that the Court should apply the same standard here and grant leave to amend and add claims against NSH. *Id.*

For the same reasons discussed above, Truinject failed to diligently pursue its claims against NSH. Judge Hall found good cause for amendment with respect to defendant Galderma because this defendant was already before the Court. D.I. 358 at 3. Therefore, adding claims against Galderma was unlikely to cause prejudice. *Id.* The same cannot be said for NSH in this action because of Truinject's failure to diligently pursue jurisdiction over NSH in this Court.

Accordingly, the Court finds Truinject lacks good cause to amend its pleading to add breach of contract claims against NSH.

### c. Truinject was not Diligent in Asserting its Antitrust Claims Against Defendants

Truinject argues that the Court misapplied the law in holding Truinject did not act diligently in pursuing its attempted monopolization and Cartwright Act claims. D.I. 360 at 5.

4

Judge Hall ruled that Truinject failed to act diligently because Truinject had notice of the underlying facts giving rise to their antitrust claim in mid-2018. D.I. 358 at 8. Truinject did not seek to amend its complaint until Truinject's third amended complaint, which was filed on March 9, 2021. *See* D.I. 293 (Plaintiff Truinject Corp.'s Motion for Leave to File Its Third Amended Complaint). Truinject contends that it acted diligently because Truinject was not aware of the relevant market until it received documents from Defendants in November 2019. Truinject claims these documents show Defendants' belief that "facial injection training technology was Defendants' "own market." D.I. 360 at 5. Truinject claims it acted diligently because Truinject retained an antitrust expert in March 2020 and subsequently filed antitrust claims against Defendants in a Texas federal court. *Id.* at 6-7.

Truinject's argument, however, is unconvincing. Although Truinject claims that it could not pursue its claim until Defendants identified their "own market," it is the plaintiff's—not defendants'—burden to define the relevant market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997). Moreover, Truinject was already on notice that Defendants could be participants of a "relevant market" when Truinject learned of the facts giving rise to the antitrust claims. Truinject's first complaint alleged that Defendants "wanted to gain an advantage over their competitors in the training market." D.I. 1 at 109. Once Truinject had knowledge of the underlying facts, nothing prevented Truinject from retaining an expert to explore whether Defendants possessed monopoly power in a relevant market. Instead, Truinject failed to retain an expert, or otherwise pursue its claim, until Defendants identified the market in which they participated. D.I. 360 at 5.

Further, Truinject did not move to amend its complaint until March 9, 2021—almost a year after Truinject obtained an expert draft report. *Id.* at 6-7. Truinject admits it was "on notice of the

5

existing market" at the time it received the report. *Id.* Truinject contends it filed in Texas, rather than seeking to amend its complaint in this Court, because of the Court's previous ruling that it lacked jurisdiction over NSH. *Id.* at 7. Truinject now contends this Court's initial ruling on personal jurisdiction was incorrect because of an alleged misrepresentation. *Id.* at 3. However, even if that were true, Truinject was aware of that misrepresentation by May 20, 2020. *Id.* Thus, Truinject's failure to seek leave to amend in this Court until March of 2021 is not justified.

For these reasons, the Court finds Truinject did not pursue its antitrust claims against Defendants in the Court diligently. Thus, Truinject lacks good cause to amend its pleading to add these claims against Defendants.

## III. Truinject's Motion to Compel Document Production

Truinject argues Defendants should be compelled to produce employee personnel files on sixteen individuals identified by Truinject. *Id.* at 8. Truinject claims these files are necessary to "show who employed these people, when the people were employed, and if the employees were evaluated based on Holly and LucyLive." *Id.* Truinject served an interrogatory requesting that Defendants "identify all employees who invented, created, designed, or developed Holly and LucyLive." *Id.* Defendants' response listed only three employees, but Truinject contends at least eight other employees were involved in the production of these products. *Id.* at 9. Defendants argue their response was sufficient because the interrogatory did not ask "who certain individuals worked for or what they worked on." D.I. 371 at 10 n. 58.

Judge Hall ordered Defendants to determine the existence of "particular documents in personnel files that suggest that particular individuals worked or took credit for developing the technology at issue." D.I. 358 at 8. If any such documents were identified, Judge Hall further

6

ordered the parties to and meet and confer about whether and in what form these documents should be produced. *Id.*

Rule 26 allows parties to obtain discovery on any nonprivileged matter that is relevant to any party's claim or defense. Fed. R. Evid. 26. However, discovery must be "proportional to the needs of the case." *Id.* Accordingly, while personnel files are discoverable, courts have required a "specific" and "particularized" showing of relevance before compelling disclosure. *Lawson v. Love's Travel Stops & Country Stores, Inc.*, C.A. No. 17-CV-1266, 2020 WL 94078 at *3 (M.D. Pa. Jan. 8, 2020). This showing is necessary because discovery files contain confidential information, and the court must therefore weigh the right to relevant discovery against the privacy interests of non-parties to the litigation. *Id.*

The Court agrees with Judge Hall's ruling that production of the entire personnel file is not relevant and proportional to Truinject's need to answer which employees worked for which company. Accordingly, the Court finds that Judge Hall did not clearly err in ruling that Defendants' need not produce the employee personnel files on the sixteen individuals identified by Truinject.

## IV.    CONCLUSION

WHEREFORE, at Wilmington this 15th day of September, 2023, **IT IS HEREBY ORDERED** that Judge Hall's September 14, 2021 Memorandum Order recommending that the Court deny Plaintiff's motion for leave to amend the complaint and deny Plaintiff's motion to compel discovery is **ADOPTED** for the reasons stated by Judge Hall.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

7

# EXHIBIT 8



CONFIDENTIAL



CONFIDENTIAL

ARM_01305480

# EXHIBIT 9



CONFIDENTIAL

# EXHIBIT 10



ARM_01296809



CONFIDENTIAL

ARM_01296810



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

ARM_01296813



CONFIDENTIAL



ARM_01296815



CONFIDENTIAL

ARM_01296816



CONFIDENTIAL

ARM_01296817



ARM_01296818



CONFIDENTIAL

ARM_01296819



CONFIDENTIAL



CONFIDENTIAL

ARM_01296821



CONFIDENTIAL

ARM_01296822



ARM_01296823



CONFIDENTIAL

ARM_01296824



CONFIDENTIAL

ARM_01296825

# EXHIBIT 11



CONFIDENTIAL

ARM_01296738



CONFIDENTIAL

ARM_01296739



CONFIDENTIAL

ARM_01296740



ARM_01296741



CONFIDENTIAL

ARM_01296742



CONFIDENTIAL

ARM_01296743



ARM_01296744



CONFIDENTIAL

ARM_01296745



ARM_01296746



CONFIDENTIAL

ARM_01296747



ARM_01296748



CONFIDENTIAL

ARM_01296749



CONFIDENTIAL



CONFIDENTIAL

ARM_01296751



CONFIDENTIAL

ARM_01296752



CONFIDENTIAL

ARM_01296753



ARM_01296754



ARM_01296755



CONFIDENTIAL

ARM_01296756



CONFIDENTIAL

ARM_01296757



ARM_01296758

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 28, 2024, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
mvaughn@paulweiss.com
jbraly@paulweiss.com
abutwin@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Brian Shiue
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
bshiue@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) (LDH) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | **REDACTED -** |
| TECHNOLOGIES, INC. and NUVIA, INC.,| ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' LETTER TO THE HONORABLE LAURA D. HATCHER
### REQUESTING LEAVE TO AMEND ANSWER AND COUNTERCLAIM

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

OF COUNSEL:
Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Brian Shiue
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

Andrea L. D'Ambra
Susana Medeiros
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 318-3000

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

Kira Latham
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
(214) 855-8000

*Attorneys for Defendants*

**Original Filing Date: February 21, 2024**
**Redacted Filing Date: February 29, 2024**

Dear Judge Hatcher:

Defendants (collectively, "Qualcomm") respectfully move for leave to amend their Answer and Counterclaims (D.I. 18) to allege additional counterclaims based on information recently uncovered through discovery. (*See* Ex. 1 (Qualcomm's proposed amendment); Ex. 2 (redline).)

**Background.** The deadline to amend pleadings in this case was April 28, 2023. (D.I. 87.) ARM produced the vast majority of its documents—roughly 46,000 of the 60,000 total documents—the week of, or after, the August 18 substantial completion deadline. Additionally, due to scheduling conflicts—and by agreement of the parties (*see* D.I 254 at 2)—the depositions of certain key ARM witnesses did not occur until November and December 2023, including: Richard Grisenthwaite (Chief Architect, on November 15), Mark Werkheiser ("Distinguished Engineer" and Fellow, on December 7), and Vivek Agrawal (Senior Principal Engineer, on December 14). (*See* Exs. 3-5.)

In those depositions, Qualcomm learned that ARM committed multiple, serious breaches of its agreements with Qualcomm and NUVIA—and that ARM had intentionally concealed or misrepresented facts related to those violations, which include breaches of (1) ██████████ of the NUVIA ALA and TLA by ██████████████████████████████████████████████; and (2) ██████████ of the Qualcomm ALA by ██████████████ (*See* Ex. 1 ¶¶ 234-245, 255-59, 271-294, 302-315.) Qualcomm promptly informed ARM on January 3, 2024 that it intended to amend its counterclaims and asked to meet and confer. (Ex. 6 at 18.) Qualcomm conveyed that the new counterclaims would require limited additional discovery and that they could be tried with the current claims in the case, provided that the trial date is moved to December 9, 2024, as requested in Qualcomm's January 23, 2024 motion to move the trial. (D.I. 254.) Qualcomm also provided a proposed schedule, a description of the basis for the counterclaims with citations to relevant evidence, and a proposed redline of the counterclaims. (Ex. 6 at 8, 14-17.) On January 19, 2024, ARM indicated it would oppose Qualcomm's motion because it did not understand how the amendments would impact the case schedule or be "treated procedurally" and because it believed Qualcomm lacked diligence with respect to its claim that ARM breached ██████████ of the NUVIA ALA. (*Id.* at 4, 6.) ARM indicated that it "may" have additional arguments regarding diligence and futility, but refused to articulate them. (*Id.* at 4.)

**Legal Standard.** "The Third Circuit has adopted a liberal policy favoring the amendment of pleadings to ensure that claims are decided on the merits rather than on technicalities." *WebXchange Inc.* v. *Dell Inc.*, 2010 WL 256547, at *2 (D. Del. Jan. 20, 2010). Absent a showing of "undue delay, bad faith or dilatory motives" or where the amendment would be futile or prejudice another party, leave should be granted. *WiTricity Corp.* v. *Momentum Dynamics Corp.*, 563 F.Supp.3d 309, 326 (D. Del. 2021) (citation omitted); *see also* Fed. R. Civ. P. 15(a)(2). Where, as here, a party seeks to amend the pleadings after a deadline imposed by a scheduling order, Rule 16(b)(4) provides that the schedule "may be modified only for good cause and with the judge's consent." "The good cause element requires the movant to demonstrate that, despite diligence, the proposed claims could not have been reasonably sought in a timely manner." *Chemours Co. FC, LLC* v. *Daikin Indus. Ltd.*, 2022 WL 855518, at *2 (D. Del. Mar. 23, 2022).

**Qualcomm Has Good Cause to Amend.** Under Rule 16(b)(4), Qualcomm has good cause to amend its counterclaims because Qualcomm did not learn the information on which it now relies

until the November and December 2023 depositions. *Chemours*, 2022 WL 855518, at *2. The bases for Qualcomm's amended counterclaims are as follows:

*First*, under ███████████ of the NUVIA ALA and TLA, ARM was obligated, upon termination of these agreements effective March 1, 2022, to ███████████ and, at NUVIA's option, to ███████████ any such information in its possession. (Ex. 7; Ex. 8.) ARM never certified compliance with this obligation, but wrote to Qualcomm in April 2022 stating ███████████ ███████████ (Ex. 9.) ARM reiterated in its Complaint that it had fulfilled those obligations. (D.I. 1, ¶ 60.) But on December 14, 2023 Mr. Agrawal testified ███████████ (Ex. 5 at 95:22-99:8) and on December 7, Mr. Werkheiser testified ███████████ (Ex. 4 at 60:22-25) and ███████████ (*id*. at 52:4-54:17; 55:18-56:20). To date, ARM's only argument is that Qualcomm's Answer stated that "ARM never certified its own compliance with the termination provisions" (D.I. 18, ¶ 233 n.31), but prior to the depositions, Qualcomm had no concrete evidence that ARM failed to comply with its ███████████ obligations (as opposed to only failing to provide a certification).

*Second*, under ███████████ of the Qualcomm ALA, ARM must ███████████ the ARM Technology to which Qualcomm is entitled under that contract ███████████ (Ex. 10 at 11.) Qualcomm first suspected ARM was withholding ARM Technology—███████████ ███████████—in November 2022, at which time it gave ARM written notice of non-compliance in accordance with ███████████ of the Qualcomm ALA. (Ex. 11.) ARM's counsel responded on December 6, 2022, ███████████ ███████████ (Ex. 12.) Prior to discovery, Qualcomm had no reason to dispute that representation. But through discovery, Qualcomm learned that ARM's December 6, 2022 letter misrepresented the facts. On November 2, 2023, ARM produced a document ███████████ (*see* Ex. 13; *see also* Ex. 3 at 211:16-212:12; Ex. 5 at 154:12-156:16, 163:6-164:1), and at his December 12, 2023 deposition, Mr. Agrawal testified ███████████ ███████████. (*See id.* at 157:13-159:22; *see also* Ex. 13.) It was not until Mr. Agrawal's deposition that Qualcomm was able to confirm ███████████ ███████████ ███████████.

Qualcomm has been diligent in seeking its proposed amendment. Less than three weeks after Mr. Agrawal's deposition, Qualcomm asked ARM to meet and confer. ARM would not meaningfully engage until January 16. After the parties' third meet and confer on January 19, the parties promptly contacted the Court the next business day, January 22, pursuant to the dispute process set forth in the Scheduling Order. Courts have consistently found diligence when a party has sought leave to amend pleadings within three months of learning new information.[1]

---

[1] *See, e.g.*, *Compagnie des Grands Hotels d'Afrique SA* v. *Starwood Capital Grp. Glob. I LLC*,

**Qualcomm's Amendments Are Not Futile, Nor Do They Prejudice ARM.** An amendment is futile only if it fails to satisfy the standard set forth in FRCP 12(b)(6). *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). "The elements of a breach-of-contract claim under California law are: (1) the existence of a contract, (2) the plaintiff's performance or excuse of nonperformance, (3) defendant's breach, and (4) resulting damages to the plaintiff." *Jackson* v. *Meta Platforms, Inc.*, 2023 WL 2537003, at *2 (D. Del. Mar. 16, 2023). Qualcomm has plausibly alleged the elements of its proposed amended counterclaims, laying out in non-conclusory fashion ARM's breaches (*see* Ex. 1 ¶¶ 234-45, 255-59, 271-94, 302-315) and Qualcomm's resulting damages (*see id.* ¶¶ 245, 291-94, 307, 311, 315); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). ARM has articulated no argument to the contrary. Neither has ARM articulated any prejudice. Qualcomm's new counterclaims would not "fundamentally alter[] the proceedings," nor "could [they] have been asserted earlier." *Spartan Concrete Prods., LLC* v. *Argos USVI, Corp.*, 929 F.3d 107, 116 (3d Cir. 2019). Moreover, this is not a case where there has been a "protracted and unjustified" delay that would prejudice ARM. *Id.* at 115. Any delay resulted solely from ARM's concealment of and delay in producing necessary facts. ARM "may use the legitimate litigation strategies at hand to delay disclosure of [a] document until absolutely necessary, but that delay cannot thereafter form [ARM's] argument for prejudice if it leads to a belated request to amend." *Mullin* v. *Balicki*, 875 F.3d 140, 157 (3d Cir. 2017).

**In the Alternative, the Court Should Amend the Protective Order.** To the extent the Court does not grant Qualcomm's motion to amend, Qualcomm respectfully requests that the Court amend Paragraph 34 of the Protective Order (PO) so Qualcomm can use discovery from this litigation to pursue the above-described claims in a separate action.[2] ARM has not responded to Qualcomm's request for such relief. (*See* Ex. 6 at 1-2.) Courts have discretion to modify the terms of a PO upon a showing of good cause. *See Pansy* v. *Borough of Stroudsburg*, 23 F.3d 772, 790 (3d Cir. 1994). To establish good cause, the party seeking to modify the protective order "must come forward with a reason to modify the order." *Arnold* v. *Pa., Dep't of Transp.*, 477 F.3d 105, 108 (3d Cir. 2007). The court then conducts a multifactor balancing test, including whether the information is sought for a legitimate purpose and whether sharing it will promote fairness and efficiency. *See id.*; *INVISTA N. Am. S.à.r.l.* v. *M & G USA Corp.*, 2014 WL 1908286, at *9 n.14 (D. Del. Apr. 25, 2014). Qualcomm's desire to vindicate its rights upon discovering additional claims against ARM is a legitimate reason to modify the PO.[3] Modifying the PO also promotes fairness and efficiency because ARM should not be permitted to use the PO as a shield against Qualcomm's claims. The remaining balancing test factors are neutral or do not apply. *See INVISTA*, 2014 WL 1908286, at *9 n.14.

---

2021 WL 6883231, at *4 (D. Del. Feb. 10, 2021) (amendment within 3 months); *Home Semiconductor Corp.* v. *Samsung Electronics Co.*, 2019 WL 2135858, at *5 (D. Del. May 16, 2019) (amendment 3 months after M&C) ("[O]ther courts in the Third Circuit have found diligence when a party has sought leave to amend within three months of learning new information.").

[2] The PO in this case permits parties to use "Confidential" and "Highly Confidential – Attorneys' Eyes Only" discovery materials "only for purposes of this Litigation." (D.I. 38 ¶¶ 19, 34.)

[3] *See, e.g.*, *VLSI Tech. LLC* v. *Intel Corp.*, No. 18-966-CFC-CJB, D.I. 693 (D. Del. Feb. 3, 2021); *Eddystone Rail Co.* v. *Bridger Logistics, LLC*, 2022 WL 704206, at *2-3 (E.D. Pa. Mar. 9, 2022).

Respectfully,

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)

JBB:lo
Enclosures
cc:    Clerk of the Court (via hand delivery)
        All Counsel of Record (via e-mail)

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | **CONFIDENTIAL – FILED UNDER** |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | **SEAL** |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT AND JURY DEMAND AND DEFENDANTS' SECOND AMENDED COUNTERCLAIMS

1.      Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") are poised to release to the market several innovative products enabled by custom-designed high-performance, low-power central processing units ("CPUs") containing a novel microarchitecture and related technologies that will deliver the next era of computing innovation. While many in the industry see in this pivotal moment the opportunity for technological advancement, ARM sees an opportunity to strongarm Qualcomm into renegotiating the financial terms of the parties' longstanding license agreements, using this baseless lawsuit as leverage. With this lawsuit, ARM makes clear to the marketplace that it will act recklessly and opportunistically, threatening the development of new and innovative products as a negotiating tactic, not because it has valid license and trademark claims.

2.      ARM claims, with no legal or contractual basis, that following Qualcomm's acquisition of NUVIA Inc. ("NUVIA") for $1.4 billion, Qualcomm's use of *any* technology acquired from NUVIA—including NUVIA technology that was further developed by Qualcomm

and has nothing to do with ARM—violates a previously-terminated license agreement between ARM and NUVIA.

3.      Qualcomm has its own license agreements with ARM, under which Qualcomm has licensed and paid for the same intellectual property that NUVIA licensed under its own separate agreements with ARM.  Therefore, even though ARM terminated the NUVIA licenses, Qualcomm owns independent licenses for the same ARM technology and information that allow it to provide ARM-compliant products to its customers for many years to come—a fact ARM glaringly omitted from its complaint, and which ARM has attempted to obfuscate through an aggressive misinformation campaign.  Thus, ARM has no right to demand any destruction of Qualcomm's CPU technology because Qualcomm's use of ARM technology and information is licensed under its overlapping license agreements.

4.      The notion that ARM has the right to control technology that is not ARM's—and worse yet, to ask Defendants to destroy their innovation and inventions unless substantial monetary tribute is paid to ARM—offends customary norms of technology ownership, as well as NUVIA's and Qualcomm's rights under their agreements with ARM.

5.      Even putting aside Qualcomm's broad license rights, ARM's reading of the termination obligations in the NUVIA Architecture License Agreement ("ALA") is wrong.  To the extent any destruction obligation exists, it explicitly applies only to ARM Confidential Information.[1]  But ARM again omits important facts: (1) under the NUVIA ALA, information in the public domain is not subject to confidentiality obligations, and (2) ARM publishes its instruction set without confidentiality restrictions.  Anyone is free to go to the ARM website and

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the relevant license agreements.

download the 10,000+ page ARM Architecture Reference Manual.[2]  In this case, Qualcomm's CPU cores are designed to be compatible with the publicly-available ARM Architecture version ████████████

6.  Seeking additional leverage it can use to attain royalties from Qualcomm to which it is not entitled under the contracts, ARM now demands that Qualcomm stop using *all* NUVIA technology, regardless of whether it contains ARM Confidential Information.  Qualcomm's license rights, and any reasonable reading of the termination provisions of the NUVIA ALA, demonstrate that ARM has no right to require Qualcomm to stop using or destroy Qualcomm or NUVIA technology.

7.  ARM's position is a threat to the industry generally.  Unless this Court rejects ARM's arguments, ARM's extreme position could be weaponized against all of its licensees, allowing ARM to claim ownership over all its licensees' innovations.

8.  As this litigation will show, Qualcomm and NUVIA have not violated NUVIA's ALA or any other license agreement.  Nor have they misused ARM's trademarks.

**Qualcomm Announced Its Acquisition Of NUVIA In January 2021**

9.  In January 2021, Qualcomm announced that it would acquire NUVIA, a start-up working on a custom CPU—the portion of a computer that retrieves and executes instructions— known as the Phoenix Core.  NUVIA was also working on a custom "System-on-a Chip" ("SoC") that incorporated multiple Phoenix Cores for use in data centers and servers.  SoCs are integrated circuits used in computers and other electronics that combine many elements of a computer system into a single chip.

---

[2] ███████████████████████████████████████████ (last visited Sept. 28, 2022).

10.     Although Qualcomm and NUVIA were focused on different market segments, the NUVIA CPU and SoC technologies comprised promising, innovative technology.  Because the NUVIA CPU cores were being designed to be ARM architecture-compatible, this technology was (and is) compatible with Qualcomm's existing computer and mobile device chipset technologies.

11.     Qualcomm's plan was to complete the development of the Phoenix Core after the acquisition and ultimately drive this technology into various SoCs, particularly for use in the "compute" (e.g., laptops/PCs), "mobile" (e.g., smartphones), and "automotive" (e.g., digital cockpit) markets.  Qualcomm also planned to continue the development of a SoC for use in data centers and servers ("Server SoC").  This would allow Qualcomm's custom CPUs to compete more effectively against CPUs designed not only by rival ARM licensees and ARM, but also rival suppliers of CPUs compliant with other instruction set architectures (notably, Intel's x86).

12.     Major industry participants—including Microsoft, Google, Samsung, GM, HP, and many others—praised the acquisition as benefitting their products and end-customers.[3]  News of this acquisition appeared in Forbes and in newspapers around the world.

**Qualcomm And NUVIA Had Individual
License Agreements With ARM With Common Provisions**

13.     At the time of the acquisition, NUVIA and Qualcomm had separate, but broadly overlapping, license agreements with ARM.  Qualcomm's ALA included all the rights granted to NUVIA, as well as additional rights.  Both ALAs granted rights to use version 8 of the ARM instruction set architecture, including the ARM ███ instruction set architecture ("ISA") with

---

[3]     *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

which the Phoenix Core was compatible. Qualcomm's ALA is also broader, granting Qualcomm rights to the next generation v9 ISA.

14.    ALAs grant licensees the right to design their own custom CPUs that can execute ARM's ISA, as well as the right to design and distribute products incorporating such CPUs. An ISA lists the instructions that a software program will see, but an ISA does not tell a designer about the logic to implement it, nor how to build a CPU core, nor any of the features that make a CPU competitive. Application and software developers create their products to be compatible with particular ISAs. Applications and software that are compatible with a specific ISA can be run on any CPU that is compatible with the ISA, regardless of who has designed or manufactured the hardware. The ARM ISA allows for compatibility, as all ARM-compatible products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.

15.    To make a CPU that then can execute the ARM ISA and therefore run compatible applications and other software, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors wired together into arrays that form larger, interconnected blocks. Building a CPU requires detailed micro-architectural know-how and expertise that is not related to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

16.    A CPU developer developing a custom CPU designs *how* the core is built, *how* it performs, and *how* it executes the CPU's instructions. There are virtually infinite number of ways to design and build CPUs that can run the ARM instruction set. Companies that compete against each other to make better products utilizing ARM instruction sets employ armies of engineers who

make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.

17. Under an ALA license, ARM does not deliver any specific ARM design or tell the licensee how to make the CPU. That technological development—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the market—is left to the licensee. If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, the ALA structure can and does allow for product differentiation, even from ARM's own CPUs.

18. ARM competes against licensees designing custom cores under ALAs by offering its own "off-the-shelf" CPU designs that customers may license through a Technology License Agreement ("TLA"). When a licensee seeks to sell products licensed under a TLA—rather than under an ALA—ARM delivers complete processor core designs that a licensee can effectively drop into a larger SoC design. ARM's off-the-shelf processor cores licensed under TLAs do not allow for the same kind of product differentiation among different TLA licensees because all classes of TLA-licensed processor cores are effectively the same. However, there can still be considerable variety and differentiation among SoCs that incorporate TLA-licensed processor cores along with other functional blocks and circuits. For example, Qualcomm's Snapdragon chip products that use stock ARM cores are very successful in large part because of Qualcomm's innovation in designing many of the other functional blocks and integrating them into the SoC as a whole. Such functional blocks include graphic processing units (GPU), digital signal processors (DSP), artificial intelligence (AI) processors, image processors, modems, and other technologies.

19. Some companies make use of both custom-designed ALA processor cores and off-the-shelf TLA-licensed cores in their products. Royalty rates are generally lower under ALAs and

higher under TLAs, because the TLA royalties account for ARM's work in developing complete CPUs, whereas the licensees under an ALA make the significant investment to develop their own CPUs.

20.     With the Phoenix Core, Qualcomm will begin incorporating more of its own custom CPUs in its products.  Qualcomm is making this change because it believes its own innovation will generate better performing cores than ARM's cores.  This paradigm change will mean Qualcomm will in the future pay to ARM the lower royalty rate under its ALA for these custom CPUs, rather than the higher royalty rates under Qualcomm's TLA.

### After ARM Learned Of The NUVIA Acquisition, ARM Demanded Higher Royalties From Qualcomm

21.     Shortly after announcing the proposed acquisition of NUVIA in January 2021, Qualcomm informed ARM that the NUVIA engineers would be transferred to a Qualcomm subsidiary and would work under Qualcomm's set of license agreements with ARM.  Qualcomm also notified ARM that, to the extent NUVIA was utilizing any ARM Technology not currently covered under Qualcomm's then-current ALA and TLA, Qualcomm would work with the ARM team to complete any necessary license annexes to cover such items.

22.     Qualcomm believed that ARM would embrace the acquisition.  Even though Qualcomm would now be working on its own custom CPUs, the fact that Qualcomm is developing SoCs compatible with the ARM ISA for markets where ARM-based processors have traditionally struggled, such as the "compute" market (i.e., the market for personal computers such as laptops), represents a tremendous opportunity for ARM.  The combination of NUVIA's innovative CPU technology with Qualcomm's scale and engineering prowess provides the best opportunity for ARM to significantly increase its reach and associated royalty payments.

23.     ARM, however, acted opportunistically.  In February 2021, ARM contended that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent."  ARM insisted, without basis, that Qualcomm needed ARM's consent to "any transfer of designs, rights or licenses under NUVIA's agreements" to Qualcomm.  Later that month, ARM wrote that to secure its consent for the transfer of NUVIA's CPU design to Qualcomm, Qualcomm must: (i) incorporate the much higher royalty rates from NUVIA's licenses into Qualcomm's pre-existing licenses; (ii) restrict the ability of Qualcomm employees from working on Qualcomm's custom CPU designs such that "at a minimum" any individual with access to ARM Confidential Information wait three years before working on "any architecture CPU design" at Qualcomm; (iii) "discuss and decide on the design transfer fee associated with such CPU design transfer"; and (iv) enter into a separate license for implementation IP and software tools, which would include another undisclosed "design transfer fee."

24.     ARM's demands were outrageous.  First, it was attempting to secure supplemental payments and royalties for rights for which Qualcomm *had already paid or was continuing to pay under its own license agreements*.  Qualcomm's license agreements, on their face, make clear that Qualcomm's use of ARM Technology in connection with the further development of the technology it acquired from NUVIA would be covered by Qualcomm's pre-existing license agreements.  For example, ███████████████████████████████████ ████████████████████████████  Therefore,  Qualcomm's use of any ARM Technology utilized in NUVIA's technology was fully licensed under Qualcomm's license agreements as soon as Qualcomm acquired NUVIA.  Nonetheless, and although not necessary, Qualcomm sought ARM's consent to assign NUVIA's ARM licenses to Qualcomm, even though

Qualcomm's position was that NUVIA's technology was licensed under Qualcomm's license agreements as soon as the acquisition closed.

25. Second, ARM was claiming a right to control the transfer of NUVIA technology when NUVIA's ALA provided no such rights to ARM.

26. Third, ARM was trying to interfere with Qualcomm's business by preventing Qualcomm engineers from working for three years with absolutely no basis for such a demand in NUVIA's or Qualcomm's license agreements. ARM's demands for additional payments from Qualcomm made little sense and were inconsistent with Qualcomm's long-standing agreements. As ARM acknowledges in its complaint, NUVIA was focused on developing a CPU for use in low-volume, high-cost SoCs for the server market, whereas Qualcomm intended to use the technology NUVIA had started developing to build high-volume, lower cost SoCs for Qualcomm's traditional markets, such as the "mobile" and "compute" markets. For its data center and server products—which would be of a lower volume and higher per-unit cost than, for example, Qualcomm's higher volume and lower cost mobile products—NUVIA and ARM had negotiated a royalty rate that was many multiples higher than Qualcomm's rate. ARM's strategy, in light of Qualcomm's more favorable terms, has been to ignore Qualcomm's license rights and royalty rates and attempt to force upon Qualcomm NUVIA's substantially higher royalty rate established for its server product.

27. If ARM could not get the benefit of forcing NUVIA's royalty rate on Qualcomm's custom CPU across Qualcomm's broad SoC portfolio, its alternative strategy was to seek to preclude Qualcomm from proceeding with developing its custom CPU and, in doing so, force the purchase of ARM's off-the-shelf CPU. This is beneficial for ARM because the TLA has a higher

9

royalty rate than Qualcomm's ALA.  When Qualcomm successfully replaces ARM-designed CPUs with its own designs, Qualcomm will pay ARM lower royalties under the ALA.

28.    Given ARM's unreasonable positions, which conflict with the terms of the parties' licenses, ARM and Qualcomm were unable to resolve this dispute prior to the close of the NUVIA acquisition on March 15, 2021.  Even so, given the parties' long-standing relationship, Qualcomm reaffirmed its interest in finding a productive path forward in its discussions with ARM after the acquisition was complete.

29.    After the acquisition closed, ARM doubled down, asserting that Qualcomm needed to destroy NUVIA's engineering work and start over unless it agreed to ARM's demands, including tens of millions of dollars in both additional "transfer" payments and increased royalties. Qualcomm continued to try and reach a resolution with ARM even though ARM's attempt to control NUVIA's technology was unjustified.

30.    While the parties had intermittent discussions to resolve the dispute, in or about September 2021, ARM stopped communicating with Qualcomm about the dispute.  Meanwhile, throughout 2021 to the present day and with full knowledge by ARM, Qualcomm continued development work on the Phoenix Core and SoCs incorporating the Phoenix Core, as was its right under Qualcomm's own license agreements with ARM.

**ARM Unexpectedly Terminated The NUVIA License Agreements And Qualcomm Went To Great Lengths To Insulate Itself From ARM's Unreasonable Positions**

31.    Without warning, in a letter dated February 1, 2022 (but not received by Qualcomm until February 4, 2022), ARM terminated, effective March 1, 2022, the NUVIA ALA and TLA license agreements and demanded that NUVIA and Qualcomm destroy all ARM Confidential Information, and certify by April 1, 2022 that they had complied with ARM's demands.  Prior to the February 2022 letter, it had been over six months since ARM last suggested that NUVIA or

10

Qualcomm violated NUVIA's license agreements.  ARM's demand came out of nowhere, especially as ARM had continued to support Qualcomm in the development of the technology acquired from NUVIA.

32.    The timing of ARM's demand is telling on two fronts.

33.    First, ARM waited until Qualcomm had expended a year of engineering effort and hundreds of millions of dollars to further develop and integrate Phoenix Core technology into multiple SoCs, in addition to the $1.4 billion Qualcomm spent to acquire NUVIA.  ARM was seeking to maximize whatever leverage it had to threaten Qualcomm's investment and Qualcomm's SoC roadmap and extract exorbitant fees and royalty payments.

34.    Second, ARM terminated the NUVIA agreements just three days before ARM publicly announced the failure of its merger transaction with NVIDIA—a deal that Qualcomm and many others in the industry had opposed.  This timing suggests that, in part, ARM was seeking payback for Qualcomm's public opposition to the NVIDIA deal.

35.    Qualcomm disagreed that it was required to stop any of its work—or that destruction was appropriate—because Qualcomm holds valid licenses to all relevant ARM Technology and ARM's interpretation of the termination obligations in the NUVIA agreement were inconsistent with the plain language of the license agreements.

