**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

Plaintiffs,

v.

ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation,

Defendant.

C.A. No. 24-490 (MN)

**JURY TRIAL DEMANDED**

**STIPULATED ORDER FOR DISCOVERY, INCLUDING**
**DISCOVERY OF ELECTRONICALLY STORED INFORMATION ("ESI")**

After conferring on these matters, the Parties hereby stipulate to the following protocol for electronic discovery and respectfully ask the Court to enter this Order. Accordingly, and for good cause shown,

IT IS ORDERED that:

**1. General Provisions**

a. **Purpose**. This Stipulated Order will govern discovery of electronically stored information ("ESI") in this case. The term "ESI" carries its broadest meaning consistent with Fed. R. Civ. P. 26 and 34. Without limitation, ESI includes word-processing documents, PowerPoint or other presentation documents, spreadsheets, electronic design files and flowcharts, PDF files, image files (*e.g.*, JPEG and TIFF), and e-mail. Nothing in this Stipulated Order establishes any agreement as to either the temporal or subject matter scope of discovery. Nothing in this Stipulated Order creates an obligation by any Party to produce ESI on back-up tapes or other long-term storage media that were created for use as a disaster recovery medium. The Parties shall not be

obligated under this Stipulated Order to produce ESI that is no longer within their possession, custody, or control (*i.e.*, lost or deleted) as a result of the good-faith operation of an electronic information system or document retention policy. This Stipulated Order may be modified for good cause.

b. **Cooperation**. The Parties are aware of the importance the Court places on cooperation and hereby commit to cooperate in good faith throughout this matter consistent with this Court's Default Standard for Discovery and Fed. R. Civ. P. 26-36. The parties expect to reach agreements cooperatively on how to conduct discovery under Fed. R. Civ. P. 26-36. In the event that the parties are unable to agree on the parameters and/or timing of discovery, the following standards shall apply until further order of the Court, or the parties reach agreement.

c. **Proportionality**. The Parties agree to use reasonable, good faith and proportional efforts to preserve, identify, and produce relevant information.[1] This includes identifying appropriate limits to discovery, including limits on custodians, limits on discoverable data sources, identification of relevant subject matter, time periods for discovery and other parameters to limit and guide preservation and discovery issues. Requests for production and corresponding responses shall be reasonably targeted, clear, and as specific as practicable in compliance with Federal Rule of Civil Procedure 34(b)(1)(A).

d. **Preservation of Discoverable Information**. A party has a common law obligation to take reasonable and proportional steps to preserve discoverable information in the party's possession, custody, or control.

---

1 Information can originate in any form, including ESI and paper, and is not limited to information created or stored electronically.

(i) Absent a showing of good cause by the requesting party, the parties shall not be required to modify, on a going-forward basis, the procedures used by them in the ordinary course of business to backup and archive data; provided, however, that the parties shall preserve the non-duplicative discoverable information currently in their possession, custody, or control.

(ii) Absent a showing of good cause by the requesting party, the categories of ESI identified in **Schedule A** attached hereto need not be preserved or searched for responsive information.

e. **Privilege**.

(i) The parties will continue to confer on the nature and scope of privilege logs for the case, including whether categories of information may be excluded from any logging requirements. The privilege log should be provided within 30 days after substantial completion of production.

(ii) With respect to information generated after the filing of the Complaint, parties are not required to include any such information in privilege logs. Communications may be identified on a privilege log by category, rather than individually, if appropriate.

(iii) Logging of Redactions for Privilege. Partially privileged documents produced in redacted form may either be identified on a privilege log or the Producing Party shall provide a metadata field setting forth the nature of the privilege(s), as set forth herein. A Receiving Party may request a log identifying information sufficient to justify the claim of privilege provided in the metadata.

