IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, )
   a Delaware corporation, )
QUALCOMM TECHNOLOGIES, INC., )
   a Delaware corporation, )
                                  )    C.A. No. 24-490-MN
              Plaintiffs, )
                                  )
         v. )    **JURY TRIAL DEMANDED**
                                  )
ARM HOLDINGS PLC., f/k/a ARM LTD., )    **REDACTED – PUBLIC VERSION**
   a U.K. corporation, )    **Original Filing Date: March 27, 2025**
                                  )    **Redacted Filing Date: April 10, 2025**
             Defendant. )

## ~~FIRST~~SECOND AMENDED COMPLAINT

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant Arm Holdings PLC, formerly known as Arm Ltd. ("Arm").[1]

## NATURE OF THE ACTION

1.     This case arises out of the latest chapter in Arm's campaign to stifle competition and technology innovation by impeding the efforts of its longtime business partner Qualcomm to deliver leading computer chips to its customers and consumers around the world.  For years, Arm has received substantial royalties from licensing Qualcomm to design and sell products containing custom central processing units ("CPUs") compatible with Arm's instruction set architecture

---

[1]   On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims.  *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.  This filing contains additional background on ~~ARM's~~Arm's attempt to preclude Qualcomm's custom central processing units from competing with ~~ARM's~~Arm's own central processing units.  The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading.  Redacted Answer & Defenses to ~~ARM's~~Arm's Compl. & 2d Am. Countercls., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.

("ISA").  But following its acquisition by the venture capital firm SoftBank Group and its failed sale to NVIDIA, Arm attempted to shift its business model away from licensing its ISA for use by companies like Qualcomm that design CPUs, and toward forcing customers to buy only Arm's own CPU designs.  Qualcomm's license, however, stands in the way of Arm's effort to push aside the makers of custom CPUs:  Qualcomm's license extends until 2033, and Qualcomm's Arm-compatible microprocessors lead the industry in numerous applications.  At the direction of SoftBank and its chairman and CEO, Masayoshi Son, Arm thus sought to disrupt Qualcomm's business.  Arm's first move was to sue Qualcomm for allegedly breaching a license that Arm had previously granted to a company Qualcomm acquired but to which Qualcomm was not a party, demanding that Qualcomm cease distributing its groundbreaking microprocessors.  As soon as Arm filed that lawsuit, it blitzed Qualcomm's major customers with letters publicizing the lawsuit, accusing Qualcomm of breaching "the Arm license agreement," and threatening that it would "work vigorously to protect what is rightfully ours."  And eight months later, Arm sent another round of letters to Qualcomm's largest customers, using language Arm's CEO has admitted under oath was "confusing" and "misleading" to create the false impression that Qualcomm was clearly in breach of its agreement.  Then, on the eve of trial in that case, Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license after 60 days—the day after the trial was scheduled to end.  That laid bare Arm's intentions from the beginning: to attempt to get out of its license with Qualcomm in any way possible so Arm could eliminate alternatives to Arm's own competing CPU designs.

2.    For decades, Arm has developed and licensed intellectual property relating to chips. Arm has pursued that business through two distinct models: *first*, by licensing other companies to

use Arm's ISA—the set of commands that determines how software controls a CPU[2]—and *second*, by licensing its own CPU designs so that other companies can make and sell products that use Arm's ready-made designs. Unlike other companies that developed a proprietary ISA used only on those companies' own chips, Arm followed a distinctive, "industry-described neutral, open licensing approach"[3] of "licensing its designs to all comers."[4] That open approach encouraged widespread adoption of Arm's ISA and also its designs. Arm's ISA—which Arm CEO Rene Haas describes as "the most ubiquitous computer architecture on the planet"[5]—is used by practically every smartphone, most "internet of things" ("IoT") devices, many automobiles, and an increasing number of personal computers and datacenter servers. Arm claims that companies using its ISA have shipped 270 *billion* chips as of January 2024.[6]

3.      One of these customers was Qualcomm, which has licensed Arm technology since 1997. As relevant here, Qualcomm and Arm entered into an architecture license agreement or "ALA" in 2013 (the "QC ALA"), which licensed Qualcomm to develop and sell custom-designed

---

[2]    An ISA acts as an interface between CPU hardware and software. These instructions describe the high-level attributes of the CPU, such as the supported computer instructions. It consists of a set of a few thousand instructions (for example, "add," "multiply," "load," and "store") and a few hundred registers, which are the places where information can be read, written, or operated upon, by the instructions, which compatible software will recognize.

[3]    Compl. ¶ 5, *In the Matter of Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 (FTC filed Dec. 2, 2021) (hereinafter "FTC Complaint").

[4]    Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparks-quick-backlash-in-chip-industry-idUSKBN2650GT/.

[5]    Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas). ARM claims that "[a]bout 99% of premium smartphones are powered by Arm." *Consumer Technologies: Smartphones*, Arm, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Dec. 9, 2024).

[6]    *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

CPUs that are compatible with the Arm ISA but are otherwise the product of Qualcomm's own engineering work. Qualcomm has also entered into a~~~~ technology license ~~agreements~~ (~~"TLA~~sagreement ("TLA") authorizing Qualcomm to make and sell products, including systems-on-a-chip ("SoCs") that use Arm's ready-made CPU designs.

4.      In recent years, Arm has apparently grown dissatisfied with its longstanding open, neutral business model. Following its acquisition by SoftBank and the failure of an attempted sale to NVIDIA, Arm is now grasping for any means—fair or foul—of padding its bottom line and stock price. Eager to cash in on the ubiquity of—and lack of any viable alternatives to—the Arm ISA, and as urged by SoftBank and Son, Arm has begun turning the screws on its customers, substantially increasing the royalty rates it demands to use the Arm ISA. Nor is Arm content to simply increase the rates it charges architecture licensees like Qualcomm. Instead, it has sought to capture a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or indeed, by selling chips themselves).

5.      Qualcomm now stands as an obstacle to Arm's ambition to raise prices and eliminate alternatives for customers. Qualcomm has developed innovative products enabled by its custom-designed, high-performance, low-power CPUs, which utilize a novel microarchitecture and related technologies to deliver significant increases in both performance and efficiency. Those innovative products pose a serious obstacle to Arm's ambition to control more links in the computer-~~processor~~chip value chain. Unable to compete fairly with Qualcomm, Arm has employed a series of wrongful tactics in an attempt to stifle Qualcomm's technological leaps in CPU design, to force Qualcomm to continue to use Arm's off-the-shelf CPUs, and to coerce Qualcomm into renegotiating the QC ALA, despite it being in effect for years to come, on terms

substantially more favorable to Arm—or simply to nullify that agreement.  Indeed, Arm's tactics are part and parcel of a broader effort to enable the company to escape its existing ALAs and thereby to ensure that devices compatible with the Arm ISA run on Arm chips.

6.      Some of Arm's maneuvers are the subject of litigation pendingresulted in a trial that took place last year before this Court.  *See Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del.) (hereinafter "*Arm* v. *Qualcomm*").  That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA.  NUVIA was founded by a world-class engineering team that set out to design better chips for use in datacenters.  In 2021, Qualcomm acquired NUVIA for $1.4 billion, intending for this team to help drive innovation across Qualcomm's product segments, including in laptops and other personal computers ("compute"), smartphones ("mobile"), and the digital cockpits and driver-assistance systems that are increasingly common in cars and trucks ("automotive").  Arm could have treated that acquisition as an opportunity to grow the use of the Arm ISA in new markets but instead regarded the acquisition as a competitive threat, whose benefits should be eradicated.

7.      *First*, Arm asserted, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA, Qualcomm needed Arm's consent to transfer NUVIA's technology to Qualcomm.  Arm took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of the QC ALA.  Arm later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers—including in products that Qualcomm began developing after the NUVIA acquisition, such as the Snapdragon® X-Elite—violated a license agreement between Arm and NUVIA that Qualcomm was not using and that Arm ultimately terminated.  This made no sense.  Qualcomm has its own license agreements for Arm technology

and information that allowed it to develop and provide custom Arm-compliant cores and products incorporating such cores to its customers (including the Snapdragon® X-Elite and Snapdragon® 8-Elite) for many years to come.  Qualcomm did not need Arm's consent to develop and market this technology.[7]

8.      *Second*, Arm filed the meritless *Arm* v. *Qualcomm* action against Qualcomm, claiming that Qualcomm and NUVIA breached NUVIA's terminated agreements with Arm, despite Qualcomm not even being a party to those agreements, and infringed Arm's trademarks by marketing custom CPUs years after the NUVIA acquisition.  In that action, Arm is demanding that Qualcomm destroy these groundbreaking CPU products that Qualcomm developed after the NUVIA acquisition and in accordance with the Qualcomm/Arm agreements—even though Arm has repeatedly admitted that it suffered no actual harm as a result of the conduct allegedly forming the basis of its claims.[8]

9.      *Third*, Arm and Son promoted the *Arm* v. *Qualcomm* lawsuit to Qualcomm's customers to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and could be subject to retaliation by Arm if they did, including by misrepresenting the terms of Qualcomm's licenses with Arm to Qualcomm's customers.[9]  Arm took further action in an attempt to disrupt Qualcomm's business relationships by sending emails to Qualcomm's customers on two separate occasions that misrepresented the terms of the NUVIA

---

[7]    Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[8]    *See* Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 29, 31-37, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306; Joint Letter re Bench or Jury Trial, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308; Redacted Mar. 5, 2024 Hr'g Tr. 38:20-39:8, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1.

[9]    Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 255-70, *Arm* v. *Qualcomm*, D.I. 306.

agreements and misleadingly implied that Qualcomm was required to destroy the custom CPUs that it was working on.

10.    Qualcomm was vindicated in the *Arm* v. *Qualcomm* action, in which the jury found that Qualcomm had not breached NUVIA's agreements and that Qualcomm's products were properly licensed under the QC ALA.[10]

~~10.~~11.  This complaint seeks redress for further bad-faith conduct in which Arm has engaged in an attempt to pressure Qualcomm to cave to its demands.  That conduct includes refusing to perform certain of its obligations under the QC ALA and QC TLA and continuing to wrongfully interfere with Qualcomm's relationships with current and prospective customers.

### *Arm Withheld Deliverables in Breach of Its Obligations Under the QC ALA*

~~11.~~12.  Arm deliberately withheld deliverables to which Qualcomm is entitled under the QC ALA with Arm under the guise that the QC ALA does not entitle Qualcomm to support for "Nuvia-based technology."  Arm's excuse is unjustified, and its breach could not be clearer.

