**WILMINGTON**
RODNEY SQUARE

**Anne Shea Gaza**
P 302.571.6727
F 302.576.3439
agaza@ycst.com

**BY E-FILE AND HAND DELIVERY**

The Honorable Maryellen Noreika
United States District Court for the District of Delaware
844 North King Street Wilmington DE 19801

      Re:    *Qualcomm Inc., et al. v. Arm Holdings Plc.*, C.A. No. 24-490 (MN)

Dear Judge Noreika:

Qualcomm's ("QC") Complaint alleges across eight counts that Arm breached two different contracts on several grounds, tortiously interfered with QC's customer relationships, and engaged in unfair competition in violation of the California UCL; and that QC did not breach the QC ALA. Yet QC broadly refuses or has failed to provide discovery on its own allegations. It has failed to identify witnesses for entire counts from its Complaint, served answers to interrogatories that recycle the Complaint without responding to the core issues in the case, and has not agreed to produce documents for almost half of Arm's requests for production. Arm has engaged in dozens of hours of meet and confers with QC to no avail. With just six weeks left in fact discovery, QC still has not yet disclosed the basic contours of its claims against Arm beyond what it alleges in its Complaint or provided the discovery Arm needs to defend itself; indeed, QC has not permitted Arm's outside counsel to share with in-house counsel the identity of the two companies with whom QC contends Arm allegedly tortiously interfered. Arm has produced almost six times as many documents as QC. Yet, QC refuses to produce documents on more than **80 RFPs**,[1] and searched for ESI using overly limited search terms on unrelated custodians. In keeping with the Scheduling Order's directive that "the more detail a party provides, the more detail a party shall receive," D.I. 44 at 4, Arm submitted detailed responses to QC's interrogatories. Arm should get the same.

**QC's Improper "Relevance" Objections.** Many of the Parties' disputes over Arm's RFPs and ROGs boil down to QC's apparent view that only Arm's conduct is relevant, but virtually none of QC's conduct is—even where it bears directly on QC's own allegations and Arm's defenses. That is wrong. *Keele v. Del. State Univ. Bd. of Trustees*, 2021 WL 9649436, at *2 (D. Del. Mar. 30, 2021) ("'[A]ny nonprivileged matter that is relevant to any party's claim or defense' . . . is within the scope of discovery"). QC has even refused requests that quote its own Complaint. *See, e.g.*, RFP 6 (QC's efforts to reduce its reliance on Arm); RFP 8 (alleged harms to QC's customer relationships); RFP 37 (QC's entitlement to deliverables under the ALA for its Nuvia-based technology); RFP 57 (potential termination of the ALA); ROG 2 (Arm's alleged breach of the

---

[1] RFPs 6, 8, 10, 12, 13, 26, 28, 30, 34, 37, 52, 53, 56, 57, 59, 60, 61, 62, 63, 66, 74, 75, 78, 79, 80, 81, 83, 84, 87, 88, 90, 93, 105, 108, 109, 111, 112, 113, 116, 120, 124, 125, 126, 127, 129, 131, 132, 133, 134, 135, 136, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 165, 166, 167, 168, 171, 173.

ALA); ROG 4 (Arm's knowledge of QC's existing or prospective business relationships); ROG 6 ("required" deliverables under the ALA). When asked, QC took the indefensible position that discovery into the bases of those quotes is irrelevant because they come from the background section of the Complaint, not the counts. QC is wrong—it ignores that its counts "incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth" therein. *E.g.,* SAC ¶ 167. The discovery Arm sought is plainly relevant.

These are only the most blatant examples. QC labels Arm's licensing practices "unfair," yet refuses to produce any information about its own licensing arrangements and agreements, even for products that use Arm's ISA, on the same basis. *See, e.g.*, RFPs 108, 109, 116. How QC treats its licensees, what QC's employees have previously testified is a fair or unfair licensing practice in UCL litigation, and what conduct it itself engages in is clearly relevant to QC's claims that Arm's licensing conduct is somehow "unfair" or "harms competition." *Bardell v. Banyan Del., LLC*, 2024 WL 3273498, at *1 (D. Del. July 2, 2024).

