# Exhibit 1

1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3

4    ARM LTD.,                          )
              Plaintiff and Counterclaim )
5             Defendant,                 )  C.A. No. 22-1146
     V.                                  )  (MN)
6                                        )
     QUALCOMM INC., QUALCOMM             )
7    TECHNOLOGIES, INC. And NUVIA, INC., )
              Defendants and             )
8             Counterclaim Plaintiffs

9
                           - - - -
10
                        Wilmington, Delaware
11                      Friday, January 12, 2024
                        *Telephonic Oral Argument*
12
                           - - - -
13

14
     BEFORE:  HONORABLE LAURA D. HATCHER
15           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

16
                           - - - -
17

18

19

20

21

22

23

24

25
                              Michele L. Rolfe, RPR, CRR

54

1  is the first we heard that there was an objection from
2  Fujitsu. Fujitsu has not filed anything in this case, ARM
3  has never told us that they object. They haven't sent us
4  any letter. We don't understand what the objection is or
5  why the scope of license technology would be redacted in
6  that regard.
7          We also don't understand what -- why unique
8  licensing rates not at issue in the NUVIA ALA would prevent
9  ARM from listing the redactions on the scope of technology
10 covered by the Google and Microsoft ALAs, they're just --
11 you know, there's no way for us to assess that.
12         And as far as the other categories, I'll just
13 say that on representations and warranties, that's a
14 category that's listed in ARM's redaction log, we don't
15 really know what it's covering. Based on review of the ALAs
16 that we've seen, there can be representations and warranties
17 about a whole host of different types of provisions,
18 including pricing provisions. So it's unclear to us why
19 they think all representations and warranties are
20 irrelevant. And we think that we're entitled to see what's
21 under those redactions for all the reasons that we've
22 already stated. And I will pause there.
23         THE COURT: Okay. Thanks very much, Ms. Morgan.
24         Let's give Mr. Mooney, if it's Mr. Mooney
25 speaking, a chance to respond.

55

1          MR. VRANA: Your Honor, if I may really briefly,
2  this is Rob Vrana at Young Conaway. I just wanted to say
3  that I expect -- I think we expect ARM or potentially third
4  parties may want to seek redaction of the transcript of the
5  hearing, so I just wanted to flag that and request that the
6  Court keep the transcript sealed until that time.
7          THE COURT: Okay. Will do. Thanks.
8          MR. MOONEY: Your Honor, I will handle this.
9          Again, plenty to unpack, but given that we're
10 seven minutes to 5:00 on a holiday weekend, I'll try to be
11 as quick as possible here.
12         ARM has spent months now since the October 2023
13 hearing diligently working to produce less redacted ALAs for
14 nearly all of the licensees. And to provide some context,
15 there's basically three buckets here: Apple and Intel, two
16 licensees, have requested that we not remove redactions, we
17 have abided by that.
18         There were several licensees, but seven
19 licensees that we've worked with to remove redactions and a
20 hand full that have been nonresponsive, but the upside is
21 that the vast majority of what was redacted when we had a
22 hearing back in October is now unredacted, and what remains
23 redacted is set forth in a relatively brief redaction log.
24         Defendants haven't shown the relevance of any of
25 the currently redacted provisions, and they haven't done

56

1  this despite what I thought was very clear guidance, and
2  when I look back it seems to be, of Your Honor at the
3  October 5th hearing three months ago.
4          In fact, much of what I just heard I was getting
5  a sense of deja vu it was the same argument I heard back in
6  October. But at that hearing, Your Honor was very clear on
7  the transcript that we cannot treat the ALAs with a broad
8  brush, so they all have the same technology and parties and
9  it's ultimately situated, that is not appropriate. And Your
10 Honor specifically said "so after meet and confer, if
11 Qualcomm wants to come back to me and say there's a specific
12 license agreement that has similar or same technology, it's
13 similarly situated, such as the provisions are actually
14 relevant here, they can provide that to me with the
15 applicable California Third Circuit or Federal law, they may
16 do so."
17         They haven't done that. This was about three
18 sentences in a brief, and they didn't even attempt to meet
19 Your Honor's direction. And I think I just heard that it
20 would be impossible to meet that, it would not have.
21 For example, a short table that would list the agreement, a
22 column explaining the technology was similar and a column
23 explaining why one of the provisions or multiple provisions
24 were relevant would be quite simple, could even be an
25 exhibit. They didn't do that and they have not done that, I

57

1  think, on the fly on the phone. At least I have not heard
2  any argument that any specific provision, just technically
3  similar agreement, has any relevance whatsoever to this
4  case.
5          I guess the last thing I would say is there was
6  an attempt to leverage the change log argument, that is
7  obviously not an analogy, but I think Your Honor understands
8  that.
9          And unless Your Honor has any questions or would
10 like me to go into any specifics, that's all I have right
11 now. Thank you, Your Honor.
12         THE COURT: Okay. Thanks very much, Mr. Mooney.
13         Ms. Morgan, you can briefly respond, if you
14 like, but I'd ask you to limit your remarks to a minute or
15 two, given the hour.
16         MS. MORGAN: Yeah, I would say that the prior
17 arguments all took place before ARM submitted expert reports
18 that put the third-party ALAs squarely at issue before they
19 provided those agreements to their experts and asked their
20 experts TO rely on them and to come to conclusions that
21 necessitated examination on the third-party ALAs in their
22 entirety.
23         And as far as putting IN a table goes, I would
24 encourage Mr. Mooney to reread Exhibit 26, which sets forth
25 in exhaustive detail why each one of the ALA redactions

58

1    needs to be listed.  It took 27 pages to do that.

2            THE COURT:  Okay.

3            All right.

4            MS. MORGAN:  I guess I could also just add for

5    the Court that to the extent ARM believes that we should

6    submit a table that articulates what all of the disputes are

7    on these issues and that that wouldn't violate the page

8    limit, we are happy to do that.

9            THE COURT:  Thank you, Ms. Morgan.  I hear that

10   ship has sailed.

11           The motion to lift the redactions to the

12   third-party license is denied.

13           As our last teleconference on the issue of

14   redactions to third-party licenses, both parties were

15   instructed to meet and confer on a license-by-license basis

16   to determine relevance and specifically instructed to not

17   treat these individually negotiated and bespoke licenses

18   together as a group.  Qualcomm's somewhat watered down

19   motion does just that.

20           I have no ability, given what I have right now,

21   to evaluate the relevance of any individual license, the

22   applicability of the technology, the relevance of the

23   requested unredactions, the need for such information and

24   whether disclosure of such information could result in harm,

25   so for those reasons the motion should be denied.

59

1            Is there anything else that we need to do?

2            MR. MOONEY:  Nothing from our end, Your Honor.

3            THE COURT:  Okay.  Hearing nothing, folks,

4    thanks again for the very helpful argument, and I hope you

5    have a very nice weekend.  Take care.

6            ALL COUNSEL:  Thank you, Your Honor.

7            (Whereupon, the following proceeding concluded

8    at 4:59 p.m.)

9            I hereby certify the foregoing is a true

10   and accurate transcript from my stenographic notes in the

11   proceeding.

12           /s/ Michele L. Rolfe, RPR, CRR

                 U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 2

1

```
13:12:40        IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF DELAWARE

ARM LTD.,                    )
a U.K. corporation,          )
                             )
             Plaintiff,      )
                             )  C.A. No. 22-1146(MN)
v.                           )
                             )
QUALCOMM, INC.,              )
a Delaware corporation,      )
et al.,                      )
                             )
             Defendants.     )


             Thursday, March 7, 2024
             2:13 p.m.
             Oral Argument


             844 King Street
             Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge


APPEARANCES:


         YOUNG CONAWAY STARGATT & TAYLOR
         BY:  ANNE SHEA GAZA, ESQ.
         BY:  ROBERT M. VRANA, ESQ.

         -and-

         MORRISON FOERSTER, LLP
         BY:  KYLE W.K. MOONEY, ESQ.
         BY:  NICHOLAS R. FUNG, ESQ.
         BY:  DANIEL MACKNIDES, ESQ.

                     Counsel for the Plaintiff
```

2

1   APPEARANCES CONTINUED:

2

3       MORRIS NICHOLS ARSHT & TUNNELL LLP
        BY:  JACK BLUMENFELD, ESQ.

4       -and-

5       PAUL WEISS
        BY:  KAREN L. DUNN, ESQ.

6       BY:  ERIN MORGAN, ESQ.

7           Counsel for the Defendants

8

9       FISH & RICHARDSON
        BY:  NITIKA GUPTA FIORELLA, ESQ.

10      -and-

11      WALKER STEVENS CANNOM, LLP

12      BY:  HANNAH L. CANNOM, ESQ.

13          Counsel for Apple, Inc.

14

15      WILSON SONSINI GOODRICH & ROSATI
        BY:  BRAD SORRELS, ESQ.

16

17          Counsel for Ampere Computing

18

19      – – – – – – – – – – – – –

20

13:37:07
13:37:07 21     THE COURT:  All right.  Good afternoon everyone.
        Please be seated.
14:13:23 22     Ms. Gaza.
14:13:29 23
14:13:29 24     MS. GAZA:  Good afternoon, Your Honor.  Anne
        Gaza on behalf of plaintiff, ARM.  I'm joined today by Kyle

3

14:13:35  1   Mooney and Nicholas Fung of Morrison & Foerster as well as
14:13:38  2   my colleague, Robert Vrana and Daniel Macknides.
14:13:45  3       MR. BLUMENFELD:  Good afternoon, Your Honor.
14:13:48  4   Jack Blumenfeld from Morris Nichols for the Qualcomm
14:13:52  5   defendants.  And with me is Karen Dunn and Erin Morgan from
14:13:56  6   Paul Weiss.
14:13:56  7       THE COURT:  Great.
14:13:58  8       MS. GAZA:  Your Honor, if I may, I'm sorry, I
14:14:01  9   meant to mention also that third-party counsel for Ampere
14:14:06 10   and Apple are in attendance as well if you would like their
14:14:09 11   introduction.
14:14:10 12       THE COURT:  Sure.  You guys can give me your
14:14:12 13   input if you need to.
14:14:15 14       All right.  Let's start with -- so we have a
14:14:19 15   couple of objections and we have the trial date issue.  I
14:14:25 16   saw there was another order from Judge Hatcher yesterday.
14:14:28 17   Am I going to be getting objections for that, anyone?
14:14:35 18       MR. MOONEY:  No, Your Honor.
14:14:35 19       THE COURT:  I didn't get a yes or no.  And when
14:14:38 20   you speak, could you stand.
14:14:39 21       MS. DUNN:  Not from us, Your Honor.
14:14:41 22       MR. MOONEY:  No, Your Honor.
14:14:42 23       THE COURT:  Okay.  Great.  All right.
14:14:45 24       Okay.  Let's start with Mr., is it Son or Son?
14:14:53 25       MS. DUNN:  Yes, Your Honor.  Karen Dunn for

4

14:14:56  1   Qualcomm.
14:14:57  2       THE COURT:  So I need you to really focus me on
14:15:01  3   the standard here because I'm not looking at this de novo,
14:15:07  4   and so I need you to focus on why this was clearly erroneous
14:15:14  5   or contrary to law.
14:15:16  6       MS. DUNN:  I'm happy to do that, Your Honor.  We
14:15:19  7   have slides as to this argument that we can hand up if it
14:15:24  8   pleases the Court.  Thank you.
14:15:25  9       THE COURT:  Let me ask you this before I start.
14:15:27 10   Is there really a dispute as to whether he told Samsung or
14:15:39 11   others that Qualcomm's license was going to expire?  Is that
14:15:45 12   in dispute?
14:15:46 13       MS. DUNN:  There is a dispute about his
14:15:48 14   statements.  We know he -- there is no dispute that he made
14:15:52 15   statements.  I don't know, perhaps counsel for Arm can tell
14:15:55 16   us whether they dispute that he said the license would
14:15:58 17   expire.  I don't think that's in the record.
14:16:02 18       THE COURT:  Why don't you guys talk about that
14:16:04 19   because I need to understand what there is a dispute about
14:16:06 20   so I can decide if he has superior or unique knowledge.  If
14:16:10 21   nobody disputes what you say he said, then I'm not sure I
14:16:14 22   care as much.  Why don't you guys talk about it.  I can't
14:16:19 23   believe you haven't done that already.
14:16:21 24       (Discussion off the record.)
14:16:25 25       MR. MOONEY:  Your Honor, Rene Haas, the current

41

15:08:10 1 change something, only the terms that are non-redacted.

