# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., a Delaware corporation,
and QUALCOMM TECHNOLOGIES, INC.,
a Delaware corporation,

      Plaintiffs,

    v.

ARM HOLDINGS PLC, f/k/a ARM LTD., a
U.K. corporation,

      Defendant.

REDACTED - PUBLIC VERSION
(Filed November 21, 2025)

C.A. No. 24-490-MN



**VOLUME 1 OF 2 (EXHIBITS 1-19) TO THE
DECLARATION OF MATTHEW J. MCINTEE IN SUPPORT OF ARM HOLDINGS
PLC'S CONCISE STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT UNDER *NOERR-PENNINGTON* AND FOR LACK OF
CAUSATION WITH RESPECT TO QUALCOMM'S GOOD FAITH AND FAIR
DEALING, TORTIOUS INTERFERENCE, AND UCL CLAIMS (COUNTS III-VI); AND
FOR PARTIAL SUMMARY JUDGMENT ON QUALCOMM'S BREACH OF THE
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT III)**

Dated: October 24, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Meredith Pohl
Matthew J. McIntee
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
meredith.pohl@kirkland.com
matt.mcintee@kirkland.com

Jay Emerick
Reid McEllrath
Adam M. Janes
KIRKLAND & ELLIS LLP

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com
reid.mcellrath@kirkland.com
adam.janes@kirkland.com

Nathaniel Louis DeLucia
Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
nathaniel.delucia@kirkland.com
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

I, Matthew J. McIntee, declare as follows:

I am an attorney with the law firm of Kirkland & Ellis LLP, counsel for Arm Holdings PLC ("Arm") in the above referenced action. I submit this declaration in support of Arm's Concise Statement Facts in Support of its Motion for Summary Judgment on Qualcomm's Tortious Interference Claims (Counts III-V) ("TI SOF).

1.       Attached as **Exhibit 1** is a true and correct excerpted copy of D.I. 21 in C.A. No. 1:22-cv-01146-MN, dated November 15, 2022.

2.       Attached as **Exhibit 2** is a true and correct excerpted copy of D.I. 322 in C.A. No. 1:22-cv-01146-MN, dated April 11, 2024.

3.       Attached as **Exhibit 3** is a true and correct copy of D.I. 137 in C.A. No. 1:24-cv-00490-MN, Qualcomm's Second Amended Complaint, dated June 3, 2025. ████████████
████

4.       Attached as **Exhibit 4** is a true and correct copy of an October 22, 2024 letter from Spencer Collins to Ann Chaplin, bearing Bates stamp ARMQC_02749015. ████████████
████

5.       Attached as **Exhibit 5** is a true and correct copy of an October 28, 2024 letter from Ann Chaplin to Spencer Collins, bearing Bates number QCVARM_0573354. ████████████
████

6.       Attached as **Exhibit 6** is a true and correct excerpted copy of a U.S. Securities and Exchange Commission Form 10-K Annual Report for Qualcomm Incorporated for the fiscal year ended September 29, 2024, bearing Bates stamp ARMQC_02793451.

7.       Attached as **Exhibit 7** is a true and correct copy of an October 22, 2024 Bloomberg article by Ian King, bearing Bates stamp ARMQC_02794057.

8.      Attached as **Exhibit 8** is a true and correct excerpted copy of the November 20, 2024 Pre-Trial Conference transcript in C.A. No. 1:22-cv-01146-MN.

9.      Attached as **Exhibit 9** is a true and correct copy of a January 8, 2025 letter from Spencer Collins to Ann Chaplin, bearing Bates stamp QCVARM_0847182. ████████████

████

10.     Attached as **Exhibit 10** is a true and correct copy of a January 22, 2025 letter from Ann Chaplin to Spencer Collins, bearing Bates stamp QCVARM_0573675. ███████████

████

11.     Attached as **Exhibit 11** is a true and correct copy of a January 30, 2025 letter from Spencer Collins to Ann Chaplin, bearing Bates stamp QCVARM_0847184. ███████████

████

12.     Attached as **Exhibit 12** is a true and correct excerpted copy of the July 11, 2025 deposition transcript of Jonathan Weiser. ██████████████

13.     Attached as **Exhibit 13** is a true and correct excerpted copy of the September 5, 2025 Rebuttal Report of Steven Richards, CPA. ██████████████

14.     Attached as **Exhibit 14** is a true and correct copy of the July 3, 2025 deposition transcript of Cristiano Amon. ██████████████

15.     Attached as **Exhibit 15** is a true and correct copy of the September 19, 2025 Expert Reply Report of Eric A. Posner. ██████████████

16.     Attached as **Exhibit 16** is a true and correct copy of the October 2, 2025 deposition transcript of Eric Posner. ██████████████

17.     Attached as **Exhibit 17** is a true and correct copy of the August 8, 2025 Expert Report of Eric A. Posner. ██████████████

18.     Attached as **Exhibit 18** is a true and correct excerpted copy of the July 11, 2025 deposition transcript of Ann Chaplin. ███████████

19.     Attached as **Exhibit 19** is a true and correct copy of Qualcomm's Third Supplemental Responses and Objections to Arm's First Set of Interrogatories (Nos. 1-9), dated August 8, 2025. ███████████

20.     Attached as **Exhibit 20** is a true and correct copy of a June 6, 2024 email, bearing Bates stamp QCVARM_0856270. ███████████

21.     Attached as **Exhibit 21** is a true and correct excerpted copy of the September 5, 2025 Expert Report of Thomas W. Britven. ███████████

22.     Attached as **Exhibit 22** is a true and correct copy of an October 2, 2024 email, bearing Bates stamp QCVARM_1151620. ███████████

23.     Attached as **Exhibit 23** is a true and correct copy of an October 21, 2024 email thread, bearing Bates stamp QCVARM_0865022. ███████████

24.     Attached as **Exhibit 24** is a true and correct copy of an October 25, 2024 email thread, bearing Bates stamp QCVARM_1070034. ███████████

25.     Attached as **Exhibit 25** is a true and correct copy of an October 30, 2024 email thread, bearing Bates stamp QCVARM_0855474. ███████████

26.     Attached as **Exhibit 26** is a true and correct copy of an October 31, 2024 email thread and attachment, bearing Bates stamp QCVARM_0863641. ███████████

27.     Attached as **Exhibit 27** is a true and correct copy of a November 9, 2024 email thread and attachment, bearing Bates stamp QCVARM_0864833. ███████████

28.     Attached as **Exhibit 28** is a true and correct copy of a November 11, 2024 email thread and attachment, bearing Bates stamp QCVARM_0864967. ███████████

29. Attached as **Exhibit 29** is a true and correct copy of a ███████████████████████, bearing Bates stamp QCVARM_0855434. ████████████████

30. Attached as **Exhibit 30** is a true and correct copy of a ███████████████████████, bearing Bates stamp QCVARM_0855460. ████████████████

31. Attached as **Exhibit 31** is a true and correct copy of a ███████████████████████, bearing Bates stamp QCVARM_0855466. ████████████████

32. Attached as **Exhibit 32** is a true and correct copy of a ███████████████████████, bearing Bates stamp QCVARM_0855471. ████████████████

33. Attached as **Exhibit 33** is a true and correct copy of a ███████████████████████, bearing Bates stamp QCVARM_0855483. ████████████████

34. Attached as **Exhibit 34** is a true and correct copy of a ███████████████████████, bearing Bates stamp QCVARM_0855488. ████████████████

35. Attached as **Exhibit 35** is a true and correct copy of a ███████████████████████, bearing Bates stamp QCVARM_0855495. ████████████████

36.    Attached as **Exhibit 36** is a true and correct copy of a ████████████████, bearing Bates stamp QCVARM_0855501. ████████████

37.    Attached as **Exhibit 37** is a true and correct copy of a ████████████████, bearing Bates stamp QCVARM_0855508. ████████████

38.    Attached as **Exhibit 38** is a true and correct copy of a ████████████████, bearing Bates stamp QCVARM_0863626. ████████████

39.    Attached as **Exhibit 39** is a true and correct copy of a ████████████████, bearing Bates stamp QCVARM_0863681. ████████████

40.    Attached as **Exhibit 40** is a true and correct copy of a ████████████████, bearing Bates stamp QCVARM_0863685. ████████████

41.    Attached as **Exhibit 41** is a true and correct copy of a ████████████████, bearing Bates stamp QCVARM_0863688. ████████████

42.    Attached as **Exhibit 42** is a true and correct copy of a ████████████████, bearing Bates stamp QCVARM_0865045. ████████████

43.     Attached as **Exhibit 43** is a true and correct copy of a ███████████████████

████████████████████████████████████, bearing Bates stamp QCVARM_0865345.

██████████████████████

44.     Attached as **Exhibit 44** is a true and correct copy of a ███████████████████

████████████████████████████████████, bearing Bates stamp QCVARM_0865376.

██████████████████████

45.     Attached as **Exhibit 45** is a true and correct copy of a ███████████████████

████████████████████████████████████, bearing Bates stamp QCVARM_1016154.

██████████████████████

46.     Attached as **Exhibit 46** is a true and correct copy of a ███████████████████

████████████████████████████████████, bearing Bates stamp QCVARM_1024793.

██████████████████████

47.     Attached as **Exhibit 47** is a true and correct copy of a ███████████████████

████████████████████████████████████, bearing Bates stamp QCVARM_1024821.

██████████████████████

48.     Attached as **Exhibit 48** is a true and correct copy of a ███████████████████

████████████████████████████████████, bearing Bates stamp QCVARM_1024868.

██████████████████████

49.     Attached as **Exhibit 49** is a true and correct copy of a ███████████████████

████████████████████████████████████, bearing Bates stamp QCVARM_1029063.

██████████████████████

50.    Attached as **Exhibit 50** is a true and correct copy of a ███████████████, bearing Bates stamp QCVARM_1120812. ██████████████

51.    Attached as **Exhibit 51** is a true and correct copy of a ███████████████, bearing Bates stamp QCVARM_1120839. ██████████████

52.    Attached as **Exhibit 52** is a true and correct copy of a ███████████████, bearing Bates stamp QCVARM_1120974. ██████████████

53.    Attached as **Exhibit 53** is a true and correct copy of a ███████████████, bearing Bates stamp QCVARM_1120983. ██████████████

54.    Attached as **Exhibit 54** is a true and correct copy of a ███████████████, bearing Bates stamp QCVARM_1121004. ██████████████

55.    Attached as **Exhibit 55** is a true and correct copy of a ███████████████, bearing Bates stamp QCVARM_1121029. ██████████████

56.    Attached as **Exhibit 56** is a true and correct copy of a ███████████████, bearing Bates stamp QCVARM_1121156. ██████████████

57.     Attached as **Exhibit 57** is a true and correct copy of a ███████████ ███████████████████████████████████, bearing Bates stamp QCVARM_1121163. ██████████████████

58.     Attached as **Exhibit 58** is a true and correct copy of a ███████████ ███████████████████████████████████, bearing Bates stamp QCVARM_1121203. ████████████████

59.     Attached as **Exhibit 59** is a true and correct copy of a ███████████ ███████████████████████████████████, bearing Bates stamp QCVARM_1121207. ████████████

60.     Attached as **Exhibit 60** is a true and correct copy of a ███████████ ███████████████████████████████████, bearing Bates stamp QCVARM_1121244. ██████████████████

61.     Attached as **Exhibit 61** is a true and correct copy of a February 5, 2025 email thread, bearing Bates stamp QCVARM_0864713. ██████████████████

62.     Attached as **Exhibit 62** is a true and correct copy of a March 7, 2025 email thread, bearing Bates stamp QCVARM_1069705. ██████████████

63.     Attached as **Exhibit 63** is a true and correct copy of a May 29, 2025 email thread, bearing Bates stamp QCVARM_1120994. ██████████████

64.     Attached as **Exhibit 64** is a true and correct copy of the July 21, 2025 ████ ██████████████████████████████████████, bearing Bates stamp QCVARM_1151573. ████████████████

65.     Attached as **Exhibit 65** is a true and correct copy of a May 23, 2025 email thread and attachment, bearing Bates stamp QCVARM_1120971. ████████████████████

66.    Attached as **Exhibit 66** is a true and correct copy of a May 28, 2025 email thread, bearing Bates stamp QCVARM_1120979. ████████████████

67.    Attached as **Exhibit 67** is a true and correct excerpted copy of the July 1, 2025 deposition transcript of Pavankumar Mulabagal. ████████████████

68.    Attached as **Exhibit 68** is a true and correct copy of a June 11, 2024 email thread, bearing Bates stamp QCVARM_1069945. ████████████████

69.    Attached as **Exhibit 69** is a true and correct copy of the August 8, 2025 Expert Report of Patrick F. Kennedy, Ph.D. ████████████████

70.    Attached as **Exhibit 70** is a true and correct excerpted copy of the July 17, 2025 deposition transcript of Paul Kranhold. ████████████████

71.    Attached as **Exhibit 71** is a true and correct excerpted copy of the September 26, 2025 deposition transcript of Timothy S. Simcoe, Ph.D. ████████████████

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of October 2025 at Washington, D.C.

*/s/ Matthew J. McIntee*
Matthew J. McIntee

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 24, 2025, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Alan R. Silverstein
Sara Barry
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
asilverstein@connollygallagher.com
sbarry@connollygallagher.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Jennifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com
jhartley@dirllp.com

Richard S. Zembek
NORTON ROSE FULBRIGHT US LLP
1550 Lamar Street, Suite 2000
Houston, TX 77010
richard.zembek@nortonrosefulbright.com

Ruby J. Garrett
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweiss.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
Anish Desai
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
fpatterson@paulweiss.com
adesai@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

John Poulos
NORTON ROSE FULBRIGHT US LLP
1045 W. Fulton Market
Suite 1200
Chicago, IL 60607
john.poulos@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

TI SOF

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,

      Plaintiff,

      v.

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation, and NUVIA, INC., a
Delaware corporation,

      Defendants.

C.A. No. 22-1146-MN

**JURY TRIAL DEMANDED**

**REDACTED - PUBLIC VERSION**

## PLAINTIFF ARM LTD.'S ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANTS QUALCOMM INC., QUALCOMM TECHNOLOGIES, INC., AND NUVIA, INC.'S AMENDED COUNTERCLAIM

Plaintiff Arm Ltd. ("Arm") hereby submits its Answer and Affirmative Defenses to the Amended Counterclaim of Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively "Qualcomm"), and NuVia, Inc. ("Nuvia").

### PRELIMINARY STATEMENT

Contrary to its allegations, Qualcomm cannot continue using Arm-based technology, including the Phoenix core, that Nuvia developed under its now-terminated Architecture License Agreement ("ALA") with Arm, for several independent reasons:

*First*, pursuant to an express, independent obligation under Nuvia's ALA, the relevant Nuvia technology, including the Phoenix core, can no longer be used and must be destroyed.  This destruction obligation extends to all derivatives or embodiments of Arm technology generated at Nuvia based on Nuvia's ALA.  The Nuvia ALA leaves no doubt that the destruction obligation extends to processor cores, such as Nuvia's Phoenix core, which is the basis for Qualcomm's proposed future products.  Defendants must discontinue

1

any use of products derived from or embodying technology provided by Arm under the Nuvia ALA. These obligations were not amended, terminated, avoided, or affected in any way whatsoever by any provision in Qualcomm's ALA. In April and May 2022, Nuvia and Qualcomm expressly certified that they would comply with the obligation to destroy and not use the defined Arm technology and confidential information—which includes Defendants' products embodying and derivatives of the same—under the Nuvia ALA. Defendants belatedly seek to dispute whether Arm was entitled to terminate Nuvia's ALA, but they waived any such argument by conceding termination at the time and by purporting to certify compliance with the termination obligations shortly thereafter. Now they must actually abide by their very clear contractual obligations.

*Second*, Arm has no obligation to support Qualcomm's further attempts to continue developing unlicensed technology originally developed at Nuvia using Arm's architecture. Qualcomm's ALA with Arm expressly excludes any license to Arm technology that was not developed under that specific ALA. The Qualcomm ALA limits Qualcomm's design and manufacture rights, and Arm's verification, delivery, and support obligations, to chips (1) based on the technology Arm delivered *to Qualcomm* under that ALA, (2) created at Qualcomm, by Qualcomm engineers and Qualcomm subsidiaries during the period while those entities were subsidiaries of Qualcomm, and (3) licensed subject to the terms of that ALA. None of this is true of the Phoenix core or other designs developed by *Nuvia* engineers at *Nuvia* based on the technology and license granted to *Nuvia* by Arm when *Nuvia* was a standalone company. Thus, Qualcomm is not only trying to develop an unlicensed product, but is also materially breaching its ALA with Arm.

2

249.    Paragraph 249 contains legal conclusions to which no response is required. To the extent a response is required, the agreements referenced in this paragraph and the contents thereof speak for themselves.

250.    Paragraph 250 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph because, among other things, Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology.

251.    Paragraph 251 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

252.    Arm denies the allegations in paragraph 252.

253.    Arm denies the allegations in paragraph 253.

254.    Arm denies the allegations in paragraph 254.

255.    In answer to paragraph 255, Defendants appear to be quoting a September 13, 2020 NVIDIA press release regarding its planned acquisition of Arm, the contents of which speak for themselves.  Arm admits that NVIDIA's planned acquisition of Arm led to antitrust regulatory challenges and opposition from Qualcomm, which reportedly sought to invest in Arm itself.[4]  Arm admits that on February 7, 2022, Arm and NVIDIA announced that the acquisition would be terminated.  Arm denies the remaining allegations in this paragraph.

---

[4] *See, e.g.*, Anna Gross & Tim Bradshaw, *Qualcomm wants to buy a stake in Arm alongside its rivals*, Financial Times (May 30, 2022), https://www.ft.com/content/eab1d19d-ab4c-45b7-88b4-f1f5e115d16e.

256.    In answer to paragraph 256, Arm admits that it sent a letter to Nuvia dated February 1, 2022, stating "Arm intends to terminate" both the TLA and ALA "for material breach" and requesting immediate discontinuation and destruction of "all Arm Technology, Arm Confidential Information and any products embodying such technology or information."  Arm denies the remaining allegations in this paragraph.

257.    Arm denies the allegations in paragraph 257.

## COUNTERCLAIM
### (Declaratory Judgment)

258.    In answer to paragraph 258, Arm repeats, re-alleges, and incorporates by reference its answers to paragraphs 1-47 and 175-257 as if fully set forth herein.

259.    In answer to paragraph 259, Arm:

a. denies sub-paragraph (a) because Defendants breached the Nuvia licenses by assigning the licenses to Qualcomm without Arm's consent and failing to comply with the termination provisions requiring discontinuance and destruction of the relevant Nuvia technology, as explained in the Complaint and in paragraphs 219 and 235 above, which Arm expressly incorporates herein;

b. denies sub-paragraph (b) because after Qualcomm's acquisition of Nuvia, Qualcomm's architected cores (including all further developments, iterations, or instantiations of the relevant technology that Qualcomm acquired from Nuvia), Server SoC, and Compute SoC are not fully licensed under Qualcomm's ALA or TLA; instead, they must be discontinued and destroyed (as explained in the Complaint and above, including Arm's answers to paragraphs 5 and 235, which Arm expressly incorporates herein), and are not licensed under Qualcomm's ALA or TLA, with those licenses instead expressly excluding any license to other Arm-based

technology, such as Nuvia's implementation of Arm architecture (as explained above, including in Arm's answer to paragraph 3, which Arm expressly incorporates herein);

c. denies sub-paragraph (c), including because Qualcomm is breaching its ALA by improperly seeking to use the Qualcomm ALA to continue development of the relevant Nuvia technology, entitling Arm to terminate that ALA based on Qualcomm's material breaches (as explained below in Arm's First Defense, which Arm expressly incorporates herein);

d. denies sub-paragraph (d), including because Arm is entitled to terminate Qualcomm's ALA based on Qualcomm's material breaches of the verification, delivery, and support and maintenance provisions, as well as the covenant of good faith and fair dealing (as explained below in Arm's First Defense, which Arm expressly incorporates herein); and

e. denies sub-paragraph (e) because Qualcomm has no right to develop, let alone ship, products based on unlicensed Nuvia technology and is breaching its ALA by seeking to do so (as explained below in Arm's First Defense, which Arm expressly incorporates herein).

260.   In answer to paragraph 260, Arm denies that Qualcomm can continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA, the Qualcomm TLA, the Nuvia ALA, or the Nuvia TLA, including because the relevant Nuvia technology is subject to destruction under the termination provisions of Nuvia's ALA (as explained in the Complaint and above, including Arm's answers to paragraphs 5 and 235, which Arm expressly incorporates herein), Qualcomm products

## **AFFIRMATIVE DEFENSES**

Without admitting or acknowledging that it bears the burden of proof as to any of them, Arm asserts the following affirmative and other defenses and reserves the right to amend its Answer as additional information becomes available.

### **FIRST DEFENSE**
### **(Failure to State a Claim)**

Defendants' Counterclaim fails to state a claim upon which relief can be granted.

Qualcomm's allegations that the relevant Nuvia technology is licensed under Qualcomm's ALA fail because the license granted under the Qualcomm ALA in Section 2.0, as clarified by Section 2.6, is limited to expressly defined ████████ delivered by Arm to Qualcomm under the Qualcomm ALA, and expressly excludes a license to any other Arm technology, like the Nuvia technology based on Arm technology delivered by Arm to Nuvia under the now-terminated Nuvia ALA.

Qualcomm's allegations that it is exercising its rights with respect to the relevant Nuvia technology under Qualcomm's license agreements with Arm and is not in violation of those agreements fail because Arm has no such obligations with respect to the Nuvia technology, and Qualcomm is breaching the Qualcomm ALA by insisting otherwise. Under the Qualcomm ALA, Arm has no obligation to provide, and Qualcomm has no right to seek, verification, delivery, or support and maintenance in connection with technology developed under the now-terminated Nuvia ALA. The "verification" provisions of Section 4 of the Qualcomm ALA are limited to products manufactured ████████████████ in the ALA. The delivery (Section 5) and support and maintenance (Section 7) obligations of the Qualcomm ALA are similarly limited to the defined ██████████ and therefore likewise do not extend to the relevant Nuvia technology, which embodies and was derived

from Arm technology delivered by Arm to Nuvia under Nuvia's now-terminated ALA. Qualcomm's unreasonable, bad-faith demands that Arm comply with purported obligations for verification, delivery, and support and maintenance with respect to technology delivered and developed outside the scope of the Qualcomm ALA are contrary to the parties' expectations and undermines the benefit to Arm from the Qualcomm ALA, thereby materially breaching that agreement's terms and implied covenant of good faith and fair dealing and entitling Arm to terminate the Qualcomm ALA under Section 14.2.

## SECOND DEFENSE
### (Waiver/Estoppel/Acquiescence)

Defendants' Counterclaim and affirmative defenses are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or acquiescence. Defendants have not previously contested Arm's termination of the Nuvia agreements. Nor have Defendants previously objected to Arm's own compliance with and certification under Section 15.1 of the Nuvia ALA. Further, Defendants represented that both Nuvia and Qualcomm were in compliance with Section 15.1.

## THIRD DEFENSE
### (Unclean Hands)

Defendants' Counterclaim and affirmative defenses are barred, in whole or in part, by the equitable doctrine of unclean hands. Qualcomm tortiously induced Nuvia to breach the Nuvia ALA by acquiring Nuvia's license rights to its implementation of Arm technology without Arm's consent in violation of the Nuvia ALA's assignment provision, thereby materially breaching the Nuvia ALA. Qualcomm continues to attempt to benefit from its improper acquisition of Nuvia's license rights to its implementation of Arm technology by wrongly insisting that the unlicensed Nuvia technology is licensed under the Qualcomm

Dated: November 15, 2022

OF COUNSEL:

Michael A. Jacobs
Joyce Liou
Diek Van Nort
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
mjacobs@mofo.com
jliou@mofo.com
dvannort@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

_Anne Shea Gaza_
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 15, 2022, a copy of the foregoing

document was served on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com


YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

TI SOF

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,

        Plaintiff,

    v.

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation, and NUVIA, INC., a
Delaware corporation,

        Defendants.

C.A. No. 22-1146-MN

**JURY TRIAL DEMANDED**
REDACTED - PUBLIC VERSION
(Filed April 11, 2024)

---

## <u>PLAINTIFF ARM LTD.'S ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANTS QUALCOMM INC., QUALCOMM TECHNOLOGIES, INC., AND NUVIA, INC.'S SECOND AMENDED COUNTERCLAIMS</u>

Plaintiff Arm Ltd. ("Arm") hereby submits its Answer and Affirmative Defenses to the Second Amended Counterclaims (the "Counterclaims") of Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively "Qualcomm"), and NuVia, Inc. ("Nuvia" and, together with Qualcomm, the "Defendants").

## PRELIMINARY STATEMENT

Contrary to its allegations, Qualcomm cannot continue using Arm-based technology, including the Phoenix core, that Nuvia developed under its now-terminated Architecture License Agreement ("ALA") with Arm, for several independent reasons:

*First*, pursuant to an express, independent obligation under Nuvia's ALA, the relevant Nuvia technology, including the Phoenix core, can no longer be used and must be destroyed. This destruction obligation extends to all derivatives or embodiments of Arm technology generated at Nuvia based on Nuvia's ALA. The Nuvia ALA leaves no doubt that the destruction obligation extends to processor cores, such as Nuvia's Phoenix core,

1

which is the basis for Qualcomm's proposed future products.  Defendants must discontinue any use of products derived from or embodying technology provided by Arm under the Nuvia ALA.  These obligations were not amended, terminated, avoided, or affected in any way whatsoever by any provision in Qualcomm's ALA.  In April and May 2022, Nuvia and Qualcomm expressly certified that they would comply with the obligation to destroy and not use the defined Arm technology and confidential information—which includes Defendants' products embodying and derivatives of the same—under the Nuvia ALA.  Defendants belatedly seek to dispute whether Arm was entitled to terminate Nuvia's ALA, but they waived any such argument by conceding termination at the time and by purporting to certify compliance with the termination obligations shortly thereafter.  Now they must actually abide by their very clear contractual obligations.

*Second*, Arm has no obligation to support Qualcomm's further attempts to continue developing unlicensed technology originally developed at Nuvia using Arm's architecture. Qualcomm's ALA with Arm expressly excludes any license to Arm technology that was not developed under that specific ALA.  The Qualcomm ALA limits Qualcomm's design and manufacture rights, and Arm's verification, delivery, and support obligations, to chips (1) based on the technology Arm delivered *to Qualcomm* under that ALA, (2) created at Qualcomm, by Qualcomm engineers and Qualcomm subsidiaries during the period while those entities were subsidiaries of Qualcomm, and (3) licensed subject to the terms of that ALA.  None of this is true of the Phoenix core or other designs developed by *Nuvia* engineers at *Nuvia* based on the technology and license granted to *Nuvia* by Arm when *Nuvia* was a standalone company.  Thus, Qualcomm is not only trying to develop an unlicensed product, but is also materially breaching its ALA with Arm.

2

Magistrate Judge Hatcher's Order. (*Id.* at 9.) Reserving all rights as to Defendants' improper amendments, Arm denies the allegations in paragraph 259.

260. Arm denies the allegations in paragraph 260.

261. Arm denies the allegations in paragraph 261.

262. Arm denies the allegations in paragraph 262.

263. Arm denies the allegations in paragraph 263.

264. Arm denies the allegations in paragraph 264.

265. Arm denies the allegations in paragraph 265.

266. Paragraph 266 contains legal conclusions to which no response is required. To the extent a response is required, the agreements referenced in this paragraph and the contents thereof speak for themselves.

267. Paragraph 267 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph because, among other things, Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology.

268. Paragraph 268 contains legal conclusions to which no response is required. To the extent a response is required, Arm denies the allegations in this paragraph.

269. Arm denies the allegations in paragraph 269.

270. Arm denies the allegations in paragraph 270.

271. Arm denies the allegations in paragraph 271.

272. In answer to paragraph 272, Defendants appear to be quoting a September 13, 2020 NVIDIA press release regarding its planned acquisition of Arm, the

f. Arm denies sub-paragraph (f) because Arm fulfilled its termination obligations under ▆▆▆▆▆▆ of the Nuvia TLA.

g. denies sub-paragraph (g) because Qualcomm has no right to develop, let alone ship, products based on unlicensed Nuvia technology and is breaching its ALA by seeking to do so (as explained below in Arm's First Defense, which Arm expressly incorporates herein).

276.    In answer to paragraph 276, Arm denies that Qualcomm can continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA, the Qualcomm TLA, the Nuvia ALA, or the Nuvia TLA, including because the relevant Nuvia technology is subject to destruction under the termination provisions of Nuvia's ALA (as explained in the Complaint and above, including Arm's answers to paragraphs 5 and 235, which Arm expressly incorporates herein), Qualcomm products incorporating the same are not licensed under Qualcomm's ALA or TLA (as explained above, including in Arm's answer to paragraph 3, which Arm expressly incorporates herein), and Qualcomm is violating its ALA by seeking to continue its improper development of the unlicensed Nuvia technology via the Qualcomm ALA's provisions and procedures, even though the Qualcomm ALA does not apply to the Nuvia technology, which is based on Arm technology delivered under the now-terminated Nuvia ALA (as explained below in Arm's First Defense, which Arm expressly incorporates herein).

277.    In answer to paragraph 277, Arm denies the allegations in this paragraph, including because Arm is not preventing Qualcomm from exercising its rights under its license agreements with Arm; instead, Arm has no obligations under the Qualcomm ALA to provide verification, delivery, or support and maintenance for Qualcomm's improper

45

Qualcomm's allegations that the relevant Nuvia technology is licensed under Qualcomm's ALA fail because the license granted under the Qualcomm ALA in Section 2.0, as clarified by Section 2.6, is limited to expressly defined ███████████ delivered by Arm to Qualcomm under the Qualcomm ALA, and expressly excludes a license to any other Arm technology, like the Nuvia technology based on Arm technology delivered by Arm to Nuvia under the now-terminated Nuvia ALA.

Qualcomm's allegations that it is exercising its rights with respect to the relevant Nuvia technology under Qualcomm's license agreements with Arm and is not in violation of those agreements fail because Arm has no such obligations with respect to the Nuvia technology, and Qualcomm is breaching the Qualcomm ALA by insisting otherwise.  Under the Qualcomm ALA, Arm has no obligation to provide, and Qualcomm has no right to seek, verification, delivery, or support and maintenance in connection with technology developed under the now-terminated Nuvia ALA.  The "verification" provisions of Section 4 of the Qualcomm ALA are limited to products manufactured ████████████████████ in the ALA.  The delivery (Section 5) and support and maintenance (Section 7) obligations of the Qualcomm ALA are similarly limited to the defined ████████████ and therefore likewise do not extend to the relevant Nuvia technology, which embodies and was derived from Arm technology delivered by Arm to Nuvia under Nuvia's now-terminated ALA. Qualcomm's unreasonable, bad-faith demands that Arm comply with purported obligations for verification, delivery, and support and maintenance with respect to technology delivered and developed outside the scope of the Qualcomm ALA are contrary to the parties' expectations and undermines the benefit to Arm from the Qualcomm ALA, thereby

materially breaching that agreement's terms and implied covenant of good faith and fair dealing and entitling Arm to terminate the Qualcomm ALA under Section 14.2.

## SECOND DEFENSE
### (Waiver/Estoppel/Acquiescence)

Defendants' Counterclaims and affirmative defenses are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or acquiescence. Defendants have not previously contested Arm's termination of the Nuvia agreements. Nor have Defendants previously objected to Arm's own compliance with and certification under Section 15.1 of the Nuvia ALA. Further, Defendants represented that both Nuvia and Qualcomm were in compliance with Section 15.1.

Defendants' second and third counterclaims for the alleged breach of ████████ of the Nuvia ALA and Nuvia TLA are barred, in whole or in part, because Defendants have waived any claim that Arm's implementation of Nuvia's requests for certain features in Arm's Coherent Mesh Network ("CMN") fabric is improper or in violation of the Nuvia ALA or TLA. Beginning at least as early as 2020, Nuvia requested that Arm implement certain features into Arm's CMN fabric. Arm implemented certain of the requested features into its CMN fabric. Both Qualcomm and Nuvia received Arm's CMN fabric with these features implemented. Following termination of Nuvia's ALA and TLA, neither Qualcomm nor Nuvia requested that Arm remove these features from Arm's CMN fabric, despite Nuvia requesting the features previously.

## THIRD DEFENSE
### (Unclean Hands)

Defendants' Counterclaims and affirmative defenses are barred, in whole or in part, by the equitable doctrine of unclean hands. Qualcomm tortiously induced Nuvia to breach

Dated: April 4, 2024

OF COUNSEL:

Daralyn J. Durie
Joyce Liou
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
jliou@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-1500
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

_Anne Shea Gaza_

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

_Attorneys for Plaintiff Arm Ltd._

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 4, 2024, a copy of the foregoing document

was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
mvaughn@paulweiss.com
jbraly@paulweiss.com
abutwin@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Brian Shiue
Anna P. Lipin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
bshiue@paulweiss.com
alipin@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

_Anne Shea Gaza_

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

TI SOF

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,
a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC.,
a Delaware corporation,

           Plaintiffs,

      v.

ARM HOLDINGS PLC., f/k/a ARM LTD.,
a U.K. corporation,

           Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 24-490-MN

**JURY TRIAL DEMANDED**

███████████████████

## SECOND AMENDED COMPLAINT

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant Arm Holdings PLC, formerly known as Arm Ltd. ("Arm").[1]

## NATURE OF THE ACTION

1.    This case arises out of the latest chapter in Arm's campaign to stifle competition and technology innovation by impeding the efforts of its longtime business partner Qualcomm to deliver leading computer chips to its customers and consumers around the world. For years, Arm has received substantial royalties from licensing Qualcomm to design and sell products containing custom central processing units ("CPUs") compatible with Arm's instruction set architecture

---

[1]   On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims. *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300. This filing contains additional background on Arm's attempt to preclude Qualcomm's custom central processing units from competing with Arm's own central processing units. The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading. Redacted Answer & Defenses to Arm's Compl. & 2d Am. Countercls., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.

("ISA"). But following its acquisition by the venture capital firm SoftBank Group and its failed sale to NVIDIA, Arm attempted to shift its business model away from licensing its ISA for use by companies like Qualcomm that design CPUs, and toward forcing customers to buy only Arm's own CPU designs. Qualcomm's license, however, stands in the way of Arm's effort to push aside the makers of custom CPUs: Qualcomm's license extends until 2033, and Qualcomm's Arm-compatible microprocessors lead the industry in numerous applications. At the direction of SoftBank and its chairman and CEO, Masayoshi Son, Arm thus sought to disrupt Qualcomm's business. Arm's first move was to sue Qualcomm for allegedly breaching a license that Arm had previously granted to a company Qualcomm acquired but to which Qualcomm was not a party, demanding that Qualcomm cease distributing its groundbreaking microprocessors. As soon as Arm filed that lawsuit, it blitzed Qualcomm's major customers with letters publicizing the lawsuit, accusing Qualcomm of breaching "the Arm license agreement," and threatening that it would "work vigorously to protect what is rightfully ours." And eight months later, Arm sent another round of letters to Qualcomm's largest customers, using language Arm's CEO has admitted under oath was "confusing" and "misleading" to create the false impression that Qualcomm was clearly in breach of its agreement. Then, on the eve of trial in that case, Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license after 60 days— the day after the trial was scheduled to end. That laid bare Arm's intentions from the beginning: to attempt to get out of its license with Qualcomm in any way possible so Arm could eliminate alternatives to Arm's own competing CPU designs.

      2.    For decades, Arm has developed and licensed intellectual property relating to chips. Arm has pursued that business through two distinct models: *first*, by licensing other companies to

use Arm's ISA—the set of commands that determines how software controls a CPU[2]—and *second*, by licensing its own CPU designs so that other companies can make and sell products that use Arm's ready-made designs. Unlike other companies that developed a proprietary ISA used only on those companies' own chips, Arm followed a distinctive, "industry-described neutral, open licensing approach"[3] of "licensing its designs to all comers."[4] That open approach encouraged widespread adoption of Arm's ISA and also its designs. Arm's ISA—which Arm CEO Rene Haas describes as "the most ubiquitous computer architecture on the planet"[5]—is used by practically every smartphone, most "internet of things" ("IoT") devices, many automobiles, and an increasing number of personal computers and datacenter servers. Arm claims that companies using its ISA have shipped 270 *billion* chips as of January 2024.[6]

3.     One of these customers was Qualcomm, which has licensed Arm technology since 1997. As relevant here, Qualcomm and Arm entered into an architecture license agreement or "ALA" in 2013 (the "QC ALA"), which licensed Qualcomm to develop and sell custom-designed

---

[2]    An ISA acts as an interface between CPU hardware and software. These instructions describe the high-level attributes of the CPU, such as the supported computer instructions. It consists of a set of a few thousand instructions (for example, "add," "multiply," "load," and "store") and a few hundred registers, which are the places where information can be read, written, or operated upon, by the instructions, which compatible software will recognize.

[3]    Compl. ¶ 5, *In the Matter of Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 (FTC filed Dec. 2, 2021) (hereinafter "FTC Complaint").

[4]    Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparks-quick-backlash-in-chip-industry-idUSKBN2650GT/.

[5]    Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas). ARM claims that "[a]bout 99% of premium smartphones are powered by Arm." *Consumer Technologies: Smartphones*, Arm, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Dec. 9, 2024).

[6]    *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

CPUs that are compatible with the Arm ISA but are otherwise the product of Qualcomm's own engineering work. Qualcomm has also entered into a technology license agreement ("TLA") authorizing Qualcomm to make and sell products, including systems-on-a-chip ("SoCs") that use Arm's ready-made CPU designs.

4. In recent years, Arm has apparently grown dissatisfied with its longstanding open, neutral business model. Following its acquisition by SoftBank and the failure of an attempted sale to NVIDIA, Arm is now grasping for any means—fair or foul—of padding its bottom line and stock price. Eager to cash in on the ubiquity of—and lack of any viable alternatives to—the Arm ISA, and as urged by SoftBank and Son, Arm has begun turning the screws on its customers, substantially increasing the royalty rates it demands to use the Arm ISA. Nor is Arm content to simply increase the rates it charges architecture licensees like Qualcomm. Instead, it has sought to capture a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or indeed, by selling chips themselves).

5. Qualcomm now stands as an obstacle to Arm's ambition to raise prices and eliminate alternatives for customers. Qualcomm has developed innovative products enabled by its custom-designed, high-performance, low-power CPUs, which utilize a novel microarchitecture and related technologies to deliver significant increases in both performance and efficiency. Those innovative products pose a serious obstacle to Arm's ambition to control more links in the computer-chip value chain. Unable to compete fairly with Qualcomm, Arm has employed a series of wrongful tactics in an attempt to stifle Qualcomm's technological leaps in CPU design, to force Qualcomm to continue to use Arm's off-the-shelf CPUs, and to coerce Qualcomm into renegotiating the QC ALA, despite it being in effect for years to come, on terms substantially more

favorable to Arm—or simply to nullify that agreement. Indeed, Arm's tactics are part and parcel of a broader effort to enable the company to escape its existing ALAs and thereby to ensure that devices compatible with the Arm ISA run on Arm chips.

6.      Some of Arm's maneuvers resulted in a trial that took place last year before this Court. *See Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del.) (hereinafter "*Arm* v. *Qualcomm*"). That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA. NUVIA was founded by a world-class engineering team that set out to design better chips for use in datacenters. In 2021, Qualcomm acquired NUVIA for $1.4 billion, intending for this team to help drive innovation across Qualcomm's product segments, including in laptops and other personal computers ("compute"), smartphones ("mobile"), and the digital cockpits and driver-assistance systems that are increasingly common in cars and trucks ("automotive"). Arm could have treated that acquisition as an opportunity to grow the use of the Arm ISA in new markets but instead regarded the acquisition as a competitive threat, whose benefits should be eradicated.

7.      *First*, Arm asserted, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA, Qualcomm needed Arm's consent to transfer NUVIA's technology to Qualcomm. Arm took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of the QC ALA. Arm later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers—including in products that Qualcomm began developing after the NUVIA acquisition, such as the Snapdragon® X-Elite—violated a license agreement between Arm and NUVIA that Qualcomm was not using and that Arm ultimately terminated. This made no sense. Qualcomm has its own license agreements for Arm technology

and information that allowed it to develop and provide custom Arm-compliant cores and products incorporating such cores to its customers (including the Snapdragon® X-Elite and Snapdragon® 8-Elite) for many years to come.  Qualcomm did not need Arm's consent to develop and market this technology.[7]

8.    *Second*, Arm filed the meritless *Arm* v. *Qualcomm* action against Qualcomm, claiming that Qualcomm and NUVIA breached NUVIA's terminated agreements with Arm, despite Qualcomm not even being a party to those agreements, and infringed Arm's trademarks by marketing custom CPUs years after the NUVIA acquisition.  In that action, Arm is demanding that Qualcomm destroy these groundbreaking CPU products that Qualcomm developed after the NUVIA acquisition and in accordance with the Qualcomm/Arm agreements—even though Arm has repeatedly admitted that it suffered no actual harm as a result of the conduct allegedly forming the basis of its claims.[8]

9.    *Third*, Arm and Son promoted the *Arm* v. *Qualcomm* lawsuit to Qualcomm's customers to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and could be subject to retaliation by Arm if they did, including by misrepresenting the terms of Qualcomm's licenses with Arm to Qualcomm's customers.[9]  Arm took further action in an attempt to disrupt Qualcomm's business relationships by sending emails to Qualcomm's customers on two separate occasions that misrepresented the terms of the NUVIA

---

[7]    Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[8]    *See* Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 29, 31-37, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306; Joint Letter re Bench or Jury Trial, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308; Redacted Mar. 5, 2024 Hr'g Tr. 38:20-39:8, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1.

[9]    Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 255-70, *Arm* v. *Qualcomm*, D.I. 306.

agreements and misleadingly implied that Qualcomm was required to destroy the custom CPUs that it was working on.

10. Qualcomm was vindicated in the *Arm* v. *Qualcomm* action, in which the jury found that Qualcomm had not breached NUVIA's agreements and that Qualcomm's products were properly licensed under the QC ALA.[10]

11. This complaint seeks redress for further bad-faith conduct in which Arm has engaged in an attempt to pressure Qualcomm to cave to its demands. That conduct includes refusing to perform certain of its obligations under the QC ALA and QC TLA and continuing to wrongfully interfere with Qualcomm's relationships with current and prospective customers.

### *Arm Withheld Deliverables in Breach of Its Obligations Under the QC ALA*

12. Arm deliberately withheld deliverables to which Qualcomm is entitled under the QC ALA with Arm under the guise that the QC ALA does not entitle Qualcomm to support for "Nuvia-based technology." Arm's excuse is unjustified, and its breach could not be clearer.

13. Qualcomm first suspected that Arm was withholding QC ALA deliverables in the fall of 2022. At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within Arm's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

14. Arm capitalized on this lack of transparency, with its General Counsel stating definitively that ███████████████████████████ Arm further stated that Qualcomm ███ ████████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables. Here again, Arm

---

[10] Verdict Form, *Arm* v. *Qualcomm*, D.I. 572.

was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

15.     Arm went on to state that Qualcomm's written notice was a ████████ to cause Arm ████████ because ████████ was at issue, which Arm purported was ████████████

████████ ████████. Additionally, Arm threatened Qualcomm that, if Qualcomm availed itself ████████ ████████, Arm would harm Qualcomm, including by terminating Qualcomm's multiple licenses with Arm.

16.     Arm's statement that ████████ was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted in *Arm* v. *Qualcomm* revealed incontrovertible evidence that Arm not only had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, Arm was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the use of technology acquired from NUVIA.

17.     Arm never cured its failure to deliver, causing Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

18.     Arm's failure to deliver violated the QC ALA, which ████████ ████████ under that agreement. Under the QC ALA, if Arm is found to be in breach of Section ██ of the QC ALA, it must ████████. If Arm fails ████ ████████, pursuant to Section ████

███████████████████████████████████████████████████████

███████████████████████ .

19.    Arm's withholding of deliverables and deliberate decision not to cure the issue

███████████████████████████ is a material breach of the QC ALA.  Accordingly,

Qualcomm is entitled to financial damages, including but not limited to ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ .

***Arm Violated the QC TLA By Refusing to License Qualcomm CPU Cores***

20.    Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses

to its off-the-shelf cores at commercially reasonable prices to Qualcomm.  Arm's actions are

violations of licensing provisions negotiated between the parties.

21.    For example, in April 2024, Qualcomm submitted requests to renew licenses from

Arm for off-the-shelf cores Cortex-A720 (codenamed "██████") and Cortex-A520 (codenamed

"██████").  Despite repeated follow-ups over the following several months, Arm refused to provide

any licensing offer for either core.

22.    In August 2024, Qualcomm submitted a request to Arm to renew a license to Arm's

off-the-shelf core Cortex-M55 (codenamed "██████").  Arm once again refused to provide a

licensing offer for the ██████ core and continued to refuse to provide a licensing offer for the

██████████ cores.

23.    Given Arm's prolonged refusal to engage, Qualcomm's General Counsel sent Arm

a notice of breach of, and non-compliance with, the QC TLA on September 20, 2024.  Qualcomm

sent a second notice on September 27, 2024 when Arm failed to provide confirmation of having

received the initial letter.

24.     Arm waited nearly a month to respond to Qualcomm's notices of non-compliance. In its October 23, 2024 response, Arm's Chief Legal Officer wrote that Arm did not ███████ ████████████████████████████████████████████████████ Despite the clear indication that Arm did not intend to proceed ███████████, ███████████████████████████ ████████████████████████████.

25.     Arm subsequently provided Qualcomm with a licensing offer for the requested cores and microcontroller.  As Arm must have been aware, its proposal was extreme and clearly not commercially feasible for Qualcomm.  Arm's proposal was a constructive failure to offer a license ████████████████████████████.  Under the terms of the QC TLA, ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████.

26.     As with the QC ALA, ████████████████████████████████████ ██████████████████████, which Qualcomm sent in September 2024. ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████.

27.     Arm's proposal violated the QC TLA by presenting financial terms that were so exorbitant as to be commercially unreasonable and not ███████, and therefore a constructive failure to offer a license.  It also greatly exceeded ████████████████████████████████████ ████████████████████████████████████████████████████.  Furthermore, Arm's proposal failed to comply with the QC TLA by ████████████████████ ████████████████████████████.

28.     Arm has refused to offer commercially reasonable terms for any of the requested cores, and has thereby failed to cure its breach of the QC TLA.

### Arm Threatened to Terminate the QC ALA Without Basis

29.     Apparently seeking to ratchet up pressure on Qualcomm before trial in *Arm* v. *Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter (the "Breach Letter") asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing "unlicensed cores," and claiming that Arm will be entitled to terminate the QC ALA if Qualcomm does not capitulate to Arm's demands for a "cure" within 60 days. Those demands, which had no basis in the agreement, included that Qualcomm should "at a minimum" stop development of any CPUs that use any designs, technology, or code created by NUVIA employees; cease requesting ██████████████████████ for any such CPUs; cease manufacturing and selling such CPUs; and cease manufacturing or selling CPUs that Arm has refused to validate and verify.  The Breach Letter also demanded, without support in the QC ALA or the law, that Qualcomm withdraw its claims against Arm in this case for Arm's breach of its delivery obligations under Section ███.

30.     Arm's assertion that Qualcomm was in material breach of the QC ALA lacked any basis in that agreement.  The premise of Arm's Breach Letter was that certain Qualcomm CPU cores allegedly contain aspects of designs that were started by NUVIA employees.  But the QC

ALA does not prohibit Qualcomm from acquiring nascent microarchitecture technology and using that technology to develop Qualcomm CPUs. And it certainly does not permit Arm to terminate the QC ALA as payback for Qualcomm's suing to protect its rights under that agreement. Because Qualcomm has not committed a ████████████████████████████ Arm has no right to terminate the QC ALA, and any purported termination of that agreement is null and void.

31.    Moreover, Arm's claim of a material breach was inconsistent with Arm's own conduct throughout this dispute. Arm has known since at least 2021 that Qualcomm would be acquiring NUVIA and using the technology that Arm now belatedly claims was improperly licensed. Yet for three years, Arm took no steps towards attempting to terminate the QC ALA and stood by while Qualcomm, through significant investments of time and money, developed and brought to market innovative products featuring Qualcomm's custom CPUs. Arm's belated threat to terminate the QC ALA on the eve of trial and while Qualcomm was announcing new products based on its high-performance custom CPUs demonstrates that Arm's claim of a material breach was a pretext to justify Arm's true aim: escaping the QC ALA and other ALAs so Arm can attempt to dominate the market free from competition from Qualcomm and other designers of custom CPUs.

### Arm Continues to Wrongfully Attempt to Injure Qualcomm's Business

32.    Arm's Breach Letter was the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers.

33.    The Breach Letter was not only legally groundless, but also timed and publicly released in an effort to damage Qualcomm's business. Arm sent the Breach Letter to coincide with Qualcomm's annual Snapdragon® Summit, where Qualcomm unveiled an SoC that offers

greater CPU performance and efficiency than those offered by Qualcomm's competitors, including those competitors that use Arm off-the-shelf products in their SoCs.  To ensure that the Breach Letter reached Qualcomm's customers, Arm also promptly leaked it to Bloomberg, which published a story on the threatened termination that very day.[11]  Arm did so knowing that Qualcomm's customers would likely be concerned that termination of the QC ALA could destabilize their own supply chains, because Arm's actions implied, despite the actual terms of the QC ALA, that Arm could and would impede Qualcomm's ability to deliver the SoCs its customers ordered, and that Qualcomm's customers might even face intellectual-property litigation brought by Arm.  Both the timing and the disclosure of the Breach Letter were thus calculated to interfere with Qualcomm's customer relationships and prospective business opportunities.

34.    The Breach Letter was also timed to interfere with *Arm* v. *Qualcomm*.  In the Breach Letter, Arm threatens that it "shall be entitled" to terminate the QC ALA on December 21, 2024—the day after trial in *Arm* v. *Qualcomm* was expected to conclude.  Arm's counsel's statements to this Court that termination would not be "automatic" after 60 days, that he "hope[d] that there are discussions between the parties," and that the Breach Letter could prompt the parties to "evaluat[e] their positions" underscore that Arm sent the Breach Letter to pressure Qualcomm to accede to Arm's unjustified demands.[12]  Arm's wrongful tactics have harmed Qualcomm.  Following Arm's bad-faith claim that Qualcomm has breached the QC ALA and leak of the Breach Letter, important Qualcomm customers delayed entering into new (or renewing existing) contracts with Qualcomm or have insisted that Qualcomm provide them with additional commitments regarding its ability to

---

[11]    Ian King, *Arm to Cancel Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024, 8:17 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

[12]    Oct. 30, 2024, Hr'g Tr. 39:14-40:2, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

deliver licensed products.  Arm's campaign not only deprived Qualcomm of the ability to finalize these business opportunities promptly and without providing additional commitments, but also required Qualcomm executives and employees to spend considerable time responding to and alleviating customer inquiries.  None of those demands would have existed but for Arm's wrongful conduct.

35.    At trial in the *Arm* v. *Qualcomm* case, Arm continued to misrepresent its relationship with Qualcomm and its position in the marketplace.  Arm's Chief Executive Officer, Rene Haas, repeatedly stated that Arm did not view Qualcomm as a competitor because Arm did not build or sell semiconductor chips in the marketplace, which Mr. Haas stated would amount to direct competition between the companies.  Despite Mr. Haas' sworn statements denying Arm's involvement in chip development, Arm is now in the process of designing and distributing its own semiconductor chips.[13]  Moreover, Arm "sought to hire executives from its customers as early as November," several weeks before Mr. Haas' sworn testimony in court.[14]  Specifically, Arm's recruiter told the customer executive that this new position will help with Arm's "transformation from solely designing processor architecture (IP) to also selling its own silicon."[15]  To facilitate its entry into selling its own chips, Arm now seeks to force Qualcomm—which would otherwise be a competitor—out from the marketplace.

36.    Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025,

███████████████████████████████████████

---

[13] *Arm recruits from customer as it plans to sell its own chips*, Stephen Nellis and Max Cherney, REUTERS,       https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (Feb. 13, 2025).

[14] *Id.*

[15] *Id.*

██████████████████████████████████████████████████████████

But even then, Arm confirmed that it was not abandoning its efforts to obstruct Qualcomm's developments of custom cores, insisting that ███████████████████████████████

███████████████████████████████████████ Moreover, Arm sought to prevent Qualcomm from curing the impression created in the market by its deliberate leak of the Breach Letter, ████████████████████████████████████████████████████

█████████████████████████████████

37.     Arm's non-compliance with its contractual obligations to Qualcomm should be seen for what it is: the latest in a series of anti-competitive maneuvers intended to force Qualcomm to renegotiate an existing, long-term license agreement that Arm's current management views as disadvantageous, and to frustrate Qualcomm's efforts to design and deliver industry-leading technology.  Arm's tactics—its refusal to provide technology it is contractually obligated to deliver and its attempts to undermine customers' confidence in Qualcomm—should be wholly rejected.

## THE PARTIES

38.     Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm is a leading technology innovator in mobile communication products and the driving force behind the development, launch, and expansion of 5G technology.  Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone.  Qualcomm brings the benefits of mobile to new industries, including automotive, IoT, and computing, where Qualcomm's technology has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

39.     Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm Technologies is a wholly owned subsidiary

of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering and research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

40.     Defendant Arm Holdings PLC is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

42.     Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because Arm is "a defendant not resident in the United States" and therefore can be "sued in any judicial district." Arm has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[16]

## FACTUAL ALLEGATIONS

### I.    ARM LICENSES AND THE CUSTOM CPU MARKET

43.     Arm is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars. Arm's licensing model has been based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee. For many years, Arm has offered different types of license contracts, of which two are at issue in this case: ALAs and TLAs.

---

[16]    *See generally* Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

## A.    ALAs and the Arm ISA

44.    An ALA grants licensees the right under Arm's intellectual property to design their own custom Architecture Compliant Cores using specific licensed ISA technology and to manufacture, sell, and distribute Arm Compliant Products incorporating such cores.[17]

45.    CPU cores (also known simply as cores) are a particular component of SoCs, which are integrated circuits used in cellular phones, computers, and other devices that combine several technologies used in such products into a single chip.  A core or CPU performs processing within the SoC.

46.    An Arm Compliant Core is compatible with the Arm ISA.  As a general matter, an ISA lists the instructions that allow hardware (like SoCs) to interface with software programs. Application and software developers create their products to be compatible with particular ISAs. As a result of greater investment in Arm-based systems by hardware companies like Qualcomm and software developers, the Arm ISA is now "ubiquitous" and used in practically every premium smartphone, as well as a large percentage of automobiles and IoT devices and a growing number of personal computers and datacenter servers.

47.    The Arm ISA allows for software compatibility across all Arm-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.  The Arm ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

---

[17] ██████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

48.    To make a CPU that then can execute the Arm ISA and therefore run applications and other software that have been written to be compatible with that ISA, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

49.    A CPU developer developing a custom CPU designs **how** the core is built, **how** it performs, and **how** it executes the CPU's instructions.  There are a virtually infinite number of ways to design and build CPUs that can implement the Arm ISA.  Companies that design custom CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.  Many of these design choices are driven by the requirements of the product segment the designer is targeting—CPUs for mobile applications can have different design priorities than those for laptop computers or automobiles.

50.    Under an ALA, Arm does not deliver any specific Arm design or tell the licensee how to make the CPU.  That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee.  As Arm has publicly acknowledged, "the creation of an optimized CPU is very costly and time consuming," and Arm therefore "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the

18

customization often does not provide a reasonable return on investment."[18]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.  Arm has executed ALAs with Qualcomm and a number of other companies.

### B.    TLAs and Off-the-Shelf CPUs

51.    In addition to granting licensees rights under ALAs to make custom-designed products that are compatible with the Arm ISA, Arm also designs "off-the-shelf" CPUs and other peripheral intellectual property ("IP") that customers may license through a TLA.  Under a TLA, Arm delivers complete processor core designs that a licensee can incorporate into a larger SoC design, saving the licensee the trouble and expense of designing its own CPU.  In addition to CPUs, Arm also designs, and licenses under the TLA, peripheral IP, which is technology used in SoCs to perform specific functions and interface with the CPU.  This peripheral IP takes a variety of forms, such as "interconnects" that facilitate the transfer of information between different components of an SoC or various pieces of software that are incorporated into a semiconductor chip as a means of certifying safety capabilities of the chip.  Recently, Arm has placed greater emphasis on licensing off-the-shelf CPU technology, including by launching a "Compute Subsystems" business that offers integrated designs that pair CPUs with other technology—all in exchange for "significantly higher royalty rates" than Arm receives for licensing its ISA.[19]

52.    But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance.  Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it

---

[18]    Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

[19]    *Id.*

charges for a license to the Arm ISA. Moreover, when an SoC developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs. And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing SoCs that can compete against those with more advanced custom CPUs.

## II. QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

53.     Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications." Qualcomm is a world leader in the design and production of semiconductor microchips, including SoCs. Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines. Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

54.     Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates. In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive industry designed to deliver connected experiences that are safer and customizable. Included among these products are custom CPUs and SoCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

**A.    Qualcomm Builds Innovative Arm-Compatible Products.**

55.    Qualcomm has held Arm licenses since 1997.  Those licenses include an ALA entered in 2003, and the currently operative QC ALA, ███████████████, which Qualcomm[20] and Arm entered into on May 30, 2013, and Annex 1 to that agreement for Arm v8-A Architecture deliverables.  On June 23, 2020, Qualcomm and Arm entered into an additional Annex 1 to the QC ALA for Arm v9-A Architecture deliverables.

56.    Under the QC ALA and corresponding Annex 1s, Qualcomm has rights, using specific licensed technology, to design, manufacture, sell, and distribute Qualcomm's v8-A and v9 Arm-compatible custom cores, custom Arm ISA-compatible CPU cores, and products incorporating those cores.  ████████████████████████████████████ ████████████████████████████████████████.  Since Qualcomm entered into the QC ALA, Qualcomm has developed and shipped custom Arm ISA-compatible CPUs.

57.    Qualcomm is today one of Arm's largest licensees—it "accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024."[21]  Since 2013, Qualcomm has paid Arm total license fees of ██████████ and running royalties of ██████████ under the QC ALA.  Qualcomm has fully complied with its obligations under the QC ALA and has continued to tender royalty payments to Arm (under protest) pending resolution of this dispute.

58.    In recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for

---

[20]    The actual party to the ALA and TLA ███████████████████████████████ ██████████.  The terms of the agreements ████████████████████████████████ ██████████████████████████████████████████████.

[21]    ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024 (Form 20-F) at 28 (Aug. 12, 2024).

Qualcomm to compete by relying on Arm-designed cores. In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical.

59.     In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SoC specifically for use in datacenter servers. At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs. Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary compute, mobile, and automotive product segments. Qualcomm also planned to continue development of the server CPU and SoC for use in data centers and servers that NUVIA had originally intended to design.

60.     Since acquiring NUVIA and integrating the NUVIA team as Qualcomm employees, Qualcomm spent years developing innovative products with custom-designed CPUs using a novel microarchitecture and related technologies.

61.     Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86). Qualcomm's new products with custom CPUs have drawn praise as being "incredibly potent"[22] and "shockingly fast."[23]

62.     Qualcomm is not alone in its belief that its custom cores offerings will transform and advance the industry. Major industry participants—including Microsoft, Google, Samsung,

---

[22]   Aaron Klotz, *Snapdragon X Elite Beats AMD and Intel Flagship Mobile CPUs in Geekbench 6*, Tom's Hardware (Apr. 2, 2024), https://www.tomshardware.com/pc-components/cpus/snapdragon-x-elite-beats-amd-and-intel-flagship-mobile-cpus-in-geekbench-6-qualcomms-new-laptop-chip-leads-in-single-and-multi-core-tests.

[23]   Mark Hachman, *Qualcomm's Snapdragon X Elite Chip Attracts Unprecedented PC Partnerships*, PCWorld (Oct. 25, 2023), https://www.pcworld.com/article/2116395/qualcomms-latest-snapdragon-attracts-huge-pc-partnerships.html.

GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[24]

**B.    Relevant Provisions of the Qualcomm ALA**

63.    On May 30, 2013, Qualcomm and Arm entered into an Amended and Restated Architecture License Agreement, ███████████████, and Annex 1 to that agreement. The QC ALA is a binding and enforceable agreement.

64.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

65.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

66.    ████████████████████████████████████

████████████████████████████████████████████

---

[24]    *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.



C.    **Arm's Evolving Business Model**

68.    For years, Arm expressed its commitment to an open, neutral model for licensing the use of its ISA.  Under that model, which led to Arm commonly being referred to as the "Switzerland of chips," Arm held itself out as not discriminating against companies that sought to use the Arm ISA.[27]  That model benefited the software developers, which could develop software

---

[25]  ████████████ and ███████████████████ are defined terms in the QC ALA. *See* ██████████████.

[26]  ████████████████████████ is a defined term in the QC ALA. █████████.

[27]  FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point

that would be interoperable across Arm-compatible devices, and ultimately benefited customers. Indeed, Arm continues to tout the benefits of its "broad, standardized software ecosystem," which it claims "ensures diversity and robustness in supply, as well as easy software portability between Arm-based systems."[28]  That model also benefited Arm, leading to widespread adoption of the ISA.  As a senior Arm executive has explained, "[w]hat makes an architecture successful is actually the number of people that use it," as greater adoption of an ISA creates a "virtuous circle" in which the "more people that use your architecture, the more people will want to use it."[29]

69.    After being acquired by SoftBank, however, Arm has pivoted away from that model.  When the chipmaker NVIDIA attempted to acquire Arm in 2020, the proposed acquisition met with harsh responses from regulators and other companies that rely on the Arm ISA, based on fears that NVIDIA could use its control of Arm to undermine its rivals, "including by manipulating levers such as [Arm]'s pricing, the terms and timing of access to [Arm]'s Processor Technology, … [Arm]'s technological developments and features, and [Arm]'s provision of service and support."[30]

70.    When that acquisition fell apart under regulatory scrutiny, Arm pursued a variety of strategies to try to bolster royalty revenues at SoftBank's and Son's behest, including unsuccessful attempts to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made, and to force a major customer

---

about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees").

[28]  *The Arm Advantage: Choosing Arm Technology*, Arm.com, https://www.arm.com/company/arm-advantage (last visited Dec. 9, 2024).

[29]  Arm, *What Is CPU Architecture?*, YouTube.com (Aug. 18, 2021), https://www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.

[30]  FTC Compl. ¶ 8.

to renegotiate royalty rates notwithstanding the parties' existing contract.[31]  After releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores.[32] Indeed, in its calls with investors, Arm routinely touts the increased revenues it expects to collect as a result of widespread adoption of v9.Arm has also attempted to bolster its income—and thus its valuation—by abandoning its historic role of neutral and open licensing of its ISA.  Having made that ISA "ubiquitous" for the entire smartphone and IoT markets and made significant inroads in other sectors, Arm now seeks to leverage that ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA.  Mr. Haas has hinted at precisely that sort of leveraging, explaining that as the company "defining a computer architecture and … building the future of computing," it is "easier" to understand the best ways to integrate hardware and software "if you're building something than if you're licensing IP" because "building something" makes a company "much closer to that interlock" and gives it "much better perspective in terms of the design tradeoffs to make," which is why "if we were to do something, that would be one of the reasons."[33]  Moreover, Arm has also sought to develop more complex, integrated "subsystems" that combine CPUs with other chips and intellectual property.[34]  And it was recently

---

[31]  Wayne Ma & Cory Weinberg, *How a Lopsided Apple Deal Got Under Arm's Skin*, The Information (Nov. 29, 2023), https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin.

[32]  *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas).

[33]  Alex Health, *What Arm's CEO Makes of the Intel Debacle*, The Verge (Dec. 6, 2024, 4:45 PM), https://www.theverge.com/2024/12/6/24315123/arm-ceo-rene-haas-intel-ai-chips-samsung-changes.

[34]  *Client Solutions: Arm Compute Subsystems (CSS) for Client*, Arm, https://www.arm.com/products/compute-subsystems-for-client (last visited Dec. 9, 2024).

reported that, in a "radical change to [Arm's] business model," Arm was planning to launch its own chip by as early as this summer.[35]  This transformation from licensing intellectual property to positioning itself primarily as a chip designer creates the potential for Arm to make substantially more money:  These businesses "carry significantly higher royalty rates"[36] than merely licensing use of the Arm ISA.

71.    But this transformation also brings Arm into direct conflict with existing licensees and customers.  When an architecture licensee like Qualcomm designs a custom Arm ISA-compatible CPU, that CPU does not belong to Arm.  Instead, as Arm has publicly acknowledged, those custom CPUs "compete with" and "pose a threat to Arm's implementation IP business"— that is, Arm's effort to position itself as a designer of CPUs.[37]

72.    Arm has thus responded by pressuring customers (such as Qualcomm) to purchase Arm's off-the-shelf CPUs and by attempting to prevent Qualcomm from designing CPUs compatible with the Arm ISA.

## III.    ARM UNFAIRLY AND UNLAWFULLY ATTEMPTS TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

73.    Developing its own CPUs frees Qualcomm of the need to rely on Arm's off-the-shelf CPU designs.  That can both reduce the royalty rates Qualcomm pays Arm— ██████████

---

[35]  Matthew Garrahan et al., *Arm To Launch Its Own Chip in Move That Could Upend Semiconductor Industries*, Financial Times (Feb. 13, 2025), https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008 .  According to the report, the chip is "expected to be a [CPU] for servers in large data centres and is built on a base that can then be customized for clients."

[36]  *Arm First Quarter Fiscal Year 2025* at 5, Arm (July 31, 2024), https://investors.arm.com/static-files/393afe3f-13ff-4aa8-a4b3-41b1afaa5a91 (statement of Rene Haas).

[37]  Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

██████████████████████████████████████—and demonstrate that products using Qualcomm custom CPUs can outcompete products using Arm's off-the-shelf designs.  Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an even better product for customers and opening new product segments for chips compatible with Arm's ISA, Arm has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

**A.    Arm Wrongfully Withholds Deliverables Owed to Qualcomm Under the QC ALA.**

74.    In an effort to limit competition posed by Qualcomm's custom CPU, Arm breached its contractual obligations to provide Qualcomm with deliverables paid for under the QC ALA.

*1.    The QC ALA requires Arm to provide Qualcomm with certain deliverables.*

75.    The two contract provisions at issue here—Sections ██ and ██—are clear and unambiguous.

76.    Section ██ of the QC ALA requires Arm to ████████████████████████████ ██████████████████████████████████████████████████████ and to ████████████████████████████████████████████████████████ ███████████████████████ Arm is also required to deliver ████████████████ ████████████████████████████████ ███████████████████ is defined in the Qualcomm ALA as ████████████████████████████████████████████████ ██████████████████████████████ under that agreement.

77.    Under Section ██ of the QC ALA, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ :



### 2.    *Arm withholds the deliverables.*

78.    Qualcomm first suspected that Arm was withholding ████████████ under the QC ALA in the fall of 2022.  At that time, Qualcomm was embarking on its verification process for its ████ SoC.  As is the customary practice between an ALA licensee and Arm, Qualcomm provided Arm with details about its ████ CPU so that Arm would provide a formal list of agreed Arm Compliance Kit ("ACK") tests for which Arm would expect to see verification data.  But Arm withheld the formal list of tests (known as the "OOB") ████████████████ ████████████████████████████████████████████ ████████.

79.    Qualcomm then attempted to resolve the issue without court intervention.

80.    On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug fixes) from Arm.  Arm engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll be able to share OOB and various patches after my management has given their approval."

### 3.    *Qualcomm provides written notice of Arm's failure to deliver—but Arm does not cure.*

81.    Almost one month later and after still not having received the deliverables under the QC ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022, Qualcomm notified Arm in writing of its failure to provide certain deliverables, including the OOB, stating explicitly that Arm should take the letter as "Qualcomm's required notice under Section ██ that Arm is not in compliance with its obligations under Section █, and that Arm must cure this breach in accordance with the time and procedures set forth therein."

82.    After not hearing from Arm, pursuant to Section ▆ of the QC ALA, Qualcomm sent a follow-up letter on December 5, 2022.  The letter was Qualcomm's "second written notice of non-compliance ███████████████████████████████████." The letter stated that "ARM must ██████████████████████████████ set forth" in the QC ALA "or ███████████████████████████████."

83.    Pursuant to Section ▆ of the QC ALA, Arm ██████████ to remedy its failure to provide the deliverable.  ████████ passed without Arm remedying the issue.

84.    Arm responded on December 6, 2022.

85.    In its response, Arm disagreed that Section ▆ was at issue "or that provision of the OOB implicates Section ▆."  Arm additionally asserted that the ACK deliverables are governed by Section ▆ of the QC ALA, not Section ▆, and that remedies for a breach of that section do not include ███████████████████.

86.    Notably, Arm additionally claimed that ███████████████████████ stating explicitly that Arm ██████████████████████████████████ ████████████████████████████ As to the OOB specifically, Arm claimed that ███ █████████████████████████████████████████████████████████ ████████

87.    Arm was definitive in its assertions, stating that "[n]o additional delivery is required," and "[n]o breach of Section ▆ has occurred."  Qualcomm was unable to verify this assertion because the "patches" are created by Arm and provided solely by Arm.  Accordingly, Qualcomm has no way of knowing definitively whether Arm has released patches for verification until they are delivered (or until someone from Arm tells Qualcomm they are available, which did not occur in this case).

88.    Arm's letter further stated that Qualcomm "does not have ▓▓▓▓▓▓▓ ▓▓▓▓ rights under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  Arm additionally threatened Qualcomm that if it did not drop its invocation of Section ▓ , Arm would take steps that would harm Qualcomm.  Arm claimed that Qualcomm's invocation of Section ▓ was "a new, material breach of the Qualcomm ALA" and that, to the extent Qualcomm exercised ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ , Arm would "not hesitate to terminate" Qualcomm's licenses.  Arm further stated that Qualcomm's letter was a "malicious effort" to cause Arm "economic duress," which Arm purported was "inconsistent with the language, spirit, and purpose of the ALA and ▓▓▓▓▓▓▓▓▓▓▓ ."

### 4.    *Discovery reveals that Arm deliberately withheld the deliverables.*

89.    But more than a year later, Qualcomm discovered that Arm's December 6, 2022, letter misrepresented the facts and concealed Arm's strategy of deliberately withholding the OOB and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm duress.

90.    "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'"  In response to Qualcomm's requests for production, Arm produced an October 2022 email chain in which Richard Grisenthwaite, Arm's Executive Vice President and Chief Architect, explicitly instructed others at Arm not to provide Qualcomm with the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[38]

---

[38]    On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include Arm's breach of Section ▓ of the QC ALA.  These allegations and

91.     In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that Arm concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  Arm's multi-tiered deception was successful for more than a year.  "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section ██ of the Qualcomm ALA."[39]

92.     The applicable Annex 1 to the QC ALA includes █████████████

████████████████████████████████████████████████

███████████████████.

93.     Accordingly, when it was revealed through document and deposition testimony that, contrary to Arm's December 6, 2022, letter, Arm had deliberately withheld the ACK deliverables to which Qualcomm was entitled, it became clear that Arm breached its obligations under Section █████████████.

---

quotations are taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order.  Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5.  Notably, at that hearing, Arm advocated against adding this claim to the case in which this discovery was produced; and instead, Arm advocated for Qualcomm to bring a separate lawsuit.  Redacted Mar. 5, 2024 Hr'g Tr. 39:13-20, *Arm* v. *Qualcomm*, D.I. 312-1.

[39]   Redacted Mar. 6 Order at 4, *Arm* v. *Qualcomm*, D.I. 303; *see also* Redacted Mar. 5, 2024 Hr'g Tr. 17:18-19:9, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

94.     Arm's Chief Legal Officer concealed the facts, explicitly (and definitively) stating in Arm's December 6, 2022, letter that it had provided Qualcomm with ▉▉▉▉ to the ACK and that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Qualcomm did not have a valid basis to dispute that factual representation without discovery.

### 5.     *Arm's breach of the QC ALA has harmed Qualcomm.*

95.     To date, Arm still has not provided the OOB and relevant patches to which Qualcomm is entitled, and Arm's failure to do so increased Qualcomm's burden in verification.

96.     By failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA, even in the absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the QC ALA.

97.     Similarly, by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches, which Qualcomm paid for and was entitled to receive under the QC ALA.  Qualcomm was damaged as a result.

98.     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

99.     Pursuant to Section ▉ of the QC ALA:



100.    Accordingly, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

██████████████████████████████████████████████████

████████████████████████████.

101.    In addition, because ███████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████.

**B.    Arm Fails to Provide Qualcomm With** ████████ **Licensing Proposals in Violation of the QC TLA.**

102.    Arm has not only attempted to disrupt Qualcomm's development of custom CPUs but also attempted to interfere with Qualcomm's development of products containing off-the-shelf Arm cores by intentionally failing to provide commercially reasonable, and therefore ██████, licensing proposals to Qualcomm ██████████████████. In addition to the below, Qualcomm expects discovery to show that Arm ████████████████████████████████████ ████ in its licensing negotiations involving peripheral TLA IP.

*1.    The QC TLA requires Arm to* ███████████████████ ████████████.

103.    The QC TLA contains ██████████████████████████████

██████████████████████████████████████████████.

104.    Section ▮▮▮ sets forth a series of requirements that Arm must follow for each of its off-the-shelf cores. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

105.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

106.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Arm has never provided Qualcomm with written notice that ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

107.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████

████████████ .

108. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ :

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████ .

### 2.    *Arm fails to respond to Qualcomm's licensing requests.*

109.    As part of its product development cycle, Qualcomm monitors the terms of licensing agreements to determine whether renewals or extensions of third-party IP will be necessary in order to plan for future product development and sales.  Qualcomm has historically licensed and renewed licenses for various ████████████████ .  For example, Qualcomm sought to renew licenses to certain ████████████████████████

████████████████████████████████████████████████████

████████████████████████ .

110.    Qualcomm's licenses for all three cores, which were ████████████ licenses entered into in 2019, are set to expire in ████ .  Given Qualcomm's desire to avoid disruption to its development schedule and roadmap, it began negotiations for new licenses for each core in 2024.

111.    In April 2024, Qualcomm sent Arm written requests to license both ████████ ████ .

112.    Arm failed to respond to Qualcomm's requests, ███████████████████ ██████, and ignored continued outreach from Qualcomm in the subsequent months.

113.    In August 2024, Qualcomm submitted a written request for ██████. Arm failed to respond to this request as well.

114.    Faced with Arm's continued non-compliance and the potential impact to its roadmap, Qualcomm sent Arm a notice of non-compliance with Section ██ of the QC TLA (including ██████████████) in September 2024. Qualcomm told Arm that the letter "serves as Qualcomm's written notice of ARM's breach of, and non-compliance with, ██████████ of the TLA." The letter asked that "ARM provide the requested core license immediately and in accordance with the terms and conditions of the TLA as required by ████████████████ of the TLA, or Qualcomm will be forced to exercise its remedies under the TLA."

115.    Once again, Arm failed to respond. A week later, Qualcomm wrote to Arm again, informing Arm of the "second written notice of breach and non-compliance in accordance with the notice process set forth in Section ██ of the TLA."

*3.        Arm fails to provide ███████ licensing terms to Qualcomm.*

116.    Nearly four weeks later, Arm finally responded to Qualcomm's notice of non-compliance. In its October 23, 2024 letter, Arm ██████████████████████████ ████████████. Instead, Arm told Qualcomm that it did not ████████████████████████ ████████████████████████████████████

117.    In connection with the letter, Arm provided offers to the requested cores that Arm claimed were ████████████████████████████████ However, not only was this untrue, but also Arm's proposal contained terms so unreasonable that it was a constructive failure to license.

118.    The financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and ██████████████. For example, ███████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████. ██████████████ was not justified by any change or improvement in the technology and is grossly inconsistent with the market for any comparable technology. Arm was aware of the unrealistic terms of its proposal, which Arm acknowledged it only provided because of Qualcomm's notice of non-compliance with Section ████████████████████████████████████████████████████ ████. This constructive failure to offer a license to the requested cores violated the terms of the QC TLA.

119.    Arm's proposal also violated the QC TLA requirement under Section ██████████ ████████████████████████████████████████████████.

120.    Furthermore, by █████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████.

### 4. Qualcomm has been harmed by Arm's TLA violations.

121.    As a result of Arm's exorbitant proposal, Qualcomm has been forced to proceed in development of SoCs without knowing what CPUs it will be using after the licenses to ████ █████████████ expire.

122.    Due to the development lifecycle for semiconductor chips, Arm's ████████ refusal to offer licenses and to change ████████████████ of its licensing offers is already impacting Qualcomm. Qualcomm must undergo reviews of its planning roadmaps to ensure that it will have suitable CPUs for its customers. This effort requires (i) that additional resources be shifted to

design custom CPUs for each of its semiconductor chips (ii) that Qualcomm allocate resources to identify workarounds based on RISC-V and redesign products to function with a different microprocessor design, or (iii) rely on older, less competitive versions of Arm CPUs that Qualcomm has licensed.

123.    The QC TLA sets forth the remedies for Arm's violations.

124.    ████████████████████ states that Qualcomm may seek ██████████



125.    In addition, Section ██ of the QC TLA states:



126.    Qualcomm sent its first notice of breach on September 20, 2024 and its second notice on September 27, 2024.  Arm's purported offer in response to Qualcomm's notices was dated October 24, 2024.  To date, Arm has failed to provide any commercially reasonable, ████, ████, offer and, as such, has failed to remedy its breach within the ██████████.

127.    Qualcomm is entitled to ██████████████ under both the QC TLA and QC ALA for a period of ████████████████████████████████.  While Qualcomm will continue to ████████████ until Arm's breach of the QC TLA is finally

resolved, Qualcomm believes that Arm is not entitled to receive those █████████ ████████████████████████ pursuant to the QC TLA and ALA ████████████ ██████████████████████████████████████. For this reason, Qualcomm does not believe that any ███████████████████████.

**C.      Arm Refuses to Negotiate a License to the Latest Version of Its ISA ██████ █████████████.**

128.    Arm has not only taken steps to destroy or delay Qualcomm's present development efforts.  It has also tried to hamstring Qualcomm's future development efforts by failing to negotiate a license to future versions of the Arm Architecture.

129.    In addition to failing to provide the deliverables █████████████████ and constructively failing to offer licensing proposals ███████████, Arm has also refused to negotiate an extension of ████████ to cover future versions of ███████████████ ███████ requires it to do.

130.    As noted, Section ████████ of the QC ALA ██████████████████████ ███████████████████████████████████████████████████████████████ ██████████. Qualcomm has ███████████████████. Additionally, Section █████████ of the QC ALA ████████████████████████████████████████ ██████████████████████████████.

131.    On April 17, 2020, a Qualcomm employee emailed an Arm counterpart to ask if Arm was working on a new version (v10) of the Arm ISA to replace v9 and explained that the request was made in the context of ██████████████████████████████ ██████████████. The Arm employee responded the following week that ███████████ █████████████████████████████████████████████████████████████.

██████ would expire but that there was ████████████████████████████

████████████████████████████████████

132.  On May 20, 2020, Qualcomm emailed Arm stating that Qualcomm ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

133.  Arm never responded to that email or followed up at any other time regarding Qualcomm's rights ████████████████████.

134.  Arm's actions underscore its strategy of attempting to eliminate existing ALAs and to force Qualcomm and other licensees to use Arm's off-the-shelf CPU designs—or to cease designing Arm-compatible chips entirely.

**D.  Arm Engages in a Campaign to Undermine Qualcomm's Customer Relationships.**

135.  In addition to the breaches described above, Arm has also deliberately sought to impair Qualcomm's standing and relationships with current and prospective customers.  As Qualcomm has detailed, Arm, through its leadership and through SoftBank and Son, has engaged in a misinformation campaign to mislead Qualcomm's customers into believing that Qualcomm will not be able to deliver licensed Arm-compatible products after 2024, and that Qualcomm customers must obtain their own direct licenses from Arm.[40]  That misinformation campaign included multiple rounds of letters to Qualcomm customers misleadingly claiming that Qualcomm had breached its ALA and suggesting that customers could face legal jeopardy from using

---

[40]  Defs.' Answer and Defenses to Pl.'s Compl. & Jury Demand & Defs.' 2d Am. Countercls. ¶¶ 255-70, 275(b)-(d), *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.

Qualcomm products. More recently, Arm began "ratcheting up the pressure" on Qualcomm in *Arm* v. *Qualcomm*,[41] and Arm continued this misinformation campaign by declaring without basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter. By doing so, Arm has caused tangible harm to Qualcomm's customer relationships.

### 1.    *Arm repeatedly attempts to interfere in Qualcomm's customer relationships.*

136.    On August 31, 2022, Arm commenced *Arm* v. *Qualcomm* in the U.S. District Court for the District of Delaware. In that action, Arm alleges that Qualcomm and NUVIA breached the NUVIA ALA by not destroying all design work undertaken by NUVIA pursuant to its license with Arm following Qualcomm's acquisition of NUVIA.

137.    On the same day that Arm filed that action, it launched a premeditated campaign to blitz Qualcomm's customers with letters publicizing the lawsuit. As Mr. Haas admitted under oath at trial, Arm sent letters to top executives at 37 companies that were customers of both Arm and Qualcomm. In those letters, Arm stated that Qualcomm had breached the terms of "the Arm license agreement," implying that Qualcomm had breached its own ALA. That was misleading: Arm's complaint in the *Arm* v. *Qualcomm* action accused Qualcomm and Nuvia of breaching the *Nuvia* ALA and never accused Arm of breaching the *Qualcomm* ALA. Mr. Haas thus also admitted under oath that the letter "should have said" that Qualcomm had supposedly breached the Nuvia ALA, not Qualcomm's "Arm license agreement."

138.    Additionally, the August 31 letters asserted that Arm would ███████████ ████████████████████████ and thus (despite assuring customers that there would be ██ ████████████████████████████████) suggested that companies could face legal jeopardy if

---

[41]    Oct. 30, 2024, Hr'g Tr. 34:6, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

they used the Qualcomm products that incorporated Nuvia technology. The letter attached a letter from Arm's general counsel to Qualcomm's general counsel that made this point explicitly, asserting that ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ .

139.    Eight months later, in May 2023, Arm launched another round of customer letters. Arm executive Will Abbey sent a series of additional letters to key Qualcomm customers ██████████████████████████████████████████████ Mr. Haas agreed at trial that there was no independent event that triggered Arm's decision to send these letters.  That letter stated that Qualcomm's designs based on Nuvia technology, specifically including the Phoenix core, "can no longer be used and must be destroyed."  Mr. Haas also agreed at trial that it was very important to Arm to tell customers that it was demanding destruction of technology. The letter extensively quoted from Arm's prior threat letter to Qualcomm but did so in a manner intended to convey that it was quoting from a contract between Qualcomm and Arm that specifically required Qualcomm to cease using "Arm-based technology" developed by Nuvia and to destroy such technology.  In fact, no such contract existed, and the intended implication of quoting that language was thus false.  Mr. Haas admitted at trial that he was "quite confused" by the language of the letter and agreed that the letter was "misleading."

140.    Like the prior letters, the May 2023 letters reassured customers that there would be no disruptions to their partnership with Arm, but only if that partnership was ██████████████ ██████████  It also offered to answer questions that customers might have regarding how the litigation might impact the availability of licensed Arm technology going forward, which necessarily

implied that the litigation could impact the availability of the Qualcomm products that Arm claims were unlicensed.

### 2. Arm waits years before taking steps to terminate the QC ALA.

141.    Although Arm now asserts that Qualcomm is in material breach of the QC ALA, Arm waited years before taking any steps towards terminating the QC ALA.  When it filed the *Arm* v. *Qualcomm* action, Arm neither alleged that Qualcomm had breached the QC ALA nor sent Qualcomm any notice to that effect, ███████████████████████████████████████ ██████ .

142.    On September 30, 2022, Qualcomm answered Arm's complaint in *Arm* v. *Qualcomm* and filed a Counterclaim against Arm seeking, among other things, a declaratory judgment that its conduct was fully licensed under the QC ALA, and that it could "continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA" or any other relevant agreement with Arm.  When Arm answered that counterclaim, it generally alleged that Qualcomm was breaching the QC ALA, though it did not send Qualcomm any written notice to that effect ████████████████████ .

143.    On March 13, 2024, Qualcomm filed its second amended counterclaims in *Arm* v. *Qualcomm*.  Arm answered on April 4, 2024, and again alleged that Qualcomm was breaching the QC ALA, entitling Arm to terminate that agreement.  Again, however, Arm did not send Qualcomm any written notice to that effect ██████████████████ .

### 3. Arm's Breach Letter groundlessly asserts that Qualcomm is in material breach of the QC ALA.

144.    It was not until more than seven months later, on October 22, 2024, that Arm sent Qualcomm the Breach Letter, which purported to provide notice to Qualcomm █████████ ████████████████████ that Qualcomm is in material breach of that agreement.

145.    The Breach Letter asserted that the QC ALA authorizes Qualcomm solely "to develop, verify, and sell designs for CPUs … that use, rely on, or derive from Arm technology *delivered by Arm to Qualcomm* and *developed by Qualcomm employees*, not third parties."[42]  It did not attribute these assertions to any particular provision of the QC ALA but instead cited a string of contract sections, ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████.  The Breach Letter also referred generally to "Annex 1," a lengthy document describing ███████████████████████.  But nowhere in the Breach Letter did Arm identify any provision of the QC ALA that imposes the particular obligations Arm asserts in the Breach Letter.

146.    In the Breach Letter, Arm claimed that Qualcomm "systematically and willfully breached these obligations" by "develop[ing] CPUs and market[ing] multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party."[43]  The Breach Letter thus reprised the same arguments it has made in *Arm* v. *Qualcomm* about the NUVIA ALA: in essence, that Qualcomm somehow breached the *NUVIA* ALA by developing CPUs in part by using technology created by and acquired from NUVIA.  Arm has not explained in that litigation and did not explain in its Breach Letter how Qualcomm allegedly breached any provision in the *QC* ALA by developing CPUs in the manner it did.  In short, there is a reason why Arm's purported notice letter failed to state clearly which express contractual provision Qualcomm materially breached, or when or how Qualcomm breached any such provision: None exists.

---

[42]    Ex. A at 1 (emphasis added).

[43]    *Id.*

147.    Having invoked Section ▮▮▮ of the QC ALA, Arm's Breach Letter demanded that Qualcomm "cure" the alleged breach(es) within 60 days, including by stopping the development of "Nuvia designs" and the manufacture and sale of Qualcomm CPUs that allegedly "use Nuvia designs or technology."  The Breach Letter further demanded that Qualcomm "cure" the alleged breaches by withdrawing its complaint in this Action against Arm.  And the Breach Letter asserted that if Qualcomm does not "cure" the alleged breaches in this manner within 60 days, Arm would be entitled to immediately terminate the QC ALA.

148.    The "cures" that Arm demanded in its Letter—other than the dismissal of this Action—are the same remedies that Arm has requested in *Arm* v. *Qualcomm*.  By sending the Breach Letter, Arm attempted to pressure Qualcomm to yield to its demands regardless of the outcome of *Arm* v. *Qualcomm*, as well as this case, before the former went to trial.

149.    The timing of the Breach Letter belied Arm's assertion that Qualcomm has materially breached the QC ALA.  Arm knew about Qualcomm's acquisition of NUVIA in 2021, and asserted in its November 2022 Answer to Qualcomm's Counterclaim that Qualcomm was supposedly in breach of the QC ALA.  Yet before sending the October 22, 2024, Breach Letter, Arm never even attempted to provide the notice ▮▮▮▮▮▮▮ that Qualcomm had supposedly breached the agreement.  Quite to the contrary, Arm *celebrated* Qualcomm's development of the Snapdragon® X Elite SoC that contains CPU designs whose development Arm now claims breach the QC ALA, with Arm's CEO stating that Arm was "very excited to see the announcement of the brand new Windows on Arm PCs that run Copilot, true AI PCs."[44]  In the

---

[44]  *Arm First Quarter Fiscal Year 2025*, at 3.  Mr. Haas further commented that "the products that are out today are using the most advanced Arm technology," because they "are optimized with Microsoft for the most effective battery life on the planet."  *Id.* at 10.

Breach Letter, Arm nowhere explained why it waited more than three years after Qualcomm allegedly breached the Nuvia ALA before it provided notice of an alleged breach of the QC ALA.

150.    Because Qualcomm did not materially breach the QC ALA, Arm did not identify any valid grounds on which to terminate the QC ALA, and any purported termination based on the Breach Letter is null and void.

### 4.    Arm leaks the Breach Letter to harm Qualcomm's customer relationships.

151.    Arm's assertion that Qualcomm was in material breach not only lacked legal or factual basis, but was also made in a manner calculated to damage Qualcomm's customer relationships. Arm's claim that it has the authority to terminate the QC ALA was false, wrongful, and calculated to pressure Qualcomm to accede to Arm's demands and to prevent Qualcomm from gaining new business opportunities.

152.    From October 21–23, 2024, Qualcomm hosted its annual Snapdragon® Summit. At that Summit, Qualcomm unveiled new technology, including its new Snapdragon® 8 Elite Mobile Platform, an SoC featuring Qualcomm's custom-built second generation Qualcomm Oryon™ CPU. That SoC delivers significant performance and efficiency improvements over competitors, ███████████████████████████████████████.

153.    Arm issued its Breach Letter on October 22, 2024, in the middle of the Snapdragon® Summit. That timing was no accident, but was an intentional Arm media stunt intended to embarrass Qualcomm and to interfere with its relationships with its current and potential customers and business partners, including by creating unwarranted uncertainty about Qualcomm's ability to continue delivering licensed Arm-compatible products.

154.    In addition to sending the Breach Letter to Qualcomm, Arm also leaked the Breach Letter or its contents to Bloomberg, which published a story that same day.[45]  The story was based on and referred to "a document seen by Bloomberg."  On the afternoon of October 22, 2024—the same day Qualcomm received the Breach Letter—a Bloomberg reporter contacted Qualcomm requesting comment on Arm's having sent Qualcomm a "60-day letter" notifying Qualcomm that it was purportedly in breach of the QC ALA.  The reporter was familiar with details of the letter. Later that day, Bloomberg published its story reporting on Arm's purported cancellation of the QC ALA.[46]  The story relayed details about the Breach Letter "according to a document seen by Bloomberg."  Because Qualcomm did not leak the Breach Letter, the Letter could have reached Bloomberg only if it had been leaked by Arm.

155.    Arm leaked the Breach Letter to distract from the Snapdragon® Summit and the groundbreaking products released at the Summit, and to ensure that the attention of Qualcomm's customers and business partners focused on the parties' licensing dispute rather than on Qualcomm's products, which pose a threat to Arm's own competitive ambitions.  The leak of the Breach Letter thus further demonstrated Arm's deliberate efforts to interfere with Qualcomm's customer relationships.

### 5.    Arm's leak of the Breach Letter harms Qualcomm.

156.    The release of the Breach Letter has caused Qualcomm harm, by impairing its relationships with current and prospective customers and interfering with its future business opportunities.

---

[45]    See Ian King, *supra* note 11.

[46]    *Id.*

157.    Following Bloomberg's publication of the news story about the Breach Letter, multiple Qualcomm customers and business partners have contacted the company to express concern about the Breach Letter.  As a result of the Breach Letter—and, in particular, Arm's baseless assertion that it can terminate the QC ALA—several Qualcomm customers have deferred finalizing pending business agreements pending resolution of the *Arm* v. *Qualcomm* litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products.

158.    For example, a major customer (the "Smartphone Company") had informed Qualcomm that it was designing a new mobile phone that would rely on Qualcomm's innovative Snapdragon® 8-Elite SoC.  After learning that Arm was threatening to terminate the QC ALA, however, a senior executive of the customer informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm.  The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm.

159.    Additionally, a potential customer (the "AI and Ecosystem Company") that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU.  After the Breach Letter was published, the customer delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities.  The AI and Ecosystem Company has stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question.  As a result of the uncertainty stemming from Arm's assertion and

leak of the Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity.

160.    Simultaneous with its actions that have set back Qualcomm's efforts to finalize a deal with the AI and Ecosystem Company, Arm is also attempting to supply the AI and Ecosystem Company directly.  Despite Arm's insistence at trial in *Arm* v. *Qualcomm* that it does not make chips, it was recently reported that Arm had reached an agreement with the AI and Ecosystem Company under which Arm would begin producing its own chips for use in a datacenter operated by the AI and Ecosystem Company.[47]  Arm has thus not only delayed Qualcomm's efforts to finalize a contract with the AI and Ecosystem Company but has separately developed its own datacenter chips that it is trying to sell to the same company.

161.    Arm leaked the Breach Letter at a time when it knew that the Smartphone Company is an existing customer of Qualcomm and when it knew or should have known that the AI and Ecosystem Company was a customer of Qualcomm or was likely to be absent Arm's interference. On information and belief, Arm leaked the Breach Letter knowing (or in circumstances in which it should have known) that its wrongful threats to cancel the QC ALA would disrupt those customer relationships and that Qualcomm was likely to be harmed as a result.

> ### 6.    *Arm's withdrawal of the Breach Letter offers no assurance that Arm will not attempt to terminate the QC ALA.*

162.    Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025, Arm Chief Legal Officer Spencer Collins sent Qualcomm a letter (the "Notice") withdrawing the Breach Letter and stating ███████████████████████████████████████

███████████████████████████████████████    The Notice also

---

[47] Reuters, *Arm Secures Meta as First Customer for Ambitious New Chip Project, FT Reports* (Feb. 13, 2025).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  The Notice asserted, however, that Arm ████████████████

████████████████████████████████████████████████████████

████████████████████████████  The Notice thus indicated that Arm was pausing its efforts to terminate the QC ALA, but in no way suggested that Arm had any plan to abandon its long-term efforts to force Qualcomm to use Arm off-the-shelf cores and to block Qualcomm from creating and delivering products using its own custom cores (or indeed, any chips that might compete with Arm's own offerings).

163.    Arm also sought to prevent Qualcomm from addressing the uncertainty created by Arm's own leak of the Breach Letter.  Despite leaking that letter to the press, Arm ████████████ ████████████████  thereby attempting to limit Qualcomm's ability to disclose the letter. Arm authorized Qualcomm to ████████████████████████████████ thereby seeking to obstruct Qualcomm from communicating about the letter publicly or with potential customers or other business partners.

## IV.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY

164.    Arm's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end.  Despite Arm's CEO's sworn testimony to the contrary, it is clear that Arm seeks to take control of the semiconductor industry and will do whatever it takes to undermine and dominate the companies that it once treated as partners.

165.    Arm's tactics violate basic contract principles and are directly contrary to the purpose of the QC ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ████████  they bargained for without fear that Arm will unilaterally

abdicate its contractual obligations in an effort to disrupt a licensee's innovation if Arm views the licensee as an unacceptable competitor. ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

166. The assault on Qualcomm's business through the improper refusal to provide commercially reasonable, ██████, licensing offers under the QC TLA likewise threatens reliance on the Arm ecosystem and the fundamentals of licensing. Licensees enter into TLAs with Arm under the assumption that they will be joining a collaborative and open ecosystem and will be able to license the IP necessary to compete and grow in the market. Arm's transformation into a chipmaker, combined with its throttling of the delivery of critical IP, is a dramatic reversal of Arm's longstanding business model that endangers the semiconductor industry and the manner in which its participants interact.

## COUNT I

### (Declaratory Judgment)

167. Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

168. Plaintiffs are entitled to a declaratory judgment that:

    A.    Arm breached the QC ALA by withholding ██████████ that Arm was obligated ████████████ to deliver under Section ██ of the QC ALA, and by withholding ██████ Arm was required to deliver ██████████████ under Section ██ of the QC ALA;

    B.    As a result of Arm's breach of Section ██ of the QC ALA, Qualcomm is entitled to ████████████████ ██████████████;

    C.    Arm breached the QC TLA by ████████████ ████████████████, including ██████████

████████████████████████████████████ in violation of ████████
████ of the QC TLA.

D.    As a result of Arm's breach of Section ████ of the QC TLA,
      Qualcomm is entitled to ██████████████████████████████
      ████████████████████████████████████, including ████████
      ████████████████, and ██████████████████████████████
      ████████████████████████████████████████████████████.

E.    Arm breached the QC TLA by ██████████████████████████
      ████████████████████████████████, including ████████
      ████████████████████, in violation of ████████████████.

F.    As a result of Arm's breach of Section ████ of the QC TLA,
      ████████████████████████████████████████████████████
      ██████████████████████████████.

G.    Arm breached the QC TLA by ████████████████████████████
      ████████████████████████████████, including ████████████
      ████████, with ██████████████████████████████████████
      ████████████████████████████████ of the QC TLA.

H.    As a result of Arm's breach of Section ████ of the QC TLA,
      ████████████████████████████████████████████████████
      ████████████████████████████████.

I.    Qualcomm has not breached the QC ALA as asserted in the October
      22, 2024, Breach Letter; and

J.    Arm is therefore not entitled to terminate the QC ALA.

169.   A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C.

§§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm

its belief that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

170.   A valid and justiciable controversy exists between Qualcomm and Arm because

████████████████████████████████████████████████ Arm is threatening to terminate the

QC ALA if Qualcomm ████████████████████████ pursuant to Section ████ of the ALA.

171.   A declaratory judgment is also necessary and appropriate so that Qualcomm may

ascertain Arm's obligations and Qualcomm's rights and obligations under the QC ALA and clear

any cloud that may exist over its business as a result of Arm's false assertions of breach and threats to terminate the QC ALA.

172.    A valid and justiciable controversy exists between Qualcomm and Arm because Arm has asserted that Qualcomm is in breach of the QC ALA and has asserted that Arm has the right to terminate the QC ALA on December 21, 2024. Qualcomm disputes both assertions. Qualcomm also reasonably expects that Arm would attempt to use its purported termination to damage Qualcomm with its customers, in the media, and with analysts, in light of Arm's behaviors to date.

## COUNT II

### (Breach of Section █ of the QC ALA)

173.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

174.    The QC ALA is a valid, binding contract.

175.    Arm failed to fulfill its obligation under Section █ of the QC ALA because it intentionally withheld from Qualcomm certain █████████ to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

176.    Accordingly, Arm did not ████████████████████████ ████████████████████████████████ or ████████ ████████████████████████████████ or ██████████████████████████████████ ████████████████████ as is required by Section █ of the agreement.

177.    Arm's failure to comply with its contractual obligation to timely deliver bargained-for technology was not only intentional, but it was also done with an intent to deceive Qualcomm.

178.    Qualcomm put Arm on written notice of this violation and Arm ████████████ ██████, as is required under the contract.

179.    Arm's breach of Section ██ of the QC ALA entitles Qualcomm ████████ ████████████████████████████████████.

180.    As a proximate result of Arm's breach of contract, Qualcomm has been damaged both (i) by delay that could have been avoided had Arm fulfilled its obligations, (ii) by costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK tests to verify that its products are compliant with the Arm ISA and use its own engineers to address issues that would have been addressed by Arm's patches, and (iii) by ██████████████████████ ████████████████████████████████████ not misrepresented its compliance with the parties' agreement.

## COUNT III

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

181.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

182.    Under California law, every contract implies a covenant for each party not to do anything that will deprive the parties of the benefits of the contract.

183.    At all relevant times, Arm agreed and was required by law to act fairly and in good faith with respect to its obligations under the QC ALA and TLA.

184.    Arm breached this implied covenant of good faith and fair dealing under both agreements.  For example, Arm withheld deliverables that it was required to provide Qualcomm under the QC ALA; asserted, without valid basis under the QC ALA, that Qualcomm was supposedly in material breach of that agreement; sent letters to Qualcomm customers and leaked

the Breach Letter to the media to create uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs; failed to negotiate an extension to the QC ALA that would cover future version of the architecture, including v10, and failed to provide licensing proposals for ████████████████ to Qualcomm in violation of provisions of the QC TLA.

185.    Arm's actions have been willful and carried out in bad faith, as part of an effort to enable Arm to disregard the QC ALA and TLA so that it can prevent Qualcomm from competing with Arm's sale of its own CPU and other chip designs, or, at a minimum, coerce into renegotiating the QC ALA so that Arm can extract payments from Qualcomm that exceed those due under the QC ALA.

186.    Arm's actions have unfairly frustrated the essential purposes of the QC ALA and TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm, including the right to produce and sell custom CPUs that are compatible with the Arm ISA ██████████████████████████.

187.    For at least the foregoing reasons, Arm has breached the implied covenant of good faith and fair dealing for both the QC ALA and TLA.

188.    As a proximate result of Arm's breach of the implied covenant of good faith and fair dealing, Qualcomm has been injured in its business or property, and is threatened by imminent loss of profits and loss of actual and potential customers and business opportunities.

## COUNT IV

### (Intentional Interference with Prospective Economic Advantage)

189.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

190.    Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above.

191.    Absent Arm's interference, these relationships would likely result or would have likely resulted in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations.    These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship.

192.    Arm knew of these relationships but nevertheless engaged in conduct aimed at interfering with Qualcomm's business opportunities, including by (a) purporting to give notice that it "shall be entitled" to terminate the QC ALA based on nonexistent alleged material breaches of the QC ALA; (b) deliberately leaking the Breach Letter in the middle of Qualcomm's Snapdragon® Summit; and (c) making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

193.    Arm's interference with Qualcomm's business opportunities was wrongful.    For example, as explained below, Arm's conduct represented unfair business acts and practices in violation of California law.

194.    By engaging in this conduct, Arm intended to disrupt these relationships or knew that disruption of these relationships was certain or substantially certain to occur.

195.    As a result of that conduct, these relationships have in fact been disrupted.  The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a substitute contract with Arm instead, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional assurances.  As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm.

196.    Arm's efforts to interfere with Qualcomm's business relationships have been a substantial factor in causing that harm, which Qualcomm would not have suffered but for Arm's misconduct.

## COUNT V

### (Negligent Interference with Prospective Economic Advantage)

197.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

198.    Arm knew or should have known that Qualcomm has substantial business relationships with a number of customers, including the Smartphone Company and the AI and Ecosystem Company.

199.    Arm also knew or should have known that these relationships would be disrupted by Arm's failure to act with reasonable care by purporting to terminate the QC ALA despite lacking legal or factual grounds for doing so, by leaking the Breach Letter in bad faith and in disregard of its duties to Qualcomm as a contract counterparty, and by making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

200.    Arm owes Qualcomm a duty to act with reasonable care based on, among other things, the parties' contractual relationship and the foreseeability that interfering with Qualcomm's customer relationships would cause Qualcomm harm.

201.    Arm failed to act with reasonable care when, in bad faith, it purported to declare that Qualcomm is in material breach of the QC ALA, leaked the Breach Letter, and made those misleading and threatening statements to Qualcomm's customers.

202.    Arm's conduct was wrongful because, for example, it was "unfair" under California law.

203.    As a result of Arm's wrongful conduct, Qualcomm's relationships with the customers identified herein have been disrupted, as customers have required additional assurances or delayed entering into additional transactions with Qualcomm.

## COUNT VI

### (Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

204.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

205.    The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

206.    By engaging in the conduct described above, Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL. These unfair business acts or practices include deliberately withholding deliverables it was required to provide Qualcomm ███████████████; misrepresenting to Qualcomm that it was not withholding deliverables; refusing to negotiate license terms with Qualcomm ██████████; repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's

current and prospective customers; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA; to pressure Qualcomm to accede to its demands in *Arm* v. *Qualcomm*; and to prevent Qualcomm from continuing to litigate its meritorious claims in the instant case.

207.    Arm's actions are part of a broader campaign to harm or threaten to harm competition for CPU and other computer chip designs, in California and elsewhere. Arm is employing a variety of unfair acts and practices so that it can leverage its control over the ISA used in all premium smartphones and a large and growing share of other computing devices to attempt to prevent Qualcomm from developing and marketing products with CPUs that threaten to outcompete products containing Arm's off-the-shelf CPU designs. These tactics include making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of preventing Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores.

208.    Arm's conduct is also unfair because it threatens to significantly harm competition not only for CPU designs, but also for the SoCs used in a variety of platforms, and ultimately for the devices that use those CPUs and SoCs. If Arm's conduct goes unchecked, Qualcomm and other chip designers will be forced to rely on Arm's off-the-shelf CPUs and will be at Arm's mercy if Arm wishes—as it has signaled it does—to foreclose them from making chips that are compatible with the Arm ISA. As a result of Arm's efforts to reduce competition to create those CPUs and SoCs, consumers will be deprived of products that are built around innovative, high-

performance, high-efficiency Qualcomm chips and/or will have to pay more for (or will have reduced choices among) products that incorporate CPUs compatible with the Arm ISA. Arm's conduct towards Qualcomm—a longtime Arm licensee—threatens incipient violations of competition laws; violates the policy or spirit of those laws; threatens to significantly harm competition; is immoral, unethical, oppressive, and unscrupulous; and threatens to harm consumers and competition in a manner vastly disproportionate to whatever supposed benefits that behavior could possibly create.

209.    Arm's conduct is also unlawful because it violates California common law, including state law prohibiting intentional and negligent interference with prospective economic advantage.

210.    Arm's unlawful and unfair business acts and practices are a direct and proximate cause of injury to Qualcomm. Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers. If Arm is allowed to continue in its unlawful and unfair business acts and practices, Qualcomm risks being denied access to a widely used ISA for which there are no readily available alternatives for certain applications, which threatens to impede Qualcomm's ability to continue developing and marketing its high-performance products based on its own custom CPU designs. Arm's conduct thus threatens to harm competition among SoC producers but also in end users, who will be forced to use products built with Arm chips and CPUs.

211.    Qualcomm has standing to bring this claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct.

212.    Qualcomm requires equitable relief under the UCL because it lacks adequate remedies at law to address Arm's anticompetitive and unfair actions, which are ongoing and which have caused or threaten to cause Qualcomm to suffer significant harm.

## COUNT VII

### (Breach of Section ███ of the QC TLA)

213.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

214.    The QC TLA is a valid, binding contract.

215.    Arm failed to fulfill its obligation under Section ███ of the QC TLA because the licensing offers it provided to Qualcomm for ███████████████, including ████████████ ████████████████████████████████.

216.    Arm's failure to comply with its contractual obligation ██████████████████ █████████████████████████████████████████████ ███████████████.

217.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ████, as is required under the contract.

218.    Arm's breach of Section ██████ of the QC TLA entitles Qualcomm to a ████████████████████████████████████, including ███████ █████████████, and a license offer █████████████████.

219.    Arm's breach of Section ██████ of the QC TLA entitles Qualcomm to ███████ █████████████████████████████████████████████ ████.

220.    As a proximate result of Arm's breach of contract, Qualcomm has been harmed both by (i) shifting resources to its custom CPU team in order to analyze and begin development of CPUs for future SoCs that would have used the ███████████████, including ████ ████████████ cores, (ii) the uncertainty caused by Arm's refusal to license the ███ ███████████, which causes complications in the roadmapping and SoC planning process, and (iii) by ███████████████████████████████████████████ ████.

## COUNT VIII

(Breach of Section ███ of the QC TLA)

221.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

222.    The QC TLA is a valid, binding contract.

223.    Arm failed to fulfill its obligation under Section ███ of the QC TLA because the licensing offers it provided to Qualcomm for ███████████, including ██████████ ████████████████████████████████████████ ███████████████.

224.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ████, as is required under the contract.

225.    Arm's breach of Section ███ of the QC TLA entitles Qualcomm to ████████ ██████████████████████████████████████████ ████.

226.    As a proximate result of Arm's breach of contract, Qualcomm has been forced to seek alternative means to ensure that it is protected according to the ███████████ that it

negotiated in the QC TLA and to divert additional resources in order to continue development of its SoCs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment and relief as follows:

A       For the declaratory judgments set forth in Plaintiffs' claims;

B       For an Order requiring Arm to comply with all its obligations under the QC ALA, including (but not limited to) by providing ███████████████, OOB, Patches, and ██████, without discrimination or retaliation;

C       For an Order requiring Arm to comply with all its obligations under the QC TLA, including (but not limited to) by ████████████████████████████ ██████████████████, including ████████████████████████ ████████████████████████████;

D       For an Order enjoining Arm from engaging in the unlawful, unfair, and anticompetitive actions and practices described in this Amended Complaint and from any other unlawful, fraudulent, or unfair acts or practices aimed at obstructing Qualcomm's ability to develop and sell chips;

E       For an Order that Qualcomm is entitled to ████████████████████ with respect ████████████████ licenses at pricing structures ██████████████;

F       For an Order ████████████████████████████████ ████████████████ as a result of Arm's breach of the QC ALA and TLA;

G       For an Order that the Breach Letter is ineffective notice of an alleged material breach and that Arm has no right to terminate the QC ALA on the grounds stated in the Breach Letter;

H       For recovery of all ████████████████████████████ ████████████████████████;

I       For damages resulting from the wrongful conduct alleged in this Amended Complaint, including from Arm's threat to terminate the QC ALA and its leak of the Breach Letter, failure to offer ████████ licensing terms ████████████, and specifically including damages arising from the postponement of the business opportunity with the AI and Ecosystem Company;

J       For restitution of amounts Arm derived from the unfair and anticompetitive conduct described in this Amended Complaint;

K      For costs and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief; or, in the alternative, for additional damages, in the alternative, that the Court deems appropriate;

L      For an award of attorneys' fees and costs as allowed by law; and

M      For such other and further relief available at law and equity as the Court may deem just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL

BY JURY of all claims and issues presented in this Complaint that are so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

June 3, 2025

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 3, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                 *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Karen E. Keller, Esquire                                 *VIA ELECTRONIC MAIL*
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                              *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                                *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Kyle W.K. Mooney, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Erik J. Olson, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Defendant*

Gregg F. LoCascio, P.C. *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*

*/s/ Jennifer Ying*

_____

Jennifer Ying (#5550)

# TI SOF

# Exhibit 4



Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121

22 October 2024

Dear Ann,

Pursuant to section ████ of the Qualcomm Architecture License Agreement (LES-TLA-20039) ("the Qualcomm ALA"), Arm hereby provides notice that Qualcomm is in material breach of the Qualcomm ALA. Unless Qualcomm cures its material breach ██████████ Arm shall be entitled ██████████████████████████████████████████████████████████ ████████████.

Under the Qualcomm ALA, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. The Qualcomm ALA permits ████████████

████████████████████████████████████

██████████████████████. Qualcomm is only permitted to ████████████

requirements of the Qualcomm ALA and ████████████████████████████████████
████████ And Qualcomm is entitled to ████████████████████████████████████████
████████ within the scope of the ALA. These obligations are reflected in multiple places in the Qualcomm ALA, including but not limited to Sections ████████████████████████
████████████.

Qualcomm has systematically and willfully breached these obligations, and its breaches have accelerated and expanded in recent months. Specifically, Qualcomm has ████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████. And Qualcomm initiated and continues to prosecute contractual claims that arise from Qualcomm's improper conduct with respect to these unlicensed cores.

Due to Qualcomm's willful, ongoing, and renewed actions, Qualcomm is in material breach of the Qualcomm ALA. Pursuant to Section ████████████████████████████████████████
████. To do so, Qualcomm must, at a minimum, ████████████████████████████████████



. If Qualcomm does not do so

, Arm shall be entitled to immediately terminate the ALA

. Following termination, Qualcomm shall be subject to the

Qualcomm ALA.

Sincerely,

Spencer Collins
EVP, Chief Legal Officer
Arm Limited
110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom

2

ARMQC_02749016

# TI SOF

# Exhibit 5

Qualcomm

**Qualcomm Incorporated**

5775 Morehouse Drive, San Diego, CA 92121

www.qualcomm.com

VIA ELECTRONIC & REGISTERED MAIL

Spencer Collins
EVP, Chief Legal Officer
Arm Limited
110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom

October 28, 2024

Dear Spencer,

I write in response to your October 22, 2024 letter (the "Letter") citing Section ████ of the Qualcomm Architecture License Agreement ████████ ("Qualcomm ALA"), purporting to notify Qualcomm of alleged material breach.

**Arm's Notice Is Insufficient**

Arm's Letter does not provide effective written notice of any breach as required under Section ████. Your Letter cites a string of contract sections, but does not even purport to explain how any one of them is breached, let alone all of them. You also failed to allege any breach of any specific ████. The substance of your Letter also contains numerous inaccuracies and misrepresentations of the Qualcomm ALA and Qualcomm's obligations thereunder.

Your description of alleged material breaches is not actually tied to the Qualcomm ALA and instead echoes the claims in the current litigation pending in the District of Delaware between the parties, *ARM Ltd. v. Qualcomm Inc., et al.*, C.A. No. 22-1146-MN, which is scheduled for trial on December 16, 2024. Your Letter mostly reiterates claims regarding alleged breaches of the *Nuvia* ALA, which are the basis of the pending litigation.

Qualcomm rejects Arm's attempt to provide notice under Section ████ without specifying in detail the provisions that you allege were materially breached and the manner in which they were allegedly breached.

**Arm's Demanded Cures Are Not Tied to Any Alleged Breach**

Your Letter ends by listing a series of actions that you assert Qualcomm must perform ████████ ████ to cure the unidentified alleged material breach. These actions are all remedies Arm has requested in the pending litigation, as well as dismissal of Qualcomm's pending lawsuit against Arm for violations of Section ██ of the Qualcomm ALA. None of these alleged remedies are tied to any

Qualcoʌʌʌ

specific alleged material breach of an identified provision in the Qualcomm ALA. Rather, your demand that Qualcomm "cure" the alleged breaches is an exercise in improper self-help, with Arm attempting to hijack issues that are squarely within the purview of the Court.

I note that Arm's Letter was timed so that the ▮▮▮▮▮▮▮▮▮▮ December 21, 2024—the day after trial is set to end in the pending litigation. Moreover, it is suspect that your Letter was also timed to coincide with Qualcomm's annual Snapdragon Summit, seemingly to attract the greatest press attention and attempt to inflict damage to Qualcomm's relationships with current and prospective customers. It also appears that Arm leaked the Letter to the press, in violation of the Qualcomm ALA and the Mutual Non-Disclosure Agreement between the parties, which has existed since ▮▮▮▮▮▮▮▮ and which prohibits such releases of confidential and/or proprietary information to third parties.

## Arm Waived Termination Based on the Development of Qualcomm's Custom CPUs

Irrespective of the fact that Arm has failed to specify any provision that Qualcomm has allegedly materially breached or the manner in which the alleged breach occurred, Arm has also waived its ability to terminate the Qualcomm ALA based on the design and development of Qualcomm's custom CPUs. In its November 11, 2022 Answer to Qualcomm's Counterclaims, Arm alleged that Qualcomm's CPU development actions were in violation of the Qualcomm ALA, *see* ¶260 and Arm's First Defense, yet Arm made no attempt to notify Qualcomm of an alleged material breach under Section ▮▮▮▮ Nor did Arm attempt to terminate in the nearly two intervening years, including following the 2023 public announcement and launch of the Snapdragon X Elite SoC that Arm has alleged contains unlicensed CPU designs. To the contrary, Arm's CEO touted the release of Microsoft laptops containing Qualcomm's Snapdragon X Elite chip on Arm's July 31, 2024 earnings call, stating: "We were very excited to see the announcement of the brand new Windows on Arm PCs that run Copilot, true AI PCs." Arm First Quarter Fiscal Year 2025, at 3 (July 31, 2024), *available at* https://investors.arm.com/static-files/393afe3f-13ff-4aa8-a4b3-41b1afaa5a91. He commented that "the products that are out today are using the most advanced Arm technology," because they "are optimized with Microsoft for the most effective battery life on the planet." *Id.* at 10. Instead of taking any timely action to enforce its purported rights, Arm waited until the 2024 Snapdragon Summit and ▮▮▮▮▮▮ before the end of the scheduled trial to provide purported notice under Section ▮▮▮▮ Arm's timing connotes opportunism rather than any real concern of a material breach.

## Next Steps

Arm's conduct is relevant to the pending litigation. We intend to make the Court aware of your Letter, and to raise the issue of necessary discovery into Arm's recent actions. Qualcomm is also considering which remedies to seek for the leak.

# Qualcoʌʌʌ

Qualcomm demands that Arm preserve all Documents[1] and Communications[2] regarding the subject matter of and allegations in your Letter, including but not limited to Documents and Communications with any and all third parties, including but not limited to Bloomberg L.P. or any Bloomberg-related company.

Please confirm that Arm is taking the necessary steps to preserve all such Documents and Communications.

Qualcomm reserves all rights.

Sincerely,

Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated

---

[1]  The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and to include, without limitation, all "writing[s]," "recording[s]," and "photograph[s]," as those terms are defined by Federal Rule of Evidence 1001. A draft, prior or subsequent version, or non-identical copy is a separate "Document" within the meaning of the term. The term "Document" should also be deemed to include, without limitation, the file-folder, labeled-box, or notebook containing the Document, as well as any index, table of contents, list, or summaries that serve to organize, identify, or reference the Document.

[2]  "Communication" shall mean every manner of transmitting or receiving facts, information, thoughts or opinions, whether written, oral or by any other means, including but not limited to all memoranda, notices of meetings, electronic mail, text messages, conversations by telephone calls, records of conversations or messages whether in writing or upon any mechanical, electrical or electronic recording device, and oral conversations and statements.

TI SOF

# Exhibit 6

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-K

(Mark one)

☒　　　　　　　ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended September 29, 2024**

**OR**

☐　　　　　　　TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from _____ to _____ .**

**Commission File Number 0-19528**

# QUALCOMM Incorporated
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **95-3685934** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |
| **5775 Morehouse Dr., San Diego, California** | **92121-1714** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(858) 587-1121**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common stock, $0.0001 par value | QCOM | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | |
|---|---|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its

audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant at March 22, 2024 (the last business day of the registrant's most recently completed second fiscal quarter) was $190.0 billion, based upon the closing price of the registrant's common stock on that date as reported on the NASDAQ Global Select Market.

The number of shares outstanding of the registrant's common stock was 1,111 million at November 4, 2024.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement for its 2025 Annual Meeting of Stockholders, to be filed with the Commission subsequent to the date hereof, are incorporated by reference into Part III of this Annual Report where indicated.

ARMQC_02793452

**QUALCOMM Incorporated**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 7. Commitments and Contingencies**

*Legal and Regulatory Proceedings.*

*Consolidated Securities Class Action Lawsuit:* On January 23, 2017 and January 26, 2017, securities class action complaints were filed by purported stockholders of us in the United States District Court for the Southern District of California against us and certain of our then current and former officers and directors. The complaints alleged, among other things, that we violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder, by making false and misleading statements and omissions of material fact in connection with certain allegations that we are or were engaged in anticompetitive conduct. The complaints sought unspecified damages, interest, fees and costs. The court consolidated the two actions, and on July 3, 2017, the plaintiffs filed a consolidated amended complaint asserting the same basic theories of liability and requesting the same basic relief. On May 23, 2022, the plaintiffs filed a motion for class certification, and on March 20, 2023, the court issued an order granting in part and denying in part the plaintiffs' motion for class certification. The order denied class certification on the basis of alleged misrepresentations relating to our chip-level licensing practices, but certified a class on the basis of alleged misrepresentations relating to the separate operations of QCT and QTL. We reached a proposed settlement with the plaintiffs to resolve this litigation, and on June 18, 2024, we and the plaintiffs, along with the individual defendants, filed a joint Stipulation and Agreement of Settlement with the court. The settlement was approved by the court on September 27, 2024. In the third quarter of fiscal 2024, we recorded a charge of $75 million to other expenses for the settlement amount, which amount was paid in the fourth quarter of fiscal 2024.

*Consumer Class Action Lawsuits:* Beginning in January 2017, a number of consumer class action complaints were filed against us in the United States District Courts for the Southern and Northern Districts of California, each on behalf of a putative class of purchasers of cellular phones and other cellular devices. The cases filed in the Southern District of California were subsequently transferred to the Northern District of California. On July 11, 2017, the plaintiffs filed a consolidated amended complaint alleging that we violated California and federal antitrust and unfair competition laws by, among other things, refusing to license standard-essential patents to our competitors, conditioning the supply of certain of our baseband chipsets on the purchaser first agreeing to license our entire patent portfolio, entering into exclusive deals with companies, including Apple Inc., and charging unreasonably high royalties that do not comply with our commitments to standard setting organizations. The complaint sought unspecified damages and disgorgement and/or restitution, as well as an order that we be enjoined from further unlawful conduct. On September 27, 2018, the court certified the class. We appealed the court's class certification order to the United States Court of Appeals for the Ninth Circuit (Ninth Circuit). On September 29, 2021, the Ninth Circuit vacated the class certification order, ruling that the district court had failed to correctly assess the propriety of applying California law to a nationwide class, and remanded the case to the district court. On June 10, 2022, the plaintiffs filed an amended complaint, limiting the proposed class to California residents rather than a nationwide class. We filed a motion to dismiss the amended complaint, and on January 6, 2023, the court issued an order granting in part and denying in part our motion to dismiss. We subsequently filed a motion for summary judgment on the plaintiffs' remaining claims. The court granted our motion in its entirety and, on October 5, 2023, entered final judgment in Qualcomm's favor. On November 2, 2023, the plaintiffs filed a notice of appeal to the Ninth Circuit, and on October 15, 2024, the court held a hearing on the appeal. The court has not yet issued a ruling. We intend to continue to vigorously defend ourselves in this matter.

Beginning in November 2017, several other consumer class action complaints were filed against us in Canada (in the Supreme Court of British Columbia and the Quebec Superior Court), Israel (in the Haifa District Court) and the United Kingdom (in the Competition Appeal Tribunal), each on behalf of a putative class of purchasers of cellular phones and other cellular devices, alleging violations of certain of those countries' competition and consumer protection laws and seeking damages. The claims in these complaints are similar to those in the U.S. consumer class action complaints described above. These matters are at various stages of litigation, and we intend to continue to vigorously defend ourselves in this matter.

*ParkerVision, Inc. v. QUALCOMM Incorporated:* On May 1, 2014, ParkerVision filed a complaint against us in the United States District Court for the Middle District of Florida alleging that certain of our products infringed seven ParkerVision patents. On August 21, 2014, ParkerVision amended the complaint, alleging that we infringed 11 ParkerVision patents and sought damages and injunctive and other relief. ParkerVision subsequently reduced the number of patents asserted to three. The asserted patents are now expired, and injunctive relief is no longer available. ParkerVision continues to seek damages related to the sale of many of our radio frequency (RF) products sold between 2008 and 2018. On March 23, 2022, the district court entered judgment in our favor on all claims and closed the case. On April 20, 2022, ParkerVision filed a notice of appeal to the United States Court of Appeals for the Federal Circuit (Federal Circuit). On September 6, 2024, the Federal Circuit reversed the judgment of the district court, citing certain substantive and procedural issues, and remanded the case to the district court for further proceedings. We intend to continue to vigorously defend ourselves in this matter.

*Arm Ltd. v. QUALCOMM Incorporated:* On August 31, 2022, Arm Ltd. (Arm) filed a complaint against us in the United States District Court for the District of Delaware. Our subsidiaries Qualcomm Technologies, Inc. and NuVia, Inc. (Nuvia) are also named in the complaint. The complaint alleges that following our acquisition of Nuvia, we and Nuvia breached Nuvia's Architecture License Agreement with Arm (the Nuvia ALA) by failing to comply with the termination obligations under the Nuvia ALA. Arm is seeking specific performance, including that we cease all use of and destroy any technology that was developed under the Nuvia ALA, including processor core technology (which Arm alleges includes our custom Qualcomm Oryon CPU cores). Arm's complaint also contends that we violated the Lanham Act through trademark infringement and false designation of origin through unauthorized use of Arm's trademarks and seeks associated injunctive and declaratory relief; however, Arm subsequently informed the court of its intent to withdraw such claims.

F-23

ARMQC_02793530

**QUALCOMM Incorporated**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On September 30, 2022, we filed our Answer and Counterclaim in response to Arm's complaint denying Arm's claims. Our counterclaim seeks a declaratory judgment that we did not breach the Nuvia ALA or the Technology License Agreement between Nuvia and Arm (together with the Nuvia ALA, the Arm-Nuvia Agreements) and that, following the acquisition of Nuvia, our architected cores (including all further developments, iterations or instantiations of the technology we acquired from Nuvia) and System-on-Chip (SoC) products incorporating such cores are fully licensed under our existing Architecture License Agreement with Arm (the Qualcomm ALA) and Technology License Agreement with Arm (together with the Qualcomm ALA, the Arm-Qualcomm Agreements). We further seek an order enjoining Arm from making any claim that our products are not licensed under the Arm-Qualcomm Agreements, are not Arm-compliant or that we are prohibited from using Arm's marks in the marketing of any such products. On October 26, 2022, we filed an Amended Counterclaim seeking additional declaratory relief that certain statements Arm is making in the marketplace concerning our rights under the Arm-Qualcomm Agreements are false, and that Arm has no right to prevent us from shipping our products, which are validly licensed. On March 22, 2024, we filed a Second Amended Counterclaim asserting that Arm has breached the Arm-Nuvia Agreements by continuing to use Nuvia technology and by failing to return or destroy Nuvia confidential information after the Arm-Nuvia Agreements were terminated. The Second Amended Counterclaim seeks damages related to the asserted breaches. On July 10, 2024, Arm filed a motion for partial summary judgment that the Nuvia ALA was properly terminated, that the Nuvia ALA was breached, and that Arm did not breach the Arm-Nuvia Agreements. We also filed a motion for summary judgment on Arm's breach of contract claims, that Qualcomm's architected cores are licensed under the Qualcomm ALA, and that Qualcomm has not infringed Arm's trademarks. On October 30, 2024, the court denied both parties' motions for summary judgment. Trial is scheduled to begin on December 16, 2024. We intend to continue to vigorously defend ourselves against Arm's claims in this matter.

On April 18, 2024, we filed a separate complaint (captioned QUALCOMM Incorporated v. Arm Ltd.) against Arm in the United States District Court for the District of Delaware. The complaint alleges that Arm has breached the Qualcomm ALA by failing to provide certain deliverables that Arm is obligated to provide. The complaint seeks an order that Arm comply with its contractual obligations, damages, and additional relief. Arm moved to dismiss this complaint, and on October 30, 2024, the court denied Arm's motion to dismiss. No trial date has been set for this case.

On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA by marketing products that contain CPUs that Arm alleges use designs, technology and code created by Nuvia employees prior to our acquisition of Nuvia; by seeking support and verification from Arm for additional products that use such alleged designs, technology and code; and by suing Arm for breach of the Qualcomm ALA. Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice. We disagree with Arm's allegations, including that we are in breach of the Qualcomm ALA.

*Contingent Losses and Other Considerations:* Litigation and investigations are inherently uncertain, and we face difficulties in evaluating or estimating likely outcomes or ranges of possible loss, particularly in antitrust and trade regulation investigations. We have not recorded any accrual at September 29, 2024 for contingent losses associated with the pending matters described above based on our belief that losses, while reasonably possible, are not probable. Further, any possible amount or range of loss cannot be reasonably estimated at this time. The unfavorable resolution of one or more of these matters could have a material adverse effect on our business, results of operations, financial condition or cash flows. We are engaged in numerous other legal actions not described above (for example, our 2010 European Commission matter relating to the Icera complaint, and other matters arising in the ordinary course of our business, including those relating to employment matters or the initiation or defense of proceedings relating to intellectual property rights) and, while there can be no assurance, we believe that the ultimate outcome of these other legal actions will not have a material adverse effect on our business, results of operations, financial condition or cash flows.

**Indemnifications.** We generally do not indemnify our customers, licensees and suppliers for losses sustained from infringement of third-party intellectual property rights. However, we are contingently liable under certain agreements to defend and/or indemnify certain customers, licensees, and suppliers against certain types of liability and/or damages arising from the infringement of third-party intellectual property rights and to indemnify certain companies that purchased businesses we previously consolidated against certain contingent losses. Our obligations under these agreements may be limited in terms of time and/or amounts, and in some instances, we may have recourse against third parties for certain payments made by us. Claims and reimbursements under indemnification arrangements have not been material to our consolidated financial statements. We have not recorded accruals for certain claims under indemnification arrangements based on our belief that additional liabilities, while possible, are not probable. Further, any possible range of loss cannot be reasonably estimated at this time.

F-24

ARMQC_02793531

**EXHIBIT 31.1**

**CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Cristiano R. Amon, certify that:

1.  I have reviewed this Annual Report on Form 10-K of QUALCOMM Incorporated;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 6, 2024

/s/ Cristiano R. Amon
_____
Cristiano R. Amon
President and Chief Executive Officer

ARMQC_02793593

**EXHIBIT 31.2**

**CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Akash Palkhiwala, certify that:

1. I have reviewed this Annual Report on Form 10-K of QUALCOMM Incorporated;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 6, 2024

/s/ Akash Palkhiwala
_____
Akash Palkhiwala
Chief Financial Officer and Chief Operating Officer

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

**(18 U.S.C. SECTION 1350)**

In connection with the accompanying Annual Report of QUALCOMM Incorporated (the "Company") on Form 10-K for the fiscal year ended September 29, 2024 (the "Report"), I, Cristiano R. Amon, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 6, 2024

/s/ Cristiano R. Amon
_____
Cristiano R. Amon
President and Chief Executive Officer

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

**(18 U.S.C. SECTION 1350)**

In connection with the accompanying Annual Report of QUALCOMM Incorporated (the "Company") on Form 10-K for the fiscal year ended September 29, 2024 (the "Report"), I, Akash Palkhiwala, Chief Financial Officer and Chief Operating Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 6, 2024

/s/ Akash Palkhiwala
_____
Akash Palkhiwala
Chief Financial Officer and Chief Operating Officer

**TI SOF**

# Exhibit 7

Technology

## Arm to Scrap Qualcomm Chip Design License in Feud Escalation

- Arm sued its longtime partner for breach of contract in 2022
- The company gave Qualcomm a 60-day notice of cancellation

By Ian King
October 22, 2024 at 8:17 PM EDT
*Updated on October 23, 2024 at 10:47 PM EDT*

Arm Holdings Plc is canceling a license that allowed longtime partner Qualcomm Inc. to use Arm intellectual property to design chips, escalating a legal dispute over vital smartphone technology.

Arm, based in the UK, has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a document seen by Bloomberg. The contract allows Qualcomm to create its own chips based on standards owned by Arm.

The showdown threatens to roil the smartphone and personal computer markets, as well as disrupt the finances and operations of two of the most influential companies in the semiconductor industry.

Qualcomm shares fell as much as 3% after trading opened in New York on Wednesday. Arm dropped as much as 6.4%, a sign investors are concerned about the fallout hurting both sides.

Qualcomm sells hundreds of millions of processors annually – technology used in the majority of Android smartphones. If the cancellation takes effect, the company might have to stop selling products that account for much of its roughly $39 billion in revenue, or face claims for massive damages.

The move ratchets up a legal fight that began when Arm sued San Diego-based Qualcomm – one of its biggest customers – for breach of contract and trademark infringement in 2022. With the cancellation notice, Arm is giving the US company an eight-week period to remedy the dispute.

Arm confirmed that it sent the notice in a statement Wednesday. The company took the step because it was "necessary to protect the unparalleled ecosystem that Arm and its highly valued partners have built over more than 30 years," according to the statement.

A Qualcomm spokesperson said the UK company was trying to use "more unfounded threats designed to strong-arm a longtime partner" and increase royalty rates.

It "appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless," the spokesperson said in an emailed statement. "Arm's anticompetitive conduct will not be tolerated."

The two are headed to a trial to resolve the breach-of-contract claim by Arm and a countersuit by Qualcomm. The disagreement centers on Qualcomm's 2021 acquisition of another Arm licensee and a failure – according to Arm – to renegotiate contract terms. Qualcomm argues that its existing agreement covers the activities of the company that it purchased, the chip-design startup Nuvia.

Arm said it was "fully prepared" for the trial in December and "remains confident that the court will find in Arm's favor."

Read More: Arm Sues Qualcomm, Clashing With One of Its Top Customers

Nuvia's work on microprocessor design has become central to new personal computer chips that Qualcomm sells to companies such as HP Inc. and Microsoft Corp. The processors are the key component to a new line of artificial intelligence-focused laptops dubbed AI PCs. Earlier this week, Qualcomm announced plans to bring Nuvia's design – called Oryon – to its more widely used Snapdragon chips for smartphones.

ARMQC_02794057

Arm says that move is a breach of Qualcomm's license and is demanding that the company destroy Nuvia designs that were created before the Nuvia acquisition. They can't be transferred to Qualcomm without permission, according to the original suit filed by Arm in the US District Court in Delaware. Nuvia's licenses were terminated in February 2023 after negotiations failed to reach a resolution.

"Arm's move to cancel Qualcomm's architectural license looks like an effort to gain leverage in advance of the parties' Dec. 16 trial," Bloomberg Intelligence analysts Tamlin Bason and Kunjan Sobhani wrote in a research note. "Our Thesis: Arm's suit against Qualcomm likely ends in a negotiated license, granting the chipmaker rights to customize Arm architecture, but at higher royalty rate than Nuvia had been paying."

Read More: Qualcomm Countersues Arm in Dispute Over Chip Technology

Like many others in the chip industry, Qualcomm relies on an instruction set from Cambridge, England-based Arm, a company that has created much of the underlying technology for mobile electronics. An instruction set is the basic computer code that chips use to run software such as operating systems.

If Arm follows through with the license termination, Qualcomm would be prevented from doing its own designs using Arm's instruction set. It would still be able to license Arm's blueprints under separate product agreements, but that path would cause significant delays and force the company to waste work that's already been done.



Qualcomm CEO Cristiano Amon, right, with HP Inc. executive Enrique Lores on June 3. *Photographer: Annabelle Chih/Bloomberg*

Prior to the dispute, the two companies were close partners that helped advance the smartphone industry. Now, under newer leadership, both of them are pursuing strategies that increasingly make them competitors.

Under Chief Executive Officer Rene Haas, Arm has shifted to offering more complete designs – ones that companies can take directly to contract manufacturers. Haas believes that his company, still majority owned by Japan's SoftBank Group Corp., should be rewarded more for the engineering work it does. That shift encroaches on the business of Arm's traditional customers, like Qualcomm, who use Arm's technology in their own final chip designs.

ARMQC_02794058

Meanwhile, under CEO Cristiano Amon, Qualcomm is moving away from using Arm designs and is prioritizing its own work, something that potentially makes it a less lucrative customer for Arm. He's also expanding into new areas, most notably computing, where Arm is making its own push. But the two companies' technologies remain intertwined, and Qualcomm isn't yet in a position to make a clean break from Arm.

Arm was acquired in 2016 by SoftBank, and part of it was sold to the public in an offering in September of last year. The Japanese company still owns more than 80% of Arm.

Arm has two types of customers: companies that use its designs as the basis for their chips and ones that create their own semiconductors and only license the Arm instruction set.

Qualcomm is no stranger to licensing disputes. The company gets a large chunk of its profit from selling the rights to its own technology – a key part of mobile wireless communications. Its customers include Samsung Electronics Co. and Apple Inc., the two biggest smartphone makers.

Qualcomm emerged victorious in 2019 from a wide-ranging legal fight with Apple. It also won a court decision on appeal against the US Federal Trade Commission, which alleged that the company was using predatory licensing activities.

*(Updates with Arm statement starting in seventh paragraph.)*

Contact us:
**Provide news feedback or report an error**

Site feedback:
**Take our Survey** ☑

Confidential tip?
**Send a tip to our reporters**

Before it's here, it's on the Bloomberg Terminal

©2025 Bloomberg L.P. All Rights Reserved.

ARMQC_02794059

# TI SOF

# Exhibit 8

13:41:50

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3

4
        ARM LTD.,                      )
5       a U.K. corporation,            )
                                       )
6                    Plaintiff,        )
                                       ) C.A. No. 22-1146(MN)
7       v.                             )
                                       )
8       QUALCOMM, INC.,                )
        a Delaware corporation,        )
9       et al.,                        )
                                       )
10                   Defendants.       )

11

12
                         Wednesday, November 20, 2024
13                       2:00 p.m.
                         Pretrial Conference
14

15                       844 King Street
                         Wilmington, Delaware
16

17

18      BEFORE:   THE HONORABLE MARYELLEN NOREIKA
                  United States District Court Judge
19

20

21      APPEARANCES:

22
                         YOUNG CONAWAY STARGATT & TAYLOR
23                       BY:  ANNE SHEA GAZA, ESQ.
                         BY:  ROBERT M. VRANA, ESQ.
24                       BY:  DANIEL MACKRIDES, ESQ.

25                       -and-

9

| | |
|---|---|
| 14:13:05 **1** | THE COURT: All right. And defendants agree? |
| 14:13:10 **2** | MS. DUNN: We do, Your Honor. |
| 14:13:11 **3** | THE COURT: Thank you. |
| 14:13:13 **4** | MS. YING: Your Honor, with respect to |
| 14:13:17 **5** | defendants' motion in limine number 3, and that's regarding |
| 14:13:19 **6** | the Apple v. Williams case and the use of documents from |
| 14:13:23 **7** | that litigation, the parties have agreed that ARM may |
| 14:13:26 **8** | question Mr. Williams about the substance of those documents |
| 14:13:30 **9** | subject to the following: ARM will not reference the NuVia |
| 14:13:34 **10** | or Williams Bates stamps on those documents and will not |
| 14:13:38 **11** | reference the Apple v. Williams litigation or that these |
| 14:13:43 **12** | documents came from that litigation. Defendants have |
| 14:13:45 **13** | represented that the documents were collected prior to the |
| 14:13:50 **14** | termination of the NuVia ALA and on that basis, ARM will not |
| 14:13:54 **15** | examine Mr. Williams regarding whether he personally |
| 14:13:57 **16** | possessed the documents produced in the Apple v. Williams |
| 14:14:01 **17** | litigation following the termination of the NuVia ALA. |
| 14:14:06 **18** | ARM will not argue that the possession of these |
| 14:14:09 **19** | documents post termination of the NuVia ALA constitutes a |
| 14:14:14 **20** | violation or breach of Section 15.1 of the NuVia ALA. ARM |
| 14:14:19 **21** | reserves the right to refer to the Bates stamps if |
| 14:14:23 **22** | Mr. Williams denies that he personally possessed these |
| 14:14:26 **23** | documents bearing the Williams stamps or that NuVia did not |
| 14:14:30 **24** | possess the documents bearing the NuVia stamp. And |
| 14:14:33 **25** | defendants do not waive any argument that the Apple v. |

10

| | |
|---|---|
| 14:14:36 **1** | William documents constitute ARM confidential information or |
| 14:14:40 **2** | are subject to the NuVia ALA termination provision. |
| 14:14:45 **3** | THE COURT: All right. Thank you. And you all |
| 14:14:47 **4** | agree to that, plaintiffs? |
| 14:14:49 **5** | MS. DURIE: Yes, Your Honor. |
| 14:14:49 **6** | THE COURT: Okay. Thank you for coming to those |
| 14:14:53 **7** | agreements. |
| 14:14:53 **8** | All right. Then we have ARM's motion in limine |
| 14:14:59 **9** | number 2 which is excluding evidence that either party |
| 14:15:03 **10** | breached the Qualcomm ALA including the October 22nd letter. |
| 14:15:11 **11** | And this one -- all right. Let me hear from ARM. |
| 14:15:31 **12** | MR. OLSON: Thank you, Your Honor. |
| 14:15:39 **13** | First there is agreement within the papers that |
| 14:15:45 **14** | defendants will not refer to the second lawsuit or to the |
| 14:15:48 **15** | allegations of breach regarding Section 5.1. |
| 14:15:53 **16** | THE COURT: Or 8.3. |
| 14:15:54 **17** | MR. OLSON: Or 8.3, correct. So those issues, |
| 14:15:59 **18** | that part of the motion in limine is resolved. |
| 14:16:02 **19** | It appears that the center of the issue is the |
| 14:16:08 **20** | October 22nd letter. |
| 14:16:09 **21** | THE COURT: Just so I'm clear, it was -- I |
| 14:16:14 **22** | didn't understand it to be referring to the lawsuit, I |
| 14:16:17 **23** | understood it to be mentioning that there was another |
| 14:16:20 **24** | breach. So by you saying you're not going to refer to the |
| 14:16:24 **25** | lawsuit, you mean they're not going to assert that there was |

11

| | |
|---|---|
| 14:16:27 **1** | a breach? |
| 14:16:28 **2** | MR. OLSON: That they're not going to assert or |
| 14:16:30 **3** | make claims, introduce evidence regarding a separate breach |
| 14:16:34 **4** | of the ALA. And I understand them to not -- to saying that |
| 14:16:39 **5** | they're not going to refer to the lawsuit, I may have that |
| 14:16:42 **6** | wrong. |
| 14:16:42 **7** | THE COURT: I wanted to make sure it was both. |
| 14:16:45 **8** | MS. DUNN: Yes, Your Honor, it was both, we |
| 14:16:47 **9** | don't believe those breaches -- |
| 14:16:48 **10** | THE COURT: You're not going to be talking about |
| 14:16:50 **11** | those? |
| 14:16:51 **12** | MS. DUNN: Yes, we're not going to be talking |
| 14:16:53 **13** | about it. |
| 14:16:54 **14** | THE COURT: All right. Okay. And I think I got |
| 14:16:56 **15** | from the papers that you said with respect to that, the only |
| 14:17:00 **16** | reason you would do that is if they opened the door to |
| 14:17:03 **17** | something, which makes sense. |
| 14:17:04 **18** | MS. DUNN: Yes, Your Honor. |
| 14:17:05 **19** | THE COURT: Okay. Then we have the October 22nd |
| 14:17:07 **20** | letter which defendants says evidences ARM's scheme to |
| 14:17:12 **21** | prevent Qualcomm from commercializing its custom CPU. |
| 14:17:17 **22** | MR. OLSON: Understood, Your Honor. And we |
| 14:17:18 **23** | don't believe that the letter has any probative evidence |
| 14:17:21 **24** | towards the question of the license defense which is the |
| 14:17:25 **25** | only issue under which it would have a meaning or importance |

12

| | |
|---|---|
| 14:17:29 **1** | in connection with this trial. |
| 14:17:29 **2** | And the license defense entirely depends on what |
| 14:17:35 **3** | is the nature and scope of the Qualcomm ALA and license. It |
| 14:17:40 **4** | does not then depend on what notices of material breach were |
| 14:17:45 **5** | given, whether those will result in cure, what discussions |
| 14:17:48 **6** | are happening between the parties over cure and what will |
| 14:17:52 **7** | happen if it is not cured. |
| 14:17:54 **8** | Moreover, California and law generally says that |
| 14:18:00 **9** | the motives for enforcing a contract are not relevant to the |
| 14:18:06 **10** | determination of whether or not a breach has occurred within |
| 14:18:10 **11** | the nature and scope of the existing contract. You |
| 14:18:14 **12** | determine the nature and scope of the contract based on the |
| 14:18:18 **13** | language of the agreement and the scope of its license. For |
| 14:18:22 **14** | both of these reasons, the evidence is not relevant. |
| 14:18:27 **15** | And the Century 21 case speaks to that issue. |
| 14:18:31 **16** | So also the Century 21 case also cites a Seventh Circuit |
| 14:18:36 **17** | opinion called *Tuf Racing Products v. American Suzuki* which |
| 14:18:42 **18** | is 223 F.3d 585 from Judge Posner speaking to the same issue |
| 14:18:48 **19** | regarding motive for enforcing. Your motive for enforcing |
| 14:18:53 **20** | a contract is not evidence of whether or not the contract is |
| 14:18:57 **21** | being breached or not being breached in the context. |
| 14:19:00 **22** | And given these circumstances, we don't believe |
| 14:19:05 **23** | that it provides any relevance and it further then creates |
| 14:19:09 **24** | undue prejudice under 403 in light of the creating a |
| 14:19:16 **25** | question in the jury's mind regarding -- in many ways what |

13

| | | |
|---|---|---|
| 14:19:20 | 1 | goes also to specific performance of what the downstream |
| 14:19:24 | 2 | effects may be one way or the other. |
| 14:19:26 | 3 | THE COURT:  All right.  Let me hear from |
| 14:19:28 | 4 | defendants. |
| 14:19:28 | 5 | MR. OLSON:  Thank you, Your Honor. |
| 14:19:30 | 6 | MS. NYARADY:  Thank you, Your Honor.  Catherine |
| 14:19:34 | 7 | Nyarady for Qualcomm.  As Mr. Olson said and is in our |
| 14:19:38 | 8 | papers, we do have a defense based on -- we have a |
| 14:19:40 | 9 | counterclaim and a defense based on the Qualcomm ALA covers |
| 14:19:44 | 10 | our products.  And with respect to Qualcomm's alleged breach |
| 14:19:50 | 11 | under the Qualcomm ALA, ARM itself has put that in the case |
| 14:19:56 | 12 | starting at the very beginning.  When you go to their answer |
| 14:19:59 | 13 | at DI 21, they say Qualcomm is not only trying to develop an |
| 14:20:06 | 14 | unlicensed product, but it's also materially breaching its |
| 14:20:09 | 15 | ALA with ARM.  It then goes on multiple more times in |
| 14:20:14 | 16 | paragraph 250 -- |
| 14:20:15 | 17 | THE COURT:  Wait, I thought you guys agreed that |
| 14:20:20 | 18 | nobody was going to talk about breaching the Qualcomm ALA. |
| 14:20:25 | 19 | MS. NYARADY:  That's with respect to ARM's |
| 14:20:27 | 20 | breach of the ALA, that's the subject of the second lawsuit. |
| 14:20:30 | 21 | I think we're talking here the second piece of this that is |
| 14:20:33 | 22 | not agreed upon is the Qualcomm breach which is the subject |
| 14:20:35 | 23 | of that October 22nd letter as well.  And I'm just making |
| 14:20:38 | 24 | the point, Your Honor, that this breach has been in the case |
| 14:20:42 | 25 | since the very beginning.  And it's been in the case as a |

14

| | | |
|---|---|---|
| 14:20:46 | 1 | result of the response that ARM gave to our counterclaim and |
| 14:20:50 | 2 | to our defense when we said that we're licensed under the |
| 14:20:53 | 3 | Qualcomm ALA. |
| 14:20:55 | 4 | So as early as November 15, 2022, in DI 21, |
| 14:21:00 | 5 | there are multiple allegations made by ARM in the pleadings, |
| 14:21:07 | 6 | at paragraph 250 they say Qualcomm is materially breaching |
| 14:21:10 | 7 | its own ALA and giving ARM the right to terminate that |
| 14:21:15 | 8 | agreement.  And Qualcomm -- the Qualcomm ALA does not |
| 14:21:18 | 9 | provide licensing coverage for the products in question. |
| 14:21:21 | 10 | There is more reference to this, there is at |
| 14:21:23 | 11 | least five or six references throughout their pleading.  In |
| 14:21:26 | 12 | the most recent pleading at DI 318, they repeal all these. |
| 14:21:32 | 13 | The breach of the Qualcomm ALA, it's not an issue in the |
| 14:21:35 | 14 | case in terms of it's not on the verdict form that they have |
| 14:21:38 | 15 | sought a breach of the Qualcomm ALA, but we have asked for a |
| 14:21:42 | 16 | determination that our products are covered by the Qualcomm |
| 14:21:44 | 17 | ALA, that is on our proposed verdict form. |
| 14:21:48 | 18 | And in response to that, there have been |
| 14:21:50 | 19 | repeated allegations that the Qualcomm ALA has been breached |
| 14:21:55 | 20 | by Qualcomm.  The letter on October 22nd is actually not new |
| 14:21:59 | 21 | news in the sense of alleging these breaches.  It has been |
| 14:22:03 | 22 | in the case squarely and we anticipate that it is going to |
| 14:22:07 | 23 | be raised by ARM in response to the arguments that we have |
| 14:22:09 | 24 | regarding the fact that our products are licensed. |
| 14:22:12 | 25 | In addition, most recently at the pretrial order |

15

| | | |
|---|---|---|
| 14:22:15 | 1 | that was filed, in Exhibit 2 at paragraph 16, ARM confirms |
| 14:22:23 | 2 | that one of the issues that remains to be litigated is |
| 14:22:26 | 3 | whether Qualcomm's ALA provides a license to the technology |
| 14:22:30 | 4 | developed by NuVia prior to the acquisition, and then at |
| 14:22:35 | 5 | Exhibit 13 of the pretrial order in plaintiff's statement of |
| 14:22:40 | 6 | intended proofs, there are numerous paragraphs talking at |
| 14:22:42 | 7 | length about the Qualcomm ALA, the scope of the ALA.  In |
| 14:22:49 | 8 | addition -- the paragraphs for reference, it's 25, 26, 27 -- |
| 14:22:54 | 9 | THE COURT:  But help me out, I don't understand |
| 14:23:00 | 10 | the scheme.  You want to say look, you're not saying we |
| 14:23:05 | 11 | didn't -- you're saying we didn't breach because whatever, |
| 14:23:12 | 12 | and then you're saying but we're licensed?  How is you being |
| 14:23:22 | 13 | licensed under a separate agreement a defense to whether |
| 14:23:26 | 14 | Qualcomm breached or NuVia breached the original agreement? |
| 14:23:30 | 15 | MS. NYARADY:  Well, Qualcomm and NuVia obviously |
| 14:23:33 | 16 | are separate parties. |
| 14:23:34 | 17 | THE COURT:  I know, I know, please don't tell me |
| 14:23:36 | 18 | that.  I get it.  I'm not that dumb.  I got it. |
| 14:23:39 | 19 | MS. NYARADY:  The issue, Your Honor, is the fact |
| 14:23:41 | 20 | that ARM has taken the position that Qualcomm is selling |
| 14:23:45 | 21 | unlicensed products currently.  And so the response to that |
| 14:23:49 | 22 | has been that we are licensed under the Qualcomm ALA, we are |
| 14:23:54 | 23 | allowed to take the technology from NuVia under the Qualcomm |
| 14:23:58 | 24 | ALA and work with that technology as we've done. |
| 14:24:03 | 25 | THE COURT:  They're arguing that part of the |

16

| | | |
|---|---|---|
| 14:24:04 | 1 | breach is that you all, whichever party, was supposed to |
| 14:24:10 | 2 | destroy everything and didn't, and the defense is well, |
| 14:24:20 | 3 | we're licensed to have it, so we didn't have to destroy it? |
| 14:24:24 | 4 | MS. NYARADY:  Yes, Your Honor, I think that's |
| 14:24:26 | 5 | part of it.  That we got the material under the Qualcomm ALA |
| 14:24:31 | 6 | pre-termination and we're licensed under the Qualcomm ALA, |
| 14:24:34 | 7 | these are not unlicensed products.  We also importantly, |
| 14:24:38 | 8 | Your Honor, have an unclean hands defense. |
| 14:24:40 | 9 | THE COURT:  That's not going before the jury, |
| 14:24:43 | 10 | though, right?  Isn't that an equitable defense? |
| 14:24:48 | 11 | MS. NYARADY:  I think there is a question as to |
| 14:24:51 | 12 | the full scope of what's going to the jury. |
| 14:24:53 | 13 | THE COURT:  When are you going to decide that? |
| 14:24:55 | 14 | We're at the pretrial conference. |
| 14:24:57 | 15 | Let her finish this one and then I'll let you go |
| 14:25:01 | 16 | to that.  But yeah, okay. |
| 14:25:04 | 17 | MS. NYARADY:  But there are allegations |
| 14:25:06 | 18 | regarding why ARM refused, for example, to give consent to |
| 14:25:10 | 19 | the acquisition, and again, you know, we've said this |
| 14:25:17 | 20 | before, but part of the motivation was getting out from |
| 14:25:20 | 21 | under the Qualcomm ALA.  So the Qualcomm ALA has been |
| 14:25:24 | 22 | intertwined with a number of issues that are directly |
| 14:25:27 | 23 | relevant. |
| 14:25:27 | 24 | THE COURT:  Okay.  So I am going to grant this |
| 14:25:30 | 25 | motion in limine.  No other parties can assert that the |

15:58:05  1          COURTROOM DEPUTY:  All rise.  Court is
15:58:07  2  adjourned.

3          (Court adjourned at 3:58 p.m.)

4

5          I hereby certify the foregoing is a true and
accurate transcript from my stenographic notes in the proceeding.

6

7                    /s/ Dale C. Hawkins
                  Official Court Reporter
8                  U.S. District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TI SOF

# Exhibit 9



110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom
Spencer.Collins@arm.com

January 8, 2025

**VIA E-MAIL ONLY**

Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121-1714
AChaplin@qualcomm.com

███████████████

Dear Ann:

I write concerning Qualcomm's Architecture License Agreement ("Qualcomm ALA") and certain CPUs that include designs and code acquired in the Nuvia acquisition ("Nuvia CPUs", including at a minimum Qualcomm's █████████████████████████ products).

The Qualcomm ALA was the subject of an incomplete jury verdict on December 20 that found in Qualcomm's favor. That verdict is not final and is subject to a variety of legal challenges. Nonetheless, Arm respects and values the jury process and the Court's ongoing role in resolving the parties' disputes. As a result, and while Arm's ongoing legal challenges are pending, Arm will treat the Nuvia CPUs as falling within the scope of the Qualcomm ALA, and Arm therefore withdraws the pending October 22, 2024 notice of material breach. Arm has no current plan to terminate the Qualcomm ALA until the legal process resolves the parties' disputes over the Qualcomm ALA. Arm also conditionally accepts ████████████████████████████████████████████████

████████. Pursuant to separate correspondence, Arm ████████████████████████

████████████████████████████████████████ while the related legal challenges remain outstanding.

Arm's prior correspondence and relevant court filings in the Delaware litigation reflect Arm's legal position regarding the scope of the Qualcomm ALA and the required actions

QCVARM_0847182



that Nuvia acting in concert with Qualcomm must take in light of the termination of the Nuvia ALA on March 1, 2022.  Arm's future legal filing will reflect its legal position regarding the non-final verdict, a new trial and judgment in the legal case.  Arm reserves all rights and none of Arm's conduct, support and verification reflects a waiver of Arm's present or future rights or claims.

Qualcomm may wish to share this notice with its customers only on a confidential basis, and Arm confirms Qualcomm may do so.

Sincerely,

Spencer Collins
EVP, Chief Legal Officer
Arm Limited

2

QCVARM_0847183

# TI SOF

# Exhibit 10

Qualcoʍʍ

**Qualcomm Incorporated**

5775 Morehouse Drive, San Diego, CA 92121

www.qualcomm.com

VIA ELECTRONIC & REGISTERED MAIL

Spencer Collins
EVP, Chief Legal Officer
Arm Limited
110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom

January 22, 2025

Dear Spencer,

I write regarding your letter of January 8, 2025, which follows Arm's notice on October 22, 2024 asserting that Qualcomm was in material breach of the Qualcomm ALA and that, absent cure ▮▮▮▮ ▮▮▮ Arm was entitled ▮▮▮▮▮▮▮▮▮▮▮. In light of the jury's unanimous verdict that the Qualcomm ALA authorizes Qualcomm to design and market products containing CPUs that include designs acquired from Nuvia, your letter of January 8 withdraws Arm's October 22 notice and states that Arm ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, as the Qualcomm ALA requires.

As you are aware, Arm ensured that its October 22 notice of alleged breach and claim of ▮▮▮▮▮ ▮▮▮▮ was promptly obtained by Bloomberg and numerous other outlets, which publicly reported that Arm planned to terminate the Qualcomm ALA.[1] Your letter suggests that your retraction of the October 22 notice should be treated as confidential except under limited circumstances. Publicizing the October 22 notice but then claiming that the January 8 letter retracting that notice is confidential is entirely unacceptable and further evidence of Arm's bad-faith efforts to harm Qualcomm.

---

[1] Ian King, *Arm to Scrap Qualcomm Chip Design License in Feud Escalation*, Bloomberg (updated Oct. 23, 2024, 10:47 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud; *Arm Holdings to Cancel Qualcomm Chip Design License, Source Says*, Reuters (updated Oct. 23, 2024, 4:13 PM), https://www.reuters.com/technology/arm-holdings-cancel-qualcomm-chip-design-license-bloomberg-news-reports-2024-10-23/; Andrew Cunningham, *Report: Arm Cancels Qualcomm's Architecture License, Endangering Its Chip Business*, ArsTechnica (updated Oct. 23, 2024, 1:42 PM), https://arstechnica.com/gadgets/2024/10/report-arm-cancels-qualcomms-architecture-license-endangering-its-chip-business/; Arjun Kharpal, *Qualcomm Shares Fall After Report of Arm Threat to Scrap Key License in Escalating Dispute*, CNBC (updated Oct. 24, 2024, 2:31 AM), https://www.cnbc.com/2024/10/23/qualcomm-shares-fall-4point5percent-after-arm-threatens-to-scrap-key-license.html; Richard Priday, *Qualcomm's Arm License Is Getting Cancelled and It Could Have a Huge Impact on the Laptops and Phones We Buy*, Tom's Guide (updated Oct. 24, 2024), https://www.tomsguide.com/phones/android-phones/qualcomm-in-crisis-chipmaker-faces-ban-on-license-that-allows-it-to-produce-snapdragon-chips-this-is-huge.

Qualcomm

Even if that letter were itself "Confidential"—and it is not—Qualcomm is nevertheless required by law to disclose the fact that Arm has withdrawn that notice and indicated that it has no current plan to terminate the Qualcomm ALA pending resolution of challenges to the jury verdict. For instance, in filings with the U.S. Securities & Exchange Commission, Qualcomm has disclosed Arm's October 22 notice and Arm's threats to terminate the Qualcomm ALA. Qualcomm intends to update those disclosures in light of Arm's withdrawal of that notice and statement that it does not currently intend to terminate the Qualcomm ALA pending resolution of challenges to the jury verdict. We presume that you have no objection to this legally required update.

Additionally, please identify any actual or potential Qualcomm customers with which Arm or its affiliates have communicated regarding the October 22 notice so that Qualcomm can notify those customers that Arm's notice has been withdrawn.

For the avoidance of doubt, nothing in this letter should be understood as agreeing with your January 8 letter's characterization of the parties' dispute or the rights of the respective parties. Qualcomm also does not concede that disclosure of Arm's withdrawal of its October 22 notice will be sufficient to correct the harm Qualcomm has suffered and will suffer as a result of Arm's conduct. Qualcomm reserves all rights.

Sincerely,

Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated

TI SOF

# Exhibit 11



110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom
Spencer.Collins@arm.com

January 30, 2025

**VIA E-MAIL ONLY**

Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121-1714
AChaplin@qualcomm.com

███████████████████

Dear Ann:

I write in response to your letter dated January 22, 2025.

Contrary to your assertions, Arm is proceeding in good faith with respect to its October 22, 2024 notice of breach, as made clear by Arm's January 8, 2025 voluntary withdrawal of that notice and ███████████████████████████, even though the relevant legal proceedings remain ongoing. Arm understands that Qualcomm has concluded that the October 22, 2024 notice and the January 8, 2025 withdrawal are material events that require Qualcomm to provide public disclosures under the securities laws. Arm neither contests that conclusion nor objects to an accurate disclosure of recent communication in Qualcomm's public securities filings.  Arm already provided Qualcomm the ability to communicate the January 8 withdrawal to customers.



Arm denies your allegations of wrongdoing and will not otherwise respond to the erroneous assertions in your letter. Consistent with the January 8, 2025 letter, Arm reserves all rights.

Sincerely,

Spencer Collins
EVP, Chief Legal Officer
Arm Limited

2

QCVARM_0847185

**TI SOF**

# Exhibit 12

Case 1:24-cv-00490-MN   Document 510   Filed 11/21/25   Page 137 of 157 PageID #: 22417

7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED, a      )
Delaware corporation,        )
QUALCOMM TECHNOLOGIES, INC.,)
a Delaware corporation,      )
                             )
            Plaintiffs, )
                             )
        vs.                  ) C.A. No.: 24-49-MN
                             )
ARM HOLDINGS PLC, f/k/a,     )
ARM LTD. a U.K. corporation,)
                             )
            Defendants.  )
_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF JONATHAN WEISER
San Diego, California
Friday, July 11, 2025



Reported by:
CATHY A. WOOD, RDR, RMR, CRR
CSR No. 2825



_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser

Page 6

1  Yon Sohn of Qualcomm.
2       THE VIDEOGRAPHER:  Thank you.  Will the court
3  reporter please now swear the witness.
4
5            JONATHAN WEISER,
6    having been first duly sworn, was examined
7    and testified as follows:
8
9              EXAMINATION
10 BY MR. EMERICK:
11    Q.  Good morning, Mr. Weiser.
12    A.  Good morning.
13    Q.  Any reason why you can't give complete and
14 accurate testimony today?
15    A.  I don't believe so.
16    Q.  Are you aware of any ways in which ARM is
17 unfairly competing with Qualcomm?
18       MS. ZAPPALA:  Objection to form.
19       THE WITNESS:  Uh, to my knowledge, I haven't
20 investigated that, I don't know.
21 BY MR. EMERICK:
22    Q.  During your time at Qualcomm, were you aware of
23 any ways in which ARM was unfairly competing with
24 Qualcomm?
25       MS. ZAPPALA:  Objection to form.

Page 7

1       THE WITNESS:  I'm not aware of anything
2  specifically.
3  BY MR. EMERICK:
4     Q.  Is ARM the only company that makes an
5  instruction set architecture?
6     A.  No, I believe there are others.
7     Q.  What are the others you're aware of?
8     A.  I believe Intel makes instruction set
9  architecture.  I believe there's a few other instruction
10 sets architectures, one may be RISC-V.  I'm not sure
11 which company's behind that.  Off the top of my head
12 today, that's all I can remember.
13    Q.  Does Qualcomm have a choice in which
14 architecture it chooses to use?
15       MS. ZAPPALA:  Objection to form.
16       THE WITNESS:  Qualcomm is able to select
17 different architectures, yes.
18 BY QUESTIONER:
19    Q.  Qualcomm doesn't --
20    A.  Can you speak up a little?
21    Q.  Sure.  Qualcomm doesn't have to use the ARM
22 architecture, right?
23       MS. ZAPPALA:  Objection to form.
24       THE WITNESS:  Qualcomm is not obligated █████
25 ████████ to use the instruction set architecture that

Page 8

1  ARM supports.
2  BY MR. EMERICK:
3     Q.  Qualcomm could develop chips using the RISC-V
4  architecture?
5        MS. ZAPPALA:  Objection to form.
6        THE WITNESS:  Qualcomm could develop chips
7  using RISC-V.
8  BY MR. EMERICK:
9     Q.  Qualcomm can develop chips using the X86
10 architecture?
11       MS. ZAPPALA:  Objection to form.
12       THE WITNESS:  Qualcomm could use the X86
13 architecture.
14 BY MR. EMERICK:
15    Q.  Can Qualcomm develop its own architecture?
16       MS. ZAPPALA:  Objection to form.
17       THE WITNESS:  Qualcomm could develop its own
18 architecture like any company.
19 BY MR. EMERICK:
20    Q.  Does ARM have a monopoly over the instruction
21 set market?
22       MS. ZAPPALA:  Objection to form, vague and
23 ambiguous.
24       THE WITNESS:  Yeah, I believe that ARM does
25 have a monopoly in the mobile space, wireless space,

Page 9

1  cell phone technology with regard to its adoption of its
2  architecture for use in that -- in that segment.
3  BY MS. ZAPPALA:
4     Q.  Can you describe ARM's monopoly in the mobile
5  space?
6        MS. ZAPPALA:  Objection to form.  Calls for
7  legal conclusion.
8        THE WITNESS:  ARM has virtually a hundred
9  percent of the mobile segment for architecture
10 solutions.
11 BY MR. EMERICK:
12    Q.  And so is the conclusion that ARM has a
13 monopoly in the mobile space just based on the current
14 market share that it has or is there any other basis?
15       MS. ZAPPALA:  Objection to form.  Misstates
16 prior testimony and calls for legal conclusion.
17       THE WITNESS:  Yeah, I believe ARM has a
18 monopoly in the mobile space based on its market share.
19 BY MR. EMERICK:
20    Q.  Anything other than the market share as a basis
21 for your opinion that ARM has a monopoly in the mobile
22 space?
23       MS. ZAPPALA:  Same objection.
24       THE WITNESS:  As I sit here today, nothing pops
25 up in my brain.

3  (Pages  6  to  9)

7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser

Page 38

1  BY MR. EMERICK:
2      Q.  And has Qualcomm ▇▇▇▇▇▇▇▇?
3      MS. ZAPPALA:  Outside the scope.
4      THE WITNESS:  I don't know.
5  BY MR. EMERICK:
6      Q.  We started briefly talking before about the
7  European Commission, the Federal Trade Commission, and
8  Korean Federal Trade Commission.  Do you recall that?
9      MS. ZAPPALA:  Outside the scope.
10     THE WITNESS:  I recall your question, yes.
11 BY MR. EMERICK:
12     Q.  Do you have an understanding of the current
13 status of those actions against ARM?
14     MS. ZAPPALA:  Objection to form.  Outside the
15 scope.  You can answer to the extent you can without
16 revealing any privileged communications.
17     THE WITNESS:  Yeah, no, I'm not aware of the
18 status.
19 BY MR. EMERICK:
20     Q.  Are you aware of any communications between
21 Qualcomm and the European Commission regarding ARM?
22     MS. ZAPPALA:  Same objection.
23     THE WITNESS:  I'm not aware of any.
24 BY MR. EMERICK:
25     Q.  What about for the --

Page 39

1      A.  I didn't work on the matter.
2      Q.  Aware of any communications between Qualcomm
3  and the Federal Trade Commission or Korean Federal Trade
4  Commission regarding ARM?
5      MS. ZAPPALA:  Same objection.
6      THE WITNESS:  Yeah, I -- I'm not aware.  I
7  wouldn't have been involved in any of those meetings, I
8  did not work on those matters.
9  BY MR. EMERICK:
10     Q.  Are you aware there was a story published
11 earlier this year about Qualcomm's actions against ARM
12 in the European Commission, the FTC, and the KFTC?
13     MS. ZAPPALA:  Outside the scope.
14     THE WITNESS:  I don't recall a story.
15 BY MR. EMERICK:
16     Q.  Do you recall any media regarding Qualcomm's
17 actions against ARM in the European Commission and the
18 FTC or the KFTC?
19     MS. ZAPPALA:  Outside the scope.
20     THE WITNESS:  As I sit here today, I'm not
21 aware.
22 BY MR. EMERICK:
23     Q.  Is Qualcomm a public company?
24     MS. ZAPPALA:  Outside the scope.
25     THE WITNESS:  Yes, it is.

Page 40

1  BY MR. EMERICK:
2      Q.  Do you know if Qualcomm's required to disclose
3  certain information in SEC filings?
4      MS. ZAPPALA:  Outside the scope.
5      THE WITNESS:  As a public company, it would
6  have certain obligations to disclose in SEC filings.
7  BY MR. EMERICK:
8      Q.  What kind of information is Qualcomm required
9  to disclose in SEC filings?
10     MS. ZAPPALA:  Outside the scope.  You can
11 answer to the extent without divulging privileged
12 communications.
13     THE WITNESS:  I -- so yeah, so I don't handle
14 Qualcomm, or when I was working at Qualcomm -- I'm
15 retired now -- I didn't handle Qualcomm's SEC filings.
16 So I didn't work on those matters.
17     Typically, I seem to recall matters would
18 include various different disclosures with regard to
19 risk to Qualcomm's business, financial information,
20 information with regard to key employees.  But, again,
21 it wasn't -- it wasn't an area that I worked on.
22 BY MR. EMERICK:
23     Q.  Are you aware that in October 2024, ARM sent a
24 letter to Qualcomm stating that Qualcomm was in breach
25 of the Qualcomm ALA?

Page 41

1      MS. ZAPPALA:  Outside the scope.
2      THE WITNESS:  I believe that I reviewed that
3  letter.  It was sent to me.  And the letter is actually
4  a letter that announces or informs Qualcomm that it --
5  that ARM was terminating Qualcomm's license providing a
6  ▇▇▇▇  notice of termination.
7  BY MR. EMERICK:
8      Q.  That's your understanding that as of -- that
9  the letter terminated the license?
10     A.  It was --
11     MS. ZAPPALA:  Outside the scope.
12     THE WITNESS:  Yeah, my reading of the letter is
13 that it was a -- I think the letter was October 2024,
14 that's the letter you're referring to?
15     Q.  Yes.
16     A.  It was a letter to put Qualcomm on notice that
17 ARM would terminate Qualcomm's license ▇▇▇▇▇▇▇▇.
18     Q.  And would the termination be automatic ▇▇▇▇▇
19 ▇▇▇  or it's -- would it need to be something that ARM
20 would -- a separate step that ARM would take -- have to
21 take ▇▇▇▇▇▇▇▇?
22     MS. ZAPPALA:  Outside the scope.
23     THE WITNESS:  I don't seem to recall.
24 ///
25

11  (Pages 38 to 41)

7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser

Page 42

1  BY MR. EMERICK:
2      Q.  Is that October 2024 letter something that
3  would need to be disclosed in an SEC filing?
4      MS. ZAPPALA:  Objection.  Outside the scope and
5  you can answer to the extent you can without divulging
6  privileged information.
7      THE WITNESS:  Yeah, I think two things:  I
8  think ARM released it to a Bloomberg reporter and the
9  Bloomberg reporter reported on it the very day we got
10  the letter.  I also think that we, Qualcomm, did put a
11  statement or two in its SEC filings suggesting that ARM
12  had issued a notice of termination of the license and --
13  and that was part of our Qualcomm SEC filing.
14  BY MR. EMERICK:
15      Q.  Why did Qualcomm include that in an SEC filing?
16      MS. ZAPPALA:  It's outside the scope.
17      You can answer if you can without divulging
18  privileged information.
19      THE WITNESS:  Yeah.  I think it did -- I think
20  it was a material risk factor in Qualcomm's business in
21  my personal view.
22  BY MR. EMERICK:
23      Q.  So is it something that would have been
24  disclosed in an SEC filing regardless of whether the
25  letter was shared with Bloomberg?

Page 43

1      MS. ZAPPALA:  Outside the scope.
2      And you can answer to the extent you can
3  without divulging privileged information.
4      THE WITNESS:  I didn't do the analysis on that,
5  but I believe it is a risk factor.  And, as a risk
6  factor, we -- Qualcomm would have made a determination
7  whether it was material enough to disclose.
8  BY MR. EMERICK:
9      Q.  Did Qualcomm -- do you know if Qualcomm had any
10  obligation to notify its customers that ARM had sent a
11  letter to Qualcomm stating that Qualcomm was in breach
12  of the QC ALA?
13      MS. ZAPPALA:  Objection.  Outside the scope.
14      To the extent you know without divulging
15  privileged information.
16      THE WITNESS:  As I sit here today, I can't
17  recall a contractual provision in the customer agreement
18  where they were obligated to disclose the ARM letter.
19      Many customers actually reached out to us to
20  discuss the ARM letter because, as I said, ARM, I
21  believe, leaked it to Bloomberg and Bloomberg published
22  an article on it.  So many customers would have reached
23  out to us to discuss it.
24  BY MR. EMERICK:
25      Q.  If ARM hadn't, as you say, leaked the letter to

Page 44

1  Bloomberg, would Qualcomm have disclosed it to its
2  customers?
3      MS. ZAPPALA:  Objection to form, outside the
4  scope, calls for hypothetical.
5      And you can answer to the extent you can
6  without divulging privileged information.
7      THE WITNESS:  Yeah, I -- I don't know as to
8  each and every customer, it certainly would be on a
9  circumstance-by-circumstance basis.
10  BY MR. EMERICK:
11      Q.  Is there any reason Qualcomm would have to not
12  disclose that letter to its customers or the fact that
13  ARM had accused Qualcomm of breaching the Qualcomm ALA?
14      MS. ZAPPALA:  Objection.  Outside the scope,
15  objection to form, calls for hypothetical.
16      You can answer to the extent without divulging
17  privileged information.
18      THE WITNESS:  So the lawsuit that ARM filed
19  against Qualcomm in 2021 was the allegation of breach
20  not as to Qualcomm ALA at that time, but as to the NUVIA
21  ALA.  So many customers were very aware of the lawsuit,
22  and there was many discussions with them over the
23  three-year period before the 2024 letter.
24  BY MR. EMERICK:
25      Q.  Qualcomm was having ongoing discussions with

Page 45

1  customers regarding the litigation --
2      MS. ZAPPALA:  Same objection.
3  BY MR. EMERICK:
4      Q.  -- since its inception?
5      MS. ZAPPALA:  Same objection.  Same
6  instruction.
7      THE WITNESS:  I can't answer that question
8  without divulging confidential privileged information.
9  BY MR. EMERICK:
10      Q.  Well, where's the privilege if it's with a
11  customer?
12      A.  Are you asking about the content of those
13  discussions?
14      Q.  Yeah, I'm asking about communications with
15  third-party customers.  I'm not talking about internal
16  Qualcomm.
17      A.  Oh, my apologies.
18      So yes, so Qualcomm, at least I, as the
19  representative of Qualcomm at the time, did have
20  discussions with certain customers over the period of
21  the three years.
22      Q.  Who were the customers that you had
23  communications with regarding the litigation with ARM?
24      MS. ZAPPALA:  Outside the scope.
25      THE WITNESS:  I can tell you the customers that

12  (Pages 42 to 45)

# TI SOF

# Exhibit 13

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

QUALCOMM INCORPORATED A DELAWARE
CORPORATION,
QUALCOMM TECHNOLOGIES, INC.,

                          Plaintiff,

        -against-

ARM HOLDINGS PLC., f/k/a ARM LTD.,
a U.K. corporation,

                       Defendants.          c.a. No. 24-490-MN

**REBUTTAL REPORT OF**

**STEVEN RICHARDS, CPA**

**September 5, 2025**

14.    A copy of my curriculum vitae is attached as Exhibit 1 to this report.

15.    Based on my knowledge, skills, experience, training, and education, I am qualified to provide an expert opinion on the above question presented in this case.

## C.  Documents and Materials Considered

16.    I, and Ankura staff members working under my direct supervision, considered the documents, testimony transcripts, and other materials set forth in Exhibit 2 to this report. The opinions and conclusions in this report are based on review of the documents, testimony transcripts, and other materials I considered, as well as my knowledge, training, and experience.[6]

17.    My opinions are based on information available to me as of the date of this report. It is possible that additional information may affect my opinions herein. I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

## D.  Compensation

18.    Ankura bills fees and expenses in this matter based on hourly rates and expenses incurred. Ankura is being compensated for my time at a rate of ███ per hour and for the time of other staff members assisting on this engagement at hourly rates ranging from ████████. No portion of my firm's compensation (or my compensation) is dependent on my opinions or testimony or on the outcome of this matter.

## E.  Standards Governing my Work

19.    I performed this engagement in accordance with the AICPA Statement on Standards for Forensic Services No. 1[7] and the AICPA Code of Professional Conduct.[8]

20.    This report should not be construed as expressing opinions on matters of law, which are outside of my expertise. However, to the extent I have interpreted conduct and evidence, those interpretations reflect my understanding from an accountant's perspective.

## II.    Summary of Opinions

21.    **Qualcomm was required to disclose the Breach Letter in its 2024 Form 10-K regardless of the publication of the Breach Letter's contents in the Bloomberg Article.**  Qualcomm disclosed the

---

[6] There was no restriction on what documents and testimony I was able to review and consider.
[7] Statement on Standards for Forensic Services No. 1.
[8] AICPA Code of Professional Conduct, Effective December 15, 2014; Updated for all official releases through March 2025.

51.    Disclosure controls and procedures are defined as controls and other procedures designed to ensure that information required to be disclosed by the company in its reports is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.[106] Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.[107]

52.    Companies must disclose management assessment of the company's internal control over financial reporting in management's annual report.[108] This report should include a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting; an assessment of the effectiveness of the company's internal control over financial reporting as of the end of the most recent fiscal year; and a statement identifying the framework used by management to evaluate the effectiveness of the internal control over financial reporting.[109] Companies must disclose any change in their internal control over financial reporting that occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.[110]

53.    Qualcomm filed its Form 10-K for the fiscal year ending September 29, 2024 on November 6, 2024.[111]

### c)  Form 10-Q

54.    Domestic, publicly traded companies are required by law to file quarterly reports on Form 10-Q.[112] The Form 10-Q includes unaudited interim financial statements and provides a continuing view of the company's financial position during the year. The report must be filed for each of the first three fiscal quarters of the company's fiscal year.[113]

---

[106] 17 CFR § 240.13a-15 (e)- Controls and procedures.
[107] 17 CFR § 240.13a-15 (e)- Controls and procedures.
[108] 17 CFR § 229.308 (a) - (Item 308) Internal control over financial reporting.
[109] 17 CFR § 229.308 (a) - (Item 308) Internal control over financial reporting.
[110] 17 CFR § 229.308 (c) - (Item 308) Internal control over financial reporting.
[111] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 1.
[112] SEC Introduction to Investing Glossary, Form 10-Q.
[113] SEC Introduction to Investing Glossary Form 10-Q.

55. Under a Form 10-Q companies must disclose information under topics such as legal proceedings, risk factors, MDA, and disclosure controls and procedures as per the requirements discussed above for Form 10-K.[114]

56. Unlike Form 10-K, the financial statements and management's disclosure of controls and procedures under Form 10-Q are not required to be audited by independent auditors.[115] [116] Under Form 10-Q, the signing officers for these periodic reports are required to have evaluated the effectiveness of internal controls and indicate whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.[117]

57. Within Form 10-Q, a company must disclose any material changes in risk factors previously disclosed within its Form 10-K filing for Item 1A Risk Factors.[118]  Further, if there are any material changes in financial condition and results of operations, as well as any changes in performance trends or uncertainties that could materially affect the company from the end of the preceding fiscal year to the date of the quarterly report, they must be disclosed in the Management Discussion and Analysis section in Item 2. [119] With respect to legal proceedings, the matters that must be reported in the 10-Q are matters that first became a reportable event in the quarter or if there have been material developments in a matter.[120] Subsequent Form 10-Q filings in which a legal proceeding or a material development is reported should reference any previous reports from that year that discuss the same legal proceeding.[121]

58. Qualcomm filed its first Form 10-Q following receipt of the Breach Letter on February 5, 2025 in relation to its first quarter of the 2025 fiscal year.[122]

## E. Investor Events

59. Investor events and investor calls (also known as earnings calls or conference calls) allow "publicly traded companies to discuss their performance with investors and analysts"[123]. These are "usually

---

[114] SEC General Instructions, Form 10-Q.
[115] Sarbanes-Oxley Act of 2002, § 404(a)(b).
[116] SEC Financial Reporting Manual, Topic 1 Registrant's Financial Statements, 1110.1 and 1120.
[117] Sarbanes-Oxley Act of 2002, § 302 4(a-d), 6.
[118] SEC General Instructions, Form 10-Q.
[119] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, pp. 169-170.
[120] SEC General Instructions, Form 10-Q.
[121] SEC General Instructions, Form 10-Q.
[122] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 1.
[123] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.

conducted by the chief executive officer ("CEO") and chief financial officer ("CFO")."[124] and other executives.[125] Investor's often "use information from earnings calls to make more informed investment decisions".[126] Companies usually conduct investor calls "immediately following the release of financial results, typically at the end of each quarter. These are known as quarterly earnings results conference calls."[127]

60. Companies must comply with the SEC's Regulation Fair Disclosure ("Regulation FD") which requires that companies make public rather than selective disclosure of any material nonpublic information. [128] Regulation FD applies to communications where it is reasonably foreseeable that the security holder will trade on the basis of the information.[129] In its guidance on Regulation FD, one of the SEC's suggestions for making a planned disclosure of material information includes holding a conference call in an open manner, permitting investors to listen in either by telephonic means or through internet webcasting.[130] The SEC notes that some types of information or events that should be reviewed carefully to determine whether they are material: (1) earnings information; (2) mergers, acquisitions, tender offers, joint ventures, or changes in assets; (3) new products or discoveries, or developments regarding customers or suppliers (e.g., the acquisition or loss of a contract); (4) changes in control or in management; (5) change in auditors or auditor notification that the issuer may no longer rely on an auditor's audit report; (6) events regarding the issuer's securities; and (7) bankruptcies or receiverships. [131]  These events must be assessed for their materiality to inform what is required to be disclosed.[132]

61. Qualcomm participated in three investor events in the period following receipt of the Breach Letter[133]: Q4 2024 Earnings Conference Call on November 6, 2024[134]; Investor Day 2024: IoT and Automotive Diversification Update on November 19, 2024;[135] and UBS Global Technology and AI Conference on December 4, 2024.[136]

---

[124] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[125] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[126] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[127] Investopedia, Earnings Conference Call: What it is, How it Works, September 11, 2022.
[128] 17 CFR Part 243.100(a), Regulation Fair Disclosure.
[129] 17 CFR Part 243.100(b)(iv), Regulation Fair Disclosure.
[130] SEC Final Rule: Selective Disclosure and Insider Trading, p. 17.
[131] SEC Final Rule: Selective Disclosure and Insider Trading, p. 9.
[132] SEC Final Rule: Selective Disclosure and Insider Trading, p. 9.
[133] Qualcomm Press Announcement, December 20, 2024.
https://www.qualcomm.com/news/releases/2024/12/qualcomm-statement-on-trial-verdict-win#:~:text=We%20are%20pleased%20with%20today's,by%20Qualcomm's%20contract%20with%20ARM.
[134] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[135] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[136] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.

REBUTTAL REPORT OF STEVEN RICHARDS                                    Page | 18

██████████████████████████████████████████

## IV.    Basis for Opinions and Analysis

62.    The Kennedy Report opines that Qualcomm suffered damage due to the Breach Letter and its alleged leak among other allegations posed by Qualcomm.[137] He states:

    a.    "Qualcomm alleges that the Notice Letter was leaked to the media by Arm as an attempt to interfere with Qualcomm's current and potential business relationships"[138]

    b.    "Qualcomm alleges that, as a result of the Notice Letter, as well as the prior communications discussed above, its business ████████████████████████ ████████████████ has been impacted."[139]



    c.    "I understand that Qualcomm alleges that due to Arm's leak of the Notice Letter, ████



"[140]

63.    The Posner Report opines that "Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm," including "leaking the [Breach Letter]" to "undermine customers' confidence in Qualcomm."[141]

### A.    Qualcomm was required to disclose the Breach Letter within its 2024 Form 10-K regardless of the publication of its contents in the Bloomberg Article.

64.    A Form 10-K is a mandatory annual disclosure for publicly traded domestic companies.[142] It offers " a detailed picture of a company's business, the risks it faces, and the operating and financial results for the fiscal year."[143]  In addition to the information expressly required to be included in a Form 10-K, further

---

[137] Expert Report of Mr. Kennedy, paragraph 68,80, Figure 27.
[138] Expert Report of Mr. Kennedy, paragraph 118.
[139] Expert Report of Mr. Kennedy, paragraph 124.
[140] Expert Report of Mr. Kennedy, paragraph 125.
[141] Expert Report of Mr. Posner, paragraph 65.
[142] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[143] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

███████████████████████████████████

"material" information (as defined above) should be added to ensure the disclosures are "not misleading." [144] Included within this "material" information are Loss Contingencies, the disclosures for which are governed by Accounting Standards Codification 450-20 ("ASC 450-20"). Companies are required to make a disclosure on contingent losses which are defined as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." [145]

65. How a loss contingency is disclosed depends on the probability of the loss occurring and whether the loss can be measured.  ASC 450-20 categorizes levels of probability as 1) **remote** - the chance of the future event or events occurring is slight, 2) **reasonably possible** - the chance of the future event or events occurring is more than remote but less than likely, and 3) **probable** - the future event or events are likely to occur. [146]  The loss can be measured if the amount of loss can be reasonably estimated. [147] Disclosure of the contingency is made if there is "at least a reasonable possibility" that a loss or an additional loss "may have been incurred" and an accrual in the financial statement is not made. [148]

66. Disclosure of a loss contingency arising after the date of an entity's financial statements but before those financial statements are issued, may be necessary to keep the financial statements from being misleading if an accrual is not required. [149] If disclosure is deemed necessary, the financial statements shall include the nature of the loss or loss contingency and an estimate of the amount or range of loss or possible loss or a statement that such an estimate cannot be made. [150]

67. Deposition testimony shows Qualcomm perceived the Breach Letter was a "material business event" and the relevant content states that "[u]nless Qualcomm cures its material breach ███████, Arm shall be entitled to immediately terminate the ALA." [151]  The loss contingency related to the Breach Letter was required to be disclosed as the deposition testimony shows Qualcomm perceived that it was reasonably possible that a loss may have been incurred if Qualcomm did not cure the alleged material breach within 60 days. To support this conclusion, in the deposition of Mr. Amon, the CEO and President of Qualcomm, he was asked, ███████████████████████████████████
███████████████████████████████████████ ██ ███████

---

[144] SEC Form 10-K, General Instructions, p. 2.
[145] FASB ASC. 450-20, Loss Contingencies, Glossary.
[146] FASB ASC. 450-20, Loss Contingencies, Glossary.
[147] FASB ASC. 450-20-25-2b, Loss Contingencies, Recognition.
[148] FASB ASC. 450-20-50-3, Loss Contingencies, Disclosure, Unrecognized Contingencies.
[149] FASB ASC. 450-20-50-9, Loss Contingencies, Losses Arising After the Date of the Financial Statements.
[150] FASB ASC. 450-20-50-9, Loss Contingencies, Losses Arising After the Date of the Financial Statements.
[151] The Breach Letter, October 22, 2024.
[152] Deposition of Cristiano Amon dated July 3, 2025, p. 220.

██████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
████ ██████████ ."[153]

68.  Based on my review of the relevant accounting standards, depositions and related documents, as well as experience in evaluating such disclosures, Qualcomm was required to disclose the Breach Letter in the 2024 Form 10-K as Qualcomm determined that it was reasonably possible that a material loss contingency may have been incurred related to the potential termination of the QC ALA. Qualcomm would have been obliged to make this disclosure irrespective of the reporting of the contents of the Breach Letter within the Bloomberg Article.

## B. Qualcomm's public disclosures do not convey the significant harm resulting from the Breach Letter as alleged in the Second Amended Complaint.

### a)  Qualcomm's Allegations in the Second Amended Complaint

69.  In its Second Amended Complaint, Qualcomm alleges that:

a.  "Absent Arm's interference, these relationships [Smartphone Company and AI and Ecosystem Company] would likely result or would have likely resulted in profitable business opportunities for Qualcomm... These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship."[154]

b.  "As a result of that conduct, these relationships have in fact been disrupted. The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a substitute contract with Arm instead, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional

---

[153] Deposition of Cristiano Amon dated July 3, 2025, p. 220.
[154] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 56.

Article as having an impact on customer relationships or a potential impact on or creating uncertainty about earnings. In the Q1 2025 Form 10-Q, there is reference to the Breach Letter being withdrawn.[209] There is no reference to the Breach Letter or its publication in the Bloomberg Article having caused or potentially caused any harm to customer relationships since it was received, and there is no reference to it having any potential impact on or creating uncertainty about earnings on future revenue or earnings as alleged in Qualcomm's Second Amended Complaint.

91.    In my experience, if the Breach Letter or its publication in the Bloomberg Article had any or all of the material adverse impact set out in Qualcomm's Second Amended Complaint—i.e., interfering, interrupting or causing delays with Qualcomm's business relationships with the "major customer" or the "large buyer" or sabotaging its business relationships, resulting in actual harm—these impacts would have been mentioned somewhere within Qualcomm's periodic reporting and related investor events, if they were material.  Qualcomm's failure to make any mention of the nature of any adverse or incremental adverse impact on any business relationship because of the Breach Letter or its publication in the Bloomberg Article within in its 2024 Form 10-K, during investor events, investor calls or its first quarter Form10-Q for the 2025 fiscal year[210] suggest to me, based on my experience evaluating these types of disclosures, that Qualcomm did not consider that the Breach Letter or its publication in the Bloomberg Article had a material adverse impact as alleged in Qualcomm's Second Amended Complaint.

## V.    Opinions and Conclusion

92.    It is my opinion that Qualcomm was required to disclose the Breach Letter in the 2024 Form 10-K as it was reasonably possible that a material loss contingency may have been incurred related to the potential termination of Qualcomm's ALA.  Qualcomm would have been obligated to make this disclosure irrespective of the reporting of the contents of the Breach Letter within the Bloomberg Article.

93.    For all the reasons stated above, it is my opinion that the Breach Letter and its publication in the Bloomberg Article did not have the material adverse impact on Qualcomm that Qualcomm described in the Second Amended Complaint, as there was no disclosure whatsoever from receipt of the Breach Letter to Qualcomm's Q1 2025 earnings call on February 5, 2025 that indicates that the Breach Letter or its publication in the Bloomberg Article had any material adverse impact relating to interfering, interrupting or causing delays with Qualcomm's business relationships with the "major customer" or "large buyer" or

---

[209] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 13.
[210] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 1.

sabotaging its business relationships resulting in actual harm as alleged in the Second Amended Complaint.

## VI.    SIGNATURE AND RIGHT TO MODIFY

94.    My opinions are based upon the information available to me as of the date of this report. It is possible that additional information may affect my opinions herein. I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

\*\*\*\*\*

Signed this 5th day of September 2025

_____

Steven Richards, CPA

# TI SOF

# Exhibit 14
## (REDACTED IN ITS ENTIRETY)

# TI SOF

# Exhibit 15

## (REDACTED IN ITS ENTIRETY)

# TI SOF

# Exhibit 16
## (REDACTED IN ITS ENTIRETY)

# TI SOF

# Exhibit 17

## (REDACTED IN ITS ENTIRETY)

TI SOF

# Exhibit 18

**(REDACTED IN ITS ENTIRETY)**

# TI SOF

# Exhibit 19

## (REDACTED IN ITS ENTIRETY)