# Exhibit 1

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

| | |
|---|---|
| BRUSSELS | TOKYO |
| HONG KONG | TORONTO |
| LONDON | WASHINGTON, DC |
| LOS ANGELES | WILMINGTON |
| SAN FRANCISCO | |

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

EXAL DIRECT DIAL: +1 212 373 3532
EMAIL: CNYARADY@PAULWEISS.COM

August 21, 2025

**Via Email**

Adam Janes
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Re: *Qualcomm Inc.* v. *Arm Holdings Plc.*
C.A. No. 24-00490-MN

Dear Adam,

We write in response to your August 15, 2025 letter regarding Arm's production of ARMQC_02785286. Arm's production does not resolve the dispute over Arm's failure to produce discovery into its decision-making regarding its withholding of deliverables from Qualcomm.

At the August 14th hearing, you represented to the Special Master that you "conducted an investigation" into the documents referenced by Martin Weidmann at his deposition, "identified several e-mail chains," "confirmed those were the e-mails he was thinking about," then "identified those e-mails to counsel for Qualcomm." 8/14/25 Hr'g Tr. at 134:11-19. But following the Weidmann deposition, Arm identified just two documents (not several e-mail chains) regarding its decision to withhold deliverables from Qualcomm. 7/24/25 Ltr. from J. Emerick at 1; 7/10/25 Email from A. Janes; *see* ARM_01230110 (marked as QX96 at Richard Grisenthwaite's deposition in the prior case and provided to the Special Master as Arm's Ex. 21);[1] ARM_01314327 (marked as QX97 and not provided to the Special Master). Please confirm these were the only two e-mail chains Mr. Weidmann "confirmed . . . he was thinking about."

You similarly told the Special Master that, following the deposition of Anupa George, you "again investigated" and identified the document since produced as ARMQC_02785286. 8/14/25 Hr'g Tr. at 135:5-19. ARMQC_02785286 refers to a then-forthcoming email from Spencer Collins "████████████████████" from Arm's 2022 lawsuit against Qualcomm. Please confirm that the email referenced in ARMQC_02785286 appears on Arm's privilege log at ARMQC_PLOG_00000835.

---

[1] We note that Mr. Weidmann is not the sender of or a recipient of the topmost three emails in ARM_01230110.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

Moreover, at his deposition, Martin Weidmann testified that ███████████████ in December 2024, the "███████████████████████ Weidmann Dep. Tr. at 125:22-126:14. Arm still has not produced that email or, to the extent Arm believes it was already produced, identified it.

Arm told the Special Master that it "produced communications showing Arm's decision to . . . resume support for" Qualcomm following trial, Arm 8/7/25 Ltr. at 4, yet cited nine documents from May 2022 (Exs. 15-23) and one from September 2022 (Ex. 24)—none postdate the December 2024 jury verdict.

Then, at the August 14th conference, Arm said it "identif[ied] those 2025 e-mails to counsel for Qualcomm both in an e-mail and in a letter." 8/14/25 Hr'g Tr. at 144:2-9. That is wrong. Arm identified just one document (ARMQC_02779076) "showing Arm's resumption of support to Qualcomm." 7/24/25 Ltr. from J. Emerick at 1; 7/10/25 Email from A. Janes. But that document shows nothing about Arm's ***decision-making*** to again provide deliverables and contains only a stray reference to "the latest legal guidance." ARMQC_02779076 at -079.

If Arm is asserting privilege over documents showing its post-verdict decision-making, similar to ARMQC_PLOG_00000835, please add these documents to your privilege log and identify them. Otherwise, please immediately produce the document(s) described by Mr. Weidmann.

Sincerely,

*/s/ Catherine Nyarady*

Catherine Nyarady

# Exhibit 2

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

EXAL DIRECT DIAL:  +1 212 373 3532
EMAIL:  CNYARADY@PAULWEISS.COM

BRUSSELS      TOKYO
HONG KONG     TORONTO
LONDON        WASHINGTON, DC
LOS ANGELES   WILMINGTON
SAN FRANCISCO

September 24, 2025

**Via Email**

Adam Janes
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Re: *Qualcomm Inc.* v. *Arm Holdings Plc.*
C.A. No. 24-00490-MN

Dear Adam,

We write in response to your September 11, 2025 letter regarding Arm's continued refusal to identify or produce documents reflecting its decision-making regarding the withholding of deliverables to Qualcomm. Arm continues to misrepresent—both to Qualcomm and to the Special Master—its production and identification of relevant documents.

At the August 15 hearing, you told the Special Master that you "identified *several* e-mail chains" referenced by Martin Weidmann at his deposition regarding Arm's 2022 decision to withhold deliverables from Qualcomm. 8/14/25 Hr'g Tr. at 133:24-134:17 (emphasis added). You then told the Special Master that you "identified *those* e-mails to counsel for Qualcomm." *Id.* at 134:18-19 (emphasis added). But Arm's July 10 and July 24 identifications list just *two* emails from 2022:  ARM_01230110 and ARM_01314327.[1] 7/24/25 Ltr. from J. Emerick at 1; 7/10/25 Email from A. Janes. Two is not several. Now, in your September 11 letter, you state that "Arm conducted an investigation, and we can confirm that Arm's production of responsive, non-privileged documents on this issue is complete." 9/11/25 Ltr. from A. Janes. That is not responsive to our question, which asks for confirmation that the email chains you identified (to the Special Master and purportedly to Qualcomm) were the only email chains Mr. Weidmann referred to when he testified about emails providing guidance to cease providing materials and information to Qualcomm. We therefore again ask you to confirm that ARM_01230110 and ARM_01314327 were the only two "communication[s] in 2022 from management providing instructions on the

---

[1]    As I noted in my August 21 letter, Mr. Weidmann is not the sender or a recipient of the topmost three emails in ARM_01230110, so it is unclear how he could have "confirmed" that email was one "he was thinking about when he provided that testimony." 8/14/25 Hr'g Tr. at 134:11-17.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

level of support to provide to Qualcomm" that Mr. Weidmann "confirmed . . . he was thinking about" at his deposition.  8/14/25 Hr'g Tr. at 133:24-134:17.

Arm also misrepresented to the Special Master that it "produced communications showing Arm's ***decision*** to . . . resume support for" Qualcomm following trial.  Arm 8/7/25 Ltr. at 4 (emphasis added).  The third document Arm identified in July, ARMQC_02779076, says nothing about Arm's post-trial decision-making beyond that a decision was made.  Neither do any of the 15 other documents listed in your letter.[2]  To be clear, Qualcomm is not asking Arm to identify documents showing that Arm resumed providing support, it is asking Arm to identify documents showing Arm's ***decision-making***, following Qualcomm's victory at trial in December 2024, to resume that support.  Please respond to our inquiry and identify the documents or state that no such documents exist.

Arm appears to be claiming privilege over its decision-making communications, but refuses to actually say so.  For example, in response to Qualcomm's request that Arm confirm that the email referenced in ARMQC_02785286 (produced following the deposition of Anupa George) appears on Arm's privilege log at ARMQC_PLOG_00000835, you have instead provided a non-answer that Arm has "more than sufficiently describe[d] the privilege."  9/11/25 Ltr. from A. Janes at 1.  We again ask that you confirm (1) that ARMQC_PLOG_00000835 is the email referenced in ARMQC_02785286, leaving aside Arm's description of the privilege (and whether Arm can claim privilege over such a communication), and (2) that Arm is asserting privilege over documents showing its post-verdict decision-making, even if Arm will not yet add these documents to its privilege log.

Sincerely,

*/s/ Catherine Nyarady*

Catherine Nyarady

---

[2]    We note that many of these documents are from the same e-mail thread.

# Exhibit 3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3    QUALCOMM INCORPORATED a Delaware corporation, ) Case No.

     QUALCOMM TECHNOLOGIES, INC., a Delaware        ) 24-490-MN

4    corporation,                                   )

                                                    )

5         Plaintiffs,                               )

                                                    )

6       vs.                                         )

                                                    )

7    ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.       )

     corporation,,                                  )

8                                                   )

          Defendant.                                )

9    _____)

10              ATTORNEYS EYES ONLY VIDEOTAPED

11            DEPOSITION OF APARAJITA BHATTACHARYA

12                  Palo Alto, California

13                  Monday, July 7, 2025

14

15

16            REPORTED BY: Derek L. Hoagland

17                  CSR No. 13445

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

1  Q.    And did Mr. Grisenthwaite communicate to you the
2  purpose of asking these questions to Mr. Agarwal?
3        MR. JANES:  Again, I will instruct the witness,
4  to the extent you can answer without disclosing the
5  substance of any privilege conversation involving an
6  attorney --
7        THE DEPONENT:  Mm-hmm.
8        MR. JANES:  -- or information that originated
9  from a privileged conversation, you can do so.
10       Otherwise, I instruct you not to answer.
11       THE DEPONENT:  Could you repeat the question.
12 BY MR. BRALY:
13 Q.    Did you understand the purpose behind asking
14 these specific questions to Mr. Agarwal?
15 A.    He wanted to know the nature of the interactions
16 that were ongoing between Vivek's team and Qualcomm at
17 the time.
18 Q.    And do you know why he wanted to know that?
19       MR. JANES:  Object to form.
20       THE DEPONENT:  He was asking for information on
21 what's the nature to assess, yeah, what's the nature of
22 the interactions.
23 BY MR. BRALY:
24 Q.    He was asking for information on what's the
25 nature to assess.  To assess what exactly?

Page 83

1  A.    What's been the exchange between partner
2  enablement team and Qualcomm.
3  Q.    And why did he want to know what had been
4  exchanged between the partner enablement team and
5  Qualcomm?
6  A.    I'm not sure.
7        MR. JANES:  Object to form.  Asked and answered.
8  Calls for speculation.
9        THE DEPONENT:  I'm not sure.
10 BY MR. BRALY:
11 Q.    Okay.  In the second bullet on the same page --
12 A.    Mm-hmm.
13 Q.    -- you say:
14

23

Page 84

1  A.    Yes.
2  Q.    Okay.  And if you look at the prior page.  335
3  is the ending Bates number.
4  A.    Mm-hmm.
5  Q.    Why did you send this email to this particular
6  group of people?
7        MR. JANES:  And I'm just going to caution the
8  witness, to the extent you can answer without disclosing
9  the substance of a conversation that you may or may not
10 have had with an attorney, you can do so.
11       THE DEPONENT:  Okay.
12       MR. JANES:  Otherwise, I instruct you not to
13 answer.
14       THE DEPONENT:  These are all the people who have
15 interactions in some form or other with Qualcomm or
16 indirectly manage people who do.
17 BY MR. BRALY:
18 Q.    Are these all people that work in ATG in
19 Bangalore?
20 A.    Yes.
21 Q.    Okay.  Did you understand that ARM believed at
22 this time that Qualcomm was developing unlicensed
23 products?
24       MR. JANES:  Object to form.
25       THE DEPONENT:  I don't have an answer to that.

Page 85

1  BY MR. BRALY:
2  Q.    Do you know whether at this point in time ARM
3  believed that Qualcomm's CPUs that it was developing
4  were not properly licensed?
5        MR. JANES:  Object to form.  And, again, I'm
6  going to instruct the witness, to the extent you can
7  answer without disclosing the substance of a
8  conversation that you may or may not have had with an
9  attorney, you can do so.  Otherwise, I instruct you not
10 to answer.
11       THE DEPONENT:  I don't have an answer to that.
12 BY MR. BRALY:
13 Q.    ████████████████████████████████████
   ████████████████████    ████████████?
15       MR. JANES:  I will instruct the witness, to the
16 extent you can answer without disclosing the substance
17 of privilege communications with counsel, you can do so.
18 Otherwise, I instruct you not to answer.
19       THE DEPONENT:  This pertains to privilege, I
20 think.
21       MR. JANES:  Okay.  So I instruct the witness not
22 to answer.
23 BY MR. BRALY:
24 Q.    Do you know whether ARM stopped providing ████
25 ████████████████████ to Qualcomm?

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 86

1  A.    Pertaining to a particular design, yes.
2  Q.    Which particular design?
3  A.    The ones that are mentioned here, ▆▆▆▆▆
4  Q.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆?
6  A.    From this point on, yes.
7  Q.    For any other CPU designs or just ▆▆▆▆
8  A.    At the time, just ▆▆▆▆▆▆
9  Q.    What about after this email?
10 A.    For the follow-on also, we did not provide.
11 Q.    And ARM has not provided ▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆ for Qualcomm's custom CPUs until January of this
13 year, right?
14 A.    Yes.
15 Q.    Do you understand the reasoning behind not
16 providing an ▆▆▆▆▆▆▆▆ to Qualcomm for its custom
17 CPUs?
18       MR. JANES:  Objection.  Calls for privilege.  I
19 instruct the witness not to answer.
20 BY MR. BRALY:
21 Q.    Do you understand the reasoning ARM has not
22 provided ▆▆▆▆▆▆▆ to Qualcomm for its custom CPUs?
23       MR. JANES:  Objection.  Calls for privilege.  I
24 instruct the witness not to answer.
25 ///

Page 87

1  BY MR. BRALY:
2  Q.    Were you provided guidance not to provide
3  ▆▆▆▆▆▆▆▆▆▆▆▆ to Qualcomm?
4        MR. JANES:  So I'll instruct the witness, to the
5  extent you can answer without disclosing the substance
6  of a conversation that you may have had or someone else
7  may have had with an attorney --
8        THE DEPONENT:  Mm-hmm.
9        MR. JANES:  -- you can do so.
10       Otherwise, I instruct you not to answer.
11       THE DEPONENT:  We were providing ▆▆▆▆▆▆▆
12 ▆▆▆▆ to Qualcomm.
13 BY MR. BRALY:
14 Q.    But you were not providing ▆▆▆ ▆▆▆▆ to
15 Qualcomm?
16 A.    That's correct.
17 Q.    And your testimony is that when ARM identifies a
18 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, right?
20 A.    That's right.
21       MR. JANES:  Object to form.
22       THE DEPONENT:  Sorry.  Yes.
23 BY MR. BRALY:
24 Q.    So why were you not providing ▆▆▆▆▆▆ to
25 Qualcomm, but you were providing ▆▆▆▆▆▆▆▆▆▆?

Page 88

1        MR. JANES:  I'm going to instruct the witness
2  not to answer on the basis of privilege.
3  BY MR. BRALY:
4  Q.    ▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆?
5  A.    Not necessarily.
6  Q.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ right?
10 A.    It would go into the ▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆.
13 Q.    But as you said when we were talking about
14 specific ▆▆▆▆▆ a test may fail on one partner's
15 implementation, but not on another's because it
16 specifically relates to how that partner has configured
17 or implemented architectural features, right?
18 A.    Correct.  Correct.  But we would still roll the
19 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
20 Q.    If you look at the page Bates numbered 334.
21 A.    Mm-hmm.
22 Q.    Mr. Agarwal responds to you, and he says at the
23 second-to-last bullets or carets in the email --
24 A.    Mm-hmm.
25 Q.    It's bracketed "VA," Vivek Agarwal.  He says:

Page 89

1  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
4  What is the ▆▆▆▆▆ from Mr. Grisenthwaite that
5  Mr. Agarwal is referring to?
6        MR. JANES:  And I will just instruct the
7  witness, to the extent you can answer without disclosing
8  the substance of privileged information involving
9  attorneys, you can do so.  Otherwise, I instruct you not
10 to answer.
11       THE DEPONENT:  So, yeah, at that time, we
12 stopped any interaction regarding the ▆▆▆▆ code.
13 That's what it means.
14 BY MR. BRALY:
15 Q.    And below that, Mr. Agarwal says:
16 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
19 Right?
20 A.    Correct.
21 Q.    So by September 2022, ARM was no longer
22 delivering patches to Qualcomm, right?
23 A.    No longer delivering specific patches to
24 Qualcomm.
25 Q.    If you turn to the page Bates stamp ending in

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150

1   MR. BRALY: I just have a couple of additional
2   questions based on what your lawyer just asked.
3        EXAMINATION
4   BY MR. BRALY:
5   Q.   Now, you testified that the ███ is separate from
6   the ████████████ , right?
7   A.   Yes. The ████████ .
8   Q.   The ████████ is delivered separately from the
9   ████████████ correct?
10  A.   There is a ████████ that is included as part
11  of the ████████████ , as part of the ████
12  ████  The ████████ is delivered outside of the
13  AC -- ████████████ .
14  Q.   Right. ████████████████████████
15  ████ ████████████████ ████████████████
16  ████████████████████████ ,
17  correct?
18  A.   Yes. And it's not always delivered.
19  Q.   But when is -- when it is delivered, it's
20  delivered, currently at least, within the same day as
21  the ████████ right?
22       MR. JANES: Object to form.
23       THE DEPONENT: It's a separate -- separate
24  ████
25  ///

Page 151

1   BY MR. BRALY:
2   Q.   I understand it's delivered separately. But
3   it's delivered the same day as the ████████ , correct?
4   A.   There is an attempt to deliver on the same.
5   Q.   Okay.
6   A.   Same day.
7   Q.   If the process --
8   A.   There -- there are --
9   Q.   -- is followed?
10  A.   Yes. But there are occasions where it is not
11  delivered on the same day, as you can see in some of the
12  presentations. It also has non same day.
13  Q.   Right. But if the process is followed properly
14  or as intended, the ████████ would be delivered on
15  the same day as the ████████ , correct?
16  A.   It --
17       MR. JANES: Object to form.
18       THE DEPONENT: It depends on whether we caught
19  the configuration in time, we were able to have the time
20  to be able to flesh out the results. If everything were
21  as per schedule, then yes, it would go up on the same
22  day.
23  BY MR. BRALY:
24  Q.   Counsel asked you, if Qualcomm would have
25  requested an ████████ that was not a Nuvia-based

Page 152

1   design between mid 2022 and the end of 2024, would ARM
2   have provided an ████ for that non-Nuvia-based design,
3   and you said yes, right?
4   A.   Yes. Absolutely yes.
5   Q.   Why?
6        MR. JANES: I will just instruct the witness, to
7   the extent you can answer without revealing the
8   substance of any conversation that you had with an
9   attorney or --
10       THE DEPONENT: Mm-hmm.
11       MR. JANES: -- something that was derived from
12  an attorney, you can do so.
13       Otherwise, I will instruct you not to answer.
14       THE DEPONENT: So I think this goes back to
15  privilege.
16  BY MR. BRALY:
17  Q.   You were also asked, if Qualcomm had asked for a
18  custom CPU design that was not a Nuvia-based design,
19  would ARM have provided an ████████ assuming what
20  Qualcomm had identified was actually an issue with the
21  ████████ , and you said yes?
22  A.   Yes.
23  Q.   Why?
24       MR. JANES: Same instruction.
25       THE DEPONENT: Same reason. It is legal

Page 153

1   instruction.
2        MR. BRALY: Okay. I have no further questions.
3        MR. JANES: Nothing from me.
4        THE VIDEOGRAPHER: We are off the record at
5   1:31 p.m., and this concludes today's testimony given by
6   Aparajita Bhattacharya. The total number of media used
7   was four and will be retained by Veritext Legal
8   Solutions.
9        (Proceeding Concludes at 1:31 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

39 (Pages 150 - 153)

# Exhibit 4

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

3  QUALCOMM INCORPORATED a Delaware corporation, ) Case No.

   QUALCOMM TECHNOLOGIES, INC., a Delaware    )24-490-MN

4  corporation,                              )

                                             )

5        Plaintiffs,                         )

                                             )

6     vs.                                    )

                                             )

7  ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.  )

   corporation,                              )

8                                            )

         Defendant.                          )

9  _____)

10       CONFIDENTIAL ATTORNEYS EYES ONLY VIDEOTAPED

11            DEPOSITION OF VIVEK N. AGRAWAL

12                Palo Alto, California

13                Friday, July 11, 2025

14

15

16          REPORTED BY: Derek L. Hoagland

17                CSR No. 13445

18

19

20

21

22

23

24

25

Page 78

1 Q.    Okay.  And then he says:
2      ████████████████████████████████
       ██████████████████████████
4      Do you see that?
5 A.    Yes.
6 Q.    And he's telling you there ████████
       ████████████████████████████████,
8 right?
9      MR. JANES:  Object to form.
10     THE DEPONENT:  I don't remember that, but
11 whether it was submitted by Qualcomm, I need to go
12 through that document.  But should I?
13 BY MS. NYARADY:
14 Q.    It's up to you.  I mean, I can represent to you
15 that the acquisition was in 2021.  So at this point in
16 time, Mr. Trivedi would be working at Qualcomm, right?
17     MR. JANES:  Mr. Agrawal, if you want to take the
18 time to review the document, you can do so.
19     THE DEPONENT:  I do not remember all these exact
20 dates or sequence of the events.
21 BY MS. NYARADY:
22 Q.    Okay.  Well, whether it's Nuvia or Qualcomm,
23 he's telling you ██████████████████████████
████████████████, right?
25 A.    Yes, he is saying that, ████████████████

Page 79

████████████████████.
2 Q.    Okay.  And then if you go to 089, the page
3 before where we started, at the bottom there,
4 Mr. Grisenthwaite -- this is also in May 18th, 2022,
5 he's emailing you and he specifically says, ████████
6 ████████████████████████ right?
7      Does that help you with your recollection that
8 this was a Qualcomm custom core?
9      MR. JANES:  Object to form.
10     THE DEPONENT:  So one -- one thing is confusion
11 here in the documentation.  Somewhere, we are talking
12 about the Nuvia and Qualcomm, and I -- I would like to
13 acknowledge, at that moment we were very -- ████████
████████████████████████████████████.
16 BY MS. NYARADY:
17 Q.    Okay.  But the company that you were interacting
18 with was Qualcomm at this time, right?
19     MR. JANES:  Object to form.
20     THE DEPONENT:  I would say yes, because the main
21 idea what I was interacting with Jignesh, his main idea
22 was having a Qualcomm domain name.
23 BY MS. NYARADY:
24 Q.    Okay.  And do you know why Mr. Grisenthwaite was
25 telling you ████████████████████████████

Page 80

1 ████████████████████████████████?
2      MR. JANES:  Mr. Agrawal, I will just provide you
3 with an instruction.  To the extent you can answer her
4 question without disclosing the substance of a
5 conversation that might have involved an attorney, you
6 can do so.  Otherwise, I will instruct you not to
7 answer.
8      THE DEPONENT:  Since this is written by Richard,
9 I will not be able to comment what he is talking about.
10 BY MS. NYARADY:
11 Q.    You don't have any information as to why you
12 were given this instruction in May of 2022?
13     MR. JANES:  Same instruction as it relates to
14 privilege, Mr. Agrawal.
15     THE DEPONENT:  No, I have no idea.  At that
16 moment, definitely I had no idea.
17 BY MS. NYARADY:
18 Q.    Did you subsequently become aware -- and to be
19 clear, I'm not asking for interactions or information
20 from lawyers.  Did you, separate from communications
21 with lawyers, did you ever become aware as to why
22 Mr. Grisenthwaite wanted you ████████████████████████
████████████████████████████████████?
24     MR. JANES:  Mr. Agrawal, I will just instruct
25 you, to the extent you can answer without disclosing the

Page 81

1 substance of something that originated from a lawyer or
2 a conversation you had with a lawyer, you can do so.
3 Otherwise, I instruct you not to answer.
4      THE DEPONENT:  Can you please repeat your
5 question.
6 BY MS. NYARADY:
7 Q.    Did you subsequently become aware as to why
8 Mr. Grisenthwaite wanted you ████████████████████████
████████████████████████████?
10     MR. JANES:  Same instruction as it relates to
11 privilege, Mr. Agrawal.
12     THE DEPONENT:  I do remember Richard told me
13 something, but I do not remember what exactly he told
14 me.
15 BY MS. NYARADY:
16 Q.    Did you -- do you remember asking him why?
17 A.    No.  I did not ask.
18 Q.    You didn't think it was weird that he was
19 saying, ████████████████████████████████████?
20     MR. JANES:  Object to form.
21     THE DEPONENT:  It was a little different than
22 what I thought for, but -- yes, it was a different.
23 BY MS. NYARADY:
24 Q.    Have you ever been told -- well, strike that.
25     Have you ever been directed ████████████████

21 (Pages 78 - 81)

Page 82

1   ████████████████████████████?
2      MR. JANES:  Just caution you not to disclose the
3 substance of any conversation you might have had with an
4 attorney.  To the extent you can answer otherwise, you
5 can do so.
6      THE DEPONENT:  When you say "████████████
7 ████," can you please elaborate, what do you mean by
8 ████████████████?
9 BY MS. NYARADY:
10 Q.   So assuming the core passes all of the tests and
11 from a technical perspective you view the core as ARM
12 compliant, once you pass that hurdle, have you ever been
13 told ████████████████████████████████████████████
14 ████████████████████?
15      MR. JANES:  So same instruction as it relates to
16 privilege.  Don't disclose the substance of any
17 conversation you may or may not have had with an
18 attorney, but if you can answer otherwise, you can do
19 so.
20      THE DEPONENT:  I would say that, number one,█
██████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████
██████████████████████
25 ///

Page 83

1 BY MS. NYARADY:
2 Q.   Has he ever told you to --
3 A.   ████████████████████████████████████████
████.
5      MR. JANES:  Mr. Agrawal, if you could just let
6 her finish her question.
7      THE DEPONENT:  I'm sorry.
8 BY MS. NYARADY:
9 Q.   Has he ever told you ████████████████████████
██████
11     -- I'm sorry.  Strike that.
Has he ever told you ████████████████████████
████████████████████████████████████████?
13 A.   As I said before, I do not interact with many
14 other partners.  ████████████████████████████████
████████████████████████████████████████
17 Q.   Are you personally aware of any instance of
18 Mr. Grisenthwaite ████████████████████████████████
████████████████████?
20 A.   Yes.  It -- I am aware that it may have happened
21 or it has happened in the past, also.
22 Q.   ████████████████████?
23 A.   No, that name I don't remember.
24 Q.   What were the circumstances of the instance that
25 you recall?

Page 84

1 A.   No, I -- I don't remember all those details.
2 Q.   When was it?
3 A.   This also, I do not remember.
4 Q.   So you think it happened before, but you don't
5 have any idea which ████████ when it might have been, or
6 the circumstances under which Mr. Grisenthwaite said ███
████████████  Is that your testimony?
8      MR. JANES:  Object to form.
9      THE DEPONENT:  Yes, I have heard that sometimes
10 also in the past has happened.  He would have ████████
████████
12 BY MS. NYARADY:
13 Q.   Okay.  And no more -- is there any other detail
14 you can give me about that?
15 A.   I don't remember all right.  I am not personally
16 involved into those communications.
17 Q.   Do you interact with Mr. Grisenthwaite often?
18 A.   Often is actually not -- what is your idea about
19 often means?
20 Q.   Well, how often do you interact with
21 Mr. Grisenthwaite?  Do you have --
22 A.   ████████████████████████████████.
23 Q.   So about how many times a week would that be?
24 A.   No, it will not be a week.
25 Q.   Not every week?

Page 85

1 A.   Not every week.
2 Q.   So how many times a month do you think you
3 interact with him?
4 A.   It may not be a month, also.  It may be more
5 than a month.
6 Q.   Okay.  So it's -- it's just the cadence of
7 whenever ████████████████████████.  Is that fair?
8 A.   Yes, yes.
9      MS. NYARADY:  Okay.  Let's go to QCX 232.
10     (Exhibit No. 232 marked for identification.)
11      MS. NYARADY:  This is ARM 1743 through 75.  This
12 is an email from you to Mr. Trivedi at Qualcomm.
13 BY MS. NYARADY:
14 Q.   Do you see his -- his email address says
15 Qualcomm, and this is May 19th, 2022.  So this is an
16 email you sent Mr. Trivedi, yes?
17 A.   What was your question?  Is it --
18 Q.   This is an email you sent to Mr. Trivedi?
19 A.   Yes, I sent this email to Jignesh.
20 Q.   And this involves the ████████ CPU, right?  And if
21 you look at -- just to help you out, if you look at
22 page 475 --
23 A.   Well.
24 Q.   -- the CPU name is there.
25 A.   Oh, okay.

22 (Pages 82 - 85)

# Exhibit 5

08:12:43

                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF DELAWARE


ARM LTD.,                           )
a U.K. corporation,                 )
                                    ) VOLUME 2
           Plaintiff,               )
                                    ) C.A. No. 22-1146(MN)
v.                                  )
                                    )
QUALCOMM, INC.,                     )
a Delaware corporation,             )
et al.,                             )
                                    )
           Defendants.              )




                    Monday, December 16, 2024
                    8:30 a.m.
                    Jury Trial


                    844 King Street
                    Wilmington, Delaware



BEFORE:   THE HONORABLE MARYELLEN NOREIKA
               United States District Court Judge




APPEARANCES:


               YOUNG CONAWAY STARGATT & TAYLOR
               BY:  ANNE SHEA GAZA, ESQ.

               -and-

09:27:55  1   Qualcomm pursuant to the acquisition.  Qualcomm knew exactly

09:27:59  2   what was required, and one of the reasons they knew exactly

09:28:02  3   what was required is this had happened before.  Qualcomm had

09:28:06  4   bought another company that had a license from Arm that had

09:28:09  5   a similar position, and they had negotiated a deal to get

09:28:12  6   access for the stuff with that other company from Arm, so

09:28:17  7   Qualcomm knew the score, and they asked for our consent.

09:28:20  8   And we wrote back and we said we're willing to provide

09:28:23  9   consent to the assignment of designs on the condition that

09:28:28  10  Qualcomm agrees to assume the existing terms and conditions

09:28:32  11  under which the design was created, including the royalty

09:28:37  12  rates.  In other words, if you want to take the code, you

09:28:41  13  got to take the contract.  We made that offer.  They wanted

09:28:46  14  to take the code, they didn't want to take the contract.

09:28:50  15         And then two weeks later, without getting the

09:28:56  16  consent that they had asked for and they knew they needed,

09:28:59  17  they just closed the deal anyway.  And went forward, took

09:29:05  18  the code, and started integrating the Nuvia CPU, you're

09:29:12  19  going to hear those referred to as cores, into a whole range

09:29:16  20  of Qualcomm product, you're going to hear about what is now

09:29:20  21  called the Phoenix, remember that was the Nuvia CPU built on

09:29:26  22  Arm, the Phoenix CPU families includes Hamoa, that's for

09:29:32  23  laptops, Pakala, that's for phones, Nordschleife, that's for

09:29:38  24  cars, in all of those they are using now the Nuvia

09:29:43  25  technology created under the Nuvia license.

# Exhibit 6

08:22:44

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4
     ARM LTD.,                        )
 5   a U.K. corporation,              )
                                      ) VOLUME 3
 6             Plaintiff,             )
                                      ) C.A. No. 22-1146(MN)
 7   v.                               )
                                      )
 8   QUALCOMM, INC.,                  )
     a Delaware corporation,          )
 9   et al.,                          )
                                      )
10             Defendants.            )

11

12
                     Tuesday, December 17, 2024
13                   8:50 a.m.
                     Jury Trial
14

15                   844 King Street
                     Wilmington, Delaware
16

17

18   BEFORE:  THE HONORABLE MARYELLEN NOREIKA
                 United States District Court Judge
19

20

21
     APPEARANCES:
22

23                   YOUNG CONAWAY STARGATT & TAYLOR
                     BY:  ANNE SHEA GAZA, ESQ.
24
                     -and-
25
```

412

Williams - cross

10:14:54 1    A.      Assuming they pass the verification sweep, the intent

10:14:58 2    is that they become a compliant core.

10:15:01 3    Q.      Now, after the acquisition, you also started working

10:15:04 4    on a mobile platform called Pakala, right?

10:15:08 5    A.      Yes.

10:15:08 6    Q.      And you refer to the core for that product as

10:15:11 7    Phoenix?

10:15:13 8    A.      Yes.  That's what the name was.

10:15:16 9    Q.      Now, after Qualcomm acquired Nuvia, we've already

10:15:20 10   seen that you kept using the Phoenix documentation that was

10:15:24 11   written by Nuvia, but you also kept using the Phoenix code,

10:15:28 12   right?

10:15:29 13   A.      You said Phoenix code?

10:15:31 14   Q.      Phoenix code.

10:15:34 15   A.      The CPU code that was Nuvia technology was continued

10:15:37 16   to be used, yes.

10:15:39 17   Q.      Right.  And you would agree that there are some

10:15:41 18   elements of that Nuvia Phoenix code in the compute and

10:15:47 19   mobile platforms at Qualcomm; correct?

10:15:49 20   A.      There are elements there, yes.

10:15:52 21           MS. DURIE:  Pass the witness.

10:15:53 22           THE COURT:  All right.  Thank you.  Cross-exam.

10:15:59 23                CROSS-EXAMINATION

10:16:00 24   BY MR. ISAACSON:

10:16:43 25   Q.      Good morning, Mr. Williams.

# Exhibit 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,    )
  a Delaware corporation; and    )
QUALCOMM TECHNOLOGIES, INC.,    )
  a Delaware corporation,    )
    )
    Plaintiffs,    )
    )
    v.    )    C.A. No. 24-490 (MN)
    )
ARM HOLDINGS PLC., f/k/a ARM LTD.,    )
  a U.K. corporation,    )
    )
    Defendant.    )

## <u>DECLARATION TO BE BOUND BY PROTECTIVE ORDER</u>

I, <u>Michael C. Brogioli</u> [print or type full name], a citizen of

<u>United States of America</u> [print or type country of citizenship], am a

<u>Managing Director</u> [print or type present occupation or job description] of

<u>Polymathic Consulting, 111 Congress Ave, St 500, Austin Texas</u> [print or type business name

and business address] and declare under penalty of perjury that I have read in its entirety and

understand the Protective Order that was issued by the United States District Court for the

District of Delaware on <u>3/21/2025</u> [date] in the above-captioned Litigation.

I have received and carefully read the Protective Order in this Litigation and understand

its provisions. Specifically, I understand that I am obligated, under order of the Court, to hold in

confidence and not to disclose the contents of anything provided to me in the above-captioned

case marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

ONLY" except as permitted by the Protective Order. According to the restrictions of Paragraph

34 of the Protective Order, I will use Discovery Material, including CONFIDENTIAL Discovery

Material, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY Discovery Material, or

information derived therefrom solely for purposes relating to the above-captioned Litigation.  I

will never use such Discovery Material or information derived therefrom, directly or indirectly,

in competition with the Producing Party, including hardware or software development work or

product development work intended for commercial purposes related to the information

disclosed in the Protected Material, from the time of receipt of such material through and

including the date that I cease to have access to any Protected Material, nor will I permit others

to do so.

      In addition to the foregoing, I understand that I must abide by all of the provisions of the

Protective Order.  At the termination of this Litigation or any time requested by Outside Counsel

for the Party by whom I am engaged, I will return or destroy all documents and other materials,

including notes, computer data, summaries, abstracts, or any other materials containing or

reflecting CONFIDENTIAL Discovery Material or HIGHLY CONFIDENTIAL –

ATTORNEYS' EYES ONLY Discovery Material that have come into my possession, and will

return or destroy all documents or things I have prepared relating to or reflecting such

information.

      I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the

Protective Order in this Litigation.  I declare under penalty of perjury of the laws of the United

States that the foregoing is true and correct.


Date: May 15, 2025

Signature: _Michael C. Brogioli._

# Exhibit 8

IMAGE PLACEHOLDER - FILE PRODUCED NATIVELY

FILE NAME: ███████████████████.xlsx

CONFIDENTIAL

QCVARM_0600067

# Exhibit 9

Page 1

1

2   IN THE UNITED STATES DISTRICT COURT

3   FOR THE DISTRICT OF DELAWARE

4   ----------------------------------x

5   QUALCOMM INCORPORATED, a Delaware
    corporation, QUALCOMM TECHNOLOGIES,

6   INC., a Delaware corporation,

7                       Plaintiffs,

8       -against-        C.A. No. 24-49-MN

9   ARM HOLDINGS PLC, f/k/a ARM LTD.,
    a U.K. corporation,

10

                        Defendant.

11

    ----------------------------------x

12

              HIGHLY CONFIDENTIAL

13            ATTORNEYS' EYES ONLY

14

        REMOTE VIDEOTAPED DEPOSITION OF

15               EHAB YOUSEFF
             Palo Alto, California

16              June 26, 2025

17

18

    Reported By:

19

    ERIC J. FINZ

20

21

22

23

24

25

Page 2

1
2          June 26, 2025
3              12:39 p.m. Eastern
4              9:39 a.m. Pacific
5      Remote Videotaped Deposition of EHAB
6  YOUSSEF, taken by Plaintiffs, pursuant to
7  Notice, before ERIC J. FINZ, a Shorthand
8  Reporter and Notary Public within and for
9  the State of New York.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  A P P E A R A N C E S: (All Via Remote)
3  PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     Attorneys for Plaintiffs
4      1285 Avenue of the Americas
       New York, New York 10019
5
   BY: ANISH DESAI, ESQ.
6      adesai@paulweiss.com
7
8  MORRISON & FOERSTER LLP
     Attorneys for Defendant
9      755 Page Mill Road
       Palo Alto, California 94304
10
   BY: CATHARINA McWILLIAMS, ESQ.
11     cmcwilliams@mofo.com
12
13  KIRKLAND & ELLIS LLP
      Attorneys for Defendant
14      333 W Wolf Point Plaza
        Chicago, Illinois 60654
15
   BY: JAY EMERICK, ESQ.
16     jay.emerick@kirkland.com
       AUSTIN PENNINGTON, ESQ.
17     austin.pennington@kirkland.com
18
19
20  ALSO PRESENT:
21     ROBERT CALICO
22     STEPHANIE L. CHIN, ESQ.
       schin@paulweiss.com
23
       MJ ZIMDAHL, Videographer
24
25

Page 4

1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2          THE VIDEOGRAPHER: Good
3  morning -- good afternoon,
4  depending where you are. We are
5  going on the record today at 9:39
6  a.m. Pacific time on June 26, 2025.
7          Please note that this
8  deposition is being conducted
9  virtually. Quality of the
10  recording depends on the quality of
11  the camera and the internet
12  connection of participants. What
13  is seen from the witness and heard
14  on the screen is what will be
15  recorded. Audio and video
16  recording will continue to take
17  place unless all parties agree to
18  go off the record.
19          This is the video recorded
20  deposition of Ehab Youseff, taken
21  in the matter of Qualcomm, Inc.
22  versus Arm Holdings PLC. This
23  deposition is being conducted
24  remotely using virtual technology.
25          My name is MJ Zimdahl

Page 5

1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  representing Veritext and I'm the
3  videographer. The court reporter
4  is Eric Finz also from Veritext. I
5  am not authorized to administer an
6  oath, I am not related to any party
7  in this action nor am I financially
8  interested in the outcome.
9          If there are any objections to
10  proceedings, please state them at
11  the time of your appearance.
12  Counsel and all present, including
13  remotely, will now state their
14  appearance and affiliations for the
15  record, beginning with the noticing
16  attorney.
17          MR. DESAI: Anish Desai here
18  on behalf of Qualcomm from Paul
19  Weiss. With me for this deposition
20  is Stephanie Chin also from Paul
21  Weiss.
22          MR. EMERICK: Jay Emerick from
23  Kirkland & Ellis on behalf of Arm.
24  With me is Austin Pennington from
25  Kirkland, who is in the room and

2 (Pages 2 - 5)

**Page 6**

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    off camera, as well as Rob Calico,
3    who is in the room and off camera.
4    Rob Calico from Arm.
5         THE VIDEOGRAPHER: Will the
6    court reporter please swear in the
7    witness and counsel may proceed.
8         MR. DESAI: There is some
9    other people on the Zoom that
10   probably should introduce
11   themselves.
12        MR. EMERICK: I believe we
13   have Cat McWilliams from Morrison &
14   Foerster who is for Arm.
15   EHAB YOUSSEF,
16   having been first duly sworn by the
17   Notary Public (Eric J. Finz), was
18   examined and testified as follows:
19        EXAMINATION BY
20        MR. DESAI:
21   Q.   Good morning, Mr. Youseff.
22   Could you state your full name for the
23   record?
24   A.   Yes, good morning. I'm Ehab
25   Youseff.

**Page 7**

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    Q.   And are you currently employed
3    at Arm?
4    A.   Yes.
5    Q.   Have you ever been deposed
6    before?
7    A.   Yes.
8    Q.   How many times?
9    A.   I recall just once.
10   Q.   Just a few ground rules or
11   tips. If you don't understand a
12   question, just please ask me to clarify
13   and I'll do my best to ask a better
14   question. And if your attorney objects
15   to questions, which will likely happen,
16   you should still answer the question
17   unless you're instructed not to answer.
18        Do you understand that?
19   A.   Yes.
20   Q.   If you need to take a break,
21   just let me know. I'm planning to take a
22   break each hour. But otherwise if you'd
23   like to take an earlier break, you let me
24   know.
25        What did you do to prepare for

**Page 8**

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    this deposition?
3    A.   I reviewed a variety of
4    documents and I have --
5         MR. EMERICK: I'll caution the
6    witness, he can testify with
7    respect to things you did for your
8    30(b)(6) topics on which you're
9    designated that involve document
10   review. With respect to your
11   deposition in your personal
12   capacity, you should not discuss
13   the contents of any attorney-client
14   communication or which documents,
15   if any, you looked at.
16        You can go ahead.
17   A.   So I reviewed a variety of
18   documents. And I also had a Zoom call
19   yesterday afternoon.
20   Q.   Okay. Sticking with the
21   preparation for the 30(b)(6), what
22   documents did you review?
23   A.   So I reviewed the Qualcomm
24   ALA, the Qualcomm TLA, the █████████
25   ████████ peripherals proposal. The

**Page 9**

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    stand-alone peripherals proposal. And
3    the█████████████ proposal.
4    I also reviewed the original
5    ████████████████ annex.
6    Q.   Did you review any of the
7    annexes for the ALA as part of your
8    30(b)(6) preparation?
9    A.   Yes, I did.
10   Q.   And you mentioned a Zoom call.
11   Was that for your 30(b)(6) preparation?
12   A.   That is correct.
13   Q.   And who was that with?
14   A.   So that Zoom call was with
15   Akshay Bhatangar, Karthik Shivashankar,
16   and my counsel.
17   Q.   And what was the subject
18   matter of that discussion?
19   A.   We discussed the specific
20   30(b)(6) topic relating to █████████
21   █████ specifically relating ██████████
22   ████████████
23   Q.   And were you speaking with
24   them to educate yourself on that topic?
25   A.   I was speaking with Karthik

Page 10

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2    and Akshay to obtain the 30(b)(6)
3    knowledge on that.
4         MR. DESAI:  Why don't we mark
5    the 30(b)(6) notice as Exhibit 1.
6    This is Youseff Exhibit 1.
7         (Youseff Exhibit 1 for
8    identification, defendant Arm
9    Holdings PLC's objections and
10   responses to plaintiffs' notice of
11   30(b)(6) deposition.)
12        MR. DESAI:  Stephanie is going
13   to upload that.
14        Is it showing up?
15        MS. CHIN:  Just introduced it.
16        MR. DESAI:  Do you have a
17   screen, Mr. Youseff, to view the
18   documents?
19        THE WITNESS:  I do have a
20   screen, yes.
21        MR. EMERICK:  Anish, I'm not
22   seeing either where -- I also have
23   the same setup, I'm not seeing
24   where the document is shared.
25        MR. DESAI:  Should we just

Page 11

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2    quickly go off the record to make
3    sure we can get everyone set up.
4         THE VIDEOGRAPHER:  I'll take
5    us off.  The time is 9:48 a.m.
6    Pacific, and we are off the record.
7         (A recess was taken.)
8         THE VIDEOGRAPHER:  The time is
9    10 a.m. Pacific, and we are back on
10   the record.
11   BY DESAI:
12        Q.  Mr. Youseff, are you able to
13   take a look at what we marked as Exhibit
14   1, which is Arm's responses and
15   objections to Qualcomm's 30(b)(6) notice?
16        A.  Yes, I see an Exhibit 1 under
17   the marked exhibits.  Is that the one?
18        Q.  That should be it.  Let me
19   know when you have it open.
20        A.  I have it open.  Is there a
21   way to increase the font?  I believe
22   there should be, right?  Got it now.
23        I can see it.
24        Q.  Okay, great.
25        Do you understand that you've

Page 12

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2    been designated on certain 30(b)(6)
3    topics?  I'll go through them and
4    identify them for you.  But if you
5    understand that you have been designated
6    on some topics.
7         A.  Yes.
8         Q.  So why don't you flip to page
9    7. Do you see topic 2?
10        A.  Yes, I see it.
11        Q.  And you understand that you've
12   been designated to testify on this topic
13   2. Correct?
14        MR. EMERICK:  Subject to Arm's
15    objections and responses.
16        MR. DESAI:  Yes, I'll repeat.
17        Q.  You understand you've been
18   designated to testify on topic 2 subject
19   to Arm's objections?
20        A.  Yes.
21        Q.  And aside from reviewing the
22   documents that you mentioned earlier, did
23   you do anything to prepare for this
24   topic?
25        A.  Yes.

Page 13

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2         Q.  What else did you do?
3         A.  As I mentioned, I had a Zoom
4    call yesterday with Akshay and Karthik.
5         Q.  And what did you discuss with
6    them relevant to topic No. 2?
7         A.  I discussed the ███████████
8    ███████████████████████
9    ██
10        Q.  Aside from the ██████████
11   █████████ ████████ did you discuss
12   anything else with them?
13        A.  The specifics of the ████████
14   ████████████████████████████
15   █████████████████████.
16        Q.  And what did they tell you
17   about the ████████████████████
18   █████████?
19        A.  Well, we discussed the topic
20   again of ███████████████████████
21   ████████████████████████████
22   ███████████████████████
23   ███████ ███████████████████
24   ███████████████████████

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 14
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL

Page 16
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL

22        Q.   You know what, I'll come back
23   to that with some specific docs, it will
24   be easier that way.
25            All right.  Let's go to topic

Page 15
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL

Page 17
1        EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    3 on the next page of Exhibit 1, page 8.
3            You understand you've been
4    designated to testify on topic 3-A,
5    subject to Arm's objections and
6    responses?
7        A.   Yes.
8        Q.   Let's go to topic 20, on page
9    22.  Are you there?
10       A.   Yes, I'm here.
11       Q.   And you've been designated to
12   testify on topic 20, subject to Arm's
13   responses and objections.  Correct?
14       A.   Yes.
15       Q.   And then page 24, looking at
16   topic 22.  You understand you've been
17   designated to testify on that topic 22
18   subject to Arm's responses and
19   objections?
20       A.   Yes.
21       Q.   I believe the last one is
22   topic 29 on page 28.  Do you understand
23   you've been designated on that topic 29
24   subject to Arm's objections and
25   responses?

5 (Pages 14 - 17)

Page 18

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2      A.   Yes.
3      Q.   Could you just quickly give me
4  your educational background?
5      A.   Sure.  I went to undergraduate
6  school at UC Davis and completed a BS in
7  health science management law.  I then
8  attended Santa Clara University, where I
9  obtained my JD, specializing in high
10  technology.
11     Q.   And you joined Arm in 2011.
12  Is that right?
13     A.   I joined Arm initially in
14  1998.
15     Q.   What was your position --
16  sorry.
17         Have you worked at Arm from
18  1998 to the present continuously?
19     A.   No.
20     Q.   Okay.  Could you just walk me
21  through your employment history with Arm
22  in terms of the years you worked there?
23     A.   Sure.  Yes.  So I started with
24  Arm initially in 1998.  I was with Arm
25  until 2005-ish.  I then went and started

Page 19

1  my own law practice.  And I came back to
2  Arm in 2011.
3      Q.   From 1998 to 2005, what was
4  your title at Arm?
5      A.   I think my initial title was
6  senior corporate counsel.
7      Q.   And were you a corporate
8  counsel that entire first period of
9  working with Arm from 1998 to 2005?
10     A.   No.
11     Q.   What were your other roles?
12     A.   So over that period of time my
13  roles went -- my title went from senior
14  corporate counsel to vice president to
15  general manager.
16     Q.   When you returned in 2011,
17  what was your initial title?
18     A.   I returned in 2011 as vice
19  president of legal.
20     Q.   And how long did you hold that
21  title?
22     A.   For approximately -- let me
23  think this one through.  Approximately,
24  let's call it five years.  Approximately

Page 20

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  five years.
3      Q.   Okay.  And then what was
4  your -- what title did you move to after
5  that?
6      A.   Then I went to vice president
7  and assistant general counsel of
8  commercial licensing and trade
9  compliance.
10     Q.   And that would have been in
11  2016?
12     A.   Approximately.
13     Q.   Okay.  Did you move -- when
14  did you -- is your current title now VP
15  and deputy general counsel of licensing,
16  legal ops and trade compliance?
17     A.   Yes, that's right.
18     Q.   And when did you take that
19  title?
20     A.   I took that title
21  approximately, let's call it
22  two-and-a-half years ago.  So sometime in
23  I believe late '22.
24     Q.   What are your responsibilities
25  in this role?

Page 21

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2      A.   So I have a team, I'm
3  responsible for a team of lawyers that
4  handles the commercial licensing aspects,
5  the trade compliance aspects, legal
6  operations, and a host of other legal
7  matters that play into this.
8      Q.   And would your
9  responsibilities with respect to
10  licensing include Arm's negotiation and
11  execution of ALAs and TLAs?
12     A.   Could you repeat that?
13     Q.   I believe you said you had
14  responsibilities -- your responsibilities
15  included commercial licensing.  Is that
16  right?
17     A.   Yes, my team is responsible
18  for commercial licensing.
19     Q.   And the team that you are
20  managing with respect to commercial
21  licensing, would that involve managing
22  their negotiation and execution of Arm's
23  ALAs and TLAs?
24     A.   Yes, that's correct.
25     Q.   All right.

6 (Pages 18 - 21)

Page 22

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2        And you understand what an ALA
3    is?
4        A.   I have an understanding of
5    what ALA stands for.  I'm not sure if you
6    and I are both using the same
7    understanding.
8        Q.   Perhaps.  What is your
9    understanding of what an ALA is at Arm?
10        MR. EMERICK:  Objection.
11        A.   At Arm, when we use the term
12    ALA, we're referring to architecture
13    license agreement.
14        Q.   And you understand that
15    Qualcomm has an ALA.  Correct?
16        A.   Yes, Qualcomm has an
17    architecture license agreement, an ALA.
18        MR. DESAI:  Why don't we mark
19    the Qualcomm ALA as Exhibit 2.
20        (Youseff Exhibit 2 for
21    identification, Amended and
22    Restated Architecture License
23    Agreement, production numbers
24    ARM_00055357 through ARM_00055399.)
25        MS. CHIN:  It should be

Page 23

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    introduced now.
3        MR. DESAI:  Let me know when
4    you could see it.
5        THE WITNESS:  Yes, I can see
6    an exhibit.
7        MR. DESAI:  Just for the
8    record, this has been marked as
9    Exhibit 2.  It's the Qualcomm-Arm
10    ALA, with the beginning Bates label
11    ARM_00055537.
12 BY DESAI:
13        Q.   And you have that document in
14    front of you?  When I say Bates label,
15    there is a number at the very bottom
16    right of the document, that was the
17    number I just read off.
18        A.   Yes, I see that.
19        Q.   And when was the last time you
20    reviewed this document?
21        A.   Yesterday.
22        Q.   Has Arm negotiated any ALAs
23    with other companies besides Qualcomm
24    since January 1, 2019?
25        MR. EMERICK:  Objection;

Page 24

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    scope.  He's been designated with
3    respect to Qualcomm.
4        Q.   You can answer.
5        A.   I just need to think through
6    if I can provide an answer to that based
7    on knowledge outside of my role of the
8    privilege.  So are you asking me if I
9    have facts about negotiations outside my
10    scope as a lawyer at Arm?
11        MR. DESAI:  I don't see how
12    this calls for any privileged
13    information.  So I'll ask again.  I
14    don't think your attorney made a
15    privilege objection.
16        Q.   Has Arm negotiated any ALAs
17    with other companies besides Qualcomm
18    since January 1, 2019?
19        MR. EMERICK:  And I will give
20    the instruction, which is, for you,
21    Mr. Youseff, if you have
22    nonprivileged knowledge regarding
23    negotiations of ALAs and TLAs with
24    parties other than Arm and
25    Qualcomm, you can answer.  If you

Page 25

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    only know that from the context of
3    an attorney-client communication,
4    you should exclude that from your
5    answer.
6        MR. DESAI:  First of all, it's
7    a yes or no question.
8        MR. EMERICK:  So same
9    instruction, Mr. Youseff.  If you
10    have -- if you only have knowledge
11    regarding subject matter by virtue
12    of an attorney-client
13    communication, something asking you
14    for advice, you providing advice,
15    then you should not answer with
16    respect to any of that knowledge.
17        A.   I only have knowledge of
18    negotiations through my capacity as a
19    lawyer at Arm.
20        Q.   Have you had any
21    communications with -- have you had new
22    communications with any third party
23    regarding the negotiation of any ALA
24    since January 1, 2019?
25        A.   I'm going to again ask you,

7 (Pages 22 - 25)

Page 26

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2   are you asking me if I have knowledge of
3   facts about negotiations outside of my
4   role as a lawyer?
5       Q.   Mr. Youseff, listen to the
6   question carefully, okay.  And I'll try
7   again.
8           Have you had any
9   communications with a third party about
10  the negotiation of an ALA since January
11  1, 2019?
12      A.   And again, I'm going to ask
13  for clarification there.  I understand,
14  and if we need to take a break and I have
15  to consult with my lawyer about
16  privilege, we can do that.  But I want to
17  understand -- I understand that I'm the
18  30(b)(6) deponent with respect to the
19  Qualcomm negotiations.
20      Q.   You've also --
21           (Simultaneous crosstalk.)
22      Q.   Your personal deposition has
23  also been noticed.  Let's try it one more
24  time, and then if we need to take a break
25  so you can ask your lawyer, we can do

Page 27

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2   that.  And I'll ask a different question.
3           Are you acting as a lawyer for
4   any third parties with respect to the
5   negotiation of an ALA?  Or have you since
6   2019.
7           MR. EMERICK:  Objection to
8   form.
9       Q.   That's a yes or no question.
10          MR. EMERICK:  Objection to
11  form, scope.
12      A.   I understand, but that
13  question could be subject to privilege is
14  my understanding.
15      Q.   You're absolutely wrong.  If
16  you want to take a break and talk to
17  your lawyer, you should do that.
18  Otherwise we'll have to bring you back
19  for another deposition.  Okay?  So I
20  suggest you take a break and talk to your
21  lawyer.
22      A.   Repeat the question so we're
23  clear on what you're asking.
24      Q.   Are you, Mr. Youseff,
25  representing, or have you represented any

Page 28

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2   third parties as a lawyer with respect to
3   the negotiation of an ALA since January
4   1, 2019?
5       A.   And you're asking me this
6   subject to the 30(b)(1), not the
7   30(b)(6).  Is that correct?
8       Q.   I don't think it matters.  I'm
9   trying to get some information to figure
10  out whether there is actually any basis
11  for you saying there is a privilege here.
12  So let's answer the question.
13      A.   I need to understand if you're
14  asking me pursuant to 30(b)(6), where I
15  have factual knowledge after talking to
16  people, versus 30(b)(1), where I would
17  need to understand whether you're asking
18  me about knowledge outside of my
19  privileged area, i.e. being a lawyer.
20      Q.   I asked you.  I asked the
21  question you, Mr. Youseff.  You.  I
22  didn't say Arm.
23      A.   I'm a lawyer.
24      Q.   It doesn't matter if you're a
25  lawyer.  I'm asking the question you.

Page 29

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2   Have you had any communications -- sorry,
3   repeat the question.
4           Are you, Mr. Youseff,
5   representing any third parties or have
6   you represented any third parties in the
7   negotiation of an ALA since January 1,
8   2019?
9           MR. EMERICK:  Objection; form.
10      A.   Okay.  I would ask then,
11  please, that I go talk to my counsel.
12          MR. DESAI:  I mean, go ahead.
13  This is --
14          MR. EMERICK:  Why don't we
15  take a break.
16          MR. DESAI:  You should resolve
17  this quickly.  We're going to have
18  to bring him back for another
19  deposition if this is how it's
20  going to go.
21          THE VIDEOGRAPHER:  I'll take
22  us off.  The time is 10:25 a.m.
23  Pacific, and we are off the record.
24          (A recess was taken.)
25          THE VIDEOGRAPHER:  The time is

8 (Pages 26 - 29)

Page 30

```
1       EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2       10:33 a.m. Pacific, and we are back
3       on the record.
4           MR. DESAI:  Let me just try a
5       couple of questions and we'll see
6       if we're going to get anywhere,
7       otherwise I'll just move on.  And
8       we can deal with the privilege
9       objections later.
10 BY DESAI:
11      Q.  Has Arm executed any new ALAs
12  since January 1, 2019?
13          MR. EMERICK:  Objection;
14  scope.
15      A.  So repeat the date one more
16  time.  Since when?
17      Q.  January 1, 2019.
18
```



```
25      Q.  We have a protective order in
```

Page 31

```
1       EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2   this case, so we can mark this deposition
3   transcript as confidential.
4           MR. EMERICK:  Let's mark it
5       highly confidential, attorneys'
6       eyes only, thanks.
7           Mr. Youseff, you can answer.
8       A.
```



Page 32

```
1       EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2
9       Q.  Who at Arm has the primary
10  responsibility for negotiations relating
11  to ALAs?
12      A.  I don't think there is one
13  person.  There are different people that
14  are involved in different areas, as you
15  can imagine.  So there is sales, there is
16  licensing, there is legal.
17      Q.  Well, who at Arm is required
18  to sign off on the execution of an ALA?
19      A.  Again, there would be various
20  sign-offs.  So there would be multiple
21  sign-offs.
22      Q.  Who are they?
23      A.  There would need to be a legal
24  sign-off, there would need to be a sales
25  sign-off, a licensing sign-off.  And most
```

Page 33

```
1       EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2   likely an executive sign-off.
3           MR. DESAI:  Why don't we go
4       ahead and mark as Exhibit 3, the
5       Qualcomm-Arm TLA.
6           (Youseff Exhibit 3 for
7       identification, Technology License
8       Agreement, production numbers
9       ARM_00103918 through ARM_00103972.)
10          MR. DESAI:  Let me know when
11      you see that on your screen.
12          THE WITNESS:  Okay, it's on
13      the screen now.
14 BY DESAI:
15      Q.  You should see the
16  Qualcomm-Arm, which has a date of ███
17  ███ on the top left, and a Bates
18  number on the bottom right of
19  ARM_00103918.
20          Do you see that?
21      A.  Yes.
22      Q.  And you are familiar with this
23  Qualcomm TLA?  You've seen it before?
24      A.  I've seen this TLA before,
25  yes.
```

9 (Pages 30 - 33)



Page 34
1 EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2 Q.   All right.
3        And do you understand that
4 there are annexes to the Qualcomm TLA?
5 A.   There are annexes, yes, under
6 the Qualcomm TLA.
7 Q.   And, for example, ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
11 A.   ▮▮▮▮
▮▮▮▮▮▮▮.
13        MR. DESAI:  Why don't we mark
14 as Exhibit 4, one of the Qualcomm
15 TLA annexes.  It's tab 11.
16        (Youseff Exhibit 4 for
17 identification, Annex 1, production
18 numbers ARM_00062474 through
19 ARM_00062493.)
20        MR. DESAI:  Let me know when
21 you can see that.
22        THE WITNESS:  We can see it.
23 BY DESAI:
24 Q.   You should have in front of
25 you an Annex 1, with a date of ▮▮▮

Page 35
1 EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2 ▮▮▮ at the top left.  And the Bates
3 label ARM_00062474.
4        Do you see that?
5 A.   Yes.
6 Q.   And you have seen this
7 document before?
8 A.   Yes.
9 Q.   This is one that you reviewed
10 in your preparation for this deposition?
11 A.   That's correct.
12 Q.   Among the products being
13 linked here are cores that are code named
14 ▮▮▮▮.  Correct?
15 A.   That's correct.
16 Q.   And it's your understanding
17 that this ▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮
19 ▮▮▮
20 A.   Yes, to my recollection this
21 is the ▮▮▮
22 Q.   And according to this annex,
23 the term of the license is ▮▮ ▮▮
24 A.   That's correct.
25 Q.   The term would have been from

Page 36
1 EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2 ▮▮▮▮▮▮▮ --
3 sorry, strike that.
4        The term is from ▮▮▮▮
▮▮▮▮ Correct?
6 A.   That's correct.
7 Q.   And ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
11 Correct?
12 A.   And you're referring to
13 designs of one of the products in this
14 annex?
15 Q.   No, I'm sorry.  No, I didn't
16 mean that.
17        I meant ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
▮▮▮▮▮.  Right?
22 A.   The ▮▮▮ under the
23 TLA, right, allow ▮▮▮▮▮▮
▮▮▮▮▮▮▮
25 ▮▮▮ And there are various provisions

Page 37
1 EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2 in the TLA where there might be
3 ▮▮▮▮ things like that.
4 Q.   Okay.  ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮ Correct?
10        MR. EMERICK:  Objection; form.
11 And for questions, you're asking
12 about the TLA.  If you have
13 nonprivileged knowledge, factual
14 knowledge that's not in the context
15 of an attorney-client
16 communication, you can answer as to
17 that.  If your only knowledge is
18 with respect to legal analysis,
19 legal opinion, you should exclude
20 that from your answer.
21 A.   So to be very clear, the only
22 knowledge I have about these agreements
23 and the terms and conditions under them,
24 what Qualcomm can do under X period of
25 time, is, again, through my capacity as a

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 38

```
 1        EHAB YOUSSEF - HIGHLY CONFIDENTIAL
 2    lawyer negotiating these deals, drafting
 3    these deals, understanding the terms and
 4    conditions.
 5        Q.   Okay.  So you're claiming
 6    privilege.  Is that right?  Just to be
 7    clear.  Yes or no.
 8        A.   That's a question for me?
 9        Q.   I think ultimately that lies
10    in your hands.  Your attorney can
11    instruct you and you can accept his
12    instruction or not.  I just need clarity
13    for the record if you're not going to
14    answer because you're claiming that it's
15    privileged.
16        A.   Yeah, and so I'm going to,
17    again, and I'm sorry, but I have to make
18    sure I understand clearly.  30(b)(6) or
19    30(b)(1).  For 30(b)(6), what I've been
20    prepared on as far as my knowledge on the
21    facts, I can talk about that.  If you're
22    asking me more broadly around 30(b)(1), I
23    will be able to speak about matters that
24    are not legally privileged.
25            In other words, if I have
```

Page 40

```
 1        EHAB YOUSSEF - HIGHLY CONFIDENTIAL
 2    factual aspects of Qualcomm --
 3            MR. DESAI:  Jay, you can just
 4    state your objection quickly, let's
 5    just get on with it.  All right?
 6    This is a speaking objection.
 7            MR. EMERICK:  Your question
 8    was inaccurate.  You just said he
 9    was designated with respect to
10    topic 6.  And it's topic 6 with
11    respect -- as with our objections
12    and response.
13            MR. DESAI:  We already covered
14    that, though.
15            MR. EMERICK:  We did not.  You
16    didn't even ask him about this
17    topic at the beginning.  This is
18    the first time you've been asking
19    him about topic 6.  You didn't
20    cover it when you went down the
21    list.
22            MR. DESAI:  I apologize.  I
23    thought I covered all the topics.
24    We can go back.  Why don't we go
25    back to the 30(b)(6) notice,
```

Page 39

```
 1        EHAB YOUSSEF - HIGHLY CONFIDENTIAL
 2    knowledge outside of my role as a lawyer
 3    for Arm.
 4        Q.   Let's try and do this a
 5    different way, okay?  I just need answers
 6    about, if you can answer the question,
 7    answer it, if you can't answer it because
 8    you think it's privileged, just say that.
 9    You don't need to say anything more.
10            Topic 6, which you were
11    designated on, involves the Qualcomm TLA,
12    including the drafting, negotiation,
13    interpretation and construction of the
14    Qualcomm TLA, including amendments and
15    annexes.  So this is a 30(b)(6) topic,
16    that's my view.
17            Now, I'm going to ask you, is
18    it Arm's interpretation ████████████
      ████████████████████████████████
      ████████████████████████████████████
      ████████████████████████████████████
23            MR. EMERICK:  And subject to
24    our objections in which we've made
25    a witness available regarding
```

Page 41

```
 1        EHAB YOUSSEF - HIGHLY CONFIDENTIAL
 2    Exhibit 1.  I apologize for
 3    skipping that.
 4 BY DESAI:
 5        Q.   Do you have Exhibit 1?
 6        A.   I do.
 7        Q.   All right.  We're on page 11.
 8    Do you see topic 6?
 9        A.   Yes.
10        Q.   Okay.  You've been designated
11    on this topic, subject to your company's
12    objections and responses.  Right?
13        A.   Correct.
14        Q.   Okay.  Now, I'm going to go
15    repeat that question I asked before.  I'm
16    going to go back to the TLA annex, which
17    I think is Exhibit 4.
18    ████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████
      ████████████████████████████
24            MR. EMERICK:  Objection;
25    scope.
```

11 (Pages 38 - 41)

Page 42

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2        And again, if you have
3    nonprivileged knowledge regarding
4    any Arm position on this
5    interpretation, you can answer.
6    Otherwise you should not answer.
7        A.   Okay.  And because I believe
8    this is asking me a legal conclusion,
9    which I can only answer based on
10   privileged information, I can't answer
11   that.
12       Q.   All right.
13       So the company's position on
14   this issue is, on that question, is that
15   the answer is privileged.  Correct?
16       MR. EMERICK:  Objection;
17   scope.
18       And then with respect to any
19   privileged information you have,
20   you should exclude that from your
21   answer.
22       MR. DESAI:  All right, we'll
23   keep going.
24   BY DESAI:
25       Q.   If we go back to the TLA,

Page 43

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    Exhibit 3.  I want to pull that up.  And
3    I'd like to direct your attention to
4    ██████████  Let me know when you're
5    there.  It's on the page that ends in,
6    the Bates label ends in 930.
7        A.   Okay, I'm there.
8        Q.   Have you reviewed this section
9    ██████ before?
10       A.   Yes.
11       Q.   And in your preparation for
12   this deposition and your testimony on the
13   30(b)(6) topics, did you review ██████
14   ██████
15       A.   Yes.
16       Q.   And you understand that this
17   ██████████ includes what's been
18   referred to as a ██████████
19   provision?
20       A.   The language has the words
21   ██████████ yes.
22       Q.   What is Arm's understanding of
23   the ██████████ provision in
24   ██████████
25       MR. EMERICK:  Objection;

Page 44

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    scope.
3        And with respect to any
4    privileged analysis you may be
5    aware of, you should exclude that
6    from your answer.  If you have
7    nonprivileged information regarding
8    Arm's interpretation of this, you
9    can answer.
10       A.   I will answer under 30(b)(6)
11   explaining how Arm conducts its analysis
12   in ██████████.  Is
13   that acceptable?
14       Q.   You can answer how you want.
15   I asked my question, you choose how to
16   answer it.
17       MR. EMERICK:  You should
18   exclude from your answer any
19   privileged analysis, any legal
20   analysis that Arm does regarding
21   this term of the TLA.  If there is
22   a business process, nonprivileged
23   activity that goes on, you can
24   testify as to that nonprivileged
25   activity.

Page 45

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2        MR. DESAI:  Let me be clear.
3    I'd like a clear answer to my
4    question.  Which wasn't about
5    business practices.  So you and
6    your attorney can -- you'll have a
7    chance to have a direct examination
8    with your attorney later on.  My
9    question is different.
10       Q.   I want to understand if Arm,
11   the company, has a position on what this
12   ██████████ clause
13   means.  And you're the 30(b)(6) witness
14   on Arm's interpretation.  And so I just
15   need to know --
16       MR. EMERICK:  No, he's not.
17   No, he's not.
18       MR. DESAI:  Jay, just take it
19   easy, okay.  You can take it easy
20   for a second.
21       MR. EMERICK:  He's not.
22       MR. DESAI:  If the answer is
23   Arm does not want to answer that
24   question because it's privileged,
25   that's fine.  So I'll ask again.

12 (Pages 42 - 45)



Page 46

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2      MR. EMERICK: He's not
3  designated on that topic, Anish.
4      MR. DESAI: He's not
5  designated on topic 6?
6      MR. EMERICK: It's subject to
7  our objections and responses.
8  Those objections and responses say
9  that "Arm will make one or more
10  witnesses available to testify as
11  to nonprivileged, relevant
12  information in Arm's possession,
13  custody or control that is known or
14  reasonably available to Arm
15  regarding factual aspects of the
16  Qualcomm TLA. Factual aspects of
17  the Qualcomm TLA that are relevant
18  to the claims or defenses" --
19      MR. DESAI: You might want to
20  slow down for the court reporter.
21  Do you want to try again?
22      MR. EMERICK: Sure. I will
23  read our topic 6 designations.
24  Which says, "Subject to and without
25  waiving its general objections and

Page 47

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  specific objections, Arm will make
3  available one or more witnesses to
4  testify as to nonprivileged,
5  relevant information in Arm's
6  possession, custody or control that
7  is known or reasonably available to
8  Arm regarding, factual aspects of
9  the Qualcomm TLA that are relevant
10  to the claims or defenses in this
11  case, and drafting and negotiation
12  of the Qualcomm TLA."
13      MR. DESAI: Thank you for
14  reading that. I'll ask one more
15  time.
16  BY DESAI:
17      Q.  What is Arm's understanding of
18  the ███████████ provision?
19      MR. EMERICK: And I'll object
20  based on scope.
21      If you have any kind of
22  nonprivileged understanding of any
23  such position, you can answer. But
24  if it's something that was done as
25  part of a legal analysis, then you

Page 48

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  should exclude that from your
3  answer.
4      A.  So based on that, I will
5  answer as follows:  Arm's analysis of
6  ████████████████████████████
7  ████████████████████████████
8  ████████████████████████
9  ████████████████████████████
10  ████████████████████████████
11  ████████████████████████████
12  ████████████████████████
13  ████████████████████████████████
14  ████████████████
15      And then there is an analysis
16  including ████████████████
17  ████████████████████████.  And
18  at the end of the day, under that
19  process, there is ████████████████
20  ████████████████████████
21  Per the defined term.
22      Q.  Okay. Do you understand that
23  Qualcomm made a request to ████████
24  ████████████████ before the
25  execution of the Annex 1 from ████████

Page 49

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ████ that's been marked as Exhibit 4?
3      A.  I understand that Qualcomm
4  made a request for ████████████
5  ████████████████████████.  And
6  they did that ████████████████
7  ████
8      Q.  And that wasn't my question.
9  You're skipping ahead to a different time
10  frame. I'm going to try again.
11      I was asking about what
12  preceded the ████████████████ that's
13  tab 4. Do you understand? Just to set
14  the stage here.
15      A.  I see. So please do repeat
16  the question then if I got that wrong.
17      Q.  Did Qualcomm make a request to
18  ████████████████████████ before
19  the execution of Annex 1 from ████████
20  ████ that is Exhibit 4?
21      A.  I don't have direct knowledge
22  of that request. But I will say they
23  have an annex, ████ so from that I can
24  say there must have been requests that
25  caused Arm to provide an annex.

13 (Pages 46 - 49)



Page 50

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2  Q.   Okay.  And you understand that
3  the annex, Exhibit 4, includes an
4  agreement on pricing for ████████████
5  ████████.  Correct?
6  A.   The annex includes ████████
7  ████████████  and lots of other things.
8
9  Q.   And is it Arm's position that
10  when it offered the pricing for ████████
11  ████████████  that is reflected in the
12  ████████████  agreement, that it provided
13  that pricing pursuant to the ████████
14  ████████████  in the TLA?
15  MR. EMERICK:  Objection; form.
16  A.   Based on, again, my factual
17  knowledge and not talking about anything
18  I know from a privileged perspective, I
19  know that an annex was executed for
20  ████████████████████████████████████
21  ████████████████████████████████  under
22  ████████████████████████████████
23  this clause.
24  ████████████████████.
25  ████████████████████████████████████

████████████████████████████████████████
████
3
4
5
6
7
8  A.   Again, regarding the word
9  "understanding," I don't have an
10  understanding because I don't know what
11  analysis was done.  I only know that
12  there is a process whereby we do that.
13  Q.   Who would know?
14  A.   I would know if the documents
15  were in front of me or the licensing
16  person that did the analysis would.
17  Q.   When you say the documents are
18  in front of me, what documents would you
19  be referring to?
20  A.   Any documents that would
21  demonstrate that they did the analysis
22  that are nonprivileged.
23  Q.   What kind of documents are
24  generated at Arm when performing this
25  ████████████████  analysis?

Page 52

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2  MR. EMERICK:  I'll just
3  caution you, any sort of business
4  analysis on this, you can testify
5  to.  If there is any legal analysis
6  that's separate, you should exclude
7  that from your answer.
8  MR. DESAI:  Well, I'm asking
9  about the kind of documents.  So
10  I'm not asking about the contents.
11  So if you're instructing him not to
12  answer, I don't agree with that
13  instruction.
14  I'll try my question again,
15  let's see how you answer, but.  And
16  I'm not asking about the contents
17  of any privileged documents.
18  Q.   The question is, when Arm
19  conducts this ████████  analysis
20  that you've already testified about, what
21  kind of documents are generated?
22  MR. EMERICK:  So same
23  instruction.  You should exclude
24  from your -- you can testify as to
25  nonprivileged documents that -- if

Page 53

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2  any, that are created.  With
3  respect to any privileged documents
4  or privileged analysis, you should
5  exclude that from your answer.
6  ████████████████████████████████
7  ████████████████████████████████
8  ████████████████████████████████
9  ████████████████████████████████
10  ████████████████████████████████
11  ████████████████████████████████
12  ████████████████████████████████
13  ████████████████████████████████
14  MR. EMERICK:  You shouldn't
15  get into any discussions with
16  counsel, I'll caution you on that.
17  MR. DESAI:  I don't think he
18  is.  Jay, you probably need to get
19  a lesson on attorney-client
20  privilege.  I mean, but he hasn't
21  testified about any communications
22  specifically.
23  Basically what I'm saying is
24  when you don't understand the
25  attorney-client privilege, you're

14 (Pages 50 - 53)

Page 54

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    obstructing the deposition. So, I
3    mean, you're just going to buy us
4    another deposition, if that's what
5    you want.
6        Do you want to try to finish
7    your answer?
8        MR. EMERICK: You can try to
9    provoke an argument with me if you
10   want. I'm not obstructing the
11   deposition. I'm cautioning the
12   witness regarding attorney-client
13   privilege. This is an attorney
14   deposition. And your questions
15   routinely are calling for subject
16   matter that's attorney-client
17   privileged.
18       MR. DESAI: Can we repeat the
19   last question.
20       (Record read as requested.)
21       THE WITNESS: Would it be
22   possible to read the answer as
23   well, please, if you want me to
24   supplement that.
25       MR. DESAI: That's fine with

Page 55

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    me, if you want to read the answer.
3        (Record read as requested.)
4        THE WITNESS: So the only
5    thing I'll add, again, is that
6    Qualcomm I think has seen the
7    factual confirmation in the form of
8    letters that might go from Arm to
9    Qualcomm. ████████████████
██████████████████████████████
██████████████████████████████
██████████████████.
15   BY DESAI:
16       Q. When Qual -- sorry. When Arm
17   performs a ████████████,
18   is there a document or an email that
19   reflects the ████████████████
20   ████████████████████████?
21       MR. EMERICK: Same
22   instruction. If there is a
23   nonprivileged document that
24   describes that, testify to that.
25   To exclude from your answer any

Page 56

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    privileged analysis.
3        A. There would not be document
4    that I could recall in that context.
5        Q. And just to be clear, when you
6    say you can't recall a document that
7    would reflect what ███████████
█████████████████, are you --
9    do you mean any document or do you mean
10   you're not aware of any nonprivileged
11   document?
12       MR. EMERICK: Objection; form.
13       A. I don't have any knowledge of
14   a nonprivileged document that Arm would
15   have done outside of what I've just
16   described and what was provided to
17   Qualcomm.
18       Q. And when Arm conducts a
19   ████████████████, for example,
20   ████████████████████████
█████ would there be a privileged
22   document that identifies what the
23   ████████████████████
24       (Direction not to answer.)
25       MR. EMERICK: Instruction not

Page 57

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    to answer.
3        MR. DESAI: That's a
4    completely inappropriate objection.
5    This is the kind of information
6    that would be on a privilege log.
7    I have not asked for the contents
8    of the document. I'm simply asking
9    if such a privilege document would
10   exist --
11       (Simultaneous crosstalk.)
12       MR. EMERICK: The question is
13   asking is there a privileged
14   document regarding, that says X.
15   That's --
16       (Simultaneous crosstalk.)
17       MR. DESAI: That's not what I
18   said.
19       MR. EMERICK: That's
20   exactly --
21       MR. DESAI: ██████████████
██████████████████████████
██████████████████████████
██████████████████████

15 (Pages 54 - 57)



Page 58

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1     EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2     identified as, which would be the
3     content of the document. I'm
4     asking if such a privileged
5     document would exist.
6         MR. EMERICK: Instruction not
7     to answer. You're asking about is
8     there a privileged document with a
9     certain content.
10 BY DESAI:
11     Q. Are you going to follow your
12 attorney's instruction?
13     A. Yes.
14     Q. All right.
15     Do you understand that
16 Qualcomm requested a ████████
17 ████████████████████?
18     A. Yes.
19     MR. DESAI: Why don't we pull
20 up tab 25.
21     THE WITNESS: Did you say tab
22 25? A new exhibit, correct?
23     MR. DESAI: It should be
24 showing up. We're going to mark it
25 as Exhibit 5.

Page 59

1     EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2     (Youseff Exhibit 5 for
3 identification, letter dated
4 ████████, production
5 numbers QCVARM_0573671 through
6 QCVARM_0573673.)
7     THE WITNESS: We can see it.
8 BY DESAI:
9     Q. And if you skip to -- sorry.
10     MR. DESAI: For the record,
11 the beginning Bates number of this
12 is QCVARM_0573671.
13     Q. I'd like you to skip to the
14 next page that ends in 72.
15     Do you see that?
16     A. I see the second page, yes.
17     Q. Okay. And this is a ████████
18 ████████ letter from Qualcomm to a
19 Spencer Collins at Arm. Correct?
20     A. That's what it says, yes.
21     Q. And do you know Mr. Collins?
22     A. Yes.
23     Q. And do you report to
24 Mr. Collins?
25     A. Yes.

Page 60

1     EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2     Q. Okay. And you can see in the
3 second paragraph, that Qualcomm is
4 notifying Arm that ████████████
5 ████████████████████████████,
6 ████████████████████ Is that
7 right?
8     A. That's what the letter says,
9 yes.
10     Q. And you understand that Arm
11 ultimately ████████████████████
12 ████████████████████████████ in
13 response. Is that right?
14     A. ████████████████████████
15 ████████████████████████████████
16 ████████████████████████████████████
17 ████████████████████████.
18     Q. Okay.
19     MR. DESAI: Why don't we pull
20 up that response, or that proposal,
21 sorry. Tab 27.
22     (Youseff Exhibit 6 for
23 identification, ████████████████,
24 ████████████████, production numbers
25 QCVARM_0526828 through

Page 61

1     EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2 QCVARM_0526830.)
3     MR. DESAI: Are you there?
4     THE WITNESS: Yes, we're
5 there.
6     MR. DESAI: Okay. So we're
7 going to mark this as Exhibit 6.
8 For the record, it is a document
9 labeled QCVARM_0526828.
10 BY DESAI:
11     Q. Have you seen this document
12 before?
13     A. Yes.
14     Q. And you reviewed this as part
15 of your 30(b)(6) preparation?
16     A. Yes.
17     Q. And this is an ████████████████
18 ████████████████████████████████████
19 ████████████████████████████████████
20 ████████████ Correct?
21 ████████████
22     A. ████████████████████████
23 ████████████████████████████████
24 ████████████████.
25     Q. ████████████████████,

16 (Pages 58 - 61)



Page 62

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ████████████
3  ████████ of
4  ████████?
5      MR. EMERICK:  Objection; form.
6      A.  ████████
7  ████████
8  ████████
9      Q.  Who ████████?
10 ████████
11 ████████
12 ████████
13 ████████
14 ████████
15 ████████
16 ████████
17 ████████
18 ████████
19 ████████
20 ████████
21 ████████
22 ████████
23 ████████
24 ████████
25 ████████

Page 63

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ████████.
3      Q.  Did these individuals ████████
4  ████████
5  ████████
6  ████████?
7      A.  To my knowledge, I don't
8  know -- I'm going to answer it this way:
9  With respect to nonprivileged documents,
10 I don't have any factual knowledge of.
11     Q.  Just to be clear, Arm's
12 position is that ████████
13 ████████
14 ████████
15 ████████
16 ████████ Is that
17 correct?
18     MR. EMERICK:  Objection; form.
19     A.  To the best of my knowledge, I
20 don't have any factual knowledge of
21 nonprivileged documents regarding the
22 ████████ under the
23 ████████ of the TLA.
24     Q.  What was the ████████
25 ████████

Page 64

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ████████
3  ████████?
4      MR. EMERICK:  Objection.
5  Objection; form.
6      A.  I'm going to clarify before I
7  answer that question.
8      Q.  Sure.
9      A.  I'm going to use first the
10 definition ████████, to be
11 clear.  So when you say
12 ████████l or
13 ████████ the answer for the
14 definition is ████████
15     Q.  And is that with respect to
16 all three of those cores, ████████
17 ████████
18     A.  With respect to the
19 definition, ████████
20 ████████
21 ████████
22 ████████
23     Q.  What was the date of the
24 ████████ deal?
25     A.  Sorry, I have to have that in

Page 65

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  front of me.  I don't recall that.
3      MR. DESAI:  Counsel, I'm just
4  confirming, if this particular
5  ████████ deal hasn't be been
6  produced, we ask that it be
7  produced.  I don't know off the top
8  of my head if it has.  I just make
9  that request now.
10     (Request for production.)
11     MR. EMERICK:  Request
12 received.
13 BY DESAI:
14     Q.  And so is it Arm's position
15 that the ████████ in Exhibit 5 --
16 sorry, Exhibit 6, for ████████
17 ████████
18 ████████ you're referring
19 to?
20     A.  I'm going to ask you to repeat
21 that, please.
22     Q.  Okay.  We'll break it into
23 pieces here.
24     I believe you've testified now
25 that the ████████ that was

17 (Pages 62 - 65)



Page 66

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    ████████████████████████████
3    ████████████████████████████
5    Correct?
6        A.   That's correct.
7        Q.   Okay.  And is it Arm's
8    understanding that the ████████████████
9    ████████████████████████████
11   ████████████████████████████
13       A.   I'm going to clarify as I
14   answer, okay.  So as I tried to explain,
15   ████████████████ as defined means
16   ████████████████████████████
17   ████  That's the definition.  Maybe we
18   can -- can I go back to the other
19   document?  Possible?
20       Q.   Which one?  The TLA?
21       A.   It would be the TLA, yes.
22       Q.   Sure.  That's Exhibit 3.
23       A.   Thank you.  It's coming up
24   now.  I don't know if you see what I see,
25   but I'm going to ██████████

Page 67

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2        Q.   I have a paper copy, I'm
3    looking at it.
4        A.   Okay.  So the clarification is
5    that the definition as defined in ████████
6    ████████████████████████████
7    ████████████████████████████
8    ████████████████████████
9    ████████████████████████████
10   ████████████████████████████
11   ████████████████  And then, quote,
14   the ████████████
15   ████████  To be clear, when I use the
16   definition ████████████████, I'm making
17   it clear that ████████████████████
18   ████████████████████████████
19   ████████████████████████████
20   ████████.
21       Q.   Correct.
22       A.   I think you're asking --
23       Q.   I think that part we've
24   established, that with respect to ████████
25   ████████████ in Exhibit 27, the, quote,

Page 68

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    ████████████ as defined in ██████
3    ████████████████████████.
4    Correct?
5            MR. EMERICK:  Objection; form.
6        A.   A ████████████████████████
7    ██  ██████████████████
8    ████████████ per that definition.
9        Q.   That's the, ██████ ████████
10   ████ in the TLA.  Right?
11       A.   That's right.
12       Q.   Okay.  Moving on to the next
13   part of ████ is it ████████████████
15   ████████████████████████████
16   ████████████████████████████
17   ████████
18       A.   I'm going to answer again with
19   a clarification.
20       Q.   Okay.  Maybe you could try
21   with a yes or a no first.  And then you
22   can explain.
23       A.   So the answer is yes.  The
24   answer is yes.
25   ████████████████████████

Page 69

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    ████████████████████████████
3    ████████████████████████████
4    ████████████████████████████
5    ████████████████████████████
6    ████████████████████████████
7    ████████████████████████████
8    ████████████████████████████
9    ████████████████████████████
10   ████████████████████████████
11   ████████████████████████████
12   ████████████████████████████
13   ████████████████████████████
14   ████████████████████████████
15   ████████████████████████████
16   ████████████████████████████
17   ████████████████████████████
18   ████████████████████████████
19   ████████████████████████████
20   ████████████████████████████
21   ████████████████████████████
22   ████████████████████████████
23   ████████████████████████████
24   ████████████████████████████
25   ████████████████████████

18 (Pages 66 - 69)



Page 70

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

Page 71

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  the
4      Q.   What was that other licensee?
5  Or who, sorry.  Who.
6      A.   The other licensee is
7
8      Q.   So as I understand your
9  response,
            Is that right?
13     A.   And I'll clarify that.  What
14  I'm intending to say is that

Page 72

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

4      And, then I'll stop here, the
5  important point is whether it's

10     Q.   In one of your earlier answers
11  a few moments ago I think you used the
12  phrase "                        ."  Do you
13  remember saying that?
14     A.   You have to read it back to
15  me, I'm not sure if I said that.
16     Q.   I'll represent to you you said
17  that.  And the transcript will.
18

24     A.   And again, I'll answer with
25  respect to nonprivileged portion.

Page 73

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2      Q.   Sorry, the names of the people
3  who perform it are not privileged.  So
4  that's all I'm asking first.
5      A.   I can tell you the folks on
6  the

15     Q.   And when did they -- with
16  respect to this Qualcomm
                    ?
20     A.   Prior to the        being sent
21  over.
22     Q.   A month before, six months
23  before?
24     A.



Page 74

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

13    Q.    And you spoke to individuals
14  about this in preparation for your
15  deposition.  Correct?
16    A.    I did, yes.
17    Q.    And did you discuss with them
18
19              ?
20    A.    I'm sorry, I did not ask them
21
23    Q.    Okay.
25    A.    I think -- this is my opinion.

Page 75

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

1
2  If you want that, I'll give you an
3  opinion.  I don't know.

Page 76

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

2    Q.    Okay.
                                . Correct?
5        MR. EMERICK:  Objection; form.
6    A.
9    Q.    Okay.
                                . Correct?
12        MR. EMERICK:  Objection; form.
13    A.
17    Q.    That wasn't my question.  And
18  let's be clear.  I am not asking you to
19  reveal the contents.

Page 77

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

                          Regardless of whether
5  you're claiming that they're privileged
6  or not.
7    A.    And my answer is there may
8  be -- you're talking now specifically
9                          , is that right?
10    Q.    I'm focused on
                  .
12    A.    I'm not aware of any
13  nonprivileged documents.
14    Q.    Are you aware of privileged
15  documents?
16        MR. EMERICK:  I'll caution the
17  witness on this.  You're asking
18  about documents with specific
19  subject matter.  And so you should
20  exclude --
21        MR. DESAI:  I got to tell you,
22  Jay, I'll take this one to court.
23  You can go ahead and instruct him
24  not to answer if you want.  For a
25  clear record, I can ask again, and

20 (Pages 74 - 77)



Page 78

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  you can make your instruction.  Do
3  you want me to do that?
4  Okay, I'll ask one more time.
5  MR. EMERICK:  Use your 70
6  hours however you want.
7  Q.  ███████████████████
   ███████████████████████████
   ███████████████████████████
   ██████████████?
12  (Direction not to answer.)
13  MR. EMERICK:  I'll instruct
14  not to answer since your asking
15  about the content of privileged
16  documents.
17 BY DESAI:
18  Q.  Did you review any documents
19 in preparation for your 30(b)(6)
20 testimony that ████████████████
   ███████████████████████████
   ████████?
23  A.  I did not review any documents
24 that are nonprivileged.
25  Q.  Did you review privileged

Page 79

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  documents to prepare yourself to testify
3  on the 30(b)(6) topic regarding this
4  ████████████████████████████
   ████████████?
6  A.  I'm going to ask you to repeat
7  that because I think it's a little
8  different than your first question.
9  Could you repeat that, please?
10  Q.  It was different.
11  I said, did you review any
12 privileged documents to prepare yourself
13 to testify on the 30(b)(6) topic that
14 encompasses ██████████████████
   ███████████████████████████?
17  A.  Are you asking me if I've
18 reviewed privileged documents?
19  Q.  That's not the full extent of
20 my question.  I'll have the court
21 reporter -- I'm going to repeat the
22 question.  And it's a yes or no answer.
23 It's a yes, no, or I can't answer.  Or
24 I'm not -- refusing to answer.
25  MR. DESAI:  Can we please

Page 80

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  repeat the question.
3  (Record read as requested.)
4  MR. EMERICK:  And I'll caution
5  you, there appears to be confusion
6  on the question.  It has to be
7  specific to 30(b)(6) preparation.
8  Not anything 30(b)(1) or more
9  generally.  It has to be specific
10  to 30(b)(6) preparation.
11  THE WITNESS:  And the reason
12 I'm struggling -- I'm going to
13 answer.  I've reviewed documents,
14 I'm quoting here, ████████████
   ██████████████████████
   ███████████████████████
   ██████████████████████████
   ███████████████████████████
   ██████████████████████████████
22  MR. DESAI:  Let me narrow
23 that, okay.
24 BY DESAI:
25  Q.  The preparation for the

Page 81

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  30(b)(6) topic regarding ████████████
   ████████████████████████████
   ████████████████████████████
   ████████████████████████████
   █████████████████████████████?
7  MR. EMERICK:  Again, I'll
8  caution you, the question is
9  specific to 30(b)(6) preparation.
10  So anything relating to 30(b)(1),
11  anything relating to your work
12  generally that you've done, this is
13  specific to 30(b)(6).  Not anything
14  in 30(b)(1).
15  A.  Okay.  And the reason I'm
16  genuinely struggling is I'm not certain
17  which documents the lawyers have put into
18  a privilege log.  So I reviewed documents
19  for my 30(b)(6) prep.  And I'm testifying
20  based on that factual knowledge relating
21  to what I've reviewed.
22  Now, I'm not certain if any
23  those documents are in a privilege log.
24 We can take a break if I need to go
25 understand that.

21 (Pages 78 - 81)

Q. I mean, I just want to know, first of all, your attorney wouldn't even let you answer the first question. I'll start over.
In preparation for your deposition --
MR. EMERICK: He's got a question.
MR. DESAI: Don't interrupt me.
Q. In preparation for your 30(b)(6) testimony --
MR. EMERICK: You're interrupting him.
MR. DESAI: I'm not. He finished his answer.
MR. EMERICK: He said he has a question about privilege. And wanted to take a break.
MR. DESAI: He said if we need to. Jay, stop talking. I'm going to ask one more time.
MR. EMERICK: He had a question about privilege. And



mentioned a break. I'd like to take a break.
MR. DESAI: You don't get to call for a break. So I'm going to ask the question, and then if you want to go take a break after I ask the question, you can do that. Let's ask the question first, all right?
MR. EMERICK: Ask your question.
MR. DESAI: Thank you.
BY DESAI:
Q. Did you review, in preparation for the 30(b)(6) topics, that include the [REDACTED]? That's a yes or no question.
A. And I need to take a break to go talk about privilege.
MR. EMERICK: Let's take a break.



THE VIDEOGRAPHER: The time is 11:38 a.m. Pacific, and we are off the record.
(A recess was taken.)
THE VIDEOGRAPHER: The time is 11:49 a.m. Pacific, and we are back on the record.
MR. DESAI: Could you repeat the last question.
(Record read as requested.)
A. For my 30(b)(6) prep, I did not.
BY DESAI:
Q. Did you review any -- same question about reviewing documents. With respect to [REDACTED], did you review any documents to refresh your recollection in preparation for this deposition?
A. And my answer is for my preparation as a 30(b)(6) witness, I did not.
Q. But you did for your 30(b)(1)



preparation, to refresh your memory?
(Direction not to answer.)
MR. EMERICK: Objection; form. And you can exclude from your answer anything that counsel showed you. So you can say whether --
MR. DESAI: Are you telling him how to answer the question? Are you serious?
MR. EMERICK: You're asking him if I showed him documents. Just ask the question again.
MR. DESAI: Do you want me to ask you the questions? It sounds like you want to answer for the witness. I think you're crossing a line here in a big way.
Can we repeat the question.
(Record read as requested.)
MR. EMERICK: Objection; form. And I'll instruct not to answer, attorney-client.
MR. DESAI: Let's go back to Exhibit 4. It's the TLA annex.



Page 86

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  BY DESAI:
3        Q.   Are you there?
4        A.   Yes.
5        Q.   Could you turn to the page
6  that ends in 488 at the bottom right.
7        A.   488?
8        Q.   Yes.
9             Do you see the ███████
10 ████████████████████████████████
11 ████████████████████████████████
12 ████████████████████████████████
14       A.   Yes.
15       Q.   What is this ████ describing?
16       A.   So this ████████████████
17 ████████████████████████████████
18 ████████████████████████████████
19 ████████████████████████
21       Q.   What does it mean ████████
22 ██████████████████████
24            MR. EMERICK:  I'll caution the
25       witness, you can testify as to

Page 87

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2       facts, but any attorney-client
3       communication or analysis or
4       contract term you should exclude
5       from your answer.
6       A.   ████████████████████████
        ████████████████████████████████
        ████████████████████████████████
        ████████████████████████████████
        ████████████████████████████████
        ████████████████████████████████
        ████████████████████████████████
        ████████████████████████████████
18      Q.   ████████████████████████
        ████████████████████████
        ████████ ██████████████████
        ████████████████████████████
        ████████████████████████████████

Page 88

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ████████████████████████████████
3  ████████████████████████████████
   ████████████████████████████████
   ████████████████████████████████
8       Q.   Is there any other -- to your
9  knowledge, is there any other ████████
10 ████████████████████████████████
11        ████ in the Qualcomm-Arm TLA aside from
12 ████████████
13      A.   I'm sorry, would you mind
14 repeating that?
15      Q.   You know what, I'll skip that
16 question.  Don't worry about it.
17           MR. DESAI:  Why don't we pull
18      up tab 22.  And mark that as
19      Exhibit 7.
20      Q.   Before we go to that, let's go
21 back to the annex real quick, I have one
22 question.  That's Exhibit 4.
23           And what were -- strike that.
24           How does -- if we take, for
25 example, on the ████████

Page 89

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ████████████████████████████████
3  ████████████████████████████████
4  ███████████████████████.
5           Do you see that?
6       A.   Remind me of the page, if you
7  don't mind.
8       Q.   It's 488 at the bottom.
9       A.   488, okay.
10           Okay, I'm there.
11      Q.   So the ████████████████
12 ████████████████████████ Right?
13      A.   That's correct.
14      Q.   And how does that differ, if
15 at all, from the actual license fees that
16 were paid for ████
17      A.   So there was ████████████
   ████████████████████████████████
   ████████████████████████████████
   ████████████████████████████████
           ████. Otherwise we wouldn't know
   ████████████████████████████████

23 (Pages 86 - 89)



Page 90

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

3    Q.   So this was ████ ████████ Correct?

6        MR. EMERICK:  Objection; form.

7    A.   Yeah, I'm not sure I would
8  answer it that way.  I would say that
9  this was the agreement between Qualcomm
10  and Arm with respect to ████████ ████████

13    Q.   You mentioned that there was a
14  ████████ .  Is that right?

16        MR. EMERICK:  Objection; form.

17        (Simultaneous crosstalk.)

18    Q.   If you didn't understand, I'll
19  ask it again.

20    A.   You can just repeat it if you
21  want.  To be sure I understand.  Go
22  ahead.

23    Q.   I think you said that there
24  was ████████ ████████

Page 91

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

2  ████████ .
3  Is that right?

4    A.   That's my recollection, yes.

5    Q.   Okay.  And is that ████

7    A.   I'm trying to recall how
8  the -- this would have been, the
████████ .  So
11  obviously the ████████
           And it's not listed in
14  this annex.

15    Q.   Let me ask you this:  If we
16  were to ████████

21        MR. EMERICK:  Objection; form.

22    A.   I would expect normally that
23  it would.

24    Q.   All right.  We can move to
25  Exhibit 7.

Page 92

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

2        (Youseff Exhibit 7 for
3  identification, ████████

         production numbers
6  QCVARM_1014030 through
7  QCVARM_1014112.)

8  BY DESAI:

9    Q.   Do you have that in front of
10  you?

11    A.   Yes, I have it now.

12        MR. DESAI:  For the record
13  this is labeled QCVARM_1014030.

14    Q.   Have you seen this document
15  before?

16    A.   Yes.

17    Q.   Is this one you reviewed in
18  preparation for your 30(b)(6) deposition?

19    A.   No.

20    Q.   I'm going to go to page 8.

21        When was the last time you've
22  seen this document?

23    A.   I'm sure I've seen this within
24  the last six months.

25    Q.   Let's go to page 8.

Page 93

EHAB YOUSSEF - HIGHLY CONFIDENTIAL

2    A.   Okay, I'm there.

3    Q.   What is reflected in this
4  ████ that spans ██ pages?

5    A.   So this ████████

11    Q.   And so this does reflect
12  the -- ████████

14  that's on the next page.  Correct?

15    A.   I see ████████

18    Q.   These are the ████████

21  Correct?

22    A.   I'm going to look to see if
23  this is the latest. ████████



Page 94

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2       So to the best of my
3   recollection, this is the most recent.
4   So again, to the best of my recollection,
5   ███████████████████████████
███████
7       MR. DESAI:  Why don't we pull
8   up tab 29.  And we're going to mark
9   this as Exhibit 8.
10      (Youseff Exhibit 8 for
11  identification, email dated January
12  10, 2025, production numbers
13  QCVARM_0527544 through
14  QCVARM_0527545.)
15 BY DESAI:
16  Q.   Do you see that?
17  A.   I see it now.
18  Q.   Okay.  So this is Exhibit 8.
19  It's an email from Jeff Fonseca, it's
20  labeled QCVARM_0527544.
21      Have you seen this email
22  before?
23  A.   I haven't seen this specific
24  email.  This may have been part of an
25  email string.  But I haven't seen this

Page 95

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2   specific.
3   Q.   There is an attachment to the
4   email, I want to show you that.  It's tab
5   29.1.
6       MR. DESAI:  Mark it as Exhibit
7   9.
8       (Youseff Exhibit 9 for
9   identification, ███████████████
███     production numbers
11  QCVARM_0527546 through
12  QCVARM_0527548.)
13      THE WITNESS:  Okay, I see it.
14      MR. DESAI:  Hold on, my
15  computer just froze.  Give me a
16  second.
17      For the record, this is
18  labeled QCVARM_0527546.
19      MR. EMERICK:  And this
20  shouldn't be Exhibit 8.
21      MR. DESAI:  I'm sorry, Exhibit
22  9.
23      And this is a ███████████
24  ████  to Qualcomm.
25 BY DESAI:

Page 96

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2   Q.   Do you see that?
3   A.   Yes, I see that.
4   Q.   And is this a document you
5   reviewed in your 30(b)(6) preparation?
6   A.   Yes.
7   Q.   And this is ██████████████
█████████████████████████,
█████████████████████.  I think these are
10  called peripherals.  Is that right?
11  A.   That's right, we commonly
12  refer to these things sometimes as
13  peripherals.
14  Q.   And this is a -- ████████████
██████████████████████████████████
16  that we looked at earlier.  Correct?
17  Which was Exhibit 6.
18  A.   Give me one second, let me go
19  back and look at this, Exhibit 6.
20      Yes, Exhibit 6 is a different
21  offer.
22  Q.   And the amounts -- █████████
███████████████████████████████
███████████████████████████████
25  Correct?

Page 97

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1
2   A.   I'm sorry, can you repeat
3   that?  What are you asking me?
4   Q.   Right.
5   ████████████████████████████
██████████████████████████
████████████████████████████████
█████████  Right?
10  A.   Yeah, █████████████████████
████████████████████████  The
12  Exhibit 6 contained ████████████████
14  Q.   I understand.  I'm focused on
15  the peripherals.
16      The █████████████████████████
█████████████████████████████████
████████████████████████
████  Correct?
20  A.   Okay, I think I understand the
21  question.  So you're asking me if the
22  ████████████████████████████████████
████████████████████████████████████
██████████████████████████
██████████████████  Is that right?

25 (Pages 94 - 97)



Page 98

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2      Q.   That's right.
3      A.   And the answer is yes.
4      Q.   Okay.  And what is the reason
5  why Qualcomm -- sorry.
6          What is the reason that ████
7  ████████████████████████████████
8  ████████████████████████████████
9      A.   I'll answer it this way: ████
10 ████████████████████████████████
11 ████████████████████████████████
12 ████████████████████████████
13     The reason that the ████████
14 ████████████████████████████████
15 ████████████████████████████████
16 ████████████████████████████████
17 ████████████████████████████
18 ████████████████████████████
19 ████████████████████
20 ████████████████████████████████
21 ████████████████████████████████
22 ████████████████████████████████
23 ████████████████████████████████
24 ████████████████████████████████
25 ████████████████████████████████

Page 100

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ████████████████████████
3      Q.   Okay.  Going back to the
4  ████████████.  The sole reason for
5  ████████████████████████████████
6  ████████████████████████████████
7  ████████████████████████████████
8  ████████████████████████████████
9  ████████████████████████████████
10 ████████  Correct?
11     MR. EMERICK:  Objection; form.
12     A.   No.  I didn't say that's the
13 sole reason.
14     Q.   What are the other reasons
15 then?
16     A.   I ██████████████████████
17 ██████████████████████.  But what I can
18 tell you, for example, is that -- let me
19 just make sure.
20         So if you look at the --
21 sorry.  This is the ████████████████
22 ████████████████████████████████
23 ████████████  If you go again down to the
24 bottom and look at the ████████████
25 You'll see ████████████████████████

1  ████████████████████████████████
2  ████████████████████████████████
3  ████████████████████████████████
4  ████████████████████████████████
5  ████████████████████████████████
6      Q.   Where does -- let's go back to
7  the ████████████  That's Exhibit
8  6.  Are you there?
9      A.   Almost there.  Yes, I'm there.
10     Q.   ████████████████████████████
11 ████████████████████████████
12 ████████████████████████████████
13 ████  ████████████████████
14 ████  ████████████████  ████████
15 ██  ████████  ██████████  ████████
16 ████  ██████████  ████████
17 ████████
18     Q.   Yes.
19     A.   And you'll see some ██
20 ████████████████████  I believe that if
21 you look at number ██ it reads,
22 ████████████████████████████████
23 ████████████████████████████████
24 ████████████████████████████████

Page 101

1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ████████████████████████████████
3  ████████████████████████████████
4  ████████████████████████████████
5  ████████████████████████████████
6  ████████████████████████████████
7  ████████████████████████████████.
8      Q.   Any other reasons?  I think
9  we've got ████████████████████████
10 ████████████████████████████████
11 ████████  Are there any other reasons
12 why ████████████████████████████
13 ████████████████████████████████
14     A.   ████████████████████████████
15 ████████████████████████████████
16 ████████████████████████████████
17 ████████████████████████████████.
18 And the discussions between Qualcomm and
19 Arm ████████████████████████████
20 ████████████████████████████
21         So I only know what I can see.
22 And I know ████████████████ would have
23 increased it.
24 ████████████████████████████████

26 (Pages 98 - 101)



Page 102

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  ███████████.
3  Q.  Would there have been someone
4  who ████████████████
   ████████████████████
   ████████████████████
   ██████████ ██████?
9  A.  Someone would have ████████
   ██████████████
   ██████.
12  Q.  Who ████████?
13  Who ████████ne?
14  A.  So there is no one individual
15  ████████████████
   ████████████████
   ████████████████
   ████████████████████
   ████████████████
   ████████████
   ████████████
   ██████████
   ████████████

Page 103

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
   ████████████████
   ████████████████████
   ████████ ████████
   ████████████████
8  (Direction not to answer.)
9  MR. EMERICK:  Instruction not
10  to answer.
11  BY DESAI:
12  Q.  You're going to take that
13  instruction? I'll ask it again.
   ████████████████
   ████████ Exhibit, I think it's 9, which
17  is this ████████?
18  (Direction not to answer.)
19  MR. EMERICK:  Instruction not
20  to answer.
21  MR. DESAI:  I don't have any
22  more questions.  Thank you for your
23  time.
24  MR. EMERICK:  Nothing from me.
25  Thank you.

Page 104

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  THE VIDEOGRAPHER:  I'll take
3  us off then.  The time is 12:17
4  p.m. Pacific, and that concludes
5  the deposition.
6  (Time noted:  12:17 p.m. Pacific)
7  (Time noted:  3:17 p.m. Eastern)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 105

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1  EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2  STATE OF _____  )
3            ss:
4  COUNTY OF _____  )
5
6  I, EHAB YOUSSEF, the witness herein,
7  having read the foregoing testimony of
8  the pages of this deposition, do hereby
9  certify it to be a true and correct
10  transcript, subject to the corrections,
11  if any, shown on the attached page.
12
13
14
15  EHAB YOUSSEF
16
17  Subscribed and sworn to before me
18
19  This _____ day of _____, 2025.
20
21
22
23  _____
24  Notary Public
25

27 (Pages 102 - 105)

Page 106

```
1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2         C E R T I F I C A T E
3   STATE OF NEW YORK   )
                        : ss.
4   COUNTY OF NEW YORK  )
5
6      I, ERIC J. FINZ, a Shorthand
7   Reporter and Notary Public within and for
8   the State of New York, do hereby certify:
9      That EHAB YOUSSEF, the witness whose
10  deposition is hereinbefore set forth, was
11  duly sworn by me and that such deposition
12  is a true record of the testimony given
13  by the witness.
14     I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I
17  am in no way interested in the outcome of
18  this matter.
19     IN WITNESS WHEREOF, I have hereunto
20  set my hand this 27th day of June,
21  2025.
22
23
24        ERIC J. FINZ
25
```

Page 107

```
1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2         E X H I B I T S
3   DESCRIPTION                  PAGE
4   (Youseff Exhibit 1 for      10
5   identification, defendant Arm
6   Holdings PLC's objections and
7   responses to plaintiffs' notice
8   of 30(b)(6) deposition.)
9   (Youseff Exhibit 2 for      22
10  identification, Amended and
11  Restated Architecture License
12  Agreement, production numbers
13  ARM_00055357 through
14  ARM_00055399.)
15  (Youseff Exhibit 3 for      33
16  identification, Technology
17  License Agreement, production
18  numbers ARM_00103918 through
19  ARM_00103972.)
20  (Youseff Exhibit 4 for      34
21  identification, Annex 1,
22  production numbers ARM_00062474
23  through ARM_00062493.)
24
25
```

Page 108

```
1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2      E X H I B I T S (Continued)
3   DESCRIPTION                  PAGE
4   (Youseff Exhibit 5 for      59
5   identification, letter dated
6   September 27, 2024, production
7   numbers QCVARM_0573671 through
8   QCVARM_0573673.)
9   (Youseff Exhibit 6 for      60
10  identification,
11                     , production
12  numbers QCVARM_0526828 through
13  QCVARM_0526830.)
14  (Youseff Exhibit 7 for      92
15  identification, Fifteenth
16  Amended and Restated Master
17  Royalty Schedule, production
18  numbers QCVARM_1014030 through
19  QCVARM_1014112.)
20  (Youseff Exhibit 8 for      94
21  identification, email dated
22  January 10, 2025, production
23  numbers QCVARM_0527544 through
24  QCVARM_0527545.)
25
```

Page 109

```
1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2      E X H I B I T S (Continued)
3   DESCRIPTION                  PAGE
4   (Youseff Exhibit 9 for      95
5   identification,
6                     , production
7   numbers QCVARM_0527546 through
8   QCVARM_0527548.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

28 (Pages 106 - 109)

Page 110

```
 1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
 2          DIRECTIONS NOT TO ANSWER
 3                    PAGE
 4     (Direction not to answer.)      56
 5     (Direction not to answer.)      78
 6     (Direction not to answer.)      85
 7     (Direction not to answer.)      103
 8     (Direction not to answer.)      103
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 112

```
 1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
 2          INSTRUCTIONS TO WITNESS
 3
 4          Please read your deposition
 5   over carefully and make any necessary
 6   corrections.  You should state the reason
 7   in the appropriate space on the errata
 8   sheet for any corrections that are made.
 9          After doing so, please sign
10   the errata and date it.
11          You are signing same subject
12   to the changes you have noted on the
13   errata sheet, which will be attached to
14   your deposition.
15          It is imperative that you
16   return the original errata sheet to the
17   deposing attorney within thirty (30) days
18   of receipt of the deposition transcript
19   by you.  If you fail to do so, the
20   deposition transcript may be deemed to be
21   accurate and may be used in court.
22
23
24
25
```

Page 111

```
 1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
 2   REQUESTS FOR DOCUMENTS AND/OR
 3              INFORMATION
 4                    PAGE
 5     (Request for production.)      65
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 113

```
 1      EHAB YOUSSEF - HIGHLY CONFIDENTIAL
 2                    ERRATA
 3   I wish to make the following changes for
 4   the following reasons:
 5   PAGE LINE
 6   ____ ____ CHANGE _____
           REASON:_____
 7
       ____ ____ CHANGE _____
 8         REASON:_____
 9   ____ ____ CHANGE _____
           REASON:_____
10
       ____ ____ CHANGE _____
11         REASON:_____
12   ____ ____ CHANGE _____
           REASON:_____
13
       ____ ____ CHANGE _____
14         REASON:_____
15   ____ ____ CHANGE _____
           REASON:_____
16
       ____ ____ CHANGE _____
17         REASON:_____
18   ____ ____ CHANGE _____
           REASON:_____
19
       ____ ____ CHANGE _____
20         REASON:_____
21
     _____
22       EHAB YOUSSEF
     Subscribed and sworn to before me
23   this _____ day of _____, 2025.
24
25   _____
```

29 (Pages 110 - 113)

# Exhibit 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
2
3     QUALCOMM INCORPORATED,     §
      A DELAWARE CORPORATION,    §
4     QUALCOMM TECHNOLOGIES,     §   C.A. NO. 24-490-MN
      INC., A DELAWARE           §
5     CORPORATION,               §
                                 §
6        PLAINTIFFS,             §
                                 §
7     - AGAINST -                §
                                 §
8     ARM HOLDINGS PLC.,         §
      F/K/A ARM LTD., A U.K.     §
9     CORPORATION,               §
                                 §
10       DEFENDANT.              §
11        **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
12     ORAL AND VIDEOTAPED DEPOSITION OF AKSHAY BHATNAGAR
                      JULY 10, 2025
13
14
15
16     ORAL AND VIDEOTAPED DEPOSITION OF AKSHAY
       BHATNAGAR, produced as a witness at the instance of
       the Plaintiffs and duly sworn, was taken in the
17     above styled and numbered cause on Thursday,
       July 10, 2025, from 9:22 a.m. to 12:39 p.m., before
18     TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of
       Texas, reported by computerized stenotype machine,
19     at the offices of Kirkland & Ellis, LLP, 401
       Congress Avenue, Austin, Texas, pursuant to the
20     Federal Rules of Civil Procedure and any provisions
       stated on the record herein.
21
22
23
24
25     Job No. NY 7464214

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 38

14  I'm going to
14  caution you on the basis of a third-party
15  confidentiality obligation.
16       The question was "do you recall."
17  Just answer that as a "yes" or "no" and then let's
18  be careful about ▓▓▓▓ we're talking
19  about and which companies we're talking about.
20       So just answer that question "yes" or
21  "no," do you recall.
22       A.  No.
23       Q.  What was the ▓▓▓▓ for
24  ▓▓▓▓
25       MR. EVANGELATOS:  Are you asking him

Page 39

1  ▓▓▓▓
2  ▓▓▓▓?
3       MR. SCOTT:  I'm asking what the ▓▓▓▓
4  ▓▓▓.
5       MR. EVANGELATOS:  Well, so, I need to
6  instruct him on a third-party confidentiality.  So
7  if you want to narrow it first and see if he
8  recalls, and then we can take it by by -- company
9  by company.
10       MR. SCOTT:  For the record, I don't
11  think that it's appropriate for you to instruct him
12  not to answer on the basis of a purported
13  third-party confidentiality.
14       MR. EVANGELATOS:  So, look, we told
15  you yesterday ▓▓▓▓ has objected to revealing
16  their confidential information.  So that -- we
17  understand they're going to file something
18  imminently.  And so we can't reveal certain
19  information based on that dispute.
20       MR. SCOTT:  And they filed something?
21       MR. EVANGELATOS:  My understanding is
22  they're filing something any day now.  And so they
23  have objected.  And without -- on the basis of that
24  objection we're going to instruct him not to answer
25  about ▓▓▓▓ confidential information.

Page 40

1       So I'm just asking you, if you want
2  to ask questions about the others that have not
3  objected, go ahead.  If you want to probe that, go
4  ahead.  But as to ▓▓▓▓ in particular, I do need
5  to instruct him on that.
6       MR. SCOTT:  I just want to make clear
7  for the record, you're instructing your witness not
8  to answer based on your belief that a third-party
9  may file for a protective order in the future?
10       MR. EVANGELATOS:  No, that's not
11  accurate.  I'm instructing -- specifically as to
12  ▓▓▓▓  I've told you ▓▓▓▓ has informed us
13  that they object to that disclosure and they will
14  file something.  I don't know off the top of my head
15  if they filed something yet.  If -- because on the
16  basis of that dispute, I will instruct him not to
17  answer as to ▓▓▓▓
18       MR. SCOTT:  Okay.  Just for the
19  record, we believe that instruction is improper and
20  we will hold the deposition open.
21       MR. EVANGELATOS:  Okay.  We can agree
22  to disagree.
23       MR. SCOTT:  Great.
24       Q.  Let's see.  So just getting back to --
25  you were testifying about the guidance you received

Page 41



8  correctly?
9       A.  So, again, these discussions were more
10  than a year back, or around a year back, so I may
11  not remember the specific works.
17       Q.  I'm -- I'm -- I'm asking what they told
18  you at this time, and not what you think they would
19  have told you or presumed that they might have told
20  you.  So I just want to restate the question.
24       A.

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 46

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?
5        MR. EVANGELATOS:  I'm -- I'm going to
6 caution you to the extent he's asking about the
7 contents of that document, that I'm going to
8 instruct you on privilege and third-party
9 confidentiality grounds not to reveal the contents
10 of the document.
11        If there's any nonprivileged or piece
12 of the document or information in the document that
13 is not subject to a third-party confidentiality
14 obligation, in other words, ▮▮▮▮▮▮ information,
15 speak about it at a high level.
16        MR. SCOTT:  And, again, for the
17 record, we think that -- that third-party
18 confidentiality instruction is improper, but we can
19 take it under advisement.  We don't have to keep --
20        MR. EVANGELATOS:  Yeah.  Sure.  We
21 take -- we'll take our (unintelligible).  I
22 understand your -- I understand your objection to
23 that.
24        MR. SCOTT:  I understand your
25 position as well.

Page 47

1        MR. EVANGELATOS:  Yeah.  Yeah.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

Page 48

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23        (Discussion off the written record.)
24        MR. EVANGELATOS:  Do you want to take
25 a break now?  We've been going for a little while.

Page 49

1 1        MR. SCOTT:  Yeah.  We can take a
2 2 break.
3 3        MR. EVANGELATOS:  So let's go --
4 4        THE VIDEOGRAPHER:  Going off the
   10:35 5    record.  The time is    .
5 6        (Break.)
6 7        THE VIDEOGRAPHER:  Back on the
7 8 record.  The time is 10:48.
8 9    Q.   Before we get started.  Did you discuss
9 10 your testimony with counsel while we were on break?
10 11   A.   No.
11 12   Q.   Thank you.
12 13        If we could stick with QCX 208, that
13 14 email thread.  Actually, strike that.
14 15        I believe you testified that ▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Do you remember
16 17 that?
17 18   A.   Sorry.  With respect to this --
18 19   Q.   Ignore the -- I'm sorry.  Ignore the --
19 20   A.   Oh, okay.
20 21   Q.   -- email thread.
21 22        You -- you -- you testified earlier that
22 23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮.  Do you remember that?
24
25 25   A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 (Pages 46 - 49)

# Exhibit 11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD.,

          Plaintiff,

    v.

QUALCOMM INC., QUALCOMM
TECHNOLOGIES, INC., and NUVIA, INC.,

          Defendants.

C.A. No. 22-1146-MN

**FILED UNDER SEAL**

## PLAINTIFF ARM LTD.'S BRIEF IN OPPOSITION TO DEFENDANT NUVIA, INC.'S RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW

Dated: February 14, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
AGAZA@YCST.COM
RVRANA@YCST.COM
SWILSON@YCST.COM

*Attorneys for Plaintiff Arm Ltd.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

NATURE AND STAGE OF PROCEEDINGS ....................................................................... 2

STATEMENT OF FACTS .................................................................................................... 2

LEGAL STANDARDS ......................................................................................................... 5

ARGUMENT ........................................................................................................................ 5

I.      ARM PRESENTED SUFFICIENT EVIDENCE OF HARM. ...................................... 5

        A.      Arm Does Not Need to Show Appreciable and Actual Damages. ....................... 5

        B.      There is Sufficient Evidence of Actual Damages. ................................................ 8

II.     ARM PRESENTED SUFFICIENT EVIDENCE NUVIA BREACHED...................... 10

        A.      Nuvia's Code is a Derivative of ARM Technology............................................. 10

        B.      Nuvia's Excuses for Ignoring Its Contractual Obligations Fall Flat.................. 14

                1.      *Nuvia and Arm Technology Are Not Mutually Exclusive.* ....................... 14

                2.      *It Is Irrelevant That the Arm ARM Is Public*............................................ 15

                3.      *Nuvia's Overbreadth Argument is Baseless.* ........................................... 17

                4.      *Nuvia's Focus on Opcodes and Register Definitions Is Wrong.* ............. 18

                5.      *Partially Complete ACCs Are Derivatives of Arm Technology*............... 20

CONCLUSION..................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguilera v. Pirelli Armstrong Tire Corp.*,
    223 F.3d 1010 (9th Cir. 2000) ...................................................................................7

*Bauer Bros. v. Nike, Inc.*,
    159 F. Supp. 3d 1202 (S.D. Cal. 2016) ......................................................................8

*Darbun Enterprises, Inc. v. San Fernando Cmty. Hosp.*,
    239 Cal. App. 4th 399 (2015) .....................................................................................6

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*,
    No. 1-04-CV-031829, 2012 WL 12987159 (Cal. Super. Jan. 09, 2012) ............9 n.2

*Elation Sys., Inc. v. Fenn Bridge LLC*,
    71 Cal. App. 5th 958 (2021) ...............................................................................1, 6, 7

*Fed. Deposit Ins. Corp. v. Cap. Funding Corp.*,
    No. SA CV 14-00967-AB (ANx), 2015 WL 13916255 (N.D. Cal. Aug. 28,
    2015) .........................................................................................................................10

*Fisher v. Hampton*,
    44 Cal. App. 3d 741 (1975) ........................................................................................8

*Jamieson v. City Council of the City of Carpinteria*,
    204 Cal. App. 4th 755 (2012) ...................................................................................11

*Kids' Universe v. In2Labs*,
    95 Cal. App. 4th 870 (2002) .......................................................................................8

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
    107 Cal. App. 4th 516 (2003) ...................................................................................12

*Lundy v. Facebook Inc.*,
    No. 18-cv-06793, 2021 WL 4503071 (N.D. Cal. Sept. 30, 2021) ..............................6

*Mancini v. Northampton*,
    836 F.3d 308 (3d Cir. 2016) .......................................................................................5

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
    No. 09-80-LPS, 2015 WL 2379485 (D. Del. May 18, 2015) ...................................10

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) ......................................................................7

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC,*
  3 Cal. 5th 744 (2017) .............................................................................................................11

*Raiser v. Ventura Coll. of L.,*
  488 F. App'x 219 (9th Cir. 2012) ...........................................................................................6

*Rodriguez v. American Technologies, Inc.,*
  136 Cal. App. 4th 1110 (2006) .....................................................................................16, 17

*Sun Microsystems, Inc. v. Microsoft Corp.,*
  87 F. Supp. 2d 992 (N.D. Cal. 2000) ................................................................................9 n.2

*Sweet v. Johnson,*
  169 Cal. App. 2d 630 (1959) ...............................................................................................6, 7

*T.N. Incorporation, Ltd. v. Fidelity Nat'l Info. Servs., Inc.,*
  No. 18-5552, 2022 WL 910092 (E.D. Pa. Mar. 29, 2022) ...................................................17

*Tucker v. PNC Bank, N.A.,*
  No. B323708, 2024 WL 4703474 (Cal. Ct. App. Nov. 7, 2024)............................................8

*Unicom Sys., Inc. v. Farmers Grp., Inc.,*
  No. 04-4604, 2007 WL 9705875 (C.D. Cal. June 12, 2007) ...........................................15 n.4

*WDT-Winchester v. Nilsson,*
  27 Cal. App. 4th 516 (1994) .................................................................................................11

*Estate of Wemyss,*
  49 Cal. App. 3d 53 (1975) ....................................................................................................17

**Statutes**

Cal. Civ. Code § 1442...........................................................................................................15 n.4

Cal. Civ. Code § 3360............................................................................................................6, 7

**Other Authorities**

Webster's Dictionary (Merriam-Webster.com) ...........................................................................13

Williston on Contracts § 38:13 (4th ed.).............................................................................15 n.4

## INTRODUCTION AND SUMMARY OF ARGUMENT

Nuvia's motion for judgment as a matter of law misstates California law and rests on an erroneous interpretation of the Nuvia ALA. Once Arm terminated that contract, Nuvia had to "immediately discontinue any use and distribution of all ARM Technology" and "any products embodying such technology" and "either destroy or return" any "ARM Technology or derivatives" in its possession. (JTX-0001 § 15.1(a).) Nuvia does not dispute that it set out to design an Arm-compliant CPU core based on Arm's v8-A architecture, part of the "Arm Technology" delivered under the ALA. Nuvia therefore should have returned or destroyed the pre-acquisition code for its CPU design when Arm terminated the Nuvia ALA, rather than continuing to use that code in Qualcomm products. Nuvia makes the remarkable argument that the only derivatives of Arm Technology in its pre-acquisition code were a few opcodes and register definitions it could easily swap out. If Arm's industry-leading architecture added so little, it is hard to understand why Nuvia paid millions for a license. And it is equally hard to understand why Nuvia ever had a license to Arm's architecture under its narrow reading of the contract. The truth is Nuvia's CPU design and RTL code are derivatives of Arm's architecture and Arm Technology through and through.

Contrary to Nuvia's arguments, Arm presented sufficient evidence of harm. Nuvia erroneously asserts that Arm failed to provide evidence of appreciable and actual damages, and therefore cannot prevail on a breach of contract claim. But the law is well-settled in California that a plaintiff need not show appreciable and actual damages to prevail on a breach of contract claim. Nuvia's contrary arguments were squarely rejected in *Elation Systems, Inc. v. Fenn Bridge LLC*, 71 Cal. App. 5th 958, 964-67 (2021), a decision Nuvia never mentions. Moreover, Arm showed actual harm via evidence that Nuvia's breach caused Arm to receive lower royalty payments.

Arm also presented sufficient evidence that Nuvia breached § 15.1. The code Qualcomm acquired from Nuvia constituted the bulk of the code for what ultimately became an Architecture

1

Compliant Core ("ACC"). That falls squarely within the bounds of the "ARM Technology or derivatives" that Nuvia must return or destroy upon termination. (JTX-0001 § 15.1(a).) The Nuvia ALA is explicit that "ARM Technology and derivatives … includ[es] Architecture Compliant Cores." (JTX-0001 § 1.8.) Nuvia has no answer grounded in the language of the contract for why its obligation to return or destroy an ACC would not extend to a partially completed ACC. Rather than meaningfully engage with the contract language, Nuvia offers a grab-bag set of reasons for rewriting the terms of the contract. The Court should enforce the Nuvia ALA as-written, not a version of the agreement Nuvia now wishes it had negotiated.

## NATURE AND STAGE OF PROCEEDINGS

On December 16, 2024, the Court commenced a four-day jury trial, asking the jury to decide, among other things, whether Nuvia breached its contract with Arm ("Question 1"). (D.I. 569.) On December 20, the jury deadlocked on the issue, (Trial Tr. ("Tr.") 1000:3-1004:10), and the Court declared a mistrial (*id*. at 1017:5-1021:3). On January 17, 2025, Nuvia moved for judgment as a matter of law on that issue. (D.I. 597.) That same day, Arm moved for JMOL and a new trial as to Question 1, as well as the other questions presented to the jury. (D.I. 595.)

## STATEMENT OF FACTS

Arm developed an industry-leading instruction set architecture ("ISA") to facilitate energy-efficient, yet fast, processors. (Tr. 260:7-261:24, 267:19-268:8, 442:16-443:3, 512:6-14.) Stated simply, ISAs are a list of instructions that a CPU and software must both know how to perform. (Tr. 478:10-22.) These instructions enable essential compatibility between electronic devices and software, allowing software (*i.e.*, Microsoft Word) to "speak" the same language as a CPU for any Arm-based device (*e.g.*, smartphone, computer, tablet). (Tr. 260:7-261:24, 681:9-22, 684:20-685:8, 691:7-13.) Arm codifies its instructions in its "architecture reference manual," or "ARM," which engineers use to design CPUs. (Tr. 479:16-25.)

Arm monetizes its instruction set architecture through licenses. (Tr. 266:3-23.) These licenses—and the intellectual property they monetize—are central to Arm's business. (Tr. 263:22-264:13, 277:9-25.) One type of license Arm offers—and the one at issue here—is called an "Architecture License Agreement," or "ALA," in which Arm licenses its intellectual property (*i.e.*, its instruction set architecture) so that the licensee can write RTL (a software language used in designing CPUs) for Arm-compliant CPUs or cores. (Tr. 266:6-9.)

Nuvia was founded in February 2019 by engineers seeking to build Arm-compliant server CPUs. (Tr. 161:19-162:5, 421:2-11, 381:12-382:4, 388:20-22; PTX-103 at 2.) Nuvia told investors that it intended to build an "ARM v8" processor (PTX-0103 at 2), describing the license internally as a "critical" piece of its business plan. (PTX-0105 at 3.) After months of negotiation, (Tr. 384:3-5), Arm and Nuvia signed an ALA agreement for Nuvia to design its own Arm-compliant cores. (JTX-0001; JTX-0002; JTX-0005.) In the end, Nuvia paid $22 million of its start-up funds to acquire a license so that it could generate RTL to build and sell an ACC. (Tr. 440:7-10.) Contrary to Nuvia's efforts to treat the Nuvia ALA as an afterthought or a narrow license grant to 30 or so pages of supplemental material, this evidence shows that the Nuvia ALA was the foundation for Nuvia's efforts to develop an Arm-compliant CPU.

During negotiations, Arm and Nuvia agreed that the ALA would be "NULL" if Nuvia were acquired. (PTX-0122.) The Nuvia ALA imposed certain obligations on Nuvia if Arm terminated. Under Section 15.1(a), Nuvia had to stop using "ARM Technology," "ARM Confidential Information," and "any products embodying such technology or information." (JTX-0001 § 15.1(a).) Section 15.1(a) also required Nuvia to "destroy or return" any "ARM Technology," "ARM Confidential Information," or "derivatives" of Arm Technology. (*Id.*)

3

After reaching agreement on an ALA, Nuvia began work on an Arm-compliant CPU. Between 2019 and 2021, Nuvia developed RTL code for a processor called "Phoenix." (Tr. 390:8-24.) Nuvia intended to develop an ACC—which is expressly identified as a derivative of Arm Technology—under the Nuvia ALA. (Tr. 390:8-17 ("After Nuvia signed this Architecture License Agreement with Arm, Nuvia worked on building some RTL code that was known as Phoenix, right? A. Yes, the code name of the processor was Phoenix, and it was RTL that was written for it, yes. Q. And you said the plan was for that to be an architecture compliant core, that meant that it would be able to handle all of the ARMv8 Arm instructions, right? A. It was meant to be an architecture compliant core, but it was not yet an architecture compliant core.")

Nuvia's relationship with Arm soured in 2021, when Nuvia was acquired by Qualcomm. (PTX-0212 at 1-2; PTX-0234 at 2; Tr. 172:8-173:7, 216:14-23.) Pursuant to § 16.3 of the Nuvia ALA, Nuvia (through Qualcomm) asked for Arm's consent to assign the Nuvia ALA and code to Qualcomm. (Tr. 177:17-21; PTX-0253 at 1-2; PTX-0268.) Even though Arm did not consent (PTX-0240; PTX-0247; PTX-0260 at 2; Tr. 180:20-181:7, 226:21-24), Qualcomm and Nuvia transferred Nuvia's pre-acquisition code to Qualcomm, in breach of the Nuvia ALA. (Tr. 409:16-21, 410:2-21, 412:9-20, 552:9-20, 809:1-12, 810:1-21.)

After good-faith attempts at resolution of the parties' dispute, Arm terminated the Nuvia ALA, effective March 1, 2022. (JTX-0008.) Arm's termination required Nuvia to cease using and destroy ARM Technology, ARM Confidential Information, and derivatives of and products embodying ARM Technology. (JTX-0001 § 15.1.) Nuvia and Qualcomm, however, did not stop use of or destroy Nuvia's pre-acquisition code. (Tr. 409:16-21, 824:21-24; PTX-0650 at 1.) Instead, Qualcomm incorporated pre-acquisition Nuvia code into products it continues to sell today. (Tr. 409:16-21, 412:9-20, 552:9-20, 824:21-24.)

## LEGAL STANDARDS

JMOL is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Mancini v. Northampton*, 836 F.3d 308, 314 (3d Cir. 2016). The Court "may not weigh the evidence, determine the credibility of witnesses, or substitute [its] version of the facts for the jury's version." *Id.*

## ARGUMENT

### I.    ARM PRESENTED SUFFICIENT EVIDENCE OF HARM.

Nuvia contends Arm cannot establish breach, given the need to show "appreciable and actual damage" from the breach. (D.I. 598 ("Br.") at 4.) But Nuvia's argument misinterprets California law: well-settled precedent makes clear that Arm does not need to show actual damage from Nuvia's breach to prevail on a breach of contract claim; the breach itself is harm enough. Further, Arm presented sufficient evidence establishing that Nuvia's breach of the Nuvia ALA harmed Arm by resulting in lower royalty payments from Qualcomm for products based on pre-acquisition Nuvia code.

#### A.    Arm Does Not Need to Show Appreciable and Actual Damages.

Nuvia's argument that Arm needs to show appreciable and actual damages stumbles out of the gate. As an initial matter, Nuvia forgets that Arm sought specific performance, not monetary damages. (*See* D.I. 1 at 18; Tr. 101:2-7 ("[W]e're not seeking damages from the jury as a remedy, we're going to ask Your Honor for specific performance.").) When a plaintiff seeks specific performance, as here, it generally must show (among other things) that there is no "remedy at law"—i.e., there are *no* adequate and quantifiable appreciable or actual damages. *See Darbun Enters., Inc. v. San Fernando Cmty. Hosp.*, 239 Cal. App. 4th 399, 409 n.5 (2015) (listing elements of breach of contract claim seeking specific performance). Nuvia's argument flips this element on

its head, and tries to put Arm in a catch-22 by asserting that Arm is "required to identify 'appreciable and actual damage[s]'" for purposes of breach, but having done so, "the availability of damages is fatal to the specific-performance remedy Arm sought." (Br. at 4, 6.) This is contrary to governing California law.

Whether seeking monetary damages or specific performance, California law is clear that Arm need not show actual damages for purposes of establishing breach. The "inability to show actual damages does not preclude recovery for breach of contract." *Raiser v. Ventura Coll. of L.*, 488 F. App'x 219, 222 (9th Cir. 2012); *Lundy v. Facebook Inc*., No. 18-cv-06793, 2021 WL 4503071, at *2 (N.D. Cal. Sept. 30, 2021) ("[A]n inability to show actual damages does not preclude recovery for breach of contract under California law."). Instead, a plaintiff may prevail on a breach of contract claim even where there is "no appreciable determinant to the party affected," because a "violation of a contractual right" supports a finding of breach and would justify at least nominal damages. *Elation Sys., Inc. v. Fenn Bridge LLC*, 71 Cal. App. 5th 958, 965 (2021); Cal. Civ. Code § 3360 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages"). This has been the law in California for more than sixty years. *See, e.g.*, *Sweet v. Johnson*, 169 Cal. App. 2d 630, 632 (1959) ("A plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted upon him."). While Arm presented evidence of much more than nominal damages, these principles suffice to reject Nuvia's argument.

Nuvia ignores this well-settled law, instead relying exclusively on the Ninth Circuit's decision in *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010 (9th Cir. 2000). (Br. at 4.) But California state and federal courts have repudiated *Aguilera* as out-of-step with California law. *See, e.g.*, *Elation*, 71 Cal. App. 5th at 964-67; *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F.

Supp. 3d 1218, 1258-59 (N.D. Cal. 2022). In *Elation*, the California Court of Appeal specifically rejected Nuvia's argument that a plaintiff must show "appreciable and actual damage" from the breach. 71 Cal. App. 5th at 964-67. Like Nuvia here, the defendant in *Elation* grounded its argument for an appreciable-harm requirement in the Ninth Circuit's *Aguilera* decision. *Id.* at 966-67. *Elation* rejected *Aguilera*'s reasoning, because it failed to follow "section 3360 and *Sweet*" and did not "consider[] the availability of nominal damages in the absence of actual damages." *Id.* at 967. And, in case there were any doubt about *Elation*'s reach, a federal court in *Meta Platforms* made clear that it was *Elation*, and not *Aguilera*, which controlled, stating that there is "no convincing evidence that the California Supreme Court would decide this issue differently from the *Elation Systems* court's conclusion." *See Meta Platforms*, 605 F. Supp. 3d at 1259.

That conclusion forecloses Nuvia's argument. As *Elation* held, even "[w]hen a breach of duty has caused no appreciable detriment to the party affected," the party can still win its breach claim "because failure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual damages." *Elation*, 71 Cal. App. 5th at 965-66. Arm presented sufficient evidence that Nuvia breached the Nuvia ALA for the reasons explained in § II, *infra*. Arm therefore has presented sufficient evidence of harm, based on the breach alone. *Sweet*, 169 Cal. App. 2d at 632; *Elation*, 71 Cal. App. 5th at 965-66 (noting party with no actual damages may still seek specific performance); (*see also* D.I. 1 at 26 (seeking "damages incidental to specifical performance"); Tr. 91:11-16 (explaining that Arm disclosed its theory that Nuvia "breached the deal so [Arm] ha[s] been harmed."); Tr. 850:21-23).

Nuvia also asserts that this legal proposition was "reflected in an uncontested jury instruction." (Br. at 4.) Not so. The jury instruction simply states that Arm must prove "Arm suffered harm"—not appreciable or actual damages. (*See* Tr. 885:20-23; *see also* D.I. 568 at 6.)

Nuvia mentions two other cases in passing, but both are inapposite. *Behnke v. State Farm Gen. Ins. Co.* turned on a failure to prove a breach that might support even nominal damages. 196 Cal. App. 4th 1443, 1468 (2011); *Tucker v. PNC Bank, N.A.*, No. B323708, 2024 WL 4703474, at *5 (Cal. Ct. App. Nov. 7, 2024) (explaining that nominal damages could not be awarded where plaintiff "did not prove a breach") (unpublished). And *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.* focuses on causation, in terms of whether there are "damages *resulting from the breach.*" 101 Cal. App. 4th 1038, 1060 (2002) (emphasis in original).

### B.    There is Sufficient Evidence of Actual Damages.

Even if Arm had to show appreciable and actual damages, the evidence at trial established that Nuvia's breach caused Arm damages. A plaintiff can show actual damages by showing lost profits, *Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 883 (2002), including lost royalty payments resulting from a breach, *Fisher v. Hampton*, 44 Cal. App. 3d 741, 747 (1975); *Bauer Bros., LLC v. Nike, Inc*., 159 F. Supp. 3d 1202, 1213 (S.D. Cal. 2016).

Here, evidence in the record shows that Nuvia's breach caused Arm to lose royalty payments. Arm wanted Qualcomm to pay the Nuvia rates for pre-acquisition Nuvia code used in Qualcomm products. (Tr. 228:8-18, 229:15-24, 247:11-248:4; PTX-0260.) Qualcomm, however, refused to pay those rates. (Tr. 223:20-21.) Arm therefore gave Qualcomm an option: pay the higher Nuvia rates, or Arm would exercise its rights under the contract and require Qualcomm to destroy the Nuvia code and start over. (Tr. 228:8-18, 229:15-24, 247:11-248:4; PTX-0260.)

In either scenario, if Nuvia had not breached its termination obligations, Arm would have received higher royalty rates. In the first scenario, Qualcomm would have paid the Nuvia ALA rates, which were "multiple times higher," (PTX-0277; Tr. 228:19-229:5, 735:10-12), than Qualcomm's rates. (*Compare* JTX-0005 at 10-11 (Nuvia royalties), *with* JTX-0011 at 20 (Qualcomm royalties).) In the second scenario, Qualcomm would have used CPUs licensed under

its TLA agreement with Arm, for which Qualcomm paid higher royalty rates than those in its ALA. (Tr. 229:8-14; PTX-0350 at 5 (Qualcomm projecting that it could save as much as "~$1.4B annually" in licensing costs if its ALA rates were applied rather than TLA rates).) By instead paying the Qualcomm ALA rates, Arm could lose $50 million or more in royalty payments per year. (Tr. 293:1-19; DTX-144.) This more than supports a jury verdict on harm.

Nuvia asserts that the Court precluded Arm from relying on this theory. Not so. At trial, the Court asked Arm whether it "disclose[d] that [it was] going to argue [harm from different royalty rates] during discovery." (Tr. 96:2-4, 102:1-7.) The answer is "yes." While Arm seeks specific performance (D.I. 1 at 18; Tr. 101:2-7), Arm made clear in discovery that *some* of its harm is quantifiable.[1] In Arm's response to an interrogatory asking why adequate damages were not ascertainable, Arm noted that "prospective monetary damages" were difficult to calculate. (D.I. 535, Ex. B at 61-62 (Arm Resp. to Interrog. No. 8).) But Arm also stated that "Defendants' anticipated underpayment of royalties owed to Arm" had harmed it and were calculable, even if additional harms—including the harm to Arm's business model—could not be remedied by money alone. (*Id.* at 62); *see also* Tr. 277:18-25 (Arm's CEO Rene Haas testifying that Arm needed to enforce its rights against Qualcomm's unlicensed use "as Arm is an IP company . . . and contracts are the only tool that we have to protect our inventions.").) Accordingly, Arm disclosed that the

---

[1] As Arm has consistently maintained, monetary compensation for lost royalties would not be adequate to compensate for the full harm that Defendants' breach imposes on Arm's licensing ecosystem. *See, e.g.*, *DVD Copy Control Ass'n v. Kaleidescape, Inc.*, No. 1-04-CV-031829, 2012 WL 12987159, at *26-27 (Cal. Super. Jan. 9, 2012) (finding irreparable harm where "an unaddressed breach of the License Agreement would likely beget follow-on breaches" that would "compromis[e] DVDCCA's authority to enforce the rules going forward"); *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992, 997 (N.D. Cal. 2000) (finding irreparable harm where defendant's "unauthorized distribution of incompatible implementations" of plaintiff's technology threatened to "undermine" plaintiff's compatibility goals and harm relationships with licensees).

lost royalty rates had harmed it, and Nuvia was on notice that Arm would present evidence on differing royalty rates. (Tr. 91:17-92:15.) Nuvia cannot now ask the Court to ignore evidence presented to the jury. *Masimo Corp. v. Philips Elec. N. Am. Corp.*, C.A. No. 09-80-LPS, 2015 WL 2379485, at *20 (D. Del. May 18, 2015) ("[C]hallenges to . . . evidence are improper on a JMOL motion."). This is particularly true when Nuvia itself raised and emphasized the difference in royalty rates in its examinations. (*See, e.g.*, Tr. 293:1-19.)

Qualcomm's suggestion in a footnote that the jury's finding on Qualcomm's license defense and counterclaim somehow precludes breach is also wrong. First, that question is subject to Arm's Rule 50(b) motion and motion for a new trial; Nuvia's argument is thus contingent on the outcome of those motions. Moreover, even if Qualcomm were licensed, Nuvia has independent obligations under the termination provisions that trump any general license. *See Fed. Deposit Ins. Corp. v. Cap. Funding Corp.*, No. SA CV 14-00967-AB (ANx), 2015 WL 13916255, at *6 n.4 (N.D. Cal. Aug. 28, 2015) ("Distinct contracts impose distinct legal obligations, and, upon their breach, give rise to distinct claims for relief."). Nuvia cites no authority that supports its assumption that a license provided to one party might override more specific and independent contractual obligations for another.

## II.    ARM PRESENTED SUFFICIENT EVIDENCE NUVIA BREACHED.

Arm presented more than sufficient evidence that Nuvia breached § 15.1. As Arm explained in its pending post-trial motion, the evidence and the language of the contract in fact require judgment as a matter of law in Arm's favor on this issue. (D.I. 596 at 9-10.)

### A.    Nuvia's Code is a Derivative of ARM Technology.

The pre-acquisition Nuvia code is a "derivative" of "ARM Technology," as defined by the Nuvia ALA, and therefore is directly subject to Nuvia's obligations under § 15.1. In interpreting a contract, the Court begins with the words themselves. *Jamieson v. City Council of the City of*

*Carpinteria*, 204 Cal. App. 4th 755, 761 (2012). Where the language is "clear" and "explicit," this language "controls [the Court's] interpretation." *WDT-Winchester v. Nilsson*, 27 Cal. App. 4th 516, 528 (1994). The Court's goal is to understand the intention of the parties and interpret the contract with "reference to the circumstances under which it was made and the matter to which it relates." *Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 752 (2017).

Upon termination by Arm, Section 15.1 generally requires Nuvia to stop using and destroy technology developed under the Nuvia ALA. Specifically, Section 15.1 requires Nuvia to "immediately discontinue" any "use and distribution" of (1) "ARM Technology," (2) "ARM Confidential Information," or (3) "any products embodying such technology or information." (JTX-0001 § 15.1(a).) Section 15.1 also requires Nuvia to "destroy or return to ARM" any "ARM Confidential Information" and "any ARM Technology or derivatives," including "any translation, modification, compilation, abridgment or other form in which the ARM Technology has been recast, transformed, or adapted." (JTX-0001 § 15.1.) The ALA expressly identifies an ACC as a non-limiting example of a "derivative" of "Arm Technology." (JTX-0001 § 1.8.)

Arm presented ample evidence from which a jury could conclude that "ARM Technology" includes the Arm architecture as codified in the Arm ARM. "ARM Technology"—which is directly subject to discontinuance and destruction under § 15.1, regardless of whether it is "Arm Confidential Information"—is defined as "the technology identified in *each* Annex 1 and any Updates thereto delivered by ARM to LICENSEE." (*Id.* § 1.5.) The September 2019 Annex 1 and March 2020 Annex 1 each contain a list of Arm Technology delivered to Nuvia, including the ARMv8-A Architecture itself (delivered under the September Annex 1) and the Arm ARM (delivered under the March Annex 1). (JTX-0002 at 2-3; JTX-0005 at 2-3.) Annex 1 identifies Part AR100-DA-70000 as part of the Arm Technology delivered under the ALA (JTX-0002 at 2;

JTX-0005 at 2) which both Mr. Williams and Mr. Abbey testified included the Arm ARM (Tr. 414:5-11; Tr. 169:3-22). Annex 1 also defines "Armv8-A Architecture Reference Manual" (which witnesses testified referred to the Arm ARM, *see* Tr. 370:7-15) as the documentation in Section 1 of Annex 1. (*See* JTX-0005 § A6.) And the contract defines "Documentation" to include the Arm ARM (JTX-0005 at § A.15), lists "Documentation" as one of the deliverables (*id.* at 2), and makes clear the Arm ARM is "Included Technology" based on its role in defining the Arm v8-A profile (*id.* at §§ A.18, A.9).

Taking a step back, that the Arm architecture and ARM is "ARM Technology" is inescapable. Nuvia wanted, and negotiated for, a license to make and sell products compliant with the Arm architecture's instruction set. (Tr. 381:9-182:25; 388:16-18; 422:15-24.) Nuvia, of course, could have chosen to follow another instruction set, (Tr. 685:13-22), but didn't. The Nuvia ALA gives Nuvia a license to use "ARM Technology." (JTX-0001 § 2.1.) If the Arm ARM and Arm's instruction set are not "ARM Technology" in the contract, then Nuvia never got a license to use the Arm architecture or ARM, and it would not be clear why Nuvia was paying millions of dollars to Arm for an "architecture" license. *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 526 (2003) ("[C]ourts must give a 'reasonable and commonsense interpretation' of a contract consistent with the parties' apparent intent.").

Arm also presented sufficient evidence for a jury to conclude that the Nuvia code is a "derivative" of "ARM Technology" like the v8-A architecture and the Arm ARM. (*See* Tr. 482:14–19.) The examples of derivatives in the ALA confirm the term is broad. The Nuvia ALA provides that "derivatives" of Arm Technology include "any translation, modification, compilation, abridgement or other form in which the ARM Technology has been recast, transformed or adapted." (JTX-0001 § 1.8.) This is consistent with the ordinary and popular

definition of "derivative": something "made up of or marked by derived elements." (*Derivative*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/derivative (last visited Feb. 14, 2025).) Nuvia's pre-acquisition RTL code—which was developed based on the Arm architecture as specified by the Arm ARM—is a "translation" or other "form" (*i.e.*, implementation) of Arm's instruction set that has been "recast" or "adapted" into something else (a core design). (JTX-0001 § 1.8.) There is no dispute that Nuvia's code implemented Arm's instructions: Nuvia obtained an ALA license so it could design an Arm-compliant core, (PTX-0103 at 2), and it developed its pre-acquisition code to be compliant with Arm's architecture, consulting the Arm ARM in doing so (Tr. 390:8-17; 490:8-491:22; 558:7-12; 559:12-14 ("Q. As part of your job at Nuvia in 2020, you would have consulted that Arm version eight architecture specification? A. Yes."); 689:16-692:17; 694:18-695:9; 696:4 698:1; 357:20-25; DTX-358.)

Further, the ALA makes clear that an ACC—the very thing Nuvia was developing under its ALA, as made clear in Annex 1—is a derivative of the Arm Technology. (JTX-0001 § 1.8 (listing ACC as a derivative); JTX-0005 § A.5 (defining "Architecture Compliant Core" as "a microprocessor core *developed by LICENSEE [Nuvia]* under the licenses granted in this Annex 1").) Nuvia's code is a partially complete ACC, and thus a derivative. (Tr. 390:8-24.)

For the same reasons, the Qualcomm products incorporating pre-acquisition Nuvia code are "product[s] embodying" the "ARM Technology," subject to the termination obligations of § 15.1. (JTX-0001 § 15.1.)[2] As witnesses explained, Arm's instruction set in the Arm ARM is "the description of the behavior of an abstract machine," but the *implementation* of those instructions

---

[2] Nuvia's RTL code fits this description: it "embodied," i.e., "made concrete," Arm's instruction set. (*Embody*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/embody (last visited Feb. 14, 2025).)

is "an embodiment of that abstract machine." (Tr. 598:16-599:2; *see also* Tr. 491:20-22 ("[D]esigns that are intending to be Arm compliant, must embody parts of the Arm ARM").) Because the Nuvia code implementing Arm's architecture "embod[ies] parts of the Arm ARM," (Tr. 491:9-22), products incorporating that code also embody Arm Technology for purposes of Section 15.1.

Both Mr. Williams and a former Nuvia engineer, Jignesh Trivedi, admitted that, prior to Nuvia's acquisition by Qualcomm, Nuvia was developing code for an ACC, specifically for the Armv8-A Architecture. (Tr. 390:8-17, 558:7-12.) Because Nuvia's pre-acquisition code was designed to comply with the Armv8-A Architecture, that code is derivative of the Armv8-A Architecture. With the benefit of his extensive experience with CPU architectures, Dr. Colwell agreed that the Nuvia's code was a derivative of Arm Technology. (Tr. 490:8-491:22.)

Dr. Colwell and Dr. Chen also testified that the pre-acquisition code was reused after termination. (Tr. 490:8-491:22, 536:12-538:5.) Mr. Williams and Qualcomm's witnesses admitted the same thing. (Tr. 409:16-21, 410:2-21, 412:9-20, 426:5-11, 552:9-20, 705:12-20, 809:1-12.) Arm thus presented more than enough evidence to survive JMOL on the issue of breach.

### B.    Nuvia's Excuses for Ignoring Its Contractual Obligations Fall Flat.

#### 1.    *Nuvia and Arm Technology Are Not Mutually Exclusive.*

Nuvia contends that the pre-acquisition Nuvia RTL is "Nuvia Technology," and therefore cannot also be a derivative of "ARM Technology." But this argument rests on an illusory distinction. Nothing in the contract requires code to be *either* "ARM Technology" or "Nuvia Technology." Instead, the contract permits technology to be both, listing an "Architecture Compliant Core" both as ARM Technology and Nuvia Technology. (*See* JTX-0001 § 1.8.) Further, the ALA expressly identifies an ACC as a derivative of Arm Technology, even though the entire purpose of the ALA was to have Nuvia write the code for an ACC, reinforcing that

Nuvia Technology is not an exclusive subset distinct from derivatives of Arm Technology. (JTX-0001 § 1.8; JTX-0005 § A.5 (defining "Architecture Compliant Core" as "a microprocessor core *developed by LICENSEE [Nuvia]* under the licenses granted in this Annex 1").)

The testimony at trial makes clear that the purpose of the "Nuvia Technology" definition was the opposite of what Nuvia asserts. Contrary to Nuvia's argument, the "Nuvia Technology" definition was not included as a *shield* to protect Nuvia's code from destruction under § 15.1(a).[3] Instead, the "Nuvia Technology" definition was included as a *sword* to prevent use of Nuvia's work in Arm products. Under the Nuvia ALA, Nuvia could not assert so-called "Essential Claims" in Nuvia's patents against Arm if Arm developed a CPU implementing those claims. (JTX-0001 §§ 1.11, 2.18.) Nuvia therefore sought a definition of "Nuvia Technology" and corresponding destruction requirements in § 15.1(b) "to protect [Nuvia's IP] that is not essential claims" and keep its designs out of Arm TLA products. (Tr. 164:13-25; 389:23-390:6 (provision included "to protect Nuvia technology"; DTX-1095); *see also* Tr. 435:10-24; 465:7-16; DTX-1113.)

2.       *It Is Irrelevant That the Arm ARM Is Public.*

Nuvia claims that "ARM Technology" only includes confidential information, (Br. at 10-13), and thus the Arm ARM, as a public document, is not "Arm Technology." (*Id.*) Nuvia swats away the presence of "ARMv8-A Architecture – Specifications" in the list of ALA deliverables—which witnesses testified referred to the Arm ARM—as instead referring to additional confidential "extensions" (*i.e.*, edits) Arm made to the Arm ARM. (*Id.*)

Nuvia ignores contract language that directly refutes its argument. For example, Nuvia's

---

[3] California's policy against forfeitures applies only where there is an ambiguity, and Nuvia fails to identify one. *See Unicom Sys., Inc. v. Farmers Grp., Inc.*, No. 04-4604-GHK, 2007 WL 9705875, at *13 (C.D. Cal. June 12, 2007) (applying Cal. Civ. Code § 1442 "to the extent that the terms [in the license] are ambiguous"); *cf* Williston on Contracts § 38:13 (4th ed.) (no preference for interpretation reducing risk of forfeiture where risk assumed.)

contention that "Armv8-A Architecture Reference Manual" is not present in Section 1, Annex 1 is beside the point. The "Armv8-A Architecture Reference Manual" (i.e., the Arm ARM) is defined as everything in Section 1, Annex 1, and therefore is "ARM Technology." (*See* JTX-0005 § A.8 (Arm ARM is "the documentation identified in Section 1 Subsection 1 Part A of this Annex 1").) Furthermore, as discussed above (*see supra* § II(A)), "Documentation," is defined to include the Arm ARM, and "Documentation," is in turn expressly listed as a deliverable.

Nuvia's argument relies on defining "ARMv8-A Architecture – Specifications" to mean "extensions." (Br. at 11-12.) Never mind that "extensions" is used elsewhere in the ALA separate from specifications. (*See* JTX-0005 §§ A.3, A.4, A.18.) And never mind that witnesses testified that "ARMv8-A Architecture – Specifications" refers to the Arm ARM. (Tr. 370:9-17 (explaining that "Armv8-A Architecture Reference Manual" refers to the Arm ARM).) All Nuvia can muster in support is off-hand testimony by witnesses not directly addressed to this issue. (*See* Br. at 11.) When the witnesses Nuvia relies on *did* address the issue, they clarified that the Arm ARM was included as "ARM Technology." (*E.g.*, Tr. 371:5-9 (testimony of Mr. Williams) ("Q. But in the Architecture License Agreement that you signed with Arm, you got a license to use that documentation, the ArmV8-A Architecture Reference Manual, to make architecture compliant cores, right? A. That's what this terminology says, right.").)

Without a textual hook or trial testimony, Nuvia is left arguing that rejecting its interpretation will lead to the "bizarre result" of Nuvia having to destroy a public document. (Br. at 12.) That argument is a non sequitur. The real dispute is not over the destruction of a reference manual, but rather Nuvia's continued use of code designed based on Arm's architecture and reference manual after Nuvia lost its license. This highlights why the real "bizarre result" would be *accepting* Nuvia's interpretation. If "ARM Technology" does *not* include the Arm ARM and

Arm's architecture, then Nuvia never received a license to design and sell Arm-compliant custom cores. (*See* JTX-0001 § 2.1; JTX-0005 § B.1.) That interpretation would be at odds with the overwhelming evidence in the record and intention of the parties. (*See supra* § II(A).) Even if there were tension arising from the plain language of the ALA defining the term Arm Confidential Information to include otherwise public Arm Technology, it would not be enough reason for the Court to rewrite the express terms of the contract. *Rodriguez v. American Technologies, Inc*., 136 Cal.App.4th 1110, 1122 (2006) ("While we may question the wisdom of the parties' choice, . . . the parties were free to choose their [contractual agreement].").

> 3. *Nuvia's Overbreadth Argument is Baseless.*

Unhappy with the contract language, Nuvia protests that the contract language would lead to "astounding overbreadth," giving Arm the right to "control . . . most CPUs worldwide." (Br. at 13.) Not so. Under Arm's ALA with Nuvia, Arm can seek destruction of Nuvia's code only if Nuvia materially breaches the contract and Arm terminates. A comparison with the Qualcomm ALA is dispositive on this point: the Qualcomm ALA grants Qualcomm the "████████████,
████████████████████████████████████████
████████████████" even after termination, so long as "████████████████████████
████████████████████████████████████." (JTX-0010 ████.)
The Nuvia ALA, in contrast, does not provide post-termination rights to continue using designs developed under the now-terminated ALA. It is not the Court's job to rewrite contracts to give Nuvia post-termination rights it never sought or obtained. *Rodriguez*, 136 Cal.App.4th at 1122.

Nuvia next completely abandons the contract language and moves the goal posts: it ports over a "substantial similarity" test from the Copyright Act and claims that the Nuvia RTL is not "substantially similar" to the Arm ARM. (Br. at 13-16.) Nuvia's retreat to the Copyright Act should be rejected: the terms of the contract are clear, and "there is no reason to look at the text of a

statute" where the agreement "contains no suggestion that its interpretation should be informed by the Copyright Act." *T.N. Incorporation, Ltd. v. Fidelity Nat'l Info. Servs., Inc.*, C.A. No. 18-5552, 2022 WL 910092, at *9 n.6 (E.D. Pa. Mar. 29, 2022); *see Estate of Wemyss*, 49 Cal.App.3d 53, 59 (1975) ("[C]ourts are not empowered under the guise of construction or explanation to depart from the plain meaning of the writing and insert a term or limitation not found therein."). Further, importing tests from the Copyright Act would contradict the express terms of the contract, because the Nuvia ALA expressly identifies an ACC as an example of a "derivative." (JTX-0001 § 1.8.) Nuvia argues that the Nuvia code is not "substantially similar" to the Arm ARM, (Br. 1at 5), meaning that an ACC would flunk Nuvia's test for a derivative of Arm Technology, despite the ALA expressly identifying an ACC as a derivative of Arm Technology. (*See* JTX-0001 § 1.8.)

4.    *Nuvia's Focus on Opcodes and Register Definitions Is Wrong.*

Nuvia contends that the Nuvia code is not a derivative of the Arm ARM because "the only aspects of the Arm ARM present in the Nuvia RTL were opcodes and register definitions." (Br. at 17.) Nuvia asserts that, because these aspects were "1% or less" of the Nuvia RTL and otherwise regenerated by Qualcomm, derivatives of the Arm ARM are not a "material part" of the Arm-compliant Nuvia code. (*Id.*) Nuvia's argument is not just wrong, but requires the Court to accept Nuvia's (not Arm's) side of a disputed evidentiary issue.

Nuvia's argument wrongly assumes that the opcodes and register definitions are the only features in the Nuvia code that are derivatives. As explained by Dr. Colwell, however, the Nuvia code was designed to reflect numerous components of the Arm architecture, including the Arm server base architecture, Arm exception levels, and Arm architecture extensions. (Tr. 483:14-485:22; *see also* Tr. 558:20-22, 559:19-23.) Further, Dr. Colwell reviewed the Nuvia code beyond just the opcodes and register definitions (Tr. 486:14-16) and found references to Arm features "all over it." (Tr. 491:9-22.) Qualcomm's expert, Dr. Annavaram, admitted that the Nuvia RTL

contains references to other Arm features. (Tr. 689:16-699:12.) Additionally, Dr. Annavaram admitted that the pre-acquisition Nuvia RTL implemented "maybe . . . a third" or "half" of the thousands of instructions specified in the Arm ARM. (Tr. 686:15-687:4, 679:14-23.) Accordingly, regardless of whether Qualcomm may have updated certain opcodes or register definitions, other aspects of the pre-acquisition Nuvia code were derivative of Arm Technology. And Arm presented evidence at trial that portions of Nuvia's pre-acquisition code remained present in Qualcomm's products both after Qualcomm acquired Nuvia and after termination. (Tr. 536:12-537:13.)

The bigger problem with this argument is that Nuvia has essentially thrown in the towel when it comes to interpreting the contract language. Nuvia's opcode argument does not discuss the concept of "derivative," or try to interpret it in the context of the contract or according to its ordinary meaning. Nor does Nuvia explain why it again refers to the Copyright Act, this time to analyze whether the opcodes' presence makes the code a "derivative." (*See* Br. at 17 (citing Copyright Act case and suggesting the Nuvia code is not "derivative" because opcodes and register definitions are not a "material part" of the Arm ARM).) Nuvia ultimately has no answer for why it would pay millions for an ALA that permits it to design an ACC using the Arm architecture as specified in the Arm ARM if all this involved was copying a few register definitions and opcodes. Nuvia did not license Arm's opcodes; it licensed Arm's architecture as specified in the Arm ARM.

In sum, Arm presented ample evidence at trial that pre-acquisition Nuvia code is derivative of Arm Technology and remains incorporated in Qualcomm products, thereby breaching Section 15.1. (Tr. 536:12-537:13 (Dr. Chen testifying that Qualcomm's Hamoa, Pakala, Nordschleife, and Pegasus cores shared 40-70%, 30-55%, 30-55%, and 20-45% identical lines of code with the Nuvia pre-acquisition code, respectively)).)

5.    *Partially Complete ACCs Are Derivatives of Arm Technology.*

Nuvia separately asserts that a partially completed ACC (like the pre-acquisition Nuvia code) is not a derivative of "ARM Technology," even if a completed ACC indisputably is. (Br. at 18.) But the express identification of an "Architecture Compliant Core" as a non-limiting example of a "derivative" of "Arm Technology" is a strong confirmation that the Nuvia code (a partially complete ACC) is too. (*See supra* II(A).) Qualcomm's own Vice President identified Nuvia's Phoenix core as an ACC. (Tr. 357:20-25.)

Further, there was sufficient evidence that Nuvia's pre-acquisition code, even if not yet a completed ACC, is a "derivative" of the ARMv8-A Architecture and the Arm ARM (both of which are "Arm Technology" delivered under the Nuvia ALA). For example, Dr. Colwell testified that, given his extensive experience with CPU architectures, Nuvia's code was a derivative of Arm Technology. (Tr. 490:8-491:22.)

Nuvia nonetheless argues that, because it "intended to build a *Nuvia* Architecture Compliant Core," the Nuvia code cannot be an ACC. (Br. at 18-19.) But that is flatly inconsistent with the definition of ACC in Annex 1 (a core developed by Nuvia under the ALA), and the Nuvia ALA does not define "Nuvia Architecture Compliant Core" to be exclusive of an ACC. (*See* JTX-0001 § 1.8(ii).) The testimony Nuvia points to is about the "Nuvia Technology" term and a *TLA* contract. (Tr. 432:11-434:8.) Whatever its purpose, Nuvia does not explain how that term could negate its obligations under § 15.1(a) with respect to derivatives of Arm Technology.

## CONCLUSION

The Court should deny Nuvia's motion and grant Arm's parallel Rule 50(b) motion.

Dated: February 14, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

_/s/ Anne Shea Gaza_
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 14, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
jbraly@paulweiss.com
abutwin@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Anna P. Lipin
William T. Marks
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
alipin@paulweiss.com
wmarks@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# Exhibit 12

# ⅢORRISON FOERSTER

707 WILSHIRE BOULEVARD
SUITE 6000
LOS ANGELES
CALIFORNIA 90017-3543

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, MIAMI,
NEW YORK, PALO ALTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

Writer's Direct Contact
+1 (213) 892-5348
NFung@mofo.com

March 19, 2025

BY EMAIL

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re:     *Qualcomm Inc. v. Arm Holdings Plc.*, C.A. No. 24-00490-MN (D. Del.)

Counsel:

We write regarding the parties' meet and confers on February 28 and March 3 regarding Arm's Objections and Responses to Qualcomm's First Set of RFPs, and Qualcomm's February 24, March 3, and March 7 letters regarding the same.

**Qualcomm's RFP 1**. RFP 1 requests "[a]ll Documents and Communications Arm referenced, relied upon, or otherwise used in drafting its Answer." During the March 3 meet and confer, Qualcomm raised, for the first time, a purported issue with Arm's response not including documents "relied upon, or otherwise used." Arm confirms that it will produce non-privileged and non-work product documents in its possession, custody, or control located through a reasonable, proportional, and targeted search that Arm referenced, relied upon, or otherwise used in drafting its Answer. Arm understands that Qualcomm's purported issues with Arm's objections and response to RFP 1 have been resolved.

**Qualcomm's RFP 4**. RFP 4 requests "[a]ll Documents and Communications concerning ▇▇▇▇ to the ▇▇▇▇▇▇▇▇ or bug fixes, updates, corrections, or any other technical improvement or information licensed under the Qualcomm ALA that was, after June 1, 2022, delivered to any other Arm licensee but not to Qualcomm." Qualcomm's March 3 letter includes multiple inaccuracies concerning the parties' discussions of this RFP during the meet and confers. Arm did not agree to produce documents for this RFP, nor did Arm indicate that "it would provide internal or external communications about the provision or non-provision of IP, deliverables or support to Qualcomm." (3/3/2025 letter from C. Nyarady to N. Fung at 1.) Rather, based on Qualcomm's explanation during the meet and confer of what information Qualcomm sought from RFP 4, Arm asked Qualcomm whether the production of documents sufficient to show deliverables, ▇▇▇▇▇▇▇▇▇, and other

# ΙΙΙORRISON Ξ FOERSTER

C. Nyarady
March 19, 2025
Page Two

documents provided to Arm's third-party ALA licensees through Arm's websites would suffice. Qualcomm responded that Arm's proposed compromise would not capture, for example, communications regarding withholding materials from Qualcomm. Arm identified its responses to Qualcomm's RFPs where Arm agreed, for example, to "produce non-privileged and non-work product documents in its possession, custody, or control located through a reasonable, proportional, and targeted search through the use of agreed-upon search terms with agreed-upon custodians concerning" Qualcomm's allegations of (1) "the withholding of ███████████, the ACK, or OOB from Qualcomm" (RFP 10), (2) "Arm's withholding of ██ the ACK and OOB from Qualcomm" (RFP 29), and (3) "withholding ███ ████████ from Qualcomm" (RFP 39). Arm asked how Arm's responses to these RFPs do not address Qualcomm's concerns with Arm providing communications regarding Arm's alleged withholding from Qualcomm. Qualcomm contends Arm's responses are still insufficient because Arm's proposal for RFP 4 and other similar RFPs would not capture communications regarding the importance (or lack thereof) of what is being provided, or indicate when it was provided, and to whom. Qualcomm also expressed concerns with whether Arm was proposing to provide a list of what was provided to third-party ALA licensees, versus, for example, the actual deliverable or support materials.

Qualcomm has not alleged, and has no basis to allege, that Arm failed to provide Qualcomm with anything except for the ACK and OOB tests requested by Qualcomm. Additionally, as Arm has explained, Qualcomm received the same documents made available to all ALA licensees, including ACK releases provided to all ALA licensees, consistent with the timing such documents were provided to other licensees. Arm remains willing to provide documents sufficient to show the centralized distribution of documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal. Documents and communications concerning to whom the documents were provided, when they were provided, and the purported importance of such documents are irrelevant where Qualcomm has no basis to allege that any such documents were withheld from Qualcomm.

**Qualcomm's RFP 6**. RFP 6 requests "[a]ll versions of the ACK released after June 1, 2022, and any patches thereto." During the March 3 meet and confer, Qualcomm asked, for the first time, that Arm confirm it will produce the actual ACK and patches thereto, including source code. Arm has explained that Qualcomm received the same documents made available to all third-party ALA licensees, including ACK releases. Additionally, Arm has already agreed to search for and produce documents sufficient to show the centralized distribution of documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal. Qualcomm has not explained the relevance of the actual ACK, including source code, to its claims. Nonetheless, Arm is willing to consider Qualcomm's request for source code to the extent Qualcomm has a legitimate basis for making such request.

**IIIORRISON FOERSTER**

C. Nyarady
March 19, 2025
Page Seven

claims it was entitled to under the Qualcomm ALA. Additionally, Arm is already agreeing to search for and produce documents sufficient to show the centralized distribution of such documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal.

**Qualcomm's RFPs 28 and 32**. RFP 28 requests "[a]ll Documents and Communications concerning delivery of ███████████████, or bug fixes, updates, corrections, or any other technical improvement licensed under ALAs to third parties (*i.e.*, parties other than Qualcomm), including documents sufficient to show the licensee, the date of delivery, and the terms of any such delivery for any delivery that was not provided to Qualcomm." RFP 32 requests "[a]ll Documents and Communications related to or concerning the delivery of ACK patches to any ALA partner other than Qualcomm." Arm understands that the parties' positions regarding RFPs 28 and 32 are similar to RFPs 4 and 26. Like RFPs 4 and 26, Arm remains willing to provide documents sufficient to show the centralized distribution of documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal. Documents and communications concerning to whom the documents were provided, when they were provided, and the purported importance of such documents are irrelevant where Qualcomm has no basis to allege that any such documents were withheld from Qualcomm.

**Qualcomm's RFP 31**. RFP 31 requests "[a]ll Documents and Communications related to or concerning each ACK patch released since June 1, 2022, including documents related to the development process for each patch, the timeline for development, and each version of the Arm Architecture that the patch corresponds to." During the March 3 meet and confer, Qualcomm raised, for the first time, a purported issue with Arm's response not including the "the timeline for development, and each version of the Arm Architecture that the patch corresponds to." (3/7/2025 letter from C. Nyarady to N. Fung at 2-3.) Arm confirmed that, consistent with its objections and responses, Arm was searching for documents as kept in the ordinary course sufficient to show the development process for the ACK releases made available to all ALA licensees during the relevant time period. Arm further confirms that, consistent with its objections and response, Arm will produce non-privileged and non-work product documents in its possession, custody, or control located through a reasonable, proportional, and targeted search sufficient to show the general timeline for ACK releases provided to all ALA licensees.

**Qualcomm's RFP 33**. RFP 33 requests "[a]ll Documents and Communications concerning OOB tests, including the development process for OOB tests, the timeline to configure the ACK through the use of OOB tests, and any manuals or presentations describing the use of OOB tests with the ACK." During the March 3 meet and confer, Qualcomm raised, for the first time, a purported issue with Arm's response not including the "timeline to configure the ACK through the use of OOB tests." (3/7/2025 letter from C.

**ꟿORRISON ꟿOERSTER**

C. Nyarady
March 19, 2025
Page Eight

Nyarady to N. Fung at 2-3.) Arm confirms that, consistent with its objections and responses, it will conduct a reasonable, proportional, and targeted search for documents as kept in the ordinary course sufficient to show the development process for OOB, including documents showing the timeline for the OOB generally, if any.

**Qualcomm's RFPs 34 and 40.** RFP 34 requests "[a]ll Documents and Communications concerning any negotiations that Arm had with TLA licensees (including Third Parties) for the ███████████████████████████████████████████ ████ cores, and CPUs codenamed ████ ██ █ ███ and ████████ including but not limited to price quotes, license fees, licensing term limits, or other language to include in TLA Annexes." RFP 40 requests "[a]ll Documents and Communications concerning Arm's discussions with Qualcomm regarding licensing of the ████████ ████████████████████████████ software test libraries for the ██████ and ████ ██████████ and CPUs codenamed ████ ██████ ██████ and ████████ including discussions regarding potentially withholding any of the listed items, pricing of the items, and any potential restrictions related to the use of the items in Qualcomm's products, including in any chips that contained designs or source code that originated at Nuvia." Arm explained during the March 3 meet and confer that Arm's TLAs are not relevant to Qualcomm's claims concerning Arm's alleged failure to provide documents under the Qualcomm ALA. Notably, Qualcomm admitted during the meet and confer that its allegations regarding TLAs in the FAC are not tied to any of its claims in the FAC. Rather, Qualcomm's position is that the FAC generally alleges that Arm acted in bad faith, and that Qualcomm is entitled to use discovery to confirm whether Arm's alleged conduct extended to the TLAs. (*See* 3/7/2025 letter from C. Nyarady to N. Fung at 3 (explaining that Qualcomm "intends to take discovery on any behavior by Arm towards Qualcomm intended to undermine Qualcomm's position in the marketplace or otherwise treat Qualcomm unfairly" and that it was seeking discovery "that could form the basis for an additional claim").) Qualcomm is not entitled to discovery on matters that are not relevant to any claims or defenses in this action, such as the Qualcomm TLA. Unless and until Qualcomm is permitted to amend its Complaint to add claims for which RFPs 34 and 40 may be relevant, Arm stands by its objections to RFPs 34 and 40 and Qualcomm's other RFPs relating to the Qualcomm TLA based on those issues not being in the case.

**Qualcomm's RFPs 37, 42-44.** RFPs 37 and 42-44 request documents and communications regarding licensing of ████ why Arm moves from one version of its ISA to another, and differences between versions of Arm's ISA. Arm understands that the parties' positions regarding these RFPs are similar to RFPs 14 and 15. As Arm explained during the meet and confers, ████ is not relevant to Qualcomm's Complaint. Regardless of whether Qualcomm incorporates all of the allegations in the Complaint into Qualcomm's good faith and fair dealing claim, paragraph 136 identifies the allegations that Qualcomm contends

**ꟿORRISON ꟄOERSTER**

C. Nyarady
March 19, 2025
Page Thirteen


**Production Under Delaware Local Rule 26.2**. On March 17, 2025, the Court issued an oral order resolving the parties' dispute regarding the ESI order and PO. (*See* D.I. 74.) Arm confirms that it is proceeding with searching for and producing documents in accordance with the Court's March 17 oral order and the ESI order and PO in this action. Arm understands that this resolves Qualcomm's purported concerns regarding Arm's production of documents under Delaware Local Rule 26.2.


Sincerely,

*/s/ Nicholas Fung*

Nicholas Fung

# Exhibit 13

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

| | |
|---|---|
| QUALCOMM INCORPORATED, | ) |
| a Delaware corporation; and | ) |
| QUALCOMM TECHNOLOGIES, INC., | ) |
| a Delaware corporation, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) C.A. No. |
| vs. | ) 24-490(MN) |
| | ) |
| ARM HOLDINGS PLC., f/k/a | ) |
| ARM LTD., a U.K. corporation, | ) |
| | ) |
| Defendant. | ) |

_____

HIGHLY CONFIDENTIAL

ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF ANN NATHALIE CATHCART CHAPLIN

JULY 11, 2025

SAN DIEGO, CALIFORNIA

Reported by
Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 22

1 did you discuss anything with Mr. Weiser other than
2 the negotiations between Arm and Qualcomm around the
3 ALA in 2012?
4     A.  No.  That's all I can recall.
5     Q.  What did you discuss with Christie Thoene
6 to prepare for your corporate testimony today?
7     A.  I talked with her about an article that had
8 been published in the media.  And I'm trying to
9 remember the author.  Give me one second.  I believe
10 it was by a Josh Sisco, S-i-s-c-o.  And so I talked
11 about that with her.
12     Q.  Who is Christie Thoene?
13     A.  She is a member of our communications
14 department at Qualcomm.
15     Q.  Do you recall roughly when the article that
16 you discussed with Ms. Thoene that was authored by
17 Josh Sisco was published?
18     A.  I should -- vaguely, but just not
19 specifically.  So it was -- I want to say it was
20 October-ish of -- I'm sure it's in our production
21 and in your stack of documents.  I just don't want
22 to be wrong on the date.
23     Q.  At no point today am I trying to make this
24 a memory test.
25     A.  Yeah.

Page 23

1     Q.  Do you recall what the subject matter of
2 the article was about?
3     A.  I do.  It was about Arm being investigated
4 by regulatory agencies.
5     Q.  What did Ms. Thoene tell you about the
6 article?
7     A.  She told me that she had -- that she knows
8 Josh Sisco.  And in talking with him about other
9 things, he told her he had heard a rumor that
10 Qualcomm had complained to regulatory agencies, and
11 he asked her about it.  And she said that she had
12 nothing to share with him.  He called her again,
13 again telling her he had heard such a rumor, and she
14 said she had nothing for him on that.
15         It's my understanding he then -- that he
16 later called her and said that he was writing a
17 story on that topic, whether she commented or not,
18 because he had confirmed his story other ways.  And
19 then asked her again if she would talk to him.  She
20 then had a call with him with another person and
21 to -- on background to hear what he said his story
22 was going to be and -- where he gave an overview of
23 his story.  And she heard that and did not -- and
24 she found it to be relatively accurate from his
25 summary and, therefore, she -- that was their call.

Page 24

1     Q.  Did Ms. Thoene tell you when she first
2 spoke with Josh Sisco about the rumor that she had
3 heard?
4     A.  No.  I didn't think to ask that.  She just
5 told me that she was getting those phone calls from
6 him and that this story had was the subject of the
7 topic on which -- was not something we had placed,
8 but something she got called about repeatedly.
9     Q.  Do you know the rough dates when she had
10 any of her conversations with Josh Sisco?
11     A.  I don't recall.
12     Q.  You said she had a call with Mr. Sisco on
13 background and there was another person on the call?
14     A.  Correct.
15     Q.  Do you recall who that other person was?
16     A.  Yes.  A lawyer from my team named Alvaro
17 Ramos.
18     Q.  Do you know whether Mr. Ramos spoke with
19 Mr. Sisco as part of that background phone
20 conversation?
21     A.  It's my understanding that they heard what
22 he had, the outline of his story, and that they
23 didn't have corrections to his overview.
24     Q.  Do you know whether Mr. Ramos had any other
25 conversations with Josh Sisco besides the

Page 25

1 conversation on background to hear what the story
2 was about?
3     A.  It's my understanding there were not other
4 conversations.
5     Q.  Did Ms. Thoene tell you whether she ever
6 supplied any information to Josh Sisco about the
7 regulatory investigations that Qualcomm had
8 launched?
9     A.  No.  I think I've told you in full what I
10 learned from her.
11     Q.  Other than what you learned from
12 Ms. Thoene, do you have any other information about
13 Qualcomm's discussions with Mr. Sisco?
14     A.  I don't believe there were other
15 discussions with Mr. Sisco relating to that article.
16     Q.  Even for the discussions that we've already
17 talked about, do you know anything about those
18 discussions other than what you learned from
19 Ms. Thoene?
20     A.  No.
21     Q.  Were you aware that those discussions had
22 taken place before you had your conversation with
23 Ms. Thoene yesterday?
24     MS. DUNN:  This seems to get to what could
25 be privileged conversations, if they existed.  So I

7  (Pages 22 to 25)

# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' POST-TRIAL BRIEF REGARDING EQUITABLE DEFENSES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
William T. Marks
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

January 29, 2025

## <u>TABLE OF CONTENTS</u>

Page

I.    NATURE AND STAGE OF THE PROCEEDING............................................................ 1

II.   SUMMARY OF ARGUMENT ..................................................................................... 1

III.  STATEMENT OF FACTS ........................................................................................... 2

IV.  LEGAL STANDARD.................................................................................................. 2

V.    ARGUMENT ............................................................................................................... 3

VI.  CONCLUSION ......................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajaxo, Inc.* v. *E\*Trade Fin. Corp.*,
    261 Cal. Rptr. 3d 583 (Ct. App. 2020) .......................................................................2

*Blain* v. *Doctor's Co.*,
    272 Cal. Rptr. 250 (Ct. App. 1990)..........................................................................2, 3

*Creditors Adjustment Bureau, Inc.* v. *Imani*,
    298 Cal. Rptr. 3d 227 (Ct. App. 2022) .......................................................................3

*Fladeboe* v. *Am. Isuzu Motors, Inc.*,
    58 Cal. Rptr. 3d 225 (Ct. App. 2007) .........................................................................3

*Guardianship of Saul H.*,
    514 P.3d 871 (Cal. 2022) ............................................................................................2

*Kendall-Jackson Winery, Ltd.* v. *Superior Court*,
    76 Cal. App. 4th 970 (Ct. App. 1999).........................................................................6

*Mattco Forge, Inc.* v. *Arthur Young & Co.*,
    60 Cal. Rptr. 2d 780 (Ct. App. 1997) .........................................................................2

*Saks* v. *Int'l Longshore & Warehouse Union-Pac. Mar. Ass'n Benefit Plans*,
    637 F. App'x 282 (9th Cir. 2015) ....................................................................3, 6, 10

*Sketchley* v. *Lipkin*,
    222 P.2d 927 (Cal. Ct. App. 1950) ..........................................................................3, 6

**Other Authorities**

13 Witkin, Summary of Cal. Law § 9 (11th ed. 2024) ...................................................3

25 Williston on Contracts § 67:18 (4th ed. 2024)..........................................................3

## I.   NATURE AND STAGE OF THE PROCEEDING

The Court held a combined jury and bench trial from December 13 to 20, 2024.  D.I. 547 ¶ 3.  The bench portion of the trial concerned certain equitable defenses raised by defendants Qualcomm Inc. and Qualcomm Technologies, Inc. (collectively, "Qualcomm") and Nuvia, Inc. *Id.* ¶ 5.  The Court heard evidence on defendants' equitable defenses during the evening of December 17 and allowed the parties to lodge additional evidence without presenting it in open court.  Bench Tr. 3:12–77:7; Trial Tr. 842:22–843:2, 875:2–875:10; D.I. 574; D.I. 574, Exs. 1-10. The Court also ordered that "all evidence admitted at the jury trial will be part of the record for any bench trial."  D.I. 518 ¶ 81.

The jury returned a verdict in favor of Qualcomm that it did not breach the Nuvia ALA and that its products are licensed under Qualcomm's ALA, and the jury did not reach a verdict as to Arm's claim that Nuvia breached the Nuvia ALA.  D.I. 572 at 2.  The Court accepted the partial verdict and discharged the jury.   Trial Tr. 1016:17–1017:3, 1020:16–1021:2.   Defendants' equitable defenses remain pending.  In light of the trial evidence and the jury's verdict, defendants are withdrawing their defenses of waiver, estoppel, and laches.  For the reasons explained below, defendants now request that the Court find in their favor on their defense of unclean hands.[1]

## II.   SUMMARY OF ARGUMENT

At trial, defendants proved the defense of unclean hands.  To succeed on that defense, defendants had the burden to prove that Arm acted inequitably such that its claims should be barred.  Defendants did so by proving that Arm itself breached the Nuvia ALA and TLA, in

---

[1] As defendants explained in their post-trial status report, the entry of judgment for Qualcomm pursuant to the jury's answer to Question 2 of the verdict form will moot the defense of unclean hands with respect to Qualcomm.  D.I. 594 at 3–4.  If, however, the Court were to grant Arm's post-trial motion on its claim against Qualcomm after the entry of judgment, D.I. 595, the defense of unclean hands would become live again and would preclude a judgment in Arm's favor.

particular, by doing exactly that which it accused Nuvia of doing—failing to safeguard confidential information.

The evidence proved that Arm failed to meet its obligations under Section 15.1(b) of both the Nuvia ALA and TLA.  In both agreements, that provision required Arm to discontinue use of and destroy Nuvia Confidential Information upon Arm's termination of the agreement.  But Arm witnesses testified at trial that Arm did not destroy Nuvia Confidential Information in its possession after termination.  To the contrary, those witnesses testified that Arm not only used Nuvia Confidential Information but continued to incorporate it into Arm's products.  Those uses of Nuvia Confidential Information by Arm violated Sections 15.1(b) of the Nuvia ALA and TLA and therefore constitute unclean hands and prohibit Arm from asserting that defendants violated Section 15.1(a) of the Nuvia ALA.

## III.    STATEMENT OF FACTS

The relevant facts are set forth in defendants' Proposed Findings of Fact ("PFOF"), filed concurrently herewith, and in the Argument section, as appropriate.

## IV.    LEGAL STANDARD

Nuvia had the burden to prove its unclean hands defense by a preponderance of the evidence.  *See Ajaxo, Inc.* v. *E\*Trade Fin. Corp.*, 261 Cal. Rptr. 3d 583, 617 (Ct. App. 2020); *Mattco Forge, Inc.* v. *Arthur Young & Co.*, 60 Cal. Rptr. 2d 780, 796 (Ct. App. 1997); *see also Guardianship of Saul H.*, 514 P.3d 871, 880 (Cal. 2022) ("[P]reponderance of the evidence is the default burden of proof for findings of fact in civil cases.").  Application of an unclean hands defense depends upon "the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries."  *Blain* v. *Doctor's Co.*, 272 Cal. Rptr. 250, 256 (Ct. App. 1990).

## V.    ARGUMENT

It is well established that "He who comes into Equity must come with clean hands." *Blain* v. *Doctor's Co.*, 272 Cal. Rptr. 250, 255 (Ct. App. 1990) (quotation omitted); *see* 13 Witkin, Summary of Cal. Law § 9 (11th ed. 2024).  "Unclean hands applies when it would be inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action." *Fladeboe* v. *Am. Isuzu Motors, Inc.*, 58 Cal. Rptr. 3d 225, 235–36 (Ct. App. 2007) (unclean hands doctrine barred plaintiff automobile dealers' claims against defendant for improperly withholding consent to transfer dealership where one plaintiff transferred dealership license to second plaintiff without obtaining defendant's consent).  Whether the defense applies in particular circumstances "depends upon the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries." *Blain*, 272 Cal. Rptr. at 255.  The equitable defense of unclean hands is thus "available to any defendant against whom specific performance is sought."  25 Williston on Contracts § 67:18 (4th ed. 2024); *see Creditors Adjustment Bureau, Inc.* v. *Imani*, 298 Cal. Rptr. 3d 227, 229 (Ct. App. 2022).  Plaintiffs who have "wrongfully breached their contract [] have no right to demand of equity that it grant their claims." *Sketchley* v. *Lipkin*, 222 P.2d 927, 933 (Cal. Ct. App. 1950); *see Saks* v. *Int'l Longshore & Warehouse Union-Pac. Mar. Ass'n Benefit Plans*, 637 F. App'x 282, 284 (9th Cir. 2015) ("California has long permitted an unclean hands defense to be sustained on the basis of breach of contract.").

Here, defendants proved at trial that Arm's hands were unclean because it failed to satisfy its obligations under Section 15.1 of the Nuvia ALA and TLA, yet Arm alleges breach of Section 15.1 of the Nuvia ALA in this case.  Arm has not destroyed or returned, and has continued to use, Nuvia Confidential Information after termination of the Nuvia ALA and TLA, in breach of both agreements.  Arm terminated the Nuvia ALA and TLA effective March 1, 2022.  PFOF ¶ 6.  As

Arm has reiterated with respect to its case against Qualcomm and Nuvia under Section 15.1(a), Section 15.1(b) states that upon termination Arm was to "immediately discontinue any use of LICENSEE Confidential Information" and "either destroy [it] or return [it] to LICENSEE." PFOF ¶¶ 8, 52. The agreements also required Arm to confirm its compliance with the obligations of Section 15.1(b) within one month of termination. PFOF ¶ 9. There is no evidence in the record that Arm provided Nuvia with the required confirmation.

Following termination, "Arm did not take any specific action" with regard to Nuvia Confidential Information. PFOF ¶ 12 (quoting Bench Tr. 10:23–11:15 (Larri)). Vivek Agrawal, an Arm Senior Principal Engineer, testified that he was "never asked to destroy any [Nuvia Confidential] information." PFOF ¶ 11 (quoting D.I. 574-1 at 95:25–96:08). Mark Werkheiser, an Arm Fellow, similarly testified that he did not "remember any communication" from Arm instructing employees to destroy Nuvia Confidential Information and did not "think [he] did" so following termination of the Nuvia agreements. *Id.* (quoting Bench Tr. 24:9–12). At trial, Arm made no attempt to refute Mr. Agrawal's or Mr. Werkheiser's testimony, nor did it present any contradictory evidence. PFOF ¶ 13.

The trial record further showed that, instead of destroying Nuvia Confidential Information, Arm made affirmative use of it in two ways. *First*, Arm used confidential Nuvia information related to the configuration of the CPU under design at Nuvia to compare with the configuration of one of Qualcomm's post-acquisition designs. *Second*, Arm used certain confidential improvements to its Coherent Mesh Network ("CMN") requested by Nuvia.

1.      Nuvia provided Arm with a confidential file used to configure the Arm Architecture Compliance Kit to work with Nuvia's in-development CPU design. PFOF ¶ 3. Arm knew the configuration file constituted Nuvia Confidential Information under the Nuvia ALA. PFOF ¶ 4.

Arm has conceded that Nuvia also provided Arm with additional Nuvia Confidential Information sent by Nuvia's verification team.  PFOF ¶ 5.

Arm admitted that, in May 2022—more than two months after it terminated the Nuvia ALA—it ran a digital comparison of Nuvia's confidential configuration file with a configuration file provided by Qualcomm for one of Qualcomm's custom CPUs "to understand the relationship between the new [Qualcomm-provided] piece of information and the existing [Nuvia-provided] piece of information."  PFOF ¶ 19 (quoting Bench Tr. 11:16–12:9 (Larri)).  The undisputed record evidence shows that Mr. Agrawal ran the "diff" comparison between Qualcomm's configuration file for its Hamoa design and the Nuvia confidential configuration file for the Phoenix design in order to determine whether Nuvia design work had been used at Qualcomm.  *Id*.

Eight months later, in January 2023, Mr. Agrawal emailed his colleagues to inform them of the presence of Nuvia confidential documents in Arm's source-code databases.  He stated that Arm still had "access to those files from [his] unix project-scratch area" and that, because the Nuvia configuration files "were checked-in," the "Git history can fetch Nuvia versions," which would allow Arm employees access to view confidential information regarding Nuvia's design work.  PFOF ¶¶ 15–16 (quoting DTX-161).  At trial, Mr. Agrawal testified that, as of January 2023, Arm employees could still continue to access Nuvia confidential documents "from the revision control repositories" within Arm's "version control system."  PFOF ¶ 17 (quoting D.I. 574-1 at 99:01–99:11).  Those documents constituted Nuvia Confidential Information under the Nuvia ALA.  PFOF ¶¶ 3–5, 15.

Arm thus not only failed to destroy Nuvia Confidential Information after termination of the Nuvia ALA; it continued to use that information for almost a year after termination.  That unrebutted evidence proves Arm's violation of Section 15.1(b) of the Nuvia ALA and constitutes

5

inequitable conduct that precludes it from pursuing its claim for breach of the Nuvia ALA. *See Sketchley*, 222 P.2d at 933; *Saks*, 637 F. App'x at 284 (affirming, under California law, application of unclean hands to breach of contract action where defendant proved that plaintiff breached).

2.    Arm also continued to use Nuvia Confidential Information under the Nuvia TLA after its termination of that agreement.  The termination provision states that "ARM will immediately discontinue any use of LICENSEE Confidential Information disclosed under this ALA.  ARM shall, at LICENSEE's option, either destroy or return to LICENSEE any LICENSEE Confidential Information."  PFOF ¶¶ 8, 52.  Arm's treatment of confidential information under the TLA bears directly on whether it is equitable to permit Arm to bring its own claim relating to Arm Confidential Information.  Under California law, "any evidence of a plaintiff's unclean hands in relation to the transaction before the court or which affects the equitable relations between the litigants in the matter before the court should be available to enable the court to effect a fair result in the litigation." *Kendall-Jackson Winery, Ltd.* v. *Superior Court*, 76 Cal. App. 4th 970, 985 (Ct. App. 1999).

As part of its TLA licensing program, Arm offers licensees a CMN product that "allows the different components [of a system-on-a-chip] to communicate with each other."  PFOF ¶¶ 21, 23 (quoting Bench Tr. 18:4–16 (Werkheiser)).  Arm has offered that product for at least a decade, with Arm releasing various iterations, including CMN-650 (codename "Rhodes"), CMN-700 (codename "Kampos"), and CMN-S3 (codename "Cyprus").  PFOF ¶ 24.  Arm widely licenses its CMN product, including to companies that would compete with any product containing a custom core from Nuvia or Qualcomm.  PFOF ¶ 22.  Arm has admitted that its CMN products currently available on the market, including Kampos, include Nuvia Confidential Information in the form of features requested by Nuvia under the Nuvia TLA.  PFOF ¶ 57.

In March 2019, Nuvia expressed an interest in licensing CMN from Arm and entered into a nondisclosure agreement ("NDA"), which enabled Nuvia to obtain additional information concerning the CMN product. PFOF ¶¶ 25, 35–37. As explained at trial by Jeffrey Defilippi, Arm's Product Manager with responsibility for CMN, Arm understood during negotiation of the NDA that Nuvia intended to provide Arm with Nuvia Confidential Information concerning the CMN, which Arm subsequently received.[2] PFOF ¶¶ 35–37. Those exchanges of information provided a framework through which Nuvia was then able to discuss modifications and improvements to the CMN with Arm. After initial discussions with Arm, Nuvia engineers analyzed Arm's then-current CMN product (CMN-650/Rhodes) and requested that Arm add certain features for use in Nuvia's in-development server chip. PFOF ¶¶ 39–42.

Once Nuvia entered into the TLA with Arm, it executed an Annex to license CMN-650/Rhodes. PFOF ¶ 26. Nuvia continued to request CMN feature improvements from Arm by providing Arm with documents designated "Nuvia Confidential" containing descriptions of the requested features categorized based on improvement to performance or functionality and setting forth requested timelines for delivery of the improved CMN product to Nuvia. PFOF ¶¶ 42–43. Those documents constituted Nuvia Confidential Information under the TLA because they were labeled "Nuvia Confidential." PFOF ¶¶ 2, 52. The documents were labeled confidential and indicated that the features should be implemented in Arm's future CMN-700/Kampos product. PFOF ¶¶ 42, 44. Nuvia and Arm's engineering teams also met on a regular basis so that Nuvia could explain its confidential feature requests and discuss the development and modification of the

---

[2] The Nuvia NDA contained a provision that defined Confidential Information as "any written or tangible information disclosed directly or indirectly between the Arm Group and the Company that is identified as confidential at the time of disclosure and designated, by appropriate legend, as confidential." PFOF ¶ 35 (quoting DTX-580 at 6 § 1.2).

CMN product.[3]  PFOF ¶¶ 40-41.  Following these meetings, Nuvia would provide additional confidential documentation that echoed the discussions between the companies.  PFOF ¶ 42.

At the same time that Nuvia sought to improve the CMN product, Arm saw an opportunity to "suck[] knowledge out of Gerard's team" at Nuvia in order to benefit Arm competitively.  PFOF ¶ 45 (quoting DTX-1809 at 2).  Arm employees were directed to "accommodate as many of the NuVia requests within our roadmap product to absorb Apple/Nuvia knowledge and make our products better."  PFOF ¶ 46 (quoting DTX-1809 at 3).  As Mr. Werkheiser testified, Arm recognized that Nuvia's requested features improved the functionality of CMN, and Arm implemented many of those features as a result.  PFOF ¶ 47.  Once the features were implemented, Arm then offered the improved version of CMN to other customers, including to Nuvia's potential competitors in the market.  PFOF ¶ 48.  Arm does not dispute that fact.  PFOF ¶ 57.

At trial, Arm conceded that it did not remove the Nuvia-requested features from its CMN products following termination of the Nuvia TLA.  PFOF ¶¶ 53–57.  Arm also produced representative source code of its CMN products, including the Kampos and Cyprus versions currently available on the market.  Defendants' expert, Dr. Murali Annavaram, reviewed that code and testified that he found several of Nuvia's requested features implemented in each respective version of the CMN.  PFOF ¶ 58.  That evidence was undisputed at trial.  Arm separately admitted in interrogatory responses that certain of Nuvia's requested features remain in the Kampos product on the market today.  PFOF ¶ 57.  Those actions constitute ongoing violations of the Nuvia TLA.

---

[3] "Confidential Information" includes "any information which if first disclosed orally is identified as confidential at the time of disclosure and is thereafter reduced to writing and sent to the other party within thirty (30) days after its oral disclosure and designated, by appropriate legend, as confidential."  PFOF ¶ 2; *see id.* ¶ 52.

Arm continues to receive royalties from Nuvia and Qualcomm's competitors that have licensed the CMN products implementing Nuvia's confidential features.  PFOF ¶ 60.

At trial, Arm argued that Nuvia's confidential feature requests constituted "Input" under Annex 1 to the Nuvia TLA, which allegedly entitled Arm to post-termination rights to them.  Bench Tr. 49:3–50:24.  But Arm presented no documentary evidence supporting that argument, and the plain language of the TLA Annex contradicts its witness testimony.  The Annex defines "Input" as "all suggestions, comments, feedback, ideas, or know-how (whether in oral or written form) provided by LICENSEE to ARM in respect of a Development Release."  PFOF ¶ 27 (quoting JTX-4 § 2, cl. A.20).  In turn, the Annex defines "Development Release" as "ARM Technology *not marked* as 'LAC', 'EAC' or 'REL'."  PFOF ¶ 28 (quoting JTX-4 § 2, cl. A.10) (emphasis added).  Nuvia licensed only "LAC" and "EAC" releases of CMN; it never licensed a Development Release, meaning that its feature requests were not "Input."  PFOF ¶¶ 29–31.  Arm did not identify any Development Release of CMN licensed by Nuvia.  PFOF ¶¶ 32–33.  And Arm's only witness on the "Input" point admitted that he had no role in negotiating or drafting the TLA Annex and had only reviewed it in preparation for trial.  PFOF ¶ 33.  Further, he failed to explain the nature of Arm's rights to "Input" (beyond stating that the term appeared in the TLA Annex) or the potential application of those rights to Nuvia's requested features.  PFOF ¶ 34.[4]  The record is thus clear that Arm improperly used Nuvia Confidential Information after termination of the Nuvia TLA.

---

[4] The 2019 Annex also contained a provision that treated "any requests for changes to design and implementation of the CMN-Kampos" as "Input" if Nuvia both exercised its right to exchange CMN-Rhodes for CMN-Kampos and "received enhanced lead partner ('ELP') access for CMN-Kampos."  PFOF ¶ 27 (quoting JTX-4 § 2, cl. B.4(ii)).  Nuvia exchanged CMN-Rhodes for CMN-Kampos in January 2021, well after it had provided Arm with many of the confidential feature requests, PFOF ¶¶ 30, 44, and Arm presented no evidence at trial that Nuvia "received enhanced lead partner access."

          \*       \*       \*       \*       \*

In sum, the trial evidence proves that Arm failed to destroy or return, and continues to use, Nuvia Confidential Information, in violation of Section 15.1 of both the Nuvia ALA and TLA. That breach renders Arm's hands unclean, precluding it from seeking relief for defendants' alleged breach of the Nuvia ALA. *See Saks*, 637 F. App'x at 284.

## VI.    CONCLUSION

Defendants respectfully request that the Court find in their favor on their equitable defense of unclean hands and enter judgment for defendants on Count I of Arm's complaint.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
William T. Marks
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

January 29, 2025

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 29, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                    *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiff*

Joyce Liou, Esquire                                        *VIA ELECTRONIC MAIL*
Daralyn J. Durie, Esquire
Shaelyn Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                                     *VIA ELECTRONIC MAIL*
Meet Yatin Mehta, Esquire
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                               *VIA ELECTRONIC MAIL*
Sarah E. Brickey, Esquire
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202-5638
*Attorneys for Plaintiff*

Daniel P. Muino, Esquire                                    *VIA ELECTRONIC MAIL*
Reebehl G. El-Hage, Esquire
David Nathaniel Tan, Esquire
Sydney K. Cooper, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C. 20037
*Attorneys for Plaintiff*

Nicholas Rylan Fung, Esquire                                *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
Laura Gilbert Remus, Esquire
Zach B. Quinlan, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                                   *VIA ELECTRONIC MAIL*
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
*Attorneys for Plaintiff*

Michael J. DeStefano, Esquire                              *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
600 Brickell Avenue, Suite 1560
Miami, FL 33131
*Attorneys for Plaintiff*

*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)

# Exhibit 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARM LTD.,                                         )
                                                  )
                       Plaintiff,                 )
                                                  )
            v.                                    )     C.A. No. 22-1146 (MN)
                                                  )
QUALCOMM INC., QUALCOMM                           )
TECHNOLOGIES, INC. and NUVIA, INC.,               )
                                                  )
                       Defendants.                )

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
## POST-TRIAL BRIEF REGARDING EQUITABLE DEFENSES

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
William T. Marks
Anna P. Lipin
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

February 19, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

I.  ARGUMENT ................................................................................................... 1

A.  Arm's Inequitable Breach of Contract Constitutes Unclean Hands ...................... 1

B.  Defendants Proved at Trial That Arm's Hands Became Unclean When It Breached Section 15.1 of the Nuvia TLA and ALA................................................. 3

1.  Arm Breached the Nuvia TLA by Continuing to Use Nuvia-Requested Features in Its CMN Product. ...................................................... 3

2.  Arm Breached the Nuvia ALA by Using Nuvia's Confidential Configuration Files Months After It Terminated the Nuvia ALA. .............. 7

C.  Preservation Obligations and Certification Are No Excuse. ................................. 9

II.  CONCLUSION ............................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceptance Indem. Ins. Co.* v. *JJA Auto Sales, LLC*,
No. 15 Civ. 02954, 2017 WL 1333612 (E.D. Pa. Feb. 3, 2017),
*aff'd*, 716 F. App'x 134 (3d Cir. 2018) ........................................................................5

*Alanis* v. *Nelson*,
No. 11 Civ. 02583 (JEM), 2011 WL 13130700 (C.D. Cal. Dec. 9, 2011),
*aff'd*, 561 F. App'x 595 (9th Cir. 2014) ........................................................................7

*Bistrian* v. *Levi*,
448 F. Supp. 3d 454 (E.D. Pa. 2020) .............................................................................5

*Dollar Sys., Inc.* v. *Avcar Leasing Sys., Inc.*,
890 F.2d 165 (9th Cir. 1989) ..........................................................................................1

*In-N-Out Burgers* v. *Smashburger IP Holder LLC*,
No. 17 Civ. 1474 (JVS), 2018 WL 7891028 (C.D. Cal. 2018) ......................................1

*Katiroll Co.* v. *Kati Roll & Platters, Inc.*,
No. 10 Civ. 03620 (GEB), 2011 WL 2294260(D.N.J. Jun. 8, 2011) ..............................8

*Kendall-Jackson Winery, Ltd.* v. *Superior Court*,
76 Cal. App. 4th 970 (Ct. App. 1999) ....................................................................2, 6, 7

*Nelson* v. *Nelson*,
No. A126962, 2011 WL 213857 (Cal. Ct. App. Jan. 25, 2011) .....................................1

*O'Flaherty* v. *Belgum*,
9 Cal. Rptr. 3d 286 (Ct. App. 2004) ...............................................................................8

*Oakhurst Indus., Inc.* v. *Tubeway Assocs., L.P.*,
No. B201113, 2009 WL 4548342 (Cal. Ct. App. Dec. 7, 2009) ....................................1

*Passport Health, Inc.* v. *Travel Med, Inc.*,
No. 09 Civ. 01753 (GEB), 2011 WL 590723 (E.D. Cal. Feb. 10, 2011) .......................7

*Ricketts* v. *Compaction Plus, Inc.*,
No. D036553, 2002 WL 264645 (Cal. Ct. App. Feb. 25, 2002).....................................1

*Ridgway* v. *Ford Dealer Comput. Servs., Inc.*,
114 F.3d 94 (6th Cir. 1997) ............................................................................................4

*RLI Ins. Co.* v. *City of Visalia*,
297 F. Supp. 3d 1038 (E.D. Cal. 2018),
*aff'd*, 770 F. App'x 377 (9th Cir. 2019) ......................................................................3

*Rowen Petroleum Props., LLC* v. *Hollywood Tanning Sys., Inc.*,
No. 08 Civ. 4764 (NLH), 2013 WL 12303311 (D.N.J. Sept. 30, 2013) ..................................5

*Safety PPE, LLC* v. *Skanda Group of Industries LLC*,
No. 21 Civ. 3967 (JFW), 2023 WL 2558549 (C.D. Cal. Feb. 13, 2023) ................................7

*Saks* v. *Int'l Longshore & Warehouse Union-Pac. Mar. Ass'n Benefit Plans*,
637 F. App'x 282 (9th Cir. 2015) ........................................................................2, 3

*Schauerman* v. *Noble*,
No. A119960, 2009 WL 775108 (Cal. Ct. App. Mar. 25, 2009) ............................................1

*Sketchley* v. *Lipkin*,
222 P.2d 927 (Cal. Ct. App. 1950) ...........................................................................2

## Other Authorities

25 Williston on Contracts § 67:18 (4th ed. 2024) ..............................................................2

31 Wright & Miller, *Federal Practice and Procedure* § 7184 (2d ed. 2024) ................................4

Cal. R. of Ct. 8.1115 ............................................................................................1

U.S. Ct. of App. 9th Cir. Rule 36-3. .........................................................................2

## I.    ARGUMENT

### A.    Arm's Inequitable Breach of Contract Constitutes Unclean Hands

Defendants contend that Arm's claims are barred because Arm acted inequitably by breaching the same contractual obligations that form the basis for its own claim.  D.I. 602 at 1–2, 6.  In response, Arm spends pages disputing an argument defendants did not make: that *any* contractual breach by a plaintiff is sufficient to establish a defense of unclean hands.  Arm cites several cases that stand the uncontroversial proposition that a plaintiff's claims are not barred because it may have committed a minor or immaterial breach.  *E.g.*, *Oakhurst Indus., Inc.* v. *Tubeway Assocs., L.P.*, No. B201113, 2009 WL 4548342, at *15 (Cal. Ct. App. Dec. 7, 2009); *Dollar Sys., Inc.* v. *Avcar Leasing Sys., Inc*., 890 F.2d 165, 173 (9th Cir. 1989); *Nelson* v. *Nelson*, No. A126962, 2011 WL 213857, at *6 (Cal. Ct. App. Jan. 25, 2011).[1]  Similarly, Arm references the "general rule" that a breach by one party does not excuse a breach by the other, citing cases that either do not involve unclean hands or where the breach is not also inequitable.  D.I. 606 at 6–7 (collecting cases).

Defendants' unclean hands defense does not rely on an "[a]ccidental, inadvertent, or grossly negligent," or "simple" breach of contract by Arm.  D.I. 606 at 5–6.  Instead, defendants' unclean hands defense is based on Arm's inequitable and inconsistent conduct in suing defendants for the purported breach of an obligation that Arm itself has not fulfilled.  *See* D.I. 602 at 1–2, 6; *cf. In-N-Out Burgers* v. *Smashburger IP Holder LLC*, No. 17 Civ. 1474 (JVS), 2018 WL 7891028,

---

[1] Arm cites four unpublished state court cases that, according to California rules, "must not be cited or relied on by a court or a party."  Cal. R. of Ct. 8.1115(a); *see Oakhurst Indus.*, 2009 WL 4548342; *Nelson*, 2011 WL 213857; *Schauerman* v. *Noble*, No. A119960, 2009 WL 775108 (Cal. Ct. App. Mar. 25, 2009); *Ricketts* v. *Compaction Plus, Inc.*, No. D036553, 2002 WL 264645 (Cal. Ct. App. Feb. 25, 2002).  These cases have "neither precedential nor even potentially persuasive value."  *Id.* cmt. to (e)(3).

at *7 (C.D. Cal. Dec. 21, 2018) (denying motion to strike unclean hands defense where both parties allegedly engaged in false advertising).

California law recognizes that the unclean hands defense may invoke "[a]ny conduct that violates conscience, or good faith, or other equitable standards of conduct" so long as it relates to the plaintiff's cause of action. *Kendall-Jackson Winery, Ltd.* v. *Superior Court*, 90 Cal. Rptr. 2d 743, 749 (Ct. App. 1999). Breach of contract can satisfy this requirement. D.I. 602 at 6 (citing *Sketchley* v. *Lipkin*, 222 P.2d 927, 933 (Cal. Ct. App. 1950) and *Saks* v. *Int'l Longshore & Warehouse Union-Pac. Mar. Ass'n Benefit Plans*, 637 F. App'x 282, 284 (9th Cir. 2015)).

Arm's efforts to distinguish these authorities fall short. *Sketchley* and *Saks* establish the basic proposition that a breach of contract *can* be the inequitable conduct that forms the basis for a defense of unclean hands. *See* 25 Williston on Contracts § 67:18 (4th ed. 2024) ("Where the plaintiff has already committed a material breach of the contract, specific performance will be refused."). Arm insists incorrectly that *Sketchley* did not even involve the doctrine of unclean hands. D.I. 606 at 7. In a passage Arm does not quote, *Sketchley* states that the party would be denied recovery because "his hands are unclean" and "Equity does not aid him who has breached his agreement." 222 P.2d at 934.

Arm attempts to distinguish *Saks* by arguing that courts have rejected the Ninth Circuit's understanding that California law has "long permitted an unclean hands defense to be sustained on the basis of breach of contract." *Saks*, 637 F. App'x 282 at 284; *see* D.I. 606 at 6.[2] But the only case Arm cites to support this supposed repudiation rejected an unclean hands defense because

---

[2] Arm also purports to distinguish *Saks* on the ground that it is unpublished and that it "holds that the appellant in that case waived all of his arguments." D.I. 606 at 7–8. The latter is irrelevant, as the Ninth Circuit offered an alternative holding on the merits of the unclean hands defense. *Saks*, 637 F. App'x at 284. As to the former, unlike the unpublished state court cases cited by Arm, *see* n.1, *supra*, *Saks* is citable, persuasive authority under Ninth Circuit Rule 36-3.

2

there was no breach of contract to support the defense. *RLI Ins. Co.* v. *City of Visalia*, 297 F. Supp. 3d 1038, 1058 (E.D. Cal. 2018), *aff'd*, 770 F. App'x 377 (9th Cir. 2019). The court found an agreement did not require the insurer to indemnify the defendant city and thus rejected the city's unclean hands defense because it presented the "exact legal arguments" which the court "already resolved" in the insurer's favor. *Id.*

**B.    Defendants Proved at Trial That Arm's Hands Became Unclean When It Breached Section 15.1 of the Nuvia TLA and ALA.**

*1.    Arm Breached the Nuvia TLA by Continuing to Use Nuvia-Requested Features in Its CMN Product.*

Arm makes four arguments why its continued implementation of Nuvia-requested features in its CMN product does not render its hands unclean: (1) all feature requests were "Input," to which Arm has a perpetual license; (2) Arm's continued implementation does not violate Section 15.1 of the TLA because Arm no longer uses Nuvia Confidential documents communicating the features; (3) Arm did not act in bad faith; and (4) a breach of the Nuvia TLA cannot render Arm's hands unclean for purposes of the Nuvia ALA. Each argument is wrong.

**Input.** Arm reads Section 2, Clause B.4(ii) of the 2019 Nuvia TLA Annex to treat all "requests for changes to design and implementation of the CMN-Kampos" as "Input," regardless of whether those requests were made "in connection with a Development Release." D.I. 606 at 9 (quoting JTX-4 § 2, cl. B.4(ii)). Arm's interpretation is flawed for at least two reasons.

*First*, Clause B.4's "Input" provision is triggered only after a licensee "elect[s] to exchange" CMN-Rhodes for CMN-Kampos. JTX-4 § 2, cl. B.4. Nuvia did not make this exchange until January 18, 2021, after it had already sent Arm the CMN feature requests at issue. D.I. 603 ¶¶ 30–31, 44.

*Second*, Arm ignores that Clause B.4(ii)'s treatment as "Input" of "any requests to changes to design and implementation of the CMN-Kampos" applies only where a licensee "receive[s]

3

enhanced lead partner ('ELP') access for CMN-Kampos[.]" JTX-4 § 2, cl. B.4(ii).  Enhanced lead partners had "early access" to CMN-Kampos and "engage[d] early (pre-Alpha)[.]"  *Id.*  Arm cites no documentary evidence that Nuvia had ELP access or engaged pre-alpha, and Arm's sole witness could not recall any specifics regarding releases that Nuvia may have received.  *See* Bench Tr. 60:22–61:1 (Defilippi lacked knowledge of what Arm provided to Nuvia).  Thus, there is no viable evidence supporting Arm's contention.

**Section 15.1.**  Arm claims that because the Nuvia TLA is not in evidence, the Court cannot confirm its definition of "Confidential Information" or Arm's obligations upon termination.  D.I. 606 at 10–11.  But where, as here, a party fails to object at trial to the introduction of "relevant evidence regarding the terms of [a] contract" that was not itself introduced, any such objection is waived.  *Ridgway* v. *Ford Dealer Comput. Servs., Inc.*, 114 F.3d 94, 98 (6th Cir. 1997); *see* 31 Wright & Miller, *Federal Practice and Procedure* § 7184 (2d ed. 2024).  Moreover, Arm does not—and cannot—contest that the Nuvia TLA definition of Confidential Information and termination provision match those found in the Nuvia ALA, which is in evidence.  D.I. 603 ¶ 52.  Arm's proposed findings of fact further state that the provisions contain the same restrictions, noting that the "Nuvia TLA contains similar provisions regarding discontinuance of use" as the Nuvia ALA and that "Arm discontinued use of Nuvia Confidential Information in compliance with Section 15.1(b) of both the Nuvia ALA ***and the Nuvia TLA***."  D.I. 607 ¶¶ 33–34 (emphasis added).  Arm has repeatedly tied the two termination provisions together, including in its February 1, 2022 termination letter that quotes Section 15.1 as applied to both agreements, D.I. 603 ¶¶ 6–7, and in its response to Interrogatory No. 26 that states it "complied with Section 15.1(b) of the Nuvia ALA

and TLA by discontinuing use of materials designated 'Nuvia Confidential.'" DTX-845 at 5, 8.[3]

Next, Arm asserts that Nuvia Confidential Information consists only of documents marked "Nuvia Confidential," not the Nuvia-requested features, and that defendants "failed to present evidence that Arm used these documents following termination of the Nuvia TLA." D.I. 606 at 11–12. As an initial matter, "Confidential Information" includes "information designated in writing . . . as confidential," D.I. 603 ¶¶ 2, 52, it is not limited to the specific documents conveying the requested features. Moreover, Arm's argument is contradicted by its response to defendants' Interrogatory No. 27, which was introduced into evidence. *See id.* ¶ 57 (citing DTX-845). That interrogatory asked Arm to "describe in detail all uses (internal or external) by ARM of such NUVIA Confidential Information, including the incorporation of NUVIA Confidential Information into any ARM products, including but not limited to, [] CMN." DTX-845 at 13. Arm did not limit its response to identifying "documents" marked "Nuvia Confidential," but instead identified five Nuvia-requested features implemented in the R1 release of CMN-Kampos. *Id.* at 18. Arm cannot now argue against its own sworn statements.

In any event, if "Confidential Information" was limited as Arm now suggests, that would defeat Arm's entire claim against defendants. At trial, Arm did not present any evidence that Qualcomm and Nuvia misused any particular documents marked "Arm Confidential" following termination of the Nuvia ALA. Instead, its position was that Qualcomm's products incorporated

---

[3] The Court may also reopen the bench trial record to admit the TLA (JTX-3 (Ex. 1 hereto)). *Bistrian* v. *Levi*, 448 F. Supp. 3d 454, 483–85 (E.D. Pa. 2020). Arm cited the TLA in its opening (PDX-1.6) and also offered relevant evidence on these provisions, limiting any possible prejudice. *See, e.g., id.*; *Acceptance Indem. Ins. Co.* v. *JJA Auto Sales, LLC*, No. 15 Civ. 02954, 2017 WL 1333612, at *4 (E.D. Pa. Feb. 3, 2017) (citing *Zenith Radio Corp.* v. *Hazeltine Rsch., Inc.*, 401 U.S. 321, 331–32 (1971)), *aff'd*, 716 F. App'x 134 (3d Cir. 2018); *Rowen Petroleum Props., LLC* v. *Hollywood Tanning Sys., Inc.*, No. 08 Civ. 4764 (NLH), 2013 WL 12303311, at *2 (D.N.J. Sept. 30, 2013).

Arm Confidential Information. Arm cannot have it both ways.

**Bad Faith.** As Arm acknowledges, unclean hands can apply to "Any conduct that violates conscience, or good faith, or other equitable standards of conduct." *Kendall-Jackson*, 90 Cal. Rptr. 2d at 749; *see* D.I. 606 at 5, 8. To the extent Arm relies on "bad faith" as some heightened standard, D.I. 606 at 5, that is wrong—any inequitable conduct can suffice. There is more than sufficient evidence for the Court to conclude that Arm acted inequitably. Almost immediately after learning that Nuvia wanted to modify the CMN, Arm sought to capitalize on the opportunity to "suck[] knowledge out of Gerard's team" by "engaging [Nuvia] on our road map" rather than providing "full-fat modification rights." D.I. 603 ¶ 45 (quoting DTX-1809 at 2).[4] Arm did so by holding regular meetings with Nuvia engineers to discuss CMN. *Id.* ¶ 38. After terminating Nuvia's agreements, Arm had to discontinue its use of Nuvia Confidential Information under Section 15.1. *Id.* ¶¶ 8, 52. According to Arm, it certified compliance with Section 15.1, D.I. 606 at 18–19,[5] but did not actually comply: Arm kept Nuvia Confidential Information in its products and continued to profit from it. D.I. 603 ¶¶ 56–60. Arm then sued defendants for violating this same provision.

**Different Agreements.** Finally, Arm argues that its breach of the Nuvia <u>T</u>LA cannot render its hands unclean for purposes of the Nuvia <u>A</u>LA, although it fails to cite any relevant case.

---

[4] When asked about this email at trial, Arm's only live witness on this issue did not contest that Arm sought to "suck knowledge" from Mr. Williams, and instead said "That's not the language I would use." Bench Tr. 41:22–42:5 (Defilippi). Regardless of whether that is language Mr. Defilippi would use, it is language that other Arm executives did use. *See* DTX-1809 at 2.

[5] Arm argues "Nuvia never requested that Arm remove the Nuvia-requested features from the CMN product following termination." D.I. 606 at 12. But under Section 15.1(b) Arm had an obligation to stop using the Nuvia-requested features, which Arm concedes are Nuvia Confidential Information. *See* D.I. 603 ¶ 57. Arm does not dispute it was obligated to cease use of Nuvia Confidential Information and claims it did so post-termination, despite the features Arm admits are Nuvia Confidential Information remaining in Arm's products. D.I. 606 at 11. Moreover, Nuvia was not aware its Confidential Information remained in recent versions of CMN—something Nuvia learned during discovery in this case. *See* Mar. 6, 2024 Hr'g Tr. 4:10–5:22.

D.I. 606 at 13.[6]  Under California law, "*any* evidence of a plaintiff's unclean hands in relation to the transaction before the court or which affects the equitable relations between the litigants in the matter before the court should be available to enable the court to effect a fair result in the litigation." *Kendall-Jackson*, 90 Cal. Rptr. 2d at 754 (emphasis added); *see Alanis* v. *Nelson*, No. 11 Civ. 02583 (JEM), 2011 WL 13130700, at *6 (C.D. Cal. Dec. 9, 2011) (violation of one agreement can render hands unclean for another), *aff'd*, 561 F. App'x 595 (9th Cir. 2014).  Arm's own breach of its reciprocal Section 15.1 obligations "affects the equitable relations between the litigants" where Arm improperly misused Nuvia Confidential Information by incorporating it into products that it sold to Nuvia's competitors.  *Kendall-Jackson*, 90 Cal. Rptr. 2d at 754.

### 2.    Arm Breached the Nuvia ALA by Using Nuvia's Confidential Configuration Files Months After It Terminated the Nuvia ALA.

Arm also used Nuvia Confidential Information post-termination, including when Vivek Agrawal of Arm compared a Nuvia-confidential configuration file to a Qualcomm one.  D.I. 603 ¶ 19.  Arm does not dispute this, D.I. 607 ¶ 26, but does claim that its "employees could" only "theoretically 'access' Nuvia configuration files," D.I. 606 at 15–16.  But Arm employees admitted that they had *actual* access months after termination, as they must have to run their comparison.  D.I. 603 ¶¶ 11–20.

Arm argues that Mr. Agrawal's use of Nuvia Confidential Information was somehow not a "use" forbidden by Section 15.1 because it was a "comparative exercise," and no Nuvia Confidential Information was incorporated into Arm products.  D.I. 606 at 14–15.  Arm cites no

---

[6] In *Passport Health, Inc.* v. *Travel Med, Inc.*, a franchisor/franchisee royalty payment lawsuit, the franchisor's hands were not unclean based on alleged fraud in an unrelated transaction.  No. 09 Civ. 01753 (GEB), 2011 WL 590723, at *5 (E.D. Cal. Feb. 10, 2011).  Here, by contrast, the Nuvia ALA and TLA were part of the same transaction—they are dated the same day and include related provisions.  And *Safety PPE, LLC* v. *Skanda Group of Industries LLC* turned on lack of relevant evidence.  No. 21 Civ. 3967 (JFW), 2023 WL 2558549, at *7 (C.D. Cal. Feb. 13, 2023).

support for this strained interpretation. The Nuvia ALA says nothing about "use" within Arm products and contains no limitations regarding the types of "use" prohibited by Section 15.1. Arm concedes that it used Nuvia's confidential configuration file when it ran a "diff" comparison; that is an admission that it did not comply with Section 15.1.

Arm also seeks to excuse its breach by arguing that its motivation was pure. D.I. 606 at 13–14. Setting aside the evidence presented at trial that Arm opposed the Nuvia acquisition (and ultimately terminated the Nuvia agreement) in an attempt to extract higher royalty rates from Qualcomm, *e.g.*, DTX-57; DTX-144; DTX-145; DTX-1219, Arm's motivation when it breached the Nuvia ALA has no bearing on whether or not it committed a breach of Section 15.1.

Arm argues that because it purportedly only used Nuvia Confidential Information to "assess its contractual rights and obligations," its breach does not render its hands unclean. D.I. 606 at 14. As is clear from the trial record, looking at the details of the Nuvia microarchitecture design would not inform Arm in any way whether ARM Confidential Information, including ARM Technology, was being used in Qualcomm products. D.I. 598 at 10–18. And neither case Arm cites supports its conclusion. In *O'Flaherty* v. *Belgum*, unclean hands did not apply because the alleged inequitable conduct did not relate to the transaction at issue and would have resulted in a double punishment (forfeiture and damages). 9 Cal. Rptr. 3d 286, 298–99 (Ct. App. 2004). Neither is true here. And in *Katiroll Co.* v. *Kati Roll & Platters, Inc.*, a case that did not apply California law, the court rejected an unclean hands defense where plaintiff's letter to a third party requesting that it take down defendant's infringing content was "a *rightful* exercise of" its trademark rights. No. 10 Civ. 03620 (GEB), 2011 WL 2294260, at *2 (D.N.J. June 8, 2011) (emphasis added). A case about "the assertion of potentially valid rights to third parties" that was "not sufficiently related to the action at issue," *id.* at *3, hardly supports the proposition that Arm

was permitted to breach the Nuvia ALA in order to "assess its contractual rights." Further, as is clear from Arm's complaint, Arm knew Qualcomm intended to develop its products using Nuvia RTL, even without Mr. Agrawal's "diff" comparison. *See* D.I. 1 ¶¶ 40, 43, 51–52.

Finally, Arm contends that defendants have not been prejudiced by Arm's ALA breach.[7] But the configuration file contained confidential design information related to Nuvia's planned CPU design, which Arm recognizes as "embodying [Nuvia's] proprietary know how" and "secret sauce." Tr. 597:20–598:2 (Grisenthwaite). Arm understands the significance of accessing Confidential Information, having espoused that its entire lawsuit is "premised" on protecting IP.

### C. Preservation Obligations and Certification Are No Excuse.

Arm claims that it has "proceeded in the same manner [as defendants] with respect to the Nuvia Confidential Information in its possession, discontinuing any use rather than destroying." D.I. 606 at 17. That is wrong. As required by Section 15.1, Nuvia provided Arm with a timely certification explaining its compliance with its obligations, having "removed [Arm IP] from the Nuvia design completely and quarantined" it, "then under the Qualcomm Architecture License Agreement, we downloaded – after we relicensed, if there weren't licenses for IP, we relicensed those pieces of technology from Arm, we conferred with the engineering team that did that work, and the legal team that did that work, we reinstalled those new pieces of TLA IP into the database." Tr. 407:20–408:12 (Williams); *see also* Tr. 409:1–10 (Williams testifying that "the design team made sure to quarantine all of the IP that would have been under any Nuvia contract, isolated it and then we replaced it with IP that was downloaded under the Qualcomm TLA"). Defendants proved at trial that Arm, on the other hand, "did not take any specific action" with regard to Nuvia

---

[7] Arm does not dispute that defendants have been prejudiced by Arm's TLA breach.

Confidential Information, both retaining access to it and actually using it.  D.I. 603 ¶¶ 12–17 (quoting Bench Tr. 10:23–11:15 (Larri)).

Arm now claims that it certified compliance with Sections 15.1 of the Nuvia ALA and TLA.  Throughout discovery and at trial, Arm failed to produce any contemporaneous evidence on this issue.  Now, Arm even criticizes Qualcomm for failing to prove a negative.  Arm notes that Will Abbey testified "to the best of [his] knowledge" that Arm did so.  D.I. 607 ¶ 35.  At trial, Qualcomm elicited extensive testimony from Mr. Abbey demonstrating that "the best of [his] knowledge" was not credible.  For example, he acknowledged that he had "triggered memories" of things he had not remembered a year earlier, Tr. 191:14–21, and that these memories were triggered "fairly recently," Tr. 198:15–17.  Arm has put forward no documentary evidence to support Mr. Abbey's testimony.  To the contrary, Arm witnesses testified that they were not asked to take action with respect to Nuvia Confidential Information.  D.I. 603 ¶¶ 11–12.

## II.    CONCLUSION

For these reasons, judgment for defendants on Count I should be entered.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
William T. Marks
Anna P. Lipin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

February 19, 2025

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 19, 2025, upon the following in the manner indicated:

| | |
|---|---|
| Anne Shea Gaza, Esquire<br>Robert M. Vrana, Esquire<br>Samantha G. Wilson, Esquire<br>YOUNG CONAWAY STARGATT & TAYLOR, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Joyce Liou, Esquire<br>Daralyn J. Durie, Esquire<br>Shaelyn Dawson, Esquire<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, CA 94105<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Erik J. Olson, Esquire<br>Meet Yatin Mehta, Esquire<br>MORRISON & FOERSTER LLP<br>755 Page Mill Road<br>Palo Alto, CA 94304<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Scott F. Llewellyn, Esquire<br>Sarah E. Brickey, Esquire<br>MORRISON & FOERSTER LLP<br>4200 Republic Plaza<br>370 Seventeenth Street<br>Denver, CO 80202-5638<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |

12

Daniel P. Muino, Esquire                                    *VIA ELECTRONIC MAIL*
Reebehl G. El-Hage, Esquire
David Nathaniel Tan, Esquire
Sydney K. Cooper, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Plaintiff*

Nicholas Rylan Fung, Esquire                                *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
Laura Gilbert Remus, Esquire
Zach B. Quinlan, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                                   *VIA ELECTRONIC MAIL*
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Plaintiff*

Michael J. DeStefano, Esquire                               *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
600 Brickell Avenue, Suite 1560
Miami, FL  33131
*Attorneys for Plaintiff*

Gregg F. LoCascio, P.C.                                     *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Plaintiff*

Jay Emerick, Esquire                                        *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Plaintiff*

*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)

13

# Exhibit 16

| | |
|---|---|
| **From:** | Ying, Jennifer |
| **To:** | Helena C. Rychlicki |
| **Cc:** | Gaza, Anne Shea (agaza@ycst.com); rvrana@ycst.com; Mackrides, Daniel G.; Murray, Travis; Yenerall, Ben; #KE-ARM-Qualcomm; MoFo_Arm_QCOM; Qualcommv Arm; GRP-QCvARM |
| **Subject:** | Qualcomm v. Arm - C.A. 24-490 - Proposal on Hearing on Third-Party Protective Order Motions |
| **Date:** | Tuesday, October 21, 2025 5:13:31 PM |

Dear Special Master Rychlicki,

Pursuant to Your Honor's request, the parties have met and conferred and propose the following organization for the hearing on Third-Party Protective Orders motions.

The majority of the disputes involve TLAs.  We propose that at the outset of the hearing, Qualcomm present its arguments regarding TLAs in a joint session with all relevant third parties for no more than 30 minutes.  Following that argument, we propose conducting sequential hearings with each individual third party where the challenge is limited to production of TLA(s).  Each party will have no more than 15 minutes to present its argument, and Qualcomm is allowed 15 minutes to respond, as needed, to third party specific arguments.  For ▮▮▮▮▮ the only party where Arm has opposed the motion, Arm will also have 15 minutes to respond (making the total time a maximum of 45 minutes).

For parties challenging production of both the ALA and TLA (▮▮▮▮ and ▮▮▮▮ we propose conducting those arguments last, and the parties can address the ALA arguments in their allotted time – with each party allotted a maximum of 15 minutes.

In order to maintain confidentiality in each individual hearing, the third parties will submit attendees in advance so that they can be held in the waiting room until their scheduled appearance.

We also note that Qualcomm has conflicts counsel for the ▮▮▮▮▮ motion.  If ▮▮▮▮ objects to the joint session, they will not join the initial Qualcomm session, and instead Qualcomm will have conflicts counsel argue the entire motion during the allotted individual time.

The proposed schedule and order for the hearing is below:
- Qualcomm argument (30 minutes)
- ▮▮▮▮ (45 minutes)
- ▮▮▮▮ (30 minutes)
- ▮▮▮▮ (30 minutes)
- ▮▮▮▮▮▮ (30 minutes)
- ▮▮▮▮ (30 minutes)
- ▮▮▮ (30 minutes)
- ▮▮▮ (30 minutes)

Qualcomm requests that the hearing on the Third-Party Protective Order motions be scheduled as soon as convenient for Your Honor.  To the extent that Your Honor's ruling on the pending dispute between the parties over the scope of TLA-related discovery affects the dispute with any of these third parties, the parties will inform the third parties' counsel promptly to ensure an efficient hearing.

Arm believes that Your Honor's ruling on the pending dispute between the parties over the scope of TLA-related discovery may narrow the scope of the disputes with some of these parties. Arm requests that, after resolving the scope dispute between the parties, the hearing on the Third-Party Protective Order motions be scheduled as soon as convenient for Your Honor.

Counsel is available should Your Honor have any questions.

Respectfully,

Jennifer Ying (#5550)

---

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

# Exhibit 17

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

EXAL DIRECT DIAL: +1 212 373 3532
EMAIL: CNYARADY@PAULWEISS.COM

BRUSSELS        TOKYO
HONG KONG       TORONTO
LONDON          WASHINGTON, DC
LOS ANGELES     WILMINGTON
SAN FRANCISCO

July 11, 2025

<u>Via Email</u>                                    **Highly Confidential – Attorneys' Eyes Only**

Peter Evangelatos
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Re: *Qualcomm Inc.* v. *Arm Holdings Plc.*
C.A. No. 24-00490-MN

Dear Peter,

We write regarding the deposition of Akshay Bhatnagar on July 10, 2025.  During that deposition, Mr. Bhatnagar testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to the ▮▮▮▮ and ▮▮▮ cores, along with certain peripheral IP, he ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bhatnagar Tr. 44:4-17.  He also repeatedly described ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 44:18-21, 44:25-45:7.  When we asked Arm to produce this document, you responded that you would "take [that request] under advisement." *Id.* at 45:10-11.

Arm still has not produced that ▮▮▮▮▮▮▮, which is extraordinarily relevant to Qualcomm's claims that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, as required under ▮▮▮▮▮▮ of the Qualcomm TLA.  Arm's failure to produce this document has severely prejudiced Qualcomm's ability to prosecute its case, including by impeding its ability to depose Messrs. Shivashankar and Bhatnagar.  Please confirm that you will produce ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and any related emails or chats, by Monday, July 14.

Qualcomm reserves all rights.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Sincerely,

*/s/ Catherine Nyarady*

Catherine Nyarady

# Exhibit 18



| From: | Basner, Adam L |
| --- | --- |
| To: | Evangelatos, Peter; #KE-ARM-Qualcomm; MoFo_Arm_QCOM; vcst_arm_qualcomm |
| Cc: | GRP-QCvARM; Qualcommv Arm; jying@morrisnichols.com |
| Subject: | RE: Qualcomm v. Arm, Case No. 1:24-cv-490 |
| Date: | Wednesday, October 15, 2025 9:16:05 PM |

Peter,

As you may recall from the meet and confer five days ago, you represented that if ████████ and Qualcomm had reached an agreement on redactions, you would "get that out promptly." 2025.10.10 M&C Tr. 21:11-15. We understand that your position now is that you will not produce the redacted versions that ████████ has authorized you to produce unless and until the Special Master rules that Qualcomm's TLA claims relate only to ████ ████ and ████ or grants a protective order motion from ████████ Please confirm.

Your email mischaracterizes the parties' dispute before Judge Fallon. The subject of the parties' March briefing to the Court was whether the *producing party* should be permitted to unilaterally redact information that is allegedly subject to a third-party confidentiality agreement or that a third party requests the producing party to redact, without the third party ever moving for a protective order. Arm advocated for such redactions, proposing that "the *producing party* may redact Designated Confidential Information (as defined in the ESI Order) that is subject to a confidentiality agreement with a Third Party for which a Third Party has requested redaction." D.I. 68 Ex. D ¶ 52 (emphasis added). Qualcomm made clear its objection that the decision to redact third party confidential information should not be left to Arm and the third party. D.I. 70 at 2 ("Arm should not be permitted to redact third-party information contained in responsive documents in the first instance, forcing Qualcomm to move to have the documents unredacted"); *Id.* at 4 ("If a dispute cannot be resolved by the parties, it should be left to the Court, and not to Arm and self-interested third parties"). And Qualcomm explained that its concern was motivated by two instances of Arm's inappropriate redactions in the prior litigation—one resulting in the Court precluding Arm from using certain evidence and advancing certain theories in light of its redactions of ALAs and refusal to produce unredacted versions, and another where the Court had to scold Arm that its redactions were "sloppy, inconsistent, wrong," "ridiculous," and "garbage," and that Arm "should be embarrassed" that Qualcomm had to bring them to the Court's attention. *Id.* at 2-3 (citing 2024.09.05 Hr'g Tr.). In rejecting Arm's Protective Order proposal, Judge Fallon also acknowledged that the scope of the dispute was over Arm's proposal to "permit a *producing party* to redact information that is subject to a confidentiality agreement with a third party." D.I. 74 (emphasis added).

Nothing in the March briefing, the Court's Order, or the Protective Order prevents the ordinary course whereby a third party may negotiate with the party seeking production of its documents to resolve the dispute without Court intervention. Qualcomm's brief to Judge Fallon made clear that remained an option. D.I. 70 at 4 ("The usual method for protecting information—party negotiation followed by a prompt protective order motion by the third party to resolve any disputes—is the appropriate procedure."). Arm's apparent position to the contrary—that no redactions are ever permissible absent a motion for a protective order granted by the Court—is incorrect and invites an astonishing waste of resources for the parties, the third party, and the Court.

Consistent with the expectation in Delaware, Qualcomm engaged in a series of meet and confers with ████████ counsel, as noted in Qualcomm's letter to the Special Master. 2025.09.15 Letter to SM Rychlicki re: Newly-Learned Facts and Subsequent Events at 2 n.2. In the interest of not burdening the Special Master with yet another (repetitive) motion for a protective order, Qualcomm and ████████ agreed that ████████ would permit production of redacted versions of its agreements now, along with a corresponding redaction log, while the parties await the Special Master's rulings.

████████ further agreed to abide by the Special Master's rulings as it relates to other third-party protective order motions, such that ████████ would agree to produce a lesser redacted or unredacted version at a later date, consistent with the Special Master's rulings.

Please confirm by noon tomorrow, October 16, that Arm will promptly produce the materials ████████ provided.  Otherwise, Qualcomm intends to raise this issue with the Special Master.

Regards,
**Adam L Basner** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
2001 K Street, NW | Washington, DC 20006-1047
+1 202 223 7367 (Direct Phone) | +1 202 478 0493 (Direct Fax)
abasner@paulweiss.com | www.paulweiss.com

---

**From:** Evangelatos, Peter <peter.evangelatos@kirkland.com>
**Sent:** Tuesday, October 14, 2025 7:49 PM
**To:** Basner, Adam L <abasner@paulweiss.com>; #KE-ARM-Qualcomm <KE-ARM-Qualcomm@kirkland.com>; MoFo_Arm_QCOM <mofo_arm_qcom@mofo.com>; ycst_arm_qualcomm <ycst_arm_qualcomm@ycst.com>
**Cc:** GRP-QCvARM <GRP-QCvARM@paulweiss.com>; Qualcommv Arm <qualcommvarm@dirllp.com>; jying@morrisnichols.com
**Subject:** RE: Qualcomm v. Arm, Case No. 1:24-cv-490

Adam,

In March, the parties briefed competing Protective Order proposals for the treatment of third-party confidential information. In its briefing, Arm argued that "the Parties should be permitted to redact third-party confidential information in documents newly produced in this action." D.I. 68. Qualcomm argued that "Arm should not be permitted to redact third-party information contained in responsive documents," that "[a] third party wishing to protect confidential information has the burden of establishing good cause for doing so under Rule 26," and that "[a] third party wanting its information redacted must show why the requested redactions are appropriate." D.I. 70 at 1, 2.

The Court's ruling "reject[ed] Arm's proposals which would permit a producing party to redact information that is subject to a confidentiality agreement with a third party" and further stated that "neither the case authority cited by Arm nor the record in related Civil Action No. 22-1146-MN supports Arm's position that a provision permitting redactions of third-party confidential information should be included in the protective order and the ESI order." D.I. 74. The Court ordered that "a third party seeking further protections for its highly confidential information may follow the well-established procedure of moving for a protective order, which allows the court to balance the relevance of the information against the risk of inadvertent disclosure." *Id.*

As with any other third party confidential information, the proper procedure is for the third party, *i.e.*, ████████ to file for a protective order. Has Qualcomm received ████████ redactions, does Qualcomm agree that ████████ may redact that information, and is Qualcomm unopposed to such a motion? Assuming the Special Master rules in Arm's favor and finds that Qualcomm's only TLA

claims are for ████ ████ and ████ then Arm would not oppose the redactions we have received from ████ Arm reserves all rights to revisit these redactions if the Special Master finds that cores other than ████ ████ and ████ are in the case.

Best,
Peter

**Peter Evangelatos**
-------------------------------------------------
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 909 3291 **T** +1 516 528 6348
**F** +1 212 446 4900
-------------------------------------------------
peter.evangelatos@kirkland.com

---

**From:** Basner, Adam L <abasner@paulweiss.com>
**Sent:** Monday, October 13, 2025 7:44 PM
**To:** #KE-ARM-Qualcomm <KE-ARM-Qualcomm@kirkland.com>; MoFo_Arm_QCOM <mofo_arm_qcom@mofo.com>; ycst_arm_qualcomm <ycst_arm_qualcomm@ycst.com>;
**Cc:** GRP-QCvARM <GRP-QCvARM@paulweiss.com>; Qualcommv Arm <qualcommvarm@dirllp.com>; jying@morrisnichols.com
**Subject:** Qualcomm v. Arm, Case No. 1:24-cv-490

Counsel,

We understand that on Thursday, ████ provided Arm with redacted versions of its agreements that it is willing to have produced at this time. Please produce these agreements to us no later than tomorrow, October 14th.

Regards,
**Adam L Basner** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
2001 K Street, NW | Washington, DC 20006-1047
+1 202 223 7367 (Direct Phone) | +1 202 478 0493 (Direct Fax)
abasner@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# Exhibit 19

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3    _____

4    QUALCOMM INCORPORATED, a

5    Delaware Corporation; and

6    QUALCOMM TECHNOLOGIES, INC.,

7    a Delaware Corporation,

8              Plaintiffs,

9         v.                              Docket No.

10   ARM HOLDINGS PLC, f/k/a ARM LTD.        1:24cv490(MN)

11   a U.K. Corporation,

12             Defendant.

13   _____

14                    MEET AND CONFER

15   DATE:           Friday, May 23, 2025

16   TIME:           12:16 p.m.

17   LOCATION:       Remote Proceeding

18                   1285 Avenue of the Americas

19                   New York, NY 10019

20   REPORTED BY:   Abdul Sohail

21

22

23

24

25

Page 50

1 until, you know, we have that conversation about
2 whatever it is that, you know, you think you're
3 entitled to on the other side of that?
4         MR. EMERICK: I don't think it's
5 absolutely conditioned, including if this turns out to
6 be, as you guys hope, maybe just a handful. So I
7 wouldn't -- I'm not absolutely conditioning it on, you
8 know, you guys doing the same thing or us serving a
9 request. But it's something we'll take back, and
10 we'll take a look at.
11        MS. NYARADY: Okay. That would be
12 great.
13        MR. BRALY: And then --
14        THE REPORTER: Who is speaking?
15        MR. BRALY: I think the next one is --
16        MR. EVANGELATOS: This is Peter. I
17 think we are more than over on the second half of the
18 call, so we'll transition over to Qualcomm's responses
19 to Arm's RFPs now and pick up where we left off there.
20        THE REPORTER: Okay. So you're Peter?
21        MR. EVANGELATOS: I think we were --
22 This Is Peter from Kirkland, yes.
23        THE REPORTER: Okay. Thank you.
24        MR. EVANGELATOS: I think we were at
25 129, I believe, Meredith -- talk about that one.

Page 51

1         MS. POHL: I'm sorry, Peter. I'm
2 sorry. What set are in? Tell me again what we're
3 talking about.
4         MR. EVANGELATOS: So this is Peter from
5 Kirkland again. I was saying we'll transition over to
6 the disputes that Arm raised as to Qualcomm's
7 responses, second set of RFPs.
8         MS. POHL: This is Meredith at
9 Kirkland.
10        Did you say 129, Peter? That's where I
11 have that we left off.
12        MR. EVANGELATOS: Yeah.
13        MS. POHL: Okay. And I think maybe we
14 actually did kind of cover this in response to 128 on
15 our last meet and confer. And I think the question
16 was just whether third parties in 128 covered the
17 request also in 129.
18        And I think, Catherine, my
19 understanding was that that was accurate; but I think
20 we just didn't quite finish out the discussion here.
21        MS. NYARADY: Right. So I think we had
22 been talking about a few of these and -- because it
23 looks like when you get to 129, 130, 131 these were
24 different -- so these are all slightly different RFPs
25 about communications. But 128 had communications with

Page 52

1 third parties without limiting what the third -- who
2 the third party was; right? So I think we started to
3 talk about what the delta was in some of these
4 requests and if there was anything that you were
5 seeking beyond what was asked for in 128 in any of
6 those.
7         And our response in all of those, so in
8 129 and 130 and 131, was that we're going to produce
9 documents as set forth in 128. So I think that's
10 where we are. But if there's things in those RFPs
11 that are broader, right, that you're seeking, and it's
12 not, like, a total overlap, I think last time I had
13 invited you to kind of identify that if we're missing
14 something. So our response is going to be limited to
15 the response that we have with respect to what we're
16 willing to do in 128.
17        MS. POHL: Right. No. No. No.
18 That's helpful. I think, for example, part of the
19 question on our end is, for example, the response to
20 129 just says that you're incorporating your
21 objections to RFP 128, not the response, which is what
22 you say in response to number 130, which is that
23 you're incorporating your responses and objections to
24 128, which would include the part where you agreed to
25 produce. But you didn't incorporate that part in 129.

Page 53

1 You just said you're incorporating your objections and
2 not producing.
3         So I think our question is, are you
4 interpreting 129 in a way that is somehow different
5 for the meaning of third parties in 128 and the
6 communications requested in 130? Is there something
7 different about 129 that is causing it to be sort of
8 extra objectionable or that has, like, a different
9 wrinkle to it that 128 and 130 don't have?
10        MS. NYARADY: So I see --
11        MS. POHL: I just got your --
12        MS. NYARADY: Yeah. Yeah. Yeah.
13        MS. POHL: This is a different
14 response.
15        MS. NYARADY: Yeah. I see what you're
16 saying. And I also -- yeah, I see the difference now.
17 So I don't -- I mean, I don't -- I think there are
18 differences in terms of what we think in terms of
19 relevance for 129 and 130.
20        But in terms of how we are, right --
21 the communications just being more specific, I guess.
22 129 being with the press; 130 being with, you know,
23 customers, at least in part. So I do see that there's
24 a difference in terms of relevance or whatnot. But I
25 will say that to the extent we have documents that

14 (Pages 50 - 53)

1  we're agreeing to produce for 128, we are not
2  withholding anything because it's press; right?  So if
3  that's helpful.
4          So I think what you were asking is, you
5  know, when we say we're going to do what we're going
6  to do in 128 with respect to third parties, you know,
7  if we're coming across a communication with press,
8  publicists, you know, journalists -- like, you've got
9  the list there in 129 -- we are not withholding that.
10  Does that make sense?  So I think that answers your
11  question.
12          MS. POHL:  I think it does.  Let me
13  just say this back to you.  In other words, there's
14  not some special significance necessarily to the part
15  where the word responses and objections doesn't appear
16  in your response to 129, whereas it does in 130?
17          MS. NYARADY:  Yeah.  I mean, looking
18  back on it, we probably didn't need to make that
19  distinction.  But again, I think it was made because
20  of the fact that, you know, we don't think there's any
21  relevance to 129; and the bucket, if you will, of,
22  like, third parties that we're being asked about in
23  129, we see as different than 130.
24          But again, to the extent we're locating
25  documents in response to 128, you know, through this

1  searching and on the topics that we're talking about
2  that we said we'll produce documents on, we're not
3  withholding it just because it's a communication with,
4  you know, media or something.
5          MS. POHL:  Okay.  Okay.  That's
6  helpful.  And I think --
7          Although, Jay, if you have a different
8  view, you should chime in.
9          But I think that resolves our question
10  on these.
11          MR. EMERICK:  Yeah.  Go ahead.
12          MS. POHL:  All right.  So then the next
13  one -- I think the next one on my list, meet and
14  confers 131, which I think we covered actually, maybe.
15  Because they're all sort of -- now that I'm looking at
16  them -- similar.
17          And I think maybe this resolved
18  similarly 132, although you did not incorporate your
19  response to 128 there.  And so I think the question
20  is, is there a difference between communications,
21  documents, and things concerning agreements with or
22  payments to third parties, including press is somehow
23  different from the communications and documents with
24  third parties?  Or is there a particular -- is there a
25  difference with relevance objections for 132 that was

1  not present in 128?
2          MS. NYARADY:  I'm trying to look at the
3  difference in the scope.  I mean, I guess my answer
4  would be the same in terms of I don't -- you know, and
5  we can agree to disagree, but I don't see the
6  relevance of 132.  It's talking about agreements or
7  payments with third parties.  But to the -- if it's
8  helpful, I mean, to the extent that documents that
9  would be responsive to 132 are located, you know,
10  through the review that we're doing for 128, we're not
11  withholding that.
12          But I think because of the relevance
13  issue, that's why there was just a full objection to
14  that one and not pointing back to 128.  But as we sit
15  here now, I take your point that it's possible that
16  something could be swept up with, you know, 128, that
17  would be responsive to 132.
18          So to the extent there's anything
19  located in terms of the process for producing for 128
20  that would also be responsive to 132, you know, we're
21  not withholding that.  Does that make sense?
22          MS. POHL:  Okay.  Yeah.  But no.  That
23  does make sense, and that's really helpful.  So I
24  think maybe that resolved that one.  And 133 is
25  similar for kind of the same reason because it's

1  still -- it's agreements and payments to third
2  parties.  But instead of, you know, things -- it was
3  still related to licensing and competition, but
4  instead of payments or agreements, it is agreements or
5  payments that include sort of market analysts or
6  equity research analysts, things like that.
7          So I think it's sort of narrowing
8  the -- maybe not the scope of third parties, but it,
9  you know, I think it would sort of suggest if there's
10  a targeted group of third parties that is sort of a
11  more kind of market analyst firm or something like
12  that.  That would be in particular responsive to 133.
13          But I think for similar reasons, I know
14  you've duplicated in your objections to 132 and
15  there's a refusal to produce, but if there is anything
16  in 133 that's similarly swept up in 128, is this kind
17  of the same view that you have now about 132 that
18  would apply to 133?
19          MS. NYARADY:  Yes.  I think it would be
20  the same thing that we talked about for 132.
21          MS. POHL:  Okay.  Okay.  That's really
22  helpful.  So I think the next one is 141 that I have
23  on my list -- and this is --
24          MR. EVANGELATOS:  Meredith, this is
25  Peter.  Why don't we keep them in order?  I think we

# Exhibit 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br> a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br> a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 24-490 (MN) |
| v. | ) ) | **CONFIDENTIAL** |
| ARM HOLDINGS PLC., f/k/a ARM LTD.,<br> a U.K. corporation, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO ARM LTD.'S FIRST NOTICE OF DEPOSITION OF QUALCOMM INC. AND QUALCOMM TECHNOLOGIES, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)**

Pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure and the Local Civil Rules of this Court, Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively "Qualcomm" or "Plaintiffs") by and through their attorneys, hereby respond and object to Arm Holdings PLC's ("Arm" or "Defendant") First Notice of Deposition of Qualcomm Inc. and Qualcomm Technologies, Inc. Pursuant to Federal Rule of Civil Procedure 30(b)(6), dated June 12, 2025 ("the Notice").

## PRELIMINARY STATEMENT

Plaintiffs incorporate by reference each and every General Objection and Preliminary Statement set forth below into each and every specific response. From time to time, a specific response may repeat a General Objection or a Preliminary Statement for emphasis or some other reason. The failure to include any General Objection or Preliminary Statement in any specific response shall not constitute a waiver of any General Objection or Preliminary Statement to that discovery request.

object to this Topic on the grounds that it improperly seeks testimony regarding contentions, which is not permitted by the District of Delaware. Plaintiffs further object to this Topic to the extent the information sought is subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine. Plaintiffs object to this Topic to the extent it is more properly the subject of other discovery means, such as written interrogatories.

In light of the above objections, and because Plaintiffs are not aware of any non-privileged information, Plaintiffs decline to produce a witness to testify on this Topic.

## TOPIC NO. 60:

Your communications, or communications on Your behalf by any of Your affiliates or agents, including in-house or external counsel, or any public-relations affiliates, with Third Parties, including press, publicists, journalists, writers, media outlets (including podcasts, newsletters, blogs, and social media outlets), publishers, Arm or Qualcomm customers, or potential Arm or Qualcomm customers regarding the Disputed Subject Matter, including any communications relating to news articles, stories, accounts, reports, or publications about Arm, such as the Bloomberg News article on March 25, 2025, titled "Qualcomm Takes Legal Fight With Arm to Global Antitrust Agencies."

## OBJECTION TO TOPIC NO. 60:

Plaintiffs incorporate by reference each of their General Objections and Objections to Definitions as if fully set forth herein. Plaintiffs object to this Topic as seeking testimony regarding subject matter that is not relevant to any claim or defense of any party in this Action. Plaintiffs object that this Topic fails to describe the matters for examination with reasonable particularity as required by Federal Rule of Civil Procedure 30(b)(6). Plaintiffs further object to this Topic as overbroad and unduly burdensome to the extent it seeks testimony regarding Plaintiffs' "communications, or communications on [Plaintiffs'] behalf," without limitation. Plaintiffs further object to this Topic to the extent the information sought calls for a legal conclusion. Plaintiffs further object to this Topic as vague and ambiguous, particularly with respect to the phrase "press, publicists, journalists, writers, media outlets (including podcasts, newsletters, blogs,

and social media outlets), publishers, Arm or Qualcomm customers, or potential Arm or Qualcomm customers." Plaintiffs further object to this Topic on the grounds that it improperly seeks testimony regarding contentions, which is not permitted by the District of Delaware. Plaintiffs further object to this Topic to the extent the information sought is subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine.

Subject to and without waiving the foregoing objections, Plaintiffs agree to produce one or more witness(es) to provide testimony regarding Qualcomm's communications with potential or actual Arm or Qualcomm customers regarding Arm's October 22, 2024 breach notice and the "Bloomberg News article on March 25, 2025, titled 'Qualcomm Takes Legal Fight With Arm to Global Antitrust Agencies.'"

## TOPIC NO. 61:

Your disclosures or communications with Third Parties regarding the ALA Breach Allegations and Communications.

## OBJECTION TO TOPIC NO. 61:

Plaintiffs incorporate by reference each of their General Objections and Objections to Definitions as if fully set forth herein. Plaintiffs object to this Topic as seeking testimony regarding subject matter that is not relevant to any claim or defense of any party in this Action. Plaintiffs object that this Topic fails to describe the matters for examination with reasonable particularity as required by Federal Rule of Civil Procedure 30(b)(6). Plaintiffs further object to this Topic as overbroad and unduly burdensome to the extent it seeks testimony regarding all Plaintiffs' "disclosures or communications with Third Parties," without limitation. Plaintiffs further object to this Topic to the extent the information sought calls for a legal conclusion. Plaintiffs further object to this Topic on the grounds that it improperly seeks testimony regarding contentions, which is not permitted by the District of Delaware. Plaintiffs further object to this Topic to the extent the

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC  20004
(202) 240-2900

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA  94105
(628) 432-5100

June 23, 2025

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2025, copies of the foregoing were caused to be served upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                     *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Karen E. Keller, Esquire                                     *VIA ELECTRONIC MAIL*
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                                 *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                                   *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
Sydney D. Gaskins, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Kyle W.K. Mooney, Esquire                                   *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Erik J. Olson, Esquire                                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Defendant*

Daniel P. Muino, Esquire                                  *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
*Attorneys for Defendant*

Brian M. Kramer, Esquire                                  *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 200
San Diego, CA  92130
*Attorneys for Defendant*

William Frentzen, Esquire                                 *VIA ELECTRONIC MAIL*
Daralyn J. Durie, Esquire
Shaelyn Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*

Lydia B. Cash, Esquire                                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                                   *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                                          *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                                    *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*

*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)

# Exhibit 21

# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

September 11, 2025

Helena C. Rychlicki, Esquire
Pinckney, Weidinger, Urban & Joyce LLC
2 Mill Road, Suite 204
Wilmington, Delaware 19806
(302) 504-1497
HRychlicki@pwujlaw.com

<u>VIA ELECTRONIC MAIL</u>

Re:    *Qualcomm Inc., et al. v. ARM Holdings PLC*, C.A. No. 24-490-MN
       Nonparty ███████ <u>Motion for Protective Order</u>

Dear Special Master Rychlicki:

  Nonparty ████████████████ ) moves for entry of a protective order preventing Defendant Arm Holdings plc, f/k/a ARM Ltd. ("Arm") from producing agreements between Arm and ████████ to Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm"). This motion is brought under Federal Rule of Civil Procedure 26, ¶¶51-52 of the Stipulated Protective Order (D.I. 84), and the procedures governing disputes before the Special Master (D.I. 336; D.I. 350).

## I. INTRODUCTION

  Qualcomm seeks unredacted copies of highly sensitive, customized contracts between ██████████ and Arm. These contracts have no discernable relevance to the present dispute between Qualcomm and Arm: a breach of contract claim that does not involve ██████████.

  At the same time, the harm of producing the requested agreements is great. Qualcomm announced that it intends to launch chips for data centers and servers "very soon." Ex. A (available at https://www.cnbc.com/2025/05/19/qualcomm-to-launch-data-center-processors-that-link-to-nvidia-chips.html); Ex. B (available at https://www.datacenterknowledge.com/data-center-chips/data-center-chips-in-2024-top-trends-and-releases). This will put Qualcomm in competition with ██████████ *See* Declaration of ██████████ ("Decl.") ¶6. In the relevant space, ██████ incorporates Arm-licensed designs into its end products. Decl. ¶¶4-5, 8; Ex. C (available at ██████████████████████████████████████ ). The agreements between ██████████ and Arm that Qualcomm seeks contain ██████████ trade secrets and highly sensitive competitive information for those products. Decl. ¶¶7-10, 12. Specifically, the agreements include pricing details, payment structures, and forward-looking information. Moreover, Qualcomm could ascertain other details about ██████████ business, including costs bearing on ██████████ pricing decisions.

Helena C. Rychlicki, Esquire
September 11, 2025
Page 2

Accordingly, ██████ respectfully requests a protective order preventing disclosure of ██████ agreements with Arm. As this Court held in a related action, "[a] court may issue an order under Rule 26(c) to protect information from disclosure for good cause, which requires a movant to show that, absent the protective order, it will suffer a clearly defined and serious injury … balancing relevance, need, confidentiality, and harm." *See ARM Ltd. v. Qualcomm Inc.*, No. 22-cv-1146 (D. Del.) ("NUVIA litigation"), D.I. 207. Good cause exists here because the requested information has no bearing on Qualcomm's claims that Arm breached a contract between the parties, but would be particularly useful to Qualcomm in competition with ██████ and in its commercial negotiations.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     ██████ Agreements with Arm

██████ ██████ has agreements with Arm to license Arm's technology for incorporation into chip designs. Decl. ¶¶4-5. These agreements are highly negotiated, contain terms unique to ██████ and reveal pricing details, payment structures, and forward-looking information. Decl. ¶¶7-12. The terms are so highly confidential and commercially sensitive that these agreements are not externally distributed and internal access is particularly limited. Decl. ¶9. Participation in negotiations is limited to a few specific, high-level members of ██████ Arm, and ██████[1] Decl. ¶7. ██████ maintains the agreements internally on a recordkeeping platform with limited access for only employees who have a need to know as part of their role and responsibilities. Decl. ¶9. Access is controlled by security measures, such as user authentication and review by the legal department. Decl. ¶9.

The agreements Arm intends to produce are the ██████ ██████ These agreements contain confidentiality clauses and require protective measures. In the event of necessary disclosure, the agreements also require the disclosing party to provide advance notice. Decl. ¶10.

### B.     Protective Order Procedure in This Action

The Stipulated Protective Order (D.I. 84) permits nonparties to move for protection of highly sensitive information from disclosure in the litigation. When a party is required to produce a nonparty's confidential information, it must promptly notify the requesting party and the nonparty in writing, provide the discovery requests to the nonparty, and make the requested information available for the nonparty's inspection. D.I. 84 ¶51. The nonparty then has 21 days to move for a protective order. D.I. 84 ¶52.

On August 21, 2025, Arm sent a letter notifying ██████ that it "intends to produce to Qualcomm confidential information relating to Arm's relationship with ██████ including copies of the unredacted ██████ between Arm and ██████ Decl. ¶3. On September 3, 2025, Arm provided the Qualcomm discovery requests, in response to which Arm intends to produce

---

[1] ██████. Decl. ¶1.

Helena C. Rychlicki, Esquire
September 11, 2025
Page 3

these agreements, as required under the Stipulated Protective Order. D.I. 84 ¶51. To permit substantive discussions, Qualcomm retained conflicts counsel on September 5, 2025. Pursuant to Local Rule 7.1, ███████ and Qualcomm conferred on September 5 and 9 attempting to reach a resolution. ███████ separately conferred with Arm on September 9. Specifically, ███████ requested an explanation of why, even at a high level, the agreements sought were relevant to the pending action. The parties declined to provide any actionable information without ███████ first agreeing to a host of requirements and restrictions. ███████ now timely moves for a protective order. D.I. 84 ¶52.

      **C.**    **Prior, Similar Motions Have Been Granted By The Court**

This is not the first dispute between Qualcomm and Arm that has drawn in nonparties concerned about production of highly sensitive information. In the NUVIA Litigation, the Court granted a protective order preventing the production of competitively sensitive nonparty licenses with Arm. NUVIA Litigation, D.I. 207 (D. Del. Nov. 27, 2023) (issuing protective order preventing production of nonparty license because of the sensitivity of the information, the agreement's minimal relevance, and the harm of disclosure "given that Qualcomm's outside counsel will necessarily need to communicate generalized information about the [agreement] to its client").

**III.**    **LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 26(b)(1), parties may obtain discovery of any non-privileged information relevant to a claim or defense and proportional to the needs of the case. The party seeking discovery bears the burden of demonstrating relevance. *See Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, 2017 WL 4310221, at *4 (M.D. Pa. Sept. 28, 2017). The existence of a protective order "is not a substitute for establishing relevance or need[;]" rather, a protective order's purpose is to "prevent harm by limiting disclosure of relevant and necessary information." *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1325 (Fed. Cir. 1990).

Rule 26 also provides that "the court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense" by "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). "[G]ood cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984). "[I]t is clear that a court may issue a protective order restricting disclosure of discovery materials to protect a party from being put at a competitive disadvantage." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F. Supp. 866, 890 (E.D. Pa. 1981). In determining whether good cause exists to preclude discovery, the Court considers whether the movant has "show[n] that, absent the protective order, it will suffer a clearly defined and serious injury … balancing relevance, need, confidentiality, and harm." NUVIA Litigation, D.I. 207. Indeed, "even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit." *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 529 (D. Del. 2002).

Helena C. Rychlicki, Esquire
September 11, 2025
Page 4

## IV.    ARGUMENT

███████████ respectfully requests a protective order preventing production of its competitively sensitive information because: (1) the information is minimally, if at all, relevant to Qualcomm's claims; and (2) any need for that information is far outweighed by the harm ███████ would incur if its highly confidential information were disclosed to a competitor. ███████ motion presents similar facts and circumstances to those the Court found warranted a protective order preventing the disclosure of ████ licensing agreements in the NUVIA Litigation.

*First*, the documents and information Qualcomm seeks are, at most, minimally relevant. Qualcomm alleges Arm breached an agreement between Arm and Qualcomm primarily by alleging Arm withheld deliverables to Qualcomm. The terms of separate agreements between Arm and nonparties (like ████████ have no discernable bearing on those claims.

The Court should also reject any arguments by Qualcomm that the requested agreements are relevant to Qualcomm's claim that Arm breached its agreement with Qualcomm by "refusing to provide licensing offers at commercially reasonable prices for various TLA cores and peripherals products." D.I. 211 at 5-6. To assess whether Arm offered Qualcomm commercially reasonable prices for its intended applications, Qualcomm does not (and has not demonstrated a) need to access ██████ licensing agreements, which reflect a highly negotiated arrangement for a different set of circumstances and applications. Permitting a dissatisfied licensee to access competitors' agreements with the same licensor simply to verify the commercial reasonableness of its own agreement should be the narrowest of exceptions, not the rule, particularly where (as here) highly sophisticated parties and pioneering technologies are at issue.

*Second*, any minimal relevance is far outweighed by the harm caused to ██████ by disclosing trade secrets and highly sensitive information to a competitor focused on entering the space in which ██████ predominantly operates. Decl. ¶¶ 4, 6, 12. There is great risk that Qualcomm could readily use information from ██████ agreements with Arm to its advantage at a heavy cost to ██████ and its business. Meanwhile, ██████ does not have access to reciprocal information regarding Qualcomm's agreements with Arm. Decl. ¶13.

Having demonstrated good cause, ██████ requests that the Court enter its proposed protective order, filed herewith.

### A.    The Information Qualcomm Seeks Is Irrelevant to its Claims in this Action

Qualcomm's claims relate to alleged breaches of specific contractual provisions by Arm, namely that Arm failed to deliver certain technology it owed to Qualcomm. *See generally* SAC. ██████ agreements with Arm have no bearing on whether Arm met those obligations. *See, e.g.*, *AdTrader, Inc. v. Google LLC*, 2021 WL 937559, at *2 (N.D. Cal. Mar. 12, 2021) (holding that policies toward nonparty advertisers were not discoverable because they revealed nothing about performance of contractual obligations owed to plaintiff under a separate agreement).

In response to motions for protective orders by other nonparty Arm licensees, Qualcomm has argued that the requested agreements are relevant as ████████████████████

Helena C. Rychlicki, Esquire
September 11, 2025
Page 5



D.I. 211 at 8. But none of Qualcomm's claims in the operative complaint, to the extent disclosed publicly and thus to ████████ appears to turn on whether certain prices are ███████████████. And, ████████ agreements do not relate to circumstances and applications comparable to those covered by Qualcomm's agreements. The terms of the agreements between ███████ and Arm represent ████████ ████████████ Decl. ¶8. Further, a contract with ████████ is not necessary or sufficient to demonstrate general ████████████ particularly in view of the highly customized nature of those agreements. According to Arm, Qualcomm may argue that the agreements are relevant to allegations that Arm violated certain requirements in its TLA with Qualcomm. That does not warrant production of several entire agreements or █████ highly confidential information. The parties declined to agree to any redactions and have not disclosed the nature of the requirements at issue or any other purported basis for relevance.

In the NUVIA Litigation, the Court granted a protective order under similar circumstances. *See* NUVIA Litigation, D.I. 207. There, in a breach of contract action brought by Arm, Qualcomm argued that pricing terms in nonparty licensing agreements were "directly relevant" to its defense to Arm's claim for specific performance because (Qualcomm argued) those terms could demonstrate that monetary damages would be sufficient compensation. *See* NUVIA Litigation, D.I. 201, D.I. 243. The Court disagreed, and granted Apple's motion for a protective order, finding that the "highly bespoke" and "highly confidential" agreement between Apple and Arm was of "marginal relevance." *See* NUVIA Litigation D.I. 207, D.I. 252. The same reasoning applies here.

**B.      Disclosure Poses Substantial Risk of Competitive Harm to** ████████

The risk of significant harm to ████████ far outweighs any marginal and unarticulated relevance of the agreements to this action. *See Mannington Mills*, 206 F.R.D. at 529. The licensing terms and pricing information sought are highly confidential, protected, customized, and valuable. *See* 6 Del. C. § 2001(4)(a)-(b); *Am. Totalisator Co. v. Autotote Ltd.*, 1983 WL 21374, at *3 (Del. Ch. Aug. 18, 1983) (confirming that "information on prices and costs can be trade secret). As discussed above, Qualcomm has made clear it intends to imminently enter the space to which the requested agreement terms and pricing relate. Decl. ¶6. At this critical time, if the requested agreements are produced, Qualcomm will gain insight into the highly sensitive commercial arrangements of ████████

This competitive harm cannot be remedied by designating the information as viewable by outside counsel pursuant to the existing protective order. As this Court has recognized, "the harm of disclosure given that Qualcomm's outside counsel will necessarily need to communicate generalized information about the [agreement] to its client, all of which remains true even given the Protective Order in this case." NUVIA Litigation, D.I. 207; *see also Mannington Mills*, 206 F.R.D. at 530-32 (rejecting argument that attorney's-eyes-only designation would be sufficient). The same concern exists here. For example, if Qualcomm's counsel intends to use ████████ agreements with Arm to assess whether Arm offered Qualcomm ████████████, discussions about the details of ████████ agreement are inevitable.

Helena C. Rychlicki, Esquire
September 11, 2025
Page 6

## V.    CONCLUSION

Because this action relates to Arm's alleged breach of its agreement with Qualcomm, ███████ agreements are minimally, if at all, relevant.  The Court should disregard any relevance arguments advanced by the parties in response to this motion but not previously disclosed to ███████  Weighed against the substantial risk of competitive harm to nonparty ███████ a protective order prohibiting Arm from producing or disclosing the requested agreements to Qualcomm is warranted and respectfully requested.

Respectfully,

*/s/ Andrew C. Mayo*

Andrew C. Mayo (#5207)

Word Count: 2371

ACM/mlk

cc:    All counsel of record (via electronic mail)

# Exhibit 22

**K&L GATES**

September 16, 2025

Matthew B. Goeller
matthew.goeller@klgates.com

T +1 302 416 7082

**Via Email**

Special Master Helena C. Rychlicki
2 Mill Road, Suite 204
Wilmington, DE 19806
hrychlicki@pwujlaw.com

**Re:    *Qualcomm Inc. and Qualcomm Techs., Inc. v. Arm Holding PLC., f/k/a Arm Ltd.,***
***C.A. No. 24-490-MN***

**Letter Brief in Support of**
**Nonparty ▆▆▆▆▆▆▆▆ Motion for Protective Order**

Contains *HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY* Information

Dear Special Master Rychlicki:

Nonparty ██████████████ moves for a protective order preventing Defendant Arm Holding PLC ("Arm") from producing certain information in response to discovery requests from Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. ("Qualcomm"), which seek highly confidential ██ business information irrelevant to its dispute.

Arm recently notified ██ that Qualcomm had propounded discovery requests directed at Arm's business relationship with ██ including unredacted copies of a ████████████ between ██ and Arm, along with amendments, exhibits, annexes, and order forms related to the same (the "██ Contracts").[1] ██ understands Qualcomm has moved to compel production of the ██ Contracts over Arm's objections and that Arm intends to produce such documents to resolve Qualcomm's motion. ██ filed its Motion for Protective Order (Dkt. 390) with the Court on September 11, 2025.

The Special Master should enter a protective order prohibiting Arm from producing confidential information relating to Arm's relationship with ██ including the ██ Contracts, or in the alternative order Qualcomm to confer with counsel for ██ on reasonable redactions to such documents, for at least two reasons:

*First*, the information sought by Qualcomm and which Arm intends to produce is irrelevant to Qualcomm's claims against Arm, and its disclosure serves no legitimate purpose.

*Second*, the substantial risk of competitive harm to ██ if the disclosure is made far outweighs any purported need for the information.

## I.    BACKGROUND

████████████████████ ¶ 3 (attached hereto as **Exhibit 1**).  As part of its business, ██ has long-standing agreements with Arm to license certain Arm technology.  These agreements are highly negotiated and contain terms unique to ██ and sensitive information about ██ business model.  *Id.* ¶ 4.  Qualcomm, a direct competitor of ██ (*id.* ¶ 3), also contracts with Arm for technology that Qualcomm integrates into its products.  *See, e.g.*, Dkt. 6 ¶ 5.

The ██ Contracts contain highly confidential and commercially sensitive terms, including royalty rates and payment terms regarding specific technology ██ licenses from Arm.  ██████ Decl. ¶ 4.  The agreement terms were heavily negotiated under highly confidential conditions.  *Id.* ██ does not distribute information regarding the technology that it licenses from Arm, or the pricing structure for its licenses, outside of ██ *Id.* ¶ 9.  Even within ██ access to ██ agreements with Arm is strictly limited.  *Id.*

---

[1] ████████████████████████████████████████.

September 16, 2025

Contains *HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY* Information

The ▮▮ defines ▮▮ ▮ *Decl.* ¶ 6. ▮▮ of the TLA ▮▮:



*Id.* ▮▮ of the ▮ further provides ▮▮ *Id.* ¶ 7.

The top, center of every page of the ▮▮ is conspicuously marked as "Confidential." *Id.* ¶ 8.

On or around August 21, 2025, Arm sent ▮ a letter notifying ▮ that, in response to Qualcomm discovery requests, Arm "intends to produce to Qualcomm confidential information relating to Arm's relationship with ▮▮, including copies of the unredacted TLA, ATA, and RPA, between Arm and ▮▮, and amendments, exhibits, and annexes thereto." *See* **Exhibit 2**. ▮ objects to the production.

## II.    ARGUMENT

Rule 26(b)(1) limits discovery to non-privileged information that is relevant to a claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). The party seeking discovery bears the burden of establishing relevance. *See Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, 2017 WL 4310221, at *4 (M.D. Pa. Sept. 28, 2017). The existence of a protective order has no impact on the relevance or need for discovery. Rather, a protective order's purpose is to "prevent harm by limiting disclosure of *relevant* and *necessary* information." *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1325 (Fed. Cir. 1990) (emphasis in original).

Rule 26 limits the scope of discovery by providing that "the court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by "requiring that a trade secret or other confidential research, development, or *commercial information* not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G) (emphasis added). "[G]ood cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984). "[A] court may issue a protective order restricting disclosure of discovery materials to protect a party from being put at a competitive disadvantage."

September 16, 2025

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F. Supp. 866, 890 (E.D. Pa. 1981); *see also United States v. Dentsply Int'l, Inc.*, 187 F.R.D. 152, 158–62 (D. Del. 1999) (granting protective order shielding nonparty's confidential information from discovery by competitor's in-house attorney). In determining whether good cause exists, courts consider whether the movant has "show[n] that, absent the protective order, it will suffer a clearly defined and serious injury … balancing relevance, need, confidentiality, and harm." *See* Oral Order on Motion, *ARM Ltd. v. Qualcomm Inc., et al.*, C.A. No. 22-1146 (MN) (D. Del. Nov. 27, 2023) (Dkt. 207) (the "NUVIA litigation"). Indeed, "even if the information sought is relevant, discovery is not allowed where no need is shown … or where the potential harm caused by production outweighs the benefit." *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 529 (D. Del. 2002).

Arm should be barred from disclosing ▮▮ competitively sensitive information contained within the ▮ Contracts because: (1) the information Qualcomm seeks is not relevant to its claims against Arm; and (2) even if the ▮ Contracts information was relevant, any need for that information is far outweighed by the harm ▮▮ would suffer in having its confidential information disclosed to its direct competitor Qualcomm.

## A.    The Information Qualcomm Seeks Is Irrelevant.

The ▮▮ confidential information Qualcomm seeks, and Arm intends to produce, is irrelevant to Qualcomm's underlying dispute, and will not lead to the discovery of admissible evidence. Qualcomm's claims against Arm are based on alleged breaches of *Qualcomm's* licensing agreement with Arm, for failure to deliver technology it owed to Qualcomm. *See generally* Compl. The ▮▮▮▮ between Arm *and* ▮▮ are not relevant to Qualcomm's claims, nor are they likely to lead to the discovery of admissible evidence. Put simply, Arm's obligations and conduct with respect to third parties, including ▮▮ has no bearing on Arm's obligations and conduct towards Qualcomm. *See, e.g., AdTrader, Inc. v. Google LLC*, 2021 WL 937559, at *2 (N.D. Cal. Mar. 12, 2021) (holding that Google's policies with respect to nonparty advertisers were not discoverable and not relevant to its performance or compliance with obligations owed to plaintiff advertisers under separate contracts).

Qualcomm has only identified a single specific reason why it believes the ▮▮ Contracts are relevant. During a September 15, 2025, teleconference, Qualcomm explained to ▮▮ counsel ▮▮▮▮▮▮ and that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[2]   Notably, Qualcomm confirmed that Arm has stated in discovery that ▮▮▮▮▮ As such, the ▮▮ Contracts have no relevance as to whether Arm breached the ▮▮▮▮ in the agreement with Qualcomm.

---

[2] Neither the license agreement nor any of its language, including the purported ▮▮▮▮ ▮▮, has been provided to ▮▮

September 16, 2025

Contains *HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY* Information

While Qualcomm asserts concern about the accuracy of Arm's discovery response, it has provided no facts calling into question Arm's discovery response, and its speculation is not a sufficient basis for requiring the production of non-party ▮▮▮ highly confidential commercial information.  *See, e.g., Torre v. Charter Commc'ns, Inc.*, No. 19-CV-5708 (JMF), 2020 WL 7705940, at *1 (S.D.N.Y. Dec. 28, 2020) ("speculation is not a basis to look first to a non-party").

Because Qualcomm cannot meet its burden of demonstrating relevance, ▮▮▮ motion should be granted.  *See Mannington Mills*, 206 F.R.D. at 530–32 (quashing subpoena to nonparty on relevance grounds).

## B.     The Discovery Qualcomm Seeks Poses a Substantial Risk of Competitive Harm to ▮▮

In addition to the lack of relevance, the potential harm to ▮▮ far outweighs any purported benefit to Qualcomm and is a separate and sufficient basis to enter ▮▮ requested protective order. *See Mannington Mills*, 206 F.R.D. at 529 ("[E]ven if the information sought is relevant, discovery is not allowed where no need is shown … or where the potential harm caused by production outweighs the benefit").

The information sought by Qualcomm is undoubtedly competitively sensitive and should not be disclosed to ▮▮ competitors.  Tellingly, Qualcomm itself redacted similar information from its complaint, and refuses to share the specific details of its Arm agreements with its competitors, including ▮▮  See*, e.g.*, Compl. ¶ 40; Am. Compl. ¶¶ 63–67.[3]  The pricing structure, royalties, and related terms sought to be produced in unredacted form are ▮▮ trade secrets.  *See, e.g.*, *Am. Totalisator Co. v. Autotote Ltd.*, 1983 WL 21374, at *3 (Del. Ch. Aug. 18, 1983) ("information on prices and costs" constitutes a trade secret); *see also Syngenta Crop Prot., LLC v. Willowood, LLC*, 2016 WL 4925099, at *3 (D. Del. Sept. 14, 2016) (a trade secret is information that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use' and is subject to reasonable efforts 'to maintain its secrecy'") (quoting 6 Del. C. § 2001 (4)(a)–(b)).  Even if the at-issue ▮▮ information did not qualify for trade secret protection, it is still highly sensitive, confidential commercial information that is not publicly available and heavily restricted within ▮▮  *See* ▮▮ Decl. ¶¶ 5, 6, 9.

Disclosure of ▮▮ trade secrets and confidential information poses a serious risk of injury to ▮▮ If Qualcomm were permitted to access such information, even inadvertently, Qualcomm could reverse engineer pricing levels that ▮▮ must achieve to remain profitable.  *See id.* ¶ 10.  This competitive harm to ▮▮ cannot be remedied through a protective order that limits disclosure of the ▮▮ Contracts to an "attorneys' eyes only" basis.  As the court in the related NUVIA Litigation concluded, there is a "harm of disclosure given that Qualcomm's outside counsel will necessarily need to communicate generalized information about the ALA to its client, all of which remains true

---

[3] Qualcomm's Second Amended Complaint, which is the operative complaint at this stage, is completely under seal and no redacted version is available.

Contains *HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY* Information

even given the Protective Order in this case." Oral Order on Motion, NUVIA Litigation, (Dkt. 207) (citation omitted). The same concerns exist here—Qualcomm's outside counsel will need to confer with Qualcomm about the information and documents it receives related to ███ *See also Mannington Mills*, 206 F.R.D. at 530–32 (rejecting argument that existence of attorney's-eyes only clause in protective order prevented nonparty competitor from showing that disclosure of its confidential information would be harmful); *Amgen Inc. v. Samsung Bioepis Co.*, No. CV 24-8417 (CPO/EAP), 2025 WL 1207594, at *6 (D.N.J. Apr. 24, 2025) ("No less restrictive means are adequate to protect Celltrion's interest. Samsung claims that it seeks production of Celltrion's information on an 'Outside Attorneys' Eyes Only' basis, thus avoiding the speculated harm. Given that Amgen, Celltrion, and Samsung are all direct competitors, however, [i]t would be divorced from reality to believe that either party here would serve as the champion of its competitor ... either to maintain the confidentiality designation or to limit public disclosure as much as possible during trial.") (internal quotation marks omitted). Consistent with ███ concerns, Qualcomm did not share the content of its Arm contracts with ███ counsel or any of the specific language contained therein.

Last, the competitive harm to ███ from disclosure is not outweighed by any need for the information and documents Qualcomm seeks. As explained above, the documents Qualcomm seeks are not relevant, much less necessary, to prove Qualcomm's claims.

Because disclosure of the ███ Contracts would cause serious risk of competitive harm to non-party ███ and that harm is not outweighed by any substantial, legitimate need of the parties, entry of a protective order is justified.

## III.    CONCLUSION

For the foregoing reasons, ███ respectfully requests that the Special Master issue a protective order prohibiting Arm from producing or otherwise disclosing to Qualcomm the ███ Contracts. To the extent the Special Master is inclined to order production, ███ respectfully requests that the Special Master order Qualcomm to meet and confer with ███ directly about a proper scope of discovery and provide ███ an opportunity to seek a compromise solution regarding redactions to any ███ Contracts to be provided to Qualcomm.


Respectfully submitted,

*/s/ Matthew B. Goeller*

Matthew B. Goeller (No. 6283)

Words: 2,291 / 2,400

September 16, 2025

# Exhibit 23

7/3/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.   Jeffrey B. Golden
Highly Confidential - Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED,                  )
a Delaware corporation; and             )
QUALCOMM TECHNOLOGIES, INC.,             )
a Delaware corporation,                 )
                                        )
            Plaintiffs,                  )
                                        )  C.A. No.
            vs.                          )  24-490(MN)
                                        )
ARM HOLDINGS PLC., f/k/a                 )
ARM LTD., a U.K. corporation,            )
                                        )
            Defendant.                   )
_____)


HIGHLY CONFIDENTIAL

ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF JEFFREY B. GOLDEN

JULY 3, 2025

SAN DIEGO, CALIFORNIA




Reported by

Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646



Page 14

1 off-the-shelf core --
2    A.  Oh, definitely not off-the-shelf core.
3    Q.  I apologize.  If you could just let me
4 finish my question before you answer.
5    A.  Oh, yeah.  Sure.
6    Q.  A custom CPU design is different from an
7 off-the-shelf core that Qualcomm could get from Arm;
8 correct?
9    A.  That's correct.
10    MR. JANES:  I'm going to mark the first
11 exhibit.  This will be a document produced at the
12 Bates number QCVARM_0602952.
13    (Golden Exhibit 1 marked for identification.)
14 BY MR. JANES:
15    Q.  Mr. Golden, do you have Exhibit Number 1 in
16 front of you?
17    A.  I do.
18    Q.  Exhibit Number 1 is an email that was sent
19 to your email address; correct?
20    A.  Let's see.  Maybe I need to turn the page
21 to confirm.  No.  I see it.  Yes, I see it.
22    Q.  So jeff@nuviainc.com, that's your email
23 address; correct?
24    A.  Uh-huh.
25    Q.  So you received this email; yes?

Page 15

1    A.  Evidently did.  That's my email address.
2    Q.  On the first page of Exhibit 1, there is a
3 box, and the title of the box is ███████████
4 ███████  Do you see that?
5    A.  Uh-huh.
6    Q.  What is
7    A.  ████████████████████████████████
8 ████████████████████████
9    Q.  Who do you mean by "we"?
10    A.  NUVIA.
11    Q.  Did ████ the code name, get replaced by
12 the code name ████████████████
13    A.  I don't remember.  ██████████████████
██████████████████████████████████████ When
16 the name came into being, I don't recall.
17    Q.  Can you please turn to the second page of
18 Exhibit 1.  This is the page ending in the Bates
19 number 953.
20    A.  953.  Okay.
21    Q.  Do you see a table where the left-hand
22 column is an acronym and the right-hand column is a
23 description?
24    A.  I do.
25    Q.  Are you generally familiar with some of the

Page 16

1 acronyms that are shown on this table?
2    A.  Uh-huh.  Yes.
3    Q.  Can you please turn to the page that ends
4 in the Bates number 959.
5       Mr. Golden, do you see the acronym ████
6    A.  I do.
7    Q.  ████ stands for ████████████████; correct?
8    A.  Yes.
9    Q.  You can set this exhibit aside.
10       Mr. Golden, when you were an employee of
11 NUVIA, you worked on architecture design
12 verification; is that right?
13    A.  I did for a short time.  My original role
14 was on the load store unit DVT.
15    Q.  You mentioned DVT.  What is DVT?
16    A.  DV team.
17    Q.  The DV team?
18    A.  Yes.
19    Q.  DV stands for design verification?
20    A.  That's right.
21    Q.  Would you say your role at Qualcomm is
22 significantly different than your latest role at
23 NUVIA?
24    A.  My latest role at NUVIA was the role I have
25 now.  But we never completed a compliance run when I

Page 17

1 was in that role under NUVIA.  We were working on
2 it, but we never -- you know, we never produced a
3 core.
4    Q.  Are there employees at Qualcomm who are
5 considered part of the NUVIA team?
6    A.  There are employees at Qualcomm that came
7 from the NUVIA team and, you know, I'm one of those,
8 but we don't have a NUVIA team.  We have people that
9 came from the NUVIA team.
10    Q.  So there is no team within Qualcomm that's
11 referred to as the NUVIA CPU team.  Is that your
12 testimony?
13       MR. BRALY:  Objection.
14       THE WITNESS:  Yes.  Not that I'm aware of.
15 BY MR. JANES:
16    Q.  Earlier we talked about the code name
17 ████████  Do you remember that?
18    A.  Yes.
19    Q.  What is ████████████████████████████████
20 ██████████████████████████████████████████
██████████████████████████████████
██████████████████
24    Q.  ████████ is a NUVIA-based design; is that
25 right?