# EXHIBIT 40

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ATM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 22-1146 (MN) |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Anne Shea Gaza, Robert M. Vranna, Samantha G. Wilson, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Gregg F. LoCascio, P.C., Jason M. Wilcox, P.C., Meredith Pohl, Matthew J. McIntee, KIRKLAND & ELLIS LLP, Washington, DC; Jay Emerick, Adam M. Janes, KIRKLAND & ELLIS LLP, Chicago, IL; Peter Evangelatos, KIRKLAND & ELLIS LLP, Daralyn J. Durie, Joyce Liou, Shaelyn K. Dawson, MORRISON & FOERSTER LLP, San Francisco, CA; Erik J. Olson, MORRISON & FOERSTER LLP, Palo Alto, CA; Scott F. Llewellyn, MORRISON & FOERSTER LLP, Denver, CO; Kyle W.K. Monney, Kyle D. Friedland, MORRISON & FOERSTER LLP, New York, NY – Attorneys for Plaintiff

Jack B. Blumenfeld, Jennifer Ying, Travis Murray, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Karen L. Dunn, William A. Isaacson, Erin J. Morgan, Melissa F. Zappala, FUNN ISAACSON RHEE LLP, Washington, DC; William T. Marks, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, DC; Catherine Nyarady, Anna R. Gressel, Jabos A. Braly, Alexander M. Butwin, Paul, WEISS, RIFKIND, WHARTON & GARRISON, LLP, New York, NY; Andrea L. D'Ambra, Susana Medeiros, NORTON ROSE FULBRIGHT US LLP, New York, NY; Kira Latham, NORTON ROSE FULBRIGHT US LLP, Dallas, TX – Attorneys for Defendants

September 30, 2025
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE:**

From December 16 to 20, 2024, the Court presided over jury trial in this contract dispute between Plaintiff ARM Ltd. ("ARM" or "Plaintiff") and Defendants Nuvia Inc. ("Nuvia"), Qualcomm Inc., and Qualcomm Technologies, Inc. ("Qualcomm") (together, "Defendants"). (*See* D.I. 588, 589, 590, 591, 592 (together, "Tr.")).[1]  Pending before the Court are two post-trial motions from the parties:  (1) ARM's motion for judgment as a matter of law or a new trial; and (2) Nuvia's motion for judgment as a matter of law.  (D.I. 595, 597).  For the reasons set forth below, the Court will DENY Arm's motion and GRANT-IN-PART and DENY-IN-PART Nuvia's motion.

## I.    BACKGROUND

### A.    The Parties

This case concerns a contract dispute between two technology firms.  ARM is a British microprocessor company with a principal place of business in Cambridge, United Kingdom. (D.I. 1 ¶ 4).  Arm developed an instruction set architecture ("ISA") to build microprocessors. (Tr. at 260:7-261:24, 267:19-268:8, 442:16-443:3, 512:6-14).  An ISA is a list of instructions that enables compatibility between electronic devices (i.e., hardware) and the programs that run on them (i.e., software).  This permits smartphones, computers, and tablets, for example, to use the same software applications.  (*Id*. at 260:7-261:24, 478:10-22, 681:9-22, 684:20-685:8, 691:7-13). ARM codifies its ISAs in its "architecture reference manual" ("the Reference Manual"), which engineers use to design central processing units ("CPUs").  (*Id*. at 479:16-25).  As part of its business model, ARM licenses its ISAs.  (*Id.* at 264:7-20).

---

[1]     The Court also held a limited bench trial after the jury left for the day on December 17, 2024.  (*See* D.I. 593).

Qualcomm is a Delaware-incorporated semiconductor company with headquarters in San Diego, California. (D.I. 1 ¶¶ 5-6). Qualcomm builds microchips for consumer goods such as smartphones, laptops, and car dashboards. (Tr. at 745:9-746:2).

Nuvia was led by a team of former Apple engineers seeking to build ARM-compliant server CPUs and began working with ARM in February of 2019. (Tr. at 161:19-162:5, 421:2-11, 381:12-382:4, 388:20-22; PTX-103 at 2). Nuvia was later acquired by Qualcomm in March of 2021 through a reverse triangular merger. (Tr. at 454:9-11, 575:17-23, 808:10-12).[2]

## B.    The Dispute

On May 30, 2013, Qualcomm and ARM signed an Architecture License Agreement (the "Qualcomm ALA"). (JTX-10, 11). Among other things, the Qualcomm ALA granted Qualcomm a "non-exclusive, world-wide right and licence" to "use the applicable ARM Technology to design and have designed . . . Architecture Compliant Cores," which are "microprocessor core[s] developed by or for [Qualcomm] under the [ALA]." (JTX-11 § A.6, B.1.1).

On September 27, 2019, Nuvia and ARM executed an Architecture License Agreement ("the Nuvia ALA"). (JTX-1, 2). Similar to the Qualcomm ALA, the Nuvia ALA granted Nuvia a license to use ARM's technology to design CPUs. (*Id.*). The Nuvia ALA stipulated that the license was not transferable in the event of an acquisition without ARM's consent. (*Id.* § 16.3). It also stated that, in the event of a material breach, each party had an obligation to return or destroy certain technology received from the other. (*Id.* §§ 14.2, 15.1(a)).

In January 2021, Qualcomm announced that it had reached a deal to acquire Nuvia. (PTX-212 at 1-2; PTX-234 at 2; Tr. 172:8-173:7, 216:14-23). The acquisition occurred in March of that

---

[2]     Qualcomm formed a subsidiary corporation, and that corporation and Nuvia were merged together with Nuvia being the surviving entity. (Tr. at 575:17-23).

year.  (Tr. 808:10-14).  On February 1, 2022, Arm notified Nuvia that it would terminate the Nuvia ALA, effective March 1, 2022.  (JTX-8).

### C.     Procedural History

ARM filed this action on August 31, 2022, alleging that Nuvia and Qualcomm breached the Nuvia ALA when Qualcomm acquired Nuvia in March of 2021.  (D.I. 1).  Defendants counter that neither breached the Nuvia ALA, and that Qualcomm's use of ARM's code following the acquisition was licensed under the Qualcomm ALA.  (D.I. 300 at 56).  Both ALAs stipulate that "[t]he validity, construction and performance of this ALA shall be governed by California Law." (JTX-1 § 16.12; JTX-10 § 16.15).

From December 16 to 20, 2024, the Court presided over a jury trial.  (*See* Tr.).  At the conclusion of trial, the jury found that (1) ARM had not proven that Qualcomm breached Section 15.1(a) of the Nuvia ALA, and (2) that Qualcomm had proven that its use of ARM's code was licensed under the Qualcomm ALA.  (D.I. 572).  The jury hung, however, on the question of whether Nuvia breached the Nuvia ALA.  (*Id.*).

On January 17, 2025, the parties filed their motions for judgment as a matter of law. (D.I. 595, 597).  Those motions were fully submitted as of February 28, 2025.  (D.I. 596, 598, 608, 609, 614, 615).  The Court now addresses the motions.

## II.    <u>LEGAL STANDARDS</u>

### A.     <u>Judgment as a Matter of Law</u>

Judgment as a matter of law may be entered against a non-moving party if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue."  Fed. R. Civ. P. 50(a)(1).  A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the

advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F. 3d 354, 373 (3d Cir. 2016) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F. 3d 1153, 1166 (3d Cir. 1993)). "Judgment as a matter of law is proper only if the record is critically deficient of the minimum quantum of evidence needed to support the verdict." *Washington v. Gilmore*, 124 F. 4th 178, 185 (3d Cir. 2024) (internal quotation marks omitted). It is a remedy to be invoked "sparingly." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F. 3d 375, 383 (3d Cir. 2004); *Marra v. Philadelphia Hous. Auth.*, 497 F. 3d 286, 300 (3d Cir. 2007).

In determining whether substantial evidence supports the jury verdict, the Court may not make credibility determinations, weigh the evidence, or substitute its own conclusions for those of the jury where the record evidence supports multiple inferences. *See Rodriquez v. Southeastern Pa. Trans. Auth.*, 119 F. 4th 296, 298 (3d Cir. 2024); *Avaya*, 838 F. 3d at 373. Moreover, in the Third Circuit, when the movant bears the burden of proof on an issue, judgment as a matter of law is appropriate only if "there is insufficient evidence for permitting any different finding." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F. 2d 1171, 1177 (3d Cir. 1976) (citations omitted).

### B.     Motion for a New Trial

"[A]fter a jury trial," the Court may grant a new trial "to any party" on "all or some of the issues" for "any reason for which a new trial has heretofore been granted" in federal court actions at law. Fed. R. Civ. P. 59(a)(1)(A). Common grounds for a new trial are: "(1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence exists that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced

the verdict; or (4) where the jury's verdict was facially inconsistent." *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775 (D. Del. 2015).

Whether to grant a new trial is a question committed to the Court's discretion. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). Unlike the standard for judgment as a matter of law, on a motion for a new trial, "the Court need not view the evidence in the light most favorable to the verdict winner." *Ateliers*, 85 F. Supp. 3d at 776. "Nevertheless, new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F. 2d 1344, 1353 (3d Cir. 1991).

## III. DISCUSSION

### A. Whether Qualcomm Proved that Defendants Were Licensed Under the Qualcomm ALA (Verdict Question 3)

The jury found that Qualcomm proved by a preponderance of the evidence that the Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA. (D.I. 572). ARM challenges that finding as unsupported for three reasons, arguing: (1) that the CPU designs at issue were not developed under the Qualcomm ALA; (2) that the CPUs were developed for Nuvia, not Qualcomm; and (3) that the Qualcomm ALA's license is limited to "ARM Technology." (D.I. 596 at 4-7).

#### 1. Whether the CPUs at Issue Were Designed Under the Qualcomm ALA

The Qualcomm ALA applies to "applicable ARM Technology," including any "Architecture Compliant Core," which is "a microprocessor core developed by or for [Qualcomm] under the licenses granted in this [Agreement]." (JTX-11 §§ A.6, B.1.1). ARM asserts that the technology at issue in this case was developed by Nuvia prior to the acquisition. Qualcomm

counters that there was sufficient trial evidence for the jury to conclude that the Hamoa, Pakala, Nordschleife, and Pegasus CPUs at issue were developed by Qualcomm after the 2021 acquisition.

At trial, Qualcomm presented evidence that relevant cores "[a]ll were conceived at Qualcomm" and worked on by Qualcomm employees.  (Tr. at 430:15; *id.* at 400:13-15; *id.* at 579:15-22).  Specifically, Nuvia's CEO testified that "the design start point" for Hamoa was July 21, 2021, the Pakala product "had a start date of January 2022," Pegasus "stated roughly around the summer of 2022," and Nordschleife, "[t]he automotive platform, its design start was in February of 2023." (*Id.* at 428:20-430:12).  All of those dates succeed the March 2021 acquisition. Qualcomm's witnesses further attested to the fact that "Nuvia didn't have any finished products at the time" of the acquisition, and its original project, a "server CPU" that they were "working on at Nuvia," was "canceled" after the company became Qualcomm.  (*Id*. at 428:1-12, 579:17-18). Based on that evidence, the jury could have reasonably concluded that the CPUs at issue were built by Qualcomm employees (at least some of whom were former Nuvia employees) after the acquisition, and that the relevant cores fell under the license in the Qualcomm ALA.

ARM presented contrary evidence.  It elicited an acknowledgment, for example, that "[t]he work that Nuvia was doing when Nuvia was a separate entity, before the acquisition, was not being done by or for Qualcomm under the license granted to Qualcomm." (*Id.* at 583:4-586:15; *see also* 380:15-19, 390:7-395:24, 784:3-10; PTX-103 at 1-2; PTX-260 at 2).  But when there is conflicting testimony at trial and the evidence permits more than one reasonable finding on any given point, the jury is entitled to make credibility determinations, weigh the evidence, and believe the witnesses it considers most trustworthy.  *See Marra*, 497 F. 3d at 306; *Woodson v. Scott Paper Co.*, 109 F. 3d 913, 921 (3d Cir. 1997) ("[T]he jury had the unique opportunity to judge the credibility and demeanor of the witnesses who testified at the trial, and [therefore] it reached its

6

conclusions based in part on those observations.") (internal quotation marks omitted).  It was the jury's job to do that here, and it came out in Qualcomm's favor.  There is no basis to upset that ruling.

### 2.    Whether the CPUs at Issue Were Designed for Nuvia or Qualcomm

ARM next argues that the cores at issue were not "developed by or for" Qualcomm, as required by the Qualcomm ALA.  (JTX-11 § A.6).  ARM asserts that the license provided in the Annex is "subject to Clause 2.2 of the ALA," which "does not grant to the Designer any license in respect of the Arm Technology for any purpose other than for designing on behalf of [Qualcomm]."  (JTX-11 § B.1.1; JTX-10 § 2.2).  Qualcomm responds that the jury was entitled to read both "the plain language of the Qualcomm ALA as well as extrinsic evidence" to decide whether "all of Qualcomm's design and development work" on the at-issue CPUs was protected under the Qualcomm ALA.  (D.I. 608 at 6).

Throughout trial, the parties agreed that the provisions of the ALAs at issue were susceptible to multiple reasonable readings.  Indeed, ARM prevailed on summary judgment on that very premise.  (D.I. 513 at 27:4-6 ("Qualcomm's [motion for summary] judgment that its cores are properly licensed under the Qualcomm ALA [is] denied.  [The Court finds] [i]ssues of fact on that clearly."); D.I. 416 at 15 ("[There is] a genuine issue of fact regarding whether Qualcomm's ALA might license Qualcomm to use technology developed under other ALAs.")).  That led the Court to read ***an agreed-upon instruction*** to the jury that "Arm and Defendants dispute the meaning of the words in their contract."  (Tr. at 886:1-8).  The Court went on to instruct that, "[i]n deciding what the words of a contract mean, you must decide what the parties intended at the time the contract was created.  You may consider the usual and ordinary meaning of language used in the contract as well as the circumstances surrounding the making of the contract."  (*Id.*).

Thus, by agreement of the parties, the jury was charged with resolving which of the parties' competing interpretations was correct. *See Wolf v. Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 602 (Cal. Ct. App. 2008); *LG Infocomm U.S.A., Inc. v. Euler Am. Credit Indem. Co.*, 419 F. Supp. 2d 1248, 1258 (S.D. Cal. 2005) ("ambiguous" means "capable of two or more constructions, both of which are reasonable").

Given that, the jury was entitled to consider extrinsic evidence, including that, right after the announcement of the acquisition in January 2021, high level ARM employees thought that Qualcomm "ha[d] a reasonably bombproof arch license that covers everything [through the] mid 2020s at least," (DTX-90 at 5), and that, following the combination, the "Nuvia team will be able to use the architecture license which Qualcomm has." (DTX-52 at 1; DTX-47 at 1) ("Qualcomm Nuvia is a problem. Qualcomm already have a v8 arch license."). Indeed, ARM's CEO wrote in a contemporaneous internal message that the Nuvia ALA "had left a route to blow a hole in [ARM's] revenue plan" because "Qualcomm already ha[d] a v9 architecture license" under its own ALA. (DTX-144 at 1). That observation led him to vent that "I'm struggling not to be pissed that we set up a route for Qualcomm to collapse the payments to Arm," which "feels like in our chess game we left ourselves very exposed." (DTX-145 at 3). And Qualcomm itself told ARM that it was planning to proceed post-merger under its license in the Qualcomm ALA. (*See* DTX-1196; Tr. at 456:23-457:7, 576:9-577:23).

Once again, ARM presented evidence to the contrary. ARM argued at trial that its interpretation of the language in the Qualcomm ALA granted no rights as to Nuvia's pre-acquisition code, further retaining the obligation of showing that code was developed by or for Qualcomm. (Tr. 585:23-586:15; JTX-11 §§ A.6, B.1.1.1). And further, ARM tried to show to the jury that by acquiring Nuvia after being rejected from using their CPU core designs, Qualcomm

could not then avail itself of the Qualcomm ALA's terms permitting collaboration with a "Designer" or "Subsidiary", as those terms (per ARM) licensed collaborations "only for the period during which such control exists."  (Tr. 394:4-396:10; JTX-10 §§ 1.10, 1.23, 2.2).  Although that is competing evidence, it does not change the fact that there was sufficient evidence for the jury to reasonably accept Qualcomm's reading of the ALAs, and the jury was entitled to conclude that the challenged CPUs were developed by or for Qualcomm.

### 3.    Whether the CPUs at Issue Constitute "ARM Technology"

Lastly, ARM argues the jury's conclusion on Question 3 of the verdict was against the weight of the evidence because Qualcomm's ALA limited "ARM Technology" to only that technology delivered under the Qualcomm ALA.  (D.I. 592 at 7-9).  ARM asserts that the plain language of Qualcomm's ALA restricts the interpretation of "ARM Technology" to only that delivered to Qualcomm under *its own* ALA, which the Nuvia cores, by definition, were not; and if that argument fails, ARM argues that the Qualcomm ALA expressly disclaims a license to ARM products created or delivered under another ALA (for ARM's purposes here, the Nuvia ALA), so Qualcomm was using "'Arm technology (rather than 'Arm Technology')".  (*Id*. at 8 (underlines in original); JTX-10 §§ 1.3, 2.0, 2.6).  Qualcomm responds that the Qualcomm ALA's definition of "ARM Technology" did not control, Annex 1's definition did, and that ARM's position distinguishing between "ARM Technology" and ARM technology, more generally, was not presented to the jury, and regardless, could have been rejected.  (D.I. 608 at 9-10).

Invoking the now recurring theme, the parties once again point to competing interpretations on the issue.  Qualcomm presented at trial that where "Annex 1 provisions conflict with those in the ALA, Annex 1 controls."  (Tr. 571:6-20).  And the relevant portion of the Annex's definition of "ARM Technology" reads, "any or all, of the architecture technology identified in this Annex

9

1 and any Updates thereto[.]" (JTX-11 § 2, cl. A.10).  But according to ARM's interpretation, the Qualcomm ALA forbids the use of ARM technology, even if delivered as ARM Technology, when created under the Nuvia ALA.  (D.I. 596 at 8).  ARM did not, however, present that argument to the jury at trial.  Even if it had, and even were it based solely on the language ARM asserts was clear, the jury was charged with determining the meaning of the contract from the words and any extrinsic evidence.  *See supra* III.A.2.  With that charge, the jury was entitled to weigh the evidence and reach its verdict that Qualcomm was licensed.  *See Marra*, 497 F. 3d at 306; *Woodson*, 109 F. 3d at 921.

## B.      Whether ARM Proved that Qualcomm Breached the Nuvia ALA (Verdict Question 2)

ARM also moves for judgment as a matter of law that Qualcomm breached the Nuvia ALA. (*See* D.I. 572).  It is axiomatic that an entity can only breach a contract to which it is a party.  *See Brookfield Prop. Grp., LLC v. Liberty Mut. Fire Ins. Co.*, 679 F. Supp. 3d 971, 982 (C.D. Cal. 2023) ("As a general matter, a non-party, or nonsignatory, to a contract is not liable for a breach of that contract.") (citation omitted); *Sun v. Cheung*, No. 23-2112 (CSK), 2025 WL 1446378, at *5 (E.D. Cal. May 20, 2025).  Thus, because the Nuvia ALA was executed between ARM and Nuvia – not Qualcomm – Qualcomm can be liable for breach only if it assumed the contract upon acquisition of Nuvia.

At trial, once again, the parties presented competing evidence.  ARM argued that Qualcomm assumed the Nuvia ALA explicitly in order to use Nuvia's CPU designs, as Qualcomm supposedly knew the Nuvia ALA "defined an acquisition to be an assignment of the Nuvia ALA," and further that ARM had opposed the transfer of the designs central to the Nuvia ALA.  (D.I. 596 at 12); (*see* PTX-240; Tr. at 356:12-21, 401:5-18).  For its part, Qualcomm argues it showed evidence that the Nuvia ALA was not assumed as a matter of both law and by evidence adduced,

because ARM failed to identify a single document showing that Qualcomm either "agreed to [assume the Nuvia ALA]" or that "Qualcomm intended to do so." (D.I. 608 at 13). Indeed, documentary evidence showed that ARM asked Qualcomm to assume the contract: "ARM is willing to provide consent to the assignment of designs created under NUVIA's architecture license agreement with ARM to Qualcomm, on the condition that Qualcomm agrees to assume the existing terms and conditions under which the design was created . . . under the architecture license agreement in place between ARM and NUVIA, including without limitation the royalty rates." (PTX-260 at 2). Qualcomm showed that that request was denied. (*See, e.g.*, Tr. 180:20-181:7; PTX-242 at 2; PTX-277). On that basis, the jury had ample evidence adduced to reach a conclusion that Qualcomm did not breach the Nuvia ALA because it was explicitly *not* a party to the agreement.

ARM contends that even if the jury found that Qualcomm did not explicitly assume – and consequently breach – the Nuvia ALA, the jury worked against the great weight of evidence in finding that Qualcomm did not **implicitly** assume, by its actions, the Nuvia ALA. This is purportedly so because ARM "recounted the actions that reflected Qualcomm's intent to assume . . . the Nuvia ALA." (D.I. 614 at 6). Here, Qualcomm again points to the evidence it adduced demonstrating both an explicit refusal to accept the Nuvia obligations and actions reiterating the same. (D.I. 608 at 14).

California law states that assumption only applies "where the person accepting the benefit was a party to the original transaction" or there "has been an assumption of the obligations . . . determined by the intent of the parties as indicated by their acts, the subject matter of the contract or their words." *Recorded Picture Co. [Productions] Limited.* v. *Nelson Ent., Inc.*, 61 Cal. Rptr. 2d 742, 748 (Cal. Ct. App. 1997). The principle ordinarily applies "when a party accepts all the

benefits of an executory contract." *PF1, Inc. v. Suba*, 2023 WL 3107974, at *2 (Cal. Ct. App. Apr. 27, 2023); *see also Manela v. Stone*, 66 Cal. App. 5th 90, 96 n.2 (Cal. Ct. App. 2021). Given that (as noted above) Qualcomm adduced substantial evidence that it did not take all the benefits of the Nuvia ALA, the jury was entitled to find that Qualcomm did not assume all of the obligations and did not breach the Nuvia ALA.[3]

### C.   Whether Arm Proved that Nuvia Breached the Nuvia ALA (Verdict Question 1)

On the first question of the verdict sheet – whether Arm proved by a preponderance of the evidence that Nuvia breached Section 15.l(a) of the Nuvia ALA – the jury deadlocked.  (D.I. 572). Both parties move for judgment as a matter of law on this issue.  ARM argues that Nuvia breached as a matter of law.  (D.I. 596 at 9-10).  Nuvia, on the other hand, challenges the sufficiency of the evidence as to two essential elements of ARM's breach claim:  (1) that ARM was harmed; and (2) that Nuvia's conduct constituted a breach.  (D.I. 598 at 4, 7).

#### 1.   Harm

##### a.   Whether ARM Must Prove Harm

At the outset, the parties dispute as a matter of law whether ARM was required to prove that it suffered harm to prevail on its claim for specific performance under the Nuvia ALA. (*See* D.I. 598 at 4; D.I. 609 at 5).  ARM argues for the first time that it is entitled to "nominal damages" so long as it can establish that Defendants breached the contract.  (D.I. 609 at 5-6); Cal. Civ. Code § 3360 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages.").  Qualcomm and Nuvia reply that harm is a standalone element that must be proved in its own right.  (D.I. 598 at 4).

---

[3]     Additionally, as discussed in the following section, *infra* at III.C, ARM's failure to prove harm constitutes another basis to support the jury's finding that Qualcomm did not breach the Nuvia ALA.

The Court agrees with Defendants. An essential element of a breach of contract claim is that "plaintiff was harmed as a result" of the breaching conduct. *CSAA Ins. Exch. v. Hodroj*, 72 Cal. App. 5th 272, 276 (Cal. Ct. App. 2021); *see also Densmore v. Manzarek*, No. B186036 (MF), 2008 WL 2209993, at *13 (Cal. Ct. App. May 29, 2008); *Russo v. Andrews*, No. A155999 (VR), 2022 WL 4493590, at *6 (Cal. Ct. App. Sept. 28, 2022) ("Injury, or resulting harm, is an element of a breach of contract cause of action.") (citation modified). That being so, if a plaintiff cannot demonstrate harm that resulted from a breach of contract, the plaintiff's claim fails as a matter of law. *Smith v. NBC Universal*, 524 F. Supp. 2d 315, 327 (S.D.N.Y. 2007). To prevail on a cause of action for breach of contract, the plaintiff must prove the resulting damage to the plaintiff. Indeed, ARM agreed, representing in the Pretrial Order:

> Harm is an essential element of a breach of contract claim under California law. *Smith v. NBC Universal*, 524 F. Supp. 2d 315, 327 (S.D.N.Y. 2007). Because damages are an element of the claim, if a plaintiff cannot demonstrate harm that resulted from a breach of contract, the plaintiff's claim fails as a matter of law. *Id.* To prevail on a cause of action for breach of contract, the plaintiff must prove the resulting damage to the plaintiff. *Richman* [*v. Hartley*], 224 Cal.App.4th [1182, 1186 (2014)].

(D.I. 518-4 at 10; *see also* D.I. 372 at 20 (summary judgment briefing)).

ARM's assertion of nominal damages does not alter the analysis. Notably, ARM did not pursue its nominal damages theory prior to post trial briefing. Indeed, that theory does not appear in the Pretrial Order, the briefing on the many pretrial motions addressing ARM's assertions of harm and requests for relief or the trial transcript. Instead, ARM represented that its witnesses would describe ARM's ALA licensing program; and that "[t]he only [] reason that this evidence is relevant is to show . . . harm." (D.I. 530 at 27:20-21). At the close of evidence, ARM argued – as it did on summary judgment – that it had adduced sufficient evidence of harm to defeat judgment as a matter of law. (Tr. at 846:20-851:1). During the charge conference, ARM opposed a

standalone harm instruction on the basis that "harm is already an element of the contract elements." (*Id*. at 841:2-11). That led the Court to read an agreed-upon jury instruction that, "[t]o prove Qualcomm or Nuvia's breach of contract, ARM must prove . . . ARM suffered harm." (*Id.* at 885:8-25). And ARM closed its case by arguing to the jury that it had proven harm. (*Id.* at 988:3-6).

In sum, ARM committed to proving harm throughout this litigation. It cannot now abandon that burden after trial in the face of an adverse jury verdict. *See Haley v. Casa Del Rey Homeowners Ass'n*, 63 Cal. Rptr. 3d 514, 521-22 (Cal. Ct. App. 2007); *Copenbarger v. Morris Cerullo World Evangelism, Inc.*, 239 Cal. Rptr. 3d 838, 850 (Cal. Ct. App. 2018).

**b.    Whether ARM Proved Harm**

Aside from its assertion of nominal damages, ARM contends that it was harmed because its technology was being used in the market without a license, harming its licensing "ecosystem." (*See* Tr. at 100:21-25, 228:8-18, 229:15-24, 247:11-248:4, 278:25-281:1; D.I. 609 at 8-10). And, second, as a result, ARM received less in royalty payments than it otherwise would have. (*Id.* at 850:21-851:1; D.I. 609 at 9, n.1).

As to the first grounds, ARM presented no trial evidence from third-party market participants suggesting that ARM's licensing ecosystem was negatively impacted by Nuvia's alleged breach of the Nuvia ALA. That lack of evidence was largely due to ARM's refusal to provide discovery into its third-party contracts. (*See* D.I. 530 at 26:20-27:19) ("We do not intend to put in any evidence about the specific terms of specific agreements."). On the other hand, there was trial evidence to undermine that ARM suffered any adverse consequences at all, such as when ARM's CEO testified that ARM recorded historic licensing and royalty revenues after terminating the Nuvia ALA in 2022. (*See* Tr. at 198:18-199:21, 281:7-288:23; DTX-791 at 2, 1495 at 2-3).

14

ARM's theory of harm is further derailed by the jury's finding that Qualcomm's products were, in fact, licensed, given that a predicate to the purported harm is unlicensed use.  (Tr. at 100:19-25) ("What we are relying on to meet the element of harm . . . is that we have been damaged by the unlicensed use of our intellectual property.").  In any event, ARM does not appear to contest this point in its briefing and therefore concedes it.  *See In re Wilmington Trust Secs. Litig.*, No. 10-990 (SRF), 2017 WL 2467059, at \*2 (D. Del. June 7, 2017) ("When a responding party fails to defend against an issue which is the subject of a motion, courts consistently construe the failure to respond as an abandonment of the issue or a concession that the moving party is correct.").

Second, ARM contends that "evidence in the record shows that Nuvia's breach caused Arm to lose royalty payments."  (D.I. 609 at 8).  Even if there is such evidence, ARM's argument is foreclosed by the Court's ruling on the morning of the start of trial that ARM could not pursue a lost royalties theory without showing that it "actually disclosed that as an element of [its] claim" in discovery.  (Tr. at 96:16-97:7); *United States v. Schiff*, 602 F. 3d 152, 176 (3d Cir. 2010) ("[A] district court [has] broad discretion in its rulings concerning case management both before and during trial.").  The Court left open the possibility that ARM could seek reconsideration of its ruling should it have evidence of timely disclosure, but ARM chose not to do so.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F. 3d 254, 297 (3d Cir. 2012) ("A plaintiff omits evidence necessary to sustain a damages award at its own risk."); Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  Indeed, it was only after trial and post-trial briefing, that ARM attempted to show that it had disclosed its royalty theory during discovery. (D.I. 628 at 43:4-45:1).  Allowing such a dramatic late-breaking shift in ARM's theory of the case

would have been highly prejudicial to Defendants, who did not have the benefit of preparing a defense to such a theory. *See IPPV Enters., LLC v. Echostar Commc'ns, Corp.*, 191 F. Supp. 2d 530, 572 (D. Del. 2002) ("[T]he court finds that [plaintiff's] failure to disclose their shift in damages theory . . . prejudiced [defendant].").

Accordingly, the Court finds that no reasonable jury could find that ARM proved harm by a preponderance of the evidence and grants judgment as a matter of law to Nuvia on Question 1.

### 2.   **Breach**

The parties also move for judgment as a matter of law on the second element of ARM's breach of contract claim: breach. ARM says that the trial evidence permits only one conclusion: that Nuvia breached. (D.I. 596 at 9). Nuvia asserts the opposite. (D.I. 598 at 7). Because the Court has already found that ARM failed to present substantial evidence to sustain the element of harm, ARM's claim fails and the Court need not consider either side's arguments on the element of breach. *See Martinez v. Welk Grp., Inc.*, 907 F. Supp. 2d 1123, 1132 (S.D. Cal. 2012); *United States v. Int'l Fid. Ins. Co.*, No. 16-8064 (DSF), 2019 WL 4187846, at *2 (C.D. Cal. Sept. 4, 2019) ("[Counterclaim plaintiffs] have not proven damages. This is fatal to the [breach] counterclaim."); *Kaufman & Broad Monterey Bay v. Travelers Prop. Cas. Co. of Am.*, No. 10-2856 (EJD), 2012 WL 2945932, at *13 (N.D. Cal. July 18, 2012) ("[F]ailure to prove resulting damages is fatal to [Plaintiff's] claim.").

### D.   **ARM's Motion for a New Trial**

Finally, ARM moves for a new trial "because the jury deadlocked on th[e] issue" of "whether Nuvia breached the Nuvia ALA." (D.I. 596 at 14). ARM says that a "new trial on that single issue necessitates a new trial across the board because the issues in this case are 'so interwoven' that they 'cannot be submitted to the jury independently' without violating the

16

Seventh Amendment's Reexamination Clause." (*Id.*) (quoting *Gasoline Prods. Co. v. Champlin Refining Corp.*, 283 U.S. 494, 500 (1931)). The Court has already granted judgment as a matter of law to Nuvia, finding that ARM failed to prove at trial that Nuvia breached the Nuvia ALA. There will be no second trial on that issue, and, therefore, ARM's motion for a new trial is denied.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, ARM's renewed motion for judgment as a matter of law or a new trial (D.I. 595) is DENIED, Nuvia's motion for judgment as a matter of law (D.I. 597) is GRANTED-IN-PART and DENIED-IN-PART. An appropriate order and final judgment will follow.

# EXHIBIT 41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## **VERDICT FORM**

In answering the following questions and filling out this Verdict Form, you are to follow all of the instructions I have given you in the Court's charge. Your answer to each question must be unanimous.

We, the jury in this case, find the following answers to the following questions:

### Arm's Claims for Breach of Contract

**Question 1:**   Did Arm prove by a preponderance of the evidence that Nuvia breached Section 15.1(a) of the Nuvia ALA?

|  | YES | NO |
|---|---|---|
|  | **For Arm** | **For Nuvia** |

YES _____     NO _____

**Question 2:**   Did Arm prove by a preponderance of the evidence that Qualcomm breached Section 15.1(a) of the Nuvia ALA?

|  | YES | NO |
|---|---|---|
|  | **For Arm** | **For Qualcomm** |

YES _____     NO ____✓_____

### Qualcomm's Claim

**Question 3:**   Did Qualcomm prove by a preponderance of the evidence that the Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA?

|  | YES | NO |
|---|---|---|
|  | **For Qualcomm** | **For Arm** |

YES ____✓_____     NO _____

## **CONCLUSION**

You have reached the end of the verdict form. Review the completed form to ensure that it accurately reflects your unanimous determinations. All jurors should then sign and date the Verdict Form in the space below and notify the Court Security Officer that you have reached a verdict.

Date: 12/20/24



2

# EXHIBIT 42

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | **CONFIDENTIAL – FILED UNDER** |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | **SEAL** |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT AND
JURY DEMAND AND DEFENDANTS' SECOND AMENDED COUNTERCLAIMS**

1.      Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") are poised to release to the market several innovative products enabled by custom-designed high-performance, low-power central processing units ("CPUs") containing a novel microarchitecture and related technologies that will deliver the next era of computing innovation.  While many in the industry see in this pivotal moment the opportunity for technological advancement, ARM sees an opportunity to strongarm Qualcomm into renegotiating the financial terms of the parties' longstanding license agreements, using this baseless lawsuit as leverage.  With this lawsuit, ARM makes clear to the marketplace that it will act recklessly and opportunistically, threatening the development of new and innovative products as a negotiating tactic, not because it has valid license and trademark claims.

2.      ARM claims, with no legal or contractual basis, that following Qualcomm's acquisition of NUVIA Inc. ("NUVIA") for $1.4 billion, Qualcomm's use of *any* technology acquired from NUVIA—including NUVIA technology that was further developed by Qualcomm and has nothing to do with ARM—violates a previously-terminated license agreement between ARM and NUVIA.

3.      Qualcomm has its own license agreements with ARM, under which Qualcomm has licensed and paid for the same intellectual property that NUVIA licensed under its own separate agreements with ARM. Therefore, even though ARM terminated the NUVIA licenses, Qualcomm owns independent licenses for the same ARM technology and information that allow it to provide ARM-compliant products to its customers for many years to come—a fact ARM glaringly omitted from its complaint, and which ARM has attempted to obfuscate through an aggressive misinformation campaign. Thus, ARM has no right to demand any destruction of Qualcomm's CPU technology because Qualcomm's use of ARM technology and information is licensed under its overlapping license agreements.

4.      The notion that ARM has the right to control technology that is not ARM's—and worse yet, to ask Defendants to destroy their innovation and inventions unless substantial monetary tribute is paid to ARM—offends customary norms of technology ownership, as well as NUVIA's and Qualcomm's rights under their agreements with ARM.

5.      Even putting aside Qualcomm's broad license rights, ARM's reading of the termination obligations in the NUVIA Architecture License Agreement ("ALA") is wrong. To the extent any destruction obligation exists, it explicitly applies only to ARM Confidential Information.[1] But ARM again omits important facts: (1) under the NUVIA ALA, information in the public domain is not subject to confidentiality obligations, and (2) ARM publishes its instruction set without confidentiality restrictions. Anyone is free to go to the ARM website and download the 10,000+ page ARM Architecture Reference Manual.[2] In this case, Qualcomm's

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the relevant license agreements.

[2]   ███████████████████████████████████████████████ (last visited Sept. 28, 2022).

CPU cores are designed to be compatible with the publicly-available ARM Architecture version ▮▮▮▮▮▮

6.       Seeking additional leverage it can use to attain royalties from Qualcomm to which it is not entitled under the contracts, ARM now demands that Qualcomm stop using *all* NUVIA technology, regardless of whether it contains ARM Confidential Information.  Qualcomm's license rights, and any reasonable reading of the termination provisions of the NUVIA ALA, demonstrate that ARM has no right to require Qualcomm to stop using or destroy Qualcomm or NUVIA technology.

7.       ARM's position is a threat to the industry generally.  Unless this Court rejects ARM's arguments, ARM's extreme position could be weaponized against all of its licensees, allowing ARM to claim ownership over all its licensees' innovations.

8.       As this litigation will show, Qualcomm and NUVIA have not violated NUVIA's ALA or any other license agreement.  Nor have they misused ARM's trademarks.

**Qualcomm Announced Its Acquisition Of NUVIA In January 2021**

9.       In January 2021, Qualcomm announced that it would acquire NUVIA, a start-up working on a custom CPU—the portion of a computer that retrieves and executes instructions—known as the Phoenix Core.  NUVIA was also working on a custom "System-on-a Chip" ("SoC") that incorporated multiple Phoenix Cores for use in data centers and servers.  SoCs are integrated circuits used in computers and other electronics that combine many elements of a computer system into a single chip.

10.      Although Qualcomm and NUVIA were focused on different market segments, the NUVIA CPU and SoC technologies comprised promising, innovative technology.  Because the

NUVIA CPU cores were being designed to be ARM architecture-compatible, this technology was (and is) compatible with Qualcomm's existing computer and mobile device chipset technologies.

11.     Qualcomm's plan was to complete the development of the Phoenix Core after the acquisition and ultimately drive this technology into various SoCs, particularly for use in the "compute" (e.g., laptops/PCs), "mobile" (e.g., smartphones), and "automotive" (e.g., digital cockpit) markets.  Qualcomm also planned to continue the development of a SoC for use in data centers and servers ("Server SoC").  This would allow Qualcomm's custom CPUs to compete more effectively against CPUs designed not only by rival ARM licensees and ARM, but also rival suppliers of CPUs compliant with other instruction set architectures (notably, Intel's x86).

12.     Major industry participants—including Microsoft, Google, Samsung, GM, HP, and many others—praised the acquisition as benefitting their products and end-customers.[3]  News of this acquisition appeared in Forbes and in newspapers around the world.

**Qualcomm And NUVIA Had Individual
License Agreements With ARM With Common Provisions**

13.     At the time of the acquisition, NUVIA and Qualcomm had separate, but broadly overlapping, license agreements with ARM.  Qualcomm's ALA included all the rights granted to NUVIA, as well as additional rights.  Both ALAs granted rights to use version 8 of the ARM instruction set architecture, including the ARM ███ instruction set architecture ("ISA") with which the Phoenix Core was compatible.  Qualcomm's ALA is also broader, granting Qualcomm rights to the next generation v9 ISA.

---

[3]  *See  Qualcomm  to  Acquire  NUVIA*,  Qualcomm  Inc.  (Jan.  12,  2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

14. ALAs grant licensees the right to design their own custom CPUs that can execute ARM's ISA, as well as the right to design and distribute products incorporating such CPUs. An ISA lists the instructions that a software program will see, but an ISA does not tell a designer about the logic to implement it, nor how to build a CPU core, nor any of the features that make a CPU competitive. Application and software developers create their products to be compatible with particular ISAs. Applications and software that are compatible with a specific ISA can be run on any CPU that is compatible with the ISA, regardless of who has designed or manufactured the hardware. The ARM ISA allows for compatibility, as all ARM-compatible products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.

15. To make a CPU that then can execute the ARM ISA and therefore run compatible applications and other software, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors wired together into arrays that form larger, interconnected blocks. Building a CPU requires detailed micro-architectural know-how and expertise that is not related to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

16. A CPU developer developing a custom CPU designs **how** the core is built, **how** it performs, and **how** it executes the CPU's instructions. There are virtually infinite number of ways to design and build CPUs that can run the ARM instruction set. Companies that compete against each other to make better products utilizing ARM instruction sets employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.

17.     Under an ALA license, ARM does not deliver any specific ARM design or tell the licensee how to make the CPU.  That technological development—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the market—is left to the licensee.  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, the ALA structure can and does allow for product differentiation, even from ARM's own CPUs.

18.     ARM competes against licensees designing custom cores under ALAs by offering its own "off-the-shelf" CPU designs that customers may license through a Technology License Agreement ("TLA").  When a licensee seeks to sell products licensed under a TLA—rather than under an ALA—ARM delivers complete processor core designs that a licensee can effectively drop into a larger SoC design.  ARM's off-the-shelf processor cores licensed under TLAs do not allow for the same kind of product differentiation among different TLA licensees because all classes of TLA-licensed processor cores are effectively the same.  However, there can still be considerable variety and differentiation among SoCs that incorporate TLA-licensed processor cores along with other functional blocks and circuits.  For example, Qualcomm's Snapdragon chip products that use stock ARM cores are very successful in large part because of Qualcomm's innovation in designing many of the other functional blocks and integrating them into the SoC as a whole.  Such functional blocks include graphic processing units (GPU), digital signal processors (DSP), artificial intelligence (AI) processors, image processors, modems, and other technologies.

19.     Some companies make use of both custom-designed ALA processor cores and off-the-shelf TLA-licensed cores in their products.  Royalty rates are generally lower under ALAs and higher under TLAs, because the TLA royalties account for ARM's work in developing complete

CPUs, whereas the licensees under an ALA make the significant investment to develop their own CPUs.

20.     With the Phoenix Core, Qualcomm will begin incorporating more of its own custom CPUs in its products.  Qualcomm is making this change because it believes its own innovation will generate better performing cores than ARM's cores.  This paradigm change will mean Qualcomm will in the future pay to ARM the lower royalty rate under its ALA for these custom CPUs, rather than the higher royalty rates under Qualcomm's TLA.

### After ARM Learned Of The NUVIA Acquisition, ARM Demanded Higher Royalties From Qualcomm

21.     Shortly after announcing the proposed acquisition of NUVIA in January 2021, Qualcomm informed ARM that the NUVIA engineers would be transferred to a Qualcomm subsidiary and would work under Qualcomm's set of license agreements with ARM.  Qualcomm also notified ARM that, to the extent NUVIA was utilizing any ARM Technology not currently covered under Qualcomm's then-current ALA and TLA, Qualcomm would work with the ARM team to complete any necessary license annexes to cover such items.

22.     Qualcomm believed that ARM would embrace the acquisition.  Even though Qualcomm would now be working on its own custom CPUs, the fact that Qualcomm is developing SoCs compatible with the ARM ISA for markets where ARM-based processors have traditionally struggled, such as the "compute" market (i.e., the market for personal computers such as laptops), represents a tremendous opportunity for ARM.  The combination of NUVIA's innovative CPU technology with Qualcomm's scale and engineering prowess provides the best opportunity for ARM to significantly increase its reach and associated royalty payments.

23.     ARM, however, acted opportunistically.  In February 2021, ARM contended that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm

will require and be subject to Arm's prior consent." ARM insisted, without basis, that Qualcomm needed ARM's consent to "any transfer of designs, rights or licenses under NUVIA's agreements" to Qualcomm. Later that month, ARM wrote that to secure its consent for the transfer of NUVIA's CPU design to Qualcomm, Qualcomm must: (i) incorporate the much higher royalty rates from NUVIA's licenses into Qualcomm's pre-existing licenses; (ii) restrict the ability of Qualcomm employees from working on Qualcomm's custom CPU designs such that "at a minimum" any individual with access to ARM Confidential Information wait three years before working on "any architecture CPU design" at Qualcomm; (iii) "discuss and decide on the design transfer fee associated with such CPU design transfer"; and (iv) enter into a separate license for implementation IP and software tools, which would include another undisclosed "design transfer fee."

24.     ARM's demands were outrageous. First, it was attempting to secure supplemental payments and royalties for rights for which Qualcomm *had already paid or was continuing to pay under its own license agreements*. Qualcomm's license agreements, on their face, make clear that Qualcomm's use of ARM Technology in connection with the further development of the technology it acquired from NUVIA would be covered by Qualcomm's pre-existing license agreements. For example, ███████████████████████████████████████████ ████████████████████████████████ Therefore, Qualcomm's use of any ARM Technology utilized in NUVIA's technology was fully licensed under Qualcomm's license agreements as soon as Qualcomm acquired NUVIA. Nonetheless, and although not necessary, Qualcomm sought ARM's consent to assign NUVIA's ARM licenses to Qualcomm, even though Qualcomm's position was that NUVIA's technology was licensed under Qualcomm's license agreements as soon as the acquisition closed.

25.    Second, ARM was claiming a right to control the transfer of NUVIA technology when NUVIA's ALA provided no such rights to ARM.

26.    Third, ARM was trying to interfere with Qualcomm's business by preventing Qualcomm engineers from working for three years with absolutely no basis for such a demand in NUVIA's or Qualcomm's license agreements.  ARM's demands for additional payments from Qualcomm made little sense and were inconsistent with Qualcomm's long-standing agreements. As ARM acknowledges in its complaint, NUVIA was focused on developing a CPU for use in low-volume, high-cost SoCs for the server market, whereas Qualcomm intended to use the technology NUVIA had started developing to build high-volume, lower cost SoCs for Qualcomm's traditional markets, such as the "mobile" and "compute" markets.  For its data center and server products—which would be of a lower volume and higher per-unit cost than, for example, Qualcomm's higher volume and lower cost mobile products—NUVIA and ARM had negotiated a royalty rate that was many multiples higher than Qualcomm's rate.  ARM's strategy, in light of Qualcomm's more favorable terms, has been to ignore Qualcomm's license rights and royalty rates and attempt to force upon Qualcomm NUVIA's substantially higher royalty rate established for its server product.

27.    If ARM could not get the benefit of forcing NUVIA's royalty rate on Qualcomm's custom CPU across Qualcomm's broad SoC portfolio, its alternative strategy was to seek to preclude Qualcomm from proceeding with developing its custom CPU and, in doing so, force the purchase of ARM's off-the-shelf CPU.  This is beneficial for ARM because the TLA has a higher royalty rate than Qualcomm's ALA.  When Qualcomm successfully replaces ARM-designed CPUs with its own designs, Qualcomm will pay ARM lower royalties under the ALA.

28.     Given ARM's unreasonable positions, which conflict with the terms of the parties' licenses, ARM and Qualcomm were unable to resolve this dispute prior to the close of the NUVIA acquisition on March 15, 2021.  Even so, given the parties' long-standing relationship, Qualcomm reaffirmed its interest in finding a productive path forward in its discussions with ARM after the acquisition was complete.

29.     After the acquisition closed, ARM doubled down, asserting that Qualcomm needed to destroy NUVIA's engineering work and start over unless it agreed to ARM's demands, including tens of millions of dollars in both additional "transfer" payments and increased royalties. Qualcomm continued to try and reach a resolution with ARM even though ARM's attempt to control NUVIA's technology was unjustified.

30.     While the parties had intermittent discussions to resolve the dispute, in or about September 2021, ARM stopped communicating with Qualcomm about the dispute.  Meanwhile, throughout 2021 to the present day and with full knowledge by ARM, Qualcomm continued development work on the Phoenix Core and SoCs incorporating the Phoenix Core, as was its right under Qualcomm's own license agreements with ARM.

### ARM Unexpectedly Terminated The NUVIA License Agreements And Qualcomm Went To Great Lengths To Insulate Itself From ARM's Unreasonable Positions

31.     Without warning, in a letter dated February 1, 2022 (but not received by Qualcomm until February 4, 2022), ARM terminated, effective March 1, 2022, the NUVIA ALA and TLA license agreements and demanded that NUVIA and Qualcomm destroy all ARM Confidential Information, and certify by April 1, 2022 that they had complied with ARM's demands.  Prior to the February 2022 letter, it had been over six months since ARM last suggested that NUVIA or Qualcomm violated NUVIA's license agreements.  ARM's demand came out of nowhere,

especially as ARM had continued to support Qualcomm in the development of the technology acquired from NUVIA.

32.    The timing of ARM's demand is telling on two fronts.

33.    First, ARM waited until Qualcomm had expended a year of engineering effort and hundreds of millions of dollars to further develop and integrate Phoenix Core technology into multiple SoCs, in addition to the $1.4 billion Qualcomm spent to acquire NUVIA.  ARM was seeking to maximize whatever leverage it had to threaten Qualcomm's investment and Qualcomm's SoC roadmap and extract exorbitant fees and royalty payments.

34.    Second, ARM terminated the NUVIA agreements just three days before ARM publicly announced the failure of its merger transaction with NVIDIA—a deal that Qualcomm and many others in the industry had opposed.  This timing suggests that, in part, ARM was seeking payback for Qualcomm's public opposition to the NVIDIA deal.

35.    Qualcomm disagreed that it was required to stop any of its work—or that destruction was appropriate—because Qualcomm holds valid licenses to all relevant ARM Technology and ARM's interpretation of the termination obligations in the NUVIA agreement were inconsistent with the plain language of the license agreements.

36.    Moreover, even though ARM demanded destruction of Confidential Information obtained under NUVIA's ALA, NUVIA had implemented ARM Architecture ██, which had been publicly available on ARM's website for anyone to download since at least around January 2021—over a year before the destruction request. ████████████████████████████ ████████████████████████████████████ ████████████████████████████████ Therefore, ARM Architecture ██ was not Confidential Information, not subject to any restrictions, and not subject to any

destruction obligation.  For the same reasons, the NUVIA core design did not contain ARM Confidential Information.

37.     Nonetheless, on April 1, 2022, NUVIA certified that it had destroyed and quarantined all NUVIA-acquired ARM Confidential Information.  ARM, on the other hand, failed to fulfill its own termination obligations, which were also triggered by its termination of the NUVIA agreements.

38.     Then, on April 12, 2022, just a few weeks after NUVIA made its certification, ARM accepted test results verifying that the implementation of the Phoenix Core in the Server SoC complied with the requirements necessary to execute the ARM instruction set.  ARM confirmed that "Qualcomm . . . has validated *their CPU core* in accordance with the Verification requirements set out in the Architecture agreement."  ARM explicitly confirmed that the validation testing was conducted *under Qualcomm's ALA*.  Therefore, ARM was not only well aware that Qualcomm was working on the Phoenix Core under Qualcomm's license agreements, but ARM also affirmed this work and understood that Qualcomm had implemented ███ of the ISA.

39.     ARM's position in this litigation is not just unsupported by its verification in April 2022 and by the language of the license agreements, it is antithetical to the very nature of ARM's ALAs, which allow a licensee to design its own, proprietary ARM-compatible technology that belongs to the licensee and that can be used by the licensee to compete against other ARM-compatible products, including those designed by ARM itself.

40.     Licensees depend on this, as do regulators.  ARM explicitly told regulators in December 2021, in connection with the proposed NVIDIA acquisition, that technology created by its ALA licensees belongs to the licensees, not ARM, stating: "architectural licensees do *not* use ARM's CPU designs.  Arm architectural licensees create their *own* proprietary CPU designs using

their ***own*** engineering teams." ARM specifically referred regulators to Qualcomm's acquisition of NUVIA as an example of Qualcomm's efforts to create its own proprietary CPU.

## ARM's Claims Are Baseless

41.     In this lawsuit, ARM takes its baseless and extreme arguments public, claiming that technology that is not its own belongs to ARM, and that it is ARM's prerogative to decide whether Qualcomm can use or continue to develop NUVIA's technology. The termination provisions in the NUVIA ALA do not require such a result.

42.     ARM ignores the broad license rights ARM has granted Qualcomm under its ALA and other license agreements. Qualcomm *is* licensed to use ARM Technology in connection with Qualcomm's CPU core technology, even if any aspects trace back to NUVIA's work. Moreover, ARM attempts to misappropriate NUVIA technologies that contain no ARM information, but it makes no sense to require Qualcomm to stop using its own intellectual property.

43.     Additionally, ARM's position effectively guts its own ALA, which is intended to encourage licensees to develop their own CPU core technology with their own innovations, at their own risk and expense and for their own benefit. ARM's arguments would allow ARM to claim ownership over its licensees' innovations and inventions. That is not what ARM licensees pay for under the ALA.

44.     ARM's trademark infringement and false-origin claims are also meritless. ARM contends that Qualcomm and NUVIA's use of ARM's trademarks in connection with any products related to NUVIA technology—including, but not limited to the Phoenix Core and the upcoming SoCs—is improper. But Qualcomm's license agreements with ARM give Qualcomm the right to utilize ARM's trademarks. ██████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ ARM's website also publicly grants "any . . . third party" the right to use ARM's trademarks pursuant to various guidelines.

45. In any event, Defendants' use of ARM's trademarks constitutes fair use and therefore is permissible. Qualcomm engages in limited use of the ARM Marks, such as in marketing materials, product specifications, and technical documentations, to convey accurately that Qualcomm's products are compatible with the ARM architecture. These references are limited and truthful.

46. Rather than litigate its case in court, ARM attempted to maximize the negative impact of its filing this lawsuit by campaigning with members of the media and customers to generate additional publicity for ARM's positions.

47. This Court should reject ARM's claims and instead declare that Qualcomm and NUVIA's conduct—including use of Qualcomm-developed technology—was fully licensed.

Defendants, through their undersigned counsel, upon personal knowledge and/or upon information and belief, answer the Complaint dated August 31, 2022 (the "Complaint") as follows:

48. **COMPLAINT PARAGRAPH 1:** Arm is the world's leading provider of microprocessor intellectual property. For decades, Arm has developed innovative processor architecture and implementation designs that balance performance with energy efficiency. Billions of electronic devices use Arm processor technologies pursuant to Arm licenses—from smartphones used to interact seamlessly with friends and family around the world to an increasing number of the servers that run the essential day-to-day operations of Fortune 500 companies.

**ANSWER: Defendants admit that ARM licenses microprocessor intellectual property, and that a significant number of electronic devices use processors that are based**

**on ARM architecture and designs, such as smartphones and to a far more limited extent computers. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations set forth in Complaint Paragraph 1, and on that basis deny them.**

49.    **COMPLAINT PARAGRAPH 2:** Qualcomm is a major semiconductor manufacturer. To accelerate its processor development efforts, Qualcomm spent over $1 billion to acquire Nuvia, a start-up led by senior engineers previously from Apple and Google that licensed Arm technologies to develop high-performance processor cores for semiconductor chips. In the process, Qualcomm caused Nuvia to breach its Arm licenses, leading Arm to terminate those licenses, in turn requiring Qualcomm and Nuvia to stop using and destroy any Arm-based technology developed under the licenses. Undeterred, Qualcomm and Nuvia have continued working on Nuvia's implementation of Arm architecture in violation of Arm's rights as the creator and licensor of its technology. Further, Qualcomm's conduct indicates that it has already and further intends to use Arm's trademarks to advertise and sell the resulting products in the United States, even though those products are unlicensed.

**ANSWER: Defendants admit that Qualcomm is a leading wireless technology innovator that designs numerous products, including semiconductors. Qualcomm further admits that, in 2021, Qualcomm Technologies, Inc. acquired NUVIA for approximately $1.4 billion before working capital and other adjustments. Defendants also admit that NUVIA had license agreements with ARM LTD., such as an ALA and TLA, and that, prior to Qualcomm's acquisition, NUVIA worked on CPUs and SoCs. Defendants further admit that in a letter dated February 1, 2022, ARM stated that it intended to terminate its ALA and TLA with NUVIA effective March 1, 2022, and requested that NUVIA destroy or return to**

**ARM any ARM Confidential Information, including any copies thereof in its possession and any ARM Technology or derivatives. Defendants otherwise deny the allegations in Complaint Paragraph 2, except to the extent they purport to state legal conclusions as to which no response is required.**

50.    **COMPLAINT PARAGRAPH 3:** Arm now brings suit for specific performance of the Nuvia licenses' termination provisions to require Qualcomm and Nuvia to stop using and to destroy the relevant Nuvia technology and to stop their improper use of Arm's trademarks with their related products. Arm also seeks declaratory judgment, injunctive relief, and damages for the use of Arm's trademarks in connection with semiconductor chips incorporating the relevant Nuvia technology.

**ANSWER: Complaint Paragraph 3 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Complaint Paragraph 3, except admit that Plaintiff purports to assert the claims and seek the relief described in Complaint Paragraph 3.**

## PARTIES

51.    **COMPLAINT PARAGRAPH 4:** Plaintiff Arm is a corporation organized under the laws of the United Kingdom, has its principal place of business in Cambridge, United Kingdom, and is a resident or domiciliary of the United Kingdom.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 4, and on that basis deny them.**

52.    **COMPLAINT PARAGRAPH 5:** Defendant Qualcomm Inc. is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 5.**

53.    **COMPLAINT PARAGRAPH 6:** Defendant Qualcomm Technologies, Inc. is a subsidiary of Qualcomm Inc. and a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 6.**

54.    **COMPLAINT PARAGRAPH 7:** Defendant Nuvia is a subsidiary of Qualcomm and a Delaware corporation with its principal place of business at 2841 Mission College Blvd., Santa Clara, California 95054.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 7.**

## JURISDICTION AND VENUE

55.    **COMPLAINT PARAGRAPH 8:** The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (trademarks), and 28 U.S.C. § 1367(a) (supplemental jurisdiction). The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties, and because the amount in controversy, based on the consideration that was anticipated under the Nuvia licenses, the volume of products expected under those licenses, and Defendants' potential loss from complying with the equitable relief requested here, exceeds $75,000, exclusive of interest and costs.

**ANSWER: Complaint Paragraph 8 purports to state legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations in Complaint Paragraph 8.**

56.    **COMPLAINT PARAGRAPH 9:** The Court has personal jurisdiction over Qualcomm and Nuvia because they are incorporated in Delaware. Qualcomm and Nuvia have purposely availed themselves of the privileges and benefits of the laws of Delaware.

**ANSWER: Complaint Paragraph 9 purports to state legal conclusions as to which no response is required.  To the extent a response is required, Defendants admit that Qualcomm Inc., Qualcomm Technologies, Inc., and NUVIA, Inc. are incorporated in Delaware.**

57.     **COMPLAINT PARAGRAPH 10:** Venue is proper in this judicial district under 28 U.S.C. § 1391 because Qualcomm and Nuvia are incorporated in Delaware. Venue is also proper because Qualcomm Inc. and Qualcomm Technologies, Inc. have purposefully availed themselves of the courts in the State of Delaware and this Judicial District.

**ANSWER: Complaint Paragraph 10 purports to state legal conclusions as to which no response is required. To the extent a response is required, Defendants admit that Qualcomm Inc., Qualcomm Technologies, Inc., and NUVIA, Inc. are incorporated in Delaware.**

## FACTUAL ALLEGATIONS

*Arm's business model[4]*

58.     **COMPLAINT PARAGRAPH 11:** For decades, Arm has been a world leader in developing processor architectures, including instruction set architectures, and processor core designs implementing those architectures, all of which are covered by an extensive intellectual property portfolio.

**ANSWER: Defendants admit that ARM develops instruction set architectures for CPUs, and also designs CPUs that implement ARM's instruction set architecture. Defendants further admit that ARM owns some intellectual property.  Defendants otherwise**

---

[4]   Defendants have not specifically responded to the headings interspersed between the numbered paragraphs in ARM's complaint.  For the avoidance of doubt, and to the extent they require a response, Defendants deny any allegations made therein.

deny the allegations in Complaint Paragraph 11 except to the extent they purport to state legal conclusions as to which no response is required.

59.    **COMPLAINT PARAGRAPH 12:** Processor cores are the parts of a computer's Central Processing Unit or "CPU" that read and execute program instructions to perform specific actions. Modern CPUs often integrate multiple processor cores on a single semiconductor chip or integrated circuit ("IC").

**ANSWER: Defendants admit the allegations in Complaint Paragraph 12.**

60.    **COMPLAINT PARAGRAPH 13:** Arm owns intellectual property relating to its processor architectures and designs, including, among other things, trademarks.

**ANSWER: Defendants admit that ARM may own some intellectual property, including trademarks. Defendants otherwise deny the allegations in Complaint Paragraph 13 except to the extent they purport to state legal conclusions as to which no response is required.**

61.    **COMPLAINT PARAGRAPH 14:** Arm does not manufacture or sell chips. Instead, Arm licenses its technologies to hundreds of companies to use in developing their own chips or in their own electronic devices and works with these companies to ensure the success of Arm-based products.

**ANSWER: Defendants admit that ARM does not manufacture or sell semiconductor chips, and that ARM licenses intellectual property to various licensees. Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 14, and on that basis deny them.**

62.    **COMPLAINT PARAGRAPH 15:** Arm's customers manufacture (or have manufactured for them) chips based on Arm's technologies. The chips may then be used in the

19

customer's own devices or sold to other device manufacturers. Arm earns revenue from licensing fees and royalties based on the number of Arm-based chips its customers sell.

**ANSWER: Defendants admit that ARM receives licensing fees and royalties from licensees, and that various licensees manufacture products that may include ARM Technology. Defendants otherwise deny the allegations in Complaint Paragraph 15.**

63.    **COMPLAINT PARAGRAPH 16:** Arm's business model relies on Arm's ability to monetize its research and intellectual property by receiving both licensing fees and royalties for products incorporating Arm's technology and intellectual property. Arm therefore grows its revenues by increasing both the number of customers and the number of Arm-based products sold.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 16, and on that basis deny them.**

64.    **COMPLAINT PARAGRAPH 17:** There are two main types of Arm licenses for Arm's technologies: Technology License Agreements ("TLAs"), which allow the use of specific "off-the-shelf" Arm processor core designs with only minor modifications, and Architecture License Agreements ("ALAs"), which allow for the design of custom processor cores that are based on particular architectures provided by Arm.

**ANSWER:    Defendants admit that ARM enters into license agreements with licensees, including Technology License Agreements ("TLAs") and Architecture License Agreements ("ALAs"). Defendants otherwise deny the allegations in Paragraph 17.**

65.    **COMPLAINT PARAGRAPH 18:** Arm grants few ALAs. Custom processor cores can take years to design, at great expense and requiring significant support from Arm, with no certainty of success. If successful, ALA licensees can sell custom processor cores for use in other companies' products.

**ANSWER: Defendants admit that it requires significant expense and commitment to design custom CPUs. Defendants respectfully refer the Court to the Qualcomm and NUVIA ALAs for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 18.**

66.    **COMPLAINT PARAGRAPH 19:** Arm ALAs typically authorize licensees only to develop processor cores based on specific Arm technology provided by Arm under the licenses, rather than granting broader licenses to use Arm-based technology generally.

**ANSWER: Defendants respectfully refer the Court to the Qualcomm and NUVIA ALAs for their complete language and content. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 19, and on that basis deny them.**

*Nuvia obtains Arm licenses*

67.    **COMPLAINT PARAGRAPH 20:** Nuvia was founded as a start-up in 2019 by chip engineers who left Apple and Google. Nuvia planned to design energy-efficient CPUs for data center servers based on a custom processor implementing the Arm architecture, which would have expanded the market for Arm's technology. Nuvia's business model was thus reliant on customizing processor core designs based on Arm's technology. As one of the founders explained to the press when launching Nuvia, the start-up's premise (and one of its attractions to investors) was that Nuvia intended to build "a custom clean sheet designed from the ground up" using Arm's architecture.[5]

---

5    Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TechCrunch (Nov. 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/.

**ANSWER: Defendants admit that NUVIA worked on custom CPUs that could be used in data center servers, that the custom CPU designs would expand the market for ARM technology, and that the custom CPUs that NUVIA worked on, prior to NUVIA's acquisition by Qualcomm, were intended to be compatible with ARM architecture. Defendants respectfully refer the Court to the cited publication for its complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 20.**

68.    **COMPLAINT PARAGRAPH 21:** In September 2019, Arm granted Nuvia an ALA and TLA, providing rights to design custom processor cores based on an Arm architecture and to modify certain off-the-shelf designs. The licenses granted in the ALA and TLA are necessary to use Arm's extensive intellectual property portfolio covering the Arm architecture. The ALA and TLA included rights to use Arm trademarks in connection with products developed by Nuvia under the licenses. Arm also provided substantial, crucial, and individualized support from Arm employees to assist Nuvia in its development of Arm-based processors for data center servers.

**ANSWER: Defendants admit that NUVIA had a TLA and ALA with ARM, and respectfully refer the Court to the referenced agreements for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 21, except to the extent they purport to state legal conclusions as to which no response is required.**

69.    **COMPLAINT PARAGRAPH 22:** The licenses provided Nuvia access to specific Arm architecture, designs, intellectual property, and support in exchange for payment of licensing fees and royalties on future server products that include processor cores based on Arm's architecture, designs, or related intellectual property. Nuvia's licensing fees and royalty rates reflected the anticipated scope and nature of Nuvia's use of the Arm architecture. The licenses

safeguarded Arm's rights and expectations by prohibiting assignment without Arm's consent, regardless of whether a contemplated assignee had its own Arm licenses.

**ANSWER: Defendants admit that NUVIA's TLA and ALA provided NUVIA with a license to certain ARM Technology. Defendants further admit that NUVIA and ARM intended the licensing fees and royalties set forth in the NUVIA ALA to apply to future server products, not products for other markets. Defendants respectfully refer the Court to the referenced agreements for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 22.**

70.    **COMPLAINT PARAGRAPH 23:** From September 2019 to early 2021, Nuvia used the technology it licensed from Arm to design and develop processor cores. Arm provided preferential support for Nuvia's development efforts, with Arm seeking to accelerate research and development in next-generation processors for data center servers to support that sector's transition to Arm technology.

**ANSWER: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Complaint Paragraph 23, and on that basis deny them. Defendants otherwise deny the allegations of Complaint Paragraph 23.**

71.    **COMPLAINT PARAGRAPH 24:** In August 2020, Nuvia announced that its "first-generation CPU, code-named 'Phoenix'" would be "a custom core based on the ARM architecture."[6] It also publicized benchmark tests showing that Phoenix could double the

---

[6]    John Bruno & Sriram Dixit, *Performance Delivered a New Way*, Silicon Reimagined (Aug. 11, 2020), https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5.

performance of rival products from Apple, Intel, AMD, and Qualcomm. Based on these results, Nuvia claimed that the "Phoenix CPU core has the potential to reset the bar for the market."[7]

**ANSWER: Defendants respectfully refer the Court to the cited publication for its complete language and content. Defendants otherwise admit the allegations in Complaint Paragraph 24.**

*Qualcomm relies on designs created by Arm*

72.    **COMPLAINT PARAGRAPH 25:** Qualcomm is one of the world's largest semiconductor companies, with a portfolio of intellectual property and products directed to wireless technologies, including cellular, Bluetooth, and Wi-Fi; CPUs and ICs; networking; mobile computers; cell phones; wearables; cameras; automobiles; and other electronic devices.

**ANSWER: Defendants admit the allegations of Complaint Paragraph 25.**

73.    **COMPLAINT PARAGRAPH 26:** Even though Qualcomm has an Arm ALA, its prior attempts to design custom processors have failed. Qualcomm invested in the development of a custom Arm-based processor for data center servers until 2018, when it cancelled the project and laid off hundreds of employees.[8]

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 26. The allegation that Qualcomm's "prior attempts to design custom processors**

---

[7]    *Id.*

[8]    *See, e.g.*, Andrei Frumusanu, *Qualcomm to Acquire NUVIA: A CPU Magnitude Shift*, AnandTech (Jan. 13, 2021), https://www.anandtech.com/show/16416/qualcomm-to-acquire-nuvia-a-cpu-magnitude-shift; Andy Patrizio, *Qualcomm makes it official; no more data center chip*, Network World (Dec. 12, 2018), https://www.networkworld.com/article/3327214/qualcomm-makes-it-official-no-more-data-center-chip.html.

have failed" is patently false.  Qualcomm has had great success in developing custom processors, to ARM's significant benefit.

74.     **COMPLAINT PARAGRAPH 27:** Qualcomm's commercial products thus have relied on processor designs prepared by Arm's engineers and licensed to Qualcomm under Arm TLAs. Discovery is likely to show that as of early 2021, Qualcomm had no custom processors in its development pipeline for the foreseeable future. To fill this gap, Qualcomm sought improperly to purchase and use Nuvia's custom designs without obtaining Arm's consent.

**ANSWER: Defendants deny the allegations of Complaint Paragraph 27.**

*Qualcomm acquires Nuvia*

75.     **COMPLAINT PARAGRAPH 28:** On January 13, 2021, Qualcomm announced that Qualcomm Technologies, Inc. was acquiring Nuvia for $1.4 billion. Neither Qualcomm nor Nuvia provided prior notice of this transaction to Arm. Nor did they obtain Arm's consent to the transfer or assignment of the Nuvia licenses.

**ANSWER: Defendants admit that on January 12, 2021, Qualcomm Incorporated announced that its subsidiary, Qualcomm Technologies, Inc., entered into a definitive agreement to acquire NUVIA for approximately $1.4 billion before working capital and other adjustments.  Defendants otherwise deny the allegations of Complaint Paragraph 28, except to the extent they purport to state legal conclusions as to which no response is required.**

76.     **COMPLAINT PARAGRAPH 29:** Qualcomm indicated in its announcement that "NUVIA CPUs"—that is, Nuvia's implementations of Arm technology developed under the Nuvia licenses with Arm—would be incorporated into a range of Qualcomm products. Qualcomm's press release declared its grand ambitions for Nuvia's implementation of Arm technology: "NUVIA CPUs are expected to be integrated across Qualcomm Technologies' broad portfolio of products,

25

powering flagship smartphones, next-generation laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality and infrastructure networking solutions."[9] The press release also indicated that Qualcomm's first target would be "integrating NUVIA CPUs with Snapdragon," its flagship suite of system on a chip ("SoC") semiconductor products for mobile devices.

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 29.**

77.    **COMPLAINT PARAGRAPH 30:** As Qualcomm's CEO, Cristiano Amon, noted in a Reuters interview shortly after the acquisition closed in the first half of 2021, "Qualcomm will start selling Nuvia-based laptop chips next year."[10] Amon confirmed the negative impact this might have on Arm, saying: "If Arm . . . eventually develops a CPU that's better than what we can build ourselves, then we always have the option to license from Arm."

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 30.**

78.    **COMPLAINT PARAGRAPH 31:** Qualcomm also confirmed its prior deficiencies in core design, reportedly promoting the Nuvia acquisition as "filling a gap" because "for several years now" the company "had been relying on external IP such as Arm's Cortex

---

[9]    *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 13, 2021), https://www.qualcomm.com/news/releases/2021/01/13/qualcomm-acquire-nuvia.

[10]   Stephen Nellis, *Qualcomm's new CEO eyes dominance in the laptop markets*, Reuters (July 2, 2021), https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/.

cores."[11] Qualcomm further explained that "the immediate goals for the NUVIA team will be implementing custom CPU cores" designed for laptops.[12]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 31.**

79. **COMPLAINT PARAGRAPH 32:** Analysts confirmed that the "Qualcomm acquisition [of] NUVIA is a huge move to scale up dramatically. It can reinvigorate current lines in smartphone, Windows PC and automotive SoCs, and make them more competitive with the competition. They have been lagging."[13]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 32.**

80. **COMPLAINT PARAGRAPH 33:** Providing further confirmation of the acquisition's importance to Qualcomm in filling the "gap" in its "lagging" IP design, analysts noted that the Nuvia acquisition was "extremely speedy in terms of timeline," and Qualcomm "went as far as [to] put out a concrete roadmap for . . . using the newly acquired IP from Nuvia,"

---

[11] Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia.

[12] *Id.*

[13] Trading Places Research, *Qualcomm's Acquisition of NUVIA is a Huge Move*, Seeking Alpha (Jan. 13, 2021), https://seekingalpha.com/article/4398808-qualcomms-acquisition-of-nuvia-is-huge-move.

announcing that Nuvia's processors would be finalized for use in high-end laptops "in the second half of 2022."[14]

**ANSWER: Defendants respectfully refer the Court to the referenced publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 33.**

81.    **COMPLAINT PARAGRAPH 34:** Based on standard industry scheduling, that timeline indicated a design for data center processors would be completed "essentially as soon as possible following the acquisition" of Nuvia.[15]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 34.**

82.    **COMPLAINT PARAGRAPH 35:** This timing indicates that the Arm-based cores that Nuvia designed using Arm's technology and intellectual property were, as of the acquisition date, effectively ready for the final stages of design for Qualcomm chips, leading promptly to product integration and manufacturing. Qualcomm's November 2021 10-K filing disclosed that the $1.4 billion acquisition encompassed Nuvia's team and "certain in-process technologies,"

---

[14]    Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia (quoting *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 15, 2021), https://www.qualcomm.com/news/releases/2021/03/16/qualcomm-completes-acquisition-nuvia).

[15]    *Id.*

reflecting the availability of existing cores such as the Phoenix CPU core developed under Nuvia's ALA.[16]

**ANSWER: Defendants respectfully refer the Court to the referenced publication for its complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 35, except to the extent they purport to state legal conclusions as to which no response is required.**

83.    **COMPLAINT PARAGRAPH 36:** By entering into the acquisition of Nuvia and transferring the rights and technology developed under the Nuvia licenses without Arm's consent, Qualcomm thus greatly accelerated its ability to bring to market custom-designed processor cores—a head start that Qualcomm was willing to pay over $1 billion to obtain.

**ANSWER: Defendants admit that on January 12, 2021, Qualcomm Incorporated announced that its subsidiary, Qualcomm Technologies, Inc., entered into a definitive agreement to acquire NUVIA for approximately $1.4 billion before working capital and other adjustments. Defendants otherwise deny the allegations of Complaint Paragraph 36.**

*Arm terminates the Nuvia licenses*

84.    **COMPLAINT PARAGRAPH 37:** Soon after the announcement of the merger, Arm informed Qualcomm in writing that Nuvia could not assign its licenses and that Qualcomm could not use Nuvia's in-process designs developed under the Nuvia ALA without Arm's consent. For more than a year, Arm negotiated with Qualcomm, through Qualcomm Inc. and Qualcomm

---

[16]    Qualcomm Inc., Annual Report (Form 10-K) (Nov. 3, 2021), https://investor.qualcomm.com/ financial-information/sec-filings/content/0001728949-21-000076/0001728949-21-000076.pdf.

Technologies, Inc., in an effort to reach an agreement regarding Qualcomm's unauthorized acquisition of Nuvia's "in-process technologies" and license.

**ANSWER: Defendants admit that in a letter dated February 2, 2021, ARM wrote to Qualcomm Technologies, Inc. that "any transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent." Defendants otherwise deny the allegations of Complaint Paragraph 37, except to the extent they purport to state legal conclusions as to which no response is required.**

85.     **COMPLAINT PARAGRAPH 38:** All the while, Qualcomm continued to broadcast its intentions to rush Nuvia products to market. In November 2021, Qualcomm's Chief Technology Officer told investors that Qualcomm was "pretty far along at this point" in developing its first chip with Nuvia's implementation of Arm technology and would "sample a product at, let's say nine months from now"—which would be August 2022.[17] Then in January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO confirming that "[t]he future of the PC industry is modern Arm-based architectures" and boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[18] Elsewhere, Qualcomm's CEO reiterated that Qualcomm is "definitely in a hurry" to

---

[17] *Qualcomm Investor Day 2021 Livestream: CEO Cristiano Amon looks ahead*, YouTube (Nov. 16, 2021), https://www.youtube.com/watch?v=rUWPzROYn2E; *see also* Mark Hachman, *Qualcomm Prophesizes 2023 as the Rebirth of PC Snapdragon Chips*, PCWorld (Nov. 16, 2021), https://www.pcworld.com/article/552285/qualcomm-prophesies-2023-as-the-rebirth-of-its-snapdragon-chips.html.

[18] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

launch Nuvia's Arm-based chips "as fast as we can."[19] Based on these statements, discovery is likely to show that Qualcomm and Nuvia continued to use the relevant technology developed under Nuvia's Arm licenses.

**ANSWER: Defendants respectfully refer the Court to the referenced publications for their complete language and content. Defendants otherwise deny the allegations of Complaint Paragraph 38.**

86.     **COMPLAINT PARAGRAPH 39:** On February 1, 2022, Arm sent a letter to Nuvia and Qualcomm terminating the Nuvia licenses effective March 1, 2022. The letter terminated the licenses based on Nuvia's material breach of the assignment provisions of the Nuvia licenses by entering into the acquisition of Nuvia without Arm's consent. The letter also reminded Nuvia and Qualcomm of their obligations upon termination to stop using and destroy the Nuvia technology developed under the now-terminated licenses.

**ANSWER: Defendants admit that, on February 4, 2022, Qualcomm and Gerard Williams, NUVIA's former Chief Executive Officer, received a letter purporting to terminate NUVIA's ALA and TLA, with the termination effective as of March 1, 2022. Defendants otherwise deny the allegations of Complaint Paragraph 39, except to the extent they purport to state legal conclusions as to which no response is required.**

87.     **COMPLAINT PARAGRAPH 40:** In February 2022, pending termination of the Nuvia licenses, Nuvia sought Arm's verification that a Nuvia processor design satisfied the Arm architecture's specifications. On February 23, 2022, Qualcomm confirmed that it was still

---

[19]  Nilay Patel, *What Comes After the Smartphone, With Qualcomm CEO Cristiano Amon*, The Verge (Jan. 11, 2022), https://www.theverge.com/22876511/qualcomm-ceo-cristiano-amon-interview-decoder-podcast.

developing the relevant Nuvia technology by stating in a court filing that certain Nuvia documents were based on "years of research and work" and would "reveal secret design components of Qualcomm chips that are still in development." *Qualcomm Technologies, Inc. v. Hoang*, No. 3:22-cv-00248-CAB-BLM (S.D. Cal. Feb. 23, 2022), ECF No. 1 at 5-6.

**ANSWER: Defendants respectfully refer the Court to the cited court filing for its complete language and content. Defendants admit that Qualcomm began verification of a Qualcomm processor design in December 2021, that Qualcomm continued developing processor technology that it acquired from NUVIA beginning in March 2021 (doing so with ARM's knowledge that Qualcomm's design work was ongoing), and that ARM verified that the Qualcomm design satisfied ARM's architecture specification. Defendants otherwise deny the allegations of Complaint Paragraph 40.**

88.    **COMPLAINT PARAGRAPH 41:** On March 1, 2022, the Nuvia licenses terminated, along with the corresponding rights to use or sell products based on or incorporating Nuvia technology developed under those licenses.

**ANSWER: Defendants deny the allegations of Complaint Paragraph 41, except to the extent they purport to state legal conclusions as to which no response is required.**

89.    **COMPLAINT PARAGRAPH 42:** On April 1, 2022, Qualcomm's General Counsel sent Arm a letter enclosing a Nuvia representative's termination certification. The certification acknowledged—without objection—that the Nuvia licenses had been terminated. The certification recognized the obligations upon termination, and asserted that Nuvia was in compliance. Qualcomm and Nuvia thereby conceded that termination of the Nuvia licenses was appropriate, and that the termination provisions had been triggered, are binding, and are enforceable.

**ANSWER: Defendants admit that, on April 1, 2022, Qualcomm Incorporated's General Counsel and Corporate Secretary transmitted a Certification from Gerard Williams stating that to the best of his knowledge, information and belief after due inquiry, NUVIA was in compliance with its obligations under** ██████ **with respect to any ARM Confidential Information.   Defendants otherwise deny the allegations of Complaint Paragraph 42, except to the extent they purport to state legal conclusions as to which no response is required.**

*Qualcomm keeps using Arm-based technology developed under the Nuvia licenses*

90.   **COMPLAINT PARAGRAPH 43:** Qualcomm is subject to Nuvia's termination requirements as the acquirer of Nuvia. Qualcomm has publicly described Nuvia as a Qualcomm "team" that has been "very tight[ly] integrat[ed]" with and is "not separate" from Qualcomm.[20] Qualcomm has also acted on behalf of Nuvia publicly and in correspondence with Arm since the acquisition.   Qualcomm further told Arm that it planned to "redeploy NUVIA employees" and "transfer NUVIA's work" to Qualcomm and, consistent with that plan, Qualcomm has on-boarded Nuvia's leadership and employees as Qualcomm employees.[21]

---

[20]   Ian Cutress, *Interview with Alex Katouzian, Qualcomm SVP: Talking Snapdragon, Microsoft, Nuvia, and Discrete Graphics*, AnandTech (Jan. 31, 2022), https://www.anandtech.com/show/17233/interview-with-alex-katouzian-qualcomm-svp-talking-snapdragon-microsoft-nuvia-and-discrete-graphics; Ian Cutress, *AnandTech Interview with Miguel Nunes: VP for Windows and Chrome PCs, Qualcomm*, AnandTech (Feb. 14, 2022), https://www.anandtech.com/show/17253/anandtech-interview-with-miguel-nunes-senior-director-for-pcs-qualcomm.

[21]   *See, e.g.*, *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 16, 2021), https://investor.qualcomm.com/news-events/press-releases/detail/1304/qualcomm-completes-acquisition-of-nuvia; *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

**ANSWER:  Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants admit that, on January 27, 2021, Qualcomm wrote to ARM that Qualcomm had entered into a definitive agreement to acquire NUVIA and stating: "Following the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees continue their activities under the Qualcomm ALA and TLA, as that will be their current employer."  Defendants further admit that, on February 3, 2021, Qualcomm stated in a letter to ARM that, after the NUVIA acquisition, NUVIA would "become a wholly owned subsidiary of Qualcomm and, post-closing, our plan is to redeploy NUVIA employees to currently existing Qualcomm entities."  Defendants otherwise deny the allegations in Complaint Paragraph 43, except to the extent they purport to state legal conclusions as to which no response is required.**

91.    **COMPLAINT PARAGRAPH 44:** On April 29, 2022, Arm wrote Qualcomm clarifying that neither Nuvia nor Qualcomm was authorized to continue working on technology that was developed under the Nuvia licenses.

**ANSWER:  Defendants admit that ARM wrote a letter to Qualcomm dated April 29, 2022.  Defendants otherwise deny the allegations in Complaint Paragraph 44 except to the extent they purport to state legal conclusions as to which no response is required.**

92.    **COMPLAINT PARAGRAPH 45:** Two weeks later, on May 13, 2022, Qualcomm sought Arm's verification that a new Qualcomm processor core complied with Arm architecture so that it could be verified and incorporated into a product. Qualcomm did not explain whether this processor core design was based on Nuvia's designs under the terminated licenses.

**ANSWER:  Defendants admit that, on May 13, 2022, Qualcomm submitted to ARM a compliance report for a new Qualcomm CPU.  Defendants otherwise deny the allegations in Complaint Paragraph 45.**

93.    **COMPLAINT PARAGRAPH 46:** Based on the timing and circumstances surrounding Qualcomm's request, discovery is likely to show that Qualcomm's processor core design is based on or incorporates in whole or in part the processor core design developed under the prior Nuvia licenses.

**ANSWER:  Defendants admit that Qualcomm's Phoenix Core design incorporates intellectual property acquired from NUVIA, which is wholly independent of ARM. Defendants otherwise deny the allegations in Complaint Paragraph 46, except to the extent they purport to state legal conclusions to which no response is required.**

94.    **COMPLAINT PARAGRAPH 47:** Qualcomm's Arm licenses do not cover products based on or incorporating Arm-based technologies developed by third parties under different Arm licenses, such as the now-terminated Nuvia licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 47.**

95.    **COMPLAINT PARAGRAPH 48:** Despite Arm's termination of the Nuvia licenses, Qualcomm has continued to tell the public that its Nuvia chips will soon be joining the industry-wide "ecosystem transition to Arm."[22] Like Qualcomm's prior statements, this announcement was directed to readers throughout the United States, including to readers physically located in the State of Delaware and this Judicial District.

---

[22]  *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 48, except to the extent they purport to state legal conclusions to which no response is required.**

96.    **COMPLAINT PARAGRAPH 49:** In June 2022, Qualcomm's CEO reiterated that it would soon begin "sampling" Nuvia chips to companies, allowing them to design electronic devices incorporating the chips in the "next year."[23] Based on that timeline, he explained, "[i]n late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon with a Nuvia-designed CPU."[24]

**ANSWER: Defendants respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 49.**

97.    **COMPLAINT PARAGRAPH 50:** In the microprocessor industry, "sampling" means providing pre-production processors to original equipment manufacturers ("OEMs"), original device manufacturers ("ODMs"), or independent software vendors ("ISVs") for use in the product design cycle before product launch.

---

[23]    *Id.*; *see also* Mark Tyson, *Qualcomm CEO Admits Nuvia Chip OEM Sampling is Delayed (Update)*, Tom's Hardware (June 10, 2022), https://www.tomshardware.com/news/qualcomm-nuvia-chip-sampling-delays (Qualcomm spokesperson clarifying: "We are on track to sample the first products with our next generation CPUs this year.").

[24]    *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

**ANSWER:  Defendants admit the allegations in Complaint Paragraph 50 generally describe sampling, but note that they fail to distinguish between precommercial engineering samples and commercial samples.**

98.    **COMPLAINT PARAGRAPH 51:** Based on Qualcomm's statements that Nuvia processors took "years" to develop and "are still in development," and Qualcomm's consistent statements that it is developing Nuvia's Arm chips, discovery is likely to show that the chips that Qualcomm intends to sample in the coming months will contain Nuvia technology that Qualcomm cannot use and instead must destroy.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 51, except to the extent they purport to state legal conclusions to which no response is required.**

99.    **COMPLAINT PARAGRAPH 52:** Further, based on Qualcomm's public announcements of its plans to use Nuvia technology, discovery is likely to show that Qualcomm has continued to retain and use Nuvia technology developed pursuant to the Nuvia licenses, thereby materially breaching the termination provisions of those licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 52, except to the extent they purport to state legal conclusions to which no response is required.**

100.    **COMPLAINT PARAGRAPH 53:** News reports indicate that Qualcomm is also developing Nuvia processors for data center servers, and "already has working silicon to at least demonstrate to potential customers,"[25] which discovery is likely to show is based on or incorporates Nuvia technology developed under the now-terminated Nuvia ALA.

---

[25]  Dan Robinson, *Qualcomm readying new Arm server chip based on Nuvia acquisition*, The Register (Aug. 19, 2022), https://www.theregister.com/2022/08/19/qualcomm_arm_server_chip/ (citing Ian King,

**ANSWER:  Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 53, except to the extent they purport to state legal conclusions for which no response is required.**

101.    **COMPLAINT PARAGRAPH 54:** The failure of Nuvia and Qualcomm to comply with the post-termination obligations under the Nuvia ALA is causing, and will continue to cause, irreparable harm to Arm. Qualcomm effectively seeks to circumvent Arm's licensing model, which allocates use of the technology developed pursuant to a particular Arm license to a particular licensee.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 54, except to the extent they purport to state legal conclusions to which no response is required.**

102.    **COMPLAINT PARAGRAPH 55:** These breaches thus interfere with Arm's ability and right to control the use of its technology, negatively affecting Arm's relationships with existing and prospective licensees.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 55, except to the extent they purport to state legal conclusions to which no response is required.**

103.    **COMPLAINT PARAGRAPH 56:** The prospective monetary damages from Qualcomm's circumvention and interference with Arm's control over its technology are not readily ascertainable or calculable, given the resulting future impact on Arm's relationships with existing and prospective customers.

---

*Qualcomm Is Plotting a Return to Server Market With New Chip*, Bloomberg (Aug. 18, 2022), https://www.bloomberg.com/news/articles/2022-08-18/qualcomm-is-plotting-a-return-to-server-market-with-new-chip).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 56, except to the extent they purport to state legal conclusions to which no response is required.**

104.    **COMPLAINT PARAGRAPH 57:** Qualcomm's improper acquisition of the relevant Nuvia technology in violation of Arm's standard provisions threatens to harm Arm's position in the ecosystem of Arm-based devices, harm Arm's reputation as an intellectual property owner and technology developer whose licenses must be respected, and embolden other companies to likewise harm Arm's reasonable business expectations in issuing its licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 57, except to the extent they purport to state legal conclusions to which no response is required.**

<u>**COUNT I: BREACH OF CONTRACT – SPECIFIC PERFORMANCE**</u>
<u>**(ALL DEFENDANTS)**</u>

105.    **COMPLAINT PARAGRAPH 58:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER: Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-57 as if fully set forth herein.**

106.    **COMPLAINT PARAGRAPH 59:** The termination obligations of the ALA between Nuvia and Arm survive termination and remain valid and enforceable contract provisions, as Qualcomm's correspondence and Nuvia's termination certification confirm.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 59, except to the extent they purport to state legal conclusions to which no response is required.**

107.    **COMPLAINT PARAGRAPH 60:** Arm complied with and fulfilled all relevant duties, conditions, covenants, and obligations under the Nuvia ALA, including ceasing use of Nuvia confidential information in its possession.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 60, except to the extent they purport to state legal conclusions to which no response is required.**

108.   **COMPLAINT PARAGRAPH 61:** The Nuvia ALA terms were just and reasonable, involving adequate consideration and reasonable obligations for Nuvia in the event of Arm's termination based on Nuvia's material breach. Those obligations served to restore the license holder to its position *ex ante*, protect Arm's business model and reasonable business expectations in issuing its licenses, and prevent the unjust enrichment of Qualcomm, the party that induced Nuvia's breach.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 61, except to the extent they purport to state legal conclusions to which no response is required.**

109.   **COMPLAINT PARAGRAPH 62:** Upon termination, the Nuvia ALA requires Nuvia to cease using and destroy any technology developed under the Nuvia ALA, as well as cease using Arm's trademarks in connection with any technology developed under the Nuvia ALA.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 62, except to the extent they purport to state legal conclusions to which no response is required.**

110.   **COMPLAINT PARAGRAPH 63:** Qualcomm shares Nuvia's obligations under the Nuvia ALA in its capacity as Nuvia's acquirer, and thus Qualcomm is likewise subject to the requirements of the Nuvia licenses' termination provisions.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 63, except to the extent they purport to state legal conclusions to which no response is required.**

111.   **COMPLAINT PARAGRAPH 64:** Based on Defendants' correspondence with Arm, public statements, and processor verification requests, discovery is likely to show that

Defendants are still using and developing Nuvia technology developed under the now-terminated licenses, along with Arm trademarks, and intend to continue to do so.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 64, except to the extent they purport to state legal conclusions to which no response is required.**

112.    **COMPLAINT PARAGRAPH 65:** Defendants therefore have breached and are breaching the Nuvia ALA's termination provisions.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 65, except to the extent they purport to state legal conclusions to which no response is required.**

113.    **COMPLAINT PARAGRAPH 66:** As a direct and proximate result of Nuvia and Qualcomm's past and ongoing breaches, Arm has been irreparably injured and damaged in amounts not capable of determination, including, but not limited to, injury to Arm's global licensing program and misuse of Arm's technology.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 66, except to the extent they purport to state legal conclusions to which no response is required.**

114.    **COMPLAINT PARAGRAPH 67:** Unless Defendants' breaches of the Nuvia ALA's termination provisions are enjoined and specific performance is granted, Arm will continue to suffer irreparable harm. As such, Arm has the right to enforcement of Nuvia and Qualcomm's compliance with the ALA's termination provisions, including via injunctive relief, specific performance, or any other measures necessary to avoid irreparable harm to Arm or to mitigate damages that have been caused by, and will continue to be caused by, Defendants' breach.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 67, except to the extent they purport to state legal conclusions to which no response is required.**

115.    **COMPLAINT PARAGRAPH 68:** Arm is entitled to specific performance requiring Defendants to comply with the Nuvia ALA's termination provisions, including ceasing all use of and destroying any technology developed under the Nuvia ALA, and ceasing all use of Arm trademarks in connection with any technology developed under the Nuvia ALA—including the relevant Nuvia technology.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 68, except to the extent they purport to state legal conclusions to which no response is required.**

116.    **COMPLAINT PARAGRAPH 69:** Arm is also entitled to monetary compensation incidental to specific performance of the Nuvia ALA's termination provisions to compensate Arm for the delay in Defendants' performance of their contractual obligations.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 69, except to the extent they purport to state legal conclusions to which no response is required.**

<u>**COUNT II: DECLARATORY JUDGMENT AND TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114 (ALL DEFENDANTS)**</u>

117.    **COMPLAINT PARAGRAPH 70:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER:  Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-69 as if fully set forth herein.**

118.    **COMPLAINT PARAGRAPH 71:** Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower case letters (collectively, the "ARM Marks"), true and correct copies of which are attached as **Exhibits A and B**. These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with particular

microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services. The applications to register the marks were filed on July 31, 2017 and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

**ANSWER:  Defendants refer the Court to Exhibits A and B of the Complaint for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 71, except to the extent they purport to state legal conclusions to which no response is required.**

119.    **COMPLAINT PARAGRAPH 72:** The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.

**ANSWER: To the extent the allegations in Complaint Paragraph 72 purport to state legal conclusions, no response is required.  Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Complaint Paragraph 72, and on that basis deny them.**

120.    **COMPLAINT PARAGRAPH 73:** Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 73, except to the extent they purport to state legal conclusions to which no response is required.**

43

121.    **COMPLAINT PARAGRAPH 74:** Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

**ANSWER:  Qualcomm admits that its ALA and TLA with ARM permit the use of ARM Marks. Defendants otherwise deny the allegations in Complaint Paragraph 74, except to the extent they purport to state legal conclusions to which no response is required.**

122.    **COMPLAINT PARAGRAPH 75:** Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 75, except to the extent they purport to state legal conclusions to which no response is required.**

123.    **COMPLAINT PARAGRAPH 76:** Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to infringe Arm's trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® KryoTM 485 CPU built on ARM Cortex Technology."[26] In January 2022, Qualcomm issued a press release touting the "broad

---

[26]    *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[27] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

**ANSWER: Qualcomm admits to using certain ARM Marks as permitted by its licenses to accurately refer to ARM's technology, including, but not limited to, in marketing materials, product specifications, and technical documents. Defendants deny knowledge or information sufficient to form a belief as to how ARM's other licensees use ARM Marks. Defendants otherwise respectfully refer the Court to the cited publications for their complete language and content. Defendants otherwise deny the allegations in Complaint Paragraph 76, except to the extent they purport to state legal conclusions to which no response is required.**

124.    **COMPLAINT PARAGRAPH 77:** Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the

---

[27] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting trademark infringement in violation of 15 U.S.C. § 1114. Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

**ANSWER: Defendants deny the allegations in Complaint Paragraph 77, except to the extent they purport to state legal conclusions to which no response is required.**

125. **COMPLAINT PARAGRAPH 78:** An actual and justiciable controversy exists between Defendants and Arm regarding infringement of Arm's trademarks. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 78, except to the extent they purport to state legal conclusions to which no response is required.**

126. **COMPLAINT PARAGRAPH 79:** Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips

with the relevant Nuvia technology and the ARM Marks do and will infringe Arm's trademarks, directly and indirectly.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 79, except to the extent they purport to state legal conclusions to which no response is required.**

127.    **COMPLAINT PARAGRAPH 80:** Defendants' acts of infringement have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 80, except to the extent they purport to state legal conclusions to which no response is required.**

128.    **COMPLAINT PARAGRAPH 81:** Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 81, except to the extent they purport to state legal conclusions to which no response is required.**

129.    **COMPLAINT PARAGRAPH 82:** Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' trademark infringement. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing infringement, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other

matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their infringing conduct.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 82, except to the extent they purport to state legal conclusions to which no response is required.**

## COUNT III: DECLARATORY JUDGMENT AND FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125 (ALL DEFENDANTS)

130.    **COMPLAINT PARAGRAPH 83:** Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

**ANSWER:  Defendants repeat and reiterate their responses to ARM's Complaint Paragraphs 1-82 as if fully set forth herein.**

131.    **COMPLAINT PARAGRAPH 84:** The acts of Qualcomm and Nuvia described above constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 84, except to the extent they purport to state legal conclusions to which no response is required.**

132.    **COMPLAINT PARAGRAPH 85:** Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 85, except to the extent they purport to state legal conclusions to which no response is required.**

133.    **COMPLAINT PARAGRAPH 86:** Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

48

**ANSWER: Qualcomm admits that its ALA and TLA permit use of the ARM Marks. Defendants otherwise deny the allegations in Complaint Paragraph 86, except to the extent they purport to state legal conclusions to which no response is required.**

134.    **COMPLAINT PARAGRAPH 87:** Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 87, except to the extent they purport to state legal conclusions to which no response is required.**

135.    **COMPLAINT PARAGRAPH 88:** Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to falsely designate the origin of their products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® KryoTM 485 CPU built on ARM Cortex Technology."[28] In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely

---

[28]    *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

positions Qualcomm Technologies to drive this industry wide transition."[29] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

**ANSWER:  Qualcomm admits to using certain ARM Marks pursuant to its licenses to accurately refer to ARM's technology, including, but not limited to, in marketing materials, product specifications, and technical documents.  Defendants deny knowledge or information sufficient to form a belief as to how ARM's other customers use ARM Marks. Defendants respectfully refer the Court to the cited publications for their complete language and content.  Defendants otherwise deny the allegations in Complaint Paragraph 88, except to the extent they purport to state legal conclusions to which no response is required.**

136.    **COMPLAINT PARAGRAPH 89:** Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A). Given Arm's close

---

[29] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 89, except to the extent they purport to state legal conclusions to which no response is required.**

137.    **COMPLAINT PARAGRAPH 90:** An actual and justiciable controversy exists regarding Defendants' false designation of origin. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 90, except to the extent they purport to state legal conclusions to which no response is required.**

138.    **COMPLAINT PARAGRAPH 91:** Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will falsely designate the origin of their products, directly and indirectly.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 91, except to the extent they purport to state legal conclusions to which no response is required.**

139.    **COMPLAINT PARAGRAPH 92:** Defendants' acts of false designation of origin have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 92, except to the extent they purport to state legal conclusions to which no response is required.**

140.    **COMPLAINT PARAGRAPH 93:** Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**ANSWER:  Defendants deny the allegations in Complaint Paragraph 93, except to the extent they purport to state legal conclusions to which no response is required.**

141.    **COMPLAINT PARAGRAPH 94:** Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' false designation of origin. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing false designation of origin, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the falsely designated matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their wrongful conduct.

**ANSWER: Defendants deny the allegations in Complaint Paragraph 94, except to the extent they purport to state legal conclusions to which no response is required.**

<u>**ARM'S PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff Arm Ltd. requests that the Court grant the following relief:

a.    A judgment in Arm's favor on all claims against Defendants;

b.    An order requiring specific performance by Defendants of the Nuvia licenses' termination provisions;

c.    An award of damages incidental to specific performance as a result of Defendants' breach of contract, in amounts to be proven at trial, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

d.    A judgment and a declaration that advertising, distributing, offering for sale, or selling semiconductor chips with the relevant Nuvia technology and the ARM Marks infringes Arm's trademarks, directly and indirectly;

e.    An order and judgment permanently enjoining Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns from (1) using in any manner in connection with the relevant Nuvia technology the ARM Marks, or any mark or logo that is confusingly similar to or a colorable imitation of the ARM Marks owned by Arm; (2) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology; or (3) assisting, aiding, or abetting any other person or business entity in performing any of the aforementioned activities;

f.      An order and judgment directing Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Arm within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and ceased all offering of products with the relevant Nuvia technology under the ARM Marks, as set forth above;

g.      An order and judgment directing Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays in any manner in connection with the relevant Nuvia technology the ARM Marks or any other mark that is confusingly similar to or a colorable imitation of the ARM Marks;

h.      A judgment in the aggregate amount of (1) Defendants' profits, (2) Arm's actual damages, (3) the costs of this action pursuant to 15 U.S.C. § 1117, and (4) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants in connection with their semiconductor chips using the relevant Nuvia technology and the ARM Marks, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

i.      A judgment trebling any damages to the extent permitted by law, including under 15 U.S.C. § 1117;

j.      Exemplary or punitive damages to the extent permitted by law;

k.      Costs, expenses, and reasonable attorney fees under all applicable rules, statutes, and rules in common law that would be appropriate, with pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

l.      Equitable relief addressing any infringement occurring after entry of judgment; and

m.      Such other relief as the Court deems just and proper.

**ANSWER TO PLEA FOR RELIEF: ARM's characterization of the relief it seeks does not require a response. To the extent a response is required, Defendants deny the allegations in the prayer for relief and further deny that ARM is entitled to the requested relief, or any relief, against the Defendants, and the Defendants request that the Court dismiss all claims against them with prejudice and order such further relief as the Court deems just and proper.**

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Arm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

**ANSWER TO JURY DEMAND: ARM's jury demand states a legal conclusion to which no response is required, and Defendants otherwise reserve their right to contest ARM's jury demand.**

## DEFENSES

142.    Without admitting that the Defendants engaged in the acts and conduct set forth in ARM's Complaint or that such acts or conduct would entitle ARM to the relief it seeks or that the allegation of an affirmative or other defense requires Defendants to prove affirmatively the circumstances as alleged, the Defendants assert the following defenses with respect to the claims alleged in the Complaint, without assuming the burden of proof or persuasion where the burden rests on ARM. By designating the following defenses, the Defendants do not in any way waive or

limit any defenses which are or may be raised by their denials, allegations and averments set forth herein, and do not assume the burden of proof for any element of a claim to which the applicable law places the burden of proof on the Plaintiff.  The defenses are pleaded in the alternative, are raised to preserve the Defendants' rights to assert such defenses, and are without prejudice to their ability to raise other and further defenses.  The Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent at any time and hereby reserve all rights to amend and/or supplement any and all defenses set forth herein.

**FIRST DEFENSE**

**(Failure To State A Claim)**

143.    The Complaint fails to state a claim against the Defendants upon which relief can be granted.

**SECOND DEFENSE**

**(Defendants Did Not Breach The NUVIA ALA)**

144.    Defendants did not breach the termination provisions of NUVIA's ALA because Defendants complied with the termination provision.

145.    Defendants did not breach the NUVIA ALA.  Defendants' use of ARM technology and information was fully licensed under the Qualcomm ALA.

**THIRD DEFENSE**

**(Defendants' Use Of ARM Marks Is Licensed And Therefore Permitted Under Qualcomm's License Agreements)**

146.    Defendants are licensed to use the ARM Marks at issue and therefore they are not in violation of 15 U.S.C. §§ 1114 and 1125.

147.    For example, under ▮▮▮▮▮ of Qualcomm's ARM ALA, ARM ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████

██████████████████████████    ████████████████████████

████

148.    The Qualcomm products at issue in ARM's complaint were ████████████████████████

████████████████ Qualcomm's license agreements.  Accordingly, Defendants are permitted to use ARM's Marks licensed under that agreement.

**FOURTH DEFENSE**

**(Fair Use)**

149.    Defendants are not subject to liability for alleged trademark infringement because Defendants' use of ARM Marks constitutes fair use.

150.    Defendants use the ARM Marks in marketing materials, product specifications and technical documents to truthfully refer to ARM's technology and its relationship with Qualcomm's products.  For example, Qualcomm's website describes the Kryo CPU as follows: "The Qualcomm® Kryo™ CPU (built on ARM Cortex Technology) available in certain Snapdragon processors is optimized for high-performance mobile computing."

151.    Use of the ARM Marks in this manner is necessary to accurately describe that Qualcomm's products are compatible with ARM's technology.

152.    This use of the ARM Marks indicates that Qualcomm's products use an ARM ISA. This is a true and accurate representation of the relationship between ARM and Qualcomm's products.

153.    Defendants use only so much of the ARM Marks as necessary to describe ARM's products.

**FIFTH DEFENSE**

**(Ripeness)**

154.    ARM's claims under 15 U.S.C. §§ 1114 and 1125 are premature and not ripe for adjudication.

**SIXTH DEFENSE**

**(Plaintiff's Breach Of The NUVIA ALA Prevents It
From Seeking To Enforce The ALA)**

155.    ARM is barred from bringing or maintaining its breach of contract claim based on the NUVIA ALA, or recovering any remedy against the Defendants based on this claim, because ARM breached the NUVIA ALA, and such breach excuses any nonperformance by the answering Defendants.

156.    ARM's refusal to fulfill its responsibilities under the NUVIA ALA bars its own claims of breach of contract against the Defendants.

157.    Moreover, pursuant to ███████ of the ALA, ARM's ability to recover damages is limited.

**SEVENTH DEFENSE**

**(Unclean Hands)**

158.    ARM is barred from bringing or maintaining its claims by virtue of the equitable doctrine of unclean hands, including because ARM has refused to fulfill its contractual obligations to Defendants.

**EIGHTH DEFENSE**

**(Waiver)**

159.    By the statements, conduct, acts, or omissions attributable to ARM alone, ARM has waived all claims and causes of action and any recovery or remedy alleged in the complaint.  ARM

has been aware of Qualcomm's development of technology it acquired from NUVIA for over a year, and only now seeks to preclude Qualcomm from proceeding with its development.

## NINTH DEFENSE

### (Estoppel)

160.    By the statements, conduct, acts, or omissions attributable to ARM alone, ARM is estopped from seeking any recovery or remedy as alleged in the complaint.  ARM has been aware of Qualcomm's development of technology it acquired from NUVIA for over a year, and only now seeks to preclude Qualcomm from proceeding with its development.

## TENTH DEFENSE

### (No Damages)

161.    ARM's claims cannot be maintained because ARM cannot prove any cognizable loss, damage, or injury as a result of the conduct alleged in the Complaint.

162.    Moreover, to the extent ARM seeks damages, ARM's damages are limited pursuant to █████████ of the ALA.

## ELEVENTH DEFENSE

### (Failure To Mitigate Damages)

163.    ARM's claim for damages is barred in whole or in part due to ARM's failure to mitigate the alleged damages resulting from its claims.

164.    ARM knew in March of 2021 that Qualcomm had acquired NUVIA and that it intended to continue developing technology acquired from NUVIA.

165.    ARM waited until February 2022 to terminate the NUVIA ALA, allegedly because NUVIA violated assignments provisions in the NUVIA agreements.

166.    ARM's actions worked to maximize its alleged damages.

## TWELFTH DEFENSE

### (Equitable Defenses)

167.    The claims alleged and the relief sought in this action are barred in whole or in part by the equitable doctrines of laches, acquiescence, consent, ratification, and/or similar doctrines.

## THIRTEENTH DEFENSE

### (No Entitlement To Equitable Relief)

168.    To the extent the Complaint seeks equitable relief, such relief is barred because there is an adequate remedy at law.

## FOURTEENTH DEFENSE

### (Trademark Misuse)

169.    ARM has misused its marks inequitably, in order to harm Defendants.

170.    ARM has falsely claimed that Defendants are not entitled to utilize the ARM Marks.

171.    ARM falsely told customers, the media, and the public that Qualcomm cannot manufacture or sell products compatible with ARM's ISA that contain NUVIA technology.

172.    In so doing, ARM is indicating that Defendants are not entitled to utilize the ARM Marks.

173.    This is incorrect.    Defendants are fully licensed to the ARM Marks under Qualcomm's license agreements with ARM.

## FIFTEENTH DEFENSE

### (Other Defenses)

174.    Defendants hereby adopt and incorporate by reference any and all other defenses asserted, or that may hereafter be asserted, by any other defendant not expressly set forth herein to the extent such defense may be applicable to Defendants.

## COUNTERCLAIM

175.    Defendants, for their Counterclaim against ARM, seek a declaration that Defendants have not breached NUVIA's license agreements with ARM, and that Defendants' design, activities, and work on the Phoenix Core and associated SoCs are fully licensed pursuant to Qualcomm's license agreements with ARM.  Defendants set forth their counterclaim below, and incorporate by reference their introduction, set forth in paragraphs 1-47 above, as though set forth in full below.

## THE PARTIES

176.    Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm is the world's leading wireless technology innovator and the driving force behind the development, launch, and expansion of 5G technology. Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone.  Qualcomm brings the benefits of mobile to new industries, including automotive, the internet of things, and computing, where Qualcomm has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

177.    Qualcomm Technologies, Inc. is a Delaware corporation with a principal place of business in San Diego, California.  Qualcomm Technologies is a wholly-owned subsidiary of

Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

178.    NUVIA, Inc. was founded in February 2019 to design and develop ARM-compatible cores for use in server products.  NUVIA comprised a proven world-class CPU and technology design team, with industry-leading expertise in high-performance processors, SoCs, and power management for compute-intensive devices and applications.  Qualcomm acquired NUVIA in March 2021 for approximately $1.4 billion, before working capital and other adjustments.

179.    ARM is a corporation headquartered in Cambridge, United Kingdom and was founded in 1990.  ARM is planning to issue an IPO in the future, and ARM's positions will have a detrimental impact on this IPO unless this action is resolved beforehand.

## JURISDICTION AND VENUE

180.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

181.    Venue is proper in the District of Delaware under 28 U.S.C. § 1391 because ARM, through its Complaint dated August 31, 2022, has consented to jurisdiction and venue in the State of Delaware and this Judicial District.

## FACTUAL BACKGROUND

### I.    QUALCOMM AND NUVIA'S AGREEMENTS WITH ARM

182.    On May 30, 2013, Qualcomm[30] and ARM entered into an Amended and Restated Architecture License Agreement (the "QC ALA"), No. LES-TLA-20039, and Annex 1 to that agreement.    On May 31, 2013, Qualcomm and ARM entered into a Technology License Agreement (the "QC TLA"), No. LEC-TLA00550 and Annex 1 to that agreement.    On June 23, 2020, Qualcomm and ARM entered into an updated Annex 1 to the ALA and an Annex 1 to the QC TLA.

183.



184.    Under the QC TLA, ARM licenses to Qualcomm fully designed and functional ARM Technology.    ARM provides this technology "off the shelf" to Qualcomm (i.e., the license is for a fully designed and functional piece of technology).

185.    On September 27, 2019, NUVIA entered into both a TLA and an ALA through which it licensed certain ARM Technology.  The NUVIA ALA was later amended on October 17, 2019.

---

30

186.     Prior to ARM's termination of the NUVIA ALA and TLA, Qualcomm's and NUVIA's license agreements with ARM broadly overlapped.  At the time of termination of the NUVIA agreements, Qualcomm's ALA and TLA provided Qualcomm a license to the same technologies that were licensed under the NUVIA agreements.

187.     However, as discussed above, the royalty rates under NUVIA's license agreements were higher than those under Qualcomm's.

## II.     ARM TRIES TO TAKE ADVANTAGE OF QUALCOMM'S ACQUISITION OF NUVIA

### a.     Qualcomm Alerts ARM To Its Pending Acquisition Of NUVIA

188.     As discussed above in paragraphs 1-47, on January 13, 2021, Qualcomm announced its intent to acquire—for $1.4 billion before working capital and other adjustments—NUVIA, a start-up focused on developing a promising custom CPU compliant with the ARM ISA designed for data center servers.

189.     On January 27, 2021, Qualcomm wrote ARM a letter stating that it had entered into a definitive agreement to acquire NUVIA, and noting that Qualcomm and NUVIA had overlapping license agreements.  As Qualcomm notified ARM, "[f]ollowing the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees continue their activities under the Qualcomm ALA and TLA, as that will be their current employer."  In its letter, Qualcomm told ARM that it would be willing to "work with the ARM team to complete any necessary annexes" to Qualcomm's ALA and TLA "to the extent NUVIA was utilizing any ARM technology not currently covered under the current QTI ALA and TLA."  Given the timing of the acquisition, which was scheduled to close in March, Qualcomm requested that ARM respond by February 3, 2021.

190.    ARM did not respond until February 2, 2021, and said it would start reviewing "NUVIA's contracts with ARM" and would "aim to get in touch" regarding additional materials required to facilitate the review by February 17, 2021.  ARM further stated that it expected Qualcomm and NUVIA to "continue to follow the confidentiality obligations" in the parties' agreements and that the transfer of "designs, rights, or licenses" would be subject to "Arm's prior consent," which is "customarily documented in a three-way agreement between Arm, transferor, and transferee."

191.    Qualcomm replied the following day. Qualcomm confirmed that both "NUVIA and Qualcomm's existing agreements with ARM provide for the protection of ARM's confidential information," and that they "would abide by the confidentiality terms of those agreements." Qualcomm further requested that ARM provide its proposed "three-way agreement" for review.

192.    ARM never provided a draft of the "three-way agreement" or explained its concerns regarding protection of its confidential information.  Nor was any such "three-way agreement" necessary to transfer any designs or rights to the NUVIA technology that Qualcomm had acquired. Rather, by its terms, Qualcomm's agreements provided any rights necessary to continue the development of custom cores for the uses Qualcomm contemplated.

**b.    ARM's Baseless Threats**

193.    ARM waited nearly two weeks after Qualcomm's letter to provide any meaningful response.  On February 16, 2021, ARM gave Qualcomm a broad list of demands, claiming that ARM could only consent to the assignment of NUVIA's agreements to Qualcomm if Qualcomm agreed to several outrageous demands, set forth in Paragraph 23 above.

194.    Although assignment of the NUVIA agreement was unnecessary because of Qualcomm's own license agreements and nothing in the NUVIA agreement precluded Qualcomm from acquiring NUVIA or its technology, ARM's ploy in tying its consent to these demands was

to try and leverage the swiftly approaching closing date in a misguided attempt to disrupt Qualcomm's acquisition.

195.    In correspondence sent February 18 and February 25, 2021, Qualcomm explained that ARM's demand that Qualcomm pay the NUVIA licensing rates was not appropriate because "ARM has not proposed giving Qualcomm any additional rights or benefits in exchange for" its demand for additional payments and because there was no contractual support for ARM's imposition of NUVIA's royalty rates on Qualcomm.

196.    Qualcomm also explained that ARM's proposed restrictions on Qualcomm's engineers were inappropriate, as the proposed three-year restriction period would make it nearly impossible to develop products, thus endangering Qualcomm development work and would adversely impact ARM through the loss of licensing revenue.

197.    During Qualcomm's February 2021 discussions with ARM, it became apparent that ARM's position was that NUVIA needed to assign its license agreements to Qualcomm, and that assignment could only be made with ARM's consent under ███████████████████████
████████████████████

198.    ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████

199.    ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

200.    These assignment provisions are inapplicable to Qualcomm's acquisition of NUVIA because Qualcomm has its own separate license agreements with ARM, which covered NUVIA and its technology as soon as the acquisition closed. ██████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████

201.    In addition, the ALA gave Qualcomm broad license rights to design architecture compatible cores at all stages of implementation. ████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████

202.    Therefore, NUVIA's technology would be covered by Qualcomm's ALA upon its acquisition.  It was not necessary to transfer NUVIA's licenses to effectuate the acquisition of NUVIA or its technology.

203.    Regardless, in an effort to compromise, on February 25, 2021, Qualcomm asked that ARM consent to the transfer of the NUVIA licenses to Qualcomm by March 2, 2021.

204.    By a letter dated March 2, 2021, ARM refused to consent.  Instead, ARM reiterated its demand that Qualcomm agree to the higher royalties of the NUVIA license agreement, including for what it alleged to be "derivative[]" products developed by Qualcomm.  ARM conditioned its consent to the assignment of the agreements by NUVIA to Qualcomm on Qualcomm agreeing to these demands.

205.    Qualcomm did not agree to these demands and Qualcomm's acquisition of NUVIA was completed as scheduled on March 16, 2021.

206.    Although the parties had intermittent discussions to resolve the dispute, they were unable to resolve these issues, and in September 2021, ARM went silent.

### d.    With ARM's Knowledge And Assistance Owed To Qualcomm Under Its ALA, Qualcomm Continued Its Work Developing CPU Cores After The Acquisition Closed

207.    From March 16, 2021 through the present, Qualcomm engineers (including former NUVIA employees), operating under the Qualcomm license agreements, worked diligently to develop market-leading CPU cores and SoCs improving and further developing the technology it acquired from NUVIA.

208.    When Qualcomm acquired NUVIA, NUVIA had certain technology for a CPU core (i.e., the Phoenix Core) and the Server SoC that would use the Phoenix Core, but this technology was not fully developed.  Qualcomm continued to develop the Phoenix Core and Server SoC.

209.    Qualcomm also designed a SoC for use in the "compute" space (the "Compute SoC"), which would include aspects of the Phoenix Core.  Unlike the Server SoC, the Compute SoC was initially conceived of and innovated at Qualcomm after the NUVIA acquisition, including modifications of the Phoenix Core for this application.

210.    Throughout 2021 and 2022, Qualcomm received limited support from ARM as it developed the Phoenix Core and the two SoCs under Qualcomm's agreements, largely related to certain verification processes ARM is obligated to provide to ensure that the core design meets the architectural guidelines.  During the verification process, ARM knew that it was interacting with former NUVIA employees, and knew that Qualcomm was seeking to verify core designs that included technologies Qualcomm had acquired from NUVIA.

211. Beginning immediately after the acquisition, Qualcomm—including many Qualcomm team members who had previously worked at NUVIA—began having weekly calls with ARM engineers related to verification testing of the in-development Phoenix Core and the Server SoC.

212. The discussion between ARM and Qualcomm (which included the former NUVIA engineers) was open and transparent. ARM was aware that the discussions included Qualcomm engineers formerly at NUVIA related to Qualcomm's ongoing development of the technologies it had acquired from NUVIA.

213. ARM has also continued to license technology to Qualcomm, and Qualcomm has continued to pay ARM for those licenses.

214. For example, in July 2021, ARM delivered to Qualcomm four design-only licenses for Qualcomm internal testing. It also delivered to Qualcomm twelve single-use licenses, allowing the development of a single chipset design using the licensed ARM Technology. Subsequently, in October 2021, ARM delivered three perpetual licenses allowing for use of some of that same ARM Technology in unlimited designs. Like other licenses from ARM, Qualcomm paid for these licenses.

215. In or around late 2021, Qualcomm also introduced the Compute SoC into the parties' weekly discussions. Like the parties' discussions concerning the in-development Phoenix Core for the Server SoC, these discussions were transparent, and ARM was aware that these discussions included Qualcomm engineers formerly at NUVIA and related to Qualcomm's ongoing development of the technologies it had acquired from NUVIA.

216. Also in December 2021, Qualcomm submitted an interim compliance report to ARM for the Server SoC it had been developing since the NUVIA acquisition. This compliance

report stated that the Server SoC implemented ▮ of the ARM ISA, which was, at that time, publicly available on ARM's website and licensed under Qualcomm's ALA.

### III. ARM WAITED OVER A YEAR TO TERMINATE THE NUVIA LICENSES AND DEMAND QUALCOMM DESTROY TECHNOLOGY

#### a. On February 1, 2022, ARM Claimed NUVIA And Qualcomm Breached The NUVIA License Agreements And Terminated The Agreements

217.    As discussed above in paragraphs 31-40, in a letter dated February 1, 2022, after ARM had been interfacing with Qualcomm and its development efforts for months, ARM notified Gerard Williams III, the former CEO and President of NUVIA, that it intended to terminate both NUVIA's ALA and TLA for "material breach."

218.    ARM's February 2022 letter alleged that NUVIA had violated the assignment provisions in ▮▮▮ of both the NUVIA ALA and TLA when it was acquired by Qualcomm without ARM's consent.  ARM also alleged that NUVIA violated the confidentiality provisions of ▮▮▮ of both of the NUVIA license agreements by making unlicensed use of ARM's confidential information.  ARM's letter did not explain its assertions or define the purported breach.

219.    But NUVIA was not required to obtain consent from ARM to "transfer" its licenses or technology.  There are no provisions in the NUVIA-ARM agreements or the Qualcomm-ARM agreements that prohibited Qualcomm from purchasing NUVIA, nor are there any such provisions that required ARM's consent to purchase NUVIA.

220.    As a Qualcomm subsidiary, NUVIA was licensed under the Qualcomm ALA and TLA to use ARM Technology and Confidential Information.  And Qualcomm's licenses covered the further development of the technology acquired from NUVIA by Qualcomm.

221.    ARM's argument under ███████ fails for the same reasons.  At the time of the termination, both NUVIA and Qualcomm were licensed to use the ARM information in the Phoenix Core and related SoCs under the Qualcomm ALA and TLA, and any use of that information was fully authorized.

222.    In addition, the Phoenix Core and the Server SoC implemented ████ of the ARM ISA, and did not utilize any ARM Confidential Information because ARM has published this specification and placed it in the public domain.  ARM was well aware of this fact by the time it sent the February 1, 2022 termination letter.

223.    Thus, contrary to ARM's assertions, neither NUVIA nor Qualcomm "committed a material breach of" the NUVIA ALA.

224.    Moreover, ARM waited to terminate the NUVIA agreement until Qualcomm had already completed the design of the Phoenix Core for its Server SoC—and even after ARM had *accepted* Qualcomm's core design as ISA compatible.

225.    ARM demanded, upon termination, that NUVIA:

a.    "discontinue any use and distribution of all Arm Technology, Arm Confidential Information and any products embodying such technology or information";

b.    "[a]t Arm's option, either destroy or return to Arm any Arm Confidential Information, including any copies thereof in its possession and any Arm Technology or derivatives . . . thereof in its possession"; and

c.    "[w]ithin one month after termination, furnish to Arm a certificate signed by a duly authorized representative that to the best of his or her knowledge, information and belief, after due enquiry, NUVIA has complied with these provisions."

226.    ARM further claimed (wrongly) that these "obligations extend to Qualcomm and its widely publicized use of NUVIA's technology developed under NUVIA's ALA and TLA."

ARM contended in its termination notice that certification of the return or destruction of ARM Confidential Information should "extend to Qualcomm as well."

227.    ARM informed NUVIA that its unilateral termination would be effective as of March 1, 2022 and demanded the return or destruction of any ARM Confidential Information delivered to NUVIA by April 1, 2022.

228.    ARM's demand that NUVIA discontinue using and distributing ARM Technology, ARM Confidential Information, and any products embodying such technology or information was baseless.  NUVIA and the technology Qualcomm acquired from NUVIA was licensed under Qualcomm's license agreements.

229.    Likewise, ARM's demand that NUVIA destroy ARM Confidential Information was baseless because NUVIA was licensed to this information under Qualcomm's license agreements and Qualcomm's further development of this technology was also licensed under Qualcomm's license agreements.

230.    Nonetheless, Qualcomm and NUVIA acted swiftly, at great time and expense, to take additional measures to satisfy ARM's unreasonable demand to comply with the termination provisions in NUVIA's license agreements.

231.    Qualcomm and NUVIA removed NUVIA-acquired ARM Confidential Information from its designs and redesigned its products to replace it with information acquired under Qualcomm's license—even though it was the exact same information—then quarantined a copy. Qualcomm also removed NUVIA-acquired ARM Confidential Information from its design environment and systems and quarantined it.

232.    During this period, Qualcomm's engineers were not working on further development of products because their attention was focused on the removal of NUVIA-acquired ARM Confidential Information.

233.    NUVIA then provided ARM with its certification of its compliance with the termination provisions on April 1, 2022, as requested by ARM, even though the termination provisions were inapplicable.[31]

### b.    ARM Failed To Cease Use Of NUVIA Technology And Destroy Or Return NUVIA Confidential Information After Termination

234.    ARM's termination of the NUVIA ALA and TLA also triggered certain ARM obligations.

235.    Under ███████████ of both the NUVIA ALA and the NUVIA TLA, ARM was obligated, upon termination, to ████████████████████████████████████ ████████████████████████████████ Additionally, at NUVIA's option, ARM was obligated to ████████████████████████████████████████ Within one month of termination, ARM was further obligated to ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ its obligations under the agreement.

236.    On April 29, 2022, more than one month after ARM terminated the NUVIA ALA and TLA, ARM sent Qualcomm a letter informing Qualcomm that ARM was aware of its obligations to return or destroy "NuVia confidential information (as defined) in its possession."

---

[31]    Meanwhile, ARM never certified its own compliance with the termination provisions, in violation of the NUVIA agreements.

237.    Nonetheless, through depositions and document discovery, Defendants have discovered that ARM employees failed to destroy, return, or discontinue use of NUVIA Confidential Information in their possession[32] after ARM's termination of the agreements.

238.    Emails between Vivek Agrawal, ARM's Senior Principal Engineer, and Richard Grisenthwaite, ARM's Chief Architect, reveal that ARM retained and made use of NUVIA Confidential Information in the form of configuration files in May 2022,[33] over a month after ARM terminated the NUVIA agreements.

239.    A January 19, 2023 email from Mr. Agrawal to seven other ARM employees makes clear that, eight months later, ARM had continued to retain NUVIA Confidential Information, that the files containing that information may have been shared with others at ARM, and that the same files containing that information were accessible to ARM employees from multiple sources.

240.    In the email, Mr. Agrawal explicitly states that "[a]ny file which was shared by Nuvia (before acquisition by Qualcomm) is categorized as Nuvia confidential" and that he has "downloaded such files while working with Nuvia[.]"  He additionally states that he "might have shared any of such files with you or you may access to those files ███████████████  ███  In addition to that, their ████████ files were checked-in to ████████████████████"  Mr. Agrawal further explained that some of the files were "overwritten by latest changes [sic] after QC acquisition" but "[s]till the ██ history can fetch Nuvia versions."

241.    When asked about this email in his December 14, 2023 deposition, Mr. Agrawal testified that he sent it because he wanted the NUVIA Confidential Information available at that

---

[32]    ARM witnesses—including Mr. Agrawal and Mr. Werkheiser—have been clear that they had access to NUVIA Confidential Information.

[33]    These configuration files were generated through the use of confidential information provided to ARM by NUVIA related to the configuration of the Architecture Compliance Kit.

time to be quarantined—confirming that he had such information in his possession as of January 2023, nearly a year after ARM terminated the NUVIA licenses.  He was asked what prompted him to send the email.  His counsel advised him not to reveal privileged information and he said he was not sure what prompted it.

242.    Mark Werkheiser, a "Distinguished Engineer" and Fellow at ARM, also confirmed at his December 7, 2023 deposition that he had access to NUVIA Technology and Confidential Information, that he did not remember ever being told to destroy documents marked as NUVIA confidential, and that he did not destroy copies of documents marked as "Nuvia confidential."

243.    Mr. Werkheiser further testified that specific CMN features originating with NUVIA, which are NUVIA Confidential Information (under ███████████████████, including code derived from the NUVIA Technology, was incorporated by ARM into certain of ARM's products that are licensed or sold to third parties today.

244.    The NUVIA code and/or NUVIA identified features for the CMN is NUVIA Confidential Information (1) under ARM's interpretation of the ALA term "derivative" as applied to Qualcomm's CPUs (the same "derivative" term is used in the NUVIA TLA), (2) as a NUVIA trade secret disclosed to ARM, and (3) as NUVIA marked Confidential Information disclosed to ARM.  ARM is actively using NUVIA Confidential Information, including derivatives of NUVIA Technology —and directly profiting from that use.

245.    Defendants have been harmed by ARM's breach, which allowed ARM to access, use and profit from NUVIA Technology and Confidential Information, which belongs to the Defendants.  ARM is providing the NUVIA Confidential Information to third parties that are in direct competition with Qualcomm.  Further discovery is required to determine the precise scope

of harm Defendants have suffered—and the precise benefits ARM has wrongfully incurred—as a result of ARM's breach.

### c.    ARM Continued to Threaten Qualcomm

246.    After NUVIA's certification, ARM responded by purporting to impose even more onerous demands than required by the termination provisions.  In an April 29, 2022 letter, ARM wrote to confirm that: "both Qualcomm and NUVIA . . . will not proceed with any further development of NUVIA technology that embodies or is derivative of Arm confidential information or technology."

247.    The termination provisions do not, by their plain language, require any such thing. They require only that NUVIA ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ These provisions apply only to NUVIA, not Qualcomm.  And, of course, Qualcomm owns its own licenses to ARM Confidential Information and Technology.

248.    Moreover, in this April letter, ARM stated that "Arm does not believe that the NuVia [sic] technology discussed above constitutes or can form the basis of an Arm Compliant Product or Architecture Compliant Product for purposes of the relevant Qualcomm agreements with Arm."  This assertion was incorrect because of Qualcomm's own licenses, which do not restrict Qualcomm's ability to develop CPU cores using Qualcomm's technology, including technology it acquired from NUVIA.

249.    Then, on August 2, 2022, ARM told Qualcomm that "Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the NUVIA technology."  In other words, ARM contended—with absolutely no basis—that Qualcomm cannot use *any* of NUVIA's intellectual property, proprietary designs, or confidential information, which

include technology that ARM did not own or develop. ARM's demands go far afield of ARM Confidential Information or ARM Technology. ARM is pretending that it has rights over NUVIA Technology and NUVIA Confidential Information, a position that is baseless in light of the actual provisions of the NUVIA agreements. ARM also threatened Qualcomm's customers, asserting that "[n]either Qualcomm nor its customers are licensed to use any part of Arm's broad intellectual property portfolio with respect to such products. Arm will use all necessary means to protect its legal rights."

250.    ARM's threats are baseless. ARM apparently contends that it has rights over all technology, proprietary designs, and confidential information developed by NUVIA, including technology that had absolutely nothing to do with ARM. But ARM has no right to demand destruction of that technology. ARM does not own CPU and/or SoC designs of its licensees, as ARM's license agreements and its statements to regulators make clear.

251.    There are no provisions in either the NUVIA-ARM agreements or the Qualcomm-ARM agreements that:

a.    prohibited Qualcomm from purchasing NUVIA or acquiring NUVIA's technology;

b.    required Qualcomm to obtain ARM's consent to purchase NUVIA or access NUVIA's technology;

c.    mandate that Qualcomm stop using any NUVIA technology it acquired;

d.    mandate that Qualcomm destroy NUVIA's technology;

e.    prohibit the transfer or disclosure of NUVIA's technology or confidential information to Qualcomm;

f.    limit the use of NUVIA technology only to NUVIA; or

g.    require Qualcomm to obtain ARM's consent to further develop any in-process designs or technology that Qualcomm acquired from NUVIA.

## IV.    ARM CONTINUED TO SUPPORT QUALCOMM'S DEVELOPMENT WORK

252.    Despite ARM's demands that Qualcomm destroy and stop using NUVIA technology, for approximately one year, ARM engineers continued to provide verification support to Qualcomm in developing the Phoenix Core and related SoCs, and also continued to acknowledge the Defendants' rights under the Qualcomm ALA and TLA to that technology.

253.    For example, on April 12, 2022—after Qualcomm certified that it had destroyed all NUVIA-acquired ARM Confidential Information—ARM accepted test results verifying that the implementation of the Phoenix Core in the Server SoC complied with the requirements necessary to execute ARM's instruction set.  ARM explicitly validated this testing under the Qualcomm ALA.

254.    Similarly, in May of 2022, Qualcomm received an email from ARM stating that the Compute SoC—which integrated technology acquired from NUVIA and was first developed after Qualcomm's acquisition of NUVIA—had passed all relevant tests and was ARM-compatible. Yet, ARM's engineering team noted that it could not yet send a formal compliance waiver because ARM's legal team was withholding it.

## V.    ARM UNFAIRLY AND UNLAWFULLY ATTEMPTED TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN CORES.

255.    Discovery has revealed that ARM views Qualcomm as a competitor against ARM's own CPU designs—and an impediment to ARM's business strategy.

256.    ARM stated explicitly to regulators in connection with review of the proposed acquisition of ARM by NVIDIA that Qualcomm competes "head-to-head with the licensees that

use Arm's own CPU designs, such as MediaTek,"[34] and, in internal documents, ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

257.    At the same time, ARM employees acknowledged in internal emails and chat communications that ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

258.    In an effort to limit competition posed by Qualcomm's custom CPU, ARM systematically and persistently used its access to information about Qualcomm's products and relationships with Qualcomm's customers to unfairly, unlawfully, and fraudulently attack Qualcomm and its custom CPU.

259.    ARM used a variety of tactics to accomplish this, including by misrepresenting Qualcomm's license agreements with ARM and threatening Qualcomm customers.

260.    ARM has persistently and wrongfully attempted to disrupt Qualcomm's business and customer relationships by spreading misinformation about the nature of Qualcomm's ARM licenses to customers that purchase Qualcomm's ARM-compatible cores and chipsets.

261.    ARM has engaged in this misinformation campaign directly through its leadership and through the leadership of its owner, SoftBank, acting on ARM's behalf, in an attempt to damage Qualcomm, disparage its products, disrupt Qualcomm's relationships with its customers, and create uncertainty where there is none.  At least as early as October 2022, ARM falsely stated

---

[34]    Dec. 20, 2021 "Initial Submission" re: "Anticipated Acquisition By NVIDIA Corporation Of ARM Limited ME/6906/20" at 6.

to one or more of Qualcomm's longstanding original equipment manufacturer ("OEM") customers that unless they accept a new direct license from ARM on which they pay royalties based on the sales of the OEM's products, they will be unable to obtain ARM-compliant chips from 2025 forward.  ARM has also threatened at least one OEM that, if the OEM does not do so, ARM will go on to license the OEM's large competitors instead—the implication being that the OEM would be excluded from the market and could not obtain any ARM-compliant chips from Qualcomm or any other supplier, including "off-the-shelf" chips from ARM under a TLA.  ARM has done this despite already having approached the OEM's competitors with a direct licensing offer, while acting as if ARM would only approach the competing OEMs if the threatened OEM declined the license in the first instance.

262.    ARM also told one or more Qualcomm customers that, when the existing TLA agreements expire, ARM will cease licensing CPUs to all semiconductor companies—including Qualcomm—under an ARM TLA.  ARM claimed that it is changing its business model and will only provide licenses to the device-makers themselves.  ARM has explained to the OEMs that a direct OEM license will be the only way for device-makers to get access to ARM-compliant chips.

263.    ARM is trying to coerce such customers into accepting its direct license by falsely asserting that Qualcomm will not be able to provide them with ARM-compliant chips beginning in 2025 because Qualcomm's ARM license agreements terminate in 2024, that ARM will not extend its licenses with Qualcomm, and that ARM will not allow Qualcomm to ship products from 2025 forward.

264.    These statements are unequivocally false and are intended to harm Qualcomm's relationships with its customers—and to secure lucrative contracts with those customers for ARM—by calling into question Qualcomm's ability to maintain its ARM licenses beyond 2024

and provide products to its customers, despite Qualcomm having a clear right to do so for years to come under its ARM licenses.

265.    Qualcomm is licensed for several years past 2025 under its ALA, which provides Qualcomm with the unilateral right to extend the contract past the initial term for several more years.  Specifically, the ALA states:



266.    Accordingly, because the Qualcomm ALA has not been terminated—and because no event has occurred that would give rise to a right to terminate—the initial term of the license will continue until ▮▮▮▮▮▮.  Qualcomm then has the right to extend the license until ▮▮▮ ▮▮▮.  Accordingly, ARM does not have the right to refuse to extend Qualcomm's license or stop Qualcomm from shipping its products in 2025.

267.    Moreover, ARM has no right to require additional royalties from Qualcomm's customers.  Qualcomm's ALA provides Qualcomm with an exhaustive license, meaning that ARM is not entitled to go and seek another royalty from Qualcomm's customers on the same products for which ARM has received a royalty from Qualcomm.

268.    ARM's coercion efforts did not stop with these false statements about Qualcomm's license agreements.  To apply more pressure, ARM further stated that Qualcomm and other semiconductor manufacturers will also not be able to provide OEM customers with other components of SoCs (such as graphics processing units ("GPU"), neural processing units ("NPU"),

and image signal processor ("ISP")), because ARM plans to tie licensing of those components to the device-maker CPU license.

269.    ARM also claimed that it had already informed Qualcomm about its new business model that requires a direct license with the OEMs.  That statement is false.  ARM has not notified Qualcomm that it will be requiring direct licenses from device-makers.  ARM did not tell Qualcomm that it intends to stop licensing CPU technology as a standalone license, that it will no longer license CPU technology to semiconductor companies, or that it will require licensees to obtain other technologies (notably ARM's GPU and NPU technology) only from ARM.  As noted above, these attempted or threatened changes in ARM's business model do not account for Qualcomm's existing agreements with ARM.

270.    While ARM's statements about Qualcomm have no basis in fact, they cause significant reputational damage and harm Qualcomm's customer relationships.  Moreover, while ARM's goal may be to harm Qualcomm—and to coerce contracts with Qualcomm's customers that are unnecessary in view of the fully exhaustive rights it has granted Qualcomm under its contracts—its tactics will result in harm to ARM's customers and licensees throughout the industry.

## VI.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION ARE HARMFUL TO THE INDUSTRY AND TO ARM ITSELF

271.    ARM's mercenary desire to thwart innovation is nothing new.  Prior to Qualcomm's acquisition of NUVIA, in September 2020, NVIDIA announced that it was going to acquire ARM to "bring[] together NVIDIA's leading AI computing platform with Arm's vast ecosystem to create the premier computing company for the age of artificial intelligence."  The announcement led to immediate antitrust concerns, regulatory challenges, and public opposition from many companies, including Qualcomm.  The near universal concern was that an NVIDIA-

controlled ARM would impede innovation and lead to higher prices.  On February 7, 2022, ARM and NVIDIA announced that the acquisition would be terminated.

272.    Only three days before that announcement—when it was no doubt clear to ARM that the acquisition would not close—ARM sent its termination letter to the Defendants, terminating NUVIA's license agreements and demanding that Qualcomm stop working on any of the NUVIA technology.  As Qualcomm was one of the more public opponents of the acquisition, ARM's actions appear to be retributive.

273.    Although ARM's efforts to destroy Qualcomm's innovation and prevent Qualcomm from expanding and advancing technology may in the short term, create the illusion of ARM achieving greater profitability—either by effectively strongarming Qualcomm into paying additional, unjustified royalties or through eliminating Qualcomm as a competitor in the custom CPU and server SoC space—in the long term it only harms ARM's interest and weakens the place in the market ARM hopes for after its IPO because it is injurious to ARM customers and licensees.  ARM's positions are directly contrary to the purpose of the ALA, which will have little value if licensees are not assured that they can use it to develop their own CPU core technology, at their own risk and expense and for their own benefit.

## COUNTERCLAIMS

## COUNT I

### (Declaratory Judgment)

274.    Defendants incorporate by reference all allegations set forth in the preceding paragraphs 1-47 and 175-273 as though fully set forth herein.

275.    Defendants are entitled to declaratory judgment that:

a.      Defendants did not breach the NUVIA ALA and NUVIA TLA;

b.    After Qualcomm's acquisition of NUVIA, Qualcomm's architected cores (including all further developments, iterations, or instantiations of the technology acquired from NUVIA), Server SoC, and Compute SoC, are fully licensed under Qualcomm's ALA and TLA for the full terms of those licenses;

c.    ARM's statements that Qualcomm's ALA expires in 2024 are false;

d.    ARM's statements that Qualcomm will be unable to deliver ARM-compliant products after 2024 are false;

e.    ARM breached the NUVIA ALA by failing to fulfill its termination obligations under ▮▮▮▮▮▮▮▮;

f.    ARM breached the NUVIA TLA by failing to fulfill its termination obligations under ▮▮▮▮▮▮▮▮;

g.    ARM has no right to prevent Qualcomm from shipping its validly-licensed products.

276.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-2202 *et seq.*) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that it can continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA, the Qualcomm TLA, the NUVIA ALA, or the NUVIA TLA.

277.    A valid and justiciable controversy exists between ARM and Qualcomm because ARM is attempting to prevent Qualcomm from exercising its rights under its license agreements with ARM, including by bringing suit claiming that Defendants breached NUVIA's license agreements with ARM.

## COUNT II

**(Breach of ▮▮▮▮▮▮▮ of the NUVIA ALA)**

278.    Defendants incorporate by reference all allegations set forth in the preceding paragraphs 1-47 and 175-277 as though fully set forth herein.

279.    The NUVIA ALA was a valid, binding contract.

280.    ARM failed to fulfill its termination obligations to NUVIA, as set forth in ▮▮▮▮▮ of the NUVIA ALA, by continuing to use NUVIA Technology and failing to return or destroy NUVIA Confidential Information after termination.

281.    As a proximate result of ARM's breach of contract, Defendants have been damaged in an amount to be proven at trial.

**COUNT III**

**(Breach of ▮▮▮▮▮ of the NUVIA TLA)**

282.    Defendants incorporate by reference all allegations set forth in the preceding paragraphs 1-47 and 175-281 as though fully set forth herein.

283.    The NUVIA TLA was a valid, binding contract.

284.    ARM failed to fulfill its termination obligations to NUVIA, as set forth in ▮▮▮▮▮ of the NUVIA TLA, by continuing to use NUVIA Technology and failing to return or destroy NUVIA Confidential Information after termination.

285.    As a proximate result of ARM's breach of contract, Defendants have been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants request judgment and relief as follows:

a.    For the declaratory judgments set forth in Defendants' counterclaims;

b.    For an Order enjoining ARM from:

(i)    making any claim that Qualcomm's CPU products, including products that contain technology acquired from NUVIA, are not licensed under Qualcomm's agreements with ARM, are not ARM-compatible, cannot be commercialized as ARM-compliant, or that Qualcomm is prohibited from using ARM's marks in the marketing of any such products;

(ii)    misrepresenting the scope, terms, or rights granted to Qualcomm under its agreements with ARM; and

(iii)   making false statements about Qualcomm's ability to sell its CPU products to its customers, the media, analysts, or others;

c.      For an Order requiring ARM to comply with its obligations under Qualcomm's and NUVIA's license agreements without discrimination or retaliation;

d.      For an Order finding that ARM breached ████████ of the NUVIA ALA and ████████ of the NUVIA TLA;

e.      For damages in an amount deemed appropriate by the Court;

f.      For an award of attorney's fees and costs as allowed by law; and

g.      For such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Brian Shiue
Anna P. Lipin
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP

*Attorneys for Defendants*

1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Andrea L. D'Ambra
Susana Medeiros
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10019
(212) 318-3000

Kira Latham
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX  75201
(214) 855-8000

March 13, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 13, 2024, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                  *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiff*

Joyce Liou, Esquire                                      *VIA ELECTRONIC MAIL*
Lydia Davenport, Esquire
Daralyn J. Durie, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                                   *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                              *VIA ELECTRONIC MAIL*
Sarah E. Brickey, Esquire
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202-5638
*Attorneys for Plaintiff*

Daniel P. Muino, Esquire                                    *VIA ELECTRONIC MAIL*
Reebehl G. El-Hage, Esquire
David Nathaniel Tan, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Plaintiff*

Nicholas Rylan Fung, Esquire                                *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                                   *VIA ELECTRONIC MAIL*
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Plaintiff*

Michael J. DeStefano, Esquire                               *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
600 Brickell Avenue, Suite 1560
Miami, FL  33131
*Attorneys for Plaintiff*


                                    */s/ Jack B. Blumenfeld*
                                    _____
                                    Jack B. Blumenfeld (#1014)

# EXHIBIT 43

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ARM LTD., | |
| Plaintiff, | |
| v. | C.A. No. 22-1146-MN |
| QUALCOMM INC., QUALCOMM TECHNOLOGIES, INC., and NUVIA, INC., | **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| Defendants. | **FILED UNDER SEAL** |

## OPENING BRIEF IN SUPPORT OF PLAINTIFF ARM LTD.'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL

Dated: January 17, 2025

OF COUNSEL:

Daralyn J. Durie
Joyce Liou
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
ddurie@mofo.com
jliou@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

Kyle W.K. Mooney
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
(212) 336-4092
kmooney@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

Daniel Muino
MORRISON & FOERSTER LLP
2100 L Street, NW
Suite 900, Washington, D.C. 20037
(202) 887-1500
dmuino@mofo.com

YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS .................................................... 2

STATEMENT OF FACTS ................................................................................ 2

ARGUMENT ........................................................................................... 4

I.      THE COURT SHOULD GRANT ARM JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL. ............................................................................ 4

        A.      The Nuvia-Acquired Designs Are Not Licensed Under the Qualcomm ALA. ................................................................................ 4

                1.      The Nuvia-Acquired Designs Were Not Developed Under the Licenses Granted in the Qualcomm ALA. ............................. 5

                2.      The Nuvia-Acquired Designs Were Not Developed by or for Qualcomm. .......................................................... 6

                3.      The Qualcomm License Is Limited to ▮▮▮▮▮▮▮▮▮▮▮▮ That Arm ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ............................. 7

        B.      Nuvia Breached the Nuvia ALA (Question 1) ...................................... 9

        C.      Qualcomm Breached the Nuvia ALA (Question 2) ................................. 10

                1.      Qualcomm Breached as a Matter of Law. ............................... 10

                2.      The Court Should Grant a New Trial Because the Jury's Erroneous Verdict on Question 3 Likely Infected Its Verdict for Question 2. ........ 10

                3.      The Court Should Grant a New Trial on Question 2. ................... 12

II.     THE COURT SHOULD GRANT A NEW TRIAL ON ALL THREE QUESTIONS. ....................................................................... 14

        A.      Questions 1 and 2 Are Not Distinct and Separable Issues. ....................... 15

        B.      Whether Qualcomm Is Licensed (Question 3) Is Not Distinct and Separable from Whether Nuvia Breached (Question 1). .......................... 18

CONCLUSION .......................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Home Assur. Co. v. Sunshine Supermarket, Inc.*,
  753 F.2d 321 (3d Cir. 1985)................................................................................................16

*Brobeck, Phleger & Harrison v. Telex Corp.*,
  602 F.2d 866 (9th Cir. 1979) ...............................................................................................5

*Colonial Leasing of New England, Inc. v. Logistics Control Int'l*,
  770 F.2d 479 (5th Cir. 1985) ..............................................................................................16

*Cont'l Cas. Co. v. United States*,
  167 F.2d 107 (9th Cir. 1948) ..............................................................................................18

*Drumgold v. Callahan*,
  707 F.3d 28 (1st Cir. 2013).................................................................................................15

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000)...........................................................................................2, 14

*Encompass Off. Sols., Inc. v. La. Health Serv. & Indem. Co.*,
  919 F.3d 266 (5th Cir. 2019) ..............................................................................................16

*FNBN Rescon I, LLC v. Citrus El Dorado, LLC*,
  725 F. App'x 448 (9th Cir. 2018) ........................................................................................12

*Gasoline Prods. Co. v. Champlin Refining Corp.*,
  283 U.S. 494 (1931)..................................................................................................... *passim*

*Iqbal v. Ziadeh*,
  10 Cal. App. 5th 1 (2017) .....................................................................................................5

*Kutner Buick, Inc. v. Am. Motors Corp.*,
  868 F.2d 614 (3d Cir. 1989).................................................................................................14

*Melchior v. New Line Prods.*,
  106 Cal. App. 4th 779 (2003) ..............................................................................................12

*Morgan v. Covington Twp.*,
  563 F. App'x 896 (3d Cir. 2014) ...........................................................................................4

*Nissho-Iwai Co. v. Occidental Crude Sales*,
  729 F.2d 1530 (5th Cir. 1984) ............................................................................................16

*Norman v. Elkin*,
    849 F. Supp. 2d 418 (D. Del. 2012) .................................................................................9

*Norman v. Elkin*,
    860 F.3d 111 (3d Cir. 2017) ...........................................................................................4

*Opal Labs Inc. v. Sprinklr, Inc.*,
    No. 3:18-cv-01192, 2022 WL 526167 (D. Or. Jan. 7, 2022) ...............................15

*Payton v. Abbott Labs*,
    780 F.2d 147 (1st Cir. 1985) ..........................................................................................16

*Phila. Indem. Ins. Co. v. SMG Holdings, Inc.*,
    44 Cal. App. 5th 834 (2019) ...........................................................................................12

*Pryer v. C.O. 3 Slavic*,
    251 F.3d 448 (3d Cir. 2001) .............................................................................11, 15, 16

*Spence v. Bd. of Educ. of Christina Sch. Dist.*,
    806 F.2d 1198 (3d Cir. 1986) .........................................................................................14

*Vizzini v. Ford Motor Co.*,
    569 F.2d 754 (3d Cir. 1977) ...........................................................................................14

*Williams v. Rene*,
    72 F.3d 1096 (3d Cir. 1995) ...........................................................................................18

*Williams v. Slade*,
    431 F.2d 605 (5th Cir. 1970) ..........................................................................................18

*Williamson v. Consol. Rail Corp.*,
    926 F.2d 1344 (3d Cir. 1991) .........................................................................................12

*Witco Chem. Corp. v. Peachtree Doors, Inc.*,
    787 F.2d 1545 (Fed. Cir. 1986) ......................................................................................16

**Statutes & Other Authorities**

Cal. Civ. Code § 1589 ...............................................................................................12, 13

Fed. R. Civ. P.
    50(a) ...............................................................................................................................4
    54(b) .............................................................................................................................20
    59 ...................................................................................................................................9

32767787.1

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Qualcomm and Nuvia worked closely together in breaching Nuvia's Architecture License Agreement ("Nuvia ALA") with Arm both before and after Qualcomm acquired Nuvia. As a result, Arm terminated the Nuvia ALA and, after repeated attempts at resolution, demanded that Qualcomm and Nuvia stop using the pre-acquisition Nuvia code implementing Arm's proprietary CPU architecture. Defendants do not dispute the termination or the related duty to return or destroy derivatives and embodiments of what the Nuvia ALA calls the Arm Technology. But Defendants offer such a miserly interpretation of that duty—and such a sweeping vision of Qualcomm's rights under its separate ALA with Arm ("Qualcomm ALA")—that both Defendants would be free to continue using code implementing the Arm architecture even after Nuvia's license to that architecture terminated. Those arguments are inconsistent with the express terms of the relevant agreements.

The Court should therefore grant Arm judgment as a matter of law ("JMOL") across the board. First, the Qualcomm ALA does not grant Qualcomm a license to the Nuvia-developed code. Qualcomm's license under the Qualcomm ALA is limited to CPU cores developed (1) under the licenses granted in that ALA, (2) by or for Qualcomm, and (3) based on Arm Technology that Arm delivered to Qualcomm. The CPU designs and code Nuvia developed before it was acquired by Qualcomm check none of those boxes. Nuvia and Qualcomm each breached their return-or-destroy obligation under § 15.1 of the Nuvia ALA—an obligation Nuvia expressly accepted and that Qualcomm assumed through its conduct and by acquiring Nuvia. Following termination of the Nuvia ALA, the code created by Nuvia is not licensed to implement the Arm architecture under any ALA. Nonetheless, Qualcomm continues to use that code in its CPUs and products.

If the Court does not grant Arm JMOL, it should order a new trial on all issues. The jury deadlocked on whether Nuvia breached § 15.1, so a new trial is mandatory on that claim. The two

claims the jury did decide—whether Qualcomm breached § 15.1 and whether Qualcomm has a license to the Nuvia-developed code—are inseparable from the issue of Nuvia's breach. All three claims concern the same facts, the same course of conduct, and the parties' rights and obligations to the same technology. The two breach claims also involve the same contractual provision, while a finding that Nuvia breached its return-or-destroy obligation should be the death knell for Qualcomm's purported license argument. Given the significant factual and legal overlap between the three claims, there is no reason to depart from the "general presumption against partial new trials," *Elcock v. Kmart Corp.*, 233 F.3d 734, 758 (3d Cir. 2000), and the issues "cannot be submitted to the jury independently" without violating the Seventh Amendment's Reexamination Clause. *Gasoline Prods. Co. v. Champlin Refining Corp.,* 283 U.S. 494, 500 (1931).

## NATURE AND STAGE OF THE PROCEEDINGS

The Court held a four-day trial in December 2024. At the end of that trial, the jury was asked to answer three questions: (1) whether Nuvia breached Section 15.1(a) of the Nuvia ALA, (2) whether Qualcomm breached Section 15.1(a) of the Nuvia ALA, and (3) whether the Qualcomm CPUs based on code acquired in the Nuvia acquisition are licensed under the Qualcomm ALA (D.I. 569.)

The jury reached a verdict in Qualcomm's favor on Questions 2 and 3 but deadlocked on Question 1. (Tr. 1000:3-1004:10.) The Court accepted the verdict on Questions 2 and 3, declared a mistrial on Question 1, and excused the jury on December 20, 2024. (*Id*. at 1017:5-1021:3.) Arm now renews its motions for JMOL, and in the alternative, seeks a new trial.

## STATEMENT OF FACTS

Qualcomm signed an ALA with Arm in 2013. (JTX-0010; JTX-0011.) Nuvia was formed six years later, and entered into an unrelated, independent ALA with Arm in 2019. (JTX-0001; JTX-0002.) The pre-acquisition Nuvia code at issue was developed by Nuvia engineers under the

Nuvia ALA. (Tr. 390:7-24, 394:4-395:24, 784:3-10.) At that time, Nuvia had no relationship with Qualcomm, and was not operating under the Qualcomm ALA. (*Id.* 583:4-584:5.)

The Nuvia ALA expressly obligated Nuvia to obtain Arm's prior permission before undergoing a change of control or otherwise assigning Nuvia's rights under the Nuvia ALA. (JTX-0001 § 16.3.) Qualcomm announced its plan to acquire Nuvia in January 2021, without first consulting Arm. (PTX-0212 at 1-2; PTX-0234 at 2; Tr. 172:8-173:7, 216:14-23.) Qualcomm later asked on Nuvia's behalf to assign the Nuvia ALA and to transfer the pre-acquisition Nuvia code to Qualcomm. (Tr. 177:14-21; PTX-0234 at 2; PTX-0253 at 1-2; PTX-0268.) For months, Arm tried to negotiate with Qualcomm in good faith, but ultimately did not grant consent, because the parties couldn't agree on terms for the assignment. (PTX-0240; PTX-0247; PTX-0260 at 2; Tr. 180:20-181:7, 226:21-24.) Refusing to take no for an answer, Qualcomm nonetheless transferred Nuvia personnel and work product to itself and incorporated the pre-acquisition code Nuvia developed under the Nuvia ALA into Qualcomm designs in breach of the Nuvia ALA. (Tr. 409:16-21, 410:2-21, 412:9-20, 552:9-20, 809:1-12, 810:1-21.)

Nuvia's and Qualcomm's actions triggered Arm's contractual right to terminate the Nuvia ALA. (JTX-0001 §§ 14.2(i), 16.3.) Arm exercised its termination rights on March 1, 2022. (JTX-0008; PTX-0376.) Termination triggered an obligation under § 15.1 of the Nuvia ALA to stop using, and to return or destroy, both (1) the Arm Technology delivered under the Nuvia ALA and (2) derivatives and embodiments of that technology developed by Nuvia under the Nuvia ALA. (JTX-0001 § 15.1; JTX-0008.) Neither Nuvia nor Qualcomm questioned Arm's right to terminate the Nuvia ALA or disputed their return-or-destroy obligations upon termination. (Tr. 183:12-16, 184:9-13, 406:4-8, 563:10-19.) Yet neither company complied with those obligations, despite the certification of compliance sent by Qualcomm and signed by Nuvia's former CEO that they had

done so. (JTX-0009 at 1-2; Tr. 409:16-21, 412:9-20, 552:9-20, 705:12-20, 809:1-12; PTX-0400 at 1; PTX-0897 at 1.) Despite Qualcomm's purported "swap out" of certain peripheral code written by Arm and provided under the unrelated Nuvia *Technology* License Agreement, Nuvia and Qualcomm did not remove the CPU code that Nuvia developed pre-acquisition that implements Arm's proprietary architecture. (Tr. 380:15-19, 390:7-24, 409:1-21, 824:21-24, PTX-0650 at 1.)

Instead, Qualcomm continued to use pre-acquisition Nuvia code in products that Qualcomm sells today. (Tr. 409:19-21, 412:9-20, 552:9-20, 809:1-12; 824:21-24.) After Arm learned that Qualcomm was using Nuvia-developed code that it certified had been destroyed, and after Arm's many attempts at resolution were ignored, Arm filed suit. (D.I. 1.)

## ARGUMENT

## I.    THE COURT SHOULD GRANT ARM JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL.

The Court should grant JMOL in Arm's favor on all three questions presented to the jury. JMOL is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). A court must "view[] the evidence in the light most favorable to the nonmoving party," *Morgan v. Covington Twp.*, 563 F. App'x 896, 899 (3d Cir. 2014) (citations omitted), but "a scintilla of evidence is not enough" to tip the scales in favor of the non-moving party. *Norman v. Elkin*, 860 F.3d 111, 129 (3d Cir. 2017) (citation omitted). Here, no reasonable jury could find that (1) Qualcomm has a license to the Nuvia-acquired designs that should have been destroyed; (2) Nuvia complied with its destruction obligations under the Nuvia ALA; or (3) Qualcomm complied with its destruction obligations under the same agreement. If JMOL is not granted, a new trial should be ordered on each issue.

### A.    The Nuvia-Acquired Designs Are Not Licensed Under the Qualcomm ALA.

No reasonable jury could find that the Nuvia-acquired CPU designs are licensed under the Qualcomm ALA, which is governed by California law. (JTX-0010 § 16.15.) The "interpretation of [an] unambiguous contract . . . is solely a question of law" that the Court decides. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871-72 (9th Cir. 1979); *see also Iqbal v. Ziadeh*, 10 Cal. App. 5th 1, 8 (2017). The Qualcomm ALA is an integrated agreement (JTX-0010 § 16.10), and neither party has asserted its terms are ambiguous or introduced parol evidence to vary its plain meaning. Nothing in the language of the Qualcomm ALA grants Qualcomm a license to CPU code or designs developed under a different ALA. Qualcomm's license is instead unambiguously limited to Architecture Compliant Cores developed (1) under the licenses granted in the Qualcomm ALA, (2) by or for Qualcomm, and (3) based on ███████████████████████████ ███████████████. (JTX-0011 § A.6; JTX-0010 § ███.) The designs Qualcomm acquired from Nuvia satisfy none of those requirements.

### 1.    The Nuvia-Acquired Designs Were Not Developed Under the Licenses Granted in the Qualcomm ALA.

*First*, the Qualcomm ALA grants Qualcomm a license only to make Architecture Compliant Cores under the terms of the licenses granted in Annex 1 to the Qualcomm ALA. Section B.1.1 grants a license to use the "applicable Arm Technology" delivered by Arm to Qualcomm to design Architecture Compliant Cores. (JTX-0011 § B.1.1.) Annex 1 defines an Architecture Compliant Core as "a microprocessor core developed [1] *by or for LICENSEE* [2] *under the licenses granted in this Annex 1*." (JTX-0011 § A.6 (all emphasis added throughout unless otherwise indicated).) Qualcomm's ALA thus grants Qualcomm a license for its employees to perform development work under the licenses granted in Annex 1 of the Qualcomm ALA, not some other ALA. Qualcomm may also, subject to the restrictions set forth in § 2.2 of the Qualcomm ALA, ███████████████████████████████████████████

█████████████████████████████████.[1] (JTX-0010 §§ ██, 2.2; JTX-0011 §§ A.6, B.1.1.) But Qualcomm's ALA grants no rights with respect to CPU code developed by a third party under a different ALA, such as pre-acquisition Nuvia code developed by and for Nuvia under the Nuvia ALA. (*See* JTX-0010 § ██; JTX-0011 §§ A.6, B.1.1; Tr. 585:23-586:15.)

The undisputed evidence at trial established that Nuvia's pre-acquisition CPU code was *not* developed under the licenses granted in the Qualcomm ALA, but rather under the licenses granted in the Nuvia ALA. (PTX-0103 at 1-2; PTX-0260 at 2; Tr. 380:15-19, 390:7-24, 394:4-395:24, 583:4-584:5, 585:23-586:15, 784:3-10.) Nuvia cofounder Gerard Williams admitted that Nuvia entered into its ALA to develop an architecture compliant core. (Tr. 380:15-19, 390:7-24.) Jonathan Weiser, a Qualcomm attorney involved in negotiation of the Qualcomm ALA, conceded that Nuvia did not have any pre-acquisition rights under the Qualcomm ALA, when Nuvia was a separate company with no legal relationship to Qualcomm. (Tr. 583:4-584:5.) Qualcomm's CEO, Cristiano Amon, similarly admitted that Nuvia needed its separate Nuvia ALA to create the designs developed by Nuvia engineers before the acquisition. (Tr. 784:3-10, 786:9-19.)

## 2. The Nuvia-Acquired Designs Were Not Developed by or for Qualcomm.

*Second*, this same evidence established that Nuvia's pre-acquisition code was not developed *by* Qualcomm or *for* Qualcomm. (Tr. 585:23-586:15.) The Nuvia-acquired designs thus are not licensed under the Qualcomm ALA, which limits the universe of licensed Architecture Compliant Cores to those "developed by or for" Qualcomm. (JTX-0011 § A.6.) Qualcomm relied

---

[1] Section 2.2 requires ███████████████████████████████████████████████████████████████████████████████████████████████████. (JTX-0010 § 2.2.) Nuvia's development work does not satisfy any of these conditions.

on allegedly "broad" language in the Qualcomm ALA giving it the right "to design and have designed . . . including all stages of implementation from specification through RTL design to generation of GDSII." (Tr. 927:20-22, 928:5-23; JTX-0011 § B.1.1.) But that language is "subject to Clause 2.2 of the ALA" which ████████████████████████████████████████████

████████████████████████████████████████████████████

██ (JTX-0011 § B.1.1; JTX-0010 § 2.2.) The clause merely gives *Qualcomm* the right to design a core using the expressly delineated restrictions set forth in § 2.2 of the Qualcomm ALA. It does not relieve Qualcomm of its obligation to █████████████████████████████████████

███████████████████████████████████████████████████. (JTX-0010

§ ██; JTX-0011 §§ A.6, B.1.1.) The language in §§ B.1.1 & 2.2 thus grants no rights with respect to Nuvia's pre-acquisition code, which was developed by and for Nuvia under the Nuvia ALA, without any direction or input from Qualcomm. (Tr. 585:23-586:15.)

The ████████ and "Subsidiaries" terms in the Qualcomm ALA likewise do not confer a license. While the Qualcomm ALA ████████████████████████ there is no evidence Qualcomm entered into a ██████████████████████████ consistent with the limits § 2.2 imposes. (JTX-0010 §§ ███, 2.2.) Instead, Qualcomm's pre-acquisition attempts to use Nuvia's CPU core designs were rebuffed by Mr. Williams, leading to Qualcomm's subsequent acquisition of Nuvia. (PTX-1197 at 1-4; Tr. 394:4-396:10, 796:7-797:8.) And "Subsidiaries" is limited to a company controlled by Qualcomm, with the license operative "only for the period during which such control exists," thereby excluding pre-acquisition Nuvia. (JTX-0010 § 1.23.)

### 3.    The Qualcomm License Is Limited to ████████████ That Arm ████████████████████

*Third*, the Qualcomm ALA grants a license only to ███████████████████████

████████████████████████ That is clear from the face of the agreement, which defines ████████████ as the technology ████████████████████████████ (JTX-0010 §§ ███ ██.) This license, by its plain terms, does not provide a license to designs like the Nuvia-acquired cores, which were developed using technology Arm delivered to Nuvia under a different ALA. (JTX-0010 § ████████████████████ ████████████████████).) That should be the end of the matter. Code and designs Nuvia developed before it had any relationship with Qualcomm could not possibly have been developed using ████████████████████████████████.

If more were needed, however, the Qualcomm ALA disclaims any license to Arm technology generally, such as Arm technology created by others or delivered by Arm under another ALA. The Qualcomm ALA provides that ████████████████████████ ████████████████████████████████████ ████████████████████████████ (JTX-0010 § 2.6.) The technology that Arm delivered to Nuvia under the Nuvia ALA, which Nuvia used to develop its CPU code, is "Arm technology" (rather than ████████████) for purposes of the Qualcomm ALA, and thus expressly excluded from the Qualcomm ALA's license by § 2.6.

Nor does the Qualcomm ALA provide a license merely because Qualcomm did not formally start certain products or designs until after the Nuvia acquisition. By Qualcomm's own admission, it did not begin the CPU designs used in Hamoa, Pakala, Pegasus, and other products from scratch, but instead incorporated pre-acquisition Nuvia code. (Tr. 409:16-21 ("Q. You didn't swap out the RTL that Nuvia had written, right? A. No, because we did not believe that it was required. Q. And Qualcomm then incorporated Nuvia's technology into Qualcomm products; right? A. Yes, Qualcomm used that technology from Nuvia."), 412:9-20, 552:9-20, 705:12-20,

809:1-12; PTX-0400 at 1; PTX-0892 ("do arm know that we are using Phoenix in Hamoa based on our use of the tools?"); PTX-0897 at 1.) Dr. Chen's unrebutted code analysis showed that a substantial portion of the code for these Qualcomm CPUs was copied from the pre-acquisition Nuvia code. (Tr. 536:12-538:5 (comparing Qualcomm CPUs to the Nuvia Phoenix CPU).) The Qualcomm ALA does not provide a license to the code developed by Nuvia prior to the acquisition, regardless of whether the Nuvia-developed code was not yet complete or not fully verified. The license under the Qualcomm ALA does not turn on the state of Nuvia's code, but rather on whether the code was developed by or for Qualcomm using ███████████████████████████████ ████████████████ (JTX-0010 § ██; JTX-0011 § A.6.)

Because the unambiguous contract language establishes three times over that Qualcomm does not have a license to pre-acquisition Nuvia code, the Court should grant JMOL. At a minimum, however, a new trial is warranted because the jury's verdict is against the great weight of the evidence. *See* Fed. R. Civ. P. 59; *Norman v. Elkin*, 849 F. Supp. 2d 418, 424 (D. Del. 2012).

### B.    Nuvia Breached the Nuvia ALA (Question 1).

The Court should also grant JMOL that Nuvia breached § 15.1 of the Nuvia ALA. Nuvia does not dispute that Arm terminated the Nuvia ALA, or that upon termination Nuvia must "immediately discontinue any use and distribution of all ARM Technology" and must destroy or return "any ARM Technology or derivatives" in its possession. (JTX-0001 § 15.1.) The only conclusion supported by the record is that Nuvia breached those obligations by not returning or destroying the pre-acquisition code. (JTX-0001 § 15.1; JTX-0009 at 2; Tr. 409:16-21, 410:2-21, 412:9-20, 552:9-20, 705:12-20, 809:1-12; PTX-0400 at 1; PTX-0897 at 1.)

The unambiguous language of the Nuvia ALA identifies an "Architecture Compliant Core[]" as a non-limiting example of a "derivative[]" of "ARM Technology." (JTX-0001 § 1.8.) Pre-acquisition code developed by Nuvia for the purposes of creating an Architecture Compliant

Core is a "derivative" of Arm Technology and the Arm Architecture Reference Manual in the same way as a finished Architecture Compliant Core. (JTX-0001 §§ 1.5, 1.8; DTX-1587.) Yet Nuvia retained that pre-acquisition code and supplied it to Qualcomm for incorporation into Qualcomm designs and products, rather than discontinuing and destroying that code as required under Section 15.1(a) of the Nuvia ALA. (Tr. 409:16-21, 410:2-21, 412:9-20, 552:9-20, 705:12-20, 809:1-12.) That code remains in Qualcomm's products. (Tr. 409:16-21, 426:5-11, 536:12-538:5 (Dr. Chen's unrebutted code analysis).) Nuvia breached as a matter of law.

### C.    Qualcomm Breached the Nuvia ALA (Question 2).

#### 1.    Qualcomm Breached as a Matter of Law.

The Court should also grant JMOL that Qualcomm breached § 15.1 of the Nuvia ALA, for many of the same reasons. Qualcomm assumed the Nuvia ALA for the reasons discussed in Section I.C.3 below. The destruction obligations thus remain the same under § 15.1 regardless of whether the breaching party is Nuvia or Qualcomm. Qualcomm did not comply with those obligations, instead incorporating pre-acquisition Nuvia CPU code into its products. (JTX-0009 at 2; Tr. 409:16-21, 410:2-21, 412:9-20, 552:9-20, 705:12-20, 809:1-12; PTX-0400 at 1; PTX-0897 at 1.) Qualcomm's ALA does not excuse its failure to comply with its return-or-destroy obligations under the Nuvia ALA. For the reasons discussed in Section I.A, the Qualcomm ALA does not grant Qualcomm a license to those materials, which remain subject to an independent return-or-destroy obligation under the Nuvia ALA regardless.

#### 2.    The Court Should Grant a New Trial Because the Jury's Erroneous Verdict on Question 3 Likely Infected Its Verdict for Question 2.

If the Court does not grant JMOL, a new trial on Question 2 is necessary. Qualcomm's license defense for Arm's breach claim is inseparable from its flawed argument that it has a license

to the pre-acquisition Nuvia code. Overturning the jury's verdict on Question 3 would thus also require a new trial on Question 2.

Qualcomm repeatedly argued that it could not be found to be in breach of the Nuvia ALA because the Qualcomm ALA provided a license to the pre-acquisition Nuvia code. (Tr. 134:16-135:19, 149:2-3, 153:20-24, 456:23-457:7, 577:16-23, 807:18-808:4, 928:5-23, 933:4-8, 942:11-15, 948:6-949:15.) One of Qualcomm's witnesses, Mr. Weiser, testified that Qualcomm "had [its] own architecture license, a broad architecture license that we felt covered the activities, that the employees and the work of the employees that came over would be covered under the Qualcomm ALA." (Tr. 577:16-23.) Another witness, Mr. Amon, told the jury that the Qualcomm ALA applies to Qualcomm designs, which "may include Nuvia technology." (Tr. 807:18-808:4; *see also id.* 456:23-457:7.) Qualcomm further relied on documents claiming that "Qualcomm already has an ALA and TLA with ARM, [so] there should not be any additional agreements required as a result of the acquisition." (PTX-0242 at 2; *see also* PTX-0234 at 2; PTX-0253 at 1.) Qualcomm also invoked this evidence and its license defense in both its opening statement and its closing argument. (Tr. 134:16-135:19, 149:2-3, 153:20-24, 928:5-23, 933:4-8, 942:11-15, 948:6-949:15.)

Given that Qualcomm's license defense pervaded this case, the jury's erroneous finding that Qualcomm has a license plainly influenced its decision on Arm's breach claim. But where, as here, Qualcomm's license claim and Arm's breach claim are "so interwoven," the license claim cannot be retried without re-trying the breach claim as well. *Gasoline Prods.*, 283 U.S. at 500. This is not a rare case where "it is plain that the error which has crept into one element of the verdict did not *in any way* affect the determination *of any other issue.*" *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 455 (3d Cir. 2001) (citations omitted). Thus, granting JMOL that Qualcomm does not have a license (Question 3) would also require a re-trial on Arm's breach claim against Qualcomm

(Question 2).

### 3.    The Court Should Grant a New Trial on Question 2.

The Court should grant a new trial on whether Qualcomm breached the Nuvia ALA for a second reason: a finding that Qualcomm did not assume the Nuvia ALA would be against the great weight of the evidence. Qualcomm's post-acquisition conduct in this case leaves no doubt it assumed Nuvia's obligations under the Nuvia ALA. Any contrary factual finding by the jury "cries out to be overturned." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

Under California law, a party assumes the obligations of a contract when it knowingly accepts (or transfers to itself) the benefits of the contract. Cal. Civ. Code § 1589; *see FNBN Rescon I, LLC v. Citrus El Dorado, LLC*, 725 F. App'x 448, 451 (9th Cir. 2018) ("Because Rescon is owned by Stearns SPV I, a wholly-owned subsidiary of Stearns, the benefits of Citrus's performance ultimately ran to Stearns."); *Melchior v. New Line Prods.*, 106 Cal. App. 4th 779, 788 (2003) (defendant who "voluntarily accepted the benefit" of an agreement "by law consented to the obligations arising under" the agreement). By accepting and using the Nuvia code developed under the Nuvia ALA in Qualcomm products (Tr. 356:12-21, 401:5-18, 412:9-20, 809:1-12; PTX-0234 at 2; PTX-0212 at 1-2; PTX-0296 at 2), Qualcomm assumed Nuvia's obligations under the Nuvia ALA. *See Phila. Indem. Ins. Co. v. SMG Holdings, Inc.*, 44 Cal. App. 5th 834, 842-44 (2019) (non-party estopped from disclaiming some provisions while accepting benefits of others).

Qualcomm acquired Nuvia with its eyes wide open that it would need to assume the Nuvia ALA to use Nuvia's CPU designs. Qualcomm knew that the Nuvia ALA defined an acquisition to be an assignment of the Nuvia ALA (Tr. 396:23-397:1) and that Arm objected to the transfer of the Nuvia designs to Qualcomm. (PTX-0240 ("[A]ny transfer of designs, rights, or licenses under NUVIA's agreements with Arm to Qualcomm will require and be subject to Arm's prior consent"); PTX-0260 at 2 ("It is our intention for the NUVIA design and derivatives thereof to comply with

32767787.1

ARM's agreement with NUVIA, as it appears uncontested that such designs were created pursuant to those agreements."); PTX-0247.) Qualcomm nevertheless acquired Nuvia and used pre-acquisition Nuvia code in Qualcomm designs and products, thereby accepting the obligations that ran with that code. (PTX-0212 at 1-2; PTX-0234 at 2; PTX-0296 at 2; Tr. 356:12-21, 357:20-25, 423:19-21, 552:9-20, 809:1-12, 810:12-21.)

Qualcomm also acted as if it had assumed the Nuvia ALA. Qualcomm, not Nuvia, requested consent under § 16.3 of the Nuvia ALA. (Tr. 177:14-21; PTX-0253 at 2.) Qualcomm, rather than Nuvia, negotiated with Arm regarding the transfer of pre-acquisition Nuvia code. (PTX-0268.) Qualcomm sent the false certification of compliance following termination. (JTX-0009 at 1-2.) And Qualcomm's counterclaim in this case alleged that it had the right to enforce the Nuvia ALA. (D.I. 300 ¶¶ 278-281.) Qualcomm and Nuvia were effectively the same entity for purposes of the Nuvia ALA, given Qualcomm's ownership and control of Nuvia. (PTX-0285; Tr. 549:19-550:1, 589:9-591:4, 804:14-20.) What had previously been "'NUVIA engineering' are now Qualcomm engineers." (PTX-0285.) Even "officer[s] of Nuvia" now receive a "paycheck [that] comes from Qualcomm," (Tr. 590:12-16; *see also* Tr. 356:12-21, 401:5-18, 412:9-20, 589:18-591:4, 809:1-12.)

Qualcomm cannot accept the benefits of the Nuvia ALA without also accepting the burdens. California law is clear that "voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." Cal. Civ. Code § 1589. The obligations of the Nuvia ALA include the duty upon termination (under § 15.1) to destroy the pre-acquisition code that Nuvia developed under the Nuvia ALA. (JTX-0001 § 15.1.) When Qualcomm decided not to comply

with that obligation, it breached the Nuvia ALA. The jury's contrary verdict is against the great weight of the evidence.

## II.    THE COURT SHOULD GRANT A NEW TRIAL ON ALL THREE QUESTIONS.

If the Court does not grant Arm JMOL, it should order a new trial on all issues. A new trial is required as a matter of right on whether Nuvia breached the Nuvia ALA (Question 1) because the jury deadlocked on that issue. "[A] new trial is required" where "there was a mistrial." *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989). The new trial on that single issue necessitates a new trial across the board on all three questions, because the issues in this case are "so interwoven" that they "cannot be submitted to the jury independently" without violating the Seventh Amendment's Reexamination Clause. *Gasoline Prods.*, 283 U.S. at 500.

Given the constitutional stakes, the Third Circuit has adopted a "general presumption against partial new trials." *Elcock*, 233 F.3d at 758. The key question is whether "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Id.* (citation omitted). Thus, Nuvia and Qualcomm must show that the three jury questions in this case are *not* "too interwoven to allow a fair determination" in separate trials, *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986), and that this case does not present a "tangled or complex fact situation" that makes it difficult to separate out those three issues. *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 760 (3d Cir. 1977).

Defendants cannot make either showing here. It is hardly "clear[]" that the question whether Nuvia breached § 15.1(a) of the Nuvia ALA is "distinct and separable" from the question whether Qualcomm breached the same provision, or whether the code Qualcomm acquired from Nuvia is licensed under the separate Qualcomm ALA. *Elcock*, 233 F.3d at 758. Resolving those issues in separate trials would instead require the second jury to impermissibly reexamine the same factual issues and make new findings on issues the first jury considered. *See Gasoline Prods.*, 283

32767787.1

14

U.S. at 499-501. To avoid that constitutional problem, the Court should follow "[t]he general practice after a mistrial" of ordering "a full retrial of all issues in the case." *Drumgold v. Callahan*, 707 F.3d 28, 46 (1st Cir. 2013) (affirming full retrial where first jury resolved some issues but hung on others); *Opal Labs Inc. v. Sprinklr, Inc.*, No. 3:18-cv-01192, 2022 WL 526167, at *1 (D. Or. Jan. 7, 2022) (mistrial as to breach and fraud claims demanded new trial as to other breach claims because "partial retrial on liability for certain claims and damages presents a significant risk of jury confusion, uncertainty, and inconsistent verdicts").

### A.    Questions 1 and 2 Are Not Distinct and Separable Issues.

Here, "[t]here [is] no conceivable fashion by which a second jury could fairly evaluate" whether Nuvia breached "without also fully appreciating" the facts that give rise to Arm's breach claim against Qualcomm. *Pryer*, 251 F.3d at 458. The predicate facts for Arm's breach claim against Qualcomm are not merely intertwined with, but are largely the same as, those that underlie Arm's claim against Nuvia. Both claims arise from the same provision in the same contract. The jury was instructed to apply the same elements for both questions against Nuvia and Qualcomm. (D.I. 568, Instr. 3.3.) Both juries would need to decide the scope and meaning of § 15.1, including whether and why Nuvia code is a "derivative" of "ARM Technology," and how much of the pre-acquisition Nuvia code Qualcomm reused. (JTX-0001 § 15.1.)

The second jury, moreover, will consider the same facts as the first jury: the same pre-acquisition Nuvia technology, the same pre-acquisition course of conduct, the same corporate acquisition, the same post-acquisition communications, the same transfer of technology, the same witnesses, and the same reuse by Defendants of the same code in the same post-acquisition products. (PTX-0234 at 2; PTX-0240; PTX-0247; PTX-0253 at 1-2; PTX-0260 at 2; PTX-0268; JTX-0009; Tr. 172:8-173:7, 177:14-21, 180:20-181:7, 216:14-23, 226:21-24, 390:7-24, 394:4-395:24, 401:5-18, 590:25-591:7, 409:16-21, 410:2-21, 412:9-20, 552:9-20, 784:3-10, 809:1-12.)

The "tangled [and] complex fact[ual] situation" in this case, *Pryer*, 251 F.3d at 455 (citations omitted), would necessarily require introducing evidence relating to Qualcomm's conduct at a new trial addressing Nuvia's breach, improperly allowing a second jury to "assess[] the same evidence" the first jury considered and to second-guess the first jury's factual findings. *See Payton v. Abbott Labs*, 780 F.2d 147, 154 (1st Cir. 1985); *see also Colonial Leasing of New England, Inc. v. Logistics Control Int'l*, 770 F.2d 479, 481 (5th Cir. 1985).

Courts consistently grant new trials on related issues where, as here, there is overlapping evidence or proof. *See, e.g.*, *Am. Home Assur. Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 329 (3d Cir. 1985) (new trial on multiple claims and defenses required where issues relevant to both); *Encompass Off. Sols., Inc. v. La. Health Serv. & Indem. Co.*, 919 F.3d 266, 277 (5th Cir. 2019) (new trial on tort and contract claims ordered in action against insurer because breach of contract was basis for tort claims); *Witco Chem. Corp. v. Peachtree Doors, Inc.*, 787 F.2d 1545, 1549 (Fed. Cir. 1986) (ordering new trial on all issues where patent infringement arguments were "indistinguishably woven with the factual underpinnings of the validity and enforceability determinations and the subject matter of the contract"); *Colonial Leasing*, 770 F.2d at 481 (common questions required new trial on multiple issues); *Nissho-Iwai Co. v. Occidental Crude Sales*, 729 F.2d 1530, 1539 (5th Cir. 1984) (partial retrial limited to fraud claim denied where fraud claim "required an understanding of the contract claim").

Here, the only distinction between the two breach claims is the defendant. But that distinction is illusory. Following the announcement of the acquisition, and long before the termination obligations that form the basis for the breach of § 15.1 arose, Nuvia and Qualcomm stopped acting independently. (PTX-0285; PTX-0296 at 2; Tr. 400:13-15, 588:19-591:17.) Instead, Qualcomm effectively merged all of Nuvia, including its technology and personnel, into

Qualcomm's own operations and development work nearly a year before the termination obligations under the Nuvia ALA arose. (PTX-0285; PTX-0296 at 2; Tr. 400:13-15, 590:22-591:4.) As discussed above, Qualcomm thereafter used the pre-acquisition code Nuvia had developed in Qualcomm designs and products, continuing to do so even after Arm terminated the Nuvia ALA.

Qualcomm's conduct thus is "interwoven" with Nuvia's breach. *Gasoline Prods.*, 283 U.S. at 500. The conduct that establishes a breach of § 15.1 took place nearly a year after Qualcomm's acquisition of Nuvia, and was directed by Qualcomm, through Qualcomm employees, including former Nuvia personnel. (*See, e.g.*, JTX-0009 at 1-2.) This conduct includes, but is not limited to, the response to Arm's termination of the Nuvia ALA, delivery of Defendants' certification, the alleged swap-out, the response to Arm's pre-suit correspondence, Qualcomm's continued use of pre-acquisition Nuvia code, and the defense of this claim. (Tr. 226:4-20, 404:17-23, 409:16-21; PTX-0234 at 2; PTX-0240; PTX-0260 at 2; PTX-0268; JTX-0009 at 1-2.)

A new jury on Question 1 could not ignore Qualcomm's role in Nuvia's breach and look solely to Nuvia's conduct. There is no new instruction to the jury or explanation of the prior verdict that could separate Qualcomm and Nuvia's conduct after the acquisition. Qualcomm negotiated with Arm in 2021 and 2022 (PTX-0234 at 2; PTX-0240; PTX-0260 at 2; PTX-0268; Tr. 226:4-20); Nuvia's employees, work product, code, and designs were transferred to Qualcomm (PTX-0296 at 2; Tr. 590:25-591:7); and the response to the obligation to stop use of derivatives and embodiments of Arm Technology under § 15.1(a) was overseen by Qualcomm and implicated Qualcomm's products. (JTX-0001 § 15.1; Tr. 410:14-21, 412:9-20, 809:1-12.)

This case does not arise from the independent conduct of independent parties acting at different times, or with respect to different aspects of distinct chronologies. It is instead like other

cases in which courts have required claims against different defendants to be retried together, based on the existence of common factual issues. *See, e.g.*, *Williams v. Rene*, 72 F.3d 1096, 1101 (3d Cir. 1995) (new trial "must extend" to both defendant-employee and defendant-employer in auto accident case); *Williams v. Slade*, 431 F.2d 605, 609 (5th Cir. 1970) (rejecting partial new trial given the interrelated nature of the two defendants' potential liability); *Cont'l Cas. Co. v. United States*, 167 F.2d 107, 109 (9th Cir. 1948) (new trial for a surety required new trial for surety's principals as any new trial for surety "would be on grounds that in justice would require a similar relief for" individuals). Although Nuvia separately entered into the Nuvia ALA, and separately developed pre-acquisition code under the Nuvia ALA, the separation between Nuvia and Qualcomm ceased with Qualcomm's acquisition. (PTX-0285; PTX-0296 at 2; Tr. 400:13-15, 590:2-16, 590:22-591:4.) The breach of § 15.1—whether for purposes of Arm's claim against Nuvia or against Qualcomm—arises from the joint activities of Nuvia and Qualcomm, and the relevant conduct is not "distinct and separable." *Gasoline Prods.*, 283 U.S. at 500.

Indeed, the overlapping factual issues pose a real risk of inconsistent verdicts. As one example, the two juries may have different views about what § 15.1 requires or to what it applies. As another example, a finding by the second jury that Nuvia breached would negate Qualcomm's defense to breach based on purportedly "swap[ping] out" certain Arm materials under the Nuvia Technology License Agreement, potentially contradicting the original verdict. (Tr. 457:16-18.) Worse still, a second jury may conclude that Qualcomm's assumption of Nuvia's obligations establishes that Qualcomm, rather than Nuvia, breached § 15.1, contrary to the original verdict. The same jury needs to decide both breach claims to avoid these types of conflicts.

**B.    Whether Qualcomm Is Licensed (Question 3) Is Not Distinct and Separable from Whether Nuvia Breached (Question 1).**

32767787.1

Question 3 is equally interwoven with the facts that form the basis for Questions 1 and 2.[2] Defendants relied on Qualcomm's purported license to the Nuvia-acquired code as a defense to both breach claims in its pre-trial filings and correspondence. (*See* D.I. 529 at 1; PTX-0234 at 2; PTX-0242 at 2.) In those filings, Defendants described their declaratory judgment counterclaim on the Qualcomm ALA license (Question 3) as an "inverted lawsuit" of Arm's breach-of-contract claims against *both* Defendants. (D.I. 529 at 1.) Defendants adhered to that position at trial, where they relied on witness testimony and documents to support their position that the Qualcomm ALA license permits Qualcomm to use the Nuvia-acquired code regardless of what the Nuvia ALA says. (*See, e.g.*, Tr. 456:20-457:7, 577:16-23, 807:18-808:4; PTX-0242 at 2; PTX-0234 at 2; PTX-0253 at 1.) Defendants pulled this evidence together in closing to argue that the Qualcomm ALA provided a defense to the breach claims against *both* Nuvia and Qualcomm. (*See* Tr. 928:5-23, 942:11-15, 948:6-949:15; *see also id.* at 134:16-135:19, 149:2-3, 153:20-24.) The license question presented by Question 3 pervaded Qualcomm's defense as to Questions 1 and 2 at trial.

Defendants cannot run away from the intertwined nature of the license and breach issues now. But were there any doubt those claims are closely-related, the record unambiguously establishes those issues are inseparable. Whether Qualcomm has a license under the Qualcomm ALA implicates the same pre-acquisition Nuvia code as Arm's breach claim against Nuvia and requires a similar deep dive into the facts and course of conduct among Arm, Nuvia, and Qualcomm as Arm's breach claim. Resolving Qualcomm's license defense and Arm's breach claims thus requires drawing overlapping factual findings regarding (1) Nuvia's development of the pre-acquisition code, (2) Qualcomm's use of that pre-acquisition Nuvia code, and (3) the

---

[2] Questions 2 and 3 are inextricably intertwined for the reasons discussed in Section I.C.2. That is another reason why a new trial on Questions 1 and 2 requires a new trial on Question 3.

parties' communications over whether that use was licensed under the Qualcomm ALA. (Tr. 404:2-5, 409:19-21, 412:9-20, 809:1-12; PTX-0234 at 2; PTX-0240; PTX-0260 at 2; PTX-0268.)

If more were needed, a finding that Nuvia breached the Nuvia ALA would call into question a verdict that Qualcomm has a license to the Nuvia-acquired code under the Qualcomm ALA. Qualcomm has no viable theory for how it could have a license to code Nuvia shared with Qualcomm in breach of the Nuvia ALA and that Nuvia was contractually obligated to destroy once Arm terminated that agreement. (*See* JTX-0001 §§ 1.8, 3.1, 15.1(a); Tr. 394:11-395:24, 591:3-4.) For that reason alone, the license and breach issues are inseparable.

Qualcomm ultimately did not bring a claim seeking a declaration regarding the scope of its license rights under the Qualcomm ALA in the abstract. (D.I. 12; D.I. 300.) Instead, Qualcomm specifically requested a declaration regarding its right under the Qualcomm ALA with respect to specific technology: the pre-acquisition Nuvia code and designs that are also the subject of Arm's breach claims against Nuvia (Question 1) and Qualcomm (Question 2). (D.I. 12 ¶ 246; D.I. 300 ¶ 275.) The interwoven nature of the issues is reflected in the language of the verdict form, which refers to "designs acquired in the Nuvia acquisition." (D.I. 572.) Those designs are embodied in the code that is subject to the restrictions of § 15.1—the contractual provision at the center of Arm's breach claims. These interwoven issues, which turn on overlapping factual and contractual questions, must be resolved by the same jury in a single trial. If the Court nonetheless concludes that either Question 2 or Question 3 are distinct and separable from Question 1, certification that the partial judgment on the separate question(s) is a final judgment under Rule 54(b) is appropriate.

## CONCLUSION

For the foregoing reasons, the Court should grant Arm JMOL, or at a minimum, grant a new trial on all issues.

32767787.1

Dated: January 17, 2025

OF COUNSEL:

Daralyn J. Durie
Joyce Liou
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
ddurie@mofo.com
jliou@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

Kyle W.K. Mooney
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
(212) 336-4092
kmooney@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

Daniel Muino
MORRISON & FOERSTER LLP
2100 L Street, NW
Suite 900, Washington, D.C. 20037
(202) 887-1500
dmuino@mofo.com

YOUNG CONAWAY STARGATT &
   TAYLOR, LLP


   */s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

32767787.1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 17, 2025, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
jbraly@paulweiss.com
abutwin@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Anna P. Lipin
William T. Marks
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
alipin@paulweiss.com
wmarks@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# EXHIBIT 44

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANT NUVIA, INC.'S
RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW**

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
William T. Marks
Anna P. Lipin
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

January 17, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.     NATURE AND STAGE OF THE PROCEEDING ............................................. 1

II.    SUMMARY OF ARGUMENT ........................................................................ 1

III.   statement of facts ........................................................................................... 3

IV.   LEGAL STANDARD ....................................................................................... 3

V.    ARGUMENT .................................................................................................... 4

      A.    Arm Presented No Evidence That Nuvia's Alleged Breach Caused Any Harm. .................................................................... 4

            1.    *Unlicensed Products.* ............................................... 5

            2.    *Royalties.* ................................................................. 6

      B.    Nuvia Did Not Breach Section 15.1(a) of the Nuvia ALA. .................................... 7

            1.    *Nuvia's RTL Was "Nuvia Technology" Not Subject to Section 15.1(a).* ..... 8

            2.    *The Nuvia RTL Was Not a Derivative of Any ARM Technology.* ............ 10

                  a.    The Nuvia ALA Architecture Specifications Listed in Annex 1 Encompass Only Confidential Architecture Extensions. .............. 10

                  b.    Arm's Derivative Claims Fail Due to Overbreadth. .................... 13

            3.    The Nuvia RTL Is Not a Derivative of the Arm Architecture Reference Manual. ....................................... 17

            4.    Only Architecture Compliant Cores that Were "Recast, Transformed or Adapted" from ARM Technology Are Derivatives Subject to Section 15.1(a). .......................... 18

VI.   CONCLUSION ............................................................................................... 19

i

## TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Aguilera* v. *Pirelli Armstrong Tire Corp.*,
   223 F.3d 1010 (9th Cir. 2000) ...............................................................................4

*Ballard* v. *MacCallum*,
   101 P.2d 692 (Cal. 1940) ........................................................................................9

*Behnke* v. *State Farm Gen. Ins. Co.*,
   127 Cal. Rptr. 3d 372 (Ct. App. 2011) ...................................................................4

*Blattman* v. *Siebel*,
   Civ. No. 15-530, 2020 WL 475413 (D. Del. Jan. 29, 2020) ...................................6

*Dam Things from Denmark* v. *Russ Berrie & Co.*,
   290 F.3d 548 (3d Cir. 2002).................................................................................15

*Oracle Int'l Corp.* v. *Rimini St., Inc.*,
   123 F.4th 986 (9th Cir. 2024) ...............................................................................15

*Rodriquez* v. *Se. Pa. Transp. Auth.*,
   119 F.4th 296 (3d Cir. 2024) ..................................................................................3

*St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*,
   124 Cal. Rptr. 2d 818 (Ct. App. 2002) ...................................................................4

*Tanksley* v. *Daniels*,
   902 F.3d 165 (3d Cir. 2018)...................................................................................17

*Ticor Title Ins. Co.* v. *Rancho Santa Fe Ass'n*,
   177 Cal. App. 3d 726 (1986) .................................................................................13

*Unicom Sys., Inc.* v. *Farmers Grp., Inc.*,
   Civ. No. 04-4604, 2007 WL 9705875 (C.D. Cal. June 12, 2007) .........................10

*Universal Athletic Sales Co.* v. *Salkeld*,
   511 F.2d 904 (3d Cir. 1975)...................................................................................15

*Wilkison* v. *Wiederkehr*,
   124 Cal. Rptr. 2d 631 (Ct. App. 2002) ...................................................................6

*Windsor Secs., Inc.* v. *Hartford Life Ins. Co.*,
   986 F.2d 655 (3d Cir. 1993)....................................................................................6

*Wolf* v. *Walt Disney Pictures & Television*,
   76 Cal. Rptr. 3d 585 (Ct. App. 2008) .....................................................................9

**Statutes**

17 U.S.C. § 101 ("Copyright Act")..................................................................14, 15, 16, 18

Cal. Civ. Code § 1442.........................................................................................................9

Cal. Civ. Code § 1636, 1638............................................................................................16

Cal. Civ. Code § 1638.......................................................................................................16

**Rules**

Fed. R. Civ. P. 50(b) .........................................................................................................4

## I.    NATURE AND STAGE OF THE PROCEEDING

The Court held a combined jury and bench trial from December 13 to 20, 2024.  The jury returned a verdict in favor of defendants on two of three questions on the verdict form.  D.I. 572.  The jury found that defendants Qualcomm Inc. and Qualcomm Technologies, Inc. (together, "Qualcomm") did not breach Section 15.1(a) of the Architecture License Agreement between plaintiff Arm Ltd. and defendant Nuvia, Inc. (the "Nuvia ALA").  The jury further found that Qualcomm's central processing units that include designs acquired in its acquisition of Nuvia are licensed under the Architecture License Agreement between Arm and Qualcomm (the "Qualcomm ALA").  *Id.*  The jury failed to reach a unanimous verdict on the question whether Nuvia breached Section 15.1(a) of the Nuvia ALA.  *Id.*  The Court accepted the partial verdict on the two questions resolved by the jury and discharged the jury.  Trial Tr. (Tr.) 1016:17–1017:2, 1020:16–1021:2.

## II.    SUMMARY OF ARGUMENT

In an effort to obstruct Qualcomm's development of innovative, high-performance CPUs, Arm brought this action alleging breach of the Nuvia ALA and demanding that Qualcomm destroy all of its products that incorporated designs it obtained after acquiring Nuvia.  That effort failed.  The jury unanimously concluded that Qualcomm did not breach Section 15.1(a) of the Nuvia ALA and that Qualcomm's products based on Nuvia designs are licensed under Qualcomm's own ALA.

The jury did not reach a verdict on Arm's claim against Nuvia for breach of Section 15.1(a) of the Nuvia ALA.  Judgment as a matter of law is now warranted on that claim for two reasons.

1.    Arm presented no evidence that Nuvia's alleged breach caused Arm to suffer any cognizable harm.  To prevail on its contract claims, Arm needed to prove that the defendants' actions caused it to suffer harm.  But to avoid acknowledging that it had an adequate remedy at law—which would have foreclosed its demand for specific performance—Arm forswore past damages.  Instead, Arm argued that it was harmed by having "unlicensed" products "in the market"

1

or because it supposedly could have obtained greater royalties. Both of those theories are insufficient as a matter of law.

With respect to unlicensed products: Arm did not present any non-speculative evidence that anyone in the market perceived Qualcomm's products to be unlicensed, much less that they did so because of Nuvia's alleged breach. The only evidence presented at trial showed record growth for Arm's licensing business after Qualcomm's acquisition of Nuvia. And Arm's speculation about such harm made no sense. The evidence did not show that the market perceived Qualcomm to be offering "unlicensed products" in the face of Qualcomm's consistent position that its products were licensed. The products at issue here were also being sold by Qualcomm, which acquired an in-development design from Nuvia almost a year before Arm asked Nuvia to destroy it, and there was no evidence at trial that the market would consider a breach of the Nuvia ALA by Nuvia as meaning that Qualcomm's products were not licensed.

Arm's theory concerning royalties fares no better. The Court properly precluded Arm from asserting that theory, because Arm intentionally avoided pursuing it during pretrial proceedings in order to ensure the continued viability of its request for specific performance. In any event, Arm did not present any evidence about the royalties it supposedly could have received in the absence of a breach by Nuvia or that such royalties would have differed from what Qualcomm is already paying to Arm.

2.    Nuvia is also entitled to judgment as a matter of law because the evidence at trial showed that no reasonable jury could conclude that Nuvia breached Section 15.1(a) of the Nuvia ALA. Arm did not prove that Nuvia's design work (namely, its RTL) contained "ARM Technology" or "derivatives" subject to destruction under Section 15.1(a). As even Arm's own expert agreed, Nuvia's RTL was "Nuvia Technology" and thus *Nuvia*'s "Confidential

Information" under the Nuvia ALA. It was thus not ARM Technology or a derivative subject to Section 15.1(a). And even if Nuvia Technology were subject to Section 15.1(a), the Nuvia RTL did not contain any ARM Technology at the time of termination of the Nuvia ALA.

Arm's primary theory at trial was that the publicly available Arm Architecture Reference Manual (the "Arm ARM") constituted ARM Technology and that the entire Nuvia RTL codebase was a derivative of that document. But under the plain language of the contract, "ARM Technology" does not include the Arm ARM. The only item of actual ARM Technology that Arm's experts identified at trial—confidential architecture extensions—was never implemented in the RTL.

In any event, even if the Arm ARM did constitute ARM Technology under the Nuvia ALA, the only portions present in Nuvia's RTL—opcodes and register definitions—were wholly regenerated by Qualcomm under the Qualcomm ALA. Accordingly, at the time of termination, Nuvia's designs contained no ARM Technology delivered under the Nuvia ALA. Arm was thus left to fall back on sweeping theories that any product that relied on the Arm ARM in development or was designed to be compliant with the Arm architecture is a "derivative" subject to Section 15.1(a). That position is based not on the language of the Nuvia ALA but instead on an improper interpretation of the contract of breathtaking scope by Arm's technical expert.

## III.    STATEMENT OF FACTS

The relevant facts are set forth in the Argument section, as appropriate.

## IV.    LEGAL STANDARD

Judgment as a matter of law is appropriate where, when viewing the evidence "in the light most favorable to the non-moving party," the record lacks the "minimum quantum of evidence from which a jury might reasonably afford relief"—including when a plaintiff presents "no evidence" supporting one of the "elements required" to prove its claim. *Rodriquez* v. *Se. Pa.*

3

*Transp. Auth.*, 119 F.4th 296, 298–99 (3d Cir. 2024); *see* Fed. R. Civ. P. 50(b).

## V.    ARGUMENT

### A.    Arm Presented No Evidence That Nuvia's Alleged Breach Caused Any Harm.

As required under California law and reflected in an uncontested jury instruction, Arm was required to prove that Nuvia's alleged breach of Section 15.1(a) of the Nuvia ALA caused it harm. D.I. 568 at 6; Tr. 885:8–25; *e.g.*, *Behnke* v. *State Farm Gen. Ins. Co.*, 127 Cal. Rptr. 3d 372, 391 (Ct. App. 2011); *St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*, 124 Cal. Rptr. 2d 818, 834 (Ct. App. 2002).  Arm was required to identify "appreciable and actual damage" from the breach; claims of "speculative harm" are insufficient.  *Aguilera* v. *Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) (citation omitted).

At trial, Arm did not show that Nuvia's alleged failure to stop using and destroy microarchitecture RTL it developed caused any tangible harm to Arm, whether in the form of lost customers or business opportunities.  None of Arm's three testifying executives identified a single lost customer, a single lost business opportunity, or even a single customer complaint arising from Nuvia's alleged breach of the Nuvia ALA.  To the contrary, Arm's CEO confirmed that, as of December 2023—nearly two years after Arm terminated the Nuvia ALA, and after Qualcomm had already begun marketing the products at issue—Arm had not suffered any concrete harm.  Tr. 278:16–19, 279:10–280:7 (Haas).  The unrebutted trial evidence showed that Arm posted record licensing and royalty revenues after terminating the Nuvia ALA.  Tr. 281:7–288:23 (Haas); DTX-496, DTX-791, DTX-1495.  Arm even proclaimed that it has sold more than 300 billion Arm-compliant chips, many billions of which are Qualcomm Snapdragon chips.  Tr. 198:18–199:21 (Abbey).

In the face of that evidence, Arm attempted to prove causation of harm in two ways.  Tr. 100:19–101:7.  *First*, Arm attempted to show that it was harmed because "unlicensed technology based on a Nuvia design is now in the market."  Tr. 278:25–279:1 (Haas); *see* Tr. 100:21–25; Tr. 279:2–9, 280:23–281:1 (Haas); Tr. 850:25–851:1.  *Second*, Arm attempted to show that it received lower royalty payments than it otherwise would have but for the breach.  Tr. 850:21–851:1.  Both of those positions fail as a matter of law.

### 1.    *Unlicensed Products.*

Arm's attempt to demonstrate causation and harm by the presence of "unlicensed" products in the market fails for multiple independent reasons.  To begin with, Arm offered no evidence that any of its customers considered Qualcomm products to be unlicensed.  Instead, the evidence showed that Qualcomm consistently maintained that the products at issue were fully covered by Qualcomm's own licenses.  *E.g.*, D.I. 300 ¶¶ 145, 220.

Qualcomm, not Nuvia, was also the entity selling the products at issue here.  There was no evidence at trial that the market would consider a breach by *Nuvia* of Section 15.1(a) of the Nuvia ALA to mean that Qualcomm's products were not licensed.  Arm presented no evidence from its customers or anyone else that they somehow believed that Qualcomm's products were "unlicensed" because of a breach of the Nuvia ALA.[1]

To the extent Arm is asserting that the mere presence of unlicensed products in the market causes harm, Arm is incorrect.  The only basis Arm has for saying that the products are unlicensed is that defendants allegedly did not comply with their contracts.  But breach and harm are distinct elements of a cause of action for breach of contract, and allowing Arm to show harm merely by pointing to a supposed breach would render the harm element meaningless.  Absent any proof of

---

[1] The jury also found Qualcomm's products to be licensed.  D.I. 572.

actual harm, a jury could have found that Qualcomm's products harmed Arm only through speculation, which cannot sustain a claim. *See Windsor Secs., Inc.* v. *Hartford Life Ins. Co.*, 986 F.2d 655, 668–69 (3d Cir. 1993); *Blattman* v. *Siebel*, Civ. No. 15-530, 2020 WL 475413, at *19 (D. Del. Jan. 29, 2020).

### 2.      *Royalties.*

Arm's theory that Nuvia's alleged breach of Section 15.1(a) affected the royalties Qualcomm paid Arm is similarly insufficient as a matter of law.

*First*, the Court properly precluded Arm from relying on that theory. If Arm wanted to obtain a higher royalty rate, it could have sued for money damages. Instead, Arm disclaimed any damages, declined to produce any damages calculation in discovery, and refused to produce unredacted third-party ALA agreements showing royalty rates paid by those parties. Mar. 7, 2024 Hr'g Tr. 34:24–36:21, 60:8–61:1; Nov. 20, 2024 Pretrial Conf. Tr. 38:8–9; Tr. 98:16–99:1, 101:2–3. That was a strategic decision by Arm: the availability of damages is fatal to the specific-performance remedy Arm sought. *See Wilkison* v. *Wiederkehr*, 124 Cal. Rptr. 2d 631, 640 (Ct. App. 2002). This Court precluded Arm from arguing that it satisfied the harm element based on differences in royalty rates under the Qualcomm and Nuvia ALAs "unless and until they show [the Court] that that was something that was raised in discovery." Tr. 102:1–7. Arm did not do so; it cannot now argue a theory of harm it deliberately disavowed.

*Second*, the "lost royalties" argument was not substantiated by evidence. At trial, Arm did not present any evidence of actual lost royalties. Arm presumes that, if Nuvia had destroyed its RTL after termination of the Nuvia ALA, Qualcomm would have agreed to pay Arm higher rates under the Nuvia ALA. But Arm presented no evidence supporting that premise. The evidence

and testimony at trial provided no basis to find that Nuvia's destruction or retention of any RTL in its possession had any bearing on the royalty rates Qualcomm paid Arm.

### B.  Nuvia Did Not Breach Section 15.1(a) of the Nuvia ALA.

Section 15.1(a) of the Nuvia ALA states that, upon termination of the agreement by Arm under Section 14.2, Nuvia must (1) "immediately discontinue any use and distribution of all ARM Technology, ARM Confidential Information and any products embodying such technology or information" and (2) at Arm's request, "either destroy or return to ARM any ARM Confidential Information, including any copies thereof in its possession and any ARM Technology or derivatives (including any translation, modification, compilation, abridgement or other form in which the ARM Technology has been recast, transformed or adapted) thereof in its possession." JTX-1 § 15.1(a).  Arm's theory of breach at trial was that Nuvia violated Section 15.1(a) by failing to stop using and destroy its in-development RTL.  Tr. 893:24–897:17 (plaintiff's closing).  Any obligations Nuvia had under Section 15.1 did not exist until March 1, 2022, the date of termination, and approximately one year after Qualcomm acquired Nuvia, hired former Nuvia employees, and began progressing Nuvia-based designs under its own ALA.  Tr. 423:19–21, 456:14–457:7 (Williams); Tr. 577:16–23 (Weiser); DTX-1196.

Nuvia's RTL constituted "Nuvia Technology"—not ARM Technology or ARM Confidential Information—under the Nuvia ALA.  It was thus not subject to Section 15.1(a).  In addition, at the time of termination of the Nuvia ALA, there was no ARM Technology delivered under the Nuvia ALA in Qualcomm products.  Arm presented no evidence disputing that the Qualcomm products at issue at trial were conceived of and began at Qualcomm, not Nuvia, nor did it challenge the evidence showing that Qualcomm regenerated the only reflection of the Arm ARM purportedly identified in Nuvia's functional code at trial.  The record evidence thus points

to only one reasonable conclusion: that Nuvia's RTL was not subject to the obligations of Section 15.1(a).

### 1.    *Nuvia's RTL Was "Nuvia Technology" Not Subject to Section 15.1(a).*

The Nuvia ALA draws a clear distinction between technology developed by Nuvia and technology developed by Arm. The agreement defines "Nuvia Technology" as "the technology developed by LICENSEE" (i.e., Nuvia), and it defines "ARM Technology" to include specific, identified deliverables Arm was required to supply to Nuvia. JTX-1 § 1.27; JTX-5 § 2, cl. A.10. The agreement then distinguishes between "Nuvia Technology" and "ARM Technology" with respect to the definition of "Confidential Information." JTX-1 § 1.8. In particular, that definition treats each party's respective Technology and "derivatives" of that Technology as the party's respective Confidential Information. *Id.* The Nuvia ALA's termination provisions in Section 15.1 then reflect those distinctions by imposing reciprocal obligations on each party to "immediately discontinue any use" of the other's Technology and "either [to] destroy or return" the other party's Confidential Information, including "derivatives" of the party's Technology. *Id.* § 15.1(a) & (b).

Nuvia's RTL was Nuvia Technology, not ARM Technology, because it was "technology developed by" Nuvia. JTX-1 § 1.27. Witnesses from both parties, including Arm's expert, agreed. Tr. 186:6 (Abbey); Tr. 307:24–308:3 (Haas); Tr. 412:15–16, 444:15–24 (Williams); Tr. 542:13–19, 543:14–21 (Chen); Tr. 664:13–20 (Annavaram); Tr. 768:2–5 (Amon). And because the Nuvia RTL constitutes Nuvia Technology, it also constitutes Nuvia Confidential Information, including for purposes of Section 15.1. JTX-1 §§ 1.8(ii), 15.1. The RTL is thus not ARM Technology or ARM Confidential Information, and Section 15.1(a) does not apply to it. The RTL is subject to Section 15.1(b), which imposes obligations on Arm, not Nuvia. *Id.* § 15.1(b).

The testimony at trial supports Nuvia's interpretation. Gerard Williams testified that, despite Arm's initial position that the Nuvia ALA was a one-way license, Nuvia bargained for the

distinction between Nuvia Technology and ARM Technology with the "intent to protect all of the technology that Nuvia created," including Nuvia microprocessors and other intellectual property, to ensure "that there would be no debate about whose [technology] it was." Tr. 432:12–437:3; DTX-1095 at 1 (noting that protections for Nuvia Technology were intended to apply to Section 15); *id.* at 5, 7 (comment bubbles from Arm). Will Abbey's testimony was consistent with Mr. Williams's: Mr. Abbey testified that "Nuvia Technology" was included in the contract so that Nuvia's intellectual property would not "end up into Arm's standard products and be distributed as part of [Arm's] standard TLA products." Tr. 164:13–25. Because "there is no material conflict in the extrinsic evidence," the Court may interpret the contract as a matter of law, *Wolf* v. *Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 602–04 (Ct. App. 2008), and recognize that the Nuvia RTL is Nuvia Technology.[2]

California's policy against forfeitures further confirms the conclusion that Nuvia's RTL was not subject to destruction under Section 15.1(a). Under California law, a "condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created." Cal. Civ. Code § 1442; *Ballard* v. *MacCallum*, 101 P.2d 692, 695 (Cal. 1940). Arm interprets Section 15.1(a) to require forfeiture of the Nuvia RTL, technology Nuvia created, owned, and over which Nuvia has express contractual rights. Arm had nothing to do with creating or developing it. Tr. 444:19–24, 454:5–8 (Williams); Tr. 542:16–19 (Chen); Tr. 597:13–598:5 (Grisenthwaite). To the extent any ambiguity is present, Section 15.1(a) must be construed to avoid any such forfeiture.

---

[2] The Nuvia RTL was also never located at (or even accessible to) Arm and could thus not have been "returned" there. Arm's Chief Architect, Richard Grisenthwaite, testified that it would have been "extraordinarily unusual" for a licensee to send its RTL to Arm because licensees "regard that RTL as embodying their proprietary know how, secret sauce." Tr. 597:13–598:2. Mr. Grisenthwaite could not recall a single instance of a licensee ever providing its RTL to Arm, *id.*, and Mr. Williams confirmed that Nuvia shared no code with Arm, Tr. 453:20–454:4.

*See Unicom Sys., Inc.* v. *Farmers Grp., Inc.*, Civ. No. 04-4604, 2007 WL 9705875, at *13 (C.D. Cal. June 12, 2007) (interpreting termination provision of software license to avoid forfeiture of licensee's rights).

### 2.    *The Nuvia RTL Was Not a Derivative of Any ARM Technology.*

Aside from constituting "Nuvia Technology" not subject to Section 15.1(a) in the first instance, the plain language of the Nuvia ALA demonstrates that the Nuvia RTL was not a derivative of "ARM Technology." Arm's position at trial, and the testimony of its expert Dr. Colwell, was that Nuvia Technology (as well as the microarchitecture in 250 billion CPUs worldwide, including in 99% of smartphones) was all derivative of the publicly available Arm ARM. Tr. 510:22–511:21. That argument lacks merit for numerous reasons.

### a.    *The Nuvia ALA Architecture Specifications Listed in Annex 1 Encompass Only Confidential Architecture Extensions.*

The Nuvia ALA does not permit Arm to claim rights against the Nuvia RTL based on the publicly available Arm ARM. "ARM Technology" is defined in Annex 1 as "any or all, as the context admits, of the technology identified in Section 1 of this Annex 1, and any Updates thereto delivered by ARM to LICENSEE provided that such technology is Included Technology." JTX-5 § 2, cl. A.10. As defendants explained on summary judgment (D.I. 391 at 16–19), the term "ARM Technology" is limited to the five deliverables listed in Part A of Section 1 of Annex 1 of the Nuvia ALA. The items listed in Parts B–D of Section 1 of Annex 1—the Architecture Compliance Kit, the ETM Trace Checker, and the Crypto Extension, JTX-5 § 1, pt. A—do not constitute "ARM Technology," D.I. 391 at 17–19, and in any event were not used by Nuvia, Tr. 452:9–16 (Williams).

At trial, Arm did not attempt to prove that the Nuvia RTL was a derivative of the items listed in Parts B, C, and D of Section 1. Instead, Arm focused entirely on one item listed in Part

A:  the "ARMv8-A Architecture – Specifications," also referred to by the witnesses at trial as "extensions."    Tr.  501:1–502:6  (Colwell);  Tr.  546:6–16  (Chen);  PTX-165  (the  2020 Specifications).  And those Specifications, as defined in the contract, constitute ARM Technology under the Nuvia ALA but do not include the Arm ARM.[3]

The contract provides facial support for that conclusion.  The Arm ARM is a public document available for download from Arm's website.  *E.g.*, Tr. 123:15–16 (Arm opening); Tr. 370:22–371:4 (Williams); Tr. 597:4–9 (Grisenthwaite); PTX-651 at 1.  Yet Annex 1 lists the "ARMv8-A Architecture – Specifications" as being "Confidential except disclosure permitted to 'Designers' in accordance with Clause 3 of the ALA."  JTX-5 § 1.  The Specifications are thus distinct from the Arm ARM in that the former are confidential and the latter is not.  The "ArmV8-Architecture Reference Manual" is also a defined term in Annex 1 and is defined not as the Arm ARM but instead as "the documentation identified in Section 1 Subsection 1 Part A of this Annex 1."  JTX-5 § 2, cl. A.8.  Part A does not list the ArmV8-Architecture Reference Manual.  *Id.*

The trial record further demonstrates that the Specifications listed in Part A of Annex 1 refer to unreleased confidential extensions to the Arm Architecture, not the publicly available Arm ARM.  Vivek Agrawal, a senior principal engineer at Arm, testified that the "Specifications" refer to confidential "engineering specifications," which may eventually be incorporated into the Arm ARM, a "more formal document."  Tr. 627:10–628:4.  Mr. Williams had the same understanding: he testified that the Specifications were materials that "became incorporated in the public Arm ARM before the Qualcomm acquisition."  Tr. 452:17–21.  Notably, in an email exchange, Mr. Grisenthwaite explained to Mr. Williams that a potential non-disclosure agreement should not be

_____

[3] As discussed below, the Specifications also include register definitions associated with each new feature, which, to the extent they were added to the Nuvia RTL, were regenerated at Qualcomm before termination of the Nuvia ALA.  Tr. 547:1–13 (Chen); Tr. 665:4–666:4 (Annavaram).

"holding you up" because Nuvia could download from the internet the Arm ARM, which at the time included extensions through "8.4." Tr. 599:16–600:6; DTX-76 at 1, 3. Accordingly, both testimony and the language of Annex 1 demonstrate that the Arm ARM does not constitute ARM Technology.

At trial, the only example of a confidential extension discussed—the 2020 Architecture Extensions (PTX-165)—confirms the difference between those extensions and the Arm ARM. Dr. Colwell, Arm's technical expert, testified that the extensions contained "something new [Arm] want[ed] to add in the future" and would "merge . . . into the Arm ARM" if testing was satisfactory, Tr. 488:18–489:1, and the cover of the document refers to the extensions as "Architecture Specifications," PTX-165 at 1. Both of Arm's expert witnesses agreed that the 2020 Extensions— a 36-page document—were different from the 9,000-page Arm ARM. Tr. 501:17–502:8 (Colwell); Tr. 546:17–25 (Chen). Defendants' expert, Dr. Annavaram, had the same understanding of the 2020 Extensions document. Tr. 649:3–650:5, 674:14–24, 707:6–12.

Treating the Arm ARM as part of the "Specifications," and thus as "ARM Technology" under the Nuvia ALA, would also lead to a bizarre result. If the publicly available Arm ARM constituted ARM Technology, then the definition of "Confidential Information" would include facially non-confidential information, and Section 15.1 would require the destruction of derivatives of such non-confidential ARM Technology on the basis that it is ARM Confidential Information. JTX-1 § 1.8(i). It would be strange for a contract to define—and call for the destruction of—publicly available information and its derivatives as Confidential Information, particularly where the definition of Confidential Information refers to trade secrets; "information designed in writing by either party, by appropriate legend, as confidential"; and certain information that is "first disclosed orally" and "is identified as confidential at the time of disclosure." *Id.* § 1.8.

The Nuvia ALA's confidentiality provisions also exempt from all confidentiality obligations information that is in the public domain, or that the party already knows or received, provided that such information is not subject to other confidentiality obligations. *Id.* § 3.9(i)–(iii). It would thus make little sense to treat the Arm ARM as Confidential Information, and courts should "avoid an interpretation" of a contract "which would result in absurdity." *Ticor Title Ins. Co.* v. *Rancho Santa Fe Ass'n*, 177 Cal. App. 3d 726, 730 (1986).

Given that the Arm ARM is not ARM Technology, Arm is left with only a single example of confidential technology allegedly included in the Nuvia RTL. But no evidence showed that the Nuvia Technology was a derivative of that technology. The only confidential extensions that Arm admitted into evidence were the 2020 Architecture Extensions. PTX-165; Tr. 488:16–489:21, 502:12–17 (Colwell, discussing PDX-3.14–3.15). And the record lacks evidence that the Nuvia RTL was a derivative of those extensions. Under the appropriate definition of derivative discussed below, as well as under the broadest definition of derivative, Arm offered no evidence concerning the contents of the Specifications or how any were incorporated into or related to Nuvia Technology. Because the record lacks evidence that the Nuvia RTL implemented any of the confidential extensions, no jury could reasonably find that the RTL constituted a derivative of ARM Technology that would be subject to Section 15.1(a).

### b. *Arm's Derivative Claims Fail Due to Overbreadth.*

Arm's position at trial with respect to what constitutes a derivative not only ignored the contract's pertinent limitation of ARM Technology to the Specifications, but also made claims of astounding breadth, claiming a right of control over most CPUs worldwide. Dr. Colwell testified that any device that is Arm-compliant should be considered a derivative of the Arm ARM. Tr. 506:20–507:2, 511:15–21. As Dr. Colwell explained, some of the largest companies in the world, including Qualcomm, Amazon, Google, NVIDIA, Samsung, and Apple, ship chips with Arm-

based CPUs.  Tr. 509:19–510:3.  In total, there are over 250 billion Arm-based CPUs, used by 70% of the world's population, including in 99% of the world's smartphones.  Tr. 510:22–511:17 (Colwell); Tr. 930:14–931:1 (defendants' closing).  According to Arm, the designs for every one of those CPUs—including designs built from scratch by leading technology companies—are derivatives of the Arm ARM and subject to destruction if Arm terminates the relevant license.  Tr. 509:23–510:21, 512:15–24 (Colwell).  Dr. Colwell's definition of derivative even included designs for CPUs intended to be Arm-compliant that were not finished.  Tr. 509:2–5.  Those designs were "the blood, sweat and tears" of the designers, Tr. 444:19–24 (Williams), involving an extraordinary investment of time, money, and effort, yet Arm claims rights in them all.

Dr. Colwell based his definition of derivative on his reading of the contract.  He said the term "derivative," as a technical matter, "rang a bell," Tr. 482:14–19, and he testified that it "makes perfect sense" to him that a CPU was a derivative of the Arm ARM because it was designed by an engineer who read the Arm ARM.  Tr. 482:9–483:6; Tr. 911:19–912:16 (Arm closing presentation of PDX-6.91–6.92, containing that testimony).

Setting aside what Dr. Colwell said in his idiosyncratic reading of the contract, when setting forth examples of what constitutes a derivative of ARM Technology, the Nuvia ALA refers to any "translation," "modification," "abridgement," or "other form in which the ARM Technology has been recast, transformed or adapted."  JTX-1 § 1.8.  That language mirrors the Copyright Act, which defines the term "derivative work" to mean "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be *recast, transformed, or adapted*," including "a work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original

work of authorship." 17 U.S.C. § 101 (emphasis added). As the Third Circuit has explained, "by definition, derivative works are substantially similar to the original work, because a work is not derivative unless it has been substantially copied from a prior work." *Dam Things from Denmark* v. *Russ Berrie & Co.*, 290 F.3d 548, 565 (3d Cir. 2002) (internal quotation marks and alterations omitted). Showing that a defendant may have had access to or "referenced" the material alleged to be derivative, without a "quantum of substantial similarity" between the original and the "copied" work, is insufficient as a matter of law. *Universal Athletic Sales Co.* v. *Salkeld*, 511 F.2d 904, 907 (3d Cir. 1975). So too is showing the "mere interoperability" of new technology with a preexisting one. *Oracle Int'l Corp.* v. *Rimini St., Inc.*, 123 F.4th 986, 996 (9th Cir. 2024).

There is no record evidence that the functional code of Qualcomm products at the time of the termination of the Nuvia ALA was substantially similar to the Arm ARM or the 2020 Extensions. Neither Dr. Colwell nor Dr. Chen gave opinions for Arm on whether the code at the time of termination was substantially similar to ARM Technology. Tr. 520:18–24 (Dr. Colwell offered no opinion on what constituted ARM Technology versus Nuvia Technology); Tr. 542:13–19 (Dr. Chen testifying "I consider that all Nuvia Technology"). It was also undisputed that the Arm ARM does not provide the information necessary to build a CPU. DTX-486 at 12; Tr. 443:12–444:3 (Williams).

With respect to the extensions, Dr. Colwell identified language in the RTL purportedly copied from the 2020 Architecture Extensions, but that language appeared in a comment, not functional RTL. Tr. 488:16–489:21, 502:12–17 (discussing PDX-3.14–3.15). As Dr. Annavaram explained, comments merely reflect that the Nuvia engineers may have been considering implementing a feature, and there was no evidence that the feature discussed by Dr. Colwell was ever implemented in Nuvia RTL. Tr. 675:3–676:7. A "comment is just a comment, it's not code."

Tr. 693:18, 693:23–694:17 (Annavaram).  At best, Arm offered evidence that Nuvia engineers *referred to* the 2020 Architecture Extension, but the record does not show substantial similarity between the functional RTL and the extensions.

The absence of evidence to support Arm's claim was illustrated in closing argument when Arm argued that Nuvia's in-development Phoenix core was a derivative of the Arm ARM based on the testimony of Dr. Colwell.  Tr. 913:6–914:3 (discussing PDX-6.95).  In the cited testimony, Dr. Colwell restated his conclusion that a CPU "aiming at Arm compatibility" was an Arm derivative.  Tr. 491:9–22.  He added, as emphasized by Arm counsel in closing, that "We looked at the code, there is references to Arm all over it."  *Id.*  Dr. Colwell identified no Arm code or technology, only the "references" to Arm which he said were "congruent with the design is intended to be Arm compliant."  *Id.*  Nuvia Technology "referencing" Arm was not evidence of substantial similarity to any ARM Technology and was only evidence that the Nuvia RTL was intended to be Arm-compliant.  And the "We" to whom Dr. Colwell referred was Dr. Chen, but Dr. Chen then provided no opinions that there was any ARM Technology in Nuvia or Qualcomm products.  Tr. 542:13–19 (Chen).The definition of derivative applied by Arm and its expert at trial cannot, as a matter of law, sustain a verdict against Nuvia.  Contracts are not defined by what "rings a bell" when a technical expert reads a contract; the contract language governs.  Cal. Civ. Code §§ 1636, 1638.  And as explained, that language demonstrates that the parties adopted the concept of a derivative from the Copyright Act.  Arm's interpretation is not only inconsistent with the contract but also makes no sense:  it would mean that a licensee creating Arm-compliant products was agreeing that all of its unique and specialized RTL development would be subject to destruction, based on the use of the legal word "derivative," simply because it referenced a non-confidential document available on the internet.

16

### 3.      *The Nuvia RTL Is Not a Derivative of the Arm Architecture Reference Manual.*

Even if the Arm ARM did constitute ARM Technology, Mr. Williams explained that the only ARM Technology in the Nuvia Technology transferred to Qualcomm prior to termination of the Nuvia ALA were what are called opcodes (operation codes) and register definitions. Tr. 445:8–446:25. Consistent with that testimony, Arm's experts identified only two purported features from the Arm ARM incorporated into the Nuvia RTL: the opcodes and register definitions. Specifically, Dr. Colwell identified opcodes for the BTI and DGH instructions in Nuvia's RTL. Tr. 486:17–488:2 (discussing PDX-3.12–3.13); Tr. 666:18–667:9 (Annavaram, discussing same). And Dr. Chen identified "A64 instructions from the Arm ARM"—i.e., Arm opcodes—and "register definitions." Tr. 545:24–546:12. Arm's expert and Qualcomm's expert also agreed that the 2020 Specifications relate to register definitions. Tr. 546:20–547:13 (Chen); Tr. 665:6–666:4 (Annavaram). No Arm witness disputed that the only aspects of the Arm ARM present in the Nuvia RTL were opcodes and register definitions.

The presence of the Arm opcodes and register definitions in the Nuvia RTL does not make the RTL a derivative of the Arm ARM. The opcodes and register definitions comprised 1% or less of the RTL for Nuvia's pre-acquisition, in-development CPU design. Tr. 445:3–446:25 (Williams). Further, the Arm ARM "defines the behavior of an abstract machine," DTX-1587 at 33; the opcodes and register definitions merely provide an interface for software to use that abstract machine, Tr. 446:8–21 (Williams); Tr. 666:11–667:1 (Annavaram). As a result, the opcodes and register definitions were not a "material part" of the Arm ARM. *See Tanksley* v. *Daniels*, 902 F.3d 165, 172–73 (3d Cir. 2018) (unauthorized copying under the Copyright Act requires actual copying and material appropriation).

17

In addition, following Qualcomm's acquisition of Nuvia and during the year prior to termination of the Nuvia ALA, those opcodes and register definition files were deleted and replaced with new opcode and register definition files generated by Qualcomm engineers under Qualcomm's own ALA, a fact that no Arm witness disputed.  Tr. 445:19–446:1, 446:22–448:4 (Williams); Tr. 667:10–668:15, 669:21–674:13 (Annavaram, discussing DDX-3.12–3.17); DTX-401; DTX-401A.  Because all of the Arm opcodes and register definitions at issue at trial were regenerated at Qualcomm prior to termination of the Nuvia ALA, the Nuvia RTL did not incorporate any derivatives of the Arm ARM for purposes of *the Nuvia ALA*.  Any connection between the RTL files containing Arm opcodes and register definitions and the Nuvia ALA was thus eliminated.

### 4. *Only Architecture Compliant Cores that Were "Recast, Transformed or Adapted" from ARM Technology Are Derivatives Subject to Section 15.1(a).*

At trial, Arm argued that the Nuvia ALA's inclusion of the term "Architecture Compliant Core" as an example of a derivative of ARM Technology must mean that all microarchitecture implementing the Arm architecture must also be derivative of ARM Technology.  That argument lacks merit.

The term "Architecture Compliant Core" is defined in Annex 1 of the Nuvia ALA, and it does not include an in-development microarchitecture.  JTX-1 § 1.1.  Annex 1 lists 11 requirements that a microarchitecture must satisfy for it to constitute an "Architecture Compliant Core."  JTX-5 § 2, cl. A.5.  The undisputed evidence at trial showed that Nuvia's in-development RTL did not meet those 11 requirements.  Tr. 716:18–21 (Annavaram).  Nuvia thus did not have an Architecture Compliant Core for purposes of the Nuvia ALA.

Arm took the position at trial that, because "[t]here is microarchitecture in an architecture compliant core," the in-development Nuvia RTL must also constitute a derivative, regardless of

whether Nuvia had achieved an Architecture Compliant Core. Tr. 467:17–469:5 (Williams); *see* Tr. 710:18–712:2, 713:23–716:13 (Annavaram). But that is not what the contract says. Only Architecture Compliant Cores that were "recast, transformed or adapted" from ARM Technology are derivative of ARM Technology. JTX-1 § 1.8(i). By contrast, "Nuvia Architecture Compliant Cores" that were "recast, transformed or adapted" from Nuvia Technology are derivative of Nuvia Technology. *Id.* § 1.8(ii).

As Mr. Williams explained, the distinction between Arm Architecture Compliant Cores and Nuvia Architecture Compliant Cores existed because Nuvia discussed with Arm the possibility of modifying an off-the-shelf Arm Architecture Compliant Core rather than building a design from scratch. Tr. 433:11–434:3. Had Nuvia modified an Arm off-the-shelf core, it may have "recast, transformed or adapted" ARM Technology (in the form of the off-the-shelf core). Tr. 726:9–727:8 (Annavaram). But Nuvia built a custom core of its own rather than building from an Arm off-the-shelf core. Tr. 368:6–22, 390:8–19, 434:4–8 (Williams). Nuvia thus intended to build a *Nuvia* Architecture Compliant Core, which is protected as Nuvia's own Confidential Information. JTX-1 § 1.8(ii).

## VI.    CONCLUSION

Judgment as a matter of law should be granted to Nuvia on Count I of the Complaint (D.I. 1 ¶¶ 58–69) and on Count I(a) of the Answer and Second Amended Counterclaims (D.I. 300 ¶ 275(a)).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Anna P. Lipin
William T. Marks
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000


January 17, 2025

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 17, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                    *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiff*

Joyce Liou, Esquire                                        *VIA ELECTRONIC MAIL*
Daralyn J. Durie, Esquire
Shaelyn Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                                     *VIA ELECTRONIC MAIL*
Meet Yatin Mehta, Esquire
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                               *VIA ELECTRONIC MAIL*
Sarah E. Brickey, Esquire
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202-5638
*Attorneys for Plaintiff*

Daniel P. Muino, Esquire                                                VIA ELECTRONIC MAIL
Reebehl G. El-Hage, Esquire
David Nathaniel Tan, Esquire
Sydney K. Cooper, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Plaintiff*

Nicholas Rylan Fung, Esquire                                            VIA ELECTRONIC MAIL
Henry Huttinger, Esquire
Laura Gilbert Remus, Esquire
Zach B. Quinlan, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                                              VIA ELECTRONIC MAIL
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Plaintiff*

Michael J. DeStefano, Esquire                                          VIA ELECTRONIC MAIL
MORRISON & FOERSTER LLP
600 Brickell Avenue, Suite 1560
Miami, FL  33131
*Attorneys for Plaintiff*


                                        */s/ Jennifer Ying*
                                        _____
                                        Jennifer Ying (#5550)

# EXHIBIT 45

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ATM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 22-1146 (MN) |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC, | ) | |
| | ) | |
| Defendants. | ) | |

**FINAL JUDGMENT**

At Wilmington this 30th day of September 2025, the Court having held a jury trial (*see* D.I. 588, 589, 590, 591, 592), the jury having rendered a unanimous verdict on Questions 2 and 3 and reaching a deadlock on Question 1 on December 20, 2024 (*see* D.I. 572), and the Court having issued its Memorandum Opinions and Orders resolving the parties' post-trial motions September 30, 2025 (D.I. 631, 632), pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, IT IS HEREBY ORDERED that:

1.      Judgment is entered in favor of Defendants Nuvia Inc. ("Nuvia"), Qualcomm Inc., and Qualcomm Technologies, Inc. ("Qualcomm") (together, "Defendants") and against Plaintiff ARM Ltd. ("ARM or "Plaintiff"), that (1) Nuvia did not breach the Nuvia ALA, (2) Qualcomm did not breach the Nuvia ALA, and (3) Qualcomm was licensed under the Qualcomm ALA.

IT FURTHER ORDERED that the deadline for any party to move for costs and attorneys' fees (including under 35 U.S.C. § 285) is extended to within fourteen (14) days after the time for appeal has expired or within fourteen (14) days after issuance of the mandate from the appellate court, whichever is later, and no party shall file any such motion before that time.

The Honorable Maryellen Noreika
United States District Judge

# EXHIBIT 46

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARM LTD., a U.K. corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____ |
| QUALCOMM INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, and NUVIA, INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff Arm Ltd. ("Arm") complains and alleges as follows against Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively "Qualcomm"), and NuVia, Inc. ("Nuvia"):

## NATURE OF THE ACTION

1.      Arm is the world's leading provider of microprocessor intellectual property. For decades, Arm has developed innovative processor architecture and implementation designs that balance performance with energy efficiency.  Billions of electronic devices use Arm processor technologies pursuant to Arm licenses—from smartphones used to interact seamlessly with friends and family around the world to an increasing number of the servers that run the essential day-to-day operations of Fortune 500 companies.

2.      Qualcomm is a major semiconductor manufacturer.  To accelerate its processor development efforts, Qualcomm spent over $1 billion to acquire Nuvia, a start-up led by senior engineers previously from Apple and Google that licensed Arm technologies to develop high-performance processor cores for semiconductor chips.  In the process,

Qualcomm caused Nuvia to breach its Arm licenses, leading Arm to terminate those

licenses, in turn requiring Qualcomm and Nuvia to stop using and destroy any Arm-based

technology developed under the licenses.  Undeterred, Qualcomm and Nuvia have continued

working on Nuvia's implementation of Arm architecture in violation of Arm's rights as the

creator and licensor of its technology.  Further, Qualcomm's conduct indicates that it has

already and further intends to use Arm's trademarks to advertise and sell the resulting

products in the United States, even though those products are unlicensed.

3.      Arm now brings suit for specific performance of the Nuvia licenses'

termination provisions to require Qualcomm and Nuvia to stop using and to destroy the

relevant Nuvia technology and to stop their improper use of Arm's trademarks with their

related products.  Arm also seeks declaratory judgment, injunctive relief, and damages for

the use of Arm's trademarks in connection with semiconductor chips incorporating the

relevant Nuvia technology.

**PARTIES**

4.      Plaintiff Arm is a corporation organized under the laws of the United

Kingdom, has its principal place of business in Cambridge, United Kingdom, and is a

resident or domiciliary of the United Kingdom.

5.      Defendant Qualcomm Inc. is a Delaware corporation with its principal place

of business at 5775 Morehouse Drive, San Diego, California 92121.

6.      Defendant Qualcomm Technologies, Inc. is a subsidiary of Qualcomm Inc.

and a Delaware corporation with its principal place of business at 5775 Morehouse Drive,

San Diego, California 92121.

7.     Defendant Nuvia is a subsidiary of Qualcomm and a Delaware corporation with its principal place of business at 2841 Mission College Blvd., Santa Clara, California 95054.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (trademarks), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).  The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties, and because the amount in controversy, based on the consideration that was anticipated under the Nuvia licenses, the volume of products expected under those licenses, and Defendants' potential loss from complying with the equitable relief requested here, exceeds $75,000, exclusive of interest and costs.

9.     The Court has personal jurisdiction over Qualcomm and Nuvia because they are incorporated in Delaware.  Qualcomm and Nuvia have purposely availed themselves of the privileges and benefits of the laws of Delaware.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Qualcomm and Nuvia are incorporated in Delaware.  Venue is also proper because Qualcomm Inc. and Qualcomm Technologies, Inc. have purposefully availed themselves of the courts in the State of Delaware and this Judicial District.

## FACTUAL ALLEGATIONS

### Arm's business model

11.     For decades, Arm has been a world leader in developing processor architectures, including instruction set architectures, and processor core designs

implementing those architectures, all of which are covered by an extensive intellectual property portfolio.

12.     Processor cores are the parts of a computer's Central Processing Unit or "CPU" that read and execute program instructions to perform specific actions.  Modern CPUs often integrate multiple processor cores on a single semiconductor chip or integrated circuit ("IC").

13.     Arm owns intellectual property relating to its processor architectures and designs, including, among other things, trademarks.

14.     Arm does not manufacture or sell chips.  Instead, Arm licenses its technologies to hundreds of companies to use in developing their own chips or in their own electronic devices and works with these companies to ensure the success of Arm-based products.

15.     Arm's customers manufacture (or have manufactured for them) chips based on Arm's technologies.  The chips may then be used in the customer's own devices or sold to other device manufacturers.  Arm earns revenue from licensing fees and royalties based on the number of Arm-based chips its customers sell.

16.     Arm's business model relies on Arm's ability to monetize its research and intellectual property by receiving both licensing fees and royalties for products incorporating Arm's technology and intellectual property.  Arm therefore grows its revenues by increasing both the number of customers and the number of Arm-based products sold.

17.     There are two main types of Arm licenses for Arm's technologies: Technology License Agreements ("TLAs"), which allow the use of specific "off-the-shelf" Arm processor core designs with only minor modifications, and Architecture License

Agreements ("ALAs"), which allow for the design of custom processor cores that are based on particular architectures provided by Arm.

18.     Arm grants few ALAs.  Custom processor cores can take years to design, at great expense and requiring significant support from Arm, with no certainty of success.  If successful, ALA licensees can sell custom processor cores for use in other companies' products.

19.     Arm ALAs typically authorize licensees only to develop processor cores based on specific Arm technology provided by Arm under the licenses, rather than granting broader licenses to use Arm-based technology generally.

***Nuvia obtains Arm licenses***

20.     Nuvia was founded as a start-up in 2019 by chip engineers who left Apple and Google.  Nuvia planned to design energy-efficient CPUs for data center servers based on a custom processor implementing the Arm architecture, which would have expanded the market for Arm's technology.  Nuvia's business model was thus reliant on customizing processor core designs based on Arm's technology.  As one of the founders explained to the press when launching Nuvia, the start-up's premise (and one of its attractions to investors) was that Nuvia intended to build "a custom clean sheet designed from the ground up" using Arm's architecture.[1]

21.     In September 2019, Arm granted Nuvia an ALA and TLA, providing rights to design custom processor cores based on an Arm architecture and to modify certain off-the-

---

[1] Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TechCrunch (Nov. 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/.

shelf designs.  The licenses granted in the ALA and TLA are necessary to use Arm's extensive intellectual property portfolio covering the Arm architecture.  The ALA and TLA included rights to use Arm trademarks in connection with products developed by Nuvia under the licenses.  Arm also provided substantial, crucial, and individualized support from Arm employees to assist Nuvia in its development of Arm-based processors for data center servers.

22.     The licenses provided Nuvia access to specific Arm architecture, designs, intellectual property, and support in exchange for payment of licensing fees and royalties on future server products that include processor cores based on Arm's architecture, designs, or related intellectual property.  Nuvia's licensing fees and royalty rates reflected the anticipated scope and nature of Nuvia's use of the Arm architecture.  The licenses safeguarded Arm's rights and expectations by prohibiting assignment without Arm's consent, regardless of whether a contemplated assignee had its own Arm licenses.

23.     From September 2019 to early 2021, Nuvia used the technology it licensed from Arm to design and develop processor cores.  Arm provided preferential support for Nuvia's development efforts, with Arm seeking to accelerate research and development in next-generation processors for data center servers to support that sector's transition to Arm technology.

24.     In August 2020, Nuvia announced that its "first-generation CPU, code-named 'Phoenix'" would be "a custom core based on the ARM architecture."[2]  It also publicized benchmark tests showing that Phoenix could double the performance of rival products from

---

[2] John Bruno & Sriram Dixit, *Performance Delivered a New Way*, Silicon Reimagined (Aug. 11, 2020), https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5.

Apple, Intel, AMD, and Qualcomm. Based on these results, Nuvia claimed that the "Phoenix CPU core has the potential to reset the bar for the market."[3]

**Qualcomm relies on designs created by Arm**

25. Qualcomm is one of the world's largest semiconductor companies, with a portfolio of intellectual property and products directed to wireless technologies, including cellular, Bluetooth, and Wi-Fi; CPUs and ICs; networking; mobile computers; cell phones; wearables; cameras; automobiles; and other electronic devices.

26. Even though Qualcomm has an Arm ALA, its prior attempts to design custom processors have failed. Qualcomm invested in the development of a custom Arm-based processor for data center servers until 2018, when it cancelled the project and laid off hundreds of employees.[4]

27. Qualcomm's commercial products thus have relied on processor designs prepared by Arm's engineers and licensed to Qualcomm under Arm TLAs. Discovery is likely to show that as of early 2021, Qualcomm had no custom processors in its development pipeline for the foreseeable future. To fill this gap, Qualcomm sought improperly to purchase and use Nuvia's custom designs without obtaining Arm's consent.

**Qualcomm acquires Nuvia**

28. On January 13, 2021, Qualcomm announced that Qualcomm Technologies, Inc. was acquiring Nuvia for $1.4 billion. Neither Qualcomm nor Nuvia provided prior

---

[3] *Id.*

[4] *See, e.g.*, Andrei Frumusanu, *Qualcomm to Acquire NUVIA: A CPU Magnitude Shift*, AnandTech (Jan. 13, 2021), https://www.anandtech.com/show/16416/qualcomm-to-acquire-nuvia-a-cpu-magnitude-shift; Andy Patrizio, *Qualcomm makes it official; no more data center chip*, Network World (Dec. 12, 2018), https://www.networkworld.com/article/3327214/qualcomm-makes-it-official-no-more-data-center-chip.html.

notice of this transaction to Arm. Nor did they obtain Arm's consent to the transfer or assignment of the Nuvia licenses.

29. Qualcomm indicated in its announcement that "NUVIA CPUs"—that is, Nuvia's implementations of Arm technology developed under the Nuvia licenses with Arm—would be incorporated into a range of Qualcomm products. Qualcomm's press release declared its grand ambitions for Nuvia's implementation of Arm technology: "NUVIA CPUs are expected to be integrated across Qualcomm Technologies' broad portfolio of products, powering flagship smartphones, next-generation laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality and infrastructure networking solutions."[5] The press release also indicated that Qualcomm's first target would be "integrating NUVIA CPUs with Snapdragon," its flagship suite of system on a chip ("SoC") semiconductor products for mobile devices.

30. As Qualcomm's CEO, Cristiano Amon, noted in a Reuters interview shortly after the acquisition closed in the first half of 2021, "Qualcomm will start selling Nuvia-based laptop chips next year."[6] Amon confirmed the negative impact this might have on Arm, saying: "If Arm . . . eventually develops a CPU that's better than what we can build ourselves, then we always have the option to license from Arm."

31. Qualcomm also confirmed its prior deficiencies in core design, reportedly promoting the Nuvia acquisition as "filling a gap" because "for several years now" the

[5] *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 13, 2021), https://www.qualcomm.com/news/releases/2021/01/13/qualcomm-acquire-nuvia.

[6] Stephen Nellis, *Qualcomm's new CEO eyes dominance in the laptop markets*, Reuters (July 2, 2021), https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/.

company "had been relying on external IP such as Arm's Cortex cores."[7]  Qualcomm further

explained that "the immediate goals for the NUVIA team will be implementing custom CPU

cores" designed for laptops.[8]

32.    Analysts confirmed that the "Qualcomm acquisition [of] NUVIA is a huge

move to scale up dramatically.  It can reinvigorate current lines in smartphone, Windows PC

and automotive SoCs, and make them more competitive with the competition.  They have

been lagging."[9]

33.    Providing further confirmation of the acquisition's importance to Qualcomm

in filling the "gap" in its "lagging" IP design, analysts noted that the Nuvia acquisition was

"extremely speedy in terms of timeline," and Qualcomm "went as far as [to] put out a

concrete roadmap for . . . using the newly acquired IP from Nuvia," announcing that

Nuvia's processors would be finalized for use in high-end laptops "in the second half of

2022."[10]

---

[7] Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia.

[8] *Id.*

[9] Trading Places Research, *Qualcomm's Acquisition of NUVIA is a Huge Move*, Seeking Alpha (Jan. 13, 2021), https://seekingalpha.com/article/4398808-qualcomms-acquisition-of-nuvia-is-huge-move.

[10] Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia (quoting *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 15, 2021), https://www.qualcomm.com/news/releases/2021/03/16/qualcomm-completes-acquisition-nuvia).

34.     Based on standard industry scheduling, that timeline indicated a design for data center processors would be completed "essentially as soon as possible following the acquisition" of Nuvia.[11]

35.     This timing indicates that the Arm-based cores that Nuvia designed using Arm's technology and intellectual property were, as of the acquisition date, effectively ready for the final stages of design for Qualcomm chips, leading promptly to product integration and manufacturing.  Qualcomm's November 2021 10-K filing disclosed that the $1.4 billion acquisition encompassed Nuvia's team and "certain in-process technologies," reflecting the availability of existing cores such as the Phoenix CPU core developed under Nuvia's ALA.[12]

36.     By entering into the acquisition of Nuvia and transferring the rights and technology developed under the Nuvia licenses without Arm's consent, Qualcomm thus greatly accelerated its ability to bring to market custom-designed processor cores—a head start that Qualcomm was willing to pay over $1 billion to obtain.

***Arm terminates the Nuvia licenses***

37.     Soon after the announcement of the merger, Arm informed Qualcomm in writing that Nuvia could not assign its licenses and that Qualcomm could not use Nuvia's in-process designs developed under the Nuvia ALA without Arm's consent.  For more than a year, Arm negotiated with Qualcomm, through Qualcomm Inc. and Qualcomm

---

[11] *Id.*

[12] Qualcomm Inc., Annual Report (Form 10-K) (Nov. 3, 2021), https://investor.qualcomm.com/financial-information/sec-filings/content/0001728949-21-000076/0001728949-21-000076.pdf.

Technologies, Inc., in an effort to reach an agreement regarding Qualcomm's unauthorized acquisition of Nuvia's "in-process technologies" and license.

38.     All the while, Qualcomm continued to broadcast its intentions to rush Nuvia products to market.  In November 2021, Qualcomm's Chief Technology Officer told investors that Qualcomm was "pretty far along at this point" in developing its first chip with Nuvia's implementation of Arm technology and would "sample a product at, let's say nine months from now"—which would be August 2022.[13]  Then in January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO confirming that "[t]he future of the PC industry is modern Arm-based architectures" and boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[14]  Elsewhere, Qualcomm's CEO reiterated that Qualcomm is "definitely in a hurry" to launch Nuvia's Arm-based chips "as fast as we can."[15]  Based on these statements, discovery is likely to show that Qualcomm and Nuvia continued to use the relevant technology developed under Nuvia's Arm licenses.

---

[13] *Qualcomm Investor Day 2021 Livestream: CEO Cristiano Amon looks ahead*, YouTube (Nov. 16, 2021), https://www.youtube.com/watch?v=rUWPzROYn2E; *see also* Mark Hachman, *Qualcomm Prophesizes 2023 as the Rebirth of PC Snapdragon Chips*, PCWorld (Nov. 16, 2021), https://www.pcworld.com/article/552285/qualcomm-prophesies-2023-as-the-rebirth-of-its-snapdragon-chips.html.

[14] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

[15]  Nilay Patel, *What Comes After the Smartphone, With Qualcomm CEO Cristiano Amon*, The Verge (Jan. 11, 2022), https://www.theverge.com/22876511/qualcomm-ceo-cristiano-amon-interview-decoder-podcast.

39.     On February 1, 2022, Arm sent a letter to Nuvia and Qualcomm terminating the Nuvia licenses effective March 1, 2022.  The letter terminated the licenses based on Nuvia's material breach of the assignment provisions of the Nuvia licenses by entering into the acquisition of Nuvia without Arm's consent.  The letter also reminded Nuvia and Qualcomm of their obligations upon termination to stop using and destroy the Nuvia technology developed under the now-terminated licenses.

40.     In February 2022, pending termination of the Nuvia licenses, Nuvia sought Arm's verification that a Nuvia processor design satisfied the Arm architecture's specifications.  On February 23, 2022, Qualcomm confirmed that it was still developing the relevant Nuvia technology by stating in a court filing that certain Nuvia documents were based on "years of research and work" and would "reveal secret design components of Qualcomm chips that are still in development."  *Qualcomm Technologies, Inc. v. Hoang*, No. 3:22-cv-00248-CAB-BLM (S.D. Cal. Feb. 23, 2022), ECF No. 1 at 5-6.

41.     On March 1, 2022, the Nuvia licenses terminated, along with the corresponding rights to use or sell products based on or incorporating Nuvia technology developed under those licenses.

42.     On April 1, 2022, Qualcomm's General Counsel sent Arm a letter enclosing a Nuvia representative's termination certification.  The certification acknowledged—without objection—that the Nuvia licenses had been terminated.  The certification recognized the obligations upon termination, and asserted that Nuvia was in compliance.  Qualcomm and Nuvia thereby conceded that termination of the Nuvia licenses was appropriate, and that the termination provisions had been triggered, are binding, and are enforceable.

*Qualcomm keeps using Arm-based technology developed under the Nuvia licenses*

43.     Qualcomm is subject to Nuvia's termination requirements as the acquirer of Nuvia.  Qualcomm has publicly described Nuvia as a Qualcomm "team" that has been "very tight[ly] integrat[ed]" with and is "not separate" from Qualcomm.[16]  Qualcomm has also acted on behalf of Nuvia publicly and in correspondence with Arm since the acquisition. Qualcomm further told Arm that it planned to "redeploy NUVIA employees" and "transfer NUVIA's work" to Qualcomm and, consistent with that plan, Qualcomm has on-boarded Nuvia's leadership and employees as Qualcomm employees.[17]

44.     On April 29, 2022, Arm wrote Qualcomm clarifying that neither Nuvia nor Qualcomm was authorized to continue working on technology that was developed under the Nuvia licenses.

45.     Two weeks later, on May 13, 2022, Qualcomm sought Arm's verification that a new Qualcomm processor core complied with Arm architecture so that it could be verified and incorporated into a product.  Qualcomm did not explain whether this processor core design was based on Nuvia's designs under the terminated licenses.

46.     Based on the timing and circumstances surrounding Qualcomm's request, discovery is likely to show that Qualcomm's processor core design is based on or

---

[16] Ian Cutress, *Interview with Alex Katouzian, Qualcomm SVP: Talking Snapdragon, Microsoft, Nuvia, and Discrete Graphics*, AnandTech (Jan. 31, 2022), https://www.anandtech.com/show/17233/interview-with-alex-katouzian-qualcomm-svp-talking-snapdragon-microsoft-nuvia-and-discrete-graphics; Ian Cutress, *AnandTech Interview with Miguel Nunes: VP for Windows and Chrome PCs, Qualcomm*, AnandTech (Feb. 14, 2022), https://www.anandtech.com/show/17253/anandtech-interview-with-miguel-nunes-senior-director-for-pcs-qualcomm.

[17] *See, e.g.*, *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 16, 2021), https://investor.qualcomm.com/news-events/press-releases/detail/1304/qualcomm-completes-acquisition-of-nuvia; *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

incorporates in whole or in part the processor core design developed under the prior Nuvia licenses.

47. Qualcomm's Arm licenses do not cover products based on or incorporating Arm-based technologies developed by third parties under different Arm licenses, such as the now-terminated Nuvia licenses.

48. Despite Arm's termination of the Nuvia licenses, Qualcomm has continued to tell the public that its Nuvia chips will soon be joining the industry-wide "ecosystem transition to Arm."[18] Like Qualcomm's prior statements, this announcement was directed to readers throughout the United States, including to readers physically located in the State of Delaware and this Judicial District.

49. In June 2022, Qualcomm's CEO reiterated that it would soon begin "sampling" Nuvia chips to companies, allowing them to design electronic devices incorporating the chips in the "next year."[19] Based on that timeline, he explained, "[i]n late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon with a Nuvia-designed CPU."[20]

---

[18] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

[19] *Id.*; *see also* Mark Tyson, *Qualcomm CEO Admits Nuvia Chip OEM Sampling is Delayed (Update)*, Tom's Hardware (June 10, 2022), https://www.tomshardware.com/news/qualcomm-nuvia-chip-sampling-delays (Qualcomm spokesperson clarifying: "We are on track to sample the first products with our next generation CPUs this year.").

[20] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

50.     In the microprocessor industry, "sampling" means providing pre-production processors to original equipment manufacturers ("OEMs"), original device manufacturers ("ODMs"), or independent software vendors ("ISVs") for use in the product design cycle before product launch.

51.     Based on Qualcomm's statements that Nuvia processors took "years" to develop and "are still in development," and Qualcomm's consistent statements that it is developing Nuvia's Arm chips, discovery is likely to show that the chips that Qualcomm intends to sample in the coming months will contain Nuvia technology that Qualcomm cannot use and instead must destroy.

52.     Further, based on Qualcomm's public announcements of its plans to use Nuvia technology, discovery is likely to show that Qualcomm has continued to retain and use Nuvia technology developed pursuant to the Nuvia licenses, thereby materially breaching the termination provisions of those licenses.

53.     News reports indicate that Qualcomm is also developing Nuvia processors for data center servers, and "already has working silicon to at least demonstrate to potential customers,"[21] which discovery is likely to show is based on or incorporates Nuvia technology developed under the now-terminated Nuvia ALA.

54.     The failure of Nuvia and Qualcomm to comply with the post-termination obligations under the Nuvia ALA is causing, and will continue to cause, irreparable harm to Arm.  Qualcomm effectively seeks to circumvent Arm's licensing model, which allocates

---

[21] Dan Robinson, *Qualcomm readying new Arm server chip based on Nuvia acquisition*, The Register (Aug. 19, 2022), https://www.theregister.com/2022/08/19/qualcomm_arm_server_chip/ (citing Ian King, *Qualcomm Is Plotting a Return to Server Market With New Chip*, Bloomberg (Aug. 18, 2022), https://www.bloomberg.com/news/articles/2022-08-18/qualcomm-is-plotting-a-return-to-server-market-with-new-chip).

use of the technology developed pursuant to a particular Arm license to a particular

licensee.

    55.    These breaches thus interfere with Arm's ability and right to control the use

of its technology, negatively affecting Arm's relationships with existing and prospective

licensees.

    56.    The prospective monetary damages from Qualcomm's circumvention and

interference with Arm's control over its technology are not readily ascertainable or

calculable, given the resulting future impact on Arm's relationships with existing and

prospective customers.

    57.    Qualcomm's improper acquisition of the relevant Nuvia technology in

violation of Arm's standard provisions threatens to harm Arm's position in the ecosystem of

Arm-based devices, harm Arm's reputation as an intellectual property owner and technology

developer whose licenses must be respected, and embolden other companies to likewise

harm Arm's reasonable business expectations in issuing its licenses.

<u>**COUNT I: BREACH OF CONTRACT – SPECIFIC PERFORMANCE**</u>
<u>**(ALL DEFENDANTS)**</u>

    58.    Arm hereby restates and re-alleges the allegations set forth above and

incorporates them by reference.

    59.    The termination obligations of the ALA between Nuvia and Arm survive

termination and remain valid and enforceable contract provisions, as Qualcomm's

correspondence and Nuvia's termination certification confirm.

    60.    Arm complied with and fulfilled all relevant duties, conditions, covenants,

and obligations under the Nuvia ALA, including ceasing use of Nuvia confidential

information in its possession.

61.     The Nuvia ALA terms were just and reasonable, involving adequate consideration and reasonable obligations for Nuvia in the event of Arm's termination based on Nuvia's material breach.  Those obligations served to restore the license holder to its position *ex ante*, protect Arm's business model and reasonable business expectations in issuing its licenses, and prevent the unjust enrichment of Qualcomm, the party that induced Nuvia's breach.

62.     Upon termination, the Nuvia ALA requires Nuvia to cease using and destroy any technology developed under the Nuvia ALA, as well as cease using Arm's trademarks in connection with any technology developed under the Nuvia ALA.

63.     Qualcomm shares Nuvia's obligations under the Nuvia ALA in its capacity as Nuvia's acquirer, and thus Qualcomm is likewise subject to the requirements of the Nuvia licenses' termination provisions.

64.     Based on Defendants' correspondence with Arm, public statements, and processor verification requests, discovery is likely to show that Defendants are still using and developing Nuvia technology developed under the now-terminated licenses, along with Arm trademarks, and intend to continue to do so.

65.     Defendants therefore have breached and are breaching the Nuvia ALA's termination provisions.

66.     As a direct and proximate result of Nuvia and Qualcomm's past and ongoing breaches, Arm has been irreparably injured and damaged in amounts not capable of determination, including, but not limited to, injury to Arm's global licensing program and misuse of Arm's technology.

67. Unless Defendants' breaches of the Nuvia ALA's termination provisions are enjoined and specific performance is granted, Arm will continue to suffer irreparable harm. As such, Arm has the right to enforcement of Nuvia and Qualcomm's compliance with the ALA's termination provisions, including via injunctive relief, specific performance, or any other measures necessary to avoid irreparable harm to Arm or to mitigate damages that have been caused by, and will continue to be caused by, Defendants' breach.

68. Arm is entitled to specific performance requiring Defendants to comply with the Nuvia ALA's termination provisions, including ceasing all use of and destroying any technology developed under the Nuvia ALA, and ceasing all use of Arm trademarks in connection with any technology developed under the Nuvia ALA—including the relevant Nuvia technology.

69. Arm is also entitled to monetary compensation incidental to specific performance of the Nuvia ALA's termination provisions to compensate Arm for the delay in Defendants' performance of their contractual obligations.

## COUNT II: DECLARATORY JUDGMENT AND TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114 (ALL DEFENDANTS)

70. Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

71. Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower case letters (collectively, the "ARM Marks"), true and correct copies of which are attached as **Exhibits A and B**. These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with

particular microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services.  The applications to register the marks were filed on July 31, 2017 and were issued on March 5, 2019.  The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

72.     The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.

73.     Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

74.     Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

75.     Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

76.     Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to infringe Arm's trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.  Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die

packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® Kryo™ 485 CPU built on ARM Cortex Technology."[22] In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[23] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

77.     Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection,

---

[22] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

[23] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting trademark infringement in violation of 15 U.S.C. § 1114. Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

78. An actual and justiciable controversy exists between Defendants and Arm regarding infringement of Arm's trademarks. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

79. Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will infringe Arm's trademarks, directly and indirectly.

80.     Defendants' acts of infringement have injured Arm in an amount as yet unknown.  Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

81.     Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

82.     Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' trademark infringement.  Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing infringement, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology.  Unless enjoined, Defendants will continue their infringing conduct.

### COUNT III: DECLARATORY JUDGMENT AND FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125 (ALL DEFENDANTS)

83.     Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

84.     The acts of Qualcomm and Nuvia described above constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85. Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

86. Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

87. Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

88. Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to falsely designate the origin of their products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® Kryo™ 485 CPU built on ARM Cortex Technology."[24] In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent

---

[24] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[25]  This press release remains online.  Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

89.     Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).  Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm.  Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the

---

[25] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

90.     An actual and justiciable controversy exists regarding Defendants' false designation of origin.  Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

91.     Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will falsely designate the origin of their products, directly and indirectly.

92.     Defendants' acts of false designation of origin have injured Arm in an amount as yet unknown.  Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

93.     Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

94.     Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' false designation of origin.  Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing false designation of

origin, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for

destruction, or to show proof of said destruction or sufficient modification to eliminate the

falsely designated matter, all semiconductor chips, die encapsulation (die packages), end

user product packaging, advertising and promotional materials, technical documentation,

websites, and other matter in Defendants' possession, custody, or control that bears or

displays the ARM Marks in any manner in connection with the relevant Nuvia technology.

Unless enjoined, Defendants will continue their wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Arm Ltd. requests that the Court grant the following relief:

a.      A judgment in Arm's favor on all claims against Defendants;

b.      An order requiring specific performance by Defendants of the Nuvia licenses'

termination provisions;

c.      An award of damages incidental to specific performance as a result of

Defendants' breach of contract, in amounts to be proven at trial, including all pre-judgment

and post-judgment interest at the maximum rate permitted by law;

d.      A judgment and a declaration that advertising, distributing, offering for sale,

or selling semiconductor chips with the relevant Nuvia technology and the ARM Marks

infringes Arm's trademarks, directly and indirectly;

e.      An order and judgment permanently enjoining Defendants and their officers,

directors, agents, servants, employees, and all others acting in privity or in concert with

them, and their parents, subsidiaries, divisions, successors, and assigns from (1) using in

any manner in connection with the relevant Nuvia technology the ARM Marks, or any mark

or logo that is confusingly similar to or a colorable imitation of the ARM Marks owned by

Arm; (2) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology; or (3) assisting, aiding, or abetting any other person or business entity in performing any of the aforementioned activities;

f.      An order and judgment directing Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Arm within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and ceased all offering of products with the relevant Nuvia technology under the ARM Marks, as set forth above;

g.      An order and judgment directing Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays in any manner in connection with the relevant Nuvia technology the ARM Marks or any other mark that is confusingly similar to or a colorable imitation of the ARM Marks;

h.      A judgment in the aggregate amount of (1) Defendants' profits, (2) Arm's actual damages, (3) the costs of this action pursuant to 15 U.S.C. § 1117, and (4) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may

have been obtained by Defendants in connection with their semiconductor chips using the relevant Nuvia technology and the ARM Marks, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

      i.      A judgment trebling any damages to the extent permitted by law, including under 15 U.S.C. § 1117;

      j.      Exemplary or punitive damages to the extent permitted by law;

      k.      Costs, expenses, and reasonable attorney fees under all applicable rules, statutes, and rules in common law that would be appropriate, with pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

      l.      Equitable relief addressing any infringement occurring after entry of judgment; and

      m.      Such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Arm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

Dated: August 31, 2022

OF COUNSEL:

Michael A. Jacobs
Joyce Liou
Diek Van Nort
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
mjacobs@mofo.com
jliou@mofo.com
dvannort@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(415) 268-7000
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP

_Anne Shea Gaza_

_____
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# EXHIBIT 47

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    C.A. No. 24-490-MN
     ----------------------------------------x
4    QUALCOMM INCORPORATED, a Delaware
     corporation, QUALCOMM TECHNOLOGIES, INC.,
5    a Delaware corporation,
6                        Plaintiffs,
7          - against -
8    ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.
     corporation
9
                         Defendant.
10   ----------------------------------------x
11                   October 3, 2025
                     9:02 a.m.
12
13
14           *HIGHLY CONFIDENTIAL*
15
16       VIDEOTAPED DEPOSITION of THOMAS
17   BRITVEN, held at the offices of PAUL WEISS
18   RIFKIND WHARTON & GARRISON, LLP, located at
19   1285 Avenue of the Americas, New York, New
20   York 10019, before Anthony Giarro, a
21   Registered Professional Reporter, a Certified
22   Realtime Reporter and a Notary Public of the
23   State of New York.
24
25



Page 102

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2    contained in these notes here.
3    Q    Tell me where.
4    A    I'm looking.  Well, I'm
5    having a hard time finding it in all
6    these words and phrases.  But I know from
7    memory, they told us at least at some
8    level, some of the columns that appeared
9    on this ▮▮▮▮▮ and I think that's
10   actually in my report.  If someone has an
11   electronic version, they could probably
12   search for it.
13   Q    So what did they tell you
14   about the content of the ▮▮▮▮▮
15   A

Page 103

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Page 104

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Page 105

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL



Page 106

1   THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Page 108

1   THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

4   Q   Well, the first sentence
5   says, "

11   You see that?
12   A   Yes.
13   Q   There's no footnote there to
14   that.  So I'm trying to understand the
15   source for that statement,
17   MR. EVANGELATOS:  Objection
18   to form.
19   A   Well, you see the Footnote
20   174 at the beginning there, an
21   as follows.  It's referencing the first
22   supplemental objections in response to
23   Qual's interrogatories, as well as the
24   deposition there and another deposition.
25   So this section of the

Page 107

1   THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2

Page 109

1   THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2   report takes into account, interrogatory
3   responses, deposition testimony, the
4   interviews collectively, as well as the
5   underlying documents.
6   Q   Footnote 174 does not cite
7   your interview with ARM, does it?
8   A   It does not.
9   Q   Is that an error?
10   MR. EVANGELATOS:  Objection,
11   form.
12   A   I don't think so.  I don't
13   think citing needs to be that precise.  I
14   told you what we did here.  The
15   interviews are part of this list.
16   Q   So when you say that
during
23   your interview with the three ARM
24   individuals?
25   MR. EVANGELATOS:  Objection,

Page 166

1   THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
17  Q    You just talked about a
18  licensing background and experience that
19  forms your opinion.
20      What about economics?
21  A    Economics are an underlying
22  part of that.  So in comparing licensing
23  rights and the scope of the rights and
24  the term of the rights, you're also
25  looking at an economic perspective, oh,

Page 167

1   THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2   how do I capture the value of this IP in
3   this circumstance?  And is it appropriate
4   to have the same value in this
5   circumstance or is it different?
6       So there are a lot of
7   economics involved.  And in terms of my
8   work I go to from an economic
9   perspective, I'm looking at income
10  approach, I'm looking at cost approach,
11  which brings in my background as a CPA,
12  and I'm looking at the market approach.
13  And I'm looking at market economics, what
14  do they have to do with ARM's length?
15  I'm capturing that information to perform
16  analyses.  And I'm following these steps,
17  if you will, to get to that conclusion.
18  Q    I note if you go to the
19  fourth bullet on paragraph 17, you refer
20  to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮.  Do you see that?
22  A    Yes.
23  Q    You don't refer to ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ in the first bullet, do you?
25  A    I missed the last part.

Page 168

1   THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2   Q    You don't refer to a
3   ▮▮▮▮▮▮▮▮▮▮▮ in the first bullet,
4   do you?
5   A    Well, actually, I do. ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
7   Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
11      Would you agree that's your
12  opinion?
13  A    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮
19      MR. EVANGELATOS:  Objection,
20  form.
21  A    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 169

1   THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
23  Q    Why don't you go to
24  paragraph 78.
25  A    Yes, ma'am.



43 (Pages 166 - 169)



Page 170

1  THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2  Q     If you go to the second
3  bullet, paragraph 78, page 35.
4      MR. EVANGELATOS:  First full
5  paragraph on 35.
6  A     Yes, ma'am.
7  Q     The second bullet on the top
8  of page 35, you say, "▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
13     Do you see that?
14 A     Yes.
15 Q     ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20     MR. EVANGELATOS:  Objection
21 to form.
22 A     Sitting here today, I'm not
23 sure.  Maybe they did both.
24 Q     So you don't know if ARM
25 analyzed ▮▮▮▮ separately from ▮▮▮?

Page 171

1  THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2      MR. EVANGELATOS:  Objection,
3  form.
4  A     Sitting here today, I don't
5  remember either way.  And they could have
6  done it both ways.  I'm just not sure.
7  Q     And you don't know if ARM
8  analyzed ▮▮▮▮ separately from
▮▮▮?
10     MR. EVANGELATOS:  Objection,
11 form.
12 A     If I knew, I don't remember.
13 Q     And do you remember if you
14 asked that question of anyone at ARM?
15 A     I don't remember asking that
16 question.  I don't remember asking that
17 question.  Until recently, I didn't think
18 that the ▮▮▮▮▮▮▮▮▮ was even at
19 issue.
20 Q     What do you mean by that?
21 A     Until Kennedy's more recent
22 report came out, I thought the parties
23 pretty much agreed that ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮Then I see that
25 Kennedy appears to be taking issue with

Page 172

1  THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2  that.  But I'm not certain if he's really
3  fully in on that or just saying some
4  things.
5  Q     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮
9  A     Whenever my report -- I
10 don't remember there being tension or
11 some contest relative to whether or not
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮.  I
13 don't remember that being part of
14 Kennedy's initial report.
15     And in the reply report, he
16 brings up this notion that, oh, now maybe
17 they should be looking at things
18 individually.  That appeared to be new to
19 me.
20 Q     I want to go back to
21 paragraph 17 of your report which is on
22 page 11.
23 A     Yes.
24 Q     Go to the top.
25     You say, "Based on the above

Page 173

1  THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2  and evidence available as of the date of
3  this report, my opinions with respect to
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are as follows."
6      And then the second bullet
7  is, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12     Do you see that?
13 A     Yes.
14 Q     So that's an opinion that
15 you're offering; right?
16 A     Yes.
17 Q     And you're highlighting that
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20     MR. EVANGELATOS:  Objection,
21 form.
22 A     I didn't understand the
23 first part of your question.
24 Q     Sure.
25     So you are offering an

44 (Pages 170 - 173)



Page 194

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2    performed.  On its face, the
4    Q    So I want to direct your
5    attention to paragraph 121.
16
25    Q    And did anyone at ARM share

Page 195

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
9    Q
25    Q    And did anyone at ARM share

Page 196

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2
4        MR. EVANGELATOS:  Objection,
5    form.
6    A    Did they share that with me?
7    Q
10        MR. EVANGELATOS:  Objection,
11    form.
12    A    I'd have to go back and
13    confirm.
.  That
16    was influential.
17    Q
22        MR. EVANGELATOS:  Objection
23    to form, mischaracterizing.
24    A    I don't have a clear
25    recollection.

Page 197

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2                                          .
3    How did they make that conclusion?  Well,
4    they did that based upon an analysis of
5    rates.  And that would include an
6    analysis of        rates.
7        And the question is whether
8    or not someone told me in that interview,
9
.  So I'm not
11    sure how to tease that out.  I don't know
12    how to give you any more.
13    Q    So you don't know for sure
14    if
17        MR. EVANGELATOS:  Same
18    objections.
19    A    Yeah.  I don't have a clear
20    recollection there.  Probably the best
21    thing to do would be to ask ARM, how they
22

50 (Pages 194 - 197)



Page 290

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2 the results of the calculation you and
3 Dr. Kennedy performed?
4    A    I believe I criticized him
5 for an incorrect time period. And if I'm
6 remembering correctly, he corrected that.
7    Q    I want to go to Schedule 1
8 of Dr. Kennedy's report.
9    Do you see Schedule 1 of
10 Dr. Kennedy's report reflects two
11 calculations: ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮
15    A    Yes.
16    Q    ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮  ▮  ▮▮▮▮
▮▮  ▮  ▮▮▮▮▮
24    A    Yes.
25    Q    Those numbers are very

Page 291

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2 similar; correct?
3    A    ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
6    Q    Yes. That's correct. I'm
7 looking ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
13    A    That he shows on Schedule 1.
14 That's correct.
15    Q    ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
20    A    I do.
21    Q    And that is the same number
22 that you calculate on Attachment 4.0 for
23 the same time period; is that correct?
24    A    Those two numbers are the
25 same.

Page 292

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2    Q    I want to go to Table 11 of
3 your report.
4    A    Yes, ma'am.
5    Q    Do you see in the second
6 row, you calculate damages related to the
7 extra work for ACK patches.
8    Do you see that?
9    A    Yes.
10    Q    And you calculate a range of
11 no more than ▮▮▮▮▮▮▮▮▮.
12 Do you see that?
13    A    Correct.
14    Q    And this is your attempt to
15 quantify the amount of time that
16 Qualcomm's engineers had to spend due to
17 ARM's failure to provide ACK patches;
18 correct?
19    MR. EVANGELATOS: Objection
20 to form.
21    A    It's under the assumption of
22 liability and under the assumption that
23 there was some harm. And I made these
24 calculations as further described in my
25 report.

Page 293

1    THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
2    Q    So you say in your report
3 that you read the testimony of Jeff
4 Golden and Jignesh Trivedi?
5    A    Can you point me to where
6 you're reading?
7    Q    Let's go to paragraph 235.
8    A    I'm there.
9    Q    And in paragraph 235, you
10 refer to testimony by two Qualcomm
11 employees: Mr. Jeff Golden and Jignesh
12 Trivedi; correct?
13    A    Correct.
14    Q    And you read their
15 testimony; right?
16    A    Yes.
17    Q    And you have no reason to
18 doubt the accuracy of their testimony, do
19 you?
20    MR. EVANGELATOS: Objection
21 to form.
22    A    No. As a matter of fact, I
23 use their testimony.
24    Q    And based on their
25 testimony, as reflected in paragraph 235,

74 (Pages 290 - 293)

# EXHIBIT 48

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3        QUALCOMM INCORPORATED a Delaware corporation, ) Case No.
    24-490-MN

         QUALCOMM TECHNOLOGIES, INC., a Delaware      )
4        corporation,                                 )
                                                      )
5           Plaintiffs,                               )
                                                      )
6          vs.                                        )
                                                      )
7        ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.     )
         corporation,,                                )
8                                                     )
            Defendant.                                )
9        ─────────────────────────────────────────   )
10        ATTORNEYS EYES ONLY VIDEOTAPED DEPOSITION OF

11                      WILLIAM  ABBEY

12                    Palo Alto, California

13                   Thursday, June 26, 2025

14

15

16            REPORTED BY: Derek L. Hoagland

17                   CSR No. 13445

18

19

20

21

22

23

24

25



Page 70

1  elements of the contract into a database, so I can't
2  tell you that they will take every contract and wade
3  through it.
[redacted]
.
7  BY MS. MORGAN:
8  Q.
[redacted]
13 A.    I'm sorry.  Repeat that question again.
14 Q.
[redacted]
19      MR. McELLRATH:  Object to form.
20      THE DEPONENT:  When you say "contract terms,"
21 I -- I think the way to look at it is contract terms
22 that relate to [redacted].  That's
23 the key -- that's the key term.
24 BY MS. MORGAN:
25 Q.    Right.

Page 71

1  [redacted]?
2  A.    Yes.
23 Q.    Mm-hmm.
24 A.

Page 72

1
3  Q.    I see.  So you view it as part of your job to
4
8  Q.    Okay.  Let's look at 2i, which is the next part
9  of this provision.  Sorry to make you get the glasses
10 out again.
11 A.    It's okay.  It's okay.
12 Q.

Page 73

1
10      Do you see that?
11 A.    I do, yes.
12 Q.    Okay.
15 A.    Yes.
16 Q.
21      MR. McELLRATH:  Object to form.
22      THE VIDEOGRAPHER:  Counsel, excuse me.
23 Can you just slide your microphone up a little
24 bit.
25      MS. MORGAN:  Oh, sure.

19 (Pages 70 - 73)



Page 110

1  document, which I'm going to mark as Abbey 6.
2      Oh, wait.  I'm going to keep this one.  Can you
3  do... I don't think you want the one that has my
4  scribbles on it.
5      THE DEPONENT:  It might help.  I'll take that.
6      MS. MORGAN:  It could be useful.
7      I will just preview for you, this is going to be
8  a very quick two documents and then we are going to take
9  a break.
10     THE DEPONENT:  Okay.  That's perfect.  Thank
11  you.
12  BY MS. MORGAN:
13  Q.    It should be, like, maybe like ten minutes, max.
14  A.    Okay.
15  Q.    Okay.  We just handed you a document that's
16  titled "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮."
18     Do you see that?
19  A.    Yes.
20  Q.    Okay.  There's not a Bates range on this
21  document because it was produced natively by your
22  counsel.  If you guys have a question about that, we can
23  talk about it offline.  That's -- but that's why it has
24  no Bates on it.
25     MR. WESTERHOLD:  This -- this is the first page.

Page 111

1      MS. MORGAN:  Oh, you have Bates -- I only have
2  the native.  Never mind.  I'm sorry.
3      Can you tell me what the Bates range is?
4      Okay.  So never mind.  I'm going to read the
5  Bates range into the record, which is, it's marked with
6  the beginning Bates QCV ARM 0526828.
7  BY MS. MORGAN:
8  Q.    Do you recognize this document?
9  A.    I do.
10  Q.    Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?
12  A.    It is, yes.
13  Q.    And this is dated ▮▮▮▮▮▮▮?
14  A.    It is.
15  Q.    Okay.  Have you seen this before?
16  A.    I have, yes.
17  Q.    Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮, right?
18  A.    I believe so, yes.
19  Q.    Okay.  ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
21  right?
22  A.    It is --
23     MR. McELLRATH:  Objection.  Foundation.
24     THE DEPONENT:  Sorry.  Repeat that again.
25  ///

Page 112

1  BY MS. MORGAN:

Page 113

29 (Pages 110 - 113)





Page 118

1  Q.    I see.
2  A.    If I'm not satisfied, then I would say, well,
3  show me more, right? ████████████████████████
████████████████
5  Q.    Mm-hmm.
6  A.    And sometimes they're referring to maybe their
7  own scribbles and their own notes.  I don't know.  Maybe
8  sometimes it's just on the phone.  Oftentimes I'm in a
9  different country, poor WiFi access.  I can't see
10 slides.
11 Q.    Mm-hmm.
12 A.    And so, you know, you're asking me, you know,
13 with clarity, did you see the work product.  As long as
14 they sound intelligent and thought through --
15 Q.    Mm-hmm.
16 A.    -- I don't need to see a document.
17 Q.    ██████████████████████████████████████
████████████████
19 A.    At the time, I would have done, but I can't say
20 today what it is.
21 Q.    But you think they would have told you at the
22 time?
23 A.    They would have told me, without hesitation.
24 Q.    ███████████████████████████████████
25 A.    Absolutely.

Page 119

Page 120

Page 121

11     MS. MORGAN:  Okay.  One more document, I'm going
12 to mark as 7.
13     Is it -- Mr. Abbey, the one in front of you 6?
14     THE DEPONENT:  It is, yes.
15     MS. MORGAN:  Great.  So I'm going to mark this
16 as Abbey 7.
17     It's the January.
18     He's going to grab it.
19     MR. WESTERHOLD:  Did you want to take the break
20 now?
21     MS. MORGAN:  It's like one question.
22     You know what?  I'll just ask a question to you
23 about this, and then we can come back to the document
24 after break if we need to.
25     THE DEPONENT:  Okay.

31 (Pages 118 - 121)

# EXHIBIT 49

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Qualcomm Incorporated,<br>  a Delaware corporation,<br>Qualcomm Technologies, Inc.,<br>  a Delaware corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br><br>Arm Holdings PLC., f/k/a Arm Ltd.,<br>  a U.K. corporation,<br><br>        Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 24-490-MN |

## EXPERT REPORT OF THOMAS W. BRITVEN

### September 5, 2025

By: _____

    Thomas W. Britven

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

## TABLE OF CONTENTS

1 EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND QUALIFICATIONS ...................................................................................................................4

2 SCOPE OF WORK ...........................................................................................................5

3 SUMMARY OF THE KENNEDY REPORT'S DAMAGES OPINIONS.................................8

4 SUMMARY OF OPINIONS ............................................................................................10

5 CASE BACKGROUND ...................................................................................................13
   5.1 INTRODUCTION TO DEFENDANT ARM HOLDINGS PLC .............................................13
   5.2 INTRODUCTION TO PLAINTIFFS QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC. ...........13
   5.3 INTRODUCTION TO THE SUBJECT TECHNOLOGY .......................................................14
   5.4 INTRODUCTION TO ARM'S ISA LICENSING MODELS .................................................17
   5.5 INTRODUCTION TO THE ARM-QUALCOMM TLA AND ALA AGREEMENTS AT ISSUE .....................19
   5.6 INTRODUCTION TO THE DISPUTE ...............................................................................20
      5.6.1 Overview of the Arm v. Qualcomm Dispute ...........................................................21
      5.6.2 Overview of Qualcomm's Allegations and Causes of Action in the Current Case ...........22
   5.7 TIMELINE ................................................................................................................24
   5.8 INTRODUCTION TO THE PRODUCTS AT ISSUE .............................................................26

6 ANALYSIS OF ARM'S ███████ ███ ███ ███████████████████████ ..........................................................................28
   6.1 OVERVIEW OF ███████ ██ ████ ███ ███ ██ ███ ██ ████ ..........30
   6.2 OVERVIEW OF ████████████ ██ ██ ██████ ████ ..........32
   6.3 OVERVIEW OF ██████ ██ ██████████ ....................34
   6.4 EVALUATION OF THIRD PARTY TLA LICENSES AVAILABLE AS OF THE DATE OF THIS REPORT ...................38
      6.4.1
      6.4.2
      6.4.3
      6.4.4
      6.4.5
      6.4.6
      6.4.7
      6.4.8
      6.4.9
   6.5 OBSERVATIONS REGARDING ████ ██████ ███ ██ ███ ██ ███ ..........61

7 RESPONSE TO THE KENNEDY REPORT .......................................................................70
   7.1 THE KENNEDY REPORT'S COMPARISON OF ███████████ ███ ███ TO CERTAIN BENCHMARKS ...................................................72
      7.1.1 The Kennedy Report Analysis of ███████ ██ ███████ Focuses on Measures that Are Not Relevant Under the TLA ...........................................................73
      7.1.2 The Kennedy Report Analysis of Third-Party TLA Agreements Is Incomplete ...................77
   7.2 THE KENNEDY REPORT'S ANALYSIS OF ALLEGED OVERPAYMENT FOR PERIPHERAL IP LICENSES ...........80
      7.2.1 Qualcomm's Acceptance of the Peripheral IP License Is an Indication of Commercial Reasonableness ...........................................................81
      7.2.2 The Kennedy Report's But-For Price Is Not Supported by the Available Evidence ...........86

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

7.2.2.1    Conclusion ....................................................................................................87

7.3    THE KENNEDY REPORT'S ANALYSIS OF DAMAGES DUE TO ALLEGED INTERFERENCE WITH QUALCOMM'S PROSPECTIVE ECONOMIC ADVANTAGE ..........................................................................88

7.3.1    Overview of the Kennedy Report's Calculations ................................................88

7.3.2    Evidence Discussed in the Kennedy Report Fails to Show that the Breach Letter and Other Arm Communications Harmed Qualcomm's Business with Customers ....................................91

7.3.2.1    ███████████████████████████████████████████████████████

7.3.3    ████████████████████████████████████████████████

7.3.3.2    ████████████████████████████████████████████████████████

7.4    THE KENNEDY REPORT'S QUANTIFICATION OF ALA AND TLA ROYALTIES PAID .........................................99

7.4.1    Quantification of Alleged Harm..................................................................100

7.4.2    Alleged "Extra" Work Due To Arm's Alleged Failure to Provide OOBs ........................101

7.4.3    Alleged "Extra" Work Due To Arm's Alleged Failure to Provide ACK Patches ..................102

7.4.4    Alleged "Extra" Work Due To Arm's Alleged Failure to Provide ETE Checker Support ..........107

7.4.5    Alleged "Extra" Risk Due To Arm's Alleged Failure to Provide OOBs, ACK Patches, and ETE Checker Support.........................................................................................108

7.4.6    Quantification of Support and Maintenance Fees ..............................................108

7.4.7    Comparison to Kennedy Report's Quantification of Royalties Paid ............................111

8    RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE ....................................................112

# 1   EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND QUALIFICATIONS

1.   I, Thomas W. Britven, have been asked to serve in an expert witness capacity by counsel for Arm Holdings PLC, formerly known as Arm Ltd. (collectively, "Arm," or "Defendant").  I hereby submit the following expert witness disclosure.

2.   As presently advised, I expect to testify as an expert witness on issues related to the quantification of damages and remedies, if any, due to Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm" or "Plaintiffs"), based on certain assumptions.  For the purposes of this report, I have been asked to analyze certain issues discussed in the August 8, 2025 Expert Report of Patrick F. Kennedy, Ph.D. as they relate to Qualcomm's claims under various causes of action, including breach of contract and intentional interference with prospective economic advantage.[1]  No opinions regarding liability are expressed herein. Although my analysis and opinions are based upon the current record to date, I respectfully reserve the right to revise, expand, or supplement my analysis and opinions based on any additional information that may be provided to me.

3.   I am a Partner at HKA Global LLC ("HKA") and the former President of ASQ Consulting ("ASQ"), an HKA company.  ASQ is a professional services firm that provides a multitude of services, including litigation consulting, business strategy, infrastructure development, investment banking, and private equity.  ASQ was acquired in 2023 by HKA, a leading global consultancy in risk mitigation, dispute resolution, expert witness, and litigation support services.  Prior to ASQ, I held various positions at Duff & Phelps ("D&P"), and I served as a member of its Disputes and Legal Management Practice Vision Committee. D&P, now rebranded as Kroll, is a leading investment banking and financial advisory firm offering an array of services in the areas of valuation, investment banking and transaction advice, and dispute consulting.  My experience as a business advisor and consultant has included the study of damages issues in connection with hundreds of disputed matters,

---

[1] The causes of action alleged by Qualcomm include (1) Breach of ▇▇▇ of the QC ALA; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) Intentional Interference with Prospective Economic Advantage; (4) Negligent Interference with Prospective Economic Advantage; (5) Violations of California Unfair Competition Law; (6) Breach of Section ▇▇▇ of the QC TLA; and (7) Breach of Section ▇▇▇ of the QC TLA. *See,* Second Amended Complaint, June 3, 2025, at 52-64.

including matters involving trade secret, copyright, patent, trademark, unfair competition, tortious interference, breach of contract, and fraud, among others. These matters span a variety of industries, including the automotive, aviation, biotechnology, computer, consumer goods, construction, energy, financial services, healthcare, information technology, manufacturing, medical device, pharmaceutical, retail, semiconductor, software, telecommunications, and transportation industries, among others. My resume is attached to this report as **ATTACHMENT 1.0**.

## 2 SCOPE OF WORK

4.       My assignment in connection with this litigation is to assess certain technology licensing-related work done by ARM and to review and comment on the August 8, 2025 Expert Report of Patrick F. Kennedy, Ph.D. (the "Kennedy Report").

5.       In performing my study, I and/or others working under my direction have reviewed deposition transcripts and exhibits of the following witnesses:

**Table 1**
**Depositions Received**

| Deponent | Title | Date |
|----------|-------|------|
| William Abbey | Executive Vice President and Chief Commercial Officer, Arm | June 26, 2025 |
| Vivek Agrawal | Senior Principal Engineer, Arm | July 11, 2025 |
| Cristiano Amon | President and CEO, Qualcomm, Inc. | July 3, 2025 |
| Ziad Asghar | SVP of Product Management, Qualcomm | July 7, 2025 |
| Mohamed Awad | SVP General Manager for the Infrastructure Business, Arm | July 29, 2025 |
| Ami Badani | Chief Marketing Officer, Arm | August 1, 2025 |
| Akshay Bhatnagar | Senior Manager, North America Licensing, Arm | July 10, 2025 |
| Aparajita Bhattacharya | Senior Director Engineering, Arm | July 7, 2025 |
| Ann Chaplin | General Counsel and Corporate Secretary, Qualcomm | July 11, 2025 |
| Larissa Cochron | Senior Director of Contracts, Qualcomm | July 11, 2025 |
| Spencer Collins | Executive Vice President and Chief Legal Officer, Qualcomm | June 30, 2025 |
| Lynn Couillard | VP of Strategic Alliances / VP of Sales, Arm | July 3, 2025 |
| Mark Dragicevich | Senior Director of Finance, Qualcomm | June 27, 2025 |
| Jeffrey Fonseca | Director and Partner Manager, Arm | July 9, 2025 |

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

| Deponent | Title | Date |
|---|---|---|
| Anupa George | Staff Engineer, Arm | July 30, 2025 |
| Jeffrey Golden | Hardware Engineer, Qualcomm | July 3, 2025 |
| Peter Greenhalgh | SVP of Technology, Arm | July 4, 2025 |
| Richard Grisenthwaite | Chief Architect and ARM Fellow, Arm | July 2, 2025 |
| Rene Haas | CEO, Arm | July 7, 2025 |
| Sudeep Holla | Principal Engineer, Arm | June 17, 2025 |
| John Horley | Lead Engineer, Arm | July 8, 2025 |
| Andrew Howard | Vice President of Partner Success and Licensing, Arm | July 1, 2025 |
| Philip Hughes | Corporate Vice President and Chief Communications Officer, Advanced Micro Devices, Inc. | June 17, 2025 |
| James Jeon | VP of Global Commercial Operations, Qualcomm | July 11, 2025 |
| Paul Kranhold | Co-chairman of North America, FGS Global | July 17, 2025 |
| Selena LaCroix | Vice Chair, Technology Practice, Korn Ferry | August 1, 2025 |
| Durga Malladi | Senior VP and General Manager, Technology Planning and Solutions, and Data Center, Qualcomm | July 10, 2025 |
| Richard Meacham | Principal Engineer, Automotive CPU, Qualcomm | June 27, 2025 |
| Dawn Hill Montemagni | Director of Global Sales, Arm | August 15, 2025 |
| Pavankumar Mulabagal | Senior Director of Sales and Business Development, Qualcomm | July 1, 2025 |
| Jannik Nelson | VP of Revenue, Arm | July 10, 2025 |
| Christopher Patrick | SVP and General Manager, Mobile and Wearables, Qualcomm | July 2, 2025 |
| Laura Sand | Senior VP, Legal Counsel, Qualcomm | July 8, 2025 |
| Karthik Shivashankar | Senior Director, Commercial Strategy and Licensing, Arm | June 20, 2025 |
| Kenneth Siegel | Managing Partner, Morrison & Foerster LLP | July 4, 2025 |
| Christine Tran | Senior Director, Legal, Arm | July 10, 2025 |
| Jignesh Trivedi | Director of Engineering, Qualcomm | July 9, 2025 |
| Manju Varma | Senior Director, CPU Product Management, Qualcomm | June 24, 2025 |
| Jean-Francois (Jeff) Vidon | Senior Director of Engineering, Qualcomm | July 1, 2025 |
| Martin Weidmann | Director of Product Management, Arm | June 20, 2025 |
| Jonathan Weiser | Former Lead Lawyer for Qualcomm QCT, Qualcomm | July 11, 2025 |
| Karl Whealton | Senior Director, CPU, DSP, Benchmarking, and AI H/W Product Management, Qualcomm | June 18, 2025 |
| Gerard Williams | Senior Director of Engineering, CPU Design, Qualcomm | June 25, 2025 |

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

| Deponent | Title | Date |
|---|---|---|
| Michael Williams | Lead Architect for Debug and RAS Architectures, Arm | June 27, 2025 |
| Paul Williamson | Senior Vice President and General Manager of the IoT Line of Business, Arm | July 2, 2025 |
| Kurt Wolf | Director of Sourcing, Qualcomm | June 25, 2025 |
| Ehab Youssef | VP and Deputy General Counsel, Licensing, Legal Ops, and Trade Compliance, Arm | June 26, 2025 |

6.    Also, in performing my study, I and/or others working under my direction have conducted interviews of the following individuals in connection with my work:

- Akshay Bhatnagar, Senior Manager, North America Licensing at Arm;

- technical expert Dr. Michael Brogioli;

- Jeffrey Fonseca, Director and Partner Manager at Arm;

- Karthik Shivashankar, Senior Director, Commercial Strategy and Licensing at Arm; and

- Ehab Youssef, Vice President and Deputy General Counsel, Licensing, Legal Ops, and Trade Compliance at Arm.

7.    Additionally, this report includes a listing of documents that I and/or others working under my direction and supervision have received, reviewed, and/or considered in forming the basis for my opinions as **ATTACHMENT 2.0**.

8.    I understand that I may be asked to testify about my opinions in this report as well as damages-related issues raised during cross-examination or by other witnesses. I expect to provide further explanations of the matters I discuss in this report as necessary to clarify my work and opinions to the jury or Court. I have cited to information in this report that supports my opinions, but those citations are not necessarily exhaustive, and I may have reviewed and considered additional documents or information that supports the same opinions and conclusions. If I am called to testify, I reserve the ability to rely on or discuss any information referenced generally (such as documents cited in other reports referenced herein) or specifically in this report and attachments, including in **ATTACHMENT 2.0**.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

9.    I reserve the ability to update this report and attachments as additional documentation is received, reviewed, and/or considered. I also reserve the ability to respond to and address new information that may become known to me whether near the time of trial or during trial, to the extent it relates to the content of this report and attachments.

## 3    SUMMARY OF THE KENNEDY REPORT'S DAMAGES OPINIONS

10.    The Kennedy Report presents three damages measures:



- ███████████████████████████████████████:

    1) Arm's alleged breach of ████████ of the parties' 2013 Architecture License Agreement;[2] and

    2) Arm's alleged breach of █████████████ of the parties' 2013 Technology License Agreement.[3]

- An estimate of Qualcomm's alleged overpayment of license fees paid for certain Peripheral IP, assuming the license fees offered by Arm (and agreed to and paid by Qualcomm) were offered in bad faith, resulting in an alleged breach of the implied covenant of good faith and fair dealing in the TLA;[4] and

- ███████████████████████████████████████████████████████████████████████████

11.    The Kennedy Report calculates damages under the above methods as follows:

---

[2] Kennedy Report, at 15-19. Qualcomm alleges Arm breached ████████████████████████ ████████████████ Second Amended Complaint, June 3, 2025, at 29, 52, 54-55; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 33-34, 49; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 21-22.

[3] Kennedy Report, at 19-23. Qualcomm alleges that Arm breached ██████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████ Second Amended Complaint, June 3, 2025, at 52-53, 62-64; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 8-9.

[4] Kennedy Report, at 45-67.

[5] Kennedy Report, at 68-79.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

**Table 2**
**Summary of Kennedy Report Damages Calculations**[6]



12.    In addition to the above damages quantifications, the Kennedy Report presents two licensing analyses:

- 

---

[6] Kennedy Report, at 18-19, 22-23, 66-67, 77, 80.



[7]

. Kennedy Report, at 20, 22.

[9]

[10] Kennedy Report, at 23-45.
[11] Kennedy Report, at 40.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



13.    I address the various shortcomings of the Kennedy Report's damages opinions and licensing analyses in the section that follows and throughout the balance of this report.

**4    SUMMARY OF OPINIONS**

14.    In forming my opinions, I have conducted interviews, performed research of publicly available information, and reviewed the available record, including documents produced by Qualcomm and Arm, deposition testimony, and the expert reports and corresponding attachments submitted in this matter.

15.    My opinions in this matter are based on my study and analysis of the above information, and my years of training and experience assessing damages, among other things.

16.    I understand that discovery remains ongoing.  For example, I understand that certain third-parties have objected to the disclosure of their license agreements with Arm, such as ▇▇▇▇▇, and have filed motions seeking a protective order, and that those disputes have not yet been decided by the Court.  I intend to supplement or update my opinions, analyses, and calculations as they relate to ▇▇▇▇▇▇▇▇▇▇ upon receipt of this information, if made available.  I reserve the ability to supplement or update my opinions, analyses and calculations to incorporate any additional relevant information

---

[12] Kennedy Report, at 45.
[13] Kennedy Report, at 40.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[15] Kennedy Report, at 56-63.
[16] Kennedy Report, at 63-65.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

that may be presented, such as may be revealed in additional documents, licensing agreements, or other information that may be produced at a later date.

17.    Based on the above and evidence available as of the date of this report, my opinions with respect to ███████████████████████████████████ are as follows:



18.    Based on the above, and evidence available as of the date of this report, my opinions with respect to the Kennedy Report are as follows:



**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



- the Kennedy Report's quantification of the alleged overpayment for Peripheral IP licenses relies upon a but-for price that is not supported by the available evidence;

- the economic evidence indicates that the prices Qualcomm agreed to and paid for the Peripheral IP at Issue were reasonable. In the event the trier-of-fact agrees, damages associated with this cause of action are zero;

19. I expect to update these opinions upon receipt of additional information referenced herein, including the ░░░░░░░ agreement, should it become available after resolution of certain discovery disputes.

---

[17] **ATTACHMENT 7.0;** Kennedy Report, at 77.
[18] **ATTACHMENT 3.0.**
[19] **ATTACHMENT 3.0.**

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

## 5   CASE BACKGROUND

### 5.1 Introduction to Defendant Arm Holdings PLC

20.     Defendant Arm is a world leader in central processing unit ("CPU") technology.  Arm architects, develops, and licenses high-performance, low-cost, and energy-efficient IP solutions for CPU, graphics processing units ("GPUs"), neural processing units ("NPUs"), and interconnect technologies.[20]

21.     Arm was founded as Advanced RISC Machines Ltd. in 1990 as a joint venture between Acorn Computers, Apple Computer (now Apple Inc.), and VLSI Technology (now NXP Semiconductors N.V.).[21]  Arm is headquartered in Cambridge, UK,[22] and has additional offices across Asia Pacific, Europe, Middle East, Africa, and North America.[23]  Arm employs over 7,000 people worldwide.[24]

22.     Arm licenses its architecture specifications to other companies, who in turn make Arm-compliant silicon chips[25] to be used in AI, consumer technologies, computing, automotives, and IoT, among other applications.[26]  According to Arm, there are more than 325 billion devices that contain Arm-based chips.[27]

### 5.2 Introduction to Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc.

23.     Qualcomm Incorporated was founded in 1985 with a focus on improving telecommunications standards and helped to develop 3G, 4G, and 5G wireless connectivity.[28]  Qualcomm offers semiconductor solutions for the automotive, extended

---

[20] "Company," Arm, date accessed: July 10, 2025 (accessed: https://www.arm.com/company).
[21] "The Official History of Arm," Arm Newsroom, date accessed: August 29, 2025 (accessed: https://newsroom.arm.com/blog/arm-official-history).
[22] "The Official History of Arm," Arm Newsroom, date accessed: August 29, 2025 (accessed: https://newsroom.arm.com/blog/arm-official-history).
[23] "ARM Global Offices," Arm, date accessed: July 10, 2025 (accessed: https://www.arm.com/company/offices).
[24] "The Official History of Arm," Arm Newsroom, date accessed: August 29, 2025 (accessed: https://newsroom.arm.com/blog/arm-official-history).
[25] "Arm Architecture for the Digital World," Arm, date accessed: August 29, 2025 (accessed: https://www.arm.com/architecture).
[26] "Markets," Arm, date accessed:  September 2, 2025 (accessed: https://www.arm.com/markets).
[27] "Arm Architecture for the Digital World," Arm, date accessed: August 29, 2025 (accessed: https://www.arm.com/architecture).
[28] "Our Company, Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company).

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

reality, handheld gaming, IoT, computing, and consumer technology industries, among others.[29]  Qualcomm also licenses its IP portfolio related to the manufacture and sale of certain wireless products.[30]

24.    Qualcomm is headquartered in San Diego, California[31] and has additional offices in South America, Asia, Europe, and North America.[32]

25.    Qualcomm Technologies, Inc. ("QTI") is a subsidiary of Qualcomm Incorporated and operates substantially all of Qualcomm's products and services businesses and Qualcomm's engineering, research, and development functions.[33]

### 5.3 Introduction to the Subject Technology

*Instruction Set Architecture*

26.    Instruction Set Architecture ("ISA") is "part of the abstract model of a computer that defines how the [central processing unit] is controlled by the software."  It acts as an interface between the hardware and software, "specifying both what the processor is capable of doing as well how it gets done."[34]  "The ISA defines the supported data types, the registers, how the hardware manages main memory, key features (such as virtual memory), which instructions a microprocessor can execute, and the input/output model of multiple ISA implementations."[35]  Understanding the ISA allows developers to write more

---

[29] "System Processors," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/products/system-processors).
[30] Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, at 7, date accessed: July 14, 2025 (accessed: https://s204.q4cdn.com/645488518/files/doc_financials/2024/q4/QCOM-09-29-24-FY2024-10-K.pdf).
[31] "Headquarters," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company/facilities/offices?country=USA&hQ=true).
[32] "About Qualcomm – Company Information & History," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company#locations).
[33] Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, at 13, date accessed: July 14, 2025 (accessed: https://s204.q4cdn.com/645488518/files/doc_financials/2024/q4/QCOM-09-29-24-FY2024-10-K.pdf).
[34] "What is Instruction Set Architecture (ISA)," Arm, date accessed: July 11, 2025 (accessed: https://www.arm.com/glossary/isa).
[35] "What is Instruction Set Architecture (ISA)," Arm, date accessed: July 11, 2025 (accessed: https://www.arm.com/glossary/isa).

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

efficient code and understand the output of the compiler.  ISAs are typically updated over time to "support emerging technologies, optimize efficiency, or add new functionality."[36]

27.    I understand that there are two primary computing architecture philosophies: complex instruction set computer ("CISC") ISA and reduced instruction set computer ("RISC") ISA.[37]  Differences between the two include the speed of instruction execution, power consumption, and number of transistors required (which in turn affects the size of central processing units).[38]  I understand that CPUs and the associated computing system software and hardware components in ISAs are based on the same ISA.[39]

28.    There are several licensors of both CISC and RISC ISAs, and ISAs are licensed under different brand names.  For example, I understand that x86, an architecture developed by Intel, is seen as the industry standard for CISC[40] and is the prevalent architecture used in desktop and laptop computers as well as datacenters and high-performance computing environments.[41]  Intel and AMD are the two primary manufacturers of x86-architecture processors.[42]

29.    Licensors of RISC architectures include ARM and RISC-V.[43]  Arm's RISC ISA is widely used in smartphone and tablet CPUs , and chips using ARM's ISA have recently expanded

---

[36] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 23.
[37] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 23.
[38] CISC ISA can handle fewer and more powerful demands, reducing programming complexity, and allowing software developers to write programs more efficiently.  However, CISC architecture requires more transistors, which makes processors larger and potentially slower to execute instructions.  RISC ISA, on the other hand, uses minimal, straightforward instructions that execute quickly, enhancing performance, streamlining CPU design, and reducing hardware complexity.  "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 23-25.
[39] "The Basics of Instruction Set Architecture," Lenovo, date accessed: August 26, 2025 (accessed: https://www.lenovo.com/us/en/glossary/instruction-set-architecture/?orgRef=https%253A%252F%252Fwww.bing.com%252F).
[40] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 24.
[41] "Intel and AMD are unlikely allies in new x86 ecosystem advisory group – 'we'll remain fierce competitors,'" Tom's Hardware, date accessed: August 1, 2025 (accessed: https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward#xenforo-comments-3857628); "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 24-26.
[42] "Intel and AMD are unlikely allies in new x86 ecosystem advisory group – 'we'll remain fierce competitors,'" Tom's Hardware, date accessed: August 1, 2025 (accessed: https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward#xenforo-comments-3857628).
[43] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 25.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

into desktops, automobiles, servers, and embedded systems.[44]  RISC-V is a relatively newer RISC-based ISA that is distributed using an open-source model.[45]  RISC-V is gaining popularity amongst companies including Nvidia, Google, Red Hat, SiFive, and others.[46]

## *CPU Cores*

30.    A CPU core is the processing unit that executes program instructions, performs calculations, manages data flow, and coordinates with other components.  Each core processes information independently.[47]  A CPU can have multiple cores, which enables the system to handle multiple tasks simultaneously.[48]

31.    I understand that CPUs are used in smartphones, consumer electronics (including TVs, tablets, laptops, and desktops, among others), industrial IoT (including washing machines, thermostats, cameras, and drones, among others), networking equipment, cloud computing, and other infrastructure.[49]

32.    A System-on-a-Chip ("SoC") "is a complete processing system contained in a single package that contains multiple processing parts," "typically including a [CPU], memory, input and output ports, peripheral interfaces, and secondary storage devices."[50]  In traditional PC designs, individual components are built onto a motherboard separately with

---

[44] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 25.
[45] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 26.
[46] "RISC-V's Ascent Could Reshape The Global Compute Landscape," Forbes, July 24, 2025, date accessed: July 31, 2025 (accessed: https://www.forbes.com/sites/davealtavilla/2025/07/24/risc-vs-ascent-could-reshape-the-global-compute-landscape/).
[47] "CPU Cores Explained: How Many Do You Need?," HP, date accessed: July 30, 2025 (accessed: https://www.hp.com/us-en/shop/tech-takes/cpu-cores-how-many-do-i-need?cjdata=MXxOfDB8WXww&utm_medium=af&utm_source=cj&utm_campaign=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29&utm_content=5250933_Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29_100357191&cjevent=2f013fec6d7311f081bd01750a18b8fc&subacctname=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29).
[48] "CPU Cores Explained: How Many Do You Need?," HP, date accessed: July 30, 2025 (accessed: https://www.hp.com/us-en/shop/tech-takes/cpu-cores-how-many-do-i-need?cjdata=MXxOfDB8WXww&utm_medium=af&utm_source=cj&utm_campaign=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29&utm_content=5250933_Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29_100357191&cjevent=2f013fec6d7311f081bd01750a18b8fc&subacctname=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29).
[49] ARM_01259705-6105, at 717-719.
[50] "What Is SoC Development?," Arm, date accessed: July 30, 2025 (accessed: https://www.arm.com/glossary/soc-development).

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

lines of communication between them.  SoCs have all major components built into the same silicon chip, which reduces latency and boosts performance of the system.[51]

33.    I understand that CPU design is complex and that while some CPU sellers may develop their own custom designs, others license CPU designs from third parties.[52]  Arm is one such licensor of CPU designs, licensing designs that are compatible with its own ISA.[53]  Qualcomm sells both custom SoCs (which are compliant with the ARM ISA, licensed from ARM) as well as SoCs that make use of third-party designs (including ARM ISA-compliant designs licensed from ARM).[54]  Qualcomm has identified Apple, Intel, and AMD as its biggest competitors in building custom CPUs.[55]  Indeed, in its 2024 Annual Report, Qualcomm lists its current competitors as Broadcom, HiSilicon, MediaTek, Mobileye, Nvidia, NXP Semiconductors, Qorvo, Samsung, Skyworks, Texas Instruments, and UNISOC.[56]

### 5.4 Introduction to Arm's ISA Licensing Models

34.    I understand that Arm grants several types of licenses that include its ISA technology, including, for example, Architecture License Agreements ("ALAs"), Technology License Agreements ("TLAs") and Arm Total Access Agreements ("Total Access Agreements" or "ATAs").[57]

35.    ALAs grant rights to Arm Technology that allow licensees to design their own custom CPU cores that are compatible with the Arm ISA; in addition to Qualcomm, such licensees

---

[51] "What is a System-on-Chip (SoC)?," Windows Central, date accessed: July 30, 2025 (accessed: https://www.windowscentral.com/hardware/laptops/what-is-a-system-on-chip-soc).
[52] See, "The Rise of Licensed IP In Edge AI and Smart Device Manufacturing," Forbes, date accessed: August 28, 2025 (accessed: https://www.forbes.com/councils/forbestechcouncil/2025/08/28/why-the-next-wave-of-ai-innovation-wont-be-built-from-scratch/); "The Shift to Custom Silicon: Why Companies Are Designing Their Own Chips," Nasdaq, date accessed: August 28, 2025 (accessed: https://www.nasdaq.com/articles/shift-custom-silicon-why-companies-are-designing-their-own-chips).
[53]  "Microprocessor Cores and Processor Technology - Arm®," Arm, date accessed: August 27, 2025 (accessed: https://www.arm.com/products/silicon-ip-cpu).
[54] Second Amended Complaint, June 3, 2025, at 3-4.
[55] QCVARM_0846761-870, at 764; "Intel vs AMD vs Qualcomm: Who's Leading the CPU War in 2025," Business Economy, date accessed: July 31, 2025 (accessed: https://www.businesseconomy.com/technology/intel-vs-amd-vs-qualcomm-whos-leading-the-cpu-war-in-2025/).
[56] Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, at 12.
[57] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

include ▮▮▮▮.[58]  Under an ALA, Arm does not provide designs for processors or processor components but rather grants rights to use Arm architecture.[59]  For major developments of the Arm architecture, Arm will release a new version (e.g. v7, v8, v9). These new versions of the Arm architecture are periodically released by Arm, and during the gaps between releases, Arm continues to invest in engineering.[60]  For minor developments, Arm releases an extension to the latest version of architecture, denoted by ".x" after the version number (e.g. v8.1, v8.2, v8.3).[61]  According to Arm, it does not grant many ALAs, because the design of custom processor cores by Arm customers is time-intensive, risky, and requires a significant amount of support from Arm.[62]  Compensation for an ALA agreement typically takes the form of both a fixed fee and a running royalty for the licensed products.[63]

36.    The Arm Technology granted under TLAs can include, among other things, designs for processors or processor components themselves that are compatible with the Arm ISA.[64]  I understand that under a TLA, the licensee can identify specific Arm products (referred to as "Arm IPs" or "IPs") it intends to use and taking a license to only those products.[65]  Compensation for a TLA agreement typically takes the form of both a fixed fee and a running royalty for the licensed products.[66] ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

37.    Arm's ALA and TLA agreements provide the general terms of the licenses, and are accompanied by an Annex that, among other things, lists the specific licensed Arm

---

[58] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 5; Deposition of Rene Haas, July 7, 2025, at 225:3-7.
[59] *See generally*, "Learn the architecture – Understanding the Armv8.x and Armv9.x extensions," Arm, date accessed: August 1, 2025 (accessed: https://documentation-service.arm.com/static/663e39db9007496a66f74481).
[60] Deposition of Rene Haas, July 7, 2025, at 150:12-23.
[61] "Learn the architecture – Understanding the Armv8.x and Armv9.x extensions," Arm, p.7, date accessed: August 1, 2025 (accessed: https://documentation-service.arm.com/static/663e39db9007496a66f74481).
[62] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 4-5.  Mr. Youssef testified that since Qualcomm's 2019 ALA agreement, Arm has granted only two additional ALAs: one with Apple and one with IBM.  Deposition of Ehab Youssef, June 26, 2025, at 30:11-32:5.
[63] Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 18-19.
[64] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 4-5.
[65] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[66] ARM_00006123-155, at 153-154; QCVARM_0710047-120, at 120.
[67] ARM_QC_02784120-198, at 130; Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, at 68.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

products and associated fixed fees, and by a Master Royalty Schedule, which sets out, among other things, the associated running royalties.[68]

38.  

### 5.5 Introduction to the Arm-Qualcomm TLA and ALA Agreements at Issue

39.  Arm and Qualcomm first entered into a TLA on September 30, 1997 (the "Original TLA"),[75] and entered into a new TLA[76] and associated Annexes[77] on May 30, 2013 (the "2013 TLA").  The parties agreed to additional TLA Annexes adding certain licensed

---

[68] See, e.g. ARM_00103918-972, at 918-919 [TLA]; ARM_00055357-399, at 357 [ALA]; ARM_00063298-312, at 308-309 [ANNEX to ALA].  ARM_01298891-929, at 894 [Master Royalty Schedule to ALA];  *See also,* Deposition of Ehab Youssef, June 26, 2025, at 34:3-12.
[69] ARMQC_02784120-198, at 126-127.
[70] "Arm Total Access," Arm, date accessed: August 28, 2025 (accessed: https://www.arm.com/products/licensing/arm-total-access); ARMQC_02784120-198, at 167; Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[71] ARMQC_02784120-198, at 166-178; Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[72] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[73] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[74] ARMQC_02784120-198, at 127 and 167.
[75] ARM_00103918-972, at 918.
[76] ARM_00103918-972.
[77] ARM_00103918-972, at 918.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

products, in 2019,[78] 2020,[79] and 2024.[80]   Qualcomm first received a license to three of the products at issue – █████████████████ – as part of the 2019 series of TLA-related agreements.[81]   I refer to the agreement that added rights to ███████████████ as the "2019 Annex 1."  I discuss the products at issue further in **Section 5.8.**



42.    I list certain agreements between Arm and Qualcomm in **ATTACHMENT** 10.0 and summarize the terms of of the 2013 ALA, 2013 TLA and certain additional agreements in **ATTACHMENT 2.0.**.

### 5.6 Introduction to the Dispute

43.    I understand that certain issues in the current case relate to an ongoing dispute between the parties regarding Arm's various ALA, TLA and related agreements with Qualcomm.[90]  I understand the dispute began around the time of Qualcomm's 2021 acquisition of Nuvia,

---

[78] ARM_00006123-155; ARMQC_02772366-385; QCARM_0029357-358.
[79] QCARM_3480078-094.
[80] QCVARM_0525196-202.
[81] Deposition of Ehab Youssef, June 26, 2025, at 34:24-35:21.
[82] ARM_00055357-399, at 357.
[83] ARM_00055357-399.
[84] QCARM_0343120-142.
[85] QCARM_0343954-976.
[86] QCARM_0337591-627.
[87] QCARM_0338180-242.
[88] QCARM_0338352-429.
[89] ARM_00086164-245.
[90] Second Amended Complaint, June 3, 2025, at 52-53.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

Inc. ("Nuvia"), a start-up CPU company.[91]   In the sections that follow, I give a brief overview of some of the issues in that initial dispute that the parties reference in the current case, and then provide an overview of the allegations and causes of action in the current case.

### 5.6.1   *Overview of the* Arm v. Qualcomm *Dispute*

44.     Arm filed suit against Qualcomm on August 31, 2022 (Case No. 1:22-cv-01146-MN), alleging breach of contract and trademark infringement, among other causes of action (the "*Arm v. Qualcomm* Dispute").[92]   I understand that Arm withdrew its trademark infringement claims prior to trial.

45.     I understand that a central issue in the *Arm v. Qualcomm* Dispute was Qualcomm's intent to integrate Nuvia designs into its own products and its position that the terms of Qualcomm's ALA and TLA with Arm, which gave Qualcomm the right to design custom process cores based on Arm architecture and to modify certain off-the-shelf designs, were applicable to Qualcomm products with Nuvia designs.[93]

46.      I understand that Arm disagreed with Qualcomm's position and informed Qualcomm that Qualcomm could not use Nuvia's designs that were developed under the Nuvia ALA without Arm's consent.[94]   In February 2022, Arm sent a letter to Qualcomm and Nuvia terminating the Nuvia licenses as of March 1, 2022.[95]   I understand that Qualcomm asserted that Qualcomm was developing its cores and products under its own agreements with Arm[96] and that this dispute led to the filing of the *Arm v. Qualcomm* Dispute complaint on August 31, 2022.[97]

---

[91] "Qualcomm Acquires NUVIA To Accelerate Its Future CPUs With Support From 18 Partners," Forbes, date accessed: July 28, 2025 (accessed: https://www.forbes.com/sites/patrickmoorhead/2021/01/13/qualcomm-acquires-nuvia-to-accelerate-its-future-cpus-with-support-from-18-partners/); Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 7.
[92] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 16-29.
[93] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 5-6, 8, 10.
[94] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 10.
[95] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 12.
[96] Second Amended Complaint, June 3, 2025, at 5-6.
[97] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

47.    On October 22, 2024, Arm sent a letter (the "Breach Letter") notifying Qualcomm that, among other things, it was in material breach of the ALA with respect to its use of designs, technology and code created by Nuvia, and that Arm was entitled to terminate the ALA if the breach was not cured within 60 days.[98]

48.    A trial was held, and on December 20, 2024, the jury concluded that Qualcomm had not breached Section 15.1(a) of the Nuvia ALA and that Qualcomm's CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA.[99] However, the jury did not reach a decision on Question 1 regarding Nuvia's breach of the Nuvia ALA.

### 5.6.2    Overview of Qualcomm's Allegations and Causes of Action in the Current Case

49.    Qualcomm has countersued Arm for breach of contract and other causes of action.[100] Qualcomm filed its initial complaint on April 18, 2024, and its First Amended Complaint on December 16, 2024.[101]    Qualcomm filed its Second Amended Complaint on June 3, 2025.[102]

50.    With respect to the 2013 TLA, I understand Qualcomm contends that Arm:

- breached ██████████████████████████████████████████[103] and

- breached ██████████████████████████████████████████[104]

51.    I understand that Qualcomm contends that part of its TLA claims also include an allegation that Arm breached the covenant of good faith and fair dealing implied in the 2013 TLA as

---

[98] Second Amended Complaint (Case No: 24-490-MN), Exhibit A.
[99] Verdict Form (Case No. 1:22-cv-01146-MN), December 20, 2024, at 2.
[100] Second Amended Complaint, June 3, 2025, at 29, 52-64.
[101] Complaint, April 18, 2024, at 23. First Amended Complaint, December 16, 2024, at 48.
[102] Second Amended Complaint, June 3, 2025, at 66.
[103] Second Amended Complaint, June 3, 2025, at 52-53, 62-63; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 8-9.
[104] Second Amended Complaint, June 3, 2025, at 52-53, 63-64; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 8-9.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

part as part of its alleged failure to provide commercially reasonable offers to access IP licensed under TLAs, including certain products Arm refers to as "Peripheral IP."[105]  I understand from counsel for Arm there is a dispute as to whether these allegations are part of the case.  In the event the Court determines Qualcomm's allegations are indeed part of the case, I provide my opinions below responding to the Kennedy Report's assessment of damages for Arm's alleged breach as it relates to "Peripheral IP."

52.    With respect to the 2013 ALA, I understand Qualcomm contends that Arm:

- breached █████████████████████████████████
  ████████████████████[06]

- breached the covenant of good faith and fair dealing implied in the 2013 ALA by:[107]

  o withholding deliverables,

  o asserting that Qualcomm was in material breach of the 2013 ALA,

  o making public statements, including making the Breach Letter public and making statements to Qualcomm customers, that "create[d] uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs," and

  o failing to negotiate ███████████████████ cover ████████████ of Arm's ISA.

53.    I understand that Qualcomm further alleges that Arm intentionally and negligently interfered with Qualcomm's prospective economic advantage as it relates to Qualcomm's efforts to sell its customers certain SoCs by:[108]

  o purporting to terminate the 2013 ALA, as described above,

  o by intentionally making the Breach Letter public, as described above, and

---

[105] Second Amended Complaint, June 3, 2025, at 34, 55-56; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 8-9, 18.
[106] Second Amended Complaint, June 3, 2025, at 29, 52, 54-55; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 33-34, 49; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 21-22.
[107] Second Amended Complaint, June 3, 2025, at 55-56; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 35, 50; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 19-20, 22.
[108] Second Amended Complaint, June 3, 2025, at 56-59.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

> o  by making misleading statements to Qualcomm customers, as
> described above.

Although Qualcomm has identified several customers associated with this allegation, I
understand that Qualcomm has only quantified damages with respect to Qualcomm's
█████████████████████████.[109]

54.  I describe the specific Arm Implementation Cores and Peripheral IP at issue, the allegedly
withheld deliverables, and the allegedly disrupted Qualcomm SoCs at issue in this dispute
further in **Section 5.8** below.

55.  In addition to the above claims with respect to the 2013 TLA and 2013 ALA, I understand
Qualcomm further alleges that Arm has engaged in violations of California Unfair
Competition Law, Cal. Bus. & Prof. Code §17200 by engaging in the activities described
above as "part of a broader campaign to harm or threaten to harm competition for CPU and
other computer chip designs, in California and elsewhere" and as part of an "attempt to
prevent Qualcomm from developing and marketing products with CPUs that threaten to
outcompete products containing Arm's off-the-shelf CPU designs."[110]

### 5.7 Timeline

56.  I understand Qualcomm references the following events as part of its allegations in this
case:

- **May 20, 2020**: ████████████████████████████
  ████████████████████.[111]

- **August 31, 2022**: Arm filed the *Arm v. Qualcomm* suit.[112]

- **August 2022 and May 2023:** Qualcomm asserts that Arm "reached out
  to Qualcomm customers directly about the status of Qualcomm's [2013
  ALA] license."[113]

---

[109] Kennedy Report, at 68-80.
[110] Second Amended Complaint, June 3, 2025, at 59-62.
[111] Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11,
2025, at 35; ARM_00085567-571.
[112] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022.
[113] Plaintiffs' Supplemental Responses and Objections to Defendants' Defendants' First set of Interrogatories (Nos.
1-9), July 11, 2025, at 35.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

- **Fall of 2022:** Qualcomm asserts that Arm began withholding certain deliverables under its 2013 ALA.[114]

- **November 3, 2022 and December 5, 2022:** Qualcomm notified Arm of its non-compliance with the 2013 ALA.[115]

- **September 2023 – April 2024:** Qualcomm asserts it sent ███████████ to license certain Peripheral IP in September 2023,[116] October 13, 2023,[117] and April 2024.[118]

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████

- **April 18, 2024:** Qualcomm filed its initial complaint.[122]

- **September 20, 2024 and September 27, 2024:** Qualcomm asserts it notified Arm of its alleged failure to comply with certain 2013 TLA licensing terms.[123]

- **October 2, 2024:** Qualcomm sent ███████████████████
  ████████████████████████████████████████████

- **October 22, 2024:** Arm notified Qualcomm that it was in material breach of the 2013 ALA and made the Breach Letter public.[125]

- ████████████████████████████████████████████
  ███████████████████;[126]  Qualcomm asserts that this offer failed to meet Arm's licensing obligations under the 2013 TLA.[127]

---

[114] Second Amended Complaint, June 3, 2025, at 29-30, 52, 54-55; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 33-34, 49; ARM_00056571-573.
[115] Second Amended Complaint, June 3, 2025, at 29-30, 52, 54-55; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 33-34, 49; ARM_00056571-573.
[116] QCVARM_0608131-138, at 133-134.
[117] QCVARM_0613037-039, at 037.
[118] QCVARM_0616935.
[119] QCVARM_0524362.
[120] QCVARM_0616975-976, at 975.
[121] Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 10; QCVARM_0526828-830.
[122] Complaint, April 18, 2024, at 23.
[123] QCVARM_0616912-913; QCVARM_0616916-918.
[124] QCVARM_1151620.
[125] Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 35.
[126] QCVARM_0616967-969.
[127] Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 10-11. *See also*, ARMQC_02783619-730.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

- **October 31, 2024**: Qualcomm sent the first draft of the term sheet to ██████.[128]

- **November 11, 2024**: ██████ provided a revised term sheet to Qualcomm.[129]

- ████████████████████████████████████████████████[130]

- **December 2024 – July 2025**: Qualcomm and ████ engaged in further negotiations.[131]

- **December 16, 2024**: Qualcomm filed its First Amended Complaint.[132]

- **December 20, 2024**: Jury verdict in *Arm v. Qualcomm* dispute.[133]

- ████████████████████████████████████████████.[134]

- **February 4, 2025**: ████████████████████████ ██████ ████████████[135]

- **June 3, 2025**: Qualcomm filed its Second Amended Complaint.[136]

- **July 21, 2025**: ████████████████████████████[137]

### 5.8 Introduction to the Products at Issue

57.    The Kennedy Report identifies the following ARM products at issue under the 2013 TLA breach allegations:[138]

**Table 3**



---

[128] QCVARM_0863641-643; QCVARM_0863644-646.
[129] QCVARM_0864967-968; QCVARM_0864969-972.
[130] QCVARM_0618354.
[131] QCVARM_1151573-577, at 577.
[132] First Amended Complaint, December 16, 2024, at 48.
[133] Verdict Form (Case No. 1:22-cv-01146-MN), December 20, 2024.
[134] QCVARM_0523650-652.
[135] QCVARM_0523650-652, at 652.
[136] Second Amended Complaint, June 3, 2025, at 66.
[137] QCVARM_1151573-577, at 577.
[138] Kennedy Report, at 13-14, 19-20, 45-46, Schedule 5.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



58.     I understand that Arm Implementation Cores are implementations of Arm microprocessor cores that do not contain any customizations.[139]  I refer to the Arm Implementation Cores listed in **Table 3** as either the "Implementation Cores At Issue" or as the "▮▮▮▮▮▮▮" or ▮▮▮▮  Qualcomm first received a license to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as part of the 2019 series of TLA-related agreements under a ▮▮▮▮▮▮▮ license from ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮[140]

59.     I understand that Peripheral IP includes systems IP that work in conjunction with a core.[141] I refer to the Peripheral IP listed in **Table 3**, *i.e.*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, as the "Peripheral IP at Issue."

60.     The Kennedy Report identifies the following ARM products at issue under the 2013 ALA breach allegations:[142]

•       software patches (i.e., source code updates) for the Arm Architecture Compliance Kit ("ACK"), which I understand is a series of test suites that check the compliance of a system against Arm architectural specifications,[143] which are intended for certain Arm ISA-compliant SoCs; and

•       the Out of Box ("OOB") which I understand is a master list of ACK tests,[144] for certain Arm ISA-compliant SoCs.

---

[139] Deposition of William Abbey, June 26, 2025, at 64:16-22; 140:1-4. *See also*, ARM_00103918-972, at 918.
[140] Deposition of Ehab Youssef, June 26, 2025, at 34:24-36:6.
[141] Deposition of William Abbey, June 26, 2025, at 76:3-19; Deposition of Kurt Wolf, June 25, 2025, at 44:2-5.
[142] Kennedy Report, at 5-16.  *See also,* Second Amended Complaint, June 3, 2025, at 29; Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), March 10, 2025, at 8; Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), July 11, 2025, at 19-20.
[143] "System Architecture Compliance Suites (ACS)," Arm, date accessed: September 3, 2025 (accessed: https://developer.arm.com/Architectures/Architectural%20Compliance%20Suite); Interview of Dr. Michael Brogioli. According to Jignesh Trivedi, Director of Engineering at Qualcomm, the terms ACS (i.e., Architecture Compliance Suites) and ACK are used interchangeably. Deposition of Jignesh Trivedi, July 9, 2025, at 14:20-15:1.
[144] Interview of Dr. Michael Brogioli.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

61.    The Kennedy Report identifies the following as ████████████████████
████████████████████████████████████████████



62.    I refer to the above collectively as the "Qualcomm SoCs at Issue."

**6 ANALYSIS OF ARM'S** ████████████████████████ **TO QUALCOMM UNDER** ████████████ **OF THE 2013 TLA**

63.



64.

---

[145] I understand that Qualcomm has alleged that Arm interfered with other customers; **Table 4** lists only the Qualcomm products specifically identified in the Kennedy Report's quantification of damages allegedly associated with the claimed interference. *See,* Kennedy Report, at 68-79, Schedules 7.3 and 7.5.

[146] ███████████████████████████████████████ Kennedy Report, at 74.

[147] ARMQC_02772366-385.

[148] QCVARM_0524362; QCVARM_0616975-976.

[149] See, e.g. QCVARM_1030726-729, at 726, a September 2024 internal Qualcomm email in which Kurt Wolf of Qualcomm writes an update for M55 ████████ "[s]ame reply as w ████████, ARM will not consider extending





65. I have been asked to analyze the 

66. I understand that certain information  have not yet been

---

the M55 license ████████████████ … ARM is waiting to reply sometime closer to expiration of existing license which is in ████████."
[150] QCVARM_0616912-913.
[151] Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 62-63.
[152] QCVARM_0617829-831.
[153] Second Amended Complaint, June 3, 2025, at 52-53.
[154] ARM_00103918-972, at 930.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

produced as of the date of this report due to certain discovery disputes.  For example, I understand Arm ████████████████████████████████████████████, ██████, which I understand has not yet been produced.  As such, my analysis is ongoing, and I expect to be asked to update my analyses and opinions in the event that additional documents and information are produced.

67.    In the sections that follow, I provide: 1) an overview of ████████████████████ ████████ ████████████████; 2) an overview of Arm's ████████████ ██ ████████████; 3) an overview of the evidence available as of the date of this report regarding Arm's ████████████████████ ████ ██████████, including its ████████████████████████████████████████ for the purposes of ████████████████ ████ ██████████;[155] 4) my independent assessment of the evidence available as of the date of this report regarding certain available third-party ████ licenses ████████████████;[156] and 5) observations regarding the ████████████████████████████████████████ ██████ ████████████████████████████ ████████████.

**6.1 Overview of ██████████████████████████ ████████████████**
██████

68.    ████████████████████████████████████████████
████████████████████████████████████ ████
████████████████████████████████████████████
████████████████████████ ████████████████████
████████████████████████████████████████████
████████████████████████████████████████

██ ████████████████████████████████████████████
████████████████████████ ████████████████████

---

[155] ARM_00103918-972, at 930.
[156] Deposition of Kurt Wolf, June 25, 2025, at Exhibit 4; QCVARM_0617829-831.
[157] QCVARM_0524362; Deposition of Kurt Wolf, June 25, 2025, at 92:1-25.
[158] Deposition of Kurt Wolf, June 25, 2025, at 93:1-4.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



71.

---

[159] QCVARM_0604257-259.

[160] Deposition of Kurt Wolf, June 25, 2025, at 41:5-11.

[161] Deposition of Kurt Wolf, June 25, 2025, at 41:5-42:22. *See also*, Deposition of Gerard Williams, June 25, 2025, at 49:13-51:10 where he testifies that ███████████████████████████████████████████████████

[162] Deposition of Kurt Wolf, June 25, 2025 at 75:2-76:17, 81:8-17, 86:4-19. *See also*, QCVARM_0605055-062.

[163] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Interview of Mr. Jeffrey Fonseca. *See also*, Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60. *See also*, Deposition of William Abbey, June 26, 2025, at 66:15-67:9.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



72.  I understand Arm alleges that, despite the ambiguity of ██████████, Arm acted in good faith and ███████████████████████████████████ ██████████. I understand that Arm personnel ████████████████ ███████████████████████████████████ ██████████████████████████████.[167] I understand that, because Qualcomm failed to provide guidance to Arm of its intended uses of ██████████████, ███████████████████████████████ ███████████████████████.[168] ████████████████████ ███████████████████████████████████ ██████████████.[169]

73.  Next, I provide an overview of ██████████ ██████ ████████. I then provide an overview of the available evidence regarding Arm's ██████████ ██████.

**6.2 Overview of Arm's ██████████ ██ ████████████████████**

74.  Arm's ████████ ███████████████████████████████████

---

[164] I understand that the negotiation process for the 2019 licensing deal with Qualcomm ████████████████████ ██████████████. Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[165] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Interview of Mr. Jeffrey Fonseca.

[166] Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59.

[167] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[168] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[169] Deposition of Kurt Wolf, June 25, 2025, at Exhibit 4; QCVARM_0617829-831; Interview of Mr. Jeffrey Fonseca.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

**Figure 1**
**Arm's October 2024 HHY Licensing Offer to Qualcomm[170]**



75.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

76.   In addition to the above-listed fees and royalty rates, the offer's general terms listed, among other things:[173]

---

[170] QCVARM_0616967-969, at 968.
[171] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[172] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[173] QCVARM_0616967-969, at 969.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



### 6.3 Overview of Arm's ██████████████████████

77.    In this section, I discuss my understanding of the ████████████████████ ██████████████ Arm's interrogatory responses and deposition testimony provide evidence regarding ███████████████████████████ ████████ portion of the offer described above. I have also interviewed Mr. Akshay Bhatnagar, Mr. Jeffrey Fonseca, Mr. Karthik Shivashankar, and Mr. Ehab Youssef regarding Arm's ████████

78.    Arm describes the ██████████████████████████████ as follows:[174]



---

[174] Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60. *See also,* Deposition of Karthik Shivashankar, June 20, 2025, at 63:12-24, 67:12-20, 82:10-83:2; 85:9-86:10. *See also,* Deposition of William Abbey, June 26, 2025, at 65:13-68:1

[175] ARMQC_02779314-363, at 314, 347; ARMQC_02774844-855, at 844; and ARMQC_02774816-817.

[176] ARMQC_02779483-500, at 483; ARMQC_02774738-747, at 738, 746.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



- 

- 

- 



**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

---

[188] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef. *See also,* Deposition of Ehab Youssef, June 26, 2025, at 68:6-71:7; Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60.

[189] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef. *See also,* ARMQC_02779314-363, at 347; ARMQC_02774816-817; ARMQC_02783967-084, at 971-976; QCVARM_0616967-969.

[190] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef. "2024 Business Report for the year ended December 31, 2024," Samsung Electronics Co., Ltd., date accessed: September 1, 2025 (accessed: https://images.samsung.com/is/content/samsung/assets/global/ir/docs/2024_4Q_Interim_Report.pdf), at 4-5; "System Processors," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/products/system-processors); Qualcomm describes its QCT Segment as "a leading developer and supplier of integrated circuits products and system software with advanced connectivity and high-performance, low-power computing technologies, for use in mobile devices; automotive systems for connectivity, digital cockpit and ADAS/AD; and IoT including consumer electronic devices, industrial devices and edge networking products." In addition to its QCT segment, Qualcomm also operates a technology licensing segment and a strategic investments (Qualcomm Ventures) segment. Qualcomm Incorporated Form 10-k for the fiscal year ended September 29, 2024, date accessed: September 1, 2025 (accessed: https://s204.q4cdn.com/645488518/files/doc_financials/2024/q4/QCOM-09-29-24-FY2024-10-K.pdf), at 10-13.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



---

[191] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60.

[192] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60.

[193] Deposition of Ehab Youssef, June 26, 2025, at 71:15-72:3. See also, Shivashankar, at 97:18-98:2.

[194] I understand that ▮▮▮▮▮▮▮▮ of the 2013 TLA does not require consideration of ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[195] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

79. I understand that it is Arm's position that the ███████████ ████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████████[196] I further
understand that Arm contends that ██████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████

## 6.4 Evaluation of Third Party TLA Licenses Available as of the Date of This Report

80. As described above, █████████████████████████████████████,
███████████████████████████████████████████████ for
Qualcomm:



---

[196] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 60-61, Deposition of Ehab Youssef, June 26, 2025, at 68:13-69:23, 71:15-25.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

151.   Based on my understanding of the ████ ████████████████████████, the evidence regarding ████████████████████████████████████████ ████ my independent assessment of third-party license agreements available as of the date of this report, evidence that the ██████ ████████████████████████████████████████████████████ ████████████████ and based on my training and experience, it is my opinion that:

•

•

•

•

152.   In the event additional information is produced, I intend to supplement or update my analysis upon receipt of this information.

## 7   RESPONSE TO THE KENNEDY REPORT

153.   As an initial matter, I note certain analyses that are absent from the Kennedy Report. First, the Kennedy Report made no attempt to quantify Qualcomm's alleged present "harm" due

to Arm's ███████████████████████.[390]  Although Qualcomm declined to accept ████████████████████████, as noted above, Qualcomm has had a license to ████████████████████████████████████████████████████████ ████████████████[391]  Therefore, Qualcomm has ████████████ to continue to use those IPs, to the extent it so chooses. ████████████████████████████ ████████████████████████████████████████.[392]  This evidence, as well as the Kennedy Report's lack of quantification, calls into question the extent to which Qualcomm has indeed suffered any actual harm to date as a result of Arm's ████████████████ ██



155.    With respect to analyses that are put forward in the Kennedy Report, I have been asked to respond to 1) the Kennedy Report's comparison of ████████████████████████ ████████████████ ████ ████████████████ relative to certain benchmarks; 2) the Kennedy Report's estimate of Qualcomm's damages associated with alleged overpayment of license fees for the Peripheral IP at issue, including the Kennedy Report's analysis of a "but-for" price; 3)  the Kennedy Report's estimate of Qualcomm's damages

---

[390] *See generally,* Kennedy Report.
[391] ARMQC_02772366-385, at 366-367.
[392] Deposition of Kurt Wolf, June 25, 2025, at 41:5-42:22, 75:2-76:17, 81:8-17, 86:4-19; Deposition of Gerard Williams, June 25, 2025, at 46:18-51:10.
[393] *See generally,* Kennedy Report.
[394] Kennedy Report, at 47-48.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

associated with Arm's alleged interference with Qualcomm's prospective economic advantage; and 4) the Kennedy Report's quantification of ████████████████████ ████████ to a) evidence regarding the harm Qualcomm alleges it suffered under the alleged ALA and TLA breaches and, b) the amount of support and maintenance fees paid by Qualcomm under the terms of the ALA.

**7.1 The Kennedy Report's Comparison of Arm's ████████ ███ ████████ to Certain Benchmarks**

156.   As described throughout this report, Qualcomm alleges that ████████████ ███ ████████████████████████████████ ███ ████████████ ████████████████████████ ████████ ████████████████████

157.   The Kennedy Report compares ████████████████████████ ███ ████████████████████████████████████████ ████████████████ ████████████████████████████████████; ████████████████████████████. As described in the sections that follow, I understand that the first two comparisons are not relevant under the terms of the allegedly breached section of the TLA.

158.   The Kennedy Report's observations under the third comparison are misleading and incomplete even with respect to the third-party agreements that have been produced as of the date of this report. The Kennedy Report asserts that an analysis of third-party agreements is not possible with the available information. However, as demonstrated above, it is possible to identify relevant terms and ████████████████ ███ ████████████████████████████████████████ ██ ████████████████ ████████████████████ ██ ████████████████████. Therefore, the Kennedy Report's failure to adequately analyze the "████████████████," including the failure to address certain obvious issues altogether, further underscores the Kennedy Report's failure to demonstrate that the ████████ ████████████████████████████████



### 7.1.1  The Kennedy Report Analysis of ███████████ ███ ███████████ **Focuses on Measures that Are**

---

[395] ARM_00103918-972, at 930.
[396] Deposition of Jonathan Weiser, July 11, 2025, at 181:2-182:17.
[397] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**





---

[401] Kennedy Report, at 25-26.
[402] Kennedy Report, at footnote 131.
[403] Deposition of Karthik Shivashankar, June 20, 2025, at 47:18-21, testifying that ███████████
████████████████
[404] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[405] Kennedy Report, at 25 and footnote 131, citing ARMQC_02784199-203 at 202.
[406] ARMQC_02784199-203 at 202.
[407] Kennedy Report, at 26 and footnote, citing ARMQC_02747567-569 at 568.
[408] Kennedy Report at 25.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



---

[409] Kennedy Report, at Figure 9.

[410] *See* Kennedy Report, at footnote 158.

[411] ██████████████████████████████████████████████████████

[412] *See* **ATTACHMENT 8.0.** *See also,* Kennedy Report, at Schedule 4.1. Total license fees have been divided by the respective term to reflect average annual license fees. *See also*, ARMQC_02784120-198, at 132.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

███████████████████████████████████████████████

### 7.1.2 The Kennedy Report Analysis of Third-Party TLA Agreements Is Incomplete

167.    The Kennedy Report describes its assignment regarding third party TLA agreements as follows:  "I have been asked by Qualcomm's counsel to assess Arm's claims discussed above regarding its ████████████████████████."[414]  The claims are that 1) ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████

168.    The Kennedy Report acknowledges that it is not possible to evaluate the second and third claims as the ████████ agreement has not been produced.  It then argues that it is not possible to evaluate whether ████████ ████████████████████████████, as Arm has not produced all such agreements.[416]  As discussed in **Section 6.5** above, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ In the event that more ████ agreements become available, I will update my analyses and opinions accordingly.

███████████████████████████████████████████████

---

[414] Kennedy Report, at 37-38.
[415] Kennedy Report, at 37-38.
[416] Kennedy Report, at 38.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

169. The Kennedy Report then offers "observations of royalty rates included in Arm's agreements with other third parties that have been produced"[417] and concludes that these observations indicate ██████████████████████ ██████████████████ ████████████████████████████ Despite evidence that Qualcomm's own witness acknowledged the TLA ████████████████████ ████[419] the Kennedy Report analysis focuses exclusively on a comparison of royalty rates, and does not include a full analysis of "████████████████████ ██████ ████████████ ██████████████████ ████████████████████████████.[422]

170. While the Kennedy Report lists some basic information ████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████ pointing to incomplete production.[423]  However, my own analysis in **Sections 6.4 and 6.5** demonstrates that a more fulsome analysis based on the available information is in fact possible.



---

[417] Kennedy Report, at 40.
[418] Kennedy Report, at 42.
[419] Deposition of Jonathan Weiser, July 11, 2025, at 84:5-85:10.
[420] ARM_00103918-972, at 926-930.
[421] ARM_00103918-972, at 930.



[423] Kennedy Report, at 40.
[424] Kennedy Report, at 45.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



173.    As such, the Kennedy Report analysis of third-party agreements is incomplete.

174.    Based on the above, it is my opinion that the Kennedy Report (while recognizing its own analysis to be incomplete) fails to show that the ███████ ███ ██████████

---

425 Kennedy Report, at 45.
426 ARM_00103918-972, at 930.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

██████████████████████████████████████████████████████████
████████████████████████

175.    To the extent Mr. Kennedy attempts to address these clear gaps in the analysis, I reserve the right to supplement my opinions.

### 7.2 The Kennedy Report's Analysis of Alleged Overpayment for Peripheral IP Licenses

176.    The Kennedy Report calculates damages related to Arm's alleged breach of the implied covenant of good faith and fair dealing related to the TLA as the amount that Qualcomm allegedly overpaid for its license to the Peripheral IP at Issue.[427]  As discussed above, I understand the parties dispute whether this is an issue presently in the case. I nonetheless address it here in the event the Court determines it is an issue for trial.

177.    The Kennedy Report calculates the amount of alleged overpayment as the difference between the price offered by Arm in ████████ (which Qualcomm agreed to ████████ ████ and paid ██████████ but now asserts was made in "bad faith" and was "commercially unreasonable"[429]) and a "but-for" price.[430]  The Kennedy Report opines that the but-for price for each of the Peripheral IPs at Issue would have been ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████

178.    In the alternative, the Kennedy Report uses a but-for price equal to that in Arm's ████████ ██████████████████ (which Qualcomm accepted in principle but asked Arm to modify the scope of licensed IP).[433] ████████████████████████████████████████ ██████████████████████████████████

---

[427] Kennedy Report, at 45-46.
[428] Kennedy Report, at 54; QCVARM_0523650-652, at 652;  QCVARM_1121930-931.
[429] Kennedy Report, at 63; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 10-11.
[430] Kennedy Report, at 63-67.
[431] Kennedy Report, at 66.
[432] Kennedy Report, at 66.
[433] QCVARM_0616967-969; QCVARM_0618354.
[434] Kennedy Report, at 67.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

179.    As described further in the sections that follow, the Kennedy Report fails to show from a

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████, and the Kennedy

Report's quantification of the alleged overpayment for Peripheral IP licenses relies upon a

but-for price that is not supported by the available evidence.  Further, Qualcomm's own

acceptance of the Peripheral IP license with no objection or negotiation is an indication of

commercial reasonableness.  Taken together, these shortcomings indicate the Kennedy

Report's estimate of the alleged overpayment is speculative and should be set aside.

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

### 7.2.1    Qualcomm's Acceptance of the Peripheral IP License Is an Indication of Commercial Reasonableness

182.    ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

---

435 ARM_00103918-972, at 931.
436 Kennedy Report, at 48.
437 QCVARM_0608131-138, at 133-134.
438 QCVARM_0613037-039, at 037.
439 QCVARM_0616935.
440 QCVARM_0616967-969.

████████████████████████████████████████████████████████

████████████████ ,,441

183. ████████████████████████████████████████████████████████

████████████████████████████ ███████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

185. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ ,,446 Qualcomm signed its acceptance of this offer ████████

---

[441] QCVARM_0616967-969, at 969.
[442] QCVARM_0618354.
[443] QCVARM_0605055-062, at 057-058.
[444] Deposition of Kurt Wolf, June 25, 2025 at 75:2-76:17,
[445] QCVARM_0523650-652.
[446] QCVARM_0527544-548, at 544.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



186.    I am aware of testimony from Ms. Larissa Cochron, Senior Director of Contracts at Qualcomm, who indicated that Qualcomm disagreed that the renewal fees for the Peripheral IP at Issue should increase relative to the prices Qualcomm received in 2019.[450] Despite Ms. Cochron's testimony regarding Qualcomm's viewpoint, I am not aware of evidence that Qualcomm expressed any objections or concerns to Arm regarding the _commercial reasonableness_ of the license fees for the Peripheral IP at Issue that Arm ███████████████████████████, nor am I aware of evidence that Qualcomm requested that Arm reduce the proposed license fees or otherwise attempted to negotiate the price prior to accepting the offer or paying the agreed-upon fees.[451]  Indeed, Ms. Cochron's testimony that Qualcomm accepted Arm's ████████ because it felt it could absorb the fee increase[452] appears to be an indication that, while Qualcomm would have preferred not to pay the proposed fees, it still found the offered fees to be commercially reasonable.

187.    Despite evidence of Qualcomm's acceptance of Arm's offered terms, the Kennedy Report presents a comparison of the ████████ fees in ███████████████████ ███[453] to the ██████ fees for Peripheral IP at Issue implied in Qualcomm's 2019

---

[447] QCVARM_0523650-652, at 652.
[448] QCVARM_0573056-057 at 056.  Arm signed the agreement on February 18, 2025.
[449] QCVARM_1121930 and QCVARM_1121931.
[450] 30(b)(6) Deposition of Larissa Cochron, July 11, 2025, at 134:9-135:11.
[451] Interview of Mr. Jeffrey Fonseca. ████████████████████████████

████████████████████████████████████████

[452] Ms. Cochron testified that Qualcomm accepted the offer for the peripherals because ████████ ████████████████████████████          30(b)(6) Deposition of Larissa Cochron, July 11, 2025, at 134:9-135:11.

████████████████████████████████████████

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

license.[454]  Notably, however, Qualcomm's ███████████████████████████████

makes no reference to the price it previously paid to Arm for the same IP, makes no claim

it is entitled to the same prices, and makes no request that the offer be revised to include

the same prices.[455] ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ As such,

the Kennedy Report's comparisons to the "actual" fees paid by Qualcomm in 2019 are not

as informative to the commercial reasonableness of Arm's ████████████████████

████ as is Qualcomm's actual acceptance of the higher prices.



**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

---

[458] *See* **ATTACHMENT 9.0**; Kennedy Report, at Schedule 3.4. Total license fees have been divided by the respective term to reflect average annual fee and have been adjusted for selling and marketing. *See also*, ARMQC_02784120-198, at 132.
[459] Kennedy Report, at 64.
[460] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

### 7.2.2  The Kennedy Report's But-For Price is Not Supported by the Available Evidence

190.    Despite evidence regarding Qualcomm's acceptance of the Peripheral IP license in ████████ and the lack of evidence that Qualcomm objected to or attempted to negotiate the offered prices before signing the agreement, the Kennedy Report offers damages calculations assuming Qualcomm overpaid for Peripheral IP under ███████ ████████.

191.    The Kennedy Report does not appear to offer its own opinion that Arm's licensing offers for Peripheral IP were "commercially unreasonable and made in bad faith," but rather references Qualcomm's allegations in that regard.[462]  The Kennedy Report does not offer an analysis of what the threshold price for a "commercially reasonable" offer would be, nor does it define precisely what a "good faith" offer would entail or why an offer at a price higher than that previously paid by Qualcomm must necessarily be considered "bad faith" – a particularly relevant inquiry in light of my understanding that the terms of the TLA as they relate to Peripheral IP do not preclude price increases or require certain ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[461] QCVARM_0616967-969, at 967; QCVARM_0618354; and QCVARM_0523650-652, at 650, 652.
[462] Kennedy Report, at 63-67.
[463] Kennedy Report, at 64.
[464] Kennedy Report, at Section V.D.i.a.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

193. Additionally, the Kennedy Report provides no reasonableness checks or additional data points in support of its calculation of but-for prices. Rather, the Kennedy Report asserts that 1) Arm would have licensed ██████████████ at the same time (resulting in a broader scope of licensed IP) had the offered rates been "fair and reasonable"[466] and that 2) the "full scope of Qualcomm's actual licensing with Arm" including evidence that Qualcomm is one of Arm's "major" customers would have entitled Qualcomm to the same ████ in 2025 as it received in 2019.[467]

194. In light of the above, the Kennedy Report's analysis of the "but-for" price for Peripheral IP is unsupported and should be set aside.

### 7.2.2.1 Conclusion

195. As described in the sections above, the evidence indicates that the Kennedy Report's calculation of alleged overpayment based ████████████████████████ ████████████████████ Instead, the evidence indicates that Qualcomm itself did not object to Arm's offer and determined it could "absorb" the price increase.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

The fact that Qualcomm now claims in hindsight several million dollars in damages for an offer that it accepted and paid undermines the notion that it was "harmed" or suffered "damages" as a result of Arm's offer. This evidence, combined with my understanding that it is ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████ indicates that the prices Qualcomm paid for the Peripheral IP at Issue were reasonable.[468] In the event the trier-of-fact agrees, damages under this cause of action are zero.



---

[525] Deposition of Cristiano Amon, July 3, 2025, at 77:11-78:24.
[526] Kennedy Report, at 79.
[527] **ATTACHMENT 7.0.**
[528] Kennedy Report, at 15-17, 19-22.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



# Professional Credentials

## ATTACHMENT 1.0

**Thomas W. Britven**
*CPA, CGMA, CFE, CVA, CLP*

*Thomas Britven is a Partner at HKA Global LLC, and former President of ASQ Consulting, a leading provider of independent financial and advisory services.*

**Testimony**

- *Deloitte Consulting, LLP and Deloitte Development, LLC v. Sagitec Solutions, LLC*; Case No. 23-325-WCB; United States District Court for the District of Delaware; 2025.

- *Biohaven Therapeutics Ltd. and Yale University v. Avilar Therapeutics, Inc. and RA Capital Management GP, LLC*; C.A. No. 23-cv-328-JLH-CJB; United States District Court for the District of Delaware, 2025.

- *Oil States Energy Services, LLC v. Worldwide Machine, Inc.*; Civil Action No. 4:23-cv-00557; Deposition before the Southern District of Texas, Houston Division, 2024.

- *State Farm Mutual Automobile Insurance Co. v. Amazon.com, Inc. and Amazon.com Services LLC*; Case No. 1:22-01447-CJB; Deposition before the District of Delaware, Wilmington Division, 2024.

- *Hutchinson Technology Incorporated v. Suncall Corporation;* Case No. 21-cv-02618 SRN-TNL; Deposition before the United States District Court for the District of Minnesota, 2024.

- *Mednet Solutions, Inc. v. Eric Jacobson, and Veeva Systems, Inc.*; Case No. 0:20-cv-02502 DSD-JFD; Deposition before the District Court of Minnesota, 2024.

- *Walter Kidde Portable Equipment Inc. v. First Alert, Inc., BRK Brands, Inc.*; Case No. 6:22-cv-00566; Deposition before the Western District of Texas, Waco Division, 2023.

- *Onpoint Systems, LLC v. Protect Animals with Satellites, LLC*; C.A. No. 20-657; Deposition before the Eastern District of Texas, Sherman Division, 2023.

- *Lindt & Sprungli (North America) Inc., Lindt & Sprungli (USA), Inc., Ghirardelli Chocolate Company and Russell Stover Chocolates, LLC v. GXO Warehouse Company, Inc. f/k/a XPO Logistics Supply Chain*; Case No. 4:22-cv-00384; Deposition (2023) and trial (2024) before the Western District of Missouri, Western Division.

- *Omnitracs, LLC and XRS Corporation v. Platform Science, Inc.;* Case No. 3:20-cv-0958-CAB-MDD, Deposition (2023) and trial (2024) before the Southern District of California.

- *Unisys Corporation v. Leon Gilbert, Michael McGarvey, Atos SE and Atos IT Solutions and Services, Inc.*, Case No. 2:23-cv-00555-PD, Deposition before the Eastern District of Pennsylvania, 2023.

*Thomas W. Britven*
Page 2

*Testimony (continued)*

- *Inovalon Insights, LLC v. Komodo Health, Inc.*; *Case No. 01-22-002-3064;* Arbitration before the American Arbitration Association, 2023.

- *Carrum Technologies, LLC v. Ford Motor Company, Case No. 18-1647-RGA;* Deposition before the United States District Court for the District of Delaware; 2023.

- *J.S.T. Corporation v. Robert Bosch LLC, f/k/a Robert Bosch Corporation, Robert Bosch GmbH, and Bosch Automotive Products (Suzhou) Co., Ltd.; Case No. 2:15-cv-13842-AC-EAS;* Deposition before the United States District Court for the Eastern District of Michigan, Southern Division; 2022.

- *Epistar Corporation v. Lowe's Companies, Inc., Lowe's Home Centers, LLC; Case No. 6:20-cv-00420-ADA;* Deposition before the United States District Court for the Western District of Texas, Waco Division; 2022 and 2024.

- *RiseandShine Corporation d/b/a Rise Brewing v. Pepsico, Inc.; Case No. 1:21-cv-3198;* Deposition before the United States District Court for the Northern District of Illinois; Eastern Division; 2022.

- *Taiwan Semiconductor Manufacturing Co. v. Silicon Storage Technology Inc.; Case No. 01-21-0002-5445;* Deposition and Testimony in arbitration before The American Arbitration Association; 2022.

- *Camac Fund LP v. W. Heath Hawk, Vasileios Sfyris, and Benjamin Thomas Wiler; Case No. 1440007256;* Testimony in arbitration before Judicial Arbitration and Mediation Services, Inc. (JAMS); 2022.

- *Allrounds, Inc. v. eShares, Inc. et al.*; Case No. 3:20-cv-07083-VC; Deposition before the Northern District of California, 2022.

- *Koss Corporation v. Apple Inc.;* Case No. 6:20-cv-00665-ADA; Deposition before the Western District of Texas; 2022.

- *Kraft Heinz Foods Company v. Capri Sun Group Holding AG, Capri Sun GMBH, Indag Pouch Partners GMBH, and Rudolf Wild GMBH & Co. KG;* Arbitration in The International Centre for Dispute Resolution; ICDR Case No. 01-20-0001-7551, 2022.

- *Magema Technology LLC v. Phillips 66, Phillips 66 Company and WRB Refining LP; Case No. 4:20-cv-02444;* Deposition and trial before the Southern District of Texas, Houston Division, 2022, 2023.

- *The Chamberlain Group Inc. v. Overhead Door Corporation; Case No. 2:21-cv-0084-JRG;* Deposition and trial before the Eastern District of Texas, 2021, 2022 and 2023.

- *Kimberly-Clark Corporation and Kimberly-Clark Global Sales, LLC v. Extrusion Group, LLC; Extrusion Group Services LLC; EG Global, LLC; EG Ventures, LLC; Michael Houston; and Michael Cook; Case No. 1:18-cv-04754-SDG;* Deposition before the Northern District of Georgia, 2021.

- *Precision Medicine Group, LLC, Precision Advisors Group, Inc. and Precision Medicine Group Holdings, Inc. v. Blue Matter, LLC, Naina Ahmad, Jose Jauregui, and Mridul Malhotra; Case No. 1:20-cv-02974 (PGG);* Deposition before the Southern District of New York, 2021.

*Thomas W. Britven*
Page 3

*Testimony*
*(continued)*

- *Aspen Energy Partners, LLC and Rigminder, Inc. v. Trinidad Design & Manufacturing US, Inc. and Ensign Drilling, Inc.; No. 2019-38586;* Deposition before the 55th Judicial District Court, Harris County, Texas, 2021.

- *The Tempo at Encore, LP and CPDG2, LLC v. Siltek Group, Inc. Berkley Insurance Company, Ana P. Silveira-Sierra, Rene Sierra, Tron Construction, LLC and Siltex Group, Inc. v. The Tempo At Encore, LP and CPDG2, LLC; Case No. 16-CA-005748 (L); Consolidated for discovery with Case No. 17-CA-007385 (L);* Deposition and trial before the 13th Judicial Circuit Court of Hillsborough County, Florida, 2021 and 2023.

- *Texas Advanced Optoelectronic Solutions Inc. v. Intersil, Inc.; Case No. 4:08-cv-451;* Deposition and trial before the United States District Court for the Eastern District of Texas (Sherman Division), 2020 and 2021.

- *In re: C2R Global Manufacturing, Inc., Debtor; Case No. 18-30182-beh (Chapter 11 Proceeding);* Deposition before the United States Bankruptcy Court for the Eastern District of Wisconsin, 2020.

- *ESI Group, ESI North America, Inc. and ESI US R&D, Inc. v. Wave Six, LLC, Dassault Systemes Simulia Corp., Philip Shorter, Vincent Cotoni, Sascha Merz, and Terence Connelly; Case No. 3:17-cv-02293-AJB-MSB;* Deposition before the United States District Court for the District of California, 2020.

- *Personalized Media Communications, LLC v. Google LLC; Civil Action No. 2:19-cv-00090;* Deposition and trial before the United States District Court for the Eastern District of Texas (Marshall), 2020.

- *Baker Hughes Oilfield Operations LLC v. Smith International, Inc.; Civil Action No. 4:16-cv-1956;* Deposition before the United States District Court for the Southern District of Texas, 2019.

- *International Technologies & Systems Corporation, d/b/a/ ID Tech v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.; Case No. 8:17-cv-01748-DOC-JDE;* Deposition before the United States District Court for the Central District of California, 2019.

- *Smith International, Inc. v. Baker Hughes; Case No. 1:16-cv-00056-ER;* Deposition before the United States District Court for the District of Delaware, 2019.

- *Huawei Technologies Co., Ltd., Futurewei Technologies, Inc. v. Yiren Ronnie Huang, CNEX Labs, Inc.; Case No. 4:17-cv-893 ALM;* Deposition and trial before the Eastern District of Texas, 2019.

- *Schlumberger Technology Corporation v. BICO Drilling Tools, Inc; Civil Action 4:17-cv-3211;* Deposition before the Southern District of Texas, 2019.

- *Finjan, Inc. v. ESET, LLC, et al.; Civil Action No. 3:17-cv-00183;* Deposition and trial before the Southern District of California, 2019 and 2023.

- *Syntel Sterling Best Shores Mauritius Limited, and Syntel, Inc. v. The TriZetto Group, Inc. and Cognizant Technology Solutions Corp.; Civil Action No. 1:15-cv-0211;* Deposition and trial before the Southern District of New York, 2019, 2020, 2025.

*Thomas W. Britven*
**Page 4**

<table>
<tr>
<td><b><i>Publications and Presentations</i></b></td>
<td>

• *"Epic Systems Corporation, Plaintiff v. Tata Consultancy Services, et al, Defendants: Trade Secret Discussion," Dentons, October 17, 2016,*

• *"Intellectual Property Damages and Daubert," McAndrews, Held & Malloy, May 19, 2016.*

• *"Inter Partes Review and Secondary Considerations," Norton Rose Fulbright, January 11, 2016.*

• *"Intellectual Property Damages Update," The Elliott Law Firm, December 11, 2015.*

• *"The Use of Surveys for U.S. Patent Litigation," Kaye Scholer LLP, November 2013.*

• *"The Use of Surveys for U.S. Patent Litigation," State of California Continuing Legal Education, June 2013.*

• *"A Discussion of Economic Damages and the Entire Market Value Rule," State of Colorado Supreme Court Board of Continuing Legal & Judicial Education, Cooley LLP, 2013.*

• *"A Discussion of Economic Damages and the Entire Market Value Rule," State Bar of Texas Continuing Legal Education, Porter Hedges LLP, 2013.*

• *"Intellectual Property Damages, Putting the Pieces Together," A Discussion of Economic Damages and the Entire Market Value Rule, Southern Methodist University, 2013.*

• *"Impact of the America Invents Act on Business," Group Facilitator, Licensing Executive Society (USA and Canada), Inc. IP100 Executive Forum, 2012.*

• *"Trade Secret Damages," Chapter 9, Calculating and Proving Damages (coauthored with Christopher H. Spadea, et al.) (New York: Law Journal Press, 2011, Updated 2013, 2015).*

• *"Sharing the Risk: Patent Infringement Liability Indemnification and Insurance" Intellectual Property Litigation, Volume 21, Number 3, Spring 2010 (coauthored with Kim Cauthorn and Tamara Turek).*

• *"Approaches for Valuing Biotechnology/Pharmaceutical Inventions" Practicing Law Institute, Biotechnology Patents & Business Strategies in the New Millennium, San Diego, August 6-7, 2001.*

• *"Patent Valuation from a Business and Litigation Perspective" Licensing Executive Society (U.S.A. and Canada), Inc., Annual Meeting, Chicago, 2002.*

</td>
</tr>
<tr>
<td><b><i>Professional and Business History</i></b></td>
<td>

*HKA Global (2023-present), Partner.*

*ASQ Consulting (2014-present), President.*

*Duff & Phelps (2008-2014), positions held include: Global Intellectual Property Practice Co-Leader (2014), National Intellectual Property Consulting Practice Leader (2008-2014), and Managing Director (2008-2014).*

*Lumin Expert Group (merged with Duff & Phelps) (2006-2008), positions held include: President (2007-2008) and Managing Director (2006-2007).*

</td>
</tr>
</table>

| | |
|---|---|
| ***Professional and Business History*** *(continued)* | *LECG (2002-2006), positions held include: Senior IP Practice Director (2006), Governing Board (2002-2006), and Managing Director (2002-2006).* |
| | *Navigant Consulting (and its predecessor companies) (1983-2002), positions held include: Director (1999-2002), Vice President (1991-1999), Executive Consultant (1986-1991), and Senior Consultant (1983-1986).* |
| | *Amsted Industries (1981-1983), positions held include: Senior in Charge Auditor (1983), Senior Auditor (1982-1983), and Staff Auditor (1981-1982)* |
| ***Education and Certifications*** | Owner/President Management Program, Harvard Business School – 2012 to 2014 |
| | Chartered Global Management Accountant – May 2012 |
| | Certified Licensing Professional – May 2010 |
| | Intellectual Property and Business Strategy Program, Harvard Business School –February 2010 |
| | Leading Professional Services Firms Program, Harvard Business School – March 2009 |
| | AICPA Accredited in Business Valuation – May 2006 – March 2023 |
| | Certified Valuation Analyst – February 2004 |
| | Certified Fraud Examiner – December 1992 |
| | Certified Public Accountant, Florida – January 1989 |
| | Certified Public Accountant, Texas – February 1984 |
| | Passed Certified Public Accountant Examination, Iowa – February 1982 |
| | B.B.A., Accounting, University of Iowa – May 1981 |
| ***Professional Associations & Affiliations*** | Former Board of Directors and President of LES Foundation – 2013 and 2014 |
| | Former Board of Directors and Treasurer of LES Foundation – 2012 |
| | Former Associate Member American Bar Association |
| | Former Examiner to Federal Bankruptcy Court |
| | Member National Association of Certified Valuation Analysts |
| | Member Licensing Executive Society |
| | Member American Institute of Certified Public Accountants |
| | Member Houston Chapter of Texas Institute of Certified Public Accountants |
| | Member Association of Certified Fraud Examiners |

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1. QC HHY Royalty Report from L. Cochran Deposition
2. ARM_00001067-084
3. ARM_00001192-193
4. ARM_00001195-197
5. ARM_00001198-200
6. ARM_00001473-475
7. ARM_00001495-497
8. ARM_00001512-514
9. ARM_00001777-779
10. ARM_00002045-075
11. ARM_00003305
12. ARM_00005340-344
13. ARM_00006123-155
14. ARM_00009370-375
15. ARM_00025401-403
16. ARM_00035319-320
17. ARM_00036346-348
18. ARM_00037077
19. ARM_00039179-196
20. ARM_00043924-926
21. ARM_00052643-644
22. ARM_00055357-399
23. ARM_00056307-317
24. ARM_00056332-333
25. ARM_00056571-573
26. ARM_00062055-056
27. ARM_00062441-473
28. ARM_00062474-493
29. ARM_00063283-284
30. ARM_00063298-312
31. ARM_00064523
32. ARM_00067349-372
33. ARM_00067636-639
34. ARM_00067726-727

35. ARM_00068087-110
36. ARM_00068131-154
37. ARM_00068202-204
38. ARM_00068459-482
39. ARM_00068504-527
40. ARM_00075096-097
41. ARM_00075098-130
42. ARM_00075343-366
43. ARM_00076113-145
44. ARM_00076357-358
45. ARM_00076910
46. ARM_00079223-225
47. ARM_00079226-230
48. ARM_00079507-514
49. ARM_00079722-723
50. ARM_00080651-653
51. ARM_00080874-880
52. ARM_00081203-208
53. ARM_00082083-089
54. ARM_00082120-127
55. ARM_00082874
56. ARM_00083490-491
57. ARM_00083492
58. ARM_00083608-609
59. ARM_00084600-602
60. ARM_00085567-571
61. ARM_00085581-585
62. ARM_00085679
63. ARM_00085680
64. ARM_00085710
65. ARM_00085719-723
66. ARM_00086164-245
67. ARM_00087431-435
68. ARM_00087439-443
69. ARM_00087640-643

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 70. ARM_00087825-827 | 105. ARM_00103918-972 |
| 71. ARM_00087844-850 | 106. ARM_00104158-174 |
| 72. ARM_00087865-866 | 107. ARM_00105045-048 |
| 73. ARM_00087868-870 | 108. ARM_00105723-725 |
| 74. ARM_00088011-015 | 109. ARM_00110017-030 |
| 75. ARM_00089058-063 | 110. ARM_00110130-136 |
| 76. ARM_00089070-077 | 111. ARM_00110507 |
| 77. ARM_00090791 | 112. ARM_00110509 |
| 78. ARM_00091389-405 | 113. ARM_00110511 |
| 79. ARM_00091657-658 | 114. ARM_00110513 |
| 80. ARM_00091659-686 | 115. ARM_00110515 |
| 81. ARM_00091714-741 | 116. ARM_00110517 |
| 82. ARM_00091768-784 | 117. ARM_00110542-548 |
| 83. ARM_00091799-817 | 118. ARM_00110871-880 |
| 84. ARM_00091834-852 | 119. ARM_00110914-915 |
| 85. ARM_00091869-887 | 120. ARM_00111449 |
| 86. ARM_00091903-917 | 121. ARM_00111591-593 |
| 87. ARM_00094098-143 | 122. ARM_00112097-101 |
| 88. ARM_00094546-548 | 123. ARM_00112122-126 |
| 89. ARM_00095578 | 124. ARM_00113178 |
| 90. ARM_00095579 | 125. ARM_00113179-192 |
| 91. ARM_00096879-905 | 126. ARM_00114880 |
| 92. ARM_00097521 | 127. ARM_00118835-938 |
| 93. ARM_00097522 | 128. ARM_00119119 |
| 94. ARM_00097625-627 | 129. ARM_00119602 |
| 95. ARM_00098373-375 | 130. ARM_00132241-242 |
| 96. ARM_00100013-029 | 131. ARM_01014940-941 |
| 97. ARM_00102683 | 132. ARM_01020186-189 |
| 98. ARM_00103566-600 | 133. ARM_01020195-196 |
| 99. ARM_00103635-669 | 134. ARM_01215564 |
| 100. ARM_00103702-703 | 135. ARM_01215878-879 |
| 101. ARM_00103710-711 | 136. ARM_01215885 |
| 102. ARM_00103718-719 | 137. ARM_01215887 |
| 103. ARM_00103781-782 | 138. ARM_01215888 |
| 104. ARM_00103804-818 | 139. ARM_01215889 |

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 140. ARM_01215890 | 175. ARM_01231032 |
| 141. ARM_01215997-6001 | 176. ARM_01231033 |
| 142. ARM_01216178-179 | 177. ARM_01231034 |
| 143. ARM_01216189-194 | 178. ARM_01231037 |
| 144. ARM_01228027 | 179. ARM_01231038 |
| 145. ARM_01228031 | 180. ARM_01231039 |
| 146. ARM_01228035 | 181. ARM_01231040 |
| 147. ARM_01228039 | 182. ARM_01231041 |
| 148. ARM_01228043 | 183. ARM_01231042 |
| 149. ARM_01228044 | 184. ARM_01231043 |
| 150. ARM_01228048 | 185. ARM_01231044 |
| 151. ARM_01228049 | 186. ARM_01231045 |
| 152. ARM_01228053 | 187. ARM_01231046 |
| 153. ARM_01228054 | 188. ARM_01231047 |
| 154. ARM_01228058 | 189. ARM_01231048 |
| 155. ARM_01228059 | 190. ARM_01231049 |
| 156. ARM_01228063 | 191. ARM_01231050 |
| 157. ARM_01228064 | 192. ARM_01231051 |
| 158. ARM_01228073 | 193. ARM_01231052 |
| 159. ARM_01228074 | 194. ARM_01231053 |
| 160. ARM_01228075 | 195. ARM_01231054 |
| 161. ARM_01229969-979 | 196. ARM_01231055 |
| 162. ARM_01230032-036 | 197. ARM_01231056 |
| 163. ARM_01230076-083 | 198. ARM_01231057 |
| 164. ARM_01230084-091 | 199. ARM_01231058 |
| 165. ARM_01230117-122 | 200. ARM_01231059 |
| 166. ARM_01230155-162 | 201. ARM_01231060 |
| 167. ARM_01230977 | 202. ARM_01231061 |
| 168. ARM_01230978-980 | 203. ARM_01231062 |
| 169. ARM_01231025 | 204. ARM_01231063 |
| 170. ARM_01231027 | 205. ARM_01231064 |
| 171. ARM_01231028 | 206. ARM_01231249-250 |
| 172. ARM_01231029 | 207. ARM_01231267-271 |
| 173. ARM_01231030 | 208. ARM_01231394-195 |
| 174. ARM_01231031 | 209. ARM_01231614 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 210. ARM_01233086-088 | 245. ARM_01239483 |
| 211. ARM_01233089-090 | 246. ARM_01239485 |
| 212. ARM_01235323-327 | 247. ARM_01239486 |
| 213. ARM_01237129-136 | 248. ARM_01239488 |
| 214. ARM_01238132-134 | 249. ARM_01239503 |
| 215. ARM_01238384-399 | 250. ARM_01239504 |
| 216. ARM_01238422-427 | 251. ARM_01239506 |
| 217. ARM_01238895-896 | 252. ARM_01240226-236 |
| 218. ARM_01238977 | 253. ARM_01240281-282 |
| 219. ARM_01239056-068 | 254. ARM_01240305-307 |
| 220. ARM_01239440 | 255. ARM_01240308-325 |
| 221. ARM_01239441 | 256. ARM_01240382-391 |
| 222. ARM_01239442 | 257. ARM_01240438-447 |
| 223. ARM_01239444 | 258. ARM_01240448 |
| 224. ARM_01239445 | 259. ARM_01240470-507 |
| 225. ARM_01239447 | 260. ARM_01241379 |
| 226. ARM_01239448 | 261. ARM_01241472 |
| 227. ARM_01239449 | 262. ARM_01241565-566 |
| 228. ARM_01239451 | 263. ARM_01241581-582 |
| 229. ARM_01239452 | 264. ARM_01241585 |
| 230. ARM_01239453 | 265. ARM_01241587-588 |
| 231. ARM_01239458 | 266. ARM_01245720-726 |
| 232. ARM_01239459 | 267. ARM_01245939-940 |
| 233. ARM_01239464 | 268. ARM_01245941-978 |
| 234. ARM_01239465 | 269. ARM_01246043-066 |
| 235. ARM_01239470 | 270. ARM_01249519-527 |
| 236. ARM_01239471 | 271. ARM_01255498-519 |
| 237. ARM_01239472 | 272. ARM_0125886 |
| 238. ARM_01239473 | 273. ARM_01259705-60105 |
| 239. ARM_01239474 | 274. ARM_01271929-953 |
| 240. ARM_01239475 | 275. ARM_01282303 |
| 241. ARM_01239476 | 276. ARM_01282304-382 |
| 242. ARM_01239477 | 277. ARM_01282655-682 |
| 243. ARM_01239478 | 278. ARM_01291148 |
| 244. ARM_01239479 | 279. ARM_01293301-307 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 280. ARM_01293317-319 | 315. ARM_01427696-698 |
| 281. ARM_01293447-457 | 316. ARM_01427700-718 |
| 282. ARM_01298732-735 | 317. ARM_01427719-738 |
| 283. ARM_01298891-929 | 318. ARM_01427739-775 |
| 284. ARM_01299854-869 | 319. ARM_01427776-795 |
| 285. ARM_01299902-957 | 320. ARM_01427796-819 |
| 286. ARM_01300650-654 | 321. ARM_01427820-857 |
| 287. ARM_01300657-658 | 322. ARM_01427858-876 |
| 288. ARM_01300665-670 | 323. ARM_01427877-904 |
| 289. ARM_01304976-979 | 324. ARM_01427905-925 |
| 290. ARM_01304980-985 | 325. ARM_01427926-943 |
| 291. ARM_01305032-057 | 326. ARM_01427944-968 |
| 292. ARM_01308019-028 | 327. ARM_01427969-994 |
| 293. ARM_01311417 | 328. ARM_01427995-8008 |
| 294. ARM_01311418-448 | 329. ARM_01428009-032 |
| 295. ARM_01314327-337 | 330. ARM_01428033-056 |
| 296. ARM_01314501-516 | 331. ARM_01428057-058 |
| 297. ARM_01314615-622 | 332. ARM_01428059-062 |
| 298. ARM_01315194-196 | 333. ARM_01428063-102 |
| 299. ARM_01333009 | 334. ARM_01428103-144 |
| 300. ARM_01423231 | 335. ARM_01428145-178 |
| 301. ARM_01423234 | 336. ARM_01428179-206 |
| 302. ARM_01423238-244 | 337. ARM_01428207-250 |
| 303. ARM_01423239 | 338. ARM_01428251-270 |
| 304. ARM_01423632-634 | 339. ARM_01428271-292 |
| 305. ARM_01424135-208 | 340. ARM_01428293-315 |
| 306. ARM_01424330 | 341. ARM_01428316-338 |
| 307. ARM_01426582-590 | 342. ARM_01428339-376 |
| 308. ARM_01426872-895 | 343. ARM_01428377-405 |
| 309. ARM_01426896-937 | 344. ARM_01428406-430 |
| 310. ARM_01426938-956 | 345. ARM_01428431-449 |
| 311. ARM_01427634-660 | 346. ARM_01428450-471 |
| 312. ARM_01427661-682 | 347. ARM_01428472-493 |
| 313. ARM_01427683-693 | 348. ARM_01428494-514 |
| 314. ARM_01427694-695 | 349. ARM_01428515-539 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 350. ARM_01428543-549 | 385. ARMQC_02603581 |
| 351. ARM_01432965-996 | 386. ARMQC_02603582 |
| 352. ARM_01432997-3027 | 387. ARMQC_02603587 |
| 353. ARM_01453209-211 | 388. ARMQC_02604609 |
| 354. ARMQC_00000001-004 | 389. ARMQC_02604610 |
| 355. ARMQC_00000083-091 | 390. ARMQC_02604611 |
| 356. ARMQC_00000107-113 | 391. ARMQC_02604612 |
| 357. ARMQC_00000408-413 | 392. ARMQC_02604613 |
| 358. ARMQC_00001136-163 | 393. ARMQC_02604614 |
| 359. ARMQC_00024609-611 | 394. ARMQC_02604615 |
| 360. ARMQC_00027166-167 | 395. ARMQC_02604616 |
| 361. ARMQC_00028209 | 396. ARMQC_02604617 |
| 362. ARMQC_00028290-2298 | 397. ARMQC_02604618 |
| 363. ARMQC_00085998 | 398. ARMQC_02604619 |
| 364. ARMQC_02600059-071 | 399. ARMQC_02605445-464 |
| 365. ARMQC_02600334-339 | 400. ARMQC_02627275-297 |
| 366. ARMQC_02600667-671 | 401. ARMQC_02720799-803 |
| 367. ARMQC_02600713-728 | 402. ARMQC_02725741-755 |
| 368. ARMQC_02600803-818 | 403. ARMQC_02726184-233 |
| 369. ARMQC_02600819-820 | 404. ARMQC_02727255 |
| 370. ARMQC_02600838-841 | 405. ARMQC_02727609-629 |
| 371. ARMQC_02601067-071 | 406. ARMQC_02727973-983 |
| 372. ARMQC_02601116-117 | 407. ARMQC_02728703-711 |
| 373. ARMQC_02601777-811 | 408. ARMQC_02729412-414 |
| 374. ARMQC_02601829-835_001 | 409. ARMQC_02730887 |
| 375. ARMQC_02602328-331 | 410. ARMQC_02730889-894 |
| 376. ARMQC_02602445-447 | 411. ARMQC_02730917-922 |
| 377. ARMQC_02602450-452 | 412. ARMQC_02731051-053 |
| 378. ARMQC_02602454-456 | 413. ARMQC_02731250-283 |
| 379. ARMQC_02602458-460 | 414. ARMQC_02731284-305 |
| 380. ARMQC_02602462-464 | 415. ARMQC_02731630-638 |
| 381. ARMQC_02602466-468 | 416. ARMQC_02732393-395 |
| 382. ARMQC_02602472-473 | 417. ARMQC_02738597-608 |
| 383. ARMQC_02602550-553 | 418. ARMQC_02738965-972 |
| 384. ARMQC_02603580 | 419. ARMQC_02739659 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

420. ARMQC_02739661-672

421. ARMQC_02740066-069

422. ARMQC_02740386-388

423. ARMQC_02740595-599

424. ARMQC_02740600-626

425. ARMQC_02741400-403

426. ARMQC_02741404-407

427. ARMQC_02741408-411

428. ARMQC_02741412-415

429. ARMQC_02741466-467

430. ARMQC_02741727-429

431. ARMQC_02741731-734

432. ARMQC_02741735-745

433. ARMQC_02741954-2004

434. ARMQC_02742793-794

435. ARMQC_02742798-801

436. ARMQC_02742804-805

437. ARMQC_02742814-818

438. ARMQC_02742823-826

439. ARMQC_02742856-858

440. ARMQC_02742861-862

441. ARMQC_02742873-876

442. ARMQC_02743189-218

443. ARMQC_02744686-687_001-44

444. ARMQC_02745725-741

445. ARMQC_02746634-658

446. ARMQC_02746708-774

447. ARMQC_02746871-895

448. ARMQC_02747093-096

449. ARMQC_02747097-102

450. ARMQC_02747103

451. ARMQC_02747104

452. ARMQC_02747567-598

453. ARMQC_02747848-867

454. ARMQC_02747993-998

455. ARMQC_02748324-325

456. ARMQC_02749014-016

457. ARMQC_02749702-709

458. ARMQC_02750967-982

459. ARMQC_02750999-1014

460. ARMQC_02751388-394

461. ARMQC_02751596-598

462. ARMQC_02752343-347

463. ARMQC_02752632-651

464. ARMQC_02752740

465. ARMQC_02755397-428

466. ARMQC_02755446-470

467. ARMQC_02755490-514

468. ARMQC_02755534-558

469. ARMQC_02755580-604

470. ARMQC_02755624-655

471. ARMQC_02755674-705

472. ARMQC_02755903-904

473. ARMQC_02755905-928

474. ARMQC_02756148-179

475. ARMQC_02756208-244

476. ARMQC_02756245

477. ARMQC_02756246-278

478. ARMQC_02756344-375

479. ARMQC_02756542-543

480. ARMQC_02756544-572

481. ARMQC_02756860-891

482. ARMQC_02760525-553

483. ARMQC_02762874-875

484. ARMQC_02762876-877

485. ARMQC_02762878

486. ARMQC_02762879

487. ARMQC_02762898-900

488. ARMQC_02762949-951

489. ARMQC_02762963-965

RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

490. ARMQC_02762971

491. ARMQC_02762974-976

492. ARMQC_02762982-985

493. ARMQC_02762987

494. ARMQC_02762991-3025

495. ARMQC_02770389-390

496. ARMQC_02770599-603

497. ARMQC_02771124

498. ARMQC_02771125

499. ARMQC_02771126

500. ARMQC_02771127

501. ARMQC_02771128

502. ARMQC_02771129-150

503. ARMQC_02771151-167

504. ARMQC_02771200

505. ARMQC_02771221-227

506. ARMQC_02771350-453

507. ARMQC_02771883-884

508. ARMQC_02771946-948

509. ARMQC_02772155-156

510. ARMQC_02772241-245

511. ARMQC_02772246-250

512. ARMQC_02772333-365

513. ARMQC_02772366-385

514. ARMQC_02773054-055

515. ARMQC_02773055

516. ARMQC_02773185-186

517. ARMQC_02773565-569

518. ARMQC_02773570-573

519. ARMQC_02773574

520. ARMQC_02773656-370

521. ARMQC_02774029-035

522. ARMQC_02774378-384

523. ARMQC_02774494-500

524. ARMQC_02774539-547

525. ARMQC_02774642-657

526. ARMQC_02774738-747

527. ARMQC_02774748-756

528. ARMQC_02774757-766

529. ARMQC_02774767-813

530. ARMQC_02774814-815

531. ARMQC_02774816-817

532. ARMQC_02774818-843

533. ARMQC_02774844-855

534. ARMQC_02774856-863

535. ARMQC_02775090-162

536. ARMQC_02777440-441

537. ARMQC_02777448-449

538. ARMQC_02777458-464

539. ARMQC_02777465-472

540. ARMQC_02778159-166

541. ARMQC_02778177

542. ARMQC_02778178

543. ARMQC_02778241-249

544. ARMQC_02778342-343

545. ARMQC_02779064-075

546. ARMQC_02779076-083

547. ARMQC_02779099-106

548. ARMQC_02779107-115

549. ARMQC_02779116-121

550. ARMQC_02779122-132

551. ARMQC_02779133-144

552. ARMQC_02779170

553. ARMQC_02779171-173

554. ARMQC_02779174-175

555. ARMQC_02779176-178

556. ARMQC_02779179-180

557. ARMQC_02779181-182

558. ARMQC_02779269-313

559. ARMQC_02779314-363

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 560. ARMQC_02779364-390 | 595. ARMQC_02785348-407 |
| 561. ARMQC_02779391-411 | 596. ARMQC_02785408-426 |
| 562. ARMQC_02779412-432 | 597. ARMQC_02785427-428 |
| 563. ARMQC_02779433-482 | 598. ARMQC_02785429-435 |
| 564. ARMQC_02779483-511 | 599. ARMQC_02785436-473 |
| 565. ARMQC_02783473-511 | 600. ARMQC_02785474-498 |
| 566. ARMQC_02783512-532 | 601. ARMQC_02785499-500 |
| 567. ARMQC_02783533-574 | 602. ARMQC_02785501-502 |
| 568. ARMQC_02783575-594 | 603. ARMQC_02785503-512 |
| 569. ARMQC_02783595-596 | 604. ARMQC_02785513-556 |
| 570. ARMQC_02783597-598 | 605. ARMQC_02785557-577 |
| 571. ARMQC_02783599-600 | 606. ARMQC_02785578-580 |
| 572. ARMQC_02783601-602 | 607. ARMQC_02785581-582 |
| 573. ARMQC_02783603-614 | 608. ARMQC_02785583-587 |
| 574. ARMQC_02783615 | 609. FGS_0000389-390 |
| 575. ARMQC_02783618 | 610. KF00001-228 |
| 576. ARMQC_02783619-730 | 611. KF00261-466 |
| 577. ARMQC_02783731-845 | 612. KF00467-496 |
| 578. ARMQC_02783731-847 | 613. KF00507-512 |
| 579. ARMQC_02783848-966 | 614. KF00508-512 |
| 580. ARMQC_02783967-4084 | 615. KF00516-517 |
| 581. ARMQC_02784120-198 | 616. KF00578-579 |
| 582. ARMQC_02784199-203 | 617. KF00580-584 |
| 583. ARMQC_02784204 | 618. KF00585-603 |
| 584. ARMQC_02784227-244 | 619. KF00668-672 |
| 585. ARMQC_02784247-254 | 620. KF00673-675 |
| 586. ARMQC_02784258 | 621. KF00774-785 |
| 587. ARMQC_02784661-663 | 622. KF00811-816 |
| 588. ARMQC_02784664-667 | 623. KF00817-825 |
| 589. ARMQC_2781238-261 | 624. KF00826-836 |
| 590. ARMQC_2781262-285 | 625. KF01098-100 |
| 591. ARMQC_02785291-325 | 626. KF01386 |
| 592. ARMQC_02785326-341 | 627. KF01387-388 |
| 593. ARMQC_02785342-343 | 628. MOFO_ARMQC_00000001 |
| 594. ARMQC_02785344-347 | 629. MOFO_ARMQC_00000002-003 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

630. MOFO_ARMQC_00000004-005
631. MOFO_ARMQC_00000006-027
632. QC_1151573-577
633. QCARM_0016229-242
634. QCARM_0024817
635. QCARM_0027985-986
636. QCARM_0028009-021
637. QCARM_0029006-011
638. QCARM_0029040-050
639. QCARM_0167334-355
640. QCARM_0167386-411
641. QCARM_0167946-957
642. QCARM_0169753-799
643. QCARM_0169823-873
644. QCARM_0208733-745
645. QCARM_0217597
646. QCARM_0218409-443
647. QCARM_0222545-546
648. QCARM_0229357-358
649. QCARM_0277129-130
650. QCARM_0314128-207
651. QCARM_0333656-801
652. QCARM_0337591-627
653. QCARM_0337838
654. QCARM_0337857-899
655. QCARM_0338180-242
656. QCARM_0338243-262
657. QCARM_0338352-429
658. QCARM_0338573-576
659. QCARM_0338883
660. QCARM_0339100-127
661. QCARM_0340003
662. QCARM_0340017-061
663. QCARM_0343120-142
664. QCARM_0343143-222

665. QCARM_0343533-587
666. QCARM_0343954-976
667. QCARM_0344783-788
668. QCARM_0345376-389
669. QCARM_0345914-921
670. QCARM_0350039-120
671. QCARM_0360161-176
672. QCARM_0362108-109
673. QCARM_0483799-800
674. QCARM_0562765-800
675. QCARM_0566625-627
676. QCARM_0569125-164
677. QCARM_0573247-291
678. QCARM_0579579-702
679. QCARM_0626519-521
680. QCARM_2412906-907
681. QCARM_2416747-748
682. QCARM_2423696-726
683. QCARM_2430175
684. QCARM_2430181-482
685. QCARM_2533808-815
686. QCARM_3004833-834
687. QCARM_3059661
688. QCARM_3066477-483
689. QCARM_3216178-185
690. QCARM_3313115
691. QCARM_3337526-529
692. QCARM_3337900-902
693. QCARM_3338108-110
694. QCARM_3339493-495
695. QCARM_3352796-798
696. QCARM_3353006-010
697. QCARM_3353040
698. QCARM_3353126-130
699. QCARM_3419636-638

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 700. QCARM_3419788-792 | 735. QCARM_7431828 |
| 701. QCARM_3421025-028 | 736. QCARM_7431832-833 |
| 702. QCARM_3421029-033 | 737. QCARM_7463823-928 |
| 703. QCARM_3425702-706 | 738. QCARM_7464139-240 |
| 704. QCARM_3430479-482 | 739. QCARM_7464653-757 |
| 705. QCARM_3432839-842 | 740. QCARM_7464862-968 |
| 706. QCARM_3433743-780 | 741. QCARM_7464969-5069 |
| 707. QCARM_3449986-50012 | 742. QCARM_7465288-401 |
| 708. QCARM_3464080-081 | 743. QCARM_7465644-764 |
| 709. QCARM_3473070-073 | 744. QCARM_7465765-878 |
| 710. QCARM_3480078-094 | 745. QCARM_7465962-6075 |
| 711. QCARM_3480078-097 | 746. QCARM_7466191-305 |
| 712. QCARM_3485264-343 | 747. QCARM_7474253-254 |
| 713. QCARM_3489547-552 | 748. QCARM_7475224-225 |
| 714. QCARM_3496803-928 | 749. QCARM_7477117-118 |
| 715. QCARM_3509490-520 | 750. QCARM_7484460-461 |
| 716. QCARM_3509521-556 | 751. QCARM_7484463 |
| 717. QCARM_3522626-628 | 752. QCARM_7484465-466 |
| 718. QCARM_3522894 | 753. QCARM_7484477-479 |
| 719. QCARM_3533982 | 754. QCARM_7484882-888 |
| 720. QCARM_3534037 | 755. QCARM_7492376-453 |
| 721. QCARM_3537383-406 | 756. QCARM_7515834-835 |
| 722. QCARM_3537716-719 | 757. QCARM_7622616-618 |
| 723. QCARM_3633088-132 | 758. QCVARM_0000061-070 |
| 724. QCARM_3961297-298 | 759. QCVARM_0000085-091 |
| 725. QCARM_3961355-357 | 760. QCVARM_0000092-097 |
| 726. QCARM_3961358-361 | 761. QCVARM_0000114-116 |
| 727. QCARM_3961513-530 | 762. QCVARM_0000123-128 |
| 728. QCARM_7401402-419 | 763. QCVARM_0000135-138 |
| 729. QCARM_7428754-756 | 764. QCVARM_0000142-146 |
| 730. QCARM_7429134-136 | 765. QCVARM_0000180-183 |
| 731. QCARM_7429297-301 | 766. QCVARM_0000218-223 |
| 732. QCARM_7430331-332 | 767. QCVARM_0000269-275 |
| 733. QCARM_7430333-334 | 768. QCVARM_0000395-399 |
| 734. QCARM_7431509-510 | 769. QCVARM_0000482-483 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 770. QCVARM_0029609-623 | 805. QCVARM_0452598-605 |
| 771. QCVARM_0447175-181 | 806. QCVARM_0452684-686 |
| 772. QCVARM_0447242-243 | 807. QCVARM_0453129-137 |
| 773. QCVARM_0447248-251 | 808. QCVARM_0453334-353 |
| 774. QCVARM_0447252-254 | 809. QCVARM_0453724-799 |
| 775. QCVARM_0447464-473 | 810. QCVARM_0454071-072 |
| 776. QCVARM_0447871-944 | 811. QCVARM_0454629-635 |
| 777. QCVARM_0448066-078 | 812. QCVARM_0454821-824 |
| 778. QCVARM_0448085-098 | 813. QCVARM_0455016 |
| 779. QCVARM_0448361 | 814. QCVARM_0455212-268 |
| 780. QCVARM_0448362 | 815. QCVARM_0455341-354 |
| 781. QCVARM_0448757-766 | 816. QCVARM_0456283-287 |
| 782. QCVARM_0448842-844 | 817. QCVARM_0457029-035 |
| 783. QCVARM_0449160-164 | 818. QCVARM_0458346-386 |
| 784. QCVARM_0449561-565 | 819. QCVARM_0460408-411 |
| 785. QCVARM_0449653-657 | 820. QCVARM_0461296-303 |
| 786. QCVARM_0449658-661 | 821. QCVARM_0462995-3086 |
| 787. QCVARM_0449883-900 | 822. QCVARM_0463153-536 |
| 788. QCVARM_0449950-955 | 823. QCVARM_0463558 |
| 789. QCVARM_0449970-972 | 824. QCVARM_0463559-569 |
| 790. QCVARM_0450016-017 | 825. QCVARM_0463837-839 |
| 791. QCVARM_0450024-050 | 826. QCVARM_0464076-114 |
| 792. QCVARM_0450176 | 827. QCVARM_0464124-127 |
| 793. QCVARM_0450192-194 | 828. QCVARM_0464128-166 |
| 794. QCVARM_0450317-319 | 829. QCVARM_0464495-499 |
| 795. QCVARM_0450320-324 | 830. QCVARM_0464648-652 |
| 796. QCVARM_0450425-437 | 831. QCVARM_0465090-095 |
| 797. QCVARM_0450438 | 832. QCVARM_0465188-225 |
| 798. QCVARM_0450606-614 | 833. QCVARM_0465502-545 |
| 799. QCVARM_0451587 | 834. QCVARM_0465566-598 |
| 800. QCVARM_0451824-825 | 835. QCVARM_0465604-606 |
| 801. QCVARM_0452199-224 | 836. QCVARM_0465730-773 |
| 802. QCVARM_0452296-299 | 837. QCVARM_0465917-979 |
| 803. QCVARM_0452326-328 | 838. QCVARM_0465980-990 |
| 804. QCVARM_0452397-401 | 839. QCVARM_0466045-053 |

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 840. QCVARM_0466056-119 | 875. QCVARM_0524718-720 |
| 841. QCVARM_0466177-230 | 876. QCVARM_0524726 |
| 842. QCVARM_0466366-439 | 877. QCVARM_0524739 |
| 843. QCVARM_0466478-488 | 878. QCVARM_0524775-777 |
| 844. QCVARM_0466936-954 | 879. QCVARM_0524900-902 |
| 845. QCVARM_0467171-218 | 880. QCVARM_0525081-081.00042 |
| 846. QCVARM_0467529 | 881. QCVARM_0525167-169 |
| 847. QCVARM_0467601-643 | 882. QCVARM_0525196-202 |
| 848. QCVARM_0467659-663 | 883. QCVARM_0525344-353 |
| 849. QCVARM_0467694-697 | 884. QCVARM_0525354-355 |
| 850. QCVARM_0467852-855 | 885. QCVARM_0525819 |
| 851. QCVARM_0468074-075 | 886. QCVARM_0525820 |
| 852. QCVARM_0468076-080 | 887. QCVARM_0525844-850 |
| 853. QCVARM_0468082 | 888. QCVARM_0526038 |
| 854. QCVARM_0468148 | 889. QCVARM_0526286 |
| 855. QCVARM_0468164-168 | 890. QCVARM_0526828-830 |
| 856. QCVARM_0468174-181 | 891. QCVARM_0527125-134 |
| 857. QCVARM_0468212-214 | 892. QCVARM_0527427-438 |
| 858. QCVARM_0468426-431 | 893. QCVARM_0527470-502 |
| 859. QCVARM_0468612-613 | 894. QCVARM_0527544-548 |
| 860. QCVARM_0468623-625 | 895. QCVARM_0527827-830 |
| 861. QCVARM_0520880-2725 | 896. QCVARM_0527863-885 |
| 862. QCVARM_0522726-728 | 897. QCVARM_0528119 |
| 863. QCVARM_0523650-652 | 898. QCVARM_0528826 |
| 864. QCVARM_0523656-668 | 899. QCVARM_0528936-938 |
| 865. QCVARM_0523730-732 | 900. QCVARM_0528955 |
| 866. QCVARM_0523754-758 | 901. QCVARM_0528956-963 |
| 867. QCVARM_0523826-831 | 902. QCVARM_0528981 |
| 868. QCVARM_0523837-842 | 903. QCVARM_0529021 |
| 869. QCVARM_0523995-998 | 904. QCVARM_0529072-077 |
| 870. QCVARM_0524007-011 | 905. QCVARM_0529438-454 |
| 871. QCVARM_0524138-220 | 906. QCVARM_0529703-707 |
| 872. QCVARM_0524237-253 | 907. QCVARM_0529842-886 |
| 873. QCVARM_0524362 | 908. QCVARM_0529887-889 |
| 874. QCVARM_0524624-626 | 909. QCVARM_0530133-151 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 910. QCVARM_0530245-256 | 945. QCVARM_0572936-967 |
| 911. QCVARM_0530447-453 | 946. QCVARM_0573056-057 |
| 912. QCVARM_0531270-272 | 947. QCVARM_0573354-356 |
| 913. QCVARM_0531350-361 | 948. QCVARM_0573669-670 |
| 914. QCVARM_0531368 | 949. QCVARM_0573671-673 |
| 915. QCVARM_0531514-552 | 950. QCVARM_0573677-678 |
| 916. QCVARM_0531658-661 | 951. QCVARM_0573684 |
| 917. QCVARM_0531817-820 | 952. QCVARM_0573685-686 |
| 918. QCVARM_0531821-824 | 953. QCVARM_0575290 |
| 919. QCVARM_0531864 | 954. QCVARM_0575607-610 |
| 920. QCVARM_0531892-913 | 955. QCVARM_0575611-612 |
| 921. QCVARM_0531919-920 | 956. QCVARM_0575613-614 |
| 922. QCVARM_0532239-257 | 957. QCVARM_0575615 |
| 923. QCVARM_0532274-275 | 958. QCVARM_0575616 |
| 924. QCVARM_0532413-457 | 959. QCVARM_0575617-620 |
| 925. QCVARM_0532997-998 | 960. QCVARM_0575634-635 |
| 926. QCVARM_0534596-963 | 961. QCVARM_0575636-637 |
| 927. QCVARM_0534597-618 | 962. QCVARM_0575825-828 |
| 928. QCVARM_0535116-119 | 963. QCVARM_0577503-505 |
| 929. QCVARM_0535154-156 | 964. QCVARM_0577544 |
| 930. QCVARM_0535481-500 | 965. QCVARM_0578265-266 |
| 931. QCVARM_0535654 | 966. QCVARM_0579532-540 |
| 932. QCVARM_0535721-728 | 967. QCVARM_0580173-180 |
| 933. QCVARM_0535870-871 | 968. QCVARM_0580181-193 |
| 934. QCVARM_0535902-905 | 969. QCVARM_0595522-529 |
| 935. QCVARM_0537065-074 | 970. QCVARM_0595815 |
| 936. QCVARM_0539180-184 | 971. QCVARM_0599620-623 |
| 937. QCVARM_0539482-484 | 972. QCVARM_0599801-802 |
| 938. QCVARM_0540468-472 | 973. QCVARM_0600037 |
| 939. QCVARM_0543859-869 | 974. QCVARM_0600038 |
| 940. QCVARM_0544259-259.00003 | 975. QCVARM_0600039 |
| 941. QCVARM_0571333-349 | 976. QCVARM_0600040 |
| 942. QCVARM_0571705-715 | 977. QCVARM_0600041 |
| 943. QCVARM_0572833-834 | 978. QCVARM_0600042 |
| 944. QCVARM_0572851-857 | 979. QCVARM_0600043 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 980. QCVARM_0600044 | 1015. QCVARM_0600079 |
| 981. QCVARM_0600045 | 1016. QCVARM_0600080 |
| 982. QCVARM_0600046 | 1017. QCVARM_0600081 |
| 983. QCVARM_0600047 | 1018. QCVARM_0600082 |
| 984. QCVARM_0600048 | 1019. QCVARM_0600083 |
| 985. QCVARM_0600049 | 1020. QCVARM_0600084 |
| 986. QCVARM_0600050 | 1021. QCVARM_0600085 |
| 987. QCVARM_0600051 | 1022. QCVARM_0600086 |
| 988. QCVARM_0600052 | 1023. QCVARM_0600087 |
| 989. QCVARM_0600053 | 1024. QCVARM_0600088 |
| 990. QCVARM_0600054 | 1025. QCVARM_0600089 |
| 991. QCVARM_0600055 | 1026. QCVARM_0600090 |
| 992. QCVARM_0600056 | 1027. QCVARM_0600091 |
| 993. QCVARM_0600057 | 1028. QCVARM_0600092 |
| 994. QCVARM_0600058 | 1029. QCVARM_0600093 |
| 995. QCVARM_0600059 | 1030. QCVARM_0600094 |
| 996. QCVARM_0600060 | 1031. QCVARM_0600095 |
| 997. QCVARM_0600061 | 1032. QCVARM_0600096 |
| 998. QCVARM_0600062 | 1033. QCVARM_0600097 |
| 999. QCVARM_0600063 | 1034. QCVARM_0600098-100 |
| 1000. QCVARM_0600064 | 1035. QCVARM_0600101-103 |
| 1001. QCVARM_0600065 | 1036. QCVARM_0600222 |
| 1002. QCVARM_0600066 | 1037. QCVARM_0600236 |
| 1003. QCVARM_0600067 | 1038. QCVARM_0600331 |
| 1004. QCVARM_0600068 | 1039. QCVARM_0600533-553 |
| 1005. QCVARM_0600069 | 1040. QCVARM_0600730-734 |
| 1006. QCVARM_0600070 | 1041. QCVARM_0600801-804 |
| 1007. QCVARM_0600071 | 1042. QCVARM_0601671-694 |
| 1008. QCVARM_0600072 | 1043. QCVARM_0601718-723 |
| 1009. QCVARM_0600073 | 1044. QCVARM_0601787-797 |
| 1010. QCVARM_0600074 | 1045. QCVARM_0601923-926 |
| 1011. QCVARM_0600075 | 1046. QCVARM_0602168-177 |
| 1012. QCVARM_0600076 | 1047. QCVARM_0602198-203 |
| 1013. QCVARM_0600077 | 1048. QCVARM_0602227-228 |
| 1014. QCVARM_0600078 | 1049. QCVARM_0602258-261 |

RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1050. QCVARM_0602295-299 | 1085. QCVARM_0613037-039 |
| 1051. QCVARM_0602317-321 | 1086. QCVARM_0613083-084 |
| 1052. QCVARM_0602359-361 | 1087. QCVARM_0613160-169 |
| 1053. QCVARM_0602395-2400 | 1088. QCVARM_0615918-919 |
| 1054. QCVARM_0602404-405 | 1089. QCVARM_0616170-171 |
| 1055. QCVARM_0602434-435 | 1090. QCVARM_0616348 |
| 1056. QCVARM_0602564-565 | 1091. QCVARM_0616349-431 |
| 1057. QCVARM_0602952-963 | 1092. QCVARM_0616633-634 |
| 1058. QCVARM_0604135-150 | 1093. QCVARM_0616636-674 |
| 1059. QCVARM_0604257-259 | 1094. QCVARM_0616687-688 |
| 1060. QCVARM_0605055-062 | 1095. QCVARM_0616871-873 |
| 1061. QCVARM_0605502-538 | 1096. QCVARM_0616906 |
| 1062. QCVARM_0605658-659 | 1097. QCVARM_0616907-911 |
| 1063. QCVARM_0605660-660.00007 | 1098. QCVARM_0616912-913 |
| 1064. QCVARM_0605661-666 | 1099. QCVARM_0616914-915 |
| 1065. QCVARM_0605876-941 | 1100. QCVARM_0616916-918 |
| 1066. QCVARM_0606806-812 | 1101. QCVARM_0616919 |
| 1067. QCVARM_0607060 | 1102. QCVARM_0616920-927 |
| 1068. QCVARM_0607506-509 | 1103. QCVARM_0616928-934 |
| 1069. QCVARM_0607680-688 | 1104. QCVARM_0616935 |
| 1070. QCVARM_0607691-696 | 1105. QCVARM_0616936-938 |
| 1071. QCVARM_0608106-107 | 1106. QCVARM_0616939-641 |
| 1072. QCVARM_0608131-138 | 1107. QCVARM_0616942-946 |
| 1073. QCVARM_0608314-316 | 1108. QCVARM_0616947 |
| 1074. QCVARM_0608391-393 | 1109. QCVARM_0616948-949 |
| 1075. QCVARM_0608423-424 | 1110. QCVARM_0616950-951 |
| 1076. QCVARM_0608452-461 | 1111. QCVARM_0616952-954 |
| 1077. QCVARM_0608501-504 | 1112. QCVARM_0616955-958 |
| 1078. QCVARM_0608626-655 | 1113. QCVARM_0616959-962 |
| 1079. QCVARM_0608764-767 | 1114. QCVARM_0616963 |
| 1080. QCVARM_0609540 | 1115. QCVARM_0616964 |
| 1081. QCVARM_0609541-542 | 1116. QCVARM_0616965-966 |
| 1082. QCVARM_0609543-544 | 1117. QCVARM_0616967-969 |
| 1083. QCVARM_0609881-889 | 1118. QCVARM_0616970-974 |
| 1084. QCVARM_0612367-376 | 1119. QCVARM_0616975-976 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1120. QCVARM_0617243 | 1155. QCVARM_0618449 |
| 1121. QCVARM_0617244 | 1156. QCVARM_0618450 |
| 1122. QCVARM_0617401-403 | 1157. QCVARM_0618453 |
| 1123. QCVARM_0617453 | 1158. QCVARM_0618454 |
| 1124. QCVARM_0617454-455 | 1159. QCVARM_0618455 |
| 1125. QCVARM_0617456-458 | 1160. QCVARM_0618456-458 |
| 1126. QCVARM_0617459-459.000019 | 1161. QCVARM_0618459-460 |
| 1127. QCVARM_0617460-461 | 1162. QCVARM_0618461-463 |
| 1128. QCVARM_0617462-516 | 1163. QCVARM_0618568-569 |
| 1129. QCVARM_0617517-538 | 1164. QCVARM_0618694-695 |
| 1130. QCVARM_0617730-738 | 1165. QCVARM_0618702 |
| 1131. QCVARM_0617739-741 | 1166. QCVARM_0618703-704 |
| 1132. QCVARM_0617756-759 | 1167. QCVARM_0618705-706 |
| 1133. QCVARM_0617760-768 | 1168. QCVARM_0618707 |
| 1134. QCVARM_0617829-831 | 1169. QCVARM_0618708-711 |
| 1135. QCVARM_0617902 | 1170. QCVARM_0618712 |
| 1136. QCVARM_0617903-905 | 1171. QCVARM_0618741-746 |
| 1137. QCVARM_0617947 | 1172. QCVARM_0618843-850 |
| 1138. QCVARM_0617948-950 | 1173. QCVARM_0618975-976 |
| 1139. QCVARM_0617951-953 | 1174. QCVARM_0621447 |
| 1140. QCVARM_0617954-956 | 1175. QCVARM_0621448-540 |
| 1141. QCVARM_0617957 | 1176. QCVARM_0621692 |
| 1142. QCVARM_0617958-960 | 1177. QCVARM_0624133-135 |
| 1143. QCVARM_0617961-963 | 1178. QCVARM_0626519-521 |
| 1144. QCVARM_0617964-966 | 1179. QCVARM_0626590-598 |
| 1145. QCVARM_0617978-979 | 1180. QCVARM_0626603-611 |
| 1146. QCVARM_0618320 | 1181. QCVARM_0667395-396 |
| 1147. QCVARM_0618324-327 | 1182. QCVARM_0685544-547 |
| 1148. QCVARM_0618336-337 | 1183. QCVARM_0685578-579 |
| 1149. QCVARM_0618338-340 | 1184. QCVARM_0687237-238 |
| 1150. QCVARM_0618354 | 1185. QCVARM_0687476-478 |
| 1151. QCVARM_0618377-381 | 1186. QCVARM_0687479-481 |
| 1152. QCVARM_0618387-388 | 1187. QCVARM_0687758-759 |
| 1153. QCVARM_0618420-423 | 1188. QCVARM_0687760 |
| 1154. QCVARM_0618448 | 1189. QCVARM_0687766-768 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1190. QCVARM_0687862-864 | 1225. QCVARM_0713527 |
| 1191. QCVARM_0688777 | 1226. QCVARM_0713528 |
| 1192. QCVARM_0688778 | 1227. QCVARM_0713530-531 |
| 1193. QCVARM_0688834-835 | 1228. QCVARM_0713532-534 |
| 1194. QCVARM_0688922-924 | 1229. QCVARM_0713535-537 |
| 1195. QCVARM_0688932-934 | 1230. QCVARM_0713538 |
| 1196. QCVARM_0689117-120 | 1231. QCVARM_0713652-654 |
| 1197. QCVARM_0691521-525 | 1232. QCVARM_0713665-668 |
| 1198. QCVARM_0691526-530 | 1233. QCVARM_0713773-775 |
| 1199. QCVARM_0691853-854 | 1234. QCVARM_0713840-842 |
| 1200. QCVARM_0692586-588 | 1235. QCVARM_0717359-360 |
| 1201. QCVARM_0692665-666 | 1236. QCVARM_0717660 |
| 1202. QCVARM_0692718 | 1237. QCVARM_0717756 |
| 1203. QCVARM_0699176-177 | 1238. QCVARM_0717757-761 |
| 1204. QCVARM_0699179-181 | 1239. QCVARM_0717764 |
| 1205. QCVARM_0699275-277 | 1240. QCVARM_0717765-767 |
| 1206. QCVARM_0699278-281 | 1241. QCVARM_0717964-965 |
| 1207. QCVARM_0707732-034 | 1242. QCVARM_0846761-870 |
| 1208. QCVARM_0707997-999 | 1243. QCVARM_0846871-925 |
| 1209. QCVARM_0708086-087 | 1244. QCVARM_0847000-056 |
| 1210. QCVARM_0708107-108 | 1245. QCVARM_0847094-099 |
| 1211. QCVARM_0708118-121 | 1246. QCVARM_0847182-183 |
| 1212. QCVARM_0709978-991 | 1247. QCVARM_0847184-185 |
| 1213. QCVARM_0710047-120 | 1248. QCVARM_0847668-671 |
| 1214. QCVARM_0710418-418.00029 | 1249. QCVARM_0847765-812 |
| 1215. QCVARM_0711109 | 1250. QCVARM_0848786-853 |
| 1216. QCVARM_0711110-113 | 1251. QCVARM_0848924-9042 |
| 1217. QCVARM_0712363 | 1252. QCVARM_0850604-606 |
| 1218. QCVARM_0712364-383 | 1253. QCVARM_0850838-892 |
| 1219. QCVARM_0713409 | 1254. QCVARM_0850937-993 |
| 1220. QCVARM_0713410-441 | 1255. QCVARM_0851120-180 |
| 1221. QCVARM_0713477-479 | 1256. QCVARM_0851183-225 |
| 1222. QCVARM_0713488-489 | 1257. QCVARM_0851271-276 |
| 1223. QCVARM_0713513-515 | 1258. QCVARM_0851333-393 |
| 1224. QCVARM_0713516-517 | 1259. QCVARM_0851410-411 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1260. QCVARM_0851449-505 | 1295. QCVARM_0864833-837 |
| 1261. QCVARM_0851511 | 1296. QCVARM_0864838 |
| 1262. QCVARM_0851512-555 | 1297. QCVARM_0864839-842 |
| 1263. QCVARM_0851782-836 | 1298. QCVARM_0864901-903 |
| 1264. QCVARM_0851837-875 | 1299. QCVARM_0864924-925 |
| 1265. QCVARM_0851876-907 | 1300. QCVARM_0864933-934 |
| 1266. QCVARM_0852203-286 | 1301. QCVARM_0864967-968 |
| 1267. QCVARM_0852621-644 | 1302. QCVARM_0864969-972 |
| 1268. QCVARM_0854027-044 | 1303. QCVARM_0865022-028 |
| 1269. QCVARM_0854985-5046 | 1304. QCVARM_0865233 |
| 1270. QCVARM_0855117-132 | 1305. QCVARM_0865236-240 |
| 1271. QCVARM_0855434-436 | 1306. QCVARM_0865279-283 |
| 1272. QCVARM_0855438-446 | 1307. QCVARM_0865343 |
| 1273. QCVARM_0855455-456 | 1308. QCVARM_0865344-348 |
| 1274. QCVARM_0855474-476 | 1309. QCVARM_0865360 |
| 1275. QCVARM_0855614 | 1310. QCVARM_0865367-369 |
| 1276. QCVARM_0855614-615 | 1311. QCVARM_0865370 |
| 1277. QCVARM_0856270 | 1312. QCVARM_0865412-414 |
| 1278. QCVARM_0856270-271 | 1313. QCVARM_0865415 |
| 1279. QCVARM_0856340-753 | 1314. QCVARM_0865420-425 |
| 1280. QCVARM_0856754-778 | 1315. QCVARM_0865430-431 |
| 1281. QCVARM_0856864-866 | 1316. QCVARM_0865435 |
| 1282. QCVARM_0856888-894 | 1317. QCVARM_0865479-480 |
| 1283. QCVARM_0857113-148 | 1318. QCVARM_0865488-489 |
| 1284. QCVARM_0863181-185 | 1319. QCVARM_0865490 |
| 1285. QCVARM_0863300-323 | 1320. QCVARM_0865602-601 |
| 1286. QCVARM_0863428-431 | 1321. QCVARM_0866177 |
| 1287. QCVARM_0863435-437 | 1322. QCVARM_1014030-112 |
| 1288. QCVARM_0863641-643 | 1323. QCVARM_1014162-171 |
| 1289. QCVARM_0863644-646 | 1324. QCVARM_1014186-204 |
| 1290. QCVARM_0863810-823 | 1325. QCVARM_1014307-309 |
| 1291. QCVARM_0864030-057 | 1326. QCVARM_1014424-451 |
| 1292. QCVARM_0864277-282 | 1327. QCVARM_1014892 |
| 1293. QCVARM_0864713 | 1328. QCVARM_1014955 |
| 1294. QCVARM_0864833 | 1329. QCVARM_1015219-221 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1330. QCVARM_1015426 | 1365. QCVARM_1030813-814 |
| 1331. QCVARM_1015438 | 1366. QCVARM_1031097-098 |
| 1332. QCVARM_1015821-843 | 1367. QCVARM_1031251-255 |
| 1333. QCVARM_1016051-077 | 1368. QCVARM_1031267-268 |
| 1334. QCVARM_1016205-216 | 1369. QCVARM_1034376-377 |
| 1335. QCVARM_1016218-237 | 1370. QCVARM_1042773-775 |
| 1336. QCVARM_1016837-679 | 1371. QCVARM_1042776 |
| 1337. QCVARM_1017127-148 | 1372. QCVARM_1042777-779 |
| 1338. QCVARM_1017149-168 | 1373. QCVARM_1042780 |
| 1339. QCVARM_1017169-187 | 1374. QCVARM_1057229-8013 |
| 1340. QCVARM_1017295-327 | 1375. QCVARM_1066278 |
| 1341. QCVARM_1017417-437 | 1376. QCVARM_1066761-804 |
| 1342. QCVARM_1017438-463 | 1377. QCVARM_1067283 |
| 1343. QCVARM_1017467-493 | 1378. QCVARM_1067284 |
| 1344. QCVARM_1017747 | 1379. QCVARM_1067287-301 |
| 1345. QCVARM_1017997 | 1380. QCVARM_1067304-305 |
| 1346. QCVARM_1019251-252 | 1381. QCVARM_1067306-312 |
| 1347. QCVARM_1019256 | 1382. QCVARM_1067338-344 |
| 1348. QCVARM_1020165-215 | 1383. QCVARM_1067662-664 |
| 1349. QCVARM_1022267 | 1384. QCVARM_1067971-8007 |
| 1350. QCVARM_1022268 | 1385. QCVARM_1068133-134 |
| 1351. QCVARM_1022565-579 | 1386. QCVARM_1068137-139 |
| 1352. QCVARM_1023593-611 | 1387. QCVARM_1068141-148 |
| 1353. QCVARM_1024852 | 1388. QCVARM_1068152-163 |
| 1354. QCVARM_1024873-877 | 1389. QCVARM_1068191-214 |
| 1355. QCVARM_1026209-231 | 1390. QCVARM_1068222-230 |
| 1356. QCVARM_1028388 | 1391. QCVARM_1068352-355 |
| 1357. QCVARM_1028558-560 | 1392. QCVARM_1068356-359 |
| 1358. QCVARM_1028750-751 | 1393. QCVARM_1068388-396 |
| 1359. QCVARM_1029604-607 | 1394. QCVARM_1068434-442 |
| 1360. QCVARM_1029757-758 | 1395. QCVARM_1068459-467 |
| 1361. QCVARM_1029911-912 | 1396. QCVARM_1068512-515 |
| 1362. QCVARM_1030011-012 | 1397. QCVARM_1068516-520 |
| 1363. QCVARM_1030509-510 | 1398. QCVARM_1068521-524 |
| 1364. QCVARM_1030726-729 | 1399. QCVARM_1068525-534 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1400. QCVARM_1068603-611 | 1435. QCVARM_1070831-833 |
| 1401. QCVARM_1068612-621 | 1436. QCVARM_1071192 |
| 1402. QCVARM_1068645-652 | 1437. QCVARM_1071193 |
| 1403. QCVARM_1068666-670 | 1438. QCVARM_1071194 |
| 1404. QCVARM_1068739-904 | 1439. QCVARM_1071199 |
| 1405. QCVARM_1068905-921 | 1440. QCVARM_1071201-230 |
| 1406. QCVARM_1068922-965 | 1441. QCVARM_1071232-238 |
| 1407. QCVARM_1068967-968 | 1442. QCVARM_1071244 |
| 1408. QCVARM_1068986-987 | 1443. QCVARM_1071246 |
| 1409. QCVARM_1068988-989 | 1444. QCVARM_1071248-499 |
| 1410. QCVARM_1068990-993 | 1445. QCVARM_1071500-501 |
| 1411. QCVARM_1068995-9013 | 1446. QCVARM_1071502-962 |
| 1412. QCVARM_1069077-081 | 1447. QCVARM_1071972-979 |
| 1413. QCVARM_1069082-086 | 1448. QCVARM_1071980-992 |
| 1414. QCVARM_1069106-110 | 1449. QCVARM_1071993-994 |
| 1415. QCVARM_1069112-126 | 1450. QCVARM_1072199-500 |
| 1416. QCVARM_1069129-147 | 1451. QCVARM_1073895-4048 |
| 1417. QCVARM_1069363-433 | 1452. QCVARM_1088375-488 |
| 1418. QCVARM_1069483-535 | 1453. QCVARM_1090346-695 |
| 1419. QCVARM_1069555-659 | 1454. QCVARM_1115364 |
| 1420. QCVARM_1069674-675 | 1455. QCVARM_1115421-423 |
| 1421. QCVARM_1069705-707 | 1456. QCVARM_1115424-426 |
| 1422. QCVARM_1069708-709 | 1457. QCVARM_1115427 |
| 1423. QCVARM_1069710 | 1458. QCVARM_1117815-817 |
| 1424. QCVARM_1069941-944 | 1459. QCVARM_1117818-820 |
| 1425. QCVARM_1069945-948 | 1460. QCVARM_1117821-824 |
| 1426. QCVARM_1069949-952 | 1461. QCVARM_1117825-827 |
| 1427. QCVARM_1070005-007 | 1462. QCVARM_1117836-838 |
| 1428. QCVARM_1070014-019 | 1463. QCVARM_1117839-842 |
| 1429. QCVARM_1070027-028 | 1464. QCVARM_1117843-846 |
| 1430. QCVARM_1070034-040 | 1465. QCVARM_1117847-850 |
| 1431. QCVARM_1070077 | 1466. QCVARM_1117851-854 |
| 1432. QCVARM_1070081-083 | 1467. QCVARM_1117866-869 |
| 1433. QCVARM_1070271-278 | 1468. QCVARM_1117873-876 |
| 1434. QCVARM_1070640-642 | 1469. QCVARM_1117877-879 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1470. QCVARM_1117880-883
1471. QCVARM_1117884-887
1472. QCVARM_1117891-894
1473. QCVARM_1117898-900
1474. QCVARM_1117901-904
1475. QCVARM_1117905-908
1476. QCVARM_1117909-912
1477. QCVARM_1117934-937
1478. QCVARM_1117938-941
1479. QCVARM_1117942-944
1480. QCVARM_1117948-951
1481. QCVARM_1117956-959
1482. QCVARM_1117960-963
1483. QCVARM_1117971-973
1484. QCVARM_1117977-980
1485. QCVARM_1117981-984
1486. QCVARM_1117985-988
1487. QCVARM_1117989-991
1488. QCVARM_1118003-008
1489. QCVARM_1118009-011
1490. QCVARM_1118012-015
1491. QCVARM_1118016-019
1492. QCVARM_1118020-023
1493. QCVARM_1118024-028
1494. QCVARM_1118029-032
1495. QCVARM_1118036-039
1496. QCVARM_1118040-042
1497. QCVARM_1118043-047
1498. QCVARM_1118051-054
1499. QCVARM_1118055-058
1500. QCVARM_1118059-063
1501. QCVARM_1118064-066
1502. QCVARM_1118067-070
1503. QCVARM_1118081-084
1504. QCVARM_1118085-088

1505. QCVARM_1118089-092
1506. QCVARM_1118093-096
1507. QCVARM_1118097-099
1508. QCVARM_1118100-103
1509. QCVARM_1118104-107
1510. QCVARM_1118115
1511. QCVARM_1118116
1512. QCVARM_1118146-147
1513. QCVARM_1118463-465
1514. QCVARM_1118481-482
1515. QCVARM_1118510-514
1516. QCVARM_1118515-517
1517. QCVARM_1118518-523
1518. QCVARM_1118524-527
1519. QCVARM_1118528-530
1520. QCVARM_1118531-533
1521. QCVARM_1118534-537
1522. QCVARM_1118538-542
1523. QCVARM_1118543-545
1524. QCVARM_1118546-548
1525. QCVARM_1118549-551
1526. QCVARM_1118552-554
1527. QCVARM_1118555-558
1528. QCVARM_1118559-564
1529. QCVARM_1118565-566
1530. QCVARM_1118596-599
1531. QCVARM_1118617-619
1532. QCVARM_1118760-776
1533. QCVARM_1118779-782
1534. QCVARM_1118787-791
1535. QCVARM_1118795-799
1536. QCVARM_1118800-803
1537. QCVARM_1118820-825
1538. QCVARM_1118832-834
1539. QCVARM_1118836-838

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1540. QCVARM_1118842-843 | 1575. QCVARM_1119020-022 |
| 1541. QCVARM_1118844-851 | 1576. QCVARM_1119023-024 |
| 1542. QCVARM_1118862-864 | 1577. QCVARM_1119025-026 |
| 1543. QCVARM_1118865-866 | 1578. QCVARM_1119027-029 |
| 1544. QCVARM_1118870-871 | 1579. QCVARM_1119030-031 |
| 1545. QCVARM_1118884-888 | 1580. QCVARM_1119032-033 |
| 1546. QCVARM_1118890-891 | 1581. QCVARM_1119070-071 |
| 1547. QCVARM_1118894-895 | 1582. QCVARM_1119074-075 |
| 1548. QCVARM_1118896-897 | 1583. QCVARM_1119120-022 |
| 1549. QCVARM_1118898-899 | 1584. QCVARM_1119347-352 |
| 1550. QCVARM_1118901-902 | 1585. QCVARM_1120024 |
| 1551. QCVARM_1118926-927 | 1586. QCVARM_1120466 |
| 1552. QCVARM_1118928 | 1587. QCVARM_1120481 |
| 1553. QCVARM_1118929-930 | 1588. QCVARM_1120482-485 |
| 1554. QCVARM_1118931 | 1589. QCVARM_1120486-490 |
| 1555. QCVARM_1118933 | 1590. QCVARM_1120490-495 |
| 1556. QCVARM_1118934-936 | 1591. QCVARM_1120495-496 |
| 1557. QCVARM_1118945-946 | 1592. QCVARM_1120496-497 |
| 1558. QCVARM_1118972-973 | 1593. QCVARM_1120497-534 |
| 1559. QCVARM_1118976-977 | 1594. QCVARM_1120498-535 |
| 1560. QCVARM_1118978-979 | 1595. QCVARM_1120535-539 |
| 1561. QCVARM_1118980-981 | 1596. QCVARM_1120540-545 |
| 1562. QCVARM_1118983-985 | 1597. QCVARM_1120546-547 |
| 1563. QCVARM_1118986-987 | 1598. QCVARM_1120548 |
| 1564. QCVARM_1118988-899 | 1599. QCVARM_1120549 |
| 1565. QCVARM_1118990-991 | 1600. QCVARM_1120550 |
| 1566. QCVARM_1118995-996 | 1601. QCVARM_1120551 |
| 1567. QCVARM_1118997 | 1602. QCVARM_1120552 |
| 1568. QCVARM_1118998 | 1603. QCVARM_1120553 |
| 1569. QCVARM_1118999-9000 | 1604. QCVARM_1120554 |
| 1570. QCVARM_1119004 | 1605. QCVARM_1120555 |
| 1571. QCVARM_1119005-007 | 1606. QCVARM_1120556 |
| 1572. QCVARM_1119008-011 | 1607. QCVARM_1120557 |
| 1573. QCVARM_1119015-017 | 1608. QCVARM_1120558 |
| 1574. QCVARM_1119018-019 | 1609. QCVARM_1120559 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1610. QCVARM_1120560 | 1645. QCVARM_1120595 |
| 1611. QCVARM_1120561 | 1646. QCVARM_1120596 |
| 1612. QCVARM_1120562 | 1647. QCVARM_1120597 |
| 1613. QCVARM_1120563 | 1648. QCVARM_1120598 |
| 1614. QCVARM_1120564 | 1649. QCVARM_1120599 |
| 1615. QCVARM_1120565 | 1650. QCVARM_1120600 |
| 1616. QCVARM_1120566 | 1651. QCVARM_1120601 |
| 1617. QCVARM_1120567 | 1652. QCVARM_1120602 |
| 1618. QCVARM_1120568 | 1653. QCVARM_1120603 |
| 1619. QCVARM_1120569 | 1654. QCVARM_1120604 |
| 1620. QCVARM_1120570 | 1655. QCVARM_1120605 |
| 1621. QCVARM_1120571 | 1656. QCVARM_1120606 |
| 1622. QCVARM_1120572 | 1657. QCVARM_1120607 |
| 1623. QCVARM_1120573 | 1658. QCVARM_1120608 |
| 1624. QCVARM_1120574 | 1659. QCVARM_1120609 |
| 1625. QCVARM_1120575 | 1660. QCVARM_1120610 |
| 1626. QCVARM_1120576 | 1661. QCVARM_1120611 |
| 1627. QCVARM_1120577 | 1662. QCVARM_1120612 |
| 1628. QCVARM_1120578 | 1663. QCVARM_1120613 |
| 1629. QCVARM_1120579 | 1664. QCVARM_1120614 |
| 1630. QCVARM_1120580 | 1665. QCVARM_1120615 |
| 1631. QCVARM_1120581 | 1666. QCVARM_1120616 |
| 1632. QCVARM_1120582 | 1667. QCVARM_1120617 |
| 1633. QCVARM_1120583 | 1668. QCVARM_1120618 |
| 1634. QCVARM_1120584 | 1669. QCVARM_1120619 |
| 1635. QCVARM_1120585 | 1670. QCVARM_1120620 |
| 1636. QCVARM_1120586 | 1671. QCVARM_1120621 |
| 1637. QCVARM_1120587 | 1672. QCVARM_1120622 |
| 1638. QCVARM_1120588 | 1673. QCVARM_1120623 |
| 1639. QCVARM_1120589 | 1674. QCVARM_1120624 |
| 1640. QCVARM_1120590 | 1675. QCVARM_1120625 |
| 1641. QCVARM_1120591 | 1676. QCVARM_1120626 |
| 1642. QCVARM_1120592 | 1677. QCVARM_1120627 |
| 1643. QCVARM_1120593 | 1678. QCVARM_1120628 |
| 1644. QCVARM_1120594 | 1679. QCVARM_1120629 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1680. QCVARM_1120630 | 1715. QCVARM_1120665 |
| 1681. QCVARM_1120631 | 1716. QCVARM_1120666 |
| 1682. QCVARM_1120632 | 1717. QCVARM_1120667 |
| 1683. QCVARM_1120633 | 1718. QCVARM_1120668 |
| 1684. QCVARM_1120634 | 1719. QCVARM_1120669 |
| 1685. QCVARM_1120635 | 1720. QCVARM_1120670 |
| 1686. QCVARM_1120636 | 1721. QCVARM_1120671 |
| 1687. QCVARM_1120637 | 1722. QCVARM_1120672 |
| 1688. QCVARM_1120638 | 1723. QCVARM_1120673 |
| 1689. QCVARM_1120639 | 1724. QCVARM_1120674 |
| 1690. QCVARM_1120640 | 1725. QCVARM_1120675 |
| 1691. QCVARM_1120641 | 1726. QCVARM_1120676 |
| 1692. QCVARM_1120642 | 1727. QCVARM_1120677 |
| 1693. QCVARM_1120643 | 1728. QCVARM_1120678 |
| 1694. QCVARM_1120644 | 1729. QCVARM_1120679 |
| 1695. QCVARM_1120645 | 1730. QCVARM_1120680 |
| 1696. QCVARM_1120646 | 1731. QCVARM_1120681 |
| 1697. QCVARM_1120647 | 1732. QCVARM_1120682 |
| 1698. QCVARM_1120648 | 1733. QCVARM_1120683 |
| 1699. QCVARM_1120649 | 1734. QCVARM_1120684 |
| 1700. QCVARM_1120650 | 1735. QCVARM_1120685 |
| 1701. QCVARM_1120651 | 1736. QCVARM_1120686 |
| 1702. QCVARM_1120652 | 1737. QCVARM_1120687 |
| 1703. QCVARM_1120653 | 1738. QCVARM_1120688 |
| 1704. QCVARM_1120654 | 1739. QCVARM_1120689 |
| 1705. QCVARM_1120655 | 1740. QCVARM_1120690 |
| 1706. QCVARM_1120656 | 1741. QCVARM_1120691 |
| 1707. QCVARM_1120657 | 1742. QCVARM_1120692 |
| 1708. QCVARM_1120658 | 1743. QCVARM_1120693 |
| 1709. QCVARM_1120659 | 1744. QCVARM_1120694 |
| 1710. QCVARM_1120660 | 1745. QCVARM_1120695 |
| 1711. QCVARM_1120661 | 1746. QCVARM_1120696 |
| 1712. QCVARM_1120662 | 1747. QCVARM_1120697 |
| 1713. QCVARM_1120663 | 1748. QCVARM_1120698 |
| 1714. QCVARM_1120664 | 1749. QCVARM_1120699 |

RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1750. QCVARM_1120700 | 1785. QCVARM_1120825-828 |
| 1751. QCVARM_1120701 | 1786. QCVARM_1120829-832 |
| 1752. QCVARM_1120702 | 1787. QCVARM_1120833-835 |
| 1753. QCVARM_1120703 | 1788. QCVARM_1120836-838 |
| 1754. QCVARM_1120704 | 1789. QCVARM_1120839-842 |
| 1755. QCVARM_1120705 | 1790. QCVARM_1120843-846 |
| 1756. QCVARM_1120706 | 1791. QCVARM_1120847-850 |
| 1757. QCVARM_1120707 | 1792. QCVARM_1120851-953 |
| 1758. QCVARM_1120708 | 1793. QCVARM_1120960 |
| 1759. QCVARM_1120709 | 1794. QCVARM_1120961 |
| 1760. QCVARM_1120710 | 1795. QCVARM_1120962-965 |
| 1761. QCVARM_1120711 | 1796. QCVARM_1120966-696 |
| 1762. QCVARM_1120712 | 1797. QCVARM_1120971-973 |
| 1763. QCVARM_1120713 | 1798. QCVARM_1120974-977 |
| 1764. QCVARM_1120714 | 1799. QCVARM_1120979-982 |
| 1765. QCVARM_1120715 | 1800. QCVARM_1120983-986 |
| 1766. QCVARM_1120716 | 1801. QCVARM_1120987-991 |
| 1767. QCVARM_1120717 | 1802. QCVARM_1120994-998 |
| 1768. QCVARM_1120718 | 1803. QCVARM_1120999-1003 |
| 1769. QCVARM_1120719 | 1804. QCVARM_1121004-007 |
| 1770. QCVARM_1120720 | 1805. QCVARM_1121008-012 |
| 1771. QCVARM_1120721 | 1806. QCVARM_1121013-017 |
| 1772. QCVARM_1120722 | 1807. QCVARM_1121018-022 |
| 1773. QCVARM_1120723 | 1808. QCVARM_1121023-027 |
| 1774. QCVARM_1120724 | 1809. QCVARM_1121028 |
| 1775. QCVARM_1120725 | 1810. QCVARM_1121029-032 |
| 1776. QCVARM_1120726 | 1811. QCVARM_1121033-034 |
| 1777. QCVARM_1120727 | 1812. QCVARM_1121035-036 |
| 1778. QCVARM_1120728 | 1813. QCVARM_1121144-146 |
| 1779. QCVARM_1120773-784 | 1814. QCVARM_1121147-149 |
| 1780. QCVARM_1120811 | 1815. QCVARM_1121154-155 |
| 1781. QCVARM_1120812-815 | 1816. QCVARM_1121156-159 |
| 1782. QCVARM_1120816-817 | 1817. QCVARM_1121160-162 |
| 1783. QCVARM_1120818-820 | 1818. QCVARM_1121163-166 |
| 1784. QCVARM_1120821-824 | 1819. QCVARM_1121167-170 |

RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

| | |
|---|---|
| 1820. QCVARM_1121172-175 | 1855. QCVARM_1121333 |
| 1821. QCVARM_1121176-181 | 1856. QCVARM_1121334 |
| 1822. QCVARM_1121182-186 | 1857. QCVARM_1121335 |
| 1823. QCVARM_1121187-191 | 1858. QCVARM_1121336 |
| 1824. QCVARM_1121192-196 | 1859. QCVARM_1121337 |
| 1825. QCVARM_1121198-202 | 1860. QCVARM_1121338-340 |
| 1826. QCVARM_1121203-206 | 1861. QCVARM_1121341 |
| 1827. QCVARM_1121207-210 | 1862. QCVARM_1121342-343 |
| 1828. QCVARM_1121211-212 | 1863. QCVARM_1121344-345 |
| 1829. QCVARM_1121223-226 | 1864. QCVARM_1121346-347 |
| 1830. QCVARM_1121229-233 | 1865. QCVARM_1121348-349 |
| 1831. QCVARM_1121238-240 | 1866. QCVARM_1121350 |
| 1832. QCVARM_1121241 | 1867. QCVARM_1121351 |
| 1833. QCVARM_1121242-243 | 1868. QCVARM_1121354 |
| 1834. QCVARM_1121312 | 1869. QCVARM_1121359 |
| 1835. QCVARM_1121313 | 1870. QCVARM_1121360-361 |
| 1836. QCVARM_1121314 | 1871. QCVARM_1121362 |
| 1837. QCVARM_1121315 | 1872. QCVARM_1121491 |
| 1838. QCVARM_1121316 | 1873. QCVARM_1121493-496 |
| 1839. QCVARM_1121317 | 1874. QCVARM_1121510-513 |
| 1840. QCVARM_1121318 | 1875. QCVARM_1121514-517 |
| 1841. QCVARM_1121319 | 1876. QCVARM_1121518 |
| 1842. QCVARM_1121320 | 1877. QCVARM_1121519 |
| 1843. QCVARM_1121321 | 1878. QCVARM_1121522-523 |
| 1844. QCVARM_1121322 | 1879. QCVARM_1121528 |
| 1845. QCVARM_1121323 | 1880. QCVARM_1121529-530 |
| 1846. QCVARM_1121324 | 1881. QCVARM_1121531 |
| 1847. QCVARM_1121325 | 1882. QCVARM_1121536-537 |
| 1848. QCVARM_1121326 | 1883. QCVARM_1121538-540 |
| 1849. QCVARM_1121327 | 1884. QCVARM_1121541-673 |
| 1850. QCVARM_1121328 | 1885. QCVARM_1121674-857 |
| 1851. QCVARM_1121329 | 1886. QCVARM_1121930 |
| 1852. QCVARM_1121330 | 1887. QCVARM_1121931 |
| 1853. QCVARM_1121331 | 1888. QCVARM_1121932-990 |
| 1854. QCVARM_1121332 | 1889. QCVARM_1122336-337 |

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1890. QCVARM_1122338
1891. QCVARM_1122342-348
1892. QCVARM_1122355-405
1893. QCVARM_1122406-414
1894. QCVARM_1122415-428
1895. QCVARM_1122429-430
1896. QCVARM_1122431-433
1897. QCVARM_1122434-438
1898. QCVARM_1122439-447
1899. QCVARM_1122454-459
1900. QCVARM_1122462-463
1901. QCVARM_1122464-471
1902. QCVARM_1122485
1903. QCVARM_1122486-488
1904. QCVARM_1122489
1905. QCVARM_1122490-491
1906. QCVARM_1122492
1907. QCVARM_1122493-496
1908. QCVARM_1122504-506
1909. QCVARM_1122508-512
1910. QCVARM_1122515-517
1911. QCVARM_1122590-651
1912. QCVARM_1122672-675
1913. QCVARM_1122676-677
1914. QCVARM_1122684-687
1915. QCVARM_1122696-697
1916. QCVARM_1122701-712
1917. QCVARM_1122713-714
1918. QCVARM_1122715-716
1919. QCVARM_1122717-719
1920. QCVARM_1122720-724
1921. QCVARM_1122725
1922. QCVARM_1122726-728
1923. QCVARM_1122730
1924. QCVARM_1122731

1925. QCVARM_1122733
1926. QCVARM_1122735
1927. QCVARM_1122737
1928. QCVARM_1151573-577
1929. QCVARM_1151578-581
1930. QCVARM_1151582-585
1931. QCVARM_1151586-590
1932. QCVARM_1151591-596
1933. QCVARM_1151597-602
1934. QCVARM_1151603-607
1935. QCVARM_1151608-610
1936. QCVARM_1151611-613
1937. QCVARM_1151619
1938. QCVARM_1151620
1939. QCVARM_1151964
1940. QCVARM_1151965
1941. QCVARM_1151966
1942. QCVARM_3212686-689
1943. QCVARM_3432839-842
1944. QCVARM_3522626-628
1945. QSC2ARMVQC00000592-621
1946. Expert Report of Dr. Michael Brogioli, September 5, 2025
1947. Expert Report of Patrick F. Kennedy, Ph.D., August 8, 2025
1948. Deposition of William Abbey, June 26, 2025, and exhibits thereto
1949. Deposition of Vivek N. Agrawal, July 11, 2025, and exhibits thereto
1950. Deposition of Cristiano R. Amon, July 3, 2025, and exhibits thereto
1951. 30(b)(6) Deposition of Ziad Ashgar, July 7, 2025, and exhibits thereto
1952. Deposition of Mohamed Awad, July 29, 2025, and exhibits thereto
1953. Deposition of Ami Badani, August 1, 2025, and exhibits thereto

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1954. Deposition of Akshay Bhatnagar, July 10, 2025, and exhibits thereto

1955. Deposition of Aparajita Bhattacharya, July 7, 2025, and exhibits thereto

1956. 30(b)(6) Deposition of Ann N.C. Chaplin, July 11, 2025, and exhibits thereto

1957. 30(b)(1) and 30(b)(6) Deposition of Larissa Cochron, July 11, 2025, and exhibits thereto

1958. 30(b)(6) Deposition of Spencer Collins, June 30, 2025, and exhibits thereto

1959. 30(b)(6) Deposition of Lynn Couillard, Vol. I, July 3, 2025, and exhibits thereto

1960. Deposition of Mark Dragicevich, June 27, 2025, and exhibits thereto

1961. 30(b)(6) Deposition of Jeffrey M. Fonseca, July 9, 2025, and exhibits thereto

1962. Deposition of Anupa George, July 30, 2025, and exhibits thereto

1963. Deposition of Jeffrey B. Golden, July 3, 2025, and exhibits thereto

1964. Deposition of Peter Greenhalgh, July 4, 2025, and exhibits thereto

1965. 30(b)(6) Deposition of Richard Grisenthwaite, July 2, 2025, and exhibits thereto

1966. Deposition of Rene Haas, July 7, 2025, and exhibits thereto

1967. Deposition of Sudeep Holla, June 17, 2025, and exhibits thereto

1968. Deposition of John Horley, July 8, 2025, and exhibits thereto

1969. 30(b)(1) and 30(b)(6) Deposition of Andrew Howard, July 1, 2025, and exhibits thereto

1970. Deposition of Phil Hughes, June 17, 2025, and exhibits thereto

1971. 30(b)(6) Deposition of James Jeon, July 11, 2025, and exhibits thereto

1972. 30(b)(1) and 30(b)(6) Deposition of Paul Kranhold, July 17, 2025, and exhibits thereto

1973. Deposition of Selena LaCroix, August 1, 2025, and exhibits thereto

1974. 30(b)(6) Deposition of Durga Malladi, July 10, 2025, and exhibits thereto

1975. Deposition of Richard J. Meacham, June 27, 2025, and exhibits thereto

1976. Deposition of Dawn Hill Montemagni, August 15, 2025, and exhibits thereto

1977. 30(b)(6) Deposition of Pavankumar Mulabagal, July 1, 2025, and exhibits thereto

1978. 30(b)(6) Deposition of Jannik W. Nelson, July 10, 2025, and exhibits thereto

1979. Deposition of Christopher Patrick, July 2, 2025, and exhibits thereto

1980. Deposition of Laura Sand, July 8, 2025, and exhibits thereto

1981. 30(b)(1) and 30(b)(6) Deposition of Karthik Shivashankar, June 30, 2025, Vol.1, and exhibits thereto

1982. Deposition of Kenneth Siegel, July 4, 2025, and exhibits thereto

1983. 30(b)(6) and 30(b)(1) Deposition of Christine Cong Tran, Vol. 1, July 10, 2025, and exhibits thereto

1984. Deposition of Jignesh Trivedi, July 9, 2025, and exhibits thereto

1985. 30(b)(6) Deposition of Manju Varma, June 24, 2025, and exhibits thereto

1986. Deposition of Jean-Francois Vidon, July 1, 2025, and exhibits thereto

1987. 30(b)(6) Deposition of Martin Weidmann, June 20, 2025, and exhibits thereto

1988. Deposition of Jonathan Weiser, July 11, 2025, and exhibits thereto

1989. Deposition of Karl M. Whealton, June 18, 2025, and exhibits thereto

1990. Deposition of Gerard R. Williams III, June 25, 2025, and exhibits thereto

1991. Deposition of Michael J. Williams, June 27, 2025, and exhibits thereto

1992. 30(b)(6) Deposition of Paul Williamson, July 2, 2025, and exhibits thereto

1993. Deposition of Kurt Wolf, June 25, 2025, and exhibits thereto

1994. Deposition of Ehab Youssef, June 26, 2025, and exhibits thereto

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
## ATTACHMENT 2.0
### Documents Reviewed and/or Relied Upon

1995. Complaint, August 31, 2022, Case No. 1:22-cv-01146-MN

1996. Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim, November 15, 2022

1997. Complaint, April 18, 2024

1998. Answering Brief of Defendant-Appellee Qualcomm Incorporated, April 26, 2024, Case No. 3:17-md-02773-JSC

1999. Arm v. Qualcomm, Pretrial Conference Transcript, November 20, 2024

2000. Arm v. Qualcomm, Trial Transcript, Vol. 1, December 13, 2024

2001. Arm v. Qualcomm, Trial Transcript, Vol. 2, December 16, 2024

2002. First Amended Complaint, December 16, 2024, and exhibits thereto

2003. Arm v. Qualcomm, Bench Trial Transcript, Vol. 1, December 17, 2024

2004. Arm v. Qualcomm, Trial Transcript, Vol. 3, December 17, 2024

2005. Arm v. Qualcomm, Trial Transcript, Vol. 4, December 18, 2024

2006. Arm v. Qualcomm, Trial Transcript, Vol. 5, December 19, 2024

2007. Arm v. Qualcomm, Trial Transcript, Vol. 6, December 20, 2024

2008. Verdict Form, December 20, 2024, Case No. 1:22-cv-01146-MN

2009. Opening Brief in Support of Plaintiff Arm Ltd.'s Motion for Judgment as Matter of Law or a New Trial, January 17, 2025

2010. Defendants' Post-Trial Brief Regarding Equitable Defenses, January 29, 2025

2011. Scheduling Order, January 31, 2025

2012. Plaintiff Arm Ltd.'s Responsive Post-Trial Brief Regarding Equitable Defenses, February 12, 2025

2013. Defendants' Reply Brief in Support of Their Post-Trial Brief Regarding Equitable Defenses, February 19, 2025, and exhibit thereto

2014. Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), March 10, 2025

2015. Arm Holding Plc's Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), March 24, 2025

2016. Arm Holdings PLC's Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), March 24, 2025

2017. Plaintiffs' Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), May 9, 2025

2018. ARM Ltd.'s First Supplemental Objections and Responses to Qualcomm's Fifth Set of Interrogatories (Nos. 26-28), May 10, 2024

2019. Arm Holdings PLC's Objections and Responses to Qualcomm's Amended Interrogatory No. 3, May 12, 2025

2020. Second Amended Complaint, June 3, 2025, and exhibit thereto

2021. Arm's Rule 26(a)(1) Second Supplemental Initial Disclosures, June 12, 2025

2022. Plaintiffs' Supplemental Initial Disclosures, June 13, 2025

2023. Arm's Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), June 16, 2025

2024. Arm's Rule 26(a)(1) Third Supplemental Initial Disclosures, June 16, 2025

2025. Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3, June 18, 2025

2026. Plaintiffs' Responses and Objections to Arm Ltd.'s First Notice of Deposition of Qualcomm Inc., and Qualcomm Technologies, Inc., June 23, 2025

2027. Plaintiffs' First Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-4, 7, and 9), June 25, 2025

2028. Arm's Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 12), July 9, 2025

2029. Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), July 11, 2025

RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

2030. Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025

2031. Arm's First Supplemental Responses to Qualcomm's Amended Interrogatory No. 3, July 11, 2025

2032. Arm's First Supplemental Responses to Qualcomm's Third Set of Interrogatories (No. 12), July 11, 2025

2033. Arm's Responses & Objections to Qualcomm's First Set of Request for Admissions (Nos. 1-28), July 11, 2025

2034. Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admissions (Nos. 1-30), July 11, 2025

2035. Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025

2036. Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 10-13), July 11, 2025

2037. Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), July 11, 2025

2038. Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), July 11, 2025

2039. Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), August 8, 2025

2040. Plaintiffs' Second Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), August 8, 2025

2041. Plaintiffs' Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), August 8, 2025

2042. "About Nordic Semiconductor," Nordic, date accessed: September 3, 2025 (accessed: https://www.nordicsemi.com/About-us)

2043. "About Qualcomm – Company Information & History," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company#locations)

2044. "About Silicon Labs," Silicon Labs, date accessed: September 3, 2025 (accessed: https://www.silabs.com/about-us)

2045. "Amlogic," Amlogic, date accessed: September 2, 2025 (accessed: https://www.amlogic.com/#Company)

2046. "Arm Architecture for the Digital World," Arm, date accessed: August 29, 2025 (accessed: https://www.arm.com/architecture)

2047. "ARM Global Offices," Arm, date accessed: July 10, 2025 (accessed: https://www.arm.com/company/offices)

2048. "Arm Total Access," Arm, date accessed: August 28, 2025 (accessed: https://www.arm.com/products/licensing/arm-total-access)

2049. "Business Overview," Renesas, date accessed: September 1, 2025 (accessed: https://www.renesas.com/en/about/profile/business)

2050. "Company," Arm, date accessed: July 10, 2025 (accessed: https://www.arm.com/company)

2051. "CPU Cores Explained: How Many Do You Need?," HP, date accessed: July 30, 2025 (accessed: https://www.hp.com/us-en/shop/tech-takes/cpu-cores-how-many-do-i-need?cjdata=MXxOfDB8WXww&utm_medium=af&utm_source=cj&utm_campaign=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29&utm_content=5250933_Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29_100357191&cjevent=2f013fec6d7311f081bd01750a18b8fc&subacctname=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29)

2052. "Embedded Trace Extension," Arm, date accessed: September 3, 2025 (accessed: https://developer.arm.com/documentation/102856/0100/Embedded-Trace-Extension)

2053. "Headquarters," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company/facilities/offices?country=USA&hQ=true)

2054. "Home," Augentix, date accessed: September 3, 2025 (accessed: https://www.augentix.com/)

2055. "Intel and AMD are unlikely allies in new x86 ecosystem advisory group – 'we'll remain fierce competitors,'" Tom's Hardware, date accessed: August 1, 2025 (accessed: https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward#xenforo-comments-3857628)

2056. "Intel vs AMD vs Qualcomm: Who's Leading the CPU War in 2025," Business Economy, date accessed: July 31, 2025 (accessed: https://www.businesseconomy.com/technology/intel-vs-amd-vs-qualcomm-whos-leading-the-cpu-war-in-2025/)

2057. "Learn the architecture – Understanding the Armv8.x and Armv9.x extensions," Arm, date accessed: August 1, 2025 (accessed: https://documentation-service.arm.com/static/663e39db9007496a66f74481)

2058. "Markets," Arm, date accessed:  September 2, 2025 (accessed: https://www.arm.com/markets)

2059. "MediaTek.  Living in a connected world," MediaTek, date accessed:  September 1, 2025 (accessed: https://www.mediatek.com/company/discover)

2060. "Microprocessor Cores and Processor Technology - Arm®," Arm, date accessed: August 27, 2025 (accessed: https://www.arm.com/products/silicon-ip-cpu)

2061. "Microsoft is Intel's newest chip foundry customer," Manufacturing Dive, date accessed: August 31, 2025 (accessed: https://www.manufacturingdive.com/news/microsoft-intel-newest-chip-foundry-customer-18a-technology/708953/)

2062. "Our Company, Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company)

2063. "Product," Augentix, date accessed:  September 3, 2025 (accessed: https://www.augentix.com/product)

2064. "Products," Silicon Labs, date accessed: September 3, 2025 (accessed: https://www.silabs.com/products)

2065. "Qualcomm Acquires NUVIA To Accelerate Its Future CPUs With Support From 18 Partners," Forbes, date accessed: July 28, 2025 (accessed: https://www.forbes.com/sites/patrickmoorhead/2021/01/13/qualcomm-acquires-nuvia-to-accelerate-its-future-cpus-with-support-from-18-partners/)

2066. "Reality Labs,'" Meta, date accessed: August 28, 2025 (accessed: https://tech.facebook.com/reality-labs/)

2067. "Realtek in Brief," RealTek, date accessed: September 3, 2025 (accessed: https://www.realtek.com/Article/Index?menu_id=306&lang=en-GB)

2068. "RISC-V's Ascent Could Reshape The Global Compute Landscape," Forbes, July 24, 2025, date accessed: July 31, 2025 (accessed: https://www.forbes.com/sites/davealtavilla/2025/07/24/risc-vs-ascent-could-reshape-the-global-compute-landscape/)

2069. "Snapshot," RealTek, date accessed: September 3, 2025 (accessed: https://www.realtek.com/Article/Index?menu_id=305&lang=en-GB).

2070. "System Architecture Compliance Suites (ACS)," Arm, date accessed: September 3, 2025 (accessed: https://developer.arm.com/Architectures/Architectural%20Compliance%20Suite)

2071. "System Processors," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/products/system-processors)

2072. "Technological Strengths," RealTek, date accessed: September 3, 2025 (accessed: https://www.realtek.com/Article/Index?menu_id=308&lang=en-GB).

2073. "The Basics of Instruction Set Architecture," Lenovo, date accessed: August 26, 2025 (accessed: https://www.lenovo.com/us/en/glossary/instruction-set-architecture/?orgRef=https%253A%252F%252Fwww.bing.com%252F)

2074. "The Official History of Arm," Arm Newsroom, date accessed: August 29, 2025 (accessed: https://newsroom.arm.com/blog/arm-official-history)

2075. "The Rise of Licensed IP In Edge AI and Smart Device Manufacturing," Forbes, date accessed: August 28, 2025 (accessed: https://www.forbes.com/councils/forbestechcouncil/2025/08/28/why-the-next-wave-of-ai-innovation-wont-be-built-from-scratch/)

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

2076. "The Shift to Custom Silicon: Why Companies Are Designing Their Own Chips," Nasdaq, date accessed: August 28, 2025 (accessed: https://www.nasdaq.com/articles/shift-custom-silicon-why-companies-are-designing-their-own-chips)

2077. "Welcome to MediaTek," MediaTek, date accessed: September 1, 2025 (accessed: https://www.mediatek.com/)

2078. "What is a System-on-Chip (SoC)?," Windows Central, date accessed: July 30, 2025 (accessed: https://www.windowscentral.com/hardware/laptops/what-is-a-system-on-chip-soc)

2079. "What is Instruction Set Architecture (ISA)," Arm, date accessed: July 11, 2025 (accessed: https://www.arm.com/glossary/isa)

2080. "What Is SoC Development?," Arm, date accessed: July 30, 2025 (accessed: https://www.arm.com/glossary/soc-development)

2081. "What we do," Texas Instruments, date accessed: September 1, 2025 (accessed: https://www.ti.com/about-ti/company/what-we-do.html)

2082. "With a systems approach to chips, Microsoft aims to tailor everything 'from silicon to service' to meet AI demand," Microsoft, date accessed: August 31, 2025 (accessed: https://news.microsoft.com/source/features/ai/in-house-chips-silicon-to-service-to-meet-ai-demand/?msockid=11a74f0a53d86fdf16855cf652706eb3)

2083. "2024 Business Report for the year ended December 31, 2024," Samsung Electronics Co., Ltd., date accessed: September 1, 2025 (accessed: https://images.samsung.com/is/content/samsung/assets/global/ir/docs/2024_4Q_Interim_Report.pdf)

2084. "Annual Report 2024," Infineon Technologies AG, date accessed: August 31, 2025 (accessed: https://www.infineon.com/assets/row/public/documents/corporate/investors/annual-reports/2024/2024-infineon-annual-report-01-00-en.pdf)

2085. "Annual Report 2024," Microsoft, date accessed: August 31, 2025 (accessed: https://www.microsoft.com/investor/reports/ar24/?msockid=11a74f0a53d86fdf16855cf652706eb3)

2086. "NEC, Annual Report 2010," NEC.com, date accessed: August 25, 2025 (accessed: https://www.nec.com/en/global/ir/pdf/annual/2010/ar2010-e.pdf)

2087. Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025

2088. Infineon Technologies AG Annual Report 2020, Infineon, date accessed: August 29, 2025 (accessed: https://www.infineon.com/assets/row/public/documents/corporate/investors/annual-reports/2020/infineon-annual-report-report-v10-00-en.pdf)

2089. Qualcomm Incorporated Form 10-k for the fiscal year ended September 29, 2024, date accessed: September 1, 2025 (accessed: https://s204.q4cdn.com/645488518/files/doc_financials/2024/q4/QCOM-09-29-24-FY2024-10-K.pdf)

2090. "Semiconductors: Technology and Market Primer 13.0," Oppenheimer Equity Research Industry Update

2091. All documents provided in the Relativity database

2092. All documents cited in my report and the attachments thereto

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

# EXHIBIT 50

# EXHIBIT 51

# EXHIBIT 52

# EXHIBIT 53

# EXHIBIT 54

# EXHIBIT 55

# EXHIBIT 56

# EXHIBIT 57

# EXHIBIT 58

# KIRKLAND & ELLIS LLP

333 West Wolf Point Plaza
Chicago, IL 60654
United States

**Jay Emerick**
To Call Writer Directly:
+1 312 862 3772
jay.emerick@kirkland.com

+1 312 862 2000

Facsimile:
+1 312 862 2200

www.kirkland.com

July 24, 2025

**By E-mail**

**Highly Confidential - Attorney's Eyes Only**

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton &
 Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re: *Qualcomm Inc. v. Arm Holdings PLC*, C.A. No. 24-490 (D. Del.)

Dear Catherine:

We write in response to your letters regarding the production of certain documents.

## Documents Requested During the Deposition of Martin Weidmann

Qualcomm requests emails regarding Arm's provision of support to Qualcomm for Nuvia-based designs. As we previously informed you, Arm has already produced documents regarding Arm personnel allegedly receiving instruction from management not to support Nuvia-based designs during the period of the litigation. 7/10/25 Email from A. Janes (identifying ARM_01230110; ARM_01314327; ███████████). Arm has also produced documents showing Arm's resumption of support to Qualcomm. *Id.* (identifying ARMQC_02779076). Arm maintains that its production is complete.

## Documents Regarding Arm's ███████████████████████ to Qualcomm

Qualcomm seeks documents regarding Arm's ███████████████, including documents allegedly referenced at the depositions of Karthik Shivashankar, Ehab Youssef, and Akshay Bhatnagar. As we have repeatedly explained through written correspondence and at depositions, and as Arm's witnesses have confirmed, Arm's ████████████████████████ third-party agreements for ███████████ that also involved legal counsel. *See* 6/19/25 P. Evangelatos Email to J. Braly; 7/9/25 P. Evangelatos Email to E. Westerhold ("As we have previously written, due to Arm's confidentiality obligations, Arm cannot produce third-party

## KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 2

agreements for ███████████████████ without clearing that production beforehand with each third party…").  Arm has produced all third-party agreements to which it has not received an objection or a motion for a Protective Order was not filed.  We also provided corrected versions of Exhibits 5 and 5.1 from Mr. Abbey's deposition.  However, Arm will continue to withhold documents that include confidential information for ███████████, and the other third parties pending resolution of their Protective Order disputes, including Arm's agreements with both companies and ███████████████████████.  We have investigated and no other non-privileged documents reflecting Arm's █████ exist.

As to the other requests raised in your letters, Qualcomm seeks "all quarterly price books from Q1 2019 to the present."  Your letter fails to explain why six years of quarterly price books is relevant or proportional to the needs of Qualcomm's allegations, which is based on Arm's ███ for ████████████.  Arm produced to Qualcomm its price books ██████████ which is more than sufficient to understand Arm's ████████████ price book pricing as of Arm's ███████████.  Qualcomm also seeks information regarding Qualcomm's 2019 Annex to the QC TLA, particularly, "██████████████████████████ ████████" in Qualcomm's 2019 Annex to the QC TLA.  However, that agreement has already been produced and is not at issue in the SAC.  Nor is Qualcomm's 2019 agreement relevant, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  Thus, to the extent any other responsive documents even exist, they are not relevant.

As to Qualcomm's other rhetoric, we disagree with your characterization of the testimony of Mr. Youssef and Arm's privilege instructions. ████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████.  We also disagree that Qualcomm has been "severely prejudiced."  Arm has produced the documents not subject to a third-party confidentiality dispute, and Qualcomm deposed five witnesses knowledgeable about Arm's TLA offers.  Any prejudice to Qualcomm by perceived discovery delays is a problem of its own making, as Qualcomm waited until March 2025 to raise its TLA allegations.

### Documents Related to the Discussion with Bloomberg News Regarding the Breach Letter

Qualcomm seeks documents related to a "discussion" with Bloomberg News regarding Arm's October 22, 2024 notice of material breach to Qualcomm.  Yet Qualcomm incorrectly asserts that Mr. Abbey "waiv[ed] any claim of privilege to" "an alleged attorney-client communication" about Bloomberg News and demands that Arm "immediately produce all documentation of the 'discussion' between Arm and Bloomberg News regarding the breach letter."  In fact, Arm has not claimed privilege over the "discussion" with Bloomberg News regarding Arm's October 22, 2024 notice of material breach to Qualcomm. ██████████████

## KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 3



Arm did not assert privilege over FGS's discussions with Bloomberg.

Because Arm has not claimed privilege over the "discussion" with Bloomberg News, Arm waived no privilege in taking the redirect of Mr. Abbey during his deposition. Arm trusts that the testimony of Messrs. Siegel and Kranhold resolves Qualcomm's concerns about this "discussion."

### Chat Messages Involving Mr. Haas

Qualcomm demands that Arm "immediately supplement its production with at least Mr. Haas' chats responsive to Qualcomm's RFPs." However, the premise of this demand is mistaken. Contrary to the misrepresentations in your letter, Arm has already performed a reasonable search for responsive materials, including Teams chats, using search terms. And Arm has in fact produced at least 408 of Mr. Haas's Teams chats in the prior case and another 12 Teams chats in this case. *See* Haas Dep. at 146–147.[1] Arm has no further discovery obligations to search for additional Teams chats. Qualcomm speculates that more of Mr. Haas's Teams chats are responsive, but fails to identify any basis for why this is so.

---

[1] Arm notes that Qualcomm's July 10 letter appears to cite to the rough transcript of Mr. Haas's deposition. Arm herein responds to Qualcomm's July 10 letter on Arm's understanding that all citations were to the rough transcript.

## KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 4

█████████████████████████████████████████████ Qualcomm has not identified with specificity any deficiency in Arm's production of Mr. Haas's chats, and merely appears to be fishing. Moreover, Qualcomm has refused to engage in reciprocal discovery, given Qualcomm's significant deficiencies in its own searches for responsive documents, as we have explained in previous discovery correspondence. Accordingly, Arm will not produce any more documents in response to this request.

### Outside Communication Firms

Qualcomm seeks confirmation that "Brunswick was not involved in the October 22, 2024 leak or any other communications between Arm and third parties responsive to Qualcomm's RFPs." Qualcomm had the opportunity to ask Mr. Haas at his deposition whether Arm communicated with Brunswick regarding the October 22 notice of material breach. Qualcomm failed to do so. ██████████████████████████████████████████████████████. Having failed to establish that Brunswick is relevant to the events surrounding October 22, Qualcomm may not now use this letter to import last-minute discovery requests. Nevertheless, for the avoidance of doubt, Arm confirms that no communications with Brunswick are responsive to the non-objectionable scope of Qualcomm's RFPs.

### Documents Related to the Financial Times Article

Qualcomm demands that Arm "immediately produce documents responsive to" the Financial Times article titled "Arm to launch its own chip in move that could upend semiconductor industry." But Qualcomm fails to articulate how the Financial Times article (Haas Exhibit 8), or the cited testimony of Mr. Haas, is relevant to any party's claim or defense or is proportional to the needs of the case. Qualcomm also fails to explain how Mr. Haas's cited testimony in any way overcomes Arm's previous objections to the lack of relevance and proportionality for Qualcomm's RFP Nos. 104, 126, and 127. *See* D.I. 162, at 4. Arm maintains its objections to these RFPs. As your letter acknowledges, Qualcomm's motion to compel remains pending before the Court. Accordingly, Arm will not produce documents in response to this request absent Court order.

### Documents Requested During the Deposition of Andrew Howard

Qualcomm requests production of Arm's "'competitive analysis' on Qualcomm's CPUs." Qualcomm, for its part, has refused on relevance and other grounds to produce documents "concerning any comparisons of any Arm-designed cores, CPUs, or products containing the same to any cores, CPUs, or products containing the same designed by Qualcomm, Nuvia, or any Third Party." *See* Qualcomm's R&Os to Arm's RFP No. 12. In any event, Arm has already

# KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 5

produced (subject to its objections) documents concerning Arm's analyses of Qualcomm's CPUs and systems-on chips related to the Qualcomm ALA. ███████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ We trust this resolves Qualcomm's concerns.

**Documents Regarding ███ Pricing**

Qualcomm requests production of a ████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ Regarding the second request, Arm has investigated Qualcomm's request and confirmed that there is no price book that includes pricing for ███ .

Relatedly, Qualcomm also seeks information regarding ████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Likewise, information about the license subscriptions of third parties is both irrelevant and subject to third-party confidentiality disputes. Whether companies such as ████████████████████ have access to ███ is irrelevant to Qualcomm's ███ allegations, which are based on Qualcomm's purported '██████' to extend the ALA from May 2020.

**Documents Requested During the Deposition of Vivek Agrawal**

Your letter requests production of the "full [C]onfluence page in readable form" from ARMQC_02784227 and unredacted versions of ARMQC_02784661 and ARMQC_02784664 reflecting Mr. Agrawal's interactions with Copilot, as well as "any other production documents containing Copilot chat messages." While we disagree that ARMQC_02784227 is not "in readable form," Arm has produced many other versions of the same or similar Confluence page that are not truncated. *See, e.g.*, ARMQC_02773850, ARMQC_02773872, ARMQC_02773878, ARMQC_02773898, ARMQC_02773906, ARMQC_02773945, ARMQC_02774029, ARMQC_02774036, ARMQC_02774043, ARMQC_02774051, ARMQC_02774058, ARMQC_02774081, ARMQC_02774103, ARMQC_02774123, ARMQC_02774131,

## KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 6

ARMQC_02774139,    ARMQC_02774147,    ARMQC_02774155,    ARMQC_02774163,
ARMQC_02774233,    ARMQC_02774312,    ARMQC_02774319,    ARMQC_02774326,
ARMQC_02774333,    ARMQC_02774355,    ARMQC_02774378,    ARMQC_02774385,
ARMQC_02774494,    ARMQC_02774515,    ARMQC_02774523,    ARMQC_02774531,
ARMQC_02774539.    Accordingly,  Arm  will  not  reproduce  the  content  reflected  in
ARMQC_02784227.

We  also  disagree  with  your  contention  that  "Arm  cannot  claim  privilege  over"
ARMQC_02784661 and ARMQC_02784664, and any any related documents, because they
allegedly  include  "communications  .  .  .  sent  to  Microsoft  as  part  of  a  Copilot  chat."
Qualcomm's  contention  is  both  factually  inaccurate  and  legally  baseless.   These  documents
contain privileged information and were generated at the request of or pursuant to legal advice,
for the purposes of seeking legal advice, and/or contain or reflect attorney work product.  Such
correspondence is privileged, and Arm will not produce unredacted versions of QCX274 and
QCX275, nor any other production documents containing similarly privileged information, to the
extent such documents exist.

**Documents Requested During the Deposition of Christine Tran**

Your letter requests production of a copy of ARM_01426582 "with appropriate privilege
redactions, removing redactions at least for the duplicate messages that are shown unredacted in"
ARM_00085567.  We have reviewed ARM_01426582 and will re-produce that document to
align the redactions with ARM_00085567.  However, the other redactions in that document will
remain as they are to privileged information for the purposes of seeking legal advice.

**RFPs Discussed At Meet And Confers**

Qualcomm's  July  7,  2025  letter  seeks  clarification  from  recent  meet  and  confers
regarding Arm's position on certain RFPs.

**RFP 37**

We understand this Request to seek documents relating to licensing ███ to Qualcomm.
Your Letter asks "whether Arm would produce documents if 'there are discussions that concern
licensing to Qualcomm that include pricing information.'"  As discussed above, there are no non-
privileged documents concerning pricing of ███.

**RFPs 42 and 102**

Your letter explains that this Request seeks "'documents where people at Arm are saying
we should release a ███, we believe that we have made developments or introduced features,

## KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 7

whatever it is, sufficient to be ███ of the Arm architecture.'"  Your letter also acknowledges that this request "may be 'capture[d] in what you are describing you'll be producing.'"  Your letter asks "if Arm intends to produce any more documents responsive to this Request."  After reviewing our production, Arm has already produced responsive documents to this Request.

### RFP 123

Your letter asks whether "Arm intends to produce any more documents responsive to this Request."  As discussed above, Arm has already produced the third-party agreements for ███ ██████████████ in effect as of ████████ that are not subject to a third-party confidentiality dispute, but will continue to withhold documents pending the Court's resolution of the Protective Order disputes that have been filed.

### RFPs 126, 127

These Requests seek documents related to the February 13, 2025 Financial Times article. As discussed above, Arm will not produce any more documents in response to this request pending the Court's resolution of Qualcomm's motion to compel.

### RFPs 134, 135–138

We have investigated Qualcomm's request and confirmed that Arm does not use any other CRMs.  We fail to understand the relevance of what other discovery Qualcomm is seeking with these requests, as evidenced by Qualcomm's failure to ask Arm's 30(b)(6) designee on Arm's CRM systems any questions about that topic.  Accordingly, Arm will not produce any more documents in response to these Requests.

### RFP 143

We understand this Request to seek documents concerning ██████████████ , yet ██████ is not mentioned in the SAC nor has Qualcomm plead any allegations based on ██████████ ██████ Accordingly, Arm will not produce any more documents in response to this Request.

### RFP 145(2)

Arm confirms that it is not withholding any documents on the basis of whether such documents constitute a "formal" or "informal" media statement, and that its production to date is complete as to this Request.

## KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 8

### RFP 152

Arm understands that Qualcomm is seeking communications regarding any "decision" to provide ACK patches to Qualcomm.  As discussed above, Arm's production of documents responsive to this Request is complete.

### RFPs 159, 160, 163

We understand this Request to seek Arm's communications with third-party ALA licensees relating to certain materials and support that Qualcomm contends are "deliverables." Qualcomm's requests for these third-party communications have no relevance to whether Qualcomm received the materials to which it is entitled under the Qualcomm ALA. Accordingly, Arm will not produce any more documents in response to these Requests.

### RFP 166

Your letter explains that this Request seeks documents concerning competitive intelligence.  As noted in Arm's objections to this request, Qualcomm has repeatedly disclaimed, both orally and in writing, that it need prove or even identify a relevant market to support its claims. Until Qualcomm defines the relevant market(s), Arm is unable to discern for which market(s) Qualcomm seeks competitive intelligence information.  Because your letter fails to define any relevant market, Arm will not produce any more documents in response to this request.

Sincerely,

*/s/ Jay Emerick*

Jay Emerick

EXHIBIT 59

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    ------------------------------------x
     QUALCOMM INCORPORATED, a Delaware
4    Corporation, QUALCOMM TECHNOLOGIES,
     INC., a Delaware corporation,
5
                    Plaintiffs,
6

7
              - against -
8

9    ARM HOLDINGS PLC, f/k/a, ARM LTD.
     A U.K. corporation,
10
                    Defendants.
11   ------------------------------------x
12                  Zoom videoconference
13                  October 10, 2025
                    11:05 a.m.
14
15           MEET & CONFER
16
17   Transcribed by Dawn Matera, a Certified
18   Shorthand Reporter and Notary Public for
19   the State of New York.
20
21              *    *    *
22
23
24
25

Page 2

```
 1
 2 A P P E A R A N C E S :
 3
 4 PAUL WEISS RIFKIND WHARTON & GARRISON LLP
       1285 Avenue of the Americas
 5     New York, New York 10019
 6 BY: CATHERINE NYARADY, ESQ.
    BY: JAKE BRALY, ESQ.
 7 BY: JACOB APKON, ESQ.
    BY: STEPHANIE CHIN, ESQ.
 8 BY: ADAM BASNER, ESQ.
    BY: JEN HARTLEY, ESQ.
 9
10 MORRIS NICHOLS ARSHT & TUNNELL LLP
       1201 North Market Street
11     16th Floor
       Wilmington, Delaware 19899
12
    BY: JENNIFER YING, ESQ.
13 BY: TRAVIS J. MURRAY, ESQ.
14
    KIRKLAND & ELLIS LLP
15     333 West Wolf Point Plaza
       Chicago, Illinois 60654
16
    BY: JAY EMERICK, ESQ.
17 BY: PETER EVANGELATOS, ESQ.
18
19 YOUNG CONAWAY STARGATT & TAYLOR LLP
       1000 North King Street
20     Rodney Square
       Wilmington, Delaware 19801
21
    BY: DANIEL MACKRIDES, ESQ.
22
23
24
25
```

Page 3

```
 1
 2 A P P E A R A N C E S (Continued):
 3
    MORRISON & FOERSTER LLP
 4     425 Market Street
       San Francisco, California 94105
 5
    BY: NICHOLAS FUNG, ESQ.
 6
 7
              *   *   *
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1       Meet and Confer
 2       MR. BRALY:  Hopefully, this
 3 won't take long.  I think really we're
 4 just asking if you can produce the
 5 spreadsheet, I think it's been referred
 6 to in a number of depositions.  I think
 7 you also had put in your letter to the
 8 Special Master that you would produce it,
 9 but there was information on the
10 spreadsheet that pertains to some of the
11 companies that have moved for protective
12 orders.
13       So we're just asking if you
14 produce the spreadsheet and you can
15 redact the information that's relevant to
16 the third parties that have moved for
17 protective orders.  You know, if you just
18 sort of, I guess, if you leave the name
19 of the company that you redact sort of
20 all of the additional information, but to
21 make that production.
22       And then pending resolution of
23 the third-party motion of the Special
24 Master, if she says, in fact, that, you
25 know, those licenses and that information
```

Page 5

```
 1       Meet and Confer
 2 should be produced, you can then produce
 3 an updated copy of the spreadsheet and
 4 remove whatever redactions that you
 5 provide that were originally produced.
 6       MR. EMERICK:  Would producing a
 7 redacted version of the spreadsheet
 8 result in you dropping any of the
 9 disputes that are currently before the
10 Special Master?
11       MR. BRALY:  Which disputes,
12 like the third-party disputes?
13       MR. EMERICK:  Any dispute.
14       MR. BRALY:  We would have to
15 look at the spreadsheet.  Without seeing
16 it, I don't think so.  It's hard to kind
17 of make that promise without looking at
18 the spreadsheet.
19       MR. EMERICK:  Are you seeking
20 to modify the protective order at all in
21 this?
22       MR. BRALY:  What do you mean?
23       MR. EMERICK:  In connection
24 with your request or otherwise, are you
25 seeking to modify the protective order in
```

2 (Pages 2 - 5)

Page 6

Meet and Confer

1    this case at all?
2    MR. BRALY:  I guess I am not
3    sure what you mean.
4    MR. EMERICK:  So do you know
5    that we have a protective order?
6    MR. BRALY:  Of course.
7    MR. EMERICK:  And are you
8    seeking to modify that protective order
9    at all?
10   MR. BRALY:  Are you saying
11   because we're asking for redactions, is
12   that's why you're saying that?
13   MR. EMERICK:  I am asking if
14   you are seeking to modify the protective
15   order in this case?
16   MR. BRALY:  No, we are not
17   seeking to modify the protective order.
18   We are asking for a redacted version of
19   the spreadsheet, because you withheld it,
20   because you said there is information in
21   the spreadsheet that you're not providing
22   because of pending protective order
23   motions.
24   MR. EMERICK:  Is it your
25

Page 7

Meet and Confer

1    position that the protective order allows
2    Arm to produce documents with redactions
3    for third-party confidential information?
4    MR. BRALY:  No.  We are saying
5    we would like to work around the issue
6    that is currently in front of the Court
7    and we are trying to seek the spreadsheet
8    that you have referenced previously in
9    multiple depositions and, as I just said,
10   pending resolution of the Special Master
11   ruling on the protective order motions,
12   potentially produce an unredacted version
13   of the spreadsheet.
14   MS. NYARADY:  To be clear, Jay,
15   this is not any kind of, you know, effort
16   to amend the protective order and it's
17   not any kind of indication on our part
18   that we think you can produce redacted
19   documents.
20   We have a scheduling issue,
21   because things were brought to the
22   Special Master late and now we're running
23   up against summary judgment.  So it's got
24   nothing to do with trying to revise the
25

Page 8

Meet and Confer

1    fact that parties should not be
2    redacting, but the alternative is we're
3    going to have to file for summary
4    judgment without the chart and seek to
5    have you precluded from relying on it in
6    any way, so that's why we are asking for
7    it.
8    MR. EMERICK:  Sorry, what's the
9    preclusion issue?
10   MS. NYARADY:  If you won't give
11   us the chart, we were going to ask to
12   have it precluded, that you can't rely on
13   it.
14   MR. EMERICK:  Understood.
15   MS. NYARADY:  And we are
16   probably going to ask for an adverse
17   inference that the chart is not helpful
18   to you.  Because you mentioned the chart
19   repeatedly in depositions and we have
20   been unable to get access to any portion
21   of it, including portions that are not in
22   dispute.
23   MR. EVANGELATOS:  Counselor,
24   what I am curious about is why -- why now
25

Page 9

Meet and Confer

1    should we suddenly produce it, when yes,
2    we have had this dispute before the
3    Special Master.  It's briefed.  It's on
4    the Special Master's plate clearly with
5    the third-party disputes.  I mean, why
6    should we deviate from the PO obligation
7    that you guys argued for now for one
8    document and what is the basis for some
9    sort of adverse inference based on the
10   Special Master needing to take time to
11   rule on the motions?
12   MS. NYARADY:  I already said
13   it's because summary judgment is due in a
14   couple of weeks.
15   MR. EVANGELATOS:  And summary
16   judgement is due for us as well.  And I
17   hear you on the scheduling problem, it's
18   the same problem for us, but why should
19   we deviate from the PO obligation that
20   you argued for?
21   MS. NYARADY:  You don't have
22   to.  And obviously it sounds like you're
23   not going to.  And I just want to put you
24   on notice of what we are going to argue.
25

3 (Pages 6 - 9)

Page 10

Meet and Confer
1
2  So you don't have to. We made the
3  request. You've denied it. I think it's
4  a practical solution for a path forward.
5  If you don't, that's fine.
6      MR. EMERICK: If the Special
7  Master orders you guys to produce
8  something that you haven't produced, are
9  you willing to agree to an adverse
10  inference on that issue, because we
11  haven't gotten the documents as of
12  summary judgment?
13      MS. NYARADY: That's not the
14  same thing as what we are dealing with
15  here. The question is just whether
16  you're going to produce it in whole or in
17  part after the Special Master ruling.
18      MR. EMERICK: So I take it it's
19  a no?
20      MS. NYARADY: I don't think
21  there is anything pending before the
22  Special Master that has the same factual
23  predicate. If you have something in
24  mind, I'm happy to talk about it
25  specifically, but I don't think there is

Page 11

Meet and Confer
1
2  anything.
3      MR. EVANGELATOS: So by that
4  logic, Catherine, are you saying that all
5  these -- all the documents that are
6  subject to the third-party disputes, we
7  are not going to be able to rely on
8  those, that you're going to seek an
9  adverse inference on that too, or just
10  the spreadsheet?
11      MS. NYARADY: The only document
12  that we asked for is the spreadsheet, so
13  that's the one I am focused on.
14      MR. EVANGELATOS: You've asked
15  for the documents themselves, too, the
16  contracts, have you not? The ▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮, all the others,
17
18  have you not?
19      MS. NYARADY: We haven't asked
20  for that in redacted form. I thought you
21  meant what we are meeting and conferring
22  on right now; the spreadsheet redactions.
23  I thought you were referring to that
24  conversation.
25      So the only thing that we've

Page 12

Meet and Confer
1
2  asked for in redacted form is the
3  spreadsheet and that was just a
4  workaround because of the briefing
5  schedule.
6      Peter, let me just ask you one
7  question, just to make sure we're not on
8  different pages or talking past each
9  other. Your intention is to produce the
10  spreadsheet in redacted form if you win
11  the motion in front of the Special
12  Master, right? So...
13      MR. EMERICK: We don't know
14  what the Special Master is going to order
15  on this and that's kind of the point,
16  which is it's a pending dispute before
17  the Special Master. We're going to get
18  some kind of order from the Special
19  Master as to what we do with this.
20      MS. NYARADY: Well, I don't
21  think that's right. I mean --
22      MR. EMERICK: Well, I don't
23  think that's right.
24      MS. NYARADY: -- he's not
25  deciding full on whether there is a

Page 13

Meet and Confer
1
2  production of the spreadsheet. I thought
3  it was just a question of whether certain
4  information is going to be redacted, the
5  third-party stuff that's been objected
6  to, so this is helpful and this is new
7  news for me.
8      Are you saying that there is a
9  universe in which you plan on just not
10  producing the spreadsheet in its
11  entirety?
12      MR. EMERICK: I don't know what
13  the Special Master is going to order on
14  this. There is a pending Special Master
15  dispute on it. I don't know what the
16  ruling is going to look like. You seem
17  to think you know what the ruling is
18  going to look like.
19      MS. NYARADY: I don't what the
20  relief sought has been. And so based on
21  that my understanding was that at some
22  point there is going to be a production
23  of the spreadsheet and it just is a
24  question of whether or not there will be
25  redactions and the extent of those

4 (Pages 10 - 13)

Page 14

Meet and Confer

1  Meet and Confer
2  redactions.
3      It sounds like -- and this is
4  very helpful for our briefing -- it
5  sounds like --
6      MR. EMERICK: I don't know,
7  because you guys asked for a protective
8  order that says there shall not be these
9  redactions by a party. And so I don't
10  know -- I don't know what the interplay
11  is going to look like with the Special
12  Master's order and Judge Noreika's
13  protective order on that. That is all I
14  am saying. I just don't know what the
15  outcome of that is going to look like.
16      MS. NYARADY: But you're
17  envisioning a universe in which there is
18  an outcome where you don't produce the
19  spreadsheet in any form, it sounds like.
20      MR. EMERICK: I don't know.
21      MR. EVANGELATOS: Catherine
22  you're saying that. I don't think we've
23  taken a position either way.
24      I think we are saying to you
25  very clearly, and thankfully there is a

Page 15

Meet and Confer

1  Meet and Confer
2  court reporter, that we don't know what's
3  going to happen and we will address it
4  when there is a ruling from the Special
5  Master. We have not said anything about
6  not producing the document at all. Those
7  are your words.
8      MS. NYARADY: Right. And I am
9  asking if you would take a position on
10  it. I guess you're unable or unwilling
11  to. And that's fine.
12      MR. EMERICK: Our position is
13  we're going to comply with the Special
14  Master's order and Judge Noreika's
15  protective order.
16      MS. NYARADY: So if the Special
17  Master says produce it but redact the
18  third-party confidential information,
19  what are you going to do, because those
20  two comments you just made, Jay, seem to
21  be in conflict.
22      MR. EMERICK: So, Catherine, we
23  are going to comply with the orders and I
24  say the Special Master's order, but
25  that's of course subject to review, so

Page 16

Meet and Confer

1  Meet and Confer
2  just for clarification of that point on
3  the record. We are not precommitting in
4  case there is a review that goes on with
5  respect to that.
6      But we're not getting into what
7  the scenarios look like depending on if
8  the Special Master's order has this
9  particular language and what happens.
10  The point is we don't know what is going
11  to happen.
12      MS. NYARADY: Let me ask you
13  one other question. Does Arm object to
14  producing the spreadsheet other than with
15  respect to third-party objections? Put
16  it another way, but for the third-party
17  objections, would Arm have produced the
18  spreadsheet?
19      MR. EMERICK: So we'll take
20  back your request on this. I understand
21  you're seeking the adverse inference and/
22  or plan to seek an adverse inference on
23  it. So we will take this back to our
24  team and the client and we can move on to
25  the next issue.

Page 17

Meet and Confer

1  Meet and Confer
2      MR. EVANGELATOS: And then I'll
3  just note in there, as well, Catherine, I
4  think we objected, at least in part, to
5  if there is privileged information in the
6  document. I think we said that to you
7  before, that we have objected on both
8  privilege and third-party grounds, and
9  so, I'll just note that as well.
10      MS. NYARADY: Okay. And just
11  to be clear, so other than privilege,
12  though, do you have an objection to
13  producing the spreadsheet but for the
14  third-party objection? And I ask because
15  I had not understood there to be an
16  objection. I had understood that what
17  was holding up the production of the
18  spreadsheet is the third-party
19  objections, putting aside, Peter, whether
20  you intend to redact anything, you know,
21  on privileged grounds.
22      MR. EVANGELATOS: Yeah, so I
23  think that's right. So we've told you
24  this, I think in letters, I think we told
25  you -- I remember saying it myself on the

5 (Pages 14 - 17)

Page 18

Meet and Confer

1 Meet and Confer
2 record during a deposition at some point.
3 We intend to produce the document. I
4 mean, we want to rely on it just as much
5 as you want the document as well. And I
6 think we said that in our, in our
7 opposition to ███████, that the
8 documents in the ███████ information is
9 important, so I don't think there is any
10 dispute on that piece.
11     MS. NYARADY: Okay. Jen Ying,
12 anything else on your end?
13     MS. YING: No, I think we
14 understand that -- please correct me if I
15 am wrong if I didn't quite understand
16 what you just said, Peter, which is that
17 you guys, but for the third-party
18 objections, would produce the spreadsheet
19 subject to any privileged claims that you
20 guys might have; is that correct?
21     MR. EVANGELATOS: Yeah, I think
22 that's right. We've said that before,
23 you know, we want to produce the document
24 that these third-party issues are holding
25 us up, subject to the privileged

Page 19

Meet and Confer

1 Meet and Confer
2 redaction.
3     MS. YING: Okay. And would
4 your privilege claim as to the document
5 as a whole or is it as to portions of
6 document?
7     MR. EVANGELATOS: I will have
8 to go back and check on the specifics of
9 that, it's been some time since I looked
10 at that specific question. But we can
11 take it back and look at it.
12     But, I mean, clearly if we're
13 saying that the privilege -- we are
14 objecting on privilege grounds, but we
15 were going to produce the document, so I
16 don't think it's for the entirety.
17     MS. YING: Okay, thank you.
18     MS. NYARADY: I think if I have
19 this right, I think we're leaving this
20 that you at least are on notice of our
21 plans and you're going to take that back,
22 and I assume we'll get some sort of a
23 final answer on whether we can move
24 forward with a production of any kind; is
25 that fair?

Page 20

Meet and Confer

1 Meet and Confer
2     MR. EMERICK: Yeah, that's
3 right.
4     MR. EVANGELATOS: Yeah, that's
5 right. And obviously we disagree that
6 any adverse inference is appropriate.
7     MS. NYARADY: I am shocked to
8 hear that, Peter.
9     MR. EMERICK: Catherine, you
10 weren't willing to trade on the adverse
11 inference on your side?
12     MS. NYARADY: All right. I
13 think there -- was there a second issue,
14 I guess, on those other documents. I
15 don't know who's going to speak to that
16 on our side.
17     MR. BASNER: This is Adam from
18 Paul Weiss. I can just ask Peter, I
19 think you said you were going to follow
20 up by e-mail with us yesterday. So is
21 that something that we can expect to see
22 today?
23     MR. EVANGELATOS: We are
24 looking into it. I don't know I'll have
25 an answer for you today.

Page 21

Meet and Confer

1 Meet and Confer
2     MR. BASNER: Okay. And same
3 question, we understand that you've heard
4 from ███████, and just wanted to see
5 what the timeline would be on producing
6 ███████ agreement?
7     MR. EVANGELATOS: I will have
8 to check with the team on that. I know
9 you guys have been handling with them for
10 some time. I would have to check on the
11 latest on that. And, you know, if there
12 has been an agreement and redactions have
13 been agreed to we will get that out
14 promptly. I am just not sure off the top
15 of my head.
16     MR. BASNER: Okay, thanks.
17     MR. EVANGELATOS: I think
18 that's it, right, on the exchange? So if
19 there is anything else, you know, let us
20 know, but if not, I think we're done.
21     MS. NYARADY: Amazing. Have a
22 great weekend everyone.
23     MR. EMERICK: Thanks everyone.
24     (Time noted: 11:20 a.m.)
25

6 (Pages 18 - 21)

Page 22

1
2          CERTIFICATION
3
4      I, Dawn Matera, a Certified Shorthand
5   Reporter and a Notary Public, do hereby
6   certify that the foregoing is a true and
7   accurate transcription of my stenographic
8   notes.
9      I further certify that I am not
10  employed by nor related to any party in
11  this action.
12
13         *Dawn Matera*
    _____
14         Dawn Matera
15
16         *    *    *
17
18
19
20
21
22
23
24
25

7 (Page 22)

| & |
| --- |
| **&**  1:15 2:4,10 2:14,19 3:3 |

| 1 |
| --- |
| **10**  1:13 |
| **1000**  2:19 |
| **10019**  2:5 |
| **11:05**  1:13 |
| **11:20**  21:24 |
| **1201**  2:10 |
| **1285**  2:4 |
| **16th**  2:11 |
| **19801**  2:20 |
| **19899**  2:11 |

| 2 |
| --- |
| **2025**  1:13 |

| 3 |
| --- |
| **333**  2:15 |

| 4 |
| --- |
| **425**  3:4 |

| 5 |
| --- |
| **5777**  22:13 |

| 6 |
| --- |
| **60654**  2:15 |

| 9 |
| --- |
| **94105**  3:4 |

| a |
| --- |
| **a.m.**  1:13 21:24 |
| **able**  11:7 |

**access**  8:21
**accurate**  22:7
**action**  22:11
**adam**  2:8 20:17
**additional**  4:20
**address**  15:3
**adverse**  8:17 9:10 10:9 11:9 16:21,22 20:6 20:10
**agree**  10:9
**agreed**  21:13
**agreement**  21:6 21:12
**agreements**  11:17
**allows**  7:2
**alternative**  8:3
**amazing**  21:21
**amend**  7:17
**americas**  2:4
**analogix**  11:17
**answer**  19:23 20:25
**apkon**  2:7
**appropriate**  20:6
**argue**  9:25
**argued**  9:8,21
**arm**  1:9,9 7:3 16:13,17
**arsht**  2:10
**aside**  17:19

**asked**  11:12,14 11:19 12:2 14:7
**asking**  4:4,13 6:12,14,19 8:7 15:9
**assume**  19:22
**avenue**  2:4

| b |
| --- |
**back**  16:20,23 19:8,11,21
**based**  9:10 13:20
**basis**  9:9
**basner**  2:8 20:17 21:2,16
**braly**  2:6 4:2 5:11,14,22 6:3 6:7,11,17 7:5
**briefed**  9:4
**briefing**  12:4 14:4
**brought**  7:22

| c |
| --- |
**c**  2:2 3:2
**california**  3:4
**case**  6:2,16 16:4
**catherine**  2:6 11:4 14:21 15:22 17:3 20:9

**certain**  13:3
**certification**  22:2
**certified**  1:17 22:4
**certify**  22:6,9
**chart**  8:5,12,18 8:19
**check**  19:8 21:8 21:10
**chicago**  2:15
**chin**  2:7
**claim**  19:4
**claims**  18:19
**clarification**  16:2
**clear**  7:15 17:11
**clearly**  9:5 14:25 19:12
**client**  16:24
**comments**  15:20
**companies**  4:11
**company**  4:19
**comply**  15:13 15:23
**conaway**  2:19
**confer**  1:15 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1

**[confer - going]** Page 2

| | | | |
|---|---|---|---|
| 21:1 | **defendants** | **either**  14:23 | **fair**  19:25 |
| **conferring** | 1:10 | **ellis**  2:14 | **file**  8:4 |
| 11:21 | **delaware**  1:2,3 | **emerick**  2:16 | **final**  19:23 |
| **confidential** | 1:4 2:11,20 | 5:6,13,19,23 | **fine**  10:5 15:11 |
| 7:4 15:18 | **denied**  10:3 | 6:5,8,14,25 8:9 | **floor**  2:11 |
| **conflict**  15:21 | **depending**  16:7 | 8:15 10:6,18 | **focused**  11:13 |
| **connection** | **deposition**  18:2 | 12:13,22 13:12 | **foerster**  3:3 |
| 5:23 | **depositions**  4:6 | 14:6,20 15:12 | **follow**  20:19 |
| **continued**  3:2 | 7:10 8:20 | 15:22 16:19 | **foregoing**  22:6 |
| **contracts**  11:16 | **deviate**  9:7,20 | 20:2,9 21:23 | **form**  11:20 |
| **conversation** | **different**  12:8 | **employed** | 12:2,10 14:19 |
| 11:24 | **disagree**  20:5 | 22:10 | **forward**  10:4 |
| **copy**  5:3 | **dispute**  5:13 | **entirely**  13:11 | 19:24 |
| **corporation** | 8:23 9:3 12:16 | 19:16 | **francisco**  3:4 |
| 1:4,4,9 | 13:15 18:10 | **envisioning** | **front**  7:7 12:11 |
| **correct**  18:14 | **disputes**  5:9,11 | 14:17 | **full**  12:25 |
| 18:20 | 5:12 9:6 11:6 | **esq**  2:6,6,7,7,8 | **fung**  3:5 |
| **counselor**  8:24 | **district**  1:2,2 | 2:8,12,13,16,17 | **further**  22:9 |
| **couple**  9:15 | **document**  9:9 | 2:21 3:5 | |
| **course**  6:7 | 11:11 15:6 | **evangelatos** | **g** |
| 15:25 | 17:6 18:3,5,23 | 2:17 8:24 9:16 | **garrison**  2:4 |
| **court**  1:2 7:7 | 19:4,6,15 | 11:3,14 14:21 | **getting**  16:6 |
| 15:2 | **documents**  7:3 | 17:2,22 18:21 | **give**  8:11 |
| **curious**  8:25 | 7:20 10:11 | 19:7 20:4,23 | **go**  19:8 |
| **currently**  5:9 | 11:5,15 18:8 | 21:7,17 | **goes**  16:4 |
| 7:7 | 20:14 | **exchange**  21:18 | **going**  8:4,12,17 |
| | **dropping**  5:8 | **expect**  20:21 | 9:24,25 10:16 |
| **d** | **due**  9:14,17 | **extent**  13:25 | 11:7,8 12:14 |
| **daniel**  2:21 | | | 12:17 13:4,13 |
| **dawn**  1:17 22:4 | **e** | **f** | 13:16,18,22 |
| 22:14 | **e**  2:2,2 3:2,2 | **f**  1:9 | 14:11,15 15:3 |
| **dealing**  10:14 | 20:20 | **fact**  4:24 8:2 | 15:13,19,23 |
| **deciding**  12:25 | **effort**  7:16 | **factual**  10:22 | 16:10 19:15,21 |
| | | | 20:15,19 |

[gotten - meet] Page 3

**gotten** 10:11
**great** 21:22
**grounds** 17:8
  17:21 19:14
**guess** 4:18 6:3
  15:10 20:14
**guys** 9:8 10:7
  14:7 18:17,20
  21:9

**h**

**handling** 21:9
**happen** 15:3
  16:11
**happens** 16:9
**happy** 10:24
**hard** 5:16
**hartley** 2:8
**head** 21:15
**hear** 9:18 20:8
**heard** 21:3
**helpful** 8:18
  13:6 14:4
**holding** 17:17
  18:24
**holdings** 1:9
**hopefully** 4:2

**i**

**illinois** 2:15
**important** 18:9
**including** 8:22
**incorporated**
  1:3

**indication** 7:18
**inference** 8:18
  9:10 10:10
  11:9 16:21,22
  20:6,11
**information**
  4:9,15,20,25
  6:21 7:4 13:4
  15:18 17:5
  18:8
**intend** 17:20
  18:3
**intention** 12:9
**interplay** 14:10
**issue** 7:6,21
  8:10 10:10
  16:25 20:13
**issues** 18:24

**j**

**j** 2:13
**jacob** 2:7
**jake** 2:6
**jay** 2:16 7:15
  15:20
**jen** 2:8 18:11
**jennifer** 2:12
**judge** 14:12
  15:14
**judgement**
  9:17
**judgment** 7:24
  8:5 9:14 10:12

**k**

**k** 1:9
**kind** 5:16 7:16
  7:18 12:15,18
  19:24
**king** 2:19
**kirkland** 2:14
**know** 4:17,25
  6:5 7:16 12:13
  13:12,15,17
  14:6,10,10,14
  14:20 15:2
  16:10 17:20
  18:23 20:15,24
  21:8,11,19,20

**l**

**language** 16:9
**late** 7:23
**latest** 21:11
**leave** 4:18
**leaving** 19:19
**letter** 4:7
**letters** 17:24
**licenses** 4:25
**llp** 2:4,10,14,19
  3:3
**logic** 11:4
**long** 4:3
**look** 5:15 13:16
  13:18 14:11,15
  16:7 19:11
**looked** 19:9

**looking** 5:17
  20:24

**m**

**mackrides** 2:21
**made** 10:2
  15:20
**mail** 20:20
**make** 4:21 5:17
  12:7
**market** 2:10
  3:4
**master** 4:8,24
  5:10 7:11,23
  9:4,11 10:7,17
  10:22 12:12,14
  12:17,19 13:13
  13:14 15:5,17
**master's** 9:5
  14:12 15:14,24
  16:8
**matera** 1:17
  22:4,14
**mean** 5:22 6:4
  9:6 12:21 18:4
  19:12
**meant** 11:21
**mediatek** 11:16
  18:7,8
**meet** 1:15 4:1
  5:1 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1

[meet - privilege]

18:1 19:1 20:1
21:1
**meeting**  11:21
**mentioned**  8:19
**mind**  10:24
**modify**  5:20,25
6:9,15,18
**morris**  2:10
**morrison**  3:3
**motion**  4:23
12:11
**motions**  6:24
7:12 9:12
**move**  16:24
19:23
**moved**  4:11,16
**multiple**  7:10
**murray**  2:13

**n**

**n**  2:2 3:2
**name**  4:18
**needing**  9:11
**new**  1:19 2:5,5
13:6
**news**  13:7
**nicholas**  3:5
**nichols**  2:10
**noreika's**  14:12
15:14
**north**  2:10,19
**notary**  1:18
22:5

**note**  17:3,9
**noted**  21:24
**notes**  22:8
**notice**  9:25
19:20
**number**  4:6
**nyarady**  2:6
7:15 8:11,16
9:13,22 10:13
10:20 11:11,19
12:20,24 13:19
14:16 15:8,16
16:12 17:10
18:11 19:18
20:7,12 21:21

**o**

**object**  16:13
**objected**  13:5
17:4,7
**objecting**  19:14
**objection**  17:12
17:14,16
**objections**
16:15,17 17:19
18:18
**obligation**  9:7
9:20
**obviously**  9:23
20:5
**october**  1:13
**okay**  17:10
18:11 19:3,17
21:2,16

**opposition**  18:7
**order**  5:20,25
6:6,9,16,18,23
7:2,12,17
12:14,18 13:13
14:8,12,13
15:14,15,24
16:8
**orders**  4:12,17
10:7 15:23
**originally**  5:5
**outcome**  14:15
14:18

**p**

**p**  2:2,2 3:2,2
**pages**  12:8
**part**  7:18 10:17
17:4
**particular**  16:9
**parties**  4:16 8:2
**party**  4:23 5:12
7:4 9:6 11:6
13:5 14:9
15:18 16:15,16
17:8,14,18
18:17,24 22:10
**past**  12:8
**path**  10:4
**paul**  2:4 20:18
**pending**  4:22
6:23 7:11
10:21 12:16
13:14

**pertains**  4:10
**peter**  2:17 12:6
17:19 18:16
20:8,18
**piece**  18:10
**plaintiffs**  1:5
**plan**  13:9 16:22
**plans**  19:21
**plate**  9:5
**plaza**  2:15
**plc**  1:9
**please**  18:14
**po**  9:7,20 18:7
**point**  2:15
12:15 13:22
16:2,10 18:2
**portion**  8:21
**portions**  8:22
19:5
**position**  7:2
14:23 15:9,12
**potentially**
7:13
**practical**  10:4
**precluded**  8:6
8:13
**preclusion**  8:10
**precommitting**
16:3
**predicate**  10:23
**previously**  7:9
**privilege**  17:8
17:11 19:4,13
19:14

Case 1:24-cv-00490-MN    Document 570-1    Filed 11/21/25    Page 525 of 579 PageID #: 25772

**[privileged - sort]**                                    Page 5

| | | | |
|---|---|---|---|
| **privileged**  17:5 17:21 18:19,25 | **putting**  17:19 | **rely**  8:13 11:7 18:4 | **s** |
| **probably**  8:17 | **q** | **relying**  8:6 | **s**  2:2 3:2 |
| **problem**  9:18 9:19 | **qualcomm**  1:3 1:4 | **remember**  17:25 | **san**  3:4 |
| **produce**  4:4,8 4:14 5:2 7:3,13 7:19 9:2 10:7 10:16 12:9 14:18 15:17 18:3,18,23 19:15 | **question**  10:15 12:7 13:3,24 16:13 19:10 21:3 | **remove**  5:4 | **saying**  6:11,13 7:5 11:4 13:8 14:14,22,24 17:25 19:13 |
| | **quite**  18:15 | **repeatedly**  8:20 | **says**  4:24 14:8 15:17 |
| | **r** | **reporter**  1:18 15:2 22:5 | **scenarios**  16:7 |
| | **r**  2:2 3:2 | **request**  5:24 10:3 16:20 | **schedule**  12:5 |
| | **really**  4:3 | **resolution**  4:22 7:11 | **scheduling**  7:21 9:18 |
| **produced**  5:2,5 10:8 16:17 | **record**  16:3 18:2 | **respect**  16:5,15 | **second**  20:13 |
| **producing**  5:6 13:10 15:6 16:14 17:13 21:5 | **redact**  4:15,19 15:17 17:20 | **result**  5:8 | **see**  20:21 21:4 |
| | **redacted**  5:7 6:19 7:19 11:20 12:2,10 13:4 | **review**  15:25 16:4 | **seeing**  5:15 |
| | | **revise**  7:25 | **seek**  7:8 8:5 11:8 16:22 |
| **production**  4:21 13:2,22 17:17 19:24 | **redacting**  8:3 | **rifkind**  2:4 | **seeking**  5:19,25 6:9,15,18 16:21 |
| **promise**  5:17 | **redaction**  19:2 | **right**  11:22 12:12,21,23 15:8 17:23 18:22 19:19 20:3,5,12 21:18 | |
| **promptly**  21:14 | **redactions**  5:4 6:12 7:3 11:22 13:25 14:2,9 21:12 | | **seem**  13:16 15:20 |
| **protective**  4:11 4:17 5:20,25 6:6,9,15,18,23 7:2,12,17 14:7 14:13 15:15 | | | **shocked**  20:7 |
| | **referenced**  7:9 | **rodney**  2:20 | **shorthand**  1:18 22:4 |
| | **referred**  4:5 | **rule**  9:12 | **side**  20:11,16 |
| | **referring**  11:23 | **ruling**  7:12 10:17 13:16,17 15:4 | **signature**  22:13 |
| **provide**  5:5 | **related**  22:10 | | **solution**  10:4 |
| **providing**  6:22 | **relevant**  4:15 | **running**  7:23 | **sorry**  8:9 |
| **public**  1:18 22:5 | **relief**  13:20 | | **sort**  4:18,19 9:10 19:22 |
| **put**  4:7 9:24 16:15 | | | |

212-267-6868                    www.veritext.com                    516-608-2400

| | | | |
|---|---|---|---|
| **sought** 13:20 | **stuff** 13:5 | **think** 4:3,5,6 | **two** 15:20 |
| **sounds** 9:23 | **subject** 11:6 | 5:16 7:19 10:3 | **u** |
| 14:3,5,19 | 15:25 18:19,25 | 10:20,25 12:21 | **u.k.** 1:9 |
| **speak** 20:15 | **suddenly** 9:2 | 12:23 13:17 | **unable** 8:21 |
| **special** 4:8,23 | **summary** 7:24 | 14:22,24 17:4 | 15:10 |
| 5:10 7:11,23 | 8:4 9:14,16 | 17:6,23,24,24 | **understand** |
| 9:4,5,11 10:6 | 10:12 | 18:6,9,13,21 | 16:20 18:14,15 |
| 10:17,22 12:11 | **sure** 6:4 12:7 | 19:16,18,19 | 21:3 |
| 12:14,17,18 | 21:14 | 20:13,19 21:17 | **understanding** |
| 13:13,14 14:11 | **synaptics** 21:4 | 21:20 | 13:21 |
| 15:4,13,16,24 | 21:6 | **third** 4:16,23 | **understood** |
| 16:8 | **t** | 5:12 7:4 9:6 | 8:15 17:15,16 |
| **specific** 19:10 | **take** 4:3 9:11 | 11:6 13:5 | **united** 1:2 |
| **specifically** | 10:18 15:9 | 15:18 16:15,16 | **universe** 13:9 |
| 10:25 | 16:19,23 19:11 | 17:8,14,18 | 14:17 |
| **specifics** 19:8 | 19:21 | 18:17,24 | **unredacted** |
| **spreadsheet** | **taken** 14:23 | **thought** 11:20 | 7:13 |
| 4:5,10,14 5:3,7 | **talk** 10:24 | 11:23 13:2 | **unwilling** 15:10 |
| 5:15,18 6:20 | **talking** 12:8 | **time** 9:11 19:9 | **updated** 5:3 |
| 6:22 7:8,14 | **taylor** 2:19 | 21:10,24 | **v** |
| 11:10,12,22 | **team** 16:24 | **timeline** 21:5 | **version** 5:7 |
| 12:3,10 13:2 | 21:8 | **today** 20:22,25 | 6:19 7:13 |
| 13:10,23 14:19 | **technologies** | **told** 17:23,24 | **videoconfere...** |
| 16:14,18 17:13 | 1:4 | **top** 21:14 | 1:12 |
| 17:18 18:18 | **thank** 19:17 | **trade** 20:10 | **w** |
| **square** 2:20 | **thankfully** | **transcribed** | **want** 9:24 18:4 |
| **stargatt** 2:19 | 14:25 | 1:17 | 18:5,23 |
| **state** 1:19 | **thanks** 21:16 | **transcription** | **wanted** 21:4 |
| **states** 1:2 | 21:23 | 22:7 | **way** 8:7 14:23 |
| **stenographic** | **thing** 10:14 | **travis** 2:13 | 16:16 |
| 22:7 | 11:25 | **true** 22:6 | **we've** 11:25 |
| **stephanie** 2:7 | **things** 7:22 | **trying** 7:8,25 | 14:22 17:23 |
| **street** 2:10,19 | | **tunnell** 2:10 | |
| 3:4 | | | |

**[we've - zoom]**                                    Page 7

18:22
**weekend**  21:22
**weeks**  9:15
**weiss**  2:4 20:18
**west**  2:15
**wharton**  2:4
**willing**  10:9
20:10
**wilmington**
2:11,20
**win**  12:10
**withheld**  6:20
**wolf**  2:15
**words**  15:7
**work**  7:6
**workaround**
12:4
**wrong**  18:15

| **x** |
|---|
| **x**  1:3,11 |

| **y** |
|---|
| **yeah**  17:22 |
| 18:21 20:2,4 |
| **yesterday** |
| 20:20 |
| **ying**  2:12 18:11 |
| 18:13 19:3,17 |
| **york**  1:19 2:5,5 |
| **young**  2:19 |

| **z** |
|---|
| **zoom**  1:12 |

# EXHIBIT 60

# KIRKLAND & ELLIS LLP

601 Lexington Avenue
New York, NY 10022
United States

Peter Evangelatos
To Call Writer Directly:
+1 212 909 3291
peter.evangelatos@kirkland.com

+1 212 446 4800

Facsimile:
+1 212 446 4900

www.kirkland.com

October 16, 2025

**By E-mail**

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton &
  Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

Re:    *Qualcomm Inc. v. Arm Holdings PLC*, C.A. No. 24-490 (D. Del.)

Dear Catherine,

We write regarding Qualcomm's October 6, 2025 demand that Arm bypass and disregard the Court's procedures and orders for resolving third-party confidentiality disputes. Arm declines to do so, and will instead follow the Court's procedures and orders.

Qualcomm demands that Arm redact third-party confidential information subject to pending third-party motions from a spreadsheet that Arm created ████████████████ ██████████████████████████, and produce that redacted spreadsheet. *See* 10/6/25 J. Hartley Email re Production of Spreadsheet. In your correspondence on this issue and during the parties' meet and confer on October 10, 2025, Qualcomm threatened to "seek to preclude" Arm "from relying on" the spreadsheet and seek an adverse inference "that the chart is not helpful to you." *See* 10/10/25 Meet and Confer Tr. at 8. Qualcomm's request for redaction, and the relief it seeks for Arm's deference to proceedings before the Special Master, is baseless.

Arm has already agreed to produce this spreadsheet pending resolution of third-party motions for protective orders regarding this information, which are currently pending before the Special Master. The Court's orders make clear that those motions are the proper procedure for resolving this issue: Qualcomm successfully argued for a Protective Order that ***prohibits*** Arm from redacting third-party confidential information, and instead ***requires*** disputes to be resolved through third-parties filing motions for protective orders. Arm intends to comply with the Court's orders and procedures, and declines Qualcomm's demand that Arm disregard them.

## KIRKLAND & ELLIS LLP

Catherine Nyarady
October 16, 2025
Page 2

**The Spreadsheet Is Subject To Pending Third-Party Confidentiality Disputes Before The Special Master, And Arm Agreed To Produce It Once Those Disputes Are Resolved.**

As we have informed you, Arm objects to production of the spreadsheet because it contains third-party confidential information subject to pending motions, and it has withheld the document on that basis. 7/24/25 Letter from J. Emerick to C. Nyarady at 2. We have explained that the spreadsheet contains confidential third-party information, including that of ███████████ and others. *Id.* Both ███████████ have not just objected to disclosure of their confidential information to Qualcomm and its outside counsel, but also moved for protective orders. *See* D.I. 323 at 3 ("The Court should grant a protective order preventing disclosure of ███████ agreements with Arm…"); D.I. 329 ("The Court should grant a protective order preventing disclosure of ███████ unredacted agreements with ARM."). Indeed, ███████ specifically seeks to redact "the royalty rates that ███████ pays ARM and ███████ payment structure regarding the technology that ███████ licenses from ARM." D.I. 329 at 2. Those motions are fully briefed and were referred by the Court to the Special Master for consideration. D.I. 336.

Because the Special Master has not yet issued a ruling, Arm will continue to withhold the spreadsheet. When these issues are resolved by the Special Master and the Court, Arm will comply with the Court's directive (subject to any reconsideration and/or appeal). *See* 10/10/25 Meet and Confer Tr. at 14–16.

**The Court's Orders Prohibit Arm From Redacting Third-Party Confidential Information, Including Pending Resolution Of The Third-Party Confidentiality Disputes.**

The Protective Order and this Court's order, D.I. 74, prohibit Arm from redacting third-party confidential information. In March, the parties briefed competing Protective Order proposals for the treatment of third-party confidential information. In its briefing, Arm argued that "the Parties should be permitted to redact third-party confidential information in documents newly produced in this action." D.I. 68. Qualcomm opposed redactions, arguing that "Arm should not be permitted to redact third-party information contained in responsive documents," that "[a] third party wishing to protect confidential information has the burden of establishing good cause for doing so under Rule 26," and that "[a] third party wanting its information redacted must show why the requested redactions are appropriate." D.I. 70 at 1–2.

The Court's ruling "reject[ed] Arm's proposals which would permit a producing party to redact information that is subject to a confidentiality agreement with a third party" and further stated that "neither the case authority cited by Arm nor the record in related Civil Action No. 22-1146-MN supports Arm's position that a provision permitting redactions of third-party confidential information should be included in the protective order and the ESI order." D.I. 74. The Court ordered that "a third party seeking further protections for its highly confidential information may

## KIRKLAND & ELLIS LLP

Catherine Nyarady
October 16, 2025
Page 3

follow the well-established procedure of moving for a protective order, which allows the court to balance the relevance of the information against the risk of inadvertent disclosure." *Id.*

Consistent with the Court's instructions, Arm will continue to withhold the spreadsheet pending resolution of ███████████ motions. During the meet and confer, we asked for Qualcomm's reasoning as to why Arm should produce a redacted spreadsheet despite the Court's directive to the contrary. The sole explanation you provide was "it's because summary judgment is due in a couple of weeks." *See* 10/10/25 Meet and Confer Tr. at 9. The Protective Order does not contain any exception permitting the parties to produce redacted versions of disputed documents, regardless of whether there are upcoming summary judgment deadlines.

## If Qualcomm's Request Was Permitted By The Court's Orders (It Is Not), Then It Is Untimely.

Moreover, Qualcomm's request that Arm produce a redacted version of the spreadsheet is untimely. Qualcomm has been aware of the spreadsheet since the fact discovery period, yet waited months to seek production of a redacted version. Indeed, Qualcomm's October 6 email cites to Mr. Bhatnagar's July 10 deposition as well as correspondence on this issue from July. Qualcomm also questioned Karthik Shivashankar in June about whether a spreadsheet exists that reflects Arm's ████████████████████. *See, e.g.*, K. Shivashankar Dep. at 58, 83.

We have repeatedly informed you throughout discovery that Arm was withholding the spreadsheet on the grounds set forth here, including at Mr. Bhatnagar's deposition. *See* Bhatnagar Dep. at 39 ("████████ has objected to revealing their confidential information … we understand they're going to file something imminently. And so we can't reveal certain information based on that dispute."); *see also* 7/24/25 Letter from J. Emerick to C. Nyarady at 2 ("Arm will continue to withhold documents that include confidential information for ████████████, and the other third parties pending resolution of their Protective Order disputes, including Arm's agreements with both companies and the spreadsheet referenced during Mr. Bhatnagar's deposition.").

Accordingly, even if Qualcomm's request were consistent with the Court's orders (it is not), Qualcomm failed to timely raise the dispute or diligently pursue production of a redacted version and should have sought production of a redacted version months ago, including in accordance with the Court's deadlines for submitting disputes to the Special Master.

\*     \*     \*

Arm will comply with the Court's orders and procedures for the resolution of third-party confidentiality disputes, and declines Qualcomm's demand that Arm disregard them.

## KIRKLAND & ELLIS LLP

Catherine Nyarady
October 16, 2025
Page 4

Sincerely,

*/s/ Peter Evangelatos*

Peter Evangelatos

# EXHIBIT 61

Message

| | |
|---|---|
| **From:** | Kurt Wolf [kwolf@qti.qualcomm.com] |
| **Sent:** | 2/8/2025 12:07:42 AM |
| **To:** | Karl Whealton [kwhealto@qti.qualcomm.com]; Manju Varma [mvarma@qti.qualcomm.com] |
| **CC:** | Barb Acosta [bacosta@qti.qualcomm.com]; John Holland [hollandj@qti.qualcomm.com]; Tarik Isani [tisani@qti.qualcomm.com]; Aymeric Vial [avial@qti.qualcomm.com]; Wesley Holland [wholland@qti.qualcomm.com]; Darshan Jetly [djetly@qti.qualcomm.com]; Larissa Cochron [lcochron@qti.qualcomm.com]; Richard Meacham [rmeacham@qti.qualcomm.com] |
| **Subject:** | Heads up on M55 interest Re: TME - Re: ARM License Cost for Cortex M Core |

## Hi Karl and Manju



**Kurt A. Wolf**



---

**From:** Aymeric Vial <avial@qti.qualcomm.com>
**Sent:** Friday, February 7, 2025 4:01 PM
**To:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Cc:** Barb Acosta <bacosta@qti.qualcomm.com>; John Holland <hollandj@qti.qualcomm.com>; Tarik Isani <tisani@qti.qualcomm.com>
**Subject:** RE: TME - Re: ARM License Cost for Cortex M Core

Hi Kurt,

Following up on this.



Regards

QCVARM_0447252

Aymeric

**From:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Sent:** Friday, August 9, 2024 8:24 AM
**To:** Aymeric Vial <avial@qti.qualcomm.com>; John Holland <hollandj@qti.qualcomm.com>; Tarik Isani <tisani@qti.qualcomm.com>
**Cc:** Barb Acosta <bacosta@qti.qualcomm.com>
**Subject:** TME - Re: ARM License Cost for Cortex M Core

+ John Holland, Tarik Isani

Hi Aymeric!

@John Holland or @Tarik Isani Do you remember the team/open source RISC-V processor one of the security project teams  is/was using

ARM Info:
    - All ARM MCUs carry a royalty
    - QCOM does not have a license to: M23/33, M85

will

**Kurt A. Wolf**



**From:** Aymeric Vial <avial@qti.qualcomm.com>
**Sent:** Wednesday, August 7, 2024 11:21 PM
**To:** Kurt Wolf <kwolf@qti.qualcomm.com>; Barb Acosta <bacosta@qti.qualcomm.com>
**Subject:** ARM License Cost for Cortex M Core

Barb, Kurt,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Thanks a lot in advance,

Regards

Aymeric

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QCVARM_0447254

# EXHIBIT 62

855

```
13:41:50  1           IN THE UNITED STATES DISTRICT COURT

        2           FOR THE DISTRICT OF DELAWARE

        3

        4
          ARM LTD.,                    ) ROUGH DRAFT
        5 a U.K. corporation,          )
                                       ) VOLUME 5
        6           Plaintiff,         )
                                       ) C.A. No. 22-1146(MN)
        7 v.                           )
                                       )
        8 QUALCOMM, INC.,              )
          a Delaware corporation,      )
        9 et al.,                      )
                                       )
       10           Defendants.        )

       11

       12
                    Thursday, December 19, 2024
       13           8:30 a.m.
                    Jury Trial
       14

       15           844 King Street
                    Wilmington, Delaware
       16

       17

       18 BEFORE:  THE HONORABLE MARYELLEN NOREIKA
                   United States District Court Judge
       19

       20

       21

          APPEARANCES:
       22

       23      YOUNG CONAWAY STARGATT & TAYLOR
               BY:  ANNE SHEA GAZA, ESQ.
       24      BY:  ROBERT VRANA, ESQ.

       25      -and-
```

856

```
        1
          APPEARANCES (Cont'd):
        2

        3      MORRISON FOERSTER, LLP
               BY:  DARALYN DURIE, ESQ.
        4      BY:  ERIK OLSON, ESQ.
               BY:  SCOTT LLEWELLYN, ESQ.
        5      BY:  SHAELYN DAWSON, ESQ.
               BY:  NICHOLAS FUNG, ESQ.
        6      BY:  SARAH BRICKEY, ESQ.
               BY:  LAURA GILBERT REMUS, ESQ.
        7      BY:  ZACHARY QUINLAN, ESQ.
               BY:  MICHAEL DeSTAFANO, ESQ.
        8

        9           Counsel for the Plaintiff

       10

       11
               MORRIS NICHOLS ARSHT & TUNNELL LLP
       12      BY:  JACK BLUMENFELD, ESQ.
               BY:  JENNIFER YING, ESQ.
       13
               -and-
       14
               PAUL WEISS
       15      BY:  KAREN L. DUNN, ESQ.
               BY:  WILLIAM ISAACSON, ESQ.
       16      BY:  CATHERINE NYARDY, ESQ.
               BY:  JACOB BRALY, ESQ.
       17      BY:  RUBY GARRETT, ESQ.
               BY:  MELISSA ZAPPALA, ESQ.
       18      BY:  JACOB BRALY, ESQ.
               BY:  WILLIAM MARKS, ESQ.
       19

       20           Counsel for the Defendants

       21
       22

       23

                    – – – – – – – – – – – – –

08:27:52 24
08:27:52 25
```

857

```
08:27:52  1        COURTROOM DEPUTY:  All rise.  The United States
08:27:52  2 District Court for the District of Delaware is now in
08:32:53  3 session.  The Honorable Maryellen Noreika presiding.
08:32:53  4        THE COURT:  All right.  Good morning, everyone.
08:32:56  5 Please be seated.  Thank you for your agreement on a number
08:33:03  6 of things in the instructions and your close read to get rid
08:33:14  7 of some of the typos and things.
08:33:17  8        All right.  So why don't we start, plaintiff,
08:33:20  9 where is your first place where you want to make an
08:33:26 10 objection, just tell me so that if there's is first they can
08:33:31 11 be first, where is your first place?
08:33:33 12        MS. DAWSON:  3.2, the elements.
08:33:35 13        THE COURT:  And defendants, do you have anything
08:33:38 14 before 3.2?
08:33:40 15        MR. BLUMENFELD:  No, Your Honor, I don't think
08:33:42 16 we have any objections.  They have the only two.
08:33:45 17        MS. DAWSON:  That's correct.  The only
08:33:47 18 objections between the parties are 3.2, 3.3, and then
08:33:50 19 question three on the verdict form.
08:33:53 20        THE COURT:  So we are going to accept all of the
08:33:56 21 changes that you guys proposed.  And then go from there.
08:34:00 22 Okay.  So 3.2, assumption.  That was the one where I said
08:34:07 23 could defendant give me some law.
08:34:09 24        MS. DAWSON:  That's correct, Your Honor.
08:34:10 25        THE COURT:  Do you guys have any law?
```

858

```
08:34:13  1        MR. BLUMENFELD:  We do have law, Your Honor.
08:34:29  2        THE COURT:  Does everybody agree that California
08:34:31  3 law applies to the issues that we have here?
08:34:34  4        MR. BLUMENFELD:  No, Your Honor.  We think
08:34:37  5 California law applies to the issues as between the
08:34:39  6 plaintiffs and the defendants, but the issue of the merger,
08:34:45  7 the relationship between Nuvia --
08:34:47  8        THE COURT:  There was a reverse triangular
08:34:50  9 merger, you want that to be under Delaware law because you
08:34:53 10 think the Delaware law is very specific, I remember that
08:34:57 11 from Ms. Dunn.
08:34:58 12        MR. BLUMENFELD:  I think it has to be Delaware
08:35:00 13 law.
08:35:00 14        THE COURT:  I don't have to decide that right
08:35:02 15 now, right?
08:35:03 16        MR. BLUMENFELD:  But the Delaware law, the case
08:35:05 17 we have is the *Meso Scale v. Roche Diagnostics*, it's -- I
08:35:15 18 can hand it up, 62 A.3d 62.
08:35:19 19        THE COURT:  So the issues that I'm instructing
08:35:23 20 -- the issues that the jury is deciding, breach and license,
08:35:27 21 those are California law?  I don't understand, those are
08:35:34 22 California law?
08:35:35 23        MR. BLUMENFELD:  Yes, the license issues are
08:35:37 24 California law.
08:35:37 25        THE COURT:  And the -- and you think that the
```

899

10:03:38 1    was now holding itself out as the party who was going to
10:03:42 2    negotiate what was going to happen under the Nuvia contract.
10:03:45 3          And you saw every single piece of correspondence
10:03:49 4    about this gets sent over by Qualcomm.  Mr. Asghar,
10:03:55 5    vice-president of product management, he's the one who sends
10:03:59 6    over the request for assignment, right, relating to the
10:04:02 7    transfer of information and employees from Nuvia to
10:04:06 8    Qualcomm.  Qualcomm is the one who asked for that assignment
10:04:09 9    under the contract.
10:04:11 10          And then when Arm says we're going to terminate,
10:04:14 11   we think these obligations go to Qualcomm, too, because you
10:04:19 12   have got our code now, you have got the code, you have taken
10:04:22 13   the code, you know, the contractual obligations go along
10:04:26 14   with it.  Qualcomm's general counsel is the one who sends
10:04:30 15   back the certification saying we have complied, we destroyed
10:04:35 16   everything.
10:04:35 17          What did they say in the certification, we have
10:04:40 18   gotten rid of everything that was in the design databases,
10:04:43 19   work file systems, source code repositories, shared document
10:04:49 20   databases.  You may remember, I asked Mr. Amon, that's
10:04:52 21   talking about Qualcomm's systems, right, he agreed to that
10:04:55 22   because they had transferred the code over into Qualcomm's
10:04:59 23   systems.  So of course, Qualcomm was the party that was
10:05:01 24   going to have to comply because Qualcomm was the party that
10:05:05 25   had the code.

900

10:05:06 1          So again, if you accept the benefit, if you take
10:05:10 2    the code, you've got to take the contract.  And that's why
10:05:17 3    Qualcomm is also in breach of the Nuvia agreement.
10:05:21 4          Now, there is one more question, and this is a
10:05:26 5    very, very important one.  Question three, did Qualcomm
10:05:32 6    prove, this is now Qualcomm's defense, if you will, did
10:05:37 7    Qualcomm prove that the Qualcomm CPUs that include designs
10:05:42 8    acquired in the Nuvia acquisitions are licensed under the
10:05:48 9    Qualcomm license agreement?  This is Qualcomm's get out of
10:05:53 10   jail free hope, even if we're in breach they're going to say
10:05:59 11   as long as we're licensed under our ALA, it's all good.
10:06:05 12   It's not all good.  And let me explain why.
10:06:09 13          Because first and foremost, Qualcomm never
10:06:14 14   should have had this code in the first place.  If they had
10:06:17 15   lived up to their contractual obligations, they would not
10:06:21 16   have closed the transaction without our consent, and they
10:06:24 17   would not have transferred the code from Nuvia to Qualcomm
10:06:28 18   without our consent.
10:06:30 19          So Qualcomm never should have had it if they had
10:06:36 20   lived up to their contractual obligations.  And that
10:06:39 21   actually is an answer to this whole thing, because remember,
10:06:44 22   Section 16.3 of the Nuvia agreement says you can't -- you
10:06:49 23   can't do a transaction where you sell yourself without
10:06:52 24   getting our consent.
10:06:54 25          And the contemporaneous e-mails recognized this

901

10:06:59 1    is what should have happened.  We heard a bunch about
10:07:05 2    Mr. Grisenthwaite, this is an e-mail exchange that he had
10:07:07 3    with Mr. Haas and Mr. Williamson when Qualcomm was saying
10:07:11 4    hey, would you guys sign off on Hamoa, that's one of the
10:07:14 5    product designs that includes the Nuvia core.  And he says,
10:07:20 6    we are holding permission on this, they shouldn't be
10:07:23 7    progressing this design, they should no longer be in
10:07:26 8    possession of it.  The question of whether Qualcomm is
10:07:28 9    licensed doesn't even come up if they've lived up to their
10:07:31 10   contractual obligations because they were not supposed to
10:07:34 11   have this code at all.
10:07:37 12          Nuvia had the code, no consent.  Qualcomm never
10:07:43 13   gets it.  And even if they blew through 16.3 and transferred
10:07:48 14   it anyway under the termination provisions, that code had to
10:07:54 15   be destroyed following termination.  End of story, the
10:07:57 16   Qualcomm license is a red herring, it is irrelevant because
10:08:02 17   the Nuvia agreement was set up to protect Arm in the event
10:08:08 18   this happened and to make sure they could not transfer this
10:08:12 19   code to another company without our consent.
10:08:16 20          Also, it's not licensed under the Qualcomm ALA.
10:08:22 21   You don't need to get there because this answers the
10:08:25 22   question.  But if you look at the Qualcomm ALA, that's not
10:08:28 23   licensed.  Now, what does Qualcomm say about this, they show
10:08:33 24   you in their opening this e-mail exchange among Arm people
10:08:39 25   and this is their slide from opening, this is what they

902

10:08:42 1    showed you, Qualcomm had a reasonably bomb proof ALA.  And
10:08:47 2    it says this is why the Nuvia novation, remember, that's
10:08:53 3    getting an agreement about what's going to happen with this
10:08:55 4    code, a new agreement covering the code is so critical.  And
10:09:00 5    the piece that they really liked and they spent a lot of
10:09:03 6    time talking to you about, Qualcomm had a reasonably bomb
10:09:07 7    proof architecture license that covers everything so I'm not
10:09:10 8    sure how the novation discussion gets to undo that, it
10:09:14 9    sounds bad if you're on the Arm side of the table, but it
10:09:18 10   doesn't end there because the conversation continues.
10:09:21 11   Mr. Greenhalgh, oh, and my understanding there was something
10:09:25 12   explicit in the Nuvia contract, where if they were sold then
10:09:29 13   the microarchitecture cannot be transferred without our
10:09:33 14   permission, that's what I was just saying, right, you had to
10:09:36 15   get our permission to do a transfer under the Nuvia
10:09:39 16   agreement.  And Mr. Greenhalgh said so there is a legal
10:09:46 17   basis.  Without our permission, all Qualcomm has bought is a
10:09:51 18   CPU engineering team.  And that is exactly correct and
10:09:56 19   exactly consistent with everything we have been saying to
10:09:59 20   you over the course of this trial.
10:10:01 21          The same thing with Mr. Segars, they showed you
10:10:06 22   this e-mail, he said there is nothing to stop them closing
10:10:10 23   without an assigned contract from us, partners do this all
10:10:13 24   the time.  There is nothing we can do to stop the
10:10:16 25   transaction from closing, it's a breach of a contract, we

# EXHIBIT 63

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED,        )
a Delaware corporation; and  )
QUALCOMM TECHNOLOGIES, INC.,  )
a Delaware corporation,      )
                              )
        Plaintiffs,        )
                              )  C.A. No.
        vs.               )  24-490(MN)
                              )
ARM HOLDINGS PLC., f/k/a     )
ARM LTD., a U.K. corporation, )
                              )
        Defendant.        )
_____)

HIGHLY CONFIDENTIAL

ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF ANN NATHALIE CATHCART CHAPLIN

JULY 11, 2025

SAN DIEGO, CALIFORNIA

Reported by
Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Case 1:24-cv-00490-MN    Document 570-1    Filed 11/21/25    Page 542 of 579 PageID #: 25789

7/11/2025                Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.        Ann Nathalie Cathcart Chaplin
                                    Highly Confidential - Attorneys' Eyes Only

Page 190

1  third party to speak to the media about the
2  litigation between Arm and Qualcomm?
3         MS. DUNN:  I'll instruct the witness to the
4  extent that she has any information about this, if
5  it is in her capacity overseeing the litigation, to
6  exclude that from her answer.
7         THE WITNESS:  I don't.
8  BY MR. WILCOX:
9      Q.  Would your answer be different absent
10  counsel's instruction?
11        MS. DUNN:  I don't think that's an
12  appropriate question.
13        MR. WILCOX:  Are you instructing her not to
14  answer?
15        MS. DUNN:  I don't think you can ask a
16  question about like --
17        MR. WILCOX:  Let me ask a different --
18        MS. DUNN:  Something is wrong with the
19  question.
20        MR. WILCOX:  Let me ask a different
21  question.
22        MS. DUNN:  Okay.
23  BY MR. WILCOX:
24      Q.  Is there anything that you are omitting
25  from your previous answer based on the instruction

Page 191

1  you received from counsel?
2         MS. DUNN:  That's not a proper question.
3  I'm going to instruct the witness not to answer.
4  BY MR. WILCOX:
5      Q.  Are you going to follow counsel's
6  instruction?
7      A.  I will.
8      Q.  Has Qualcomm directed or authorized any
9  third party to speak to the media about Arm's
10  supposedly anticompetitive behavior?
11        MS. DUNN:  Same instruction.  To the extent
12  that this information exists if it is only something
13  that Ms. Chaplin knows in her capacity as
14  general counsel overseeing the litigation, she
15  should exclude that from her answer.
16        THE WITNESS:  No.
17  BY MR. WILCOX:
18      Q.  I'll hand you what will be marked as
19  Chaplin Exhibit 23.
20        (Chaplin Exhibit 23 marked for identification.)
21        THE WITNESS:  I have it.
22  BY MR. WILCOX:
23      Q.  Exhibit 23 is a March 25, 2025, article
24  from Bloomberg titled, "Qualcomm Takes Legal Fight
25  With Arm to Global Antitrust Agencies."  Do you see

Page 192

1  that?
2      A.  I see that.
3      Q.  Is this the article that you were
4  referencing earlier where someone from Qualcomm's
5  communication team had a conversation with
6  Jon Sisco?
7         MS. DUNN:  Objection to form.
8         THE WITNESS:  Yes.  This is the article
9  that I mentioned before relating to a conversation
10  she ended up having with Josh Sisco after he said he
11  was running a story.
12  BY MR. WILCOX:
13      Q.  Did anyone at Qualcomm have any
14  conversations with Ian King, who is also listed as
15  an author on this story?
16      A.  No.
17      Q.  Do you know whether Ian King joined the
18  conversation between Qualcomm and Josh Sisco?
19      A.  Not to my knowledge.
20      Q.  Do you see the second paragraph of this
21  story where it says, "In private meetings and
22  confidential filings," and goes on from there?
23      A.  I see that sentence, yes, in the second
24  paragraph.
25



7/11/2025
Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.
Highly Confidential - Attorneys' Eyes Only
Ann Nathalie Cathcart Chaplin



Page 194

1
3
7
11
24  BY MR. WILCOX:
25

Page 195

1
10  BY MR. WILCOX:
11    Q.  Do you believe that Arm gave this story to
12  Bloomberg?
13    A.  I don't know who gave --
14        MS. DUNN:  Objection to -- just give me one
15  second.
16        THE WITNESS:  I'm sorry.
17        MS. DUNN:  That's okay.
18        Objection to form.
19        THE WITNESS:  I don't know who gave the
20  story to Bloomberg.
21  BY MR. WILCOX:
22    Q.  When we were discussing the October 2024
23  Bloomberg story, you told me you were able to infer
24  from context who the story must have originated
25  from; correct?

Page 196

1    A.  I gave you where I inferred it, yes.
2
9
12    Q.  This article references regulators on three
13  different continents; correct?
14    A.  It does.
15    Q.  So if the source of the story was the
16  regulators, it would have to be three different
17  regulators talking to the media; correct?
18        MS. DUNN:  Objection to form.
19        THE WITNESS:  I don't know.
20  BY MR. WILCOX:
21    Q.  Sitting here today, are you aware of any
22  instances where regulators discussed confidential
23  filings with the media as the source for a story?
24        MS. DUNN:  Objection to form.
25        And I'll also caution the witness that if

Page 197

1  she can answer this question without revealing
2  privileged information, she can do so.
3        THE WITNESS:  I'm unable to answer.  I
4  don't have an answer outside of privileged
5  information.
6  BY MR. WILCOX:
7    Q.  Sitting here today without disclosing
8  privileged information, are you aware of any
9  instances where regulators discussed private
10  meetings that they have had with the media in order
11  to serve as a source for a story about potential
12  investigations?
13    A.  I don't know.  I've seen numerous such
14  articles.  So I don't know where they're from.
15

50  (Pages 194 to 197)

Page 198

1  Commission, the Federal Trade Commission, and the
2  Korean Federal Trade Commission?
3      A.  I'm not aware of any other than what we've
4  discussed.  I don't even know who a bunch of those
5  people are, so...
6      Q.  They are all people who are referenced in
7  one place or another as contributing to the story.
8      A.  Oh, okay.  I'm like I'm sorry, I was not
9  tracking.
10

17
21
25      Q.  So sitting here today, you simply have no

Page 199

1  idea who the source for -- strike that.
2          So sitting here today, you simply have no
3  idea who the original source for this Bloomberg
4  article from March 2025 could have been?
5      A.  Correct.
6      Q.  You can set that aside.
7          I'll hand you what's been marked as
8  Chaplin Exhibit 24.
9      (Chaplin Exhibit 24 marked for identification.)
10  BY MR. WILCOX:
11      Q.  Chaplin Exhibit 24 is a February 2025
12  Reuters article entitled, "Exclusive:  Arm recruits
13  from customers as it plans to sell its own chips";
14  correct?
15      A.  I see that.
16      Q.  Was anyone affiliated with Qualcomm, its
17  outside counsel, or any communication firms,
18  retained by Qualcomm a source for this story?
19      A.  You're asking me as a corporate
20  representative?
21      MS. DUNN:  This is not within Ms. Chaplin's
22  30(b)(6) topic, so I -- so the question would have
23  to be posed to her in her individual capacity.
24      MR. WILCOX:  I agree.  This question is in
25  her individual capacity.

Page 200

1      MS. DUNN:  Okay.  And so to the extent that
2  there is any privileged information, I just ask her
3  to exclude from her answer.
4      THE WITNESS:  I just have to read it.
5  BY MR. WILCOX:
6      Q.  Take your time.
7      A.  Okay.  I only wish people could print
8  things larger.
9      Q.  While you're reviewing, I'll say that for
10  some reason this Bloomberg -- or sorry -- this
11  Reuters article --
12      A.  Yeah.
13      Q.  -- includes two articles.  One is what
14  we've been talking about, and another one is about a
15  Brazilian antitrust regulator.  I want to make clear
16  I'm only asking you about the first article.
17      A.  Okay.  Got it.  Thank you.
18          Yes.  These things always print very weird,
19  don't they?
20      MR. WILCOX:  I should also add for one
21  clarification for the record while she reviews.
22      MS. DUNN:  Sure.
23      MR. WILCOX:  On the 30(b)(6) topics, I
24  think we disagree on the scope of that 30(b)(6)
25  topic, and so I wasn't waiving our position on that.

Page 201

1  I was just recognizing that today she is testifying
2  in her individual capacity.
3      MS. DUNN:  Understood.
4      THE WITNESS:  Okay.  I have read this.  I'm
5  sorry.  Can you --
6  BY MR. WILCOX:
7      Q.  I will scroll back to my question so I can
8  ask it.
9      A.  Thank you.
10      Q.  Was anyone affiliated with Qualcomm, its
11  outside counsel, or any communication firms retained
12  by Qualcomm a source for this Reuters story?
13      A.  So it's not something I prepared on to
14  really definitively know the answer to your
15  question, right, from a -- because it's not in my
16  corporate representative things.  So I see -- I see
17  a bunch of stuff about different companies.  The
18  one -- so I guess I don't know definitively, is my
19  answer.
20      MS. DUNN:  So also let me -- let me clarify
21  for the witness.  So this is only being asked about
22  in your individual capacity.
23      THE WITNESS:  Okay.
24      MS. DUNN:  So -- and he's not asking you to
25  interpret the document.  So if you have firsthand,

# EXHIBIT 64

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


------------------------x
QUALCOMM INCORPORATED,      )
a Delaware corporation;     )
QUALCOMM TECHNOLOGIES,      ) C.A. No. 24-490-MN
INC., a Delaware           )
corporation,               )
                           )
            Plaintiffs,    )
                           )
    v.                     )
                           )
ARM HOLDINGS PLC, f/k/a    )
ARM LTD., a U.K.           )
corporation,               )
                           )
            Defendants.    )
                           )
------------------------x


HIGHLY CONFIDENTIAL
30(b)(6) DEPOSITION OF QUALCOMM INCORPORATED and
QUALCOMM TECHNOLOGIES, INC., by and through
its Designated Representative,
CRISTIANO R. AMON
SAN DIEGO, CALIFORNIA
THURSDAY, JULY 3, 2025
9:14 A.M.


Reported by: Leslie A. Todd, CSR No. 5129 and RPR

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

7/3/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Cristiano R. Amon 30(b)(6)
Highly Confidential

**Page 198**

1    A.    Usually, if we want to have press
2  releases on new product announcements, sometimes we
3  will have a disclosure to a few media under
4  embargo.  And they -- that is before the
5  announcement until it gets released.
6    **Q.    When you say under embargo, what does**
7  **that mean?**
8    A.    It means that they get the contents
9  of the press release, the contents on the products,
10  give them time to write the stories.  And they
11  don't release those stories until when the product
12  is announced.
13    **Q.    Meaning that Qualcomm provides**
14  **information to the reporter before it's public to**
15  **others?**
16    A.    Before a press release is issued, for
17  example.
18    **Q.    And have you personally been involved**
19  **with that?**
20    A.    I have been in the past.  I can't
21  precise when, but when -- when we have, for
22  example, announcements that we are going to make at
23  Snapdragon Summit, I have been involved in
24  briefings.
25          I also have recorded -- I have

**Page 199**

1  recorded TV interviews that are going -- that are
2  live to tape.  They're taped, and they are released
3  after the announcement goes up.
4    **Q.    Now, you're also aware, sir, not just**
5  **about press releases, and providing those to**
6  **reporters before an article publishes, but folks at**
7  **Qualcomm talking to reporters about either**
8  **competitors or customers, either off the record or**
9  **not for attribution?**
10    A.    Is that a statement or a question?
11    **Q.    It's a question, sir.  Are you aware**
12  **of that?**
13    A.    I was aware that Qualcomm will
14  have -- could have conversations with reporters off
15  the record.
16    **Q.    And are you aware that sometimes**
17  **Qualcomm provides comments that don't attribute**
18  **them to that specific person, but they're not off**
19  **the record?**
20    A.    Personally, I'm not aware.
21    **Q.    Okay.**



**Page 200**

1

18

23          (Exhibit No. 7 was marked for
24          identification.)
25  BY MR. LoCASCIO:

**Page 201**

1    **Q.    I'll show you Amon 7.  This is a**
2  **March 25th, 2025, article in Bloomberg called**
3  **Qualcomm Takes Legal Fight With Arm to Global**
4  **Antitrust Agencies.  Do you see that?**
5    A.    I see this article, yes.
6    **Q.    And do you see Ian King is one of the**
7  **authors of this article?**
8    A.    Yes, I do.
9    **Q.    If you look at the second paragraph,**
10  **it says, "In private meetings and confidential**
11  **filings to regulators on three continents,**
12  **Qualcomm's arguing that Arm, its biggest**
13  **supplier, is guilty of anticompetitive behavior,**
14  **according to people familiar with the matter."**
15          **Do you see that?**
16    A.    Yes.
17    **Q.    Are you aware, sir, that Qualcomm**
18  **provided information to Ian King in connection with**
19  **the article at Amon 7?**
20          MS. DUNN:  Objection to form.
21          THE WITNESS:  I am not aware of
22          Qualcomm providing information to Ian
23          King.
24  BY MR. LoCASCIO:
25    **Q.    For this article, or ever?**

51  (Pages 198 to 201)

Page 202

1    A.   For this article. I assumed that was
2 your question.
3    Q.



13    Q.   Okay. Sir, do you see the next
14 paragraph says, "'Qualcomm's complaints to the
15 European Commission, US FTC, and Korean Fair Trade
16 Commission allege that Arm is hurting competition
17 by restricting access to its technology after
18 operating an open network for more than 20 years,'
19 said the people."
20      Do you see that?
21    A.   Yeah.
22    Q.   And then right after that, we turn
23 the page, there's a photo of you. Do you see that?
24    A.   Yes.
25    Q.   Every one of these articles -- or

Page 203

1 paragraphs, sir, look at the next one, said,
2 "'Qualcomm is telling competition authorities
3 around the world that that dynamic market is now
4 threatened,' said the people who asked not to be
5 named, discussing confidential matters."
6      Did I read that correctly?
7    A.   You're reading that correctly.
8    Q.   Sir, is it your testimony that at no
9 point were you aware that Qualcomm was speaking
10 with Ian King about the substance of Amon 7?
11    A.   It is.
12      MS. DUNN: Objection to form.
13 BY MR. LoCASCIO:
14    Q.   And, sir, do you have -- withdrawn.
15      Can you say, sir, under oath that
16 Qualcomm wasn't the source of these anonymous
17 comments?
18    A.   I can say under oath that I'm not
19 aware of Qualcomm talking to Ian King about those
20 matters.
21    Q.   But you can't dispute that it did,
22 can you?
23    A.   I'm not aware. So I can't dispute
24 one way or the other.
25    Q.   Who would know at Qualcomm if

Page 204

1 Qualcomm was involved in or behind this article,
2 Amon 7?
3    A.   I think the person to -- that would
4 probably be more qualified to answer the question
5 is the marketing communications team that has the
6 relationship with Ian King.
7    Q.   Does it -- withdrawn.
8      Would it trouble you in any way, as
9 the CEO and president, if Qualcomm was putting out
10 these statements to Bloomberg anonymously?
11      MS. DUNN: Objection. Calls for
12 speculation.
13 BY MR. LoCASCIO:
14    Q.   Go ahead, sir.
15    A.   I had had opportunity in public
16 forums, in conferences when they'd be asking, that
17 I have said that Arm has been anticompetitive in
18 the industry. I have said that Arm became a
19 dominant provider in mobile, with an open licensing
20 model, and is changing its practice. And that is
21 anticompetitive. So I had made those public
22 statements myself.
23    Q.   Okay. But my question, sir, was
24 different. My question is, would it trouble you in
25 any way, as the CEO and president, if people on

Page 205

1 your team or under your authority were providing
2 this information anonymously or off the record to
3 Mr. King?
4      MS. DUNN: Objection to form.
5 BY MR. LoCASCIO:
6    Q.   Go ahead?
7      MS. DUNN: States facts not in
8 evidence.
9      THE WITNESS: Yes, my answer to
10 the question, based on what I just told
11 you, I would not be troubled if Qualcomm
12 spokespersons will talk about Arm
13 anticompetitive behavior, providing full
14 attribution to the person, to the press.
15 I would not -- I would not oppose that.
16 As I told you --
17 BY MR. LoCASCIO:
18    Q.   That's different than this.
19    A.   As I told you before --
20      MS. DUNN: Objection to form.
21      THE WITNESS: I told you before,
22 what Ian King is saying here, this said,
23 the people. It didn't say
24 confidentially. I am not aware of
25 anybody from Qualcomm having

52 (Pages 202 to 205)

# EXHIBIT 65

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARM LTD., | |
|     Plaintiff, | |
|     v. | C.A. No. 22-1146-MN |
| QUALCOMM INC., QUALCOMM TECHNOLOGIES, INC., and NUVIA, INC., | |
|     Defendants. | |

## PLAINTIFF ARM LTD.'S RESPONSIVE POST-TRIAL BRIEF REGARDING EQUITABLE DEFENSES

Dated: February 12, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington DC  20004
(202) 389-5000
gregg.locascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Joyce Liou
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
ddurie@mofo.com
jliou@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

Kyle W.K. Mooney
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
(212) 336-4092
kmooney@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

NATURE AND STAGE OF THE PROCEEDINGS .................................................................. 2

STATEMENT OF FACTS ....................................................................................................... 3

LEGAL STANDARD ............................................................................................................... 4

ARGUMENT ........................................................................................................................... 5

    I.      A BREACH OF CONTRACT IS INSUFFICIENT TO ESTABLISH AN
          UNCLEAN HANDS DEFENSE. ........................................................................... 5

    II.     ARM DID NOT BREACH ITS CONTRACTUAL OBLIGATIONS OR
          ACT WITH UNCLEAN HANDS. ......................................................................... 8

          A.      ARM HAD A LICENSE UNDER THE NUVIA TLA TO
                 CONTINUE USING THE CMN FEATURES REQUESTED BY
                 NUVIA. ................................................................................................... 9

          B.      ARM DID NOT IMPROPERLY USE ANY NUVIA
                 CONFIDENTIAL INFORMATION POST-TERMINATION. .............. 13

          C.      ARM COMPLIED WITH ITS RETURN-OR-DESTROY
                 PROMISE TO THE EXTENT PERMITTED BY ITS
                 PRESERVATION OBLIGATIONS. ...................................................... 16

          D.      DEFENDANTS PRESENT NO EVIDENCE THAT ARM DID
                 NOT PROVIDE THE CONTRACTUALLY REQUIRED
                 CERTIFICATION. ................................................................................ 18

CONCLUSION ....................................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A. I. Gage Plumbing Supply Co. v. Local 300 of Int'l Hod Carriers*,
    202 Cal. App. 2d 197 (1962) ...................................................................................13

*Aguayo v. Amaro*,
    213 Cal. App. 4th 1102 (2013) ..............................................................................15

*Align Tech., Inc. v. 3Shape A/S*,
    C.A. No. 17-1647-LPS, 2020 WL 5979353 (D. Del. Oct. 8, 2020) .........................8

*Ample Bright Dev., Ltd. v. Comis Int'l*,
    913 F. Supp. 2d 925 (C.D. Cal. 2012) ...............................................................4, 18

*Ball v. Johanns*,
    No. 07-cv-1190-LKK, 2008 WL 269069 (E.D. Cal. Jan. 29, 2008).................12, 18

*Bank of Am., N.A. v. Roberts*,
    217 Cal. App. 4th 1386 (2013) ...........................................................................5, 17

*Brawley v. J.C. Interiors, Inc.*,
    161 Cal. App. 4th 1126 (2008) .................................................................................6

*Cal.-Agrex, Inc. v. Van Tassell*,
    258 F.R.D. 340 (N.D. Cal. 2009).............................................................................12

*Champy v. Beazer Homes Corp.*,
    No. 15-cv-4098-MBS, 2016 WL 6525484 (D.S.C. Nov. 2, 2016).........................10

*Concrete Washout Sys., Inc. v. Neaton Cos., LLC*,
    No. 08-cv-02088-GEB, 2008 WL 11385581 (E.D. Cal. Oct. 22, 2008) ..................7

*Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*,
    890 F.2d 165 (9th Cir. 1989) ..............................................................................1, 5

*Fairbairn v. Fid. Invs. Charitable Gift Fund*,
    No. 18-cv-04881-JSC, 2020 WL 999752 (N.D. Cal. Mar. 2, 2020)................4, 5, 19

*Filet Menu, Inc. v. C.C.L. & G., Inc.*,
    79 Cal. App. 4th 852 (2000) ....................................................................................6

*HDOS Franchise Brands, LLC v. El Paso Hot Dog, LLC*,
    No. 21-cv-00201, 2021 WL 5629923 (S.D. Cal. June 29, 2021) .............................6

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.*,
  229 Cal. App. 4th 635 (2014) ...................................................................................15, 19

*Jay Bharat Developers, Inc. v. Minidis*,
  167 Cal. App. 4th 437 (2008) ...........................................................................................7

*Katiroll Co. v. Kati Roll & Platters, Inc.*,
  C.A. No. 10-3620 (GEB), 2011 WL 2294260 (D.N.J. June 8, 2011)019) .............................14

*Kaufman v. Warner Bros. Ent'mt Inc.*,
  No. 16-cv-02248-PHX-JAT, 2019 WL 1150953 (D. Ariz. Mar. 13, 2019) .........................10

*LL B Sheet 1, LLC v. Loskutoff*,
  362 F. Supp. 3d 804 (N.D. Cal. 2019) .............................................................................12

*Nelson v. Nelson*,
  No. A126962, 2011 WL 213857 (Cal. Ct. App. Jan. 25, 2011) .............................................6

*O'Flaherty v. Belgum*,
  115 Cal. App. 4th 1044 (2004) ........................................................................................14

*Oakhurst Indus., Inc. v. Tubeway Assocs., L.P.*,
  No. B201113, 2009 WL 4548342 (Cal. Ct. App. Dec. 7, 2009) ......................................1, 5, 6

*Passport Health, Inc. v. Travel Med, Inc.*,
  No. 09-cv-01753-GEB, 2011 WL 590723 (E.D. Cal. Feb. 10, 2011) ...................................13

*Ricketts v. Compaction Plus, Inc.*,
  No. D036553, 2002 WL 264645 (Cal. Ct. App. Feb. 25, 2002)............................................6

*RLI Ins. Co. v. City of Visalia*,
  297 F.Supp.3d 1038 (E.D. Cal. 2018)....................................................................1, 5, 8, 15

*Safety PPE, LLC v. Skanda Grp. of Indus. LLC*,
  No. 21-cv-3967-JFW, 2023 WL 2558549 (C.D. Cal. Feb. 13, 2023), *aff'd*, No.
  23-55241, 2024 WL 2816494 (9th Cir. June 3, 2024)..........................................................13

*Saks v. International Longshore & Warehouse Union-Pacific Maritime
  Association Benefit Plans*,
  637 F. App'x 282 (9th Cir. 2015) ....................................................................................7, 8

*Schauerman v. Noble*,
  No. A119960, 2009 WL 775108 (Cal. Ct. App. Mar. 25, 2009)............................................6

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Sketchley v. Lipkin*,
   99 Cal. App. 2d 849 (1950) ................................................................7, 8

*Sublett v. Henry's Turk & Taylor Lunch*,
   21 Cal. 2d 273 (1942) .......................................................................11

*United Food Group, LLC v. Cargill, Inc.*,
   No. 11-cv-7752 SS, 2014 WL 12925566 (C.D. Cal. Dec. 18, 2014) .....................................16

*Walters v. PDI Mgmt. Servs.*,
   No. 02-cv-01100-JDT-TAB, 2004 WL 2137513 (S.D. Ind. June 14, 2004) ..........................10

**Other Authorities**

Fed. R. Evid. 1002 ............................................................................10

Restatement (Second) Contract § 369 ...............................................................6

## INTRODUCTION AND SUMMARY OF ARGUMENT

Arm did not act with unclean hands. Arm upheld its contractual promises, worked in good faith to try to resolve its disputes with Defendants, and only turned to the courts when Defendants refused to stop using the pre-acquisition Nuvia code despite their contractual promise to do so. The Court should not close the courthouse doors on Arm's efforts to enforce contractual obligations based on an unclean hands defense that mirrors misguided contract arguments that Nuvia dropped in advance of trial, is factually unsupported, and is legally flawed.

As an initial matter, Defendants fail to grapple with the heavy burden required to establish unclean hands. It is not enough for Defendants to show that Arm committed some inadvertent breach of a contractual provision. Rather, unclean hands requires bad-faith conduct: courts applying California law hold that "[b]ad intent is the essence of the defense of unclean hands." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989). Breach of contract does not require bad faith, and California courts regularly hold that plaintiffs who themselves breach a contractual provision may still bring contract claims seeking damages or specific performance. For that reason, Defendants are wrong to assume any purported Arm breach is sufficient to escape their obligations. "The act of breaching a contract cannot also be the exact same act that constitutes unclean hands—otherwise every breach of contract would implicate the doctrine of unclean hands." *RLI Ins. Co. v. City of Visalia*, 297 F.Supp.3d 1038, 1058 (E.D. Cal. 2018), *aff'd*, 770 F. App'x 377 (9th Cir. 2019); *see also Oakhurst Indus., Inc. v. Tubeway Assocs., L.P.*, No. B201113, 2009 WL 4548342, at *15 (Cal. Ct. App. Dec. 7, 2009) (theory that plaintiff's breach of contract's implied covenant precluded specific performance was "without merit").

Setting aside the legal flaws in Defendants' arguments, their unclean hands defense faces an even more fundamental problem: Arm did not breach any contractual provision in either the Nuvia Architecture License Agreement ("Nuvia ALA") or the Nuvia Technology License

1

Agreement ("Nuvia TLA"). Defendants' theories of breach all misread highly technical contract provisions that did not result in any prejudice to Defendants and that at worst showed that Arm treated Defendants the same as Arm's other customers. Defendants' claim that Arm misused "Confidential Information" in the form of Nuvia's requests for additional features in Arm's products, for example, ignores that Annex 1 to the Nuvia ALA expressly defines such feature requests as "Input" to which Arm has a perpetual license. (*See* Proposed Findings of Fact ("FOF") ¶¶ 4-10.) Defendants' complaint that Arm purportedly ran a "diff" comparing a Nuvia configuration file to a Qualcomm configuration file, meanwhile, ignores that Arm ran that comparison only in response to a Qualcomm request for verification of a new Qualcomm product. And Defendants' complaint that Arm did not "return or destroy" confidential information ignores that Defendants never asked that Arm take either of those steps, as well as the fact that Arm was required to preserve the relevant materials given its preservation obligations in this litigation.

None of Arm's actions gives rise to the sort of bad-faith, inequitable misconduct that unclean hands is intended to address. The Court should reject Defendants' unclean hands defense, and also dismiss with prejudice the now-abandoned waiver, estoppel, and laches defenses.

## NATURE AND STAGE OF THE PROCEEDINGS

In March 2024, Defendants (both Nuvia and Qualcomm) amended their counterclaim to allege a breach of contract claim based on the Nuvia agreements relating to Arm's alleged misuse of suggestions from Nuvia regarding Arm's CMN product and comparison of two prior configuration files (a "diff"). (D.I. 300.) The day before the pretrial conference, Defendants withdrew their contract claims. (D.I. 526.)

The Court held a four-day trial in December 2024. As part of those proceedings, the Court held a bench trial to address Defendants' equitable defenses on the evening of December 17. At the end of the four-day trial, the jury was asked to answer three questions: (1) whether Nuvia

breached Section 15.1(a) of the Nuvia ALA, (2) whether Qualcomm breached Section 15.1(a) of the Nuvia ALA, and (3) whether the Qualcomm CPUs based on code acquired in the Nuvia acquisition are licensed under the Qualcomm ALA. (D.I. 569.)

The jury reached a verdict in Qualcomm's favor on Questions 2 and 3 but deadlocked on Question 1. (Tr. 1000:3-1004:10.) The Court accepted the verdict on Questions 2 and 3, declared a mistrial on Question 1, and excused the jury on December 20, 2024. (*Id*. 1017:5-1021:3.) The parties filed post-trial motions addressing the jury's verdict on January 17, 2025. (D.I. 595, 597.) On January 29, 2025, Defendants filed their post-trial brief regarding their equitable defenses. (D.I. 602 ("Defs.' Br.").)

## STATEMENT OF FACTS

The relevant facts are set forth below and in Arm's concurrently filed Proposed Findings of Fact. On September 27, 2019, Arm and Nuvia entered into an Architecture License Agreement so that Nuvia could design customized CPUs that are compliant with the Arm instruction set architecture. (FOF ¶ 1.) The two companies entered into a separate Technology License Agreement and related Annex 1 on the same day; the Annex was admitted into evidence as JTX-0004, but Defendants did not make the Nuvia TLA itself part of the record. (FOF ¶ 2.) Under the terms of the Nuvia TLA, Arm licensed certain off-the-shelf products to Nuvia, including "CMN-Rhodes-Max." (FOF ¶ 2.)

Section G.2 of Annex 1 states that "[Nuvia] hereby grants to ARM and its Subsidiaries, under all of [Nuvia's] and its affiliates' (as applicable) Intellectual Property rights that are embodied in the Input, the following worldwide, nonexclusive, irrevocable, royalty free, fully paid up rights: (i) to make, use, copy, modify, publish and create derivative works of the Input." (FOF ¶ 4.) "Input" is defined as "all suggestions, comments, feedback, ideas, or know-how

3

(whether in oral or written form) provided by [Nuvia] to ARM in respect of a Development Release." (FOF ¶ 5 (quoting JTX-0004 at 10 (§ A.20)).)

Annex 1 also provided Nuvia the option to "exchange [] the CMN-Rhodes-Max for a single use license to the ARM Technology known as 'CMN-Kampos.'" (FOF ¶ 6 (quoting JTX-0004 at 12 (§ B.4)).) Nuvia "agree[d] that any requests for changes to design and implementation of the CMN-Kampos *shall be considered Input* and subject to the provisions of Part G below in this Section 2." (FOF ¶ 7 (quoting JTX-0004 at 12 (§ B.4(ii))) (emphasis added).) Section G.7 provides that, "[n]otwithstanding anything to the contrary in this Annex 1 or the TLA, the Input shall not be treated as confidential information by Arm and ARM shall be free to use, copy, disclose or otherwise distribute any Input to any third party . . . without obligation or restriction of any kind." (FOF ¶ 8.)

Nuvia requested certain features for implementation in CMN-Kampos, sending documents designated confidential to Arm. (*See* FOF ¶ 12.) Arm implemented certain Nuvia-requested features in CMN-Kampos, creating its own specifications for these features. (FOF ¶¶ 16, 18.) On January 18, 2021, Arm and Nuvia entered into an amendment to the Nuvia TLA to license "CMN-700-Max," the product number for CMN-Kampos. (FOF ¶ 13.)

Defendants did not present any evidence that Arm used Nuvia confidential documents regarding feature requests following termination of the Nuvia TLA and ALA. Only one or two features requested by Nuvia remain implemented in Arm's CMN products. (FOF ¶ 20.) Defendants did not request that Arm remove the Nuvia-requested CMN features following termination of the Nuvia TLA or ALA. (FOF ¶ 19.)

**LEGAL STANDARD**

To prevail on a defense of unclean hands, Defendants have the burden of showing that Arm "acted unfairly or fraudulently respecting the matter in controversy." *Ample Bright Dev., Ltd. v.*

*Comis Int'l*, 913 F. Supp. 2d 925, 940 (C.D. Cal. 2012). "[T]he misconduct must prejudicially affect the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief." *Fairbairn v. Fid. Invs. Charitable Gift Fund*, No. 18-cv-04881-JSC, 2020 WL 999752, at *4 (N.D. Cal. Mar. 2, 2020) ("Not every wrongful act constitutes unclean hands.") (citation omitted); *see also Bank of Am., N.A. v. Roberts*, 217 Cal. App. 4th 1386, 1400 (2013) (denying unclean hands defense where "there was nothing inequitable or prejudicial" to defendant regarding plaintiff's alleged misconduct).

## ARGUMENT

### I.     A BREACH OF CONTRACT IS INSUFFICIENT TO ESTABLISH AN UNCLEAN HANDS DEFENSE.

Defendants' unclean hands defense cannot succeed, first and foremost because Defendants rely on the wrong legal standard. Unclean hands is no easy test: the defense is reserved for conduct that "violates conscience, or good faith, or other equitable standards of conduct." *Oakhurst*, 2009 WL 4548342, at *18 (quoting *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 979 (1999)). Unlike breach of contract (which does not turn on subjective intent), unclean hands requires bad faith: "[b]ad intent is the essence of the defense of unclean hands." *Dollar Sys.*, 890 F.2d at 173. Accidental, inadvertent, or even grossly negligent behavior by itself does not suffice. *Id.* Given this high standard, California courts and courts applying California law reject the argument Defendants make here, which assumes that just any contractual breach by a plaintiff necessarily precludes a plaintiff's contract-related claims or plaintiff's request for specific performance. That argument is "without merit." *Oakhurst*, 2009 WL 4548342, at *15-16; *see also id.* at *18 (breach of contract's implied covenant did not give rise to unclean hands); *RLI Ins. Co.*, 297 F.Supp.3d at 1058 ("The act of breaching a contract cannot also be the exact same act that constitutes unclean hands—otherwise every breach of contract would implicate the doctrine of

unclean hands."); *see also Dollar Sys.*, 890 F.2d at 173 ("[Plaintiff] cites no authority for its argument that simple breach of contract merits application of the unclean hands doctrine.").

These decisions make sense. Following their holdings is the only way to reconcile unclean hands with black-letter contract principles. It is well established, for example, that "not every breach by a plaintiff . . . will prevent him from obtaining a decree for specific performance." *Nelson v. Nelson*, No. A126962, 2011 WL 213857, at *6 (Cal. Ct. App. Jan. 25, 2011) (citation and quotation omitted); *see also Oakhurst*, 2009 WL 4548342, at *20; *HDOS Franchise Brands, LLC v. El Paso Hot Dog, LLC*, No. 21-cv-00201, 2021 WL 5629923, at *6 (S.D. Cal. June 29, 2021) (granting preliminary injunction, despite plaintiffs' purported breach of franchise agreement); Restatement (Second) Contract § 369 ("Specific performance or an injunction may be granted in spite of a breach by the party seeking relief, unless the breach is serious enough to discharge the other party's remaining duties of performance."). A rule that unclean hands precludes specific performance any time the plaintiff also breached the contract is flatly inconsistent with this principle.

Defendants' rule would equally upend well-settled principles about when a plaintiff can recover damages in a contract case. As Defendants concede, unclean hands provides "a complete defense to both legal and equitable causes of action." *Schauerman v. Noble*, No. A119960, 2009 WL 775108, at *5 (Cal. Ct. App. Mar. 25, 2009) (citation and quotation omitted). But the general rule is that a breach by the plaintiff does not justify a breach by the defendant or preclude the plaintiff from recovering damages. *See, e.g.*, *Ricketts v. Compaction Plus, Inc.*, No. D036553, 2002 WL 264645, at *3 (Cal. Ct. App. Feb. 25, 2002) (rejecting argument that "the trial court erred in awarding damages on Ricketts's breach of contract claims because the court found Ricketts breached the same contract" because "the failure to perform one severable part of a contract does

6

not bar recovery for performance of another party."); *Filet Menu, Inc. v. C.C.L. & G., Inc.*, 79 Cal. App. 4th 852, 860 (2000) (similar); *Brawley v. J.C. Interiors, Inc.*, 161 Cal. App. 4th 1126 (2008) (both parties recovered); *Concrete Washout Sys., Inc. v. Neaton Cos., LLC*, No. 08-cv-02088-GEB, 2008 WL 11385581, at *3 (E.D. Cal. Oct. 22, 2008) (defendant's breach not excused, even if defendant "may [also] have a claim for damages"); *cf. Jay Bharat Developers, Inc. v. Minidis*, 167 Cal. App. 4th 437, 443-44 (2008) ("Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided or continue its performance and sue for damages. Under no circumstance may the non-breaching party stop performance and continue to take advantage of the contract's benefits.") (citation and quotation omitted). Defendants' position here would render these principles a dead letter. Nothing in principle or precedent supports that result.

Nothing in Defendants' cases requires that result either. (*See* Defs.' Br. at 3.) To be sure, *Sketchley* stated that plaintiffs who have "wrongfully breached their contract [] have no right to demand of equity that it grant their claims." *Sketchley v. Lipkin*, 99 Cal. App. 2d 849, 858 (1950). But that was not an unclean hands holding, and instead stands for the more modest proposition that "equity follows the law"—so when a plaintiff has no breach of contract claim as a matter of law given their own "willful breach," equity is "without authority to grant what the law denies." *Id.* Were there any doubt that *Sketchley* does not stand for the proposition that a breach by the plaintiff necessarily establishes unclean hands in a contract case, as Defendants contend, no California court has read *Sketchley* that way in the seventy-five years since that decision issued.

That leaves *Saks v. International Longshore & Warehouse Union-Pacific Maritime Association Benefit Plans*, 637 F. App'x 282 (9th Cir. 2015). *Saks* is a short, unpublished *per*

*curiam* opinion that holds that the appellant in that case waived all of his arguments. *Id.* at 284. *Saks* also references *Sketchley*, but its unpublished reasoning does not support the theory that any contractual breach supports an unclean hands defense, particularly where that broader holding would conflict with decades of more recent California contract jurisprudence. Indeed, even in *Saks*, there were facts that could show bad faith separate from any mere contractual breach—the doctor in *Saks* "continu[ed] to collect payments for treatments" even after his medical license was suspended, knowingly collecting over a million dollars in improper payments. *Id.* at 284-85. *Saks* also involved only an equitable quantum meruit claim, not the breach and specific performance claims that Arm brings in this case. *Id.* at 283. District courts in the Ninth Circuit have not felt compelled to follow *Saks*'s lead, *e.g.*, *RLI Ins. Co.*, 297 F.Supp.3d at 1058, and neither should this Court. Nothing in Defendants' cases shows that a simple contractual breach suffices to invoke an unclean hands defense.

This fundamental legal flaw in Defendants' arguments is reason enough to reject their unclean hands defense. Defendants' arguments turn solely on their assertion that Arm breached the Nuvia ALA and TLA. But even if that were true (and it is not), Defendants do not even attempt to show that Arm's alleged breaches violate the conscience or reflect bad intent. Defendants cannot try to fill in that gap in reply, *see Align Tech., Inc. v. 3Shape A/S*, C.A. No. 17-1647-LPS, 2020 WL 5979353, at *3 n.5 (D. Del. Oct. 8, 2020) (citing D. Del. L.R. 7.1.3(c)(2)), and without that evidence and argument, they have no unclean hands defense.

## II.   ARM DID NOT BREACH ITS CONTRACTUAL OBLIGATIONS OR ACT WITH UNCLEAN HANDS.

Even if a simple breach of contract could establish the unclean hands defense, Arm did not breach here—much less commit the type of *bad-faith* breach needed to establish unclean hands.

A.     **ARM HAD A LICENSE UNDER THE NUVIA TLA TO CONTINUE USING THE CMN FEATURES REQUESTED BY NUVIA.**

Arm has not breached the Nuvia TLA by maintaining certain "features requested by Nuvia" in CMN-Campos. (Defs.' Br. at 6.) This theory of breach runs headlong into the Nuvia TLA's plain text. As Defendants admit, the TLA grants Arm a license to all "Input" provided by Nuvia. (*Id.* at 9.) Defendants argue that Arm nevertheless does not have a license to continue using features requested by Nuvia because "Input" is purportedly limited to features "provided . . . in respect of a Development Release." (*Id.*) In Defendants' view, Nuvia "never licensed a Development Release," and so its feature requests cannot have been "input." (*Id.*)

This argument ignores separate provisions in Annex 1, which grant Arm a perpetual license to maintain Nuvia-requested CMN features whether or not they are related to a "Development Release." Annex 1 provides that "any requests for changes to design and implementation of the CMN-Kampos *shall be considered Input* and subject to the provisions of Part G…" (FOF ¶ 7 (quoting JTX-0004 at 12 (§ B.4(ii))) (emphasis added).) Section G.7 in turn provides that, "[n]otwithstanding anything to the contrary in this Annex 1 or the TLA, the Input"—here, the feature requests relating to CMN-Kampos—"shall not be treated as confidential information by Arm and ARM shall be free to use, copy, disclose or otherwise distribute any Input to any third party . . . without obligation or restriction of any kind." (FOF ¶ 8.)

In addition, Annex 1 to the Nuvia TLA grants a "worldwide non-exclusive, irrevocable, royalty free" license for "rights . . . embodied in the Input" to "(i) make, use, copy, modify, publish and create derivative works of the Input, (ii) to publicly perform or display, import, broadcast, publish, transmit, distribute, license, offer to sell, and sell, rent, lease, or lend copies of the whole or any part of the Input (and derivative works thereof); and (iii) to sublicense to third parties the

foregoing rights." (FOF ¶ 4 (quoting JTX-0004 at 14 (§ G.2)).) The license grant to such Input "survive[s] expiration or termination." (FOF ¶ 10 (quoting JTX-0004 at 14 (§ G.3)).)

Arm thus had (and has) a perpetual license to the CMN-Kampos feature requests as Input, whether or not they were made in connection with a Development Release. Defendants admit that the feature requests were for "Arm's future CMN-700/Kampos product." (Defs.' Br. at 7.) The record similarly shows that the feature requests were directed to the Kampos product.[1] On the plain text of Annex 1, there was no breach. And, although Defendants contend in a footnote that Annex 1 cannot apply where Defendants purportedly were not given "enhanced lead partner" access (*id.* at 9 n.4), that is also wrong: Arm provided Nuvia with enhanced lead partner access to CMN-Kampos consistent with the "Input" provisions of Annex 1. (FOF ¶ 17.) Further, Arm's license to Input with respect to Kampos does not turn on enhanced lead partner status, as sections B.4 and G.7 make clear (as discussed above).

Separately, Defendants' "Input" theory of breach would also fail to establish the bad faith needed to establish an unclean hands defense for numerous additional reasons. If Arm breached (and it did not), it suggests, at most, that Arm misread the contract. There was no malice.

*First*, Defendants failed to introduce the Nuvia TLA (JTX-0003) into evidence. (*See* D.I. 581, 582.) This alone forecloses Defendants' theory of breach, as the Best Evidence Rule requires Defendants to introduce that written agreement into evidence to prove its contents. *See* Fed. R. Evid. 1002; *Kaufman v. Warner Bros. Ent'mt Inc.*, No. 16-cv-02248-PHX-JAT, 2019 WL

---

[1] Documents on which Defendants rely are titled "Feature support and proposed timelines for CMN Kampos." (FOF ¶ 15.) Moreover, Defendants' witness, Vedaraman Geetha, testified that her understanding was that any features Nuvia requested would go in CMN-Kampos. (FOF ¶ 14 ("Q. What was your understanding of the status of Kampos at the time you joined Nuvia? A. I think at the time I joined Nuvia, there was no Kampos RTL. There was only Rhodes RTL, and so I remember that any features that we had would go in that. Q. By that do you mean that any features that Nuvia requested would go in Kampos? A. Yes." (quoting D.I. 593 ("Bench Tr.") at 4:21-5:3 (Geetha))).)

1150953, at *4 (D. Ariz. Mar. 13, 2019) (refusing to reconsider grant of summary judgment against party asserting contract where party failed to introduce written contract); *Champy v. Beazer Homes Corp.*, No. 15-cv-4098-MBS, 2016 WL 6525484, at *2 (D.S.C. Nov. 2, 2016); *Walters v. PDI Mgmt. Servs.*, No. 02-cv-01100-JDT-TAB, 2004 WL 2137513, at *4 (S.D. Ind. June 14, 2004) (denying summary judgment in favor of party asserting contract where party did not introduce written agreement). Indeed, "where a written contract is relied upon, its introduction is required because it is the best evidence of the actual agreement." *Sublett v. Henry's Turk & Taylor Lunch*, 21 Cal. 2d 273, 275 (1942). Defendants' arguments prove why introducing the agreement into evidence is essential. Without that written agreement in evidence, Defendants cannot establish how the Nuvia TLA defined "Confidential Information" or whether Arm could have breached those terms. Defendants' failure to introduce the Nuvia TLA into evidence forecloses all of their arguments based on Arm's alleged breach of that agreement.

*Second*, Defendants did not present evidence that Arm improperly used documents designated Nuvia Confidential Information. The Confidential Information consists of only five documents marked as "Nuvia Confidential." (*See* D.I. 603 ¶ 42 (citing DTX-127, DTX-129, DTX-378, DTX-379, PTX-0197); FOF ¶ 12.) These documents were titled "CMN feature requests," "Feature support and proposed timelines for CMN Kampos," and "Proposed timeline for features yet to be delivered." (FOF ¶ 15.) They were Input.

Yet Defendants failed to present evidence that Arm used these documents following termination of the Nuvia TLA. Instead, Arm's Director of Product Management for CMN, Jeff Defilippi, testified that Arm ceased using these documents long before termination, and that Arm did not use the Nuvia documents in deciding how to implement the requested CMN features. As Mr. Defilippi explained, when Arm decided to implement a requested feature, it would create its

own specification and perform the development work itself. (FOF ¶ 18.) By the time CMN-Kampos was released—nearly a year before the TLA terminated—Arm had no need to continue using these documents, nor is there any evidence it did so. (FOF ¶ 21.)

*Third*, even if Arm could have somehow breached the TLA's confidentiality provisions, Arm did not act in bad faith—instead, it only treated Nuvia the same as every other Arm customer. The trial record shows that Arm regularly solicits feedback from all of its partners. The license to "Input" under Annex 1 of the Nuvia TLA is a standard provision that Arm provides to many licensees, and it provides Arm with the rights to make and use input and feedback provided by those licensees to Arm's products. (FOF ¶ 9 ("It's a provision that's included with all of our IP products and essentially what it states is any input provided by the partner or customer that Arm has the licensing rights to make, use and modify it as it sees fit." (quoting Bench Tr. at 49:3-17 (Defilippi))).) Arm did not single out Nuvia or act in a manner that imposed any injury (let alone a targeted injury) on Nuvia.

The evidence presented at trial also confirms that Nuvia understood that its requests for CMN features would be licensed to Arm under the Nuvia TLA, because Nuvia never requested that Arm remove the Nuvia-requested features from the CMN product following termination. (FOF ¶ 19.) "[B]ecause all parties to the [Nuvia TLA] were aware of what was taking place, [Arm's] conduct was not inequitable with respect to Defendants." *Cal.-Agrex, Inc. v. Van Tassell*, 258 F.R.D. 340, 352 (N.D. Cal. 2009).

All of this is more than enough to reject any bad-faith unclean hands defense. Arm did not breach the Nuvia TLA, but even if it did, its breach would at most have been inadvertent or negligent, not in bad faith. *See, e.g.*, *Ball v. Johanns*, No. 07-cv-1190-LKK, 2008 WL 269069, at *3 (E.D. Cal. Jan. 29, 2008) ("[U]nclean hands might be avoided if there is inadvertent or innocent

behavior in good faith.") (internal quotations omitted); *LL B Sheet 1, LLC v. Loskutoff*, 362 F. Supp. 3d 804, 821 (N.D. Cal. 2019) (no unclean hands where "[d]efendant cites no evidence" that plaintiff's failure to perform due diligence in transaction "was somehow made in bad faith") (applying California law). Instead, the trial testimony shows that Arm "[did] not have unclean hands when" it operated "in good faith," believing that Nuvia's requests were licensed as "Input" under Annex 1. *A. I. Gage Plumbing Supply Co. v. Local 300 of Int'l Hod Carriers*, 202 Cal. App. 2d 197, 207 (1962); (FOF ¶ 22.) This is particularly true where there were only five CMN feature requests unique to Nuvia, and even as to those five features, most are no longer maintained. (FOF ¶ 20 (testimony that one or two Nuvia CMN feature requests remain in the product).)

*Fourth*, Defendants fail to offer evidence regarding whether or how Arm's treatment of information under the Nuvia *TLA* "occurred in a transaction directly related to the rights and responsibilities of the parties" to the contract at issue: the Nuvia *ALA*. *Passport Health, Inc. v. Travel Med, Inc.*, No. 09-cv-01753-GEB, 2011 WL 590723, at *5 (E.D. Cal. Feb. 10, 2011); *see also Safety PPE, LLC v. Skanda Grp. of Indus. LLC*, No. 21-cv-3967-JFW, 2023 WL 2558549, at *7 (C.D. Cal. Feb. 13, 2023), *aff'd*, No. 23-55241, 2024 WL 2816494 (9th Cir. June 3, 2024) (finding no unclean hands where defendants failed to demonstrate relevance to contract at issue). The two contracts are separate agreements that impose distinct rights and responsibilities. This flaw again cuts across all of Defendants' arguments based on the Nuvia TLA.

## B. ARM DID NOT IMPROPERLY USE ANY NUVIA CONFIDENTIAL INFORMATION POST-TERMINATION.

Defendants also do not show that Arm's "diff" comparison amounted to a breach of the Nuvia ALA, much less that this comparison resulted in unclean hands. Defendants briefly assert that "in May 2022 . . . [Arm] ran a digital comparison of Nuvia's confidential configuration file with a configuration file provided by Qualcomm for one of Qualcomm's custom CPUs." (Defs.'

Br. at 5.) Defendants assert that Arm ran this "diff" comparison "to determine whether Nuvia design work had been used at Qualcomm" and that this somehow breached the Nuvia ALA. (*Id.*)

These arguments do not show a breach, let alone the bad-faith inequity needed to establish unclean hands, particularly where Defendants omit that Arm's "diff" comparison was prompted by Defendants' own request for verification of their "Hamoa core" product. Qualcomm requested verification of its Hamoa core in May 2022. (FOF ¶ 23.) To determine whether Arm had verification obligations—and whether Defendants had stopped using code developed under the Nuvia ALA in compliance with Section 15.1, as they had previously certified—Arm compared a configuration file provided by Nuvia with one provided by Qualcomm (the "diff"). (FOF ¶ 26.) This comparison demonstrated that Defendants were continuing to use code from Phoenix in Hamoa.

Arm's comparison of the Nuvia configuration file to the Qualcomm file to assess its contractual rights and obligations does not support an unclean hands defense. *O'Flaherty v. Belgum*, 115 Cal. App. 4th 1044, 1060 (2004) ("[T]he doctrine of unclean hands must not be applied where to do so would create an injustice.") (citation and quotation omitted); *c.f. Katiroll Co. v. Kati Roll & Platters, Inc.*, C.A. No. 10-3620 (GEB), 2011 WL 2294260, at *2 (D.N.J. June 8, 2011) ("The assertion of potentially valid rights is not unclean hands, but is a rightful exercise of those rights.").

Defendants failed to present any evidence in support of their assumption that the "diff" constituted improper "use" of Nuvia Confidential Information under the Nuvia ALA. There is no evidence in the record that Arm used the content of the Phoenix configuration file in any Arm design, product, or development. Instead, it is undisputed that Arm used the results of the "diff" only to determine whether Defendants were in compliance with Section 15.1 and whether Arm

had verification obligations under the Qualcomm ALA. (FOF ¶ 26 ("Q. So is it your testimony that Mr. Agrawal did not access Nuvia confidential information after termination of the Nuvia agreements? A. Mr. Agrawal did a DIFF on one file in response to Qualcomm sending to Arm a new piece of confidential information to seek approval for a tapeout. The only thing Mr. Agrawal did was a comparison of the new piece of information and that one existing file, being a configuration file for Arm's architecture compliance kit, to understand the relationship between the new piece of information and the existing piece of information." (quoting Bench Tr. at 11:16-12:1 (Larri))).) This comparative exercise, without more, does not constitute the affirmative "use" that is contemplated and prohibited by the Nuvia ALA following termination. A preliminary effort to verify Nuvia's compliance with its termination obligations in connection with Defendants' request to verify a CPU design under the Qualcomm ALA is not a breach of the relevant contracts.

Further, Defendants failed to present any evidence that running the diff was behavior "tainted by inequity or bad faith." *RLI Ins. Co.*, 287 F. Supp. 3d at 1058. Defendants identify no authority for their assumption that an attempt to determine whether Arm had contractual rights or obligations with respect to the Qualcomm configuration file necessarily constituted "the kind of bad faith, unconscionable conduct that a trial court, sitting as a court of equity, can reasonably conclude is sufficient to invoke the doctrine of unclean hands." *Aguayo v. Amaro*, 213 Cal. App. 4th 1102, 1113 (2013). Defendants also failed to offer any evidence that this purported "use" was misconduct that "prejudicially affected its rights." *Jade Fashion & Co., Inc. v. Harkham Industries, Inc.*, 229 Cal. App. 4th 635, 654 (2014) (denying unclean hands defense).

Defendants' assertion that Arm employees could theoretically "access" Nuvia configuration files—which were overwritten—because they existed in a previous version of a version control repository (Defs.' Br. at 5) is also insufficient to qualify as improper "use" of Nuvia

15

Confidential Information under the ALA. At trial, Defendants produced no evidence that, aside from running the "diff," Arm ever accessed the diff or the Nuvia configuration file again. In the absence of a showing that Arm did more than retain "access" to Nuvia configuration files stored deep within a version control system, Arm's actions do not constitute "any form of fraud, deceit, bad faith, or other unconscionable or inequitable conduct" that might support an unclean hands defense. *United Food Group, LLC v. Cargill, Inc.*, No. 11-cv-7752 SS, 2014 WL 12925566, at *3 (C.D. Cal. Dec. 18, 2014).

### C. ARM COMPLIED WITH ITS RETURN-OR-DESTROY PROMISE TO THE EXTENT PERMITTED BY ITS PRESERVATION OBLIGATIONS.

Defendants also fail to establish unclean hands on the theory that Arm "has not destroyed or returned . . . Nuvia Confidential Information" and therefore breached "the Nuvia ALA and TLA." (Defs.' Br. at 3-4.) This theory ignores relevant contractual text and the litigation history.

*First*, Defendants ignore that Arm had no obligation to either "return" or "destroy" Nuvia's Confidential Information in the absence of direction from Nuvia. By the terms of Section 15.1(b) of the Nuvia ALA, Arm was under no obligation to either return or destroy Nuvia Confidential Information in the absence of an election by Defendants as to which should occur. (FOF ¶ 28 ("ARM shall, at LICENSEE's option, either destroy or return to LICENSEE any LICENSEE Confidential Information." (quoting JTX-0001 at 14 (§ 15.1))).) Although it is not in evidence, the terms of the Nuvia TLA are similar. This makes any inaction by Arm under Section 15.1(b) of both agreements the result of Defendants' choice—a result that cannot support an unclean hands defense.

Arm's witness testimony at trial affirmed that Defendants never requested the return or destruction of Nuvia Confidential Information following termination. (FOF ¶ 30 ("Q. Are you aware of any requests by Nuvia or Qualcomm to remove any CMN features following termination?

A. I'm not aware of any requests to remove features after termination." (quoting Bench Tr. 58:6-9 (Defilippi))).) Thus, Defendants fail to establish contractual breach. And, even if Defendants could show a breach of this obligation, Defendants certainly do not establish bad faith—Defendants cannot show that Arm's breach was so inequitable as to constitute bad faith, when Defendants did not ask for Arm to return or destroy the Confidential Information in any event.

*Second*, Defendants also ignore that Arm could not destroy the relevant Confidential Information given Arm's preservation obligations in this litigation. Defendants did not raise these claims through amendment until Arm and Qualcomm were already more than 16 months into this litigation. Litigation preservation obligations had long since arisen before notice was given.

Notably, in their post-termination certification to Arm, Defendants stated that they could not destroy Arm Confidential Information due to ESI preservation obligations. (FOF ¶ 31 ("Further, Nuvia has independent preservation obligations that require it to hold all relevant documents and electronically stored information ('ESI') thus making permanent destruction of all ARM Confidential Information not feasible at this time." (quoting JTX-0009 at 2)).) Arm proceeded in the same manner with respect to the Nuvia Confidential Information in its possession, discontinuing any use rather than destroying. (FOF ¶ 32 ("Q. So the access by Arm personnel, such that it existed, during the normal course of business remained the same post-termination. Is that correct? A. The access remained the same with the two provisos that the document preservation order had been issued, so even things that would be normally destroyed in the normal course of business would be preserved, and as people had no reason to access the Nuvia confidential information, and they were very busy with many other things, that they would not have had any reason to access it." (quoting Bench Tr. 11:6-15 (Larri))).)

Defendants' own position thus confirms that there was "nothing inequitable or prejudicial" about Arm's similar treatment of Nuvia's Confidential Information following termination. *Bank of Am., N.A.*, 217 Cal. App. 4th at 1400 (finding no unclean hands). Arm's retention of Nuvia Confidential Information in light of its preservation obligations was entirely proper, and Defendants confirmed this by their own actions. Arm's preservation of Nuvia Confidential Information while discontinuing use is not inequitable when it mirrors Defendants' written position, asserted nearly two years before Defendants accused Arm of any wrong-doing. *See, e.g.*, *Ample Bright Dev., Ltd.*, 913 F. Supp. 2d at 940 (misconduct must "affect the equitable relations between the litigants" for a finding of unclean hands) (citation and quotation omitted).

*Third*, and finally, Arm did not actually use the Nuvia Confidential Information following termination of the Nuvia ALA and TLA. At trial, Arm witnesses testified regarding Arm's good-faith efforts to comply with Section 15.1 and discontinue use of Nuvia Confidential Information post-termination. (FOF ¶ 34.) Defendants offer no testimony or documentary evidence showing otherwise. Accordingly, a finding of unclean hands must be "avoided" given Arm's evidence of its "behavior in good faith." *Johanns*, 2008 WL 269069, at *3.

### D. DEFENDANTS PRESENT NO EVIDENCE THAT ARM DID NOT PROVIDE THE CONTRACTUALLY REQUIRED CERTIFICATION.

Defendants also cannot establish unclean hands on the theory that Arm did not "confirm its compliance with the obligations of Section 15.1(b)" in both the ALA and the TLA "within one month of termination." (Defs.' Br. at 4.) This argument is contradicted by undisputed witness testimony and is insufficient to support unclean hands regardless.

At trial, Arm's Chief Commercial Officer, Will Abbey, testified that Arm certified its compliance with Section 15.1 following termination of the Nuvia ALA and TLA. (FOF ¶ 35.) This testimony is consistent with Arm's position in its responsive pleadings in November 2022. (D.I.

23 ¶ 233 ("Arm denies that it never certified its own compliance with the termination provisions; instead, Arm certified its own compliance with the Nuvia ALA and TLA's termination provisions on April 1, 2022, with the certification sent to Nuvia in the manner specified by the Nuvia agreements.").) In contrast, Defendants offer no evidence that Arm failed to certify compliance with Section 15.1.

Notwithstanding Arm's testimony and Defendants' lack thereof, Defendants also have not shown that any alleged failure to provide a documentary certification "prejudicially affected its rights." *Jade Fashion & Co.*, 229 Cal. App. 4th at 654. Nor could they, given their failure to complain about the purported absence of a written certification at the time. Unlike the harm from Nuvia's false and misleading certification, Defendants do not identify any way in which they were harmed by the purported absence of a written certification by Arm, despite obviously being on notice of the absence by the date certification was required. Because Defendants have not presented testimony or evidence showing that they were "prejudiced as a result" of the "alleged misconduct," 2020 WL 999752, at *5, a purported failure to provide a writing certifying compliance with Section 15.1 cannot give rise to the level of prejudicial or inequitable conduct required to establish unclean hands.

## CONCLUSION

For the foregoing reasons, the Court should reject Defendants' unclean hands defense. Because "[D]efendants are withdrawing their defenses of waiver, estoppel, and laches" (Defs.' Br. 1), the Court should dismiss those defenses with prejudice.

Dated: February 12, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
gregg.locascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Joyce Liou
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
jliou@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Kyle W.K. Mooney
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
(212) 336-4092
kmooney@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP


  */s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 12, 2025, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
jbraly@paulweiss.com
abutwin@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Anna P. Lipin
William T. Marks
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
alipin@paulweiss.com
wmarks@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

2