# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Qualcomm Incorporated,<br>a Delaware corporation,<br>Qualcomm Technologies, Inc.,<br>a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Arm Holdings PLC., f/k/a Arm Ltd.,<br>a U.K. corporation,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 24-490-MN |

**EXPERT REPORT OF THOMAS W. BRITVEN**

**September 5, 2025**

By: ______________________
Thomas W. Britven

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

**TABLE OF CONTENTS**

**1 EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND QUALIFICATIONS ....... 4**

**2 SCOPE OF WORK ....... 5**

**3 SUMMARY OF THE KENNEDY REPORT'S DAMAGES OPINIONS ....... 8**

**4 SUMMARY OF OPINIONS ....... 10**

**5 CASE BACKGROUND ....... 13**

5.1 INTRODUCTION TO DEFENDANT ARM HOLDINGS PLC ....... 13
5.2 INTRODUCTION TO PLAINTIFFS QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC. ....... 13
5.3 INTRODUCTION TO THE SUBJECT TECHNOLOGY ....... 14
5.4 INTRODUCTION TO ARM'S ISA LICENSING MODELS ....... 17
5.5 INTRODUCTION TO THE ARM-QUALCOMM TLA AND ALA AGREEMENTS AT ISSUE ....... 19
5.6 INTRODUCTION TO THE DISPUTE ....... 20
*5.6.1 Overview of the Arm v. Qualcomm Dispute ....... 21*
*5.6.2 Overview of Qualcomm's Allegations and Causes of Action in the Current Case ....... 22*
5.7 TIMELINE ....... 24
5.8 INTRODUCTION TO THE PRODUCTS AT ISSUE ....... 26

**6 ANALYSIS OF ARM'S OCTOBER 2024 HHY LICENSING OFFER TO QUALCOMM UNDER SECTIONS [REDACTED] OF THE 2013 TLA ....... 28**

6.1 OVERVIEW OF [REDACTED] ....... 30
6.2 OVERVIEW OF [REDACTED] ....... 32
6.3 OVERVIEW OF [REDACTED] ....... 34
6.4 EVALUATION OF THIRD PARTY TLA LICENSES AVAILABLE AS OF THE DATE OF THIS REPORT ....... 38
*6.4.1* [REDACTED]
*6.4.2* [REDACTED]
*6.4.3* [REDACTED]
*6.4.4* [REDACTED]
*6.4.5* [REDACTED]
*6.4.6* [REDACTED]
*6.4.7* [REDACTED]
*6.4.8* [REDACTED]
*6.4.9* [REDACTED]
6.5 OBSERVATIONS REGARDING [REDACTED] ....... 61

**7 RESPONSE TO THE KENNEDY REPORT ....... 70**

7.1 THE KENNEDY REPORT'S COMPARISON OF [REDACTED] TO CERTAIN BENCHMARKS ....... 72
*7.1.1 The Kennedy Report Analysis of [REDACTED] Focuses on Measures that Are Not Relevant Under the TLA ....... 73*
*7.1.2 The Kennedy Report Analysis of Third-Party TLA Agreements Is Incomplete ....... 77*
7.2 THE KENNEDY REPORT'S ANALYSIS OF ALLEGED OVERPAYMENT FOR PERIPHERAL IP LICENSES ....... 80
*7.2.1 Qualcomm's Acceptance of the Peripheral IP License Is an Indication of Commercial Reasonableness ....... 81*
*7.2.2 The Kennedy Report's But-For Price is Not Supported by the Available Evidence ....... 86*

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

*7.2.2.1 Conclusion* ..... *87*

7.3 THE KENNEDY REPORT'S ANALYSIS OF DAMAGES DUE TO ALLEGED INTERFERENCE WITH QUALCOMM'S PROSPECTIVE ECONOMIC ADVANTAGE ..... 88

*7.3.1 Overview of the Kennedy Report's Calculations* ..... *88*

*7.3.2 Evidence Discussed in the Kennedy Report Fails to Show that the Breach Letter and Other Arm Communications Harmed Qualcomm's Business with Customers* ..... *91*

*7.3.2.1* [redacted]

*7.3.3* [redacted]

*7.3.3.2* [redacted]

7.4 THE KENNEDY REPORT'S QUANTIFICATION OF ALA AND TLA ROYALTIES PAID ..... 99

*7.4.1 Quantification of Alleged Harm* ..... *100*

*7.4.2 Alleged "Extra" Work Due To Arm's Alleged Failure to Provide OOBs* ..... *101*

*7.4.3 Alleged "Extra" Work Due To Arm's Alleged Failure to Provide ACK Patches* ..... *102*

*7.4.4 Alleged "Extra" Work Due To Arm's Alleged Failure to Provide ETE Checker Support* ..... *107*

*7.4.5 Alleged "Extra" Risk Due To Arm's Alleged Failure to Provide OOBs, ACK Patches, and ETE Checker Support* ..... *108*

*7.4.6 Quantification of Support and Maintenance Fees* ..... *108*

*7.4.7 Comparison to Kennedy Report's Quantification of Royalties Paid* ..... *111*

**8 RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE ..... 112**

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

# 1 EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND QUALIFICATIONS

1. I, Thomas W. Britven, have been asked to serve in an expert witness capacity by counsel for Arm Holdings PLC, formerly known as Arm Ltd. (collectively, "Arm," or "Defendant"). I hereby submit the following expert witness disclosure.

2. As presently advised, I expect to testify as an expert witness on issues related to the quantification of damages and remedies, if any, due to Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm" or "Plaintiffs"), based on certain assumptions. For the purposes of this report, I have been asked to analyze certain issues discussed in the August 8, 2025 Expert Report of Patrick F. Kennedy, Ph.D. as they relate to Qualcomm's claims under various causes of action, including breach of contract and intentional interference with prospective economic advantage.[1] No opinions regarding liability are expressed herein. Although my analysis and opinions are based upon the current record to date, I respectfully reserve the right to revise, expand, or supplement my analysis and opinions based on any additional information that may be provided to me.

3. I am a Partner at HKA Global LLC ("HKA") and the former President of ASQ Consulting ("ASQ"), an HKA company. ASQ is a professional services firm that provides a multitude of services, including litigation consulting, business strategy, infrastructure development, investment banking, and private equity. ASQ was acquired in 2023 by HKA, a leading global consultancy in risk mitigation, dispute resolution, expert witness, and litigation support services. Prior to ASQ, I held various positions at Duff & Phelps ("D&P"), and I served as a member of its Disputes and Legal Management Practice Vision Committee. D&P, now rebranded as Kroll, is a leading investment banking and financial advisory firm offering an array of services in the areas of valuation, investment banking and transaction advice, and dispute consulting. My experience as a business advisor and consultant has included the study of damages issues in connection with hundreds of disputed matters,

[1] The causes of action alleged by Qualcomm include (1) Breach of [REDACTED] of the QC ALA; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) Intentional Interference with Prospective Economic Advantage; (4) Negligent Interference with Prospective Economic Advantage; (5) Violations of California Unfair Competition Law; (6) Breach of Section [REDACTED] of the QC TLA; and (7) Breach of Section [REDACTED] of the QC TLA. *See,* Second Amended Complaint, June 3, 2025, at 52-64.

including matters involving trade secret, copyright, patent, trademark, unfair competition, tortious interference, breach of contract, and fraud, among others. These matters span a variety of industries, including the automotive, aviation, biotechnology, computer, consumer goods, construction, energy, financial services, healthcare, information technology, manufacturing, medical device, pharmaceutical, retail, semiconductor, software, telecommunications, and transportation industries, among others. My resume is attached to this report as **ATTACHMENT 1.0**.

## 2 SCOPE OF WORK

4. My assignment in connection with this litigation is to assess certain technology licensing-related work done by ARM and to review and comment on the August 8, 2025 Expert Report of Patrick F. Kennedy, Ph.D. (the "Kennedy Report").

5. In performing my study, I and/or others working under my direction have reviewed deposition transcripts and exhibits of the following witnesses:

**Table 1**
**Depositions Received**

| Deponent | Title | Date |
|---|---|---|
| William Abbey | Executive Vice President and Chief Commercial Officer, Arm | June 26, 2025 |
| Vivek Agrawal | Senior Principal Engineer, Arm | July 11, 2025 |
| Cristiano Amon | President and CEO, Qualcomm, Inc. | July 3, 2025 |
| Ziad Asghar | SVP of Product Management, Qualcomm | July 7, 2025 |
| Mohamed Awad | SVP General Manager for the Infrastructure Business, Arm | July 29, 2025 |
| Ami Badani | Chief Marketing Officer, Arm | August 1, 2025 |
| Akshay Bhatnagar | Senior Manager, North America Licensing, Arm | July 10, 2025 |
| Aparajita Bhattacharya | Senior Director Engineering, Arm | July 7, 2025 |
| Ann Chaplin | General Counsel and Corporate Secretary, Qualcomm | July 11, 2025 |
| Larissa Cochron | Senior Director of Contracts, Qualcomm | July 11, 2025 |
| Spencer Collins | Executive Vice President and Chief Legal Officer, Arm | June 30, 2025 |
| Lynn Couillard | VP of Strategic Alliances / VP of Sales, Arm | July 3, 2025 |
| Mark Dragicevich | Senior Director of Finance, Qualcomm | June 27, 2025 |
| Jeffrey Fonseca | Director and Partner Manager, Arm | July 9, 2025 |

| Deponent | Title | Date |
|---|---|---|
| Anupa George | Staff Engineer, Arm | July 30, 2025 |
| Jeffrey Golden | Hardware Engineer, Qualcomm | July 3, 2025 |
| Peter Greenhalgh | SVP of Technology, Arm | July 4, 2025 |
| Richard Grisenthwaite | Chief Architect and ARM Fellow, Arm | July 2, 2025 |
| Rene Haas | CEO, Arm | July 7, 2025 |
| Sudeep Holla | Principal Engineer, Arm | June 17, 2025 |
| John Horley | Lead Engineer, Arm | July 8, 2025 |
| Andrew Howard | Vice President of Partner Success and Licensing, Arm | July 1, 2025 |
| Philip Hughes | Corporate Vice President and Chief Communications Officer, Advanced Micro Devices, Inc. | June 17, 2025 |
| James Jeon | VP of Global Commercial Operations, Qualcomm | July 11, 2025 |
| Paul Kranhold | Co-chairman of North America, FGS Global | July 17, 2025 |
| Selena LaCroix | Vice Chair, Technology Practice, Korn Ferry | August 1, 2025 |
| Durga Malladi | Senior VP and General Manager, Technology Planning and Solutions, and Data Center, Qualcomm | July 10, 2025 |
| Richard Meacham | Principal Engineer, Automotive CPU, Qualcomm | June 27, 2025 |
| Dawn Hill Montemagni | Director of Global Sales, Arm | August 15, 2025 |
| Pavankumar Mulabagal | Senior Director of Sales and Business Development, Qualcomm | July 1, 2025 |
| Jannik Nelson | VP of Revenue, Arm | July 10, 2025 |
| Christopher Patrick | SVP and General Manager, Mobile and Wearables, Qualcomm | July 2, 2025 |
| Laura Sand | Senior VP, Legal Counsel, Qualcomm | July 8, 2025 |
| Karthik Shivashankar | Senior Director, Commercial Strategy and Licensing, Arm | June 20, 2025 |
| Kenneth Siegel | Managing Partner, Morrison & Foerster LLP | July 4, 2025 |
| Christine Tran | Senior Director, Legal, Arm | July 10, 2025 |
| Jignesh Trivedi | Director of Engineering, Qualcomm | July 9, 2025 |
| Manju Varma | Senior Director, CPU Product Management, Qualcomm | June 24, 2025 |
| Jean-Francois (Jeff) Vidon | Senior Director of Engineering, Qualcomm | July 1, 2025 |
| Martin Weidmann | Director of Product Management, Arm | June 20, 2025 |
| Jonathan Weiser | Former Lead Lawyer for Qualcomm QCT, Qualcomm | July 11, 2025 |
| Karl Whealton | Senior Director, CPU, DSP, Benchmarking, and AI H/W Product Management, Qualcomm | June 18, 2025 |
| Gerard Williams | Senior Director of Engineering, CPU Design, Qualcomm | June 25, 2025 |

| Deponent | Title | Date |
|---|---|---|
| Michael Williams | Lead Architect for Debug and RAS Architectures, Arm | June 27, 2025 |
| Paul Williamson | Senior Vice President and General Manager of the IoT Line of Business, Arm | July 2, 2025 |
| Kurt Wolf | Director of Sourcing, Qualcomm | June 25, 2025 |
| Ehab Youssef | VP and Deputy General Counsel, Licensing, Legal Ops, and Trade Compliance, Arm | June 26, 2025 |

6. Also, in performing my study, I and/or others working under my direction have conducted interviews of the following individuals in connection with my work:

- Akshay Bhatnagar, Senior Manager, North America Licensing at Arm;
- technical expert Dr. Michael Brogioli;
- Jeffrey Fonseca, Director and Partner Manager at Arm;
- Karthik Shivashankar, Senior Director, Commercial Strategy and Licensing at Arm; and
- Ehab Youssef, Vice President and Deputy General Counsel, Licensing, Legal Ops, and Trade Compliance at Arm.

7. Additionally, this report includes a listing of documents that I and/or others working under my direction and supervision have received, reviewed, and/or considered in forming the basis for my opinions as **ATTACHMENT 2.0**.

8. I understand that I may be asked to testify about my opinions in this report as well as damages-related issues raised during cross-examination or by other witnesses. I expect to provide further explanations of the matters I discuss in this report as necessary to clarify my work and opinions to the jury or Court. I have cited to information in this report that supports my opinions, but those citations are not necessarily exhaustive, and I may have reviewed and considered additional documents or information that supports the same opinions and conclusions. If I am called to testify, I reserve the ability to rely on or discuss any information referenced generally (such as documents cited in other reports referenced herein) or specifically in this report and attachments, including in **ATTACHMENT 2.0**.

9. I reserve the ability to update this report and attachments as additional documentation is received, reviewed, and/or considered. I also reserve the ability to respond to and address new information that may become known to me whether near the time of trial or during trial, to the extent it relates to the content of this report and attachments.

## 3 SUMMARY OF THE KENNEDY REPORT'S DAMAGES OPINIONS

10. The Kennedy Report presents three damages measures:

- [REDACTED]:
  1) Arm's alleged breach of [REDACTED] of the parties' 2013 Architecture License Agreement;[2] and
  2) Arm's alleged breach of [REDACTED] of the parties' 2013 Technology License Agreement.[3]
- An estimate of Qualcomm's alleged overpayment of license fees paid for certain Peripheral IP, assuming the license fees offered by Arm (and agreed to and paid by Qualcomm) were offered in bad faith, resulting in an alleged breach of the implied covenant of good faith and fair dealing in the TLA;[4] and
- [REDACTED]

11. The Kennedy Report calculates damages under the above methods as follows:

[2] Kennedy Report, at 15-19. Qualcomm alleges Arm breached [REDACTED] Second Amended Complaint, June 3, 2025, at 29, 52, 54-55; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 33-34, 49; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 21-22.

[3] Kennedy Report, at 19-23. Qualcomm alleges that Arm breached [REDACTED] Second Amended Complaint, June 3, 2025, at 52-53, 62-64; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 8-9.

[4] Kennedy Report, at 45-67.

[5] Kennedy Report, at 68-79.

**Table 2**

[6]

12. In addition to the above damages quantifications, the Kennedy Report presents two licensing analyses:

- 

[6] Kennedy Report, at 18-19, 22-23, 66-67, 77, 80.

[7]

. Kennedy Report, at 20, 22.

[9]

[10] Kennedy Report, at 23-45.

[11] Kennedy Report, at 40.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY



- 

13. I address the various shortcomings of the Kennedy Report's damages opinions and licensing analyses in the section that follows and throughout the balance of this report.

## 4 SUMMARY OF OPINIONS

14. In forming my opinions, I have conducted interviews, performed research of publicly available information, and reviewed the available record, including documents produced by Qualcomm and Arm, deposition testimony, and the expert reports and corresponding attachments submitted in this matter.

15. My opinions in this matter are based on my study and analysis of the above information, and my years of training and experience assessing damages, among other things.

16. I understand that discovery remains ongoing. For example, I understand that certain third-parties have objected to the disclosure of their license agreements with Arm, such as [REDACTED] and have filed motions seeking a protective order, and that those disputes have not yet been decided by the Court. I intend to supplement or update my opinions, analyses, and calculations as they relate to [REDACTED] upon receipt of this information, if made available. I reserve the ability to supplement or update my opinions, analyses and calculations to incorporate any additional relevant information

[12] Kennedy Report, at 45.
[13] Kennedy Report, at 40.
[15] Kennedy Report, at 56-63.
[16] Kennedy Report, at 63-65.

that may be presented, such as may be revealed in additional documents, licensing agreements, or other information that may be produced at a later date.

17. Based on the above and evidence available as of the date of this report, my opinions with respect to [REDACTED] are as follows:

18. Based on the above, and evidence available as of the date of this report, my opinions with respect to the Kennedy Report are as follows:

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



[redacted]

- the Kennedy Report's quantification of the alleged overpayment for Peripheral IP licenses relies upon a but-for price that is not supported by the available evidence;
- the economic evidence indicates that the prices Qualcomm agreed to and paid for the Peripheral IP at Issue were reasonable. In the event the trier-of-fact agrees, damages associated with this cause of action are zero;
- [redacted]
- [redacted]
- [redacted]
- [redacted]

19. I expect to update these opinions upon receipt of additional information referenced herein, including the [redacted] agreement, should it become available after resolution of certain discovery disputes.

---

[17] **ATTACHMENT 7.0;** Kennedy Report, at 77.
[18] **ATTACHMENT 3.0.**
[19] **ATTACHMENT 3.0.**

# 5 CASE BACKGROUND

## 5.1 Introduction to Defendant Arm Holdings PLC

20. Defendant Arm is a world leader in central processing unit ("CPU") technology. Arm architects, develops, and licenses high-performance, low-cost, and energy-efficient IP solutions for CPU, graphics processing units ("GPUs"), neural processing units ("NPUs"), and interconnect technologies.[20]

21. Arm was founded as Advanced RISC Machines Ltd. in 1990 as a joint venture between Acorn Computers, Apple Computer (now Apple Inc.), and VLSI Technology (now NXP Semiconductors N.V.).[21] Arm is headquartered in Cambridge, UK,[22] and has additional offices across Asia Pacific, Europe, Middle East, Africa, and North America.[23] Arm employs over 7,000 people worldwide.[24]

22. Arm licenses its architecture specifications to other companies, who in turn make Arm-compliant silicon chips[25] to be used in AI, consumer technologies, computing, automotives, and IoT, among other applications.[26] According to Arm, there are more than 325 billion devices that contain Arm-based chips.[27]

## 5.2 Introduction to Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc.

23. Qualcomm Incorporated was founded in 1985 with a focus on improving telecommunications standards and helped to develop 3G, 4G, and 5G wireless connectivity.[28] Qualcomm offers semiconductor solutions for the automotive, extended

[20] "Company," Arm, date accessed: July 10, 2025 (accessed: https://www.arm.com/company).
[21] "The Official History of Arm," Arm Newsroom, date accessed: August 29, 2025 (accessed: https://newsroom.arm.com/blog/arm-official-history).
[22] "The Official History of Arm," Arm Newsroom, date accessed: August 29, 2025 (accessed: https://newsroom.arm.com/blog/arm-official-history).
[23] "ARM Global Offices," Arm, date accessed: July 10, 2025 (accessed: https://www.arm.com/company/offices).
[24] "The Official History of Arm," Arm Newsroom, date accessed: August 29, 2025 (accessed: https://newsroom.arm.com/blog/arm-official-history).
[25] "Arm Architecture for the Digital World," Arm, date accessed: August 29, 2025 (accessed: https://www.arm.com/architecture).
[26] "Markets," Arm, date accessed: September 2, 2025 (accessed: https://www.arm.com/markets).
[27] "Arm Architecture for the Digital World," Arm, date accessed: August 29, 2025 (accessed: https://www.arm.com/architecture).
[28] "Our Company, Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company).

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

reality, handheld gaming, IoT, computing, and consumer technology industries, among others.[29] Qualcomm also licenses its IP portfolio related to the manufacture and sale of certain wireless products.[30]

24. Qualcomm is headquartered in San Diego, California[31] and has additional offices in South America, Asia, Europe, and North America.[32]

25. Qualcomm Technologies, Inc. ("QTI") is a subsidiary of Qualcomm Incorporated and operates substantially all of Qualcomm's products and services businesses and Qualcomm's engineering, research, and development functions.[33]

### 5.3 Introduction to the Subject Technology

*Instruction Set Architecture*

26. Instruction Set Architecture ("ISA") is "part of the abstract model of a computer that defines how the [central processing unit] is controlled by the software." It acts as an interface between the hardware and software, "specifying both what the processor is capable of doing as well as how it gets done."[34] "The ISA defines the supported data types, the registers, how the hardware manages main memory, key features (such as virtual memory), which instructions a microprocessor can execute, and the input/output model of multiple ISA implementations."[35] Understanding the ISA allows developers to write more

---

[29] "System Processors," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/products/system-processors).
[30] Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, at 7, date accessed: July 14, 2025 (accessed: https://s204.q4cdn.com/645488518/files/doc_financials/2024/q4/QCOM-09-29-24-FY2024-10-K.pdf).
[31] "Headquarters," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company/facilities/offices?country=USA&hQ=true).
[32] "About Qualcomm – Company Information & History," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company#locations).
[33] Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, at 13, date accessed: July 14, 2025 (accessed: https://s204.q4cdn.com/645488518/files/doc_financials/2024/q4/QCOM-09-29-24-FY2024-10-K.pdf).
[34] "What is Instruction Set Architecture (ISA)," Arm, date accessed: July 11, 2025 (accessed: https://www.arm.com/glossary/isa).
[35] "What is Instruction Set Architecture (ISA)," Arm, date accessed: July 11, 2025 (accessed: https://www.arm.com/glossary/isa).

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

efficient code and understand the output of the compiler.  ISAs are typically updated over time to "support emerging technologies, optimize efficiency, or add new functionality."[36]

27.    I understand that there are two primary computing architecture philosophies: complex instruction set computer ("CISC") ISA and reduced instruction set computer ("RISC") ISA.[37]  Differences between the two include the speed of instruction execution, power consumption, and number of transistors required (which in turn affects the size of central processing units).[38]  I understand that CPUs and the associated computing system software and hardware components in ISAs are based on the same ISA.[39]

28.    There are several licensors of both CISC and RISC ISAs, and ISAs are licensed under different brand names.  For example, I understand that x86, an architecture developed by Intel, is seen as the industry standard for CISC[40] and is the prevalent architecture used in desktop and laptop computers as well as datacenters and high-performance computing environments.[41]  Intel and AMD are the two primary manufacturers of x86-architecture processors.[42]

29.    Licensors of RISC architectures include ARM and RISC-V.[43]  Arm's RISC ISA is widely used in smartphone and tablet CPUs , and chips using ARM's ISA have recently expanded

---

[36] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 23.

[37] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 23.

[38] CISC ISA can handle fewer and more powerful demands, reducing programming complexity, and allowing software developers to write programs more efficiently.  However, CISC architecture requires more transistors, which makes processors larger and potentially slower to execute instructions.  RISC ISA, on the other hand, uses minimal, straightforward instructions that execute quickly, enhancing performance, streamlining CPU design, and reducing hardware complexity.  "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 23-25.

[39] "The Basics of Instruction Set Architecture," Lenovo, date accessed: August 26, 2025 (accessed: https://www.lenovo.com/us/en/glossary/instruction-set-architecture/?orgRef=https%253A%252F%252Fwww.bing.com%252F).

[40] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 24.

[41] "Intel and AMD are unlikely allies in new x86 ecosystem advisory group – 'we'll remain fierce competitors,'" Tom's Hardware, date accessed: August 1, 2025 (accessed: https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward#xenforo-comments-3857628); "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 24-26.

[42] "Intel and AMD are unlikely allies in new x86 ecosystem advisory group – 'we'll remain fierce competitors,'" Tom's Hardware, date accessed: August 1, 2025 (accessed: https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward#xenforo-comments-3857628).

[43] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 25.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

into desktops, automobiles, servers, and embedded systems.[44]  RISC-V is a relatively newer RISC-based ISA that is distributed using an open-source model.[45]  RISC-V is gaining popularity amongst companies including Nvidia, Google, Red Hat, SiFive, and others.[46]

*CPU Cores*

30.    A CPU core is the processing unit that executes program instructions, performs calculations, manages data flow, and coordinates with other components.  Each core processes information independently.[47]  A CPU can have multiple cores, which enables the system to handle multiple tasks simultaneously.[48]

31.    I understand that CPUs are used in smartphones, consumer electronics (including TVs, tablets, laptops, and desktops, among others), industrial IoT (including washing machines, thermostats, cameras, and drones, among others), networking equipment, cloud computing, and other infrastructure.[49]

32.    A System-on-a-Chip ("SoC") "is a complete processing system contained in a single package that contains multiple processing parts," "typically including a [CPU], memory, input and output ports, peripheral interfaces, and secondary storage devices."[50]  In traditional PC designs, individual components are built onto a motherboard separately with

---

[44] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 25.
[45] "Semiconductors: Technology and Market Primer 13.0, Oppenheimer Equity Research Industry Update, at 26.
[46] "RISC-V's Ascent Could Reshape The Global Compute Landscape," Forbes, July 24, 2025, date accessed: July 31, 2025 (accessed: https://www.forbes.com/sites/davealtavilla/2025/07/24/risc-vs-ascent-could-reshape-the-global-compute-landscape/).
[47] "CPU Cores Explained: How Many Do You Need?," HP, date accessed: July 30, 2025 (accessed: https://www.hp.com/us-en/shop/tech-takes/cpu-cores-how-many-do-i-need?cjdata=MXxOfDB8WXww&utm_medium=af&utm_source=cj&utm_campaign=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29&utm_content=5250933_Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29_100357191&cjevent=2f013fec6d7311f081bd01750a18b8fc&subacctname=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29).
[48] "CPU Cores Explained: How Many Do You Need?," HP, date accessed: July 30, 2025 (accessed: https://www.hp.com/us-en/shop/tech-takes/cpu-cores-how-many-do-i-need?cjdata=MXxOfDB8WXww&utm_medium=af&utm_source=cj&utm_campaign=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29&utm_content=5250933_Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29_100357191&cjevent=2f013fec6d7311f081bd01750a18b8fc&subacctname=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29).
[49] ARM_01259705-6105, at 717-719.
[50] "What Is SoC Development?," Arm, date accessed: July 30, 2025 (accessed: https://www.arm.com/glossary/soc-development).

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

lines of communication between them.  SoCs have all major components built into the same silicon chip, which reduces latency and boosts performance of the system.[51]

33.    I understand that CPU design is complex and that while some CPU sellers may develop their own custom designs, others license CPU designs from third parties.[52]  Arm is one such licensor of CPU designs, licensing designs that are compatible with its own ISA.[53] Qualcomm sells both custom SoCs (which are compliant with the ARM ISA, licensed from ARM) as well as SoCs that make use of third-party designs (including ARM ISA-compliant designs licensed from ARM).[54]  Qualcomm has identified Apple, Intel, and AMD as its biggest competitors in building custom CPUs.[55]  Indeed, in its 2024 Annual Report, Qualcomm lists its current competitors as Broadcom, HiSilicon, MediaTek, Mobileye, Nvidia, NXP Semiconductors, Qorvo, Samsung, Skyworks, Texas Instruments, and UNISOC.[56]

### 5.4 Introduction to Arm's ISA Licensing Models

34.    I understand that Arm grants several types of licenses that include its ISA technology, including, for example, Architecture License Agreements ("ALAs"), Technology License Agreements ("TLAs") and Arm Total Access Agreements ("Total Access Agreements" or "ATAs").[57]

35.    ALAs grant rights to Arm Technology that allow licensees to design their own custom CPU cores that are compatible with the Arm ISA; in addition to Qualcomm, such licensees

---

[51] "What is a System-on-Chip (SoC)?," Windows Central, date accessed: July 30, 2025 (accessed: https://www.windowscentral.com/hardware/laptops/what-is-a-system-on-chip-soc).
[52] See, "The Rise of Licensed IP In Edge AI and Smart Device Manufacturing," Forbes, date accessed: August 28, 2025 (accessed: https://www.forbes.com/councils/forbestechcouncil/2025/08/28/why-the-next-wave-of-ai-innovation-wont-be-built-from-scratch/); "The Shift to Custom Silicon: Why Companies Are Designing Their Own Chips," Nasdaq, date accessed: August 28, 2025 (accessed: https://www.nasdaq.com/articles/shift-custom-silicon-why-companies-are-designing-their-own-chips).
[53]  "Microprocessor Cores and Processor Technology - Arm®," Arm, date accessed: August 27, 2025 (accessed: https://www.arm.com/products/silicon-ip-cpu).
[54] Second Amended Complaint, June 3, 2025, at 3-4.
[55] QCVARM_0846761-870, at 764; "Intel vs AMD vs Qualcomm: Who's Leading the CPU War in 2025," Business Economy, date accessed: July 31, 2025 (accessed: https://www.businesseconomy.com/technology/intel-vs-amd-vs-qualcomm-whos-leading-the-cpu-war-in-2025/).
[56] Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, at 12.
[57] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

include [REDACTED][58] Under an ALA, Arm does not provide designs for processors or processor components but rather grants rights to use Arm architecture.[59] For major developments of the Arm architecture, Arm will release a new version (e.g. v7, v8, v9). These new versions of the Arm architecture are periodically released by Arm, and during the gaps between releases, Arm continues to invest in engineering.[60] For minor developments, Arm releases an extension to the latest version of architecture, denoted by ".x" after the version number (e.g. v8.1, v8.2, v8.3).[61] According to Arm, it does not grant many ALAs, because the design of custom processor cores by Arm customers is time-intensive, risky, and requires a significant amount of support from Arm.[62] Compensation for an ALA agreement typically takes the form of both a fixed fee and a running royalty for the licensed products.[63]

36. The Arm Technology granted under TLAs can include, among other things, designs for processors or processor components themselves that are compatible with the Arm ISA.[64] I understand that under a TLA, the licensee can identify specific Arm products (referred to as "Arm IPs" or "IPs") it intends to use and taking a license to only those products.[65] Compensation for a TLA agreement typically takes the form of both a fixed fee and a running royalty for the licensed products.[66] [REDACTED]

37. Arm's ALA and TLA agreements provide the general terms of the licenses, and are accompanied by an Annex that, among other things, lists the specific licensed Arm

[58] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 5; Deposition of Rene Haas, July 7, 2025, at 225:3-7.
[59] *See generally*, "Learn the architecture – Understanding the Armv8.x and Armv9.x extensions," Arm, date accessed: August 1, 2025 (accessed: https://documentation-service.arm.com/static/663e39db9007496a66f74481).
[60] Deposition of Rene Haas, July 7, 2025, at 150:12-23.
[61] "Learn the architecture – Understanding the Armv8.x and Armv9.x extensions," Arm, p.7, date accessed: August 1, 2025 (accessed: https://documentation-service.arm.com/static/663e39db9007496a66f74481).
[62] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 4-5. Mr. Youssef testified that since Qualcomm's 2019 ALA agreement, Arm has granted only two additional ALAs: one with Apple and one with IBM. Deposition of Ehab Youssef, June 26, 2025, at 30:11-32:5.
[63] Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 18-19.
[64] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 4-5.
[65] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[66] ARM_00006123-155, at 153-154; QCVARM_0710047-120, at 120.
[67] ARM_QC_02784120-198, at 130; Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, at 68.

products and associated fixed fees, and by a Master Royalty Schedule, which sets out, among other things, the associated running royalties.[68]

38.

**5.5 Introduction to the Arm-Qualcomm TLA and ALA Agreements at Issue**

39. Arm and Qualcomm first entered into a TLA on September 30, 1997 (the "Original TLA"),[75] and entered into a new TLA[76] and associated Annexes[77] on May 30, 2013 (the "2013 TLA"). The parties agreed to additional TLA Annexes adding certain licensed

---

[68] See, e.g. ARM_00103918-972, at 918-919 [TLA]; ARM_00055357-399, at 357 [ALA]; ARM_00063298-312, at 308-309 [ANNEX to ALA]. ARM_01298891-929, at 894 [Master Royalty Schedule to ALA]; *See also,* Deposition of Ehab Youssef, June 26, 2025, at 34:3-12.

[69] ARMQC_02784120-198, at 126-127.

[70] "Arm Total Access," Arm, date accessed: August 28, 2025 (accessed: https://www.arm.com/products/licensing/arm-total-access); ARMQC_02784120-198, at 167; Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[71] ARMQC_02784120-198, at 166-178; Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[72] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[73] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[74] ARMQC_02784120-198, at 127 and 167.

[75] ARM_00103918-972, at 918.

[76] ARM_00103918-972.

[77] ARM_00103918-972, at 918.

products, in 2019,[78] 2020,[79] and 2024.[80] Qualcomm first received a license to three of the products at issue – ████████ – as part of the 2019 series of TLA-related agreements.[81] I refer to the agreement that added rights to ████████ as the "2019 Annex 1." I discuss the products at issue further in **Section 5.8.**

40.

41.

42. I list certain agreements between Arm and Qualcomm in **ATTACHMENT** 10.0 and summarize the terms of of the 2013 ALA, 2013 TLA and certain additional agreements in **ATTACHMENT 2.0.**.

### 5.6 Introduction to the Dispute

43. I understand that certain issues in the current case relate to an ongoing dispute between the parties regarding Arm's various ALA, TLA and related agreements with Qualcomm.[90] I understand the dispute began around the time of Qualcomm's 2021 acquisition of Nuvia,

[78] ARM_00006123-155; ARMQC_02772366-385; QCARM_0029357-358.
[79] QCARM_3480078-094.
[80] QCVARM_0525196-202.
[81] Deposition of Ehab Youssef, June 26, 2025, at 34:24-35:21.
[82] ARM_00055357-399, at 357.
[83] ARM_00055357-399.
[84] QCARM_0343120-142.
[85] QCARM_0343954-976.
[86] QCARM_0337591-627.
[87] QCARM_0338180-242.
[88] QCARM_0338352-429.
[89] ARM_00086164-245.
[90] Second Amended Complaint, June 3, 2025, at 52-53.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

Inc. ("Nuvia"), a start-up CPU company.[91] In the sections that follow, I give a brief overview of some of the issues in that initial dispute that the parties reference in the current case, and then provide an overview of the allegations and causes of action in the current case.

### 5.6.1 *Overview of the* **Arm v. Qualcomm** *Dispute*

44. Arm filed suit against Qualcomm on August 31, 2022 (Case No. 1:22-cv-01146-MN), alleging breach of contract and trademark infringement, among other causes of action (the "*Arm v. Qualcomm* Dispute").[92] I understand that Arm withdrew its trademark infringement claims prior to trial.

45. I understand that a central issue in the *Arm v. Qualcomm* Dispute was Qualcomm's intent to integrate Nuvia designs into its own products and its position that the terms of Qualcomm's ALA and TLA with Arm, which gave Qualcomm the right to design custom process cores based on Arm architecture and to modify certain off-the-shelf designs, were applicable to Qualcomm products with Nuvia designs.[93]

46. I understand that Arm disagreed with Qualcomm's position and informed Qualcomm that Qualcomm could not use Nuvia's designs that were developed under the Nuvia ALA without Arm's consent.[94] In February 2022, Arm sent a letter to Qualcomm and Nuvia terminating the Nuvia licenses as of March 1, 2022.[95] I understand that Qualcomm asserted that Qualcomm was developing its cores and products under its own agreements with Arm[96] and that this dispute led to the filing of the *Arm v. Qualcomm* Dispute complaint on August 31, 2022.[97]

---

[91] "Qualcomm Acquires NUVIA To Accelerate Its Future CPUs With Support From 18 Partners," Forbes, date accessed: July 28, 2025 (accessed: https://www.forbes.com/sites/patrickmoorhead/2021/01/13/qualcomm-acquires-nuvia-to-accelerate-its-future-cpus-with-support-from-18-partners/); Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 7.
[92] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 16-29.
[93] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 5-6, 8, 10.
[94] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 10.
[95] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022, at 12.
[96] Second Amended Complaint, June 3, 2025, at 5-6.
[97] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

47. On October 22, 2024, Arm sent a letter (the "Breach Letter") notifying Qualcomm that, among other things, it was in material breach of the ALA with respect to its use of designs, technology and code created by Nuvia, and that Arm was entitled to terminate the ALA if the breach was not cured within 60 days.[98]

48. A trial was held, and on December 20, 2024, the jury concluded that Qualcomm had not breached Section 15.1(a) of the Nuvia ALA and that Qualcomm's CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA.[99] However, the jury did not reach a decision on Question 1 regarding Nuvia's breach of the Nuvia ALA.

#### 5.6.2 Overview of Qualcomm's Allegations and Causes of Action in the Current Case

49. Qualcomm has countersued Arm for breach of contract and other causes of action.[100] Qualcomm filed its initial complaint on April 18, 2024, and its First Amended Complaint on December 16, 2024.[101] Qualcomm filed its Second Amended Complaint on June 3, 2025.[102]

50. With respect to the 2013 TLA, I understand Qualcomm contends that Arm:

- breached [REDACTED][103] and
- breached [REDACTED][104]

51. I understand that Qualcomm contends that part of its TLA claims also include an allegation that Arm breached the covenant of good faith and fair dealing implied in the 2013 TLA as

---

[98] Second Amended Complaint (Case No: 24-490-MN), Exhibit A.
[99] Verdict Form (Case No. 1:22-cv-01146-MN), December 20, 2024, at 2.
[100] Second Amended Complaint, June 3, 2025, at 29, 52-64.
[101] Complaint, April 18, 2024, at 23. First Amended Complaint, December 16, 2024, at 48.
[102] Second Amended Complaint, June 3, 2025, at 66.
[103] Second Amended Complaint, June 3, 2025, at 52-53, 62-63; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 8-9.
[104] Second Amended Complaint, June 3, 2025, at 52-53, 63-64; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 8-9.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

part as part of its alleged failure to provide commercially reasonable offers to access IP licensed under TLAs, including certain products Arm refers to as "Peripheral IP."[105] I understand from counsel for Arm there is a dispute as to whether these allegations are part of the case. In the event the Court determines Qualcomm's allegations are indeed part of the case, I provide my opinions below responding to the Kennedy Report's assessment of damages for Arm's alleged breach as it relates to "Peripheral IP."

52. With respect to the 2013 ALA, I understand Qualcomm contends that Arm:

- breached [REDACTED] [106]
- breached the covenant of good faith and fair dealing implied in the 2013 ALA by:[107]
  - withholding deliverables,
  - asserting that Qualcomm was in material breach of the 2013 ALA,
  - making public statements, including making the Breach Letter public and making statements to Qualcomm customers, that "create[d] uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs," and
  - failing to negotiate [REDACTED] cover [REDACTED] of Arm's ISA.

53. I understand that Qualcomm further alleges that Arm intentionally and negligently interfered with Qualcomm's prospective economic advantage as it relates to Qualcomm's efforts to sell its customers certain SoCs by:[108]

  - purporting to terminate the 2013 ALA, as described above,
  - by intentionally making the Breach Letter public, as described above, and

[105] Second Amended Complaint, June 3, 2025, at 34, 55-56; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 8-9, 18.
[106] Second Amended Complaint, June 3, 2025, at 29, 52, 54-55; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 33-34, 49; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 21-22.
[107] Second Amended Complaint, June 3, 2025, at 55-56; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 35, 50; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 19-20, 22.
[108] Second Amended Complaint, June 3, 2025, at 56-59.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**

- by making misleading statements to Qualcomm customers, as described above.

Although Qualcomm has identified several customers associated with this allegation, I understand that Qualcomm has only quantified damages with respect to Qualcomm's [REDACTED].[109]

54. I describe the specific Arm Implementation Cores and Peripheral IP at issue, the allegedly withheld deliverables, and the allegedly disrupted Qualcomm SoCs at issue in this dispute further in **Section 5.8** below.

55. In addition to the above claims with respect to the 2013 TLA and 2013 ALA, I understand Qualcomm further alleges that Arm has engaged in violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §17200 by engaging in the activities described above as "part of a broader campaign to harm or threaten to harm competition for CPU and other computer chip designs, in California and elsewhere" and as part of an "attempt to prevent Qualcomm from developing and marketing products with CPUs that threaten to outcompete products containing Arm's off-the-shelf CPU designs."[110]

### 5.7 Timeline

56. I understand Qualcomm references the following events as part of its allegations in this case:

- **May 20, 2020**: [REDACTED].[111]
- **August 31, 2022**: Arm filed the *Arm v. Qualcomm* suit.[112]
- **August 2022 and May 2023:** Qualcomm asserts that Arm "reached out to Qualcomm customers directly about the status of Qualcomm's [2013 ALA] license."[113]

---

[109] Kennedy Report, at 68-80.
[110] Second Amended Complaint, June 3, 2025, at 59-62.
[111] Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 35; ARM_00085567-571.
[112] Complaint (Case No. 1:22-cv-01146-MN), August 31, 2022.
[113] Plaintiffs' Supplemental Responses and Objections to Defendants' Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 35.

- **Fall of 2022:** Qualcomm asserts that Arm began withholding certain deliverables under its 2013 ALA.[114]
- **November 3, 2022 and December 5, 2022**: Qualcomm notified Arm of its non-compliance with the 2013 ALA.[115]
- **September 2023 – April 2024**: Qualcomm asserts it sent [REDACTED] to license certain Peripheral IP in September 2023,[116] October 13, 2023,[117] and April 2024.[118]
- [REDACTED]
- **April 18, 2024**: Qualcomm filed its initial complaint.[122]
- **September 20, 2024 and September 27, 2024:** Qualcomm asserts it notified Arm of its alleged failure to comply with certain 2013 TLA licensing terms.[123]
- **October 2, 2024**: Qualcomm sent [REDACTED]
- **October 22, 2024**: Arm notified Qualcomm that it was in material breach of the 2013 ALA and made the Breach Letter public.[125]
- [REDACTED];[126] Qualcomm asserts that this offer failed to meet Arm's licensing obligations under the 2013 TLA.[127]

---

[114] Second Amended Complaint, June 3, 2025, at 29-30, 52, 54-55; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 33-34, 49; ARM_00056571-573.
[115] Second Amended Complaint, June 3, 2025, at 29-30, 52, 54-55; Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 33-34, 49; ARM_00056571-573.
[116] QCVARM_0608131-138, at 133-134.
[117] QCVARM_0613037-039, at 037.
[118] QCVARM_0616935.
[119] QCVARM_0524362.
[120] QCVARM_0616975-976, at 975.
[121] Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 10; QCVARM_0526828-830.
[122] Complaint, April 18, 2024, at 23.
[123] QCVARM_0616912-913; QCVARM_0616916-918.
[124] QCVARM_1151620.
[125] Plaintiffs' Supplemental Responses and Objections to Defendants' First set of Interrogatories (Nos. 1-9), July 11, 2025, at 35.
[126] QCVARM_0616967-969.
[127] Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 10-11. *See also*, ARMQC_02783619-730.

- **October 31, 2024**: Qualcomm sent the first draft of the term sheet to [REDACTED].[128]
- **November 11, 2024**: [REDACTED] provided a revised term sheet to Qualcomm.[129]
- [REDACTED][130]
- **December 2024 – July 2025**: Qualcomm and [REDACTED] engaged in further negotiations.[131]
- **December 16, 2024**: Qualcomm filed its First Amended Complaint.[132]
- **December 20, 2024:** Jury verdict in *Arm v. Qualcomm* dispute.[133]
- [REDACTED].[134]
- **February 4, 2025**: [REDACTED][135]
- **June 3, 2025**: Qualcomm filed its Second Amended Complaint.[136]
- **July 21, 2025**: [REDACTED].[137]

### 5.8 Introduction to the Products at Issue

57. The Kennedy Report identifies the following ARM products at issue under the 2013 TLA breach allegations:[138]

**Table 3**

[128] QCVARM_0863641-643; QCVARM_0863644-646.
[129] QCVARM_0864967-968; QCVARM_0864969-972.
[130] QCVARM_0618354.
[131] QCVARM_1151573-577, at 577.
[132] First Amended Complaint, December 16, 2024, at 48.
[133] Verdict Form (Case No. 1:22-cv-01146-MN), December 20, 2024.
[134] QCVARM_0523650-652.
[135] QCVARM_0523650-652, at 652.
[136] Second Amended Complaint, June 3, 2025, at 66.
[137] QCVARM_1151573-577, at 577.
[138] Kennedy Report, at 13-14, 19-20, 45-46, Schedule 5.



58. I understand that Arm Implementation Cores are implementations of Arm microprocessor cores that do not contain any customizations.[139] I refer to the Arm Implementation Cores listed in **Table 3** as either the "Implementation Cores At Issue" or as the "[REDACTED]" or [REDACTED] Qualcomm first received a license to [REDACTED] as part of the 2019 series of TLA-related agreements under a [REDACTED] license from [REDACTED] [REDACTED][140]

59. I understand that Peripheral IP includes systems IP that work in conjunction with a core.[141] I refer to the Peripheral IP listed in **Table 3**, *i.e.*, [REDACTED], as the "Peripheral IP at Issue."

60. The Kennedy Report identifies the following ARM products at issue under the 2013 ALA breach allegations:[142]

- software patches (i.e., source code updates) for the Arm Architecture Compliance Kit ("ACK"), which I understand is a series of test suites that check the compliance of a system against Arm architectural specifications,[143] which are intended for certain Arm ISA-compliant SoCs; and
- the Out of Box ("OOB") which I understand is a master list of ACK tests,[144] for certain Arm ISA-compliant SoCs.

[139] Deposition of William Abbey, June 26, 2025, at 64:16-22; 140:1-4. *See also*, ARM_00103918-972, at 918.
[140] Deposition of Ehab Youssef, June 26, 2025, at 34:24-36:6.
[141] Deposition of William Abbey, June 26, 2025, at 76:3-19; Deposition of Kurt Wolf, June 25, 2025, at 44:2-5.
[142] Kennedy Report, at 5-16. *See also,* Second Amended Complaint, June 3, 2025, at 29; Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), March 10, 2025, at 8; Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), July 11, 2025, at 19-20.
[143] "System Architecture Compliance Suites (ACS)," Arm, date accessed: September 3, 2025 (accessed: https://developer.arm.com/Architectures/Architectural%20Compliance%20Suite); Interview of Dr. Michael Brogioli. According to Jignesh Trivedi, Director of Engineering at Qualcomm, the terms ACS (i.e., Architecture Compliance Suites) and ACK are used interchangeably. Deposition of Jignesh Trivedi, July 9, 2025, at 14:20-15:1.
[144] Interview of Dr. Michael Brogioli.

61. The Kennedy Report identifies the following as [redacted]

[redacted]

62. I refer to the above collectively as the "Qualcomm SoCs at Issue."

## 6 ANALYSIS OF ARM'S [redacted] TO QUALCOMM UNDER [redacted] OF THE 2013 TLA

63. [redacted]

64. [redacted]

[145] I understand that Qualcomm has alleged that Arm interfered with other customers; **Table 4** lists only the Qualcomm products specifically identified in the Kennedy Report's quantification of damages allegedly associated with the claimed interference. *See,* Kennedy Report, at 68-79, Schedules 7.3 and 7.5.

[146] [redacted] Kennedy Report, at 74.

[147] ARMQC_02772366-385.

[148] QCVARM_0524362; QCVARM_0616975-976.

[149] See, e.g. QCVARM_1030726-729, at 726, a September 2024 internal Qualcomm email in which Kurt Wolf of Qualcomm writes an update for M55[redacted]s]ame reply as w[redacted], ARM will not consider extending





65. I have been asked to analyze the reasonableness of .

66. I understand that certain information , have not yet been

the M55 license … ARM is waiting to reply sometime closer to expiration of existing license which is in ."

[150] QCVARM_0616912-913.

[151] Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 62-63.

[152] QCVARM_0617829-831.

[153] Second Amended Complaint, June 3, 2025, at 52-53.

[154] ARM_00103918-972, at 930.

produced as of the date of this report due to certain discovery disputes. For example, I understand Arm [REDACTED] [REDACTED], which I understand has not yet been produced. As such, my analysis is ongoing, and I expect to be asked to update my analyses and opinions in the event that additional documents and information are produced.

67. In the sections that follow, I provide: 1) an overview of [REDACTED] [REDACTED] [REDACTED]; 2) an overview of Arm's [REDACTED] [REDACTED] [REDACTED]; 3) an overview of the evidence available as of the date of this report regarding Arm's [REDACTED] [REDACTED], including its [REDACTED]" for the purposes of [REDACTED] [REDACTED] [REDACTED];[155] 4) my independent assessment of the evidence available as of the date of this report regarding certain available third-party [REDACTED] licenses [REDACTED];[156] and 5) observations regarding the [REDACTED] [REDACTED] [REDACTED] [REDACTED].

### 6.1 Overview of [REDACTED] [REDACTED] [REDACTED]

68. [REDACTED]

[REDACTED] [REDACTED]

[155] ARM_00103918-972, at 930.
[156] Deposition of Kurt Wolf, June 25, 2025, at Exhibit 4; QCVARM_0617829-831.
[157] QCVARM_0524362; Deposition of Kurt Wolf, June 25, 2025, at 92:1-25.
[158] Deposition of Kurt Wolf, June 25, 2025, at 93:1-4.



71.

[159] QCVARM_0604257-259.
[160] Deposition of Kurt Wolf, June 25, 2025, at 41:5-11.
[161] Deposition of Kurt Wolf, June 25, 2025, at 41:5-42:22. *See also*, Deposition of Gerard Williams, June 25, 2025, at 49:13-51:10 where he testifies that
[162] Deposition of Kurt Wolf, June 25, 2025 at 75:2-76:17, 81:8-17, 86:4-19. *See also,* QCVARM_0605055-062.
[163] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Interview of Mr. Jeffrey Fonseca. *See also,* Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60. *See also*, Deposition of William Abbey, June 26, 2025, at 66:15-67:9.

[redacted]

72. I understand Arm alleges that, despite the ambiguity of [redacted], Arm acted in good faith and [redacted] I understand that Arm personnel [redacted].[167] I understand that, because Qualcomm failed to provide guidance to Arm of its intended uses of [redacted], [redacted][168] [redacted].[169]

73. Next, I provide an overview of [redacted]. I then provide an overview of the available evidence regarding Arm's [redacted]

### 6.2 Overview of Arm's [redacted]

74. Arm's [redacted]

---

[164] I understand that the negotiation process for the 2019 licensing deal with Qualcomm [redacted] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[165] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Interview of Mr. Jeffrey Fonseca.
[166] Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59.
[167] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[168] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[169] Deposition of Kurt Wolf, June 25, 2025, at Exhibit 4; QCVARM_0617829-831; Interview of Mr. Jeffrey Fonseca.

**Figure 1**
**Arm's October 2024 HHY Licensing Offer to Qualcomm**[170]

75.

76. In addition to the above-listed fees and royalty rates, the offer's general terms listed, among other things:[173]

[170] QCVARM_0616967-969, at 968.
[171] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[172] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[173] QCVARM_0616967-969, at 969.



- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

**6.3 Overview of Arm's [redacted]**

77. In this section, I discuss my understanding of the [redacted]. Arm's interrogatory responses and deposition testimony provide evidence regarding [redacted] portion of the offer described above. I have also interviewed Mr. Akshay Bhatnagar, Mr. Jeffrey Fonseca, Mr. Karthik Shivashankar, and Mr. Ehab Youssef regarding Arm's [redacted]

78. Arm describes the [redacted] as follows:[174]

- [redacted]

[174] Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60. *See also,* Deposition of Karthik Shivashankar, June 20, 2025, at 63:12-24, 67:12-20, 82:10-83:2; 85:9-86:10. *See also*, Deposition of William Abbey, June 26, 2025, at 65:13-68:1
[175] ARMQC_02779314-363, at 314, 347; ARMQC_02774844-855, at 844; and ARMQC_02774816-817.
[176] ARMQC_02779483-500, at 483; ARMQC_02774738-747, at 738, 746.





[188] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef. *See also,* Deposition of Ehab Youssef, June 26, 2025, at 68:6-71:7; Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60.

[189] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef. *See also,* ARMQC_02779314-363, at 347; ARMQC_02774816-817; ARMQC_02783967-084, at 971-976; QCVARM_0616967-969.

[190] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef. "2024 Business Report for the year ended December 31, 2024," Samsung Electronics Co., Ltd., date accessed: September 1, 2025 (accessed: https://images.samsung.com/is/content/samsung/assets/global/ir/docs/2024_4Q_Interim_Report.pdf), at 4-5; "System Processors," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/products/system-processors); Qualcomm describes its QCT Segment as "a leading developer and supplier of integrated circuits products and system software with advanced connectivity and high-performance, low-power computing technologies, for use in mobile devices; automotive systems for connectivity, digital cockpit and ADAS/AD; and IoT including consumer electronic devices, industrial devices and edge networking products." In addition to its QCT segment, Qualcomm also operates a technology licensing segment and a strategic investments (Qualcomm Ventures) segment. Qualcomm Incorporated Form 10-k for the fiscal year ended September 29, 2024, date accessed: September 1, 2025 (accessed: https://s204.q4cdn.com/645488518/files/doc_financials/2024/q4/QCOM-09-29-24-FY2024-10-K.pdf), at 10-13.

**RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY**



[redacted]

[redacted]

[191] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60.

[192] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 59-60.

[193] Deposition of Ehab Youssef, June 26, 2025, at 71:15-72:3. See also, Shivashankar, at 97:18-98:2.

[194] I understand that [redacted] of the 2013 TLA does not require consideration of [redacted] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

[195] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

79. I understand that it is Arm's position that the [redacted].[196] I further understand that Arm contends that [redacted]

## 6.4 Evaluation of Third Party TLA Licenses Available as of the Date of This Report

80. As described above, [redacted] Qualcomm:

[redacted]

[196] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef; Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, at 60-61, Deposition of Ehab Youssef, June 26, 2025, at 68:13-69:23, 71:15-25.

[redacted]

[redacted]

151. Based on my understanding of the [redacted], the evidence regarding [redacted], my independent assessment of third-party license agreements available as of the date of this report, evidence that the [redacted], and based on my training and experience, it is my opinion that:

- [redacted]

152. In the event additional information is produced, I intend to supplement or update my analysis upon receipt of this information.

## 7 RESPONSE TO THE KENNEDY REPORT

153. As an initial matter, I note certain analyses that are absent from the Kennedy Report. First, the Kennedy Report made no attempt to quantify Qualcomm's alleged present "harm" due

to Arm's [REDACTED].[390] Although Qualcomm declined to accept [REDACTED], as noted above, Qualcomm has had a license to [REDACTED][391] Therefore, Qualcomm has [REDACTED] to continue to use those IPs, to the extent it so chooses. [REDACTED].[392] This evidence, as well as the Kennedy Report's lack of quantification, calls into question the extent to which Qualcomm has indeed suffered any actual harm to date as a result of Arm's [REDACTED].

[REDACTED]

155. With respect to analyses that are put forward in the Kennedy Report, I have been asked to respond to 1) the Kennedy Report's comparison of [REDACTED] relative to certain benchmarks; 2) the Kennedy Report's estimate of Qualcomm's damages associated with alleged overpayment of license fees for the Peripheral IP at issue, including the Kennedy Report's analysis of a "but-for" price; 3) the Kennedy Report's estimate of Qualcomm's damages

---

[390] *See generally,* Kennedy Report.
[391] ARMQC_02772366-385, at 366-367.
[392] Deposition of Kurt Wolf, June 25, 2025, at 41:5-42:22, 75:2-76:17, 81:8-17, 86:4-19; Deposition of Gerard Williams, June 25, 2025, at 46:18-51:10.
[393] *See generally,* Kennedy Report.
[394] Kennedy Report, at 47-48.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

associated with Arm's alleged interference with Qualcomm's prospective economic advantage; and 4) the Kennedy Report's quantification of [redacted] o a) evidence regarding the harm Qualcomm alleges it suffered under the alleged ALA and TLA breaches and, b) the amount of support and maintenance fees paid by Qualcomm under the terms of the ALA.

### 7.1 The Kennedy Report's Comparison of Arm's [redacted] to Certain Benchmarks

156. As described throughout this report, Qualcomm alleges that [redacted]

157. The Kennedy Report compares [redacted]. As described in the sections that follow, I understand that the first two comparisons are not relevant under the terms of the allegedly breached section of the TLA.

158. The Kennedy Report's observations under the third comparison are misleading and incomplete even with respect to the third-party agreements that have been produced as of the date of this report. The Kennedy Report asserts that an analysis of third-party agreements is not possible with the available information. However, as demonstrated above, it is possible to identify relevant terms and [redacted]" [redacted]. Therefore, the Kennedy Report's failure to adequately analyze the "[redacted]," including the failure to address certain obvious issues altogether, further underscores the Kennedy Report's failure to demonstrate that the [redacted]



[redacted]

#### 7.1.1 The Kennedy Report Analysis of the [redacted] Focuses on Measures that Are [redacted]

395 ARM_00103918-972, at 930.
396 Deposition of Jonathan Weiser, July 11, 2025, at 181:2-182:17.
397 Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

Page 73 of 112
RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY





Page 74 of 112
RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY



[redacted]

[401] Kennedy Report, at 25-26.
[402] Kennedy Report, at footnote 131.
[403] Deposition of Karthik Shivashankar, June 20, 2025, at 47:18-21, testifying that [redacted]
[404] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.
[405] Kennedy Report, at 25 and footnote 131, citing ARMQC_02784199-203 at 202.
[406] ARMQC_02784199-203 at 202.
[407] Kennedy Report, at 26 and footnote, citing ARMQC_02747567-569 at 568.
[408] Kennedy Report at 25.

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY



[redacted]

[409] Kennedy Report, at Figure 9.
[410] *See* Kennedy Report, at footnote 158.
[411] [redacted].
[412] *See* **ATTACHMENT 8.0.** *See also,* Kennedy Report, at Schedule 4.1. Total license fees have been divided by the respective term to reflect average annual license fees. *See also*, ARMQC_02784120-198, at 132.

#### 7.1.2 The Kennedy Report Analysis of Third-Party TLA Agreements Is Incomplete

167. The Kennedy Report describes its assignment regarding third party TLA agreements as follows: "I have been asked by Qualcomm's counsel to assess Arm's claims discussed above regarding its [REDACTED]."[414] The claims are that 1) [REDACTED]

168. The Kennedy Report acknowledges that it is not possible to evaluate the second and third claims as the [REDACTED] agreement has not been produced. It then argues that it is not possible to evaluate whether [REDACTED], as Arm has not produced all such agreements.[416] As discussed in **Section 6.5** above, [REDACTED] In the event that more [REDACTED] agreements become available, I will update my analyses and opinions accordingly.

[415] Kennedy Report, at 37-38.
[416] Kennedy Report, at 38.

169. The Kennedy Report then offers "observations of royalty rates included in Arm's agreements with other third parties that have been produced"[417] and concludes that these observations indicate [redacted] Despite evidence that Qualcomm's own witness acknowledged the TLA [redacted],[419] the Kennedy Report analysis focuses exclusively on a comparison of royalty rates, and does not include a full analysis of "[redacted][422]

170. While the Kennedy Report lists some basic information [redacted] pointing to incomplete production.[423] However, my own analysis in **Sections 6.4 and 6.5** demonstrates that a more fulsome analysis based on the available information is in fact possible.

[redacted]

[417] Kennedy Report, at 40.
[418] Kennedy Report, at 42.
[419] Deposition of Jonathan Weiser, July 11, 2025, at 84:5-85:10.
[420] ARM_00103918-972, at 926-930.
[421] ARM_00103918-972, at 930.
[redacted]
[423] Kennedy Report, at 40.
[424] Kennedy Report, at 45.



[redacted]

173. As such, the Kennedy Report analysis of third-party agreements is incomplete.

174. Based on the above, it is my opinion that the Kennedy Report (while recognizing its own analysis to be incomplete) fails to show that the [redacted]

[425] Kennedy Report, at 45.
[426] ARM_00103918-972, at 930.

[redacted]

175. To the extent Mr. Kennedy attempts to address these clear gaps in the analysis, I reserve the right to supplement my opinions.

### 7.2 The Kennedy Report's Analysis of Alleged Overpayment for Peripheral IP Licenses

176. The Kennedy Report calculates damages related to Arm's alleged breach of the implied covenant of good faith and fair dealing related to the TLA as the amount that Qualcomm allegedly overpaid for its license to the Peripheral IP at Issue.[427] As discussed above, I understand the parties dispute whether this is an issue presently in the case. I nonetheless address it here in the event the Court determines it is an issue for trial.

177. The Kennedy Report calculates the amount of alleged overpayment as the difference between the price offered by Arm in [redacted] (which Qualcomm agreed to in [redacted] and paid in [redacted] but now asserts was made in "bad faith" and was "commercially unreasonable"[429]) and a "but-for" price.[430] The Kennedy Report opines that the but-for price for each of the Peripheral IPs at Issue would have been [redacted]

178. In the alternative, the Kennedy Report uses a but-for price equal to that in Arm's [redacted] (which Qualcomm accepted in principle but asked Arm to modify the scope of licensed IP).[433] [redacted]

---

[427] Kennedy Report, at 45-46.
[428] Kennedy Report, at 54; QCVARM_0523650-652, at 652; QCVARM_1121930-931.
[429] Kennedy Report, at 63; Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025, at 10-11.
[430] Kennedy Report, at 63-67.
[431] Kennedy Report, at 66.
[432] Kennedy Report, at 66.
[433] QCVARM_0616967-969; QCVARM_0618354.
[434] Kennedy Report, at 67.

179. As described further in the sections that follow, the Kennedy Report fails to show from a [redacted], and the Kennedy Report's quantification of the alleged overpayment for Peripheral IP licenses relies upon a but-for price that is not supported by the available evidence. Further, Qualcomm's own acceptance of the Peripheral IP license with no objection or negotiation is an indication of commercial reasonableness. Taken together, these shortcomings indicate the Kennedy Report's estimate of the alleged overpayment is speculative and should be set aside.

[redacted]

#### 7.2.1 Qualcomm's Acceptance of the Peripheral IP License Is an Indication of Commercial Reasonableness

182. [redacted]

435 ARM_00103918-972, at 931.
436 Kennedy Report, at 48.
437 QCVARM_0608131-138, at 133-134.
438 QCVARM_0613037-039, at 037.
439 QCVARM_0616935.
440 QCVARM_0616967-969.



."[441]

183.

185. ."[446] Qualcomm signed its acceptance of this offer

[441] QCVARM_0616967-969, at 969.
[442] QCVARM_0618354.
[443] QCVARM_0605055-062, at 057-058.
[444] Deposition of Kurt Wolf, June 25, 2025 at 75:2-76:17,
[445] QCVARM_0523650-652.
[446] QCVARM_0527544-548, at 544.



[redacted]

186. I am aware of testimony from Ms. Larissa Cochron, Senior Director of Contracts at Qualcomm, who indicated that Qualcomm disagreed that the renewal fees for the Peripheral IP at Issue should increase relative to the prices Qualcomm received in 2019.[450] Despite Ms. Cochron's testimony regarding Qualcomm's viewpoint, I am not aware of evidence that Qualcomm expressed any objections or concerns to Arm regarding the *commercial reasonableness* of the license fees for the Peripheral IP at Issue that Arm [redacted], nor am I aware of evidence that Qualcomm requested that Arm reduce the proposed license fees or otherwise attempted to negotiate the price prior to accepting the offer or paying the agreed-upon fees.[451] Indeed, Ms. Cochron's testimony that Qualcomm accepted Arm's [redacted] because it felt it could absorb the fee increase[452] appears to be an indication that, while Qualcomm would have preferred not to pay the proposed fees, it still found the offered fees to be commercially reasonable.

187. Despite evidence of Qualcomm's acceptance of Arm's offered terms, the Kennedy Report presents a comparison of the [redacted] fees in [redacted][453] to the [redacted] fees for Peripheral IP at Issue implied in Qualcomm's 2019

[447] QCVARM_0523650-652, at 652.
[448] QCVARM_0573056-057 at 056. Arm signed the agreement on February 18, 2025.
[449] QCVARM_1121930 and QCVARM_1121931.
[450] 30(b)(6) Deposition of Larissa Cochron, July 11, 2025, at 134:9-135:11.
[451] Interview of Mr. Jeffrey Fonseca. [redacted]
[452] Ms. Cochron testified that Qualcomm accepted the offer for the peripherals because [redacted]." 30(b)(6) Deposition of Larissa Cochron, July 11, 2025, at 134:9-

[redacted]

license.[454] Notably, however, Qualcomm's [redacted] makes no reference to the price it previously paid to Arm for the same IP, makes no claim it is entitled to the same prices, and makes no request that the offer be revised to include the same prices.[455] [redacted] As such, the Kennedy Report's comparisons to the "actual" fees paid by Qualcomm in 2019 are not as informative to the commercial reasonableness of Arm's [redacted] as is Qualcomm's actual acceptance of the higher prices.

[redacted]

[redacted]



[458] *See* **ATTACHMENT 9.0**; Kennedy Report, at Schedule 3.4. Total license fees have been divided by the respective term to reflect average annual fee and have been adjusted for selling and marketing. *See also*, ARMQC_02784120-198, at 132.

[459] Kennedy Report, at 64.

[460] Interview of Akshay Bhatnagar, Karthik Shivashankar, and Ehab Youssef.

### 7.2.2 The Kennedy Report's But-For Price is Not Supported by the Available Evidence

190. Despite evidence regarding Qualcomm's acceptance of the Peripheral IP license in [redacted] and the lack of evidence that Qualcomm objected to or attempted to negotiate the offered prices before signing the agreement, the Kennedy Report offers damages calculations assuming Qualcomm overpaid for Peripheral IP under the [redacted]

191. The Kennedy Report does not appear to offer its own opinion that Arm's licensing offers for Peripheral IP were "commercially unreasonable and made in bad faith," but rather references Qualcomm's allegations in that regard.[462] The Kennedy Report does not offer an analysis of what the threshold price for a "commercially reasonable" offer would be, nor does it define precisely what a "good faith" offer would entail or why an offer at a price higher than that previously paid by Qualcomm must necessarily be considered "bad faith" – a particularly relevant inquiry in light of my understanding that the terms of the TLA as they relate to Peripheral IP do not preclude price increases or require certain [redacted]

[redacted] [redacted]

[461] QCVARM_0616967-969, at 967; QCVARM_0618354; and QCVARM_0523650-652, at 650, 652.
[462] Kennedy Report, at 63-67.
[463] Kennedy Report, at 64.
[464] Kennedy Report, at Section V.D.i.a.

[redacted]

193. Additionally, the Kennedy Report provides no reasonableness checks or additional data points in support of its calculation of but-for prices. Rather, the Kennedy Report asserts that 1) Arm would have licensed [redacted] at the same time (resulting in a broader scope of licensed IP) had the offered rates been "fair and reasonable"[466] and that 2) the "full scope of Qualcomm's actual licensing with Arm" including evidence that Qualcomm is one of Arm's "major" customers would have entitled Qualcomm to the same [redacted] in 2025 as it received in 2019.[467] [redacted]

194. In light of the above, the Kennedy Report's analysis of the "but-for" price for Peripheral IP is unsupported and should be set aside.

*7.2.2.1 Conclusion*

195. As described in the sections above, the evidence indicates that the Kennedy Report's calculation of alleged overpayment based [redacted] Instead, the evidence indicates that Qualcomm itself did not object to Arm's offer and determined it could "absorb" the price increase.

[redacted]

RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY

The fact that Qualcomm now claims in hindsight several million dollars in damages for an offer that it accepted and paid undermines the notion that it was "harmed" or suffered "damages" as a result of Arm's offer. This evidence, combined with my understanding that it is [REDACTED], indicates that the prices Qualcomm paid for the Peripheral IP at Issue were reasonable.[468] In the event the trier-of-fact agrees, damages under this cause of action are zero.



[525] Deposition of Cristiano Amon, July 3, 2025, at 77:11-78:24.
[526] Kennedy Report, at 79.
[527] **ATTACHMENT 7.0.**
[528] Kennedy Report, at 15-17, 19-22.



HKA

# Professional Credentials

## ATTACHMENT 1.0

***Thomas W. Britven***
*CPA, CGMA, CFE, CVA, CLP*

***Thomas Britven is a Partner at HKA Global LLC, and former President of ASQ Consulting, a leading provider of independent financial and advisory services.***

***Testimony***

- *Deloitte Consulting, LLP and Deloitte Development, LLC v. Sagitec Solutions, LLC*; Case No. 23-325-WCB; United States District Court for the District of Delaware; 2025.
- *Biohaven Therapeutics Ltd. and Yale University v. Avilar Therapeutics, Inc. and RA Capital Management GP, LLC*; C.A. No. 23-cv-328-JLH-CJB; United States District Court for the District of Delaware, 2025.
- *Oil States Energy Services, LLC v. Worldwide Machine, Inc.*; Civil Action No. 4:23-cv-00557; Deposition before the Southern District of Texas, Houston Division, 2024.
- *State Farm Mutual Automobile Insurance Co. v. Amazon.com, Inc. and Amazon.com Services LLC*; Case No. 1:22-01447-CJB; Deposition before the District of Delaware, Wilmington Division, 2024.
- *Hutchinson Technology Incorporated v. Suncall Corporation;* Case No. 21-cv-02618 SRN-TNL; Deposition before the United States District Court for the District of Minnesota, 2024.
- *Mednet Solutions, Inc. v. Eric Jacobson, and Veeva Systems, Inc.*; Case No. 0:20-cv-02502 DSD-JFD; Deposition before the District Court of Minnesota, 2024.
- *Walter Kidde Portable Equipment Inc. v. First Alert, Inc., BRK Brands, Inc.*; Case No. 6:22-cv-00566; Deposition before the Western District of Texas, Waco Division, 2023.
- *Onpoint Systems, LLC v. Protect Animals with Satellites, LLC*; C.A. No. 20-657; Deposition before the Eastern District of Texas, Sherman Division, 2023.
- *Lindt & Sprungli (North America) Inc., Lindt & Sprungli (USA), Inc., Ghirardelli Chocolate Company and Russell Stover Chocolates, LLC v. GXO Warehouse Company, Inc. f/k/a XPO Logistics Supply Chain*; Case No. 4:22-cv-00384; Deposition (2023) and trial (2024) before the Western District of Missouri, Western Division.
- *Omnitracs, LLC and XRS Corporation v. Platform Science, Inc.;* Case No. 3:20-cv-0958-CAB-MDD, Deposition (2023) and trial (2024) before the Southern District of California.
- *Unisys Corporation v. Leon Gilbert, Michael McGarvey, Atos SE and Atos IT Solutions and Services, Inc.*, Case No. 2:23-cv-00555-PD, Deposition before the Eastern District of Pennsylvania, 2023.

***Testimony (continued)***

- *Inovalon Insights, LLC v. Komodo Health, Inc.*; *Case No. 01-22-002-3064;* Arbitration before the American Arbitration Association, 2023.

- *Carrum Technologies, LLC v. Ford Motor Company, Case No. 18-1647-RGA;* Deposition before the United States District Court for the District of Delaware; 2023.

- *J.S.T. Corporation v. Robert Bosch LLC, f/k/a Robert Bosch Corporation, Robert Bosch GmbH, and Bosch Automotive Products (Suzhou) Co., Ltd.; Case No. 2:15-cv-13842-AC-EAS;* Deposition before the United States District Court for the Eastern District of Michigan, Southern Division; 2022.

- *Epistar Corporation v. Lowe's Companies, Inc., Lowe's Home Centers, LLC; Case No. 6:20-cv-00420-ADA;* Deposition before the United States District Court for the Western District of Texas, Waco Division; 2022 and 2024.

- *RiseandShine Corporation d/b/a Rise Brewing v. Pepsico, Inc.; Case No. 1:21-cv-3198;* Deposition before the United States District Court for the Northern District of Illinois; Eastern Division; 2022.

- *Taiwan Semiconductor Manufacturing Co. v. Silicon Storage Technology Inc.; Case No. 01-21-0002-5445;* Deposition and Testimony in arbitration before The American Arbitration Association; 2022.

- *Camac Fund LP v. W. Heath Hawk, Vasileios Sfyris, and Benjamin Thomas Wiler; Case No. 1440007256;* Testimony in arbitration before Judicial Arbitration and Mediation Services, Inc. (JAMS); 2022.

- *Allrounds, Inc. v. eShares, Inc. et al.*; Case No. 3:20-cv-07083-VC; Deposition before the Northern District of California, 2022.

- *Koss Corporation v. Apple Inc.;* Case No. 6:20-cv-00665-ADA; Deposition before the Western District of Texas; 2022.

- *Kraft Heinz Foods Company v. Capri Sun Group Holding AG, Capri Sun GMBH, Indag Pouch Partners GMBH, and Rudolf Wild GMBH & Co. KG;* Arbitration in The International Centre for Dispute Resolution; ICDR Case No. 01-20-0001-7551, 2022.

- *Magema Technology LLC v. Phillips 66, Phillips 66 Company and WRB Refining LP; Case No. 4:20-cv-02444;* Deposition and trial before the Southern District of Texas, Houston Division, 2022, 2023.

- *The Chamberlain Group Inc. v. Overhead Door Corporation; Case No. 2:21-cv-0084-JRG;* Deposition and trial before the Eastern District of Texas, 2021, 2022 and 2023.

- *Kimberly-Clark Corporation and Kimberly-Clark Global Sales, LLC v. Extrusion Group, LLC; Extrusion Group Services LLC; EG Global, LLC; EG Ventures, LLC; Michael Houston; and Michael Cook; Case No. 1:18-cv-04754-SDG;* Deposition before the Northern District of Georgia, 2021.

- *Precision Medicine Group, LLC, Precision Advisors Group, Inc. and Precision Medicine Group Holdings, Inc. v. Blue Matter, LLC, Naina Ahmad, Jose Jauregui, and Mridul Malhotra; Case No. 1:20-cv-02974 (PGG);* Deposition before the Southern District of New York, 2021.

***Testimony***
*(continued)*

- *Aspen Energy Partners, LLC and Rigminder, Inc. v. Trinidad Design & Manufacturing US, Inc. and Ensign Drilling, Inc.; No. 2019-38586;* Deposition before the 55th Judicial District Court, Harris County, Texas, 2021.
- *The Tempo at Encore, LP and CPDG2, LLC v. Siltek Group, Inc. Berkley Insurance Company, Ana P. Silveira-Sierra, Rene Sierra, Tron Construction, LLC and Siltex Group, Inc. v. The Tempo At Encore, LP and CPDG2, LLC; Case No. 16-CA-005748 (L); Consolidated for discovery with Case No. 17-CA-007385 (L);* Deposition and trial before the 13th Judicial Circuit Court of Hillsborough County, Florida, 2021 and 2023.
- *Texas Advanced Optoelectronic Solutions Inc. v. Intersil, Inc.; Case No. 4:08-cv-451;* Deposition and trial before the United States District Court for the Eastern District of Texas (Sherman Division), 2020 and 2021.
- *In re: C2R Global Manufacturing, Inc., Debtor; Case No. 18-30182-beh (Chapter 11 Proceeding); Deposition before the United States Bankruptcy Court for the Eastern District of Wisconsin, 2020.*
- *ESI Group, ESI North America, Inc. and ESI US R&D, Inc. v. Wave Six, LLC, Dassault Systemes Simulia Corp., Philip Shorter, Vincent Cotoni, Sascha Merz, and Terence Connelly; Case No. 3:17-cv-02293-AJB-MSB; Deposition before the United States District Court for the District of California, 2020.*
- *Personalized Media Communications, LLC v. Google LLC; Civil Action No. 2:19-cv-00090; Deposition and trial before the United States District Court for the Eastern District of Texas (Marshall), 2020.*
- *Baker Hughes Oilfield Operations LLC v. Smith International, Inc.; Civil Action No. 4:16-cv-1956; Deposition before the United States District Court for the Southern District of Texas, 2019.*
- *International Technologies & Systems Corporation, d/b/a/ ID Tech v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.; Case No. 8:17-cv-01748-DOC-JDE; Deposition before the United States District Court for the Central District of California, 2019.*
- *Smith International, Inc. v. Baker Hughes; Case No. 1:16-cv-00056-ER; Deposition before the United States District Court for the District of Delaware, 2019.*
- *Huawei Technologies Co., Ltd., Futurewei Technologies, Inc. v. Yiren Ronnie Huang, CNEX Labs, Inc.; Case No. 4:17-cv-893 ALM; Deposition and trial before the Eastern District of Texas, 2019.*
- *Schlumberger Technology Corporation v. BICO Drilling Tools, Inc; Civil Action 4:17-cv-3211; Deposition before the Southern District of Texas, 2019.*
- *Finjan, Inc. v. ESET, LLC, et al.; Civil Action No. 3:17-cv-00183; Deposition and trial before the Southern District of California, 2019 and 2023.*
- *Syntel Sterling Best Shores Mauritius Limited, and Syntel, Inc. v. The TriZetto Group, Inc. and Cognizant Technology Solutions Corp.; Civil Action No. 1:15-cv-0211; Deposition and trial before the Southern District of New York, 2019, 2020, 2025.*

***Publications and Presentations***

- *"Epic Systems Corporation, Plaintiff v. Tata Consultancy Services, et al, Defendants: Trade Secret Discussion," Dentons, October 17, 2016,*
- *"Intellectual Property Damages and Daubert," McAndrews, Held & Malloy, May 19, 2016.*
- *"Inter Partes Review and Secondary Considerations," Norton Rose Fulbright, January 11, 2016.*
- *"Intellectual Property Damages Update," The Elliott Law Firm, December 11, 2015.*
- *"The Use of Surveys for U.S. Patent Litigation," Kaye Scholer LLP, November 2013.*
- *"The Use of Surveys for U.S. Patent Litigation," State of California Continuing Legal Education, June 2013.*
- *"A Discussion of Economic Damages and the Entire Market Value Rule," State of Colorado Supreme Court Board of Continuing Legal & Judicial Education, Cooley LLP, 2013.*
- *"A Discussion of Economic Damages and the Entire Market Value Rule," State Bar of Texas Continuing Legal Education, Porter Hedges LLP, 2013.*
- *"Intellectual Property Damages, Putting the Pieces Together," A Discussion of Economic Damages and the Entire Market Value Rule, Southern Methodist University, 2013.*
- *"Impact of the America Invents Act on Business," Group Facilitator, Licensing Executive Society (USA and Canada), Inc. IP100 Executive Forum, 2012.*
- *"Trade Secret Damages," Chapter 9, Calculating and Proving Damages (coauthored with Christopher H. Spadea, et al.) (New York: Law Journal Press, 2011, Updated 2013, 2015).*
- *"Sharing the Risk: Patent Infringement Liability Indemnification and Insurance" Intellectual Property Litigation, Volume 21, Number 3, Spring 2010 (coauthored with Kim Cauthorn and Tamara Turek).*
- *"Approaches for Valuing Biotechnology/Pharmaceutical Inventions" Practicing Law Institute, Biotechnology Patents & Business Strategies in the New Millennium, San Diego, August 6-7, 2001.*
- *"Patent Valuation from a Business and Litigation Perspective" Licensing Executive Society (U.S.A. and Canada), Inc., Annual Meeting, Chicago, 2002.*

***Professional and Business History***

*HKA Global (2023-present), Partner.*

*ASQ Consulting (2014-present), President.*

*Duff & Phelps (2008-2014), positions held include: Global Intellectual Property Practice Co-Leader (2014), National Intellectual Property Consulting Practice Leader (2008-2014), and Managing Director (2008-2014).*

*Lumin Expert Group (merged with Duff & Phelps) (2006-2008), positions held include: President (2007-2008) and Managing Director (2006-2007).*

***Professional and Business History*** *(continued)*

*LECG (2002-2006), positions held include: Senior IP Practice Director (2006), Governing Board (2002-2006), and Managing Director (2002-2006).*

*Navigant Consulting (and its predecessor companies) (1983-2002), positions held include: Director (1999-2002), Vice President (1991-1999), Executive Consultant (1986-1991), and Senior Consultant (1983-1986).*

*Amsted Industries (1981-1983), positions held include: Senior in Charge Auditor (1983), Senior Auditor (1982-1983), and Staff Auditor (1981-1982)*

***Education and Certifications***

Owner/President Management Program, Harvard Business School – 2012 to 2014
Chartered Global Management Accountant – May 2012
Certified Licensing Professional – May 2010
Intellectual Property and Business Strategy Program, Harvard Business School –February 2010
Leading Professional Services Firms Program, Harvard Business School – March 2009
AICPA Accredited in Business Valuation – May 2006 – March 2023
Certified Valuation Analyst – February 2004
Certified Fraud Examiner – December 1992
Certified Public Accountant, Florida – January 1989
Certified Public Accountant, Texas – February 1984
Passed Certified Public Accountant Examination, Iowa – February 1982
B.B.A., Accounting, University of Iowa – May 1981

***Professional Associations & Affiliations***

Former Board of Directors and President of LES Foundation – 2013 and 2014
Former Board of Directors and Treasurer of LES Foundation – 2012
Former Associate Member American Bar Association
Former Examiner to Federal Bankruptcy Court
Member National Association of Certified Valuation Analysts
Member Licensing Executive Society
Member American Institute of Certified Public Accountants
Member Houston Chapter of Texas Institute of Certified Public Accountants
Member Association of Certified Fraud Examiners

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1. QC HHY Royalty Report from L. Cochran Deposition
2. ARM_00001067-084
3. ARM_00001192-193
4. ARM_00001195-197
5. ARM_00001198-200
6. ARM_00001473-475
7. ARM_00001495-497
8. ARM_00001512-514
9. ARM_00001777-779
10. ARM_00002045-075
11. ARM_00003305
12. ARM_00005340-344
13. ARM_00006123-155
14. ARM_00009370-375
15. ARM_00025401-403
16. ARM_00035319-320
17. ARM_00036346-348
18. ARM_00037077
19. ARM_00039179-196
20. ARM_00043924-926
21. ARM_00052643-644
22. ARM_00055357-399
23. ARM_00056307-317
24. ARM_00056332-333
25. ARM_00056571-573
26. ARM_00062055-056
27. ARM_00062441-473
28. ARM_00062474-493
29. ARM_00063283-284
30. ARM_00063298-312
31. ARM_00064523
32. ARM_00067349-372
33. ARM_00067636-639
34. ARM_00067726-727
35. ARM_00068087-110
36. ARM_00068131-154
37. ARM_00068202-204
38. ARM_00068459-482
39. ARM_00068504-527
40. ARM_00075096-097
41. ARM_00075098-130
42. ARM_00075343-366
43. ARM_00076113-145
44. ARM_00076357-358
45. ARM_00076910
46. ARM_00079223-225
47. ARM_00079226-230
48. ARM_00079507-514
49. ARM_00079722-723
50. ARM_00080651-653
51. ARM_00080874-880
52. ARM_00081203-208
53. ARM_00082083-089
54. ARM_00082120-127
55. ARM_00082874
56. ARM_00083490-491
57. ARM_00083492
58. ARM_00083608-609
59. ARM_00084600-602
60. ARM_00085567-571
61. ARM_00085581-585
62. ARM_00085679
63. ARM_00085680
64. ARM_00085710
65. ARM_00085719-723
66. ARM_00086164-245
67. ARM_00087431-435
68. ARM_00087439-443
69. ARM_00087640-643

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

70. ARM_00087825-827
71. ARM_00087844-850
72. ARM_00087865-866
73. ARM_00087868-870
74. ARM_00088011-015
75. ARM_00089058-063
76. ARM_00089070-077
77. ARM_00090791
78. ARM_00091389-405
79. ARM_00091657-658
80. ARM_00091659-686
81. ARM_00091714-741
82. ARM_00091768-784
83. ARM_00091799-817
84. ARM_00091834-852
85. ARM_00091869-887
86. ARM_00091903-917
87. ARM_00094098-143
88. ARM_00094546-548
89. ARM_00095578
90. ARM_00095579
91. ARM_00096879-905
92. ARM_00097521
93. ARM_00097522
94. ARM_00097625-627
95. ARM_00098373-375
96. ARM_00100013-029
97. ARM_00102683
98. ARM_00103566-600
99. ARM_00103635-669
100. ARM_00103702-703
101. ARM_00103710-711
102. ARM_00103718-719
103. ARM_00103781-782
104. ARM_00103804-818
105. ARM_00103918-972
106. ARM_00104158-174
107. ARM_00105045-048
108. ARM_00105723-725
109. ARM_00110017-030
110. ARM_00110130-136
111. ARM_00110507
112. ARM_00110509
113. ARM_00110511
114. ARM_00110513
115. ARM_00110515
116. ARM_00110517
117. ARM_00110542-548
118. ARM_00110871-880
119. ARM_00110914-915
120. ARM_00111449
121. ARM_00111591-593
122. ARM_00112097-101
123. ARM_00112122-126
124. ARM_00113178
125. ARM_00113179-192
126. ARM_00114880
127. ARM_00118835-938
128. ARM_00119119
129. ARM_00119602
130. ARM_00132241-242
131. ARM_01014940-941
132. ARM_01020186-189
133. ARM_01020195-196
134. ARM_01215564
135. ARM_01215878-879
136. ARM_01215885
137. ARM_01215887
138. ARM_01215888
139. ARM_01215889

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

140. ARM_01215890
141. ARM_01215997-6001
142. ARM_01216178-179
143. ARM_01216189-194
144. ARM_01228027
145. ARM_01228031
146. ARM_01228035
147. ARM_01228039
148. ARM_01228043
149. ARM_01228044
150. ARM_01228048
151. ARM_01228049
152. ARM_01228053
153. ARM_01228054
154. ARM_01228058
155. ARM_01228059
156. ARM_01228063
157. ARM_01228064
158. ARM_01228073
159. ARM_01228074
160. ARM_01228075
161. ARM_01229969-979
162. ARM_01230032-036
163. ARM_01230076-083
164. ARM_01230084-091
165. ARM_01230117-122
166. ARM_01230155-162
167. ARM_01230977
168. ARM_01230978-980
169. ARM_01231025
170. ARM_01231027
171. ARM_01231028
172. ARM_01231029
173. ARM_01231030
174. ARM_01231031
175. ARM_01231032
176. ARM_01231033
177. ARM_01231034
178. ARM_01231037
179. ARM_01231038
180. ARM_01231039
181. ARM_01231040
182. ARM_01231041
183. ARM_01231042
184. ARM_01231043
185. ARM_01231044
186. ARM_01231045
187. ARM_01231046
188. ARM_01231047
189. ARM_01231048
190. ARM_01231049
191. ARM_01231050
192. ARM_01231051
193. ARM_01231052
194. ARM_01231053
195. ARM_01231054
196. ARM_01231055
197. ARM_01231056
198. ARM_01231057
199. ARM_01231058
200. ARM_01231059
201. ARM_01231060
202. ARM_01231061
203. ARM_01231062
204. ARM_01231063
205. ARM_01231064
206. ARM_01231249-250
207. ARM_01231267-271
208. ARM_01231394-195
209. ARM_01231614

Page 3 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

210. ARM_01233086-088
211. ARM_01233089-090
212. ARM_01235323-327
213. ARM_01237129-136
214. ARM_01238132-134
215. ARM_01238384-399
216. ARM_01238422-427
217. ARM_01238895-896
218. ARM_01238977
219. ARM_01239056-068
220. ARM_01239440
221. ARM_01239441
222. ARM_01239442
223. ARM_01239444
224. ARM_01239445
225. ARM_01239447
226. ARM_01239448
227. ARM_01239449
228. ARM_01239451
229. ARM_01239452
230. ARM_01239453
231. ARM_01239458
232. ARM_01239459
233. ARM_01239464
234. ARM_01239465
235. ARM_01239470
236. ARM_01239471
237. ARM_01239472
238. ARM_01239473
239. ARM_01239474
240. ARM_01239475
241. ARM_01239476
242. ARM_01239477
243. ARM_01239478
244. ARM_01239479
245. ARM_01239483
246. ARM_01239485
247. ARM_01239486
248. ARM_01239488
249. ARM_01239503
250. ARM_01239504
251. ARM_01239506
252. ARM_01240226-236
253. ARM_01240281-282
254. ARM_01240305-307
255. ARM_01240308-325
256. ARM_01240382-391
257. ARM_01240438-447
258. ARM_01240448
259. ARM_01240470-507
260. ARM_01241379
261. ARM_01241472
262. ARM_01241565-566
263. ARM_01241581-582
264. ARM_01241585
265. ARM_01241587-588
266. ARM_01245720-726
267. ARM_01245939-940
268. ARM_01245941-978
269. ARM_01246043-066
270. ARM_01249519-527
271. ARM_01255498-519
272. ARM_0125886
273. ARM_01259705-60105
274. ARM_01271929-953
275. ARM_01282303
276. ARM_01282304-382
277. ARM_01282655-682
278. ARM_01291148
279. ARM_01293301-307

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**

**Documents Reviewed and/or Relied Upon**

280. ARM_01293317-319
281. ARM_01293447-457
282. ARM_01298732-735
283. ARM_01298891-929
284. ARM_01299854-869
285. ARM_01299902-957
286. ARM_01300650-654
287. ARM_01300657-658
288. ARM_01300665-670
289. ARM_01304976-979
290. ARM_01304980-985
291. ARM_01305032-057
292. ARM_01308019-028
293. ARM_01311417
294. ARM_01311418-448
295. ARM_01314327-337
296. ARM_01314501-516
297. ARM_01314615-622
298. ARM_01315194-196
299. ARM_01333009
300. ARM_01423231
301. ARM_01423234
302. ARM_01423238-244
303. ARM_01423239
304. ARM_01423632-634
305. ARM_01424135-208
306. ARM_01424330
307. ARM_01426582-590
308. ARM_01426872-895
309. ARM_01426896-937
310. ARM_01426938-956
311. ARM_01427634-660
312. ARM_01427661-682
313. ARM_01427683-693
314. ARM_01427694-695
315. ARM_01427696-698
316. ARM_01427700-718
317. ARM_01427719-738
318. ARM_01427739-775
319. ARM_01427776-795
320. ARM_01427796-819
321. ARM_01427820-857
322. ARM_01427858-876
323. ARM_01427877-904
324. ARM_01427905-925
325. ARM_01427926-943
326. ARM_01427944-968
327. ARM_01427969-994
328. ARM_01427995-8008
329. ARM_01428009-032
330. ARM_01428033-056
331. ARM_01428057-058
332. ARM_01428059-062
333. ARM_01428063-102
334. ARM_01428103-144
335. ARM_01428145-178
336. ARM_01428179-206
337. ARM_01428207-250
338. ARM_01428251-270
339. ARM_01428271-292
340. ARM_01428293-315
341. ARM_01428316-338
342. ARM_01428339-376
343. ARM_01428377-405
344. ARM_01428406-430
345. ARM_01428431-449
346. ARM_01428450-471
347. ARM_01428472-493
348. ARM_01428494-514
349. ARM_01428515-539

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

350. ARM_01428543-549
351. ARM_01432965-996
352. ARM_01432997-3027
353. ARM_01453209-211
354. ARMQC_00000001-004
355. ARMQC_00000083-091
356. ARMQC_00000107-113
357. ARMQC_00000408-413
358. ARMQC_00001136-163
359. ARMQC_00024609-611
360. ARMQC_00027166-167
361. ARMQC_00028209
362. ARMQC_00028290-2298
363. ARMQC_00085998
364. ARMQC_02600059-071
365. ARMQC_02600334-339
366. ARMQC_02600667-671
367. ARMQC_02600713-728
368. ARMQC_02600803-818
369. ARMQC_02600819-820
370. ARMQC_02600838-841
371. ARMQC_02601067-071
372. ARMQC_02601116-117
373. ARMQC_02601777-811
374. ARMQC_02601829-835_001
375. ARMQC_02602328-331
376. ARMQC_02602445-447
377. ARMQC_02602450-452
378. ARMQC_02602454-456
379. ARMQC_02602458-460
380. ARMQC_02602462-464
381. ARMQC_02602466-468
382. ARMQC_02602472-473
383. ARMQC_02602550-553
384. ARMQC_02603580
385. ARMQC_02603581
386. ARMQC_02603582
387. ARMQC_02603587
388. ARMQC_02604609
389. ARMQC_02604610
390. ARMQC_02604611
391. ARMQC_02604612
392. ARMQC_02604613
393. ARMQC_02604614
394. ARMQC_02604615
395. ARMQC_02604616
396. ARMQC_02604617
397. ARMQC_02604618
398. ARMQC_02604619
399. ARMQC_02605445-464
400. ARMQC_02627275-297
401. ARMQC_02720799-803
402. ARMQC_02725741-755
403. ARMQC_02726184-233
404. ARMQC_02727255
405. ARMQC_02727609-629
406. ARMQC_02727973-983
407. ARMQC_02728703-711
408. ARMQC_02729412-414
409. ARMQC_02730887
410. ARMQC_02730889-894
411. ARMQC_02730917-922
412. ARMQC_02731051-053
413. ARMQC_02731250-283
414. ARMQC_02731284-305
415. ARMQC_02731630-638
416. ARMQC_02732393-395
417. ARMQC_02738597-608
418. ARMQC_02738965-972
419. ARMQC_02739659

Page 6 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

420. ARMQC_02739661-672
421. ARMQC_02740066-069
422. ARMQC_02740386-388
423. ARMQC_02740595-599
424. ARMQC_02740600-626
425. ARMQC_02741400-403
426. ARMQC_02741404-407
427. ARMQC_02741408-411
428. ARMQC_02741412-415
429. ARMQC_02741466-467
430. ARMQC_02741727-429
431. ARMQC_02741731-734
432. ARMQC_02741735-745
433. ARMQC_02741954-2004
434. ARMQC_02742793-794
435. ARMQC_02742798-801
436. ARMQC_02742804-805
437. ARMQC_02742814-818
438. ARMQC_02742823-826
439. ARMQC_02742856-858
440. ARMQC_02742861-862
441. ARMQC_02742873-876
442. ARMQC_02743189-218
443. ARMQC_02744686-687_001-44
444. ARMQC_02745725-741
445. ARMQC_02746634-658
446. ARMQC_02746708-774
447. ARMQC_02746871-895
448. ARMQC_02747093-096
449. ARMQC_02747097-102
450. ARMQC_02747103
451. ARMQC_02747104
452. ARMQC_02747567-598
453. ARMQC_02747848-867
454. ARMQC_02747993-998
455. ARMQC_02748324-325
456. ARMQC_02749014-016
457. ARMQC_02749702-709
458. ARMQC_02750967-982
459. ARMQC_02750999-1014
460. ARMQC_02751388-394
461. ARMQC_02751596-598
462. ARMQC_02752343-347
463. ARMQC_02752632-651
464. ARMQC_02752740
465. ARMQC_02755397-428
466. ARMQC_02755446-470
467. ARMQC_02755490-514
468. ARMQC_02755534-558
469. ARMQC_02755580-604
470. ARMQC_02755624-655
471. ARMQC_02755674-705
472. ARMQC_02755903-904
473. ARMQC_02755905-928
474. ARMQC_02756148-179
475. ARMQC_02756208-244
476. ARMQC_02756245
477. ARMQC_02756246-278
478. ARMQC_02756344-375
479. ARMQC_02756542-543
480. ARMQC_02756544-572
481. ARMQC_02756860-891
482. ARMQC_02760525-553
483. ARMQC_02762874-875
484. ARMQC_02762876-877
485. ARMQC_02762878
486. ARMQC_02762879
487. ARMQC_02762898-900
488. ARMQC_02762949-951
489. ARMQC_02762963-965

Page 7 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

490. ARMQC_02762971
491. ARMQC_02762974-976
492. ARMQC_02762982-985
493. ARMQC_02762987
494. ARMQC_02762991-3025
495. ARMQC_02770389-390
496. ARMQC_02770599-603
497. ARMQC_02771124
498. ARMQC_02771125
499. ARMQC_02771126
500. ARMQC_02771127
501. ARMQC_02771128
502. ARMQC_02771129-150
503. ARMQC_02771151-167
504. ARMQC_02771200
505. ARMQC_02771221-227
506. ARMQC_02771350-453
507. ARMQC_02771883-884
508. ARMQC_02771946-948
509. ARMQC_02772155-156
510. ARMQC_02772241-245
511. ARMQC_02772246-250
512. ARMQC_02772333-365
513. ARMQC_02772366-385
514. ARMQC_02773054-055
515. ARMQC_02773055
516. ARMQC_02773185-186
517. ARMQC_02773565-569
518. ARMQC_02773570-573
519. ARMQC_02773574
520. ARMQC_02773656-370
521. ARMQC_02774029-035
522. ARMQC_02774378-384
523. ARMQC_02774494-500
524. ARMQC_02774539-547
525. ARMQC_02774642-657
526. ARMQC_02774738-747
527. ARMQC_02774748-756
528. ARMQC_02774757-766
529. ARMQC_02774767-813
530. ARMQC_02774814-815
531. ARMQC_02774816-817
532. ARMQC_02774818-843
533. ARMQC_02774844-855
534. ARMQC_02774856-863
535. ARMQC_02775090-162
536. ARMQC_02777440-441
537. ARMQC_02777448-449
538. ARMQC_02777458-464
539. ARMQC_02777465-472
540. ARMQC_02778159-166
541. ARMQC_02778177
542. ARMQC_02778178
543. ARMQC_02778241-249
544. ARMQC_02778342-343
545. ARMQC_02779064-075
546. ARMQC_02779076-083
547. ARMQC_02779099-106
548. ARMQC_02779107-115
549. ARMQC_02779116-121
550. ARMQC_02779122-132
551. ARMQC_02779133-144
552. ARMQC_02779170
553. ARMQC_02779171-173
554. ARMQC_02779174-175
555. ARMQC_02779176-178
556. ARMQC_02779179-180
557. ARMQC_02779181-182
558. ARMQC_02779269-313
559. ARMQC_02779314-363

Page 8 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

560. ARMQC_02779364-390
561. ARMQC_02779391-411
562. ARMQC_02779412-432
563. ARMQC_02779433-482
564. ARMQC_02779483-511
565. ARMQC_02783473-511
566. ARMQC_02783512-532
567. ARMQC_02783533-574
568. ARMQC_02783575-594
569. ARMQC_02783595-596
570. ARMQC_02783597-598
571. ARMQC_02783599-600
572. ARMQC_02783601-602
573. ARMQC_02783603-614
574. ARMQC_02783615
575. ARMQC_02783618
576. ARMQC_02783619-730
577. ARMQC_02783731-845
578. ARMQC_02783731-847
579. ARMQC_02783848-966
580. ARMQC_02783967-4084
581. ARMQC_02784120-198
582. ARMQC_02784199-203
583. ARMQC_02784204
584. ARMQC_02784227-244
585. ARMQC_02784247-254
586. ARMQC_02784258
587. ARMQC_02784661-663
588. ARMQC_02784664-667
589. ARMQC_2781238-261
590. ARMQC_2781262-285
591. ARMQC_02785291-325
592. ARMQC_02785326-341
593. ARMQC_02785342-343
594. ARMQC_02785344-347
595. ARMQC_02785348-407
596. ARMQC_02785408-426
597. ARMQC_02785427-428
598. ARMQC_02785429-435
599. ARMQC_02785436-473
600. ARMQC_02785474-498
601. ARMQC_02785499-500
602. ARMQC_02785501-502
603. ARMQC_02785503-512
604. ARMQC_02785513-556
605. ARMQC_02785557-577
606. ARMQC_02785578-580
607. ARMQC_02785581-582
608. ARMQC_02785583-587
609. FGS_0000389-390
610. KF00001-228
611. KF00261-466
612. KF00467-496
613. KF00507-512
614. KF00508-512
615. KF00516-517
616. KF00578-579
617. KF00580-584
618. KF00585-603
619. KF00668-672
620. KF00673-675
621. KF00774-785
622. KF00811-816
623. KF00817-825
624. KF00826-836
625. KF01098-100
626. KF01386
627. KF01387-388
628. MOFO_ARMQC_00000001
629. MOFO_ARMQC_00000002-003

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

630. MOFO_ARMQC_00000004-005
631. MOFO_ARMQC_00000006-027
632. QC_1151573-577
633. QCARM_0016229-242
634. QCARM_0024817
635. QCARM_0027985-986
636. QCARM_0028009-021
637. QCARM_0029006-011
638. QCARM_0029040-050
639. QCARM_0167334-355
640. QCARM_0167386-411
641. QCARM_0167946-957
642. QCARM_0169753-799
643. QCARM_0169823-873
644. QCARM_0208733-745
645. QCARM_0217597
646. QCARM_0218409-443
647. QCARM_0222545-546
648. QCARM_0229357-358
649. QCARM_0277129-130
650. QCARM_0314128-207
651. QCARM_0333656-801
652. QCARM_0337591-627
653. QCARM_0337838
654. QCARM_0337857-899
655. QCARM_0338180-242
656. QCARM_0338243-262
657. QCARM_0338352-429
658. QCARM_0338573-576
659. QCARM_0338883
660. QCARM_0339100-127
661. QCARM_0340003
662. QCARM_0340017-061
663. QCARM_0343120-142
664. QCARM_0343143-222
665. QCARM_0343533-587
666. QCARM_0343954-976
667. QCARM_0344783-788
668. QCARM_0345376-389
669. QCARM_0345914-921
670. QCARM_0350039-120
671. QCARM_0360161-176
672. QCARM_0362108-109
673. QCARM_0483799-800
674. QCARM_0562765-800
675. QCARM_0566625-627
676. QCARM_0569125-164
677. QCARM_0573247-291
678. QCARM_0579579-702
679. QCARM_0626519-521
680. QCARM_2412906-907
681. QCARM_2416747-748
682. QCARM_2423696-726
683. QCARM_2430175
684. QCARM_2430181-482
685. QCARM_2533808-815
686. QCARM_3004833-834
687. QCARM_3059661
688. QCARM_3066477-483
689. QCARM_3216178-185
690. QCARM_3313115
691. QCARM_3337526-529
692. QCARM_3337900-902
693. QCARM_3338108-110
694. QCARM_3339493-495
695. QCARM_3352796-798
696. QCARM_3353006-010
697. QCARM_3353040
698. QCARM_3353126-130
699. QCARM_3419636-638

Page 10 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

700. QCARM_3419788-792
701. QCARM_3421025-028
702. QCARM_3421029-033
703. QCARM_3425702-706
704. QCARM_3430479-482
705. QCARM_3432839-842
706. QCARM_3433743-780
707. QCARM_3449986-50012
708. QCARM_3464080-081
709. QCARM_3473070-073
710. QCARM_3480078-094
711. QCARM_3480078-097
712. QCARM_3485264-343
713. QCARM_3489547-552
714. QCARM_3496803-928
715. QCARM_3509490-520
716. QCARM_3509521-556
717. QCARM_3522626-628
718. QCARM_3522894
719. QCARM_3533982
720. QCARM_3534037
721. QCARM_3537383-406
722. QCARM_3537716-719
723. QCARM_3633088-132
724. QCARM_3961297-298
725. QCARM_3961355-357
726. QCARM_3961358-361
727. QCARM_3961513-530
728. QCARM_7401402-419
729. QCARM_7428754-756
730. QCARM_7429134-136
731. QCARM_7429297-301
732. QCARM_7430331-332
733. QCARM_7430333-334
734. QCARM_7431509-510
735. QCARM_7431828
736. QCARM_7431832-833
737. QCARM_7463823-928
738. QCARM_7464139-240
739. QCARM_7464653-757
740. QCARM_7464862-968
741. QCARM_7464969-5069
742. QCARM_7465288-401
743. QCARM_7465644-764
744. QCARM_7465765-878
745. QCARM_7465962-6075
746. QCARM_7466191-305
747. QCARM_7474253-254
748. QCARM_7475224-225
749. QCARM_7477117-118
750. QCARM_7484460-461
751. QCARM_7484463
752. QCARM_7484465-466
753. QCARM_7484477-479
754. QCARM_7484882-888
755. QCARM_7492376-453
756. QCARM_7515834-835
757. QCARM_7622616-618
758. QCVARM_0000061-070
759. QCVARM_0000085-091
760. QCVARM_0000092-097
761. QCVARM_0000114-116
762. QCVARM_0000123-128
763. QCVARM_0000135-138
764. QCVARM_0000142-146
765. QCVARM_0000180-183
766. QCVARM_0000218-223
767. QCVARM_0000269-275
768. QCVARM_0000395-399
769. QCVARM_0000482-483

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

770. QCVARM_0029609-623
771. QCVARM_0447175-181
772. QCVARM_0447242-243
773. QCVARM_0447248-251
774. QCVARM_0447252-254
775. QCVARM_0447464-473
776. QCVARM_0447871-944
777. QCVARM_0448066-078
778. QCVARM_0448085-098
779. QCVARM_0448361
780. QCVARM_0448362
781. QCVARM_0448757-766
782. QCVARM_0448842-844
783. QCVARM_0449160-164
784. QCVARM_0449561-565
785. QCVARM_0449653-657
786. QCVARM_0449658-661
787. QCVARM_0449883-900
788. QCVARM_0449950-955
789. QCVARM_0449970-972
790. QCVARM_0450016-017
791. QCVARM_0450024-050
792. QCVARM_0450176
793. QCVARM_0450192-194
794. QCVARM_0450317-319
795. QCVARM_0450320-324
796. QCVARM_0450425-437
797. QCVARM_0450438
798. QCVARM_0450606-614
799. QCVARM_0451587
800. QCVARM_0451824-825
801. QCVARM_0452199-224
802. QCVARM_0452296-299
803. QCVARM_0452326-328
804. QCVARM_0452397-401
805. QCVARM_0452598-605
806. QCVARM_0452684-686
807. QCVARM_0453129-137
808. QCVARM_0453334-353
809. QCVARM_0453724-799
810. QCVARM_0454071-072
811. QCVARM_0454629-635
812. QCVARM_0454821-824
813. QCVARM_0455016
814. QCVARM_0455212-268
815. QCVARM_0455341-354
816. QCVARM_0456283-287
817. QCVARM_0457029-035
818. QCVARM_0458346-386
819. QCVARM_0460408-411
820. QCVARM_0461296-303
821. QCVARM_0462995-3086
822. QCVARM_0463153-536
823. QCVARM_0463558
824. QCVARM_0463559-569
825. QCVARM_0463837-839
826. QCVARM_0464076-114
827. QCVARM_0464124-127
828. QCVARM_0464128-166
829. QCVARM_0464495-499
830. QCVARM_0464648-652
831. QCVARM_0465090-095
832. QCVARM_0465188-225
833. QCVARM_0465502-545
834. QCVARM_0465566-598
835. QCVARM_0465604-606
836. QCVARM_0465730-773
837. QCVARM_0465917-979
838. QCVARM_0465980-990
839. QCVARM_0466045-053

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

840. QCVARM_0466056-119
841. QCVARM_0466177-230
842. QCVARM_0466366-439
843. QCVARM_0466478-488
844. QCVARM_0466936-954
845. QCVARM_0467171-218
846. QCVARM_0467529
847. QCVARM_0467601-643
848. QCVARM_0467659-663
849. QCVARM_0467694-697
850. QCVARM_0467852-855
851. QCVARM_0468074-075
852. QCVARM_0468076-080
853. QCVARM_0468082
854. QCVARM_0468148
855. QCVARM_0468164-168
856. QCVARM_0468174-181
857. QCVARM_0468212-214
858. QCVARM_0468426-431
859. QCVARM_0468612-613
860. QCVARM_0468623-625
861. QCVARM_0520880-2725
862. QCVARM_0522726-728
863. QCVARM_0523650-652
864. QCVARM_0523656-668
865. QCVARM_0523730-732
866. QCVARM_0523754-758
867. QCVARM_0523826-831
868. QCVARM_0523837-842
869. QCVARM_0523995-998
870. QCVARM_0524007-011
871. QCVARM_0524138-220
872. QCVARM_0524237-253
873. QCVARM_0524362
874. QCVARM_0524624-626
875. QCVARM_0524718-720
876. QCVARM_0524726
877. QCVARM_0524739
878. QCVARM_0524775-777
879. QCVARM_0524900-902
880. QCVARM_0525081-081.00042
881. QCVARM_0525167-169
882. QCVARM_0525196-202
883. QCVARM_0525344-353
884. QCVARM_0525354-355
885. QCVARM_0525819
886. QCVARM_0525820
887. QCVARM_0525844-850
888. QCVARM_0526038
889. QCVARM_0526286
890. QCVARM_0526828-830
891. QCVARM_0527125-134
892. QCVARM_0527427-438
893. QCVARM_0527470-502
894. QCVARM_0527544-548
895. QCVARM_0527827-830
896. QCVARM_0527863-885
897. QCVARM_0528119
898. QCVARM_0528826
899. QCVARM_0528936-938
900. QCVARM_0528955
901. QCVARM_0528956-963
902. QCVARM_0528981
903. QCVARM_0529021
904. QCVARM_0529072-077
905. QCVARM_0529438-454
906. QCVARM_0529703-707
907. QCVARM_0529842-886
908. QCVARM_0529887-889
909. QCVARM_0530133-151

Page 13 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

910. QCVARM_0530245-256
911. QCVARM_0530447-453
912. QCVARM_0531270-272
913. QCVARM_0531350-361
914. QCVARM_0531368
915. QCVARM_0531514-552
916. QCVARM_0531658-661
917. QCVARM_0531817-820
918. QCVARM_0531821-824
919. QCVARM_0531864
920. QCVARM_0531892-913
921. QCVARM_0531919-920
922. QCVARM_0532239-257
923. QCVARM_0532274-275
924. QCVARM_0532413-457
925. QCVARM_0532997-998
926. QCVARM_0534596-963
927. QCVARM_0534597-618
928. QCVARM_0535116-119
929. QCVARM_0535154-156
930. QCVARM_0535481-500
931. QCVARM_0535654
932. QCVARM_0535721-728
933. QCVARM_0535870-871
934. QCVARM_0535902-905
935. QCVARM_0537065-074
936. QCVARM_0539180-184
937. QCVARM_0539482-484
938. QCVARM_0540468-472
939. QCVARM_0543859-869
940. QCVARM_0544259-259.00003
941. QCVARM_0571333-349
942. QCVARM_0571705-715
943. QCVARM_0572833-834
944. QCVARM_0572851-857
945. QCVARM_0572936-967
946. QCVARM_0573056-057
947. QCVARM_0573354-356
948. QCVARM_0573669-670
949. QCVARM_0573671-673
950. QCVARM_0573677-678
951. QCVARM_0573684
952. QCVARM_0573685-686
953. QCVARM_0575290
954. QCVARM_0575607-610
955. QCVARM_0575611-612
956. QCVARM_0575613-614
957. QCVARM_0575615
958. QCVARM_0575616
959. QCVARM_0575617-620
960. QCVARM_0575634-635
961. QCVARM_0575636-637
962. QCVARM_0575825-828
963. QCVARM_0577503-505
964. QCVARM_0577544
965. QCVARM_0578265-266
966. QCVARM_0579532-540
967. QCVARM_0580173-180
968. QCVARM_0580181-193
969. QCVARM_0595522-529
970. QCVARM_0595815
971. QCVARM_0599620-623
972. QCVARM_0599801-802
973. QCVARM_0600037
974. QCVARM_0600038
975. QCVARM_0600039
976. QCVARM_0600040
977. QCVARM_0600041
978. QCVARM_0600042
979. QCVARM_0600043

Page 14 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

980. QCVARM_0600044
981. QCVARM_0600045
982. QCVARM_0600046
983. QCVARM_0600047
984. QCVARM_0600048
985. QCVARM_0600049
986. QCVARM_0600050
987. QCVARM_0600051
988. QCVARM_0600052
989. QCVARM_0600053
990. QCVARM_0600054
991. QCVARM_0600055
992. QCVARM_0600056
993. QCVARM_0600057
994. QCVARM_0600058
995. QCVARM_0600059
996. QCVARM_0600060
997. QCVARM_0600061
998. QCVARM_0600062
999. QCVARM_0600063
1000. QCVARM_0600064
1001. QCVARM_0600065
1002. QCVARM_0600066
1003. QCVARM_0600067
1004. QCVARM_0600068
1005. QCVARM_0600069
1006. QCVARM_0600070
1007. QCVARM_0600071
1008. QCVARM_0600072
1009. QCVARM_0600073
1010. QCVARM_0600074
1011. QCVARM_0600075
1012. QCVARM_0600076
1013. QCVARM_0600077
1014. QCVARM_0600078
1015. QCVARM_0600079
1016. QCVARM_0600080
1017. QCVARM_0600081
1018. QCVARM_0600082
1019. QCVARM_0600083
1020. QCVARM_0600084
1021. QCVARM_0600085
1022. QCVARM_0600086
1023. QCVARM_0600087
1024. QCVARM_0600088
1025. QCVARM_0600089
1026. QCVARM_0600090
1027. QCVARM_0600091
1028. QCVARM_0600092
1029. QCVARM_0600093
1030. QCVARM_0600094
1031. QCVARM_0600095
1032. QCVARM_0600096
1033. QCVARM_0600097
1034. QCVARM_0600098-100
1035. QCVARM_0600101-103
1036. QCVARM_0600222
1037. QCVARM_0600236
1038. QCVARM_0600331
1039. QCVARM_0600533-553
1040. QCVARM_0600730-734
1041. QCVARM_0600801-804
1042. QCVARM_0601671-694
1043. QCVARM_0601718-723
1044. QCVARM_0601787-797
1045. QCVARM_0601923-926
1046. QCVARM_0602168-177
1047. QCVARM_0602198-203
1048. QCVARM_0602227-228
1049. QCVARM_0602258-261

Page 15 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**

**Documents Reviewed and/or Relied Upon**

1050. QCVARM_0602295-299
1051. QCVARM_0602317-321
1052. QCVARM_0602359-361
1053. QCVARM_0602395-2400
1054. QCVARM_0602404-405
1055. QCVARM_0602434-435
1056. QCVARM_0602564-565
1057. QCVARM_0602952-963
1058. QCVARM_0604135-150
1059. QCVARM_0604257-259
1060. QCVARM_0605055-062
1061. QCVARM_0605502-538
1062. QCVARM_0605658-659
1063. QCVARM_0605660-660.00007
1064. QCVARM_0605661-666
1065. QCVARM_0605876-941
1066. QCVARM_0606806-812
1067. QCVARM_0607060
1068. QCVARM_0607506-509
1069. QCVARM_0607680-688
1070. QCVARM_0607691-696
1071. QCVARM_0608106-107
1072. QCVARM_0608131-138
1073. QCVARM_0608314-316
1074. QCVARM_0608391-393
1075. QCVARM_0608423-424
1076. QCVARM_0608452-461
1077. QCVARM_0608501-504
1078. QCVARM_0608626-655
1079. QCVARM_0608764-767
1080. QCVARM_0609540
1081. QCVARM_0609541-542
1082. QCVARM_0609543-544
1083. QCVARM_0609881-889
1084. QCVARM_0612367-376
1085. QCVARM_0613037-039
1086. QCVARM_0613083-084
1087. QCVARM_0613160-169
1088. QCVARM_0615918-919
1089. QCVARM_0616170-171
1090. QCVARM_0616348
1091. QCVARM_0616349-431
1092. QCVARM_0616633-634
1093. QCVARM_0616636-674
1094. QCVARM_0616687-688
1095. QCVARM_0616871-873
1096. QCVARM_0616906
1097. QCVARM_0616907-911
1098. QCVARM_0616912-913
1099. QCVARM_0616914-915
1100. QCVARM_0616916-918
1101. QCVARM_0616919
1102. QCVARM_0616920-927
1103. QCVARM_0616928-934
1104. QCVARM_0616935
1105. QCVARM_0616936-938
1106. QCVARM_0616939-641
1107. QCVARM_0616942-946
1108. QCVARM_0616947
1109. QCVARM_0616948-949
1110. QCVARM_0616950-951
1111. QCVARM_0616952-954
1112. QCVARM_0616955-958
1113. QCVARM_0616959-962
1114. QCVARM_0616963
1115. QCVARM_0616964
1116. QCVARM_0616965-966
1117. QCVARM_0616967-969
1118. QCVARM_0616970-974
1119. QCVARM_0616975-976

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1120. QCVARM_0617243
1121. QCVARM_0617244
1122. QCVARM_0617401-403
1123. QCVARM_0617453
1124. QCVARM_0617454-455
1125. QCVARM_0617456-458
1126. QCVARM_0617459-459.000019
1127. QCVARM_0617460-461
1128. QCVARM_0617462-516
1129. QCVARM_0617517-538
1130. QCVARM_0617730-738
1131. QCVARM_0617739-741
1132. QCVARM_0617756-759
1133. QCVARM_0617760-768
1134. QCVARM_0617829-831
1135. QCVARM_0617902
1136. QCVARM_0617903-905
1137. QCVARM_0617947
1138. QCVARM_0617948-950
1139. QCVARM_0617951-953
1140. QCVARM_0617954-956
1141. QCVARM_0617957
1142. QCVARM_0617958-960
1143. QCVARM_0617961-963
1144. QCVARM_0617964-966
1145. QCVARM_0617978-979
1146. QCVARM_0618320
1147. QCVARM_0618324-327
1148. QCVARM_0618336-337
1149. QCVARM_0618338-340
1150. QCVARM_0618354
1151. QCVARM_0618377-381
1152. QCVARM_0618387-388
1153. QCVARM_0618420-423
1154. QCVARM_0618448
1155. QCVARM_0618449
1156. QCVARM_0618450
1157. QCVARM_0618453
1158. QCVARM_0618454
1159. QCVARM_0618455
1160. QCVARM_0618456-458
1161. QCVARM_0618459-460
1162. QCVARM_0618461-463
1163. QCVARM_0618568-569
1164. QCVARM_0618694-695
1165. QCVARM_0618702
1166. QCVARM_0618703-704
1167. QCVARM_0618705-706
1168. QCVARM_0618707
1169. QCVARM_0618708-711
1170. QCVARM_0618712
1171. QCVARM_0618741-746
1172. QCVARM_0618843-850
1173. QCVARM_0618975-976
1174. QCVARM_0621447
1175. QCVARM_0621448-540
1176. QCVARM_0621692
1177. QCVARM_0624133-135
1178. QCVARM_0626519-521
1179. QCVARM_0626590-598
1180. QCVARM_0626603-611
1181. QCVARM_0667395-396
1182. QCVARM_0685544-547
1183. QCVARM_0685578-579
1184. QCVARM_0687237-238
1185. QCVARM_0687476-478
1186. QCVARM_0687479-481
1187. QCVARM_0687758-759
1188. QCVARM_0687760
1189. QCVARM_0687766-768

Page 17 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1190. QCVARM_0687862-864
1191. QCVARM_0688777
1192. QCVARM_0688778
1193. QCVARM_0688834-835
1194. QCVARM_0688922-924
1195. QCVARM_0688932-934
1196. QCVARM_0689117-120
1197. QCVARM_0691521-525
1198. QCVARM_0691526-530
1199. QCVARM_0691853-854
1200. QCVARM_0692586-588
1201. QCVARM_0692665-666
1202. QCVARM_0692718
1203. QCVARM_0699176-177
1204. QCVARM_0699179-181
1205. QCVARM_0699275-277
1206. QCVARM_0699278-281
1207. QCVARM_0707732-034
1208. QCVARM_0707997-999
1209. QCVARM_0708086-087
1210. QCVARM_0708107-108
1211. QCVARM_0708118-121
1212. QCVARM_0709978-991
1213. QCVARM_0710047-120
1214. QCVARM_0710418-418.00029
1215. QCVARM_0711109
1216. QCVARM_0711110-113
1217. QCVARM_0712363
1218. QCVARM_0712364-383
1219. QCVARM_0713409
1220. QCVARM_0713410-441
1221. QCVARM_0713477-479
1222. QCVARM_0713488-489
1223. QCVARM_0713513-515
1224. QCVARM_0713516-517
1225. QCVARM_0713527
1226. QCVARM_0713528
1227. QCVARM_0713530-531
1228. QCVARM_0713532-534
1229. QCVARM_0713535-537
1230. QCVARM_0713538
1231. QCVARM_0713652-654
1232. QCVARM_0713665-668
1233. QCVARM_0713773-775
1234. QCVARM_0713840-842
1235. QCVARM_0717359-360
1236. QCVARM_0717660
1237. QCVARM_0717756
1238. QCVARM_0717757-761
1239. QCVARM_0717764
1240. QCVARM_0717765-767
1241. QCVARM_0717964-965
1242. QCVARM_0846761-870
1243. QCVARM_0846871-925
1244. QCVARM_0847000-056
1245. QCVARM_0847094-099
1246. QCVARM_0847182-183
1247. QCVARM_0847184-185
1248. QCVARM_0847668-671
1249. QCVARM_0847765-812
1250. QCVARM_0848786-853
1251. QCVARM_0848924-9042
1252. QCVARM_0850604-606
1253. QCVARM_0850838-892
1254. QCVARM_0850937-993
1255. QCVARM_0851120-180
1256. QCVARM_0851183-225
1257. QCVARM_0851271-276
1258. QCVARM_0851333-393
1259. QCVARM_0851410-411

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1260. QCVARM_0851449-505
1261. QCVARM_0851511
1262. QCVARM_0851512-555
1263. QCVARM_0851782-836
1264. QCVARM_0851837-875
1265. QCVARM_0851876-907
1266. QCVARM_0852203-286
1267. QCVARM_0852621-644
1268. QCVARM_0854027-044
1269. QCVARM_0854985-5046
1270. QCVARM_0855117-132
1271. QCVARM_0855434-436
1272. QCVARM_0855438-446
1273. QCVARM_0855455-456
1274. QCVARM_0855474-476
1275. QCVARM_0855614
1276. QCVARM_0855614-615
1277. QCVARM_0856270
1278. QCVARM_0856270-271
1279. QCVARM_0856340-753
1280. QCVARM_0856754-778
1281. QCVARM_0856864-866
1282. QCVARM_0856888-894
1283. QCVARM_0857113-148
1284. QCVARM_0863181-185
1285. QCVARM_0863300-323
1286. QCVARM_0863428-431
1287. QCVARM_0863435-437
1288. QCVARM_0863641-643
1289. QCVARM_0863644-646
1290. QCVARM_0863810-823
1291. QCVARM_0864030-057
1292. QCVARM_0864277-282
1293. QCVARM_0864713
1294. QCVARM_0864833
1295. QCVARM_0864833-837
1296. QCVARM_0864838
1297. QCVARM_0864839-842
1298. QCVARM_0864901-903
1299. QCVARM_0864924-925
1300. QCVARM_0864933-934
1301. QCVARM_0864967-968
1302. QCVARM_0864969-972
1303. QCVARM_0865022-028
1304. QCVARM_0865233
1305. QCVARM_0865236-240
1306. QCVARM_0865279-283
1307. QCVARM_0865343
1308. QCVARM_0865344-348
1309. QCVARM_0865360
1310. QCVARM_0865367-369
1311. QCVARM_0865370
1312. QCVARM_0865412-414
1313. QCVARM_0865415
1314. QCVARM_0865420-425
1315. QCVARM_0865430-431
1316. QCVARM_0865435
1317. QCVARM_0865479-480
1318. QCVARM_0865488-489
1319. QCVARM_0865490
1320. QCVARM_0865602-601
1321. QCVARM_0866177
1322. QCVARM_1014030-112
1323. QCVARM_1014162-171
1324. QCVARM_1014186-204
1325. QCVARM_1014307-309
1326. QCVARM_1014424-451
1327. QCVARM_1014892
1328. QCVARM_1014955
1329. QCVARM_1015219-221

Page 19 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1330. QCVARM_1015426
1331. QCVARM_1015438
1332. QCVARM_1015821-843
1333. QCVARM_1016051-077
1334. QCVARM_1016205-216
1335. QCVARM_1016218-237
1336. QCVARM_1016837-679
1337. QCVARM_1017127-148
1338. QCVARM_1017149-168
1339. QCVARM_1017169-187
1340. QCVARM_1017295-327
1341. QCVARM_1017417-437
1342. QCVARM_1017438-463
1343. QCVARM_1017467-493
1344. QCVARM_1017747
1345. QCVARM_1017997
1346. QCVARM_1019251-252
1347. QCVARM_1019256
1348. QCVARM_1020165-215
1349. QCVARM_1022267
1350. QCVARM_1022268
1351. QCVARM_1022565-579
1352. QCVARM_1023593-611
1353. QCVARM_1024852
1354. QCVARM_1024873-877
1355. QCVARM_1026209-231
1356. QCVARM_1028388
1357. QCVARM_1028558-560
1358. QCVARM_1028750-751
1359. QCVARM_1029604-607
1360. QCVARM_1029757-758
1361. QCVARM_1029911-912
1362. QCVARM_1030011-012
1363. QCVARM_1030509-510
1364. QCVARM_1030726-729
1365. QCVARM_1030813-814
1366. QCVARM_1031097-098
1367. QCVARM_1031251-255
1368. QCVARM_1031267-268
1369. QCVARM_1034376-377
1370. QCVARM_1042773-775
1371. QCVARM_1042776
1372. QCVARM_1042777-779
1373. QCVARM_1042780
1374. QCVARM_1057229-8013
1375. QCVARM_1066278
1376. QCVARM_1066761-804
1377. QCVARM_1067283
1378. QCVARM_1067284
1379. QCVARM_1067287-301
1380. QCVARM_1067304-305
1381. QCVARM_1067306-312
1382. QCVARM_1067338-344
1383. QCVARM_1067662-664
1384. QCVARM_1067971-8007
1385. QCVARM_1068133-134
1386. QCVARM_1068137-139
1387. QCVARM_1068141-148
1388. QCVARM_1068152-163
1389. QCVARM_1068191-214
1390. QCVARM_1068222-230
1391. QCVARM_1068352-355
1392. QCVARM_1068356-359
1393. QCVARM_1068388-396
1394. QCVARM_1068434-442
1395. QCVARM_1068459-467
1396. QCVARM_1068512-515
1397. QCVARM_1068516-520
1398. QCVARM_1068521-524
1399. QCVARM_1068525-534

Page 20 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1400. QCVARM_1068603-611
1401. QCVARM_1068612-621
1402. QCVARM_1068645-652
1403. QCVARM_1068666-670
1404. QCVARM_1068739-904
1405. QCVARM_1068905-921
1406. QCVARM_1068922-965
1407. QCVARM_1068967-968
1408. QCVARM_1068986-987
1409. QCVARM_1068988-989
1410. QCVARM_1068990-993
1411. QCVARM_1068995-9013
1412. QCVARM_1069077-081
1413. QCVARM_1069082-086
1414. QCVARM_1069106-110
1415. QCVARM_1069112-126
1416. QCVARM_1069129-147
1417. QCVARM_1069363-433
1418. QCVARM_1069483-535
1419. QCVARM_1069555-659
1420. QCVARM_1069674-675
1421. QCVARM_1069705-707
1422. QCVARM_1069708-709
1423. QCVARM_1069710
1424. QCVARM_1069941-944
1425. QCVARM_1069945-948
1426. QCVARM_1069949-952
1427. QCVARM_1070005-007
1428. QCVARM_1070014-019
1429. QCVARM_1070027-028
1430. QCVARM_1070034-040
1431. QCVARM_1070077
1432. QCVARM_1070081-083
1433. QCVARM_1070271-278
1434. QCVARM_1070640-642
1435. QCVARM_1070831-833
1436. QCVARM_1071192
1437. QCVARM_1071193
1438. QCVARM_1071194
1439. QCVARM_1071199
1440. QCVARM_1071201-230
1441. QCVARM_1071232-238
1442. QCVARM_1071244
1443. QCVARM_1071246
1444. QCVARM_1071248-499
1445. QCVARM_1071500-501
1446. QCVARM_1071502-962
1447. QCVARM_1071972-979
1448. QCVARM_1071980-992
1449. QCVARM_1071993-994
1450. QCVARM_1072199-500
1451. QCVARM_1073895-4048
1452. QCVARM_1088375-488
1453. QCVARM_1090346-695
1454. QCVARM_1115364
1455. QCVARM_1115421-423
1456. QCVARM_1115424-426
1457. QCVARM_1115427
1458. QCVARM_1117815-817
1459. QCVARM_1117818-820
1460. QCVARM_1117821-824
1461. QCVARM_1117825-827
1462. QCVARM_1117836-838
1463. QCVARM_1117839-842
1464. QCVARM_1117843-846
1465. QCVARM_1117847-850
1466. QCVARM_1117851-854
1467. QCVARM_1117866-869
1468. QCVARM_1117873-876
1469. QCVARM_1117877-879

Page 21 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1470. QCVARM_1117880-883
1471. QCVARM_1117884-887
1472. QCVARM_1117891-894
1473. QCVARM_1117898-900
1474. QCVARM_1117901-904
1475. QCVARM_1117905-908
1476. QCVARM_1117909-912
1477. QCVARM_1117934-937
1478. QCVARM_1117938-941
1479. QCVARM_1117942-944
1480. QCVARM_1117948-951
1481. QCVARM_1117956-959
1482. QCVARM_1117960-963
1483. QCVARM_1117971-973
1484. QCVARM_1117977-980
1485. QCVARM_1117981-984
1486. QCVARM_1117985-988
1487. QCVARM_1117989-991
1488. QCVARM_1118003-008
1489. QCVARM_1118009-011
1490. QCVARM_1118012-015
1491. QCVARM_1118016-019
1492. QCVARM_1118020-023
1493. QCVARM_1118024-028
1494. QCVARM_1118029-032
1495. QCVARM_1118036-039
1496. QCVARM_1118040-042
1497. QCVARM_1118043-047
1498. QCVARM_1118051-054
1499. QCVARM_1118055-058
1500. QCVARM_1118059-063
1501. QCVARM_1118064-066
1502. QCVARM_1118067-070
1503. QCVARM_1118081-084
1504. QCVARM_1118085-088
1505. QCVARM_1118089-092
1506. QCVARM_1118093-096
1507. QCVARM_1118097-099
1508. QCVARM_1118100-103
1509. QCVARM_1118104-107
1510. QCVARM_1118115
1511. QCVARM_1118116
1512. QCVARM_1118146-147
1513. QCVARM_1118463-465
1514. QCVARM_1118481-482
1515. QCVARM_1118510-514
1516. QCVARM_1118515-517
1517. QCVARM_1118518-523
1518. QCVARM_1118524-527
1519. QCVARM_1118528-530
1520. QCVARM_1118531-533
1521. QCVARM_1118534-537
1522. QCVARM_1118538-542
1523. QCVARM_1118543-545
1524. QCVARM_1118546-548
1525. QCVARM_1118549-551
1526. QCVARM_1118552-554
1527. QCVARM_1118555-558
1528. QCVARM_1118559-564
1529. QCVARM_1118565-566
1530. QCVARM_1118596-599
1531. QCVARM_1118617-619
1532. QCVARM_1118760-776
1533. QCVARM_1118779-782
1534. QCVARM_1118787-791
1535. QCVARM_1118795-799
1536. QCVARM_1118800-803
1537. QCVARM_1118820-825
1538. QCVARM_1118832-834
1539. QCVARM_1118836-838

Page 22 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1540. QCVARM_1118842-843
1541. QCVARM_1118844-851
1542. QCVARM_1118862-864
1543. QCVARM_1118865-866
1544. QCVARM_1118870-871
1545. QCVARM_1118884-888
1546. QCVARM_1118890-891
1547. QCVARM_1118894-895
1548. QCVARM_1118896-897
1549. QCVARM_1118898-899
1550. QCVARM_1118901-902
1551. QCVARM_1118926-927
1552. QCVARM_1118928
1553. QCVARM_1118929-930
1554. QCVARM_1118931
1555. QCVARM_1118933
1556. QCVARM_1118934-936
1557. QCVARM_1118945-946
1558. QCVARM_1118972-973
1559. QCVARM_1118976-977
1560. QCVARM_1118978-979
1561. QCVARM_1118980-981
1562. QCVARM_1118983-985
1563. QCVARM_1118986-987
1564. QCVARM_1118988-899
1565. QCVARM_1118990-991
1566. QCVARM_1118995-996
1567. QCVARM_1118997
1568. QCVARM_1118998
1569. QCVARM_1118999-9000
1570. QCVARM_1119004
1571. QCVARM_1119005-007
1572. QCVARM_1119008-011
1573. QCVARM_1119015-017
1574. QCVARM_1119018-019
1575. QCVARM_1119020-022
1576. QCVARM_1119023-024
1577. QCVARM_1119025-026
1578. QCVARM_1119027-029
1579. QCVARM_1119030-031
1580. QCVARM_1119032-033
1581. QCVARM_1119070-071
1582. QCVARM_1119074-075
1583. QCVARM_1119120-022
1584. QCVARM_1119347-352
1585. QCVARM_1120024
1586. QCVARM_1120466
1587. QCVARM_1120481
1588. QCVARM_1120482-485
1589. QCVARM_1120486-490
1590. QCVARM_1120490-495
1591. QCVARM_1120495-496
1592. QCVARM_1120496-497
1593. QCVARM_1120497-534
1594. QCVARM_1120498-535
1595. QCVARM_1120535-539
1596. QCVARM_1120540-545
1597. QCVARM_1120546-547
1598. QCVARM_1120548
1599. QCVARM_1120549
1600. QCVARM_1120550
1601. QCVARM_1120551
1602. QCVARM_1120552
1603. QCVARM_1120553
1604. QCVARM_1120554
1605. QCVARM_1120555
1606. QCVARM_1120556
1607. QCVARM_1120557
1608. QCVARM_1120558
1609. QCVARM_1120559

Page 23 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1610. QCVARM_1120560
1611. QCVARM_1120561
1612. QCVARM_1120562
1613. QCVARM_1120563
1614. QCVARM_1120564
1615. QCVARM_1120565
1616. QCVARM_1120566
1617. QCVARM_1120567
1618. QCVARM_1120568
1619. QCVARM_1120569
1620. QCVARM_1120570
1621. QCVARM_1120571
1622. QCVARM_1120572
1623. QCVARM_1120573
1624. QCVARM_1120574
1625. QCVARM_1120575
1626. QCVARM_1120576
1627. QCVARM_1120577
1628. QCVARM_1120578
1629. QCVARM_1120579
1630. QCVARM_1120580
1631. QCVARM_1120581
1632. QCVARM_1120582
1633. QCVARM_1120583
1634. QCVARM_1120584
1635. QCVARM_1120585
1636. QCVARM_1120586
1637. QCVARM_1120587
1638. QCVARM_1120588
1639. QCVARM_1120589
1640. QCVARM_1120590
1641. QCVARM_1120591
1642. QCVARM_1120592
1643. QCVARM_1120593
1644. QCVARM_1120594
1645. QCVARM_1120595
1646. QCVARM_1120596
1647. QCVARM_1120597
1648. QCVARM_1120598
1649. QCVARM_1120599
1650. QCVARM_1120600
1651. QCVARM_1120601
1652. QCVARM_1120602
1653. QCVARM_1120603
1654. QCVARM_1120604
1655. QCVARM_1120605
1656. QCVARM_1120606
1657. QCVARM_1120607
1658. QCVARM_1120608
1659. QCVARM_1120609
1660. QCVARM_1120610
1661. QCVARM_1120611
1662. QCVARM_1120612
1663. QCVARM_1120613
1664. QCVARM_1120614
1665. QCVARM_1120615
1666. QCVARM_1120616
1667. QCVARM_1120617
1668. QCVARM_1120618
1669. QCVARM_1120619
1670. QCVARM_1120620
1671. QCVARM_1120621
1672. QCVARM_1120622
1673. QCVARM_1120623
1674. QCVARM_1120624
1675. QCVARM_1120625
1676. QCVARM_1120626
1677. QCVARM_1120627
1678. QCVARM_1120628
1679. QCVARM_1120629

Page 24 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1680. QCVARM_1120630
1681. QCVARM_1120631
1682. QCVARM_1120632
1683. QCVARM_1120633
1684. QCVARM_1120634
1685. QCVARM_1120635
1686. QCVARM_1120636
1687. QCVARM_1120637
1688. QCVARM_1120638
1689. QCVARM_1120639
1690. QCVARM_1120640
1691. QCVARM_1120641
1692. QCVARM_1120642
1693. QCVARM_1120643
1694. QCVARM_1120644
1695. QCVARM_1120645
1696. QCVARM_1120646
1697. QCVARM_1120647
1698. QCVARM_1120648
1699. QCVARM_1120649
1700. QCVARM_1120650
1701. QCVARM_1120651
1702. QCVARM_1120652
1703. QCVARM_1120653
1704. QCVARM_1120654
1705. QCVARM_1120655
1706. QCVARM_1120656
1707. QCVARM_1120657
1708. QCVARM_1120658
1709. QCVARM_1120659
1710. QCVARM_1120660
1711. QCVARM_1120661
1712. QCVARM_1120662
1713. QCVARM_1120663
1714. QCVARM_1120664
1715. QCVARM_1120665
1716. QCVARM_1120666
1717. QCVARM_1120667
1718. QCVARM_1120668
1719. QCVARM_1120669
1720. QCVARM_1120670
1721. QCVARM_1120671
1722. QCVARM_1120672
1723. QCVARM_1120673
1724. QCVARM_1120674
1725. QCVARM_1120675
1726. QCVARM_1120676
1727. QCVARM_1120677
1728. QCVARM_1120678
1729. QCVARM_1120679
1730. QCVARM_1120680
1731. QCVARM_1120681
1732. QCVARM_1120682
1733. QCVARM_1120683
1734. QCVARM_1120684
1735. QCVARM_1120685
1736. QCVARM_1120686
1737. QCVARM_1120687
1738. QCVARM_1120688
1739. QCVARM_1120689
1740. QCVARM_1120690
1741. QCVARM_1120691
1742. QCVARM_1120692
1743. QCVARM_1120693
1744. QCVARM_1120694
1745. QCVARM_1120695
1746. QCVARM_1120696
1747. QCVARM_1120697
1748. QCVARM_1120698
1749. QCVARM_1120699

Page 25 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1750. QCVARM_1120700
1751. QCVARM_1120701
1752. QCVARM_1120702
1753. QCVARM_1120703
1754. QCVARM_1120704
1755. QCVARM_1120705
1756. QCVARM_1120706
1757. QCVARM_1120707
1758. QCVARM_1120708
1759. QCVARM_1120709
1760. QCVARM_1120710
1761. QCVARM_1120711
1762. QCVARM_1120712
1763. QCVARM_1120713
1764. QCVARM_1120714
1765. QCVARM_1120715
1766. QCVARM_1120716
1767. QCVARM_1120717
1768. QCVARM_1120718
1769. QCVARM_1120719
1770. QCVARM_1120720
1771. QCVARM_1120721
1772. QCVARM_1120722
1773. QCVARM_1120723
1774. QCVARM_1120724
1775. QCVARM_1120725
1776. QCVARM_1120726
1777. QCVARM_1120727
1778. QCVARM_1120728
1779. QCVARM_1120773-784
1780. QCVARM_1120811
1781. QCVARM_1120812-815
1782. QCVARM_1120816-817
1783. QCVARM_1120818-820
1784. QCVARM_1120821-824
1785. QCVARM_1120825-828
1786. QCVARM_1120829-832
1787. QCVARM_1120833-835
1788. QCVARM_1120836-838
1789. QCVARM_1120839-842
1790. QCVARM_1120843-846
1791. QCVARM_1120847-850
1792. QCVARM_1120851-953
1793. QCVARM_1120960
1794. QCVARM_1120961
1795. QCVARM_1120962-965
1796. QCVARM_1120966-696
1797. QCVARM_1120971-973
1798. QCVARM_1120974-977
1799. QCVARM_1120979-982
1800. QCVARM_1120983-986
1801. QCVARM_1120987-991
1802. QCVARM_1120994-998
1803. QCVARM_1120999-1003
1804. QCVARM_1121004-007
1805. QCVARM_1121008-012
1806. QCVARM_1121013-017
1807. QCVARM_1121018-022
1808. QCVARM_1121023-027
1809. QCVARM_1121028
1810. QCVARM_1121029-032
1811. QCVARM_1121033-034
1812. QCVARM_1121035-036
1813. QCVARM_1121144-146
1814. QCVARM_1121147-149
1815. QCVARM_1121154-155
1816. QCVARM_1121156-159
1817. QCVARM_1121160-162
1818. QCVARM_1121163-166
1819. QCVARM_1121167-170

Page 26 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**

**Documents Reviewed and/or Relied Upon**

1820. QCVARM_1121172-175
1821. QCVARM_1121176-181
1822. QCVARM_1121182-186
1823. QCVARM_1121187-191
1824. QCVARM_1121192-196
1825. QCVARM_1121198-202
1826. QCVARM_1121203-206
1827. QCVARM_1121207-210
1828. QCVARM_1121211-212
1829. QCVARM_1121223-226
1830. QCVARM_1121229-233
1831. QCVARM_1121238-240
1832. QCVARM_1121241
1833. QCVARM_1121242-243
1834. QCVARM_1121312
1835. QCVARM_1121313
1836. QCVARM_1121314
1837. QCVARM_1121315
1838. QCVARM_1121316
1839. QCVARM_1121317
1840. QCVARM_1121318
1841. QCVARM_1121319
1842. QCVARM_1121320
1843. QCVARM_1121321
1844. QCVARM_1121322
1845. QCVARM_1121323
1846. QCVARM_1121324
1847. QCVARM_1121325
1848. QCVARM_1121326
1849. QCVARM_1121327
1850. QCVARM_1121328
1851. QCVARM_1121329
1852. QCVARM_1121330
1853. QCVARM_1121331
1854. QCVARM_1121332
1855. QCVARM_1121333
1856. QCVARM_1121334
1857. QCVARM_1121335
1858. QCVARM_1121336
1859. QCVARM_1121337
1860. QCVARM_1121338-340
1861. QCVARM_1121341
1862. QCVARM_1121342-343
1863. QCVARM_1121344-345
1864. QCVARM_1121346-347
1865. QCVARM_1121348-349
1866. QCVARM_1121350
1867. QCVARM_1121351
1868. QCVARM_1121354
1869. QCVARM_1121359
1870. QCVARM_1121360-361
1871. QCVARM_1121362
1872. QCVARM_1121491
1873. QCVARM_1121493-496
1874. QCVARM_1121510-513
1875. QCVARM_1121514-517
1876. QCVARM_1121518
1877. QCVARM_1121519
1878. QCVARM_1121522-523
1879. QCVARM_1121528
1880. QCVARM_1121529-530
1881. QCVARM_1121531
1882. QCVARM_1121536-537
1883. QCVARM_1121538-540
1884. QCVARM_1121541-673
1885. QCVARM_1121674-857
1886. QCVARM_1121930
1887. QCVARM_1121931
1888. QCVARM_1121932-990
1889. QCVARM_1122336-337

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1890. QCVARM_1122338
1891. QCVARM_1122342-348
1892. QCVARM_1122355-405
1893. QCVARM_1122406-414
1894. QCVARM_1122415-428
1895. QCVARM_1122429-430
1896. QCVARM_1122431-433
1897. QCVARM_1122434-438
1898. QCVARM_1122439-447
1899. QCVARM_1122454-459
1900. QCVARM_1122462-463
1901. QCVARM_1122464-471
1902. QCVARM_1122485
1903. QCVARM_1122486-488
1904. QCVARM_1122489
1905. QCVARM_1122490-491
1906. QCVARM_1122492
1907. QCVARM_1122493-496
1908. QCVARM_1122504-506
1909. QCVARM_1122508-512
1910. QCVARM_1122515-517
1911. QCVARM_1122590-651
1912. QCVARM_1122672-675
1913. QCVARM_1122676-677
1914. QCVARM_1122684-687
1915. QCVARM_1122696-697
1916. QCVARM_1122701-712
1917. QCVARM_1122713-714
1918. QCVARM_1122715-716
1919. QCVARM_1122717-719
1920. QCVARM_1122720-724
1921. QCVARM_1122725
1922. QCVARM_1122726-728
1923. QCVARM_1122730
1924. QCVARM_1122731
1925. QCVARM_1122733
1926. QCVARM_1122735
1927. QCVARM_1122737
1928. QCVARM_1151573-577
1929. QCVARM_1151578-581
1930. QCVARM_1151582-585
1931. QCVARM_1151586-590
1932. QCVARM_1151591-596
1933. QCVARM_1151597-602
1934. QCVARM_1151603-607
1935. QCVARM_1151608-610
1936. QCVARM_1151611-613
1937. QCVARM_1151619
1938. QCVARM_1151620
1939. QCVARM_1151964
1940. QCVARM_1151965
1941. QCVARM_1151966
1942. QCVARM_3212686-689
1943. QCVARM_3432839-842
1944. QCVARM_3522626-628
1945. QSC2ARMVQC00000592-621
1946. Expert Report of Dr. Michael Brogioli, September 5, 2025
1947. Expert Report of Patrick F. Kennedy, Ph.D., August 8, 2025
1948. Deposition of William Abbey, June 26, 2025, and exhibits thereto
1949. Deposition of Vivek N. Agrawal, July 11, 2025, and exhibits thereto
1950. Deposition of Cristiano R. Amon, July 3, 2025, and exhibits thereto
1951. 30(b)(6) Deposition of Ziad Ashgar, July 7, 2025, and exhibits thereto
1952. Deposition of Mohamed Awad, July 29, 2025, and exhibits thereto
1953. Deposition of Ami Badani, August 1, 2025, and exhibits thereto

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

1954. Deposition of Akshay Bhatnagar, July 10, 2025, and exhibits thereto
1955. Deposition of Aparajita Bhattacharya, July 7, 2025, and exhibits thereto
1956. 30(b)(6) Deposition of Ann N.C. Chaplin, July 11, 2025, and exhibits thereto
1957. 30(b)(1) and 30(b)(6) Deposition of Larissa Cochron, July 11, 2025, and exhibits thereto
1958. 30(b)(6) Deposition of Spencer Collins, June 30, 2025, and exhibits thereto
1959. 30(b)(6) Deposition of Lynn Couillard, Vol. I, July 3, 2025, and exhibits thereto
1960. Deposition of Mark Dragicevich, June 27, 2025, and exhibits thereto
1961. 30(b)(6) Deposition of Jeffrey M. Fonseca, July 9, 2025, and exhibits thereto
1962. Deposition of Anupa George, July 30, 2025, and exhibits thereto
1963. Deposition of Jeffrey B. Golden, July 3, 2025, and exhibits thereto
1964. Deposition of Peter Greenhalgh, July 4, 2025, and exhibits thereto
1965. 30(b)(6) Deposition of Richard Grisenthwaite, July 2, 2025, and exhibits thereto
1966. Deposition of Rene Haas, July 7, 2025, and exhibits thereto
1967. Deposition of Sudeep Holla, June 17, 2025, and exhibits thereto
1968. Deposition of John Horley, July 8, 2025, and exhibits thereto
1969. 30(b)(1) and 30(b)(6) Deposition of Andrew Howard, July 1, 2025, and exhibits thereto
1970. Deposition of Phil Hughes, June 17, 2025, and exhibits thereto
1971. 30(b)(6) Deposition of James Jeon, July 11, 2025, and exhibits thereto
1972. 30(b)(1) and 30(b)(6) Deposition of Paul Kranhold, July 17, 2025, and exhibits thereto
1973. Deposition of Selena LaCroix, August 1, 2025, and exhibits thereto
1974. 30(b)(6) Deposition of Durga Malladi, July 10, 2025, and exhibits thereto
1975. Deposition of Richard J. Meacham, June 27, 2025, and exhibits thereto
1976. Deposition of Dawn Hill Montemagni, August 15, 2025, and exhibits thereto
1977. 30(b)(6) Deposition of Pavankumar Mulabagal, July 1, 2025, and exhibits thereto
1978. 30(b)(6) Deposition of Jannik W. Nelson, July 10, 2025, and exhibits thereto
1979. Deposition of Christopher Patrick, July 2, 2025, and exhibits thereto
1980. Deposition of Laura Sand, July 8, 2025, and exhibits thereto
1981. 30(b)(1) and 30(b)(6) Deposition of Karthik Shivashankar, June 30, 2025, Vol.1, and exhibits thereto
1982. Deposition of Kenneth Siegel, July 4, 2025, and exhibits thereto
1983. 30(b)(6) and 30(b)(1) Deposition of Christine Cong Tran, Vol. 1, July 10, 2025, and exhibits thereto
1984. Deposition of Jignesh Trivedi, July 9, 2025, and exhibits thereto
1985. 30(b)(6) Deposition of Manju Varma, June 24, 2025, and exhibits thereto
1986. Deposition of Jean-Francois Vidon, July 1, 2025, and exhibits thereto
1987. 30(b)(6) Deposition of Martin Weidmann, June 20, 2025, and exhibits thereto
1988. Deposition of Jonathan Weiser, July 11, 2025, and exhibits thereto
1989. Deposition of Karl M. Whealton, June 18, 2025, and exhibits thereto
1990. Deposition of Gerard R. Williams III, June 25, 2025, and exhibits thereto
1991. Deposition of Michael J. Williams, June 27, 2025, and exhibits thereto
1992. 30(b)(6) Deposition of Paul Williamson, July 2, 2025, and exhibits thereto
1993. Deposition of Kurt Wolf, June 25, 2025, and exhibits thereto
1994. Deposition of Ehab Youssef, June 26, 2025, and exhibits thereto

Page 29 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

**ATTACHMENT 2.0**

**Documents Reviewed and/or Relied Upon**

1995. Complaint, August 31, 2022, Case No. 1:22-cv-01146-MN
1996. Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim, November 15, 2022
1997. Complaint, April 18, 2024
1998. Answering Brief of Defendant-Appellee Qualcomm Incorporated, April 26, 2024, Case No. 3:17-md-02773-JSC
1999. Arm v. Qualcomm, Pretrial Conference Transcript, November 20, 2024
2000. Arm v. Qualcomm, Trial Transcript, Vol. 1, December 13, 2024
2001. Arm v. Qualcomm, Trial Transcript, Vol. 2, December 16, 2024
2002. First Amended Complaint, December 16, 2024, and exhibits thereto
2003. Arm v. Qualcomm, Bench Trial Transcript, Vol. 1, December 17, 2024
2004. Arm v. Qualcomm, Trial Transcript, Vol. 3, December 17, 2024
2005. Arm v. Qualcomm, Trial Transcript, Vol. 4, December 18, 2024
2006. Arm v. Qualcomm, Trial Transcript, Vol. 5, December 19, 2024
2007. Arm v. Qualcomm, Trial Transcript, Vol. 6, December 20, 2024
2008. Verdict Form, December 20, 2024, Case No. 1:22-cv-01146-MN
2009. Opening Brief in Support of Plaintiff Arm Ltd.'s Motion for Judgment as Matter of Law or a New Trial, January 17, 2025
2010. Defendants' Post-Trial Brief Regarding Equitable Defenses, January 29, 2025
2011. Scheduling Order, January 31, 2025
2012. Plaintiff Arm Ltd.'s Responsive Post-Trial Brief Regarding Equitable Defenses, February 12, 2025
2013. Defendants' Reply Brief in Support of Their Post-Trial Brief Regarding Equitable Defenses, February 19, 2025, and exhibit thereto
2014. Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), March 10, 2025
2015. Arm Holding Plc's Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), March 24, 2025
2016. Arm Holdings PLC's Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), March 24, 2025
2017. Plaintiffs' Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), May 9, 2025
2018. ARM Ltd.'s First Supplemental Objections and Responses to Qualcomm's Fifth Set of Interrogatories (Nos. 26-28), May 10, 2024
2019. Arm Holdings PLC's Objections and Responses to Qualcomm's Amended Interrogatory No. 3, May 12, 2025
2020. Second Amended Complaint, June 3, 2025, and exhibit thereto
2021. Arm's Rule 26(a)(1) Second Supplemental Initial Disclosures, June 12, 2025
2022. Plaintiffs' Supplemental Initial Disclosures, June 13, 2025
2023. Arm's Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), June 16, 2025
2024. Arm's Rule 26(a)(1) Third Supplemental Initial Disclosures, June 16, 2025
2025. Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3, June 18, 2025
2026. Plaintiffs' Responses and Objections to Arm Ltd.'s First Notice of Deposition of Qualcomm Inc., and Qualcomm Technologies, Inc., June 23, 2025
2027. Plaintiffs' First Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-4, 7, and 9), June 25, 2025
2028. Arm's Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 12), July 9, 2025
2029. Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), July 11, 2025

**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

2030. Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025
2031. Arm's First Supplemental Responses to Qualcomm's Amended Interrogatory No. 3, July 11, 2025
2032. Arm's First Supplemental Responses to Qualcomm's Third Set of Interrogatories (No. 12), July 11, 2025
2033. Arm's Responses & Objections to Qualcomm's First Set of Request for Admissions (Nos. 1-28), July 11, 2025
2034. Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admissions (Nos. 1-30), July 11, 2025
2035. Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), July 11, 2025
2036. Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 10-13), July 11, 2025
2037. Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), July 11, 2025
2038. Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), July 11, 2025
2039. Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), August 8, 2025
2040. Plaintiffs' Second Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), August 8, 2025
2041. Plaintiffs' Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), August 8, 2025
2042. "About Nordic Semiconductor," Nordic, date accessed: September 3, 2025 (accessed: https://www.nordicsemi.com/About-us)
2043. "About Qualcomm – Company Information & History," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company#locations)
2044. "About Silicon Labs," Silicon Labs, date accessed: September 3, 2025 (accessed: https://www.silabs.com/about-us)
2045. "Amlogic," Amlogic, date accessed: September 2, 2025 (accessed: https://www.amlogic.com/#Company)
2046. "Arm Architecture for the Digital World," Arm, date accessed: August 29, 2025 (accessed: https://www.arm.com/architecture)
2047. "ARM Global Offices," Arm, date accessed: July 10, 2025 (accessed: https://www.arm.com/company/offices)
2048. "Arm Total Access," Arm, date accessed: August 28, 2025 (accessed: https://www.arm.com/products/licensing/arm-total-access)
2049. "Business Overview," Renesas, date accessed: September 1, 2025 (accessed: https://www.renesas.com/en/about/profile/business)
2050. "Company," Arm, date accessed: July 10, 2025 (accessed: https://www.arm.com/company)
2051. "CPU Cores Explained: How Many Do You Need?," HP, date accessed: July 30, 2025 (accessed: https://www.hp.com/us-en/shop/tech-takes/cpu-cores-how-many-do-i-need?cjdata=MXxOfDB8WXww&utm_medium=af&utm_source=cj&utm_campaign=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29&utm_content=5250933_Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29_100357191&cjevent=2f013fec6d7311f081bd01750a18b8fc&subacctname=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29)
2052. "Embedded Trace Extension," Arm, date accessed: September 3, 2025 (accessed: https://developer.arm.com/documentation/102856/0100/Embedded-Trace-Extension)
2053. "Headquarters," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company/facilities/offices?country=USA&hQ=true)
2054. "Home," Augentix, date accessed: September 3, 2025 (accessed: https://www.augentix.com/)
2055. "Intel and AMD are unlikely allies in new x86 ecosystem advisory group – 'we'll remain fierce competitors,'" Tom's Hardware, date accessed: August 1, 2025 (accessed: https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-

Page 31 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward#xenforo-comments-3857628)

2056. "Intel vs AMD vs Qualcomm: Who's Leading the CPU War in 2025," Business Economy, date accessed: July 31, 2025 (accessed: https://www.businesseconomy.com/technology/intel-vs-amd-vs-qualcomm-whos-leading-the-cpu-war-in-2025/)

2057. "Learn the architecture – Understanding the Armv8.x and Armv9.x extensions," Arm, date accessed: August 1, 2025 (accessed: https://documentation-service.arm.com/static/663e39db9007496a66f74481)

2058. "Markets," Arm, date accessed: September 2, 2025 (accessed: https://www.arm.com/markets)

2059. "MediaTek. Living in a connected world," MediaTek, date accessed: September 1, 2025 (accessed: https://www.mediatek.com/company/discover)

2060. "Microprocessor Cores and Processor Technology - Arm®," Arm, date accessed: August 27, 2025 (accessed: https://www.arm.com/products/silicon-ip-cpu)

2061. "Microsoft is Intel's newest chip foundry customer," Manufacturing Dive, date accessed: August 31, 2025 (accessed: https://www.manufacturingdive.com/news/microsoft-intel-newest-chip-foundry-customer-18a-technology/708953/)

2062. "Our Company, Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/company)

2063. "Product," Augentix, date accessed: September 3, 2025 (accessed: https://www.augentix.com/product)

2064. "Products," Silicon Labs, date accessed: September 3, 2025 (accessed: https://www.silabs.com/products)

2065. "Qualcomm Acquires NUVIA To Accelerate Its Future CPUs With Support From 18 Partners," Forbes, date accessed: July 28, 2025 (accessed: https://www.forbes.com/sites/patrickmoorhead/2021/01/13/qualcomm-acquires-nuvia-to-accelerate-its-future-cpus-with-support-from-18-partners/)

2066. "Reality Labs,'" Meta, date accessed: August 28, 2025 (accessed: https://tech.facebook.com/reality-labs/)

2067. "Realtek in Brief," RealTek, date accessed: September 3, 2025 (accessed: https://www.realtek.com/Article/Index?menu_id=306&lang=en-GB).

2068. "RISC-V's Ascent Could Reshape The Global Compute Landscape," Forbes, July 24, 2025, date accessed: July 31, 2025 (accessed: https://www.forbes.com/sites/davealtavilla/2025/07/24/risc-vs-ascent-could-reshape-the-global-compute-landscape/)

2069. "Snapshot," RealTek, date accessed: September 3, 2025 (accessed: https://www.realtek.com/Article/Index?menu_id=305&lang=en-GB).

2070. "System Architecture Compliance Suites (ACS)," Arm, date accessed: September 3, 2025 (accessed: https://developer.arm.com/Architectures/Architectural%20Compliance%20Suite)

2071. "System Processors," Qualcomm, date accessed: August 29, 2025 (accessed: https://www.qualcomm.com/products/system-processors)

2072. "Technological Strengths," RealTek, date accessed: September 3, 2025 (accessed: https://www.realtek.com/Article/Index?menu_id=308&lang=en-GB).

2073. "The Basics of Instruction Set Architecture," Lenovo, date accessed: August 26, 2025 (accessed: https://www.lenovo.com/us/en/glossary/instruction-set-architecture/?orgRef=https%253A%252F%252Fwww.bing.com%252F)

2074. "The Official History of Arm," Arm Newsroom, date accessed: August 29, 2025 (accessed: https://newsroom.arm.com/blog/arm-official-history)

2075. "The Rise of Licensed IP In Edge AI and Smart Device Manufacturing," Forbes, date accessed: August 28, 2025 (accessed: https://www.forbes.com/councils/forbestechcouncil/2025/08/28/why-the-next-wave-of-ai-innovation-wont-be-built-from-scratch/)

Page 32 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

*Qualcomm Inc. and Qualcomm Technologies, Inc. v. ARM Holdings PLC., f/k/a ARM LTD.*
**ATTACHMENT 2.0**
**Documents Reviewed and/or Relied Upon**

2076. "The Shift to Custom Silicon: Why Companies Are Designing Their Own Chips," Nasdaq, date accessed: August 28, 2025 (accessed: https://www.nasdaq.com/articles/shift-custom-silicon-why-companies-are-designing-their-own-chips)

2077. "Welcome to MediaTek," MediaTek, date accessed: September 1, 2025 (accessed: https://www.mediatek.com/)

2078. "What is a System-on-Chip (SoC)?," Windows Central, date accessed: July 30, 2025 (accessed: https://www.windowscentral.com/hardware/laptops/what-is-a-system-on-chip-soc)

2079. "What is Instruction Set Architecture (ISA)," Arm, date accessed: July 11, 2025 (accessed: https://www.arm.com/glossary/isa)

2080. "What Is SoC Development?," Arm, date accessed: July 30, 2025 (accessed: https://www.arm.com/glossary/soc-development)

2081. "What we do," Texas Instruments, date accessed: September 1, 2025 (accessed: https://www.ti.com/about-ti/company/what-we-do.html)

2082. "With a systems approach to chips, Microsoft aims to tailor everything 'from silicon to service' to meet AI demand," Microsoft, date accessed: August 31, 2025 (accessed: https://news.microsoft.com/source/features/ai/in-house-chips-silicon-to-service-to-meet-ai-demand/?msockid=11a74f0a53d86fdf16855cf652706eb3)

2083. "2024 Business Report for the year ended December 31, 2024," Samsung Electronics Co., Ltd., date accessed: September 1, 2025 (accessed: https://images.samsung.com/is/content/samsung/assets/global/ir/docs/2024_4Q_Interim_Report.pdf)

2084. "Annual Report 2024," Infineon Technologies AG, date accessed: August 31, 2025 (accessed: https://www.infineon.com/assets/row/public/documents/corporate/investors/annual-reports/2024/2024-infineon-annual-report-01-00-en.pdf)

2085. "Annual Report 2024," Microsoft, date accessed: August 31, 2025 (accessed: https://www.microsoft.com/investor/reports/ar24/?msockid=11a74f0a53d86fdf16855cf652706eb3)

2086. "NEC, Annual Report 2010," NEC.com, date accessed: August 25, 2025 (accessed: https://www.nec.com/en/global/ir/pdf/annual/2010/ar2010-e.pdf)

2087. Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025

2088. Infineon Technologies AG Annual Report 2020, Infineon, date accessed: August 29, 2025 (accessed: https://www.infineon.com/assets/row/public/documents/corporate/investors/annual-reports/2020/infineon-annual-report-report-v10-00-en.pdf)

2089. Qualcomm Incorporated Form 10-k for the fiscal year ended September 29, 2024, date accessed: September 1, 2025 (accessed: https://s204.q4cdn.com/645488518/files/doc_financials/2024/q4/QCOM-09-29-24-FY2024-10-K.pdf)

2090. "Semiconductors: Technology and Market Primer 13.0," Oppenheimer Equity Research Industry Update

2091. All documents provided in the Relativity database

2092. All documents cited in my report and the attachments thereto

Page 33 of 33
**RESTRICTED – OUTSIDE ATTORNEYS' EYES ONLY**

Case 1:24-cv-00490-MN     Document 572-1     Filed 11/21/25     Page 201 of 616 PageID #: 26694

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
C.A. No. 24-490-MN

---------------------------------------x

QUALCOMM INCORPORATED, a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

Plaintiffs,

- against -

ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K. corporation

Defendant.

---------------------------------------x

October 3, 2025
9:02 a.m.

*HIGHLY CONFIDENTIAL*

VIDEOTAPED DEPOSITION of THOMAS BRITVEN, held at the offices of PAUL WEISS RIFKIND WHARTON & GARRISON, LLP, located at 1285 Avenue of the Americas, New York, New York 10019, before Anthony Giarro, a Registered Professional Reporter, a Certified Realtime Reporter and a Notary Public of the State of New York.

Page 38

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q Anything else?
A No.
Q Any other errors in your report that you would like to correct?
A Yes.
Q What is it?
A Somewhere in my report, there's a reference to a request by ARM to Qualcomm for some additional information. That is not correct.
Q Can you explain what you're referring to?
A Well, it's kind of a straight comment. There's no citing to it. And -- how can I think about this? In connection with the licensing of [REDACTED], I have a whole section that describes the exchange or lack of exchange between Qualcomm and ARM.

Elsewhere, I have this comment that says that ARM requested information from Qualcomm. But I've been really specific to the expected use of

Page 39

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

[REDACTED]. I haven't able to confirm that.
Q I want to make sure I'm understanding.

So in your report, you said that ARM asked Qualcomm for information about the expected use of [REDACTED] [REDACTED]; correct?
A Yes. So that was the general process that they follow. And I think we erroneously said that that was the circumstance here. But upon follow-up, I can't get anyone to recall them doing that specifically in this case. They do generally. And they've done that in the past but not in this particular circumstance. And so that one little sentence just needs to be modified.
Q And you said upon follow-up, I can't get anyone to recall them doing that specifically in this case.

What follow-up are you referring to?

Page 40

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

A I asked the lawyers to go ahead --

MR. EVANGELATOS: If you're going to discuss something with counsel, I'm going to instruct you not to reveal that.

THE WITNESS: Okay.

MR. EVANGELATOS: You can speak to any conversations you had with witnesses in the course of preparing your report.

THE WITNESS: Yeah.

MR. EVANGELATOS: And your team.

MS. ZAPPALA: Well, I think if conversations with counsel relate to information on which Mr. Britven is opining, which he certainly just said, then that's discoverable.

MR. EVANGELATOS: I'm going to instruct him not to answer and reveal conversations he had with counsel. If he can talk about an interview he conducted or if he spoke

Page 41

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

with a witness, then that's discoverable. But I'm not going to let him talk about what he talked about with counsel.

Q Is there any basis for your statement that you are not able to confirm that ARM asked Qualcomm for information about [REDACTED] [REDACTED] other than conversations with counsel?

MR. EVANGELATOS: Again, not to reveal anything you may have discussed with attorneys.

A I'm not sure.
Q You don't know?
A I'm not sure.
Q Can you identify for me the source, other than counsel, which is the basis for your statement that you are not able to confirm that ARM asked Qualcomm for information about the expected use of [REDACTED]?
A I'm not sure.
Q You don't know?

11 (Pages 38 - 41)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 50

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q Which parts of the report are you referring to?

A I just referred to three of them.

Q Anything else?

A Potentially.

Q You're not able to tell me right now?

A I can look through my 112-page report if you'd like.

Q Without looking through the report, are you able to identify for me what sections your team might be working on updating?

A Well, I know with certainty, they're doing Table 6.1.

Q Other than the tables.

A Okay. You're asking me what my team is doing specifically relative to the license agreements in terms of updating the report?

Q Yes.

A I don't know what they're doing, if anything, beyond what I

Page 51

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

described relative to the report. They are looking at the agreements.

Q And why is your team looking at the agreements?

A As part of my ongoing study. So as new information comes in, we make it part of the ongoing study. And I make reference to that in the report, that my analysis are based on the current record. The record continues to evolve. And we continue to receive information and perform work.

Q Have you discussed these new license agreements with anyone at ARM?

A No.

Q Has anyone on your team discussed these new license agreements with anyone at ARM?

A Not that I'm aware of.

Q Have you discussed these new license agreements with counsel?

MR. EVANGELATOS: I'm going to instruct you not to answer that question.

Page 52

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

A I'll be following advice of counsel.

Q Do you currently have any opinions related to these new license agreements?

A No final opinions, no.

Q Do you have any non-final opinions?

MR. EVANGELATOS: To the extent that gets into anything you may have discussed with attorneys, I'm going to instruct you not to answer that.

A I don't have any modified or new opinions at this point. It's all part of the ongoing study.

Q Now, after you served your report on September 5, Qualcomm served some additional expert reports; right?

A Yes.

Q Did you review any of those reports?

A Yes.

Q Which ones?

Page 53

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

A The report of Dr. Kennedy, for example.

Q Any others?

A I have some technical expert reports. I don't remember the names specifically. I probably looked at something beyond Kennedy. But I certainly looked at Kennedy.

Q Did you form any opinion in connection with Dr. Kennedy's report? And to be clear, I'm referring to the one served after your report.

A Right. I think I have some observations regarding his work in his reply report.

Q Do you intend to offer anything about these observations at trial in this case?

A I don't know.

Q Can you tell me what these observations are?

MR. EVANGELATOS: Objection, form.

A Right. So we need to look

14 (Pages 50 - 53)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 86

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

You see that?
A Yes.
Q And then you list interviews with five individuals. You see that?
A Yes.
Q Did you personally participate in the interviews listed here?
A Yes.
Q You personally participated in every interview with Akshay Bhatnagar?
A Yes.
Q And you personally participated in every interview with Dr. Michael Brogioli?
A Yes.
Q And Mr. Fonseca?
A Yes.
Q And Mr. Shivashankar?
A Yes.
Q And Mr. Youssef?
A Yes.
Q Did any of those working with you talk to any of these individuals

Page 87

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

without you being present?
A Not to my knowledge.
Q Did you talk to these individuals separately or altogether?
A It depends.
Q What do you mean by that?
A Well, I think your question asked me if in one circumstance, I talked to all five of these people at the same time. I didn't do that. But there is a group of them I did speak with collectively.
Q Who did you speak with collectively?
A Bhatnagar, Shivashankar and Youssef. Those would have been interviews collectively performed at the same time.
Q So you spoke with Mr. Bhatnagar, Mr. Shivashankar and Mr. Youssef together?
A Correct.
Q How many times did you speak with them together?

Page 88

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

A Once.
Q Did you speak with them separately at any point?
A No.
Q When did you speak with Mr. Shivashankar, Mr. Youssef and Mr. Bhatnagar collectively?
A I don't remember the exact date. It would have been likely late August, second half of August, somewhere in there. I don't remember the exact date.
Q How long was your conversation with the three of them, collectively?
A I don't remember exactly. But I estimate an hour, maybe a little more.
Q Other than you and these three individuals, was anyone else present for this conversation?
A Yes.
Q Who?
A My team members and counsel.

Page 89

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q Which team members?
A I believe Robin Heider and Doug Ellis. But I'm not sure -- I'm not exactly sure on Doug Ellis. But I know Heider was there.
Q And which counsel are you referring to?
A No. Doug Ellis was there, yes. Doug Ellis was there; Robin Heider was there; I was there.
Q What counsel was present?
A Hard to recall. Counsel from Kirkland & Ellis.
Q Do you have any notes of the conversation you had with these three individuals?
A I don't recall.
Q Did you personally take any notes?
A I may have. I don't specifically recall.
Q Do you know if anyone on your team took any notes?
A I don't know.



THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q What did you speak with Mr. Bhatnagar, Mr. Shivashankar and Mr. Youssef about?

A We spoke about a lot of things. And the largest part of that conversation would have been

MR. EVANGELATOS: Objection, form.

A

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

.

Q I don't mean to interrupt.
But what are you looking at?

A I'm looking at the footnotes in my report.

Q What do you mean you're looking at the footnotes of your report?

A I have a listing of the footnotes of my report here by interviewee.

MS. ZAPPALA: I'm going to mark that document as Exhibit 5 to Mr. Britven's deposition.

(The above-referred-to document was marked as Exhibit 5 for identification, as of this date.)

MS. ZAPPALA: We're going to mark it and go off so I could make a copy of that.

THE VIDEOGRAPHER: Off the record at 10:57.

(A short recess was taken.)

Page 94

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

THE VIDEOGRAPHER: On the record 11:08. Please proceed.

Q Mr. Britven, I am looking at Exhibit 5 which is entitled at the top, Interviews Relied Upon-Mr. Akshay Bhatnagar. You see that?

A Yes.

Q Can you tell me what is this document that is Exhibit 5?

A This is information that's contained in my report. It's just organized in a different way. So it's the same information. So every time I reference this interview, you know, I have various interviews throughout the report, this simply accumulates those interviews by interviewee and puts them in one place. So it makes it easier to find.

Q You see the middle column, it says "Statement"?

A Yes.

Q Are all of these statements included in your report?

Page 95

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

A Yes.

Q Verbatim?

A Yes. They're cut and paste.

Q If you see here on the left-hand column, there's a statement, interviewee, and then there's a singular name under here that says "Mr. Bhatnagar."

You see that?

A Yes.

Q Do any of the footnotes of your report identify statements coming solely from Mr. Bhatnagar?

A I don't believe so. I think the statements for those three are all the same because I interviewed them simultaneously. So that's how the interview occurred.

Q So you interviewed them simultaneously, but you did not in your report identify which statements came specifically from Mr. Bhatnagar as opposed to Mr. Shivashankar or Mr. Youssef?

Page 96

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

A That assumes that there are statements that only came from one person. But regardless of how I interpret your question, the interview occurred simultaneously. And that's the way it's reflected in the report.

Q Well, if you look at page 1 in Exhibit 5, the first five pages are entitled Interviews Relied Upon-Mr. Akshay Bhatnagar. You see that?

A Yes.

Q And then if you flip down, I don't know what number because they're not all paginated, but there's another section called Interview Relied Upon-Mr. Karthik Shivashankar. You see that?

A Yes.

Q So therefore, you identify different statements made by these different individuals in different parts of your notes; correct?

A Not -- I wouldn't describe it that way. That's just the way the

Page 97

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

formatting occurs here. So I think if you look at the report and you look at that statement, you'd see the three interviewees referenced; all right? And the purpose of Exhibit 5 is to show the statements by person.

So that statement is attributable to all three. And therefore, when you list it out by person, it appears under each person's name. That's the way Exhibit 5 is developed.

Q Does Exhibit 5 include the universe of everything that you spoke with Mr. Bhatnagar, Mr. Shivashankar and Mr. Youssef about?

A They certainly encompassed the universe of all of the referenced items in the report. Do we talk about other things that didn't make it into the report; is that your question?

Q Sure.

A Okay.

Probably. I don't remember

25 (Pages 94 - 97)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 98

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
what they are. But it'd be unlikely that everything we talked about, including what day of the week it is and the weather, is in the report and correspondingly, in the footnotes.
Q And you may have said this, but can you remind me who created Exhibit 5?
A One of my team members.
Q And Exhibit 5 is not attached to your report; correct?
A Well, it's subsumed within a body of the report. But Exhibit 5 per se is not attached in this organized matter. But here again, it comes from. And it's the same information that's contained in the report.
Q Are there any other documents that you brought with you today to the deposition that are not attached to your report, but are relevant to your report?
A What do you mean by relative to the report?

Page 99

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
Q Well, Exhibit 5 is something I've never seen before. But you brought today to facilitate your testimony.
Are there any other documents that you brought with you today to facilitate your testimony so we don't have to stop and do this again?
A No. I just brought these two things.
Q When you say two things, what do you mean?
A My report and the interviews relied upon.
Q When you spoke with Mr. Bhatnagar, Mr. Shivashankar and Mr. Youssef, was it a Zoom meeting? Was it a video conference?
A It was a video conference.
Q Were they looking at any notes when they were on the phone with you?
A I don't know.
Q Were they looking at anything on their computers when they

Page 100

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
were speaking with you?
A Hard to say.
Q You don't know for sure?
A Yeah. I don't know if I remember well enough. And I don't remember the angle of the camera and all those things.
Q Do you recall them saying anything about looking at any documents while on the phone with you?
A I don't recall, one way or the other.
Q Earlier, you mentioned a spreadsheet?
A Yes.
Q Did this spreadsheet come up on your call with Mr. Bhatnagar, Mr. Shivashankar and Mr. Youssef?
A Yes.
Q Tell me what was discussed about this spreadsheet.
A [redacted]

Page 101

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
[redacted]
Q Were any of the individuals on the call with you looking at the spreadsheet when they were talking to you?
A I don't know.
Q Can you tell me more about what they said was on the spreadsheet?
A Well, I think that's

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

those interviewees in my footnotes in Exhibit 5. And you could try to go from my memory. But I'm telling you Exhibit 5's a lot better.

Q So can you tell me where on Exhibit 5 these three individuals [redacted]?

A That's what I was trying to find earlier without success. But I'm happy to look again. I [redacted]

[redacted]. I can't remember which ones. They were either in the footnotes or in the report or I don't know. And I tried to find them for you on the footnotes.

Q [redacted]

[redacted]

You see that?

A Yes.

Q So what I'm trying to understand is, are you saying here that [redacted] to [redacted]?

MR. EVANGELATOS: Objection, form.

A It's my understanding that [redacted], just as described there. The question is, did I get that from ARM through the interview or from the interrogatories or some combination? I don't have that all

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

parsed out in my mind, especially by licensee.

Q Well, the first sentence says, "[redacted]

You see that?

A Yes.

Q There's no footnote there to that. So I'm trying to understand the source for that statement, [redacted].

MR. EVANGELATOS: Objection to form.

A Well, you see the Footnote 174 at the beginning there, [redacted]. It's referencing the first supplemental objections in response to Qual's interrogatories, as well as the deposition there and another deposition.

So this section of the

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

report takes into account, interrogatory responses, deposition testimony, the interviews collectively, as well as the underlying documents.

Q Footnote 174 does not cite your interview with ARM, does it?

A It does not.

Q Is that an error?

MR. EVANGELATOS: Objection, form.

A I don't think so. I don't think citing needs to be that precise. I told you what we did here. The interviews are part of this list.

Q [redacted], you don't know if you [redacted] during your interview with the three ARM individuals?

MR. EVANGELATOS: Objection,

Page 130

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
A Did you say page 34?
Q I'm sorry.
MR. EVANGELATOS: Paragraph 77, page 34.
A Sorry. Yes. Paragraph 77, page 34. Thank you.
Q And there's a section header, 6.3.
And that section header says, "Overview of ARM's [REDACTED] [REDACTED] [REDACTED] [REDACTED]."
You see that?
A Are you reading the first sentence there? Yes. I see that.
Q And then Section 6.3 goes from paragraph 77 to 79 which is on page 38. You see that?
A Yes.
Q So am I correct that paragraphs 77 through 79 reflect your understanding of ARM's [REDACTED] [REDACTED] for [REDACTED]?
MR. EVANGELATOS: Objection,

Page 131

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
[REDACTED]
MR. EVANGELATOS: Objection, form.
A So they certainly clear those pages. I don't think of my 112 pages, I would say those are the only pages that are relevant to business steps.
Q What else is relevant to your understanding that ARM took reasonable business steps?

Page 132

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
MR. EVANGELATOS: Objection, form.
A I don't know that I could point to every place or even a series of places that would be relevant. But there's other aspects of the report that would apply here.
So again, I just wouldn't limit it to those pages. But that opinion is not based upon those pages exclusively, otherwise if that was my only opinion, I would have a four-page report. That doesn't make any sense.
Q You offer a lot of opinions in your report.
A I know. But if I have that only one opinion and that was the only issue in the case, I'd issue a four-page report. I don't think I've ever done that.
Q When you talk about the reasonable business steps --
A Yes.
Q -- that ARM took, are you

Page 133

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
referring to the steps in paragraphs 77 to 79?
MR. EVANGELATOS: Objection, form.
A Generally speaking, as an overview, yes. Doesn't mean it's all inclusive.
Q What is your understanding of the term, reasonable business steps?
A Reasonable business steps would be based on my experience in licensing and from a business perspective as to what would logically be done in terms of formulating an offer in this circumstance.
And that's what I'm drawing upon: What did they do, does that make sense, is that consistent with good business practices, is that consistent with good licensing practices, does it make sense from a financial perspective? That's what I'm talking about.
And relative to the steps specifically, are they going in a logical

Page 134

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

order to achieve a reasonable outcome? And that's what I'm looking at. And I describe that in the report.

Q Anything else encompassed in your understanding of the term, reasonable business steps?

A Not beyond what's in my report.

Q When you say what's in your report, what do you mean?

MR. EVANGELATOS: Objection to form.

A Well, my report talks a lot of things, talks about the industry, talks about the party, talks about the business practice, talks about the background. All those things would make a backdrop relative to reasonable business steps in this particular circumstance.

Q So I'm trying to understand because you offered an opinion that ARM engaged in reasonable business steps. And I'm just trying to make sure I

Page 135

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

understand the definition of the term, reasonable business steps.

MR. EVANGELATOS: Objection, form.

A Yes.

Q What is your definition of the term, reasonable business steps?

MR. EVANGELATOS: Objection to form.

A I already described it. It's not as if there's a place you can say, okay, there's four reasonable business steps that must occur. [redacted]

So based upon my experience in the licensing area from a business perspective and from a financial and economic perspective, what they did is logical and makes sense.

Those are all reasonable steps to achieve a result. I haven't seen the actual result yet. But so far, I'm saying so good, so far, so good.

Q What is the criteria that

Page 136

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

you are applying to conclude that ARM engaged in reasonable business steps?

A What I described, as well as my understanding of the contract language here.

MR. EVANGELATOS: Objection to form as well. Go ahead.

Q Remind me what you described.

MR. EVANGELATOS: Objection to form, asked and answered.

A Yeah. I've answered that twice, I think.

Q Answer it again, please.

MR. EVANGELATOS: Same objections.

A So from a licensing perspective, from a business perspective and from a financial perspective, what would be the logical steps that would occur to get to a result, [redacted] and would that process generate a correct answer?

Page 137

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

The answer is, yes, based upon what I've seen. There's not a glowing air that I have seen or some kind of a deficiency that would say, oh, no, they can't get there. What I've seen is consistent with the logical business steps that should result in a logical and reasonable result. And those are the reasonable steps to get there.

Q What do you mean by logical steps?

MR. EVANGELATOS: Objection to form.

A Logical steps, logical, reasonable business steps, it's all the same. There's a sequence of planned activities, get you to the result. Is there a gaping air from a business perspective or licensing perspective or an economic perspective? No, not that I've seen.

Q You referred to sequence of planned activities.

What are the sequence of



THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

planned activities you're referring to in connection with ARM's [redacted] [redacted]?

MR. EVANGELATOS: Objection to form.

A I couldn't understand the words. Sequence of planned activities? Well, they're one in the same. Those are the activities planned. And those were the actual activities executed on.

Q What are the activities planned that you're referring to?

MR. EVANGELATOS: Objection to form.

A [redacted] [redacted] [redacted], [redacted] [redacted] [redacted] [redacted] [redacted] That's all reasonable business steps.

[redacted] [redacted]

[redacted] [redacted] [redacted]

Q What authorities are you relying on to say that these are reasonable business steps?

MR. EVANGELATOS: Objection to form.

A My general licensing experience. The things sort of described are typical and consistent with what parties generally do in terms of developing offers around license agreements. It's also consistent with my business experience, what would you do to develop a license offer in a business

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

environment? You would do those types of things, those very steps that ARM did; okay? Does it make sense from a financial perspective? Yes. It's the financial analysis associated with those steps that would also apply.

But the steps there, they're going to perform the financial analysis, okay. Those are -- those are -- those are the steps that are consistent with good licensing practice, good business practice.

Q You've reviewed the TLA between Qualcomm and ARM; correct?

A Yes.

Q [redacted] [redacted] [redacted] [redacted] [redacted]

Q [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted]

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

MR. EVANGELATOS: Objection to form.

A [redacted] [redacted] [redacted] [redacted] [redacted]

Q Let's take a look at the TLA.

MS. ZAPPALA: I'm going to mark as Exhibit 6, a copy of the TLA between Qualcomm and ARM which is Bates numbered ARM00103918.

(The above-referred-to document was marked as Exhibit 6 for identification, as of this date.)

Q If you turn to the page ending in Bates No. 955, that has Section [redacted] of the TLA in there.

A Yes.

Q So you testified that the words, reasonable business steps, do not appear in Section [redacted] of the TLA; right?

A Those specific words. But



Page 150

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
understand your question.
Q Sure.
You have testified about various [REDACTED] that were part of ARM's offer to Qualcomm; correct?
MR. EVANGELATOS: Objection to form.
A [REDACTED]
[REDACTED].
Q [REDACTED]
[REDACTED]
MR. EVANGELATOS: Objection to form, calls for a legal conclusion.
A So from a legal perspective, I don't have an answer for you.

Page 151

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
Q [REDACTED], you're offering an interpretation of this agreement; correct?
MR. EVANGELATOS: Objection to form, mischaracterizing, calls for a legal conclusion.
A So I think you are mischaracterizing my testimony. I [REDACTED]
Q So you're not offering an opinion as to whether ARM [REDACTED]

Page 152

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
[REDACTED]
MR. EVANGELATOS: Same objections.
A Correct. My opinion is as stated on page 11.
MS. ZAPPALA: How long have we been on the record?
THE VIDEOGRAPHER: 2 hours, 48 minutes.
MS. ZAPPALA: The last break?
THE WITNESS: An hour and ten minutes.
MS. ZAPPALA: I think it's lunchtime. Want to take a break?
MR. EVANGELATOS: Do you prefer to keep going for a little bit and then eat? What would you prefer?
THE WITNESS: I don't know. What time is it?
MR. EVANGELATOS: It's 12:15.
THE WITNESS: It probably

Page 153

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
makes sense to eat now.
THE VIDEOGRAPHER: Off the record 12:15, ending Media Unit No. 2.
(A lunch recess was taken.)
THE VIDEOGRAPHER: On the record 12:55, beginning Media Unit No. 3.
Q Mr. Britven, before the break, we were looking at Exhibit 6 and [REDACTED] of Exhibit 6 which is a TLA. Do you remember that?
A Yes.
Q And then we were talking about [REDACTED] Do you remember that?
A We talked about that. And just so I'm clear, [REDACTED]
Q Yes. That section.
And we talked about how this [REDACTED]

39 (Pages 150 - 153)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
[REDACTED]. Do you remember that?
MR. EVANGELATOS: Objection to form.
A If you're referencing this language, which was a little different than your question, yes.
Q [REDACTED]; correct?
MR. EVANGELATOS: Objection to form, asked and answered.
A I have no legal conclusions, no legal opinions, no legal conclusions.
Q Do you have any non-legal opinions as to whether ARM [REDACTED]?
MR. EVANGELATOS: Same objections.
A You asked about non-legal.
[REDACTED].

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
Q I'm sorry.
What's the answer?
A No, I do not.
Q [REDACTED]
MR. EVANGELATOS: Objection to form.
A So as I understand your question and understanding the case facts, [REDACTED]
Q [REDACTED]
MR. EVANGELATOS: Objection, form, mischaracterizes.
A [REDACTED]

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
[REDACTED] If you're asking whether or not I did my own analysis relative to [REDACTED], the answer is no, not in its entirety.
Q [REDACTED]
Q My question is, did you do any analysis of what ARM considered when it put together the license agreement to

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
[REDACTED]
MR. EVANGELATOS: Objection to form.
A Did I do anything in terms of what ARM considered? Did I do anything? Yes. I documented what I thought they did. That's part of our ongoing analysis. We expect to receive more information relative to what they specifically looked at, including, for example, [REDACTED] So I'm in the middle of this, what did ARM do.
Q My question is a little bit different.
My question was asking about ARM's analysis, [REDACTED],



Page 186

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q

MR. EVANGELATOS: Objection, form, mischaracterizes.

A You know, this is early cryptic description. We probably need to look at the agreement. But it would be my view, you know, kind of just chatting here at the table,

Q And were not used --

MR. EVANGELATOS: Wait. He was still answering.

A

Page 187

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q

Q ?

MR. EVANGELATOS: Objection, form.

A Well, I think it'd be more appropriate -- it'll be a little safer to

Page 188

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Page 189

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

,



Page 190

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

MR. EVANGELATOS: Objection,

:

Page 192

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

7

Do you see that?

A I do.

Q

Q

49 (Pages 190 - 193)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



Page 198

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q I want to go to Exhibit 7 which is [REDACTED].

A Yes, ma'am.

Q Then if you go to Footnote 281 of your report --

MR. EVANGELATOS: It's

Page 199

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q

Page 200

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Q

Q



Page 226

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
MR. EVANGELATOS: Objection, asked and answered and mischaracterizes.
A So as a general notion, based on my experience, it's a typical practice. It's one I would expect. And you're asking me whether I did some kind of a specific analysis?
So I'm drawing on my experience; okay? They're telling me what they do. Okay. What they tell me they do is evidence. And then later on, I performed a more precise analysis, in essence, in response to Kennedy. And it's consistent with what ARM is telling me.
Q And at the time you wrote your report before you reviewed Dr. Kennedy's reply report, when you said that there is evidence that the

Page 227

Q And that analysis that you did, you did not do at the time of your

Page 228

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
report that you submitted in this matter?
MR. EVANGELATOS: Same objections.
A Yeah. That additional analysis was performed after the issuance of this report. My study's ongoing.
Q You also indicated that there's not a linear relationship. That's testimony you gave; correct?
A Today?
Q Yes.
A That's right.
Q

Page 229

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
,
Q And you did not generate any
at the time you submitted your report; correct?
MR. EVANGELATOS: Objection, form.
A I didn't deem there to be a necessity to do that. It's pretty common stuff. I'm really only responding to Kennedy.
Q Go to the top of page 37 in your report. And you say in the second -- well, let's go to the first sentence in the top bullet.



Page 238

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

finished with my study.

Q So there's a possibility that you might offer such an opinion?

MR. EVANGELATOS: Objection, form.

A I think it'd be inappropriate for me to say I'm not going to do something at this point because I don't know what I'm going to do.

Q

Page 239

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

.

Page 240

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

Page 241

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

MR. EVANGELATOS: Objection to form, calls for a legal conclusion.

A I think you are asking for a legal conclusion.

Q

A

You guys can fight about all of those things.

From a licensing perspective, when you're looking to make adjustments --okay?-- to a license agreement, which I do, you know, all-day long, year after year in my business, we



Page 242

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
[redacted]
In this particular circumstance, [redacted]
Q So you've concluded that the [redacted]

Page 243

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
MR. EVANGELATOS: Objection to form.
A That's correct. There's some obvious overlap. But I'm not here to make [redacted]
Q I want to turn to paragraph 18 of your report.
A Yes, ma'am.
Q And I'm sorry.
Before we go to paragraph 18, you testified that ARM [redacted]

Page 244

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
[redacted].
[redacted]?
A Hard to say from memory.
But ARM [redacted]? And then there's a question of timing. [redacted]. It's not quite clear. But we're going to see more later.
Q [redacted]

[redacted]



Page 250

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

MR. EVANGELATOS: Objection to form.

A The bigger point here is that ARM got it wrong. And they're in violation. And that's what we're saying here. He doesn't have that opinion. He hasn't proved -- and I acknowledge while recognizing it -- being Kennedy's -- own analysis to be incomplete. So he's incomplete. I'm telling you where we are. He hasn't taken that position or made that opinion.

Q

Page 251

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

.

Q And what evidence of that analysis do you have?

MR. EVANGELATOS: Objection to form.

A We discussed this. I have the interview. But I don't have the specifics relative to

Q And you referred to the interviews that you conducted. Dr. Kennedy did not have access to those interviews, does he?

Page 252

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

MR. EVANGELATOS: Objection to form.

A No. But those people were deposed. I also refer to interrogatories that he does have access to. And I'm of the view he has the same documents I do. Notwithstanding all that, I recognize the record is incomplete.

Q Is it your position that ARM provided the same information in the interviews as it did in deposition testimony?

MR. EVANGELATOS: Objection to form, speculation and foundation.

A Not necessarily. The information provided in depositions would be subject to the questions presented before the deponents. They're pretty short depositions.

Q Are you aware that ARM witnesses were asked in deposition ?

Page 253

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

A I've seen testimony to that effect.

Q And are you aware that ARM employees ?

MR. EVANGELATOS: Objection to form.

A We'd have to go to the specific testimony and look at that.

Q But if I represent to you that ARM employees ?

MR. EVANGELATOS: Objection to form.

A Only to an extent, I received, yes, . . In my view, it goes to, were the deponents asked specifically,

64 (Pages 250 - 253)

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

[redacted] versus some broad-brushed question?

There's lots of explanations as to why there may be differences between what I gleaned in an hour interview and what they were able to testify to in deposition.

Q I want to go to paragraph 172 of your report which is on page 79.

A Yes, ma'am.

Q In paragraph 172 in the second sentence, you say, "For example, the Kennedy report fails to identify [redacted]

You see that?

A I lost you at the beginning.

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

You kind of ran out of the gate in front of me. So let me just catch up; okay?

Q Okay.

A Thank you.

Q And then if you go to the last sentence of that paragraph, you say, "The Kennedy report did not evaluate, for example."

And then you list five things.

You see that?

A Yes.

Q What was the basis for saying that Dr. Kennedy should have considered these five things?

MR. EVANGELATOS: Objection to form.

A Well, I don't think there's any debate that he didn't do these five things. Certainly at the time of his first report, I think he's trying to come back and do some piece of this later. I think I probably came up with these.

[redacted]

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

[redacted]

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

[redacted]

Q So your opinion is that these five factors that are listed in paragraph 172 [redacted]; is that correct?

A Well, specifically, I'm saying Kennedy didn't do that; okay? It'd be nice to see these things. It would. He didn't do those things.

Q So you've talked about your experience in the licensing field.

So based on your experience, these five things should be considered [redacted]; correct?

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

MR. EVANGELATOS: Objection to form.

A And I think in this circumstance, these are all fair game to be considered. [redacted]. But certainly, these things should be considered.

Q Can you tell me what evidence there is that ARM [redacted]?

MR. EVANGELATOS: Objection to form.

A So I think I'm constrained by the record. I described for you what I learned through my interview with ARM. We also had interrogatories as to what they did. Some of these things are addressed elsewhere in the report, some are not. And the work is ongoing.

Q [redacted]

[redacted]

Q [redacted]

Q [redacted]

Q [redacted]

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

[redacted]?

A [redacted]

Q So do you understand that

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

[redacted]?

MR. EVANGELATOS: Objection to form.

A Just so we're clear, ARM did not receive from Qualcomm, hey, here's your expected use; okay? So ARM [redacted].

Q What is the basis for your understanding that ARM did that [redacted]

MR. EVANGELATOS: Objection, form.

A Well, in terms of their understanding of how Qualcomm would use this, I remember that being part of the interview.

Q And that's the case for [redacted]

A I don't know that I broke it out for one or all or second one only,

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
that actually has a bullet in front of me.
A "The evidence summarized in the Kennedy report."
Q Yes.
You write, [REDACTED]
You see that?
A Yes.
Q So you're offering an opinion that the evidence cited by Dr. Kennedy did not cause the alleged wrongdoing. You see that?
MR. EVANGELATOS: Objection, form.
A Caused by other factors. That's correct.

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
Q So you're offering an opinion as to what caused or did not cause harm to Qualcomm; correct?
MR. EVANGELATOS: Objection to form, mischaracterizing.
A So I read the whole opinion, and it might be helpful for a perspective. So I'm the damages guy. I consider causation to have one leg in damages and one leg in liability.
And I think looking at causation is fair game for a damages expert, outside the context of liability. I need to know what I'm quantifying. And I need to know if there's a causal link. That is the context of this opinion.
Q So you think it is appropriate for a damages expert to opine on causation?
MR. EVANGELATOS: Objection to form, mischaracterizing.
A So I think it's appropriate for damage experts to include the non-liability aspect of causation in

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
their analysis.
Q Can you explain to me what a non-liability aspect of causation is?
A Here again, in my view, causation has one leg in liability and one leg in damages. There needs to be a link between those two. Part of that is the damages analysis.
And that's the analysis I'm performing here. I'm not performing a liability. I've assumed liability. I've assumed liability. But even with that, I don't see this causal connection that's necessary from a damages perspective.
Q But you agree that causation is part of a liability analysis; correct?
MR. EVANGELATOS: Objection to form, calls for a legal conclusion.
A That's true. In my view, causation has one foot in liability and one foot in damages.
Q And are you able to explain to me, the distinction between the two?

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
A Well, I think I have.
Q Please explain again.
MR. EVANGELATOS: Objection to form.
A So I could have an assumption of liability. But those bad acts have to be tied to damages. I don't see the linkage here to damages. How is it that these damages that are claimed flow from the alleged liability? That hasn't been demonstrated.
Q So you have an opinion that the damages claimed by Dr. Kennedy do not flow from the alleged liability?
MR. EVANGELATOS: Objection to form.
A Well, my opinion is, as stated here, that the Kennedy reports damage calculations were caused by factors other than the alleged -- Kennedy reports damage calculations were caused by factors other than the alleged wrongdoing.
Q So you're opining that the

Page 282
THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
damages calculated were not caused by the alleged wrongdoing?
A As described by Dr. Kennedy.
Q I want to turn you to paragraph 215 of your report.
If you go to the second sentence, do you see it says, "Assuming the trier of fact finds that Qualcomm has proven causation (it has not), the Kennedy report's calculations are overstated."
Do you see that?
A Yes.
Q So you are opining that Qualcomm has not proven causation; correct?
MR. EVANGELATOS: Objection, mischaracterizes.
A I think that's a mischaracterization of my opinion. My opinion is stated on page 12; okay? And what I'm saying here is, assuming the trier of fact finds Qualcomm has proven causation, I don't think they have --

Page 283
THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
okay? -- based upon the work in the Kennedy report. But if that's the case, if there's a causal link, then Kennedy's report's calculations overstate the amount.
Q But you have a parentheses here where you express your view that Qualcomm has not proven causation; correct?
A Right. And that's shorthand for what I said earlier about what's contained in the Kennedy report and the analysis that he performed. I'm rebutting Kennedy on this. Don't read more into it than that.
Q And your opinion is that Kennedy should have, but they did not prove causation; correct?
MR. EVANGELATOS: Objection, mischaracterizing.
A No. It's not that firm. I think he should have tested causation. He should have explained causation. You can do those things. He can demonstrate

Page 284
THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
causation.
But he runs away from causation, hey, I got -- I'm not saying anything in here about liability, I'm not saying anything in here about causation, I'm just going to do this. Well, that's not very helpful because the damages are supposed to flow from the underlying wrongdoing.
Q Is it your opinion that a damages expert could not assume causation?
MR. EVANGELATOS: Objection, mischaracterizes.
A No. A damages expert can assume causation. But typically, when we see that in my experience, then there's an explanation as to why that's a reasonable assumption. I don't see that here either.
Q So going back to paragraph 215 when you say assuming the trier of fact finds that Qualcomm has proven causation, it has not, your

Page 285
THOMAS BRITVEN -- HIGHLY CONFIDENTIAL
testimony is that you are not opining as to whether Qualcomm has proven causation?
A That's correct.
Q So what are you opining on then?
A That Kennedy hasn't demonstrated causation based on his descriptions. I think you're reading more into this. This is Qualcomm and everything they're doing. That's beyond what I'm looking at. I'm looking at the Kennedy report and what he said. Maybe it'd be better if I were to substitute Kennedy in here.
Assuming the trier of fact finds that whatever Kennedy has done proves causation, then the report calculations are overstated. But my point relative to causation relates to Kennedy more so -- well, it relates to Kennedy and not Qualcomm in the aggregate. I'm looking at Kennedy's work.
Q So your opinion is that

72 (Pages 282 - 285)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

A That was my initial job for a couple of years out of college.

Q Do you recall being asked today, some questions about whether you ever examined specific cores that Qualcomm or combinations of cores that Qualcomm puts in an SoC?

MS. ZAPPALA: Objection to form.

A Only generally in terms of kind of what goes into each core and how the total compute. Is that where you're going with your question?

Q Well, let me ask a different question.

A Yes.

Q Are you offering any technical opinions regarding the contents of any Qualcomm SoCs in this case?

A No.

Q

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

MS. ZAPPALA: Objection to form.

A

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

.

Q Do you remember also generally being asked about specifically whether ARM faced risk and considered whether it faced risk when it made an

THOMAS BRITVEN -- HIGHLY CONFIDENTIAL

offer to Qualcomm?

MS. ZAPPALA: Objection to form.

A Yes. That was a topic of conversation during the deposition.

Q And I apologize. I don't remember the specific page that that bullet is on.

A It was the last bullet in a series.

Q If you know where that is, if you could take us there, I'd appreciate that. I guess 172. I guessed correct. 172, let's go there.

A Yes.

Q What type of risk were you referring to here when you made this comment in your report?

A . Working

C E R T I F I C A T I O N

I, ANTHONY GIARRO, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, THOMAS BRITVEN, was duly sworn on the date indicated, and that the foregoing, to the best of my ability, is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

______________________
ANTHONY GIARRO

QUALCOMM INCORPORATED, et al.
vs. ARM HOLDINGS PLC
10/3/2025 - THOMAS BRITVEN

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________
______________________________________
REASON________________________________
PAGE_____ LINE_____ CHANGE________________
______________________________________
REASON________________________________
PAGE_____ LINE_____ CHANGE________________
______________________________________
REASON________________________________
PAGE_____ LINE_____ CHANGE________________
______________________________________
REASON________________________________
PAGE_____ LINE_____ CHANGE________________
______________________________________
REASON________________________________
PAGE_____ LINE_____ CHANGE________________
______________________________________
REASON________________________________

______________________ _____________
THOMAS BRITVEN Date

QUALCOMM INCORPORATED, et al.
vs. ARM HOLDINGS PLC
10/3/2025 - THOMAS BRITVEN

ACKNOWLEDGEMENT OF DEPONENT

I, THOMAS BRITVEN, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________ _____________
THOMAS BRITVEN Date
*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ______________, 20___.

______________________
NOTARY PUBLIC

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, §
A DELAWARE CORPORATION, §
QUALCOMM TECHNOLOGIES, § C.A. NO. 24-490-MN
INC., A DELAWARE §
CORPORATION, §
§
PLAINTIFFS, §
§
- AGAINST - §
§
ARM HOLDINGS PLC., §
F/K/A ARM LTD., A U.K. §
CORPORATION, §
§
DEFENDANT. §

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

ORAL AND VIDEOTAPED DEPOSITION OF AKSHAY BHATNAGAR
JULY 10, 2025

ORAL AND VIDEOTAPED DEPOSITION OF AKSHAY BHATNAGAR, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above styled and numbered cause on Thursday, July 10, 2025, from 9:22 a.m. to 12:39 p.m., before TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of Texas, reported by computerized stenotype machine, at the offices of Kirkland & Ellis, LLP, 401 Congress Avenue, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Job No. NY 7464214

Page 34

Page 36

Q. Let me break that down a little bit.
You testified that
?
A. I don't remember. It's been a while.
Q.
?
A.
.
Q. You referred to -- you testified -- I'm sorry. Strike that.

Page 35

?
MR. EVANGELATOS: Objection.
I'm going to caution you again. To the extent any of that analysis or any discussions about that analysis involve attorneys, you should not include that in your answer, and you should answer as to anything outside of anything you may have discussed with any attorneys.
MR. SCOTT: I'll just note for the record that our position would be that that claim of privilege is overbroad, but you can -- I respect your right to instruct your witness.
MR. EVANGELATOS: Yeah. Obviously I disagree. I mean, let him testify to -- in accordance with my instruction.
So go ahead and answer.
A.

Page 37

Q.

Page 38

MR. EVANGELATOS:

The question was "do you recall." Just answer that as a "yes" or "no" and then let's be careful about

So just answer that question "yes" or "no," do you recall.

A. No.

Q.

Page 40

MR. SCOTT: Okay. Just for the record, we believe that instruction is improper and we will hold the deposition open.

MR. EVANGELATOS: Okay. We can agree to disagree.

MR. SCOTT: Great.

Q. Let's see. So just getting back to --

Page 41

.

Q. I'm -- I'm -- I'm asking what they told you at this time, and not what you think they would have told you or presumed that they might have told you. So I just want to restate the question.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

Page 43

Page 44

Page 45



[redacted] -- did -- I'm sorry. Let me -- let me strike that.

What -- what did tha[redacted]

MR. EVANGELATOS: I'm -- I'm going to caution you to the extent he's asking about the contents of that document, that I'm going to instruct you on privilege [redacted] grounds not to reveal the contents of the document.

If there's any nonprivileged or piece of the document or information in the document that is not subject [redacted] in other words, [redacted], speak about it at a high level.

MR. SCOTT: And, again, for the record, we think that -- [redacted] is improper, but we can take it under advisement. We don't have to keep --

MR. EVANGELATOS: Yeah. Sure. We take -- we'll take our (unintelligible). I understand your -- I understand your objection to that.

MR. SCOTT: I understand your position as well.

MR. EVANGELATOS: Yeah. Yeah.

[redacted]

[redacted]

(Discussion off the written record.)

MR. EVANGELATOS: Do you want to take a break now? We've been going for a little while.

MR. SCOTT: Yeah. We can take a break.

MR. EVANGELATOS: So let's go --

THE VIDEOGRAPHER: Going off the 10:35 record. The time is .

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 10:48.

Q. Before we get started. Did you discuss your testimony with counsel while we were on break?

A. No.

Q. Thank you.

If we could stick with QCX 208, that email thread. Actually, strike that.

I believe you testified that [redacted] Do you remember that?

A. Sorry. With respect to this --

Q. Ignore the -- I'm sorry. Ignore the --

A. Oh, okay.

Q. -- email thread.

You -- you -- you testified earlier that [redacted]. Do you remember that?

A. [redacted]

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

A. Sorry. Say that again.

Q.

MR. EVANGELATOS: Objection; form.

A.

.

in

Page 71

.

Page 72

Page 73

19 (Pages 70 - 73)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 78

[redacted]

Page 79

[redacted]

Q. [redacted]

Page 80

[redacted]

Page 81

[redacted]

21 (Pages 78 - 81)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



Page 82

[REDACTED]?

MR. EVANGELATOS: Objection; form, vague, legal conclusion, mischaracterizing document.

[REDACTED]

Page 83

Q. Okay. I'm going to hand you -- and this will be -- I think we can take a break after this one. I'm going to hand you another document with the Bates No. ARMQC_2751388. I'm marking this as QCX 211.

(Exhibit QCX 211 was marked.)

Q. So this is an email thread between you and Mr. Shivashankar dated December 2024.

Do you see that?

And it's got the subject line "[REDACTED]."

A. (Pause.)

Q. Do you recall receiving this email?

A. (Pause.)

I can see that I'm on the email. I don't exactly remember the email.

Q. It looks like an email you sent in the course of work at Arm, though, doesn't it?

A. (Nods.)

Q. Is that a yes? Sorry. The court reporter can't get nodding.

A. It does look like -- yes, it does look like that email.

Q. Great. Thank you.

[REDACTED]

Page 84

[REDACTED]

MR. EVANGELATOS: Objection; form and asked and answered.

A. I mean, I heard the term tossed around maybe in some conversations. What exactly it means, I don't know.

[REDACTED]

Q. [REDACTED]

[REDACTED]s.

Page 85

[REDACTED]

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

Plaintiffs,

vs. C.A. No. 24-490 (MN)

ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation,

Defendant.

______________________________

**ATTORNEYS' EYES ONLY**

VIDEO DEPOSITION OF ARM HOLDINGS PLC's 30(b)(6) and 30(b)(1) REPRESENTATIVE - KARTHIK SHIVASHANKAR

Palo Alto, California

Friday, June 20, 2025

Volume 1

STENOGRAPHICALLY REPORTED BY:
REBECCA L. ROMANO, RPR, CSR, CCR
California CSR No. 12546
Nevada CCR No. 827
Oregon CSR No. 20-0466
Washington CCR No. 3491
JOB NO. 7428915
PAGES 1 - 189



Page 86

Page 88

Page 89

MR. KRAMER: Objection to form.
THE DEPONENT: So can you say the question again.
Q. (By Ms. Zappala)

A. I do not recall exactly, I mean, yeah, what documents was exchanged because, I mean, yeah, more than a year ago.
Q.



Page 90

?
A. I do not exactly remember
Q. I know you can't remember
.
Can you remember some information about them?
A. I mean, yeah,
Q.

Page 91

MR. KRAMER: Objection to form. Calls for legal conclusion.
THE DEPONENT:
.
Q. (By Ms. Zappala)

Page 92

Do you see that?
MR. KRAMER: Objection to form.
THE DEPONENT: I mean, I cannot, I mean,

Page 93

yeah, comment on -- on --
Q. (By Ms. Zappala)
?
MR. KRAMER: Objection to form.
THE DEPONENT:
.
Q. (By Ms. Zappala) But my question was,
?
MR. KRAMER: Objection to form.
THE DEPONENT: So I do not exactly, I mean, yeah, recall.
.
Q. (By Ms. Zappala)
?
?
MR. KRAMER: Objection to form.

Page 110

[redacted]?

A. [redacted].

[redacted],

Page 111

[redacted]

A. That's correct.

MS. ZAPPALA: Why don't we take a quick break.

MR. KRAMER: Sure, yeah.

THE VIDEOGRAPHER: This marks the end of the media file labeled No. 3. Off the record at 11:37 a.m.

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of media file labeled No. 4. Back on the record at 11:52 a.m.

Q. (By Ms. Zappala) Just a couple of follow-up questions before we go on to the next topic.

A. Okay.

Q. If you go back to Exhibit 13, which is the [redacted].

Page 112

A. Okay.

Q. I'm going to direct your attention to the last page under "[redacted]," No. 12.

You see it says, "[redacted]."

Do you see that?

A. Yeah, I can see that sentence you read out, yup.

Q. And then I want to direct your attention back to Exhibit 9, which is the October 2019 annex licensing [redacted].

A. Yeah, I have the Exhibit 9.

Q. Do you see under Section [redacted], which is on page 19, there is a provision for [redacted] that we looked at earlier?

A. Page 19?

Q. Yes.

A. Yes, I can see the table.

[redacted]

A. I can see the IPs you mentioned.

Q. Then earlier, you testified that the

Page 113

[redacted] for [redacted]

MR. KRAMER: Objection to form.

THE DEPONENT: [redacted].

Q. (By Ms. Zappala) The one in Exhibit 13 -- I'm sorry, Exhibit 13.

A. Exhibit 13, yes.

Q. And Exhibit 13, which is [redacted]

Do you see that?

A. Yes, it includes [redacted].

Q. [redacted]

Do you recall that?

MR. KRAMER: Objection to form.

THE DEPONENT: Yes, that is correct.

[redacted]

Q. (By Ms. Zappala) [redacted]



Page 114

Q. And then going back to the offer in Exhibit 15, which is a ."
Do you see that?
A. Sorry, Exhibit 15?
Q. Exhibit 15, yes.
A. I have the Exhibit 15.
Q. And earlier, you testified that you -- in Exhibit 15, correct?
A. Yes,

Page 115

, Exhibit 15.
Q. , correct?
A. .
Q. I'm going to move on to a different topic.
So you are familiar with the Qualcomm architecture license agreement with Arm, correct?
A. Sorry, that is a very broad statement.
I mean, yeah, I know that there is a license agreement which exists with Qualcomm.
Q. Let me show you, marked as Exhibit 16, the Qualcomm ALA agreement with Arm.
(Exhibit 16 was marked for identification by the Court Reporter and is attached hereto.)
Q. (By Ms. Zappala) Have you ever reviewed --
MS. ZAPPALA: Sorry, for the record, Exhibit 16 is Bates-stamped ARM_00055357, and it is the ALA agreement between Qualcomm and Arm, dated May 31st, 2013.
Q. (By Ms. Zappala) Have you ever reviewed

Page 116

this ALA agreement?
A. No, I have not reviewed this agreement.
Q. Have you ever seen it before?
A. I have come across, I mean, yeah, this -- this document.
Q. Okay. And so this is a 2013 ALA.
Q. Let's show that to you.
MR. KRAMER: Ms. Zappala, I'll note that on Exhibit 16, at least, there are some pages that are -- maybe they're copied poorly, or maybe they were originally poorly. But perhaps at some point we'll substitute another version of this in.
If you're going to ask about this page, we might have some difficulty.
MS. ZAPPALA: I don't think I'll be asking him about that page.
MR. KRAMER: Okay.
MS. ZAPPALA: But I think this was the version that was produced by Arm.
MR. KRAMER: Okay.
(Exhibit 17 was marked for identification by the Court Reporter and is attached hereto.)

Page 117

MS. ZAPPALA:
MR. KRAMER: I'm -- I'm missing Bates numbers on my version. Do you have -- I don't see any Bates numbers on this.
(Discussion off the stenographic record.)
MR. KRAMER: What you just handed me that I think was 17, do you have -- are there any Bates numbers?
There's no Bates numbers on either one of them. We can still use it, but you -- you just read a Bates number into the record, I thought, right?
MS. ZAPPALA: I have it in my notes. So maybe at the break, we can swap out the exhibits.
MR. KRAMER: Okay.
MS. ZAPPALA: But this will be , which is Exhibit 17.
Q. (By Ms. Zappala) Have you ever reviewed this document before?
A. I have not reviewed this document.
Q. Are you generally familiar with the

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) | |
| Plaintiffs, | ) | C.A. No. 24-490 (MN) |
| v. | ) | **CONFIDENTIAL** |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) | |
| Defendant. | ) | |

**QUALCOMM'S FIRST SET OF REQUESTS FOR PRODUCTION (NOS. 1–52)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Civil Rules of this Court, Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (collectively, "Plaintiffs" or "Qualcomm") request that Defendant Arm Holdings PLC ("Arm") serve its written responses to these requests for production and produce copies of the Documents and tangible things requested below at the law offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064 within thirty (30) days of service.

**INSTRUCTIONS**

1. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these requests for Documents and things are continuing in nature. If, after producing the requested Documents and things, Arm obtains or becomes aware of any further responsive Document or thing, Arm must produce to Qualcomm such additional Document or thing.

2. If Arm withholds any Document or thing based upon a claim of privilege or any other claim of immunity from discovery, Arm shall state the specific basis for withholding the Document or thing and describe the facts and circumstances giving rise to such withholding in

writing in a manner sufficient for Qualcomm to evaluate, and the Court to adjudicate, the merits of the claim.

3.      If a claim of privilege is asserted with respect to any requested Document or thing, such Document or thing shall be scheduled on a privilege log that provides all of the information required by Rule 26(b)(5) of the Federal Rules of Civil Procedure subject to any agreement by the parties in this litigation regarding claims of privilege and privilege logs.  To the extent a requested Document or thing contains non-privileged information, the privileged information shall be redacted from the same and the redacted version of the Document or thing produced.

4.      If an objection is asserted with respect to any request for production of any Document or thing, Arm shall respond to the portion of the request believed to be unobjectionable and specifically identify that aspect of the request that Arm claims to be objectionable and why, pursuant to Federal Rule of Civil Procedure 34(b)(2).

5.      If an objection is asserted with respect to any request for production of any Document or thing, Arm shall state whether Arm is withholding any responsive material on the basis of that objection, pursuant to Federal Rule of Civil Procedure 34(b)(2).

6.      If Arm claims that information requested or required in response to any request for production of any Document or thing is also responsive to another request, Arm may not answer the request by referring to the answer to another request unless the answer to the request being referred to supplies a complete and accurate response to the request being answered, pursuant to Federal Rule of Civil Procedure 34(b)(2).

7.      If, in responding to any request for production, Arm believes there are any ambiguities in the request's wording, the response shall set forth the matter deemed ambiguous and the construction used in responding.

8. If a Document or thing that is responsive to any request for production has been destroyed, the response shall identify (i) the preparer of the Document or thing; (ii) its addresser (if different), addressee, and each recipient; (iii) each Person to whom it was distributed or shown; (iv) the date it was prepared; (v) the date it was transmitted (if different); (vi) the date it was received; (vii) a description of its contents and subject matter; (viii) the date of its destruction; (ix) the manner of its destruction; (x) the name, title, and address of the Person authorizing its destruction; (xi) the reason(s) for its destruction; (xii) the name, title and address of the Person destroying the Document or thing; and (xiii) a description of the efforts to locate the Document or thing and/or copies of it.

9. Responsive Documents or things should not be limited solely to those under Arm's physical custody, but should include those that are under its "possession, custody, or control," as that phrase is used in Rule 34 of the Federal Rules of Civil Procedure and has been interpreted by case law.

10. None of the definitions and instructions or the requests for production should be construed as an admission by Qualcomm relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in any definition, instruction, or request for production.

11. No request shall be read as limiting any other request.

**DEFINITIONS**

Unless otherwise indicated, the following definitions shall apply.

1. The definitions and instructions set forth in Federal Rules of Civil Procedure 26 and 34 are incorporated herein by reference.

2. Any capitalized term not otherwise defined herein retains its meaning consistent with the Qualcomm ALA, dated May 31, 2013 ([REDACTED]).

3. The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and to include, without limitation, all Communications, Things, and "writing[s]," "recording[s]," and "photograph[s]," as those terms are defined by Federal Rule of Evidence 1001, including, without limitation, electronic or computerized data compilations. A draft, prior or subsequent version, or non-identical copy is a separate "Document" within the meaning of the term. The term "Document" should also be deemed to include, without limitation, the file-folder, labeled-box, or notebook containing the Document, as well as any index, table of contents, list, or summaries that serve to organize, identify, or reference the Document.

4. "Communication" shall mean every manner of transmitting or receiving facts, information, thoughts or opinions, whether written, oral or by any other means, including but not limited to all memoranda, notices of meetings, electronic mail, text messages, conversations by telephone calls, records of conversations or messages whether in writing or upon any mechanical, electrical or electronic recording device, and oral conversations and statements.

5. "Concerning" is used in the broadest sense of the term and shall mean concerning, relating to, referring to, in connection with, describing, evidencing, constituting, containing, reflecting, constituting a basis for, commenting upon, mentioning, supporting, modifying, contradicting, disproving or criticizing.

6. "Defendant," "Arm," "you," and "your" mean Plaintiff Arm Holdings PLC and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners,

principals, employees, representatives, agents, officers, trustees, directors, attorneys, and all other Persons or entities acting or purporting to act on their behalf.

7. "Plaintiffs" means, collectively, Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc., and their principals, employees, representatives, agents, and officers.

8. "Complaint" means the First Amended Complaint filed by Qualcomm in the District of Delaware on December 16, 2024, captioned *Qualcomm Inc.* v. *Arm Holdings PLC*, No. 24-490 (MN).

9. "ALA" means Architecture License Agreement, including all amendments and annexes to any such agreement.

10. "TLA" means Technology License Agreement, including all amendments and annexes to any such agreement.

11. "Person" means any natural person or any business, legal, governmental, or regulatory entity or association, and the "acts" of a Person are defined to include acts of trustees, directors, officers, owners, members, employees, agents, or attorneys acting on the Person's behalf.

12. "Third Party" or "Third Parties" means any Person other than Plaintiffs and Defendant, as defined in the foregoing paragraphs.

13. "Thing" and its plural form means any tangible thing under the Federal Rules, including, without limitation, objects of every kind and nature, as well as prototypes, models, and drafts.

14. [redacted]

15. "[REDACTED]" means the definition of "[REDACTED]" as set forth in [REDACTED] of the Qualcomm ALA.

16. "Answer" means Arm's Answer filed in response to Qualcomm's Complaint.

17. "ACK" means Arm's Architecture Compliance Kit or Arm's Architecture Validation Suite or Arm's Architecture Compliance Suite.

18. "[REDACTED]" means the definition of "[REDACTED]" as set forth in [REDACTED] of the Qualcomm ALA.

19. "OOB" means Arm's Out of Box tests.

20. As used in these requests, the singular shall include the plural, and the past tense shall include the present tense, and vice versa; the words "and" and "or" shall be both conjunctive and disjunctive; the word "all" shall mean "any and all"; the word "including" shall mean "including, without limitation," so as to be most inclusive.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All Documents and Communications Arm referenced, relied upon, or otherwise used in drafting its Answer.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and Communications Arm contends support its defenses or that rebut its defenses.

**REQUEST FOR PRODUCTION NO. 3:**

Documents and Communications sufficient to show all error corrections, [REDACTED] [REDACTED] modifications, maintenance releases, and enhancements to the [REDACTED] licensed under the Qualcomm ALA and released or distributed (internally or otherwise) since June 1, 2022.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents and Communications concerning [REDACTED] or bug fixes, updates, corrections, or any other technical improvement or information licensed under the Qualcomm ALA that was, after June 1, 2022, delivered to any other Arm licensee but not to Qualcomm.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents and Communications since June 1, 2022 related to or concerning the Qualcomm's ACK or Qualcomm's OOB tests, and any patches thereto.

**REQUEST FOR PRODUCTION NO. 6:**

All versions of the ACK released after June 1, 2022, and any patches thereto.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents and Communications concerning Arm's position that [REDACTED] [REDACTED] of the Qualcomm ALA governs delivery of ACK deliverables listed in [REDACTED] of any of the Qualcomm ALA Annexes.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents and Communications concerning or interpreting [REDACTED] [REDACTED] of the Qualcomm ALA.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents and Communications concerning or interpreting the definition of "[REDACTED]", and sections governing verification, delivery, support, and any remedies for failure to deliver [REDACTED] in any Third Party ALAs.

8. If a Document or thing that is responsive to any request for production has been destroyed, the response shall identify (i) the preparer of the Document or thing; (ii) its addresser (if different), addressee, and each recipient; (iii) each Person to whom it was distributed or shown; (iv) the date it was prepared; (v) the date it was transmitted (if different); (vi) the date it was received; (vii) a description of its contents and subject matter; (viii) the date of its destruction; (ix) the manner of its destruction; (x) the name, title, and address of the Person authorizing its destruction; (xi) the reason(s) for its destruction; (xii) the name, title and address of the Person destroying the Document or thing; and (xiii) a description of the efforts to locate the Document or thing and/or copies of it.

9. Responsive Documents or things should not be limited solely to those under Arm's physical custody, but should include those that are under its "possession, custody, or control," as that phrase is used in Rule 34 of the Federal Rules of Civil Procedure and has been interpreted by case law.

10. None of the definitions and instructions or the requests for production should be construed as an admission by Qualcomm relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in any definition, instruction, or request for production.

11. No request shall be read as limiting any other request.

**DEFINITIONS**

Unless otherwise indicated, the following definitions shall apply.

1. The definitions and instructions set forth in Federal Rules of Civil Procedure 26 and 34 are incorporated herein by reference.

2. Any capitalized term not otherwise defined herein retains its meaning consistent with the Qualcomm ALA, dated May 31, 2013 ([REDACTED]).

3. The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and to include, without limitation, all Communications, Things, and "writing[s]," "recording[s]," and "photograph[s]," as those terms are defined by Federal Rule of Evidence 1001, including, without limitation, electronic or computerized data compilations. A draft, prior or subsequent version, or non-identical copy is a separate "Document" within the meaning of the term. The term "Document" should also be deemed to include, without limitation, the file-folder, labeled-box, or notebook containing the Document, as well as any index, table of contents, list, or summaries that serve to organize, identify, or reference the Document.

4. "Communication" shall mean every manner of transmitting or receiving facts, information, thoughts or opinions, whether written, oral or by any other means, including but not limited to all memoranda, notices of meetings, electronic mail, text messages, conversations by telephone calls, records of conversations or messages whether in writing or upon any mechanical, electrical or electronic recording device, and oral conversations and statements.

5. "Concerning" is used in the broadest sense of the term and shall mean concerning, relating to, referring to, in connection with, describing, evidencing, constituting, containing, reflecting, constituting a basis for, commenting upon, mentioning, supporting, modifying, contradicting, disproving or criticizing.

6. "Defendant," "Arm," "you," and "your" mean Plaintiff Arm Holdings PLC and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners,

principals, employees, representatives, agents, officers, trustees, directors, attorneys, and all other Persons or entities acting or purporting to act on their behalf.

7. "Plaintiffs" means, collectively, Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc., and their principals, employees, representatives, agents, and officers.

8. "Complaint" means the First Amended Complaint filed by Qualcomm in the District of Delaware on December 16, 2024, captioned *Qualcomm Inc.* v. *Arm Holdings PLC*, No. 24-490 (MN).

9. "ALA" means Architecture License Agreement, including all amendments and annexes to any such agreement.

10. "TLA" means Technology License Agreement, including all amendments and annexes to any such agreement.

11. "Person" means any natural person or any business, legal, governmental, or regulatory entity or association, and the "acts" of a Person are defined to include acts of trustees, directors, officers, owners, members, employees, agents, or attorneys acting on the Person's behalf.

12. "Third Party" or "Third Parties" means any Person other than Plaintiffs and Defendant, as defined in the foregoing paragraphs.

13. "Thing" and its plural form means any tangible thing under the Federal Rules, including, without limitation, objects of every kind and nature, as well as prototypes, models, and drafts.

14. [redacted]

15. "[REDACTED]" means the definition of "[REDACTED]" as set forth in [REDACTED] of the Qualcomm ALA.

16. "Answer" means Arm's Answer filed in response to Qualcomm's Complaint.

17. "ACK" means Arm's Architecture Compliance Kit or Arm's Architecture Validation Suite or Arm's Architecture Compliance Suite.

18. "[REDACTED]" means the definition of "[REDACTED]" as set forth in [REDACTED] of the Qualcomm ALA.

19. "OOB" means Arm's Out of Box tests.

20. As used in these requests, the singular shall include the plural, and the past tense shall include the present tense, and vice versa; the words "and" and "or" shall be both conjunctive and disjunctive; the word "all" shall mean "any and all"; the word "including" shall mean "including, without limitation," so as to be most inclusive.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All Documents and Communications Arm referenced, relied upon, or otherwise used in drafting its Answer.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and Communications Arm contends support its defenses or that rebut its defenses.

**REQUEST FOR PRODUCTION NO. 3:**

Documents and Communications sufficient to show all error corrections, [REDACTED] [REDACTED] modifications, maintenance releases, and enhancements to the [REDACTED] licensed under the Qualcomm ALA and released or distributed (internally or otherwise) since June 1, 2022.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents and Communications concerning [REDACTED] or bug fixes, updates, corrections, or any other technical improvement or information licensed under the Qualcomm ALA that was, after June 1, 2022, delivered to any other Arm licensee but not to Qualcomm.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents and Communications since June 1, 2022 related to or concerning the Qualcomm's ACK or Qualcomm's OOB tests, and any patches thereto.

**REQUEST FOR PRODUCTION NO. 6:**

All versions of the ACK released after June 1, 2022, and any patches thereto.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents and Communications concerning Arm's position that [REDACTED] [REDACTED] of the Qualcomm ALA governs delivery of ACK deliverables listed in [REDACTED] of any of the Qualcomm ALA Annexes.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents and Communications concerning or interpreting [REDACTED] [REDACTED] of the Qualcomm ALA.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents and Communications concerning or interpreting the definition of "[REDACTED]", and sections governing verification, delivery, support, and any remedies for failure to deliver [REDACTED] in any Third Party ALAs.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents and Communications concerning the withholding of [REDACTED] or other deliverables from Qualcomm, including any Documents and Communications discussing Arm's justification(s) for those withholdings.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents and Communications related to or concerning Arm's assertion that Qualcomm has no "[REDACTED]" and that [REDACTED] (12/6/2022 Letter from S. Collins to A. Chaplin).

**REQUEST FOR PRODUCTION NO. 12:**

All Documents and Communications related to or concerning Qualcomm's notices of failure to deliver, sent to Arm on November 3, 2022 and December 5, 2022.

**REQUEST FOR PRODUCTION NO. 13:**

All Documents and Communications related to or concerning Arm's decision not to provide Qualcomm with OOB tests or ACK patches after receiving Qualcomm's November 3, 2022 and December 5, 2022 notices of failure to deliver.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents and Communications concerning any inquiry or request made by Qualcomm to Arm regarding the Arm's development of v10 of the Arm ISA (including the April 17, 2020 email from Rajiv Gupta at Qualcomm to Lynn Couillard at Arm) and Arm's response to those inquiries.

**REQUEST FOR PRODUCTION NO. 15**:

All Documents and Communications concerning the past, current, or future development of another version of the Arm ISA, including but not limited to a v10 of the Arm ISA.

**REQUEST FOR PRODUCTION NO. 16**:

All Documents and Communications related to or concerning Arm's October 22, 2024 letter to Qualcomm alleging that Qualcomm is in breach of its ALA.

**REQUEST FOR PRODUCTION NO. 17**:

All Documents and Communications related to or concerning Arm's sharing of its October 22, 2024 letter to Qualcomm or the allegations contained in that letter with Third Parties.

**REQUEST FOR PRODUCTION NO. 18**:

All Documents and Communications related to or concerning Qualcomm's May 20, 2020 email from Brett Bettesworth to Lynn Couillard electing to extend the [REDACTED] of the Qualcomm ALA and to negotiate the terms of the extension.

**REQUEST FOR PRODUCTION NO. 19**:

All Documents and Communications related to or concerning Arm's analysis or discussion of whether to extend the [REDACTED] of the Qualcomm ALA following Qualcomm's May 20, 2020 email.

**REQUEST FOR PRODUCTION NO. 20**:

All Documents and Communications concerning Arm's discussions with Third Parties regarding the claims in Qualcomm's Complaint.

**REQUEST FOR PRODUCTION NO. 21**:

All Documents and Communications related to or concerning Arm's discussions with Third Parties regarding the status of Qualcomm's licenses with Arm.

**REQUEST FOR PRODUCTION NO. 22**:

All Documents and Communications related to or concerning Arm's discussions with Third Parties regarding Qualcomm's relationship with Arm.

**REQUEST FOR PRODUCTION NO. 23:**

All Documents and Communications related to or concerning the projected or forecasted impact to Arm's revenue or profits if the Qualcomm ALA is terminated.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents and Communications containing any analysis or evaluation of the projected or forecasted impact to Arm's revenue or profits if the Qualcomm ALA is terminated.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents and Communications related to or concerning Arm's potential termination of the Qualcomm ALA.

**REQUEST FOR PRODUCTION NO. 26:**

All Documents and Communications concerning deliverables included as licensed under the Qualcomm ALA, including the , that was, after June 1, 2022, delivered to any other Arm licensee but not to Qualcomm.

**REQUEST FOR PRODUCTION NO. 27:**

All ALAs and Annexes with Third Parties (*i.e.*, parties other than Qualcomm).

**REQUEST FOR PRODUCTION NO. 28:**

All Documents and Communications concerning delivery of [REDACTED], or bug fixes, updates, corrections, or any other technical improvement licensed under ALAs to third parties (*i.e.*, parties other than Qualcomm), including documents sufficient to show the licensee, the date of delivery, and the terms of any such delivery for any delivery that was not provided to Qualcomm.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents and Communications with Arm's Board of Directors and/or Masayoshi Son concerning the decision to withhold deliverables, including [REDACTED] or bug fixes, updates, corrections, or any other technical improvement or other information licensed under the Qualcomm ALA, from Qualcomm.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents and Communications related to or concerning Arm's communications with Qualcomm regarding the delivery of [REDACTED] or other deliverables licensed under the Qualcomm ALA, including but not limited to communications from Arm to Qualcomm, informing Qualcomm that deliverables would be delayed or would need legal approval, and documents and communications regarding Arm's strategy or plans for communications with Qualcomm regarding the delivery of [REDACTED].

**REQUEST FOR PRODUCTION NO. 31:**

All Documents and Communications related to or concerning each ACK patch released since June 1, 2022, including documents related to the development process for each patch, the timeline for development, and each version of the Arm Architecture that the patch corresponds to.

**<u>REQUEST FOR PRODUCTION NO. 32</u>:**

All Documents and Communications related to or concerning the delivery of ACK patches to any ALA partner other than Qualcomm.

**<u>REQUEST FOR PRODUCTION NO. 33</u>:**

All Documents and Communications concerning OOB tests, including the development process for OOB tests, the timeline to configure the ACK through the use of OOB tests, and any manuals or presentations describing the use of OOB tests with the ACK.

**<u>REQUEST FOR PRODUCTION NO. 34</u>:**

All Documents and Communications concerning any negotiations that Arm had with TLA licensees (including Third Parties) for the [redacted], software test libraries for the [redacted] and [redacted] cores, and CPUs codenamed [redacted] including but not limited to price quotes, license fees, licensing term limits, or other language to include in TLA Annexes.

**<u>REQUEST FOR PRODUCTION NO. 35</u>:**

All Documents and Communications related to or concerning Arm's October 22, 2024 letter to Qualcomm.

**<u>REQUEST FOR PRODUCTION NO. 36</u>:**

All Documents and Communications related to or concerning Arm's sharing of the October 22, 2024 letter with Third Parties, including but not limited to Arm's decision to share the letter with Third Parties.

**REQUEST FOR PRODUCTION NO. 37**:

All Documents and Communications related to or concerning internal discussions of licensing v10 of the Arm ISA to Qualcomm, including discussions regarding whether to withhold v10 and potential pricing for v10.

**REQUEST FOR PRODUCTION NO. 38**:

All Documents and Communications concerning or related to Arm's January 8, 2025 letter to Qualcomm withdrawing the notice of termination of the Qualcomm ALA.

**REQUEST FOR PRODUCTION NO. 39**:

All Documents and Communications concerning or related to withholding [REDACTED] [REDACTED] from Qualcomm.

**REQUEST FOR PRODUCTION NO. 40:**

All Documents and Communications concerning Arm's discussions with Qualcomm regarding licensing of the [REDACTED] [REDACTED], software test libraries for the [REDACTED] and [REDACTED] cores, and CPUs codenamed [REDACTED] including discussions regarding potentially withholding any of the listed items, pricing of the items, and any potential restrictions related to the use of the items in Qualcomm's products, including in any chips that contained designs or source code that originated at Nuvia.

**REQUEST FOR PRODUCTION NO. 41**:

All Documents and Communications concerning the decision not to provide Qualcomm with information or documents related to the configuration or enablement of the [REDACTED] [REDACTED] including but not limited to communications regarding Qualcomm's requests for delivery of the [REDACTED]

**REQUEST FOR PRODUCTION NO. 42**:

All Documents and Communications concerning the decision to introduce the v9 Architecture, including but not limited to the timing and reasoning for Arm's decision to move from v8 to v9 Architecture.

**REQUEST FOR PRODUCTION NO. 43**:

All Documents and Communications concerning the decision to introduce the v10 Architecture, including the timing and reasoning for Arm's decision to move from v9 to v10 Architecture and the differences between the v9 and v10 Architecture.

**REQUEST FOR PRODUCTION NO. 44**:

All Documents and Communications concerning the addition of instructions between v8 and v9 of the Arm ISA, and between v9 and v10 of the Arm ISA.

**REQUEST FOR PRODUCTION NO. 45**:

All Documents and Communications concerning Arm's analysis of whether v9 met the contractual definition of "[REDACTED]" as defined at [REDACTED] of the Qualcomm ALA.

**REQUEST FOR PRODUCTION NO. 46**:

All Documents and Communications concerning "[REDACTED]" as defined at [REDACTED] of the Qualcomm ALA.

**REQUEST FOR PRODUCTION NO. 47**:

Organizational charts for Arm's engineering, verification, product management, Intellectual Property Group, Internet of Things, and business departments, including names of sub-unit or team within a department and the names of leadership of each department and any sub-unit or team within a department.

**<u>REQUEST FOR PRODUCTION NO. 48</u>**:

All minutes or records of Arm's Technology Advisory Board meetings for the past 10 years, including documents sufficient to show the dates of each meeting, the attendees, and the matters discussed.

**<u>REQUEST FOR PRODUCTION NO. 49</u>:**

All Documents and Communications related to or concerning Qualcomm's notices of Arm's breach of [REDACTED] of the Qualcomm TLA, sent to Arm on September 20, 2024 and September 27, 2024.

**<u>REQUEST FOR PRODUCTION NO. 50</u>:**

All Documents and Communications related to or concerning Qualcomm's notices of Arm's breach of [REDACTED] of the Qualcomm TLA, sent to Arm on September 20, 2024 and September 27, 2024.

**<u>REQUEST FOR PRODUCTION NO. 51</u>:**

All Documents and Communications related to or concerning Arm's October 22, 2024 letter to Qualcomm regarding Arm's breach of [REDACTED] of the Qualcomm TLA.

**<u>REQUEST FOR PRODUCTION NO. 52</u>:**

Documents sufficient to show every ALA and TLA provided or made available to Nvidia or its counsel as part of Nvidia's planned acquisition of Arm.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

January 21, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2025, copies of the foregoing were caused to be served upon the following in the manner indicated:

Anne Shea Gaza, Esquire
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Scott F. Llewellyn, Esquire
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Nicholas R. Fung, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

*/s/ Jennifer Ying*

Jennifer Ying (#5550)

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 24-490 (MN) |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) | **CONFIDENTIAL** |
| Defendant. | ) | |

**QUALCOMM'S THIRD SET OF REQUESTS FOR PRODUCTION (NOS. 121-156)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Civil Rules of this Court, Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (collectively, "Plaintiffs" or "Qualcomm") request that Defendant Arm Holdings PLC ("Arm") serve Qualcomm with its written responses to these requests for production and produce copies of the Documents and tangible things requested below at the law offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064 within thirty (30) days of service.

**INSTRUCTIONS**

1. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these requests for Documents and things are continuing in nature. If, after producing the requested Documents and things, Arm obtains or becomes aware of any further responsive Document or thing, Arm shall produce to Qualcomm such additional Document or thing.

2. If Arm withholds any Document or thing based upon a claim of privilege or any other claim of immunity from discovery, Arm shall state the specific basis for withholding the Document or thing and describe the facts and circumstances giving rise to such withholding in

writing in a manner sufficient for Qualcomm to evaluate, and the Court to adjudicate, the merits of the claim.

3.     If a claim of privilege is asserted with respect to any requested Document or thing, such Document or thing shall be scheduled on a privilege log that provides all of the information required by Rule 26(b)(5) of the Federal Rules of Civil Procedure subject to any agreement by the parties in this litigation regarding claims of privilege and privilege logs.  To the extent a requested Document or thing contains non-privileged information, the privileged information shall be redacted from the same and the redacted version of the Document or thing produced.

4.     If an objection is asserted with respect to any request for production of any Document or thing, Arm shall respond to the portion of the request believed to be unobjectionable and specifically identify that aspect of the request that Arm claims to be objectionable and why, pursuant to Federal Rule of Civil Procedure 34(b)(2).

5.     If an objection is asserted with respect to any request for production of any Document or thing, Arm shall state whether Arm is withholding any responsive material on the basis of that objection, pursuant to Federal Rule of Civil Procedure 34(b)(2).

6.     If Arm claims that information requested or required in response to any request for production of any Document or thing is also responsive to another request, Arm may not answer the request by referring to the answer to another request unless the answer to the request being referred to supplies a complete and accurate response to the request being answered, pursuant to Federal Rule of Civil Procedure 34(b)(2).

7.     If, in responding to any request for production, any ambiguities in the request's wording are encountered, the response shall set forth the matter deemed ambiguous and the construction used in responding.

8. If a Document or thing that is responsive to any request for production has been destroyed, the response shall identify (i) the preparer of the Document or thing; (ii) its addresser (if different), addressee, and each recipient; (iii) each Person to whom it was distributed or shown; (iv) the date it was prepared; (v) the date it was transmitted (if different); (vi) the date it was received; (vii) a description of its contents and subject matter; (viii) the date of its destruction; (ix) the manner of its destruction; (x) the name, title, and address of the Person authorizing its destruction; (xi) the reason(s) for its destruction; (xii) the name, title and address of the Person destroying the Document or thing; and (xiii) a description of the efforts to locate the Document or thing and/or copies of it.

9. Responsive Documents or things should not be limited solely to those under Arm's physical custody, but should include those that are under its "possession, custody, or control," as that phrase is used in Rule 34 of the Federal Rules of Civil Procedure and has been interpreted by case law.

10. None of the definitions and instructions or the requests for production should be construed as an admission by Qualcomm relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in any definition, instruction, or request for production.

11. No request shall be read as limiting any other request.

## DEFINITIONS

Unless otherwise indicated, the following definitions shall apply.

1. The definitions and instructions set forth in Federal Rules of Civil Procedure 26 and 34 are incorporated herein by reference.

2. Any capitalized term not otherwise defined herein retains its meaning consistent with the Qualcomm ALA, dated May 31, 2013 ([REDACTED]).

3. The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and to include, without limitation, all Communications, Things, and "writing[s]," "recording[s]," and "photograph[s]," as those terms are defined by Federal Rule of Evidence 1001, including, without limitation, electronic or computerized data compilations. A draft, prior or subsequent version, or non-identical copy is a separate "Document" within the meaning of the term. The term "Document" should also be deemed to include, without limitation, the file-folder, labeled-box, or notebook containing the Document, as well as any index, table of contents, list, or summaries that serve to organize, identify, or reference the Document.

4. "Communication" shall mean every manner of transmitting or receiving facts, information, thoughts or opinions, whether written, oral or by any other means, including but not limited to all memoranda, notices of meetings, electronic mail, text messages, conversations by telephone calls, records of conversations or messages whether in writing or upon any mechanical, electrical or electronic recording device, and oral conversations and statements.

5. "Concerning" is used in the broadest sense of the term and shall mean concerning, relating to, referring to, in connection with, describing, evidencing, constituting, containing, reflecting, constituting a basis for, commenting upon, mentioning, supporting, modifying, contradicting, disproving or criticizing.

6. "Defendant," "Arm," "you," and "your" mean Plaintiff Arm Holdings PLC and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners,

principals, employees, representatives, agents, officers, trustees, directors, attorneys, and all other Persons or entities acting or purporting to act on their behalf.

7. "Plaintiffs" means, collectively, Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc., and their principals, employees, representatives, agents, and officers.

8. "Complaint" means the operative complaint filed by Qualcomm, including Qualcomm's Second Amended Complaint, which was the subject of a Motion for Leave to File a Second Amended Complaint filed on March 27, 2025.

9. "ALA" means Architecture License Agreement, including all amendments and annexes to any such agreement.

10. "TLA" means Technology License Agreement, including all amendments and annexes to any such agreement.

11. "Person" means any natural person or any business, legal, governmental, or regulatory entity or association, and the "acts" of a Person are defined to include acts of trustees, directors, officers, owners, members, employees, agents, or attorneys acting on the Person's behalf.

12. "Third Party" or "Third Parties" means any Person other than Plaintiffs and Defendant, as defined in the foregoing paragraphs.

13. "Thing" and its plural form means any tangible thing under the Federal Rules, including, without limitation, objects of every kind and nature, as well as prototypes, models, and drafts.

14. [redacted]

15. "[REDACTED]" means the definition of "[REDACTED]" as set forth in [REDACTED] of the Qualcomm ALA.

16. "Answer" means Arm's Answer filed in response to Qualcomm's Complaint.

17. "ACK" means Arm's Architecture Compliance Kit or Arm's Architecture Validation Suite or Arm's Architecture Compliance Suite.

18. "[REDACTED]" means the definition of "[REDACTED]" as set forth in [REDACTED] of the Qualcomm ALA.

19. "OOB" means Arm's Out of Box tests.

20. "ISA" means Arm's A-Profile Instruction Set Architecture.

21. As used in these requests, the singular shall include the plural, and the past tense shall include the present tense, and vice versa; the words "and" and "or" shall be both conjunctive and disjunctive; the word "all" shall mean "any and all"; the word "including" shall mean "including, without limitation," so as to be most inclusive.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 121:**

All Documents and Communications relating to or concerning negotiations between Arm and [REDACTED], or its subsidiaries, related to Arm's effort to supply [REDACTED] with silicon chips.

**REQUEST FOR PRODUCTION NO. 122:**

All Documents and Communications relating to or concerning Arm's knowledge since January 1, 2022 that any Third Party is or has been a customer for Qualcomm CPUs or other products.

**REQUEST FOR PRODUCTION NO. 123:**

All agreements licensing [REDACTED] codenamed [REDACTED] [REDACTED], including TLAs and corresponding Annexes.

**REQUEST FOR PRODUCTION NO. 124:**

All licensing fee and royalty information for licenses offered by Arm for [REDACTED] [REDACTED] codenamed [REDACTED]

**REQUEST FOR PRODUCTION NO. 125:**

All Documents and Communications relating to or concerning Arm's investigation into or review of any Arm license agreement with a third party for [REDACTED] codenamed [REDACTED], including pursuant to the Qualcomm TLA, following Qualcomm's written requests to license those cores in April and August 2024.

**REQUEST FOR PRODUCTION NO. 126:**

All Documents and Communications relating to or concerning the article written by Financial Times on February 13, 2025 titled "Arm to launch its own chip in move that could upend semiconductor industry".

**REQUEST FOR PRODUCTION NO. 127:**

All Communications with Financial Times, Matthew Garrahan, Tim Bradshaw, or David Keohane relating to or concerning Arm's efforts to launch and distribute its own silicon chips and to secure [REDACTED] as a customer.

**REQUEST FOR PRODUCTION NO. 128:**

All Documents and Communications relating to or concerning discussions between Arm or Softbank and Ampere related to Qualcomm.

**REQUEST FOR PRODUCTION NO. 129:**

All Documents and Communications relating to or concerning discussions between Arm or Softbank and Ampere related to Softbank's planned acquisition of Ampere.

**REQUEST FOR PRODUCTION NO. 130:**

All Documents and Communications relating to or concerning Softbank's planned acquisition of Ampere.

**REQUEST FOR PRODUCTION NO. 131:**

All Documents and Communications relating to or concerning changes or modifications to the Ampere ALA and Annexes and the Ampere TLA and Annexes, whether implemented or not, in connection with Softbank's planned acquisition of Ampere.

**REQUEST FOR PRODUCTION NO. 132:**

All Documents and Communications relating to or concerning negotiations with Ampere in connection with Softbank's planned acquisition of Ampere.

**REQUEST FOR PRODUCTION NO. 133:**

All Documents and Communications relating to or concerning negotiations with Ampere discussing or concerning Qualcomm.

**REQUEST FOR PRODUCTION NO. 134:**

Documents identifying any of Arm's customer relationship management systems ("CRMs"), including but not limited to Salesforce, Salesforce CPQ and Salesforce Sales Cloud, and any other internal or external CRM systems or software.

**REQUEST FOR PRODUCTION NO. 135:**

Documents sufficient to show all fields and record types maintained in any CRM system used by Arm.

**REQUEST FOR PRODUCTION NO. 136:**

Documents sufficient to show sales processes and workflows used by Arm in its CRM systems to track potential and actual Arm customers.

**REQUEST FOR PRODUCTION NO. 137:**

All Documents maintained in Arm's CRM systems related to communications with customers concerning Qualcomm.

**REQUEST FOR PRODUCTION NO. 138:**

All Documents maintained in Arm's CRM systems containing information concerning Arm's plans and efforts to manufacture and sell its own silicon.

**REQUEST FOR PRODUCTION NO. 139:**

All Documents and Communications relating to or concerning the resources, including time allocation and funds spent, required for Arm to create ACK patches, in whole or in part, since January 1, 2022.

**REQUEST FOR PRODUCTION NO. 140:**

All TLAs and corresponding Annexes entered into since January 1, 2019.

**REQUEST FOR PRODUCTION NO. 141:**

All Documents and Communications sufficient to show deliverables that Arm claims it provided to Qualcomm, including [REDACTED], but that Qualcomm alleges it did not receive pursuant to the Qualcomm ALA.

**REQUEST FOR PRODUCTION NO. 142:**

All Documents and Communications showing deliverables, including [REDACTED] [REDACTED], that were provided to Qualcomm pursuant to the Qualcomm ALA since January 1, 2022.

**REQUEST FOR PRODUCTION NO. 143:**

All Documents and Communications relating to or concerning [REDACTED].

**REQUEST FOR PRODUCTION NO. 144:**

All Documents and Communications relating to or concerning the facts discussed in Arm's response to Qualcomm's Interrogatory Number 3.

**REQUEST FOR PRODUCTION NO. 145:**

All Communications with FGS Global concerning Qualcomm, including but not limited to Arm's October 22, 2024 letter, and all Communications related to meetings or calls between [REDACTED] [REDACTED] and Third Parties.

**REQUEST FOR PRODUCTION NO. 145:**

All Documents and Communications relating to or concerning Arm's statement provided to, or communications with, [REDACTED] concerning Arm's October 22, 2024 letter.

**REQUEST FOR PRODUCTION NO. 146:**

All Communications with Morrison & Foerster concerning Arm's October 22, 2024 letter related to meetings or calls between Morrison & Foerster and Third Parties.

**REQUEST FOR PRODUCTION NO. 147:**

All Communications between [REDACTED] and Third Parties concerning Arm's October 22, 2024 letter.

**REQUEST FOR PRODUCTION NO. 148:**

All Communications with [REDACTED] relating to or concerning Qualcomm.

**REQUEST FOR PRODUCTION NO. 149:**

All Communications with [REDACTED] concerning Arm's October 22, 2024 letter.

**REQUEST FOR PRODUCTION NO. 150:**

All Documents and Communications relating to [REDACTED] role on the [REDACTED] [REDACTED].

**REQUEST FOR PRODUCTION NO. 151:**

All Documents and Communications responsive to Qualcomm's prior Requests for Production to the extent that Arm withheld production pending Qualcomm's amendment of its Complaint.

**REQUEST FOR PRODUCTION NO. 156:**

All Documents and Communications relating to or concerning changes in Arm's behavior towards Qualcomm, including decisions to provide deliverables and licensing offers to Qualcomm pursuant to the Qualcomm ALA and TLA, following the jury verdict in *Arm* v. *Qualcomm* (22-1146-MN).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

April 2, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2025, copies of the foregoing were caused to be served upon the following in the manner indicated:

Anne Shea Gaza, Esquire
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Scott F. Llewellyn, Esquire
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Nicholas R. Fung, Esquire
Henry Huttinger, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Kyle W.K. Mooney, Esquire
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Erik J. Olson, Esquire
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Jay Emerick, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

*/s/ Jennifer Ying*

Jennifer Ying (#5550)

# EXHIBIT 24

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

EXAL DIRECT DIAL: +1 212 373 3532
EMAIL: CNYARADY@PAULWEISS.COM

BRUSSELS
HONG KONG
LONDON
LOS ANGELES
SAN FRANCISCO
TOKYO
TORONTO
WASHINGTON, DC
WILMINGTON

July 11, 2025

**Via Email** **Highly Confidential – Attorneys' Eyes Only**

Peter Evangelatos
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Re: *Qualcomm Inc.* v. *Arm Holdings Plc.*
C.A. No. 24-00490-MN

Dear Peter,

We write regarding the deposition of Akshay Bhatnagar on July 10, 2025. During that deposition, Mr. Bhatnagar testified that [redacted]. Bhatnagar Tr. 44:4-17. He also repeatedly described that [redacted] *Id.* at 44:18-21, 44:25-45:7. When we asked Arm to produce this document, you responded that [redacted] *Id.* at 45:10-11.

Arm still has not produced that [redacted]. Arm's failure to produce this document has severely prejudiced Qualcomm's ability to prosecute its case, including by impeding its ability to depose Messrs. Shivashankar and Bhatnagar. Please confirm that you will produce this [redacted], and any related emails or chats, by Monday, July 14.

Qualcomm reserves all rights.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

Sincerely,

*/s/ Catherine Nyarady*

Catherine Nyarady

# EXHIBIT 25

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

BRUSSELS TOKYO
HONG KONG TORONTO
LONDON WASHINGTON, DC
LOS ANGELES WILMINGTON
SAN FRANCISCO

EXAL DIRECT DIAL: +1 212 373 3532
EMAIL: CNYARADY@PAULWEISS.COM

July 16, 2025

**Via Email**
Jay Emerick
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Re: *Qualcomm Inc.* v. *Arm Holdings Plc.*
C.A. No. 24-00490-MN

Dear Jay,

We write regarding outstanding document requests made during or immediately after the depositions of Arm witnesses, including Martin Weidmann, Karthik Shivashankar, Akshay Bhatnagar, Will Abbey, Ehab Youssef, Jeff Fonseca, Vivek Agrawal, Andrew Howard, Jannik Nelson, and Christine Tran. Arm's deficient production and improper privilege assertions continue to severely prejudice Qualcomm's ability to prosecute its case, particularly now after the close of fact discovery. Arm must immediately produce the documents requested below. To the extent Arm continues to withhold responsive documents based on any claim of privilege, Arm must immediately supplement its privilege log to include the withheld documents.

**Documents Showing** [REDACTED]

On June 23, 2025, Qualcomm requested various unproduced documents based on the deposition testimony of Karthik Shivashankar, including documentation containing the [REDACTED]. *See* 6/23/25 Letter from C. Nyarady to J. Emerick. To date, Arm has not responded to our June 23 letter.

Qualcomm reiterated its request for production of documents [REDACTED] on July 8, 2025, based on additional deposition testimony from Ehab Youssef and Will Abbey. 7/8/25 Letter from C. Nyarady to Nick Fung. Qualcomm also noted that, [REDACTED]. Qualcomm requested that Arm immediately provide a supplemental privilege log to identify the entries corresponding to the

[redacted]. To date, Arm has not responded to our July 8 letter and has not provided the requested privilege log entries.

Qualcomm again reiterated its request for production of documents underlying the October 2024 TLA Offers on July 9, 2025, specifically requesting [redacted] based on Arm's request for an additional reminder during to the deposition of Jeff Fonseca. 7/9/25 Email from E. Westerhold to Brain Kramer. Arm responded on July 9, 2025, stating that [redacted] 7/9/2025 Email from P. Evangelatos to E. Westerhold.

On July 11, 2025 Qualcomm requested additional documents relevant to the 2024 TLA Offers based on the deposition testimony of Akshay Bhatnagar. 7/11/2025 Letter from C. Nyarady to P. Evangelatos. Specifically, Mr. Bhatnagar testified that [redacted] Bhatnagar Tr. 44:4-17. He also repeatedly described that [redacted] *Id.* at 44:18-21, 44:25-45:7. To date, Arm has not responded to our July 11 letter or produced the requested spreadsheet.

Arm's has produced a single email chain and attachment regarding the 2024 TLA Offers. ARMQC_02784199; ARMQC_02784204. Qualcomm objects to the continued redaction of ARMQC_02784199 and ARMQC_02784204 for the reasons set forth in our July 8, 2025 Letter, and notes that Arm has refused to justify any continued privilege claim. In any event, a single email chain and attachment is obviously insufficient to fulfill Qualcomm's various requests noted above for [redacted], based on the testimony of five separate Arm witnesses.

Qualcomm hereby reiterates its various requests for production made above in full. Specifically, Qualcomm requests production of all documentation of the [redacted], including the [redacted] pending resolution of the protective order dispute.

**<u>Documents Related to the "Discussion" with Bloomberg News Regarding Arm's Notice of Termination</u>**

On July 8, 2025, Qualcomm requested production of documents regarding Arm's communications with Bloomberg News based on the deposition testimony of Will Abbey. During his deposition, Mr. Abbey testified that [redacted] Abbey Depo Tr. at 160:5-15. On redirect, Arm elicited testimony from Mr. Abbey that [redacted] Abbey Depo Tr. at 165:13-21. [redacted]



[redacted] Abbey Depo Tr. at 173:18-174:2. Mr. Abbey further testified that [redacted] Abbey Depo Tr. at 172:15-173:10, 174:3-175:14.

Arm has since provided its Second Supplemental Initial Privilege Log containing entries for some of these communications. However, Qualcomm maintains that privilege over these communications has been waived by Mr. Abbey's redirect testimony. [redacted] Specifically, privilege has been waived for Mr. Abbey's [redacted] As such, Arm must immediately produce all documentation of the "discussion" between Arm and Bloomberg News, whether that "discussion" was conducted through its counsel at Morrison & Forrester or through other agents.

**<u>Documents Requested During the Deposition of Martin Weidmann</u>**

On June 23, 2025, Qualcomm requested documents showing an instruction from Arm management not to support Nuvia designs, and the rescinding of that instruction, both based on the testimony of Mr. Weidmann:

- Mr. Weidmann testified that [redacted] Rough Tr. 115:5–116:19. Qualcomm requested production of these emails during Mr. Weidmann's deposition, and Counsel for Arm stated that [redacted] Rough Tr. 116:16–117:10.

- Mr. Weidmann further testified that [redacted] Rough Tr. 124:11–125:11.

6/23/25 Letter from C. Nyarady to J. Emerick.

Hearing no response for weeks, Qualcomm again requested the production of the documents noted above on July 10, 2025. 7/10/25 Email from J. Apkon. In response, Arm stated that [redacted] 7/10/25 Email from A. Janes.

Qualcomm disagrees that Arm's production is sufficient in either regard. None of the documents cited in Mr. Janes' email contain the instruction from management not to support Nuvia

designs or the rescinding of that instruction. At most, the cited documents show [redacted] But the instructions themselves remain absent from Arm's production. Arm must immediately produce the requested emails showing Arm management's instructions (1) not to support Nuvia designs and (2) to resume support for Nuvia designs.

**Other Documents Requested During the Deposition of Karthik Shivashankar**

On June 23, 2025, in addition to [redacted], Qualcomm requested several other categories of unproduced documents based on the deposition testimony of Karthik Shivashankar, including: [redacted] *See* 6/23/25 Letter from C. Nyarady to J. Emerick. To date, Arm has not responded to our June 23 letter.

Qualcomm hereby reiterates its various requests for production made above in full. Specifically, Arm must immediately produce the following documents:

- [redacted]

**Documents Requested During the Deposition of Andrew Howard**

During his deposition, Andrew Howard testified that [redacted]. Andrew Howard Depo Tr. at 182:10-20. He further testified that [redacted] Andrew Howard Depo Tr. at 187:4-12. Mr. Howard clarified that [redacted] Andrew Howard Depo Tr. at 187:13-24.

Qualcomm's counsel requested production of the [redacted] on the record as unproduced document(s) used to by Mr. Howard for his 30(b)(6) testimony. Andrew Howard Depo Tr. at 188:5-13. Specifically, the requested documents were used to support Mr. Howards corporate testimony for Qualcomm's Rule 30(b)(6) Topic 31(a): "ARM's analyses of Qualcomm's CPUs and systems on chips, including discussions with third-parties regarding the same." To the extent Arm believes it has produced the competitive analysis chart referenced by Mr. Howard during his deposition, please provide such Bates number(s). Otherwise, Arm must immediately produce the requested document(s).



**Documents Requested During the Deposition of Jannik Nelson**

During his deposition, Jannik Nelson gave corporate testimony regarding the [redacted] pursuant to Qualcomm's 30(b)(6) Topic 27. Jannik Nelson Depo Tr. at 71:17-23. As part of this corporate testimony, Mr. Nelson testified that [redacted] Jannik Nelson Depo Tr. at 90:15-25, 92:2-7. Qualcomm's counsel requested production of this [redacted] Jannik Nelson Depo Tr. at 92:17-23. Mr. Nelson further testified that [redacted] Jannik Nelson Depo Tr. at 88:10-18. Arm has produced a limited number of price books from 2024 in response to Qualcomm's requests, but not for [redacted] Qualcomm hereby requests production of [redacted]

To the extent Arm believes it has produced the message sent to Mr. Nelson containing [redacted] referenced by Mr. Nelson during his deposition, please provide such Bates numbers. Otherwise, Arm must immediately produce the requested documents.

**Documents Requested During the Deposition of Vivek Agrawal**

Exhibit QCX273 (ARMQC_02784227), introduced during Mr. Agrawal's deposition, is a [redacted] Vivek Agrawal Depo Tr. at 185:10-186:12. Mr. Agrawal testified that [redacted] Vivek Agrawal Depo Tr. at 186:13-22. Qualcomm's counsel requested production of the [redacted]. Vivek Agrawal Depo Tr. at 186:23-187:1. Arm must immediately produce the requested confluence page in full, readable form.

Exhibit QCX274 (ARMQC_02784661) and QCX275 (ARMQC_02784664) both introduced during Mr. Agrawal's deposition, are [redacted] Vivek Agrawal Depo Tr. at 187:2-188:15. Arm has redacted various messages in both documents for privilege, from both Mr. Agrawal and from Copilot. Qualcomm's counsel requested production of unredacted copies of Exhibit QCX274 and QCX275 on the record. Vivek Agrawal Depo Tr. at 188:16-22. Copilot is an AI chatbot provided by Microsoft. Microsoft, a third-party, logs user queries to Copilot and Copilot's responses. *See* https://learn.microsoft.com/en-us/copilot/microsoft-365/microsoft-365-copilot-privacy?source=recommendations#data-stored-about-user-interactions-with-microsoft-365-copilot ("When a user interacts with Microsoft 365 Copilot… we store data about these interactions. The stored data includes the user's prompt and Copilot's response."). Arm cannot claim privilege over communications from Mr. Agrawal, or any other Arm employee, sent to Microsoft as part of a Copilot chat. Arm also cannot claim privilege over Copilot's responses, which are messages generated by a third-party AI chatbot. Arm must immediately produce unredacted versions of QCX274 and QCX275, as well as any other production documents containing Copilot chat messages, whether queries or responses, that Arm has redacted for privilege.

**Documents Requested During the Deposition of Christine Tran**

Exhibit QCX258 (ARM_01426582), introduced during Ms. Tran's deposition, is an [REDACTED]. Christine Tran Depo Tr. at 110:9-111:21. QCX258 includes two redacted emails from Lynn Couillard on May 20, 2020 and June 5, 2020 that are unredacted in another version of the email chain which Arm has previously produced, QCX259 (ARM_00085567). Christine Tran Depo Tr. at 111:22-115:8. Qualcomm's counsel requested production of an unredacted copy of QCX258 on the record. Christine Tran Depo Tr. at 115:9-12. Arm must immediately produce a copy of QCX258 with appropriate privilege redactions, removing redactions at least for the duplicate messages that are shown unredacted in QCX259.

Qualcomm reserves all rights.

Sincerely,

*/s/ Catherine Nyarady*

Catherine Nyarady

# EXHIBIT 26

**From:** Jenifer Hartley
**To:** #KE-ARM-Qualcomm; MoFo_Arm_QCOM; ycst_arm_qualcomm
**Cc:** Qualcommv Arm; GRP-QCvARM; jying@morrisnichols.com
**Subject:** Qualcomm v. Arm - Production of Spreadsheet
**Date:** Monday, October 6, 2025 7:18:19 PM
**Attachments:** Outlook-ppzpufzy.png

---

Counsel,

We write regarding the [REDACTED] that Akshay Bhatnagar testified that [REDACTED] which Qualcomm has repeatedly requested that Arm produce. *See, e.g.*, 2025.07.10 Bhatnagar Tr. 44:17-45:24; 2025.07.11 Ltr. from C. Nyarady to J. Emerick; 2025.07.16 Ltr. from C. Nyarady to J. Emerick at 2.

Arm has represented that [REDACTED]. *See, e.g.*, 2025.07.24 Ltr. from J. Emerick to C. Nyarady at 2; 2025.07.28 Meet and Confer Tr. 38:4-17; 2025.08.14 Special Master Hearing Tr. 245:12-246:8. Arm has withheld this document in its entirety, notwithstanding that it indisputably contains information not subject to any pending motion for a protective order (e.g., [REDACTED]).

Given that the third-party motions remain pending less than three weeks before the parties' dispositive motions are due and that there is no need for Arm to withhold this document in its entirety to protect third-party confidentiality concerns, please produce a copy of this [REDACTED] with narrow redactions for the confidential information of any third party that has a motion for a protective order pending. Of course, Qualcomm expects that Arm will produce an updated copy of this [REDACTED] with redactions removed in accordance with the Special Master's order once the pending motions are resolved.

Please confirm by the close of business on October 7 that Arm will produce a redacted copy of this document this week or provide your availability to meet and confer on October 7 or 8.

Best,
Jen

**Jen Hartley | Associate**
**Dunn Isaacson Rhee LLP**
jhartley@dirllp.com
(202) 240-2922 (direct) | [REDACTED]
401 9th Street NW, Washington, DC 20004



Website | LinkedIn
*Admitted in New York only. Practice is supervised by D.C. Bar members.*

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance, or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

Plaintiffs,

v.

ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation,

Defendant.

C.A. No. 24-490 (MN)

**SUBMITTED UNDER SEAL – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**PLAINTIFFS' LETTER TO SPECIAL MASTER HELENA C. RYCHLICKI REGARDING SUBSEQUENT EVENTS RELATING TO THEIR MOTION TO COMPEL PRODUCTION OF ARM'S ANALYSIS OF THIRD-PARTY LICENSES**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Catherine Nyarady
Jacob A. Braly
Jacob Apkon
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Adam Basner
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
DUNN, ISAACSON, RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Erin J. Morgan
DUNN, ISAACSON, RHEE LLP
11 Park Place
New York, NY 10007
(202) 240-2900

October 17, 2025

Dear Special Master Rychlicki:

Pursuant to D. Del. LR 7.1.2, Plaintiffs write to advise Your Honor of newly-learned facts and subsequent events that have occurred since the August hearings that relate to Qualcomm's pending motion to compel production of documents related to Arm's analysis of Qualcomm's licensing requests. Ex. 1 at 4-5.

As Your Honor is aware, Arm's witness Akshay Bhatnagar testified at deposition that [redacted] Ex. 2 at 44:17-45:24. Qualcomm requested production of that [redacted] on numerous occasions. *See, e.g.*, Ex. 3; Ex. 4 at 2. Arm said it is withholding the [redacted] *See, e.g.*, Ex. 5 at 2; Ex. 6 at 38:4-17; Ex. 7 at 245:12-246:8; Ex. 8.

Dispositive motions are due in this case on October 24. D.I. 44 ¶ 9. And, given that Arm did not otherwise object to producing this [redacted] so that Qualcomm can address it in its upcoming summary judgment briefing. Ex. 9. Following the parties' October 10 meet and confer, Arm refused this request, claiming that Qualcomm's request is prohibited by the Protective Order ("PO") and untimely.[1] Arm is wrong.

**Protective Order.** Arm claims that the PO prohibits its ability to provide the [redacted] because a third party has objected. This argument makes no sense because Qualcomm seeks only a redacted version of this [redacted]

Arm also claims that the PO ***prohibits*** it from producing a redacted document in this case. While the producing party is not permitted to unilaterally redact documents for reasons other than privilege or other immunity, it is illogical to suggest that the PO ***prohibits*** the production of a document in redacted form if the parties agree. For the same reasons explained in Qualcomm's other October 17 letter, the parties' PO dispute in March before Judge Fallon has no bearing on the production of the [redacted] in redacted form. Ex. 11 at 3.

**Timing.** Arm claims Qualcomm's request is untimely because Qualcomm did not request a redacted version of this [redacted] earlier. As explained above, Qualcomm repeatedly requested production of the [redacted], including in the deposition where Qualcomm first learned of its existence. Ex. 2 at 44:17-21. Given the upcoming summary judgment deadline, Qualcomm now seeks a redacted version of the [redacted] to reduce the prejudice to its summary judgment briefing.

Arm also suggests Qualcomm should have raised this issue with Your Honor in August. Ex. 8 at 3. But, at the time there was no dispute over production of a redacted version of the [redacted]. In light of the upcoming summary judgment deadline and the current status of the parties' discovery disputes, Qualcomm made a reasonable, good faith request for a redacted version of the [redacted]. Arm's refusal to provide those portions of the [redacted] that it can

[1] To the extent Arm separately contends that any part of the spreadsheet is privileged, Ex. 10 at 17:2-9, the Protective Order permits such privilege redactions. Qualcomm reserves all rights to challenge any privilege designation.

at this time, based on an illogical reading of the protective order and meritless timing allegations, is improper and prejudices Qualcomm in the upcoming briefing.

Qualcomm respectfully requests that Arm be compelled to produce a redacted version of the [REDACTED] pending resolution of the third-party protective order motions.

Respectfully submitted,

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Words: 589

Encls.

# EXHIBIT 28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**United States District Court**

**District of Delaware**

| | |
|---|---|
| Qualcomm Incorporated and Qualcomm Technologies, Inc.,<br>*Plaintiffs,*<br>v.<br>Arm Holdings plc., f/k/a Arm Ltd.,<br>*Defendant*. | Civil Action No. 1:24-cv-00490-MN |

# Rebuttal Expert Report of Professor Timothy S. Simcoe

**September 5, 2025**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**TABLE OF CONTENTS**

**I. ASSIGNMENT AND QUALIFICATIONS ..... 5**

**II. SUMMARY OF OPINIONS ..... 7**

**III. BACKGROUND AND INDUSTRY OVERVIEW ..... 19**

**A. Overview of Semiconductor Technology and Value Chain ..... 20**

**B. Segments and Competitive Dynamics ..... 23**

**C. Arm's Business Model and Licensing Structure ..... 25**

**D. Qualcomm's Business Model ..... 29**

**IV. ORIGIN OF THE DISPUTE ..... 33**

**V. PROF. POSNER'S ANALYSIS OF THE RELEVANT MARKETS AND MARKET POWER IS INCOMPLETE AND IGNORES KEY FEATURES OF THE INDUSTRY ..... 37**

**A. Prof. Posner Improperly Disregards the Competitive Constraint from the x86 and RISC-V Ecosystems ..... 39**

**B. Arm's ISA Share Varies Significantly Across Chip Application Segments ..... 45**

**VI. PROF. POSNER AND DR. KENNEDY PROVIDE NO EVIDENCE THAT QUALCOMM HAS SUFFERED HARM FROM ARM'S ALLEGED ANTICOMPETITIVE CONDUCT ..... 47**

**A. Qualcomm's Strong Financial Performance Since the Acquisition of Nuvia ..... 49**

**B. No Evidence of Lost Business ..... 55**

[redacted]

[redacted]

3. Qualcomm's Broader Customer Base Was Not Harmed ..... 67

**VII. PROF. POSNER'S CLAIM THAT ARM HAS THE ABILITY AND INCENTIVE TO FORECLOSE QUALCOMM IS BASED ON AN INCOMPLETE ANALYSIS THAT IGNORES KEY FACTS AND IS UNTETHERED FROM SOUND ECONOMIC ANALYSIS ..... 69**

**A. Relevant Economic Framework ..... 72**

1. Arm's Licensing Strategy Is Tailored to Partner-Specific Circumstances ..... 72

2. The Nuvia Agreement Illustrates Arm's Legitimate Interest in Managing Risk and Securing Value ..... 76

3. Qualcomm and Prof. Posner Have Not Demonstrated that Arm's Dispute with Qualcomm Is Anticompetitive Conduct Rather than a Standard Commercial Disagreement ... 79

4. Protecting Competition Does Not Require Arm to License Its ISA on Qualcomm's Preferred Terms ... 82

**B. Prof. Posner's Opinions on Ability to Foreclose Are Flawed ... 85**

**C. Prof. Posner Does Not Account for Costs that Arm Would Suffer from the Alleged Foreclosure of Qualcomm and Other Customers ... 88**

1. The Role of Qualcomm and Other Partners in Expanding Arm's Success and Ecosystem Against Alternative ISAs ... 89

2. Qualcomm's Successful Business Diversification Strategy Disincentivizes Arm from Foreclosing Qualcomm ... 97

3. Prof. Posner's Diversion Analysis Is Incomplete and Ignores Important Foreclosure Costs that Arm Would Incur ... 100

**D. Foreclosure of Qualcomm Alone Would Unlikely Be Profitable for Arm ... 106**

**VIII. PROF. POSNER HAS NOT DEMONSTRATED THAT ARM'S CONDUCT IS ANTICOMPETITIVE ... 106**

**A. Arm Protecting the Terms of Its Contracts Is Procompetitive ... 107**

1. Contract Enforcement Is a Legitimate Procompetitive Action ... 107

[REDACTED]

**B. Arm's Entry into the Chip Design Stage of the Value Chain Is Procompetitive ... 109**

1. The Start of the Alleged Foreclosure Significantly Predates Arm's Data Center Chip Launch ... 110

2. Vertical Integration Is Common and Typically Beneficial ... 111

3. Arm's Ecosystem Remains Open ... 120

**C. Increases in Royalty Rates Are Not Inherently Anticompetitive ... 127**

1. Arm's Share of the Chip "Stack" Is Smaller than Qualcomm's ... 129

2. Price Increases Are Not Inherently Anticompetitive ... 132

**D. "Dominant" Shares Do Not Imply a Lack of Competitive Pressure ... 136**

1. Arm Continues to Invest a Significant Portion of Its Revenue ... 136

2. Current High Shares Do Not Guarantee Future High Shares ... 141

3. Any Attempt by Arm to Foreclose Customers Would Accelerate Development of Alternatives such as RISC-V ..... 144

4. There Is No Evidence that Arm's Purported Decision to Stop Supporting v8 Is Anticompetitive..... 149

**IX. PROF. POSNER HAS NOT DEMONSTRATED THAT ARM'S CONDUCT HARMED COMPETITION AND CONSUMERS ..... 150**

**A. Qualcomm Has Not Demonstrated that Arm Had Anticompetitive Intent..... 152**

**B. Arm's Litigation Position Was Public and Transparent from as Early as 2022 ..... 153**

**C. There Is No Evidence of Harm to Competition..... 159**

**X. APPENDICES..... 163**

## I. ASSIGNMENT AND QUALIFICATIONS

1. My name is Timothy S. Simcoe. I am the David J. McGrath Jr. Professor and Chair of the Strategy and Innovation department at the Boston University Questrom School of Business. I am also a faculty director of the Boston University Technology Policy Research Initiative, and a Research Associate at the National Bureau of Economic Research.

2. I received my Bachelor's degree in Applied Math with Economics from Harvard College in 1995. I received a Master's degree in Economics in 2003, and a Doctorate in Business Administration in 2004, both from the University of California at Berkeley. During the 2014-2015 academic year, I served as a Senior Economist on the President's Council of Economic Advisers.

3. As a professor at Boston University, I teach business strategy to students in both the Master of Business Administration program and the undergraduate business concentration. This business strategy course covers topics such as the commercialization of new technologies, industry evolution, industry structure, and strategic positioning. I also teach a Technology Strategy course to MBA and executive MBA students, a course in Data Analysis to executive MBA students, and a PhD-level class in research methods.

4. I have published more than 25 peer reviewed academic articles, including in top academic economic journals such as the *American Economic Review, Management Science,* and the *RAND Journal of Economics*. I have also published numerous articles in other widely read outlets, such as policy and antitrust publications. My academic work primarily falls under the economic discipline of Industrial Organization, which studies topics including competition between firms, market power, monopolies, and antitrust issues. My research covers topics including technological interoperability, innovation, and intellectual property ("IP").

5. A copy of my curriculum vitae, including a list of my prior testimony during the past five years, is attached as **Appendix A.**

6. A list of materials that I relied upon in reaching the opinions expressed in this report is attached as **Appendix B**.[1]

7. I have been asked by Counsel for Arm to provide an economic assessment of Qualcomm's claims that Arm has engaged in anticompetitive conduct that has caused economic harm to Qualcomm,[2] and that "Arm's actions are part of a broader campaign to harm or threaten to harm competition for central processing units ("CPUs") and other computer chip designs, in California and elsewhere."[3] I have also been asked to review and respond to the analysis and conclusions in the expert report of Prof. Posner, and to some aspects of Dr. Kennedy's analysis.[4]

8. The opinions I offer in this report are based on my review of Qualcomm's Second Amended Complaint ("SAC"), Prof. Eric A. Posner's August 8, 2025 Expert Report (including supporting materials) (hereinafter "Posner Report"), and Prof. Patrick F. Kennedy's August 8, 2025 Expert Report (including supporting materials) (hereinafter "Kennedy Report"), as well as my review of depositions and documents produced both in this litigation and in the ongoing litigation that Arm filed against Qualcomm in Delaware federal court (hereinafter *Arm v. Qualcomm*).[5] I was given access to all material produced in the context of both these litigations.

---

[1] My analysis and conclusions are based on the information available to me at present. I reserve the right to update my opinions and analysis as appropriate if additional information or materials become available. I also reserve the right to create and use demonstrative exhibits to assist in providing testimony.

[2] *See* for example, Qualcomm Inc. v. Arm Holdings, plc., C.A. No. 24-490-MN, Dkt. Nos. 137; 137-1 (Ex. A) (June 3, 2025) (hereinafter Qualcomm's Second Amended Complaint or "SAC"), ¶ 210 ("Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers.").

[3] SAC, ¶ 207.

[4] Expert Report of Eric A. Posner, August 8, 2025 (hereinafter "Posner Report") and Expert Report of Patrick F. Kennedy, August 8, 2025 (hereinafter "Kennedy Report").

[5] In *Arm v. Qualcomm,* the jury found that (i) Qualcomm did not breach the Nuvia ALA and (ii) Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA. The jury was unable to reach a verdict with respect to Arm's claim as to whether Nuvia breached the Nuvia ALA. *See,* Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146 (D. Del. filed August 31, 2022), Dkt. Nos. 571, 572. *See also* Tobias Mann, "Jury spares Qualcomm's AI PC ambitions, but Arm eyes a retrial," The Register, December 23, 2024, https://www.theregister.com/2024/12/23/qualcomm_arm_trial/; [redacted] I understand that Arm has filed post-trial briefing challenging the jury verdict, and that the final unresolved count will need to be retried in any event. Plaintiff Arm Ltd.'s Motion for Judgment as a Matter of Law or a New Trial, Case 1:22-cv-01146-MN, Dkt. No. 595.

9. Counsel for Arm has instructed me to assume that the disagreement with Qualcomm concerning the correct interpretation of various terms of the relevant Qualcomm and Nuvia agreements with Arm, as set forth in the pleadings and other materials from the cases,[6] reflects Arm's genuine views of Arm's, Qualcomm's, and Nuvia's contractual obligations.

## II. Summary of Opinions

10. The origin of this litigation is a dispute over the interpretation of a set of contracts among Arm, Qualcomm, and Nuvia. The dispute was triggered by Qualcomm's acquisition of Nuvia in March 2021, and by Qualcomm's decision to incorporate Nuvia's technology into its own products. Arm has alleged that Qualcomm and Nuvia have breached their license agreements with Arm. In the present case, Qualcomm alleges that Arm has breached the Qualcomm Architecture License Agreement ("ALA"), breached the Qualcomm Technology License Agreement ("TLA"), tortiously interfered with Qualcomm's customers, and engaged in "unlawful, unfair or fraudulent" business acts or practices.[7]

11. Qualcomm's unfair competition claims are based upon Arm's conduct after the parties were unable to reach an agreement over the terms of Nuvia's and Qualcomm's license to use Arm's IP. Specifically, Qualcomm alleges that by initiating litigation over Qualcomm's use of the CPU designs created at Nuvia, communicating about the ongoing litigation with Qualcomm customers that use products incorporating Arm's technology, and providing notice that Arm believes Qualcomm has breached the Qualcomm and Nuvia ALAs, Arm intends to "eliminate alternatives to Arm's own competing CPU designs."[8] Prof. Posner's report echoes these claims by arguing that Arm's conduct constitutes a "broad scheme" to foreclose Qualcomm's access to the Arm

[6] "Arm's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3)," Arm Holdings, July 11, 2025, pp. 4-17; "Arm's First (Corrected) Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-11)," Arm Ltd., March 1, 2024, pp. 3-17.

[7] SAC, ¶¶ 173-226 (Counts V-VIII).

[8] SAC, ¶ 1. In this report, I do not opine on the question of whether either party has violated any contractual commitments.

Instruction Set Architecture ("ISA") and its associated ecosystem of software developers and users.

12. To support his opinions, Prof. Posner relies on a stylized economic model of the potential foreclosure effects of a vertical merger. He does not explain why this stylized model of a vertical *merger* is an appropriate tool for analyzing Arm's downstream *organic entry*, given that economists generally view entry as procompetitive. Even more importantly, Prof. Posner does not link the model or its underlying assumptions to the facts of this case. His analysis simply ignores broad swaths of the factual record that point to a much simpler explanation for Arm's conduct: Arm seeks to protect its IP and earn a return on its investments. For example,

- Prof. Posner hardly mentions the Nuvia acquisition despite its central role in this dispute. I have seen no evidence that Arm's original lawsuit against Qualcomm and Nuvia was meritless. From an economic perspective, litigation is recognized as a widely accepted means of resolving contractual disputes that can produce a variety of procompetitive benefits.

- Prof. Posner claims that "Arm has interfered with Qualcomm's relationship with its customers by sowing doubts about Qualcomm's continued ability to sell Arm-compliant chips."[9] But the initial lawsuit between Arm and Qualcomm was public knowledge and widely discussed in the press. In that context, Arm's communication with Qualcomm's customers that use Arm-based chips reflects Arm's incentive to be transparent with users of its technology.

- Prof. Posner claims that Arm is pivoting to a business model that involves, "foreclos[ing] customers in sectors that Arm seeks to enter."[10] The only Arm customer that he specifically mentions is Qualcomm. Throughout its dispute with Arm, Qualcomm has maintained access to the Arm ISA under its ALA and TLA contracts. [redacted] Despite disagreeing about the interpretation of the ALA, Arm and Qualcomm have

[9] Posner Report, ¶ 45.

[10] Posner Report, ¶ 66.

negotiated during the pendency of this litigation. The parties' failure so far to find mutually agreeable terms for amending the ALA is unremarkable (and does not preclude that an agreement will eventually be reached). Arm's proposal that Qualcomm [REDACTED] moreover, does not constitute evidence of a "scheme" to foreclose Qualcomm's (or any other customer's) access to Arm's ISA.

- Prof. Posner points to Arm's development of a chip for data centers as a key piece of evidence in favor of his foreclosure theory.[11] [REDACTED] He also fails to mention that in data centers, Qualcomm currently has no chip and thus zero share, [REDACTED] If Arm were pursuing the foreclosure strategy hypothesized by Prof. Posner, then data center chips would be a surprisingly poor choice for the initial application, because much of the demand served by Arm's existing customers would likely be diverted to an alternative ISA, Intel's x86, which currently has the highest share of data center chips.[14]

13. Economic models are useful in antitrust because they provide an internally consistent framework for analyzing the full range of costs and benefits associated with certain kinds of

[11] Posner Report, ¶¶ 46, 64. The term "foreclosure" can refer to either or both of partial foreclosure (whereby a firm worsens a customers' access to an input, e.g., by raising price or degrading quality) and full foreclosure (whereby a firm ends a customers' access to an input). I use foreclosure to encompass the possibilities of both partial and full foreclosure, unless specified.

[12] *See* Deposition of Mohamed Awad, July 29, 2025 (hereinafter "Awad (Arm) Deposition"), 37:11-20, 48:12-23, 49:4-51:17; Ian King, "Qualcomm Plans Exit From Server Chips," Bloomberg, May 7, 2018 https://www.bloomberg.com/news/articles/2018-05-07/qualcomm-is-said-to-plan-exit-from-server-chips-amid-cost-cuts.

[13] *See* [REDACTED] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf; [REDACTED]

[14] Arm estimates that its ISA has a 20 percent share in the data center segment (see Section V).

business activity.[15] This allows an economist to carefully compare (and measure, where possible) the relevant cost-benefit tradeoffs before reaching a conclusion about antitrust harm. That is not what Prof. Posner does. Instead, he simply claims that certain kinds of harm *might* occur when a firm is vertically integrated, and either ignores or dismisses the potential benefits of vertical integration to reach the conclusion that harm *must* have occurred. Since Prof. Posner's application of a stylized model of potential foreclosure effects under a vertical merger is superficial and untethered from the evidence, his opinions are highly speculative and lack evidentiary support. He alternates between definitive statements and non-committal language—such as "may," "could," "appears to," and "suggests"—in both cases without presenting concrete evidence of harm to Qualcomm or to competition. For example, the following statements are offered without supporting evidence:

- "Arm has adopted the indirect strategy of driving Qualcomm out of business and taking its margins."[16]
- "Arm no longer wishes to keep its prior commitments and instead plans to cut off ALA licensees and sell SoCs directly to OEMs,[17] such as data centers, automobile companies, and mobile phone manufacturers."[18]

---

[15] Stylized models are often used as a starting point by antitrust agencies in merger review. But those agencies also gather facts and adapt the model to account for industry institutions and case-specific evidence. For example, the U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, https://www.justice.gov/d9/383663.pdf states: "Investigations Are Intensively Fact-Driven, Iterative Processes. Merger analysis depends heavily on the specific facts of each case. […] In testing a particular postulated risk of competitive harm arising from a merger, the Agencies take into account pertinent characteristics of the market's competitive process using data, documents, and other information obtained from the parties, their competitors, their customers, databases of various sorts, and academic literature or private industry studies. […] The Agencies also carefully consider prospects for efficiencies that the proposed transaction may generate and evaluate the effects of any efficiencies on the outcome of the competitive process."

[16] Posner Report, ¶ 87.

[17] Original Equipment Manufacturers ("OEMs").

[18] Posner Report, ¶ 88. I note here that Prof. Posner mischaracterized a statement by Arm's CEO, Rene Haas, as his only support for this claim. As such, Prof. Posner effectively offers no evidence for this claim. *See* Section VIII.B.3 below.

- "[T]he more successful [Arm licensees] are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them."[19]

And here are several examples of non-committal language:

- "Arm […] **appears** to have the incentive to foreclose Qualcomm…"[20]
- "Arm **may** be acting in bad faith…"[21]
- "Arm **might** continue to benefit from Qualcomm…"[22]
- "Arm […] **may** raise upstream barriers…"[23]
- "Arm […] **may** impede innovation…"[24]

14. Prof. Posner's overarching theory is that Arm is (or "may" be) engaged in a "broad […] scheme" to "undermine Qualcomm's ability" to compete within the Arm ISA ecosystem.[25] He claims that Arm holds "a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA."[26] He alleges that Arm is attempting to "extend […] its dominance over the Arm ISA ecosystem"[27] by "obstructing" Qualcomm's ability to design custom cores under its ALA, thereby coercing Qualcomm into relying on Arm's "off-the-shelf" ("OTS") cores licensed under the TLA,[28] [redacted]

[19] Posner Report, ¶ 90.

[20] Posner Report, ¶ 64 (emphasis added).

[21] Posner Report, ¶ 65 (emphasis added).

[22] Posner Report, ¶ 72 (emphasis added).

[23] Posner Report, ¶ 78 (emphasis added).

[24] Posner Report, ¶ 77 (emphasis added).

[25] Posner Report, ¶ 13.

[26] Posner Report, ¶ 11.

[27] Posner Report, ¶ 14.

[28] Posner Report, ¶ 13.

[29] Posner Report, ¶¶ 17, 71.

15. This report provides a response to each of Prof. Posner's main claims. The remainder of this Section summarizes my opinions regarding the core elements of his theory.

**Prof. Posner's analysis of relevant markets and market power is incomplete and ignores key features of the industry.**

16. Although Prof. Posner does not define relevant markets for his analysis, he implicitly assumes that Arm is a monopolist or has a "dominant position" in the market for a license to its own ISA.[30] Prof. Posner does not appear to define markets or analyze competition at other stages of the chip industry supply chain, such as central processing unit ("CPU") cores or chips.[31]

17. This approach leads him to ignore (i) the current and future competitive constraint from the RISC-V ISA, a freely-available alternative; (ii) the fact that, if Qualcomm were foreclosed, Qualcomm's sales may divert to other ALA customers, such as Apple, rather than Arm cores sold under the TLA or Arm's own chips; and (iii) competitive constraints due to Original Equipment Manufacturer ("OEM") customers being able to choose among chips that use different ISAs.[32]

18. While Prof. Posner discusses Arm's "monopoly" and "dominant position," economics does not condemn either, to the extent that they are the result of successful competition and innovation.[33] Furthermore, Prof. Posner does not consider that current high shares do not guarantee future high shares, as demonstrated by the many examples of once "dominant" firms that lost significant shares

---

[30] Posner Report, ¶ 11 ("[…] Arm has a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA.").

[31] For the purpose of my report, I consider the terms "chips," "System on a Chip" ("SoCs"), and "chipsets" to be synonymous. I will typically use the term "chip."

[32] Prof. Posner does acknowledge that "in some sectors, like data centers and compute, OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips." Posner Report, ¶ 58. However, he does not account for this competitive constraint on Arm's licensing strategy.

[33] Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1, 2022, https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf, p. 2 ("In many markets, the competitive process naturally results in a market structure with lots of suppliers. […] In many other markets, where economies of scale are sizeable, the competitive process naturally results in a market structure with just a few large firms. We typically see this outcome in the manufacturing of highly sophisticated equipment, from aircraft to farm machinery to advanced microprocessors. There is nothing inherently wrong with that outcome, so long as it results from legitimate competition rather than anticompetitive mergers or exclusionary conduct.").

to rivals.[34] Prof. Posner fails to explain why, as a "monopolist" protected by high "barriers to entry,"[35] Arm would continue to invest a significant portion of its revenue in research and development ("R&D"), and does not consider that Arm's sustained investment is more consistent with a firm responding to competitive pressure than with one exercising unchecked market power.

**Prof. Posner and Dr. Kennedy provide no evidence that Qualcomm has suffered harm from Arm's alleged anticompetitive conduct.**

19. Prof. Posner claims that Qualcomm was harmed in various ways by Arm's conduct, but he provides no evidence of actual harm. I show that there is no real-world compelling evidence of harm to Qualcomm. Since its acquisition of Nuvia, in March 2021, Qualcomm's financial reports, statements to investors, and customer relationships show sustained growth and strong financial performance. Qualcomm also forecasts strong financial performance going forward.

20. Neither Prof. Posner nor Dr. Kennedy demonstrate that Qualcomm suffered any harm in its relationship with specific customers. Specifically, neither Qualcomm nor its experts provide any evidence that the letter that Arm sent to Qualcomm on October 22, 2024, (hereinafter "Breach Letter") (which Arm withdrew on January 8, 2025) is the only factor, or even just a contributing factor,[36] for the change in the terms of a Qualcomm agreement with [redacted] Negotiations, particularly between parties of that scale and sophistication, are a sequence of give and take, and there is nothing remarkable about the fact that Qualcomm did not ultimately receive the exact terms it proposed at an earlier stage in the process.

21. More generally, negotiations between business partners involve constant back-and-forth communications, exchanges of requests and concessions, expected and unexpected challenges and roadblocks, and can be affected by internal frictions and changing external factors. The presence of "rough patches" in a relationship is not evidence of anticompetitive conduct. In fact,

[34] See Section VIII.D. For example, Arm estimates that Arm-based chips' share of data centers is currently 20 percent (see Section V), but it was essentially zero in 2018 (Awad (Arm) Deposition, 48-12:2).

[35] Posner Report, ¶¶ 18, 58.

[36] As I discuss in Section IX.B, Prof. Posner has also not explained how Arm's October 2024 notice and its publication could interfere with Qualcomm's business opportunities given that, as early as 2022, Arm repeatedly, clearly, and publicly stated that (a) Qualcomm was in breach of the Qualcomm ALA and (b) Arm had the right to terminate the ALA as a result.

it is not difficult to find examples of friction in Qualcomm's relationships with its customers that predate the filing of the *Arm v. Qualcomm* lawsuit, and that are thus unrelated to Arm's alleged anticompetitive conduct.

**Prof. Posner's claim that Arm has the ability and incentive to foreclose Qualcomm is based on an incomplete analysis that ignores key facts and is untethered from sound economic analysis.**

22. Prof. Posner's claim that Arm is able to foreclose Qualcomm and other customers from Arm's ISA is incorrect.[37] First, his analysis does not distinguish among downstream sectors, even though the RISC-V architecture is currently a substitute in some applications, and OEMs can (and do) readily switch to x86 in others. Second, Qualcomm's ALA and TLA with Arm do not expire until [redacted] and many of Arm's other customers similarly have contractual commitments that extend many years into the future.[38] These long-term commitments provide time for chipmakers to invest in alternatives to the Arm ISA, thereby constraining Arm's ability to foreclose even in sectors like mobile where short-run substitutes to Arm's ISA are not currently available.

23. Prof. Posner also claims that Arm has the incentive to foreclose Qualcomm's access to its ISA.[39] But his analysis is incomplete, and it is based on a static model that ignores various costs that Arm would incur if it pursued such a foreclosure strategy. *First*, foreclosure would deprive Arm of the benefits of Qualcomm's and other ALA customers' investments in Arm-based chip design, which increase the value of Arm's ecosystem. *Second*, Arm would lose sales in downstream applications where chipmakers or OEMs can switch to an alternative ISA. *Third*, a "broad scheme" of foreclosure would carry reputational costs to Arm, and cause harm to the Arm ecosystem, by making it more difficult to migrate existing customers onto future versions of the Arm ISA. *Fourth*, industry leaders would respond to Arm's purported foreclosure scheme by accelerating investments in the development of the freely-available RISC-V ISA, thereby putting

---

[37] Posner Report, ¶¶ 65-66.

[38] For example, Apple has an ALA with Arm that "extends beyond 2040." *See* "Amendment No. 2 to Form F-1," Arm Holdings plc, September 5, 2023, p. 4, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm. *See also* ARM_00119603 (a list of agreements as of 2021).

[39] Posner Report, ¶¶ 72, 74.

Arm's entire business at risk. As a matter of economics, these are real costs that Arm would bear if it foreclosed its customers and thus should be accounted for in an analysis of Arm's incentives to foreclose. By ignoring or downplaying these real costs, Prof. Posner systematically overstates Arm's incentive to engage in the foreclosure strategy that he hypothesizes.

**Prof. Posner has not demonstrated that Arm's conduct is anticompetitive.**

24. Even in the context of Prof. Posner's stylized theoretical vertical merger model (i.e., a model of an upstream firm entering into downstream markets through acquisition of another firm already operating in those markets), a vertical merger does not *necessarily* lead to higher costs for downstream rivals.[40] Importantly, his model does not capture Arm's *organic entry* approach (i.e., *de novo* entry by designing its own chips). His analysis either ignores or dismisses the procompetitive effects of vertical integration (where a firm is present at multiple levels of the supply chain). Those benefits include the elimination of "double marginalization" (when an OEM passes the suppliers' markup on to its own customers) and implementation experience that helps a supplier learn how to improve its products.[41]

---

[40] As one recent paper concludes, "Vertical mergers may also allow a firm to engage in anticompetitive conduct, like raising rivals' costs ('RRC'), complete foreclosure, or misuse of information. Yet RRC and EDM [Elimination of Double Marginalization] are both inherent, unilateral competitive effects-two sides of the same coin-even if they do not necessarily share equal magnitude. As a result, the economic literature finds that a vertical merger's aggregate procompetitive benefits are likely to exceed its anticompetitive effects across a wide range of-but not all possible scenarios." Blair, Roger D., Christine S. Wilson, D. Daniel Sokol, Keith Klovers and Jeremy A. Sandford, "Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies," George Mason Law Review, 2020, Vol. 27, No. 3, p. 762. *See also* Lu, Shihua, Serge Moresi, and Steven C. Salop, "A Note on Vertical Mergers with an Upstream Monopolist: Foreclosure and Welfare Effects," 2007, Working Paper and De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1.

[41] *See*, for example, "Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, https://hbsp.harvard.edu/product/711463-PDF-ENG ("Qualcomm has been willing to move downstream into end product in order to demonstrate proof of concept. While other IP firms only do technology (which sometimes creates problem in implementation, such as Rambus), Qualcomm repeatedly created end-user products and systems to show that the technology could really work."); Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, November 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/ ("Making its own mobile processors has helped Apple innovate with such features as facial recognition and augmented reality on the iPhone. Designing its own chips for devices like the MacBooks and Mac Mini announced Tuesday should also allow Apple to be more creative with PCs. […] When chip, device, and software engineers work closely together they can squeeze more performance out of a device than is possible with an off-the-shelf chip.").

25. Prof. Posner also *assumes* that Arm's conduct is motivated by incentives to raise Qualcomm's input costs and divert sales to Arm, while ignoring more plausible alternative explanations. For example, Prof. Posner says almost nothing about the Nuvia acquisition and Arm's belief that Qualcomm breached the terms of that license. He does not consider any procompetitive benefits of Arm's efforts to exercise its contractual rights, or the possibility that Arm might seek to increase royalty rates to earn a return on its R&D investments, fund additional R&D investments, or simply respond to increased demand.[42]

26. Prof. Posner provides no evidence that Arm's royalty adjustments are not simply a result of competitive dynamics in an industry where R&D investments are costly and necessary to a firm's ability to compete. As a general matter of economics, price increases are common in business and not inherently anticompetitive. Even in perfectly competitive markets, prices change when supply and demand conditions change. In fact, price increases can be procompetitive—particularly in high-tech industries—as they can lead to increased R&D investment and reward innovation. Such investment can enable a firm to improve existing products (such as Arm improving its ISA from v8 to v9), bring innovative products to market (such as Arm's successful launch of its compute subsystem ("CSS") offerings), or expand into new markets (such as Arm's recent organic entry into data center chip design). When a firm successfully innovates, raising prices to reflect the value of its improved technology is not anticompetitive but a standard commercial response.

27. For evidence of incentives, Prof. Posner points to Arm's recent entry into data center chip design, which he argues is an indication that Arm is actively seeking to compete directly with its licensees, including Qualcomm.[43] It is unusual and economically counter-intuitive to claim that a firm's organic entry into a related market is evidence of anti-competitive conduct. Moreover, in this case, Arm entered at [REDACTED] (i.e., at a customer's behest), and only after Qualcomm abandoned its own effort to produce an Arm-based chip for that application. Despite Qualcomm and Prof. Posner's assertion of a "broad campaign" to harm Qualcomm, Prof. Posner points to no

---

[42] I also discuss in Section VIII.C.1 that a comparison of Arm's and Qualcomm's royalty revenues highlights that Arm's share of the chip "stack" is smaller than Qualcomm's.

[43] Posner Report, ¶¶ 13-14.

evidence that Arm has plans to enter the smartphone and personal computer ("PC") segments [REDACTED], nor am I aware of any.[44]

28. Finally, Prof. Posner opines that Arm's actions "may" impede the development of alternative ISAs, such as RISC-V.[45] He claims that if Arm "weakens" the firms that would otherwise support such alternatives,[46] new ISAs "will have trouble attracting chipmakers and thus face greater barriers to entry."[47] This claim seems to reflect the idea that, even if foreclosure increases incentives for Arm's customers to invest in other ISAs (as the evidence I review in Section VIII.D.3 shows), they would have fewer financial resources to make those investments. Without measuring either effect, however, Prof. Posner can only speculate that the financial costs of foreclosure would outweigh the increased incentives to invest in other ISAs. In reality, many of Arm's customers [REDACTED]) are huge enterprises with vast financial reserves and easy access to credit markets, which undermines the idea that they could not afford to invest in alternative ISAs.

**Prof. Posner's claim that Arm pivoted from a longstanding "open" and "neutral" business model "to a different model" in which it forecloses its customers is incorrect.**

29. Prof. Posner claims Qualcomm and others invested in Arm's ecosystem because they trusted that Arm would remain "open" and "neutral."[48] He further asserts that Arm entering into chip design represents a "dramatic departure" from Arm's historically neutral licensing model.[49] Prof. Posner's claims that Arm's large and sophisticated customers rely on a vague promise of openness or neutrality are belied by the fact that their heavily negotiated ALA and TLA licenses provide long-term contractual guarantees of access to the Arm ISA and related Arm chip designs.

---

[44] [REDACTED] Qualcomm's Handsets revenue ($24.9 billion) is 75% of QCT revenue ($33.2 billion) and 63.8% of total revenue ($39.0 billion) in fiscal 2024. Qualcomm Incorporated, Form 10-K, for the fiscal year ended September 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/fd08c4f6-61ba-4a6a-a339-0e3b522ed739.pdf (hereinafter, "Qualcomm 2024 Form 10-K"), pp. 41, 44.

[45] Posner Report, ¶ 18.

[46] Posner Report, ¶ 18.

[47] Posner Report, ¶ 18.

[48] Posner Report, ¶ 66.

[49] Posner Report, ¶¶ 19, 66, 86.

30. I have seen no evidence of a "dramatic" change in Arm's business model. Arm has always been careful about the customers to whom it will grant an ALA (to ensure the growth of the Arm ecosystem and the success of both Arm and its customers); but it has recently signed an ALA with Nuvia in 2019, and since then with large, sophisticated customers such as Apple, IBM, and Google. For over a decade, Arm has also licensed core designs via TLAs to customers such as Qualcomm, and Prof. Posner makes no claims that Arm's TLA licensing practices are inherently anticompetitive. Thus, Arm was operating at multiple levels of the chip supply chain—by granting licenses to implement its ISA while also selling its own cores—well before the Nuvia acquisition and the start of its litigation with Qualcomm.

31. Entry into chip design for data centers is simply an example of organic vertical expansion, which is an extremely common business strategy that does not necessarily represent evidence of attempted foreclosure or a "dramatic departure" from Arm's existing practices. Prof. Posner's use of a stylized theoretical model of vertical interaction, untethered from the facts in this case, could be used to show that any vertical expansion by a firm with market power at some stage in a supply chain (including through organic entry) must inherently be anticompetitive. That conclusion contradicts a large body of economic literature, as well as the established practice of accounting for the economic efficiencies of vertical integration in antitrust analysis.[50]

32. Arm's entry into chip design for data centers is not surprising given (i) its long history of designing cores and other IP that is incorporated into chips, (ii) the Arm ISA's relatively small share of the rapidly growing data center segment, and (iii) [REDACTED] request that Arm develop a chip.

[50] *See* for example, Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59 ("In theory, vertical mergers can have both procompetitive and anticompetitive effects. […] Overall, we find that the existing literature on vertical integration contains mixed results, with evidence of harm to competition as well as evidence of procompetitive effects.") The potential procompetitive benefit of vertical mergers is reflected in recent Court decisions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc*., U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, Case 4:24-cv-02508, Dkt. Entry 511 (S.D. Tex. Jan. 31, 2025) ("The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns. […] [T]he inquiry must proceed with recognition that 'academics, courts, and antitrust enforcement authorities alike' have repeatedly recognized that vertical mergers may serve to benefit competition and consumers.").

**Prof. Posner has not demonstrated that Arm's conduct has harmed competition and consumers.**

33. Prof. Posner provides no real-world evidence that Qualcomm was harmed by Arm's alleged anticompetitive conduct. Even if it were true that Arm's conduct harmed Qualcomm, Prof. Posner does not demonstrate, or even attempt to demonstrate, that the conduct harmed competition and the competitive process. Economists, as well as U.S. antitrust laws, are concerned with "the protection of competition, not competitors."[51] Ultimately, Prof. Posner's claims that Arm has harmed competition or consumers rest on a flawed analysis that is unsubstantiated and inconsistent with the evidence as well as untethered from any standard economic analysis of harm to competition. Arm's decision to make substantial engineering investments that allow it to operate at stages of the value chain beyond the supply of its ISA—either via improved cores or CSSs or through selling chips—are best understood as procompetitive business strategy that will stimulate competition and innovation in a highly dynamic industry.

## III. Background and Industry Overview

34. This Section provides an overview of relevant semiconductor technologies and associated value chain, and it summarizes competitive dynamics across key segments, including smartphones, personal computers, data centers, automotives, and Internet of Things ("IoT"). I also describe Arm's and Qualcomm's business models, focusing on their licensing frameworks and strategic roles within the ecosystem. These elements establish the foundation for assessing the parties' incentives and the economic implications of the dispute.

---

[51] *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). (The Supreme Court stating: "The antitrust laws, however, were enacted for 'the protection of competition, not competitors.'"). *See also* Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1, 2022, https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf, p. 2 ("Competition is messy. Competition can be rough-and-tumble. Competition can feel deeply unfair when one loses. […] Promoting competition does not mean shielding any businesses from the buffeting winds of legitimate competition, be they large firms with outsize political influence or small firms that are struggling to compete against larger rivals with lower costs. As a champion of competition, I am instinctively skeptical of pleas by politically powerful businesses to be shielded from competition.").

**A. Overview of Semiconductor Technology and Value Chain**

35. Semiconductor "chips" are highly engineered components that power a wide range of digital devices, including smartphones, personal computers, data centers, automotives and IoT.[52] The global semiconductor industry generated approximately $655 billion in revenue in 2024—a 21% increase from the prior year—reflecting its central role in modern technology.[53] The largest suppliers of chips include Qualcomm, Samsung, Intel, Broadcom, NVIDIA, Micron, AMD, and MediaTek.[54]

36. Chips are typically customized to suit the needs of various applications. For instance, efficient power consumption may be an important product characteristic in mobile, whereas performance and flexibility are more important in data centers, where the ability to perform large number of calculations in parallel is essential for training artificial intelligence ("AI") models.[55] These differing requirements influence chip design choices and the competitive landscape across application segments.

37. Each chip contains multiple functioning units, including CPUs, graphics processing units ("GPUs"), and peripherals.[56] This case is primarily concerned with CPUs, which are the "computer's brain [that] handles the assignment and processing of tasks and manages operational

---

52 In Qualcomm's documents, "data centers," "servers," and "infrastructure" appear to be used interchangeably.

53 "Gartner Says Worldwide Semiconductor Revenue Grew 21% in 2024," Gartner, April 10, 2025, https://www.gartner.com/en/newsroom/press-releases/2025-04-10-gartner-says-worldwide-semiconductor-revenue-grew-21-percent-in-2024.

54 *Ibid*.

55 Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025 https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation. *See also*, "AI Accelerator Chips Overview and Comparison," HardwareBee, https://hardwarebee.com/ai-accelerator-chips-overview-and-comparison/, accessed August 22, 2025.

56 Briana Watson, "SOC vs CPU: Breaking Down the Differences and their Optimal Usage," November 15, 2023, https://www.totalphase.com/blog/2023/11/soc-vs-cpu-breaking-down-the-differences-and-their-optimal-usage/. *See also* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 3, 2025 ("A chipset is a set of integrated circuits that work together to manage data flow between the processor, memory, and other components in the computer. It serves as the motherboard's 'traffic cop,' controlling how each component interacts and sending signals back and forth to manage operations. Chipsets handle data differently depending on its type. Whether it's audio or video, Internet protocol […] packets or system-level tasks.").

functions that all types of computers use."[57] Every CPU is built to follow a specific ISA, "which defines the software instructions that can be executed by the CPU. […] The ISA sets the foundation for a large library of compatible software which runs on those CPUs."[58]

38. There are a few commercially deployed ISAs—the Arm ISA, the Intel x86 ISA, and the RISC-V ISA. Because software written for CPUs based on one of these ISAs is not compatible with CPUs based on a different ISA, each ISA has its own "ecosystem," i.e., the network of compatible software, hardware, developers, and users.

39. Chips are complex products that incorporate significant IP, reflecting years of R&D investments conducted by many innovative companies, including Arm and Qualcomm, as well as institutions such as universities and government research labs.[59] Many companies specialize in specific stages of the production process—such as design, manufacturing, or systems integration—depending on their capabilities and strategic focus.[60]

---

[57] Phill Powell, "Types of central processing units (CPUs)," https://www.ibm.com/think/topics/central-processing-unit-types. *See also* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 4, 2025 ("What is the difference between a Chipset and a processor? A chipset serves as a bridge between the processor, memory, and peripheral devices, while a processor is responsible for executing instructions and performing calculations. Think of the chipset as the traffic controller that manages the flow of data, while the processor is the worker that actually performs the tasks. The chipset plays a crucial role in the communication between the various components of a computer and is responsible for ensuring that data is transferred accurately and efficiently.").

[58] Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2025, https://investors.arm.com/static-files/9be77c9d-75ee-4639-bfe4-17efd23c56b5 (hereinafter, "Arm 2025 Form 20-F"), p. 56.

[59] Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, p. 9, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf ("Chip design is a complex process requiring highly trained engineers and scientists, advanced technology, and intellectual property to create the designs for the performance and functionality of the chip"); Jeffrey Mervis, "To beat China, new U.S. law offers billions for microchip research and training," Science, September 6, 2022, https://www.science.org/content/article/beat-china-new-u-s-law-offers-billions-microchip-research-and-training.

[60] Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, p. 9, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf ("[Fabless companies] companies focus exclusively on chip design, and partner with third-party merchant foundries to fabricate (that is, manufacture) their chips. [Integrated device manufacturers] both design and manufacture chips. Within IDMs, design and manufacturing teams work together to bring to market new chips usually at in-house fabrication facilities, or "fabs." [Original equipment manufacturers] like auto makers, use semiconductors as inputs for other products. Some OEMs have begun to design their own chips, primarily for their own products. [EDA/IP providers] are trusted intermediaries between design companies and foundries providing design tools, reference flows and some services. Third party IP providers design and license IP building blocks (processors, libraries, memories, interfaces, sensors, and security).").

40. The semiconductor value chain consists of four key steps:

- *ISA Development:* Arm develops and licenses its ISA to select partners through an ALA. The RISC-V ISA is an open-source alternative to the Arm ISA.[61] Intel and AMD sell chips that use Intel's proprietary x86 ISA.[62]
- *Core Design:* Arm and other firms design CPU cores that are compliant with a particular ISA.[63] A core is a re-usable component (or "building block") that can be incorporated into more complex and specialized chip designs.[64] Arm uses TLAs to provide customers with access to OTS cores, such as [REDACTED][65] Arm's ALA partners can choose to purchase an Arm OTS core or develop their own custom cores.[66] Firms can also choose to develop custom cores using the RISC-V ISA.[67]

---

[61] "About RISC-V," RISC-V International, https://riscv.org/about/, accessed August 15, 2025 ("At the base level, the RISC-V ISA and extensions ratified by RISC-V International are royalty free and open base building blocks for anyone to build their own solutions and services on.").

[62] On the difference between the Arm and x86 ISAs, see Robert Triggs, "Arm vs x86: Instruction sets, architecture, and all key differences explained," Android Authority, December 20, 2023, https://www.androidauthority.com/arm-vs-x86-key-differences-explained-568718/. Intel licenses x86 to AMD as the result of a settlement agreement. See "Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025.

[63] A CPU core is the "processing unit within the CPU that can execute instructions." A CPU can contain multiple cores and "the more cores a CPU has, the more tasks it can handle simultaneously. *See* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/cpu-core/, accessed September 4, 2025.

[64] "What are IP Cores in Semiconductor Design: Types & Advantages," Techovedas, April 21, 2024, https://techovedas.com/what-are-ip-cores-in-semiconductor-design-types-advantages/ ("In semiconductor design, an IP core, short for Intellectual Property core, is a pre-designed and reusable block of logic or functionality that serves as a building block for creating complex chips.").

[65] Paul Williamson, Arm's Senior VP and general manager of IoT, explained that "our processes [Arm's CPU cores] come in three families or our process architectures: A class, R class and M class. […] M is typically for deeply embedded low power. This is at the high level. R is for real time control system, time critical systems. And A is for advanced application processes, typically." [REDACTED] For more details, see "Arm CPU Architecture: A Foundation for Computing Everywhere," Arm, https://www.arm.com/architecture/cpu, accessed September 4, 2025.

[REDACTED]

[67] "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential (reporting Ziad Asghar, Senior Vice President & General Manager - XR & Spatial Computing at Qualcomm, stating that "RISC-V clearly has amazing potential. For a product developer, it eliminates the issue of being tied to the limited portfolio of

- *Subsystem Integration:* Arm also offers CSS, which combine multiple cores—such as Arm's CPU and GPU cores—with other technologies to serve as the computing component of a larger chip.[68] These subsystems can help chip designers reduce development costs and shorten time-to-market.[69]
- *Chip Design and Manufacturing:* Chip designers can combine Arm's OTS cores, their own customized cores, or pre-integrated CSS with other technologies to design full chips, which are then produced by semiconductor fabrication plants (also known as "foundries" or "fabs").[70] These chips are ultimately embedded in end products like smartphones, laptops, vehicles, and data center servers.

## B. Segments and Competitive Dynamics

41. The semiconductor industry spans a diverse set of application segments, each with distinct performance, power, and integration requirements. These differences shape the design and

---

cores available from a proprietary ISA […] OEMs want to develop highly customized cores. And RISC-V really fits that bill […] RISC-V makes sense for pretty much all use cases, because instead of having to choose from a given fixed number of processor cores, it allows you to optimize for specific use cases. This ability to customize the cores for what you need means the cores can be optimized for what you care most about whether that be power, performance, or area.").

[68] For more details, see "Fastest Path to Production Silicon with World-Leading Performance, on Leading-Edge Technology," Arm, https://www.arm.com/products/neoverse-compute-subsystems, accessed September 4, 2025. *See also* Deposition of Peter Greenhalgh, July 4, 2025 (hereinafter "Greenhalgh (Arm) Deposition"), 73:2-11 ("So the way we think of compute subsystems is not perfectly defined. There's not like only one way that they get created. But they're a combination of our own CPU, GPU, if it's relevant for that market, interconnect, other pieces of IP that are being brought together and proven to achieve a certain capability. So that's a compute subsystem.").

[69] Arm 2025 Form 20-F, p. 59, ("Compute Platform Products. Arm's CPU, GPU, and System IP products integrated into a foundational compute platform optimized for a specific end market. These CSSs are pre-integrated and pre-verified configurations of Arm technology that deliver significantly higher value to customers by reducing development costs and time-to-market.").

[70] Chip manufacturing is a complex and highly specialized process conducted at semiconductor fabrication plants, also called foundries or fabs. "Top 10 Semiconductor Foundries in the World," Cytech Systems, March 13, 2024 https://www.cytechsystems.com/news/top-10-semiconductor-foundries. The world's largest semiconductor foundry is Taiwan Semiconductor Manufacturing Company ("TSMC"), with a share well in excess of 50%. Other large semiconductor foundries are Samsung, Semiconductor Manufacturing International Corporation ("SIMC"), and United Microelectronics Corporation ("UMC"). "4Q24 Global Top 10 Foundries Set New Revenue Record, TSMC Leads in Advanced Process Nodes," TechPowerUp, March 10, 2025, https://www.techpowerup.com/333868/4q24-global-top-10-foundries-set-new-revenue-record-tsmc-leads-in-advanced-process-nodes ("[TSMC] secured a 67% market share to maintain its leading position. Samsung Foundry ranked second, […] representing an 8.1% market share.").

deployment of CPUs,[71] chips, and solutions across applications such as smartphones, PCs, data centers, automotive systems, and connected devices (IoT).[72]

42. In the smartphone segment, Arm's ISA is widely used because of its superior power efficiency and the depth of its ecosystem.[73] Arm-based chips are particularly suitable for mobile environments, where energy consumption and thermal performance are critical, and are supported by a mature suite of tools and developer resources.[74]

43. In contrast, the PC and data center segments have historically been dominated by x86-based architectures, primarily from Intel and AMD. Recent advancements in Arm-based CPUs have begun to challenge this status quo. These custom Arm-based designs offer high performance and energy efficiency, making them increasingly viable in laptops and data servers.[75]

---

[71] Different CPUs are created to meet the specific computing and efficiency needs of the different applications. [redacted]

[72] Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025, https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation.

[73] Beth Kindig, "Arm Stock: AI Chip Favorite Is Overpriced," Forbes, Mar 21, 2024, https://www.forbes.com/sites/bethkindig/2024/03/21/arm-stock-ai-chip-favorite-is-overpriced/.

[74] Arm 2025 Form 20-F, p. 59 ("The mobile applications processor is the primary chip in a smartphone and runs the operating system and applications in addition to controlling many of the device functions, including gaming, music, video, and any other applications. While high compute performance is required for today's applications, processors also must be highly energy efficient so that the smartphone's battery will last all day without needing to be recharged.").

[75] Melissa Riofrio, "Surface Pro X revealed: Thin, light, and supercharged with a custom SQ1 ARM chip," PC World, October 2, 2019, https://www.pcworld.com/article/398146/microsofts-surface-pro-x-is-thin-light-and-supercharged-with-a-custom-sq1-arm-chip.html ("'With SQ1 we pushed the boundary of an ARM-based 7-watt chipset,' Panay said. While ARM-based laptops PCWorld has tested so far have been lackluster, Panay claimed 'three times more performance per watt than then Surface Pro 6,' as well as over 2 teraflops of power from the custom GPU."). *See also* ARMQC_02749177 at '179.

44. The IoT and automotive segments present a broader range of requirements, including real-time processing, connectivity, and low power consumption.[76] Here, both Arm and its licensees, including Qualcomm, offer tailored solutions that address the specific needs of these segments.[77]

45. These segment-specific dynamics are central to understanding the parties' incentives. Qualcomm's diversification strategy targets growth in PCs, automotive, and IoT[78]—segments where Arm's position is evolving and competitive pressure from alternative ISAs, such as x86 and RISC-V, is more pronounced. As a result, the economic implications of Arm's licensing decisions and product strategy vary significantly across segments.

### C. Arm's Business Model and Licensing Structure

46. Arm's business model entails developing new technologies as well as the licensing and selling of those technologies. Unlike Intel, which does not license its technologies (except to AMD),[79] Arm has chosen to be more open.[80] Arm licenses its technology through two primary mechanisms, the ALA and the TLA. These agreements reflect different levels of customization and engineering responsibility for licensees and allow Arm to serve a broad range of customers—from those seeking turnkey solutions to those investing in differentiated, custom designs.

---

[76] Arm 2025 Form 20-F, p. 60-61 ("The industrial IoT and embedded semiconductor market includes chips used by a wide range of goods, including washing machines, thermostats, digital cameras, drones, sensors, surveillance cameras, manufacturing equipment, robotics, electric motor controllers and city infrastructure and building management equipment. […] The automotive market includes all chips with processors within vehicles. This includes chips used for in-vehicle-infotainment ("IVI"), advanced driver assistance systems ("ADAS"), engine management, and body and chassis control. Today, our market share in the automotive market is highest in more technologically advanced functional areas such as IVI and ADAS.").

[77] Arm estimated that in 2024 its share of the automotive segment was 41% (based on chip value). *See* "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 11.

[78] *See* Section VII.C.2.

[79] Intel licenses x86 to AMD as the result of a settlement agreement. See "Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025.

[80] Deposition of Richard Grisenthwaite, July 2, 2025 (hereinafter "Grisenthwaite (Arm) Deposition"), 16:17-17:6 ("[…] ARM, as I say in the slide itself, has been involved in the democratization of computing. We have made our technology available in many different ways. Unlike, for example, Intel, we haven't just said buy our chips, we've had architecture licenses, we've had implementations licenses, we've essentially allowed people to come up with their own competitive solutions competing with each other while removing unvaluable differences by having different architectures that are the same in essence but different in detail.").

- *Architecture License Agreement ("ALA"):* Under an ALA, Arm licenses the right to use its ISA, allowing licensees to design their own custom CPU cores.[81] Different licensees engage in different stages of the supply chain. For instance, Apple uses the chips it makes in its own products (such as the iPhone), while Qualcomm sells chips to customers such as Samsung (who, in turn, for example, sells the Samsung Galaxy Android smartphones). These CPU cores must remain compliant with Arm's ISA, but the licensee is responsible for developing the implementation. This model allows for greater customization and flexibility but requires additional and significant engineering investment by the licensee.[82] Arm has historically been selective about granting ALA licenses because not all firms are capable of developing an Arm-compliant custom core,[83] and failed development efforts can be costly to both Arm and its customer.[84] Arm granted an ALA license to Nuvia in 2019, and currently has ALA licenses with Qualcomm, Apple, IBM, Google, Microsoft, and a few other customers.[85]

---

[81] Arm explains that developing own customized CPUs based on the ISA is very difficult: "Under an ALA, the licensee is allowed to develop their own highly customized CPU designs that is compliant with the Arm instruction set architecture ("ISA") for a fixed architecture license fee. As the creation of an optimized CPU is very costly and time consuming, architecture licensees will often also license Arm CPU designs to use either as a complementary processor alongside the licensee's Arm-compliant CPU design, or in other chips where the licensee's own design is unsuitable." Arm 2025 Form 20-F, p. 68. *See also,* Arm Holdings plc, Form F-1, August 21, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523216983/d393891df1.htm (hereinafter, "Arm 2023 Form F-1") p. 121 ("With the complexity of CPU design increasing exponentially, over the past decade no company has successfully designed a modern CPU from scratch.").

[82] *See* ARM_00055357 and QCARM_ 0338573 for Arm's 2013 ALA with Qualcomm.

[83] See, for example, Deposition of Rene Haas, July 7, 2025 (hereinafter "Haas (Arm) Deposition"), 185:10-22, explaining that, "[the auto industry is] a market that's been in transition where OEMs are developing chips, not chip companies. And OEMs need a lot of help in terms of developing SOCs because they're not very experienced. So I believe that going to subsystems, which is the amalgamation of all the IP blocks, would be more advantageous to us because it would get us and the customers to market faster."

[84] Deposition of Will Abbey, October 27, 2023 (hereinafter "Abbey (Arm) October 2023 Deposition"), 29:24-30:7 ("So there would be a technical conversation around capabilities because oftentimes just because somebody wants an architecture, they may not know what it takes to make the architecture successful into a product. And so we care passionately about the ecosystem, about making sure our partners are going to be successful, so we talk about capabilities, we talk about risks, we talk about the expertise of the team."). Mr. Grisenthwaite estimates that Arm currently has "between ten and twenty" ALAs but only "about six or seven" ALA partners actively build CPU designs under their ALA, *See* Grisenthwaite (Arm) Deposition, 49:11-24.

[85] *See* footnote 290.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

- *Technology License Agreement ("TLA"):* Under a TLA, Arm provides licensees with OTS CPU designs, also known as implementation cores.[86] Arm does the engineering work to implement the ISA, and licensees pay to use the pre-designed cores.[87] Because TLA OTS cores and CSS incorporate more Arm R&D, they generally command a higher royalty rate than the ALA. I understand that the vast majority of Arm's commercial relationships are governed by TLAs, which have historically been the standard licensing model adopted by most of Arm's partners.[88]

47. Recently, Arm has expanded the range of licensing options it offers to customers. In 2019, Arm has also introduced Arm Flexible Access ("AFA"), a "pay-as-you-go" model that offers customers "a wide portfolio of […] Arm technology and tools" with the option of only paying "license fees for IP used in their final chip design and only at the point of manufacture."[89] In 2020, Arm began offering a subscription program called Arm Total Access ("ATA") that provides the "most comprehensive package of IP products, tools and models, support and training, software and physical design"[90] to maximize their customers' success.[91]

---

[86] CSS are generally licensed based on a license specific to a CSS or in the Annex of a broader agreement. Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025.

[87] *See* ARM_00103918 and ARMQC_02772366 for Arm's 2013 TLA with Qualcomm.

[88] ARM_01259705 at '794; Deposition of Simon Segars, November 16, 2023 (hereinafter "Simon Segars (formerly Arm) Deposition"), 29:24–30:7.

[89] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models. See also Deposition of Will Abbey, June 26, 2025 (hereinafter "Abbey (Arm) June 2025 Deposition"), 144:19-145:13 ("At the low end, through ARM Flexible Access, we're giving broader access to our partners because we want to deepen and broaden the ecosystem.").

[90] Abbey (Arm) June 2025 Deposition, 86:22-87:23; "Arm Total Access," Arm, https://www.arm.com/products/licensing/arm-total-access, accessed August 30, 2025 ("Arm Total Access provides the most comprehensive package of IP products, tools and models, support and training, software and physical design in an easy-to-access subscription. Ideal for organizations building complex systems that require multiple Arm products, including the latest Cortex and Neoverse CPUs, Mali GPUs, and CoreLink System IP. The annual subscription includes manufacture rights, as well as full support, training, and development tools.").

[91] ARM_00080472 at '480; ARMQC_02770676 at '677. See also ARM_01294236 at '237, a February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("Greater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time To Market]") and for Arm ("Deeper customer engagement, greater predictability, more design wins, more revenue").

48. Arm's license agreements generally specify that Arm will be paid an upfront license fee and a running royalty based on the number of units sold by the licensee.[92] Royalty rates vary depending on the type of license, the product segment, and the level of customization.

49. Unlike the x86 ISA, which is only used by Intel and AMD to develop CPUs,[93] Arm's ISA is broadly licensed across the industry. This licensing model has enabled a wide range of companies to build Arm-based chips for diverse applications.[94] The RISC-V ISA is an open-source alternative that any implementer is free to use, modify, and deploy without the need to pay an upfront licensing fee or running royalty.[95]

---

[92] Running royalties can be either a dollar amount per-chip sold or a percentage of the chip's selling price. In fiscal year ending in March 2025, Arm had total revenue of $1,241 million, consisting of $607 million in running royalties ("up 18% YoY driven primarily by the continued adoption of the Armv9 architecture, the ramp of chips based on Arm CSS [compute subsystems], and increased usage of Arm-based chips in data centers") and $634 million in "license and other revenue" ("up 53% YoY due to normal fluctuations in the timing and size of multiple high-value license agreements and contributions from backlog"). *See* "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, p. 8, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274.

[93] Paul Alcorn, "Intel and AMD are unlikely allies in new x86 ecosystem advisory group," Tom's Hardware, October 15, 2024, https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward ("The 46-year-old x86 is the most prevalent ISA used for general computing for PCs and data centers, and Intel and AMD are the only two primary x86 architecture licensees that build new processors in high volumes, creating a duopoly." Recently, "Intel and AMD jointly announced the formation of a new x86 advisory group to ensure a unified x86 instruction set architecture (ISA) moving forward […] Cooperation between the two, with the input of a bevy of customers and end users, will help to build a more unified approach that reduces or even eliminates custom ISA implementations that can be problematic for the duopoly's hardware and software customers. That's becoming even more important as the x86 ecosystem faces intense pressure from Arm in both the consumer and data center markets, not to mention the continuing rise of RISC-V.").

[94] Arm, "The ARM processor business model," https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model, accessed August 22, 2025 ("ARM does not manufacture processor hardware. Instead, ARM creates microprocessor designs that are licensed to our customers, who integrate them into *System-on-Chip* (SoC) devices.").

[95] *See* Section VIII.D.3 for a discussion of current efforts by several large companies, including Qualcomm, to further develop and promote the adoption of RISC-V. RISC-V was developed in 2010 at the University of California, Berkeley as the fifth generation of RISC processors created at the university since 1981. See Roddy Urquhart, "Systems & Design: Opinion, Semiconductor Engineering," March 29, 2021, https://semiengineering.com/what-does-risc-v-stand-for/. In 2015, development and maintenance of the standard was transferred to RISC-V International, a non-profit organization based in Switzerland with more than 4,500 members as of 2025. *See* "About RISC-V," RISC-V International, accessed August 3, 2025, https://riscv.org/about/.

### D. Qualcomm's Business Model

50. Qualcomm is a leading semiconductor company that designs and develops chip solutions and other software and services for a wide range of applications, including smartphones, personal computers, automotives, wearables, and other connected systems.[96] The company is also a key contributor to the development and deployment of wireless technology, and owns an extensive portfolio of patents.[97] In fiscal year 2024 (ending in September), Qualcomm had total annual revenues of $39 billion, more than 10 times the revenue earned by Arm during the same period.[98]

51. Qualcomm operates primarily through two business segments:[99]

- *Qualcomm CDMA Technologies ("QCT"):* This segment designs and supplies both chips and system-level solutions.[100] Its portfolio includes products for mobile, automotive, personal computing, extended reality, industrial IoT, and networking applications.[101]
- *Qualcomm Technology Licensing ("QTL"):* This segment manages Qualcomm's IP portfolio, licensing both standard-essential patents ("SEPs") related to cellular technologies such as 3G, 4G, and 5G and non-SEPs to device manufacturers.[102] Qualcomm does not offer licenses to rival suppliers of modem chips, such as Broadcom and MediaTek.[103]

---

[96] SAC, ¶¶ 53-54.

[97] SAC, ¶¶ 53-54. *See also,* Qualcomm 2024 Form 10-K, p. 7.

[98] In the fiscal year ending September 2024, Qualcomm generated $39.0 billion in total revenue, consisting of $32.8 billion from the sale of equipment and services and $6.2 billion in licensing revenue. Qualcomm 2024 Form 10-K, p. 41. During the same period, Arm generated $3.5 billion in total revenue. Arm Holdings plc, Quarterly Results, https://investors.arm.com/financials/quarterly-annual-results.

[99] "Qualcomm Implements New Corporate Structure," Qualcomm Press Release, October 1, 2012, https://www.qualcomm.com/news/releases/2012/10/qualcomm-implements-new-corporate-structure.

[100] Qualcomm 2024 Form 10-K, p. 7.

[101] Qualcomm 2024 Form 10-K, p. 11 ("QCT utilizes a fabless production model, which means that we do not own or operate foundries for the production of silicon wafers from which our integrated circuits are made. Therefore, we primarily rely on third parties to perform the manufacturing and assembly, and most of the testing, of our integrated circuits based primarily on our proprietary designs and test programs.").

[102] Qualcomm 2024 Form 10-K, p. 7.

[103] *See*, for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy

52. According to Qualcomm's most recent Form 10-K, "QCT's current competitors include, but are not limited to, companies such as Broadcom, HiSilicon, MediaTek, Mobileye, Nvidia, NXP Semiconductors, Qorvo, Samsung, Skyworks, Texas Instruments and UNISOC. QCT also faces competition, which may intensify in the future, from products internally developed by [Qualcomm's] customers, including some of [Qualcomm's] largest customers, such as Apple and Samsung, to early-stage companies."[104] The relative strength of rival firms varies by segment.[105]

53. Qualcomm's chips, including its well-known Snapdragon products, typically integrate Arm-based cores—either custom cores designed under an ALA or OTS cores licensed under a TLA—with Qualcomm's own cellular and wireless networking technology.[106] Qualcomm has

---

Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International. ("Qualcomm licensed its SEPs to original equipment manufacturers ("OEMs") of mobile devices, such Apple and Samsung. Qualcomm did not offer licenses to its SEPs to rival suppliers of modem chips, such as Intel, Broadcom, and MediaTek. Nor did Qualcomm enforce its patents against these rivals, even though their products infringed Qualcomm's SEPs. Instead, Qualcomm chose to collect its SEP royalties further downstream, from OEMs."). Qualcomm's policy of licensing device manufacturers is aimed at collecting higher royalty revenue. See *FTC v. Qualcomm*, Case 17-CV-00220-LHK, Judge Lucy H. Koh, Findings of Fact and Conclusions of Law, pp. 129-130 (reporting that Eric Reifschneider (QTL Senior Vice President and General Manager) "told the IRS that Qualcomm decided to 'concentrate our licensing program and our licensing negotiations on the guys who make the cell phones and the base stations and the test equipment, because that's where the real money is.' […] Thus, when the IRS asked whether Qualcomm's decision to stop licensing its SEPs to rivals was a "business decision," Marv Blecker (QTL Senior Vice President) agreed: 'Oh it's more than that, it's more than that. That's an understatement.' […] Blecker told the IRS that to license rivals would have 'the potential of threatening our entire revenue stream at the handset level.' […] Fabian Gonell (now QTL Legal Counsel and Senior Vice President, Licensing Strategy) agreed that Qualcomm stopped licensing rival modem chip suppliers because Qualcomm had to choose between licensing rivals and OEMs, and licensing OEMs is far more lucrative: 'But having – having to choose between one or the other then you're right, obviously the handset is humongously more . . . lucrative for a bunch of – a bunch of reasons.'").

[104] Qualcomm 2024 Form 10-K, p. 12.

[105] For example, MediaTek is a strong rival in the mobile segment, and Intel and AMD are strong rivals in PC and data centers. *See* Kelsey Ziser, "MediaTek and Qualcomm's rivalry heats up in 5G smartphone market – Omdia," Light Reading, July 16, 2024, https://www.lightreading.com/smartphones-devices/mediatek-and-qualcomm-s-rivalry-heats-up-in-5g-smartphone-market-omdia (citing MediaTek as "Qualcomm's biggest industry challenger."). *See* also Timothy Green, "Qualcomm is Going After Intel and AMD in This Lucrative Market," January 16, 2025, https://finance.yahoo.com/news/qualcomm-going-intel-amd-lucrative-101500205.html.

[106] *See* "Is Snapdragon an ARM Processor? Understanding the Core Technology Behind Qualcomm's Mobile Chipsets," Indian Institute of Embedded Systems, https://iies.in/blog/is-snapdragon-an-arm-processor-understanding-the-core-technology-behind-qualcomms-mobile-chipsets/.

licensed Arm technology since 1997.[107] This includes an ALA signed in 2003, and the current ALA and TLA, both dated May 30, 2013.[108]

54. Although QCT has traditionally focused on the smartphone segment, it is currently pursuing a diversification strategy to expand its sales presence in other applications and end uses.[109] Qualcomm's chips are currently used or are at the development stage in the following segments:

- *Handsets:* Qualcomm chips are widely used in premium and mid-range smartphones, offering integrated connectivity, AI acceleration, and multimedia processing.[110]
- *Automotive:* Qualcomm provides connectivity, infotainment, and advanced driver-assistance systems ("ADAS") solutions.[111]
- *IoT:* Qualcomm supports a diverse set of IoT applications, including PCs, wearables, virtual reality, and industrial IoT.[112]
- *Data center:* Qualcomm's initial effort to supply chips for data center servers was halted in 2018.[113] More recently, Qualcomm has explored Arm-based server processors, particularly through its custom CPU initiatives. In May 2025, Qualcomm announced its

[107] Qualcomm is currently one of Arm's largest customers and "accounted for 10% of our total revenue for the fiscal year ended March 31, 2025." *See* Arm 2025 Form 20-F, p. 28.

[108] SAC, ¶¶ 3, 53.

[109] *See* Qualcomm 2024 Form 10-K, p. 44. *See also* "Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, pp. 3-4, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf; "Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, , pp. 2-3, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf.

[110] "Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, accessed August 5, 2025.

[111] Steve McDowell, "Qualcomm's Game-Changing Move Into Automotive And Industrial IoT," Forbes, January 28, 2025, https://www.forbes.com/sites/stevemcdowell/2025/01/28/qualcomms-game-changing-move-into-automotive-and-industrial-iot/.

[112] "Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, accessed August 5, 2025.

[113] *See* "4 Reasons Qualcomm's Data Center Business Failed," The Motley Fool, December 21, 2018, https://www.nasdaq.com/articles/4-reasons-qualcomms-data-center-business-failed-2018-12-21 ("Qualcomm downsized its data center unit in June but denied that it was exiting the market. However, several rounds of layoffs, including one in early December, reduced the size of Qualcomm's data center technologies group from roughly 1,000 employees to about 50.").

first data center chip in partnership with NVIDIA.[114] In July 2025, Qualcomm signed a term sheet with [REDACTED] that included plans for a data center chip.[115] According to Qualcomm's most recent July 2025 earnings call, however, it appears that Qualcomm will not begin selling any data center chips before fiscal year 2028.[116]

55. In March 2021, Qualcomm acquired Nuvia, a startup founded by former Apple and Google chip designers, for $1.4 billion.[117] Founded in 2019, Nuvia was developing high-performance custom CPU cores for data center applications based on the Arm ISA.[118] The custom CPUs based on Nuvia technology are expected to power current and future generations of Snapdragon platforms, particularly in premium smartphones, PCs, and [REDACTED]

[114] Sebastian Moss, "Qualcomm Announces Data Center CPUs, Will Support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025, https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/. In June 2025, Qualcomm announced its intention to acquire Alphawave Semi aiming "to further accelerate, and provide key assets for, Qualcomm's expansion into data centers." *See* "Qualcomm to Acquire Alphawave Semi," Qualcomm, June 9, 2025, https://www.qualcomm.com/news/releases/2025/06/qualcomm-to-acquire-alphawave-semi.

[REDACTED]

[116] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [datacenter] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. If successful, we expect revenues to begin in the fiscal '28 timeframe.").

[117] "Qualcomm Completes Acquisition of NUVIA," Qualcomm Press Release, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.

[118] "NUVIA Raises $53 Million to Reimagine Silicon Design for the Data Center," Globe News Wire, November 15, 2019, https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.html.

[119] [REDACTED]

## IV. Origin of the Dispute

56. The origin of the dispute between Arm and Qualcomm is a contractual disagreement triggered by Qualcomm's acquisition of Nuvia in March 2021.[120] Arm filed a breach of contract lawsuit against Qualcomm in August 2022.[121] The present litigation is a closely related follow-on complaint that Qualcomm and Nuvia filed in April 2024.[122] As part of its UCL claim, Qualcomm argues, among other things, that the lawsuit that Arm filed in August 2022 is part of a broad "campaign" to undermine Qualcomm that also involves various other Arm actions (e.g., "making misleading statements to Qualcomm's customers […].").[123]

57. In September 2019, Arm entered into an ALA with Nuvia, a start-up that designed chips for data centers.[124] [redacted]

[120] The contracts at issue are Arm's ALAs with Qualcomm and Nuvia.

[121] "Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement.

[122] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3.

[123] SAC, ¶ 207.

[124] [redacted].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████

████ ████ Nuvia and Arm also entered into a TLA.[127]

58.   ████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████ Qualcomm's internal calculations support



<hr />

[127] *See* QCARM_0338297 and QCARM_0275743.

██ ████████████████████████████████████████████████

██ ████████████████████████████████████████████████

[redacted] Arm and Qualcomm also have a TLA.[130]

59. The different terms in the Nuvia and Qualcomm ALA licenses reflect Arm's approach to licensing, where each license agreement is considered "individually and in the context of the specific needs of the partner, market segment, and end-users, resulting in various license structures."[131] Arm's contracts with customers "are all unique, given the terms, […] the length of the license, the rights that are granted, so they're […] typically custom,"[132] such that "every different contract is somewhat bespoke."[133]

60. According to Arm, [redacted]

---

[redacted]

[129] [redacted]

[130] The 2013 TLA superseded the original TLA from September 30, 1997. [redacted]

[131] *See* "Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (No 4-11)," Arm Holdings, July 11, 2025, p. 18.

[132] Haas (Arm) Deposition, 169:20-22.

[133] Haas (Arm) Deposition, 169:7-8.

[redacted]

[redacted]

61. Qualcomm completed the acquisition of Nuvia in March 2021. Arm contends that the license it granted Nuvia could not be "transferred" to Qualcomm without Arm's consent and that Qualcomm could not use Nuvia's designs built using the Nuvia ALA without Arm's prior consent.[136] Arm further contends that Qualcomm incorporated Nuvia's technology in its custom CPUs without obtaining Arm's consent. Qualcomm disputes that Arm's consent was required, and it also claims that the royalty it should pay on those CPUs is the much lower royalty rate in Qualcomm's ALA (a claim that Arm has disputed), rather than the significantly higher rate in Nuvia's ALA.

62. Unable to reach an agreement with Qualcomm on the transfer of Nuvia's Arm-based technology, Arm terminated its licenses with Nuvia on February 1, 2022, and requested that Qualcomm destroy and stop using custom chips based on Nuvia's technology pursuant to the terms of the Nuvia ALA.[137] On August 31, 2022, Arm filed the *Arm v. Qualcomm* litigation.[138] After filing the lawsuit, Arm made public statements and corresponded with customers informing them of the lawsuit, explaining its reason for initiating the litigation and its belief that Qualcomm was in breach of Nuvia ALA.[139] Qualcomm initially filed a lawsuit concerning the Qualcomm ALA in

---

[135] Arm's Opening Statement in *Arm v. Qualcomm*, December 16, 2024, 109:4-12. [redacted]

[redacted]

[137] QCARM_0338883.

[138] "Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement.

[139] *Ibid. See also,* examples of Arm's correspondence with customers about the lawsuit, ARM_01238895, ARM_01230977, ARM_00110511.

April 2024.[140] Qualcomm amended its claims to add the claims addressed by Prof. Posner in December 2024 and April 2025.

## V. PROF. POSNER'S ANALYSIS OF THE RELEVANT MARKETS AND MARKET POWER IS INCOMPLETE AND IGNORES KEY FEATURES OF THE INDUSTRY

63. Prof. Posner does not explicitly conduct a "market definition" exercise, nor does he explicitly define the relevant product or geographic market, as for example specified in the U.S. merger guidelines.[141] His perfunctory analysis is superficial, and while he mentions some analytical tools that economists generally employ to delineate the relevant antitrust markets, he does not undertake those analyses himself.[142] The methods that economists use to define a relevant antitrust market receive little more than a sentence in his report, yielding an analysis that is insufficiently connected to the facts to produce a reliable conclusion.[143]

[140] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3.

[141] *See*, for example, U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf, § 3, p.3 ("In any merger enforcement action involving a vertical merger, the Agencies will normally identify one or more relevant markets in which the merger may substantially lessen competition.").

[142] Prof. Posner does not use the Hypothetical Monopolist Test or the "Small but Significant Non-transitory Increase in Price" ("SSNIP") Test, which are common methods used by economists to identify a group of products that constitute a relevant antitrust market. *See* U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, § 4.3.A (explaining that the Hypothetical Monopolist Test "is a method by which the Agencies often define relevant antitrust markets," and describing the SSNIP Test.).

[143] For example, in paragraph 58, Prof. Posner states that "Arm's dominance is widely recognized by the industry," which may be a hint to the "industry or public recognition of the submarket as a separate economic entity" discussed in the U.S. merger guidelines (U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, p. 41). However, Prof. Posner does not consider that, as recently discussed by Prof. Hovenkamp, "industry recognition, might be right depending on what the industry is recognizing. If they are looking at their closest price competitors, then this factor might provide a crude metric but certainly not as precise as the HMT. Other factors, such as a product's 'peculiar characteristics and uses' are so generic that they do not provide much guidance." Herbert Hovenkamp, "Antitrust Market Definition: the Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, https://www.networklawreview.org/hovenkamp-market-definition/. Prof. Posner's mention of an article on the CNBC website stating that "Arm has become the dominant company making this chip architecture, and it powers nearly every smartphone today" (Posner Report, footnote 95) falls far short of the fact-intensive investigation

64. Prof. Posner seems to posit a market for the supply of Arm's ISA, reaching the conclusion that Arm "has a monopoly or a dominant position" because Arm is the only supplier of its own ISA.[144] For example, he states:

- "Arm has a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA."[145]
- "Chip designers who make Arm-compliant chips for mobile phones and certain other products do not treat non-Arm ISAs as substitutes for the Arm ISA."[146]
- "Arm's ISA has no rivals at all in the Arm ecosystem for the simple reason that Arm demands that a license is necessary to design and sell Arm-compliant SoCs or cores."[147]

65. Prof. Posner is non-committal and vague about whether he concludes that there is a single market for the supply of the Arm ISA as opposed to separate markets for different applications. Concerning the chip applications, he appears to define multiple markets because different applications have different requirements.

66. In Prof. Posner's theory, Arm can exercise its "monopoly power" to foreclose Qualcomm (and any other customers), potentially leading to higher prices or lower quality for Arm-based chips.[148] This Section of my report explains how Prof. Posner's market definition provides a biased view that ignores important competitive constraints that Arm faces.

---

underlying reliable market definition exercises. *See*, for example, U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, 2006, https://www.justice.gov/d9/383663.pdf, at p. 3 ("Investigations Are Intensively Fact-Driven, Iterative Processes."). Further, in the very same paragraph 58, as well as again in his paragraphs 11 and 64, Prof. Posner in fact acknowledges that Intel x86—not the Arm ISA—is dominant in key chip applications including data center and personal computers, directly undermining his sweeping claim that "Arm's dominance is widely recognized by the industry."

[144] Posner Report, ¶ 11.

[145] Posner Report, ¶ 11.

[146] Posner Report, ¶ 33. Prof. Posner does not identify these "certain other products." *See* also *id.*, ¶ 30 ("In the course of its analysis [of the proposed Nvidia acquisition of Arm], the FTC noted that there are no close substitutes for ARM's ISA.") and ¶ 55 ("Firms that produce Arm-compliant SoCs and cores under one of the Arm licenses cannot substitute to non-Arm ISA licenses if Arm raises the price of its licenses substantially above marginal cost.").

[147] Posner Report, ¶ 58.

[148] Posner Report, ¶ 70.

### A. Prof. Posner Improperly Disregards the Competitive Constraint from the x86 and RISC-V Ecosystems

67. Prof. Posner's analysis completely disregards competition from the x86 and RISC-V ecosystems. He appears to exclude Intel's x86 because it is not licensed to third parties.[149] Despite acknowledging that "RISC-V is a threat to Arm's dominance,"[150] he excludes RISC-V due to its current limitations.[151]

68. Prof. Posner's analysis is incomplete and misleading. Irrespective of whether Arm is a "monopolist" in a purported upstream market for the supply of Arm's ISA (as Prof. Posner asserts, without any analysis), the Arm ecosystem does in fact face competition from the x86 and RISC-V ecosystems. Any material deterioration in the value provided by the Arm ecosystem will disincentivize the development of Arm-based technologies for current and future applications, incentivize the development of alternative ecosystems, and push companies towards alternative ecosystems so that Arm-based chips can be displaced by non-Arm-based chips.[152] Prof. Posner recognizes this in his report but ignores its implications for his analysis.[153] While Prof. Posner

[149] Posner Report, ¶ 55 ("Firms that produce Arm-compliant SoCs and cores under one of the Arm licenses cannot substitute to non-Arm ISA licenses if Arm raises the price of its licenses substantially above marginal cost.").

[150] Posner Report, ¶ 78. I note that Prof. Posner asserts that Arm "may raise upstream barriers of entry against upstarts like RISC-V" and as evidence he claims "Arm has attempted to spread 'fear, uncertainty, and doubt' about RISC-V. Among other things, Arm launched a website with the web address 'riscv-basics.com,' which was 'designed to plant seeds of doubt in the minds of developers who might use RISC-V as their processor architecture instead of Arm.'" What Prof. Posner failed to mention is that the source document he cites makes clear the website was only live for a single day: "The website was taken down a day later, after uproar from angry Arm engineers in Cambridge." *See* QCVARM_1066820 at 7165 (document cited by Prof. Posner). *See also* Chris Williams, "Up in arms! Arm kills off its anti-RISC-V smear site after own staff revolt," The Register, July 10, 2018, https://www.theregister.com/2018/07/10/arm_riscv_website/ ("Arm has taken offline its website attacking rival processor architecture RISC-V within days of it going live – after its own staff objected to the underhand tactic. […] If anything, the site made RISC-V sound like a viable alternative to Arm's crown, giving the upstart architecture more credibility.").

[151] Posner Report, ¶ 35 ("because of the enormous complexity of coordination among multiple firms necessary to move from one network to another, RISC-V is unlikely to displace Arm's ISA in most sectors, including mobile and other sectors that require high-level operating systems, for many years, if ever.").

[152] *See,* for example, Armstrong, Mark, "Competition in Two-Sided Markets," 2006, RAND Journal of Economics, Vol. 37, No. 3.

[153] Posner Report, ¶ 90 ("As the industry observes Arm's mistreatment of Qualcomm, firms will become less willing to invest in the Arm ecosystem. Their incentives to invest are reduced because the more successful they are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them. […] Rather than invest in new Arm-compliant products, firms will look for ways to escape the Arm ecosystem, for example, by

acknowledges that "RISC-V is a threat to Arm's dominance, as Arm is well-aware,"[154] he fails to account for it as a current and future competitive constraint.[155] [redacted] Evidence also shows that Qualcomm has already adopted RISC-V in some applications, such as microcontrollers, and it has announced developing a RISC-V application processor for wearables.[159]

---

collaboratively or unilaterally developing an alternative ISA. The early development of the open-source ISA, RISC-V, may reflect this concern.").

[154] Posner Report, ¶ 78.

[155] The inference that Prof. Posner seems to draw from the fact that Arm sees RISC-V as a threat is that this creates an incentive for Arm to anticompetitively harm RISC-V. However, he provides no evidence. In the absence of evidence, the most likely scenario is that harm to rivals is just competition at work. In *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945), Judge Hand famously captured the idea that competition harms rivals by stating that it would be contrary to the spirit of the antitrust laws to punish a firm that led to the exit of its rivals as a result of its "superior skill, foresight and industry. […] The successful competitor, having been urged to compete, must not be turned upon when he wins."

[156] [redacted].

[redacted]

[redacted]

[159] *See* Section VIII.D.3. *See also* Francisco Cheng, "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential; "Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC-VInternational (Manju Varma (Qualcomm) stating: "To date, we have shipped over 650 million RISC-V cores in the market and this number just keeps growing. […] We have shipped RISC-V cores in PC, mobile, automotive, XR, and wearable segments."); "Qualcomm to Bring RISC-V Based Wearable Platform to Wear OS by Google," Qualcomm, October 17, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-to-bring-risc-v-based-wearable-platform-to--wear-os-by-; "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 8:59, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational (Ziad Asghar (Qualcomm) stating: "[T]his was a couple of weeks ago where we talked about our engagement with Google. What we're going to be doing is to be creating a product for wearables which is a smartwatch that actually uses RISC-V as the application processor.").



69. Furthermore, Qualcomm has been "very active in development" of RISC-V and has invested in it,[160] stating internally, [redacted][161] For example, the current Chair of the Board of Directors for RISC-V International is Lu Dai, Qualcomm's Senior Director of Engineering,[162] and Qualcomm is a founding member of Quintauris, a joint venture formed with other major semiconductor companies (Bosch, Infineon, Nordic Semiconductor, NXP, and STMicroelectronics) "to accelerate the development and commercialization of RISC-V–based products."[163] In addition, many of the largest firms in the tech sector collaborate to develop software for the RISC-V ISA through the RISC-V Software Ecosystem, or "RISE," which "is a collaborative effort led by industry leaders with a mission to accelerate the development of open source software for the RISC-V architecture."[164] Members of RISE include Nvidia, Samsung, Qualcomm, Google, MediaTek, Red Hat, Alibaba, and others.[165]

---

[160] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, p. 29 (Amon touting Qualcomm's role in the development of RISC-V: "Look, there has been quite a bit of development on RISC-V. I think also, there was a desire to actually drive RISC-V towards high performance and commercialization. As a matter of fact, I think we've been very pleased at Qualcomm being elected to chair, I think the standard body right now, we have been very active in development. There's a number of other companies and ecosystems. I think we have a joint venture called Qu[i]enta[u]ris, which is a really focus of that with some of the European semiconductor company. It will take time, but I think it's encouraging to see development on RISC-V, especially as not a lot of love, I think, to semiconductor companies from the other ecosystem [Arm]. I think that's an accelerate, accelerating. I think the R&D on RISC-v [sic] across the board.").

[161] [redacted]

[162] "RISC-V International Governance," RISC-V, https://riscv.org/about/board/, accessed August 13, 2025. In addition, Larry Wikelius, Senior Director at Qualcomm, is a member of the Governing Board of RISC-V Software Ecosystem industry consortium (according to "Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025.). "The RISC-V Software Ecosystem (RISE) project is a collaborative effort led by industry leaders with a mission to accelerate the development of open source software for the RISC-V architecture" (*see* "Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025.).

[163] "Quintauris: Accelerating RISC-V Innovation for next-gen Hardware ," November 4, 2024, https://www.quintauris.com/quintauris-accelerating-risc-v-innovation-for-next-gen-hardware.

[164] "Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025.

[165] "Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025.

70. [redacted] [redacted] [redacted][167]

71. Qualcomm's dispute with Arm seems to have increased Qualcomm's effort to support RISC-V.[168] [redacted][169] While RISC-V does not appear to currently compete in certain applications, such as mobile, it may become a viable alternative in the future.[170] [redacted]

---

166 [redacted]

[redacted]

168 *See* Section VIII.D.3.

169 [redacted]

170 [redacted]

The relevance of future competition is acknowledged in the U.S. Merger Guidelines, which state that "[f]irms not currently supplying products in the relevant market, but that have committed to entering the market in the near future, are also considered market participants." U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, § 4.4.A.

[redacted] This threat of future competition is particularly relevant since Prof. Posner's foreclosure story relies on a claim that Arm aims to steer Qualcomm away from designing custom cores, accepting "short term" royalty losses in favor of higher "long term" margins from licensing or selling its own cores and chips.[172] Prof. Posner does not consider that these "long term" benefits may not materialize because of competition from RISC-V or x86. [173]

---

[171] [redacted]

[172] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the **short term**, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the **long term** than the margins on existing ALA licenses." (emphasis added)).

[173] *See*, for example, ARMQC_02726982, a January 2024 presentation from Arm tracking RISC-V progress as well as the "risks [that] RISC-V poses to Arm" and "key market problems" arising from the adoption of RISC-V. The presentation shows evidence that the RISC-V ISA competes with Arm ISA in several lines of business. For example, at '985 to '989, it highlights in automotives, RISC-V is "encroaching R & M for all automotive" and "SIPs [silicon providers] building their own ecosystem making RISC-V credible," in IoT, Arm needs to "continue investing in the Ecosystem to maintain its leadership" in response to the "growing [RISC-V] ecosystem," and in data center, "RISC-V has gained traction as preferred arch[itecture] amongst CPSs and Infra startups to build custom datacenter class AI hardware accelerators for training/inference," where RISC-V competitors have developed full systems targeted towards data centers. At '991, Arm further identifies "[l]oss of [s]martwatch [m]arket" and "[p]artnership between Google and QCOM" where Arm needs to "[u]nderstand why the customer is migrating to RISC-V." ARMQC_02748499 at '501, a September 2021 presentation titled "IPG Risk Profile," identifying the risk that "x86 architecture leverages its dominant position in servers and PCs to compete against ARM in core or growth markets."; ARM_00076604 at '605 and '637 (October 2021 presentation titled "Infrastructure LoB: Business and Strategy Review," identifying a "[t]echnology gap with Intel and AMD" in data centers, and stating that "[e]xecution of planned technology roadmap with speed of light integration of customer feedback is important - depending on our customers to bring much of the innovation AMD and Intel are trying to bring to the market.").

72. In reality, the critical threat of future competition from RISC-V, which has the benefit of being a freely available open source ISA, acts as a constraint on Arm today.[174] To illustrate the flaw in Prof. Posner's reasoning, consider that—by his logic—Intel would be a vertically integrated monopolist supplier of the x86 ISA.[175] Yet, this has not protected the x86 ecosystem from Arm's expansion in applications such as PCs and data centers where x86 once accounted for nearly 100 percent of sales.[176]

73. Regardless of whether Prof. Posner is correct in calling Arm the "monopolist" supplier of its own ISA, his failure to account for competitive constraints from non-Arm ISAs is a fatal flaw. It matters little whether x86 and RISC-V ISAs are, formalistically, included in the same market as

---

[174] *See* ARMQC_02600713 at '716 (In the context of a December 2022 Arm internal discussion about RISC-V, Peter Greenhalgh, SVP of Technology at Arm, stated: "In the IoT and Embedded world, the quality and PPA [Price, Performance, Area] of our [Arm's] CPU offerings will not be sufficient to offset the massive pricing pressure we would come under the myriad of small RISC-V IP companies and internal developments."). Arm has recognized that the competitive threat from RISC-V is related to Arm's own strategic business decisions. For example, when Arm was considering a "direct-to-OEM business model," it was concerned that such an approach would lead to increased RISC-V adoption. *See* ARMQC_02739661 at '661 and '671 (A 2021 Arm "[w]orking draft strategic narrative to support the FY22-FY25 financial plan which is the cornerstone of our Initial Public Offering" highlights "Key risks to the plan[:] […] In this section, we dive into the risk that the drive by Arm to a direct-to-OEM business model will push OEMs to look elsewhere, either to competing Arm-architecture products (e.g., Qualcomm's own designs), or products based on the x86 or RISC-V architectures. If this happens in a material way, it can be catastrophic to Arm delivering on its business goals, valuation and growth plans. The direct-to-OEM business model project needs to monitor for signs that companies are seriously considering alternate investments. The 'stickiness' of Arm's architecture and ecosystem mitigates this risk somewhat, but we estimate that the industry would only need to spend $5Bn to create a credible Android smartphone alternative to Arm from RISC-V.").

[175] Or a duopoly if accounting for AMD, who receives a license to x86 as part of a settlement agreement. *See* Greg Tang, "Intel and the x86 Architecture: A Legal Perspective," The Harvard Journal of Law & Technology, January 4, 2011, https://jolt.law.harvard.edu/digest/intel-and-the-x86-architecture-a-legal-perspective. In either case, Arm would not be part of the market that Prof. Posner's approach would imply.

[176] Based on Counterpoint Research estimates, x86's PC share in 2019 was 99% (with Intel at 84% and AMD at 15.1%), with Arm at less than 1%. *See* Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027. For data centers, *see* Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html; Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market. Prof. Posner claims that "Arm's ecosystem is protected by entry barriers." *See* Posner Report, ¶ 57. However, as I describe in detail in Section VIII.D.2 below, even in industries that are, in "theory," characterized by network effects and entry barriers, incumbent monopolists often face competition from entrants, as Arm's recent entry into data centers and PCs illustrates.

Arm's ISA or treated as competitive constraints outside of that market.[177] The bottom line is the same. The x86 and RISC-V ecosystems competitively constrain Arm.

74. In data centers, Prof. Posner acknowledges competition among chip suppliers using alternative ISAs. He reports that "Intel's x86 still dominates the data center sector a with [sic] roughly 84% share"[178] and acknowledges that "in some sectors, like data centers and compute [PCs], OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips."[179] However, as I discuss in Section VII.C, he fails to consider the implication of competition between chips that use x86 and RISC-V architecture on Arm's incentives to foreclose its customers of its ISA. Prof. Posner's failure to account for competitive pressure from the x86 and RISC-V ecosystems undermines the credibility of his analysis.

### B. Arm's ISA Share Varies Significantly Across Chip Application Segments

75. Prof. Posner is non-committal and vague about whether he concludes that there is a single market for the supply of the Arm ISA as opposed to separate markets for different applications. Concerning the chip applications, he appears to define multiple markets because different applications have different requirements.[180]

76. Prof. Posner does not account for the fact that Arm's share varies significantly across application segments. Arm is very successful in smartphones, but it has a much lower share in other segments such as PCs, data centers, and IoT. The chart below shows that Arm estimates the current share of Arm-based technology for the "mobile applications" segment (i.e., smartphones)

---

[177] For example, *see* Shapiro, Carl, "Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case," Review of Industrial Organization, 2021, Vol. 59, pp. 303–341 (at 306, "Readers who are accustomed to studying horizontal mergers may wonder where market definition and market shares fit into this framework. The short answer is that market shares are less informative for studying vertical mergers than they are for studying horizontal mergers, so using market shares as a screen does not work well." (emphasis in original)).

[178] Posner Report, ¶ 64.

[179] Posner Report, ¶ 58. Posner further acknowledges competition in those sectors, recognizing that "the Arm ISA is rapidly gaining share in some of those sectors, including data centers."

[180] Posner Report, ¶ 12 ("Within the Arm ISA ecosystem, there are multiple SoC sectors because the OEMs demand different kinds of SoCs for their different computing products."), ¶¶ 60-61 ("As the requirements of each sector are unique, the SoCs are sector-specific. […] In each sector, Qualcomm faces varying degrees of competition from other chip makers.").

to be nearly 100%.[181] Excluding "Other Mobile" applications,[182] Arm's average share across other segments is 37%,[183] ranging from 15% in "Other Infrastructure" to 50% in "IoT & Embedded."[184] Smartphones and "Other Mobile" segments, where Arm has a share in excess of 50%, represent only 24% of all of Arm's segments ("Total Opportunity").

181 "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, p. 11, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553. For a definition of the various segments, see Arm 2025 Form 20-F, pp. 59-61.

182 Arm explained that "mobile phones contain many chips beyond the main applications processor, including the modem, Wi-Fi, Bluetooth and NFC connectivity chips, GPS chips, touchscreen controllers, power management chips, camera chips, audio chips and more, which we refer to collectively as the 'other mobile chips market.'" Arm 2025 Form 20-F, p. 60.

183 This average share is weighed by dollars.

184 Including "Other Mobile," Arm's average share across all segments other than smartphones is 40%. Concerning definitions: "Other Infrastructure refers to the technological components and systems that support various aspects of computing, networking, and data processing and include chips deployed into HPC systems, enterprise servers, and edge networking equipment," and "[t]he industrial IoT and embedded semiconductor market includes chips used by a wide range of goods, including washing machines, thermostats, digital cameras, drones, sensors, surveillance cameras, manufacturing equipment, robotics, electric motor controllers and city infrastructure and building management equipment." Arm 2025 Form 20-F, p. 60.

77. Prof. Posner notes that the "Arm ISA is rapidly gaining share in certain sectors, including data centers."[185] Such growth reflects competitive success. Arm is not being handed market share by competitors such as Intel's x86; instead Arm is gaining share through sustained R&D investment and innovation by Arm and its partners.[186] As I discuss in Section VIII.D.1, Arm invests a larger share of its revenue in R&D than either Qualcomm or Intel. Furthermore, Prof. Posner does not explain why Arm's growth in these applications would not put more pressure on rivals to innovate in seeking to preserve their sales, and why Arm's growth would thus not be procompetitive.

78. In summary, Prof. Posner's analysis rests on an incomplete and speculative framework that ignores competitive constraints due to OEM customers being able to choose among chips that rely on different ISA ecosystems. He does not adequately address the significant variation in Arm's market share across application segments, nor does he explain how Arm's competitive gains—particularly in areas like data centers—reflect innovation and investment rather than market power. By overlooking these dynamics, Prof. Posner fails to account for the procompetitive implications of Arm's growth and the ongoing pressure it places on rivals to innovate, which undermines any suggestion of dominance or lack of competition in the broader ISA landscape.

## VI. Prof. Posner and Dr. Kennedy Provide No Evidence that Qualcomm Has Suffered Harm from Arm's Alleged Anticompetitive Conduct

79. Prof. Posner claims that Qualcomm was harmed in various ways by Arm's conduct.[187] The SAC states that, as a result of Arm's "unlawful and unfair business acts and practices," Qualcomm

[185] Posner Report, ¶ 58.

[186] ARM_00118635 at '641 (April 2020 internal Arm presentation discussing that it has "proactively increased its R&D investments to capture market share in new markets such as Servers, Cloud & Edge, Networking, AI/ML; Automotive, IoT, etc.") and ARM_01282304 at '314 (a 2018 Arm presentation reporting R&D as a percentage of revenue going back to 2005 and showing an increase in 2016-2017 compared to prior years.).

[187] [redacted]

"has suffered or faces the threat of loss of profits, customers, and potential customers" and "has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct."[188]

80. Neither Prof. Posner nor Dr. Kennedy provide any supporting evidence of lost business opportunities. Prof. Posner claims that, due to Arm's conduct, "Qualcomm *may* […] find it difficult to believe, or to convince its customers, that it can continue to rely on Arm to comply with the licenses in good faith."[189] His statement is a theoretical possibility for which he provides no evidence. Dr. Kennedy purports to estimate Qualcomm's lost profit from a change in the Qualcomm [REDACTED][190] However, Dr. Kennedy merely compares the term sheets before and after the Breach Letter and, as he himself acknowledges, his analysis does not causally link the changes in the terms to Arm's allegedly anticompetitive conduct.[191]

81. In this Section, I show that there is no real-world compelling evidence of harm to Qualcomm. Qualcomm has continued to grow and experience strong financial performance since its acquisition of Nuvia in March 2021 and public awareness of the lawsuit in August 2022, and it forecasts strong financial performance going forward. As a general matter, to the extent possible, economists determine damages based on a comparison between the actual world with the alleged anticompetitive conduct and the counterfactual or "but-for" world without that conduct.[192] While my analysis tracks the evolution of Qualcomm's profitability over time and does not construct a but-for scenario, it does provide real world evidence that, contrary to Prof. Posner's claim that Arm's conduct would cause Qualcomm to be "badly wounded,"[193] Qualcomm's profitability

---

[188] SAC, ¶¶ 210-211.

[189] Posner Report, ¶ 65 (emphasis added).

[190] Kennedy Report, ¶¶ 130-137.

[191] Kennedy Report, footnote 317 [REDACTED]

[192] Damages reflect the reduction in profits caused by the alleged anticompetitive conduct.

[193] Posner Report, ¶ 78.

improved. In these situations, Plaintiff experts often raise the possibility that the Plaintiff's profitability would have improved even more in the absence of the allegedly anticompetitive conduct (and that thus the Plaintiff was harmed even while its performance improved over time). In this case, however, neither Prof. Posner nor Dr. Kennedy construct a but-for world or provide any evidence based on market prices or terms and conditions for an actual license (as opposed to a term sheet that merely reflects Qualcomm's aspirations at a certain point in the negotiating process).[194]

### A. Qualcomm's Strong Financial Performance Since the Acquisition of Nuvia

82. Prof. Posner opines that Arm has engaged in a "broad [] scheme" to "undermine Qualcomm's ability" to compete within the Arm ISA ecosystem.[195] He claims that Arm is "obstructing" Qualcomm's ability to design custom cores under its ALA, thereby coercing Qualcomm into relying on Arm's OTS cores licensed under the TLA, which carry higher royalty rates and margins. He further alleges that, if successful, Arm will be able to "extend [] its dominance over the Arm ISA ecosystem, leaving it with not only control of the ISA itself and the design and sale of its own cores, but also with a significant role in designing and selling SoCs."[196] This claim is unsupported by evidence.

83. Qualcomm has grown dramatically since it acquired Nuvia in March 2021. Qualcomm's total revenue increased more than 38% from Q1 2021 to Q1 2025, while its operating profit increased by 44%, as shown in **Exhibit 1** and **Exhibit 2** below. In the QCT segment, Qualcomm's

[194] To be clear, I do acknowledge that a number of factors impact how Qualcomm's profits evolve over time, and that thus my analysis does not isolate the effect of Arm's conduct. However, the lack of any evidence of harm to Qualcomm in the data I do analyze contrasts with the lack of any compelling, real-world evidence in Prof. Posner and Dr. Kennedy's analyses.

[195] Posner Report, ¶¶ 13-14.

[196] Posner Report, ¶¶ 13-14, 17, 71.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

revenue increased over 50% and its net income before taxes increased 80% over the same time period.[197]

**Exhibit 1: Qualcomm Revenue (USD in billions)**[198]

By Business Segment, 2019-2025Q2

12.0
10.0
8.0
6.0
4.0
2.0
-
Nuvia Acquisition (2021Q1)
2019Q1
2019Q2
2019Q3
2019Q4
2020Q1
2020Q2
2020Q3
2020Q4
2021Q1
2021Q2
2021Q3
2021Q4
2022Q1
2022Q2
2022Q3
2022Q4
2023Q1
2023Q2
2023Q3
2023Q4
2024Q1
2024Q2
2024Q3
2024Q4
2025Q1
2025Q2
QCT Revenue
QTL Revenue

[197] Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

[198] Note: Excludes a *de minimis* amount of Qualcomm Strategic Initiatives (QSI) revenue and other revenue. Source: Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

50

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Exhibit 2: Qualcomm Operating Profit (USD in billions)**[199]

2019-2025Q2

Nuvia Acquisition
(2021Q1)
4.5
4.0
3.5
3.0
2.5
2.0
1.5
1.0
0.5
-
2019Q1
2019Q2
2019Q3
2019Q4
2020Q1
2020Q2
2020Q3
2020Q4
2021Q1
2021Q2
2021Q3
2021Q4
2022Q1
2022Q2
2022Q3
2022Q4
2023Q1
2023Q2
2023Q3
2023Q4
2024Q1
2024Q2
2024Q3
2024Q4
2025Q1
2025Q2

84. Moreover, over the past two years, Qualcomm repeatedly and publicly touted its robust current and forecasted financial performance, particularly in its QCT segment (which includes its chip business). In a series of recent earnings calls, Qualcomm's senior executives described the

[199] Source: Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

51

company's strong financials.[200,201,202,203] To cite just one example, in its February 2025 earnings call, Cristiano Amon, Qualcomm's President and Chief Executive Officer, said:

*In fiscal Q1, we delivered record revenues of $11.7 billion in non-GAAP earnings per share of $3.41. Our chipset business achieved record revenues of $10.1 billion, the first*

---

200 "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, pp. 1, 23-24, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf. (Akash Palkhiwala, Qualcomm's Chief Financial Officer and Chief Operating Officer, described Qualcomm's strong growth over the past five years: "So we picked fiscal [year] [20]19 as the starting point so we can get rid of the Covid. Complexity and the ups and downs inventory, build bleed that it introduced. So over the last five years, how have we done our revenues have doubled EPs has tripled very strong performance. This performance validates our strategy and it provides a strong foundation to accelerate growth and diversification. From this point on. Now if you look at Qct [sic], our chip business, for the same metrics, we've more than doubled revenue. There and we've increased our operating margins from 15% to 29%, very closely aligned with the long term target of 30% that we've set. We also saw very strong growth in our revenue streams, 31% CAGR in automotive, double digit growth in handset and IoT, as well in handsets. If you abstract out the share gain at Apple and look at Android, we grew low double digits in Android as well. So very strong performance across the board, across our portfolio." He similarly described Qualcomm's strong growth in fiscal year 2024 (i.e., October 2023 through September 2024): "So fiscal [year] 24, we delivered very strong results, very strong execution. Revenue grew by 9%, EPs grew by 21%. And that shows the operating leverage in the business.").

201 "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, pp. 5-6, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf. (Mr. Palkhiwala stated: "We are pleased to announce revenues of $11.7 billion and non-GAAP EPS of $3.41, both of which were above the high end of our guidance. […] QCT delivered record revenues of $10.1 billion, which was above the high end of our guidance on outperformance across Android handsets, IoT, and automotive. QCT handset revenues were a record $7.6 billion with 13% year-over-year growth, reflecting higher volume and content increase in Android premium tier, driven by industry-leading performance of our newly launched Snapdragon 8 Elite platform. […] Lastly, we returned $2.7 billion to stockholders, including $1.8 billion in stock repurchases and $942 million in dividends. […] In closing, we are very pleased with our strong first-quarter results with new records across the following metrics: total company revenue, non-GAAP EPS, QCT revenues, QCT Handset revenues, and QCT Automotive revenues.").

202 "Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, pp. 2-3 and 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf. (Mr. Amon stated: "In fiscal Q2, we delivered non-GAAP revenues of $10.8 billion and non-GAAP earnings per share of $2.85. Revenues of $9.5 billion from our chipset business were driven by strength across handsets, automotive and IoT, all exceeding revenue expectations. Automotive and IoT revenues increased 59% and 27% year-over-year, respectively. Licensing business revenues were $1.3 billion. Demand for our industry-leading platforms continues to expand as high-performance connectivity and processing at the edge are increasingly important, and AI becomes more pervasive across industries. We have the industry's broadest product and IP portfolio, a strong track record of establishing a technology leadership position in every industry we enter and a clear vision for the future." Mr. Palkhiwala further described Qualcomm's strong overall financial performance: "In closing, we are very pleased with our strong results in the first half of fiscal '25, with revenue and non-GAAP EPS growth of 17% and 21%, respectively, versus a year ago period.").

203 "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 5, 9, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Palkhiwala stated: "QCT Handset revenues increased 7% year over year to $6.3 billion, reflecting

*$10 billion quarter for QCT, including record quarterly Handset and Automotive revenues. Licensing business revenues were $1.5 billion. We're off to a great start in fiscal '25. Our mobile roadmap is the strongest in our history, with exceptional traction for Snapdragon in premium tier handsets, and we are delivering growth across our diversification initiatives. This quarter, Automotive and IoT revenues grew 61% year over year and 36% year over year, respectively. We're committed to achieving $22 billion on non-handset revenues by 2029 as outlined in our 2024 Investor Day.*[204]

85. Over the longer term, Qualcomm forecasts that its IoT (i.e., PCs, mixed and virtual reality, industrial, networking, and tablets, headphones, and smartwatches)[205] revenue will increase from $5.4 billion to $14.0 billion by fiscal year 2029, an increase of over 150%.[206] For automotive,

---

strong demand for premium tier handsets, enabled by our Snapdragon 8 Elite platform. QCT IoT revenues grew 24% year over year to $1.7 billion. The outperformance, relative to expectations, was driven by increased demand for our Snapdragon AR1 chipset, the clear industry leader in emerging AI smart glasses category. We delivered another record quarter in QCT Automotive with revenues of $984 million, an increase of 21% year over year, driven by content growth in new vehicle launches with our Snapdragon Digital Chassis platform. […] [W]e are very pleased with our performance in fiscal '25 […] [Y]ou should think of this as a very strong quarter for us." Looking forward to the next quarter (Q3 2025), Mr. Palkhiwala forecasted strong Qualcomm growth in the QCT segment, stating: "We are forecasting fiscal '25 to be the second consecutive year of greater than 15% year over year growth in total QCT non-Apple revenues. We anticipate QCT IoT and Automotive revenues to grow by approximately 20% and 35%, respectively, reinforcing our confidence in achieving our fiscal '29 target of $22 billion in combined Automotive and IoT revenues. We are pleased to see our customer relationships strengthening[.]"). Similarly, *see also* "Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, p. 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf.

[204] "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, pp. 3 and 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf. (Mr. Amon also discussed the strong performance of Qualcomm's licensing business: "Finally, we remain very pleased with the execution of our QTL business in recent years, and we're well positioned to maintain fiscal '24 revenue scale going forward. Over the past year, we have extended key agreements with major OEMs, and we're poised to shortly execute new long-term license agreements with two additional large OEMs.").

[205] Qualcomm defines IoT as follows: "In IoT, our inventions have helped power growth in industries and applications such as consumer (including personal computers (PCs), tablets, voice and music and extended reality (XR)), edge networking (including mobile broadband and wireless access points) and industrial (including handhelds, retail, tracking and logistics and utilities)." *See* Qualcomm 2024 Form 10-K, p. 6.

[206] Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, p. 20, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf.

Qualcomm is forecasting "strong revenue growth" with revenue increasing from $2.9 billion to $8.0 billion by fiscal year 2029, an increase of approximately 175%.[207]

86. Prof. Posner and the SAC do not discuss this real-world evidence. Qualcomm's success in the marketplace undermines its claim that it was "harmed" by Arm's communications with its customers.[208] It also casts doubt on Qualcomm's claim that it suffered harm due to Arm's alleged failure to provide certain "deliverables" that Qualcomm was allegedly entitled to receive.[209] Even

---

[207] Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, p. 12, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf. Qualcomm does not appear to have provided long-term forecasts for handsets. Apple is transitioning to its own in-house modem, which may lead to a reduction in Qualcomm revenue, although in its latest earnings call Qualcomm still forecasted growing handset revenue. *See* "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf ("We anticipate QCT Handset revenues to grow approximately 5% sequentially, consistent with typical historical trends, despite lower Apple revenues."). *See* Rashika Singh, "Qualcomm shares slide as Apple modem shift, tariffs raise growth concerns," Yahoo Finance, July 31, 2025, https://finance.yahoo.com/news/qualcomm-shares-slide-apple-modem-085843911.html ("The San Diego-based chip supplier warned investors that Apple's move to depend on in-house modems, starting with the February launch of the iPhone 16e would hit future chip revenue.").

[208] SAC, ¶ 34.

[209] *See* SAC, ¶ 184 ("Arm withheld deliverables that it was required to provide Qualcomm under the QC ALA") and [redacted]

[redacted]

if those claims were true, there is no evidence that Qualcomm's performance and market success were adversely affected in meaningful ways.[210]

**B. No Evidence of Lost Business**

87. The SAC claims that Arm's communications regarding Qualcomm, particularly the October 2024 Breach Letter, have "harmed Qualcomm."[211] Specifically, Qualcomm claims that "important Qualcomm customers delayed entering into new (or renewing existing) contracts with Qualcomm or have insisted that Qualcomm provide them with additional commitments regarding its ability to deliver licensed products."[212] [redacted]

88. Prof. Posner provides no evidence to support Qualcomm's claims and ignores the fact that there is no evidence of lost business. As I discuss below, Qualcomm continues to expand business with key customers despite what Qualcomm characterizes as a "misinformation campaign."[214]

---

[210] [redacted]

[211] SAC, ¶ 34.

[212] SAC, ¶ 34. Prof. Posner also claims that "Arm conducted a misinformation campaign designed to undermine customers' confidence in Qualcomm" and that "[t]he campaign included leaking the notice letter that Arm sent to Qualcomm and sending 'confusing' and 'misleading' messages to customers of Arm and Qualcomm that suggested that they faced legal jeopardy if they used Qualcomm products." Posner Report, ¶¶ 65-66.

[213] "Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," July 11, 2025, Qualcomm, p. 14.

[214] Posner Report, ¶ 65.

1. [REDACTED]

89. [REDACTED] Prof. Posner also claims that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers" (though he does not specifically discuss any purported harm to Qualcomm's relationship with [REDACTED].[217] [REDACTED]

90. [REDACTED]

> [REDACTED]

91. Even though [REDACTED] "insisted" on additional reassurances,[219] this type of "reassurance" to customers and investors is common and therefore is not the type of evidence that economists consider to form conclusions on anticompetitive harm. For example, contracts often include indemnification provisions to protect parties against supply disruptions, disputes over the assignment of IP rights, and other sources of uncertainty that are endemic to most business

---

[215] Referred to as the "Smartphone Company" in the SAC.

[216] SAC, ¶¶ 158, 195.

[217] Posner Report, ¶ 45.

[218] "[REDACTED]

[219] SAC, ¶ 158.

endeavors.[220] These terms are a widespread and completely unremarkable way for a supplier to share risk with its customers.

92. More generally, negotiations between business partners involve constant back-and-forth communications, exchanges of requests and concessions, expected and unexpected challenges and roadblocks, and can be affected by internal frictions and changing external factors.[221] This process can last for many months, and with that context in mind, there is nothing unusual about the alleged "delays" that Qualcomm perceived in its negotiation with [REDACTED].[222]

93. [REDACTED]

---

[220] [REDACTED]

[221] For example, [REDACTED] *See also* "Your Negotiation Challenges," Karrass, June 17, 2025, https://www.karrass.com/blog/your-negotiation-challenges ("Negotiation presents a wide range of challenges that can derail even the most prepared professionals. From misaligned goals to emotional tension, each situation brings unique hurdles. One common issue in negotiation is conflicting objectives between parties. These misalignments can create impasses that feel insurmountable without a clear strategy to resolve them. Additionally, ambiguity in roles, expectations, or desired outcomes often leads to confusion and delays in decision-making. […] Finally, power imbalances can distort the negotiation process. When one party feels they hold all the leverage, they may pressure the other side into agreements that aren't sustainable.").

[222] [REDACTED]

[223] [REDACTED]

[224] [REDACTED]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████     █

94.    Additionally, in an internal Qualcomm chat in February 2024, Christopher Patrick, Senior Vice President and General Manager of the Mobile and Wearables Business at Qualcomm, lamented that it is ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████     ████████

    2.    ████████████████████████████████████████████████████

        ████████████████████████████

95.    Qualcomm also points to ████████ as a customer whose relationship with Qualcomm was harmed by Arm's conduct. Qualcomm claims that, as a result of Arm's October 2024 Breach

_____

██ ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

[226] QCVARM_0463837 at '839.

██ █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Letter, [redacted] Prof. Posner makes similar claims.[229]

96. However, evidence shows that [redacted]

[redacted]

[redacted]

[redacted]

[228] SAC, ¶ 159 (discussing "a potential customer (the 'AI and Ecosystem Company') that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU. After the Breach Letter was published, the customer delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities. […] As a result of the uncertainty stemming from Arm's assertion and the leak of the Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity."). [redacted]

[229] Posner Report, ¶ 45 (claiming that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

97.

60

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

61



[redacted]

[redacted] Complex negotiations often occur over many months, and a protracted negotiation is not evidence of anticompetitive effects.[241] A brief delay is unlikely to be a material disruption to the business relationship.[242] In any case, even if a delay did occur because of the Breach Letter, that would not imply that Arm's conduct was anticompetitive. Firms are routinely harmed by the actions of their competitors or suppliers when, for example, competitors reduce prices or introduce an improved product or when suppliers delay negotiations or raise prices. Harm to a competitor does not automatically translate into harm to competition.[243]

100. [redacted]

---

[redacted]

240 In the ordinary course of business, delays in negotiations can occur for various reasons. [redacted]

241 [redacted]

242 [redacted]

243 *See*, for example, U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-

[redacted]

[redacted]

ii. *Second*, Qualcomm has provided no evidence that the October 2024 Breach Letter (which Arm withdrew on January 8, 2025)[246] is the only factor, or even a contributing factor, for

---

trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf, ("The Agencies are concerned with harm to competition, not to competitors."). This basic and important economic principle has been adopted by the Courts. For example, the DC Circuit has stated that an antitrust plaintiff "must demonstrate that the monopolist's conduct harmed competition, not just a competitor." *United States v. Microsoft Corp*., 253 F.3d 59 (2001).

[redacted]

245 [redacted]

246 *See* Simon Sharwood, "Arm gives up on killing off Qualcomm's vital chip license," The Register, February 6, 2025, https://www.theregister.com/2025/02/06/arm_qualcomm_nuvia/ ("Arm has given up on terminating one of its key licenses with Qualcomm, leaving the latter free to continue producing homegrown Arm-compatible chips for PCs, phones, and servers. […] During Qualcomm's Q1 2025 earnings conference call with Wall Street, CEO Cristiano Amon confirmed Arm 'has no current plan to terminate the Qualcomm Architecture License Agreement. We're excited to continue to develop performance leading, world-class products that benefit consumers worldwide that include our incredible Oryon custom CPUs.'"). *See also* Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 29, 2024, p. 13, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/1b687286-85e9-44e6-a579-d19d089eacfb.pdf ("On January 8, 2025, Arm notified us that it was withdrawing its October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm ALA, while serving its rights pending the outcome of the ongoing litigation."). Spencer Collins, a member of Arm's executive committee, indicated that Arm issued the letter because "we felt it was appropriate to send a notice to Qualcomm, making it clear that we respect – whilst we don't agree with the outcome from the court and the jury verdict, we respect it. And on that basis, we wanted to retract the breach notification and also make it clear that we have no intention to terminate the Qualcomm ALA." Deposition of Spencer Collins, June 30, 2025 (hereinafter "Collins (Arm) Deposition"), 111:22-112:7.

the change in terms. Negotiations are a sequence of give and take, and proposed terms are modified in subsequent counteroffers.[247]

iii. *Third*, the *Arm v. Qualcomm* litigation, which was filed on August 31, 2022, was public and widely discussed in the press.[248] Qualcomm also recognized that Arm's October 2024 Breach Letter was not "new news." In *Arm v. Qualcomm*, Qualcomm's counsel acknowledged during the November 20, 2024 pre-trial conference that Arm's allegation of breach of the Qualcomm ALA has been part of the case "starting at the very beginning" and that "the letter on October 22nd [was] actually not new news in the sense of alleging these breaches."[249] [redacted]

iv. *Fourth*, terms less favorable to Qualcomm could simply be due to [redacted]

247 [redacted]

248 *See*, for example, Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31/.

249 *See Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024, pp. 13, 14 ("And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed.").

[redacted]

[redacted]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

v. *Fifth*, even if it were true that Qualcomm was harmed, harm to Qualcomm is not the same as harm to competition. I discuss this in more detail in Section IX below.

101.

[254] Kennedy Report, ¶ 125.

65

102. [redacted] His calculations are unreliable for determining damages because they cannot isolate the effect of Arm's alleged conduct from other potential explanatory factors. He conjectures, without support, that changes in contractual terms between the first (unaccepted) proposed term sheet and the last term sheet are due to the Breach Letter alone, rather than the normal evolution of offers and counteroffers in the context of complex negotiations.[257] In reality, changes in contractual terms are a normal part of negotiations and an initial proposed term sheet is often not the final accepted term sheet.[258] For example, the negotiation between Arm and Nuvia had multiple turns of offers and counteroffers, and the fact that the final term sheet was not the same as the initial is not evidence of harm, as none existed or is alleged in the case of the Nuvia negotiation.[259]

103. In fact, even though Qualcomm [redacted] both parties understood from the outset that detailed negotiations would follow—and indeed, they continued well beyond the trial decision.[260] [redacted]

---

[redacted]

[256] Kennedy Report, ¶ 135.

[257] Kennedy Report, ¶ 132.

[258] *See*, for example, "The Value of Making Concessions In Negotiation," Red Bear, November 12, 2024, https://www.redbearnegotiation.com/blog/making-concessions-in-negotiation ("Effective negotiation requires a strategic balance of give and take if you want to achieve a successful outcome for two or more parties. In other words, you need to make a concession every once in a while. Effective concessions are built on strategic planning, and a well-executed concession strategy can significantly impact the outcome of a deal, bringing you closer to a mutually beneficial agreement."); Rajeev Dhir, "Negotiation: Stages and Strategies," Investopedia, June 04, 2024, https://www.investopedia.com/terms/n/negotiation.asp ("Negotiation is a strategic discussion intended to resolve an issue that both parties find acceptable. Negotiations involve give and take, where one or both parties will usually need to make some concessions.").

[redacted]

[260] [redacted]

[redacted]

3. <u>Qualcomm's Broader Customer Base Was Not Harmed</u>

104. Qualcomm claims that the *Bloomberg* article reporting Arm's October 2024 Breach Letter to Qualcomm,[264] hampered Qualcomm's ability to negotiate business opportunities [redacted] Prof. Posner also claims that Arm sent "'confusing' and 'misleading' messages to customers of Arm and Qualcomm that suggested that they faced legal jeopardy if they used Qualcomm products."[266]

105. Prof. Posner conflates transparency with anticompetitive intent. It is rational for users of a technology under litigation to collect more information that may help them assess and manage

---

[261] [redacted]

[262] The Bloomberg article discussing the Breach Letter was published on October 22, 2024 (Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud) and [redacted]

[redacted]

[264] Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

[redacted]

[266] Posner Report, ¶ 65.

risks to their businesses. Qualcomm argues it was harmed because Arm disclosed the risk of a potential supply disruption to users of chips embedding Arm's technology. However, this disclosure stemmed from Arm's legitimate effort to resolve a contractual dispute through litigation. If firms faced antitrust liability simply for trying to exercise their contractual rights or protect their IP rights—on the basis that doing so might disadvantage a counterparty—it would create perverse incentives for counterparties to breach and infringe, ultimately diminishing the value of contracts, harming firms' incentives to cooperate, innovate, and create economic value.[267,268]

106. [redacted] This implies that any harm to Qualcomm after November 6, 2024 was not *caused* by the publication of the Bloomberg article ([redacted]), but rather by the existence of the dispute. It is Qualcomm's conduct, as much as Arm's decision to initiate litigation,

---

[267] The legal system attempts to root out "sham" litigation but reaffirms the value of litigations based on genuine disagreements. *See* Lianos, Ioannis and Pierre Regibeau, "'Vexatious'/'Sham' Litigation: When Can It Arise and How Can It Be Reduced?," The Antitrust Bulletin, 2017, Vol. 62, No. 4, pp. 2-4 ("The regulatory and judicial system is often the theatre of intense business conflict, sometimes resulting from 'genuine' disputes between the parties over the interpretation of the law, or the application of the law to the specific fact pattern, each of the parties seeking to secure governmental action in its favour but sometimes also, or uniquely, motivated by the motive of directly harming competitors. […] [I]n practice, the use of the regulatory and/or litigation process stays presumptively outside the scope of competition law, through the operation of some form of antitrust immunity, in both the US and in Europe. […] However, […] the immunity does not cover the abuse of such regulatory and litigation processes, when these are used for foreign purposes than those they have been put in place to serve at the first place. […] The key piece of evidence in identifying sham litigation is the absence of genuine interest in receiving judicial relief.").

[268] For similar reasons, antitrust laws protect competition and the competitive process, but not individual rivals. Protecting rivals would create incentives to start litigations that ultimately reduce the incentive to compete and thus harm customers.

[269] Mr. Richards also opines that Qualcomm was obligated to make this disclosure regardless of the publication of the Breach Letter's contents in the Bloomberg Article. Moreover, I understand that Mr. Richards opines that Qualcomm's public disclosures do not convey the significant or material harm resulting from the Breach Letter that Qualcomm alleges it suffered in the Second Amended Complaint. *See* Expert Report of Mr. Steven Richards, CPA, September 5, 2025. *See also* Qualcomm 2024 Form 10-K, pp. 13, F-24 (Qualcomm disclosed the Breach Letter in its Annual Report issued on November 6, 2024.).

that led to the dispute, and for that reason it is improper for Prof. Posner to treat the litigation and successive communications as a form of anticompetitive conduct.

## VII. Prof. Posner's Claim that Arm Has the Ability and Incentive to Foreclose Qualcomm Is Based on an Incomplete Analysis that Ignores Key Facts and Is Untethered from Sound Economic Analysis

107. Prof. Posner claims to use a "standard framework for determining whether input foreclosure is anticompetitive," and purports to conduct an "ability/incentive framework" analysis.[270] In practice, Prof. Posner relies on a stylized model of vertical interaction that is designed to isolate specific effects from a vertical merger and does not fully capture marketplace realities.[271] For example, the model is static and does not account for dynamic effects such as Arm's loss of reputation from foreclosure and any increased incentive of Arm's customers to invest in or switch to an alternative ISA. As a matter of economics, these are real costs that Arm

[270] Posner Report, ¶ 53.

[271] Antitrust agencies typically use this framework as a starting point. However, agencies then conduct a fact intense investigation to verify what conclusions the evidence supports. In explaining "How to Use These Guidelines," the U.S. Department of Justice & The Federal Trade Commission 2023 Merger Guidelines explain, "When companies propose a merger that raises concerns under one or more Guidelines, the Agencies closely examine the evidence to determine if the facts are sufficient to infer that the effect of the merger may be to substantially lessen competition or to tend to create a monopoly (sometimes referred to as a "prima facie case")." U.S. Department of Justice and the Federal Trade Commission, *Merger Guidelines*, Issued: December 18, 2023, p. 2, https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf. The Guidelines further explain, "The Agencies follow the facts and the law in analyzing mergers as they do in other areas of law enforcement." (*Id.*, p. 4.) The 2020 vertical merger guidelines state that "[f]or mergers that warrant scrutiny, the Agencies will determine whether, based on an evaluation of the facts and circumstances of the relevant market, the merger may substantially lessen competition. […] To determine whether the merger may substantially lessen competition, the Agencies would analyze the specific facts and circumstances, including in particular the relative magnitude of these offsetting incentives." U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf, § 4. *See also* U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, p. 3, https://www.justice.gov/d9/383663.pdf ("Investigations Are Intensively Fact-Driven, Iterative Processes. Merger analysis depends heavily on the specific facts of each case. […] In testing a particular postulated risk of competitive harm arising from a merger, the Agencies take into account pertinent characteristics of the market's competitive process using data, documents, and other information obtained from the parties, their competitors, their customers, databases of various sorts, and academic literature or private industry studies. […] The Agencies also carefully consider prospects for efficiencies that the proposed transaction may generate and evaluate the effects of any efficiencies on the outcome of the competitive process.").

would bear if it foreclosed its customers and thus should be accounted for in an analysis of Arm's incentives to foreclose.

108. Prof. Posner and Qualcomm's SAC argue that Arm, "appears to have an incentive to foreclose Qualcomm,"[272] a customer that licenses OTS cores and an ISA from Arm, in order to reduce Qualcomm's ability to compete for the sales of chips.[273] According to their argument, this foreclosure would divert sales from Qualcomm's custom cores (which are all based on Nuvia technology), on which Arm makes a relatively small profit, to (i) Arm OTS cores and CSS customers, on which Arm makes a larger profit, and (ii) Arm's own chips, which are not yet on the market.[274] But Prof. Posner's claims about Arm's incentives to foreclose Qualcomm are incomplete, speculative, ignore real-world realities of the ecosystem, and are not tied to sound economic analysis.

109. According to Prof. Posner, this purported foreclosure can be either full foreclosure or partial foreclosure.[275] While Prof. Posner is vague about the exact foreclosure mechanism he envisions, I understand his theory to suggest that: (i) full foreclosure involves cutting off Qualcomm's access to both the ALA and the TLA;[276,277] or (ii) partial foreclosure involves cutting off Qualcomm's access to the ALA, but allowing Qualcomm's continued access to the TLA,

---

[272] Posner Report, ¶ 64 ("Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector.").

[273] Posner Report, ¶¶ 11, 13 ("First, Arm is obstructing or attempting to obstruct Qualcomm from designing and marketing products that use Qualcomm custom core designs, in order to inhibit Qualcomm from competing with Arm's OTS core designs. Second, Arm is actively attempting to sell its own SoC designs at the expense of its own licensees, including Qualcomm. To that end, Qualcomm contends, Arm seeks to design and manufacture its own chips and SoCs, and seeks to drive Qualcomm away from designing custom cores, or to drive Qualcomm out of selling chips and SoCs entirely."), ¶ 64 ("Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector."); SAC, ¶¶ 206-208.

[274] *See*, for example, Posner Report, ¶¶ 70-71.

[275] Posner Report, footnote 88.

[276] Posner Report, ¶ 71 ("If Arm is able to cut off technology supply for Qualcomm completely, then Arm loses its upstream margins on the Qualcomm license. However, Arm would gain downstream sales and the downstream margins that they produce, assuming that Arm is a viable competitor in the downstream market either through organic entry or through acquisitions.").

[277] As a matter of economics, refusing supply to a customer is equivalent to raising the price to a high enough level to make it unprofitable for the customer to buy a positive quantity.

potentially at an elevated price.[278] As such, both of Prof. Posner's alleged mechanisms of foreclosure suggest Arm completely removing Qualcomm's access to its current ALA.[279]

110. Prof. Posner assumes that foreclosure of Qualcomm has two countervailing effects on Arm's profit: (i) it has a negative effect (a "cost" for Arm) in the "short term" due to the reduction of Qualcomm's sales and associated loss of royalty revenue for Arm; and (ii) it has a positive effect (a "benefit" for Arm) in the "long term" because the sales lost by Qualcomm divert to Arm OTS cores and chips, with an associated increase in profit for Arm. He states that Arm has an incentive to foreclose Qualcomm because the "short term" costs from foreclosure are more than outweighed by the "long term" benefits.[280]

111. Prof. Posner's analysis is simplistic, incomplete, and inconsistent with standard economic analysis. It fails to account for a variety of "costs" Arm would suffer, both in the short and long term, if it foreclosed Qualcomm (or its other ALA customers).[281] Due to this failure, Prof. Posner's

---

[278] Posner Report, ¶ 13 ("[I]n the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 17 ("Arm is attempting to escape its ALA with Qualcomm so it can eliminate Qualcomm as a competing CPU developer. […] Because Arm earns a higher royalty under the TLA, Arm would profit in the long term by forcing Qualcomm to stop designing custom cores and putting its resources into using OTS cores, even if it means Arm loses royalties on ALA cores in the short term.").

[279] Prof. Posner may also have in mind a foreclosure mechanism whereby Arm maintains Qualcomm's ALA but either raises the royalty rate on the ALA or degrades the ALA service. *See* Posner Report, Figure 3 (It is not clear whether Prof. Posner's vague reference to "raising prices" refers to the price of Arm's ALA and/or TLA.) and ¶ 31 (Prof. Posner asserts that Arm's strategy includes "degrading [Qualcomm's] service under the ALA[.]").

[280] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the short term, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the long term than the margins on existing ALA licenses— and Arm is unhappy with the level of royalties that Qualcomm is required to pay under the ALA. Moreover, although Qualcomm has historically been one of Arm's most important customers, it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 87 ("As customers flee Qualcomm to Arm, Arm will lose money in foregone royalties in the short term. But, Arm hopes to obtain larger margins in the long term as it takes over Qualcomm's business or Qualcomm is pushed to increasingly make use of Arm's OTS cores.").

[281] Even in the context of the stylized model underlying Prof. Posner's analysis, the academic literature has highlighted "the interaction among often offsetting effects that complicate predicting that a vertical merger will result in consumer harm or even an increase in the price of the input to the competing downstream firm." (De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1). On the one hand, a vertical merger can create incentives for the merged firm to raise its wholesale price to downstream competitors that buy inputs from it to impair their competitiveness

analysis is unreliable and prone to overstating Arm's purported benefits from foreclosing Qualcomm (and other ALA customers).

### A. Relevant Economic Framework

112. I now outline the economic framework that informs my assessment of Arm's licensing strategy and incentives. I explain how Arm's conduct—particularly its approach to ALAs and TLAs—reflects standard commercial behavior shaped by partner-specific circumstances, competitive dynamics, and the need to balance incentives to innovate with incentives to develop the ecosystem. This framework provides necessary context for evaluating Qualcomm's claims and Prof. Posner's foreclosure theory.

#### 1. Arm's Licensing Strategy Is Tailored to Partner-Specific Circumstances

113. Arm licenses OTS cores, CSS, and its ISA to customers. In particular, Arm licenses its ISA on a standalone basis through ALAs as well as embedded into OTS cores and CSS through TLAs or other agreements.[282] More recently, Arm has decided to develop its own chip for data center

---

(raising rivals' costs). On the other hand, a vertical merger eliminates double marginalization between the upstream and downstream merging firms which can reduce downstream prices. It is therefore not surprising that a recent review of the empirical literature on the impact of vertical integration concludes: "overall, we find that the existing literature on vertical integration contains mixed results, with evidence of harm to competition as well as evidence of procompetitive effects." Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59. Note that the simple models studied in academic settings typically abstract from the various costs of foreclosure listed subsequently in Section VII. The potential overall procompetitive benefit of vertical mergers is reflected in some recent Court decisions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc*., U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, January 31, 2025, Case 4:24-cv-02508, Dkt. Entry 511 ("The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns. […] [T]he inquiry must proceed with recognition that 'academics, courts, and antitrust enforcement authorities alike' have repeatedly recognized that vertical mergers may serve to benefit competition and consumers.").

[282] *See* Section III.C. Most customers have difficulties in building their own cores and therefore, Arm supports them by building cores itself rather than providing just the ALA. *See* Haas (Arm) Deposition, 185:7-22 ("[I]t's a market [the automotive market] that's been in transition where OEMs are developing chips, not chip companies. And OEMs need a lot of help in terms of developing SOCs because they're not very experienced. So I believe that going to subsystems, which is the amalgamation of all the IP blocks, would be more advantageous to us because it would get us and the customers to market faster. So "licensing IP and only sell systems" is referring to individual components versus what we call our compute subsystems, which are the combinations of all the IP blocks.").

applications and has reached a supply agreement with Meta.[283] In addition, Arm is conducting chip design R&D for auto applications, explaining that "we've engaged and considered building for a lead partner in the automotive division, silicon for the ADAS market for a potential lead customer called Waymo."[284] In contrast, Arm is not engaging in chip design R&D for other applications, such as PCs or mobile.[285]

114. As an ISA provider, Arm competes with other ISAs, in particular x86 and RISC-V, and their respective ecosystems. Due to its advantages in terms of power efficiency, the Arm ISA currently accounts for a large share of the mobile sector.[286] This success is no happenstance but the result of Arm's R&D investment in the development of a high-quality product that customers demand. Arm continues to invest about 40% of its revenue in R&D.[287] In other applications, Arm's ISA share is smaller.[288]

115. Arm carefully negotiates the terms of its ALAs (and TLAs) to maintain its success and grow the value of its ecosystem and its profits in the marketplace.[289] Contrary to Qualcomm's claim, there is no evidence that Arm opposes negotiating ALA licenses, given that it has several ALAs, including some signed after the Nuvia agreement.[290] Any such agreement needs to be

---

[283] Gyana Swain, "Arm secures Meta as first customer in chip push, challenging industry giants," ComputerWorld, February 14, 2025, https://www.computerworld.com/article/3825123/arm-secures-meta-as-first-customer-in-chip-push-challenging-industry-giants.html.

[284] Williamson (Arm) Deposition, 125:18-22.

[285] Abbey (Arm) June 2025 Deposition, 128:21-129:10, Williamson (Arm) Deposition, 126:2-4, 175:14-25 (There are "[n]o active chips or silicon support development in the PC market." Arm discussions with OEM mobile vendors have not extended to providing them a completed chip, "Our focus has been what we call compute subsystems.").

[286] "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, p. 11, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553.

[287] Arm 2023 Form F-1, p. 99.

[288] *See* "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, p. 11, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274.

[289] *See*, for example, ARM_00095947 at '955 (Arm's CEO discussing a possible offer to Google that "has many unprecedented components to it, but at the same time I also acknowledge that Google and our relationship is an unprecedented model.").

[290] Ehab Youssef identified IBM and Apple as partners that signed an ALA since 2019. *See* Deposition of Ehab Youssef, June 26, 2025 (hereinafter "Youssef (Arm) Deposition"), 31:18-22; Google signed an ALA in June 2021 (ARM_01428339); Deposition of Martin Weidmann, June 20, 2025 (hereinafter "Weidmann (Arm) Deposition"), 35:9-36:14 (identifying eight ALA customers: Qualcomm, Apple, HiSilicon, IBM, Fujitsu, Ampere, T-HEAD and

mutually beneficial to both Arm and its licensee. The presence of mutual gain is a basic economic principle that applies to any negotiation that Arm and Qualcomm might have, including with other firms or for different products.

116. Importantly, when buyers or licensees have differing goals, needs, and strategic priorities, a standardized agreement may not be effective. To ensure that both parties in a negotiation benefit, Arm tailors the terms of agreement to each individual customer, reflecting that customer's specific circumstances and requirements.[291] If there is a potential agreement that would benefit both seller and buyer—i.e., there are mutually beneficial gains from trade—the involved parties try to discover it through the negotiating process.[292] How the gains from trade are divided between the buyer and the seller depends on various factors, such as the negotiating parties' bargaining strength (or skills), the alternatives available to them in case the parties are unable to reach an agreement, and the parties' degree of impatience.[293] Not all buyers will receive the same deal, instead the terms of their deals will vary depending on factors such as application, potential for innovation, and expected revenue.[294]

---

BRJX). [redacted]

[291] Weidmann (Arm) Deposition, 199:5-8 ("But each contract is tailored to the desires of a particular partner. Different partners work in different markets.").

[292] Unrealized gains from trade may occur in certain situations (for example, when only simple linear prices can be used, instead of more complex pricing schemes; or when the parties have largely different expectations). *See* for example, Muthoo, Abhinay, "A Non-Technical Introduction to Bargaining Theory," World Economics, April-June 2020, Vol. 1, No. 2. ("The main issue that confronts the players in a bargaining situation is the need to reach agreement over exactly how to co-operate. Each player would like to reach some agreement rather than to disagree and not reach any agreement, but each player would also like to reach an agreement that is as favorable to her as possible. It is thus possible that the players will strike an agreement only after some costly delay, or indeed fail to reach any agreement—as is witnessed by the history of disagreements and costly delayed agreements in many real-life situations (as exemplified by the occurrences of trade wars, military wars, strikes and divorce).").

[redacted]

[294] [redacted]

117. Arm agrees to deals that allow it to protect and expand its IP, ecosystem, and revenue potential, and to foster its ability to continue investing in R&D to effectively compete with alternatives currently available in the marketplace or that can become available in the future.[295]

118. Consistent with this framework, Arm has not historically provided an ALA to every incumbent or entrant chip producer that requests one.[296] When evaluating any potential agreement, Arm needs to trade-off different effects of licensing its ISA. For example, a new ALA may reduce Arm's revenue from the sale of OTS cores or its own chips (when they eventually become available). This effect needs to be weighed against the risk of not reaching an agreement, which

---

[295] ARMQC_02739661 (an Arm "working draft strategic narrative to support the FY22-FY25 financial plan" identifying Arm's "North Star" as "[t]he demand for high-performance, highly efficient compute is increasing exponentially. That means there is an opportunity to build new solutions, grow our business, and for the future of computing to be built on Arm - because Arm is the best way to build these new solutions. We don't and won't accomplish this alone. We work together within Arm and with our broader ecosystem to share knowledge, solve complex problems, and win together."). *See also* Abbey (Arm) June 2025 Deposition, 145:19-23 ("[W]e continue to look to enhance our business model […] so that the ecosystem can have broader access to ARM technology.").

[296] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025. Mr. Williamson explained that the development of a chip has a high risk of failure and is very expensive (needing large teams of engineers working on the development for multiple years), and that supporting an ALA customer's effort requires significant Arm commitment in terms of resources. In a 2021 presentation, Richard Grisenthwaite, Chief Architect at Arm, stated that Arm "strongly prefers" TLA over ALA. *See* ARMQC_02727610 at '619. He explained that the statement reflected the fact that firms may overstate their ability to develop a chip starting from Arm's architecture, not Arm's alleged anticompetitive intent: "ARM as a whole prefers people to take implementation licenses simply because we have seen too many people take an architecture license out of a belief they can do better, fail to do better, waste a great deal of money, and that money could have been spent better furthering the ARM ecosystem […] [and] investing in increasing the software ecosystem or producing products where the companies are specializing in their own areas of expertise and just taking an ARM […] TLA core as the basis and bringing their own skills and experience in some other area of the system." *See also* Grisenthwaite (Arm) Deposition, 27:4-23. *See also* Abbey (Arm) June 2025 Deposition, 46:14-18 (explaining "There's never a can you give it to me, I just give it to you. There's always a good-faith discussion and negotiation around rights and what partners are trying to achieve with the architecture."); 46:25-47:4 ("In the -- in the seven, eight years that I led the team, negotiations -- I'm sorry -- good-faith negotiations always precede any proposal that's given. Common sense, alignment around outcomes, terms, markets."). As an example of the complexity to develop a custom core, before acquiring Nuvia, Qualcomm worked on a custom core for servers which was abandoned because it was "a money sync [sic] basically" and "too expensive, and we looked at it as -- you know, our yearly cost was very high, and we didn't see it turning into significant business for many years. So we decided we could not afford the spend."

would entail the loss of ALA royalty revenue as well as the loss of the benefits in terms of a customer's complementary investments and the associated increase in the value of the Arm's ecosystem compared to alternative ecosystems.

119. The economic framework outlined above explains the benefits of Arm's two-tier licensing structure (ALA and TLA), which provides room for ALA licensees with the requisite design capabilities to differentiate their products by making investments that benefit both Arm and the licensee, while preserving widespread access to Arm's ISA via TLAs where Arm itself invests in core designs that benefit licensees.

### 2. The Nuvia Agreement Illustrates Arm's Legitimate Interest in Managing Risk and Securing Value

120. A good example of the economic incentives to reach an agreement that is mutually beneficial is Arm's negotiation with Nuvia. As discussed above, at the time of its ALA with Arm, Nuvia was a start-up company that had significant potential but limited financial means. [redacted] I note that this characterization fits the economic framework outlined above. There were mutual gains from trade that could be realized by structuring the deal in a specific way that would benefit both Arm and

---

[redacted]

Nuvia. Furthermore, Nuvia was planning to develop a chip for data center applications.[298] This made the deal particularly appealing to Arm, given that Arm's ISA had not historically gained traction in data centers.[299]

121. Arm entered the negotiation understanding that Nuvia could be acquired,[300] and that a new owner might leverage Nuvia's technology in ways that would reduce the benefit to Arm. To protect its IP and revenue stream from potential negative effects in case Nuvia were acquired, [redacted] This

298 "Silicon Design Reimagined," Nuvia, Inc., January 15, 2021, https://web.archive.org/web/20210115193713/https://nuviainc.com/ ("Our Mission [-] Is to reimagine silicon in a new way, and create computing platforms that redefine performance for the modern data center.").

299 Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025. In a December 2020 report, research firm Gartner stated that Arm-based vendors in the data center space "have [not] achieved significant success, and many have had to reevaluate their developments or fallen by the wayside. […] challenges still remain as [Arm-based] vendors have to compete with the incumbent x86 architecture, which has significant investments in both CPU development and software ecosystems." *See* ARM_00045266 at '267-268. *See also* Awad (Arm) Deposition, 48:12-23 (Reporting that in late 2018 "Arm's market share was approximately zero.") and 50:9-51:12.

[redacted]

[redacted]

provision is logical and easily explained by the economic framework outlined above: changing economic conditions require different contractual terms, and an agreement that creates mutual gain for Arm when negotiating with one potential licensee may not work when negotiating with another potential licensee.

[redacted]

122. [redacted] Arm's willingness to enter into an ALA with a start-up enabled more competition in the data center market. But this approach is only feasible if parties can later seek to enforce their understanding of the counterparties' contractual commitments, as I discuss below.

123. [redacted] Nevertheless, the economic framework outlined above suggests that the terms of the 2013 ALA with Qualcomm allowed both parties to benefit, based on the actual and expected competitive landscape at the time.

---

[redacted]

[302] [redacted]

[redacted]

3. Qualcomm and Prof. Posner Have Not Demonstrated that Arm's Dispute with Qualcomm Is Anticompetitive Conduct Rather than a Standard Commercial Disagreement

124. I do not opine whether there was a breach of contract by either Arm or Qualcomm. I have been asked by Counsel for Arm to assume that the disagreement with Qualcomm reflects Arm's genuine views of Qualcomm's and Nuvia's contractual obligations rather than an intent to harm Qualcomm.[304] I do note, as I further discuss below, that contractual disputes are common and the legal system provides the appropriate venue to resolve disputes. The reduction in uncertainty resulting from a legal resolution of disputes promotes investments and competition.[305] Legal disputes do have disruptive effects on both parties involved and their partners, but this is the cost of moving past the dispute and unlocking the gains that the dispute is holding back.[306]

[304] *See* ARM_00081753 (August 31, 2022 email from Rene Haas to Arm's employees. Mr. Haas states: "[Arm has] filed a lawsuit against Qualcomm and its subsidiary Nuvia for breach of contract with Arm and trademark infringement. Protecting intellectual property is something that is extremely important to Arm's fundamental business, and crucial for us to succeed. Our world-class semiconductor IP is the result of years of research by our people and should be recognized and respected — it is incumbent upon us to protect our rights and the rights of our ecosystem. When Qualcomm acquired Nuvia, neither Qualcomm nor Nuvia obtained our consent for the resulting assignment of Nuvia's Arm licenses to Qualcomm and the rights thereunder. This is a standard term in our licenses that protects Arm, our partners, and our ecosystem. We tried to work the issue out with Qualcomm, but those discussions failed. In March, we terminated the Nuvia license. As a result, Nuvia and Qualcomm were obligated to stop using and destroy the technology created under that license. Since Qualcomm continues to use the license, we have filed a lawsuit to enforce the contractual obligation and to prevent the use of Arm's trademarks with unlicensed products. It is unprecedented for us to take this type of action, and it's unfortunate that it has come to this point. But I feel very strongly that we can't look the other way, and need to protect our IP, our investment, our partners, our ecosystem, and our company. This is the right thing for us to do."

[305] Uncertainty is a factor holding back firms' investments. *See* Bloom, Nick, Stephen Bond, and John Van Reenen, "Uncertainty and Investment Dynamics," The Review of Economic Studies, 2007, Vol. 74, No. 2, pp. 391-415. *See also* Aberra, Adam and Matthieu Chemin, "Does legal representation increase investment? Evidence from a field experiment in Kenya," 2021, Journal of Development Economics, Vol. 150, providing evidence of the positive effects of access to the legal system on economic activity.

[306] *See*, for example, Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007, https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451 ("Economists have long recognized that certainty of contract is essential to a healthy economy. […] Those contracts can only accomplish that goal, however, if parties know the contracts will be enforced. […] The 'fundamental function of contract law' is to 'encourage the optimal timing of economic activity' by 'deter[ring] people from behaving opportunistically toward their contracting parties.' Richard A. Posner, *Economic Analysis of Law* 91 (4th ed. 1992). […] That function cannot be accomplished without effective means for enforcement. As this Court has stated: "Market efficiency requires effective means to enforce private agreements." *Am. Airlines, Inc.* v. *Wolens*, 513 U.S. 219, 230 (1995).").

125. Within the economic framework discussed above, the dispute between Qualcomm and Arm can be interpreted as a dispute about the terms by which Nuvia could create a new design for a CPU and the terms under which Qualcomm could incorporate into its custom cores the designs that Nuvia developed under Nuvia's 2019 ALA with Arm. Qualcomm argues that it can use designs created by Nuvia using the Nuvia ALA without having to pay the royalty rates that Nuvia negotiated with Arm, and insists that it can pay the lower royalty rate in the Qualcomm-Arm ALA instead.[307] Arm contends that Arm needs to be appropriately compensated to allow the transfer of the designs created by Nuvia using the Nuvia ALA to Qualcomm.[308] There are likely gains from trade, but the parties disagree on the terms of a mutually beneficial agreement.[309] In fact, the parties did attempt to reach an agreement, but failed to do so.[310,311] Arm's and Qualcomm's unsuccessful attempt to resolve their dispute lasted for about a year.[312] After becoming aware that Qualcomm

[307] SAC, ¶ 7.

[308] [redacted]

[309] Abbey (Arm) October 2023 Deposition, 275:16-278:13.

[310] *See* ARM_00081461 (August 25, 2021, email from Rene Haas references the back and forth that Arm and Qualcomm had, stating to internal Arm leadership that "there has been so much back and forth [with Qualcomm] repositioning their asks.").

[311] Priest, George L. & Benjamin Klein, "The Selection of Disputes for Litigation," Journal of Legal Studies, 1984, Vol. 13, pp. 1-55, build a model predicting that disputes that settle out of court generally reflect similar expectations between the disputing parties, whereas those that proceed to trial often involve greater uncertainty and divergent expectations about the likely outcome of litigation. Other papers have highlighted parties' excessive optimism as a possible explanation for why a negotiation may fail to reach an agreement even though a compromise could be mutually beneficial. *See*, for example, Babcock, Linda, George Loewenstein, S. Issacharoff, and Colin Camerer, "Biased Judgements of Fairness in Bargaining," American Economic Review, 1995, Vol. 85, No. 5., pp. 1337-1343.

[redacted]

had started to use Nuvia technology in its custom cores, Arm filed the *Arm v. Qualcomm* litigation in August 2022.[313]

126. [redacted][314,315] Setting aside the contractual dispute, and within the framework outlined above, the question is whether there are potential gains from trade and, if so, what terms of the agreement would benefit both parties.[316] Qualcomm has historically been an ALA customer, and there is presumably some gain from trade, and thus a license fee and royalty rate at which Arm would be willing to grant Qualcomm the license it seeks. But in the context of this bilateral negotiation, there is nothing anticompetitive about Arm seeking

[redacted]

[313] Posner Report, ¶ 136.

[314] [redacted]

[315] SAC, ¶¶ 131-133.

[316] The legal dispute is an issue on which I do not offer an opinion.

a higher price for a license to its newly created IP at a time that is years after the 2013 ALA with Qualcomm.[317]

4. Protecting Competition Does Not Require Arm to License Its ISA on Qualcomm's Preferred Terms

127. Protecting competition—rather than specific competitors—does not require imposing on Arm a duty to grant Qualcomm an ALA license at terms that Qualcomm prefers. Even if Arm decided that it is not in its interest to license at terms that Qualcomm, subjectively, considers "reasonable,"[318] that would not be in itself anticompetitive. As a matter of economics, a duty to deal creates inefficiencies that Qualcomm and Prof. Posner ignore. For example, a duty to license may undermine incentives for R&D by reducing the value of an innovation to the inventor. As two leading scholars in industrial organization explained,

> *An obligation to deal does not necessarily increase economic welfare even in the short run. In the long run, obligations to deal can have profound adverse incentives for investment and for the creation of intellectual property. Although there is no obvious economic reason why intellectual property should be immune from an obligation to deal, the crucial role of incentives for the creation of intellectual property is reason enough to justify skepticism toward policies that call for compulsory licensing. Equal access (compulsory licensing in the case of intellectual property) is an efficient remedy only if*

[317] 

[318] SAC, ¶ 20 ("Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses to its off-the-shelf cores at commercially reasonable prices to Qualcomm."); Posner Report, ¶ 13.

> *the benefits of equal access outweigh the regulatory costs and the long run disincentives for investment and innovation. This is a high threshold, particularly in the case of intellectual property.*[319]

128. Indeed, undermining an innovator's ability to appropriate the returns to its R&D undermines the innovator's incentive to innovate in the first place.[320] Protecting IP is, therefore, crucial in incentivizing the creation and diffusion of many types of innovations.[321,322]

129. Furthermore, there is no evidence that Arm is refusing to deal with Qualcomm. In fact, as recently as August 29, 2025, Arm responded to Qualcomm's August 8, 2025, letter with a set of "initial questions" regarding the terms outlined in Qualcomm's "proposed Annex 1 to the ALA for Arm's unreleased v10," and reaffirmed its intention to "move the negotiations forward."[323] But Qualcomm appears to seek a v10 license on the same royalty rate as v8 and v9, which were set twelve years ago in 2013.[324] It is not anticompetitive for Arm to negotiate a higher royalty rate for

---

[319] Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," Proceedings of the National Academy of Sciences U.S.A., 1996, Vol. 3, pp. 12749–12755. (The authors conclude that "the welfare consequences of a refusal to deal are ambiguous and that the requirement of mandatory access may lower economic welfare in the short run as well as in the long run." They also state: "A refusal to deal by a vertically integrated firm appears on its face to adversely affect competition by denying rivals a product or service that is a necessary input for effective competition. This is hardly a complete analysis, however, because it does not account for the incentives to create the essential input or the price at which that input can optimally be sold. Clearly, the mere fact that a firm controls an input that is valuable to its competitors cannot be sufficient to compel a duty to deal, as a firm can have many innocent reasons for refusing to supply a rival.").

[320] Spulber, Daniel F., "How Do Competitive Pressures Affect Incentives to Innovate When There is a Market for Inventions?" Journal of Political Economy, 2013, Vol. 121, No. 6, pp. 1007-1054 ("When IP is not fully appropriable, markets for inventions are limited and competitive pressures can decrease incentives to innovate.").

[321] *Ibid*. ("Appropriability of IP stimulates innovation by supporting the formation of a market for inventions. The market for inventions is a critical source of incentives for innovation in the economy.").

[322] A draft letter by Arm explains, "technological achievements have required years of research and significant costs, they must be recognized and respected." *See* ARM_01230978 at '978. Without being compensated for the fruits of R&D efforts, Arm would be disincentivized from pursuing R&D.

[323] ARMQC_02785287 at '287 – '290 (August 29, 2025, letter from Spencer Collins (Arm) to Ann Chaplin (Qualcomm)). On June 13, 2025, Arm reiterated to Qualcomm that "Arm remains prepared to negotiate in good faith over the terms of a license to the v10 architecture." *See* ARMQC_02771127. In the that same letter, Arm further told Qualcomm that its "offer to meet remains open and Arm continues to believe that such a meeting would be the most efficient path forward in response to Qualcomm's request [for a v10 license]. Please have the relevant business personnel respond to Mr. Abbey with dates that Qualcomm is available for such a meeting."

[324] [redacted]

its innovations; no more anticompetitive than for Qualcomm to negotiate a higher price for its new chips.[325] On the contrary, imposing on a firm a duty to license a new and improved version of a technology at the same royalty rate as the previous version poses a clear risk of severely dampening incentives to innovate.[326] This risk is enhanced when the initial royalty rate, and thus profit margin for the innovator, is low, as it appears to be the case with the royalty rates in Qualcomm's 2013 ALA.[327]

130. In other contexts, Qualcomm seems strongly opposed to imposing any duty to deal on IP owners. For example, in its Reply Brief to the U.S. Court of Appeals, Qualcomm forcefully argued that "[u]nder settled precedent, the default rule is that even a monopolist has the right to determine with whom it will do business, and on what terms."[328] Similarly, in its Amici Brief to the Supreme Court in the *eBay* case, Qualcomm stated that "[f]inal injunctions are an established part of the relief in successful patent infringement suits because the essence of the patent is the right to exclude others from practicing the patented invention […]."[329]

---

compensation for v10 on terms no other party had actually secured and would continue to pay below-market compensation for the next twenty-three years." *See* ARMQC_02785287 at '288 (August 29, 2025 letter from to Spencer Collins (Arm) Ann Chaplin (Qualcomm)).

[325] Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html ("Qualcomm's Snapdragon 8 Elite offers a notable improvement in performance and efficiency over previous Snapdragon chips, promising next-gen Android phones with even more impressive features and longer battery life. However, this comes at a cost, with reports suggesting manufacturers are paying Qualcomm as much as $190 for the chip — 20% more than the previous models.").

[326] Ann Chaplin, Qualcomm's General Counsel and Corporate Secretary, testified that Qualcomm believed that a "royalty rate that's the same as our v9 license would be a fair rate for v10."

[327] See Section VIII.C.

[328] *Federal Trade Commission v. Qualcomm Incorporated*, "Reply brief for appellant Qualcomm Incorporated (Redacted)," December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit, p. 8.

[329] *eBay Inc. and Half.com v. MercExchange, L.L.C*, "Brief of Amici Curiae Qualcomm Inc. & Tessera, Inc. in Support of Respondent," 547 U.S. 388 (2006) (No. 05-130), p. 4. The Brief also states (p. 2) "[t]he viability of high technology industries depends in significant part on the maintenance of strong patent laws. The *amici* believe the well-established presumption in favor of permanent injunctive relief to implement a final judgment of infringement is essential to the ability of patent holders to enforce their patents."

B. **Prof. Posner's Opinions on Ability to Foreclose Are Flawed**

131. Prof. Posner says he investigates Arm's conduct within an "ability/incentive framework," which "is a standard method for evaluating the competitive effects of vertical mergers."[330] He opines that "Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector."[331] I address Prof. Posner's conclusion about ability in this Section and address his conclusion about incentives in Section VII.C.

132. Prof. Posner concludes that "Arm has the ability to foreclose Qualcomm from the Arm-compliant data center-specific SoC sector as well as other sectors" and that Arm has such ability because "Arm's control over its ecosystem allows it to discriminate against firms that participate in the ecosystem despite Arm's earlier promises to keep the system open."[332] Prof. Posner's analysis omits crucial factors and his blanket statements are oversimplifications that bely a more complex reality.

133. *First*, unless Qualcomm breaches the terms of its ALA in a way supporting termination, Arm does not have the ability to foreclose Qualcomm's access at all until [redacted]

134. *Second*, with approximately eight years to go until the expiration of its ALA and TLA, Qualcomm has ample time to further invest in RISC-V as an alternative to Arm's ISA and cores.

---

330 Posner Report, ¶ 29.

331 Posner Report, ¶ 64.

332 Posner Report, ¶ 65. Prof. Posner further claims that there exists evidence of Arm's ability to foreclose Qualcomm's access to Arm's ISA and that "Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm," such as Arm's "[f]ailure" to provide Qualcomm "with certain deliverables in violation of the ALA," Arm's "[f]ailure" to provide Qualcomm with good-faith licensing proposals under the TLA," Arm's "[r]efusal to negotiate an extension of the ALA to cover future versions of Arm's ISA," Arm's "[m]isinformation campaign […] designed to undermine customers' confidence in Qualcomm," and Arm's "[r]eduction in general support."

333 [redacted].

334 [redacted]

Qualcomm can innovate to expand RISC-V's use cases and improve its performance.[335] This fact has indeed been recognized by Qualcomm. [redacted]

135. *Third*, Prof. Posner ignores differences in competitive conditions across applications. Whereas currently RISC-V is not ready to replace Arm in high-performance chips for smartphones, Qualcomm already uses RISC-V in microcontrollers for low-end applications.[338] In fact, Qualcomm touts that there "are in excess of a billion devices that have [Qualcomm] RISC-V integrated microcontrollers in them."[339] [redacted] which is categorized as a "High-

[335] *See* Section VIII.D.3 for a discussion of RISC-V and Qualcomm's efforts to develop it.

[336] [redacted]

[337] [redacted]

[338] *See* Section VIII.D.3. *See also* "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential; "Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC-VInternational (Manju Varma (Qualcomm) stating: "To date, we have shipped over 650 million RISC-V cores in the market and this number just keeps growing. […] We have shipped RISC-V cores in PC, mobile, automotive, XR, and wearable segments.").

[339] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational, at 4:50.

[340] [redacted]

Performance CPU" on Arm's product listing.[341] Therefore, Prof. Posner's blanket statement that Arm can foreclose "Qualcomm and other firms from all sectors" is incorrect.[342]

136. Overall, a more nuanced conclusion on whether Arm can foreclose Qualcomm's access to its ISA and cores is that Arm's ability varies by use case—for some use cases, Qualcomm already uses RISC-V—and in any event such ability to foreclose would be far in the future [redacted] providing Qualcomm and others ample time to further develop a free open-source competitor to Arm.

137. Prof. Posner also suggests that Arm could foreclose Qualcomm for some applications, but not for others, allowing Arm to continue benefiting from the partnership with Qualcomm in segments where "Qualcomm has special relationships with some of its customers, a good reputation in a sector, niche abilities, and other advantages."[343] But Prof. Posner does not address the fact that Qualcomm's ALA with Arm [redacted]

341 "CPU Cortex-A78," Arm, https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78 ("Fourth-Generation, High-Performance CPU Based on DynamIQ Technology. Designed for high-end performance at best efficiency, Cortex-A78 enables superior immersive experiences, bridging the gap between mobile and laptop performance. Optimized for new form factors and foldables, Cortex-A78 is ready for the next wave of mobile innovation and continues Arm's industry-leading mobile performance and efficiency with 5G device architecture.").

342 Posner Report, ¶ 64.

343 Posner Report, ¶ 72 ("But even if Arm does not succeed in foreclosing Qualcomm entirely, Arm would still benefit from partially foreclosing Qualcomm in certain sectors. For example, if Qualcomm has special relationships with some of its customers, a good reputation in a sector, niche abilities, and other advantages, Arm might continue to benefit from Qualcomm as a chip supplier of Arm-compliant chips for certain sectors for the time being while displacing Qualcomm in other sectors. In that way, Arm continues to benefit from royalties in some sectors while taking over other sectors by degrading Qualcomm's ability to compete in those sectors.").

344 [redacted]

345 For example, Arm introduced v9 in 2021. *See* Aditya Bedi, "The Foundation of Total Compute: First Armv9 Cortex CPUs," Arm Community, May 25, 2021, https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/first-armv9-cpu-cores [redacted]

**C. Prof. Posner Does Not Account for Costs that Arm Would Suffer from the Alleged Foreclosure of Qualcomm and Other Customers**

138. A key issue is whether Arm's allegedly anticompetitive conduct was adopted to foreclose Qualcomm to benefit Arm's TLA business and Arm's own chips. Prof. Posner claims that "Arm has an incentive to engage in input foreclosure in sectors where the potential long-term gains from taking business from licensees exceed the short-term loss of royalties on the products that the licensees no longer sell."[346] He also states that "[i]t is possible that Arm would maximize profits by completely destroying Qualcomm's business opportunities in certain sectors even though it would suffer a short-term loss of royalties. […] But even if Arm does not succeed in foreclosing Qualcomm entirely, Arm would still benefit from partially foreclosing Qualcomm in certain sectors."[347] Remarkably, no evidence is provided to support these sweeping statements, other than the observation that Arm's margin from an ALA license is lower than the margin from a TLA license and from the sales of Arm's own chips.[348]

139. In this Section, I show that foreclosure of Qualcomm would have significant costs for Arm that Prof. Posner's analysis does not account for, thus rendering his analysis unreliable. In light of these significant costs, the various events that Qualcomm alleges as anticompetitive have a benign, procompetitive interpretation: in the presence of uncertainty about contractual terms, Arm was simply attempting to preserve the value of its contractual agreements. Although I do not offer an opinion on breach of contract, I do note that disagreements among firms about the right interpretation of the terms of an agreement between them are very common, especially in dynamic

---

[346] Posner Report, ¶ 67.

[347] Posner Report, ¶ 72.

[348] Posner Report, ¶ 74. The highly theoretical and wholly unsubstantiated nature of Prof. Posner's report is illustrated by his claim that "input foreclosure would likely give Arm substantial downstream power, enabling it to raise prices both unilaterally and potentially through coordination or collusion with any remaining downstream competitors." *See id.*, ¶ 75. Not a single piece of evidence, not even the "conversations" with Qualcomm employees that are the only support for some of his other claims, is provided for the claim that Arm's conduct would lead to "coordination or collusion." Such a claim is not even in the SAC or any of Qualcomm's interrogatory responses.

high-tech industries.[349] Qualcomm itself aggressively protects its IP through lawsuits and requests for injunctive relief.[350]

1. The Role of Qualcomm and Other Partners in Expanding Arm's Success and Ecosystem Against Alternative ISAs

140. Prof. Posner states that "Qualcomm uses its own custom cores in its premium tier SoCs because Arm does not sell an alternative that provides comparable functionality" and that "OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers."[351] Prof. Posner further states that "Arm benefited from the expansion of the Arm ISA network that occurred as Qualcomm penetrated various chip sectors."[352] However, he fails to recognize the implication for Arm's incentive to foreclose.

141. Qualcomm's development of custom CPU cores has allowed Arm to access new applications that were traditionally dominated by x86. For example, in the context of the *Arm v. Qualcomm* litigation, Qualcomm's expert Dr. Kennedy stated, "Qualcomm's development of

[349] *See*, for example, "2023 Patent Litigation Report," Bloomberg Law, https://pro.bloomberglaw.com/insights/intellectual-property/2023-patent-litigation-report/ (reporting that "more than 400 patent claims [were] filed in federal district courts and alternative venues in 2022."). *See also* "Patent Dispute Report: 2024 Mid-Year Report," Unified Patents, July 22, 2024, https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report; and Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581 ("[S]ignificant interpretive questions often arise in contract litigation."); Benjamin E. Hermalin et al., "Contract Law," in Handbook of Law & Economics, 2007, Vol. 3, No. 68 (ed. A. Mitchell Polinsky & Steven Shavell) ("Probably the most common source of contractual disputes is differences in interpretation […]").

[350] For example, in 2005 Qualcomm sued Nokia for patent infringement seeking an injunction and monetary damages. *See* "Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm Press Release, November 6, 2005, https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia. In 2017, Qualcomm brought a patent infringement lawsuit against Apple asking for damages and a permanent injunction enjoining Apple from infringing the patents at issue. *See* Complaint, *Qualcomm Inc. v. Apple Inc.*, No. 3:17-cv-01375-JAH-AGS (S.D. Cal. July 6, 2017), https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/2017-07-06_complaint.pdf). More recently, Qualcomm sued Transsion, one of the world's largest smartphone makers, for patent infringement. *See* Ben Schoon, "Qualcomm is suing Transsion, the largest smartphone maker that doesn't use Snapdragon," 9to5Google, July 12, 2024, https://9to5google.com/2024/07/12/qualcomm-transsion-lawsuit-report. Qualcomm's lawsuit with Transsion was settled in January 2025. *See* Florian Mueller, "BREAKING: Qualcomm settles with China's Transsion (Africa's smartphone market leader): Indian patent lawsuit withdrawn," ip fray, January 16, 2025, https://ipfray.com/breaking-qualcomm-settles-with-chinas-transsion-africas-smartphone-market-leader-indian-patent-lawsuit-withdrawn/.

[351] Posner Report, ¶¶ 38, 62.

[352] Posner Report, ¶ 27.

custom CPUs [based on Nuvia technology] should benefit Arm by contributing to the expansion of Arm-compliant products into new segments and markets at the expense of non-Arm competition."[353] In particular, he highlights "Qualcomm's development efforts of its Arm-compatible Oryon CPU cores (the 'Oryon™ Cores')," which is opening up the PC segment, traditionally dominated by x86 chips, to Arm-compliant chips.[354] He concludes that "[a]ny market share that Qualcomm gains in the PC market is market share gained for Arm versus x86 alternatives. Further, Qualcomm's sales of Oryon™ Cores will generate royalties for Arm under the Arm / Qualcomm ALA. Therefore, Qualcomm's development of the Oryon™ Cores will generate additional royalties for Arm from an increased volume of shipments for the PC market."[355]

142. Similarly, the SAC states that "Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86)."[356]

143. More broadly, Arm benefits from partnering with ALA customers because a partner's innovation, R&D investment, and marketing efforts expand Arm's ecosystem[357] and increase the

[353] Expert Report of Patrick F. Kennedy, February 27, 2024 (hereinafter Kennedy *Arm v. Qualcomm* Report), ¶ 33. *See also id.*, ¶ 56 ("Qualcomm's development efforts and business plans related to the development of custom Arm-compliant CPUs in certain markets will actually benefit Arm.").

[354] Kennedy *Arm v. Qualcomm* Report, ¶ 56. *See also id.*, ¶ 63 ("Arm itself recognized that Qualcomm's innovative product could expand Arm's presence in the Windows-based PC market. Upon seeing initial performance reports for Hamoa, Arm concluded that Qualcomm had indeed "invested sufficiently to meaningfully grow the [Windows on Arm] market.").

[355] *Id.*, ¶ 64.

[356] SAC, ¶ 61.

[357] *See* ARM_01294236 at '237 (February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("[g]reater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time to Market] ") and for Arm ("[d]eeper customer engagement, greater predictability, more design wins, more revenue"). *See also* Abbey (Arm) June 2025 Deposition, 29:24-30:7 ("So there would be a technical conversation around capabilities because oftentimes just because somebody wants an architecture, they may not know what it takes to make the architecture successful into a product. And so we care passionately about the ecosystem, about making sure our partners are going to be successful, so we talk about capabilities, we talk about risks, we talk about the expertise of the team."). *See also* Abbey (Arm) June 2025 Deposition, 145:8-23; ARMQC_02783619 at '620 ("Landing subscription deals is the first step in a closer engagement with our partners to increase their consumption of Arm technology and share in increased long-term success through royalties.").

variety of Arm products available to customers.[358] Will Abbey stated in November 2023 that "[t]hirty years on, a core philosophical tenet of Arm's original IP licensing model underpins its expanded subscription strategy to foster innovation: Arm only succeeds when partners succeed."[359] Arm monitors partner investment efforts across the ecosystem and collaborates with its partners to strengthen developer support and education.[360] The flipside is that, should Arm foreclose a partner, Arm's ecosystem would suffer. In fact, Cristiano Amon, Qualcomm's CEO, alleges that Arm's conduct harmed Qualcomm and acknowledged that, as a result, there was harm to Arm's ecosystem.[361]

144. In smartphone applications, Qualcomm is by far the leading chip supplier for premium-tier Android phones.[362] In recent public statements, Qualcomm executives tout that, for premium-tier

[358] For example, Apple helped opening the PC segment to Arm. *See* "AI Flywheel Gathering Momentum," UBS Global Research, November 24, 2024 ("Arm's moment on the PC arrived in 2020 with Apple's M1 processor-based Mac family. The initial Arm vs x86 compatibility issues were mitigated by Apple's control of its ecosystem and by the Rosetta binary translation software, while Apple iterated on the hardware design with three further M-series generations. After almost four years, Apple was joined by the launch of Qualcomm-powered PCs from several major brands this year, and with an Nvidia-MediaTek partnership expected to follow into volume production next year. Arm currently holds a 10% unit market share and 17% revenue market share, almost all owing to Apple.").

[359] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models.

[360] ARMQC_02725050 at '068 (A September 2020 presentation discusses partner efforts on the Windows-on-Arm ecosystem and details partner collaborations to provide developer support, including initiatives to facilitate app migration to arm64, engage OEMs, and expand enterprise application readiness).

[361] [redacted]

[362] Qualcomm's smartphone chips are currently custom-made. [redacted]

Android phones, Qualcomm's revenues are five times as large as its next largest rival.[363] Accordingly, reports indicate that Qualcomm's share of premium-tier Android smartphones is as high as about 70%.[364] If Arm were to foreclose Qualcomm, it would cause diversion of premium-tier demand to Apple iPhones and also lead to more lower tier Android phones being sold.[365] Since Arm's royalty revenue per unit sold tends to be higher for higher-end chips, a shift towards less expensive Android phones could reduce Arm's royalty revenue. Such a shift would represent a cost to Arm in any attempt to foreclose Qualcomm. Prof. Posner does not account for these costs in his analysis. Nor does Prof. Posner consider whether Apple has a more favorable ALA deal than

---

[363] "Q4 2024 Qualcomm Inc. Earnings Call," Qualcomm, November 6, 2024, pp. 11-12, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/06/QCOM_Q4FY24EC_Transcript_11-7-24.pdf (Mr. Amon stated: "[W]hen we compare with our closest competitor, for example, in Android, our premium tier, we get greater than 5x premium-tier revenue."); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 4, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf (Mr. Amon stated: "On handsets as we move on to the next conversations, Snapdragon eight elite, we're incredibly proud of it. It's one of the most powerful processors we've ever done in mobile, is now the industry leader in handsets across every performance category. The world's fastest mobile CPU, world's fastest 5G and Wi-Fi technology, the fastest NPU [Neural Processing Unit]. But I wanted to show you this metric. We have 5X the premium tier revenues on Android relative to the primary competitor[.]"); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, p. 24 (Mr. Palkhiwala, Qualcomm's Chief Financial Officer and Chief Operating Officer, stated: "Qualcomm has a very strong presence. If you compare us to our closest competitor, we are two X, the revenue overall and we are more than five X revenue in the premium tier. Snapdragon eight chip is the performance benchmark chip in premium tier in handsets. So we're very happy about that.").

[364] "Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/ ("Qualcomm's share in the >$500 band increased from 47% in Q1 2020 to 71% in Q1 2022"). *See also* Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo! Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html ("Android device makers have no choice but to rely on Qualcomm for sourcing flagship SoCs for their phones and tablets. MediaTek is the only other notable SoC supplier, but its flagship chips are typically behind those of Snapdragon. Its latest Dimensity 9400 changes this, rivaling or coming close to the Snapdragon 8 Elite in most benchmarks and workloads. However, the company needs to prove it can keep this momentum up to win the trust of device makers and consumers. Samsung also has its in-house Exynos division, but its SoCs have been significantly behind the competition in power efficiency and performance. The gap is so big now that Samsung might go all-in with the Snapdragon 8 Elite for the Galaxy S25 series.").

[365]



Qualcomm, such that diversion to Apple would lead to a reduction in Arm's margin on the diverted sales.[366]

145. Arm has acknowledged the importance of partners to Arm's success in competing against other ISAs, such as RISC-V. For example, Chloe Ma, Chief Business Officer at Arm, explained in December 2022 that, in targeting development of IoT applications, "we [Arm] also need to leverage our design partners (AADPs [Arm Approved Design Partners], software design services, ISVs [Independent Software Vendor]) as much as possible realizing that we don't have endless resources and we are focusing our resources on client/infrastructure. We need to hold ourselves accountable for proof of concept for the solution approach with the appropriate design point, making sure this approach can deliver the desired benefits for our target customers. But we also need to start thinking about how we can scale this approach to mobilize our large number of partners so that they are also building, promoting and benefiting from this solution-based approach and staying busy on Arm (less time on RISC-V)."[367]

146. To further the adoption of Arm technologies, Arm has also designed contracting models that provide customers with broader access to its IP portfolio, enabling them to innovate more effectively and contribute to growing the Arm ecosystem. Arm observed that some customers encountered challenges after licensing specific cores, often realizing mid-design that the selected core is "not the right fit."[368] In response, Arm transitioned to a more flexible, subscription-based licensing model to better accommodate their customers' evolving design needs. As discussed

---

[366] Apple has an ALA with Arm that "extends beyond 2040." *See* "Amendment No. 2 to Form F-1," Arm Holdings plc, September 5, 2023, p. 4, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm. [PN00305]

[367] ARMQC_02600713 at '719. *See also* Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships. *See also* ARM_00087465, the abstract of a talk by Paul Williamson, Arm's Senior VP and general manager of the Internet of Things line of business, discussing "successful examples to share where we have engaged at a deeper level, worked hand-in-hand with the partner and their ecosystem in delivering on our roadmap, allowing them to enter new markets, become #1 and leverage their investment in Arm for future success."

[368] Abbey (Arm) June 2025 Deposition, 86:22-87:23 ([W]e had determined some time ago that the most ec -- equitable way to license our technology is through a subscription, a program which we call ARM Total Access. One of the frustrations that some partners have is, I license this particular core, and after I start a design or I give some considerations to that design, I decide that that's not the right fit. So we moved away from a, you know, sort of this product with this term to more of a broader subscription-based engagements.). *See also* Grisenthwaite (Arm) Deposition, 54:1-55:13.

previously, in 2020, Arm launched ATA, a subscription program offering customers a comprehensive package of IP, tools, models, support, training, software, and physical design resources to help them succeed.[369] In 2019, Arm introduced the AFA, a pay-as-you-go model that allowed customers to access a broad range of Arm technology and tools without paying upfront—only paying license fees for IP used in their final chip design at the point of manufacture.[370] Arm introduced these flexible licensing agreements with the strategic understanding that broader access to its IP would not only empower individual partners but also strengthen and expand the overall Arm ecosystem.[371] This is a procompetitive initiative aimed at expanding the Arm ecosystem.

147. Qualcomm would be particularly important as a partner in growing the Arm ecosystem if, as Qualcomm contends, Arm's chip designs were falling behind alterative cores. For example, the SAC states that "[i]n recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for Arm-designed cores. In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical."[372] Prof. Posner similarly claims that "Arm's OTS cores [have fallen] further behind

---

[369] ARM_00080472 at '480; ARMQC_02770676 at '677; "Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 19 ("ATA licensees are typically long-term Arm partners and include more than half of our largest customers."). *See also* ARM_01294236 at '237, a February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("Greater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time To Market]") and for Arm ("Deeper customer engagement, greater predictability, more design wins, more revenue").

[370] Abbey (Arm) June 2025 Deposition, 144:19-145:13 ("At the low end, through ARM Flexible Access, we're giving broader access to our partners because we want to deepen and broaden the ecosystem."); Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models; "Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 19 ("[AFA] targeting early-stage companies developing products for markets such as AI accelerators, automotive applications, consumer electronics, robotics and smart sensors.").

[371] Abbey (Arm) June 2025 Deposition, 145:8-13; "Arm Flexible Access," Arm, https://www.arm.com/products/flexible-access ("Arm Flexible Access provides up-front, no-cost or low-cost access to a wide range of Arm IP, tools, and training. Experiment and design with the entire portfolio; license fees, if any, are only due at the point of manufacture and calculated only on the IP included in the final SoC design.").

[372] SAC, ¶ 58. [redacted]

custom cores in terms of quality."[373] In such a situation, losing the benefit of Qualcomm's innovations would be particularly harmful, and would lead to Arm ceding share to alternative ISAs, such as x86 and RISC-V.[374]

148. Furthermore, harming one of its largest customers without cause would harm Arm's reputation and damage Arm's relationships with other customers.[375] Prof. Posner agrees: "As the industry observes Arm's mistreatment of Qualcomm, firms will become less willing to invest in

[redacted]

[373] Posner Report, ¶ 58. *See also id.*, ¶ 38 ("Qualcomm's custom CPUs are 'at the top end of the performance' and 'blow away what's available from Arm on the TLA core site [sic].' Qualcomm uses its own custom cores in its premium tier SoCs because Arm does not sell an alternative that provides comparable functionality.").

[374] I do not opine on Arm's relative performance. I do note that Jeff Vidon, senior director of engineering at Qualcomm, testified that Arm "off-the-shelf" cores may have higher performance or power than Qualcomm custom cores. [redacted]

[375] For Arm, as for most firms, reputation is key to its commercial success. *See* Arm 2023 Form F-1 ("Our brand and reputation are critical factors in our relationships with customers, employees, governments, suppliers, and other stakeholders. Our failure to address, or the appearance of our failure to address, issues that give rise to reputational risk […] could significantly harm our brand and reputation. Our reputation can be impacted by catastrophic events, incidents involving unethical behavior or misconduct, product quality, security, or safety issues, allegations of legal noncompliance, internal control failures, corporate governance issues, data breaches, workplace safety incidents, environmental issues, the use of our products for illegal or objectionable applications, including AI and ML or military applications that present ethical, regulatory, or other issues, marketing practices, media statements, the conduct of our suppliers or representatives, and other issues, incidents, or statements that, whether actual or perceived, result in adverse publicity."). *See also* Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581, https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=2893&context=journal_articles ("When a dispute over the contract's meaning arises, the parties will first try to resolve it themselves. They will do this not only because of the costs of litigation, but also because of the reputation factor […] the party demonstrably in the wrong on the interpretive issue will hesitate to force the issue to litigation; he is likely to lose and in any event may acquire a reputation as someone who does not honor his commitments.").

the Arm ecosystem. Their incentives to invest are reduced because the more successful they are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them."[376] However, he fails to recognize that this reduces Arm's incentive to foreclose, as a degraded Arm ecosystem will risk losing sales to x86 and RISC-V. It is important for Arm (as well as for Qualcomm or any firm) to avoid gaining a reputation as a firm that uses the legal system to circumvent or modify contractual commitments to its advantage and at the expense of its partners. Such a reputation would make negotiating future contracts more complex, more time-consuming, and would discourage relationship-specific investments by partners.[377]

---

[376] Posner Report, ¶ 90. *See also id.*, ¶ 78 ("[O]ther licensees will have an incentive to reduce their investment in the Arm ecosystem as they see Arm abuse its own licensees."), ¶ 19 ("Arm's attempts to extend its dominance of the ecosystem will spook even chipmakers who are not pushed out of designing SoCs, by revealing that Arm will no longer keep its commitment to neutrality and openness."). I note that there is no evidence, and Prof. Posner provides none, that "the more successful" an Arm customer is at designing Arm-compliant chips, "the more likely that Arm will try to take their business away from them." In particular, there is no evidence Arm is trying to "take away" Apple's business, which is one of the most successful Arm customers. Arm has recently extended Apple's agreement for many years. *See* Stephen Nellis, "Apple inks new long-term deal with Arm for chip technology, according to filing," Reuters, September 5, 2023, https://www.reuters.com/technology/apple-inks-new-long-term-deal-with-arm-chip-technology-filing-2023-09-05/ ("Apple (AAPL.O), has signed a new deal with Arm for chip technology that "extends beyond 2040," according to Arm's initial public offering documents filed on Tuesday. […] The two companies have a long history - Apple was one of the initial companies that partnered to found the firm in 1990. […] Apple was among a number of large technology companies that that on Tuesday invested $735 million in Arm's initial public offering. Reuters last week was the first to confirm that Apple was among the strategic investors who agreed to buy shares.").

[377] Williamson (Arm) Deposition, 246:4-9 ("ARM has a reputation of trust with its partners who build technology based on ARM's technology and services associated with it. Their success is a shared success business with ARM, and trust is an important element of that continuing business practice."). Warren Buffet highlighted the importance of reputation when he said: "We can afford to lose money—even a lot of money. But we can't afford to lose reputation—even a shred of reputation." *See* Jessica Coacci, "Here's the one-page memo Warren Buffett sent to his managers every two years for over 25 years," Yahoo! Finance, August 6, 2025, https://finance.yahoo.com/news/one-page-memo-warren-buffett-140107224.html. *See also* Deepa Prahalad, "Why Trust Matters More Than Ever for Brands," Harvard Business Review, December 8, 2011, https://hbr.org/2011/12/why-trust-matters-more-than-ev ("[To create value, companies] must create an environment in which people can work well together and where they are engaged with the mission of the firm. They must treat suppliers and collaborators well. They have to give freedom to ask tough questions and experiment with new ideas. Trust is a prerequisite for all of these."); Don Fancher, Jennifer Lee, and Debbie McCormack, "Trust: A Critical Asset," Harvard Law School Forum on Corporate Governance, June 17, 2021, https://corpgov.law.harvard.edu/2021/06/17/trust-a-critical-asset/ ("[Trust] is a critical asset, albeit one that is not reported on the balance sheet or otherwise in the financial statements, as it has no intrinsic value. […] When invested by leaders in relationships with stakeholders, it enables activities and responses that can help build or rebuild an organization and enable an organization to achieve its intended purpose. Trust can also be created across various groups within the organization—between the board and management, employer-employee, among the workforce, organization and stakeholder, vendors and customers. Conversely, a breach of trust can cause a company to lose significant value.").

149. Even though Arm's ecosystem partnerships are important to its business model, making foreclosure more costly than Prof. Posner suggests, that does not mean that Arm is or should be obligated or amenable to accept the terms of every proposed partnership. Arm may determine that the terms of a specific proposed agreement are unprofitable and therefore choose not to license its technology under those terms. As discussed earlier in this Section, while having Qualcomm as a partner benefits Arm, that does not mean that Arm should enter into any agreement that Qualcomm proposes: the price needs to be "right," in the sense that it allows both Arm and Qualcomm to benefit from the partnership.

2. Qualcomm's Successful Business Diversification Strategy Disincentivizes Arm from Foreclosing Qualcomm

150. As described above, foreclosing Qualcomm would harm Arm to the extent that Arm-based Qualcomm chips are diverted to non-Arm alternative ISAs (e.g., x86, RISC-V). This harm would include costs to Arm from losing any future growth related to Qualcomm entering new or growing non-smartphone applications with Arm-based Qualcomm chips sales.

151. In November 2021, Qualcomm highlighted its new "diversification strategy" where it would diversify from its strong position in smartphones into other applications and end uses.[378] Qualcomm touted its strategy stating that it was "[u]niquely positioned to grow across multiple industries in addition to handsets" where the other industries included "Automotive," "Consumer IoT" (including personal computers, smartwatches and virtual reality devices), "Industrial IoT,"

[378] "Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, pp. 3-4, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf (Mr. Amon stated: "But the key message you're going to see is we're truly diversifying. There's so many new end markets for the company right now, and the market is really moving towards our technology. […] I want to show you that we'll always be the company defining the pace of innovation in mobile. You know us from mobile. But we're no longer defined by a single end-market and a single customer relationship. While we'll always going to be the company focused in driving innovation in mobile, there's more to Qualcomm."); "Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, p. 2, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf (Mr. Amon stated: "[W]e outlined a new strategy for the company back in 2021. And we came here to kind of walk to what we have done since then and what we're going to be doing next. […] So, I want to start by highlighting what is our mission. Our mission is really to enable intelligent computing everywhere we have been on this trajectory, realizing that the technologies we have developed over the many years and continue to develop can be very relevant to a number of different industries beyond mobile. And that is the mission that we have been pursuing since we outlined our strategy back in 2021.").

and "IoT Edge Networking."[379] Qualcomm estimated that diversification would increase its addressable market from about $100 billion to $700 billion over the next decade.[380] This included Qualcomm's belief that it was "[p]ositioned to be the preferred platform for PCs in the inevitable transition to Arm."[381]

152. As detailed above, Qualcomm has publicly reported very strong financial performance in its non-smartphone segments during 2024 and 2025.[382] In fact, in its most recent November 2024 Investor Day presentation, Qualcomm executives provided an update on its diversification strategy, which Mr. Amon summarized as follows:

> *[I]n summary, this is how we feel about the incredible opportunity ahead for Qualcomm. We have put a [diversification] strategy in [20]21. We're not changing our strategy. We've just been busy executing on that strategy. And it's working.*[383]

153. Consistent with this, Mr. Palkhiwala stated at the 2024 Investor Day that by 2029 he expected Qualcomm's non-smartphone revenue to increase to 50% of its total revenue (up from 32% at the end of 2021):

---

[379] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, pp. 6, 58, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf.

[380] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, p. 8, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf, (">7X addressable market expansion over the next decade.") and p. 10 ("Expanding TAM and diversification while increasing margins and stockholder returns[.]").

[381] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, p. 38, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf.

[382] *See* Section VI.A.

[383] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 3, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/QCOM_Investor-Day-2024_transcript_11-19-24_FINAL.pdf (Mr. Amon further stated that the goal was "to be continuing to transform Qualcomm into a diversified growth leader in the industry."). *See also* "Qualcomm Investor Day 2024 Presentation Deck," Qualcomm, Cristiano Amon, November 19, 2024, p. 27, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf (Further, the presentation deck used by Mr. Amon touted "key takeaways" such as "[s]uccessfully executing against our diversification strategy" with "[s]ignificant opportunity for growth across target industries" and "[g]rowing ecosystem of new customers and partners." His deck ultimately concluded that these factors were "[t]ransforming Qualcomm into a diversified growth leader.").

> *I want to quantify the long-term target for our diversification plan. We are targeting a mix of 50 over 50 by the end of the decade. For handset and non-handsets, and we believe this transformation will be highly value accretive.*[384]

154. Qualcomm confirmed that it is on track to hit its aggressive diversification goal. As Mr. Amon described in July 2025: "Another quarter of strong growth in QCT Automotive and IoT revenues further validates our diversification strategy and confidence in achieving our long-term revenue targets[.]"[385]

155. Qualcomm's recent success and expected future growth in these non-smartphone applications benefits Arm in at least two ways. First, in some cases—such as virtual reality devices—Qualcomm is expanding into application areas where, absent its involvement, the volume of trade would be smaller or the speed of progress slower.[386] [REDACTED]

---

[384] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 27, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/QCOM_Investor-Day-2024_transcript_11-19-24_FINAL.pdf. *See also* "Qualcomm Sets New Growth Targets, Showcasing Company's Opportunity as On-Device AI Accelerates Demand for its Technologies," Qualcomm Inc., Press Release, November 19, 2024, https://investor.qualcomm.com/news-events/press-releases/news-details/2024/Qualcomm-Sets-New-Growth-Targets-Showcasing-Companys-Opportunity-as-On-Device-AI-Accelerates-Demand-for-its-Technologies/default.aspx ("Qualcomm Incorporated (NASDAQ: QCOM), a connected computing leader, today outlined its significant opportunities for growth and diversification at its 2024 Investor Day. The company's unique position at the edge is driving access to an expanded TAM [Total Addressable Market] of approximately $900 billion by 2030, with more than 50 billion cumulative connected edge device shipments expected from 2024 through 2030. 'Qualcomm's focus on diversification and industry-leading technology roadmap has significantly strengthened the Company's growth profile,' said Cristiano Amon, President & CEO, Qualcomm Incorporated. 'As generative AI accelerates demand for our technology and we become increasingly relevant across multiple industries, Qualcomm is well positioned to address a $900 billion opportunity by 2030 across an expanding ecosystem of new customers and partners.'"). *See* Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 26, 2021, p. 11, https://s204.q4cdn.com/645488518/files/doc_financials/2022/q1/0001728949-22-000012.pdf (Qualcomm QCT revenue by segment reported for Q4 2021).

[385] "Qualcomm Announces Third Quarter Fiscal 2025 Results," Qualcomm, July 30, 2025, p. 1, https://s204.q4cdn.com/645488518/files/doc_financials/2025/q3/FY2025-3rd-Quarter-Earnings-Release.pdf. *See also*, "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, pp. 2, 12, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon stating: "Our chipset business delivered revenues of $9 billion, reflecting strength in Automotive and IoT and ongoing growth in Handsets. Automotive and IoT revenues increased 21% and 24% year over year, respectively. […] Our momentum in Automotive and IoT is the result of strong execution of our growth and diversification strategy. We remain on track to meet our fiscal 2029 target for combined Automotive and IoT revenues of $22 billion. […] We feel that the company is on the right trajectory, especially as we look for growth and diversification beyond Handsets and AI continues to be a great opportunity for us.").

[386] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 4:23, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational

[redacted][387] In both scenarios, Arm benefits significantly from its partnership with Qualcomm—whether through expanded market opportunities in emerging applications or through retained volume that might otherwise shift to competing ISAs. Foreclosing Qualcomm would mean forfeiting these growing advantages, making such a strategy economically costly for Arm, particularly in the long term.

3. Prof. Posner's Diversion Analysis Is Incomplete and Ignores Important Foreclosure Costs that Arm Would Incur

156. Prof. Posner analyzes diversion briefly and incompletely.[388] He ignores important competitive constraints that Arm faces (as discussed above in Section V) as well as important foreclosure costs that Arm would incur if it were to pursue the strategy he hypothesizes.

157. As an initial matter, Prof. Posner focuses his diversion analysis only on the supply of chips in the data center segment, as shown in his Figure 3. In his diversion setup, he presents a scenario where Qualcomm effectively is already in the "market" for data center chips, and "Arm enters the data center chip sector [by] licensing itself to manufacture Arm-compliant chips" and thereby "competes with Qualcomm."[389] In reality, Arm is about 1.5 to two years ahead of Qualcomm in developing a data center chip.[390] This means that Arm can expect to earn profits from data center chips well before Qualcomm even enters (if ever) with its own chip.[391] As a result, Arm can earn

(Ziad Asghar (Qualcomm) stating: "if you pick up any device that does virtual reality, and a device that matters, it's actually based on Snapdragon.").

[387] [redacted]

[388] Posner Report, ¶ 70 and Figure 3.

[389] Posner Report, ¶ 69.

[390] Section VIII.B.1.

[redacted]

profits without any diversion from Qualcomm over this period. In other words, Arm's ability to earn profits from its data center chip does not depend on any purported foreclosure of Qualcomm.

158. Further, Prof. Posner's Figure 3 completely disregards diversion from Qualcomm's Arm-based data center chips to chips based on non-Arm ISAs, such as Intel's x86 ISA. This is a critical oversight since x86 is the dominant architecture in data centers. Diversion to data center chips based on x86 would represent a significant cost to Arm, as Arm would lose the margin it earns on Qualcomm's Arm-based chips.[392] Prof. Posner completely ignores this cost. In **Exhibit 3**, I modify Prof. Posner's Figure 3 to properly account for diversion to x86, illustrating the lost profits that Arm would suffer.[393] The revised exhibit shows that, if Arm were to cut off Qualcomm's access to Arm's ISA, OEMs would likely respond by not only purchasing other Arm-based data center chips (if available) but also by purchasing more x86-based chips, on which Arm earns no profit at all.

[393] The logic represented in Prof. Posner's Figure 3 suffers from other infirmities which are addressed elsewhere in my report. My modification to his figure is simply done to highlight a critical oversight related to his representation of diversion.

**Exhibit 3: Diversion in Data Centers (Modified Prof. Posner Figure 3)**

**Red boxes and red text have been added to Prof. Posner's original Figure 3.**

159. More generally, if Arm were to foreclose Qualcomm "completely" by "cutting off" access to the Arm ISA,[394] as Prof. Posner considers in his Figure 3, then Qualcomm would be foreclosed from using Arm-based technology for data centers, as well as all other downstream applications, including smartphones and personal computers.[395] To properly account for this, in my **Exhibit 4**, I expand Prof. Posner's Figure 3 to account for additional paths of Qualcomm's diverted sales. By excluding diversion to these additional paths, Prof. Posner's analysis overstates Arm's ability to profitably recapture Qualcomm's volume and understates the full foreclosure cost to Arm. These additional diversion paths include:

[394] Posner Report, ¶ 70 and Figure 3 ("If Arm is able to cut off technology supply for Qualcomm completely, then Arm loses its upstream margins on the Qualcomm license. However, Arm would gain downstream sales and the downstream margins that they produce, assuming that Arm is a viable competitor in the downstream market either through organic entry or through acquisitions. Figure 3 illustrates these dynamics."). As noted above in Section VII, Prof. Posner also considers partial foreclosure of Qualcomm. Regardless of whether the alleged foreclosure is full or partial, the lost profits from diversion that I depict in **Exhibit 4** properly apply.

[395] The Snapdragon 8 Elite for mobile (i.e. smartphone) and Snapdragon X Elite for PC are also developed based on the customized Arm-based Oryon CPU. *See* "Qualcomm Oryon CPU," Qualcomm, https://www.qualcomm.com/products/technology/processors/oryon, accessed August 20, 2025.

- *Qualcomm sales diverted to x86 and RISC-V:* For these sales, Arm would forfeit its entire royalty fees from Qualcomm, with no opportunity for recapture.[396] In reality, OEMs facing reduced access to Qualcomm's Arm-based chips are likely to consider switching to x86 or RISC-V solutions, especially in segments where those architectures are established (e.g., x86 in data centers and PC and RISC-V in IoT).[397] Such diversion is particularly relevant given Qualcomm's stated plans to transition away from Arm ISA to RISC-V (discussed in Section VIII.D.3).
- *Qualcomm sales diverted to Apple:* For those Qualcomm sales lost to Apple, Arm may earn less depending on the difference between the royalty it earned from Qualcomm and the royalty it earns from Apple. Prof. Posner does not consider this possibility.
- *Qualcomm sales diverted to chips for lower-end smartphones:* Qualcomm accounts for a high share (70%) of premium-tier Android smartphones,[398] which typically generate higher royalties for Arm.[399] Thus, Qualcomm smartphone chip sales diverted to chip sales for lower-end smartphones would result in lower royalties for Arm.
- *Qualcomm sales for innovative customer products that are lost:* Qualcomm touts that its industry-leading chips are used in cutting-edge innovative customer products such as virtual reality devices.[400] If Qualcomm were foreclosed, some of these products may be

---

[396] In addition, as discussed in Section VII.C.1, any attempt by Arm to foreclose Qualcomm could damage Arm's reputation and ecosystem, leading to additional lost sales with its other customers, as these customers pivot instead to x86 or RISC-V. These additional lost sales are not shown in **Exhibit 4**.

[397] "Why RISC-V is Inevitable, Calista Redmond, RISC-V International," RISC-V International, April 6, 2023, at 8:33, https://www.youtube.com/watch?v=ktjSvlelKPk&ab_channel=RISC-VInternational ("So, consumer and IoT devices, this is again one of the areas that has been home to RISC-V for some time. The Android open source project, as far as other companies who've been bringing RISC-V into earbuds and other consumer devices. Microchip you know coming through with their portfolio. SiFive on wearables, smart home, VR, industrial IoT.").

[398] "Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/ ("Qualcomm's share in the >$500 band increased from 47% in Q1 2020 to 71% in Q1 2022").

[399] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025.

[400] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 4:23, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational (Ziad Asghar (Qualcomm) stating: "if you pick up any device that does virtual reality, and a device that matters, it's actually based on Snapdragon."); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update,"

delayed in coming to market or come to market with lower quality—resulting in lost sales (i.e., the volume of trade would be smaller). For these lost sales, Arm would forfeit its entire royalty fees from Qualcomm, with no opportunity for recapture.

**Exhibit 4: Diversion in All Applications (Modified Prof. Posner Figure 3)**

---

Cristiano Amon, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, pp. 3, 5, 6 ("We're incredibly proud in this company about the technology roadmap of Qualcomm. […] It is the industry leading technology roadmap for both at the system level and semiconductors at the edge. […] The next one is what is happening with XR [extended reality devices]. […] And we have now every single design win across everyone that is building those [smart glasses] devices. […] I want to talk about AI at the edge. […] It's a generation opportunity for Qualcomm. […] We built a platform in mobile, but now with AI, we believe we can further differentiate. We're uniquely positioned to have AI and automotive."). *See also* Posner Report, ¶ 62 ("OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers.") and ¶ 77 (describing Qualcomm's experience in developing "leading edge" chips.); "Virtual Reality: Transforming the way we experience reality," Qualcomm, https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar/virtual-reality-vr ("The Snapdragon XR2 Gen 2 Platform powers next-generation MR and VR for all with amazing performance and groundbreaking on-device AI"); "The 5 Best Features of the Meta Quest 3," Qualcomm, January 12, 2024, https://www.qualcomm.com/snapdragon/news/the-5-best-features-of-the-meta-quest-3.

160. Prof. Posner states that Arm has an incentive to foreclose Qualcomm because the "short term" costs from foreclosure are more than outweighed by the "long term" benefits.[401] He does not explain why costs are incurred in the short run and benefits materialize in the long run. In fact, a number of costs are incurred in the long run, e.g., the loss of Arm's reputation, harm to Arm's ecosystem, and the fact that an attempt by Arm to foreclose customers would accelerate the development of alternatives such as RISC-V. Similarly, benefits to Arm may occur at the same time as its loss of Qualcomm royalty. For example, if Samsung were to switch from Qualcomm chips to MediaTek chips, the increase in royalty payments from MediaTek may very well occur at the time the lost royalty payments from Qualcomm would have occurred. Therefore, the alleged anticompetitive effects may very well have net benefits or be neutral in the "short term" and have net costs in the "long term."

161. In conclusion, Prof. Posner's diversion analysis fails to account for critical economic realities that undermine his foreclosure theory. His narrow focus on data center chips overlooks diversion to competing ISAs such as x86 and RISC-V, which would result in lost royalties for Arm. He disregards the timing mismatch between Arm's and Qualcomm's chip launches. Moreover, when extended to other applications, the analysis omits additional diversion paths—including sales lost to Apple and lower-tier devices, and lost sales of innovative products—all of which may further increase the cost of foreclosure. By excluding these factors, Prof. Posner overstates Arm's ability to recapture Qualcomm's volume and understates the economic costs Arm would incur, rendering his analysis incomplete and unreliable.

---

[401] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the short term, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the long term than the margins on existing ALA licenses—and Arm is unhappy with the level of royalties that Qualcomm is required to pay under the ALA. Moreover, although Qualcomm has historically been one of Arm's most important customers, it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 87 ("As customers flee Qualcomm to Arm, Arm will lose money in foregone royalties in the short term. But, Arm hopes to obtain larger margins in the long term as it takes over Qualcomm's business or Qualcomm is pushed to increasingly make use of Arm's OTS cores.").

### D. Foreclosure of Qualcomm Alone Would Unlikely Be Profitable for Arm

162. While Qualcomm is a large customer, it accounts for only about 10% of Arm's total revenue.[402] A foreclosure strategy aimed solely at Qualcomm is unlikely to be effective, as the potential benefits are tied specifically to Qualcomm's sales, whereas the costs (reputational and other) would affect the broader Arm business.

163. As discussed in the previous sections:

i. The benefits from the alleged foreclosure of Qualcomm are the incremental profits that Arm makes on the recaptured sales, i.e., the sales that divert from Qualcomm custom chips to Arm's OTS cores and Arm's own chips, compared to the profits that Arm would have made on those diverted sales in the absence of foreclosure.

ii. The costs are the profits lost by Arm on sales that divert to another ISA (e.g., x86 and RISC-V) or to lower margin Arm-based chips (e.g., low-end Android smartphones), the loss of ecosystem benefits due to Qualcomm not making custom cores using Arm's ISA, and Arm's loss of reputation as a reliable partner. The first cost affects a portion of Arm's sales to Qualcomm, but the other two costs affect Arm's entire business, i.e., go beyond Qualcomm's sales.

164. Quantifying these benefits and costs is hard (and neither I nor Prof. Posner attempt to quantify them), but they are no less real to the profitability of Arm's business than the costs that Prof. Posner discusses in his report. By omitting these costs from his analysis, Prof. Posner reaches a biased and unreliable conclusion.

## VIII. Prof. Posner Has Not Demonstrated that Arm's Conduct Is Anticompetitive

165. Prof. Posner claims that Arm's conduct towards Qualcomm constitutes anticompetitive behavior. He states that "it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long

[402] SAC, ¶ 57 ("Qualcomm is today one of Arm's largest licensees—it 'accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024.'"). *See also* ARMQC_00000640 at '646.

term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties."[403] However, Prof. Posner provides no evidence for his claims and bases his conclusion on stylized theoretical models of vertical interactions without linking them to the industry at issue or the facts in this case.

## A. Arm Protecting the Terms of Its Contracts Is Procompetitive

166. The SAC states that "[s]ome of Arm's maneuvers resulted in a trial that took place last year before this Court. […] That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA."[404] Prof. Posner hardly mentions the Nuvia acquisition despite its central role in this dispute, but does state that "Qualcomm contends that Arm has engaged in a number of unfair acts and practices, including threatening to terminate Qualcomm's ALA […]."[405]

167. Arm's conduct—including its decision to initiate litigation against Qualcomm and its use of consent provisions in licensing agreements with Nuvia—reflects a commercially reasonable and procompetitive effort to protect its IP and clarify contractual obligations. In innovation-driven industries, legal enforcement is a standard mechanism for resolving disputes and preserving incentives for investment and cooperation. Whereas Qualcomm's claims conflate ordinary commercial disagreement with anticompetitive behavior, Arm's business practices reinforce the integrity of its licensing model and support the continued growth of its ecosystem.[406]

### 1. Contract Enforcement Is a Legitimate Procompetitive Action

168. There is no evidence that Arm initiated the *Arm v. Qualcomm* litigation for anticompetitive purposes. Rather, evidence shows that Arm acted to protect its IP and the associated revenue potential. I do not opine on whether Qualcomm or Arm breached the Qualcomm and Nuvia

[403] Posner Report, ¶ 13.

[404] SAC, ¶ 6.

[405] Posner Report, ¶ 13.

[406] Qualcomm itself aggressively protects its IP through lawsuits and requests of injunctive relief. *See* footnote 350.

agreements with Arm, and I have been instructed by Counsel for Arm to assume the disagreement with Qualcomm concerning the correct interpretation of various terms of Qualcomm and Nuvia agreements with Arm reflects Arm's genuine views of Arm's, Qualcomm's, and Nuvia's contractual obligations. In that context, pursuing legal action is a standard and appropriate means of resolving commercial disputes. The conduct that Qualcomm characterizes as anticompetitive is, in fact, consistent with a firm seeking to protect its IP and enforce its rights under the terms of its agreements.

169. Clarity on contractual terms is essential in industries where IP and licensing frameworks are central to innovation—particularly in high-technology sectors. Enforcing and interpreting contracts through the legal system is not only lawful but also promotes investment, cooperation among firms, and long-term ecosystem stability.[407] If licensees were permitted to disregard contractual obligations, it would undermine the value of IP, weaken incentives for future investment in ISA development, and ultimately harm innovation and consumer welfare.[408]

---

[407] Spulber, Daniel F., "How do Competitive Pressures Affect Incentives to Innovate When There Is a Market for Inventions?," Journal of Political Economy, 2013 Vol. 121, No. 6, pp. 1007-1054, at p. 1007 ("When IP is not fully appropriable, markets for inventions are limited and competitive pressures can decrease incentives to innovate."). *See also* Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007, pp. 8-10, https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451 ("Economists have long recognized that certainty of contract is essential to a healthy economy. […] Those contracts can only accomplish that goal, however, if parties know the contracts will be enforced. […] The 'fundamental function of contract law' is to 'encourage the optimal timing of economic activity' by 'deter[ring] people from behaving opportunistically toward their contracting parties.' Richard A. Posner, *Economic Analysis of Law* 91 (4th ed. 1992). […] That function cannot be accomplished without effective means for enforcement. As this Court has stated: 'Market efficiency requires effective means to enforce private agreements.' *Am. Airlines, Inc.* v. *Wolens*, 513 U.S. 219, 230 (1995).").

[408] Qualcomm has publicly emphasized the importance of strong IP rights in driving innovation. As stated on its website, robust IP protections "[encourage] investment in research and development by companies and individuals." *See* "Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025. Robert Giles, Senior Vice President and Chief Intellectual Property Counsel of Qualcomm similarly testified before the U.S. Senate that courts should be empowered to grant injunctions in appropriate cases to deter "efficient infringement"—a strategy where companies knowingly use patented inventions without seeking a license, assuming they will only be liable for royalties if sued. "Statement of Robert Giles Senior Vice President and Chief Intellectual Property Counsel Qualcomm Incorporated On Behalf of the Innovation Alliance," Hearing on The Patent Trial and Appeal Board: Examining Proposals to Address Predictability, Certainty, and Fairness, Before the Subcommittee on Intellectual Property, Committee of the Judiciary, United States Senate, pp. 3 and 7, June 22, 2022, https://www.judiciary.senate.gov/imo/media/doc/Testimony%20-%20Giles%20-%202022-06-22.pdf.

2. Clause 16.3 of Arm's Agreement with Nuvia Has Procompetitive Justifications

170. Arm's decision to grant Nuvia a license with specific terms is based on careful consideration of the benefits and costs to Arm and the broader impact on its ecosystem. Clause 16.3 of Arm's agreement with Nuvia, which required Arm's consent before any transfer of Nuvia's technology to Qualcomm (or any other acquiring firm), allowed Arm to evaluate the implications of a potential acquisition and ensure that its IP would continue to be used in a manner consistent with its licensing strategy, ecosystem goals, and revenue objectives.[409]

171. It is possible that, in a but-for world without clause 16.3, a mutually beneficial agreement could not have been reached. The clause provided Arm with a mechanism to assess the implications of a potential acquisition and mitigate risks to its ecosystem and profitability. Without this safeguard, Arm may have been unwilling to accept the lower upfront fees and higher running royalties that characterized the Nuvia agreement. In turn, this could have led to less innovation and fewer competitive CPU designs, particularly if Arm were unwilling to license to startups like Nuvia. The clause is therefore procompetitive.[410]

## B. Arm's Entry into the Chip Design Stage of the Value Chain Is Procompetitive

172. Qualcomm claims that Arm has shifted from a neutral licensing model to becoming a direct chip competitor. The SAC and Prof. Posner argue that "[f]or years, Arm expressed its commitment to an open, neutral model for licensing the use of its ISA," and this model "benefited the software developers, which could develop software that would be interoperable across Arm-compatible devices, and ultimately benefited customers" and "also benefited Arm, leading to widespread

---

[409] Arm's CEO testified that such a clause is "standard." *See* Rene Haas (Arm) testimony in *Arm v. Qualcomm*, Trial Transcript Vol 2.1, December 16, 2024, 165:7-19. [redacted]

[410] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025, explaining that the clause protects the value of Arm's IP investment and that, without the clause, Arm would need to develop an alternative licensing model to ensure the returns Arm needs to continue investing to address the expanding demand for increasingly complex uses of its ISA. Without the clause, Arm may have also found it necessary to shorten the length of its ALA contracts and become more vertically integrated.

adoption of the ISA."[411] Qualcomm also argues that, more recently, "Arm has pivoted away from that model," transforming itself "from licensing intellectual property to positioning itself primarily as a chip designer," including by "planning to launch its own chip by as early as this summer [in 2025]."[412] These claims are unfounded, as I explain below.

1. The Start of the Alleged Foreclosure Significantly Predates Arm's Data Center Chip Launch

173. Qualcomm and Prof. Posner argue that Arm's entry into chip design for data centers exacerbates Arm's incentive to foreclose Qualcomm,[413] suggesting that Arm seeks to divert Qualcomm's volume to its own, more profitable chips.[414] The timing and uncertainty surrounding Arm's chip launch undermine this claim.

174. Arm has not yet begun delivering its data center chips and its ultimate commercial success remains uncertain.[415] [REDACTED] The alleged foreclosure also began four years before Qualcomm even

[411] SAC, ¶ 68. *See also* Posner Report, ¶¶ 80-90.

[412] SAC, ¶¶ 69-70. *See also* Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008. *See also* QCVARM_0600104 at '122, "Complaint Against Arm Holdings Plc by Qualcomm Incorporated," Paul Weiss, December 19, 2024, discussing Arm's strategic decision to increase investments in compute subsystems and to "move up the semiconductor food chain and become a chip maker itself."

[413] SAC, ¶ 35 (stating that "[t]o facilitate its entry into selling its own chips, Arm now seeks to force Qualcomm—which would otherwise be a competitor—out from the marketplace."); *Id.*, ¶ 71.

[414] Posner Report, ¶ 71 ("[I]f Arm is a viable competitor downstream and is able to capture even some small portion of diverted sales from Qualcomm, that creates additional incentive to foreclose Qualcomm. This is because downstream margins on chip sales to data centers are likely to be higher than upstream margins for licensing. The more of Qualcomm's potential share that Arm can capture after foreclosing Qualcomm, the stronger its incentive to foreclose Qualcomm.").

[415] Will Abbey (Arm) describes the inherent uncertainty in R&D timing, particularly in the context of the v10 ALA. He explained that "the reality of engineering milestones is, six months could become eight months, could become a year, it could become two years. All that needs to happen is, during verification, there's a defect. And so if you're building a product and a business around engineering delivering a given product in a given time, I'd say, start with what we've got. And so I would be cautious about entering into those conversations early." *See* Abbey (Arm) June 2025 Deposition, 34:16-24.

[416] Qualcomm finalized Nuvia's acquisition in March 2021. *See* "Qualcomm Completes Acquisition of NUVIA," Qualcomm, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-

announced its *intention* to produce a data center chip.[417] The significant time gap and the uncertainty about outcomes are further evidence that Arm's potential launch of its own data center chip is unlikely to be part of a purported "broad scheme" to foreclose Qualcomm, or that it created any incentives to foreclose Qualcomm years before Arm's chips reached the market.[418] Indeed, Prof. Posner does not identify *any* document linking the launch of Arm's chip designs to the alleged foreclosure of Qualcomm. The absence of such evidence reinforces the conclusion that Arm's entry into chip design was a procompetitive response to evolving customer demand.

2. Vertical Integration Is Common and Typically Beneficial

175. Prof. Posner claims that Arm's entry into chip design reflects a strategy to "drive Qualcomm away from designing custom cores, or to drive Qualcomm out of selling chips and SoCs entirely."[419] However, this interpretation ignores the widespread and often procompetitive nature of vertical integration in technology markets.

176. Vertical integration—where a firm operates at multiple levels of the supply chain—is widespread and typically beneficial. Qualcomm itself is vertically integrated, licensing its IP while also selling its own chips. [REDACTED] Arm's model, which

nuvia; [REDACTED]

[417] In May 2025 Qualcomm announced its first data center chip in partnership with NVIDIA. *See* Sebastian Moss, "Qualcomm Announces Data Center CPUs, Will Support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025, https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/. As described later in this Section, Qualcomm's data center chip won't arrive until fiscal year 2028, about seven years after the alleged foreclosure began.

[418] As described later in this Section, Arm's data center chip won't arrive until 2026, a full five years after the alleged foreclosure began.

[419] Posner Report, ¶ 13.

[420] "Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, p. 10, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf. *See also* "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, p. 6 https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf, and

involves licensing its ISA and now designing chips for data center applications, mirrors this dynamic and is consistent with industry norms.

177. Vertical integration is commonplace in a variety of industries, with upstream firms often competing in the downstream markets with their own customers, without foreclosing them. The commonplace nature of benign vertical integration is described in a recent academic paper: "Examples include Apple and Microsoft, selling their products directly in their stores in addition to using retailers such as Best Buy and Walmart; Nike and Adidas, selling their products directly online in addition to using retailers such as Foot Locker and Macy's; and television networks, like HBO and ESPN, selling their content directly through their online platforms, HBO Now and ESPN+, in addition of selling their content to cable companies such as Comcast and Time Warner Cable."[421]

178. This blend of competition and cooperation is commonly referred to as "coopetition,"[422] and is a widespread phenomenon in modern business.[423] For example, Samsung and Apple are "fierce" rivals in the smartphone industry, yet Samsung—one of the leading screen manufacturers—has supplied screens for iPhones for years, dating back to the iPhone 4.[424] Despite

---

Kwon, Yona, Dahee Kang, Sinji Kim, and Seungho Choi, "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," Journal of Open Innovation: Technology, Market, and Complexity, 2020, Vol. 6, No. 1, p. 1 ("Although most of the firms seem to compete against each other to maintain their advantage continuously, firms also often cooperate with their competitors even while competing. Especially in a high-tech industry where technological innovation and change in products are fast, it is difficult to cope with global competitors with a single, static strategy. In other words, a dynamic competition and cooperation between firms is necessary to sustain a firm's competitive advantage. […] The competitive behavior of Qualcomm thus should be understood as dynamic interactions in which Qualcomm both competes with and cooperates with its rivals. These interactions with their rivals do not occur alone but are intertwined and interrelated with one another.").

421 Donna, Javier D., Pedro Pereira, Yun Pu, Andre Trindade, and Renan C. Yoshida, "Direct sales and bargaining," RAND Journal of Economics, 2024, Vol. 55, No. 4, pp. 749–787.

422 *See* Brandenburger, Adam M. and Barry J. Nalebuff, "The Rules of Co-opetition," Harvard Business Review, 2021.

423 Richard Grisenthwaite, Chief Architect at Arm, testified that "as is common with many companies in this industry, we have elements in which we cooperate and then elements in which we compete with companies that we work with. […] [S]ome elements of ARM very actively cooperate with its ALA customers and some elements of ARM more clearly compete with them, yes. […] ARM creates its own core implementations consistent with the ARM architecture and those cores end up competing with cores created by our ALA customers." *See* Grisenthwaite (Arm) Deposition, 23:15-24:10.

424 Imogen Beech, "6 real-life coopetition examples," Breezy, September 6, 2023, https://breezy.io/blog/coopetition-examples. *See also* Haroun Adamu, "Did you know: Samsung makes a lot of

competing directly in end products, the two companies continue to collaborate where it is mutually beneficial.

179. There are many procompetitive effects from vertical integration. *First*, vertical integration may allow an input supplier to gain valuable implementation experience that helps them improve their own products, benefiting consumers.[425] Arm's CEO, Rene Haas, recently made this very point. Addressing speculation about Arm's potential entry into AI chip design, Mr. Haas explained that an important reason for Arm's integration into chip design is to gain a better understanding of the link between hardware and software: "it's easier to do if you're building something than if you're licensing IP" where "you're much closer to that interlock and have a much better perspective in terms of the design tradeoffs to make. So, if we were to do something, that would be one of the reasons."[426]

---

money from iPhones," Android Authority, June 11, 2025, https://www.androidauthority.com/did-you-know-samsung-apple-partnership-3426411/.

[425] *See*, for example, "Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, p. 4, https://hbsp.harvard.edu/product/711463-PDF-ENG ("Qualcomm has been willing to move downstream into end products in order to demonstrate proof of concept. While other IP firms only do technology (which sometimes creates problems in implementation, such as Rambus), Qualcomm repeatedly created end-user products and systems to show that the technology could really work."); Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, November 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/ ("Making its own mobile processors has helped Apple innovate with such features as facial recognition and augmented reality on the iPhone. Designing its own chips for devices like the MacBooks and Mac Mini announced Tuesday should also allow Apple to be more creative with PCs. […] When chip, device, and software engineers work closely together they can squeeze more performance out of a device than is possible with an off-the-shelf chip."). *See also* Khadija Khartit, "When Does It Make Sense for a Company to Pursue Vertical Integration?" Investopedia, February 6, 2025, https://www.investopedia.com/ask/answers/012715/when-does-it-makes-sense-company-pursue-vertical-integration.asp ("Vertical integration makes sense as a strategy, as it allows a company to reduce costs across various parts of production, ensures tighter quality control, and ensures a better flow and control of information across the supply chain."). *See also* Yang, Chenyu, "Vertical Structure and Innovation: A Study of the SoC and Smartphone Industries," The RAND Journal of Economics, 2022, Vol. 51, No. 3, pp. 739–785 (Studying a hypothetical vertical merger between Qualcomm and HTC (a smartphone manufacturer) finding that it "can increase innovation and welfare, mainly driven by the investment coordination of the merged firms.").

[426] Exhibit 10 of Haas (Arm) Deposition ("If you are defining a computer architecture and you're building the future of computing, one of the things you need to be very mindful of is that link between hardware and software. You need to understand where the trade-offs are being made, where the optimizations are being made, and what are the ultimate benefits to consumers from a chip that has that type of integration. That is easier to do if you're building something than if you're licensing IP. This is from the standpoint where if you're building something, you're much closer to that interlock and you have a much better perspective in terms of the design trade-offs to make. So, if we were to do something, that would be one of the reasons we might.").

180. *Second*, Arm's entry into chip design increases competition, expanding product variety and potentially leading to lower prices and more rapid innovation, which in turn benefits consumers. While Arm's entry into data center chip design has the potential to harm Qualcomm by "stealing" volume from Qualcomm, this "stealing," if it in fact occurs, is the essence of competition.[427,428] Qualcomm points to a chat among Arm managers where Mr. Haas commented that Arm's competitors would be "hosed" if Arm were to build its own chips.[429] While framed in colloquial terms, the statement reflects the essence of competition, which is striving to create a product that customers prefer to the alternatives produced by rivals.

181. *Third*, Qualcomm and Prof. Posner provide no evidence to support their claims that Arm moved into chip design for anticompetitive reasons (seeking profit is not inherently anticompetitive). [redacted]

[427] Competition on the merits may harm to rivals. In *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945), Judge Hand famously captured the idea that competition harms rivals by stating that it would be contrary to the spirit of the antitrust laws to punish a firm that led to the exit of its rivals as a result of its "superior skill, foresight and industry."

[428] Qualcomm has until now not been successful in the data center space. However, as "part of a broader strategy from Qualcomm to diversify its business," in May 2025, it announced its plans "to launch a custom CPU for the data center that can connect to Nvidia's GPUs and software." *See* Arjun Kharpal, "Qualcomm to launch data center processors that link to Nvidia chips," CNBC, May 19, 2025, https://www.cnbc.com/2025/05/19/qualcomm-to-launch-data-center-processors-that-link-to-nvidia-chips.html. Qualcomm's recent acquisition of Alphawave Semi is also part of its strategy to expand in the data center space. *See* Majeed Kamran, "Qualcomm's Alphawave Acquisition Targets Data Centers and AI, But What's Next?" EE Times, June 9, 2025, https://www.eetimes.com/qualcomms-alphawave-acquisition-targets-data-centers-and-ai-but-whats-next/.

[429] [redacted]



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

[432] "Infrastructure" refers to data centers.

115

183. *Fourth*, Arm's chip design is currently focused on data centers, where Arm-based chips have a very low share. This is consistent with Mr. Awad's testimony and suggests that foreclosure of Qualcomm was not a motive for the decision to move into chip design.[435] Furthermore, Qualcomm has indicated that it is not expected to begin selling data center chips until fiscal year 2028.[436] Prof. Posner does not explain why, if foreclosure of Qualcomm was indeed a motivating factor behind Arm's integration into chip design, Arm would not have begun with segments where Qualcomm has a larger presence. In other words, starting its "broad scheme" to harm Qualcomm in a segment where Qualcomm does not currently generate any revenue seems ineffective and irrational.

184. *Fifth*, other firms in the industry have similarly engaged in verticalization. For example, as Paul Williamson testified, "AWS as a cloud vendor now build[s] their own silicon, rather than purchasing off-the-shelf silicon from other vendors. So that has been a verticalization trend in the

[435] Prof. Posner acknowledges that "the requirements of each sector are unique." Posner Report, ¶ 60. This implies that Arm entry in a given application does not affect competition in other applications.

[436] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [data center] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. If successful, we expect revenues to begin in the fiscal '28 timeframe.").

infrastructure market."[437] Similarly, Apple in 2020 vertically integrated upstream into computer chip design with the launch of its Arm-based M1 chip.[438]

185. Prof. Posner further alleges that Arm's entry might discourage customers from sharing confidential information.[439] These claims are speculative and unsupported. He does not provide any evidence on the existence or extent of this issue but instead simply cites the FTC's complaint on Nvidia's acquisition of Arm.[440] However, the FTC's opinion in that case did not result in a Court decision and thus is not evidence.[441] On this claim, I further note the following:

- *First*, Prof. Posner does not provide any quantification, i.e., he does not explain how much less confidential information would be shared in a world where Arm engages in chip design for data centers compared to a world where Arm only designs OTS cores and CSS, nor does he identify the impact on product development.

---

[437] Williamson (Arm) Deposition, 96:3-9.

[438] "Apple announces Mac transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/; "Apple unleashes M1," Apple Newsroom, November 10, 2020, https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/. Abbey (Arm) June 2025 Deposition, 152:11-25 (Abbey testified to the trend of OEMs vertically integrating into chip production: "The market is shifting the same way that we know that a company like Apple has a vertical integration and a Silicon team that has the ability to produce chips. The market is shifting. And so Apple is a good example. Tesla is a good example. Xiaomi is an example. And so if you do have a silicon team that's enhoused within the OEM – […] -- then, you know, who is paying royalties? It's the OEM. So as the -- as the marketplace shift, as the world shifts, we adapt to the changes that we are seeing in the marketplace. We simply want to broaden. We want to broaden the engagements that we have with all customers that consume ARM technology.").

[439] Posner Report, ¶ 19 ("As part of its traditional business model, Arm meets with its chipmaker customers to learn their business plans and technological needs so that it can improve the ISA. […] But if those customers believe that Arm may start competing with them in their line of business, they will be reluctant to share confidential information, which in turn will retard the development of Arm's ISA.").

[440] Posner Report, ¶ 89.

[441] The FTC has lost various vertical merger litigations, indicating that the FTC is not infallible in its conclusions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc*., U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, January 31, 2025, Case 4:24-cv-02508, Dkt. Entry 511 ("For the reasons specified below, the motion for a preliminary injunction is denied. […] The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns."); Swagath Bandhakavi, "FTC ends legal challenge against Microsoft's $69bn Activision Blizzard acquisition," Tech Monitor, May 23, 2025, https://www.techmonitor.ai/digital-economy/big-tech/ftc-microsoft-activision-blizzard-deal ("The FTC decided to drop the case following the dismissal of its appeal for a preliminary injunction, concluding that continuing the challenge against the already completed acquisition would not align with public interest objectives.").

- *Second*, Prof. Posner does not address why the same concerns he raises wouldn't apply to Arm's OTS cores or CSS. He does not explain why Arm's ALA customers would not already be reluctant to share confidential information that Arm could potentially use to develop its OTS cores, that indirectly compete with Qualcomm's custom cores. The absence of any evidence indicating such reluctance suggests that ALA customers are currently willing to share information and are likely to continue doing so even after Arm begins selling its own chips.[442]

- *Third,* even assuming that Prof. Posner is correct about partners becoming more reluctant to share confidential information, that would not make Arm's entry at the chip design stage anticompetitive. Prof. Posner fails to acknowledge that Arm's entry increases competition and improves Arm's ecosystem (by demonstrating that Arm-based chips are

[442] A possible reason why Prof. Posner's concern does not appear to affect transactions is that Arm limits the transmission of confidential information across the ALA and TLA teams. Ms. Bhattacharya, Senior Director of Engineering within the Architecture and Technology Group at Arm, stated that there are "concerns about sharing confidential information between parties."

a viable alternative to x86), which is procompetitive. He would need to balance any alleged anticompetitive effect with the procompetitive effects of entry.[443]

- *Fourth*, if Prof. Posner is correct that Arm's entry into chip design would "retard the development of Arm's ISA,"[444] that would represent a cost to Arm, who would risk losing sales to x86 and RISC-V. Prof. Posner acknowledges this cost, but fails to draw its implications in terms of reducing the profitability of foreclosure, and thus on Arm's incentive to foreclose. This cost would be particularly high if Prof. Posner is correct that "[t]he functionality of chips depends more on the microengineering choices of chip designers like Qualcomm than on the underlying ISA."[445] Regardless, contrary to Prof. Posner's claim, there is no evidence that Arm's entry into data center chip design has "retarded" the development of Arm's ISA.

- *Fifth*, Arm is developing chips for data centers,[446] and is experimenting with chips for automotive applications,[447] but it does not plan to develop chips for smartphones or PCs.[448] Qualcomm and Apple are already active and successful in producing chips for mobile and PC, limiting Arm's incentive to sell chips for those applications. Prof. Posner does not explain why the concern he raises is significant in light of the fact that Arm is

---

443 This is the balancing that is generally done for mergers, both horizontal and vertical. For example, the upward pricing pressure from a horizontal merger would need to be compared to merger-specific efficiencies before a conclusion that a merger harms consumers can be reached. In the case of vertical mergers, the elimination of double marginalization and other merger-specific efficiencies need to be assessed before one can conclude that they are insufficient to eliminate any potential harm to competition.

444 Posner Report, ¶ 19.

445 Posner Report, ¶ 22. The only basis Prof. Posner offers for this definitive statement is the testimony of a Qualcomm employee, "Gerard Williams, Qualcomm Senior VP Engineering."

[redacted]

447 Williamson (Arm) Deposition, 125:18-22 ("[W]e've engaged and considered building for a lead partner in the automotive division, silicon for the ADAS [Advanced Driver Assistance Systems] market for a potential lead customer called Waymo.").

448 Williamson (Arm) Deposition, 125:18-126:4, 128:15-132:2, 175:11-25 (explaining that there are "[n]o active chips or silicon support development in the PC market" and that discussions by Arm with OEM mobile vendors have not extended to providing them a completed chip, but that "[Arm's] focus has been what we call compute subsystems.").

not planning to enter segments representing the large majority (70%) of Qualcomm's revenue.[449]

186. Finally, I highlight that there is a significant difference between a vertical merger and the entry of an existing supplier into stages of the value chain that are further downstream. Antitrust agencies generally see a firm's organic entry into downstream stages of the supply chain as procompetitive because it adds a new competitor which tends to increase competition, increase variety, and eliminate double marginalization even if it can create incentives to raise rival input costs.[450]

187. In summary, vertical integration is a widely adopted and often procompetitive strategy across many industries. Arm's entry into chip design mirrors similar moves by firms like AWS, Apple, and Qualcomm, which operate at multiple levels of the supply chain. Such integration can enhance innovation, increase product variety, and eliminate inefficiencies like double marginalization. Rather than harming competition, Arm's expansion reflects standard industry practice and is a natural response to evolving customer needs.

3. Arm's Ecosystem Remains Open

188. Prof. Posner wrongly claims that Arm recently pivoted from a "longstanding business model" that is "open" and "neutral" to a "different model, one in which it forecloses customers in

[449] Posner Report, ¶¶ 25, 64 ("Though mobile handsets comprise around 70% of Qualcomm's revenue, Qualcomm has penetrated the other chip sectors to varying degrees, including automotive, virtual reality (VR) and augmented reality (AR) devices, wearables (e.g., smartwatches and smartglasses), and IoT."). Prof. Posner states that "[f]or *illustrative* purposes, I focus on the data center sector, though Arm's intentions to sell SoCs extend beyond the data center sector," but provides no support for this claim (emphasis added)).

[450] For example, an FTC press release on legislations prohibiting direct sales to consumers by auto manufacturers stated: "According to the comments by staff from the FTC's Office of Policy Planning, Bureau of Competition, and Bureau of Economics, current laws in both jurisdictions 'operate as a special protection for [independent motor vehicle dealers] – a protection that is likely harming both competition and consumers.' […] 'FTC staff offer no opinion on whether automobile distribution through independent dealerships is superior or inferior to direct distribution by manufacturers. […] [C]onsumers are the ones best situated to choose for themselves both the cars they want to buy and how they want to buy them.'" *See* "Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers," Federal Trade Commission, Press Release, May 16, 2014, https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibitions-direct-consumer-auto-sales.

sectors that Arm seeks to enter."[451] [redacted] As described below, Prof. Posner also ignores important evidence that Arm continues to maintain an open business model and its entry into data center chips is procompetitive.

189. *First*, contrary to Prof. Posner's claim, there is no evidence that Arm will not negotiate ALA licenses. In fact, Arm has several such existing agreements. Arm has recently signed an ALA with Nuvia in 2019, and since then with large, sophisticated customers such as Apple, IBM, and Google.[453] Prof. Posner provides no evidence, and in fact makes no claim, that Arm had ceased offering ALAs to other existing ALA customers. Even for Qualcomm, as recently as August 29, 2025, Arm responded to Qualcomm's August 8, 2025, letter with a set of "initial questions" regarding the terms outlined in Qualcomm's "proposed Annex 1 to the ALA for Arm's unreleased

---

[451] Posner Report, ¶ 66 ("Arm is pivoting from its open, neutral model—where it treats its customers in a nondiscriminatory manner, benefits from attracting as many licensees as possible, and therefore provides adequate support to its licensees—to a different model, one in which it forecloses customers in sectors that Arm seeks to enter."), ¶ 19 ("Arm will no longer keep its commitment to neutrality and openness"), ¶ 86 ("More than a decade later, Arm's ISA has reached such a level of dominance that licensees can no longer easily walk away. Now Arm seeks not only to raise royalty rates, but to design and manufacture SoCs, in a "dramatic departure from its traditional business model."), ¶ 87 ("Arm has already threatened to terminate Qualcomm's ALA, reversing its longstanding business model as the 'Switzerland of chips,' so that it can both increase the royalty rate, as it has done for the TLA, and take Qualcomm's SoC business.").

[redacted]

[453] Ehab Youssef identified IBM and Apple as partners that signed an ALA since 2019. *See* (Youssef (Arm) Deposition, 31:1-22); Google signed an ALA in June 2021 (ARM_01428339). *See also* ARM_00119603. Prof. Posner himself recognizes that "[i]n addition to Qualcomm, Arm licenses its architecture to a dozen or so other firms, including Apple, HiSilicon, IBM, Fujitsu, Ampere, T-Head, and BRJX." Posner Report, ¶ 24.

v10," and reaffirmed its intention to "move the negotiations forward."[454] As of the submission of this report, Qualcomm maintains both a TLA and an ALA with Arm.[455]

190. *Second*, in paragraph 88 of his expert report, Prof. Posner wildly mischaracterizes a statement made by Mr. Haas, claiming that Mr. Haas stated that Arm no longer wished to keep its prior commitments to customers and instead planned to "cut off" ALA licensees. Prof. Posner states:

> *Arm's CEO, **Rene Haas, has recently confirmed that Arm no longer wishes to keep its prior commitments and instead plans to cut off ALA licensees** and sell SoCs directly to OEMs, such as data centers, automobile companies, and mobile phone manufacturers. Rene Haas said that Arm's interest in whether to accept a prospective customer depends on "whether your business is a chip business [such as Qualcomm] or a product business."*[456]

191. To support his claim—which is critical to his antitrust narrative—Prof. Posner cites to a *single source*: a YouTube interview of Mr. Haas conducted in October 2024.[457] Contrary to Prof. Posner's characterization, the interview he cited makes no mention of ALAs or any licensing agreements whatsoever. Mr. Haas certainly did not state that Arm broke prior commitments or cut off ALA licenses. Prof. Posner's claims are simply disconnected from the plain language of Mr. Haas' answer. Below is the full quote cited by Prof. Posner, with the portion that he directly quotes in bold:

---

[454] ARMQC_02785287 (August 29, 2025, letter from Spencer Collins (Arm) to Ann Chaplin (Qualcomm)) at '287 – '290. In the same letter, Arm reiterated its offer of "an in-person meeting between the commercial teams," noting that "we have now offered [the meeting] three separate times." *Id.* at '290. On June 13, 2025, Arm reiterated to Qualcomm that "Arm remains prepared to negotiate in good faith over the terms of a license to the v10 architecture." *See* ARMQC_02771127. In the same letter, Arm further told Qualcomm that its "offer to meet remains open and Arm continues to believe that such a meeting would be the most efficient path forward in response to Qualcomm's request [for a v10 license]. Please have the relevant business personnel respond to Mr. Abbey with dates that Qualcomm is available for such a meeting."

[455] QCVARM_1014030; QCARM_3474751.

[456] Posner Report, ¶ 88 (emphasis added).

[457] "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY, at 15:20-16:00.

> *You know, first thing on, competing with our customers, you know, it's rather complicated because if you look at some of our customers, our customers are Amazon. Our customers are Microsoft. Our customers are Apple. Our customers are Tesla. They all build chips using ARM. I'm not going to build an electric car. I'm not going to build a phone. I'm not going to build a data center. So, to look at the value chain relative to who builds chips, relative to* ***whether your end business is a chip business or a product business****. It's gotten a lot more gray. We follow what the industry is demanding, and what the industry wants to see is solutions getting to market faster. And that's what we're focused on.*[458]

192. In fact, two of the four Arm customers that Mr. Haas mentioned (Apple and Microsoft) have ALAs with Arm.[459] So not only does Mr. Haas not talk about cutting off access to Arm's ISA, he highlights two customers that have active and ongoing access to Arm's ISA.

193. [redacted] For example, Android remains an open-source mobile operating system even though Google—the owner and primary developer of Android—also makes and sells Android Pixel phones.[460] Arm has long supplied customers at multiple levels of the supply chain. For over a decade, Arm has offered OTS cores (through its TLAs) to customers such as Qualcomm, and more recently Arm has entered CSS agreements with Samsung, MediaTek, and Nvidia.[461] Prof. Posner makes no claims that Arm's sale of OTS cores and CSS is inherently anticompetitive. In fact, although Prof. Posner seeks to conflate vertical integration with the shift

---

458 "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY, at 15:20-16:00. For completeness, I include a full transcript of Mr. Haas' interview in **Appendix C**.

459 Weidmann (Arm) Deposition, 35:9-36:14 (identifying eight ALA customers: Qualcomm, Apple, HiSilicon, IBM, Fujitsu, Ampere, T-HEAD and BRJX). *See also* ARM_00119603. Microsoft also has an ALA; *see* ARM_01427719 (Microsoft ALA dated May 19, 2010), ARM_01427776 (Microsoft ALA dated March 23, 2017), ARM_01427796 (Microsoft ALA dated September 3, 2020).

460 *See* Ben Schoon, "Google Pixel grows in US, settling into top 4 spot ahead of Pixel 10 launch," 9to5google, July 28, 2025, https://9to5google.com/2025/07/28/google-pixel-us-market-share-q2-2025/; "Understanding Android," Android, https://www.android.com/everyone/facts/, accessed August 29, 2025.

461 *See* Rene Haas, "Arm Holdings Plc Q3 2025 Earnings Call," February 5, 2025, https://investors.arm.com/static-files/f1190d81-408d-4276-a30c-b27c1ce5a30a, p. 4 and Rene Haas, "Arm Holdings Plc Q1 2026 Earnings Call," July 30, 2025, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008, p. 3.

to a closed business model, Arm has never stated that it intends to close off access to its ISA, and Prof. Posner provides no evidence that Arm intends to do so.

194. *Fourth*, Arm has recently entered data centers with its own chip—not because Arm intends to close its ecosystem—[redacted][462] a large potential data center customer that historically purchased only x86-based data center chips.[463] T[redacted] Arm's entry to meet the unmet need of a potential large customer is procompetitive and is in no way evidence that Arm intends to close its ecosystem.

195. *Fifth*, if Arm intended to close its ecosystem by foreclosing Qualcomm and other customers, then Arm's decision to enter with its own chip in data centers first would be an ineffective and irrational approach. As described earlier, Qualcomm currently has no chip in data centers,[465] and thus *zero share,* and is not expected to begin selling data center chips until fiscal year 2028, if at all.[466] [redacted]

---

[462] *See* Section VIII.B.2.

[463] Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008.

[464] *See* Section VIII.B.2.

[redacted]

[466] Qualcomm's fiscal year ends in September, and as such Qualcomm's entry is expected between October 2027 and September 2028. *See* "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [datacenter] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. **If successful, we expect revenues to begin in the fiscal '28 timeframe.**" (emphasis added)). [redacted]

And yet, Prof. Posner claims that Arm is behaving anticompetitively because "Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the *short term*."[469] Yet, in effect, Prof. Posner actually suggests the opposite—that Arm should sacrifice its own short term profits in data centers by not entering, simply to accommodate Qualcomm's lagging and uncertain entry. Contrary to Prof. Posner's claim, Arm's entry is not economic foreclosure; instead, it is a response to customer demand.

---

[469] Posner Report, ¶ 13 (emphasis added).

196. Moreover, as Prof. Posner highlights, "Intel's x86 still dominates the data center sector a with [sic] roughly 84% share," despite recent growth in Arm-based chips.[470] In the short term, Arm's entry is more likely to divert sales from x86 than to cannibalize sales of other Arm-based chips. For this reason, entering with data center chips first would be an ineffective and irrational strategy if Arm's goal were to close its ecosystem and foreclose its customers.

197. Relatedly, Prof. Posner suggests that the success of the Arm ISA was somewhat arbitrary, due simply more to its "open, neutral model" than its technological capabilities and advantages.[471] Although I do not opine on the accuracy of Prof. Posner's claim, I understand from Dr. Brogioli that an important aspect of the success of the Arm ISA was its superior design and functionality, particularly with respect to lower power implementations.[472] I do note, moreover, that Prof. Posner acknowledges that the Arm ISA had advantages over available alternatives. For example, he states that "[o]ther companies and groups developed ISAs but their ISA found few followers because of concerns about openness or **dissatisfaction with the design choices embedded in those other ISAs**, or because they were designed for niche devices," and that "Arm's ISA was the more attractive in part because it had **properties that better fit the needs of chipmakers**."[473] In other words, Prof. Posner seems to suggest that Arm has both a superior product and a superior business model.[474] It is therefore not surprising that Arm has succeeded over available alternatives, including the chips supplied by Intel, which has historically been a very well established and

[470] Posner Report, ¶ 64.

[471] Posner Report, ¶ 22 (stating that Arm's ISA was "more attractive" to chipmakers than other ISAs at the time, "but it is not clear that Arm's ISA was technically superior to other ISAs, in the sense of being essential to the design of higher quality chips. […] The most important factor in the success of Arm's ISA appears to be that its open, neutral model appealed to chip designers and manufacturers […] As has often been pointed out, it is important that people agree to drive on the left side or the right of the road; it is not important which side is chosen as long as everyone agrees on the same side. A common ISA solves a coordination problem in the industry, but it may not matter much which ISA is used." Prof. Posner does acknowledge that "Arm's ISA was the more attractive in part because it had properties that better fit the needs of chipmakers at the time than other ISAs did[.]").

[472] Expert Report of Dr. Michael C. Brogioli, September 5, 2025, Section VIII.A.3.c; Conversation with Dr. Michael C. Brogioli, September 2, 2025.

[473] Posner Report, ¶ 22 (emphasis added).

[474] Richard Grisenthwaite's (Chief Architect at Arm), testimony is consistent with this view. *See* Grisenthwaite (Arm) Deposition, 17:10-14 ("ARM has been successful, hence the large number of units shipped. No small part of that has been our technology, but some of it has also been because of the business model.").

successful firm.[475] Prof. Posner provides no evidence that Arm's "open, neutral model" was "the most important factor in the success of Arm's ISA" other than the opinion of a single Qualcomm employee (his sources are a "[c]onversation with Gerard Williams, Qualcomm Senior VP Engineering" and testimony by the same Gerard Williams stating that he does not think Arm had any "inherent advantages" over alternative architectures.").[476] The continued success of Arm over many years and the fact that it continues to invest in R&D and improve its technology, recently leading to share gains from x86 in various applications historically dominated by Intel, suggests that Arm's success is not arbitrary.[477]

### C. Increases in Royalty Rates Are Not Inherently Anticompetitive

198. Qualcomm criticizes the royalty rate increase that Arm implemented when it introduced Arm v9.[478] For example, the SAC states that "[a]fter releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to 'upgrade' their licenses to v9 by not releasing or supporting older v8 cores."[479] Prof. Posner makes a different royalty claim, saying that "Arm has increased royalty rates under the TLA in a way that does not appear to be based on the underlying costs of maintaining the Arm ecosystem, and even as Arm's

---

[475] "Too Good to Lose: America's Stake in Intel," Center for Strategic and International Studies, November 12, 2024, https://www.csis.org/analysis/too-good-lose-americas-stake-intel (Intel is the "largest and most advanced U.S.-headquartered manufacturer [of chips]" and "has an unmatched history of breakthrough semiconductor innovations—including the first programmable microprocessor and the x86 architecture—which have together made an indelible impact on the world of computing [that] continues to shape the digital landscape of the modern world... The company has made massive commitments to invest heavily—more than $100 billion over the next five years—in new chipmaking capability and capacity on domestic soil, aiming to develop and manufacture chips at the most advanced process nodes of 2 nanometers (nm) and below. Recognizing the importance of this, the U.S. government has announced plans to award Intel the largest share of federal support under the CHIPS Act.").

[476] Posner Report, footnotes 23-25.

[477] *See* Sections V and VIII.D.1.

[478] "Arm Holdings plc Q3 FYE24 Results Presentation," Arm Holdings, February 7, 2024, https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (reporting that "[o]ur v9 product garners roughly 2x the royalty rate of the equivalent v8 product" but "in some cases it's quite a bit more," and that "[r]oyalty revenue sequential growth is mainly coming from increasing penetration of ARM v9, where royalty rates are, on average, at least double the rates on equivalent ARM v8 products.").

[479] SAC, ¶ 70. I do not have an opinion on whether the characterization of v9 as only modestly better than v8 is appropriate.

OTS cores fall further behind custom cores in terms of quality."[480] The SAC similarly contends that Arm's October 2024 offer to Qualcomm for Arm's "core designs" was "extreme and clearly not commercially feasible for Qualcomm."[481] These claims ignore fundamental differences in Arm's and Qualcomm's licensing models and the economic realities of their positions in the value chain. Even after Arm's recent rate adjustments, its share of the overall chip "stack"—the total profit derived from chip sales—remains smaller than Qualcomm's. Moreover, price increases alone do not indicate anticompetitive conduct. In innovation-driven industries, royalty adjustments often reflect the value of new technology, or the increased value of existing technology, and the need to recover R&D investments. I discuss these arguments in detail below.

199. While I do not opine on the improvements of v9 relative to v8 of the ARM ISA, Qualcomm's internal documents show [redacted],

[480] Posner Report, ¶ 58.

[481] [redacted]

[482] [redacted]

[483] [redacted]

[redacted]

1. Arm's Share of the Chip "Stack" Is Smaller than Qualcomm's

200. Arm and Qualcomm both hold key IP in the wireless space, but their licensing models differ significantly. Arm primarily licenses to chip manufacturers, such as Qualcomm and MediaTek, and also companies further downstream in the supply chain that design their own chips, such as Apple, Amazon, and Google. Arm's royalties are typically calculated as a percentage of the average selling price ("ASP") of the chip itself, rather than the much higher price of the final product (e.g., a Samsung Galaxy smartphone). In contrast, Qualcomm licenses its patent portfolio to device manufacturers, such as Apple and Samsung, and typically calculates royalties as a percentage of the ASP of the entire device—often several times higher than the chip's ASP.[485] Qualcomm does not license its IP portfolio to rival suppliers of modem chips, such as Broadcom and MediaTek.[486]

201. Industry commentators have stated that Arm's IP is underpriced relative to Qualcomm. For example, SemiAnalysis, a research firm specializing in the Semiconductor and AI industries,

[redacted].

484 [redacted]

485 *See*, for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International. According to the SAC, Arm was unsuccessful in its attempt "to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made." *See also,* SAC, ¶ 70.

486 *See*, for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International.

observed that Qualcomm charges $13 per device for wireless transmission IP and another $25 for the baseband chip, while Arm's ISA—also essential to smartphone functionality—commands far lower royalties. The analysis questioned why Arm couldn't charge similar rates, given the critical nature of its technology.[487]

202. A comparison of Arm's and Qualcomm's aggregate royalty revenues highlights the same disparity. Both Arm and Qualcomm IP is embedded in virtually every mobile device sold globally. Yet, Qualcomm's royalty revenue significantly exceeds Arm's. Arm's total revenue in the 12-month period ending in March 2025 was $4.0 billion, with approximately 46%, representing about $1.85 billion, attributed to the mobile segment.[488] Over the same period, Qualcomm's QTL division generated $5.6 billion total revenue, "principally from royalties generated through [Qualcomm's] licensees' sales of mobile handsets."[489]

203. Even after the rate increases reflected in the October 2024 offer, Arm's share of the chip stack (i.e., of the overall profit from the sale of a chip) remains smaller than Qualcomm's share. Arm's highest proposed royalty rate in its October 2024 offer to Qualcomm was [REDACTED]

---

[487] "How would we value an essential piece of IP that every smartphone needs, with virtually no alternative? $1, $2, maybe $3 per handset? We propose it could be as much as $13 per phone. This is 24 times higher compared to current pricing! […] Apple pays Qualcomm $13 in royalties per device (not just for smartphones but also for wireless enabled iPads and watches) for the use of wireless transmission IP, and another $25 for the actual baseband chip. Effectively, $13 per device this is what Qualcomm gets away with charging for a technology that is essential to the operation of a smartphone against the company with arguably the strongest bargaining power globally. The Arm ISA is also essential to the operation of a smartphone, why couldn't they charge as much as Qualcomm? Why not more?" *See* Dylan Patel, Myron Xie, Afzal Ahmad, and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/. Even as far back as 2013, analysts were commenting, "[g]iven how many ARM designs exist in the market (and the size of some of ARM's biggest customers), it almost seems like ARM should be raising its royalty rates a bit." Anand Lal Shimpi, "The ARM Diaries, Part 1: How ARM's Business Model Works," AnandTech, June 28, 2013, https://web.archive.org/web/20130701165406/http://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works/2.

[488] Arm 2025 Form 20-F, pp. 60 ("Our royalty revenue from the mobile applications processors market constituted approximately 46% of our total royalty revenue for the fiscal year ended March 31, 2025."), 72 (reporting total revenue of $4,007M). Arm's total revenue includes revenue earned from the sale of its OTS implementation cores and CSSs. For this reason, the $1.85 billion in revenue for the mobile segment is conservatively high because it includes much more than just mobile licensing royalties for the Arm ISA.

[489] Qualcomm Financial Summary downloaded from LSEG Data & Analytics. Qualcomm 2024 Form 10-K, p. F-16.

[REDACTED].[490] In contrast, the *FTC v. Qualcomm* trial revealed that Qualcomm "currently charges smartphone makers a 5% [of the ASP of the smartphone] royalty for its whole cellular patent portfolio, capped at $20/handset, or 3.25% for LTE-only devices (capped at $13/handset)."[491] Therefore, the lowest royalty rate that Qualcomm charges is 3.25% of the smartphone's ASP, while Arm's highest rate is [REDACTED]. With some simple math, Arm's [REDACTED]

204. I do not opine on whether the royalty rates that Arm and Qualcomm charge for their IP are "excessive" or appropriate. However, the large disparity in royalty payments per device for two technologies that are both essential to the development of a smartphone suggests that Arm's IP is

---

[490] [REDACTED]

[491] "Trial Sheds Light on Q'comm Patent Holdings, Royalty Rates," EETimes, January 21, 2019, https://www.eetimes.com/trial-sheds-light-on-qcomm-patent-holdings-royalty-rates. *See also* "Qualcomm 5G NR Royalty Terms Statement," November 19, 2017, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm-5g-nr-royalty-terms-statement.pdf ("Qualcomm Incorporated today disclosed a framework for industry participants to access Qualcomm's patented inventions used in the upcoming 3rd Generation Partnership Project (3GPP) 5G New Radio (NR) standards. […] Under Qualcomm's licensing program for cellular essential patents, the following royalty terms will apply on a worldwide basis to a license for Original Equipment Manufacturer (OEM) branded mobile handsets that implement the 5G NR standard, up to and including release 15 of the 3GPP specifications: (i) An effective running royalty rate of 2.275% of the selling price of branded single-mode 5G handsets; and (ii) An effective running royalty rate of 3.25% of the selling price of branded multi-mode (3G/4G/5G) handsets. […] In addition, Qualcomm will continue to offer licenses for OEM branded mobile handsets that include both Qualcomm's cellular standard essential patents as well as those patents not essential to the standard, a total portfolio of over 130,000 patents and pending applications worldwide at royalty rates of 4% of the selling price for branded single-mode handsets and 5% of the selling price for branded multi-mode handsets.").

[492] [REDACTED]

[493] [REDACTED]

priced cheaply compared to Qualcomm's IP, contrary to claims that Arm's royalty demands are "unreasonable" or "exorbitant," as Qualcomm claims.[494]

2. Price Increases Are Not Inherently Anticompetitive

205. In high-tech industries, competition is often driven by R&D aimed at improving the quality and performance of products offered in the marketplace. The incentive to invest in costly and risky R&D stems from the expectation of earning profits from sales.[495] When a firm successfully innovates, raising prices to reflect the value of its improved technology is not anticompetitive but a standard commercial response to successful innovation.[496] In the same way, a firm may raise its price in response to an increase in demand, and it is certainly true that with the advent and recent growth of AI, the demand for Arm-based chips has never been higher.[497] Such a price increase is common in business and occurs even in the absence of any incentive to foreclose.

206. Furthermore, it is important to interpret any price increases in light of the "starting point," i.e., the price before the increase. [redacted]

[494] "Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, July 11, 2025, p. 10. I use "essential" in its colloquial meaning of necessary (in the short run).

[495] "Patents are rewards for those who have contributed to economic growth through their inventions. Any resulting market power enjoyed by a patent holder is typically considered a social cost that is necessary to stimulate innovation and provide a return on R&D expenditures." Lemley, Mark A. and Carl Shapiro, "Probabilistic Patents," Journal of Economic Perspectives, 2005, Vol. 19, No. 2, pp.75–98.

[496] In its Reply Brief to the U.S. Court of Appeals, Qualcomm stated that "Qualcomm has the right to earn a return on its investment in developing patented technologies by licensing at the OEM level and not making exhaustive sales of modem chips. And Qualcomm has a valid interest in protecting its investments in innovation and R&D and its OEM licensing program." *Federal Trade Commission v. Qualcomm Incorporated*, "Reply brief for appellant Qualcomm Incorporated (Redacted)," December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit, pp. 48-49.

[497] Rene Haas, "Arm Holding Plc Q4 2025 Earnings Call," May 7, 2025, https://investors.arm.com/static-files/181d5019-29bd-4ba5-af29-45888e25c637, p. 14 ("Arm is everywhere. Increasingly, demand for the Arm architecture is requiring us to deliver more. We're seeing that with our compute subsystems and with the advent of AI workloads running in the data center, running on a PC, running on a smartphone, running on your automobile, or even running in the earbuds, the demand for Arm technology has never been greater. So, we are incredibly excited about the future. AI is changing everything and you can't run AI without Arm."); Rene Haas, "Arm Holdings Q2 FYE25 Investor Presentation," Arm Holdings, November 6, 2024, https://investors.arm.com/static-files/623fece0-c947-4d93-94eb-e08e8dfad61b, pp. 2-3 ("I am very proud to tell you that in that year, we have exceeded all of our expectations on execution of our growth strategies. The demand for AI everywhere is increasing the demand for Arm's compute platform. […] It goes without saying that AI is everywhere. Arm is the only compute platform that can run AI from the edge to the cloud. AI is driving demand for our performance and power-efficient compute platform everywhere.").

This context matters: a price increase from a low baseline may simply reflect a correction toward a price level that reflects a technology's value.[499]

207. While Qualcomm seeks to extend the favorable terms of its 2013 ALA deal far into the future, it is not anticompetitive for Arm to adjust its pricing to reflect the value of its R&D investments. Forcing Arm to maintain outdated pricing risks significantly diminishing its incentives to innovate and develop higher quality technologies.[500] Qualcomm itself has reportedly increased the price of its chips following the launch of a new higher-performance version of its Snapdragon chip.[501] As discussed above, industry analysts have noted that Arm's IP has

498 

499 *See also* Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025, explaining that the royalty rate structure contained in Qualcomm's May 2013 ALA did not anticipate the extensive customer demand for increased chip capabilities and the expansion of application use cases observed since then. As an illustration, at the time of the 2013 agreement Qualcomm was primarily making smartphone chips and such chips had a small number of cores, typically just one or two. The $1.88 royalty cap per-chip in Qualcomm's ALA (see footnote 128128) was set based on the expectation that the number of cores would remain limited and did not anticipate the large increase in the number of cores per smartphone chip that eventually occurred. Furthermore, the Qualcomm agreement with Arm does not have a field of use restriction, and at the time of the agreement Arm was not even present in that segment. And yet today, data center chips often have over 100 cores, a scenario that the $1.88 royalty cap per chip was clearly never intended to cover.

500 On the importance of appropriating returns to investment, *see* Shapiro, Carl, "Premiums for high quality products as returns to reputations," The Quarterly Journal of Economics, 1983, Vol. 98, No. 4., pp. 659-679.

501 Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo! Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html ("Qualcomm's Snapdragon 8 Elite offers a notable improvement in performance and efficiency over previous Snapdragon chips, promising next-gen Android phones with even more impressive features and longer battery life. However, this comes at a cost, with reports suggesting manufacturers are paying Qualcomm as much as $190 for the chip — 20% more than the previous models. With such a steep price rise this year, you might expect Qualcomm not to hike the price of its next flagship SoC. Early reports suggest that might not be the case, though."). I do not have data to check if the reported price increase actually occurred; my point is that the price increase would be perfectly understandable and not anticompetitive.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

historically been underpriced. It is therefore not surprising that Arm increased the royalty rate of v9.[502]

208.

[502] *See* Dylan Patel, Myron Xie, Afzal Ahmad and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/.

134

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

209. While I do not have detailed data to compare terms offered to Qualcomm to other comparable deals,

[506] Youssef (Arm) Deposition, 66:7-71:3.

135

210. In summary, Arm's royalty rate increases are consistent with standard commercial practices in innovation-driven industries and do not reflect anticompetitive conduct. Arm's pricing remains modest relative to Qualcomm's, its share of the chip stack is smaller, and its licensing model continues to support broad access to its ISA. There is no evidence that Arm's royalty adjustments reflect a broad scheme to foreclose rivals rather than simply competitive dynamics in an industry where R&D investments are costly and necessary to preserve a firm's ability to compete.

**D. "Dominant" Shares Do Not Imply a Lack of Competitive Pressure**

211. Prof. Posner states that Arm "dominates the Arm ISA ecosystem through its control of the Arm ISA technology," with a "99% [share] of all smartphones."[508] However, Prof. Posner fails to consider that Arm's large share in smartphones (and much lower share in other applications) does not imply a lack of competitive pressure.

1. <u>Arm Continues to Invest a Significant Portion of Its Revenue</u>

212. Prof. Posner claims that "by reducing competition in designing and selling chips, Arm (and any remaining competitors) will be able to raise prices and *skimp on innovation* without fear of being undercut or outperformed by Qualcomm or other licensees that make SoCs using custom cores that deliver higher performance."[509]

213. I addressed the claim regarding royalty rates in Section VIII.C.2 and do not opine on whether the quality of Arm's OTS cores has decreased, relative to other custom cores. In this Section, I focus on Prof. Posner's assertion that Arm is skimping on innovation. Prof. Posner fails

[508] Posner Report, ¶¶ 55-56.

[509] Posner Report, ¶ 16 (emphasis added).

to explain why, as a "monopolist" protected by high "barriers to entry,"[510] Arm would continue to invest a significant portion of its revenue in R&D.[511] Prof. Posner also does not consider that Arm's sustained investment is more consistent with a firm responding to competitive pressure—particularly from x86 and RISC-V—than with one exercising unchecked market power.[512]

214. Arm's high share of smartphone chips reflects Arm's innovation and continued investment in R&D. There is no evidence that Arm is underinvesting or that Arm's focus on innovation and R&D has been declining over time.[513]

- *Arm Invests a Much Higher Share of Revenue than Qualcomm:* A common measure of the intensity of R&D investment is a firm's R&D expenditure as a share of revenue. As I show in **Exhibit 5** below, since 2019, Arm has reinvested a much higher share of its revenue in R&D than Qualcomm every year.[514] Arm's average R&D share over this period has been

[510] Posner Report, ¶¶ 18, 58.

[511] "Monopolies may also fail to innovate, as they are loath to cannibalize their own products. They may even fail to adopt minor innovations. […] The virtues of competition in action." Tirole, Jean, "Competition and the Industrial Challenge for the Digital Age," Annual Review of Economics, 2020, Vol. 156. *See also* Shapiro, Carl, "Competition and Innovation Did Arrow Hit the Bull's Eye?" in The Rate and Direction of Inventive Activity Revisited (ed. Josh Lerner and Scott Stern), 2012, University of Chicago Press ("The unifying principle, richly supported by the empirical literature, is that innovation, broadly defined, is spurred if the market is contestable; that is, if multiple firms are vying to win profitable future sales.").

[512] The SAC provides further evidence of Arm's inability to exercise its purported monopoly power: Arm was unsuccessful in its attempt to "to renegotiate [Apple's] royalty rates notwithstanding the parties' existing contract." SAC, ¶ 70. *See also* Wayne Ma & Cory Weinberg, "How a Lopsided Apple Deal Got Under Arm's Skin," The Information, November 29, 2023, https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin ("At one point, Son called Apple CEO Tim Cook to tell him Arm would be raising prices for all its major smartphone and chip customers. Cook's team reassured him that Arm couldn't raise fees, because the companies' contract at the time lasted through 2028. Son backed off. Since then Apple and Arm have been through several rounds of negotiations that have kept the financial terms of Apple's deal largely in place, people familiar with the matter said.").

[513] ARMQC_02731630 (an Arm internal email dated June 1, 2023, with subject "Android and RISC-V: Internal Talking Points." While acknowledging the limitations of RISC-V, it states that "we will likely see productized implementations within 5 years. The first products will not be mobile handsets and it remains to be seen if the industry has any appetite at all, or the funds, to undertake the monumental task of moving this category of devices and its millions of applications to R-V. […] there is still a lot of work to do to get all of the Architecture, Security and System IP standardized and in place." It concluded that "we cannot be complacent; Arm needs to continue to outpace the competition with both architecture features for real-world compute loads and micro-architecture innovations along with addressing security challenges of the future.").

[514] I acknowledge that cross company comparisons may suffer from issues such as different accounting conventions. I also acknowledge that the increase in Arm's R&D expenditure does not fully reflect an increase in R&D "effort," as Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2024, https://investors.arm.com/static-

47%, reaching 52% in the year ending March 2025.[515,516] By contrast, Qualcomm's R&D as a percentage of total revenue was always below 30% over the same period. Arm also invested a higher share than Intel whose R&D as a percentage of total revenue over the same period was approximately 23%.[517]

---

files/dcdd6629-24bb-40ef-ba55-8aca1362205a, explains at p. 71: "Research and development expenses increased by $846 million, or 75%, during the fiscal year ended March 31, 2024 as compared to the fiscal year ended March 31, 2023, primarily due to the impact of the incremental share-based compensation costs and associated employer taxes arising in connection with the IPO and new awards […]. Other factors contributing to the increase included salaries and related expenses due to headcount increases from hiring as well as increases in third-party engineering expenses, IT expenses including cloud services, and allocated facility overhead expenses, partially offset by increases in research and development tax incentives and gains from cash flow hedge activity." While not perfect, the comparison of Arm and Qualcomm R&D is informative in suggesting that Arm continues to engage in intensive R&D efforts.

[515] ARM_00000510 at '535; ARM_00000382 at '416; ARM_01259705 at '927; Arm 2025 Form 20-F, p. 72 and Arm 2023 Form F-1, p. 99. In its most recent quarter ending June 30, 2025, Arm reinvested 62% of its revenue into R&D. *See* "FYE26 Q1 (30-Jun-25) Historical Quarters Datasheet.xlsx," Arm Holdings, July 30, 2025, https://investors.arm.com/financials/quarterly-annual-results. "R&D expenses consist primarily of employee-related expenses, including salaries, bonuses, share-based compensation, and benefits associated with employees in research and development functions, along with project materials costs, third-party fees paid to consultants, depreciation and amortization, allocated overhead, information technology and other development expenses. We receive government grants to compensate for certain research activities and we recognize the benefit as a reduction of the related expenses included in R&D expenses." *See* Arm 2023 Form F-1, p. 98.

[516] *See also* ARM_01282304 at '314, a 2018 Arm presentation reporting R&D as a percentage of revenue going back to 2005 and showing an increase in 2016-2017 compared to prior years.

[517] Intel Corporation, 2021 Form 10-K, for the fiscal year ended December 25, 2021, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-22-000007/0000050863-22-000007.pdf, p. 37, and Intel Corporation, 2024 Form 10-K, for the fiscal year ended December 28, 2024, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000009/0000050863-25-000009.pdf, p. 23. The highest ratio, 31.2% was in 2024 and the lowest, 17.4%, was in 2020.

**Exhibit 5: R&D Expenditure as Percentage of Total Revenue**[518]

- *Arm Has Increased Its R&D Investment Faster than Qualcomm:* From 2019 to 2025, Arm's R&D expenditure increased by about 150% while Qualcomm's R&D increased by

[518] Arm: ARM_00000510 at '535 and Exchange Rates, "British Pound to US Dollar History: 2019," https://www.exchangerates.org.uk/GBP-USD-spot-exchange-rates-history-2019.html for 2019, ARM_00000382 at '416 for 2020; Arm 2023 Form F-1, Arm Holdings plc, August 21, 2023, p. 99 for 2021-2022; and Arm 2025 Form 20-F, p. 72 for 2023-2025. Qualcomm: MacroTrends, "QUALCOMM Research and Development Expenses 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/research-development-expenses, MacroTrends, "QUALCOMM Revenue 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/revenue. For Arm, total revenue is the sum of "Revenue from external customers" and "Revenue from related parties;" for Qualcomm, total revenue is the sum of revenue from "Equipment and services" and from "Licensing." For each year, I use the revenue and R&D expenditure figures from the latest available source.

only around 65%.[519] Some of the recent increases in Arm's investment is due to investments Arm is making to develop its own data center chips.[520]

215. Arm executives testified that Arm sees competitive threats to "[a]ll parts of our business,"[521] e.g., from RISC-V, which pushes Arm to innovate and meet its customers' requirements to maintain its technological leadership.[522]

216. Prof. Posner overlooks the fact that Arm's sustained R&D investment is both a response to competitive dynamics and a key driver of its success. Far from skimping on innovation, Arm's behavior reflects a firm actively investing to maintain and grow its position in a rapidly evolving industry.[523]

---

[519] Qualcomm Incorporated, Form 10-K, for fiscal years 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx, and Qualcomm Incorporated, Form 10-Q, for quarterly periods 2019 - 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx, ARM_00000510 at '535, ARM_00000382 at '416. Qualcomm's fiscal year ends in September; for purposes of comparison, I aggregate quarterly data to match Arm's fiscal year, which ends in March. From 2019 to 2025, Arm's R&D expenditure increased from $840 million to $2.1 billion, while Qualcomm's expenditure increased from $5.4 billion to $9.0 Billion.

[520] Rene Haas, "Arm Holdings Plc Q1 2026 Earnings Call," July 30, 2025, p. 4, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008 (In the most recent Arm earnings call, Mr. Haas described Arm's accelerate R&D investments: "We are continuing to explore the possibility of moving beyond our current platform into additional compute to subsystems, chiplets and potentially full end solutions. To ensure these opportunities are executed successfully, we have accelerated the investment into our R&D. These investments include expanding engineering delivery across multiple – levels, adding to the already significant product investments we have made to-date.").

[521] Williamson (Arm) Deposition, 102:2-10.

[522] Even when Arm innovates to meet its clients' needs, they may still choose to use a competing ISA. *See* ARMQC_02740386 at '387 ("We are on track to intercept this requirement. But they still want to bring in RISC-V").

[523] An internal Arm presentation from June 2023 outlines the company's strategic emphasis on advancing CPU technology, aligning with broader industry trends toward enhanced performance. The presentation highlights Arm's increased cadence of CPU product releases, an expansion in the number of CPUs offered, and sustained growth in both architectural complexity and engineering headcount. *See* ARM_01314793 at '797 (discussing the focus on better technology: "CPU Performance State of the Industry," […] everyone is working through the same playbook: Wider, deeper, better predictors, better prefetchers, more MHz, more datapaths, lower latency to L1/L2, larger caches,"), at '824 (characterizing its goal for the CPU Roadmap as an "[e]xplosion" with increase in the number of CPUs); at '826 (discussing that Arm's "average number of product releases [to partners] increased by ~1.8x"; at '827 (discusses growth in architecture complexity from 2000 to 2023, "~ 13% CAGR in Arch complexity from ~2015-23"), at '828 (discussing sustained growth in its CPU team over the years, "CPU has grown ~3.3x since `15 (~16% CAGR)."). *See also* ARM_01293447 at '448.

2. Current High Shares Do Not Guarantee Future High Shares

217. Prof. Posner does not consider that current high shares do not guarantee future high shares. There are many examples of once "dominant" firms that lost significant shares to rivals.

- *PC Segment:* In the PC segment, Intel's x86 had a share of nearly 100% in 2019.[524] However, the x86 share has recently come under significant competitive attack. In June 2020, Apple announced its plan to fully transition all Apple computer products from x86 to its own Arm-based chips, and by June 2023, Apple's transition was complete.[525] Then, as explained above, Qualcomm followed with Arm-based chips for Windows PCs in 2023, quickly gaining traction and further reducing the share of x86. These chips currently represent 9% of new Windows PC sales priced at $600 and above in the U.S. and the top five European countries.[526] Counterpoint Research estimated that Arm-based chips have reached 12.8% share in 2022, not accounting for Qualcomm's recent growth.[527] Looking

[524] Based on Counterpoint Research estimates, Intel's share was 84% and AMD share was 15.1%, with Arm at less than 1%. *See* Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027.

[525] *See* "Apple announces transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/ (Apple announced the transition away from Intel and towards silicon would occur over the next two years). *See also* Charles Martin and Malcom Owen, "The history—and triumph —of Arm and Apple Silicon," Apple Insider, April 22, 2024, https://appleinsider.com/articles/24/04/22/the-history----and-triumph----of-arm-and-apple-silicon (As part of the transition to silicon, Apple's Macs would use chips based on Arm designs. The Mac Pro was the last machine to make the transition in June 2023.). Apple also uses its own Arm-based chips for its iPhone pursuant to its ALA with Arm. *See* Mike Wuerthele, "Apple & ARM's iPhone & Mac chip partnership will continue for decades," Apple Insider, September 5, 2023, https://appleinsider.com/articles/23/09/05/apple-arms-iphone-mac-chip-partnership-will-continue-for-decades.

[526] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf, p.3 (Qualcomm states its goal is to achieve $4 billion in PC chip revenue by fiscal year 2029); "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf, p. 7. It's estimated that Qualcomm captured just 0.8% of the total PC market in Q3 2024. *See* Jowi Morales, "Qualcomm claims it owns 10% of U.S. Windows PC retail market for devices priced $800 and up," Tom's Hardware, February 6, 2025, https://www.tomshardware.com/tech-industry/qualcomm-claims-it-owns-10-percent-of-u-s-windows-pc-retail-market-for-devices-priced-usd800-and-up.

[527] Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027.

forward, Qualcomm targets 12% of the overall PC segment,[528] and Arm aims to reach 50% share in the Windows PC segment by 2029.[529]

- *Server Processor Segment:* In 2018, Intel held a 98% share of server processors and x86 had a 98.9% share in Q4 2019.[530] However, with the recent successes from Arm-based processors, such as AWS Graviton, Google Axion, Microsoft Azure Cobalt, and Nvidia Grace, Arm-based products have gained a share of roughly 15% as of 2024.[531] AWS estimated that "over 50% of new CPU capacity added by AWS in the last 2 years is on Arm-powered Graviton."[532] As with the PC segment, a historically dominant ISA is not guaranteed to maintain its lead over time.
- *Other industries:* The fall of MySpace, AOL, and Blockbuster further illustrates that dominance can erode quickly. A 2007 article in *The Guardian* wondered: "will [social networking service] MySpace ever lose its monopoly?"[533] Less than 5 years later MySpace was "sold for $35m in spectacular fall from $12bn heyday."[534] A similar destiny befell

---

[528] "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, pp. 11-12, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf.

[529] Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, June 3, 2024, https://www.reuters.com/technology/arm-aims-capture-50-pc-market-five-years-ceo-says-2024-06-03/.

[530] Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html; Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market.

[531] Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, March 31, 2025, https://www.reuters.com/technology/arm-expects-its-share-data-center-cpu-market-sales-rocket-50-this-year-2025-03-31/. Arm estimates that its share of "Cloud Compute" is 20%. "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553.

[532] "AWS and Arm," Arm, https://www.arm.com/markets/computing-infrastructure/cloud-computing/aws#1, accessed August 29, 2025. *See also* "AWS re: Invent 2024 - Monday Night Live with Peter DeSantis," AWS, YouTube.com, December 3, 2024, https://www.youtube.com/watch?v=vx36tyJ47ps&t=1041s;.

[533] Victor Keegan, "Will MySpace ever lose its monopoly?" The Guardian, February 8, 2007, https://www.theguardian.com/technology/2007/feb/08/business.comment.

[534] Dominic Rushe, "Myspace sold for $35m in spectacular fall from $12bn heyday," The Guardian, June 30, 2011, https://www.theguardian.com/technology/2011/jun/30/myspace-sold-35-million-news.

instant messaging AOL.[535] Blockbuster dominated the video rental space, but failed to recognize the threat posed by Netflix and other streaming services, even turning down an opportunity to acquire Netflix for $50 million in 2000.[536]

218. Prof. Posner argues that, due to "network effects," Arm's ecosystem is protected by "entry barriers."[537] While "network effects" are a feature of this industry and "entry barriers" exist, as they do in many industries, Prof. Posner provides no evidence about how "high" they are, much less that they are insurmountable. He does not attempt to quantify the strength of the effects or demonstrate that the "entry barriers" are so high to isolate Arm from competition.[538] In fact, Arm's recent success in segments previously dominated by x86 shows that "network effects" are not insurmountable (i.e., network effects did not protect x86's shares). The very fact that Qualcomm views RISC-V as a potentially viable alternative to Arm—even for high performance applications—suggests that Qualcomm does not view this existing "barrier to entry" as insurmountable.[539]

219. Moreover, contrary to Prof. Posner's suggestion, the presence of even strong "network effects" does not imply that an industry can only accommodate a single "ecosystem." Multiple ecosystems coexist in other industries with "strong" network effects such as smartphones (where iOS and Android compete by developing ecosystems of compatible hardware and software), credit

[535] Mike Wehner, "AIM is officially dead, and your childhood means nothing," Yahoo!News, October 6, 2017, https://www.yahoo.com/news/aim-officially-dead-childhood-means-nothing-174900787.html.

[536] Steve Mollman,"Blockbuster 'laughed us out of the room,' recalls Netflix cofounder on trying to sell company now worth over $150 billion for $50 million," Fortune, October 22, 2024, https://finance.yahoo.com/news/blockbuster-laughed-us-room-recalls-174322621.html.Currently, Blockbuster has a single store still operating, in Bend, Oregon. *See*, Saul Sugarman, "So I visited the last Blockbuster on the planet, and all I got was this t-shirt," The Bold Italic, December 8, 2023, https://thebolditalic.com/so-i-visited-the-last-blockbuster-on-the-planet-and-all-i-got-was-this-t-shirt-ffc6d2ed414d.

[537] Posner Report, ¶ 11 ("Arm's ISA ecosystem exhibits strong network effects"), 34 ("An ISA ecosystem is characterized by significant entry barriers"), ¶ 57 ("Arm's ecosystem is protected by entry barriers. Because so many companies specialize in Arm-compliant products, a firm that sought to develop a new ISA would have to not only produce a superior ISA. It would also have to persuade firms in the Arm ecosystem to give up their existing customers and develop products for a not-yet-existing set of customers.").

[538] Posner Report, ¶¶ 34-35, discussing features of an industry that, Prof. Posner argues, lead to "significant entry barriers" but not providing any empirical evidence. *See also* ARMQC_02770485.

[539] *See* Section V.

cards (where multiple networks coexist), and ride share platforms (where Uber and Lyft coexist with their own ecosystems).[540]

3. Any Attempt by Arm to Foreclose Customers Would Accelerate Development of Alternatives such as RISC-V

220. Prof. Posner opines that Arm's actions "may" impede the development of alternative ISAs, such as RISC-V.[541] He claims that "if Arm […] weakens" the firms that would otherwise support such alternatives, such alternatives "will have trouble attracting chipmakers and thus face greater barriers to entry."[542] He also claims that, "[i]f Qualcomm is badly wounded, then it may not be able to continue to support or boost RISC-V."[543] However, this claim is vague and unsupported. Prof. Posner does not define what "badly wounded" means, nor does he explain how such a condition would materially limit Qualcomm's ability to invest in RISC-V development. Moreover, he fails to weigh the countervailing incentive: that foreclosure would likely increase, not reduce, Qualcomm's motivation to support competing ISAs.

221. Prof. Posner's "badly wounded" claim seems to reflect the idea that, even if foreclosure increases incentives for Arm's customers to invest in other ISAs, those customers would have fewer financial resources to make those investments. This conjecture is highly speculative, however, and it implicitly assumes that the financial costs of foreclosure would outweigh the increased incentives to invest in alternative ISAs. In practice, many of Arm's customers—including Apple, Google, Meta, and Samsung—are large, well-capitalize enterprises with ample

[540] Bumblebees fly even if it was once believed that this defied the law of physics (*see* Joseph Calamia, Explained: The Physics-Defying Flight of the Bumblebee, Live Science, February 25, 2011 https://www.livescience.com/33075-how-bees-fly.html). Similarly, platforms that, in theory, are protected by network externalities and barriers to entry are displaced by new entrants, as the examples discussed above illustrate. For various other examples, *see* Ryan Bourne, "Is This Time Different? Schumpeter, the Tech Giants, and Monopoly Fatalism," Cato Institute, June 18, 2019 https://www.cato.org/publications/policy-analysis/time-different-schumpeter-tech-giants-monopoly-fatalism. Prof. Posner remains in the realm of theories and does not contend with reality; he does not explain, for example, why the barriers to entry that "defend" Arm are more impenetrable that the barriers to entry that, for example, defended MySpace. Prof. Posner behaves as a scientist that disregards the reality of bees flying because the theory does not explain the observed empirical evidence, rather than challenging and modifying the theory to accommodate the empirical evidence.

[541] Posner Report, ¶ 18.

[542] Posner Report, ¶ 18.

[543] Posner Report, ¶ 78. See *also id.*, ¶ 18.

resources to invest in alternative ISAs,[544] and evidence shows that the dispute with Arm has further increased, rather than retreating, Qualcomm's efforts to develop RISC-V.[545] Industry commentators have also noted that any attempt by Arm to restrict access to its ISA is likely to accelerate efforts to develop RISC-V as a viable, open-source alternative to Arm in the smartphone segment and other applications.[546] Faced with foreclosure, a strong and innovative company such as Qualcomm would not remain idle; it would have a strong incentive to invest in and support an alternative to Arm's ISA.

222. In reality, Qualcomm has been investing in the RISC-V ISA ecosystem and has successfully shipped over a billion low-end RISC-V applications as of 2023.[547] As of June 2024,

---

[544] For example, Apple, Alphabet (Google's parent company), and Meta are among the top 10 companies in the world in terms of market capitalization, each with a capitalization of $1.9 trillion or more (*see* Lyle Daly, "The Largest Companies by Market Cap in August 2025," The Motley Fool, August 4, 2025 https://www.fool.com/research/largest-companies-by-market-cap/) compared to a market capitalization of about $145 billion for Arm as of August 29, 2025 ("Market Capitalization of Arm Holdings," Companies Market Cap, https://companiesmarketcap.com/arm-holdings/marketcap/, accessed August 29, 2025). Samsung and Qualcomm have a capitalization of about $330 billion as of August 29, 2025 ("Market Capitalization of Samsung," Companies Market Cap, https://companiesmarketcap.com/samsung/marketcap/, accessed August 29, 2025) and $170 billion as of August 2025 ("Market Capitalization of Qualcomm," Companies Market Cap, https://companiesmarketcap.com/qualcomm/marketcap/, accessed August 29, 2025).

[545] *See* Section V.A above.

[546] *See*, for example, Abner Li, "Report: Arm cancels Qualcomm's instruction set, IP license for chip design," 9to5Google, October 22, 2024, https://9to5google.com/2024/10/22/report-qualcomm-arm-chip-design/ ("Looking ahead, this Arm uncertainty could lead to the adoption of the open source RISC-V instruction set. Back in October of 2023, Qualcomm and Google announced work on a RISC-V Wear OS chip. The Android team is actively working on adding OS support with a focus on ensuring that "any CPU running RISC-V will have all of the features we expect to achieve high performance."). *See also* Linley Gwennap, "Editorial: Arm's No-Win Legal Fight," Tech Insights, https://www.techinsights.com/blog/editorial-arms-no-win-legal-fight, accessed August 29, 2025 ("Arm and Qualcomm are locked in an ugly public spat over the rights to Nuvia's CPU. Unresolved, this conflict could hamper Arm's progress in the PC market and foment interest in RISC-V.").

[547] In November 2023, Ziad Asghar, VP of product management at Qualcomm, spoke at the RISC-V Summit about Qualcomm's efforts to develop RISC-V applications, highlighting that Qualcomm had shipped 650 million devices with RISC-V in 2022 and over a billion devices in total since then. "By 2022, just like we showed last year, we had shipped 650 million devices with RISC-V, that is an amazing number. […] What has happened since then, today we are in excess of a billion devices that have RISC-V integrated microcontrollers in them. That's a massive number." *See* "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, @ 4:37, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational. *See also* "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential ("To date, Qualcomm Technologies has shipped in excess of 650 million RISC-V cores."); [redacted]

Qualcomm has various ongoing development efforts, including support for high performance RISC-V CPU and handset applications,[548] [redacted][549] This is contrary to Prof. Posner's claim that Qualcomm "may not be able to continue to support or boost RISC-V."[550]

223. While RISC-V's current commercialization is concentrated in low-end applications such as microcontrollers and IoT, it is generally regarded as having high potential,[551] with various firms investing in its development.[552] Qualcomm's leadership has repeatedly emphasized this view,

---

[548] [redacted]

[549] [redacted] Cortex-A78 is categorized as a "High-Performance CPU" on Arm's product listing. "CPU Cortex-A78," Arm https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78, accessed August 29, 2025 ("Designed for high-end performance at best efficiency, Cortex-A78 enables superior immersive experiences, bridging the gap between mobile and laptop performance. Optimized for new form factors and foldables, Cortex-A78 is ready for the next wave of mobile innovation and continues Arm's industry-leading mobile performance and efficiency with 5G device architecture."). [redacted]

[550] Posner Report, ¶ 78.

[551] [redacted]

[552] NVIDIA uses RISC-V in its microcontroller. *See* "How NVIDIA Shipped One Billion RISC-V Cores In 2024," RISC-V International, February 25, 2025, https://riscv.org/blog/2025/02/how-nvidia-shipped-one-billion-risc-v-cores-in-2024/. [redacted]

highlighting RISC-V's properties in terms of performance, power efficiency, and customization.[553] In 2023, Qualcomm reported that over a billion of its devices already include RISC-V microcontrollers, and it continues to expand its RISC-V roadmap across mobile, automotive, and industrial applications.[554]

224. Apart from Qualcomm, various efforts within the industry are already underway to advance RISC-V for use in higher-end applications.[555] For example, AheadComputing—a startup founded

---

[redacted] Andrew Howard, Vice President of Partner Success and Licensing at Arm, testified that he sees RISC-V as a significant competitor in "in low-end markets […] I believe RISC-V is a viable substitute for Cortex M -- ARM M Profile CPUs" and that he has "knowledge that we did not achieve licenses with some customers. And sales documented it was due to RISC-V being chosen." *See* Howard (Arm) Deposition, 161:20-162:25. Similarly, Peter Greenhalgh, SVP of technology at Arm, stated that "There are markets today where RISC-V is a totally viable alternative and is being favored over ARM. […] An example would be Hardware Security Modules -- so we call them HSMs -- where they tend to use RISC-V CPUs instead of ARM CPUs. That would be one of the examples. There are other cases where in terms of sudden microcontroller functionality, which is on the larger applications processor, people will favor using a RISC-V CPU, rather than an ARM CPU. […] And another example would be the controller functions which are embedded on our applications processor." *See* Greenhalgh (Arm) Deposition, 100:3-23. *See also* ARMQC_02740205 at '214, a May 2024 presentation on assumptions about RISC-V's effect on Arm's IoT sales.

[553] [redacted]

[554] [redacted] In November 2023, Mr. Asghar spoke at the RISC-V Summit, touting RICS-V's "many advantages," "massive opportunity," and momentum, as well as its deployment in over a billion Qualcomm devices that have RISC-V microcontrollers: "I think one thing is very clear – we are at a great point where RISC-V is really gaining momentum […] we have multitude of products that are coming out that are all able to use many of the advantages that RISC-V brings. [@ 0:36] […] When you look at what we have from mobile perspective and from the side of automotive and industrial IoT, AR and VR devices. It's a massive opportunity. [@ 1:00] […] [A] product that has better performance […] better power consumption […] Those are all areas where RISC-V can really excel and differentiate itself. […] the opportunity is just massive for RISC-V. [@ 2:19] […] We just launched our latest platforms – the Snapdragon 8 Gen 3 and also the Snapdragon X Elite for PC side – but we have the ability to be able to do even better with RISC-V […] the breadth and the momentum […] the full scale of what RISC-V ecosystem looks like and that's amazingly promising. [@3:10] […] By 2022, just like we showed last year, we had shipped 650 million devices with RISC-V, that is an amazing number. […] What has happened since then, today we are in excess of a billion devices that have RISC-V integrated microcontrollers in them. That's a massive number. [@4:37]" "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational.

[555] RISC-V has features of a disruptive innovator, as discussed, for example, in Gans, Joshua "The Disruption Dilemma," MIT Press, 2016.

by former Intel chip architects—is developing RISC-V for "high-performance cores for servers and data centers" and "scalable solutions for mobile and edge applications" using RISC-V.[556] Arm has itself acknowledged in a January 2024 presentation that RISC-V has gained traction as the "preferred arch[itecture]" in certain data center products and with competitors like Tenstorrent and Ventana building full-stack RISC-V systems.[557]

225. Therefore, contrary to Prof. Posner's claims, Arm's alleged conduct and associated effect on Arm's reputation could lead to faster erosion of its share in favor of RISC-V.

226. In summary, Qualcomm's early and ongoing investment in RISC-V, and the recognition within the industry, demonstrates that RISC-V ISA is a growing and credible competitor to the Arm ISA. While RISC-V's commercialization has been limited to low-end applications thus far, sustained development efforts—by Qualcomm and various firms—are expanding its viability to be adopted in higher-end CPU products and other applications. Contrary to Prof. Posner's claim that, facing the alleged foreclosure by Arm, Qualcomm "may not be able to continue to support or boost RISC-V,"[558] the evidence shows the opposite: the dispute has only strengthened Qualcomm's incentive to accelerate RISC-V development, thereby increasing—not reducing—ISA competition.

---

[556] Skye Jacobs, "Former Intel engineers from AheadComputing to break CPU performance limits with RISC-V design," TechSpot, June 12, 2025, https://www.techspot.com/news/108281-former-intel-engineers-form-aheadcomputing-break-cpu-performance.html. *See also* QCARM_7484882. Similarly, Qualcomm, NXP, Infineon, Bosch, and Nordic Semiconductor formed a joint venture named Quintauris to accelerate the adoption of RISC-V technology. Financial services company CGS International commented that: "For most other low power markets, Arm remains the ISA of choice, due to its history, vastly superior software ecosystem, and strong product offerings. The joint venture by Qualcomm/NXP/Infineon/Bosch/Nordic to develop RISC-V hardware modestly increases competitive pressure on Arm, but JV product timelines are still uncertain and initial designs will be limited to auto." CGS International, "Arm Holdings pcl - Initiate at Outperform and $160 PT; Content Story in Early Innings," US Equity Research, Sept 12, 2024, p. 9.

[557] "RV [RISC-V] competitors (Tenstorrent, Ventana, …) have developed full (CPU + Mesh + AI accl[elerator] + IO hub) systems targeted towards datacenters/6G," where Arm needs to actively bring business in early versus RISC-V and "formally communicate details on competition." ARMQC_02726982 at '989.

[558] Posner Report, ¶ 78.

4. There Is No Evidence that Arm's Purported Decision to Stop Supporting v8 Is Anticompetitive

227. Qualcomm argues that "Arm has pressured existing v8 licensees to 'upgrade' their licenses to v9 by not releasing or supporting older v8 cores."[559] However, I have seen no evidence of the alleged pressure, and Qualcomm and Prof. Posner do not provide any.

228. To assess this claim, I compare the transition from v8 to v9 with the earlier transition from v7 to v8.[560] If Qualcomm's claim were accurate, one would expect the shift from v8 to v9 to be faster than the shift from v7 to v8. Yet, the data do not support this conclusion: there is no evidence that the ongoing transition from v8 to v9 is faster.[561] The speed of penetration of v8, reflected in the expansion of the darker blue section at the top of the bars in the red box on the left, is similar to the speed of penetration of v9, reflected in the expansion of the darkest blue section at the top of the bars in the red box on the right.

229. Although this test is admittedly rudimentary and not without limitations, it nonetheless provides more substantive insight than the speculative claims and absence of supporting evidence offered by Qualcomm and Prof. Posner.[562]

**Exhibit 6: Royalty Revenue by Technology**[563]

230. It is, moreover, standard commercial practice for firms to promote newer versions of their technology. What Qualcomm characterizes as "pressure to upgrade" is better understood as Arm encouraging its customers to adopt improved products and highlighting that the benefits of switching to its newer technology outweigh the costs.[564]

231. In conclusion, Arm faces real and growing competition from x86 and RISC-V, continues to invest heavily in R&D, and operates in a dynamic ecosystem where sustained success is not guaranteed. The evidence shows that Arm's conduct—including its licensing practices, pricing, and product transitions—is consistent with standard commercial behavior. Attempts to foreclose customers like Qualcomm would likely accelerate the development of competing ISAs, undermining Arm's own ecosystem. Prof. Posner's analysis fails to account for these constraints and costs, rendering his conclusions speculative and incomplete.

## IX. Prof. Posner Has Not Demonstrated that Arm's Conduct Harmed Competition and Consumers

232. Qualcomm claims that it suffered harm as a result of Arm's conduct.[565] Prof. Posner claims that, because of Arm's conduct, "the downstream OEMs will either pay more for chips or be required to settle for lower-quality chips, to the detriment of the ultimate consumer."[566] However, even if these unsubstantiated claims were true, harm to Qualcomm is not the same as (and does

[559] SAC, ¶ 70.

[560] David Brash, "The ARMv8-A architecture and its ongoing development," Arm Community, December 2, 2014 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development.

[561] For example, v8's share increased from a few percentage points in FY2014 to about 30% in FY2016, while v9's share increased from essentially zero in FY2022 to about 20% in the last quarter of FY2024.

[562] One reason why the test is imperfect is that many factors may be different between the two transitions, in addition to the alleged lack of support for v8. For example, the relative improvement of v9 over v8 and v8 over v7 can be a factor.

[563] Source: "Arm Holdings plc Q4 FYE24 Results Presentation," Arm Holdings, May 8, 2024, https://investors.arm.com/static-files/4f2fc46b-34a5-4bc5-94af-f13fbc348f0e (left chart); "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553 (right chart).

[564] For example, when Apple introduces a new iPhone, it generally "pushes" customers to upgrade through advertising.

[565] SAC, ¶ 34.

[566] Posner Report, ¶ 72.

not imply) harm to competition or consumers.[567] As a simple application of this general principle, entry into the supply of custom chips, including by Qualcomm's customers that start to develop their own custom chips for their own consumption or for supply to third parties, would harm Qualcomm but is likely to benefit competition and consumers.

233. As an example of harm to Qualcomm that is not harm to competition, Qualcomm argues that Arm's conduct allowed Qualcomm's customers to receive better financial terms (i.e., Qualcomm charged its customers less).[568] This is wholly unsubstantiated, but even if true, it may represent a benefit rather than harm to consumers because the lower cost to Qualcomm's customers can, to some extent, be passed-through to their own customers.

234. Qualcomm and Prof. Posner have neither shown that Qualcomm suffered competitive injury, nor, more importantly, have they shown that any such claimed harm caused harm to competition and consumers.

---

[567] This basic economic principle has been embraced by the Supreme Court, which, in discussing price reductions that harm competitors, stated: "To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for '[i]t is in the interest of competition to permit dominant firms to engage in vigorous price competition, including price competition." The Court went on emphasized that reducing prices in order to expand sales is often "the very essence of competition" and that "mistaken inferences . . . are especially costly because they chill the very conduct the antitrust laws are designed to protect." *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986). In another matter, the Supreme Court succinctly held that antitrust laws protect "competition, not competitors" (*Brown Shoe Co., Inc. v. United States*, 370 U.S. 294 (1962) at 370 U. S. 344). The Supreme Court reiterated this conclusion in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977) at 429 U. S. 488. ("The antitrust laws, however, were enacted for 'the protection of competition, not competitors'").

Economists have explained why competition rather than competitors must be protected. Disruptive innovations and creative destruction can harm competitors but more importantly benefit consumers. "The goal of antitrust policy is to protect and promote a vigorous competitive process. Effective rivalry spurs firms to introduce new and innovative products, as they seek to capture profitable sales from their competitors and to protect their existing sales from future challengers." Federico, Giulio, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," Innovation Policy and the Economy, 2020, Vol. 20, pp. 125-190. On "creative destruction," *see* Schumpeter, Joseph, "Capitalism, Socialism, and Democracy," Harper & Brothers Publishers, 1942.

[redacted]

235. As I discuss above, Arm's strategy is to work with its customers to promote and expand the ecosystem of Arm-based technology.[569] I also discuss above that Arm profits from the success of its customers, and their success in developing Arm-based rather than, e.g., RISC-V-based, technologies.[570] It is therefore natural and unsurprising that there is no evidence of Arm attempting to harm its customers.

**A. Qualcomm Has Not Demonstrated that Arm Had Anticompetitive Intent**

236. Qualcomm's SAC claims—without evidence—that Arm started the *Arm v. Qualcomm* litigation for anticompetitive reasons and that its conduct had the objective to harm Qualcomm.[571] Prof. Posner offers no evidence that Arm's conduct was anything other than a legitimate effort to protect its contractual rights and business model.

237. I do not opine on Arm's intent, which is a fact question for the Court to decide. Counsel for Arm has instructed me to assume that Arm started the *Arm v. Qualcomm* litigation to exercise its contractual rights, not to foreclose Qualcomm. However, I note that various factors suggest that Arm's actions were not aimed at harming Qualcomm, one of its main customers.

i. The *Arm v. Qualcomm* litigation is the first and only time Arm has filed a lawsuit against a customer.[572] This underscores the rarity and exceptional nature of the dispute. A one-off lawsuit is not indicative of a pattern of exclusionary conduct against customers or a broader strategy to suppress competition. Arm's strategy consists of working with its licensees to

[569] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023 https://newsroom.arm.com/blog/arm-licensing-models. (Abbey stated that "[t]hirty years on, a core philosophical tenet of Arm's original IP licensing model underpins its expanded subscription strategy to foster innovation: Arm only succeeds when partners succeed." *See also* ARMQC_02725050 at '068 (A September 2020 presentation discusses partner efforts on the Windows-on-Arm ecosystem and details partner collaborations to provide developer support and expand enterprise application readiness).

[570] Section VII.C. *See also* Chloe Ma's (Chief Business Officer at Arm) statement on leveraging Arm's partners, rather than focusing on RISC-V-based technologies, to drive success. ARMQC_02600713 at '719; Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships.

[571] SAC, ¶ 207.

[572] Rene Haas' trial testimony in *Arm v. Qualcomm*, 272:1-15 ("[In August 2022,] we were at a fork in the road, we were either going to continue for another 18-months plus to look the other way, or do something we had never done in our history and that was to file a claim, a lawsuit against a customer. But we made the choice to file the claim.").

build out the network of Arm-based technology and suing a customer runs counter to Arm's collaborative strategy. This exceptional case highlights that Arm has thus far been able to work productively with its licensees in furthering the use cases and value of its ecosystem, but it considered that it had to take action in view of a perceived breach of contract after Qualcomm's acquisition of Nuvia.

ii. While Qualcomm claims that the lawsuit was "meritless,"[573] Qualcomm ignores the fact that it did pass key pretrial motions, including a summary judgment motion.[574] These procedural outcomes indicate that Arm's claims were sufficiently substantiated to warrant a trial. Filing a lawsuit is a standard and legitimate recourse when parties are unable to reach a resolution through private negotiations. Such action cannot be considered anticompetitive per se; on the contrary, judicial resolution of uncertainty can promote clarity, expand trade, and strengthen incentives to innovate.[575]

**B. Arm's Litigation Position Was Public and Transparent from as Early as 2022**

238. Qualcomm claims that "[a]pparently seeking to ratchet up pressure on Qualcomm before trial in *Arm v. Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter […] asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing 'unlicensed cores,' and claiming that Arm will be entitled to terminate the [Qualcomm] ALA if Qualcomm does not capitulate to Arm's demands for a 'cure' within 60

---

[573] SAC, ¶ 8.

[574] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3 ("On October 30, 2024, the Court [in the *Arm v . Qualcomm* case] denied Qualcomm's and Arm's motions for summary judgment, holding that genuine issues of material fact remained for the jury.").

[575] Contractual disputes arising from honest disagreements over the correct interpretation of contractual terms are common. They can arise for a variety of reasons such as ambiguous or unclear language, and incomplete or imprecise terminology, which in turn may lead to the parties having different understandings and diverging interpretations. *See* Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581 ("[S]ignificant interpretive questions often arise in contract litigation. The obvious but not the only reason, besides clumsiness in the use of words, against which the legal linguists warn us, is that contractual performance generally occurs over time rather than being complete at the instant the contract is signed. This is a central rather than an accidental feature of the institution of contract.").

days."[576] Qualcomm also claims that the Breach Letter was "timed and publicly released in an effort to damage Qualcomm's business," because it coincided with "Qualcomm's annual Snapdragon® Summit."[577] Prof. Posner claims that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers by sowing doubts about Qualcomm's continued ability to sell Arm-compliant chips."[578]

239. Prof. Posner and Qualcomm do not explain how Arm's October 2024 letter and its publication could interfere with Qualcomm's business opportunities given that, as early as 2022, Arm repeatedly, clearly, and publicly stated that (a) Qualcomm was in breach of the Qualcomm ALA and (b) Arm had the right to terminate the ALA as a result.[579] As discussed earlier, Qualcomm also recognized that Arm's October 2024 Breach Letter was not "new news."[580] Nor do they explain how the notice could have harmed the competitive process.

240. [redacted]

[576] SAC, ¶ 29.

[577] SAC, ¶ 33.

[578] Posner Report, ¶¶ 45, 65.

[579] I understand that Arm has also maintained that it retains the right to terminate the agreement if Qualcomm is found to have breached its terms. [redacted]

[580] In *Arm v. Qualcomm*, Qualcomm's counsel acknowledged during the November 20, 2024 pre-trial conference that Arm's allegation of breach of the Qualcomm ALA has been part of the case "starting at the very beginning" and that "the letter on October 22nd [was] actually not new news in the sense of alleging [Qualcomm's] breaches" of the Qualcomm ALA because that claim was in the case "starting at the very beginning." *See also Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024, pp. 13, 14 ("And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed.").

241. Arm filed the *Arm v. Qualcomm* litigation on August 31, 2022.[582] The lawsuit was widely reported in the press.[583] In a publicly available filing dated November 15, 2022, submitted in the context of the *Arm v. Qualcomm* litigation, Arm reiterated and clarified its position.[584] The filing was also reported in detail in the press.[585]

---

581

582 *Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146* (D. Del. filed August 31, 2022), Dkt. No. 1.

583 For example, an article on the same day the lawsuit was filed reported: "Arm is suing Qualcomm, one of its key customers, in a row over the latter's Nuvia custom CPU cores. […] Arm has accused Qualcomm of being in breach of its licenses, and it wants the American giant to fulfill its obligations under those agreements, such as destroying its Nuvia CPU designs, plus cough up compensation." The article further reported: "According to Arm […] the licenses it granted Nuvia could not be transferred to and used by its new parent Qualcomm without Arm's permission. Arm says Qualcomm did not, even after months of negotiations, obtain this consent, and that Qualcomm appeared to be focused on putting Nuvia's custom CPU designs into its own line of chips without permission. That led to Arm terminating its licenses with Nuvia in early 2022, requiring Qualcomm to destroy and stop using Nuvia's designs derived from those agreements." *See* Chris Williams, "Arm sues Qualcomm over custom Nuvia CPU cores, wants designs destroyed," The Register, August 31, 2022, https://www.theregister.com/2022/08/31/arm_sues_qualcomm/. *See also* Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31.

584 *See Arm Ltd. v. Qualcomm Inc.,* No. 1:22-cv-01146-MN, Dkt. No. 1 (D. Del. August 31, 2022, filed November 15, 2022), at pp. 2-3 and ¶¶ 41, 230, 237, 250, ("Qualcomm is not only trying to develop an unlicensed product, but is also materially breaching its ALA with Arm. […] Within days after Qualcomm first contacted Arm about its planned acquisition of Nuvia, Arm informed Qualcomm in writing that it would need to enter into a new agreement if it wished to continue using the designs and technology that had been created pursuant to the Nuvia ALA. Arm did not wait in the weeds; it openly and promptly identified and communicated Nuvia's and Qualcomm's obligations. […] Qualcomm and Nuvia must stop using and destroy any Arm-based technology developed under Nuvia's ALA, and that neither Qualcomm nor Nuvia is licensed to continue developing this technology. […] Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the NuVia [sic] technology. […] Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology.").

585 *See*, for example, Dylan Patel, "Arm's Nuclear Option – Qualcomm Must Cancel Next-Generation Products If Arm Succeeds," SemiAnalysis, November 16, 2022, https://semianalysis.com/2022/11/16/arms-nuclear-option-

242. Arm's first communication with Qualcomm's customers who use products that embed Arm's technology occurred soon after filing the *Arm v. Qualcomm* litigation.[586] Arm had a legitimate reason to make its position known to users of its technology, to confirm and clarify the accounts in the public press, and to reassure customers of its lawful commitment to protect its IP.[587] Prof. Posner does not explain why that would generate harm for Qualcomm that is incremental to the alleged harm from the filing itself.

243. Similarly, Prof. Posner does not explain why the October 2024 Breach Letter would affect customer expectations or behavior given that for over two years Arm had repeatedly and publicly stated its belief that Qualcomm was in breach if its ALA, and a decision in the *Arm v. Qualcomm* litigation was expected only two months after the October 2024 Breach Letter.[588]

qualcomm-must/. *See also* Chris Williams, "Arm shells Qualcomm's Snapdragon launch party with latest salvo in license war," The Register, November 16, 2022, https://www.theregister.com/2022/11/16/arm_qualcomm_licensing_latest/.

[588] With a letter sent to Qualcomm on January 8, 2025, following the decision in the *Arm v. Qualcomm* litigation, Arm withdrew the Breach Letter.

244. Qualcomm and Prof. Posner also take issue with the "timing" of the letter and associated "leak."[589] However, Qualcomm and Prof. Posner do not explain why the alleged harm was increased by the fact that the notice was sent at the time of Qualcomm's annual Snapdragon Summit.[590] This is speculative and unsupported by evidence.

245. Arm had legitimate reasons to inform its customers of the dispute with Qualcomm and its view that Qualcomm was in breach of its ALA, and to clarify its position with users of its technology. Arm's outreach to Qualcomm's customers who use products that embed Arm's technology was a reasonable and commercially justified response to an ongoing contractual dispute, not anticompetitive conduct. First, Arm had a legitimate interest in ensuring that customers were aware of potential legal and licensing risks associated with Qualcomm's Nuvia-

---

[589] [redacted] However, Arm filed the *Arm v. Qualcomm* litigation on August 31, 2022; and the 2022 Snapdragon Summit occurred during November 15-17 in Hawaii. *See* Ben Schoon, "Qualcomm confirms November 15–17 event to reveal its next Snapdragon flagship," 9to5Google, July 19, 2022, https://9to5google.com/2022/07/19/snapdragon-summit-2022. Therefore, the Snapdragon Summit appears to have occurred over two months after the filing of the lawsuit. It is unclear how an event that took place two months before the Snapdragon Summit could have "coincided" with the timing of the Snapdragon Summit.

[590] Spencer Collins, a member of Arm's executive committee, was asked about the timing of the letter at his deposition. He explained that the letter was timed so that the [redacted] would end just after the decision for the *Arm v. Qualcomm* trial was expected, to give Arm the option to terminate the agreement at that time, if the jury had decided in Arm's favor. *See* Collins (Arm) Deposition, 75:4-78:3 ("Q. Why at this time was it appropriate? A. We had tried via numerous avenues to stop Qualcomm from breaching our agreement. So we sent letters. That didn't work. We were then left with no choice but to issue a claim, which we've never done in our 35-year history, to a customer of ours. Then we asked for certification of their adherence to the [redacted]. We believed they continued to be breached. Nothing was working. We were approaching trial. This was sent on the 22nd of October 2024. We were approaching trial. And nothing was working. This was not about money for us. This was about respecting our contracts and protecting our IP. We wanted -- our ultimate goal in this dispute was for Qualcomm to remedy the breach. We decided between me, my team and outside counsel that the appropriate thing to do is to send [redacted]. We felt, given we're approaching trial and we were making no progress with Qualcomm, that was the appropriate thing to do."), 78:17-79:13 ("Q. So you wanted to have the ability to terminate the Qualcomm ALA as soon as the jury came back if, in fact, you had won the trial in December; is that fair? A. We hadn't decided as to whether or not we would terminate the ALA. But we wanted the option. We wanted to be in business with customers respect our contracts."), and 80:2-8 (Mr. Collins also indicated he was unaware that the timing of the letter coincided with the timing of the Snapdragon Summit, but that "the [redacted] period coincided with the trial date from our standpoint as opposed to the Snapdragon conference.").

based CPUs that were at the center of the contractual dispute.[591] This kind of communication is common.[592] Second, maintaining transparency with customers helps preserve the integrity of Arm's licensing model. Failure to communicate could have created confusion or undermined confidence in Arm's IP rights, particularly given the public nature of the dispute.

246. High-tech companies operate in dynamic and uncertain environments, where well-managed firms routinely assess and mitigate risk. Arm's decision to protect its IP and seek judicial resolution of its dispute with Qualcomm is not anticompetitive. Even if this prompted some Qualcomm customers to seek "reassurance" or pause to evaluate the situation, such responses are typical in commercial settings and do not constitute harm to competition. This is not different from a firm suing for patent violation, which may also induce customers of the allegedly violating firm to require "assurance." In fact, Qualcomm agrees that protection of IP is important. For example, Qualcomm stated that "[t]he drive to invent is a core value of Qualcomm's identity, and protection of inventors' rights is important to both the company and our business model. Economists and historians agree there has been no greater incentive to invent than protection of inventors' rights to the IP produced by their hard work and creativity. Patents are the primary means of protecting IP and represent a rule-of-law guarantee akin to a deed's role in protecting the ownership of land. […] Strong patent protection in the United States and other economies

---

[591] Philip Hughes, VP for external communications at Arm, testified that the purpose of the communications to Qualcomm's customers who use products that embed Arm's technology was "just to inform customers why [Arm had] taken these actions." Deposition of Phil Hughes, June 17, 2025 (hereinafter "Hughes (Arm) Deposition"), 7:17-20; 27:4-18 ("Q. All right. And what was your understanding of the purpose of the communications to Qualcomm customers? A. Okay. Again, I think it – as I recall, it was more just to inform customers why we'd taken these actions. Q. And when you say, "to inform customers why we'd taken these actions," what actions are you referring to? A. The – the lawsuit."). Concerning the publication of the October 2024 Breach Letter, Ami Badani, Chief Marketing Officer at Arm, testified that "our goal was to make sure that our customers and partners were informed, and that was our singular goal. […] our goal was to inform our partners and customers because they would have found out anyways. So we wanted to make sure that we were getting in front of it with the right facts." Deposition of Ami Badani, August 1, 2025 (hereinafter "Badani (Arm) Deposition"), 7:20-22; 49:23-50:18.

[592] For example, during the *SCO v. IBM* litigation, the SCO Group sent letters to about 1,500 companies alleging that the use of Linux may infringe a copyright it holds on the original UNIX source code. "SCO Sends Warning Letters To Linux Users," InformationWeek, December 22, 2003, https://www.informationweek.com/it-leadership/sco-sends-warning-letters-to-linux-users; Stephen Shankland, "SCO targets Linux customers," CNET, May 14, 2003, https://www.cnet.com/tech/services-and-software/sco-targets-linux-customers/. Qualcomm also issued statements informing the broad public of lawsuits it files against other companies. For example, *see* "Qualcomm Files Lawsuit Against Motorola," Qualcomm, March 5, 1997 https://www.qualcomm.com/news/releases/1997/03/qualcomm-files-lawsuit-against-motorola, "Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm, November 6, 2005 https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia.

encourages investment in research and development by companies and individuals that has resulted in life-changing technologies, including the technologies that make possible the wireless communications that define our world today."[593] It is therefore not surprising that Qualcomm carefully protects its IP.[594]

247. In conclusion, the evidence demonstrates that Arm's litigation position was consistently public and transparent from the outset of its dispute with Qualcomm. Arm did not conceal its views or engage in a misinformation campaign; rather, it communicated its contractual concerns openly through legal filings and public statements beginning in 2022. The October 2024 Breach Letter did not introduce new information or disrupt Qualcomm's relationship with its customers, but instead reiterated Arm's long-standing position. There is no evidence that Arm's communications were a strategic attempt to harm competition rather than a commercially reasonable response to an unresolved contractual disagreement. These facts collectively undermine Qualcomm's and Prof. Posner's allegations and support the conclusion that Arm's conduct aligns with standard industry practice and reflects procompetitive behavior.

### C. There Is No Evidence of Harm to Competition

248. Qualcomm's claim of harm is inconsistent with its market performance. Since the onset of the dispute, Qualcomm has expanded its product portfolio, entered new segments, and maintained strong financial performance—indicators of a firm that is competing successfully.[595] These facts undermine the allegation that Arm's conduct harmed Qualcomm in any meaningful way. Moreover, even if Qualcomm had demonstrated that it suffered harm, such harm to Qualcomm

[593] "Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025.

[594] *See* footnote 350350.

[595] *See* Section VI.

does not equate to harm to competition. Antitrust analysis focuses on the impact to the competitive process and consumer welfare, not on the fortunes of individual firms.[596]

249. *First*, there is no evidence that Arm's decision to file its lawsuit against Qualcomm harmed competition. The legal process is a standard and legitimate mechanism for resolving genuine disputes about the terms of an agreement. While litigation may impose costs or harm upon both parties involved as well as their partners, it also serves to clarify contractual obligations, allow the parties to move forward with their businesses, and unlock the potential gains from trade that the dispute may have stalled.[597] Arm's decision to protect its IP and exercise its contractual rights reflects a lawful and commercially reasonable approach, not anticompetitive conduct, even if Qualcomm perceives harm to its own interests.

250. *Second*, Qualcomm's criticism of Arm's organic entry into chip design overlooks the procompetitive nature of such expansion. Entry by Arm introduces additional product variety and increases competitive pressure, which can benefit consumers through improved innovation and pricing. Prof. Posner fails to even consider this possibility, offering no analysis of the potential consumer benefits or efficiencies associated with Arm's organic vertical expansion. Rather than harming competition, Arm's entry reflects a natural evolution in response to customer demand and industry dynamics.

251. 

[596] Congressional Research Service, "Antitrust Law: An Introduction," May 1, 2025, https://www.congress.gov/crs_external_products/IF/PDF/IF11234/IF11234.8.pdf ("The Goals of Antitrust: The federal antitrust laws seek to protect economic competition…. Antitrust cases generally turn on whether the conduct or transaction at issue enables the exercise of market power in ways that diminish consumer welfare, total welfare, or innovation.").

[597] *See*, for example, Seitz, Michael and Martin Watzinger, "Contract enforcement and R&D investment," Research Policy, 2017, Volume 46, Issue 1 ("Motivated by the differences in innovation across countries, this paper evaluates the role of contract enforcement for R&D investments. We find empirical evidence that weak contract enforcement is associated with lower R&D investment: R&D intensity in an industry increases with the quality of the judicial system. This effect is particularly strong in industries that cannot buy inputs on competitive markets and thus depend more on contracts to acquire inputs. In line with this, we show that contract enforcement is particularly important in industries in which vertical integration is not a viable option.").

[598] *See* Section VIII.B.2.

252. *Fourth*, as discussed above, Arm's licensing practices remain open and widely accepted.[601] Arm continues to offer ALAs to a broad range of partners, including Apple, Google, and IBM, and TLAs to companies such as Microsoft, Samsung, and Texas Instruments.[602] Qualcomm and Prof. Posner provide no evidence that Arm has refused to license its ISA to other firms or restricted access in a manner that would harm competition.

253. *Fifth*, Qualcomm and Prof. Posner have not provided any evidence to show that Arm's action adversely affected any other ALA or TLA partner. The absence of harm to other licensees undermines Qualcomm's argument that Arm's actions have harmed competition, rather than simply impacting a single commercial relationship.

254. In summary, Qualcomm's allegations of competitive harm are not supported by evidence. Qualcomm's continued growth and diversification contradict the notion that Arm's conduct has harmed Qualcomm. Each of the specific actions attributed to Arm—whether enforcing its contractual rights, entering chip design, responding to customer needs, or maintaining open licensing practices—reflect standard commercial behavior, not harm to the competitive process or

[599] Awad (Arm) Deposition, 48:12-51:17.

[600] Posner Report, ¶ 66.

[601] Arm remains open through its extension of licensing agreements to various customers.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumer welfare. The absence of harm to other licensees further reinforces the conclusion that this is a bilateral dispute, not a threat to competition.

I declare under penalty of perjury that the foregoing is true and correct.

Timothy S. Simcoe
September 5, 2025

162

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## X. APPENDICES

163

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## APPENDIX A: PROFESSOR TIMOTHY S. SIMCOE'S CV

## Timothy S. Simcoe

CONTACT

Boston University Questrom School of Business
595 Commonwealth Avenue
Boston, MA 02215

(510) 685-2020
tsimcoe@bu.edu
http://people.bu.edu/tsimcoe

ACADEMIC EMPLOYMENT

**Boston University, Questrom School of Business**

- David J. McGrath Jr. Professor in Strategy & Innovation, 2024-*present*.
- Professor of Strategy & Innovation, 2022-2024.
- Associate Professor of Strategy & Innovation, 2013-2022.
- Assistant Professor of Strategy & Innovation, 2009-2013.

**University of Toronto, Joseph L. Rotman School of Management**

- Assistant Professor of Strategic Management, 2004-2009.

APPOINTMENTS

**President's Council of Economic Advisers**

- Senior Economist, 2014-2015.

**National Bureau of Economic Research**

- Research Associate, Productivity Program, 2016-*present*.
- Faculty Research Fellow, Productivity Program, 2009-2016.

**BU Technology & Policy Research Initiative**

- Faculty Director, 2020-*present*.

EDUCATION

**University of California at Berkeley**

- Ph.D., Business Administration, 2004
- M.A., Economics, 2003

**Harvard University**

- A.B., Applied Math & Economics, 1996

PUBLICATIONS

**Refereed Articles**

Mezzanotti, F. and T. Simcoe. Innovation, Patenting and Appropriability: Survey Evidence from a Nationally Representative Sample of U.S. Firms, *Review of Economics and Statistics*, forthcoming.

R. A. Gibbs, T. Simcoe and D. Waguespack. Does Earnings Management Matter for Strategy Research *Strategic Management Journal*, forthcoming.

B. Ganglmair, E. Tarantino and T. Simcoe. Learning When to Quit: An Empirical Model of Experimentation in Standards Development. *AEJ: Microeconomics*, 17(3):164–190, August 2025.

C. Righi and T. Simcoe. Patenting Inventions or Inventing Patents? Continuation Practice at the USPTO. *RAND Journal of Economics*, 54(3):416–442, Fall 2023.

J. Baron, B. Ganglmair, N. Persico, T. Simcoe and E. Tarantino. Representation is Not Sufficient for Selecting Gender Diversity. *Research Policy*, 53(6):104994, July 2024.

R. Bekkers, C. Catalini, A. Martinelli, C. Righi and T. Simcoe. Disclosure Rules and Declared Essential Patents. *Research Policy*, 52(1):104618, January 2023.

E. Basker and T. Simcoe. Upstream, Downstream: Diffusion and Impact of the Universal Product Code. *Journal of Political Economy*, 129(4):1252–1286, April 2021.

A. King, B. Goldfarb and T. Simcoe. Learning from Testimony on Quantitative Research in Management. *Academy of Management Review*, 46(3):465–488, July 2021.

X. Li and T. Simcoe. Competing or Complementary Labels? Estimating Spillovers in Chinese Green Building Certification. *Strategic Management Journal*, 42(13): 2451–2476, December 2021.

A. Agrawal, C. Rosell and T. Simcoe. Tax Credits and Small Firm R&D Spending. *American Economic Journal: Economic Policy*, 12(1): 1–21. Lead Article, May 2020.

M. Rysman, T. Simcoe and Y. Wang. Differentiation Strategies in the Adoption of Environmental Standards: LEED from 2000 to 2014. *Management Science*, 66(9): 4173–4192, September 2020.

T. Simcoe and J. Watson. Forking, Fragmentation and Splintering. *Strategy Science*, 4(4):251–342, December 2019.

F. Mezzanotti and T. Simcoe. Patent Policy and American Innovation After eBay: An Empirical Examination. *Research Policy*, 48(5): 1271–1281, June 2019.

C. Righi and T. Simcoe. Patent Examiner Specialization. *Research Policy*, 48(1):137–148, February 2019.

M. Lemley and T. Simcoe. How Essential are Standard Essential Patents? *Cornell Law Review*, 104(3): 607–642, March 2019 .

M. Catillon, P. Gertler and T. Simcoe. Who Benefits Most in Disease Management Programs?: Improving Target Efficiency. *Health Economics*, 28(2): 189–203, February 2019.

L. Freedman, I. Cockburn and T. Simcoe. The Economics of Reproducibility in Preclinical Research. *PLoS Biology*, 13(6): e1002165, June 2015.

T. Simcoe and M. Toffel. Government Green Procurement Spillovers: Evidence from Municipal Building Policies in California. *Journal of Environmental Economics and Management*, 68(3):411–434. Lead article, November 2014.

E. Rawley and T. Simcoe. Information, Knowledge and Asset Ownership in Taxicab Fleets. *Organization Science*, 24(3): 831–845, May-June 2013.

J. Farrell and T. Simcoe. Choosing the Rules for Consensus Standardization. *The RAND Journal of Economics*, 43(2): 235–252, Summer 2012.

T. Simcoe. Standard Setting Committees: Consensus Governance for Shared Technology Platforms. *American Economic Review*, 102(1): 305–336, February 2012.

M. Rysman and T. Simcoe. A NAASTy Alternative to RAND Pricing Commitments. *Telecommunications Policy*, 35(11): 1010–1017, December 2011.

A. Galasso and T. Simcoe. CEO Overconfidence and Innovation. *Management Science*, 57(8): 1469–1484, August 2011.

T. Simcoe and D. Waguespack. Status, Quality and Attention: What's in a (Missing) Name? *Management Science*, 57(2): 274–290, February 2011.

A. Mehta, M. Rysman and T. Simcoe. Identifying the Age Profile of Patent Citations: New Estimates of Knowledge Diffusion. *Journal of Applied Econometrics*, 25 (7): 1073–1222, November/December 2010.

E. Rawley and T. Simcoe. Diversification, Vertical Contracting and Diseconomies of

Scope: Evidence from the Taxicab Industry. *Management Science*, 56(9): 1534–1550, September 2010.

T. Simcoe, S. J. Graham and M. Feldman. Competing on Standards? Entrepreneurship, Intellectual Property and Platform Technologies. *Journal of Economics and Management Strategy*, 18(3): 775–816, Fall 2009.

M. Rysman and T. Simcoe. Patents and the Performance of Voluntary Standard Setting Organizations. *Management Science*, 54(11): 1920–1934, November 2008.

D. Mowery and T. Simcoe. Is the Internet a US Invention? An Economic and Technological History of Computer Networking. *Research Policy*, 31(8-9): 1369–1387, 2002.

J. Macher, D. Mowery and T. Simcoe. eBusiness and the Semiconductor Industry Value Chain: Implications for Vertical Specialization and Integrated Semiconductor Manufacturers. *Industry and Innovation*, 9:155–181, 2002.

**Working Papers**

Mezzanotti, F. and T. Simcoe. Research and/or Development: Financial Frictions and Innovation Investment. R&R at *Journal of Finance*

N. Sahoo, T. Simcoe and X. Yang. Effects of Content Sourcing Strategy on Online News Subscription. R&R at *MIS Quarterly*.

D-S. Jeon, Y. Lefouili, Y. Li and T. Simcoe. Ecosystems and Complementary Platforms.

**Other Publications**

T. Simcoe. Standard Setting Organizations. Chapter in the *Elgar Encyclopedia on the Economics of Competition and Regulation*, forthcoming.

K. Blind, M. Kenney, A. Leiponen and T. Simcoe. Standards and Innovation: A Review and Introduction to the Special Issue. *Research Policy*, 52(8), October 2023.

J. Contreras, T. Simcoe et al. Preserving the Royalty-Free Standards Ecosystem. *European Intellectual Property Review*, 45(7): 371-375, June 2023.

E. Hovenkamp and T. Simcoe. Tying and Exclusion in FRAND Licensing: Evaluating Qualcomm. *The Antitrust Source*, February 2020.

A. Sesia, T. Simcoe and M. Toffel. Platform LEEDership at the U.S. Green Building Council. Harvard Business School Case 619-027, May 2018.

B. Goldfarb, A. King and T. Simcoe. Heritability of Trust and Distrust Remains Unknown. Letter to *Proceedings of the National Academy of Sciences*, January 2018.

S. Graham, P. Menell, C. Shapiro and T. Simcoe. Final Report of the Berkeley Center for Law & Technology Patent Damages Workshop. *Texas Intellectual Property Law Journal*, 25 (1): 115–142, 2017.

A. Shampine and T. Simcoe. Economics of Patents and Standardization: Network Effects, Hold-up, Hold-out, Stacking. The Cambridge Handbook of Technical Standardization Law, Vol. 1. Cambridge University Press, 2017.

T. Simcoe and C. Righi. Standards, Patents and Innovation. Handbook of Standards and Innovation. Edward Elgar, 2017.

T. Simcoe. How to Make and Keep a Patent Pledge. Pages 285–290 in *Patent Pledges: Global Perspectives on Patent Law's Private Ordering Frontier*. Edward Elgar, 2017.

T. Simcoe. Modularity and the Evolution of the Internet. Chapter 1 in *Economic Analysis of the Digital Economy.* University of Chicago Press, 2015.

A. Agrawal, S.J. Graham, M. Rysman and T. Simcoe. Industry Standards, Intellectual Property and Innovation: Introduction to the Special Issue. *International Journal of Industrial Organization*, 36:1-3 (September 2014).

T. Simcoe. Governing the Anti-commons: Institutional Design for Standard Setting Organizations. In *Innovation Policy and the Economy*, 14:99–128, 2014.

T. Simcoe. Private and Public Approaches to Patent Holdup in Industry Standard-Setting. *Antitrust Bulletin*, 57(1): 59–88, Spring 2012.

J. Farrell and T. Simcoe. Four Paths to Compatibility. pages 34–58 in the *Oxford Handbook of the Digital Economy.* Oxford University Press, 2012.

T. Simcoe. Delay and *de jure* Standardization: Exploring the Slowdown in Internet Standards Development. Pages 260–295 in *Standards and Public Policy.* Cambridge University Press, 2007.

T. Simcoe. Explaining the Increase in Intellectual Property Disclosure. Pages 260–295 in *Standards Edge: The Golden Mean.* Bolin Group, 2007.

T. Simcoe. Open standards and Intellectual Property Rights. Pages 161–183 in *Open Innovation: Researching a New Paradigm.* Oxford University Press, 2006.

D. Mowery and T. Simcoe. Public and Private Participation in the Development and Governance of the Internet. Pages 259–294 in *The Limits of Market Organization.* Russell Sage, 2005.

D. Mowery and T. Simcoe. The Origins and Evolution of the Internet. Pages 229–265 in *Technological Innovation and Economic Performance.* Princeton University Press, 2002.

M. Rysman and T. Simcoe. Measuring the Performance of Standard Setting Organizations. Pages 81–94 in *International Standardization as a Strategic Tool: Commended Papers from the IEC Centenary Challenge 2006.* International Electrotechnical Commission, 2006.

TEACHING

**Boston University Questrom School of Business**

Technology Strategy (MBA and Executive MBA)

Strategy and Innovation (Undergraduate)

Competition, Innovation and Strategy (MBA)

Data Analysis (Executive MBA)

Causal Inference in Management Research (PhD)

**University of Toronto, Rotman School of Management**

Fundamentals of Competitive Strategy (MBA)

Entrepreneurship & Small Business Management (Undergraduate)

Models & Methods in Strategic Management (PhD)

**University of California, Berkeley**

Economic Analysis for Business Decisions, Teaching Assistant (MBA)

CONSULTING

**Expert Reports, Depositions and Testimony**

United States of America *et al.* (client) v. Google LLC. Eastern District of Virginia. Case No. 1:23-cv-00108.

Apple (client) v. Qualcomm. Southern District of California. Case No. 3:17-CV-0108.

Microsoft (client) v. Motorola. Western District of Washington. Case No. C10-1823-JLR.

HTC Corporation (client) v. Ericsson. Eastern District of Texas. Case No. 6:18-CV-00243-JRG.

ViiV Healthcare, (client) v. Gilead Sciences. District of Delaware. Case No. 1:18-CV-0224-VAC-CJB.

In Re: Qualcomm Securities Class Action Litigation (plaintiff client). Southern District of California. Case No. 3:17-CV-00121-JO-MSB

Fujitsu v. Tellabs (client). Northern District of Illinois, Eastern Division. Civil Action No. 09 CV 04530.

In the Matter of Certain Video Capable Electronic Devices, Including Computers, Streaming Devices, Televisions, Cameras, and Components and Modules Thereof (clients Amazon and Hewlett Packard). U.S. International Trade Commission Investigations Nos. 337-1379 and 337-1380.

In the Matter of Video-Capable Laptop, Desktop Computers, Handheld Computers, Tablets, Televisions, Projectors, and Components and Modules Thereof (clients Acer, AsusTek and HiSense). U.S. International Trade Commission Investigation No. 337-TA-448.

Apple (client) v. Motorola. Western District of Wisconsin. Case No. 11-CV-178.

Lenovo (client) and Motorola Mobility v. InterDigital Technology Corporation et al. District of Delaware. Case No. 19-1590-LPS

3G Licensing, Koninklijke KPN and Orange v. LG Electronics (client). District of Delaware. Case No. 17-cv-85-LPS.

Global Communications (client) v. Direct TV, et al. Northern District of Florida. Case No. 4:12-CV-00651-RH-CAS.

Zenith Electronics, Panasonic, U.S. Philips and The Trustees of Columbia University v. Craig Electronics (client). Southern District of Florida. Case No. 13-CV-80567.

**Other Consulting**

Wireless standards developer (client). Review of bylaws and procedures.

Boston Toronto Group (client). Executive education.

SERVICE

**University Governance**

Strategy & Innovation Department Chair, 2024-*present*

PhD Program Director (2015-2017, 2018-2022.)

**Editorial and Advisory Positions**

American Economic Journal: Economic Policy, Board of Editors, 2021.

Management Science, Associate Editor in Innovation and Entrepreneurship, 2014-present.

Journal of Industrial Economics, Associate Editor, 2013-present.

Management Science, Associate Editor in Business Strategy, 2012-present.

NIST Visiting Expert Committee on US National Standards Strategy for Critical and Emerging Technologies, 2023-24.

National Academy of Sciences, Member of Committee on Intellectual Property Management Practices of Standard Setting Organizations, 2012-2013.

National Academy of Sciences, Member of Committee on the Review of the Small Business Innovation Research and Small Business Technology Transfer Programs at the National Science Foundation, 2019-2021.

Co-founder, Sloan Management Review Strategy Forum, 2018-2023.

Scientific Advisory Board, Global Biological Standards Institute, 2015-2018.

**Doctoral Advising & Committees**

Xia Li, London Business School (Primary Advisor, 2023).

Jeremy Watson, University of Minnesota (Primary Advisor, 2018).

Cesare Righi, Pompeu Fabra University (Primary Advisor, 2017).

Jane Wu, UCLA (Committee Member, 2022).

Sophie Wang, UIBE Beijing (Committee Member, 2021).

Christian Catalini, MIT Sloan School (Committee Member, 2013)

Paul Seaborn, University of Denver (Primary Advisor, 2011)

Jay Horwitz, University of Bocconi (Committee Member, 2011)

Elena Kulchina, Duke University (Committee Member, 2012)

Justus Baron, Ecole des Mines / ParisTech (Committee Member, 2012)

AWARDS

Innovators Network Foundation Intellectual Property Fellow, 2021-2023
Broderick Award for Excellence in Research, 2022.
Dean's Research Scholar, 2015-2018, 2020-2022
Outstanding Contribution to Questrom Doctoral Programs, 2018
Questrom Full-time MBA Favorite Elective Professor, 2016
BU Questrom Doctoral Student's Association, Distinguished Mentor Award, 2016
John R. Russell Excellence in Teaching Award, Executive MBA, 2013
Management Science Meritorious Service Award (Reviewer), 2010
Rotman Excellence in Teaching Award, Commerce Program, 2008
Glueck Best Paper Award, Academy of Management BPS Division, 2008
Finalist, IEC Centenary Challenge, 2006
Finalist, Organization Science Dissertation Proposal Competition, 2003

GRANTS

Intel Corporation Research Gift, 2017-2020
Bell Canada University Labs, 2007-2008
Connaught New Faculty Start-Up Award, 2004-2008
Berkeley Center for I.T. Research in the Interest of Society, 2003-2004
Intel Corporation Robert M. Noyce Memorial Fellowship, 2001-2002
Haas School of Business Ph.D. Fellowship, 1999-2000
Harvard College Fellowship, 1992-1995

Prior Work Experience

**Ernst & Young LLP**

Senior Consultant, Center for Business Innovation, Boston MA, 1998-1999

Consultant, E&Y Economics Consulting, Washington DC, 1996-1998

Other

**Professional Societies**

American Economics Association, Academy of Management, Strategy Research Forum, International Society for New Institutional Economics

**Computer Code**

STATA xtpqml: Robust inference in fixed-effects poisson regression

STATA mtad: Multinomial test of agglomeration and dispersion

Personal

Married: Stephanie Tobias Gates (August 2002)

Children: Katherine, Anne and Theodore

Interests: Michigan Sailing, North Haven Golf Club, Harvard Alumni Jazz Band

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

## APPENDIX B: MATERIALS RELIED UPON

## Legal Documents

"Arm's First (Corrected) Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-11)," Arm Ltd., March 1, 2024

"Arm's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3)," Arm Holdings, July 11, 2025

"Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3," Arm Holdings, July 11, 2025

"Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11)," Arm Holdings, July 11, 2025

"Arm's First Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 12)," Arm Holdings, July 11, 2025

"Arm's Responses & Objections to Qualcomm's First Set of Request for Admissions (Nos. 1-28)," Arm Holdings, July 11, 2025

"Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, March 10, 2025

"Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, July 11, 2025

"Plaintiffs' Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, August 8, 2025

"Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13)," Qualcomm, July 11, 2025

"Plaintiffs' Second Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13)," Qualcomm, August 8, 2025

"Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, July 11, 2025

"Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, August 8, 2025

"Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission (Nos. 1-30)," Qualcomm, July 11, 2025

*Qualcomm Inc. v. Arm Holdings, plc.*, C.A. No. 24-490-MN, Dkt. Nos. 137; 137-1 (Ex. A) (June 3, 2025)

*Arm Ltd. v. Qualcomm Inc*., No. 1:22-cv-01146 (D. Del. filed August 31, 2022), Dkt. Nos. 571, 572

*Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146* (D. Del. filed August 31, 2022), Dkt. No. 1

*Arm v. Qualcomm*, No. 22-1146 (MN), Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim, D.I. 21, November 15, 2022

*Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024

*Qualcomm Inc. v. Arm Holdings, plc.*, C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025

Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007

Complaint for Patent Infringement, *Qualcomm Inc. v. Apple Inc.*, No. 3:17-cv-01375-JAH-AGS (S.D. Cal. filed July 6, 2017), https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/2017-07-06_complaint.pdf

*eBay Inc. and Half.com v. MercExchange, L.L.C.*, Brief of Amici Curiae Qualcomm Inc. & Tessera, Inc. in Support of Respondent, 547 U.S. 388 (2006) (No. 05-130)

Expert Report of Dr. Michael C. Brogioli, September 5, 2025

Expert Report of Mr. Steven Richards, CPA, September 5, 2025

Expert Report of Eric A. Posner, August 8, 2025

Expert Report of Patrick F. Kennedy, August 8, 2025

Expert Report of Patrick F. Kennedy, February 27, 2024

*Federal Trade Commission v. Qualcomm Incorporated*, "Reply brief for appellant Qualcomm Incorporated (Redacted)," Qualcomm Incorporated, December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit

Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10–13)," Qualcomm, July 11, 2025

**I incorporate by reference all documents cited in ARM's and Qualcomm's discovery responses, and all materials relied upon by Prof. Posner and Dr. Kennedy.**

## Case Law

*Brown Shoe Co., Inc. v. United States,* 370 U.S. 294 (1962)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)

*Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104 (1986)

*Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc*., U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, Case 4:24-cv-02508, Dkt. Entry 511 (S.D. Tex. Jan. 31, 2025)

*United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945)

*United States v. Microsoft Corp.*, 253 F.3d 59 (2001)

## Deposition Testimony and Associated Exhibits

*Arm v. Qualcomm,* Trial Transcript, Vol 2.1, December 16, 2024

*Arm v. Qualcomm,* Trial Transcript, Vol 3.1, December 17, 2024

*Arm v. Qualcomm,* Trial Transcript, Vol. 4.1, December 18, 2024

Deposition of Akshay Bhatnagar, July 10, 2025

Deposition of Ami Badani, August 1, 2025

Deposition of Andrew Howard, July 1, 2025

Deposition of Ann Chaplin, July 11, 2025

Deposition of Anupa George, July 30, 2025

Deposition of Aparajita Bhattacharya, July 7, 2025

Deposition of Christine Tran, July 10, 2025

Deposition of Christopher Patrick, July 2, 2025

Deposition of Cristiano Amon, July 3, 2025

Deposition of Durga Malladi, July 10, 2025

Deposition of Ehab Youssef, June 26, 2025

Deposition of Gerard Williams, June 25, 2025

Deposition of Gerard Williams, November 3, 2023

Deposition of James Jeon, July 11, 2025

Deposition of James Thompson, November 28, 2023

Deposition of Jannik Nelson, July 10, 2025

Deposition of Jean-Francois (Jeff) Vidon, July 1, 2025

Deposition of Jeff Golden, July 3, 2025

Deposition of Jeffrey M. Fonseca, July 9, 2025

Deposition of Jignesh Trivedi, July 9, 2025

Deposition of John Horley, July 8, 2025

Deposition of Jonathan Weiser, July 11, 2025

Deposition of Karl M. Whealton, June 18, 2025

Deposition of Karthik Shivashankar, June 20, 2025

Deposition of Kenneth Siegel, July 4, 2025

Deposition of Kurt Wolf, June 25, 2025

Deposition of Larissa Cochron, July 11, 2025

Deposition of Laura Sand, July 8, 2025

Deposition of Lynn Couillard, July 3, 2025

Deposition of Manju Varma, June 24, 2025

Deposition of Mark Dragicevich, June 27, 2025

Deposition of Martin Weidmann, June 20, 2025

Deposition of Michael Williams, June 27, 2025

Deposition of Mohamed Awad, July 29, 2025

Deposition of Paul Kranhold, July 17, 2025

Deposition of Paul Williamson, July 2, 2025

Deposition of Pavankumar (Pavan) Mulabagal, July 1, 2025

Deposition of Peter Greenhalgh, July 4, 2025

Deposition of Philip Hughes, June 17, 2025

Deposition of Rene Haas, July 7, 2025

Deposition of Richard Grisenthwaite, July 2, 2025

Deposition of Richard Meacham, June 27, 2025

Deposition of Selena LaCroix, August 1, 2025

Deposition of Simon Segars, November 16, 2023

Deposition of Spencer Collins, June 30, 2025

Deposition of Sudeep Holla, June 17, 2025

Deposition of Tim Herbert, October 25, 2023

Deposition of Vivek Agrawal, July 11, 2025

Deposition of Will Abbey, June 26, 2025

Deposition of Will Abbey, October 27, 2023

Deposition of Ziad Asghar, July 7, 2025

## Conversations

Conversation with Dr. Michael C. Brogioli, September 2, 2025

Conversation with Mohamed Awad, August 29, 2025

Conversation with Paul Williamson, September 2, 2025

## SEC Filings

Arm Holdings plc, Form F-1, August 21, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523216983/d393891df1.htm

Arm Holdings plc, Amendment No. 2 to Form F-1, September 5, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm

Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2024, https://investors.arm.com/static-files/dcdd6629-24bb-40ef-ba55-8aca1362205a

Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2025, https://investors.arm.com/static-files/9be77c9d-75ee-4639-bfe4-17efd23c56b5

Intel Corporation, 2021 Form 10-K, for the fiscal year ended December 25, 2021, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-22-000007/0000050863-22-000007.pdf

Intel Corporation, 2024 Form 10-K, for the fiscal year ended December 28, 2024, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000009/0000050863-25-000009.pdf

Qualcomm Incorporated, Form 10-K, for the fiscal year ended September 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/fd08c4f6-61ba-4a6a-a339-0e3b522ed739.pdf

Qualcomm Incorporated, Form 10-K, for fiscal years 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx

Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 26, 2021, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/c91b841c-1f3f-4762-9c0d-c379f1554455.pdf

Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/1b687286-85e9-44e6-a579-d19d089eacfb.pdf

Qualcomm Incorporated, Form 10-Q, for the quarterly periods 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx

## Bates Numbered Documents

ARM_00000003

ARM_00000016

ARM_00000017

ARM_00000382

ARM_00000510

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

ARM_00002955

ARM_00004029

ARM_00026351

ARM_00032601

ARM_00032602

ARM_00045266

ARM_00055357

ARM_00057511

ARM_00057560

ARM_00076604

ARM_00080472

ARM_00081203

ARM_00081461

ARM_00081462

ARM_00081753

ARM_00086285

ARM_00087465

ARM_00088600

ARM_00092788

ARM_00095947

ARM_00097388

ARM_00103918

ARM_00104733

ARM_00110511

B - 7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

ARM_00113179

ARM_00115827

ARM_00117493

ARM_00118635

ARM_00119602

ARM_00119603

ARM_01215409

ARM_01215878

ARM_01215886

ARM_01230861

ARM_01230977

ARM_01230978

ARM_01238895

ARM_01239056

ARM_01246942

ARM_01249629

ARM_01259705

ARM_01282304

ARM_01293447

ARM_01294236

ARM_01305915

ARM_01311208

ARM_01314793

ARM_01426938

B - 8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

ARM_01427719

ARM_01427776

ARM_01427796

ARM_01428339

ARMQC_00000640

ARMQC_02600713

ARMQC_02601118

ARMQC_02725050

ARMQC_02726982

ARMQC_02727610

ARMQC_02729412

ARMQC_02731630

ARMQC_02739661

ARMQC_02740205

ARMQC_02740386

ARMQC_02748499

ARMQC_02749177

ARMQC_02762992

ARMQC_02770485

ARMQC_02770649

ARMQC_02770676

ARMQC_02771127

ARMQC_02771946

ARMQC_02772366

B - 9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

ARMQC_02779314

ARMQC_02779364

ARMQC_02779391

ARMQC_02779433

ARMQC_02779483

ARMQC_02783619

ARMQC_02785287

QCARM_0020011

QCARM_0020012

QCARM_0027980

QCARM_0222737

QCARM_0275743

QCARM_0332490

QCARM_0337839

QCARM_0338297

QCARM_0338573

QCARM_0338883

QCARM_0343120

QCARM_0343954

QCARM_0353229

QCARM_0550516

QCARM_0550518

QCARM_0589823

QCARM_0591733

B - 10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

QCARM_3460234

QCARM_3474751

QCARM_3839896

QCARM_3972031

QCARM_7401071

QCARM_7484882

QCVARM_0449658

QCVARM_0451587

QCVARM_0455391

QCVARM_0463558

QCVARM_0463837

QCVARM_0464076

QCVARM_0464648

QCVARM_0465090

QCVARM_0526828

QCVARM_0527544

QCVARM_0528956

QCVARM_0532239

QCVARM_0534597

QCVARM_0537065

QCVARM_0538870

QCVARM_0538873

QCVARM_0541454

QCVARM_0573677

B - 11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

QCVARM_0600104

QCVARM_0608391

QCVARM_0621447

QCVARM_0621448

QCVARM_0847188

QCVARM_0851120

QCVARM_0851449

QCVARM_0855438

QCVARM_0856270

QCVARM_0856888

QCVARM_0857113

QCVARM_0857152

QCVARM_0863181

QCVARM_0863573

QCVARM_0863641

QCVARM_0864713

QCVARM_0864833

QCVARM_0864924

QCVARM_0865022

QCVARM_0865236

QCVARM_0865274

QCVARM_0865311

QCVARM_1014030

QCVARM_1024852

B - 12

QCVARM_1031097

QCVARM_1066820

QCVARM_1069058

QCVARM_1069082

QCVARM_1069106

QCVARM_1069760

QCVARM_1120481

QCVARM_1120999

QCVARM_1121176

QCVARM_112154

QCVARM_1121674

QCVARM_1151565

QCVARM_1151573

QCVARM_1151615

## Articles and Books

"AI Flywheel Gathering Momentum - Initiate Buy," UBS Global Research, November 24, 2024

"Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011

Aberra, Adam and Matthieu Chemin, "Does legal representation increase investment? Evidence from a field experiment in Kenya," 2021, Journal of Development Economics, Vol. 150

Armstrong, Mark, "Competition in Two-Sided Markets," 2006, RAND Journal of Economics, Vol. 37, No. 3

Babcock, Linda, George Loewenstein, S. Issacharoff, and Colin Camerer, "Biased Judgements of Fairness in Bargaining," American Economic Review, 1995, Vol. 85, No. 5

Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59

Benjamin E. Hermalin et al., "Contract Law," in Handbook of Law & Economics, 2007, Vol. 3, No. 68 (ed. A. Mitchell Polinsky & Steven Shavell)

Blair, Roger D., Christine S. Wilson, D. Daniel Sokol, Keith Klovers and Jeremy A. Sandford, "Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies," George Mason Law Review, 2020, Vol. 27, No. 3

Bloom, Nick, Stephen Bond, and John Van Reenen, "Uncertainty and Investment Dynamics," The Review of Economic Studies, 2007, Vol. 74, No. 2

Brandenburger, Adam M. and Barry J. Nalebuff, "The Rules of Co-opetition," Harvard Business Review, 2021

CGS International, "Arm Holdings pcl - Initiate at Outperform and $160 PT; Content Story in Early Innings," US Equity Research, Sept 12, 2024

De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1

Donna, Javier D., Pedro Pereira, Yun Pu, Andre Trindade, and Renan C. Yoshida, "Direct sales and bargaining," RAND Journal of Economics, 2024, Vol. 55, No. 4

Federico, Giulio, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," Innovation Policy and the Economy, 2020, Vol. 20, pp. 125-190

Gans, Joshua "The Disruption Dilemma," MIT Press, 2016

Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," Proceedings of the National Academy of Sciences U.S.A., 1996, Vol. 3

Kwon, Yona, Dahee Kang, Sinji Kim, and Seungho Choi, "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," Journal of Open Innovation: Technology, Market, and Complexity, 2020, Vol. 6, No. 1

Lemley, Mark A. and Carl Shapiro, "Probabilistic Patents," Journal of Economic Perspectives, 2005, Vol. 19, No. 2

Lianos, Ioannis and Pierre Regibeau, "'Vexatious'/'Sham' Litigation: When Can It Arise and How Can It Be Reduced?," The Antitrust Bulletin, 2017, Vol. 62, No. 4

Lu, Shihua, Serge Moresi, and Steven C. Salop, "A Note on Vertical Mergers with an Upstream Monopolist: Foreclosure and Welfare Effects," 2007, Working Paper

Muthoo, Abhinay, "A Non-Technical Introduction to Bargaining Theory," World Economics, April-June 2020, Vol. 1, No. 2

Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581

Priest, George L. & Benjamin Klein, "The Selection of Disputes for Litigation," Journal of Legal Studies, 1984, Vol. 13

Schumpeter, Joseph, "Capitalism, Socialism, and Democracy," Harper & Brothers Publishers, 1942

Seitz, Michael and Martin Watzinger, "Contract enforcement and R&D investment," Research Policy, 2017, Volume 46, Issue 1

Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International

Shapiro, Carl, "Competition and Innovation Did Arrow Hit the Bull's Eye?" in The Rate and Direction of Inventive Activity Revisited (ed. Josh Lerner and Scott Stern), 2012, University of Chicago Press

Shapiro, Carl, "Premiums for high quality products as returns to reputations," The Quarterly Journal of Economics, 1983, Vol. 98, No. 4

Shapiro, Carl, "Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case," Review of Industrial Organization, 2021, Vol. 59, pp. 303–341

Spulber, Daniel F., "How Do Competitive Pressures Affect Incentives to Innovate When There is a Market for Inventions?" Journal of Political Economy, 2013, Vol. 121, No. 6, pp. 1007-1054

Tirole, Jean, "Competition and the Industrial Challenge for the Digital Age," Annual Review of Economics, 2020, Vol. 156

Yang, Chenyu, "Vertical Structure and Innovation: A Study of the SoC and Smartphone Industries," The RAND Journal of Economics, 2022, Vol. 51, No. 3, pp. 739–785

## Websites and Other Public Sources

"2023 Patent Litigation Report," Bloomberg Law, https://pro.bloomberglaw.com/insights/intellectual-property/2023-patent-litigation-report/

"4 Reasons Qualcomm's Data Center Business Failed," The Motley Fool, December 21, 2018, https://www.nasdaq.com/articles/4-reasons-qualcomms-data-center-business-failed-2018-12-21

"4Q24 Global Top 10 Foundries Set New Revenue Record, TSMC Leads in Advanced Process Nodes," TechPowerUp, March 10, 2025, https://www.techpowerup.com/333868/4q24-global-top-10-foundries-set-new-revenue-record-tsmc-leads-in-advanced-process-nodes

"About RISC-V," RISC-V International, https://riscv.org/about/, accessed August 15, 2025

"Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025

"AI Accelerator Chips Overview and Comparison," HardwareBee, https://hardwarebee.com/ai-accelerator-chips-overview-and-comparison/, accessed on August 22, 2025

"Apple announces Mac transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/

"Apple unleashes M1," Apple Newsroom, November 10, 2020, https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/

"Arm Approved Design Partners," Arm, https://www.arm.com/partners/arm-approved-program/design-partners, accessed September 4, 2025

"Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY

"Arm Compute Subsystems (CSS) for Client," Arm, https://www.arm.com/products/compute-subsystems-for-client, accessed September 4, 2025

"Arm CoreLink GIC-700 Generic Interrupt Controller Technical Reference Manual," Arm Developer, https://developer.arm.com/documentation/101516/latest/, accessed September 4, 2025

"Arm Cortex-A Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102826/latest/, accessed September 4, 2025

"Arm Cortex-M Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102787/latest/, accessed September 4, 2025

"Arm Cortex-R Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102788/latest/, accessed September 4, 2025

"Arm CPU Architecture: A Foundation for Computing Everywhere," Arm, https://www.arm.com/architecture/cpu, accessed September 4, 2025

"Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement

"Arm Flexible Access," Arm, https://www.arm.com/products/flexible-access

"Arm Holdings plc Q1 2026 Earnings Call," July 30, 2025, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008

"Arm Holdings plc Q3 2025 Earnings Call," February 5, 2025, https://investors.arm.com/static-files/f1190d81-408d-4276-a30c-b27c1ce5a30a

"Arm Holdings plc Q4 2025 Earnings Call," May 7, 2025, https://investors.arm.com/static-files/181d5019-29bd-4ba5-af29-45888e25c637

"Arm Holdings plc Q3 FYE24 Results Presentation," Arm Holdings, February 7, 2024, https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06

"Arm Holdings plc Q4 FYE24 Results Presentation," Arm Holdings, May 8, 2024, https://investors.arm.com/static-files/4f2fc46b-34a5-4bc5-94af-f13fbc348f0e

"Arm Holdings Q2 FYE25 Investor Presentation," Arm Holdings, November 6, 2024, https://investors.arm.com/static-files/623fece0-c947-4d'93-94eb-e08e8dfad61b

"Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274

"Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553

"Arm Total Access," Arm, https://www.arm.com/products/licensing/arm-total-access, accessed August 30, 202

"At Qualcomm Trial, Apple COO Said $7.50 Per-iPhone Fee Cost Company $1 Billion a Year," Bloomberg, January 14, 2019, https://fortune.com/2019/01/14/qualcomm-trial-apple-7-50-iphone-fee-billion/

"Automated Driving | Snapdragon Ride ADAS Tech for Smart Cars," Qualcomm, https://www.qualcomm.com/products/automotive/automated-driving, accessed September 4, 2025

"AWS and Arm," Arm, https://www.arm.com/markets/computing-infrastructure/cloud-computing/aws#1, accessed August 29, 2025

"AWS re: Invent 2024 - Monday Night Live with Peter DeSantis," AWS, YouTube.com, December 3, 2024, https://www.youtube.com/watch?v=vx36tyJ47ps&t=1041s

"BoM Analysis: Samsung Galaxy S23 Ultra Costs $469 to Make," Counterpoint, May 31, 2023, https://www.counterpointresearch.com/insight/bom-analysis-samsung-galaxy-s23-ultra

"CMN-600 Coherent Mesh: Scalable Network for Smart Systems," Arm, https://www.arm.com/products/silicon-ip-system/corelink-interconnect/cmn-600, accessed September 4, 2025

"CoreSight ELA-600," Arm Developer, https://developer.arm.com/Processors/CoreSight%20ELA-600, accessed September 4, 2025

"CPU Cortex-A78", Arm https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78, accessed August 29, 2025

"Exynos Mobile Processor," Samsung Semiconductor Global, https://semiconductor.samsung.com/processor/mobile-processor/, accessed September 4, 2025

"Fastest Path to Production Silicon with World-Leading Performance, on Leading-Edge Technology," Arm, https://www.arm.com/products/neoverse-compute-subsystems, accessed September 4, 2025

"FYE26 Q1 (30-Jun-25) Historical Quarters Datasheet.xlsx," Arm Holdings, July 30, 2025, https://investors.arm.com/financials/quarterly-annual-results

"Gartner Says Worldwide Semiconductor Revenue Grew 21% in 2024," Gartner, April 10, 2025, https://www.gartner.com/en/newsroom/press-releases/2025-04-10-gartner-says-worldwide-semiconductor-revenue-grew-21-percent-in-2024

"Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/cpu-core/, accessed September 4, 2025

"Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 3, 2025

"Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025

"Here's How Much Apple Was Paying Qualcomm in Royalties," The Motley Fool, January 14, 2019, https://www.nasdaq.com/articles/heres-how-much-apple-was-paying-qualcomm-royalties-2019-01-14

"How NVIDIA Shipped One Billion RISC-V Cores In 2024," RISC-V International, February 25, 2025, https://riscv.org/blog/2025/02/how-nvidia-shipped-one-billion-risc-v-cores-in-2024/

"Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025

"Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025

"Is Snapdragon an ARM Processor? Understanding the Core Technology Behind Qualcomm's Mobile Chipsets," Indian Institute of Embedded Systems, https://iies.in/blog/is-snapdragon-an-arm-processor-understanding-the-core-technology-behind-qualcomms-mobile-chipsets

"Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC- Vinternational

"Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, @ 4:37, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-Vinternational

"Market Capitalization of Arm Holdings," Companies Market Cap, https://companiesmarketcap.com/arm-holdings/marketcap/, accessed August 29, 2025

"Market Capitalization of Qualcomm," Companies Market Cap, https://companiesmarketcap.com/qualcomm/marketcap/, accessed August 29, 2025

"Market Capitalization of Samsung," Companies Market Cap, https://companiesmarketcap.com/samsung/marketcap/, accessed August 29, 2025

"Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers," Federal Trade Commission, Press Release May 16, 2014, https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibitions-direct-consumer-auto-sales

"Neoverse N1 | CPU for Next-Gen Cloud Infrastructure," Arm, https://www.arm.com/products/silicon-ip-cpu/neoverse/neoverse-n1, accessed September 4, 2025

"Next-Gen flagship Snapdragon chip 'Pakala' & reference device slip in new Qualcomm video," March 21, 2024, https://www.gizmochina.com/2024/03/21/next-gen-snapdragon-pakala-reference-device/

"NUVIA Raises $53 Million to Reimagine Silicon Design for the Data Center," Globe News Wire, November 15, 2019, https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.htm

"Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, August 5, 2025

"PPA analysis overview," Arm Developer, https://developer.arm.com/documentation/102738/0100/Power--performance--and-area-analysis, accessed September 4, 2025

"Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf

"Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf

"Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf

"Q4 2024 Qualcomm Inc. Earnings Call," Qualcomm, November 6, 2024, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/06/QCOM_Q4FY24EC_Transcript_11-7-24.pdf

"Qualcomm 5G NR Royalty Terms Statement," November 19, 2017, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm-5g-nr-royalty-terms-statement.pdf

"Qualcomm Announces Third Quarter Fiscal 2025 Results," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_financials/2025/q3/FY2025-3rd-Quarter-Earnings-Release.pdf

"Qualcomm Cellular IoT Licensing Program," Qualcomm, https://www.qualcomm.com/licensing/cellular-iot-licensing-program, accessed September 4, 2025

"Qualcomm Completes Acquisition of NUVIA," Qualcomm Press Release, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia

"Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/

"Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm Press Release, November 6, 2005, https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia

"Qualcomm Files Lawsuit Against Motorola," Qualcomm, Mar 5, 1997 https://www.qualcomm.com/news/releases/1997/03/qualcomm-files-lawsuit-against-motorola

"Qualcomm Implements New Corporate Structure," Qualcomm Press Release, October 1, 2012, https://www.qualcomm.com/news/releases/2012/10/qualcomm-implements-new-corporate-structure

"Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf

"Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf

"Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, https://hbsp.harvard.edu/product/711463-PDF-ENG

"Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf

"Qualcomm Oryon CPU," Qualcomm, https://www.qualcomm.com/products/technology/processors/oryon, accessed August 20, 202

"Qualcomm Sets New Growth Targets, Showcasing Company's Opportunity as On-Device AI Accelerates Demand for its Technologies," Qualcomm Inc., Press Release, November 19, 2024 https://investor.qualcomm.com/news-events/press-releases/news-details/2024/Qualcomm-Sets-New-Growth-Targets-Showcasing-Companys-Opportunity-as-On-Device-AI-Accelerates-Demand-for-its-Technologies/default.aspx

"Qualcomm to Acquire Alphawave Semi," Qualcomm, June 9, 2025, https://www.qualcomm.com/news/releases/2025/06/qualcomm-to-acquire-alphawave-semi

"Qualcomm to Bring RISC-V Based Wearable Platform to Wear OS by Google," Qualcomm, October 17, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-to-bring-risc-v-based-wearable-platform-to--wear-os-by-

"Quintauris: Accelerating RISC-V Innovation for next-gen Hardware ," November 4, 2024, https://www.quintauris.com/quintauris-accelerating-risc-v-innovation-for-next-gen-hardware

"RISC-V International Governance," RISC-V, https://riscv.org/about/board/, accessed August 13, 2025

"Samsung Apologizes for Falling Behind in AI Chips Race," Wall Street Journal, October 8, 2024, https://www.wsj.com/tech/samsungs-chip-technologies-fall-behind-in-early-innings-of-ai-game-67f0f9af

"Samsung Electronics Co. Ltd.," Wall Street Journal, https://www.wsj.com/market-data/quotes/kr/xkrx/005930, accessed August 26, 2025

"SCO Sends Warning Letters To Linux Users," InformationWeek, December 22, 2003, https://www.informationweek.com/it-leadership/sco-sends-warning-letters-to-linux-users

"Silicon Design Reimagined," Nuvia, Inc., January 15, 2021, https://web.archive.org/web/20210115193713/https://nuviainc.com/

"Snapdragon Summit," SixFiveMedia, https://www.sixfivemedia.com/our-events/snapdragon-summit, accessed September 4, 2025

"Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007, https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451

"The 5 Best Features of the Meta Quest 3," Qualcomm, January 12, 2024, https://www.qualcomm.com/snapdragon/news/the-5-best-features-of-the-meta-quest-3

"The Largest Companies by Market Cap in August 2025," The Motley Fool, August 4, 2025 https://www.fool.com/research/largest-companies-by-market-cap/

"The Value of Making Concessions In Negotiation," Red Bear, November 12, 2024, https://www.redbearnegotiation.com/blog/making-concessions-in-negotiation

"Too Good to Lose: America's Stake in Intel," Center for Strategic and International Studies, November 12, 2024, https://www.csis.org/analysis/too-good-lose-americas-stake-intel

"Top 10 Semiconductor Foundries in the World," Cytech Systems, March 13, 2024 https://www.cytechsystems.com/news/top-10-semiconductor-foundries

"Trial Sheds Light on Q'comm Patent Holdings, Royalty Rates," EETimes, January 21, 2019, https://www.eetimes.com/trial-sheds-light-on-qcomm-patent-holdings-royalty-rates

"Understanding Android," Android, https://www.android.com/everyone/facts/, accessed August 29, 2025

"Virtual Reality: Transforming the way we experience reality," Qualcomm, https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar/virtual-reality-vr

"What are IP Cores in Semiconductor Design: Types & Advantages," Techovedas, April 21, 2024, https://techovedas.com/what-are-ip-cores-in-semiconductor-design-types-advantages/

"What is Windows on Arm (WoA)?" Arm, https://www.arm.com/glossary/windows-on-arm, accessed September 4, 2025

"Why RISC-V is Inevitable, Calista Redmond, RISC-V International," RISC-V International, April 6, 2023, at 8:33, https://www.youtube.com/watch?v=ktjSvlelKPk&ab_channel=RISC-VInternational

"XR/VR/AR Reimagining reality as we know it," Qualcomm, https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar, accessed September 4, 2025

"Your Negotiation Challenges," Karrass, June 17, 2025, https://www.karrass.com/blog/your-negotiation-challenges

Abner Li, "Report: Arm cancels Qualcomm's instruction set, IP license for chip design," 9to5Google, October 22, 2024, https://9to5google.com/2024/10/22/report-qualcomm-arm-chip-design/

Aditya Bedi, "The foundation of Total Compute: First Armv9 Cortex CPUs," Arm Community, May 25, 2021 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/first-armv9-cpu-cores

Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf

Anand Lal Shimpi, "The ARM Diaries, Part 1: How ARM's Business Model Works," AnandTech, June 28, 2013, https://web.archive.org/web/20130701165406/http://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works/2

Andy Patrizio, "Qualcomm makes it official; no more data center chip," Network World, December 12, 2018, https://www.networkworld.com/article/966778/qualcomm-makes-it-official-no-more-data-center-chip.html

Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027

Arjun Kharpal, "Qualcomm to launch data center processors that link to Nvidia chips," CNBC, May 19, 2025, https://www.cnbc.com/2025/05/19/qualcomm-to-launch-data-center-processors-that-link-to-nvidia-chips.html

Arm, "The ARM processor business model," https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model, accessed August 22, 2025

Ben Schoon, "Google Pixel grows in US, settling into top 4 spot ahead of Pixel 10 launch," 9to5google, July 28, 2025, https://9to5google.com/2025/07/28/google-pixel-us-market-share-q2-2025/

Ben Schoon, "Qualcomm confirms November 15–17 event to reveal its next Snapdragon flagship," 9to5Google, July 19, 2022, https://9to5google.com/2022/07/19/snapdragon-summit-2022

Ben Schoon, "Qualcomm is suing Transsion, the largest smartphone maker that doesn't use Snapdragon," 9to5Google, July 12, 2024, https://9to5google.com/2024/07/12/qualcomm-transsion-lawsuit-report

Beth Kindig, "Arm Stock: AI Chip Favorite Is Overpriced," Forbes, Mar 21, 2024, https://www.forbes.com/sites/bethkindig/2024/03/21/arm-stock-ai-chip-favorite-is-overpriced/

Briana Watson, "SOC vs CPU: Breaking Down the Differences and their Optimal Usage," November 15, 2023, https://www.totalphase.com/blog/2023/11/soc-vs-cpu-breaking-down-the-differences-and-their-optimal-usage/

Charles Martin and Malcom Owen, "The history—and triumph —of Arm and Apple Silicon", Apple Insider, April 22, 2024, https://appleinsider.com/articles/24/04/22/the-history----and-triumph----of-arm-and-apple-silicon

Chris Williams, "Arm shells Qualcomm's Snapdragon launch party with latest salvo in license war," The Register, November 16, 2022, https://www.theregister.com/2022/11/16/arm_qualcomm_licensing_latest/

Chris Williams, "Arm sues Qualcomm over custom Nuvia CPU cores, wants designs destroyed," The Register, August 31, 2022, https://www.theregister.com/2022/08/31/arm_sues_qualcomm/

Chris Williams, "Up in arms! Arm kills off its anti-RISC-V smear site after own staff revolt," The Register, July 10, 2018, https://www.theregister.com/2018/07/10/arm_riscv_website/

Congressional Research Service, "Antitrust Law: An Introduction," May 1, 2025, https://www.congress.gov/crs_external_products/IF/PDF/IF11234/IF11234.8.pdf

David Brash, "The ARMv8-A architecture and its ongoing development," Arm Community, December 2, 2014 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development

David Manners, "Qualcomm data centre business withers away," Electronics Weekly, December 11, 2018, https://www.electronicsweekly.com/news/business/qualcomm-datacentre-business-withers-away-2018-12/

Deepa Prahalad, "Why Trust Matters More Than Ever for Brands," Harvard Business Review, December 8, 2011 https://hbr.org/2011/12/why-trust-matters-more-than-ev

Dominic Rushe, "Myspace sold for $35m in spectacular fall from $12bn heyday," The Guardian, June 30, 2011, https://www.theguardian.com/technology/2011/jun/30/myspace-sold-35-million-news

Don Fancher, Jennifer Lee, and Debbie McCormack, "Trust: A Critical Asset," Harvard Law School Forum on Corporate Governance, June 17, 2021, https://corpgov.law.harvard.edu/2021/06/17/trust-a-critical-asset/

Dylan Patel, "Arm's Nuclear Option – Qualcomm Must Cancel Next-Generation Products If Arm Succeeds," SemiAnalysis, November 16, 2022, https://semianalysis.com/2022/11/16/arms-nuclear-option-qualcomm-must/

Dylan Patel, Myron Xie, Afzal Ahmad and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/

Exchange Rates, "British Pound to US Dollar History: 2019," https://www.exchangerates.org.uk/GBP-USD-spot-exchange-rates-history-2019.html

Florian Mueller, "BREAKING: Qualcomm settles with China's Transsion (Africa's smartphone market leader): Indian patent lawsuit withdrawn," ip fray, January 16, 2025, https://ipfray.com/breaking-qualcomm-settles-with-chinas-transsion-africas-smartphone-market-leader-indian-patent-lawsuit-withdrawn/

Francisco Cheng, "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential

Greg Tang, "Intel and the x86 Architecture: A Legal Perspective," The Harvard Journal of Law & Technology, January 4, 2011, https://jolt.law.harvard.edu/digest/intel-and-the-x86-architecture-a-legal-perspective

Gyana Swain, "Arm secures Meta as first customer in chip push, challenging industry giants," ComputerWorld, February 14, 2025, https://www.computerworld.com/article/3825123/arm-secures-meta-as-first-customer-in-chip-push-challenging-industry-giants.html.

Haroun Adamu, "Did you know: Samsung makes a lot of money from iPhones," Android Authority, June 11, 2025, https://www.androidauthority.com/did-you-know-samsung-apple-partnership-3426411/

Herbert Hovenkamp, "Antitrust Market Definition: the Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, https://www.networklawreview.org/hovenkamp-market-definition/

Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud

Ian King, "Qualcomm Plans Exit From Server Chips," Bloomberg, May 7, 2018 https://www.bloomberg.com/news/articles/2018-05-07/qualcomm-is-said-to-plan-exit-from-server-chips-amid-cost-cuts

Imogen Beech, "6 real-life coopetition examples," Breezy, September 6, 2023, https://breezy.io/blog/coopetition-examples

Jeffrey Mervis, "To beat China, new U.S. law offers billions for microchip research and training," Science, September 6, 2022, https://www.science.org/content/article/beat-china-new-u-s-law-offers-billions-microchip-research-and-training

Jessica Coacci, "Here's the one-page memo Warren Buffett sent to his managers every two years for over 25 years," Yahoo! Finance, August 6, 2025 https://finance.yahoo.com/news/one-page-memo-warren-buffett-140107224.html

Jim McGregor, "Arm Squares Off Against Qualcomm: Day 2," December 18, 2024, https://www.forbes.com/sites/tiriasresearch/2024/12/18/arm-squares-off-against-qualcomm-day-2/

Joseph Calamia, Explained: The Physics-Defying Flight of the Bumblebee, Live Science, February 25, 2011 https://www.livescience.com/33075-how-bees-fly.html

Jowi Morales, "Qualcomm claims it owns 10% of U.S. Windows PC retail market for devices priced $800 and up," Tom's Hardware, February 6, 2025, https://www.tomshardware.com/tech-industry/qualcomm-claims-it-owns-10-percent-of-u-s-windows-pc-retail-market-for-devices-priced-usd800-and-up

Kelsey Ziser, "MediaTek and Qualcomm's rivalry heats up in 5G smartphone market – Omdia," Light Reading, July 16, 2024, https://www.lightreading.com/smartphones-devices/mediatek-and-qualcomm-s-rivalry-heats-up-in-5g-smartphone-market-omdia

Khadija Khartit, "When Does It Make Sense for a Company to Pursue Vertical Integration?" Investopedia, February 6, 2025, https://www.investopedia.com/ask/answers/012715/when-does-it-makes-sense-company-pursue-vertical-integration.asp

Linley Gwennap, "Editorial: Arm's No-Win Legal Fight," Tech Insights, https://www.techinsights.com/blog/editorial-arms-no-win-legal-fight, accessed August 29, 2025

MacroTrends, "QUALCOMM Research and Development Expenses 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/research-development-expenses

MacroTrends, "QUALCOMM Revenue 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/revenue

Majeed Kamran, "Qualcomm's Alphawave Acquisition Targets Data Centers and AI, But What's Next?" EE Times, June 9, 2025, https://www.eetimes.com/qualcomms-alphawave-acquisition-targets-data-centers-and-ai-but-whats-next/

Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008

Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, June 3, 2024, https://www.reuters.com/technology/arm-aims-capture-50-pc-market-five-years-ceo-says-2024-06-03/

Melissa Riofrio, "Surface Pro X revealed: Thin, light, and supercharged with a custom SQ1 ARM chip," PC World, October 2, 2019, https://www.pcworld.com/article/398146/microsofts-surface-pro-x-is-thin-light-and-supercharged-with-a-custom-sq1-arm-chip.html

Mike Freeman, "Qualcomm laying off more workers in San Diego, North Carolina to cut costs," The San Diego Union-Tribune, December 8, 2018, https://www.sandiegouniontribune.com/2018/12/07/qualcomm-laying-off-more-workers-in-san-diego-north-carolina-to-cut-costs/

Mike Wehner, "AIM is officially dead, and your childhood means nothing," Yahoo!News, October 6, 2017, https://www.yahoo.com/news/aim-officially-dead-childhood-means-nothing-174900787.html

Mike Wuerthele, "Apple & ARM's iPhone & Mac chip partnership will continue for decades," Apple Insider, September 5, 2023, https://appleinsider.com/articles/23/09/05/apple-arms-iphone-mac-chip-partnership-will-continue-for-decades

Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025, https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation

Patent Dispute Report: 2024 Mid-Year Report," Unified Patents, July 22, 2024, https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report

Paul Alcorn, "Intel and AMD are unlikely allies in new x86 ecosystem advisory group," Tom's Hardware, October 15, 2024, https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward

Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships

Phill Powell, "Types of central processing units (CPUs)," https://www.ibm.com/think/topics/central-processing-unit-types

Qualcomm Financial Summary downloaded from LSEG Data & Analytics

Rajeev Dhir, "Negotiation: Stages and Strategies," Investopedia, June 04, 2024, https://www.investopedia.com/terms/n/negotiation.asp

Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html

Rashika Singh, "Qualcomm shares slide as Apple modem shift, tariffs raise growth concerns," Yahoo Finance, July 31, 2025, https://finance.yahoo.com/news/qualcomm-shares-slide-apple-modem-085843911.html

Robert Triggs, "Arm vs x86: Instruction sets, architecture, and all key differences explained", Android Authority, December 20, 2023 https://www.androidauthority.com/arm-vs-x86-key-differences-explained-568718/

Roddy Urquhart, "Systems & Design: Opinion, Semiconductor Engineering," March 29, 2021, https://semiengineering.com/what-does-risc-v-stand-for/

Ryan Bourne, "Is This Time Different? Schumpeter, the Tech Giants, and Monopoly Fatalism," Cato Institute, June 18, 2019 https://www.cato.org/publications/policy-analysis/time-different-schumpeter-tech-giants-monopoly-fatalism

Saul Sugarman, "So I visited the last Blockbuster on the planet, and all I got was this t-shirt," The Bold Italic, December 8, 2023, https://thebolditalic.com/so-i-visited-the-last-blockbuster-on-the-planet-and-all-i-got-was-this-t-shirt-ffc6d2ed414d

Sebastian Moss, "Qualcomm announces data center CPUs, will support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025 https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/

Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf

Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1 2022 https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf

Simon Sharwood, "Arm gives up on killing off Qualcomm's vital chip license," The Register, February 6, 2025, https://www.theregister.com/2025/02/06/arm_qualcomm_nuvia/

Skye Jacobs, "Former Intel engineers from AheadComputing to break CPU performance limits with RISC-V design," TechSpot, June 12, 2025, https://www.techspot.com/news/108281-former-intel-engineers-form-aheadcomputing-break-cpu-performance.html

Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market

Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31

Stephen Nellis, "Apple inks new long-term deal with Arm for chip technology, according to filing," Reuters, September 5, 2023 https://www.reuters.com/technology/apple-inks-new-long-term-deal-with-arm-chip-technology-filing-2023-09-05/

Stephen Shankland, "SCO targets Linux customers," CNET, May 14, 2003, https://www.cnet.com/tech/services-and-software/sco-targets-linux-customers/

Steve McDowell, "Qualcomm's Game-Changing Move Into Automotive And Industrial IoT," Forbes, January 28, 2025, https://www.forbes.com/sites/stevemcdowell/2025/01/28/qualcomms-game-changing-move-into-automotive-and-industrial-iot/

Steve Mollman, "Blockbuster 'laughed us out of the room,' recalls Netflix cofounder on trying to sell company now worth over $150 billion for $50 million," Fortune, October 22, 2024, https://finance.yahoo.com/news/blockbuster-laughed-us-room-recalls-174322621.html

Swagath Bandhakavi, "FTC ends legal challenge against Microsoft's $69bn Activision Blizzard acquisition," Tech Monitor, May 23, 2025 https://www.techmonitor.ai/digital-economy/big-tech/ftc-microsoft-activision-blizzard-deal

Timothy Green, "Qualcomm is Going After Intel and AMD in This Lucrative Market," January 16, 2025, https://finance.yahoo.com/news/qualcomm-going-intel-amd-lucrative-101500205.html

Tobias Mann, "Jury spares Qualcomm's AI PC ambitions, but Arm eyes a retrial," The Register, December 23, 2024, https://www.theregister.com/2024/12/23/qualcomm_arm_trial/

Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, Nov 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/

U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf

U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, https://www.justice.gov/d9/383663.pdf

U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf

Victor Keegan, "Will MySpace ever lose its monopoly?" The Guardian, February 8, 2007, https://www.theguardian.com/technology/2007/feb/08/business.comment

Wayne Ma & Cory Weinberg, "How a Lopsided Apple Deal Got Under Arm's Skin," The Information, November 29, 2023, https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin

Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models

Young Hyun Jun, "Dearvalued [sic] customers, investors, and employees of Samsung Electronics," Samsung, October 8, 2024, https://www.samsung.com/global/ir/reports-disclosures/public-disclosure-view.84206/

Zac Hall, "Apple makes up less than 5% of Arm's revenue, and Arm can't do anything about it," 9to5mac, November 29, 2023, https://9to5mac.com/2023/11/29/apple-arm-licensing-revenue/

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## APPENDIX C: TRANSCRIPT OF INTERVIEW OF RENE HAAS, ARM'S CEO, OCTOBER 22, 2024

**Source: "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, https://www.youtube.com/watch?v=6FnBz8rxWUY**

*Peter Elstrom (Executive Editor Technology Bloomberg, PE): That's why I have you. And thank you all for joining us. We have a lot of questions for you, so we'll go ahead and get started. First, I begin. You are not just the of Arm you're now a podcaster. You began in your spare time I guess. You began a new podcast is called 'Tech Unheard' and your first interview was was with Jensen Huang. That's right which I gave a listen to. First of all, what gave you the idea to start a podcast? And secondly, how do you find the time as CEO to do something like that too?*

Rene Haas (Arm CEO): Yeah. So first off, thank you again for for having me here. I'm an amateur at this, so you don't have to worry about your day job as far as podcasting goes. You know, we were talking with some of our board members about how to use a unique medium to talk to two leaders, talk about the Arm story. And one of the ideas that was suggested was was a podcast. I was a radio disc jockey actually spinning records in university. So, I had a little bit of experience and aspirations to do that kind of work early in my life. So, in talking with some folks, you know, around the team, we said, you know, let's let's try this and let's do something a little bit more innovative and talk to other leaders and give them a perspective of maybe a conversation that they may not naturally have with someone who's professional like you are. So, yeah, we kicked it off. Please listen, it's on Apple Music, Spotify and Jensen was my first guest.

*Peter Elstrom: Great, Great. Congratulations. And, you know, in terms of the business Arm was acquired by SoftBank for about three two billion dollars. At some point, SoftBank agreed to sell it for about 40 billion dollars. That deal didn't go through, of course, NVIDIA was supposed to buy it. That deal didn't go through. Now, you went public just over a year ago, companies worth roughly 160 billion dollars, which seems like a successful IPO. But could you talk to us about what the business model for* Arm *has been and how it's evolved over time, over that period of time? And especially, what's the strategy going forward?*

Rene Haas: Yeah, well, thank you for the you know, for the nice words. 30-year-old plus company. Our business model for most of our time on earth, if you will, was very horizontal in that we had a licensing model. We develop IP. Our products are primarily CPUs. The business model is very horizontal in nature, meaning that we designed a very general-purpose product,

very power efficient product, and then license it to customers independent of the vertical market. And in other words, we didn't really target a certain vertical. I took over the core IP business right after SoftBank bought Arm and we pivoted to a more of a vertical approach, meaning that we now have products very specific for the data center, very specific for automotive, very specific for IoT. Smartphones we were born. And that diversification really allowed us to expand into many new markets with brand new products. SoftBank buying Arm in 2016 allowed us to invest in those new areas. So fast forward the result. What you're seeing now in terms of performance is that strategy. You know, going forward as we think about the next number of years, what we're seeing in the marketplace is a need for more solutions. Chips are getting increasingly more difficult to build. It takes a long time to design a chip, takes even longer to fabricate the chip. So, the more that Arm can do to help customers get to market faster is helpful. So, we're now developing solutions, what we call "CSSs" that get people to market sooner and allow them to get more profitably in a sooner way.

*Peter Elstrom: Mm hmm. Okay. I want to talk about AI. And in particular, the opportunities in AI. There is some debate, as we've referred to, I think, in a couple of these sessions about whether there's a bubble in AI. And I I'm going to assume that you think that there are real opportunities there. But can you talk about what Arm's role is there and how you see the company evolving to take advantage of those opportunities?*

Rene Haas: So, one of the most unique things about our company is the fact that the device that we build, the CPU, we estimate that 70% of the world's population touches Arm in some way. We're in security cameras, automobiles, PCs, smartphones, data center. And what that means is every workload, whether it's an application, an operating system or AI, runs through Arm in some way. So, that means AI. is going to run on Arm, period. And we're the only company on the planet that can run those AI workloads from the smallest devices on the edge. Again, a wearable, glasses, watch, phone to the data center. So, for us, AI is a gigantic opportunity in terms of growth going forward because AI is going to be everywhere. And as far as a bubble goes, I just don't ascribe to that. I look at things such as when people say, Gosh, is it overhyped? Or the stocks have gone down last quarter. That's almost like saying should I short AT&T in 2000 because the Internet is not going to happen. Or if Ford was a stock in 1907, would I short them? Because the automobile is not going to happen. It's just not. I mean, AI is we've seen such

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

advancement across the AI in the last couple of years that the amount of innovation that it's going to drive is just going to be incredible.

*Peter Elstrom: Okay. Okay. The chip company that probably has taken the most opportunity that has been able to capitalize the most on AI so far is NVIDIA. Chip maker in your space. They now have a near monopoly in terms of the highest end AI accelerators. How do you see that evolving in the future? And are there opportunities for Arm in particular to be able to play in that space and drive real revenue from?*

Rene Haas: Yeah. So, we're there already. NVIDIA's most advanced chip called the GB200, which is Grace Blackwell. Microsoft just announced that they're going to be deploying Grace Blackwell, the most advanced NVIDIA chip in their data centers that uses the Arm CPU. So, Grace is the Arm CPU. Blackwell Is the Nvidia GPU. So, Arm is there already. So, we are going to play in the most advanced data centers using AI. Arm, Arm will be there. I think what's most exciting for us, as I mentioned though, is the fact that not only will we be in the data center for training these algorithms, ultimately the training has to be transferred into inference, and training is the teacher inference is the student. Inference is actually running the workload and inference actually running that AI agent that's going to happen in the data center, that's going to happen in the car, that's going to happen on your watch. That's going to happen in glasses, that's going to happen in phones, and everywhere it happens, it's going to run on Arm. So, it's going to be a gigantic opportunity for us. The data center is just one place.

*Peter Elstrom: Mm hmm. Okay. So, you see Arm having opportunities kind of from the beginning to the end.*

Rene Haas: More than, more than opportunities. The agents will run locally. And the reason for that is you'll have a hybrid situation where some of that will run in the cloud. Some of it will run in your local device. Again, your glasses, your wearable, your phone. But locally, what you'll be able to add is security, things that can make sure it's private to you that not all your data is being passed to the cloud and vice versa. So yeah for for Arm I think it's going to be just an amazingly large opportunity.

*Peter Elstrom: Okay. As we were talking about before, I just moved from Japan where we spent a lot of time looking at SoftBank and especially Masayoshi Son's ambitions. We've written stories*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

*about how SoftBank is looking at ways to enter the AI chip market and particularly to compete with NVIDIA, quite directly in GPUs. He has a secret plan "Izanagi" that we've written about in the past. How does* Arm *isn't still 90% owned by SoftBank? How does* Arm *fit into that equation?*

Rene Haas: Yeah, so no, no product launch announcements today. So, nothing I can say about products coming out that you've written about. I can say that on the SoftBank board member, I do advisory work for SoftBank. I talked to Masa all the time. It's no secret that he is a big believer in AI has been for quite some time. He's talked about it actually, probably as long as any of the folks out there. I think his vision in terms of where it's all coming together now, you can start to see the pieces of it as I just described. Where does Arm fit  - all those AI workloads are going to run on Arm somewhere somehow. So that's the reason that we spend a lot of time talking to SoftBank about the future.

*Peter Elstrom: Okay. Okay. Earlier we had the ASML CEO on and he was talking about some of the challenges that they're facing in the market. They surprised investors last week as we talked about. And it does seem that there's a little bit of a disconnect in the market where many people see opportunities. ASML reported that their orders were about half what analysts had thought they were going to be. Seems there are certain areas of the chip industry that are struggling quite a bit. And on the other end you have Sam Altman talking about how we need more capacity in the chip industry. We need billions of dollars, maybe trillions of dollars of investment. What is the disconnect and how does that get resolved?*

Rene Haas: Yeah, so there's a lot to unpack there. Where Arm plays, as I mentioned because 70 % of the world's population uses Arm. And I think 300 billion chips have shipped since we were started that have Arm inside. And every year about 30 billion chips. We have a unique view into the industry because just about every digital device uses Arm. There are some markets that aren't accelerating as fast as others and candidly those are the ones that aren't using AI in a very large way. But in areas that can use AI and will use AI, people can't go fast enough. And I'll give you an example. Many of the hardware devices that are being introduced today were designed two or three years ago. That means the chips were designed two or three years ago. The chips that are going in your phones or your wearables. Those were all invented before ChatGPT was released

or before Lamo was released. So what we're seeing on one end of the industry is just a rush to develop more and more chips that have this AI capability. Now it takes time. You know, chips aren't built overnight. In fact, it takes from the time we engage a partner, you know, two or three years at least until that comes to market. So I think you'll see some of these new products coming out. I think what Sam is talking about is just generally the ceiling to get to AGI. Artificial general intelligence requires more compute. And the more compute you have, the better the models get. So, I see. I see both. But generally speaking, I'm pretty optimistic about the growth for our industry.

*Peter Elstrom: Okay. Okay. We were talking about this a bit before. One of the gating factors is making sure that you have chip manufacturers who can make the most advanced chips. TSMC seems to be gaining market share right now as a couple of the key competitors struggle, Intel in particular. And Samsung also has been struggling a bit. They're both trying to move into the foundry business a bit in competition with TSMC. What what are the dangers around having TSMC garner so much market share in foundry? And is it good for the industry or would it be better if there's a more diversified manufacturing base for the industry?*

Rene Haas: Yeah, TSMC is an amazing company. They've just done so much for the industry relative to the innovation, how they work with partners, etc. etc. If you remove semiconductor manufacturing or foundry for a moment and just step back and say, is it healthy for any industry to have a one dominant supplier and then add on top of that a dominant supplier that's largely concentrated in one part of the world? Not, not really. So as a result, I think it's necessary just in terms of diversity of supply base, to have more and more advanced manufacturing and geographic diversity. Fabs in the United States. Fabs in Europe. Fabs in India. Fabs in Saudi Arabia. I think over time, we're going to see not only more suppliers, but geographic diversity as well.

*Peter Elstrom: Okay. Governments obviously are investing a lot in that very question. You're seeing the United States do it. You're seeing Europe do it. Japan has spent a lot of money on it, too. Do you think that's making progress at this point? Do you see light at the end of that tunnel?*

Rene Haas: It's the the capital expenditures required for these fabs are enormous. TSMC, Intel, Samsung, I think their CapEx is anywhere between 30 to 35 billion dollars a year in new

factories. And if you start looking at the revenues that these companies produce, you start very quickly looking at, oh my gosh, that is a lot of money to invest. Now, on one hand, you can look at it and say, well, the demand will be there, AI, etc., etc.. But it doesn't take much in terms of a year slowdown in demand and the companies have a really negative financial outcome. So, yes, governments have been involved, I think should be involved in my opinion. We saw in the U.S. for the very first time a policy act around CHIPS Act to put funding into the fabs, which I generally a big supporter of. I think it's necessary.

*Peter Elstrom: Okay. Let's talk a little bit more about Intel and their struggles. You grew up in a chip industry where Intel was really the dominant player, kind of set the pace for technology evolution over time. Now we're openly talking about whether Intel is going to be broken up, maybe sold into pieces. What kind of opportunities are there for* Arm *within that space as Intel goes through these struggles?*

Rene Haas: Yes, we work very closely with Intel. It's a bit of strange bedfellows. Many folks would consider Arm and Intel to be natural competitors on the product space. But what's very important to us, back to this discussion around supply base is that "Intel Foundry Services" IFS is successful. We do a lot of work with Intel as we do with Samsung and TSMC to ensure that our products can be manufactured there. We work very closely with their engineers to ensure that the leading edge technology can can run on Arm. So, we want to see Intel successful and we want to see IFS successful. I think it might be strange to hear the Arm CEO say that, but we want Intel manufacturing to be successful.

*Peter Elstrom: Okay. Bloomberg reported that* Arm *took a pretty close look at buying a part of Intel. Would you like to comment?*

Rene Haas: Nothing I can say on that one.

*Peter Elstrom: "Okay. All right. Thank you. Thank you. I wanted to turn. You talked about are moving up the value stack kind of moving beyond its traditional place in the industry. And as you have moved up the value chain, you've gotten closer to doing what some of your customers do."*

Rene Haas: "Right."

*Peter Elstrom: "Getting closer to being able to do these complete designs. And. Yes. It speeds up innovation, as you were alluding to, but it also puts you in closer competition with some of your customers. You have a lawsuit with Qualcomm in particular."*

Rene Haas: "Yeah."

*Peter Elstrom: "Isn't it in both companies interest to settle that and to resolve the legal dispute at this point? Or what would you say?"*

Rene Haas: "These are these are tough questions. It's a good thing I'm a podcaster, so I know what's coming. You know, first thing on, competing with our customers, you know, it's rather complicated because if you look at some of our customers, our customers are Amazon. Our customers are Microsoft. Our customers are Apple. Our customers are Tesla. They all build chips using Arm. I'm not going to build an electric car. I'm not going to build a phone. I'm not going to build a data center. So, to look at the value chain relative to who builds chips, relative to whether you're end business is a chip business or a product business. It's gotten a lot more gray. We follow what the industry is demanding, and what the industry wants to see is solutions getting to market faster. And that's what we're focused on. Qualcomm. Not much I can say on that, other than we're headed to a trial. I think it's the third week in December. We feel very good about our case. We think our case is quite simple and straightforward. And as I said, December, we'll find out."

*Peter Elstrom: "Okay. So, you head to the courtroom then. One last question. I think we have time for this. In this audience in particular, there's a lot of interest in whether* Arm*, which is historically a British company, whether they would ever look at doing some sort of dual listing. Of course, we've heard about this many times in the past. A year ago when you did your IPO, you decided you would do it in the U.S. instead. One of the opportunities for listing here, what are the pluses and minuses of that sort of thing?"*

Rene Haas: "Yeah, we did. We listed in New York over over a year ago. And at that time our comments were we would look at a secondary listing. We're still open to it. It's not something that's top of mind right now, quite candidly. But we'll continue to have discussions with both stakeholders in the government and in the local exchange. We'd love to find a way at some point

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

in time, but also at the same time, there's a lot of other things that keep me busy relative to my day job."

*Peter Elstrom: "Okay. All right. Rene Haas, thank you very much. Please join me in welcoming. Thank you. Thank you."*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## APPENDIX A: PROFESSOR TIMOTHY S. SIMCOE'S CV

# Timothy S. Simcoe

CONTACT

Boston University Questrom School of Business
595 Commonwealth Avenue
Boston, MA 02215

(510) 685-2020
tsimcoe@bu.edu
http://people.bu.edu/tsimcoe

ACADEMIC EMPLOYMENT

**Boston University, Questrom School of Business**

- David J. McGrath Jr. Professor in Strategy & Innovation, 2024-*present*.
- Professor of Strategy & Innovation, 2022-2024.
- Associate Professor of Strategy & Innovation, 2013-2022.
- Assistant Professor of Strategy & Innovation, 2009-2013.

**University of Toronto, Joseph L. Rotman School of Management**

- Assistant Professor of Strategic Management, 2004-2009.

APPOINTMENTS

**President's Council of Economic Advisers**

- Senior Economist, 2014-2015.

**National Bureau of Economic Research**

- Research Associate, Productivity Program, 2016-*present*.
- Faculty Research Fellow, Productivity Program, 2009-2016.

**BU Technology & Policy Research Initiative**

- Faculty Director, 2020-*present*.

EDUCATION

**University of California at Berkeley**

- Ph.D., Business Administration, 2004
- M.A., Economics, 2003

**Harvard University**

- A.B., Applied Math & Economics, 1996

PUBLICATIONS

**Refereed Articles**

Mezzanotti, F. and T. Simcoe. Innovation, Patenting and Appropriability: Survey Evidence from a Nationally Representative Sample of U.S. Firms, *Review of Economics and Statistics*, forthcoming.

R. A. Gibbs, T. Simcoe and D. Waguespack. Does Earnings Management Matter for Strategy Research *Strategic Management Journal*, forthcoming.

B. Ganglmair, E. Tarantino and T. Simcoe. Learning When to Quit: An Empirical Model of Experimentation in Standards Development. *AEJ: Microeconomics*, 17(3):164–190, August 2025.

C. Righi and T. Simcoe. Patenting Inventions or Inventing Patents? Continuation Practice at the USPTO. *RAND Journal of Economics*, 54(3):416–442, Fall 2023.

J. Baron, B. Ganglmair, N. Persico, T. Simcoe and E. Tarantino. Representation is Not Sufficient for Selecting Gender Diversity. *Research Policy*, 53(6):104994, July 2024.

R. Bekkers, C. Catalini, A. Martinelli, C. Righi and T. Simcoe. Disclosure Rules and Declared Essential Patents. *Research Policy*, 52(1):104618, January 2023.

E. Basker and T. Simcoe. Upstream, Downstream: Diffusion and Impact of the Universal Product Code. *Journal of Political Economy*, 129(4):1252–1286, April 2021.

A. King, B. Goldfarb and T. Simcoe. Learning from Testimony on Quantitative Research in Management. *Academy of Management Review*, 46(3):465–488, July 2021.

X. Li and T. Simcoe. Competing or Complementary Labels? Estimating Spillovers in Chinese Green Building Certification. *Strategic Management Journal*, 42(13): 2451–2476, December 2021.

A. Agrawal, C. Rosell and T. Simcoe. Tax Credits and Small Firm R&D Spending. *American Economic Journal: Economic Policy*, 12(1): 1–21. Lead Article, May 2020.

M. Rysman, T. Simcoe and Y. Wang. Differentiation Strategies in the Adoption of Environmental Standards: LEED from 2000 to 2014. *Management Science*, 66(9): 4173–4192, September 2020.

T. Simcoe and J. Watson. Forking, Fragmentation and Splintering. *Strategy Science*, 4(4):251–342, December 2019.

F. Mezzanotti and T. Simcoe. Patent Policy and American Innovation After eBay: An Empirical Examination. *Research Policy*, 48(5): 1271–1281, June 2019.

C. Righi and T. Simcoe. Patent Examiner Specialization. *Research Policy*, 48(1):137–148, February 2019.

M. Lemley and T. Simcoe. How Essential are Standard Essential Patents? *Cornell Law Review*, 104(3): 607–642, March 2019 .

M. Catillon, P. Gertler and T. Simcoe. Who Benefits Most in Disease Management Programs?: Improving Target Efficiency. *Health Economics*, 28(2): 189–203, February 2019.

L. Freedman, I. Cockburn and T. Simcoe. The Economics of Reproducibility in Preclinical Research. *PLoS Biology*, 13(6): e1002165, June 2015.

T. Simcoe and M. Toffel. Government Green Procurement Spillovers: Evidence from Municipal Building Policies in California. *Journal of Environmental Economics and Management*, 68(3):411–434. Lead article, November 2014.

E. Rawley and T. Simcoe. Information, Knowledge and Asset Ownership in Taxicab Fleets. *Organization Science*, 24(3): 831–845, May-June 2013.

J. Farrell and T. Simcoe. Choosing the Rules for Consensus Standardization. *The RAND Journal of Economics*, 43(2): 235–252, Summer 2012.

T. Simcoe. Standard Setting Committees: Consensus Governance for Shared Technology Platforms. *American Economic Review*, 102(1): 305–336, February 2012.

M. Rysman and T. Simcoe. A NAASTy Alternative to RAND Pricing Commitments. *Telecommunications Policy*, 35(11): 1010–1017, December 2011.

A. Galasso and T. Simcoe. CEO Overconfidence and Innovation. *Management Science*, 57(8): 1469–1484, August 2011.

T. Simcoe and D. Waguespack. Status, Quality and Attention: What's in a (Missing) Name? *Management Science*, 57(2): 274–290, February 2011.

A. Mehta, M. Rysman and T. Simcoe. Identifying the Age Profile of Patent Citations: New Estimates of Knowledge Diffusion. *Journal of Applied Econometrics*, 25 (7): 1073–1222, November/December 2010.

E. Rawley and T. Simcoe. Diversification, Vertical Contracting and Diseconomies of

Scope: Evidence from the Taxicab Industry. *Management Science*, 56(9): 1534–1550, September 2010.

T. Simcoe, S. J. Graham and M. Feldman. Competing on Standards? Entrepreneurship, Intellectual Property and Platform Technologies. *Journal of Economics and Management Strategy*, 18(3): 775–816, Fall 2009.

M. Rysman and T. Simcoe. Patents and the Performance of Voluntary Standard Setting Organizations. *Management Science*, 54(11): 1920–1934, November 2008.

D. Mowery and T. Simcoe. Is the Internet a US Invention? An Economic and Technological History of Computer Networking. *Research Policy*, 31(8-9): 1369–1387, 2002.

J. Macher, D. Mowery and T. Simcoe. eBusiness and the Semiconductor Industry Value Chain: Implications for Vertical Specialization and Integrated Semiconductor Manufacturers. *Industry and Innovation*, 9:155–181, 2002.

**Working Papers**

Mezzanotti, F. and T. Simcoe. Research and/or Development: Financial Frictions and Innovation Investment. R&R at *Journal of Finance*

N. Sahoo, T. Simcoe and X. Yang. Effects of Content Sourcing Strategy on Online News Subscription. R&R at *MIS Quarterly*.

D-S. Jeon, Y. Lefouili, Y. Li and T. Simcoe. Ecosystems and Complementary Platforms.

**Other Publications**

T. Simcoe. Standard Setting Organizations. Chapter in the *Elgar Encyclopedia on the Economics of Competition and Regulation*, forthcoming.

K. Blind, M. Kenney, A. Leiponen and T. Simcoe. Standards and Innovation: A Review and Introduction to the Special Issue. *Research Policy*, 52(8), October 2023.

J. Contreras, T. Simcoe et al. Preserving the Royalty-Free Standards Ecosystem. *European Intellectual Property Review*, 45(7): 371-375, June 2023.

E. Hovenkamp and T. Simcoe. Tying and Exclusion in FRAND Licensing: Evaluating Qualcomm. *The Antitrust Source*, February 2020.

A. Sesia, T. Simcoe and M. Toffel. Platform LEEDership at the U.S. Green Building Council. Harvard Business School Case 619-027, May 2018.

B. Goldfarb, A. King and T. Simcoe. Heritability of Trust and Distrust Remains Unknown. Letter to *Proceedings of the National Academy of Sciences*, January 2018.

S. Graham, P. Menell, C. Shapiro and T. Simcoe. Final Report of the Berkeley Center for Law & Technology Patent Damages Workshop. *Texas Intellectual Property Law Journal*, 25 (1): 115–142, 2017.

A. Shampine and T. Simcoe. Economics of Patents and Standardization: Network Effects, Hold-up, Hold-out, Stacking. The Cambridge Handbook of Technical Standardization Law, Vol. 1. Cambridge University Press, 2017.

T. Simcoe and C. Righi. Standards, Patents and Innovation. Handbook of Standards and Innovation. Edward Elgar, 2017.

T. Simcoe. How to Make and Keep a Patent Pledge. Pages 285–290 in *Patent Pledges: Global Perspectives on Patent Law's Private Ordering Frontier*. Edward Elgar, 2017.

T. Simcoe. Modularity and the Evolution of the Internet. Chapter 1 in *Economic Analysis of the Digital Economy*. University of Chicago Press, 2015.

A. Agrawal, S.J. Graham, M. Rysman and T. Simcoe. Industry Standards, Intellectual Property and Innovation: Introduction to the Special Issue. *International Journal of Industrial Organization*, 36:1-3 (September 2014).

T. Simcoe. Governing the Anti-commons: Institutional Design for Standard Setting Organizations. In *Innovation Policy and the Economy*, 14:99–128, 2014.

T. Simcoe. Private and Public Approaches to Patent Holdup in Industry Standard-Setting. *Antitrust Bulletin*, 57(1): 59–88, Spring 2012.

J. Farrell and T. Simcoe. Four Paths to Compatibility. pages 34–58 in the *Oxford Handbook of the Digital Economy*. Oxford University Press, 2012.

T. Simcoe. Delay and *de jure* Standardization: Exploring the Slowdown in Internet Standards Development. Pages 260–295 in *Standards and Public Policy*. Cambridge University Press, 2007.

T. Simcoe. Explaining the Increase in Intellectual Property Disclosure. Pages 260–295 in *Standards Edge: The Golden Mean*. Bolin Group, 2007.

T. Simcoe. Open standards and Intellectual Property Rights. Pages 161–183 in *Open Innovation: Researching a New Paradigm*. Oxford University Press, 2006.

D. Mowery and T. Simcoe. Public and Private Participation in the Development and Governance of the Internet. Pages 259–294 in *The Limits of Market Organization*. Russell Sage, 2005.

D. Mowery and T. Simcoe. The Origins and Evolution of the Internet. Pages 229–265 in *Technological Innovation and Economic Performance*. Princeton University Press, 2002.

M. Rysman and T. Simcoe. Measuring the Performance of Standard Setting Organizations. Pages 81–94 in *International Standardization as a Strategic Tool: Commended Papers from the IEC Centenary Challenge 2006*. International Electrotechnical Commission, 2006.

TEACHING

**Boston University Questrom School of Business**

Technology Strategy (MBA and Executive MBA)

Strategy and Innovation (Undergraduate)

Competition, Innovation and Strategy (MBA)

Data Analysis (Executive MBA)

Causal Inference in Management Research (PhD)

**University of Toronto, Rotman School of Management**

Fundamentals of Competitive Strategy (MBA)

Entrepreneurship & Small Business Management (Undergraduate)

Models & Methods in Strategic Management (PhD)

**University of California, Berkeley**

Economic Analysis for Business Decisions, Teaching Assistant (MBA)

## Consulting

**Expert Reports, Depositions and Testimony**

United States of America *et al.* (client) v. Google LLC. Eastern District of Virginia. Case No. 1:23-cv-00108.

Apple (client) v. Qualcomm. Southern District of California. Case No. 3:17-CV-0108.

Microsoft (client) v. Motorola. Western District of Washington. Case No. C10-1823-JLR.

HTC Corporation (client) v. Ericsson. Eastern District of Texas. Case No. 6:18-CV-00243-JRG.

ViiV Healthcare, (client) v. Gilead Sciences. District of Delaware. Case No. 1:18-CV-0224-VAC-CJB.

In Re: Qualcomm Securities Class Action Litigation (plaintiff client). Southern District of California. Case No. 3:17-CV-00121-JO-MSB

Fujitsu v. Tellabs (client). Northern District of Illinois, Eastern Division. Civil Action No. 09 CV 04530.

In the Matter of Certain Video Capable Electronic Devices, Including Computers, Streaming Devices, Televisions, Cameras, and Components and Modules Thereof (clients Amazon and Hewlett Packard). U.S. International Trade Commission Investigations Nos. 337-1379 and 337-1380.

In the Matter of Video-Capable Laptop, Desktop Computers, Handheld Computers, Tablets, Televisions, Projectors, and Components and Modules Thereof (clients Acer, AsusTek and HiSense). U.S. International Trade Commission Investigation No. 337-TA-448.

Apple (client) v. Motorola. Western District of Wisconsin. Case No. 11-CV-178.

Lenovo (client) and Motorola Mobility v. InterDigital Technology Corporation et al. District of Delaware. Case No. 19-1590-LPS

3G Licensing, Koninklijke KPN and Orange v. LG Electronics (client). District of Delaware. Case No. 17-cv-85-LPS.

Global Communications (client) v. Direct TV, et al. Northern District of Florida. Case No. 4:12-CV-00651-RH-CAS.

Zenith Electronics, Panasonic, U.S. Philips and The Trustees of Columbia University v. Craig Electronics (client). Southern District of Florida. Case No. 13-CV-80567.

**Other Consulting**

Wireless standards developer (client). Review of bylaws and procedures.

Boston Toronto Group (client). Executive education.

## Service

**University Governance**

Strategy & Innovation Department Chair, 2024-*present*

PhD Program Director (2015-2017, 2018-2022.)

**Editorial and Advisory Positions**

American Economic Journal: Economic Policy, Board of Editors, 2021.

Management Science, Associate Editor in Innovation and Entrepreneurship, 2014-present.

Journal of Industrial Economics, Associate Editor, 2013-present.

Management Science, Associate Editor in Business Strategy, 2012-present.

NIST Visiting Expert Committee on US National Standards Strategy for Critical and Emerging Technologies, 2023-24.

National Academy of Sciences, Member of Committee on Intellectual Property Management Practices of Standard Setting Organizations, 2012-2013.

National Academy of Sciences, Member of Committee on the Review of the Small Business Innovation Research and Small Business Technology Transfer Programs at the National Science Foundation, 2019-2021.

Co-founder, Sloan Management Review Strategy Forum, 2018-2023.

Scientific Advisory Board, Global Biological Standards Institute, 2015-2018.

**Doctoral Advising & Committees**

Xia Li, London Business School (Primary Advisor, 2023).

Jeremy Watson, University of Minnesota (Primary Advisor, 2018).

Cesare Righi, Pompeu Fabra University (Primary Advisor, 2017).

Jane Wu, UCLA (Committee Member, 2022).

Sophie Wang, UIBE Beijing (Committee Member, 2021).

Christian Catalini, MIT Sloan School (Committee Member, 2013)

Paul Seaborn, University of Denver (Primary Advisor, 2011)

Jay Horwitz, University of Bocconi (Committee Member, 2011)

Elena Kulchina, Duke University (Committee Member, 2012)

Justus Baron, Ecole des Mines / ParisTech (Committee Member, 2012)

Awards

Innovators Network Foundation Intellectual Property Fellow, 2021-2023
Broderick Award for Excellence in Research, 2022.
Dean's Research Scholar, 2015-2018, 2020-2022
Outstanding Contribution to Questrom Doctoral Programs, 2018
Questrom Full-time MBA Favorite Elective Professor, 2016
BU Questrom Doctoral Student's Association, Distinguished Mentor Award, 2016
John R. Russell Excellence in Teaching Award, Executive MBA, 2013
Management Science Meritorious Service Award (Reviewer), 2010
Rotman Excellence in Teaching Award, Commerce Program, 2008
Glueck Best Paper Award, Academy of Management BPS Division, 2008
Finalist, IEC Centenary Challenge, 2006
Finalist, Organization Science Dissertation Proposal Competition, 2003

Grants

Intel Corporation Research Gift, 2017-2020
Bell Canada University Labs, 2007-2008
Connaught New Faculty Start-Up Award, 2004-2008
Berkeley Center for I.T. Research in the Interest of Society, 2003-2004
Intel Corporation Robert M. Noyce Memorial Fellowship, 2001-2002
Haas School of Business Ph.D. Fellowship, 1999-2000
Harvard College Fellowship, 1992-1995

Prior Work Experience

**Ernst & Young LLP**

Senior Consultant, Center for Business Innovation, Boston MA, 1998-1999

Consultant, E&Y Economics Consulting, Washington DC, 1996-1998

Other

**Professional Societies**

American Economics Association, Academy of Management, Strategy Research Forum, International Society for New Institutional Economics

**Computer Code**

STATA xtpqml: Robust inference in fixed-effects poisson regression

STATA mtad: Multinomial test of agglomeration and dispersion

Personal

Married: Stephanie Tobias Gates (August 2002)

Children: Katherine, Anne and Theodore

Interests: Michigan Sailing, North Haven Golf Club, Harvard Alumni Jazz Band

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

## APPENDIX B: MATERIALS RELIED UPON

## Legal Documents

"Arm's First (Corrected) Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-11)," Arm Ltd., March 1, 2024

"Arm's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3)," Arm Holdings, July 11, 2025

"Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3," Arm Holdings, July 11, 2025

"Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11)," Arm Holdings, July 11, 2025

"Arm's First Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 12), Arm Holdings, July 11, 2025

"Arm's Responses & Objections to Qualcomm's First Set of Request for Admissions (Nos. 1-28)," Arm Holdings, July 11, 2025

"Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, March 10, 2025

"Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, July 11, 2025

"Plaintiffs' Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, August 8, 2025

"Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13)," Qualcomm, July 11, 2025

"Plaintiffs' Second Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13)," Qualcomm, August 8, 2025

"Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, July 11, 2025

"Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, August 8, 2025

"Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission (Nos. 1-30)," Qualcomm, July 11, 2025

*Qualcomm Inc. v. Arm Holdings, plc.*, C.A. No. 24-490-MN, Dkt. Nos. 137; 137-1 (Ex. A) (June 3, 2025)

*Arm Ltd. v. Qualcomm Inc*., No. 1:22-cv-01146 (D. Del. filed August 31, 2022), Dkt. Nos. 571, 572

*Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146* (D. Del. filed August 31, 2022), Dkt. No. 1

*Arm v. Qualcomm*, No. 22-1146 (MN), Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim, D.I. 21, November 15, 2022

*Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024

*Qualcomm Inc. v. Arm Holdings, plc.*, C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025

Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007

Complaint for Patent Infringement, *Qualcomm Inc. v. Apple Inc.*, No. 3:17-cv-01375-JAH-AGS (S.D. Cal. filed July 6, 2017), https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/2017-07-06_complaint.pdf

*eBay Inc. and Half.com v. MercExchange, L.L.C.*, Brief of Amici Curiae Qualcomm Inc. & Tessera, Inc. in Support of Respondent, 547 U.S. 388 (2006) (No. 05-130)

Expert Report of Dr. Michael C. Brogioli, September 5, 2025

Expert Report of Mr. Steven Richards, CPA, September 5, 2025

Expert Report of Eric A. Posner, August 8, 2025

Expert Report of Patrick F. Kennedy, August 8, 2025

Expert Report of Patrick F. Kennedy, February 27, 2024

*Federal Trade Commission v. Qualcomm Incorporated*, "Reply brief for appellant Qualcomm Incorporated (Redacted)," Qualcomm Incorporated, December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit

Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10–13)," Qualcomm, July 11, 2025

**I incorporate by reference all documents cited in ARM's and Qualcomm's discovery responses, and all materials relied upon by Prof. Posner and Dr. Kennedy.**

## Case Law

*Brown Shoe Co., Inc. v. United States*, 370 U.S. 294 (1962)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986)

*Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc*., U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, Case 4:24-cv-02508, Dkt. Entry 511 (S.D. Tex. Jan. 31, 2025)

*United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945)

*United States v. Microsoft Corp.*, 253 F.3d 59 (2001)

## Deposition Testimony and Associated Exhibits

*Arm v. Qualcomm*, Trial Transcript, Vol 2.1, December 16, 2024

*Arm v. Qualcomm*, Trial Transcript, Vol 3.1, December 17, 2024

*Arm v. Qualcomm*, Trial Transcript, Vol. 4.1, December 18, 2024

Deposition of Akshay Bhatnagar, July 10, 2025

Deposition of Ami Badani, August 1, 2025

Deposition of Andrew Howard, July 1, 2025

Deposition of Ann Chaplin, July 11, 2025

Deposition of Anupa George, July 30, 2025

Deposition of Aparajita Bhattacharya, July 7, 2025

Deposition of Christine Tran, July 10, 2025

Deposition of Christopher Patrick, July 2, 2025

Deposition of Cristiano Amon, July 3, 2025

Deposition of Durga Malladi, July 10, 2025

Deposition of Ehab Youssef, June 26, 2025

Deposition of Gerard Williams, June 25, 2025

Deposition of Gerard Williams, November 3, 2023

Deposition of James Jeon, July 11, 2025

Deposition of James Thompson, November 28, 2023

Deposition of Jannik Nelson, July 10, 2025

Deposition of Jean-Francois (Jeff) Vidon, July 1, 2025

Deposition of Jeff Golden, July 3, 2025

Deposition of Jeffrey M. Fonseca, July 9, 2025

Deposition of Jignesh Trivedi, July 9, 2025

Deposition of John Horley, July 8, 2025

Deposition of Jonathan Weiser, July 11, 2025

Deposition of Karl M. Whealton, June 18, 2025

Deposition of Karthik Shivashankar, June 20, 2025

Deposition of Kenneth Siegel, July 4, 2025

Deposition of Kurt Wolf, June 25, 2025

Deposition of Larissa Cochron, July 11, 2025

Deposition of Laura Sand, July 8, 2025

Deposition of Lynn Couillard, July 3, 2025

Deposition of Manju Varma, June 24, 2025

Deposition of Mark Dragicevich, June 27, 2025

Deposition of Martin Weidmann, June 20, 2025

Deposition of Michael Williams, June 27, 2025

Deposition of Mohamed Awad, July 29, 2025

Deposition of Paul Kranhold, July 17, 2025

Deposition of Paul Williamson, July 2, 2025

Deposition of Pavankumar (Pavan) Mulabagal, July 1, 2025

Deposition of Peter Greenhalgh, July 4, 2025

Deposition of Philip Hughes, June 17, 2025

Deposition of Rene Haas, July 7, 2025

Deposition of Richard Grisenthwaite, July 2, 2025

Deposition of Richard Meacham, June 27, 2025

Deposition of Selena LaCroix, August 1, 2025

Deposition of Simon Segars, November 16, 2023

Deposition of Spencer Collins, June 30, 2025

Deposition of Sudeep Holla, June 17, 2025

Deposition of Tim Herbert, October 25, 2023

Deposition of Vivek Agrawal, July 11, 2025

Deposition of Will Abbey, June 26, 2025

Deposition of Will Abbey, October 27, 2023

Deposition of Ziad Asghar, July 7, 2025

## Conversations

Conversation with Dr. Michael C. Brogioli, September 2, 2025

Conversation with Mohamed Awad, August 29, 2025

Conversation with Paul Williamson, September 2, 2025

## SEC Filings

Arm Holdings plc, Form F-1, August 21, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523216983/d393891df1.htm

Arm Holdings plc, Amendment No. 2 to Form F-1, September 5, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm

Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2024, https://investors.arm.com/static-files/dcdd6629-24bb-40ef-ba55-8aca1362205a

Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2025, https://investors.arm.com/static-files/9be77c9d-75ee-4639-bfe4-17efd23c56b5

Intel Corporation, 2021 Form 10-K, for the fiscal year ended December 25, 2021, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-22-000007/0000050863-22-000007.pdf

Intel Corporation, 2024 Form 10-K, for the fiscal year ended December 28, 2024, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000009/0000050863-25-000009.pdf

Qualcomm Incorporated, Form 10-K, for the fiscal year ended September 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/fd08c4f6-61ba-4a6a-a339-0e3b522ed739.pdf

Qualcomm Incorporated, Form 10-K, for fiscal years 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx

Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 26, 2021, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/c91b841c-1f3f-4762-9c0d-c379f1554455.pdf

Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/1b687286-85e9-44e6-a579-d19d089eacfb.pdf

Qualcomm Incorporated, Form 10-Q, for the quarterly periods 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx

## Bates Numbered Documents

ARM_00000003

ARM_00000016

ARM_00000017

ARM_00000382

ARM_00000510

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

ARM_00002955

ARM_00004029

ARM_00026351

ARM_00032601

ARM_00032602

ARM_00045266

ARM_00055357

ARM_00057511

ARM_00057560

ARM_00076604

ARM_00080472

ARM_00081203

ARM_00081461

ARM_00081462

ARM_00081753

ARM_00086285

ARM_00087465

ARM_00088600

ARM_00092788

ARM_00095947

ARM_00097388

ARM_00103918

ARM_00104733

ARM_00110511

B - 7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

ARM_00113179

ARM_00115827

ARM_00117493

ARM_00118635

ARM_00119602

ARM_00119603

ARM_01215409

ARM_01215878

ARM_01215886

ARM_01230861

ARM_01230977

ARM_01230978

ARM_01238895

ARM_01239056

ARM_01246942

ARM_01249629

ARM_01259705

ARM_01282304

ARM_01293447

ARM_01294236

ARM_01305915

ARM_01311208

ARM_01314793

ARM_01426938

B - 8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

ARM_01427719

ARM_01427776

ARM_01427796

ARM_01428339

ARMQC_00000640

ARMQC_02600713

ARMQC_02601118

ARMQC_02725050

ARMQC_02726982

ARMQC_02727610

ARMQC_02729412

ARMQC_02731630

ARMQC_02739661

ARMQC_02740205

ARMQC_02740386

ARMQC_02748499

ARMQC_02749177

ARMQC_02762992

ARMQC_02770485

ARMQC_02770649

ARMQC_02770676

ARMQC_02771127

ARMQC_02771946

ARMQC_02772366

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

ARMQC_02779314

ARMQC_02779364

ARMQC_02779391

ARMQC_02779433

ARMQC_02779483

ARMQC_02783619

ARMQC_02785287

QCARM_0020011

QCARM_0020012

QCARM_0027980

QCARM_0222737

QCARM_0275743

QCARM_0332490

QCARM_0337839

QCARM_0338297

QCARM_0338573

QCARM_0338883

QCARM_0343120

QCARM_0343954

QCARM_0353229

QCARM_0550516

QCARM_0550518

QCARM_0589823

QCARM_0591733

B - 10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

QCARM_3460234

QCARM_3474751

QCARM_3839896

QCARM_3972031

QCARM_7401071

QCARM_7484882

QCVARM_0449658

QCVARM_0451587

QCVARM_0455391

QCVARM_0463558

QCVARM_0463837

QCVARM_0464076

QCVARM_0464648

QCVARM_0465090

QCVARM_0526828

QCVARM_0527544

QCVARM_0528956

QCVARM_0532239

QCVARM_0534597

QCVARM_0537065

QCVARM_0538870

QCVARM_0538873

QCVARM_0541454

QCVARM_0573677

B - 11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

QCVARM_0600104

QCVARM_0608391

QCVARM_0621447

QCVARM_0621448

QCVARM_0847188

QCVARM_0851120

QCVARM_0851449

QCVARM_0855438

QCVARM_0856270

QCVARM_0856888

QCVARM_0857113

QCVARM_0857152

QCVARM_0863181

QCVARM_0863573

QCVARM_0863641

QCVARM_0864713

QCVARM_0864833

QCVARM_0864924

QCVARM_0865022

QCVARM_0865236

QCVARM_0865274

QCVARM_0865311

QCVARM_1014030

QCVARM_1024852

B - 12

QCVARM_1031097

QCVARM_1066820

QCVARM_1069058

QCVARM_1069082

QCVARM_1069106

QCVARM_1069760

QCVARM_1120481

QCVARM_1120999

QCVARM_1121176

QCVARM_112154

QCVARM_1121674

QCVARM_1151565

QCVARM_1151573

QCVARM_1151615

## Articles and Books

"AI Flywheel Gathering Momentum - Initiate Buy," UBS Global Research, November 24, 2024

"Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011

Aberra, Adam and Matthieu Chemin, "Does legal representation increase investment? Evidence from a field experiment in Kenya," 2021, Journal of Development Economics, Vol. 150

Armstrong, Mark, "Competition in Two-Sided Markets," 2006, RAND Journal of Economics, Vol. 37, No. 3

Babcock, Linda, George Loewenstein, S. Issacharoff, and Colin Camerer, "Biased Judgements of Fairness in Bargaining," American Economic Review, 1995, Vol. 85, No. 5

Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59

Benjamin E. Hermalin et al., "Contract Law," in Handbook of Law & Economics, 2007, Vol. 3, No. 68 (ed. A. Mitchell Polinsky & Steven Shavell)

Blair, Roger D., Christine S. Wilson, D. Daniel Sokol, Keith Klovers and Jeremy A. Sandford, "Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies," George Mason Law Review, 2020, Vol. 27, No. 3

Bloom, Nick, Stephen Bond, and John Van Reenen, "Uncertainty and Investment Dynamics," The Review of Economic Studies, 2007, Vol. 74, No. 2

Brandenburger, Adam M. and Barry J. Nalebuff, "The Rules of Co-opetition," Harvard Business Review, 2021

CGS International, "Arm Holdings pcl - Initiate at Outperform and $160 PT; Content Story in Early Innings," US Equity Research, Sept 12, 2024

De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1

Donna, Javier D., Pedro Pereira, Yun Pu, Andre Trindade, and Renan C. Yoshida, "Direct sales and bargaining," RAND Journal of Economics, 2024, Vol. 55, No. 4

Federico, Giulio, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," Innovation Policy and the Economy, 2020, Vol. 20, pp. 125-190

Gans, Joshua "The Disruption Dilemma," MIT Press, 2016

Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," Proceedings of the National Academy of Sciences U.S.A., 1996, Vol. 3

Kwon, Yona, Dahee Kang, Sinji Kim, and Seungho Choi, "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," Journal of Open Innovation: Technology, Market, and Complexity, 2020, Vol. 6, No. 1

Lemley, Mark A. and Carl Shapiro, "Probabilistic Patents," Journal of Economic Perspectives, 2005, Vol. 19, No. 2

Lianos, Ioannis and Pierre Regibeau, "'Vexatious'/'Sham' Litigation: When Can It Arise and How Can It Be Reduced?," The Antitrust Bulletin, 2017, Vol. 62, No. 4

Lu, Shihua, Serge Moresi, and Steven C. Salop, "A Note on Vertical Mergers with an Upstream Monopolist: Foreclosure and Welfare Effects," 2007, Working Paper

Muthoo, Abhinay, "A Non-Technical Introduction to Bargaining Theory," World Economics, April-June 2020, Vol. 1, No. 2

Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581

Priest, George L. & Benjamin Klein, "The Selection of Disputes for Litigation," Journal of Legal Studies, 1984, Vol. 13

Schumpeter, Joseph, "Capitalism, Socialism, and Democracy," Harper & Brothers Publishers, 1942

Seitz, Michael and Martin Watzinger, "Contract enforcement and R&D investment," Research Policy, 2017, Volume 46, Issue 1

Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International

Shapiro, Carl, "Competition and Innovation Did Arrow Hit the Bull's Eye?" in The Rate and Direction of Inventive Activity Revisited (ed. Josh Lerner and Scott Stern), 2012, University of Chicago Press

Shapiro, Carl, "Premiums for high quality products as returns to reputations," The Quarterly Journal of Economics, 1983, Vol. 98, No. 4

Shapiro, Carl, "Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case," Review of Industrial Organization, 2021, Vol. 59, pp. 303–341

Spulber, Daniel F., "How Do Competitive Pressures Affect Incentives to Innovate When There is a Market for Inventions?" Journal of Political Economy, 2013, Vol. 121, No. 6, pp. 1007-1054

Tirole, Jean, "Competition and the Industrial Challenge for the Digital Age," Annual Review of Economics, 2020, Vol. 156

Yang, Chenyu, "Vertical Structure and Innovation: A Study of the SoC and Smartphone Industries," The RAND Journal of Economics, 2022, Vol. 51, No. 3, pp. 739–785

## Websites and Other Public Sources

"2023 Patent Litigation Report," Bloomberg Law, https://pro.bloomberglaw.com/insights/intellectual-property/2023-patent-litigation-report/

"4 Reasons Qualcomm's Data Center Business Failed," The Motley Fool, December 21, 2018, https://www.nasdaq.com/articles/4-reasons-qualcomms-data-center-business-failed-2018-12-21

"4Q24 Global Top 10 Foundries Set New Revenue Record, TSMC Leads in Advanced Process Nodes," TechPowerUp, March 10, 2025, https://www.techpowerup.com/333868/4q24-global-top-10-foundries-set-new-revenue-record-tsmc-leads-in-advanced-process-nodes

"About RISC-V," RISC-V International, https://riscv.org/about/, accessed August 15, 2025

"Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025

"AI Accelerator Chips Overview and Comparison," HardwareBee, https://hardwarebee.com/ai-accelerator-chips-overview-and-comparison/, accessed on August 22, 2025

"Apple announces Mac transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/

"Apple unleashes M1," Apple Newsroom, November 10, 2020, https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/

"Arm Approved Design Partners," Arm, https://www.arm.com/partners/arm-approved-program/design-partners, accessed September 4, 2025

"Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY

"Arm Compute Subsystems (CSS) for Client," Arm, https://www.arm.com/products/compute-subsystems-for-client, accessed September 4, 2025

"Arm CoreLink GIC-700 Generic Interrupt Controller Technical Reference Manual," Arm Developer, https://developer.arm.com/documentation/101516/latest/, accessed September 4, 2025

"Arm Cortex-A Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102826/latest/, accessed September 4, 2025

"Arm Cortex-M Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102787/latest/, accessed September 4, 2025

"Arm Cortex-R Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102788/latest/, accessed September 4, 2025

"Arm CPU Architecture: A Foundation for Computing Everywhere," Arm, https://www.arm.com/architecture/cpu, accessed September 4, 2025

"Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement

"Arm Flexible Access," Arm, https://www.arm.com/products/flexible-access

"Arm Holdings plc Q1 2026 Earnings Call," July 30, 2025, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008

"Arm Holdings plc Q3 2025 Earnings Call," February 5, 2025, https://investors.arm.com/static-files/f1190d81-408d-4276-a30c-b27c1ce5a30a

"Arm Holdings plc Q4 2025 Earnings Call," May 7, 2025, https://investors.arm.com/static-files/181d5019-29bd-4ba5-af29-45888e25c637

"Arm Holdings plc Q3 FYE24 Results Presentation," Arm Holdings, February 7, 2024, https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06

"Arm Holdings plc Q4 FYE24 Results Presentation," Arm Holdings, May 8, 2024, https://investors.arm.com/static-files/4f2fc46b-34a5-4bc5-94af-f13fbc348f0e

"Arm Holdings Q2 FYE25 Investor Presentation," Arm Holdings, November 6, 2024, https://investors.arm.com/static-files/623fece0-c947-4d'93-94eb-e08e8dfad61b

"Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274

"Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553

"Arm Total Access," Arm, https://www.arm.com/products/licensing/arm-total-access, accessed August 30, 202

"At Qualcomm Trial, Apple COO Said $7.50 Per-iPhone Fee Cost Company $1 Billion a Year," Bloomberg, January 14, 2019, https://fortune.com/2019/01/14/qualcomm-trial-apple-7-50-iphone-fee-billion/

"Automated Driving | Snapdragon Ride ADAS Tech for Smart Cars," Qualcomm, https://www.qualcomm.com/products/automotive/automated-driving, accessed September 4, 2025

"AWS and Arm," Arm, https://www.arm.com/markets/computing-infrastructure/cloud-computing/aws#1, accessed August 29, 2025

"AWS re: Invent 2024 - Monday Night Live with Peter DeSantis," AWS, YouTube.com, December 3, 2024, https://www.youtube.com/watch?v=vx36tyJ47ps&t=1041s

"BoM Analysis: Samsung Galaxy S23 Ultra Costs $469 to Make," Counterpoint, May 31, 2023, https://www.counterpointresearch.com/insight/bom-analysis-samsung-galaxy-s23-ultra

"CMN-600 Coherent Mesh: Scalable Network for Smart Systems," Arm, https://www.arm.com/products/silicon-ip-system/corelink-interconnect/cmn-600, accessed September 4, 2025

"CoreSight ELA-600," Arm Developer, https://developer.arm.com/Processors/CoreSight%20ELA-600, accessed September 4, 2025

"CPU Cortex-A78", Arm https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78, accessed August 29, 2025

"Exynos Mobile Processor," Samsung Semiconductor Global, https://semiconductor.samsung.com/processor/mobile-processor/, accessed September 4, 2025

"Fastest Path to Production Silicon with World-Leading Performance, on Leading-Edge Technology," Arm, https://www.arm.com/products/neoverse-compute-subsystems, accessed September 4, 2025

"FYE26 Q1 (30-Jun-25) Historical Quarters Datasheet.xlsx," Arm Holdings, July 30, 2025, https://investors.arm.com/financials/quarterly-annual-results

"Gartner Says Worldwide Semiconductor Revenue Grew 21% in 2024," Gartner, April 10, 2025, https://www.gartner.com/en/newsroom/press-releases/2025-04-10-gartner-says-worldwide-semiconductor-revenue-grew-21-percent-in-2024

"Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/cpu-core/, accessed September 4, 2025

"Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 3, 2025

"Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025

"Here's How Much Apple Was Paying Qualcomm in Royalties," The Motley Fool, January 14, 2019, https://www.nasdaq.com/articles/heres-how-much-apple-was-paying-qualcomm-royalties-2019-01-14

"How NVIDIA Shipped One Billion RISC-V Cores In 2024," RISC-V International, February 25, 2025, https://riscv.org/blog/2025/02/how-nvidia-shipped-one-billion-risc-v-cores-in-2024/

"Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025

"Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025

"Is Snapdragon an ARM Processor? Understanding the Core Technology Behind Qualcomm's Mobile Chipsets," Indian Institute of Embedded Systems, https://iies.in/blog/is-snapdragon-an-arm-processor-understanding-the-core-technology-behind-qualcomms-mobile-chipsets

"Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC- Vinternational

"Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, @ 4:37, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-Vinternational

"Market Capitalization of Arm Holdings," Companies Market Cap, https://companiesmarketcap.com/arm-holdings/marketcap/, accessed August 29, 2025

"Market Capitalization of Qualcomm," Companies Market Cap, https://companiesmarketcap.com/qualcomm/marketcap/, accessed August 29, 2025

"Market Capitalization of Samsung," Companies Market Cap, https://companiesmarketcap.com/samsung/marketcap/, accessed August 29, 2025

"Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers," Federal Trade Commission, Press Release May 16, 2014, https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibitions-direct-consumer-auto-sales

"Neoverse N1 | CPU for Next-Gen Cloud Infrastructure," Arm, https://www.arm.com/products/silicon-ip-cpu/neoverse/neoverse-n1, accessed September 4, 2025

"Next-Gen flagship Snapdragon chip 'Pakala' & reference device slip in new Qualcomm video," March 21, 2024, https://www.gizmochina.com/2024/03/21/next-gen-snapdragon-pakala-reference-device/

"NUVIA Raises $53 Million to Reimagine Silicon Design for the Data Center," Globe News Wire, November 15, 2019, https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.htm

"Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, August 5, 2025

"PPA analysis overview," Arm Developer, https://developer.arm.com/documentation/102738/0100/Power--performance--and-area-analysis, accessed September 4, 2025

"Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf

"Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf

"Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf

"Q4 2024 Qualcomm Inc. Earnings Call," Qualcomm, November 6, 2024, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/06/QCOM_Q4FY24EC_Transcript_11-7-24.pdf

"Qualcomm 5G NR Royalty Terms Statement," November 19, 2017, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm-5g-nr-royalty-terms-statement.pdf

"Qualcomm Announces Third Quarter Fiscal 2025 Results," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_financials/2025/q3/FY2025-3rd-Quarter-Earnings-Release.pdf

"Qualcomm Cellular IoT Licensing Program," Qualcomm, https://www.qualcomm.com/licensing/cellular-iot-licensing-program, accessed September 4, 2025

"Qualcomm Completes Acquisition of NUVIA," Qualcomm Press Release, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia

"Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/

"Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm Press Release, November 6, 2005, https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia

"Qualcomm Files Lawsuit Against Motorola," Qualcomm, Mar 5, 1997 https://www.qualcomm.com/news/releases/1997/03/qualcomm-files-lawsuit-against-motorola

"Qualcomm Implements New Corporate Structure," Qualcomm Press Release, October 1, 2012, https://www.qualcomm.com/news/releases/2012/10/qualcomm-implements-new-corporate-structure

"Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf

"Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf

"Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, https://hbsp.harvard.edu/product/711463-PDF-ENG

"Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf

"Qualcomm Oryon CPU," Qualcomm, https://www.qualcomm.com/products/technology/processors/oryon, accessed August 20, 202

"Qualcomm Sets New Growth Targets, Showcasing Company's Opportunity as On-Device AI Accelerates Demand for its Technologies," Qualcomm Inc., Press Release, November 19, 2024 https://investor.qualcomm.com/news-events/press-releases/news-details/2024/Qualcomm-Sets-New-Growth-Targets-Showcasing-Companys-Opportunity-as-On-Device-AI-Accelerates-Demand-for-its-Technologies/default.aspx

"Qualcomm to Acquire Alphawave Semi," Qualcomm, June 9, 2025, https://www.qualcomm.com/news/releases/2025/06/qualcomm-to-acquire-alphawave-semi

"Qualcomm to Bring RISC-V Based Wearable Platform to Wear OS by Google," Qualcomm, October 17, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-to-bring-risc-v-based-wearable-platform-to--wear-os-by-

"Quintauris: Accelerating RISC-V Innovation for next-gen Hardware ," November 4, 2024, https://www.quintauris.com/quintauris-accelerating-risc-v-innovation-for-next-gen-hardware

"RISC-V International Governance," RISC-V, https://riscv.org/about/board/, accessed August 13, 2025

"Samsung Apologizes for Falling Behind in AI Chips Race," Wall Street Journal, October 8, 2024, https://www.wsj.com/tech/samsungs-chip-technologies-fall-behind-in-early-innings-of-ai-game-67f0f9af

"Samsung Electronics Co. Ltd.," Wall Street Journal, https://www.wsj.com/market-data/quotes/kr/xkrx/005930, accessed August 26, 2025

"SCO Sends Warning Letters To Linux Users," InformationWeek, December 22, 2003, https://www.informationweek.com/it-leadership/sco-sends-warning-letters-to-linux-users

"Silicon Design Reimagined," Nuvia, Inc., January 15, 2021, https://web.archive.org/web/20210115193713/https://nuviainc.com/

"Snapdragon Summit," SixFiveMedia, https://www.sixfivemedia.com/our-events/snapdragon-summit, accessed September 4, 2025

"Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007, https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451

"The 5 Best Features of the Meta Quest 3," Qualcomm, January 12, 2024, https://www.qualcomm.com/snapdragon/news/the-5-best-features-of-the-meta-quest-3

"The Largest Companies by Market Cap in August 2025," The Motley Fool, August 4, 2025 https://www.fool.com/research/largest-companies-by-market-cap/

"The Value of Making Concessions In Negotiation," Red Bear, November 12, 2024, https://www.redbearnegotiation.com/blog/making-concessions-in-negotiation

"Too Good to Lose: America's Stake in Intel," Center for Strategic and International Studies, November 12, 2024, https://www.csis.org/analysis/too-good-lose-americas-stake-intel

"Top 10 Semiconductor Foundries in the World," Cytech Systems, March 13, 2024 https://www.cytechsystems.com/news/top-10-semiconductor-foundries

"Trial Sheds Light on Q'comm Patent Holdings, Royalty Rates," EETimes, January 21, 2019, https://www.eetimes.com/trial-sheds-light-on-qcomm-patent-holdings-royalty-rates

"Understanding Android," Android, https://www.android.com/everyone/facts/, accessed August 29, 2025

"Virtual Reality: Transforming the way we experience reality," Qualcomm, https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar/virtual-reality-vr

"What are IP Cores in Semiconductor Design: Types & Advantages," Techovedas, April 21, 2024, https://techovedas.com/what-are-ip-cores-in-semiconductor-design-types-advantages/

"What is Windows on Arm (WoA)?" Arm, https://www.arm.com/glossary/windows-on-arm, accessed September 4, 2025

"Why RISC-V is Inevitable, Calista Redmond, RISC-V International," RISC-V International, April 6, 2023, at 8:33, https://www.youtube.com/watch?v=ktjSvlelKPk&ab_channel=RISC-VInternational

"XR/VR/AR Reimagining reality as we know it," Qualcomm, https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar, accessed September 4, 2025

"Your Negotiation Challenges," Karrass, June 17, 2025, https://www.karrass.com/blog/your-negotiation-challenges

Abner Li, "Report: Arm cancels Qualcomm's instruction set, IP license for chip design," 9to5Google, October 22, 2024, https://9to5google.com/2024/10/22/report-qualcomm-arm-chip-design/

Aditya Bedi, "The foundation of Total Compute: First Armv9 Cortex CPUs," Arm Community, May 25, 2021 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/first-armv9-cpu-cores

Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf

Anand Lal Shimpi, "The ARM Diaries, Part 1: How ARM's Business Model Works," AnandTech, June 28, 2013, https://web.archive.org/web/20130701165406/http://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works/2

Andy Patrizio, "Qualcomm makes it official; no more data center chip," Network World, December 12, 2018, https://www.networkworld.com/article/966778/qualcomm-makes-it-official-no-more-data-center-chip.html

Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027

Arjun Kharpal, "Qualcomm to launch data center processors that link to Nvidia chips," CNBC, May 19, 2025, https://www.cnbc.com/2025/05/19/qualcomm-to-launch-data-center-processors-that-link-to-nvidia-chips.html

Arm, "The ARM processor business model," https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model, accessed August 22, 2025

Ben Schoon, "Google Pixel grows in US, settling into top 4 spot ahead of Pixel 10 launch," 9to5google, July 28, 2025, https://9to5google.com/2025/07/28/google-pixel-us-market-share-q2-2025/

Ben Schoon, "Qualcomm confirms November 15–17 event to reveal its next Snapdragon flagship," 9to5Google, July 19, 2022, https://9to5google.com/2022/07/19/snapdragon-summit-2022

Ben Schoon, "Qualcomm is suing Transsion, the largest smartphone maker that doesn't use Snapdragon," 9to5Google, July 12, 2024, https://9to5google.com/2024/07/12/qualcomm-transsion-lawsuit-report

Beth Kindig, "Arm Stock: AI Chip Favorite Is Overpriced," Forbes, Mar 21, 2024, https://www.forbes.com/sites/bethkindig/2024/03/21/arm-stock-ai-chip-favorite-is-overpriced/

Briana Watson, "SOC vs CPU: Breaking Down the Differences and their Optimal Usage," November 15, 2023, https://www.totalphase.com/blog/2023/11/soc-vs-cpu-breaking-down-the-differences-and-their-optimal-usage/

Charles Martin and Malcom Owen, "The history—and triumph —of Arm and Apple Silicon", Apple Insider, April 22, 2024, https://appleinsider.com/articles/24/04/22/the-history----and-triumph----of-arm-and-apple-silicon

Chris Williams, "Arm shells Qualcomm's Snapdragon launch party with latest salvo in license war," The Register, November 16, 2022, https://www.theregister.com/2022/11/16/arm_qualcomm_licensing_latest/

Chris Williams, "Arm sues Qualcomm over custom Nuvia CPU cores, wants designs destroyed," The Register, August 31, 2022, https://www.theregister.com/2022/08/31/arm_sues_qualcomm/

Chris Williams, "Up in arms! Arm kills off its anti-RISC-V smear site after own staff revolt," The Register, July 10, 2018, https://www.theregister.com/2018/07/10/arm_riscv_website/

Congressional Research Service, "Antitrust Law: An Introduction," May 1, 2025, https://www.congress.gov/crs_external_products/IF/PDF/IF11234/IF11234.8.pdf

David Brash, "The ARMv8-A architecture and its ongoing development," Arm Community, December 2, 2014 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development

David Manners, "Qualcomm data centre business withers away," Electronics Weekly, December 11, 2018, https://www.electronicsweekly.com/news/business/qualcomm-datacentre-business-withers-away-2018-12/

Deepa Prahalad, "Why Trust Matters More Than Ever for Brands," Harvard Business Review, December 8, 2011 https://hbr.org/2011/12/why-trust-matters-more-than-ev

Dominic Rushe, "Myspace sold for $35m in spectacular fall from $12bn heyday," The Guardian, June 30, 2011, https://www.theguardian.com/technology/2011/jun/30/myspace-sold-35-million-news

Don Fancher, Jennifer Lee, and Debbie McCormack, "Trust: A Critical Asset," Harvard Law School Forum on Corporate Governance, June 17, 2021, https://corpgov.law.harvard.edu/2021/06/17/trust-a-critical-asset/

Dylan Patel, "Arm's Nuclear Option – Qualcomm Must Cancel Next-Generation Products If Arm Succeeds," SemiAnalysis, November 16, 2022, https://semianalysis.com/2022/11/16/arms-nuclear-option-qualcomm-must/

Dylan Patel, Myron Xie, Afzal Ahmad and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/

Exchange Rates, "British Pound to US Dollar History: 2019," https://www.exchangerates.org.uk/GBP-USD-spot-exchange-rates-history-2019.html

Florian Mueller, "BREAKING: Qualcomm settles with China's Transsion (Africa's smartphone market leader): Indian patent lawsuit withdrawn," ip fray, January 16, 2025, https://ipfray.com/breaking-qualcomm-settles-with-chinas-transsion-africas-smartphone-market-leader-indian-patent-lawsuit-withdrawn/

Francisco Cheng, "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential

Greg Tang, "Intel and the x86 Architecture: A Legal Perspective," The Harvard Journal of Law & Technology, January 4, 2011, https://jolt.law.harvard.edu/digest/intel-and-the-x86-architecture-a-legal-perspective

Gyana Swain, "Arm secures Meta as first customer in chip push, challenging industry giants," ComputerWorld, February 14, 2025, https://www.computerworld.com/article/3825123/arm-secures-meta-as-first-customer-in-chip-push-challenging-industry-giants.html.

Haroun Adamu, "Did you know: Samsung makes a lot of money from iPhones," Android Authority, June 11, 2025, https://www.androidauthority.com/did-you-know-samsung-apple-partnership-3426411/

Herbert Hovenkamp, "Antitrust Market Definition: the Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, https://www.networklawreview.org/hovenkamp-market-definition/

Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud

Ian King, "Qualcomm Plans Exit From Server Chips," Bloomberg, May 7, 2018 https://www.bloomberg.com/news/articles/2018-05-07/qualcomm-is-said-to-plan-exit-from-server-chips-amid-cost-cuts

Imogen Beech, "6 real-life coopetition examples," Breezy, September 6, 2023, https://breezy.io/blog/coopetition-examples

Jeffrey Mervis, "To beat China, new U.S. law offers billions for microchip research and training," Science, September 6, 2022, https://www.science.org/content/article/beat-china-new-u-s-law-offers-billions-microchip-research-and-training

Jessica Coacci, "Here's the one-page memo Warren Buffett sent to his managers every two years for over 25 years," Yahoo! Finance, August 6, 2025 https://finance.yahoo.com/news/one-page-memo-warren-buffett-140107224.html

Jim McGregor, "Arm Squares Off Against Qualcomm: Day 2," December 18, 2024, https://www.forbes.com/sites/tiriasresearch/2024/12/18/arm-squares-off-against-qualcomm-day-2/

Joseph Calamia, Explained: The Physics-Defying Flight of the Bumblebee, Live Science, February 25, 2011 https://www.livescience.com/33075-how-bees-fly.html

Jowi Morales, "Qualcomm claims it owns 10% of U.S. Windows PC retail market for devices priced $800 and up," Tom's Hardware, February 6, 2025, https://www.tomshardware.com/tech-industry/qualcomm-claims-it-owns-10-percent-of-u-s-windows-pc-retail-market-for-devices-priced-usd800-and-up

Kelsey Ziser, "MediaTek and Qualcomm's rivalry heats up in 5G smartphone market – Omdia," Light Reading, July 16, 2024, https://www.lightreading.com/smartphones-devices/mediatek-and-qualcomm-s-rivalry-heats-up-in-5g-smartphone-market-omdia

Khadija Khartit, "When Does It Make Sense for a Company to Pursue Vertical Integration?" Investopedia, February 6, 2025, https://www.investopedia.com/ask/answers/012715/when-does-it-makes-sense-company-pursue-vertical-integration.asp

Linley Gwennap, "Editorial: Arm's No-Win Legal Fight," Tech Insights, https://www.techinsights.com/blog/editorial-arms-no-win-legal-fight, accessed August 29, 2025

MacroTrends, "QUALCOMM Research and Development Expenses 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/research-development-expenses

MacroTrends, "QUALCOMM Revenue 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/revenue

Majeed Kamran, "Qualcomm's Alphawave Acquisition Targets Data Centers and AI, But What's Next?" EE Times, June 9, 2025, https://www.eetimes.com/qualcomms-alphawave-acquisition-targets-data-centers-and-ai-but-whats-next/

Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html

Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008

Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, June 3, 2024, https://www.reuters.com/technology/arm-aims-capture-50-pc-market-five-years-ceo-says-2024-06-03/

Melissa Riofrio, "Surface Pro X revealed: Thin, light, and supercharged with a custom SQ1 ARM chip," PC World, October 2, 2019, https://www.pcworld.com/article/398146/microsofts-surface-pro-x-is-thin-light-and-supercharged-with-a-custom-sq1-arm-chip.html

Mike Freeman, "Qualcomm laying off more workers in San Diego, North Carolina to cut costs," The San Diego Union-Tribune, December 8, 2018, https://www.sandiegouniontribune.com/2018/12/07/qualcomm-laying-off-more-workers-in-san-diego-north-carolina-to-cut-costs/

Mike Wehner, "AIM is officially dead, and your childhood means nothing," Yahoo!News, October 6, 2017, https://www.yahoo.com/news/aim-officially-dead-childhood-means-nothing-174900787.html

Mike Wuerthele, "Apple & ARM's iPhone & Mac chip partnership will continue for decades," Apple Insider, September 5, 2023, https://appleinsider.com/articles/23/09/05/apple-arms-iphone-mac-chip-partnership-will-continue-for-decades

Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025, https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation

Patent Dispute Report: 2024 Mid-Year Report," Unified Patents, July 22, 2024, https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report

Paul Alcorn, "Intel and AMD are unlikely allies in new x86 ecosystem advisory group," Tom's Hardware, October 15, 2024, https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward

Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships

Phill Powell, "Types of central processing units (CPUs)," https://www.ibm.com/think/topics/central-processing-unit-types

Qualcomm Financial Summary downloaded from LSEG Data & Analytics

Rajeev Dhir, "Negotiation: Stages and Strategies," Investopedia, June 04, 2024, https://www.investopedia.com/terms/n/negotiation.asp

Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html

Rashika Singh, "Qualcomm shares slide as Apple modem shift, tariffs raise growth concerns," Yahoo Finance, July 31, 2025, https://finance.yahoo.com/news/qualcomm-shares-slide-apple-modem-085843911.html

Robert Triggs, "Arm vs x86: Instruction sets, architecture, and all key differences explained", Android Authority, December 20, 2023 https://www.androidauthority.com/arm-vs-x86-key-differences-explained-568718/

Roddy Urquhart, "Systems & Design: Opinion, Semiconductor Engineering," March 29, 2021, https://semiengineering.com/what-does-risc-v-stand-for/

Ryan Bourne, "Is This Time Different? Schumpeter, the Tech Giants, and Monopoly Fatalism," Cato Institute, June 18, 2019 https://www.cato.org/publications/policy-analysis/time-different-schumpeter-tech-giants-monopoly-fatalism

Saul Sugarman, "So I visited the last Blockbuster on the planet, and all I got was this t-shirt," The Bold Italic, December 8, 2023, https://thebolditalic.com/so-i-visited-the-last-blockbuster-on-the-planet-and-all-i-got-was-this-t-shirt-ffc6d2ed414d

Sebastian Moss, "Qualcomm announces data center CPUs, will support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025 https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/

Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf

Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1 2022 https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf

Simon Sharwood, "Arm gives up on killing off Qualcomm's vital chip license," The Register, February 6, 2025, https://www.theregister.com/2025/02/06/arm_qualcomm_nuvia/

Skye Jacobs, "Former Intel engineers from AheadComputing to break CPU performance limits with RISC-V design," TechSpot, June 12, 2025, https://www.techspot.com/news/108281-former-intel-engineers-form-aheadcomputing-break-cpu-performance.html

Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market

Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31

Stephen Nellis, "Apple inks new long-term deal with Arm for chip technology, according to filing," Reuters, September 5, 2023 https://www.reuters.com/technology/apple-inks-new-long-term-deal-with-arm-chip-technology-filing-2023-09-05/

Stephen Shankland, "SCO targets Linux customers," CNET, May 14, 2003, https://www.cnet.com/tech/services-and-software/sco-targets-linux-customers/

Steve McDowell, "Qualcomm's Game-Changing Move Into Automotive And Industrial IoT," Forbes, January 28, 2025, https://www.forbes.com/sites/stevemcdowell/2025/01/28/qualcomms-game-changing-move-into-automotive-and-industrial-iot/

Steve Mollman, "Blockbuster 'laughed us out of the room,' recalls Netflix cofounder on trying to sell company now worth over $150 billion for $50 million," Fortune, October 22, 2024, https://finance.yahoo.com/news/blockbuster-laughed-us-room-recalls-174322621.html

Swagath Bandhakavi, "FTC ends legal challenge against Microsoft's $69bn Activision Blizzard acquisition," Tech Monitor, May 23, 2025 https://www.techmonitor.ai/digital-economy/big-tech/ftc-microsoft-activision-blizzard-deal

Timothy Green, "Qualcomm is Going After Intel and AMD in This Lucrative Market," January 16, 2025, https://finance.yahoo.com/news/qualcomm-going-intel-amd-lucrative-101500205.html

Tobias Mann, "Jury spares Qualcomm's AI PC ambitions, but Arm eyes a retrial," The Register, December 23, 2024, https://www.theregister.com/2024/12/23/qualcomm_arm_trial/

Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, Nov 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/

U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf

U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, https://www.justice.gov/d9/383663.pdf

U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf

Victor Keegan, "Will MySpace ever lose its monopoly?" The Guardian, February 8, 2007, https://www.theguardian.com/technology/2007/feb/08/business.comment

Wayne Ma & Cory Weinberg, "How a Lopsided Apple Deal Got Under Arm's Skin," The Information, November 29, 2023, https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin

Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models

Young Hyun Jun, "Dearvalued [sic] customers, investors, and employees of Samsung Electronics," Samsung, October 8, 2024, https://www.samsung.com/global/ir/reports-disclosures/public-disclosure-view.84206/

Zac Hall, "Apple makes up less than 5% of Arm's revenue, and Arm can't do anything about it," 9to5mac, November 29, 2023, https://9to5mac.com/2023/11/29/apple-arm-licensing-revenue/

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## APPENDIX C: TRANSCRIPT OF INTERVIEW OF RENE HAAS, ARM'S CEO, OCTOBER 22, 2024

**Source: "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, https://www.youtube.com/watch?v=6FnBz8rxWUY**

*Peter Elstrom (Executive Editor Technology Bloomberg, PE): That's why I have you. And thank you all for joining us. We have a lot of questions for you, so we'll go ahead and get started. First, I begin. You are not just the of Arm you're now a podcaster. You began in your spare time I guess. You began a new podcast is called 'Tech Unheard' and your first interview was was with Jensen Huang. That's right which I gave a listen to. First of all, what gave you the idea to start a podcast? And secondly, how do you find the time as CEO to do something like that too?*

Rene Haas (Arm CEO): Yeah. So first off, thank you again for for having me here. I'm an amateur at this, so you don't have to worry about your day job as far as podcasting goes. You know, we were talking with some of our board members about how to use a unique medium to talk to two leaders, talk about the Arm story. And one of the ideas that was suggested was was a podcast. I was a radio disc jockey actually spinning records in university. So, I had a little bit of experience and aspirations to do that kind of work early in my life. So, in talking with some folks, you know, around the team, we said, you know, let's let's try this and let's do something a little bit more innovative and talk to other leaders and give them a perspective of maybe a conversation that they may not naturally have with someone who's professional like you are. So, yeah, we kicked it off. Please listen, it's on Apple Music, Spotify and Jensen was my first guest.

*Peter Elstrom: Great, Great. Congratulations. And, you know, in terms of the business Arm was acquired by SoftBank for about three two billion dollars. At some point, SoftBank agreed to sell it for about 40 billion dollars. That deal didn't go through, of course, NVIDIA was supposed to buy it. That deal didn't go through. Now, you went public just over a year ago, companies worth roughly 160 billion dollars, which seems like a successful IPO. But could you talk to us about what the business model for* Arm *has been and how it's evolved over time, over that period of time? And especially, what's the strategy going forward?*

Rene Haas: Yeah, well, thank you for the you know, for the nice words. 30-year-old plus company. Our business model for most of our time on earth, if you will, was very horizontal in that we had a licensing model. We develop IP. Our products are primarily CPUs. The business model is very horizontal in nature, meaning that we designed a very general-purpose product,

very power efficient product, and then license it to customers independent of the vertical market. And in other words, we didn't really target a certain vertical. I took over the core IP business right after SoftBank bought Arm and we pivoted to a more of a vertical approach, meaning that we now have products very specific for the data center, very specific for automotive, very specific for IoT. Smartphones we were born. And that diversification really allowed us to expand into many new markets with brand new products. SoftBank buying Arm in 2016 allowed us to invest in those new areas. So fast forward the result. What you're seeing now in terms of performance is that strategy. You know, going forward as we think about the next number of years, what we're seeing in the marketplace is a need for more solutions. Chips are getting increasingly more difficult to build. It takes a long time to design a chip, takes even longer to fabricate the chip. So, the more that Arm can do to help customers get to market faster is helpful. So, we're now developing solutions, what we call "CSSs" that get people to market sooner and allow them to get more profitably in a sooner way.

*Peter Elstrom: Mm hmm. Okay. I want to talk about AI. And in particular, the opportunities in AI. There is some debate, as we've referred to, I think, in a couple of these sessions about whether there's a bubble in AI. And I I'm going to assume that you think that there are real opportunities there. But can you talk about what Arm's role is there and how you see the company evolving to take advantage of those opportunities?*

Rene Haas: So, one of the most unique things about our company is the fact that the device that we build, the CPU, we estimate that 70% of the world's population touches Arm in some way. We're in security cameras, automobiles, PCs, smartphones, data center. And what that means is every workload, whether it's an application, an operating system or AI, runs through Arm in some way. So, that means AI. is going to run on Arm, period. And we're the only company on the planet that can run those AI workloads from the smallest devices on the edge. Again, a wearable, glasses, watch, phone to the data center. So, for us, AI is a gigantic opportunity in terms of growth going forward because AI is going to be everywhere. And as far as a bubble goes, I just don't ascribe to that. I look at things such as when people say, Gosh, is it overhyped? Or the stocks have gone down last quarter. That's almost like saying should I short AT&T in 2000 because the Internet is not going to happen. Or if Ford was a stock in 1907, would I short them? Because the automobile is not going to happen. It's just not. I mean, AI is we've seen such

advancement across the AI in the last couple of years that the amount of innovation that it's going to drive is just going to be incredible.

*Peter Elstrom: Okay. Okay. The chip company that probably has taken the most opportunity that has been able to capitalize the most on AI so far is NVIDIA. Chip maker in your space. They now have a near monopoly in terms of the highest end AI accelerators. How do you see that evolving in the future? And are there opportunities for Arm in particular to be able to play in that space and drive real revenue from?*

Rene Haas: Yeah. So, we're there already. NVIDIA's most advanced chip called the GB200, which is Grace Blackwell. Microsoft just announced that they're going to be deploying Grace Blackwell, the most advanced NVIDIA chip in their data centers that uses the Arm CPU. So, Grace is the Arm CPU. Blackwell Is the Nvidia GPU. So, Arm is there already. So, we are going to play in the most advanced data centers using AI. Arm, Arm will be there. I think what's most exciting for us, as I mentioned though, is the fact that not only will we be in the data center for training these algorithms, ultimately the training has to be transferred into inference, and training is the teacher inference is the student. Inference is actually running the workload and inference actually running that AI agent that's going to happen in the data center, that's going to happen in the car, that's going to happen on your watch. That's going to happen in glasses, that's going to happen in phones, and everywhere it happens, it's going to run on Arm. So, it's going to be a gigantic opportunity for us. The data center is just one place.

*Peter Elstrom: Mm hmm. Okay. So, you see Arm having opportunities kind of from the beginning to the end.*

Rene Haas: More than, more than opportunities. The agents will run locally. And the reason for that is you'll have a hybrid situation where some of that will run in the cloud. Some of it will run in your local device. Again, your glasses, your wearable, your phone. But locally, what you'll be able to add is security, things that can make sure it's private to you that not all your data is being passed to the cloud and vice versa. So yeah for for Arm I think it's going to be just an amazingly large opportunity.

*Peter Elstrom: Okay. As we were talking about before, I just moved from Japan where we spent a lot of time looking at SoftBank and especially Masayoshi Son's ambitions. We've written stories*

*about how SoftBank is looking at ways to enter the AI chip market and particularly to compete with NVIDIA, quite directly in GPUs. He has a secret plan "Izanagi" that we've written about in the past. How does* Arm *isn't still 90% owned by SoftBank? How does* Arm *fit into that equation?*

Rene Haas: Yeah, so no, no product launch announcements today. So, nothing I can say about products coming out that you've written about. I can say that on the SoftBank board member, I do advisory work for SoftBank. I talked to Masa all the time. It's no secret that he is a big believer in AI has been for quite some time. He's talked about it actually, probably as long as any of the folks out there. I think his vision in terms of where it's all coming together now, you can start to see the pieces of it as I just described. Where does Arm fit - all those AI workloads are going to run on Arm somewhere somehow. So that's the reason that we spend a lot of time talking to SoftBank about the future.

*Peter Elstrom: Okay. Okay. Earlier we had the ASML CEO on and he was talking about some of the challenges that they're facing in the market. They surprised investors last week as we talked about. And it does seem that there's a little bit of a disconnect in the market where many people see opportunities. ASML reported that their orders were about half what analysts had thought they were going to be. Seems there are certain areas of the chip industry that are struggling quite a bit. And on the other end you have Sam Altman talking about how we need more capacity in the chip industry. We need billions of dollars, maybe trillions of dollars of investment. What is the disconnect and how does that get resolved?*

Rene Haas: Yeah, so there's a lot to unpack there. Where Arm plays, as I mentioned because 70 % of the world's population uses Arm. And I think 300 billion chips have shipped since we were started that have Arm inside. And every year about 30 billion chips. We have a unique view into the industry because just about every digital device uses Arm. There are some markets that aren't accelerating as fast as others and candidly those are the ones that aren't using AI in a very large way. But in areas that can use AI and will use AI, people can't go fast enough. And I'll give you an example. Many of the hardware devices that are being introduced today were designed two or three years ago. That means the chips were designed two or three years ago. The chips that are going in your phones or your wearables. Those were all invented before ChatGPT was released

or before Lamo was released. So what we're seeing on one end of the industry is just a rush to develop more and more chips that have this AI capability. Now it takes time. You know, chips aren't built overnight. In fact, it takes from the time we engage a partner, you know, two or three years at least until that comes to market. So I think you'll see some of these new products coming out. I think what Sam is talking about is just generally the ceiling to get to AGI. Artificial general intelligence requires more compute. And the more compute you have, the better the models get. So, I see. I see both. But generally speaking, I'm pretty optimistic about the growth for our industry.

*Peter Elstrom: Okay. Okay. We were talking about this a bit before. One of the gating factors is making sure that you have chip manufacturers who can make the most advanced chips. TSMC seems to be gaining market share right now as a couple of the key competitors struggle, Intel in particular. And Samsung also has been struggling a bit. They're both trying to move into the foundry business a bit in competition with TSMC. What what are the dangers around having TSMC garner so much market share in foundry? And is it good for the industry or would it be better if there's a more diversified manufacturing base for the industry?*

Rene Haas: Yeah, TSMC is an amazing company. They've just done so much for the industry relative to the innovation, how they work with partners, etc. etc. If you remove semiconductor manufacturing or foundry for a moment and just step back and say, is it healthy for any industry to have a one dominant supplier and then add on top of that a dominant supplier that's largely concentrated in one part of the world? Not, not really. So as a result, I think it's necessary just in terms of diversity of supply base, to have more and more advanced manufacturing and geographic diversity. Fabs in the United States. Fabs in Europe. Fabs in India. Fabs in Saudi Arabia. I think over time, we're going to see not only more suppliers, but geographic diversity as well.

*Peter Elstrom: Okay. Governments obviously are investing a lot in that very question. You're seeing the United States do it. You're seeing Europe do it. Japan has spent a lot of money on it, too. Do you think that's making progress at this point? Do you see light at the end of that tunnel?*

Rene Haas: It's the the capital expenditures required for these fabs are enormous. TSMC, Intel, Samsung, I think their CapEx is anywhere between 30 to 35 billion dollars a year in new

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

factories. And if you start looking at the revenues that these companies produce, you start very quickly looking at, oh my gosh, that is a lot of money to invest. Now, on one hand, you can look at it and say, well, the demand will be there, AI, etc., etc.. But it doesn't take much in terms of a year slowdown in demand and the companies have a really negative financial outcome. So, yes, governments have been involved, I think should be involved in my opinion. We saw in the U.S. for the very first time a policy act around CHIPS Act to put funding into the fabs, which I generally a big supporter of. I think it's necessary.

*Peter Elstrom: Okay. Let's talk a little bit more about Intel and their struggles. You grew up in a chip industry where Intel was really the dominant player, kind of set the pace for technology evolution over time. Now we're openly talking about whether Intel is going to be broken up, maybe sold into pieces. What kind of opportunities are there for* Arm *within that space as Intel goes through these struggles?*

Rene Haas: Yes, we work very closely with Intel. It's a bit of strange bedfellows. Many folks would consider Arm and Intel to be natural competitors on the product space. But what's very important to us, back to this discussion around supply base is that "Intel Foundry Services" IFS is successful. We do a lot of work with Intel as we do with Samsung and TSMC to ensure that our products can be manufactured there. We work very closely with their engineers to ensure that the leading edge technology can can run on Arm. So, we want to see Intel successful and we want to see IFS successful. I think it might be strange to hear the Arm CEO say that, but we want Intel manufacturing to be successful.

*Peter Elstrom: Okay. Bloomberg reported that* Arm *took a pretty close look at buying a part of Intel. Would you like to comment?*

Rene Haas: Nothing I can say on that one.

*Peter Elstrom: "Okay. All right.  Thank you. Thank you. I wanted to turn. You talked about are moving up the value stack kind of moving beyond its traditional place in the industry. And as you have moved up the value chain, you've gotten closer to doing what some of your customers do."*

Rene Haas: "Right."

*Peter Elstrom: "Getting closer to being able to do these complete designs. And. Yes. It speeds up innovation, as you were alluding to, but it also puts you in closer competition with some of your customers. You have a lawsuit with Qualcomm in particular."*

Rene Haas: "Yeah."

*Peter Elstrom: "Isn't it in both companies interest to settle that and to resolve the legal dispute at this point? Or what would you say?"*

Rene Haas: "These are these are tough questions. It's a good thing I'm a podcaster, so I know what's coming. You know, first thing on, competing with our customers, you know, it's rather complicated because if you look at some of our customers, our customers are Amazon. Our customers are Microsoft. Our customers are Apple. Our customers are Tesla. They all build chips using Arm. I'm not going to build an electric car. I'm not going to build a phone. I'm not going to build a data center. So, to look at the value chain relative to who builds chips, relative to whether you're end business is a chip business or a product business. It's gotten a lot more gray. We follow what the industry is demanding, and what the industry wants to see is solutions getting to market faster. And that's what we're focused on. Qualcomm. Not much I can say on that, other than we're headed to a trial. I think it's the third week in December. We feel very good about our case. We think our case is quite simple and straightforward. And as I said, December, we'll find out."

*Peter Elstrom: "Okay. So, you head to the courtroom then. One last question. I think we have time for this. In this audience in particular, there's a lot of interest in whether* Arm, *which is historically a British company, whether they would ever look at doing some sort of dual listing. Of course, we've heard about this many times in the past. A year ago when you did your IPO, you decided you would do it in the U.S. instead. One of the opportunities for listing here, what are the pluses and minuses of that sort of thing?"*

Rene Haas: "Yeah, we did. We listed in New York over over a year ago. And at that time our comments were we would look at a secondary listing. We're still open to it. It's not something that's top of mind right now, quite candidly. But we'll continue to have discussions with both stakeholders in the government and in the local exchange. We'd love to find a way at some point

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

in time, but also at the same time, there's a lot of other things that keep me busy relative to my day job."

*Peter Elstrom: "Okay. All right. Rene Haas, thank you very much. Please join me in welcoming. Thank you. Thank you."*

C - 8

# EXHIBIT 29

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - x

QUALCOMM INCORPORATED and

QUALCOMM TECHNOLOGIES, INC.

Plaintiffs

vs. CA No. 1:24-cv-00490-MN

ARM HOLDINGS plc, f/k/a/ ARM LTD.

Defendant

- - - - - - - - - - - - - - - - - - - - - x

H I G H L Y C O N F I D E N T I A L

VIDEO DEPOSITION of TIMOTHY S. SIMCOE, PhD

Friday, September 26, 2025 - 9:00 a.m.

Kirkland & Ellis LLP

200 Clarendon Street

Boston, Massachusetts

Reporter: Jill K. Ruggieri, RPR, RMR, FCRR, CRR

Mohamed Awad --
A Yes.
Q -- on August 29, 2025?
A Yes.
Q Who is that?
A To be honest, I don't recall my conversation with Mr. Awad. We would have to look through the report to see what --
Q It's not cited in your report. I'll represent that to you, so --
A Ah.
Q That's why I was going to ask you what was the conversation about.
A Okay.
Q Sounds like it wasn't memorable, so...
A No.
Q You don't remember?
A I don't.
Q Okay.
And then there is a conversation with a Dr. Michael Brogioli on September 2nd as well?
A Yes.
Q Who is Dr. Brogioli?

A He's an electrical engineer who knows about instruction set architecture and semiconductors manufacturing and design. I think he's at Rice University.
Q And how long did you speak with Dr. Brogioli?
A I think that conversation was 15 or 20 minutes.
Q And what did you speak about?
A I mean, one of the topics was there was some claims that Professor Posner made in his opening report about the reasons for Arm's success having nothing to do with the quality of its products, more -- you know, that's paraphrasing. That it was like just an arbitrary choice. We had to pick an ISA and this one emerged as the winner.
Like, you know, he's done an analogy of driving on the left side or the right side of the road. I thought I could usefully speak to someone who knows the technology about whether that was accurate or not, and Dr. Brogioli suggested it wasn't.
Q Okay.
So you don't have any

independent opinions about whether or not the success of Arm's ISA was due to the quality of its product versus something else?
A Well, that's not quite right. I've looked at a number of factors that lead me to think that there are things like its power consumption, that's a characteristic of products that implement the Arm architecture that are viewed as quality, a high-quality attribute in the market, and that contributes to its success.
I rely in part on Dr. Brogioli, but I rely on other kinds of market evidence to re- -- you know, to understand that, and I describe it in the report.
Q Okay.
So you do have an opinion as to whether the quality of the product was a reason for Arm's success?
A What I would say is that the evidence suggests that there is a relationship between the quality of Arm's ISA and its success in the market. I provide all that evidence here.
I'm not opining as a technical expert about how as a matter of engineering you

produce an ISA that is low-power-consuming or has the right set of, you know, sort of instructions in the instruction set. But, you know, I think the evidence supports the idea that Arm's market success is related to the quality of its intellectual property.
Q Now, twice in your answers -- the last two answers you've mentioned power consumption as being part of that quality that's contributed to their success; is that right?
A Yes.
Q And is there another way of describing that as -- in documents I've seen, as energy efficiency?
A Fair.
Q All right.
Do you have an opinion as to whether there were other things that led to Arm's success besides power consumption?
A Well, I would say I point to Arm's sustained research and development investment. I didn't make a detailed investigation of how -- you know, what are the list of product characteristics that different application

Page 26

sectors demand, you know. So one thing I'm aware of and I've seen in preparing these reports is they use something called, like -- there's a die area.

This is kind of like power, performance, area, and I know that some of their products -- products implementing the Arm ISA perform well in those characteristics. That's one way you measure quality in these markets.

I know that there are other characteristics that have different -- I would say take different weights depending on the application sector you're talking about, whether it's mobile, data centers, laptops and PCs, automobiles.

But it really wasn't my assignment to lay out all of the characteristics that go into some notion of quality.

I was mostly just rebutting what I thought were Professor Posner's assertions that there was no quality explanation for Arm's success.

Q All right.

Page 27

So just to cover the one thing you mentioned there, power, performance, area, is that a feature of Arm's ISA or is that a measure of energy efficiency?

MS. POHL: Object to form.

A It's a measure -- it's a way of measuring what's the performance of a chipset, is my understanding.

Q It's a way of measuring energy efficiency?

A Well, no, area is different from efficiency.

Another characteristic that can be valuable is how much area does a chip take in the final product.

Q Right.

I thought you said performance per area, like I thought you were correlating the two in your answer.

Is that wrong?

A No.

Q Okay.

So going back to my previous question, do you have an opinion as to whether there are other things besides power

Page 28

consumption that have led to Arm's success?

A I think I answered that question. I've looked at evidence that suggests there are other characteristics, but I haven't as part of my assignment developed a comprehensive list, so I guess no.

Q Okay.

Do you have an opinion as to whether Arm's licensing model contributed to its success?

A Well, mostly my opinions are, you know, because I was asked to provide a rebuttal report, opinions about Professor Posner's use of economic methodologies and evidence.

So the question is do I have an opinion about whether Arm's licensing model -- I guess I haven't been asked to sort of evaluate whether there's some relationship there.

Q So the answer is no?

A I guess not.

Q Going back to the feature or quality of energy efficiency, have you evaluated whether there are other instruction set architectures, past or present, that provide

Page 29

that quality of energy efficiency?

A I haven't done any technical evaluation of any instruction set architectures, but I can observe that there are other competing instruction set architectures and that they achieve a degree of success in different chip markets.

Q Okay.

So more specifically, the question is have you evaluated whether there are other instruction set architectures, past or present, that provide that quality of energy efficiency?

MS. POHL: Object to form.

A Well, you -- you know, as I said, I haven't done any technical evaluation of any instruction set architectures.

Your question is vague as to whether the evaluation you're asking for is economic or technical.

Q I think it's technical.

A Okay.

Q First.

A The answer is no, I have not done any technical performance evaluation of any chips

or any instruction set architectures.
Q Okay.
And have you relied on anyone else's opinion about whether there are instruction set architectures, past or present, that provide the quality of energy efficiency?
A I don't recall that I've relied on anyone -- I don't think that that was the topic of my conversation with Dr. Brogioli.
I recall looking at articles that discuss performance, say technical performance of different instruction set architectures, and some of them may be cited in my report for various reasons.
But it's -- as I say, I don't -- as I sit here, I can't think of how my opinions rest in any important way on a technical comparison of instruction set architectures.
Q Can we go to paragraph 56 of your report? It's on page 33.
And this is the beginning of a section in your report that's titled "Origin of the Dispute."
Am I right?
A Correct.

Q And here, you are outlining the origin of the dispute between Arm and Qualcomm and that it was a contractual disagreement triggered by Qualcomm's acquisition of Nuvia in March 2021, correct?
A Yes. I'm explaining that prior to the present litigation, there was a dispute between Arm and Qualcomm over Qualcomm's acquisition of Nuvia and incorporation of Nuvia's designs into Qualcomm's products.
Q Now, in footnote 120 you identify the contracts at issue as Arm's ALAs with Qualcomm and Nuvia, right?
A In that earlier litigation, that's correct.
Q Right.
And do you believe that the Nuvia ALA is at issue in this case?
MS. POHL: Object to form.
A Depends how you think about it. There is a jury decision in the other case; which I understand was sort of mixed as to the different claims. And I would say Professor Posner's report seeks to use the prior case -- sometimes without referencing it, but he kind

of takes it as evidence related to Arm's intent. And in that sense, it's related to this dispute.
Q So what about -- I mean, in your opinion, what about the Nuvia ALA is at issue in this case?
A Well, with respect to what I was just describing, what's at issue is in Professor Posner's opening report, he asserts that Arm's actions are part of a scheme to deny Qualcomm -- or -- either deny Qualcomm access to the Arm ISA or to somehow raise input prices in a manner that would be advantageous to Arm.
And he uses the existence of the prior case at various points along the way as evidence that Arm was all along intending to sort of pursue this scheme.
Much of my report rebuts all of that. But to the extent that -- you know, so there was prior litigation and he uses it in that way, it's important to understand it.
That's what I -- that's what I'm trying to do here, is explain that.
Q All right.
And in paragraphs 57 to 62, you

discuss Arm's position regarding the Nuvia ALA?
A Sorry, paragraphs 57 to --
Q 62.
MS. POHL: I'll take this time to designate the transcript highly confidential.
(The deponent read the document.)
A Some of this seems to be just factual. Some of it seems to be my own understanding, supported by -- well, let's see what I'm citing.
(The deponent read the document.)
A Some of this stuff that's cited in these paragraphs comes from Qualcomm, some from Arm.
But yes, it's my own understanding of the initial original dispute.
Q Including Arm's position regarding the Nuvia ALA?
A I don't think all of these paragraphs speak to exactly what you're saying, but yes, I think Arm's position in the original lawsuit is described in these paragraphs, yes.

Page 34

Q Okay.
Now, in one of your answers you mentioned that there was a jury verdict and you said it was sort of mixed as to the different claims.
A Mm-hmm.
Q Right?
A Yes.
Q And you reviewed that jury verdict?
A I've seen the form, yes.
Q All right.
You didn't reference that jury verdict in your opening report, right?
A I'll take your word for it.
Q Is there a reason why?
A No.
Q Okay.
MR. DESAI: We'll mark this as Exhibit 4.
(Exhibit 4 marked for identification.)
BY MR. DESAI:
Q I apologize, you did actually refer to it in footnote 5 of your report, so that was my mistake.

Page 35

A Okay. Apology accepted.
Q Exhibit 4 is the verdict form from the Arm v. Qualcomm litigation, and you, as we discussed, reviewed this before, right?
A Yes.
Q When you said there was a mixed result, can you explain what you meant?
A Well, the -- I apologize for my lack of sophistication as to legal terminology.
Q Yeah.
A Question 1 here has no checkmark on it. I believe that means that the jury hung on the question of -- well, as it's put: Did Arm prove by a preponderance of the evidence that Nuvia breached Section 15.1(a) of the Nuvia ALA?
So in other words, the jury couldn't decide whether Nuvia breached the ALA that it had signed with Arm. And in that sense, it's mixed.
Q Okay.
But with respect to Qualcomm and whether Qualcomm breached the Nuvia ALA, there was not a mixed verdict, correct?
MS. POHL: Object to form.

Page 36

A Well, if you accept my mangled terminology, yes, though I understand that all of this is under appeal and that there's posttrial stuff, posttrial motions happening and so forth.
But yes, the jury decided, according to this form, that, quote -- they decided that Qualcomm had not breached Section 15.1(a) of the Nuvia ALA, and that Qualco CPUs, including designs acquired in the Nuvia acquisition, are licensed under the Qualcomm ALA.
Q Okay.
Why don't you go back to your report. We'll turn to paragraph 124. That's on page 79.
A Yes.
Q Okay.
And as part of forming your opinions, you were asked to assume that the disagreement with Qualcomm reflects Arm's genuine views of Qualcomm's and Nuvia's contractual obligations rather than an intent to harm Qualcomm, right?
A I don't recall writing -- let's see. I guess that says -- that's the first sentence

Page 37

here.
I think it's important in understanding that assumption to understand what I'm doing.
You know, sort of my understanding here is that this question of intent is really for the jury, not for an economist, not something -- you know, I don't have economic methods that let me peer inside the heads of Arm's executives and let me understand what they intended to do.
Professor Posner takes a bunch of positions that suggest he feels otherwise, and so I felt it was important to clarify that.
I can still have opinions about the litigation, I guess as the section header here shows.
But yes, I -- so when I made that statement, I was trying to clarify that I'm not going to sort of preempt the jury by assuming intent.
Q Right.
But you're assuming as part of your opinions that the disagreement with Qualcomm reflects Arm's genuine views of

Page 38

Qualcomm's and Nuvia's contractual obligations rather than an intent to harm Qualcomm, right?

A Well, I see that as consistent with a variety of evidence that I provide in this section of the report. I don't simply make an assumption and move on. I illustrate how the evidence is consistent with the idea that there was a genuine dispute and that that dispute persists.

But I'm not going to assume that I'm able to divine the intent, look inside the heads of the people at issue to understand what caused them to take the actions they were taking.

Q Right.

But you're assuming there was no intent, right?

MS. POHL: Objection.

Q You're not being neutral on intent. You're assuming there was no intent, right?

A I am both looking at the evidence to try and understand whether the conduct that you see is what Professor Posner characterizes as a broad scheme to foreclose as opposed to just two parties engaged in a contractual dispute.

Page 39

And I explain throughout my report why I think that evidence is consistent with -- as a matter of economics -- two parties that have a contractual dispute and not a scheme to foreclose.

At the same time, I don't want to suggest that economics allows me to reach the question of what is the intent of an individual person, what are they thinking in the moment. That's for a jury to do, so I don't do it.

Q Okay.

A And I make that -- and I make this assumption.

Q Right.

So if it's for the jury to decide whether or not there was intent to harm, why are you assuming that there was no intent to harm?

MS. POHL: Object to form.

A Well, if I was to assume the -- I guess I don't want to make the mistake that I think Professor Posner makes, which is to assume the conclusion.

He makes the opposite

Page 40

assumption, and then it's conclusory.

What I say is if I assume -- if I made the opposite assumption, there would be intent to harm. This is sort of -- this is a situation where I think the evidence supports the assumption that I make, but I want to be clear about what are the limits of the kind of analysis I do.

Q Okay.

So you -- you are taking the position in your report that there -- that you've looked at evidence and it supports that there was no intent to harm, right?

I think that's what you just said.

A The way I would put it is there are competing hypotheses here, okay? The one that Professor Posner considers, which is all of these actions are a scheme to harm Qualcomm. Another is that there are two parties that have a contractual dispute that was triggered, you know, sort of by this earlier acquisition of Nuvia and the actions that flowed from that, and that what he points to as anticompetitive I see as just the actions of two parties trying

Page 41

to resolve a dispute.

But I can't answer the question of what were you, you know, either Arm or Qualcomm executive, thinking in the moment.

I can look at their testimony. I can look at -- I can use economic tools to assess their actions. And so I think of it as a likelihood problem, which of these two explanations are more likely.

I explain in my report why I think the likelier explanation is that they're just in a contractual dispute.

But as to the question -- so let me put it this way: Given that I think that's the more likely explanation based on the economics and the facts that I see, it would be strange to make the opposite assumption, if an assumption has to be made.

But I see -- it feels to me, at least, implicitly, like that's what Professor Posner has done, so I want to be clear that I'm not doing that.

Q Okay. I want to understand what you were doing.

So is this a fair

Page 42

characterization of what you've done, which is you've assumed that there was -- the dispute was about -- over contractual obligations rather than an intent to harm, and then you've looked at various pieces of evidence and said that I've looked at this evidence and it supports my assumption that there was no intent to harm; is that right?

MS. POHL: Object to form.

A No. I look at the evidence and I conclude that the evidence supports the conclusion -- sorry. Would you repeat the question? Because there was something about "harm" in there, and I think I missed that. I think I originally already had disagreed with part of the premise.

Q Okay. I'll try it again. That's fair.

Is it a fair characterization that this is what you've done? You've said that the dispute in this litigation was about genuine views regarding contractual obligations rather than an intent to harm, and then you've looked at a bunch of evidence and testimony, documents, and it's your view that that

Page 43

supports your assumption that there was no intent to harm?

MS. POHL: Same objection.

A I see. I think that the way to -- again, I think I've tried to explain this. I don't view my -- the analysis that I do as supporting an assumption, which is the way you framed the question, I believe.

The -- as I said, there are -- you know, what I see as at issue in the case here is whether Qualcomm's claims that Arm's actions are anticompetitive is correct or not. I think it is not correct, okay?

One aspect of Qualcomm's claims or part of investigating Arm's conduct is asking what was their intent.

I can look at the economic evidence and I can say I see very little evidence that there is actual harm. Moreover, as to the question of intent, their activities look to be -- to be consistent with an explanation of Arm and Qualcomm having a legitimate disagreement over the interpretation of these contracts.

In fact, I view the evidence is

Page 44

more consistent with that interpretation, that there is a legitimate disagreement, than with the alternative explanation that Arm set out to harm Qualcomm and has been engaged in some anticompetitive scheme.

And as I've explained several times, part of that question is, well, what do you assume about intent? Because economics doesn't let us peer into the minds of the relevant people to know what they were doing, and I can't weigh that evidence.

So I make an assumption. My assumption is the testimony from Arm's executives about what they were intending to do or how they understood this dispute to be sort of a genuine dispute over these contracts was true testimony. I assume they weren't lying under oath, and I proceed. I think Professor Posner makes the assumption, though not explicitly, that they were lying under oath.

Q Can you point me to the place in Professor Posner's report or reports where he is assuming that they were -- people were lying under oath?

A Well, he doesn't say that. As I

Page 45

said, it was implicit, no?

Q Well, where are you implying that from in his report?

(The deponent read the document.)

A Where does he do the...

(The deponent read the document.)

A So let me -- let me -- I'll sort of do it in three steps.

The first step is that Professor Posner's report, as I sort of explain in my own report, really ignores the alternative explanation. So Nuvia, I think, appears once or twice, but there's zero explanation of the prior dispute or consideration of the idea that this might -- sort of that Arm's actions might be actions taken because there's an actual dispute, which was litigated and went past summary judgment, as to how those contracts should be interpreted.

The second thing I would point to is sort of on page 23 of his report, he talks about Arm engaging in a misinformation campaign, you know, sort of -- which is really

Page 46

just parroting things from Qualcomm's second amended complaint, I think.

And the third is where he misstates Rene Haas at paragraph 88, where he says, "Haas is confirming that Arm no longer wishes to keep prior commitments and instead plans to cut off ALA licensees." And I explain how that's really misrepresenting what was being said.

Q I don't see where we get an implication about people lying under oath from --

A Implicitly.

Q What testimony from someone under oath are we referring to?

A Oh, gosh.

Well, we'd have to go back and look at Arm executives' testimony about Arm's intent.

Q Okay.

The statements by Mr. Haas you refer to in paragraph 88, that's not testimony under oath, right?

A Correct.

Q All right.

Page 47

Now, you brought up getting past summary judgment in your answer with respect to Arm's claims in the prior case, right?

A Correct.

Q Is it your view that because the case proceeded past summary judgment, the litigation cannot be part of a broader anticompetitive scheme?

A I am not a lawyer, but my understanding is that one reason for summary judgment is to screen out sham litigation. The fact that this case made it past summary judgment and got to a jury suggests that there was some evaluation of the claims and that they were perceived to have enough merit so as not to be thrown out, to be put to a jury.

That weighs on the side of thinking that there could be a genuine dispute.

Q All right.

So is it your view that because the case proceeded to a trial and there was, in your view, a genuine dispute, that means the litigation cannot be part of a broader anticompetitive scheme?

MS. POHL: Object to form.

Page 48

A My view is that in this case, that evidence and other evidence supports the view that this litigation was not part of a broader anticompetitive scheme.

If you want to sort of go through hypotheticals about other cases, that's fine.

Q I think I understand.

I'm going back to one of your previous answers, and you said, "I view the evidence as more consistent with that interpretation, that there is a legitimate disagreement, than with the alternative explanation that Arm set out to harm Qualcomm and has been engaged in some anticompetitive scheme."

Okay? That was your testimony. I just read it.

In viewing the evidence and making that sort of balance of whether it demonstrates that it's more likely that it's a legitimate disagreement versus some plan to harm Qualcomm, before you did that, you assumed that Arm did not intend to harm Qualcomm, right?

Page 49

A No.

Q All right.

A That's not correct.

Q Okay.

Then I'm not sure I understand -- if we go back to that paragraph 124 -- what you mean when you say that counsel for Arm asked you to assume that the disagreement with Qualcomm reflects Arm's genuine views rather than an intent to harm Qualcomm.

Can you explain?

A Well, let me explain why I answered "no" to your question.

Q Sure.

A Your question had the word "before" in it.

Do you want to read it again so we can be clear?

Q No.

A Okay. Your question said did I make this assumption before I looked at the evidence and assessed that the evidence was more consistent with one explanation than another explanation.

Page 50

That's not what I did. I looked at the evidence first, okay? I considered these two explanations, okay? And then, as I have explained, you reach this question of, well, how do you approach the matter of intent, okay? The -- you know, intent of the individuals.

And because I don't think that it's something that economic tools are designed to assess -- as I've explained, it's kind of a psychological question -- and because I don't want to preempt a jury, which I think is -- or at least it's my understanding that this is a question for the jury, I don't want to preempt them -- I said I will make this assumption based -- you know, and it's an assumption that is consistent with my view of the evidence, which I did before making the assumption. So you had the order reversed in the question. Yeah.

Q Now, if we go to paragraph 237 of your report. It's on page 152.

A Sorry, which paragraph?

Q 237.

A Thank you.

Page 51

Q Here, you say, "Counsel for Arm has instructed me to assume that Arm started the Arm v. Qualcomm litigation to exercise its contractual rights, not to foreclose Qualcomm," right?

A That's true, and I would encourage you to read the next sentence --

Q I'm going to.

A -- and what follows. Okay.

Q So you have -- in forming your opinions -- I just want to understand.

In forming your opinions in this report, what I just read, that sentence, that is an assumption that you were asked to make by Arm's counsel, correct?

A I mean -- yes. I mean, I think it's actually an assumption that we reached a point where I recognized the need to address this question of intent, so it is not the case that they said coming into the assignment, "you assume this and go from there and everything flows from it."

As I just explained, I looked at all the evidence. I reached, you know, the conclusion or was close to reaching the

Page 52

conclusion. I thought that the evidence really supports the view that there was a genuine dispute, and yet there's this open issue: What are we going to do about the question of intent? It's really related to what Professor Posner did, so I ought to have something to say about it, but it's not something that's necessarily reachable using standard economic tools.

So I had a conversation with counsel and they supported the view that we should have this assumption.

Q Okay.

Now, in the next sentence, you do say, "I note that various factors suggest that Arm's actions were not aimed at harming Qualcomm, one of its main customers."

Right?

A Correct.

Q Okay.

So is it fair to say what you've done is you've taken a look at this evidence about the litigation, about the Nuvia ALA, the Qualcomm ALA, testimony, right, and you've said, objectively speaking, looking at all

Page 53

this, based on my expertise and my knowledge, this looks more like a lawsuit about genuine contractual dispute rather than a lawsuit that's directed at harming and foreclosing Qualcomm, right?

A I think you just left -- I mean, broadly, yes, but you left out an important category of things to look at, which is the economics of the scheme that Professor Posner alleges.

So the economics is really critical to understanding whether the scheme theory makes any sense.

Q Okay.

A So it's not just the, you know, kind of pattern of facts around the litigation that I evaluated and weighed.

MR. DESAI: Okay. Why don't we take a break.

THE VIDEOGRAPHER: The time is now 9:58, and we are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is now 10:10, and we are on the record.

BY MR. DESAI:

Page 86

license to expire to do something.

And the statement about enemies just sort of suggests that the two companies, although they have deep business relationships, and I would expect those to continue, are in a dispute.

Q Okay.

In making the assumption that we've talked about now that's written in your report that the litigation reflected Arm's views -- genuine views about contractual obligations and not an intent to harm or foreclose Qualcomm, you didn't expressly consider these internal chats as part of making that assumption, right?

A I didn't need to for the reasons I explained earlier about what the purpose of the assumption is --

Q Why don't we get to whether you needed to or not -- just first answer the question about whether you did consider them, and then I can ask you the next question about whether you needed to.

A Well, there's two parts to consider. I didn't cite them. I think that might be your

Page 87

question.

But, as I said, I've reviewed them and I didn't -- it doesn't change my views at all.

Q Okay.

Today after reviewing them, it's your view that they don't change your opinions, right?

A Today and when I had seen them before. Like I said, I -- I had seen the parts of these things that were -- "struggling not to be pissed" and -- what was the other quote? -- "go full bore," thought about that. No, it didn't change my views.

Q When did you think about those? When did you see these and think about them in forming these opinions?

A No, no, you misapprehend.

Q Oh, okay.

A If I used these, if I relied on these to form my opinions, I would have cited them in my report. I saw them at some point, I think, in preparation for deposition. I considered them. They didn't change my views.

Q Okay.

Page 88

When you say you -- I just want to get some clarity on when you said you've seen these, because it's not clear to me.

A Okay.

Q Is it after you served this report?

A I don't know if I saw them before I served this report.

I had access to every document that was produced in the case. As you know, there are many of them.

Q Yeah.

A I reviewed many chats. It's likely I saw these. I don't know. I do recall seeing the language that you were referring to in preparing for the deposition.

Does that clarify the timeline?

Q Think so.

And you definitely did not speak with Mr. Williamson about these, right?

A Correct.

Q I'm about to switch topics, so if we want to take our break, now's a good time.

A Whatever.

Q Yeah, let's take a quick break.

MS. POHL: Okay.

Page 89

A Yeah.

THE VIDEOGRAPHER: The time is now 10:57. We are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is now 11:12, and we are on the record.

BY MR. DESAI:

Q It is your opinion that [REDACTED] ?

A Yes.

Q Okay.

Do you have an opinion as to whether x86 or RISC-V are currently options available for Qualcomm to use to build custom cores?

A Qualcomm is actively using the RISC-V ISA in some of its products.

Q Okay.

How about x86?

A X86, to my knowledge, is only available via Intel and AMD.

Q Now, I assume your opinion about whether RISC-V is an option available to Qualcomm is not based on any analysis of RISC-V

Page 90

from a technical perspective, right?
A Correct.
Q All right.
So is it -- is your opinion based on your assessment of whether RISC-V is a commercially viable option for Qualcomm to use to build cores?
A Well, Qualcomm says that they -- I've seen statements by Qualcomm saying that they've shipped, I think it's a billion embedded, low-power, you know, sort of -- in some markets, they have a billion devices with RISC-V.
Q What markets?
A Like I said, I think it was like embedded systems, I don't -- maybe automotive. Sort of microcontrollers, I think.
Q So in forming your opinions about whether RISC-V is currently an option for Qualcomm, did you assess what segments or markets RISC-V is actually being used in?
A Yes, that's something that I looked at.
Q Okay.
And so which segments?

Page 91

A I just -- well, I looked -- I'm aware that RISC-V has been deployed in devices, I think in, like, embedded systems. That's kind of the main one where I think it's -- and I think it might be on aspects of systems on chips in other markets, but it's something I evaluated.
Q Okay.
Well, you said, "I think it might be on aspects of systems on chips in other markets."
Can you be more specific? If you need to look at your report, that's fine, too, but...
A Let's be specific about what we mean, right? So I think -- well, let me look at this.
There are two ways that I think about answering your question. One is that there are markets for completed chipsets that are used in products.
Okay? In Professor Posner's report he refers to those, I think, as applications. I think I adopt the same terminology. Those would be things like

Page 92

mobile, compute, which is PCs and laptops, data center, IOT.
So there's a figure that might be useful in my report that speaks to -- here it is. This is at page 46 in my report. This is an Arm figure that shows different end use. Automotive. I believe that RISC-V is being used in the IOT and embedded market and is being actively developed for products in many of these other segments that may not be currently sold.
At the same time, a chip -- you know, a completed chip has many components, okay? And some of those components in chips that are sold into other markets, like consumer electronics or automotive, maybe mobile, might use a RISC-V architecture for part of the complete solution, is my understanding.
I haven't looked at the question of is there some marketed device somewhere that uses RISC-V as a component but not the core CPU on a system on a chip solution in mobile or automotive. I just understand it might happen. So that's one way to interpret your question.
The other is, you know, sort of

Page 93

where is RISC-V being used as the CPU. I think it's IOT, embedded. It's the sort -- as I said, it's the embedded systems.
Q All right.
Do you have an understanding what an embedded system is?
A It is a -- I think sometimes it's like -- well, it is a custom solution used in certain kinds of products, right?
So many, many products need a chip these days. My washing machine, my refrigerator, toys, okay? Those chips perform a wide variety of functions that are specific to the products, and those kinds of chips are embedded systems.
Q Are there any other ISAs besides x86 and RISC-V, in your opinion, that Arm faces competition from?
A I would say presently, [redacted]
[redacted]
[redacted]. There are other ISAs that I'm aware of that are in certain segments, MIPS, for instance.
I don't think of them as -- you know, I don't write about them in my report.

Page 98

about accelerating the development of RISC-V --
A Mm-hmm.
Q -- have you given -- do you have an opinion as to what you mean in terms of how long that would take, like accelerating, meaning when would Qualcomm be able to actually produce a chip with RISC-V for a data center?
A So I can't do that as a technical matter, and I understand that there are many kinds of investments needed to improve RISC-V as an architectural substitute.
[redacted]
Q What kind of investments would be needed?
A To -- to do what? Sorry.
Q To -- to produce RISC-V as a -- as a -- an architectural substitute in a segment like mobile.
A Investments in designing hardware that runs on the RISC-V architecture, and investments in software, such as compilers, that allow software developers to write code

Page 99

that runs on chips that implement the RISC-V architecture.
Q Anything else?
A At a high level, those are the types of engineering investments involved.
Q Would there -- would you need other investments besides engineering investments?
A Well, as a practical matter, you do marketing. There would be -- the question, you know, sort of depends --
Yes, there are a variety of kinds of investments. We can sort of talk about many categories, but I think the key ones are the engineering investments that I just described.
Q Okay.
Now, you understand that RISC-V is open source and freely available, right?
A Yes.
Q In other words, there is no license fee that a chip maker needs to pay in order to design a CPU that is based on RISC-V, right?
A Well, that's part of what open source means, yes. It's available for use without any royalties.

Page 100

Q All right.
And that's unlike the Arm ISA, right?
A Correct.
Q Companies like Qualcomm that design Arm-based CPUs or use Arm off-the-shelf cores must pay royalties to Arm under either an ALA or a TLA, right?
A Yes. Arm charges for the intellectual property and its architecture whether you access it through cores or through something like an ALA, so that's correct.
Q Do you know how long RISC-V has been available?
A What do you mean by "available"? I'm not sure I understand.
Q How long has RISC-V been available for a company like Qualcomm to build a chip with?
A I'm still not sure I understand. Available to build a chip?
Q Okay.
You -- you've -- we've already -- maybe I'm using the wrong words.
A Okay.

Page 101

Q I mean, you've -- you've already, I think, said that Qualcomm has made a billion chips with RISC-V, right? Didn't you say that earlier?
A In the embedded segment, yes.
Q Okay.
How long has that been a possibility for Qualcomm to use RISC-V to build a chip?
A So RISC-V is an outgrowth of an academic project to develop reduced instruction set architectures.
Qualcomm or others could have adopted early variants of it in a very experimental way many years ago. I can't recall exactly what the start date was. I think it was early 2000s or something like that.
As a commercial endeavor, RISC-V has only taken off in the last several years. Again, I didn't investigate, like, the precise timing. I may have some, you know -- there may be some citation in my report to a general history of RISC-V.
But it has been available at --

clear about is in this hypothetical, am I being asked to assume that there's no difference technically between the Arm and the RISC-V ISA?

Q I think in this hypothetical, you're being asked to assume that the RISC-V ISA can meet the same requirements that the Arm ISA can meet from a technical perspective. Okay?

A Okay. So --

Q Let me ask the question. Yeah, let me ask the question.

A Fair enough.

Q With that -- with that assumption, you would agree that these companies, Apple -- sorry, Google, Meta, Samsung, Microsoft, NVIDIA, have an incentive to adopt RISC-V because it would eliminate royalties that they pay to Arm, right?

A If there's a perfect substitute available and that substitute actually is zero price, then I would expect all of those companies to choose the lower-priced or zero-priced option, yes.

Q Okay.

So as of right now, what is preventing these companies from transitioning

to RISC-V and eliminating the royalties that they pay to Arm?

A It's that the assumption you asked me to make in the hypothetical is incorrect.

Q Okay.

So your view is that the reason why these companies are unable to currently substitute RISC-V for Arm is because right now, Arm -- RISC-V cannot meet the technical requirements that Arm is able to? Is that right?

A Well, I think it's -- if we go back to earlier, there are different segments that have different requirements. RISC-V is being deployed in some of those segments.

In other segments, it's not. There are -- RISC-V presently, right now, the hardware and software investments that have to be made to produce improvements in the performance of RISC as an instruction set, as an ecosystem, those are being made.

It's improving over time and [REDACTED]; but right now, you know, sort of, it is not a choice that we see firms making in some segments.

Q Do you have a view as to when it will be a choice that some firms will be making in segments like mobile and data center?

[REDACTED] I think -- you know, my understanding is that -- I feel like I've seen press reports that say that there's work going on for RISC-V in the data center that would arrive before then.

So my general understanding is that RISC-V will continue to diffuse, as I said, as sort of a normal trajectory for something like a disruptive technology. It starts in low-end applications and sort of moves up the quality ladder. [REDACTED]

[REDACTED]

But, again, this is sort of technical evidence that's not -- I'm not offering opinions about those performance characteristics.

Q Sure.

(Exhibit 7 marked for identification.)

BY MR. DESAI:

Q I'm going to hand you what's been marked as Exhibit -- I think we're at 7, and it's labeled QCVARM_0532239.

(Counsel conferred.)

MR. DESAI: We're going to take that back.

BY MR. DESAI:

Q Just keep it as 7, but -- just keep it over there. You can -- I don't know if I'm going to use it.

MR. DESAI: We'll just mark this as Exhibit 8.

MS. POHL: Okay.

(Exhibit 8 marked for identification.)

MR. DESAI: Simpler, I guess.

Page 114

Exhibit 8 is labeled QCVARM_0866937.

(The deponent read the document.)

Q This is a -- an article that includes a conversation with Rene Haas; do you see that?

A Yes.

Q This is from January 2024.

A June 2024.

Q Sorry, June. My bad.

Have you seen this before?

A Maybe. I don't know if I've seen an excerpt from it. I mean, I haven't reviewed the whole thing. I don't recall seeing it in this form.

Q Well, regardless of its form, do you recall seeing this conversation with Rene Haas?

(The deponent read the document.)

A I think maybe I've read this, or parts of it. I honestly -- I don't recall. I think there's some of it that looks familiar as I read it, but...

Q It's not something that you cited in your report, right?

Page 115

A If I did, I don't remember why I cited it.

Q Okay.

There we go. I want you to take a look at the top of the page, the ending Bates number is 944.

A Would you like me to look at the first paragraph on 944?

Q I want you to look at Mr. Haas's two answers -- the first two answers on that page. Let me know when you're done.

(The deponent read the document.)

A Okay.

Q Is it a fair summary here that Mr. Haas does not believe that RISC-V is really in competition with Arm?

A I think this is Mr. Haas in public making statements about RISC-V to try and steer customers towards Arm.

This is sort of public-facing marketing kind of activity that CEOs do.

Q And in this public-facing activity, Mr. Haas is explaining that they don't view RISC-V as competition, right?

Page 116

A I think he's hyping his own -- the relative benefits of his own product, because that's what's in his interest to do.

Q Well, I mean, is it -- when he says, "There's no software anywhere for RISC-V in these places. None," is that hyping Arm or is that explaining that RISC-V is not really a competitive threat?

A I keep reading and I see nothing in his statements about competition.

He is trying to suggest that Arm has more software available for that solution. In that sense, he's hyping it. Hyping is a relative thing. He's saying the product I'm selling is better than the RISC-V alternative.

Q Did you talk to Mr. Haas about this?

A No.

Q Did you talk to Paul Williamson about these statements regarding RISC-V?

A No.

Q Okay.

Do you have any reason to disagree with what Mr. Haas is saying about RISC-V on this page?

(The deponent read the

Page 117

document.)

A As I said, no, I don't have a -- any insights into why Mr. Haas said -- well, I guess -- what I think is this is marketing. That's what I said before.

Do I have an -- I guess you'd have to ask me specifically what you want me to disagree with, but I don't see anything in particular.

Q Okay.

Do you disagree with his statement that RISC-V is not interesting from a CPU standpoint because it's not running any key software?

A I haven't -- no, I haven't evaluated that.

Q Okay.

Do you disagree with his statement that "There's no software anywhere for RISC-V in these places. None"?

MS. POHL: Object to form.

A Sorry?

Q Do you disagree with his statement, "There's no software anywhere for RISC-V in these places. None"?

MS. POHL: Same objection.
A I don't know what Mr. Haas is -- I will say I have not evaluated the relative size of the software ecosystem, so I guess we should let Mr. Haas's statement just stand. I'm not going to disagree with it.
Q Do you agree that a gating problem for RISC-V is -- is getting a large network of software developers to develop software for that architecture?
A What do you mean by a "gating problem"?
I guess I agree that an ISA benefits from having software that can be run on chips that implement that ISA.
Q Do you agree that in order for RISC-V to be a competitive threat to Arm, it will require a large network of software developers for RISC-V?
A I don't know, you know, sort of -- the large piece of that sounds like you're inviting quantitative comparisons that I haven't done.
I do -- my understanding is that these ISAs require architecture-specific

software investments.
So yes, the -- you know, sort of developers need to write things like compilers that are specific to an ISA. That allows applications developers to port their applications to chips that implement that ISA. That increases the value of what's called the ecosystem.
Q At present, RISC-V lacks the network of software developers that exist for Arm's ISA and even for, for example, Intel's x86 ISA, right?
MS. POHL: Object to form.
A My sense is that -- again, we had this earlier discussion about, you know, implementations of an ISA for different markets.
In, for example, the embedded systems market, it seems like RISC-V is a viable solution. It's making progress.
I know that there are efforts to sort of make the software investments to grow the ecosystem, but I haven't done a comparison of the sizes of the software, the number of developers or the number of applications on

these ISAs.
My general understanding is that today, x86 and Arm have a larger installed base of developers, but that RISC-V is growing.
Q Okay.
MR. DESAI: Why don't we mark this as Exhibit 9.
(Exhibit 9 marked for identification.)
BY MR. DESAI:
Q Exhibit 9 is Bates-labeled ARMQC_00001038. Take a moment to look through it and answer if you've seen this before.
A I don't think I've seen this before.
Q Looks like it's a presentation from May 8, 2024.
A From Arm's head of investor relations, yes.
Q Okay.
And I want you to go to the slide that is labeled 1065.
(Pause.)
A Okay.
Q And this is a slide, the title is "Arm is the ubiquitous choice."

Do you see that?
A Yes.
Q All right.
And there's a comparison here of Arm, x86 and RISC-V?
A Yes.
Q Okay.
And both Arm and x86 are labeled as -- checked as having a software ecosystem but RISC-V is not, right?
A That is what is on this slide, yes.
Q Okay.
And is the lack of a software ecosystem one of the reasons that RISC-V is not in a position to currently compete with Arm in various segments like mobile and data center?
MS. POHL: Object to form.
A No. This is a presentation from Arm's head of investor relations, whose job, in part, is to sell Arm to investors in Arm's stock, okay.
He is -- this check is not -- or absence of a check is not, I don't think, representative of the complete presence or absence of software development on these ISAs.

Page 122

That's not how I would interpret this slide deck.

There is software development happening for RISC-V. I see in the evidence that I cite in my own report evidence that

[REDACTED]

Q Okay.

What about data center?

A I didn't provide a date for data center, but I -- my understanding that I expressed was that it's likely to be a bit sooner.

Q And when you say there's software being written for RISC-V, that's because you understand it's being used in low-end embedded systems, right?

A Well, there's --

Q That do have software.

Page 123

A There is the RISE consortium, the RISC Instruction Set -- whatever it is. We should look up the acronym.

But my understanding is that one of the things that these companies with all of the resources that we discussed earlier, Google and Meta, are doing is forming a consortium to stand up a better software ecosystem for RISC-V.

Because those companies are interested in markets like data center, I believe that that software development is underway.

Q Right.

But, at present, RISC-V lacks a software ecosystem for segments like mobile and data center, right?

A I wouldn't accept that characterization. I think you're trying to present ecosystem as though it was a binary choice. You have an ecosystem or you don't. You have software developers or you don't.

The way an economist would think about this is it's more of a continuous choice. There's some number of software developers or

Page 124

some amount of investment going on. It is not zero.

Q Well, do you have an opinion as to what it is for RISC-V?

A As I said, I haven't done a quantitative evaluation of the relative size of the ecosystems measured in that way.

Q But you do understand the size of the Arm software ecosystem for segments like mobile and data center, right?

A I don't know what you mean by I "understand the size."

Q Well, you've seen some evidence in some of these reports about that size, right?

A What I have is -- what I think I already said is that I understand that Arm has and x86 has presently a larger number of developers that have made these investments or worked on applications that are specific to those ISAs than for RISC-V.

Q I think somewhere in Mr. Posner's report he quotes Arm as saying there's something like 22 million software developers for Arm.

Does that sound right to you?

Page 125

A I will take your word for that.

Q All right.

And do you have a sense of where that stands for RISC-V?

A I have -- no, I do not.

Q Now, if you go to paragraph 218 of your report, you point out that Professor Posner argues that, "Due to network effects, Arm's ecosystem is protected by entry barriers."

Do you see that?

A Yes.

Q And I guess I'll ask, do you agree that the Arm ISA is protected from competition because of network effects?

A The point that I make here is that Professor Posner embraces kind of a binary or like a Mankiw economic model where network effects lead inevitably to tipping and sort of monopoly for prolonged or indefinite periods of time, which is just wrong.

The point I'm making here is that even in markets where network effects exist, the firms whose products benefit from those network effects can face effective

Page 198

that a monopolist would invest less in innovation than firms that face competition or competitive constraints.

Arm's substantial investments in R&D are more consistent, you know, within that modeling framework with a firm that faces competition than with Arm being a monopolist.

Q Okay.

Now --

A In the sense of not -- a monopolist in the sense of not facing competitive constraint or threats of displacement.

Q And I think the data you used for R&D expenditures on page 139, which is showing their expenditure as a percent of total revenue, right?

A I mean, you could look at levels, but yeah, this is a standard way to sort of just illustrate that as a share of revenue, Arm is investing a substantial amount in R&D and more as a share of revenue than Qualcomm is.

Q Right.

This is Arm's total R&D revenue, correct?

A I mean, I think what you mean is

Page 199

total R&D expenditure.

Q Sorry, I didn't -- yeah.

This is Arm's total R&D expenditure as a percentage of total revenue, right?

A Yes.

Q So that would include R&D on off-the-shelf cores, R&D on its new cores that it's making, as well as R&D that's specific to the ISA, right?

A All Arm R&D, yes.

Q Okay.

Did you perform any analysis to break down what the expenditure Arm is doing in R&D that is dedicated to the ISA, differentiated from R&D on the development and design of cores?

A I don't think -- well, there's two answers to that. One is that it's not so easy to tell, because -- so if we could --

I cite elsewhere, for instance, Mr. Haas explaining that R&D that you do in cores helps you build a better ISA, okay?

Companies widely kind of recognize -- or the people I've spoken to in

Page 200

many different contexts understand that investments downstream help you with your upstream products and investments upstream help you with your downstream products. They're complementaries, in other words.

So in terms of the benefits, it is not quite -- not very easy to disentangle. I don't have data. The sort of simple answer to your question is I do not have data that from a cost perspective allows me to say this R&D project is ISA; this R&D project is core or something else.

Q Okay.

A And to do that decomposition.

Q All right.

Did you ask for that data and it didn't exist or did you just simply choose to rely on R&D expenditures as a total amount?

A I didn't ask, because I don't think that that kind of detailed decomposition is necessary to make the point I'm making here.

Q So you don't know how much Arm spends in terms of R&D in terms of improving the Arm ISA from one version to the next, right?

A I guess I'm not sure what you mean by

Page 201

that. So here, there is spending by year, and you can roughly correlate year over year with transitions in the ISA.

But as I just explained -- well, I'm not sure I understand the question about transition the ISA.

Q So you would attribute all of this revenue -- sorry, all of this R&D expenditure on page 139 to -- as R&D that's improving the ISA from [REDACTED] [REDACTED], et cetera?

Do you understand what I'm saying?

A I think I understand what you're saying. So you're saying that some of Arm's R&D investment goes into the improving the ISA and that at some point in time when improvements accumulate, they release a new version of the ISA that has different features in it.

I'm not able to sort of say how much investment went to [REDACTED] based on costs. I didn't do that.

Q Okay.

You would agree that Arm does

of competition that applies to the entire chip developments, you know, sort of, layer of the supply chain.

Q Are you willing to -- do you have an opinion as to whether competition is more fierce at the chip level than it is at the ISA level?

A Again -- well, no, for the same reason I just said. I think you would have to look at an individual -- you'd have to define a chip market. I will -- I would grant that there are chip markets that are very competitive.

Q Which ones?

A I think -- my understanding is these embedded systems are pretty competitive, that there are a large number of suppliers in that space.

Q Anything else?

A I'd want to do the work, and that's not something I was asked to do.

Q Okay.

Would it alter your opinion if Arm's R&D spend on the ISA is much lower than the R&D it spends on off-the-shelf cores or new

cores?

A I would love to know what opinion you're referring to, but it won't change the opinions that I offer in the report for the reason I explained earlier.

There are complementarities in R&D investment. So your questioning continues to sort of take the view that we should think about this on a cost basis and apportion the R&D between products or stages in the supply chain based on, say, an org chart and where that, you know, R&D was done.

But part of the point -- you know, one of the benefits of vertical integration that is akin to the eliminating double marginalization effect that we talked about earlier is that when you do downstream R&D, it helps you improve your upstream products.

And in that sense, it's quite difficult to disentangle the benefits of the R&D investments that from a cost perspective might be apportioned out into different products or stages of the supply chain.

Q I don't have any more questions.

MS. POHL: I don't have any questions for you.

MR. DESAI: All right.

THE VIDEOGRAPHER: The time is now 2:46, and we're off the record. Thank you, everyone.

(Whereupon, the proceedings adjourned.)

C E R T I F I C A T E

I, Jill K. Ruggieri, Registered Merit Reporter and Certified Realtime Reporter, do certify that the deposition of TIMOTHY S. SIMCOE, PhD, in the above-captioned matter, on September 26, 2025, was stenographically recorded by me; that the witness provided satisfactory evidence of identification, as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, a Notary Public in and for the Commonwealth of Massachusetts; that the transcript produced by me is a true record and accurate record of the proceedings to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel emplo[illegible] nor financially or otherw[illegible] ne of the action.

Jill K. Ruggieri, RPR, RMR, FCRR, CRR

Transcript review wasrequested of the reporter.

# EXHIBIT 30

Technology sector

# Rene Haas: 'Arm has the most ubiquitous computer architecture on the planet'

Chip designer's chief executive talks about diversification and how AI is changing the devices we use

Tim Bradshaw

Published JUN 7 2024

Rene Haas is chief executive of Arm, the chip designer behind the processors in 99 per cent of all smartphones. After being bought by SoftBank in 2016, the UK-headquartered company became last year's biggest initial public offering, in a deal valuing it at $54.5bn on Nasdaq. Since then, Arm's market capitalisation has nearly tripled to around $140bn, as it has been caught in the updraft of investor excitement about artificial intelligence.

Based in Silicon Valley, Haas has worked in the industry for almost 40 years, including seven years at AI chipmaker Nvidia before joining Arm in 2013. Since becoming chief executive in 2022, he has pushed Arm to diversify further from its mobile phone roots into PCs, automotive and industrial components and, increasingly, servers — all underpinned by the same promise of power efficiency that has kept its technology at the heart of the iPhone.

Arm does not manufacture its own processors — though a recent report suggested that may soon change — instead licensing a growing array of designs to the biggest names in the tech industry, including Microsoft, Nvidia, Apple, Google, Samsung, Amazon, and Taiwan Semiconductor Manufacturing Company.

After Apple switched its Mac processors from Intel to its own Arm-based versions in 2020, Microsoft this year unveiled a series of Arm-powered Windows PCs, hailing a new era of the "AI PC".

In this conversation with FT global technology correspondent Tim Bradshaw, Haas discusses the growing importance of software to chipmakers and how AI is changing the devices we use.

---

**Tim Bradshaw:** Microsoft has been making a big push with Arm-based Windows PCs in the past few weeks but this isn't the first time Microsoft tried to make that switch. What's different now compared with the failed efforts of the past, such as 2012's Windows RT?

**Rene Haas:** I worked on the very first Windows on Arm PCs back in 2012. And a lot has changed since that time. One of the things that's probably the biggest difference now is that virtually the entire application ecosystem is native to Arm — meaning that, not only is the performance going to be fantastic, but try to find an application that's not going to run. If you go back 12 years when Windows on Arm kicked off, it was a completely different world in terms of local apps versus cloud, and Windows on Arm didn't support a lot of popular applications [such as Apple's iTunes and Google's Chrome web browser]. That was a killer blow.

## Tech Exchange

The FT's top reporters and commentators hold conversations with the world's most thought-provoking technology leaders, innovators and academics, to discuss the future of the digital world and the role of Big Tech companies in shaping it. The dialogues are in-depth and detailed, focusing on the way technology groups, consumers and authorities will interact to solve global problems and provide new services. Read them all here

Fast forward to 2024, there's no issue with application ecosystems. And what's been proven on the Windows on Arm platforms as an extension of the other ecosystem, MacOS, is the experience is phenomenal, when we look at the battery life and the performance that the Macs have . . . It's going to be a very different game this time.

**TB:** And now with the extra sales pitch of 'AI everywhere'. Where do you think we're up to in finding the right applications for these new AI tools?

**RH:** Talking about AI PCs, I think it's very early. I think you have Copilot [Microsoft's brand for products enhanced by AI assistants recently extended to its latest AI PCs] that has now been introduced. So the feature set that has been talked about, I think it's going to start to take advantage of the underlying hardware.

We know there's going to be some other [Windows AI PC] systems coming out in the upcoming years. So, while the first-generation systems are going to be interesting, the second generation systems are going to be even more [so]. And folks who bought the first ones are probably going to be a little bit green with envy when they see what the second ones look like.

**TB:** Buying version one of any new product is just part of the risk/reward of being an early adopter. Are you an early adopter? What tech are you playing with right now?



It's early for AI PCs: Microsoft's Copilot+ on display at the company's campus in Redmond © Chona Kasinger/Bloomberg

**RH:** Whether it's game consoles, whether it's phones . . . I'm a very much an early adopter. I probably have every mobile phone in existence. I'm a big foldable phone guy. I think they're great. Because they are small enough when folded to act like a mobile phone. But when you expand it out, you can look at spreadsheets, you can watch videos. It's like a mini tablet.

**TB:** It seems like we're in another moment where people are experimenting with different form factors for consumer electronics, with folding phones and AI glasses. Have you tried any of those new AI wearables?

**RH:** I have tried some of them. I do like the Meta Ray Ban augmented reality glasses. They're stylish. The video quality is good. They are good sunglasses and they don't feel bulky or weird. Me, personally, I don't like something heavy on my head. So that's why I like the Ray Bans and they have Arm inside, which is also what I like.

**TB:** Do you see that becoming a big product category? Because we've been here before with Google Glass which — to say the least — was not successful.

**RH:** I think augmented reality is still emerging in terms of the capabilities of that field. I think there's a huge opportunity with holograms, with display technology. That is an area that is probably early days still in terms of being figured out. I think it's a generational thing . . . I think a generation has to grow up being comfortable with wearing things for an extended amount of time. [So] it's more of a niche item right now.

> **Whether it's game consoles, whether it's phones . . . I'm a very much an early adopter. I probably have every mobile phone in existence. I'm a big foldable phone guy**

**TB:** All of these products, whether AI PCs or smart glasses, are part of a broader trend for moving from AI services that run in the cloud — like the ChatGPT app, which needs an internet connection to work — to systems that run on the "edge" [industry jargon essentially meaning people's or companies' own devices, like phones or factory equipment]. There's much more competition here than in AI chips, where Nvidia totally dominates right now. Do you see the edge becoming a bigger opportunity for chipmakers than the cloud?

**RH:** We are still in very early days in terms of AI workloads running everywhere. So to your point of, 'what is an edge device?' maybe the user would describe that as 'not the cloud'. So what has to happen is the [AI] models . . . need to evolve. I think the models need to get a little bit smaller, a little bit more efficient to run in these other areas.

Where is Arm going to play? They're all going to run through Arm because, first off, you have to have a CPU [central processing unit], which is table stakes and for any of these end devices, and the installed base is all Arm anyway. So the software ecosystem is going to look to optimise around Arm.

We're showing some information at Computex [the trade event in Taiwan this week] around compute libraries that will essentially make it very, very easy to run these AI workloads on Arm CPUs. Developers, in the past, did not have access to the Arm CPU when they wanted to run an AI application. Arm will now be making these libraries available to developers. So they can write the application and it takes advantage of the hardware. It could run three times faster, four times faster, at the same power.



Rene Haas in New York the day Arm's share started trading on Nasdaq in September last year © Michael M. Santiago/Getty Images

**TB:** These libraries are part of the broader package of Arm products that you describe as the 'compute subsystem'. This is a core part of Arm's strategy now, to go beyond designing one single chip for customers to build on. Can you explain more about that — and why you're doing it?

**RH:** What really makes Arm unique is we have the most ubiquitous computer architecture on the planet. Our CPUs are in 30bn devices per year, almost 300bn in total. What we are finding is that the chips are becoming increasingly more difficult to build and it takes longer to build them . . . as you get to smaller transistors.

So how can Arm help? Let's say, in a server, you might have 128 ARM CPUs. And with those 128 ARM CPUs, you have all of the [networking systems] that connect them together. You have a memory mapping system, you have a mesh network . . . Previously, the end customer would have to put all that stuff together and then build their chip. With compute subsystems, we put all that together for them.

We are in mobile phones, we are in PCs, we're in automotive applications, we are in complex AI training, and we are in general-purpose server[s]. All of those are Arm CPUs [and] areas that we are going to do compute subsystems. So, over time, it's going to be a very, very large part of our business.

**TB:** One of your big new customer wins on the data centre side recently was Microsoft which is doing a new Arm-based CPU for its cloud called Cobalt. You've now got Amazon, Google, Microsoft — the three biggest cloud computing providers — all running Arm CPUs as part of their cloud platforms. When did that work start from your side to see that come to fruition?

**30bn**

Number of devices built every year with an Arm central processing unit

**RH:** We have been working on this for over 10 years. It's been a tremendous amount of work [in which] two things had to come together. The CPUs had to get performant enough against the competition. They had to be very efficient. They had to be very high speed. And we had to have all the components around it. And then . . . the software ecosystem had to have everything required that you could just run the servers. So Linux distributions, like Red Hat and SuSE. We were working in parallel to have all the pieces of the software together.

When you combine the software being ready with world-class products and power efficiency, you now have a compelling advantage in terms of the chip. Now, what makes it even more compelling is, by building a custom chip, you can essentially build a custom blade, a custom rack, and a custom server that's very unique to what Microsoft is running with Azure or what Google is running in Google Cloud or AWS.

**TB:** Power efficiency is a big part of Arm's pitch over traditional server chipmakers like Intel and AMD. Microsoft said recently that it's investing so fast in AI data centres that it's looking like it might miss some of its climate targets. That must be a problem all the Big Tech companies are facing right now?

**RH:** Oh, yes, it's massive. Two things are going to accelerate Arm's adoption in the cloud. One is just broadly, this power efficiency issue. And secondly, the fact that, on AI, we can greatly reduce power by this customisation. Just look at Nvidia. Nvidia built a chip called Grace Hopper and then they built a chip called Grace Blackwell. They are essentially replacing the Intel or AMD CPU with an Arm CPU, which is called Grace.

**TB:** One Big Tech company that hasn't announced an Arm-based chip in its data centres yet is Meta, Facebook's owner. Its new chip for AI inference [the kind needed to deliver AI services rather than create them], called MTIA, is using an open-source alternative to Arm's architecture called RISC-V . . . Are they using Arm in other ways or have they decided to go down a different path?

**RH:** This MTIA chip is an accelerator. And that accelerator has to connect to a CPU. So it can connect to an ARM CPU, or it can connect to an Intel CPU. RISC-V is not interesting from a CPU standpoint, because it's not running any key software . . . I'll leave it to Meta to say whether they're going to connect to Intel or Arm.

**TB:** The analysts I speak to see big potential growth for RISC-V in areas like automotive, where Arm is also hoping to grow. Do you worry that RISC-V is starting to nibble at the edges?

**RH:** Where I don't see it nibbling anywhere is running key software applications. I think there's a misunderstanding commonly between the RISC-V architecture as it applies to being a chip and when it's really running [key] software. Because it's all about the software.

And, again, back to what makes Arm very unique: every mass popular application you can think of has been ported to and optimised for Arm. It takes a long, long time not only to get the software written, but ported and optimised. There's no software anywhere for RISC-V in these places. None.

**TB:** So, if not competition from RISC-V, what does keep you up at night?



**It took us 20 years to get to $1bn. It took us another 10 to get to $2bn. It took us two years to get to $3bn. And we're looking to get to $4bn in one year**

**RH:** The things that I worry about are the stuff that's inside my control. We have massive opportunity with all these compute subsystems. We have massive opportunity with growth in AI. We have massive opportunity to reduce power to go solve this issue relative to data centres. It's just making sure that we can execute on the strategies we have, because we are at a magical time in our industry relative to the growth potential.

**TB:** How much does being a public company keep you awake at night?

**RH:** Generally speaking, it doesn't change how I think about running the company because I don't really think about the company from quarter to quarter. I think about the company from year to year. Most of my discussions that I have with our internal teams or engineers are about 2027, 2028.

**TB:** Unfortunately, Wall Street does tend to look at things quarter by quarter. You've had a lot of stock-price volatility around your quarterly earnings reports. That's not uncommon for a newly-listed company but do you think investors really understand the Arm business?

**RH:** What I would say about the volatility is we've had three quarters of being a public company and each quarter was bigger than the last one. And each quarter that we talked about going forward was larger . . . we basically indicated that we see 20 per cent growth year on year and we see that continue for the next few years.

We achieved $3bn in revenue over this past year. It took us 20 years to get to $1bn. It took us, I think, another 10 to get to $2bn. It took us two years to get to $3bn. And we're looking to get to $4bn in one year. So the trajectory is in the right place.

We have incredible visibility in terms of our business, [not only because] we get reports from our customers, but because our market share is so high.

**TB:** Some investors worry about visibility in two parts of your business in particular. One of them is Apple, one of your biggest customers but which is famously not very open with its partners. The other is Arm China. You warned in your IPO prospectus of past problems obtaining "accurate information" from Arm China. What insight do you really have?

**RH:** We have great insight with Apple. They're a phenomenal partner for us. They have signed a long-term [contract] extension. They're very committed to Arm.

Arm China, that's our joint venture in China. They are essentially a distributor for us. So we have very good visibility in terms of how we work with partners there. With China, the issue that we've faced in terms of export control are no different from other [chip] companies. But, in general, I would say, with Arm China, things are going quite well.



Apple's latest iPad Air uses the Arm-based M2 chip © Bloomberg

**TB:** How has being a public company changed your relationship with SoftBank and its chief executive, Masayoshi Son? They're still a 90 per cent shareholder but you're more out on your own now. How does that dynamic change?

**RH:** I think it's changed in the sense that, as a public company, we now have a board that has independent directors that represent shareholders. So all the things that we have to do from a governance standpoint, that's a little bit different. I'd say we are certainly more independent in terms of how we think about the company, how we talk about the company. But SoftBank's our largest shareholder, so obviously they have a big say in terms of things at the boardroom table.

With Masa, I would say the relationship is no different. We talk all the time. He's a brilliant guy. I think he gets a little bit of a bad rap in the press. He's a guy who started the company 40 years ago and is still running it. There's a pretty small group of people who have done that kind of thing, and the company is still broadly successful.

**TB:** How does Arm fit in with SoftBank's broader strategic goals around AI?

**RH:** Clearly, Masa is very bullish on all things AI and — given that it's pretty hard to talk about an AI application that doesn't bump into Arm — we're at the centre of many of those things. For example, SoftBank made an investment into a UK company called Wayve, which is doing some amazing work in LLMs [large language models, the complex AI systems that sit behind applications such as ChatGPT] for full self-driving cars. It's running on Arm. So there is an area where if Wayve does well, Arm does well.

**TB:** Does that mean you're going to move into making your own AI chips, as Nikkei reported recently?

**RH:** I can't give you anything on that one. I can't comment.

**TB:** Silicon Valley in general, and the chip industry in particular, is full of 'frenemies'. Nvidia's biggest customers are all making their own AI chips, for example. Where do you think you can, and can't, compete with your customers?

**RH:** I tend to think more about where can we add value and where is the industry going? Back to compute subsystems. When we kicked the idea off, this was a bit controversial because, by doing a full subsystem implementation, some customers might say, 'Hey, that's the kind of work I do. Arm, I don't need to have your finished solution.' Fast forward, we solve a lot of problems in terms of engineering overhead. We solve a lot of problems relative to time to market. We solve a lot of problems relative to broadening out Arm's platforms.

So that's an example of something that might be a frenemy kind of thing where people might look at it and say, 'That's my domain'. But I would say it's worked out far better than we thought. Even the early customers who pushed back at it are adopting it.

**TB:** Another example of a frenemy for Arm is Intel. At the same time as competing for a lot of Intel's PC and server business, you're actually getting closer to them on the foundry side. You were recently on stage at an Intel event — which some people who have been watching this industry for 30 years might have seen as a 'hell freezing over' kind of moment. What is the nature of that relationship exactly?

**RH:** Yeah, that's a great example of the world moving around. Intel, 10 years ago, probably saw it was very beneficial to see Arm as not a healthy competitor. Fast forward, Intel has a burgeoning business that is trying to grow around Intel Foundry. What does Intel Foundry need? They need volume. Well, who drives the most volume in terms of CPUs? It's Arm. So they obviously see the size of that opportunity . . . They've taken a lot of money from the US government on the Chips Act and they need to put that money to work. I think working with Arm is going to be the fastest way they can do that.

**TB:** We've talked a lot about AI in the abstract. What are the particular applications of AI that you're most excited about personally?

> **How long does it take to develop a new drug? Ten years. That can be cut in half, it can be cut by two-thirds by using AI. That to me is incredibly exciting**

**RH:** A really simple AI application that I use is to remove people from photographs. I'll take pictures of my kids, my grandkids, my friends, and someone will photobomb. And you can just clean that stuff up. With [Google Photos] Magic Eraser, you can do that. Crazy simple, but that's AI.

But the areas that I personally find far more interesting are drug research and medical. A very simple example: You're ill, you go to the pharmacy, they prescribe some medicine to you, and you look at the medicine and the side effects are as generic as it can be. That seems like something that, if the doctor knew my DNA genome sequence and would be able to map out exactly which drugs will give me what kind of reaction, knowing exactly my background and profile, that would be compelling. I was meeting this morning with somebody who's in this industry and was asking that question. With AI, that's probably three to four years away.

Another interesting example is drug research. How long does it take to develop a new drug? Ten years. That can be cut in half, it can be cut by two-thirds by using AI. That to me is incredibly exciting.

**TB:** Some AI boosters argue the technology will soon replace all human labour. Do you think your grandchildren will have to work?

**RH:** I hope so. I hope so. What a life if they don't.

*This transcript has been edited for brevity and clarity*

Copyright The Financial Times Limited 2025. All rights reserved.

## Follow the topics in this article

**Technology sector**

**Semiconductors**

**Artificial intelligence**

**Arm Ltd**

**Tim Bradshaw**

# EXHIBIT 31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

Plaintiffs,

vs.

ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation,

Defendant.

C.A. No. 24-490(MN)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
DEPOSITION OF ZIAD ASGHAR
JULY 7, 2025
SAN DIEGO, CALIFORNIA

Reported by
Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 202

**Q. Do you know if next is v9?**
A. Possibly. Is it more than that? I don't know.
**Q. Do you know if next is v10?**
MS. NYARADY: Objection. Asked and answered.
THE WITNESS: I don't know.
BY MR. EMERICK:
**Q. Do you know if next is v11?**
A. Same answer.
**Q. Next it says, "Arm is high royalty fees." Is that accurate?**
A. In the second bullet?
**Q. Yes.**
A. Yes.
**Q. So there is a preference to move to RISC-V which is royalty-free?**
A. Yes.
MS. NYARADY: Objection.
THE WITNESS: If it were a viable product, which it isn't today.
BY MR. EMERICK:

(Asghar Exhibit 11 marked for identification.)
BY MR. EMERICK:
**Q. All right. Next, Exhibit 11, Qualcomm v. Arm 463559 through 569.**
**If you turn to the page ending in 62 -- well, first, do you recognize this slide deck?**

Page 204

A. Yes, I do.
**Q. What is this slide deck?**
A. This is a technology business review, kind of work out that my last team used to do.
**Q. What was the purpose of these technology business reviews?**
A. To really look at the gamut of possibilities, to look at the different options. What are the inflection points that are coming in technology in this particular case for CPU, but we did that for all the technologies, such as camera and graphics and AI and so on and so forth.

Page 205

7/7/2025 Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Ziad Asghar
Highly Confidential - Attorneys' Eyes Only

Page 206

**Q. Have you ever assisted in sharing Qualcomm's business plans for RISC-V with any of Qualcomm's customers?**
A. Sorry. Repeat your question.

Page 207

**Q. Okay.**
A. Because of given the immaturity.
(Asghar Exhibit 13 marked for identification.)
BY MR. EMERICK:
**Q. All right. Next is Exhibit 13, which is QCVARM_449653 through 449657.**
**If you turn to the very last email in the chain on the last page ending in 57.**
A. Yes.
**Q. So this is an email you received from someone named Yongjae Chang. Do you see that?**

Page 208

A. Yes.

Page 209

BY MR. EMERICK:

53 (Pages 206 to 209)
www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2025 202-232-0646

# EXHIBIT 32

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation

Plaintiff,

v. C.A. No. 24-490-MN

ARM HOLDINGS PLC, f/k/a, ARM LTD. a U.K. corporation
Defendant.

***HIGHLY CONFIDENTIAL***
***PURSUANT TO PROTECTIVE ORDER***
VIDEOTAPED DEPOSITION OF JIGNESH TRIVEDI
WEDNESDAY, JULY 9, 2025
SAN DIEGO, CALIFORNIA

REPORTED BY: PATRICIA Y. SCHULER, CSR NO. 11949

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

7/9/2025 Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Jignesh Trivedi
Highly Confidential - Pursuant to Protective Order

Page 98

THE WITNESS: Whether it is partner-specific, that is a question for Arm. It helps us run that test. If the test is fixed correctly, it should pass on our design.

BY MR. JANES:

**Q. An ACK patch is a fix to an ACK test error, bug, or issue, right?**

A. Can you restate the question, please?

**Q. Yup. An ACK patch is a fix to an ACK test issue or error or bug, correct?**

A. An ACK test defect is a badness in the test which prevents us from verifying the architecture feature that it is targeting.

**Q. We've talked about something called OOB. OOB sometimes stands "out of box" right? Actually, sorry. Let me rephrase that.**

**OOB stands for "out of box," correct?**

A. I have heard it referred to as that. That is an Arm acronym, so I wouldn't want to speculate.

**Q. Okay. Is OOB sometimes called a reference list?**

MS. NYARADY: Objection.

THE WITNESS: It contains what we call a reference list, but it has more information than

Page 99

just a reference list.

BY MR. JANES:

**Q. OOB contains a reference list?**

A. OOB contains a reference list as well as a result of each test on the Arm reference model. Along with that, it contains a failure list as an additional part of the package, which dictates -- or which -- "dictate" is the wrong word -- which explains, if any failure in those tests, what were the cause of the failure, whether it's a failure because of AEM or the failure to do a test defect, so a partner should not their spend time analyzing those tests.

**Q. Is OOB sometimes referred to as a target config?**

A. It should not.

**Q. What's the difference between an OOB and a target config?**

A. A target config is a configuration file that a partner fills in and provides to Arm, from which Arm generates an OOB.

**Q. Is OOB sometimes referred to as a test list?**

MS. NYARADY: Objection.

THE WITNESS: I'll rephrase or reiterate

Page 100

my earlier answer. OOB has a list of tests that are based on a given target config a partner needs to run for compliance. But it also has results of those tests on an Arm reference model and additional analysis if the test failed, indicating it's a test defect or just an AEM defect. It has much more information than just the list.

BY MR. JANES:

**Q. Okay. So the test list is the reference list, right?**

A. Again, OOB has a list and additional information. The reference list is part of that, yes.

**Q. Have you heard of something called a Design Under Test or a DUT?**

A. Yes, I have.

**Q. What is a DUT?**

A. It's basically a very common word in verification. The design that you are verifying, you wrap it around with a test bench, so you call it a design under test.

**Q. Is the DUT related to the OOB?**

A. To the extent that the OOB -- it represents the OOB is generated using a target configuration. The DUT is -- so the DUT is a set

Page 101

of features that we are designing too. We reflect that in the target config. And the target config used to generate the OOB by Arm.

**Q. The reference list that is in the OOB is a list that identifies a subset of the ACK tests that are specific to a partner's -- sorry. Let me ask that differently.**

**The reference list that's within the OOB is a list identifying a subset of the ACK tests that relate to an ALA partner's individual CPU design, correct?**

A. I will answer it in this way. We talked earlier that the -- you know, it contains close to hundreds of thousands of tests. A partner applies their target configuration, gives it to Arm. A specific list of tests -- there are variations in the test names which make the test different based on your configuration.

So precisely what, based on a partner's target configuration, a partner needs to run, that is what the OOB reference list part of the OOB tells you.

**Q. The OOB is partner-specific, correct?**

A. Again, when we provide a target configuration for that design, Arm provides an OOB.

26 (Pages 98 to 101)
www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2025 202-232-0646

Page 102

So because it is corresponding to that design, it is partner-specific.

**Q. The OOB is also design-specific, correct?**

A. Again, you could provide OOBs for different configurations in a package. What a partner needs to use is a design-specific OOB.

**Q. The OOB is not part of the Arm instruction set architecture, right?**

A. The OOB is a list of tests; it is not part of the Arm instruction set architecture.

**Q. Are any of the tests that are listed in the OOB not included in the broader ACK suite?**

A. Again, the ACK contains base tests. When you provide a target configuration, there is various configurations that the test and the ACK package can decide what a customer needs to run. So as an analogy, if a test name is A, there could be Configuration B.C.D that is generated. Those are not present in the ACK. Those configurations are based on the partner's configurations.

So if I, as the partner, have certain configuration, I might choose -- I might be told by the OOB that I need to run A.B.C. A different partner for the same test might be told they will need to run A.B.B. So just having the test in the

Page 103

ACK is not good enough. The configuration fine-tunes it to give you the specificity that you need to run.

**Q. Mr. Trivedi, earlier we were looking at a list of parts in the v8 Annex 1 and the v9 Annex 1.**

**Do you remember that?**

A. Yes.

**Q. Did any of the parts that we were looking at -- scratch that.**

MS. NYARADY: Objection; asked and answered.

BY MR. JANES:

**Q. Mr. Trivedi, I'm not asking about the normal process. I'm asking about the list of parts that we were looking at in the v8 and v9 Annex 1. We can look at the documents if you would like.**

MS. NYARADY: Objection; asked and answered. And I object to the extent it calls for a

Page 104

contract interpretation or a legal conclusion.

BY MR. JANES:

MS. NYARADY: Same objection; asked and answered. And object to the extent it calls for contract interpretation.

BY MR. JANES:

Page 105

.

**Q. Okay. So we were talking about how the ACK was the -- well, scratch that. I will move so.**

**Does Arm make Qualcomm CPU-specific OOB available to all of its ALA partners or just Qualcomm?**

MS. NYARADY: Objection.

If you know what Arm does, you can answer.

THE WITNESS: It used to make it available to us, until the litigation.

BY MR. JANES:

**Q. That's not what I asked you, Mr. Trivedi.**

**Does Arm make Qualcomm CPU-specific OOBs available to all of its ALA partners or just to Qualcomm?**

MS. NYARADY: Objection.

THE WITNESS: That is Qualcomm confidential. So that OOB is for Qualcomm only.

BY MR. JANES:

**Q. When Qualcomm receives an OOB that is CPU-specific from Arm, does it have an associated part number?**

MS. NYARADY: Objection.

THE WITNESS: I think none of the



7/9/2025 Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Jignesh Trivedi
Highly Confidential - Pursuant to Protective Order

Page 170

**Q. Did this issue cost Qualcomm any money?**
A. I would not be the best judge to answer that question.
**Q. You don't know?**
A. No.
**Q. Has Qualcomm attempted to quantify the harm that it suffered as a result of Arm not providing OOB or ACK patches to Qualcomm?**
A. Again, I wouldn't be the best person to quantify that harm. We just walked through the risks that it creates. But when there is a realized risk, there is open test issues which could be more risks.
**Q. Who would be better suited to quantify the harm to Qualcomm as a result of Arm not providing OOB and ACK patches?**
A. I don't think I would be best person to answer that. I would be guessing there. Who would be the person to make that judgment about the quantification? I can't answer that one. I don't know who is the person who can tell you that answer.
**Q. Sorry. I did not mean to cut you off.**
**Do you keep track of your time when you work?**

Page 171

A. Can you be more specific?
**Q. Sure.**
**Do you log your time on a project basis or a task basis?**
A. I think there is -- no. I don't log in on an hourly basis, to be frank.
**Q. Does Qualcomm sell any chips that use the or cores and that you were just referencing?**
MS. NYARADY: Objection.
THE WITNESS: We design them to be productized. I do not know if they have been productized or not. I can't answer that one.
BY MR. JANES:
**Q. Are you aware of any customers ?**
A.
**Q. Does anyone on your team keep track of their time spent on specific projects or tasks?**
A. I would have to ask them. I don't ask them to keep track and report to me the hourly time they spent on it.

Page 172

Page 173

BY MR. JANES:
MS. NYARADY: Objection.
BY MR. JANES:

44 (Pages 170 to 173)
www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2025 202-232-0646

7/9/2025 Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Jignesh Trivedi
Highly Confidential - Pursuant to Protective Order

Page 174

BY MR. JANES:

**Q. So it does not take a significant amount of time to generate the ACK reference list, right?**

A. Fair.

**Q. That is something that you do, regardless of whether Arm provides you an OOB, right?**

A. We generate a reference list,

**Q. Understood. We will talk about the in a second.**

**But regardless of whether Arm provides you an OOB or not, Qualcomm generates the reference list of ACK tests, correct?**

A. Yes.

Page 175

Page 176

Page 177

45 (Pages 174 to 177)
www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2025 202-232-0646

# EXHIBIT 33

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
C.A. No. 24-490-MN
---------------------------------------x
QUALCOMM INCORPORATED, a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

Plaintiffs,

- against -

ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation

Defendant.

---------------------------------------x

July 30, 2025
9:10 a.m.

*HIGHLY CONFIDENTIAL*

VIDEOTAPED DEPOSITION of ANUPA GEORGE, held at the offices of PAUL WEISS RIFKIND WHARTON & GARRISON, LLP, located at 1285 Avenue of the Americas, New York, New York 10019, before Danielle Grant, a Certified Realtime Reporter and a Notary Public of the State ofNew York.

does each C file correspond to one test case?

MR. JANES: Object to form.

A I would not call a C file a test case. A test case could be in my double-C files, mostly my double-S files or dot-S files. One test case could be structured in my double-dot-S files. So I would not say it like that.

(Whereupon, the court reporter requested clarification.)

THE WITNESS: Dot, as in "dot." Yeah.

Q So when Arm creates a new test for a feature, is it writing multiple C files and S files to test for that feature?

MR. JANES: Object to form.

A Depends on the requirement of that feature. Depends on how big that feature is or what has to be tested.

Q Can you explain more what you are referring to?

A It depends on the size and complexity of the feature. If it's -- if

it's a tiny volume versus tiny feature, we could do it in one test or do it in a number of tests.

Q But either way, you're writing C files and S files to test for the feature; it's just a question of how many C files or S files you write?

MR. JANES: Object to form.

A So in my capacity as an ACK team member, I have not written C files. I have written dot-S files, and dot-S files will have the logic of a test case. And it requires other files to support simulating it on a model.

Q So if I understand correctly, a single test can use multiple S files?

MR. JANES: Yeah. object to form.

And you can answer.

But real time is out I think.

Q Do you want to go off the record?

MR. JANES: Yeah, let's go off the record and see if we can fix this.

VIDEOGRAPHER: We're going to go off the record. The time is 9:26 a.m. And this concludes Media Unit Number 1.

(Whereupon, at 9:26 a.m., a recess was taken to 9:30 a.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: We're back on record. The time is 9:30 a.m. And this is the start of Media Unit Number 2.

Q So we were just talking about the S files that you said you've worked on for the ACK.

And am I understanding correctly that multiple S files can cover one test case?

A If structured that way, we could do it in one dot S file, or we can structure it in multiple dot-S file. That's more like an ease of maintenance.

Q Okay. And before, you were saying the ACK tests are self-checking tests; they either pass or they fail,

right?

A Or skip.

Q Or skip.

And skip is where the feature that is being tested for is just not implemented in the CPU, right?

A That is one reason. And --

Q What are the other reasons?

A So the feature is there, but for some other setup that is required to test the feature, it's not in that partner implementation. So we skip it.

Q I'm sorry. I missed what you said at the end: For some other reason, it's not in the partner implementation; so we skip; is that what you said?

A Yeah, any setup -- any setup required to test the feature, if it's missing, we skip the test.

Q Okay. And if a test fails, it can fail for multiple reasons, right?

A Depends on how the test is written.

Q But there could be a defect in the partners implementation that causes

the test to fail, right?
A One of the reasons, or it could be a test that is --
Q There could also be a test defect?
A Yeah.
Q Okay. And Arm sometimes identifies defects in ACK tests on its own, right?
A We have a regular quality maintenance that happens. So if issues are found, we fix them.
Q And when Arm identifies a test issue, the engineer in the CPU compliance team will go in and will correct the C files or the S files that correspond to that defective test right?
MR. JANES: Object to form.
A If the quality issue is in a C file or a dot-S file, yes. If not, we fix the appropriate files that are required.
Q And then, once those files are fixed, are they placed back into the ACK repository for the general ACK release?

A Yes.
Q Okay. So there's one ACK repository where the code for the ACK is maintained?
MR. JANES: Object to form.
A I am not sure about that logistics, but from my perspective, once I locally fix it, I would push it to a central repository. Whether that's the only repository or not, I am not sure.
Q Okay. And in addition to Arm identifying test defects, sometimes partners also tell Arm that they have identified what they think is a defective test, right?
A Sometimes, yes.
Q And when a partner identifies what they believe to be a defective test, Arm will sometimes issue what is called a patch to that partner for the test that has been identified as defective, right?
MR. JANES: Object to form.
A So what is important when an issue is found is to fix the test. And what I can tell for sure is that fixed

test or its other files will go into the repository and be part of the quarterly release, but whether a patch is required or not is not unconditional. It doesn't happen always.
(Whereupon, the court reporter requested clarification.)
THE WITNESS: Test.
MR. JANES: I think it's "or."
(Whereupon, the court reporter requested clarification.)
Q So I don't think that quite was answering the question that I was asking.
I'm just saying on some occasions Arm does issue a patch to partners to fix a test that a partner identified as potentially defective, right?
MR. JANES: Object to form.
A So if the test is identified as defective, the test is fixed. A patch is created on a conditional basis. So what must be done is the test fix, and whether a patch is created or not depends

on the situation.
Q I'm not asking for your opinion on what you think must be done or not.
I'm just saying there are situations where Arm issues patches to partners to fix tests that the partner has identified as potentially defective, right?
MR. JANES: Object to form.
A Sometimes. Depends on the situation.
Q When a patch is created, that is the same process that we just described with respect to fixing the defective files, whether it's a C file or an S file, right?
MR. JANES: Object to form.
A No. Fixing is a fix of the files, C or S or any other files. It's different from a patch being created.
Q What is the difference between a patch being created and a fix being performed on a test?
A Fix is just the technical

analysis. We find out whether the issue is right or needs to be addressed. We edit the test. And a patch is just a logistics process. It's just a one-click process where you get a zipped file -- a zipped -- a compressed folder of the edited files.

Q What is included in the zipped file?

A Depends on what is edited, which file is edited.

Q The edited file you're referring to is the fixed test, right?

MR. JANES: Object to form.

A The fix will be in the -- sorry -- the edit will be made on the files that need the fix, and only those files will be part of the patch.

Q Right. I think we're saying the same thing, which is that the patch itself contains the edited or fixed test files?

MR. JANES: Object to form.

A I would -- I would still frame it the other way, that the fixed or edited

files will be made into a patch, which is a compressed zipped file or a folder.

Q Okay. And then those are sent to the partner?

A Whether they're sent as is or whether it's wrapped in some other format and sent, I am not sure. But this is what a patch will have. It will have the edited files.

Q Okay. But you know that that is -- when we talk about a patch that's sent to a partner, that's what we're referring to, right?

MR. JANES: Object to form.

A That is what I think it happens, but I have not done it personally. That's not my responsibility. So I'm not sure.

Q But you are involved in the development of patches, right?

A I'm involved in the creation of patches.

Q Okay. And when you say you're involved in the creation of patches, it's the process we just described, which is

editing the files related to the ACK and then wrapping them up in some compressed file that will later be sent to the partner, right?

MR. JANES: Object to form.

A So I am involved in editing the files. I'm involved in creating the patch, if requested, and then providing it to the partner enablement team. What happens beyond that is not in my responsibility, so...

Q How do you know when you should create a patch?

A That's not a decision that me, as an engineer, would take. That's -- so my decision would stop and end at the technical analysis and fixing the test. If requested by the partner enablement team, I would create a patch and then give it to them.

Q So the partner enablement team tells you that they want you to create a patch?

A So if the test needs a fix, let's say the issue requires a test fix,

we fix the test. It goes to the repository. And once the partner enablement team gets to know that the test required a fix, they will tell us whether a patch is required, I mean, needed to be created or not.

Q Is there a document that explains the patch design process or the reasoning for when a patch should be created or when a patch should not be created?

A Not that I'm aware of as a member of the ACS team. I mean, in my capacity, that's not something that I look into.

Q Do you know why Arm sends patches to partners?

MR. JANES: Object to form.

A Again, that's not something that I would look at. So my role starts at whether a patch is requested by the partner enablement team or not.

Q And when there are test failures, Arm doesn't always issue a test fix, right; sometimes it issues a waiver?

# EXHIBIT 34

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

Plaintiffs,

vs.

ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation,

Defendant.

C.A. No. 24-490(MN)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
VIDEO DEPOSITION OF JEFFREY B. GOLDEN
JULY 3, 2025
SAN DIEGO, CALIFORNIA

Reported by
Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 34

Page 35

Q. What's the difference between an ACK test and an ACK test instance?

A. So if we think about the test as being -- it really depends on how you define it. But the way that it is sometimes defined -- again, I think this is an Arm idea, although I'm not sure. I may have a test that says -- let's give you an example.

A register X test. And then that test is comprised of all of the source code that's specific for that test, all of the source code that speaks to maybe that test and a group of similar tests, and then all the source code that is used across all tests and happens to be pulled in by this test.

Now, the test instance is taking the source code -- all the source code I just talked about, including the one for the register X test, and then it takes into account potentially

Page 36

and which may make what gets generated specific for the flavor of architecture that we're implementing, plus some random choices. And so those two extra ingredients create the test instance.

Page 37

7/3/2025 Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Jeffrey B. Golden
Highly Confidential - Attorneys' Eyes Only

Page 38

[redacted]

**Q. Are you familiar with something called an [redacted] checker?**

A. Yes.

[redacted]

**Q. Earlier we were talking about how Arm makes periodic deliveries of the updated version of the ACK. Do you remember that?**

A. Uh-huh.

**Q. More broadly, Arm makes architecture and verification materials available to Qualcomm; right?**

MR. BRALY: Objection.

THE WITNESS: More broadly. What -- I

Page 39

don't understand.

BY MR. JANES:

**Q. So I just -- the updated ACK is just one instance, but Arm makes architecture and verification materials available to Qualcomm; right?**

MR. BRALY: Objection.

THE WITNESS: I don't know. I don't think I know that.

BY MR. JANES:

**Q. Arm makes the Arm ARM available to Qualcomm; right?**

MR. BRALY: Objection.

THE WITNESS: I think my experience with the Arm ARM is I download it from Arm. And they make it available to everyone through that mechanism.

BY MR. JANES:

**Q. And you -- I'm sorry. Earlier I think you testified you're not directly involved in the receiving of materials from Arm; is that right?**

A. That's correct.

[redacted]

Page 40

[redacted]

Page 41

[redacted]

11 (Pages 38 to 41)

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2025 202-232-0646