# Exhibit 39

# Exhibit 40

# Exhibit 41

# Exhibit 42

# Exhibit 43

# Exhibit 44

# Exhibit 45

# Exhibit 46

# Exhibit 47

# Exhibit 48

| From: | Lederer, Jim </O=QUALCOMM/OU=SAN DIEGO ADMIN GROUP/CN=RECIPIENTS /CN=JLEDERER> |
|---|---|
| To: | Weiser, Jonathan; Sand, Laura; Cohen, Darcy M. |
| CC: | Tessitore, Ron |
| Sent: | 3/24/2012 4:58:48 PM |
| Subject: | FW: QC/ARM compromise language |

☐ **Redacted-Privileged**

**From:** Lederer, Jim
**Sent:** Saturday, March 24, 2012 9:58 AM
**To:** 'Warren East'
**Cc:** Tessitore, Ron; 'Antonio.Viana@arm.com'
**Subject:** RE: QC/ARM compromise language

Warren:

Thanks for your response. ██████████████████████████

████████████████████████  ████████████████████████
████████████  █████████████████████████████████████
████████████████████

██████████████████████████  ████████████████████████
█████████████████  ██████████████████████

████████████████  █████████████████████████
████████████████  █████████████████████████████
██████████████  █████████████████████████████
████████████  █  ███████████████████████████████
██████████  █  ████████████████████████████
████████████████████████  █████████████████████████
██████████████████

████████████████████████████████████████████████████
████████████████████████████  █████████████████████████
██████████████████████████  ████████████████████

Thanks for your attention to this ████████████████████.

Jim


-----Original Message-----
From: Warren East [mailto:Warren.East@arm.com]
Sent: Friday, March 23, 2012 10:36 AM
To: Lederer, Jim
Subject: Re: QC/ARM compromise language


Jim,
Thanks for the email. I totally agree with your paragraphs explaining the background - we
are aligned. ████████████████████  ████████████  ████████████████████
████████████████████████████████████████  ██████████████████████

CONFIDENTIAL                                                                                      QCARM_7475229

Thanks for making contact.

  - Warren

From: James P Lederer <jlederer@qualcomm.com<mailto:jlederer@qualcomm.com>>
Date: Fri, 23 Mar 2012 03:32:18 +0000
To: Warren East <warren.east@arm.com<mailto:warren.east@arm.com>>
Cc: Antonio Viana <Antonio.Viana@arm.com<mailto:Antonio.Viana@arm.com>>, Ron Tessitore
<rontess@qualcomm.com<mailto:rontess@qualcomm.com>>
Subject: QC/ARM compromise language

Warren:

Below is our compromise proposal.

Please accept our proposed compromise language below.

Thanks,
Jim

CONFIDENTIAL

COMPROMISE PROPOSAL:



-- IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

# Exhibit 49

| | |
|---|---|
| **From:** | Tessitore, Ron </O=QUALCOMM/OU=SAN DIEGO ADMIN GROUP/CN=RECIPIENTS /CN=RONTESS> |
| **To:** | Sand, Laura; Lederer, Jim; Weiser, Jonathan |
| **Sent:** | 3/26/2012 7:10:59 PM |
| **Subject:** | RE: New TLA Clause....as discussed... |

# Redacted-Privileged

-ron

**From:** Sand, Laura
**Sent:** Monday, March 26, 2012 2:18 PM
**To:** Tessitore, Ron; Lederer, Jim; Weiser, Jonathan
**Cc:** Sand, Laura
**Subject:** RE: New TLA Clause....as discussed...

# Redacted-Privileged

Laura

**From:** Tessitore, Ron
**Sent:** Monday, March 26, 2012 10:57 AM
**To:** Lederer, Jim; Weiser, Jonathan
**Cc:** Sand, Laura

CONFIDENTIAL

QCARM_7475067

**Subject:** FW: New TLA Clause....as discussed...

**Redacted-Privileged**

-Ron

**From:** Antonio Viana [mailto:Antonio.Viana@arm.com]
**Sent:** Monday, March 26, 2012 1:11 PM
**To:** Tessitore, Ron
**Subject:** New TLA Clause....as discussed...

Hi Ron,

As we just discussed...

QCARM_7475068



Take care,
Antonio

*******************************

Antonio J. Viana
Executive Vice President, WorldWide Sales

ARM
The Architecture of the Digital World

5375 Mira Sorrento Pl. Suite 290
San Diego, CA 92121

www.arm.com

Phone:   +1-858-453-1900 x1
Cell:        +1-760-390-5752
*******************************

-- IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

QCARM_7475069

# Exhibit 50

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED, a

Delaware corporation, QUALCOMM

TECHNOLOGIES, INC., a Delaware

corporation

    Plaintiff,

v.                                C.A. No. 24-490-MN

ARM HOLDINGS PLC, f/k/a, ARM

LTD. a U.K. corporation

    Defendant.

_____

***HIGHLY CONFIDENTIAL -

PURSUANT TO PROTECTIVE ORDER***

VIDEOTAPED DEPOSITION OF LAURA SAND

TUESDAY, JULY 8, 2025

SAN DIEGO, CALIFORNIA

REPORTED BY:  JEANNA MALCUIT, CSR NO. 14564

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

7/8/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.          Laura Sand
Highly Confidential - Pursuant to Protective Order

---

Page 86

[redacted]

---

Page 88

1  BY ATTORNEY DAWSON:
2     Q   It sounds like your answer is yes.
3     A   That would be --
4         ATTORNEY MORGAN:  Objection.
5  Mischaracterizes the testimony.
6  BY ATTORNEY DAWSON:

[redacted]

13        ATTORNEY MORGAN:  Objection.  Form.  Asked
14  and answered.  Misstates the testimony.

[redacted]

22        ATTORNEY MORGAN:  Objection.  Asked and
23  answered.  Misstates the witness's testimony.
24  BY ATTORNEY DAWSON:
25     Q   Okay.  Um, in your previous deposition,

---

Page 87

[redacted]

4         ATTORNEY MORGAN:  Objection to form, and
5  objection to the extent the question calls for the
6  content of privileged communications, witness cannot
7  answer.

[redacted]

12  BY ATTORNEY DAWSON:

[redacted]

20        ATTORNEY MORGAN:  Objection.  Asked and
21  answered.

[redacted]

25

---

Page 89

1  you testified you were involved in negotiating the
2  amended and restated TLA.  Do you know what a TLA
3  is?
4     A   I do.
5     Q   What's that?
6     A   Technology license agreement.
7     Q   You also testified, though, that you had a
8  lesser role in the TLA than the ALA; does that sound
9  true?
10    A   That is true.
11    Q   And in that deposition, you testified that
12  the only provision you remembered was something
13  called the [redacted]; does that
14  sound right?
15    A   It was what I said in the deposition and
16  it remains where we spent a material portion of our
17  time in the TLA.
18    Q   In that deposition when asked about the
19  [redacted] you said it was
[redacted]
[redacted]  does that remain true?
23    A   Yes.
24    Q   Okay.  What do you remember about the
25  negotiations with Arm, um, relating to the [redacted]

---

23  (Pages 86 to 89)

7/8/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.          Laura Sand
Highly Confidential - Pursuant to Protective Order



Page 94

1  understood at this time that Arm constructs deals
2  with different ALA licensees that have different
3  structures?
4      A   Well, this is the TLA.
5      Q   Excuse me.  You're right.  Let me say that
6  again.  You understood at this time that Arm
7  constructs deals with different TLA licensees that
8  have different structures?
9      A   Yes.
10     Q   And you understood that it was difficult
11  for Arm to do an apples-to-apples comparison?
12     A   I understood that to be Arm's position,
13  yes.
14     Q   And you understood at this time that Arm
15  was going to take into account ███████████████
16  ███████████████████████████████████, correct?
17     A   I understood that to be Arm's proposal,
18  the final contract language ██████████████████████
    ██████████████████████████████████████████.
21     Q   But not simply ████████ here, just
22  focusing on the email for a minute that meant -- did
23  you understand that to mean just the ████████
24  ████████?
25     A   Yes.

Page 95

1      Q   The email also mentions a ████████.  In
2  other words, in this email discussion, this
3  provision only applied to an █████████████████
4  ███████████████████████████████████████ right?
5      A   █████████████████████████████████████████
    ██████████████████████████████████████████████
8      Q   It wouldn't apply to a ████████ though,
9  correct?
10     A   That is not correct.
11     Q   Why is that not correct?
12     A   There's no such limitation in the TLA.
13         ATTORNEY DAWSON:  Okay.  We'll go to the
14  TLA.  Here's the TLA.
15         THE WITNESS:  Keep this out?
16         ATTORNEY DAWSON:  Um, sure.
17         (Whereupon Exhibit 9 was marked for
18         identification.)
19  BY ATTORNEY DAWSON:
20     Q   So if you'll go to section ██ of the TLA.
21     A   Why do they make the font so small.  You
22  said ██?
23     Q   I'm sorry --
24     A   Did you mean ██?
25     Q   █████████████████████████████

Page 96

1  ███████████████ which is what we've been
2  discussing.  That's also, um, in the email I just
3  showed you, that was what was being negotiated in
4  this email, right?
5      A   Yeah.  It looks like this email was as to
6  a very specific piece within this provision.
7      Q   Okay.  But agree we're talking about the
8  TLA?
9      A   Yes.
10     Q   Okay.  So if you look at ████ in the TLA,
11  it says ██████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████

Page 97

1  ██████████████████████████████████████████████████
2  ██████████████████████████████████████████████████
3  ██████████████████████████████████████████████████
4  ██████████████████████████████████████████. Do
5  you see that?
6      A   I do see that.
7      Q   Okay.  This language here talks about
8  ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
18     Q   So I understand what you're saying, but
19  you didn't answer my question, which is point to me
20  where in here ████████ it says that ████████████████
    ████████████████
22         ATTORNEY MORGAN:  Objection.  Asked and
23  answered.
24         THE WITNESS:  ██████████████████████████████

# Exhibit 51

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3      QUALCOMM INCORPORATED a Delaware corporation, ) Case No.
   24-490-MN

        QUALCOMM TECHNOLOGIES, INC., a Delaware      )
4      corporation,                                  )
                                                     )
5          Plaintiffs,                               )
                                                     )
6         vs.                                        )
                                                     )
7      ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.      )
       corporation,,                                 )
8                                                    )
           Defendant.                                )
9      _____ )

10       ATTORNEYS EYES ONLY VIDEOTAPED DEPOSITION OF

11                     WILLIAM  ABBEY

12                  Palo Alto, California

13                  Thursday, June 26, 2025

14

15

16             REPORTED BY: Derek L. Hoagland

17                    CSR No. 13445

18

19

20

21

22

23

24

25

Page 6

1  please identify yourself for the record.
2       MR. McELLRATH:  Reid McEllrath of Kirkland &
3  Ellis on behalf of ARM Holding.
4       MS. BARNETT:  Mary Barnett from Kirkland & Ellis
5  on behalf of ARM Holding.
6       MR. McELLRATH:  And with us also is
7  Phillip Price of ARM, Inc.
8       MS. MORGAN:  Erin Morgan from Paul Weiss on
9  behalf of Qualcomm.
10       MR. WESTERHOLD:  Eric Westerhold, also with
11  Paul Weiss, on behalf of Qualcomm.
12       THE VIDEOGRAPHER:  Mr. Court Reporter, could you
13  please swear in the witness and make your appearance.
14       THE REPORTER:  Yes.  My name is Derek Hoagland,
15  and my CSR is 13445.
16       (Whereupon, the deponent is duly sworn by the
17  court reporter.)
18       MS. MORGAN:  Good morning, Mr. Abbey.
19       THE DEPONENT:  Good morning.
20       MS. MORGAN:  How are you today?
21       THE DEPONENT:  I'm doing well.  Thank you.
22       MS. MORGAN:  So we just re-met off the record,
23  but I'll re-introduce myself.
24       I'm Erin Morgan.  I'm from Paul Weiss, and I'm
25  here to ask you some questions on behalf of Qualcomm.

Page 7

1            WILLIAM ABBEY,
2       having first been duly sworn,
3       was examined and testified as follows:
4
5            EXAMINATION
6  BY MS. MORGAN:
7  Q.    I know you've been deposed before because I
8  deposed you before in 2023, right?
9  A.    That's right.  That's right.
10  Q.    So I'M going to quickly go over some ground
11  rules, although I know your attorneys have probably gone
12  over them with you already.
13       You understand you're under oath today --
14  A.    I do.
15  Q.    -- during your deposition?
16  A.    I do.
17  Q.    We can take a break whenever you need one.  I'll
18  probably set the pace to take a break about every hour
19  because that's what I like, but if you want to break
20  earlier than that, just let me know.  I will just ask
21  that you finish answering the question, and then we can
22  take time off the record.
23  A.    That sounds good.
24  Q.    If you don't understand a question, feel free to
25  ask me to clarify.  Okay?

Page 8

1  A.    Yes.  Okay.
2  Q.    And this is the hard one, which I know you know
3  because you've been deposed by me before.  We have to
4  try not to talk over each other.  So I will try to ask
5  questions slowly, and I will try to not cut you off, and
6  I will ask that you do the same.
7  A.    That's fine.
8  Q.    And that way, the court reporter can make a good
9  record.
10  A.    That makes sense.
11  Q.    Okay.  Do you have any questions before we get
12  started?
13  A.    No.
14  Q.    Okay.  Let's talk a little bit about your
15  employment.
16       When you were deposed in October of 2023, you
17  were an executive vice president and chief commercial
18  officer at ARM.  Is that still the case?
19  A.    Yeah, that's still the case.
20  Q.    The number of people that reported to you at
21  that time was about 450.  Is that still the same?
22  A.    Give or take.  It may have gone up slightly.
23  Q.    Okay.  Do you still report directly to ARM's CEO
24  René Haas?
25  A.    I do.

Page 9

1  Q.    Do you report to anyone else?
2  A.    No.
3  Q.    What about Masayoshi-San?
4  A.    I do not report to Masa.
5  Q.    Who are your direct reports?
6  A.    So this is a memory test.  I have four
7  individuals in Asia.
8  Q.    Mm-hmm.
9  A.    I have -- these are all country managers?
10  Q.    Mm-hmm.
11  A.    I have an individual called Tak-San in Japan, an
12  individual called S.W. Wang in Korea.  I have an
13  individual, a deputy right now, it's a bit of a hybrid,
14  CK.  He's still covering Taiwan, but he's moved to
15  North America, picking up North America activity for me.
16  I have a VP of operations based out of the US office
17  called Ben Taft.
18       I have an individual that runs partner success
19  licensing called Andy Howard, based out of the UK.  I
20  have an individual called Kieren Dunn that runs, we call
21  it partner enablement, but for all intents and purposes
22  it's support.
23       I have an individual in North America called
24  Lynn Coullard.  She runs strategic alliance with a
25  particular focus on hyperscalers.  I have another

3 (Pages 6 - 9)

Page 10

1  individual called Shashoudry, who runs strategic
2  alliance with a focus on client devices, so anything
3  with a screen.
4      Have I missed anybody else?  This is where
5  somebody would look at this and say, you forget the role
6  that I do.
7  Q.    You did pretty well.  That was a long list.
8  A.    I think I've go everybody.
9      Yeah, sorry.  There is an individual.  I have an
10  individual at times, based out of the UK, that runs
11  EMIA, which is Europe, Middle East, India and Africa,
12  and his name is Bart.
13  Q.    Okay.  Bart what?
14  A.    I can't pronounce his surname, which is
15  terrible.
16  Q.    We will look it up.
17      Do you --
18  A.    Vanker.  We can provide that later on.
19  Q.    That's great.  Are you aware that you were
20  identified by ARM's counsel as being knowledgeable about
21  ARM's relationship with Qualcomm and Nuvia in this case?
22  A.    I am, yes.
23  Q.    Okay.  Do you agree that you're knowledgeable
24  about ARM's relationship with Qualcomm and Nuvia?
25  A.    I am, yes.

Page 11

1  Q.    Okay.  What's the basis for your knowledge?
2  A.    I have worked at ARM for over 21 years.  In the
3  14 years I've been in the US, I have had interactions
4  with -- with Qualcomm.  They are an important partner.
5  I understand the nature of their business.  I understand
6  the nature of our relationship with them.
7  Q.    Do you have direct responsibilities for the
8  Qualcomm relationship today?
9  A.    Not direct, but indirect, yes.
10  Q.    Okay.  And who that works under you has direct
11  responsibilities for Qualcomm?
12  A.    Today, it's an individual called Jeff Fonseca.
13  Q.    And he was not one of the people that you listed
14  as a direct report, right?
15  A.    Yeah.  So Jeff reports to an individual called
16  CK that reports to me.
17  Q.    CK was formerly in Taiwan and now is both in
18  Taiwan and North America?
19  A.    That's right.
20  Q.    Okay.  Have you negotiated directly with
21  Qualcomm in the past?
22  A.    I have, yes.
23  Q.    In what context?
24  A.    So the nature of our business is that the -- the
25  account team, the individuals that are responsible for

Page 12

1  the relationship, they do the bulk of the negotiations.
2  Occasionally, if their negotiations becomes complicated
3  and it needs an escalation, I am the escalation point
4  for all our partners, and, you know, throughout the last
5  ten years or so there's been points of -- points where
6  escalation was needed.  And, again, it's normal course
7  of business, and that's when I have had to negotiate
8  directly with Qualcomm.
9  Q.    Okay.  What are some examples of when escalation
10  would be needed?
11  A.    Disparity in expectations on -- on commercials,
12  non-standard access to technology and products, or just
13  a need for executive alignment because our working teams
14  don't see eye to eye in terms of, you know, strategic
15  alignment.  In addition to that, because Qualcomm is an
16  important partner, there are periods where I would just
17  want to have a conversation with the executives in
18  Qualcomm.
19  Q.    ARM has been involved in litigation with
20  Qualcomm since 2022, right?
21  A.    That's right, yes.
22  Q.    Okay.  Have you taken a larger role in the
23  Qualcomm relationship as a result of the litigation?
24  A.    I have spent more time on Qualcomm as a
25  consequence of the litigation, yes.

Page 13

1  Q.    Do you --
2  A.    But I don't think my role has changed.
3  Q.    Have there been a higher number of escalation
4  points during the litigation period?
5  A.    I would say that's a --
6      MR. McELLRATH:  Object to form.
7      THE DEPONENT:  I think that's a fair
8  characterization, yes.
9  BY MS. MORGAN:
10  Q.    Are you familiar with the Qualcomm architecture
11  license agreement?
12  A.    I know a bit about it, yeah.
13  Q.    If I refer to it as the ALA, will you know what
14  I'm talking about?
15  A.    Yes.
16  Q.    You did not negotiate the Qualcomm ALA when it
17  was entered in 2013.  Is that right?
18  A.    That's correct.
19  Q.    And you didn't negotiate any renewal of that
20  agreement after 2013, right?
21  A.    That's correct.
22  Q.    Okay.  Have you read the agreement?
23  A.    Not fully.
24  Q.    Are there annexes to the Qualcomm ALA?
25  A.    Yes.

4 (Pages 10 - 13)

Page 18

1   A.      You know, our classic is the ARM partner meeting
2   that takes place in August in Cambridge.  You know, four
3   or five different alignment discussions and meetings
4   will take place, and I would be involved in those
5   meetings.  Periodically, I would just say to the account
6   team, hey, I would like to try to meet with Qualcomm
7   individuals that are responsible for product Y,
8   product -- product X.  You know, our relationship with
9   Qualcomm up until the point of -- of litigation has been
10  one where, you know, we frequently would talk, both
11  sides a little bit more cautious now.
12  Q.      Yeah.  Are you aware that in addition to the
13  relationship with Qualcomm, ARM has also identified you
14  as being knowledgeable about ████████████████?
15  A.      Yes.
16  Q.      Okay.  Do you know what ████ refers to?
17  A.      I do.
18  Q.      What is it?
19  A.      ███████████████
20  Q.      Do you agree that you have knowledge about
21  ██████████████████████?
22  A.      I do.
23  Q.      Okay.  What's the basis for your knowledge?
24  A.      I am the individual that has tried to come to a
25  commercial agreement with Qualcomm over access to █

Page 19

1   Q.      Okay.
2   A.      █████████████████████.
3   Q.      Do you have any knowledge of ██████████████
4   ███████████ with other partners besides Qualcomm?
5   A.      █████████████████ discussions with other
6   individuals over and above -- other than Qualcomm?
7   Q.      Yes.
8   A.      I don't -- not to my recollection.
9   Q.      Okay.
10          THE REPORTER:  There's a phone near someone's
11  mic that is --
12          THE DEPONENT:  It's not -- not me.
13          MS. MORGAN:  Mine is all the way over here.
14          THE REPORTER:  It's in there, so.
15          MS. MORGAN:  Do you want to -- I mean, like, you
16  can put my phone away.  I don't know if that will make a
17  difference.
18          THE DEPONENT:  Just double-check the question.
19  You said ████ specific license discussions?
20          MS. MORGAN:  Yes.
21          THE DEPONENT:  Can you repeat the question.
22  BY MS. MORGAN:
23  Q.      Yeah.  Do you have knowledge of ████████████
24  ██████████ with other partners besides Qualcomm?
25  A.      Not ██████████████████.

Page 20

1   Q.      Okay.  What's the distinction that you're
2   drawing when you say not ████████████████████
3   ███████████████?
4   A.      I'm just asking -- answering your question.  So
5   the question was, do I have knowledge of ████████████
6   ████████████  Have I personally been involved in ██
7   ██████████████████
8   Q.      Right.
9   A.      And the answer is no.
10  Q.      Have you been involved in any discussions with
11  other partners where ███████████
12          MR. McELLRATH:  Object to form.
13          THE DEPONENT:  So I'm thinking because most of
14  our discussions that I have been involved in is
15  version -- it is not version specific.  Right?  There
16  may be a discussion around ████████████████████
17  --
18          MS. MORGAN:  Mm-hmm.
19          THE DEPONENT:  -- that remained.
20  BY MS. MORGAN:
21  Q.      I see.
22          What other partners have you been involved in
23  discussions with regarding ████████████████████████
24  ████████████████?
25          MR. McELLRATH:  Object to form.

Page 21

1           THE DEPONENT:  ███████████████████████████.
2   BY MS. MORGAN:
3   Q.      Anyone else?
4   A.      Not that I recall right now.
5   Q.      Okay.  Is ████████████████████?
6   A.      ████████████████.
7   Q.      ████████████████████████████████
8   ████████████████████████████████
9   ████████████████████████████
10  ████████████████████████████████
11  ████████████████████████████████
12  ████████████████████████████████
13  ████████████████████████████████
14  ████████████████████████████
15  ████████████████████████████████
16  ████████████████████████████
17  ████████████████████████████████
18  ████████████████████████████████
19  ████████████████████████████████
20  ████████████████████████
21  ████████████████████████████████
22  ████████████████████████████████
23  ████████████████████████████████
24  Q.      Okay.  Do you know when V9 was available to
25  partners?

6 (Pages 18 - 21)



Page 22

1  A.    Several years ago.  Again, again, I can't tell
2  you specifically when it was first made available.
3  Q.

Page 23

1  Q.    Is Richard Grisenthwaite the head of the
2  architecture group?
3  A.    He is.
4  Q.    Who else in the architecture group would be
5  involved in making those decisions?
6  A.    His team.  But he's the main point of contact
7  for me.
8  Q.    So people who work under him?
9  A.    Yes.
10  Q.

14        MR. McELLRATH:  Objection.  Foundation.
15  BY MS. MORGAN:
16  Q.

24        MR. McELLRATH:  Objection.  Foundation.
25        THE DEPONENT:  I've never thought about it that

Page 24

1  way.
2  BY MS. MORGAN:
3  Q.    Are there commercial factors that are considered
4  as part of that decision, to your knowledge?
5        MR. McELLRATH:  Objection.  Foundation.
6        THE DEPONENT:  Again, I have never had a
7  discussion with -- and, again, I'm -- I'm the chief
8  commercial officer.  No one --
9  BY MS. MORGAN:
10  Q.    That's why I'm asking you.
11  A.

Page 25

1

21  Q.    You mentioned discussions with
22            .  Has ARM made any offers
24        MR. McELLRATH:  Objection.  Form.
25        THE DEPONENT:  Can you repeat the question

7 (Pages 22 - 25)

Page 26

1  again.
2  BY MS. MORGAN:
3  Q.    Yeah.  It was not a good question.
4        Has ARM -- has ARM made any offers or proposals
5  to license to any partner a █████████████████?
6  A.    We have -- we have broad proposals --
7  Q.    Mm-hmm.
8  A.    -- that span multiple dimensions of architecture
9  engagements with different partners.
10 Q.    Which partners?
11 A.    So again, the proposals that I've been involved
12 in are the ones that I've just mentioned, █████████
13 ████████████
14 Q.    Putting aside the ones that you've been involved
15 in, are you aware of any others?
16 A.    Not that I'm qualified to comment on, because I
17 have not been involved.  Cursory knowledge, but, you
18 know, to go on the record, I've got to know what I'm
19 talking about, and so they're the ones that I'm
20 intimately aware of.
21 Q.    Right.  But when you say cursory knowledge,
22 what's your cursory knowledge of the other discussions?
23 A.    We have about ██ licensees to the architecture.
24 I am -- perhaps beyond the ███ that I am knowledgeable
25 of, there may be broader agreements already in place.

Page 27

1  Again, I can't sit here and tell you with absolute
2  clarity that I know intimate knowledge of all ████
3  Q.    Okay.  Earlier, you said you have broad
4  proposals with different partners that span multiple
5  dimensions of architecture engagements.
6  A.    We have made broad proposals.
7  Q.    You've made broad proposals.  So this goes to my
8  question.
9  ████████████████████████████████████████████
10 ████████████████████████████████████████████?
11 A.    The --
12       MR. McELLRATH:  Object to form.
13       THE DEPONENT:  -- ███ that I'm comfortable with
14 and knowledgeable of are the ███ that I've already said
15 that I was involved in.
16       MS. MORGAN:  Mm-hmm.
17       THE DEPONENT:  And so those are broad.
18 BY MS. MORGAN:
19 Q.    Mm-hmm.  █████████████████████████████
20 █████████████████████████████████████████████
21 ███████████████████████████████████████████
22 ███████████████████████?
23       MR. McELLRATH:  Object to form.
24       THE DEPONENT:  Can you repeat the question
25 again.

Page 28

1  BY MS. MORGAN:
2  Q.    Yeah.  ████████████████████████████████
3  █████████████████████████████████████████████
4  ████████████████████████████████?
5        MR. McELLRATH:  Object to form.
6        THE DEPONENT:  ██████████████████████████
7  █████████████████████████████████████████
8  ████████████████████
9  BY MS. MORGAN:
10 Q.    Okay.  ██████████████████████████████████
11 ███████████████████████████████████████
12 ████████████████?
13 A.    ███████████████████████████████████████
14 ████████████████.
15 Q.    ██████████████████████████████████████
16 ███████████████████████████████████████?
17 A.    ██████████████████████████████████.  I
18 would have to have a look -- you know, the agreement's
19 not in front of me, and so I'd have to be -- it would
20 have to be in front of me for me to remember, recollect,
21 and be very specific.
22 Q.    You would have to see the agreements with the
23 third parties in order to answer questions about those
24 relationships?
25 A.    Yes.

Page 29

1  Q.    I understand.  Is there a standard process that
2  ARM follows ██████████████████████████████████
3  ██████████████████████████?
4        MR. McELLRATH:  Object to form.
5        THE DEPONENT:  You know, there's no rule book
6  that says it's these ten steps.  I am not aware of a
7  standard, a standard per se.  But fundamentally, if
8  somebody comes to us and says, I want access to this
9  version of the architecture, the typical response would
10 be ████████████████████████████████████████████.
11 So at a point to which ████████████████, we can
12 then have a technical and commercial discussion around
13 ██████████████████████████████████████.
14 BY MS. MORGAN:
15 Q.    Okay.  Is there standard information that you
16 expect a partner to provide to you when they ask for
17 access to a version of the architecture?
18 A.    Oh, absolutely.
19 Q.    What's the information that you ask for?
20 A.    Well, I think -- I think more broadly, if a
21 partner asks for access to the architecture, in other
22 words, I would want -- I want to license an architecture
23 from -- from you, ARM, we would seek to understand, is
24 this product the right fit for the partner.  So there
25 would be a technical conversation around capabilities

8 (Pages 26 - 29)



Page 62

1  Q.    You can take a second and flip through it if you
2  want, but I'm going to ask questions just about
3  section █.
4  A.    Okay.
5  Q.    Which is on page 13 of the PDF, and the end
6  Bates is 1330.
7  A.    You said section █?
8  Q.    Section █ is titled ██████████
9        Do you see that?
10  A.    I do, yes.
11  Q.    Okay.
12  A.    Just about.  The font is incredibly small.
13  Q.    Yeah, it is very, very tiny.
14  A.    We have to do a better job.
15  Q.    I will say, this was produced by ARM, but
16  everybody's version of this contract is tiny, so.
17  A.    Incredible.
18  Q.    So no one can really improve it, I don't think.
19        Okay.  Are you familiar with this provision?
20  A.    I wouldn't say I'm familiar with it.  I would
21  have to read it.
22  Q.    Sure.  Have you seen it before, do you think?
23  A.    Vaguely, yeah.  I think I've seen -- I think I
24  have seen this before, yeah.
25  Q.    I will give you a second to read it.  Just let

Page 63

1  me know when you're done.  I'm just going to ask you
2  about ██████████ so I don't -- you know, you're
3  welcome to read the whole provision, but I'm not going
4  to ask about ██████████.
5  A.    Yep.  Okay.
6  Q.    Okay.  Now, that you've read it, do you think
7  that you've seen this before?
8  A.    Not necessarily in this form, but I have -- I
9  have seen this before, but a long time ago.  I can't
10  remember exactly.
11  Q.    You're familiar with this obligation?
12  A.    I am, yes.
13  Q.    Have you discussed this with anyone who
14  negotiated it?
15  A.    No.
16  Q.    Okay.  And you did not negotiate it, right?
17  A.    Well, I did not negotiate it, and to be candid,
18  I don't know who negotiated it.  So I may have had a
19  conversation with someone who negotiated it without me,
20  knowing that they negotiated it.
21  Q.    Fair -- fair enough.  Okay.  At the top of this
22  provision, it says:
23  ██████████████████████
   ██████████████████
25        Do you see that?

Page 64

1  A.    I do, yes.
2  Q.    Okay.  And then under █, it says:
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
13        Do you see where I am?
14        THE DEPONENT:  Yeah.  Yeah.
15  BY MS. MORGAN:
16  Q.    Okay.  The ██████████████████,
18  right?
19  A.    That's correct, yes.
20  Q.    Okay.  So this provision is about ██████
21  ██████████████?
22  A.    That's correct, yes.
23  Q.    Okay.  And, again, the licensee here is
24  Qualcomm?
25  A.    Yes, that's correct.

Page 65

1  Q.    So the first obligation that's listed here under
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
11        Do you see that?
12  A.    I do, yes.
13  Q.    Okay.  To your knowledge, has ARM ever
██████████████████████
██████████?
17  A.    Yes.
18  Q.    Okay.  In what circumstances does ARM do that?
19  A.    ██████████████████████
21  Q.    Okay.  ██████████████
23  A.    It --
24        MR. McELLRATH:  Object to form.
25        THE DEPONENT:  You ask some really hard

17 (Pages 62 - 65)

Page 66

1  questions.  I -- I don't --

3        MS. MORGAN:  Mm-hmm.
4        THE DEPONENT:  Given the circumstances.
5  BY MS. MORGAN:
6  Q.     I'll ask a different question, maybe that's a
7  little easier.
8        How quickly does ARM
?
11 A.

14 Q.     Okay.
15 A.

Page 67

10        MS. MORGAN:  Mm-hmm.
11        THE DEPONENT:  --

21        MS. MORGAN:  Mm-hmm.
22        THE DEPONENT:  --

Page 68

2  BY MS. MORGAN:
3  Q.     I see.  Okay.  So is the licensing team led by
4  Karthik Shivashankar?
5  A.     No.
6  Q.     Okay.  Who is the lead on the licensing team?
7  A.     Today that individual is Andy Howard.
8  Q.     Okay.  Do you know --
9  A.     Just a -- what was the question again?  Does
10 Karthik.
11 Q.     Is Karthik the leader of the licensing team?
12 A.     Okay.
13 Q.     Is he on the licensing team?
14 A.     He is the -- he is on the licensing team.
15 Q.     I thought so.
16 A.     But he is not the leader.
17 Q.     He is not the leader?
18 A.     He leads a team, but he is not the leader.
19 Q.     Okay.  And he participants in licensing
20 analysis?
21 A.     He does, yeah.
22 Q.     Yeah.  That's really -- that's really just for
23 my own edification.  That's what I thought I remembered,
24 because I deposed him in December of 2023.
25 A.     Yeah, he's one of many in the licensing team.

Page 69

1  Q.     Okay.

3  A.

8  Q.     Mm-hmm.
9  A.

13        That's what they do.
14 Q.

18 A.
19 Q.

22 A.
23        MR. McELLRATH:  Object to foundation.
24        THE DEPONENT:



18 (Pages 66 - 69)



Page 70

7 BY MS. MORGAN:
8 Q.    So if I wanted to verify that

13 A.    I'm sorry.  Repeat that question again.
14 Q.

19       MR. McELLRATH:  Object to form.
20       THE DEPONENT:

24 BY MS. MORGAN:
25 Q.

Page 71

1
2 A.
3 Q.

5 A.

9 Q.

12 A.
13 Q.

17 A.

23 Q.    Mm-hmm.
24 A.

Page 72

1

3 Q.    I see.  So you view it as part of your job to
4 ensure that you are in the --

6 A.

8 Q.    Okay.  Let's look at ▮, which is the next part
9 of this provision.  Sorry to make you get the glasses
10 out again.
11 A.    It's okay.  It's okay.
12 Q.    It just follows where there's the parenthetical
13 that said
14 A.    Just bear with me.  I find -- I can't quite find
15 it.
16 Q.    It's, like, one, two, three, four, five, six --
17 A.    Yeah, I've got it.
18 Q.    Yeah.  Okay.
19 A.    Previous -- yeah.
20 Q.    So this is the rest of the obligation.  It says
21 that:
22

Page 73

10       Do you see that?
11 A.    I do, yes.
12 Q.    Okay.

15 A.
16 Q.    Okay.

21       MR. McELLRATH:  Object to form.
22       THE VIDEOGRAPHER:  Counsel, excuse me.
23 Can you just slide your microphone up a little
24 bit.
25       MS. MORGAN:  Oh, sure.

19 (Pages 70 - 73)



Page 74

```
1        THE VIDEOGRAPHER:  No not yours, his.
2     There you go.  Thank you.
3        MS. MORGAN:  It's almost always me that has a
4     problem.
5        THE DEPONENT:  Yes.
6  BY MS. MORGAN:
7     Q.    Okay.
10    A.
11    Q.    Okay.
13    A.
14       MR. McELLRATH:  Objection.  Foundation.
15       THE DEPONENT:  Y
17  BY MS. MORGAN:
18    Q.    Let me ask it a different way.
19
22    A.
23    Q.    Okay.  And you have --
24    A.
```

Page 75

```
5     Q.    Okay.
8     A.
12    Q.
15       MR. McELLRATH:  Objection.  Form.
16       THE DEPONENT:
17  BY MS. MORGAN:
18    Q.    Yeah.  Does -- Qualcomm sometimes licenses other
19  types of technology that are not cores but that are used
20  in conjunction with cores.  Is that right?
21    A.    Most of my involvement of being -- with respect
22  to this provision has been for cores.  I have to have
23  another look at it to see whether it's applicable to
24  peripheral IP.
25    Q.    Okay.  I'll show you something later.  We can
```

Page 76

```
1   talk about that.
2     A.    Okay.
3     Q.    I think you said that this is referred -- oh.
4        Are you familiar with something called systems
5   IP?  Is that a better term than peripheral IP?
6     A.    Yeah, I'm familiar.
7        MR. McELLRATH:  Object to form.
8   BY MS. MORGAN:
9     Q.    Is systems IP something that's licensed under
10  the TLA?
11       MS. MORGAN:  Thank you.
12       MR. McELLRATH:  Objection.  Form.  Foundation.
13       THE DEPONENT:  Repeat the question again,
14  please.
15  BY MS. MORGAN:
16    Q.    Yeah.  Is systems IP something that's licensed
17  under the TLA?
18       MR. McELLRATH:  Same objections.
19       THE DEPONENT:  Generally, I think so, yes.
20  BY MS. MORGAN:
21    Q.    Do you know if ARM
24       MR. McELLRATH:  Objection.  Foundation.
25       THE DEPONENT:
```

Page 77

```
1
2        MS. MORGAN:  Mm-hmm.
3        THE DEPONENT:
6        MS. MORGAN:  Okay.
7        THE DEPONENT:
9        MS. MORGAN:  All right.  Let's go ahead, you can
10  put that aside.
11       THE DEPONENT:  Okay.
12       MS. MORGAN:  I'm going to show you another
13  document.
14  BY MS. MORGAN:
15    Q.
17    A.
18    Q.
20    A.
22    Q.    What other customers?
23    A.            comes to mind.
24
```

20 (Pages 74 - 77)

# Exhibit 52

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

   _____

4                                   )

   QUALCOMM INCORPORATED a          )

5   Delaware corporation,            )

   QUALCOMM TECHNOLOGIES, INC., )

6   a Delaware corporation,          )

                                    )

7          Plaintiffs,              )

   vs.                              ) No. 24-490-MN

8                                   )

   ARM HOLDINGS PLC, f/k/a ARM  )

9   LTD., a U.K. corporation,       )

                                    )

10          Defendant.              )

   _____)

11

12

13

14

15    *** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

16          *** ATTORNEYS' EYES ONLY ***

17      VIDEOTAPED DEPOSITION OF LYNN COUILLARD

18              Costa Mesa, California

19              Thursday, July 3, 2025

20                   Volume I

21

22   Stenographically Reported By:

   Melissa M. Villagran, RPR

23   CSR No. 12543

24   Job No. 7452746

25   PAGES 1 - 177

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1  Q  Okay.
2     So your title changed in July 2024?
3  A  Yes.
4  Q  To VP of Strategic Alliances?
5  A  Correct.
6  Q  And did you take on any new responsibilities
7  as part of that?
8  A  My responsibilities changed.  So not only new
9  but different altogether.
10  Q  So can you explain what your new
11  responsibilities are?
12  A  Sure.
13     I have four customers -- ████████████
14  ███████████████████t -- and I have two salespeople
15  that report to me.
16  Q  And so in July of 2024, you became
17  responsible for███████████████████████;
18  is that correct?
19  A  To add just some clarity, I didn't take over
20  █████ as a responsibility until October -- beginning
21  of October of '24, but the other ones, yes, in about
22  the end of July.
23  Q  And prior to taking on -- strike that.
24     Prior to July of 2024, what were your
25  responsibilities as VP of Sales?

Page 15

1  A  All North America accounts, and had a team of
2  people that worked on those accounts, all accounts,
3  with the exception of those four that I listed off,
4  in North America.
5  Q  So prior to July of -- strike that.
6     When did you become VP of Sales?
7  A  For North America?
8  Q  Yes.
9  A  I believe July of 2022.
10  Q  And, again, what were your responsibilities
11  from 2022 to July of 2024?
12  A  All North American accounts -- sales for all
13  North American accounts, with the exception of
14  ██████████████████████.
15  Q  And was Qualcomm one of your accounts?
16  A  Yes.  That fall within the North America
17  territory, yes.
18  Q  And then in July of 2024, your
19  responsibilities shifted.  So then you became
20  responsible for████████████████████████
21  ████████████████████████████████████?
22  A  Yes.
23  Q  And what -- can you give me an overview of
24  what your responsibilities are with respect to these
25  four accounts,████████████████████████?

Page 16

1  A  Sure.
2     Sales to those four accounts, so responsible
3  for selling Arm products into those accounts.  And I
4  have two salespeople that work for me that call on
5  those accounts directly.  They -- you know, I manage
6  their activities.
7  Q  And who are those salespeople?
8  A  Eric Shieh and Christopher Gentile.
9  Q  And do you have any responsibility for the
10  Qualcomm account after July of 2024?
11  A  No.
12  Q  All right.  I'm going to mark as Exhibit 117
13  the Qualcomm ALA, which is Bates stamped 00055357.
14     (Exhibit 117 was marked for
15     identification and is attached
16     hereto.)
17  BY MS. ZAPPALA:
18  Q  Do you recognize Exhibit 117 which is the
19  Qualcomm ALA from 2013?
20  A  Yes.
21  Q  You were not involved in the drafting of this
22  agreement, correct?
23  A  Correct.
24  Q  So how are you familiar with this agreement?
25  A  This would be something that we would have

Page 17

1  had as -- as the Qualcomm partner manager, I had
2  access to these documents.  And if there were ever
3  any questions from the customer on any technical
4  issues or licensing, I could have reviewed these
5  documents, this along with the TLA, in reference to
6  any questions, to help solve any problems.
7  Q  And can you tell me the years in which you
8  were responsible for the Qualcomm account?
9  A  Sure.
10     Directly responsible, in that I was the
11  account manager from July 2018 until July of 2022.
12     And then when I moved to the VP of North
13  America role, Qualcomm fell under my purview and
14  there was -- but it was two -- I was two folks
15  removed from that, so there was a person that called
16  on -- that took my old role, and then there was
17  another manager in between that person and myself.
18  Q  And there is -- I will mark Exhibit 118 the
19  ████████████████████ which is Bates stamped
20  QCARM_0343120.
21     (Exhibit 118 was marked for
22     identification and is attached
23     hereto.)
24  BY MS. ZAPPALA:
25  Q  Have you seen this -- ████████████████

5 (Pages 14 - 17)

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 18

1  ███ before?
2  A  Yes, it looks familiar.  I'm not -- I don't
3  know all the details of it, but, yes, it looks
4  familiar.
5  Q  So this is the ████████████
   ████████, correct?
7  MR. KRAMER:  Objection to form.
8  THE DEPONENT:  It looks like it, yes.
9  BY MS. ZAPPALA:
10  Q  And then I'm going to mark as Exhibit 119 a
11  document Bates stamped QCARM_0338573 which is the ███
   ████████████████.
13  (Exhibit 119 was marked for
14  identification and is attached
15  hereto.)
16  BY MS. ZAPPALA:
17  Q  Ms. Couillard, have you previously seen the
18  ████████████████ to the ALA which is
19  Exhibit 119?
20  A  I don't recall seeing this specific document,
21  no.
22  Q  Okay.
23  Are you familiar -- strike that.
24  Do you understand that Qualcomm had a license
25  to something called the ████████████?

Page 19

1  A  Yes.
2  Q  So I want to turn your attention to Section 1
3  of Exhibit 119, which is Bates stamped 574.  Look at
4  the top.
5  Do you see something called ████████
   ████████?
7  A  Yes.
8  Q  And do you see it says (as read):
   █
   █         ████████████
   █  ████████████████████
   █
   █  ████████████████████████
   █
   █  ████████████████
15  Do you see that?
16  A  Yes.
17  Q  Do you understand that ████████ is a term
18  that is defined in the ALA, correct?
19  A  I don't know that for sure.
20  Q  That's what the document says, though, right?
21  MR. KRAMER:  Objection to form.  Calls for a
22  legal conclusion.
23  BY MS. ZAPPALA:
24  Q  Do you see that this document says that (as
25  read):

Page 20

   █       ████████████████████
   █  ████████████████████████
   █
   █  ████████████████████████████
5  Do you see that?
6  A  Yes.
7  Q  And then let's go back to Exhibit 117,
8  please.
9  This is the Qualcomm ALA?
10  A  Yes.
11  Q  Then I want to direct your attention to the
12  page that ends in Bates Stamp 5360.
13  And do you see there is a Section ███ at the
14  top?
15  A  Yes.
16  Q  And do you see it contains a definition of
17  ████?
18  A  Yes.
19  Q  Have you ever reviewed this definition of ████
20  ████ in Section ███?
21  A  I don't recall reviewing it, specifically.
22  Q  You don't have any recollection of reviewing
23  the definition of ████████ in the Qualcomm ALA?
24  A  No, I don't recall reading these details.
25  No.

Page 21

1  Q  You are aware that Qualcomm has a license to
2  the V9 Arm architecture, correct?
3  A  Yes.  Yes.
4  Q  And you were involved in the negotiation
5  between Arm and Qualcomm for the V9 architecture,
6  correct?
7  A  No.
8  Q  You were not?
9  A  No.
10  MS. ZAPPALA:  Can I have Tab 10.
11  BY MS. ZAPPALA:
12  Q  I'm going to mark as Exhibit 120 an e-mail
13  from Ms. Couillard to Brett Bettesworth from
14  December 4, 2019, that is Bates stamped
15  QCVARM_0712363.
16  And then I'm going to mark as Exhibit 121 the
17  attachment to that e-mail which is at Bates stamp
18  QCVARM_0712364.
19  (Exhibit 120 was marked for
20  identification and is attached
21  hereto.)
22  (Exhibit 121 was marked for
23  identification and is attached
24  hereto.)
25  (Discussion was held off the record.)

6 (Pages 18 - 21)

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 146

1   Q  I want to direct your attention to the fourth
2  paragraph in this e-mail.  Ms. Webster writes (as
3  read):
4  ▮
5  ▮
6  ▮
7  ▮
8  ▮
9  ▮
10      Do you see that?
11  A  I do.
12  Q  Do you have an understanding of what ▮
13  ▮ refers to?
14  A  ▮, I believe.
15  Q  And do you have an understanding of how
16  ▮?
17  A  ▮
18  Q  Do you have an understanding of whether
19  ▮
20  ▮
21      MR. KRAMER:  Objection to form.  Vague.
22      THE DEPONENT:  Sorry.  Can you repeat that.
23  BY MS. ZAPPALA:
24  Q  Sure.
25  ▮

Page 147

1  ▮
2  ▮
3      MR. KRAMER:  Same objection.
4      THE DEPONENT:  ▮
5      MS. ZAPPALA:  I'm going to mark as
6  Exhibit 146 a document entitled "▮
7  ▮,
8  Bates numbered QCVARM_0526828.
9      (Exhibit 146 was marked for
10      identification and is attached
11      hereto.)
12  BY MS. ZAPPALA:
13  Q  Ms. Couillard, have you ever seen the
14  document that's been Bates marked (indecipherable)
15  before?
16  A  No.
17  Q  If you have any -- if you turn to the page
18  that ends in Bates No. 829, do you see there's
19  various IP listed here?
20  A  I do.  I do see that.
21  Q  Were you involved in any discussions
22  regarding the license fees and royalty rates
23  reflected on this page?
24  A  No.
25  Q  You can put that to the side.

Page 148

1      Are you familiar with the concept of a ▮ in
2  Qualcomm TRA agreement?
3  A  I am familiar that -- ▮
4  ▮
5  ▮
6  Q  How -- what are the basis for your
7  understanding that ▮ in the TLA?
8  A  ▮
9  ▮
10  ▮
11  ▮
12  ▮
13  ▮
14  ▮
15  ▮
16  Q  If you can recall, what is the last Qualcomm
17  deal you worked on that ▮?
18      MR. KRAMER:  Objection to form.  Lacks
19  foundation.
20      THE DEPONENT:  ▮
21  ▮
22  ▮
23  ▮
24  ▮
25      ///

Page 149

1  BY MS. ZAPPALA:
2  Q  You moved off the Qualcomm account --
3      When did you move off of the Qualcomm
4  account?
5      COURT REPORTER:  When did you what?
6      MS. ZAPPALA:  Move off of the Qualcomm
7  account.
8      THE DEPONENT:  July 2022.
9  BY MS. ZAPPALA:
10  Q  So did you have any ▮
11  discussion related to Qualcomm after July of 2022?
12  A  ▮
13  Q  And prior to July of 2022, do you recall the
14  last agreement between Arm and Qualcomm that
15  ▮?
16      MR. KRAMER:  Objection to form.  Lacks
17  foundation.
18      THE DEPONENT:  ▮
19  ▮
20  ▮
21  ▮
22  ▮
23  ▮
24  BY MS. ZAPPALA:
25  Q  Let me ask a more precise question.

38 (Pages 146 - 149)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

1    Do you remember which the last IP at issue is?
2    COURT REPORTER:  I don't understand.
3 BY MS. ZAPPALA:
4    Q  Do you recall the last IP at issue for which
5    ██████████ -- strike that.
6    Do you recall the last IP that Qualcomm
7 acquired from Arm prior to you getting off of the
8 Qualcomm account?
9    A  No, I don't.
10   Q  And while you have an understanding that
11   ██████████ in the TLA, you don't know precisely
12   ██████████; is that correct?
13   A  ██████████
14   Q  And you've never been involved in ██████████
15   ████████████████████
16 correct?
17   A  ██████████
18   MS. ZAPPALA:  Why don't we take a break.
19   MR. KRAMER:  Okay.  Off the record.
20   THE VIDEOGRAPHER:  We are off the record.
21 The time is 3:07 p.m.
22   (Recess.)
23   THE VIDEOGRAPHER:  We are on the record.  The
24 time is 3:33 p.m.
25   ///

Page 151

1 BY MS. ZAPPALA:
2    Q  Ms. Couillard, I just wanted to clarify on
3 one thing that you testified about earlier.
4    Earlier you testified that Arm's business
5 involves licensing and selling silicon.
6    Do you remember that?
7    A  Yes.
8    Q  Is there anything else that Arm's business
9 involves?
10   MR. KRAMER:  Objection to form.
11   THE DEPONENT:  I can't think of anything.
12 BY MS. ZAPPALA:
13   Q  So you would describe Arm's business as
14 involving licensing and the sale of silicon, right?
15   MR. KRAMER:  Objection to form.
16   THE DEPONENT:  We have -- yes, we have
17 entered into those types of agreements, yes.
18   MS. ZAPPALA:  I want to mark as
19 Exhibit 146 --
20   COURT REPORTER:  147.
21   MS. ZAPPALA:  147 an e-mail Bates stamped
22 QCVARM_0608501.
23   (Exhibit 147 was marked for
24   identification and is attached
25   hereto.)

Page 152

1 BY MS. ZAPPALA:
2    Q  This is an e-mail from a Karl Whealton to
3 Jonathan Weiser at Qualcomm, dated September 25,
4 2022.  You are not on the top e-mail, but you are on
5 the e-mail starting -- on the e-mail chain starting
6 halfway down the first page.
7    Do you see that?
8    A  Yes.
9    Q  And do you recall the e-mail chain reflected
10 in this exhibit?
11   A  I don't recall it, but I don't -- it looks
12 like I received it.
13   Q  You participated in these e-mails, you just
14 don't remember them?
15   A  Correct.
16   Q  If you go to the last -- sorry, the first
17 e-mail on the page ending in Bates Stamp 503,
18 there's an e-mail from you to Mr. Gupta, dated
19 November 30, 2021.
20   Do you see that?
21   A  Yes.
22   Q  And you write (as read):
23   "Hello, Rajiv.  Thank you for your
24   interest in ██████████████████
25   ██████████ and for your patience while

Page 153

1    the Arm team reviewed the request for
2    quote, your proposal, and our
3    response."
4    Do you see that?
5    A  I do.
6    Q  And if you go to the bottom, do you see you
7 write (as read):
8    "For your review, we provide here
9    our quote for ██████████████████
10   ██████████
11   Do you see that?
12   A  I do.
13   Q  And then there appears to be a quote that
14 involved a ██████████████████ under that.
15   Do you see that?
16   A  I do.
17   Q  Were you involved in the development of the
18 ████████████████████████████,
19   ██████████ reflected here?
20   MR. KRAMER:  Objection to form.
21   THE DEPONENT:  I don't remember being
22 involved in it.
23 BY MS. ZAPPALA:
24   Q  And then if you see the royalty rates on the
25 next page, the royalty rates listed for ██████████

39 (Pages 150 - 153)

# Exhibit 53

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF DELAWARE

4    ----------------------------------x

5    QUALCOMM INCORPORATED, a Delaware
     corporation, QUALCOMM TECHNOLOGIES,

6    INC., a Delaware corporation,

7                          Plaintiffs,

8        -against-        C.A. No. 24-49-MN

9    ARM HOLDINGS PLC, f/k/a ARM LTD.,
     a U.K. corporation,

10

                         Defendant.

11

     ----------------------------------x

12

              HIGHLY CONFIDENTIAL

13            ATTORNEYS' EYES ONLY

14

        REMOTE VIDEOTAPED DEPOSITION OF

15             EHAB YOUSEFF
             Palo Alto, California

16            June 26, 2025

17

18

     Reported By:

19

     ERIC J. FINZ

20

21

22

23

24

25



Page 58

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    identified as, which would be the
3    content of the document.  I'm
4    asking if such a privileged
5    document would exist.
6          MR. EMERICK:  Instruction not
7    to answer.  You're asking about is
8    there a privileged document with a
9    certain content.
10 BY DESAI:
11    Q.   Are you going to follow your
12 attorney's instruction?
13    A.   Yes.
14    Q.   All right.
15          Do you understand that
16    ███████████████████████████
18    A.   Yes.
19          MR. DESAI:  Why don't we pull
20 up tab 25.
21          THE WITNESS:  Did you say tab
22 25?  A new exhibit, correct?
23          MR. DESAI:  It should be
24 showing up.  We're going to mark it
25 as Exhibit 5.

Page 59

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2          (Youseff Exhibit 5 for
3    identification, letter dated
4    September 27, 2024, production
5    numbers QCVARM_0573671 through
6    QCVARM_0573673.)
7          THE WITNESS:  We can see it.
8 BY DESAI:
9    Q.   And if you skip to -- sorry.
10          MR. DESAI:  For the record,
11    the beginning Bates number of this
12    is QCVARM_0573671.
13    Q.   I'd like you to skip to the
14 next page that ends in 72.
15          Do you see that?
16    A.   I see the second page, yes.
17    Q.   Okay.  And this is a September
18 20, 2024 letter from Qualcomm to a
19 Spencer Collins at Arm.  Correct?
20    A.   That's what it says, yes.
21    Q.   And do you know Mr. Collins?
22    A.   Yes.
23    Q.   And do you report to
24 Mr. Collins?
25    A.   Yes.

Page 60

EHAB YOUSSEF - HIGHLY CONFIDENTIAL
1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    Q.   Okay.  And you can see in the
3 second paragraph, that Qualcomm is
4 notifying Arm that it ████████████
   █████████████████████████████████
   ███████████████████████  Is that
7 right?
8    A.   That's what the letter says,
9 yes.
10    Q.   And you understand that Arm
   ████████████████████████████████
   ████████████████████████████████
   ████████  Is that right?
14    A.   ████████████████████████████
   ████████████████████████████████
   ████████████████████████████████
   █████████
18    Q.   Okay.
19          MR. DESAI:  Why don't we pull
20 up that ████████████████████████,
21 sorry.  Tab 27.
22          (Youseff Exhibit 6 for
23    identification, Qualcomm IP
24    Extension Offer, production numbers
25    QCVARM_0526828 through

Page 61

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    QCVARM_0526830.)
3          MR. DESAI:  Are you there?
4          THE WITNESS:  Yes, we're
5    there.
6          MR. DESAI:  Okay.  So we're
7    going to mark this as Exhibit 6.
8    For the record, it is a document
9    labeled QCVARM_0526828.
10 BY DESAI:
11    Q.   Have you seen this document
12 before?
13    A.   Yes.
14    Q.   And you reviewed this as part
15 of your 30(b)(6) preparation?
16    A.   Yes.
17    Q.   And this is an ████████████
18 document reflecting an ████████████
   ████████████████████████████████
   ████████████████████████████████
   ████████████  Correct?
22    A.   ██████████████████████████
   ████████████████████████████████
   █████████████
25    Q.   And in preparing this offer,

16 (Pages 58 - 61)

Page 62

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    did Arm ███████████████████
█    █████████████████████?
5          MR. EMERICK:  Objection; form.
6       A.   ████████████████████
7    ████████████████████
█    ████████████████
9       Q.   ███████
10      A.   ████████████
█    ████████████████
█    ████████████████████
█    ████████████████
█    ████████████████
█    ████████████████
█    ████████████████
█    ████████████████
█    ████████████████████
█    ████████████████
25      And those are the

Page 63

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    nonprivileged portion.
3       Q.   ███████████████
█    ████████████████████
█    ████████████████
█    ████████████
7       A.   ████████████████
█    ████████████████████
█    ████████████████████
11      Q.   Just to be clear, Arm's
12   position is that there are no
13   nonprivileged documents that ███████
█    ████████████████████
█    ████████████████   Is that
17   correct?
18         MR. EMERICK:  Objection; form.
19      A.   To the best of my knowledge, I
20   don't have any factual knowledge of
21   nonprivileged documents regarding
█    ████████████████████
24      Q.   What was the ████████
█    ████   that was identified as part of the

Page 64

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    ████████████████████
█    ████████?
4          MR. EMERICK:  Objection.
5    Objection; form.
6       A.   I'm going to clarify before I
7    answer that question.
8       Q.   Sure.
9       A.   I'm going to use first the
10   definition ████████, to be
11   clear.  So when you say who was the
12   ████████████ or what was the
13   ████████████, the answer for the
14   definition is ████████
15      Q.   And is that with respect to
16   ████████████████████
█    ████████?
18      A.   With respect to the
19   definition, ████████████████
█    ████████████████
█    ████████████████████
23      Q.   What was the date of the
24   ████████   deal?
25      A.   Sorry, I have to have that in

Page 65

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    front of me.  I don't recall that.
3          MR. DESAI:  Counsel, I'm just
4    confirming, if this particular
5    ████████   deal hasn't be been
6    produced, we ask that it be
7    produced.  I don't know off the top
8    of my head if it has.  I just make
9    that request now.
10         (Request for production.)
11         MR. EMERICK:  Request
12   received.
13   BY DESAI:
14      Q.   And so is it Arm's position
15   that the license offer in Exhibit 5 --
16   sorry, Exhibit 6, for ████████████
█    ████████████████████
█    ██?
20      A.   I'm going to ask you to repeat
21   that, please.
22      Q.   Okay.  We'll break it into
23   pieces here.
24      I believe you've testified now
25   that the ████████████   that was

17 (Pages 62 - 65)



Page 98

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2      Q.   That's right.
3      A.   And the answer is yes.
4      Q.   Okay.  And what is the reason
5    why Qualcomm -- sorry.
6         What is the reason that Arm
7    ███████████████████████████████
8    ███████████████████████████?
9      A.   I'll answer it this way:  ███

Page 99

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
6      Q.   Where does -- let's go back to
7    the ███████████████.  That's Exhibit
8    6.  Are you there?
9      A.   Almost there.  Yes, I'm there.
10     Q.   Where does this offer make
11   clear that the ███████████████████
12   ███████████████████?
13     A.   Okay, if you look at -- let's
14   see, the last page.
15     Q.   Okay.
16     A.   There is a set of general
17   terms.
18     Q.   Yes.
19     A.   And you'll see some ████

Page 100

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
3      Q.   Okay.  Going back to the
4    █████████████.  The sole reason for
5    ████████████████████████████
6    ████████████████████████████████
7    ███████████████████████████████████
8    ████████ Correct?
11         MR. EMERICK:  Objection; form.
12     A.   No.  I didn't say that's the
13   sole reason.
14     Q.   What are the other reasons
15   then?
16     A.   ████████████████████████

Page 101

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
8      Q.   Any other reasons?
14     A.   Again, I don't know all the
15   reasons that the pricing is what it is.
16   Again, I can tell you it's because the
17   pricing is based on █████████████████
21   ████████████████████████████████

26 (Pages 98 - 101)

Page 102

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    ███████████
3    Q.   Would there have been someone
4    who ██████████████████████
███████████████████████
███████████████████████
███████ at Qualcomm?
9    A.   Someone would have determined
10    the pricing. ██████████████
11    ██
12    Q.   Who determines the pricing?
13    Who determined the pricing for this one?
14    A.   ███████████████
███████████████████
███████████████████
███████████████████
█████████████████████
███████████████████
█████████████████
█████████████████████
███████████████
██████████████████████

Page 103

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    ██████████████████
3    ███████████████████
5    Q.   Is there any legal analysis
6    that's involved in that process of
7    determining the pricing?
8    (Direction not to answer.)
9    MR. EMERICK:  Instruction not
10    to answer.
11    BY DESAI:
12    Q.   You're going to take that
13    instruction?  I'll ask it again.
14    Is there any legal analysis
15    that's performed to develop the pricing
16    that's in Exhibit, I think it's 9, which
17    is this January 2025 offer?
18    (Direction not to answer.)
19    MR. EMERICK:  Instruction not
20    to answer.
21    MR. DESAI:  I don't have any
22    more questions.  Thank you for your
23    time.
24    MR. EMERICK:  Nothing from me.
25    Thank you.

Page 104

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    THE VIDEOGRAPHER:  I'll take
3    us off then.  The time is 12:17
4    p.m. Pacific, and that concludes
5    the deposition.
6    (Time noted:  12:17 p.m. Pacific)
7    (Time noted:  3:17 p.m. Eastern)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 105

1    EHAB YOUSSEF - HIGHLY CONFIDENTIAL
2    STATE OF _____  )
3                         ss:
4    COUNTY OF _____  )
5
6    I, EHAB YOUSSEF, the witness herein,
7    having read the foregoing testimony of
8    the pages of this deposition, do hereby
9    certify it to be a true and correct
10    transcript, subject to the corrections,
11    if any, shown on the attached page.
12
13
14
15    EHAB YOUSSEF
16
17    Subscribed and sworn to before me
18
19    This _____ day of _____, 2025.
20
21
22
23    _____
24    Notary Public
25

27 (Pages 102 - 105)



# Exhibit 54

```
                                              Page 1

 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF DELAWARE
 3
 4   QUALCOMM INCORPORATED, a
     Delaware corporation,
 5   QUALCOMM TECHNOLOGIES, INC.,
     a Delaware corporation,
 6
           Plaintiffs,
 7
               vs.                 C.A. No. 24-490 (MN)
 8
     ARM HOLDINGS PLC., f/k/a
 9   ARM LTD., a U.K.
     corporation,
10
           Defendant.
11   _____
12
13              **ATTORNEYS' EYES ONLY**
14   VIDEO DEPOSITION OF ARM HOLDINGS PLC's 30(b)(6) and
15      30(b)(1) REPRESENTATIVE - KARTHIK SHIVASHANKAR
16                 Palo Alto, California
17                 Friday, June 20, 2025
18                      Volume 1
19
20
     STENOGRAPHICALLY REPORTED BY:
21   REBECCA L. ROMANO, RPR, CSR, CCR
     California CSR No. 12546
22   Nevada CCR No. 827
     Oregon CSR No. 20-0466
23   Washington CCR No. 3491
24   JOB NO. 7428915
25   PAGES 1 - 189
```



Page 58

14    MR. KRAMER:  Objection to form.

19    Q.  (By Ms. Zappala)  Are there --

21    Q.

22    ?

23    A.  At this point, I don't recall exactly
24  what documents I actually used.  I would say, I
25  mean, a

Page 59

2    Q.  Do you know if there are
3  associated with the            by Qualcomm on
4  these        products?
5    MR. KRAMER:  Objection to form.
6    THE DEPONENT:  It's been a few years.
7  I'd need to go through, look at the details,
                                              So
9  there are a lot of details in this document.
10    Q.  (By Ms. Zappala)  So you don't know for
11  sure if there's            ?
12    A.  Well, without having gone through in
13  detail, I cannot say for sure, yeah.
14    Q.  When you
                                              ?
17    MR. KRAMER:  Objection to form.
18    THE DEPONENT:

24    And as a special case for Qualcomm, for
25  the            , so we do actually, I mean, yeah,

Page 60

1
.
3    Q.  (By Ms. Zappala)  You mentioned the
5    What did you mean by that?
6    A.

15    Q.  So when you determined the license fees
16  for                    , did you
18    MR. KRAMER:  Objection to form.
19    THE DEPONENT:  Yes, as part of the -- I
20  mean, the proposal, I mean, yeah, for Qualcomm,
21  I -- we were -- I would have taken, I mean, yeah,
22            , I mean, yeah, before quoting
23  the -- the -- the proposal for Qualcomm.
24    Q.  (By Ms. Zappala)  And when you determined
25  the                    , you

Page 61

1                    , correct?
2    MR. KRAMER:  Objection to form.
3    THE DEPONENT:  As I can recall now, yes,
4  we would -- I would have taken through the process,
5  I mean, yeah, when we quoted.
6    Q.  (By Ms. Zappala)  And then I want to turn
7  back to Exhibit 8, please, which is the Qualcomm
8  TLA agreement, please.
9    And if you turn to the page that ends in
10  Bates Stamp -3930, which is 13 of 28.
11    Do you see that?
12    A.  Yes, I'm on page 13 of 28.
13    Q.  And do you see Section        ?
14    A.  I can see      .
15    Q.  Is this provision                that
16  you were referencing earlier?
17    A.  Sorry, can you say the question again.
18    Q.  Sure.
19    Is this provision in Section        of the
20  Qualcomm TLA                that you were
21  referencing earlier?
22    A.  Yes, this looks like the
                                              , I mean, yeah, or
24  the obligation that's part of Qualcomm.
25    Q.  And if you look at this provision, if you



Page 62

1  go to the fourth line in this provision, there is a
2  clause that says, ███████████████
███████████████████████████
███████████████████████████
███████████████████████████
9       Do you see that?
10      A.  I can see the sentence which you read
11  out.
12      Q.  And when you are looking to set the terms
13  of a license agreement under the TLA for Qualcomm,
14  do you ████████████████?
16      MR. KRAMER:  Objection to form.
17      MS. ZAPPALA:  Let me strike that.
18      Q.  (By Ms. Zappala) When you are trying to
19  determine a -- the terms under which to license a
20  product under a TLA to Qualcomm, ███████████
████████████████████?
22      MR. KRAMER:  Objection to form.  Vague as
23  to time.
24      THE DEPONENT:  So as part of the process,
25  I mean, yeah, ██████████████████, I mean,

Page 63

1  yeah, we do, I mean, yeah, ██████, I mean, yeah,
2  ████████████████, I mean, yeah, with ███
███s.
4       Q.  (By Ms. Zappala) Okay.  And you also
5  ████████████████████████,
6  correct?
7       A.  So as part of ███████████, yes, so
8  we do ████████████████, I
9  mean, yeah, as part of the ███████████
10      Q.  When you say ██████████
████████████ what are you referring to there?
12      A.  So as part of the -- I mean, the --
13  the -- ████████████, I mean, yeah, we do.  So
14  we █████ I mean, ████████████████
████████████████████████
████████████████████████
████████
███   ██████████████
████████████████████████
████████████████████████
████████████████████
25      Q.  I want to direct your attention to ████,

Page 64

1  which is on the next page ending -03931.
2       And do you see here it says, ████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
11      Do you see that?
12      A.  I can see this sentence which you read
13  out, yeah,
14      Q.  So would you agree ████████████
████████████?
16      MR. KRAMER:  Objection to form.
17      THE DEPONENT:  Can you say the question
18  again.
19      Q.  (By Ms. Zappala)  Sure.
20      Would you agree ████████████████
██████████?
22      MR. KRAMER:  Objection to form.
23      THE DEPONENT:  I cannot, I mean, yeah,
24  comment on that, I mean, yeah.  So, I mean, that's
25  a contractual term, so, I mean, yeah, I -- yeah, I

Page 65

1  cannot, I mean, yeah, conclude on that, yeah.
2       Q.  (By Ms. Zappala) Going back to ████,
3  which you ████████████████████ for
4  the Qualcomm TLA, correct?
5       MR. KRAMER:  Objection to form.
6       THE DEPONENT:  So in -- I mean, I cannot
7  conclude, I mean, yeah, ████████████, I mean,
8  yeah, provision which you are referring to, I mean,
9  yeah, ████.
10      As I said before, like, I mean, yeah,
11  when we ████████████████████████
████████████████████████████
████████████████████████████
15      Q.  (By Ms. Zappala)  And what does it mean
16  for Qualcomm to ████████████████?
17      MR. KRAMER:  Objection to form.
18      THE DEPONENT:  So as part of, I mean,
19  yeah, my role when I actually inherited, I mean, as
20  part of the process, I mean, yeah, as I explained
21  before, so while ████████████████████
████████████████████████████
████████████████████████
████████

17 (Pages 62 - 65)



Page 66

1    Q.   (By Ms. Zappala)  And is it true that
2    under ████████████████████████████████████
████████████████████████████████████████████
████████?
5         MR. KRAMER:  Objection to form.  Calls
6    for a legal conclusion.
7         THE DEPONENT:  Can you say again.
8    Q.   (By Ms. Zappala)  Sure.
9    ███████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████?
13        MR. KRAMER:  Objection to form.  Calls
14   for legal conclusion.
15        THE DEPONENT:  Yeah, so this is
16   something, yeah, again, not my, I mean, yeah,
17   expertise, right?
18        I mean, so what this actually says, I
19   mean, yeah, that's, I mean, yeah, for -- that's not
20   my expertise to actually determine.
21   Q.   (By Ms. Zappala)  So when you're trying
22   to ███████████████████████████████?
23   A.   ██████████████████████████████████
████████████████████████████████████████████

Page 67

1    ██████████████████████████████████████
██████████████████████████████████
█████████
██████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████
12   Q.   And when you say you're looking to
13   ██████████████████████████████████████████,
14   what did you mean by that?
15   A.   ██████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████
██  █████████████████████████████████████
███████████████████████████████████████████
███████████████████████
25        MR. KRAMER:  Ms. Zappala, we've been

Page 68

1    going an hour and 15 minutes.
2         Is now a good time for a break?
3         MS. ZAPPALA:  Let me ask two more
4    questions, and then we can break.
5         Okay?
6    Q.   (By Ms. Zappala)  So I want to direct
7    your attention to █████████████████████████
████████████████████████████████
10        Do you see that?
11   A.   I'm sorry, can you say the line number
12   again.
13   Q.   There is a provision ███████ on line 9,
14   if you count down.
15   A.   Yeah, I can see the ███████████  yup.
16   Q.   And do you see it says, █████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████

Page 69

████████████████████████████████████████
████████████████████████████████████
4         Do you see that?
5    A.   Yeah, I can see the sentence which you
6    read out.
7    Q.   When you ████████████████████, do you
8    ██████████████████ referenced here?
9         MR. KRAMER:  Objection to form.  Vague.
10        THE DEPONENT:  So I don't remember the
11   specifics ██████████
12        But as part of the process, as I said,
13   again, I mean, yeah, ████████████████████████
14   ██████████████
16   Q.   (By Ms. Zappala)  And so the deal that is
17   offered to Qualcomm ██████████████████████
██████████?
19        MR. KRAMER:  Objection to form.  Vague.
20        THE DEPONENT:  Yeah, I cannot actually, I
21   mean, yeah, conclude on -- on -- on the -- on the
22   meaning of the sentences you read out.  I mean,
23   again, that's not my expertise.
24   ████████████████████████████████████
████████████████████████████████████████

18 (Pages 66 - 69)

# Exhibit 55

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUALCOMM INC., a Delaware corporation, and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,<br><br><br>Plaintiffs,<br><br>v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation,<br><br>Defendant. | C.A. No. 24-490 (MN)<br><br><br>**HIGHLY CONFIDENTIAL -**<br>**ATTORNEYS EYES ONLY** |

## ARM'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO QUALCOMM'S SECOND SET OF INTERROGATORIES (NOS. 4-11)

Pursuant to Rules 23 and 33 of the Federal Rules of Civil Procedure, and the applicable Local Rules of the United States District Court for the District of Delaware, Defendant Arm Holdings PLC ("Arm") hereby responds to Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm")'s Second Set of Interrogatories (Nos. 4-11).

## GENERAL OBJECTIONS

Arm makes the following general objections, which are hereby incorporated by reference and made part of its response to each and every Interrogatory.

1.      Arm objects to each Interrogatory to the extent it purports to impose upon Arm discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware, orders entered in this case, or agreements among the parties.

2.      Arm objects to the "Instructions" and "Definitions" sections to the extent they purport to alter the plain meaning and/or scope of any specific Interrogatory, on the ground that such alteration renders the Interrogatory vague, ambiguous, overly broad, and/or uncertain, by

2019 as part of a ██████████ that the parties negotiated for ██████████, and thus made its ██████████ no later than 2019.  *See, e.g.*, QCARM_0029040 at 29043.  Under ██████████,

because ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

### Arm Did Not Breach ████████████████████████
### Or The Implied Covenant Of Good Faith An Fair Dealing

Qualcomm alleges in its Second Amended Complaint that "[t]he financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and ████████ ████" and that "Arm has breached the implied covenant of good faith and fair dealing" for the Qualcomm TLA.  Second Amended Complaint ¶¶ 118, 187.

Arm did not breach either the ██████████████ provisions of ██████████ of the TLA or any implied covenant of good faith and fair dealing for the reasons described above: Arm did not breach the TLA, ████████████████████████████████████████████████ ████████.

Further, any allegation that Arm breached the implied covenant of good faith and fair dealing is ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

Arm identifies the following individuals as knowledgeable regarding aspects of this subject matter: Jeff Fonseca and Karthik Shivashankar.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (July 11, 2025):**

Arm incorporates by reference its initial response to this Interrogatory.  Subject to and without waiver of its general and specific objections, Arm further responds as follows:

**Arm Did Not Breach The Qualcomm TLA Because Arm's ████████████████ Satisfied The ██████████████ Term**

Arm's ███████████████████████████ satisfied the ████████████ term because Arm ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

**Arm Did Not Breach The Qualcomm TLA Because** ████████████
████████████████████████████████████████████████

Arm did not breach ████████ of the TLA because there was ████████
████████████████████████████████████████████████████████
████████████████

Qualcomm's allegation for an alleged breach of ████████ is apparently based on the statement in ████████████████ that ████████████████████████
████████████████████ QCVARM_0617829 at 831.  However, there was never a ████
████████████████████ and Qualcomm is mistaken. ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

Arm never communicated to Qualcomm that it was ████████████████████
████████████████████████████████████ Indeed, Arm confirmed to

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Qualcomm, *i.e.*, Kurt Wolf, that █████████████████████████████████████

████████████████████████████████████ ARMQC_02774856; Wolf Dep. at

176.  Mr. Wolf admitted that after receiving ███████████████ ████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████ Mr. Fonseca testified that, consistent with the

parties' prior conduct, he expected Arm and Qualcomm to ███████████████████

███████████████████████████████ *See, e.g.*, ARMQC_02772246;

ARM_01300657; ARM_01300665; ARM_01298732; ARM_01300650.

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████

**Arm Did Not Breach The Qualcomm TLA Because Arm** █████████████

██████████████████████████████████████████████████

████████████ of the Qualcomm TLA limits █████████████████████████████

█████████████████████████████████████████████████████████████████

████████████ In addition to Qualcomm's ███████████████████████████

█████████████████████████████████████████████████████████████████

████████████ of the TLA provides that ████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



ARM_00103918 at 918, 955.

*See, e.g.*,  ARMQC_02771126; QCVARM_0605055.

### Arm Did Not Breach Any Obligation To ▮▮▮▮▮▮▮▮▮▮
### Or The Implied Covenant Of Good Faith And Fair Dealing

Qualcomm alleges in its Second Amended Complaint that "[t]he financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and ▮▮▮▮▮▮ ▮▮" and that "Arm has breached the implied covenant of good faith and fair dealing" for the Qualcomm TLA.  Second Amended Complaint ¶¶ 118, 187.  For the additional reasons discussed above, Arm did not breach the ▮▮▮▮▮▮▮▮ provision of ▮▮▮▮ of the TLA or any implied covenant of good faith and fair dealing.  Arm made ▮▮▮▮▮▮▮ in accordance with ▮▮, and did not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### Additional Factual and Legal Bases Regarding Qualcomm's TLA Allegations

Arm further states that Qualcomm has failed to prove that Arm's alleged conduct was the but-for or proximate cause of any supposed "harm" that Qualcomm has allegedly suffered. Qualcomm has failed to articulate any "harm" that it has allegedly suffered as a result of Arm's supposed breach of either ▮▮▮▮▮ of the TLA.  As discussed above, Arm has not breached the TLA or any ▮▮▮▮▮▮▮▮ provisions therein.  Qualcomm has failed to make any effort to quantify any "harm," such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  While Qualcomm's witnesses have vaguely alleged that Qualcomm had to ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ as a result of Arm's actions with regard to the ▮▮▮▮▮▮▮, Qualcomm has failed to produce or identify any documentary evidence

corroborating those claims.  Qualcomm has also failed to prove any casual connection between Arm's ███████████ and any of this supposed "harm."

To the contrary, discovery has confirmed that Qualcomm has suffered no harm *at all* from Arm's ███████████████████████████████ to ████████████████████ Regarding ███████ Qualcomm ████████████████████████ ██████ ███████.  ARMQC_02778342.  As to █████ and █████ Qualcomm ████████████████████████████████████████ ████████████████████████████████████████ *See* Williams Dep. at 49–51.  Arm incorporates by reference its response to Interrogatory No. 12 and discussion of its unclean hands defense.  Qualcomm only █████████████████████████████████████ ████████████████████████████████████████████████████ QCVARM_0605055;  QCVARM_0447175;  Wolf Dep. at 75–77.  ████████████████████████████████████████ ████████████████████████████████████████ ███████████████ ████████████████████████████████████████ QCVARM_0524726.  ████████████████████████████████████████ ███████████.  QCVARM_0524726; QCVARM_0523650.  This lack of harm undermines any notion that Qualcomm should be entitled to ███████████████████████ ██████████████████ under ██████████ of the TLA.

Arm further notes that, to date, Qualcomm has failed to disclose any legal or factual bases for its theories as to how Arm has allegedly breached the TLA.  Other than Qualcomm's vague allegations in the SAC—which are legally insufficient as set forth in Arm's Motion to Dismiss (D.I. 232, 233, 305)—Qualcomm has not answered any interrogatory or otherwise disclosed its theories for how Arm allegedly breached ███████████ or ██████ of the TLA.  Arm served interrogatories to

Qualcomm seeking such information on June 11, 2025, to which Qualcomm could have responded but has not. Qualcomm similarly failed to provide any response to Arm's theories regarding the TLA, which were disclosed to Qualcomm on June 16, 2025. Accordingly, Arm reserves the right to supplement these responses after it has an opportunity to review any such theories Qualcomm discloses at a later date.

Arm further responds that pursuant to Federal Rule of Civil Procedure 33(d), Arm identifies the following documents from which information responsive to the non-objectionable scope of this Interrogatory may be derived: ARMQC_02772366, QCARM_0222545, QCARM_0344783.

Arm further incorporates by reference its response to Interrogatory No. 6, including the documents and testimony cited therein.

Arm further incorporates by reference the testimony of the following witnesses: Karthik Shivashankar, Ehab Youssef, Akshay Bhatnagar, Jeff Fonseca, Kurt Wolf, Manju Varma, Larissa Cochran, Spencer Collins, Will Abbey, Cristiano Amon, Ann Chaplin, Lynn Couillard, Durga Malladi, Richard Meacham, Laura Sand, Christine Tran, Jonathan Weiser, and Gerard Williams, including the documents used at each of those depositions.

Arm further incorporates by reference any documents withheld on the basis of third-party confidentiality disputes, including due to an objection or motion for a Protective Order filed by any such third parties. Arm reserves the right to supplement this response to address such documents should any such disputes be resolved and result in the production of such documents to Qualcomm.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (September 5, 2025):**

Arm incorporates by reference its previous responses to this Interrogatory. Subject to and without waiver of its general and specific objections, Arm further responds as follows:

Arm further incorporates by reference the forthcoming expert reports and testimony of Thomas Britven, as well as documents and testimony cited therein.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Dated: September 5, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Matthew J. McIntee
Meredith Pohl
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
matt.mcintee@kirkland.com
meredith.pohl@kirkland.com

Jay Emerick
Reid McEllrath
Adam Janes
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com
reid.mcellrath@kirkland.com
adam.janes@kirkland.com

Nathaniel Louis DeLucia
Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
nathaniel.delucia@kirkland.com
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP


  */s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings PLC*

# Exhibit 56

# Exhibit 57



110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom
Spencer.Collins@arm.com

October 23, 2024

**VIA E-MAIL ONLY**

Ann Chaplin
General Counsel & Corporate Secretary
Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121-1714
AChaplin@qualcomm.com

Privileged & Confidential

Dear Ann:

I write in response to your letter dated September 27, 2024, regarding Arm's compliance with its obligations under ▮▮▮▮▮▮▮▮▮▮ of the Qualcomm TLA.

Arm disagrees that any offers are currently due under ▮▮▮▮▮▮▮ of the Qualcomm TLA. The language of ▮▮▮▮▮ makes clear that ▮▮▮▮▮▮

Nor does Arm have any good faith obligation under the TLA to ▮▮▮▮▮▮▮ ▮▮ contrary to Qualcomm's suggestion. Qualcomm currently has ▮▮▮▮ ▮▮▮▮▮▮ Qualcomm's ▮▮▮▮▮▮ her than a matter of urgency. Put



simply, Arm has not breached ▮▮▮▮▮▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮▮▮▮▮▮▮ instead, Arm has already complied with its obligations to ▮▮▮▮▮▮ under those sections of the TLA, and Qualcomm has no need for ▮▮▮▮▮▮ at this time.

Given, however, Qualcomm's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Arm nonetheless is available for a meeting between the parties' senior executives if Qualcomm believes necessary or appropriate.

Sincerely,

Spencer Collins
EVP, Chief Legal Officer
Arm Limited

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 58

Message

| | |
|---|---|
| **From:** | Rajiv Gupta [grajiv@qti.qualcomm.com] |
| **Sent:** | 9/30/2022 5:38:36 PM |
| **To:** | Kurt Wolf [kwolf@qti.qualcomm.com] |
| **Subject:** | FW: Arm Contracts: AutoBU |

FYI

**From:** Rajiv Gupta
**Sent:** Friday, September 30, 2022 7:00 AM
**To:** Dan Vrechek <dvrechek@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Arm Contracts: AutoBU



Regards,

Rajiv for Team

**From:** Dan Vrechek <dvrechek@qti.qualcomm.com>
**Sent:** Wednesday, September 28, 2022 12:58 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

## Redacted for Privilege

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Wednesday, September 28, 2022 2:56:47 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma

<mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

```
┌─────────────────────────────────────────────────────────────────┐
│                                                                   │
│                    Redacted for Privilege                         │
│                                                                   │
│                                                                   │
└─────────────────────────────────────────────────────────────────┘
```

Sent via the Samsung Galaxy Z Fold4, an AT&T 5G smartphone
Get Outlook for Android

---

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Sent:** Wednesday, September 28, 2022, 21:32
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

```
┌─────────────────────────────────────────────────────────────────┐
│                                                                   │
│                                                                   │
│                    Redacted for Privilege                         │
│                                                                   │
│                                                                   │
│                                                                   │
└─────────────────────────────────────────────────────────────────┘
```

Regards,

Rajiv

---

**From:** Rajiv Gupta
**Sent:** Tuesday, September 27, 2022 8:32 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani

<skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

---

**Redacted for Privilege**

---

Regards,

Rajiv

---

**From:** Rajiv Gupta
**Sent:** Monday, September 26, 2022 1:02 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

---

**Redacted for Privilege**

---

-Rajiv

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Monday, September 26, 2022 10:07 AM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

---

**Redacted for Privilege**

---

**Redacted for Privilege**

Sent via the Samsung Galaxy Z Fold4, an AT&T 5G smartphone
Get Outlook for Android

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Sent:** Friday, September 23, 2022 7:34:49 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

Hi Nakul,

**Redacted for Privilege**

-Rajiv

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Friday, September 23, 2022 5:31 PM
**To:** Dan Vrechek <dvrechek@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

Thanks Dan

**Redacted for Privilege**

Thanks
Nakul

**From:** Dan Vrechek <dvrechek@qti.qualcomm.com>
**Date:** Friday, September 23, 2022 at 5:20 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>, Rajiv Gupta <grajiv@qti.qualcomm.com>, Jonathan Weiser <jweiser@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Ziad Asghar

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

<zasghar@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>

**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>

**Subject:** RE: Arm Contracts: AutoBU

**Redacted for Privilege**

---

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Friday, September 23, 2022 7:15 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

**Redacted for Privilege**

---

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Friday, September 23, 2022 at 5:08 PM
**To:** Dan Vrechek <dvrechek@qti.qualcomm.com>, Jonathan Weiser <jweiser@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Nakul Duggal <nduggal@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma

<mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

> **Redacted for Privilege**

**From:** Dan Vrechek <dvrechek@qti.qualcomm.com>
**Sent:** Friday, September 23, 2022 4:44 PM
**To:** Jonathan Weiser <jweiser@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

> **Redacted for Privilege**

**From:** Jonathan Weiser <jweiser@qti.qualcomm.com>
**Sent:** Friday, September 23, 2022 6:36:01 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

> **Redacted for Privilege**

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Sent:** Friday, September 23, 2022 4:29:51 PM
**To:** Larissa Cochron <lcochron@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

Hi Nakul, JW and Ziad,

> **Redacted for Privilege**

> **Redacted for Privilege**

Regards,

Rajiv

**From:** Larissa Cochron <lcochron@qti.qualcomm.com>
**Sent:** Wednesday, September 21, 2022 9:16 PM
**To:** Dan Vrechek <dvrechek@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

> **Redacted for Privilege**

Thanks,
Larissa

**From:** Dan Vrechek <dvrechek@qti.qualcomm.com>
**Sent:** Wednesday, September 21, 2022 7:50 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani

<skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

```
┌──────────────────────────────────────────────────────────────────────┐
│                        Redacted for Privilege                          │
└──────────────────────────────────────────────────────────────────────┘
```

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Wednesday, September 21, 2022 9:42:48 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

```
┌──────────────────────────────────────────────────────────────────────┐
│                                                                        │
│                                                                        │
│                                                                        │
│                        Redacted for Privilege                          │
│                                                                        │
│                                                                        │
│                                                                        │
└──────────────────────────────────────────────────────────────────────┘
```

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Date:** Monday, September 19, 2022 at 3:51 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>, Jonathan Weiser <jweiser@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Dan Vrechek <dvrechek@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Redacted for Privilege**

Thanks
Nakul

---

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Saturday, September 17, 2022 at 1:59 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>, Jonathan Weiser <jweiser@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Dan Vrechek <dvrechek@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

**Redacted for Privilege**

Regards,

Rajiv

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Friday, September 16, 2022 7:59 AM
**To:** Jonathan Weiser <jweiser@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

Rajiv

---

**Redacted for Privilege**

---

Thanks
Nakul

**From:** Jonathan Weiser <jweiser@qti.qualcomm.com>
**Date:** Friday, September 16, 2022 at 7:51 AM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>, Nakul Duggal <nduggal@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Dan Vrechek <dvrechek@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

---

**Redacted for Privilege**

---

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Sent:** Friday, September 16, 2022 6:44:37 AM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

Hi Larissa,

---

**Redacted for Privilege**

---

<div style="border:1px dashed">

**Redacted for Privilege**

</div>

Regards,

Rajiv

---

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Thursday, September 15, 2022 5:57 PM
**To:** Larissa Cochron <lcochron@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

<div style="border:1px dashed">

**Redacted for Privilege**

</div>

Sent via the Samsung Galaxy Z Fold4, an AT&T 5G smartphone
Get Outlook for Android

---

**From:** Larissa Cochron <lcochron@qti.qualcomm.com>
**Sent:** Thursday, September 15, 2022 4:23:46 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

<div style="border:1px dashed">

**Redacted for Privilege**

</div>

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Thanks,
Larissa

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Thursday, September 15, 2022 3:57 PM
**To:** Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

```
                          Redacted for Privilege
```

**From:** Dan Vrechek <dvrechek@qti.qualcomm.com>
**Date:** Thursday, September 15, 2022 at 3:49 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>, Jonathan Weiser <jweiser@qti.qualcomm.com>, Rajiv Gupta <grajiv@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

```
                          Redacted for Privilege
```

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Thursday, September 15, 2022 5:46:17 PM
**To:** Dan Vrechek <dvrechek@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

```




                          Redacted for Privilege




```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**From:** Dan Vrechek <dvrechek@qti.qualcomm.com>
**Date:** Thursday, September 15, 2022 at 3:31 PM
**To:** Jonathan Weiser <jweiser@qti.qualcomm.com>, Nakul Duggal <nduggal@qti.qualcomm.com>, Rajiv Gupta <grajiv@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

**Redacted for Privilege**

**From:** Jonathan Weiser <jweiser@qti.qualcomm.com>
**Sent:** Thursday, September 15, 2022 11:16 AM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>; Dan Vrechek <dvrechek@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

+ Dan Vrechek

Larissa– **Redacted for Privilege**

**Redacted for Privilege**

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Thursday, September 15, 2022 9:12 AM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>; Jonathan Weiser <jweiser@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

+ JW

**Redacted for Privilege**

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Thursday, September 15, 2022 at 9:00 AM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

**Redacted for Privilege**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Redacted for Privilege**

Regards,

Rajiv

**From:** Rajiv Gupta
**Sent:** Monday, September 12, 2022 9:22 AM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

Regards,

Rajiv

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Monday, September 12, 2022 8:13 AM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

<dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

On item 3, can you please summarize what is pending now?

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Monday, September 12, 2022 at 7:58 AM
**To:** Ziad Asghar <zasghar@qti.qualcomm.com>, Nakul Duggal <nduggal@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

Good progress last week.  #1 and #2 are completed.



Regards,

Rajiv for QC team

**From:** Rajiv Gupta
**Sent:** Thursday, September 08, 2022 7:16 AM
**To:** Ziad Asghar <zasghar@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm Contracts: AutoBU

Very productive day yesterday (9/7). Good co-operation and support from Arm Team including backups (no excuses) to meet QC communicated deadlines.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Manju and I will summarize Arm feedback and next steps in a separate thread dedicated to ▮▮▮▮ discussions.



---

**From:** Ziad Asghar <zasghar@qti.qualcomm.com>
**Sent:** Tuesday, September 06, 2022 9:56 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>;

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QCVARM_0605694

Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm Contracts: AutoBU

Thx for the update.   Hopefully we will have ███ sorted out this week.

On ████████ might be good to have Dawn hands it off to Andy while she is out?

Ziad

---

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Sent:** Tuesday, September 6, 2022 9:47:09 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Arm Contracts: AutoBU

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

---

**From:** Rajiv Gupta
**Sent:** Tuesday, September 06, 2022 8:36 AM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

<jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>;
Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch
<dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm ▮▮▮▮▮ Proposal

Hi Nakul,



Regards,

Rajiv

**From:** Rajiv Gupta
**Sent:** Monday, September 05, 2022 9:09 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Ziad
Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston
<jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>;
Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch
<dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm ▮▮▮▮▮ Proposal

▮▮▮▮▮ – call scheduled with Arm/Dawn, Tuesday Sept 6th to ▮▮▮▮▮▮▮▮

Response in-line below to your questions

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Saturday, September 03, 2022 5:37 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Ziad
Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston
<jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>;
Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch
<dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** Re: Arm ▮▮▮▮▮ Proposal

**What's the status on** ███████**?**

More inline below

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Friday, September 2, 2022 at 5:54 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>, Anshuman Saxena <ansaxena@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>, Larissa Cochron <lcochron@qti.qualcomm.com>, Ernest Chao <echao@qti.qualcomm.com>, Dan Welch <dwelch@qti.qualcomm.com>, Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm ███████ Proposal



Regards,

Rajiv

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**From:** Rajiv Gupta
**Sent:** Friday, September 02, 2022 6:44 AM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm ▮▮▮▮▮ Proposal



-Rajiv

**From:** Rajiv Gupta
**Sent:** Friday, September 02, 2022 5:54 AM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>; Sanjay Kurani <skurani@qti.qualcomm.com>
**Subject:** RE: Arm ▮▮▮▮▮ Proposal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Hi Nakul,

███████████████████████████████████████████████

Regards,

Rajiv


**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Thursday, September 01, 2022 10:08 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>; Dan Welch <dwelch@qti.qualcomm.com>
**Subject:** Re: Arm ████████ Proposal

███████████████████████████████████████████████

+ Dan Welch

Sent via the Samsung Galaxy Z Fold3 5G, an AT&T 5G smartphone
Get Outlook for Android

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Sent:** Friday, September 2, 2022 1:12:05 AM
**To:** Anshuman Saxena <ansaxena@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>; Larissa Cochron <lcochron@qti.qualcomm.com>; Ernest Chao <echao@qti.qualcomm.com>
**Subject:** RE: Arm ████████ Proposal

+ Larissa

**Redacted for Privilege**

**Redacted for Privilege**

**From:** Anshuman Saxena <ansaxena@qti.qualcomm.com>
**Sent:** Thursday, September 01, 2022 2:21 PM
**To:** Ziad Asghar <zasghar@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>
**Subject:** RE: Arm ▮▮▮▮ Proposal

-Anshuman

**From:** Ziad Asghar <zasghar@qti.qualcomm.com>
**Sent:** Thursday, September 1, 2022 1:21 PM
**To:** Manju Varma <mvarma@qti.qualcomm.com>; Anshuman Saxena <ansaxena@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>
**Subject:** RE: Arm ▮▮▮▮ Proposal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Any updates now?

Ziad

**From:** Manju Varma <mvarma@qti.qualcomm.com>
**Sent:** Thursday, September 1, 2022 10:21 AM
**To:** Anshuman Saxena <ansaxena@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>
**Subject:** RE: Arm ▉▉▉▉ Proposal

Hi Rajiv,

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Thank you,
Manju

**From:** Anshuman Saxena <ansaxena@qti.qualcomm.com>
**Sent:** Wednesday, August 31, 2022 3:12 PM
**To:** Manju Varma <mvarma@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>
**Subject:** RE: Arm ▉▉▉▉ Proposal

Looks good.

Thanks
Anshuman

**From:** Manju Varma <mvarma@qti.qualcomm.com>
**Sent:** Wednesday, August 31, 2022 3:05 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Nakul Duggal <nduggal@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Anshuman Saxena <ansaxena@qti.qualcomm.com>; Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>
**Subject:** RE: Arm ▉▉▉▉ Proposal

Hi Rajiv,

Yes, Olivier confirmed we would be ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Regards,
Manju

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Sent:** Wednesday, August 31, 2022 2:58 PM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**To:** Nakul Duggal <nduggal@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Anshuman Saxena <ansaxena@qti.qualcomm.com>; Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>
**Subject:** RE: Arm ▓▓▓▓▓ Proposal

Thank you.

Manju/Jeremiah, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Regards,

Rajiv

**From:** Nakul Duggal <nduggal@qti.qualcomm.com>
**Sent:** Wednesday, August 31, 2022 2:42 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Ziad Asghar <zasghar@qti.qualcomm.com>; Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Anshuman Saxena <ansaxena@qti.qualcomm.com>; Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>; Karl Whealton <kwhealto@qti.qualcomm.com>
**Subject:** Re: Arm ▓▓▓▓▓ Proposal

Looks good to me.

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Wednesday, August 31, 2022 at 2:30 PM
**To:** Nakul Duggal <nduggal@qti.qualcomm.com>, Ziad Asghar <zasghar@qti.qualcomm.com>, Jeremiah Golston <jgolston@qti.qualcomm.com>
**Cc:** Anshuman Saxena <ansaxena@qti.qualcomm.com>, Shyam Krishnamurthy <shyamkr@qti.qualcomm.com>, Manju Varma <mvarma@qti.qualcomm.com>, Karl Whealton <kwhealto@qti.qualcomm.com>
**Subject:** Arm ▓▓▓▓▓ Proposal



**From:** Dawn Hill <Dawn.Hill@arm.com>
**Sent:** Tuesday, August 23, 2022 5:25 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QCVARM_0605703

**Cc:** Kristin Webster <Kristin.Webster@arm.com>; Karthik Shivashankar <Karthik.Shivashankar@arm.com>
**Subject:** RE: Arm ▮▮▮▮▮ Proposal

**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do not enable macros.

Thank you Rajiv,

████████████████████████████████████████████████

Many thanks,
Dawn

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Sent:** Monday, August 22, 2022 7:18 AM
**To:** Dawn Hill <Dawn.Hill@arm.com>; Karthik Shivashankar <Karthik.Shivashankar@arm.com>
**Cc:** Kristin Webster <Kristin.Webster@arm.com>
**Subject:** RE: Arm ▮▮▮▮▮ Proposal

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Pls note that QC response has been reviewed and approved by AutoBU executives.

**From:** Rajiv Gupta
**Sent:** Monday, August 22, 2022 6:36 AM
**To:** Dawn Hill <Dawn.Hill@arm.com>; Karthik Shivashankar <karthik.shivashankar@arm.com>
**Cc:** Kristin Webster <Kristin.Webster@arm.com>
**Subject:** RE: Arm ▮▮▮▮▮ Proposal

Hi Karthik and Kris,

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Thanks,

Rajiv

**From:** Dawn Hill <Dawn.Hill@arm.com>
**Sent:** Tuesday, August 16, 2022 6:03 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>; Manju Varma <mvarma@qti.qualcomm.com>
**Cc:** Kristin Webster <Kristin.Webster@arm.com>
**Subject:** Arm ▮▮▮▮▮ Proposal

**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do not enable macros.

Hi Rajiv, Manju,

Thank you for your patience.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Dawn Hill** | Director, Global Sales | ARM - Irvine
dawn.hill@arm.com |
Mobile: +1-949-400-9002
**Visit the new ARM Connected Community** | www.arm.com

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.
IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 59

# Exhibit 60



**Qualcomm Technologies, Inc.**

5775 Morehouse Drive, San Diego, CA 92121

www.qualcomm.com

<u>**VIA OVERNIGHT COURIER AND ELECTRONIC MAIL**</u>                     November 22, 2024

ARM Limited
110 Fulbourn Road
Cambridge, CB2 2HT
United Kingdom
Attn: Jeff Fonseca, Account Manager, <u>Jeff.Fonseca@arm.com</u>

Dear Jeff,

Best regards,

Kurt Wolf
Director, Sourcing
Qualcomm Technologies, Inc.

cc:     ARM Legal (via facsimile +44 1223 400546)

CONFIDENTIAL

# Exhibit 61

# Exhibit 62

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>    a Delaware corporation,<br>QUALCOMM TECHNOLOGIES, INC.,<br>    a Delaware corporation,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>    a U.K. corporation,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 24-490-MN<br><br>**HIGHLY CONFIDENTIAL –<br>ATTORNEYS' EYES ONLY** |

**PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANT'S THIRD SET OF INTERROGATORIES (NO. 14)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiffs Qualcomm

Inc. and Qualcomm Technologies, Inc. (collectively "Qualcomm" or "Plaintiffs") by and through

their attorneys, hereby supplement their responses and objections to defendant Arm Holdings

PLC's ("Defendant" or "Arm") Interrogatories to Plaintiffs dated June 11, 2025, as follows:

## GENERAL OBJECTIONS

1.      Plaintiffs object to each Interrogatory to the extent that it seeks to impose greater

or different obligations on Plaintiffs than those provided for by the Federal Rules of Civil

Procedure, the Local Rules of the United States District Court for the District of Delaware, any

discovery orders entered into this case, any other applicable Court orders, or agreements reached

by the parties.

2.      Plaintiffs object to each Interrogatory to the extent that it seeks documents, things,

or information protected by the attorney-client privilege, the work-product doctrine, or any other

applicable privilege or immunity.  Nothing contained in these Responses and Objections is

intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

13.     Plaintiffs object to Instruction No. 6 as overbroad, unduly burdensome, and on the ground that it purports to impose requirements inconsistent with or more burdensome than those imposed by the Federal Rules, local rules, and applicable law.

14.     Plaintiffs object to Instruction No. 7 to the extent it purports to require Plaintiffs to respond to Interrogatories that are not reasonably limited in time, including on subjects other than those for which such discovery is permitted under the Delaware Default Standard for Discovery or as agreed upon in the parties' anticipated agreement regarding electronic discovery.  Plaintiffs will agree to respond from June 1, 2022 forward, unless otherwise specified.

Subject to and without limiting the foregoing, Plaintiffs specifically object and respond as follows:

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 14:



Describe with specificity the complete legal and factual basis for Your contention(s) that Arm breached the Qualcomm TLA, including: (i) the identification of all section(s) of the TLA Qualcomm contends were allegedly breached by Arm, and how each such section(s) was allegedly breached by Arm; (ii) how Arm allegedly "fail[ed] to provide commercially reasonable, and therefore ████████, licensing proposals to Qualcomm ████████████████████" (SAC ¶ 102, 118); (iii) how Arm allegedly proposed "terms so unreasonable that it was a constructive failure to license" (SAC ¶ 117); (iv) why you contend that ████████████████████████████ ████████████████ constitutes a breach of the TLA (SAC ¶ 118); and (v) the ████████████████ ████████ allegedly changed by Arm. Your response shall further include the identification of all documents supporting or refuting Qualcomm's contention(s), and the three witnesses most knowledgeable about Qualcomm's allegations.

### RESPONSE TO INTERROGATORY NO. 14:

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions.  Plaintiffs object to Interrogatory No. 14 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

not been completed and Arm has not or has only recently produced documents relevant to these issues. As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's breach. Plaintiffs further object to the Interrogatory as improperly compound. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint and in Qualcomm's September 20, 2024 and September 27, 2024 letters, is readily within the possession of Defendant, or that is more easily available to it. Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 20-28 and 102-134 of the Second Amended Complaint (D.I. 137) and incorporate them by reference as if fully set forth herein.

Plaintiffs further state that █████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

Under California law, every contract implies a covenant for each party not to do anything that will deprive the parties of the benefits of the contract. *E.g.*, *Tameny* v. *Atl. Richfield Co.*, 610 P.2d 1330, 1337 n.12 (Cal. 1980). At all relevant times, Arm agreed and was required by law to act fairly and in good faith with respect to its obligations under the QC TLA.

Arm breached the Qualcomm TLA and the implied covenant of good faith and fair dealing by failing to respond to repeated licensing requests by Qualcomm and to provide Qualcomm with good faith licensing proposals for ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████ Arm's actions have unfairly frustrated the essential purposes of the QC TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

e

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████    ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████    ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

Qualcomm  also  made  an  ████████████████████████████

███████████████████████████████████████████████. In

August and November 2022, Arm provided Qualcomm with a licensing and royalty proposal for

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



This proposal for ████████ breached ████████████

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained: QCVARM_0524362; QCVARM_0616913; QCVARM_0616916; ARMQC_02747993; ARMQC_02731284; QCVARM_0526828; QCVARM_0618354; QCVARM_0527544; QCVARM_1068969; QCARM_7484882; ARMQC_02783619. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Manju Varma; Deposition of Karl Whealton; Deposition of Karthik Shivashankar; Deposition of Akshay Bhatnagar ("Bhatnagar Tr."); Deposition of Jeff Fonseca.

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Kurt Wolf

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

- Larissa Cochron

- Manju Varma

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:</u>**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference the sections of the Expert Report of Patrick F. Kennedy, Ph.D. (dated August 8, 2025) entitled "███████████████████████████ ███████████████████" and "Qualcomm's Damages Related to Arm's Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing in the Qualcomm TLA," along with their accompanying schedules. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

33(d).  In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Deposition of Kurt Wolf ("Wolf Dep.") 45:3-46:13 (testifying regarding Arm's delay in responding to █████████████ █████████████████████████), 46:20-47:5, 47:17-48:12 (testifying regarding Arm's delay in responding to ███████████████████████████████████), 51:9-56:9, 132:4-133:3, 134:1-135:7, 139:22-141:17, 151:2-152:14, 154:3-156:6 (testifying regarding ████████████ █████████████████████████ ████████████████████ ████████), 188:15-178:7; Deposition of Larissa Cochron ("Cochron Dep.") 109:14-110:1, 110:14-111:4, 114:8-13, 116:15-120:20, 223:8-226:21, 154:17-156:14; Deposition of Karthik Shivashankar ("Shivashankar Dep.") 62:18–63:24, 67:12–24; Deposition of Akshay Bhatnagar ("Bhatnagar Dep.") 34:22-36:23, 37:18-22, 41:17-42:9, 42:24-43:4, 44:6-16, 47:24-48:6, 55:5-10, 70:8-21, 93:13-94:25; Deposition of Rene Haas ("Haas Dep.") 164:10-24; Deposition of Ehab Youssef ("Youssef Dep.") 97:14-98:3, 100:14-101:7; Deposition of Manju Varma ("Varma Dep.") 46:6-48:10, 50:4-22, 56:2-57:2, 81:16-83:7, 99:23-100:2, 100:20-101:2, 1103:11-21, 103:25-104:2, 142:6-20, 147:6-147:12; Deposition of Jeffrey Fonseca ("Fonseca Dep.") 25:21-29:5, 78:16-79:10; Deposition of Jean-Francois Vidon ("Vidon Dep.") 47:15-48:8; ARMQC_02783619 (█████████████████ ███████████); ARMQC_02784199 (Arm correspondence regarding ███████████ █████████████████████████: ████████████████████████ █████████████████████████████████████ ARM_00062474; QCARM_0027985;    ARM_00062441;    QCVARM_0573056;    QCVARM_1121930; QCVARM_1121931; QCVARM_1118081; QCVARM_1118085.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, and further to their previous responses, Plaintiffs further respond as follows: ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████  ██████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████

Deposition testimony from Arm's witnesses confirms that Arm did not ██████████████ ████████████████████████████████████████ at the time of Qualcomm's relevant ███████████████ in order to █████████████████████████████████████. Neither of the Arm witnesses with personal involvement testified that they conducted ███████████████.

████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

Arm's interrogatory responses and documents produced after the July 11 close of fact discovery further indicate that ████████████████████████████████████ ████████████████████████████.  Arm's First Supplemental Response to Qualcomm's Interrogatory No. 11—which Arm served on the last day of fact discovery—states that ████ ████████████████████  ██████████████████████████████ ████████████████  ████████"—a statement that is itself inconsistent with the deposition testimony of Arm witnesses with personal knowledge of what Arm actually did, as described above.  On July 24, Arm represented in a letter to Qualcomm that ██████████████████ ████████████████████  ██████████████  ██████████████████████████ ████████████████  2025.07.24 Letter from J. Emerick to C. Nyarady.  Yet after Qualcomm

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

██████████████████████████████████ on July 30th—based on Qualcomm's review of public sources—Arm's counsel agreed to investigate whether Arm's production was in fact complete.  2025.07.30 Meet and Confer Tr. at 46:17–51:11.  As a result of that investigation, Arm has since identified █████████████████████████████████ ██████████████ ████████ Arm then █████████████████████████████, starting on September 4.[2]  That Arm failed to ████████████████████████ █████████████████████ during fact discovery, before Qualcomm raised apparent deficiencies in Arm's production, further confirms that Arm did not ██████████████████████████████ ███████████████████████████████████.  Had Arm done so, ████████████████████████ would have been readily available to Arm's witnesses and Arm's counsel.

To the extent Arm did any investigation, it is apparent that Arm did not do so ████████ ██████████████████████████████████████.  For example, Arm's expert—having personally participated in a group interview of Mr. Bhatnagar, Mr. Shivashankar, and Mr. Youssef—testified that he did not know whether Arm ██████████ ████████████████████ ████████████████████ ████████████ Britven Tr. at 170:7–171:12.  And Qualcomm's ongoing review of Arm's recently-produced ████ ████████████ has confirmed that Arm did not do so, as Arm has ███████ ██████ ████████ ████████████████████ ████████████████████████ █████ ███. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████



---

[2] Several others that Arm identified after the July 30th meet and confer have not yet been produced.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

Arm's expert Thomas Britven claims that "██████████████ ██████████ ████████

was based on Arm's understanding that ████████████████████████████████

████████████████████████████████████████████████████

█████████████ Rebuttal Expert Report of T. Britven ¶ 78.  This post-hoc rationalization cannot

excuse Arm's failure to ████████████████████████, for at least several

reasons.  This claim is not supported by the evidence.  Not a single Arm witness testified that Arm

████████ ████████ as the ████████████████ for ████████ on these grounds, nor did Arm respond

as such in its response to Interrogatory No. 11.  Had Arm in fact ████████████████████with

the ██████████████████ and concluded that ████████ was the ███████████████████████ on

this ground, that explanation would have been readily available to Arm's counsel and should have

been disclosed.

Moreover, nothing in the TLA supports Arm's theory—as expressed in Mr. Britven's

report—that the ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



. Putting aside that Mr. Britven is not a lawyer and cannot opine on the meaning of a contract, Britven Tr. 151:21–23, 154:15–16, 174:15–18, 204:3–7, 204:17–18,

In addition to the testimony cited herein, Plaintiffs further incorporate by reference the deposition testimony of Karthik Shivashankar, Akshay Bhatnagar, Ehab Youssef, and Jeffrey Fonseca, the expert reports of Dr. Patrick Kennedy as well as any supplemental reports he may provide. Plaintiffs reserve the right to supplement or amend their response based on any documents produced after the date of this interrogatory response or any further analyses from Dr. Kennedy.

**INTERROGATORY NO. 15:**

For each section of the Qualcomm TLA allegedly breached by Arm, describe with specificity any and all remedies (monetary, non-monetary, and/or equitable) Qualcomm seeks for each such alleged breach. Your response to this Interrogatory shall include a discussion of each such remedy sought by Qualcomm and the legal and factual support for such remedies, including for: (i) Qualcomm's allegations in paragraphs 121–122 of the SAC that ███████████████████ ████████████████████████████████████████ ; (ii) Qualcomm's alleged entitlement to ██████████████████ (SAC ¶ 127); and (iii) alleged ███████████ ██████████ (SAC ¶ 107). Your response shall further include the identification of all documents supporting or refuting Qualcomm's contention(s), and the three witnesses most knowledgeable about Qualcomm's allegations.

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs object to Interrogatory No. 15 as premature at this stage of the litigation,

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Jenifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC  20004
(202) 240-2900

Erin J. Morgan
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10017
(202) 240-2900

Catherine Nyarady
Anish Desai
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

*Attorneys for Plaintiffs*

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA  94105
(628) 432-5100

October 9, 2025

# Exhibit 63

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3   QUALCOMM INCORPORATED a Delaware corporation, ) Case No.
     QUALCOMM TECHNOLOGIES, INC., a Delaware       )24-490-MN
4   corporation,                                   )
                                                    )
5        Plaintiffs,                                )
                                                    )
6      vs.                                          )
                                                    )
7   ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.        )
     corporation,,                                  )
8                                                   )
         Defendant.                                 )
9   _____)

10            ATTORNEYS EYES ONLY VIDEOTAPED

11        30(b)(6) DEPOSITION OF JEFFREY M. FONSECA

12                 Palo Alto, California

13               Wednesday, July 9, 2025

14

15

16          REPORTED BY: Derek L. Hoagland

17                CSR No. 13445

18

19

20

21

22

23

24

25

Page 14

1 Q.    And what does it mean to manage Qualcomm and
2 these two accounts?
3 A.    I'm the key point of contact for sales for all
4 three accounts.
5 Q.    So is it fair to say that as of June 2024 you
6 became the key point of sales for the Qualcomm account?
7 A.    Yes.
8 Q.    And what does it mean to be the key point of
9 sales for the Qualcomm account?
10 A.    Basically, anything that relates to customer
11 engagement, we call them partners, is I'm the first
12 point of contact, myself and my technical liaison, and
13 basically we help validate any inquiries that come in
14 from the partners.
15 Q.    Who do you interact with at Qualcomm?
16 A.    Currently, Kurt wolf, Richard Meacham.
17 Q.    Anyone else?
18 A.    Primary contacts that I deal with on a running
19 basis every week.
20 Q.    And have Kurt Wolf and Richard Meacham been your
21 primary point of contacts since June of 2024?
22 A.    Yes.
23 Q.    Anyone else at Qualcomm?
24 A.    I have interacted with Manju Varma and Karl,
25 Manju Varma and Karl Whealton.  That's his name

Page 15

1 correctly, yeah, W-h-e-l -- e-a-l-t-o-n.  And then I've
2 interacted with some other people, like John.  I can't
3 remember his last name.  They're in the WiFi group.
4 We've talked to other engineering teams through
5 Kurt and Richard that facilitate these conversations,
6 but they were always part of the conversations.
7 Q.    And I think you said you and a technical liaison
8 validate inquiries that come in?
9 A.    Yes.
10 Q.    And the partners.
11        Who is that technical liaison?
12 A.    Currently, it's a guy called Gonzalo Delgado.
13 Previously, it was a guy named Jeff Coulter.  That
14 changed two months ago.
15 Q.    So up until two months ago, it was Jeff Coulter?
16 A.    Yes.
17 Q.    So from June 2024 to around May --
18 A.    May.
19 Q.    -- it was Jeff?
20 A.    Yes.
21 Q.    And now it's a gentleman by the name of Gonzalo?
22 A.    Gonzalo Delgado Huiton.  I cannot spell his last
23 name.  I'm sorry.
24 Q.    And going back to your previous job as vice
25 president of strategic alliances, did -- were your job

Page 16

1 responsibilities for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2 essentially the same as your current responsibilities
3 for Qualcomm and ▮▮▮▮▮▮▮?
4 A.    Yes.
5        MS. ZAPPALA:  I'm going to show you -- what
6 exhibit number?
7        MR. BASNER:  QC_169.
8        MS. ZAPPALA:  QCX Exhibit No. 169, the 30(b)(6)
9 notice that Qualcomm issued to -- Brian, we'll he
10 heading into the 30(b)(6) portion of the deposition.
11        MR. KRAMER:  Thank you.
12        MS. ZAPPALA:  169.
13        MR. CLUBOK:  If you want us to create a shred
14 bin for you?
15        MS. ZAPPALA:  Would you like to read along?
16        THE REPORTER:  Sure.
17        (Exhibit No. 169 marked for identification.)
18 BY MS. ZAPPALA:
19 Q.    Mr. Fonseca, have you seen this exhibit before,
20 which is titled "Plaintiff's Notice of Rule 30(B)(6)
21 Deposition of Defendant"?
22 A.    I have seen something similar to this.
23 Q.    Okay.  I want to -- I believe you have been
24 designated -- so strike that.
25        This notice identifies various topics that

Page 17

1 Qualcomm has noticed to ARM for 30(b)(6) deposition
2 topics.
3 A.    Mm-hmm.
4 Q.    And my understanding is that you've been
5 designated on topics 8, 18, 19, and 21, which are listed
6 in here.
7        Does that sound accurate to you?
8 A.    That is correct.
9        MR. KRAMER:  I will represent, he is designated
10 on those topics, 8, 18, 19, and 21, subject to the
11 narrowing objections that we made on June 19th.
12 BY MS. ZAPPALA:
13 Q.    Mr. Fonseca, what did you do to prepare to
14 testify on the 30(b)(6) topics?
15 A.    Reviewed the documentation that was related to
16 each of the topics that I have been assigned, or
17 designated on, and then discussed some of the historical
18 aspects of some of those documents, just for the record,
19 and then with respect to my clarification and
20 understanding, talked to one specific individual to help
21 reconcile my correct understanding, and that was with
22 Karthik Shivashankar, on one of the topics -- on two of
23 the topics, I'm sorry.
24 Q.    So I want to unpack that a bit.
25        You said you reviewed some documentation related

5 (Pages 14 - 17)

Page 18

1 to those topics. What documentation is that?
2 A.    I don't recall off the top of my head because I
3 had the documents in front of me yesterday.
4 Q.    Okay. And you said you spoke with a
5 Mr. Karthik Shivashankar. Is that correct?
6 A.    Yes.
7 Q.    Related to two topics, right?
8 A.    Related to two topics, yes, if I recall, topic
9 8 -- let me go back and check it. I'm sorry. The
10 topics are here.
11     Yeah. It was around ARM's general practice of
12 licensing, in one respect, and around topic 20 -- yeah,
13 around 20, the process for quoting.
14 Q.    Is that topic 20? I don't believe you're
15 designated on 20.
16 A.    I'm sorry. 20 -- 21. Sorry. 18, because it
17 was around the quoting.
18 Q.    When you say "quoting," what are you referring
19 to?
20 A.    The request for Qualcomm to get quotes on the
21 ████████ on the licenses.
22 Q.    Are you referring to Qualcomm's requests for
23 licenses to ████████████?
24 A.    Yes.
25 Q.    So you spoke with Mr. Shivashankar regarding

Page 19

1 Qualcomm's request for quotes on ████████
████?
3 A.    Yes.
4 Q.    And for how long did you speak with
5 Mr. Shivashankar?
6 A.    Approximately 15 minutes.
7 Q.    On both topics that you have identified?
8 A.    Yes.
9 Q.    Can you tell me what Mr. Shivashankar told you
10 about the general practice of licensing -- let me strike
11 that question.
12     You said you spoke with Mr. Shivashankar about
13 ARM's general practice of licensing in one respect.
14 A.    Mm-hmm.
15 Q.    What was that respect you were referring to?
16     MR. KRAMER: Objection to form.
17     THE DEPONENT: If I remember, the question was
18 around what is ARM's general policy of how we license
19 products, right, and -- and the process that we go
20 through for doing such. So that's what I was
21 reconciling my recollection with him about, is my
22 description of that, correct.
23 BY MS. ZAPPALA:
24 Q.    And what did Mr. Shivashankar tell you about
25 ARM's general practice of how ARM licenses products?

Page 20

1 ██ ████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████
14 Q.    And did Mr. Shivashankar provide you with any
15 information about quotes provided to Qualcomm?
16 A.    We discussed quotes provided to Qualcomm because
17 we had actually provide -- prepared those quotes
18 together, so.
19 Q.    And when you said you have provide -- you have
20 prepared those quotes together --
21 A.    Yes.
22 Q.    -- what quotes are you referencing?
23 A| ████████████████████████████
████████████████████, that was initiated, you know,
25 through -- from Qualcomm requesting to us, and that was

Page 21

1 initiated through Karthik and team to go prepare that
2 quote. And then they did the diligence on, you know,
3 looking at the numbers for that, and then from there, my
4 job was to actually prepare that into a formal quote to
5 present to Qualcomm.
6 Q.    When you -- I think you said Gelas. Is that
7 correct?
8 ███ ████████████████████ -- what was the
9 quote? Because I don't remember it off the top of my
10 head. One thing you should note about me is I have a
11 slight dyslexia, so mixing words and terms. So...
12 Q.    Have you --
13 A.    That's why when I look at paper, I can actually
14 recall better than you if you ask me blindly. Then it
15 might not come across correct.
16 Q.    Understood. Okay. So I want to take a step
17 back. We will come back to that, but I want to take a
18 step back.
19     So you spoke with Mr. Shivashankar about the
20 quote you provided in October to Qualcomm?
21 A.    Mm-hmm.
22 Q.    Can you just describe for me everything you
23 remember about that conversation with Mr. Shivashankar?
24 A.    From yesterday? That was a recollection that,
25 you know, when he prepared the quote, he went through

6 (Pages 18 - 21)



Page 22

1 the assessment for the -- ████████████, and
2 that his process for doing that is what he followed.
3 And I'm not part of that process, but at the same time,
4 I said, my recollection is you went through that
5 exercise and then we prepared the quote accordingly, and
6 the answer was yes. He verified that my understanding
7 was correct.
8 Q.    And did Mr. Shivashankar give you any
9 information about the process that he followed?
10 A.    I only -- I only know at a high level what the
11 process is. But in terms of the actual devil's in the
12 details of how they do that, conduct that analysis, I am
13 not privy to.
14 Q.    Can you tell me your high-level understanding of
15 that process?
16 A.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████
24 Q.    ████████████████████████████████
████  ████████.

Page 23

1 Q.    So I understood you to say that Mr. Shiva --
2 you -- strike that.
3        Your understanding is that ████████████
████████████████████████████████
████████    Is that correct?
6 A.    Yes.
7 Q.    What do you mean by ████████████
8 A.    Meaning ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
13 Q.    And do you have an understanding of how to
14 determine ████████████████████████
15 A.    I do, because then it's basically -- it comes
16 out as a ████████████████████████████
18 Q.    So you --
████████████████████████████████████████
████████████████████████████
21 A.    Yes.
22 Q.    Who were those ████████████
23 A.    That was -- ████████████████████████
████████████
25 Q.    As part of the process of determining which

Page 24

1 ████████████████████████████████████████
████████████████████████████
3 A.    I don't know that.
4        THE REPORTER:  You said ████████████████?
5 BY MS. ZAPPALA:
6 Q.    Does ARM ████████████████████████████
████████████████████████████
8 A.    I don't know that that's part of Karthik's
9 team's responsibility on how they do that assessment.
10 Q.    So when Mr. Shivashankar's team identified
11 ████████████████████████████████████, do
12 you have an understanding of why Mr. Shivashankar's team
13 selected ████████████████?
14 A.    My understanding is that --
15        MR. KRAMER:  Objection to form.  You can --
16        THE DEPONENT:  My understanding is that they
17 ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
23 BY MS. ZAPPALA:
24 Q.    And when you say ████████████████████████
████████████████    what are you referring to?

Page 25

1 A.    That's --
2        MR. KRAMER:  Objection.  Outside the scope of --
3        THE DEPONENT:  Yeah.
4        MR. KRAMER:  -- the specific topic 8.
5        But go ahead.
6        THE DEPONENT:  That's their definition.  I don't
7 have that definition.
8 BY MS. ZAPPALA:
9 Q.    So you have an understanding that there's
10 something called ████████████████████, but
11 you don't know what that refers to?
12 A.    Correct.
13 Q.    So do you have an understanding of whether ████
████████████████████████████████████████
████████████████████████████████████████
17        MR. KRAMER:  Objection.  Outside scope.
18        THE DEPONENT:  My understanding is that, yes,
19 ████████████████████████████████████████
20 BY MS. ZAPPALA:
21 Q.    And do you have an understanding of ████████
████████████████████████████████
23 A.    No, I do not.
24 Q.    What about for ████████
25 A.    No, I do not.  I am not privy to ████████  or

7 (Pages 22 - 25)



**Page 26**

1  ████████████ to answer that question.
2  Q.  So you understand ██████████████████
3  ████████████████ -- strike that.
4     You understand that you █████████████████
5  ████████████████ -- strike that.
6     So you understand that ARM ██████████████
7  ████████████████████████, but you don't have
8  ████████████████████████
9  an understanding of the specifics of why ██████
10 █████████████
11 A.  I gave you an answer earlier. I believe I said
12 that ████████████████████████████████████
13 ████████████████████████ that I don't understand.
14 Q.  And -- but you don't have an understanding of
15
16 ████████████████████████, correct?
17 A.  No, I don't.
18 Q.  And you don't have an understanding of ██
19 ████████████████████, correct?
20 A.  No, I do not.
21 Q.  Do you -- so the October -- actually, let me put
22 it in front of you so we're talking about the same
23 thing.
24    And you don't have an understanding of ███
   ████████████████████ correct?

**Page 27**

1  A.  No.
2  Q.  And you don't have an understanding ███
3  ████████████████████, correct?
4  A.  No, I do not.
5     MS. ZAPPALA: I'm going to mark as Exhibit 170 a
6  document Bates stamp 1946, which is ███████████
7  ██████
8     (Exhibit No. 170 marked for identification.)
9     MS. ZAPPALA: 170. Yes, 170.
10 BY MS. ZAPPALA:
11 Q.  Mr. Fonseca, do you recognize the document that
12 I put in front of you as QCX_170?
13 A.  Yes, I do.
14 Q.  What is it?
15 A.  It's the quote that I prepared for Qualcomm on
16 ███████████████.
17 Q.  And can you describe for me the process of
18 preparing this ████████████
19 A.  ████████████████████████████████
   ████████████████████████████████
   ████████████████████████████
   ████████████████████████████████
   ████████████████████████████████

**Page 28**

1  ████████████████████████████████
   ████████████████████████████████
   ████████████████████████████████
   ██████████
6  Q.  Understood. So Mr. Shivashankar's team
7  determined the ████████████████ reflected
8  on page --
9  A.  Correct.
10 Q.  -- 1947, correct?
11 A.  Correct.
12 Q.  And you -- you personally had no input into
13 these numbers, correct?
14 A.  Correct.
15 Q.  You took these numbers that were given to you by
16 Mr. Shivashankar's team, and then you put it into this
17 document, correct?
18 A.  Correct.
19 Q.  And then after Mr. Shivashankar's team gave you
20 the numbers to provide to Qualcomm, did you discuss
21 those numbers with anyone else at ARM?
22 █ ████████████████████████
   ████████████████████████████████
   ████████████████████████████████

**Page 29**

1  ████████████████████████████████
   ████████████████████████████████
   ██████████
6  Q.  And so you're saying that's the process for any
7  entity that requests a license when ARM --
8  A.  Depending on the level.
9     MR. KRAMER: Mr. Fonseca, I'm just going to
10 remind you, just give her a second to finish --
11    THE DEPONENT: Okay.
12    MR. KRAMER: And maybe give a little pause in
13 between.
14    THE DEPONENT: Sorry.
15    MR. KRAMER: That will make the court reporter
16 like us much more.
17    THE DEPONENT: Okay.
18 BY MS. ZAPPALA:
19 Q.  So let -- let me ask the question again.
20 ████████████████████████████████
   █ █████████████████
   ████████████████████████████████
   ████ ████████████ If the

8 (Pages 26 - 29)



Page 66

1 Q.    And then Qualcomm had sent its letter that we
2 just looked at on November 22nd, 2924, correct?
3 A.    Yes.
4 Q.    Why had you not responded to Qualcomm's letter
5 by December 9th, 2024?
6    MR. KRAMER:  Objection to form.
7    THE DEPONENT:  We were still reviewing and
8 discussing the quote.
9 BY MS. ZAPPALA:
10 Q.    And who were you discussing the quote with?
11 A.    Akshay and Doreen.  And part of that was also
12 during the holiday.
13 Q.    And then did you have any discussions with
14 Mr. Wolf about the Qualcomm ███████████████
███████████  MR. KRAMER:  Objection to form.
16    MR. KRAMER:  Objection to form.
17    THE DEPONENT:  We had a conversation because we
18 have weekly calls, and I think this call he had missed,
19 but then we were having a call after, and my
20 recollection is I told him we were still reviewing and
21 processing at the time on that call.  It was just me and
22 him.
23    MS. ZAPPALA:  And then I want to show you
24 Exhibit 178 and 179.
25    (Exhibit Nos. 178 and 179 marked for

Page 67

1 identification.)
2    MS. ZAPPALA:  178 is going to be an email from
3 Mr. Fonseca dated January 10th, 2025, to Mr. Wolf.  And
4 179 is going to be an attached
███████ Bates stamped -- dated January 10th, 2025, and
6 Bates stamped QCVARM_0527546.
7    MR. KRAMER:  I'm sorry.  Just give me a second
8 to mark up my copies, please.
9    This is 178 and 179.  Is that right?
10    MS. ZAPPALA:  Yes.  And just for the record, the
11 cover email, 178, is Bates stamped QCVARM_0527544.
12 BY MS. ZAPPALA:
13 Q.    Mr. Fonseca, do you recall sending Exhibits 178
14 and 179?
15 A.    Yes.
16 Q.    And you see that he wrote:
17 ████████████████████████████████
████████████████████████████████████
████████████████████████████████
█████████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████

Page 68

████████████████████████████████████
████████
3    Do you see that?
4 A.    Yes.
5 Q.    ████████████████████████████████
███████████████████████ ████████████
███████?
9 A.    Yes.
10 Q.    Why?
11 A.    ████████████████████████████
████████████████████████████
14 Q.    ████████████████████████
15 A.    I don't know.
16 Q.    █████████████████████████
████████████████████████████████████
18 ████████████████████████████████████
20 A.    No.  It comes from Karthik and Akshay.
21 Q.    You were not involved ████████████████
23 A.    No.
24 Q.    Did Mr. Shivashankar tell you that ████████
████████████████████████████████████

Page 69

1 A.    ████████████████
██████████
3 Q.    ████████████████████
5 A.    █████████████
██████████████
█████████████████████████████████
██████████████████████████████
█████████████████████████
11 Q.    ████████████████████████Who was in that discussion?
13    MR. KRAMER:  As to -- you can -- caution the
14 witness not to reveal any communications with counsel.
15    THE DEPONENT:  Correct.  ████████████████████
██████████████████
17 BY MS. ZAPPALA:
18 Q.    Did you see any written documentation of ████
██?
20    MR. KRAMER:  You can answer that question "yes"
21 or "no" without revealing attorney-client
22 communications, or "I don't know."
23    THE DEPONENT:  No.  Just the quotes.
24 BY MS. ZAPPALA:
25 Q.    (Inaudible) -- documentation?

18 (Pages 66 - 69)



Page 70

1  A.    Just the draft quotes.
2  Q.    And Mr. Shivashankar's team determined the
3  ███████████ reflected in Exhibit 179 and gave
4  that to you, correct?
5  A.    Correct.
6  Q.    And you don't have any understanding of
███████████ correct?
8  A.    Correct.
9  Q.    If you go down to the general terms, No. 5, do
10 you see it says:
11 ███████████
███████████
13    Do you see that?
14 A.    Yes.
15 Q.    And the Exhibit 170, if you recall, we saw that
16 ███████████
17    Do you remember that?
18 A.    Yes, I remember.
19 Q.    Why does it now say ███████████
███████████ in 179?
21 A.    ███████████
23 ███████████.
24 ███████████

Page 71

1  ███████████
███████████
███████████
███████████
6  Q.    When did ARM change that?
7  A.    About a year and a half ago, I believe.
8  Q.    So sometime between ███████████
███████████. Is that correct?
11 A.    Yes.
12    MR. KRAMER:  Objection to form.
13    THE DEPONENT:  Yes, that's correct.
14 BY MS. ZAPPALA:
15 Q.    And do you know who -- who was responsible for
16 making that policy change?
17 A.    The pricing team makes that change.
18 Q.    Who is the pricing team?
19 A.    It falls under Sabina Polnar.
20 Q.    Can you spell that?
21 A.    P-o-l-n-a-r.
22 Q.    And what is the responsibility of the pricing
23 team?
24 A.    ███████████
███████████

Page 72

1  A.    Yes.
2  ███████████
███████████
5  Q.    So what is the difference between
6  responsibility -- strike that.
7  ███████████
8     MR. KRAMER:  Objection to form.  Outside the
9  scope.
10 ███████████
12 BY MS. ZAPPALA:
13 Q.    ███████████
16 A.    Comes up with?  No.
17 Q.    ███████████
███████████
███████████
███████████
23    MR. KRAMER:  Objection to form.  Outside the
24 scope.
25    THE DEPONENT:  It's a general governance

Page 73

1  practice.  If you think about operational as a company,
2  ███████████
4  BY MS. ZAPPALA:
5  ███████████
███████████
7  A.    No.
8     MR. KRAMER:  Objection to form.  Outside the
9  scope.
10 BY MS. ZAPPALA:
11 Q.    What I'm trying to understand is, earlier you
12 were talking about how the licensing team, including
13 Mr. Shivashankar --
14 A.    Yes.
15 Q.    -- ███████████ to
16 ███████████
███████████
███████████
███████████
███████████
███████████
25 ///

19 (Pages 70 - 73)

# Exhibit 64

# Exhibit 65



CONFIDENTIAL

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

CONFIDENTIAL

QCVARM_0527545

# Exhibit 66

1

```
13:12:40          IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF DELAWARE


         ARM LTD.,                    )
         a U.K. corporation,          )
                                      )
                   Plaintiff,         )
                                      )  C.A. No. 22-1146(MN)
         v.                           )
                                      )
         QUALCOMM, INC.,              )
         a Delaware corporation,      )
         et al.,                      )
                                      )
                   Defendants.        )


                    Thursday, March 7, 2024
                    2:13 p.m.
                    Oral Argument


                    844 King Street
                    Wilmington, Delaware


         BEFORE:  THE HONORABLE MARYELLEN NOREIKA
                  United States District Court Judge


         APPEARANCES:


                  YOUNG CONAWAY STARGATT & TAYLOR
                  BY:  ANNE SHEA GAZA, ESQ.
                  BY:  ROBERT M. VRANA, ESQ.

                    -and-

                  MORRISON FOERSTER, LLP
                  BY:  KYLE W.K. MOONEY, ESQ.
                  BY:  NICHOLAS R. FUNG, ESQ.
                  BY:  DANIEL MACKNIDES, ESQ.

                         Counsel for the Plaintiff
```

2

```
 1    APPEARANCES CONTINUED:

 2

 3    MORRIS NICHOLS ARSHT & TUNNELL LLP
      BY:  JACK BLUMENFELD, ESQ.

 4    -and-

 5    PAUL WEISS
      BY:  KAREN L. DUNN, ESQ.
 6    BY:  ERIN MORGAN, ESQ.

 7        Counsel for the Defendants

 8
 9    FISH & RICHARDSON
      BY:  NITIKA GUPTA FIORELLA, ESQ.
10    -and-

11    WALKER STEVENS CANNOM, LLP
12    BY:  HANNAH L. CANNOM, ESQ.

13        Counsel for ████████

14

15    WILSON SONSINI GOODRICH & ROSATI
      BY:  BRAD SORRELS, ESQ.
16
17        Counsel for ██████████

18

19        – – – – – – – – – – – – –

20

13:37:07 21        THE COURT:  All right.  Good afternoon everyone.
13:37:07    Please be seated.
14:13:23 22        Ms. Gaza.
14:13:28 23        MS. GAZA:  Good afternoon, Your Honor.  Anne
14:13:29 24  Gaza on behalf of plaintiff, ARM.  I'm joined today by Kyle
14:13:31 25
```

3

```
14:13:35  1  Mooney and Nicholas Fung of Morrison & Foerster as well as
14:13:38  2  my colleague, Robert Vrana and Daniel Macknides.
14:13:45  3        MR. BLUMENFELD:  Good afternoon, Your Honor.
14:13:48  4  Jack Blumenfeld from Morris Nichols for the Qualcomm
14:13:52  5  defendants.  And with me is Karen Dunn and Erin Morgan from
14:13:56  6  Paul Weiss.
14:13:56  7        THE COURT:  Great.
14:13:58  8        MS. GAZA:  Your Honor, if I may, I'm sorry, I
14:14:01  9  meant to mention also that third-party counsel for ████████
14:14:06 10  and █████ are in attendance as well if you would like their
14:14:09 11  introduction.
14:14:10 12        THE COURT:  Sure.  You guys can give me your
14:14:12 13  input if you need to.
14:14:15 14        All right.  Let's start with -- so we have a
14:14:19 15  couple of objections and we have the trial date issue.  I
14:14:25 16  saw there was another order from Judge Hatcher yesterday.
14:14:28 17  Am I going to be getting objections for that, anyone?
14:14:35 18        MR. MOONEY:  No, Your Honor.
14:14:35 19        THE COURT:  I didn't get a yes or no.  And when
14:14:38 20  you speak, could you stand.
14:14:39 21        MS. DUNN:  Not from us, Your Honor.
14:14:41 22        MR. MOONEY:  No, Your Honor.
14:14:42 23        THE COURT:  Okay.  Great.  All right.
14:14:45 24        Okay.  Let's start with Mr., is it Son or Son?
14:14:53 25        MS. DUNN:  Yes, Your Honor.  Karen Dunn for
```

4

```
14:14:56  1  Qualcomm.
14:14:57  2        THE COURT:  So I need you to really focus me on
14:15:01  3  the standard here because I'm not looking at this de novo,
14:15:07  4  and so I need you to focus on why this was clearly erroneous
14:15:14  5  or contrary to law.
14:15:16  6        MS. DUNN:  I'm happy to do that, Your Honor.  We
14:15:19  7  have slides as to this argument that we can hand up if it
14:15:24  8  pleases the Court.  Thank you.
14:15:25  9        THE COURT:  Let me ask you this before I start.
14:15:27 10  Is there really a dispute as to whether he told █████ or
14:15:39 11  others that Qualcomm's license was going to expire?  Is that
14:15:45 12  in dispute?
14:15:46 13        MS. DUNN:  There is a dispute about his
14:15:48 14  statements.  We know he -- there is no dispute that he made
14:15:52 15  statements.  I don't know, perhaps counsel for Arm can tell
14:15:55 16  us whether they dispute that he said the license would
14:15:58 17  expire.  I don't think that's in the record.
14:16:02 18        THE COURT:  Why don't you guys talk about that
14:16:04 19  because I need to understand what there is a dispute about
14:16:06 20  so I can decide if he has superior or unique knowledge.  If
14:16:10 21  nobody disputes what you say he said, then I'm not sure I
14:16:14 22  care as much.  Why don't you guys talk about it.  I can't
14:16:19 23  believe you haven't done that already.
14:16:23 24        (Discussion off the record.)
14:16:25 25        MR. MOONEY:  Your Honor, Rene Haas, the current
```

41

| | |
|---|---|
| 15:08:10 | 1 change something, only the terms that are non-redacted. |
| 15:08:13 | 2 MR. MOONEY: Yes, Your Honor is right that we as |
| 15:08:16 | 3 you pointed out to counsel at Qualcomm, having redacted that |
| 15:08:19 | 4 information we are not going to be able to rely what is |
| 15:08:22 | 5 beneath those redactions to make that argument, that's |
| 15:08:25 | 6 right. |
| 15:08:25 | 7 THE COURT: You're not going to be able to argue |
| 15:08:27 | 8 that you're changing terms or that you will change terms |
| 15:08:32 | 9 that have been redacted in any way. So, if, for example, |
| 15:08:37 | 10 you can't say whatever is in appendix A, you can't say well |
| 15:08:43 | 11 -- annex A, we're not going to change what we do in annex A |
| 15:08:47 | 12 because you never disclosed what you did previously so you |
| 15:08:50 | 13 can't say how you're going to change it, right? |
| 15:08:53 | 14 MR. MOONEY: I believe Your Honor would not let |
| 15:08:54 | 15 us get away with that. We would not be able to rely on any |
| 15:08:59 | 16 redacted information. |
| 15:09:00 | 17 THE COURT: And your expert hasn't given any |
| 15:09:02 | 18 specifics so you can't come in later with some specifics, is |
| 15:09:05 | 19 that right? |
| 15:09:05 | 20 MR. MOONEY: Well, the expert, yes, Your Honor, |
| 15:09:07 | 21 I didn't see in looking at Mr. Schoettelkotte's expert |
| 15:09:11 | 22 report, the passages that we were pointed to, any statements |
| 15:09:14 | 23 about changes being made to ALAs, any reliance on any |
| 15:09:19 | 24 redacted material, in fact, Mr. Schoettelkotte had the very |
| 15:09:22 | 25 same redacted documents that Qualcomm's experts had. I have |

42

| | |
|---|---|
| 15:09:26 | 1 heard for the first time today a complaint that our expert |
| 15:09:29 | 2 spoke to some ARM employees. I have not heard that before |
| 15:09:33 | 3 in this case -- |
| 15:09:34 | 4 THE COURT: Well, I saw something in the papers |
| 15:09:36 | 5 saying they didn't give them the licenses or maybe they gave |
| 15:09:40 | 6 them redacted versions of licenses, but I did see something |
| 15:09:44 | 7 saying he's not opining based on the licenses, he's opining |
| 15:09:47 | 8 based on something else. |
| 15:09:50 | 9 MR. MOONEY: Our expert, both Mr. Schoettelkotte |
| 15:09:53 | 10 and others did have conversations with some ARM employees in |
| 15:09:56 | 11 connection with preparing the report, just as Qualcomm's |
| 15:09:59 | 12 expert spoke to Qualcomm employees. I would like to say |
| 15:10:03 | 13 though, that Your Honor just heard that Qualcomm did not |
| 15:10:06 | 14 have a chance to have conversations with the people that |
| 15:10:08 | 15 Mr. Schoettelkotte spoke to. They did. They deposed these |
| 15:10:12 | 16 people and I was present at those depositions. |
| 15:10:14 | 17 THE COURT: And did this come before or after |
| 15:10:16 | 18 those depositions? |
| 15:10:17 | 19 MR. MOONEY: This expert report was served a few |
| 15:10:20 | 20 weeks after the fact depositions. |
| 15:10:22 | 21 THE COURT: So they didn't have a chance to ask |
| 15:10:24 | 22 because they didn't know that Mr. Abbey and Mr. Williamson |
| 15:10:29 | 23 had discussions with Mr. Schoettelkotte, right? |
| 15:10:33 | 24 MR. MOONEY: I would not agree with that. They |
| 15:10:33 | 25 knew what -- they knew the sphere of responsibility that |

43

| | |
|---|---|
| 15:10:37 | 1 those employees had, we had produced 1.5 million pages of |
| 15:10:42 | 2 documents -- |
| 15:10:43 | 3 THE COURT: They had no idea, when they took |
| 15:10:45 | 4 those depositions, they couldn't say, Mr. Abbey, what did |
| 15:10:48 | 5 you discuss with the expert? |
| 15:10:50 | 6 MR. MOONEY: I agree with that, Your Honor. |
| 15:10:51 | 7 THE COURT: Okay. |
| 15:10:52 | 8 MR. MOONEY: But Your Honor, that's not unlike |
| 15:10:55 | 9 -- |
| 15:10:55 | 10 THE COURT: I think that's what Mr. Blumenfeld |
| 15:10:57 | 11 was getting at, he's saying I can't have the same |
| 15:11:00 | 12 discussions with these folks and ask, you know, have my |
| 15:11:04 | 13 expert ask them questions because fact discovery is over. |
| 15:11:10 | 14 MR. MOONEY: It is true, Your Honor -- |
| 15:11:11 | 15 THE COURT: He can't ask about what they |
| 15:11:14 | 16 discussed with the expert. |
| 15:11:15 | 17 MR. MOONEY: It is true that in this case |
| 15:11:17 | 18 Qualcomm's -- if I'm following this, Qualcomm's counsel was |
| 15:11:21 | 19 not able to depose ARM employees after ARM's expert put in |
| 15:11:26 | 20 reports, that's true. That's true in every case. What is |
| 15:11:30 | 21 also true in this case -- |
| 15:11:31 | 22 THE COURT: Yeah, but what's not true in every |
| 15:11:33 | 23 case is every -- my gosh, we have from footnote 196 through |
| 15:11:38 | 24 at least -- through at least footnote 219, there is nothing |
| 15:11:43 | 25 else other than discussion, or maybe a deposition. |

44

| | |
|---|---|
| 15:11:49 | 1 MR. MOONEY: I agree with Your Honor that |
| 15:11:51 | 2 Mr. Schoettelkotte in particular had many discussions with |
| 15:11:54 | 3 our employees and this is a heavily footnoted report. Those |
| 15:11:58 | 4 are not the only sources Mr. Schoettelkotte relied on by any |
| 15:12:02 | 5 means. |
| 15:12:02 | 6 THE COURT: It is the only source in what I |
| 15:12:04 | 7 have. |
| 15:12:04 | 8 MR. MOONEY: It is the only source in the four |
| 15:12:09 | 9 pages that Your Honor has been handed from the report, |
| 15:12:09 | 10 Mr. Schoettelkotte has a schedule of information that was |
| 15:12:11 | 11 relied on that includes many thousands of documents in the |
| 15:12:14 | 12 case, many thousands of transcripts and exhibits in addition |
| 15:12:18 | 13 -- |
| 15:12:18 | 14 THE COURT: So let's say -- and I'll give the |
| 15:12:23 | 15 third parties a chance to weigh in on this, too, tell me |
| 15:12:29 | 16 about the confidentiality. We have a protective order, we |
| 15:12:33 | 17 have an outside counsel only provision. So say that this |
| 15:12:38 | 18 stuff is at risk of all of the comments went sort of generic |
| 15:12:44 | 19 saying this is going to give Qualcomm a competitive |
| 15:12:47 | 20 advantage. The way it gives Qualcomm a competitive |
| 15:12:51 | 21 advantage is if the information is given to outside counsel |
| 15:12:54 | 22 and outside counsel gives it to Qualcomm, which is quite an |
| 15:13:02 | 23 accusation. |
| 15:13:02 | 24 So why is the protective order not sufficient? |
| 15:13:07 | 25 MR. MOONEY: Well, as Your Honor knows, the law |

45

```
15:13:10   1   is clear that the protective order isn't sufficient to
15:13:13   2   require parties to produce information that's not relevant
15:13:16   3   in the case.
15:13:17   4            THE COURT:  Let's say I'm not convinced that
15:13:19   5   it's not relevant.
15:13:20   6            MR. MOONEY:  Your Honor is right, we are not
15:13:21   7   suggesting that Qualcomm outside counsel is going to
15:13:25   8   deliberately disclose this information to anybody, that's
15:13:28   9   not the concern.  The concern is that this is highly
15:13:30  10   confidential competitive information that goes to the very
15:13:34  11   core of our business and to the very core of our
15:13:34  12   competitor's business and this is information that could be
15:13:40  13   misused by our competitors and our customers.  And that any
15:13:45  14   risk that this information is inadvertently specifically or
15:13:50  15   generally used or disclosed by any counsel or anyone else
15:13:54  16   involved in the case who might have access to this
15:13:56  17   information under the protective order, which certainly
15:14:00  18   isn't just counsel sitting at the table is enough of a risk
15:14:03  19   that we worked very carefully with our customers, ████
15:14:08  20   here, to remove as many --
15:14:11  21            THE COURT:  You haven't worked at all with
15:14:12  22   anyone on the ████████████, that's just a big fat
15:14:17  23   no, right?  You don't even have the first page of it that
15:14:20  24   says agreement.
15:14:21  25            MR. MOONEY:  It is true that the ██████████
```

46

```
15:14:24   1   ████ has not been produced and on that, I would let ████
15:14:29   2   speak further.
15:14:29   3            If you have any other further questions for me,
15:14:32   4   I'm happy to address them.
15:14:34   5            THE COURT:  All right.  ██████.
15:14:37   6            MS. CANNOM:  Thank you, Your Honor.  Hannah
15:14:40   7   Cannom on behalf of ████████.  A couple of points that I
15:14:43   8   think we need to look at.  First of all, it's from Judge
15:14:46   9   Hatcher's order where she says that balancing the minimal
15:14:50  10   relevance when combined with the harm of disclosure --
15:14:53  11            THE COURT:  I might think it's a little bit more
15:14:55  12   relevant than she does.
15:14:58  13            MS. CANNOM:  What she then goes on to say it
15:15:01  14   will necessarily need to generate generalized information
15:15:03  15   from the ARM clients.  This is different than a source code
15:15:05  16   situation where the source code is in a room and what we're
15:15:07  17   worried about is inadvertent disclosure of large swaths of
15:15:11  18   code.  Here we have information that once it's heard --
15:15:15  19            THE COURT:  Tell me what exactly that means,
15:15:18  20   necessarily -- I don't know why that is, so why is it
15:15:23  21   different than you have source code and you say we can't
15:15:30  22   make out an infringement case because, you know, the source
15:15:34  23   code doesn't have this, or we can make out an infringement
15:15:38  24   case so that, therefore, they are, you know, confirming that
15:15:41  25   the source code shows that something works.  Why -- like,
```

47

```
15:15:45   1   why is that different from this?  Why do you think that if
15:15:52   2   someone, outside counsel for Qualcomm gets it, like what is
15:15:56   3   -- give me an example, what necessarily would they have to
15:15:59   4   disclose that's so -- that's so secret that it would be
15:16:04   5   harmful.
15:16:05   6            MS. CANNOM:  Right.  So speaking generally about
15:16:06   7   ████████████ provision, if they were entitled to see the
15:16:10   8   ████████ provision, then they would have to tell their
15:16:15   9   client whether the ████████ provision was similar or
15:16:17  10   different and that's why that mattered to the specific issue
15:16:20  11   here.
15:16:21  12            There are also other, you know, certain
15:16:23  13   licensing terms --
15:16:25  14            THE COURT:  Well, I mean the termination
15:16:26  15   provision, that wasn't even something -- that was redacted
15:16:29  16   in the ████ one, so I'm not sure why I understand that's
15:16:33  17   so secretive.
15:16:35  18            MS. CANNOM:  And ████████ position is that
15:16:38  19   everything that's within the ████ ALA is very highly
15:16:41  20   protected even within ████.
15:16:44  21            THE COURT:  That assumes a bit much to me.
15:16:47  22   You're telling me the very first words that say this ALA
15:16:51  23   between ████ and ARM, that's super secret.  Come on, right
15:16:54  24   then you're losing a little bit of credibility because
15:16:57  25   you're not even -- I mean, that's not -- let's put it this
```

48

```
15:17:00   1   way.  The Third Circuit test for confidentiality, you didn't
15:17:05   2   meet it when you're telling me that.  I'm supposed to go
15:17:09   3   line by line in things according to the Third Circuit.  So
15:17:13   4   you just saying there is an agreement, but you can't even
15:17:17   5   see who signed it tells me right then that you're being
15:17:23   6   overly inclusive and you're not encouraging me to follow the
15:17:26   7   Third Circuit's guidance on confidentiality.
15:17:30   8            MS. CANNOM:  Understood, Your Honor.  Your
15:17:33   9   Honor, and if you were to order that ████ would have to
15:17:36  10   produce a redacted version in line with the other ALAs, that
15:17:40  11   would be certainly something we would do.  Our concern here,
15:17:43  12   however, is that the clearly defined serious injury that
15:17:47  13   ████ has vis-a-vis its competitor and more broadly --
15:17:50  14            THE COURT:  I'm still not getting it.  You're
15:17:52  15   telling me it's so harmful to you if the example you gave
15:17:57  16   me, the ████████████████ were disclosed, yet other
15:18:02  17   competitors, ████████████████ are disclosed, and maybe
15:18:08  18   there is something super secret in ████ s
15:18:12  19   ████████ but the fact that it sort of undermines your
15:18:18  20   argument when other competitors are like okay, you can't see
15:18:21  21   how much we pay, but you can see what happens if we
15:18:24  22   ████████
15:18:26  23            MS. CANNOM:  To be clear, there are multiple
15:18:28  24   other ALAs that have been produced in redacted material
15:18:32  25   here.  What we're concerned is the most recent one which has
```

# Exhibit 67

# Exhibit 68

86

```
08:12:43  1              IN THE UNITED STATES DISTRICT COURT

          2              FOR THE DISTRICT OF DELAWARE

          3

          4
             ARM LTD.,                  ) ROUGH DRAFT
          5  a U.K. corporation,        )
                                        ) VOLUME 2
          6         Plaintiff,          )
                                        ) C.A. No. 22-1146(MN)
          7  v.                         )
                                        )
          8  QUALCOMM, INC.,            )
             a Delaware corporation,    )
          9  et al.,                    )
                                        )
         10         Defendants.         )

         11

         12
                        Monday, December 16, 2024
         13             8:30 a.m.
                        Jury Trial
         14

         15             844 King Street
                        Wilmington, Delaware
         16

         17

         18  BEFORE:  THE HONORABLE MARYELLEN NOREIKA
                      United States District Court Judge
         19

         20

         21

         22  APPEARANCES:

         23     YOUNG CONAWAY STARGATT & TAYLOR
                BY:  ANNE SHEA GAZA, ESQ.
         24
                        -and-
         25
```

87

```
 1  APPEARANCES (Cont'd):

 2

 3      MORRISON FOERSTER, LLP
        BY:  DARALYN DURIE, ESQ.
        BY:  ERIK OLSON, ESQ.
 4      BY:  SCOTT LLEWELLYN, ESQ.
        BY:  SHAELYN DAWSON, ESQ.
 5      BY:  NICHOLAS FUNG, ESQ.
        BY:  SARA BRICKEY, ESQ.
 6      BY:  LAURA GILBERT REMUS, ESQ.
        BY:  ZACHARY QUINLAN, ESQ.
 7      BY:  MICHAEL DeSTAFANO, ESQ.

 8
            Counsel for the Plaintiff
 9

10

11      MORRIS NICHOLS ARSHT & TUNNELL LLP
        BY:  JACK BLUMENFELD, ESQ.
12      BY:  JENNIFER YING, ESQ.

13      -and-

14      PAUL WEISS
        BY:  KAREN L. DUNN, ESQ.
15      BY:  CATHERINE NYARDY, ESQ.
        BY:  JACOB BRALY, ESQ.
16      BY:  RUBY GARRETT, ESQ.
        BY:  WILLIAM MARKS, ESQ.
17      BY:  WILLIAM ISAACSON, ESQ.

18
            Counsel for the Defendants
19

20

21           - - - - - - - - - - - - -

08:14:19 22
08:14:19 23
08:16:06 24
08:16:17 25
```

88

```
08:16:17  1          COURTROOM DEPUTY:  All rise.  The United States
08:16:17  2  District Court for the District of Delaware is now in
08:17:08  3  session.  The Honorable Maryellen Noreika presiding.
08:36:53  4          THE COURT:  All right.  Good morning, everyone.
08:36:56  5  Please be seated.
08:36:57  6          So we have a few issues.  I haven't looked at
08:37:01  7  the letters, so you can make your arguments.
08:37:06  8          MS. YING:  Your Honor, before we begin, I told
08:37:08  9  your courtroom deputy, Mr. Buckson, that we have resolved
08:37:11 10  one of the issues that was in one of the letters.
08:37:13 11          THE COURT:  Yeah, he told me that.  So it's just
08:37:15 12  one exhibit for the defense side?
08:37:17 13          MS. YING:  That's correct.  Thank you, Your
08:37:23 14  Honor.
08:37:27 15          MR. MARKS:  Thank you, William Marks for the
08:37:29 16  defendants.  We object to PTX-118.  This a letter from a
08:37:33 17  company called CSR, that Qualcomm acquired in 2015.  In the
08:37:38 18  letter CSR asked for Arm to agree to the assignment of a
08:37:43 19  technology license agreement.  We believe this letter is
08:37:46 20  hearsay, and it's from a third party who is not present,
08:37:48 21  it's not a business record of Arm, and it's not relevant to
08:37:51 22  any of the issues in the case because what CSR thought it
08:37:55 23  needed to obtain from Arm, is not relevant to what Qualcomm
08:37:58 24  needs to obtain from Arm related to a different type of
08:38:02 25  contract under different circumstances.
```

89

```
08:38:04  1          THE COURT:  Okay.  Ms. Durie?
08:38:07  2          MS. DURIE:  Thank you, Your Honor, and good
08:38:09  3  morning.  Exhibit 118 is actually a counter signed
08:38:13  4  assignment of the CSR contract executed by Arm in connection
08:38:20  5  with Qualcomm's purchase of CSR.  It reflects the course of
08:38:25  6  dealings of the parties when Qualcomm enters into a contract
08:38:29  7  to purchase another company that has a preexisting contract
08:38:32  8  with Arm.  Arm witnesses will be able to authenticate it,
08:38:38  9  it's not hearsay because this is being presented for its
08:38:42 10  authentic legal effect in addition to the dealing.
08:38:45 11          THE COURT:  Do you want to respond to that?
08:38:49 12          MR. MARKS:  Thank you, Your Honor.  I believe
08:38:51 13  that the letter is hearsay because being offered for the
08:38:54 14  truth of the matter, to the extent that it's relevant to the
08:38:57 15  course of dealings --
08:38:58 16          THE COURT:  She just said it's not being offered
08:39:00 17  for the truth, so can you respond to that?
08:39:02 18          MR. MARKS:  Yes, I think she said she believes
08:39:05 19  it goes to the course of dealings because it shows how
08:39:09 20  Qualcomm interprets a provision of the contract and I think
08:39:11 21  that that goes directly to the contents of the letter which
08:39:14 22  makes it hearsay.
08:39:15 23          THE COURT:  I think she's saying this is what
08:39:18 24  they said, not actually what they did or whether it's true.
08:39:21 25          MR. MARKS:  Right, Your Honor, I would also say
```

206

Abbey - cross

| | | |
|---|---|---|
| 12:02:53 | 1 | company on August 21, 2022? |
| 12:02:55 | 2 | **A.** That's correct. |
| 12:02:56 | 3 | **Q.** Do not put this on the screen. And this is an e-mail |
| 12:03:03 | 4 | that someone -- to someone you know as a customer of |
| 12:03:06 | 5 | Qualcomm, right? |
| 12:03:06 | 6 | **A.** A customer of Arm as well, yes. |
| 12:03:08 | 7 | **Q.** But you know it's a major customer of Qualcomm, |
| 12:03:12 | 8 | right? |
| 12:03:12 | 9 | **A.** A major customer of Arm as well, yes. |
| 12:03:15 | 10 | **Q.** A major customer of both of your companies? |
| 12:03:19 | 11 | **A.** Absolutely, I agree with that. |
| 12:03:20 | 12 | **Q.** And what you write is, you write -- |
| 12:03:23 | 13 | MR. ISAACSON: I move to admit DTX-28. |
| 12:03:25 | 14 | MR. LLEWELLYN: No objection, Your Honor. |
| 12:03:27 | 15 | THE COURT: It's admitted. |
| 12:03:28 | 16 | (DTX Exhibit No. 28 was admitted into evidence.) |
| 12:03:29 | 17 | BY MR. ISAACSON: |
| 12:03:29 | 18 | **Q.** And you inform him of the news of this lawsuit, |
| 12:03:31 | 19 | right? |
| 12:03:32 | 20 | **A.** Which is public, yes. |
| 12:03:33 | 21 | **Q.** And you say that Qualcomm attempted to transfer Nuvia |
| 12:03:37 | 22 | licenses without Arm consent? |
| 12:03:39 | 23 | **A.** Yes. |
| 12:03:40 | 24 | **Q.** You told him? |
| 12:03:42 | 25 | **A.** Absolutely. |

207

Abbey - cross

| | | |
|---|---|---|
| 12:03:42 | 1 | **Q.** And you also said, Qualcomm has breached the terms of |
| 12:03:49 | 2 | Arm's license agreement by continuing development under the |
| 12:03:53 | 3 | terminated licenses, correct? |
| 12:03:55 | 4 | **A.** That was my testimony, yes. |
| 12:03:57 | 5 | **Q.** All right. So let's be clear here. Before there was |
| 12:04:01 | 6 | any final ruling from this case that Qualcomm had breached |
| 12:04:08 | 7 | anything, you were telling customers that Qualcomm had |
| 12:04:12 | 8 | breached its agreement: right? |
| 12:04:14 | 9 | **A.** That's right, yes. |
| 12:04:15 | 10 | **Q.** And the agreement you're talking about is the Nuvia |
| 12:04:19 | 11 | ALA; right? |
| 12:04:20 | 12 | **A.** That's right, yes. |
| 12:04:21 | 13 | **Q.** That's not -- the Nuvia ALA is not something Qualcomm |
| 12:04:25 | 14 | ever assigned, it's not a party to that agreement: right? |
| 12:04:29 | 15 | **A.** The conversations of consent was coming from |
| 12:04:34 | 16 | Qualcomm, not Nuvia. |
| 12:04:35 | 17 | **Q.** I'm just talking about the Nuvia ALA, that contract, |
| 12:04:38 | 18 | that's between Nuvia and Arm, it's not with Qualcomm, right? |
| 12:04:41 | 19 | **A.** I'm talking to you about the particular topic and |
| 12:04:44 | 20 | you're representing Nuvia in those conversations, that's |
| 12:04:48 | 21 | from Qualcomm. |
| 12:04:48 | 22 | **Q.** You don't know who is a party to the contract, I'll |
| 12:04:52 | 23 | just move on. |
| 12:04:52 | 24 | **A.** Okay. |
| 12:04:53 | 25 | **Q.** You say that Qualcomm is going to continue |

208

Abbey - cross

| | | |
|---|---|---|
| 12:04:55 | 1 | development under the terminated license. You were telling |
| 12:04:57 | 2 | this customer that Qualcomm was going to continue |
| 12:05:01 | 3 | development of CPU's under the Nuvia license, but not its |
| 12:05:07 | 4 | own license: right? |
| 12:05:08 | 5 | **A.** That's right, yes. |
| 12:05:09 | 6 | **Q.** And you didn't tell the customer, oh, Qualcomm has |
| 12:05:13 | 7 | its own license: right? |
| 12:05:15 | 8 | **A.** But the products that were developed that were under |
| 12:05:19 | 9 | -- |
| 12:05:19 | 10 | **Q.** Simple question, did you tell the customer -- |
| 12:05:21 | 11 | **A.** Didn't have to, no. |
| 12:05:23 | 12 | **Q.** You believed, I believe you said you didn't have to. |
| 12:05:27 | 13 | So you believed you could tell these -- this customer that |
| 12:05:32 | 14 | we -- that Qualcomm was developing under the terminated |
| 12:05:37 | 15 | license even though it had its own license because you |
| 12:05:41 | 16 | didn't have to tell them that, that's your testimony, right? |
| 12:05:43 | 17 | **A.** I can't share with customers confidential information |
| 12:05:48 | 18 | that relates to Qualcomm, no, I didn't tell them that, I |
| 12:05:52 | 19 | didn't have to, I can't do that, I wouldn't do that. |
| 12:05:54 | 20 | **Q.** You told the customers about the Nuvia ALA, right? |
| 12:05:57 | 21 | **A.** That's right. |
| 12:05:58 | 22 | **Q.** You considered that confidential, didn't you? |
| 12:06:00 | 23 | **A.** It's terminated. |
| 12:06:02 | 24 | **Q.** After it was terminated, it remained confidential, |
| 12:06:05 | 25 | didn't it? |

209

Abbey - cross

| | | |
|---|---|---|
| 12:06:05 | 1 | **A.** I guess so, you're right. |
| 12:06:07 | 2 | **Q.** You were telling them about one confidential |
| 12:06:09 | 3 | agreement, but not about another? |
| 12:06:11 | 4 | **A.** Yes, yes, that's correct. |
| 12:06:12 | 5 | **Q.** And if we can look at DTX-30. Don't put it on the |
| 12:06:19 | 6 | screen? |
| 12:06:20 | 7 | MR. ISAACSON: I'll move to admit DTX-30, this |
| 12:06:24 | 8 | is another communication to the same individual. |
| 12:06:31 | 9 | MR. LLEWELLYN: |
| 12:06:33 | 10 | MR. ISAACSON: This is from you, isn't it. |
| 12:06:37 | 11 | THE WITNESS: This is, yes. |
| 12:06:38 | 12 | MR. LLEWELLYN: No objection. |
| 12:06:40 | 13 | MR. ISAACSON: Thank you. |
| 12:06:40 | 14 | THE COURT: Thank you. It's admitted. |
| 12:06:42 | 15 | (DTX Exhibit No. 30 was admitted into evidence.) |
| 12:06:43 | 16 | BY MR. ISAACSON: |
| 12:06:43 | 17 | **Q.** Now, you're writing to the same big customer of both |
| 12:06:52 | 18 | companies, right? |
| 12:06:52 | 19 | **A.** That's right. |
| 12:06:52 | 20 | **Q.** In the second paragraph, you say Arm is seeking to -- |
| 12:06:58 | 21 | in the second paragraph, in the last sentence, under the |
| 12:07:01 | 22 | relevant agreement, do you see that? |
| 12:07:03 | 23 | **A.** I do, yes. |
| 12:07:04 | 24 | **Q.** And what you told this customer is under the relevant |
| 12:07:07 | 25 | agreement, the Nuvia technology including the Phoenix core, |

254

Williamson - cross

13:53:31   1   Qualcomm about Nuvia products, and we were -- my
13:53:38   2   recollection is that therefore they would be concerned or
13:53:42   3   aware of a lawsuit impacting their business and therefore be
13:53:45   4   interested.
13:53:46   5       Q.     So you wanted to make sure that you were talking to
13:53:50   6   Qualcomm's premium customers, right?
13:53:52   7       A.     No, I would say Arm's partners who are using Arm
13:53:58   8   technology who would be concerned to see us engage in a
13:54:01   9   lawsuit with a major partner.
13:54:03   10      Q.     All right.  But what you wrote here, are the premium
13:54:06   11  mobile vendors Qualcomm are targeting with Nuvia, right?
13:54:10   12      A.     Yes.  So in this business there is a significant
13:54:13   13  overlap --
13:54:13   14      Q.     Answer my question.
13:54:14   15      A.     Sorry.
13:54:14   16      Q.     So when you say targeting with Nuvia, you mean trying
13:54:17   17  to sell products to them, right?
13:54:20   18      A.     Yes.
13:54:20   19      Q.     Right.  So you are talking about targeting the
13:54:25   20  customers of Qualcomm who they are trying to sell products
13:54:29   21  to, right?
13:54:30   22      A.     I am talking about Arm partners who are using Arm
13:54:36   23  technology who are also being marketed to by Qualcomm and
13:54:39   24  Nuvia.
13:54:41   25             MR. ISAACSON:  I have no further questions.

255

Williamson - redirect

13:54:42   1              THE COURT:  All right.  Thank you.  Redirect.
13:54:44   2              MR. LLEWELLYN:  Yes, Your Honor, just a few
13:54:46   3   questions.
13:54:49   4                     REDIRECT EXAMINATION
13:54:50   5   BY MR. LLEWELLYN:
13:54:53   6       Q.     Good afternoon, Mr. Williamson.
13:54:57   7              If you could pull up PTX-247.
13:55:02   8       A.     Yes, that's in the original binder.
13:55:05   9       Q.     We can see it on the screen here.
13:55:07   10      A.     Okay.
13:55:07   11      Q.     You were asked about a variety of safeguards that Arm
13:55:11   12  was trying to put into place.  What concerns were these
13:55:18   13  safeguards intended to address?
13:55:21   14      A.     So, my recollection is that in the discussion with
13:55:24   15  Mr. Asghar, when we talked about options for Qualcomm in
13:55:29   16  relation to these contracts, they were in a situation where
13:55:32   17  one of the suggestions were that they would just move the
13:55:36   18  team, and they didn't need the agreement and they could
13:55:39   19  build their own cores under the Qualcomm architecture
13:55:43   20  agreement, and that is something that absolutely we said
13:55:46   21  fine, that would be acceptable.  But we were concerned that
13:55:49   22  in doing so, that team might access the Arm, our own
13:55:53   23  in-house designs and initiate their designs as a derivative
13:55:59   24  from our design, so effectively copy a process that we had
13:56:04   25  already built, and we wanted to be, have reassurance,

256

Williamson - redirect

13:56:10   1   reassurance that they wouldn't be building our inventions,
13:56:10   2   if we got both agreements, that they don't take the team and
13:56:14   3   then immediately introduce to them access to the Arm
13:56:18   4   designed processor and then immediately start copying or
13:56:22   5   using that as a suggested starting point.  As Mr. Asghar had
13:56:27   6   invoked this idea that they might start from scratch but
13:56:30   7   they would have access to those cores, I sought reassurances
13:56:35   8   from them that they would ensure that that wouldn't happen
13:56:39   9   and there wouldn't overlap or copying of designs which is
13:56:43   10  something we wanted to protect against.
13:56:45   11      Q.     If you could pull up JTX-11, please, and go to
13:56:48   12  page 7.
13:56:49   13             You were shown this during the examination that
13:56:53   14  just occurred, and under B.1.1?
13:56:58   15      A.     Sorry, lost track, JTX which, 11?
13:57:02   16      Q.     Yes.
13:57:03   17      A.     Okay.  Yes.
13:57:09   18      Q.     And there were questions about using the applicable
13:57:14   19  Arm capital T technology, do you see that?  Right in the
13:57:20   20  first line after B.1.1?
13:57:25   21      A.     I'm sorry, right at the top, the applicable Arm
13:57:29   22  technology to design and then operating, yes.
13:57:31   23      Q.     And Arm technology is a defined term, if you look on
13:57:35   24  the preceding -- go to page 4?
13:57:41   25      A.     Yes, A.10.

257

Williamson - redirect

13:57:46   1       Q.     You weren't shown this when you were asked about it.
13:57:48   2   But Arm technology means the architecture technology
13:57:51   3   identified in this annex one.  Do you see that word "this."
13:57:57   4       A.     Yes.
13:57:57   5       Q.     This annex one, if you look at the top of the page,
13:58:00   6   it's dated 2013, do you see that?
13:58:02   7       A.     I do, yes.
13:58:03   8       Q.     How many years was that before Qualcomm bought Nuvia?
13:58:09   9       A.     That's eight years, isn't it?
13:58:13   10      Q.     How many years was that before Nuvia was founded, do
13:58:18   11  you know?
13:58:18   12      A.     So that's six years.
13:58:20   13      Q.     And then if you look at architecture compliant core,
13:58:28   14  a microprocessor core in that first line, developed by or
13:58:35   15  for licensee, that's Qualcomm?
13:58:37   16      A.     Yes.
13:58:37   17      Q.     Under the licenses granted in this annex one.  Do you
13:58:40   18  see that?
13:58:41   19      A.     Yes.
13:58:42   20      Q.     In 2013, Nuvia didn't exist, right?
13:58:45   21      A.     That's correct.
13:58:47   22             MR. LLEWELLYN:  Nothing further, Your Honor.
13:58:48   23             THE COURT:  All right.  Thank you.  Thank you,
13:58:48   24  sir, you may be excused.
13:58:52   25             THE WITNESS:  Thank you, Your Honor.

326

Haas - cross

15:51:00 1    Q.    You are aware, though, that Arm sent another e-mail

15:51:03 2    in May of 2023, 8 months later to customers, right?

15:51:07 3    A.    Yes.

15:51:08 4    Q.    All right.  And if you could direct your attention to

15:51:11 5    DTX-30, it's already been admitted.  And this is a copy of

15:51:17 6    the second letter that Arm sent to customers.  The subject

15:51:24 7    line Qualcomm disputes protecting our Ecosystem.  You can

15:51:28 8    see that this e-mail is marked high importance?

15:51:31 9    A.    I'm sorry, you said DTX --

15:51:34 10   Q.    I'm sorry, this will be easiest if you look at this

15:51:38 11   on the screen because it was admitted with a prior witness.

15:51:41 12   You see this e-mail from Will Abbey, and he's marked the

15:51:46 13   importance high, that's like when you click the red

15:51:50 14   exclamation point.  Do you see that?

15:51:52 15   A.    Yes.

15:51:53 16   Q.    And Mr. Abbey's e-mail says to customers of Qualcomm

15:51:57 17   and Arm, by way of reminder, Arm is seeking to enforce

15:52:00 18   Qualcomm's obligation to destroy and stop using the

15:52:03 19   unlicensed Nuvia designs because Qualcomm cannot continue

15:52:06 20   using Arm-based technology, including the Phoenix core that

15:52:11 21   Nuvia developed under its now terminated ALA.  Do you see

15:52:14 22   that?

15:52:14 23   A.    Yes.

15:52:15 24   Q.    Now, you're not aware that there was any catorizing

15:52:21 25   event to send this e-mail, this is just by way of reminder,

---

327

Haas - cross

15:52:25 1    right?

15:52:25 2    A.    That's right.

15:52:26 3    Q.    And it also mentions destruction of technology twice

15:52:30 4    in one paragraph.  Do you see that?

15:52:33 5    A.    Yes.

15:52:38 6    Q.    Okay.  And Arm presumably thought it was really

15:52:45 7    important for the customers to understand that it was

15:52:47 8    demanding destruction of technology, right?

15:52:49 9    A.    I'm sorry, can you repeat that?

15:52:51 10   Q.    You said Arm presumably thought it was very important

15:52:55 11   that it tell customers it was demanding destruction of

15:52:59 12   technology, right?

15:53:01 13   A.    Yes.

15:53:01 14   Q.    And you also see that there are quotes in this

15:53:04 15   letter, right?

15:53:06 16   A.    Yes.

15:53:07 17   Q.    And are you aware, sir, that the quotes in this

15:53:09 18   letter are not quotes of the actual language of the Nuvia

15:53:14 19   agreement?

15:53:20 20   A.    I'm sorry, can you repeat that one more time?

15:53:23 21   Q.    I said are you aware that the quotes that are being

15:53:26 22   quoted here are not the actual quotes of the Nuvia

15:53:30 23   agreement?

15:53:30 24         And actually Mr. Spalding, can you scroll down a

15:53:36 25   little bit.  Okay.  So we can see, do you see where it says

---

328

Haas - cross

15:53:40 1    under the relevant agreement and then there is quoted

15:53:42 2    language?

15:53:43 3    A.    Yes.  Thank you.  I remember this letter and

15:53:45 4    paragraph very well, you and I talked about it at the

15:53:48 5    deposition, and at the time I found it to be very confusing.

15:53:53 6    Subsequently in preparation for this trial, I have reviewed

15:53:56 7    these letters and I have reviewed the claim that we made,

15:54:00 8    and this language is actually from the claim.  It's not from

15:54:04 9    the contract.

15:54:06 10   Q.    Right.  So the letter that was sent to customers,

15:54:09 11   that says under the relevant agreement and puts quotes,

15:54:12 12   quotes something that is Arm's claim, not the actual

15:54:15 13   contract; right?

15:54:16 14   A.    That's right.

15:54:17 15   Q.    Okay.  And we can agree that that is misleading,

15:54:21 16   can't we?

15:54:21 17   A.    Yes, as I said, during the deposition we had this

15:54:28 18   conversation, and I was quite confused by the language, and

15:54:28 19   you're right, this is language from the claim, not from the

15:54:32 20   Nuvia license.

15:54:34 21   Q.    So just to be clear what happened here, Arm sent

15:54:37 22   e-mails to Qualcomm's customers for no reason, marked it

15:54:42 23   high importance, quoted language that it said was from a

15:54:45 24   contract, accused Qualcomm of breach, and quoted language

15:54:49 25   that was just from Arm's litigation claim, that's what

---

329

Haas - cross

15:54:53 1    happened?

15:54:53 2    A.    I would qualify that no reason, at this time, the

15:54:58 3    litigation had been going on, we're getting lots of

15:55:01 4    questions from customers and partners about what's going on.

15:55:06 5    Almost every meeting we have with senior executives we were

15:55:10 6    asked about it.  So the part of your question or statement

15:55:13 7    that I take issue with, is no reason.  We would not do

15:55:16 8    things without a reason.

15:55:17 9    Q.    Well you don't think that what you just said is an

15:55:20 10   excuse to send a misleading letter to Qualcomm's customers

15:55:25 11   saying that it's in breach quoting language that is in no

15:55:29 12   contract at all, right, you're not excusing that?

15:55:32 13   A.    I'm just responding to your comment that we had no

15:55:35 14   reason.  I felt we had a reason.  This litigation, this

15:55:39 15   issue around unlicensed technology is unchartered waters for

15:55:42 16   us, and we have so many questions from legal, so

15:55:45 17   respectfully, I don't agree with no reason.

15:55:47 18   Q.    But not only did Arm think it was okay without a

15:55:51 19   finding in this case by a jury to go ahead and tell

15:55:55 20   customers that Qualcomm was in breach, it thought it was

15:55:59 21   okay to misquote the contract, right?

15:56:02 22   A.    As I said, in reviewing the documents as we talked

15:56:06 23   about at the deposition was confusing, so it's not referring

15:56:10 24   to the language correctly.  But it doesn't change the fact

15:56:13 25   that we were in a very, very unprecedented situation with

---

342

Haas - cross

16:12:01 1   A.   If, that's your question, if, but we don't, we don't

16:12:05 2   build chips.

16:12:05 3   Q.   Right.  But at this point, you're clearly thinking

16:12:09 4   about it, right?

16:12:10 5   A.   I'm an executive of a company, I think about the

16:12:13 6   future all the time, we're about inventions, we're about

16:12:16 7   technology, that's all I think about, honestly is the

16:12:19 8   future.

16:12:19 9   Q.   So your testimony today to the jury, is that this

16:12:22 10  idea of building chips is just something your speculating

16:12:25 11  about in your teams chat?

16:12:27 12  A.   I didn't say I was speculating, I said if, we didn't

16:12:30 13  say we were going to build chips.

16:12:32 14  Q.   All right.  We can come back to that.

16:12:34 15        All right.  You tell Ms. Gill that you have been

16:12:38 16  thinking about it, I think you have to scroll down for that,

16:12:41 17  Mr. Spalding.  You say I think we can actually, I have been

16:12:45 18  thinking about it.  And you say think of it, if we build it,

16:12:51 19  rest are hosed.  Do you see that?

16:12:53 20  A.   Yes.

16:12:55 21  Q.   And the rest here refers to all the other chip

16:12:58 22  companies, including Qualcomm, right?

16:13:01 23  A.   Honestly I don't -- this was three years ago, I don't

16:13:06 24  know what I really meant by rest here.

16:13:07 25  Q.   Okay.  Well, we discussed this at your deposition,

343

Haas - cross

16:13:12 1   sir.  And let me ask you if you remember the company that

16:13:17 2   you named at your deposition.  NXP, ST, Infinian, Texas

16:13:23 3   Instruments, MicroChip, Broadcom, NVIDIA, MediaTek and

16:13:28 4   Qualcomm, do you recall that?

16:13:29 5   A.   Yeah, I recall the question was at the deposition you

16:13:32 6   were asking me name companies that build chips, and that's

16:13:36 7   what that deposition answer was.

16:13:46 8   Q.   All right.  We're going to disagree on that, but I'm

16:13:49 9   going to move on.

16:13:50 10        All right.  If you go to -- so we just talked

16:13:53 11  about, you said, you know, I'm a CEO, I'm thinking of ideas

16:13:57 12  all the time, the idea of building chips is just something

16:14:02 13  I'm thinking about, right?

16:14:04 14  A.   We were talking around building things in the future,

16:14:09 15  et cetera, et cetera, chips are one of them.

16:14:12 16  Q.   Let's show you DTX-142.  This is a February 2022 deck

16:14:23 17  that you prepared for Mr. Son, chairman of your board, do

16:14:29 18  you recognize that?

16:14:29 19  A.   I do.

16:14:30 20        MS. DUNN:  Your Honor, move to admit DTX-142.

16:14:32 21        MR. OLSON:  Without objection.

16:14:33 22        THE COURT:  Thank you.  It's admitted.

16:14:35 23        (DTX Exhibit No. 142 was admitted into

16:14:35 24  evidence.)

16:14:35 25  BY MS. DUNN:

344

Haas - cross

16:14:37 1   Q.   All right.  The deck is entitled the next chapter,

16:14:40 2   changing the world again, and I'm going to ask you to turn

16:14:43 3   all the way to page 49.  And again, the date on this is

16:14:50 4   February 2022.  So at this point, a couple years ago.  And

16:14:56 5   the slide here is titled Arm's future and the first bullet

16:15:00 6   says Arm will become the world's most important

16:15:03 7   semiconductor company.  Do you see that?

16:15:05 8   A.   Yes.

16:15:05 9   Q.   And under that, it says Arm will accelerate building

16:15:09 10  chips, do you see that?

16:15:10 11  A.   Yes.

16:15:10 12  Q.   And you actually hired Qualcomm's former SVP of

16:15:18 13  engineering, Mr. Kechichian?

16:15:22 14  A.   Yes.

16:15:22 15  Q.   And Mr. Kechichian ran the team that made the

16:15:26 16  Snapdragon chips at Qualcomm?

16:15:28 17  A.   That's right.

16:15:29 18  Q.   And that's part of the plan to accelerate building

16:15:32 19  chips, right?

16:15:32 20  A.   Well, just to be clear, this presentation was a

16:15:36 21  presentation I made to the board to become the CEO, so in

16:15:40 22  it, I was painting my long-term vision for the company,

16:15:45 23  including potentially building chips.

16:15:47 24  Q.   And is it your testimony that we're not going to see

16:15:50 25  any decks from after you became CEO that talk about Arm

345

Haas - cross

16:15:54 1   building chips?

16:15:55 2   A.   I think you'll probably see it, we have been talking

16:15:58 3   about it for a long time, we have been exploring it for a

16:16:01 4   long time.

16:16:01 5   Q.   By the way, do you know that a couple months ago

16:16:05 6   Mr. Kechichian called one of Nuvia's other founders to see

16:16:09 7   if Gerard Williams would be willing to come work at Arm?

16:16:14 8   A.   I am not aware of that.

16:16:15 9   Q.   Let's look at PTX-447, this is already in evidence,

16:16:20 10  it's the deck you discussed on your direct examination.

16:16:23 11  This is the deck you put together for a meeting with Samsung

16:16:27 12  on October 4th of 2022.  And do you recall that meeting, it

16:16:34 13  took place in Korea?

16:16:36 14  A.   Yes, I'm sorry, let me find it.

16:16:41 15  Q.   It's 447, but it's also in your direct examination

16:16:45 16  binder.

16:16:50 17  A.   Okay.

16:16:51 18  Q.   All right.  Now, you testified about a meeting that

16:16:55 19  you had in Korea, and also that Mr. Son, Masa attended with

16:17:05 20  you, right?

16:17:06 21  A.   Yes.

16:17:07 22  Q.   And you talked about how at that meeting, among other

16:17:10 23  things, you discussed this litigation.  Right?

16:17:13 24  A.   Yes.

16:17:13 25  Q.   And Jay Y. Lee is the chairman of Samsung and he was

346

Haas - cross

16:17:19  1  at that meeting, right?

16:17:20  2  A.    Yes.

16:17:20  3  Q.    And there were other top Samsung executives, right?

16:17:24  4  A.    Yes.

16:17:24  5  Q.    And you testified that at that meeting, Mr. Son

16:17:28  6  represented to Samsung that Qualcomm's architectural license

16:17:34  7  would expire in 2025, do you recall that?

16:17:37  8  A.    I don't recall that.

16:17:40  9        MS. DUNN:  Your Honor, at this point, I would

16:17:42  10  like to read into record the joint statement of uncontested

16:17:46  11  facts paragraph 13.

16:17:47  12       THE COURT:  Okay.

16:17:47  13       MS. DUNN:  Thanks.  On October 4th, 2022,

16:17:51  14  Masayoshi son, Mr. Son and Renee Haas met with certain

16:17:55  15  executives with Samsung electronic company LTD.  During the

16:17:59  16  coverings Mr. Son said among other things that Qualcomm's

16:18:02  17  license would expire in 2025.

16:18:06  18       Mr. Haas, you're aware that Qualcomm's license

16:18:10  19  does not expire in 2025, right?

16:18:12  20       THE WITNESS:  Correct.

16:18:14  21  BY MS. DUNN:

16:18:14  22  Q.    All right.  Now, if you turn to page 32 of this deck,

16:18:21  23  this is post acquisition in this meeting with Samsung that

16:18:25  24  you attended with Masa, and you are positioning Arm as a

16:18:30  25  competitor to Nuvia; correct?

347

Haas - cross

16:18:38  1  A.    Not directly.  Because Samsung buys its chips from

16:18:46  2  Qualcomm that uses Arm technology, they also buy chips from

16:18:49  3  Samsung themselves, they have an internal chip group, so we

16:18:54  4  were talking to the both JY Lee, who represents the chip

16:18:58  5  group, and the phone group, so we were talking to a few

16:19:01  6  audiences here, not really a direct competitor.

16:19:04  7  Q.    But you would agree on one side you have Arm CPU's,

16:19:08  8  and on the other side you have Nuvia CPU's, right?

16:19:12  9  A.    Yes.

16:19:12  10  Q.    And you understand that the Nuvia, the Nuvia

16:19:15  11  engineers were working on server designs, right?

16:19:21  12  A.    Sorry, say that one more time.

16:19:22  13  Q.    That the Nuvia engineers had been working on designs

16:19:26  14  for a server, right?

16:19:27  15  A.    Before they were acquired?

16:19:29  16  Q.    Correct.  And you note here also that zero product

16:19:34  17  has shipped, right?

16:19:35  18  A.    Yes.

16:19:35  19  Q.    And you also -- this is basically a pitch deck to

16:19:39  20  Samsung, right?

16:19:40  21  A.    There is a lot inside this deck, I wouldn't

16:19:43  22  characterize it that way, but yes it's a deck that talks

16:19:46  23  about a number of different areas.

16:19:46  24  Q.    Right.  And you're promoting your product to Samsung?

16:19:52  25  A.    We were promoting Black Hawk as I mentioned.

348

Haas - cross

16:19:54  1  Q.    And one of the things that you used to promote the

16:19:57  2  product is your lawsuit against Qualcomm and Nuvia; right,

16:20:01  3  it's right there on the slide, do you see it?

16:20:04  4  A.    Yes.

16:20:07  5  Q.    All right.  Now if you look at page 22 of the deck,

16:20:14  6  you see all the way to the right, it says 2026, Samsung and

16:20:21  7  Arm vertically optimized.  And we already talked about that

16:20:25  8  going vertical means building chips, right?

16:20:30  9  A.    Say that one more time, I'm sorry.

16:20:33  10  Q.    If you look at the slide right in front, top

16:20:36  11  right-hand corner it says Samsung and Arm vertically

16:20:40  12  optimized.  Do you see that?

16:20:41  13  A.    Yes.

16:20:42  14  Q.    And we already talked about going vertical means

16:20:46  15  building chips, right?

16:20:47  16  A.    Yes.  But not in this -- not in the context of this

16:20:52  17  slide.

16:20:52  18  Q.    Okay.  And at the bottom of this slide in the lower

16:20:56  19  right-hand corner, there is a box that says Arm compute chip

16:21:00  20  for Samsung, do you see that?

16:21:01  21  A.    Yes.

16:21:02  22  Q.    And so part of your deck is describing an Arm compute

16:21:09  23  could be a laptop or computer chip for Samsung, right?

16:21:12  24  A.    No.  No.  No.  No.  Samsung, I recognize this is

16:21:16  25  going to be confusing.  Samsung builds chips themselves.

349

Haas - redirect

16:21:22  1  Okay.  So this deck in this context is talking about Arm

16:21:26  2  supplying technology to the Samsung group that builds chips.

16:21:31  3  And they build chips for Samsung groups that builds phones,

16:21:36  4  it's a very important distinction.

16:21:38  5  Q.    Just to be clear where it says Arm compute chip for

16:21:42  6  Samsung, your testimony is you're not talking about an Arm

16:21:46  7  chip for Samsung?

16:21:47  8  A.    Samsung chip group, Arm chip group for Samsung chip,

16:21:52  9  that's a collaboration, that's why it's done here together,

16:21:55  10  Samsung Arm, Samsung chip.

16:21:58  11  Q.    You're going to work together with Samsung?

16:22:00  12  A.    With Samsung chip group.

16:22:00  13  Q.    Arm is planning to work together with Samsung chip

16:22:05  14  group on a chip?

16:22:06  15  A.    On a chip that Samsung will build.

16:22:08  16       MS. DUNN:  No further questions, Your Honor.  We

16:22:10  17  pass the witness.

16:22:11  18       THE COURT:  Thank you.  Redirect.

16:22:14  19       REDIRECT EXAMINATION

16:22:15  20  BY MR. OLSON:

16:22:16  21  Q.    Mr. Haas, we're late in the day, and so I am going to

16:22:20  22  see if we can deal with just three topics, fairly quickly.

16:22:24  23       First of which is let me have you turn, if you

16:22:31  24  can, it would be in the defendants' cross binder, it would

16:22:36  25  be DTX-110.  DTX-110, not 1108.  Thank you, Mr. Lee.

# Exhibit 69

Message

| | |
|---|---|
| **From:** | Larissa Cochron [lcochron@qti.qualcomm.com] |
| **Sent:** | 10/18/2023 6:34:17 PM |
| **To:** | Kurt Wolf [kwolf@qti.qualcomm.com] |
| **Subject:** | ███████████████████████████ |

Thanks. After we sync, I'll need to update my management too.

**From:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Sent:** Wednesday, October 18, 2023 10:38 AM
**To:** Larissa Cochron <lcochron@qti.qualcomm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>
**Subject:** FW: feedback on ███████ #2) - RE: #2) RE: QCOM : Open Items 15Sept23

---

### Redacted for Privilege

---

**Kurt A. Wolf**



**From:** Dawn Hill <Dawn.Hill@arm.com>
**Sent:** Wednesday, October 18, 2023 10:34 AM
**To:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>
**Subject:** RE: feedback on ███████ #2) - RE: #2) RE: QCOM : Open Items 15Sept23

**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do not enable macros.

Hi Kurt,

Arm's feedback is that that ████████████████████████████████████████ ████████████ ████
████████████████████████ Please let me know if you have any questions.

Dawn

---

**From:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Sent:** Wednesday, October 18, 2023 10:28 AM
**To:** Dawn Hill <Dawn.Hill@arm.com>

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>
**Subject:** feedback on ▮▮▮▮▮ #2) - RE: #2) RE: QCOM : Open Items 15Sept23

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Hi Dawn

feedback on ▮▮▮▮▮▮ which I will send out today: **Please let us know if you plan to forward this** ▮▮▮▮▮
(#2)) to us?


**Kurt A. Wolf**



**From:** Dawn Hill <Dawn.Hill@arm.com>
**Sent:** Thursday, October 5, 2023 1:22 PM
**To:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Subject:** Re: #2) RE: QCOM : Open Items 15Sept23


**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do
not enable macros.

Hi Kurt,

Thanks for your patience. I have some feedback on ▮▮▮▮▮▮▮▮▮ #2) which I will send out today. Let
me know if you have any questions or would like to set up a call to review. We will also have a call tomorrow
on #3.

Thanks,
Dawn



**From:** Dawn Hill
**Sent:** Tuesday, September 19, 2023 9:48 AM
**To:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>; Asim Chaudhry <Asim.Chaudhry@arm.com>
**Subject:** RE: #2) RE: QCOM : Open Items 15Sept23

Hi Kurt,

#1) Asim replied on the deliverables. Please let us know if you have any question and advise how you'd like to proceed.
#2) ▮▮▮▮ request is being reviewed.
#3) Please let me know if Sept 28th or Aug 6th works. Perhaps we use both.
#4) ▮▮▮ - I hope to have an update on Wed.

Thanks,
Dawn

---

**From:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Sent:** Monday, September 18, 2023 3:32 PM
**To:** Dawn Hill <Dawn.Hill@arm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>; Asim Chaudhry <Asim.Chaudhry@arm.com>
**Subject:** #2) RE: QCOM : Open Items 15Sept23

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Hi Dawn  -  reply for 2) below

2) Because we want to (in as pleasant an 'email voice' as possible 😊)
  - Please confirm (as you said on call last Friday) that you did enter QCOM request in ARM system, last Friday
evening, to ███████████████ ▌ ███████████████ beginning ████████

**Kurt A. Wolf**



---

**From:** Dawn Hill <Dawn.Hill@arm.com>
**Sent:** Friday, September 15, 2023 7:43 PM
**To:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>; Asim Chaudhry <Asim.Chaudhry@arm.com>
**Subject:** QCOM : Open Items 15Sept23

**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do
not enable macros.

Hi Kurt,

>Our expectations were definitely out of sync – we expected a DRAFT Word.doc version similar to attached (we
understand ARM will not provide ████)

  • When will ARM provide such a DRAFT Word.doc version to us  -  we can review and discuss such a DRAFT
*DH: Once we agree to commercial terms in the proposal for* ████████ *, we can go to legal draft.*

The actions I took away from our call today are:

1. **Asim to get you a deliverables list with a detailed description similar to the below**:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2. ▮▮▮▮▮ : ▮▮▮▮▮▮▮ **QCOM wishes to** ▮▮▮▮▮▮▮▮
DH: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Given this doesn't ▮▮▮▮▮▮▮▮▮ why do you wish to do this
now and not prior to expiration?

3. **Cybersecurity: Looking at other times. I just sent out 3 options. There are conflicts with at least one person at Arm so we'll have to see what happens.**
   a. 7:30AM PST Sept 22nd
   b. 7:30AM PST Sept 26th
   c. 7:30AM PST Oct 6th.
4. ▮▮▮**Proposal** – I'll give you an update next Wednesday after our commercial call.

Thanks,
Dawn

---

**From:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Sent:** Wednesday, September 13, 2023 4:34 PM
**To:** Dawn Hill <Dawn.Hill@arm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>; Asim Chaudhry <Asim.Chaudhry@arm.com>
**Subject:** RE: Extremely disappointing! - RE: Heads-up: Mail to Lynn - RE: General Alignment for turn-around-time before helping to escalate - RE: an update from ARM to make progress on a few open agreements

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Hi Dawn

Our expectations were definitely out of sync – we expected a DRAFT Word.doc version similar to attached (we understand ARM will not provide ▮▮▮
- When will ARM provide such a DRAFT Word.doc version to us  -  we can review and discuss such a DRAFT

As parallel topic we need to discuss and set clear expectations at beginning of our requests
- Lets discuss expectations for ARM's reply to our ▮▮ proposal this week – we don't want another experience like the ▮▮▮▮ reply Friday

Thx
**Kurt A. Wolf**



**From:** Kurt Wolf
**Sent:** Friday, September 8, 2023 7:27 PM
**To:** 'Dawn Hill' <Dawn.Hill@arm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>; Asim Chaudhry <Asim.Chaudhry@arm.com>
**Subject:** Extremely disappointing! - RE: Heads-up: Mail to Lynn - RE: General Alignment for turn-around-time before helping to escalate - RE: an update from ARM to make progress on a few open agreements

Hi Dawn

Extremely disappointing!

**Kurt A. Wolf**



**From:** Dawn Hill <Dawn.Hill@arm.com>
**Sent:** Friday, September 8, 2023 6:55 PM
**To:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>; Asim Chaudhry <Asim.Chaudhry@arm.com>
**Subject:** RE: Heads-up: Mail to Lynn - RE: General Alignment for turn-around-time before helping to escalate - RE: an update from ARM to make progress on a few open agreements

> **WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do not enable macros.

Hi Kurt,

Thanks for the heads up. Fortunately, we were able to turn around all approvals. Thanks for your patience. Let me know if you have any questions regarding the quote.
I'll submit for a contract as soon as I receive your approval. We should have a contract shortly after that.

Thanks,
Dawn

**From:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Sent:** Friday, September 8, 2023 5:25 PM
**To:** Dawn Hill <Dawn.Hill@arm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>; Asim Chaudhry <Asim.Chaudhry@arm.com>
**Subject:** Heads-up: Mail to Lynn - RE: General Alignment for turn-around-time before helping to escalate - RE: an update from ARM to make progress on a few open agreements

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Hi Dawn
In order to help, Please give Lynn heads up that I will send her (cc: you, Kristin, Asim) email this weekend.

My Message to Lynn...
QCOM needs ARM to give us a commitment on date to provide ▓▓▓▓ proposal early next week

FYI - I will ask for Will's email and send him same message if we do not have a (reasonable) committed date to receive the ▓▓▓▓ proposal from ARM by 9/13/2023

**Kurt A. Wolf**



**From:** Dawn Hill <Dawn.Hill@arm.com>
**Sent:** Thursday, September 7, 2023 5:38 PM
**To:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>; Asim Chaudhry <Asim.Chaudhry@arm.com>
**Subject:** RE: General Alignment for turn-around-time before helping to escalate - RE: an update from ARM to make progress on a few open agreements

**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do not enable macros.

Hi Kurt,

Per your request, the path to escalation will be first to Kris Webster kristin..webster@arm.com then to Lynn lynn.couillard@arm.com
Beyond this, Will Abbey is the last resort. I'm targeting a proposal for ▓▓▓▓ to you by tomorrow.

Thanks,
Dawn

**From:** Kurt Wolf <kwolf@qti.qualcomm.com>
**Sent:** Monday, August 28, 2023 7:42 PM
**To:** Dawn Hill <Dawn.Hill@arm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>
**Subject:** General Alignment for turn-around-time before helping to escalate - RE: an update from ARM to make progress on a few open agreements

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Hi Again Dawn

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

I like to sync w you and get guidance on who at ARM I should also escalate these long-open requests. I like to discuss and agree on reasonable time-frame for ARM to reply to QCOM (80/20 rule); after that waiting period, Then I should begin to help escalate within ARM 😊

Our Radar is pinging on two items...
      1ˢᵗ priority is ▆▆▆▆ the oldest
      Soon I should escalate ▆▆▆▆▆▆▆▆▆▆

Pls proposae a time-slot for me and Richard to discuss w you ok

Thx
**Kurt A. Wolf**



**From:** Kurt Wolf
**Sent:** Tuesday, August 15, 2023 8:04 PM
**To:** Dawn Hill <Dawn.Hill@arm.com>
**Cc:** Richard Meacham <rmeacham@qti.qualcomm.com>
**Subject:** an update from ARM to make progress on a few open agreements

Hi Dawn

I like to have an update from ARM to make progress on a few open agreements;

- ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
- ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
- ▆▆▆ ▆▆▆

Next, I will send a mtg proposal and include a few other time-slot that can work for us

Thx,
**Kurt A. Wolf**



IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.
IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.
IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

 QCVARM_0608137

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QCVARM_0608138

# Exhibit 70

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARM LTD., a U.K. corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____ |
| QUALCOMM INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, and NUVIA, INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff Arm Ltd. ("Arm") complains and alleges as follows against Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively "Qualcomm"), and NuVia, Inc. ("Nuvia"):

## NATURE OF THE ACTION

1.     Arm is the world's leading provider of microprocessor intellectual property. For decades, Arm has developed innovative processor architecture and implementation designs that balance performance with energy efficiency.  Billions of electronic devices use Arm processor technologies pursuant to Arm licenses—from smartphones used to interact seamlessly with friends and family around the world to an increasing number of the servers that run the essential day-to-day operations of Fortune 500 companies.

2.     Qualcomm is a major semiconductor manufacturer.  To accelerate its processor development efforts, Qualcomm spent over $1 billion to acquire Nuvia, a start-up led by senior engineers previously from Apple and Google that licensed Arm technologies to develop high-performance processor cores for semiconductor chips.  In the process,

Qualcomm caused Nuvia to breach its Arm licenses, leading Arm to terminate those licenses, in turn requiring Qualcomm and Nuvia to stop using and destroy any Arm-based technology developed under the licenses. Undeterred, Qualcomm and Nuvia have continued working on Nuvia's implementation of Arm architecture in violation of Arm's rights as the creator and licensor of its technology. Further, Qualcomm's conduct indicates that it has already and further intends to use Arm's trademarks to advertise and sell the resulting products in the United States, even though those products are unlicensed.

3.     Arm now brings suit for specific performance of the Nuvia licenses' termination provisions to require Qualcomm and Nuvia to stop using and to destroy the relevant Nuvia technology and to stop their improper use of Arm's trademarks with their related products. Arm also seeks declaratory judgment, injunctive relief, and damages for the use of Arm's trademarks in connection with semiconductor chips incorporating the relevant Nuvia technology.

## PARTIES

4.     Plaintiff Arm is a corporation organized under the laws of the United Kingdom, has its principal place of business in Cambridge, United Kingdom, and is a resident or domiciliary of the United Kingdom.

5.     Defendant Qualcomm Inc. is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

6.     Defendant Qualcomm Technologies, Inc. is a subsidiary of Qualcomm Inc. and a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.

7.      Defendant Nuvia is a subsidiary of Qualcomm and a Delaware corporation with its principal place of business at 2841 Mission College Blvd., Santa Clara, California 95054.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (trademarks), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).  The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties, and because the amount in controversy, based on the consideration that was anticipated under the Nuvia licenses, the volume of products expected under those licenses, and Defendants' potential loss from complying with the equitable relief requested here, exceeds $75,000, exclusive of interest and costs.

9.      The Court has personal jurisdiction over Qualcomm and Nuvia because they are incorporated in Delaware.  Qualcomm and Nuvia have purposely availed themselves of the privileges and benefits of the laws of Delaware.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Qualcomm and Nuvia are incorporated in Delaware.  Venue is also proper because Qualcomm Inc. and Qualcomm Technologies, Inc. have purposefully availed themselves of the courts in the State of Delaware and this Judicial District.

## FACTUAL ALLEGATIONS

### Arm's business model

11.     For decades, Arm has been a world leader in developing processor architectures, including instruction set architectures, and processor core designs

implementing those architectures, all of which are covered by an extensive intellectual property portfolio.

12.     Processor cores are the parts of a computer's Central Processing Unit or "CPU" that read and execute program instructions to perform specific actions.  Modern CPUs often integrate multiple processor cores on a single semiconductor chip or integrated circuit ("IC").

13.     Arm owns intellectual property relating to its processor architectures and designs, including, among other things, trademarks.

14.     Arm does not manufacture or sell chips.  Instead, Arm licenses its technologies to hundreds of companies to use in developing their own chips or in their own electronic devices and works with these companies to ensure the success of Arm-based products.

15.     Arm's customers manufacture (or have manufactured for them) chips based on Arm's technologies.  The chips may then be used in the customer's own devices or sold to other device manufacturers.  Arm earns revenue from licensing fees and royalties based on the number of Arm-based chips its customers sell.

16.     Arm's business model relies on Arm's ability to monetize its research and intellectual property by receiving both licensing fees and royalties for products incorporating Arm's technology and intellectual property.  Arm therefore grows its revenues by increasing both the number of customers and the number of Arm-based products sold.

17.     There are two main types of Arm licenses for Arm's technologies: Technology License Agreements ("TLAs"), which allow the use of specific "off-the-shelf" Arm processor core designs with only minor modifications, and Architecture License

Agreements ("ALAs"), which allow for the design of custom processor cores that are based on particular architectures provided by Arm.

18.     Arm grants few ALAs.  Custom processor cores can take years to design, at great expense and requiring significant support from Arm, with no certainty of success.  If successful, ALA licensees can sell custom processor cores for use in other companies' products.

19.     Arm ALAs typically authorize licensees only to develop processor cores based on specific Arm technology provided by Arm under the licenses, rather than granting broader licenses to use Arm-based technology generally.

***Nuvia obtains Arm licenses***

20.     Nuvia was founded as a start-up in 2019 by chip engineers who left Apple and Google.  Nuvia planned to design energy-efficient CPUs for data center servers based on a custom processor implementing the Arm architecture, which would have expanded the market for Arm's technology.  Nuvia's business model was thus reliant on customizing processor core designs based on Arm's technology.  As one of the founders explained to the press when launching Nuvia, the start-up's premise (and one of its attractions to investors) was that Nuvia intended to build "a custom clean sheet designed from the ground up" using Arm's architecture.[1]

21.     In September 2019, Arm granted Nuvia an ALA and TLA, providing rights to design custom processor cores based on an Arm architecture and to modify certain off-the-

---

[1] Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TechCrunch (Nov. 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/.

shelf designs. The licenses granted in the ALA and TLA are necessary to use Arm's extensive intellectual property portfolio covering the Arm architecture. The ALA and TLA included rights to use Arm trademarks in connection with products developed by Nuvia under the licenses. Arm also provided substantial, crucial, and individualized support from Arm employees to assist Nuvia in its development of Arm-based processors for data center servers.

22.     The licenses provided Nuvia access to specific Arm architecture, designs, intellectual property, and support in exchange for payment of licensing fees and royalties on future server products that include processor cores based on Arm's architecture, designs, or related intellectual property. Nuvia's licensing fees and royalty rates reflected the anticipated scope and nature of Nuvia's use of the Arm architecture. The licenses safeguarded Arm's rights and expectations by prohibiting assignment without Arm's consent, regardless of whether a contemplated assignee had its own Arm licenses.

23.     From September 2019 to early 2021, Nuvia used the technology it licensed from Arm to design and develop processor cores. Arm provided preferential support for Nuvia's development efforts, with Arm seeking to accelerate research and development in next-generation processors for data center servers to support that sector's transition to Arm technology.

24.     In August 2020, Nuvia announced that its "first-generation CPU, code-named 'Phoenix'" would be "a custom core based on the ARM architecture."[2] It also publicized benchmark tests showing that Phoenix could double the performance of rival products from

---

[2] John Bruno & Sriram Dixit, *Performance Delivered a New Way*, Silicon Reimagined (Aug. 11, 2020), https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5.

Apple, Intel, AMD, and Qualcomm.  Based on these results, Nuvia claimed that the

"Phoenix CPU core has the potential to reset the bar for the market."[3]

### Qualcomm relies on designs created by Arm

25.    Qualcomm is one of the world's largest semiconductor companies, with a

portfolio of intellectual property and products directed to wireless technologies, including

cellular, Bluetooth, and Wi-Fi; CPUs and ICs; networking; mobile computers; cell phones;

wearables; cameras; automobiles; and other electronic devices.

26.    Even though Qualcomm has an Arm ALA, its prior attempts to design custom

processors have failed.  Qualcomm invested in the development of a custom Arm-based

processor for data center servers until 2018, when it cancelled the project and laid off

hundreds of employees.[4]

27.    Qualcomm's commercial products thus have relied on processor designs

prepared by Arm's engineers and licensed to Qualcomm under Arm TLAs.  Discovery is

likely to show that as of early 2021, Qualcomm had no custom processors in its

development pipeline for the foreseeable future.  To fill this gap, Qualcomm sought

improperly to purchase and use Nuvia's custom designs without obtaining Arm's consent.

### Qualcomm acquires Nuvia

28.    On January 13, 2021, Qualcomm announced that Qualcomm Technologies,

Inc. was acquiring Nuvia for $1.4 billion.  Neither Qualcomm nor Nuvia provided prior

---

[3] *Id.*

[4] *See, e.g.*, Andrei Frumusanu, *Qualcomm to Acquire NUVIA: A CPU Magnitude Shift*, AnandTech (Jan. 13, 2021), https://www.anandtech.com/show/16416/qualcomm-to-acquire-nuvia-a-cpu-magnitude-shift; Andy Patrizio, *Qualcomm makes it official; no more data center chip*, Network World (Dec. 12, 2018), https://www.networkworld.com/article/3327214/qualcomm-makes-it-official-no-more-data-center-chip.html.

notice of this transaction to Arm. Nor did they obtain Arm's consent to the transfer or assignment of the Nuvia licenses.

29.     Qualcomm indicated in its announcement that "NUVIA CPUs"—that is, Nuvia's implementations of Arm technology developed under the Nuvia licenses with Arm—would be incorporated into a range of Qualcomm products. Qualcomm's press release declared its grand ambitions for Nuvia's implementation of Arm technology: "NUVIA CPUs are expected to be integrated across Qualcomm Technologies' broad portfolio of products, powering flagship smartphones, next-generation laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality and infrastructure networking solutions."[5] The press release also indicated that Qualcomm's first target would be "integrating NUVIA CPUs with Snapdragon," its flagship suite of system on a chip ("SoC") semiconductor products for mobile devices.

30.     As Qualcomm's CEO, Cristiano Amon, noted in a Reuters interview shortly after the acquisition closed in the first half of 2021, "Qualcomm will start selling Nuvia-based laptop chips next year."[6] Amon confirmed the negative impact this might have on Arm, saying: "If Arm . . . eventually develops a CPU that's better than what we can build ourselves, then we always have the option to license from Arm."

31.     Qualcomm also confirmed its prior deficiencies in core design, reportedly promoting the Nuvia acquisition as "filling a gap" because "for several years now" the

---

[5] *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 13, 2021), https://www.qualcomm.com/news/releases/2021/01/13/qualcomm-acquire-nuvia.

[6] Stephen Nellis, *Qualcomm's new CEO eyes dominance in the laptop markets*, Reuters (July 2, 2021), https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/.

company "had been relying on external IP such as Arm's Cortex cores."[7]  Qualcomm further explained that "the immediate goals for the NUVIA team will be implementing custom CPU cores" designed for laptops.[8]

      32.    Analysts confirmed that the "Qualcomm acquisition [of] NUVIA is a huge move to scale up dramatically.  It can reinvigorate current lines in smartphone, Windows PC and automotive SoCs, and make them more competitive with the competition.  They have been lagging."[9]

      33.    Providing further confirmation of the acquisition's importance to Qualcomm in filling the "gap" in its "lagging" IP design, analysts noted that the Nuvia acquisition was "extremely speedy in terms of timeline," and Qualcomm "went as far as [to] put out a concrete roadmap for . . . using the newly acquired IP from Nuvia," announcing that Nuvia's processors would be finalized for use in high-end laptops "in the second half of 2022."[10]

---

[7] Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia.

[8] *Id.*

[9] Trading Places Research, *Qualcomm's Acquisition of NUVIA is a Huge Move*, Seeking Alpha (Jan. 13, 2021), https://seekingalpha.com/article/4398808-qualcomms-acquisition-of-nuvia-is-huge-move.

[10] Andrei Frumusanu, *Qualcomm Completes Acquisition of NUVIA: Immediate focus on Laptops (Updated)*, AnandTech (Mar. 16, 2021), https://www.anandtech.com/show/16553/qualcomm-completes-acquisition-of-nuvia (quoting *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 15, 2021), https://www.qualcomm.com/news/releases/2021/03/16/qualcomm-completes-acquisition-nuvia).

34.     Based on standard industry scheduling, that timeline indicated a design for data center processors would be completed "essentially as soon as possible following the acquisition" of Nuvia.[11]

35.     This timing indicates that the Arm-based cores that Nuvia designed using Arm's technology and intellectual property were, as of the acquisition date, effectively ready for the final stages of design for Qualcomm chips, leading promptly to product integration and manufacturing.  Qualcomm's November 2021 10-K filing disclosed that the $1.4 billion acquisition encompassed Nuvia's team and "certain in-process technologies," reflecting the availability of existing cores such as the Phoenix CPU core developed under Nuvia's ALA.[12]

36.     By entering into the acquisition of Nuvia and transferring the rights and technology developed under the Nuvia licenses without Arm's consent, Qualcomm thus greatly accelerated its ability to bring to market custom-designed processor cores—a head start that Qualcomm was willing to pay over $1 billion to obtain.

***Arm terminates the Nuvia licenses***

37.     Soon after the announcement of the merger, Arm informed Qualcomm in writing that Nuvia could not assign its licenses and that Qualcomm could not use Nuvia's in-process designs developed under the Nuvia ALA without Arm's consent.  For more than a year, Arm negotiated with Qualcomm, through Qualcomm Inc. and Qualcomm

---

[11] *Id.*

[12] Qualcomm Inc., Annual Report (Form 10-K) (Nov. 3, 2021), https://investor.qualcomm.com/financial-information/sec-filings/content/0001728949-21-000076/0001728949-21-000076.pdf.

Case 3:24-cv-00490-MCR-MDN Document 577-1 Filed 06/31/22/25 Page 10 of 349 Page ID #:
28342
Case 2:24-cv-00490-MCR-MDN Document 577-1 Filed 06/31/22/25 Page 1 of 442 Page ID #:

Technologies, Inc., in an effort to reach an agreement regarding Qualcomm's unauthorized acquisition of Nuvia's "in-process technologies" and license.

38.     All the while, Qualcomm continued to broadcast its intentions to rush Nuvia products to market.  In November 2021, Qualcomm's Chief Technology Officer told investors that Qualcomm was "pretty far along at this point" in developing its first chip with Nuvia's implementation of Arm technology and would "sample a product at, let's say nine months from now"—which would be August 2022.[13]  Then in January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO confirming that "[t]he future of the PC industry is modern Arm-based architectures" and boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[14]  Elsewhere, Qualcomm's CEO reiterated that Qualcomm is "definitely in a hurry" to launch Nuvia's Arm-based chips "as fast as we can."[15]  Based on these statements, discovery is likely to show that Qualcomm and Nuvia continued to use the relevant technology developed under Nuvia's Arm licenses.

---

[13] *Qualcomm Investor Day 2021 Livestream: CEO Cristiano Amon looks ahead*, YouTube (Nov. 16, 2021), https://www.youtube.com/watch?v=rUWPzROYn2E; *see also* Mark Hachman, *Qualcomm Prophesizes 2023 as the Rebirth of PC Snapdragon Chips*, PCWorld (Nov. 16, 2021), https://www.pcworld.com/article/552285/qualcomm-prophesies-2023-as-the-rebirth-of-its-snapdragon-chips.html.

[14] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

[15]  Nilay Patel, *What Comes After the Smartphone, With Qualcomm CEO Cristiano Amon*, The Verge (Jan. 11, 2022), https://www.theverge.com/22876511/qualcomm-ceo-cristiano-amon-interview-decoder-podcast.

39.     On February 1, 2022, Arm sent a letter to Nuvia and Qualcomm terminating the Nuvia licenses effective March 1, 2022.  The letter terminated the licenses based on Nuvia's material breach of the assignment provisions of the Nuvia licenses by entering into the acquisition of Nuvia without Arm's consent.  The letter also reminded Nuvia and Qualcomm of their obligations upon termination to stop using and destroy the Nuvia technology developed under the now-terminated licenses.

40.     In February 2022, pending termination of the Nuvia licenses, Nuvia sought Arm's verification that a Nuvia processor design satisfied the Arm architecture's specifications.  On February 23, 2022, Qualcomm confirmed that it was still developing the relevant Nuvia technology by stating in a court filing that certain Nuvia documents were based on "years of research and work" and would "reveal secret design components of Qualcomm chips that are still in development."  *Qualcomm Technologies, Inc. v. Hoang*, No. 3:22-cv-00248-CAB-BLM (S.D. Cal. Feb. 23, 2022), ECF No. 1 at 5-6.

41.     On March 1, 2022, the Nuvia licenses terminated, along with the corresponding rights to use or sell products based on or incorporating Nuvia technology developed under those licenses.

42.     On April 1, 2022, Qualcomm's General Counsel sent Arm a letter enclosing a Nuvia representative's termination certification.  The certification acknowledged—without objection—that the Nuvia licenses had been terminated.  The certification recognized the obligations upon termination, and asserted that Nuvia was in compliance.  Qualcomm and Nuvia thereby conceded that termination of the Nuvia licenses was appropriate, and that the termination provisions had been triggered, are binding, and are enforceable.

*Qualcomm keeps using Arm-based technology developed under the Nuvia licenses*

43.     Qualcomm is subject to Nuvia's termination requirements as the acquirer of Nuvia.  Qualcomm has publicly described Nuvia as a Qualcomm "team" that has been "very tight[ly] integrat[ed]" with and is "not separate" from Qualcomm.[16]  Qualcomm has also acted on behalf of Nuvia publicly and in correspondence with Arm since the acquisition. Qualcomm further told Arm that it planned to "redeploy NUVIA employees" and "transfer NUVIA's work" to Qualcomm and, consistent with that plan, Qualcomm has on-boarded Nuvia's leadership and employees as Qualcomm employees.[17]

44.     On April 29, 2022, Arm wrote Qualcomm clarifying that neither Nuvia nor Qualcomm was authorized to continue working on technology that was developed under the Nuvia licenses.

45.     Two weeks later, on May 13, 2022, Qualcomm sought Arm's verification that a new Qualcomm processor core complied with Arm architecture so that it could be verified and incorporated into a product.  Qualcomm did not explain whether this processor core design was based on Nuvia's designs under the terminated licenses.

46.     Based on the timing and circumstances surrounding Qualcomm's request, discovery is likely to show that Qualcomm's processor core design is based on or

---

[16] Ian Cutress, *Interview with Alex Katouzian, Qualcomm SVP: Talking Snapdragon, Microsoft, Nuvia, and Discrete Graphics*, AnandTech (Jan. 31, 2022), https://www.anandtech.com/show/ 17233/interview-with-alex-katouzian-qualcomm-svp-talking-snapdragon-microsoft-nuvia-and-discrete-graphics; Ian Cutress, *AnandTech Interview with Miguel Nunes: VP for Windows and Chrome PCs, Qualcomm*, AnandTech (Feb. 14, 2022), https://www.anandtech.com/show/17253/ anandtech-interview-with-miguel-nunes-senior-director-for-pcs-qualcomm.

[17] *See, e.g.*, *Qualcomm Completes Acquisition of NUVIA*, Qualcomm Inc. (Mar. 16, 2021), https://investor.qualcomm.com/news-events/press-releases/detail/1304/qualcomm-completes-acquisition-of-nuvia; *Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

incorporates in whole or in part the processor core design developed under the prior Nuvia licenses.

47.     Qualcomm's Arm licenses do not cover products based on or incorporating Arm-based technologies developed by third parties under different Arm licenses, such as the now-terminated Nuvia licenses.

48.     Despite Arm's termination of the Nuvia licenses, Qualcomm has continued to tell the public that its Nuvia chips will soon be joining the industry-wide "ecosystem transition to Arm."[18]  Like Qualcomm's prior statements, this announcement was directed to readers throughout the United States, including to readers physically located in the State of Delaware and this Judicial District.

49.     In June 2022, Qualcomm's CEO reiterated that it would soon begin "sampling" Nuvia chips to companies, allowing them to design electronic devices incorporating the chips in the "next year."[19]  Based on that timeline, he explained, "[i]n late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon with a Nuvia-designed CPU."[20]

---

[18] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

[19] *Id.*; *see also* Mark Tyson, *Qualcomm CEO Admits Nuvia Chip OEM Sampling is Delayed (Update)*, Tom's Hardware (June 10, 2022), https://www.tomshardware.com/news/qualcomm-nuvia-chip-sampling-delays (Qualcomm spokesperson clarifying: "We are on track to sample the first products with our next generation CPUs this year.").

[20] *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375.

50.     In the microprocessor industry, "sampling" means providing pre-production processors to original equipment manufacturers ("OEMs"), original device manufacturers ("ODMs"), or independent software vendors ("ISVs") for use in the product design cycle before product launch.

51.     Based on Qualcomm's statements that Nuvia processors took "years" to develop and "are still in development," and Qualcomm's consistent statements that it is developing Nuvia's Arm chips, discovery is likely to show that the chips that Qualcomm intends to sample in the coming months will contain Nuvia technology that Qualcomm cannot use and instead must destroy.

52.     Further, based on Qualcomm's public announcements of its plans to use Nuvia technology, discovery is likely to show that Qualcomm has continued to retain and use Nuvia technology developed pursuant to the Nuvia licenses, thereby materially breaching the termination provisions of those licenses.

53.     News reports indicate that Qualcomm is also developing Nuvia processors for data center servers, and "already has working silicon to at least demonstrate to potential customers,"[21] which discovery is likely to show is based on or incorporates Nuvia technology developed under the now-terminated Nuvia ALA.

54.     The failure of Nuvia and Qualcomm to comply with the post-termination obligations under the Nuvia ALA is causing, and will continue to cause, irreparable harm to Arm.  Qualcomm effectively seeks to circumvent Arm's licensing model, which allocates

---

[21] Dan Robinson, *Qualcomm readying new Arm server chip based on Nuvia acquisition*, The Register (Aug. 19, 2022), https://www.theregister.com/2022/08/19/qualcomm_arm_server_chip/ (citing Ian King, *Qualcomm Is Plotting a Return to Server Market With New Chip*, Bloomberg (Aug. 18, 2022), https://www.bloomberg.com/news/articles/2022-08-18/qualcomm-is-plotting-a-return-to-server-market-with-new-chip).

use of the technology developed pursuant to a particular Arm license to a particular

licensee.

55.     These breaches thus interfere with Arm's ability and right to control the use

of its technology, negatively affecting Arm's relationships with existing and prospective

licensees.

56.     The prospective monetary damages from Qualcomm's circumvention and

interference with Arm's control over its technology are not readily ascertainable or

calculable, given the resulting future impact on Arm's relationships with existing and

prospective customers.

57.     Qualcomm's improper acquisition of the relevant Nuvia technology in

violation of Arm's standard provisions threatens to harm Arm's position in the ecosystem of

Arm-based devices, harm Arm's reputation as an intellectual property owner and technology

developer whose licenses must be respected, and embolden other companies to likewise

harm Arm's reasonable business expectations in issuing its licenses.

## COUNT I: BREACH OF CONTRACT – SPECIFIC PERFORMANCE
## (ALL DEFENDANTS)

58.     Arm hereby restates and re-alleges the allegations set forth above and

incorporates them by reference.

59.     The termination obligations of the ALA between Nuvia and Arm survive

termination and remain valid and enforceable contract provisions, as Qualcomm's

correspondence and Nuvia's termination certification confirm.

60.     Arm complied with and fulfilled all relevant duties, conditions, covenants,

and obligations under the Nuvia ALA, including ceasing use of Nuvia confidential

information in its possession.

61.     The Nuvia ALA terms were just and reasonable, involving adequate consideration and reasonable obligations for Nuvia in the event of Arm's termination based on Nuvia's material breach.  Those obligations served to restore the license holder to its position *ex ante*, protect Arm's business model and reasonable business expectations in issuing its licenses, and prevent the unjust enrichment of Qualcomm, the party that induced Nuvia's breach.

62.     Upon termination, the Nuvia ALA requires Nuvia to cease using and destroy any technology developed under the Nuvia ALA, as well as cease using Arm's trademarks in connection with any technology developed under the Nuvia ALA.

63.     Qualcomm shares Nuvia's obligations under the Nuvia ALA in its capacity as Nuvia's acquirer, and thus Qualcomm is likewise subject to the requirements of the Nuvia licenses' termination provisions.

64.     Based on Defendants' correspondence with Arm, public statements, and processor verification requests, discovery is likely to show that Defendants are still using and developing Nuvia technology developed under the now-terminated licenses, along with Arm trademarks, and intend to continue to do so.

65.     Defendants therefore have breached and are breaching the Nuvia ALA's termination provisions.

66.     As a direct and proximate result of Nuvia and Qualcomm's past and ongoing breaches, Arm has been irreparably injured and damaged in amounts not capable of determination, including, but not limited to, injury to Arm's global licensing program and misuse of Arm's technology.

67. Unless Defendants' breaches of the Nuvia ALA's termination provisions are enjoined and specific performance is granted, Arm will continue to suffer irreparable harm. As such, Arm has the right to enforcement of Nuvia and Qualcomm's compliance with the ALA's termination provisions, including via injunctive relief, specific performance, or any other measures necessary to avoid irreparable harm to Arm or to mitigate damages that have been caused by, and will continue to be caused by, Defendants' breach.

68. Arm is entitled to specific performance requiring Defendants to comply with the Nuvia ALA's termination provisions, including ceasing all use of and destroying any technology developed under the Nuvia ALA, and ceasing all use of Arm trademarks in connection with any technology developed under the Nuvia ALA—including the relevant Nuvia technology.

69. Arm is also entitled to monetary compensation incidental to specific performance of the Nuvia ALA's termination provisions to compensate Arm for the delay in Defendants' performance of their contractual obligations.

### COUNT II: DECLARATORY JUDGMENT AND TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114 (ALL DEFENDANTS)

70. Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

71. Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower case letters (collectively, the "ARM Marks"), true and correct copies of which are attached as **Exhibits A and B**. These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with

particular microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services. The applications to register the marks were filed on July 31, 2017 and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

72.      The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.

73.      Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

74.      Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

75.      Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

76.      Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to infringe Arm's trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die

packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District.  Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® Kryo™ 485 CPU built on ARM Cortex Technology."[22]  In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[23]  This press release remains online.  Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.  Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

77.     Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection,

---

[22] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

[23] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting trademark infringement in violation of 15 U.S.C. § 1114. Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

78. An actual and justiciable controversy exists between Defendants and Arm regarding infringement of Arm's trademarks. Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

79. Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will infringe Arm's trademarks, directly and indirectly.

80. Defendants' acts of infringement have injured Arm in an amount as yet unknown. Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

81. Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

82. Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' trademark infringement. Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing infringement, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their infringing conduct.

## COUNT III: DECLARATORY JUDGMENT AND FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125 (ALL DEFENDANTS)

83. Arm hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

84. The acts of Qualcomm and Nuvia described above constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85.     Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.

86.     Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years.

87.     Arm has not authorized Qualcomm or Nuvia to use the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology developed under the now-terminated licenses, instead terminating those licenses.

88.     Qualcomm and Nuvia have engaged in substantial preparation and taken concrete steps with the intent to falsely designate the origin of their products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Arm's customers—including Qualcomm and Nuvia, as discovery is likely to show—often use the ARM Marks in their die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, and websites directed to users throughout the United States, including users physically located in the State of Delaware and this Judicial District. Qualcomm promotes Snapdragon products as incorporating Arm technology, such as by saying on its website that "Snapdragon 855 is equipped with the cutting-edge Qualcomm® Kryo™ 485 CPU built on ARM Cortex Technology."[24]  In January 2022, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent

---

[24] *Samsung Galaxy Note10+*, Qualcomm Inc., https://www.qualcomm.com/snapdragon/device-finder/smartphones/samsung-galaxy-note10-5g.

acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[25] This press release remains online. Also, Qualcomm and Nuvia's plans to begin sampling chips with the relevant Nuvia technology as soon as August 2022 would require manufacturing a limited run of the chips in advance, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers. Qualcomm and Nuvia have thus used the ARM Marks in connection with the advertising, distribution, offering for sale, or sale of the chips, and Arm believes discovery will show that their further use is imminent if it has not happened already.

89.     Qualcomm and Nuvia's unauthorized use of the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology is likely to cause confusion, mistake, or deception on the part of consumers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology, constituting false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A). Given Arm's close relationships with its customers and individualized support for their products, there is and is likely to be confusion in the marketplace because consumers encountering the ARM Marks in connection with semiconductor chips incorporating the relevant Nuvia technology do and will likely believe that the products are endorsed by, licensed by, or otherwise associated with Arm. Semiconductor chips incorporating the relevant Nuvia technology are also readily identifiable without the use of the ARM Marks, such as by not mentioning the

---

[25] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

processor architecture or by using the generic term "RISC" (for reduced instruction set computer).

90.     An actual and justiciable controversy exists regarding Defendants' false designation of origin.  Although Arm repeatedly notified Qualcomm and Nuvia that their development of the relevant Nuvia technology is unlicensed following termination of the Nuvia licenses, Qualcomm has continued to tell reporters that the technology is on track to be sampled to customers this year, and news reports indicate that Qualcomm already has some working chips to demonstrate to potential customers.

91.     Arm is entitled to a declaratory judgment that Qualcomm and Nuvia's advertising, distribution, offering for sale, or sale of semiconductor chips with the relevant Nuvia technology and the ARM Marks do and will falsely designate the origin of their products, directly and indirectly.

92.     Defendants' acts of false designation of origin have injured Arm in an amount as yet unknown.  Arm is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

93.     Based on Qualcomm and Nuvia's continued development of the relevant Nuvia technology after repeated notifications that the technology is unlicensed following termination of the Nuvia licenses, discovery is likely to show that Qualcomm and Nuvia are acting willfully to usurp Arm's rights, warranting treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

94.     Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' false designation of origin.  Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing false designation of

origin, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the falsely designated matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology. Unless enjoined, Defendants will continue their wrongful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Arm Ltd. requests that the Court grant the following relief:

a.      A judgment in Arm's favor on all claims against Defendants;

b.      An order requiring specific performance by Defendants of the Nuvia licenses' termination provisions;

c.      An award of damages incidental to specific performance as a result of Defendants' breach of contract, in amounts to be proven at trial, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

d.      A judgment and a declaration that advertising, distributing, offering for sale, or selling semiconductor chips with the relevant Nuvia technology and the ARM Marks infringes Arm's trademarks, directly and indirectly;

e.      An order and judgment permanently enjoining Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns from (1) using in any manner in connection with the relevant Nuvia technology the ARM Marks, or any mark or logo that is confusingly similar to or a colorable imitation of the ARM Marks owned by

Arm; (2) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the affiliation, connection, or association of Defendants with Arm, or as to the origin, sponsorship, or approval of Defendants' semiconductor chips using the relevant Nuvia technology; or (3) assisting, aiding, or abetting any other person or business entity in performing any of the aforementioned activities;

      f.     An order and judgment directing Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Arm within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and ceased all offering of products with the relevant Nuvia technology under the ARM Marks, as set forth above;

      g.     An order and judgment directing Defendants and their officers, directors, agents, servants, employees, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays in any manner in connection with the relevant Nuvia technology the ARM Marks or any other mark that is confusingly similar to or a colorable imitation of the ARM Marks;

      h.     A judgment in the aggregate amount of (1) Defendants' profits, (2) Arm's actual damages, (3) the costs of this action pursuant to 15 U.S.C. § 1117, and (4) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may

have been obtained by Defendants in connection with their semiconductor chips using the relevant Nuvia technology and the ARM Marks, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

      i.     A judgment trebling any damages to the extent permitted by law, including under 15 U.S.C. § 1117;

      j.     Exemplary or punitive damages to the extent permitted by law;

      k.     Costs, expenses, and reasonable attorney fees under all applicable rules, statutes, and rules in common law that would be appropriate, with pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

      l.     Equitable relief addressing any infringement occurring after entry of judgment; and

      m.     Such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Arm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

Dated: August 31, 2022

OF COUNSEL:

Michael A. Jacobs
Joyce Liou
Diek Van Nort
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
mjacobs@mofo.com
jliou@mofo.com
dvannort@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(415) 268-7000
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP

_Anne Shea Gaza_

_____
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# Exhibit 71

# Exhibit 72

**PROPOSED PRETRIAL ORDER**

# EXHIBIT 1

**<u>JOINT STATEMENT OF UNCONTESTED FACTS</u>**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,

      Plaintiff,

    v.

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation, and NUVIA, INC., a
Delaware corporation

Defendants.

**C.A. No. 22-1146-MN**

## EXHIBIT 1: JOINT STATEMENT OF UNCONTESTED FACTS

1.    Plaintiff Arm Ltd. ("Arm") is a semiconductor and software design company founded in 1990.  Arm develops instruction set architectures and processor core designs implementing those architectures.

2.    Defendant Nuvia Inc. ("Nuvia") was founded in February 2019.

3.    Defendant Qualcomm Inc. is a technology company.  Defendant Qualcomm Technologies, Inc. is a subsidiary of Qualcomm Inc that develops semiconductor products.

4.    On September 27, 2019, Nuvia and Arm entered into an Architecture License Agreement, license number ████████, (the "Nuvia ALA")

5.    On September 27, 2019, Nuvia and Arm entered into an Annex 1 to the Nuvia ALA, number ████████.

6.    On March 27, 2020, Nuvia and Arm entered into an Annex 1 to the Nuvia ALA, number ████████.

7.    On September 27, 2019, Nuvia and Arm entered into a Technology License Agreement license number ████████ (the "Nuvia TLA").

8.    On September 27, 2019, Nuvia and Arm entered into an Annex 1 to the Nuvia TLA, number ████████.

9.    On March 27, 2020, Nuvia and Arm entered into an Annex 1 to the Nuvia TLA, number ████████.

10.    Qualcomm and Arm entered into an Architecture License Agreement license number ████████ (the "Qualcomm ALA") and multiple Annex 1s to that agreement as of May 30, 2013, including Annex 1 V8-A Architecture (████████) and Annex-1 V8 Next Architecture (████████).

11. 

12.    Qualcomm and Arm entered into a Technology License Agreement ████ ████ (the "Qualcomm TLA") and Annex 1 (████████) to that agreement as of May 30, 2013.

13.    On October 4, 2022, Masayoshi Son ("Mr. Son") and Rene Haas met with certain executives from ████████████████ During the conversation, Mr. Son said, among other things, that Qualcomm's license would expire in 2025.

# Exhibit 73

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 74

Message

| | |
|---|---|
| **From**: | Tejas Krishnamohan [tkrishna@qti.qualcomm.com] |
| **Sent**: | 10/31/2024 7:59:25 PM |
| **To**: | Pavan Mulabagal [pavanm@qti.qualcomm.com]; Rohit Bhasin [rbhasin@qti.qualcomm.com] |
| **CC**: | Tejas Krishnamohan [tkrishna@qti.qualcomm.com] |
| **Subject**: | Fw: ARM |



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 75

Case 1:24-cv-00490-MN    Document 577-1    Filed 11/21/25    Page 388 of 442 PageID #: 28383

7/1/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.  Pavankumar Mulabagal
Highly Confidential - Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


QUALCOMM INCORPORATED, A DELAWARE        )

CORPORATION; QUALCOMM TECHNOLOGIES,      )

INC., A DELAWARE CORPORATION,            )

                                         ) C.A. No. 24-490-MN

                      PLAINTIFFS, )

                                         )

             v.                          )

                                         )

ARM HOLDINGS PLC, F/K/A ARM LTD.,        )

A U.K. CORPORATION,                      )

                                         )

                      DEFENDANT. )

_____)

        * * *  HIGHLY CONFIDENTIAL  * * *

       * * *  ATTORNEYS' EYES ONLY  * * *

        VIDEO-RECORDED DEPOSITION OF

              PAVANKUMAR MULABAGAL

     IN HIS PERSONAL AND 30(B)(6) CAPACITIES

             TUESDAY, JULY 1, 2025

                9:50 A.M. PDT

              PALO ALTO, CALIFORNIA


     REPORTED BY AUDRA E. CRAMER, CSR NO. 9901

_____

              DIGITAL EVIDENCE GROUP

           1730 M Street, NW, Suite 812

              Washington, D.C. 20036

                (202) 232-0646

11 (Pages 38 to 41)

7/1/2025                    Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.  Pavankumar Mulabagal

12 (Pages 42 to 45)

7/1/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.  Pavankumar Mulabagal

13 (Pages 46 to 49)

7/1/2025                    Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.  Pavankumar Mulabagal
Highly Confidential - Attorneys' Eyes Only



Page 50

1    Q.  Okay.
2        MR. SCOTT:  I'm sorry.  Which email are
3    you referring to, Counsel?
4        MR. FRENTZEN:  At the top where it all
5    gets forwarded to the witness.
6    Q.  Right?
7        Sorry.
8    A.  Yes.
9    Q.  And this is on October 31, 2024?
10       MR. SCOTT:  I'm sorry.  You're
11   referring still to the one at the top?
12       MR. FRENTZEN:  Yeah.
13       MR. SCOTT:  Okay.
14       THE WITNESS:  Yeah.
15   BY MR. FRENTZEN:
16   Q.  Yeah.
17       I'm going to butcher these names, so I
18   apologize.
19       But the person who sent this to you at
20   Qualcomm, how do we pronounce that name?
21   A.  Tejas.
22   Q.  Tejas?

Page 51

1    A.  Yeah.
2    Q.  And then this is a forward of, at least
3    most recently, somebody
4        And again I'll butcher, probably, the
5    last name, but Mike -- do you know how to
6    pronounce that last name?
7
10
                    .  Does that appear -- which was
13   forwarded to you.
14       Does that appear to have been sent on
15   October 28, 2024?
16   A.  Yes.
17   Q.  Who is Tejas?
18   A.  Tejas is my manager, and he's also head
19   of all of -- at that time he was the head of all
20   strategic accounts.
21   Q.  So at that time -- if you take a look
22                    email, do you see, "Thought I'd

Page 52

1    reach out with a quick update"; right?
2    A.  Uh-huh.
3    Q.  Then he says -- and I'm sorry.  For the
4    record, you have to say yes or no, not uh-huh.
5    A.  Yeah.
6    Q.  That's fine.
7    A.  Yes.
8

Page 53

1

14  (Pages 50 to 53)

7/1/2025                    Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.  Pavankumar Mulabagal

7/1/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.  Pavankumar Mulabagal

# Exhibit 76

# Exhibit 77

Message

| | |
|---|---|
| **From**: | Manju Varma [mvarma@qti.qualcomm.com] |
| **Sent**: | 10/23/2024 2:02:50 AM |
| **To**: | Xiaomin Ma (Steven) [xiaominm@qti.qualcomm.com]; Steven Miller [smiller@qti.qualcomm.com]; Salman Saeed [ssaeed@qti.qualcomm.com]; Deepu John (PDM) [jdeepu@qti.qualcomm.com] |
| **Subject**: | Re: ARM claim to cancel architectural license to QC |

Manju Varma
CPU Product Management
Qualcomm Inc

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

多数安卓智能手机都使用这种技术。如果这一取消生效，该公司可能不得不停止销售占其约390亿美元收入很大一部分的产品，或者面临巨额损失索赔。2022年，Arm起诉高通，称后者在收购CPU初创公司Nuvia后，"滥用"前者对Nuvia的知识产权授权。（彭博）

获取 Outlook for iOS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 78



Br,
Mike

Here is our corporate position on this:

*This is more of the same from ARM – more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license. With a trial fast approaching in December, Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed. Arm's anticompetitive conduct will not be tolerated.*

Please let me know if you have any questions or concerns.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QCVARM_0713516

Regards,
Bill



Nothing in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

Confidentiality Note: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 79



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do not enable macros.

[External]

ross end-to-
milestone for

John.Saw@t-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QCVARM_1029605

**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do not enable macros.

Hope you had a safe trip back to Seattle. Let's chalk out the next steps, if you had any further thoughts on how to proceed.
I understand your team is coming down to San Diego next month.

Thanks,
Durga

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QCVARM_1029606

See you at the CTIA board meeting tomorrow.

Thanks,
Durga

# Exhibit 80

Message



For information on Desktop Products, visit http://techconnect.bankofamerica.com

*Click here for monitor setup, docking station and mouse questions:*



*Life's better when we're connected*

This message, and any attachment(s), is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/electronic-disclaimer. If you are not the intended recipient, please delete this message. For more information about how Bank of America protects your privacy, including specific rights that may apply, please visit the following pages: https://business.bofa.com/en-us/content/global-privacy-notices.html (which includes global privacy notices) and https://www.bankofamerica.com/security-center/privacy-overview/ (which includes US State specific privacy notices such as the http://www.bankofamerica.com/ccpa-notice).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 81

Message

**From:**      Eric Yang [eriyan@qti.qualcomm.com]
**Sent:**      11/4/2024 2:35:43 AM
**To:**
**CC:**                                                              Adrien    Rendu    [arendu@qti.qualcomm.com];    Brian    Tucker
               [briatuck@qti.qualcomm.com]
**Subject:**   RE: Legal suit of Qualcomm and ARM


+Brian,

Hi ██

This is more of the same from ARM – more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license. With a trial fast approaching in December, Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed. Arm's anticompetitive conduct will not be tolerated.

Best Regards,
**Eric Yang**
QUALCOMM Global Account
+86-18611128864

Qualcomm·
snapdragon

---

**Sent:** Friday, November 1, 2024 4:09 PM
**To:** Eric Yang <eriyan@qti.qualcomm.com>
██████████████████████ Adrien Rendu <arendu@qti.qualcomm.com>
**Subject:** Legal suit of Qualcomm and ARM


**CAUTION:** This email originated from a known Qualcomm vendor. Please exercise caution with any unexpected requests, links, or attachments.

Hi Eric

As news informed below , regarding legal suit between ARM and Qualcomm., any update or guarantee from Qualcomm to assure no trouble on the current cooperated projects with us ? Tks

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QCVARM_1121347

# Exhibit 82

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

———————————————————————

QUALCOMM INCORPORATED, a            )
Delaware corporation,              )
QUALCOMM TECHNOLOGIES,             )
INC., a Delaware                   )
corporation,                       )          C.A. No. 24-490-MN
                                   )
                                   )
            Plaintiffs,            )
                                   )
       vs.                         )
                                   )
ARM HOLDINGS PLC, f/k/a,           )
ARM LTD., a U.K.                   )
corporation,                       )
                                   )
                                   )
            Defendant.             )
———————————————————————

HIGHLY CONFIDENTIAL - COUNSELS' EYES ONLY
DEPOSITION OF JAMES JEON
AS CORPORATE DESIGNEE FOR QUALCOMM INCORPORATED
CONDUCTED REMOTELY
JULY 11, 2025

REPORTED BY KAYLEE G. WOOD, RPR, CRR, CSR NO. 14348
_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.          James Jeon
Highly Confidential - Counsels' Eyes Only

Page 10

1  you had, and what kind of thing the customer saying to
2  you, right?
3          So those are the generic questions that I
4  asked the group, and then I asked actually the regional
5  team provided those data input to me so I can
6  understand over the customer communication related to
7  the Arm case.
8      Q.  Was the input provided by these regional --
9      A.  Yes.
10     Q.  -- team members, was that provided to you --
11  like did you have a phone conversation or was it
12  provided over e-mail?  How was -- how did they provide
13  answers to those questions that you asked?
14     A.  There was the tablet that they actually
15  provided all the information into the document, and
16  then the -- some of the discussion I had over the phone
17  just to clarify their input.
18     Q.  So a template was provided to these regional
19  team leads that you just identified, and then they
20  filled it in?
21     A.  Yeah.
22     Q.  Is that correct?
23     A.  Yeah.
24     Q.  Okay.  And when did that happen?
25     A.  I think it was mid-June time frame, early

Page 11

1  June.
2      Q.  Okay.  So we might be talking past each other
3  a little bit.  So in preparing for your deposition
4  testimony, did you speak with any of those six folks --
5      A.  Yes.
6      Q.  -- that you identified?
7      A.  Yes.
8      Q.  Okay.  When did you speak with them most
9  recently?
10     A.  Recently, this week.
11     Q.  Okay.
12     A.  Yeah.
13     Q.  Do you recall when this week?  Was it
14  yesterday?
15     A.  I talked to some of them yesterday and then
16  some of them early this week like Monday.
17     Q.  Okay.
18     A.  And then some of them like Tuesday.  Yes.
19     Q.  Okay.  So let me ask you this.  When did
20  you -- and I just want a date.  I don't -- I'm not
21  asking for the contents of anything you discussed with
22  your attorneys, but when did you meet with your
23  attorneys to prepare for your deposition?
24     A.  I briefly met on Monday and then today, this
25  morning.

Page 12

1      Q.  Okay.  This morning when you were with your
2  attorneys, did you speak to any of those regional team
3  leads?
4      A.  Not the one that I told you.  Yeah.
5      Q.  Okay.  Did you speak with anyone who was not
6  an attorney this morning in preparing for your
7  deposition?
8      A.  In Qualcomm?
9      Q.  So let's start with in Qualcomm.
10     A.  Yes.  I talked to a couple people in
11  Qualcomm.
12     Q.  Okay.  Who did you speak with this morning
13  who was not an attorney to prepare for your deposition?
14     A.  I talked to the ████
15     Q.          Okay.
16     A.  Yeah.
17     Q.  Anyone else?
18     A.  I talked to -- we talked to the ████
19     Q.  Can you spell that?
20     A.      ████  -- I need to gather the detailed
21  name --
22     Q.  Okay.
23     A.  I don't remember his spelling.
24     Q.  Is that a first name or --
25     A.  His first name.  Yeah, yeah.

Page 13

1      Q.  And what's the surname?
2      A.      ████
3      Q.      ████
4      A.  Yeah.
5      Q.  Okay.
6      A.  Yeah.
7      Q.  Anyone else besides --
8          (Reporter clarification.)
9      A.  I talked to our Europe team member ████  I
10  don't remember his last name.  Yeah.
11     Q.  Okay.  Anyone else?
12     A.  I think that was it.  Yeah.
13     Q.  Okay.  And then you -- so ████, and
14  ████ were employees of Qualcomm that you spoke with
15  this morning?
16     A.  Yeah.
17     Q.  You said you also met with your attorneys on
18  Monday, is that right?
19     A.  Briefly, yes.
20     Q.  Okay.  When you met with your attorneys
21  briefly on Monday, did you speak with any
22  non-attorneys?
23     A.  No.
24     Q.  Okay.  Starting with ████ what did
25  tell you?

4  (Pages 10 to 13)

7/11/2025     Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.     James Jeon
Highly Confidential - Counsels' Eyes Only



**Page 14**

1   A. So ▮▮▮▮▮
2   **Q. Okay.**
3   A. I was wondering what kind of the inquiry he
4 got from the customer, North America customer, right,
5 regarding the Arm case so far, so just generally
6 hearing about the -- what kind of things he's hearing.
▮▮▮▮▮
▮▮▮▮ So he handled those account.
11     I asked him, hey, when Arm case happened in
12 September 2022, did you get --
13     (Reporter clarification.)
14   A. -- a lot of inquiry from the customer about
15 that case? And he said, yes, there's a lot of the
16 customer reaching out, particularly the compute
17 customer asking about a lot of the question about this
18 Arm case. And then they're worried about like this is
19 going to impact our product or business that we are
20 working with Qualcomm, so I just was asking about
21 those, you know, what kind of the customers' reactions
22 and what kind of things they're asking about.
23   **Q. Okay. Did he provide to you any specific**
24 **customer reactions?**
25   A. He gave me the --

**Page 15**

1     (Reporter clarification.)

**Page 16**

24   **Q. What -- didn't mean to cut you off. Yeah.**
25 **One thing about today is because the court reporter**

**Page 17**

1 **here is going to be typing up everything said, it's**
2 **really important that one of us talk at a time. I'll**
3 **try not to interrupt you.**
4   A. Same here.

5 (Pages 14 to 17)

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.          James Jeon
Highly Confidential - Counsels' Eyes Only



Page 18

1  understand all the conversations you had --
2     A.  Yeah, yeah.
3     Q.  -- to provide testimony here today.
4     A.  Yeah.
5     Q.  So we spoke briefly, and you had some
6  conversations --
7     A.  Yeah.
8     Q.  -- earlier this morning, correct?
9     A.  Yeah.
10    Q.  Monday, did you have any conversations with
11 anyone to prepare for your deposition and understand --
12    A.  That was just with the lawyer.  I told that I
13 didn't have any others.
14    Q.  Okay.
15    A.  That was a brief conversation with the
16 deposition prep.
17    Q.  And then Tuesday, you spoke with the account
18 leads --
19    A.  Yeah.
20    Q.  --
21    A.  Yeah.
22    Q.  Is that the same person or different people?
23    A.  Same person.
24    Q.  Okay.  Who is that?

Page 20

1  all about Arm or the other?  So I try to get the some
2  clear understanding of their specific timeline and the
3  specific that their discussion that they had with the
4  Arm case, so I had a couple of those phone call with
5  the select group of those people.
6     Q.  Okay.
7     A.  So that's what happened.  As I said, give
8  you -- those are the -- some of the people name that I
9  talk to, but doesn't mean that's the only the customer
10 that I had, that we had an inquiry.  There's a long
11 list of the customer who reached out to Qualcomm team,
12 not directly to me, but there was a lot of account
13 teams in the region.  They got a phone call.  They got
14 an e-mail.
15       So I just want to make sure you understand
16 that the customer communication is not only limited to
17 that specific customer that I talk to.
18    Q.  Yeah.  I understand.  So regarding
19 let's take them one at a time.
20    A.  Yeah.
21    Q.  What did Mr.          explain to you about
22       when you asked those questions about any feedback
23 they had provided regarding the Arm litigation?
24    A.  So       and        pretty much just similar,
25 even including          Those are the compute OEM.

2     Q.  Okay.
3     A.  Yeah.
4     Q.  And what did he tell you about
5       Strike that.  Let me ask you a better question.
6       What did you ask Mr. Cnosson about Lenovo
8     A.  Maybe let me step back and give you some full
9  understanding before you go to talk about that specific
10 account.
11    Q.  Sure.
12    A.  As I said, I think that -- I didn't talk to
13 every single account team or sales team.  What I asked
14 is I asked the team just to try to understand all the
15 communication happened.  Some of the stuff I asked
16 the -- our regional team even before, like here's
17 the -- all the Arm incident happened.  I asked them
18 what they're discussing about, what customer, which
19 customer reaching out to, and what they're asking
20 about, right?  So those all information came from the
21 regional team.
22       I only look at the some of the account that
23 has unclear to me what was exactly they're asking or
24 some clarification I needed, like when they said, I
25 talked to this account like two, three hours, was that

Page 21

1  When they had the first lawsuit in September 2022, they
2  are panicked, and then we are working on the -- our
3  project already with them.  And then actually the --
4  you know, so they are working -- asking us if this is
5  any impact on our current project.
6       And then is it going to be delayed while the
7  Qualcomm chips are launched?  Or what if you guys lose
8  the battle against Arm, what's going to impact or do
9  you guys have a backup plan?  There's a lot of those
10 challenging questions they got when the first of those
11 incident happened.
12       So       had to calm down all those customer.
13 Hey, we have our full -- we think we have a full legal
14 right to use the Arm license.  And then we delivered
15 our approved statement, consistent message to the
16 customer.

22    Q.  Okay.
23       MS. YING:  And I'm just going to take a
24 moment here to mark the transcript highly confidential,
25 counsels' eyes only.

6  (Pages 18 to 21)

7/11/2025            Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.            James Jeon
Highly Confidential - Counsels' Eyes Only

Page 50

1  our approved message.  That was it.
2      Q.  Okay.  And you mentioned a ███████ from
3  Europe?
4      A.  Europe, yes, yes.
5      Q.  What -- why did you speak with ███████?
6
7
8
9
10
11
12
13
14
15
16
17
18
19      Q.  Do you know who the customer was?
20      A.  I think that was ███████
21      Q. ████████
    ████████████████████████  So we were
24  talking with them to provide our compute device as
25  enterprise customer. ████████████████

Page 51

1  of the enterprise PC from Qualcomm partner, OEM
2  partner. ████████
3  ████████████████████████
4  ████████████████████████
5      Q.  Do you know which Qualcomm products
    ██ ████ was considering purchasing from Qualcomm?
7      A.  That was our PC product.
8      Q.  Have you heard the term custom core before?
9      A.  You mean custom chipset?
10      Q.  What is a custom chipset?
11      MS. YING:  Objection.
12      A.  I mean, Qualcomm custom chipset with Qualcomm
13  IP.
14      Q.  Okay.  Let me ask you this.  Have you heard
15  the term implementation core before?
16      A.  No.
17      Q.  Okay.  So just fair to say ███████ was
18  considering purchasing PC products from Qualcomm?
19      A.  No.  PC product from our OEM, PC OEM partner.
20      Q.  Okay.
21      A.  So they are enterprise insurance company.
22  They want to buy the PC for their enterprise use, but
23  then they were considering one of our OEM partner.  I
24  don't remember there was ███████
25  whomever, they were considering out buy the Qualcomm

Page 52

████████████████████████
████████████████████████
████████████████████████
4      Q.  Got it.  Do you know who the specific OEM
5  partner was?
6      A.  I don't recall correctly, remember exactly
7  who was the OEM.
8      Q.  Okay.
9      A.  I do remember in the same ████ e-mail
10  there was another customer company -- ████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
16      Q.  Okay.
17      A.  Yeah.
18      Q.  And -- okay.  And you learned that from
19  Mr. ████████
20      A.  Yes.
21      Q.  Did you learn anything else from Mr. ████
22      A.  No.  That was the reason I called him to
23  clarify to understand what exactly discussion he had
24  with those people.
25      Q.  Okay.  You mentioned you also spoke with

Page 53

1  ████████
2      A.  Mm-hmm.
3      Q.  Who is ████████
4      A.  He's our ████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
    ████████████████████████
24      Q.  So I'd like to jump to that.
25      A.  Okay.

14  (Pages 50 to 53)

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.          James Jeon
Highly Confidential - Counsels' Eyes Only

Page 54

1    Q.  So what did he tell you about
2    A.

Page 56

23    Q.  So I've handed you what's been marked Jeon 6.
24    A.  Okay.
25        (Whereupon, Exhibit 6, Quarterly Report, was

Page 57

1  marked for identification.)
2       Q.  This is titled:  Global region Q3 FY '23
3  quarterly report.
4       A.  Okay.
5       Q.  And you're familiar with this, right?
6       A.  Yes.
7       Q.  Do you see the little numbers in the bottom
8  right-hand side?
9       A.  The --
10       Q.  Bottom right-hand corner of each page,
11  there's little numbers there.
12       A.  Yeah, yeah, yeah, yeah.
13       Q.  I'd like you to turn to the page ending in
14  794.
15       A.  794.  Yep.
16       Q.  This is on the left-hand side running top to
17  bottom.  It says, top one, loss pending by BU.  BU
18  refers to business unit, right?
19       A.  Mm-hmm.
20       MS. YING:  And I'm just going to just note
21  here for the record you're now into 30(b)(1) land, is
22  that right?  Because the topic is limited to your
23  disclosures and communications with third parties
24  regarding the ALA breach allegations and communications
25  which is a very specific definition in your 30(b)(6)

15 (Pages 54 to 57)

Page 66

1  chipset, correct?
2      A.  Mm-hmm.
3      MS. YING:  Objection.
4      **Q.  And as a result of that issue identified in**
5  **the quality by Qualcomm, Qualcomm could not provide as**
6  **many chipsets of** ▮▮▮▮▮▮▮▮▮▮▮▮▮?
7      A.  Yes, at that point.  But two things, be
8  clear.  This quality issue in the leading note.  When
9  you launch the new chipset every year, this is the
10  3 nanometer, first time we're doing the 3 nanometer.
11  This is the normal.  It's not like something you have
12  the quality issue in a certain product.  When you do
13  every new leading note, there's always ramp-up page.
14      So some of those issue we are finding, I
15  don't want this as consider as like special problem
16  that we are creating.  This is general. ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
20      **Q.  I appreciate that.  In this particular**
21  **circumstance, I hear you.  I hear your testimony loud**
22  **and clear.  But at this time --**
23      A.  Yes.
24      **Q.  -- at this point in time --**
25      A.  Yes.

Page 67

1      **Q.  -- Qualcomm had identified quality issues**
2  **with the** ▮▮▮▮▮ **chipset --**
3      A.  Yes.
4      **Q.  -- and could not provide the quality that**
5  ▮▮▮▮▮ **needed, fair?**
6      A.  At that point.
7      MS. YING:  Objection.
8      A.  At that point.  But after that, we recover
9  the supply.  We met their all demand in the end.  So
10  outcome in the end, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17      **Q.  And when did they get the supply that they**
18  **needed?**
19      A.  Within a two, three weeks.
20      **Q.  So in --**
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮  That's why I want to
24  point out that this is a normal process.  When you do
25  the leading note, there's always some hiccup happening

Page 68

1  here and there.  You have to sometimes decommit, but
2  then you have to catch up, so --
3      **Q.  You also earlier mentioned that you spoke in**
4  **preparation for your testimony today with the sales**
5  **lead in Japan?**
6      A.  Yes.
7      **Q.  Who is that?**
8      A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10      **Q.  Did he tell you anything that -- let me**
11  **strike that and try to ask a better question.**
12      **Did you ask him the same questions that you**
13  **asked, for instance,** ▮▮▮▮▮▮▮▮ **that we already**
14  **discussed?**
15      A.  Yes, very similar question.  Hey, what do you
16  guys hearing from the Japan customer?  We see that the
17  OEM report saying you had some multiple customer you
18  talk to.  What was particularly their questioning
19  about, their concerning about?  Yes.
20      **Q.  Did he tell you anything that deferred [sic]**
21  **from what** ▮▮▮▮▮ **told you?**
22      MS. YING:  Objection.  Form.
23      A.  No.  The -- when I talk to the Japan team was
24  nothing related to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  It
25  was more about the general Japan customers' feedback

Page 69

1  from their perspective.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



18  (Pages 66 to 69)

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.          James Jeon
Highly Confidential - Counsels' Eyes Only



**Page 70**

22    Q.   Okay.  And is it true that across the board
23  for those customers the general approved corporate
24  statement is provided?
25    A.   Yes.

**Page 72**

22    Q.   And to your knowledge, you can't provide
23  specifics on whether any of the specific follow-up
24  questions were answered, fair?
25        MS. YING:  Objection.

**Page 71**

1     Q.   And as we looked at earlier, specific
2   questions are not necessarily answered, is that
3   correct?
4         MS. YING:  Objection.
5     A.   I don't have full knowledge on the every
6   single detail follow-up questions, what they may have.
7   But generally the -- my understanding with those
8   communication with the team, they try to just deliver
9   the approved message only consistently, not anything we
10  message.
11        They gather those follow-up question,
12  challenging question, but they couldn't really explain
13  that detail.  So they just say high-level message, we
14  have the same position, no change, don't get distract
15  because of this, stay with our Qualcomm business.  That
16  kind of message is only they deliver.  But I'm not
17  aware any of the detail follow-up they got, so --

**Page 73**

1     A.   Again, I gathered all the regional teams'
2   report.  They provided all their messages, what they
3   provided.  That's what I know.  Yeah.  That's only I
4   can understand, what we can share.
5     Q.   So to answer my question though, to the best
6   of your knowledge, you can't provide specifics on
7   whether any of the specific follow-up questions
8   provided to Qualcomm from those various customers were
9   answered, fair?
10    A.   Let me clarify.  I think I do know there's a
11  customer asking a lot of follow-up questions, something
12  our regional team couldn't speak or share the detail.
13  But I don't know there's any other -- the original
14  message that the regional team deliver to customer, my
15  understanding most of the regional team report to me in
16  their report, they been consistent with our approved
17  message all the time, so --
18    Q.   Yeah.  So this is -- I want to make sure I
19  have a clear answer, and you ended up getting there,
20  but specifically focused on the potential for those
21  derivative messages --
22    A.   Yes.
23    Q.   -- you don't have personal knowledge of those
24  potential derivative messages that were sent to those
25  customers, correct?

19  (Pages 70 to 73)

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.          James Jeon
Highly Confidential - Counsels' Eyes Only



**Page 82**

1    A.  Yes.

14    Q.  Do you -- in the ordinary course of what you
15 do at Qualcomm, either in your capacity as a member of
16 the IRT or as -- I apologize.  I forget your title.
17    A.  No, it's okay.
18    Q.  What was your title?
19    A.  VP.
20    Q.  Yes.  So let me ask the question again.
21    A.  Yes.
22    Q.  In the ordinary course of your roles at
23 Qualcomm, either as a member of the IRT or as a VP, do
24 you work with the marketing communications department?
25    MS. YING:  Objection.

**Page 83**

1    A.  I'm working -- are you talking about
2 Arm-specific case or the general?
3    Q.  I am not talking about Arm specifically.  I'm
4 talking generally.
5    A.  Generally, the things that I'm working with
6 the marketing group sometimes in my group is the --
7 some of the announcement that we are making with the
8 partner, our customer.  So then the regional team, they
9 have their -- whatever the announcement they want to
10 make, and then I'm helping on the -- some of the
11 announcement, public announcement with our partner at
12 the event or certain things, right?
13    So I'm involved in some of those partner
14 media announcement together.  But Arm specific, I'm not
15 involved in any of the marketing discussions and
16 communication discussion.
17    MR. MCINTEE:  Why don't we take a break?
18    MS. YING:  Okay.
19    THE VIDEOGRAPHER:  This marks the end of
20 media number 2.  The time is 4:05 p.m., and we are off
21 the record.
22    (Whereupon, a recess was taken.)
23    THE VIDEOGRAPHER:  Here begins media number 3
24 in the continuing deposition of James Jeon.  The time
25 is 4:16 p.m., and we are back on the record.

**Page 84**

1 BY MR. MCINTEE:
2    Q.  Mr. Jeon --
3    A.  Yes.
4    Q.  -- at any point today have you discussed with
5 your counsel present the testimony you've provided thus
6 far?
7    MS. YING:  Objection.  I think you mean since
8 his deposition started?
9    MR. MCINTEE:  Yeah.  Let me ask it again.
10    Q.  Since -- on the breaks today have you
11 discussed your testimony with your counsel?
12    A.  With this -- no.
13    Q.  Okay.  And you understand you're under oath
14 today, correct?
15    A.  Yes.
16    Q.  Okay.  And there's no reason you can't give
17 full and truthful testimony, right?
18    A.  Yes.
19    Q.  Okay.  You've mentioned -- zooming out,
20 you've identified a number of people that you spoke to
21 to prepare to provide this testimony, correct?
22    A.  Yes.

16    A.  Because the when we send the approved message
17 to the regional team and customer group, right, I asked
18 if there's any other question, the media question you
19 maybe going to get from the region, please reach out to
20 the marketing group.  So I just asking them what
21 they're hearing from their side, you know, from the
22 regional team, any region reach out to you, any
23 particular like media inquiry, you know, coming to the
24 region to them.
25    Q.  Did you ask ████ -- strike that.



Page 86

Page 88

1  And I heard, by the way, the same thing from
2  the ███ as well, the OEM side.  They were saying, hey,
3  Qualcomm solution and chipset has challenges, and it
4  has some risk, potential risk.  So you should now not
5  go to Qualcomm.  You should continue with our chipset.
6  So definitely there's also competitor side they're
7  actually leveraging it.  So those are some of those
8  information I heard.
9  **Q.  Right.  My question was specific about the**
10 **Arm case, so I want to make sure you understand my**
11 **question.  Did ███ provide you any specific concerns**
12 **that customers on the channel compute side had**
13 **regarding the Arm case?  Yes or no?**
14 **A.**  Yes.
15 **Q.  Okay.  What were they?**
16 **A.**  As I said, same concern, similar concern the
17 other customer had.  They're worried about our chipset
18 cannot supply to the key OEM so they cannot get their
19 PC into the channel business.  And then they're asking
20 about our, you know, if we don't win this case, what's
21 our plan?  So there's questions from the other channel.

23 **Q.  What did he tell you?**
24 **A.**  I was just wondering is there any compute
25 channel customer side, any concern you hearing from

Page 87

1  the -- from them on the Arm?  He said, yes, there's
2  several channel customers reaching out regarding the
3  Arm case because they're buying the Qualcomm Snapdragon
4  PC, and then this Arm case is concerning them worrying
5  about the result or any outcome.
6  And then there -- he was gave the same kind
7  of approved message to them, but there's like a
8  follow-up question from them, same thing like, you
9  know, what is the impact if this is legal result not
10 coming out your favor?

4  **Q.  Okay.  You would agree those other**
5  **competitors would still seek those customers' business**
6  **absent the dispute with Arm, correct?**
7  MS. YING:  Objection.
8  **A.**  As I said, I think the competition in the
9  market is always there, but they are leveraging this
10 Arm case.  They were leveraging the Arm case when we
11 had the situation with the Arm.  They go tell the
12 customer, because the Arm case that you see from the
13 news, you should not go with Qualcomm.  They're
14 creating this more risk for you.  That's what they were
15 leveraging.  So yes, general competition in the market
16 always there, but this is accelerating our competitors
17 to push to the customer.
18 **Q.  Did ███ tell you how he communicated with**
19 **those channel compute customers?  Was it by phone or**
20 **via e-mail?**
21 **A.**  It was most of the phone the -- he had the
22 communication, phone conversation.
23 **Q.  What about these other people you spoke with**
24 **to prepare for your testimony?**
25 **A.**  Most of them told me verbal conversations.  A

23  (Pages 86 to 89)

7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.        James Jeon
Highly Confidential - Counsels' Eyes Only



Page 90

1  few of them have the e-mail discussions, but most of
2  them was like a verbal.
3    Q.  Was above?  What was the last thing you said?
4    A.  Most of them was a verbal conversation.
5    MS. YING:  Verbal.
6    Q.  Verbal conversation.  Thank you.
7       So just make sure I have it clear, the other
8  Qualcomm employees that you spoke with, ████
   █████████████████████ they told you that most of the
11 conversations they had were verbal, correct?
12   A.  Yes.
13   Q.  And the verbal conversations I'm referring to
14 were the conversations with the respective customers in
15 their --
16   A.  Yes.
17   Q.  -- segments?
18   A.  Yes.
19   Q.  I'm handing you Jeon 8.
20   A.  Okay.
21      (Whereupon, Exhibit 8, January 2025 E-mail,
22 was marked for identification.)
23   MR. MCINTEE:  Only got one.
24   MS. YING:  Okay.
25   Q.  This is an e-mail that was produced this

Page 91

1  afternoon with two sets of Bates numbers on it, but
2  it's an e-mail from ███████████████████████████
   ████████████
5    A.  Yes.
6    Q.  And this is from October 23, 2024, correct?
7    A.  Yes.
8    Q.  At the bottom of this first page here it has
9  that same Qualcomm corporate statement, correct?
10   A.  Yes.
11   Q.  Who's ████
13   Q. ██████████████████████████
   ████
   ████
   ████
   ████
   ████
22   Q.  Got it.
23   A.  Yes.
24   Q.  Got it.  ████ message here -- let me take
25 a step back.  This is -- originates from a request from

Page 92

1  ████ right?
2    A.  Yes.
3  ██████████████████████
   ████
   ██████████████████████████
   ██████████████████████████
   ██████████████████████
   ████
13   Q.  I mean, not your question.  Is it fair that
14 this corporate statement that Qualcomm had was meant to
15 only be provided if someone specifically asked for a
16 comment on the Arm issue?
17   MS. YING:  Objection.
18   A.  No, I don't think that way.  I mean, we just
19 provided a message to the group.  Either they get the
20 question, they can give that as a reactive.  Also, they
21 can provide a proactive message as well if they need
22 it, so --
23   Q.  Okay.  So what is your basis -- and it might
24 be -- it might go beyond this e-mail.  But what is your
25 basis for what you just said, that Qualcomm could also

Page 93

1  provide a proactive message?  What did you mean by
2  that?
3    A.  Oh, because -- oh, yeah.  When we provide
4  this kind of message, approved message, we told the
5  customer particularly like in the September example, I
6  use that example.  When that first incident happened,
7  we actually asked the customer, our regional team reach
8  out to their some of the key customer which moved a lot
9  of the revenue in our business.  They should know
10 earlier, and they should know our message before they
11 find out from the media or any other.
12      So we actually highly recommend regional
13 team, go talk to some of your key customer sharing this
14 approved message, so make sure that they're not get
15 surprised by media or some speculate article.
16   Q.  I got it.  So in this September time frame
17 for that issue --
18   A.  Yeah.
19   Q.  -- proactive was approved.  Here he's
20 specifically saying it can be used reactively, right?
21   A.  I mean, obviously he can say that he can use
22 it as a reactive, reactively.  But I don't recall,
23 remember we gave the directions only you have to use
24 this for reactively.
25   Q.  Okay.

24  (Pages 90 to 93)

Page 94

1    A.  When we are provide that approved message,
2    because when I deliver this message to the team, this
3    is the news article came out first from Bloomberg.  We
4    got all surprised, and then we quickly work on the our
5    approved message, tell the regional team, this is what
6    you can share with the customer.
7        Q.  Okay.
8        A.  We didn't tell them that you only have to do
9    this reactively.
10       Q.  He at least had some concern that it could
11   cause confusion if it was used for any way other than
12   reactively?
13       A.  Again, this is not my e-mail from my side.  I
14   don't know what detail discussion he may have had with
15   ▮▮▮ what is his discussion he had, so I don't have
16   enough knowledge to say that this is what it actually
17   means, the confusion.
18       MR. MCINTEE:  Okay.  So at this point I don't
19   have any more questions, but I do have some things to
20   get on the record.  So for multiple reasons, we're
21   keeping this dep open.  To start, we got 36 documents
22   an hour before the dep began, many of which were in a
23   foreign language with no translation.
24       We've already covered this, but Qualcomm
25   appears to be withholding relevant responsive

Page 95

1    documentation that is not privileged, based on the
2    testimony of Mr. Jeon, summarizing exchanges between
3    Qualcomm and its customers.  And he further testified
4    that he relied on it to prepare for his corporate
5    testimony.
6        Additionally, we're holding it open for the
7    further reason that he testified he had no knowledge of
8    the procedures regarding the marketing communications
9    department, which would fall squarely within topic 61
10   as it relates to the breach allegations.
11       MS. YING:  So I didn't know if you were
12   actually going to pass me the witness, but I'm assuming
13   you're passing the witness to me right now, right?
14   So --
15       MR. MCINTEE:  Sure.
16       MS. YING:  We disagree with that, and I'll
17   get to that all in a second.
18   EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
19   BY MS. YING:
20       Q.  But, Mr. Jeon, did you speak with any -- if
21   you go to Exhibit 5 that's marked -- it had the e-mail
22   that's marked as Exhibit 5 that was shown to you.
23       A.  Exhibit 5.
24       Q.  It has a sticker on it, and it says 5 on it.
25       A.  Yeah.

Page 96

1        Q.  It's an e-mail from ▮▮▮▮▮
2        A.  Yes.
3        Q.  Okay.  Did you speak with ▮▮▮▮ or
4    anyone in auto to prepare for your deposition today?
5        A.  Yes.  I talked to ▮▮▮▮.  Thanks for
6    reminding me.  Sorry.
7        Q.  Okay.  So did you speak with anybody else
8    with ▮▮▮
9        A.  Did I speak with anyone else other than Mike
10   or --
11       Q.  With ▮▮▮
12       A.  Yes.  I talked to ▮▮▮ about the auto
13   specific because he owned the auto account in North
14   America, so I ask him about the -- over the discussion
15   he had.
16       Q.  Okay.  And then the template that you were
17   referring to earlier in your testimony.
18       A.  Yes.
19       Q.  Is that a template that you were instructed
20   by counsel to fill out?
21       A.  I didn't created the template.  I don't think
22   that --
23       Q.  It's a yes-or-no question.
24       A.  Okay.
25       Q.  So let me --

Page 97

1        A.  Okay.
2        Q.  Following your meeting with counsel, did you
3    use a template -- were you instructed to use a template
4    to collect the information from your regional teams?
5    Yes or no?
6        A.  Yes.
7        MS. YING:  Okay.  I'll pass the witness back
8    if you have anything.  Otherwise, I can respond to your
9    other points.
10   EXAMINATION BY COUNSEL FOR THE DEFENDANT
11   BY MR. MCINTEE:
12       Q.  So when I asked you if you had spoken to
13   anyone else, I think you said no. ▮▮▮▮▮▮

7/11/2025            Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.            James Jeon
Highly Confidential - Counsels' Eyes Only



Page 98

[text redacted]

He's hearing

---

Page 100

1  using from Qualcomm.

[text redacted]

So they were
8  questioning about those auto specific – their business
9  impact.
10      Q.  Did he identify whether ▓ is pulling any of
11  their agreements with Qualcomm or identify any lost
12  business opportunities that Qualcomm's going to have
13  with ▓
14      MS. YING:  Objection.  Form.
15      A.  I'm not aware that the detail of the deal
16  discussion, but he said there was the some of the
17  challenge he had in the part of the deal.  But I'm not
18  aware of the detail, the negotiations.
19      MR. MCINTEE:  Okay.  Pass the witness.
20      MS. YING:  Okay.  All right, and so I'll just
21  respond.  We obviously -- as you noted, as you counted,
22  the witness spoke to ten people to prepare for this
23  deposition on a single topic.  The topic does not talk
24  about policies and procedures with regards to speaking
25  with the press, which is apparently what you had

---

Page 99

1  the same kind of concern during the litigation process.
2  Again, he was pretty consistent with other regions. ▓
3  was the – obviously the one who has the -- some more
4  concern than the other.
5      He said they asked a lot of follow-up
6  question from our approved message.  He told that he
7  had separate the legal – two legal discussions with
8  the ▓▓▓ team and then the Qualcomm team.

[text redacted]

15

[text redacted]

-- what he said is
24  because of the Arm litigation is this impacted their --
25  any of their auto chip, right, auto chip that we were

---

Page 101

1  identified as allegedly being what the witness was not
2  prepared on, so we obviously disagree.
3      I believe the privilege question has been
4  answered on redirect by the witness as to why that is a
5  document that is privileged, and we will not be
6  producing it.  And I'm also going to reserve for the
7  witness to read and sign.
8      MR. MCINTEE:  Yeah.  I'll respond in part
9  where necessary, but topic 61, the full scope is
10  disclosures, communications with third parties.  He
11  testified marketing communications speaks to third
12  parties and could not provide details as to how they do
13  so or what they said.
14      Additionally, and for another reason that
15  we're going to seek that document that is not
16  privileged, your redirect waived privilege when you
17  asked, following your meeting with counsel, did you use
18  a template -- were you instructed to use a template to
19  collect the information from your regional teams?  So
20  for the additional reason that's waiver.  I don't have
21  any other questions.
22      COURT REPORTER:  Confirming your standing
23  order.
24      MS. YING:  Yeah.  I think we have one which
25  is, what, the rough today and I don't know what the

# Exhibit 83

Case 1:24-cv-00490-MN    Document 577-1    Filed 11/21/25    Page 435 of 442 PageID #: 28430

7/2/2025    Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Christopher Patrick
Highly Confidential - Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED,                )
a Delaware corporation; and           )
QUALCOMM TECHNOLOGIES, INC.,          )
a Delaware corporation,               )
                                      )
          Plaintiffs,                 )
                                      )  C.A. No.
          vs.                         )  24-490(MN)
                                      )
ARM HOLDINGS PLC., f/k/a              )
ARM LTD., a U.K. corporation,         )
                                      )
          Defendant.                  )
_____)


HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
VIDEO DEPOSITION OF CHRISTOPHER PATRICK
JULY 2, 2025
SAN DIEGO, CALIFORNIA


Reported by
Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95


_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

7/2/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Christopher Patrick
Highly Confidential - Attorneys' Eyes Only



Page 70

1    Q.  -- is this something that you keep records
2  of?  By "you" I mean the royal you.
3    A.  Yes.  Qualcomm.  Yes.  So we have our
4  communications team.  Essentially either their
5  specific interviews and they -- you know, those are
6  well documented.  Or we occasionally have what we
7  call kind of analyst roundtables with a variety of
8  people from the industry like -- and those are
9  organized.  So organized essentially by the team.
10      So like virtually everything -- any
11  interaction I have with media is really on my
12  calendar, so almost nothing off of that.
13    Q.  Have you been asked to provide any of those
14  calendar entries, to your knowledge, in connection
15  with this litigation?
16      MS. ZAPPALA:  And I object.
17  BY MR. FRENTZEN:
18    Q.  I don't want to know about communications
19  with counsel.  I just want to know if you know
20  whether or not you have collected your calendars for
21  this litigation.
22    A.  I believe all of my electronic media,
23  including my calendar, have been collected for this
24  litigation.
25    Q.  Okay.  Do you expect that there might be

Page 71

1  interactions with media that would not be reflected
2  on your electronic calendar?
3    A.  I cannot recall interactions with media not
4  reflected in my calendar.
5    Q.  Are there folks in the media out there that
6  have your -- for example, that have your number and
7  call you?
8    A.  I don't believe so.
9    Q.  So you don't have the experience of being
10  sort of cold called by media members?
11    A.  No.  I think I have the good fortune not to
12  have that happen.  That's right.
13    Q.  All right.  And in terms of the
14  communications team at Qualcomm --
15    A.  Yes.
16    Q.  -- to your knowledge, would they also be
17  documenting contacts with the media by employees at
18  Qualcomm?
19    A.  I can't speak to the broader practice.
20    Q.  Okay.  You don't know?
21    A.  I don't know how they handle logging of
22  media interactions.  I have no idea.
23    Q.  Do you -- so let me ask --
24      Can I get tab 21, please.
25      (Patrick Exhibit 10 marked for identification.)

Page 72

1  BY MR. FRENTZEN:
2    Q.  Do you recognize Exhibit 10, Mr. Patrick?
3    A.  To the best of my knowledge, I have not
4  seen this document before today.

10    Q.  And if you take a look at the last
11  paragraph on Exhibit 10, do you see it says,

21    Q.  To your knowledge, did anyone else at
22  Qualcomm do so?
23    A.  I do not have any specific knowledge of an
24  update on this to Samsung from anyone at Qualcomm.

9      MS. ZAPPALA:  Objection to form.
10      THE WITNESS:  Can you repeat the question?
11  BY MR. FRENTZEN:
12    Q.  Yes.  Let me ask it a different way and see
13  if this works.

22    Q.  When you say you think it was a subject of
23  executive discussions, are you talking about
24  yourself or are you talking about other executives?
25    A.  When I say frequent conversation and

19 (Pages 70 to 73)

7/2/2025                 Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Christopher Patrick
Highly Confidential - Attorneys' Eyes Only

Page 74

1  executive discussions, I mean largely at the CEO
2  level between, for example, Cristiano Amon and
3  ▮▮▮▮▮▮▮▮▮ and others in conversations in which I
4  was present.
5     Q.  In conversations what?
6     A.  In which I was present.
7     Q.  You were present?
8     A.  Uh-huh.
9     Q.  How many such conversations took place?
10    A.  I don't recall a specific number of
11  conversations, but we have regular executive
12  sync-ups between the teams.  So in different forms.
13  So usually there will be multiple of them per year.
14    Q.  How many per year?
15    A.  Depends on the year.
16    Q.  How many in 2024?
17    A.  I don't recall how many specifically in
18  2024, but there are usually meetings at large kind
19  of industry forums and other events.  So multiple
20  per year.
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮

Page 75

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮
4     Q.  If that was the forum in which this subject
5  was going to come up, did that happen?
6     A.  I don't recall the contents of that meeting
7  specifically.  I don't recall if that meeting
8  happened.  I don't recall the contents of the
9  meeting specifically.
10    Q.  So, so far as you know, the subject of the
11  notice of material breach did not come up in the --
12  in those meetings?
13    MS. ZAPPALA:  Objection to form.
14    THE WITNESS:  I don't recall a specific
15  communication about this -- contents of this email
16  with ▮▮▮▮▮▮▮▮▮▮▮▮  What I was
17  describing was that communication on the topic of
18  Qualcomm litigation was a frequent discussion in
19  executive meetings.  So it may have come up.  I
20  don't recall specifically if there was a meeting at
21  the Snapdragon summit in November, but it's
22  possible -- at that event it is possible this would
23  have come up, but I don't recall specific.
24  BY MR. FRENTZEN:
25    Q.  And I appreciate what I think is a

Page 76

1  broadening of the topic.  So let me ask it this way.
2  Are you saying that the subject of the Arm-Qualcomm
3  litigation you believe came up in these executive
4  meetings?  Let me stop there.  Is that what you're
5  saying?
6     A.  I'm saying the subject of Arm-Qualcomm
7  litigation did come up in executive meetings between
8  the two companies, yes.
9     Q.  And now I'll ask a little more
10  specifically.  And maybe this is -- maybe this is
11  the trick.
12    Do you have a recollection of the topic of
13  Arm's notice of material breach to Qualcomm coming
14  up in any of the executive meetings?
15    A.  I don't recall a specific conversation
16  about that specific topic, no.
17    Q.  Okay.  Thank you.
18    Do you need a moment?
19    A.  No.  I'm just re -- I want to make sure I
20  understood the question.  So I may have answered the
21  wrong question.  Can you repeat the last question?
22  Is it possible?
23    Q.  Do you have a recollection of the topic of
24  Arm's notice of material breach to Qualcomm coming
25  up in any of the executive meetings?

Page 77

1     A.  So, yeah, I'm not familiar with what
2  "notice of material breach" means.  So I'm not sure
3  which aspect of the ongoing litigation between
4  Qualcomm and Arm is the notice of breach.
5     Q.  So the -- and that's fine.  I get it.
6     So the subject of the October 22, 2024,
7  Bloomberg article?
8     A.  Sure.  I see.
9     Q.  Do you recall the subject of that, which is
10  the -- you know, this notice of material breach?
11    A.  I see.
12    Q.  Do you recall that coming up in these
13  executive meetings?
14    A.  I don't recall the specific conversation
15  about this particular -- this particular notice from
16  Arm, et cetera, in those executive conversations.
17    Q.  Thank you.
18    Do you want to take a brief break?  I've
19  got one more document that I seem to have misplaced,
20  so I'll find it, and then we can hopefully wind up.
21    THE VIDEOGRAPHER:  We're off the record at
22  11:13 a.m.
23    (Recess, 11:13 a.m. to 11:30 a.m.)
24    THE VIDEOGRAPHER:  This is the beginning of
25  media number 3.  We're on the record at 11:30 a.m.

20  (Pages 74 to 77)

7/2/2025                Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Christopher Patrick
Highly Confidential - Attorneys' Eyes Only



Page 78

1      MS. ZAPPALA:  I believe Mr. Patrick had a
2  clarification he wanted to make.
3      THE WITNESS:  Okay.  So, yeah.  I think
4  earlier you asked about sort of journalist media
5  kind of analysts that I speak to.  And, yeah, for
6  some reason I've forgotten in the moment.  But,
7  yeah, so a number of folks we speak to.  So, yeah,
8  again, I do interviews and sometimes in roundtables
9  with different analysts.
10      For example, Patrick Moorhead of kind of
11  Moorhead Research.  Or Ben Wood, I believe he's at
12  CNET.  Or -- I'm sorry.  I've forgotten the last
13  name, but Carolyn -- I believe Carolyn M.  But,
14  yeah.  Well-known kind of analysts in the cellular
15  communication space we speak to.  Counterpoint
16  Research is an analyst we speak to.  I'm sorry.
17  BY MR. FRENTZEN:
18      Q.  I did not mean to interrupt as you're going
19  through this.  I just want to make sure I got it
20  clear.  You said Carolyn M.?
21      A.  Carolyn, I forgot her last name.
22      Q.  Are you saying it starts with an M?
23      A.  Yes.  Starts with an M.
24      Q.  Sorry.  Go ahead.
25      A.  No, no.  No problem.  So I can't remember

Page 79

1  the name of her firm, her group.  But, yeah, members
2  of CNET.  Counterpoint Research, for example, we do
3  interviews with them periodically.  So a number of
4  kind of people who cover the cellular mobile space.
5      Q.  Are those in -- thank you for that.
6      A.  Sure.
7      Q.  Are those in response to kind of my
8  question about repeat players that you have spoken
9  with?
10      A.  Yes.  So your question was, are there
11  people in the industry that you commonly speak to
12  that are -- yeah, the term media, are they media or
13  are they analysts is sort of a gray term here, but I
14  mean, they provide commentary at least and share
15  news on the space.
16      So there are some people I speak to
17  repeatedly either at Qualcomm events or, for
18  example, at roundtables organized by our
19  communications team.
20      Q.  Thanks for that.

7/2/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Christopher Patrick
Highly Confidential - Attorneys' Eyes Only



Page 82

Page 84

1  describing discussions with ▮▮▮ do you have
2  any recollection, specific instances of
3  conversations with anyone at ▮▮▮
▮▮▮
5           MS. ZAPPALA:  Objection to form.
6           THE WITNESS:  So maybe to clarify.
7  BY MR. FRENTZEN:
8      Q.  Yes.
9      A.  In conversations that I would have led with
10  members of ▮▮▮ I don't have any specific
11  recollection of another conversation after that on
12  the Arm-Qualcomm litigation.  Many other meetings,
13  as I described, executive meetings between ▮▮▮
▮▮▮ in which I was present in which
15  this topic of the Arm-Qualcomm litigation would have
16  come up.
17      Q.  Okay.  Thank you for that clarification.
18          And so you would have been present then at
19  these -- what we talked about before, the executive
20  meetings --
21      A.  Yes.
22      Q.  -- where you were present?
23      A.  Yes.
24      Q.  But no other specific one-on-one
25  conversations between you and ▮▮▮ after the one

Page 85

1  you just described in 2023?
2      A.  Not that I recall.
3           MS. ZAPPALA:  Objection to form.
4           THE WITNESS:  My apologies.
5           Not that I recall specifically.
6           MR. FRENTZEN:  Okay.  Thank you.
7           All right.  I'd like to ask you --
8           Can I get tab 22, please.
9       (Patrick Exhibit 11 marked for identification.)
10  BY MR. FRENTZEN:
11      Q.  Mr. Patrick, we're giving you Exhibit 11.
12  And go ahead and take a look at that, see if you
13  recognize it.
14      A.  Okay.
15           MR. FRENTZEN:  I don't know.  Do you --
16  sorry.  I just noticed something.
17           Can we go off the record briefly?
18           THE VIDEOGRAPHER:  We're off the record at
19  11:40 a.m.
20           (Recess, 11:40 a.m. to 11:48 a.m.)
21           THE VIDEOGRAPHER:  We're back on the record
22  at 11:48 a.m.
23           MR. FRENTZEN:  All right.  Thank you for
24  that break.  I'm sorry that I required it.
25           And just so I understand, with respect to

after that that
18  you recall?
19           MS. ZAPPALA:  Objection to form.
20           THE WITNESS:  I don't recall specific
21  one-on-one conversations with ▮▮▮ on this
22  subject after that, but I also -- we certainly could
23  have discussed it.
24  BY MR. FRENTZEN:
25      Q.  Okay.  And sorry.  If you were just

22  (Pages 82 to 85)

7/2/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Christopher Patrick
Highly Confidential - Attorneys' Eyes Only



Page 90

1    Q.  Are you denying having any conversations
2    with anyone at Qualcomm other than lawyers about
3    Qualcomm's complaints to these agencies regarding
4    Arm?
5      A.  I'm trying to make sure I answer the
6    question within -- with the guidance from counsel.
7    So I don't recall any conversations about this that
8    would not have been covered by communications with
9    counsel, with other people perhaps present.
10    Q.  All right.  What about the underlying
11    subject matter of the complaint?  In other words,
12    what about Arm's conduct?  Did you have
13    conversations with anyone about Arm's conduct other
14    than counsel?
15      MS. ZAPPALA:  Objection to form.  Vague as
16    to "conduct."
17    BY MR. FRENTZEN:
18    Q.  You can answer.
19      A.  I'm thinking.  Excuse me.  So this is in
20    '25.  March 2025.  Okay.  One more time.  I'm sorry.
21    Can you repeat the question?
22    Q.  I'll put it this way.  Do you have any
23    recollection of having conversations with anyone at
24    Qualcomm other than counsel about Arm's conduct
25    alleged in these complaints?

Page 91

1      MS. ZAPPALA:  Same objection.
2      THE WITNESS:  I'm not familiar with the
3    specific conduct described here.  Again, not been
4    briefed in detail about this -- the details of this
5    complaint.  I think the subject of Arm-Qualcomm
6    litigation I think was broadly discussed within
7    Qualcomm over this entire period.
8    BY MR. FRENTZEN:
9

Page 92

25  ///

24  (Pages 90 to 93)

7/2/2025    Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Christopher Patrick

Highly Confidential - Attorneys' Eyes Only



Page 110

1  they're in a position to broker such a three-party
2  deal and what the scope of such a three-party deal
3  could be.
4  BY MR. FRENTZEN:
5      **Q.  To your recollection, did you ever get an**
6  **answer to what this was about?**
7          MS. ZAPPALA:  Objection to form.
8          THE WITNESS:  I don't recall a clear
9  conclusion.

15         MR. FRENTZEN:  I think I'm done.
16         MS. ZAPPALA:  Okay.
17         MR. FRENTZEN:  Do you want to take it or do
18  you want to break or what do you want to do?
19         MS. ZAPPALA:  Let's take a break and I'll
20  see if I have any redirect.
21         MR. FRENTZEN:  If we're going to take a
22  break, I wouldn't have more than maybe a couple
23  questions, but I'll just -- if that's okay, I'll
24  hold over just to make sure.
25         MS. ZAPPALA:  Okay.

Page 111

1          MR. FRENTZEN:  But I think I'm done.
2          THE VIDEOGRAPHER:  We're off the record at
3  12:30 p.m.
4          (Recess, 12:30 p.m. to 12:36 p.m.)
5          THE VIDEOGRAPHER:  We're back on the record
6  at 12:36 p.m.
7
8              EXAMINATION
9  BY MS. ZAPPALA:
10     **Q.  Mr. Patrick, Melissa Zappala on behalf of**
11  **Qualcomm.  I just have a couple of questions for**
12  **you.**
13         **Do you recall earlier you testified about a**
14  **deal between**

25  ///

Page 112

1  BY MS. ZAPPALA:

7/2/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Christopher Patrick
Highly Confidential - Attorneys' Eyes Only



Page 114

4       MS. ZAPPALA: No further questions.
5       MR. FRENTZEN: Great. We're done.
6       MS. ZAPPALA: Just to clarify. I know
7   earlier you had held the deposition open because of
8   Exhibit 11. We allowed you to ask questions about
9   it, so we consider the deposition closed.
10      MR. FRENTZEN: Understood.
11      THE VIDEOGRAPHER: This concludes the
12  video-recorded proceeding of Chris Patrick. We're
13  off the record at 12:40 p.m.
14      (Pause in proceedings.)
15      MS. ZAPPALA: Qualcomm marks this
16  deposition as highly confidential, attorneys' eyes
17  only.
18      (Deposition adjourned at 12:41 p.m.)
19          * * * * *
20
21
22
23
24
25

Page 115

1       CERTIFIED SHORTHAND REPORTER'S CERTIFICATE
2       I, Cynthia J. Vega, a Certified Shorthand
3   Reporter for the State of California, do hereby
4   certify:
5       That the witness in the foregoing
6   deposition was by me duly sworn; that the deposition
7   was then taken before me at the time and place
8   herein set forth; that the testimony and proceedings
9   were reported by me stenographically and were
10  transcribed through computerized transcription under
11  my direction; and the foregoing is a true and
12  correct record of the testimony and proceedings
13  taken at that time.
14      I further certify that I am not of counsel
15  or attorney for either or any of the parties in the
16  foregoing proceeding and caption named or in any way
17  interested in the outcome of the cause in said
18  caption.
19      IN WITNESS WHEREOF, I have subscribed my
20  name this 8th day of July, 2025.
21      Reading and Signing was not requested.
22
23
24  _____
25      Cynthia J. Vega, CA CSR No. 6640, RMR

Page 116

1   Christopher Patrick, c/o
2   DUNN ISAACSON RHEE
3   401 Ninth Street, NW
4   Washington, DC 20004
5
6   Case: Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.
7   Date of deposition: July 2, 2025
8   Deponent: Christopher Patrick
9
10  Please be advised that the transcript in the above
11  referenced matter is now complete and ready for signature.
12  The deponent may come to this office to sign the transcript,
13  a copy may be purchased for the witness to review and sign,
14  or the deponent and/or counsel may waive the option of
15  signing. Please advise us of the option selected.
    Please forward the errata sheet and the original signed
    signature page to counsel noticing the deposition, noting the
16  applicable time period allowed for such by the governing
17  Rules of Procedure. If you have any questions, please do
18  not hesitate to call our office at (202)-232-0646.
19
20
21  Sincerely,
22  Digital Evidence Group
23  Copyright 2025 Digital Evidence Group
24  Copying is forbidden, including electronically, absent
25  express written consent.

Page 117

1   Digital Evidence Group, L.L.C.
2   1730 M Street, NW, Suite 812
3   Washington, D.C. 20036
4   (202) 232-0646
5
6   SIGNATURE PAGE
7   Case: Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.
8   Witness Name: Christopher Patrick
9   Deposition Date: July 2, 2025
10
11  I do hereby acknowledge that I have read
12  and examined the foregoing pages
13  of the transcript of my deposition and that:
14
15  (Check appropriate box):
16  ( ) The same is a true, correct and
17  complete transcription of the answers given by
    me to the questions therein recorded.
18  ( ) Except for the changes noted in the
    attached Errata Sheet, the same is a true,
19  correct and complete transcription of the
    answers given by me to the questions therein
20  recorded.
21  _____   _____
    DATE            WITNESS SIGNATURE
22
23  _____   _____
24  DATE            NOTARY
25

30 (Pages 114 to 117)