# Exhibit 84

# TECH DRIVERS

**TECH DRIVERS**

## How Arm is gaining chip dominance with its architecture in Apple, Nvidia, AMD, Amazon, Qualcomm and more

PUBLISHED THU, NOV 9 2023•8:00 AM EST   UPDATED THU, NOV 9 2023•5:54 PM EST

**Katie Tarasov**
@KATIETARASOV

WATCH LIVE



VIDEO 15:45

Why Apple, Amazon and Qualcomm base their chips on Arm, helping it become the year's biggest IPO

Follow your favorite stocks  CREATE FREE ACCOUNT

**In this article**

WE

Behind the scenes of every chipmaker, there's a set of instructions that dictates how their products will function. Over the last three decades, Arm has become the dominant company making this chip architecture, and it powers nearly every smartphone today. Apple bases its



  

QCVARM_0867422

Case 1:24-cv-00490-MN    Document 57-1    Filed 04/21/25    Page 3 of 228 PageID #: 28444

custom silicon for iPhones and MacBooks on Arm, and now Nvidia and AMD    are reportedly making Arm-based PC chips, too.

Arm's blockbuster IPO in September valued it above $54 billion, thanks in part to the growing list of companies choosing Arm over Intel    's rival x86 architecture.

On Wednesday, it beat Wall Street expectations in its first post-IPO earnings report, with revenue up 28% on an annual basis during the quarter. Still, revenue guidance fell short of expectations, sending Arm shares down more than 7% in extended trading.

The UK-based company sells licenses for its chip architecture to companies that make central processing units, or CPUs. It also collects royalties on every chip shipped with its technology. Haas says that number topped 30 billion last year. Its customers are the biggest names in tech and chips, including Apple, Nvidia, Google  , Microsoft  , Amazon  , Samsung, Intel and Taiwan Semiconductor Manufacturing Company.

"Most people think about a device. Then maybe if they're really sophisticated, they think about the chip, but they don't think about the company that came up with the original ideas behind how that chip operates," said Bob O'Donnell, president and chief analyst at TECHnalysis Research. "But once you do understand what they do, it's absolutely amazing the influence they have."

Arm enables chips to use less power than those made with x86. Lately, it's seen a big surge in adoption.

Arm is the basis for Apple's custom processors, which have replaced Intel chips in Macs. Amazon Web Services bases its custom server chips on Arm. Qualcomm's flagship Snapdragon chips are also Arm-based, and getting ready to make a meaningful move into the PC market.

But Arm has also faced plenty of risks in recent years. About 20% of its revenue comes from China, according to the company. Smartphones, which almost all contain Arm processors, are seeing a major sales slump. And when Nvidia tried to buy Arm for $40 billion, the deal was blocked by regulators last year.

"That didn't go the way that everyone anticipated or hoped that it would. But the sun comes up the next day, right? And you have to be able to build from that," CEO Rene Haas told CNBC in an interview in October.



QCVARM_0867423

How Arm gained chip dominance with Apple, Nvidia, Amazon and Qualcomm

CNBC went to Arm's headquarters in Cambridge, England, to find out how it became the year's biggest IPO despite struggling smartphone sales and geopolitical uncertainty.

## From smartphones to AI

Arm was founded in 1990 by 12 chip designers working out of a turkey barn in Cambridge. It was originally a joint venture between Apple, Acorn Computers, and VLSI, which is now part of NXP.

Arm's big break came in 1993, when Apple launched its early handheld Newton device on the Arm610 processor. Haas said this gets at the "hallmarks" of the company. "We were born running a device off a battery that was going to be low cost," he said.



**Arm's big break came in 1993 when Apple released its handheld Newton device on the Arm610 processor.**
*Arm Holdings*

That same year, Arm struck a deal with Texas Instruments, putting its processors in early Nokia mobile phones and beginning Arm's climb to become the dominant smartphone architecture it is today. Arm went public for the first time in 1998. Chief architect Richard Grisenthwaite was there.



QCVARM_0867424

"We were about 100 people, and I've been very much involved in this tremendous transition that the company has gone through, expanding out from being targeting one particular market area into a wide range of different computing environments," Grisenthwaite said.

Indeed, Arm grew rapidly in the 2000s, with the first touchscreen phones introduced in 2007 and the growth of connected home devices in the 2010s.

Arm now has some 6,500 employees globally. Grisenthwaite said the majority of those employees are in the UK, and about a sixth are in the U.S., where Arm has offices in Arizona, California, North Carolina and Texas. It also has locations in Norway, Sweden, France and India.

In 2016, Arm once again became a private company when Japan's SoftBank    acquired it for $32 billion. Haas was president of the IP products group at the time, spearheading diversification into emerging markets, including AI.

"PC and phone, automotive, data center and IoT. Those are the primary markets that we address. Every single one of those markets has AI embedded in some way, shape or form," he said.

Arm has some 6,800 patents worldwide, with another 2,700 applications pending. Some of those are for Arm's Neoverse line for high-performance and cloud computing, which has helped it break into AI since its launch in 2018.

In August, Nvidia announced its latest Grace Hopper Superchip, which couples its own GPUs with Arm's Neoverse cores.

"By bringing those together and tightly coupling the way that Nvidia has with the Grace Hopper, they're able to come up with something that's something like 2 to 4 times the performance of what you'd get on an x86 system for a similar amount of power," Grisenthwaite explained.

## Cash and competition

If you rewind just a couple years, Nvidia's interest in Arm went far beyond technology integration. Arm owner Softbank needed cash after losing money on high-profile investments in companies like WeWork and Uber    . In 2020, SoftBank struck a deal with Nvidia to sell Arm for $40 billion. Eighteen months later, the deal fell apart, blocked by regulators and some of Arm's biggest customers, which also compete with Nvidia.



QCVARM_0867425

Instead, Softbank announced plans to take Arm public again and Haas took over as CEO.



**Arm CEO Rene Haas talks with CNBC's Katie Tarasov in San Jose, California, on October 12, 2023.**
*Katie Brigham*

Arm made its second public debut this September, climbing nearly 25% that day.

The stock has fallen significantly since then.

One risk comes from a free, open-source rival architecture called RISC-V. It's seen a recent surge in backing from some of Arm's big customers like Google, Samsung and Qualcomm, which may have been seeking alternatives when it looked like Nvidia was going to buy Arm.

For now, RISC-V remains a low risk competitor according to Futurum Group CEO Daniel Newman.

"RISC-V sits a few years behind where Arm is at, and I don't think we're going to hear a lot about it right away. I do think in low power, in IoT, in simpler designs, that RISC-V does have some traction," Newman said.

Arm's bigger competition comes from x86. Developed by Intel in the 70s, x86 is the dominant architecture used for PC processors, with a massive amount of software developed for it.



QCVARM_0867426

"The amount of software support is the thing that actually tends to determine the success or failure of that in the long run. Intel was very good early on with getting a ton of software support for x86," O'Donnell explained.

Most servers have also traditionally been based on x86, but O'Donnell said that could shift.

"What's happened in the server market is that the software has been componentized. It's broken up into containers and things like that, and that makes it easier to run on other architectures like Arm," he said.

Amazon Web Services is a big player making Arm-based server chips. AWS launched its Graviton chips to rival x86 CPUs from AMD and Intel in 2018.

"And really from there, Arm went from this mobile, low power IoT, automotive specialty embedded to holy cow, we can build next generation servers, PCs, and of course continue on this massive run of silicon for smartphones, all based on Arm," Newman said.

## 'If Apple can do it, can others?'

Apple is the big partner helping Arm break into the laptop market.

Apple moved to its own Arm-based processors in Mac computers in 2020, breaking away from the Intel x86 processors that had powered them for 15 years.

In October, Apple announced its latest line of M3 processors and the MacBooks and iMacs running on them. Apple said Arm-based M3 gives the newest MacBook up to 22 hours of battery life.

"Nobody really believed, until Apple went all in and basically cut ties with x86 instruction sets and said, 'We are going to bet the future of the Mac on Arm.' And that was a huge inflection for the company. It was a change of the guard. And this isn't to say that Intel's future is in big trouble, but it certainly started to raise some question marks as to, well, if Apple can do it, can others?" Newman said.

In September, Apple extended its deal with Arm through at least 2040.

Qualcomm is another major customer making its latest PC processors using Arm, although that relationship is strained. Arm is suing Qualcomm over the right to make certain chips with its



QCVARM_0867427

"Nuvia was actually supposed to be designing a server chip initially, so they had different terms with them. And so Qualcomm thought they could have the same terms. Arm felt no, different companies have different terms. And it's boiled down to essentially that: legal discussions around what those terms ought to be," O'Donnell explained.

The case is set to go to trial in 2024.

Arm is also growing in the automotive space. Although its chips have long been in cars, it's now a rapid growth area with the rise of self-driving capabilities and partnerships with companies like Cruise.

Arm's Grisenthwaite calls self-driving "one of the most computationally intensive tasks we've ever seen on this planet."

"What we need to provide is a standard platform to allow the world's software developers to really concentrate on this incredibly hard task going forward," he said.

This simplification is also making Arm the choice for non-chip companies like Apple, Amazon, Google and Microsoft designing their own custom silicon.

"They've got a smaller team than entire companies built on that. And so you have to make that process easier and simpler. And that, for example, is where Arm is starting to move in terms of enabling the design of multiple components that connect together," O'Donnell said.



QCVARM_0867428



**Arm Holdings headquarters in Cambridge, England, on October 3, 2023.**
*Max Thurlow*

## 'China is a good market for us'

Although more companies are making inroads into semiconductor design, the recent chip shortage exposed major concern over the fact that more than 90% of the world's chips are manufactured in Asia.

Now China and the U.S. are going back and forth imposing export controls on chip technologies. For now, Arm says it's seen minimal impact from the export controls.

"What we do is obviously comply with all kinds of export regulations whenever they come out. Of course we comply. China is a good market for us: about 20% of our business. It's shifted over the years. It used to be largely mobile phone based. Now it's mostly around the data center and automotive," Haas said.

In 2018, SoftBank broke off Arm's China business into an independent entity, Arm China, that's majority owned by a group of Chinese investors.

Haas explained further, "It's essentially to allow us to not only grow our business in China, which is our essentially base core business. We set up a distributor arm, but at the same time, we also



QCVARM_0867429

created an R&D arm that allows an independent entity to develop products specifically for the China market, some that are Arm based but some that are not Arm based."

Arm China has also been embroiled in controversy, with SoftBank and Arm trying to oust the CEO of the China business, Allen Wu. Despite being fired, Wu refused to leave for years.

"It's been very ugly and kind of messy and confusing," O'Donnell said.

Now, several former Arm China employees are starting a new internal chip design company in China with backing from Shenzhen's government. Arm's stock slid more than 5% on the news, but O'Donnell said it's not an immediate risk.

"A lot of Chinese companies have long standing relationships with Arm, so the expectation is they're going to want to work there because they have that huge base of software. If somebody creates a new architecture, they have to build the software, and that takes years and years and years," he said.

Arm also faces some risk from the major slump in smartphone sales.

"We're not as impacted as folks might think because one of the trends we've seen, particularly in smartphones, is more and more Arm processors that go into those phones," Haas said. "So for us, we've actually seen an increase in royalty per phone."

Labor is another challenge across the industry. The world's chip leader, TSMC, is blaming a shortage of skilled workers for delays at its $40 billion fab under construction in Arizona.

"It's hard for our whole industry because there's no way that demand for semiconductors in the next 10 to 15 years will abate. It's only going to increase. So it's a pretty fierce talent war," Haas said.

*Correction: An earlier version of this story incorrectly described the AVA developer platform.*

Follow your favorite stocks   CREATE FREE ACCOUNT

**In this article**

| WE |
|----|



QCVARM_0867430

4/1/25, 2:10 PM    Case 1:24-cv-00490-MN    Document 578-1    Filed 11/21/25    Page 11 of 228 PageID #:
How Arm gained chip dominance with Apple, Nvidia, Amazon and Qualcomm
28452

**RELATED**


How to delete yourself from the internet


Weighing the pros and cons of A.I. in education


OpenAI-powered app from Microsoft will instantly transcribe patient notes during doctor visits



QCVARM_0867431



**Apple's stock underperformed top tech peers in 2023 due to longest revenue slide in 22 years**

---

# MORE IN TECH DRIVERS



VIDEO 01:38

**Bill introduced to ensure Black & Hispanic communities are ready for AI**



QCVARM_0867432



**Here's what Meta CEO Mark Zuckerberg has to say about the Apple Vision Pro**

Ashley Capoot



**Meta says it will identify more AI-generated images ahead of upcoming elections**

Hayden Field

READ MORE ⌄



Subscribe to CNBC PRO

Licensing & Reprints

Select Personal Finance

Join the CNBC Panel

Select Shopping

Digital Products

Internships

About CNBC

Site Map

Careers

Subscribe to Investing Club

CNBC Councils

CNBC on Peacock

Supply Chain Values

Closed Captioning

News Releases

Corrections

Ad Choices

Podcasts

Help



QCVARM_0867433

      

## News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

## Advertise With Us

PLEASE CONTACT US

 **CNBC Newsletters**

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

Privacy Policy

 Your Privacy Choices

CA Notice

Terms of Service

© 2025 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by



QCVARM_0867434

# Exhibit 85

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    C.A. No. 24-490-MN
     ----------------------------------------x
4    QUALCOMM INCORPORATED, a Delaware
     corporation, QUALCOMM TECHNOLOGIES, INC.,
5    a Delaware corporation,
6                          Plaintiffs,
7            - against -
8    ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K.
     corporation
9
                         Defendant.
10
     ----------------------------------------x
11
                      July 1, 2025
12                    9:03 a.m.
13
14            *HIGHLY CONFIDENTIAL*
15
16        VIDEOTAPED DEPOSITION of ANDREW HOWARD,
17    held at the offices of PAUL WEISS RIFKIND
18    WHARTON & GARRISON, LLP, located at 1285
19    Avenue of the Americas, New York, New York
20    10019, before Anthony Giarro, a Registered
21    Professional Reporter, a Certified Realtime
22    Reporter and a Notary Public of the State of
23    New York.
24
25

Page 146

1    ANDREW HOWARD -- HIGHLY CONFIDENTIAL
2 architectures.
3    Q    How many customers,
4 approximately, do you think Intel has?
5    A    For its licensing business?
6    Q    Yes.
7    A    For the license for its
8 instruction set architectures.
9        MS. POHL:  Object to form.
10    A    My understanding is one.
11    Q    What about RISC-V?  Does
12 that have a licensing program?
13    A    So RISC-V is an open source.
14 It's licensable.
15    Q    It's an open source
16 instruction set architecture; right?
17    A    Yeah.
18    Q    That means there's no
19 license required to use it to
20 commercialize products?
21    A    It depends how you get
22 through it.  If you take an open source
23 implementation or if you go through
24 commercial companies, then they will have
25 commercial terms.

Page 147

1    ANDREW HOWARD -- HIGHLY CONFIDENTIAL
2    Q    What about Tensilica?  Do
3 you know how many licensees they have?
4    A    No.
5    Q    Is it fewer than ARM?
6        MS. POHL:  Object to form.
7    A    I would be guessing.
8    Q    You're not sure today?
9    A    I would be guessing.  And my
10 guess would be lower.
11    Q    How much lower?
12    A    Oh, I don't know.
13    Q    You have no idea?
14    A    No.
15    Q    What about ARC?  Do you have
16 any idea how many fewer licensees ARC has
17 than ARM?
18    A    Not specifically.
19    Q    Do you think it might be
20 close to the number of licensees ARM has?
21        MS. POHL:  Object to form.
22    A    No.  I don't think it is
23 close, no.  I think it would be less.
24    Q    And for Tensilica, do you
25 think it's possibly close to the number

Page 148

1    ANDREW HOWARD -- HIGHLY CONFIDENTIAL
2 of licensees ARM has?
3    A    No.  It would be less.
4    Q    Significantly less; right?
5        MS. POHL:  Object to form.
6    A    Depends what you mean by
7 significant.
8    Q    You're unable to say if it's
9 significantly less, sitting here today,
10 as the head of licensing?
11        MS. POHL:  Object to form.
12    A    Yeah.
13    Q    What about Toshiba?  Does
14 Toshiba have close to the same number of
15 licensees as ARM?
16    A    No.
17    Q    And what about RH?  Do they
18 have close to the same number of
19 licensees as ARM?
20    A    No.
21    Q    Does any instruction set
22 architecture have close to the same
23 number of licensees as ARM?
24        MS. POHL:  Object to form.
25    A    No.

Page 149

1    ANDREW HOWARD -- HIGHLY CONFIDENTIAL
2    Q    Has ARM analyzed RISC-V as a
3 competitor?
4        MS. POHL:  Object to form.
5    A    So I don't have any personal
6 knowledge of that.  I've never performed
7 an analysis of RISC-V, competitive
8 nature.
9    Q    Have you ever seen any
10 analysis of the competition from RISC-V?
11    A    So I've seen kind of we know
12 that a customer has potentially used that
13 product.  Why they chose it, what the
14 benefits were, I don't know.
15    Q    Do any of ARM's licensees
16 have products that use RISC-V?
17    A    I'm sorry.  I didn't
18 quite --
19    Q    I'll ask a different
20 question.
21        Do any of ARM's licensees
22 have commercialized products on the
23 market that use RISC-V?
24    Q    Do any of ARM's?
25    Q    Do any of ARM's licensees

38 (Pages 146 - 149)

# Exhibit 86

7/1/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. Jean-Francois Vidon
Highly Confidential - Outside Counsel Eyes Only

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
QUALCOMM INCORPORATED,              )
a Delaware corporation; and        )
QUALCOMM TECHNOLOGIES, INC.,        )
a Delaware corporation,            )
                                   )
          Plaintiffs,              )
                                   ) C.A. No.
          vs.                      ) 24-490(MN)
                                   )
ARM HOLDINGS PLC., f/k/a           )
ARM LTD., a U.K. corporation,      )
                                   )
          Defendant.               )
_____)



              HIGHLY CONFIDENTIAL
           OUTSIDE COUNSEL EYES ONLY
      VIDEO DEPOSITION OF JEAN-FRANCOIS VIDON
                  JULY 1, 2025
              SAN DIEGO, CALIFORNIA




Reported by:
Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95
_____
              DIGITAL EVIDENCE GROUP
            1730 M Street, NW, Suite 812
              Washington, D.C. 20036
                 (202) 232-0646
```

7/1/2025                Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.Jean-Francois Vidon
                        Highly Confidential - Outside Counsel Eyes Only

Page 14

1    A.  Yes.
2    Q.  Is the best power usage low power usage?
3    A.  Yes.
4    Q.  Is the best performance high performance?
5    A.  Yes.
6    Q.  What was your next position at Qualcomm
7    after being a senior staff engineer?
8    A.  Principal engineer.
9    Q.  That's your current job title; correct?
10   A.  No.
11   Q.  No.  What were your responsibilities as a
12   principal engineer?
13   A.  I was still responsible of the CPU
14   implementation and PPA and also at managing
15   responsibility.
16   Q.  Who did you manage?
17   A.  A team of a few people.
18   Q.  Approximately how many people did you
19   manage?
20   A.  Started probably with two, three, and
21   probably up to five to ten at some point.
22   Q.  Did you have any other responsibilities as
23   a principal engineer at Qualcomm?
24   A.  No.  It was about CPU implementation and
25   PPA.

Page 15

1    Q.  How long were you a principal engineer at
2    Qualcomm for?
3    A.  I would say four or five years.
4    Q.  What was your next role at Qualcomm after
5    being the principal engineer?
6    A.  Senior director of engineering, of
7    technology.  It changed after, but yeah.
8    Q.  This is your current position; correct?
9    A.  Correct.
10   Q.  What are your job responsibilities as
11   senior director of engineer?  I'm sorry.  I
12   misspoke.  Let me ask that again.
13       What are your job responsibilities as
14   senior director of engineering?
15   A.  I'm responsible of CPU implementation and
16   PPA.  So I'm responsible of the implementation of
17   one design every year and also with a team, which I
18   have in -- I mean, in San Diego.  I'm also
19   responsible of the PPA of all the Qualcomm CPU
20   products.
21   Q.  When you were a principal engineer, did you
22   work on any implementations that used Arm
23   architecture?
24   A.  Yes.
25   Q.  When you were a principal engineer at

Page 16

1    Qualcomm, did you work on any implementations that
2    did not use Arm architecture?
3    A.  No.  Well, no.  Yeah.
4    Q.  As senior director of engineering, have you
5    worked on CPU implementations that use Arm
6    architecture?
7    A.  Yes.
8    Q.  As senior director of engineering, have you
9    worked on CPU implementations that do not use Arm
10   architecture?
11   A.  Yes, I do.
12   Q.  What other architectures have you worked on
13   at Qualcomm as a senior director of engineering?
14   A.  We evaluated CPU based on RISC-V
15   architecture.
16   Q.  What does it mean to evaluate CPUs based on
17   RISC-V architecture?
18   A.  That we are getting an evaluation RTL and
19   we were looking at understanding the power,
20   performance, and area aspect of that specific
21   design.
22   Q.  Is RISC-V's architecture a competing
23   architecture to Arm's architecture?
24   A.  This is an alternative architecture.  We
25   don't say it competes with Arm today.

Page 17

1    Q.  I'm not asking for your evaluation of the
2    level of competition.  I just want to know, do you
3    consider RISC-V's architecture to compete with Arm's
4    architecture?
5    A.  No.
6    Q.  Why not?
7    A.  It doesn't have the ecosystem and all the
8    acceptance in the industry.
9    Q.  Does the RISC-V architecture have the
10   promise of competing with Arm's architecture in the
11   future?
12   A.  I'm not familiar with the required goal
13   eventually to comment on that.
14   Q.  Do you think it's possible that the RISC-V
15   architecture could be a competitive threat to Arm's
16   architecture in the future?
17       MR. BRALY:  Objection.
18       THE WITNESS:  I don't know.
19   BY MR. JANES:
20   Q.  Have you evaluated any other architectures
21   besides RISC-V and Arm?
22   A.  No, I didn't.
23   Q.  Has your work at Qualcomm involved CPUs
24   designed for the mobile space?
25   A.  Well, it involves some part of the CPU

5 (Pages 14 to 17)

Page 18

1 design because I'm working on the implementation.
2 So we already start with an existing RTL, and we do
3 the physical implementation.
4    **Q.  Does your work with physical implementation**
5 **involve CPUs that are meant for the mobile space?**
6    A.  Yes.
7    **Q.  Does your work at Qualcomm involve CPUs**
8 **that are meant for the server space?**
9    A.  I've been asked to work on some of the
10 server aspect recently.
11    **Q.  Who asked you to work on some of the server**
12 **aspects of Qualcomm's business?**
13    A.  My manager.
14    **Q.  Who is your manager?**
15    A.  Raghava.
16    **Q.  Can you spell that, please.**
17    A.  R-a-g-h-a-v-a, and his last name is
18 Denduluri, D-e-n-d-u-l-u-r-i.
19    **Q.  What specifically are you doing in the**
20 **server space for Qualcomm?**
21    A.  I was putting together some power
22 performance curves.
23    **Q.  What is a power performance curve?**
24    A.  It's a curve which shows two axis.  So on
25 this one we add on the X, the frequency, and the Y,

Page 19

1 we add the power consumption.
2    **Q.  Does your work at Qualcomm involve CPUs**
3 **that are intended for the Total Compute space?**
4    A.  What do you mean by "Total Compute"?
5    **Q.  Does Qualcomm have a term for CPUs designed**
6 **for laptops or computers?**
7    A.  Yes.
8    **Q.  What is that term?**
9    A.  It's compute.
10    **Q.  Compute.  Does your work at Qualcomm**
11 **involve CPUs that are meant for the compute space?**
12    A.  Yes.
13    **Q.  Does your work for Qualcomm involve CPUs**
14 **that are meant for the wearable market --**
15    A.  Yes.
16    **Q.  -- like smart watches?**
17       **Does your work at Qualcomm that involves**
18 **the compute space consist of you performing a PPA**
19 **analysis for those CPUs?**
20    A.  Yes.
21    **Q.  Do you do anything else in the compute**
22 **space?**
23    A.  It's mostly PPA analysis.
24    **Q.  What about for wearables, is your work**
25 **mostly limited to performing a PPA analysis of CPUs?**

Page 20

1    A.  Yes.  PPA analysis and definition of the
2 product.
3    **Q.  Are you familiar with NUVIA?**
4    A.  Yes.  NUVIA is a company acquired by
5 Qualcomm a few years ago.
6    **Q.  Is NUVIA a separate division within**
7 **Qualcomm?**
8    A.  No.  NUVIA has been integrated as a
9 Qualcomm CPU division.
10    **Q.  Are there Qualcomm employees who are**
11 **considered to be NUVIA employees?**
12    A.  No.  They are all Qualcomm employees.
13    **Q.  Is there a NUVIA team within Qualcomm?**
14    A.  No.



21    **Q.  What do you mean by "custom CPU"?**
22    A.  It's a CPU designed within Qualcomm to be
23 compared with third-party CPU, which we license.
24    **Q.  Have you ever heard of the term Arm**
25 **implementation core?**

Page 21

1    A.  Yes.
2    **Q.  Is an Arm implementation core an example of**
3 **the third-party CPU that Qualcomm licenses?**
4    A.  Yes.
5    **Q.  Are Arm implementation cores sometimes**
6 **called off-the-shelf cores?**
7    A.  I'm not sure.



7/1/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.Jean-Francois Vidon
Highly Confidential - Outside Counsel Eyes Only



Page 54

1  implementation core -- yeah, of core from Arm.
2     Q.  Arm provides support regularly to Qualcomm
3  for its implementation cores?
4     A.  Correct.

Page 56

1     A.  Yes.
2
3
4
5
6     A.  I haven't heard about it so far.
7
8
9     A.  I don't know that.
10    Q.  Does Arm compete unfairly?
11       MR. BRALY:  Objection.
12       THE WITNESS:  I can't comment on that.
13 BY MR. JANES:
14    Q.  Are you aware of any facts supporting a
15 claim that Arm competes unfairly?
16    A.  I don't know that.
17    Q.  Earlier we talked about the RISC-V
18 instruction set architecture.  Do you remember that?
19    A.  Right.
20    Q.  RISC-V is an alternative instruction set
21 architecture to Arm's instruction set architecture;
22 correct?
23    A.  Yes.  It is another instruction set.
24    Q.  So customers in the market have a choice
25 between using Arm's instruction set architecture or

Page 57

3     Q.  Is some delay fairly common?
4        MR. BRALY:  Objection.
5        THE WITNESS:  It depends on generation.  So
6  we cannot say to generating.
7  BY MR. JANES:

18    Q.  Did Qualcomm try to quantify the impact to
19 Qualcomm from this delay?
20    A.  I don't remember.  I don't know.
21    Q.  Are you familiar with Arm's v8
22 architecture?
23    A.  Yes.
24    Q.  Are you familiar with Arm's v9
25 architecture?

1  the RISC-V architecture; correct?
2     A.  I would say when we build a CPU, we can
3  build it with an Arm architecture, an X86
4  architecture, or a RISC-V architecture or some
5  others, but that's for CPU design, not -- yeah.
6     Q.  X86 is an Intel architecture; correct?
7     A.  That's what I know.
8     Q.  X86 competes with Arm's architecture;
9  correct?
10       MR. BRALY:  Objection.
11       THE WITNESS:  Well, I would say Arm is
12 dominant on the mobile market, and X86 is used in --
13 mostly in the laptop computer and servers.
14 BY MR. JANES:
15    Q.  So at least in the laptop computer and
16 server spaces, the X86 architecture is a competing
17 architecture to Arm's architecture; correct?
18       MR. BRALY:  Objection.
19       THE WITNESS:  Yeah.  We can say that on
20 laptop.  We have various architecture options, X86
21 or Arm, what we see in the price.
22 BY MR. JANES:
23    Q.  Have you ever heard of the MIPS
24 architecture, M-I-P-S?
25    A.  I heard about it, yes.

15 (Pages 54 to 57)

7/1/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.Jean-Francois Vidon
Highly Confidential - Outside Counsel Eyes Only

Page 58

1    Q.  MIPS is a competing architecture to Arm's
2  architecture; correct?
3    A.  I don't know because I can't name any
4  product using MIPS today.
5    Q.  MIPS is an alternative to Arm's
6  architecture?
7    A.  I'm not sure we can say it's an
8  alternative.  It is another architecture, but I
9  don't think we can use it as a product, on-site
10  product today.
11    Q.  Have you ever heard of the SPARC
12  architecture, S-P-A-R-C?
13    A.  Yes.
14    Q.  SPARC is an alternative to Arm's
15  architecture; correct?
16    A.  No.  We cannot use SPARC in mobile.
17    Q.  SPARC is an architecture that can be used
18  in other spaces besides mobile; correct?
19    A.  Yeah.  I used to work on a SPARC computer
20  20 years ago.
21    Q.  So at least in the computer space, the
22  SPARC architecture competes with the Arm
23  architecture; correct?
24    MR. BRALY:  Objection.
25    THE WITNESS:  I would say it used to be

Page 59

1  20 years ago.  I don't know about today.
2  BY MR. JANES:
3    Q.  Have you ever heard of power ISA?
4    A.  No.  That doesn't ring a bell.
5    Q.  Arm provides implementation cores to
6  customers; correct?
7    A.  Correct.
8    Q.  There are other companies besides Arm that
9  sell implementation cores; right?
10    A.  There are company, but I don't know of any
11  with Arm architecture.
12    Q.  There are other companies besides Arm that
13  provide CPU designs; correct?
14    A.  Yes, but with other architectures than Arm.
15    Q.  Arm licenses its architectures to companies
16  like Qualcomm so that they can develop their own CPU
17  designs; correct?
18    A.  Yes.
19    Q.  Do you know whether Intel licenses its X86
20  architecture to companies like Qualcomm so that they
21  can design their own X86 CPU designs?
22    A.  I don't know that, no.  I haven't looked
23  into that.
24    Q.  Qualcomm sells silicon chips; correct?
25    A.  Correct.

Page 60

1    Q.  What other companies sell silicon chips?
2    A.  Multiple, multiple companies like Intel,
3  Nvidia, Broadcom, and many others.
4    Q.  There are many companies that sell silicon
5  chips?
6    A.  Yes.
7    Q.  Is the silicon chip market competitive?
8    MR. BRALY:  Objection.
9    THE WITNESS:  Be like every market, I would
10  say.  It's vague.
11  BY MR. JANES:
12    Q.  There are silicon chips on the market that
13  use the RISC-V architecture; correct?
14    A.  That's a good question.  I don't know.
15    Q.  You don't know whether Qualcomm sells
16  silicon chips that use the RISC-V architecture?
17    A.  We do use RISC-V architecture for
18  microcontrollers.
19    Q.  So Qualcomm sells chips that use RISC-V
20  architecture?
21    MR. BRALY:  Objection.
22    THE WITNESS:  On microcontrollers.
23  BY MR. JANES:
24    Q.  Qualcomm sells chips that use RISC-V
25  architecture on microcontrollers; correct?

Page 61

1    A.  Yes.
2    Q.  Are you familiar -- let me ask that again.
3    Are you familiar with a company called
4  SiFive?
5    A.  Yes.
6    Q.  SiFive sells chips that use the RISC-V
7  architecture; right?
8    A.  Yes.
9    Q.  I'm going to --
10    A.  Oh, I mean, no.  They license CPU, which
11  use RISC-V architecture.  They are not selling
12  chips.
13    Q.  SiFive licenses CPU designs that use RISC-V
14  architecture; correct?
15    A.  Yes.
16    MR. JANES:  I'm going to mark Exhibit
17  Number 2.  This is a document produced at the Bates
18  number QCVARM_044728.
19    (Vidon Exhibit 2 marked for identification.)
20  BY MR. JANES:
21    Q.  Mr. Vidon, do you have Exhibit 2 in front
22  of you?
23    A.  Yes.
24    Q.  Exhibit 2 is an email chain that you were
25  included on; correct?

16 (Pages 58 to 61)

# Exhibit 87

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED,                )
a Delaware corporation; and           )
QUALCOMM TECHNOLOGIES, INC.,          )
a Delaware corporation,               )
                                      )
          Plaintiffs,                 )
                                      ) C.A. No.
          vs.                         ) 24-490(MN)
                                      )
ARM HOLDINGS PLC., f/k/a              )
ARM LTD., a U.K. corporation,         )
                                      )
          Defendant.                  )
_____)


HIGHLY CONFIDENTIAL

ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF ANN NATHALIE CATHCART CHAPLIN

JULY 11, 2025

SAN DIEGO, CALIFORNIA


Reported by

Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Case 1:24-cv-00490-MN    Document 578-1    Filed 11/21/25    Page 26 of 228 PageID #: 28467

7/11/2025     Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.     Ann Nathalie Cathcart Chaplin
Highly Confidential - Attorneys' Eyes Only

Page 26

1 assume you're not meaning to ask about that.
2     MR. WILCOX: I'm not. And I'll ask the
3 question again so that hopefully it's clear.
4     MS. DUNN: Okay.
5 BY MR. WILCOX:





10     Q. Do you know whether those unrelated matters
11 concerned Arm?
12     A. I don't believe so. I believe she was
13 telling me that she -- right, just as a
14 communication person at Qualcomm has other
15 conversations with media.
16     Q. Setting aside any privileged conversations
17 you may have had, you're not aware of any
18 conversations that Qualcomm has had with ████
19 related to the ongoing litigation between Arm and
20 Qualcomm?
21     A. Not to my knowledge.
22     Q. Other than ████████████████, you
23 didn't talk to anyone else to prepare for your
24 30(b)(6) deposition today?
25     A. No.

Page 28

1     Q. What conduct by Arm does Qualcomm believe
2 represents an unfair business practice?
3     MS. DUNN: This is probably going to be
4 representative of how our day goes, but obviously
5 Ms. Chaplin's a lawyer for the company, and I think
6 your question goes to her view as a lawyer. So just
7 to be helpful to you, if there is some topic you're
8 asking her about where she's been designated as a
9 corporate representative, you can show that to her.
10 But I think broad questions like that are going to
11 draw privilege objections.
12 BY MR. WILCOX:
13     Q. Would you please turn in Chaplin Exhibit 1
14 to page 15?
15     A. I'm there.
16     Q. Do you see topic 73 on page 15?
17     A. I do.
18     Q. That topic is "The harm to Qualcomm, if
19 any, associated with any of Arm's conduct or actions
20 that you allege constitute unlawful and unfair
21 business acts or practices prohibited by the UCL."
22 Do you see that?
23     A. I see it.
24     Q. As Qualcomm's corporate representative on
25 topic 73, what is your understanding of the conduct

Page 29

1 by Arm that Qualcomm believes constitutes unlawful
2 and unfair business acts or practices?
3     A. Sure. So there is obviously a number of
4 them.



8 (Pages 26 to 29)

7/11/2025     Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.     Ann Nathalie Cathcart Chaplin

Highly Confidential - Attorneys' Eyes Only



Page 30

22    Q.  That's a good start.  The first one you
23  mentioned was Arm's breach of the architectural
24  license?
25    A.  Yes.

Page 31

1    Q.  As Qualcomm's corporate representative,
2  what breach are you referring to?
3    A.  So Arm failed to

Page 32

22  BY MR. WILCOX:
23    Q.  Yes.  I'm not asking for privileged
24  information.  If you can't answer my question
25  without divulging privileged information, just say

Page 33

1  you can't answer the question, and that's fine.
2  Since you brought it up, I'm just trying to explore
3  what you know and what you can tell me.
4    A.  That's fine.  I don't think -- yeah.  I
5  don't know.
6    MS. DUNN:  I also would tell you, we can
7  come back to it if there is more she can offer
8  beyond what she said.
9  BY MR. WILCOX:
10    Q.  At least at the moment, you don't think you
11  can answer that question without revealing
12  privileged information.  Fair?
13    A.  Fair.  And I'm happy to step out and
14  explore that if you want me to.  I just don't want
15  to ruin your flow.
16    Q.  I don't think we need to do that.  You guys
17  can talk at a break if you want, and if you think
18  there is more that you can offer, that's great.  If
19  there isn't, that's fine too.
20    A.  Okay.  Very good.
21    Q.  As Qualcomm's corporate representative, is
22  it your understanding that another way in which Arm
23  has breached the Qualcomm ALA is

9  (Pages 30 to 33)

7/11/2025     Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.     Ann Nathalie Cathcart Chaplin

Highly Confidential - Attorneys' Eyes Only

Page 50

1  ask the company's GC to analyze if this and if that.
2  Because I think that requires her to think like a
3  lawyer about things that are not facts within the
4  topics.
5      So that's my -- I'm going to explain the
6  instruction, but I'm going to instruct the witness
7  not to answer.
8  BY MR. WILCOX:
9      **Q. Are you going to follow your counsel's**
10  **instruction?**
11      A. I am.
12      MR. WILCOX: So I think that -- I'm not
13  going to make a big deal out of that right now as
14  long as you're telling me that she's not going to
15  take the stand at trial and answer questions that
16  are trying to unravel these hypotheticals if you ask
17  them.
18      MS. DUNN: So, I mean, I think we'd have to
19  have a longer conversation about what's permissible
20  at trial. I do think saying to a lawyer, you know,
21  if this were the case, what would you think, calls
22  for her to do some sort of legal analysis, because
23  you're basically asking would it change your view of
24  your legal claim.
25      So I don't -- you know, I think it is

Page 51

1  premature to discuss what Ms. Chaplin will or will
2  not do at trial if she is called by a witness from
3  either party, but we'll have this transcript to look
4  at and assess what is acceptable for both sides.
5      I also think given that now I've done a lot
6  of talking, maybe we could take a break, given that
7  we're almost at an hour, I think.
8      MR. WILCOX: That's totally fine. We can
9  take a break.
10      MS. DUNN: Okay. Great.
11      THE VIDEOGRAPHER: We're off the record at
12  10:02 a.m.
13      (Recess, 10:02 a.m. to 10:17 a.m.)
14      THE VIDEOGRAPHER: This marks the beginning
15  of media number 2. We're on the record at
16  10:17 a.m.
17      MS. DUNN: So during the break I let
18  Mr. Wilcox know that I had a couple things to put on
19  the record.
20      So first of all, I want to be completely
21  clear that topic 73 is about the harm to Qualcomm,
22  and that is what Ms. Chaplin's testimony discusses.
23  And so in that respect, we are going to let her go
24  ahead and answer counsel's question about ████████

Page 52



4      With respect to the questions about
5  commercial reasonableness, we have the -- Qualcomm
6  has designated other 30(b)(6) testimony that is not
7  Ms. Chaplin. So we're going to let that person who
8  handled that 30(b)(6) testimony have handled that.
9  She should not have to handle that. It's beyond the
10  scope of her topics.
11      All right. That's all I have.
12      MR. WILCOX: I'm not sure we 100 percent
13  agree on that, but that's something we can sort out
14  later.
15      MS. DUNN: We can sort that out later.
16  BY MR. WILCOX:
17  ████████████████████



23  BY MR. WILCOX:
24      **Q. Your testimony is it doesn't change your**
25  **position on whether that would or would not harm**

14 (Pages 50 to 53)

7/11/2025    Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Ann Nathalie Cathcart Chaplin
Highly Confidential - Attorneys' Eyes Only



**Page 54**

1  **Qualcomm; correct?**
2      A.  Qualcomm -- right.

21  BY MR. WILCOX:
22      **Q.  Another category of unfair acts that**
23  **supposedly harmed Qualcomm you mentioned earlier was**
24  **Arm requesting that Qualcomm destroy certain**
25  **products; is that correct?**

**Page 55**

1      A.  Correct.
2      **Q.  What was the harm to Qualcomm from that**
3  **request?**
4      A.  So we were harmed by Arm making that
5  request and sharing it with all of our customers
6  that it was demanding that our cores be destroyed
7  and trying to tell our customers that we would not
8  be able to provide them cores.  And Arm knew we were
9  licensed, turned around and pursued that anyway,
10  told all of our customers we wouldn't be able to
11  provide them cores and worked very hard to damage
12  our business.
13          They met with our customers on that point.
14  They issued them letters, which I learned at trial
15  and saw in the public trial, that contained false
16  information on that point and damaged our business,
17  both with by -- through all of their communication
18  to our customers and what they put out there also
19  for our shareholders to see.
20      **Q.  Is the harm that you're referring to harm**
21  **to Qualcomm's reputation?**
22      A.  It certainly included harm to Qualcomm's
23  reputation.

**Page 56**

1                       .  It caused -- it's also
2  harm for all of our time trying to address that with
3  customers.  We had harm from delays in the success
4  of us selling our products and, therefore, delayed
5  revenue and changing contract terms as a result
6  because they worried our customers.  We lost certain
7  sales from it.  It was a myriad of harms.
8      **Q.  Can you quantify how -- put a dollar amount**
9  **on how much Qualcomm's reputation was harmed by**
10  **Arm's insisting that Qualcomm needed to destroy**
11  **products and would not have a license to those**
12  **products?**
13          MS. DUNN:  Objection to form.  And also
14  this topic calls for harm under the UCL in
15  particular.  So are you asking about a monetary
16  amount under the UCL?
17          MR. WILCOX:  Yeah.  All these questions are
18  supposed to be on topic 76, so I'm trying to do a
19  shorthand so I don't have to say the UCL every time,
20  but yes.
21          MS. DUNN:  Okay.  You mean topic 73, but I
22  understand your answer.
23          MR. WILCOX:  I meant 73, yes.
24          MS. DUNN:  Yes.
25  ///

**Page 57**

1  BY MR. WILCOX:



Page 58

Page 60

Page 59

1    Q.   In your previous answer you said that you
2    attended the deposition of Cristiano Amon as part of
3    my, and then trailed off.  What did you attend that
4    deposition as part of?
5    A.   Oh, right.  A part of my job, yes.
6    Q.   For purposes of topic 73, you also said
7    there was harm from the time that Qualcomm spent
8    addressing concerns from customers --
9    A.   Yes.
10    Q.   -- is that correct?
11    A.   Yes.

19    BY MR. WILCOX:
20    Q.   As part of your preparation to testify on
21    topic 73, did you do anything to look into the
22    amount of that harm?

7/11/2025 — Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al. — Ann Nathalie Cathcart Chaplin
Highly Confidential - Attorneys' Eyes Only



Page 62

17  BY MR. WILCOX:
18      Q.  The harms that we just discussed, are those
19  the same harms from Arm's alleged threats to cancel
20  Qualcomm's architectural license?
21          MS. DUNN:  Object to form.  I'm not even
22  sure I understand the question, though.
23  BY MR. WILCOX:
24      Q.  We just discussed a number of harms that
25  Qualcomm alleges it suffered because of Arm's unfair

Page 63

1  conduct; correct?
2      A.  Yes.
3      Q.  Are there any harms tied to any of Arm's
4  unfair conduct that you and I have not discussed
5  that you're aware of for purposes of your corporate
6  testimony on topic 73?
7      A.  I believe so.  I believe we haven't -- I
8  mean, I believe I answered them in my answers, but
9  I -- but for the question you just discussed, I
10  think you discussed a subset of them.  Am I tracking
11  your question correctly?

Page 64

25  ///

17  (Pages  62  to  65)



Page 166

Page 167

Page 168

15    Q.  Do you still have the Qualcomm ALA in front
16  of you?
17    A.  I do.
18    Q.  Can you please look again ▌
19    A.  Yes.  I'm on that page still.
20    Q.  If you look at the second sentence of that
21  provision.
22    A.  One second.  I'm sorry.  It is very small
23  for me.  My apologies.
24    Q.  It is small for me too.
25    A.  Okay.  Good.  I have to hold it at just the

Page 169

 1  right distance.

25  ///

43  (Pages 166 to 169)

# Exhibit 88

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4    QUALCOMM INCORPORATED, a         )

     Delaware corporation, QUALCOMM  )

5    TECHNOLOGIES, INC., a Delaware   )

     corporation,                     )

6                                     )

7            Plaintiffs,              )

                                      )

8            vs.                      ) C.A. No. 24-490(MN)

                                      )

     ARM HOLDINGS PLC, f/k/a ARM      )

9    LTD., a U.K. corporation,        )

                                      )

10           Defendant.               )

     _____ )

11

12

13        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14         VIDEO-RECORDED DEPOSITION OF RENE HAAS

15

16                 Monday, July 7, 2025

17                 Palo Alto, California

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 7428967



Page 98

13  BY MS. DUNN:

22     Q.  And when ARM sent this letter, you were
23  also aware that you were sending it during
24  Qualcomm's -- what's called the Snapdragon Summit;
25  right?

Page 100

1     A.  Yes.
2     Q.  Okay.  Why did ARM want the notice period
3  of this letter to expire the day after trial ended?
4     A.  Yeah, so my recollection was that the
5  trial was coming up, and it would be around this
6  time, the [redacted] would have -- would be on --
7  on top of that.  It would increase our optionality
8  in terms of how to move forward should we win the
9  case.
10     Q.  Okay.  When you say that "ARM wanted to
11  increase its optionality in terms of how to move
12  forward," what do you mean?
13     A.  Just that.  That this had been going on
14  for a really long time.  We were pretty exasperated
15  with -- with how long the process had gone on.  So
16  by timing it this way, we had thought that it would
17  give us a greater degree of freedom to operate and
18  also being able to close out all the outstanding
19  issues around the -- the litigation.
20     Q.  Okay.  So when you say you wanted to
21  "increase ARM's optionality," optionality with
22  regard to what?  What options were you trying to
23  create?
24     A.  Timing, primarily.
25     Q.  Okay.  Please explain what you mean by

Page 101

1  that.
2     A.  Well, as I said, the claims had been going
3  on for a number of years.  And we wanted to be able
4  to increase our flexibility around timing to move
5  forward on a process had we won the trial.
6     Q.  And when you talk about you wanted to
7  "increase your optionality with respect to timing,"
8  timing of what in particular?
9     A.  Timing of whether we were to actually
10  terminate the license or further discussions with
11  Qualcomm, et cetera, et cetera.
12     Q.  Okay.  So you're -- you're basically
13  saying ARM wanted to increase optionality with
14  respect to what the remedy would be after a trial?
15     A.  That's one option, yeah.
16     Q.  Okay.  And you understand that after a
17  trial, if ARM had won, which it did not, that that
18  would have been up to the Court to impose a remedy;
19  correct?
20     A.  Correct.
21     Q.  Right.
22        And so, when you're talking about creating
23  optionality should ARM have won the trial, you're
24  really talking about creating an additional
25  option -- an alternative option to what the Court

26 (Pages 98 - 101)

Page 102

1 would do?
2    MR. LoCASCIO: Object to form.
3    THE WITNESS: No. We were really just,
4 again, trying to create optionality around timing.
5 This had gone on a long, long time.
6 BY MS. DUNN:
7    Q. Okay. But, sir, what do you -- what do
8 you then mean with respect to optionality of the
9 timing? What normally happens, as you know, is if
10 you win a trial, then the Court im- -- imposes a
11 remedy. And you know here that ARM had asked for an
12 injunction. So it would have been up to the Court
13 to impose an injunction. So when you're talking
14 about optionality with respect to timing, timing of
15 what exactly?
16    MR. LoCASCIO: Object to form.
17    THE WITNESS: So, again, the litigation
18 and dispute had been going on for a long, long time,
19 and the market wanted to see some level of closure.
20 So our thinking at that time to terms of why we
21 timed it that way was to increase the optionality or
22 potential of achieving closure sooner rather than
23 later.
24 BY MS. DUNN:
25    Q. Okay. And when you say "sooner rather

Page 103

1 than later," what you mean is, it would have taken
2 the Court some time to issue an injunction, and you
3 wanted to get ahead of that?
4    MR. LoCASCIO: Object to form.
5    THE WITNESS: No. It had nothing to do
6 with -- with the -- the injunction. It's more about
7 trying to get some level of closure around a very
8 long process.
9 BY MS. DUNN:
10    Q. Okay. And why did you believe that
11 terminating the Qualcomm ALA would have been an
12 appropriate remedy after a trial where ARM had
13 brought claims about the NUVIA ALA?
14    A. Well, in our mind, they were quite linked
15 because Qualcomm was using NUVIA designs. And by
16 using designs created by a third party, Qualcomm was
17 in breach.
18    Q. Okay. And -- and you understand the jury
19 found otherwise under the Qualcomm ALA, we went over
20 that; right?
21    MR. LoCASCIO: Object to form.
22    THE WITNESS: Well, the process didn't
23 really end up in a [verbatim] area where we would
24 have any judgment on anything.
25 BY MS. DUNN:

Page 104

1    Q. Okay. Okay. And what do you think would
2 have happened if -- if ARM had -- had won the case
3 and had terminated the Qualcomm ALA, what would have
4 happened to the remedy imposed by the Court?
5    A. Well, the let- --
6    MR. LoCASCIO: Object to form.
7    THE WITNESS: Yeah, well -- well, the
8 letter says we were en- -- we are entitled to. The
9 letter doesn't say we're going to.
10 BY MS. DUNN:
11    Q. Okay. But -- but what you're saying is
12 that in case you won, you wanted to have optionality
13 with respect to the impact of the case. So in --
14 under that theory, if the case had ended and you had
15 won and then you terminated the Qualcomm ALA, what
16 would have happened with respect to the remedy in --
17 that the Court would impose?
18    MR. LoCASCIO: Object to form.
19    THE WITNESS: Yeah, so -- so, again, the
20 optionality we were trying to create was around
21 timing, not linked to remedy. Just time -- timing.
22 And the letter says we were entitled to cancel or --
23 or terminate, not that we would terminate. So,
24 again, it just goes back to giving ourselves time --
25 timing optionality depending on what the verdict

Page 105

1 was.
2 BY MS. DUNN:
3    Q. Okay. And when you say "timing
4 optionality," the timing of what, the timing of
5 termination of the Qualcomm ALA? What are you
6 talking about?
7    A. Yeah, the -- the -- you -- you had asked
8 the question regarding the ████████. And ████████
9 ████████████████████████████████████████. And
10 had the trial on some of the verdicts been ruled and
11 judgment in our -- in our favor, then we would have
12 had a greater degree of flexibility and optionality
13 about what to do next.
14    Q. Right.
15    And let's say you hadn't sent this letter,
16 but you had won the trial, then what would have been
17 the option after that?
18    A. Say that --
19    MR. LoCASCIO: Object to form.
20    THE WITNESS: I'm sorry. Say it one more
21 time.
22 BY MS. DUNN:
23    Q. So if -- let's say that ARM had -- let's
24 say ARM had not sent this letter but had won at
25 trial, what -- what, in your view, would have

27 (Pages 102 - 105)

Page 106

1 happened then?
2      MR. LoCASCIO:  Object to form.
3      THE WITNESS:  I don't know.  I mean,
4 you're -- you're asking me to speculate.
5 BY MS. DUNN:
6      Q.  Well, I -- what I'm really asking you is,
7 is you're saying we did this to create optionality.
8 I'm asking, like, the op- -- optionality as opposed
9 to what?  So you gave yourselves the ability to
10 terminate that day after trial.  Let's say you had
11 not sent the letter.  What would -- what would ARM
12 have viewed its options to be then?
13      MR. LoCASCIO:  Object to form.
14      THE WITNESS:  I'm sorry.  That's a --
15 big complex question there.  Can you break it down
16 again?
17 BY MS. DUNN:
18      Q.  Yeah.
19      What -- what was the option -- what was
20 the existing option that you were crying -- trying
21 to create more optionality with respect to?
22      A.  What we were trying to do with this
23 letter -- oops -- we were -- should we have won,
24 then we would be entitled to terminate the license,
25 had we received the judgment at trial, which would

Page 107

1 have given us, again, from a timing standpoint, more
2 flexibility rather than waiting a lot -- waiting
3 longer.
4      Q.  Okay.  But you understand that if ARM had
5 acted on its own to impose a remedy, that that would
6 have been an alternative to something the Court
7 would have done?
8      MR. LoCASCIO:  Object to form.
9      THE WITNESS:  Again, this letter was timed
10 in such a way that had we received the judgment in
11 our favor, we would have had a greater degree of
12 flexibility and optionality sooner rather than
13 later.
14 BY MS. DUNN:
15      Q.  Right.
16      But you understand that the party that
17 normally imposes a remedy after a trial is the
18 Court, not ARM; right?
19      A.  The party -- say that again, I'm sorry.
20      Q.  Right.
21      The entity that imposes a remedy after a
22 trial is the Court --
23      A.  Yes.
24      Q.  -- you understand that; right?
25      A.  Yes.

Page 108

1      Q.  Right.
2      And so, here you're creating an option for
3 ARM to impose a remedy?
4      A.  Correct.
5      Q.  Okay.  All right.
6      Now, you know that your counsel conveyed
7 to the Court that when ARM sent this letter, the
8 hope was it would result in the parties talking;
9 you've heard that?
10      A.  I can't recall specifically if I've heard
11 that.
12      Q.  Okay.  Nobody told you that Mr. Olson told
13 the Court that that was the purpose of the letter?
14      MR. LoCASCIO:  Object to form.
15      THE WITNESS:  I -- I don't recall.
16 BY MS. DUNN:
17      Q.  Okay.  Do you agree that one of the
18 purposes of sending this notice letter was to move
19 the parties to start talking about settlement in
20 advance of the trial?
21      A.  I'm sorry.  Say that question again.
22      Q.  Do you agree that one of the purposes of
23 sending this notice letter was to move the parties
24 to start talking about settlement in advance of the
25 trial?

Page 109

1      A.  I think I would characterize it this way:
2 Every letter that we sent we were hoping would
3 resolve in a settlement prior to trial.
4      Q.  Okay.  And when you sent this letter, were
5 you hoping that it would result in a settlement
6 prior to trial?
7      A.  We were hoping -- I think, again, that
8 when we sent the letters that it would bring two
9 sides to the table to get to a settlement.
10      Q.  Okay.  Focus on my question:  When you
11 sent this letter, were you hoping that it would
12 result in a settlement prior to trial?
13      A.  I would say yes.
14      Q.  Okay.  All right.
15      MS. DUNN:  Okay.  Can we mark Haas 3.
16      (Haas Deposition Exhibit 3 was marked for
17 identification.)
18 BY MS. DUNN:
19      Q.  Okay.  All right.
20      So, Mr. Haas, you have in front of you an
21 e-mail from Kenneth Siegel to you and to Spencer
22 Collins on October 23rd, 2024th [sic], and you'll
23 see it's a forward of an October 22nd, 2024, article
24 by Ian King of Bloomberg News.
25      Do you see that?

28 (Pages 106 - 109)

Page 110

1     A.   Yes.
2     Q.   And the article is entitled "Arm to Cancel
3   Qualcomm Chip Design License in Escalation of Feud."
4        Do you see that?
5     A.   Yes.
6     Q.   And you see that Bloomberg characterizes
7   the notice that was sent to Qualcomm as an
8   escalation?
9     A.   Let me read through this.
10       (Witness reviews.)
11       Sorry, can you repeat the question?
12    Q.   Yes.
13       You see that Bloomberg characterizes the
14   notice that was sent to Qualcomm as an escalation?
15    A.   Yes.
16    Q.   Okay.  Mr. Siegel is an attorney at
17   Morrison & Foerster, a law firm representing ARM in
18   this litigation; correct?
19    A.   Yes.
20    Q.   And Mr. Siegel sits on the SoftBank board
21   with you?
22    A.   Yes.
23    Q.   And Mr. Siegel advised in 2025 SoftBank
24   and ARM on the acquisition of a company called
25   Ampere; right?

Page 111

1     A.   Yes.
2     Q.   All right.
3        And Mr. Siegel sends this e-mail to both
4   you and Spencer Collins.  And he's forwarding a
5   message from FGS Global which is ARM's outside
6   communications firm.
7        You see that?
8        MR. LoCASCIO:  Object to form.
9        THE WITNESS:  Can you repeat that
10   question?
11   BY MS. DUNN:
12    Q.   Yeah.
13       If you look at the bottom of the second
14   page, it says "FGS Global."
15    A.   Mm-hmm.
16    Q.   And FGS Global is ARM's outside
17   communications firm; correct?
18    A.   Yes.  One of them.
19    Q.   Okay.  Who are the others?
20    A.   I believe we -- we've used Brunswick.
21    Q.   I didn't know that.  Okay.
22       Now the body of this e-mail is just the
23   text of the Bloomberg news article, and it's dated
24   October 22nd, 2024.  And you recognize that as the
25   same day that ARM sent its notice letter to

Page 112

1   Qualcomm.  Right?
2     A.   Double check here.
3        Yes.
4     Q.   Okay.  Now, if you look at the second
5   paragraph of Mr. King's article, it says quote,
6   "ARM, based in the UK, has given Qualcomm a mandated
7   60-day notice of the cancellation of their so-called
8   architectural license agreement, according to a
9   document seen by Bloomberg."
10       Do you see that?
11    A.   Yes.
12    Q.   And do you have any quibble with the
13   accuracy of this language in the Bloomberg article?
14    A.   Do I -- the question is, do I have any --
15   what's the word you used?
16    Q.   "Quibble."
17    A.   Quibble.
18       Are you asking if I disagree with it?
19    Q.   My question is, do you have any quibble
20   with the accuracy of this language in the Bloomberg
21   article?
22    A.   I'm sorry.  Can you -- can you define
23   "quibble."
24    Q.   Yeah.
25       Do you take any issue with the accuracy of

Page 113

1   this language in the Bloomberg article?
2     A.   I'm not sure the word "mandated" is -- is
3   correct.  I would take issue with that word
4   "mandated."
5     Q.   Okay.  Anything else that you think is
6   inaccurate about this statement from Bloomberg?
7     A.   Well, it's -- again, it's -- the notice of
8   the cancellation isn't really accurate.  It's -- the
9   letter said we would be entitled to cancel it.
10   This letter -- this -- this is a little strong.
11    Q.   Okay.  But you would agree this is how
12   Bloomberg characterized the notice letter?
13    A.   I would agree that this is a Bloomberg
14   article and that's how they wrote it.
15    Q.   Yeah.
16       And you would also agree that the headline
17   says "Arm to Cancel Qualcomm Chip Design License."
18       You see that?
19    A.   Yes.
20    Q.   Right.
21       So it seems like Bloomberg's
22   interpretation is closer to Qualcomm's
23   interpretation than it is to yours; correct?
24       MR. LoCASCIO:  Object to form.
25       THE WITNESS:  I don't know what Qualcomm's

29 (Pages 110 - 113)

Page 118

1    A.  I'm sorry.  One -- one more time.
2    Q.  Okay.  Now that you're aware that it's
3  possible that somebody at ARM or one of ARM's agents
4  showed Bloomberg the notice letter, is that
5  something that you would take action about as CEO of
6  the company?
7    A.  Would I take action now?
8    Q.  Yeah.
9    A.  I would have to think about it.
10    Q.  Okay.  Would it concern you if this notice
11  letter was shared by ARM or ARM's agents with the
12  media?
13    A.  Would it concern me?
14    Q.  Yes.
15    A.  Can you expand on what you mean by concern
16  me?
17    Q.  Whatever definition you like.  Would it
18  concern you, Mr. Haas, if this notice letter was
19  shared by ARM or ARM's agents with the media?
20    A.  I would try to understand more.
21    Q.  Okay.  ███████████████████████████
███████████████████████████████████████████
24    MR. LoCASCIO:  Object to form.
25    THE WITNESS:  ████████████████████████

███████████████████████████████████████
███████████████████████████
3  BY MS. DUNN:
4    Q.  Okay.  But you saw that the letter
5  contains contract provisions; correct?
6    MR. LoCASCIO:  Object to form.
7    THE WITNESS:  The letter does con- -- yep.
8  BY MS. DUNN:
9    Q.  And you know that the contracts are
10  confidential; correct?
11    MR. LoCASCIO:  Same objection.
12    THE WITNESS:  Some -- some -- most of the
13  contracts, yes.
14  BY MS. DUNN:
15    Q.  Okay.  Which contracts are not
16  confidential?
17    A.  I'm not familiar with all the contracts.
18    Q.  Okay.  ████████████████████████████
███████████████████████████████████████████
21    MR. LoCASCIO:  Object to form.
22    THE WITNESS:  I don't know that to be
23  true.
24  BY MS. DUNN:
25    Q.  Okay.  Do you -- you don't know that

Page 120

1  that's true?
2    A.  I don't.
3    Q.  Nobody told you that?
4    A.  I'm sorry.  Repeat the question.
5    Q.  Nobody told you that ARM is taking the
6  position that all of its contracts are confidential?
7    A.  I'm not aware of that.
8    Q.  Okay.  And you're also not aware that the
9  contracts themselves say that they are confidential?
10    A.  Lot -- there are so many contracts.  I'm
11  not familiar with all of them.
12    Q.  Okay.  Well, the Qualcomm litigation which
13  has involved the Qualcomm ALA at this point for
14  years is confidential.  Are you aware of that?
15    A.  That contract, yes.
16    Q.  Yes.
17    And if the Qualcomm ALA provisions that
18  are cited in the notice letter were shared with the
19  media, would that concern you as the CEO?
20    A.  If if the -- if confidential information
21  from Qualcomm was leaked to the media, would that
22  concern me?
23    Q.  Yes.
24    A.  I would want to find out more.
25    Q.  Okay.  But it wouldn't automatically

Page 121

1  concern you?  You just would want to do some
2  investigation?
3    A.  I don't -- the -- if confidential
4  information was shared externally, I would want to
5  understand more detail.
6    Q.  Okay.  And if confidential information was
7  shared externally in breach of the Qualcomm/ARM
8  agreement, would that concern you?
9    A.  I would want to understand more.
10    Q.  Okay.  So it wouldn't be just
11  automatically -- you couldn't say -- automatically
12  say you'd be concerned, you just need to know more
13  details?
14    A.  I don't -- I would need understand more
15  detail.  That's right.
16    Q.  All right.
17    So it might be okay with you?
18    A.  No.  I would just want to understand more.
19    Q.  Okay.  So do you plan to try to
20  investigate more about how -- about whether the
21  notice letter was shared with the media?
22    A.  I have to think about what to do next.
23    Q.  You don't know, sitting here today,
24  what to do about this?
25    A.  That's right.

31 (Pages 118 - 121)

Page 122

1    Q.  Okay.  Now, when your outside lawyer
2  sends -- oh, strike that.
3        Did you read this article at the time?
4    A.  I believe so.
5    Q.  Okay.  And when Mr. Siegel, your lawyer,
6  sends -- sends this e-mail to you and to your chief
7  legal officer, Mr. Collins, it does not say that
8  somebody has -- strike that.
9        So when Mr. Siegel, your outside lawyer,
10  sends this article to you and to Mr. Collins, your
11  chief legal officer, he does not ask any questions
12  about the document that Bloomberg says they have
13  seen; correct?
14    A.  I'm sorry.  Say -- say that again.
15    Q.  When Mr. Siegel, your outside lawyer,
16  sends this article to you and Mr. Collins, your
17  chief legal officer, he does not ask any questions
18  about the document that Bloomberg says it saw;
19  correct?
20    A.  There's no reference to that in this
21  e-mail.
22    Q.  Right.
23        And you don't recall having any
24  conversations at the time trying to figure out who
25  showed a document to Bloomberg; right?

Page 123

1    A.  Yeah, I don't recall.
2    Q.  Right.  Okay.
3        Now, ARM has admitted that Mr. Siegel and
4  Mr. Kranhold spoke to the Bloomberg reporter.
5        Did either Mr. Siegel or Mr. Kranhold tell
6  you about their conversation with the Bloomberg
7  reporter?
8    A.  No.
9    Q.  Okay.  So sitting here today, no one has
10  ever told you about the conversation that ARM had
11  with Bloomberg that preceded this article?
12        MR. LoCASCIO:  Object to form.  And
13  whether there were or not, I want to -- I want to
14  exclude any communications you may have had with
15  counsel relating to this issue.  But otherwise, you
16  can answer the question.
17        THE WITNESS:  Okay.
18        Yeah, so the first question was, did I
19  speak to Ken or Paul?  And then the next question
20  was, had I spoke [verbatim] to anyone?
21        I think -- is that what you asked?
22  BY MS. DUNN:
23    Q.  My question was, so sitting here today, no
24  one has ever told you about the conversation that
25  ARM had with Bloomberg that preceded this article?

Page 124

1  And you can exclude any conversation with lawyers.
2    A.  Yeah, so I have talked to Spencer.
3    Q.  Okay.  And what did Spencer tell you about
4  his conversation with Bloomberg?
5        MR. LoCASCIO:  Object to form.
6        Ms. Dunn, if -- the way the question's
7  written is Spencer telling you about his
8  conversation with Bloomberg, there might be
9  boundaries around that, if that had happened, then I
10  would let him answer.
11        I -- I think that's a different thing from
12  what you were asking a second ago.
13        So if you want to leave that question on,
14  I'll instruct him on that question; or do you want
15  to rephrase the question?
16        MS. DUNN:  Well, now I have something else
17  to ask about.
18  BY MS. DUNN:
19    Q.  Okay.  So you said that you talked to
20  Mr. Collins about Mr. Collins' conversation with
21  Bloomberg?
22        MR. LoCASCIO:  Object to form.
23        THE WITNESS:  No.  No, no.  No.  Maybe I
24  misunderstood your question.
25  BY MS. DUNN:

Page 125

1    Q.  Okay.  But your testimony is that you
2  spoke to Mr. Collins about the conversation that
3  Mr. Siegel and Mr. Kranhold had with Bloomberg?
4        MR. LoCASCIO:  I want you to -- if you can
5  answer the question and you have a recollection of
6  it, you can answer it yes or no, but don't say
7  anything beyond that.
8        THE WITNESS:  My recollection was having a
9  conversation with Spencer about it.
10  BY MS. DUNN:
11    Q.  Okay.  And did you have a conversation
12  with Spencer at the time?
13    A.  I don't recall.
14    Q.  Okay.
15        MS. DUNN:  I -- given that this is about a
16  news article, I don't -- I don't know that there
17  would be privilege concerns.  You can talk about
18  that at the break, and we'll come back to it.
19        MR. LoCASCIO:  If you want to -- I'll talk
20  to the witness at the break about it.
21        MS. DUNN:  Yeah, I -- well, 'cause I'm
22  going to ask about it, but I want --
23        MR. LoCASCIO:  Well --
24        MS. DUNN:  Yeah.
25        MR. LoCASCIO:  -- just so the record's

32 (Pages 122 - 125)



Page 154

Page 155

```
5    A.  It's generally quite collaborative.  Some
6  partners are more active than others in terms of
7  guidance
```

```
15      So it's usually driven by the software
16  ecosystem, not so much by people who license
17  directly from a chip standpoint.
```

Page 156

```
2    Q.  Okay.  And have you nego- -- extended
3  agreements specifically with any other company?
4    A.  Not directly to my knowledge.
```

40 (Pages 154 - 157)



Page 158

1    A.  I don't know.
2    Q.  And who would know that?
3    A.  Will Abbey.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 238

1 ARM was to build chips, why the value would be
2 unique.
3 BY MS. DUNN:

[redacted]

12 Q. Okay. All right.
13 If you look at page 20 -- just flip the
14 page over -- the interviewer asked the question,
15 "Are you worried at all about competing with your
16 customers, though?"
17 Do you see that?
18 A. Yes.
19 Q. Right.
20 And -- and the -- the question here is if
21 you're going to start designing or making or
22 supplying chips, you would be competing with some of
23 your customers. You understood that to be the
24 question. Right?
25 A. Yes.

Page 239

1 Q. Okay. And you say -- you mentioned
2 customers including Apple, Tesla, and Amazon, all
3 device makers; correct?
4 A. Device makers. They're -- they're -- I
5 consider them OEMs.
6 Q. Right.
7 And you do not list Qualcomm and other
8 chip makers as competitors; you just list the OEMs.
9 Correct?
10 MR. LoCASCIO: Object to form.
11 THE WITNESS: I'm sorry, say that one more
12 time.
13 BY MS. DUNN:
14 Q. You do not list here as your competitors
15 Qualcomm and other chip makers as competitors; you
16 list only the OEMs?
17 MR. LoCASCIO: Object to form.
18 Mischaracterizes the document.
19 THE WITNESS: The question that was asked
20 here, competing with my customers. And I pointed
21 out who my customers were.
22 BY MS. DUNN:
23 Q. Right.
24 And you list Apple and Tesla and Amazon;
25 correct?

Page 240

1 A. Yes.
2 Q. Right.
3 And the reason you list them is because
4 they make phones and cars and data centers; correct?
5 A. Yes.
6 Q. Right.
7 And you do not list Qualcomm that makes
8 chips; correct?
9 A. That's correct.
10 Q. Okay. And you don't list any other chip
11 maker; correct?
12 A. Correct.
13 [redacted]

Page 241

[redacted]

11 Q. Okay. And is it your testimony as you sit
12 here today that Qualcomm and ARM are competitors?
13 A. No.
14 Q. Okay. All right.
15 Now, is it also fair to say that you're --
16 ARM has moved away from the idea of acting as
17 Switzerland?
18 A. I'm sorry, say that again.
19 Q. Is it fair to say that ARM has moved away
20 from the idea of acting as Switzerland?
21 MR. LoCASCIO: Object to form.
22 THE WITNESS: Yeah, so I never considered
23 us to be Swit- -- Switzerland.
24 BY MS. DUNN:
25 Q. Okay. And --

61 (Pages 238 - 241)

Page 242

1     A.  So I -- so I can't say we're moving away
2  from it because I never considered that to be our
3  position.
4     Q.  Okay.  And would you say that ARM is -- is
5  neutral as of -- as among its other large companies
6  in the technology space --
7        MR. LoCASCIO:  Object to form.
8  BY MS. DUNN:
9     Q.  -- today?
10    A.  Say the question again.
11    Q.  I said, would you say that ARM is -- acts
12 neutrally as among other large companies in the
13 technology space today?
14       MR. LoCASCIO:  Same objection.
15       THE WITNESS:  I would say we are no
16 different than most of the people in the technology
17 space, which moves very, very fast.
18       MS. DUNN:  Okay.  So, let's go off the
19 record.
20       THE VIDEOGRAPHER:  This is the end of
21 Media Number 4.  We're off the record at 1:47 p.m.
22       (Short recess taken.)
23       (Haas Deposition Exhibit 11 was marked for
24       identification.)
25       THE VIDEOGRAPHER:  This is the start of

Page 243

1  Media 5.  We're back on the record at 2:00 p.m.
2  Proceed.
3  BY MS. DUNN:
4     Q.  Okay.  Mr. Haas, you have in front of you
5  Haas 11.  This is a Bloomberg article that published
6  last week.  The headline is, "SoftBank's Ampere Deal
7  Faces In-Depth U.S. Probe in Threat to AI
8  Ambitions."
9        Do you see that?
10    A.  Yes.
11    Q.  Okay.  Did you speak with Bloomberg in
12 advance of this article?
13    A.  No.
14    Q.  Okay.  And do you have any thoughts about
15 who might have leaked this news to Bloomberg?
16    A.  No.
17    Q.  Okay.  And do you think it could have been
18 the regulators?
19    A.  Do I think --
20       MR. LoCASCIO:  Object to form.
21       THE WITNESS:  I'm sorry.  Say -- repeat
22 that.
23 BY MS. DUNN:
24    Q.  Do you think that the regulators could
25 have been responsible for this leak?

Page 244

1     A.  I don't know who it was.
2     Q.  Okay.  But it probably wasn't SoftBank
3  leaking out that they were targeted with a second
4  request; right?
5     A.  I would think it would not be SoftBank.
6     Q.  Right.
7        And another party who would know about
8  that about that was the FTC; correct?
9     A.  That's -- that's correct.
10    Q.  Okay.  And are you aware of any other
11 parties besides SoftBank, ARM, and the FTC who knew
12 that there was a second request?
13       MR. LoCASCIO:  Object to form.
14       THE WITNESS:  Can you repeat that
15 question?
16 BY MS. DUNN:
17    Q.  Are you -- do you know of any other
18 parties besides SoftBank, ARM, and the FTC who knew
19 there was a second request in conjunction with the
20 Ampere acquisition?
21       MR. LoCASCIO:  Object to form.
22       THE WITNESS:  Ampere would know.
23 BY MS. DUNN:
24    Q.  Fair.
25       Do you know of any other parties besides

Page 245

1  SoftBank, ARM, Ampere, and the FTC who knew that
2  there was a second request?
3        MR. LoCASCIO:  Same objection.
4        THE WITNESS:  I would not speculate who
5  beyond those three.
6  BY MS. DUNN:
7     Q.  Okay.  And we can agree it's unlikely
8  SoftBank, ARM, or Ampere would put this news out;
9  right?
10    A.  I think it would be likely.
11    Q.  Okay.  ███████████████████
   ███████████████████████████████████
   ██████████████?
14    A.  Yes, that's correct.
15    Q.  And I think you might have said earlier,
16 but did you participate in the decision to acquire
17 Ampere?
18    A.  I was in the discussions to acquire
19 Ampere, yes.
20    Q.  Okay.  And would you agree that if Ampere
21 is acquired by SoftBank, then it would not be a
22 competitor to ARM because they both will be under
23 the SoftBank umbrella?
24    A.  Can you repeat that?
25    Q.  Yes.

62 (Pages 242 - 245)

# Exhibit 89

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

1           UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DELAWARE

3                  ---oOo---

4

5    ARM LTD., a UK Corporation, )
                                 )
6                Plaintiff,      )
                                 )
7    vs.                         )  C.A. No. 22-1146 (MN)
                                 )
8    QUALCOMM INC., a Delaware   )
     corporation; QUALCOMM       )
9    TECHNOLOGIES, INC., a       )
     Delaware Corporation, and   )
10   NUVIA, INC., a Delaware     )
     Corporation,                )
11                               )
                 Defendants.     )
12   _____)

13

14

15         HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

16            VIDEOTAPED DEPOSITION OF RENE HAAS

17              TUESDAY, DECEMBER 12, 2023

18

19

20

21   STENOGRAPHICALLY REPORTED BY:

22   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

23   CSR LICENSE NO. 9830

24   JOB NO. 6326906

25



Page 18

Page 20

1    Q   Okay.  So when you were talking about
2 developing your own chiplets, subcomponents to larger
3 chips, who were the partners who you would sell those
4 to?
5        MR. JACOBS:  Objection; form.
6        THE WITNESS:  Yeah, can you repeat the
7 question.
8        MS. DUNN:  Q.  When you were talking about
9 developing your own chiplets, which you've described
10 as subcomponents to larger chips, who were the
11 partners who you would sell those to.
12       MR. JACOBS:  Object to form.
13       THE WITNESS:  The -- the -- a chiplet can be
14 sold to many different customers.
15       MS. DUNN:  Okay.
16    Q   And can you name some of the customers you
17 could sell those to.
18    A   It applies to almost any -- any market.  So
19 automotive, hyperscalers, laptops, game consoles.
20    Q   Okay.  Could you sell them to Qualcomm?
21    A   Chiplets?
22    Q   Yeah.
23    A   We could.
24    Q   How about NVIDIA?
25    A   Sure.

Page 21

1    Q   MediaTek?
2    A   Sure.
3    Q   Intel?
4    A   Sure.
5    Q   Samsung?
6    A   Anybody.
7    Q   Samsung?
8    A   Anybody.
9    Q   Including Samsung?
10   A   There isn't anybody who we wouldn't sell it
11 to.
12   Q   Okay.  So you could sell them to -- any
13 company, you're --
14   A   Correct.
15   Q   -- saying, could buy your chiplets?
16   A   Correct.
17   Q   And do any of those companies I just named
18 develop chiplets on their own?
19       MR. JACOBS:  Objection; form.
20       THE WITNESS:  Can you repeat the question.
21       MS. DUNN:  Q.  Do any one of those companies
22 that I just named develop their own chiplets.
23   A   Some.
24   Q   Okay.  And so if Arm was going to develop its
25 own chiplets, it would be in competition to some of

16        So when you're talking -- well, first of all,
17 what's a chiplet?
18   A   A chiplet is a component that is essentially
19 a die, if you will.  So the way to think about it is,
20 a semiconductor wafer is essentially a series of die.
21 When you slice up that wafer into a single die, that's
22 what's called a chiplet.  So it's not encapsulated.
23 It can't go onto a motherboard.  It's not a physical
24 chip, per se.  It's a -- kind of a subcomponent to a
25 larger chip, if you will.

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY



Page 22

1   those other companies that I named; correct?
2      A   No.
3         MR. JACOBS:  Objection; form.
4         MS. DUNN:  Q.  No.
5      A   No.
6      Q   So you would sell your chiplets, they would
7   sell their chiplets, and you were not proposing to
8   compete with them?
9      A   You asked whether our chiplets compete with
10  their chiplets, and the answer to that is no.
11     Q   Okay.  Do you consider Arm to be a competitor
12  of Qualcomm?
13     A   No.
14     Q   Okay.  Do you consider Arm to be a competitor
15  to any company?
16     A   To any company?
17     Q   Yeah.
18     A   Sure.
19     Q   Who are Arm's competitors?
20     A   Intel.
21     Q   Who else?
22     A   AMD.
23     Q   Anyone else?
24     A   Those are the primary competitors.
25     Q   Okay.  Who are the secondary competitors?

Page 23

1         MR. JACOBS:  Objection; form.
2         THE WITNESS:  Yeah, I don't know that I would
3   classify anyone beyond AMD and Intel as --
4         MS. DUNN:  Okay.
5      Q   So you -- so Arm considers itself in a market
6   of three:  itself, Intel, and AMD; is that right?
7         MR. JACOBS:  Objection; form.
8         THE WITNESS:  No, I wouldn't say that.
9         MS. DUNN:  Q.  But you said you didn't have
10  any other competitors.
11     A   Yeah, but I -- but you said "a market of
12  three."  That's just not how I think about it.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 98

1    Q  Okay.  Sitting here today, can you think of
2    any basis for making that demand?
3        A  No.  I don't remember, and I don't remember
4    the details of this.
5        Q  Okay.  Does Arm believe it can restrict
6    engineers' use of their know-how in going to their
7    next job?
8        MR. JACOBS:  Objection; form.
9        THE WITNESS:  Can you repeat that.
10       MS. DUNN:  Q.  Does Arm believe it can
11   restrict engineers' use of their know-how when the
12   engineers move to their next job.
13       MR. JACOBS:  Objection; form.
14       THE WITNESS:  Yeah, I don't know.
15       MS. DUNN:  Okay.
16       Q  You don't know if Arm --
17       A  I -- I -- I'm not familiar with the
18   agreements that we sign with companies that would
19   restrict employees who leave the company -- who leave
20   their company and go work for another company.
21       Q  Okay.  Do you believe that Arm could enter
22   into any agreement that would restrict engineers' use
23   of know-how when they move from job to job?
24       MR. JACOBS:  Objection; form.
25       THE WITNESS:  Can you repeat the question.

Page 99

1        MS. DUNN:  Q.  Do you believe that Arm could
2    enter into any agreement that would restrict an
3    engineer's use of know-how when they move from job to
4    job.
5        A  We could.
6        Q  But you -- can you think of an instance where
7    you've done that?
8        A  Not offhand.
9        Q  Okay.  Can you think of an instance where any
10   company you know of has done that?
11       A  Not offhand.



Page 100

12       Now, during this time, your predecessor,
13   Mr. Segars, was leading the negotiations with
14   Qualcomm; correct?
15       A  During this time, February '21?
16       Q  Yeah.
17       A  I think it was sometime after that.
18       Q  Okay.  What was your general opinion of
19   Mr. Segars?
20       A  My general opinion of him?
21       Q  Yeah.
22       A  He's a good guy.
23       Q  Yeah.
24       He was your boss; right?
25       A  Uh-huh.

26 (Pages 98 - 101)

# Exhibit 90

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    C.A. No. 24-490-MN
     ----------------------------------------x
4    QUALCOMM INCORPORATED, a Delaware
     corporation, QUALCOMM TECHNOLOGIES, INC.,
5    a Delaware corporation,
6                        Plaintiffs,
7         - against -
8    ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K.
     corporation
9
                         Defendant.
10
     ----------------------------------------x
11
                    July 2, 2025
12                  9:09 a.m.
13
14           *HIGHLY CONFIDENTIAL*
          *OUTSIDE ATTORNEYS' EYES ONLY*
15
16       VIDEOTAPED DEPOSITION of PAUL
17   WILLIAMSON, held at the offices of PAUL WEISS
18   RIFKIND WHARTON & GARRISON, LLP, located at
19   1285 Avenue of the Americas, New York, New
20   York 10019, before Anthony Giarro, a
21   Registered Professional Reporter, a Certified
22   Realtime Reporter and a Notary Public of the
23   State of New York.
24
25

Page 86

PAUL WILLIAMSON -- HIGHLY CONFIDENTIAL -- OUTSIDE
ATTORNEYS' EYES ONLY

2  Q    Do you recognize this
3  document?
4  A    I don't recognize it,
5  actually.  I'm not sure.  It doesn't give
6  me the context.
7  Q    Do you see on the first page
8  in the top comment on the side, it says
9  "mailed to paul.williamson@arm.com"?
10  A    So the first page, do you
11  mean the comments?
12  Q    Yes.
13  A    Yes.
14  Q    Do you recognize that as a
15  comment from you on this document?
16     MR. WILCOX:  Objection,
17  form.
18  A    I believe that's actually a
19  comment from someone else.
20  Q    Is it a comment to you?
21  A    It could be, yeah.  I think
22  that's how it's structured in this
23  document.
24  Q    And then the comment below
25  that, "replies," is that comment from

Page 87

PAUL WILLIAMSON -- HIGHLY CONFIDENTIAL -- OUTSIDE
ATTORNEYS' EYES ONLY

2  you?
3  A    I can't be sure because it
4  says "pwtr1."  And I don't actually know
5  if that is me or not, the way this
6  document's been marked.
7  Q    You have no reason to doubt
8  that this document came from your files?
9  A    No.  If you tell me it came
10  from my files, I would totally accept
11  that.
12  Q    And you could see at the
13  bottom, it's Bates Stamped with an ARM
14  Bates Stamp, indicating that it came from
15  ARM.  You see that?
16  A    Yeah.
17  Q    At the top of this document,
18  it says, ████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████
25     Do you see that?

Page 88

PAUL WILLIAMSON -- HIGHLY CONFIDENTIAL -- OUTSIDE
ATTORNEYS' EYES ONLY

2  A    I do.
3  Q    What offering is this
4  referring to?
5  A    It's not specific.  So I'd
6  be speculating.
7  Q    Does ARM have offerings that
8  compete with Qualcomm?
9     MR. WILCOX:  Objection,
10  form.
11  A    We don't -- well, we
12  consider Qualcomm to be both a partner to
13  us, and we supply technology.  But they
14  do compete with our other partners who
15  use ARM technology.
16  Q    But you don't think that
17  Qualcomm competes with ARM?
18  A    We wouldn't refer to them as
19  a competitor, no.
20  Q    Let's look down a couple of
21  lines.
22     There's a paragraph that
23  starts with the words, "The current
24  proposals have been binary."
25     Do you see that?

Page 89

PAUL WILLIAMSON -- HIGHLY CONFIDENTIAL -- OUTSIDE
ATTORNEYS' EYES ONLY

2  A    Sorry.  Front page?
3  Q    Yes, front page.
4  A    Yes.
5  Q    That sentence says, "████████████
████████████████████████████████████
████████████████████████████████."
8     You see that?
9  A    Yes.
10  Q    And below that, it says, ████
████████████████████████████████████████
████████████████████████████████
█████████
14     Do you see that?
15  A    I do.
16  Q    "████████████████████████
████████████████████████████████████
███████."
19     Do you see that?
20  A    I do.
21  Q    Do you know why this
22  document says ████████████████████████
██████████████████████████?
24     MR. WILCOX:  Objection,
25  form.

23 (Pages 86 - 89)



Page 122
1 PAUL WILLIAMSON -- HIGHLY CONFIDENTIAL -- OUTSIDE ATTORNEYS' EYES ONLY
2 to be true.
16 Q

Page 124
1 PAUL WILLIAMSON -- HIGHLY CONFIDENTIAL -- OUTSIDE ATTORNEYS' EYES ONLY
2 form.
3 A
11 Q     What's Graphcore?
12 A     Graphcore was a UK-based AI
13 chip startup who were acquired by the
14 SoftBank Group.

Page 123
1 PAUL WILLIAMSON -- HIGHLY CONFIDENTIAL -- OUTSIDE ATTORNEYS' EYES ONLY
2
25     MR. WILCOX:  Objection,

# Exhibit 91

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
 2

 3     QUALCOMM INCORPORATED,     §
       A DELAWARE CORPORATION,    §
 4     QUALCOMM TECHNOLOGIES,     §  C.A. NO. 24-490-MN
       INC., A DELAWARE           §
 5     CORPORATION,               §
                                  §
 6        PLAINTIFFS,             §
                                  §
 7     - AGAINST -                §
                                  §
 8     ARM HOLDINGS PLC.,         §
       F/K/A ARM LTD., A U.K.     §
 9     CORPORATION,               §
                                  §
10        DEFENDANT.              §
11          **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
12       ORAL AND VIDEOTAPED DEPOSITION OF AKSHAY BHATNAGAR
                         JULY 10, 2025
13

14

15

          ORAL AND VIDEOTAPED DEPOSITION OF AKSHAY
16     BHATNAGAR, produced as a witness at the instance of
       the Plaintiffs and duly sworn, was taken in the
17     above styled and numbered cause on Thursday,
       July 10, 2025, from 9:22 a.m. to 12:39 p.m., before
18     TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of
       Texas, reported by computerized stenotype machine,
19     at the offices of Kirkland & Ellis, LLP, 401
       Congress Avenue, Austin, Texas, pursuant to the
20     Federal Rules of Civil Procedure and any provisions
       stated on the record herein.
21

22

23

24

25     Job No. NY 7464214
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 50

1   collect.
2       Q.   Okay.  Thank you for that clarification.
3           What did he say -- did he say anything
4   when you provided that data to him?
5       A.   Anything with respect to what?
6       Q.   Any -- anything.  Did he have any
7   reactions that he shared with you when you provided
8   that data to him?
9       A.   Reactions, I don't remember.  But when I
10  presented the data and he reviewed it, he gave me
11  his guidance on the next step.
12      Q.   What was that guidance?
13      A.

Page 51

1       Q.   But you -- you just testified a second
2   again that he gave you

9           MR. EVANGELATOS:  Objection; form.
10      A.   So he gave me

13      Q.

15          MR. EVANGELATOS:  Objection; form.
16      Q.

23      Q.   Uh-huh.  Yes.
24          MR. EVANGELATOS:  Same objection.
25      A.   I don't know.  He's the best person to

Page 52

1   explain that.

25          MR. EVANGELATOS:  Same objections.

Page 53

8       Q.   I'm handing you a document that's been
9   previously marked as Exhibit 8 in Mr. Shivashankar's
10  deposition.  It has the Bates No. Arm 00103918.
11          I'm handing you -- or I've handed you a
12  copy of Qualcomm's TLA with Arm dated

14          Are you familiar with this contract?
15          MR. EVANGELATOS:  Objection; form.
16      A.   (Pause.)
17          Like I said, I am familiar that they have
18  a TLA, but if it is this specific draft or some
19  other draft, I'm not really sure.
20      Q.   Have you reviewed the terms of the TLA
21  before?
22      A.   I have not.
23      Q.   Any of the terms?
24          MR. EVANGELATOS:  Yeah.  I'm going to
25  caution you to the extent that if that was something

14 (Pages 50 - 53)

# Exhibit 92

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE YORK
2
      QUALCOMM INC., a Delaware
3     corporation, and QUALCOMM
      TECHNOLOGIES, INC., a Delaware
4     corporation                        CASE NO.
                                          24-490-MN
5                     Plaintiffs,

6             -against-

7     ARM HOLDINGS PLC, f/k/a, ARM
      LTD. a U.K. corporation
8
                      Defendant.
9


10             *** HIGHLY CONFIDENTIAL ***

11             VIDEO-RECORDED DEPOSITION OF
                       ERIC POSNER
12
               Hyatt Place Albany Downtown
13               82 Montgomery Street
                 Albany, New York  12207
14
                       10/02/2025
15               9:04 a.m. (EDT)

16

17

18

19

20         REPORTED BY:  MONIQUE CABRERA
                 JOB NO. 170927
21     _____
               DIGITAL EVIDENCE GROUP
22           1730 M Street, NW, Suite 812
               Washington, D.C. 20036
                 (202) 232-0646
```

**Page 326**

1  BY MR. WILCOX:
2      Q.   Can you go to paragraph 67 of your
3  report?  Actually let's go to paragraph 71.
4  That's the wrong one.
5           In paragraph 71, do you see the
6  sentence that starts:  Further?
7      A.   Yes.
8      Q.   And your opinion in that sentence is
9  that if Arm is a viable competitor downstream and
10  is able to capture even a small portion of
11  diverted sales from Qualcomm, that creates
12  additional incentives to foreclose Qualcomm,
13  correct?
14      A.   Correct.

21      Q.   What you say here is just data
22  centers, right?

**Page 327**

1      A.   Right.  But I think I explained -- I
2  thought I explained in the report that I am using
3  data centers for illustrative purposes, as I say
4  in paragraph 69.

12      Q.   So it would be economically rational
13  for Arm to do that, correct?
14      A.   I think so.
15      Q.   And it wouldn't require Arm to
16  sacrifice any profits in the short term to do
17  that, would it?
18      A.   Well, it kind of sort of depends on
19  the magnitudes.  But if you are asking whether
20  it's possible for Arm both to -- to enter the
21  downstream market and lose -- and lose royalties
22  from its competitors, that it's possible for Arm

**Page 328**

1  to -- to benefit in the short term, the answer is
2  "yes."

10      A.   Well, yes, it will increase its
11  profits.  Yes.
12      Q.   That again, doesn't require
13  sacrificing any profits in the short term to do
14  that, right?
15      A.   Not necessarily.  Depends.
16      Q.   Can you go to paragraph 9 of your
17  reply, please?
18      A.   Paragraph 9?
19      Q.   Correct.

2      A.   In paragraph 9?
3           MR. DESAI:  Objection.  Form.
4      A.   Yes.
5  BY MR. WILCOX:
6      Q.   And in your opinion, employing that
7  strategy, Arm would immediately benefit in the
8  short-term, correct?
9      A.   It could immediately benefit in the
10  short-term, not necessarily.
11      Q.   You said several times today that
12  you are not offering any legal opinions, correct?
13      A.   That's correct.
14      Q.   And you have no legal principle
15  section, for example, in either of your reports,
16  correct?
17      A.   Correct.
18      Q.   You are not providing an opinion on
19  whether Arm's conduct violates or threatens to
20  violate section 1 of the Sherman Act?
21      A.   I am not.
22      Q.   You are also not offer that opinion

# Exhibit 93

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.     Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED, a     )
Delaware corporation,        )
QUALCOMM TECHNOLOGIES, INC.,)
a Delaware corporation,      )
                             )
              Plaintiffs, )
                             )
         vs.                 ) C.A. No.: 24-49-MN
                             )
ARM HOLDINGS PLC, f/k/a,     )
ARM LTD. a U.K. corporation,)
                             )
              Defendants.  )
_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF JONATHAN WEISER
San Diego, California
Friday, July 11, 2025

Reported by:
CATHY A. WOOD, RDR, RMR, CRR
CSR No. 2825

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only

---

Page 38

```
1   BY MR. EMERICK:
2
3
4
5   BY MR. EMERICK:
6       Q.  We started briefly talking before about the
7   European Commission, the Federal Trade Commission, and
8   Korean Federal Trade Commission.  Do you recall that?
9       MS. ZAPPALA:  Outside the scope.
10      THE WITNESS:  I recall your question, yes.
11  BY MR. EMERICK:
12      Q.  Do you have an understanding of the current
13  status of those actions against ARM?
14      MS. ZAPPALA:  Objection to form.  Outside the
15  scope.  You can answer to the extent you can without
16  revealing any privileged communications.
17      THE WITNESS:  Yeah, no, I'm not aware of the
18  status.
19  BY MR. EMERICK:
20
21
22
23
24  BY MR. EMERICK:
25      Q.  What about for the --
```

Page 39

```
1       A.  I didn't work on the matter.
2
3
4
5
6
7
8
9   BY MR. EMERICK:
10      Q.  Are you aware there was a story published
11  earlier this year about Qualcomm's actions against ARM
12  in the European Commission, the FTC, and the KFTC?
13      MS. ZAPPALA:  Outside the scope.
14      THE WITNESS:  I don't recall a story.
15  BY MR. EMERICK:
16      Q.  Do you recall any media regarding Qualcomm's
17  actions against ARM in the European Commission and the
18  FTC or the KFTC?
19      MS. ZAPPALA:  Outside the scope.
20      THE WITNESS:  As I sit here today, I'm not
21  aware.
22  BY MR. EMERICK:
23      Q.  Is Qualcomm a public company?
24      MS. ZAPPALA:  Outside the scope.
25      THE WITNESS:  Yes, it is.
```

Page 40

```
1   BY MR. EMERICK:
2       Q.  Do you know if Qualcomm's required to disclose
3   certain information in SEC filings?
4       MS. ZAPPALA:  Outside the scope.
5       THE WITNESS:  As a public company, it would
6   have certain obligations to disclose in SEC filings.
7   BY MR. EMERICK:
8       Q.  What kind of information is Qualcomm required
9   to disclose in SEC filings?
10      MS. ZAPPALA:  Outside the scope.  You can
11  answer to the extent without divulging privileged
12  communications.
13      THE WITNESS:  I -- so yeah, so I don't handle
14  Qualcomm, or when I was working at Qualcomm -- I'm
15  retired now -- I didn't handle Qualcomm's SEC filings.
16  So I didn't work on those matters.
17      Typically, I seem to recall matters would
18  include various different disclosures with regard to
19  risk to Qualcomm's business, financial information,
20  information with regard to key employees.  But, again,
21  it wasn't -- it wasn't an area that I worked on.
22  BY MR. EMERICK:
23      Q.  Are you aware that in October 2024, ARM sent a
24  letter to Qualcomm stating that Qualcomm was in breach
25  of the Qualcomm ALA?
```

Page 41

```
1       MS. ZAPPALA:  Outside the scope.
2       THE WITNESS:  I believe that I reviewed that
3   letter.  It was sent to me.  And the letter is actually
4   a letter that announces or informs Qualcomm that it --
5   that ARM was terminating Qualcomm's license providing a
6            notice of termination.
7   BY MR. EMERICK:
8       Q.  That's your understanding that as of -- that
9   the letter terminated the license?
10      A.  It was --
11      MS. ZAPPALA:  Outside the scope.
12      THE WITNESS:  Yeah, my reading of the letter is
13  that it was a -- I think the letter was October 2024,
14  that's the letter you're referring to?
15  BY MR. EMERICK:
16      Q.  Yes.
17      A.  It was a letter to put Qualcomm on notice that
18  ARM would terminate Qualcomm's license in 60 days.
19      Q.  And would the termination be automatic after 60
20  days or it's -- would it need to be something that ARM
21  would -- a separate step that ARM would take -- have to
22  take after the 60 days?
23      MS. ZAPPALA:  Outside the scope.
24      THE WITNESS:  I don't seem to recall.
25  ///
```

11  (Pages 38 to 41)

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only



Page 42

1  BY MR. EMERICK:

14  BY MR. EMERICK:

22  BY MR. EMERICK:

Page 44

10  BY MR. EMERICK:

25    Q.  Qualcomm was having ongoing discussions with

Page 45

1   customers regarding the litigation --
2       MS. ZAPPALA:  Same objection.
3   BY MR. EMERICK:
4       Q.  -- since its inception?
5       MS. ZAPPALA:  Same objection.  Same
6   instruction.
7       THE WITNESS:  I can't answer that question
8   without divulging confidential privileged information.
9   BY MR. EMERICK:
10      Q.  Well, where's the privilege if it's with a
11  customer?
12      A.  Are you asking about the content of those
13  discussions?
14      Q.  Yeah, I'm asking about communications with
15  third-party customers.  I'm not talking about internal
16  Qualcomm.
17      A.  Oh, my apologies.
18      So yes, so Qualcomm, at least I, as the
19  representative of Qualcomm at the time, did have
20  discussions with certain customers over the period of
21  the three years.
22      Q.  Who were the customers that you had
23  communications with regarding the litigation with ARM?
24      MS. ZAPPALA:  Outside the scope.
25      THE WITNESS:  I can tell you the customers that

24  BY MR. EMERICK:

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only



Page 50

1  because Bloomberg reported ARM leaked it to Bloomberg,
2  it became -- it became public knowledge so we had to
3  address it.
4  BY MR. EMERICK:

21  BY MR. EMERICK:
22      Q.  Are you aware of any business opportunities
23  that Qualcomm lost as a result of ARM's October 2024
24  letter or reporting thereon?
25          MS. ZAPPALA:  Objection.  Outside the scope.

Page 51

1          THE WITNESS:  I could say this, I could say
2  that customers were very concerned about Qualcomm's
3  ability to deliver.  That concern rose out of not only
4  ARM's filing the lawsuit, but statements that they had
5  received from ARM and ARM, again, acting as a bad
6  partner in mischaracterizing the rights we had under the
7  Qualcomm ALA.
8          Those were front and center in the minds of
9  customers and not only created a lot of grief, but
10  created a lot of uncertainty.  How they acted upon that,
11  I'm not sure of the specifics necessarily with regard to
12  their product decisions.
13      MR. EMERICK:  All right.  Let's take a break.
14      THE VIDEOGRAPHER:  Going off the record at
15  10:05.
16          (Brief recess was taken.)
17      THE VIDEOGRAPHER:  We are back on the record at
18  10:23.  This is media No. 2 in the deposition of
19  Jonathan Weiser.
20  BY MR. EMERICK:
21      Q.  During the break, did you have any
22  conversations with your counsel regarding your
23  testimony?
24      A.  I did not.
25      Q.  During the break, did you have any

Page 52

1  conversations regarding this case?
2      A.  I did not.
3      Q.  Were you present during any conversations
4  regarding your testimony?
5      A.  I don't understand the question.
6      Q.  Yeah, were you present during any conversations
7  regarding your testimony?
8      A.  No.
9      Q.  And were you present during any conversations
10  regarding this case?
11      A.  No.

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.     Jonathan Weiser
                              Highly Confidential - Attorneys' Eyes Only



7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
                 Highly Confidential - Attorneys' Eyes Only



Page 58

Page 60

4  BY MR. EMERICK:

7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only



Page 74

1   little time.

Page 76

1       Do you recognize this?
2   A.  I do.
3       (Exhibit No. 1 was marked for
4       identification.)
5   BY MR. EMERICK:
6       Q.  What is this?
7   A.  It's the Amended and Restated Architecture
8   License Agreement that was entered into May 30th, 2013.
9       Q.  This is the 2013 Qualcomm/ARM ALA?
10  A.  It is.

24      Q.  All right.  Handing you what has been marked as
25  Exhibit 1 which is ARM 55357 through ARM 55399.

7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only



7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only



www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2025        202-232-0646

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
                          Highly Confidential - Attorneys' Eyes Only



www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2025          202-232-0646

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only



7/11/2025        Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser
Highly Confidential - Attorneys' Eyes Only



48  (Pages 186 to 189)



Page 190

Page 192

```
 3        MR. EMERICK:  Can we take like a two-minute
 4   break?
 5        MS. ZAPPALA:  Sure.
 6        THE VIDEOGRAPHER:  Going off the record at
 7   3:40.
 8            (Brief recess was taken.)
 9        THE VIDEOGRAPHER:  We are back on the record at
10   3:43 p.m.
11        MR. EMERICK:  I'll pass the witness.
12        MS. ZAPPALA:  I have no questions for the
13   witness.
14        THE VIDEOGRAPHER:  Anything, Cathy?
15        THE REPORTER:  Let me just confirm on the record
16   copy orders.
17        MR. EMERICK:  Paralegal.
18        MS. ZAPPALA:  Paralegal.  And I designated it
19   highly confidential attorneys' eyes only, but I just
20   want to confirm this on the record.
21        THE VIDEOGRAPHER:  This concludes today's
22   deposition of Jonathan Weiser at 3:44.
23            (Deposition concluded at 3:44 p.m.)
24
25
```

49  (Pages 190 to 193)

# Exhibit 94

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    C.A. No. 24-490-MN
     ----------------------------------------x
4    QUALCOMM INCORPORATED, a Delaware
     corporation, QUALCOMM TECHNOLOGIES, INC.,
5    a Delaware corporation,
6                        Plaintiffs,
7         - against -
8    ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K.
     corporation
9
                        Defendant.
10
     ----------------------------------------x
11
                    July 4, 2025
12                  9:10 a.m.
13
14              *HIGHLY CONFIDENTIAL*
                *ATTORNEYS' EYES ONLY*
15
16        VIDEOTAPED DEPOSITION of PETER
17   GREENHALGH, held at the offices of PAUL WEISS
18   RIFKIND WHARTON & GARRISON, LLP, located at
19   1285 Avenue of the Americas, New York, New
20   York 10019, before Anthony Giarro, a
21   Registered Professional Reporter, a Certified
22   Realtime Reporter and a Notary Public of the
23   State of New York.
24
25

Page 30

PETER GREENHALGH -- HIGHLY CONFIDENTIAL --
ATTORNEYS' EYES ONLY

2 from ATG about features that ALA partners
3 are implementing in their custom cores?
4        MR. EMERICK: Objection,
5 form.
6        A      What would you describe as
7 often?
8        Q      Well, let's do it another
9 way.
10        How often do you get
11 information from ATG about features that
12 ALA partners are implementing in their
13 custom cores?
14        A      Do you mean me personally
15 or -- when you say you, you mean me?
16        Q      Let's start there. You
17 personally.
18        A      I don't recall. But not --
19 it's not common.
20        Q      What do you mean by not
21 common?
22        A      For example, I wouldn't
23 every week have a conversation. But the
24 nature of my role, at least in the
25 moment, is not to build CPUs or to align

Page 31

PETER GREENHALGH -- HIGHLY CONFIDENTIAL --
ATTORNEYS' EYES ONLY

2 architectural features between cores.
3        Q      So how often would you get
4 such information?
5        A      This time, I don't think I
6 would have a conversation that would talk
7 about this more than a few times a year,
8 but possibly not even once a year.
9        Q      And how often do you think
10 those conversations happen for others
11 that report to you or in the CPU
12 development role?
13        MR. EMERICK: Objection,
14 form.
15        A      I wouldn't like to
16 speculate. I don't know.
17        Q      Do you know of any instances
18 in which people who report to you or are
19 in the CPU development role have received
20 such information?
21        A      I don't recall a specific
22 instance.
23        Q      Would you agree with me that
24 the ARM CPUs that you work on compete
25 with the ALA partner custom CPUs?

Page 32

PETER GREENHALGH -- HIGHLY CONFIDENTIAL --
ATTORNEYS' EYES ONLY

2        MR. EMERICK: Objection,
3 form.
4        A      What do you mean by compete?
5        Q      Do you sell to the same
6 customers or try to?
7        █████████████████
████████████████████████
█████████████████████.
11        Q      How do you know they're not
12 trying to?
██  █  ███████████████
████████████████████████
17        Q      Ultimately, would they be
18 competitive within products --
19        MR. EMERICK: Objection.
20        Q      -- of the ARM CPUs and
21 custom CPUs?
22        MR. EMERICK: Objection,
23 form.
24        A      So the products are -- the
25 products that our silicon partners create

Page 33

PETER GREENHALGH -- HIGHLY CONFIDENTIAL --
ATTORNEYS' EYES ONLY

2 will be compared on many different
3 aspects, like their video display, modem,
4 if it's in a mobile device. There's lots
5 of different aspects which our
6 partners -- our silicon partners will go
7 and create chips around. It's not just
8 about the CPU.
9        Q      Would you characterize that
10 as competing or not?
11        MR. EMERICK: Objection,
12 form.
13        A      I characterize that as just
14 a business practice of these different
15 companies that will be building products,
16 some of which will be used on
17 implementation, some of which won't.
18        Q      So you don't have a view,
19 one way or the other, as to whether ARM
20 implementation cores compete at any level
21 with custom cores; is that accurate?
22        A      So there will be comparisons
23 made, but more by our silicon partners
24 who are providing their silicon
25 implementations into the companies that

9 (Pages 30 - 33)

# Exhibit 95

# Exhibit 96

# Exhibit 97

# Exhibit 98

Message

| | |
|---|---|
| **From:** | Lynn Couillard [Lynn.Couillard@arm.com] |
| **Sent:** | 05/06/2020 02:19:04 |
| **To:** | Todd Lepinski [Todd.Lepinski@arm.com]; Laurence Bryant [Laurence.Bryant@arm.com]; Karthik Shivashankar [Karthik.Shivashankar@arm.com]; Akshay Bhatnagar [Akshay.Bhatnagar@arm.com] |
| **Subject:** | |

+Karthik and Akshay

Hi team -

Just checking on this one. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Is there any need for us to respond to this?

Please advise.

Thanks
Lynn

**From:** Lynn Couillard <Lynn.Couillard@arm.com>
**Date:** Wednesday, May 20, 2020 at 1:10 PM
**To:** Todd Lepinski <Todd.Lepinski@arm.com>, Laurence Bryant <Laurence.Bryant@arm.com>
**Subject:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hi Todd and Laurence,

Here's the response from Qualcomm, which I think is quite clever. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Any ideas on next steps/response?

Lynn

**From:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Date:** Wednesday, May 20, 2020 at 1:05 PM
**To:** Lynn Couillard <Lynn.Couillard@arm.com>, Rajiv Gupta <grajiv@qti.qualcomm.com>
**Cc:** Todd Lepinski <Todd.Lepinski@arm.com>
**Subject:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hi Lynn,

Thanks for your email and the note below. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

███████████████████████████████████████

███████████████████████████████

Sincerely,
Brett

**From:** Lynn Couillard <Lynn.Couillard@arm.com>
**Sent:** Friday, May 15, 2020 9:49 AM
**To:** Brett Bettesworth <betteswb@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>
**Cc:** Todd Lepinski <Todd.Lepinski@arm.com>
**Subject:** ███████████████████████████

Hello Brett and Rajiv, (+Todd)

Please let us know if you'd like to discuss, we can set something up for next week.

Thanks
Lynn

**From:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Date:** Thursday, May 7, 2020 at 1:57 PM
**To:** Lynn Couillard <Lynn.Couillard@arm.com>, Rajiv Gupta <grajiv@qti.qualcomm.com>
**Subject:** ███████████████████████████

Hi Lynn,

Friendly reminder on the ██████████████████████. I know you had mentioned targeting a response for the second half of this week.

Please let us know if we need to initiate an ██████████████. If acceptable to ARM, QC would also be comfortable with an email confirmation ███████████████████

Thanks so much,
Brett

**From:** Lynn Couillard <Lynn.Couillard@arm.com>
**Sent:** Monday, May 4, 2020 8:49 AM
**To:** Brett Bettesworth <betteswb@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>
**Subject:** ███████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Hi Brett,

Thanks for your em. I'll discuss with my team and get back to you target second half this week.

Regards
Lynn

**From:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Date:** Friday, May 1, 2020 at 12:33 PM
**To:** Lynn Couillard <Lynn.Couillard@arm.com>, Rajiv Gupta <grajiv@qti.qualcomm.com>
**Subject:**

Hi Lynn,

Thanks so much for providing the Roadmap and information below.



Thank you!
Brett

**From:** Lynn Couillard <Lynn.Couillard@arm.com>
**Sent:** Tuesday, April 21, 2020 4:10 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>

ARM_00085569

**Cc:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Subject:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HI Rajiv,

Thanks, ok. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hope that helps.

Lynn

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Tuesday, April 21, 2020 at 3:38 PM
**To:** Lynn Couillard <Lynn.Couillard@arm.com>
**Cc:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Subject:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hi Lynn,

So, this is the context.

Rajiv

**From:** Lynn Couillard <Lynn.Couillard@arm.com>
**Sent:** Monday, April 20, 2020 4:48 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Cc:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Subject:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hi Rajiv,

Yes, I'm checking with the team. What is the context of this ask (sorry I meant to bring this up on our earlier call). Is someone looking for specific features? Other?

Thanks
Lynn

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Monday, April 20, 2020 at 4:14 PM
**To:** Lynn Couillard <Lynn.Couillard@arm.com>
**Cc:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Subject:** RE: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Hi Lynn,

Appreciate update on the request below.

-Rajiv

**From:** Lynn Couillard <Lynn.Couillard@arm.com>
**Sent:** Friday, April 17, 2020 1:14 PM
**To:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Cc:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Subject:** 

Hi Rajiv
Checking..
Lynn

**From:** Rajiv Gupta <grajiv@qti.qualcomm.com>
**Date:** Friday, April 17, 2020 at 12:35 PM
**To:** Lynn Couillard <Lynn.Couillard@arm.com>
**Cc:** Brett Bettesworth <betteswb@qti.qualcomm.com>
**Subject:** 

Hi Lynn,

Is anyone at Arm working on 

Rajiv

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

# Exhibit 99

Qualcoʌʌʌ

**Qualcomm Incorporated**

5775 Morehouse Drive, San Diego, CA 92121

www.qualcomm.com

## VIA OVERNIGHT COURIER AND ELECTRONIC MAIL

September 22, 2025

Arm Limited
110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom
Attn: Spencer Collins, Executive Vice President and Chief Legal Officer, spencer.collins@arm.com

Dear Spencer,

Thank you for your August 29 letter concerning Qualcomm's ongoing—yet still unfulfilled—request
for █████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ We are of course happy to
have another in-person meeting with Arm to advance negotiations, but it is difficult to see how such a
meeting can be productive without Arm first providing its starting position for key commercial terms.
Because we welcome Arm's engagement in meaningful discussions, we ask that Arm expeditiously
provide its position on the key commercial terms in writing, which we would expect to receive in
advance of a meeting.

As a reminder, Qualcomm has attempted to ███████████████████████████████████████
████████ Qualcomm first requested Arm to provide a ████████████████████████████████
███████████████████████████████████████████████████████████████████████████
█████████████████████████████ Following Arm's October 19, 2024 presentation regarding the
███████████████████████████████████████████████████████████████████████████
██████████████████████████ We again attempted to move negotiations
for █████████████ forward in the fall of 2024 and throughout 2025 by repeatedly requesting a licensing
proposal. Yet, Arm has not provided us with any proposed commercial terms or even outlined Arm's
high-level position on any key commercial terms. Indeed, your August 29th letter avoids any proposals,
recycles legal arguments that Qualcomm has long rebutted, and purports to ask questions while
avoiding any meaningful response to ███████████████████ that Qualcomm sent to Arm in an effort to
move negotiations forward.

Your letter seems to place importance on Arm's belief that the ███████████████████████████
███████████████████████████████████████████████████████████████████████████
████████████████████████████████████ We also understand from that presentation that Arm

# Qualcomm

planned to ███████████████████████████████████████. Regardless, █████████████ ███ cannot be a legitimate reason to delay the negotiation of any license in light of the parties' past practice in negotiating licenses ██████████████████████████████████████████ Contrary to your suggestion, it is our understanding that Arm has ████████████████████████ ████████████████ If we are mistaken in that understanding, we ask that Arm please confirm that it has not entered into licenses ██████████████████████████████████

Qualcomm is providing responses to the questions in your August 29 letter below in a good-faith effort to advance negotiations. These resolve all questions that Arm has posed to Qualcomm, and there is no legitimate reason to continue delaying sending us Arm's proposed position on the key commercial terms in writing ahead of our next in-person meeting.



CONFIDENTIAL



CONFIDENTIAL



\*        \*        \*

We will be happy to provide dates for a meeting once you provide us with a written proposal. We have met in person with Arm multiple times to ███████, but have yet to receive a concrete

CONFIDENTIAL

Qualcomm

proposal ████████████ We have provided Arm a written proposal, and we ask that you provide a
written counter-proposal to enable us to then meet and negotiate.

Qualcomm reserves all rights.

Regards,

Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated

# Exhibit 100

```
                                          Page 1

1

2      IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF DELAWARE
3      C.A. No. 24-490-MN
       ----------------------------------------x
4      QUALCOMM INCORPORATED, a Delaware
       corporation, QUALCOMM TECHNOLOGIES, INC.,
5      a Delaware corporation,
6                            Plaintiffs,
7           - against -
8      ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K.
       corporation
9
                             Defendant.
10
       ----------------------------------------x
11
                         June 30, 2025
12                       9:03 a.m.
13
14                    *CONFIDENTIAL*
15
16         VIDEOTAPED DEPOSITION of SPENCER
17     COLLINS, held at the offices of PAUL WEISS
18     RIFKIND WHARTON & GARRISON, LLP, located at
19     1285 Avenue of the Americas, New York, New
20     York 10019, before Anthony Giarro, a
21     Registered Professional Reporter, a Certified
22     Realtime Reporter and a Notary Public of the
23     State of New York.
24
25
```

Page 74

```
1         SPENCER COLLINS -- CONFIDENTIAL
2   early as the answer in the original
3   lawsuit between these parties, there is
4   an allegation of breach of the Qualcomm
5   ALA; is that right?
6       A       Can you repeat that, please?
7       Q       You recall that as early as
8   the answer in the prior litigation, there
9   were allegations of breach of the
10  Qualcomm ALA; is that right?
11      A       I do loosely recall that.
12      Q       And again, those pleadings,
13  that answer would have been something
14  that you approved for filing?
15      A       Yes. I would have signed
16  off on the document.
17      Q       Did you ask your lawyers to
18  draft this October 22nd, 2024 letter?
19      A       It was agreed with my --
20  this topic was discussed with my outside
21  counsel and my team. And we decided that
22  the appropriate thing to do was to have
23  this letter drafted and, indeed, sent to
24  Qualcomm because we wanted to give
25  Qualcomm formal notification of the
```

Page 75

```
1         SPENCER COLLINS -- CONFIDENTIAL
2   breach, such that they had the
3   opportunity to cure the breach.
4       Q       Why at this time was it
5   appropriate?
6       A       We had tried via numerous
7   avenues to stop Qualcomm from breaching
8   our agreement. So we sent letters. That
9   didn't work. We were then left with no
10  choice but to issue a claim, which we've
11  never done in our 35-year history, to a
12  customer of ours. Then we asked for
13  certification of their adherence to the
14  termination provisions. We believed they
15  continued to be breached.
16          Nothing was working. We
17  were approaching trial. This was sent on
18  the 22nd of October 2024. We were
19  approaching trial. And nothing was
20  working. This was not about money for
21  us. This was about respecting our
22  contracts and protecting our IP. We
23  wanted -- our ultimate goal in this
24  dispute was for Qualcomm to remedy the
25  breach. We decided between me, my team
```

Page 76

```
1         SPENCER COLLINS -- CONFIDENTIAL
2   and outside counsel that the appropriate
3   thing to do is to send a formal
4   notification of material breach, as
5   provided for under the contract, such
6   that they were formally on notice to cure
7   their breach.
8       Q       And this only occurred to
9   you to do this 60 days before the trial
10  when you had known for years, or you had
11  thought for years that the Qualcomm ALA
12  was being breached; right?
13      A       I wouldn't characterize it
14  that way.
15      Q       Well, you just testified
16  that the answer contended that the
17  Qualcomm ALA was in breach.
18      A       Mm-hmm.
19      Q       And that was filed years
20  before this letter went out; right?
21      A       Mm-hmm.
22      Q       And so then suddenly in
23  October of 2024, you wake up and decide
24  this is the right time to send this
25  letter; right?
```

Page 77

```
1         SPENCER COLLINS -- CONFIDENTIAL
2       A       As I said, we were
3   approaching trial. We were hopeful that
4   a long, serving and trusted partner in
5   the form of Qualcomm would cure their
6   breach from when we issued a claim,
7   actually when we first did it in the
8   first letter back in 2022. Sadly, they
9   did not cure the breach. We were hoping
10  that over time, they would cure the
11  breach and respect our contracts.
12          Unfortunately, they
13  continued to refuse to do that. So we
14  were left with no option, other than to
15  comply with the contract and follow the
16  procedure in the contract. ████████████
17  ██████████████████████████████████
18  ███████████████████████████████
19  ██████████████████████████████
20  ████████████████████████
21  ██████████████████████
22  ███████████████████████████████████
23  █████████████████████████
24  ██████████████ We felt, given we're
25  approaching trial and we were making no
```

Page 78

SPENCER COLLINS -- CONFIDENTIAL

1        SPENCER COLLINS -- CONFIDENTIAL
2    progress with Qualcomm, that was the
3    appropriate thing to do.
4        Q    So the fact that trial was
5    looming was a factor in sending this
6    letter; correct?
7        A    Yes.
8        Q    And so it was intentional
9    that you had the ████████████
████████████████████████████████████
████████████████████
12       A    We were aware of the fact
13   that the ████████████ would expire at or
14   around the conclusion of the trial.  That
15   is correct.  What we wanted was to have
16   optionality in terms of remedy.
17       Q    So you wanted to have the
18   ability to terminate the Qualcomm ALA as
19   soon as the jury came back if, in fact,
20   you had won the trial in December; is
21   that fair?
22       A    We hadn't decided as to
23   whether or not we would terminate the
24   ALA.  But we wanted the option.  We
25   wanted to be in business with customers

Page 79

1        SPENCER COLLINS -- CONFIDENTIAL
2    that respect our contracts.
3        Q    Did you know at the time
4    that you sent this letter that the
5    Snapdragon Summit, the Qualcomm's
6    Snapdragon Summit was in progress?
7        A    I don't know at what point I
8    became aware of the fact that it was a
9    conference.  I think you called it
10   Snapdragon conference.  I don't recall at
11   what point, I became aware.  But I was
12   aware that -- I was made aware that there
13   was a conference.
14       Q    Before you sent the letter?
15       A    I don't recall the specific
16   timing of that.
17       Q    How about before the letter
18   was leaked?  Did you know that the
19   Snapdragon conference was in progress
20   when you leaked the letter?
21            MR. LoCASCIO:  Object to
22   form.
23       A    I'm not aware of the letter
24   being leaked.  You just insinuated that
25   we -- I assume you mean ARM -- leaked the

Page 80

1        SPENCER COLLINS -- CONFIDENTIAL
2    letter.  We did not.  And I don't recall
3    the exact time I became aware of the
4    Snapdragon conference.
5            But what I can tell you is,
6    the ████████████ coincided with the
7    trial date from our standpoint as opposed
8    to the Snapdragon conference.
9        Q    You do not dispute, do you,
10   that Paul Kranhold, who is at FGS Global,
11   and Kenneth Siegel, who is a director at
12   SoftBank and also a Morrison & Foerster
13   partner, discussed this letter, the
14   October 22nd letter that we've been
15   talking about with Ian King at Bloomberg,
16   do you?
17       A    I am aware that they had a
18   conversation around the sending of a
19   material breach notice.  I don't know
20   what detail was discussed in terms of
21   letter.
22       Q    Was anyone from ARM in that
23   conversation?
24       A    Not to my understanding.
25       Q    And you didn't get a report

Page 81

1        SPENCER COLLINS -- CONFIDENTIAL
2    back on what was said?
3        A    No.
4        Q    Did you talk to Mr. Kranhold
5    or Mr. Siegel in advance of their
6    conversation with Bloomberg about the
7    fact that they were going to have a
8    conversation with Bloomberg?
9        A    I spoke with Mr. Siegel.  I
10   don't recall whether I spoke with Paul
11   Kranhold.  I don't know.  But I do
12   remember speaking to Ken Siegel.
13       Q    So did you authorize
14   Mr. Siegel to speak to Ian King at
15   Bloomberg?
16       A    I did.
17       Q    And you're aware that the
18   Bloomberg article says that Ian King was
19   shown a document; correct?
20       A    I have subsequently seen
21   that in the article that came out.  I
22   don't know whether he was or not; wasn't
23   on the call.
24       Q    And you don't have any
25   information as to what that document may

21 (Pages 78 - 81)

Page 82

SPENCER COLLINS -- CONFIDENTIAL

1 be, do you?
2 A    Sorry.  Could you repeat
3 that?
4 Q    Do you have any information
5 as to what document Mr. King was shown,
6 if any?
7 A    No.  I wasn't on the call.
8 Q    So how do you know it wasn't
9 the October 22nd letter?
10 A    I don't know whether it was
11 or whether it wasn't.
12 Q    But previously, you
13 testified that the letter was not leaked.
14        And so you don't actually
15 know -- is that fair? -- whether the
16 letter was leaked?
17 A    Sorry to cut you off.  It
18 certainly was not leaked by ARM.  I think
19 your question insinuated that ARM leaked
20 it.
21 Q    It could be that your
22 lawyers leaked it; right?
23 A    They may have; they may not.
24 I don't know.

Page 83

SPENCER COLLINS -- CONFIDENTIAL

1 Q    And FGS Global, that's your
2 like PR communications company; right?
3 A    It is a PR firm that we
4 engaged, at or around this time.
5 Q    So your PR firm could have
6 leaked it; Mr. Kranhold could have leaked
7 it; right?
8 A    They may have; they may not.
9 Again, I wasn't on the call.
10 Q    And you've never asked them
11 whether they did that?
12 A    I never asked them whether
13 they showed or leaked the letter.
14 Q    Why not?  We have an entire
15 lawsuit centered around this leak.  You
16 never asked whether or not that happened.
17        MR. LoCASCIO:  Object to
18 form.  This is a different question
19 than the last question, Catherine.
20 So the question, as it stands,
21 conversations you had with counsel in
22 the matter, I'm going to instruct you
23 not to answer.  The question before
24 was, the two individuals, if you

Page 84

SPENCER COLLINS -- CONFIDENTIAL

1 asked them.  And so that question,
2 I'll let you answer.
3        MS. NYARADY:  Say that one
4 more time.  I want to understand the
5 distinction you're drawing.
6        MR. LoCASCIO:  I think your
7 question first was, did you ask
8 Mr. Siegel or Mr. Kranhold?  Then I
9 think your question was, did you ever
10 ask anyone?  The latter question, I'm
11 going to instruct him not to answer.
12        MS. NYARADY:  Thank you for
13 that.
14        MR. LoCASCIO:  Sure.
15 Q    Let's start with
16 Mr. Kranhold and Mr. Siegel.
17        Did you at any point in time
18 ask either of those two gentlemen whether
19 or not they showed Ian King at Bloomberg
20 the October 22nd, 2024 letter?
21 A    No.
22 Q    Have you asked anyone
23 whether or not the October 22nd letter
24 was shown to Ian King at Bloomberg in

Page 85

SPENCER COLLINS -- CONFIDENTIAL

1 advance of his article?
2        MR. LoCASCIO:  To the extent
3 you had conversations with counsel
4 about this topic, I'm going to
5 instruct the witness not to answer.
6 A    On that basis, I'm unable to
7 answer that.
8 Q    As you sit here today,
9 though, you do not know whether the
10 letter was shown to Mr. King; is that
11 correct?
12 A    That is correct.
13 Q    Why did you authorize
14 Mr. Siegel and Mr. Kranhold to speak with
15 Bloomberg about a communication that you
16 had with Qualcomm?
17 A    We were aware that
18 throughout the trial, Qualcomm -- we had
19 strong reason to believe that Qualcomm
20 had leaked various stories or placed
21 various stories in the press relating to
22 this litigation.  So therefore, there was
23 a possibility from our standpoint, they
24 would do something similar here.

22 (Pages 82 - 85)

# Exhibit 101

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
                Case No.  24-490-MN
 3      QUALCOMM INCORPORATED a Delaware corporation, )
        QUALCOMM TECHNOLOGIES, INC., a Delaware       )
 4      corporation,                                  )
                                                      )
 5         Plaintiffs,                                )
                                                      )
 6         vs.                                        )
                                                      )
 7      ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.      )
        corporation,                                  )
 8                                                    )
           Defendant.                                 )
 9      _____)
10      CONFIDENTIAL ATTORNEYS EYES ONLY VIDEOTAPED DEPOSITION
11                        OF AMI BADANI
12                    Palo Alto, California
13                    Friday, August 1, 2025
14
15
16            REPORTED BY: Derek L. Hoagland
17                    CSR No. 13445
18
19
20
21
22
23
24
25
```

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 38

1    THE DEPONENT:  Yes.
2  BY MS. DUNN:
3  Q.    Okay.  And you just testified that you had some
4  conversation where you became aware or where the
5  decision was made to place this story.  Who was that
6  conversation with?
7  A.    Our legal team.
8  Q.    Okay.  And when you say "our legal team," who
9  specifically do you mean?
10  A.    Spencer.
11  Q.    Okay.  Mr. Collins?
12  A.    That's right.
13  Q.    And what do you recall about that conversation?
14    MR. EMERICK:  And I will caution you not to
15  reveal the contents of any attorney-client communication
16  here that gives or receives legal advice, but if you
17  exchanged certain facts outside of that context or if
18  you got a directive, then you can testify as to that.
19    THE DEPONENT:  Okay.  To my recollection,
20  Spencer and I had a conversation about the letter and --
21  and how we wanted to inform our customers and partners
22  using a media outlet.
23  BY MS. DUNN:
24  Q.    Okay.  And tell me everything that you remember
25  about that conversation.

Page 39

1    MR. EMERICK:  Same instruction.
2    THE DEPONENT:  That -- that's what I remember
3  about that conversation.
4  BY MS. DUNN:
5  Q.    Okay.  And was it in that conversation that you
6  and Mr. Collins decided that the way you wanted to
7  inform people about ARM sending this letter to Qualcomm
8  was to place this story in Bloomberg?
9  A.    Yes we wanted to inform customers and partners,
10  and we thought that using a media story would be the
11  best tactic at that time.
12  Q.    Okay.  And the -- the decision to use the tactic
13  of placing this story in Bloomberg was your decision and
14  Mr. Collins' decision together?
15  A.    Yes.
16  Q.    Okay.  And -- and who took responsibility for
17  implementing the tactic of placing this story in
18  Bloomberg?
19    MR. EMERICK:  Objection.  Form.
20    THE DEPONENT:  Implementing as it relates to?
21  How would you describe implementing?
22  BY MS. DUNN:
23  Q.    So you and Mr. Collins decide, okay, we're going
24  to place this story about the ▮▮▮▮▮ to Qualcomm
25  in Bloomberg.  What happens next?

Page 40

1  A.    Someone out -- someone does an outreach to --
2  well, we decide who the reporter is, and then someone
3  reaches out to that reporter.
4  Q.    Okay.  And how did you decide that the reporter
5  was going to be Ian King of Bloomberg?
6  A.    I made that decision based on Ian's knowledge of
7  the business.
8  Q.    Okay.  And you know Paul Kranhold of FGS?
9  A.    I do.
10  Q.    Okay.  And he was part of the FGS relationship,
11  reporting up to you in this circumstance?
12  A.    Yes, I believe so.
13  Q.    Okay.
14  A.    I don't know all the dynamics of the FGS team,
15  but I believe that's sort of how it works.
16  Q.    Mr. Kranhold has already testified in
17  this litigation that FGS showed Ian King the notice
18  letter on a call on October 22nd, 2024.
19    Are you aware of that?
20  A.    I was not aware.
21  Q.    Okay.  Now, so there's already -- given that and
22  other evidence in this case, there's substantial
23  evidence that -- that when Bloomberg writes, "According
24  to a document seen by Bloomberg, they're -- that's
25  talking about the notice letter.  Do you have any reason

Page 41

1  to believe that that's not true?
2    MR. EMERICK:  Objection.  Form.
3    THE DEPONENT:  I was not involved.  You would
4  have to ask Paul.
5    MS. DUNN:  Okay.  So we did ask Paul, and he
6  said that they showed Bloomberg the notice letter.  And
7  FGS reports to you, so I just wanted to make sure that
8  you have no knowledge to the contrary that this
9  Bloomberg article is not referring specifically to the
10  notice letter.
11    MR. EMERICK:  Objection.  Form.
12    THE DEPONENT:  To my knowledge, we -- we spoke
13  briefly.  It was mainly the conversation between Spencer
14  and Paul.  Those two were speaking often and regularly,
15  but I wasn't involved with Paul directly on this matter.
16  BY MS. DUNN:
17  Q.    Okay.  So let me unpack that.
18    So you have already testified that you and
19  Mr. Collins talked about the strategy of placing this
20  article in Bloomberg, and then you testified that you
21  were the one to select Mr. King.  And I think you just
22  said that you and Mr. Collins then spoke to Mr. Kranhold
23  of FGS.  Do I have that right?
24    MR. EMERICK:  Objection.  Form.
25    THE DEPONENT:  I don't remember if we both spoke

11 (Pages 38 - 41)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 42

1  to Paul or if it was just Spencer directly.
2  BY MS. DUNN:
3  Q.    Okay.  And what do you know about Mr. Collins
4  and perhaps also your conversation with Mr. Kranhold?
5  A.    I just remember us having a conversation about
6  the fact that we wanted to inform customers and partners
7  of the letter that was served to Qualcomm.
8  Q.    Okay.  And what do you remember was told to
9  Mr. Kranhold about -- about how to execute the tactic in
10  Bloomberg?
11      MR. EMERICK: Objection. Form.
12      THE DEPONENT: All I remember was we discussed
13  making sure Ian is informed of the facts of why we
14  served the notice.
15  BY MS. DUNN:
16  Q.    Okay.  And did you know that FGS was going to
17  show Mr. King the notice letter?
18  A.    No.  Until you just told me, I wasn't even aware
19  that the letter was shown.
20  Q.    Okay.  Now that you know that it was, is that
21  something that you should have approved?
22      MR. EMERICK: Objection. Form.
23      THE DEPONENT: Not necessarily.  We trust our
24  media partners to do the right thing.
25  BY MS. DUNN:

Page 43

1  Q.    Okay.  So -- so if -- your testimony is that if
2  FGS showed Mr. King the notice letter, as Mr. Kranhold
3  has testified, that wouldn't concern you because you
4  trust your vendors, in this case FGS, to do the right
5  thing?
6      MR. EMERICK: Objection. Form.
7      THE DEPONENT: That's right.
8  BY MS. DUNN:
9  Q.    Okay.  And if Mr. Collins was aware that
10  Mr. Kranhold was going to show Mr. King the notice
11  letter, he -- Mr. Collins never let you know that?
12  A.    Yes.
13  Q.    All right.  Now, are you aware that the terms of
14  the Qualcomm ALA are confidential and cannot be
15  disclosed?
16      MR. EMERICK: Objection. Form.
17      THE DEPONENT: I am not aware.
18  BY MS. DUNN:
19  Q.    Okay.  So the first time you would have heard
20  that the terms of Qualcomm's ALA are confidential is
21  right now when I'm telling you this, right?
22      MR. EMERICK: Objection. Form.
23      THE DEPONENT: That's right.
24  BY MS. DUNN:
25  Q.    Okay.  So when you and Mr. Collins spoke about

Page 44

1  talking to Bloomberg about the notice letter and about
2  the ████ he didn't tell you that the Qualcomm ALA,
3  including the ████████████, are confidential?
4  A.    Not to my knowledge.
5  Q.    Okay.  This is the first time you're learning
6  that?
7  A.    That's right.
8  Q.    Okay.  All right.  And so as head of marketing
9  and communications at ARM, you are unaware of ARM's
10  confidentiality -- confidentiality obligations under its
11  ALAs?
12  A.    We make sure our partners and customers
13  information is always confidential, but in terms of
14  particulars of certain contracts, I don't know what's
15  specifically in those contracts.
16  Q.    Okay.  So when you talked to -- strike that.
17      So as head of marketing and communications at
18  ARM, when you oversaw FGS reaching out to Mr. King about
19  the notice letter, you were unaware that the Qualcomm
20  ALA prohibits any of its terms being disclosed,
21  including the ████████████?
22      MR. EMERICK: Objection. Form.
23      THE DEPONENT: Repeat the question.
24  BY MS. DUNN:
25  Q.    As head of marketing and communications at ARM,

Page 45

1  when you oversaw FGS reaching out to Bloomberg about the
2  notice letter, you were unaware that the Qualcomm ALA
3  prohibits any of its terms being disclosed, including
4  the ████████████?
5      MR. EMERICK: Objection. Form.
6      THE DEPONENT: I don't know any of the specifics
7  of the contracts or the details of the language in any
8  of our ALA contracts.
9  BY MS. DUNN:
10  Q.    Okay.  But -- so having no knowledge of any
11  details of the contracts, including no knowledge of the
12  confidentiality provisions, you went ahead and
13  authorized FGS to -- to disclose the fact of the notice
14  letter to Bloomberg?
15      MR. EMERICK: Objection. Form.
16  BY MS. DUNN:
17  Q.    Correct?
18  A.    I always have the legal team involved in any of
19  these conversations, so you would have to ask the legal
20  team in terms of our confidentiality provisions, and
21  they were on phone calls with us, around advising around
22  specifically this article.
23  Q.    Okay.  And on any phone call that you were on
24  with FGS and the legal team advising about specifically
25  this article, do you recall anybody at any time raising

12 (Pages 42 - 45)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 46

1 the confidentiality obligations under the Qualcomm ARM
2 ALA?
3      MR. EMERICK: Objection. Form.
4      THE DEPONENT: I don't recall.
5 BY MS. DUNN:
6 Q.    Okay. And you are -- you testified that you
7 were on many phone calls with the legal team and -- and
8 FGS specifically with respect to this article. What do
9 you recall being said on those many phone calls that you
10 attended?
11      MR. EMERICK: Objection. Form.
12 Mischaracterizes.
13      THE DEPONENT: I said that I was on calls with
14 our legal team around our media strategy. Whether FGS
15 was involved in those calls or not, I don't remember.
16 BY MS. DUNN:
17 Q.    Okay. So far, the only call you have told us
18 about with respect to the media strategy and this
19 article was the one call you have had with Mr. Collins.
20 What other calls do you remember having with the legal
21 team about this article?
22 A.    There were ongoing conversations with the legal
23 team around how we should respond to inbound requests
24 from reporters post the article going live.
25 Q.    Okay. Now, earlier you said that you trust

Page 47

1 the -- the communications firms working for you, like
2 FGS, to do the right thing. As the person who
3 supervise -- supervises those firms as being -- as ARM's
4 agents, do you ever train them on their confidentiality
5 obligations under ARM's contracts?
6      MR. EMERICK: Objection. Form.
7      THE DEPONENT: Confidentiality provisions, what
8 do you mean train them on that? Just...
9 BY MS. DUNN:
10 Q.    Yeah. So as the person who is responsible at
11 ARM for what the consulting firms like FGS are doing on
12 ARM's behalf, do you ever train them on their
13 confidentiality obligations under ARM's contracts?
14      MR. EMERICK: Objection. Form.
15      THE DEPONENT: They know to keep confidential
16 matters confidential.
17 BY MS. DUNN:
18 Q.    Okay. And specifically in this instance, how is
19 FGS going to know to keep confidential contract terms
20 confidential if no one had ever told them that they were
21 confidential and the person who supervised them has
22 never seen the contract?
23      MR. EMERICK: Objection. Form.
24      THE DEPONENT: You would have to ask our legal
25 team.

Page 48

1 BY MS. DUNN:
2 Q.    Okay. So if FGS disclosed confidential
3 information in violation of ARM's own contract, that
4 would be the responsibility of the legal team, not of
5 you?
6      MR. EMERICK: Objection. Form.
7      THE DEPONENT: That's right. I mean, I don't
8 know all of our confidentiality provisions in our
9 contracts in particular. That would be up to the legal
10 team.
11 BY MS. DUNN:
12 Q.    Okay. All right. Now, why did you not speak to
13 Mr. King about the October 22nd letter yourself?
14 A.    It's based on who has relationships.
15 Q.    Okay. And here the people who spoke to --
16 strike that.
17      You're the one who selected Mr. King, but the
18 two people who spoke to him were Mr. Siegel, a lawyer at
19 the law firm Morrison & Foerster, and Mr. Kranhold. Why
20 was it decided that Mr. Siegel and Mr. Kranhold were
21 better to talk to Mr. King than you would be?
22      MR. EMERICK: Objection. Form.
23      THE DEPONENT: It's based on who has the right
24 relationships with the media.
25 ///

Page 49

1 BY MS. DUNN:
2 Q.    Okay. And who had the relationship in this
3 circumstance?
4 A.    To my recollection, it was Paul.
5 Q.    Okay. Now, you were aware before you made the
6 decision to publicize the notice letter that publicizing
7 the possibility of terminating the Qualcomm ALA could
8 harm Qualcomm's business, right?
9      MR. EMERICK: Objection. Objection. Form.
10      THE DEPONENT: That the -- the point of the
11 media article was to inform our customers and partners
12 that we had served Qualcomm a notice of breach.
13      MS. DUNN: Move to strike as nonresponsive.
14 BY MS. DUNN:
15 Q.    My question is --
16      MR. EMERICK: Motion opposed.
17 BY MS. DUNN:
18 Q.    Whether you were -- my question is whether you
19 were aware that publicizing the possibility of
20 terminating the Qualcomm ALA could hurt -- could hurt
21 Qualcomm's business.
22      MR. EMERICK: Objection. Form.
23      THE DEPONENT: To my knowledge, we -- our goal
24 was to make sure that our customers and partners were
25 informed, and that was our singular goal.

13 (Pages 46 - 49)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 106

1 ███████████████████████████████

███████████████████

4  Q.    Okay.  And who participates in the conversation
5  you're referring to?
6  A.    Richard G. makes that decision.
7  Q.    Okay.  But who -- when you're talking about
8  ongoing discussions, who are the participants in those
9  discussions?
10 A.    I don't recall.  But I'm sure Richard G. is
11 involved.
12 Q.    Okay.  And at what point would you get involved?
13 A.    █████████████████████████████

██████████████████████████████████

15 Q.    Okay.  But if ARM had spoken to certain
16 customers ████████████████  you might not necessarily
17 know about that?
18 A.    That's right.
19 Q.    Okay.
20     MS. DUNN:  All right.  Let's show Ms. Badani, I
21 guess -- what is it?  7?
22     MS. HARTLEY:  6.
23     MS. DUNN:  Oh, okay.  Let's show Ms. Badani
24 Badani 6.
25     (Exhibit No. 6 marked for identification.)

Page 107

1 BY MS. DUNN:
2  Q.    Okay.  So, Ms. Badani, this is an email thread
3  between you, Ms. Al-Qattan from FGS, Mr. Collins and
4  others from ARM, continuing to discuss media strategy
5  with respect to the notice letter.  And if you look at
6  the last page of the document, you can see that this
7  chain starts with Mr. Collins, the company's chief legal
8  officer circulating a Financial Times story by
9  Richard Waters.
10     Do you see that?
11 A.    Yes.
12 Q.    And do you recall that Mr. Haas had spoken to
13 the Financial Times before this piece came out?
14 A.    Vaguely.
15 Q.    Okay.  You vaguely recall that Mr. Waters was
16 one of the reporters who Mr. Haas talked to after the
17 Bloomberg story came out, correct?
18 A.    I don't remember the timing, but I know that
19 Rene and Mr. Waters have spoken in the past.
20 Q.    And do you see in -- if you look, you see
21 where Mr. Collins circulates the FT piece on the page
22 marked 984 at the bottom?
23     Do you see that?
24 A.    Yes.
25 Q.    Okay.  And you see a paragraph near the top, the

Page 108

1 second down from the top, it says:
2     "The twist this week came as Qualcomm unveiled
3 its first well-received smartphone chip based on Nuvia's
4 technology, as well as its use of the technology in
5 cars."
6     Do you see that?
7  A.    Yes, I see that line.
8  Q.    And that is referring to, when it says "Qualcomm
9 unveiled, it's talking about the Snapdragon Summit that
10 Qualcomm has every year.  You -- you know that, right?
11     MR. EMERICK:  Objection to form.
12     THE DEPONENT:  You have to ask Richard Waters
13 what he meant by that statement.
14 BY MS. DUNN:
15 Q.    Okay.  You're unaware that Qualcomm has a huge
16 event every year called the Snapdragon event where it
17 unveils new products?
18     MR. EMERICK:  Objection to form.
19     THE DEPONENT:  I am aware they have an annual
20 event, yes.
21 BY MS. DUNN:
22 Q.    Okay.  Mr. Waters' article goes on to say:
23     "ARM's response a day later was stunning in its
24 severity."
25     Do you see that?

Page 109

1  A.    Yes.
2  Q.    And would you agree with Mr. Waters' assessment
3 that ARM's response with the notice letter was stunning
4 in its severity?
5  A.    You would have to ask Mr. Waters.
6  Q.    I'm asking whether you agree with Mr. Waters.
7  A.    I don't have context around what he means by
8 severity and stunning, so it's a lot of words.
9  Q.    Yeah.  Just to be clear, I am not asking what he
10 means.  I'm asking whether you agree with it.
11     MR. EMERICK:  Objection.  Form.
12     THE DEPONENT:  I'm not going to comment on
13 stunning in its severity.  Yes, we did respond with the
14 letter, as we discussed earlier.
15 BY MS. DUNN:
16 Q.    And do you see he issued official notice, plans
17 to cancel a key to Qualcomm in 60 days time, cutting off
18 that company's ability to ship chips based on anything
19 other than ARM design cores?
20     Do you see that?
21 A.    Yes.
22 Q.    Okay.  And if you look at the next email in the
23 chain, which is again from Mr. Collins, he is responding
24 to this article from the FT, and he says:
25     "It makes the point that Qualcomm has more to

28 (Pages 106 - 109)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 110

1 lose than ARM, but it's otherwise neutral."
2     Do you see that?
3  A.   Yes.
4  Q.   Right.  So you see that Mr. Collins responds to
5 this article that talked about ARM's plans to cancel a
6 key license to Qualcomm in 60 days as that the article
7 is neutral.  You see that?
8  A.   That's what -- that's what Spencer is saying
9 here, yes.
10  Q.   Right.  And Mr. Collins goes on to say:
11    "We need something stronger out there, in my
12 opinion."
13    Do you see that?
14  A.   Yes.
15  Q.   And when Mr. Collins wrote to you and others,
16 including Ms. Al-Qattan at FGS and other members of the
17 communications team and Mr. Haas, that we need something
18 stronger out there, what did you take him to mean by
19 something stronger?
20    MR. EMERICK:  Objection to form.
21    THE DEPONENT:  I don't know.  You will have to
22 ask Spencer.
23 BY MS. DUNN:
24  Q.   Okay.  I'm not asking what he meant.  I'm asking
25 what you, a recipient of this email, understood him to

Page 111

1 mean.
2  A.   I don't recall.
3  Q.   Okay.  And sitting here today, what do you think
4 he meant?
5  A.   I don't know.  I would have to think through it.
6  Q.   Okay.  And you are unable to think through it
7 sitting here today under oath?
8  A.   Yes.  I mean, I -- I think he just said he
9 wanted something stronger.  So I'm not sure what that
10 means.  I would have to have a conversation with
11 Spencer.
12  Q.   Okay.  So your testimony is that in order to
13 understand what Mr. Spencer meant in an email that you
14 received, you would have to further talk to Mr. Spencer
15 to understand what you think he's saying?
16  A.   Yes.
17  Q.   Is there anything else that Mr. Spencer writes
18 in here that you could understand just simply by reading
19 the email, without having to have a conversation with
20 him?
21    MR. EMERICK:  Objection to form.
22    THE DEPONENT:  The Financial Times article.
23 BY MS. DUNN:
24  Q.   Okay.  So you can understand the Financial Times
25 article without an additional conversation with

Page 112

1 Mr. Collins, but you can't understand Mr. Collins' email
2 to you without talking to him on the phone?
3    MR. EMERICK:  Objection to form.
4    THE DEPONENT:  That's right.  The emails require
5 context.
6 BY MS. DUNN:
7  Q.   Okay.  So maybe the context of Ms. Catan's
8 response will help you understand what you took
9 Mr. Collins to mean.
10    So she responds, "We strive to achieve favorable
11 coverage, though we are past following our strong first
12 move.  So it is unlikely that any reputable publication
13 will write a new one-sided piece that only reflects our
14 perspective tomorrow, or generally, for that matter."
15    Does Ms. Al-Qattan's response help you
16 understand or help you formulate an answer as to what
17 you understand Mr. Collins to mean?
18  A.   I do not.
19  Q.   Okay.  And do you understand when Ms. Al-Qattan
20 says "our strong first move," do you have -- as a
21 recipient of this email, do you have an understanding
22 what she was talking about?
23  A.   I do not.  You would have to ask her.
24  Q.   Okay.  Now, in this email, we can tell that
25 Mr. Collins is circulating the piece from the Financial

Page 113

1 Times, and he's also directing additional communications
2 strategy.  What was Mr. Collins' role in overseeing the
3 communications strategy with respect to the notice
4 letter?
5  A.   I don't know the ins and outs of what Spencer
6 was specifically responsible for beyond serving up the
7 letter to Qualcomm.
8  Q.   Okay.  But you had previously testified that you
9 had numerous conversations with Mr. Collins about the
10 media strategy?
11  A.   That's right.
12  Q.   So can you explain what his role was in the
13 media's -- in dictating the media's strategy?
14  A.   We discussed the letter, the facts of the
15 letter, and we discussed our media strategy was to
16 inform customers and partners through the media and give
17 our perspective.  So that's all I can recollect from --
18 from my conversations with Spencer at the time.
19  Q.   And Mr. Collins here is, in part, directing FGS
20 and you that we need something stronger than this FT
21 piece.
22    Did -- was Mr. Collins involved in directing
23 media strategy during this time?
24  A.   Can you define directing?
25  Q.   However you would define it.

29 (Pages 110 - 113)

# Exhibit 102

```
                                                Page 1

 1

 2   IN THE UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF DELAWARE

 3   C.A. No. 24-490-MN

 4   ---------------------------------------x

 5   QUALCOMM INCORPORATED, a Delaware

 6   corporation, QUALCOMM TECHNOLOGIES, INC.,

 7   a Delaware corporation,

 8                    Plaintiffs,

 9   - against -

10   ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K.

11   corporation

12                    Defendant.

13   ---------------------------------------x

14                    July 4, 2025

15                     1:18 p.m.

16

17           *HIGHLY CONFIDENTIAL*

18                    VIDEOTAPED DEPOSITION of

19   KENNETH SIEGEL, held at the offices of PAUL

20   WEISS RIFKIND WHARTON & GARRISON, LLP, located

21   at 1285 Avenue of the Americas, New York, New

22   York 10019, before Danielle Grant, a Certified

23   Realtime Reporter and a Notary Public of the

24   State ofNew York.

25
```

Page 14

HIGHLY CONFIDENTIAL

1  yeah, draft communications regarding an
2  alleged breach of the Qualcomm ALA?
3       MR. WILCOX: I'm going to
4    instruct -- caution the witness that
5    you can answer to the extent it
6    doesn't reveal privileged
7    attorney-client communications
8    between Arm and Morrison & Foerster.
9       A   Yes. I think I saw, early in the
10 process when Qualcomm did not take -- did
11 not get the consent, did not negotiate a
12 consent for the Nvidia acquisition. I
13 think there were draft letters and letters
14 sent to Qualcomm alleging a breach. And I
15 think I saw drafts of those. I don't
16 believe I saw other communications alleging
17 a breach after that.
18      Q   And just to be clear if you
19 recall, the early letters, would those have
20 been alleging a breach of the Nuvia ALA or
21 the Qualcomm ALA?
22      MR. BIRNBAUM: I'm going to
23    object and ask counsel, which of the
24    agreed-upon topics is this relating

(renumbered — the above are lines 1-25)

Page 15

HIGHLY CONFIDENTIAL

1  to?
2       MS. NYARADY: This is
3    background.
4       MR. BIRNBAUM: A little leeway
5    here, but we're not going to get into
6    the general topping of the letters.
7    We're here to talk about the press
8    briefing as it relates to the
9    letters.
10      MS. NYARADY: I disagree. The
11 topics are broader than that, but...
12      MR. BIRNBAUM: The objection was
13    already made. There was a meet and
14    confer, and there was an email
15    following up from your firm
16    clarifying the topics for the
17    production. That's what we're going
18    to testify. We're not going to
19    reopen it to all the other topics
20    just because they were noticed.
21      MS. NYARADY: Okay. Well, we
22 noticed all of them. We have written
23 and had meet and confers saying that
24 we think the objections were

Page 16

HIGHLY CONFIDENTIAL

1  improper. You can instruct him not
2  to answer if you're not going to let
3  him answer, but I am not going to
4  agree not to ask my questions based
5  on the communications that the
6  parties have had. You know, you know
7  our positions to the objections.
8  So...
9       MR. BIRNBAUM: I do. And as
10 last stated you asked for the topics
11 related to the disclosure of the
12 press briefings, and he's here to
13 provide testimony on that today.
14      MS. NYARADY: I don't think
15 they're limited to that. But that's
16 okay. I take your point, and I think
17 you take my point. But...
18      MR. WILCOX: Before you answer,
19 I'm just going to give you the same
20 caution about you can answer the
21 question to the extent it doesn't
22 involve revealing attorney-client
23 communications that may have happened
24 between Morrison & Foerster and Arm.

Page 17

HIGHLY CONFIDENTIAL

1       THE WITNESS: Okay.
2       A   And what was the question.
3       Q   That's a good question.
4       You were talking about the --
5  seeing some early communications.
6       A   Correct.
7       Q   Between the parties.
8       And my question was just whether
9  you know if those communications were
10 alleging a breach of the Nuvia ALA or a
11 breach of the Qualcomm ALA, or both?
12      MR. WILCOX: I'll give you the
13    same caution.
14      A   I don't recall.
15      Q   Do you know when discussions
16 began about sending the letter that was
17 ultimately sent on October 22 alleging a
18 breach of the Qualcomm ALA?
19      MR. WILCOX: I'm going to
20    instruct the witness not to answer
21    that question. I think that does go
22    to privileged communications between
23    Morrison & Foerster and Arm.
24      Q   And you're going to follow that

Page 18

1        HIGHLY CONFIDENTIAL
2 instruction?
3    A   Yes.
4    Q   Do you know why the letter was
5 timed to be sent on October 22?
6    A   Arm determined to send it 60 days
7 before the end of the trial was my
8 understanding.  Yeah.
9    Q   Were you involved at all in the
10 process or approving the sending of this
11 letter?
12       MR. WILCOX:  That's a yes-or-no
13 answer just to be clear.
14    A   No.
15    Q   So you weren't a decision-maker
16 in terms of sending this letter?
17    A   No.
18    Q   Just to be clear.
19    A   I was not.
20    Q   Did you know that the letter was
21 sent in the middle of the Qualcomm
22 Snapdragon summit where Qualcomm has its
23 yearly big announcement of new products?
24       MR. BIRNBAUM:  Object to form.
25       You can answer.

Page 19

1        HIGHLY CONFIDENTIAL
2    A   I was aware that that conference
3 was going on at the same time.
4    Q   And you were aware before the
5 letter went out?
6    A   Yes, I was.
7    Q   And do you know if others at Arm
8 were aware of the timing issues?
9       MR. WILCOX:  And I'll instruct
10 you that you can answer only to the
11 extent that you're not revealing
12 attorney-client communications.
13       MR. BIRNBAUM:  And I'll just
14 object to the form.
15    A   I think everything I know is
16 privileged on that topic, would have been
17 part of a legal conversation I suspect.
18       MS. NYARADY:  And, Jason, you're
19 alleging privilege over whether
20 people knew that the conference was
21 going on?
22       MR. WILCOX:  The only way the
23 witness would know that if Morrison &
24 Foerster or Mr. Siegel is, at least
25 according to his answer, based on

Page 20

1        HIGHLY CONFIDENTIAL
2 privileged conversations he had in
3 his role as a lawyer.  If you wanted
4 to ask Arm witnesses that question,
5 they could, I think, answer that.
6 But I don't think you can get it
7 through Mr. Siegel.
8       MS. NYARADY:  So you're taking
9 the position that it must have been
10 communicated requesting legal advice?
11       MR. WILCOX:  That was the
12 caution I gave him, and he said the
13 only way he could to do it was by
14 revealing communications that were
15 purveying legal advice.
16       MS. NYARADY:  But the caution
17 you gave him was not to reveal
18 anything that involved a conversation
19 or communication, right, with
20 counsel.  That doesn't necessarily
21 make it privileged.
22       MR. WILCOX:  Okay.  How about
23 you ask the question again.  I'll
24 give an instruction that will be
25 clear what the bounds are, and then

Page 21

1        HIGHLY CONFIDENTIAL
2 we can see what his answer is.
3       MS. NYARADY:  Okay.
4    Q   Do you know if others at Arm were
5 aware that this letter was being sent
6 during the Qualcomm Snapdragon summit?
7       MR. WILCOX:  I'll instruct you
8 that you can answer only to the
9 extent that you're not revealing
10 attorney-client communications in the
11 context of Arm seeking legal advice
12 from Morrison & Foerster.
13       THE WITNESS:  So can you restate
14 your instruction to me again?
15       MR. WILCOX:  Yeah.  So you can
16 answer as long as answering the
17 question doesn't reveal conversations
18 you had in the context of providing
19 legal advice to Arm.
20    A   Yes.
21    Q   So the answer --
22    A   I'm aware that somebody -- I am
23 aware that someone else knew that, yes.
24    Q   Who at Arm are you aware of that
25 knew that this letter was being sent during

6 (Pages 18 - 21)

Page 58

HIGHLY CONFIDENTIAL

1
2    or screenshare?  Or -- I don't know
3    if you're talking about something
4    transmitted or not.  That's the only
5    reason I'm --
6        A    Either he showed it to him on the
7    screen, or he sent it to him.  I'm not sure
8    that he actually transmitted a copy in any
9    form to him.
10       Q    Okay.  Fair enough?
11       A    To Ian.
12       Q    Thanks for the clarification.
13       A    Yeah.
14       Q    And just to make sure I'm
15   understanding the course of events and that
16   we have a clean record, you didn't show or
17   share any document or portion of a document
18   to Mr. King at Bloomberg, did you?
19       A    Correct, I did not.
20       Q    Why -- do you know why Arm did
21   not join the briefing call?
22            MR. BIRNBAUM:  Objection to
23   form.
24       A    I don't.
25       Q    Do you recall any conversations

Page 59

HIGHLY CONFIDENTIAL

1
2    around whether or not -- and to start, you
3    can say yes or no.
4        But do you recall any
5    conversations around whether or not Arm
6    should join that call?
7        A    No.
8        Q    Have you had calls like this
9    before on behalf of her clients?
10       A    Yes.
11       Q    In those instances, would it be
12   common for the client in question to join
13   the briefing, or is that not typical?
14            MR. BIRNBAUM:  Object to form.
15       A    Not in my experience.
16       Q    So typically, they don't join?
17       A    Typically, they haven't joined.
18            MR. BIRNBAUM:  Object to form.
19       For the benefit of the court
20   reporter, so I don't speak over you,
21   take a beat.
22       A    In my experience, typically, they
23   have not joined.
24       Q    Now, you provided a copy of the
25   October 22 letter to Mr. Kranhold, knowing

Page 60

HIGHLY CONFIDENTIAL

1
2    that he may either share or send that
3    letter to Ian King at Bloomberg, right?
4        A    Correct.
5        Q    Were you authorized by Arm to do
6    that?
7        A    Yes.
8        Q    So Arm was aware that this letter
9    may be shared, and had authorized the
10   sharing of this letter with Mr. King at
11   Bloomberg?
12            MR. BIRNBAUM:  Object to form.
13       A    They had authorized providing it
14   to Paul for purposes of responding if the
15   reporter who is briefed needed to know that
16   it had actually been sent.  With the caveat
17   that they prefer not to have it be sent to
18   him.
19       Q    Do you know why they preferred
20   that it not be sent to him?
21       A    I think it was just a preference
22   to not, you know, have it out more than it
23   would otherwise be out.
24       Q    Okay, but they --
25       A    It wasn't -- I wasn't told

Page 61

HIGHLY CONFIDENTIAL

1
2    specifically, yeah.
3        Q    But Arm understood that this
4    letter would potentially be shown or
5    provided to Ian King at Bloomberg, correct?
6        A    Correct.
7            MR. BIRNBAUM:  Objection to
8    form.  Sorry.
9        Q    So on the second page of
10   Exhibit 9, this is, we're in the King
11   Bloomberg article.  I know you have been
12   saying that the letter was shared, and,
13   again, I don't mean to imply that it
14   absolutely was sent.
15       A    Yeah.
16       Q    In some form it was shared with
17   Bloomberg.
18       A    Mm-hmm.
19       Q    At the top of the second page, it
20   says, Arm confirmed that it sent the notice
21   in a statement Wednesday, and I believe --
22   well, you were saying that the document
23   that was -- that's referred to on page 1
24   was just for confirmation that it -- that
25   the letter had been sent, right?

16 (Pages 58 - 61)

Page 62

HIGHLY CONFIDENTIAL

1    HIGHLY CONFIDENTIAL
2        MR. BIRNBAUM:  Object to form.
3    Q   I know this is a terrible
4 question.  I'm not really making sense.
5    A   Yeah.
6    Q   But my point is, on the first
7 page, he says, I saw a document --
8    A   Right, yes.
9    Q   -- is how I'm reporting this.
10 Separately, on the second page, it says Arm
11 confirmed that it sent the notice in a
12 statement Wednesday.  So it seems like
13 there's a document that was shown, perhaps
14 for some purposes other than confirming
15 that it was sent, and then there was a
16 statement on Wednesday that it was sent.
17        Does that refresh your
18 recollection in any way of any --
19    A   No.
20    Q   -- other documents that may have
21 been shown to Bloomberg or timing of such?
22    A   No.  It was -- my recollection
23 is, it was -- it was either sent or made
24 visible on the screen to Ian to show that
25 it had been sent so he knew it had been

Page 63

HIGHLY CONFIDENTIAL

1 sent, and that this was not something that
2 could happen or might happen, but actually
3 was happening.  And that was the reason for
4 that step.  And I'm not sure what the
5 separate statement here that he may be
6 referring to would be.
7    Q   Okay.  And whenever that was sent
8 or shown, you weren't present, correct?
9    A   Correct.
10    Q   So you don't know which -- if it
11 was just a showing of the document, you
12 don't know which part of it was shown to
13 him, do you?
14    A   I don't.
15    Q   Do you recall how long the call
16 was that you had with Mr. King?
17    A   I think it was probably ten
18 minutes or 15 minutes, something like that.
19    Q   And it was just one call?
20    A   Just one call.
21    Q   Do you know -- well, strike that.
22        Did you see a draft of the
23 article before it came out?
24    A   No.

Page 64

HIGHLY CONFIDENTIAL

1    HIGHLY CONFIDENTIAL
2    Q   Do you know if anyone at Morrison
3 & Foerster did?
4    A   I'm not aware that anyone saw the
5 article.
6    Q   Are you aware of whether anyone
7 at FGS Global saw a draft of the article
8 before it came out?
9    A   I'm not aware of that.
10    Q   All right.  Can we take a quick
11 break?
12    A   Sure.
13        VIDEOGRAPHER:  We're going to go
14 off record.  The time is 2:39 p.m.
15 This concludes Media Unit Number 3.
16        (Whereupon, at 2:39 p.m., a recess
17        was taken to 3:01 p.m.)
18        (The proceeding resumed with all
19        parties present.)
20        VIDEOGRAPHER:  We're back on
21 record.  The time is 3:01 p.m., and
22 this is the start of Media Unit
23 Number 4.
24    Q   Do you recall when you first
25 reached out to Mr. Kranhold about the Arm

Page 65

HIGHLY CONFIDENTIAL

1    HIGHLY CONFIDENTIAL
2 matter?
3    A   I think it was in the middle of
4 October.
5    Q   So let me show you what's been
6 marked as MOFO 10.
7    A   Yeah.
8        (Whereupon, a Document,
9        Bates-stamped MOFO_ARMQC_00000004
10        was marked as MOFO Exhibit No. 10
11        for identification, as of this
12        date.)
13    Q   This is an email you sent on
14 Saturday, October 12.  The first email at
15 the bottom.  The Bates number is MOFO ARM
16 QC004 to 005.
17        And you're reaching out to
18 Mr. Kranhold and saying, Looking forward to
19 seeing you on the 24.  Have you got a
20 minute to catch up?
21        Do you know -- this was produced
22 by Morrison & Foerster in response to our
23 subpoena.  Do you know if this was a
24 reach-out in part regarding the Arm matter?
25    A   I believe it was.

25    A   No.

17 (Pages 62 - 65)

# Exhibit 103

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3      QUALCOMM INCORPORATED a Delaware corporation, ) Case No.

       QUALCOMM TECHNOLOGIES, INC., a Delaware       ) 24-490-MN

4      corporation,                                  )

                                                     )

5          Plaintiffs,                               )

                                                     )

6          vs.                                       )

                                                     )

7      ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.      )

       corporation,                                  )

8                                                    )

           Defendant.                                )

9      _____)

10     CONFIDENTIAL ATTORNEYS EYES ONLY VIDEOTAPED 30(b)(6) and

11            30(b)(1) DEPOSITION OF PAUL KRANHOLD

12                 San Francisco, California

13                 Thursday, July 17, 2025

14

15

16            REPORTED BY: Derek L. Hoagland

17                 CSR No. 13445

18

19

20

21

22

23

24

25

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 86

1      MS. NYARADY:  Okay.
2  BY MS. NYARADY:
3      Q.    And it has metadata from a call, and in the
4  metadata, you can see that Mr. Spicehandler is listed as
5  joining the call and leaving the call, and Mr. King
6  is -- is listed as joining and leaving the call, right?
7      A.    Mm-hmm.  Mm-hmm.
8      Q.    Is this the -- do you know if this is a record
9  of the call that Mr. Spicehandler had with Mr. King
10  where Mr. Spicehandler shared the October 22nd letter
11  with Mr. King?
12      A.    Yes.  It's a pretty good guess, but I don't know
13  specific -- this would be no reason -- other reason for
14  Ben to be having a -- is this a record of a video call?
15      Q.    I can't tell from the document.
16      A.    Okay.
17      Q.    I don't know.
18      A.    The only -- yeah.  The way that we create video
19  calls on our system, you -- you -- you would copy
20  yourself in order to put it on your calendar as a video
21  call, so I think it's a pretty good guess.  And the way
22  that Ben described it to me is a very short video call,
23  so I think that's a -- and given the timing, I think
24  that's a pretty good guess.
25      Q.    And it --

Page 87

1      A.    But I -- I haven't seen the document before, and
2  I haven't talked to Ben about -- about the specific time
3  of day that that happened, so.
4      Q.    Okay.  But on October 22nd, at some point in
5  time, Mr. Spicehandler had a call of some sort with
6  Mr. King where he showed Mr. King the October 22nd
7  letter as sent, correct?
8      A.    Yeah, I don't -- I don't -- it looks like the
9  call took place on October 22nd UTC, but this meeting
10  looks like it was scheduled on the 23rd, which doesn't
11  make any sense to me, because the email was sent on the
12  23rd for a meeting that had already taken place.
13      Q.    Right.  No.  My understanding was this was just
14  memorializing that the meeting had happened.  But I --
15  but, you know, if you haven't seen this, that's fine.
16      But putting aside this document, is it your
17  understanding that on October 22nd, before the article
18  came out, Mr. Spicehandler had a session with Mr. King
19  during which he showed Mr. King the October 22nd letter
20  that was sent from ARM to Qualcomm?
21      A.    Somewhere in this general timeframe, before the
22  article was published, he did just that.
23      Q.    Okay.  So it was after you and Mr. Siegel talked
24  to Mr. King, but before the article was published,
25  correct?

Page 88

1      A.    Correct.
2      Q.    Okay.  Do you know whether anyone was on that
3  call other than Mr. Spicehandler and Mr. King?
4      A.    I do not.
5      Q.    What did -- you said you spoke to
6  Mr. Spicehandler in preparation for this deposition,
7  right?
8      A.    Mm-hmm.
9      Q.    Yes?
10      A.    Yes.  I'm sorry.
11      Q.    What -- what did he tell you?
12      A.    He confirmed for me that he had, in fact, done
13  what I asked him to do, which was to initiate a
14  communication with Ian King where he would show him a
15  screenshot of the letter that we're talking about.
16      Q.    Did he show him the entire letter?  I believe
17  there's a front and a back.  I just -- that's what I'm
18  getting at.
19      A.    I don't know.
20      Q.    Did he show him both sides?
21      A.    I don't know.
22      Q.    Do you have any more information on what
23  Mr. Spicehandler showed Mr. King?
24      A.    He said that's all he did when I spoke to him
25  about it.

Page 89

1      Q.    So he said that he showed him a screenshot of
2  the letter, of the October 22nd letter?
3      A.    Yes.
4      Q.    Okay.  Did he say that -- if he showed him any
5  other documents on this call?
6      A.    He did not.
7      Q.    He did not show him any other documents or he
8  did not say?
9      A.    He did not say.  I'm sorry.
10      Q.    Okay.  That's my fault.  Bad question.
11      You understand that the Bloomberg article, when
12  it published, said that Mr. King said that he had seen a
13  document.  Is it your understanding that the document he
14  was referring to is the actual October 22nd letter?
15      A.    Yes.
16      Q.    Did you get a draft of the article before
17  publication?
18      A.    No.
19      Q.    Were you able to propose any changes to the
20  article before publication?
21      A.    No.
22      Q.    Did Mr. Spicehandler tell you whether there was
23  any discussion between him and Mr. King regarding the
24  substance of the letter?
25      A.    No.  As I Recall, Ben said it was a pretty quick

23 (Pages 86 - 89)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 106

1    (Exhibit No. 13 marked for identification.)
2    MS. NYARADY:  Oops.  Which is Bates numbered
3  ARMQC_2770408 to 409.  This is an email chain that is
4  tracking -- if you go to the -- the bottom, the first
5  email, it looks like you're emailing Mr. Hughes, the
6  head of communications, right, at the time, at ARM,
7  forwarding a Bloomberg news article where -- it says
8  regarding the ARM chief, Haas.
9  BY MS. NYARADY:
10    Q.    That's Mr. Rene Haas, who is the CEO of ARM,
11  right?
12    A.    Yes.
13    Q.    So your -- your group is actively tracking press
14  regarding ARM and the ARM-Qualcomm dispute.  Is that
15  accurate?
16    A.    Yes.
17    Q.    Okay.  And you're forwarding this to Mr. Hughes
18  and you say:
19    "Not much news coming out of London event,
20  apparently.  Did they ask him about Qualcomm
21  litigation?"
22    Why are you asking Mr. Hughes about whether or
23  not Mr. Haas was asked about the Qualcomm litigation?
24    A.    Well, number one, it's one of the highest
25  profile things going at the company.

Page 107

1    Number two, I believe I -- me or Ben -- I don't
2  know what time stamp this is, what time zone this is,
3  but there's a high likelihood that we have already
4  engaged with Ian King of Bloomberg at this time.  So I
5  think I was curious as to whether or not Ian had honored
6  his agreement not to share this widely within Bloomberg.
7  And evidence that he had not would have been if one of
8  his peers in London had asked Rene about the litigation
9  or potentially even the termination notice at this
10  Bloomberg event that Rene was apparently at.
11    Q.    At the very top, there's a final email from
12  someone named Eliza Walsh to you.
13    Do you see that?
14    A.    Mm-hmm.
15    Q.    Who is Eliza Walsh?
16    A.    She's a member of Phil Hughes -- well, was a
17  member of Phil Hughes' PR team at ARM.
18    Q.    Do you know if she's still at ARM?
19    A.    I don't.  Phil is not.
20    Q.    Right.
21    A.    But Eliza could be.
22    MS. NYARADY:  I'm going to hand you what has
23  been marked FGS 14.
24    (Exhibit No. 14 marked for identification.)
25    MS. NYARADY:  This is an email.  The Bates

Page 108

1  Number is FGS_162 to 163, and this is on October 22nd.
2  BY MS. NYARADY:
3    Q.    Now, you're emailing Christina Passariello at
4  NBC Universal, right?
5    THE DEPONENT:  Yeah.  That's her email address.
6  That's -- she's a -- she -- I believe her title is the
7  bureau chief in San Francisco for CNBC.
8  BY MS. NYARADY:
9    Q.    This is someone who I assume you knew before you
10  sent this email, or is this someone --
11    A.    Yes.
12    Q.    Okay.  So you knew her, had occasion to work
13  with her before?
14    A.    Correct.
15    Q.    Interact with her?
16    A.    Yes.
17    Q.    Okay.  So after the Bloomberg article comes out,
18  you forward her a copy of the article and you say --
19  subject is Wow, right?
20    A.    Yep.
21    Q.    Okay.  And then you say:
22    "This is a really big development that could
23  impact a lot of the advanced chips in the latest PCs and
24  phones."
25    And those are referring to Qualcomm chips in PCs

Page 109

1  and phones, right?
2    A.    Yes.
3    Q.    Okay.  And then you say:
4    "Trial comes in December, but notice of
5  termination has been sent."
6    So --
7    A.    Correct.
8    Q.    -- after the Bloomberg article comes out, you do
9  a round of these.  We're going to look at a few others.
10  I mean, you're out trying to push this to -- externally
11  to members of the press, trying to get traction for the
12  story, right?
13    A.    I wouldn't say traction.  I was not encouraging
14  other journalists to write about it.  I -- it goes back
15  to what I said before, which is the -- this is a pretty
16  complicated world to cover.  If you don't cover it on a
17  day in, day out basis, it doesn't make sense.  So the
18  purpose for sending Ian's article -- Ian is widely
19  respected by his peers in journalism, and if Ian is
20  writing authoritatively on a topic, it carries a lot of
21  weight with others.  And so the idea with Christine, as
22  well as the others I'm sure you're going to ask me
23  about, was to get them to read Ian's article so that
24  they could understand the issues, and that would make
25  them less susceptible to, you know, spin or

28 (Pages 106 - 109)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 110

1  misinformation from third parties.
2  Q.     Did you have permission from ARM to further
3  discuss or circulate the Bloomberg October 22nd let --
4  article?
5  A.     Like I said, I didn't deal with ARM directly on
6  this. I think I may have had a conversation with
7  Phil Hughes at some time right around the time that Ian
8  published his article to make sure that he wasn't
9  surprised or that he knew that we were involved, and to
10 get him ready for what I expected would be follow-up
11 phone calls to the company. But I -- I -- other than
12 that, I didn't really interact with -- with ARM
13 directly. And Phil, frankly, would not have been the
14 person to give me authority to do so. The only person,
15 as I said before, that I worked with was outside
16 counsel, and I don't recall if I specifically discussed
17 sending these kind of emails with -- with Ken or not.
18 Again, it -- in my mind, it was consistent with the
19 broader strategy, which was to educate people who were
20 likely going to be writing about this with the facts,
21 and Ian's article summarized a pretty complicated set of
22 facts in a nice, concise way.
23 Q.     You would -- so I understand your testimony that
24 you're not sure if you specifically got approval from --
25 from anyone, really, to be doing this further

Page 111

1  circulation. But you would not have done that if you
2  thought that ARM would not approve of these actions,
3  would you?
4  A.     No, of course not.
5  Q.     And so is it your testimony that you sent
6  Mr. King's articles to multiple journalists and news
7  outlets, but it was just informational, you were not
8  trying to get them to further report on this or, you
9  know, create buzz around this October 22nd letter?
10 A.     Yes. That's as I recall. It was primarily
11 defensive.
12 Q.     So why make the comment that this is a really
13 big development that could impact a lot of the advanced
14 chips in the latest PCs and phones?
15 A.     Because that's what I understood the facts to
16 be.
17 Q.     But if you want the facts to be gleaned from
18 Mr. King's article, which is what you said, that you
19 just -- he was trustworthy, he had detailed information,
20 and you wanted them to read the article, why would you
21 put a spin on it in your cover email?
22 A.     All right. Well, I don't interpret it as spin.
23 Like, Bloomberg is a competitor with all of the people
24 that I sent it to, so under -- you know, doing some kind
25 of interpretation or putting something in a subject line

Page 112

1  is important because, otherwise, it could be interpreted
2  with others, like Christina and others that I have
3  relationships with, as you dumb shits, you missed this,
4  somebody else got a scoop and you didn't.
5  Q.     But you were still trying to shape the
6  narrative, weren't you?
7  A.     Again, I -- I understood the strategy was to
8  make sure that the facts were understood. People aren't
9  going to read through hundreds of pages in a docket. So
10 whether it's the initial Ian King story or the
11 follow-ups that you're asking me about, it was all part
12 of an education of the people who were likely going to
13 be continuing to cover this dispute so that they had an
14 accurate understanding of the facts.
15 Q.     And you're putting your interpretation of the
16 facts in the cover email, right? In the subject line
17 you say, "Wow."
18        And so is it your testimony as you sit here
19 today that this was purely for informational purposes
20 and you were not trying to create or stir --
21 A.     Well, these are all pretty high-level people
22 that I'm talking to, and so they get -- they get
23 thousands of emails a day. So if I want them to read
24 the article, I have to get their attention.
25 Q.     So you were trying to get their attention?

Page 113

1  A.     Yes. I wanted them to read the article so that
2  they would have the understanding, as I said, of the --
3  of the facts.
4  Q.     And your statement about how this could impact a
5  lot of the advanced chips in the latest PCs and phones
6  was also an attempt to get their attention?
7  A.     To get them to read the article.
8  Q.     So you're trying to promote the importance of
9  the substance of Mr. King's article to the audience,
10 right?
11        MR. LEWIS: I think at this point, it's been
12 asked and answered. But you can go ahead and answer.
13        THE DEPONENT: I'm trying to get them to read
14 the article for the reasons I described.
15 BY MS. NYARADY:
16 Q.     And why are you confirming that the notice of
17 termination has been sent -- or strike that.
18        You say:
19        "The trial comes in December, but the notice of
20 termination has been sent."
21        Do you understand the October 22nd letter to be
22 a notice of termination?
23 A.     Yeah, maybe I shorthanded it. I -- what I
24 understand the October 22nd letter to be is a notice of
25 intent to termination.

29 (Pages 110 - 113)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 114

1  Q.    And so you're telling the press, though, that
2  even though there's a trial in December, a notice of
3  termination has been delivered to Qualcomm, right?
4  A.    Yes.
5  Q.    And that is not accurate, right?
6  A.    A notice of -- I -- I should have said a notice
7  of intent to terminate.  But I think the article goes
8  into that.
9  Q.    Do you know if you told others that a notice of
10  termination had been sent to Qualcomm?
11  A.    I don't recall.
12  Q.    When you sent these further communications with
13  other journalists and -- did you report back to ARM or
14  Morrison & Foerster about these further communications
15  that you were having?
16  A.    Not that I recall.
17         (Exhibit No. 15 marked for identification.)
18  BY MS. NYARADY:
19  Q.    Okay.  So I have handed you FGS Exhibit 15.
20  It's Bates numbered FGS_395 to 396.  And here again,
21  you're forwarding the October 22nd Bloomberg article to
22  David Faber at NBC, correct?
23  A.    Mm-hmm.
24  Q.    And this is also on the same day that the
25  article was published, October 22nd, correct?

Page 115

1  A.    Yes.
2  Q.    And your email says:
3         "This is a really big development."
4  Right?
5  A.    Yes.
6  Q.    And why did you forward this article to David?
7  Faber at NBC?
8  A.    He covers the -- both of the companies closely.
9  Q.    He's a TV host?
10  A.    He's a coanchor of CNBC's Squawk on the Street,
11  I believe is what it was called then.
12  Q.    And were you hoping that he would report on this
13  big -- really big development --
14  A.    No.
15  Q.    -- in his broadcast?
16  A.    No.
17  Q.    You didn't want him to report on this really big
18  development?
19  A.    I was indifferent as to whether he reported on
20  it.  He has a close relationship with Qualcomm, so I
21  figured he was going to be hearing from Qualcomm on it.
22  Q.    So this was preemptive?
23  A.    The whole strategy was preemptive.
24  Q.    In what way?
25  A.    Qualcomm -- or ARM had sent the letter, and,

Page 116

1  again, the idea of getting it to Ian and letting Ian
2  write about it was to minimize risk that if Qualcomm or
3  others made the information public, that it would be
4  understood correctly.
5  Q.    So it's your testimony that even though you
6  weren't involved in the decision to talk to the press,
7  you know that the reason a decision was made to talk to
8  the press was because there was an expectation that
9  Qualcomm would make the information public.  Is that
10  your testimony?
11  A.    Qualcomm or others could.
12  Q.    Who else do you think would have gotten a copy
13  to -- of the --
14  A.    I don't know that --
15  Q.    -- between ARM and Qualcomm?
16         MR. LEWIS:  Hold on.  Let her finish the
17  question, please.
18         THE DEPONENT:  I don't -- I don't know that the
19  letter itself would have been made public, all --
20  although, you know, I -- this is potential --
21  potentially material information, so it could have been
22  made public by Qualcomm.  But, as you know, in our
23  industry, especially in this era, like nearly everything
24  leaks.  The existence of the letter could leak.  So even
25  if the letter didn't leak, the existence of a

Page 117

1  termination notice may have -- may have become public.
2  BY MS. NYARADY:
3  Q.    Okay.  And --
4  A.    So yes, it is my understanding that the idea was
5  to get ahead of that potential.  And the placement of
6  the Bloomberg story was one part of that, and the
7  education of the others that you're asking me about was
8  an extension of that.
9  Q.    So you did -- ARM decided to leak it first,
10  right?
11  A.    That -- that's my understanding.
12         MS. NYARADY:  Okay.  Now I will hand you FGS 16.
13         (Exhibit No. 16 marked for identification.)
14         MS. NYARADY:  This is a document Bates numbered
15  FGS_409 to 410, and here you are sending this also on
16  October 22nd.  You're sending it now to Dan Gallagher at
17  The Wall Street Journal, right?
18         THE DEPONENT:  Yes.
19  BY MS. NYARADY:
20  Q.    Okay.  And you forward the article.  The first
21  email, you say:
22         "Wow, this is a big deal."
23  Right?
24  A.    Yes.
25  Q.    Are you trying to create an impression that you

30 (Pages 114 - 117)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 118

1  had nothing to do with the circulation of this story in
2  the first instance?
3  A.    I don't -- I don't think I am, but part of the
4  ground rules that we discussed earlier. When you get
5  agreement from a publication to obfuscate the sourcing
6  of information it is a two-way agreement, it's not a
7  one-way agreement. So I'm not at liberty to tell other
8  journalists what I did with Bloomberg.
9  Q.    So when you say "obfuscate the sourcing," you're
10  saying that there's an agreement between you as a
11  representative of ARM and Bloomberg that neither party
12  is going to tell the public or other reporters or
13  industry that, in fact, there was collaboration on the
14  Bloomberg article, correct?
15  A.    That's correct.
16  Q.    And, again, when we looked at these emails,
17  Exhibits 15 and 16, David Faber and Dan Gallagher, were
18  these people that you already had some sort of a
19  relationship with before October 22nd, 2024?
20  A.    Yes.
21      MS. NYARADY: I'm going to show you what's been
22  marked as FGS Exhibit 17.
23      (Exhibit No. 17 marked for identification.)
24      MS. NYARADY: It's Bates numbered FGS_458
25  through 60. It's an email chain. It's -- the first

Page 119

1  email starts on page 459, and this is you. You're
2  communicating with Don Clark.
3  BY MS. NYARADY:
4  Q.    Who is Don Clark?
5  A.    He's a journalist who writes for The Wall Street
6  Journal.
7  Q.    Okay. So you're forwarding the Bloomberg
8  article to -- he's a reporter at The Wall Street
9  Journal?
10  A.    Yes. At this point, I believe he's maybe a
11  freelance journalist, but he writes exclusively for the
12  The Wall Street Journal, I believe.
13  Q.    Okay. And here you go even a step further,
14  right? Not only do you say this is a really big deal,
15  but you say:
16      "This is a really big deal if true."
17      You say that to him, right?
18  A.    Yes.
19  Q.    So this is beyond even not just outing yourself
20  as being involved in the Bloomberg article, you actually
21  are pretending like you're not even sure if what comes
22  in the Bloomberg article is true, right?
23  A.    It appears that is what I was doing.
24  Q.    So you're trying to create an impression that
25  you had nothing to do with this article, right? It's

Page 120

1  beyond just silence. I mean, you're actively trying to
2  create the impression that you had nothing to do with
3  this.
4  A.    It appears.
5  Q.    Okay. Mr. Clark then responds and says?
6      "Kind of nuts, as that case was dormant," and
7  then he says, "ARM must be trying to force a settlement
8  to get it out of their hair."
9      Do you see that?
10  A.    Mm-hmm. Yes, I do.
11  Q.    Did you agree that ARM was trying to force a
12  settlement with Qualcomm?
13  A.    That was not my understanding.
14      MR. EMERICK: To the extent given the
15  attorney-client understanding of this, you should
16  exclude that from your answer.
17      THE DEPONENT: No. I -- thank you. I -- I
18  would just reiterate what I said before, which is, I
19  believe that the transmission of the letter that we
20  talked about earlier was really the beginning of our
21  process to terminate.
22  BY MS. NYARADY:
23  Q.    No one ever told you that there was any hope
24  that the October 22nd letter or the leaking of that
25  letter would force a settlement with Qualcomm?

Page 121

1      MR. LEWIS: Same -- same --
2      THE DEPONENT: Not that I recall.
3      MR. LEWIS: Okay. Same caution, though.
4  BY MS. NYARADY:
5  Q.    So then if you turn to the first page, which
6  ends at 458, you respond at the very bottom there, you
7  respond to Mr. Clark and you say, "Perhaps," presumably
8  in response to the settlement comment. But then you
9  say:
10      "But you don't serve a customer with a
11  termination notice unless you are prepared to go all the
12  way."
13      So here again, you're calling it a termination
14  notice and you are saying you wouldn't do that unless
15  you're prepared to go all the way. Do you mean that
16  prepared to terminate?
17  A.    Yes.
18  Q.    And then you say:
19      "My understanding is the ALA requires 
20  ■
21  ■                              "
22      And then it says "cure the breach" again.
23      And your understanding, is that based on the
24  conversations that you had with Mr. Siegel and ARM
25  around the October 22nd letter?

31 (Pages 118 - 121)

# Exhibit 104

# Exhibit 105

08:12:43  1                 IN THE UNITED STATES DISTRICT COURT

         2                   FOR THE DISTRICT OF DELAWARE

         3

         4
            ARM LTD.,                         )
         5  a U.K. corporation,              )
                                              ) VOLUME 2
         6            Plaintiff,             )
                                              ) C.A. No. 22-1146(MN)
         7  v.                                )
                                              )
         8  QUALCOMM, INC.,                  )
            a Delaware corporation,          )
         9  et al.,                          )
                                              )
        10            Defendants.            )

        11

        12
                         Monday, December 16, 2024
        13               8:30 a.m.
                         Jury Trial
        14

        15               844 King Street
                         Wilmington, Delaware
        16

        17

        18  BEFORE:   THE HONORABLE MARYELLEN NOREIKA
                      United States District Court Judge
        19

        20

        21
            APPEARANCES:
        22

        23              YOUNG CONAWAY STARGATT & TAYLOR
                        BY:  ANNE SHEA GAZA, ESQ.
        24
                        -and-
        25

Williamson - cross

13:32:52 1    in Qualcomm architecture deal and what happens if they buy

13:32:56 2    Nuvia.

13:32:57 3            You're referring to the Qualcomm ALA there when

13:33:00 4    you say Qualcomm architecture, right?

13:33:08 5    A.      Yes.

13:33:08 6    Q.      And he responds, Nuvia team will be able to use the

13:33:08 7    architecture license which Qualcomm has.  Again, Mr. Karthik

13:33:10 8    is talking about the Qualcomm ALA, correct?

13:33:13 9    A.      Yes.  That's his response in the moment, he says,

13:33:16 10   yes.

13:33:16 11   Q.      Okay.  And then if you move down, there is a

13:33:24 12   discussion of transfer fees and Karthik Shivashankar says to

13:33:26 13   you, there is no transfer fee because Nuvia will become part

13:33:30 14   of Qualcomm or a wholly owned subsidiary and there you're

13:33:34 15   talking about the acquisition that you had learned about on

13:33:37 16   January 12th, right?

13:33:38 17   A.      Yeah, I can see that, you know, is responding in the

13:33:42 18   moment and does say below that he needs to double-check.

13:33:46 19   Q.      Right.  But the person you go to in the first

13:33:48 20   instance for knowledge about these contracts told you there

13:33:52 21   would be no transfer fee, right?

13:33:54 22   A.      That's his initial reaction, yes.

13:33:56 23   Q.      Okay.  And at the bottom of the last page, you ask a

13:34:11 24   question, do you know when version 9 ALA expires at

13:34:14 25   Qualcomm?  That's again the Qualcomm ALA that you're

13:34:18  1    discussing, right?

13:34:19  2    A.      It is, yes.

13:34:20  3    Q.      And he says the current ALA term expires May 2028.

13:34:25  4    And then he goes on to say, and to complete, they do have an

13:34:30  5    option to extend the term by further five years.  And the

13:34:33  6    fee for this extension is capped at $1 million per year.

13:34:38  7    And to complete, they do have an option to extend by a

13:34:41  8    further five years.  So that would take you to 2033; right?

13:34:48  9    A.      Yeah, that appears so.

13:34:52 10    Q.      Okay.  Now, PTX-212 is in the binder your counsel

13:35:00 11    gave you.  This is the Qualcomm press announcement on

13:35:10 12    January 12th.

13:35:11 13    A.      Yes.

13:35:11 14    Q.      You can put this on the screen.  Qualcomm to acquire

13:35:15 15    Nuvia.  On the second page, the press release says in the

13:35:21 16    third paragraph, Nuvia CPUs are expected to be integrated

13:35:26 17    across Qualcomm Technologies' broad portfolio of products.

13:35:31 18    It was no secret to you or to anybody, Qualcomm was saying

13:35:39 19    we are going to use Nuvia technology in our products; right?

13:35:44 20    A.      I would say that they are saying they're going to use

13:35:48 21    Nuvia CPUs including Arm technology as well, in their

13:35:53 22    products.

13:35:53 23    Q.      But it's not a secret?

13:35:55 24    A.      No, no, this was in a press release, I agree.

13:35:58 25    Q.      Right.  And then if we look at 234, PTX-234, which I

Williamson - cross

13:36:06  1    don't remember if it's been admitted, let's look at PTX-234,

13:36:07  2    and -- it's in both binders, I guess.  It's in evidence my

13:36:15  3    colleague says.  Thank you.

13:36:17  4                And there is a letter attached here,

13:36:21  5    January 27th.  This is a letter from Qualcomm to you on

13:36:23  6    January 27th, right?

13:36:25  7    A.      Yes, this is from Mr. Asghar to myself.

13:36:33  8    Q.      All right.  So electronic copy is defective so I'll

13:36:47  9    read this to you.  In the second paragraph, he writes,

13:36:52 10    following the closing of the acquisition, for ease of

13:36:56 11    operation and structure, QTI, that's Qualcomm, right?

13:37:01 12    A.      Oh, sorry, yes.

13:37:03 13    Q.      QTI intends to transfer Nuvia's work and employees to

13:37:08 14    QTI.  In other current Qualcomm subsidiaries.  Have the then

13:37:15 15    former Nuvia employees continue their activities under the

13:37:20 16    Qualcomm ALA and TLA, we found it, so Qualcomm from the

13:37:26 17    beginning told you they were going to continue to use any

13:37:33 18    Nuvia technology under their own ALA, they told you that,

13:37:36 19    right?

13:37:36 20    A.      Mr. Asghar stated that that was their desire to do

13:37:41 21    so.

13:37:42 22    Q.      Then if we could look at PTX-240, which has been

13:37:47 23    admitted and you talked about in your examination.  This is

13:37:54 24    now February 2nd.  And in the second paragraph, you talk

13:38:02 25    about transfer of designs.  And that's a term you had used

Haas - cross

15:49:08  1    Q.      And it also does not mention that Qualcomm has an

15:49:17  2    ALA, right?

15:49:19  3    A.      That's correct.

15:49:22  4    Q.      And the other question I had for you, sir, is these

15:49:26  5    quotes, do you know whether they come from the Nuvia ALA?

15:49:41  6    A.      I don't know for certain.

15:49:43  7    Q.      And are you familiar with provision B1.1 of the

15:49:50  8    Qualcomm ALA?

15:49:51  9    A.      11.1?

15:49:55 10    Q.      It's Qualcomm's license grant in its ALA?

15:49:58 11    A.      Is it something I can look at here?

15:50:00 12    Q.      No, I'm just asking, sir, if you're familiar with it?

15:50:04 13    A.      Not every detail of it, no.

15:50:06 14    Q.      But you authorized the termination, right?

15:50:09 15    A.      Yes.

15:50:09 16    Q.      And you authorized this lawsuit, right?

15:50:12 17    A.      Yes.

15:50:12 18    Q.      And so you did both those things without knowing the

15:50:16 19    specifics of the term of Qualcomm's license grant; right?

15:50:21 20    A.      That's not what I said.  You asked me if I knew B

15:50:27 21    1.1, I said not every single word of it, but yes, very

15:50:31 22    familiar with the grant of the license agreement.

15:50:34 23    Q.      Based on whatever knowledge you had, that's the basis

15:50:37 24    on which you approved this litigation, and you approved the

15:50:40 25    termination?

Haas - cross

15:50:41  1    A.       Yes.

15:50:46  2    Q.       Do you happen to be aware if Qualcomm's license grant

15:50:54  3    mentions RTL?

15:50:55  4    A.       I don't know for sure, it's a gigantic agreement, I'm

15:50:58  5    not sure of every paragraph of it.

15:51:00  6    Q.       You are aware, though, that Arm sent another e-mail

15:51:03  7    in May of 2023, 8 months later to customers, right?

15:51:07  8    A.       Yes.

15:51:08  9    Q.       All right.  And if you could direct your attention to

15:51:11 10    DTX-30, it's already been admitted.  And this is a copy of

15:51:17 11    the second letter that Arm sent to customers.  The subject

15:51:24 12    line:  "Qualcomm Dispute - Protecting our Ecosystem."  You

15:51:28 13    can see that this e-mail is marked high importance?

15:51:31 14    A.       I'm sorry, you said DTX --

15:51:34 15    Q.       I'm sorry, this will be easiest if you look at this

15:51:38 16    on the screen because it was admitted with a prior witness.

15:51:41 17    You see this e-mail from Will Abbey, and he's marked the

15:51:46 18    importance high, that's like when you click the red

15:51:50 19    exclamation point.  Do you see that?

15:51:52 20    A.       Yes.

15:51:53 21    Q.       And Mr. Abbey's e-mail says to customers of Qualcomm

15:51:57 22    and Arm, by way of reminder, Arm is seeking to enforce

15:52:00 23    Qualcomm's obligation to destroy and stop using the

15:52:03 24    unlicensed Nuvia designs because Qualcomm cannot continue

15:52:06 25    using Arm-based technology, including the Phoenix core that

Haas - cross

15:52:11  1    Nuvia developed under its now terminated ALA.  Do you see

15:52:14  2    that?

15:52:14  3    A.      Yes.

15:52:15  4    Q.      Now, you're not aware that there was any catalyzing

15:52:21  5    event to send this e-mail, this is just by way of reminder,

15:52:25  6    right?

15:52:25  7    A.      That's right.

15:52:26  8    Q.      And it also mentions destruction of technology twice

15:52:30  9    in one paragraph.  Do you see that?

15:52:33 10    A.      Yes.

15:52:38 11    Q.      Okay.  And Arm presumably thought it was really

15:52:45 12    important for the customers to understand that it was

15:52:47 13    demanding destruction of technology, right?

15:52:49 14    A.      I'm sorry, can you repeat that?

15:52:51 15    Q.      I said Arm presumably thought it was very important

15:52:55 16    that it tell customers it was demanding destruction of

15:52:59 17    technology, right?

15:53:01 18    A.      Yes.

15:53:01 19    Q.      And you also see that there are quotes in this

15:53:04 20    letter, right?

15:53:06 21    A.      Yes.

15:53:07 22    Q.      And are you aware, sir, that the quotes in this

15:53:09 23    letter are not quotes of the actual language of the Nuvia

15:53:14 24    agreement?

15:53:20 25    A.      I'm sorry, can you repeat that one more time?

Haas - cross

15:53:23 1    Q.       I said are you aware that the quotes that are being

15:53:26 2    quoted here are not the actual quotes of the Nuvia

15:53:30 3    agreement?

15:53:32 4               And actually Mr. Spalding, can you scroll down a

15:53:36 5    little bit.  Okay.  So we can see, do you see where it says

15:53:40 6    under the relevant agreement and then there is quoted

15:53:43 7    language?

15:53:43 8    A.       Yes.  Thank you.  I remember this letter and

15:53:45 9    paragraph very well, you and I talked about it at the

15:53:48 10   deposition, and at the time I found it to be very confusing.

15:53:53 11   Subsequently in preparation for this trial, I have reviewed

15:53:56 12   these letters and I have reviewed the claim that we made,

15:54:00 13   and this language is actually from the claim.  It's not from

15:54:04 14   the contract.

15:54:06 15   Q.       Right.  So the letter that was sent to customers,

15:54:09 16   that says under the relevant agreement and puts quotes,

15:54:12 17   quotes something that is Arm's claim, not the actual

15:54:15 18   contract; right?

15:54:16 19   A.       That's right.

15:54:17 20   Q.       Okay.  And we can agree that that is misleading,

15:54:21 21   can't we?

15:54:21 22   A.       Yes, as I said, during the deposition we had this

15:54:25 23   conversation, and I was quite confused by the language, and

15:54:28 24   you're right, this is language from the claim, not from the

15:54:32 25   Nuvia license.

Haas - cross

15:54:34  1    Q.      So just to be clear what happened here, Arm sent

15:54:37  2    e-mails to Qualcomm's customers for no reason, marked it

15:54:42  3    high importance, quoted language that it said was from a

15:54:45  4    contract, accused Qualcomm of breach, and quoted language

15:54:49  5    that was just from Arm's litigation claim, that's what

15:54:53  6    happened?

15:54:53  7    A.      I would qualify that no reason, at this time, the

15:54:58  8    litigation had been going on, we're getting lots of

15:55:01  9    questions from customers and partners about what's going on.

15:55:06 10    Almost every meeting we have with senior executives we were

15:55:10 11    asked about it.  So the part of your question or statement

15:55:13 12    that I take issue with, is no reason.  We would not do

15:55:16 13    things without a reason.

15:55:17 14    Q.      Well you don't think that what you just said is an

15:55:20 15    excuse to send a misleading letter to Qualcomm's customers

15:55:25 16    saying that it's in breach, quoting language that is in no

15:55:29 17    contract at all, right, you're not excusing that?

15:55:32 18    A.      I'm just responding to your comment that we had no

15:55:35 19    reason.  I felt we had a reason.  This litigation, this

15:55:39 20    issue around unlicensed technology is unchartered waters for

15:55:42 21    us, and we have so many questions from legal, so

15:55:45 22    respectfully, I don't agree with no reason.

15:55:47 23    Q.      But not only did Arm think it was okay without a

15:55:51 24    finding in this case by a jury to go ahead and tell

15:55:55 25    customers that Qualcomm was in breach, it thought it was

Haas - cross

16:14:33  1                  THE COURT:  Thank you.  It's admitted.

16:14:35  2                  (DTX Exhibit No. 142 was admitted into

16:14:35  3      evidence.)

16:14:35  4      BY MS. DUNN:

16:14:37  5      Q.      All right.  The deck is entitled the next chapter,

16:14:40  6      changing the world again, and I'm going to ask you to turn

16:14:43  7      all the way to page 49.  And again, the date on this is

16:14:50  8      February 2022.  So at this point, a couple years ago.  And

16:14:56  9      the slide here is titled Arm's future and the first bullet

16:15:00 10      says Arm will become the world's most important

16:15:03 11      semiconductor company.  Do you see that?

16:15:05 12      A.      Yes.

16:15:05 13      Q.      And under that, it says Arm will accelerate building

16:15:09 14      chips, do you see that?

16:15:10 15      A.      Yes.

16:15:10 16      Q.      And you actually hired Qualcomm's former SVP of

16:15:20 17      Engineering, Mr. Kechichian?

16:15:22 18      A.      Yes.

16:15:22 19      Q.      And Mr. Kechichian ran the team that made the

16:15:26 20      Snapdragon chips at Qualcomm?

16:15:28 21      A.      That's right.

16:15:29 22      Q.      And that's part of the plan to accelerate building

16:15:32 23      chips, right?

16:15:32 24      A.      Well, just to be clear, this presentation was a

16:15:36 25      presentation I made to the board to become the CEO, so in

Haas - cross

16:15:40  1    it, I was painting my long-term vision for the company,

16:15:45  2    including potentially building chips.

16:15:47  3    Q.       And is it your testimony that we're not going to see

16:15:50  4    any decks from after you became CEO that talk about Arm

16:15:54  5    building chips?

16:15:55  6    A.       I think you'll probably see it, we have been talking

16:15:58  7    about it for a long time, we have been exploring it for a

16:16:01  8    long time.

16:16:01  9    Q.       By the way, do you know that a couple months ago

16:16:05 10    Mr. Kechichian called one of Nuvia's other founders to see

16:16:09 11    if Gerard Williams would be willing to come work at Arm?

16:16:14 12    A.       I am not aware of that.

16:16:15 13    Q.       Let's look at PTX-447, this is already in evidence,

16:16:20 14    it's the deck you discussed on your direct examination.

16:16:23 15    This is the deck you put together for a meeting with Samsung

16:16:27 16    on October 4th of 2022.  And do you recall that meeting, it

16:16:34 17    took place in Korea?

16:16:36 18    A.       Yes, I'm sorry, let me find it.

16:16:41 19    Q.       It's 447, but it's also in your direct examination

16:16:45 20    binder.

16:16:50 21    A.       Okay.

16:16:51 22    Q.       All right.  Now, you testified about a meeting that

16:16:55 23    you had in Korea, and also that Mr. Son, Masa attended with

16:17:05 24    you, right?

16:17:06 25    A.       Yes.

Haas - cross

16:17:07  1    Q.        And you talked about how at that meeting, among other

16:17:10  2    things, you discussed this litigation, right?

16:17:13  3    A.        Yes.

16:17:13  4    Q.        And JY Lee is the chairman of Samsung, and he was at

16:17:19  5    that meeting, right?

16:17:20  6    A.        Yes.

16:17:20  7    Q.        And there were other top Samsung executives, right?

16:17:24  8    A.        Yes.

16:17:24  9    Q.        And you testified that at that meeting, Mr. Son

16:17:28 10    represented to Samsung that Qualcomm's architectural license

16:17:34 11    would expire in 2025, do you recall that?

16:17:37 12    A.        I don't recall that.

16:17:40 13              MS. DUNN:  Your Honor, at this point, I would

16:17:42 14    like to read into the record the joint statement of

16:17:46 15    uncontested facts paragraph 13.

16:17:47 16              THE COURT:  Okay.

16:17:47 17              MS. DUNN:  Thanks.  On October 4th, 2022,

16:17:51 18    Masayoshi Son, Mr. Son and Rene Haas met with certain

16:17:55 19    executives from Samsung Electronics Company LTD.  During the

16:18:00 20    conversation, Mr. Son said among other things that

16:18:02 21    Qualcomm's license would expire in 2025.

16:18:06 22              Mr. Haas, you're aware that Qualcomm's license

16:18:10 23    does not expire in 2025, right?

16:18:12 24              THE WITNESS:  Correct.

16:18:14 25    BY MS. DUNN:

Haas - cross

16:18:14  1    Q.      All right.  Now, if you turn to page 32 of this deck,

16:18:21  2    this is post-acquisition in this meeting with Samsung that

16:18:25  3    you attended with Masa, and you are positioning Arm as a

16:18:30  4    competitor to Nuvia; correct?

16:18:38  5    A.      Not directly.  Because Samsung buys its chips from

16:18:46  6    Qualcomm that uses Arm technology, they also buy chips from

16:18:49  7    Samsung themselves, they have an internal chip group, so we

16:18:54  8    were talking to both JY Lee, who represents the chip group,

16:18:58  9    and the phone group, so we were talking to a few audiences

16:19:02 10    here, not really a direct competitor.

16:19:04 11    Q.      But you would agree on one side you have Arm CPUs,

16:19:08 12    and on the other side you have Nuvia CPUs, right?

16:19:12 13    A.      Yes.

16:19:12 14    Q.      And you understand that the Nuvia, the Nuvia

16:19:15 15    engineers were working on server designs, right?

16:19:21 16    A.      Sorry, say that one more time.

16:19:22 17    Q.      That the Nuvia engineers had been working on designs

16:19:26 18    for a server, right?

16:19:27 19    A.      Before they were acquired?

16:19:29 20    Q.      Correct.  And you note here also that zero product

16:19:34 21    has shipped, right?

16:19:35 22    A.      Yes.

16:19:35 23    Q.      And you also -- this is basically a pitch deck to

16:19:39 24    Samsung, right?

16:19:40 25    A.      There is a lot inside this deck, I wouldn't

# Exhibit 106

# **<u>Intentionally Omitted</u>**

# Exhibit 107



# Qualcomm Global Trading Pte. Ltd.

## QCOM_M55 Quote

20 March 2025

CONFIDENTIAL

SUBJECT TO CONTRACT

# Arm Technology

*Arm's Cortex and Neoverse processors are at the heart of many of the world's most successful products, offering a single, consistent, processor architecture.*

| Description | License Type | License Fee |
|---|---|---|
| Cortex-M55 Processor | | |
| Cortex-M55 Processor | | |
| Cortex-M55 Processor | | |

## Royalty Rates

| ARM Technology | Royalty rates as % ASP** |
|---|---|
| Cortex-M55 (per core) | |

# General Terms

1. This proposal expires on 19 April 2025.



12. The rights, obligations, fees and royalties in this proposal are not legally binding prior to entering into a contract signed by both parties.

*Confidential*        Copyright © 2025, Arm Limited, All rights reserved.

                                                    ARMQC_02778343

# Exhibit 108

Message

| From: | Phil Hughes [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2B7BA3D6700444AC97DD13A2070BDEF6-PHIL HUGHES] |
|---|---|
| Sent: | 24/10/2024 03:43:20 |
| To: | Ami Badani [Ami.Badani@arm.com] |
| CC: | Kristen Ray [Kristen.Ray@arm.com]; Eliza Walsh [Eliza.Walsh@arm.com] |
| Subject: | RE: Response to QCOM statement |

Ok, my only concern on the first one is that it could lead to speculation that it impacts their Cortex cores which is what we ███████████████████████████

Thanks,
-phil

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 9:39 PM
**To:** Phil Hughes <Phil.Hughes@arm.com>
**Cc:** Kristen Ray <Kristen.Ray@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Re: Response to QCOM statement

Quick responses to questions. We should confirm with Spencer [ **Redaction - Privileged** ]

• What QCOM chips does this impact
All chips that license the Arm technology across the various lines of business (not sure it is in our interest to be specific).

• What happens at the end of the 60 day
Q will need to terminate the ALA license and discontinue selling any products that use Arm's platform.

On Oct 23, 2024, at 8:09 PM, Phil Hughes <Phil.Hughes@arm.com> wrote:

Ami - Here are some additional US/UK reporters we sent to today as well. Would you like to see APAC as well? If so, I'll ask Elsa and team to share.

The main follow-up questions we're getting that we're not comment on are:
1.    What QCOM chips does this impact
2.    What happens at the end of the 60 days

**Bloomberg, Ian King:** Arm to scrap Qualcomm chip design license in feud escalation
**Endgadget, Mariella Moon:** Arm cancels Qualcomm's license to use its chip design standards
**Extreme Tech, Ryan Whitwam:** Arm Moves to cancel Qualcomm's Architecture license
**FT, Tim Bradshaw:** Arm cancels Qualcomm's chip design license amid legal dispute
**Hot Hardware, Tim Sweezy:** Arm Cancelling Qualcomm's Chip License Could Throw Mobile Market Into Upheaval
**Investor's Business Daily, Patrick Seitz**: Arm, Qualcomm Shares Fall as chip giants spar over tech licensing
**ServeTheHome, Patrick Kennedy:** Arm moves to cancel its Design License with Qualcomm
**TechSpot, Zohaib Ahmed:** In a shocking move, Arm cancels Qualcomm's license to manufacture Snapdragon chips
**Tom's Guide, Richard Priday:** Qualcomm's Arm license is getting cancelled and it could have a huge impact on laptops and phones we buy
**Tom's Hardware, Anton Shilov**: Arm to cancel Qualcomm's architecture license as feud intensifies

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Windows Central, Jez Corden:** <u>REPORT: Arm is sensationally canceling the license that allowed Qualcomm to make Snapdragon chips, which power everything from Microsoft's Copilot+ PCs to Samsung's Galaxy smartphones and tablets (Update: Qualcomm responds)</u>
**WSJ, Dan Gallagher:** <u>Heard on the Street: Arm singed by escalation of Qualcomm fight</u>
**XDA Developers, Adam Conway:** <u>Arm reportedly set to cancel Qualcomm chip design license</u>
**9to5 Google, Abner Li:** <u>Arm cancels Qualcomm's instruction set, IP license for chip design</u>

Thanks,
-phil

---

**From:** Kristen Ray <<u>Kristen.Ray@arm.com</u>>
**Sent:** Wednesday, October 23, 2024 8:40 PM
**To:** Ami Badani <<u>Ami.Badani@arm.com</u>>; Phil Hughes <<u>Phil.Hughes@arm.com</u>>; Eliza Walsh <<u>Eliza.Walsh@arm.com</u>>
**Subject:** Re: Response to QCOM statement

Hi – I've quickly pulled together a list of folks we've provided the statement to below, and coverage we're tracking. You'll see most have updated articles with our statement.

I can provide a more detailed coverage report, if needed, just let me know.

Thanks,
-k

//

1.  **Reuters**, Stephen Nellis: <u>https://www.reuters.com/technology/arm-holdings-cancel-qualcomm-chip-design-license-bloomberg-news-reports-2024-10-23/</u>
2.  **The Register,** Gavin Bonshor: <u>https://www.theregister.com/2024/10/23/arm_warns_qualcomm_on_licenses/</u> (
3.  **PC World,** Mark Hachman: <u>https://www.pcworld.com/article/2497912/arm-will-cancel-qualcomms-license-to-make-the-snapdragon-x-elite.html</u>
1.  **Axios,** Ina Fried
2.  **Nikkei (Japan),** Kosuke Shimizu
3.  **CNBC,** Ryan Browne
4.  **CNET,** David Lumb: <u>https://www.cnet.com/tech/mobile/arm-reportedly-cancels-license-qualcomm-used-to-design-its-chips/</u>
5.  **Android Authority,** Hadlee Simmons: <u>https://www.androidauthority.com/qualcomm-arm-license-termination-3493039/</u>
6.  **Barrons,** Adam Clark: <u>https://www.barrons.com/articles/qualcomm-stock-arm-chips-legal-dispute-b2cec13f?mod=barronsgooglenews</u>
7.  **Barrons,** Tae Kim: <u>https://www.barrons.com/articles/qualcomm-arm-stock-price-chip-battle-7f8cb473</u>
8.  **Capacity Media (UK),** Benjamin Woodecki: <u>https://www.capacitymedia.com/article/arm-pulls-qualcomms-architecture-licence</u>
9.  **The Information,** Wayne Ma: <u>https://www.theinformation.com/briefings/arm-cancels-qualcomms-license-to-design-chips-based-on-its-technology</u>
10. **Benzinga,** Kaustubh Bagalkote: <u>https://www.benzinga.com/markets/equities/24/10/41481425/softbank-backed-arm-threatens-to-cancel-qualcomms-chip-design-license-ahead-of-trial-in-december</u>
11. **MT Newswires,** Adrienne Valdez
12. **Android Police,** Chris Thomas: <u>https://www.androidpolice.com/arms-licensing-battle-with-qualcom-just-more-serious/</u>
13. **TechInsights,** James Sanders
14. **CNBC,** Seema Mody
15. **IT Brew/Morning Brew,** Tom McKay
16. **Fudzilla,** Fudo Abazovic: <u>https://www.fudzilla.com/news/59942-arm-threatens-qualcomm</u>

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Kristen Ray | Senior Director, Corporate Communications, Arm
m: +1 512 939 9877

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Date:** Wednesday, October 23, 2024 at 8:03 PM
**To:** Phil Hughes <Phil.Hughes@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Richard is writing a column that will publish tomorrow AM.     **Redaction - Privileged**

Eliza has been in touch with Rene on Tim.  Not sure where this landed.

---

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 5:58 PM
**To:** Ami Badani <Ami.Badani@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

We'll compile a list of everyone we've sent it to and send coverage report.

Odd that he talked with Richard Waters from FT.

Phil Hughes
+1 512 694 7382

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 6:55:48 PM
**To:** Eliza Walsh <Eliza.Walsh@arm.com>; Kristen Ray <Kristen.Ray@arm.com>
**Cc:** Phil Hughes <Phil.Hughes@arm.com>
**Subject:** Re: Response to QCOM statement

Any further comments/questions?

Did anyone publish?

Did we reach out to friendlies beyond Tim?

Rene spoke with Ben, Pat, and Richard Waters.

I believe Ben and Pat tweeted.  Richard will likely be publishing something tomorrow   **Redaction - Privileged**
**Redaction - Privileged**

---

**From:** Eliza Walsh <Eliza.Walsh@arm.com>
**Date:** Wednesday, October 23, 2024 at 11:08 AM
**To:** Kristen Ray <Kristen.Ray@arm.com>
**Cc:** Phil Hughes <Phil.Hughes@arm.com>, Ami Badani <Ami.Badani@arm.com>
**Subject:** Re: Response to QCOM statement

I'm sending to tim now thanks

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Thanks,
Eliza


On Oct 23, 2024, at 7:01 PM, Kristen Ray <Kristen.Ray@arm.com> wrote:


Thanks all. We're on it.

**Kristen Ray** | Senior Director, Corporate Communications, Arm
m: +1 512 939 9877

---

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 12:58 PM
**To:** Ami Badani <Ami.Badani@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Thanks Ami.
Adding Kristen.

We'll send out ASAP

Phil Hughes
+1 512 694 7382

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 11:54:12 AM
**To:** Phil Hughes <Phil.Hughes@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Response to QCOM statement

Spoke with Phil. We are planning to send out the following statement to journalists to update their stories and others that we have a trusted relationship with.

You both should connect on how best to handle Tim.

*Following Qualcomm's repeated material breaches of Arm's license agreement, Arm is left with no choice but to take formal action requiring Qualcomm to remedy its breach or face termination of the agreement. This is necessary to protect the unparalleled ecosystem that Arm and its highly valued partners have built over more than 30 years. Arm is fully prepared for the trial in December and remains confident that the Court will find in Arm's favor.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 109

Page 1

1

2                IN THE UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF DELAWARE

4                          -ooOoo-

5      QUALCOMM INCORPORATED, a          )

       Delaware corporation,            )

6      QUALCOMM TECHNOLOGIES, INC.,      )

       a Delaware corporation,          )

7                                        ) C.A. No. 24-490-MN

                    Plaintiffs,          )

8                                        )

       v.                                )

9                                        )

       ARM HOLDINGS PLC, f/k/a, ARM      )

10     LTD. a U.K. corporation,          )

                                         )

11                   Defendant.          )

                                         )

12     _____  )

13

14            VIDEO RECORDED and VIRTUAL DEPOSITION

                       OF PHIL HUGHES

15

16

17

18            Taken on Tuesday, June 17, 2025

19               8:05 a.m. to 9:56 a.m.

20

21

22

23     Reported by:  Abigail D.W. Johnson, RPR, CRR, CRC

                     Utah, California, Idaho, Washington

24

25

Page 66

1  statement in italics.
2      Is that the statement you were referring to
3  earlier?
4      MR. EMERICK: Objection. Form.
5      THE WITNESS: Well, yes. This is the
6  statement that we were sending out with media
7  inquiries, yes.
8  BY MR. ISAACSON:
9      Q. And it says, "You should both connect on
10  how best to handle Tim."
11      Who is Tim?
12      A. Oh, that probably would have been
13  Tim Bradshaw from the Financial Times.
14      Q. All right. And on page -- on the second
15  page of the email, there's an email from Ray -- Kristen
16  Ray or Ray, Kristen?
17      A. Kristen Ray.
18      Q. Kristen Ray, thank you.
19      On October 23rd, "I've quickly pulled
20  together a list of folks we've provided the statement
21  to below."
22      A. Mm-hmm.
23      Q. And then there's a list of 16 media
24  outlets.
25      Is that -- you understood that those were

Page 67

1  all media outlets that received the statement that --
2  that's in this -- that we were just looking at?
3      A. Yes, that's what I would believe it to be.
4      Q. All right. And then on the first page of
5  the email, you wrote at the bottom, "Ami - Here are
6  some additional US/UK reporters we sent to today as
7  well."
8      There is a list of 1, 2, 3, 4, 5, 6, 7, 8,
9  9, 10 and continued on the next page --
10      A. Mm-hmm.
11      Q. -- 11, 12, 13, 14.
12      If I counted right, 14 reporters that you
13  sent the statement to; correct?
14      A. Yes.
15      Q. And you say, "The main follow-up questions
16  we're getting that we're not commenting on are: What
17  QCOM chips does this impact?"
18      So that was a question you were getting
19  that you were not commenting on --
20      A. Mm-hmm.
21      Q. -- right.
22      A. Correct.
23      Q. And you also were getting questions, "What
24  happens at the end of the 60 days?"
25      And you were not commenting on that?

Page 68

1      A. Correct. It looks like that and appears
2  that way, yes.
3      Q. Okay. But then Ami Badani responds to the
4  top -- or on top of your email, "Quick responses to
5  questions. We should confirm with Spencer."
6      Now there is a question. "What QCOM chips
7  does this impact? All chips that license the Arm
8  technology across the various lines of business (not
9  sure if it is in our interest to be specific)."
10      You understood that to be a correct answer
11  to the question, "What QCOM chips does this impact,"
12  referring to the notice that Arm gave to Qualcomm?
13      MR. EMERICK: And I will caution you that
14  if you have an understanding whether this is correct or
15  not, if that comes from an attorney, you should not
16  answer. If you have an independent or non-attorney
17  understanding of whether this is correct or not --
18      THE WITNESS: Right.
19      MR. EMERICK: -- you can respond.
20      THE WITNESS: So I -- I don't know if it is
21  correct or not because Ami wrote these. These were --
22  it appears to be quick responses that she wrote.
23  BY MR. ISAACSON:
24      Q. And do you know if she gave those answers
25  to -- to reporters?

Page 69

1      A. I -- I don't know.
2      Q. Okay. And did she have responsibility for
3  talking to reporters as well as you?
4      A. She did.
5      Q. Okay. And the response to what happens at
6  the end of the 60-day, "Q," Qualcomm "will need to
7  terminate the ALA license and discontinue selling any
8  products that use Arm's platform."
9      Did you -- did you understand that
10  Ami Badani was answering that question to the press
11  with that answer?
12      A. Again, I don't know what conversations she
13  had with the press.
14      And if I can give a little context here, at
15  this point, I had already told Arm, Ami and I, the week
16  before, agreed that I was going to leave. We basically
17  had been working on that for a little while.
18      And one of the reasons I was leaving was
19  because I -- she had differences in opinions on how we
20  should deal with the media, where she was having a lot
21  of conversations directly herself as the chief
22  marketing officer, which is kind of out of practice for
23  the most part, and was not informing me or my team of
24  the conversations she was having. And it made it very
25  difficult for us to do our jobs.

18 (Pages 66 - 69)

Page 70

1    Q.   All right.  And did you understand that
2   Ami Badani, during this period, was having direct
3   communications with reporters?
4    A.   During this period, she was, yes.
5    Q.   All right.
6    A.   Again, I don't know what it was specific
7   to, if it was related to this, but I know she was
8   having conversations with reporters and industry
9   analysts.
10   Q.   And you say, "My only concern on the first
11  one," that is all chips that license the Arm technology
12  across the various lines of business --
13   A.   Mm-hmm.
14   Q.   -- "is it could lead to speculation that it
15  impacts their Cortex cores which is what ███████████
16  ████████████████████████████████████."
17   A.   Mm-hmm.
18   Q.   "Cortex cores" refers to Qualcomm Cortex
19  cores; correct?
20   A.   It would refer to, yes, the cores that are
21  part of the -- any technology license agreement, the
22  TLA agreements.
23   Q.   Okay.  And when you were saying ████████
   ████████████████████████████████████████████████
   ████████████████████████████████████████████████

Page 71

1   ████████████████
2    A.   That's likely, yes, what I meant.  Yes.
3    Q.   And what was your general understanding of
4   the magnitude of ██████████
5    A.   I don't know what the numbers were.  I
6   didn't see them, but I know that that -- what I was
7   saying here is, again, at that point, they were
8   ████████████████████████████████████████████████
   ████████████████████████████
10   And so, again, my -- I flagged it as an
11  issue that, Hey -- her response was:  All chips that
12  license Arm technology across various lines of
13  business.  That could include Cortex cores, if you were
14  to say that comment.
15   Q.   All right.  And did you understand the --
16  the ██████████████████████████████████████████████
   ████████████████████████████████████████?
18   A.   Again, I know that that was where nearly
19  ████████████████████████████████████████████.
20   I don't know what the number was, but at
21  the time, ██████████████████████████████████████
   ████████████████████████████████████████████████
   ███████████████████████████████████.
24   I don't know if they were still ████████
   ████████████████████

Page 72

1    Q.   In terms of the amount of royalties paid to
2   Arm, do you know where Qualcomm ranked as a customer?
3    A.   I don't recall.  But I believe there was --
4   always usually in the top five, but I don't know
5   specifically what ranking.
6    Q.   The -- and was Ami Badani, by this point,
7   also talking to Mr. King?
8    A.   She had had conversations with Ian King,
9   but I don't believe she was having any conversations
10  with him in the context of this at this time.  But
11  again, I can't be certain of this.
12   MR. EMERICK:  Phil, are you still doing
13  okay?  We are in a marathon --
14   THE WITNESS:  Yeah.
15   MR. EMERICK:  -- an hour and 45.
16   THE WITNESS:  Yeah.
17   MR. EMERICK:  All right.  I just want to
18  check in with the court reporter and videographer.  You
19  guys are okay?
20   COURT REPORTER:  A break soon would be
21  good.
22   MR. ISAACSON:  Frankly, I only have one
23  more document.
24   MR. EMERICK:  If you only have one more,
25  you think that you can hold out?

Page 73

1    COURT REPORTER:  Oh, yeah.
2    MR. ISAACSON:  Hughes 21.
3    (Exhibit No. 21 was marked
4    for identification.)
5   BY MR. ISAACSON:
6    Q.   Hughes 21 is Bates-stamped ARMQC_02741735
7   through 1745.
8    This is an email exchange between you and
9   Jeremy Kahn of Fortune.
10   A.   Mm-hmm.
11   Q.   Now we are back in 2022.  I believe this
12  will be May 10th.
13   A.   Okay.
14   Q.   And do you recognize that you -- these are
15  emails between you and Mr. Kahn; correct?
16   A.   Correct.
17   Q.   And on the first page, in the middle, is an
18  email from Mr. Kahn to you.
19   Do you see that?
20   A.   Yes.
21   Q.   Okay.  And he says, "I'm ready to
22  fact-check the Arm feature now.  What follows is a list
23  of facts, not the actual story text."
24   And then for the rest of it, there's a
25  whole list of things he characterize as facts --

19 (Pages 70 - 73)

# Exhibit 110

Confidential – Contains Business Secrets

ANTICIPATED ACQUISITION BY

NVIDIA CORPORATION

OF

ARM LIMITED

ME/6906/20

---

INITIAL SUBMISSION

---

20 December 2021

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ARM_01239742

Confidential – Contains Business Secrets

1. **INTRODUCTION**

This submission concerns the anticipated acquisition by NVIDIA Corporation ("**NVIDIA**") of the Intellectual Property Group of Arm Limited ("**Arm**") from SoftBank Group (the "**Transaction**") and provides the Parties' response to the report of the Competition and Markets Authority ("**CMA**"), dated 20 July 2021, and the decision of the Secretary of State, dated 16 November 2021 (the "**Decision**"). NVIDIA and Arm are together referred to as the **Parties** in this submission and, for statements referring to the future, as the **Merged Entity**.

A.     **With SoftBank's investment phase at an end, Arm is at a crossroads.**

The vision of Arm that the Decision describes—an entity that ignores its profit motive and has no competition—is a mirage.

Arm is a private for-profit business at a crossroads. After acquiring Arm several years ago, SoftBank increased Arm's headcount, hoping to spur long-term growth in several markets, including datacenter and personal computer ("**PC**"), long dominated by Intel and x86. SoftBank's investment phase has concluded, and one way or another, SoftBank intends to exit Arm.

Regulators worldwide have been considering two different outcomes for Arm: (i) acquired by NVIDIA, subject to legally binding commitments to expand Arm's R&D across the board and license Arm IP to all without bias or discrimination, or (ii) a profit-maximizing IP licensing firm, with no other profit generators, no specific legal restrictions on its licensing practices, and perhaps most importantly to NVIDIA and other licensees, no binding and enforceable assurance that Arm will invest in any market or product.

B.     **An IPO would pressure Arm to narrow its focus and limit investments.**

In the media, deal opponents urge the CMA to block the deal so that Arm can pursue an initial public offering ("**IPO**"), which they assume would be launched in the UK on the London Stock Exchange. They equate Arm's popularity with a high market valuation and success, but the public markets are unsentimental. The capital markets demand profitability and performance.

SoftBank considered and rejected an IPO in 2019 and again in early 2020 because the markets would not give SoftBank the necessary return on its investment.[1] While Arm's licensees such as Apple, Qualcomm, and Amazon have enjoyed skyrocketing revenue growth and profits, as well as soaring market valuations, Arm has lately endured comparably flat revenues, rising costs, and lower profits that would likely present challenges for a 30-year old public company. The capital markets would expect Arm to make significant strategic changes, including cutting costs to maximize Arm's value.

As Arm's CEO, Simon Segars, explained: "*We contemplated an IPO but determined that the pressure to deliver short-term revenue growth and profitability would suffocate our ability to invest, expand, move fast and innovate.*"[2]

As a standalone business, Arm faces significant challenges to growth.

---

[1]     See response to question 1 of EC RFI 13 of 18 May 2021. See also SB-CMA-00020864_0001.

[2]     https://www.arm.com/blogs/blueprint/arm-nvidia.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     ARM_01239743

**Confidential – Contains Business Secrets**

Arm's original market, and the largest source of its revenue, mobile, is saturated.

Datacenter and PC, two markets that SoftBank targeted with its investments in Arm, are far more difficult to crack. Unlike Arm, the x86 incumbents in datacenter and PC (Intel and AMD) benefit from an established ecosystem of developers, software, systems, and peripherals. They are also vertically integrated, enjoying profits generated from multiple levels of the technology stack, allowing them to make massive R&D investments. As a result, any competitor following an IP-only licensing model, like Arm, is at a major ecosystem and economic disadvantage.

In addition, Arm does not have the systems building expertise, the software engineering scale, or the R&D resources of x86 vendors like Intel and AMD. Even under the most optimistic projections, standalone Arm could not generate the revenue necessary to invest and compete toe-to-toe with the entrenched x86 incumbents.

To date, Arm has only managed to achieve limited inroads in datacenter, mainly licensing to Amazon, which makes custom chips for its own use, and start-up Ampere Computing, the only entity that offers merchant Arm central processing units ("**CPUs**") for datacenter.

In the PC market, Arm's designs do not have significant market penetration, and Arm's two high-profile PC customers,                        , have publicly stated that they will *not* use Arm's cores for their next-generation PC SoCs—they will create and rely on their own designs.

Standalone Arm would face pressure to narrow its investments and enhance profitability.

These observations are not criticisms of Arm's technology or engineering team. Arm has great engineering talent in the areas where it focuses. But as a standalone IP licensing business, and without access to further capital, Arm has inherent scale, scope, and economic limitations that would impact Arm's future as a standalone licensing firm.

As a publicly traded company, Arm would likely not have the financial resources to invest sufficiently in early stage revenue businesses. NVIDIA is particularly concerned that these pressures would drive Arm to deprioritize datacenter and PC and to instead focus on its core mobile and growing IoT businesses. The result would be a concentrated CPU market largely controlled by Intel/AMD (x86), with the remainder controlled by powerful and far more profitable Arm architectural licensees such as

Deal opponents argue that so long as Arm remains "independent", Arm should take pride and comfort in the success of its customers. But soaring profits for Intel, Apple, Qualcomm, and Amazon have not manifested as a "win" for Arm, or for competition in general. The industry titans will be powerful and competitive, no matter what path Arm takes. The question at hand is whether regulators will approve the Transaction and allow Arm to take the steps needed to enable others to compete.

C.     **The Transaction represents a unique, once-in-a-generation opportunity to expand and enhance Arm's ecosystem, benefitting the UK and all Arm licensees.**

NVIDIA did not approach SoftBank to buy Arm. NVIDIA is a strong supporter of the x86 ecosystem and has developed accelerated computing platforms for x86 PCs and datacenters throughout its history. Intel and AMD make industry-leading CPUs and SoCs suitable for

-2-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                          ARM_01239744

Confidential – Contains Business Secrets

many industries and products, including NVIDIA's own DGX systems and supercomputers such as Cambridge-1.

Regardless of the Transaction, NVIDIA will continue to support x86 and work with Intel, AMD, and others in the x86 ecosystem. The x86 platform will always be important to the industry, and NVIDIA is committed to support it for the long haul. For example, NVIDIA is developing its Omniverse platform—the foundation for the next generation, 3D worldwide web—on x86 systems. Ideally, however, the industry would have other options as well.

Along with its long-term support for x86, NVIDIA has been an Arm licensee for many years.

When SoftBank approached NVIDIA with the possibility to buy Arm, the Parties realized that NVIDIA would be uniquely suited to help Arm create new IP and develop a world-class ecosystem that could stand as an alternative to x86, giving customers more choice and growing markets worldwide. A viable alternative ecosystem would spur growth and demand for NVIDIA's platforms. It would encourage the x86 giants to innovate and expand their offerings as well, benefitting NVIDIA.

Arm's limitations as a standalone, IP-licensing only entity, have become apparent over many years. Arm licensees, including Broadcom, Qualcomm and more recently Marvell, have tried and failed to penetrate datacenter and PC. As mere licensees, they were neither able to direct Arm to make the necessary investment in datacenter and PC CPU, nor able to infuse Arm with the ecosystem-building expertise it needs.

The Transaction would materially change Arm's incentives and opportunities. In contrast to a standalone Arm, the Merged Entity would have every incentive, and the ability, to dramatically increase investment in Arm R&D across the board, rather than facing the difficult choices of where to de-invest and face further customer and competitive pressures.

After signing the Share Purchase Agreement, in public statements and binding offers to the UK government, NVIDIA committed to expand Arm's engineering teams in the UK, adding a new UK-based group dedicated to creating purpose-built CPU IP for datacenter and PCs. The enhanced investment in the UK, combined with NVIDIA's technological expertise, would accelerate Arm's product development and the Arm roadmap, allowing Arm to expand its reach into areas that it underserves today.

NVIDIA would also bring its expertise in SoC design, software, accelerators, and system designs to attract software, hardware and system developers to the Arm datacenter ecosystem. NVIDIA would port its platform solutions to Arm, and help developers optimize code for Arm-based accelerated systems.

Thus, the Transaction represents a unique, once-in-a-generation opportunity to expand and enhance Arm's ecosystem in critical markets. NVIDIA's investments in Arm and the UK would deconcentrate CPU markets long dominated by Intel's x86 CPUs, while accelerating Arm's roadmaps for mobile, IoT, and other areas Arm has traditionally served.

Given the strong competition Arm faces from Intel and AMD in every relevant antitrust market and NVIDIA's commitment to maintain Arm's open licensing model, the Parties did not foresee any insurmountable objection to the Transaction.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential – Contains Business Secrets

The Parties' businesses are highly complementary and relate to different levels of the semiconductor value chain. Arm primarily licenses CPU IP for low-power mobile devices, a sector in which NVIDIA is not active.

NVIDIA designs and supplies accelerated computing platforms, including graphics processing units ("**GPUs**"), for high-end gaming PCs[3] and datacenters. NVIDIA supplies its products to PC or server original equipment manufacturers ("**OEMs**").

Today, NVIDIA is best known for its industry-leading AI-enabled platforms and systems, including the "Cambridge-1" supercomputer NVIDIA built at its own expense and launched in the UK for medical research. (Reflecting Arm's minimal position in the datacenter market, NVIDIA purchased AMD x86 CPUs for the Cambridge-1 supercomputer—no suitable Arm CPU was available.) NVIDIA's investments in AI-related technologies have soared in recent years; most recently, in addition to developing Omniverse on x86 platforms, NVIDIA announced plans to develop "Earth-2": the world's largest and most powerful supercomputer, which will be dedicated to climate science.

In the few areas where NVIDIA uses Arm's CPU IP—primarily datacenter CPUs, SmartNICs (sometimes referred to as "data processing units" or **DPUs**), and autonomous vehicle SoCs—NVIDIA's competitors have numerous alternatives and are not at risk of foreclosure. And NVIDIA is not a potential competitor to Arm in any market. NVIDIA does not license its IP to others and absent the Transaction, has no plans to do so.

D.    **While NVIDIA and Arm engage with regulators, Arm's competition has been exploiting the delay and moving fast.**

NVIDIA, SoftBank, and Arm have been working with regulators at the CMA and worldwide for over a year, explaining how the Transaction will create new opportunities and new alternatives to the dominant x86 platform. Several leading Arm licensees (MediaTek, Broadcom, Marvell) expressed their support for the Transaction, but Intel and Qualcomm, which compete against Arm's own engineering teams and designs, have not.

In the meantime, Intel, Qualcomm, and Arm's other competitors continue to expand their offerings, exploiting the uncertainty surrounding Arm's future.

(i)    *Intel's x86 licensing program is a direct challenge to Arm.*

In March 2021, several months after NVIDIA and SoftBank announced the Transaction, Intel made its countermove, announcing that it will license its dominant x86 CPU IP to chip designers as part of its "foundry services" ("**Intel IFS**").

Intel heralded IFS as a "*meaningful shift in how people think about Arm versus x86.*"[4] IFS will leverage the power of "*a trillion lines of code that have been optimized for the x86*" ecosystem.[5]

---

[3]    High-end gaming PCs are PCs equipped with high-performance discrete GPUs.

[4]    Intel CEO says co-designed x86 chips will fend off Arm threat, PC Gamer (Apr. 23, 2021), available at https://www.pcgamer.com/intel-x86-vs-arm-gelsinger/.

[5]    Ibid.

-4-

Confidential – Contains Business Secrets

Moving rapidly out of the gate, Intel is already competing head-to-head with Arm to supply CPU IP for important customers, targeting cloud service providers. Intel's CEO Pat Gelsinger recently noted "*a lot of interest*" from a wide range of customers, including interests that include "*embedded-like use cases up to HPC use-cases with data center and cloud customers somewhat in the middle of those.*"[6]

Intel and Qualcomm quickly partnered on IFS, and, according to Intel's CEO, Qualcomm is "*driving [Intel] to do a more aggressive optimization for power/performance than [its] more performance-centric product lines would be*".[7]

IFS is a strong challenge to Arm's efforts in the datacenter and PC markets. Customization was Arm's greatest selling point in the datacenter, as Arm does not have the mature ecosystem or massive R&D resources that Intel can bring to bear. Now Arm's handful of datacenter customers can create custom x86 CPUs that will benefit from the massive x86 code base.

Every Arm customer—including NVIDIA—will now have IFS as a viable option, allowing chip designers to use x86 for every new product generation and line.

For Arm, investing in datacenter and PC has become a high-risk investment.

(ii)    **RISC-V's momentum is accelerating.**

The RISC-V community is also exploiting the regulatory delay and uncertainty. The past year saw a flurry of activity in RISC-V, a threat to Arm in automotive, IoT, and SmartNICs.

In June 2021, for example, SiFive announced its "P550" high-performance CPU IP based on RISC-V, which compares favorably to Arm's contemporary CPU IP block (Cortex-A75), in a smaller package.[8] In December 2021, SiFive announced that its next-generation microarchitecture (available in 2022), the "P650," which targets "high-end servers and other applications requiring large arrays of multiple processor cores."[9]

Meanwhile, in August 2021, Esperanto introduced a "supercomputer-on-a-chip" AI accelerator that uses more than 1,000 CPU cores based on RISC-V.[10] RISC-V vendor Imagination Technologies announced its roadmap for a full line of RISC-V processors, including CPU IP targeting server and autonomous driving applications.[11] Imagination and

---

[6]    Intel's Pat Gelsinger on Super Moore's Law Making Multi-Billion Dollar Bets, Tom's Hardware (Oct. 28, 2021), available at https://www.tomshardware.com/news/intels-pat-gelsinger-on-super-moores-law-making-multi-billion-dollar-bets.

[7]    Bringing Geek Back: Q&A with Intel CEO Pat Gelsinger, Anandtech (Oct. 29, 2021), available at https://www.anandtech.com/show/17042/bringing-geek-back-qa-with-intel-ceo-pat-gelsinger.

[8]    https://www.sifive.com/press/sifive-performance-p550-core-sets-new-standard-as-highest.

[9]    "SiFive Unveils 64-Bit RISC-V Server Core," EE Times (Dec. 2, 2021), available at https://www.eetimes.com/sifive-unveils-64-bit-risc-v-server-core/#; "SiFive Envisions 128-Core RISC-V SoCs as Gap With x86 and Arm Closes," Tom's Hardware (Oct. 22, 2021), available at https://www.tomshardware.com/news/sifive-develops-ultra-high-performance-risc-v-core.

[10]   https://www.esperanto.ai/esperanto-technologies-unveils-energy-efficient-risc-v-based-machine-learning-accelerator-chip-at-hot-chips-33-conference/.

[11]   "Imagination Technologies unveils Catapult RISC-V CPU family," VentureBeat (Dec. 6, 2021), available at https://venturebeat.com/2021/12/06/imagination-technologies-unveils-catapult-risc-v-cpu-family/.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ARM_01239747

other RISC-V vendors have a strong incentive not only to compete in the marketplace, but also to ▮▮▮▮▮▮▮▮▮▮▮▮ Established vendors are using more and more RISC-V in their offerings—Renesas is partnering with SiFive to develop jointly next-generation automotive solutions,[12] Intel is deploying RISC-V in certain FPGAs,[13] and Alibaba has released open-source RISC-V processor designs.[14]

### E. Arm's architectural licensees, including Qualcomm, are competing with (and recruiting from) Arm's implementation IP teams.

The Decision erroneously presumes that architectural licensees such as Apple and Qualcomm demonstrate Arm's success. But the architectural licensees do *not* use Arm's CPU designs. Arm architectural licensees create their *own* proprietary CPU designs using their *own* engineering teams in the United States.

As a result, these architectural licensees *compete* with Arm's own engineers. Their success will *concentrate* the market, because they do *not* license their designs to anyone else. Apple's industry leading M1 processor, for example, was designed entirely by Apple, not Arm. It is captive and available only to Apple.

Arm's architectural licensees, such as Qualcomm, compete head-to-head with the licensees that use Arm's own CPU designs, such as MediaTek. As a result, those architectural licensees would *benefit* from less competitive Arm designs. They would benefit from reduced investment in Arm's own engineering teams. They would also *benefit* if Arm was forced to remain standalone and had to scale back on its R&D to please the public markets. It is no coincidence that the industry's most prominent architectural licensee, Qualcomm, is the party most publicly opposed to the Transaction. The Decision implies that Ampere Computing, another architectural licensee, is against the Transaction as well. MediaTek, Broadcom, and Marvell, all implementation licensees who want Arm's engineering teams to be strong and would benefit from the increased R&D that NVIDIA will provide, support the Transaction.

Since the Parties entered into the Transaction, Arm's architectural licensees have doubled down, seeking to maintain their advantage over Arm's own engineering teams and other downstream customers. Qualcomm, for example, paid $1.4 billion to acquire NUVIA's CPU design team (comprised of Arm and Apple alumni) and create a proprietary CPU that Qualcomm will keep for itself.[15]

---

[12]    Renesas and SiFive Partner to Jointly-Develop Next-Generation High-End RISC-V Solutions for Automotive Applications (April 21, 2021), available at <https://www.renesas.com/eu/en/about/press-room/renesas-and-sifive-partner-jointly-develop-next-generation-high-end-risc-v-solutions-automotive>.

[13]    Nios V Processors, Intel, available at https://www.intel.com/content/www/us/en/products/details/fpga/nios-processor/v.html.

[14]    Alibaba's new 16-core CPU will challenge Intel Xeon in datacenters, TechRadar (August 28, 2020), available at https://www.techradar.com/uk/news/alibabas-new-16-core-cpu-will-challenge-intel-xeon-in-datacenters.

[15]    Qualcomm's new CEO eyes dominance in the laptop markets, Reuters (July 2, 2021), available at https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ARM_01239748

Confidential – Contains Business Secrets

The Decision appears to be confused by the fact that architectural licensees pay fees to Arm. Those fees compensate Arm for any copyrights and patents embodied in the Arm ISA, as well as verification collateral. But the architectural licensees do **not** use Arm's designs.

As a result, the architectural licensees pose a threat to Arm's implementation IP business. When architectural licensees create implementations that are more advanced or powerful than Arm's own, innovation and competition suffer. Arm ultimately will find it increasingly difficult to fund its own engineering teams to create implementation IP for its implementation licensees who need that IP to compete against the architectural licensees. Instead, Arm could be pressured to further cut back on investment to drive profitability, while Apple and Qualcomm create their proprietary designs and chips for the downstream markets, which cannot be sublicensed to other companies.

This is not a theoretical risk. Arm's architectural licensees are among the most profitable technology companies in the world, larger and far better funded than Arm. The architectural licensees also have the means and incentive to challenge Arm for engineering talent, risking a downward spiral—*i.e.*, Arm must pay more to retain its engineers, which increases Arm's costs, which makes Arm less profitable, which discourages Arm from making further investments in its own implementation IP, which makes Arm less competitive with the architectural licensees (and less competitive with x86), and so on.

The Decision fails to grapple with this threat, but Arm cannot ignore it. The existence of architectural licenses creates pressure on Arm to find the funding to increase resources and scale to compete with designs from powerful semiconductor giants with larger R&D budgets.

F.      **The Merged Entity would have no ability to foreclose competition.**

The Decision contends that Arm has market power, which would allow the Merged Entity to foreclose competition in numerous downstream markets. The Decision's logic and conclusions are flawed.

**First**, the Decision ignores competition from Intel in every relevant market. Antitrust law preserves **competition**—it does not empower customers and competitors with veto rights over acquisitions. The Decision appears to lose sight of this fundamental principle, contending instead that if enough high-profile Arm customers object to the deal, the Transaction must be anticompetitive and should be blocked.

But even if some customers and competitors are unhappy with Arm's plans, the Transaction has no risk of **foreclosing competition**. In datacenter and PC CPUs, for example, the Merged Entity cannot foreclose Intel, which has been the dominant CPU supplier for over 30 years. Downstream customers have several Intel options—Intel not only offers its own CPU designs, but now also licenses x86 IP for third parties to make their own custom CPU and SoC designs.

The Decision disparages Intel, AMD, and hundreds of RISC-V supporters as forever unable to compete with Arm. No industry observer can seriously contend that Intel, AMD, and Arm's other competitors are so incapable that they cannot even **compete** with Arm. Intel and AMD are the industry leaders, not also-rans. NVIDIA has chosen x86 for its DGX and its supercomputers for good reason. Intel and AMD's CPUs are not going anywhere, and they will compete with Arm for the foreseeable future. With or without the Transaction, Arm cannot foreclose competition.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    ARM_01239749

Confidential – Contains Business Secrets

*Second*, the Decision ignores the power of Arm's long-term licensee contracts (and Arm's powerful architectural licensees), which ensure that the Merged Entity cannot foreclose its licensees *for many years*, and therefore, cannot foreclose competition. Arm licensees even have perpetual manufacturing rights, which means that they can forever continue to make, use, and sell chips designed during the license term.

*Third*, the Decision ignores Arm's history and financials. The past few years have been extraordinary for the semiconductor industry, with unprecedented growth. If the CMA's view of Arm were correct and Arm has "market power" in every market, then Arm should have soaring profits, especially with its largest customers (Apple, Qualcomm, Amazon) achieving unprecedented financial returns. But the record reflects that Arm continues to lag far behind its customers. Only one rational conclusion can be drawn: Arm faces significant competition in every relevant market.

G.    **The Merged Entity will have no incentive to foreclose.**

Even if the Merged Entity *could* foreclose competition, it would have no incentive to do so. Rather, the Merged Entity would have every incentive to do exactly what NVIDIA has repeatedly pledged: increase Arm's R&D, grow the ecosystem, and license all existing and prospective customers without discrimination.

The Decision disagrees, suggesting that because NVIDIA makes more money selling its products than Arm makes licensing IP, NVIDIA must have a secret plan to destroy Arm's business, rather than grow it.

The Decision's theory does not hold up to scrutiny. Arm licenses IP for products that will not come to market *for years*. As a result, any foreclosure strategy cannot possibly benefit NVIDIA's downstream sales *for years* (if ever). Yet trying to foreclose Arm licensees would *immediately* reduce Arm's licensing revenue, *immediately* damaging NVIDIA's investment.

No economically rational, publicly traded entity would embrace such a self-defeating strategy. The Decision fails to offer any rational economic theory or other credible explanation for why, in the face of competition from x86 and RISC-V, the Merged Entity would destroy NVIDIA's multibillion dollar investment in an entirely speculative hope of winning more downstream business many years into the future.

The Decision fails to identify *any* evidence—not a single NVIDIA document—suggesting that NVIDIA plans to embark on such a self-defeating foreclosure strategy. To the contrary, the evidence and common sense shows that any foreclosure strategy would not only lead to financial calamity, but as Arm's licensees are also NVIDIA's current customers and suppliers, it also would incur the wrath of NVIDIA's most powerful ecosystem suppliers and customers. The Merged Entity would have no incentive to foreclose.

H.    **NVIDIA offered legally-binding and easily enforceable guarantees that would give customers and regulators far more assurances and rights than they have today.**

Although the Transaction does not give rise to a substantial lessening of competition ("**SLC**") in any market, NVIDIA has been willing to stand by its promises to Arm and its customers from the outset. With that in mind, NVIDIA offered comprehensive guarantees (which Arm does *not* provide today, and would *not* provide if it went through an IPO) to:

-8-

Confidential – Contains Business Secrets

(i)     Implement an open licensing program, with equal and early access available to all Arm licensees,

(ii)    Expand Arm's R&D in the UK and support Arm's product roadmaps,

(iii)   Promote interoperability and allow Arm customers to determine interoperability as they deem fit, and

(iv)   Protect any confidential Arm customer information.

When deal opponents argued that NVIDIA could still somehow keep the "best" Arm IP for itself, NVIDIA offered additional guarantees, pledging to license *any* CPU IP the Merged Entity creates, including any CPU IP generated by *NVIDIA's own CPU design teams*. In other words, NVIDIA would give Arm customers such as Intel, Qualcomm, and others a significant advantage. Arm customers could continue to create their own proprietary CPU designs for themselves, but NVIDIA would keep nothing for itself, and offer *every* CPU design to all Arm licensees.

When deal opponents claimed that the law would be powerless to enforce NVIDIA's contractual and regulatory promises, NVIDIA proposed to create a new and independent entity, the Arm Licensing Co. ("**ALC**"), that would be solely responsible for negotiating, licensing, and distributing Arm IP to all interested parties, eliminating any concern about discrimination. The ALC would administer contracts with customers and provide support services, eliminating any concern about confidentiality.

NVIDIA would be a passive minority shareholder but would not control the ALC. By its corporate charter, the ALC would be legally obligated to pursue a single purpose: growing the Arm ecosystem, maximizing the revenue available for Arm R&D, and treating *all* Arm customers fairly, without discrimination or unfair preferential access.

Without the Transaction, Arm would be under no such obligations.

I.     **The Decision ignores Arm's profit motive and erroneously assumes that structural independence guarantees that Arm is (and will remain) "neutral".**

The Decision dismisses all remedies without substantive engagement. Instead, the Decision suggests that (i) Arm's long-term, legally binding contracts will not limit NVIDIA's post-close conduct, and (ii) the CMA and regulators worldwide will be powerless to enforce NVIDIA's binding commitments.

The Decision argues that to protect competition, Arm must be "neutral," and that only Arm's structural independence will guarantee neutrality. The Decision also presumes, without any evidence, that a structurally independent Arm will make investment and roadmap decisions that will promote competition. The Decision's premise and conclusion are flawed.

*First*, the Decision fails to recognize that while Arm is open, it is *not* strictly "neutral" today. To the contrary, the evidence reveals that Arm consistently seeks to maximize its own profits, like any other private business. For example, Arm previously allowed       and select other customers to pay a premium for early access to CPU IP with a performance boost that Arm did not make available to other licensees until later. Arm also operates a limited "Lead Partner" program, with select licensees given priority access to Arm IP, for a fee.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    ARM_01239751

Arm's contract terms, license fees and royalties vary across licensees. Arm gave the world's most powerful entities, ▮▮▮▮▮▮▮▮▮▮▮▮▮ the right to create their own proprietary instructions, allowing them to leverage their market power over their software to chips. Arm made sizable financial investments in certain customers (*e.g.*, Ampere and Marvell), but not others, and has a greater financial interest in their success.

*Second*, the Decision does not present any rational economic theory supporting the assumption that Arm's structural independence ensures that it will treat all customers the same. Economic theory holds that as an independent entity, Arm will continue to act in its own profit-maximizing self-interest.

The Decision ignores this inconvenient truth. Where profitable, standalone Arm could continue to favor some licensees over others, grant preferential licensing terms, and benefit its largest and most powerful customers. If an Arm licensee gave Arm a highly profitable offer for exclusive early access, standalone Arm could grant such rights, if it wished. NVIDIA has made a binding, enforceable offer to do no such thing.

*Third*, the Decision does not present any evidence or economic theory supporting its argument that Arm's structural independence means that it would make investment decisions that would promote downstream competition. Rather, Arm would make investment decisions that benefit standalone Arm, and please its new investors. Where Arm has less to gain from a market (such as datacenter and PC), Arm would be less inclined to invest.

The Decision fails to grapple with this economic reality. A hypothetic standalone post-IPO Arm would have an incentive to cut costs in the UK and worldwide, jettison unprofitable projects, and increase revenues to please its future shareholders. Such cuts would benefit the industry's dominant players, who have little interest in seeing Arm enable others.

The CMA insists that Arm must forever be locked into its current form, and that any "change in incentives" is harmful to competition. The Transaction will change Arm's incentives, but to the *benefit* of competition, not to its harm. The Merged Entity will have a far *greater* incentive to invest in markets that Arm may otherwise be forced to neglect, an incentive to grow Arm's R&D teams in the UK and elsewhere, and reason to pour resources and technology into a broad effort to grow Arm's ecosystem.

J.      **The UK's extended review will not benefit Arm or promote competition.**

The Transaction is not nearly as complicated as the Decision would suggest. In every relevant market, Arm faces powerful competition that it cannot foreclose, and with that, the CMA's review should have concluded that the Transaction does not give rise to a concern in any market.

Nonetheless, deal opponents urge the CMA to block the Transaction. That outcome may please the world's most powerful and profitable technology companies, but it would not help Arm, drive innovation, or preserve competition. Rather, it will likely lead to less investment in the UK, less resources for Arm, less innovation, and less competition worldwide.

Offering concrete and enforceable guarantees, NVIDIA has pledged to help build an innovative, non-discriminatory Arm that would increase investment in the UK, and create and democratize world leading Arm IP. Over a year has passed since the Transaction was announced, and for Arm, time is of the essence. With Arm's adversaries moving quickly

Confidential – Contains Business Secrets

worldwide, and the Decision urging Arm's perpetual "independence", an opportunity for
Arm and the UK is slipping away.

## 2.    DATACENTER CPUs

Citing customer testimonials, the Decision jumps to the conclusion that standalone Arm is
finally poised to conquer the datacenter market and relegate Intel, AMD, and x86 to also-ran
status. But even Arm's most ardent supporters do not believe that x86 will suddenly
disappear from the datacenter market. To the contrary, Arm's most optimistic projections
(before Intel launched IFS) did not portend Intel's demise, conceding that Intel will account
for a large majority of the datacenter CPU market for the foreseeable future. From an
antitrust perspective, that should have been the end of the matter; if Intel cannot be
foreclosed, there can be no SLC on the market for datacentre CPUs.

### A.    Summary of the Parties' activities

**Arm** develops and licenses general-purpose CPU IP and does not supply CPUs. **NVIDIA**
does not license CPU IP to others, and today, NVIDIA does not currently have a datacenter
CPU product.[16]

### B.    No ability to foreclose

#### (i)    No ability to foreclose Intel (or AMD)

The Decision notes that Arm's few datacenter customers are happy with Arm, and therefore,
declares that Arm has market power that NVIDIA could abuse.

Satisfied customers are not an antitrust market. Arm-based/compatible datacenter CPUs
indisputably compete with Intel (and AMD), which dominates the downstream market for
datacenter CPUs with x86-based processors (>95% share in terms of volume and value).
Arm-based/compatible CPUs account for only ▮▮% of the overall market for datacenter
CPUs in terms of value in 2020 (and only ▮▮% in terms of volume).

In the face of these facts, the Decision claims "*that the importance of x86-based Datacentre
CPUs downstream for server OEMs is declining based on Intel's decreasing share of
supply*"—pointing to Intel's decline from ▮▮▮▮▮ by volume and ▮▮▮▮▮ by value
between 2018 and 2020.[17] The Decision ignores the obvious explanation—Intel has
primarily lost share to AMD (another x86-based supplier), *not* to Arm-based designs, which
still represent a tiny fraction of the addressable market. As industry expert The Next
Platform observed, "*[w]e don't hear of a single big HPC system in the United States that
does not have AMD CPUs.*"[18]

The CMA cannot dispute that the x86 ecosystem dwarfs Arm's. The x86 ISA is ubiquitous
in datacenters, and has been for decades, leading to the development of an enormous software
and developer ecosystem. The x86 ecosystem has "*one trillion lines of code*" optimized for

---

[16]    NVIDIA is currently developing an Arm-compatible datacenter CPU (Grace), intended for a narrow
sliver of the datacenter space.

[17]    The Decision, para. 7.37.

[18]    AMD Rides The High Performance Computing Megacycle, The Next Platform (January 26, 2021),
available at <https://www.nextplatform.com/2021/01/26/amd-rides-the-high-performance-computing-
megacycle/>.

-11-

Confidential – Contains Business Secrets

its architecture, creating a compelling reason for customers to choose x86 over Arm.[19]  These lines of code support critical software offerings that are directly available on x86 but unavailable on Arm, including Microsoft's enterprise apps, Salesforce, Adobe, SAP, Oracle ERP, Workday, ServiceNow, and Intuit.  The fabric of the 3D worldwide web, powered by NVIDIA's Omniverse, is being developed based *entirely* on x86 systems, not on Arm.  The lack of a competitive Arm ecosystem is also corroborated by Broadcom, Qualcomm and Marvell's exit from the general-purpose Arm-based CPU IP datacenter market segment.

Despite this, the Decision attempts to disqualify x86 from consideration on the grounds that Intel is "*proprietary IP or self-supply (including Intel, AMD and IBM), not currently available to third parties*".[20]  This curious criticism is misplaced for several reasons.

*First*, even if "proprietary" IP were not widely available to third parties, CPUs based on that IP still constrain Arm's business.  At no point does the CMA suggest that the downstream market can be limited to datacenter CPU suppliers who use only "non-proprietary" CPU IP—and such a distinction would lack any basis in economics or the law.

*Second*, x86 IP is available to *all* of Arm's customers.[21]  Intel is directly targeting Arm's narrow toehold in datacenter, enabling customers to use Intel IP to create custom chips.[22]  Arm's highest-profile datacenter customer, Amazon, has already lined up as one of Intel's first IFS customers.[23]  Dozens of other customers have already engaged with Intel, which is "*opening the doors*" to Intel IP and causing a "*meaningful shift in how people think about Arm.*"[24]

The Decision dismisses Intel's licensing program, suggesting that downstream customers will shun x86 IP and refuse to collaborate with Intel.[25]  Aside from being economically irrational, that would be surprising to Intel and the dozens of customers that have already engaged with it.[26]

---

[19]    Transcript of INTC Q1 2021 Earnings Call (April 22, 2021).

[20]    The Decision, para. 7.26.

[21]    Intel CEO Pat Gelsinger Announces 'IDM 2.0' Strategy for Manufacturing, Innovation and Product Leadership, Intel (March 23, 2021), available at https://www.intel.com/content/www/us/en/newsroom/news/idm-manufacturing-innovation-product-leadership.html#gs.aeohs7; INTC Q1 2020 Earnings Call (Apr. 22, 2021), at p. 18-19.

[22]    Intel: The Empire Strikes Back," Seeking Alpha (May 12, 2021), available at https://seekingalpha.com/article/4427816-intel-the-empire-strikes-back ("Pat Gelsinger certainly wasn't shy about name-dropping potential customers, such as the cloud providers as well as possibly Apple… . [I]f a cloud service provider wanted to take Intel's x86 cores and create their own chips based on these cores, this would be completely possible—in the process effectively sidestepping the Intel client or data center business.  **This could hence be seen as an alternative to Arm's Neoverse effort.**  Whether this eventually results in x86-based AWS Graviton instances remains to be seen.  But it does provide a clear, perhaps even visionary, response to some of the concerns of those players developing their own (Arm-based) silicon, at least in principle" (emphasis added).

[23]    Intel to build Qualcomm chips, aims to catch foundry rivals by 2025, Reuters (July 26, 2021), available at https://www.reuters.com/technology/intel-build-qualcomm-chips-aims-catch-foundry-rivals-by-2025-2021-07-26/.

[24]    INTC Q1 2021 Earnings Call (Apr. 22, 2021), at p. 18-19.

[25]    The Decision, para. 7.37.

[26]    For example, Intel is collaborating with Qualcomm on foundry opportunities.  As Mr. Gelsinger explained, "For instance, our engagement with Qualcomm. They're driving us to do a more aggressive

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ARM_01239754

Confidential – Contains Business Secrets

In fact, in a recent interview, Intel's CEO Pat Gelsinger explained why Intel expects to continue to win against Arm in the datacenter:

> *"And when you think about the datacenter space, the role of Arm is very minimal today, and us getting our act together, I think it stays that way. I just don't see that people want to go through all that hard, heavy lifting of changing the software environment for another architecture if there [aren't] major [total cost of ownership] advantages on the table – and there [aren't] if we've done our job well in that respect."[27]*

Over the next few years (before Arm licensee contracts expire) every Arm licensee, including NVIDIA itself, will have an opportunity to consider Intel IFS.

The Decision brushes Intel's progress aside, arguing that Intel's success in datacenter—Intel's core market and a space it has dominated for decades—is simply too uncertain to be given credit as a material competitive constraint. But Intel, not Arm, is the datacenter incumbent, with the attendant advantages. Arm's datacenter CPU IP is not designed from the ground up for the datacenter,[28] and there are multiple examples of Arm-based datacenter CPU suppliers that tried and exited the market, including Qualcomm, Broadcom, and Marvell.[29]

Today's cutting-edge technologies and systems, including NVIDIA's Omniverse and Cambridge-1 supercomputers, are based on x86 CPUs, not Arm. Whatever the CMA may think about Intel and AMD, it cannot dismiss x86 as serious competition for the foreseeable future, and that, alone, defeats any SLC.

---

optimization for power/performance than our more performance-centric product lines would be, so they're making IDM better by the engagement with IFS customers, standardized PDKs, and other things." See Intel's Pat Gelsinger on Super Moore's Law Making Multi-Billion Dollar Bets, Tom's Hardware (October 28, 2021), available at https://www.tomshardware.com/news/intels-pat-gelsinger-on-super-moores-law-making-multi-billion-dollar-bets. See also Intel: The Empire Strikes Back, Seeking Alpha (May 12, 2021), available at https://seekingalpha.com/article/4427816-intel-the-empire-strikes-back ("Pat Gelsinger certainly wasn't shy about name-dropping potential customers, such as the cloud providers as well as possibly Apple. . . . [I]f a cloud service provider wanted to take Intel's x86 cores and create their own chips based on these cores, this would be completely possible—in the process effectively sidestepping the Intel client or data center business. This could hence be seen as an alternative to Arm's Neoverse effort. Whether this eventually results in x86-based AWS Graviton instances remains to be seen. But it does provide a clear, perhaps even visionary, response to some of the concerns of those players developing their own (Arm-based) silicon, at least in principle."). Intel now identifies Qualcomm as one of its top strategic customers. See Intel Calls Qualcomm A Top Strategic Account In Sales Reorg Memo, CRN, November 10, 2021, available at https://www.crn.com/news/components-peripherals/intel-calls-qualcomm-a-top-strategic-account-in-sales-reorg-memo.

[27] Intel CEO says AMD's time is 'over', PCWorld (October 4, 2021), available at https://www.pcworld.com/article/540875/intel-ceo-says-amds-time-is-over.html.

[28] NVIDIA-CMA-007845211.

[29] Qualcomm's new CEO eyes dominance in the laptop markets, Reuters (July 2, 2021), available at https://www.reuters.com/technology/qualcomms-new-ceo-eyes-dominance-laptop-markets-2021-07-01/ ("Qualcomm has no plans to build its own products to enter the other big market for CPUs—data centers for cloud computing companies."). See Broadcom quietly dismantles its 'Vulcan' ARM server chip project, The Register (December 7, 2016), available at https://www.theregister.com/2016/12/07/broadcom_arm_processor_vulcan/.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ARM_01239755

Confidential – Contains Business Secrets

### (ii)    *No ability to foreclose RISC-V or other alternatives to Arm*

The Decision also dismisses the looming threat posed by RISC-V, noting that today, third-party datacenter CPU suppliers report that they prefer Arm.[30]  The question is not whether Arm's **existing** customers prefer Arm **today**.  They obviously selected Arm over RISC-V in the first place.  Rather, the question is whether hypothetically, if the Merged Entity were to refuse to license future datacenter IP as soon as it can (**which is many years down the road**), customers could pursue other alternatives **at that time**.  The Decision does not grapple with that question, simply assuming that RISC-V will forever trail Arm, and never be competitive.

Given the long timeframe at issue (customers **already** have the IP in their possession, and it will be many years before their contracts are up for renewal) and the significant international effort underway on RISC-V, the CMA cannot presume that RISC-V will fail.  RISC-V has two potential advantages over Arm today—it is both less expensive and more customizable than Arm.  Even if customers prefer Arm today, RISC-V creates a very real competitive constraint.

The trade press is filled with the steady drumbeat of recent public announcements supporting RISC-V.  SiFive announced server-class CPU IP based on RISC-V, available in 2022.[31]  At least one vendor has already produced a "demo board" for a high-performance computing server based on SiFive CPU IP.[32]  Imagination Technologies has likewise announced a full stack of CPU IP based on RISC-V, specifically targeting the Arm stack of microcontrollers and microprocessors.[33]  The RISC-V standard itself has been advanced to support developments in AI and machine learning.[34]  Alibaba developed RISC-V CPU chip designs for the datacenter, which they have released on an open-source basis and which they are continuing to develop.[35]  SiFive and others also supply chips based on their own CPU designs.

The CMA does not address the critical question: if RISC-V is as uncompetitive as the Decision claims, why are so many industry leaders around the world pursuing it?  Sophisticated firms are spending billions of dollars on RISC-V for a reason.  RISC-V is a very real competitive constraint, and the CMA cannot ignore it.

### (iii)    *No ability to foreclose architectural licensees*

The Decision also fails to address the impact of Arm's architectural licensees.  Arm's architectural licensees, including Apple, Qualcomm/NUVIA, Marvell, Ampere and

---

[30]    The Decision, paras. 7.17 to 7.19.

[31]    *See* SiFive Unveils 64-Bit RISC-V Server Core, EETimes (December 2, 2021), available at https://www.eetimes.com/sifive-unveils-64-bit-risc-v-server-core/#.    *see    also* https://www.tomshardware.com/news/sifive-announces-p650-riscv;    *and    see* https://www.cnet.com/tech/mobile/sifives-new-risc-v-chip-challenges-decades-old-computing-designs/.

[32]    *See* https://www.tomshardware.com/news/risc-v-cluster-demonstrated.  As this article notes, the demo board being sampled is designed to help other vendors test their software and develop an "ecosystem" around RISC-V CPUs for the datacenter.

[33]    https://www.anandtech.com/show/17104/imagination-launches-catapult-family-of-riscv-cpu-cores.

[34]    https://www.notebookcheck.net/RISC-V-specifications-update-brings-improved-machine-learning-virtualization-and-encryption-instructions.582665.0.html.

[35]    https://www.cnx-software.com/2021/10/20/alibaba-open-source-risc-v-cores-xuantie-e902-e906-c906-and-c910/.

-14-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Confidential – Contains Business Secrets**

Microsoft, do *not* need to rely on Arm's CPU designs. Rather, the architectural licensees have designed their *own* CPUs compatible with the Arm ISA.

The Decision fails to recognize that Arm has *already* granted all the rights that architectural licensees need to compete. Neither Arm nor the Merged Entity can foreclose Arm's architectural licensees—they do not need anything further to design their own CPUs. For example, **NUVIA** (now owned by Qualcomm) created its *own* CPU design to compete with Intel, AMD, and Arm's other licensees. NUVIA's CEO, a former CPU developer at Arm and Apple, explained that NUVIA would not use Arm's "off-the-shelf" IP and emphasized that NUVIA's custom Arm-compatible CPUs will compete with Arm's own IP:

> "*This is a server-class CPU, with an SoC surrounding it, and it is designed to be the clear-cut winner on each of those categories – and in totality," says Carvill, throwing down the gauntlet to all of the remaining CPU players, who each have their own ideas about how to take on Intel's hegemony. "And we are not talking about the incremental performance improvements that we have come to expect over the past five years. We are talking about really meaningful, significant, double-digit performance improvements over what anyone has seen before…. What we are doing is custom, and we will not be using off the shelf, licensed cores. We are going to use an Arm ISA, but we are doing it as a clean sheet architecture from the ground up that is built for the hyperscaler world.*"[36]

Thus, the Merged Entity cannot foreclose Apple, Qualcomm, and others.

### (iv)    *Arm contracts ensure that the Merged Entity cannot even attempt to foreclose, much less impact downstream markets, for years.*

The Decision presumes that the Merged Entity will be able to deprive Arm customers of Arm IP in the very near future. But Arm cannot "claw back" IP from customers—once a customer has created a chip with the IP it has licensed from Arm, it can use that IP to make as many chips as it wants.

Moreover, Arm licensees receive the right to design Arm-based chips for a long duration, often between 2-7 years, and in some cases much longer. ████████████████████████
████████████████████████████████████████████████

Arm licensees also have perpetual manufacturing rights, allowing them to make, use and sell chips forever. If the Merged Entity suddenly announced that it would breach its contracts (and its commitments to regulators) and refused to license henceforth, licensees could still manufacture and sell Arm-based chips throughout the *next decade*—and sell them for even longer (because all Arm licensees have perpetual manufacturing rights). Licensees would have plenty of time to find alternatives, with no benefit to the Merged Entity for many years. Accordingly, the Merged Entity cannot foreclose Arm customers, even if it wished.

---

[36]    Throwing Down The Gauntlet To CPU Incumbents, The Next Platform (February 11, 2020), available at    <https://www.nextplatform.com/2020/02/11/throwing-down-the-gauntlet-to-cpu-incumbents> (emphasis added).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    ARM_01239757

**Confidential – Contains Business Secrets**

C.    **No incentive to foreclose**

    *(i)    Attempting to foreclose would be economically irrational.*

The Decision argues that when the Transaction closes, NVIDIA will declare that its promises to customers and regulators have been a ruse and will announce itself to be the world's single source of Arm CPUs for datacenters.

Even if that were possible (and it is not), NVIDIA knows that such a strategy would be self-defeating, and has no incentive to pursue it. The Decision does not explain why *any* downstream customer would embrace a sole-source ecosystem. Even x86 has always had two *bona fide* suppliers (Intel and AMD), and now, x86 is licensable to anyone. Unable to explain why NVIDIA would try to foreclose, the Decision argues that Arm's few datacenter customers are so happy with Arm and would never leave, no matter how badly Arm mistreats them. Even if that were true of some customers, the lion's share of the market does not use Arm *at all*, meaning that customers would simply choose x86.

NVIDIA's incentives are straightforward and clear. By improving Arm CPU IP and licensing it to all interested parties, NVIDIA maximizes the probability of expanding the Arm ecosystem in the datacenter, creating new competition with Intel and AMD, and deconcentrating the datacenter CPU market with more CPUs and lower CPU prices. A deconcentrated datacenter CPU market translates into more acceleration opportunities for NVIDIA's GPU business, a fact the Decision ignores.

Furthermore, NVIDIA has every incentive to invest *more* in datacenter IP and *grow* an Arm ecosystem in datacenter, not crush it before it has a chance to succeed. Arm's CPU IP customers currently represent very low single digits of the datacenter market, so the Merged Entity would have little to foreclose. If the Merged Entity could foreclose access to Arm IP for datacenter CPUs, customers would simply turn to Intel IFS/x86, or to other options. No economically rational entity would engage in a foreclosure strategy that guaranteed an immediate loss of licensing revenues and future lost royalties for an uncertain future gain.

    *(ii)    Attempting to foreclose would damage NVIDIA's business and reputation.*

Foreclosure would damage NVIDIA's business in a myriad of other ways. Arm's customers are NVIDIA's customers and suppliers—NVIDIA cannot antagonize them.

For example, NVIDIA engages in projects with **AWS**, **Microsoft**, **Google**, and other leading software creators for datacenters. For NVIDIA to succeed, the world's largest software operators and cloud service providers must continue to support NVIDIA-accelerated platforms, and decide to port their software to work on the Arm ISA.

NVIDIA also welcomes collaboration with **Qualcomm**, which is the dominant supplier of 4G and 5G chips. Qualcomm is one of Arm's most important customers due to its leading position in the mobile segment. At the same time, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, Qualcomm has immediate power over NVIDIA and Arm, while it enjoys long-term protection for its current and future designs against strategic behavior by the Merged Entity.

Large datacenter customers, including AWS, Google, Microsoft, and leading OEMs, have enormous R&D budgets, purchasing power, and leverage. They can choose from a complete

-16-

Confidential – Contains Business Secrets

suite of products from x86 suppliers Intel and AMD (including CPUs and GPUs) or build their own custom products. NVIDIA seeks to work with them, not foreclose them. The Decision's assertion that "*the limited alternatives to Arm… will undermine any buyer power (and any contractual protection) that licensees may have*"[37] does not hold water, in particular given the alternative suppliers outlined above.

### D.    No SLC in the supply of datacenter CPUs

Compared to a standalone Arm, the Merged Entity will promote competition, not lessen it. Arm datacenter CPUs account for only a sliver of the datacenter CPU market, while the vast majority of datacenter servers use x86 CPUs and would be unaffected by any foreclosure attempt (representing over 95% of the market for datacenter CPUs). The only theoretical area of future foreclosure—new Arm-based CPU cores from implementation licensees— would have no effect on competition in datacenters.

### 3.    DATACENTER SMARTNICS

Relying again on customer testimonials, ignoring competition from x86 and RISC-V, and neglecting the limitations of Arm's business, the Decision contends that the Merged Entity may have the ability and incentive to foreclose competitors in the nascent downstream SmartNIC market.[38] To the contrary, the Merged Entity would have every reason to expand Arm's IP and license it to everyone.

### A.    Summary of the Parties' activities

**Arm** supplies general-purpose CPU IP which can be used in any processor. Arm's Cortex-A is used in (amongst others) many SmartNICs for their principal processing function.

**NVIDIA** supplies finished SmartNICs based on the Ethernet and InfiniBand communication protocols.

### B.    No ability to foreclose

#### (i)    *Arm has no market power in CPU IP licensing used in SmartNICs.*

SmartNICs are peripheral devices that do not require specific IP. General-purpose CPU IP suitable for SmartNICs is available from a range of suppliers other than Arm, including SiFive and other RISC-V vendors. Nonetheless, the Decision cites an Arm customer that declares "*Arm-based processors are an 'essential piece' of a SmartNIC as they have the right mix of power, performance and ability to interface various IP blocks needed in a SmartNIC.*"[39]

Customer satisfaction with an Arm product does not reflect market power. The question is not whether Arm's current customers are satisfied with Arm IP (they chose it, after all) but rather, whether the Merged Entity would have the power to foreclose ***competition***.

---

[37]    The Decision, para. 7.65.

[38]    The Decision, para. 7.115.

[39]    The Decision, para. 7.45(a).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    ARM_01239759

Confidential – Contains Business Secrets

In the hypothetical event of foreclosure, SmartNIC suppliers could switch to any other supplier of CPU technologies for the next generation of SmartNICs. Intel and AMD could turn to their own x86 CPU technology or RISC-V, as Intel recently has for its next generation of "soft processors" for its FPGAs.[40] Other SmartNIC providers could license x86 from Intel or proprietary designs from companies such as Synopsys, buy RISC-V and Power alternatives (*e.g.*, from SiFive, Andes, or MIPS), or take these open-source ISAs and build their own.[41]

Indeed, SiFive's CPU IP (including its next-generation microarchitecture, which SiFive states "*is within reach of Arm's Cortex A78 and Intel's Rocket Lake family*"[42]) is capable of addressing the requirements of SmartNICs. The Decision fails to provide any reason why RISC-V would not constitute a viable alternative to Arm, especially in the long timeframe at issue.

> (ii)  ***Arm licensees are contractually protected against foreclosure.***

The same arguments discussed above in relation to the contractual provisions protecting Arm customers in relation to datacenter CPUs also hold true for SmartNICs. As a result, NVIDIA cannot foreclose competition in SmartNICs.

## C.    No incentive to foreclose

As with datacenter CPUs, the Merged Entity would immediately forgo licensing revenues if it attempted to foreclose new IP, but it would ***not*** shift any downstream sales for years, if ever.

SmartNIC competitors such as Intel and AMD/Xilinx have demonstrated that state-of-the-art SmartNICs do not need to use the most current Arm IP—they are using Cortex-A53 cores, a decade old. Refusing to grant new licenses to any SmartNIC customers or degrading their terms would merely push the entire SmartNIC market to Intel and AMD, who do not need new Arm IP to succeed. Moreover, as decade-old CPU cores are adequate to make state-of-the-art SmartNICs, Arm competitors such as SiFive, Andes, MIPS, and others would immediately step in and offer CPU cores that are more than adequate.

To the extent that Intel and AMD/Xilinx wish to use new Arm IP over their own x86 designs, NVIDIA has no reason to antagonize them. NVIDIA's products must work with x86 CPUs from **Intel** and **AMD**, as the majority of NVIDIA's revenue continues to be based on x86 systems for the foreseeable future.

## D.    No SLC in the supply of SmartNICs

Arm customers appreciate Arm IP today, but it does not follow that the Transaction will harm competition. As is the case in the analysis of datacenters, the Decision elevates customer testimonials and complaints over economic reality, the law, and common sense. Even if the

---

[40]    Nios         V         Processor,         Intel,         available         at https://www.intel.com/content/www/us/en/products/details/fpga/nios-processor/v.html.

[41]    See Merger Notice, paras. 589 to 594.

[42]    SiFive Envisions 128-Core RISC-V SoCs as Gap With x86 and Arm Closes, Tom's Hardware (October 22, 2021), available at https://www.tomshardware.com/news/sifive-develops-ultra-high-performance-risc-v-core.

-18-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential – Contains Business Secrets

Merged Entity wished to follow an irrational foreclosure strategy, it could not foreclose competition in SmartNICs, and would have no incentive to do so.

## 4.    DATACENTER CONGLOMERATE EFFECTS

The Decision raises a series of "conglomerate" fears, arguing that the Merged Entity might find a way to combine NVIDIA and Arm technology to hurt competitors.

### A.    **The Merged Entity would not have the ability to engage in tying or bundling.**

The Decision contends that the Merged Entity will tie or bundle, citing vague and unsubstantiated allegations that NVIDIA has engaged in "aggressive bundled pricing."[43]

However, the Decision does not explain why the CMA is criticizing NVIDIA for charging *low* prices to customers—that is the essence of competition and should be exactly what the CMA wants to see.

In any event, the Merged Entity would have no ability to engage in merger-specific tying or bundling. Arm licenses IP that customers design into chips that will not reach the downstream market *for years*. NVIDIA sells GPUs and associated platforms to downstream customers that will be used in datacenters *immediately*.

The Merged Entity cannot tie or bundle the Arm and NVIDIA products because the customers are different and the purchasing decisions are made at entirely different times.

The Decision raises another theory that is not merger specific, claiming that "*the common set of third parties demanding NVIDIA's products and Arm-based products in datacentre will grow.*"[44] That is not a legitimate objection to the Transaction. Even if more customers want bundles of NVIDIA and Arm-based downstream products, that concern has nothing to do with the Transaction—any Arm licensee, including NVIDIA, can sell its own accelerators and Arm-based products together.

Even if NVIDIA offered discounted "mixed bundles" of Arm-compatible CPUs (which NVIDIA does not make today) and other NVIDIA components, it could not foreclose Intel and AMD, which have their own ability to create CPU bundles with x86.

### B.    **The Merged Entity would not have the ability to foreclose by degrading interoperability or distorting Arm technology.**

The Decision accuses NVIDIA of planning engineering mischief, contending that the Merged Entity will find a way to modify the interoperability of Arm-based datacenter CPUs and SmartNICs to (1) *enhance* the interoperability between various NVIDIA products and, simultaneously, (2) *undermine* the interoperability between competitors' Arm-based CPUs and NVIDIA products.[45]

The Decision does not explain how the Merged Entity could accomplish such a remarkable feat. Instead, the Decision recites a list of NVIDIA technologies (NVLink, CUDA) and

---

[43]    The Decision, para. 7.93.

[44]    The Decision, para. 7.97.

[45]    The Decision, paras 7.100 and 7.108.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    ARM_01239761

Confidential – Contains Business Secrets

claims that NVIDIA might "*sell [ ...] product combinations more effectively through modifying product interoperability in NVIDIA's favour.*"[46]

The Decision's theory is wildly off-base.

First, Arm's customers, **not** Arm, make their own CPUs, and they have complete control over the chip interfaces they use.  The Merged Entity cannot change that fact.

Second, interoperability is not determined by any Arm product—rather, interoperability is determined by the chip itself (*e.g.*, an SoC) that **surrounds** the Arm IP.  Arm does not supply the input/output IP for these chips and has no insight (and no need for insight) into customers' interoperability choices.

Furthermore, even if NVIDIA could somehow distort Arm IP to benefit itself, the Merged Entity could not do **anything** to foreclose Intel and AMD's suite of chips, or foreclose the architectural licensees such as Apple, Qualcomm, and Microsoft.  The concern is a red herring.

C.    **No incentive to foreclose**

The Decision ignores reality, contending that NVIDIA will seek to foreclose because it would only lose "*some CPU IP licensing revenues.*"[47]  To the contrary, the Merged Entity has no incentive, ability, or expertise to engage in such far-fetched schemes.

First, any attempt to foreclose datacenter CPU, GPU or SmartNIC suppliers (especially Intel and AMD) would jeopardize NVIDIA's business in the x86 ecosystem, which is far larger than the Arm space.

Second, any attempted foreclosure would destroy NVIDIA's investment in Arm, because it would (i) undermine the creation of the ecosystem network effects that are crucial to Arm's success in datacenters; (ii) reduce third parties' and customers' incentives to buy into the Arm ecosystem; (iii) not allow NVIDIA to benefit from the diversification of risks downstream; and (iv) jeopardize customers' trust in and commitment to the Arm ecosystem in the datacenter market (and in other markets).

D.    **No SLC**

No conglomerate strategy could result in a substantial lessening of competition in datacenter; nothing the Merged Entity can do would foreclose Intel and AMD.

5.    **GENERAL-PURPOSE PCS AND CONSOLES**

The Decision raises concerns about two other areas where x86 is dominant—general-purpose PCs[48] and high-end gaming consoles ("**Consoles**").

Regarding general-purpose PCs, the Decision simply states that after a year, "*the CMA has not been able to investigate [the general-purpose PCs] area sufficiently to come to a*

---

[46]    The Decision, para. 7.80.

[47]    The Decision, para. 7.106(d).

[48]    General-purpose PCs are PCs which are not equipped with high-performance discrete GPUs (*i.e.*, PCs which are not high-end gaming PCs).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                              ARM_01239762

*conclusion as to whether there is a realistic prospect of an SLC*."[49] NVIDIA is not present in
PC CPUs, and the analysis of the general-purpose PC market could not be more
straightforward.

The Decision offers little more in Consoles, where NVIDIA competes, but x86 controls most
of the market.[50]

## A.    **Summary of the Parties' activities**

**Arm** does not supply PC CPUs or Consoles; it licenses general-purpose CPU IP that is used
primarily for SoCs in mobile devices. Arm's general-purpose CPU IP is also used in some
PC SoCs, but its adoption rate has been *de minimis* (▮% market share by volume and ▮%
by value in 2018-2020).

Arm's ▮ implementation licensees for PCs are Qualcomm (although Qualcomm also has
an architectural license and has acquired another one following its purchase of NUVIA) and
MediaTek, whose market shares by volume are less than ▮% and ▮%, respectively, in
2018-2020 (less than ▮% in terms of value for both licensees).[51,52] Arm's market share in
CPU IP for PC SoCs is not expected to grow materially in the foreseeable future, regardless
of Apple's transition to the Arm ISA.

Arm has no meaningful presence in PC GPUs; its GPU IP is designed for mobile, not PC.[53]

Arm does not supply any gaming components, or design IP targeted at Consoles (nor does
Arm currently have any plans to develop such an offering in the future).

**NVIDIA** does not make PC CPUs. NVIDIA's GEFORCE GPU business is complementary
to CPUs. Today, the overwhelming majority of NVIDIA's GEFORCE business and R&D
effort supports x86 CPUs and platforms.

In Consoles, NVIDIA supplies semi-custom SoCs for Consoles (specifically, Nintendo
Switch). NVIDIA does not license the GPU IP technology that enables it to compete
effectively in the supply of Console SoCs.

## B.    **No ability to foreclose**

Intel's x86 CPUs dominate the PC space; Arm's presence in general-purpose PCs is *de
minimis* and no Arm ecosystem exists in general-purpose PCs. Arm licensees such as
Qualcomm and Apple have architectural licenses and make their own IP to compete with
Intel in PCs—they do not use Arm's designs and cannot be foreclosed.

---

[49]    The Decision, para. 8.8.

[50]    The Decision, para. 7.238.

[51]    Market shares by proxy of downstream SoC sales.

[52]    Arm cores are only used in the following Windows PCs (all of them laptops): Lenovo IdeaPad 5G,
Samsung Galaxy Book S LTE, ASUS NovaGo TP370QL, HP Elite Folio, and Microsoft Surface Pro X.
All of them were launched in or after 2020. Arm cores are also used in Chromebook devices.

[53]    Arm is not tracked by industry analysts such as IDC and Mercury. To the extent that a few Chromebook
OEMs use Arm Mali, they would do so using mobile SoCs and this would be included in the market
shares provided to the CMA for mobiles and other iOS and Android devices.

-21-

Confidential – Contains Business Secrets

As Apple's former head of Mac development, Jean-Louis Gassée, observed in relation to Apple, this means that "*Apple designs its own Silicon and has a perpetual Architecture License that gives them total freedom*" and, consequently, the Transaction would have no "*strategic impact on Apple*".[54]  This applies equally to Qualcomm/NUVIA.  The Merged Entity would have no ability to profit from any foreclosure strategy in PC.

In Consoles, three customers purchase semi-custom SoCs—Sony (PlayStation), Microsoft (Xbox), and Nintendo (Switch).  AMD currently (and exclusively) supplies SoCs for both Xbox and PlayStation, while NVIDIA supplies Nintendo.  Intel may enter in the future,[55] although the Decision does not identify Intel (or anyone else) as a potential competitor.

Both AMD and Intel design SoCs based on their x86 CPU and GPU technologies and are therefore not Arm-dependent.  The Merged Entity obviously cannot foreclose AMD's x86 SoCs, and therefore, cannot foreclose competition in Consoles.

Nevertheless, the Decision argues that other Arm licensees ***might*** in the future wish to compete with Intel and AMD in the general-purpose PC and Console markets.  The CMA's Merger Assessment Guidelines make clear that, when considering potential entry by third parties as a countervailing factor, only entry that is ***timely*** (typically within two years),[56] likely and sufficient is relevant.  It would be incongruous for the CMA to apply a different standard when considering potential entry in this case.  It is clear that any hypothetical entry in this space would be neither timely, nor likely.

The Decision does not identify any Arm-based PC or Console SoC supplier that (i) could make a competitive SoC in that timeframe, and (ii) does not ***already*** have the Arm license it needs to do so.

Even if the CMA could identify any such potential competitor, Intel's decision to license its x86 CPU IP would grant any such entrants an alternative to Arm that already has established success in the PC and Console space.

C.    **No incentive to foreclose**

NVIDIA has no incentive to foreclose in PCs or Consoles.  Even if NVIDIA chooses to enter the PC CPU space, its primary competitor would be Intel (and AMD) x86 CPUs, not other Arm customers.  If the Merged Entity refused to license IP to any potential Console entrant, Intel or the RISC-V licensors would do so.  Attempting to foreclose competition in PC and Console would be just as irrational as in datacenter, and for all the same reasons:  the attempt could not possibly help NVIDIA's downstream sales for years (if ever), would destroy Arm's business, and harm NVIDIA's reputation.  And of course, as discussed in Section 2.B(iv), above, Arm licensees are contractually protected against any foreclosure attempt by the Merged Entity.

---

[54]    *See* https://twitter.com/gassee/status/1305025521428774912.

[55]    Intel is expected to release a GPU dedicated to gaming in Q1 2022. See Intel's Arc GPUs will compete with GeForce and Radeon in early 2022, ArsTechnica (August 16, 2021), available at https://arstechnica.com/gadgets/2021/08/intels-arc-gpus-will-compete-with-geforce-and-radeon-in-early-2022.

[56]    CMA Merger Assessment Guidelines, para. 8.33.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                ARM_01239764

Confidential – Contains Business Secrets

D.    **No SLC**

NVIDIA seeks to grow and enhance Arm's IP in PC, and to license it broadly, helping Arm to build an ecosystem in PC.  NVIDIA's strategy would undeniably benefit Arm, the UK, and Arm customers worldwide, not harm competition. The Transaction will spur competition in Consoles, as NVIDIA will have an incentive to enhance Arm's IP to compete with x86 chips from Intel and AMD.

6.    **INTERNET OF THINGS**

The Decision contends that the Transaction will create an SLC in the "Internet of Things". But NVIDIA is ***not*** a commodity IoT chipmaker and does not participate in the broad IoT market that concerns the CMA.  To the contrary, NVIDIA is pioneering a nascent and narrow space, where Intel's x86 is the primary competitor.

A.    **Summary of the Parties' activities**

**Arm** licenses general-purpose IP that can be integrated into SoCs for use in IoT devices.  Its Cortex-M and -R series of CPU cores are optimized for low-cost and energy-efficient microcontrollers ("**MCUs**") and can perform low-performance ("**LP**") IoT functionalities. Arm also licenses IP that can be integrated into high-performance ("**HP**") IoT devices. Within HP IoT, most of Arm's customers focus on high-volume applications that do not require intensive AI analytics, such as wearables, smart TVs and cameras.

**NVIDIA** is active in only a narrow area related to IoT, "Autonomous HP IoT" (*i.e.*, computationally-intensive applications such as machine learning and AI).  NVIDIA does not offer products for the LP IoT or other HP IoT applications.  In addition, NVIDIA does not license any of its own IP on a revenue-generating basis.[57]

Autonomous HP IoT focuses on compute-intensive applications that NVIDIA targets with its GPU and software offerings.  NVIDIA's leading GPU architecture, software stack, and tools for autonomous applications differentiate NVIDIA's Autonomous HP IoT offerings.

The Decision mischaracterizes NVIDIA's activities (and, consequently, mischaracterizes the vertical relationship between the Parties), claiming that NVIDIA offers "entry-level" IoT products.[58]  To the contrary, NVIDIA's "entry-level" (*i.e.*, Jetson Nano), "mid-range" and "high-performance" products are ***not*** general purpose IoT devices—they are ***all*** part of the narrow HP IoT niche that NVIDIA is pursuing.

B.    **No ability to foreclose**

    (i)    ***Intel, the leading competitor in the nascent segment that NVIDIA targets, does not rely on Arm IP and cannot be foreclosed.***

NVIDIA is not a commodity chipmaker for IoT.  Rather, NVIDIA focuses on a narrow segment where Intel's x86 platforms are the primary competitor.

---

[57]    For completeness, NVIDIA licenses its NVDLA design, a deep learning accelerator to execute machine learning algorithms, to third parties on a royalty-free, open-source basis to promote the adoption of deep-learning inferencing in third-party designs and IoT devices.

[58]    The Decision, para. 7.123.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    ARM_01239765

Confidential – Contains Business Secrets

The Decision concedes that Intel does not use Arm IP for Autonomous HP IoT and therefore, cannot be foreclosed. Nonetheless, the Decision dismisses Intel as a meaningful competitor, contending that "*Intel-based SoCs are power and cost-inefficient for IoT applications generally.*"[59]

NVIDIA is not active in the market "for IoT applications generally." Rather, NVIDIA competes with Intel in the nascent Autonomous HP IoT market, where Intel is NVIDIA's strongest competitor. Intel will continue to be a significant competitive constraint on the Merged Entity, thanks to its large and expanding portfolio,[60] large customer base, and vast R&D capacities. Intel's use of x86-based in-house designs for its Autonomous HP IoT solutions precludes any hypothetical attempt at foreclosure.[61]

>    (ii)    ***Arm has no market power in the narrow market that NVIDIA pursues.***

Even if the Decision could ignore Intel and x86, Arm has no market power in the nascent space that matters for this analysis—Autonomous HP IoT.

NVIDIA's future competitors in Autonomous HP IoT could use any of several alternative CPU IP suppliers including RISC-V, MIPS, or Power, or even develop in-house technologies. Future competitors do not need the newest Arm CPU to compete in Autonomous HP IoT—they can develop their own GPUs or accelerators, just as NVIDIA has done. For example, some versions of NVIDIA's Jetson platform use a very old version of Arm's CPU IP (*i.e.*, Arm Cortex-A57) dating back to 2012.

Furthermore, future competitors do not need to use Arm IP for software compatibility—Autonomous HP IoT devices run custom, embedded programs, not a large library of third-party software. For example, Jetson developers write their software for their own Autonomous HP IoT solutions, not for others. In other words, the Arm ISA does not have a significant software "lock in" effect in the Autonomous HP IoT space—and even if customers wanted to shift to other hardware, they can port their software to a competing CPU ISA, such as RISC-V.

The Decision again notes that Arm customers in the IoT space are happy with Arm's IP and performance. Customer testimonials are beside the point. The question is not whether Arm customers appreciate its IP—they do—but rather, whether Arm has ***market power*** that the Merged Entity could abuse, and in the Autonomous HP IoT space, Arm does not.

C.    **No incentive to foreclose**

Any attempt at foreclosure in the Autonomous HP IoT segment could not be profitable because NVIDIA's primary competitor is Intel, not Arm's other customers. The effort would be just as irrational as in datacenter, and for all the same reasons:  the attempt could not

---

[59]    The Decision, para. 7.132.

[60]    In 2020, Intel continued to expand its industrial and Autonomous HP IoT offerings by launching several new products, including the 11th Gen Intel Core processors, Intel Atom x6000E series processors, Pentium processors, and CeleronN and J series processors.

[61]    Intel's platforms use the x86 ISA. They also include a "Programmable Services Engine" (PSE) with an Arm Cortex-M7 microcontroller. See Driving performance, integration, and versatility with Intel's first Enhanced for IoT platform, Intel Platform Brief, available at https://www.intel.com/content/dam/www/public/us/en/documents/platform-briefs/enhanced-for-iot-platform-brief.pdf.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    ARM_01239766

Case 1:24-cv-00490-MN    Document 578-1    Filed 11/21/25    Page 221 of 228 PageID #:
28662

Confidential – Contains Business Secrets

possibly help NVIDIA's downstream sales for years (if ever), would destroy Arm's business, and harm NVIDIA's reputation. And of course, as discussed in Section 2.B(iv), above, Arm licensees are contractually protected against any foreclosure attempt by the Merged Entity.

## D.    **No SLC**

The Transaction presents no SLC in any area of IoT. Even if the Merged Entity had the ability and incentive to attempt to foreclose downstream rivals, which it does not, such a strategy would not harm effective competition in relation to HP IoT applications (notwithstanding that is not the relevant downstream market, as explained above). Existing and prospective entrants are not dependent on Arm's IP, as they can use rival IP (x86, RISC-V, MIPS) or develop their own in-house technologies swiftly.[62]

To be clear, although NVIDIA does not compete in the broad IoT market or plan to enter it, NVIDIA does not intend to allow Arm's position in IoT to atrophy and cede the IP licensing field to Arm's competitors. Rather, NVIDIA is committed to support Arm's roadmap and to accelerate innovation in that space.

## 7.    **AUTOMOTIVE (ADAS AND INFOTAINMENT)**

Finally, the Decision contends that the Transaction will cause an SLC in automotive markets for Advanced Driver Assistance Systems ("**ADAS**") and infotainment.[63]  As with every other market, the Decision ignores the impact of Intel and AMD's platforms and products (including Mobileye), mischaracterizes the limits on Arm's business, and misstates NVIDIA's position.

## A.    **Summary of the Parties' activities**

**Arm** does not supply SoCs for automotive applications. Rather, it licenses IP to semiconductor vendors. **NVIDIA** supplies finished SoCs and SoC-based platform solutions, primarily for autonomous driving. NVIDIA does not create new designs for "legacy" infotainment, but instead focuses on computation-intensive AI-enabled solutions that benefit from NVIDIA's unique expertise.

## B.    **No ability to foreclose**

As with every other market, the Decision ignores the impact of Intel, claiming that Arm has "market power" that the Merged Entity could abuse.

Arm does not have market power in the markets for IP licensing for ADAS/autonomous driving or infotainment. Arm's market share in CPU IP in ADAS/autonomous driving ( ▮ and infotainment ▮ ) does not confer market power on Arm (volume, 2018–2020 period).

---

[62]    Similar considerations also hold true in relation to GPU IP and ISP IP. For completeness, the Parties note that in relation to GPU IP, NVIDIA's actual and potential competitors are not dependent on Arm GPU IP. These include, among others, Intel, AMD and Texas Instruments. Arm has ▮ GPU IP royalties in IoT, approx. USD ▮ , which accounted for ▮ % of Arm's total IoT royalties in FY 2019. As regards ISP IP, NVIDIA's actual and potential competitors do not depend on Arm's ISP IP, as many of them have ISP IP in-house capabilities. Arm has ▮ ISP IP royalties in IoT, approx. USD ▮ which accounted for ▮ % of Arm's total IoT royalties in FY 2019.

[63]    The Decision, para. 7.209.

-25-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                          ARM_01239767

Confidential – Contains Business Secrets

The Decision dismisses concrete market shares as understating "*Arm's current and potential future strength*",[64] relying on testimonials from Arm customers. Arm customers may be satisfied with Arm's products and prices, but Arm is far from the only game in town: Intel/Mobileye has used MIPS and x86 for years, and robotaxi services (Waymo, Uber, *etc.*) have used Intel's x86. MIPS processors reportedly power more than 80% of ADAS-enabled cars today,[65] with a total of 40 million cars on the road (in over 300+ car models).

In addition, Intel is targeting automotive with its IFS licensing program, emphasizing that it will "*launch Intel Foundry Services Accelerator to help automotive chip designer's transition to advanced nodes*" and that it will offer "*both custom and industry-standard intellectual property (IP) to support the unique needs of automotive customers.*"[66]

The Decision dismisses RISC-V as a competitive threat to Arm for the next decade. But the Decision is contradicted by ███████████████████████████████████████████████████████████████ The CMA cannot have it both ways.

In truth, RISC-V is a strong competitive threat to Arm, and it is only picking up steam.[67] RISC-V vendors are already seeing engagements in automotive and, in the years after the Transaction closes, RISC-V will gain more customers. SiFive is engaged in strategic partnerships targeting automotive, working with industry leader Renesas "*to jointly develop next-generation, high-end RISC-V solutions for automotive applications. The partnership will also include SiFive licensing the use of their RISC-V core IP portfolio to Renesas.*"[68] SiFive states that its CPU IP (including its next-generation microarchitecture, which SiFive states "*is within reach of Arm's Cortex A78 and Intel's Rocket Lake family*"[69]) is capable of addressing the requirements of ADAS SoCs.

In addition, Imagination Technologies recently announced its "*development and launch of a RISC-V CPU family, which will cater to both the discrete CPU market as well as the heterogeneous computing landscape.*"[70] This will further pave the way for RISC-V being used in automotive as a viable alternative to Arm CPU IP. A recent example of an

---

64    The Decision, paras. 7.163 and 7.178.

65    See Wave Computing Automotive Solutions, available at https://wavecomp.ai/automotive-solutions/.

66    Intel CEO Predicts Chips Will Be More than 20% of Premium Vehicle BOM by 2030, Intel (September 7, 2021), available at https://www.intel.com/content/www/us/en/newsroom/news/intel-mobileye-iaa-mobility.html#gs.dkzjiv.

67    See para. 627 of the Merger Notice for further details.

68    Renesas and SiFive Partner to Jointly-Develop Next-Generation High-End RISC-V Solutions for Automotive Applications, Renesas (April 21, 2021), available at <https://www.renesas.com/eu/en/about/press-room/renesas-and-sifive-partner-jointly-develop-next-generation-high-end-risc-v-solutions-automotive>.

69    SiFive Envisions 128-Core RISC-V SoCs as Gap With x86 and Arm Closes, Tom's Hardware (October 22, 2021), available at https://www.tomshardware.com/news/sifive-develops-ultra-high-performance-risc-v-core.

70    Imagination Technologies Enters the CPU Space With RISC-V Architecture, Tom's Hardware (August 25, 2021), available at: https://www.tomshardware.com/uk/news/imagination-technologies-risc-v-cpu.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    ARM_01239768

Confidential – Contains Business Secrets

automotive SoC vendor announcing a RISC-V-based SoC for ADAS is Kneron (which is supported by Qualcomm and Alibaba) in November 2021 (for Levels 1-2).[71]

Nonetheless, the Decision ignores the competitive reality, arguing that Arm customers do not want to "switch" to the many alternatives. Again, the question is not whether customers **want** to switch. The question is whether customers **could** use other alternatives in the relevant timeframe, and whether those alternatives constrain Arm. (And NVIDIA has offered numerous assurances to try to ensure that customers do not feel any need to switch.)

Furthermore, if Arm had any "market power" in automotive, every economic theory holds that Arm would exercise it. Once again, the Decision fails to offer any explanation why, if Arm has market power in the automotive space, Arm fails to exercise it.

The record supports only one conclusion: while Arm customers are pleased with Arm's products and prices, the market is highly competitive, and Arm does **not** have market power.

C.    **No incentive to foreclose**

Even if the Merged Entity **could** foreclose competition in automotive, it has no incentive to do so. The effort would be just as irrational as in datacenter, PC, Consoles, and IoT, and for the same reasons—the attempt could not possibly help NVIDIA's downstream sales for many years (if ever), would immediately destroy Arm's business, and harm NVIDIA's reputation and ability to work with others in the automotive ecosystem.

D.    **No SLC in ADAS or Infotainment**

Competition in ADAS and Infotainment is strong and vibrant today, with multiple options and powerful competition from Intel/Mobileye, RISC-V, and Arm's architectural licensees.

Furthermore, to compete with Intel/Mobileye and RISC-V in the coming years, Arm will need an infusion of resources and technology, but as a standalone entity, Arm will have to make hard choices. It cannot invest and compete everywhere. Absent the Transaction, standalone Arm will not be able to grow and invest in datacenter, PC, IoT, and automotive— it will face great pressure to scale back investment, enhance profitability, and let the industry giants consolidate their power. By contrast, the Transaction will not result in a **lessening** of competition—it will promote and enhance competition in every market.

8.    **CONCLUSION**

Deal opponents romanticize Arm's past and either ignore or disparage Arm's most powerful competition. But if Arm had market power, it would have sizable revenue growth and would be enormously profitable. If Arm alone could vanquish x86 in datacenter and PC, its market share would not be mired in the low single digits, and tomorrow's technologies—such as Omniverse—would be developed on Arm, not x86.

---

[71]    Kneron's CEO stated that this is "*the first certified automobile-grade Kneron chip and is a steppingstone for the company to get more deeply into the automobile market*" (see Kneron Unveils Its First RISC-V SoC Built for Autonomous, Assisted Driving, InterpriseAI (November 3, 2021), available at https://www.enterpriseai.news/2021/11/03/kneron-unveils-its-first-risc-v-soc-built-for-autonomous-assisted-driving/). Kneron's has already been the preferred supplier for several electric vehicles, including Toyota.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    ARM_01239769

Confidential – Contains Business Secrets

Rejecting the prospect of any remedy, the Decision would not promote competition.  Rather, it would prevent Arm from bringing competition into areas that have been long dominated by x86.  The alternative outcome urged by deal opponents would result in a standalone, profit-maximizing business without any guarantees about licensing policy or investments.  It would likely result in less investment in the UK, less resources for Arm, less innovation, and less competition worldwide.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ARM_01239770

# Exhibit 111

Message

---

**From**:        Will Abbey [Will.Abbey@arm.com]
**Sent**:        02/05/2023 23:04:25
**To**:          joe.hur@samsung.com
**Subject**:     Qualcomm Dispute – Protecting our Ecosystem

**Importance**:   High

Dear Joe,

Arm is following up on its prior letter regarding Arm's lawsuit against Qualcomm, which Arm filed to protect Arm, the Arm ecosystem, and partners who rely on our intellectual property and innovative designs. The litigation remains pending, with trial set for September 2024, and Arm remains confident in the merits of its claims.

By way of reminder, Arm is seeking to enforce Qualcomm's "obligation to destroy and stop using the unlicensed Nuvia designs" because "Qualcomm cannot continue using Arm-based technology, including the Phoenix core, that Nuvia developed under its now-terminated Architecture License Agreement ("ALA") with Arm." Under the relevant agreement, the "Nuvia technology, including the Phoenix core, can no longer be used and must be destroyed." As Arm has noted, "Arm has no obligation to support Qualcomm's further attempts to continue developing unlicensed technology."

Arm's architecture, implementations and technology lead the industry as a result of decades of intensive investment. A company can only sell or use chips or designs that incorporate that technology if it has a valid license.

Arm is available to answer questions you might have regarding how the litigation might impact the availability of licensed Arm technology going forward. In the meantime, we again wanted to confirm that there will be no disruptions to your partnership with Arm so long as it is based on a valid license. You will continue to receive world-class products and support. Please do not hesitate to reach out if you have any questions.

Regards,

**Will Abbey** | CCO & EVP, Sales & Partner Enablement | arm 120 Rose Orchard Way San Jose, CA 95134 | Mobile +1 408.813.1588

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 112

Message

| | |
|---|---|
| **From**: | Rene Haas [Rene.Haas@arm.com] |
| **Sent**: | 31/08/2022 18:55:45 |
| **To**: | malvin.kyung@samsung.com; yi33.park@samsung.com |
| **CC**: | Saumil Shah [Saumil.Shah@arm.com] |
| **Subject**: | Arm News |
| **Attachments**: | Letter 2 Aug.pdf |

Dear KH, Yong-in,

I want to personally inform you regarding some news you may hear about in the press soon. Today we have filed a lawsuit against Qualcomm and Nuvia for breach of contract and trademark infringement. As an intellectual property company, Arm must act to protect our rights and the rights of our ecosystem.

In connection with Qualcomm's acquisition of Nuvia, Qualcomm attempted to transfer Nuvia licenses without Arm's consent, which is a standard restriction under Arm's license agreements. Nuvia's licenses therefore terminated in March 2022. Before and after that date, Arm made multiple good faith efforts to seek a resolution. Whereas in contrast, Qualcomm has breached the terms of the Arm license agreement by continuing development under the terminated licenses.

Qualcomm has failed to comply with those provisions, as we told Qualcomm by letter dated August 2, 2022 (enclosed).  As set forth in that letter, "after termination, Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the Nuvia technology" and "any resulting products will not be protected by any existing license agreement." Despite this, Qualcomm continues to indicate publicly a plan to use the technology developed under the former Nuvia license.

Arm takes pride in our role as innovator of the world's most critical semiconductor IP and the billions of devices that run on Arm. These technological achievements have required years of research and significant costs, they must be recognized and respected. We will work vigorously to protect what is rightfully ours and we are confident that the courts will agree with us.

In the meantime, there will be no disruptions to your partnership with Arm and you can continue to expect world-class products and support. Please do not hesitate to reach out if you have any questions.

Regards,

Rene Haas

CEO

Arm

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY