IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>   a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>   a Delaware corporation, | ) ) ) ) ) | C.A. No. 24-490 (MN) |
| Plaintiffs, | ) ) | ■■■■■■■■■■■■■■■■ |
| v. | ) ) | **REDACTED - PUBLIC VERSION** |
| ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>   a U.K. corporation, | ) ) ) | |
| Defendant. | ) ) | |

**APPENDIX TO PLAINTIFFS' OBJECTIONS TO THE SPECIAL
MASTER'S JANUARY 7, 2026 ORDER DENYING PLAINTIFFS'
MOTION FOR LEAVE TO AMEND (VOL. 2: A406-A795)**

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Erin J. Morgan
DUNN, ISAACSON, RHEE LLP
11 Park Place
New York, NY 10007
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

January 14, 2026

**Original Filing Date: January 14, 2026**
**Redacted Filing Date: January 21, 2026**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

| Document | Page Range |
|---|---|
| *Qualcomm Inc. and Qualcomm Techs., Inc. v. Arm Holding PLC., f/k/a Arm Ltd., C.A. No. 24-490-MN,* Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Motion for Leave to Amend (Aug. 1, 2025) | A001 – A007 |
| Qualcomm Exhibit 1 - Arm Holdings Ltd. Form F-1 Registration Statement (Aug. 2023) | A008 – A014 |
| Qualcomm Exhibit 2 - Arm's First Supplemental Response to Qualcomm's Third Set of Interrogatories (No. 12) (July 11, 2025) | A015 – A030 |
| Qualcomm Exhibit 3 - Arm's Rule 26(a)(1) Fourth Supplemental Initial Disclosures (July 11, 2025) | A031 – A044 |
| Qualcomm Exhibit 4 - Arm Holdings PLC's First Set of Requests for Production to Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (Nos. 1-58) (Feb. 7, 2025) | A045 – A052 |
| Qualcomm Exhibit 5 - Arm Holdings PLC's Second Set of Requests for Production to Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (Nos. 59-122) (Mar. 14, 2025) | A053 – A060 |
| Qualcomm Exhibit 6 - Arm Holdings PLC's Third Set of Requests for Production to Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (Nos. 123-173) (Apr. 1, 2025) | A061 – A066 |
| Qualcomm Exhibit 7 - Arm's Fourth Set of Requests for Production to Qualcomm (Nos. 174-227) (June 9, 2025) | A067 – A071 |
| Qualcomm Exhibit 8 - Arm's Fifth Set of Requests for Production to Qualcomm (Nos. 228-287) (June 11, 2025) | A072 – A076 |
| Qualcomm Exhibit 9 - Arm Holdings PLC's First Set of Interrogatories to Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (Nos. 1-9) (Feb. 7, 2025) | A077 – A083 |
| Qualcomm Exhibit 10 - Arm Holdings PLC's Second Set of Interrogatories to Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (Nos. 10-13) (Apr. 9, 2025) | A084 – A090 |
| Qualcomm Exhibit 11 - Arm's Third Set of Interrogatories to Qualcomm (Nos. 14-23) (June 11, 2025) | A091 – A095 |

| | |
|---|---|
| Qualcomm Exhibit 12 - Arm's First Set of Requests for Admission to Qualcomm (Nos. 1-30) (June 11, 2025) | A096 – A101 |
| Qualcomm Exhibit 13 - Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) (July 11, 2025) | A102 – A131 |
| Qualcomm Exhibit 14 - Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3 (July 11, 2025) | A132 – A141 |
| Qualcomm Exhibit 15 - Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11) (July 11, 2025) | A142 – A211 |
| Qualcomm Exhibit 16 - Deposition of Spencer Collins (June 30, 2025) Excerpt | A212 – A216 |
| Qualcomm Exhibit 17 - Deposition of Michael J. Williams (June 27, 2025) Excerpt | A217 – A219 |
| Qualcomm Exhibit 18 - Deposition of Peter Greenhalgh (July 4, 2025) Excerpt | A220 – A222 |
| Qualcomm Exhibit 19 - Deposition of Jannik W. Nelson (July 10, 2025) Excerpt | A223 – A225 |
| Qualcomm Exhibit 20 - Deposition of Mohamed Awad (July 29, 2025) Excerpt | A226 – A228 |
| Qualcomm Exhibit 21 - Production Letter from David Nathaniel Tan to Catherine Nyarady (Apr. 22, 2025) | A229 – A230 |
| Qualcomm Exhibit 22 - Production Letter from David Nathaniel Tan to Catherine Nyarady (Apr. 28, 2025) | A231 – A232 |
| Qualcomm Exhibit 23 - Production Letter from David Nathaniel Tan to Catherine Nyarady (May 1, 2025) | A233 – A234 |
| Qualcomm Exhibit 24 - Production Letter from Henry Huttinger to Catherine Nyarady (June 3, 2025) | A235 – A236 |
| Qualcomm Exhibit 25 - Production Letter from Henry Huttinger to Catherine Nyarady (June 13, 2025) | A237 – A238 |
| Qualcomm Exhibit 26 - Production Letter from Henry Huttinger to Catherine Nyarady (June 17, 2025) | A239 – A240 |
| Qualcomm Exhibit 27 - Production Letter from Henry Huttinger to Catherine Nyarady (June 18, 2025) | A241 – A242 |

| | |
|---|---|
| Qualcomm Exhibit 28 - Production Letter from Henry Huttinger to Catherine Nyarady (June 19, 2025) | A243 – A244 |
| Qualcomm Exhibit 29 - Production Letter from Henry Huttinger to Catherine Nyarady (June 24, 2025) | A245 – A246 |
| Qualcomm Exhibit 30 - Production Letter from Henry Huttinger to Catherine Nyarady (June 3, 2025) | A247 – A248 |
| Qualcomm Exhibit 31 - Production Letter from Henry Huttinger to Catherine Nyarady (July 1, 2025) | A249 – A250 |
| Qualcomm Exhibit 32 - Production Letter from Henry Huttinger to Catherine Nyarady (July 3, 2025) | A251 – A252 |
| Qualcomm Exhibit 33 - Production Letter from Henry Huttinger to Catherine Nyarady (July 4, 2025) | A253 – A254 |
| Qualcomm Exhibit 34 - Production Letter from Henry Huttinger to Catherine Nyarady (July 8, 2025) | A255 – A256 |
| Qualcomm Exhibit 35 - Production Letter from Henry Huttinger to Catherine Nyarady (July 9, 2025) | A257 – A258 |
| Qualcomm Exhibit 36 – Letter from Henry Huttinger to Catherine Nyarady (July 11, 2025) | A259 – A260 |
| Qualcomm Exhibit 37 - Production Letter from Henry Huttinger to Catherine Nyarady (July 11, 2025) | A261 – A262 |
| Qualcomm Exhibit 38 - Arm Initial Privilege Log | A263 – A264 |
| Qualcomm Exhibit 39 - Arm First Supplemental Initial Privilege Log | A265 – A266 |
| Qualcomm Exhibit 40 - Arm Second Supplemental Initial Privilege Log | A267 – A268 |
| Qualcomm Exhibit 41 - Arm's Responses & Objections to Qualcomm's First Set of Request for Admissions (Nos. 1-28) | A269 – A275 |
| Qualcomm Exhibit 42 - Email from Jennifer Ying re: Qualcomm/Arm - C.A. No. 24-490 - Stipulation re Caption and Joinder (July 2025) | A276 – A281 |

| | |
|---|---|
| *Qualcomm Inc. and Qualcomm Techs., Inc. v. Arm Holding PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, ADI Letter Brief in Support of Nonparty Analog Devices, Inc.'s Motion for Protective Order (Sep. 16, 2025), Exhibit 2 | A282 |
| *Qualcomm Inc. and Qualcomm Techs., Inc. v. Arm Holding plc, f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Defendant Arm Holdings plc's Letter Brief to Special Master Rychlicki Opposing Plaintiffs' Motion for Leave to Amend (Aug. 7, 2025) | A283 – A289 |
| Declaration of Matthew J. McIntee in Support of Defendant's Letter to Special Master Helena C. Rychlicki Opposing Plaintiffs' Motion for Leave to Amend | A290 – A296 |
| Arm Exhibit 1 - Form 424B4 for Arm Holdings PLC UK (Sep. 13, 2023) | A297 – A301 |
| Arm Exhibit 2 - May 2024 Annual Report, 20-F Arm Holdings PLC FY2024 | A302 – A307 |
| Arm Exhibit 3 - D.I. 12, Arm's Corporate Disclosure Statement (June 12, 2024) | A308 – A312 |
| Arm Exhibit 4 - D.I. 31, Arm's Initial Answer to Qualcomm's Complaint (Nov. 13, 2024) | A313 – A338 |
| Arm Exhibit 5 - D.I. 234, Arm's Answer to Qualcomm's Second Amended Complaint (June 17, 2025) | A339 – A389 |
| Arm Exhibit 6 - Arm's First Supplemental Responses and Objections to Qualcomm's Third Set of Interrogatories (July 11, 2025) | A390 – A405 |
| Arm Exhibit 7 - D.I. 44, Scheduling Order (Jan. 31, 2025) | A406 – A417 |
| Arm Exhibit 8 - ARM_00055357 (May 31, 2013) | A418 – A461 |
| Arm Exhibit 9 - ARM_00103918 (May 31, 2013) | A462 – A517 |
| Arm Exhibit 10 - ARM_00063298 (May 29, 2013) | A518 – A533 |
| Arm Exhibit 11 - QCARM_0338573 (May 29, 2013) | A534 – A538 |
| Arm Exhibit 12 - QCARM_0343954 (June 19, 2020) | A539 – A562 |
| Arm Exhibit 13 - ARMQC_02772333 (Oct. 17, 2019) | A563 – A596 |
| Arm Exhibit 14 - ARMQC_02772366 (Oct. 17, 2019) | A597 – A617 |
| Arm Exhibit 15 - Qualcomm's Original Complaint (Apr. 18, 2024) | A618 – A642 |

| | |
|---|---|
| Arm Exhibit 16 - Qualcomm's First Amended Complaint (Dec. 16, 2024) | A643 – A694 |
| Arm Exhibit 17 - Qualcomm's Second Amended Complaint (June 3, 2025) | A695 – A765 |
| Arm Exhibit 18 - Qualcomm Purchase Order (Apr. 17, 2024) | A766 – A768 |
| Arm Exhibit 19 - Arm Holdings Form F-1 (Aug. 21, 2023) | A769 – A772 |
| Arm Exhibit 20 - Alphabet 2023 10-K | A773 – A778 |
| Arm Exhibit 21 - Anheuser-Busch 20-F | A779 – A783 |
| Arm Exhibit 22 - Qualcomm 2024 10-K | A784 – A787 |
| *Qualcomm Inc. and Qualcomm Techs., Inc. v. Arm Holding PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Special Master Hearing Transcript (Aug. 22, 2025) Excerpt | A789 – A795 |

# Exhibit 12

# Exhibit 13

# Exhibit 14

# Exhibit 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>   a Delaware corporation,<br>QUALCOMM TECHNOLOGIES, INC.,<br>   a Delaware corporation, | ) )<br>)<br>)<br>) | C.A. No. _____ |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | **CONFIDENTIAL – FILED UNDER** |
| ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>   a U.K. corporation, | ) )<br>)<br>) | **SEAL** |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant ARM Holdings PLC, formerly known as ARM LTD. ("ARM").[1]

## NATURE OF THE ACTION

1.      Qualcomm is poised to release to the market innovative products enabled by Qualcomm's custom-designed, high-performance, low-power central processing units ("CPUs") utilizing a novel microarchitecture and related technologies that will deliver the next era of computing innovation. Qualcomm's first-in-line custom Oryon CPU, which is designed for the compute market, is contained within the Snapdragon X Elite System-On-a-Chip ("SOC"). It

---

[1]      On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims. (*Arm Ltd. v. Qualcomm Inc.*, No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.) This filing contains additional background on ARM's attempt to preclude Qualcomm's custom central processing units from competing with ARM's own central processing units. The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading. (Redacted Answer and Defenses to ARM's Complaint and Second Amended Counterclaims, *Arm Ltd.*, No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.)

delivers up to 52% faster performance than the latest x86-based competition offerings at the same power and matches the x86 competition's peak performance at 60% lower power. When compared to other competing ARM-based products, the Snapdragon X Elite delivers 28% faster multi-threaded CPU performance, making it the industry leader in CPU performance and power efficiency. While many in the industry see in this pivotal moment the opportunity for technological advancement, ARM sees an opportunity to attempt to strong-arm Qualcomm into renegotiating the financial terms of the parties' longstanding license agreements by any means necessary and to attempt to prevent Qualcomm's custom CPUs from competing with ARM's off-the-shelf CPUs.

2.      In furtherance of this effort, ARM has attempted to stifle Qualcomm's technological leaps in CPU design by intentionally withholding deliverables paid for and due to Qualcomm under Qualcomm's ARM architecture license agreement ("ALA"), misrepresenting the existence of those deliverables when Qualcomm provided written notice of ARM's failure to deliver, and threatening to terminate Qualcomm's licenses if it attempted to enforce its contractual right to obtain the deliverables in question.

3.      ARM's refusal to honor its contractual obligation to timely deliver bargained-for technology is a material breach of Qualcomm's ALA and forms the basis of this action.

4.      It is, however, only the latest in a series of tactics deployed by ARM to attempt to inflict commercial damage on Qualcomm in its effort to force Qualcomm to acquiesce to extraordinary financial demands that would undeservingly enrich ARM by hundreds of millions of dollars for technology that ARM did not invent nor has any rights to.

5.      *First*, ARM claimed, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA Inc. ("NUVIA") for $1.4 billion, Qualcomm needed ARM's consent

2

**A620**

to transfer NUVIA's technology to Qualcomm. ARM took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of Qualcomm's ALA. ARM later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers— including in products that were started at Qualcomm after the NUVIA acquisition, such as the Snapdragon X-Elite—violated a license agreement between ARM and NUVIA that Qualcomm was not using and that ARM ultimately terminated. This made no sense. Qualcomm has its own license agreements for ARM technology and information that allowed it to develop and provide custom ARM-compliant cores and products incorporating such cores to its customers (including the Snapdragon X-Elite) for many years to come. Therefore, it did not need ARM's consent.[2]

6.      *Second*, ARM filed a meritless lawsuit against Qualcomm, alleging that Qualcomm and NUVIA breached NUVIA's terminated agreements with ARM and infringed ARM's trademarks by marketing custom CPUs after the NUVIA acquisition. In that action, ARM is demanding that Qualcomm destroy these ground-breaking CPU products that Qualcomm developed after the acquisition in accordance with the Qualcomm/ARM agreements—despite ARM admitting that ARM has suffered no actual harm as a result of the conduct allegedly forming the basis of ARM's claims.[3]

7.      *Third*, ARM promoted its lawsuit to Qualcomm's customers in order to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and

---

[2]      Complaint, *Arm Ltd.*, No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[3]      Redacted Answer and Defenses to ARM's Complaint and Second Amended Counterclaims ¶¶ 29, 31-37, *supra* note 1; Redacted March 5, 2024 Hearing Transcript at 38:20-39:8, *Arm Ltd.*, No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Joint Letter re Bench or Jury Trial, *Arm Ltd.*, No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308.

could be subject to retaliation by ARM if they did, including by misrepresenting the terms of Qualcomm's licenses with ARM to Qualcomm's customers.[4]

8.    *Fourth*, ARM misused confidential information belonging to Qualcomm by commercializing products containing such confidential information after repeatedly representing in letters and court filings that ARM had, in accordance with its legal obligations, ceased using that information.[5]

9.    *Finally*, as noted above and as is at issue in this case, ARM deliberately withheld deliverables to which Qualcomm is entitled under its ALA with ARM under the guise that Qualcomm's ALA does not entitle Qualcomm to support for "Nuvia-based technology." ARM's excuse is unjustified, and its breach could not be more clear.

10.    Qualcomm first suspected that ARM was withholding ALA deliverables in the fall of 2022. At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within ARM's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

11.    ARM capitalized on this lack of transparency, with its General Counsel stating definitively that "[n]o failure of delivery has occurred." ARM further stated that Qualcomm "█████ ███████████████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables. Here again, ARM was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

---

[4]    Redacted Answer and Defenses to ARM's Complaint and Second Amended Counterclaims ¶¶ 255-70, *supra* note 1.

[5]    *Id.* ¶¶ 234-45.

12.     ARM went on to state that Qualcomm's written notice was a "malicious effort" to cause ARM "economic duress" because "as much as ███████████" was at issue, which ARM purported was "inconsistent with the language, spirit, and purpose of the ALA and ███████ ████████████████." Additionally, ARM threatened Qualcomm that, if Qualcomm availed itself ████████████████████████████████████████, ARM would harm Qualcomm, including by terminating Qualcomm's multiple licenses with ARM.

13.     ARM's statement that "[n]o failure of delivery has occurred" was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted as part of ARM's meritless lawsuit against Qualcomm revealed incontrovertible evidence that ARM not only had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, ARM was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the NUVIA acquisition.

14.     ARM never cured its failure to deliver, causing Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

15.     ARM's failure to deliver violated the Qualcomm ALA, which requires ARM to ████████████████████████████████████████████████████████████████████ ██████. Under the Qualcomm ALA, if ARM is found to be in breach of Section █████ ██, it must █████████████████████████████████████. If ARM fails ████████████████████████████████████, pursuant to Section ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.

16.    ARM's withholding of deliverables and deliberate decision not to cure the issue within the time prescribed by the contract is a material breach of the Qualcomm ALA. Accordingly, Qualcomm is entitled to financial damages, including but not limited to ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

17.    ARM's non-compliance with its contractual obligations to Qualcomm should be seen for what it is: the latest in a series of anti-competitive maneuvers intended to extract hundreds of millions of dollars from Qualcomm by renegotiating license agreements ARM's current management views as disadvantageous.  ARM's decision to weaponize its failure to provide technology as a negotiating tactic—against a decades-long partner, merely because it is expedient for ARM to do so—should be wholly rejected, particularly given the many licensees who expect ARM to uphold the terms of their agreements every day, not only when it benefits ARM to do so.

## THE PARTIES

18.    Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm is a leading technology innovator in mobile communication products and the driving force behind the development, launch, and expansion of 5G technology.  Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone.  Qualcomm brings the benefits of mobile to new industries, including automotive, the internet of things, and computing, where Qualcomm's technology has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

19.    Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm Technologies is a wholly-owned subsidiary

of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

20.    Defendant ARM Holdings PLC is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

22.    Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because ARM is "a defendant not resident in the United States" and therefore can be "sued in any judicial district."   ARM has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[6]

## FACTUAL ALLEGATIONS

### I.    ARM LICENSES AND THE CUSTOM CPU MARKET

23.    ARM is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars. ARM's licensing model is based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee.

24.    ARM's ALAs grant licensees the right under ARM's intellectual property ██

██████████████████████████████████████████████████████████████ using specific

---

[6]    Complaint, *supra* note 2.

licensed technology and to manufacture, sell, and distribute ████████████████
████████████████.[7]

25.    CPU Cores (also known simply as cores) are a particular component of SOCs, which are integrated circuits used in cellular phones, computers and other devices that combine several technologies used in such products into a single chip.  A core or CPU performs processing within the SOC.

26.    An ████████████████ is compatible with the ARM instruction set architecture ("ISA").  As a general matter, an ISA lists the instructions that allow hardware (like SOCs) to interact with software programs.  Application and software developers create their products to be compatible with particular ISAs.

27.    The ARM ISA allows for compatibility across all ARM-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.  The ARM ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

28.    To make a CPU that then can execute the ARM ISA and therefore run compatible applications and other software, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction

---

[7] ████████████████████████████████████████
████████████████████████████████████████████████

techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

29.    A CPU developer developing a custom CPU designs *how* the core is built, *how* it performs, and *how* it executes the CPU's instructions.  There are a virtually infinite number of ways to design and build CPUs that can implement the ARM instruction set.  Companies that design custom CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.

30.    Under an ALA license, ARM does not deliver any specific ARM design or tell the licensee how to make the CPU.  That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the market—is left to the licensee.  As ARM has publicly acknowledged, "the creation of an optimized CPU is very costly and time consuming," and ARM, therefore, "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the customization often does not provide a reasonable return on investment."[8]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by ARM.

31.    ARM competes directly against architecture licensees by offering its own "off-the-shelf" CPU designs that customers may license through a TLA.  When a licensee seeks to sell products incorporating ARM technology licensed under a TLA, ARM delivers complete processor

---

[8]      Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

**A627**

core designs that a licensee can incorporate into a larger SOC design, saving the licensee the trouble and expense of designing its own CPU.  But this comes at the cost of being beholden to ARM and does not allow SOC developers to differentiate the CPU from other TLA licensees. Moreover, when ARM fails to keep up with the state of the art in CPU development, as recently has occurred in the compute market, any purchaser of off-the-shelf cores may offer SOCs that have difficulty competing against more technologically-advanced CPUs.

## II.     QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

32.     Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications."  Qualcomm is a world leader in the design and production of semiconductor microchips, including SOCs.  Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines.  Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

33.     Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates.  In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive industry designed to deliver connected experiences that are safer and customizable.

34.     Included among these products are custom CPUs and SOCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

**A628**

35.     Qualcomm has held ARM licenses since 1997 and is today one of ARM's largest licensees—it "accounted for 11% of [ARM's] total revenue for [ARM's] fiscal year ended March 31, 2023."[9]

36.     On May 30, 2013, Qualcomm[10] and ARM entered into an ███████████████ █████████████████ (the "QC ALA"), ████████████████, and Annex 1 to that agreement for █████████████████ deliverables.  On June 23, 2020, Qualcomm and ARM entered into an additional Annex 1 to the ALA for ██████████████ deliverables.

37.     Under the ALA and corresponding Annex 1s, Qualcomm has ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ Since Qualcomm entered into its ALA, Qualcomm has developed and shipped custom ARM ISA-compatible CPUs.

38.     In recent years, as ARM's implementation cores have fallen behind custom cores developed by other ARM ALA licensees, it has become more challenging for Qualcomm to compete by relying on ARM-built cores.  In particular, ARM has been unable to provide an implementation core that is competitive in the compute market; thus, the need for developing custom CPUs has become more critical.

---

[9]     ARM Registration Statement, *supra* note 8, at 44.

[10]    The actual party to the ALA and TLA was ████████████████████████████ ███████████  The terms of the agreements ████████████████████████████████ ████████████████████████████████████████████████████

39.     Qualcomm's custom ARM ISA-compatible CPUs do not belong to ARM.  Instead, as ARM has publicly acknowledged, Qualcomm's custom CPUs "compete with" as well as "pose a threat to Arm's implementation IP business."[11]

40.     Since 2013, Qualcomm has paid ARM total license fees of ██████ and running royalties of ████████████ under its ALA.  Qualcomm has fully complied with its obligations under the Qualcomm ALA.

41.     In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SOC, both specifically for use in data centers and servers.

42.     At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs.  Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary product segments of "compute" (e.g., laptops/PCs), "mobile" (e.g., smartphones), and "automotive" (e.g., digital cockpit).  Qualcomm also planned to continue development of the server CPU and SOC for use in data centers and servers ("Server SOC") that NUVIA had originally intended to design.

43.     As planned, Qualcomm's custom CPUs will soon compete more effectively against CPUs designed not only by ARM and its other ALA licensees, but also by rival suppliers of CPUs compliant with other instruction set architectures (notably, Intel's x86).

44.     Qualcomm is not alone in its belief that its custom cores offering will transform and advance the industry.  Indeed, major industry participants—including Microsoft, Google,

---

[11]     Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

**A630**

Samsung, GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[12]

### III.    ARM UNFAIRLY AND UNLAWFULLY ATTEMPTED TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

45.    Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an even better product for customers and opening new product segments for ARM Compliant Cores, ARM has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

46.    Indeed, in an effort to limit competition posed by Qualcomm's custom CPU, ARM violated its contractual obligations to provide Qualcomm with deliverables paid for under the Qualcomm ALA.

47.    The two contract provisions at issue here—Sections ███ and ███—are clear and unambiguous.

48.    Section ███ of the Qualcomm ALA requires ARM to ████████████████████ ████████████████████████████████████████████████████ ███████ and to ████████████████████████████████████ ████████████████████████ ARM is also required to deliver ████████████ ████████████████████████████████████████████████ is defined in the Qualcomm ALA as ████████████████████████████ ████████████████████████████████████████ under that agreement.

---

[12]    *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

49.    Under Section █ of the Qualcomm ALA, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████



50.    Qualcomm first suspected that ARM was withholding ███████████ under the Qualcomm ALA in the fall of 2022.  At that time, Qualcomm was embarking on its verification process for its ██████ SOC.  As is the customary practice between an ALA licensee and ARM, Qualcomm provided ARM with details about its █████ CPU so that ARM would provide a formal list of agreed ARM Compliance Kit ("ACK") tests for which ARM would expect to see verification data.  But ARM withheld the formal list of tests (known as the "OOB") ███████████ ████████████████████████████████████████████ ██████████████████████

51.    Qualcomm then attempted to resolve the issue without court intervention.

52.    On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug fixes) from ARM.  ARM engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll be able to share OOB and various patches after my management has given their approval."

**IV.    QUALCOMM PROVIDED WRITTEN NOTICE OF ARM'S FAILURE TO DELIVER—BUT ARM DID NOT CURE**

53.    Almost one month later and after still not having received the deliverables under the ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022, Qualcomm notified ARM in writing of its failure to provide certain deliverables, including the

OOB, stating explicitly that ARM should take the letter as "Qualcomm's required notice under Section ▮ that ARM is not in compliance with its obligations under ▮▮▮▮, and that ARM must cure this breach in accordance with the time and procedures set forth therein."

54.    After not hearing from ARM, pursuant to Section ▮ of the Qualcomm ALA, Qualcomm sent a follow-up letter on December 5, 2022.  The letter was Qualcomm's "second written notice of non-compliance ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮." The letter stated that "ARM must ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ set forth" in the ALA "or ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

55.    Pursuant to Section ▮ of the Qualcomm ALA, ARM ▮▮▮▮▮▮ to remedy its failure to provide the deliverable. ▮▮▮▮ passed without ARM remedying the issue.

56.    ARM responded on December 6, 2022.

57.    In its response, ARM disagreed that Section ▮ was at issue "or that provision of the OOB implicates Section ▮." ARM additionally asserted that the ACK deliverables are governed by Section ▮ of the Qualcomm ALA, not Section ▮, and that remedies for a breach of that section do not include ▮▮▮▮▮▮▮▮▮▮▮▮▮.

58.    Notably, ARM additionally claimed that "[n]o failure of delivery has occurred," stating explicitly that ARM "provided Qualcomm with the ▮▮▮▮▮▮▮▮▮▮▮ ▮ long ago and has delivered ▮▮▮▮ to that kit." As to the OOB specifically, ARM claimed that "the OOB is a subset of the tests Arm has already delivered to Qualcomm in the ▮▮▮▮▮▮ ▮▮▮▮▮."

59.    ARM was definitive in its assertions, stating that "[n]o additional delivery is required," and "[n]o breach of ▮▮▮▮ has occurred." Qualcomm was unable to verify this assertion because the "patches" are created by ARM and provided solely by ARM.  Accordingly,

Qualcomm has no way of knowing definitively whether ARM has released patches for verification until they are delivered (or until someone from ARM tells Qualcomm they are available, which did not occur in this case).

60.     ARM's letter further stated that Qualcomm "does not have verification, delivery, or support rights under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  ARM additionally threatened Qualcomm that if it did not drop its invocation of Section ██, ARM would take steps that would harm Qualcomm.  ARM claimed that Qualcomm's invocation of Section ██ was "a new, material breach of the Qualcomm ALA" and that, to the extent Qualcomm exercised its ████████████████████████ ████████████████, ARM would "not hesitate to terminate" Qualcomm's licenses.  ARM further stated that Qualcomm's letter was a "malicious effort" to cause ARM "economic duress," which ARM purported was "inconsistent with the language, spirit, and purpose of the ALA and ████████████████."

61.     But more than a year later, Qualcomm discovered that ARM's December 6, 2022 letter misrepresented the facts and concealed ARM's strategy of deliberately withholding the OOB and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm legal and economic duress.

62.     "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'"  In response to Qualcomm's requests for production, ARM produced an October 2022 email chain in which Richard Grisenthwaite, ARM's Executive Vice President and Chief Architect, explicitly instructed others at ARM not to provide Qualcomm with

16
**A634**

the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[13]

63.    In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that ARM concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  ARM's multi-tiered deception was successful for more than a year.  "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section ▮ of the Qualcomm ALA."[14]

64.    The applicable Annex 1 to the Qualcomm ALA includes ████████████████ ████████████████████████████████████████████ ███████████████████.

65.    Accordingly, when it was revealed through document and deposition testimony that, contrary to ARM's December 6, 2022 letter, ARM had deliberately withheld the ACK

---

[13]    On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include ARM's breach of Section ▮ of the ALA.  These allegations and quotations taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order.  (Redacted March 5, 2024 Hearing Transcript, *supra* note 3; Redacted March 6 Order, *Arm Ltd.*, No. 22-01146-MN (D. Del. Mar. 20, 2024), D.I. 303-02.)  Notably, at that hearing, ARM advocated against adding this claim to the case in which this discovery was produced; and instead, ARM advocated for Qualcomm bringing a separate lawsuit.  (Redacted March 5, 2024 Hearing Transcript, *supra* note 3, at 39:13-20.)

[14]    Redacted March 6 Order, *supra* note 13, at 4; *see also* Redacted March 5, 2024 Hearing Transcript, *supra* note 3, at 17:18-19:9 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

17

**A635**

deliverables to which Qualcomm was entitled, it became clear that ARM breached its obligations under Section ███ of the Qualcomm ALA.

66.    ARM's General Counsel concealed the facts, explicitly (and definitively) stating in ARM's December 6, 2022 letter that it had provided Qualcomm with ███ to the ACK and that "[n]o failure of delivery ha[d] occurred."  Qualcomm did not have a valid basis to dispute that factual representation without discovery.

67.    To date, ARM still has not provided the OOB and relevant patches to which Qualcomm is entitled, and ARM's failure to do so increased Qualcomm's burden in verification.

68.    By failing to deliver the OOB, ARM forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the ARM architecture, even in the absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the ALA.

69.    Similarly, by failing to deliver the patches, ARM forced Qualcomm to use its own engineers to address issues that would have been addressed by ARM's patches, which Qualcomm paid for and was entitled to receive under the ALA.  Qualcomm was damaged as a result.

70.    ███████████████████████████.

71.    Pursuant to Section ███ of the Qualcomm ALA:

███████████████████████████████
███████████████████████████████

███████████████████████████████
███████████████████████████████

72.    Accordingly, ███████████████████████

███████████████████████████████

18

**A636**

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ .

73.     In addition, because Qualcomm ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

**V.     ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY AND TO ARM ITSELF**

74.     ARM's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end.

75.     ARM's tactics violate basic contract principles and are directly contrary to the purpose of the ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ████████ they bargained for without fear that ARM will unilaterally decide to abdicate its contractual obligations in an effort to disrupt a licensee's innovation solely because ARM views the licensee as a competitor poised to reach new heights, including developing CPUs that are superior to ARM's offerings.

19

**A637**

76.    ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

## COUNT I
### (Declaratory Judgment)

77.    Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

78.    Plaintiffs are entitled to a declaratory judgment that:

a.    ARM breached the Qualcomm ALA by withholding ████████ that ARM was obligated ████████████ to deliver under Section █ of the Qualcomm ALA, and by withholding ███ ARM was required to deliver ████████████ under Section █ of the Qualcomm ALA;

b.    As a result of ARM's breach of Section █ of the Qualcomm ALA, Qualcomm is entitled to ██████████████████████ and ███

c.    Qualcomm's efforts ████████████ of the Qualcomm ALA do not entitle ARM to terminate Qualcomm's ARM licenses.

79.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that ████████████████████████████████████ ████████████████.

80.    A valid and justiciable controversy exists between Qualcomm and ARM because ████████████████████ as ARM is threatening to terminate Qualcomm's ALA license if Qualcomm ████████████ pursuant to Section █ of the ALA.

## COUNT II
### (Breach of Section █ of the Qualcomm ALA)

81.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

82.    The Qualcomm ALA is a valid, binding contract.

83.     ARM failed to fulfill its obligation under Section ██ of the Qualcomm ALA because it intentionally withheld from Qualcomm certain ARM Technology to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

84.     Accordingly, ARM did not ████████████████████████████████ ████████████████████████████████ or ████████████ ████████████████████████████████████████████ ██████ or deliver ████████████████████████████████ ████████████████████████ as is required by Section ██ of the agreement.

85.     ARM's failure to comply with its contractual obligation ██████████████ ██████████████ was not only intentional, but it was also done with an intent to deceive Qualcomm.

86.     Qualcomm put ARM on written notice of this violation and ARM ██████████ ██████████, as is required under the contract.

87.     ARM's breach of Section ██ of the Qualcomm ALA entitles Qualcomm ██ ████████████████████████████████████████.

88.     As a proximate result of ARM's breach of contract, Qualcomm has been damaged both (i) by delay that could have been avoided had ARM fulfilled its obligations, (ii) by costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK tests to verify that its products are compliant with the ARM architecture and use its own engineers to address issues that would have been addressed by ARM's patches, and (iii) by ████████████████ ████████████████████████████████████████████ ████████ had ARM not misrepresented its compliance with the parties' agreement.

**A639**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment and relief as follows:

a.      For the declaratory judgments set forth in Plaintiffs' claims;

b.      For an Order requiring ARM to comply with its obligations under Qualcomm's license agreement, including (but not limited to) by providing the ███████, OOB, Patches, and ████, without discrimination or retaliation;

c.      For an Order that ████████████████████████ ████████████;

d.      For recovery of all ████████████████████████ ████████████████████;

e.      For cost and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief;

f.      For additional damages, in the alternative, that the Court deems appropriate;

g.      For an award of attorneys' fees and costs as allowed by law; and

h.      For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

**A640**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Karen L. Dunn

William A. Isaacson

Melissa F. Zappala

Ruby J. Garrett

PAUL, WEISS, RIFKIND, WHARTON

   & GARRISON LLP

2001 K Street, NW

Washington, DC  20006-1047

(202) 223-7300

Catherine Nyarady

Erin J. Morgan

Madalyn G. Vaughn

Jacob A. Braly

PAUL, WEISS, RIFKIND, WHARTON

   & GARRISON LLP

1285 Avenue of the Americas

New York, NY  10019-6064

(212) 373-3000

April 18, 2024

_____

Jack B. Blumenfeld (#1014)

Jennifer Ying (#5550)

1201 North Market Street

P.O. Box 1347

Wilmington, DE  19899

(302) 658-9200

jblumenfeld@morrisnichols.com

jying@morrisnichols.com

*Attorneys for Plaintiffs*

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.

**DEFENDANTS**

ARM HOLDINGS PLC., f/k/a ARM LTD.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jennifer Ying, Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, P.O. Box 1347 Wilmington, DE 19899
302-658-9200

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question *(U.S. Government Not a Party)*

☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332 and 28 U.S.C. §§ 2201-2202

Brief description of cause:
Breach of contract, and declaratory judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE  Noreika

DOCKET NUMBER  22-1146

DATE
04/18/2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ Jennifer Ying

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**A642**

# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,      )
   a Delaware corporation,      )
QUALCOMM TECHNOLOGIES, INC.,      )
   a Delaware corporation,      )
                                          )      C.A. No. 24-490-MN
                Plaintiffs,      )
                                          )      **JURY TRIAL DEMANDED**
       v.      )
                                          )      **FILED UNDER SEAL**
ARM HOLDINGS PLC., f/k/a ARM LTD.,      )
   a U.K. corporation,      )
                                          )
           Defendant.      )

## FIRST AMENDED COMPLAINT

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant Arm Holdings PLC, formerly known as Arm Ltd. ("Arm").[1]

## NATURE OF THE ACTION

1.    This case arises out of the latest chapter in Arm's campaign to stifle competition and technology innovation by impeding the efforts of its longtime business partner Qualcomm to deliver leading computer chips to its customers and consumers around the world.  For years, Arm has received substantial royalties from licensing Qualcomm to design and sell products containing custom central processing units ("CPUs") compatible with Arm's instruction set architecture

---

[1]   On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims.  *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.  This filing contains additional background on ARM's attempt to preclude Qualcomm's custom central processing units from competing with ARM's own central processing units.  The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading.  Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.

**A644**

("ISA"). But following its acquisition by the venture capital firm SoftBank Group and its failed sale to NVIDIA, Arm attempted to shift its business model away from licensing its ISA for use by companies like Qualcomm that design CPUs, and toward forcing customers to buy only Arm's own CPU designs. Qualcomm's license, however, stands in the way of Arm's effort to push aside the makers of custom CPUs: Qualcomm's license extends until 2033, and Qualcomm's Arm-compatible microprocessors lead the industry in numerous applications. At the direction of SoftBank and its chairman and CEO, Masayoshi Son, Arm thus sought to disrupt Qualcomm's business. Arm's first move was to sue Qualcomm for allegedly breaching a license that Arm had previously granted to a company Qualcomm acquired but to which Qualcomm was not a party, demanding that Qualcomm cease distributing its groundbreaking microprocessors. Then, on the eve of trial in that case, Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license after 60 days—the day after the trial was scheduled to end. That laid bare Arm's intentions from the beginning: to attempt to get out of its license with Qualcomm in any way possible so Arm could eliminate alternatives to Arm's own competing CPU designs.

2.     For decades, Arm has developed and licensed intellectual property relating to chips. Arm has pursued that business through two distinct models: *first*, by licensing other companies to use Arm's ISA—the set of commands that determines how software controls a CPU[2]—and *second*, by licensing its own CPU designs so that other companies can make and sell products that use Arm's ready-made designs. Unlike other companies that developed a proprietary ISA used only

---

[2]     An ISA acts as an interface between CPU hardware and software. These instructions describe the high-level attributes of the CPU, such as the supported computer instructions. It consists of a set of a few thousand instructions (for example, "add," "multiply," "load," and "store") and a few hundred registers, which are the places where information can be read, written, or operated upon, by the instructions, which compatible software will recognize.

on those companies' own chips, Arm followed a distinctive, "industry-described neutral, open licensing approach"[3] of "licensing its designs to all comers."[4]  That open approach encouraged widespread adoption of Arm's ISA and also its designs.  Arm's ISA—which Arm CEO Rene Haas describes as "the most ubiquitous computer architecture on the planet"[5]—is used by practically every smartphone, most "internet of things" ("IoT") devices, many automobiles, and an increasing number of personal computers and datacenter servers.  Arm claims that companies using its ISA have shipped 270 *billion* chips as of January 2024.[6]

3.      One of these customers was Qualcomm, which has licensed Arm technology since 1997.  As relevant here, Qualcomm and Arm entered into an architecture license agreement or "ALA" in 2013 (the "QC ALA"), which licensed Qualcomm to develop and sell custom-designed CPUs that are compatible with the Arm ISA but are otherwise the product of Qualcomm's own engineering work.  Qualcomm has also entered into technology license agreements ("TLAs") authorizing Qualcomm to make and sell products, including systems-on-a-chip ("SoCs") that use Arm's ready-made CPU designs.

4.      In recent years, Arm has apparently grown dissatisfied with its longstanding open, neutral business model.  Following its acquisition by SoftBank and the failure of an attempted sale

---

[3]    Compl. ¶ 5, *In the Matter of Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 (FTC filed Dec. 2, 2021) (hereinafter "FTC Complaint").

[4]    Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparks-quick-backlash-in-chip-industry-idUSKBN2650GT/.

[5]    Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas).  ARM claims that "[a]bout 99% of premium smartphones are powered by Arm." *Consumer Technologies: Smartphones*, Arm, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Dec. 9, 2024).

[6]    *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

to NVIDIA, Arm is now grasping for any means—fair or foul—of padding its bottom line and stock price. Eager to cash in on the ubiquity of—and lack of any viable alternatives to—the Arm ISA, and as urged by SoftBank and Son, Arm has begun turning the screws on its customers, substantially increasing the royalty rates it demands to use the Arm ISA. Nor is Arm content to simply increase the rates it charges architecture licensees like Qualcomm. Instead, it has sought to capture a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or indeed, by selling chips themselves).

5.    Qualcomm now stands as an obstacle to Arm's ambition to raise prices and eliminate alternatives for customers. Qualcomm has developed innovative products enabled by its custom-designed, high-performance, low-power CPUs, which utilize a novel microarchitecture and related technologies to deliver significant increases in both performance and efficiency. Those innovative products pose a serious obstacle to Arm's ambition to control more links in the computer-processor value chain. Unable to compete fairly with Qualcomm, Arm has employed a series of wrongful tactics in an attempt to stifle Qualcomm's technological leaps in CPU design, to force Qualcomm to continue to use Arm's off-the-shelf CPUs, and to coerce Qualcomm into renegotiating the QC ALA, despite it being in effect for years to come, on terms substantially more favorable to Arm—or simply to nullify that agreement. Indeed, Arm's tactics are part and parcel of a broader effort to enable the company to escape its existing ALAs and thereby to ensure that devices compatible with the Arm ISA run on Arm chips.

6.    Some of Arm's maneuvers are the subject of litigation pending before this Court. *See Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del.) (hereinafter "*Arm* v. *Qualcomm*"). That case arises primarily from Arm's attempt to use Qualcomm's acquisition of

the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA.  NUVIA was founded by a world-class engineering team that set out to design better chips for use in datacenters.  In 2021, Qualcomm acquired NUVIA for $1.4 billion, intending for this team to help drive innovation across Qualcomm's product segments, including in laptops and other personal computers ("compute"), smartphones ("mobile"), and the digital cockpits and driver-assistance systems that are increasingly common in cars and trucks ("automotive").  Arm could have treated that acquisition as an opportunity to grow the use of the Arm ISA in new markets but instead regarded the acquisition as a competitive threat, whose benefits should be eradicated.

7.    *First*, Arm asserted, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA, Qualcomm needed Arm's consent to transfer NUVIA's technology to Qualcomm.  Arm took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of the QC ALA.  Arm later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers—including in products that Qualcomm began developing after the NUVIA acquisition, such as the Snapdragon® X-Elite—violated a license agreement between Arm and NUVIA that Qualcomm was not using and that Arm ultimately terminated.  This made no sense.  Qualcomm has its own license agreements for Arm technology and information that allowed it to develop and provide custom Arm-compliant cores and products incorporating such cores to its customers (including the Snapdragon® X-Elite and Snapdragon® 8-Elite) for many years to come.  Qualcomm did not need Arm's consent to develop and market this technology.[7]

---

[7]    Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

5

**A648**

8.      *Second*, Arm filed the meritless *Arm* v. *Qualcomm* action against Qualcomm, claiming that Qualcomm and NUVIA breached NUVIA's terminated agreements with Arm, despite Qualcomm not even being a party to those agreements, and infringed Arm's trademarks by marketing custom CPUs years after the NUVIA acquisition.  In that action, Arm is demanding that Qualcomm destroy these groundbreaking CPU products that Qualcomm developed after the NUVIA acquisition and in accordance with the Qualcomm/Arm agreements—even though Arm has repeatedly admitted that it suffered no actual harm as a result of the conduct allegedly forming the basis of its claims.[8]

9.      *Third*, Arm and Son promoted the *Arm* v. *Qualcomm* lawsuit to Qualcomm's customers to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and could be subject to retaliation by Arm if they did, including by misrepresenting the terms of Qualcomm's licenses with Arm to Qualcomm's customers.[9]

10.      This complaint seeks redress for further bad-faith conduct in which Arm has engaged in an attempt to pressure Qualcomm to cave to its demands.  That conduct includes refusing to perform certain of its obligations under the QC ALA and continuing to wrongfully interfere with Qualcomm's relationships with current and prospective customers.

---

[8]      *See* Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 29, 31-37, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306; Joint Letter re Bench or Jury Trial, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308; Redacted Mar. 5, 2024 Hr'g Tr. 38:20-39:8, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1.

[9]      Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 255-70, *Arm* v. *Qualcomm*, D.I. 306.

***Arm Withheld Deliverables in Breach of Its Obligations Under the QC ALA***

11.     Arm deliberately withheld deliverables to which Qualcomm is entitled under the QC ALA with Arm under the guise that the QC ALA does not entitle Qualcomm to support for "Nuvia-based technology." Arm's excuse is unjustified, and its breach could not be clearer.

12.     Qualcomm first suspected that Arm was withholding QC ALA deliverables in the fall of 2022. At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within Arm's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

13.     Arm capitalized on this lack of transparency, with its General Counsel stating definitively that ███████████████████." Arm further stated that Qualcomm "██ ████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables. Here again, Arm was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

14.     Arm went on to state that Qualcomm's written notice was a "███████████" to cause Arm "███████████" because "████████████████" was at issue, which Arm purported was "████████████████████████████████████████ ████████████████" ████████████████████████████████████████████. Additionally, Arm threatened Qualcomm that, if Qualcomm availed itself ███████████ ████████████████████, Arm would harm Qualcomm, including by terminating Qualcomm's multiple licenses with Arm.

15.     Arm's statement that ████████████████████████" was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted in *Arm* v. *Qualcomm* revealed incontrovertible evidence that Arm not only

had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, Arm was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the use of technology acquired from NUVIA.

16.    Arm never cured its failure to deliver, causing Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

17.    Arm's failure to deliver violated the QC ALA, which   ███████████  under that agreement.  Under the QC ALA, if Arm is found to be in breach of Section ██ of the QC ALA, it must ██████████████████████████████████  If Arm fails ████  ███████████████████████████  pursuant to Section ██████  ████████████████████████████████████████  ████████████████████.

18.    Arm's withholding of deliverables and deliberate decision ████████████  ████████████████████ is a material breach of the QC ALA.  Accordingly, Qualcomm is entitled to financial damages, including but not limited to ███████████  ██████████████████████████████████████████  ██████████████████████████████████  ████████████████████.

### Arm Threatened to Terminate the QC ALA Without Basis

19.    Apparently seeking to ratchet up pressure on Qualcomm before trial in *Arm* v. *Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter (the "Breach Letter") asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing "unlicensed cores," and claiming that Arm will be entitled to terminate

the QC ALA if Qualcomm does not capitulate to Arm's demands for a "cure" within 60 days.[10] Those demands, which have no basis in the agreement, include that Qualcomm should "at a minimum" stop development of any CPUs that use any designs, technology, or code created by NUVIA employees; cease requesting ████████████████ for any such CPUs; cease manufacturing and selling such CPUs; and cease manufacturing or selling CPUs that Arm has refused to validate and verify. The Breach Letter also demands, without support in the QC ALA or the law, that Qualcomm withdraw its claims against Arm in this case for Arm's breach of its delivery obligations under Section ██.

20.    Arm's assertion that Qualcomm is in material breach of the QC ALA lacks any basis in that agreement. The premise of Arm's Breach Letter is that certain Qualcomm CPU cores allegedly contain aspects of designs that were started by NUVIA employees. But the QC ALA does not prohibit Qualcomm from acquiring nascent microarchitecture technology and using that technology to develop Qualcomm CPUs. And it certainly does not permit Arm to terminate the QC ALA as payback for Qualcomm's suing to protect its rights under that agreement. Because Qualcomm has not committed a "████████████████████████████████," Arm has no right to terminate the QC ALA, and any purported termination of that agreement is null and void.

21.    Moreover, Arm's claim of a material breach is inconsistent with Arm's own conduct throughout this dispute. Arm has known since at least 2021 that Qualcomm would be acquiring NUVIA and using the technology that Arm now belatedly claims was improperly licensed. Yet for three years, Arm took no steps towards attempting to terminate the Qualcomm ALA and stood by while Qualcomm, through significant investments of time and money,

---

[10]    A copy of the Breach Letter is attached as Exhibit A to this Amended Complaint.

developed and brought to market innovative products featuring Qualcomm's custom CPUs. Arm's belated threat to terminate the QC ALA only last month—on the eve of trial and while Qualcomm was announcing new products based on its high-performance custom CPUs—demonstrates that Arm's claim of a material breach is a pretext to justify Arm's true aim: escaping the QC ALA and other ALAs so Arm can attempt to dominate the market free from competition from Qualcomm and other designers of custom CPUs.

*Arm Continues to Wrongfully Attempt to Injure Qualcomm's Business*

22.    Arm's Breach Letter is the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers.

23.    The Breach Letter was not only legally groundless, but also timed and publicly released in an effort to damage Qualcomm's business. Arm sent the Breach Letter to coincide with Qualcomm's annual Snapdragon® Summit, where Qualcomm unveiled an SoC that offers greater CPU performance and efficiency than those offered by Qualcomm's competitors, including those competitors that use Arm off-the-shelf products in their SOCs. To ensure that the Breach Letter reached Qualcomm's customers, Arm also promptly leaked it to Bloomberg, which published a story on the threatened termination that very day.[11] Arm did so knowing that Qualcomm's customers would likely be concerned that termination of the QC ALA could destabilize their own supply chains, because Arm's actions implied, despite the actual terms of the QC ALA, that Arm could and would impede Qualcomm's ability to deliver the SoCs its customers ordered, and that Qualcomm's customers might even face intellectual-property litigation brought

---

[11]    Ian King, *Arm to Cancel Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024, 8:17 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

by Arm.  Both the timing and the disclosure of the Breach Letter were thus calculated to interfere with Qualcomm's customer relationships and prospective business opportunities.

24.    The Breach Letter was also timed to interfere with *Arm* v. *Qualcomm*.  In the Breach Letter, Arm threatens that it "shall be entitled" to terminate the QC ALA on December 21, 2024—the day after trial in *Arm* v. *Qualcomm* is expected to conclude.  Arm's counsel's recent statements to this Court that termination would not be "automatic" after 60 days, that he "hope[d] that there are discussions between the parties," and that the Breach Letter could prompt the parties to "evaluat[e] their positions" underscore that Arm sent the Breach Letter to pressure Qualcomm to accede to Arm's unjustified demands.[12]

25.    Arm's wrongful tactics have harmed Qualcomm.  Following Arm's bad-faith claim that Qualcomm has breached the QC ALA and leak of the Breach Letter, important Qualcomm customers have delayed entering into new (or renewing existing) contracts with Qualcomm, or have insisted that Qualcomm provide them with additional commitments regarding its ability to deliver licensed products.  Arm's campaign has not only deprived Qualcomm of the ability to finalize these business opportunities promptly and without providing additional commitments, but also required Qualcomm executives and employees to spend considerable time responding to and alleviating customer inquiries.  None of those demands would have existed but for Arm's wrongful conduct.

26.    Arm's non-compliance with its contractual obligations to Qualcomm should be seen for what it is: the latest in a series of anti-competitive maneuvers intended to force Qualcomm to renegotiate an existing, long-term license agreement that Arm's current management views as

---

[12]    Oct. 30, 2024, Hr'g Tr. 39:14-40:2, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

disadvantageous, and to frustrate Qualcomm's efforts to design and deliver industry-leading technology. Arm's tactics—its refusal to provide technology it is contractually obligated to deliver and its attempts to undermine customers' confidence in Qualcomm—should be wholly rejected.

## THE PARTIES

27.     Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California. Qualcomm is a leading technology innovator in mobile communication products and the driving force behind the development, launch, and expansion of 5G technology. Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone. Qualcomm brings the benefits of mobile to new industries, including automotive, IoT, and computing, where Qualcomm's technology has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

28.     Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal place of business in San Diego, California. Qualcomm Technologies is a wholly owned subsidiary of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering and research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

29.     Defendant Arm Holdings PLC is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

31.     Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because Arm is "a defendant not resident in the United States" and therefore can be "sued in any judicial district."  Arm has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[13]

### FACTUAL ALLEGATIONS

### I.     ARM LICENSES AND THE CUSTOM CPU MARKET

32.     Arm is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars. Arm's licensing model is based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee.  For many years, Arm has offered different types of license contracts, of which two are at issue in this case: ALAs and TLAs.

### A.  ALAs and the Arm ISA

33.     An ALA grants licensees the right under Arm's intellectual property to design their own custom Architecture Compliant Cores using specific licensed ISA technology and to manufacture, sell, and distribute Arm Compliant Products incorporating such cores.[14]

34.     CPU Cores (also known simply as cores) are a particular component of SoCs, which are integrated circuits used in cellular phones, computers, and other devices that combine several technologies used in such products into a single chip.  A core or CPU performs processing within the SoC.

---

[13]  *See generally* Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[14] ███████████████████████████████████████████████████████

35.    An Arm Compliant Core is compatible with the Arm ISA.  As a general matter, an ISA lists the instructions that allow hardware (like SoCs) to interface with software programs. Application and software developers create their products to be compatible with particular ISAs. As a result of greater investment in Arm-based systems by hardware companies like Qualcomm and software developers, the Arm ISA is now "ubiquitous" and used in practically every premium smartphone, as well as a large percentage of automobiles and IoT devices and a growing number of personal computers and datacenter servers.

36.    The Arm ISA allows for software compatibility across all Arm-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.  The Arm ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

37.    To make a CPU that then can execute the Arm ISA and therefore run applications and other software that have been written to be compatible with that ISA, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

38.    A CPU developer developing a custom CPU designs ***how*** the core is built, ***how*** it performs, and ***how*** it executes the CPU's instructions.  There are a virtually infinite number of ways to design and build CPUs that can implement the Arm ISA.  Companies that design custom

14

**A657**

CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs. Many of these design choices are driven by the requirements of the product segment the designer is targeting—CPUs for mobile applications can have different design priorities than those for laptop computers or automobiles.

39.    Under an ALA, Arm does not deliver any specific Arm design or tell the licensee how to make the CPU. That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee. As Arm has publicly acknowledged, "the creation of an optimized CPU is very costly and time consuming," and Arm therefore "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the customization often does not provide a reasonable return on investment."[15]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm. Arm has executed ALAs with Qualcomm and a number of other companies.

### B.    TLAs and Off-the-Shelf CPUs

40.    In addition to granting licensees rights under ALAs to make custom-designed products that are compatible with the Arm ISA, Arm also designs "off-the-shelf" CPUs that customers may license through a TLA. Under a TLA, Arm delivers complete processor core designs that a licensee can incorporate into a larger SoC design, saving the licensee the trouble and expense of designing its own CPU. Recently, Arm has placed greater emphasis on licensing off-the-shelf CPU technology, including by launching a "Compute Subsystems" business that offers

---

[15]    Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

integrated designs that pair CPUs with other technology—all in exchange for "significantly higher royalty rates" than Arm receives for licensing its ISA.[16]

41.    But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance. Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it charges for a license to the Arm ISA. Moreover, when an SoC developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs. And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing SoCs that can compete against those with more advanced custom CPUs.

## II.    QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

42.    Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications." Qualcomm is a world leader in the design and production of semiconductor microchips, including SoCs. Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines. Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

43.    Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates. In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help

---

[16]    *Id.*

Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive industry designed to deliver connected experiences that are safer and customizable. Included among these products are custom CPUs and SoCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

### A. Qualcomm Builds Innovative Arm-Compatible Products

44.    Qualcomm has held Arm licenses since 1997. Those licenses include an ALA entered in 2003, and the currently operative QC ALA, ███████████, which Qualcomm[17] and Arm entered into on May 30, 2013, and Annex 1 to that agreement for Arm v8-A Architecture deliverables. On June 23, 2020, Qualcomm and Arm entered into an additional Annex 1 to the QC ALA for Arm v9-A Architecture deliverables.

45.    Under the QC ALA and corresponding Annex 1s, Qualcomm has rights, using specific licensed technology, to design, manufacture, sell, and distribute Qualcomm's v8-A and v9 Arm-compatible custom cores, custom Arm ISA-compatible CPU cores, and products incorporating those cores. ███████████████████████████ ██████████████████████████████████████ Since Qualcomm entered into the QC ALA, Qualcomm has developed and shipped custom Arm ISA-compatible CPUs.

---

[17]   The actual party to the ALA and TLA ████████████████████ ████████. The terms of the agreements ████████████████████████ █████████████████████████████████████████████.

**A660**

46.    Qualcomm is today one of Arm's largest licensees—it "accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024."[18]  Since 2013, Qualcomm has paid Arm total license fees of ███████ and running royalties of ███████████ under the QC ALA.  Qualcomm has fully complied with its obligations under the Qualcomm ALA and has continued to tender royalty payments to Arm (under protest) pending resolution of this dispute.

47.    In recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for Qualcomm to compete by relying on Arm-designed cores.  In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical.

48.    In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SoC specifically for use in datacenter servers.  At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs.  Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary compute, mobile, and automotive product segments.  Qualcomm also planned to continue development of the server CPU and SoC for use in data centers and servers that NUVIA had originally intended to design.

49.    Since acquiring NUVIA and integrating the NUVIA team as Qualcomm employees, Qualcomm spent years developing innovative products with custom-designed CPUs using a novel microarchitecture and related technologies.

---

[18]    ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024 (Form 20-F) at 28 (Aug. 12, 2024).

**A661**

50.    Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86).  Qualcomm's new products with custom CPUs have drawn praise as being "incredibly potent"[19] and "shockingly fast."[20]

51.    Qualcomm is not alone in its belief that its custom cores offerings will transform and advance the industry.  Major industry participants—including Microsoft, Google, Samsung, GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[21]

### B.  Relevant Provisions of the Qualcomm ALA

52.    On May 30, 2013, Qualcomm and Arm entered into an Amended and Restated Architecture License Agreement, No. LES-TLA-20039, and Annex 1 to that agreement.  The QC ALA is a binding and enforceable agreement.

53.    ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

---

[19]  Aaron Klotz, *Snapdragon X Elite Beats AMD and Intel Flagship Mobile CPUs in Geekbench 6*, Tom's Hardware (Apr. 2, 2024), https://www.tomshardware.com/pc-components/cpus/snapdragon-x-elite-beats-amd-and-intel-flagship-mobile-cpus-in-geekbench-6-qualcomms-new-laptop-chip-leads-in-single-and-multi-core-tests.

[20]  Mark Hachman, *Qualcomm's Snapdragon X Elite Chip Attracts Unprecedented PC Partnerships*, PCWorld (Oct. 25, 2023), https://www.pcworld.com/article/2116395/qualcomms-latest-snapdragon-attracts-huge-pc-partnerships.html.

[21]  *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.



54. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

55. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

56. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

22 ███████████████████████████████████████████
███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████

### C.  Arm's Evolving Business Model

57.    For years, Arm expressed its commitment to an open, neutral model for licensing the use of its ISA.  Under that model, which led to Arm commonly being referred to as the "Switzerland of chips," Arm held itself out as not discriminating against companies that sought to use the Arm ISA.[24]  That model benefited the software developers, which could develop software that would be interoperable across Arm-compatible devices, and ultimately benefited customers. Indeed, Arm continues to tout the benefits of its "broad, standardized software ecosystem," which it claims "ensures diversity and robustness in supply, as well as easy software portability between Arm-based systems."[25]  That model also benefited Arm, leading to widespread adoption of the ISA.  As a senior Arm executive has explained, "[w]hat makes an architecture successful is actually number of people that use it," as greater adoption of an ISA creates a "virtuous circle" in which the "more people that use your architecture, the more people will want to use it."[26]

---

[23] █████████████████████████████████████

[24]    FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees").

[25] *The Arm Advantage: Choosing Arm Technology*, Arm.com, https://www.arm.com/company/arm-advantage (last visited Dec. 9, 2024).

[26] Arm, *What Is CPU Architecture?*, YouTube.com (Aug. 18, 2021), https://www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.

21

**A664**

58.     After being acquired by SoftBank, however, Arm has pivoted away from that model.  When the chipmaker NVIDIA attempted to acquire Arm in 2020, the proposed acquisition met with harsh responses from regulators and other companies that rely on the Arm ISA, based on fears that NVIDIA could use its control of Arm to undermine its rivals, "including by manipulating levers such as [Arm]'s pricing, the terms and timing of access to [Arm]'s Processor Technology, … [Arm]'s technological developments and features, and [Arm]'s provision of service and support."[27]

59.     When that acquisition fell apart under regulatory scrutiny, Arm pursued a variety of strategies to try to bolster royalty revenues at SoftBank's and Son's behest, including unsuccessful attempts to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made, and to force a major customer to renegotiate royalty rates notwithstanding the parties' existing contract.[28]  After releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores.[29] Indeed, in its calls with investors, Arm routinely touts the increased revenues it expects to collect as a result of widespread adoption of v9.

60.     Arm has also attempted to bolster its income—and thus its valuation—by abandoning its historic role of neutral and open licensing of its ISA.  Having made that ISA

---

[27]   FTC Compl. ¶ 8.

[28]   Wayne Ma & Cory Weinberg, *How a Lopsided Apple Deal Got Under Arm's Skin*, The Information (Nov. 29, 2023), https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin.

[29]   *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas).

"ubiquitous" for the entire smartphone and IoT markets and made significant inroads in other sectors, Arm now seeks to leverage that ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA.  Haas has hinted at precisely that sort of leveraging, explaining that as the company "defining a computer architecture and … building the future of computing," it is "easier" to understand the best ways to integrate hardware and software "if you're building something than if you're licensing IP" because "building something" makes a company "much closer to that interlock" and gives it "much better perspective in terms of the design tradeoffs to make," which is why "if we were to do something, that would be one of the reasons."[30] Moreover, Arm has also sought to develop more complex, integrated "subsystems" that combine CPUs with other chips and intellectual property.[31]  This transformation from licensing intellectual property to positioning itself primarily as a chip designer creates the potential for Arm to make substantially more money:  These businesses "carry significantly higher royalty rates"[32] than merely licensing use of the Arm ISA.

61.    But this transformation also brings Arm into direct conflict with existing licensees and customers.  When an architecture licensee like Qualcomm designs a custom Arm ISA-compatible CPU, that CPU does not belong to Arm.  Instead, as Arm has publicly acknowledged, those custom CPUs "compete with" and "pose a threat to Arm's implementation IP business"—

---

[30]    Alex Health, *What Arm's CEO Makes of the Intel Debacle*, The Verge (Dec. 6, 2024, 4:45 PM), https://www.theverge.com/2024/12/6/24315123/arm-ceo-rene-haas-intel-ai-chips-samsung-changes.

[31]    *Client Solutions:  Arm Compute Subsystems (CSS) for Client*, Arm, https://www.arm.com/products/compute-subsystems-for-client (last visited Dec. 9, 2024).

[32]    *Arm First Quarter Fiscal Year 2025* at 5, Arm (July 31, 2024), https://investors.arm.com/static-files/393afe3f-13ff-4aa8-a4b3-41b1afaa5a91 (statement of Rene Haas).

that is, Arm's effort to position itself as a designer of CPUs.[33]   Arm has thus responded by pressuring customers (such as Qualcomm) to purchase Arm's off-the-shelf CPUs and by attempting to prevent Qualcomm from designing CPUs compatible with the Arm ISA.

### III.   ARM UNFAIRLY AND UNLAWFULLY ATTEMPTS TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

62.   Developing its own CPUs frees Qualcomm of the need to rely on Arm's off-the-shelf CPU designs.  That would both reduce the royalty rates Qualcomm pays Arm—████ ██████████████████████████████████████████████—and demonstrate that products using Qualcomm custom CPUs can outcompete products using Arm's off-the-shelf designs. Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an even better product for customers and opening new product segments for chips compatible with Arm's ISA, Arm has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

### A. Arm Wrongfully Withholds Deliverables Owed to Qualcomm Under the QC ALA.

63.   In an effort to limit competition posed by Qualcomm's custom CPU, Arm breached its contractual obligations to provide Qualcomm with deliverables paid for under the QC ALA.

#### 1.   *The QC ALA requires Arm to provide Qualcomm with certain deliverables.*

64.   The two contract provisions at issue here—Sections ██ and ██—are clear and unambiguous.

---

[33]   Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

65.    Section ▮ of the QC ALA requires Arm to "████████████████

████████████████████████████████████████████" and

to "████████████████████████████████████████

████████████████" Arm is also required ████████████ "████████████

████████████████████." ████████████ is defined in the

Qualcomm ALA as "████████████████████████████████

████████████████████████" under that agreement.

66.    Under Section ▮ of the QC ALA, ████████████████████████

████████████████████████████████████████████████

████████████████████████:



### 2. *Arm withholds the deliverables.*

67.    Qualcomm first suspected that Arm was withholding ████████████ under the

QC ALA in the fall of 2022.  At that time, Qualcomm was embarking on its verification process

for its ████ SoC.  As is the customary practice between an ALA licensee and Arm, Qualcomm

provided Arm with details about its ████ CPU so that Arm would provide a formal list of agreed

Arm Compliance Kit ("ACK") tests for which Arm would expect to see verification data.  But

Arm withheld the formal list of tests (known as the "OOB") ████████████████

████████████████████████████████████████████████

████████████.

68.    Qualcomm then attempted to resolve the issue without court intervention.

69.     On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug fixes) from Arm.  Arm engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll be able to share OOB and various patches after my management has given their approval."

### 3. *Qualcomm provides written notice of Arm's failure to deliver—but Arm does not cure.*

70.     Almost one month later and after still not having received the deliverables under the QC ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022, Qualcomm notified Arm in writing of its failure to provide certain deliverables, including the OOB, stating explicitly that Arm should take the letter as "Qualcomm's required notice under Section ▮ that Arm is not in compliance with its obligations under ▮▮▮▮, and that Arm must cure this breach in accordance with the time and procedures set forth therein."

71.     After not hearing from Arm, pursuant to Section ▮ of the QC ALA, Qualcomm sent a follow-up letter on December 5, 2022.  The letter was Qualcomm's "second written notice of non-compliance ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." The letter stated that "ARM must ▮▮▮▮▮▮▮▮▮▮▮▮ set forth" in the QC ALA "or ▮▮▮▮▮▮▮▮▮▮▮▮▮."

72.     Pursuant to Section ▮ of the QC ALA, Arm ▮▮▮▮ to remedy its failure to provide the deliverable.  ▮▮▮▮ passed without Arm remedying the issue.

73.     Arm responded on December 6, 2022.

74.     In its response, Arm disagreed that Section ▮ was at issue "or that provision of the OOB implicates Section ▮." Arm additionally asserted that the ACK deliverables are governed by Section ▮ of the QC ALA, not Section ▮, and that remedies for a breach of that section do not include ▮▮▮▮▮▮▮▮.

75.    Notably, Arm additionally claimed that ," stating explicitly that Arm "███████████████████████████████████ ███████████████████████████." As to the OOB specifically, Arm claimed that "█ ███████████████████████████████████████████████████ ███████."

76.    Arm was definitive in its assertions, stating that "[n]o additional delivery is required," and "[n]o breach of ████████ has occurred."  Qualcomm was unable to verify this assertion because the "patches" are created by Arm and provided solely by Arm.  Accordingly, Qualcomm has no way of knowing definitively whether Arm has released patches for verification until they are delivered (or until someone from Arm tells Qualcomm they are available, which did not occur in this case).

77.    Arm's letter further stated that Qualcomm "does not have ████████████ ██████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  Arm additionally threatened Qualcomm that if it did not drop its invocation of Section ██, Arm would take steps that would harm Qualcomm.  Arm claimed that Qualcomm's invocation of Section ██ was "a new, material breach of the Qualcomm ALA" and that, to the extent Qualcomm exercised ████████████████████████████ ████████████████████, Arm would "not hesitate to terminate" Qualcomm's licenses.  Arm further stated that Qualcomm's letter was a "malicious effort" to cause Arm "economic duress," which Arm purported was "inconsistent with the language, spirit, and purpose of the ALA and ████████████████████."

### 4.  Discovery reveals that Arm deliberately withheld the deliverables.

78.    But more than a year later, Qualcomm discovered that Arm's December 6, 2022, letter misrepresented the facts and concealed Arm's strategy of deliberately withholding the OOB

and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm duress.

79.    "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'"  In response to Qualcomm's requests for production, Arm produced an October 2022 email chain in which Richard Grisenthwaite, Arm's Executive Vice President and Chief Architect, explicitly instructed others at Arm not to provide Qualcomm with the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[34]

80.    In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that Arm concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  Arm's multi-tiered deception was successful for more than a year.  "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether

---

[34]    On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include ARM's breach of Section ■ of the QC ALA.  These allegations and quotations are taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order.  Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5.  Notably, at that hearing, ARM advocated against adding this claim to the case in which this discovery was produced; and instead, ARM advocated for Qualcomm to bring a separate lawsuit.  Redacted Mar. 5, 2024 Hr'g Tr. 39:13-20, *Arm* v. *Qualcomm*, D.I. 312-1.

the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section ███ of the Qualcomm ALA."[35]

81.    The applicable Annex 1 to the QC ALA includes ███████████  ████████████████████████████████████████████████████ ██████████████████████.

82.    Accordingly, when it was revealed through document and deposition testimony that, contrary to Arm's December 6, 2022, letter, Arm had deliberately withheld the ACK deliverables to which Qualcomm was entitled, it became clear that Arm breached its obligations under Section ███ of the QC ALA.

83.    Arm's General Counsel concealed the facts, explicitly (and definitively) stating in Arm's December 6, 2022, letter that it had provided Qualcomm with ██████ to the ACK and that "[n]o failure of delivery ha[d] occurred."  Qualcomm did not have a valid basis to dispute that factual representation without discovery.

### 5.  *Arm's breach of the QC ALA has harmed Qualcomm.*

84.    To date, Arm still has not provided the OOB and relevant patches to which Qualcomm is entitled, and Arm's failure to do so increased Qualcomm's burden in verification.

85.    By failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA, even in the

---

[35]  Redacted Mar. 6 Order at 4, *Arm* v. *Qualcomm*, D.I. 303; *see also* Redacted Mar. 5, 2024 Hr'g Tr. 17:18-19:9, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the QC ALA.

86.    Similarly, by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches, which Qualcomm paid for and was entitled to receive under the QC ALA.  Qualcomm was damaged as a result.

87.    .

88.    Pursuant to Section ▮ of the QC ALA:



89.    Accordingly, 

90.    In addition, because 

30

**A673**

**B. Arm Refuses to Negotiate a License to the Latest Version of Its ISA** ██████
██████████████.

91.      In addition to failing to ███████████████████████████, Arm
has also refused ███████████████████████████████████████████
███████████████████████████.

92.      As noted, Section ████████ of the QC ALA ███████████████████
████████████████████████████████████████████████████████████
████████████.  Qualcomm has ████████████████████████.  Additionally, Section
████████ of the QC ALA ██████████████████████████████████████████
████████████████████████.

93.      On April 17, 2020, a Qualcomm employee emailed an Arm counterpart to ask if
Arm was working on a new version (v10) of the Arm ISA to replace v9 and explained that the
request was made in the context of ████████████████████████████████████████
████████████████.  The Arm employee responded the following week that ██████████████
████████████████████████████████████████████████████████████████
████████  would expire but that there was ██████████████████████████████
████████████████████████████████████████.

94.      On May 20, 2020, Qualcomm emailed Arm stating that Qualcomm ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████."

95.     Arm never responded to that email or followed up at any other time regarding

███████████████████████████████

96.     Arm's actions underscore its strategy of attempting to eliminate existing ALAs and to force Qualcomm and other licensees to use Arm's off-the-shelf CPU designs—or to cease designing Arm-compatible chips entirely.

### C. Arm Wrongfully—and Publicly—Accuses Qualcomm of Breaching the QC ALA.

97.     In addition to the breaches described above, Arm has also deliberately sought to impair Qualcomm's standing and relationships with current and prospective customers.  As Qualcomm has detailed, Arm, through its leadership and through SoftBank and Son, has engaged in a misinformation campaign to mislead Qualcomm's customers into believing that Qualcomm will not be able to deliver licensed Arm-compatible products after 2024, and that Qualcomm customers must obtain their own direct licenses from Arm.[36]  More recently, in an apparent effort to "ratchet[] up the pressure" on Qualcomm in *Arm* v. *Qualcomm*,[37] Arm continued this misinformation campaign by declaring without basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter.  By doing so, Arm has caused tangible harm to Qualcomm's customer relationships.

#### 1. *Arm waits years before taking steps to terminate the QC ALA.*

98.     Although Arm now asserts that Qualcomm is in material breach of the QC ALA, Arm waited years before taking any steps towards terminating the QC ALA.  On August 31, 2022,

---

[36]  Defs.' Answer and Defenses to Pl.'s Compl. & Jury Demand & Defs.' 2d Am. Countercls. ¶¶ 255-70, 275(b)-(d), *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.

[37]  Oct. 30, 2024, Hr'g Tr. 34:6, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

Arm commenced *Arm* v. *Qualcomm* in the U.S. District Court for the District of Delaware.  In that action, Arm alleges that Qualcomm and NUVIA breached the NUVIA ALA by not destroying all design work undertaken by NUVIA pursuant to its license with Arm following Qualcomm's acquisition of NUVIA.  When it filed that action, Arm neither alleged that Qualcomm had breached the QC ALA nor sent Qualcomm any notice to that effect ████████████████████████ ████████████████████

99.    On September 30, 2022, Qualcomm answered Arm's complaint in *Arm* v. *Qualcomm* and filed a Counterclaim against Arm seeking, among other things, a declaratory judgment that its conduct was fully licensed under the QC ALA, and that it could "continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA" or any other relevant agreement with Arm.  When Arm answered that counterclaim, it generally alleged that Qualcomm was breaching the QC ALA, though it did not send Qualcomm any written notice to that effect ████████████████████

100.    On March 13, 2024, Qualcomm filed its second amended counterclaims in *Arm* v. *Qualcomm*.  Arm answered on April 4, 2024, and again alleged that Qualcomm was breaching the QC ALA, entitling Arm to terminate that agreement.  Again, however, Arm did not send Qualcomm any written notice to that effect ████████████████

### 2.    *Arm's Breach Letter groundlessly asserts that Qualcomm is in material breach of the QC ALA.*

101.    It was not until more than seven months later, on October 22, 2024, that Arm sent Qualcomm the Breach Letter, which purports to provide notice to Qualcomm under ██████ ████████████████ that Qualcomm is in material breach of that agreement.

102.    The Breach Letter asserts that the QC ALA authorizes Qualcomm solely ██ ████████████████████████████████████

33

**A676**

███████████████████████████████████████████████████"[38] It
does not attribute these assertions to any particular provision of the QC ALA but instead ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████. The Breach Letter also refers generally to "Annex 1," a lengthy document
describing ███████████████████. But nowhere in the Breach Letter does Arm identify
any provision of the QC ALA that imposes the particular obligations Arm asserts in the Breach
Letter.

103.    In the Breach Letter, Arm claims that Qualcomm "systematically and willfully
breached these obligations" by ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████[39] The Breach Letter thus adverts to the same arguments it has made in *Arm* v.
*Qualcomm* about the NUVIA ALA: in essence, that Qualcomm somehow breached the ***NUVIA***
ALA by developing CPUs in part by using technology created by and acquired from NUVIA. Arm
has not explained in that litigation and does not explain in its Breach Letter how Qualcomm
allegedly breached any provision in the ***QC*** ALA by developing CPUs in the manner it did. In
short, there is a reason why Arm's purported notice letter failed to state clearly which express
contractual provision Qualcomm materially breached, or when or how Qualcomm breached any
such provision: None exists.

104.    Having invoked Section ████ of the QC ALA, Arm's Breach Letter demands
that Qualcomm "cure" the alleged breach(es) within 60 days, including by stopping the

---

[38]  Ex. A at 1 (emphasis added).

[39]  *Id.*

development of "Nuvia designs" and the manufacture and sale of Qualcomm CPUs that allegedly "use Nuvia designs or technology."  The Breach Letter further demands that Qualcomm "cure" the alleged breaches by withdrawing its complaint in this Action against Arm.  And the Breach Letter asserts that if Qualcomm does not "cure" the alleged breaches in this manner within 60 days, Arm will be entitled to immediately terminate the QC ALA.

105.    The "cures" that Arm demands in its Letter—other than the dismissal of this Action—are the same remedies that Arm has requested in *Arm* v. *Qualcomm*.  By sending the Breach Letter, Arm is attempting to pressure Qualcomm to yield to its demands regardless of the outcome of *Arm* v. *Qualcomm*, as well as this case, before the former goes to trial.

106.    The timing of the Breach Letter belies Arm's assertion that Qualcomm has materially breached the QC ALA.  Arm knew about Qualcomm's acquisition of NUVIA in 2021, and asserted in its November 2022 Answer to Qualcomm's Counterclaim that Qualcomm was supposedly in breach of the QC ALA.  Yet before sending the October 22, 2024, Breach Letter, Arm never even attempted to provide the notice ████████████████ that Qualcomm had supposedly breached the agreement.  Quite to the contrary, Arm *celebrated* Qualcomm's development of the Snapdragon® X Elite SoC that contains CPU designs whose development Arm now claims breach the QC ALA, with Arm's CEO stating that Arm was "very excited to see the announcement of the brand new Windows on Arm PCs that run Copilot, true AI PCs."[40]  In the Breach Letter, Arm nowhere explains why it waited more than three years after Defendants allegedly breached the Nuvia ALA before it provided notice of an alleged breach of the QC ALA.

---

[40]    *Arm First Quarter Fiscal Year 2025*, at 3.  Haas further commented that "the products that are out today are using the most advanced Arm technology," because they "are optimized with Microsoft for the most effective battery life on the planet."  *Id.* at 10.

107.    Because Qualcomm has not materially breached the QC ALA, Arm has not identified any valid grounds on which to terminate the QC ALA and any purported termination based on the Breach Letter is null and void.

### 3.  Arm leaks the Breach Letter to harm Qualcomm's customer relationships.

108.    Arm's assertion that Qualcomm is in material breach not only lacks legal or factual basis, but was also made in a manner calculated to damage Qualcomm's customer relationships. Arm's claim that it has the authority to terminate the QC ALA is false, wrongful, and calculated to pressure Qualcomm to accede to Arm's demands and to prevent Qualcomm from gaining new business opportunities.

109.    From October 21-23, 2024, Qualcomm hosted its annual Snapdragon® Summit. At that Summit, Qualcomm unveiled new technology, including its new Snapdragon® 8 Elite Mobile Platform, an SoC featuring Qualcomm's custom-built second generation Qualcomm Oryon™ CPU.  That SoC delivers significant performance and efficiency improvements over competitors ███████████████████████████████.

110.    Arm issued its Breach Letter on October 22, 2024, in the middle of the Snapdragon® Summit.  That timing was no accident, but was an intentional Arm media stunt intended to embarrass Qualcomm and to interfere with its relationships with its current and potential customers and business partners, including by creating unwarranted uncertainty about Qualcomm's ability to continue delivering licensed Arm-compatible products.

111.    In addition to sending the Breach Letter to Qualcomm, Arm also leaked the Breach Letter or its contents to Bloomberg, which published a story that same day.[41]  The story was based

---

[41]  See Ian King, *supra* note 11.

on and referred to "a document seen by Bloomberg."  On the afternoon of October 22, 2024—the same day Qualcomm received the Breach Letter—a Bloomberg reporter contacted Qualcomm requesting comment on Arm's having sent Qualcomm a "60-day letter" notifying Qualcomm that it was purportedly in breach of the QC ALA.  The reporter was familiar with details of the letter. Later that day, Bloomberg published its story reporting on Arm's purported cancellation of the QC ALA.[42]  The story relayed details about the Breach Letter "according to a document seen by Bloomberg."  Because Qualcomm did not leak the Breach Letter, the Letter could have reached Bloomberg only if it had been leaked by Arm.

112.    Arm leaked the Breach Letter to distract from the Snapdragon® Summit and the groundbreaking products released at the Summit, and to ensure that the attention of Qualcomm's customers and business partners focused on the parties' licensing dispute rather than on Qualcomm's products, which pose a threat to Arm's own competitive ambitions.  The leak of the Breach Letter thus further demonstrates Arm's deliberate efforts to interfere with Qualcomm's customer relationships.

### 4.    *Arm's leak of the Breach Letter has harmed Qualcomm.*

113.    The release of the Breach Letter has caused Qualcomm harm, by impairing its relationships with current and prospective customers and interfering with its future business opportunities.

114.    Following Bloomberg's publication of the news story about the Breach Letter, multiple Qualcomm customers and business partners have contacted the company to express concern about the Breach Letter.  As a result of the Breach Letter—and, in particular, Arm's baseless assertion that it can terminate the QC ALA—several Qualcomm customers have deferred

---

[42]    *Id.*

finalizing pending business agreements pending resolution of the *Arm* v. *Qualcomm* litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products.

115.    For example, a major customer (the "Smartphone Company") had informed Qualcomm that it was designing a new mobile phone that would rely on Qualcomm's innovative Snapdragon® 8-Elite SoC.  After learning that Arm was threatening to terminate the QC ALA, however, a senior executive of the customer informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm.  The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm.

116.    Additionally, a potential customer (the "AI and Ecosystem Company") that currently relies on a competitor's chips for its substantial processing needs was on the cusp of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU.  Since the Breach Letter was published, the customer has refused to finalize a termsheet for an agreement under which Qualcomm would design that custom chip. The AI and Ecosystem Company has stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question.  As a result of the uncertainty stemming from Arm's assertion and leak of the Breach Letter, Qualcomm has been unable to finalize this valuable opportunity.

117.    Arm leaked the Breach Letter at a time when it knew that the Smartphone Company is an existing customer of Qualcomm and when it knew or should have known that the AI and Ecosystem Company was a customer of Qualcomm or was likely to be absent Arm's interference. On information and belief, Arm leaked the Breach Letter knowing (or in circumstances in which

38

**A681**

it should have known) that its wrongful threats to cancel the QC ALA would disrupt those customer relationships and that Qualcomm was likely to be harmed as a result.

### IV.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY

118.    Arm's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end.  Arm's tactics violate basic contract principles and are directly contrary to the purpose of the QC ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ▮▮▮▮ they bargained for without fear that Arm will unilaterally abdicate its contractual obligations in an effort to disrupt a licensee's innovation if Arm views the licensee as an unacceptable competitor.  ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

<u>**COUNT I**</u>
**(Declaratory Judgment)**

119.    Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

120.    Plaintiffs are entitled to a declaratory judgment that:

A.    Arm breached the QC ALA by withholding ▮▮▮▮▮▮▮ that Arm was obligated ▮▮▮▮▮▮▮▮▮▮ to deliver under Section ▮▮ of the QC ALA, and by withholding ▮▮▮ Arm was required to deliver "▮▮▮ ▮▮▮▮" under Section ▮ of the QC ALA;

B.    As a result of Arm's breach of Section ▮ of the QC ALA, Qualcomm is entitled to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮;

C.    Qualcomm has not breached the QC ALA as asserted in the October 22, 2024, Breach Letter; and

D.    Arm is therefore not entitled to terminate the QC ALA.

**A682**

121.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that ███████████████████████████████████████████████████ ██████████████████████ .

122.    A valid and justiciable controversy exists between Qualcomm and Arm because ██████████████████████████████████ Arm is threatening to terminate the QC ALA if Qualcomm ████████████████████ pursuant to Section ██ of the ALA.

123.    A declaratory judgment is also necessary and appropriate so that Qualcomm may ascertain Arm's obligations and Qualcomm's rights and obligations under the QC ALA and clear any cloud that may exist over its business as a result of Arm's false assertions of breach and threats to terminate the QC ALA.

124.    A valid and justiciable controversy exists between Qualcomm and Arm because Arm has asserted that Qualcomm is in breach of the QC ALA and has asserted that Arm has the right to terminate the QC ALA on December 21, 2024.  Qualcomm disputes both assertions. Qualcomm also reasonably expects that Arm would attempt to use its purported termination to damage Qualcomm with its customers, in the media, and with analysts, in light of Arm's behaviors to date.

## COUNT II
### (Breach of Section ██ of the QC ALA)

125.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

126.    The QC ALA is a valid, binding contract.

127.    Arm failed to fulfill its obligation under Section ▮ of the QC ALA because it intentionally withheld from Qualcomm certain ▬▬▬▬▬ to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

128.    Accordingly, Arm did not "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" or "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" or "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" as is required by Section ▮ of the agreement.

129.    Arm's failure to comply with its contractual obligation to timely deliver bargained-for technology was not only intentional, but it was also done with an intent to deceive Qualcomm.

130.    Qualcomm put Arm on written notice of this violation and Arm ▬▬▬▬▬▬▬▬▬, as is required under the contract.

131.    Arm's breach of Section ▮ of the QC ALA entitles Qualcomm ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

132.    As a proximate result of Arm's breach of contract, Qualcomm has been damaged both (i) by delay that could have been avoided had Arm fulfilled its obligations, (ii) by costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK tests to verify that its products are compliant with the Arm ISA and use its own engineers to address issues that would have been addressed by Arm's patches, and (iii) by ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ had Arm not misrepresented its compliance with the parties' agreement.

41

**A684**

## COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

133.     Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

134.     Under California law, every contract implies a covenant for each party not to do anything that will deprive the parties of the benefits of the contract.

135.     At all relevant times, Arm agreed and was required by law to act fairly and in good faith with respect to its obligations under the QC ALA.

136.     Arm breached this implied covenant of good faith and fair dealing by, among other things, withholding deliverables that it was required to provide Qualcomm under the QC ALA; asserting, without valid basis under the QC ALA, that Qualcomm was supposedly in material breach of that agreement; and leaking that Breach Letter to the media to create uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs.

137.     Arm's actions have been willful and carried out in bad faith, as part of an effort to enable Arm to disregard the QC ALA so that it can prevent Qualcomm from competing with Arm's sale of its own CPU and other chip designs, or, at a minimum, coerce into renegotiating the QC ALA so that Arm can extract payments from Qualcomm that exceed those due under the QC ALA.

138.     Arm's actions have unfairly frustrated the essential purposes of the QC ALA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm, including the right to produce and sell custom CPUs that are compatible with the Arm ISA.

139.     By reason of the foregoing, Arm has breached the implied covenant of good faith and fair dealing.

140.    As a proximate result of Arm's breach of the implied covenant of good faith and fair dealing, Qualcomm has been injured in its business or property, and is threatened by imminent loss of profits and loss of actual and potential customers and business opportunities.

<u>**COUNT IV**</u>
**(Intentional Interference with Prospective Economic Advantage)**

141.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

142.    Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above.

143.    Absent Arm's interference, these relationships would likely result in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations.

144.    Arm knew of these relationships but nevertheless engaged in wrongful conduct aimed at interfering with Qualcomm's business opportunities, including by (a) purporting to give notice that it "shall be entitled" to terminate the QC ALA based on nonexistent alleged material breaches of the QC ALA and (b) deliberately leaking the Breach Letter in the middle of Qualcomm's Snapdragon® Summit.

145.    By engaging in this conduct, Arm intended to disrupt these relationships or knew that disruption of these relationships was certain or substantially certain to occur.

146.    As a result of that conduct, these relationships have in fact been disrupted. The AI and Ecosystem Company has delayed finalizing a valuable agreement with Qualcomm that it would have finalized absent Arm's interference, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional assurances. As a

43
**A686**

result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm.

147.    Arm's efforts to interfere with Qualcomm's business relationships have been a substantial factor in causing that harm, which Qualcomm would not have suffered but for Arm's misconduct.

<u>**COUNT V**</u>
**(Negligent Interference with Prospective Economic Advantage)**

148.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

149.    Arm knew or should have known that Qualcomm has business relationships with a number of customers, including the Smartphone Company and the AI and Ecosystem Company.

150.    Arm also knew or should have known that these relationships would be disrupted by Arm's failure to act with reasonable care by purporting to terminate the QC ALA despite lacking legal or factual grounds for doing so and by leaking the Breach Letter in bad faith and in disregard of its duties to Qualcomm as a contract counterparty.

151.    Arm failed to act with reasonable care when, in bad faith, it purported to declare that Qualcomm is in material breach of the QC ALA and leaked the Breach Letter.

152.    As a result of Arm's wrongful conduct, Qualcomm's relationships with the customers identified herein have been disrupted, as customers have required additional assurances or delayed entering into additional transactions with Qualcomm.

<u>**COUNT VI**</u>
**(Violations of California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

153.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

154.    The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

155.    By engaging in the conduct described above, Arm has committed unfair business acts or practices prohibited by the UCL.  These unfair business acts or practices include wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby eliminate a competing supplier of chips compatible with the Arm ISA; to pressure Qualcomm to accede to its demands in *Arm* v. *Qualcomm*; and to prevent Qualcomm from continuing to litigate its meritorious claims in the instant case.

156.    Qualcomm's actions are part of a broader campaign to harm or threaten to harm competition in the markets for CPUs and SoCs, in California and elsewhere.  Arm is employing a variety of unfair practices so that it can leverage its monopoly with respect to the ISA used in all premium smartphones and a large and growing share of other computing devices to attempt to prevent Qualcomm from developing and marketing products with CPUs that threaten to outcompete products containing ████████████████████.  These tactics include threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA, either to eliminate a competitor or to pressure Qualcomm to accede to Arm's unjustified demands.

157.    Arm's conduct threatens to harm consumers by depriving them of products that are built around innovative, high-performance, high-efficiency Qualcomm chips and/or by increasing the prices that customers will have to pay for products that incorporate CPUs compatible with the Arm ISA, as a result of reducing competition to create those CPUs.

158.    Arm's unlawful and unfair business acts and practices are a direct and proximate cause of injury to Qualcomm.  Qualcomm has suffered harm in California and elsewhere as a

supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers.  If Arm is allowed to continue in its unlawful and unfair business acts and practices, Qualcomm risks being denied access to a widely used ISA for which there are no readily available alternatives for certain applications, which threatens to impede Qualcomm's ability to continue developing and marketing its high-performance products based on its own custom CPU designs.

159.    Qualcomm has standing to bring this claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment and relief as follows:

A. For the declaratory judgments set forth in Plaintiffs' claims;

B. For an Order requiring Arm to comply with its obligations under Qualcomm's license agreement, including (but not limited to) by providing the ██████, OOB, Patches, and ██████, without discrimination or retaliation;

C. For an Order enjoining Arm from engaging in the unfair and anticompetitive actions described in this Amended Complaint;

D. For an Order ███████████████████████████████████████ ████████████████ as a result of Arm's breach;

E. For an Order that the Breach Letter is ineffective notice of an alleged material breach and that Arm has no right to terminate the QC ALA on the grounds stated in the Breach Letter;

F. For recovery of all ██████████████████████████████████ ████████████████████████████

G. For damages resulting from the wrongful conduct alleged in this Amended Complaint, including from Arm's threat to terminate the QC ALA and its leak of the Breach Letter, and specifically including damages arising from the postponement of the business opportunity with the AI and Ecosystem Company;

H.  For restitution of amounts Arm derived from the unfair and anticompetitive conduct described in this Amended Complaint;

I.  For costs and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief; or, in the alternative, for additional damages, in the alternative, that the Court deems appropriate;

J.  For an award of attorneys' fees and costs as allowed by law; and

K.  For such other and further relief available at law and equity as the Court may deem just and proper.

### JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL

BY JURY of all claims and issues presented in this Complaint that are so triable.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

December 16, 2024

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

47

**A690**

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 16, 2024, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                               *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                           *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                             *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*


                                        */s/ Jennifer Ying*
                                        _____
                                        Jennifer Ying (#5550)

48

**A691**

EXHIBIT A



Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121

22 October 2024

Dear Ann,

Pursuant to section ███ of the Qualcomm Architecture License Agreement (LES-TLA-20039) ("the Qualcomm ALA"), Arm hereby provides notice that Qualcomm is in material breach of the Qualcomm ALA. Unless Qualcomm cures its material breach ████████████ Arm shall be entitled ██████████████████████████
████████████

Under the Qualcomm ALA, ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ The Qualcomm ALA permits ████████
████████████████ Qualcomm is only permitted to ████████████████
requirements of the Qualcomm ALA and ████████████████████████
████ And Qualcomm is entitled to ████████████████████████████
████ within the scope of the ALA. These obligations are reflected in multiple places in the Qualcomm ALA, including but not limited to Sections ████████████████
████████████████

Qualcomm has systematically and willfully breached these obligations, and its breaches have accelerated and expanded in recent months. Specifically, Qualcomm has ██████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ And Qualcomm initiated and continues to prosecute contractual claims that arise from Qualcomm's improper conduct with respect to these unlicensed cores.

Due to Qualcomm's willful, ongoing, and renewed actions, Qualcomm is in material breach of the Qualcomm ALA. Pursuant to Section ████████████████████████████████
████ To do so, Qualcomm must, at a minimum, ████████████████████████████
████████████

**A693**



If Qualcomm does not do so Arm shall be entitled to immediately terminate the ALA Following termination, Qualcomm shall be subject to the ualcomm ALA.

Sincerely,

Spencer Collins
EVP, Chief Legal Officer
Arm Limited
110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom

# Exhibit 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, )
    a Delaware corporation, )
QUALCOMM TECHNOLOGIES, INC., )
    a Delaware corporation, )
                        )    C.A. No. 24-490-MN
           Plaintiffs, )
                        )
          v. )  **JURY TRIAL DEMANDED**
                        )
ARM HOLDINGS PLC., f/k/a ARM LTD., )  **FILED UNDER SEAL**
    a U.K. corporation, )
                        )
         Defendant. )

## SECOND AMENDED COMPLAINT

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant Arm Holdings PLC, formerly known as Arm Ltd. ("Arm").[1]

## NATURE OF THE ACTION

1.     This case arises out of the latest chapter in Arm's campaign to stifle competition and technology innovation by impeding the efforts of its longtime business partner Qualcomm to deliver leading computer chips to its customers and consumers around the world. For years, Arm has received substantial royalties from licensing Qualcomm to design and sell products containing custom central processing units ("CPUs") compatible with Arm's instruction set architecture

---

[1]   On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims. *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300. This filing contains additional background on Arm's attempt to preclude Qualcomm's custom central processing units from competing with Arm's own central processing units. The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading. Redacted Answer & Defenses to Arm's Compl. & 2d Am. Countercls., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.

**A696**

("ISA"). But following its acquisition by the venture capital firm SoftBank Group and its failed sale to NVIDIA, Arm attempted to shift its business model away from licensing its ISA for use by companies like Qualcomm that design CPUs, and toward forcing customers to buy only Arm's own CPU designs. Qualcomm's license, however, stands in the way of Arm's effort to push aside the makers of custom CPUs: Qualcomm's license extends until 2033, and Qualcomm's Arm-compatible microprocessors lead the industry in numerous applications. At the direction of SoftBank and its chairman and CEO, Masayoshi Son, Arm thus sought to disrupt Qualcomm's business. Arm's first move was to sue Qualcomm for allegedly breaching a license that Arm had previously granted to a company Qualcomm acquired but to which Qualcomm was not a party, demanding that Qualcomm cease distributing its groundbreaking microprocessors. As soon as Arm filed that lawsuit, it blitzed Qualcomm's major customers with letters publicizing the lawsuit, accusing Qualcomm of breaching "the Arm license agreement," and threatening that it would "work vigorously to protect what is rightfully ours." And eight months later, Arm sent another round of letters to Qualcomm's largest customers, using language Arm's CEO has admitted under oath was "confusing" and "misleading" to create the false impression that Qualcomm was clearly in breach of its agreement. Then, on the eve of trial in that case, Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license after 60 days—the day after the trial was scheduled to end. That laid bare Arm's intentions from the beginning: to attempt to get out of its license with Qualcomm in any way possible so Arm could eliminate alternatives to Arm's own competing CPU designs.

2. For decades, Arm has developed and licensed intellectual property relating to chips. Arm has pursued that business through two distinct models: *first*, by licensing other companies to

use Arm's ISA—the set of commands that determines how software controls a CPU[2]—and *second*, by licensing its own CPU designs so that other companies can make and sell products that use Arm's ready-made designs.  Unlike other companies that developed a proprietary ISA used only on those companies' own chips, Arm followed a distinctive, "industry-described neutral, open licensing approach"[3] of "licensing its designs to all comers."[4]  That open approach encouraged widespread adoption of Arm's ISA and also its designs.  Arm's ISA—which Arm CEO Rene Haas describes as "the most ubiquitous computer architecture on the planet"[5]—is used by practically every smartphone, most "internet of things" ("IoT") devices, many automobiles, and an increasing number of personal computers and datacenter servers.  Arm claims that companies using its ISA have shipped 270 *billion* chips as of January 2024.[6]

      3.     One of these customers was Qualcomm, which has licensed Arm technology since 1997.  As relevant here, Qualcomm and Arm entered into an architecture license agreement or "ALA" in 2013 (the "QC ALA"), which licensed Qualcomm to develop and sell custom-designed

---

[2]    An ISA acts as an interface between CPU hardware and software.  These instructions describe the high-level attributes of the CPU, such as the supported computer instructions.  It consists of a set of a few thousand instructions (for example, "add," "multiply," "load," and "store") and a few hundred registers, which are the places where information can be read, written, or operated upon, by the instructions, which compatible software will recognize.

[3]    Compl. ¶ 5, *In the Matter of Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 (FTC filed Dec. 2, 2021) (hereinafter "FTC Complaint").

[4]    Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparks-quick-backlash-in-chip-industry-idUSKBN2650GT/.

[5]    Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas).  ARM claims that "[a]bout 99% of premium smartphones are powered by Arm." *Consumer Technologies: Smartphones*, Arm, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Dec. 9, 2024).

[6]    *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

CPUs that are compatible with the Arm ISA but are otherwise the product of Qualcomm's own engineering work. Qualcomm has also entered into a technology license agreement ("TLA") authorizing Qualcomm to make and sell products, including systems-on-a-chip ("SoCs") that use Arm's ready-made CPU designs.

4.    In recent years, Arm has apparently grown dissatisfied with its longstanding open, neutral business model. Following its acquisition by SoftBank and the failure of an attempted sale to NVIDIA, Arm is now grasping for any means—fair or foul—of padding its bottom line and stock price. Eager to cash in on the ubiquity of—and lack of any viable alternatives to—the Arm ISA, and as urged by SoftBank and Son, Arm has begun turning the screws on its customers, substantially increasing the royalty rates it demands to use the Arm ISA. Nor is Arm content to simply increase the rates it charges architecture licensees like Qualcomm. Instead, it has sought to capture a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or indeed, by selling chips themselves).

5.    Qualcomm now stands as an obstacle to Arm's ambition to raise prices and eliminate alternatives for customers. Qualcomm has developed innovative products enabled by its custom-designed, high-performance, low-power CPUs, which utilize a novel microarchitecture and related technologies to deliver significant increases in both performance and efficiency. Those innovative products pose a serious obstacle to Arm's ambition to control more links in the computer-chip value chain. Unable to compete fairly with Qualcomm, Arm has employed a series of wrongful tactics in an attempt to stifle Qualcomm's technological leaps in CPU design, to force Qualcomm to continue to use Arm's off-the-shelf CPUs, and to coerce Qualcomm into renegotiating the QC ALA, despite it being in effect for years to come, on terms substantially more

favorable to Arm—or simply to nullify that agreement. Indeed, Arm's tactics are part and parcel of a broader effort to enable the company to escape its existing ALAs and thereby to ensure that devices compatible with the Arm ISA run on Arm chips.

6.      Some of Arm's maneuvers resulted in a trial that took place last year before this Court. *See Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del.) (hereinafter "*Arm* v. *Qualcomm*"). That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA. NUVIA was founded by a world-class engineering team that set out to design better chips for use in datacenters. In 2021, Qualcomm acquired NUVIA for $1.4 billion, intending for this team to help drive innovation across Qualcomm's product segments, including in laptops and other personal computers ("compute"), smartphones ("mobile"), and the digital cockpits and driver-assistance systems that are increasingly common in cars and trucks ("automotive"). Arm could have treated that acquisition as an opportunity to grow the use of the Arm ISA in new markets but instead regarded the acquisition as a competitive threat, whose benefits should be eradicated.

7.      *First*, Arm asserted, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA, Qualcomm needed Arm's consent to transfer NUVIA's technology to Qualcomm. Arm took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of the QC ALA. Arm later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers—including in products that Qualcomm began developing after the NUVIA acquisition, such as the Snapdragon® X-Elite—violated a license agreement between Arm and NUVIA that Qualcomm was not using and that Arm ultimately terminated. This made no sense. Qualcomm has its own license agreements for Arm technology

5

**A700**

and information that allowed it to develop and provide custom Arm-compliant cores and products incorporating such cores to its customers (including the Snapdragon® X-Elite and Snapdragon® 8-Elite) for many years to come.  Qualcomm did not need Arm's consent to develop and market this technology.[7]

8.    *Second*, Arm filed the meritless *Arm* v. *Qualcomm* action against Qualcomm, claiming that Qualcomm and NUVIA breached NUVIA's terminated agreements with Arm, despite Qualcomm not even being a party to those agreements, and infringed Arm's trademarks by marketing custom CPUs years after the NUVIA acquisition.  In that action, Arm is demanding that Qualcomm destroy these groundbreaking CPU products that Qualcomm developed after the NUVIA acquisition and in accordance with the Qualcomm/Arm agreements—even though Arm has repeatedly admitted that it suffered no actual harm as a result of the conduct allegedly forming the basis of its claims.[8]

9.    *Third*, Arm and Son promoted the *Arm* v. *Qualcomm* lawsuit to Qualcomm's customers to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and could be subject to retaliation by Arm if they did, including by misrepresenting the terms of Qualcomm's licenses with Arm to Qualcomm's customers.[9]  Arm took further action in an attempt to disrupt Qualcomm's business relationships by sending emails to Qualcomm's customers on two separate occasions that misrepresented the terms of the NUVIA

---

[7]    Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[8]    *See* Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 29, 31-37, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306; Joint Letter re Bench or Jury Trial, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308; Redacted Mar. 5, 2024 Hr'g Tr. 38:20-39:8, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1.

[9]    Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 255-70, *Arm* v. *Qualcomm*, D.I. 306.

agreements and misleadingly implied that Qualcomm was required to destroy the custom CPUs that it was working on.

10.      Qualcomm was vindicated in the *Arm* v. *Qualcomm* action, in which the jury found that Qualcomm had not breached NUVIA's agreements and that Qualcomm's products were properly licensed under the QC ALA.[10]

11.      This complaint seeks redress for further bad-faith conduct in which Arm has engaged in an attempt to pressure Qualcomm to cave to its demands.  That conduct includes refusing to perform certain of its obligations under the QC ALA and QC TLA and continuing to wrongfully interfere with Qualcomm's relationships with current and prospective customers.

### *Arm Withheld Deliverables in Breach of Its Obligations Under the QC ALA*

12.      Arm deliberately withheld deliverables to which Qualcomm is entitled under the QC ALA with Arm under the guise that the QC ALA does not entitle Qualcomm to support for "Nuvia-based technology."  Arm's excuse is unjustified, and its breach could not be clearer.

13.      Qualcomm first suspected that Arm was withholding QC ALA deliverables in the fall of 2022.  At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within Arm's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

14.      Arm capitalized on this lack of transparency, with its General Counsel stating definitively that ████████████████████ Arm further stated that Qualcomm ████ ████████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  Here again, Arm

---

[10] Verdict Form, *Arm* v. *Qualcomm*, D.I. 572.

was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

15.    Arm went on to state that Qualcomm's written notice was a "████████████" to cause Arm "████████████" because "████████████████" was at issue, which Arm purported was "████████████████████████████████████ ████████████████" ████████████████████████████████████████████████. Additionally, Arm threatened Qualcomm that, if Qualcomm availed itself ████████████ ████████████████████, Arm would harm Qualcomm, including by terminating Qualcomm's multiple licenses with Arm.

16.    Arm's statement that "████████████████████" was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted in *Arm* v. *Qualcomm* revealed incontrovertible evidence that Arm not only had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, Arm was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the use of technology acquired from NUVIA.

17.    Arm never cured its failure to deliver, causing Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

18.    Arm's failure to deliver violated the QC ALA, which ████████████████████ ████████████████████████████████████████ under that agreement.  Under the QC ALA, if Arm is found to be in breach of Section ██ of the QC ALA, it must ████████████████████████████████████. If Arm fails ████ ████████████████████████████ pursuant to Section ████████

8

**A703**

██████████████████████████████████████████████████

████████████████████████.

19.    Arm's withholding of deliverables and deliberate decision not to cure the issue

███████████████████████ is a material breach of the QC ALA.  Accordingly,

Qualcomm is entitled to financial damages, including but not limited to ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████

*Arm Violated the QC TLA By Refusing to License Qualcomm CPU Cores*

20.    Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses

to its off-the-shelf cores at commercially reasonable prices to Qualcomm.  Arm's actions are

violations of licensing provisions negotiated between the parties.

21.    For example, in April 2024, Qualcomm submitted requests to renew licenses from

Arm for off-the-shelf cores Cortex-A720 (codenamed "██████") and Cortex-A520 (codenamed

"█████").  Despite repeated follow-ups over the following several months, Arm refused to provide

any licensing offer for either core.

22.    In August 2024, Qualcomm submitted a request to Arm to renew a license to Arm's

off-the-shelf core Cortex-M55 (codenamed "██████").  Arm once again refused to provide a

licensing offer for the ██████ core and continued to refuse to provide a licensing offer for the

████████████ cores.

23.    Given Arm's prolonged refusal to engage, Qualcomm's General Counsel sent Arm

a notice of breach of, and non-compliance with, the QC TLA on September 20, 2024.  Qualcomm

sent a second notice on September 27, 2024 when Arm failed to provide confirmation of having

received the initial letter.

24.     Arm waited nearly a month to respond to Qualcomm's notices of non-compliance. In its October 23, 2024 response, Arm's Chief Legal Officer wrote that Arm did not ███████████ ███████████████████████████████████████████████ Despite the clear indication that Arm did not intend to proceed ██████████, ██████████████████████ ██████████████████████.

25.     Arm subsequently provided Qualcomm with a licensing offer for the requested cores and microcontroller.  As Arm must have been aware, its proposal was extreme and clearly not commercially feasible for Qualcomm.  Arm's proposal was a constructive failure to offer a license ██████████████████████████.  Under the terms of the QC TLA, ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

26.     As with the QC ALA, ████████████████████████████████

██████████████████████, which Qualcomm sent in September 2024.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

10

**A705**

27.     Arm's proposal violated the QC TLA by presenting financial terms that were so exorbitant as to be commercially unreasonable and not ███████, and therefore a constructive failure to offer a license.  It also greatly exceeded ████████████████████████████ ████████████████████████████████████████████████████████████ Furthermore, Arm's proposal failed to comply with the QC TLA by ███████████████████ ████████████████████████████████████

28.     Arm has refused to offer commercially reasonable terms for any of the requested cores, and has thereby failed to cure its breach of the QC TLA.

### *Arm Threatened to Terminate the QC ALA Without Basis*

29.     Apparently seeking to ratchet up pressure on Qualcomm before trial in *Arm* v. *Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter (the "Breach Letter") asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing "unlicensed cores," and claiming that Arm will be entitled to terminate the QC ALA if Qualcomm does not capitulate to Arm's demands for a "cure" within 60 days. Those demands, which had no basis in the agreement, included that Qualcomm should "at a minimum" stop development of any CPUs that use any designs, technology, or code created by NUVIA employees; cease requesting ██████████████████████ for any such CPUs; cease manufacturing and selling such CPUs; and cease manufacturing or selling CPUs that Arm has refused to validate and verify.  The Breach Letter also demanded, without support in the QC ALA or the law, that Qualcomm withdraw its claims against Arm in this case for Arm's breach of its delivery obligations under Section ███.

30.     Arm's assertion that Qualcomm was in material breach of the QC ALA lacked any basis in that agreement.  The premise of Arm's Breach Letter was that certain Qualcomm CPU cores allegedly contain aspects of designs that were started by NUVIA employees.  But the QC

ALA does not prohibit Qualcomm from acquiring nascent microarchitecture technology and using that technology to develop Qualcomm CPUs. And it certainly does not permit Arm to terminate the QC ALA as payback for Qualcomm's suing to protect its rights under that agreement. Because Qualcomm has not committed a "██████████████████████████████" Arm has no right to terminate the QC ALA, and any purported termination of that agreement is null and void.

31.     Moreover, Arm's claim of a material breach was inconsistent with Arm's own conduct throughout this dispute. Arm has known since at least 2021 that Qualcomm would be acquiring NUVIA and using the technology that Arm now belatedly claims was improperly licensed. Yet for three years, Arm took no steps towards attempting to terminate the QC ALA and stood by while Qualcomm, through significant investments of time and money, developed and brought to market innovative products featuring Qualcomm's custom CPUs. Arm's belated threat to terminate the QC ALA on the eve of trial and while Qualcomm was announcing new products based on its high-performance custom CPUs demonstrates that Arm's claim of a material breach was a pretext to justify Arm's true aim: escaping the QC ALA and other ALAs so Arm can attempt to dominate the market free from competition from Qualcomm and other designers of custom CPUs.

### Arm Continues to Wrongfully Attempt to Injure Qualcomm's Business

32.     Arm's Breach Letter was the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers.

33.     The Breach Letter was not only legally groundless, but also timed and publicly released in an effort to damage Qualcomm's business. Arm sent the Breach Letter to coincide with Qualcomm's annual Snapdragon® Summit, where Qualcomm unveiled an SoC that offers

greater CPU performance and efficiency than those offered by Qualcomm's competitors, including those competitors that use Arm off-the-shelf products in their SoCs. To ensure that the Breach Letter reached Qualcomm's customers, Arm also promptly leaked it to Bloomberg, which published a story on the threatened termination that very day.[11] Arm did so knowing that Qualcomm's customers would likely be concerned that termination of the QC ALA could destabilize their own supply chains, because Arm's actions implied, despite the actual terms of the QC ALA, that Arm could and would impede Qualcomm's ability to deliver the SoCs its customers ordered, and that Qualcomm's customers might even face intellectual-property litigation brought by Arm. Both the timing and the disclosure of the Breach Letter were thus calculated to interfere with Qualcomm's customer relationships and prospective business opportunities.

34.    The Breach Letter was also timed to interfere with *Arm* v. *Qualcomm*. In the Breach Letter, Arm threatens that it "shall be entitled" to terminate the QC ALA on December 21, 2024—the day after trial in *Arm* v. *Qualcomm* was expected to conclude. Arm's counsel's statements to this Court that termination would not be "automatic" after 60 days, that he "hope[d] that there are discussions between the parties," and that the Breach Letter could prompt the parties to "evaluat[e] their positions" underscore that Arm sent the Breach Letter to pressure Qualcomm to accede to Arm's unjustified demands.[12] Arm's wrongful tactics have harmed Qualcomm. Following Arm's bad-faith claim that Qualcomm has breached the QC ALA and leak of the Breach Letter, important Qualcomm customers delayed entering into new (or renewing existing) contracts with Qualcomm or have insisted that Qualcomm provide them with additional commitments regarding its ability to

---

[11]   Ian King, *Arm to Cancel Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024, 8:17 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

[12]   Oct. 30, 2024, Hr'g Tr. 39:14-40:2, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

deliver licensed products. Arm's campaign not only deprived Qualcomm of the ability to finalize these business opportunities promptly and without providing additional commitments, but also required Qualcomm executives and employees to spend considerable time responding to and alleviating customer inquiries. None of those demands would have existed but for Arm's wrongful conduct.

35.     At trial in the *Arm* v. *Qualcomm* case, Arm continued to misrepresent its relationship with Qualcomm and its position in the marketplace. Arm's Chief Executive Officer, Rene Haas, repeatedly stated that Arm did not view Qualcomm as a competitor because Arm did not build or sell semiconductor chips in the marketplace, which Mr. Haas stated would amount to direct competition between the companies. Despite Mr. Haas' sworn statements denying Arm's involvement in chip development, Arm is now in the process of designing and distributing its own semiconductor chips.[13] Moreover, Arm "sought to hire executives from its customers as early as November," several weeks before Mr. Haas' sworn testimony in court.[14] Specifically, Arm's recruiter told the customer executive that this new position will help with Arm's "transformation from solely designing processor architecture (IP) to also selling its own silicon."[15] To facilitate its entry into selling its own chips, Arm now seeks to force Qualcomm—which would otherwise be a competitor—out from the marketplace.

36.     Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025,

███████████████████████████████████████

---

[13] *Arm recruits from customer as it plans to sell its own chips*, Stephen Nellis and Max Cherney, REUTERS, https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (Feb. 13, 2025).

[14] *Id.*

[15] *Id.*

█████████████████████████████████████████████████████ ."

But even then, Arm confirmed that it was not abandoning its efforts to obstruct Qualcomm's

developments of custom cores, insisting that ██████████████████████████████

██████████████████████████████████ Moreover, Arm sought to prevent

Qualcomm from curing the impression created in the market by its deliberate leak of the Breach

Letter, █████████████████████████████████████████████████████

████████████████████████████

    37.    Arm's non-compliance with its contractual obligations to Qualcomm should be

seen for what it is: the latest in a series of anti-competitive maneuvers intended to force Qualcomm

to renegotiate an existing, long-term license agreement that Arm's current management views as

disadvantageous, and to frustrate Qualcomm's efforts to design and deliver industry-leading

technology. Arm's tactics—its refusal to provide technology it is contractually obligated to deliver

and its attempts to undermine customers' confidence in Qualcomm—should be wholly rejected.

## THE PARTIES

    38.    Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place

of business in San Diego, California. Qualcomm is a leading technology innovator in mobile

communication products and the driving force behind the development, launch, and expansion of

5G technology. Qualcomm's foundational technologies enable the mobile ecosystem and are

found in every 3G, 4G, and 5G smartphone. Qualcomm brings the benefits of mobile to new

industries, including automotive, IoT, and computing, where Qualcomm's technology has driven

the convergence of PC and mobile technology to increase productivity, connectivity, and security

in portable laptops.

    39.    Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal

place of business in San Diego, California. Qualcomm Technologies is a wholly owned subsidiary

of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering and research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

40.    Defendant Arm Holdings PLC is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

41.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

42.    Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because Arm is "a defendant not resident in the United States" and therefore can be "sued in any judicial district." Arm has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[16]

## FACTUAL ALLEGATIONS

### I.    ARM LICENSES AND THE CUSTOM CPU MARKET

43.    Arm is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars. Arm's licensing model has been based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee. For many years, Arm has offered different types of license contracts, of which two are at issue in this case: ALAs and TLAs.

---

[16]    *See generally* Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

A.    ALAs and the Arm ISA

44.    An ALA grants licensees the right under Arm's intellectual property to design their own custom Architecture Compliant Cores using specific licensed ISA technology and to manufacture, sell, and distribute Arm Compliant Products incorporating such cores.[17]

45.    CPU cores (also known simply as cores) are a particular component of SoCs, which are integrated circuits used in cellular phones, computers, and other devices that combine several technologies used in such products into a single chip.  A core or CPU performs processing within the SoC.

46.    An Arm Compliant Core is compatible with the Arm ISA.  As a general matter, an ISA lists the instructions that allow hardware (like SoCs) to interface with software programs.  Application and software developers create their products to be compatible with particular ISAs.  As a result of greater investment in Arm-based systems by hardware companies like Qualcomm and software developers, the Arm ISA is now "ubiquitous" and used in practically every premium smartphone, as well as a large percentage of automobiles and IoT devices and a growing number of personal computers and datacenter servers.

47.    The Arm ISA allows for software compatibility across all Arm-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.  The Arm ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

---

[17]

48.    To make a CPU that then can execute the Arm ISA and therefore run applications and other software that have been written to be compatible with that ISA, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

49.    A CPU developer developing a custom CPU designs **how** the core is built, **how** it performs, and **how** it executes the CPU's instructions.  There are a virtually infinite number of ways to design and build CPUs that can implement the Arm ISA.  Companies that design custom CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.  Many of these design choices are driven by the requirements of the product segment the designer is targeting—CPUs for mobile applications can have different design priorities than those for laptop computers or automobiles.

50.    Under an ALA, Arm does not deliver any specific Arm design or tell the licensee how to make the CPU.  That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee.  As Arm has publicly acknowledged, "the creation of an optimized CPU is very costly and time consuming," and Arm therefore "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the

customization often does not provide a reasonable return on investment."[18]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.  Arm has executed ALAs with Qualcomm and a number of other companies.

    **B.**    **TLAs and Off-the-Shelf CPUs**

    51.    In addition to granting licensees rights under ALAs to make custom-designed products that are compatible with the Arm ISA, Arm also designs "off-the-shelf" CPUs and other peripheral intellectual property ("IP") that customers may license through a TLA.  Under a TLA, Arm delivers complete processor core designs that a licensee can incorporate into a larger SoC design, saving the licensee the trouble and expense of designing its own CPU.  In addition to CPUs, Arm also designs, and licenses under the TLA, peripheral IP, which is technology used in SoCs to perform specific functions and interface with the CPU.  This peripheral IP takes a variety of forms, such as "interconnects" that facilitate the transfer of information between different components of an SoC or various pieces of software that are incorporated into a semiconductor chip as a means of certifying safety capabilities of the chip.  Recently, Arm has placed greater emphasis on licensing off-the-shelf CPU technology, including by launching a "Compute Subsystems" business that offers integrated designs that pair CPUs with other technology—all in exchange for "significantly higher royalty rates" than Arm receives for licensing its ISA.[19]

    52.    But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance.  Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it

---

[18]    Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

[19]    *Id.*

charges for a license to the Arm ISA.  Moreover, when an SoC developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs.  And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing SoCs that can compete against those with more advanced custom CPUs.

## II.    QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

53.    Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications."  Qualcomm is a world leader in the design and production of semiconductor microchips, including SoCs.  Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines.  Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

54.    Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates.  In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive industry designed to deliver connected experiences that are safer and customizable.  Included among these products are custom CPUs and SoCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

**A.      Qualcomm Builds Innovative Arm-Compatible Products.**

55.      Qualcomm has held Arm licenses since 1997.  Those licenses include an ALA entered in 2003, and the currently operative QC ALA, ███████████, which Qualcomm[20] and Arm entered into on May 30, 2013, and Annex 1 to that agreement for Arm v8-A Architecture deliverables.  On June 23, 2020, Qualcomm and Arm entered into an additional Annex 1 to the QC ALA for Arm v9-A Architecture deliverables.

56.      Under the QC ALA and corresponding Annex 1s, Qualcomm has rights, using specific licensed technology, to design, manufacture, sell, and distribute Qualcomm's v8-A and v9 Arm-compatible custom cores, custom Arm ISA-compatible CPU cores, and products incorporating those cores.  ███████████████████████████████████████ ██████████████████████████████████████████████████████████.  Since Qualcomm entered into the QC ALA, Qualcomm has developed and shipped custom Arm ISA-compatible CPUs.

57.      Qualcomm is today one of Arm's largest licensees—it "accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024."[21]  Since 2013, Qualcomm has paid Arm total license fees of ████████ and running royalties of ████████████ under the QC ALA.  Qualcomm has fully complied with its obligations under the QC ALA and has continued to tender royalty payments to Arm (under protest) pending resolution of this dispute.

58.      In recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for

---

[20]   The actual party to the ALA and TLA ████████████████████████████████ ███████ The terms of the agreements ████████████████████████████████████████

[21]   ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024 (Form 20-F) at 28 (Aug. 12, 2024).

Qualcomm to compete by relying on Arm-designed cores. In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical.

59.    In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SoC specifically for use in datacenter servers. At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs. Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary compute, mobile, and automotive product segments. Qualcomm also planned to continue development of the server CPU and SoC for use in data centers and servers that NUVIA had originally intended to design.

60.    Since acquiring NUVIA and integrating the NUVIA team as Qualcomm employees, Qualcomm spent years developing innovative products with custom-designed CPUs using a novel microarchitecture and related technologies.

61.    Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86). Qualcomm's new products with custom CPUs have drawn praise as being "incredibly potent"[22] and "shockingly fast."[23]

62.    Qualcomm is not alone in its belief that its custom cores offerings will transform and advance the industry. Major industry participants—including Microsoft, Google, Samsung,

---

[22]   Aaron Klotz, *Snapdragon X Elite Beats AMD and Intel Flagship Mobile CPUs in Geekbench 6*, Tom's Hardware (Apr. 2, 2024), https://www.tomshardware.com/pc-components/cpus/snapdragon-x-elite-beats-amd-and-intel-flagship-mobile-cpus-in-geekbench-6-qualcomms-new-laptop-chip-leads-in-single-and-multi-core-tests.

[23]   Mark Hachman, *Qualcomm's Snapdragon X Elite Chip Attracts Unprecedented PC Partnerships*, PCWorld (Oct. 25, 2023), https://www.pcworld.com/article/2116395/qualcomms-latest-snapdragon-attracts-huge-pc-partnerships.html.

**A717**

GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[24]

**B.    Relevant Provisions of the Qualcomm ALA**

63.    On May 30, 2013, Qualcomm and Arm entered into an Amended and Restated Architecture License Agreement, ▮▮▮▮▮▮▮▮▮, and Annex 1 to that agreement.  The QC ALA is a binding and enforceable agreement.

64.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

65.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

66.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[24]    *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

**A718**



67.    ████████████████████████████████████████████

████████████████████████████████████████████████
██████████████████████████████████████████████ █
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████.[26]

### C.    Arm's Evolving Business Model

68.    For years, Arm expressed its commitment to an open, neutral model for licensing

the use of its ISA.  Under that model, which led to Arm commonly being referred to as the

"Switzerland of chips," Arm held itself out as not discriminating against companies that sought to

use the Arm ISA.[27]  That model benefited the software developers, which could develop software

---

[25] ████████████ and ████████████████ are defined terms in the QC ALA. *See* ████████████

[26] ████████████████ is a defined term in the QC ALA. ████████

[27]  FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point

**A719**

that would be interoperable across Arm-compatible devices, and ultimately benefited customers. Indeed, Arm continues to tout the benefits of its "broad, standardized software ecosystem," which it claims "ensures diversity and robustness in supply, as well as easy software portability between Arm-based systems."[28]  That model also benefited Arm, leading to widespread adoption of the ISA.  As a senior Arm executive has explained, "[w]hat makes an architecture successful is actually the number of people that use it," as greater adoption of an ISA creates a "virtuous circle" in which the "more people that use your architecture, the more people will want to use it."[29]

69.    After being acquired by SoftBank, however, Arm has pivoted away from that model.  When the chipmaker NVIDIA attempted to acquire Arm in 2020, the proposed acquisition met with harsh responses from regulators and other companies that rely on the Arm ISA, based on fears that NVIDIA could use its control of Arm to undermine its rivals, "including by manipulating levers such as [Arm]'s pricing, the terms and timing of access to [Arm]'s Processor Technology, … [Arm]'s technological developments and features, and [Arm]'s provision of service and support."[30]

70.    When that acquisition fell apart under regulatory scrutiny, Arm pursued a variety of strategies to try to bolster royalty revenues at SoftBank's and Son's behest, including unsuccessful attempts to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made, and to force a major customer

---

about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees").

[28] *The Arm Advantage: Choosing Arm Technology*, Arm.com, https://www.arm.com/company/arm-advantage (last visited Dec. 9, 2024).

[29] Arm, *What Is CPU Architecture?*, YouTube.com (Aug. 18, 2021), https://www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.

[30] FTC Compl. ¶ 8.

to renegotiate royalty rates notwithstanding the parties' existing contract.[31]  After releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores.[32] Indeed, in its calls with investors, Arm routinely touts the increased revenues it expects to collect as a result of widespread adoption of v9.Arm has also attempted to bolster its income—and thus its valuation—by abandoning its historic role of neutral and open licensing of its ISA.  Having made that ISA "ubiquitous" for the entire smartphone and IoT markets and made significant inroads in other sectors, Arm now seeks to leverage that ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA.  Mr. Haas has hinted at precisely that sort of leveraging, explaining that as the company "defining a computer architecture and … building the future of computing," it is "easier" to understand the best ways to integrate hardware and software "if you're building something than if you're licensing IP" because "building something" makes a company "much closer to that interlock" and gives it "much better perspective in terms of the design tradeoffs to make," which is why "if we were to do something, that would be one of the reasons."[33]  Moreover, Arm has also sought to develop more complex, integrated "subsystems" that combine CPUs with other chips and intellectual property.[34]  And it was recently

---

[31]    Wayne Ma & Cory Weinberg, *How a Lopsided Apple Deal Got Under Arm's Skin*, The Information (Nov. 29, 2023), https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin.

[32]    *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas).

[33]    Alex Health, *What Arm's CEO Makes of the Intel Debacle*, The Verge (Dec. 6, 2024, 4:45 PM), https://www.theverge.com/2024/12/6/24315123/arm-ceo-rene-haas-intel-ai-chips-samsung-changes.

[34]    *Client Solutions: Arm Compute Subsystems (CSS) for Client*, Arm, https://www.arm.com/products/compute-subsystems-for-client (last visited Dec. 9, 2024).

reported that, in a "radical change to [Arm's] business model," Arm was planning to launch its own chip by as early as this summer.[35] This transformation from licensing intellectual property to positioning itself primarily as a chip designer creates the potential for Arm to make substantially more money: These businesses "carry significantly higher royalty rates"[36] than merely licensing use of the Arm ISA.

71.    But this transformation also brings Arm into direct conflict with existing licensees and customers. When an architecture licensee like Qualcomm designs a custom Arm ISA-compatible CPU, that CPU does not belong to Arm. Instead, as Arm has publicly acknowledged, those custom CPUs "compete with" and "pose a threat to Arm's implementation IP business"— that is, Arm's effort to position itself as a designer of CPUs.[37]

72.    Arm has thus responded by pressuring customers (such as Qualcomm) to purchase Arm's off-the-shelf CPUs and by attempting to prevent Qualcomm from designing CPUs compatible with the Arm ISA.

## III.  ARM UNFAIRLY AND UNLAWFULLY ATTEMPTS TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

73.    Developing its own CPUs frees Qualcomm of the need to rely on Arm's off-the-shelf CPU designs. That can both reduce the royalty rates Qualcomm pays Arm— ██████████

---

[35]  Matthew Garrahan et al., *Arm To Launch Its Own Chip in Move That Could Upend Semiconductor Industries*, Financial Times (Feb. 13, 2025), https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008 . According to the report, the chip is "expected to be a [CPU] for servers in large data centres and is built on a base that can then be customized for clients."

[36]  *Arm First Quarter Fiscal Year 2025* at 5, Arm (July 31, 2024), https://investors.arm.com/static-files/393afe3f-13ff-4aa8-a4b3-41b1afaa5a91 (statement of Rene Haas).

[37]  Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

27

**A722**

██████████████████████████—and demonstrate that products using Qualcomm custom CPUs can outcompete products using Arm's off-the-shelf designs.  Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an even better product for customers and opening new product segments for chips compatible with Arm's ISA, Arm has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

**A.    Arm Wrongfully Withholds Deliverables Owed to Qualcomm Under the QC ALA.**

74.    In an effort to limit competition posed by Qualcomm's custom CPU, Arm breached its contractual obligations to provide Qualcomm with deliverables paid for under the QC ALA.

*1.    The QC ALA requires Arm to provide Qualcomm with certain deliverables.*

75.    The two contract provisions at issue here—Sections ██ and ██—are clear and unambiguous.

76.    Section ██ of the QC ALA requires Arm to "████████████████████████ ██████████████████████████████████████████████████████████" and to "████████████████████████████████████████ ██████████████████████." Arm is also required to deliver ████ "██████████ ██████████████████████████████." ████████████ is defined in the Qualcomm ALA as "██████████████████████████████████████████ ██████████████████████" under that agreement.

77.    Under Section ██ of the QC ALA, ████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████:

28

**A723**

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████

### 2. *Arm withholds the deliverables.*

78.    Qualcomm first suspected that Arm was withholding ████████████ under the QC ALA in the fall of 2022.  At that time, Qualcomm was embarking on its verification process for its ████ SoC.  As is the customary practice between an ALA licensee and Arm, Qualcomm provided Arm with details about its ████ CPU so that Arm would provide a formal list of agreed Arm Compliance Kit ("ACK") tests for which Arm would expect to see verification data.  But Arm withheld the formal list of tests (known as the "OOB") ████ ████████████

████████████████████████████████████████████

████████

79.    Qualcomm then attempted to resolve the issue without court intervention.

80.    On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug fixes) from Arm.  Arm engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll be able to share OOB and various patches after my management has given their approval."

### 3. *Qualcomm provides written notice of Arm's failure to deliver—but Arm does not cure.*

81.    Almost one month later and after still not having received the deliverables under the QC ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022, Qualcomm notified Arm in writing of its failure to provide certain deliverables, including the OOB, stating explicitly that Arm should take the letter as "Qualcomm's required notice under Section ██ that Arm is not in compliance with its obligations under Section █, and that Arm must cure this breach in accordance with the time and procedures set forth therein."

82.    After not hearing from Arm, pursuant to Section ▮ of the QC ALA, Qualcomm sent a follow-up letter on December 5, 2022.  The letter was Qualcomm's "second written notice of non-compliance ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  The letter stated that "ARM must ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ set forth" in the QC ALA "or ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

83.    Pursuant to Section ▮ of the QC ALA, Arm ▮▮▮▮▮ to remedy its failure to provide the deliverable.  ▮▮▮▮ passed without Arm remedying the issue.

84.    Arm responded on December 6, 2022.

85.    In its response, Arm disagreed that Section ▮ was at issue "or that provision of the OOB implicates Section ▮."  Arm additionally asserted that the ACK deliverables are governed by Section ▮ of the QC ALA, not Section ▮, and that remedies for a breach of that section do not include ▮▮▮▮▮▮▮▮▮.

86.    Notably, Arm additionally claimed that "▮▮▮▮▮▮▮▮▮▮," stating explicitly that Arm "▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮."  As to the OOB specifically, Arm claimed that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮."

87.    Arm was definitive in its assertions, stating that "[n]o additional delivery is required," and "[n]o breach of Section ▮ has occurred."  Qualcomm was unable to verify this assertion because the "patches" are created by Arm and provided solely by Arm.  Accordingly, Qualcomm has no way of knowing definitively whether Arm has released patches for verification until they are delivered (or until someone from Arm tells Qualcomm they are available, which did not occur in this case).

**A725**

88.    Arm's letter further stated that Qualcomm "does not have ███████████ ████ rights under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  Arm additionally threatened Qualcomm that if it did not drop its invocation of Section ██, Arm would take steps that would harm Qualcomm.  Arm claimed that Qualcomm's invocation of Section ██ was "a new, material breach of the Qualcomm ALA" and that, to the extent Qualcomm exercised ████████████████████████ ████████████████████, Arm would "not hesitate to terminate" Qualcomm's licenses.  Arm further stated that Qualcomm's letter was a "malicious effort" to cause Arm "economic duress," which Arm purported was "inconsistent with the language, spirit, and purpose of the ALA and ███████████████."

### 4.    Discovery reveals that Arm deliberately withheld the deliverables.

89.    But more than a year later, Qualcomm discovered that Arm's December 6, 2022, letter misrepresented the facts and concealed Arm's strategy of deliberately withholding the OOB and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm duress.

90.    "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'"  In response to Qualcomm's requests for production, Arm produced an October 2022 email chain in which Richard Grisenthwaite, Arm's Executive Vice President and Chief Architect, explicitly instructed others at Arm not to provide Qualcomm with the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[38]

---

[38]    On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include Arm's breach of Section ██ of the QC ALA.  These allegations and

91.    In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that Arm concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  Arm's multi-tiered deception was successful for more than a year.  "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section ▮ of the Qualcomm ALA."[39]

92.    The applicable Annex 1 to the QC ALA includes ███████████████

███████████████████████████████████████

███████████████████

93.    Accordingly, when it was revealed through document and deposition testimony that, contrary to Arm's December 6, 2022, letter, Arm had deliberately withheld the ACK deliverables to which Qualcomm was entitled, it became clear that Arm breached its obligations under Section ███████████.

---

quotations are taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order.  Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5.  Notably, at that hearing, Arm advocated against adding this claim to the case in which this discovery was produced; and instead, Arm advocated for Qualcomm to bring a separate lawsuit.  Redacted Mar. 5, 2024 Hr'g Tr. 39:13-20, *Arm* v. *Qualcomm*, D.I. 312-1.

[39]  Redacted Mar. 6 Order at 4, *Arm* v. *Qualcomm*, D.I. 303; *see also* Redacted Mar. 5, 2024 Hr'g Tr. 17:18-19:9, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

94.     Arm's Chief Legal Officer concealed the facts, explicitly (and definitively) stating in Arm's December 6, 2022, letter that it had provided Qualcomm with ███ to the ACK and that "███████████████████." Qualcomm did not have a valid basis to dispute that factual representation without discovery.

### 5.     *Arm's breach of the QC ALA has harmed Qualcomm.*

95.     To date, Arm still has not provided the OOB and relevant patches to which Qualcomm is entitled, and Arm's failure to do so increased Qualcomm's burden in verification.

96.     By failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA, even in the absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the QC ALA.

97.     Similarly, by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches, which Qualcomm paid for and was entitled to receive under the QC ALA. Qualcomm was damaged as a result.

98.     ████████████████████████████

99.     Pursuant to Section ██ of the QC ALA:



100.     Accordingly, ████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

101.    In addition, because ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

**B.    Arm Fails to Provide Qualcomm With** ████████ **Licensing Proposals in Violation of the QC TLA.**

102.    Arm has not only attempted to disrupt Qualcomm's development of custom CPUs but also attempted to interfere with Qualcomm's development of products containing off-the-shelf Arm cores by intentionally failing to provide commercially reasonable, and therefore ████████, licensing proposals to Qualcomm ██████████████████. In addition to the below, Qualcomm expects discovery to show that Arm ██████████████████████████████ ████ in its licensing negotiations involving peripheral TLA IP.

*1.    The QC TLA requires Arm to* ████████████████ ██████████████████████

103.    The QC TLA contains ████████████████████████████

██████████████████████████████████████████████████

104.    Section ███ sets forth a series of requirements that Arm must follow for each of its off-the-shelf cores. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

105.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

106.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ Arm has never provided Qualcomm with written notice that ████████████

████████████████████████████

107.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

108. █████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████

████████████████████████████████████████

██████████████████████████

### 2. *Arm fails to respond to Qualcomm's licensing requests.*

109.    As part of its product development cycle, Qualcomm monitors the terms of licensing agreements to determine whether renewals or extensions of third-party IP will be necessary in order to plan for future product development and sales.  Qualcomm has historically licensed and renewed licenses for various █████████████.  For example, Qualcomm sought to renew licenses to certain ██████████████, ██████████████ ██████████████████████████████████████████████ ████████████████████████████

110.    Qualcomm's licenses for all three cores, which were ██████████ licenses entered into in 2019, are set to expire in ████.  Given Qualcomm's desire to avoid disruption to its development schedule and roadmap, it began negotiations for new licenses for each core in 2024.

111.    In April 2024, Qualcomm sent Arm written requests to license both ██████████ ████

36

**A731**

112.    Arm failed to respond to Qualcomm's requests, ███████████████ ████ and ignored continued outreach from Qualcomm in the subsequent months.

113.    In August 2024, Qualcomm submitted a written request for ████.  Arm failed to respond to this request as well.

114.    Faced with Arm's continued non-compliance and the potential impact to its roadmap, Qualcomm sent Arm a notice of non-compliance with Section ██ of the QC TLA (including ████████████) in September 2024.  Qualcomm told Arm that the letter "serves as Qualcomm's written notice of ARM's breach of, and non-compliance with, ████████ of the TLA."  The letter asked that "ARM provide the requested core license immediately and in accordance with the terms and conditions of the TLA as required by ████████████ of the TLA, or Qualcomm will be forced to exercise its remedies under the TLA."

115.    Once again, Arm failed to respond.  A week later, Qualcomm wrote to Arm again, informing Arm of the "second written notice of breach and non-compliance in accordance with the notice process set forth in Section ██ of the TLA."

### 3.    *Arm fails to provide ████████ licensing terms to Qualcomm.*

116.    Nearly four weeks later, Arm finally responded to Qualcomm's notice of non-compliance.  In its October 23, 2024 letter, Arm "█████████████████████████ ████████".  Instead, Arm told Qualcomm that it did not "█████████████████████████ ████████████████████████."

117.    In connection with the letter, Arm provided offers to the requested cores that Arm claimed were "██████████████████████████████████."  However, not only was this untrue, but also Arm's proposal contained terms so unreasonable that it was a constructive failure to license.

118.    The financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and ██████████. For example, ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████. ██████████ was not justified by any change or improvement in the technology and is grossly inconsistent with the market for any comparable technology.  Arm was aware of the unrealistic terms of its proposal, which Arm acknowledged it only provided because of Qualcomm's notice of non-compliance with Section ████████████████████████████████████████████ ████. This constructive failure to offer a license to the requested cores violated the terms of the QC TLA.

119.    Arm's proposal also violated the QC TLA requirement under Section ██████████ ████████████████████████████████████████████.

120.    Furthermore, by ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████.

**4.  *Qualcomm has been harmed by Arm's TLA violations.***

121.    As a result of Arm's exorbitant proposal, Qualcomm has been forced to proceed in development of SoCs without knowing what CPUs it will be using after the licenses to ██████ ████████████ expire.

122.    Due to the development lifecycle for semiconductor chips, Arm's ████████ refusal to offer licenses and to change ████████████████ of its licensing offers is already impacting Qualcomm.  Qualcomm must undergo reviews of its planning roadmaps to ensure that it will have suitable CPUs for its customers.  This effort requires (i) that additional resources be shifted to

38

**A733**

design custom CPUs for each of its semiconductor chips (ii) that Qualcomm allocate resources to identify workarounds based on RISC-V and redesign products to function with a different microprocessor design, or (iii) rely on older, less competitive versions of Arm CPUs that Qualcomm has licensed.

123.    The QC TLA sets forth the remedies for Arm's violations.

124.    ████████████████ states that Qualcomm may seek ████████████████



125.    In addition, Section ██ of the QC TLA states:



126.    Qualcomm sent its first notice of breach on September 20, 2024 and its second notice on September 27, 2024.  Arm's purported offer in response to Qualcomm's notices was dated October 24, 2024.  To date, Arm has failed to provide any commercially reasonable, ███ ███, offer and, as such, has failed to remedy its breach within the ████████████.

127.    Qualcomm is entitled to ████████████████ under both the QC TLA and QC ALA for a period of ████████████████████████████████████.  While Qualcomm will continue to ████████████████ until Arm's breach of the QC TLA is finally

**A734**

resolved, Qualcomm believes that Arm is not entitled to receive those █████████████ ██████████████████████ pursuant to the QC TLA and ALA ██████████████ █████████████████████████████████ For this reason, Qualcomm does not believe that any ████████████████████████████

**C.**    **Arm Refuses to Negotiate a License to the Latest Version of Its ISA** ████████ ███████████████

128.    Arm has not only taken steps to destroy or delay Qualcomm's present development efforts.  It has also tried to hamstring Qualcomm's future development efforts by failing to negotiate a license to future versions of the Arm Architecture.

129.    In addition to failing to provide the deliverables █████████████████ and constructively failing to offer licensing proposals ████████████, Arm has also refused to negotiate an extension of ████████ to cover future versions of ████████████████ ████████ requires it to do.

130.    As noted, Section ████████ of the QC ALA ██████████████████ ████████████████████████████████████████████ ████████. Qualcomm has ██████████████████████.  Additionally, Section ████████ of the QC ALA ████████████████████████████████████████ ████████████████████████████.

131.    On April 17, 2020, a Qualcomm employee emailed an Arm counterpart to ask if Arm was working on a new version (v10) of the Arm ISA to replace v9 and explained that the request was made in the context ████████████████████████████ ████████████████. The Arm employee responded the following week that "████████████████ ████████████████████████████████████████████

███████  would expire but that there was "███████████████████████████

████████████████████████████████."

132.    On May 20, 2020, Qualcomm emailed Arm stating that Qualcomm "████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████."

133.    Arm never responded to that email or followed up at any other time regarding Qualcomm's rights ███████████████.

134.    Arm's actions underscore its strategy of attempting to eliminate existing ALAs and to force Qualcomm and other licensees to use Arm's off-the-shelf CPU designs—or to cease designing Arm-compatible chips entirely.

### D.    Arm Engages in a Campaign to Undermine Qualcomm's Customer Relationships.

135.    In addition to the breaches described above, Arm has also deliberately sought to impair Qualcomm's standing and relationships with current and prospective customers.  As Qualcomm has detailed, Arm, through its leadership and through SoftBank and Son, has engaged in a misinformation campaign to mislead Qualcomm's customers into believing that Qualcomm will not be able to deliver licensed Arm-compatible products after 2024, and that Qualcomm customers must obtain their own direct licenses from Arm.[40]  That misinformation campaign included multiple rounds of letters to Qualcomm customers misleadingly claiming that Qualcomm had breached its ALA and suggesting that customers could face legal jeopardy from using

---

[40]  Defs.' Answer and Defenses to Pl.'s Compl. & Jury Demand & Defs.' 2d Am. Countercls. ¶¶ 255-70, 275(b)-(d), *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.

Qualcomm products.  More recently, Arm began "ratcheting up the pressure" on Qualcomm in *Arm* v. *Qualcomm*,[41] and Arm continued this misinformation campaign by declaring without basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter.  By doing so, Arm has caused tangible harm to Qualcomm's customer relationships.

> ### 1.    *Arm repeatedly attempts to interfere in Qualcomm's customer relationships.*

136.    On August 31, 2022, Arm commenced *Arm* v. *Qualcomm* in the U.S. District Court for the District of Delaware.  In that action, Arm alleges that Qualcomm and NUVIA breached the NUVIA ALA by not destroying all design work undertaken by NUVIA pursuant to its license with Arm following Qualcomm's acquisition of NUVIA.

137.    On the same day that Arm filed that action, it launched a premeditated campaign to blitz Qualcomm's customers with letters publicizing the lawsuit.  As Mr. Haas admitted under oath at trial, Arm sent letters to top executives at 37 companies that were customers of both Arm and Qualcomm.  In those letters, Arm stated that Qualcomm had breached the terms of "the Arm license agreement," implying that Qualcomm had breached its own ALA.  That was misleading: Arm's complaint in the *Arm* v. *Qualcomm* action accused Qualcomm and Nuvia of breaching the *Nuvia* ALA and never accused Arm of breaching the *Qualcomm* ALA.  Mr. Haas thus also admitted under oath that the letter "should have said" that Qualcomm had supposedly breached the Nuvia ALA, not Qualcomm's "Arm license agreement."

138.    Additionally, the August 31 letters asserted that Arm would "███████████ ███████████████████" and thus (despite assuring customers that there would be "███ ███████████████████████") suggested that companies could face legal jeopardy if

---

[41]    Oct. 30, 2024, Hr'g Tr. 34:6, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

they used the Qualcomm products that incorporated Nuvia technology. The letter attached a letter from Arm's general counsel to Qualcomm's general counsel that made this point explicitly, asserting that ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████

139.    Eight months later, in May 2023, Arm launched another round of customer letters. Arm executive Will Abbey sent a series of additional letters to key Qualcomm customers "████████████████████████████████████████████████." Mr. Haas agreed at trial that there was no independent event that triggered Arm's decision to send these letters.  That letter stated that Qualcomm's designs based on Nuvia technology, specifically including the Phoenix core, "can no longer be used and must be destroyed."  Mr. Haas also agreed at trial that it was very important to Arm to tell customers that it was demanding destruction of technology. The letter extensively quoted from Arm's prior threat letter to Qualcomm but did so in a manner intended to convey that it was quoting from a contract between Qualcomm and Arm that specifically required Qualcomm to cease using "Arm-based technology" developed by Nuvia and to destroy such technology.  In fact, no such contract existed, and the intended implication of quoting that language was thus false.  Mr. Haas admitted at trial that he was "quite confused" by the language of the letter and agreed that the letter was "misleading."

140.    Like the prior letters, the May 2023 letters reassured customers that there would be no disruptions to their partnership with Arm, but only if that partnership was "████████████ ████."  It also offered to answer questions that customers might have regarding how the litigation might impact the availability of licensed Arm technology going forward, which necessarily

43

**A738**

implied that the litigation could impact the availability of the Qualcomm products that Arm claims were unlicensed.

**2.  *Arm waits years before taking steps to terminate the QC ALA.***

141.  Although Arm now asserts that Qualcomm is in material breach of the QC ALA, Arm waited years before taking any steps towards terminating the QC ALA.  When it filed the *Arm* v. *Qualcomm* action, Arm neither alleged that Qualcomm had breached the QC ALA nor sent Qualcomm any notice to that effect, ███████████████████████████████████ ██████.

142.  On September 30, 2022, Qualcomm answered Arm's complaint in *Arm* v. *Qualcomm* and filed a Counterclaim against Arm seeking, among other things, a declaratory judgment that its conduct was fully licensed under the QC ALA, and that it could "continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA" or any other relevant agreement with Arm.  When Arm answered that counterclaim, it generally alleged that Qualcomm was breaching the QC ALA, though it did not send Qualcomm any written notice to that effect ██████████████████.

143.  On March 13, 2024, Qualcomm filed its second amended counterclaims in *Arm* v. *Qualcomm*.  Arm answered on April 4, 2024, and again alleged that Qualcomm was breaching the QC ALA, entitling Arm to terminate that agreement.  Again, however, Arm did not send Qualcomm any written notice to that effect ████████████████.

**3.  *Arm's Breach Letter groundlessly asserts that Qualcomm is in material breach of the QC ALA.***

144.  It was not until more than seven months later, on October 22, 2024, that Arm sent Qualcomm the Breach Letter, which purported to provide notice to Qualcomm ██████████ ████████████████ that Qualcomm is in material breach of that agreement.

145.    The Breach Letter asserted that the QC ALA authorizes Qualcomm solely "to develop, verify, and sell designs for CPUs … that use, rely on, or derive from Arm technology *delivered by Arm to Qualcomm* and *developed by Qualcomm employees*, not third parties."[42]  It did not attribute these assertions to any particular provision of the QC ALA but instead cited a string of contract sections, ███████████████████████████████████████ ██████████████████████████████████████████████████ ████████████.  The Breach Letter also referred generally to "Annex 1," a lengthy document describing ██████████████████.  But nowhere in the Breach Letter did Arm identify any provision of the QC ALA that imposes the particular obligations Arm asserts in the Breach Letter.

146.    In the Breach Letter, Arm claimed that Qualcomm "systematically and willfully breached these obligations" by "develop[ing] CPUs and market[ing] multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party."[43]  The Breach Letter thus reprised the same arguments it has made in *Arm* v. *Qualcomm* about the NUVIA ALA: in essence, that Qualcomm somehow breached the *NUVIA* ALA by developing CPUs in part by using technology created by and acquired from NUVIA.  Arm has not explained in that litigation and did not explain in its Breach Letter how Qualcomm allegedly breached any provision in the *QC* ALA by developing CPUs in the manner it did.  In short, there is a reason why Arm's purported notice letter failed to state clearly which express contractual provision Qualcomm materially breached, or when or how Qualcomm breached any such provision: None exists.

---

[42]    Ex. A at 1 (emphasis added).

[43]    *Id.*

147.    Having invoked Section ███ of the QC ALA, Arm's Breach Letter demanded that Qualcomm "cure" the alleged breach(es) within 60 days, including by stopping the development of "Nuvia designs" and the manufacture and sale of Qualcomm CPUs that allegedly "use Nuvia designs or technology." The Breach Letter further demanded that Qualcomm "cure" the alleged breaches by withdrawing its complaint in this Action against Arm. And the Breach Letter asserted that if Qualcomm does not "cure" the alleged breaches in this manner within 60 days, Arm would be entitled to immediately terminate the QC ALA.

148.    The "cures" that Arm demanded in its Letter—other than the dismissal of this Action—are the same remedies that Arm has requested in *Arm* v. *Qualcomm*. By sending the Breach Letter, Arm attempted to pressure Qualcomm to yield to its demands regardless of the outcome of *Arm* v. *Qualcomm*, as well as this case, before the former went to trial.

149.    The timing of the Breach Letter belied Arm's assertion that Qualcomm has materially breached the QC ALA. Arm knew about Qualcomm's acquisition of NUVIA in 2021, and asserted in its November 2022 Answer to Qualcomm's Counterclaim that Qualcomm was supposedly in breach of the QC ALA. Yet before sending the October 22, 2024, Breach Letter, Arm never even attempted to provide the notice ███████████ that Qualcomm had supposedly breached the agreement. Quite to the contrary, Arm *celebrated* Qualcomm's development of the Snapdragon® X Elite SoC that contains CPU designs whose development Arm now claims breach the QC ALA, with Arm's CEO stating that Arm was "very excited to see the announcement of the brand new Windows on Arm PCs that run Copilot, true AI PCs."[44] In the

---

[44]   *Arm First Quarter Fiscal Year 2025*, at 3. Mr. Haas further commented that "the products that are out today are using the most advanced Arm technology," because they "are optimized with Microsoft for the most effective battery life on the planet." *Id.* at 10.

Breach Letter, Arm nowhere explained why it waited more than three years after Qualcomm allegedly breached the Nuvia ALA before it provided notice of an alleged breach of the QC ALA.

150.    Because Qualcomm did not materially breach the QC ALA, Arm did not identify any valid grounds on which to terminate the QC ALA, and any purported termination based on the Breach Letter is null and void.

### 4.    *Arm leaks the Breach Letter to harm Qualcomm's customer relationships.*

151.    Arm's assertion that Qualcomm was in material breach not only lacked legal or factual basis, but was also made in a manner calculated to damage Qualcomm's customer relationships.  Arm's claim that it has the authority to terminate the QC ALA was false, wrongful, and calculated to pressure Qualcomm to accede to Arm's demands and to prevent Qualcomm from gaining new business opportunities.

152.    From October 21–23, 2024, Qualcomm hosted its annual Snapdragon® Summit. At that Summit, Qualcomm unveiled new technology, including its new Snapdragon® 8 Elite Mobile Platform, an SoC featuring Qualcomm's custom-built second generation Qualcomm Oryon™ CPU.  That SoC delivers significant performance and efficiency improvements over competitors, ███████████████████████████.

153.    Arm issued its Breach Letter on October 22, 2024, in the middle of the Snapdragon® Summit.  That timing was no accident, but was an intentional Arm media stunt intended to embarrass Qualcomm and to interfere with its relationships with its current and potential customers and business partners, including by creating unwarranted uncertainty about Qualcomm's ability to continue delivering licensed Arm-compatible products.

154.    In addition to sending the Breach Letter to Qualcomm, Arm also leaked the Breach Letter or its contents to Bloomberg, which published a story that same day.[45]  The story was based on and referred to "a document seen by Bloomberg."  On the afternoon of October 22, 2024—the same day Qualcomm received the Breach Letter—a Bloomberg reporter contacted Qualcomm requesting comment on Arm's having sent Qualcomm a "60-day letter" notifying Qualcomm that it was purportedly in breach of the QC ALA.  The reporter was familiar with details of the letter. Later that day, Bloomberg published its story reporting on Arm's purported cancellation of the QC ALA.[46]  The story relayed details about the Breach Letter "according to a document seen by Bloomberg."  Because Qualcomm did not leak the Breach Letter, the Letter could have reached Bloomberg only if it had been leaked by Arm.

155.    Arm leaked the Breach Letter to distract from the Snapdragon® Summit and the groundbreaking products released at the Summit, and to ensure that the attention of Qualcomm's customers and business partners focused on the parties' licensing dispute rather than on Qualcomm's products, which pose a threat to Arm's own competitive ambitions.  The leak of the Breach Letter thus further demonstrated Arm's deliberate efforts to interfere with Qualcomm's customer relationships.

### 5.    *Arm's leak of the Breach Letter harms Qualcomm.*

156.    The release of the Breach Letter has caused Qualcomm harm, by impairing its relationships with current and prospective customers and interfering with its future business opportunities.

---

[45]   See Ian King, *supra* note 11.

[46]   *Id.*

157.    Following Bloomberg's publication of the news story about the Breach Letter, multiple Qualcomm customers and business partners have contacted the company to express concern about the Breach Letter.  As a result of the Breach Letter—and, in particular, Arm's baseless assertion that it can terminate the QC ALA—several Qualcomm customers have deferred finalizing pending business agreements pending resolution of the *Arm* v. *Qualcomm* litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products.

158.    For example, a major customer (the "Smartphone Company") had informed Qualcomm that it was designing a new mobile phone that would rely on Qualcomm's innovative Snapdragon® 8-Elite SoC.  After learning that Arm was threatening to terminate the QC ALA, however, a senior executive of the customer informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm.  The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm.

159.    Additionally, a potential customer (the "AI and Ecosystem Company") that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU.  After the Breach Letter was published, the customer delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities.  The AI and Ecosystem Company has stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question.  As a result of the uncertainty stemming from Arm's assertion and

leak of the Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity.

160.    Simultaneous with its actions that have set back Qualcomm's efforts to finalize a deal with the AI and Ecosystem Company, Arm is also attempting to supply the AI and Ecosystem Company directly.  Despite Arm's insistence at trial in *Arm* v. *Qualcomm* that it does not make chips, it was recently reported that Arm had reached an agreement with the AI and Ecosystem Company under which Arm would begin producing its own chips for use in a datacenter operated by the AI and Ecosystem Company.[47]  Arm has thus not only delayed Qualcomm's efforts to finalize a contract with the AI and Ecosystem Company but has separately developed its own datacenter chips that it is trying to sell to the same company.

161.    Arm leaked the Breach Letter at a time when it knew that the Smartphone Company is an existing customer of Qualcomm and when it knew or should have known that the AI and Ecosystem Company was a customer of Qualcomm or was likely to be absent Arm's interference. On information and belief, Arm leaked the Breach Letter knowing (or in circumstances in which it should have known) that its wrongful threats to cancel the QC ALA would disrupt those customer relationships and that Qualcomm was likely to be harmed as a result.

**6.    *Arm's withdrawal of the Breach Letter offers no assurance that Arm will not attempt to terminate the QC ALA.***

162.    Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025, Arm Chief Legal Officer Spencer Collins sent Qualcomm a letter (the "Notice") withdrawing the Breach Letter and stating █████████████████████████████████████████████

█████████████████████████████████████████████████████."    The Notice also

_____

[47] Reuters, *Arm Secures Meta as First Customer for Ambitious New Chip Project, FT Reports* (Feb. 13, 2025).



The Notice thus indicated that Arm was pausing its efforts to terminate the QC ALA, but in no way suggested that Arm had any plan to abandon its long-term efforts to force Qualcomm to use Arm off-the-shelf cores and to block Qualcomm from creating and delivering products using its own custom cores (or indeed, any chips that might compete with Arm's own offerings).

163.    Arm also sought to prevent Qualcomm from addressing the uncertainty created by Arm's own leak of the Breach Letter.  Despite leaking that letter to the press, Arm ████████ ████████████████ thereby attempting to limit Qualcomm's ability to disclose the letter. Arm authorized Qualcomm to "████████████████████████████████," thereby seeking to obstruct Qualcomm from communicating about the letter publicly or with potential customers or other business partners.

## IV.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY

164.    Arm's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end.  Despite Arm's CEO's sworn testimony to the contrary, it is clear that Arm seeks to take control of the semiconductor industry and will do whatever it takes to undermine and dominate the companies that it once treated as partners.

165.    Arm's tactics violate basic contract principles and are directly contrary to the purpose of the QC ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ████ they bargained for without fear that Arm will unilaterally

51

**A746**

abdicate its contractual obligations in an effort to disrupt a licensee's innovation if Arm views the licensee as an unacceptable competitor. ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

166. The assault on Qualcomm's business through the improper refusal to provide commercially reasonable, ███████, licensing offers under the QC TLA likewise threatens reliance on the Arm ecosystem and the fundamentals of licensing. Licensees enter into TLAs with Arm under the assumption that they will be joining a collaborative and open ecosystem and will be able to license the IP necessary to compete and grow in the market. Arm's transformation into a chipmaker, combined with its throttling of the delivery of critical IP, is a dramatic reversal of Arm's longstanding business model that endangers the semiconductor industry and the manner in which its participants interact.

## **COUNT I**

### **(Declaratory Judgment)**

167. Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

168. Plaintiffs are entitled to a declaratory judgment that:

    A.    Arm breached the QC ALA by withholding ████████████ that Arm was obligated ███████████ to deliver under Section ██ of the QC ALA, and by withholding ████████ Arm was required to deliver "████████████████████" under Section ██ of the QC ALA;

    B.    As a result of Arm's breach of Section ██ of the QC ALA, Qualcomm is entitled to ████████████████████████████████;

    C.    Arm breached the QC TLA by ████████████████████ for ████████████████, including ████████████████████

█████████████████████████████████████ in violation of ████████ ███ of the QC TLA.

D.    As a result of Arm's breach of Section ████ of the QC TLA, Qualcomm is entitled to ███████████████████████ including ███ ███████████████, and ███████

E.    Arm breached the QC TLA by ███████████████████████ ███████████████████, including ███████████████ in violation of ████████ of the QC TLA.

F.    As a result of Arm's breach of Section ████ of the QC TLA, ███████████████████████████████

G.    Arm breached the QC TLA by ███████████████████ for ████████████████████████, including ████, with ████████████████████████████████ of the QC TLA.

H.    As a result of Arm's breach of Section ████ of the QC TLA, ███████████████████████████████

I.    Qualcomm has not breached the QC ALA as asserted in the October 22, 2024, Breach Letter; and

J.    Arm is therefore not entitled to terminate the QC ALA.

169.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that ████████████████████████████████████████████████████████ ███████████████████████████████████████████.

170.    A valid and justiciable controversy exists between Qualcomm and Arm because ██████████████████████████ Arm is threatening to terminate the QC ALA if Qualcomm ████████████████████ pursuant to Section ███ of the ALA.

171.    A declaratory judgment is also necessary and appropriate so that Qualcomm may ascertain Arm's obligations and Qualcomm's rights and obligations under the QC ALA and clear

any cloud that may exist over its business as a result of Arm's false assertions of breach and threats to terminate the QC ALA.

172.    A valid and justiciable controversy exists between Qualcomm and Arm because Arm has asserted that Qualcomm is in breach of the QC ALA and has asserted that Arm has the right to terminate the QC ALA on December 21, 2024.   Qualcomm disputes both assertions. Qualcomm also reasonably expects that Arm would attempt to use its purported termination to damage Qualcomm with its customers, in the media, and with analysts, in light of Arm's behaviors to date.

## COUNT II

### (Breach of Section ██ of the QC ALA)

173.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

174.    The QC ALA is a valid, binding contract.

175.    Arm failed to fulfill its obligation under Section ██ of the QC ALA because it intentionally withheld from Qualcomm certain ████████████ to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

176.    Accordingly, Arm did not "████████████████████ ████████████████████████," or "████████ ████████████████████████████," or ████████████████████████ ████████████," as is required by Section ██ of the agreement.

177.    Arm's failure to comply with its contractual obligation to timely deliver bargained-for technology was not only intentional, but it was also done with an intent to deceive Qualcomm.

54

**A749**

178.    Qualcomm put Arm on written notice of this violation and Arm ████████████ ████, as is required under the contract.

179.    Arm's breach of Section ████ of the QC ALA entitles Qualcomm ████████ ████████████████████████████████████████████████████████████.

180.    As a proximate result of Arm's breach of contract, Qualcomm has been damaged both (i) by delay that could have been avoided had Arm fulfilled its obligations, (ii) by costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK tests to verify that its products are compliant with the Arm ISA and use its own engineers to address issues that would have been addressed by Arm's patches, and (iii) by ████████████████████████ ████████████████████████████████████████████████████████████████████ not misrepresented its compliance with the parties' agreement.

## COUNT III

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

181.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

182.    Under California law, every contract implies a covenant for each party not to do anything that will deprive the parties of the benefits of the contract.

183.    At all relevant times, Arm agreed and was required by law to act fairly and in good faith with respect to its obligations under the QC ALA and TLA.

184.    Arm breached this implied covenant of good faith and fair dealing under both agreements. For example, Arm withheld deliverables that it was required to provide Qualcomm under the QC ALA; asserted, without valid basis under the QC ALA, that Qualcomm was supposedly in material breach of that agreement; sent letters to Qualcomm customers and leaked

the Breach Letter to the media to create uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs; failed to negotiate an extension to the QC ALA that would cover future version of the architecture, including v10, and failed to provide licensing proposals for ███████████ to Qualcomm in violation of provisions of the QC TLA.

185.    Arm's actions have been willful and carried out in bad faith, as part of an effort to enable Arm to disregard the QC ALA and TLA so that it can prevent Qualcomm from competing with Arm's sale of its own CPU and other chip designs, or, at a minimum, coerce into renegotiating the QC ALA so that Arm can extract payments from Qualcomm that exceed those due under the QC ALA.

186.    Arm's actions have unfairly frustrated the essential purposes of the QC ALA and TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm, including the right to produce and sell custom CPUs that are compatible with the Arm ISA ███████████.

187.    For at least the foregoing reasons, Arm has breached the implied covenant of good faith and fair dealing for both the QC ALA and TLA.

188.    As a proximate result of Arm's breach of the implied covenant of good faith and fair dealing, Qualcomm has been injured in its business or property, and is threatened by imminent loss of profits and loss of actual and potential customers and business opportunities.

## COUNT IV

### (Intentional Interference with Prospective Economic Advantage)

189.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

190.    Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above.

191.    Absent Arm's interference, these relationships would likely result or would have likely resulted in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations.   These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship.

192.    Arm knew of these relationships but nevertheless engaged in conduct aimed at interfering with Qualcomm's business opportunities, including by (a) purporting to give notice that it "shall be entitled" to terminate the QC ALA based on nonexistent alleged material breaches of the QC ALA; (b) deliberately leaking the Breach Letter in the middle of Qualcomm's Snapdragon® Summit; and (c) making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

193.    Arm's interference with Qualcomm's business opportunities was wrongful.   For example, as explained below, Arm's conduct represented unfair business acts and practices in violation of California law.

194.    By engaging in this conduct, Arm intended to disrupt these relationships or knew that disruption of these relationships was certain or substantially certain to occur.

**A752**

195.    As a result of that conduct, these relationships have in fact been disrupted.  The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a substitute contract with Arm instead, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional assurances.  As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm.

196.    Arm's efforts to interfere with Qualcomm's business relationships have been a substantial factor in causing that harm, which Qualcomm would not have suffered but for Arm's misconduct.

## COUNT V

### (Negligent Interference with Prospective Economic Advantage)

197.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

198.    Arm knew or should have known that Qualcomm has substantial business relationships with a number of customers, including the Smartphone Company and the AI and Ecosystem Company.

199.    Arm also knew or should have known that these relationships would be disrupted by Arm's failure to act with reasonable care by purporting to terminate the QC ALA despite lacking legal or factual grounds for doing so, by leaking the Breach Letter in bad faith and in disregard of its duties to Qualcomm as a contract counterparty, and by making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

200. Arm owes Qualcomm a duty to act with reasonable care based on, among other things, the parties' contractual relationship and the foreseeability that interfering with Qualcomm's customer relationships would cause Qualcomm harm.

201. Arm failed to act with reasonable care when, in bad faith, it purported to declare that Qualcomm is in material breach of the QC ALA, leaked the Breach Letter, and made those misleading and threatening statements to Qualcomm's customers.

202. Arm's conduct was wrongful because, for example, it was "unfair" under California law.

203. As a result of Arm's wrongful conduct, Qualcomm's relationships with the customers identified herein have been disrupted, as customers have required additional assurances or delayed entering into additional transactions with Qualcomm.

## <u>COUNT VI</u>

### (Violations of California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

204. Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

205. The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

206. By engaging in the conduct described above, Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL. These unfair business acts or practices include deliberately withholding deliverables it was required to provide Qualcomm ████████████████████; misrepresenting to Qualcomm that it was not withholding deliverables; refusing to negotiate license terms with Qualcomm ████████; repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's

current and prospective customers; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA; to pressure Qualcomm to accede to its demands in *Arm* v. *Qualcomm*; and to prevent Qualcomm from continuing to litigate its meritorious claims in the instant case.

207.    Arm's actions are part of a broader campaign to harm or threaten to harm competition for CPU and other computer chip designs, in California and elsewhere. Arm is employing a variety of unfair acts and practices so that it can leverage its control over the ISA used in all premium smartphones and a large and growing share of other computing devices to attempt to prevent Qualcomm from developing and marketing products with CPUs that threaten to outcompete products containing Arm's off-the-shelf CPU designs. These tactics include making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of preventing Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores.

208.    Arm's conduct is also unfair because it threatens to significantly harm competition not only for CPU designs, but also for the SoCs used in a variety of platforms, and ultimately for the devices that use those CPUs and SoCs. If Arm's conduct goes unchecked, Qualcomm and other chip designers will be forced to rely on Arm's off-the-shelf CPUs and will be at Arm's mercy if Arm wishes—as it has signaled it does—to foreclose them from making chips that are compatible with the Arm ISA. As a result of Arm's efforts to reduce competition to create those CPUs and SoCs, consumers will be deprived of products that are built around innovative, high-

performance, high-efficiency Qualcomm chips and/or will have to pay more for (or will have reduced choices among) products that incorporate CPUs compatible with the Arm ISA. Arm's conduct towards Qualcomm—a longtime Arm licensee—threatens incipient violations of competition laws; violates the policy or spirit of those laws; threatens to significantly harm competition; is immoral, unethical, oppressive, and unscrupulous; and threatens to harm consumers and competition in a manner vastly disproportionate to whatever supposed benefits that behavior could possibly create.

209.    Arm's conduct is also unlawful because it violates California common law, including state law prohibiting intentional and negligent interference with prospective economic advantage.

210.    Arm's unlawful and unfair business acts and practices are a direct and proximate cause of injury to Qualcomm. Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers. If Arm is allowed to continue in its unlawful and unfair business acts and practices, Qualcomm risks being denied access to a widely used ISA for which there are no readily available alternatives for certain applications, which threatens to impede Qualcomm's ability to continue developing and marketing its high-performance products based on its own custom CPU designs. Arm's conduct thus threatens to harm competition among SoC producers but also in end users, who will be forced to use products built with Arm chips and CPUs.

211.    Qualcomm has standing to bring this claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct.

212.    Qualcomm requires equitable relief under the UCL because it lacks adequate remedies at law to address Arm's anticompetitive and unfair actions, which are ongoing and which have caused or threaten to cause Qualcomm to suffer significant harm.

## COUNT VII

### (Breach of Section ██ of the QC TLA)

213.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

214.    The QC TLA is a valid, binding contract.

215.    Arm failed to fulfill its obligation under Section ██ of the QC TLA because the licensing offers it provided to Qualcomm for ███████████████, including ████████ ███████████████████████████████████.

216.    Arm's failure to comply with its contractual obligation ███████████████ ███████████████████████████████████ ███████████.

217.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ████, as is required under the contract.

218.    Arm's breach of Section ██████ of the QC TLA entitles Qualcomm to a ███████████████████████████████, including █████ ███████████, and a license offer ███████████████.

219.    Arm's breach of Section ██████ of the QC TLA entitles Qualcomm to ███████ ███████████████████████████████ ███.

62

**A757**

220.    As a proximate result of Arm's breach of contract, Qualcomm has been harmed both by (i) shifting resources to its custom CPU team in order to analyze and begin development of CPUs for future SoCs that would have used the ██████████████, including ████████ ██████████████ cores, (ii) the uncertainty caused by Arm's refusal to license the ████ ██████████████, which causes complications in the roadmapping and SoC planning process, and (iii) by ██████████████████████████████████████████████████████████ ████████.

## COUNT VIII

(Breach of Section ████ of the QC TLA)

221.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

222.    The QC TLA is a valid, binding contract.

223.    Arm failed to fulfill its obligation under Section ████ of the QC TLA because the licensing offers it provided to Qualcomm for ██████████████, including ████████████ ███████████████████████████████████████████████████████████ ████████████████████████.

224.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ████████, as is required under the contract.

225.    Arm's breach of Section ████ of the QC TLA entitles Qualcomm to ████████ ███████████████████████████████████████████████████████████ ████.

226.    As a proximate result of Arm's breach of contract, Qualcomm has been forced to seek alternative means to ensure that it is protected according to the ██████████████ that it

negotiated in the QC TLA and to divert additional resources in order to continue development of its SoCs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment and relief as follows:

A    For the declaratory judgments set forth in Plaintiffs' claims;

B    For an Order requiring Arm to comply with all its obligations under the QC ALA, including (but not limited to) by providing the ███████████, OOB, Patches, and ██████, without discrimination or retaliation;

C    For an Order requiring Arm to comply with all its obligations under the QC TLA, including (but not limited to) by ███████████████████████████ ██████████████████████, including ██████ ████████████████████████████████████;

D    For an Order enjoining Arm from engaging in the unlawful, unfair, and anticompetitive actions and practices described in this Amended Complaint and from any other unlawful, fraudulent, or unfair acts or practices aimed at obstructing Qualcomm's ability to develop and sell chips;

E    For an Order that Qualcomm is entitled to ███████████████████ with respect to ████████████████ licenses at pricing structures ██████████ ██████████████████;

F    For an Order ████████████████████████████████████ ████████████████ as a result of Arm's breach of the QC ALA and TLA;

G    For an Order that the Breach Letter is ineffective notice of an alleged material breach and that Arm has no right to terminate the QC ALA on the grounds stated in the Breach Letter;

H    For recovery of all ███████████████████████████ ████████████████████;

I    For damages resulting from the wrongful conduct alleged in this Amended Complaint, including from Arm's threat to terminate the QC ALA and its leak of the Breach Letter, failure to offer ████████ licensing terms and specifically including damages arising from the postponement of the business opportunity with the AI and Ecosystem Company;

J    For restitution of amounts Arm derived from the unfair and anticompetitive conduct described in this Amended Complaint;

K      For costs and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief; or, in the alternative, for additional damages, in the alternative, that the Court deems appropriate;

L      For an award of attorneys' fees and costs as allowed by law; and

M      For such other and further relief available at law and equity as the Court may deem just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL

BY JURY of all claims and issues presented in this Complaint that are so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

June 3, 2025

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

65

**A760**

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 3, 2025, upon the following in the manner indicated:

| | |
|---|---|
| Anne Shea Gaza, Esquire<br>Robert M. Vrana, Esquire<br>Samantha G. Wilson, Esquire<br>YOUNG CONAWAY STARGATT & TAYLOR, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Karen E. Keller, Esquire<br>SHAW KELLER LLP<br>I.M. Pei Building<br>1105 North Market Street, 12th Floor<br>Wilmington, DE 19801<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Scott F. Llewellyn, Esquire<br>MORRISON & FOERSTER LLP<br>4200 Republic Plaza<br>370 Seventeenth Street<br>Denver, CO 80202<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Nicholas R. Fung, Esquire<br>Henry Huttinger, Esquire<br>MORRISON & FOERSTER LLP<br>707 Wilshire Blvd., Suite 6000<br>Los Angeles, CA 90017<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |

Kyle W.K. Mooney, Esquire                                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Erik J. Olson, Esquire                                       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                                      *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                                         *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                                   *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*


                                   */s/ Jennifer Ying*
                                   _____

                                   Jennifer Ying (#5550)

**A762**

EXHIBIT A



Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121

22 October 2024

Dear Ann,

Pursuant to section ████ of the Qualcomm Architecture License Agreement (LES-TLA-20039) ("the Qualcomm ALA"), Arm hereby provides notice that Qualcomm is in material breach of the Qualcomm ALA. Unless Qualcomm cures its material breach ██████████████ Arm shall be entitled ████████████████████████ ████████████.

Under the Qualcomm ALA, ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ The Qualcomm ALA permits ████████████ ████████████████ Qualcomm is only permitted ████████████ ████████████ requirements of the Qualcomm ALA and ████████████ ████ And Qualcomm is entitled to ████████████████ within the scope of the ALA. These obligations are reflected in multiple places in the Qualcomm ALA, including but not limited to Sections ████████████████ ████████████.

Qualcomm has systematically and willfully breached these obligations, and its breaches have accelerated and expanded in recent months. Specifically, Qualcomm has ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ And Qualcomm initiated and continues to prosecute contractual claims that arise from Qualcomm's improper conduct with respect to these unlicensed cores.

Due to Qualcomm's willful, ongoing, and renewed actions, Qualcomm is in material breach of the Qualcomm ALA. Pursuant to Section ████████████████████████ ████ To do so, Qualcomm must, at a minimum, ████████████████████████ ████████.

**A764**



If Qualcomm does not do so Arm shall be entitled to immediately terminate the ALA Following termination, Qualcomm shall be subject to the Qualcomm ALA.

Sincerely,

Spencer Collins
EVP, Chief Legal Officer
Arm Limited
110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom

# Exhibit 18

A766

# Exhibit 19

F-1 1 d393891df1.htm F-1

Table of Contents

As filed with the Securities and Exchange Commission on August 21, 2023.

Registration Statement No. 333-

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### Form F-1
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Arm Holdings Limited[1]

| England and Wales | 3674 | Not applicable |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

110 Fulbourn Road
Cambridge CB1 9NJ
United Kingdom
Tel: +44 (1223) 400 400
(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

Arm, Inc.
120 Rose Orchard Way
San Jose, CA 95134
Tel: +1 (408) 576-1500
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies of all communications, including communications sent to agent for service, should be sent to:*

| Justin R. Salon | Kenneth A. Siegel | Richard D. Truesdell, Jr. |
|---|---|---|
| R. John Beasley | Jesse S. Gillespie | Derek J. Dostal |
| John T. Owen | Morrison & Foerster LLP | Davis Polk & Wardwell LLP |
| Morrison & Foerster LLP | Shin-Marunouchi Building, 29th Floor | 450 Lexington Avenue |
| 2100 L Street, NW, Suite 900 | 5-1, Marunouchi 1-Chome | New York, New York 10017 |
| Washington, D.C. 20037 | Chiyoda-ku, Tokyo, Japan 100-6529 | +1 (212) 450-4000 |
| +1 (202) 887-1500 | +81-3 3214 6522 | |

**Approximate date of commencement of proposed sale to public:**
**As soon as practicable after this registration statement becomes effective.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act.

Emerging growth company  ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act.  ☐

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the Commission, acting pursuant to such Section 8(a), shall determine.**

---

†    The term "new or revised financial accounting standards" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

‡    Arm Holdings Limited, a company with limited liability incorporated under the laws of England and Wales, will become the holding company of Arm Limited and will be the Registrant. We intend to alter the legal status of the Registrant under English law from a private limited company by re-registering as a public limited company and changing the name of the Registrant from Arm Holdings Limited to Arm Holdings plc prior to the completion of this offering. See the section titled "Corporate Reorganization" in the prospectus which forms a part of this registration statement.

**A770**

ARM_01262030

Table of Contents

The information contained in this prospectus is not complete and may be changed. The selling shareholder may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and the selling shareholder is not soliciting offers to buy these securities in any jurisdiction where the offer or sale is not permitted.

Subject to Completion
Preliminary Prospectus dated August 21, 2023.

# American Depositary Shares
## (Representing            Ordinary Shares)

[C] LOGO

This is an initial offering of American depositary shares ("ADSs") representing ordinary shares of Arm Holdings plc.

All of the ADSs to be sold in this offering are currently held by the selling shareholder identified in this prospectus. We are not selling any of the ADSs in this offering and will not receive any proceeds from the sale of the ADSs by the selling shareholder in this offering. Each ADS represents the right to receive one ordinary share, nominal value £0.001 per share, and may be evidenced by American depositary receipts ("ADRs").

Prior to this offering, there has been no public market for the ADSs or our ordinary shares. The initial public offering price per ADS is estimated to be between $        and $        . We have applied to list our ADSs on the Nasdaq Global Select Market ("Nasdaq") under the symbol "ARM".

We are a "foreign private issuer" as defined under the U.S. federal securities laws and, as such, will be subject to reduced public company reporting and stock exchange governance requirements. See "Management and Executive Remuneration—Foreign Private Issuer Exemption" for additional information.

SoftBank Group Corp. ("SoftBank Group") is expected to beneficially own approximately        % of our outstanding ordinary shares following the completion of this offering (or approximately        % if the underwriters exercise in full their option to purchase additional ADSs from the selling shareholder). As a result of SoftBank Group's ownership, after the completion of this offering, we will be a "controlled company" within the meaning of Nasdaq rules. See "Management and Executive Remuneration—Controlled Company Status."

**Investing in our ADSs involves a high degree of risk. Before buying any ADSs, you should carefully read the discussion of material risks of investing in our ADSs in "Risk Factors" beginning on page 21 of this prospectus.**

|  | PER ADS | TOTAL |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discounts and commissions |  |  |
| Proceeds, before expenses, to the selling shareholder |  |  |

The underwriters may also exercise their option to purchase up to an additional        ADSs from the selling shareholder at the initial public offering price, less the underwriting discounts and commissions, for 30 days after the date of the final prospectus. We will not receive any proceeds from the sale of such additional ADSs by the selling shareholder.

Raine Securities LLC is acting as our financial advisor in connection with this offering.

The underwriters expect to deliver the ADSs against payment in U.S. dollars to purchasers on or about        , 2023.

Neither the Securities and Exchange Commission nor any U.S. state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

| Barclays | Goldman Sachs & Co. LLC | J.P. Morgan | Mizuho |
|---|---|---|---|

*(in alphabetical order)*

| BofA Securities | Citigroup | Deutsche Bank Securities | Jefferies |
|---|---|---|---|
| BNP PARIBAS | Credit Agricole CIB | MUFG | Natixis | Santander | SMBC Nikko |

| BMO Capital Markets | Daiwa Capital Markets America | Evercore ISI | Guggenheim Securities | HSBC | IMI - Intesa Sanpaolo | Independence Point Securities |
| KeyBanc Capital Markets | Loop Capital Markets | Ramirez & Co., Inc. | Rosenblatt | SOCIETE GENERALE | TD Cowen | Wolfe | Nomura Alliance |

The date of this prospectus is        , 2023.

ARM_01262031

Table of Contents

Neither we, the selling shareholder nor the underwriters have authorized anyone to provide you with information that is different from that contained in this prospectus or in any free writing prospectus we may authorize to be delivered or made available to you. Neither we, the selling shareholder nor the underwriters take any responsibility for, or provide any assurance as to the reliability of, any other information that others may give you. We, the selling shareholder and the underwriters are offering to sell ADSs and seeking offers to purchase ADSs only in the U.S. and certain other jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date on the cover page of this prospectus, regardless of the time of delivery of this prospectus or any sale of ADSs.

For investors outside the U.S.: Neither we, the selling shareholder nor any of the underwriters have taken any action to permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the U.S. You are required to inform yourselves about and to observe any restrictions relating to this offering and the distribution of this prospectus.

We are incorporated under the laws of England and Wales and a majority of our outstanding securities is owned by non-U.S. residents. Under the rules of the U.S. Securities and Exchange Commission (the "SEC"), we are eligible for treatment as a "foreign private issuer." As a foreign private issuer, we will not be required to file periodic reports and financial statements with the SEC as frequently or as promptly as domestic registrants whose securities are registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

## ABOUT THIS PROSPECTUS

Prior to the completion of this offering, we underwent a corporate reorganization described under the section titled "Corporate Reorganization," pursuant to which Arm Limited became a wholly owned subsidiary of Arm Holdings Limited, a holding company with nominal assets and no liabilities, contingencies or commitments, which has not conducted any operations prior to this offering other than acquiring the entire issued share capital of Arm Limited. Prior to the completion of this offering, we intend to re-register Arm Holdings Limited as a public limited company and to change its name from Arm Holdings Limited to Arm Holdings plc.

Unless otherwise indicated or the context otherwise requires, in this prospectus, "Arm," the "Company," "we," "us" and "our" refer to (i) Arm Limited and its consolidated subsidiaries prior to the completion of our corporate reorganization, (ii) Arm Holdings Limited and its consolidated subsidiaries after the completion of our corporate reorganization and prior to the re-registration of Arm Holdings Limited as a public limited company and (iii) Arm Holdings plc and its consolidated subsidiaries after the re-registration of Arm Holdings Limited as a public limited company. See "Corporate Reorganization" and "Description of Share Capital and Articles of Association."

## NOTE REGARDING TRADEMARKS, TRADENAMES AND SERVICE MARKS

This prospectus includes trademarks, tradenames and service marks, certain of which belong to us and others that are the property of other organizations. Solely for convenience, trademarks, tradenames and service marks referred to in this prospectus appear without the ®, ™ and ℠ symbols, but the absence of those symbols is not intended to indicate, in any way, that we will not assert our rights or that the applicable owner will not assert its rights to these trademarks, tradenames and service marks to the fullest extent under applicable law. We do not intend our use or display of other parties' trademarks, tradenames or service marks to imply, and such use or display should not be construed to imply, a relationship with, or endorsement or sponsorship of us by, these other parties.

ii

**A772**

ARM_01262036

# Exhibit 20

goog-20231231

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2023
**OR**

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission file number: **001-37580**

# Alphabet Inc.

**(Exact name of registrant as specified in its charter)**

| **Delaware** | **61-1767919** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1600 Amphitheatre Parkway**
**Mountain View, CA 94043**
(Address of principal executive offices, including zip code)
**(650) 253-0000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| <u>Title of each class</u> | <u>Trading Symbol(s)</u> | <u>Name of each exchange on which registered</u> |
|---|---|---|
| **Class A Common Stock, $0.001 par value** | **GOOGL** | **Nasdaq Stock Market LLC** |
| | | **(Nasdaq Global Select Market)** |
| **Class C Capital Stock, $0.001 par value** | **GOOG** | **Nasdaq Stock Market LLC** |
| | | **(Nasdaq Global Select Market)** |

Securities registered pursuant to Section 12(g) of the Act:

<u>Title of each class</u>
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of June 30, 2023, the aggregate market value of shares held by non-affiliates of the registrant (based upon the closing sale prices of such shares on the Nasdaq Global Select Market on June 30, 2023) was approximately $1,331.2 billion. For purposes of calculating the aggregate market value of shares held by non-affiliates, we have assumed that all outstanding shares are held by non-affiliates, except for shares held by each of our executive officers, directors, and 5% or greater stockholders. In the case of 5% or greater stockholders, we have not deemed such stockholders to be affiliates unless there are facts and circumstances which would indicate that such stockholders exercise any control over our company, or unless they hold 10% or more of our outstanding common stock. These assumptions should not be deemed to constitute an admission that all executive officers, directors, and 5% or greater stockholders are, in fact, affiliates of our company, or that there are not other persons who may be deemed to be affiliates of our company. Further information concerning shareholdings of our officers, directors, and principal stockholders is included or incorporated by reference in Part III, Item 12 of this Annual Report on Form 10-K.

As of January 23, 2024, there were 5,893 million shares of Alphabet's Class A stock outstanding, 869 million shares of Alphabet's Class B stock outstanding, and 5,671 million shares of the Alphabet's Class C stock outstanding.

---

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Proxy Statement for the 2024 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2023.

**A775**

goog-20231231

Table of Contents

Alphabet Inc.

We also know businesses of all sizes around the world rely on Google Ads to find customers and grow their businesses — and we make that even easier with AI. With Performance Max, advertisers simply tell us their campaign goals and share their creative assets, and AI will automatically produce and run a highly effective ad campaign across all of Google's properties, to meet their budget. Product Studio brings the benefits of AI to businesses of all sizes, helping them easily create uniquely-tailored imagery featuring their products — for free. Additionally, we are experimenting with Search and Shopping ads that are directly integrated into the AI-powered snapshot and conversational mode in Search Generative Experience.

### Build the Most Helpful Personal Computing Platforms and Devices

Over the years, our Pixel phones have incorporated AI compute directly into the device and built experiences on top of it. Our latest Pixel devices were built around AI, bringing the best AI-assistive experiences to our users, such as Best Take, Magic Editor, and Audio Magic Eraser. As we look ahead, we are designing our Android and Chrome operating systems with new AI-forward user experiences.

### Moonshots

Many companies get comfortable doing what they have always done, making only incremental changes. This incrementalism leads to irrelevance over time, especially in technology, where change tends to be revolutionary, not evolutionary. People thought we were crazy when we acquired YouTube and Android and when we launched Chrome, but those efforts have matured into major platforms for digital video and mobile devices and a safer, popular browser. Our early investments in AI started out as moonshots but are now incorporated into our core products and central to future developments. We continue to look toward the future and to invest for the long term, most notably for the application of AI to our products and services, as well as other frontier technologies such as quantum computing. As we said in the original founders' letter, we will not shy away from high-risk, high-reward projects that we believe in, as they are the key to our long-term success.

### Privacy and Security

We make it a priority to protect the privacy and security of our products, users, and customers, even if there are near-term financial consequences. We do this by continuously investing in building products that are secure by default; strictly upholding responsible data practices that emphasize privacy by design; and building easy-to-use settings that put people in control. We are continually enhancing these efforts over time, whether by enabling users to auto-delete their data, giving them tools, such as My Ad Center, to control their ad experience, or advancing anti-malware, anti-phishing, and password security features.

### Google

For reporting purposes Google comprises two segments: Google Services and Google Cloud.

### Google Services

### Serving Our Users

We have always been committed to building helpful products that can improve the lives of millions of people worldwide. Our product innovations are what make our services widely used, and our brand one of the most recognized in the world. Google Services' core products and platforms include ads, Android, Chrome, devices, Gmail, Google Drive, Google Maps, Google Photos, Google Play, Search, and YouTube, with broad and growing adoption by users around the world.

Our products and services have come a long way since the company was founded more than 25 years ago. While Google Search started as a way to find web pages, organized into ten blue links, we have driven technical advancements and product innovations that have transformed Google Search into a dynamic, multimodal experience. We first expanded from traditional desktop browsers into mobile web search, making it easier to navigate on smaller screens. As new types of content surfaced on the internet, Universal Search made it possible to search multiple content types, like news, images, videos, and more, to deliver rich, relevant results. The introduction of new search modalities, like voice and visual search, made it easier for people to express their curiosity in natural and intuitive ways. We took that a step further with multisearch, which lets people search with text and images at the same time. Large language models like BERT and Multitask Unified Models, or MUMs, have made it possible to express more natural language queries, vastly improving the quality of results. Each advancement has made it easier and more natural for people to find what they are looking for.

This drive to make information more accessible and helpful has led us over the years to improve the discovery and creation of digital content both on the web and through platforms like Google Play and YouTube. People are consuming many forms of digital content, including watching videos, streaming TV, playing games, listening to music,

6.

A776

goog-20231231

Table of Contents

Alphabet Inc.

reading books, and using apps. Working with content creators and partners, we continue to build new ways for people around the world to create and find great digital content.

Fueling all of these great digital experiences are extraordinary platforms and devices. That is why we continue to invest in platforms like our Android mobile operating system, Chrome browser, and Chrome operating system, as well as growing our family of devices. We see tremendous potential for devices to be helpful and make people's lives easier by combining the best of our AI, software, and hardware. This potential is reflected in our latest generation of devices, such as the new Pixel 8 and Pixel 8 Pro, and the Pixel Watch 2. Creating products and services that people rely on every day is a journey that we are investing in for the long-term.

### How We Make Money

We have built world-class advertising technologies for advertisers, agencies, and publishers to power their digital marketing businesses. Our advertising solutions help millions of companies grow their businesses through our wide range of products across devices and formats, and we aim to ensure positive user experiences by serving the right ads at the right time and by building deep partnerships with brands and agencies. AI has been foundational to our advertising business for more than a decade. Products like Performance Max and Product Studio use the full power of our AI to help advertisers find untapped and incremental conversion opportunities.

Google Services generates revenues primarily by delivering both performance and brand advertising that appears on Google Search & other properties, YouTube, and Google Network partners' properties ("Google Network properties"). We continue to invest in both performance and brand advertising and seek to improve the measurability of advertising so advertisers understand the effectiveness of their campaigns.

- **Performance advertising** creates and delivers relevant ads that users will click on leading to direct engagement with advertisers. Performance advertising lets our advertisers connect with users while driving measurable results. Our ads tools allow performance advertisers to create simple text-based ads.

- **Brand advertising** helps enhance users' awareness of and affinity for advertisers' products and services, through videos, text, images, and other interactive ads that run across various devices. We help brand advertisers deliver digital videos and other types of ads to specific audiences for their brand-building marketing campaigns.

We have allocated substantial resources to stopping bad advertising practices and protecting users on the web. We focus on creating the best advertising experiences for our users and advertisers in many ways, including filtering out invalid traffic, removing billions of bad ads from our systems every year, and closely monitoring the sites, apps, and videos where ads appear and blocklisting them when necessary to ensure that ads do not fund bad content.

In addition, Google Services increasingly generates revenues from products and services beyond advertising, including:

- **consumer subscriptions,** which primarily include revenues from YouTube services, such as YouTube TV, YouTube Music and Premium, and NFL Sunday Ticket, as well as Google One;

- **platforms,** which primarily include revenues from Google Play from the sales of apps and in-app purchases; and

- **devices,** which primarily include sales of the Pixel family of devices.

### Google Cloud

Through our Google Cloud Platform and Google Workspace offerings, Google Cloud generates revenues primarily from consumption-based fees and subscriptions for infrastructure, platform, collaboration tools and other cloud services. Customers use five key capabilities from Google Cloud.

- **AI-optimized Infrastructure:** provides open, reliable, and scalable compute, networking, and storage to enable customers to run workloads anywhere — on our Cloud, at the edge, or in their data centers. It can be used to migrate and modernize IT systems and to train and serve various types of AI models.

- **Cybersecurity:** helps customers detect, protect, and respond to a broad range of cybersecurity threats, with AI integrated to further strengthen security outcomes, prioritize which threats to investigate, and identify attack paths, as well as accelerate resolution of cybersecurity threats.

- **Databases and Analytics:** provides a variety of different types of databases — relational, key-value, in-memory — to store and manage data for different types of applications. Our Data Cloud also unifies data lakes, data warehouses, data governance, and advanced machine learning into a single platform that can analyze data across any cloud.

7.

A777

goog-20231231

Table of Contents

Alphabet Inc.

- **Collaboration Tools:** Google Workspace and Duet AI in Google Workspace provide easy-to-use, secure communication and collaboration tools, including apps like Gmail, Docs, Drive, Calendar, Meet, and more. These tools enable secure hybrid and remote work, boosting productivity and collaboration. AI has been used in Google Workspace for years to improve grammar, efficiency, security, and more with features like Smart Reply, Smart Compose, and malware and phishing protection in Gmail. Duet AI in Google Workspace helps users write, organize, visualize, accelerate workflows, and have richer meetings.

- **AI Platform and Duet AI for Google Cloud:** Our Vertex AI platform gives developers the ability to train, tune, augment, and deploy applications using generative AI models and services such as Enterprise Search and Conversations. Duet AI for Google Cloud provides pre-packaged AI agents that assist developers to write, test, document, and operate software.

**Other Bets**

Across Alphabet, we are also using technology to try to solve big problems that affect a wide variety of industries from improving transportation and health technology to exploring solutions to address climate change. Alphabet's investment in the portfolio of Other Bets includes businesses that are at various stages of development, ranging from those in the R&D phase to those that are in the beginning stages of commercialization. Our goal is for them to become thriving, successful businesses. Other Bets operate as independent companies and some of them have their own boards with independent members and outside investors. While these early-stage businesses naturally come with considerable uncertainty, some of them are already generating revenue and making important strides in their industries. Revenues from Other Bets are generated primarily from the sale of healthcare-related services and internet services.

**Competition**

Our business is characterized by rapid change as well as new and disruptive technologies. We face formidable competition in every aspect of our business, including, among others, from:

- general purpose search engines and information services;

- vertical search engines and e-commerce providers for queries related to travel, jobs, and health, which users may navigate directly to rather than go through Google;

- online advertising platforms and networks;

- other forms of advertising, such as billboards, magazines, newspapers, radio, and television as our advertisers typically advertise in multiple media, both online and offline;

- digital content and application platform providers;

- providers of enterprise cloud services;

- developers and providers of AI products and services;

- companies that design, manufacture, and market consumer hardware products, including businesses that have developed proprietary platforms;

- providers of digital video services;

- social networks, which users may rely on for product or service referrals, rather than seeking information through traditional search engines;

- providers of workspace communication and connectivity products; and

- digital assistant providers.

Competing successfully depends heavily on our ability to develop and distribute innovative products and technologies to the marketplace across our businesses. For example, for advertising, competing successfully depends on attracting and retaining:

- users, for whom other products and services are literally one click away, largely on the basis of the relevance of our advertising, as well as the general usefulness, security, and availability of our products and services;

- advertisers, primarily based on our ability to generate sales leads, and ultimately customers, and to deliver their advertisements in an efficient and effective manner across a variety of distribution channels; and

- content providers, primarily based on the quality of our advertiser base, our ability to help these partners generate revenues from advertising, and the terms of our agreements with them.

8.

# Exhibit 21

**Table of Contents**

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 20-F

**(Mark One)**

☐   **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended 31 December 2023**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐   **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report _____

Commission File No.: 001-37911

# Anheuser-Busch InBev SA/NV
### (Exact name of Registrant as specified in its charter)

**N/A**
(Translation of Registrant's name into English)

**Belgium**
(Jurisdiction of incorporation or organization)

**Brouwerijplein 1,**
**3000 Leuven, Belgium**
(Address of principal executive offices)

**John Blood**
**Chief Legal and Corporate Affairs Officer and Company Secretary**
**Brouwerijplein 1,**
**3000 Leuven, Belgium**
**Telephone No.: + 32 16 27 61 11**
**Email: Corporategovernance@ab-inbev.com**
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Trading symbol | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares without nominal value | | New York Stock Exchange* |
| American Depositary Shares, each representing one ordinary share without nominal value | BUD | New York Stock Exchange |
| 3.750% Notes due 2042 (issued July 2012) | BUD42A | New York Stock Exchange |
| 4.000% Notes due 2043 (issued January 2013) | BUD/43 | New York Stock Exchange |
| 4.625% Notes due 2044 (issued January 2014) | BUD/44 | New York Stock Exchange |
| 4.700% Notes due 2036 (issued January 2016) | BUD/36 | New York Stock Exchange |
| 4.900% Notes due 2046 (issued January 2016) | BUD/46 | New York Stock Exchange |
| 4.950% Notes due 2042 (issued December 2016) | BUD/42 | New York Stock Exchange |
| 6.625% Notes due 2033 (issued December 2016) | BUD/33 | New York Stock Exchange |
| 5.875% Notes due 2035 (issued December 2016) | BUD/35 | New York Stock Exchange |
| 4.000% Notes due 2028 (issued April 2018) | BUD/28 | New York Stock Exchange |
| 4.375% Notes due 2038 (issued April 2018) | BUD/38 | New York Stock Exchange |
| 4.600% Notes due 2048 (issued April 2018) | BUD/48A | New York Stock Exchange |
| 4.750% Notes due 2058 (issued April 2018) | BUD/58 | New York Stock Exchange |
| 4.750% Notes due 2029 (issued January 2019) | BUD/29 | New York Stock Exchange |
| 4.900% Notes due 2031 (issued January 2019) | BUD/31 | New York Stock Exchange |
| 5.450% Notes due 2039 (issued January 2019) | BUD/39A | New York Stock Exchange |
| 5.550% Notes due 2049 (issued January 2019) | BUD/49 | New York Stock Exchange |
| 5.800% Notes due 2059 (issued January 2019) | BUD/59 | New York Stock Exchange |
| 3.500% Notes due 2030 (issued April 2020) | BUD/30 | New York Stock Exchange |
| 4.350% Notes due 2040 (issued April 2020) | BUD/40 | New York Stock Exchange |
| 4.500% Notes due 2050 (issued April 2020) | BUD/50 | New York Stock Exchange |
| 4.600% Notes due 2060 (issued April 2020) | BUD/60 | New York Stock Exchange |

\*    Not for trading, but in connection with the registration of American Depositary Shares, pursuant to the requirements of the Securities and Exchange Commission.

**Securities registered or to be registered pursuant to Section 12(g) of the Act.**

**None**
(Title of Class)

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.**

**None**
(Title of Class)

_____

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

1,737,197,263 ordinary shares without nominal value

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    ☒ Yes    ☐ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.    ☐ Yes    ☒ No

Note – Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    ☒ Yes    ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    ☒ Yes    ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer    ☒        Accelerated filer    ☐        Non-accelerated filer    ☐

**A781**

Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 762(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐          International Financial Reporting Standards as issued                                    Other ☐
                     by the International Accounting Standards Board          ☒

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow. N/A  ☐ Item 17  ☐ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  ☐ Yes  ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. N/A  ☐ Yes  ☐ No

Table of Contents

Belgium if it infringes upon one or more of the grounds for refusal which are exhaustively listed in Article 25 of the Belgian Code of Private International Law. In addition to recognition or enforcement, a judgment by a federal or state court in the United States against us may also serve as evidence in a similar action in a Belgian court if it meets the conditions required for the authenticity of judgments according to the law of the state where it was rendered.

### ITEM 4.      INFORMATION ON THE COMPANY

#### A.      HISTORY AND DEVELOPMENT OF THE COMPANY

We are the world's largest brewer by volume and one of the world's top ten consumer products companies by revenue. As a consumer-focused, insights-driven company, we produce, market, distribute and sell a diversified portfolio of well over 500 beer and other malt beverage brands. These include brands with significant international distribution, such as Budweiser, Corona (except in the United States), Stella Artois, Michelob ULTRA, Beck's, Leffe and Hoegaarden; and brands primarily distributed to local markets such as Bud Light in the United States, Modelo Especial, Victoria and Pacifico in Mexico; Skol, Brahma and Antarctica in Brazil; Aguila and Poker in Colombia; Cristal and Pilsen Callao in Peru; Quilmes in Argentina; Jupiler in Belgium and the Netherlands; Franziskaner in Germany; Carling Black Label, Castle Lager, Castle Lite and Hansa Pilsener in South Africa; Hero and Trophy in Nigeria; Safari and Kilimanjaro in Tanzania; Harbin and Sedrin in China; and Cass in South Korea. We also produce and distribute soft drinks, particularly in Central and South America and Africa, and Beyond Beer products, such as Cutwater and NÜTRL Seltzer in the United States; NÜTRL Seltzer, Palm Bay, and Mike's Hard Spirit in Canada; and Brutal Fruit and Flying Fish in South Africa.

Our dedication to quality goes back to a brewing tradition of more than 600 years with the Den Hoorn brewery in Leuven, Belgium, as well as the pioneering spirit of the Anheuser & Co. brewery, with origins in St. Louis, U.S.A. since 1852, and the history of the South African Breweries with its origins in Johannesburg in 1895. As of 31 December 2023, we employed approximately 155,000 people based in nearly 50 countries worldwide. As a result, we have a global footprint with a balanced exposure to developed and developing markets and production facilities spread across our geographic regions. Since 1 January 2019, we have reported our results under the following five regions: North America, Middle Americas, South America, EMEA and Asia Pacific. We also report the results of Global Export and Holding Companies, which includes our global headquarters and the export businesses, which have not been allocated to the regions.

Our 2023 volumes (beer and non-beer) were 585 million hectoliters and our revenue amounted to USD 59 billion.

#### Registration and Main Corporate Details

Anheuser-Busch InBev SA/NV was incorporated on 3 March 2016 for an unlimited duration under the laws of Belgium under the original name Newbelco SA/NV, and is the successor entity to predecessor Anheuser-Busch InBev SA/NV, which was incorporated on 2 August 1977 for an unlimited duration under the laws of Belgium under the original name BEMES. It has the legal form of a public limited liability company (*naamloze vennootschap/société anonyme*). Its registered office is located at Grand-Place/Grote Markt 1, 1000 Brussels, Belgium, and it is registered with the Register of Legal Entities of Brussels under the number 0417.497.106. Our global headquarters are located at Brouwerijplein 1, 3000 Leuven, Belgium (tel.: +32 16 27 61 11). Our agent in the United States is Anheuser-Busch InBev Services LLC, 250 Park Avenue, 2nd Floor, New York, NY 10177.

We are a publicly traded company, with our primary listing on Euronext Brussels under the symbol "ABI." We also have secondary listings on the Johannesburg Stock Exchange under the symbol "ANH" and the Mexican Stock Exchange under the symbol "ANB." ADSs representing rights to receive our Ordinary Shares are listed and trade on the NYSE under the symbol "BUD."

-38-

**A783**

# Exhibit 22

A784

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-K

(Mark one)

☒     ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended September 29, 2024**

**OR**

☐     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from _ to _.**

**Commission File Number 0-19528**

# QUALCOMM Incorporated

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| Delaware | 95-3685934 |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |
| 5775 Morehouse Dr., San Diego, California | 92121-1714 |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(858) 587-1121**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common stock, $0.0001 par value | QCOM | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company | ☐ | Emerging growth company | ☐ |
|---|---|---|---|---|---|---|---|---|---|

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant at March 22, 2024 (the last business day of the registrant's most recently completed second fiscal quarter) was $190.0 billion, based upon the closing price of the registrant's common stock on that date as reported on the NASDAQ Global Select Market.

The number of shares outstanding of the registrant's common stock was 1,111 million at November 4, 2024.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement for its 2025 Annual Meeting of Stockholders, to be filed with the Commission subsequent to the date hereof, are incorporated by reference into Part III of this Annual Report where indicated.

---

In this Annual Report, the words "Qualcomm," the "Company," "we," "our," "ours" and "us" refer only to QUALCOMM Incorporated and its subsidiaries and not any other person or entity. This Annual Report (including but not limited to the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations") contains forward-looking statements. Words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "may," "will," "would" and similar expressions or variations of such words are intended to identify forward-looking statements, but are not the exclusive means of identifying forward-looking statements in this Annual Report. Additionally, statements concerning future matters such as our future business, prospects, results of operations or financial condition; research and development or technology investments; new or enhanced products, services or technologies; emerging industries or business models; design wins or product launches; industry, market or technology trends, dynamics or transitions; our expectations regarding future demand or supply conditions; strategic investments or acquisitions, and the anticipated timing or benefits thereof; legal or regulatory matters; U.S./China trade or national security tensions; vertical integration by our customers; competition; and other statements regarding matters that are not historical are also forward-looking statements.

Although forward-looking statements in this Annual Report reflect our good faith judgment, such statements can only be based on facts and factors currently known by us. Consequently, forward-looking statements are inherently subject to risks and uncertainties and actual results and outcomes may differ materially from the results and outcomes discussed in or anticipated by the forward-looking statements. Factors that could cause or contribute to such differences in results and outcomes include without limitation those discussed under "Part I, Item 1A. Risk Factors" below, as well as those discussed elsewhere in this Annual Report. Readers are urged not to place undue reliance on these forward-looking statements, which speak only as of the date of this Annual Report. We undertake no obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this Annual Report. Readers are urged to carefully review and consider the various disclosures made in this Annual Report, which attempt to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

## PART I

### Item 1. Business

We incorporated in California in 1985 and reincorporated in Delaware in 1991. We operate and report using a 52-53 week fiscal year ending on the last Sunday in September. Our 52-week fiscal years consist of four equal fiscal quarters of 13 weeks each, and our 53-week fiscal years consist of three 13-week fiscal quarters and one 14-week fiscal quarter. The financial results for our 53-week fiscal years and our 14-week fiscal quarters will not be exactly comparable to our 52-week fiscal years and our 13-week fiscal quarters. Our fiscal years for 2024, 2023 and 2022 included 53 weeks, 52 weeks and 52 weeks, respectively. Our fiscal year for 2025 will include 52 weeks.

### Overview

We are a global technology leader, helping to bring intelligent computing everywhere through the development and commercialization of foundational technologies, including 3G (third generation), 4G (fourth generation) and 5G (fifth generation) wireless connectivity, high-performance and low-power computing and on-device artificial intelligence (AI). Our technologies and products have helped power the growth in smartphones and other connected devices. We are scaling our innovations across industries and applications beyond mobile handsets, driving digital transformation with our ecosystem partners in areas including automotive and the internet of things (IoT). In automotive, our Snapdragon® Digital Chassis™ platforms, including connectivity, digital cockpit and advanced driver assistance and automated driving (ADAS/AD), are helping to connect the car to its environment and the cloud, creating unique in-cabin experiences and enabling a comprehensive assisted and automated driving solution. In IoT, our inventions have helped power growth in industries and applications such as consumer (including personal computers (PCs), tablets, voice and music and extended reality (XR)), edge networking (including mobile broadband and wireless access points) and industrial (including handhelds, retail, tracking and logistics and utilities). We derive revenues principally from sales of integrated circuit products, including our Snapdragon® family of highly-integrated, system-based solutions, and licensing of our intellectual property, including patents and other rights.

The foundational technologies we invent help power modern digital experiences. We share these inventions broadly through our licensing programs enabling wide ecosystem access to technologies at the core of mobile innovation, and through the sale of our integrated circuit platforms (also known as integrated circuit products, chips, chipsets or modules) and other products. We innovate and collaborate across many ecosystems, including with manufacturers, operators, developers, system integrators, cloud providers, test tool vendors, service providers, governments and industry standards organizations, to enable next-generation digital transformation. For nearly 40 years, we have been a leader in setting industry standards and creating era-defining technology breakthroughs, and we continue to play a leading role in developing system-level inventions that serve as the foundation for multiple generations of advanced wireless technologies. This includes technologies such as CDMA (Code Division Multiple Access) and OFDMA (Orthogonal Frequency Division Multiple Access) families of technologies, with the latter encompassing LTE (Long-Term Evolution) and 5G NR (New Radio), which are the primary digital technologies currently used to transmit voice or data over radio waves using a public or private cellular wireless network.

6

**A787**

**In the Matter Of:**

*QUALCOMM INCORPORATED vs*

*ARM HOLDINGS PLC - HIGHLY CONFIDENTIAL*

---

*SPECIAL MASTER HEARING*

*August 22, 2025*

---



1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

HIGHLY CONFIDENTIAL/ ATTORNEYS' EYES ONLY

4

5    QUALCOMM INCORPORATED,  )
     a Delaware corporation, )
6    QUALCOMM TECHNOLOGIES,  )
     INC., a Delaware        )
7    corporation,            )
                             )
8         Plaintiffs,        )
                             )Civil Action
9    v.                      )No. 24-490-MN
                             )
10   ARM HOLDINGS PLC,       )
     f/k/a ARM LTD., a U.K.  )
11   corporation,            )
                             )
12        Defendant.         )

13

14            August 22, 2025
              12:00 p.m.

15

16

17   BEFORE:
          HELENA C. RYCHLICKI, ESQ.
18        SPECIAL DISCOVERY MASTER

19

              TRANSCRIPT OF PROCEEDINGS

20

21

              LEXITAS REPORTING
22      Registered Professional Reporters
              1330 King Street
23        Wilmington, Delaware 19801
              (302) 655-0477
24           www.lexitaslegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 14, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 14, 2026, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                              *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                            *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
Sydney D. Gaskins, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Kyle W.K. Mooney, Esquire                            *VIA ELECTRONIC MAIL*
Alexandra Corrinne Hottenrott, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Erik J. Olson, Esquire                                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Defendant*


Daniel P. Muino, Esquire                                  *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
*Attorneys for Defendant*


Brian M. Kramer, Esquire                                  *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 200
San Diego, CA  92130
*Attorneys for Defendant*


William Frentzen, Esquire                                 *VIA ELECTRONIC MAIL*
Daralyn J. Durie, Esquire
Shaelyn Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*


Lydia B. Cash, Esquire                                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendant*


Gregg F. LoCascio, P.C.                                   *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                                       *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McElrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                                 *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*

/s/ Jennifer Ying
_____
Jennifer Ying (#5550)

3