36.    Moreover, even though ARM demanded destruction of Confidential Information obtained under NUVIA's ALA, NUVIA had implemented ARM Architecture ██, which had been publicly available on ARM's website for anyone to download since at least around January 2021—over a year before the destruction request.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████  Therefore, ARM Architecture

███ was not Confidential Information, not subject to any restrictions, and not subject to any destruction obligation. For the same reasons, the NUVIA core design did not contain ARM Confidential Information.

37. Nonetheless, on April 1, 2022, NUVIA certified that it had destroyed and quarantined all NUVIA-acquired ARM Confidential Information. ARM, on the other hand, failed to fulfill its own termination obligations, which were also triggered by its termination of the NUVIA agreements.

38. Then, on April 12, 2022, just a few weeks after NUVIA made its certification, ARM accepted test results verifying that the implementation of the Phoenix Core in the Server SoC complied with the requirements necessary to execute the ARM instruction set. ARM confirmed that "Qualcomm . . . has validated *their CPU core* in accordance with the Verification requirements set out in the Architecture agreement." ARM explicitly confirmed that the validation testing was conducted *under Qualcomm's ALA*. Therefore, ARM was not only well aware that Qualcomm was working on the Phoenix Core under Qualcomm's license agreements, but ARM also affirmed this work and understood that Qualcomm had implemented ███ of the ISA.

39. ARM's position in this litigation is not just unsupported by its verification in April 2022 and by the language of the license agreements, it is antithetical to the very nature of ARM's ALAs, which allow a licensee to design its own, proprietary ARM-compatible technology that belongs to the licensee and that can be used by the licensee to compete against other ARM-compatible products, including those designed by ARM itself.

40. Licensees depend on this, as do regulators. ARM explicitly told regulators in December 2021, in connection with the proposed NVIDIA acquisition, that technology created by its ALA licensees belongs to the licensees, not ARM, stating: "architectural licensees do *not* use

ARM's CPU designs.  Arm architectural licensees create their *own* proprietary CPU designs using

their *own* engineering teams."  ARM specifically referred regulators to Qualcomm's acquisition

of NUVIA as an example of Qualcomm's efforts to create its own proprietary CPU.

### ARM's Claims Are Baseless

41.     In this lawsuit, ARM takes its baseless and extreme arguments public, claiming that

technology that is not its own belongs to ARM, and that it is ARM's prerogative to decide whether

Qualcomm can use or continue to develop NUVIA's technology.  The termination provisions in

the NUVIA ALA do not require such a result.

42.     ARM ignores the broad license rights ARM has granted Qualcomm under its ALA

and other license agreements.  Qualcomm *is* licensed to use ARM Technology in connection with

Qualcomm's CPU core technology, even if any aspects trace back to NUVIA's work.  Moreover,

ARM attempts to misappropriate NUVIA technologies that contain no ARM information, but it

makes no sense to require Qualcomm to stop using its own intellectual property.

43.     Additionally, ARM's position effectively guts its own ALA, which is intended to

encourage licensees to develop their own CPU core technology with their own innovations, at their

own risk and expense and for their own benefit.  ARM's arguments would allow ARM to claim

ownership over its licensees' innovations and inventions.  That is not what ARM licensees pay for

under the ALA.

44.     ARM's trademark infringement and false-origin claims are also meritless.  ARM

contends that Qualcomm and NUVIA's use of ARM's trademarks in connection with any products

related to NUVIA technology—including, but not limited to the Phoenix Core and the upcoming

SoCs—is improper.  But Qualcomm's license agreements with ARM give Qualcomm the right to

utilize ARM's trademarks. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ ARM's website also publicly grants "any . . . third party" the right to use ARM's trademarks pursuant to various guidelines.

45.     In any event, Defendants' use of ARM's trademarks constitutes fair use and therefore is permissible.  Qualcomm engages in limited use of the ARM Marks, such as in marketing materials, product specifications, and technical documentations, to convey accurately that Qualcomm's products are compatible with the ARM architecture.  These references are limited and truthful.

46.     Rather than litigate its case in court, ARM attempted to maximize the negative impact of its filing this lawsuit by campaigning with members of the media and customers to generate additional publicity for ARM's positions.

47.     This Court should reject ARM's claims and instead declare that Qualcomm and NUVIA's conduct—including use of Qualcomm-developed technology—was fully licensed.

Defendants, through their undersigned counsel, upon personal knowledge and/or upon information and belief, answer the Complaint dated August 31, 2022 (the "Complaint") as follows:

48.     **COMPLAINT PARAGRAPH 1:** Arm is the world's leading provider of microprocessor intellectual property. For decades, Arm has developed innovative processor architecture and implementation designs that balance performance with energy efficiency. Billions of electronic devices use Arm processor technologies pursuant to Arm licenses—from smartphones used to interact seamlessly with friends and family around the world to an increasing number of the servers that run the essential day-to-day operations of Fortune 500 companies.

ANSWER: **Defendants admit that ARM licenses microprocessor intellectual property, and that a significant number of electronic devices use processors that are based on ARM architecture and designs, such as smartphones and to a far more limited extent computers. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations set forth in Complaint Paragraph 1, and on that basis deny them.**

49.     **COMPLAINT PARAGRAPH 2:** Qualcomm is a major semiconductor manufacturer. To accelerate its processor development efforts, Qualcomm spent over $1 billion to acquire Nuvia, a start-up led by senior engineers previously from Apple and Google that licensed Arm technologies to develop high-performance processor cores for semiconductor chips. In the process, Qualcomm caused Nuvia to breach its Arm licenses, leading Arm to terminate those licenses, in turn requiring Qualcomm and Nuvia to stop using and destroy any Arm-based technology developed under the licenses. Undeterred, Qualcomm and Nuvia have continued working on Nuvia's implementation of Arm architecture in violation of Arm's rights as the creator and licensor of its technology. Further, Qualcomm's conduct indicates that it has already and further intends to use Arm's trademarks to advertise and sell the resulting products in the United States, even though those products are unlicensed.

ANSWER: **Defendants admit that Qualcomm is a leading wireless technology innovator that designs numerous products, including semiconductors. Qualcomm further admits that, in 2021, Qualcomm Technologies, Inc. acquired NUVIA for approximately $1.4 billion before working capital and other adjustments. Defendants also admit that NUVIA had license agreements with ARM LTD., such as an ALA and TLA, and that, prior to Qualcomm's acquisition, NUVIA worked on CPUs and SoCs. Defendants further admit that**

15

in a letter dated February 1, 2022, ARM stated that it intended to terminate its ALA and TLA with NUVIA effective March 1, 2022, and requested that NUVIA destroy or return to ARM any ARM Confidential Information, including any copies thereof in its possession and any ARM Technology or derivatives.  Defendants otherwise deny the allegations in Complaint Paragraph 2, except to the extent they purport to state legal conclusions as to which no response is required.

50.     **COMPLAINT PARAGRAPH 3:** Arm now brings suit for specific performance of the Nuvia licenses' termination provisions to require Qualcomm and Nuvia to stop using and to destroy the relevant Nuvia technology and to stop their improper use of Arm's trademarks with their related products. Arm also seeks declaratory judgment, injunctive relief, and damages for the use of Arm's trademarks in connection with semiconductor chips incorporating the relevant Nuvia technology.

**ANSWER: Complaint Paragraph 3 purports to state legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations in Complaint Paragraph 3, except admit that Plaintiff purports to assert the claims and seek the relief described in Complaint Paragraph 3.**

<u>**PARTIES**</u>

51.     **COMPLAINT PARAGRAPH 4:** Plaintiff Arm is a corporation organized under the laws of the United Kingdom, has its principal place of business in Cambridge, United Kingdom, and is a resident or domiciliary of the United Kingdom.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 4, and on that basis deny them.**

16

52.     **COMPLAINT PARAGRAPH 5:** Defendant Qualcomm Inc. is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 5.**

53.     **COMPLAINT PARAGRAPH 6:** Defendant Qualcomm Technologies, Inc. is a subsidiary of Qualcomm Inc. and a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 6.**

54.     **COMPLAINT PARAGRAPH 7:** Defendant Nuvia is a subsidiary of Qualcomm and a Delaware corporation with its principal place of business at 2841 Mission College Blvd., Santa Clara, California 95054.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 7.**

### <u>JURISDICTION AND VENUE</u>

55.     **COMPLAINT PARAGRAPH 8:** The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (trademarks), and 28 U.S.C. § 1367(a) (supplemental jurisdiction). The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties, and because the amount in controversy, based on the consideration that was anticipated under the Nuvia licenses, the volume of products expected under those licenses, and Defendants' potential loss from complying with the equitable relief requested here, exceeds $75,000, exclusive of interest and costs.

**ANSWER: Complaint Paragraph 8 purports to state legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations in Complaint Paragraph 8.**

56. **COMPLAINT PARAGRAPH 9:** The Court has personal jurisdiction over Qualcomm and Nuvia because they are incorporated in Delaware. Qualcomm and Nuvia have purposely availed themselves of the privileges and benefits of the laws of Delaware.

**ANSWER: Complaint Paragraph 9 purports to state legal conclusions as to which no response is required.  To the extent a response is required, Defendants admit that Qualcomm Inc., Qualcomm Technologies, Inc., and NUVIA, Inc. are incorporated in Delaware.**

57. **COMPLAINT PARAGRAPH 10:** Venue is proper in this judicial district under 28 U.S.C. § 1391 because Qualcomm and Nuvia are incorporated in Delaware. Venue is also proper because Qualcomm Inc. and Qualcomm Technologies, Inc. have purposefully availed themselves of the courts in the State of Delaware and this Judicial District.

**ANSWER: Complaint Paragraph 10 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants admit that Qualcomm Inc., Qualcomm Technologies, Inc., and NUVIA, Inc. are incorporated in Delaware.**

## FACTUAL ALLEGATIONS

*Arm's business model*[4]

58. **COMPLAINT PARAGRAPH 11:** For decades, Arm has been a world leader in developing processor architectures, including instruction set architectures, and processor core designs implementing those architectures, all of which are covered by an extensive intellectual property portfolio.

---

[4] Defendants have not specifically responded to the headings interspersed between the numbered paragraphs in ARM's complaint.  For the avoidance of doubt, and to the extent they require a response, Defendants deny any allegations made therein.

ANSWER: Defendants admit that ARM develops instruction set architectures for CPUs, and also designs CPUs that implement ARM's instruction set architecture. Defendants further admit that ARM owns some intellectual property. Defendants otherwise deny the allegations in Complaint Paragraph 11 except to the extent they purport to state legal conclusions as to which no response is required.

59.     **COMPLAINT PARAGRAPH 12:** Processor cores are the parts of a computer's Central Processing Unit or "CPU" that read and execute program instructions to perform specific actions. Modern CPUs often integrate multiple processor cores on a single semiconductor chip or integrated circuit ("IC").

**ANSWER:  Defendants admit the allegations in Complaint Paragraph 12.**

60.     **COMPLAINT PARAGRAPH 13:** Arm owns intellectual property relating to its processor architectures and designs, including, among other things, trademarks.

**ANSWER: Defendants admit that ARM may own some intellectual property, including trademarks.  Defendants otherwise deny the allegations in Complaint Paragraph 13 except to the extent they purport to state legal conclusions as to which no response is required.**

61.     **COMPLAINT PARAGRAPH 14:** Arm does not manufacture or sell chips. Instead, Arm licenses its technologies to hundreds of companies to use in developing their own chips or in their own electronic devices and works with these companies to ensure the success of Arm-based products.

**ANSWER: Defendants admit that ARM does not manufacture or sell semiconductor chips, and that ARM licenses intellectual property to various licensees.   Defendants**

otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 14, and on that basis deny them.

62.     **COMPLAINT PARAGRAPH 15:** Arm's customers manufacture (or have manufactured for them) chips based on Arm's technologies. The chips may then be used in the customer's own devices or sold to other device manufacturers. Arm earns revenue from licensing fees and royalties based on the number of Arm-based chips its customers sell.

**ANSWER: Defendants admit that ARM receives licensing fees and royalties from licensees, and that various licensees manufacture products that may include ARM Technology. Defendants otherwise deny the allegations in Complaint Paragraph 15.**

63.     **COMPLAINT PARAGRAPH 16:** Arm's business model relies on Arm's ability to monetize its research and intellectual property by receiving both licensing fees and royalties for products incorporating Arm's technology and intellectual property. Arm therefore grows its revenues by increasing both the number of customers and the number of Arm-based products sold.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 16, and on that basis deny them.**

64.     **COMPLAINT PARAGRAPH 17:** There are two main types of Arm licenses for Arm's technologies: Technology License Agreements ("TLAs"), which allow the use of specific "off-the-shelf" Arm processor core designs with only minor modifications, and Architecture License Agreements ("ALAs"), which allow for the design of custom processor cores that are based on particular architectures provided by Arm.

**ANSWER:  Defendants admit that ARM enters into license agreements with licensees, including Technology License Agreements ("TLAs") and Architecture License Agreements ("ALAs"). Defendants otherwise deny the allegations in Paragraph 17.**

65.     **COMPLAINT PARAGRAPH 18:** Arm grants few ALAs. Custom processor cores can take years to design, at great expense and requiring significant support from Arm, with no certainty of success. If successful, ALA licensees can sell custom processor cores for use in other companies' products.

**ANSWER: Defendants admit that it requires significant expense and commitment to design custom CPUs.  Defendants respectfully refer the Court to the Qualcomm and NUVIA ALAs for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 18.**

66.     **COMPLAINT PARAGRAPH 19:** Arm ALAs typically authorize licensees only to develop processor cores based on specific Arm technology provided by Arm under the licenses, rather than granting broader licenses to use Arm-based technology generally.

**ANSWER: Defendants respectfully refer the Court to the Qualcomm and NUVIA ALAs for their complete language and content.  Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 19, and on that basis deny them.**

*Nuvia obtains Arm licenses*

67.     **COMPLAINT PARAGRAPH 20:** Nuvia was founded as a start-up in 2019 by chip engineers who left Apple and Google. Nuvia planned to design energy-efficient CPUs for data center servers based on a custom processor implementing the Arm architecture, which would have expanded the market for Arm's technology. Nuvia's business model was thus reliant on customizing processor core designs based on Arm's technology. As one of the founders explained to the press when launching Nuvia, the start-up's premise (and one of its attractions to investors)

was that Nuvia intended to build "a custom clean sheet designed from the ground up" using Arm's architecture.[5]

**ANSWER: Defendants admit that NUVIA worked on custom CPUs that could be used in data center servers, that the custom CPU designs would expand the market for ARM technology, and that the custom CPUs that NUVIA worked on, prior to NUVIA's acquisition by Qualcomm, were intended to be compatible with ARM architecture. Defendants respectfully refer the Court to the cited publication for its complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 20.**

68.     **COMPLAINT PARAGRAPH 21:** In September 2019, Arm granted Nuvia an ALA and TLA, providing rights to design custom processor cores based on an Arm architecture and to modify certain off-the-shelf designs. The licenses granted in the ALA and TLA are necessary to use Arm's extensive intellectual property portfolio covering the Arm architecture. The ALA and TLA included rights to use Arm trademarks in connection with products developed by Nuvia under the licenses. Arm also provided substantial, crucial, and individualized support from Arm employees to assist Nuvia in its development of Arm-based processors for data center servers.

**ANSWER: Defendants admit that NUVIA had a TLA and ALA with ARM, and respectfully refer the Court to the referenced agreements for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 21, except to the extent they purport to state legal conclusions as to which no response is required.**

---

[5]     Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TechCrunch (Nov. 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/.

69.     **COMPLAINT PARAGRAPH 22:** The licenses provided Nuvia access to specific Arm architecture, designs, intellectual property, and support in exchange for payment of licensing fees and royalties on future server products that include processor cores based on Arm's architecture, designs, or related intellectual property.   Nuvia's licensing fees and royalty rates reflected the anticipated scope and nature of Nuvia's use of the Arm architecture. The licenses safeguarded Arm's rights and expectations by prohibiting assignment without Arm's consent, regardless of whether a contemplated assignee had its own Arm licenses.

**ANSWER: Defendants admit that NUVIA's TLA and ALA provided NUVIA with a license to certain ARM Technology.  Defendants further admit that NUVIA and ARM intended the licensing fees and royalties set forth in the NUVIA ALA to apply to future server products, not products for other markets.  Defendants respectfully refer the Court to the referenced agreements for their complete language and content.  Defendants otherwise deny the allegations of Complaint Paragraph 22.**

70.     **COMPLAINT PARAGRAPH 23:** From September 2019 to early 2021, Nuvia used the technology it licensed from Arm to design and develop processor cores. Arm provided preferential support for Nuvia's development efforts, with Arm seeking to accelerate research and development in next-generation processors for data center servers to support that sector's transition to Arm technology.

**ANSWER:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Complaint Paragraph 23, and on that basis deny them.  Defendants otherwise deny the allegations of Complaint Paragraph 23.**

71.     **COMPLAINT PARAGRAPH 24:** In August 2020, Nuvia announced that its "first-generation CPU, code-named 'Phoenix'" would be "a custom core based on the ARM

architecture."[6] It also publicized benchmark tests showing that Phoenix could double the performance of rival products from Apple, Intel, AMD, and Qualcomm. Based on these results, Nuvia claimed that the "Phoenix CPU core has the potential to reset the bar for the market."[7]

**ANSWER: Defendants respectfully refer the Court to the cited publication for its complete language and content. Defendants otherwise admit the allegations in Complaint Paragraph 24.**

*Qualcomm relies on designs created by Arm*

72.     **COMPLAINT PARAGRAPH 25:** Qualcomm is one of the world's largest semiconductor companies, with a portfolio of intellectual property and products directed to wireless technologies, including cellular, Bluetooth, and Wi-Fi; CPUs and ICs; networking; mobile computers; cell phones; wearables; cameras; automobiles; and other electronic devices.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 25.**

73.     **COMPLAINT PARAGRAPH 26:** Even though Qualcomm has an Arm ALA, its prior attempts to design custom processors have failed. Qualcomm invested in the development of a custom Arm-based processor for data center servers until 2018, when it cancelled the project and laid off hundreds of employees.[8]

---

[6]     John Bruno & Sriram Dixit, *Performance Delivered a New Way*, Silicon Reimagined (Aug. 11, 2020), https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5.

[7]     *Id.*

[8]     *See, e.g.*, Andrei Frumusanu, *Qualcomm to Acquire NUVIA: A CPU Magnitude Shift*, AnandTech (Jan. 13, 2021), https://www.anandtech.com/show/16416/qualcomm-to-acquire-nuvia-a-cpu-magnitude-shift; Andy Patrizio, *Qualcomm makes it official; no more data center chip*, Network World (Dec. 12, 2018), https://www.networkworld.com/article/3327214/qualcomm-makes-it-official-no-more-data-center-chip.html.

ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants otherwise deny the allegations of Complaint Paragraph 26.  The allegation that Qualcomm's "prior attempts to design custom processors have failed" is patently false.  Qualcomm has had great success in developing custom processors, to ARM's significant benefit.

74.    **COMPLAINT PARAGRAPH 27:** Qualcomm's commercial products thus have relied on processor designs prepared by Arm's engineers and licensed to Qualcomm under Arm TLAs. Discovery is likely to show that as of early 2021, Qualcomm had no custom processors in its development pipeline for the foreseeable future. To fill this gap, Qualcomm sought improperly to purchase and use Nuvia's custom designs without obtaining Arm's consent.

ANSWER: Defendants deny the allegations of Complaint Paragraph 27.

*Qualcomm acquires Nuvia*

75.    **COMPLAINT PARAGRAPH 28:** On January 13, 2021, Qualcomm announced that Qualcomm Technologies, Inc. was acquiring Nuvia for $1.4 billion. Neither Qualcomm nor Nuvia provided prior notice of this transaction to Arm. Nor did they obtain Arm's consent to the transfer or assignment of the Nuvia licenses.

ANSWER: Defendants admit that on January 12, 2021, Qualcomm Incorporated announced that its subsidiary, Qualcomm Technologies, Inc., entered into a definitive agreement to acquire NUVIA for approximately $1.4 billion before working capital and other adjustments.  Defendants otherwise deny the allegations of Complaint Paragraph 28, except to the extent they purport to state legal conclusions as to which no response is required.

76.    **COMPLAINT PARAGRAPH 29:** Qualcomm indicated in its announcement that "NUVIA CPUs"—that is, Nuvia's implementations of Arm technology developed under the Nuvia

licenses with Arm—would be incorporated into a range of Qualcomm products. Qualcomm's press release declared its grand ambitions for Nuvia's implementation of Arm technology: "NUVIA CPUs are expected to be integrated across Qualcomm Technologies' broad portfolio of products, powering flagship smartphones, next-generation laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality and infrastructure networking solutions."[9] The press release also indicated that Qualcomm's first target would be "integrating NUVIA CPUs with Snapdragon," its flagship suite of system on a chip ("SoC") semiconductor products for mobile devices.

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 29.**

77.     **COMPLAINT PARAGRAPH 30:** As Qualcomm's CEO, Cristiano Amon, noted in a Reuters interview shortly after the acquisition closed in the first half of 2021, "Qualcomm will start selling Nuvia-based laptop chips next year."[10] Amon confirmed the negative impact this might have on Arm, saying: "If Arm . . . eventually develops a CPU that's better than what we can build ourselves, then we always have the option to license from Arm."

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 30.**

---

[9]     *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 13, 2021), https://www.qualcomm.com/news/releases/2021/01/13/qualcomm-acquire-nuvia.

[10]   Stephen Nellis, *Qualcomm's new CEO eyes dominance in the laptop markets*, Reuters (July 2, 2021), https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/.

78.     **COMPLAINT PARAGRAPH 31:** Qualcomm also confirmed its prior deficiencies in core design, reportedly promoting the Nuvia acquisition as "filling a gap" because "for several years now" the company "had been relying on external IP such as Arm's Cortex cores."[11] Qualcomm further explained that "the immediate goals for the NUVIA team will be implementing custom CPU cores" designed for laptops.[12]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content.  Defendants otherwise deny the allegations of Complaint Paragraph 31.**

79.     **COMPLAINT PARAGRAPH 32:** Analysts confirmed that the "Qualcomm acquisition [of] NUVIA is a huge move to scale up dramatically. It can reinvigorate current lines in smartphone, Windows PC and automotive SoCs, and make them more competitive with the competition. They have been lagging."[13]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content.  Defendants otherwise deny the allegations of Complaint Paragraph 32.**

80.     **COMPLAINT PARAGRAPH 33:** Providing further confirmation of the acquisition's importance to Qualcomm in filling the "gap" in its "lagging" IP design, analysts noted that the Nuvia acquisition was "extremely speedy in terms of timeline," and Qualcomm

---

[11]   Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia.

[12]   *Id.*

[13]   Trading Places Research, *Qualcomm's Acquisition of NUVIA is a Huge Move*, Seeking Alpha (Jan. 13, 2021), https://seekingalpha.com/article/4398808-qualcomms-acquisition-of-nuvia-is-huge-move.

"went as far as [to] put out a concrete roadmap for . . . using the newly acquired IP from Nuvia,"
announcing that Nuvia's processors would be finalized for use in high-end laptops "in the second
half of 2022."[14]

**ANSWER: Defendants respectfully refer the Court to the referenced publications for
their complete language and content.   Defendants otherwise deny the allegations of
Complaint Paragraph 33.**

81.   **COMPLAINT PARAGRAPH 34:** Based on standard industry scheduling, that
timeline indicated a design for data center processors would be completed "essentially as soon as
possible following the acquisition" of Nuvia.[15]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for
its complete language and content.   Defendants otherwise deny the allegations of Complaint
Paragraph 34.**

82.   **COMPLAINT PARAGRAPH 35:** This timing indicates that the Arm-based cores
that Nuvia designed using Arm's technology and intellectual property were, as of the acquisition
date, effectively ready for the final stages of design for Qualcomm chips, leading promptly to
product integration and manufacturing. Qualcomm's November 2021 10-K filing disclosed that
the $1.4 billion acquisition encompassed Nuvia's team and "certain in-process technologies,"

---

[14]   Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on
Laptops (Updated)*, AnandTech (Mar. 16, 2021),
https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia (quoting
*Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 15, 2021),
https://www.qualcomm.com/news/releases/2021/03/16/qualcomm-completes-acquisition-
nuvia).

[15]   *Id.*

reflecting the availability of existing cores such as the Phoenix CPU core developed under Nuvia's ALA.[16]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 35, except to the extent they purport to state legal conclusions as to which no response is required.**

83.     **COMPLAINT PARAGRAPH 36:** By entering into the acquisition of Nuvia and transferring the rights and technology developed under the Nuvia licenses without Arm's consent, Qualcomm thus greatly accelerated its ability to bring to market custom-designed processor cores—a head start that Qualcomm was willing to pay over $1 billion to obtain.

**ANSWER: Defendants admit that on January 12, 2021, Qualcomm Incorporated announced that its subsidiary, Qualcomm Technologies, Inc., entered into a definitive agreement to acquire NUVIA for approximately $1.4 billion before working capital and other adjustments. Defendants otherwise deny the allegations of Complaint Paragraph 36.**

*Arm terminates the Nuvia licenses*

84.     **COMPLAINT PARAGRAPH 37:** Soon after the announcement of the merger, Arm informed Qualcomm in writing that Nuvia could not assign its licenses and that Qualcomm could not use Nuvia's in-process designs developed under the Nuvia ALA without Arm's consent. For more than a year, Arm negotiated with Qualcomm, through Qualcomm Inc. and Qualcomm

---

[16]    Qualcomm Inc., Annual Report (Form 10-K) (Nov. 3, 2021), https://investor.qualcomm.com/financial-information/sec-filings/content/0001728949-21-000076/0001728949-21-000076.pdf.

Technologies, Inc., in an effort to reach an agreement regarding Qualcomm's unauthorized acquisition of Nuvia's "in-process technologies" and license.

**ANSWER: Defendants admit that in a letter dated February 2, 2021, ARM wrote to Qualcomm Technologies, Inc. that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent." Defendants otherwise deny the allegations of Complaint Paragraph 37, except to the extent they purport to state legal conclusions as to which no response is required.**

85.     **COMPLAINT PARAGRAPH 38:** All the while, Qualcomm continued to broadcast its intentions to rush Nuvia products to market. In November 2021, Qualcomm's Chief Technology Officer told investors that Qualcomm was "pretty far along at this point" in developing its first chip with Nuvia's implementation of Arm technology and would "sample a product at, let's say nine months from now"—which would be August 2022.[17] Then in January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO confirming that "[t]he future of the PC industry is modern Arm-based architectures" and boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[18] Elsewhere, Qualcomm's CEO reiterated that Qualcomm is "definitely in a hurry" to

---

[17]   *Qualcomm Investor Day 2021 Livestream: CEO Cristiano Amon looks ahead*, YouTube (Nov. 16, 2021),_https://www.youtube.com/watch?v=rUWPzROYn2E; *see also* Mark Hachman, *Qualcomm Prophesizes 2023 as the Rebirth of PC Snapdragon Chips*, PCWorld (Nov. 16, 2021), https://www.pcworld.com/article/552285/qualcomm-prophesies-2023-as-the-rebirth-of-its-snapdragon-chips.html.

[18]   *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

launch Nuvia's Arm-based chips "as fast as we can."[19] Based on these statements, discovery is likely to show that Qualcomm and Nuvia continued to use the relevant technology developed under Nuvia's Arm licenses.

**ANSWER: Defendants respectfully refer the Court to the referenced publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 38.**

86.     **COMPLAINT PARAGRAPH 39:** On February 1, 2022, Arm sent a letter to Nuvia and Qualcomm terminating the Nuvia licenses effective March 1, 2022. The letter terminated the licenses based on Nuvia's material breach of the assignment provisions of the Nuvia licenses by entering into the acquisition of Nuvia without Arm's consent. The letter also reminded Nuvia and Qualcomm of their obligations upon termination to stop using and destroy the Nuvia technology developed under the now-terminated licenses.

**ANSWER: Defendants admit that, on February 4, 2022, Qualcomm and Gerard Williams, NUVIA's former Chief Executive Officer, received a letter purporting to terminate NUVIA's ALA and TLA, with the termination effective as of March 1, 2022. Defendants otherwise deny the allegations of Complaint Paragraph 39, except to the extent they purport to state legal conclusions as to which no response is required.**

87.     **COMPLAINT PARAGRAPH 40:** In February 2022, pending termination of the Nuvia licenses, Nuvia sought Arm's verification that a Nuvia processor design satisfied the Arm architecture's specifications. On February 23, 2022, Qualcomm confirmed that it was still

---

[19]   Nilay Patel, *What Comes After the Smartphone, With Qualcomm CEO Cristiano Amon*, The Verge (Jan. 11, 2022), https://www.theverge.com/22876511/qualcomm-ceo-cristiano-amon-interview-decoder-podcast.

developing the relevant Nuvia technology by stating in a court filing that certain Nuvia documents were based on "years of research and work" and would "reveal secret design components of Qualcomm chips that are still in development." *Qualcomm Technologies, Inc. v. Hoang*, No. 3:22-cv-00248-CAB-BLM (S.D. Cal. Feb. 23, 2022), ECF No. 1 at 5-6.

**ANSWER: Defendants respectfully refer the Court to the cited court filing for its complete language and content. Defendants admit that Qualcomm began verification of a Qualcomm processor design in December 2021, that Qualcomm continued developing processor technology that it acquired from NUVIA beginning in March 2021 (doing so with ARM's knowledge that Qualcomm's design work was ongoing), and that ARM verified that the Qualcomm design satisfied ARM's architecture specification. Defendants otherwise deny the allegations of Complaint Paragraph 40.**

88.     **COMPLAINT PARAGRAPH 41:** On March 1, 2022, the Nuvia licenses terminated, along with the corresponding rights to use or sell products based on or incorporating Nuvia technology developed under those licenses.

**ANSWER: Defendants deny the allegations of Complaint Paragraph 41, except to the extent they purport to state legal conclusions as to which no response is required.**

89.     **COMPLAINT PARAGRAPH 42:** On April 1, 2022, Qualcomm's General Counsel sent Arm a letter enclosing a Nuvia representative's termination certification. The certification acknowledged—without objection—that the Nuvia licenses had been terminated. The certification recognized the obligations upon termination, and asserted that Nuvia was in compliance. Qualcomm and Nuvia thereby conceded that termination of the Nuvia licenses was appropriate, and that the termination provisions had been triggered, are binding, and are enforceable.

32

ANSWER: Defendants admit that, on April 1, 2022, Qualcomm Incorporated's General Counsel and Corporate Secretary transmitted a Certification from Gerard Williams stating that to the best of his knowledge, information and belief after due inquiry, NUVIA was in compliance with its obligations under ▆▆▆▆▆ with respect to any ARM Confidential Information. Defendants otherwise deny the allegations of Complaint Paragraph 42, except to the extent they purport to state legal conclusions as to which no response is required.

*Qualcomm keeps using Arm-based technology developed under the Nuvia licenses*

90.    **COMPLAINT PARAGRAPH 43:** Qualcomm is subject to Nuvia's termination requirements as the acquirer of Nuvia. Qualcomm has publicly described Nuvia as a Qualcomm "team" that has been "very tight[ly] integrat[ed]" with and is "not separate" from Qualcomm.[20] Qualcomm has also acted on behalf of Nuvia publicly and in correspondence with Arm since the acquisition. Qualcomm further told Arm that it planned to "redeploy NUVIA employees" and "transfer NUVIA's work" to Qualcomm and, consistent with that plan, Qualcomm has on-boarded Nuvia's leadership and employees as Qualcomm employees.[21]

---

[20]  Ian Cutress, *Interview with Alex Katouzian, Qualcomm SVP: Talking Snapdragon, Microsoft, Nuvia, and Discrete Graphics*, AnandTech (Jan. 31, 2022), https://www.anandtech.com/show/17233/interview-with-alex-katouzian-qualcomm-svp-talking-snapdragon-microsoft-nuvia-and-discrete-graphics; Ian Cutress, *AnandTech Interview with Miguel Nunes: VP for Windows and Chrome PCs, Qualcomm*, AnandTech (Feb. 14, 2022), https://www.anandtech.com/show/17253/anandtech-interview-with-miguel-nunes-senior-director-for-pcs-qualcomm.

[21]  *See, e.g.*, *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 16, 2021), https://investor.qualcomm.com/news-events/press-releases/detail/1304/qualcomm-completes-acquisition-of-nuvia; *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

**ANSWER:  Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants admit that, on January 27, 2021, Qualcomm wrote to ARM that Qualcomm had entered into a definitive agreement to acquire NUVIA and stating: "Following the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees continue their activities under the Qualcomm ALA and TLA, as that will be their current employer."  Defendants further admit that, on February 3, 2021, Qualcomm stated in a letter to ARM that, after the NUVIA acquisition, NUVIA would "become a wholly owned subsidiary of Qualcomm and, post-closing, our plan is to redeploy NUVIA employees to currently existing Qualcomm entities." Defendants otherwise deny the allegations in Complaint Paragraph 43, except to the extent they purport to state legal conclusions as to which no response is required.**

91.    **COMPLAINT PARAGRAPH 44:** On April 29, 2022, Arm wrote Qualcomm clarifying that neither Nuvia nor Qualcomm was authorized to continue working on technology that was developed under the Nuvia licenses.

**ANSWER:  Defendants admit that ARM wrote a letter to Qualcomm dated April 29, 2022.  Defendants otherwise deny the allegations in Complaint Paragraph 44 except to the extent they purport to state legal conclusions as to which no response is required.**

92.    **COMPLAINT PARAGRAPH 45:** Two weeks later, on May 13, 2022, Qualcomm sought Arm's verification that a new Qualcomm processor core complied with Arm architecture so that it could be verified and incorporated into a product. Qualcomm did not explain whether this processor core design was based on Nuvia's designs under the terminated licenses.

**ANSWER:  Defendants admit that, on May 13, 2022, Qualcomm submitted to ARM a compliance report for a new Qualcomm CPU.  Defendants otherwise deny the allegations in Complaint Paragraph 45.**

93.     **COMPLAINT PARAGRAPH 46:** Based on the timing and circumstances surrounding Qualcomm's request, discovery is likely to show that Qualcomm's processor core design is based on or incorporates in whole or in part the processor core design developed under the prior Nuvia licenses.

**ANSWER:  Defendants admit that Qualcomm's Phoenix Core design incorporates intellectual property acquired from NUVIA, which is wholly independent of ARM. Defendants otherwise deny the allegations in Complaint Paragraph 46, except to the extent they purport to state legal conclusions to which no response is required.**

94.     **COMPLAINT PARAGRAPH 47:** Qualcomm's Arm licenses do not cover products based on or incorporating Arm-based technologies developed by third parties under different Arm licenses, such as the now-terminated Nuvia licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 47.**

95.     **COMPLAINT PARAGRAPH 48:** Despite Arm's termination of the Nuvia licenses, Qualcomm has continued to tell the public that its Nuvia chips will soon be joining the industry-wide "ecosystem transition to Arm."[22] Like Qualcomm's prior statements, this announcement was directed to readers throughout the United States, including to readers physically located in the State of Delaware and this Judicial District.

---

[22] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 48, except to the extent they purport to state legal conclusions to which no response is required.**

96.     **COMPLAINT PARAGRAPH 49:** In June 2022, Qualcomm's CEO reiterated that it would soon begin "sampling" Nuvia chips to companies, allowing them to design electronic devices incorporating the chips in the "next year."[23] Based on that timeline, he explained, "[i]n late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon with a Nuvia-designed CPU."[24]

**ANSWER:  Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 49.**

97.     **COMPLAINT PARAGRAPH 50:** In the microprocessor industry, "sampling" means providing pre-production processors to original equipment manufacturers ("OEMs"), original device manufacturers ("ODMs"), or independent software vendors ("ISVs") for use in the product design cycle before product launch.

---

[23]  *Id.*; *see also* Mark Tyson, *Qualcomm CEO Admits Nuvia Chip OEM Sampling is Delayed (Update)*, Tom's Hardware (June 10, 2022), https://www.tomshardware.com/news/qualcomm-nuvia-chip-sampling-delays (Qualcomm spokesperson clarifying: "We are on track to sample the first products with our next generation CPUs this year.").

[24]  *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

**ANSWER: Defendants admit the allegations in Complaint Paragraph 50 generally describe sampling, but note that they fail to distinguish between precommercial engineering samples and commercial samples.**

98.     **COMPLAINT PARAGRAPH 51:** Based on Qualcomm's statements that Nuvia processors took "years" to develop and "are still in development," and Qualcomm's consistent statements that it is developing Nuvia's Arm chips, discovery is likely to show that the chips that Qualcomm intends to sample in the coming months will contain Nuvia technology that Qualcomm cannot use and instead must destroy.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 51, except to the extent they purport to state legal conclusions to which no response is required.**

99.     **COMPLAINT PARAGRAPH 52:** Further, based on Qualcomm's public announcements of its plans to use Nuvia technology, discovery is likely to show that Qualcomm has continued to retain and use Nuvia technology developed pursuant to the Nuvia licenses, thereby materially breaching the termination provisions of those licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 52, except to the extent they purport to state legal conclusions to which no response is required.**

100.     **COMPLAINT PARAGRAPH 53:** News reports indicate that Qualcomm is also developing Nuvia processors for data center servers, and "already has working silicon to at least demonstrate to potential customers,"[25] which discovery is likely to show is based on or incorporates Nuvia technology developed under the now-terminated Nuvia ALA.

---

[25]   Dan Robinson, *Qualcomm readying new Arm server chip based on Nuvia acquisition*, The Register         (Aug.         19,         2022), https://www.theregister.com/2022/08/19/qualcomm_arm_server_chip/ (citing Ian King,

**ANSWER:  Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 53, except to the extent they purport to state legal conclusions for which no response is required.**

101.    **COMPLAINT PARAGRAPH 54:** The failure of Nuvia and Qualcomm to comply with the post-termination obligations under the Nuvia ALA is causing, and will continue to cause, irreparable harm to Arm. Qualcomm effectively seeks to circumvent Arm's licensing model, which allocates use of the technology developed pursuant to a particular Arm license to a particular licensee.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 54, except to the extent they purport to state legal conclusions to which no response is required.**

102.    **COMPLAINT PARAGRAPH 55:** These breaches thus interfere with Arm's ability and right to control the use of its technology, negatively affecting Arm's relationships with existing and prospective licensees.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 55, except to the extent they purport to state legal conclusions to which no response is required.**

103.    **COMPLAINT PARAGRAPH 56:** The prospective monetary damages from Qualcomm's circumvention and interference with Arm's control over its technology are not readily ascertainable or calculable, given the resulting future impact on Arm's relationships with existing and prospective customers.

_____

*Qualcomm Is Plotting a Return to Server Market With New Chip*, Bloomberg (Aug. 18, 2022), https://www.bloomberg.com/news/articles/2022-08-18/qualcomm-is-plotting-a-return-to-server-market-with-new-chip).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 56, except to the extent they purport to state legal conclusions to which no response is required.**

104.    **COMPLAINT PARAGRAPH 57:** Qualcomm's improper acquisition of the relevant Nuvia technology in violation of Arm's standard provisions threatens to harm Arm's position in the ecosystem of Arm-based devices, harm Arm's reputation as an intellectual property owner and technology developer whose licenses must be respected, and embolden other companies to likewise harm Arm's reasonable business expectations in issuing its licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 57, except to the extent they purport to state legal conclusions to which no response is required.**

### COUNT I: BREACH OF CONTRACT – SPECIFIC PERFORMANCE (ALL DEFENDANTS)

105.    **COMPLAINT PARAGRAPH 58:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER: Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-57 as if fully set forth herein.**

106.    **COMPLAINT PARAGRAPH 59:** The termination obligations of the ALA between Nuvia and Arm survive termination and remain valid and enforceable contract provisions, as Qualcomm's correspondence and Nuvia's termination certification confirm.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 59, except to the extent they purport to state legal conclusions to which no response is required.**

107.    **COMPLAINT PARAGRAPH 60:** Arm complied with and fulfilled all relevant duties, conditions, covenants, and obligations under the Nuvia ALA, including ceasing use of Nuvia confidential information in its possession.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 60, except to the extent they purport to state legal conclusions to which no response is required.**

108.    **COMPLAINT PARAGRAPH 61:** The Nuvia ALA terms were just and reasonable, involving adequate consideration and reasonable obligations for Nuvia in the event of Arm's termination based on Nuvia's material breach. Those obligations served to restore the license holder to its position *ex ante*, protect Arm's business model and reasonable business expectations in issuing its licenses, and prevent the unjust enrichment of Qualcomm, the party that induced Nuvia's breach.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 61, except to the extent they purport to state legal conclusions to which no response is required.**

109.    **COMPLAINT PARAGRAPH 62:** Upon termination, the Nuvia ALA requires Nuvia to cease using and destroy any technology developed under the Nuvia ALA, as well as cease using Arm's trademarks in connection with any technology developed under the Nuvia ALA.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 62, except to the extent they purport to state legal conclusions to which no response is required.**

110.    **COMPLAINT PARAGRAPH 63:** Qualcomm shares Nuvia's obligations under the Nuvia ALA in its capacity as Nuvia's acquirer, and thus Qualcomm is likewise subject to the requirements of the Nuvia licenses' termination provisions.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 63, except to the extent they purport to state legal conclusions to which no response is required.**

111.    **COMPLAINT PARAGRAPH 64:** Based on Defendants' correspondence with Arm, public statements, and processor verification requests, discovery is likely to show that

Defendants are still using and developing Nuvia technology developed under the now-terminated licenses, along with Arm trademarks, and intend to continue to do so.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 64, except to the extent they purport to state legal conclusions to which no response is required.**

112.    **COMPLAINT PARAGRAPH 65:** Defendants therefore have breached and are breaching the Nuvia ALA's termination provisions.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 65, except to the extent they purport to state legal conclusions to which no response is required.**

113.    **COMPLAINT PARAGRAPH 66:** As a direct and proximate result of Nuvia and Qualcomm's past and ongoing breaches, Arm has been irreparably injured and damaged in amounts not capable of determination, including, but not limited to, injury to Arm's global licensing program and misuse of Arm's technology.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 66, except to the extent they purport to state legal conclusions to which no response is required.**

114.    **COMPLAINT PARAGRAPH 67:** Unless Defendants' breaches of the Nuvia ALA's termination provisions are enjoined and specific performance is granted, Arm will continue to suffer irreparable harm. As such, Arm has the right to enforcement of Nuvia and Qualcomm's compliance with the ALA's termination provisions, including via injunctive relief, specific performance, or any other measures necessary to avoid irreparable harm to Arm or to mitigate damages that have been caused by, and will continue to be caused by, Defendants' breach.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 67, except to the extent they purport to state legal conclusions to which no response is required.**

115. **COMPLAINT PARAGRAPH 68:** Arm is entitled to specific performance requiring Defendants to comply with the Nuvia ALA's termination provisions, including ceasing all use of and destroying any technology developed under the Nuvia ALA, and ceasing all use of Arm trademarks in connection with any technology developed under the Nuvia ALA—including the relevant Nuvia technology.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 68, except to the extent they purport to state legal conclusions to which no response is required.**

116. **COMPLAINT PARAGRAPH 69:** Arm is also entitled to monetary compensation incidental to specific performance of the Nuvia ALA's termination provisions to compensate Arm for the delay in Defendants' performance of their contractual obligations.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 69, except to the extent they purport to state legal conclusions to which no response is required.**

<u>COUNT II: DECLARATORY JUDGMENT AND</u>
<u>TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114</u>
<u>(ALL DEFENDANTS)</u>

117. **COMPLAINT PARAGRAPH 70:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER: Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-69 as if fully set forth herein.**

118. **COMPLAINT PARAGRAPH 71:** Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower case letters (collectively, the "ARM Marks"), true and correct copies of which are attached as **Exhibits A and B**. These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with particular

microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services. The applications to register the marks were filed on July 31, 2017 and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

**ANSWER: Defendants refer the Court to Exhibits A and B of the Complaint for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 71, except to the extent they purport to state legal conclusions to which no response is required.**

119. **COMPLAINT PARAGRAPH 72:** The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.

**ANSWER: To the extent the allegations in Complaint Paragraph 72 purport to state legal conclusions, no response is required. Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Complaint Paragraph 72, and on that basis deny them.**

120. **COMPLAINT PARAGRAPH 73:** Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 73, except to the extent they purport to state legal conclusions to which no response is required.**

121.   **COMPLAINT PARAGRAPH 74:** Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

**ANSWER:  Qualcomm admits that its ALA and TLA with ARM permit the use of ARM Marks. Defendants otherwise deny the allegations in Complaint Paragraph 74, except to the extent they purport to state legal conclusions to which no response is required.**

122.   **COMPLAINT PARAGRAPH 75:** Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 75, except to the extent they purport to state legal conclusions to which no response is required.**

123.   **COMPLAINT PARAGRAPH 76:** Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to infringe Arm's trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® KryoTM 485 CPU built on ARM Cortex Technology."[26] In January 2022, Qualcomm issued a press release touting the "broad

---

[26]   *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[27] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

**ANSWER: Qualcomm admits to using certain ARM Marks as permitted by its licenses to accurately refer to ARM's technology, including, but not limited to, in marketing materials, product specifications, and technical documents. Defendants deny knowledge or information sufficient to form a belief as to how ARM's other licensees use ARM Marks. Defendants otherwise respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 76, except to the extent they purport to state legal conclusions to which no response is required.**

124.    **COMPLAINT PARAGRAPH 77:** Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the

---

[27] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting trademark infringement in violation of 15 U.S.C. § 1114. Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 77, except to the extent they purport to state legal conclusions to which no response is required.**

125. **COMPLAINT PARAGRAPH 78:** An actual and justiciable controversy exists between Defendants and Arm regarding infringement of Arm's trademarks. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 78, except to the extent they purport to state legal conclusions to which no response is required.**

126. **COMPLAINT PARAGRAPH 79:** Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips

with the relevant Nuvia technology and the ARM Marks do and will infringe Arm's trademarks, directly and indirectly.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 79, except to the extent they purport to state legal conclusions to which no response is required.**

127.    **COMPLAINT PARAGRAPH 80:** Defendants' acts of infringement have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 80, except to the extent they purport to state legal conclusions to which no response is required.**

128.    **COMPLAINT PARAGRAPH 81:** Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 81, except to the extent they purport to state legal conclusions to which no response is required.**

129.    **COMPLAINT PARAGRAPH 82:** Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' trademark infringement. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing infringement, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other

matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their infringing conduct.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 82, except to the extent they purport to state legal conclusions to which no response is required.**

**COUNT III: DECLARATORY JUDGMENT AND**
**FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125**
**(ALL DEFENDANTS)**

130.    **COMPLAINT PARAGRAPH 83:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER:  Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-82 as if fully set forth herein.**

131.    **COMPLAINT PARAGRAPH 84:** The acts of Qualcomm and Nuvia described above constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 84, except to the extent they purport to state legal conclusions to which no response is required.**

132.    **COMPLAINT PARAGRAPH 85:** Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 85, except to the extent they purport to state legal conclusions to which no response is required.**

133.    **COMPLAINT PARAGRAPH 86:** Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

**ANSWER: Qualcomm admits that its ALA and TLA permit use of the ARM Marks. Defendants otherwise deny the allegations in Complaint Paragraph 86, except to the extent they purport to state legal conclusions to which no response is required.**

134.    **COMPLAINT PARAGRAPH 87:** Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 87, except to the extent they purport to state legal conclusions to which no response is required.**

135.    **COMPLAINT PARAGRAPH 88:** Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to falsely designate the origin of their products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® KryoTM 485 CPU built on ARM Cortex Technology."[28] In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely

---

[28]    *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

positions Qualcomm Technologies to drive this industry wide transition."[29] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

**ANSWER: Qualcomm admits to using certain ARM Marks pursuant to its licenses to accurately refer to ARM's technology, including, but not limited to, in marketing materials, product specifications, and technical documents. Defendants deny knowledge or information sufficient to form a belief as to how ARM's other customers use ARM Marks. Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 88, except to the extent they purport to state legal conclusions to which no response is required.**

136. **COMPLAINT PARAGRAPH 89:** Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A). Given Arm's close

---

[29] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 89, except to the extent they purport to state legal conclusions to which no response is required.**

137.    **COMPLAINT PARAGRAPH 90:** An actual and justiciable controversy exists regarding Defendants' false designation of origin. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 90, except to the extent they purport to state legal conclusions to which no response is required.**

138.    **COMPLAINT PARAGRAPH 91:** Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will falsely designate the origin of their products, directly and indirectly.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 91, except to the extent they purport to state legal conclusions to which no response is required.**

139.     **COMPLAINT PARAGRAPH 92:** Defendants' acts of false designation of origin have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 92, except to the extent they purport to state legal conclusions to which no response is required.**

140.     **COMPLAINT PARAGRAPH 93:** Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 93, except to the extent they purport to state legal conclusions to which no response is required.**

141.     **COMPLAINT PARAGRAPH 94:** Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' false designation of origin. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing false designation of origin, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the falsely designated matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their wrongful conduct.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 94, except to the extent they purport to state legal conclusions to which no response is required.**

<u>**ARM'S PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff Arm Ltd. requests that the Court grant the following relief:

**a.**     A judgment in Arm's favor on all claims against Defendants;

**b.**     An order requiring specific performance by Defendants of the Nuvia licenses' termination provisions;

**c.**     An award of damages incidental to specific performance as a result of Defendants' breach of contract, in amounts to be proven at trial, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

**d.**     A judgment and a declaration that advertising, distributing, offering for sale, or selling semiconductor chips with the relevant Nuvia technology and the ARM Marks infringes Arm's trademarks, directly and indirectly;

**e.**     An order and judgment permanently enjoining Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns from (1) using in any manner in connection with the relevant Nuvia technology the ARM Marks, or any mark or logo that is confusingly similar to or a colorable imitation of the ARM Marks owned by Arm; (2) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology; or (3) assisting, aiding, or abetting any other person or business entity in performing any of the aforementioned activities;

f.      An order and judgment directing Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Arm within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and ceased all offering of products with the relevant Nuvia technology under the ARM Marks, as set forth above;

g.      An order and judgment directing Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays in any manner in connection with the relevant Nuvia technology the ARM Marks or any other mark that is confusingly similar to or a colorable imitation of the ARM Marks;

h.      A judgment in the aggregate amount of (1) Defendants' profits, (2) Arm's actual damages, (3) the costs of this action pursuant to 15 U.S.C. § 1117, and (4) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants in connection with their semiconductor chips using the relevant Nuvia technology and the ARM Marks, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

i.      A judgment trebling any damages to the extent permitted by law, including under 15 U.S.C. § 1117;

j.      Exemplary or punitive damages to the extent permitted by law;

54

     **k.**     Costs, expenses, and reasonable attorney fees under all applicable rules, statutes, and rules in common law that would be appropriate, with pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

     **l.**     Equitable relief addressing any infringement occurring after entry of judgment; and

     **m.**     Such other relief as the Court deems just and proper.

**ANSWER TO PLEA FOR RELIEF: ARM's characterization of the relief it seeks does not require a response. To the extent a response is required, Defendants deny the allegations in the prayer for relief and further deny that ARM is entitled to the requested relief, or any relief, against the Defendants, and the Defendants request that the Court dismiss all claims against them with prejudice and order such further relief as the Court deems just and proper.**

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Arm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

**ANSWER TO JURY DEMAND: ARM's jury demand states a legal conclusion to which no response is required, and Defendants otherwise reserve their right to contest ARM's jury demand.**

## DEFENSES

142.     Without admitting that the Defendants engaged in the acts and conduct set forth in ARM's Complaint or that such acts or conduct would entitle ARM to the relief it seeks or that the allegation of an affirmative or other defense requires Defendants to prove affirmatively the circumstances as alleged, the Defendants assert the following defenses with respect to the claims alleged in the Complaint, without assuming the burden of proof or persuasion where the burden rests on ARM. By designating the following defenses, the Defendants do not in any way waive or

limit any defenses which are or may be raised by their denials, allegations and averments set forth herein, and do not assume the burden of proof for any element of a claim to which the applicable law places the burden of proof on the Plaintiff.  The defenses are pleaded in the alternative, are raised to preserve the Defendants' rights to assert such defenses, and are without prejudice to their ability to raise other and further defenses.  The Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent at any time and hereby reserve all rights to amend and/or supplement any and all defenses set forth herein.

### FIRST DEFENSE

### (Failure To State A Claim)

143.    The Complaint fails to state a claim against the Defendants upon which relief can be granted.

### SECOND DEFENSE

### (Defendants Did Not Breach The NUVIA ALA)

144.    Defendants did not breach the termination provisions of NUVIA's ALA because Defendants complied with the termination provision.

145.    Defendants did not breach the NUVIA ALA.  Defendants' use of ARM technology and information was fully licensed under the Qualcomm ALA.

### THIRD DEFENSE

### (Defendants' Use Of ARM Marks Is Licensed And Therefore Permitted Under Qualcomm's License Agreements)

146.    Defendants are licensed to use the ARM Marks at issue and therefore they are not in violation of 15 U.S.C. §§ 1114 and 1125.

147.    For example, under ████████ of Qualcomm's ARM ALA, ARM ████████
███████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████   ███████████████████

███████

148.    The Qualcomm products at issue in ARM's complaint were ███████████████ ████████████ Qualcomm's license agreements.  Accordingly, Defendants are permitted to use ARM's Marks licensed under that agreement.

### FOURTH DEFENSE

### (Fair Use)

149.    Defendants are not subject to liability for alleged trademark infringement because Defendants' use of ARM Marks constitutes fair use.

150.    Defendants use the ARM Marks in marketing materials, product specifications and technical documents to truthfully refer to ARM's technology and its relationship with Qualcomm's products.    For example, Qualcomm's website describes the Kryo CPU as follows: "The Qualcomm® Kryo™ CPU (built on ARM Cortex Technology) available in certain Snapdragon processors is optimized for high-performance mobile computing."

151.    Use of the ARM Marks in this manner is necessary to accurately describe that Qualcomm's products are compatible with ARM's technology.

152.    This use of the ARM Marks indicates that Qualcomm's products use an ARM ISA. This is a true and accurate representation of the relationship between ARM and Qualcomm's products.

153.    Defendants use only so much of the ARM Marks as necessary to describe ARM's products.

## FIFTH DEFENSE

### (Ripeness)

154.     ARM's claims under 15 U.S.C. §§ 1114 and 1125 are premature and not ripe for adjudication.

## SIXTH DEFENSE

### (Plaintiff's Breach Of The NUVIA ALA Prevents It From Seeking To Enforce The ALA)

155.     ARM is barred from bringing or maintaining its breach of contract claim based on the NUVIA ALA, or recovering any remedy against the Defendants based on this claim, because ARM breached the NUVIA ALA, and such breach excuses any nonperformance by the answering Defendants.

156.     ARM's refusal to fulfill its responsibilities under the NUVIA ALA bars its own claims of breach of contract against the Defendants.

157.     Moreover, pursuant to ████████ of the ALA, ARM's ability to recover damages is limited.

## SEVENTH DEFENSE

### (Unclean Hands)

158.     ARM is barred from bringing or maintaining its claims by virtue of the equitable doctrine of unclean hands, including because ARM has refused to fulfill its contractual obligations to Defendants.

## EIGHTH DEFENSE

### (Waiver)

159.     By the statements, conduct, acts, or omissions attributable to ARM alone, ARM has waived all claims and causes of action and any recovery or remedy alleged in the complaint.  ARM

has been aware of Qualcomm's development of technology it acquired from NUVIA for over a year, and only now seeks to preclude Qualcomm from proceeding with its development.

## NINTH DEFENSE

### (Estoppel)

160.    By the statements, conduct, acts, or omissions attributable to ARM alone, ARM is estopped from seeking any recovery or remedy as alleged in the complaint.  ARM has been aware of Qualcomm's development of technology it acquired from NUVIA for over a year, and only now seeks to preclude Qualcomm from proceeding with its development.

## TENTH DEFENSE

### (No Damages)

161.    ARM's claims cannot be maintained because ARM cannot prove any cognizable loss, damage, or injury as a result of the conduct alleged in the Complaint.

162.    Moreover, to the extent ARM seeks damages, ARM's damages are limited pursuant to ███████ of the ALA.

## ELEVENTH DEFENSE

### (Failure To Mitigate Damages)

163.    ARM's claim for damages is barred in whole or in part due to ARM's failure to mitigate the alleged damages resulting from its claims.

164.    ARM knew in March of 2021 that Qualcomm had acquired NUVIA and that it intended to continue developing technology acquired from NUVIA.

165.    ARM waited until February 2022 to terminate the NUVIA ALA, allegedly because NUVIA violated assignments provisions in the NUVIA agreements.

166.    ARM's actions worked to maximize its alleged damages.

## TWELFTH DEFENSE

### (Equitable Defenses)

167.     The claims alleged and the relief sought in this action are barred in whole or in part by the equitable doctrines of laches, acquiescence, consent, ratification, and/or similar doctrines.

## THIRTEENTH DEFENSE

### (No Entitlement To Equitable Relief)

168.     To the extent the Complaint seeks equitable relief, such relief is barred because there is an adequate remedy at law.

## FOURTEENTH DEFENSE

### (Trademark Misuse)

169.     ARM has misused its marks inequitably, in order to harm Defendants.

170.     ARM has falsely claimed that Defendants are not entitled to utilize the ARM Marks.

171.     ARM falsely told customers, the media, and the public that Qualcomm cannot manufacture or sell products compatible with ARM's ISA that contain NUVIA technology.

172.     In so doing, ARM is indicating that Defendants are not entitled to utilize the ARM Marks.

173.     This is incorrect.   Defendants are fully licensed to the ARM Marks under Qualcomm's license agreements with ARM.

## FIFTEENTH DEFENSE

### (Other Defenses)

174.    Defendants hereby adopt and incorporate by reference any and all other defenses asserted, or that may hereafter be asserted, by any other defendant not expressly set forth herein to the extent such defense may be applicable to Defendants.

## COUNTERCLAIM

175.    Defendants, for their Counterclaim against ARM, seek a declaration that Defendants have not breached NUVIA's license agreements with ARM, and that Defendants' design, activities, and work on the Phoenix Core and associated SoCs are fully licensed pursuant to Qualcomm's license agreements with ARM.  Defendants set forth their counterclaim below, and incorporate by reference their introduction, set forth in paragraphs 1-47 above, as though set forth in full below.

## THE PARTIES

176.    Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm is the world's leading wireless technology innovator and the driving force behind the development, launch, and expansion of 5G technology. Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone.  Qualcomm brings the benefits of mobile to new industries, including automotive, the internet of things, and computing, where Qualcomm has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

177.    Qualcomm Technologies, Inc. is a Delaware corporation with a principal place of business in San Diego, California.  Qualcomm Technologies is a wholly-owned subsidiary of

Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

178.    NUVIA, Inc. was founded in February 2019 to design and develop ARM-compatible cores for use in server products.  NUVIA comprised a proven world-class CPU and technology design team, with industry-leading expertise in high-performance processors, SoCs, and power management for compute-intensive devices and applications.  Qualcomm acquired NUVIA in March 2021 for approximately $1.4 billion, before working capital and other adjustments.

179.    ARM is a corporation headquartered in Cambridge, United Kingdom and was founded in 1990.  ARM is planning to issue an IPO in the future, and ARM's positions will have a detrimental impact on this IPO unless this action is resolved beforehand.

## JURISDICTION AND VENUE

180.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

181.    Venue is proper in the District of Delaware under 28 U.S.C. § 1391 because ARM, through its Complaint dated August 31, 2022, has consented to jurisdiction and venue in the State of Delaware and this Judicial District.

## FACTUAL BACKGROUND

### I.    QUALCOMM AND NUVIA'S AGREEMENTS WITH ARM

182.    On May 30, 2013, Qualcomm[30] and ARM entered into an Amended and Restated Architecture License Agreement (the "QC ALA"), No. LES-TLA-20039, and Annex 1 to that agreement.    On May 31, 2013, Qualcomm and ARM entered into a Technology License Agreement (the "QC TLA"), No. LEC-TLA00550 and Annex 1 to that agreement.    On June 23, 2020, Qualcomm and ARM entered into an updated Annex 1 to the ALA and an Annex 1 to the QC TLA.

183.    

184.    Under the QC TLA, ARM licenses to Qualcomm fully designed and functional ARM Technology.  ARM provides this technology "off the shelf" to Qualcomm (i.e., the license is for a fully designed and functional piece of technology).    

185.    On September 27, 2019, NUVIA entered into both a TLA and an ALA through which it licensed certain ARM Technology.  The NUVIA ALA was later amended on October 17, 2019.

---

30

186.    Prior to ARM's termination of the NUVIA ALA and TLA, Qualcomm's and NUVIA's license agreements with ARM broadly overlapped.  At the time of termination of the NUVIA agreements, Qualcomm's ALA and TLA provided Qualcomm a license to the same technologies that were licensed under the NUVIA agreements.

187.    However, as discussed above, the royalty rates under NUVIA's license agreements were higher than those under Qualcomm's.

## II.    ARM TRIES TO TAKE ADVANTAGE OF QUALCOMM'S ACQUISITION OF NUVIA

### a.    Qualcomm Alerts ARM To Its Pending Acquisition Of NUVIA

188.    As discussed above in paragraphs 1-47, on January 13, 2021, Qualcomm announced its intent to acquire—for $1.4 billion before working capital and other adjustments—NUVIA, a start-up focused on developing a promising custom CPU compliant with the ARM ISA designed for data center servers.

189.    On January 27, 2021, Qualcomm wrote ARM a letter stating that it had entered into a definitive agreement to acquire NUVIA, and noting that Qualcomm and NUVIA had overlapping license agreements.  As Qualcomm notified ARM, "[f]ollowing the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees continue their activities under the Qualcomm ALA and TLA, as that will be their current employer."  In its letter, Qualcomm told ARM that it would be willing to "work with the ARM team to complete any necessary annexes" to Qualcomm's ALA and TLA "to the extent NUVIA was utilizing any ARM technology not currently covered under the current QTI ALA and TLA."  Given the timing of the acquisition, which was scheduled to close in March, Qualcomm requested that ARM respond by February 3, 2021.

190.    ARM did not respond until February 2, 2021, and said it would start reviewing "NUVIA's contracts with ARM" and would "aim to get in touch" regarding additional materials required to facilitate the review by February 17, 2021.  ARM further stated that it expected Qualcomm and NUVIA to "continue to follow the confidentiality obligations" in the parties' agreements and that the transfer of "designs, rights, or licenses" would be subject to "Arm's prior consent," which is "customarily documented in a three-way agreement between Arm, transferor, and transferee."

191.    Qualcomm replied the following day. Qualcomm confirmed that both "NUVIA and Qualcomm's existing agreements with ARM provide for the protection of ARM's confidential information," and that they "would abide by the confidentiality terms of those agreements." Qualcomm further requested that ARM provide its proposed "three-way agreement" for review.

192.    ARM never provided a draft of the "three-way agreement" or explained its concerns regarding protection of its confidential information.  Nor was any such "three-way agreement" necessary to transfer any designs or rights to the NUVIA technology that Qualcomm had acquired. Rather, by its terms, Qualcomm's agreements provided any rights necessary to continue the development of custom cores for the uses Qualcomm contemplated.

**b.    ARM's Baseless Threats**

193.    ARM waited nearly two weeks after Qualcomm's letter to provide any meaningful response.  On February 16, 2021, ARM gave Qualcomm a broad list of demands, claiming that ARM could only consent to the assignment of NUVIA's agreements to Qualcomm if Qualcomm agreed to several outrageous demands, set forth in Paragraph 23 above.

194.    Although assignment of the NUVIA agreement was unnecessary because of Qualcomm's own license agreements and nothing in the NUVIA agreement precluded Qualcomm from acquiring NUVIA or its technology, ARM's ploy in tying its consent to these demands was

to try and leverage the swiftly approaching closing date in a misguided attempt to disrupt Qualcomm's acquisition.

195.    In correspondence sent February 18 and February 25, 2021, Qualcomm explained that ARM's demand that Qualcomm pay the NUVIA licensing rates was not appropriate because "ARM has not proposed giving Qualcomm any additional rights or benefits in exchange for" its demand for additional payments and because there was no contractual support for ARM's imposition of NUVIA's royalty rates on Qualcomm.

196.    Qualcomm also explained that ARM's proposed restrictions on Qualcomm's engineers were inappropriate, as the proposed three-year restriction period would make it nearly impossible to develop products, thus endangering Qualcomm development work and would adversely impact ARM through the loss of licensing revenue.

197.    During Qualcomm's February 2021 discussions with ARM, it became apparent that ARM's position was that NUVIA needed to assign its license agreements to Qualcomm, and that assignment could only be made with ARM's consent under ██████████████████████████ ████████████████████████.

198.    ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████.

199.    ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

200.     These assignment provisions are inapplicable to Qualcomm's acquisition of NUVIA because Qualcomm has its own separate license agreements with ARM, which covered NUVIA and its technology as soon as the acquisition closed. ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

201.     In addition, the ALA gave Qualcomm broad license rights to design architecture compatible cores at all stages of implementation. ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████

202.     Therefore, NUVIA's technology would be covered by Qualcomm's ALA upon its acquisition.  It was not necessary to transfer NUVIA's licenses to effectuate the acquisition of NUVIA or its technology.

203.     Regardless, in an effort to compromise, on February 25, 2021, Qualcomm asked that ARM consent to the transfer of the NUVIA licenses to Qualcomm by March 2, 2021.

204.     By a letter dated March 2, 2021, ARM refused to consent.  Instead, ARM reiterated its demand that Qualcomm agree to the higher royalties of the NUVIA license agreement, including for what it alleged to be "derivative[]" products developed by Qualcomm.  ARM conditioned its consent to the assignment of the agreements by NUVIA to Qualcomm on Qualcomm agreeing to these demands.

67

205.    Qualcomm did not agree to these demands and Qualcomm's acquisition of NUVIA was completed as scheduled on March 16, 2021.

206.    Although the parties had intermittent discussions to resolve the dispute, they were unable to resolve these issues, and in September 2021, ARM went silent.

### d.    With ARM's Knowledge And Assistance Owed To Qualcomm Under Its ALA, Qualcomm Continued Its Work Developing CPU Cores After The Acquisition Closed

207.    From March 16, 2021 through the present, Qualcomm engineers (including former NUVIA employees), operating under the Qualcomm license agreements, worked diligently to develop market-leading CPU cores and SoCs improving and further developing the technology it acquired from NUVIA.

208.    When Qualcomm acquired NUVIA, NUVIA had certain technology for a CPU core (i.e., the Phoenix Core) and the Server SoC that would use the Phoenix Core, but this technology was not fully developed.  Qualcomm continued to develop the Phoenix Core and Server SoC.

209.    Qualcomm also designed a SoC for use in the "compute" space (the "Compute SoC"), which would include aspects of the Phoenix Core.  Unlike the Server SoC, the Compute SoC was initially conceived of and innovated at Qualcomm after the NUVIA acquisition, including modifications of the Phoenix Core for this application.

210.    Throughout 2021 and 2022, Qualcomm received limited support from ARM as it developed the Phoenix Core and the two SoCs under Qualcomm's agreements, largely related to certain verification processes ARM is obligated to provide to ensure that the core design meets the architectural guidelines.  During the verification process, ARM knew that it was interacting with former NUVIA employees, and knew that Qualcomm was seeking to verify core designs that included technologies Qualcomm had acquired from NUVIA.

68

211.    Beginning immediately after the acquisition, Qualcomm—including many Qualcomm team members who had previously worked at NUVIA—began having weekly calls with ARM engineers related to verification testing of the in-development Phoenix Core and the Server SoC.

212.    The discussion between ARM and Qualcomm (which included the former NUVIA engineers) was open and transparent.  ARM was aware that the discussions included Qualcomm engineers formerly at NUVIA related to Qualcomm's ongoing development of the technologies it had acquired from NUVIA.

213.    ARM has also continued to license technology to Qualcomm, and Qualcomm has continued to pay ARM for those licenses.

214.    For example, in July 2021, ARM delivered to Qualcomm four design-only licenses for Qualcomm internal testing.  It also delivered to Qualcomm twelve single-use licenses, allowing the development of a single chipset design using the licensed ARM Technology.  Subsequently, in October 2021, ARM delivered three perpetual licenses allowing for use of some of that same ARM Technology in unlimited designs.  Like other licenses from ARM, Qualcomm paid for these licenses.

215.    In or around late 2021, Qualcomm also introduced the Compute SoC into the parties' weekly discussions.  Like the parties' discussions concerning the in-development Phoenix Core for the Server SoC, these discussions were transparent, and ARM was aware that these discussions included Qualcomm engineers formerly at NUVIA and related to Qualcomm's ongoing development of the technologies it had acquired from NUVIA.

216.    Also in December 2021, Qualcomm submitted an interim compliance report to ARM for the Server SoC it had been developing since the NUVIA acquisition.  This compliance

report stated that the Server SoC implemented ▮▮▮ of the ARM ISA, which was, at that time, publicly available on ARM's website and licensed under Qualcomm's ALA.

### III.   ARM WAITED OVER A YEAR TO TERMINATE THE NUVIA LICENSES AND DEMAND QUALCOMM DESTROY TECHNOLOGY

### a.   On February 1, 2022, ARM Claimed NUVIA And Qualcomm Breached The NUVIA License Agreements And Terminated The Agreements

217.   As discussed above in paragraphs 31-40, in a letter dated February 1, 2022, after ARM had been interfacing with Qualcomm and its development efforts for months, ARM notified Gerard Williams III, the former CEO and President of NUVIA, that it intended to terminate both NUVIA's ALA and TLA for "material breach."

218.   ARM's February 2022 letter alleged that NUVIA had violated the assignment provisions in ▮▮▮▮ of both the NUVIA ALA and TLA when it was acquired by Qualcomm without ARM's consent.  ARM also alleged that NUVIA violated the confidentiality provisions of ▮▮▮▮ of both of the NUVIA license agreements by making unlicensed use of ARM's confidential information.  ARM's letter did not explain its assertions or define the purported breach.

219.   But NUVIA was not required to obtain consent from ARM to "transfer" its licenses or technology.  There are no provisions in the NUVIA-ARM agreements or the Qualcomm-ARM agreements that prohibited Qualcomm from purchasing NUVIA, nor are there any such provisions that required ARM's consent to purchase NUVIA.

220.   As a Qualcomm subsidiary, NUVIA was licensed under the Qualcomm ALA and TLA to use ARM Technology and Confidential Information.  And Qualcomm's licenses covered the further development of the technology acquired from NUVIA by Qualcomm.

221.    ARM's argument under ███████ fails for the same reasons.  At the time of the termination, both NUVIA and Qualcomm were licensed to use the ARM information in the Phoenix Core and related SoCs under the Qualcomm ALA and TLA, and any use of that information was fully authorized.

222.    In addition, the Phoenix Core and the Server SoC implemented ███ of the ARM ISA, and did not utilize any ARM Confidential Information because ARM has published this specification and placed it in the public domain.  ARM was well aware of this fact by the time it sent the February 1, 2022 termination letter.

223.    Thus, contrary to ARM's assertions, neither NUVIA nor Qualcomm "committed a material breach of" the NUVIA ALA.

224.    Moreover, ARM waited to terminate the NUVIA agreement until Qualcomm had already completed the design of the Phoenix Core for its Server SoC—and even after ARM had *accepted* Qualcomm's core design as ISA compatible.

225.    ARM demanded, upon termination, that NUVIA:

   a.    "discontinue any use and distribution of all Arm Technology, Arm Confidential Information and any products embodying such technology or information";

   b.    "[a]t Arm's option, either destroy or return to Arm any Arm Confidential Information, including any copies thereof in its possession and any Arm Technology or derivatives . . . thereof in its possession"; and

   c.    "[w]ithin one month after termination, furnish to Arm a certificate signed by a duly authorized representative that to the best of his or her knowledge, information and belief, after due enquiry, NUVIA has complied with these provisions."

226.    ARM further claimed (wrongly) that these "obligations extend to Qualcomm and its widely publicized use of NUVIA's technology developed under NUVIA's ALA and TLA."

ARM contended in its termination notice that certification of the return or destruction of ARM Confidential Information should "extend to Qualcomm as well."

227.    ARM informed NUVIA that its unilateral termination would be effective as of March 1, 2022 and demanded the return or destruction of any ARM Confidential Information delivered to NUVIA by April 1, 2022.

228.    ARM's demand that NUVIA discontinue using and distributing ARM Technology, ARM Confidential Information, and any products embodying such technology or information was baseless.  NUVIA and the technology Qualcomm acquired from NUVIA was licensed under Qualcomm's license agreements.

229.    Likewise, ARM's demand that NUVIA destroy ARM Confidential Information was baseless because NUVIA was licensed to this information under Qualcomm's license agreements and Qualcomm's further development of this technology was also licensed under Qualcomm's license agreements.

230.    Nonetheless, Qualcomm and NUVIA acted swiftly, at great time and expense, to take additional measures to satisfy ARM's unreasonable demand to comply with the termination provisions in NUVIA's license agreements.

231.    Qualcomm and NUVIA removed NUVIA-acquired ARM Confidential Information from its designs and redesigned its products to replace it with information acquired under Qualcomm's license—even though it was the exact same information—then quarantined a copy. Qualcomm also removed NUVIA-acquired ARM Confidential Information from its design environment and systems and quarantined it.

232.    During this period, Qualcomm's engineers were not working on further development of products because their attention was focused on the removal of NUVIA-acquired ARM Confidential Information.

233.    NUVIA then provided ARM with its certification of its compliance with the termination provisions on April 1, 2022, as requested by ARM, even though the termination provisions were inapplicable.[31]

    **b.**    **ARM Failed To** ███████████████████████
███████████████████ **After Termination**

234.    ARM's termination of the NUVIA ALA and TLA also triggered certain ARM obligations.

235.    Under ███████████ of both the NUVIA ALA and the NUVIA TLA, ARM was obligated, upon termination, to █████████████████████████████████
██████████████████████ Additionally, at NUVIA's option, ARM was obligated to █████████████████████████████████████████
Within one month of termination, ARM was further obligated to ████████████
████████████████████████████████████████████████████
█████████████████████████ its obligations under the agreement.

236.    On April 29, 2022, more than one month after ARM terminated the NUVIA ALA and TLA, ARM sent Qualcomm a letter informing Qualcomm that ARM was aware of its obligations to ████████████ ████████████████████████████████

---

[31] Meanwhile, ARM never certified its own compliance with the termination provisions, in violation of the NUVIA agreements.

237.    Nonetheless, through depositions and document discovery, Defendants have discovered that ARM employees failed to ████████████████████████████████████████ ████████████████████████████████████ [32] after ARM's termination of the agreements.

238.    Emails between Vivek Agrawal, ARM's Senior Principle Engineer, and Richard Grisenthwaite, ARM's Chief Architect, reveal that ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████

239.    A January 19, 2023 email from Mr. Agrawal to seven other ARM employees makes clear that, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

240.    In the email, Mr. Agrawal explicitly states that ████████████████████████ ████████████████████████████████████████████████████████ and that he has ████████████████████████████████████████ He additionally states that he ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Mr. Agrawal further explained that some of the files were ████████████████████████████ ████████████████████████████████████████

---

[32]    ARM witnesses—including Mr. Agrawal and Mr. Werkheiser—have been clear that ████████ ████████████████████████████████

[33]    ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████

241.    When asked about this email in his December 13, 2023 deposition, Mr. Agrawal testified that ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

242.    Mark Werkheiser, a "Distinguished Engineer" and Fellow at ARM, also confirmed at his December 7, 2023 deposition that ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

243.    Mr. Werkheiser further testified that █████████████████████

████████████████████████████  ████████████████████

████████████████████████████████████████████████

██████████████████████████████

244.    The NUVIA code and/or NUVIA identified features for the CMN is NUVIA Confidential Information (1) under ARM's ████████████████████████ as applied to Qualcomm's CPUs ████████████████████████████ (2) as a NUVIA trade secret disclosed to ARM, and (3) as NUVIA marked Confidential Information disclosed to ARM.  ARM is actively using NUVIA Confidential Information, including derivatives of NUVIA Technology —and directly profiting from that use.

245.    Defendants have been harmed by ARM's breach, which allowed ARM to access, use and profit from NUVIA Technology and Confidential Information, which belongs to the Defendants.  ARM is providing the NUVIA Confidential Information to third parties that are in

direct competition with Qualcomm.  Further discovery is required to determine the precise scope of harm Defendants have suffered—and the precise benefits ARM has wrongfully incurred—as a result of ARM's breach.

### c.    ARM Continued to Threaten Qualcomm

246.    After NUVIA's certification, ARM responded by purporting to impose even more onerous demands than required by the termination provisions.  In an April 29, 2022 letter, ARM wrote to confirm that: "both Qualcomm and NUVIA . . . will not proceed with any further development of NUVIA technology that embodies or is derivative of Arm confidential information or technology."

247.    The termination provisions do not, by their plain language, require any such thing. They require only that NUVIA ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

These provisions apply only to NUVIA, not Qualcomm.  And, of course, Qualcomm owns its own licenses to ARM Confidential Information and Technology.

248.    Moreover, in this April letter, ARM stated that "Arm does not believe that the NuVia [sic] technology discussed above constitutes or can form the basis of an Arm Compliant Product or Architecture Compliant Product for purposes of the relevant Qualcomm agreements with Arm."  This assertion was incorrect because of Qualcomm's own licenses, which do not restrict Qualcomm's ability to develop CPU cores using Qualcomm's technology, including technology it acquired from NUVIA.

249.    Then, on August 2, 2022, ARM told Qualcomm that "Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the NUVIA technology."  In other words, ARM contended—with absolutely no basis—that Qualcomm cannot

use *any* of NUVIA's intellectual property, proprietary designs, or confidential information, which include technology that ARM did not own or develop. ARM's demands go far afield of ARM Confidential Information or ARM Technology. ARM is pretending that it has rights over NUVIA Technology and NUVIA Confidential Information, a position that is baseless in light of the actual provisions of the NUVIA agreements. ARM also threatened Qualcomm's customers, asserting that "[n]either Qualcomm nor its customers are licensed to use any part of Arm's broad intellectual property portfolio with respect to such products. Arm will use all necessary means to protect its legal rights."

250. ARM's threats are baseless. ARM apparently contends that it has rights over all technology, proprietary designs, and confidential information developed by NUVIA, including technology that had absolutely nothing to do with ARM. But ARM has no right to demand destruction of that technology. ARM does not own CPU and/or SoC designs of its licensees, as ARM's license agreements and its statements to regulators make clear.

251. There are no provisions in either the NUVIA-ARM agreements or the Qualcomm-ARM agreements that:

    **a.** prohibited Qualcomm from purchasing NUVIA or acquiring NUVIA's technology;

    **b.** required Qualcomm to obtain ARM's consent to purchase NUVIA or access NUVIA's technology;

    **c.** mandate that Qualcomm stop using any NUVIA technology it acquired;

    **d.** mandate that Qualcomm destroy NUVIA's technology;

    **e.** prohibit the transfer or disclosure of NUVIA's technology or confidential information to Qualcomm;

    **f.** limit the use of NUVIA technology only to NUVIA; or

    **g.** require Qualcomm to obtain ARM's consent to further develop any in-process designs or technology that Qualcomm acquired from NUVIA.

## IV.   ARM CONTINUED TO SUPPORT QUALCOMM'S DEVELOPMENT WORK

252.    Despite ARM's demands that Qualcomm destroy and stop using NUVIA technology, for approximately one year, ARM engineers continued to provide verification support to Qualcomm in developing the Phoenix Core and related SoCs, and also continued to acknowledge the Defendants' rights under the Qualcomm ALA and TLA to that technology.

253.    For example, on April 12, 2022—after Qualcomm certified that it had destroyed all NUVIA-acquired ARM Confidential Information—ARM accepted test results verifying that the implementation of the Phoenix Core in the Server SoC complied with the requirements necessary to execute ARM's instruction set.  ARM explicitly validated this testing under the Qualcomm ALA.

254.    Similarly, in May of 2022, Qualcomm received an email from ARM stating that the Compute SoC—which integrated technology acquired from NUVIA and was first developed after Qualcomm's acquisition of NUVIA—had passed all relevant tests and was ARM-compatible. Yet, ARM's engineering team noted that it could not yet send a formal compliance waiver because ARM's legal team was withholding it.

## V.   ARM UNFAIRLY AND UNLAWFULLY ATTEMPTED TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN CORES.

255.    Discovery has revealed that ARM views Qualcomm as a competitor against ARM's own CPU designs—and an impediment to ARM's business strategy.

256.    ARM stated explicitly to regulators in connection with review of the proposed acquisition of ARM by NVIDIA that Qualcomm competes "head-to-head with the licensees that

use ARM's own CPU designs, such as MediaTek,"[34] and, in internal documents, ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

257.   At the same time, ARM employees acknowledged in internal emails and chat communications that ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

258.   In an effort to limit competition posed by Qualcomm's custom CPU, ARM systematically and persistently used its access to information about Qualcomm's products and relationships with Qualcomm's customers to unfairly, unlawfully, and fraudulently attack Qualcomm and its custom CPU.

259.   ARM used a variety of tactics to accomplish this, including by misrepresenting Qualcomm's license agreements with ARM, threatening Qualcomm customers, and violating its contractual obligations to make reasonable efforts to provide Qualcomm with deliverables paid for under the Qualcomm license agreements.

### a.   ARM Misrepresented Qualcomm's Licenses And Threatened Qualcomm Customers In An Effort To Thwart Competition From Qualcomm

260.   ARM has persistently and wrongfully attempted to disrupt Qualcomm's business and customer relationships by spreading misinformation about the nature of Qualcomm's ARM licenses to customers that purchase Qualcomm's ARM-compatible cores and chipsets.

---

[34]   Dec. 20, 2021 "Initial Submission" re: "Anticipated Acquisition By NVIDIA Corporation Of ARM Limited ME/6906/20" at 6.

261.    ARM has engaged in this misinformation campaign directly through its leadership and through the leadership of its owner, SoftBank, acting on ARM's behalf, in an attempt to damage Qualcomm, disparage its products, disrupt Qualcomm's relationships with its customers, and create uncertainty where there is none.  At least as early as October 2022, ARM falsely stated to one or more of Qualcomm's longstanding original equipment manufacturer ("OEM") customers that unless they accept a new direct license from ARM on which they pay royalties based on the sales of the OEM's products, they will be unable to obtain ARM-compliant chips from 2025 forward.  ARM has also threatened at least one OEM that, if the OEM does not do so, ARM will go on to license the OEM's large competitors instead—the implication being that the OEM would be excluded from the market and could not obtain any ARM-compliant chips from Qualcomm or any other supplier, including "off-the-shelf" chips from ARM under a TLA.  ARM has done this despite already having approached the OEM's competitors with  a direct licensing offer, while acting as if ARM would only approach the competing OEMs if the threatened OEM declined the license in the first instance.

262.    ARM also told one or more Qualcomm customers that, when the existing TLA agreements expire, ARM will cease licensing CPUs to all semiconductor companies—including Qualcomm—under an ARM TLA.  ARM claimed that it is changing its business model and will only provide licenses to the device-makers themselves.  ARM has explained to the OEMs that a direct OEM license will be the only way for device-makers to get access to ARM-compliant chips.

263.    ARM is trying to coerce such customers into accepting its direct license by falsely asserting that Qualcomm will not be able to provide them with ARM-compliant chips beginning in 2025 because Qualcomm's ARM license agreements terminate in 2024, that ARM will not

extend its licenses with Qualcomm, and that ARM will not allow Qualcomm to ship products from 2025 forward.

264.   These statements are unequivocally false and are intended to harm Qualcomm's relationships with its customers—and to secure lucrative contracts with those customers for ARM—by calling into question Qualcomm's ability to maintain its ARM licenses beyond 2024 and provide products to its customers, despite Qualcomm having a clear right to do so for years to come under its ARM licenses.

265.   Qualcomm is licensed for several years past 2025 under its ALA, which provides Qualcomm with the unilateral right to extend the contract past the initial term for several more years.  Specifically, the ALA states:



266.   Accordingly, because the Qualcomm ALA has not been terminated—and because no event has occurred that would give rise to a right to terminate—the initial term of the license will continue until ████████.  Qualcomm then has the right to extend the license until ████ ████.  Accordingly, ARM does not have the right to refuse to extend Qualcomm's license or stop Qualcomm from shipping its products in 2025.

267.   Moreover, ARM has no right to require additional royalties from Qualcomm's customers.  Qualcomm's ALA provides Qualcomm with an exhaustive license, meaning that ARM is not entitled to go and seek another royalty from Qualcomm's customers on the same products for which ARM has received a royalty from Qualcomm.

268.     ARM's coercion efforts did not stop with these false statements about Qualcomm's license agreements.  To apply more pressure, ARM further stated that Qualcomm and other semiconductor manufacturers will also not be able to provide OEM customers with other components of SoCs (such as graphics processing units ("GPU"), neural processing units ("NPU"), and image signal processor ("ISP")), because ARM plans to tie licensing of those components to the device-maker CPU license.

269.     ARM also claimed that it had already informed Qualcomm about its new business model that requires a direct license with the OEMs.  That statement is false.  ARM has not notified Qualcomm that it will be requiring direct licenses from device-makers.  ARM did not tell Qualcomm that it intends to stop licensing CPU technology as a standalone license, that it will no longer license CPU technology to semiconductor companies, or that it will require licensees to obtain other technologies (notably ARM's GPU and NPU technology) only from ARM.  As noted above, these attempted or threatened changes in ARM's business model do not account for Qualcomm's existing agreements with ARM.

270.     While ARM's statements about Qualcomm have no basis in fact, they cause significant reputational damage and harm Qualcomm's customer relationships.  Moreover, while ARM's goal may be to harm Qualcomm—and to coerce contracts with Qualcomm's customers that are unnecessary in view of the fully exhaustive rights it has granted Qualcomm under its contracts—its tactics will result in harm to ARM's customers and licensees throughout the industry.

**b.     ARM Attempted to Disrupt Qualcomm's Development of Custom Cores By Failing to Provide Deliverables To Which Qualcomm Is Entitled**

271.    After filing its Complaint in this case, ARM attempted to disrupt Qualcomm's development of custom cores under its ALA by refusing to provide deliverables to which Qualcomm is contractually entitled.

272.    ████████ of the Qualcomm ALA requires ARM to ████████████████ ████████████████████████████████████████████████████████ ████████ and to ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

273.    Under ████████ of the Qualcomm ALA, where ARM ████████████████ ████████████████████████████████ any breach of ████████ of the Qualcomm ALA, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████

274.    Qualcomm first discovered that ARM was withholding ARM Technology under the Qualcomm ALA in the fall of 2022.  At this time, Qualcomm was embarking on its verification process for its ████████.  As is the customary practice between an ALA licensee and ARM, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ ██ ████████████████ ████████████████████████████ ████████ the ALA.

275.    On November 3, 2022, Qualcomm notified ARM in writing of its failure to ███████ ████████████████████████, stating explicitly that ARM should take the letter as "Qualcomm's required notice under ██████ that ████████████████████████████ ████ ████████ ██████████████████████████████████████████████ ██████████████ Qualcomm's letter otherwise complied with the notice requirements set forth in the Qualcomm ALA.

276.    After not hearing from ARM, Qualcomm sent a follow-up letter on December 5, 2022.

277.    ARM responded on December 6, 2022.  In its response, ARM stated that it disagreed that ██████████ was at issue ████████████████████████████ ARM additionally asserted that ██████████████ are governed by ████████ of the Qualcomm ALA, not ██████████ and that remedies for a breach of that section do not include ████████████████ ██████████

278.    ARM additionally claimed that ████████████████████████ stating explicitly that ████████████████████████ ████ ██████████████████████, ARM claimed that ████ ████████████████████████████████████████████████████████████ ██████████ ARM was definitive in its factual assertions, stating that ████████████████████ ████████████████████ ████████ ████████████

279.    ARM's letter additionally threatened Qualcomm that if it did not drop its invocation of ██████████, ARM would take steps to harm Qualcomm.  ARM claimed that Qualcomm's invocation of ██████████ was ████████████████████████████ and that, to the extent ██████████████████████████████████ ██████████, ARM would ████

██████████████████████████. ARM further stated that Qualcomm's letter was █

██████████████████████████████ which ARM purported was ████████

████████████████████████ ███████████████."

280.   More than a year later, discovery has revealed that ARM's December 6, 2022 letter misrepresented the facts—and concealed ARM's strategy of █████████████

████████████████████ seemingly in an effort to create leverage by causing Qualcomm legal and economic duress.

281.   In response to Qualcomm's requests for production, ARM produced an October 2022 email chain in which Richard Grisenthwaite ███████████████████

████████████████████████████

████████████████████████████

█████████

282.   Later in the email chain, on October 10, 2022, ARM engineer Vivek Agrawal ████████████████████

283.   ████████████████████

284.   Mr. Agrawal's documents and testimony additionally revealed that ARM █

████████████████████████

285.   Mr. Agrawal stated at his December 13, 2023 deposition that ████████████

████████████████████████

████████ In his deposition, Mr. Grisenthwaite ██████████████

████████████████████████

████████ Neither Mr. Agrawal, nor Mr. Grisenthwaite, ████████████████

█████████████████████████████████████████████████████████████████████

███████████

286.    The applicable ███████ to the Qualcomm ALA includes the ██████ ████████

████████████████████████████████████████████████████

287.    Accordingly, when it was revealed through document and deposition testimony that, contrary to ARM's December 6, 2022 letter, ARM had ████████████████████████ ██████████████████████████████, it became clear that ARM breached its obligations under ███████ of the Qualcomm ALA.

288.    Qualcomm was unable to ascertain this information prior to document discovery and depositions of Mr. Grisenthwaite and Mr. Agrawal.

289.    ARM's in-house counsel concealed the facts, explicitly (and definitively) stating in ARM's December 6, 2022 letter that ████████████████████████████████████████ ██████████████████████████ Qualcomm did not have a valid basis to dispute that factual representation without discovery.

290.    This is particularly true for the ████████████████████████████ ███████████████████████████████████████. Accordingly, Qualcomm has no way of knowing definitively whether ARM had ████████████████████████ █████████████████████████████████████████████████████████████ ███████████████ Mr. Agrawal's recent deposition testimony was the first time Qualcomm was able to confirm ████████████████████████████████████████.[35]

---

[35] Even today, Qualcomm's team is not aware that ████████████████████████████████ ████████████████████ ARM designated its documents and testimony on this issue as highly confidential and attorneys' eyes only, ensuring that Qualcomm's business and engineering teams could not learn these facts.

291.    ARM's failure to  increased Qualcomm's burden in verification.

292.    By failing to ███████████, ARM forced Qualcomm to expend time and resources to ensure that Qualcomm could verify its products, even in the absence of ██████ ███████████████████████████████████████████

293.    Similarly, by failing to ███████████, ARM forced Qualcomm to use its own engineers to address issues that would have been addressed by ███████████████ ████████████████████████. Qualcomm was damaged as a result.

294.    Additionally, because Qualcomm notified ARM of its failure to █████ ████████████████████████████████████████████ and █████ ██████████████████████████████████, Qualcomm was entitled to █████ █████████████████████████████████████████ ████████████████████████ as a result of ARM's continued concealment of its breach.

## VI.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION ARE HARMFUL TO THE INDUSTRY AND TO ARM ITSELF

295.    ARM's mercenary desire to thwart innovation is nothing new.  Prior to Qualcomm's acquisition of NUVIA, in September 2020, NVIDIA announced that it was going to acquire ARM to "bring[] together NVIDIA's leading AI computing platform with Arm's vast ecosystem to create the premier computing company for the age of artificial intelligence."  The announcement led to immediate antitrust concerns, regulatory challenges, and public opposition from many companies, including Qualcomm.  The near universal concern was that an NVIDIA-controlled ARM would impede innovation and lead to higher prices.  On February 7, 2022, ARM and NVIDIA announced that the acquisition would be terminated.

296.   Only three days before that announcement—when it was no doubt clear to ARM that the acquisition would not close—ARM sent its termination letter to the Defendants, terminating NUVIA's license agreements and demanding that Qualcomm stop working on any of the NUVIA technology.  As Qualcomm was one of the more public opponents of the acquisition, ARM's actions appear to be retributive.

297.   Although ARM's efforts to destroy Qualcomm's innovation and prevent Qualcomm from expanding and advancing technology may in the short term, create the illusion of ARM achieving greater profitability—either by effectively strongarming Qualcomm into paying additional, unjustified royalties or through eliminating Qualcomm as a competitor in the custom CPU and server SoC space—in the long term it only harms ARM's interest and weakens the place in the market ARM hopes for after its IPO because it is injurious to ARM customers and licensees.  ARM's positions are directly contrary to the purpose of the ALA, which will have little value if licensees are not assured that they can use it to develop their own CPU core technology, at their own risk and expense and for their own benefit.

## **COUNTERCLAIMS**

## **COUNT I**

### **(Declaratory Judgment)**

298.   Defendants incorporate by reference all allegations set forth in the preceding paragraphs 1-47 and 175-257 as though fully set forth herein.

299.   Defendants are entitled to declaratory judgment that:

**a.**   Defendants did not breach the NUVIA ALA and NUVIA TLA;

**b.**   After Qualcomm's acquisition of NUVIA, Qualcomm's architected cores (including all further developments, iterations, or instantiations of the technology acquired from NUVIA), Server SoC, and Compute SoC, are fully licensed under Qualcomm's ALA and TLA for the full terms of those licenses;

    **c.**    ARM's statements that Qualcomm's ALA expires in 2024 are false;

    **d.**    ARM's statements that Qualcomm will be unable to deliver ARM-compliant products after 2024 are false;

    **e.**    ARM breached the Qualcomm ALA by withholding deliverables ARM was obligated to make ███████████ to deliver under ████████ of the Qualcomm ALA;

    **f.**    As a result of ARM's breach of ███████ of the Qualcomm ALA, Qualcomm is entitled to █████████████████████████████████ ██████████████;

    **g.**    Qualcomm's efforts to seek a remedy under ████████ of the Qualcomm ALA that provision ████████████████████████████

    **h.**    ARM breached the NUVIA ALA by failing to fulfill its termination obligations under ██████████;

    **i.**    ARM has no right to prevent Qualcomm from shipping its validly-licensed products.

300.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-2202 *et seq.*) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that it can continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA, the Qualcomm TLA, the NUVIA ALA, or the NUVIA TLA.

301.    A valid and justiciable controversy exists between ARM and Qualcomm because ARM is attempting to prevent Qualcomm from exercising its rights under its license agreements with ARM, including by bringing suit claiming that Defendants breached NUVIA's license agreements with ARM.

**COUNT II**

**(Breach of ████████ of the Qualcomm ALA)**

302.    Defendant Qualcomm repeats and reallege all of the preceding allegations as if set forth fully herein.

303.    The Qualcomm ALA is a valid, binding contract.

304.    ARM failed to fulfill its obligation under ████████ of the Qualcomm ALA because it ████████████████████████████████████████████████

████████████████████████████████████████

305.    Accordingly, ARM did not ████████████████████████████████

████████████████████████████ and to ████████████

████████████████████████████████████████████████

████ as is required by ████████ of the agreement.

306.    Qualcomm ████████████████████████████████████

████████, as is required under the contract.

307.    As a proximate result of ARM's breach of contract, Qualcomm has been damaged by delay that could have been avoided had ARM fulfilled its obligations and ████████

████████████████████████████████████████████

████████████████████████████████████████████.

## COUNT III

### (Breach of ████████████ of the NUVIA ALA)

308.    Defendants repeat and reallege all of the preceding allegations as if set forth fully herein.

309.    The NUVIA ALA was a valid, binding contract.

310.    ARM failed to fulfill its termination obligations to NUVIA, as set forth in ████████████ of the NUVIA ALA, by ████████████████████████████

████████████████████████████████.

311.    As a proximate result of ARM's breach of contract, Defendants have been damaged in an amount to be proven at trial.

## COUNT IV

### (Breach of  of the NUVIA TLA)

312.    Defendants repeat and reallege all of the preceding allegations as if set forth fully herein.

313.    The NUVIA TLA was a valid, binding contract.

314.    ARM failed to fulfill its termination obligations to NUVIA, as set forth in █████████ of the NUVIA ALA, by ████████████████████████████████████ ████████████████████████████████████.

315.    As a proximate result of ARM's breach of contract, Defendants have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Defendants request judgment and relief as follows:

**a.**    For the declaratory judgments set forth in Defendants' counterclaims;

**b.**    For an Order enjoining ARM from:

(i)    making any claim that Qualcomm's CPU products, including products that contain technology acquired from NUVIA, are not licensed under Qualcomm's agreements with ARM, are not ARM-compatible, cannot be commercialized as ARM-compliant, or that Qualcomm is prohibited from using ARM's marks in the marketing of any such products;

(ii)    misrepresenting the scope, terms, or rights granted to Qualcomm under its agreements with ARM; and

(iii)    making false statements about Qualcomm's ability to sell its CPU products to its customers, the media, analysts, or others;

**c.**    For an Order requiring ARM to comply with its obligations under Qualcomm's license agreements without discrimination or retaliation;

**d.**      For damages in an amount deemed appropriate by the Court;

**e.**      For an award of attorney's fees and costs as allowed by law; and

**f.**      For such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:
Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Brian Shiue
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Andrea L. D'Ambra
Susana Medeiros
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10019
(212) 318-3000

Kira Latham
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX  75201
(214) 855-8000

February 21, 2024

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | **CONFIDENTIAL – FILED UNDER** |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | **SEAL** |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT AND
JURY DEMAND AND DEFENDANTS' SECOND AMENDED
COUNTERCLAIMCOUNTERCLAIMS**

1.      Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") are poised to release to the market several innovative products enabled by custom-designed high-performance, low-power central processing units ("CPUs") containing a novel microarchitecture and related technologies that will deliver the next era of computing innovation.  While many in the industry see in this pivotal moment the opportunity for technological advancement, ARM sees an opportunity to strongarm Qualcomm into renegotiating the financial terms of the parties' longstanding license agreements, using this baseless lawsuit as leverage.  With this lawsuit, ARM makes clear to the marketplace that it will act recklessly and opportunistically, threatening the development of new and innovative products as a negotiating tactic, not because it has valid license and trademark claims.

2.      ARM claims, with no legal or contractual basis, that following Qualcomm's acquisition of NUVIA Inc. ("NUVIA") for $1.4 billion, Qualcomm's use of *any* technology acquired from NUVIA—including NUVIA technology that was further developed by Qualcomm

and has nothing to do with ARM—violates a previously-terminated license agreement between ARM and NUVIA.

3.     Qualcomm has its own license agreements with ARM, under which Qualcomm has licensed and paid for the same intellectual property that NUVIA licensed under its own separate agreements with ARM.  Therefore, even though ARM terminated the NUVIA licenses, Qualcomm owns independent licenses for the same ARM technology and information that allow it to provide ARM-compliant products to its customers for many years to come—a fact ARM glaringly omitted from its complaint, and which ARM has attempted to obfuscate through an aggressive misinformation campaign.  Thus, ARM has no right to demand any destruction of Qualcomm's CPU technology because Qualcomm's use of ARM technology and information is licensed under its overlapping license agreements.

4.     The notion that ARM has the right to control technology that is not ARM's—and worse yet, to ask Defendants to destroy their innovation and inventions unless substantial monetary tribute is paid to ARM—offends customary norms of technology ownership, as well as NUVIA's and Qualcomm's rights under their agreements with ARM.

5.     Even putting aside Qualcomm's broad license rights, ARM's reading of the termination obligations in the NUVIA Architecture License Agreement ("ALA") is wrong.  To the extent any destruction obligation exists, it explicitly applies only to ARM Confidential Information.[1]  But ARM again omits important facts: (1) under the NUVIA ALA, information in the public domain is not subject to confidentiality obligations, and (2) ARM publishes its instruction set without confidentiality restrictions.  Anyone is free to go to the ARM website and

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the relevant license agreements.

download the 10,000+ page ARM Architecture Reference Manual.[2]  In this case, Qualcomm's CPU cores are designed to be compatible with the publicly-available ARM Architecture version ███████████.

6.      Seeking additional leverage it can use to attain royalties from Qualcomm to which it is not entitled under the contracts, ARM now demands that Qualcomm stop using *all* NUVIA technology, regardless of whether it contains ARM Confidential Information.  Qualcomm's license rights, and any reasonable reading of the termination provisions of the NUVIA ALA, demonstrate that ARM has no right to require Qualcomm to stop using or destroy Qualcomm or NUVIA technology.

7.      ARM's position is a threat to the industry generally.  Unless this Court rejects ARM's arguments, ARM's extreme position could be weaponized against all of its licensees, allowing ARM to claim ownership over all its licensees' innovations.

8.      As this litigation will show, Qualcomm and NUVIA have not violated NUVIA's ALA or any other license agreement.  Nor have they misused ARM's trademarks.

### Qualcomm Announced Its Acquisition Of NUVIA In January 2021

9.      In January 2021, Qualcomm announced that it would acquire NUVIA, a start-up working on a custom CPU—the portion of a computer that retrieves and executes instructions—known as the Phoenix Core.  NUVIA was also working on a custom "System-on-a Chip" ("SoC") that incorporated multiple Phoenix Cores for use in data centers and servers. SoCs are integrated circuits used in computers and other electronics that combine many elements of a computer system into a single chip.

---

[2]  ████████████████████████████████████████████████  (last visited Sept. 28, 2022).

10.     Although Qualcomm and NUVIA were focused on different market segments, the NUVIA CPU and SoC technologies comprised promising, innovative technology.  Because the NUVIA CPU cores were being designed to be ARM architecture-compatible, this technology was (and is) compatible with Qualcomm's existing computer and mobile device chipset technologies.

11.     Qualcomm's plan was to complete the development of the Phoenix Core after the acquisition and ultimately drive this technology into various SoCs, particularly for use in the "compute" (e.g., laptops/PCs), "mobile" (e.g., smartphones), and "automotive" (e.g., digital cockpit) markets.  Qualcomm also planned to continue the development of a SoC for use in data centers and servers ("Server SoC").  This would allow Qualcomm's custom CPUs to compete more effectively against CPUs designed not only by rival ARM licensees and ARM, but also rival suppliers of CPUs compliant with other instruction set architectures (notably, Intel's x86).

12.     Major industry participants—including Microsoft, Google, Samsung, GM, HP, and many others—praised the acquisition as benefitting their products and end-customers.[3] News of this acquisition appeared in Forbes and in newspapers around the world.

### Qualcomm And NUVIA Had Individual License Agreements With ARM With Common Provisions

13.     At the time of the acquisition, NUVIA and Qualcomm had separate, but broadly overlapping, license agreements with ARM.  Qualcomm's ALA included all the rights granted to NUVIA, as well as additional rights.  Both ALAs granted rights to use version 8 of the ARM instruction set architecture, including the ARM ███ instruction set architecture ("ISA") with

---

[3]     *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

which the Phoenix Core was compatible.  Qualcomm's ALA is also broader, granting Qualcomm

rights to the next generation v9 ISA.

14.     ALAs grant licensees the right to design their own custom CPUs that can execute

ARM's ISA, as well as the right to design and distribute products incorporating such CPUs.  An

ISA lists the instructions that a software program will see, but an ISA does not tell a designer

about the logic to implement it, nor how to build a CPU core, nor any of the features that make a

CPU competitive.  Application and software developers create their products to be compatible

with particular ISAs.  Applications and software that are compatible with a specific ISA can be

run on any CPU that is compatible with the ISA, regardless of who has designed or

manufactured the hardware.  The ARM ISA allows for compatibility, as all ARM-compatible

products can receive the same inputs (instructions) and, for each of those inputs, determine and

output the proper result.

15.     To make a CPU that then can execute the ARM ISA and therefore run compatible

applications and other software, the CPU developer must design and build a complicated

integrated circuit consisting of billions of transistors wired together into arrays that form larger,

interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and

expertise that is not related to the ISA, and requires expertise in cache design, branch prediction

techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic,

schedulers, power delivery, power measurement and management, clocking methodology, and

many other areas.

16.     A CPU developer developing a custom CPU designs *how* the core is built, *how* it

performs, and *how* it executes the CPU's instructions.  There are virtually infinite number of

ways to design and build CPUs that can run the ARM instruction set.  Companies that compete

against each other to make better products utilizing ARM instruction sets employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.

17.     Under an ALA license, ARM does not deliver any specific ARM design or tell the licensee how to make the CPU.  That technological development—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the market—is left to the licensee.  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, the ALA structure can and does allow for product differentiation, even from ARM's own CPUs.

18.     ARM competes against licensees designing custom cores under ALAs by offering its own "off-the-shelf" CPU designs that customers may license through a Technology License Agreement ("TLA").  When a licensee seeks to sell products licensed under a TLA—rather than under an ALA—ARM delivers complete processor core designs that a licensee can effectively drop into a larger SoC design.  ARM's off-the-shelf processor cores licensed under TLAs do not allow for the same kind of product differentiation among different TLA licensees because all classes of TLA-licensed processor cores are effectively the same.  However, there can still be considerable variety and differentiation among SoCs that incorporate TLA-licensed processor cores along with other functional blocks and circuits.  For example, Qualcomm's Snapdragon chip products that use stock ARM cores are very successful in large part because of Qualcomm's innovation in designing many of the other functional blocks and integrating them into the SoC as a whole.  Such functional blocks include graphic processing units (GPU), digital signal processors (DSP), artificial intelligence (AI) processors, image processors, modems, and other technologies.

19.     Some companies make use of both custom-designed ALA processor cores and off-the-shelf TLA-licensed cores in their products.  Royalty rates are generally lower under ALAs and higher under TLAs, because the TLA royalties account for ARM's work in developing complete CPUs, whereas the licensees under an ALA make the significant investment to develop their own CPUs.

20.     With the Phoenix Core, Qualcomm will begin incorporating more of its own custom CPUs in its products.  Qualcomm is making this change because it believes its own innovation will generate better performing cores than ARM's cores.  This paradigm change will mean Qualcomm will in the future pay to ARM the lower royalty rate under its ALA for these custom CPUs, rather than the higher royalty rates under Qualcomm's TLA.

### After ARM Learned Of The NUVIA Acquisition, ARM Demanded Higher Royalties From Qualcomm

21.     Shortly after announcing the proposed acquisition of NUVIA in January 2021, Qualcomm informed ARM that the NUVIA engineers would be transferred to a Qualcomm subsidiary and would work under Qualcomm's set of license agreements with ARM.  Qualcomm also notified ARM that, to the extent NUVIA was utilizing any ARM Technology not currently covered under Qualcomm's then-current ALA and TLA, Qualcomm would work with the ARM team to complete any necessary license annexes to cover such items.

22.     Qualcomm believed that ARM would embrace the acquisition.  Even though Qualcomm would now be working on its own custom CPUs, the fact that Qualcomm is developing SoCs compatible with the ARM ISA for markets where ARM-based processors have traditionally struggled, such as the "compute" market (i.e., the market for personal computers such as laptops), represents a tremendous opportunity for ARM.  The combination of NUVIA's

innovative CPU technology with Qualcomm's scale and engineering prowess provides the best opportunity for ARM to significantly increase its reach and associated royalty payments.

23.     ARM, however, acted opportunistically.  In February 2021, ARM contended that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent."  ARM insisted, without basis, that Qualcomm needed ARM's consent to "any transfer of designs, rights or licenses under NUVIA's agreements" to Qualcomm.  Later that month, ARM wrote that to secure its consent for the transfer of NUVIA's CPU design to Qualcomm, Qualcomm must: (i) incorporate the much higher royalty rates from NUVIA's licenses into Qualcomm's pre-existing licenses; (ii) restrict the ability of Qualcomm employees from working on Qualcomm's custom CPU designs such that "at a minimum" any individual with access to ARM Confidential Information wait three years before working on "any architecture CPU design" at Qualcomm; (iii) "discuss and decide on the design transfer fee associated with such CPU design transfer"; and (iv) enter into a separate license for implementation IP and software tools, which would include another undisclosed "design transfer fee."

24.     ARM's demands were outrageous.  First, it was attempting to secure supplemental payments and royalties for rights for which Qualcomm *had already paid or was continuing to pay under its own license agreements*.  Qualcomm's license agreements, on their face, make clear that Qualcomm's use of ARM Technology in connection with the further development of the technology it acquired from NUVIA would be covered by Qualcomm's pre-existing license agreements.  For example, ███████████████████████ ████████████████████████████████████████  Therefore, Qualcomm's use of any ARM Technology utilized in NUVIA's technology was fully licensed

under Qualcomm's license agreements as soon as Qualcomm acquired NUVIA.  Nonetheless, and although not necessary, Qualcomm sought ARM's consent to assign NUVIA's ARM licenses to Qualcomm, even though Qualcomm's position was that NUVIA's technology was licensed under Qualcomm's license agreements as soon as the acquisition closed.

25.     Second, ARM was claiming a right to control the transfer of NUVIA technology when NUVIA's ALA provided no such rights to ARM.

26.     Third, ARM was trying to interfere with Qualcomm's business by preventing Qualcomm engineers from working for three years with absolutely no basis for such a demand in NUVIA's or Qualcomm's license agreements.  ARM's demands for additional payments from Qualcomm made little sense and were inconsistent with Qualcomm's long-standing agreements. As ARM acknowledges in its complaint, NUVIA was focused on developing a CPU for use in low-volume, high-cost SoCs for the server market, whereas Qualcomm intended to use the technology NUVIA had started developing to build high-volume, lower cost SoCs for Qualcomm's traditional markets, such as the "mobile" and "compute" markets.  For its data center and server products—which would be of a lower volume and higher per-unit cost than, for example, Qualcomm's higher volume and lower cost mobile products—NUVIA and ARM had negotiated a royalty rate that was many multiples higher than Qualcomm's rate.  ARM's strategy, in light of Qualcomm's more favorable terms, has been to ignore Qualcomm's license rights and royalty rates and attempt to force upon Qualcomm NUVIA's substantially higher royalty rate established for its server product.

27.     If ARM could not get the benefit of forcing NUVIA's royalty rate on Qualcomm's custom CPU across Qualcomm's broad SoC portfolio, its alternative strategy was to seek to preclude Qualcomm from proceeding with developing its custom CPU and, in doing so, force the

purchase of ARM's off-the-shelf CPU.  This is beneficial for ARM because the TLA has a higher royalty rate than Qualcomm's ALA.  When Qualcomm successfully replaces ARM-designed CPUs with its own designs, Qualcomm will pay ARM lower royalties under the ALA.

28.    Given ARM's unreasonable positions, which conflict with the terms of the parties' licenses, ARM and Qualcomm were unable to resolve this dispute prior to the close of the NUVIA acquisition on March 15, 2021.  Even so, given the parties' long-standing relationship, Qualcomm reaffirmed its interest in finding a productive path forward in its discussions with ARM after the acquisition was complete.

29.    After the acquisition closed, ARM doubled down, asserting that Qualcomm needed to destroy NUVIA's engineering work and start over unless it agreed to ARM's demands, including tens of millions of dollars in both additional "transfer" payments and increased royalties.  Qualcomm continued to try and reach a resolution with ARM even though ARM's attempt to control NUVIA's technology was unjustified.

30.    While the parties had intermittent discussions to resolve the dispute, in or about September 2021, ARM stopped communicating with Qualcomm about the dispute.  Meanwhile, throughout 2021 to the present day and with full knowledge by ARM, Qualcomm continued development work on the Phoenix Core and SoCs incorporating the Phoenix Core, as was its right under Qualcomm's own license agreements with ARM.

**ARM Unexpectedly Terminated The NUVIA License Agreements And Qualcomm Went To Great Lengths To Insulate Itself From ARM's Unreasonable Positions**

31.    Without warning, in a letter dated February 1, 2022 (but not received by Qualcomm until February 4, 2022), ARM terminated, effective March 1, 2022, the NUVIA ALA and TLA license agreements and demanded that NUVIA and Qualcomm destroy all ARM

Confidential Information, and certify by April 1, 2022 that they had complied with ARM's demands.  Prior to the February 2022 letter, it had been over six months since ARM last suggested that NUVIA or Qualcomm violated NUVIA's license agreements.  ARM's demand came out of nowhere, especially as ARM had continued to support Qualcomm in the development of the technology acquired from NUVIA.

32.    The timing of ARM's demand is telling on two fronts.

33.    First, ARM waited until Qualcomm had expended a year of engineering effort and hundreds of millions of dollars to further develop and integrate Phoenix Core technology into multiple SoCs, in addition to the $1.4 billion Qualcomm spent to acquire NUVIA.  ARM was seeking to maximize whatever leverage it had to threaten Qualcomm's investment and Qualcomm's SoC roadmap and extract exorbitant fees and royalty payments.

34.    Second, ARM terminated the NUVIA agreements just three days before ARM publicly announced the failure of its merger transaction with NVIDIA—a deal that Qualcomm and many others in the industry had opposed.  This timing suggests that, in part, ARM was seeking payback for Qualcomm's public opposition to the NVIDIA deal.

35.    Qualcomm disagreed that it was required to stop any of its work—or that destruction was appropriate—because Qualcomm holds valid licenses to all relevant ARM Technology and ARM's interpretation of the termination obligations in the NUVIA agreement were inconsistent with the plain language of the license agreements.

36.    Moreover, even though ARM demanded destruction of Confidential Information obtained under NUVIA's ALA, NUVIA had implemented ARM Architecture ███, which had been publicly available on ARM's website for anyone to download since at least around January 2021—over a year before the destruction request. ████████████████████████

██████████████████████████████████████████████

████████████████████████████████  Therefore, ARM

Architecture ███ was not Confidential Information, not subject to any restrictions, and not

subject to any destruction obligation.  For the same reasons, the NUVIA core design did not

contain ARM Confidential Information.

37.     Nonetheless, on April 1, 2022, NUVIA certified that it had destroyed and

quarantined all NUVIA-acquired ARM Confidential Information.  **ARM, on the other hand,**

**failed to fulfill its own termination obligations, which were also triggered by its**

**termination of the NUVIA agreements.**

38.     Then, on April 12, 2022, just a few weeks after NUVIA made its certification,

ARM accepted test results verifying that the implementation of the Phoenix Core in the Server

SoC complied with the requirements necessary to execute the ARM instruction set.  ARM

confirmed that "Qualcomm . . . has validated *their CPU core* in accordance with the Verification

requirements set out in the Architecture agreement."  ARM explicitly confirmed that the

validation testing was conducted *under Qualcomm's ALA*.  Therefore, ARM was not only well

aware that Qualcomm was working on the Phoenix Core under Qualcomm's license agreements,

but ARM also affirmed this work and understood that Qualcomm had implemented ███ of the

ISA.

39.     ARM's position in this litigation is not just unsupported by its verification in

April 2022 and by the language of the license agreements, it is antithetical to the very nature of

ARM's ALAs, which allow a licensee to design its own, proprietary ARM-compatible

technology that belongs to the licensee and that can be used by the licensee to compete against

other ARM-compatible products, including those designed by ARM itself.

40.     Licensees depend on this, as do regulators.  ARM explicitly told regulators in December 2021, in connection with the proposed NVIDIA acquisition, that technology created by its ALA licensees belongs to the licensees, not ARM, stating: "architectural licensees do ***not*** use ARM's CPU designs.  Arm architectural licensees create their ***own*** proprietary CPU designs using their ***own*** engineering teams."  ARM specifically referred regulators to Qualcomm's acquisition of NUVIA as an example of Qualcomm's efforts to create its own proprietary CPU.

## ARM's Claims Are Baseless

41.     In this lawsuit, ARM takes its baseless and extreme arguments public, claiming that technology that is not its own belongs to ARM, and that it is ARM's prerogative to decide whether Qualcomm can use or continue to develop NUVIA's technology.  The termination provisions in the NUVIA ALA do not require such a result.

42.     ARM ignores the broad license rights ARM has granted Qualcomm under its ALA and other license agreements.  Qualcomm *is* licensed to use ARM Technology in connection with Qualcomm's CPU core technology, even if any aspects trace back to NUVIA's work.  Moreover, ARM attempts to misappropriate NUVIA technologies that contain no ARM information, but it makes no sense to require Qualcomm to stop using its own intellectual property.

43.     Additionally, ARM's position effectively guts its own ALA, which is intended to encourage licensees to develop their own CPU core technology with their own innovations, at their own risk and expense and for their own benefit.  ARM's arguments would allow ARM to claim ownership over its licensees' innovations and inventions.  That is not what ARM licensees pay for under the ALA.

44. ARM's trademark infringement and false-origin claims are also meritless. ARM contends that Qualcomm and NUVIA's use of ARM's trademarks in connection with any products related to NUVIA technology—including, but not limited to the Phoenix Core and the upcoming SoCs—is improper. But Qualcomm's license agreements with ARM give Qualcomm the right to utilize ARM's trademarks. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ ARM's website also publicly grants "any . . . third party" the right to use ARM's trademarks pursuant to various guidelines.

45. In any event, Defendants' use of ARM's trademarks constitutes fair use and therefore is permissible. Qualcomm engages in limited use of the ARM Marks, such as in marketing materials, product specifications, and technical documentations, to convey accurately that Qualcomm's products are compatible with the ARM architecture. These references are limited and truthful.

46. Rather than litigate its case in court, ARM attempted to maximize the negative impact of its filing this lawsuit by campaigning with members of the media and customers to generate additional publicity for ARM's positions.

47. This Court should reject ARM's claims and instead declare that Qualcomm and NUVIA's conduct—including use of Qualcomm-developed technology—was fully licensed.

Defendants, through their undersigned counsel, upon personal knowledge and/or upon information and belief, answer the Complaint dated August 31, 2022 (the "Complaint") as follows:

48.     **COMPLAINT PARAGRAPH 1:** Arm is the world's leading provider of microprocessor intellectual property. For decades, Arm has developed innovative processor architecture and implementation designs that balance performance with energy efficiency. Billions of electronic devices use Arm processor technologies pursuant to Arm licenses—from smartphones used to interact seamlessly with friends and family around the world to an increasing number of the servers that run the essential day-to-day operations of Fortune 500 companies.

**ANSWER: Defendants admit that ARM licenses microprocessor intellectual property, and that a significant number of electronic devices use processors that are based on ARM architecture and designs, such as smartphones and to a far more limited extent computers. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations set forth in Complaint Paragraph 1, and on that basis deny them.**

49.     **COMPLAINT PARAGRAPH 2:** Qualcomm is a major semiconductor manufacturer. To accelerate its processor development efforts, Qualcomm spent over $1 billion to acquire Nuvia, a start-up led by senior engineers previously from Apple and Google that licensed Arm technologies to develop high-performance processor cores for semiconductor chips. In the process, Qualcomm caused Nuvia to breach its Arm licenses, leading Arm to terminate those licenses, in turn requiring Qualcomm and Nuvia to stop using and destroy any Arm-based technology developed under the licenses. Undeterred, Qualcomm and Nuvia have continued working on Nuvia's implementation of Arm architecture in violation of Arm's rights as the creator and licensor of its technology. Further, Qualcomm's conduct indicates that it has

already and further intends to use Arm's trademarks to advertise and sell the resulting products in the United States, even though those products are unlicensed.

**ANSWER: Defendants admit that Qualcomm is a leading wireless technology innovator that designs numerous products, including semiconductors. Qualcomm further admits that, in 2021, Qualcomm Technologies, Inc. acquired NUVIA for approximately $1.4 billion before working capital and other adjustments. Defendants also admit that NUVIA had license agreements with ARM LTD., such as an ALA and TLA, and that, prior to Qualcomm's acquisition, NUVIA worked on CPUs and SoCs. Defendants further admit that in a letter dated February 1, 2022, ARM stated that it intended to terminate its ALA and TLA with NUVIA effective March 1, 2022, and requested that NUVIA destroy or return to ARM any ARM Confidential Information, including any copies thereof in its possession and any ARM Technology or derivatives. Defendants otherwise deny the allegations in Complaint Paragraph 2, except to the extent they purport to state legal conclusions as to which no response is required.**

50. **COMPLAINT PARAGRAPH 3:** Arm now brings suit for specific performance of the Nuvia licenses' termination provisions to require Qualcomm and Nuvia to stop using and to destroy the relevant Nuvia technology and to stop their improper use of Arm's trademarks with their related products. Arm also seeks declaratory judgment, injunctive relief, and damages for the use of Arm's trademarks in connection with semiconductor chips incorporating the relevant Nuvia technology.

**ANSWER: Complaint Paragraph 3 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the**

allegations in Complaint Paragraph 3, except admit that Plaintiff purports to assert the claims and seek the relief described in Complaint Paragraph 3.

## PARTIES

51.     **COMPLAINT PARAGRAPH 4:** Plaintiff Arm is a corporation organized under the laws of the United Kingdom, has its principal place of business in Cambridge, United Kingdom, and is a resident or domiciliary of the United Kingdom.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 4, and on that basis deny them.**

52.     **COMPLAINT PARAGRAPH 5:** Defendant Qualcomm Inc. is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 5.**

53.     **COMPLAINT PARAGRAPH 6:** Defendant Qualcomm Technologies, Inc. is a subsidiary of Qualcomm Inc. and a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 6.**

54.     **COMPLAINT PARAGRAPH 7:** Defendant Nuvia is a subsidiary of Qualcomm and a Delaware corporation with its principal place of business at 2841 Mission College Blvd., Santa Clara, California 95054.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 7.**

## JURISDICTION AND VENUE

55.     **COMPLAINT PARAGRAPH 8:** The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (trademarks), and 28 U.S.C. §

1367(a) (supplemental jurisdiction). The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties, and because the amount in controversy, based on the consideration that was anticipated under the Nuvia licenses, the volume of products expected under those licenses, and Defendants' potential loss from complying with the equitable relief requested here, exceeds $75,000, exclusive of interest and costs.

**ANSWER: Complaint Paragraph 8 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Complaint Paragraph 8.**

56. **COMPLAINT PARAGRAPH 9:** The Court has personal jurisdiction over Qualcomm and Nuvia because they are incorporated in Delaware. Qualcomm and Nuvia have purposely availed themselves of the privileges and benefits of the laws of Delaware.

**ANSWER: Complaint Paragraph 9 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants admit that Qualcomm Inc., Qualcomm Technologies, Inc., and NUVIA, Inc. are incorporated in Delaware.**

57. **COMPLAINT PARAGRAPH 10:** Venue is proper in this judicial district under 28 U.S.C. § 1391 because Qualcomm and Nuvia are incorporated in Delaware. Venue is also proper because Qualcomm Inc. and Qualcomm Technologies, Inc. have purposefully availed themselves of the courts in the State of Delaware and this Judicial District.

**ANSWER: Complaint Paragraph 10 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants admit that**

Qualcomm Inc., Qualcomm Technologies, Inc., and NUVIA, Inc. are incorporated in Delaware.

<u>FACTUAL ALLEGATIONS</u>

*Arm's business model[4]*

58.     **COMPLAINT PARAGRAPH 11:** For decades, Arm has been a world leader in developing processor architectures, including instruction set architectures, and processor core designs implementing those architectures, all of which are covered by an extensive intellectual property portfolio.

**ANSWER: Defendants admit that ARM develops instruction set architectures for CPUs, and also designs CPUs that implement ARM's instruction set architecture. Defendants further admit that ARM owns some intellectual property. Defendants otherwise deny the allegations in Complaint Paragraph 11 except to the extent they purport to state legal conclusions as to which no response is required.**

59.     **COMPLAINT PARAGRAPH 12:** Processor cores are the parts of a computer's Central Processing Unit or "CPU" that read and execute program instructions to perform specific actions. Modern CPUs often integrate multiple processor cores on a single semiconductor chip or integrated circuit ("IC").

**ANSWER:  Defendants admit the allegations in Complaint Paragraph 12.**

60.     **COMPLAINT PARAGRAPH 13:** Arm owns intellectual property relating to its processor architectures and designs, including, among other things, trademarks.

---

[4]   Defendants have not specifically responded to the headings interspersed between the numbered paragraphs in ARM's complaint.  For the avoidance of doubt, and to the extent they require a response, Defendants deny any allegations made therein.

**ANSWER: Defendants admit that ARM may own some intellectual property, including trademarks.  Defendants otherwise deny the allegations in Complaint Paragraph 13 except to the extent they purport to state legal conclusions as to which no response is required.**

61.    **COMPLAINT PARAGRAPH 14:** Arm does not manufacture or sell chips. Instead, Arm licenses its technologies to hundreds of companies to use in developing their own chips or in their own electronic devices and works with these companies to ensure the success of Arm-based products.

**ANSWER: Defendants admit that ARM does not manufacture or sell semiconductor chips, and that ARM licenses intellectual property to various licensees. Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 14, and on that basis deny them.**

62.    **COMPLAINT PARAGRAPH 15:** Arm's customers manufacture (or have manufactured for them) chips based on Arm's technologies. The chips may then be used in the customer's own devices or sold to other device manufacturers. Arm earns revenue from licensing fees and royalties based on the number of Arm-based chips its customers sell.

**ANSWER: Defendants admit that ARM receives licensing fees and royalties from licensees, and that various licensees manufacture products that may include ARM Technology.  Defendants otherwise deny the allegations in Complaint Paragraph 15.**

63.    **COMPLAINT PARAGRAPH 16:** Arm's business model relies on Arm's ability to monetize its research and intellectual property by receiving both licensing fees and royalties for products incorporating Arm's technology and intellectual property. Arm therefore grows its

revenues by increasing both the number of customers and the number of Arm-based products sold.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 16, and on that basis deny them.**

64. **COMPLAINT PARAGRAPH 17:** There are two main types of Arm licenses for Arm's technologies: Technology License Agreements ("TLAs"), which allow the use of specific "off-the-shelf" Arm processor core designs with only minor modifications, and Architecture License Agreements ("ALAs"), which allow for the design of custom processor cores that are based on particular architectures provided by Arm.

**ANSWER: Defendants admit that ARM enters into license agreements with licensees, including Technology License Agreements ("TLAs") and Architecture License Agreements ("ALAs"). Defendants otherwise deny the allegations in Paragraph 17.**

65. **COMPLAINT PARAGRAPH 18:** Arm grants few ALAs. Custom processor cores can take years to design, at great expense and requiring significant support from Arm, with no certainty of success. If successful, ALA licensees can sell custom processor cores for use in other companies' products.

**ANSWER: Defendants admit that it requires significant expense and commitment to design custom CPUs. Defendants respectfully refer the Court to the Qualcomm and NUVIA ALAs for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 18.**

66. **COMPLAINT PARAGRAPH 19:** Arm ALAs typically authorize licensees only to develop processor cores based on specific Arm technology provided by Arm under the licenses, rather than granting broader licenses to use Arm-based technology generally.

ANSWER: Defendants respectfully refer the Court to the Qualcomm and NUVIA ALAs for their complete language and content. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 19, and on that basis deny them.

*Nuvia obtains Arm licenses*

67.     **COMPLAINT PARAGRAPH 20:** Nuvia was founded as a start-up in 2019 by chip engineers who left Apple and Google. Nuvia planned to design energy-efficient CPUs for data center servers based on a custom processor implementing the Arm architecture, which would have expanded the market for Arm's technology. Nuvia's business model was thus reliant on customizing processor core designs based on Arm's technology. As one of the founders explained to the press when launching Nuvia, the start-up's premise (and one of its attractions to investors) was that Nuvia intended to build "a custom clean sheet designed from the ground up" using Arm's architecture.[5]

ANSWER: Defendants admit that NUVIA worked on custom CPUs that could be used in data center servers, that the custom CPU designs would expand the market for ARM technology, and that the custom CPUs that NUVIA worked on, prior to NUVIA's acquisition by Qualcomm, were intended to be compatible with ARM architecture. Defendants respectfully refer the Court to the cited publication for its complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 20.

---

[5]     Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TechCrunch (Nov. 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/.

68.     **COMPLAINT PARAGRAPH 21:** In September 2019, Arm granted Nuvia an ALA and TLA, providing rights to design custom processor cores based on an Arm architecture and to modify certain off-the-shelf designs. The licenses granted in the ALA and TLA are necessary to use Arm's extensive intellectual property portfolio covering the Arm architecture. The ALA and TLA included rights to use Arm trademarks in connection with products developed by Nuvia under the licenses. Arm also provided substantial, crucial, and individualized support from Arm employees to assist Nuvia in its development of Arm-based processors for data center servers.

**ANSWER: Defendants admit that NUVIA had a TLA and ALA with ARM, and respectfully refer the Court to the referenced agreements for their complete language and content.  Defendants otherwise deny the allegations of Complaint Paragraph 21, except to the extent they purport to state legal conclusions as to which no response is required.**

69.     **COMPLAINT PARAGRAPH 22:** The licenses provided Nuvia access to specific Arm architecture, designs, intellectual property, and support in exchange for payment of licensing fees and royalties on future server products that include processor cores based on Arm's architecture, designs, or related intellectual property.  Nuvia's licensing fees and royalty rates reflected the anticipated scope and nature of Nuvia's use of the Arm architecture. The licenses safeguarded Arm's rights and expectations by prohibiting assignment without Arm's consent, regardless of whether a contemplated assignee had its own Arm licenses.

**ANSWER: Defendants admit that NUVIA's TLA and ALA provided NUVIA with a license to certain ARM Technology.  Defendants further admit that NUVIA and ARM intended the licensing fees and royalties set forth in the NUVIA ALA to apply to future server products, not products for other markets.  Defendants respectfully refer the Court**

to the referenced agreements for their complete language and content. **Defendants otherwise deny the allegations of Complaint Paragraph 22.**

70.     **COMPLAINT PARAGRAPH 23:** From September 2019 to early 2021, Nuvia used the technology it licensed from Arm to design and develop processor cores. Arm provided preferential support for Nuvia's development efforts, with Arm seeking to accelerate research and development in next-generation processors for data center servers to support that sector's transition to Arm technology.

**ANSWER:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Complaint Paragraph 23, and on that basis deny them.  Defendants otherwise deny the allegations of Complaint Paragraph 23.**

71.     **COMPLAINT PARAGRAPH 24:** In August 2020, Nuvia announced that its "first-generation CPU, code-named 'Phoenix'" would be "a custom core based on the ARM architecture."[6] It also publicized benchmark tests showing that Phoenix could double the performance of rival products from Apple, Intel, AMD, and Qualcomm. Based on these results, Nuvia claimed that the "Phoenix CPU core has the potential to reset the bar for the market."[7]

**ANSWER: Defendants respectfully refer the Court to the cited publication for its complete language and content.  Defendants otherwise admit the allegations in Complaint Paragraph 24.**

---

[6]     John Bruno & Sriram Dixit, *Performance Delivered a New Way*, Silicon Reimagined (Aug. 11,                                                                        2020), https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5.

[7]     *Id.*

*Qualcomm relies on designs created by Arm*

72. **COMPLAINT PARAGRAPH 25:** Qualcomm is one of the world's largest semiconductor companies, with a portfolio of intellectual property and products directed to wireless technologies, including cellular, Bluetooth, and Wi-Fi; CPUs and ICs; networking; mobile computers; cell phones; wearables; cameras; automobiles; and other electronic devices.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 25.**

73. **COMPLAINT PARAGRAPH 26:** Even though Qualcomm has an Arm ALA, its prior attempts to design custom processors have failed. Qualcomm invested in the development of a custom Arm-based processor for data center servers until 2018, when it cancelled the project and laid off hundreds of employees.[8]

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 26. The allegation that Qualcomm's "prior attempts to design custom processors have failed" is patently false. Qualcomm has had great success in developing custom processors, to ARM's significant benefit.**

74. **COMPLAINT PARAGRAPH 27:** Qualcomm's commercial products thus have relied on processor designs prepared by Arm's engineers and licensed to Qualcomm under Arm TLAs. Discovery is likely to show that as of early 2021, Qualcomm had no custom processors in

---

[8] *See, e.g.*, Andrei Frumusanu, *Qualcomm to Acquire NUVIA: A CPU Magnitude Shift*, AnandTech (Jan. 13, 2021), https://www.anandtech.com/show/16416/qualcomm-to-acquire-nuvia-a-cpu-magnitude-shift; Andy Patrizio, *Qualcomm makes it official; no more data center chip*, Network World (Dec. 12, 2018), https://www.networkworld.com/article/3327214/qualcomm-makes-it-official-no-more-data-center-chip.html.

its development pipeline for the foreseeable future. To fill this gap, Qualcomm sought improperly to purchase and use Nuvia's custom designs without obtaining Arm's consent.

**ANSWER: Defendants deny the allegations of Complaint Paragraph 27.**

*Qualcomm acquires Nuvia*

75.　**COMPLAINT PARAGRAPH 28:** On January 13, 2021, Qualcomm announced that Qualcomm Technologies, Inc. was acquiring Nuvia for $1.4 billion. Neither Qualcomm nor Nuvia provided prior notice of this transaction to Arm. Nor did they obtain Arm's consent to the transfer or assignment of the Nuvia licenses.

**ANSWER: Defendants admit that on January 12, 2021, Qualcomm Incorporated announced that its subsidiary, Qualcomm Technologies, Inc., entered into a definitive agreement to acquire NUVIA for approximately $1.4 billion before working capital and other adjustments.　Defendants otherwise deny the allegations of Complaint Paragraph 28, except to the extent they purport to state legal conclusions as to which no response is required.**

76.　**COMPLAINT PARAGRAPH 29:** Qualcomm indicated in its announcement that "NUVIA CPUs"—that is, Nuvia's implementations of Arm technology developed under the Nuvia licenses with Arm—would be incorporated into a range of Qualcomm products. Qualcomm's press release declared its grand ambitions for Nuvia's implementation of Arm technology: "NUVIA CPUs are expected to be integrated across Qualcomm Technologies' broad portfolio of products, powering flagship smartphones, next-generation laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality and infrastructure

networking solutions."[9] The press release also indicated that Qualcomm's first target would be "integrating NUVIA CPUs with Snapdragon," its flagship suite of system on a chip ("SoC") semiconductor products for mobile devices.

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 29.**

77. **COMPLAINT PARAGRAPH 30:** As Qualcomm's CEO, Cristiano Amon, noted in a Reuters interview shortly after the acquisition closed in the first half of 2021, "Qualcomm will start selling Nuvia-based laptop chips next year."[10] Amon confirmed the negative impact this might have on Arm, saying: "If Arm . . . eventually develops a CPU that's better than what we can build ourselves, then we always have the option to license from Arm."

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 30.**

78. **COMPLAINT PARAGRAPH 31:** Qualcomm also confirmed its prior deficiencies in core design, reportedly promoting the Nuvia acquisition as "filling a gap" because "for several years now" the company "had been relying on external IP such as Arm's Cortex

---

9   *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 13, 2021), https://www.qualcomm.com/news/releases/2021/01/13/qualcomm-acquire-nuvia.

10  Stephen Nellis, *Qualcomm's new CEO eyes dominance in the laptop markets*, Reuters (July 2, 2021), https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/.

cores."[11] Qualcomm further explained that "the immediate goals for the NUVIA team will be implementing custom CPU cores" designed for laptops.[12]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 31.**

79.   **COMPLAINT PARAGRAPH 32:** Analysts confirmed that the "Qualcomm acquisition [of] NUVIA is a huge move to scale up dramatically. It can reinvigorate current lines in smartphone, Windows PC and automotive SoCs, and make them more competitive with the competition. They have been lagging."[13]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 32.**

80.   **COMPLAINT PARAGRAPH 33:** Providing further confirmation of the acquisition's importance to Qualcomm in filling the "gap" in its "lagging" IP design, analysts noted that the Nuvia acquisition was "extremely speedy in terms of timeline," and Qualcomm "went as far as [to] put out a concrete roadmap for . . . using the newly acquired IP from Nuvia," announcing that Nuvia's processors would be finalized for use in high-end laptops "in the second half of 2022."[14]

---

[11]   Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia.

[12]   *Id.*

[13]   Trading Places Research, *Qualcomm's Acquisition of NUVIA is a Huge Move*, Seeking Alpha (Jan. 13, 2021), https://seekingalpha.com/article/4398808-qualcomms-acquisition-of-nuvia-is-huge-move.

[14]   Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021),

**ANSWER: Defendants respectfully refer the Court to the referenced publications for their complete language and content.   Defendants otherwise deny the allegations of Complaint Paragraph 33.**

81.    **COMPLAINT PARAGRAPH 34:** Based on standard industry scheduling, that timeline indicated a design for data center processors would be completed "essentially as soon as possible following the acquisition" of Nuvia.[15]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content.   Defendants otherwise deny the allegations of Complaint Paragraph 34.**

82.    **COMPLAINT PARAGRAPH 35:** This timing indicates that the Arm-based cores that Nuvia designed using Arm's technology and intellectual property were, as of the acquisition date, effectively ready for the final stages of design for Qualcomm chips, leading promptly to product integration and manufacturing. Qualcomm's November 2021 10-K filing disclosed that the $1.4 billion acquisition encompassed Nuvia's team and "certain in-process technologies," reflecting the availability of existing cores such as the Phoenix CPU core developed under Nuvia's ALA.[16]

---

[15]  *Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia (quoting *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 15, 2021), https://www.qualcomm.com/news/releases/2021/03/16/qualcomm-completes-acquisition-nuvia).

[15]  *Id.*

[16]  Qualcomm Inc., Annual Report (Form 10-K) (Nov. 3, 2021), https://investor.qualcomm.com/financial-information/sec-filings/content/0001728949-21-000076/0001728949-21-000076.pdf.

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 35, except to the extent they purport to state legal conclusions as to which no response is required.**

83.     **COMPLAINT PARAGRAPH 36:** By entering into the acquisition of Nuvia and transferring the rights and technology developed under the Nuvia licenses without Arm's consent, Qualcomm thus greatly accelerated its ability to bring to market custom-designed processor cores—a head start that Qualcomm was willing to pay over $1 billion to obtain.

**ANSWER: Defendants admit that on January 12, 2021, Qualcomm Incorporated announced that its subsidiary, Qualcomm Technologies, Inc., entered into a definitive agreement to acquire NUVIA for approximately $1.4 billion before working capital and other adjustments. Defendants otherwise deny the allegations of Complaint Paragraph 36.**

*Arm terminates the Nuvia licenses*

84.     **COMPLAINT PARAGRAPH 37:** Soon after the announcement of the merger, Arm informed Qualcomm in writing that Nuvia could not assign its licenses and that Qualcomm could not use Nuvia's in-process designs developed under the Nuvia ALA without Arm's consent. For more than a year, Arm negotiated with Qualcomm, through Qualcomm Inc. and Qualcomm Technologies, Inc., in an effort to reach an agreement regarding Qualcomm's unauthorized acquisition of Nuvia's "in-process technologies" and license.

**ANSWER: Defendants admit that in a letter dated February 2, 2021, ARM wrote to Qualcomm Technologies, Inc. that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior**

consent."  Defendants otherwise deny the allegations of Complaint Paragraph 37, except to the extent they purport to state legal conclusions as to which no response is required.

85.     **COMPLAINT PARAGRAPH 38:** All the while, Qualcomm continued to broadcast its intentions to rush Nuvia products to market. In November 2021, Qualcomm's Chief Technology Officer told investors that Qualcomm was "pretty far along at this point" in developing its first chip with Nuvia's implementation of Arm technology and would "sample a product at, let's say nine months from now"—which would be August 2022.[17] Then in January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO confirming that "[t]he future of the PC industry is modern Arm-based architectures" and boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[18] Elsewhere, Qualcomm's CEO reiterated that Qualcomm is "definitely in a hurry" to launch Nuvia's Arm-based chips "as fast as we can."[19] Based on these statements, discovery is likely to show that Qualcomm and Nuvia continued to use the relevant technology developed under Nuvia's Arm licenses.

---

[17]    *Qualcomm Investor Day 2021 Livestream: CEO Cristiano Amon looks ahead*, YouTube (Nov. 16, 2021), https://www.youtube.com/watch?v=rUWPzROYn2E; *see also* Mark Hachman, *Qualcomm Prophesizes 2023 as the Rebirth of PC Snapdragon Chips*, PCWorld (Nov. 16, 2021), https://www.pcworld.com/article/552285/qualcomm-prophesies-2023-as-the-rebirth-of-its-snapdragon-chips.html.

[18]    *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

[19]    Nilay Patel, *What Comes After the Smartphone, With Qualcomm CEO Cristiano Amon*, The Verge (Jan. 11, 2022), https://www.theverge.com/22876511/qualcomm-ceo-cristiano-amon-interview-decoder-podcast.

ANSWER: Defendants respectfully refer the Court to the referenced publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 38.

86. **COMPLAINT PARAGRAPH 39:** On February 1, 2022, Arm sent a letter to Nuvia and Qualcomm terminating the Nuvia licenses effective March 1, 2022. The letter terminated the licenses based on Nuvia's material breach of the assignment provisions of the Nuvia licenses by entering into the acquisition of Nuvia without Arm's consent. The letter also reminded Nuvia and Qualcomm of their obligations upon termination to stop using and destroy the Nuvia technology developed under the now-terminated licenses.

**ANSWER: Defendants admit that, on February 4, 2022, Qualcomm and Gerard Williams, NUVIA's former Chief Executive Officer, received a letter purporting to terminate NUVIA's ALA and TLA, with the termination effective as of March 1, 2022. Defendants otherwise deny the allegations of Complaint Paragraph 39, except to the extent they purport to state legal conclusions as to which no response is required.**

87. **COMPLAINT PARAGRAPH 40:** In February 2022, pending termination of the Nuvia licenses, Nuvia sought Arm's verification that a Nuvia processor design satisfied the Arm architecture's specifications. On February 23, 2022, Qualcomm confirmed that it was still developing the relevant Nuvia technology by stating in a court filing that certain Nuvia documents were based on "years of research and work" and would "reveal secret design components of Qualcomm chips that are still in development." *Qualcomm Technologies, Inc. v. Hoang*, No. 3:22-cv-00248-CAB-BLM (S.D. Cal. Feb. 23, 2022), ECF No. 1 at 5-6.

**ANSWER: Defendants respectfully refer the Court to the cited court filing for its complete language and content. Defendants admit that Qualcomm began verification of a**

Qualcomm processor design in December 2021, that Qualcomm continued developing processor technology that it acquired from NUVIA beginning in March 2021 (doing so with ARM's knowledge that Qualcomm's design work was ongoing), and that ARM verified that the Qualcomm design satisfied ARM's architecture specification. Defendants otherwise deny the allegations of Complaint Paragraph 40.

88.  **COMPLAINT PARAGRAPH 41:** On March 1, 2022, the Nuvia licenses terminated, along with the corresponding rights to use or sell products based on or incorporating Nuvia technology developed under those licenses.

**ANSWER: Defendants deny the allegations of Complaint Paragraph 41, except to the extent they purport to state legal conclusions as to which no response is required.**

89.  **COMPLAINT PARAGRAPH 42:** On April 1, 2022, Qualcomm's General Counsel sent Arm a letter enclosing a Nuvia representative's termination certification. The certification acknowledged—without objection—that the Nuvia licenses had been terminated. The certification recognized the obligations upon termination, and asserted that Nuvia was in compliance. Qualcomm and Nuvia thereby conceded that termination of the Nuvia licenses was appropriate, and that the termination provisions had been triggered, are binding, and are enforceable.

**ANSWER: Defendants admit that, on April 1, 2022, Qualcomm Incorporated's General Counsel and Corporate Secretary transmitted a Certification from Gerard Williams stating that to the best of his knowledge, information and belief after due inquiry, NUVIA was in compliance with its obligations under ▇▇▇▇▇ with respect to any ARM Confidential Information.  Defendants otherwise deny the allegations of Complaint**

Paragraph 42, except to the extent they purport to state legal conclusions as to which no response is required.

*Qualcomm keeps using Arm-based technology developed under the Nuvia licenses*

90.    **COMPLAINT PARAGRAPH 43:** Qualcomm is subject to Nuvia's termination requirements as the acquirer of Nuvia. Qualcomm has publicly described Nuvia as a Qualcomm "team" that has been "very tight[ly] integrat[ed]" with and is "not separate" from Qualcomm.[20] Qualcomm has also acted on behalf of Nuvia publicly and in correspondence with Arm since the acquisition.  Qualcomm further told Arm that it planned to "redeploy NUVIA employees" and "transfer NUVIA's work" to Qualcomm and, consistent with that plan, Qualcomm has on-boarded Nuvia's leadership and employees as Qualcomm employees.[21]

**ANSWER:  Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants admit that, on January 27, 2021, Qualcomm wrote to ARM that Qualcomm had entered into a definitive agreement to acquire NUVIA and stating: "Following the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees continue**

---

[20]   Ian Cutress, *Interview with Alex Katouzian, Qualcomm SVP: Talking Snapdragon, Microsoft, Nuvia, and Discrete Graphics*, AnandTech (Jan. 31, 2022), https://www.anandtech.com/show/17233/interview-with-alex-katouzian-qualcomm-svp-talking-snapdragon-microsoft-nuvia-and-discrete-graphics; Ian Cutress, *AnandTech Interview with Miguel Nunes: VP for Windows and Chrome PCs, Qualcomm*, AnandTech (Feb. 14, 2022), https://www.anandtech.com/show/17253/anandtech-interview-with-miguel-nunes-senior-director-for-pcs-qualcomm.

[21]   *See, e.g.*, *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 16, 2021), https://investor.qualcomm.com/news-events/press-releases/detail/1304/qualcomm-completes-acquisition-of-nuvia; *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

their activities under the Qualcomm ALA and TLA, as that will be their current employer." Defendants further admit that, on February 3, 2021, Qualcomm stated in a letter to ARM that, after the NUVIA acquisition, NUVIA would "become a wholly owned subsidiary of Qualcomm and, post-closing, our plan is to redeploy NUVIA employees to currently existing Qualcomm entities." Defendants otherwise deny the allegations in Complaint Paragraph 43, except to the extent they purport to state legal conclusions as to which no response is required.

91.    **COMPLAINT PARAGRAPH 44:** On April 29, 2022, Arm wrote Qualcomm clarifying that neither Nuvia nor Qualcomm was authorized to continue working on technology that was developed under the Nuvia licenses.

**ANSWER: Defendants admit that ARM wrote a letter to Qualcomm dated April 29, 2022. Defendants otherwise deny the allegations in Complaint Paragraph 44 except to the extent they purport to state legal conclusions as to which no response is required.**

92.    **COMPLAINT PARAGRAPH 45:** Two weeks later, on May 13, 2022, Qualcomm sought Arm's verification that a new Qualcomm processor core complied with Arm architecture so that it could be verified and incorporated into a product. Qualcomm did not explain whether this processor core design was based on Nuvia's designs under the terminated licenses.

**ANSWER: Defendants admit that, on May 13, 2022, Qualcomm submitted to ARM a compliance report for a new Qualcomm CPU. Defendants otherwise deny the allegations in Complaint Paragraph 45.**

93.    **COMPLAINT PARAGRAPH 46:** Based on the timing and circumstances surrounding Qualcomm's request, discovery is likely to show that Qualcomm's processor core

design is based on or incorporates in whole or in part the processor core design developed under the prior Nuvia licenses.

**ANSWER: Defendants admit that Qualcomm's Phoenix Core design incorporates intellectual property acquired from NUVIA, which is wholly independent of ARM. Defendants otherwise deny the allegations in Complaint Paragraph 46, except to the extent they purport to state legal conclusions to which no response is required.**

94.     **COMPLAINT PARAGRAPH 47:** Qualcomm's Arm licenses do not cover products based on or incorporating Arm-based technologies developed by third parties under different Arm licenses, such as the now-terminated Nuvia licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 47.**

95.     **COMPLAINT PARAGRAPH 48:** Despite Arm's termination of the Nuvia licenses, Qualcomm has continued to tell the public that its Nuvia chips will soon be joining the industry-wide "ecosystem transition to Arm."[22] Like Qualcomm's prior statements, this announcement was directed to readers throughout the United States, including to readers physically located in the State of Delaware and this Judicial District.

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 48, except to the extent they purport to state legal conclusions to which no response is required.**

96.     **COMPLAINT PARAGRAPH 49:** In June 2022, Qualcomm's CEO reiterated that it would soon begin "sampling" Nuvia chips to companies, allowing them to design

---

[22]     *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id10

electronic devices incorporating the chips in the "next year."[23] Based on that timeline, he explained, "[i]n late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon with a Nuvia-designed CPU."[24]

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 49.**

97.     **COMPLAINT PARAGRAPH 50:** In the microprocessor industry, "sampling" means providing pre-production processors to original equipment manufacturers ("OEMs"), original device manufacturers ("ODMs"), or independent software vendors ("ISVs") for use in the product design cycle before product launch.

**ANSWER: Defendants admit the allegations in Complaint Paragraph 50 generally describe sampling, but note that they fail to distinguish between precommercial engineering samples and commercial samples.**

98.     **COMPLAINT PARAGRAPH 51:** Based on Qualcomm's statements that Nuvia processors took "years" to develop and "are still in development," and Qualcomm's consistent statements that it is developing Nuvia's Arm chips, discovery is likely to show that the chips that

---

https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id10 91374076?i=1000565773375.

[23]    *Id.*; *see also* Mark Tyson, *Qualcomm CEO Admits Nuvia Chip OEM Sampling is Delayed (Update)*, Tom's Hardware (June 10, 2022), https://www.tomshardware.com/news/qualcomm-nuvia-chip-sampling-delays (Qualcomm spokesperson clarifying: "We are on track to sample the first products with our next generation CPUs this year.").

[24]    *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id10 91374076?i=1000565773375.

Qualcomm intends to sample in the coming months will contain Nuvia technology that Qualcomm cannot use and instead must destroy.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 51, except to the extent they purport to state legal conclusions to which no response is required.**

99.     **COMPLAINT PARAGRAPH 52:** Further, based on Qualcomm's public announcements of its plans to use Nuvia technology, discovery is likely to show that Qualcomm has continued to retain and use Nuvia technology developed pursuant to the Nuvia licenses, thereby materially breaching the termination provisions of those licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 52, except to the extent they purport to state legal conclusions to which no response is required.**

100.     **COMPLAINT PARAGRAPH 53:** News reports indicate that Qualcomm is also developing Nuvia processors for data center servers, and "already has working silicon to at least demonstrate to potential customers,"[25] which discovery is likely to show is based on or incorporates Nuvia technology developed under the now-terminated Nuvia ALA.

**ANSWER:  Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 53, except to the extent they purport to state legal conclusions for which no response is required.**

---

[25]   Dan Robinson, *Qualcomm readying new Arm server chip based on Nuvia acquisition*, The Register               (Aug.               19,               2022), https://www.theregister.com/2022/08/19/qualcomm_arm_server_chip/ (citing Ian King, *Qualcomm Is Plotting a Return to Server Market With New Chip*, Bloomberg (Aug. 18, 2022), https://www.bloomberg.com/news/articles/2022-08-18/qualcomm-is-plotting-a-return-to-server-market-with-new-chip).

101. **COMPLAINT PARAGRAPH 54:** The failure of Nuvia and Qualcomm to comply with the post-termination obligations under the Nuvia ALA is causing, and will continue to cause, irreparable harm to Arm. Qualcomm effectively seeks to circumvent Arm's licensing model, which allocates use of the technology developed pursuant to a particular Arm license to a particular licensee.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 54, except to the extent they purport to state legal conclusions to which no response is required.**

102. **COMPLAINT PARAGRAPH 55:** These breaches thus interfere with Arm's ability and right to control the use of its technology, negatively affecting Arm's relationships with existing and prospective licensees.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 55, except to the extent they purport to state legal conclusions to which no response is required.**

103. **COMPLAINT PARAGRAPH 56:** The prospective monetary damages from Qualcomm's circumvention and interference with Arm's control over its technology are not readily ascertainable or calculable, given the resulting future impact on Arm's relationships with existing and prospective customers.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 56, except to the extent they purport to state legal conclusions to which no response is required.**

104. **COMPLAINT PARAGRAPH 57:** Qualcomm's improper acquisition of the relevant Nuvia technology in violation of Arm's standard provisions threatens to harm Arm's position in the ecosystem of Arm-based devices, harm Arm's reputation as an intellectual property owner and technology developer whose licenses must be respected, and embolden other companies to likewise harm Arm's reasonable business expectations in issuing its licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 57, except to the extent they purport to state legal conclusions to which no response is required.**

<u>COUNT I: BREACH OF CONTRACT – SPECIFIC PERFORMANCE</u>
<u>(ALL DEFENDANTS)</u>

105.    **COMPLAINT PARAGRAPH 58:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER: Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-57 as if fully set forth herein.**

106.    **COMPLAINT PARAGRAPH 59:** The termination obligations of the ALA between Nuvia and Arm survive termination and remain valid and enforceable contract provisions, as Qualcomm's correspondence and Nuvia's termination certification confirm.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 59, except to the extent they purport to state legal conclusions to which no response is required.**

107.    **COMPLAINT PARAGRAPH 60:** Arm complied with and fulfilled all relevant duties, conditions, covenants, and obligations under the Nuvia ALA, including ceasing use of Nuvia confidential information in its possession.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 60, except to the extent they purport to state legal conclusions to which no response is required.**

108.    **COMPLAINT PARAGRAPH 61:** The Nuvia ALA terms were just and reasonable, involving adequate consideration and reasonable obligations for Nuvia in the event of Arm's termination based on Nuvia's material breach. Those obligations served to restore the license holder to its position *ex ante*, protect Arm's business model and reasonable business expectations in issuing its licenses, and prevent the unjust enrichment of Qualcomm, the party that induced Nuvia's breach.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 61, except to the extent they purport to state legal conclusions to which no response is required.**

109.    **COMPLAINT PARAGRAPH 62:** Upon termination, the Nuvia ALA requires Nuvia to cease using and destroy any technology developed under the Nuvia ALA, as well as cease using Arm's trademarks in connection with any technology developed under the Nuvia ALA.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 62, except to the extent they purport to state legal conclusions to which no response is required.**

110.    **COMPLAINT PARAGRAPH 63:** Qualcomm shares Nuvia's obligations under the Nuvia ALA in its capacity as Nuvia's acquirer, and thus Qualcomm is likewise subject to the requirements of the Nuvia licenses' termination provisions.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 63, except to the extent they purport to state legal conclusions to which no response is required.**

111.    **COMPLAINT PARAGRAPH 64:** Based on Defendants' correspondence with Arm, public statements, and processor verification requests, discovery is likely to show that Defendants are still using and developing Nuvia technology developed under the now-terminated licenses, along with Arm trademarks, and intend to continue to do so.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 64, except to the extent they purport to state legal conclusions to which no response is required.**

112.    **COMPLAINT PARAGRAPH 65:** Defendants therefore have breached and are breaching the Nuvia ALA's termination provisions.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 65, except to the extent they purport to state legal conclusions to which no response is required.**

113.    **COMPLAINT PARAGRAPH 66:** As a direct and proximate result of Nuvia and Qualcomm's past and ongoing breaches, Arm has been irreparably injured and damaged in amounts not capable of determination, including, but not limited to, injury to Arm's global licensing program and misuse of Arm's technology.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 66, except to the extent they purport to state legal conclusions to which no response is required.**

114.    **COMPLAINT PARAGRAPH 67:** Unless Defendants' breaches of the Nuvia ALA's termination provisions are enjoined and specific performance is granted, Arm will continue to suffer irreparable harm. As such, Arm has the right to enforcement of Nuvia and Qualcomm's compliance with the ALA's termination provisions, including via injunctive relief, specific performance, or any other measures necessary to avoid irreparable harm to Arm or to mitigate damages that have been caused by, and will continue to be caused by, Defendants' breach.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 67, except to the extent they purport to state legal conclusions to which no response is required.**

115.    **COMPLAINT PARAGRAPH 68:** Arm is entitled to specific performance requiring Defendants to comply with the Nuvia ALA's termination provisions, including ceasing all use of and destroying any technology developed under the Nuvia ALA, and ceasing all use of Arm trademarks in connection with any technology developed under the Nuvia ALA—including the relevant Nuvia technology.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 68, except to the extent they purport to state legal conclusions to which no response is required.**

116. **COMPLAINT PARAGRAPH 69:** Arm is also entitled to monetary compensation incidental to specific performance of the Nuvia ALA's termination provisions to compensate Arm for the delay in Defendants' performance of their contractual obligations.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 69, except to the extent they purport to state legal conclusions to which no response is required.**

## COUNT II: DECLARATORY JUDGMENT AND TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114 (ALL DEFENDANTS)

117. **COMPLAINT PARAGRAPH 70:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER: Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-69 as if fully set forth herein.**

118. **COMPLAINT PARAGRAPH 71:** Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower case letters (collectively, the "ARM Marks"), true and correct copies of which are attached as **Exhibits A and B**. These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with particular microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services. The applications to register the marks were filed on July 31, 2017 and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for

Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

**ANSWER:  Defendants refer the Court to Exhibits A and B of the Complaint for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 71, except to the extent they purport to state legal conclusions to which no response is required.**

119.    **COMPLAINT PARAGRAPH 72:** The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.

**ANSWER: To the extent the allegations in Complaint Paragraph 72 purport to state legal conclusions, no response is required.  Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Complaint Paragraph 72, and on that basis deny them.**

120.    **COMPLAINT PARAGRAPH 73:** Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 73, except to the extent they purport to state legal conclusions to which no response is required.**

121.    **COMPLAINT PARAGRAPH 74:** Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

**ANSWER:  Qualcomm admits that its ALA and TLA with ARM permit the use of ARM Marks. Defendants otherwise deny the allegations in Complaint Paragraph 74,**

except to the extent they purport to state legal conclusions to which no response is required.

122.   **COMPLAINT PARAGRAPH 75:** Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 75, except to the extent they purport to state legal conclusions to which no response is required.**

123.   **COMPLAINT PARAGRAPH 76:** Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to infringe Arm's trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® KryoTM 485 CPU built on ARM Cortex Technology."[26] In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[27] This press release

---

[26]   *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

[27]   *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022),

remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

**ANSWER: Qualcomm admits to using certain ARM Marks as permitted by its licenses to accurately refer to ARM's technology, including, but not limited to, in marketing materials, product specifications, and technical documents. Defendants deny knowledge or information sufficient to form a belief as to how ARM's other licensees use ARM Marks. Defendants otherwise respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 76, except to the extent they purport to state legal conclusions to which no response is required.**

124. **COMPLAINT PARAGRAPH 77:** Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting trademark infringement in violation of 15 U.S.C. § 1114. Given Arm's close

---

*PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-part ners-build-industry-momentum-windows-arm.

relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 77, except to the extent they purport to state legal conclusions to which no response is required.**

125.    **COMPLAINT PARAGRAPH 78:** An actual and justiciable controversy exists between Defendants and Arm regarding infringement of Arm's trademarks. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 78, except to the extent they purport to state legal conclusions to which no response is required.**

126.    **COMPLAINT PARAGRAPH 79:** Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will infringe Arm's trademarks, directly and indirectly.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 79, except to the extent they purport to state legal conclusions to which no response is required.**

127.   **COMPLAINT PARAGRAPH 80:** Defendants' acts of infringement have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 80, except to the extent they purport to state legal conclusions to which no response is required.**

128.   **COMPLAINT PARAGRAPH 81:** Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 81, except to the extent they purport to state legal conclusions to which no response is required.**

129.   **COMPLAINT PARAGRAPH 82:** Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' trademark infringement. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing infringement, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays

the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their infringing conduct.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 82, except to the extent they purport to state legal conclusions to which no response is required.**

## COUNT III: DECLARATORY JUDGMENT AND
## FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125
## (ALL DEFENDANTS)

130.     **COMPLAINT PARAGRAPH 83:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER:  Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-82 as if fully set forth herein.**

131.     **COMPLAINT PARAGRAPH 84:** The acts of Qualcomm and Nuvia described above constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 84, except to the extent they purport to state legal conclusions to which no response is required.**

132.     **COMPLAINT PARAGRAPH 85:** Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 85, except to the extent they purport to state legal conclusions to which no response is required.**

133.     **COMPLAINT PARAGRAPH 86:** Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

**ANSWER: Qualcomm admits that its ALA and TLA permit use of the ARM Marks. Defendants otherwise deny the allegations in Complaint Paragraph 86, except to the extent they purport to state legal conclusions to which no response is required.**

134. **COMPLAINT PARAGRAPH 87:** Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 87, except to the extent they purport to state legal conclusions to which no response is required.**

135. **COMPLAINT PARAGRAPH 88:** Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to falsely designate the origin of their products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® KryoTM 485 CPU built on ARM Cortex Technology."[28] In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of

---

[28] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[29] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

**ANSWER:  Qualcomm admits to using certain ARM Marks pursuant to its licenses to accurately refer to ARM's technology, including, but not limited to, in marketing materials, product specifications, and technical documents.  Defendants deny knowledge or information sufficient to form a belief as to how ARM's other customers use ARM Marks. Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 88, except to the extent they purport to state legal conclusions to which no response is required.**

136.  **COMPLAINT PARAGRAPH 89:** Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship,

---

[29]  *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A). Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 89, except to the extent they purport to state legal conclusions to which no response is required.**

137. **COMPLAINT PARAGRAPH 90:** An actual and justiciable controversy exists regarding Defendants' false designation of origin. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 90, except to the extent they purport to state legal conclusions to which no response is required.**

138. **COMPLAINT PARAGRAPH 91:** Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will falsely designate the origin of their products, directly and indirectly.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 91, except to the extent they purport to state legal conclusions to which no response is required.**

139.   **COMPLAINT PARAGRAPH 92:** Defendants' acts of false designation of origin have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 92, except to the extent they purport to state legal conclusions to which no response is required.**

140.   **COMPLAINT PARAGRAPH 93:** Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 93, except to the extent they purport to state legal conclusions to which no response is required.**

141.   **COMPLAINT PARAGRAPH 94:** Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' false designation of origin. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing false designation of origin, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the falsely designated matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that

bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their wrongful conduct.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 94, except to the extent they purport to state legal conclusions to which no response is required.**

## ARM'S PRAYER FOR RELIEF

WHEREFORE, Plaintiff Arm Ltd. requests that the Court grant the following relief:

**a.**      A judgment in Arm's favor on all claims against Defendants;

**b.**      An order requiring specific performance by Defendants of the Nuvia licenses' termination provisions;

**c.**      An award of damages incidental to specific performance as a result of Defendants' breach of contract, in amounts to be proven at trial, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

**d.**      A judgment and a declaration that advertising, distributing, offering for sale, or selling semiconductor chips with the relevant Nuvia technology and the ARM Marks infringes Arm's trademarks, directly and indirectly;

**e.**      An order and judgment permanently enjoining Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns from (1) using in any manner in connection with the relevant Nuvia technology the ARM Marks, or any mark or logo that is confusingly similar to or a colorable imitation of the ARM Marks owned by Arm; (2) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using

the relevant Nuvia technology; or (3) assisting, aiding, or abetting any other person or business entity in performing any of the aforementioned activities;

     **f.**     An order and judgment directing Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Arm within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and ceased all offering of products with the relevant Nuvia technology under the ARM Marks, as set forth above;

     **g.**     An order and judgment directing Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays in any manner in connection with the relevant Nuvia technology the ARM Marks or any other mark that is confusingly similar to or a colorable imitation of the ARM Marks;

     **h.**     A judgment in the aggregate amount of (1) Defendants' profits, (2) Arm's actual damages, (3) the costs of this action pursuant to 15 U.S.C. § 1117, and (4) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants in connection with their semiconductor chips using the relevant Nuvia technology and the ARM Marks, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

**i.** A judgment trebling any damages to the extent permitted by law, including under 15 U.S.C. § 1117;

**j.** Exemplary or punitive damages to the extent permitted by law;

**k.** Costs, expenses, and reasonable attorney fees under all applicable rules, statutes, and rules in common law that would be appropriate, with pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

**l.** Equitable relief addressing any infringement occurring after entry of judgment; and

**m.** Such other relief as the Court deems just and proper.

**ANSWER TO PLEA FOR RELIEF: ARM's characterization of the relief it seeks does not require a response. To the extent a response is required, Defendants deny the allegations in the prayer for relief and further deny that ARM is entitled to the requested relief, or any relief, against the Defendants, and the Defendants request that the Court dismiss all claims against them with prejudice and order such further relief as the Court deems just and proper.**

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Arm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

**ANSWER TO JURY DEMAND: ARM's jury demand states a legal conclusion to which no response is required, and Defendants otherwise reserve their right to contest ARM's jury demand.**

## DEFENSES

142.     Without admitting that the Defendants engaged in the acts and conduct set forth in ARM's Complaint or that such acts or conduct would entitle ARM to the relief it seeks or that the allegation of an affirmative or other defense requires Defendants to prove affirmatively the circumstances as alleged, the Defendants assert the following defenses with respect to the claims alleged in the Complaint, without assuming the burden of proof or persuasion where the burden rests on ARM.  By designating the following defenses, the Defendants do not in any way waive or limit any defenses which are or may be raised by their denials, allegations and averments set forth herein, and do not assume the burden of proof for any element of a claim to which the applicable law places the burden of proof on the Plaintiff.  The defenses are pleaded in the alternative, are raised to preserve the Defendants' rights to assert such defenses, and are without prejudice to their ability to raise other and further defenses.  The Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent at any time and hereby reserve all rights to amend and/or supplement any and all defenses set forth herein.

### FIRST DEFENSE

### (Failure To State A Claim)

143.     The Complaint fails to state a claim against the Defendants upon which relief can be granted.

### SECOND DEFENSE

### (Defendants Did Not Breach The NUVIA ALA)

144.     Defendants did not breach the termination provisions of NUVIA's ALA because Defendants complied with the termination provision.

145.    Defendants did not breach the NUVIA ALA.  Defendants' use of ARM technology and information was fully licensed under the Qualcomm ALA.

### THIRD DEFENSE

**(Defendants' Use Of ARM Marks Is Licensed And Therefore
Permitted Under Qualcomm's License Agreements)**

146.    Defendants are licensed to use the ARM Marks at issue and therefore they are not in violation of 15 U.S.C. §§ 1114 and 1125.

147.    For example, under ████████ of Qualcomm's ARM ALA, ARM ████████



148.    The Qualcomm products at issue in ARM's complaint were ████████████ ████████████ Qualcomm's license agreements.  Accordingly, Defendants are permitted to use ARM's Marks licensed under that agreement.

### FOURTH DEFENSE

**(Fair Use)**

149.    Defendants are not subject to liability for alleged trademark infringement because Defendants' use of ARM Marks constitutes fair use.

150.    Defendants use the ARM Marks in marketing materials, product specifications and technical documents to truthfully refer to ARM's technology and its relationship with Qualcomm's products.  For example, Qualcomm's website describes the Kryo CPU as follows:

"The Qualcomm® Kryo™ CPU (built on ARM Cortex Technology) available in certain Snapdragon processors is optimized for high-performance mobile computing."

151.    Use of the ARM Marks in this manner is necessary to accurately describe that Qualcomm's products are compatible with ARM's technology.

152.    This use of the ARM Marks indicates that Qualcomm's products use an ARM ISA.    This is a true and accurate representation of the relationship between ARM and Qualcomm's products.

153.    Defendants use only so much of the ARM Marks as necessary to describe ARM's products.

## FIFTH DEFENSE

### (Ripeness)

154.    ARM's claims under 15 U.S.C. §§ 1114 and 1125 are premature and not ripe for adjudication.

## SIXTH DEFENSE

### (Plaintiff's Breach Of The NUVIA ALA Prevents It From Seeking To Enforce The ALA)

155.    ARM is barred from bringing or maintaining its breach of contract claim based on the NUVIA ALA, or recovering any remedy against the Defendants based on this claim, because ARM breached the NUVIA ALA, and such breach excuses any nonperformance by the answering Defendants.

156.    ARM's refusal to fulfill its responsibilities under the NUVIA ALA bars its own claims of breach of contract against the Defendants.

157.    Moreover, pursuant to ███████ of the ALA, ARM's ability to recover damages is limited.

## SEVENTH DEFENSE

## (Unclean Hands)

158.    ARM is barred from bringing or maintaining its claims by virtue of the equitable doctrine of unclean hands, including because ARM has refused to fulfill its contractual obligations to Defendants.

## EIGHTH DEFENSE

## (Waiver)

159.    By the statements, conduct, acts, or omissions attributable to ARM alone, ARM has waived all claims and causes of action and any recovery or remedy alleged in the complaint. ARM has been aware of Qualcomm's development of technology it acquired from NUVIA for over a year, and only now seeks to preclude Qualcomm from proceeding with its development.

## NINTH DEFENSE

## (Estoppel)

160.    By the statements, conduct, acts, or omissions attributable to ARM alone, ARM is estopped from seeking any recovery or remedy as alleged in the complaint. ARM has been aware of Qualcomm's development of technology it acquired from NUVIA for over a year, and only now seeks to preclude Qualcomm from proceeding with its development.

## TENTH DEFENSE

## (No Damages)

161.    ARM's claims cannot be maintained because ARM cannot prove any cognizable loss, damage, or injury as a result of the conduct alleged in the Complaint.

162.    Moreover, to the extent ARM seeks damages, ARM's damages are limited pursuant to ▮▮▮▮▮▮ of the ALA.

## ELEVENTH DEFENSE

## (Failure To Mitigate Damages)

163.     ARM's claim for damages is barred in whole or in part due to ARM's failure to mitigate the alleged damages resulting from its claims.

164.     ARM knew in March of 2021 that Qualcomm had acquired NUVIA and that it intended to continue developing technology acquired from NUVIA.

165.     ARM waited until February 2022 to terminate the NUVIA ALA, allegedly because NUVIA violated assignments provisions in the NUVIA agreements.

166.     ARM's actions worked to maximize its alleged damages.

## TWELFTH DEFENSE

## (Equitable Defenses)

167.     The claims alleged and the relief sought in this action are barred in whole or in part by the equitable doctrines of laches, acquiescence, consent, ratification, and/or similar doctrines.

## THIRTEENTH DEFENSE

## (No Entitlement To Equitable Relief)

168.     To the extent the Complaint seeks equitable relief, such relief is barred because there is an adequate remedy at law.

## FOURTEENTH DEFENSE

## (Trademark Misuse)

169.     ARM has misused its marks inequitably, in order to harm Defendants.

170.     ARM has falsely claimed that Defendants are not entitled to utilize the ARM Marks.

171.     ARM falsely told customers, the media, and the public that Qualcomm cannot manufacture or sell products compatible with ARM's ISA that contain NUVIA technology.

172.     In so doing, ARM is indicating that Defendants are not entitled to utilize the ARM Marks.

173.     This is incorrect.   Defendants are fully licensed to the ARM Marks under Qualcomm's license agreements with ARM.

## FIFTEENTH DEFENSE

### (Other Defenses)

174.     Defendants hereby adopt and incorporate by reference any and all other defenses asserted, or that may hereafter be asserted, by any other defendant not expressly set forth herein to the extent such defense may be applicable to Defendants.

## COUNTERCLAIM

175.     Defendants, for their Counterclaim against ARM, seek a declaration that Defendants have not breached NUVIA's license agreements with ARM, and that Defendants' design, activities, and work on the Phoenix Core and associated SoCs are fully licensed pursuant to Qualcomm's license agreements with ARM.  Defendants set forth their counterclaim below, and incorporate by reference their introduction, set forth in paragraphs 1-47 above, as though set forth in full below.

## THE PARTIES

176.     Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California. Qualcomm is the world's leading wireless technology innovator and the driving force behind the development, launch, and expansion of 5G technology.  Qualcomm's foundational technologies enable the mobile ecosystem and are found

in every 3G, 4G, and 5G smartphone. Qualcomm brings the benefits of mobile to new industries, including automotive, the internet of things, and computing, where Qualcomm has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

177.    Qualcomm Technologies, Inc. is a Delaware corporation with a principal place of business in San Diego, California. Qualcomm Technologies is a wholly-owned subsidiary of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

178.    NUVIA, Inc. was founded in February 2019 to design and develop ARM-compatible cores for use in server products. NUVIA comprised a proven world-class CPU and technology design team, with industry-leading expertise in high-performance processors, SoCs, and power management for compute-intensive devices and applications. Qualcomm acquired NUVIA in March 2021 for approximately $1.4 billion, before working capital and other adjustments.

179.    ARM is a corporation headquartered in Cambridge, United Kingdom and was founded in 1990. ARM is planning to issue an IPO in the future, and ARM's positions will have a detrimental impact on this IPO unless this action is resolved beforehand.

## JURISDICTION AND VENUE

180.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

181.    Venue is proper in the District of Delaware under 28 U.S.C. § 1391 because ARM, through its Complaint dated August 31, 2022, has consented to jurisdiction and venue in the State of Delaware and this Judicial District.

**FACTUAL BACKGROUND**

### I.    QUALCOMM AND NUVIA'S AGREEMENTS WITH ARM

182.    On May 30, 2013, Qualcomm[30] and ARM entered into an Amended and Restated Architecture License Agreement (the "QC ALA"), No. LES-TLA-20039, and Annex 1 to that agreement.    On May 31, 2013, Qualcomm and ARM entered into a Technology License Agreement (the "QC TLA"), No. LEC-TLA00550 and Annex 1 to that agreement.    On June 23, 2020, Qualcomm and ARM entered into an updated Annex 1 to the ALA and an Annex 1 to the QC TLA.

183.    

184.    Under the QC TLA, ARM licenses to Qualcomm fully designed and functional ARM Technology.    ARM provides this technology "off the shelf" to Qualcomm (i.e., the license is for a fully designed and functional piece of technology).

---

30



185.     On September 27, 2019, NUVIA entered into both a TLA and an ALA through which it licensed certain ARM Technology.  The NUVIA ALA was later amended on October 17, 2019.

186.     Prior to ARM's termination of the NUVIA ALA and TLA, Qualcomm's and NUVIA's license agreements with ARM broadly overlapped.  At the time of termination of the NUVIA agreements, Qualcomm's ALA and TLA provided Qualcomm a license to the same technologies that were licensed under the NUVIA agreements.

187.     However, as discussed above, the royalty rates under NUVIA's license agreements were higher than those under Qualcomm's.

## II.     ARM TRIES TO TAKE ADVANTAGE OF QUALCOMM'S ACQUISITION OF NUVIA

### a.     Qualcomm Alerts ARM To Its Pending Acquisition Of NUVIA

188.     As discussed above in paragraphs 1-47, on January 13, 2021, Qualcomm announced its intent to acquire—for $1.4 billion before working capital and other adjustments—NUVIA, a start-up focused on developing a promising custom CPU compliant with the ARM ISA designed for data center servers.

189.     On January 27, 2021, Qualcomm wrote ARM a letter stating that it had entered into a definitive agreement to acquire NUVIA, and noting that Qualcomm and NUVIA had overlapping license agreements.  As Qualcomm notified ARM, "[f]ollowing the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees continue their activities under the Qualcomm ALA and TLA, as that will be their current employer."  In its letter, Qualcomm told ARM that it would be willing to "work with the

ARM team to complete any necessary annexes" to Qualcomm's ALA and TLA "to the extent NUVIA was utilizing any ARM technology not currently covered under the current QTI ALA and TLA."  Given the timing of the acquisition, which was scheduled to close in March, Qualcomm requested that ARM respond by February 3, 2021.

190.   ARM did not respond until February 2, 2021, and said it would start reviewing "NUVIA's contracts with ARM" and would "aim to get in touch" regarding additional materials required to facilitate the review by February 17, 2021.  ARM further stated that it expected Qualcomm and NUVIA to "continue to follow the confidentiality obligations" in the parties' agreements and that the transfer of "designs, rights, or licenses" would be subject to "Arm's prior consent," which is "customarily documented in a three-way agreement between Arm, transferor, and transferee."

191.    Qualcomm replied the following day. Qualcomm confirmed that both "NUVIA and Qualcomm's existing agreements with ARM provide for the protection of ARM's confidential information," and that they "would abide by the confidentiality terms of those agreements."   Qualcomm further requested that ARM provide its proposed "three-way agreement" for review.

192.   ARM never provided a draft of the "three-way agreement" or explained its concerns regarding protection of its confidential information.  Nor was any such "three-way agreement" necessary to transfer any designs or rights to the NUVIA technology that Qualcomm had acquired.  Rather, by its terms, Qualcomm's agreements provided any rights necessary to continue the development of custom cores for the uses Qualcomm contemplated.

### b. ARM's Baseless Threats

193.    ARM waited nearly two weeks after Qualcomm's letter to provide any meaningful response.  On February 16, 2021, ARM gave Qualcomm a broad list of demands, claiming that ARM could only consent to the assignment of NUVIA's agreements to Qualcomm if Qualcomm agreed to several outrageous demands, set forth in Paragraph 23 above.

194.    Although assignment of the NUVIA agreement was unnecessary because of Qualcomm's own license agreements and nothing in the NUVIA agreement precluded Qualcomm from acquiring NUVIA or its technology, ARM's ploy in tying its consent to these demands was to try and leverage the swiftly approaching closing date in a misguided attempt to disrupt Qualcomm's acquisition.

195.    In correspondence sent February 18 and February 25, 2021, Qualcomm explained that ARM's demand that Qualcomm pay the NUVIA licensing rates was not appropriate because "ARM has not proposed giving Qualcomm any additional rights or benefits in exchange for" its demand for additional payments and because there was no contractual support for ARM's imposition of NUVIA's royalty rates on Qualcomm.

196.    Qualcomm also explained that ARM's proposed restrictions on Qualcomm's engineers were inappropriate, as the proposed three-year restriction period would make it nearly impossible to develop products, thus endangering Qualcomm development work and would adversely impact ARM through the loss of licensing revenue.

197.    During Qualcomm's February 2021 discussions with ARM, it became apparent that ARM's position was that NUVIA needed to assign its license agreements to Qualcomm, and that assignment could only be made with ARM's consent under ████████████████ ████████████████████████

198. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

199. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████

200.    These assignment provisions are inapplicable to Qualcomm's acquisition of NUVIA because Qualcomm has its own separate license agreements with ARM, which covered NUVIA and its technology as soon as the acquisition closed. ████████████████

████████████████████████████████████████████

███████████████████████████████████████ █

████████████████████████████████████████████

████████████████████████████████████████████

████████████

201.    In addition, the ALA gave Qualcomm broad license rights to design architecture compatible cores at all stages of implementation. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

202.     Therefore, NUVIA's technology would be covered by Qualcomm's ALA upon its acquisition.  It was not necessary to transfer NUVIA's licenses to effectuate the acquisition of NUVIA or its technology.

203.     Regardless, in an effort to compromise, on February 25, 2021, Qualcomm asked that ARM consent to the transfer of the NUVIA licenses to Qualcomm by March 2, 2021.

204.     By a letter dated March 2, 2021, ARM refused to consent.  Instead, ARM reiterated its demand that Qualcomm agree to the higher royalties of the NUVIA license agreement, including for what it alleged to be "derivative[]" products developed by Qualcomm. ARM conditioned its consent to the assignment of the agreements by NUVIA to Qualcomm on Qualcomm agreeing to these demands.

205.     Qualcomm did not agree to these demands and Qualcomm's acquisition of NUVIA was completed as scheduled on March 16, 2021.

206.     Although the parties had intermittent discussions to resolve the dispute, they were unable to resolve these issues, and in September 2021, ARM went silent.

**d.      With ARM's Knowledge And Assistance Owed To Qualcomm Under Its ALA, Qualcomm Continued Its Work Developing CPU Cores After The Acquisition Closed**

207.     From March 16, 2021 through the present, Qualcomm engineers (including former NUVIA employees), operating under the Qualcomm license agreements, worked diligently to develop market-leading CPU cores and SoCs improving and further developing the technology it acquired from NUVIA.

208.     When Qualcomm acquired NUVIA, NUVIA had certain technology for a CPU core (i.e., the Phoenix Core) and the Server SoC that would use the Phoenix Core, but this

technology was not fully developed. Qualcomm continued to develop the Phoenix Core and Server SoC.

209. Qualcomm also designed a SoC for use in the "compute" space (the "Compute SoC"), which would include aspects of the Phoenix Core. Unlike the Server SoC, the Compute SoC was initially conceived of and innovated at Qualcomm after the NUVIA acquisition, including modifications of the Phoenix Core for this application.

210. Throughout 2021 and 2022, Qualcomm received limited support from ARM as it developed the Phoenix Core and the two SoCs under Qualcomm's agreements, largely related to certain verification processes ARM is obligated to provide to ensure that the core design meets the architectural guidelines. During the verification process, ARM knew that it was interacting with former NUVIA employees, and knew that Qualcomm was seeking to verify core designs that included technologies Qualcomm had acquired from NUVIA.

211. Beginning immediately after the acquisition, Qualcomm—including many Qualcomm team members who had previously worked at NUVIA—began having weekly calls with ARM engineers related to verification testing of the in-development Phoenix Core and the Server SoC.

212. The discussion between ARM and Qualcomm (which included the former NUVIA engineers) was open and transparent. ARM was aware that the discussions included Qualcomm engineers formerly at NUVIA related to Qualcomm's ongoing development of the technologies it had acquired from NUVIA.

213. ARM has also continued to license technology to Qualcomm, and Qualcomm has continued to pay ARM for those licenses.

214.    For example, in July 2021, ARM delivered to Qualcomm four design-only licenses for Qualcomm internal testing.  It also delivered to Qualcomm twelve single-use licenses, allowing the development of a single chipset design using the licensed ARM Technology.  Subsequently, in October 2021, ARM delivered three perpetual licenses allowing for use of some of that same ARM Technology in unlimited designs.  Like other licenses from ARM, Qualcomm paid for these licenses.

215.    In or around late 2021, Qualcomm also introduced the Compute SoC into the parties' weekly discussions.  Like the parties' discussions concerning the in-development Phoenix Core for the Server SoC, these discussions were transparent, and ARM was aware that these discussions included Qualcomm engineers formerly at NUVIA and related to Qualcomm's ongoing development of the technologies it had acquired from NUVIA.

216.    Also in December 2021, Qualcomm submitted an interim compliance report to ARM for the Server SoC it had been developing since the NUVIA acquisition.  This compliance report stated that the Server SoC implemented ▮ of the ARM ISA, which was, at that time, publicly available on ARM's website and licensed under Qualcomm's ALA.

### III.    ARM WAITED OVER A YEAR TO TERMINATE THE NUVIA LICENSES AND DEMAND QUALCOMM DESTROY TECHNOLOGY

#### a.    On February 1, 2022, ARM Claimed NUVIA And Qualcomm Breached The NUVIA License Agreements And Terminated The Agreements

217.    As discussed above in paragraphs 31-40, in a letter dated February 1, 2022, after ARM had been interfacing with Qualcomm and its development efforts for months, ARM notified Gerard Williams III, the former CEO and President of NUVIA, that it intended to terminate both NUVIA's ALA and TLA for "material breach."

218.  ARM's February 2022 letter alleged that NUVIA had violated the assignment provisions in ███████████ of both the NUVIA ALA and TLA when it was acquired by Qualcomm without ARM's consent.  ARM also alleged that NUVIA violated the confidentiality provisions of ██████████ of both of the NUVIA license agreements by making unlicensed use of ARM's confidential information.  ARM's letter did not explain its assertions or define the purported breach.

219.  But NUVIA was not required to obtain consent from ARM to "transfer" its licenses or technology.  There are no provisions in the NUVIA-ARM agreements or the Qualcomm-ARM agreements that prohibited Qualcomm from purchasing NUVIA, nor are there any such provisions that required ARM's consent to purchase NUVIA.

220.  As a Qualcomm subsidiary, NUVIA was licensed under the Qualcomm ALA and TLA to use ARM Technology and Confidential Information.  And Qualcomm's licenses covered the further development of the technology acquired from NUVIA by Qualcomm.

221.  ARM's argument under ██████████ fails for the same reasons.  At the time of the termination, both NUVIA and Qualcomm were licensed to use the ARM information in the Phoenix Core and related SoCs under the Qualcomm ALA and TLA, and any use of that information was fully authorized.

222.  In addition, the Phoenix Core and the Server SoC implemented ████ of the ARM ISA, and did not utilize any ARM Confidential Information because ARM has published this specification and placed it in the public domain.  ARM was well aware of this fact by the time it sent the February 1, 2022 termination letter.

223.  Thus, contrary to ARM's assertions, neither NUVIA nor Qualcomm "committed a material breach of" the NUVIA ALA.

224.     Moreover, ARM waited to terminate the NUVIA agreement until Qualcomm had already completed the design of the Phoenix Core for its Server SoC—and even after ARM had *accepted* Qualcomm's core design as ISA compatible.

225.     ARM demanded, upon termination, that NUVIA:

**a.**     "discontinue any use and distribution of all Arm Technology, Arm Confidential Information and any products embodying such technology or information";

**b.**     "[a]t Arm's option, either destroy or return to Arm any Arm Confidential Information, including any copies thereof in its possession and any Arm Technology or derivatives . . . thereof in its possession"; and

**c.**     "[w]ithin one month after termination, furnish to Arm a certificate signed by a duly authorized representative that to the best of his or her knowledge, information and belief, after due enquiry, NUVIA has complied with these provisions."

226.     ARM further claimed (wrongly) that these "obligations extend to Qualcomm and its widely publicized use of NUVIA's technology developed under NUVIA's ALA and TLA." ARM contended in its termination notice that certification of the return or destruction of ARM Confidential Information should "extend to Qualcomm as well."

227.     ARM informed NUVIA that its unilateral termination would be effective as of March 1, 2022 and demanded the return or destruction of any ARM Confidential Information delivered to NUVIA by April 1, 2022.

228.     ARM's demand that NUVIA discontinue using and distributing ARM Technology, ARM Confidential Information, and any products embodying such technology or information was baseless.  NUVIA and the technology Qualcomm acquired from NUVIA was licensed under Qualcomm's license agreements.

229.     Likewise, ARM's demand that NUVIA destroy ARM Confidential Information was baseless because NUVIA was licensed to this information under Qualcomm's license agreements and Qualcomm's further development of this technology was also licensed under Qualcomm's license agreements.

230.     Nonetheless, Qualcomm and NUVIA acted swiftly, at great time and expense, to take additional measures to satisfy ARM's unreasonable demand to comply with the termination provisions in NUVIA's license agreements.

231.     Qualcomm and NUVIA removed NUVIA-acquired ARM Confidential Information from its designs and redesigned its products to replace it with information acquired under Qualcomm's license—even though it was the exact same information—then quarantined a copy.   Qualcomm also removed NUVIA-acquired ARM Confidential Information from its design environment and systems and quarantined it.

232.     During this period, Qualcomm's engineers were not working on further development of products because their attention was focused on the removal of NUVIA-acquired ARM Confidential Information.

233.     NUVIA then provided ARM with its certification of its compliance with the termination provisions on April 1, 2022, as requested by ARM, even though the termination provisions were inapplicable.[31]

**b.** **ARM Failed To** ███████████████████████████ **After Termination**

**234.** **ARM's termination of the NUVIA ALA and TLA also triggered certain ARM obligations.**

---

[31] Meanwhile, ARM never certified its own compliance with the termination provisions, in violation of the NUVIA agreements.

235.    Under ███████████ of both the NUVIA ALA and the NUVIA TLA, ARM was obligated, upon termination, to ██████████████████████████████████ ███████████████████████████████████████████ Additionally, at NUVIA's option, ARM was obligated to ██████████████████████████ ████████████████████████ Within one month of termination, ARM was further obligated to ██████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████ its obligations under the agreement.

236.    On April 29, 2022, more than one month after ARM terminated the NUVIA ALA and TLA, ARM sent Qualcomm a letter informing Qualcomm that ARM was aware of its obligations to ███████████ ██████████████████████████ ███████

237.    Nonetheless, through depositions and document discovery, Defendants have discovered that ARM employees failed to █████████████████████████████ █████████████████████████[32] after ARM's termination of the agreements.

238.    Emails between Vivek Agrawal, ARM's Senior Principle Engineer, and Richard Grisenthwaite, ARM's Chief Architect, reveal that ███████████████ ████████████████████████████████████████████████ ███████████████████████████

---

[32] ARM witnesses—including Mr. Agrawal and Mr. Werkheiser—have been clear that ████████████████████████████████

[33] ████████████████████████████████████████ ██████████████████████████ ████████████

**239.** **A January 19, 2023 email from Mr. Agrawal to seven other ARM employees makes clear that,** ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████

**240.** **In the email, Mr. Agrawal explicitly states that** ████████████

████████████████████████████████████████████ **and that he has** ████████████████████████████ **He additionally states that he** ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ **Mr. Agrawal further explained that some of the files were** ████████████████████████████████████████████████████████████

████████████████

**241.** **When asked about this email in his December 13, 2023 deposition, Mr. Agrawal testified that** ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

**242.** **Mark Werkheiser, a "Distinguished Engineer" and Fellow at ARM, also confirmed at his December 7, 2023 deposition that** ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████

**243.** **Mr. Werkheiser further testified that** ██████████████████████

███████████████████████████████████▌███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

**244.** **The NUVIA code and/or NUVIA identified features for the CMN is NUVIA Confidential Information (1) under ARM's** ████████████████████████████ **as applied to Qualcomm's CPUs** ██████████████████████████████████ **(2) as a NUVIA trade secret disclosed to ARM, and (3) as NUVIA marked Confidential Information disclosed to ARM.  ARM is actively using NUVIA Confidential Information, including derivatives of NUVIA Technology—and directly profiting from that use.**

**245.** **Defendants have been harmed by ARM's breach, which allowed ARM to access, use and profit from NUVIA Technology and Confidential Information, which belongs to the Defendants.  ARM is providing the NUVIA Confidential Information to third parties that are in direct competition with Qualcomm.  Further discovery is required to determine the precise scope of harm Defendants have suffered—and the precise benefits ARM has wrongfully incurred—as a result of ARM's breach.**

~~b~~c. **ARM Continued ~~To~~to Threaten Qualcomm**

~~234~~246.      After NUVIA's certification, ARM responded by purporting to impose even more onerous demands than required by the termination provisions.  In an April 29, 2022 letter, ARM wrote to confirm that: "both Qualcomm and NUVIA . . . will not proceed with any

further development of NUVIA technology that embodies or is derivative of Arm confidential information or technology."

235247.        The termination provisions do not, by their plain language, require any such thing.  They require only that NUVIA ███████████████████████████ ████████████████████████████████████████████████████ ██████████        These provisions apply only to NUVIA, not Qualcomm.  And, of course, Qualcomm owns its own licenses to ARM Confidential Information and Technology.

236248.         Moreover, in this April letter, ARM stated that "Arm does not believe that the NuVia [sic] technology discussed above constitutes or can form the basis of an Arm Compliant Product or Architecture Compliant Product for purposes of the relevant Qualcomm agreements with Arm."  This assertion was incorrect because of Qualcomm's own licenses, which do not restrict Qualcomm's ability to develop CPU cores using Qualcomm's technology, including technology it acquired from NUVIA.

237249.        Then, on August 2, 2022, ARM told Qualcomm that "Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the NUVIA technology."   In other words, ARM contended—with absolutely no basis—that Qualcomm cannot use *any* of NUVIA's intellectual property, proprietary designs, or confidential information, which include technology that ARM did not own or develop.  ARM's demands go far afield of ARM Confidential Information or ARM Technology.  ARM is pretending that it has rights over NUVIA Technology and NUVIA Confidential Information, a position that is baseless in light of the actual provisions of the NUVIA agreements.  ARM also threatened Qualcomm's customers, asserting that "[n]either Qualcomm nor its customers are licensed to use any part of

Arm's broad intellectual property portfolio with respect to such products. Arm will use all necessary means to protect its legal rights."

~~238~~**250**. ARM's threats are baseless. ARM apparently contends that it has rights over all technology, proprietary designs, and confidential information developed by NUVIA, including technology that had absolutely nothing to do with ARM. But ARM has no right to demand destruction of that technology. ARM does not own CPU and/or SoC designs of its licensees, as ARM's license agreements and its statements to regulators make clear.

~~239~~**251**. There are no provisions in either the NUVIA-ARM agreements or the Qualcomm-ARM agreements that:

**a.** prohibited Qualcomm from purchasing NUVIA or acquiring NUVIA's technology;

**b.** required Qualcomm to obtain ARM's consent to purchase NUVIA or access NUVIA's technology;

**c.** mandate that Qualcomm stop using any NUVIA technology it acquired;

**d.** mandate that Qualcomm destroy NUVIA's technology;

**e.** prohibit the transfer or disclosure of NUVIA's technology or confidential information to Qualcomm;

**f.** limit the use of NUVIA technology only to NUVIA; or

**g.** require Qualcomm to obtain ARM's consent to further develop any in-process designs or technology that Qualcomm acquired from NUVIA.

**IV. ARM ~~CONTINUES~~CONTINUED TO SUPPORT QUALCOMM'S DEVELOPMENT WORK**

~~240~~**252**. Despite ARM's demands that Qualcomm destroy and stop using NUVIA technology, for approximately one year, ARM **engineers** continued to provide verification support to Qualcomm in developing the Phoenix Core and related SoCs, and also continued to acknowledge the Defendants' rights under the Qualcomm ALA and TLA to that technology.

241253.     For example, on April 12, 2022—after Qualcomm certified that it had destroyed all NUVIA-acquired ARM Confidential Information—ARM accepted test results verifying that the implementation of the Phoenix Core in the Server SoC complied with the requirements necessary to execute ARM's instruction set.  ARM explicitly validated this testing under the Qualcomm ALA.

242254.     Similarly, in May of 2022, Qualcomm received an email from ARM stating that the Compute SoC—which integrated technology acquired from NUVIA and was first developed after Qualcomm's acquisition of NUVIA—had passed all relevant tests and was ARM-compatible.  Yet, ARM's engineering team noted that it could not yet send a formal compliance waiver because ARM's legal team was withholding it.

V.     ARM IS ATTEMPTING TO DISRUPTUNFAIRLY AND UNLAWFULLY ATTEMPTED TO PREVENT QUALCOMM'S CUSTOMER RELATIONSHIPS BY MISREPRESENTING QUALCOMM'S ALACUSTOM CORES FROM COMPETING WITH ARM'S OWN CORES.

255.     Discovery has revealed that ARM views Qualcomm as a competitor against ARM's own CPU designs—and an impediment to ARM's business strategy.

256.     ARM stated explicitly to regulators in connection with review of the proposed acquisition of ARM by NVIDIA that Qualcomm competes "head-to-head with the licensees that use ARM's own CPU designs, such as MediaTek,"[34] and, in internal documents, ███████████████████████████

████████████████████████████████████████████

---

[34]   Dec. 20, 2021 "Initial Submission" re: "Anticipated Acquisition By NVIDIA Corporation Of ARM Limited ME/6906/20" at 6.

███████████████████████████████████████████████████████

███████████████

**257.** **At the same time, ARM employees acknowledged in internal emails and chat communications that** ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

**258.** **In an effort to limit competition posed by Qualcomm's custom CPU, ARM systematically and persistently used its access to information about Qualcomm's products and relationships with Qualcomm's customers to unfairly, unlawfully, and fraudulently attack Qualcomm and its custom CPU.**

**259.** **ARM used a variety of tactics to accomplish this, including by misrepresenting Qualcomm's license agreements with ARM, threatening Qualcomm customers, and violating its contractual obligations to make reasonable efforts to provide Qualcomm with deliverables paid for under the Qualcomm license agreements.**

**a.** **ARM Misrepresented Qualcomm's Licenses And Threatened Qualcomm Customers In An Effort To Thwart Competition From Qualcomm**

~~243.~~ ~~Since filing the~~ ~~Complaint in this case~~ ~~on August 31, 2022,~~**260.** ARM has persistently and wrongfully attempted to disrupt Qualcomm's business and customer relationships by spreading misinformation about the nature of Qualcomm's ARM licenses to customers that purchase Qualcomm's ARM-compatible cores and chipsets.

~~244~~**261**. ARM has engaged in this misinformation campaign directly through its leadership and through the leadership of its owner, SoftBank, acting on ARM's behalf, in an

attempt to damage Qualcomm, disparage its products, disrupt Qualcomm's relationships with its customers, and create uncertainty where there is none.

245.    At least as early as October 2022, ARM falsely stated to one or more of Qualcomm's longstanding original equipment manufacturer ("OEM") customers that unless they accept a new direct license from ARM on which they pay royalties based on the sales of the OEM's products, they will be unable to obtain ARM-compliant chips from 2025 forward.  ARM has also threatened at least one OEM that, if the OEM does not do so, ARM will go on to license the OEM's large competitors instead—the implication being that the OEM would be excluded from the market and could not obtain any ARM-compliant chips from Qualcomm or any other supplier, including "off-the-shelf" chips from ARM under a TLA.  ARM has done this despite already having approached the OEM's competitors with  a direct licensing offer, while acting as if ARM would only approach the competing OEMs if the threatened OEM declined the license in the first instance.

246262.    ARM also told one or more Qualcomm customers that, when the existing TLA agreements expire, ARM will cease licensing CPUs to all semiconductor companies—including Qualcomm—under an ARM TLA.  ARM claimed that it is changing its business model and will only provide licenses to the device-makers themselves.  ARM has explained to the OEMs that a direct OEM license will be the only way for device-makers to get access to ARM-compliant chips.

247263.    ARM is trying to coerce such customers into accepting its direct license by falsely asserting that Qualcomm will not be able to provide them with ARM-compliant chips beginning in 2025 because Qualcomm's ARM license agreements terminate in 2024, that ARM

will not extend its licenses with Qualcomm, and that ARM will not allow Qualcomm to ship products from 2025 forward.

248264. These statements are unequivocally false and are intended to harm Qualcomm's relationships with its customers—and to secure lucrative contracts with those customers for ARM—by calling into question Qualcomm's ability to maintain its ARM licenses beyond 2024 and provide products to its customers, despite Qualcomm having a clear right to do so for years to come under its ARM licenses.

249265. Qualcomm is licensed for several years past 2025 under its ALA, which provides Qualcomm with the unilateral right to extend the contract past the initial term for several more years. Specifically, the ALA states:



250266. Accordingly, because the Qualcomm ALA has not been terminated—and because no event has occurred that would give rise to a right to terminate—the initial term of the license will continue until ▮▮▮▮▮. Qualcomm then has the right to extend the license until ▮▮▮▮▮. Accordingly, ARM does not have the right to refuse to extend Qualcomm's license or stop Qualcomm from shipping its products in 2025.

251267. Moreover, ARM has no right to require additional royalties from Qualcomm's customers. Qualcomm's ALA provides Qualcomm with an exhaustive license, meaning that ARM is not entitled to go and seek another royalty from Qualcomm's customers on the same products for which ARM has received a royalty from Qualcomm.

252268.     ARM's coercion efforts did not stop with these false statements about Qualcomm's license agreements.  To apply more pressure, ARM further stated that Qualcomm and other semiconductor manufacturers will also not be able to provide OEM customers with other components of SoCs (such as graphics processing units ("GPU"), neural processing units ("NPU"), and image signal processor ("ISP")), because ARM plans to tie licensing of those components to the device-maker CPU license.

253269.     ARM also claimed that it had already informed Qualcomm about its new business model that requires a direct license with the OEMs.  That statement is false.  ARM has not notified Qualcomm that it will be requiring direct licenses from device-makers.  ARM did not tell Qualcomm that it intends to stop licensing CPU technology as a standalone license, that it will no longer license CPU technology to semiconductor companies, or that it will require licensees to obtain other technologies (notably ARM's GPU and NPU technology) only from ARM.  As noted above, these attempted or threatened changes in ARM's business model do not account for Qualcomm's existing agreements with ARM.

254270.     While ARM's statements about Qualcomm have no basis in fact, they cause significant reputational damage and harm Qualcomm's customer relationships.  Moreover, while ARM's goal may be to harm Qualcomm—and to coerce contracts with Qualcomm's customers that are unnecessary in view of the fully exhaustive rights it has granted Qualcomm under its contracts—its tactics will result in harm to ARM's customers and licensees throughout the industry.

**b.     ARM Attempted to Disrupt Qualcomm's Development of Custom Cores By Failing to Provide Deliverables To Which Qualcomm Is Entitled**

271.   After filing its Complaint in this case, ARM attempted to disrupt Qualcomm's development of custom cores under its ALA by refusing to provide deliverables to which Qualcomm is contractually entitled.

272.   ███████ of the Qualcomm ALA requires ARM to ████████████

██████████████████████████████████████████████████

█████████████ and to ████████████████████████████

██████████████████████████ ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

273.   Under ████████ of the Qualcomm ALA, where ARM ████████████

██████████████████████████████ any breach of ████████ of the Qualcomm ALA, ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

274.   Qualcomm first discovered that ARM was withholding ARM Technology under the Qualcomm ALA in the fall of 2022. At this time, Qualcomm was embarking on its verification process for its ████████. As is the customary practice between an ALA licensee and ARM, ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████ ████ ████████████████████████████████████████████████████ █ to the ALA.

**275.** On November 3, 2022, Qualcomm notified ARM in writing of its failure to ███████████████████████████████████, stating explicitly that ARM should take the letter as "Qualcomm's required notice under ████████ that ████████████████ ████████████ █ ███████ █ ██████████████████████████████████ █ Qualcomm's letter otherwise complied with the notice requirements set forth in the Qualcomm ALA.

**276.** After not hearing from ARM, Qualcomm sent a follow-up letter on December 5, 2022.

**277.** ARM responded on December 6, 2022. In its response, ARM stated that it disagreed that ████████ was at issue ████████████████████████████████ ARM additionally asserted that ██████████████ are governed by ████████ of the Qualcomm ALA, not ████████, and that remedies for a breach of that section do not include ████████████████████████.

**278.** ARM additionally claimed that ████████████████████████████ stating explicitly that ███████████████████████████ ███ ████████████████████, ARM claimed that ████████████████████████████████████████ ARM was definitive in its factual assertions, stating that ████████████████████████████ █ ████████ ████████████.

**279.** ARM's letter additionally threatened Qualcomm that if it did not drop its invocation of ████████, ARM would take steps to harm Qualcomm. ARM claimed that

Qualcomm's invocation of █████████ was █████████████████████████████████ ██████ and that, to the extent █████████████████████████████████████████ ██████████, ARM would ███████████████████████████████████  ARM further stated that Qualcomm's letter was █████████████████████████████████ which ARM purported was ████████████████████████████████ ██████ ██████████████████████████████

280.    More than a year later, discovery has revealed that ARM's December 6, 2022 letter misrepresented the facts—and concealed ARM's strategy of ████████████████ ████████████████████████████████████████████, seemingly in an effort to create leverage by causing Qualcomm legal and economic duress.

281.    In response to Qualcomm's requests for production, ARM produced an October 2022 email chain in which Richard Grisenthwaite █████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

282.    Later in the email chain, on October 10, 2022, ARM engineer Vivek Agrawal ████████████████████████████████████████

283.    ███████████████████████████████████.

284.    Mr. Agrawal's documents and testimony additionally revealed that ARM █████████████████████████████████████████████

285.    Mr. Agrawal stated at his December 13, 2023 deposition that ██████████ █████████████████████████████████████████████████ █████████████████████████████ In his deposition, Mr. Grisenthwaite ███████

██████████████████████████████████████████████████████████████

████████████████████████ l.  Neither Mr. Agrawal, nor Mr. Grisenthwaite, ████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

286.    The applicable ██████ to the Qualcomm ALA includes the ██████████

██████████████████████████████████████████████████████████

287.    Accordingly, when it was revealed through document and deposition testimony that, contrary to ARM's December 6, 2022 letter, ARM had ██████████

████████████████████████████████████████, it became clear that ARM breached its obligations under ██████████ of the Qualcomm ALA.

288.    Qualcomm was unable to ascertain this information prior to document discovery and depositions of Mr. Grisenthwaite and Mr. Agrawal.

289.    ARM's in-house counsel concealed the facts, explicitly (and definitively) stating in ARM's December 6, 2022 letter that ████████████████████████████

██████████████████████████████ Qualcomm did not have a valid basis to dispute that factual representation without discovery.

290.    This is particularly true for the ███████████████████████████████

██████████ ████████████████████████████████████████████████. Accordingly, Qualcomm has no way of knowing definitively whether ARM had ████████

██████████████████████████████████████████████████

███████████████████████████████████ Mr. Agrawal's recent deposition testimony was the first time Qualcomm was able to confirm ██████████████

████████████████████████████████████.[35]

[35]  Even today, Qualcomm's team is not aware that ██████████████████████████ ██████████████████████████ ARM designated its documents and testimony



291.   ARM's failure to ███████████████ increased Qualcomm's burden in verification.

292.   By failing to ████████, ARM forced Qualcomm to expend time and resources to ensure that Qualcomm could verify its products, even in the absence of ██ ████████████████████████

293.   Similarly, by failing to ██████████, ARM forced Qualcomm to use its own engineers to address issues that would have been addressed by ████████ ████████████████████ Qualcomm was damaged as a result.

294.   Additionally, because Qualcomm notified ARM of its failure to ████ ███████████████████████ and ████████████████████, Qualcomm was entitled to ██████████████████████████ as a result of ARM's continued concealment of its breach.

## VI.   ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION ARE HARMFUL TO THE INDUSTRY AND TO ARM ITSELF

~~255~~295.   ARM's mercenary desire to thwart innovation is nothing new.  Prior to Qualcomm's acquisition of NUVIA, in September 2020, NVIDIA announced that it was going to acquire ARM to "bring[] together NVIDIA's leading AI computing platform with Arm's vast ecosystem to create the premier computing company for the age of artificial intelligence."  The

---

████████████████████ ARM designated its documents and testimony on this issue as highly confidential and attorneys' eyes only, ensuring that Qualcomm's business and engineering teams could not learn these facts.

announcement led to immediate antitrust concerns, regulatory challenges, and public opposition from many companies, including Qualcomm.  The near universal concern was that an NVIDIA-controlled ARM would impede innovation and lead to higher prices.  On February 7, 2022, ARM and NVIDIA announced that the acquisition would be terminated.

~~256~~**296**.     Only three days before that announcement—when it was no doubt clear to ARM that the acquisition would not close—ARM sent its termination letter to the Defendants, terminating NUVIA's license agreements and demanding that Qualcomm stop working on any of the NUVIA technology.  As Qualcomm was one of the more public opponents of the acquisition, ARM's actions appear to be retributive.

~~257~~**297**.     Although ARM's efforts to destroy Qualcomm's innovation and prevent Qualcomm from expanding and advancing technology may in the short term, create the illusion of ARM achieving greater profitability—either by effectively strongarming Qualcomm into paying additional, unjustified royalties or through eliminating Qualcomm as a competitor in the custom CPU and server SoC space—in the long term it only harms ARM's interest and weakens the place in the market ARM hopes for after its IPO because it is injurious to ARM customers and licensees.  ARM's positions are directly contrary to the purpose of the ALA, which will have little value if licensees are not assured that they can use it to develop their own CPU core technology, at their own risk and expense and for their own benefit.

<h2 style="text-align:center;">~~COUNTERCLAIM~~ COUNTERCLAIMS</h2>

<h3 style="text-align:center;">COUNT I</h3>

<strong>(Declaratory Judgment)</strong>

~~258~~**298**.     Defendants incorporate by reference all allegations set forth in the preceding paragraphs 1-47 and 175-257 as though fully set forth herein.

259**299**.      Defendants are entitled to declaratory judgment that:

a.      Defendants did not breach the NUVIA ALA and NUVIA TLA;

b.      After Qualcomm's acquisition of NUVIA, Qualcomm's architected cores (including all further developments, iterations, or instantiations of the technology acquired from NUVIA), Server SoC, and Compute SoC, are fully licensed under Qualcomm's ALA and TLA for the full terms of those licenses;

c.      ARM's statements that Qualcomm's ALA expires in 2024 are false;

d.      ARM's statements that Qualcomm will be unable to deliver ARM-compliant products after 2024 are false;

e.      **ARM breached the Qualcomm ALA by withholding deliverables ARM was obligated to make** ███████████████ **to deliver under** ███████ **of the Qualcomm ALA;**

f.      **As a result of ARM's breach of** ███████ **of the Qualcomm ALA, Qualcomm is entitled to** ████████████████████████
███████████████████

g.      **Qualcomm's efforts to seek a remedy under** ████████ **of the Qualcomm ALA that provision** ██████████████████████
██████**;**

h.      **ARM breached the NUVIA ALA by failing to fulfill its termination obligations under** ████████**;**

e**i**.      ARM has no right to prevent Qualcomm from shipping its validly-licensed products.

260**300**.      A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-2202 *et seq.*) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that it can continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA, the Qualcomm TLA, the NUVIA ALA, or the NUVIA TLA.

261**301**.      A valid and justiciable controversy exists between ARM and Qualcomm because ARM is attempting to prevent Qualcomm from exercising its rights under its license

agreements with ARM, including by bringing suit claiming that Defendants breached NUVIA's license agreements with ARM.

## COUNT II

### (Breach of ███████ of the Qualcomm ALA)

302. Defendant Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

303. The Qualcomm ALA is a valid, binding contract.

304. ARM failed to fulfill its obligation under ███████ of the Qualcomm ALA because it ████████████████████████████████████████████████

█████████████████████████████████████

305. Accordingly, ARM did not ████████████████████

██████████████████████████████████████

and to ██████████████████████████████████████

████████████████████ as is required by ███████ of the agreement.

306. Qualcomm ██████████████████████████████████

██████████████ as is required under the contract.

307. As a proximate result of ARM's breach of contract, Qualcomm has been damaged by delay that could have been avoided had ARM fulfilled its obligations and █

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████

## COUNT III

### (Breach of ███████ of the NUVIA ALA)

308.    Defendants repeat and reallege all of the preceding allegations as if set forth fully herein.

309.    The NUVIA ALA was a valid, binding contract.

310.    ARM failed to fulfill its termination obligations to NUVIA, as set forth in ███████ of the NUVIA ALA, by ████████████████████ ████████████████████████

311.    As a proximate result of ARM's breach of contract, Defendants have been damaged in an amount to be proven at trial.

## COUNT IV

### (Breach of ███████ of the NUVIA TLA)

312.    Defendants repeat and reallege all of the preceding allegations as if set forth fully herein.

313.    The NUVIA TLA was a valid, binding contract.

314.    ARM failed to fulfill its termination obligations to NUVIA, as set forth in ███████ of the NUVIA ALA, by ████████████████████ ████████████████████████

315.    As a proximate result of ARM's breach of contract, Defendants have been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants request judgment and relief as follows:

**a.** For the declaratory judgments set forth in Defendants'

~~counterclaim~~**counterclaims**;

**b.** For an Order enjoining ARM from:

(i) making any claim that Qualcomm's CPU products, including products that contain technology acquired from NUVIA, are not licensed under Qualcomm's agreements with ARM, are not ARM-compatible, cannot be commercialized as ARM-compliant, or that Qualcomm is prohibited from using ARM's marks in the marketing of any such products;

(ii) misrepresenting the scope, terms, or rights granted to Qualcomm under its agreements with ARM; and

(iii) making false statements about Qualcomm's ability to sell its CPU products to its customers, the media, analysts, or others;

**c.** For an Order requiring ARM to comply with its obligations under Qualcomm's license agreements without discrimination or retaliation;

**d.** **For damages in an amount deemed appropriate by the Court;**

**d~~e~~.** For an award of attorney's fees and costs as allowed by law; and

**e~~f~~.** For such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

OF COUNSEL:
Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
**Brian Shiue**
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

**Catherine Nyarady**
Erin J. Morgan
**Anna R. Gressel**
**Madalyn G. Vaughn**

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendants*

**Jacob A. Braly**
**Alexander M. Butwin**
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

**Andrea L. D'Ambra**
**Susana Medeiros**
**NORTON ROSE FULBRIGHT US LLP**
**1301 Avenue of the Americas**
**New York, NY  10019**
**(212) 318-3000**

**Kira Latham**
**NORTON ROSE FULBRIGHT US LLP**
**2200 Ross Avenue, Suite 3600**
**Dallas, TX  75201**
**(214) 855-8000**
October 26, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 21, 2024, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                    *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Plaintiff*

Michael A. Jacobs, Esquire                                 *VIA ELECTRONIC MAIL*
Joyce Liou, Esquire
Diek Van Nort, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                                     *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                                *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
*Attorneys for Plaintiff*

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)

# EXHIBIT 3

```
                                              Page 1

 1        H I G H L Y   C O N F I D E N T I A L

 2                ATTORNEYS' EYES ONLY

 3        IN THE UNITED STATES DISTRICT COURT

 4            FOR THE DISTRICT OF DELAWARE

 5                        C.A. NO: 22-1146 (MN)

 6     -----------------------------------

 7     ARM LTD., a UK Corporation,

 8

 9            Plaintiff,

10     v.

11     QUALCOMM INC., a Delaware corporation,

12     QUALCOMM TECHNOLOGIES, INC., a

13     Delaware Corporation, and NUVIA, INC., a

14     Delaware Corporation,

15            Defendants.

16     -----------------------------------

17       Deposition of RICHARD GRISENTHWAITE, taken by AILSA

18       WILLIAMS, Certified Court Reporter, held at the

19       offices of Norton Rose Fulbright, London, United

20       Kingdom, on 15 November, 2023 at 9:00 a.m

21

22

23

24

25
```

# EXHIBIT 4

1          IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE

2

ARM LTD.,                  §

3                          §

   Plaintiff and           §

4    Counterclaim Defendant §

                           §

5  VS.                     §      CIVIL ACTION NUMBER

                           §      22-1145 (MN)

6  QUALCOMM INC., QUALCOMM  §

TECHNOLOGIES, INC. and     §

7  NUVIA, INC.,            §

                           §

8    Defendants and        §

     Counterclaim Plaintiffs§

9

10

11

12          CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14

15          VIDEOTAPED ORAL DEPOSITION OF

16                MARK WERKHEISER

17                 Austin, Texas

18              December 7, 2023

19                  9:12 a.m.

20

21

22

23  Reported by:

24  Micheal A. Johnson, RDR, CRR

25  Job No. 6326913

# EXHIBIT 5

Page 1

```
 1            IN THE UNTIED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3    ─────────────────────────────────
                                        )
 4    ARM, LTD,                         )CASE NO.:
                                        )
 5                     Plaintiff,       )22CV1146MM
                                        )
 6            v.                        )
                                        )
 7    QUALCOMM INC., QUALCOMM           )
      TECHNOLOGIES, INC. And Nuvia,     )
 8    INC.,                             )
                                        )
 9                     Defendants.      )
      ─────────────────────────────────)
10
11
12
13
14
15            DEPOSITION OF VIVEK AGRAWAL
16                      VOLUME I
17            REMOTELY IN BANGALORE, INDIA
18            THURSDAY, DECEMBER 14, 2023
19
20
21
22
23
24    REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR
                      CSR NO. 14125
25    JOB NO.:       6326948
```

# EXHIBIT 6

| | |
|---|---|
| **From:** | Vaughn, Madalyn |
| **Sent:** | Monday, January 22, 2024 2:22 PM |
| **To:** | Li, Jack; Fung, Nicholas Rylan; Olson, Erik J. (Palo Alto); Jacobs, Michael A.; Llewellyn, Scott F.; Muino, Daniel P.; Mooney, Kyle W.; Liou, Joyce; Brickey, Sarah E.; Davenport, Lydia; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM |
| **Cc:** | GRP-QC; Dunn, Karen L; Isaacson, William A; Nyarady, Catherine; Zappala, Melissa Felder; Gressel, Anna R; Braly, Jacob; jying@morrisnichols.com; Blumenfeld, Jack; Morgan, Erin J |
| **Subject:** | RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN |

Counsel:

We write in response to your January 22, 2024 emails regarding Qualcomm's proposed extension to the case schedule and draft amended counterclaims. As an initial matter, we disagree with ARM's unsupported statement that Qualcomm's characterization of the parties' discussions to date is "not accurate." (1/22/2024 Email from J. Li.) We also disagree that Qualcomm has "fail[ed] to make definitive proposals" (*id.*) on these issues, and address below the one purported example that ARM cites concerning the potential filing of Qualcomm's counterclaims as a new action.

With respect to the case schedule, the "delay by ARM" referenced in Qualcomm's January 20, 2024 email is a clear reference to ARM's delay responding to Qualcomm's proposed extension to the case schedule. Specifically, Qualcomm contacted ARM about this issue on January 3, 2024 and, following the parties' January 5, 2024 meet and confer, sent ARM a proposed revised case schedule on January 8, 2024. (1/8/2024 Email from E. Morgan.) Despite the parties' two meet and confers since that time, ARM failed to send a counterproposal until two weeks later when counsel for ARM circulated a counterproposal this morning—merely 3 minutes before sending your below email claiming that ARM had "already sent Qualcomm a counterproposal" concerning the schedule. (*See* 1/22/2024 Email from J. Li at 11:21 a.m. ET (sending counterproposal); 1/22/2024 Email from J. Li at 11:24 a.m. ET (claiming that ARM had "already sent a counterproposal").)

Moreover, ARM's counterproposal that we received this morning does not address Qualcomm's concerns with the existing case schedule. Instead, under the guise of addressing Qualcomm's concern about the time allotted to depose experts, ARM has proposed a revised case schedule that prejudices Qualcomm by decreasing its time to submit rebuttal reports to ARM's five expert reports by 11 days, while only decreasing ARM's time to submit reply reports by 3 days. This proposal is not workable. As ARM is well aware, experts are already in the process of drafting rebuttal reports based on the current schedule. To propose shortening that schedule by nearly two weeks (and making rebuttal reports due in less than a month, when no one has been working toward that deadline) is impracticable and prejudicial. To the extent ARM viewed this as a real solution, it could have proposed it weeks ago, before expert work had been taking place for more than a month. Additionally, ARM's proposal does not address the other concerns with the existing schedule that Qualcomm has raised during the parties' meet and confers. Namely, that there are still fact discovery issues in the process of being resolved, including (a) Qualcomm's production of commit logs, which requires Qualcomm to collect, review and produce 100,000 pages of technical documents and which Qualcomm has already stated will not be complete until February 9, and (b) ARM's insistence as recently as January 16 that it may still seek fact depositions from two Qualcomm witnesses, Jonathan Weiser and John Bruno. ARM's proposal also fails to take into consideration Qualcomm's stated intent to seek leave to amend its pleadings to add additional counterclaims.

With respect to Qualcomm's amended counterclaims, Qualcomm's local counsel will coordinate with ARM's local counsel this afternoon to contact the Court. To clarify Qualcomm's question regarding whether ARM would oppose Qualcomm filing the amended counterclaims as a new action, Qualcomm is requesting that ARM confirm whether—notwithstanding the language in Paragraph 34 of the Protective Order that "Protected Material produced by a Party . . . may be used by the Receiving Party only for purposes of this Litigation" (D.I. 38)—ARM would consent to Qualcomm's

use of such material in filing a separate action to assert its additional counterclaims, or consent to amend the Protective Order to expressly permit Qualcomm's use of such material in a related matter. Please provide ARM's position on this issue by 3:30 p.m. ET today.

Qualcomm reserves all rights.

Best,
Madalyn


**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Monday, January 22, 2024 11:24 AM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Morgan, Erin J <ejmorgan@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We write in response to your January 21 email regarding Qualcomm's proposed (1) changes to the current case schedule and (2) amendment to the pleadings. Qualcomm's characterization of the parties' discussions is not accurate. But you are correct that Arm continues to oppose Qualcomm's proposed changes to the schedule and the pleadings, in part because Qualcomm continues to fail to make definitive proposals. For example, it is unclear what Qualcomm means in asking "whether ARM would oppose Defendants filing the amended counterclaims as a new action." If Qualcomm has a proposal to make, please do so with specificity, so that Arm can assess.

With respect to the case schedule, we do not understand your vague reference to "delay by ARM," and Arm continues to believe that the current schedule remains workable. Nevertheless, to resolve the issue, Arm has already sent Qualcomm a counterproposal that should address Qualcomm's concern regarding timing of expert depositions, which was the sole reason Qualcomm identified on the January 19 meet-and-confer for proposing amending the case schedule.

With respect to Qualcomm's proposed amended counterclaims, as noted previously and consistent with the scheduling order, Arm is willing to have its Delaware counsel join a call to the Court regarding a letter briefing schedule for Qualcomm's contemplated motion to amend.

Best,

Jack

**Jack Li**
Associate
jackli@mofo.com
T: +1 (202) 887-1562

Morrison Foerster
2100 L Street, NW, Suite 900
Washington, DC 20037

**Morrison Foerster**

mofo.com | LinkedIn | Twitter

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Saturday, January 20, 2024 10:40 PM
**To:** Li, Jack <JackLi@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Morgan, Erin J <ejmorgan@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

---

Counsel:

We write to memorialize our January 19, 2024 meet and confer regarding the basis for ARM's objections to Qualcomm's proposed extension to the case schedule and draft amended counterclaims.

With respect to the case schedule, we understand ARM's objection to be its general belief that the current case schedule may be fine as is, and that the parties could wait and see if they are able to comply with the schedule as it currently exists.  Based on your January 19 email, we understand that ARM intends to object to Defendants' motion to extend the schedule on that basis.  As noted previously, in our view it is important to get to the Court by Monday on these issues, as we continue to fear that further delay by ARM risks availability of 2024 trial dates and inconveniencing the Court.  Accordingly, to the extent ARM is now considering making a counterproposal to Qualcomm's proposed schedule—which we heard for the first time yesterday, despite the fact that the reasons we stated for the proposed schedule adjustment were no different yesterday than those we articulated previously on our January 5, 2024 and January 16, 2024 meet and confers—we ask (again) that ARM provide that information by Monday at 12 p.m. ET, so we can consider it before we file our motion.

With respect to Qualcomm's amended counterclaims, ARM also stated in its January 19 email that it plans to oppose Defendants' motion to amend the pleadings.  ARM was not prepared to engage in substantive discussions about the counterclaims, despite having the text of those claims—with supporting citations to depositions and documents in the record and descriptions of how and when the information underlying those claims was revealed in discovery—for 10 days.  When pushed, ARM articulated the following bases for its objection to Qualcomm's anticipated Rule 15 motion:  (i) ARM's lack of understanding with respect to how the amended counterclaims will impact the case schedule; (ii) ARM's lack of understanding with respect to how Qualcomm's amended counterclaims will be "treated procedurally"; and (iii) ARM's claim that Qualcomm lacked diligence with respect to its claim that ARM breached ███ ██ of the NUVIA ALA.  ARM also indicated that it "may" have additional arguments regarding diligence and a potential futility argument, but that it was not prepared to confer on those potential arguments at this time, and that, rather than discussing them, it would submit them to the Court in response to Defendants' motion to amend the pleadings.  ARM asked for no further information about the amended counterclaims, but again articulated that it would be interested to hear if Defendants had any unspecified "compromise proposals."

While Defendants believe that the parties are at an impasse on the issues of scheduling and Defendants' efforts to amend the counterclaims, we are interested to know whether ARM would oppose Defendants filing the amended counterclaims as a new action.  Please let us know your thoughts by Monday at 12 p.m. ET, and please also provide local counsel's availability to jointly contact the court on Monday regarding a briefing schedule for Qualcomm's Rule 15 motion.

Qualcomm reserves all rights.

Best,
Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Friday, January 19, 2024 11:47 AM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Morgan, Erin J <ejmorgan@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We are available during the previously-scheduled meet-and-confer (from 3 to 3:30 PM ET), and can discuss these issues on that call.

Thank you,
Jack

**Jack Li**
Associate
jackli@mofo.com
T: +1 (202) 887-1562

Morrison Foerster
2100 L Street, NW, Suite 900
Washington, DC 20037

**ⅢORRISON FOERSTER**

mofo.com | LinkedIn | Twitter

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Friday, January 19, 2024 8:20 AM
**To:** Li, Jack <JackLi@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Morgan, Erin J <ejmorgan@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

---

Counsel:

We're available between 12 and 2:30 p.m. ET today to meet and confer regarding the basis for ARM's objections.  Please let us know if a time in that window works for ARM and we will send an invite.  To the extent a time during that window does not work, we can add this issue to our privilege log meet and confer later this afternoon.

Best,
Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**

1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Friday, January 19, 2024 7:00 AM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Morgan, Erin J <ejmorgan@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We write in response to your January 17 email regarding Qualcomm's proposed (1) changes to the current case schedule and (2) amendment to the pleadings.  In view of the parties' discussion during the meet-and-confer, and Qualcomm's responses to the questions Arm raised, Arm continues to oppose Qualcomm's proposed changes to the schedule and the pleadings.

Consistent with the scheduling order, Arm is willing to have its Delaware counsel join a call to the Court regarding a letter briefing schedule for Qualcomm's contemplated Rule 15 motion, but does not understand there to be any need to contact the Court regarding Qualcomm's contemplated request to amend the schedule for currently pending claims (and further notes that it has not confirmed the absence of conflicts for its entire team for the week of December 9, given Arm's opposition to changing the trial date).

We are available to meet and confer further as necessary regarding the basis for Arm's objections, including the lack of specificity in certain aspects of Qualcomm's proposal and the status of current proceedings.

Thank you,
Jack

**Jack Li**
Associate
jackli@mofo.com
T: +1 (202) 887-1562

Morrison Foerster
2100 L Street, NW, Suite 900
Washington, DC 20037

**ΙΙΙMORRISON
FOERSTER**

mofo.com | LinkedIn | Twitter

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Thursday, January 18, 2024 11:54 PM
**To:** Li, Jack <JackLi@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Morgan, Erin J <ejmorgan@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

Counsel:

We write to follow up on our January 17, 2024 email regarding Qualcomm's proposed extension of the schedule and draft amended counterclaims.  Specifically, we write to reiterate our request for ARM to promptly provide its position on both of these issues, which we ask that ARM provide by no later than COB tomorrow (January 19).  To the extent we do not hear from ARM by tomorrow, we intend to approach the Court as it has now been more than two weeks since Qualcomm first raised these issues and we fear further delay by ARM risks the availability of trial dates and inconveniencing the Court.

Qualcomm reserves all rights.

Best,
Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

**From:** Vaughn, Madalyn
**Sent:** Wednesday, January 17, 2024 12:15 PM
**To:** Li, Jack <JackLi@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A

<wisaacson@paulweiss.com>; Nyarady, Catherine <CNyarady@paulweiss.com>; Zappala, Melissa Felder <MZappala@paulweiss.com>; Gressel, Anna R <AGressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Morgan, Erin J <ejmorgan@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel:

Following up on our meet and confer yesterday afternoon concerning Qualcomm's proposed extension of the schedule and intention to amend its counterclaims, we write to respond to the various questions ARM raised during our call, which we have summarized below.  For ease of review, we've included responses to the questions ARM raised in blue text below.

In order to address this issue while the Court is still available the week of December 9, 2024—which we understand from our discussion yesterday to be a week during which neither party is presently aware of any conflict—we think the parties need to contact the Court by no later than the end of this week to (i) address the schedule, and (ii) request a briefing schedule and argument for the Rule 15 motion.  Please provide your local counsel's availability this Thursday (January 18) to call the Court regarding these issues.  As discussed during our call and in the interest of time, to the extent ARM has further questions on these issues that can easily be addressed in writing, such as many of those below, we ask that ARM please promptly send them via email rather than delay raising them until the parties speak on a meet and confer.

1. Please confirm that Qualcomm will provide a redline against the first amended counterclaims prior to filing.  The current redline is attached.  Qualcomm reserves all rights to make further revisions to this redline prior to filing.  Please note that the redline is designated HC-AEO, but can be shared with your client (though it cannot be shared publicly).

2. Please provide Qualcomm's view about what the briefing schedule would look like for the Rule 15 motion.  As noted on our call yesterday afternoon, pursuant to Paragraph 8 of the Scheduling Order, the procedure outlined in Paragraph 7(g) of the Scheduling Order would govern the briefing schedule of a Rule 15 motion.  (*See* D.I. 26.)

3. Please confirm whether the proposed expert discovery dates in the revised case schedule Qualcomm provided would account for any supplemental expert discovery needed (if any) for the amended counterclaims.  As discussed during our call yesterday afternoon, Qualcomm will not know to what extent it needs supplemental expert discovery and on what subjects—if any—until the Court determines the scope of permissible amended counterclaims and until ARM files its answer and defenses.  The timing of any supplemental expert discovery will also necessarily depend on the scope of and timeline for any supplemental fact discovery.  However, as represented on our call, Qualcomm believes that any necessary supplemental expert and fact discovery should be a reasonably cabined universe such that it could proceed on a parallel schedule and not impact a December 9 trial date.

4. Related to the above, please confirm whether ongoing expert discovery and any supplemental expert discovery needed for the counterclaims would be on separate tracks, and if so, provide Qualcomm's anticipated timing/proposed deadlines for that separate expert track.  As discussed during our call yesterday afternoon, and as previewed above, Qualcomm's view is that any supplemental expert and fact discovery could proceed on a parallel track to the scheduled outlined in Qualcomm's proposed revised case schedule.  In other words, any supplemental discovery could be scheduled around the deadlines in Qualcomm's proposed revised case schedule without the need to adjust any of those proposed deadlines.

5. Please confirm that Qualcomm intends to seek to move the case schedule (including the trial date) irrespective of whether the Court permits Qualcomm to amend its counterclaims.  Qualcomm confirms that it intends to seek an extension to the schedule, including by moving the trial date to the week of December 9, 2024, irrespective of the outcome of the separate motion it intends to file seeking to amend its counterclaims.  As discussed during our meet and confers to date regarding this issue, Qualcomm's view is that the current

schedule is unworkable and the modest extension it proposes is necessary to allow the parties to timely wind up any remaining fact discovery issues, depose the significant number of experts in this case in a reasonable number of days, and brief Daubert and dispositive motions without cutting into the Court's time to decide those motions.

6. Please confirm whether Qualcomm has any alternatives in mind other than amending the pleadings. During our call yesterday afternoon, ARM further explained its question by asking whether Qualcomm would still seek to amend its counterclaims even if ARM offered a "compromise" position (for example, by agreeing to a December 9 trial date in exchange for Qualcomm dropping its proposed amended counterclaims). Subject to Qualcomm's positions set forth in our responses to the questions above, Qualcomm will consider any "compromise" proposal ARM makes, but cannot hypothetically determine whether such a proposal would be acceptable.

Best,
Madalyn


**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Morgan, Erin J <ejmorgan@paulweiss.com>
**Sent:** Tuesday, January 16, 2024 2:25 PM
**To:** Li, Jack <JackLi@mofo.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Hi Jack—

When I just spoke to Kyle 10 minutes ago, we confirmed that 2:30 pm EST today worked. Why are we now not able to proceed as scheduled?

Thanks,

Erin


**Erin J. Morgan** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3387 (Direct Phone) | +1 212 492 0387 (Direct Fax)
ejmorgan@paulweiss.com | www.paulweiss.com

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Tuesday, January 16, 2024 2:22 PM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Hi Madalyn,

We are available tomorrow from 10 AM to 1 PM ET or 2 PM to 4 PM ET. We are also available on Thursday (Jan. 18) after 10:30 AM ET. Please let us know any of those times work for you, and we can send an invite.

Thank you,
Jack

**JACK LI**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Tuesday, January 16, 2024 2:00 PM
**To:** Li, Jack <JackLi@mofo.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

Counsel:

We need to reschedule our call this afternoon at 2 p.m. ET as we unfortunately now have a conflict.  We will circle back as soon as possible with additional times we are available.

Best,
Madalyn


**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Vaughn, Madalyn
**Sent:** Friday, January 12, 2024 5:10 PM
**To:** Li, Jack <JackLi@mofo.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <CNyarady@paulweiss.com>; Zappala, Melissa Felder <MZappala@paulweiss.com>; Gressel, Anna R <AGressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel:

We are available on Tuesday, January 16 at 12 p.m. ET or 2 p.m. ET.  Assuming one of those times work for ARM, please send an invite.

Best,
Madalyn


**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Thursday, January 11, 2024 8:58 PM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>

**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We are not available tomorrow at 8:30 AM ET.  Please provide Qualcomm's availability for Tuesday, Jan. 16.

Thank you,
Jack

**JACK LI**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Wednesday, January 10, 2024 8:00 PM
**To:** Li, Jack <JackLi@mofo.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

---

Counsel:

We are not available at 9 a.m. ET on Friday, but can be available from 8:30-9 a.m. ET on Friday (1/12).  Assuming that works for ARM, please send an invite.

Best,
Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Wednesday, January 10, 2024 4:50 PM
**To:** Morgan, Erin J <ejmorgan@paulweiss.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

Thank you for sending Qualcomm's proposed schedule and summary of contemplated amendments. Please let us know if Qualcomm is available to meet and confer further on Friday (Jan. 12) at 9-9:30 AM ET regarding Qualcomm's proposal.

Best,
Jack

**JACK LI**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

**From:** Morgan, Erin J <ejmorgan@paulweiss.com>
**Sent:** Monday, January 8, 2024 7:26 PM
**To:** Fung, Nicholas Rylan <NFung@mofo.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Li, Jack <JackLi@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

Counsel—

Thank you for speaking Friday about a proposed extension of the schedule and Qualcomm's intention to amend its counterclaims. As discussed, we are writing to provide further details on both issues.

On the schedule, as discussed, Qualcomm proposes asking the Court to move the trial date to the week of December 9. This modest extension will allow the parties to create space in the schedule to wind up fact discovery disputes, depose the significant number of experts in this case, and brief Daubert and dispositive motions without cutting into the Court's time to decide those motions. A proposed schedule is attached.

As to the amended counterclaims, Qualcomm intends to assert three counterclaims, which are summarized below, with references to the bases for each claim.

Please let us know when you are available to meet and confer further on these issues.

Best,
Erin





2.



█████████████████████████

**Erin J. Morgan** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3387 (Direct Phone) | +1 212 492 0387 (Direct Fax)
ejmorgan@paulweiss.com | www.paulweiss.com

---

**From:** Fung, Nicholas Rylan <NFung@mofo.com>
**Sent:** Thursday, January 4, 2024 1:12 PM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Li, Jack <JackLi@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R <agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Madalyn,

We are available to meet and confer tomorrow at noon or 1 pm ET.

Best,

**NICHOLAS FUNG**
Partner | Morrison & Foerster LLP
707 Wilshire Boulevard | Los Angeles, CA 90017-3543
P: +1 (213) 892-5348
mofo.com | LinkedIn | Twitter

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Wednesday, January 3, 2024 12:36 PM
**To:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Li, Jack <JackLi@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; MoFo_Arm_QCOM <MoFo_Arm_QCOM@mofo.com>
**Cc:** GRP-QC <GRP-QC@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Gressel, Anna R

<agressel@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jying@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>
**Subject:** ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

<mark>External Email</mark>

---

Counsel:

We would like to meet and confer at your earliest convenience regarding (a) seeking an extension to the case schedule, including by moving the trial date, and (b) Qualcomm's intention to amend its counterclaims in this case.  Please let us know your availability tomorrow (Thursday, January 4) and Friday (January 5) for that discussion.

Best,

Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3974 (Direct Phone) | +1 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is

prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

================================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

================================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

================================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

================================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

================================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# EXHIBIT 7

# EXHIBIT 8

# EXHIBIT 9

# EXHIBIT 10

# EXHIBIT 11

# EXHIBIT 12

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) (LDH) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER

WHEREAS, the Court having considered Defendants' Motion for Leave to Amend Answer and Counterclaim, and any opposition thereto;

IT IS HEREBY ORDERED that Defendants' Motion is GRANTED.  Defendants are directed to file their amended answer and counterclaims on or before March 7, 2024.


**SO ORDERED**, this _____ day of _____, 2024.


_____
J.