(iv) Contents of Privilege Log. Consistent with Fed. R. Civ. P. 26(b)(5), the following information should be provided (as applicable) in the privilege log for each document or category of documents:

(1) unique document identification numbers;

(2) nature of privilege or protection claimed (e.g., Attorney-Client Privilege, Work-Product);

(3) name of the authors (if known) – to the extent a document is an email or email chain, the name of the senders of the most recent email in the chain shall be identified;

(4) date range of documents in each category (based on metadata, for electronic documents);

(5) for emails, names of the recipient(s), including those in the TO, CC, and BCC fields;

(6) general nature of the reasons for the privilege assertion that, without revealing the information itself that is privileged or protected, is sufficient to enable the requesting party to assess the validity of the privilege claim.

(v) Challenges to Privilege Log.

(1) The parties retain the right to request metadata for individual documents and emails, including lesser-included communications in email strings, if necessary to properly assess the privilege claim for any document included in a categorical privilege log.

(2) If a requesting party believes in good faith that one or more items or categories in a producing party's privilege log should be produced and are inappropriately being withheld, then it shall raise the issue as to each log entry with the producing party in writing with

reasonably sufficient detail so that the producing party may understand the reasons for the requesting party's complaint. Within 7 calendar days, the producing party shall respond in writing. If the response does not satisfy the requesting party, then the parties shall meet and confer, and if the dispute as to the privileged nature of the material cannot be resolved, then the requesting party may seek relief from the Court as to the specific log entries raised with the producing party. Nothing in this procedure to challenge a Party's privilege log modifies the producing party's burden to establish the privileged nature of the withheld document.

(vi) Activities undertaken in compliance with the duty to preserve information are protected from disclosure and discovery under Fed. R. Civ. P. 26(b)(3)(A) and (B).

(vii) The Parties have conferred on an appropriate non-waiver order under Fed. R. Evid. 502, as set forth in the proposed Protective Order. Until a non-waiver order is entered, information that contains privileged matter or attorney work product shall be immediately returned if such information appears on its face to have been inadvertently produced or if notice is provided of inadvertent production.

(viii) Nothing in this Order, including any production of documents under the ESI protocol set forth herein, shall constitute a waiver by any Party for any purpose.

**2. Specific E-Discovery Issues**

a. **On-site inspection of electronic media**. Such an inspection shall not be permitted absent a demonstration by the requesting party of specific need and good cause.

b. **Search methodology**.

(i) If the producing party elects to use search terms to locate potentially responsive ESI from a particular data source, it shall disclose the search terms so used and any exclusion criteria (including, but not limited to, date restrictions). In analyzing possible search terms for use in locating potentially responsive ESI, the producing party may run test searches to analyze the suitability of possible search terms or exclusion criteria. Absent a showing of good cause based on the size, complexity, and issues of this specific case, a requesting party may request no more than 10 additional search terms for testing by the producing party with respect to the ESI data source(s) on which the producing party elected to use search terms to locate potentially responsive ESI. Within 14 days of receiving additional search terms from the requesting party, the producing party shall perform test searches for the requested search terms, disclose search terms results, and inform the requesting party whether it objects to any of the requested terms, including (but not limited to) search terms that return a disproportionate amount of non-responsive or immaterial ESI, or an unreasonably large number of results. In such cases, the parties shall work together to modify or revise the search terms as appropriate. If the parties cannot reach agreement regarding appropriate search terms, they shall submit their dispute to the Court in accordance with the Court's discovery dispute procedures. Without waiting for a ruling on the disputed search terms, the producing party shall use the undisputed search terms, if any, to search ESI. The identification of materials via agreed-upon searches shall not prevent the producing party from withholding such materials on the grounds that they are not responsive, or protected from disclosure by applicable privilege, immunity, or agreement between the parties. Notwithstanding prior agreement on the search terms to be used for electronic searches, if a search term returns a disproportionate amount of non-responsive or immaterial ESI, or an unreasonably large number of results, the parties shall (at the producing party's request) meet and confer to discuss application

of negative search restrictions, and the party receiving production shall not unreasonably oppose further restrictions to filter a disproportionate amount of non-responsive or immaterial ESI, or an unreasonably large number of results. After the parties come to agreement on reasonable terms, each producing party shall perform elusion testing of the ESI population that did not hit on search terms (the null set) by conducting a statistical sample (95% confidence level, +/- 2% margin of error) of the null set to confirm whether any responsive ESI was missed. If a producing party finds that more than 10% of the null set is responsive, the producing party will add terms as necessary to identify responsive ESI found in the null set, then conduct additional null set sampling and adding of additional search terms until the proportion of missed responsive ESI is less than 10%, provided that the additional terms return a proportion of responsive or material documents greater than the non-responsive or immaterial documents also resulting from the additional terms (after calibrating the terms to get reasonable precision).

(ii) Focused terms, rather than over-broad terms (*e.g.*, product and company names), shall be employed. A conjunctive combination of multiple words or phrases (*e.g.*, "computer" and "system") narrows the search and shall count as a single search term. A disjunctive combination of multiple words or phrases (*e.g.*, "computer" or "system") broadens the search, and thus each word or phrase shall count as a separate search term unless they are variants of the same word or are part of a conjunctive search term (*e.g.*, "computer" and "system" or "printer" or "mainframe"). Use of narrowing search criteria (*e.g.*, "and," "but not," "w/x") is encouraged to limit the search.

(iii) To the extent possible, the producing party shall locate potentially responsive ESI from (i) the non-custodial data sources identified in accordance with paragraph 3(b) of the Default Standard for Discovery; and (ii) the custodians identified in accordance with

paragraph 3(a) of the Default Standard for Discovery. The Parties shall exchange lists of the custodians whose data will be searched, as well as the applicable date ranges. The Parties agree to meet and confer on any additional data sources or custodians a requesting party identifies as having potentially relevant information.

c. **Technology Assisted Review (TAR)**. No Party can compel another Party to use TAR or to produce documents without human review over the producing party's objection. To the extent a producing party elects to use technology for prioritization or other workflows designed for review efficiency while still reviewing all of the documents within the review population, this use is not required to be disclosed to the requesting party. On the other hand, a producing party that elects to use TAR to cull documents from the review population shall promptly inform the requesting party of its intent to do so. The parties shall promptly meet and confer to agree on the information that must be disclosed regarding the producing party's proposed use of TAR, but at minimum, such disclosure shall set forth the tool it intends to employ, the validation methodology it intends to use, and exceptions to the application of TAR.

d. **Deduplication**. The parties shall de-duplicate stand-alone documents or entire document families globally using MD5, or SHA-1 Hash value matching. Deduplication shall not break apart families and shall be performed at a family level (for example, email attachments shall not be eliminated from the parent email). Hard copy documents shall not be eliminated as duplicates of responsive ESI. The producing party shall take reasonable steps to de-duplicate ESI on a family level globally (i.e., both within a particular custodian's files and across all custodians).[2] No Party shall be required to identify and/or eliminate electronic duplicates by manual review or

[2] There may be non-custodial data sources that cannot be globally deduped or for which global deduplication is not appropriate.

some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above. In globally de-duped, incremental productions, there will be instances when production of documents from additional custodians will include documents previously produced. A Custodian Append overlay load file using the load file format described above shall be provided with updated AllCustodian and AllFilePaths fields; BegBates and EndBates fields may be used as the unique identifiers.

e. **Format**. ESI and non-ESI shall be produced to the requesting party as text searchable image files (e.g., TIFF). When a text-searchable image file is produced, the producing party must preserve the integrity of the underlying ESI, *i.e.*, the original formatting; the metadata (as noted below); hidden comments, tracked changes, speaker notes, and columns, rows, and sheets; and, where applicable, the revision history. The parties shall produce their information in the following format: single-page TIFF greyscale format images and associated multi-page text files containing extracted text or OCR with Concordance and Opticon load files containing all requisite information including relevant metadata and document breaks.

f. **Native files**. The only files that should be produced in native format are files not easily converted to image format, such as audio, video, and spreadsheet files (e.g., Excel). A party that receives a document produced in non-native format may make a reasonable request to receive the document in its native format. In lieu of a TIFF image version of each spreadsheet file, a Bates-stamped single-page TIFF placeholder file shall be produced along with the native format version of each file. When redaction is necessary, a redacted TIFF image version shall be produced. Content that would otherwise be available in the native format, including hidden columns, rows, and sheets; comments; and "track changes" (and similar in-line editing) must be included in the

image version. The parties reserve the right to request access to the native format versions of such files.

g. **Databases and Structured Data Format**. To the extent a response to discovery requires production of discoverable ESI contained in a database, the producing party may elect to produce the data in a report format if that format is reasonably usable or in a native format compatible with Microsoft Excel or Microsoft Access.

h. **Paper Documents**. In scanning paper documents, distinct documents should not be merged into a single record and single documents should not be split into multiple records. If a document is more than one page, to the extent possible, the unitization of the document and any attachments or affixed notes should be maintained as it existed when collected by the producing party and should be reflected in proper coding of the family fields set out in the metadata fields specified herein. Parties may unitize their documents using either physical unitization (i.e., based on physical binding or organizational elements present with the original paper documents like staples, clips, and binder inserts) or logical unitization (i.e., a manual review of the paper to determine what logically constitutes a document like page numbers or headers). If unitization cannot be reasonably maintained, the original unitization should be documented in the data load file or otherwise electronically tracked if reasonably possible. The producing party should scan and produce folders, redwelds, binder-covers and other organizational structure. Such materials should be produced as independent documents and be produced before the documents that were contained in these elements to the extent reasonably accomplishable by the above-addressed unitization, (e.g., the file folder should have a Production number immediately before the documents contained in the file folder). The producing party will provide the name of the custodian who had possession of the document when it was collected. A custodian can consist of

the name of an employee or other person, a department, or an archive storage location. The producing party will create and produce optical character recognition (OCR) of paper documents.

i. **Color**. The parties will accommodate reasonable and proportional requests made in good faith for the production of specific color images originally produced in greyscale TIFF format to the extent available and where reasonably necessary to decipher the complete meaning, context, or content of the documents on a case by case basis.

j. **Redactions**. The producing party may redact, from any TIFF image, metadata field, and/or native file, information that is protected from disclosure by any applicable privilege or immunity law or regulation, including but not limited to information protected by the attorney-client privilege, work product doctrine, joint defense work product doctrine, individually identifiable health information, or personal identifying information. Each redaction shall be clearly labeled and include the reason for the redaction, such as "Redacted-Privileged" or "Redacted-Private," as appropriate. The producing party shall preserve an unredacted version of the document. Where a document contains both protected and non-protected responsive content, the producing party shall redact the protected material and produce the remainder of the document as redacted. The parties agree to meet and confer in good faith to attempt to resolve any dispute arising under this paragraph. No party shall be required to produce a redaction log provided that the reason for the redaction appears on the redaction label (e.g., "Privileged," "Private"). Redacted documents may have certain metadata fields withheld from production. The parties shall cooperate to create a list of metadata fields which may be produced for these documents.

k. **Non-English language documents**. Documents shall be produced in their original language. Where a requested document exists in a foreign language and the producing party also has a reasonably available English-language version of the document that it prepared for non-

litigation purposes prior to the filing of this lawsuit, the producing party shall produce both the original document and any such English-language versions. In addition, if the producing party has a reasonably available certified translation of a foreign-language document that is being produced (whether or not the translation is prepared for purposes of litigation), the producing party shall produce both the original document and the certified translation.

l. **Instant Messages**. For instant message and chat application data stored in company enterprise systems, the Parties shall produce messages in a 24-hour period, as opposed to a custom time period or producing individual messages. This does not limit the Parties from redacting information that is protected from disclosure within the 24-hour period.

m. **Email threads**. The parties are obligated to produce only the most inclusive part of an email thread (for example, only the last-in-time email in an email chain comprised of 15 emails), with the exception of any individual emails in an email thread with unique attachments, which should also be produced.

n. **Document Family**. All document family relationships shall be produced together and children files should follow parent files in sequential Bates number order. This does not impose any requirement on parties to associate and produce together hyperlinked documents.

o. **Embedded Files**. The parties will not review or produce embedded images or documents outside the document in which the file is embedded (e.g., .vcf files embedded in emails, .xlsx files embedded in PowerPoint presentations). The parties will accommodate reasonable and proportional requests made in good faith for the production of embedded files (non-images), on a case by case basis.

p. **Metadata fields**. The parties are obligated to provide only the following metadata for all ESI produced, to the extent such metadata exists: All Custodian, File Path,[3] Email Subject, Conversation Index, From, To, CC, BCC, Date Sent, Time Sent, Date Received, Time Received, Date Accessed, Time Accessed, Meeting Start Date, Meeting Start Time, Meeting End Date, Meeting End Time, Message ID, Importance, Sensitivity, Filename, Author, Date Created, Time Created, Date Saved, Time Saved, MD5 Hash, File Size, Title, File Extension, File Size, Confidentiality Designation, Redacted (indicating whether document is redacted), Redaction Reason (nature of the privilege), Hidden Content, Text Path, Native Path, Bates Number Begin, Bates Number End, Attachment Count, Attachment Range, Attachment Begin, and Attachment End (or the equivalent thereof).

q. **Encrypted or Password Protected Files**. The parties will make reasonable efforts to ensure that all Documents they produce are decrypted, and if possible, will decrypt any encrypted documents on the receiving party's request.

r. **Production Media**. The parties will make reasonable efforts to ensure that any productions made are free from malware. Any media on which Documents are produced may be encrypted by the producing party. In such cases, the producing party shall transmit the encryption key or password to the requesting party under separate cover upon service of the encrypted media.

[3] File path metadata created in the course of collecting files for purposes of litigation is not required to be produced if such production would reveal privileged information.

**SCHEDULE A**

1. Deleted, slack, fragmented, or other data only accessible by forensics.
2. Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system.
3. On-line access data such as temporary internet files, history, cache, cookies, and the like.
4. Data in metadata fields that are frequently updated automatically, such as last opened dates.
5. Back-up data that are substantially duplicative of data that are more accessible elsewhere.
6. Voice messages and voicemails.
7. Instant messages that are not ordinarily printed or maintained in a server dedicated to instant messaging. Instant messages that are retained on corporate servers dedicated to instant messaging are not included here.
8. Electronic mail or pin-to-pin messages sent to or from mobile devices (e.g., iPhone and Blackberry devices), provided that a copy of such mail is routinely saved elsewhere.
9. Other electronic data stored on a mobile device, such as calendar or contact data or notes, provided that a copy of such information is routinely saved elsewhere.
10. Text messages, instant messages, chat application data, and other data stored on mobile devices.
11. Logs of calls made from mobile devices.
12. Server, system, or network logs.
13. Electronic data temporarily stored by laboratory equipment or attached electronic equipment, provided that such data is not ordinarily preserved as part of a laboratory report.
14. Data remaining from systems no longer in use that is unintelligible on the systems in use.

15. Dynamic fields of databases or log files that are not retained in the usual course of business.

16. Automatically saved versions of documents and emails as temporary files.

17. Personal computers and personal e-mail not regularly used for business activities.

18. Social media sites.

19. Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and disposition of computer equipment.

20. Files that do not store user-created content during ordinary use such as structural files, operating system files, application source code, configuration, and other similar application files.

21. Files included on the National Institute of Standards and Technology (NIST) List (https://www.nist.gov/itl/ssd/software-quality-group/national-software-reference-library-nsrl/nsrl-download).

22. Other forms of ESI the preservation of which requires extraordinary affirmative measures that are not utilized in the ordinary course of business. Data stored on photocopiers, scanners, and fax machines.

23. Data remaining from systems no longer in use that is unintelligible on the systems in use.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis J. Murray
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
rjgarrett@paulweiss.com

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
cnyarady@paulweiss.com
ejmorgan@paulweiss.com
jbraly@paulweiss.com

*Attorneys for Plaintiffs*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
shaelyndawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Kyle W.K. Mooney
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
(212) 336-4092
kmooney@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

*Attorneys for Defendant*

**SO ORDERED this _____ day of March 2025.**

___________________________________

**The Honorable Maryellen Noreika**
**United States District Judge**