~~12.~~13.  Qualcomm first suspected that Arm was withholding QC ALA deliverables in the fall of 2022.  At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within Arm's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

~~13.~~14.  Arm capitalized on this lack of transparency, with its General Counsel stating definitively that ███████████████████████ Arm further stated that Qualcomm ████ ██████████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  Here again, Arm

---

[10] Verdict Form, *Arm* v. *Qualcomm*, D.I. 572.

was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

~~14.~~15.  Arm went on to state that Qualcomm's written notice was a "████████████" to cause Arm "███████████" because "████████████████" was at issue, which Arm purported was "█████████████████████████████

████████████████" ███████████████████████████████████ Additionally, Arm threatened Qualcomm that, if Qualcomm availed itself ████████████ ████████████████████████ Arm would harm Qualcomm, including by terminating Qualcomm's multiple licenses with Arm.

~~15.~~16.  Arm's statement that █████████████████████" was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted in *Arm* v. *Qualcomm* revealed incontrovertible evidence that Arm not only had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, Arm was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the use of technology acquired from NUVIA.

~~16.~~17.  Arm never cured its failure to deliver, causing Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

~~17.~~18.  Arm's failure to deliver violated the QC ALA, which █████████████████████ █████████████████████████████████████████████ under that agreement.  Under the QC ALA, if Arm is found to be in breach of Section ██ of the QC ALA, it must █████████████████████████████████. If Arm fails ████████ ██████████████████████████████████, pursuant to Section ████████

██████████████████████████████████████████████████████████████

██████████████████████████████.

~~18.~~ 19.  Arm's withholding of deliverables and deliberate decision not to cure the issue

████████████████████████████████ is a material breach of the QC ALA.  Accordingly,

Qualcomm is entitled to financial damages, including but not limited to ██████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████.

***Arm Violated the QC TLA By Refusing to License Qualcomm CPU Cores***

20.     Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses

to its off-the-shelf cores at commercially reasonable prices to Qualcomm.  Arm's actions are

violations of licensing provisions negotiated between the parties.

21.     For example, in April 2024, Qualcomm submitted requests to renew licenses from

Arm for off-the-shelf cores Cortex-A720 (codenamed "█████") and Cortex-A520 (codenamed

"█████").  Despite repeated follow-ups over the following several months, Arm refused to provide

any licensing offer for either core.

22.     In August 2024, Qualcomm submitted a request to Arm to renew a license to Arm's

off-the-shelf core Cortex-M55 (codenamed "█████").  Arm once again refused to provide a

licensing offer for the █████ core and continued to refuse to provide a licensing offer for the

██████████ cores.

23.     Given Arm's prolonged refusal to engage, Qualcomm's General Counsel sent Arm

a notice of breach of, and non-compliance with, the QC TLA on September 20, 2024.  Qualcomm

sent a second notice on September 27, 2024 when Arm failed to provide confirmation of having

received the initial letter.

24.     Arm waited nearly a month to respond to Qualcomm's notices of non-compliance. In its October 23, 2024 response, Arm's Chief Legal Officer wrote that Arm did not ███████ ████████████████████████████████████████████████  Despite the clear indication that Arm did not intend to proceed ████████ . ████████████████████████████ ████████████████████████ .

25.     Arm subsequently provided Qualcomm with a licensing offer for the requested cores and microcontroller.  As Arm must have been aware, its proposal was extreme and clearly not commercially feasible for Qualcomm.  Arm's proposal was a constructive failure to offer a license ████████████████████ .  Under the terms of the QC TLA, ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████

26.     As with the QC ALA, ████████████████████████████████ ████████████████████ , which Qualcomm sent in September 2024. ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████

27.     Arm's proposal violated the QC TLA by presenting financial terms that were so exorbitant as to be commercially unreasonable and not in ████████, and therefore a constructive failure to offer a license.  It also greatly exceeded ████████████████████████████████

████████████████████████████████████████████████████████████.  Furthermore, Arm's proposal failed to comply with the QC TLA by ████████████████████

████████████████████████████████████.

28.     Arm has refused to offer commercially reasonable terms for any of the requested cores, and has thereby failed to cure its breach of the QC TLA.

### *Arm Threatened to Terminate the QC ALA Without Basis*

~~19.~~29.  Apparently seeking to ratchet up pressure on Qualcomm before trial in *Arm* v. *Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter (the "Breach Letter") asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing "unlicensed cores," and claiming that Arm will be entitled to terminate the QC ALA if Qualcomm does not capitulate to Arm's demands for a "cure" within 60 days.[11] Those demands, which ~~have~~had no basis in the agreement, ~~include~~included that Qualcomm should "at a minimum" stop development of any CPUs that use any designs, technology, or code created by NUVIA employees; cease requesting ████████████████████ for any such CPUs; cease manufacturing and selling such CPUs; and cease manufacturing or selling CPUs that Arm has refused to validate and verify.  The Breach Letter also ~~demands~~demanded, without support in the QC ALA or the law, that Qualcomm withdraw its claims against Arm in this case for Arm's breach of its delivery obligations under Section ███.

---

[11]  ~~A copy of the Breach Letter is attached as Exhibit A to this Amended Complaint.~~

20.30.  Arm's assertion that Qualcomm ~~is~~was in material breach of the QC ALA ~~lacks~~lacked any basis in that agreement.  The premise of Arm's Breach Letter ~~is~~was that certain Qualcomm CPU cores allegedly contain aspects of designs that were started by NUVIA employees.  But the QC ALA does not prohibit Qualcomm from acquiring nascent microarchitecture technology and using that technology to develop Qualcomm CPUs.  And it certainly does not permit Arm to terminate the QC ALA as payback for Qualcomm's suing to protect its rights under that agreement.  Because Qualcomm has not committed a " ██████████ ████████████████████████," Arm has no right to terminate the QC ALA, and any purported termination of that agreement is null and void.

21.31.  Moreover, Arm's claim of a material breach ~~is~~was inconsistent with Arm's own conduct throughout this dispute.  Arm has known since at least 2021 that Qualcomm would be acquiring NUVIA and using the technology that Arm now belatedly claims was improperly licensed.  Yet for three years, Arm took no steps towards attempting to terminate the ~~Qualcomm~~QC ALA and stood by while Qualcomm, through significant investments of time and money, developed and brought to market innovative products featuring Qualcomm's custom CPUs.  Arm's belated threat to terminate the QC ALA ~~only last month~~—on the eve of trial and while Qualcomm was announcing new products based on its high-performance custom CPUs— demonstrates that Arm's claim of a material breach ~~is~~was a pretext to justify Arm's true aim: escaping the QC ALA and other ALAs so Arm can attempt to dominate the market free from competition from Qualcomm and other designers of custom CPUs.

### *Arm Continues to Wrongfully Attempt to Injure Qualcomm's Business*

22.32.  Arm's Breach Letter ~~is~~was the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers.

~~23.~~33.  The Breach Letter was not only legally groundless, but also timed and publicly released in an effort to damage Qualcomm's business.  Arm sent the Breach Letter to coincide with Qualcomm's annual Snapdragon® Summit, where Qualcomm unveiled an SoC that offers greater CPU performance and efficiency than those offered by Qualcomm's competitors, including those competitors that use Arm off-the-shelf products in their ~~SOCs~~SoCs.  To ensure that the Breach Letter reached Qualcomm's customers, Arm also promptly leaked it to Bloomberg, which published a story on the threatened termination that very day.[12]  Arm did so knowing that Qualcomm's customers would likely be concerned that termination of the QC ALA could destabilize their own supply chains, because Arm's actions implied, despite the actual terms of the QC ALA, that Arm could and would impede Qualcomm's ability to deliver the SoCs its customers ordered, and that Qualcomm's customers might even face intellectual-property litigation brought by Arm.  Both the timing and the disclosure of the Breach Letter were thus calculated to interfere with Qualcomm's customer relationships and prospective business opportunities.

~~24.~~    The Breach Letter was also timed to interfere with *Arm* v. *Qualcomm*.  In the Breach Letter, Arm threatens that it "shall be entitled" to terminate the QC ALA on December 21, 2024— the day after trial in *Arm* v. *Qualcomm* ~~is~~was expected to conclude.  Arm's counsel's ~~recent~~ statements to this Court that termination would not be "automatic" after 60 days, that he "hope[d] that there are discussions between the parties," and that the Breach Letter could prompt the parties to "evaluat[e] their positions" underscore that Arm sent the Breach Letter to pressure Qualcomm to accede to Arm's unjustified demands.[13]

---

[12]   Ian King, *Arm to Cancel Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024, 8:17 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

[13]   Oct. 30, 2024, Hr'g Tr. 39:14-40:2, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

25.34.  Arm's wrongful tactics have harmed Qualcomm.  Following Arm's bad-faith claim that Qualcomm has breached the QC ALA and leak of the Breach Letter, important Qualcomm customers have delayed entering into new (or renewing existing) contracts with Qualcomm, or have insisted that Qualcomm provide them with additional commitments regarding its ability to deliver licensed products.  Arm's campaign has not only deprived Qualcomm of the ability to finalize these business opportunities promptly and without providing additional commitments, but also required Qualcomm executives and employees to spend considerable time responding to and alleviating customer inquiries.  None of those demands would have existed but for Arm's wrongful conduct.

35.    At trial in the *Arm* v. *Qualcomm* case, Arm continued to misrepresent its relationship with Qualcomm and its position in the marketplace.  Arm's Chief Executive Officer, Rene Haas, repeatedly stated that Arm did not view Qualcomm as a competitor because Arm did not build or sell semiconductor chips in the marketplace, which Mr. Haas stated would amount to direct competition between the companies.  Despite Mr. Haas' sworn statements denying Arm's involvement in chip development, Arm is now in the process of designing and distributing its own semiconductor chips.[14]  Moreover, Arm "sought to hire executives from its customers as early as November," several weeks before Mr. Haas' sworn testimony in court.[15]  Specifically, Arm's recruiter told the customer executive that this new position will help with Arm's "transformation from solely designing processor architecture (IP) to also selling its own silicon."[16]  To facilitate its

---

[14] *Arm recruits from customer as it plans to sell its own chips*, Stephen Nellis and Max Cherney, REUTERS,    https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (Feb. 13, 2025).

[15] *Id.*

[16] *Id.*

entry into selling its own chips, Arm now seeks to force Qualcomm—which would otherwise be a competitor—out from the marketplace.

36.     Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025, ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ But even then, Arm confirmed that it was not abandoning its efforts to obstruct Qualcomm's developments of custom cores, insisting that ████████████████████████████████ ████████████████████████████████████   Moreover, Arm sought to prevent Qualcomm from curing the impression created in the market by its deliberate leak of the Breach Letter, ████████████████████████████████████████████████████████████ ████████████████████████████████████

26.37.  Arm's non-compliance with its contractual obligations to Qualcomm should be seen for what it is: the latest in a series of anti-competitive maneuvers intended to force Qualcomm to renegotiate an existing, long-term license agreement that Arm's current management views as disadvantageous, and to frustrate Qualcomm's efforts to design and deliver industry-leading technology.  Arm's tactics—its refusal to provide technology it is contractually obligated to deliver and its attempts to undermine customers' confidence in Qualcomm—should be wholly rejected.

## THE PARTIES

27.38.   Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm is a leading technology innovator in mobile communication products and the driving force behind the development, launch, and expansion of 5G technology.  Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone.  Qualcomm brings the benefits of mobile to new industries, including automotive, IoT, and computing, where Qualcomm's technology has driven

the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

28.39.  Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm Technologies is a wholly owned subsidiary of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering and research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

29.40.  Defendant Arm Holdings PLC is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

30.41.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

31.42.  Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because Arm is "a defendant not resident in the United States" and therefore can be "sued in any judicial district."  Arm has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[17]

## FACTUAL ALLEGATIONS

### I.    ARM LICENSES AND THE CUSTOM CPU MARKET

32.43.  Arm is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars.

---

[17]  *See generally* Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

Arm's licensing model ~~is~~has been based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee. For many years, Arm has offered different types of license contracts, of which two are at issue in this case: ALAs and TLAs.

### A. ALAs and the Arm ISA

~~33.~~44. An ALA grants licensees the right under Arm's intellectual property to design their own custom Architecture Compliant Cores using specific licensed ISA technology and to manufacture, sell, and distribute Arm Compliant Products incorporating such cores.[18]

~~34.~~45. CPU ~~Cores~~cores (also known simply as cores) are a particular component of SoCs, which are integrated circuits used in cellular phones, computers, and other devices that combine several technologies used in such products into a single chip. A core or CPU performs processing within the SoC.

~~35.~~46. An Arm Compliant Core is compatible with the Arm ISA. As a general matter, an ISA lists the instructions that allow hardware (like SoCs) to interface with software programs. Application and software developers create their products to be compatible with particular ISAs. As a result of greater investment in Arm-based systems by hardware companies like Qualcomm and software developers, the Arm ISA is now "ubiquitous" and used in practically every premium smartphone, as well as a large percentage of automobiles and IoT devices and a growing number of personal computers and datacenter servers.

~~36.~~47. The Arm ISA allows for software compatibility across all Arm-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs,

---

[18] ███████████████████████████████████

determine and output the proper result.  The Arm ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

37.48.  To make a CPU that then can execute the Arm ISA and therefore run applications and other software that have been written to be compatible with that ISA, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

38.49.  A CPU developer developing a custom CPU designs **how** the core is built, **how** it performs, and **how** it executes the CPU's instructions.  There are a virtually infinite number of ways to design and build CPUs that can implement the Arm ISA.  Companies that design custom CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.  Many of these design choices are driven by the requirements of the product segment the designer is targeting—CPUs for mobile applications can have different design priorities than those for laptop computers or automobiles.

39.50.  Under an ALA, Arm does not deliver any specific Arm design or tell the licensee how to make the CPU.  That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee.  As Arm has publicly acknowledged, "the creation of an optimized CPU is very

costly and time consuming," and Arm therefore "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the customization often does not provide a reasonable return on investment."[19]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.  Arm has executed ALAs with Qualcomm and a number of other companies.

### B.     TLAs and Off-the-Shelf CPUs

40.51.  In addition to granting licensees rights under ALAs to make custom-designed products that are compatible with the Arm ISA, Arm also designs "off-the-shelf" CPUs and other peripheral intellectual property ("IP") that customers may license through a TLA.  Under a TLA, Arm delivers complete processor core designs that a licensee can incorporate into a larger SoC design, saving the licensee the trouble and expense of designing its own CPU.  In addition to CPUs, Arm also designs, and licenses under the TLA, peripheral IP, which is technology used in SoCs to perform specific functions and interface with the CPU.  This peripheral IP takes a variety of forms, such as "interconnects" that facilitate the transfer of information between different components of an SoC or various pieces of software that are incorporated into a semiconductor chip as a means of certifying safety capabilities of the chip.  Recently, Arm has placed greater emphasis on licensing off-the-shelf CPU technology, including by launching a "Compute Subsystems" business that offers integrated designs that pair CPUs with other technology—all in exchange for "significantly higher royalty rates" than Arm receives for licensing its ISA.[20]

---

[19]   Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

[20]   *Id.*

41.52.  But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance.  Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it charges for a license to the Arm ISA.  Moreover, when an SoC developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs.  And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing SoCs that can compete against those with more advanced custom CPUs.

## II.    QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

42.53.  Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications."  Qualcomm is a world leader in the design and production of semiconductor microchips, including SoCs.  Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines.  Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

43.54.  Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates.  In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive

industry designed to deliver connected experiences that are safer and customizable. Included among these products are custom CPUs and SoCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

      **A.**      **Qualcomm Builds Innovative Arm-Compatible Products.**

    44.55. Qualcomm has held Arm licenses since 1997. Those licenses include an ALA entered in 2003, and the currently operative QC ALA, ███████████████, which Qualcomm[21] and Arm entered into on May 30, 2013, and Annex 1 to that agreement for Arm v8-A Architecture deliverables. On June 23, 2020, Qualcomm and Arm entered into an additional Annex 1 to the QC ALA for Arm v9-A Architecture deliverables.

    45.56. Under the QC ALA and corresponding Annex 1s, Qualcomm has rights, using specific licensed technology, to design, manufacture, sell, and distribute Qualcomm's v8-A and v9 Arm-compatible custom cores, custom Arm ISA-compatible CPU cores, and products incorporating those cores. ████████████████████████████████

████████████████████████████████████████. Since Qualcomm entered into the QC ALA, Qualcomm has developed and shipped custom Arm ISA-compatible CPUs.

    46.57. Qualcomm is today one of Arm's largest licensees—it "accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024."[22] Since 2013, Qualcomm has paid Arm total license fees of ███████ and running royalties of ███████ under the QC ALA. Qualcomm has fully complied with its obligations under the ~~Qualcomm~~QC

---

[21] The actual party to the ALA and TLA ████████████████████████████████ The terms of the agreements ████████████████████████████████████████

[22] ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024 (Form 20-F) at 28 (Aug. 12, 2024).

ALA and has continued to tender royalty payments to Arm (under protest) pending resolution of this dispute.

47.58.  In recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for Qualcomm to compete by relying on Arm-designed cores.  In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical.

48.59.  In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SoC specifically for use in datacenter servers.  At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs.  Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary compute, mobile, and automotive product segments.  Qualcomm also planned to continue development of the server CPU and SoC for use in data centers and servers that NUVIA had originally intended to design.

49.60.  Since acquiring NUVIA and integrating the NUVIA team as Qualcomm employees, Qualcomm spent years developing innovative products with custom-designed CPUs using a novel microarchitecture and related technologies.

50.61.  Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival

suppliers of CPUs compatible with other ISAs (notably, Intel's x86).  Qualcomm's new products with custom CPUs have drawn praise as being "incredibly potent"[23] and "shockingly fast."[24]

51.62.  Qualcomm is not alone in its belief that its custom cores offerings will transform and advance the industry.  Major industry participants—including Microsoft, Google, Samsung, GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[25]

### B.    Relevant Provisions of the Qualcomm ALA

52.63.  On May 30, 2013, Qualcomm and Arm entered into an Amended and Restated Architecture License Agreement, ████████████, and Annex 1 to that agreement.  The QC ALA is a binding and enforceable agreement.

53.64.  ████████████████████████

████████████████████████████

████████████████████████████

██████████████████

54.65.  ████████████████████████

████████████████████████████

████████████████████████████

---

[23]  Aaron Klotz, *Snapdragon X Elite Beats AMD and Intel Flagship Mobile CPUs in Geekbench 6*, Tom's Hardware (Apr. 2, 2024), https://www.tomshardware.com/pc-components/cpus/snapdragon-x-elite-beats-amd-and-intel-flagship-mobile-cpus-in-geekbench-6-qualcomms-new-laptop-chip-leads-in-single-and-multi-core-tests.

[24]  Mark Hachman, *Qualcomm's Snapdragon X Elite Chip Attracts Unprecedented PC Partnerships*, PCWorld (Oct. 25, 2023), https://www.pcworld.com/article/2116395/qualcomms-latest-snapdragon-attracts-huge-pc-partnerships.html.

[25]  *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.



55.66.

56.67.

---

[26] ██████████ and ██████████ are defined terms in the QC ALA. *See* ██████████.

██████████████████████████████████████████████████

████ .[27]

### C.    Arm's Evolving Business Model

~~57.~~68.  For years, Arm expressed its commitment to an open, neutral model for licensing the use of its ISA.  Under that model, which led to Arm commonly being referred to as the "Switzerland of chips," Arm held itself out as not discriminating against companies that sought to use the Arm ISA.[28]  That model benefited the software developers, which could develop software that would be interoperable across Arm-compatible devices, and ultimately benefited customers. Indeed, Arm continues to tout the benefits of its "broad, standardized software ecosystem," which it claims "ensures diversity and robustness in supply, as well as easy software portability between Arm-based systems."[29]  That model also benefited Arm, leading to widespread adoption of the ISA.  As a senior Arm executive has explained, "[w]hat makes an architecture successful is actually the number of people that use it," as greater adoption of an ISA creates a "virtuous circle" in which the "more people that use your architecture, the more people will want to use it."[30]

~~58.~~69.  After being acquired by SoftBank, however, Arm has pivoted away from that model.  When the chipmaker NVIDIA attempted to acquire Arm in 2020, the proposed acquisition

---

[27] ██████████████████████████████    is a defined term in the QC ALA. ██████████

[28]  FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees").

[29]  *The Arm Advantage: Choosing Arm Technology*, Arm.com, https://www.arm.com/company/arm-advantage (last visited Dec. 9, 2024).

[30]  Arm, *What Is CPU Architecture?*, YouTube.com (Aug. 18, 2021), https://www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.

met with harsh responses from regulators and other companies that rely on the Arm ISA, based on fears that NVIDIA could use its control of Arm to undermine its rivals, "including by manipulating levers such as [Arm]'s pricing, the terms and timing of access to [Arm]'s Processor Technology, … [Arm]'s technological developments and features, and [Arm]'s provision of service and support."[31]

59.    When that acquisition fell apart under regulatory scrutiny, Arm pursued a variety of strategies to try to bolster royalty revenues at SoftBank's and Son's behest, including unsuccessful attempts to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made, and to force a major customer to renegotiate royalty rates notwithstanding the parties' existing contract.[32]  After releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores.[33] Indeed, in its calls with investors, Arm routinely touts the increased revenues it expects to collect as a result of widespread adoption of v9.

60.70.  Arm has also attempted to bolster its income—and thus its valuation—by abandoning its historic role of neutral and open licensing of its ISA.  Having made that ISA "ubiquitous" for the entire smartphone and IoT markets and made significant inroads in other sectors, Arm now seeks to leverage that ubiquity to exclude competitors from designing and selling

---

[31]  FTC Compl. ¶ 8.

[32]  Wayne Ma & Cory Weinberg, *How a Lopsided Apple Deal Got Under Arm's Skin*, The Information (Nov. 29, 2023), https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin.

[33]  *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas).

chips that are compatible with the Arm ISA.  Mr. Haas has hinted at precisely that sort of leveraging, explaining that as the company "defining a computer architecture and … building the future of computing," it is "easier" to understand the best ways to integrate hardware and software "if you're building something than if you're licensing IP" because "building something" makes a company "much closer to that interlock" and gives it "much better perspective in terms of the design tradeoffs to make," which is why "if we were to do something, that would be one of the reasons."[34]  Moreover, Arm has also sought to develop more complex, integrated "subsystems" that combine CPUs with other chips and intellectual property.[35]  And it was recently reported that, in a "radical change to [Arm's] business model," Arm was planning to launch its own chip by as early as this summer.[36]  This transformation from licensing intellectual property to positioning itself primarily as a chip designer creates the potential for Arm to make substantially more money: These businesses "carry significantly higher royalty rates"[37] than merely licensing use of the Arm ISA.

71.    But this transformation also brings Arm into direct conflict with existing licensees and customers.  When an architecture licensee like Qualcomm designs a custom Arm ISA-

---

[34]   Alex Health, *What Arm's CEO Makes of the Intel Debacle*, The Verge (Dec. 6, 2024, 4:45 PM), https://www.theverge.com/2024/12/6/24315123/arm-ceo-rene-haas-intel-ai-chips-samsung-changes.

[35]   *Client Solutions: Arm Compute Subsystems (CSS) for Client*, Arm, https://www.arm.com/products/compute-subsystems-for-client (last visited Dec. 9, 2024).

[36]   Matthew Garrahan et al., *Arm To Launch Its Own Chip in Move That Could Upend Semiconductor Industries*, Financial Times (Feb. 13, 2025), https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008 .  According to the report, the chip is "expected to be a [CPU] for servers in large data centres and is built on a base that can then be customized for clients."

[37]   *Arm First Quarter Fiscal Year 2025* at 5, Arm (July 31, 2024), https://investors.arm.com/static-files/393afe3f-13ff-4aa8-a4b3-41b1afaa5a91 (statement of Rene Haas).

compatible CPU, that CPU does not belong to Arm.  Instead, as Arm has publicly acknowledged, those custom CPUs "compete with" and "pose a threat to Arm's implementation IP business"— that is, Arm's effort to position itself as a designer of CPUs.[38]

61.72.  Arm has thus responded by pressuring customers (such as Qualcomm) to purchase Arm's off-the-shelf CPUs and by attempting to prevent Qualcomm from designing CPUs compatible with the Arm ISA.

## III.   ARM UNFAIRLY AND UNLAWFULLY ATTEMPTS TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

62.73.  Developing its own CPUs frees Qualcomm of the need to rely on Arm's off-the-shelf CPU designs.  That wouldcan both reduce the royalty rates Qualcomm pays Arm— ██████ ███████████████████████████████████████ —and demonstrate that products using Qualcomm custom CPUs can outcompete products using Arm's off-the-shelf designs.  Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an even better product for customers and opening new product segments for chips compatible with Arm's ISA, Arm has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

### A.    Arm Wrongfully Withholds Deliverables Owed to Qualcomm Under the QC ALA.

63.74.  In an effort to limit competition posed by Qualcomm's custom CPU, Arm breached its contractual obligations to provide Qualcomm with deliverables paid for under the QC ALA.

---

[38]   Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

1.    **The QC ALA requires Arm to provide Qualcomm with certain deliverables.**

~~64.~~ 75.  The two contract provisions at issue here—Sections █ and █—are clear and unambiguous.

~~65.~~ 76.  Section █ of the QC ALA requires Arm to "███████████████████████████████████████████████████████████████████████████" and to "███████████████████████████████████████████████████████████" Arm is also required to deliver ███████ "████████████████████████████████████████████" ███████████ is defined in the Qualcomm ALA as "████████████████████████████████████████████████████" under that agreement.

~~66.~~ 77.  Under Section █ of the QC ALA, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████:

███████████████████████████████████████████████████████████████████████████████████████████████████████████████.

2.    **Arm withholds the deliverables.**

~~67.~~ 78.  Qualcomm first suspected that Arm was withholding ████████████ under the QC ALA in the fall of 2022.  At that time, Qualcomm was embarking on its verification process for its ████ SoC.  As is the customary practice between an ALA licensee and Arm, Qualcomm provided Arm with details about its ████ CPU so that Arm would provide a formal list of agreed Arm Compliance Kit ("ACK") tests for which Arm would expect to see verification data.  But Arm withheld the formal list of tests (known as the "OOB") ████████████████████

██████████████████████████████████████████████████████

█████████

~~68.~~79.  Qualcomm then attempted to resolve the issue without court intervention.

~~69.~~80.  On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug fixes) from Arm.  Arm engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll be able to share OOB and various patches after my management has given their approval."

### 3. *Qualcomm provides written notice of Arm's failure to deliver—but Arm does not cure.*

~~70.~~81.  Almost one month later and after still not having received the deliverables under the QC ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022, Qualcomm notified Arm in writing of its failure to provide certain deliverables, including the OOB, stating explicitly that Arm should take the letter as "Qualcomm's required notice under Section ██ that Arm is not in compliance with its obligations under Section █, and that Arm must cure this breach in accordance with the time and procedures set forth therein."

~~71.~~82.  After not hearing from Arm, pursuant to Section ██ of the QC ALA, Qualcomm sent a follow-up letter on December 5, 2022.  The letter was Qualcomm's "second written notice of non-compliance ██████████████████████████████████." The letter stated that "ARM must ███████████████████████ set forth" in the QC ALA "or ████████████████████████."

~~72.~~83.  Pursuant to Section ██ of the QC ALA, Arm ██████████ to remedy its failure to provide the deliverable.  █████████ passed without Arm remedying the issue.

~~73.~~84.  Arm responded on December 6, 2022.

~~74.~~85.  In its response, Arm disagreed that Section ██ was at issue "or that provision of the OOB implicates Section █." Arm additionally asserted that the ACK deliverables are governed

by Section ██ of the QC ALA, not Section ██, and that remedies for a breach of that section do not include ████████████████████████████.

~~75.~~86.  Notably, Arm additionally claimed that ████████████████████████████,” stating explicitly that Arm “████████████████████████████ ████████████████████████.” As to the OOB specifically, Arm claimed that “██ ████████████████████████████████████ ████████”

~~76.~~87.  Arm was definitive in its assertions, stating that “[n]o additional delivery is required,” and “[n]o breach of Section ██ has occurred.”  Qualcomm was unable to verify this assertion because the “patches” are created by Arm and provided solely by Arm.  Accordingly, Qualcomm has no way of knowing definitively whether Arm has released patches for verification until they are delivered (or until someone from Arm tells Qualcomm they are available, which did not occur in this case).

~~77.~~88.  Arm's letter further stated that Qualcomm “does not have ████████████ ████ rights under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks” deliverables.  Arm additionally threatened Qualcomm that if it did not drop its invocation of Section ██, Arm would take steps that would harm Qualcomm.  Arm claimed that Qualcomm's invocation of Section ██ was “a new, material breach of the Qualcomm ALA” and that, to the extent Qualcomm exercised ████████████████████████, Arm would “not hesitate to terminate” Qualcomm's licenses.  Arm further stated that Qualcomm's letter was a “malicious effort” to cause Arm “economic duress,” which Arm purported was “inconsistent with the language, spirit, and purpose of the ALA and ████████████████████.”

### 4.    *Discovery reveals that Arm deliberately withheld the deliverables.*

~~78.~~89.  But more than a year later, Qualcomm discovered that Arm's December 6, 2022, letter misrepresented the facts and concealed Arm's strategy of deliberately withholding the OOB and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm duress.

~~79.~~90.  "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'"  In response to Qualcomm's requests for production, Arm produced an October 2022 email chain in which Richard Grisenthwaite, Arm's Executive Vice President and Chief Architect, explicitly instructed others at Arm not to provide Qualcomm with the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[39]

~~80.~~91.  In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that Arm concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  Arm's multi-tiered deception was successful for more than

---

[39]  On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include ~~ARM's~~Arm's breach of Section ▮ of the QC ALA.  These allegations and quotations are taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order.  Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5.  Notably, at that hearing, ~~ARM~~Arm advocated against adding this claim to the case in which this discovery was produced; and instead, ~~ARM~~Arm advocated for Qualcomm to bring a separate lawsuit. Redacted Mar. 5, 2024 Hr'g Tr. 39:13-20, *Arm* v. *Qualcomm*, D.I. 312-1.

a year. "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section [redacted] of the Qualcomm ALA."[40]

~~81.~~92. The applicable Annex 1 to the QC ALA includes [redacted].

~~82.~~93. Accordingly, when it was revealed through document and deposition testimony that, contrary to Arm's December 6, 2022, letter, Arm had deliberately withheld the ACK deliverables to which Qualcomm was entitled, it became clear that Arm breached its obligations under Section [redacted].

~~83.~~94. Arm's ~~General Counsel~~Chief Legal Officer concealed the facts, explicitly (and definitively) stating in Arm's December 6, 2022, letter that it had provided Qualcomm with [redacted] to the ACK and that [redacted]." Qualcomm did not have a valid basis to dispute that factual representation without discovery.

***5. Arm's breach of the QC ALA has harmed Qualcomm.***

~~84.~~95. To date, Arm still has not provided the OOB and relevant patches to which Qualcomm is entitled, and Arm's failure to do so increased Qualcomm's burden in verification.

~~85.~~96. By failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA, even in the

---

[40] Redacted Mar. 6 Order at 4, *Arm* v. *Qualcomm*, D.I. 303; *see also* Redacted Mar. 5, 2024 Hr'g Tr. 17:18-19:9, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the QC ALA.

86.97.  Similarly, by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches, which Qualcomm paid for and was entitled to receive under the QC ALA.  Qualcomm was damaged as a result.

87.98.  ███████████████████████████████.

88.99.  Pursuant to Section ██ of the QC ALA:



89.100.    Accordingly, ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████.

90.101.    In addition, because ██████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████

**B.    Arm Fails to Provide Qualcomm With ███████ Licensing Proposals in Violation of the QC TLA.**

102.    Arm has not only attempted to disrupt Qualcomm's development of custom CPUs but also attempted to interfere with Qualcomm's development of products containing off-the-shelf Arm cores by intentionally failing to provide commercially reasonable, and therefore ███████ licensing proposals to Qualcomm ███████████████. In addition to the below, Qualcomm expects discovery to show that Arm ██████████████████████████████ ██ in its licensing negotiations involving peripheral TLA IP.

*1.    The QC TLA requires Arm to* █████████████████ ███████████████:

103.    The QC TLA contains ██████████████████████████ ████████████████████████████████████████████████.

104.    Section ████ sets forth a series of requirements that Arm must follow for each of its off-the-shelf cores. ██████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████

105.    ████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████



106. ██████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████  Arm has never provided Qualcomm with written notice that ████

██████████████████████

107. ██████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

████████████

108. ██████████████████████

██████████████████████████████

██████████████████████████████

████████████████

### 2. Arm fails to respond to Qualcomm's licensing requests.

109. As part of its product development cycle, Qualcomm monitors the terms of licensing agreements to determine whether renewals or extensions of third-party IP will be necessary in order to plan for future product development and sales. Qualcomm has historically licensed and renewed licenses for various ███████████████. For example, Qualcomm sought to renew licenses to certain ███████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████.

110. Qualcomm's licenses for all three cores, which were ████████ licenses entered into in 2019, are set to expire in ████. Given Qualcomm's desire to avoid disruption to its development schedule and roadmap, it began negotiations for new licenses for each core in 2024.

111. In April 2024, Qualcomm sent Arm written requests to license both ████████ ████.

112. Arm failed to respond to Qualcomm's requests, ██████████████████ ████, and ignored continued outreach from Qualcomm in the subsequent months.

113. In August 2024, Qualcomm submitted a written request for ████. Arm failed to respond to this request as well.

114. Faced with Arm's continued non-compliance and the potential impact to its roadmap, Qualcomm sent Arm a notice of non-compliance with Section ██ of the QC TLA (including ████████████) in September 2024. Qualcomm told Arm that the letter "serves as Qualcomm's written notice of ARM's breach of, and non-compliance with, ████████ of the TLA." The letter asked that "ARM provide the requested core license immediately and in

accordance with the terms and conditions of the TLA as required by ██████████ of the TLA, or Qualcomm will be forced to exercise its remedies under the TLA."

115.    Once again, Arm failed to respond.  A week later, Qualcomm wrote to Arm again, informing Arm of the "second written notice of breach and non-compliance in accordance with the notice process set forth in Section ██ of the TLA."

### 3.    *Arm fails to provide* ████████ *licensing terms to Qualcomm.*

116.    Nearly four weeks later, Arm finally responded to Qualcomm's notice of non-compliance.  In its October 23, 2024 letter, Arm "████████████████████████████ ██████████".  Instead, Arm told Qualcomm that it did not "████████████████████████ ████████████████████████."

117.    In connection with the letter, Arm provided offers to the requested cores that Arm claimed were "████████████████████████████████████."  However, not only was this untrue, but also Arm's proposal contained terms so unreasonable that it was a constructive failure to license.

118.    The financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and ████████████.  For example, ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████ █ ████████████ was not justified by any change or improvement in the technology and is grossly inconsistent with the market for any comparable technology.  Arm was aware of the unrealistic terms of its proposal, which Arm acknowledged it only provided because of Qualcomm's notice of non-compliance with Section ████████████████████████████████████████████████████████████ ████.  This constructive failure to offer a license to the requested cores violated the terms of the QC TLA.

119.    Arm's proposal also violated the QC TLA requirement under Section ██████

████████████████████████████████████████████████████

120.    Furthermore, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

### 4.   Qualcomm has been harmed by Arm's TLA violations.

121.    As a result of Arm's exorbitant proposal, Qualcomm has been forced to proceed in development of SoCs without knowing what CPUs it will be using after the licenses to ██████ ████████████ expire.

122.    Due to the development lifecycle for semiconductor chips, Arm's ██████ refusal to offer licenses and to change ██████████████ of its licensing offers is already impacting Qualcomm.  Qualcomm must undergo reviews of its planning roadmaps to ensure that it will have suitable CPUs for its customers.  This effort requires (i) that additional resources be shifted to design custom CPUs for each of its semiconductor chips (ii) that Qualcomm allocate resources to identify workarounds based on RISC-V and redesign products to function with a different microprocessor design, or (iii) rely on older, less competitive versions of Arm CPUs that Qualcomm has licensed.

123.    The QC TLA sets forth the remedies for Arm's violations.

124.   ██████████████ states that Qualcomm may seek ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



125.    In addition, Section ▮ of the QC TLA states:

126.    Qualcomm sent its first notice of breach on September 20, 2024 and its second notice on September 27, 2024.  Arm's purported offer in response to Qualcomm's notices was dated October 24, 2024.  To date, Arm has failed to provide any commercially reasonable, ▮ ▮, offer and, as such, has failed to remedy its breach within the ▮.

127.    Qualcomm is entitled to ▮ under both the QC TLA and QC ALA for a period of ▮ ▮.  While Qualcomm will continue to ▮ until Arm's breach of the QC TLA is finally resolved, Qualcomm believes that Arm is not entitled to receive those ▮ ▮ pursuant to the QC TLA and ALA ▮ ▮.  For this reason, Qualcomm does not believe that any ▮.

### ~~B.~~C.    Arm Refuses to Negotiate a License to the Latest Version of Its ISA ▮ ▮.

128.    Arm has not only taken steps to destroy or delay Qualcomm's present development efforts.  It has also tried to hamstring Qualcomm's future development efforts by failing to negotiate a license to future versions of the Arm Architecture.

91.129.    In addition to failing to provide the deliverables ███████████████

and constructively failing to offer licensing proposals, ██████████████, Arm has also refused to

negotiate an extension of ██████████ to cover future versions of ████████████████████

████████ requires it to do.

92.130.    As noted, Section ██████████ of the QC ALA ████████████████████

████████████████████████████████████████████████████████

████████████████████████. Qualcomm has ████████████████████████████.

Additionally, Section ██████████ of the QC ALA ████████████████████████

████████████████████████████████████████████.

93.131.    On April 17, 2020, a Qualcomm employee emailed an Arm counterpart to

ask if Arm was working on a new version (v10) of the Arm ISA to replace v9 and explained that

the request was made in the context of ████████████████████████████████

████████████████ The Arm employee responded the following week that "████████████████

████████████████████████████████████████████████████████

████████ would expire but that there was "████████████████████████████

████████████████████████████████████."

94.132.    On May 20, 2020, Qualcomm emailed Arm stating that Qualcomm "████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████"

95.133.    Arm never responded to that email or followed up at any other time

regarding Qualcomm's rights ████████████████████████.

96.134.    Arm's actions underscore its strategy of attempting to eliminate existing ALAs and to force Qualcomm and other licensees to use Arm's off-the-shelf CPU designs—or to cease designing Arm-compatible chips entirely.

C.  Arm Wrongfully  and Publicly  Accuses Qualcomm of Breaching the QC ALA.

**D.    Arm Engages in a Campaign to Undermine Qualcomm's Customer Relationships.**

97.135.    In addition to the breaches described above, Arm has also deliberately sought to impair Qualcomm's standing and relationships with current and prospective customers. As Qualcomm has detailed, Arm, through its leadership and through SoftBank and Son, has engaged in a misinformation campaign to mislead Qualcomm's customers into believing that Qualcomm will not be able to deliver licensed Arm-compatible products after 2024, and that Qualcomm customers must obtain their own direct licenses from Arm.[41] That misinformation campaign included multiple rounds of letters to Qualcomm customers misleadingly claiming that Qualcomm had breached its ALA and suggesting that customers could face legal jeopardy from using Qualcomm products.  More recently, in an apparent effort to "ratchet[]Arm began "ratcheting up the pressure" on Qualcomm in *Arm* v. *Qualcomm*,[42] and Arm continued this misinformation campaign by declaring without basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter.  By doing so, Arm has caused tangible harm to Qualcomm's customer relationships.

---

[41]   Defs.' Answer and Defenses to Pl.'s Compl. & Jury Demand & Defs.' 2d Am. Countercls. ¶¶ 255-70, 275(b)-(d), *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.

[42]   Oct. 30, 2024, Hr'g Tr. 34:6, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

*6.   Arm ~~waits years before taking steps~~<u>repeatedly attempts</u> to ~~terminate the QC ALA.~~*

*1.      ~~Although Arm now asserts that Qualcomm is~~<u>interfere</u> in ~~material breach of the QC ALA, Arm waited years before taking any steps towards terminating the QC ALA.~~ <u>Qualcomm's customer relationships.</u>*

<u>136.</u>    On August 31, 2022, Arm commenced *Arm* v. *Qualcomm* in the U.S. District Court for the District of Delaware.  In that action, Arm alleges that Qualcomm and NUVIA breached the NUVIA ALA by not destroying all design work undertaken by NUVIA pursuant to its license with Arm following Qualcomm's acquisition of NUVIA.  ~~When it filed that~~

<u>137.    On the same day that Arm filed that action, it launched a premeditated campaign to blitz Qualcomm's customers with letters publicizing the lawsuit.  As Mr. Haas admitted under oath at trial, Arm sent letters to top executives at 37 companies that were customers of both Arm and Qualcomm.  In those letters, Arm stated that Qualcomm had breached the terms of "the Arm license agreement," implying that Qualcomm had breached its own ALA.  That was misleading; Arm's complaint in the *Arm* v. *Qualcomm* action accused Qualcomm and Nuvia of breaching the *Nuvia* ALA and never accused Arm of breaching the *Qualcomm* ALA.  Mr. Haas thus also admitted under oath that the letter "should have said" that Qualcomm had supposedly breached the Nuvia ALA, not Qualcomm's "Arm license agreement."</u>

<u>138.    Additionally, the August 31 letters asserted that Arm would "</u>███████████
██████████████████████" and thus (despite assuring customers that there would be "███
██████████████████████") suggested that companies could face legal jeopardy if they used the Qualcomm products that incorporated Nuvia technology. The letter attached a letter from Arm's general counsel to Qualcomm's general counsel that made this point explicitly, asserting that "███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

139.    Eight months later, in May 2023, Arm launched another round of customer letters. Arm executive Will Abbey sent a series of additional letters to key Qualcomm customers "████████████████████████████████████████████."  Mr. Haas agreed at trial that there was no independent event that triggered Arm's decision to send these letters.  That letter stated that Qualcomm's designs based on Nuvia technology, specifically including the Phoenix core, "can no longer be used and must be destroyed."  Mr. Haas also agreed at trial that it was very important to Arm to tell customers that it was demanding destruction of technology. The letter extensively quoted from Arm's prior threat letter to Qualcomm but did so in a manner intended to convey that it was quoting from a contract between Qualcomm and Arm that specifically required Qualcomm to cease using "Arm-based technology" developed by Nuvia and to destroy such technology.  In fact, no such contract existed, and the intended implication of quoting that language was thus false.  Mr. Haas admitted at trial that he was "quite confused" by the language of the letter and agreed that the letter was "misleading."

140.    Like the prior letters, the May 2023 letters reassured customers that there would be no disruptions to their partnership with Arm, but only if that partnership was "████████████ ████."  It also offered to answer questions that customers might have regarding how the litigation might impact the availability of licensed Arm technology going forward, which necessarily implied that the litigation could impact the availability of the Qualcomm products that Arm claims were unlicensed.

**2.    *Arm waits years before taking steps to terminate the QC ALA.***

~~98.~~141.    Although Arm now asserts that Qualcomm is in material breach of the QC ALA, Arm waited years before taking any steps towards terminating the QC ALA.  When it filed

the *Arm* v. *Qualcomm* action, Arm neither alleged that Qualcomm had breached the QC ALA nor sent Qualcomm any notice to that effect, █████████████████████████████████ ████████ .

~~99.~~142.        On September 30, 2022, Qualcomm answered Arm's complaint in *Arm* v. *Qualcomm* and filed a Counterclaim against Arm seeking, among other things, a declaratory judgment that its conduct was fully licensed under the QC ALA, and that it could "continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA" or any other relevant agreement with Arm.  When Arm answered that counterclaim, it generally alleged that Qualcomm was breaching the QC ALA, though it did not send Qualcomm any written notice to that effect ████████████████ .

~~100.~~143.        On March 13, 2024, Qualcomm filed its second amended counterclaims in *Arm* v. *Qualcomm*.  Arm answered on April 4, 2024, and again alleged that Qualcomm was breaching the QC ALA, entitling Arm to terminate that agreement.  Again, however, Arm did not send Qualcomm any written notice to that effect █████████████████ .

### ~~2.~~3.    *Arm's Breach Letter groundlessly asserts that Qualcomm is in material breach of the QC ALA.*

~~101.~~144.        It was not until more than seven months later, on October 22, 2024, that Arm sent Qualcomm the Breach Letter, which ~~purports~~purported to provide notice to Qualcomm ██████████████████████████ that Qualcomm is in material breach of that agreement.

~~102.~~145.        The Breach Letter ~~asserts~~asserted that the QC ALA authorizes Qualcomm solely "to develop, verify, and sell designs for CPUs … that use, rely on, or derive from Arm technology *delivered by Arm to Qualcomm* and *developed by Qualcomm employees*, not third

parties."[43]  It ~~does~~did not attribute these assertions to any particular provision of the QC ALA but instead ~~cites~~cited a string of contract sections, ███████████████████████████ ████████████████████████████████████████████████ ███████████████████████████.  The Breach Letter also ~~refers~~referred generally to "Annex 1," a lengthy document describing ████████████████████.  But nowhere in the Breach Letter ~~does~~did Arm identify any provision of the QC ALA that imposes the particular obligations Arm asserts in the Breach Letter.

~~103.~~146.        In the Breach Letter, Arm ~~claims~~claimed that Qualcomm "systematically and willfully breached these obligations" by "develop[ing] CPUs and market[ing] multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party."[44]  The Breach Letter thus ~~adverts to~~reprised the same arguments it has made in *Arm* v. *Qualcomm* about the NUVIA ALA: in essence, that Qualcomm somehow breached the *NUVIA* ALA by developing CPUs in part by using technology created by and acquired from NUVIA.  Arm has not explained in that litigation and ~~does~~did not explain in its Breach Letter how Qualcomm allegedly breached any provision in the *QC* ALA by developing CPUs in the manner it did.  In short, there is a reason why Arm's purported notice letter failed to state clearly which express contractual provision Qualcomm materially breached, or when or how Qualcomm breached any such provision: None exists.

~~104.~~147.        Having invoked Section █████ of the QC ALA, Arm's Breach Letter ~~demands~~demanded that Qualcomm "cure" the alleged breach(es) within 60 days, including by stopping the development of "Nuvia designs" and the manufacture and sale of Qualcomm CPUs

---

[43]   Ex. A at 1 (emphasis added).

[44]   *Id.*

that allegedly "use Nuvia designs or technology." The Breach Letter further ~~demands~~demanded that Qualcomm "cure" the alleged breaches by withdrawing its complaint in this Action against Arm. And the Breach Letter ~~asserts~~asserted that if Qualcomm does not "cure" the alleged breaches in this manner within 60 days, Arm ~~will~~would be entitled to immediately terminate the QC ALA.

~~105.~~148.        The "cures" that Arm ~~demands~~demanded in its Letter—other than the dismissal of this Action—are the same remedies that Arm has requested in *Arm* v. *Qualcomm*. By sending the Breach Letter, Arm ~~is attempting~~attempted to pressure Qualcomm to yield to its demands regardless of the outcome of *Arm* v. *Qualcomm*, as well as this case, before the former ~~goes~~went to trial.

~~106.~~149.        The timing of the Breach Letter ~~belies~~belied Arm's assertion that Qualcomm has materially breached the QC ALA. Arm knew about Qualcomm's acquisition of NUVIA in 2021, and asserted in its November 2022 Answer to Qualcomm's Counterclaim that Qualcomm was supposedly in breach of the QC ALA. Yet before sending the October 22, 2024, Breach Letter, Arm never even attempted to provide the notice ███████████████ that Qualcomm had supposedly breached the agreement. Quite to the contrary, Arm *celebrated* Qualcomm's development of the Snapdragon® X Elite SoC that contains CPU designs whose development Arm now claims breach the QC ALA, with Arm's CEO stating that Arm was "very excited to see the announcement of the brand new Windows on Arm PCs that run Copilot, true AI PCs."[45] In the Breach Letter, Arm nowhere ~~explains~~explained why it waited more than three years after ~~Defendants~~Qualcomm allegedly breached the Nuvia ALA before it provided notice of an alleged breach of the QC ALA.

---

[45] *Arm First Quarter Fiscal Year 2025*, at 3. Mr. Haas further commented that "the products that are out today are using the most advanced Arm technology," because they "are optimized with Microsoft for the most effective battery life on the planet." *Id.* at 10.

107.150.     Because Qualcomm ~~has~~did not materially ~~breached~~breach the QC ALA, Arm ~~has~~did not ~~identified~~identify any valid grounds on which to terminate the QC ALA, and any purported termination based on the Breach Letter is null and void.

### *3.*4.     *Arm leaks the Breach Letter to harm Qualcomm's customer relationships.*

108.151.     Arm's assertion that Qualcomm ~~is~~was in material breach not only ~~lacks~~lacked legal or factual basis, but was also made in a manner calculated to damage Qualcomm's customer relationships. Arm's claim that it has the authority to terminate the QC ALA ~~is~~was false, wrongful, and calculated to pressure Qualcomm to accede to Arm's demands and to prevent Qualcomm from gaining new business opportunities.

109.152.     From October ~~21~~21–23, 2024, Qualcomm hosted its annual Snapdragon® Summit. At that Summit, Qualcomm unveiled new technology, including its new Snapdragon® 8 Elite Mobile Platform, an SoC featuring Qualcomm's custom-built second generation Qualcomm Oryon™ CPU. That SoC delivers significant performance and efficiency improvements over competitors, ██████████████████████████.

110.153.     Arm issued its Breach Letter on October 22, 2024, in the middle of the Snapdragon® Summit. That timing was no accident, but was an intentional Arm media stunt intended to embarrass Qualcomm and to interfere with its relationships with its current and potential customers and business partners, including by creating unwarranted uncertainty about Qualcomm's ability to continue delivering licensed Arm-compatible products.

111.154.     In addition to sending the Breach Letter to Qualcomm, Arm also leaked the Breach Letter or its contents to Bloomberg, which published a story that same day.[46] The story was based on and referred to "a document seen by Bloomberg." On the afternoon of October 22,

---

[46] See Ian King, *supra* note ~~11.~~11.

2024—the same day Qualcomm received the Breach Letter—a Bloomberg reporter contacted Qualcomm requesting comment on Arm's having sent Qualcomm a "60-day letter" notifying Qualcomm that it was purportedly in breach of the QC ALA.  The reporter was familiar with details of the letter.  Later that day, Bloomberg published its story reporting on Arm's purported cancellation of the QC ALA.[47]  The story relayed details about the Breach Letter "according to a document seen by Bloomberg."  Because Qualcomm did not leak the Breach Letter, the Letter could have reached Bloomberg only if it had been leaked by Arm.

~~112.~~155.    Arm leaked the Breach Letter to distract from the Snapdragon® Summit and the groundbreaking products released at the Summit, and to ensure that the attention of Qualcomm's customers and business partners focused on the parties' licensing dispute rather than on Qualcomm's products, which pose a threat to Arm's own competitive ambitions.  The leak of the Breach Letter thus further ~~demonstrates~~demonstrated Arm's deliberate efforts to interfere with Qualcomm's customer relationships.

### ~~4.~~5.    Arm's leak of the Breach Letter ~~has harmed~~harms Qualcomm.

~~113.~~156.    The release of the Breach Letter has caused Qualcomm harm, by impairing its relationships with current and prospective customers and interfering with its future business opportunities.

~~114.~~157.    Following Bloomberg's publication of the news story about the Breach Letter, multiple Qualcomm customers and business partners have contacted the company to express concern about the Breach Letter.  As a result of the Breach Letter—and, in particular, Arm's baseless assertion that it can terminate the QC ALA—several Qualcomm customers have deferred finalizing pending business agreements pending resolution of the *Arm* v. *Qualcomm*

---

[47]    *Id.*

litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products.

~~115.~~158.    For example, a major customer (the "Smartphone Company") had informed Qualcomm that it was designing a new mobile phone that would rely on Qualcomm's innovative Snapdragon® 8-Elite SoC.  After learning that Arm was threatening to terminate the QC ALA, however, a senior executive of the customer informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm.  The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm.

159.    Additionally, a potential customer (the "AI and Ecosystem Company") that currently relies on a competitor's chips for its substantial processing needs was ~~on~~in the ~~cusp~~process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU.  ~~Since~~After the Breach Letter was published, the customer ~~has refused to finalize~~delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities.  The AI and Ecosystem Company has stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question.  As a result of the uncertainty stemming from Arm's assertion and leak of the Breach Letter, ~~Qualcomm has been unable~~there was a delay in Qualcomm's ability to finalize this valuable opportunity.

~~116.~~160.    Simultaneous with its actions that have set back Qualcomm's efforts to finalize a deal with the AI and Ecosystem Company, Arm is also attempting to supply the AI and Ecosystem Company directly.  Despite Arm's insistence at trial in *Arm* v. *Qualcomm* that it does

not make chips, it was recently reported that Arm had reached an agreement with the AI and Ecosystem Company under which Arm would begin producing its own chips for use in a datacenter operated by the AI and Ecosystem Company.[48] Arm has thus not only delayed Qualcomm's efforts to finalize a contract with the AI and Ecosystem Company but has separately developed its own datacenter chips that it is trying to sell to the same company.

161.    Arm leaked the Breach Letter at a time when it knew that the Smartphone Company is an existing customer of Qualcomm and when it knew or should have known that the AI and Ecosystem Company was a customer of Qualcomm or was likely to be absent Arm's interference. On information and belief, Arm leaked the Breach Letter knowing (or in circumstances in which it should have known) that its wrongful threats to cancel the QC ALA would disrupt those customer relationships and that Qualcomm was likely to be harmed as a result.

### 6.    Arm's withdrawal of the Breach Letter offers no assurance that Arm will not attempt to terminate the QC ALA.

162.    Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025, Arm Chief Legal Officer Spencer Collins sent Qualcomm a letter (the "Notice") withdrawing the Breach Letter and stating ███████████████████████████████████████████████

███████████████████████████████████████████."  The Notice also

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  The Notice asserted, however, that Arm ████████████████

████████████████████████████████████████████████████████

███████████████████████████████  The Notice thus indicated that Arm was

[48] Reuters, *Arm Secures Meta as First Customer for Ambitious New Chip Project, FT Reports* (Feb. 13, 2025).

pausing its efforts to terminate the QC ALA, but in no way suggested that Arm had any plan to abandon its long-term efforts to force Qualcomm to use Arm off-the-shelf cores and to block Qualcomm from creating and delivering products using its own custom cores (or indeed, any chips that might compete with Arm's own offerings).

117.163.    Arm also sought to prevent Qualcomm from addressing the uncertainty created by Arm's own leak of the Breach Letter.  Despite leaking that letter to the press, Arm ████████████████████████████████ thereby attempting to limit Qualcomm's ability to disclose the letter.  Arm authorized Qualcomm to "███████████████████████████████████ ████████████" thereby seeking to obstruct Qualcomm from communicating about the letter publicly or with potential customers or other business partners.

## IV.  ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY

164.    Arm's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end.  Despite Arm's CEO's sworn testimony to the contrary, it is clear that Arm seeks to take control of the semiconductor industry and will do whatever it takes to undermine and dominate the companies that it once treated as partners.

118.165.    Arm's tactics violate basic contract principles and are directly contrary to the purpose of the QC ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ██████ they bargained for without fear that Arm will unilaterally abdicate its contractual obligations in an effort to disrupt a licensee's innovation if Arm views the licensee as an unacceptable competitor.  ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

166.    The assault on Qualcomm's business through the improper refusal to provide commercially reasonable, ███████, licensing offers under the QC TLA likewise threatens reliance on the Arm ecosystem and the fundamentals of licensing.  Licensees enter into TLAs with Arm under the assumption that they will be joining a collaborative and open ecosystem and will be able to license the IP necessary to compete and grow in the market.  Arm's transformation into a chipmaker, combined with its throttling of the delivery of critical IP, is a dramatic reversal of Arm's longstanding business model that endangers the semiconductor industry and the manner in which its participants interact.

## COUNT I

### (Declaratory Judgment)

~~119.~~167.    Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

~~120.~~168.    Plaintiffs are entitled to a declaratory judgment that:

A.    Arm breached the QC ALA by withholding ████████████ that Arm was obligated █████████████ to deliver under Section ██ of the QC ALA, and by withholding ████ Arm was required to deliver "███████████████████" under Section ██ of the QC ALA;

B.    As a result of Arm's breach of Section ██ of the QC ALA, Qualcomm is entitled █████████████████████████████████████████████████████████████

C.    Arm breached the QC TLA by ████████████████████ for ███████ ███████████████s, including ████ ███████████████████ in violation of ██ of the QC TLA.

D.    As a result of Arm's breach of Section ██ of the QC TLA, Qualcomm is entitled to ██████████████████████████████, including █ ███████████, and ████████████████████████████████████████████-

E.    Arm breached the QC TLA by ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ including ▮▮▮▮▮▮ in violation of ▮▮▮▮ of the QC TLA.

F.    As a result of Arm's breach of Section ▮▮ of the QC TLA, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮

G.    Arm breached the QC TLA by ▮▮▮▮▮▮▮▮ for ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, including ▮▮▮▮ ▮, with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of the QC TLA.

H.    As a result of Arm's breach of Section ▮▮ of the QC TLA, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮

~~C.~~I.    Qualcomm has not breached the QC ALA as asserted in the October 22, 2024, Breach Letter; and

~~D.~~J.    Arm is therefore not entitled to terminate the QC ALA.

~~121.~~169.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮

~~122.~~170.    A valid and justiciable controversy exists between Qualcomm and Arm because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Arm is threatening to terminate the QC ALA if Qualcomm ▮▮▮▮▮▮▮▮▮▮▮▮ pursuant to Section ▮▮ of the ALA.

~~123.~~171.    A declaratory judgment is also necessary and appropriate so that Qualcomm may ascertain Arm's obligations and Qualcomm's rights and obligations under the QC ALA and clear any cloud that may exist over its business as a result of Arm's false assertions of breach and threats to terminate the QC ALA.

124.172.    A valid and justiciable controversy exists between Qualcomm and Arm because Arm has asserted that Qualcomm is in breach of the QC ALA and has asserted that Arm has the right to terminate the QC ALA on December 21, 2024.  Qualcomm disputes both assertions.  Qualcomm also reasonably expects that Arm would attempt to use its purported termination to damage Qualcomm with its customers, in the media, and with analysts, in light of Arm's behaviors to date.

## COUNT II

### (Breach of Section ██ of the QC ALA)

125.173.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

126.174.    The QC ALA is a valid, binding contract.

127.175.    Arm failed to fulfill its obligation under Section ██ of the QC ALA because it intentionally withheld from Qualcomm certain ████████████ to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

128.176.    Accordingly, Arm did not "████████████████████████████████████████ ," or "████████████████████████████████████████ ," or ████████████████ ," or ████████████████████████████ ," as is required by Section ██ of the agreement.

129.177.    Arm's failure to comply with its contractual obligation to timely deliver bargained-for technology was not only intentional, but it was also done with an intent to deceive Qualcomm.

130.178.      Qualcomm put Arm on written notice of this violation and Arm ██████
███████████, as is required under the contract.

131.179.      Arm's breach of Section ██ of the QC ALA entitles Qualcomm ██████████
███████████████████████████████████████████████████████████████.

132.180.      As a proximate result of Arm's breach of contract, Qualcomm has been
damaged both (i) by delay that could have been avoided had Arm fulfilled its obligations, (ii) by
costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK
tests to verify that its products are compliant with the Arm ISA and use its own engineers to address
issues that would have been addressed by Arm's patches, and (iii) by ███████████████████
████████████████████████████████████████████████████████████████
████████ not misrepresented its compliance with the parties' agreement.

## COUNT III

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

133.181.      Plaintiff Qualcomm repeats and realleges all of the preceding allegations as
if set forth fully herein.

134.182.      Under California law, every contract implies a covenant for each party not
to do anything that will deprive the parties of the benefits of the contract.

135.183.      At all relevant times, Arm agreed and was required by law to act fairly and
in good faith with respect to its obligations under the QC ALA and TLA.

136.184.      Arm breached this implied covenant of good faith and fair dealing by,
among other things, withholdingunder both agreements.  For example, Arm withheld deliverables
that it was required to provide Qualcomm under the QC ALA, assertingasserted, without valid
basis under the QC ALA, that Qualcomm was supposedly in material breach of that agreement;

~~and leaking that~~sent letters to Qualcomm customers and leaked the Breach Letter to the media to create uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs~~.~~; failed to negotiate an extension to the QC ALA that would cover future version of the architecture, including v10, and failed to provide licensing proposals for ████████████ ████ to Qualcomm in violation of provisions of the QC TLA.

~~137.~~185.    Arm's actions have been willful and carried out in bad faith, as part of an effort to enable Arm to disregard the QC ALA and TLA so that it can prevent Qualcomm from competing with Arm's sale of its own CPU and other chip designs, or, at a minimum, coerce into renegotiating the QC ALA so that Arm can extract payments from Qualcomm that exceed those due under the QC ALA.

~~138.~~186.    Arm's actions have unfairly frustrated the essential purposes of the QC ALA and TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm, including the right to produce and sell custom CPUs that are compatible with the Arm ISA ██████████████████████ ████.

~~139.~~187.    ~~By reason of~~For at least the foregoing reasons, Arm has breached the implied covenant of good faith and fair dealing for both the QC ALA and TLA.

~~140.~~188.    As a proximate result of Arm's breach of the implied covenant of good faith and fair dealing, Qualcomm has been injured in its business or property, and is threatened by imminent loss of profits and loss of actual and potential customers and business opportunities.

## COUNT IV

**(Intentional Interference with Prospective Economic Advantage)**

~~141.~~189.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

~~142.~~190.    Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above.

~~143.~~191.    Absent Arm's interference, these relationships would likely result or would have likely resulted in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations. These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship.

192.    Arm knew of these relationships but nevertheless engaged in ~~wrongful~~ conduct aimed at interfering with Qualcomm's business opportunities, including by (a) purporting to give notice that it "shall be entitled" to terminate the QC ALA based on nonexistent alleged material breaches of the QC ALA ~~and~~; (b) deliberately leaking the Breach Letter in the middle of Qualcomm's Snapdragon® Summit; and (c) making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

58

144.193.    Arm's interference with Qualcomm's business opportunities was wrongful.
For example, as explained below, Arm's conduct represented unfair business acts and practices in
violation of California law.

145.194.    By engaging in this conduct, Arm intended to disrupt these relationships or
knew that disruption of these relationships was certain or substantially certain to occur.

146.195.    As a result of that conduct, these relationships have in fact been disrupted.
The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with
Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a
substitute contract with Arm instead, and the Smartphone Company has likewise delayed
extending its business relationship with Qualcomm pending additional assurances.  As a result of
these delays and interruptions in its business relationships, Qualcomm has suffered actual harm.

147.196.    Arm's efforts to interfere with Qualcomm's business relationships have
been a substantial factor in causing that harm, which Qualcomm would not have suffered but for
Arm's misconduct.

## COUNT V

### (Negligent Interference with Prospective Economic Advantage)

148.197.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as
if set forth fully herein.

149.198.    Arm knew or should have known that Qualcomm has substantial business
relationships with a number of customers, including the Smartphone Company and the AI and
Ecosystem Company.

150.199.    Arm also knew or should have known that these relationships would be
disrupted by Arm's failure to act with reasonable care by purporting to terminate the QC ALA

despite lacking legal or factual grounds for doing so ~~and,~~ by leaking the Breach Letter in bad faith

and in disregard of its duties to Qualcomm as a contract counterparty~~.~~, and by making misleading

and threatening statements to Qualcomm's customers to undermine their relationships to

Qualcomm and to induce them not to procure products from Qualcomm.

200.   Arm owes Qualcomm a duty to act with reasonable care based on, among other

things, the parties' contractual relationship and the foreseeability that interfering with Qualcomm's

customer relationships would cause Qualcomm harm.

~~151.~~201.   Arm failed to act with reasonable care when, in bad faith, it purported to

declare that Qualcomm is in material breach of the QC ALA ~~and,~~ leaked the Breach Letter, and

made those misleading and threatening statements to Qualcomm's customers.

202.   Arm's conduct was wrongful because, for example, it was "unfair" under California

law.

~~152.~~203.   As a result of Arm's wrongful conduct, Qualcomm's relationships with the

customers identified herein have been disrupted, as customers have required additional assurances

or delayed entering into additional transactions with Qualcomm.

## COUNT VI

### (Violations of California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

~~153.~~204.   Plaintiff Qualcomm repeats and realleges all of the preceding allegations as

if set forth fully herein.

~~154.~~205.   The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200,

prohibits "unfair competition," including any "unlawful, unfair or fraudulent business act or

practice."

60

155.206.    By engaging in the conduct described above, Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL. ~~These unfair business acts or practices include~~These unfair business acts or practices include deliberately withholding deliverables it was required to provide Qualcomm ████████████; misrepresenting to Qualcomm that it was not withholding deliverables; refusing to negotiate license terms with Qualcomm ██████████; repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's current and prospective customers; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA; to pressure Qualcomm to accede to its demands in *Arm* v. *Qualcomm*; and to prevent Qualcomm from continuing to litigate its meritorious claims in the instant case.

156.207.    ~~Qualcomm's~~Arm's actions are part of a broader campaign to harm or threaten to harm competition ~~in the markets~~ for ~~CPUs~~CPU and ~~SoCs~~other computer chip designs, in California and elsewhere.  Arm is employing a variety of unfair acts and practices so that it can leverage its ~~monopoly with respect to~~control over the ISA used in all premium smartphones and a large and growing share of other computing devices to attempt to prevent Qualcomm from developing and marketing products with CPUs that threaten to outcompete products containing Arm's off-the-shelf CPU designs.  These tactics include making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA~~, either to eliminate a competitor or to pressure Qualcomm to accede to~~ with the goal of preventing Qualcomm from

developing custom cores that would compete with Arm's ~~unjustified demands.~~own designs and from marketing products that contain Qualcomm custom cores.

208.   ~~Arm's conduct threatens to harm consumers by depriving them~~Arm's conduct is also unfair because it threatens to significantly harm competition not only for CPU designs, but also for the SoCs used in a variety of platforms, and ultimately for the devices that use those CPUs and SoCs.  If Arm's conduct goes unchecked, Qualcomm and other chip designers will be forced to rely on Arm's off-the-shelf CPUs and will be at Arm's mercy if Arm wishes—as it has signaled it does—to foreclose them from making chips that are compatible with the Arm ISA.  As a result of Arm's efforts to reduce competition to create those CPUs and SoCs, consumers will be deprived of products that are built around innovative, high-performance, high-efficiency Qualcomm chips and/or ~~by increasing the prices that customers~~ will have to pay ~~for~~more for (or will have reduced choices among) products that incorporate CPUs compatible with the Arm ISA~~, as~~.  Arm's conduct towards Qualcomm—a ~~result~~longtime Arm licensee—threatens incipient violations of ~~reducing~~ competition laws; violates the policy or spirit of those laws; threatens to significantly harm competition; is immoral, unethical, oppressive, and unscrupulous; and threatens to harm consumers and competition in a manner vastly disproportionate to whatever supposed benefits that behavior could possibly create~~ those CPUs~~.

~~157.~~209.       Arm's conduct is also unlawful because it violates California common law, including state law prohibiting intentional and negligent interference with prospective economic advantage.

~~158.~~210.       Arm's unlawful and unfair business acts and practices are a direct and proximate cause of injury to Qualcomm.  Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss

of profits, customers, and potential customers.  If Arm is allowed to continue in its unlawful and unfair business acts and practices, Qualcomm risks being denied access to a widely used ISA for which there are no readily available alternatives for certain applications, which threatens to impede Qualcomm's ability to continue developing and marketing its high-performance products based on its own custom CPU designs.  Arm's conduct thus threatens to harm competition among SoC producers but also in end users, who will be forced to use products built with Arm chips and CPUs.

159.211.    Qualcomm has standing to bring this claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct.

212.    Qualcomm requires equitable relief under the UCL because it lacks adequate remedies at law to address Arm's anticompetitive and unfair actions, which are ongoing and which have caused or threaten to cause Qualcomm to suffer significant harm.

**COUNT VII**

**(Breach of Section ▮ of the QC TLA)**

213.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

214.    The QC TLA is a valid, binding contract.

215.    Arm failed to fulfill its obligation under Section ▮ of the QC TLA because the licensing offers it provided to Qualcomm for ▮▮▮▮▮, including ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.

216.    Arm's failure to comply with its contractual obligation ▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮.

217.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ▮▮▮▮, as is required under the contract.

218.    Arm's breach of Section ▮▮▮▮▮ of the QC TLA entitles Qualcomm to a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, including ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, and a license offer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

219.    Arm's breach of Section ▮▮▮▮▮ of the QC TLA entitles Qualcomm to ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮.

220.    As a proximate result of Arm's breach of contract, Qualcomm has been harmed both by (i) shifting resources to its custom CPU team in order to analyze and begin development of CPUs for future SoCs that would have used the ▮▮▮▮▮▮▮▮▮, including ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ cores, (ii) the uncertainty caused by Arm's refusal to license the ▮▮ ▮▮▮▮▮▮▮▮, which causes complications in the roadmapping and SoC planning process, and (iii) by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮.

## COUNT VIII

(Breach of Section ▮▮ of the QC TLA)

221.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

222.    The QC TLA is a valid, binding contract.

223.    Arm failed to fulfill its obligation under Section ▮▮ of the QC TLA because the licensing offers it provided to Qualcomm for ▮▮▮▮▮▮▮▮▮▮, including ▮▮▮▮▮▮▮

████████████████████████████████████████████████████████████████

████████████████████████████.

224.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ██████ as is required under the contract.

225.    Arm's breach of Section ██████ of the QC TLA entitles Qualcomm to ████████ ████████████████████████████████████████████████████████████████ ██████

226.    As a proximate result of Arm's breach of contract, Qualcomm has been forced to seek alternative means to ensure that it is protected according to the ██████████████ that it negotiated in the QC TLA and to divert additional resources in order to continue development of its SoCs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment and relief as follows:

A.A    For the declaratory judgments set forth in Plaintiffs' claims;

B.B    For an Order requiring Arm to comply with all its obligations under ~~Qualcomm's license agreement~~the QC ALA, including (but not limited to) by providing the ████████████████, OOB, Patches, and ██████████, without discrimination or retaliation;

C    For an Order requiring Arm to comply with all its obligations under the QC TLA, including (but not limited to) by ████████████████████████████████████████, including ██████████████████████████████████████████████████████

C.D    For an Order enjoining Arm from engaging in the unlawful, unfair, and anticompetitive actions and practices described in this Amended Complaint and from any other unlawful, fraudulent, or unfair acts or practices aimed at obstructing Qualcomm's ability to develop and sell chips;

E    For an Order that Qualcomm is entitled to a ██████████████████████ with respect to ████████████████ licenses at pricing structures ██████████ ████████████████████.

65

D. F    For an Order █████████████████████████████████ as a result of Arm's breach of the QC ALA and TLA;

E. G    For an Order that the Breach Letter is ineffective notice of an alleged material breach and that Arm has no right to terminate the QC ALA on the grounds stated in the Breach Letter;

F. H    For recovery of all ██████████████████████████████████████████████ ███████████████████████████;

G. I    For damages resulting from the wrongful conduct alleged in this Amended Complaint, including from Arm's threat to terminate the QC ALA and its leak of the Breach Letter, failure to offer ████████ licensing terms ████████, and specifically including damages arising from the postponement of the business opportunity with the AI and Ecosystem Company;

H. J    For restitution of amounts Arm derived from the unfair and anticompetitive conduct described in this Amended Complaint;

I. K    For costs and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief; or, in the alternative, for additional damages, in the alternative, that the Court deems appropriate;

J. L    For an award of attorneys' fees and costs as allowed by law; and

K. M    For such other and further relief available at law and equity as the Court may deem just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC -20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY -10019-6064
(212) 373-3000

~~December 16, 2024~~

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE -19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 16, 2024, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                              *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                            *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017
*Attorneys for Defendant*

                                        */s/ Jennifer Ying*

                                        Jennifer Ying (#5550)

March 27, 2025