**QC's Breach Claim Deficiencies.** QC alleges that Arm breached its ALA with QC by failing to provide certain materials (OOBs and ACK patches). However, QC refuses to produce discovery that would allow Arm to assess these allegations. In response to Arm's ROG 6, which seeks QC's bases for alleging breach, QC simply refers to the Complaint and quotes portions of the ALA—providing no additional specificity or explanation, identifying no documents or individuals, and failing to address QC's implied covenant breach claim at all. Other than identifying high level material types (OOB and ACK patches), QC has provided no specificity on which OOB or ACK patches were allegedly withheld, or for which designs. And despite QC alleging in its Complaint that it had to "expend[] extra time and resources," QC has refused to describe the facts and circumstances of that expenditure. SAC ¶ 96. For example, QC has refused to produce information about its "efforts to verify compliance" with Arm's ISA, RFP 149, or documents related to "validation" of compliant cores, RFP 160. QC's interrogatory responses similarly do not describe its verification efforts for any particular core, nor do they identify or describe any difference between QC's previous verification efforts and any allegedly increased verification efforts that QC contends resulted from Arm's alleged breach. *See* ROG 13.

**QC's Tortious Interference Claim Deficiencies.** QC has not provided meaningful discovery on its tortious interference claims. For example, QC's interrogatory responses simply recycle the allegations from its Complaint: both allege without more that because of Arm's alleged communications with the press, a Smartphone Company insisted on additional reassurances from QC, and an AI and Ecosystem Company refused to finalize a term sheet for an agreement. QC does not appear to have even produced documents showing the additional reassurances the Smartphone Company allegedly requested or the internal discussions at QC regarding those requested reassurances. And QC has produced minimal communications between QC and the AI and Ecosystem Company concerning the alleged term sheet. At a baseline, QC has sealed the customer's names and refuses to share the identities with Arm's in-house counsel. Similarly, QC refuses to produce communications with the media or customers about its rights under the QC ALA despite alleging that Arm's statements about the same damaged QC's customer relationships. *See* RFPs 124, 125, 126, 127, 129, 131, 142. Indeed, three of QC's claims center on Arm's supposedly wrongful, tortious, and unscrupulous "leaking" of a letter "to the media," *e.g.*, SAC ¶ 206, but QC refuses to produce the same discovery on its publication of the same letter in its SEC filings, including just days later, and refuses to produce documents concerning its own

"leaking," including for a story about confidential competition complaints QC placed with the same reporter at the same news outlet Arm allegedly communicated with. *See* RFPs 145, 146, 147, 157, 158, 159.

**QC's Competition-Related Deficiencies.**  Arm served various interrogatories seeking the bases of QC's UCL claim. *See* ROGs 5, 7, 8. QC refused to meaningfully answer, instead copying and pasting the same six word-for-word paragraphs taking up approximately three pages each time. *See* QC's R&O 1st Set of ROGs 5, 7, and 8. QC's response to ROG 7 contains **one** additional sentence gesturing at the kind of damages details sought, but that sentence neglects to mention equitable relief—the only kind of relief available under the California UCL. *Key v. Qualcomm, Inc.*, 129 F.4th 1129, 1141 (9th Cir. 2025). Those responses are unacceptable. *See Korn v. New Castle Cnty.*, 2004 WL 3048839, at *1–2 (Del. Ch. Dec. 6, 2004) (holding it was error to "cop[y] and past[e] the same answer to each of the twelve interrogatories in question").

Arm's interrogatories seek basic information about QC's UCL theories that Arm needs to defend itself. QC says it "reserves the right to prove that Arm's business acts and practices were 'unfair' under ***any tests*** California courts apply." 4/28/2025 Ltr. From C. Nyarady at 2 (emphasis added). One of those tests—the one that applies in disputes between sophisticated corporations—requires proof that Arm's conduct "[1] threatens an incipient violation of an antitrust law, or [2] violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or [3] otherwise significantly threatens or harms competition." *Cel-Tech Comm'cns, Inc. v. L.A. Cell. Tel. Co.*, 20 Cal. 4th 163, 187 (1999). Yet QC refuses to identify the antitrust laws supposedly implicated by Arm's conduct. Without this basic information, Arm cannot fully and fairly develop its legal or factual defenses to show its conduct does not threaten an incipient antitrust violation or violate the spirit of those laws.

QC's refusal to identify any relevant market(s) with respect to its UCL claim has likewise prejudiced Arm's ability to take discovery. *See Novanta Corp. v. Iradion Laser, Inc.*, 2016 WL 4987110, at *7 (D. Del. Sept. 16, 2016). Here, the relevant market could be any number of things ranging from an all-CPU and/or SoC market, any number of chip market segments (mobile, data center, automotive, etc.), and the market for instruction set architectures themselves. Indeed, it is impossible to say how "competition" is harmed in the absence of a market or identification of any alternative products—"competition" with what products, or with whom? *See Gamboa v. Apple Inc.*, 2025 WL 660190, at *6 (N.D. Cal. Feb. 28, 2025) ("Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition."); *Racek v. Rady Children's Hosp. of San Diego*, 2012 WL 2947881, at *6 (Cal. App. July 20, 2012) (similar); *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992, 1001–02 (N.D. Cal. 2000) (similar).

No court has adopted QC's *sui generis* position that under the UCL it need not even ***identify*** a relevant market. Although QC insists it has cited cases in support, it has not. QC cites *PeopleBrowsr, Inc. v. Twitter, Inc.*, 2013 WL 843032 (N.D. Cal. Mar. 6, 2013) in its repetitive ROG responses, but the issue there was one of federal subject matter jurisdiction—the court did not hold that parties could plead UCL claims without identifying any relevant market. In *Epic Games, Inc. v. Apple, Inc.*, there was extensive discovery (expert and otherwise) into the relevant market in that case, the holding was simply that, even if a party does not ***prove*** a market to a Sherman Act certainty under the federal balancing test, a plaintiff can still satisfy the UCL. 67 F.4th 946, 1001 (9th Cir. 2023). It does not stand for the proposition that a party need not identify a relevant market, competitors within that market, or substitutable products at issue ***at all***. Nor has

QC ever argued that its UCL claim raises the kind of "quick look" legal question related to price fixing in which "a precise market-definition is not needed." *Id.* at 1002. Arm understands that QC is not pleading a Sherman Act claim, which is all its cases say. That does not absolve QC of its obligation to explain the basic theory on which it plans to litigate its UCL claim, including in what market competition was harmed, what competitors (besides QC) were harmed, how so and what products were affected, and what effect that had on consumers in that market.

**QC's Harm And Damages-Related Deficiencies.** QC has refused to provide meaningful responses to Arm's requests relating to QC's harm and damages. For example, in response to Arm's ROG 1, which asks for QC's complete contention regarding how it was harmed, QC simply recycles its Complaint with no further detail. So too for Arm's ROG 3, which calls for specific harm as part of QC's tortious interference claim. QC's response to Arm's damages interrogatory, ROG 9, provides none of the information Arm requested to understand QC's damages demand. QC's Complaint suggests several possible damages theories, but because QC refuses to provide discovery into its licensing revenue, royalties profit, licenses with third parties, ongoing customer and business relationships, and other discovery relevant to its claims, Arm cannot assess them. *See* RFPs 24-26, 28, 30-32, 35, 55-56, 75, 78, 81, 91-92, 108-09, 112-13, 118, 161-64, 169, 172; ROGs 1, 3, 9.

**QC's ESI Search Terms and Custodians Are Deficient**. QC's ESI search terms are inadequate. QC provided its first and only list of search terms on March 17 in response to Arm's first set of RFPs, despite the fact that Arm subsequently served additional RFPs on March 14 and April 1 covering new and different issues. QC has categorically refused to supplement or broaden its terms or custodians whatsoever. Further, QC's March 17 terms are unduly narrow, containing overly-limiting conjunctions and including only portions of relevant terms without root expanders (i.e., "RISC," without a root expander, instead of "RISC*" or "RISC-V", the proper name). For core issues like unfair competition and Arm's alleged withholding of OOB and ACK patches, QC has only a *single* search term. Now that the SAC is operative, Arm should receive discovery on Qualcomm's allegations regarding alleged withholding of a license to v10 or breach of the TLA. Yet Qualcomm only has three narrow search terms that do not adequately cover those issues. Further compounding these issues, Qualcomm refuses to run its terms against even witnesses it has identified as knowledgeable about the key issues. Arm is entitled to serve an additional handful of search terms, but given the significant gaps in Qualcomm's production, Arm cannot cover the waterfront.

**QC's Arbitrary Discovery Window of June 1, 2022 to Present.** QC has artificially cabined its discovery responses from June 1, 2022 to present, despite its own Complaint alleging conduct from at least 2020, and its discovery responses referencing earlier information. *See, e.g.*, SAC ¶¶ 131–133; QC's R&Os to 1st Set of RFPs at 4, 9. For example, QC cites 2020 communications in support of its allegation that Arm breached its obligation to negotiate a v10 license. SAC ¶¶ 131–133. Similarly, several of QC's claims relate to Arm's alleged interference with QC's customers— putting at issue QC's relationships with those customers prior to any alleged interference—yet QC has refused to produce that information, contending it is irrelevant and outside the time period.

In sum, QC has failed to provide documents or interrogatory responses on many issues core to its case and Arm's defenses. Arm respectfully requests that the Court order QC to produce the documents and responses described above.

                                                Respectfully submitted,

                                                */s/ Anne Shea Gaza*

                                                Anne Shea Gaza (No. 4093)

cc: All Counsel of Record (by CM/ECF)