15:08:13 2 MR. MOONEY: Yes, Your Honor is right that we as

15:08:16 3 you pointed out to counsel at Qualcomm, having redacted that

15:08:19 4 information we are not going to be able to rely what is

15:08:22 5 beneath those redactions to make that argument, that's

15:08:25 6 right.

15:08:25 7 THE COURT: You're not going to be able to argue

15:08:27 8 that you're changing terms or that you will change terms

15:08:32 9 that have been redacted in any way. So, if, for example,

15:08:37 10 you can't say whatever is in appendix A, you can't say well

15:08:43 11 -- annex A, we're not going to change what we do in annex A

15:08:50 12 because you never disclosed what you did previously so you

15:08:50 13 can't say how you're going to change it, right?

15:08:53 14 MR. MOONEY: I believe Your Honor would not let

15:08:54 15 us get away with that. We would not be able to rely on any

15:08:59 16 redacted information.

15:09:00 17 THE COURT: And your expert hasn't given any

15:09:02 18 specifics so you can't come in later with some specifics, is

15:09:05 19 that right?

15:09:05 20 MR. MOONEY: Well, the expert, yes, Your Honor,

15:09:07 21 I didn't see in looking at Mr. Schoettelkotte's expert

15:09:11 22 report, the passages that we were pointed to, any statements

15:09:14 23 about changes being made to ALAs, any reliance on any

15:09:19 24 redacted material, in fact, Mr. Schoettelkotte had the very

15:09:22 25 same redacted documents that Qualcomm's experts had. I have

42

15:09:26 1 heard for the first time today a complaint that our expert

15:09:29 2 spoke to some ARM employees. I have not heard that before

15:09:33 3 in this case --

15:09:34 4 THE COURT: Well, I saw something in the papers

15:09:36 5 saying they didn't give them the licenses or maybe they gave

15:09:40 6 them redacted versions of licenses, but I did see something

15:09:44 7 saying he's not opining based on the licenses, he's opining

15:09:49 8 based on something else.

15:09:50 9 MR. MOONEY: Our expert, both Mr. Schoettelkotte

15:09:53 10 and others did have conversations with some ARM employees in

15:09:56 11 connection with preparing the report, just as Qualcomm's

15:09:59 12 expert spoke to Qualcomm employees. I would like to say

15:10:03 13 though, that Your Honor just heard that Qualcomm did not

15:10:06 14 have a chance to have conversations with the people that

15:10:08 15 Mr. Schoettelkotte spoke to. They did. They deposed these

15:10:12 16 people and I was present at those depositions.

15:10:14 17 THE COURT: And did this come before or after

15:10:16 18 those depositions?

15:10:17 19 MR. MOONEY: This expert report was served a few

15:10:20 20 weeks after the fact depositions.

15:10:22 21 THE COURT: So they didn't have a chance to ask

15:10:24 22 because they didn't know that Mr. Abbey and Mr. Williamson

15:10:29 23 had discussions with Mr. Schoettelkotte, right?

15:10:31 24 MR. MOONEY: I would not agree with that. They

15:10:33 25 knew what -- they knew the sphere of responsibility that

43

15:10:37 1 those employees had, we had produced 1.5 million pages of

15:10:42 2 documents --

15:10:43 3 THE COURT: They had no idea, when they took

15:10:45 4 those depositions, they couldn't say, Mr. Abbey, what did

15:10:48 5 you discuss with the expert?

15:10:50 6 MR. MOONEY: I agree with that, Your Honor.

15:10:51 7 THE COURT: Okay.

15:10:52 8 MR. MOONEY: But Your Honor, that's not unlike

15:10:55 9 --

15:10:55 10 THE COURT: I think that's what Mr. Blumenfeld

15:10:57 11 was getting at, he's saying I can't have the same

15:11:00 12 discussions with these folks and ask, you know, have my

15:11:04 13 expert ask them questions because fact discovery is over.

15:11:04 14 MR. MOONEY: It is true, Your Honor --

15:11:11 15 THE COURT: He can't ask about what they

15:11:14 16 discussed with the expert.

15:11:15 17 MR. MOONEY: It is true that in this case

15:11:17 18 Qualcomm's -- if I'm following this, Qualcomm's counsel was

15:11:21 19 not able to depose ARM employees after ARM's expert put in

15:11:26 20 reports, that's true. That's true in every case. What is

15:11:30 21 also true in this case --

15:11:31 22 THE COURT: Yeah, but what's not true in every

15:11:33 23 case is every -- my gosh, we have from footnote 196 through

15:11:38 24 at least -- through at least footnote 219, there is nothing

15:11:43 25 else other than discussion, or maybe a deposition.

44

15:11:49 1 MR. MOONEY: I agree with Your Honor that

15:11:51 2 Mr. Schoettelkotte in particular had many discussions with

15:11:54 3 our employees and this is a heavily footnoted report. Those

15:11:58 4 are not the only sources Mr. Schoettelkotte relied on by any

15:12:02 5 means.

15:12:02 6 THE COURT: It is the only source in what I

15:12:04 7 have.

15:12:04 8 MR. MOONEY: It is the only source in the four

15:12:06 9 pages that Your Honor has been handed from the report,

15:12:09 10 Mr. Schoettelkotte has a schedule of information that was

15:12:11 11 relied on that includes many thousands of documents in the

15:12:14 12 case, many thousands of transcripts and exhibits in addition

15:12:18 13 --

15:12:18 14 THE COURT: So let's say -- and I'll give the

15:12:23 15 third parties a chance to weigh in on this, too, tell me

15:12:29 16 about the confidentiality. We have a protective order, we

15:12:33 17 have an outside counsel only provision. To say that this

15:12:38 18 stuff is at risk of all of the comments were sort of generic

15:12:44 19 saying this is going to give Qualcomm a competitive

15:12:47 20 advantage. The way it gives Qualcomm a competitive

15:12:51 21 advantage is if the information is given to outside counsel

15:12:54 22 and outside counsel gives it to Qualcomm, which is quite an

15:13:02 23 accusation.

15:13:02 24 So why is the protective order not sufficient?

15:13:07 25 MR. MOONEY: Well, as Your Honor knows, the law

45

| | |
|---|---|
| 15:13:10 | 1 is clear that the protective order isn't sufficient to |
| 15:13:13 | 2 require parties to produce information that's not relevant |
| 15:13:16 | 3 in the case. |
| 15:13:17 | 4     THE COURT:  Let's say I'm not convinced that |
| 15:13:19 | 5 it's not relevant. |
| 15:13:20 | 6     MR. MOONEY:  Your Honor is right, we are not |
| 15:13:21 | 7 suggesting that Qualcomm outside counsel is going to |
| 15:13:25 | 8 deliberately disclose this information to anybody, that's |
| 15:13:28 | 9 not the concern.  The concern is that this is highly |
| 15:13:30 | 10 confidential competitive information that goes to the very |
| 15:13:34 | 11 core of our business and to the very core of our |
| 15:13:38 | 12 competitor's business and this is information that could be |
| 15:13:40 | 13 misused by our competitors and our customers.  And that any |
| 15:13:45 | 14 risk that this information is inadvertently specifically or |
| 15:13:50 | 15 generally used or disclosed by any counsel or anyone else |
| 15:13:54 | 16 involved in the case who might have access to this |
| 15:13:56 | 17 information under the protective order, which certainly |
| 15:14:00 | 18 isn't just counsel sitting at the table is enough of a risk |
| 15:14:03 | 19 that we worked very carefully with our customers, Apple |
| 15:14:08 | 20 here, to remove as many -- |
| 15:14:11 | 21     THE COURT:  You haven't worked at all with |
| 15:14:12 | 22 anyone on the 2023 Apple agreement, that's just a big fat |
| 15:14:17 | 23 no, right?  You don't even have the first page of it that |
| 15:14:20 | 24 says agreement. |
| 15:14:21 | 25     MR. MOONEY:  It is true that the Apple agreement |

46

| | |
|---|---|
| 15:14:24 | 1 2023 has not been produced and on that, I would let Apple |
| 15:14:29 | 2 speak further. |
| 15:14:29 | 3     If you have any other further questions for me, |
| 15:14:32 | 4 I'm happy to address them. |
| 15:14:34 | 5     THE COURT:  All right.  Apple. |
| 15:14:37 | 6     MS. CANNOM:  Thank you, Your Honor.  Hannah |
| 15:14:40 | 7 Cannom on behalf of Apple, Inc.  A couple of points that I |
| 15:14:43 | 8 think we need to look at.  First of all, it's from Judge |
| 15:14:46 | 9 Hatcher's order where she says that balancing the minimal |
| 15:14:50 | 10 relevance when combined with the harm of disclosure -- |
| 15:14:53 | 11     THE COURT:  I might think it's a little bit more |
| 15:14:55 | 12 relevant than she does. |
| 15:14:58 | 13     MS. CANNOM:  What she then goes on to say it |
| 15:15:01 | 14 will necessarily need to generate generalized information |
| 15:15:03 | 15 from the ARM clients.  This is different than a source code |
| 15:15:05 | 16 situation where the source code is in a room and what we're |
| 15:15:07 | 17 worried about is inadvertent disclosure of large swaths of |
| 15:15:11 | 18 code.  Here we have information that once it's heard -- |
| 15:15:15 | 19     THE COURT:  Tell me what exactly that means, |
| 15:15:18 | 20 necessarily -- I don't know why that is, so why is it |
| 15:15:23 | 21 different than you have source code and you say we can't |
| 15:15:30 | 22 make out an infringement case because, you know, the source |
| 15:15:34 | 23 code doesn't have this, or we can make out an infringement |
| 15:15:38 | 24 case so that, therefore, they are, you know, confirming that |
| 15:15:41 | 25 the source code shows that something works.  Why -- like, |

47

| | |
|---|---|
| 15:15:45 | 1 why is that different from this?  Why do you think that if |
| 15:15:52 | 2 someone, outside counsel for Qualcomm gets it, like what is |
| 15:15:56 | 3 -- give me an example, what necessarily would they have to |
| 15:15:59 | 4 disclose that's so -- that's so secret that it would be |
| 15:16:04 | 5 harmful. |
| 15:16:05 | 6     MS. CANNOM:  Right.  So speaking generally about |
| 15:16:06 | 7 the termination provision, if they were entitled to see the |
| 15:16:10 | 8 termination provision, then they would have to tell their |
| 15:16:15 | 9 client whether the termination provision was similar or |
| 15:16:17 | 10 different and that's why that mattered to the specific issue |
| 15:16:20 | 11 here. |
| 15:16:21 | 12     There are also other, you know, certain |
| 15:16:23 | 13 licensing terms -- |
| 15:16:25 | 14     THE COURT:  Well, I mean the termination |
| 15:16:26 | 15 provision, that wasn't even something -- that was redacted |
| 15:16:29 | 16 in the Google one, so I'm not sure why I understand that's |
| 15:16:33 | 17 so secretive. |
| 15:16:35 | 18     MS. CANNOM:  And Apple's position is that |
| 15:16:38 | 19 everything that's within the 2023 ALA is very highly |
| 15:16:41 | 20 protected even within Apple. |
| 15:16:44 | 21     THE COURT:  That assumes a bit much to me. |
| 15:16:47 | 22 You're telling me the very first words that say this ALA |
| 15:16:51 | 23 between Apple and ARM, that's super secret.  Come on, right |
| 15:16:54 | 24 then you're losing a little bit of credibility because |
| 15:16:57 | 25 you're not even -- I mean, that's not -- let's put it this |

48

| | |
|---|---|
| 15:17:00 | 1 way.  The Third Circuit test for confidentiality, you didn't |
| 15:17:05 | 2 meet it when you're telling me that.  I'm supposed to go |
| 15:17:09 | 3 line by line in things according to the Third Circuit.  So |
| 15:17:13 | 4 you just saying there is an agreement, but you can't even |
| 15:17:17 | 5 see who signed it tells me right then that you're being |
| 15:17:21 | 6 overly inclusive and you're not encouraging me to follow the |
| 15:17:26 | 7 Third Circuit's guidance on confidentiality. |
| 15:17:30 | 8     MS. CANNOM:  Understood, Your Honor.  Your |
| 15:17:33 | 9 Honor, and if you were to order that Apple would have to |
| 15:17:36 | 10 produce a redacted version in line with the other ALAs, that |
| 15:17:40 | 11 would be certainly something we would do.  Our concern here, |
| 15:17:43 | 12 however, is that the clearly defined serious injury that |
| 15:17:47 | 13 Apple has vis-a-vis its competitor and more broadly -- |
| 15:17:50 | 14     THE COURT:  I'm still not getting it.  You're |
| 15:17:52 | 15 telling me it's so harmful to you if the example you gave |
| 15:17:57 | 16 me, the termination provisions were disclosed, yet other |
| 15:18:02 | 17 competitors, termination provisions are disclosed, and maybe |
| 15:18:08 | 18 there is something super secret in Apple's termination |
| 15:18:12 | 19 provision, but the fact that it sort of undermines your |
| 15:18:18 | 20 argument when other competitors are like okay, you can't see |
| 15:18:18 | 21 how much we pay, but you can see what happens if we |
| 15:18:24 | 22 terminate or how we terminate. |
| 15:18:26 | 23     MS. CANNOM:  To be clear, there are multiple |
| 15:18:28 | 24 other ALAs that have been produced in redacted material |
| 15:18:32 | 25 here.  What we're concerned is the most recent one which has |

61

| | |
|---|---|
| 15:35:45 | 1  Your Honor. |
| 15:35:45 | 2       THE COURT:  Did you ever tell me that?  Is that |
| 15:35:47 | 3  in the scheduling order? |
| 15:35:49 | 4       MR. BLUMENFELD:  No, they demanded a jury. |
| 15:35:50 | 5       THE COURT:  Because I have a jury trial.  When |
| 15:35:52 | 6  did you tell me it was going to be a bench trial? |
| 15:35:56 | 7       MR. MOONEY:  I have to look back, Your Honor.  I |
| 15:36:00 | 8  don't have that at my fingertips, I'm sorry. |
| 15:36:02 | 9       THE COURT:  Do you think you ever did? |
| 15:36:25 | 10      MR. MOONEY:  I'm taking a look, Your Honor.  I |
| 15:36:27 | 11 don't know the answer to that.  It could have been a delay |
| 15:36:29 | 12 in the products being released has caused -- |
| 15:36:33 | 13      THE COURT:  So the answer is no.  But you're |
| 15:37:00 | 14 going -- are you asking for a jury? |
| 15:37:03 | 15      MR. BLUMENFELD:  I expect that we are going to |
| 15:37:04 | 16 ask for a jury on our counterclaims.  We always thought |
| 15:37:08 | 17 until about two days ago that this was going to be a jury |
| 15:37:11 | 18 trial and then ARM's lawyers said something before Judge |
| 15:37:19 | 19 Hatcher the other day suggesting that they didn't see it |
| 15:37:21 | 20 that way. |
| 15:37:27 | 21      MR. MOONEY:  Our understanding, Your Honor, that |
| 15:37:29 | 22 the only claim in the case right now -- |
| 15:37:32 | 23      THE COURT:  I'm just looking at the scheduling |
| 15:37:34 | 24 order that you guys proposed to me which talks about a |
| 15:37:38 | 25 five-day jury trial.  So if you changed your mind, it would |

62

| | |
|---|---|
| 15:37:44 | 1  have been nice to have a little bit of a notice, especially |
| 15:37:48 | 2  when you know we're talking about trial dates. |
| 15:37:52 | 3       MR. BLUMENFELD:  And I'm not sure, Your Honor, |
| 15:37:55 | 4  that they're permitted to withdraw a jury demand without our |
| 15:37:59 | 5  consent at this point.  It's not something we've ever |
| 15:38:04 | 6  discussed. |
| 15:38:05 | 7       MR. MOONEY:  I understand that the bench trial |
| 15:38:07 | 8  did come up before Judge Hatcher, Your Honor.  I don't know |
| 15:38:12 | 9  how long ago that was. |
| 15:38:13 | 10      THE COURT:  That's really not relevant to me. |
| 15:38:22 | 11 So I am going to overrule the objections for right now.  I |
| 15:38:28 | 12 think we need to understand -- assuming this were to go to a |
| 15:38:33 | 13 jury trial, I think I could address -- I could allow you to |
| 15:38:44 | 14 raise this again once I understand the arguments being made |
| 15:38:51 | 15 as to irreparable harm. |
| 15:38:54 | 16      If it's going to be a bench trial, then I need |
| 15:39:00 | 17 to think about it a little bit more.  And it may be that we |
| 15:39:04 | 18 just phase the bench trial so that I can understand what the |
| 15:39:09 | 19 arguments are.  Because my problem is right now I can see |
| 15:39:13 | 20 relevance, but I can't make a determination that the |
| 15:39:16 | 21 relevance is enough to overcome some valid -- I think |
| 15:39:22 | 22 Apple's 2023 agreement is not credible because saying you |
| 15:39:28 | 23 can't produce it at all is just not even trying.  But I |
| 15:39:34 | 24 can't say that they don't have valid concerns about the |
| 15:39:39 | 25 confidentiality aspects.  And I'm sorry, I forgot the other |

63

| | |
|---|---|
| 15:39:43 | 1  company. |
| 15:39:45 | 2       MR. SORRELS:  Ampere, Your Honor. |
| 15:39:46 | 3       THE COURT:  Ampere, I think those concerns |
| 15:39:48 | 4  were -- at least they were specific concerns. |
| 15:39:50 | 5       So I am not ready to argue -- I'm not ready to |
| 15:39:57 | 6  rule that the relevance, that Judge Hatcher got it clearly |
| 15:40:00 | 7  wrong when she weighed the relevance and the harm. |
| 15:40:04 | 8       But I am also not clear that there is going to |
| 15:40:10 | 9  be arguments made where it would be unfair for the defendant |
| 15:40:12 | 10 to be able to defend itself. |
| 15:40:14 | 11      So I am going to make that ruling without |
| 15:40:20 | 12 prejudice.  If it turns out that you make a specific showing |
| 15:40:26 | 13 of what you would need to respond to something or to make an |
| 15:40:28 | 14 argument, you can come back and just remind us.  And that it |
| 15:40:34 | 15 should not go to Judge Hatcher, that it should come to me. |
| 15:40:38 | 16      MR. BLUMENFELD:  Thank you, Your Honor. |
| 15:40:39 | 17      THE COURT:  Okay.  And you guys need to talk |
| 15:40:41 | 18 about the trial and can you guys do that and in the next two |
| 15:40:46 | 19 weeks get back to us on your positions as to jury, bench and |
| 15:40:51 | 20 whether they can withdraw it at this point? |
| 15:40:53 | 21      Okay.  So now we have to talk about the trial |
| 15:40:56 | 22 schedule.  I don't remember when the trial was scheduled. |
| 15:41:31 | 23 September. |
| 15:41:36 | 24      MS. DUNN:  I believe September 23rd. |
| 15:41:38 | 25      THE COURT:  There it is.  September 23rd.  Okay. |

64

| | |
|---|---|
| 15:41:44 | 1  So when were you looking to have it moved to? |
| 15:41:48 | 2       MS. DUNN:  Your Honor, the date that we proposed |
| 15:41:51 | 3  is a date that we believe was open on Your Honor's calendar, |
| 15:41:56 | 4  December 9th.  We did call the Court some time ago for that |
| 15:42:04 | 5  date, so we don't know if your calendar is still available. |
| 15:42:08 | 6       THE COURT:  It's not. |
| 15:42:10 | 7       MS. DUNN:  We certainly could do it any time |
| 15:42:14 | 8  after that. |
| 15:42:14 | 9       THE COURT:  I have December 2nd, the week of |
| 15:42:17 | 10 December 2nd. |
| 15:42:22 | 11      MS. DUNN:  That date I believe would work for |
| 15:42:25 | 12 us.  I don't know about my friends on the other side. |
| 15:42:30 | 13      MR. MOONEY:  Your Honor, we do have availability |
| 15:42:35 | 14 the week of December 2nd if Your Honor decides to delay the |
| 15:42:40 | 15 trial.  Our position is that counsel has not shown good |
| 15:42:43 | 16 cause to extend the schedule or change the trial date, |
| 15:42:46 | 17 particularly in light of the ruling coming out Monday, and |
| 15:42:51 | 18 that the trial date should remain in September. |
| 15:42:55 | 19      THE COURT:  I haven't decided if I am going to |
| 15:43:00 | 20 change it. |
| 15:43:03 | 21      Actually I have a naturalization ceremony that |
| 15:43:03 | 22 week, so what about the week of the 16th of December? |
| 15:43:14 | 23      MS. DUNN:  That works for Qualcomm. |
| 15:43:18 | 24      MR. MOONEY:  Did Your Honor have availability |
| 15:43:20 | 25 before that date if Your Honor decides to delay the trial? |

# Exhibit 3

1

```
13:41:50  1              IN THE UNITED STATES DISTRICT COURT

          2              FOR THE DISTRICT OF DELAWARE

          3

          4
             ARM LTD.,                      )
          5  a U.K. corporation,            )
                                            )
          6           Plaintiff,            )
                                            ) C.A. No. 22-1146(MN)
          7     v.                          )
                                            )
          8  QUALCOMM, INC.,                )
             a Delaware corporation,        )
          9  et al.,                        )
                                            )
         10           Defendants.           )

         11

         12
                        Wednesday, November 20, 2024
         13             2:00 p.m.
                        Pretrial Conference
         14

         15             844 King Street
                        Wilmington, Delaware
         16

         17

         18  BEFORE:  THE HONORABLE MARYELLEN NOREIKA
                      United States District Court Judge
         19

         20

         21  APPEARANCES:

         22
                        YOUNG CONAWAY STARGATT & TAYLOR
         23             BY:  ANNE SHEA GAZA, ESQ.
                        BY:  ROBERT M. VRANA, ESQ.
         24             BY:  DANIEL MACKRIDES, ESQ.

         25             -and-
```

2

```
          1  APPEARANCES (Cont'd):

          2

          3          MORRISON FOERSTER, LLP
                     BY:  DARALYN DURIE, ESQ.
                     BY:  ERIK OLSON, ESQ.
          4          BY:  DANIEL MUINO, ESQ.
                     BY:  SHAELYN DAWSON, ESQ.
          5          BY:  NICHOLAS FUNG, ESQ.
                     BY:  HENRY HUTTINGER, ESQ.
          6          BY:  LAURA GILBERT REMUS, ESQ.

          7
                          Counsel for the Plaintiff
          8

          9

         10          MORRIS NICHOLS ARSHT & TUNNELL LLP
                     BY:  JACK BLUMENFELD, ESQ.
         11          BY:  JENNIFER YING, ESQ.

         12          -and-

         13          PAUL WEISS
                     BY:  KAREN L. DUNN, ESQ.
         14          BY:  CATHERINE NYARDY, ESQ.
                     BY:  JACOB BRALY, ESQ.
         15          BY:  RUBY GARRETT, ESQ.
                     BY:  ERIN MORGAN, ESQ.
         16          BY:  ANNA LIPIN, ESQ.
                     BY:  FLINT PATTERSON, ESQ.

         17
                          Counsel for the Defendants
         18

         19

         20

         21          - - - - - - - - - - - - -

         22
         23
14:00:58 24          COURTROOM DEPUTY:  All rise.  The United States
         25  District Court for the District of Delaware is now in
```

3

```
14:04:02  1  session.  The Honorable Maryellen Noreika presiding.

14:04:02  2          THE COURT:  All right.  Good afternoon,

14:04:04  3  everyone.  Please be seated.

14:04:06  4          All right.  Ms. Gaza.

14:04:09  5          MS. GAZA:  Good afternoon, Your Honor.  Anne

14:04:11  6  Gaza from Young, Conaway on behalf of plaintiff, ARM.  I'm

14:04:15  7  joined today by Daralyn Durie, Erik Olson, Shaelyn Dawson,

14:04:22  8  Nicholas Fung, Daniel Muino, Henry Huttinger, Laura Gilbert

14:04:28  9  Remus all from Morrison Foerster as well as my colleagues,

14:04:32 10  Rehoboth Vrana and Daniel Mackrides.

14:04:35 11          THE COURT:  All right.  Good afternoon everyone.

14:04:37 12          MR. BLUMENFELD:  Good afternoon, Your Honor.

14:04:38 13          THE COURT:  Good afternoon.

14:04:39 14          MR. BLUMENFELD:  Jack Blumenfeld from Morris

14:04:44 15  Nichols for Qualcomm and NuVia.  With me at counsel table

14:04:47 16  are Karen Dunn, Catherine Nyrady and Jacob Braly from Paul

14:04:53 17  Weiss.  Behind them, Jennifer Ying from Morris Nichols, Erin

14:04:57 18  Morgan from Paul Weiss, and behind them, Flint Patterson,

14:05:02 19  Ruby Garrett and, Chris Longman from Qualcomm.

14:05:02 20          THE COURT:  All right.  Welcome to all of you

14:05:08 21  and good afternoon.

14:05:09 22          Okay.  All right.  Let me just get my document

14:05:19 23  ready here.

14:05:26 24          So I appreciate the letter that we received last

14:05:31 25  night from the defendants on simplifying the case.  I think
```

4

```
14:05:39  1  it's dropping the counterclaims.  How are we going to

14:05:45  2  resolve those?

14:05:46  3          MS. DUNN:  Your Honor, they're out of the case,

14:05:51  4  so we are dropping them as claims.

14:05:54  5          THE COURT:  So I always run into this problem

14:05:56  6  and then I get like after the case are they dismissed, are

14:06:00  7  they dismissed with prejudice, did you fail to put in

14:06:03  8  evidence on them, so I'm granting judgment, what are we

14:06:07  9  doing with them?  You can't just say we're dropping them.

14:06:10 10  They're in the case.  How do I get them out of it?

14:06:13 11          MS. DUNN:  We can file a voluntary withdraw of

14:06:16 12  the claims if that is what Your Honor would like.

14:06:22 13          THE COURT:  I want to know what you guys have

14:06:24 14  agreed to do.  So have you talked with the other side?

14:06:28 15          MS. DUNN:  We talked to the other side and

14:06:30 16  agreed that we would drop the claims so they're aware.  I

14:06:33 17  don't think we've talked mechanically how we would do that.

14:06:36 18  We're happy to do that and make a submission to the Court.

14:06:39 19          THE COURT:  That would be very helpful.

14:06:40 20          MS. DUNN:  Okay.

14:06:41 21          THE COURT:  And I don't mean to suggest that I

14:06:43 22  don't appreciate that you're dropping them, it's just that I

14:06:47 23  have gotten myself into trouble before when I don't figure

14:06:50 24  out what that means.

14:06:51 25          MS. DUNN:  Understood, Your Honor.  Plaintiff's
```

25

14:38:11 1 the founders received compensation in the acquisition, or to
14:38:15 2 the fact that there is a bonus structure laid out and a term
14:38:20 3 sheet that was signed as part of the acquisition. All of
14:38:23 4 the reasons that ARM provides in their response are
14:38:27 5 satisfied without disclosing the actual proceeds that were
14:38:31 6 made by the NuVia founders who are nonparties to this
14:38:36 7 action. And including that information and introducing that
14:38:39 8 evidence into this case would only seek to inflame the jury.
14:38:42 9 To also address one of the issues that's raised
14:38:45 10 in ARM's response, they question whether a particular
14:38:50 11 milestone -- I think the last pending milestone payment was
14:38:53 12 paid out based on --
14:38:55 13 THE COURT: How much money are we talking about?
14:38:59 14 MR. BRALY: It is approximately 80 to $100
14:39:03 15 million, Your Honor. Mr. Gulati in Exhibit 1A to our
14:39:08 16 opening brief provides a breakdown of the amount on pages
14:39:11 17 137 to 138, and describes both the stock transfer as well as
14:39:17 18 a cash payment and then, of course, there are milestone
14:39:20 19 payments as well.
14:39:22 20 THE COURT: Okay. Let me hear from the
14:39:24 21 plaintiff.
14:39:25 22 MS. DURIE: Thank you, Your Honor. Daralyn
14:39:30 23 Durie for ARM.
14:39:31 24 Evidence of the amount of money that the
14:39:34 25 founders stood to make by virtue of the acquisition is

26

14:39:39 1 highly relevant to their motivation for disregarding their
14:39:45 2 contractual obligations. And closing that transaction
14:39:50 3 notwithstanding the consent requirement and failing to get
14:39:54 4 consent, and then using the ARM technology that had been
14:40:01 5 developed at NuVia in order to speed product development at
14:40:06 6 Qualcomm and get the milestone payments that had been
14:40:10 7 promised to them. And I think the case law is quite clear
14:40:14 8 that evidence of the amount of money that a party stands to
14:40:19 9 gain is evidence of bias. And it shows their motivation for
14:40:24 10 engaging in the specific conduct that is at issue in this
14:40:28 11 case.
14:40:28 12 THE COURT: All right. I think I have heard
14:40:30 13 enough.
14:40:30 14 MS. DURIE: Thank you.
14:40:31 15 THE COURT: I am going to deny the motion. If
14:40:38 16 defendants -- I've already permitted defendants to use the
14:40:40 17 royalty rate to show motive and bias from plaintiff's part,
14:40:45 18 then plaintiff can also use Qualcomm's buyout figures to
14:40:49 19 show motive or bias of the NuVia folks.
14:40:53 20 Okay. Qualcomm's motion in limine number 2,
14:40:58 21 defendants seek to preclude ARM from making arguments about
14:41:01 22 its ALA program, ALAs generally unless it produces all of
14:41:07 23 its third-party ALAs without redactions. We had a little
14:41:07 24 bit of a discussion about this at the last hearing. I'm not
14:41:16 25 sure if I screwed that up. So I do need to understand

27

14:41:19 1 what's going on because plaintiff now seems to be saying
14:41:26 2 look, we're not going to use those, which I appreciate
14:41:30 3 because you didn't produce them, you shouldn't be able to
14:41:33 4 use them.
14:41:34 5 But what I'm not sure happens is instead it
14:41:37 6 seems like you're saying we're just going to have people
14:41:40 7 testify. Well, what are you going to have them testify?
14:41:43 8 Are you going to have them testify about things that they
14:41:45 9 need those documents to cross-examine them on, or are you
14:41:48 10 going to testify about stuff that you've already produced
14:41:52 11 discovery on? So that is what I need some help on.
14:41:55 12 MS. DURIE: Thank you. And the answer, Your
14:41:57 13 Honor, is the latter. So we will have witnesses describe at
14:42:03 14 a high level the ALA program, and that there are ALA's with
14:42:11 15 a number of different companies. That I think is not a
14:42:13 16 contested fact. We do not intend to put in any evidence
14:42:17 17 about the specific terms of specific agreements that would
14:42:22 18 implicate in any way any information that was redacted from
14:42:27 19 those agreements.
14:42:28 20 The only -- the reason that this evidence is
14:42:32 21 relevant to show -- in part to show harm. Obviously the
14:42:38 22 details of that harm are for the remedies phase for a
14:42:43 23 specific performance, but Qualcomm has taken the position
14:42:46 24 that we need to show as an element of the breach of contract
14:42:50 25 claim harm from the breach.

28

14:42:51 1 THE COURT: And I agree with that.
14:42:52 2 MS. DURIE: Right. And so we intend to have
14:42:56 3 testimony both that ARM is harmed by the unlicensed use of
14:43:00 4 our technology by Qualcomm and not being compensated for
14:43:06 5 that use in the way that they believe they should have been,
14:43:10 6 and that there is harm generally to ARM from the unlicensed
14:43:15 7 use of its technology, this is not the only ALA.
14:43:19 8 THE COURT: But I need to know specifically what
14:43:23 9 you suggest someone is going to testify about because if
14:43:25 10 that person is going to say well, gosh, it affects our
14:43:30 11 ability to negotiate good prices on other ALA's, that seems
14:43:34 12 like something you should have produced.
14:43:36 13 MS. DURIE: I understand. We are not going to
14:43:39 14 have witness testimony that there has been any past
14:43:44 15 impairment in our ability to negotiate specific ALA terms
14:43:49 16 including rates. We do think that to the extent that
14:43:55 17 Qualcomm's conduct is blessed here and that Qualcomm was
14:44:00 18 ultimately permitted to use unlicensed technology, that that
14:44:06 19 would have negative consequences going forward, but we're
14:44:06 20 not going to put in any testimony --
14:44:13 21 THE COURT: How is that showing damages? That's
14:44:16 22 showing speculative stuff for the future. How is that
14:44:19 23 showing that you have been damaged by the breach?
14:44:24 24 MS. DURIE: I think there is exigent harm to the
14:44:26 25 licensing ecosystem, but I think for purposes of showing

29

14:44:30 1  harm as an element of the breach of contract claim, the fact
14:44:34 2  that our technology is being used in an unlicensed fashion
14:44:39 3  without compensation, without in our view adequate
14:44:42 4  compensation --
14:44:43 5          THE COURT:  That one I understood.  I understood
14:44:45 6  that one.  I don't understand you saying and now we're going
14:44:50 7  to put someone up and he's not going to say we've already
14:44:53 8  been harmed because we couldn't negotiate better deals or
14:44:57 9  people were like you let Qualcomm get away with it, so we
14:45:03 10 can get away with paying less or something, you're not going
14:45:06 11 to do that and instead you want him to say well, it may
14:45:09 12 happen in the future, that doesn't seem like harm for a
14:45:12 13 breach of contract.  That seems kind of speculative and
14:45:18 14 future.
14:45:18 15         MS. DURIE:  I don't disagree that it is about
14:45:20 16 the future.  It is about why this lawsuit is important to
14:45:23 17 ARM, it is about why ARM made the decision which was as I
14:45:28 18 understand it literally unprecedented to sue one of its
14:45:32 19 licensees for the unlicensed use of its technology.
14:45:37 20         I agree that is not what we will be relying on,
14:45:40 21 it is the predicate for a determination of harm as an
14:45:44 22 element of a breach of contract claim, I believe that is the
14:45:47 23 harm that will be specific from the unlicensed use of this
14:45:50 24 technology.
14:45:50 25         THE COURT:  Let me ask you a question because it

30

14:45:53 1  sort of your explanation kind of raised this which is let's
14:45:59 2  say you go before the jury and the jury says there was a
14:46:04 3  breach, and the damage, there was damage and loss of
14:46:10 4  reputation, something like that.  Okay?  Something that's
14:46:13 5  damages, but that is sufficient to show damages for purposes
14:46:18 6  of making out a breach of contract claim.  And then you come
14:46:22 7  to me and you've already just said part of your damage may
14:46:27 8  be that you're not compensated adequately for the breach,
14:46:32 9  for the use of our technology, so it's using your technology
14:46:36 10 but not compensating you adequately.
14:46:39 11         So let's just say after I hear you out on that I
14:46:42 12 say it doesn't seem to me that there is no adequate monetary
14:46:47 13 relief.  What happens because there has been no request for
14:46:53 14 damages, and if I don't give you specific performance but
14:46:56 15 there is a breach, where are we?
14:46:59 16         MS. DURIE:  So the Court has the power in equity
14:47:04 17 to make awards incidental to an equitable request for
14:47:10 18 specific performance.
14:47:14 19         THE COURT:  Did you ask for that in the pretrial
14:47:16 20 order?
14:47:16 21         MS. DURIE:  We asked for that in the pleadings
14:47:18 22 and I believe it is in the pretrial order as well.
14:47:21 23         I do want to make clear that what I have been
14:47:24 24 talking about is harm as an element of a breach of contract
14:47:27 25 claim as distinct from damages.

31

14:47:29 1          THE COURT:  I understand.  But if you're going
14:47:31 2  to convince me -- if you want to tell the jury that our harm
14:47:36 3  is that we haven't been adequately compensated, I can't
14:47:41 4  pretend that I didn't hear that.  Compensation sounds
14:47:44 5  money-ish.
14:47:45 6          MS. DURIE:  I understand, and that is an element
14:47:47 7  of harm and I understand Your Honor's point.  So the answer
14:47:49 8  to your question I think is remedies that are incidental to
14:47:54 9  specific performance.
14:47:55 10         THE COURT:  All right.
14:47:56 11         MS. DURIE:  Thank you.
14:47:56 12         THE COURT:  Mr. Blumenfeld, did we help with
14:47:59 13 some of that?  So they're not going to put in ALA's, they're
14:48:04 14 not going to testify that anything -- that there was
14:48:10 15 anything in the past where they -- their negotiations or
14:48:13 16 their ALA's were somehow impacted, and that's damages.  I'm
14:48:21 17 not sure I'm going to let them put in something speculative
14:48:25 18 about the future, while maybe this will happen, maybe it
14:48:29 19 won't.  So that leaves us with an argument that they're not
14:48:35 20 being adequately compensated for their -- for the alleged
14:48:41 21 breach.  That seems like it's outside of this motion in
14:48:45 22 limine.  So what is left of the motion in limine that I need
14:48:49 23 to address?
14:48:51 24         MR. BLUMENFELD:  So a couple of things, Your
14:48:53 25 Honor, and I want to swing back to the damages issue that

32

14:48:55 1  you raised with Ms. Durie.  I don't think it's correct that
14:49:02 2  all they intend to do is call some executives and say oh,
14:49:06 3  there may be some harm to us in the future which Your Honor
14:49:11 4  has said you haven't decided whether you will let them do
14:49:15 5  that or not.  This came up a little bit during summary
14:49:17 6  judgment where they put in a declaration from two of the
14:49:20 7  executives.  In fact, if you read their MIL response it
14:49:24 8  specifically says --
14:49:25 9          THE COURT:  That caught my attention in the MIL,
14:49:29 10 we're going to have somebody testify and I'm like okay,
14:49:32 11 about what.
14:49:33 12         MR. BLUMENFELD:  It says about royalties that
14:49:36 13 have been decreased.  That doesn't sound like the future,
14:49:38 14 that sounds like --
14:49:39 15         THE COURT:  I understand, but we've now had a
14:49:44 16 representation that suggest that's not going to happen,
14:49:46 17 unless the royalties that have been decreased means that
14:49:49 18 they're not being paid, they're Qualcomm or NuVia royalties
14:49:55 19 that they're not getting paid.
14:49:56 20         MR. BLUMENFELD:  Right.  If I could hand up one
14:49:59 21 of the declarations they put in, this is a big part of our
14:50:02 22 concern.  It's from Williamson.  It came in in August, we
14:50:06 23 objected to it as part of the summary judgment proceedings
14:50:09 24 because it is speculative, and also because it does disclose
14:50:25 25 things or argues things that we didn't get discovery of

33

14:50:29 1  because we didn't get the ALA's in for other reasons.  But
14:50:33 2  if you look at Mr. Williamson's declaration, and he is
14:50:38 3  listed as a trial witness, so he's senior vice-president and
14:50:42 4  general manager, and he says in paragraph 6 that the
14:50:51 5  unlicensed use of ARM's technology has caused multiple harms
14:50:55 6  to ARM.  And then he goes on to explain that, and in
14:50:59 7  paragraph 7, he says based on my experience at ARM and
14:51:03 8  marketing and business roles since 2015, the industry's
14:51:08 9  perception of ARM's reputation and its ability to protect
14:51:12 10 its intellectual property impacts ARM's contracts with its
14:51:15 11 licensees, for example, it affects the terms that ARM's
14:51:19 12 licensees are willing to accept, their proposals during
14:51:23 13 negotiations, their willingness to comply with those issues.
14:51:26 14 Terms that may be impacted include that products are
14:51:29 15 licensed financial terms, scope of license technology, I
14:51:34 16 don't know how I'm supposed to be able to cross-examine him
14:51:37 17 on these things happen when I'm talking to our licensees, by
14:51:41 18 the way, you don't have the licenses so you can't use these
14:51:44 19 to cross-examine me --
14:51:47 20     THE COURT:  Hold on.  Let me ask.  Ms. Durie, I
14:51:51 21 would have thought based on our representations you weren't
14:51:53 22 planning to have him do that because I kind of agree,
14:51:57 23 Mr. Blumenfeld can't just say --
14:52:00 24     MS. DURIE:  That is correct, we are not going to
14:52:02 25 say that there have been any such impacts to date.

34

14:52:06 1      THE COURT:  But you want him to say but there
14:52:11 2  will be.
14:52:12 3      MS. DURIE:  I would like for him to be able to
14:52:15 4  say that one of the reasons that ARM brought this case is
14:52:20 5  because its licensee ecosystem is extremely important to it
14:52:28 6  and it is very important to ARM as an IP licensing entity
14:52:32 7  that its licensees respect its intellectual property.  And
14:52:38 8  that in ARM's view, if Qualcomm were able to use ARM
14:52:42 9  technology in an unlicensed fashion, that could have very
14:52:46 10 severe downstream consequences for ARM.  I don't expect
14:52:50 11 anyone to spend a long time belaboring the point.
14:52:52 12     I think at that high level, they are -- Qualcomm
14:52:57 13 has said that they are going to try to suggest that ARM's
14:53:01 14 reasons for refusing to consent and bringing the case was
14:53:06 15 because it wanted to get rid of the Qualcomm ALA.  Our
14:53:10 16 response to that is to say no, that is not true, the reason
14:53:14 17 that we are here is not because we want to get rid of the
14:53:17 18 Qualcomm ALA, the reason that we are here is because
14:53:20 19 Qualcomm is using our technology in an unlicensed fashion
14:53:23 20 and that is important to us.
14:53:24 21     But we don't intend to belabor the point and we
14:53:28 22 do not intend to make any argument that there has been any
14:53:31 23 specific effect in any specific license agreement that would
14:53:35 24 give rise to the need to cross-examine on that.
14:53:38 25     THE COURT:  So with that --

35

14:53:40 1      MR. BLUMENFELD:  Your Honor, if you go on to --
14:53:42 2  I want to respond also to her point about motivation, how it
14:53:46 3  is their motivation.  The suit gets in after, what Mr. Olson
14:53:50 4  said, after our motivation.
14:53:52 5      THE COURT:  I know.  Well, you are going to talk
14:53:55 6  about their motivation to sue, that's all I heard over here
14:53:58 7  is they're suing us because they want more money so I can
14:54:02 8  sort of see why they get to respond and say no, we're not
14:54:05 9  suing them because we want more money, we're suing them
14:54:09 10 because this is harmful to our business model.
14:54:12 11     MR. BLUMENFELD:  Well, we will get to that
14:54:15 12 undoubtedly when things come up at trial, but on the
14:54:18 13 specific things that Ms. Durie said about what they're going
14:54:22 14 to do, if you turn to paragraph 11 and then paragraph 13 of
14:54:27 15 Mr. Williamson's declaration, he says he --
14:54:30 16     THE COURT:  Yeah, let's just check before you
14:54:33 17 tell me, are you going -- this seems like past stuff, since
14:54:38 18 June people have contacted me and I have been damaged.  So
14:54:43 19 we need -- you're not going to put this in.
14:54:46 20     MS. DURIE:  That's correct, Your Honor.
14:54:47 21     THE COURT:  Okay.  So that was paragraph 11.
14:54:50 22     MS. DURIE:  Paragraph 11, that's right.
14:54:52 23     THE COURT:  And then --
14:54:53 24     MS. DURIE:  I want to be clear, we're talking
14:54:55 25 about the phase in front of the jury, obviously specific

36

14:54:58 1  performance is a separate question and we'll address that at
14:55:01 2  a separate time in front of Your Honor.
14:55:04 3      THE COURT:  We can do that, I'm just saying the
14:55:06 4  extent that you want him to say I have been contacted by
14:55:09 5  people and our agreements are suffering, I would have
14:55:14 6  expected that all of that underlying stuff be produced, and
14:55:19 7  that you're not just going to have him get up there and say
14:55:24 8  it and leave Mr. Blumenfeld to say I don't know if that's
14:55:28 9  true or not.  So you can ask again to put it in if there is
14:55:33 10 a bench trial phase, but I still in a bench trial require
14:55:40 11 you to disclose stuff during discovery.
14:55:43 12     All right.  What about paragraph 12, did you
14:55:46 13 have a problem with paragraph 12, Mr. Blumenfeld?  This is
14:55:51 14 -- that's different, that's Qualcomm's position as to what's
14:55:54 15 licensed.
14:55:55 16     MR. BLUMENFELD:  It's 13, that's the other
14:55:56 17 issue.  But on this entire subject, I don't -- so they put
14:56:02 18 in a declaration saying I have talked to our partners, I
14:56:06 19 have talked to our licensees, here is what I have learned
14:56:09 20 from them.  They say that in the declaration.  They're not
14:56:12 21 going to do that at trial.  I don't know how he can get on
14:56:15 22 the stand and just say but this is going to happen.
14:56:18 23     THE COURT:  And I haven't quite gotten through
14:56:21 24 that.  I understand that concern.  I understand that
14:56:26 25 concern.  And I'm not -- but I guess what I'm thinking is I

37

| | |
|---|---|
| 14:56:33 | 1 |
| 14:56:37 | 2 |
| 14:56:41 | 3 |
| 14:56:45 | 4 |
| 14:56:47 | 5 |
| 14:56:50 | 6 |
| 14:56:54 | 7 |
| 14:56:57 | 8 |
| 14:56:59 | 9 |
| 14:56:59 | 10 |
| 14:57:05 | 11 |
| 14:57:10 | 12 |
| 14:57:13 | 13 |
| 14:57:16 | 14 |
| 14:57:19 | 15 |
| 14:57:22 | 16 |
| 14:57:26 | 17 |
| 14:57:30 | 18 |
| 14:57:34 | 19 |
| 14:57:37 | 20 |
| 14:57:40 | 21 |
| 14:57:44 | 22 |
| 14:57:48 | 23 |
| 14:57:51 | 24 |
| 14:57:55 | 25 |

1  need to understand more of what he's going to say, right?
2  Like, why can't he get up there and say this is our whole
3  business model, our business model is we licensed
4  technology, and you know, if you're going to be out there --
5  and we think we have great technology.  But it's important
6  to us that people respect our licenses because if people
7  don't respect our licenses, our business model is not worth
8  the paper that it's written on.  Right?
9          MS. DURIE:  Right.
10          THE COURT:  And then he can say and our
11  perception is that Qualcomm or NuVia, or I know there is two
12  different parties, I don't know who I'm talking about at
13  this moment, but you don't have to tell me there is two
14  different parties, whoever is not respecting our licenses,
15  probably both, right, neither of them respected the license
16  according to the plaintiff.  So that seems okay to me and
17  that's not speculative damages, that's saying it's important
18  to us that people respect it, and it's important to our
19  business model that people respect it, and they're not
20  respecting it.  And you can say well, you don't have any
21  evidence that it actually had an impact, but why can't he
22  get up there and say, come on, we're a licensing company,
23  all we do is enter agreements and if we say everybody can
24  just kind of pooh pooh our agreements, you know, it doesn't
25  -- the jury can look at that and be like well, that sounds

38

| | |
|---|---|
| 14:57:58 | 1 |
| 14:58:00 | 2 |
| 14:58:02 | 3 |
| 14:58:05 | 4 |
| 14:58:09 | 5 |
| 14:58:13 | 6 |
| 14:58:17 | 7 |
| 14:58:21 | 8 |
| 14:58:26 | 9 |
| 14:58:30 | 10 |
| 14:58:33 | 11 |
| 14:58:37 | 12 |
| 14:58:40 | 13 |
| 14:58:43 | 14 |
| 14:58:46 | 15 |
| 14:58:51 | 16 |
| 14:58:55 | 17 |
| 14:58:59 | 18 |
| 14:58:59 | 19 |
| 14:59:02 | 20 |
| 14:59:06 | 21 |
| 14:59:11 | 22 |
| 14:59:11 | 23 |
| 14:59:13 | 24 |
| 14:59:16 | 25 |

1  bad.
2          MR. BLUMENFELD:  So here is the problem with
3  that, and it goes to the question Your Honor raised with
4  Ms. Durie.  How do I cross-examine him?  Because, for
5  example, we know that they've entered into other licenses
6  since the termination of the NuVia license.  We all know
7  about Apple and there are others they've entered into since
8  then.  We don't have them, or we have them in redacted forms
9  that we don't know what the terms are.  We went through that
10  back in March with the Google licenses where the terms are
11  totally redacted.  So if he gets on the stand and says this
12  is going to affect our licensing program, it's going to
13  affect our ability to collect royalties, it's going to
14  affect people's willingness to take a license and all I can
15  say is well, people took licenses, right, and I don't have
16  those licenses and I can't cross-examine him on whether the
17  harm is real or whether it's just something he's making up
18  for the jury.
19          THE COURT:  Let me ask Ms. Durie on that
20  specific point because that one seems --
21          MS. DURIE:  So we're not arguing that there has
22  been any affect on any exigent license agreements because
23  the harm hasn't happened yet --
24          THE COURT:  Hold on, hold on.  If he's going to
25  get up there and say well, it's going to harm us in the

39

| | |
|---|---|
| 14:59:19 | 1 |
| 14:59:23 | 2 |
| 14:59:26 | 3 |
| 14:59:30 | 4 |
| 14:59:34 | 5 |
| 14:59:38 | 6 |
| 14:59:41 | 7 |
| 14:59:41 | 8 |
| 14:59:43 | 9 |
| 14:59:48 | 10 |
| 14:59:48 | 11 |
| 14:59:53 | 12 |
| 14:59:55 | 13 |
| 14:59:58 | 14 |
| 14:59:58 | 15 |
| 15:00:01 | 16 |
| 15:00:03 | 17 |
| 15:00:07 | 18 |
| 15:00:11 | 19 |
| 15:00:15 | 20 |
| 15:00:18 | 21 |
| 15:00:21 | 22 |
| 15:00:24 | 23 |
| 15:00:28 | 24 |
| 15:00:32 | 25 |

1  future and Mr. Blumenfeld could if he had the agreement say
2  good of you to say, but by the way, since this all happened,
3  you have entered into 89 license agreements and, in fact,
4  you got better terms than you ever had before, that's a
5  pretty good cross of him saying oh, it's going to now hurt
6  us.
7          MS. DURIE:  So I disagree --
8          THE COURT:  Well, I don't --
9          MS. DURIE:  But the distinction, I want to draw
10  the distinction between what will happen as a consequence of
11  Qualcomm being allowed to use technology in an unlicensed
12  way without consequences --
13          THE COURT:  Yes.  According to you -- hold on.
14          MS. DURIE:  Yes.
15          THE COURT:  According to you, Qualcomm has been
16  allowed to do this.
17          MS. DURIE:  Not yet.  We're in court litigating
18  over that very issue.  They have not gotten away with it.
19  They make -- if they were to get away with it, if this were
20  to not have a consequence, we would be harmed.  But we are
21  not saying -- there has been no --
22          THE COURT:  Now you're getting super
23  speculative.  So the jury has to now assume that the damage
24  is that they find that there is a breach, but they can't
25  find that there is a breach unless there is damage.  So I

40

| | |
|---|---|
| 15:00:35 | 1 |
| 15:00:37 | 2 |
| 15:00:37 | 3 |
| 15:00:40 | 4 |
| 15:00:43 | 5 |
| 15:00:48 | 6 |
| 15:00:54 | 7 |
| 15:00:56 | 8 |
| 15:00:59 | 9 |
| 15:01:02 | 10 |
| 15:01:06 | 11 |
| 15:01:11 | 12 |
| 15:01:14 | 13 |
| 15:01:20 | 14 |
| 15:01:26 | 15 |
| 15:01:31 | 16 |
| 15:01:36 | 17 |
| 15:01:40 | 18 |
| 15:01:43 | 19 |
| 15:01:47 | 20 |
| 15:01:52 | 21 |
| 15:01:57 | 22 |
| 15:02:02 | 23 |
| 15:02:06 | 24 |
| 15:02:09 | 25 |

1  can't -- that seemed wrong to me.
2          MS. DURIE:  So let me be clear.  The allegation
3  of harm for purposes of whether there was a breach is that
4  they are using our unlicensed technology and they are not
5  paying for it.  That is harm.  And that suffices to show
6  harm for purposes of a breach.
7          THE COURT:  You know what, that's all I'm going
8  to let him say at trial.  He cannot say -- no, he cannot say
9  and in the future, this is going to cause us problems if the
10  jury finds that there was a breach and this can all go and
11  they are allow to get away with it.  He cannot say it.
12  Okay?  He cannot say it.  You can stop arguing it because
13  you did not produce -- you did not produce information that
14  would allow the defendants to fairly cross-examine your
15  witnesses because I get it, you're saying well, they didn't
16  get away with it until the jury finds they got away with it.
17  The fact is they're doing it now.  There is no -- no, he
18  can't -- and so one, no, you didn't produce the documents.
19  Two, no, it seems awfully speculative to say we think that
20  at some point if the jury finds that there wasn't -- I don't
21  even know if the jury finds there was a breach or there
22  wasn't a breach that we're going to be harmed.
23          MS. DURIE:  It's not the jury verdict.  Let me
24  very be very clear, it's why we brought the lawsuit.  If we
25  had allowed this conduct to go unchallenged, if we had

41

15:02:12 1 allowed Qualcomm to use our IP in an unlicensed fashion and
15:02:16 2 not take an action, that would have threatened our
15:02:20 3 ecosystem, the reason we brought --
15:02:22 4 THE COURT: There is a difference between saying
15:02:24 5 it will threaten our ecosystem and saying, and what that
15:02:28 6 means is we are going to be harmed in the future by people,
15:02:35 7 you know, everybody -- no one is going to respect our
15:02:39 8 licenses. It's one thing if he gets up there and says this
15:02:42 9 is our business model, we need people to respect our
15:02:46 10 licenses, they're not respecting our licenses, okay, I don't
15:02:50 11 know exactly what that establishes, but the jury I suppose
15:02:54 12 could fairly draw an inference from that. It's a very
15:02:58 13 different thing for him to say and by the way, we will be
15:03:01 14 harmed in the future, or we may be harmed in the future if
15:03:06 15 this is allowed.
15:03:07 16 MS. DURIE: May I just say in response to the
15:03:09 17 attack on our motive for bringing the lawsuit, which
15:03:13 18 Qualcomm intends to put at issue by saying we refused to
15:03:17 19 consent to try to get out from under the Qualcomm ALA, we
15:03:20 20 would like our witness to be able to say that's not why
15:03:23 21 we're here, the reason why we're here, why we brought the
15:03:27 22 lawsuit and why we are insisting on our rights is because we
15:03:32 23 are a licensing shop. If our technology is used in an
15:03:35 24 unlicensed fashion, that threatens our entire business model
15:03:39 25 and we're very concerned about what the consequences of that

42

15:03:43 1 would be. We're not saying we're harmed by that --
15:03:46 2 THE COURT: Yes, but the problem I have is --
15:03:49 3 and you can say that I'm talking about something different,
15:03:52 4 but I still think it's fair within the scope of
15:03:55 5 cross-examination, if your witness gets up there and says
15:03:58 6 all hell is going to break loose if people don't respect our
15:04:02 7 licenses, our business model is not worth the paper it's
15:04:05 8 written on, and Mr. Blumenfeld or Ms. Dunn or Ms. Nyrady or
15:04:10 9 whoever can't get up and say well, wait a second, everybody
15:04:15 10 knows that according to you, Qualcomm has not been
15:04:20 11 respecting our technology and has just been using it as you
15:04:22 12 say in an unlicensed manner and the sky has not fallen in,
15:04:28 13 in fact all of this other stuff has happened, the problem is
15:04:32 14 he can't say that or they can't say that because you didn't
15:04:35 15 produce the documents.
15:04:36 16 MS. DURIE: I would think, Your Honor, we could
15:04:38 17 arrive at a stipulation to solve that problem because that
15:04:40 18 is not the argument that we are making. We are saying if we
15:04:43 19 had not enforced our rights and just sat on the sidelines
15:04:48 20 and didn't take action to protect our intellectual property
15:04:52 21 and allowed the unlicensed use of our IP without
15:04:57 22 consequence, that is what would threaten our entire model,
15:05:00 23 not being here pursuing this litigation, but sitting on the
15:05:02 24 sidelines and not taking action.
15:05:05 25 If Qualcomm wants to cross-examine our witnesses

43

15:05:09 1 --
15:05:09 2 THE COURT: How are they supposed to say we
15:05:11 3 don't believe you, that's not true?
15:05:14 4 MS. DURIE: I think we could work out a
15:05:15 5 stipulation. If their goal is to be able to establish that
15:05:19 6 we are not contending there has been any such harm with
15:05:23 7 respect to the terms of license agreements that we were able
15:05:27 8 to negotiate in view of the fact that we did file a lawsuit,
15:05:31 9 we have no problem with that, and I think we could work out
15:05:34 10 a stipulation to that effect.
15:05:36 11 THE COURT: All right. This is what I am going
15:05:37 12 to do. You can't use the ALA. It sounds like you don't
15:05:41 13 want to use the ALA. And you can't use anything that's
15:05:44 14 happened to date, and it doesn't sound like you want to use
15:05:47 15 anything that's happened to date. So that I will rule on.
15:05:55 16 Whatever happens, see if you can come up with a stipulation
15:05:57 17 that will allow you to deal with it. If not, you can use
15:06:02 18 some of your trial time to argue the rest of this, whatever
15:06:05 19 is left of this motion to me.
15:06:07 20 MS. DURIE: Understood. Thank you, Your Honor.
15:06:09 21 THE COURT: But I understood the motion to be
15:06:14 22 that defendants seek to preclude ARM from making argument
15:06:17 23 about its ALA product program and so I guess to the extent
15:06:21 24 that we're talking about not specific agreements but the
15:06:26 25 program, then I -- let me know what's left of that motion.

44

15:06:34 1 MR. BLUMENFELD: I'm not sure, Your Honor, that
15:06:37 2 there is anything left that we need to deal with today. We
15:06:40 3 may well get into the issue of them putting Mr. Williamson,
15:06:44 4 Mr. Abby, Mr. Haas, their witnesses on to talk about -- to
15:06:49 5 create an impression that there is a parade of horribles
15:06:53 6 that are going to happen and if that does --
15:06:54 7 THE COURT: I understand. I understand. And
15:06:56 8 I'm not in any way precluding you from objecting to that, or
15:07:01 9 from raising that before the witnesses get on the stand and
15:07:04 10 asking for a proffer on what they're going to say on that so
15:07:08 11 we can address it.
15:07:09 12 MR. BLUMENFELD: Thank you.
15:07:09 13 If I can respond to the colloquy that you had on
15:07:12 14 damages, this is kind of an interesting issue for us. Back
15:07:15 15 when we were before you in March, you asked them whether
15:07:18 16 they were asserting a damages claim and they said no. They
15:07:23 17 left themselves open to possibly doing it later. They've
15:07:26 18 never given us a damages expert report. They've never given
15:07:29 19 us a disclosure of a damages theory. They haven't put --
15:07:33 20 THE COURT: How scary it must be that they want
15:07:39 21 me to figure it out.
15:07:39 22 MR. BLUMENFELD: But if you go to the pretrial
15:07:41 23 order, I don't know if you have it in front of you.
15:07:44 24 THE COURT: I can pull it up. Give me a second.
15:07:49 25 MR. BLUMENFELD: It's Exhibit 13 to the pretrial

# Exhibit 4

Page 1

1           IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF DELAWARE
3

4    QUALCOMM INCORPORATED, a
     Delaware corporation,
5    QUALCOMM TECHNOLOGIES, INC.,
     a Delaware corporation,
6
         Plaintiffs,
7
               vs.              C.A. No. 24-490 (MN)
8
     ARM HOLDINGS PLC., f/k/a
9    ARM LTD., a U.K.
     corporation,
10
         Defendant.
11   _____
12
13              **ATTORNEYS' EYES ONLY**
14   VIDEO DEPOSITION OF ARM HOLDINGS PLC's 30(b)(6) and
15      30(b)(1) REPRESENTATIVE - KARTHIK SHIVASHANKAR
16               Palo Alto, California
17              Friday, June 20, 2025
18                    Volume 1
19
20
     STENOGRAPHICALLY REPORTED BY:
21   REBECCA L. ROMANO, RPR, CSR, CCR
     California CSR No. 12546
22   Nevada CCR No. 827
     Oregon CSR No. 20-0466
23   Washington CCR No. 3491
24   JOB NO. 7428915
25   PAGES 1 - 189

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 86

1  which is requested from Qualcomm.  So we determine,
2  I mean, the implementation CPUs.
3        And then we look at other partners who
4  have licensed, I mean, yeah, the same set of IP and
5  look at the commercials of that.  That goes as an
6  input.
7        And then, I mean, yeah, based on that, I
8  mean, yeah, we determine, I mean, yeah, the -- the
9  total financial considerations and make sure that
10  it has, I mean, everything the MFN has.
11      Q.  (By Ms. Zappala)  What other partners did
12  you consider?
13      A.  I don't exactly remember the long list of
14  partners, I mean, yeah, which we considered in the
15  analysis.
16      Q.  Your testimony is that the license fees
17  here were developed after comparing the proposed
18  terms to license fees paid by other partners?
19      A.  The commercials of this quote is
20  generated after the -- the MFN analysis.  I mean,
21  we wouldn't particularly pick on one variable, but
22  the commercials was generated after the MFN
23  analysis.
24      Q.  And if I wanted to understand -- sorry,
25  if I want to see the specifics of the MFN analysis,

Page 87

1  what would I look at?
2        MR. KRAMER:  Objection to form.
3      Q.  (By Ms. Zappala)  Is there a document
4  that has the MFN analysis in it?
5        MR. KRAMER:  Objection to form.
6        THE DEPONENT:  So can you say the
7  question again.
8      Q.  (By Ms. Zappala)  So you said the -- you
9  went through a whole MFN analysis.  You compared
10  the proposed license rates to the license rates
11  paid by other partners.
12        How can I find the documentation
13  supporting that analysis?
14        MR. KRAMER:  Objection to form.
15        THE DEPONENT:  I mean, as part of the
16  analysis, I mean, yeah, there were like, I mean,
17  yeah, documents involved.  As I said, I don't
18  exactly remember, I mean, yeah, which documents.
19      Q.  (By Ms. Zappala)  Did Mr. Akshay [sic]
20  send you an email that listed the rates paid by
21  other partners?
22      A.  I do not recall exactly, I mean, yeah,
23  what documents was exchanged because, I mean, yeah,
24  more than a year ago.
25      Q.  When you confirmed the MFN analysis, what

Page 88

1  were you looking at when you confirmed the MFN
2  analysis?
3      A.  So as part of the review, I would have
4  actually gone through, I mean, yeah, and looked at,
5  I mean, the -- the other partners who have
6  actually, I mean, yeah, licensed, I mean, yeah, the
7  set of IP and the commercials.
8        And then, I mean, yeah, based on that, I
9  would review to make sure that my team member has
10  done things right and followed the process of the
11  MFN analysis.
12      Q.  So this proposal was not even a year ago.
13  It was October of last year.
14        And you don't remember any of the other
15  partners that you looked at?
16      A.  I do not exactly remember the list of, I
17  mean, yeah, partners which was considered as part
18  of the analysis.
19      Q.  Is there a list that you keep in your
20  files as to which partners you looked at?
21      A.  As part of the review, the documents
22  would be presented to me, I mean, yeah.  But I do
23  not, I mean, yeah, exactly remember, I mean, yeah,
24  which documents was -- was in play.
25      Q.  And who presented the documents to you?

Page 89

1      A.  So as part of the analysis, I mean, it
2  was Akshay, I mean, yeah, who would present me, I
3  mean, yeah, with this analysis for the review.  And
4  then, I mean, yeah, that...
5      Q.  I want to take a look at the royalty
6  rates here.  If you'd take a look at the royalty
7  rates listed as a percentage of ASP on the
8  left-hand column.
9        Do you see that?
10      A.  I can see the royalty rates listed, I
11  mean, yeah, in the table.
12      Q.  Can you identify for me the process you
13  derived to develop those royalty rates.
14      A.  Yeah, the process, again, going back to
15  my explanation, so we would actually, I mean, yeah,
16  look at the other partners who have actually
17  licensed, I mean, yeah, the -- the implementation
18  cores requested by Qualcomm.  So we look at the
19  commercials of those partners.  That goes as an
20  input for the process.
21        And based on that, I mean, yeah, we
22  determine the commercial proposals.  And as part of
23  that, that would have resulted in the royalty rates
24  which you're seeing in the quote.
25      Q.  And what partners did you consider as

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 90

1 part of that analysis?
2    A.  I do not exactly remember the list of
3 partners.  But as part of the process, we would
4 have considered licensees who have licensed, I
5 mean, yeah, this implementation CPUs, which is
6 Hunter, Hayes and Yamin.
7    Q.  I know you can't remember the exact list
8 of partners.
9        Can you remember some information about
10 them?
11    A.  I mean, yeah, as part of the analysis, I
12 mean, yeah, the -- the partner which was considered
13 as a previous was MediaTek.  I think, I mean,
14 that's as far as I remember.
15        But there was a bunch of other partners,
16 I mean, yeah, in the -- in the comparison too.
17    Q.  And do you understand -- so I want you to
18 take a look, if you compare -- strike that.
19        If you go to the "Total Compute
20 Configurations" to the right.
21        Do you see that?
22    A.  I can see the "Total Compute
23 Configurations" table.
24    Q.  Are those proposed rates subject to an
25 MFN provision?

Page 91

1        MR. KRAMER:  Objection to form.  Calls
2 for legal conclusion.
3        THE DEPONENT:  As part of the -- I mean,
4 the -- the proposal generation, I mean, yeah, we
5 would have, I mean, yeah, considered, I mean, all
6 the analysis which is required for the -- for the
7 MFN.
8    Q.  (By Ms. Zappala)  So you would have gone
9 through an MFN analysis for the total compute
10 configurations royalty rates?
11    A.  I don't precisely remember the steps, I
12 mean, yeah, as part of that analysis at this point
13 of time.
14    Q.  So you don't recall if there was an MFN
15 analysis in connection with the total compute
16 configurations?
17    A.  I do not recall at this point.
18

24 (Pages 90 - 93)

# Exhibit 5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
 3   QUALCOMM INCORPORATED,      §
     A DELAWARE CORPORATION,     §
 4   QUALCOMM TECHNOLOGIES,      §   C.A. NO. 24-490-MN
     INC., A DELAWARE            §
 5   CORPORATION,                §
                                 §
 6      PLAINTIFFS,              §
                                 §
 7   - AGAINST -                 §
                                 §
 8   ARM HOLDINGS PLC.,          §
     F/K/A ARM LTD., A U.K.      §
 9   CORPORATION,                §
                                 §
10     DEFENDANT.                §
11       **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
12     ORAL AND VIDEOTAPED DEPOSITION OF AKSHAY BHATNAGAR
                     JULY 10, 2025
13
14
15
        ORAL AND VIDEOTAPED DEPOSITION OF AKSHAY
16   BHATNAGAR, produced as a witness at the instance of
     the Plaintiffs and duly sworn, was taken in the
17   above styled and numbered cause on Thursday,
     July 10, 2025, from 9:22 a.m. to 12:39 p.m., before
18   TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of
     Texas, reported by computerized stenotype machine,
19   at the offices of Kirkland & Ellis, LLP, 401
     Congress Avenue, Austin, Texas, pursuant to the
20   Federal Rules of Civil Procedure and any provisions
     stated on the record herein.
21
22
23
24
25   Job No. NY 7464214
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 34

1    Q.   You've testified about the analysis that
2  you do when requests for IPs come to Arm.  What do
3  you understand analysis to mean?
4    A.   By any analysis, did you mean the pricing
5  analysis that I mentioned about?
6    Q.   I mean any analysis that you did relating
7  to this request for Hunter and Hayes?
8    A.   This request in the email?
9    Q.   Qualcomm's request for Hunter and Hayes?
10    A.   So I'm just trying to make sure I'm
11  getting the timeline correct.  Are you talking about
12  this request dated May 9, 2024?
13    Q.   You understand that Qualcomm requested a
14  license to Hunter, Hayes, and Yamin in mid-2024,
15  don't you?
16    A.   I don't remember when exactly they
17  requested it.
18    Q.   Do you remember that there was such a
19  request in 2024?
20    A.   I remember there was a request to extend
21  the licenses sometime in 2024.
22    Q.   And my question is what analysis did you
23  do in connection with that request?
24    A.   Wait.  So once my manager asked me to do
25  the pricing analysis, which I explained earlier for

Page 35

1  Qualcomm, we went ahead and did that same for the
2  list of IPs which was in that request.
3    Q.   What did that pricing analysis consist
4  of?
5        MR. EVANGELATOS:  Objection.
6        I'm going to caution you again.  To
7  the extent any of that analysis or any discussions
8  about that analysis involve attorneys, you should
9  not include that in your answer, and you should
10  answer as to anything outside of anything you may
11  have discussed with any attorneys.
12        MR. SCOTT:  I'll just note for the
13  record that our position would be that that claim of
14  privilege is overbroad, but you can -- I respect
15  your right to instruct your witness.
16        MR. EVANGELATOS:  Yeah.  Obviously I
17  disagree.  I mean, let him testify to -- in
18  accordance with my instruction.
19        So go ahead and answer.
20    A.   So like I said, I remember doing the
21  pricing analysis based on my manager's guidance
22  sometime in 2024.  Yeah, I'm not sure about the
23  timeline, but the -- the analysis was basically he
24  asked me to find the -- the royalty rates for
25  certain licensees for -- for those Arm IPs, and the

Page 36

1  price book information on the license fees and
2  royalty rates in the price book for -- for those
3  IPs.
4        And I remember I -- once I collected that
5  information based on his guidance, and I presented
6  that to him, he then gave me guidance on what should
7  be the numbers that we should put in the -- in the
8  offer for extension of the Arm IPs.
9    Q.   Let me break that down a little bit.
10        You testified that he asked you to find
11  the royalty rates for certain licensees for those
12  Arm IPs.  Who were those certain licensees?
13    A.   I don't remember.  It's been a while.
14    Q.   Did he ask you to find royalty rates for
15  specific companies?
16    A.   No.  He asked me to find the royalty
17  rates for those IPs based on the guidance that he
18  suggested from his end.  And I remember with another
19  licensing expert, Paris Christ, that based on his
20  guidance -- yeah, he asked me to find the -- the
21  royalty rates for the licensees that came from both
22  of these experts, because these were the lowest
23  royalties rates for those IPs.
24    Q.   You referred to -- you testified -- I'm
25  sorry.  Strike that.

Page 37

1        Who are the licensing experts you just
2  referred to?
3    A.   So Karthik Shivashankar is a licensing
4  expert.  Paris Christ is another.
5    Q.   And who -- Paris?
6    A.   Paris.
7    Q.   And what's Paris's last name?
8    A.   Christ.
9    Q.   So they identified for you the licensees
10  that, according to them, had the lowest royalty
11  rates?
12        MR. EVANGELATOS:  Objection; form.
13    A.   They gave me guidance on the licensees
14  who, in their knowledge, had the lowest royalty
15  rates for those IPs.
16    Q.   What was that guidance?
17    A.   The licensees list.
18    Q.   So it was a list of licensees?
19    A.   They -- they gave a name.  A few names.
20  A few names of licensees.
21    Q.   What were those few names?
22    A.   I don't remember.
23    Q.   Was one MediaTek?
24    A.   I think I member MediaTek.
25  ████████████████████████

10 (Pages 34 - 37)

# Exhibit 6

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3    QUALCOMM INCORPORATED a Delaware corporation, ) Case No.
     QUALCOMM TECHNOLOGIES, INC., a Delaware       )24-490-MN
4    corporation,                                  )
                                                   )
5         Plaintiffs,                              )
                                                   )
6         vs.                                      )
                                                   )
7    ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.      )
     corporation,,                                 )
8                                                  )
          Defendant.                               )
9    _____)

10              ATTORNEYS EYES ONLY VIDEOTAPED

11         30(b)(6) DEPOSITION OF JEFFREY M. FONSECA

12                  Palo Alto, California

13                Wednesday, July 9, 2025

14

15

16            REPORTED BY: Derek L. Hoagland

17                  CSR No. 13445

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 22

1 the assessment for the -- per the Qualcomm contract, and
2 that his process for doing that is what he followed.
3 And I'm not part of that process, but at the same time,
4 I said, my recollection is you went through that
5 exercise and then we prepared the quote accordingly, and
6 the answer was yes. He verified that my understanding
7 was correct.
8 Q. And did Mr. Shivashankar give you any
9 information about the process that he followed?
10 A. I only -- I only know at a high level what the
11 process is. But in terms of the actual devil's in the
12 details of how they do that, conduct that analysis, I am
13 not privy to.
14 Q. Can you tell me your high-level understanding of
15 that process?
16 A. A high-level understanding is that they look at
17 something we call the total financial considerations of
18 likely situated partners that, you know, are looking at
19 similar cores, licenses, and then they make a comparison
20 of the request to those likely situated partners and
21 they make an assessment analysis based on that to look
22 at what we would end up quoting to Qualcomm for both the
23 booking fee and the royalties.
24 Q. When you say "booking fee," what is that?
25 A. License fee.

Page 23

1 Q. So I understood you to say that Mr. Shiva --
2 you -- strike that.
3 Your understanding is that ARM looks at the
4 total financial considerations of likely situated
5 partners. Is that correct?
6 A. Yes.
7 Q. What do you mean by likely?
8 A. Meaning they're trying to license similar
9 products. So if it's another partner saying -- say
10 Hunter as an example. Okay, Qualcomm wants to license
11 Hunter, then we go look at another partner likely
12 situated that wants to license Hunter.
13 Q. And do you have an understanding of how to
14 determine which partners are likely situated?
15 A. I do, because then it's basically -- it comes
16 out as a comparison that they made, which is the two --
17 the two partners they did compare it to in reference.
18 Q. So you -- you understand the two partners that
19 Mr. Shivashankar's team compared Qualcomm's request for
20 Hunter, Hayes license to?
21 A. Yes.
22 Q. Who were those partners?
23 A. That was -- ███████ was one and Mediatech was
24 another.
25 Q. As part of the process of determining which

Page 24

1 partners to assess, does ARM identify the partners with
2 the lowest MOT rates for the products at issue?
3 A. I don't know that.
4 THE REPORTER: You said M-O-T rates, M-O-T?
5 BY MS. ZAPPALA:
6 Q. Does ARM identify the partners with the lowest
7 royalty rates for the products at issue?
8 A. I don't know that that's part of Karthik's
9 team's responsibility on how they do that assessment.
10 Q. So when Mr. Shivashankar's team identified
11 ███████ and Mediatech as likely situated partners, do
12 you have an understanding of why Mr. Shivashankar's team
13 selected those two entities?
14 A. My understanding is that --
15 MR. KRAMER: Objection to form. You can --
16 THE DEPONENT: My understanding is that they
17 were comparing those two as ones that were likely
18 situated, like I said, in respect to the cores that were
19 specifically looking at Qualcomm wanted to license, and
20 that they made the comparison to those two based upon
21 whatever the total definition of total financial
22 considerations is.
23 BY MS. ZAPPALA:
24 Q. And when you say "definition of total financial
25 considerations," what are you referring to?

Page 25

1 A. That's --
2 MR. KRAMER: Objection. Outside the scope of --
3 THE DEPONENT: Yeah.
4 MR. KRAMER: -- the specific topic 8.
5 But go ahead.
6 THE DEPONENT: That's their definition. I don't
7 have that definition.
8 BY MS. ZAPPALA:
9 Q. So you have an understanding that there's
10 something called a total financial consideration, but
11 you don't know what that refers to?
12 A. Correct.
13 Q. So do you have an understanding of whether the
14 total financial consideration that are considered in
15 selecting likely situated -- likely situated partners
16 con -- includes royalty rates paid by those partners?
17 MR. KRAMER: Objection. Outside scope.
18 THE DEPONENT: My understanding is that, yes,
19 that it includes booking fee and royalty rates.
20 BY MS. ZAPPALA:
21 Q. And do you have an understanding of the royalty
22 rates paid by ███████ for Hunter?
23 A. No, I do not.
24 Q. What about for Hayes?
25 A. No, I do not. I am not privy to ███████

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 38**

1 Q.    What is your understanding of the previous best
2 deal that was considered -- strike that.
3        Do you have an understanding of whether ARM
4 identified something called the previous best deal in
5 consideration -- in connection with the October 2024
6 offer?
7        MR. KRAMER:  Objection form.  Calls for a
8 legal conclusion.
9        THE DEPONENT:  So as far as my concern was
10 whether or not Karthik and his team did that, and
11 they're instructing me that they have done that.
12 BY MS. ZAPPALA:
13 Q.    Do you have an understanding of whether
14 Karthik's team considered ▮▮▮ to be the previous
15 best deal?
16       MR. KRAMER:  Objection to form.  Calls --
17       THE DEPONENT:  No.
18       MR. KRAMER:  -- for a legal conclusion.
19 BY MS. ZAPPALA:
20 Q.    The answer is no?
21 A.    No, I don't have an understanding of that.
22 Q.    Do you have an understanding of whether Karthik
23 and his team considered Mediatech to be a previous best
24 deal?
25 A.    Well --

**Page 39**

1        MR. KRAMER:  Objection to form.  Objection to
2 form.  Calls for a legal conclusion.
3        THE DEPONENT:  I think you're asking the
4 question that's, like, leading towards one or the other,
5 and the answer is no.  You asked, first, ▮▮▮ then
6 you asked Mediatech, as if it has to be one or the
7 other.
8 BY MS. ZAPPALA:
9 Q.    I'm asking whether either of them was the
10 previous best deal.
11       MR. KRAMER:  Objection to form.  Calls for a
12 legal conclusion.
13 BY MS. ZAPPALA:
14 Q.    So earlier, you testified that you understood
15 Mr. Shivashankar and his team looked at the ▮▮▮ and
16 Mediatech agreements.
17 A.    Correct.
18 Q.    And they looked at the ▮▮▮ and Mediatech
19 agreements as part of considering the total financial
20 consideration, correct?
21 A.    Correct.
22 Q.    And do you understand whether ▮▮▮ or
23 Mediatech qualify as a previous best deal under
24 Section 8.1?
25       MR. KRAMER:  Objection to form.  Calls for a

**Page 40**

1 legal conclusion.
2        THE DEPONENT:  So based on the output that I saw
3 from their assessment, it was made against Mediatech at
4 the end of the day.
5 BY MS. ZAPPALA:
6 Q.    It was made against Mediatech?
7 A.    Yes.
8 Q.    So to make sure I understand, Mr. Shivashankar
9 and his team considered the ▮▮▮
10 A.    Yes.
11 A.    -- and Mediatech agreements --
12 A.    Correct.
13 Q.    -- correct?
14       MR. KRAMER:  Just hang on.  Just let her get --
15 let her finish her question, and then -- I'm sorry.
16       Can you ask the question again?  I think our
17 answer interrupted your question.  But can we just do
18 that again so I can get the right objections on?
19       MS. ZAPPALA:  Sure.
20 BY MS. ZAPPALA:
21 Q.    To make sure I understand, Mr. Shivashankar and
22 his team considered the ▮▮▮ and Mediatech agreements
23 when analyzing the total financial considerations,
24 correct?
25 A.    Correct.

**Page 41**

1 Q.    And your understanding is Mr. Shivashankar's
2 team ultimately selected the Mediatech agreement,
3 correct?
4 A.    Correct.
5 Q.    And when you say his team selected the Mediatech
6 agreement, what do you mean by that?
7 A.    They used that for the basis of what we compared
8 for the total financial considerations.
9 Q.    And do you have any understanding of why
10 Mr. Shivashankar's team selected the Mediatech
11 agreement?
12 A.    No.
13 Q.    You -- Section 8.1b of the TLA refers to making
14 an offer to licensee, Qualcomm that is no more than
15 ▮▮▮ higher than the ▮▮▮.
16       Do you see that language?
17 A.    Yes.
18 Q.    Did you see any analysis of whether the offer to
19 Qualcomm was ▮▮▮ higher than the ▮▮▮
20 ▮▮▮?
21 A.    No.
22 Q.    Do you -- did you see any analysis of whether
23 the offer to Qualcomm was ▮▮▮ higher than the
24 Mediatech deal?
25 A.    No.

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY