## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., a Delaware corporation, and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

        Plaintiffs,

    v.

ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K. corporation,

        Defendant.

REDACTED - PUBLIC VERSION
FILED JANUARY 27, 2026

C.A. No. 24-490-MN



## DECLARATION OF MEREDITH POHL IN SUPPORT OF DEFENDANT ARM HOLDINGS PLC'S MOTION TO BIFURCATE THE 2026 TRIAL AND TO STRIKE IN PART QUALCOMM'S JURY DEMAND

Dated: January 20, 2026

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Meredith Pohl
Matthew J. McIntee
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
meredith.pohl@kirkland.com
matt.mcintee@kirkland.com

Jay Emerick
Reid McEllrath
Adam M. Janes
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

reid.mcellrath@kirkland.com
adam.janes@kirkland.com

Nathaniel Louis DeLucia
Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
nathaniel.delucia@kirkland.com
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

I, Meredith Pohl, declare as follows:

I am an attorney with the law firm of Kirkland & Ellis LLP, counsel for Arm Holdings PLC ("Arm") in the above referenced action.  I submit this declaration in support of Arm's Motion to Bifurcate the 2026 Trial and to Strike in Part Qualcomm's Jury Demand.

1.      Attached as **Exhibit 1** is a true and correct copy of Qualcomm's Third Supplemental Responses and Objections to Arm's First Set of Interrogatories (Nos. 1-9), dated August 8, 2025. ████████████

2.      Attached as **Exhibit 2** is a true and correct excerpted copy of the October 2, 2025 deposition transcript of Eric Posner. ████████████

3.      Attached as **Exhibit 3** is a true and correct copy of the September 5, 2025 Rebuttal Expert Report of Professor Timothy S. Simcoe. ████████████

4.      Attached as **Exhibit 4** is a true and correct copy of the August 8, 2025 Opening Expert Report of Eric A. Posner. ████████████

5.      Attached as **Exhibit 5** is a true and correct copy of the September 19, 2025 Reply Expert Report of Eric A. Posner. ████████████

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 20th day of January 2026.

*/s/ Meredith Pohl*
Meredith Pohl

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 20, 2026, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jying@morrisnichols.com
tmurray@morrisnichols.com

Alan R. Silverstein
Sara Barry
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
asilverstein@connollygallagher.com
sbarry@connollygallagher.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Jennifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com
jhartley@dirllp.com

Richard S. Zembek
NORTON ROSE FULBRIGHT US LLP
1550 Lamar Street, Suite 2000
Houston, TX 77010
richard.zembek@nortonrosefulbright.com
John Poulos
NORTON ROSE FULBRIGHT US LLP

Ruby J. Garrett
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweis.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
Anish Desai
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
fpatterson@paulweiss.com
adesai@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

1045 W. Fulton Market
Suite 1200
Chicago, IL 60607
john.poulos@nortonrosefulbright.com

Dated: January 20, 2026
                    YOUNG CONAWAY STARGATT &
                    TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

# Exhibit 1
## (REDACTED IN ITS ENTIRETY)

# Exhibit 2
## (REDACTED IN ITS ENTIRETY)

# Exhibit 3

**United States District Court**

**District of Delaware**

Qualcomm Incorporated and
Qualcomm Technologies, Inc.,

   *Plaintiffs,*

 v.

Arm Holdings plc., f/k/a Arm Ltd.,

   *Defendant.*

Civil Action No. 1:24-cv-00490-MN

**Rebuttal Expert Report of Professor Timothy S. Simcoe**

**September 5, 2025**

███████████████████████

█████████████████

# TABLE OF CONTENTS

**I.**    ASSIGNMENT AND QUALIFICATIONS ................................................................ 5

**II.**   SUMMARY OF OPINIONS ............................................................................. 7

**III.**  BACKGROUND AND INDUSTRY OVERVIEW ............................................... 19

    **A.** Overview of Semiconductor Technology and Value Chain .................................. 20

    **B.** Segments and Competitive Dynamics ................................................. 23

    **C.** Arm's Business Model and Licensing Structure .................................... 25

    **D.** Qualcomm's Business Model ........................................................ 29

**IV.**  ORIGIN OF THE DISPUTE .......................................................................... 33

**V.**   PROF. POSNER'S ANALYSIS OF THE RELEVANT MARKETS AND MARKET POWER IS INCOMPLETE AND IGNORES KEY FEATURES OF THE INDUSTRY .................................... 37

    **A.** Prof. Posner Improperly Disregards the Competitive Constraint from the x86 and RISC-V Ecosystems .......................................................... 39

    **B.** Arm's ISA Share Varies Significantly Across Chip Application Segments ........ 45

**VI.**  PROF. POSNER AND DR. KENNEDY PROVIDE NO EVIDENCE THAT QUALCOMM HAS SUFFERED HARM FROM ARM'S ALLEGED ANTICOMPETITIVE CONDUCT ..................... 47

    **A.** Qualcomm's Strong Financial Performance Since the Acquisition of Nuvia ..... 49

    **B.** No Evidence of Lost Business ....................................................... 55

        ■  ████████████████████████████████████

        ■  ████████████████████████████████████

        3.  Qualcomm's Broader Customer Base Was Not Harmed ...................... 67

**VII.** PROF. POSNER'S CLAIM THAT ARM HAS THE ABILITY AND INCENTIVE TO FORECLOSE QUALCOMM IS BASED ON AN INCOMPLETE ANALYSIS THAT IGNORES KEY FACTS AND IS UNTETHERED FROM SOUND ECONOMIC ANALYSIS .................................... 69

    **A.** Relevant Economic Framework ..................................................... 72

        1. Arm's Licensing Strategy Is Tailored to Partner-Specific Circumstances ........... 72

        2. The Nuvia Agreement Illustrates Arm's Legitimate Interest in Managing Risk and Securing Value ................................................... 76

3.   Qualcomm and Prof. Posner Have Not Demonstrated that Arm's Dispute with Qualcomm Is Anticompetitive Conduct Rather than a Standard Commercial Disagreement ........................................................................................ 79

4.   Protecting Competition Does Not Require Arm to License Its ISA on Qualcomm's Preferred Terms ........................................................................ 82

**B. Prof. Posner's Opinions on Ability to Foreclose Are Flawed ............................... 85**

**C. Prof. Posner Does Not Account for Costs that Arm Would Suffer from the Alleged Foreclosure of Qualcomm and Other Customers ..................................... 88**

1.   The Role of Qualcomm and Other Partners in Expanding Arm's Success and Ecosystem Against Alternative ISAs ........................................................ 89

2.   Qualcomm's Successful Business Diversification Strategy Disincentivizes Arm from Foreclosing Qualcomm ........................................................................ 97

3.   Prof. Posner's Diversion Analysis Is Incomplete and Ignores Important Foreclosure Costs that Arm Would Incur .................................................... 100

**D. Foreclosure of Qualcomm Alone Would Unlikely Be Profitable for Arm ........ 106**

**VIII. PROF. POSNER HAS NOT DEMONSTRATED THAT ARM'S CONDUCT IS ANTICOMPETITIVE ..................................................................................................... 106**

**A. Arm Protecting the Terms of Its Contracts Is Procompetitive ........................... 107**

1.   Contract Enforcement Is a Legitimate Procompetitive Action ...................... 107

**B. Arm's Entry into the Chip Design Stage of the Value Chain Is Procompetitive ....................................................................................................................................... 109**

1.   The Start of the Alleged Foreclosure Significantly Predates Arm's Data Center Chip Launch ........................................................................................ 110

2.   Vertical Integration Is Common and Typically Beneficial ........................... 111

3.   Arm's Ecosystem Remains Open .................................................................. 120

**C. Increases in Royalty Rates Are Not Inherently Anticompetitive ...................... 127**

1.   Arm's Share of the Chip "Stack" Is Smaller than Qualcomm's ...................... 129

2.   Price Increases Are Not Inherently Anticompetitive ..................................... 132

**D. "Dominant" Shares Do Not Imply a Lack of Competitive Pressure .................. 136**

1.   Arm Continues to Invest a Significant Portion of Its Revenue ...................... 136

2.   Current High Shares Do Not Guarantee Future High Shares ......................... 141

3

3. Any Attempt by Arm to Foreclose Customers Would Accelerate Development of Alternatives such as RISC-V ............................................................................ 144

4. There Is No Evidence that Arm's Purported Decision to Stop Supporting v8 Is Anticompetitive ................................................................................................................. 149

IX.  **PROF. POSNER HAS NOT DEMONSTRATED THAT ARM'S CONDUCT HARMED COMPETITION AND CONSUMERS** ....................................................................... **150**

A. **Qualcomm Has Not Demonstrated that Arm Had Anticompetitive Intent** ....... **152**

B. **Arm's Litigation Position Was Public and Transparent from as Early as 2022** .................................................................................................................... **153**

C. **There Is No Evidence of Harm to Competition** .................................................... **159**

X.  **APPENDICES** ............................................................................................................. **163**

4

## I.   ASSIGNMENT AND QUALIFICATIONS

1.      My name is Timothy S. Simcoe. I am the David J. McGrath Jr. Professor and Chair of the Strategy and Innovation department at the Boston University Questrom School of Business. I am also a faculty director of the Boston University Technology Policy Research Initiative, and a Research Associate at the National Bureau of Economic Research.

2.      I received my Bachelor's degree in Applied Math with Economics from Harvard College in 1995. I received a Master's degree in Economics in 2003, and a Doctorate in Business Administration in 2004, both from the University of California at Berkeley. During the 2014-2015 academic year, I served as a Senior Economist on the President's Council of Economic Advisers.

3.      As a professor at Boston University, I teach business strategy to students in both the Master of Business Administration program and the undergraduate business concentration. This business strategy course covers topics such as the commercialization of new technologies, industry evolution, industry structure, and strategic positioning. I also teach a Technology Strategy course to MBA and executive MBA students, a course in Data Analysis to executive MBA students, and a PhD-level class in research methods.

4.      I have published more than 25 peer reviewed academic articles, including in top academic economic journals such as the *American Economic Review, Management Science,* and the *RAND Journal of Economics*. I have also published numerous articles in other widely read outlets, such as policy and antitrust publications. My academic work primarily falls under the economic discipline of Industrial Organization, which studies topics including competition between firms, market power, monopolies, and antitrust issues. My research covers topics including technological interoperability, innovation, and intellectual property ("IP").

5.      A copy of my curriculum vitae, including a list of my prior testimony during the past five years, is attached as **Appendix A.**

6. A list of materials that I relied upon in reaching the opinions expressed in this report is attached as **Appendix B**.[1]

7. I have been asked by Counsel for Arm to provide an economic assessment of Qualcomm's claims that Arm has engaged in anticompetitive conduct that has caused economic harm to Qualcomm,[2] and that "Arm's actions are part of a broader campaign to harm or threaten to harm competition for central processing units ("CPUs") and other computer chip designs, in California and elsewhere."[3] I have also been asked to review and respond to the analysis and conclusions in the expert report of Prof. Posner, and to some aspects of Dr. Kennedy's analysis.[4]

8. The opinions I offer in this report are based on my review of Qualcomm's Second Amended Complaint ("SAC"), Prof. Eric A. Posner's August 8, 2025 Expert Report (including supporting materials) (hereinafter "Posner Report"), and Prof. Patrick F. Kennedy's August 8, 2025 Expert Report (including supporting materials) (hereinafter "Kennedy Report"), as well as my review of depositions and documents produced both in this litigation and in the ongoing litigation that Arm filed against Qualcomm in Delaware federal court (hereinafter *Arm v. Qualcomm*).[5] I was given access to all material produced in the context of both these litigations.

---

[1] My analysis and conclusions are based on the information available to me at present. I reserve the right to update my opinions and analysis as appropriate if additional information or materials become available. I also reserve the right to create and use demonstrative exhibits to assist in providing testimony.

[2] *See* for example, Qualcomm Inc. v. Arm Holdings, plc., C.A. No. 24-490-MN, Dkt. Nos. 137; 137-1 (Ex. A) (June 3, 2025) (hereinafter Qualcomm's Second Amended Complaint or "SAC"), ¶ 210 ("Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers.").

[3] SAC, ¶ 207.

[4] Expert Report of Eric A. Posner, August 8, 2025 (hereinafter "Posner Report") and Expert Report of Patrick F. Kennedy, August 8, 2025 (hereinafter "Kennedy Report").

[5] In *Arm v. Qualcomm,* the jury found that (i) Qualcomm did not breach the Nuvia ALA and (ii) Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA. The jury was unable to reach a verdict with respect to Arm's claim as to whether Nuvia breached the Nuvia ALA. *See,* Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146 (D. Del. filed August 31, 2022), Dkt. Nos. 571, 572. *See also* Tobias Mann, "Jury spares Qualcomm's AI PC ambitions, but Arm eyes a retrial," The Register, December 23, 2024, https://www.theregister.com/2024/12/23/qualcomm_arm_trial/; ███████████████████ ██████████████████████████████ I understand that Arm has filed post-trial briefing challenging the jury verdict, and that the final unresolved count will need to be retried in any event. Plaintiff Arm Ltd.'s Motion for Judgment as a Matter of Law or a New Trial, Case 1:22-cv-01146-MN, Dkt. No. 595.

9.      Counsel for Arm has instructed me to assume that the disagreement with Qualcomm
concerning the correct interpretation of various terms of the relevant Qualcomm and Nuvia
agreements with Arm, as set forth in the pleadings and other materials from the cases,[6] reflects
Arm's genuine views of Arm's, Qualcomm's, and Nuvia's contractual obligations.

## II.   SUMMARY OF OPINIONS

10.     The origin of this litigation is a dispute over the interpretation of a set of contracts among
Arm, Qualcomm, and Nuvia. The dispute was triggered by Qualcomm's acquisition of Nuvia in
March 2021, and by Qualcomm's decision to incorporate Nuvia's technology into its own
products. Arm has alleged that Qualcomm and Nuvia have breached their license agreements with
Arm. In the present case, Qualcomm alleges that Arm has breached the Qualcomm Architecture
License Agreement ("ALA"), breached the Qualcomm Technology License Agreement ("TLA"),
tortiously interfered with Qualcomm's customers, and engaged in "unlawful, unfair or fraudulent"
business acts or practices.[7]

11.     Qualcomm's unfair competition claims are based upon Arm's conduct after the parties
were unable to reach an agreement over the terms of Nuvia's and Qualcomm's license to use Arm's
IP. Specifically, Qualcomm alleges that by initiating litigation over Qualcomm's use of the CPU
designs created at Nuvia, communicating about the ongoing litigation with Qualcomm customers
that use products incorporating Arm's technology, and providing notice that Arm believes
Qualcomm has breached the Qualcomm and Nuvia ALAs, Arm intends to "eliminate alternatives
to Arm's own competing CPU designs."[8] Prof. Posner's report echoes these claims by arguing that
Arm's conduct constitutes a "broad scheme" to foreclose Qualcomm's access to the Arm

---

[6] "Arm's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3)," Arm
Holdings, July 11, 2025, pp. 4-17; "Arm's First (Corrected) Supplemental Objections and Responses to
Qualcomm's First Set of Interrogatories (Nos. 1-11)," Arm Ltd., March 1, 2024, pp. 3-17.

[7] SAC, ¶¶ 173-226 (Counts V-VIII).

[8] SAC, ¶ 1. In this report, I do not opine on the question of whether either party has violated any contractual
commitments.

Instruction Set Architecture ("ISA") and its associated ecosystem of software developers and users.

12.     To support his opinions, Prof. Posner relies on a stylized economic model of the potential foreclosure effects of a vertical merger. He does not explain why this stylized model of a vertical *merger* is an appropriate tool for analyzing Arm's downstream *organic entry*, given that economists generally view entry as procompetitive. Even more importantly, Prof. Posner does not link the model or its underlying assumptions to the facts of this case. His analysis simply ignores broad swaths of the factual record that point to a much simpler explanation for Arm's conduct: Arm seeks to protect its IP and earn a return on its investments. For example,

- Prof. Posner hardly mentions the Nuvia acquisition despite its central role in this dispute. I have seen no evidence that Arm's original lawsuit against Qualcomm and Nuvia was meritless. From an economic perspective, litigation is recognized as a widely accepted means of resolving contractual disputes that can produce a variety of procompetitive benefits.

- Prof. Posner claims that "Arm has interfered with Qualcomm's relationship with its customers by sowing doubts about Qualcomm's continued ability to sell Arm-compliant chips."[9] But the initial lawsuit between Arm and Qualcomm was public knowledge and widely discussed in the press. In that context, Arm's communication with Qualcomm's customers that use Arm-based chips reflects Arm's incentive to be transparent with users of its technology.

- Prof. Posner claims that Arm is pivoting to a business model that involves, "foreclos[ing] customers in sectors that Arm seeks to enter."[10] The only Arm customer that he specifically mentions is Qualcomm. Throughout its dispute with Arm, Qualcomm has maintained access to the Arm ISA under its ALA and TLA contracts. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Despite disagreeing about the interpretation of the ALA, Arm and Qualcomm have

---

[9] Posner Report, ¶ 45.

[10] Posner Report, ¶ 66.



negotiated during the pendency of this litigation. The parties' failure so far to find mutually agreeable terms for amending the ALA is unremarkable (and does not preclude that an agreement will eventually be reached). Arm's proposal that Qualcomm ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ moreover, does not constitute evidence of a "scheme" to foreclose Qualcomm's (or any other customer's) access to Arm's ISA.

- Prof. Posner points to Arm's development of a chip for data centers as a key piece of evidence in favor of his foreclosure theory.[11] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He also fails to mention that in data centers, Qualcomm currently has no chip and thus zero share, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ If Arm were pursuing the foreclosure strategy hypothesized by Prof. Posner, then data center chips would be a surprisingly poor choice for the initial application, because much of the demand served by Arm's existing customers would likely be diverted to an alternative ISA, Intel's x86, which currently has the highest share of data center chips.[14]

13. Economic models are useful in antitrust because they provide an internally consistent framework for analyzing the full range of costs and benefits associated with certain kinds of

---

[11] Posner Report, ¶¶ 46, 64. The term "foreclosure" can refer to either or both of partial foreclosure (whereby a firm worsens a customers' access to an input, e.g., by raising price or degrading quality) and full foreclosure (whereby a firm ends a customers' access to an input). I use foreclosure to encompass the possibilities of both partial and full foreclosure, unless specified.

[12] *See* Deposition of Mohamed Awad, July 29, 2025 (hereinafter "Awad (Arm) Deposition"), 37:11-20, 48:12-23, 49:4-51:17; Ian King, "Qualcomm Plans Exit From Server Chips," Bloomberg, May 7, 2018 https://www.bloomberg.com/news/articles/2018-05-07/qualcomm-is-said-to-plan-exit-from-server-chips-amid-cost-cuts.

[13] *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

[14] Arm estimates that its ISA has a 20 percent share in the data center segment (see Section V).

business activity.[15] This allows an economist to carefully compare (and measure, where possible) the relevant cost-benefit tradeoffs before reaching a conclusion about antitrust harm. That is not what Prof. Posner does. Instead, he simply claims that certain kinds of harm *might* occur when a firm is vertically integrated, and either ignores or dismisses the potential benefits of vertical integration to reach the conclusion that harm *must* have occurred. Since Prof. Posner's application of a stylized model of potential foreclosure effects under a vertical merger is superficial and untethered from the evidence, his opinions are highly speculative and lack evidentiary support. He alternates between definitive statements and non-committal language—such as "may," "could," "appears to," and "suggests"—in both cases without presenting concrete evidence of harm to Qualcomm or to competition. For example, the following statements are offered without supporting evidence:

- "Arm has adopted the indirect strategy of driving Qualcomm out of business and taking its margins."[16]

- "Arm no longer wishes to keep its prior commitments and instead plans to cut off ALA licensees and sell SoCs directly to OEMs,[17] such as data centers, automobile companies, and mobile phone manufacturers."[18]

---

[15] Stylized models are often used as a starting point by antitrust agencies in merger review. But those agencies also gather facts and adapt the model to account for industry institutions and case-specific evidence. For example, the U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, https://www.justice.gov/d9/383663.pdf states: "Investigations Are Intensively Fact-Driven, Iterative Processes. Merger analysis depends heavily on the specific facts of each case. […] In testing a particular postulated risk of competitive harm arising from a merger, the Agencies take into account pertinent characteristics of the market's competitive process using data, documents, and other information obtained from the parties, their competitors, their customers, databases of various sorts, and academic literature or private industry studies. […] The Agencies also carefully consider prospects for efficiencies that the proposed transaction may generate and evaluate the effects of any efficiencies on the outcome of the competitive process."

[16] Posner Report, ¶ 87.

[17] Original Equipment Manufacturers ("OEMs").

[18] Posner Report, ¶ 88. I note here that Prof. Posner mischaracterized a statement by Arm's CEO, Rene Haas, as his only support for this claim. As such, Prof. Posner effectively offers no evidence for this claim. *See* Section VIII.B.3 below.

- "[T]he more successful [Arm licensees] are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them."[19]

And here are several examples of non-committal language:

- "Arm […] **appears** to have the incentive to foreclose Qualcomm…"[20]

- "Arm **may** be acting in bad faith…"[21]

- "Arm **might** continue to benefit from Qualcomm…"[22]

- "Arm […] **may** raise upstream barriers…"[23]

- "Arm […] **may** impede innovation…"[24]

14.     Prof. Posner's overarching theory is that Arm is  (or "may" be) engaged in a "broad […] scheme" to "undermine Qualcomm's ability" to compete within the Arm ISA ecosystem.[25] He claims that Arm holds "a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA."[26] He alleges that Arm is attempting to "extend […] its dominance over the Arm ISA ecosystem"[27] by "obstructing" Qualcomm's ability to design custom cores under its ALA, thereby coercing Qualcomm into relying on Arm's "off-the-shelf" ("OTS") cores licensed under the TLA,[28]

---

[19] Posner Report, ¶ 90.

[20] Posner Report, ¶ 64 (emphasis added).

[21] Posner Report, ¶ 65 (emphasis added).

[22] Posner Report, ¶ 72 (emphasis added).

[23] Posner Report, ¶ 78 (emphasis added).

[24] Posner Report, ¶ 77 (emphasis added).

[25] Posner Report, ¶ 13.

[26] Posner Report, ¶ 11.

[27] Posner Report, ¶ 14.

[28] Posner Report, ¶ 13.

[29] Posner Report, ¶¶ 17, 71.

15.     This report provides a response to each of Prof. Posner's main claims. The remainder of this Section summarizes my opinions regarding the core elements of his theory.

**Prof. Posner's analysis of relevant markets and market power is incomplete and ignores key features of the industry.**

16.     Although Prof. Posner does not define relevant markets for his analysis, he implicitly assumes that Arm is a monopolist or has a "dominant position" in the market for a license to its own ISA.[30] Prof. Posner does not appear to define markets or analyze competition at other stages of the chip industry supply chain, such as central processing unit ("CPU") cores or chips.[31]

17.     This approach leads him to ignore (i) the current and future competitive constraint from the RISC-V ISA, a freely-available alternative; (ii) the fact that, if Qualcomm were foreclosed, Qualcomm's sales may divert to other ALA customers, such as Apple, rather than Arm cores sold under the TLA or Arm's own chips; and (iii) competitive constraints due to Original Equipment Manufacturer ("OEM") customers being able to choose among chips that use different ISAs.[32]

18.     While Prof. Posner discusses Arm's "monopoly" and "dominant position," economics does not condemn either, to the extent that they are the result of successful competition and innovation.[33] Furthermore, Prof. Posner does not consider that current high shares do not guarantee future high shares, as demonstrated by the many examples of once "dominant" firms that lost significant shares

---

[30] Posner Report, ¶ 11 ("[…] Arm has a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA.").

[31] For the purpose of my report, I consider the terms "chips," "System on a Chip" ("SoCs"), and "chipsets" to be synonymous. I will typically use the term "chip."

[32] Prof. Posner does acknowledge that "in some sectors, like data centers and compute, OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips." Posner Report, ¶ 58. However, he does not account for this competitive constraint on Arm's licensing strategy.

[33] Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1, 2022, https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf, p. 2 ("In many markets, the competitive process naturally results in a market structure with lots of suppliers. […] In many other markets, where economies of scale are sizeable, the competitive process naturally results in a market structure with just a few large firms. We typically see this outcome in the manufacturing of highly sophisticated equipment, from aircraft to farm machinery to advanced microprocessors. There is nothing inherently wrong with that outcome, so long as it results from legitimate competition rather than anticompetitive mergers or exclusionary conduct.").

███████████████████████████████

████████████████████████

to rivals.[34] Prof. Posner fails to explain why, as a "monopolist" protected by high "barriers to entry,"[35] Arm would continue to invest a significant portion of its revenue in research and development ("R&D"), and does not consider that Arm's sustained investment is more consistent with a firm responding to competitive pressure than with one exercising unchecked market power.

**Prof. Posner and Dr. Kennedy provide no evidence that Qualcomm has suffered harm from Arm's alleged anticompetitive conduct.**

19.     Prof. Posner claims that Qualcomm was harmed in various ways by Arm's conduct, but he provides no evidence of actual harm. I show that there is no real-world compelling evidence of harm to Qualcomm. Since its acquisition of Nuvia, in March 2021, Qualcomm's financial reports, statements to investors, and customer relationships show sustained growth and strong financial performance. Qualcomm also forecasts strong financial performance going forward.

20.     Neither Prof. Posner nor Dr. Kennedy demonstrate that Qualcomm suffered any harm in its relationship with specific customers. Specifically, neither Qualcomm nor its experts provide any evidence that the letter that Arm sent to Qualcomm on October 22, 2024, (hereinafter "Breach Letter") (which Arm withdrew on January 8, 2025) is the only factor, or even just a contributing factor,[36] for the change in the terms of a Qualcomm agreement with ████ Negotiations, particularly between parties of that scale and sophistication, are a sequence of give and take, and there is nothing remarkable about the fact that Qualcomm did not ultimately receive the exact terms it proposed at an earlier stage in the process.

21.     More generally, negotiations between business partners involve constant back-and-forth communications, exchanges of requests and concessions, expected and unexpected challenges and roadblocks, and can be affected by internal frictions and changing external factors. The presence of "rough patches" in a relationship is not evidence of anticompetitive conduct. In fact,

---

[34] See Section VIII.D. For example, Arm estimates that Arm-based chips' share of data centers is currently 20 percent (see Section V), but it was essentially zero in 2018 (Awad (Arm) Deposition, 48-12:2).

[35] Posner Report, ¶¶ 18, 58.

[36] As I discuss in Section IX.B, Prof. Posner has also not explained how Arm's October 2024 notice and its publication could interfere with Qualcomm's business opportunities given that, as early as 2022, Arm repeatedly, clearly, and publicly stated that (a) Qualcomm was in breach of the Qualcomm ALA and (b) Arm had the right to terminate the ALA as a result.

it is not difficult to find examples of friction in Qualcomm's relationships with its customers that predate the filing of the *Arm v. Qualcomm* lawsuit, and that are thus unrelated to Arm's alleged anticompetitive conduct.

**Prof. Posner's claim that Arm has the ability and incentive to foreclose Qualcomm is based on an incomplete analysis that ignores key facts and is untethered from sound economic analysis.**

22.     Prof. Posner's claim that Arm is able to foreclose Qualcomm and other customers from Arm's ISA is incorrect.[37] First, his analysis does not distinguish among downstream sectors, even though the RISC-V architecture is currently a substitute in some applications, and OEMs can (and do) readily switch to x86 in others. Second, Qualcomm's ALA and TLA with Arm do not expire until ▇▇▇▇ and many of Arm's other customers similarly have contractual commitments that extend many years into the future.[38] These long-term commitments provide time for chipmakers to invest in alternatives to the Arm ISA, thereby constraining Arm's ability to foreclose even in sectors like mobile where short-run substitutes to Arm's ISA are not currently available.

23.     Prof. Posner also claims that Arm has the incentive to foreclose Qualcomm's access to its ISA.[39] But his analysis is incomplete, and it is based on a static model that ignores various costs that Arm would incur if it pursued such a foreclosure strategy. *First*, foreclosure would deprive Arm of the benefits of Qualcomm's and other ALA customers' investments in Arm-based chip design, which increase the value of Arm's ecosystem. *Second*, Arm would lose sales in downstream applications where chipmakers or OEMs can switch to an alternative ISA. *Third*, a "broad scheme" of foreclosure would carry reputational costs to Arm, and cause harm to the Arm ecosystem, by making it more difficult to migrate existing customers onto future versions of the Arm ISA. *Fourth*, industry leaders would respond to Arm's purported foreclosure scheme by accelerating investments in the development of the freely-available RISC-V ISA, thereby putting

---

[37] Posner Report, ¶¶ 65-66.

[38] For example, Apple has an ALA with Arm that "extends beyond 2040." *See* "Amendment No. 2 to Form F-1," Arm Holdings plc, September 5, 2023, p. 4, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm. *See also* ARM_00119603 (a list of agreements as of 2021).

[39] Posner Report, ¶¶ 72, 74.

14

Arm's entire business at risk. As a matter of economics, these are real costs that Arm would bear if it foreclosed its customers and thus should be accounted for in an analysis of Arm's incentives to foreclose. By ignoring or downplaying these real costs, Prof. Posner systematically overstates Arm's incentive to engage in the foreclosure strategy that he hypothesizes.

**Prof. Posner has not demonstrated that Arm's conduct is anticompetitive.**

24.     Even in the context of Prof. Posner's stylized theoretical vertical merger model (i.e., a model of an upstream firm entering into downstream markets through acquisition of another firm already operating in those markets), a vertical merger does not *necessarily* lead to higher costs for downstream rivals.[40] Importantly, his model does not capture Arm's *organic entry* approach (i.e., *de novo* entry by designing its own chips). His analysis either ignores or dismisses the procompetitive effects of vertical integration (where a firm is present at multiple levels of the supply chain). Those benefits include the elimination of "double marginalization" (when an OEM passes the suppliers' markup on to its own customers) and implementation experience that helps a supplier learn how to improve its products.[41]

---

[40] As one recent paper concludes, "Vertical mergers may also allow a firm to engage in anticompetitive conduct, like raising rivals' costs ('RRC'), complete foreclosure, or misuse of information. Yet RRC and EDM [Elimination of Double Marginalization] are both inherent, unilateral competitive effects-two sides of the same coin-even if they do not necessarily share equal magnitude. As a result, the economic literature finds that a vertical merger's aggregate procompetitive benefits are likely to exceed its anticompetitive effects across a wide range of-but not all possible scenarios." Blair, Roger D., Christine S. Wilson, D. Daniel Sokol, Keith Klovers and Jeremy A. Sandford, "Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies," George Mason Law Review, 2020, Vol. 27, No. 3, p. 762. *See also* Lu, Shihua, Serge Moresi, and Steven C. Salop, "A Note on Vertical Mergers with an Upstream Monopolist: Foreclosure and Welfare Effects," 2007, Working Paper and De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1.

[41] *See*, for example, "Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, https://hbsp.harvard.edu/product/711463-PDF-ENG ("Qualcomm has been willing to move downstream into end product in order to demonstrate proof of concept. While other IP firms only do technology (which sometimes creates problem in implementation, such as Rambus), Qualcomm repeatedly created end-user products and systems to show that the technology could really work."); Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, November 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/ ("Making its own mobile processors has helped Apple innovate with such features as facial recognition and augmented reality on the iPhone. Designing its own chips for devices like the MacBooks and Mac Mini announced Tuesday should also allow Apple to be more creative with PCs. […] When chip, device, and software engineers work closely together they can squeeze more performance out of a device than is possible with an off-the-shelf chip.").

25.     Prof. Posner also *assumes* that Arm's conduct is motivated by incentives to raise Qualcomm's input costs and divert sales to Arm, while ignoring more plausible alternative explanations. For example, Prof. Posner says almost nothing about the Nuvia acquisition and Arm's belief that Qualcomm breached the terms of that license. He does not consider any procompetitive benefits of Arm's efforts to exercise its contractual rights, or the possibility that Arm might seek to increase royalty rates to earn a return on its R&D investments, fund additional R&D investments, or simply respond to increased demand.[42]

26.     Prof. Posner provides no evidence that Arm's royalty adjustments are not simply a result of competitive dynamics in an industry where R&D investments are costly and necessary to a firm's ability to compete. As a general matter of economics, price increases are common in business and not inherently anticompetitive. Even in perfectly competitive markets, prices change when supply and demand conditions change. In fact, price increases can be procompetitive—particularly in high-tech industries—as they can lead to increased R&D investment and reward innovation. Such investment can enable a firm to improve existing products (such as Arm improving its ISA from v8 to v9), bring innovative products to market (such as Arm's successful launch of its compute subsystem ("CSS") offerings), or expand into new markets (such as Arm's recent organic entry into data center chip design). When a firm successfully innovates, raising prices to reflect the value of its improved technology is not anticompetitive but a standard commercial response.

27.     For evidence of incentives, Prof. Posner points to Arm's recent entry into data center chip design, which he argues is an indication that Arm is actively seeking to compete directly with its licensees, including Qualcomm.[43] It is unusual and economically counter-intuitive to claim that a firm's organic entry into a related market is evidence of anti-competitive conduct. Moreover, in this case, Arm entered at ▮▮▮▮▮▮▮ (i.e., at a customer's behest), and only after Qualcomm abandoned its own effort to produce an Arm-based chip for that application. Despite Qualcomm and Prof. Posner's assertion of a "broad campaign" to harm Qualcomm, Prof. Posner points to no

---

[42] I also discuss in Section VIII.C.1 that a comparison of Arm's and Qualcomm's royalty revenues highlights that Arm's share of the chip "stack" is smaller than Qualcomm's.

[43] Posner Report, ¶¶ 13-14.

16

████████████████████████████████████████

evidence that Arm has plans to enter the smartphone and personal computer ("PC") segments ████████████████████████████████████████, nor am I aware of any.[44]

28.  Finally, Prof. Posner opines that Arm's actions "may" impede the development of alternative ISAs, such as RISC-V.[45] He claims that if Arm "weakens" the firms that would otherwise support such alternatives,[46] new ISAs "will have trouble attracting chipmakers and thus face greater barriers to entry."[47] This claim seems to reflect the idea that, even if foreclosure increases incentives for Arm's customers to invest in other ISAs (as the evidence I review in Section VIII.D.3 shows), they would have fewer financial resources to make those investments. Without measuring either effect, however, Prof. Posner can only speculate that the financial costs of foreclosure would outweigh the increased incentives to invest in other ISAs. In reality, many of Arm's customers ████████████████████████████) are huge enterprises with vast financial reserves and easy access to credit markets, which undermines the idea that they could not afford to invest in alternative ISAs.

**Prof. Posner's claim that Arm pivoted from a longstanding "open" and "neutral" business model "to a different model" in which it forecloses its customers is incorrect.**

29.  Prof. Posner claims Qualcomm and others invested in Arm's ecosystem because they trusted that Arm would remain "open" and "neutral."[48] He further asserts that Arm entering into chip design represents a "dramatic departure" from Arm's historically neutral licensing model.[49] Prof. Posner's claims that Arm's large and sophisticated customers rely on a vague promise of openness or neutrality are belied by the fact that their heavily negotiated ALA and TLA licenses provide long-term contractual guarantees of access to the Arm ISA and related Arm chip designs.

---

[44] ████████████████████ Qualcomm's Handsets revenue ($24.9 billion) is 75% of QCT revenue ($33.2 billion) and 63.8% of total revenue ($39.0 billion) in fiscal 2024. Qualcomm Incorporated, Form 10-K, for the fiscal year ended September 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/fd08c4f6-61ba-4a6a-a339-0e3b522ed739.pdf (hereinafter, "Qualcomm 2024 Form 10-K"), pp. 41, 44.

[45] Posner Report, ¶ 18.

[46] Posner Report, ¶ 18.

[47] Posner Report, ¶ 18.

[48] Posner Report, ¶ 66.

[49] Posner Report, ¶¶ 19, 66, 86.

30.     I have seen no evidence of a "dramatic" change in Arm's business model.  Arm has always been careful about the customers to whom it will grant an ALA (to ensure the growth of the Arm ecosystem and the success of both Arm and its customers); but it has recently signed an ALA with Nuvia in 2019, and since then with large, sophisticated customers such as Apple, IBM, and Google. For over a decade, Arm has also licensed core designs via TLAs to customers such as Qualcomm, and Prof. Posner makes no claims that Arm's TLA licensing practices are inherently anticompetitive. Thus, Arm was operating at multiple levels of the chip supply chain—by granting licenses to implement its ISA while also selling its own cores—well before the Nuvia acquisition and the start of its litigation with Qualcomm.

31.     Entry into chip design for data centers is simply an example of organic vertical expansion, which is an extremely common business strategy that does not necessarily represent evidence of attempted foreclosure or a "dramatic departure" from Arm's existing practices. Prof. Posner's use of a stylized theoretical model of vertical interaction, untethered from the facts in this case, could be used to show that any vertical expansion by a firm with market power at some stage in a supply chain (including through organic entry) must inherently be anticompetitive. That conclusion contradicts a large body of economic literature, as well as the established practice of accounting for the economic efficiencies of vertical integration in antitrust analysis.[50]

32.     Arm's entry into chip design for data centers is not surprising given (i) its long history of designing cores and other IP that is incorporated into chips, (ii) the Arm ISA's relatively small share of the rapidly growing data center segment, and (iii) ▮▮▮▮ request that Arm develop a chip.

---

[50] *See* for example, Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59 ("In theory, vertical mergers can have both procompetitive and anticompetitive effects. […] Overall, we find that the existing literature on vertical integration contains mixed results, with evidence of harm to competition as well as evidence of procompetitive effects.") The potential procompetitive benefit of vertical mergers is reflected in recent Court decisions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc.*, U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction,  Case 4:24-cv-02508, Dkt. Entry 511 (S.D. Tex. Jan. 31, 2025) ("The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns. […] [T]he inquiry must proceed with recognition that 'academics, courts, and antitrust enforcement authorities alike' have repeatedly recognized that vertical mergers may serve to benefit competition and consumers.").

**Prof. Posner has not demonstrated that Arm's conduct has harmed competition and consumers.**

33.     Prof. Posner provides no real-world evidence that Qualcomm was harmed by Arm's alleged anticompetitive conduct. Even if it were true that Arm's conduct harmed Qualcomm, Prof. Posner does not demonstrate, or even attempt to demonstrate, that the conduct harmed competition and the competitive process. Economists, as well as U.S. antitrust laws, are concerned with "the protection of competition, not competitors."[51] Ultimately, Prof. Posner's claims that Arm has harmed competition or consumers rest on a flawed analysis that is unsubstantiated and inconsistent with the evidence as well as untethered from any standard economic analysis of harm to competition. Arm's decision to make substantial engineering investments that allow it to operate at stages of the value chain beyond the supply of its ISA—either via improved cores or CSSs or through selling chips—are best understood as procompetitive business strategy that will stimulate competition and innovation in a highly dynamic industry.

## III.   BACKGROUND AND INDUSTRY OVERVIEW

34.     This Section provides an overview of relevant semiconductor technologies and associated value chain, and it summarizes competitive dynamics across key segments, including smartphones, personal computers, data centers, automotives, and Internet of Things ("IoT"). I also describe Arm's and Qualcomm's business models, focusing on their licensing frameworks and strategic roles within the ecosystem. These elements establish the foundation for assessing the parties' incentives and the economic implications of the dispute.

---

[51] *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). (The Supreme Court stating: "The antitrust laws, however, were enacted for 'the protection of competition, not competitors.'"). *See also* Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1, 2022, https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf, p. 2 ("Competition is messy. Competition can be rough-and-tumble. Competition can feel deeply unfair when one loses. […]  Promoting competition does not mean shielding any businesses from the buffeting winds of legitimate competition, be they large firms with outsize political influence or small firms that are struggling to compete against larger rivals with lower costs. As a champion of competition, I am instinctively skeptical of pleas by politically powerful businesses to be shielded from competition.").

19

██████████████████████████████████

███████████████████████████

## A. Overview of Semiconductor Technology and Value Chain

35.     Semiconductor "chips" are highly engineered components that power a wide range of digital devices, including smartphones, personal computers, data centers, automotives and IoT.[52] The global semiconductor industry generated approximately $655 billion in revenue in 2024—a 21% increase from the prior year—reflecting its central role in modern technology.[53] The largest suppliers of chips include Qualcomm, Samsung, Intel, Broadcom, NVIDIA, Micron, AMD, and MediaTek.[54]

36.     Chips are typically customized to suit the needs of various applications. For instance, efficient power consumption may be an important product characteristic in mobile, whereas performance and flexibility are more important in data centers, where the ability to perform large number of calculations in parallel is essential for training artificial intelligence ("AI") models.[55] These differing requirements influence chip design choices and the competitive landscape across application segments.

37.     Each chip contains multiple functioning units, including CPUs, graphics processing units ("GPUs"), and peripherals.[56] This case is primarily concerned with CPUs, which are the "computer's brain [that] handles the assignment and processing of tasks and manages operational

---

[52] In Qualcomm's documents, "data centers," "servers," and "infrastructure" appear to be used interchangeably.

[53] "Gartner Says Worldwide Semiconductor Revenue Grew 21% in 2024," Gartner, April 10, 2025, https://www.gartner.com/en/newsroom/press-releases/2025-04-10-gartner-says-worldwide-semiconductor-revenue-grew-21-percent-in-2024.

[54] *Ibid.*

[55] Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025 https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation. *See also*, "AI Accelerator Chips Overview and Comparison," HardwareBee, https://hardwarebee.com/ai-accelerator-chips-overview-and-comparison/, accessed August 22, 2025.

[56] Briana Watson, "SOC vs CPU: Breaking Down the Differences and their Optimal Usage," November 15, 2023, https://www.totalphase.com/blog/2023/11/soc-vs-cpu-breaking-down-the-differences-and-their-optimal-usage/. *See also* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 3, 2025 ("A chipset is a set of integrated circuits that work together to manage data flow between the processor, memory, and other components in the computer. It serves as the motherboard's 'traffic cop,' controlling how each component interacts and sending signals back and forth to manage operations. Chipsets handle data differently depending on its type. Whether it's audio or video, Internet protocol […] packets or system-level tasks.").

functions that all types of computers use."[57] Every CPU is built to follow a specific ISA, "which defines the software instructions that can be executed by the CPU. […] The ISA sets the foundation for a large library of compatible software which runs on those CPUs."[58]

38.     There are a few commercially deployed ISAs—the Arm ISA, the Intel x86 ISA, and the RISC-V ISA. Because software written for CPUs based on one of these ISAs is not compatible with CPUs based on a different ISA, each ISA has its own "ecosystem," i.e., the network of compatible software, hardware, developers, and users.

39.     Chips are complex products that incorporate significant IP, reflecting years of R&D investments conducted by many innovative companies, including Arm and Qualcomm, as well as institutions such as universities and government research labs.[59] Many companies specialize in specific stages of the production process—such as design, manufacturing, or systems integration—depending on their capabilities and strategic focus.[60]

---

[57] Phill Powell, "Types of central processing units (CPUs)," https://www.ibm.com/think/topics/central-processing-unit-types. *See also* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 4, 2025 ("What is the difference between a Chipset and a processor? A chipset serves as a bridge between the processor, memory, and peripheral devices, while a processor is responsible for executing instructions and performing calculations. Think of the chipset as the traffic controller that manages the flow of data, while the processor is the worker that actually performs the tasks. The chipset plays a crucial role in the communication between the various components of a computer and is responsible for ensuring that data is transferred accurately and efficiently.").

[58] Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2025, https://investors.arm.com/static-files/9be77c9d-75ee-4639-bfe4-17efd23c56b5 (hereinafter, "Arm 2025 Form 20-F"), p. 56.

[59] Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, p. 9, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf ("Chip design is a complex process requiring highly trained engineers and scientists, advanced technology, and intellectual property to create the designs for the performance and functionality of the chip"); Jeffrey Mervis, "To beat China, new U.S. law offers billions for microchip research and training," Science, September 6, 2022, https://www.science.org/content/article/beat-china-new-u-s-law-offers-billions-microchip-research-and-training.

[60] Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, p. 9, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf ("[Fabless companies] companies focus exclusively on chip design, and partner with third-party merchant foundries to fabricate (that is, manufacture) their chips. [Integrated device manufacturers] both design and manufacture chips. Within IDMs, design and manufacturing teams work together to bring to market new chips usually at in-house fabrication facilities, or "fabs." [Original equipment manufacturers] like auto makers, use semiconductors as inputs for other products. Some OEMs have begun to design their own chips, primarily for their own products. [EDA/IP providers] are trusted intermediaries between design companies and foundries providing design tools, reference flows and some services. Third party IP providers design and license IP building blocks (processors, libraries, memories, interfaces, sensors, and security).").

40.     The semiconductor value chain consists of four key steps:

- *ISA Development:* Arm develops and licenses its ISA to select partners through an ALA. The RISC-V ISA is an open-source alternative to the Arm ISA.[61] Intel and AMD sell chips that use Intel's proprietary x86 ISA.[62]

- *Core Design:* Arm and other firms design CPU cores that are compliant with a particular ISA.[63] A core is a re-usable component (or "building block") that can be incorporated into more complex and specialized chip designs.[64] Arm uses TLAs to provide customers with access to OTS cores, such as ████████████████████[65] Arm's ALA partners can choose to purchase an Arm OTS core or develop their own custom cores.[66] Firms can also choose to develop custom cores using the RISC-V ISA.[67]

---

[61] "About RISC-V," RISC-V International, https://riscv.org/about/, accessed August 15, 2025 ("At the base level, the RISC-V ISA and extensions ratified by RISC-V International are royalty free and open base building blocks for anyone to build their own solutions and services on.").

[62] On the difference between the Arm and x86 ISAs, see Robert Triggs, "Arm vs x86: Instruction sets, architecture, and all key differences explained," Android Authority, December 20, 2023, https://www.androidauthority.com/arm-vs-x86-key-differences-explained-568718/. Intel licenses x86 to AMD as the result of a settlement agreement. See "Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025.

[63] A CPU core is the "processing unit within the CPU that can execute instructions." A CPU can contain multiple cores and "the more cores a CPU has, the more tasks it can handle simultaneously. *See* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/cpu-core/, accessed September 4, 2025.

[64] "What are IP Cores in Semiconductor Design: Types & Advantages," Techovedas, April 21, 2024, https://techovedas.com/what-are-ip-cores-in-semiconductor-design-types-advantages/ ("In semiconductor design, an IP core, short for Intellectual Property core, is a pre-designed and reusable block of logic or functionality that serves as a building block for creating complex chips.").

[65] Paul Williamson, Arm's Senior VP and general manager of IoT, explained that "our processes [Arm's CPU cores] come in three families or our process architectures: A class, R class and M class. […] M is typically for deeply embedded low power. This is at the high level. R is for real time control system, time critical systems. And A is for advanced application processes, typically." ████████████████ For more details, see "Arm CPU Architecture: A Foundation for Computing Everywhere," Arm, https://www.arm.com/architecture/cpu, accessed September 4, 2025.

████████████████████████████████████████

[67] "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential (reporting Ziad Asghar, Senior Vice President & General Manager - XR & Spatial Computing at Qualcomm, stating that "RISC-V clearly has amazing potential. For a product developer, it eliminates the issue of being tied to the limited portfolio of

22

████████████████████████████████████

████████████████████████████

- *Subsystem Integration:*  Arm also offers CSS, which combine multiple cores—such as Arm's CPU and GPU cores—with other technologies to serve as the computing component of a larger chip.[68] These subsystems can help chip designers reduce development costs and shorten time-to-market.[69]

- *Chip Design and Manufacturing:* Chip designers can combine Arm's OTS cores, their own customized cores, or pre-integrated CSS with other technologies to design full chips, which are then produced by semiconductor fabrication plants (also known as "foundries" or "fabs").[70]  These chips are ultimately embedded in end products like smartphones, laptops, vehicles, and data center servers.

## B.  Segments and Competitive Dynamics

41.     The semiconductor industry spans a diverse set of application segments, each with distinct performance, power, and integration requirements. These differences shape the design and

---

cores available from a proprietary ISA […] OEMs want to develop highly customized cores. And RISC-V really fits that bill […] RISC-V makes sense for pretty much all use cases, because instead of having to choose from a given fixed number of processor cores, it allows you to optimize for specific use cases. This ability to customize the cores for what you need means the cores can be optimized for what you care most about whether that be power, performance, or area.").

[68] For more details, see "Fastest Path to Production Silicon with World-Leading Performance, on Leading-Edge Technology," Arm, https://www.arm.com/products/neoverse-compute-subsystems, accessed September 4, 2025. *See also* Deposition of Peter Greenhalgh, July 4, 2025 (hereinafter "Greenhalgh (Arm) Deposition"), 73:2-11 ("So the way we think of compute subsystems is not perfectly defined. There's not like only one way that they get created. But they're a combination of our own CPU, GPU, if it's relevant for that market, interconnect, other pieces of IP that are being brought together and proven to achieve a certain capability. So that's a compute subsystem.").

[69] Arm 2025 Form 20-F, p. 59, ("Compute Platform Products. Arm's CPU, GPU, and System IP products integrated into a foundational compute platform optimized for a specific end market. These CSSs are pre-integrated and pre-verified configurations of Arm technology that deliver significantly higher value to customers by reducing development costs and time-to-market.").

[70] Chip manufacturing is a complex and highly specialized process conducted at semiconductor fabrication plants, also called foundries or fabs.  "Top 10 Semiconductor Foundries in the World," Cytech Systems, March 13, 2024 https://www.cytechsystems.com/news/top-10-semiconductor-foundries.  The world's largest semiconductor foundry is Taiwan Semiconductor Manufacturing Company ("TSMC"), with a share well in excess of 50%.   Other large semiconductor foundries are Samsung, Semiconductor Manufacturing International Corporation ("SIMC"), and United Microelectronics Corporation ("UMC").  "4Q24 Global Top 10 Foundries Set New Revenue Record, TSMC Leads in Advanced Process Nodes," TechPowerUp, March 10, 2025, https://www.techpowerup.com/333868/4q24-global-top-10-foundries-set-new-revenue-record-tsmc-leads-in-advanced-process-nodes ("[TSMC] secured a 67% market share to maintain its leading position. Samsung Foundry ranked second, […] representing an 8.1% market share.").

23

deployment of CPUs,[71] chips, and solutions across applications such as smartphones, PCs, data centers, automotive systems, and connected devices (IoT).[72]

42.     In the smartphone segment, Arm's ISA is widely used because of its superior power efficiency and the depth of its ecosystem.[73] Arm-based chips are particularly suitable for mobile environments, where energy consumption and thermal performance are critical, and are supported by a mature suite of tools and developer resources.[74]

43.     In contrast, the PC and data center segments have historically been dominated by x86-based architectures, primarily from Intel and AMD. Recent advancements in Arm-based CPUs have begun to challenge this status quo. These custom Arm-based designs offer high performance and energy efficiency, making them increasingly viable in laptops and data servers.[75]

---

[71] Different CPUs are created to meet the specific computing and efficiency needs of the different applications.

[72] Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025, https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation.

[73] Beth Kindig, "Arm Stock: AI Chip Favorite Is Overpriced," Forbes, Mar 21, 2024, https://www.forbes.com/sites/bethkindig/2024/03/21/arm-stock-ai-chip-favorite-is-overpriced/.

[74] Arm 2025 Form 20-F, p. 59 ("The mobile applications processor is the primary chip in a smartphone and runs the operating system and applications in addition to controlling many of the device functions, including gaming, music, video, and any other applications. While high compute performance is required for today's applications, processors also must be highly energy efficient so that the smartphone's battery will last all day without needing to be recharged.").

[75] Melissa Riofrio, "Surface Pro X revealed: Thin, light, and supercharged with a custom SQ1 ARM chip," PC World, October 2, 2019, https://www.pcworld.com/article/398146/microsofts-surface-pro-x-is-thin-light-and-supercharged-with-a-custom-sq1-arm-chip.html ("'With SQ1 we pushed the boundary of an ARM-based 7-watt chipset,' Panay said. While ARM-based laptops PCWorld has tested so far have been lackluster, Panay claimed 'three times more performance per watt than then Surface Pro 6,' as well as over 2 teraflops of power from the custom GPU."). *See also* ARMQC_02749177 at '179.

44.     The IoT and automotive segments present a broader range of requirements, including real-time processing, connectivity, and low power consumption.[76] Here, both Arm and its licensees, including Qualcomm, offer tailored solutions that address the specific needs of these segments.[77]

45.     These segment-specific dynamics are central to understanding the parties' incentives. Qualcomm's diversification strategy targets growth in PCs, automotive, and IoT[78]—segments where Arm's position is evolving and competitive pressure from alternative ISAs, such as x86 and RISC-V, is more pronounced. As a result, the economic implications of Arm's licensing decisions and product strategy vary significantly across segments.

## C.  Arm's Business Model and Licensing Structure

46.     Arm's business model entails developing new technologies as well as the licensing and selling of those technologies. Unlike Intel, which does not license its technologies (except to AMD),[79] Arm has chosen to be more open.[80] Arm licenses its technology through two primary mechanisms, the ALA and the TLA. These agreements reflect different levels of customization and engineering responsibility for licensees and allow Arm to serve a broad range of customers—from those seeking turnkey solutions to those investing in differentiated, custom designs.

---

[76] Arm 2025 Form 20-F, p. 60-61 ("The industrial IoT and embedded semiconductor market includes chips used by a wide range of goods, including washing machines, thermostats, digital cameras, drones, sensors, surveillance cameras, manufacturing equipment, robotics, electric motor controllers and city infrastructure and building management equipment. […] The automotive market includes all chips with processors within vehicles. This includes chips used for in-vehicle-infotainment ("IVI"), advanced driver assistance systems ("ADAS"), engine management, and body and chassis control. Today, our market share in the automotive market is highest in more technologically advanced functional areas such as IVI and ADAS.").

[77] Arm estimated that in 2024 its share of the automotive segment was 41% (based on chip value). *See* "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 11.

[78] *See* Section VII.C.2.

[79] Intel licenses x86 to AMD as the result of a settlement agreement. See "Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025.

[80] Deposition of Richard Grisenthwaite, July 2, 2025 (hereinafter "Grisenthwaite (Arm) Deposition"), 16:17-17:6 ("[…] ARM, as I say in the slide itself, has been involved in the democratization of computing. We have made our technology available in many different ways. Unlike, for example, Intel, we haven't just said buy our chips, we've had architecture licenses, we've had implementations licenses, we've essentially allowed people to come up with their own competitive solutions competing with each other while removing unvaluable differences by having different architectures that are the same in essence but different in detail.").

25

- *Architecture License Agreement ("ALA"):* Under an ALA, Arm licenses the right to use its ISA, allowing licensees to design their own custom CPU cores.[81] Different licensees engage in different stages of the supply chain. For instance, Apple uses the chips it makes in its own products (such as the iPhone), while Qualcomm sells chips to customers such as Samsung (who, in turn, for example, sells the Samsung Galaxy Android smartphones). These CPU cores must remain compliant with Arm's ISA, but the licensee is responsible for developing the implementation. This model allows for greater customization and flexibility but requires additional and significant engineering investment by the licensee.[82] Arm has historically been selective about granting ALA licenses because not all firms are capable of developing an Arm-compliant custom core,[83] and failed development efforts can be costly to both Arm and its customer.[84] Arm granted an ALA license to Nuvia in 2019, and currently has ALA licenses with Qualcomm, Apple, IBM, Google, Microsoft, and a few other customers.[85]

---

[81] Arm explains that developing own customized CPUs based on the ISA is very difficult: "Under an ALA, the licensee is allowed to develop their own highly customized CPU designs that is compliant with the Arm instruction set architecture ("ISA") for a fixed architecture license fee. As the creation of an optimized CPU is very costly and time consuming, architecture licensees will often also license Arm CPU designs to use either as a complementary processor alongside the licensee's Arm-compliant CPU design, or in other chips where the licensee's own design is unsuitable." Arm 2025 Form 20-F, p. 68. *See also,* Arm Holdings plc, Form F-1, August 21, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523216983/d393891df1.htm (hereinafter, "Arm 2023 Form F-1") p. 121 ("With the complexity of CPU design increasing exponentially, over the past decade no company has successfully designed a modern CPU from scratch.").

[82] *See* ARM_00055357 and QCARM_ 0338573 for Arm's 2013 ALA with Qualcomm.

[83] See, for example, Deposition of Rene Haas, July 7, 2025 (hereinafter "Haas (Arm) Deposition"), 185:10-22, explaining that, "[the auto industry is] a market that's been in transition where OEMs are developing chips, not chip companies. And OEMs need a lot of help in terms of developing SOCs because they're not very experienced. So I believe that going to subsystems, which is the amalgamation of all the IP blocks, would be more advantageous to us because it would get us and the customers to market faster."

[84] Deposition of Will Abbey, October 27, 2023 (hereinafter "Abbey (Arm) October 2023 Deposition"), 29:24-30:7 ("So there would be a technical conversation around capabilities because oftentimes just because somebody wants an architecture, they may not know what it takes to make the architecture successful into a product. And so we care passionately about the ecosystem, about making sure our partners are going to be successful, so we talk about capabilities, we talk about risks, we talk about the expertise of the team."). Mr. Grisenthwaite estimates that Arm currently has "between ten and twenty" ALAs but only "about six or seven" ALA partners actively build CPU designs under their ALA, *See* Grisenthwaite (Arm) Deposition, 49:11-24.

[85] *See* footnote 290.

26

- *Technology License Agreement ("TLA"):* Under a TLA, Arm provides licensees with OTS CPU designs, also known as implementation cores.[86] Arm does the engineering work to implement the ISA, and licensees pay to use the pre-designed cores.[87] Because TLA OTS cores and CSS incorporate more Arm R&D, they generally command a higher royalty rate than the ALA. I understand that the vast majority of Arm's commercial relationships are governed by TLAs, which have historically been the standard licensing model adopted by most of Arm's partners.[88]

47.    Recently, Arm has expanded the range of licensing options it offers to customers. In 2019, Arm has also introduced Arm Flexible Access ("AFA"), a "pay-as-you-go" model that offers customers "a wide portfolio of […] Arm technology and tools" with the option of only paying "license fees for IP used in their final chip design and only at the point of manufacture."[89] In 2020, Arm began offering a subscription program called Arm Total Access ("ATA") that provides the "most comprehensive package of IP products, tools and models, support and training, software and physical design"[90] to maximize their customers' success.[91]

---

[86] CSS are generally licensed based on a license specific to a CSS or in the Annex of a broader agreement. Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025.

[87] *See* ARM_00103918 and ARMQC_02772366 for Arm's 2013 TLA with Qualcomm.

[88] ARM_01259705 at '794; Deposition of Simon Segars, November 16, 2023 (hereinafter "Simon Segars (formerly Arm) Deposition"), 29:24–30:7.

[89] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models. See also Deposition of Will Abbey, June 26, 2025 (hereinafter "Abbey (Arm) June 2025 Deposition"), 144:19-145:13 ("At the low end, through ARM Flexible Access, we're giving broader access to our partners because we want to deepen and broaden the ecosystem.").

[90] Abbey (Arm) June 2025 Deposition, 86:22-87:23; "Arm Total Access," Arm, https://www.arm.com/products/licensing/arm-total-access, accessed August 30, 2025 ("Arm Total Access provides the most comprehensive package of IP products, tools and models, support and training, software and physical design in an easy-to-access subscription. Ideal for organizations building complex systems that require multiple Arm products, including the latest Cortex and Neoverse CPUs, Mali GPUs, and CoreLink System IP. The annual subscription includes manufacture rights, as well as full support, training, and development tools.").

[91] ARM_00080472 at '480; ARMQC_02770676 at '677. See also ARM_01294236 at '237, a February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("Greater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time To Market]") and for Arm ("Deeper customer engagement, greater predictability, more design wins, more revenue").

48. Arm's license agreements generally specify that Arm will be paid an upfront license fee and a running royalty based on the number of units sold by the licensee.[92] Royalty rates vary depending on the type of license, the product segment, and the level of customization.

49. Unlike the x86 ISA, which is only used by Intel and AMD to develop CPUs,[93] Arm's ISA is broadly licensed across the industry. This licensing model has enabled a wide range of companies to build Arm-based chips for diverse applications.[94] The RISC-V ISA is an open-source alternative that any implementer is free to use, modify, and deploy without the need to pay an upfront licensing fee or running royalty.[95]

---

[92] Running royalties can be either a dollar amount per-chip sold or a percentage of the chip's selling price. In fiscal year ending in March 2025, Arm had total revenue of $1,241 million, consisting of $607 million in running royalties ("up 18% YoY driven primarily by the continued adoption of the Armv9 architecture, the ramp of chips based on Arm CSS [compute subsystems], and increased usage of Arm-based chips in data centers") and $634 million in "license and other revenue" ("up 53% YoY due to normal fluctuations in the timing and size of multiple high-value license agreements and contributions from backlog"). *See* "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, p. 8, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274.

[93] Paul Alcorn, "Intel and AMD are unlikely allies in new x86 ecosystem advisory group," Tom's Hardware, October 15, 2024, https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward ("The 46-year-old x86 is the most prevalent ISA used for general computing for PCs and data centers, and Intel and AMD are the only two primary x86 architecture licensees that build new processors in high volumes, creating a duopoly." Recently, "Intel and AMD jointly announced the formation of a new x86 advisory group to ensure a unified x86 instruction set architecture (ISA) moving forward [...] Cooperation between the two, with the input of a bevy of customers and end users, will help to build a more unified approach that reduces or even eliminates custom ISA implementations that can be problematic for the duopoly's hardware and software customers. That's becoming even more important as the x86 ecosystem faces intense pressure from Arm in both the consumer and data center markets, not to mention the continuing rise of RISC-V.").

[94] Arm, "The ARM processor business model," https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model, accessed August 22, 2025 ("ARM does not manufacture processor hardware. Instead, ARM creates microprocessor designs that are licensed to our customers, who integrate them into *System-on-Chip* (SoC) devices.").

[95] *See* Section VIII.D.3 for a discussion of current efforts by several large companies, including Qualcomm, to further develop and promote the adoption of RISC-V. RISC-V was developed in 2010 at the University of California, Berkeley as the fifth generation of RISC processors created at the university since 1981. See Roddy Urquhart, "Systems & Design: Opinion, Semiconductor Engineering," March 29, 2021, https://semiengineering.com/what-does-risc-v-stand-for/. In 2015, development and maintenance of the standard was transferred to RISC-V International, a non-profit organization based in Switzerland with more than 4,500 members as of 2025. *See* "About RISC-V," RISC-V International, accessed August 3, 2025, https://riscv.org/about/.

## D. Qualcomm's Business Model

50.     Qualcomm is a leading semiconductor company that designs and develops chip solutions and other software and services for a wide range of applications, including smartphones, personal computers, automotives, wearables, and other connected systems.[96] The company is also a key contributor to the development and deployment of wireless technology, and owns an extensive portfolio of patents.[97] In fiscal year 2024 (ending in September), Qualcomm had total annual revenues of $39 billion, more than 10 times the revenue earned by Arm during the same period.[98]

51.     Qualcomm operates primarily through two business segments:[99]

- *Qualcomm CDMA Technologies ("QCT"):* This segment designs and supplies both chips and system-level solutions.[100] Its portfolio includes products for mobile, automotive, personal computing, extended reality, industrial IoT, and networking applications.[101]

- *Qualcomm Technology Licensing ("QTL"):* This segment manages Qualcomm's IP portfolio, licensing both standard-essential patents ("SEPs") related to cellular technologies such as 3G, 4G, and 5G and non-SEPs to device manufacturers.[102] Qualcomm does not offer licenses to rival suppliers of modem chips, such as Broadcom and MediaTek.[103]

---

[96] SAC, ¶¶ 53-54.

[97] SAC, ¶¶ 53-54. *See also,* Qualcomm 2024 Form 10-K, p. 7.

[98] In the fiscal year ending September 2024, Qualcomm generated $39.0 billion in total revenue, consisting of $32.8 billion from the sale of equipment and services and $6.2 billion in licensing revenue. Qualcomm 2024 Form 10-K, p. 41. During the same period, Arm generated $3.5 billion in total revenue. Arm Holdings plc, Quarterly Results, https://investors.arm.com/financials/quarterly-annual-results.

[99] "Qualcomm Implements New Corporate Structure," Qualcomm Press Release, October 1, 2012, https://www.qualcomm.com/news/releases/2012/10/qualcomm-implements-new-corporate-structure.

[100] Qualcomm 2024 Form 10-K, p. 7.

[101] Qualcomm 2024 Form 10-K, p. 11 ("QCT utilizes a fabless production model, which means that we do not own or operate foundries for the production of silicon wafers from which our integrated circuits are made. Therefore, we primarily rely on third parties to perform the manufacturing and assembly, and most of the testing, of our integrated circuits based primarily on our proprietary designs and test programs.").

[102] Qualcomm 2024 Form 10-K, p. 7.

[103] *See*, for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy

██████████████████████████████

████████████████████████

52. According to Qualcomm's most recent Form 10-K, "QCT's current competitors include, but are not limited to, companies such as Broadcom, HiSilicon, MediaTek, Mobileye, Nvidia, NXP Semiconductors, Qorvo, Samsung, Skyworks, Texas Instruments and UNISOC. QCT also faces competition, which may intensify in the future, from products internally developed by [Qualcomm's] customers, including some of [Qualcomm's] largest customers, such as Apple and Samsung, to early-stage companies."[104] The relative strength of rival firms varies by segment.[105]

53. Qualcomm's chips, including its well-known Snapdragon products, typically integrate Arm-based cores—either custom cores designed under an ALA or OTS cores licensed under a TLA—with Qualcomm's own cellular and wireless networking technology.[106] Qualcomm has

---

Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International. ("Qualcomm licensed its SEPs to original equipment manufacturers ("OEMs") of mobile devices, such Apple and Samsung. Qualcomm did not offer licenses to its SEPs to rival suppliers of modem chips, such as Intel, Broadcom, and MediaTek. Nor did Qualcomm enforce its patents against these rivals, even though their products infringed Qualcomm's SEPs. Instead, Qualcomm chose to collect its SEP royalties further downstream, from OEMs."). Qualcomm's policy of licensing device manufacturers is aimed at collecting higher royalty revenue. See *FTC v. Qualcomm*, Case 17-CV-00220-LHK, Judge Lucy H. Koh, Findings of Fact and Conclusions of Law, pp. 129-130 (reporting that Eric Reifschneider (QTL Senior Vice President and General Manager) "told the IRS that Qualcomm decided to 'concentrate our licensing program and our licensing negotiations on the guys who make the cell phones and the base stations and the test equipment, because that's where the real money is.' […] Thus, when the IRS asked whether Qualcomm's decision to stop licensing its SEPs to rivals was a "business decision," Marv Blecker (QTL Senior Vice President) agreed: 'Oh it's more than that, it's more than that. That's an understatement.' […] Blecker told the IRS that to license rivals would have 'the potential of threatening our entire revenue stream at the handset level.' […] Fabian Gonell (now QTL Legal Counsel and Senior Vice President, Licensing Strategy) agreed that Qualcomm stopped licensing rival modem chip suppliers because Qualcomm had to choose between licensing rivals and OEMs, and licensing OEMs is far more lucrative: 'But having – having to choose between one or the other then you're right, obviously the handset is humongously more . . . lucrative for a bunch of – a bunch of reasons.'").

[104] Qualcomm 2024 Form 10-K, p. 12.

[105] For example, MediaTek is a strong rival in the mobile segment, and Intel and AMD are strong rivals in PC and data centers. *See* Kelsey Ziser, "MediaTek and Qualcomm's rivalry heats up in 5G smartphone market – Omdia," Light Reading, July 16, 2024, https://www.lightreading.com/smartphones-devices/mediatek-and-qualcomm-s-rivalry-heats-up-in-5g-smartphone-market-omdia (citing MediaTek as "Qualcomm's biggest industry challenger."). *See also* Timothy Green, "Qualcomm is Going After Intel and AMD in This Lucrative Market," January 16, 2025, https://finance.yahoo.com/news/qualcomm-going-intel-amd-lucrative-101500205.html.

[106] *See* "Is Snapdragon an ARM Processor? Understanding the Core Technology Behind Qualcomm's Mobile Chipsets," Indian Institute of Embedded Systems, https://iies.in/blog/is-snapdragon-an-arm-processor-understanding-the-core-technology-behind-qualcomms-mobile-chipsets/.

licensed Arm technology since 1997.[107] This includes an ALA signed in 2003, and the current ALA and TLA, both dated May 30, 2013.[108]

54. Although QCT has traditionally focused on the smartphone segment, it is currently pursuing a diversification strategy to expand its sales presence in other applications and end uses.[109] Qualcomm's chips are currently used or are at the development stage in the following segments:

- *Handsets:* Qualcomm chips are widely used in premium and mid-range smartphones, offering integrated connectivity, AI acceleration, and multimedia processing.[110]
- *Automotive:* Qualcomm provides connectivity, infotainment, and advanced driver-assistance systems ("ADAS") solutions.[111]
- *IoT:* Qualcomm supports a diverse set of IoT applications, including PCs, wearables, virtual reality, and industrial IoT.[112]
- *Data center:* Qualcomm's initial effort to supply chips for data center servers was halted in 2018.[113] More recently, Qualcomm has explored Arm-based server processors, particularly through its custom CPU initiatives. In May 2025, Qualcomm announced its

---

[107] Qualcomm is currently one of Arm's largest customers and "accounted for 10% of our total revenue for the fiscal year ended March 31, 2025." *See* Arm 2025 Form 20-F, p. 28.

[108] SAC, ¶¶ 3, 53.

[109] *See* Qualcomm 2024 Form 10-K, p. 44. *See also* "Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, pp. 3-4, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf; "Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, , pp. 2-3, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf.

[110] "Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, accessed August 5, 2025.

[111] Steve McDowell, "Qualcomm's Game-Changing Move Into Automotive And Industrial IoT," Forbes, January 28, 2025, https://www.forbes.com/sites/stevemcdowell/2025/01/28/qualcomms-game-changing-move-into-automotive-and-industrial-iot/.

[112] "Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, accessed August 5, 2025.

[113] *See* "4 Reasons Qualcomm's Data Center Business Failed," The Motley Fool, December 21, 2018, https://www.nasdaq.com/articles/4-reasons-qualcomms-data-center-business-failed-2018-12-21 ("Qualcomm downsized its data center unit in June but denied that it was exiting the market. However, several rounds of layoffs, including one in early December, reduced the size of Qualcomm's data center technologies group from roughly 1,000 employees to about 50.").

first data center chip in partnership with NVIDIA.[114] In July 2025, Qualcomm signed a term sheet with ████ that included plans for a data center chip.[115] According to Qualcomm's most recent July 2025 earnings call, however, it appears that Qualcomm will not begin selling any data center chips before fiscal year 2028.[116]

55.     In March 2021, Qualcomm acquired Nuvia, a startup founded by former Apple and Google chip designers, for $1.4 billion.[117]  Founded in 2019, Nuvia was developing high-performance custom CPU cores for data center applications based on the Arm ISA.[118]  The custom CPUs based on Nuvia technology are expected to power current and future generations of Snapdragon platforms, particularly in premium smartphones, PCs, and ████████████████████

---

[114] Sebastian Moss, "Qualcomm Announces Data Center CPUs, Will Support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025, https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/. In June 2025, Qualcomm announced its intention to acquire Alphawave Semi aiming "to further accelerate, and provide key assets for, Qualcomm's expansion into data centers." *See* "Qualcomm to Acquire Alphawave Semi," Qualcomm, June 9, 2025, https://www.qualcomm.com/news/releases/2025/06/qualcomm-to-acquire-alphawave-semi.

████ ████████████████████████████████████████████████████

[116] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [datacenter] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. If successful, we expect revenues to begin in the fiscal '28 timeframe.").

[117] "Qualcomm Completes Acquisition of NUVIA," Qualcomm Press Release, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.

[118] "NUVIA Raises $53 Million to Reimagine Silicon Design for the Data Center," Globe News Wire, November 15, 2019, https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.html.

[119] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

████████████████████████████████████████

████████████████████████████████████

## IV.  ORIGIN OF THE DISPUTE

56.     The origin of the dispute between Arm and Qualcomm is a contractual disagreement
triggered by Qualcomm's acquisition of Nuvia in March 2021.[120] Arm filed a breach of contract
lawsuit against Qualcomm in August 2022.[121] The present litigation is a closely related follow-on
complaint that Qualcomm and Nuvia filed in April 2024.[122] As part of its UCL claim, Qualcomm
argues, among other things, that the lawsuit that Arm filed in August 2022 is part of a broad
"campaign" to undermine Qualcomm that also involves various other Arm actions (e.g., "making
misleading statements to Qualcomm's customers [...].").[123]

57.     In September 2019, Arm entered into an ALA with Nuvia, a start-up that designed chips
for data centers.[124] ████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[120] The contracts at issue are Arm's ALAs with Qualcomm and Nuvia.

[121] "Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark
Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-
nuvia-for-breach-of-license-agreements-and-trademark-infringement.

[122] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support
of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3.

[123] SAC, ¶ 207.

[124] ████████████████████████████████████████████████████████████.

Nuvia and Arm also entered into a TLA.[127]

58.

Qualcomm's internal calculations support



[127] *See* QCARM_0338297 and QCARM_0275743.

34

███████████████████████████████████████

█████████████████████████████████

████ Arm and Qualcomm also have a TLA.[130]

59.     The different terms in the Nuvia and Qualcomm ALA licenses reflect Arm's approach to licensing, where each license agreement is considered "individually and in the context of the specific needs of the partner, market segment, and end-users, resulting in various license structures."[131]  Arm's contracts with customers "are all unique, given the terms, […] the length of the license, the rights that are granted, so they're […] typically custom,"[132] such that "every different contract is somewhat bespoke."[133]

60.     According to Arm, ████████████████████████████████



[129] ████████████████████████████████████████████

███████████████████████████████████████

[130] The 2013 TLA superseded the original TLA from September 30, 1997. ████████████████████████████████

██████

[131] *See* "Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (No 4-11)," Arm Holdings, July 11, 2025, p. 18.

[132] Haas (Arm) Deposition, 169:20-22.

[133] Haas (Arm) Deposition, 169:7-8.

██ ██████████████████████████████

35

███████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

61.     Qualcomm completed the acquisition of Nuvia in March 2021. Arm contends that the license it granted Nuvia could not be "transferred" to Qualcomm without Arm's consent and that Qualcomm could not use Nuvia's designs built using the Nuvia ALA without Arm's prior consent.[136] Arm further contends that Qualcomm incorporated Nuvia's technology in its custom CPUs without obtaining Arm's consent. Qualcomm disputes that Arm's consent was required, and it also claims that the royalty it should pay on those CPUs is the much lower royalty rate in Qualcomm's ALA (a claim that Arm has disputed), rather than the significantly higher rate in Nuvia's ALA.

62.     Unable to reach an agreement with Qualcomm on the transfer of Nuvia's Arm-based technology, Arm terminated its licenses with Nuvia on February 1, 2022, and requested that Qualcomm destroy and stop using custom chips based on Nuvia's technology pursuant to the terms of the Nuvia ALA.[137] On August 31, 2022, Arm filed the *Arm v. Qualcomm* litigation.[138] After filing the lawsuit, Arm made public statements and corresponded with customers informing them of the lawsuit, explaining its reason for initiating the litigation and its belief that Qualcomm was in breach of Nuvia ALA.[139] Qualcomm initially filed a lawsuit concerning the Qualcomm ALA in

---

[135] Arm's Opening Statement in *Arm v. Qualcomm*, December 16, 2024, 109:4-12. ███████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████
██ █████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

[137] QCARM_0338883.

[138] "Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement.

[139] *Ibid. See also,* examples of Arm's correspondence with customers about the lawsuit, ARM_01238895, ARM_01230977, ARM_00110511.

36

████████████████████████████████

████████████████████████

April 2024.[140] Qualcomm amended its claims to add the claims addressed by Prof. Posner in
December 2024 and April 2025.


## V. PROF. POSNER'S ANALYSIS OF THE RELEVANT MARKETS AND MARKET POWER IS INCOMPLETE AND IGNORES KEY FEATURES OF THE INDUSTRY

63.     Prof. Posner does not explicitly conduct a "market definition" exercise, nor does he
explicitly define the relevant product or geographic market, as for example specified in the U.S.
merger guidelines.[141] His perfunctory analysis is superficial, and while he mentions some
analytical tools that economists generally employ to delineate the relevant antitrust markets, he
does not undertake those analyses himself.[142] The methods that economists use to define a relevant
antitrust market receive little more than a sentence in his report, yielding an analysis that is
insufficiently connected to the facts to produce a reliable conclusion.[143]

---

[140] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3.

[141] *See,* for example, U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf, § 3, p.3 ("In any merger enforcement action involving a vertical merger, the Agencies will normally identify one or more relevant markets in which the merger may substantially lessen competition.").

[142] Prof. Posner does not use the Hypothetical Monopolist Test or the "Small but Significant Non-transitory Increase in Price" ("SSNIP") Test, which are common methods used by economists to identify a group of products that constitute a relevant antitrust market. *See* U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, § 4.3.A (explaining that the Hypothetical Monopolist Test "is a method by which the Agencies often define relevant antitrust markets," and describing the SSNIP Test.).

[143] For example, in paragraph 58, Prof. Posner states that "Arm's dominance is widely recognized by the industry," which may be a hint to the "industry or public recognition of the submarket as a separate economic entity" discussed in the U.S. merger guidelines (U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, p. 41). However, Prof. Posner does not consider that, as recently discussed by Prof. Hovenkamp, "industry recognition, might be right depending on what the industry is recognizing. If they are looking at their closest price competitors, then this factor might provide a crude metric but certainly not as precise as the HMT. Other factors, such as a product's 'peculiar characteristics and uses' are so generic that they do not provide much guidance." Herbert Hovenkamp, "Antitrust Market Definition: the Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, https://www.networklawreview.org/hovenkamp-market-definition/. Prof. Posner's mention of an article on the CNBC website stating that "Arm has become the dominant company making this chip architecture, and it powers nearly every smartphone today" (Posner Report, footnote 95) falls far short of the fact-intensive investigation

64.     Prof. Posner seems to posit a market for the supply of Arm's ISA, reaching the conclusion that Arm "has a monopoly or a dominant position" because Arm is the only supplier of its own ISA.[144] For example, he states:

- "Arm has a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA."[145]

- "Chip designers who make Arm-compliant chips for mobile phones and certain other products do not treat non-Arm ISAs as substitutes for the Arm ISA."[146]

- "Arm's ISA has no rivals at all in the Arm ecosystem for the simple reason that Arm demands that a license is necessary to design and sell Arm-compliant SoCs or cores."[147]

65.     Prof. Posner is non-committal and vague about whether he concludes that there is a single market for the supply of the Arm ISA as opposed to separate markets for different applications. Concerning the chip applications, he appears to define multiple markets because different applications have different requirements.

66.     In Prof. Posner's theory, Arm can exercise its "monopoly power" to foreclose Qualcomm (and any other customers), potentially leading to higher prices or lower quality for Arm-based chips.[148] This Section of my report explains how Prof. Posner's market definition provides a biased view that ignores important competitive constraints that Arm faces.

---

underlying reliable market definition exercises. *See*, for example, U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, 2006, https://www.justice.gov/d9/383663.pdf, at p. 3 ("Investigations Are Intensively Fact-Driven, Iterative Processes."). Further, in the very same paragraph 58, as well as again in his paragraphs 11 and 64, Prof. Posner in fact acknowledges that Intel x86—not the Arm ISA—is dominant in key chip applications including data center and personal computers, directly undermining his sweeping claim that "Arm's dominance is widely recognized by the industry."

[144] Posner Report, ¶ 11.

[145] Posner Report, ¶ 11.

[146] Posner Report, ¶ 33. Prof. Posner does not identify these "certain other products." *See* also *id.*, ¶ 30 ("In the course of its analysis [of the proposed Nvidia acquisition of Arm], the FTC noted that there are no close substitutes for ARM's ISA.") and ¶ 55 ("Firms that produce Arm-compliant SoCs and cores under one of the Arm licenses cannot substitute to non-Arm ISA licenses if Arm raises the price of its licenses substantially above marginal cost.").

[147] Posner Report, ¶ 58.

[148] Posner Report, ¶ 70.

38

## A.  Prof. Posner Improperly Disregards the Competitive Constraint from the x86 and RISC-V Ecosystems

67.     Prof. Posner's analysis completely disregards competition from the x86 and RISC-V ecosystems. He appears to exclude Intel's x86 because it is not licensed to third parties.[149] Despite acknowledging that "RISC-V is a threat to Arm's dominance,"[150] he excludes RISC-V due to its current limitations.[151]

68.     Prof. Posner's analysis is incomplete and misleading. Irrespective of whether Arm is a "monopolist" in a purported upstream market for the supply of Arm's ISA (as Prof. Posner asserts, without any analysis), the Arm ecosystem does in fact face competition from the x86 and RISC-V ecosystems. Any material deterioration in the value provided by the Arm ecosystem will disincentivize the development of Arm-based technologies for current and future applications, incentivize the development of alternative ecosystems, and push companies towards alternative ecosystems so that Arm-based chips can be displaced by non-Arm-based chips.[152] Prof. Posner recognizes this in his report but ignores its implications for his analysis.[153] While Prof. Posner

---

[149] Posner Report, ¶ 55 ("Firms that produce Arm-compliant SoCs and cores under one of the Arm licenses cannot substitute to non-Arm ISA licenses if Arm raises the price of its licenses substantially above marginal cost.").

[150] Posner Report, ¶ 78. I note that Prof. Posner asserts that Arm "may raise upstream barriers of entry against upstarts like RISC-V" and as evidence he claims "Arm has attempted to spread 'fear, uncertainty, and doubt' about RISC-V. Among other things, Arm launched a website with the web address 'riscv-basics.com,' which was 'designed to plant seeds of doubt in the minds of developers who might use RISC-V as their processor architecture instead of Arm.'" What Prof. Posner failed to mention is that the source document he cites makes clear the website was only live for a single day: "The website was taken down a day later, after uproar from angry Arm engineers in Cambridge." *See* QCVARM_1066820 at 7165 (document cited by Prof. Posner). *See also* Chris Williams, "Up in arms! Arm kills off its anti-RISC-V smear site after own staff revolt," The Register, July 10, 2018, https://www.theregister.com/2018/07/10/arm_riscv_website/ ("Arm has taken offline its website attacking rival processor architecture RISC-V within days of it going live – after its own staff objected to the underhand tactic. […] If anything, the site made RISC-V sound like a viable alternative to Arm's crown, giving the upstart architecture more credibility.").

[151] Posner Report, ¶ 35 ("because of the enormous complexity of coordination among multiple firms necessary to move from one network to another, RISC-V is unlikely to displace Arm's ISA in most sectors, including mobile and other sectors that require high-level operating systems, for many years, if ever.").

[152] *See,* for example, Armstrong, Mark, "Competition in Two-Sided Markets," 2006, RAND Journal of Economics, Vol. 37, No. 3.

[153] Posner Report, ¶ 90 ("As the industry observes Arm's mistreatment of Qualcomm, firms will become less willing to invest in the Arm ecosystem. Their incentives to invest are reduced because the more successful they are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them. […] Rather than invest in new Arm-compliant products, firms will look for ways to escape the Arm ecosystem, for example, by



acknowledges that "RISC-V is a threat to Arm's dominance, as Arm is well-aware,"[154] he fails to account for it as a current and future competitive constraint.[155]



Evidence also shows that Qualcomm has already adopted RISC-V in some applications, such as microcontrollers, and it has announced developing a RISC-V application processor for wearables.[159]

---

collaboratively or unilaterally developing an alternative ISA. The early development of the open-source ISA, RISC-V, may reflect this concern.").

[154] Posner Report, ¶ 78.

[155] The inference that Prof. Posner seems to draw from the fact that Arm sees RISC-V as a threat is that this creates an incentive for Arm to anticompetitively harm RISC-V. However, he provides no evidence. In the absence of evidence, the most likely scenario is that harm to rivals is just competition at work. In *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945), Judge Hand famously captured the idea that competition harms rivals by stating that it would be contrary to the spirit of the antitrust laws to punish a firm that led to the exit of its rivals as a result of its "superior skill, foresight and industry. [...] The successful competitor, having been urged to compete, must not be turned upon when he wins."

[156]



[159] *See* Section VIII.D.3. *See also* Francisco Cheng, "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential; "Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC-VInternational (Manju Varma (Qualcomm) stating: "To date, we have shipped over 650 million RISC-V cores in the market and this number just keeps growing. [...] We have shipped RISC-V cores in PC, mobile, automotive, XR, and wearable segments."); "Qualcomm to Bring RISC-V Based Wearable Platform to Wear OS by Google," Qualcomm, October 17, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-to-bring-risc-v-based-wearable-platform-to--wear-os-by-; "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 8:59, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational (Ziad Asghar (Qualcomm) stating: "[T]his was a couple of weeks ago where we talked about our engagement with Google. What we're going to be doing is to be creating a product for wearables which is a smartwatch that actually uses RISC-V as the application processor.").

40

████████████████████████████████████████████

        ██████████████████████████████████

69.     Furthermore, Qualcomm has been "very active in development" of RISC-V and has
invested in it,[160] stating internally, ████████████████████████████████████████

████████████████████████████████████████████████████ [161] For example, the current Chair
of the Board of Directors for RISC-V International is Lu Dai, Qualcomm's Senior Director of
Engineering,[162] and Qualcomm is a founding member of Quintauris, a joint venture formed with
other major semiconductor companies (Bosch, Infineon, Nordic Semiconductor, NXP, and
STMicroelectronics) "to accelerate the development and commercialization of RISC-V–based
products."[163] In addition, many of the largest firms in the tech sector collaborate to develop
software for the RISC-V ISA through the RISC-V Software Ecosystem, or "RISE," which "is a
collaborative effort led by industry leaders with a mission to accelerate the development of open
source software for the RISC-V architecture."[164] Members of RISE include Nvidia, Samsung,
Qualcomm, Google, MediaTek, Red Hat, Alibaba, and others.[165]

---

[160] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, p. 29 (Amon touting Qualcomm's role in the development of RISC-V: "Look, there has been quite a bit of development on RISC-V. I think also, there was a desire to actually drive RISC-V towards high performance and commercialization. As a matter of fact, I think we've been very pleased at Qualcomm being elected to chair, I think the standard body right now, we have been very active in development. There's a number of other companies and ecosystems. I think we have a joint venture called Qu[i]enta[u]ris, which is a really focus of that with some of the European semiconductor company. It will take time, but I think it's encouraging to see development on RISC-V, especially as not a lot of love, I think, to semiconductor companies from the other ecosystem [Arm]. I think that's an accelerate, accelerating. I think the R&D on RISC-v [sic] across the board.").

[161] ██████████████████████████████

[162] "RISC-V International Governance," RISC-V, https://riscv.org/about/board/, accessed August 13, 2025. In addition, Larry Wikelius, Senior Director at Qualcomm, is a member of the Governing Board of RISC-V Software Ecosystem industry consortium (according to "Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025.). "The RISC-V Software Ecosystem (RISE) project is a collaborative effort led by industry leaders with a mission to accelerate the development of open source software for the RISC-V architecture" (see "Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025.).

[163] "Quintauris: Accelerating RISC-V Innovation for next-gen Hardware ," November 4, 2024, https://www.quintauris.eu/quintauris-accelerating-risc-v-innovation-for-next-gen-hardware.

[164] "Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025.

[165] "Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025.

███████████████████████████████████████████

████████████████████████████████

70.  █████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████ ██ ████████████████████

██████████████████████[167]

71.     Qualcomm's dispute with Arm seems to have increased Qualcomm's effort to support RISC-V.[168] ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████[169] While RISC-V does not appear to currently compete in certain applications, such as mobile, it may become a viable alternative in the future.[170] ███████████████████████████

████████████████████████████████████████████████

---

[166] ████

██ ██████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████

[168] *See* Section VIII.D.3.

[169] ████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

[170] ██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

The relevance of future competition is acknowledged in the U.S. Merger Guidelines, which state that "[f]irms not currently supplying products in the relevant market, but that have committed to entering the market in the near future, are also considered market participants." U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, § 4.4.A.

███████████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████ ███ This threat of future competition is
particularly relevant since Prof. Posner's foreclosure story relies on a claim that Arm aims to steer
Qualcomm away from designing custom cores, accepting "short term" royalty losses in favor of
higher "long term" margins from licensing or selling its own cores and chips.[172] Prof. Posner does
not consider that these "long term" benefits may not materialize because of competition from
RISC-V or x86. [173]



[172] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm
loses royalties on those custom cores in the **short term**, because Arm's margins on selling and/or licensing its own
cores, chips and SoCs would be higher in the **long term** than the margins on existing ALA licenses." (emphasis
added)).

[173] *See*, for example, ARMQC_02726982, a January 2024 presentation from Arm tracking RISC-V progress as well
as the "risks [that] RISC-V poses to Arm" and "key market problems" arising from the adoption of RISC-V. The
presentation shows evidence that the RISC-V ISA competes with Arm ISA in several lines of business. For example,
at '985 to '989, it highlights in automotives, RISC-V is "encroaching R & M for all automotive" and "SIPs [silicon
providers] building their own ecosystem making RISC-V credible," in IoT, Arm needs to "continue investing in the
Ecosystem to maintain its leadership" in response to the "growing [RISC-V] ecosystem," and in data center, "RISC-
V has gained traction as preferred arch[itecture] amongst CPSs and Infra startups to build custom datacenter class AI
hardware accelerators for training/inference," where RISC-V competitors have developed full systems targeted
towards data centers. At '991, Arm further identifies "[l]oss of [s]martwatch [m]arket" and "[p]artnership between
Google and QCOM" where Arm needs to "[u]nderstand why the customer is migrating to RISC-V."
ARMQC_02748499 at '501, a September 2021 presentation titled "IPG Risk Profile," identifying the risk that "x86
architecture leverages its dominant position in servers and PCs to compete against ARM in core or growth
markets."; ARM_00076604 at '605 and '637 (October 2021 presentation titled "Infrastructure LoB: Business and
Strategy Review," identifying a "[t]echnology gap with Intel and AMD" in data centers, and stating that
"[e]xecution of planned technology roadmap with speed of light integration of customer feedback is important -
depending on our customers to bring much of the innovation AMD and Intel are trying to bring to the market.").

43

██████████████████████████████████████

████████████████████████████████

72.     In reality, the critical threat of future competition from RISC-V, which has the benefit of being a freely available open source ISA, acts as a constraint on Arm today.[174] To illustrate the flaw in Prof. Posner's reasoning, consider that—by his logic—Intel would be a vertically integrated monopolist supplier of the x86 ISA.[175] Yet,  this has not protected the x86 ecosystem from Arm's expansion in applications such as PCs and data centers where x86 once accounted for nearly 100 percent of sales.[176]

73.     Regardless of whether Prof. Posner is correct in calling Arm the "monopolist" supplier of its own ISA, his failure to account for competitive constraints from non-Arm ISAs is a fatal flaw. It matters little whether x86 and RISC-V ISAs are, formalistically, included in the same market as

---

[174] See ARMQC_02600713 at '716 (In the context of a December 2022 Arm internal discussion about RISC-V, Peter Greenhalgh, SVP of Technology at Arm, stated: "In the IoT and Embedded world, the quality and PPA [Price, Performance, Area] of our [Arm's] CPU offerings will not be sufficient to offset the massive pricing pressure we would come under the myriad of small RISC-V IP companies and internal developments."). Arm has recognized that the competitive threat from RISC-V is related to Arm's own strategic business decisions. For example, when Arm was considering a "direct-to-OEM business model," it was concerned that such an approach would lead to increased RISC-V adoption. See ARMQC_02739661 at '661 and '671 (A 2021 Arm "[w]orking draft strategic narrative to support the FY22-FY25 financial plan which is the cornerstone of our Initial Public Offering" highlights "Key risks to the plan[:] […] In this section, we dive into the risk that the drive by Arm to a direct-to-OEM business model will push OEMs to look elsewhere, either to competing Arm-architecture products (e.g., Qualcomm's own designs), or products based on the x86 or RISC-V architectures. If this happens in a material way, it can be catastrophic to Arm delivering on its business goals, valuation and growth plans. The direct-to-OEM business model project needs to monitor for signs that companies are seriously considering alternate investments. The 'stickiness' of Arm's architecture and ecosystem mitigates this risk somewhat, but we estimate that the industry would only need to spend $5Bn to create a credible Android smartphone alternative to Arm from RISC-V.").

[175] Or a duopoly if accounting for AMD, who receives a license to x86 as part of a settlement agreement. See Greg Tang, "Intel and the x86 Architecture: A Legal Perspective," The Harvard Journal of Law & Technology, January 4, 2011, https://jolt.law.harvard.edu/digest/intel-and-the-x86-architecture-a-legal-perspective. In either case, Arm would not be part of the market that Prof. Posner's approach would imply.

[176] Based on Counterpoint Research estimates, x86's PC share in 2019 was 99% (with Intel at 84% and AMD at 15.1%), with Arm at less than 1%. See Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027. For data centers, see Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html; Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market. Prof. Posner claims that "Arm's ecosystem is protected by entry barriers." See Posner Report, ¶ 57. However, as I describe in detail in Section VIII.D.2 below, even in industries that are, in "theory," characterized by network effects and entry barriers, incumbent monopolists often face competition from entrants, as Arm's recent entry into data centers and PCs illustrates.

Arm's ISA or treated as competitive constraints outside of that market.[177] The bottom line is the same. The x86 and RISC-V ecosystems competitively constrain Arm.

74.     In data centers, Prof. Posner acknowledges competition among chip suppliers using alternative ISAs. He reports that "Intel's x86 still dominates the data center sector a with [sic] roughly 84% share"[178] and acknowledges that "in some sectors, like data centers and compute [PCs], OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips." [179] However, as I discuss in Section VII.C, he fails to consider the implication of competition between chips that use x86 and RISC-V architecture on Arm's incentives to foreclose its customers of its ISA. Prof. Posner's failure to account for competitive pressure from the x86 and RISC-V ecosystems undermines the credibility of his analysis.

## B.  Arm's ISA Share Varies Significantly Across Chip Application Segments

75.     Prof. Posner is non-committal and vague about whether he concludes that there is a single market for the supply of the Arm ISA as opposed to separate markets for different applications. Concerning the chip applications, he appears to define multiple markets because different applications have different requirements.[180]

76.     Prof. Posner does not account for the fact that Arm's share varies significantly across application segments. Arm is very successful in smartphones, but it has a much lower share in other segments such as PCs, data centers, and IoT. The chart below shows that Arm estimates the current share of Arm-based technology for the "mobile applications" segment (i.e., smartphones)

---

[177] For example, *see* Shapiro, Carl, "Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case," Review of Industrial Organization, 2021, Vol. 59, pp. 303–341 (at 306, "Readers who are accustomed to studying horizontal mergers may wonder where market definition and market shares fit into this framework. The short answer is that market shares are less informative for studying vertical mergers than they are for studying horizontal mergers, so using market shares as a screen does not work well." (emphasis in original)).

[178] Posner Report, ¶ 64.

[179] Posner Report, ¶ 58. Posner further acknowledges competition in those sectors, recognizing that "the Arm ISA is rapidly gaining share in some of those sectors, including data centers."

[180] Posner Report, ¶ 12 ("Within the Arm ISA ecosystem, there are multiple SoC sectors because the OEMs demand different kinds of SoCs for their different computing products."), ¶¶ 60-61 ("As the requirements of each sector are unique, the SoCs are sector-specific. […] In each sector, Qualcomm faces varying degrees of competition from other chip makers.").

45

to be nearly 100%.[181] Excluding "Other Mobile" applications,[182] Arm's average share across other segments is 37%,[183] ranging from 15% in "Other Infrastructure" to 50% in "IoT & Embedded."[184] Smartphones and "Other Mobile" segments, where Arm has a share in excess of 50%, represent only 24% of all of Arm's segments ("Total Opportunity").



Royalty: Gaining Share in a Massive Market

---

[181] "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, p. 11, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553. For a definition of the various segments, see Arm 2025 Form 20-F, pp. 59-61.

[182] Arm explained that "mobile phones contain many chips beyond the main applications processor, including the modem, Wi-Fi, Bluetooth and NFC connectivity chips, GPS chips, touchscreen controllers, power management chips, camera chips, audio chips and more, which we refer to collectively as the 'other mobile chips market.'" Arm 2025 Form 20-F, p. 60.

[183] This average share is weighed by dollars.

[184] Including "Other Mobile," Arm's average share across all segments other than smartphones is 40%. Concerning definitions: "Other Infrastructure refers to the technological components and systems that support various aspects of computing, networking, and data processing and include chips deployed into HPC systems, enterprise servers, and edge networking equipment," and "[t]he industrial IoT and embedded semiconductor market includes chips used by a wide range of goods, including washing machines, thermostats, digital cameras, drones, sensors, surveillance cameras, manufacturing equipment, robotics, electric motor controllers and city infrastructure and building management equipment." Arm 2025 Form 20-F, p. 60.

77.     Prof. Posner notes that the "Arm ISA is rapidly gaining share in certain sectors, including data centers."[185] Such growth reflects competitive success. Arm is not being handed market share by competitors such as Intel's x86; instead Arm is gaining share through sustained R&D investment and innovation by Arm and its partners.[186] As I discuss in Section VIII.D.1, Arm invests a larger share of its revenue in R&D than either Qualcomm or Intel.  Furthermore, Prof. Posner does not explain why Arm's growth in these applications would not put more pressure on rivals to innovate in seeking to preserve their sales, and why Arm's growth would thus not be procompetitive.

78.     In summary, Prof. Posner's analysis rests on an incomplete and speculative framework that ignores competitive constraints due to OEM customers being able to choose among chips that rely on different ISA ecosystems. He does not adequately address the significant variation in Arm's market share across application segments, nor does he explain how Arm's competitive gains—particularly in areas like data centers—reflect innovation and investment rather than market power. By overlooking these dynamics, Prof. Posner fails to account for the procompetitive implications of Arm's growth and the ongoing pressure it places on rivals to innovate, which undermines any suggestion of dominance or lack of competition in the broader ISA landscape.

## VI. PROF. POSNER AND DR. KENNEDY PROVIDE NO EVIDENCE THAT QUALCOMM HAS SUFFERED HARM FROM ARM'S ALLEGED ANTICOMPETITIVE CONDUCT

79.     Prof. Posner claims that Qualcomm was harmed in various ways by Arm's conduct.[187] The SAC states that, as a result of Arm's "unlawful and unfair business acts and practices," Qualcomm

---

[185] Posner Report, ¶ 58.

[186] ARM_00118635 at '641 (April 2020 internal Arm presentation discussing that it has "proactively increased its R&D investments to capture market share in new markets such as Servers, Cloud & Edge, Networking, AI/ML; Automotive, IoT, etc.") and ARM_01282304 at '314 (a 2018 Arm presentation reporting R&D as a percentage of revenue going back to 2005 and showing an increase in 2016-2017 compared to prior years.).

[187] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

47

"has suffered or faces the threat of loss of profits, customers, and potential customers" and "has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct."[188]

80.    Neither Prof. Posner nor Dr. Kennedy provide any supporting evidence of lost business opportunities. Prof. Posner claims that, due to Arm's conduct, "Qualcomm *may* […] find it difficult to believe, or to convince its customers, that it can continue to rely on Arm to comply with the licenses in good faith."[189] His statement is a theoretical possibility for which he provides no evidence. Dr. Kennedy purports to estimate Qualcomm's lost profit from a change in the Qualcomm ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[190] However, Dr. Kennedy merely compares the term sheets before and after the Breach Letter and, as he himself acknowledges, his analysis does not causally link the changes in the terms to Arm's allegedly anticompetitive conduct.[191]

81.    In this Section, I show that there is no real-world compelling evidence of harm to Qualcomm. Qualcomm has continued to grow and experience strong financial performance since its acquisition of Nuvia in March 2021 and public awareness of the lawsuit in August 2022, and it forecasts strong financial performance going forward. As a general matter, to the extent possible, economists determine damages based on a comparison between the actual world with the alleged anticompetitive conduct and the counterfactual or "but-for" world without that conduct.[192] While my analysis tracks the evolution of Qualcomm's profitability over time and does not construct a but-for scenario, it does provide real world evidence that, contrary to Prof. Posner's claim that Arm's conduct would cause Qualcomm to be "badly wounded,"[193] Qualcomm's profitability

---

[188] SAC, ¶¶ 210-211.

[189] Posner Report, ¶ 65 (emphasis added).

[190] Kennedy Report, ¶¶ 130-137.

[191] Kennedy Report, footnote 317 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[192] Damages reflect the reduction in profits caused by the alleged anticompetitive conduct.

[193] Posner Report, ¶ 78.

48

improved. In these situations, Plaintiff experts often raise the possibility that the Plaintiff's profitability would have improved even more in the absence of the allegedly anticompetitive conduct (and that thus the Plaintiff was harmed even while its performance improved over time). In this case, however, neither Prof. Posner nor Dr. Kennedy construct a but-for world or provide any evidence based on market prices or terms and conditions for an actual license (as opposed to a term sheet that merely reflects Qualcomm's aspirations at a certain point in the negotiating process).[194]

## A. Qualcomm's Strong Financial Performance Since the Acquisition of Nuvia

82.     Prof. Posner opines that Arm has engaged in a "broad [] scheme" to "undermine Qualcomm's ability" to compete within the Arm ISA ecosystem.[195] He claims that Arm is "obstructing" Qualcomm's ability to design custom cores under its ALA, thereby coercing Qualcomm into relying on Arm's OTS cores licensed under the TLA, which carry higher royalty rates and margins. He further alleges that, if successful, Arm will be able to "extend [] its dominance over the Arm ISA ecosystem, leaving it with not only control of the ISA itself and the design and sale of its own cores, but also with a significant role in designing and selling SoCs." [196] This claim is unsupported by evidence.

83.     Qualcomm has grown dramatically since it acquired Nuvia in March 2021. Qualcomm's total revenue increased more than 38% from Q1 2021 to Q1 2025, while its operating profit increased by 44%, as shown in **Exhibit 1** and **Exhibit 2** below. In the QCT segment, Qualcomm's

---

[194] To be clear, I do acknowledge that a number of factors impact how Qualcomm's profits evolve over time, and that thus my analysis does not isolate the effect of Arm's conduct. However, the lack of any evidence of harm to Qualcomm in the data I do analyze contrasts with the lack of any compelling, real-world evidence in Prof. Posner and Dr. Kennedy's analyses.

[195] Posner Report, ¶¶ 13-14.

[196] Posner Report, ¶¶ 13-14, 17, 71.

revenue increased over 50% and its net income before taxes increased 80% over the same time period.[197]

## Exhibit 1: Qualcomm Revenue (USD in billions)[198]

### By Business Segment, 2019-2025Q2



—— QCT Revenue    – – QTL Revenue

---

[197] Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

[198] Note: Excludes a *de minimis* amount of Qualcomm Strategic Initiatives (QSI) revenue and other revenue. Source: Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

**Exhibit 2: Qualcomm Operating Profit (USD in billions)**[199]

2019-2025Q2



84.    Moreover, over the past two years, Qualcomm repeatedly and publicly touted its robust current and forecasted financial performance, particularly in its QCT segment (which includes its chip business). In a series of recent earnings calls, Qualcomm's senior executives described the

___

[199] Source: Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

company's strong financials.[200,201,202,203]  To cite just one example, in its February 2025 earnings call, Cristiano Amon, Qualcomm's President and Chief Executive Officer, said:

> *In fiscal Q1, we delivered record revenues of $11.7 billion in non-GAAP earnings per share of $3.41. Our chipset business achieved record revenues of $10.1 billion, the first*

---

[200] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, pp. 1, 23-24, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf. (Akash Palkhiwala, Qualcomm's Chief Financial Officer and Chief Operating Officer, described Qualcomm's strong growth over the past five years: "So we picked fiscal [year] [20]19 as the starting point so we can get rid of the Covid. Complexity and the ups and downs inventory, build bleed that it introduced. So over the last five years, how have we done our revenues have doubled EPs has tripled very strong performance. This performance validates our strategy and it provides a strong foundation to accelerate growth and diversification. From this point on. Now if you look at Qct [sic], our chip business, for the same metrics, we've more than doubled revenue. There and we've increased our operating margins from 15% to 29%, very closely aligned with the long term target of 30% that we've set. We also saw very strong growth in our revenue streams, 31% CAGR in automotive, double digit growth in handset and IoT, as well in handsets. If you abstract out the share gain at Apple and look at Android, we grew low double digits in Android as well. So very strong performance across the board, across our portfolio." He similarly described Qualcomm's strong growth in fiscal year 2024 (i.e., October 2023 through September 2024): "So fiscal [year] 24, we delivered very strong results, very strong execution. Revenue grew by 9%, EPs grew by 21%. And that shows the operating leverage in the business.").

[201] "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025,  pp. 5-6, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf. (Mr. Palkhiwala stated: "We are pleased to announce revenues of $11.7 billion and non-GAAP EPS of $3.41, both of which were above the high end of our guidance. […] QCT delivered record revenues of $10.1 billion, which was above the high end of our guidance on outperformance across Android handsets, IoT, and automotive. QCT handset revenues were a record $7.6 billion with 13% year-over-year growth, reflecting higher volume and content increase in Android premium tier, driven by industry-leading performance of our newly launched Snapdragon 8 Elite platform. […] Lastly, we returned $2.7 billion to stockholders, including $1.8 billion in stock repurchases and $942 million in dividends. […] In closing, we are very pleased with our strong first-quarter results with new records across the following metrics: total company revenue, non-GAAP EPS, QCT revenues, QCT Handset revenues, and QCT Automotive revenues.").

[202] "Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, pp. 2-3 and 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf. (Mr. Amon stated: "In fiscal Q2, we delivered non-GAAP revenues of $10.8 billion and non-GAAP earnings per share of $2.85. Revenues of $9.5 billion from our chipset business were driven by strength across handsets, automotive and IoT, all exceeding revenue expectations. Automotive and IoT revenues increased 59% and 27% year-over-year, respectively. Licensing business revenues were $1.3 billion. Demand for our industry-leading platforms continues to expand as high-performance connectivity and processing at the edge are increasingly important, and AI becomes more pervasive across industries. We have the industry's broadest product and IP portfolio, a strong track record of establishing a technology leadership position in every industry we enter and a clear vision for the future." Mr. Palkhiwala further described Qualcomm's strong overall financial performance: "In closing, we are very pleased with our strong results in the first half of fiscal '25, with revenue and non-GAAP EPS growth of 17% and 21%, respectively, versus a year ago period.").

[203] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 5, 9, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Palkhiwala stated: "QCT Handset revenues increased 7% year over year to $6.3 billion, reflecting

52

*$10 billion quarter for QCT, including record quarterly Handset and Automotive revenues. Licensing business revenues were $1.5 billion. We're off to a great start in fiscal '25. Our mobile roadmap is the strongest in our history, with exceptional traction for Snapdragon in premium tier handsets, and we are delivering growth across our diversification initiatives. This quarter, Automotive and IoT revenues grew 61% year over year and 36% year over year, respectively. We're committed to achieving $22 billion on non-handset revenues by 2029 as outlined in our 2024 Investor Day.*[204]

85.    Over the longer term, Qualcomm forecasts that its IoT (i.e., PCs, mixed and virtual reality, industrial, networking, and tablets, headphones, and smartwatches)[205] revenue will increase from $5.4 billion to $14.0 billion by fiscal year 2029, an increase of over 150%.[206] For automotive,

[204] "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, pp. 3 and 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf. (Mr. Amon also discussed the strong performance of Qualcomm's licensing business: "Finally, we remain very pleased with the execution of our QTL business in recent years, and we're well positioned to maintain fiscal '24 revenue scale going forward. Over the past year, we have extended key agreements with major OEMs, and we're poised to shortly execute new long-term license agreements with two additional large OEMs.").

[205] Qualcomm defines IoT as follows: "In IoT, our inventions have helped power growth in industries and applications such as consumer (including personal computers (PCs), tablets, voice and music and extended reality (XR)), edge networking (including mobile broadband and wireless access points) and industrial (including handhelds, retail, tracking and logistics and utilities)." *See* Qualcomm 2024 Form 10-K, p. 6.

[206] Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, p. 20, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf.

53

Qualcomm is forecasting "strong revenue growth" with revenue increasing from $2.9 billion to $8.0 billion by fiscal year 2029, an increase of approximately 175%.[207]

86.     Prof. Posner and the SAC do not discuss this real-world evidence. Qualcomm's success in the marketplace undermines its claim that it was "harmed" by Arm's communications with its customers.[208] It also casts doubt on Qualcomm's claim that it suffered harm due to Arm's alleged failure to provide certain "deliverables" that Qualcomm was allegedly entitled to receive.[209] Even

---

[207] Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, p. 12, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf. Qualcomm does not appear to have provided long-term forecasts for handsets. Apple is transitioning to its own in-house modem, which may lead to a reduction in Qualcomm revenue, although in its latest earnings call Qualcomm still forecasted growing handset revenue. *See* "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf ("We anticipate QCT Handset revenues to grow approximately 5% sequentially, consistent with typical historical trends, despite lower Apple revenues."). *See* Rashika Singh, "Qualcomm shares slide as Apple modem shift, tariffs raise growth concerns," Yahoo Finance, July 31, 2025, https://finance.yahoo.com/news/qualcomm-shares-slide-apple-modem-085843911.html ("The San Diego-based chip supplier warned investors that Apple's move to depend on in-house modems, starting with the February launch of the iPhone 16e would hit future chip revenue.").

[208] SAC, ¶ 34.

[209] *See* SAC, ¶ 184 ("Arm withheld deliverables that it was required to provide Qualcomm under the QC ALA") and

---

████████████████████████████████████████

███████████████████████████████

if those claims were true, there is no evidence that Qualcomm's performance and market success were adversely affected in meaningful ways.[210]

## B. No Evidence of Lost Business

87.     The SAC claims that Arm's communications regarding Qualcomm, particularly the October 2024 Breach Letter, have "harmed Qualcomm."[211] Specifically, Qualcomm claims that "important Qualcomm customers delayed entering into new (or renewing existing) contracts with Qualcomm or have insisted that Qualcomm provide them with additional commitments regarding its ability to deliver licensed products."[212] ██████████████████████

████████████████████████████████████████████████████████

88.     Prof. Posner provides no evidence to support Qualcomm's claims and ignores the fact that there is no evidence of lost business. As I discuss below, Qualcomm continues to expand business with key customers despite what Qualcomm characterizes as a "misinformation campaign."[214]

---

[210] 

[211] SAC, ¶ 34.

[212] SAC, ¶ 34. Prof. Posner also claims that "Arm conducted a misinformation campaign designed to undermine customers' confidence in Qualcomm" and that "[t]he campaign included leaking the notice letter that Arm sent to Qualcomm and sending 'confusing' and 'misleading' messages to customers of Arm and Qualcomm that suggested that they faced legal jeopardy if they used Qualcomm products." Posner Report, ¶¶ 65-66.

[213] "Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," July 11, 2025, Qualcomm, p. 14.

[214] Posner Report, ¶ 65.

█████████████████████████████████████

████████████████████████████████

1.   ███████████████████████████████████████████

89.   ████████████████████████ ███████ █████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████ Prof. Posner also claims that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers" (though he does not specifically discuss any purported harm to Qualcomm's relationship with ████████.[217] ██████████████████████████

██████████████████████████████████

90.   ████████████████████████████████████████████████████████████

█████████████████████████████████

    ██████████████████████████████████████████████████████

    ██████████████████████████████████████████████████████

    █████████████████████████████████████████████████████ ███

91.   Even though ████████ "insisted" on additional reassurances,[219] this type of "reassurance" to customers and investors is common and therefore is not the type of evidence that economists consider to form conclusions on anticompetitive harm. For example, contracts often include indemnification provisions to protect parties against supply disruptions, disputes over the assignment of IP rights, and other sources of uncertainty that are endemic to most business

---

[215] Referred to as the "Smartphone Company" in the SAC.

[216] SAC, ¶¶ 158, 195.

[217] Posner Report, ¶ 45.

[218] "████████████████████████████████████

██████████████████████████████████████████████ are ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

[219] SAC, ¶ 158.

███████████████████████████████████████████

endeavors.[220] These terms are a widespread and completely unremarkable way for a supplier to share risk with its customers.

92.    More generally, negotiations between business partners involve constant back-and-forth communications, exchanges of requests and concessions, expected and unexpected challenges and roadblocks, and can be affected by internal frictions and changing external factors.[221] This process can last for many months, and with that context in mind, there is nothing unusual about the alleged "delays" that Qualcomm perceived in its negotiation with ████████.[222]

93.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ ██ ██████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████ ██ ████████
████████████████████████████████████████████████████████

---

[220] ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

[221] For example, █████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████ *See also* "Your Negotiation Challenges," Karrass, June 17, 2025, https://www.karrass.com/blog/your-negotiation-challenges ("Negotiation presents a wide range of challenges that can derail even the most prepared professionals. From misaligned goals to emotional tension, each situation brings unique hurdles. One common issue in negotiation is conflicting objectives between parties. These misalignments can create impasses that feel insurmountable without a clear strategy to resolve them. Additionally, ambiguity in roles, expectations, or desired outcomes often leads to confusion and delays in decision-making. […] Finally, power imbalances can distort the negotiation process. When one party feels they hold all the leverage, they may pressure the other side into agreements that aren't sustainable.").

[222] ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████

[223] ███████████████████████████████████████████████████

[224] ███████████████████████████████████████████████████
█████████████████████████████████████████



94.     Additionally, in an internal Qualcomm chat in February 2024, Christopher Patrick, Senior Vice President and General Manager of the Mobile and Wearables Business at Qualcomm, lamented that it is ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

          2.     ████████████████████████████████████████████████████████████
          ████████████████████████████████████

95.     Qualcomm also points to ███████ as a customer whose relationship with Qualcomm was harmed by Arm's conduct. Qualcomm claims that, as a result of Arm's October 2024 Breach

---

██ ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████

[226] QCVARM_0463837 at '839.

██ ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Letter, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Prof. Posner makes similar claims.[229]

96.    However, evidence shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮

[228] SAC, ¶ 159 (discussing "a potential customer (the 'AI and Ecosystem Company') that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU. After the Breach Letter was published, the customer delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities. […] As a result of the uncertainty stemming from Arm's assertion and the leak of the Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity."). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮

[229] Posner Report, ¶ 45 (claiming that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers.").

59



97.

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

███████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

██ ████████████████████████████████████████████████

███████████████████████████████████ Complex negotiations often occur over many months, and a protracted negotiation is not evidence of anticompetitive effects.[241] A brief delay is unlikely to be a material disruption to the business relationship.[242] In any case, even if a delay did occur because of the Breach Letter, that would not imply that Arm's conduct was anticompetitive. Firms are routinely harmed by the actions of their competitors or suppliers when, for example, competitors reduce prices or introduce an improved product or when suppliers delay negotiations or raise prices. Harm to a competitor does not automatically translate into harm to competition.[243]

100.   ██████████████████████████████████████████████████

████████████████████████████████████████████████████

──────────────────────

██ ███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[240] In the ordinary course of business, delays in negotiations can occur for various reasons. ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████

[241] ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████

[242] ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

[243] *See*, for example, U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-

62



ii. *Second*, Qualcomm has provided no evidence that the October 2024 Breach Letter (which Arm withdrew on January 8, 2025)[246] is the only factor, or even a contributing factor, for

---

trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf. ("The Agencies are concerned with harm to competition, not to competitors."). This basic and important economic principle has been adopted by the Courts. For example, the DC Circuit has stated that an antitrust plaintiff "must demonstrate that the monopolist's conduct harmed competition, not just a competitor." *United States v. Microsoft Corp.*, 253 F.3d 59 (2001).

[245] ███████████████████████████████

[246] *See* Simon Sharwood, "Arm gives up on killing off Qualcomm's vital chip license," The Register, February 6, 2025, https://www.theregister.com/2025/02/06/arm_qualcomm_nuvia/ ("Arm has given up on terminating one of its key licenses with Qualcomm, leaving the latter free to continue producing homegrown Arm-compatible chips for PCs, phones, and servers. […] During Qualcomm's Q1 2025 earnings conference call with Wall Street, CEO Cristiano Amon confirmed Arm 'has no current plan to terminate the Qualcomm Architecture License Agreement. We're excited to develop performance leading, world-class products that benefit consumers worldwide that include our incredible Oryon custom CPUs.'"). *See also* Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 29, 2024, p. 13, https://d18m0p25nwr6d.cloudfront.net/CIK-0000804328/1b687286-85e9-44e6-a579-d19d089eacfb.pdf ("On January 8, 2025, Arm notified us that it was withdrawing its October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm ALA, while serving its rights pending the outcome of the ongoing litigation."). Spencer Collins, a member of Arm's executive committee, indicated that Arm issued the letter because "we felt it was appropriate to send a notice to Qualcomm, making it clear that we respect – whilst we don't agree with the outcome from the court and the jury verdict, we respect it. And on that basis, we wanted to retract the breach notification and also make it clear that we have no intention to terminate the Qualcomm ALA." Deposition of Spencer Collins, June 30, 2025 (hereinafter "Collins (Arm) Deposition"), 111:22-112:7.

the change in terms. Negotiations are a sequence of give and take, and proposed terms are modified in subsequent counteroffers.[247]

iii.  *Third*, the *Arm v. Qualcomm* litigation, which was filed on August 31, 2022, was public and widely discussed in the press.[248] Qualcomm also recognized that Arm's October 2024 Breach Letter was not "new news." In *Arm v. Qualcomm*, Qualcomm's counsel acknowledged during the November 20, 2024 pre-trial conference that Arm's allegation of breach of the Qualcomm ALA has been part of the case "starting at the very beginning" and that "the letter on October 22nd [was] actually not new news in the sense of alleging these breaches."[249] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

iv.  *Fourth*, terms less favorable to Qualcomm could simply be due to ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮[1] ▮▮▮▮▮▮▮▮▮▮▮▮

---

[247] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[248] *See*, for example, Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's \$1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31/.

[249] *See Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024, pp. 13, 14 ("And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed.").

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



v. *Fifth*, even if it were true that Qualcomm was harmed, harm to Qualcomm is not the same as harm to competition. I discuss this in more detail in Section IX below.

101.

[254] Kennedy Report, ¶ 125.



102. ███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ ██ ███

█████████████████████████████████████████████████████████████████████ His

calculations are unreliable for determining damages because they cannot isolate the effect of Arm's alleged conduct from other potential explanatory factors. He conjectures, without support, that changes in contractual terms between the first (unaccepted) proposed term sheet and the last term sheet are due to the Breach Letter alone, rather than the normal evolution of offers and counteroffers in the context of complex negotiations.[257] In reality, changes in contractual terms are a normal part of negotiations and an initial proposed term sheet is often not the final accepted term sheet.[258] For example, the negotiation between Arm and Nuvia had multiple turns of offers and counteroffers, and the fact that the final term sheet was not the same as the initial is not evidence of harm, as none existed or is alleged in the case of the Nuvia negotiation.[259]

103.   In fact, even though Qualcomm ████████████████████████████████ both parties understood from the outset that detailed negotiations would follow—and indeed, they continued well beyond the trial decision.[260] █████████████████████████████████████████████████

_____

[256] Kennedy Report, ¶ 135.

[257] Kennedy Report, ¶ 132.

[258] *See*, for example, "The Value of Making Concessions In Negotiation," Red Bear, November 12, 2024, https://www.redbearnegotiation.com/blog/making-concessions-in-negotiation ("Effective negotiation requires a strategic balance of give and take if you want to achieve a successful outcome for two or more parties. In other words, you need to make a concession every once in a while. Effective concessions are built on strategic planning, and a well-executed concession strategy can significantly impact the outcome of a deal, bringing you closer to a mutually beneficial agreement."); Rajeev Dhir, "Negotiation: Stages and Strategies," Investopedia, June 04, 2024, https://www.investopedia.com/terms/n/negotiation.asp ("Negotiation is a strategic discussion intended to resolve an issue that both parties find acceptable. Negotiations involve give and take, where one or both parties will usually need to make some concessions.").

[260] ███████████████████████████████████████████████████████████████████

66

███████████████████████████████████████

██████████████████   ████████████████████████████
██████████████████ █   █████████████████████████
█████████████████████████████████████████████ █
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████   █

### 3. Qualcomm's Broader Customer Base Was Not Harmed

104.    Qualcomm claims that the *Bloomberg* article reporting Arm's October 2024 Breach Letter

to Qualcomm,[264] hampered Qualcomm's ability to negotiate business opportunities ████████

██████████████████████████████████ ■ Prof. Posner also claims that Arm sent "'confusing' and

'misleading' messages to customers of Arm and Qualcomm that suggested that they faced legal

jeopardy if they used Qualcomm products."[266]

105.    Prof. Posner conflates transparency with anticompetitive intent. It is rational for users of a

technology under litigation to collect more information that may help them assess and manage

---

[261] ████████████████████████████████████

[262] The Bloomberg article discussing the Breach Letter was published on October 22, 2024 (Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud) and ███████████████████████████████████████

■ ███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████

[264] Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████

[266] Posner Report, ¶ 65.

67

███████████████████████████████████

█████████████████████████████████

risks to their businesses. Qualcomm argues it was harmed because Arm disclosed the risk of a potential supply disruption to users of chips embedding Arm's technology. However, this disclosure stemmed from Arm's legitimate effort to resolve a contractual dispute through litigation. If firms faced antitrust liability simply for trying to exercise their contractual rights or protect their IP rights—on the basis that doing so might disadvantage a counterparty—it would create perverse incentives for counterparties to breach and infringe, ultimately diminishing the value of contracts, harming firms' incentives to cooperate, innovate, and create economic value.[267,268]

106. 

███████████████████████████████████ This implies that any harm to Qualcomm after November 6, 2024 was not *caused* by the publication of the Bloomberg article (████████████████████████████████████), but rather by the existence of the dispute. It is Qualcomm's conduct, as much as Arm's decision to initiate litigation,

---

[267] The legal system attempts to root out "sham" litigation but reaffirms the value of litigations based on genuine disagreements. *See* Lianos, Ioannis and Pierre Regibeau, "'Vexatious'/'Sham' Litigation: When Can It Arise and How Can It Be Reduced?," The Antitrust Bulletin, 2017, Vol. 62, No. 4, pp. 2-4 ("The regulatory and judicial system is often the theatre of intense business conflict, sometimes resulting from 'genuine' disputes between the parties over the interpretation of the law, or the application of the law to the specific fact pattern, each of the parties seeking to secure governmental action in its favour but sometimes also, or uniquely, motivated by the motive of directly harming competitors. […] [I]n practice, the use of the regulatory and/or litigation process stays presumptively outside the scope of competition law, through the operation of some form of antitrust immunity, in both the US and in Europe. […] However, […] the immunity does not cover the abuse of such regulatory and litigation processes, when these are used for foreign purposes than those they have been put in place to serve at the first place. […] The key piece of evidence in identifying sham litigation is the absence of genuine interest in receiving judicial relief.").

[268] For similar reasons, antitrust laws protect competition and the competitive process, but not individual rivals. Protecting rivals would create incentives to start litigations that ultimately reduce the incentive to compete and thus harm customers.

[269] Mr. Richards also opines that Qualcomm was obligated to make this disclosure regardless of the publication of the Breach Letter's contents in the Bloomberg Article. Moreover, I understand that Mr. Richards opines that Qualcomm's public disclosures do not convey the significant or material harm resulting from the Breach Letter that Qualcomm alleges it suffered in the Second Amended Complaint. *See* Expert Report of Mr. Steven Richards, CPA, September 5, 2025. *See also* Qualcomm 2024 Form 10-K, pp. 13, F-24 (Qualcomm disclosed the Breach Letter in its Annual Report issued on November 6, 2024.).

that led to the dispute, and for that reason it is improper for Prof. Posner to treat the litigation and successive communications as a form of anticompetitive conduct.

## VII. PROF. POSNER'S CLAIM THAT ARM HAS THE ABILITY AND INCENTIVE TO FORECLOSE QUALCOMM IS BASED ON AN INCOMPLETE ANALYSIS THAT IGNORES KEY FACTS AND IS UNTETHERED FROM SOUND ECONOMIC ANALYSIS

107.    Prof. Posner claims to use a "standard framework for determining whether input foreclosure is anticompetitive," and purports to conduct an "ability/incentive framework" analysis.[270] In practice, Prof. Posner relies on a stylized model of vertical interaction that is designed to isolate specific effects from a vertical merger and does not fully capture marketplace realities.[271] For example, the model is static and does not account for dynamic effects such as Arm's loss of reputation from foreclosure and any increased incentive of Arm's customers to invest in or switch to an alternative ISA. As a matter of economics, these are real costs that Arm

---

[270] Posner Report, ¶ 53.

[271] Antitrust agencies typically use this framework as a starting point. However, agencies then conduct a fact intense investigation to verify what conclusions the evidence supports. In explaining "How to Use These Guidelines," the U.S. Department of Justice & The Federal Trade Commission 2023 Merger Guidelines explain, "When companies propose a merger that raises concerns under one or more Guidelines, the Agencies closely examine the evidence to determine if the facts are sufficient to infer that the effect of the merger may be to substantially lessen competition or to tend to create a monopoly (sometimes referred to as a "prima facie case")." U.S. Department of Justice and the Federal Trade Commission, *Merger Guidelines*, Issued: December 18, 2023, p. 2, https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf. The Guidelines further explain, "The Agencies follow the facts and the law in analyzing mergers as they do in other areas of law enforcement." (*Id.*, p. 4.) The 2020 vertical merger guidelines state that "[f]or mergers that warrant scrutiny, the Agencies will determine whether, based on an evaluation of the facts and circumstances of the relevant market, the merger may substantially lessen competition. […] To determine whether the merger may substantially lessen competition, the Agencies would analyze the specific facts and circumstances, including in particular the relative magnitude of these offsetting incentives." U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf. § 4. *See also* U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, p. 3, https://www.justice.gov/d9/383663.pdf ("Investigations Are Intensively Fact-Driven, Iterative Processes. Merger analysis depends heavily on the specific facts of each case. […] In testing a particular postulated risk of competitive harm arising from a merger, the Agencies take into account pertinent characteristics of the market's competitive process using data, documents, and other information obtained from the parties, their competitors, their customers, databases of various sorts, and academic literature or private industry studies. […] The Agencies also carefully consider prospects for efficiencies that the proposed transaction may generate and evaluate the effects of any efficiencies on the outcome of the competitive process.").

69

would bear if it foreclosed its customers and thus should be accounted for in an analysis of Arm's incentives to foreclose.

108. Prof. Posner and Qualcomm's SAC argue that Arm, "appears to have an incentive to foreclose Qualcomm,"[272] a customer that licenses OTS cores and an ISA from Arm, in order to reduce Qualcomm's ability to compete for the sales of chips.[273] According to their argument, this foreclosure would divert sales from Qualcomm's custom cores (which are all based on Nuvia technology), on which Arm makes a relatively small profit, to (i) Arm OTS cores and CSS customers, on which Arm makes a larger profit, and (ii) Arm's own chips, which are not yet on the market.[274] But Prof. Posner's claims about Arm's incentives to foreclose Qualcomm are incomplete, speculative, ignore real-world realities of the ecosystem, and are not tied to sound economic analysis.

109. According to Prof. Posner, this purported foreclosure can be either full foreclosure or partial foreclosure.[275] While Prof. Posner is vague about the exact foreclosure mechanism he envisions, I understand his theory to suggest that: (i) full foreclosure involves cutting off Qualcomm's access to both the ALA and the TLA;[276,277] or (ii) partial foreclosure involves cutting off Qualcomm's access to the ALA, but allowing Qualcomm's continued access to the TLA,

---

[272] Posner Report, ¶ 64 ("Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector.").

[273] Posner Report, ¶¶ 11, 13 ("First, Arm is obstructing or attempting to obstruct Qualcomm from designing and marketing products that use Qualcomm custom core designs, in order to inhibit Qualcomm from competing with Arm's OTS core designs. Second, Arm is actively attempting to sell its own SoC designs at the expense of its own licensees, including Qualcomm. To that end, Qualcomm contends, Arm seeks to design and manufacture its own chips and SoCs, and seeks to drive Qualcomm away from designing custom cores, or to drive Qualcomm out of selling chips and SoCs entirely."), ¶ 64 ("Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector."); SAC, ¶¶ 206-208.

[274] *See*, for example, Posner Report, ¶¶ 70-71.

[275] Posner Report, footnote 88.

[276] Posner Report, ¶ 71 ("If Arm is able to cut off technology supply for Qualcomm completely, then Arm loses its upstream margins on the Qualcomm license. However, Arm would gain downstream sales and the downstream margins that they produce, assuming that Arm is a viable competitor in the downstream market either through organic entry or through acquisitions.").

[277] As a matter of economics, refusing supply to a customer is equivalent to raising the price to a high enough level to make it unprofitable for the customer to buy a positive quantity.

███████████████████████████████████████

██████████████████████████████████████

potentially at an elevated price.[278] As such, both of Prof. Posner's alleged mechanisms of foreclosure suggest Arm completely removing Qualcomm's access to its current ALA.[279]

110.    Prof. Posner assumes that foreclosure of Qualcomm has two countervailing effects on Arm's profit: (i) it has a negative effect (a "cost" for Arm) in the "short term" due to the reduction of Qualcomm's sales and associated loss of royalty revenue for Arm; and (ii) it has a positive effect (a "benefit" for Arm) in the "long term" because the sales lost by Qualcomm divert to Arm OTS cores and chips, with an associated increase in profit for Arm. He states that Arm has an incentive to foreclose Qualcomm because the "short term" costs from foreclosure are more than outweighed by the "long term" benefits.[280]

111.    Prof. Posner's analysis is simplistic, incomplete, and inconsistent with standard economic analysis. It fails to account for a variety of "costs" Arm would suffer, both in the short and long term, if it foreclosed Qualcomm (or its other ALA customers).[281] Due to this failure, Prof. Posner's

---

[278] Posner Report, ¶ 13 ("[I]n the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 17 ("Arm is attempting to escape its ALA with Qualcomm so it can eliminate Qualcomm as a competing CPU developer. […] Because Arm earns a higher royalty under the TLA, Arm would profit in the long term by forcing Qualcomm to stop designing custom cores and putting its resources into using OTS cores, even if it means Arm loses royalties on ALA cores in the short term.").

[279] Prof. Posner may also have in mind a foreclosure mechanism whereby Arm maintains Qualcomm's ALA but either raises the royalty rate on the ALA or degrades the ALA service. *See* Posner Report, Figure 3 (It is not clear whether Prof. Posner's vague reference to "raising prices" refers to the price of Arm's ALA and/or TLA.) and ¶ 31 (Prof. Posner asserts that Arm's strategy includes "degrading [Qualcomm's] service under the ALA[.]").

[280] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the short term, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the long term than the margins on existing ALA licenses— and Arm is unhappy with the level of royalties that Qualcomm is required to pay under the ALA. Moreover, although Qualcomm has historically been one of Arm's most important customers, it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 87 ("As customers flee Qualcomm to Arm, Arm will lose money in foregone royalties in the short term. But, Arm hopes to obtain larger margins in the long term as it takes over Qualcomm's business or Qualcomm is pushed to increasingly make use of Arm's OTS cores.").

[281] Even in the context of the stylized model underlying Prof. Posner's analysis, the academic literature has highlighted "the interaction among often offsetting effects that complicate predicting that a vertical merger will result in consumer harm or even an increase in the price of the input to the competing downstream firm." (De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1). On the one hand, a vertical merger can create incentives for the merged firm to raise its wholesale price to downstream competitors that buy inputs from it to impair their competitiveness

analysis is unreliable and prone to overstating Arm's purported benefits from foreclosing Qualcomm (and other ALA customers).

## A. Relevant Economic Framework

112.    I now outline the economic framework that informs my assessment of Arm's licensing strategy and incentives. I explain how Arm's conduct—particularly its approach to ALAs and TLAs—reflects standard commercial behavior shaped by partner-specific circumstances, competitive dynamics, and the need to balance incentives to innovate with incentives to develop the ecosystem. This framework provides necessary context for evaluating Qualcomm's claims and Prof. Posner's foreclosure theory.

### 1.  Arm's Licensing Strategy Is Tailored to Partner-Specific Circumstances

113.    Arm licenses OTS cores, CSS, and its ISA to customers. In particular, Arm licenses its ISA on a standalone basis through ALAs as well as embedded into OTS cores and CSS through TLAs or other agreements.[282] More recently, Arm has decided to develop its own chip for data center

---

(raising rivals' costs). On the other hand, a vertical merger eliminates double marginalization between the upstream and downstream merging firms which can reduce downstream prices. It is therefore not surprising that a recent review of the empirical literature on the impact of vertical integration concludes: "overall, we find that the existing literature on vertical integration contains mixed results, with evidence of harm to competition as well as evidence of procompetitive effects." Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59. Note that the simple models studied in academic settings typically abstract from the various costs of foreclosure listed subsequently in Section VII. The potential overall procompetitive benefit of vertical mergers is reflected in some recent Court decisions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc.*, U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, January 31, 2025, Case 4:24-cv-02508, Dkt. Entry 511 ("The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns. […] [T]he inquiry must proceed with recognition that 'academics, courts, and antitrust enforcement authorities alike' have repeatedly recognized that vertical mergers may serve to benefit competition and consumers.").

[282] *See* Section III.C. Most customers have difficulties in building their own cores and therefore, Arm supports them by building cores itself rather than providing just the ALA. *See* Haas (Arm) Deposition, 185:7-22 ("[I]t's a market [the automotive market] that's been in transition where OEMs are developing chips, not chip companies. And OEMs need a lot of help in terms of developing SOCs because they're not very experienced. So I believe that going to subsystems, which is the amalgamation of all the IP blocks, would be more advantageous to us because it would get us and the customers to market faster. So "licensing IP and only sell systems" is referring to individual components versus what we call our compute subsystems, which are the combinations of all the IP blocks.").

applications and has reached a supply agreement with Meta.[283] In addition, Arm is conducting chip design R&D for auto applications, explaining that "we've engaged and considered building for a lead partner in the automotive division, silicon for the ADAS market for a potential lead customer called Waymo."[284] In contrast, Arm is not engaging in chip design R&D for other applications, such as PCs or mobile.[285]

114.     As an ISA provider, Arm competes with other ISAs, in particular x86 and RISC-V, and their respective ecosystems. Due to its advantages in terms of power efficiency, the Arm ISA currently accounts for a large share of the mobile sector.[286] This success is no happenstance but the result of Arm's R&D investment in the development of a high-quality product that customers demand. Arm continues to invest about 40% of its revenue in R&D.[287] In other applications, Arm's ISA share is smaller.[288]

115.     Arm carefully negotiates the terms of its ALAs (and TLAs) to maintain its success and grow the value of its ecosystem and its profits in the marketplace.[289] Contrary to Qualcomm's claim, there is no evidence that Arm opposes negotiating ALA licenses, given that it has several ALAs, including some signed after the Nuvia agreement.[290] Any such agreement needs to be

---

[283] Gyana Swain, "Arm secures Meta as first customer in chip push, challenging industry giants," ComputerWorld, February 14, 2025, https://www.computerworld.com/article/3825123/arm-secures-meta-as-first-customer-in-chip-push-challenging-industry-giants.html.

[284] Williamson (Arm) Deposition, 125:18-22.

[285] Abbey (Arm) June 2025 Deposition, 128:21-129:10, Williamson (Arm) Deposition, 126:2-4, 175:14-25 (There are "[n]o active chips or silicon support development in the PC market." Arm discussions with OEM mobile vendors have not extended to providing them a completed chip, "Our focus has been what we call compute subsystems.").

[286] "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, p. 11, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553.

[287] Arm 2023 Form F-1, p. 99.

[288] See "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, p. 11, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274.

[289] See, for example, ARM_00095947 at '955 (Arm's CEO discussing a possible offer to Google that "has many unprecedented components to it, but at the same time I also acknowledge that Google and our relationship is an unprecedented model.").

[290] Ehab Youssef identified IBM and Apple as partners that signed an ALA since 2019. See Deposition of Ehab Youssef, June 26, 2025 (hereinafter "Youssef (Arm) Deposition"), 31:18-22; Google signed an ALA in June 2021 (ARM_01428339); Deposition of Martin Weidmann, June 20, 2025 (hereinafter "Weidmann (Arm) Deposition"), 35:9-36:14 (identifying eight ALA customers: Qualcomm, Apple, HiSilicon, IBM, Fujitsu, Ampere, T-HEAD and



mutually beneficial to both Arm and its licensee. The presence of mutual gain is a basic economic principle that applies to any negotiation that Arm and Qualcomm might have, including with other firms or for different products.

116.    Importantly, when buyers or licensees have differing goals, needs, and strategic priorities, a standardized agreement may not be effective. To ensure that both parties in a negotiation benefit, Arm tailors the terms of agreement to each individual customer, reflecting that customer's specific circumstances and requirements.[291] If there is a potential agreement that would benefit both seller and buyer—i.e., there are mutually beneficial gains from trade—the involved parties try to discover it through the negotiating process.[292] How the gains from trade are divided between the buyer and the seller depends on various factors, such as the negotiating parties' bargaining strength (or skills), the alternatives available to them in case the parties are unable to reach an agreement, and the parties' degree of impatience.[293] Not all buyers will receive the same deal, instead the terms of their deals will vary depending on factors such as application, potential for innovation, and expected revenue.[294]

---

BRJX). ███████████████████████████████████████████████

[291] Weidmann (Arm) Deposition, 199:5-8 ("But each contract is tailored to the desires of a particular partner. Different partners work in different markets.").

[292] Unrealized gains from trade may occur in certain situations (for example, when only simple linear prices can be used, instead of more complex pricing schemes; or when the parties have largely different expectations). *See* for example, Muthoo, Abhinay, "A Non-Technical Introduction to Bargaining Theory," World Economics, April-June 2020, Vol. 1, No. 2. ("The main issue that confronts the players in a bargaining situation is the need to reach agreement over exactly how to co-operate. Each player would like to reach some agreement rather than to disagree and not reach any agreement, but each player would also like to reach an agreement that is as favorable to her as possible. It is thus possible that the players will strike an agreement only after some costly delay, or indeed fail to reach any agreement—as is witnessed by the history of disagreements and costly delayed agreements in many real-life situations (as exemplified by the occurrences of trade wars, military wars, strikes and divorce).").

[294] ██████████████████████████████████████████

117.    Arm agrees to deals that allow it to protect and expand its IP, ecosystem, and revenue potential, and to foster its ability to continue investing in R&D to effectively compete with alternatives currently available in the marketplace or that can become available in the future.[295]

118.    Consistent with this framework, Arm has not historically provided an ALA to every incumbent or entrant chip producer that requests one.[296] When evaluating any potential agreement, Arm needs to trade-off different effects of licensing its ISA. For example, a new ALA may reduce Arm's revenue from the sale of OTS cores or its own chips (when they eventually become available). This effect needs to be weighed against the risk of not reaching an agreement, which

---

[295] ARMQC_02739661 (an Arm "working draft strategic narrative to support the FY22-FY25 financial plan" identifying Arm's "North Star" as "[t]he demand for high-performance, highly efficient compute is increasing exponentially. That means there is an opportunity to build new solutions, grow our business, and for the future of computing to be built on Arm - because Arm is the best way to build these new solutions. We don't and won't accomplish this alone. We work together within Arm and with our broader ecosystem to share knowledge, solve complex problems, and win together."). *See also* Abbey (Arm) June 2025 Deposition, 145:19-23 ("[W]e continue to look to enhance our business model […] so that the ecosystem can have broader access to ARM technology.").

[296] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025. Mr. Williamson explained that the development of a chip has a high risk of failure and is very expensive (needing large teams of engineers working on the development for multiple years), and that supporting an ALA customer's effort requires significant Arm commitment in terms of resources. In a 2021 presentation, Richard Grisenthwaite, Chief Architect at Arm, stated that Arm "strongly prefers" TLA over ALA. *See* ARMQC_02727610 at '619. He explained that the statement reflected the fact that firms may overstate their ability to develop a chip starting from Arm's architecture, not Arm's alleged anticompetitive intent: "ARM as a whole prefers people to take implementation licenses simply because we have seen too many people take an architecture license out of a belief they can do better, fail to do better, waste a great deal of money, and that money could have been spent better furthering the ARM ecosystem […] [and] investing in increasing the software ecosystem or producing products where the companies are specializing in their own areas of expertise and just taking an ARM […] TLA core as the basis and bringing their own skills and experience in some other area of the system." *See also* Grisenthwaite (Arm) Deposition, 27:4-23. *See also* Abbey (Arm) June 2025 Deposition, 46:14-18 (explaining "There's never a can you give it to me, I just give it to you. There's always a good-faith discussion and negotiation around rights and what partners are trying to achieve with the architecture."); 46:25-47:4 ("In the -- in the seven, eight years that I led the team, negotiations -- I'm sorry -- good-faith negotiations always precede any proposal that's given. Common sense, alignment around outcomes, terms, markets."). As an example of the complexity to develop a custom core, before acquiring Nuvia, Qualcomm worked on a custom core for servers which was abandoned because it was "a money sync [sic] basically" and "too expensive, and we looked at it as -- you know, our yearly cost was very high, and we didn't see it turning into significant business for many years. So we decided we could not afford the spend."

75

would entail the loss of ALA royalty revenue as well as the loss of the benefits in terms of a customer's complementary investments and the associated increase in the value of the Arm's ecosystem compared to alternative ecosystems.

119.    The economic framework outlined above explains the benefits of Arm's two-tier licensing structure (ALA and TLA), which provides room for ALA licensees with the requisite design capabilities to differentiate their products by making investments that benefit both Arm and the licensee, while preserving widespread access to Arm's ISA via TLAs where Arm itself invests in core designs that benefit licensees.

> 2.    The Nuvia Agreement Illustrates Arm's Legitimate Interest in Managing Risk and Securing Value

120.    A good example of the economic incentives to reach an agreement that is mutually beneficial is Arm's negotiation with Nuvia. As discussed above, at the time of its ALA with Arm, Nuvia was a start-up company that had significant potential but limited financial means. ████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ ■ I note that this characterization fits the economic framework outlined above. There were mutual gains from trade that could be realized by structuring the deal in a specific way that would benefit both Arm and

76

███████████████████████████████████

███████████████████████

Nuvia. Furthermore, Nuvia was planning to develop a chip for data center applications.[298] This made the deal particularly appealing to Arm, given that Arm's ISA had not historically gained traction in data centers.[299]

121.    Arm entered the negotiation understanding that Nuvia could be acquired,[300] and that a new owner might leverage Nuvia's technology in ways that would reduce the benefit to Arm. To protect its IP and revenue stream from potential negative effects in case Nuvia were acquired, ███████

████████████████████████████████████████████████

████████████████████████████████████ ■ This

---

[298] "Silicon Design Reimagined," Nuvia, Inc., January 15, 2021, https://web.archive.org/web/20210115193713/https://nuviainc.com/ ("Our Mission [-] Is to reimagine silicon in a new way, and create computing platforms that redefine performance for the modern data center.").

[299] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025. In a December 2020 report, research firm Gartner stated that Arm-based vendors in the data center space "have [not] achieved significant success, and many have had to reevaluate their developments or fallen by the wayside. […] challenges still remain as [Arm-based] vendors have to compete with the incumbent x86 architecture, which has significant investments in both CPU development and software ecosystems." *See* ARM_00045266 at '267-268. *See also* Awad (Arm) Deposition, 48:12-23 (Reporting that in late 2018 "Arm's market share was approximately zero.") and 50:9-51:12.





provision is logical and easily explained by the economic framework outlined above: changing economic conditions require different contractual terms, and an agreement that creates mutual gain for Arm when negotiating with one potential licensee may not work when negotiating with another potential licensee.

122. ██████████████████████████████████████████████████████████████
█████████████████████████████████████ Arm's willingness to enter into an ALA with a start-up enabled more competition in the data center market. But this approach is only feasible if parties can later seek to enforce their understanding of the counterparties' contractual commitments, as I discuss below.

123. ██████████████████████████████████████████████████████████████
██████████████████████ Nevertheless, the economic framework outlined above suggests that the terms of the 2013 ALA with Qualcomm allowed both parties to benefit, based on the actual and expected competitive landscape at the time.

---

### 3. Qualcomm and Prof. Posner Have Not Demonstrated that Arm's Dispute with Qualcomm Is Anticompetitive Conduct Rather than a Standard Commercial Disagreement

124.    I do not opine whether there was a breach of contract by either Arm or Qualcomm. I have been asked by Counsel for Arm to assume that the disagreement with Qualcomm reflects Arm's genuine views of Qualcomm's and Nuvia's contractual obligations rather than an intent to harm Qualcomm.[304] I do note, as I further discuss below, that contractual disputes are common and the legal system provides the appropriate venue to resolve disputes. The reduction in uncertainty resulting from a legal resolution of disputes promotes investments and competition.[305] Legal disputes do have disruptive effects on both parties involved and their partners, but this is the cost of moving past the dispute and unlocking the gains that the dispute is holding back.[306]

---

[304] *See* ARM_00081753 (August 31, 2022 email from Rene Haas to Arm's employees. Mr. Haas states: "[Arm has] filed a lawsuit against Qualcomm and its subsidiary Nuvia for breach of contract with Arm and trademark infringement. Protecting intellectual property is something that is extremely important to Arm's fundamental business, and crucial for us to succeed. Our world-class semiconductor IP is the result of years of research by our people and should be recognized and respected — it is incumbent upon us to protect our rights and the rights of our ecosystem. When Qualcomm acquired Nuvia, neither Qualcomm nor Nuvia obtained our consent for the resulting assignment of Nuvia's Arm licenses to Qualcomm and the rights thereunder. This is a standard term in our licenses that protects Arm, our partners, and our ecosystem. We tried to work the issue out with Qualcomm, but those discussions failed. In March, we terminated the Nuvia license. As a result, Nuvia and Qualcomm were obligated to stop using and destroy the technology created under that license. Since Qualcomm continues to use the license, we have filed a lawsuit to enforce the contractual obligation and to prevent the use of Arm's trademarks with unlicensed products. It is unprecedented for us to take this type of action, and it's unfortunate that it has come to this point. But I feel very strongly that we can't look the other way, and need to protect our IP, our investment, our partners, our ecosystem, and our company. This is the right thing for us to do."

[305] Uncertainty is a factor holding back firms' investments. *See* Bloom, Nick, Stephen Bond, and John Van Reenen, "Uncertainty and Investment Dynamics," The Review of Economic Studies, 2007, Vol. 74, No. 2, pp. 391-415. *See also* Aberra, Adam and Matthieu Chemin, "Does legal representation increase investment? Evidence from a field experiment in Kenya," 2021, Journal of Development Economics, Vol. 150, providing evidence of the positive effects of access to the legal system on economic activity.

[306] *See*, for example, Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007, https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451 ("Economists have long recognized that certainty of contract is essential to a healthy economy. [...] Those contracts can only accomplish that goal, however, if parties know the contracts will be enforced. [...] The 'fundamental function of contract law' is to 'encourage the optimal timing of economic activity' by 'deter[ring] people from behaving opportunistically toward their contracting parties.' Richard A. Posner, *Economic Analysis of Law* 91 (4th ed. 1992). [...] That function cannot be accomplished without effective means for enforcement. As this Court has stated: "Market efficiency requires effective means to enforce private agreements." *Am. Airlines, Inc.* v. *Wolens*, 513 U.S. 219, 230 (1995).").

125.    Within the economic framework discussed above, the dispute between Qualcomm and Arm can be interpreted as a dispute about the terms by which Nuvia could create a new design for a CPU and the terms under which Qualcomm could incorporate into its custom cores the designs that Nuvia developed under Nuvia's 2019 ALA with Arm. Qualcomm argues that it can use designs created by Nuvia using the Nuvia ALA without having to pay the royalty rates that Nuvia negotiated with Arm, and insists that it can pay the lower royalty rate in the Qualcomm-Arm ALA instead.[307] Arm contends that Arm needs to be appropriately compensated to allow the transfer of the designs created by Nuvia using the Nuvia ALA to Qualcomm.[308] There are likely gains from trade, but the parties disagree on the terms of a mutually beneficial agreement.[309] In fact, the parties did attempt to reach an agreement, but failed to do so.[310,311] Arm's and Qualcomm's unsuccessful attempt to resolve their dispute lasted for about a year.[312] After becoming aware that Qualcomm

---

[307] SAC, ¶ 7.

[308] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[309] Abbey (Arm) October 2023 Deposition, 275:16-278:13.

[310] See ARM_00081461 (August 25, 2021, email from Rene Haas references the back and forth that Arm and Qualcomm had, stating to internal Arm leadership that "there has been so much back and forth [with Qualcomm] repositioning their asks.").

[311] Priest, George L. & Benjamin Klein, "The Selection of Disputes for Litigation," Journal of Legal Studies, 1984, Vol. 13, pp. 1-55, build a model predicting that disputes that settle out of court generally reflect similar expectations between the disputing parties, whereas those that proceed to trial often involve greater uncertainty and divergent expectations about the likely outcome of litigation. Other papers have highlighted parties' excessive optimism as a possible explanation for why a negotiation may fail to reach an agreement even though a compromise could be mutually beneficial. See, for example, Babcock, Linda, George Loewenstein, S. Issacharoff, and Colin Camerer, "Biased Judgements of Fairness in Bargaining," American Economic Review, 1995, Vol. 85, No. 5., pp. 1337-1343.

██████████████████████████████████████████████

████████████████████████████████████

had started to use Nuvia technology in its custom cores, Arm filed the *Arm v. Qualcomm* litigation
in August 2022.[313]

126.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████[314],[315] Setting aside the contractual
dispute, and within the framework outlined above, the question is whether there are potential gains
from trade and, if so, what terms of the agreement would benefit both parties.[316]  Qualcomm has
historically been an ALA customer, and there is presumably some gain from trade, and thus a
license fee and royalty rate at which Arm would be willing to grant Qualcomm the license it seeks.
But in the context of this bilateral negotiation, there is nothing anticompetitive about Arm seeking

---

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████

[313] Posner Report, ¶ 136.

[314]
████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

[315] SAC, ¶¶ 131-133.

[316] The legal dispute is an issue on which I do not offer an opinion.

a higher price for a license to its newly created IP at a time that is years after the 2013 ALA with Qualcomm.[317]

### 4. Protecting Competition Does Not Require Arm to License Its ISA on Qualcomm's Preferred Terms

127. Protecting competition—rather than specific competitors—does not require imposing on Arm a duty to grant Qualcomm an ALA license at terms that Qualcomm prefers. Even if Arm decided that it is not in its interest to license at terms that Qualcomm, subjectively, considers "reasonable,"[318] that would not be in itself anticompetitive. As a matter of economics, a duty to deal creates inefficiencies that Qualcomm and Prof. Posner ignore. For example, a duty to license may undermine incentives for R&D by reducing the value of an innovation to the inventor. As two leading scholars in industrial organization explained,

*An obligation to deal does not necessarily increase economic welfare even in the short run. In the long run, obligations to deal can have profound adverse incentives for investment and for the creation of intellectual property. Although there is no obvious economic reason why intellectual property should be immune from an obligation to deal, the crucial role of incentives for the creation of intellectual property is reason enough to justify skepticism toward policies that call for compulsory licensing. Equal access (compulsory licensing in the case of intellectual property) is an efficient remedy only if*



[318] SAC, ¶ 20 ("Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses to its off-the-shelf cores at commercially reasonable prices to Qualcomm."); Posner Report, ¶ 13.

*the benefits of equal access outweigh the regulatory costs and the long run disincentives for investment and innovation. This is a high threshold, particularly in the case of intellectual property.*[319]

128.    Indeed, undermining an innovator's ability to appropriate the returns to its R&D undermines the innovator's incentive to innovate in the first place.[320] Protecting IP is, therefore, crucial in incentivizing the creation and diffusion of many types of innovations.[321,322]

129.    Furthermore, there is no evidence that Arm is refusing to deal with Qualcomm. In fact, as recently as August 29, 2025, Arm responded to Qualcomm's August 8, 2025, letter with a set of "initial questions" regarding the terms outlined in Qualcomm's "proposed Annex 1 to the ALA for Arm's unreleased v10," and reaffirmed its intention to "move the negotiations forward."[323] But Qualcomm appears to seek a v10 license on the same royalty rate as v8 and v9, which were set twelve years ago in 2013.[324] It is not anticompetitive for Arm to negotiate a higher royalty rate for

---

[319] Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," Proceedings of the National Academy of Sciences U.S.A., 1996, Vol. 3, pp. 12749–12755. (The authors conclude that "the welfare consequences of a refusal to deal are ambiguous and that the requirement of mandatory access may lower economic welfare in the short run as well as in the long run." They also state: "A refusal to deal by a vertically integrated firm appears on its face to adversely affect competition by denying rivals a product or service that is a necessary input for effective competition. This is hardly a complete analysis, however, because it does not account for the incentives to create the essential input or the price at which that input can optimally be sold. Clearly, the mere fact that a firm controls an input that is valuable to its competitors cannot be sufficient to compel a duty to deal, as a firm can have many innocent reasons for refusing to supply a rival.").

[320] Spulber, Daniel F., "How Do Competitive Pressures Affect Incentives to Innovate When There is a Market for Inventions?" Journal of Political Economy, 2013, Vol. 121, No. 6, pp. 1007-1054 ("When IP is not fully appropriable, markets for inventions are limited and competitive pressures can decrease incentives to innovate.").

[321] *Ibid*. ("Appropriability of IP stimulates innovation by supporting the formation of a market for inventions. The market for inventions is a critical source of incentives for innovation in the economy.").

[322] A draft letter by Arm explains, "technological achievements have required years of research and significant costs, they must be recognized and respected." *See* ARM_01230978 at '978. Without being compensated for the fruits of R&D efforts, Arm would be disincentivized from pursuing R&D.

[323] ARMQC_02785287 at '287 – '290 (August 29, 2025, letter from Spencer Collins (Arm) to Ann Chaplin (Qualcomm)). On June 13, 2025, Arm reiterated to Qualcomm that "Arm remains prepared to negotiate in good faith over the terms of a license to the v10 architecture." *See* ARMQC_02771127. In the that same letter, Arm further told Qualcomm that its "offer to meet remains open and Arm continues to believe that such a meeting would be the most efficient path forward in response to Qualcomm's request [for a v10 license]. Please have the relevant business personnel respond to Mr. Abbey with dates that Qualcomm is available for such a meeting."

[324]

its innovations; no more anticompetitive than for Qualcomm to negotiate a higher price for its new chips.[325] On the contrary, imposing on a firm a duty to license a new and improved version of a technology at the same royalty rate as the previous version poses a clear risk of severely dampening incentives to innovate.[326] This risk is enhanced when the initial royalty rate, and thus profit margin for the innovator, is low, as it appears to be the case with the royalty rates in Qualcomm's 2013 ALA.[327]

130.    In other contexts, Qualcomm seems strongly opposed to imposing any duty to deal on IP owners. For example, in its Reply Brief to the U.S. Court of Appeals, Qualcomm forcefully argued that "[u]nder settled precedent, the default rule is that even a monopolist has the right to determine with whom it will do business, and on what terms."[328] Similarly, in its Amici Brief to the Supreme Court in the *eBay* case, Qualcomm stated that "[f]inal injunctions are an established part of the relief in successful patent infringement suits because the essence of the patent is the right to exclude others from practicing the patented invention [...]."[329]

---

compensation for v10 on terms no other party had actually secured and would continue to pay below-market compensation for the next twenty-three years." *See* ARMQC_02785287 at '288 (August 29, 2025 letter from to Spencer Collins (Arm) Ann Chaplin (Qualcomm)).

[325] Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html ("Qualcomm's Snapdragon 8 Elite offers a notable improvement in performance and efficiency over previous Snapdragon chips, promising next-gen Android phones with even more impressive features and longer battery life. However, this comes at a cost, with reports suggesting manufacturers are paying Qualcomm as much as $190 for the chip — 20% more than the previous models.").

[326] Ann Chaplin, Qualcomm's General Counsel and Corporate Secretary, testified that Qualcomm believed that a "royalty rate that's the same as our v9 license would be a fair rate for v10."

[327] See Section VIII.C.

[328] *Federal Trade Commission v. Qualcomm Incorporated*, "Reply brief for appellant Qualcomm Incorporated (Redacted)," December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit, p. 8.

[329] *eBay Inc. and Half.com v. MercExchange, L.L.C*, "Brief of Amici Curiae Qualcomm Inc. & Tessera, Inc. in Support of Respondent," 547 U.S. 388 (2006) (No. 05-130), p. 4. The Brief also states (p. 2) "[t]he viability of high technology industries depends in significant part on the maintenance of strong patent laws. The *amici* believe the well-established presumption in favor of permanent injunctive relief to implement a final judgment of infringement is essential to the ability of patent holders to enforce their patents."

## B. Prof. Posner's Opinions on Ability to Foreclose Are Flawed

131.    Prof. Posner says he investigates Arm's conduct within an "ability/incentive framework," which "is a standard method for evaluating the competitive effects of vertical mergers."[330] He opines that "Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector."[331] I address Prof. Posner's conclusion about ability in this Section and address his conclusion about incentives in Section VII.C.

132.    Prof. Posner concludes that "Arm has the ability to foreclose Qualcomm from the Arm-compliant data center-specific SoC sector as well as other sectors" and that Arm has such ability because "Arm's control over its ecosystem allows it to discriminate against firms that participate in the ecosystem despite Arm's earlier promises to keep the system open."[332] Prof. Posner's analysis omits crucial factors and his blanket statements are oversimplifications that bely a more complex reality.

133.    *First*, unless Qualcomm breaches the terms of its ALA in a way supporting termination, Arm does not have the ability to foreclose Qualcomm's access at all until ▮▮▮

134.    *Second*, with approximately eight years to go until the expiration of its ALA and TLA, Qualcomm has ample time to further invest in RISC-V as an alternative to Arm's ISA and cores.

---

[330] Posner Report, ¶ 29.

[331] Posner Report, ¶ 64.

[332] Posner Report, ¶ 65. Prof. Posner further claims that there exists evidence of Arm's ability to foreclose Qualcomm's access to Arm's ISA and that "Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm," such as Arm's "[f]ailure" to provide Qualcomm "with certain deliverables in violation of the ALA," Arm's "[f]ailure" to provide Qualcomm with good-faith licensing proposals under the TLA," Arm's "[r]efusal to negotiate an extension of the ALA to cover future versions of Arm's ISA," Arm's "[m]isinformation campaign […] designed to undermine customers' confidence in Qualcomm," and Arm's "[r]eduction in general support."

[333] ▮▮▮.

[334] ▮▮▮

85



Qualcomm can innovate to expand RISC-V's use cases and improve its performance.[335] This fact has indeed been recognized by Qualcomm.

135.  *Third*, Prof. Posner ignores differences in competitive conditions across applications. Whereas currently RISC-V is not ready to replace Arm in high-performance chips for smartphones, Qualcomm already uses RISC-V in microcontrollers for low-end applications.[338] In fact, Qualcomm touts that there "are in excess of a billion devices that have [Qualcomm] RISC-V integrated microcontrollers in them."[339]

which is categorized as a "High-

---

[335] *See* Section VIII.D.3 for a discussion of RISC-V and Qualcomm's efforts to develop it.

[336]

[337]

[338] *See* Section VIII.D.3. *See also* "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential; "Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC-VInternational (Manju Varma (Qualcomm) stating: "To date, we have shipped over 650 million RISC-V cores in the market and this number just keeps growing. […]  We have shipped RISC-V cores in PC, mobile, automotive, XR, and wearable segments.").

[339] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational, at 4:50.

[340]

86

███████████████████████████████████

Performance CPU" on Arm's product listing.[341]  Therefore, Prof. Posner's blanket statement that Arm can foreclose "Qualcomm and other firms from all sectors" is incorrect.[342]

136.    Overall, a more nuanced conclusion on whether Arm can foreclose Qualcomm's access to its ISA and cores is that Arm's ability varies by use case—for some use cases, Qualcomm already uses RISC-V—and in any event such ability to foreclose would be far in the future ████████ ██████ providing Qualcomm and others ample time to further develop a free open-source competitor to Arm.

137.    Prof. Posner also suggests that Arm could foreclose Qualcomm for some applications, but not for others, allowing Arm to continue benefiting from the partnership with Qualcomm in segments where "Qualcomm has special relationships with some of its customers, a good reputation in a sector, niche abilities, and other advantages."[343]  But Prof. Posner does not address the fact that Qualcomm's ALA with Arm ████████████████████████████



---

[341] "CPU Cortex-A78," Arm, https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78 ("Fourth-Generation, High-Performance CPU Based on DynamIQ Technology. Designed for high-end performance at best efficiency, Cortex-A78 enables superior immersive experiences, bridging the gap between mobile and laptop performance. Optimized for new form factors and foldables, Cortex-A78 is ready for the next wave of mobile innovation and continues Arm's industry-leading mobile performance and efficiency with 5G device architecture.").

[342] Posner Report, ¶ 64.

[343] Posner Report, ¶ 72 ("But even if Arm does not succeed in foreclosing Qualcomm entirely, Arm would still benefit from partially foreclosing Qualcomm in certain sectors. For example, if Qualcomm has special relationships with some of its customers, a good reputation in a sector, niche abilities, and other advantages, Arm might continue to benefit from Qualcomm as a chip supplier of Arm-compliant chips for certain sectors for the time being while displacing Qualcomm in other sectors. In that way, Arm continues to benefit from royalties in some sectors while taking over other sectors by degrading Qualcomm's ability to compete in those sectors.").

[344] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

[345] For example, Arm introduced v9 in 2021. See Aditya Bedi, "The Foundation of Total Compute: First Armv9 Cortex CPUs," Arm Community, May 25, 2021, https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/first-armv9-cpu-cores ████████████████

**C. Prof. Posner Does Not Account for Costs that Arm Would Suffer from the Alleged Foreclosure of Qualcomm and Other Customers**

138.    A key issue is whether Arm's allegedly anticompetitive conduct was adopted to foreclose Qualcomm to benefit Arm's TLA business and Arm's own chips. Prof. Posner claims that "Arm has an incentive to engage in input foreclosure in sectors where the potential long-term gains from taking business from licensees exceed the short-term loss of royalties on the products that the licensees no longer sell."[346] He also states that "[i]t is possible that Arm would maximize profits by completely destroying Qualcomm's business opportunities in certain sectors even though it would suffer a short-term loss of royalties. […] But even if Arm does not succeed in foreclosing Qualcomm entirely, Arm would still benefit from partially foreclosing Qualcomm in certain sectors."[347] Remarkably, no evidence is provided to support these sweeping statements, other than the observation that Arm's margin from an ALA license is lower than the margin from a TLA license and from the sales of Arm's own chips.[348]

139.    In this Section, I show that foreclosure of Qualcomm would have significant costs for Arm that Prof. Posner's analysis does not account for, thus rendering his analysis unreliable. In light of these significant costs, the various events that Qualcomm alleges as anticompetitive have a benign, procompetitive interpretation: in the presence of uncertainty about contractual terms, Arm was simply attempting to preserve the value of its contractual agreements. Although I do not offer an opinion on breach of contract, I do note that disagreements among firms about the right interpretation of the terms of an agreement between them are very common, especially in dynamic

---

[346] Posner Report, ¶ 67.

[347] Posner Report, ¶ 72.

[348] Posner Report, ¶ 74. The highly theoretical and wholly unsubstantiated nature of Prof. Posner's report is illustrated by his claim that "input foreclosure would likely give Arm substantial downstream power, enabling it to raise prices both unilaterally and potentially through coordination or collusion with any remaining downstream competitors." *See id.*, ¶ 75. Not a single piece of evidence, not even the "conversations" with Qualcomm employees that are the only support for some of his other claims, is provided for the claim that Arm's conduct would lead to "coordination or collusion." Such a claim is not even in the SAC or any of Qualcomm's interrogatory responses.

██████████████████████████████

████████████████████████████

high-tech industries.[349] Qualcomm itself aggressively protects its IP through lawsuits and requests for injunctive relief.[350]

### 1. The Role of Qualcomm and Other Partners in Expanding Arm's Success and Ecosystem Against Alternative ISAs

140.     Prof. Posner states that "Qualcomm uses its own custom cores in its premium tier SoCs because Arm does not sell an alternative that provides comparable functionality" and that "OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers."[351] Prof. Posner further states that "Arm benefited from the expansion of the Arm ISA network that occurred as Qualcomm penetrated various chip sectors."[352] However, he fails to recognize the implication for Arm's incentive to foreclose.

141.     Qualcomm's development of custom CPU cores has allowed Arm to access new applications that were traditionally dominated by x86. For example, in the context of the *Arm v. Qualcomm* litigation, Qualcomm's expert Dr. Kennedy stated, "Qualcomm's development of

---

[349] *See*, for example, "2023 Patent Litigation Report," Bloomberg Law, https://pro.bloomberglaw.com/insights/intellectual-property/2023-patent-litigation-report/ (reporting that "more than 400 patent claims [were] filed in federal district courts and alternative venues in 2022."). *See also* "Patent Dispute Report: 2024 Mid-Year Report," Unified Patents, July 22, 2024, https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report; and Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581 ("[S]ignificant interpretive questions often arise in contract litigation."); Benjamin E. Hermalin et al., "Contract Law," in Handbook of Law & Economics, 2007, Vol. 3, No. 68 (ed. A. Mitchell Polinsky & Steven Shavell) ("Probably the most common source of contractual disputes is differences in interpretation […]").

[350] For example, in 2005 Qualcomm sued Nokia for patent infringement seeking an injunction and monetary damages. *See* "Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm Press Release, November 6, 2005, https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia. In 2017, Qualcomm brought a patent infringement lawsuit against Apple asking for damages and a permanent injunction enjoining Apple from infringing the patents at issue. *See* Complaint, *Qualcomm Inc. v. Apple Inc.*, No. 3:17-cv-01375-JAH-AGS (S.D. Cal. July 6, 2017), https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/2017-07-06_complaint.pdf). More recently, Qualcomm sued Transsion, one of the world's largest smartphone makers, for patent infringement. *See* Ben Schoon, "Qualcomm is suing Transsion, the largest smartphone maker that doesn't use Snapdragon," 9to5Google, July 12, 2024, https://9to5google.com/2024/07/12/qualcomm-transsion-lawsuit-report. Qualcomm's lawsuit with Transsion was settled in January 2025. *See* Florian Mueller, "BREAKING: Qualcomm settles with China's Transsion (Africa's smartphone market leader): Indian patent lawsuit withdrawn," ip fray, January 16, 2025, https://ipfray.com/breaking-qualcomm-settles-with-chinas-transsion-africas-smartphone-market-leader-indian-patent-lawsuit-withdrawn/.

[351] Posner Report, ¶¶ 38, 62.

[352] Posner Report, ¶ 27.

██████████████████████████████████████

███████████████████████████████

custom CPUs [based on Nuvia technology] should benefit Arm by contributing to the expansion of Arm-compliant products into new segments and markets at the expense of non-Arm competition."[353] In particular, he highlights "Qualcomm's development efforts of its Arm-compatible Oryon CPU cores (the 'Oryon™ Cores')," which is opening up the PC segment, traditionally dominated by x86 chips, to Arm-compliant chips.[354] He concludes that "[a]ny market share that Qualcomm gains in the PC market is market share gained for Arm versus x86 alternatives. Further, Qualcomm's sales of Oryon™ Cores will generate royalties for Arm under the Arm / Qualcomm ALA. Therefore, Qualcomm's development of the Oryon™ Cores will generate additional royalties for Arm from an increased volume of shipments for the PC market."[355]

142.    Similarly, the SAC states that "Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86)."[356]

143.    More broadly, Arm benefits from partnering with ALA customers because a partner's innovation, R&D investment, and marketing efforts expand Arm's ecosystem[357] and increase the

---

[353] Expert Report of Patrick F. Kennedy, February 27, 2024 (hereinafter Kennedy *Arm v. Qualcomm* Report), ¶ 33. *See also id.*, ¶ 56 ("Qualcomm's development efforts and business plans related to the development of custom Arm-compliant CPUs in certain markets will actually benefit Arm.").

[354] Kennedy *Arm v. Qualcomm* Report, ¶ 56. *See also id.*, ¶ 63 ("Arm itself recognized that Qualcomm's innovative product could expand Arm's presence in the Windows-based PC market. Upon seeing initial performance reports for Hamoa, Arm concluded that Qualcomm had indeed "invested sufficiently to meaningfully grow the [Windows on Arm] market.").

[355] *Id.*, ¶ 64.

[356] SAC, ¶ 61.

[357] *See* ARM_01294236 at '237 (February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("[g]reater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time to Market] ") and for Arm ("[d]eeper customer engagement, greater predictability, more design wins, more revenue"). *See also* Abbey (Arm) June 2025 Deposition, 29:24-30:7 ("So there would be a technical conversation around capabilities because oftentimes just because somebody wants an architecture, they may not know what it takes to make the architecture successful into a product. And so we care passionately about the ecosystem, about making sure our partners are going to be successful, so we talk about capabilities, we talk about risks, we talk about the expertise of the team."). *See also* Abbey (Arm) June 2025 Deposition, 145:8-23; ARMQC_02783619 at '620 ("Landing subscription deals is the first step in a closer engagement with our partners to increase their consumption of Arm technology and share in increased long-term success through royalties.").

variety of Arm products available to customers.[358] Will Abbey stated in November 2023 that "[t]hirty years on, a core philosophical tenet of Arm's original IP licensing model underpins its expanded subscription strategy to foster innovation: Arm only succeeds when partners succeed."[359] Arm monitors partner investment efforts across the ecosystem and collaborates with its partners to strengthen developer support and education.[360] The flipside is that, should Arm foreclose a partner, Arm's ecosystem would suffer. In fact, Cristiano Amon, Qualcomm's CEO, alleges that Arm's conduct harmed Qualcomm and acknowledged that, as a result, there was harm to Arm's ecosystem.[361]

144.    In smartphone applications, Qualcomm is by far the leading chip supplier for premium-tier Android phones.[362] In recent public statements, Qualcomm executives tout that, for premium-tier

---

[358] For example, Apple helped opening the PC segment to Arm. *See* "AI Flywheel Gathering Momentum," UBS Global Research, November 24, 2024 ("Arm's moment on the PC arrived in 2020 with Apple's M1 processor-based Mac family. The initial Arm vs x86 compatibility issues were mitigated by Apple's control of its ecosystem and by the Rosetta binary translation software, while Apple iterated on the hardware design with three further M-series generations. After almost four years, Apple was joined by the launch of Qualcomm-powered PCs from several major brands this year, and with an Nvidia-MediaTek partnership expected to follow into volume production next year. Arm currently holds a 10% unit market share and 17% revenue market share, almost all owing to Apple.").

[359] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models.

[360] ARMQC_02725050 at '068 (A September 2020 presentation discusses partner efforts on the Windows-on-Arm ecosystem and details partner collaborations to provide developer support, including initiatives to facilitate app migration to arm64, engage OEMs, and expand enterprise application readiness).

[361]



[362] Qualcomm's smartphone chips are currently custom-made.

---

Android phones, Qualcomm's revenues are five times as large as its next largest rival.[363] Accordingly, reports indicate that Qualcomm's share of premium-tier Android smartphones is as high as about 70%.[364] If Arm were to foreclose Qualcomm, it would cause diversion of premium-tier demand to Apple iPhones and also lead to more lower tier Android phones being sold.[365] Since Arm's royalty revenue per unit sold tends to be higher for higher-end chips, a shift towards less expensive Android phones could reduce Arm's royalty revenue. Such a shift would represent a cost to Arm in any attempt to foreclose Qualcomm. Prof. Posner does not account for these costs in his analysis. Nor does Prof. Posner consider whether Apple has a more favorable ALA deal than

---

[363] "Q4 2024 Qualcomm Inc. Earnings Call," Qualcomm, November 6, 2024, pp. 11-12, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/06/QCOM_Q4FY24EC_Transcript_11-7-24.pdf (Mr. Amon stated: "[W]hen we compare with our closest competitor, for example, in Android, our premium tier, we get greater than 5x premium-tier revenue."); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 4, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf (Mr. Amon stated: "On handsets as we move on to the next conversations, Snapdragon eight elite, we're incredibly proud of it. It's one of the most powerful processors we've ever done in mobile, is now the industry leader in handsets across every performance category. The world's fastest mobile CPU, world's fastest 5G and Wi-Fi technology, the fastest NPU [Neural Processing Unit]. But I wanted to show you this metric. We have 5X the premium tier revenues on Android relative to the primary competitor[.]"); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, p. 24 (Mr. Palkhiwala, Qualcomm's Chief Financial Officer and Chief Operating Officer, stated: "Qualcomm has a very strong presence. If you compare us to our closest competitor, we are two X, the revenue overall and we are more than five X revenue in the premium tier. Snapdragon eight chip is the performance benchmark chip in premium tier in handsets. So we're very happy about that.").

[364] "Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/ ("Qualcomm's share in the >$500 band increased from 47% in Q1 2020 to 71% in Q1 2022"). *See also* Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo! Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html ("Android device makers have no choice but to rely on Qualcomm for sourcing flagship SoCs for their phones and tablets. MediaTek is the only other notable SoC supplier, but its flagship chips are typically behind those of Snapdragon. Its latest Dimensity 9400 changes this, rivaling or coming close to the Snapdragon 8 Elite in most benchmarks and workloads. However, the company needs to prove it can keep this momentum up to win the trust of device makers and consumers. Samsung also has its in-house Exynos division, but its SoCs have been significantly behind the competition in power efficiency and performance. The gap is so big now that Samsung might go all-in with the Snapdragon 8 Elite for the Galaxy S25 series.").

[365]

███████████████████████████████

███████████████████████

Qualcomm, such that diversion to Apple would lead to a reduction in Arm's margin on the diverted sales.[366]

145.    Arm has acknowledged the importance of partners to Arm's success in competing against other ISAs, such as RISC-V. For example, Chloe Ma, Chief Business Officer at Arm, explained in December 2022 that, in targeting development of IoT applications, "we [Arm] also need to leverage our design partners (AADPs [Arm Approved Design Partners], software design services, ISVs [Independent Software Vendor]) as much as possible realizing that we don't have endless resources and we are focusing our resources on client/infrastructure. We need to hold ourselves accountable for proof of concept for the solution approach with the appropriate design point, making sure this approach can deliver the desired benefits for our target customers. But we also need to start thinking about how we can scale this approach to mobilize our large number of partners so that they are also building, promoting and benefiting from this solution-based approach and staying busy on Arm (less time on RISC-V)."[367]

146.    To further the adoption of Arm technologies, Arm has also designed contracting models that provide customers with broader access to its IP portfolio, enabling them to innovate more effectively and contribute to growing the Arm ecosystem. Arm observed that some customers encountered challenges after licensing specific cores, often realizing mid-design that the selected core is "not the right fit."[368] In response, Arm transitioned to a more flexible, subscription-based licensing model to better accommodate their customers' evolving design needs. As discussed

---

[366] Apple has an ALA with Arm that "extends beyond 2040." *See* "Amendment No. 2 to Form F-1," Arm Holdings plc, September 5, 2023, p. 4,
https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm. [PN00305]

[367] ARMQC_02600713 at '719. *See also* Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships. *See also* ARM_00087465, the abstract of a talk by Paul Williamson, Arm's Senior VP and general manager of the Internet of Things line of business, discussing "successful examples to share where we have engaged at a deeper level, worked hand-in-hand with the partner and their ecosystem in delivering on our roadmap, allowing them to enter new markets, become #1 and leverage their investment in Arm for future success."

[368] Abbey (Arm) June 2025 Deposition, 86:22-87:23 ([W]e had determined some time ago that the most ec -- equitable way to license our technology is through a subscription, a program which we call ARM Total Access. One of the frustrations that some partners have is, I license this particular core, and after I start a design or I give some considerations to that design, I decide that that's not the right fit. So we moved away from a, you know, sort of this product with this term to more of a broader subscription-based engagements.). *See also* Grisenthwaite (Arm) Deposition, 54:1-55:13.

previously, in 2020, Arm launched ATA, a subscription program offering customers a comprehensive package of IP, tools, models, support, training, software, and physical design resources to help them succeed.[369] In 2019, Arm introduced the AFA, a pay-as-you-go model that allowed customers to access a broad range of Arm technology and tools without paying upfront—only paying license fees for IP used in their final chip design at the point of manufacture.[370] Arm introduced these flexible licensing agreements with the strategic understanding that broader access to its IP would not only empower individual partners but also strengthen and expand the overall Arm ecosystem.[371] This is a procompetitive initiative aimed at expanding the Arm ecosystem.

147.    Qualcomm would be particularly important as a partner in growing the Arm ecosystem if, as Qualcomm contends, Arm's chip designs were falling behind alterative cores. For example, the SAC states that "[i]n recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for Arm-designed cores. In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical."[372] Prof. Posner similarly claims that "Arm's OTS cores [have fallen] further behind

---

[369] ARM_00080472 at '480; ARMQC_02770676 at '677; "Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 19 ("ATA licensees are typically long-term Arm partners and include more than half of our largest customers."). *See also* ARM_01294236 at '237, a February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("Greater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time To Market]") and for Arm ("Deeper customer engagement, greater predictability, more design wins, more revenue").

[370] Abbey (Arm) June 2025 Deposition, 144:19-145:13 ("At the low end, through ARM Flexible Access, we're giving broader access to our partners because we want to deepen and broaden the ecosystem."); Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models; "Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 19 ("[AFA] targeting early-stage companies developing products for markets such as AI accelerators, automotive applications, consumer electronics, robotics and smart sensors.").

[371] Abbey (Arm) June 2025 Deposition, 145:8-13; "Arm Flexible Access," Arm, https://www.arm.com/products/flexible-access ("Arm Flexible Access provides up-front, no-cost or low-cost access to a wide range of Arm IP, tools, and training. Experiment and design with the entire portfolio; license fees, if any, are only due at the point of manufacture and calculated only on the IP included in the final SoC design.").

[372] SAC, ¶ 58.



custom cores in terms of quality."[373] In such a situation, losing the benefit of Qualcomm's innovations would be particularly harmful, and would lead to Arm ceding share to alternative ISAs, such as x86 and RISC-V.[374]

148.    Furthermore, harming one of its largest customers without cause would harm Arm's reputation and damage Arm's relationships with other customers.[375] Prof. Posner agrees: "As the industry observes Arm's mistreatment of Qualcomm, firms will become less willing to invest in

---

[373] Posner Report, ¶ 58. *See also id.*, ¶ 38 ("Qualcomm's custom CPUs are 'at the top end of the performance' and 'blow away what's available from Arm on the TLA core site [sic].' Qualcomm uses its own custom cores in its premium tier SoCs because Arm does not sell an alternative that provides comparable functionality.").

[374] I do not opine on Arm's relative performance. I do note that Jeff Vidon, senior director of engineering at Qualcomm, testified that Arm "off-the-shelf" cores may have higher performance or power than Qualcomm custom cores. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████

[375] For Arm, as for most firms, reputation is key to its commercial success. *See* Arm 2023 Form F-1 ("Our brand and reputation are critical factors in our relationships with customers, employees, governments, suppliers, and other stakeholders. Our failure to address, or the appearance of our failure to address, issues that give rise to reputational risk […] could significantly harm our brand and reputation. Our reputation can be impacted by catastrophic events, incidents involving unethical behavior or misconduct, product quality, security, or safety issues, allegations of legal noncompliance, internal control failures, corporate governance issues, data breaches, workplace safety incidents, environmental issues, the use of our products for illegal or objectionable applications, including AI and ML or military applications that present ethical, regulatory, or other issues, marketing practices, media statements, the conduct of our suppliers or representatives, and other issues, incidents, or statements that, whether actual or perceived, result in adverse publicity."). *See also* Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581, https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=2893&context=journal_articles ("When a dispute over the contract's meaning arises, the parties will first try to resolve it themselves. They will do this not only because of the costs of litigation, but also because of the reputation factor […] the party demonstrably in the wrong on the interpretive issue will hesitate to force the issue to litigation; he is likely to lose and in any event may acquire a reputation as someone who does not honor his commitments.").

the Arm ecosystem. Their incentives to invest are reduced because the more successful they are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them."[376] However, he fails to recognize that this reduces Arm's incentive to foreclose, as a degraded Arm ecosystem will risk losing sales to x86 and RISC-V. It is important for Arm (as well as for Qualcomm or any firm) to avoid gaining a reputation as a firm that uses the legal system to circumvent or modify contractual commitments to its advantage and at the expense of its partners. Such a reputation would make negotiating future contracts more complex, more time-consuming, and would discourage relationship-specific investments by partners.[377]

---

[376] Posner Report, ¶ 90. *See also id.*, ¶ 78 ("[O]ther licensees will have an incentive to reduce their investment in the Arm ecosystem as they see Arm abuse its own licensees."), ¶ 19 ("Arm's attempts to extend its dominance of the ecosystem will spook even chipmakers who are not pushed out of designing SoCs, by revealing that Arm will no longer keep its commitment to neutrality and openness."). I note that there is no evidence, and Prof. Posner provides none, that "the more successful" an Arm customer is at designing Arm-compliant chips, "the more likely that Arm will try to take their business away from them." In particular, there is no evidence Arm is trying to "take away" Apple's business, which is one of the most successful Arm customers. Arm has recently extended Apple's agreement for many years. *See* Stephen Nellis, "Apple inks new long-term deal with Arm for chip technology, according to filing," Reuters, September 5, 2023, https://www.reuters.com/technology/apple-inks-new-long-term-deal-with-arm-chip-technology-filing-2023-09-05/ ("Apple (AAPL.O), has signed a new deal with Arm for chip technology that "extends beyond 2040," according to Arm's initial public offering documents filed on Tuesday. [...] The two companies have a long history - Apple was one of the initial companies that partnered to found the firm in 1990. [...] Apple was among a number of large technology companies that that on Tuesday invested $735 million in Arm's initial public offering. Reuters last week was the first to confirm that Apple was among the strategic investors who agreed to buy shares.").

[377] Williamson (Arm) Deposition, 246:4-9 ("ARM has a reputation of trust with its partners who build technology based on ARM's technology and services associated with it. Their success is a shared success business with ARM, and trust is an important element of that continuing business practice."). Warren Buffet highlighted the importance of reputation when he said: "We can afford to lose money—even a lot of money. But we can't afford to lose reputation—even a shred of reputation." *See* Jessica Coacci, "Here's the one-page memo Warren Buffett sent to his managers every two years for over 25 years," Yahoo! Finance, August 6, 2025, https://finance.yahoo.com/news/one-page-memo-warren-buffett-140107224.html. *See also* Deepa Prahalad, "Why Trust Matters More Than Ever for Brands," Harvard Business Review, December 8, 2011, https://hbr.org/2011/12/why-trust-matters-more-than-ev ("[To create value, companies] must create an environment in which people can work well together and where they are engaged with the mission of the firm. They must treat suppliers and collaborators well. They have to give freedom to ask tough questions and experiment with new ideas. Trust is a prerequisite for all of these."); Don Fancher, Jennifer Lee, and Debbie McCormack, "Trust: A Critical Asset," Harvard Law School Forum on Corporate Governance, June 17, 2021, https://corpgov.law.harvard.edu/2021/06/17/trust-a-critical-asset/ ("[Trust] is a critical asset, albeit one that is not reported on the balance sheet or otherwise in the financial statements, as it has no intrinsic value. [...] When invested by leaders in relationships with stakeholders, it enables activities and responses that can help build or rebuild an organization and enable an organization to achieve its intended purpose. Trust can also be created across various groups within the organization—between the board and management, employer-employee, among the workforce, organization and stakeholder, vendors and customers. Conversely, a breach of trust can cause a company to lose significant value.").

96

149.    Even though Arm's ecosystem partnerships are important to its business model, making foreclosure more costly than Prof. Posner suggests, that does not mean that Arm is or should be obligated or amenable to accept the terms of every proposed partnership. Arm may determine that the terms of a specific proposed agreement are unprofitable and therefore choose not to license its technology under those terms. As discussed earlier in this Section, while having Qualcomm as a partner benefits Arm, that does not mean that Arm should enter into any agreement that Qualcomm proposes: the price needs to be "right," in the sense that it allows both Arm and Qualcomm to benefit from the partnership.

### 2. Qualcomm's Successful Business Diversification Strategy Disincentivizes Arm from Foreclosing Qualcomm

150.    As described above, foreclosing Qualcomm would harm Arm to the extent that Arm-based Qualcomm chips are diverted to non-Arm alternative ISAs (e.g., x86, RISC-V). This harm would include costs to Arm from losing any future growth related to Qualcomm entering new or growing non-smartphone applications with Arm-based Qualcomm chips sales.

151.    In November 2021, Qualcomm highlighted its new "diversification strategy" where it would diversify from its strong position in smartphones into other applications and end uses.[378] Qualcomm touted its strategy stating that it was "[u]niquely positioned to grow across multiple industries in addition to handsets" where the other industries included "Automotive," "Consumer IoT" (including personal computers, smartwatches and virtual reality devices), "Industrial IoT,"

---

[378] "Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, pp. 3-4, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf (Mr. Amon stated: "But the key message you're going to see is we're truly diversifying. There's so many new end markets for the company right now, and the market is really moving towards our technology. […] I want to show you that we'll always be the company defining the pace of innovation in mobile. You know us from mobile. But we're no longer defined by a single end-market and a single customer relationship. While we'll always going to be the company focused in driving innovation in mobile, there's more to Qualcomm."); "Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, p. 2, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf (Mr. Amon stated: "[W]e outlined a new strategy for the company back in 2021. And we came here to kind of walk to what we have done since then and what we're going to be doing next. […] So, I want to start by highlighting what is our mission. Our mission is really to enable intelligent computing everywhere we have been on this trajectory, realizing that the technologies we have developed over the many years and continue to develop can be very relevant to a number of different industries beyond mobile. And that is the mission that we have been pursuing since we outlined our strategy back in 2021.").

97

██████████████████████████████

███████████████████████

and "IoT Edge Networking."[379] Qualcomm estimated that diversification would increase its addressable market from about $100 billion to $700 billion over the next decade.[380] This included Qualcomm's belief that it was "[p]ositioned to be the preferred platform for PCs in the inevitable transition to Arm."[381]

152.    As detailed above, Qualcomm has publicly reported very strong financial performance in its non-smartphone segments during 2024 and 2025.[382] In fact, in its most recent November 2024 Investor Day presentation, Qualcomm executives provided an update on its diversification strategy, which Mr. Amon summarized as follows:

> [I]n summary, this is how we feel about the incredible opportunity ahead for Qualcomm. We have put a [diversification] strategy in [20]21. We're not changing our strategy. We've just been busy executing on that strategy. And it's working.[383]

153.    Consistent with this, Mr. Palkhiwala stated at the 2024 Investor Day that by 2029 he expected Qualcomm's non-smartphone revenue to increase to 50% of its total revenue (up from 32% at the end of 2021):

---

[379] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, pp. 6, 58, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf.

[380] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, p. 8, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf. (">7X addressable market expansion over the next decade.") and p. 10 ("Expanding TAM and diversification while increasing margins and stockholder returns[.]").

[381] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, p. 38, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf.

[382] See Section VI.A.

[383] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 3, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/QCOM_Investor-Day-2024_transcript_11-19-24_FINAL.pdf (Mr. Amon further stated that the goal was "to be continuing to transform Qualcomm into a diversified growth leader in the industry."). See also "Qualcomm Investor Day 2024 Presentation Deck," Qualcomm, Cristiano Amon, November 19, 2024, p. 27, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf (Further, the presentation deck used by Mr. Amon touted "key takeaways" such as "[s]uccessfully executing against our diversification strategy" with "[s]ignificant opportunity for growth across target industries" and "[g]rowing ecosystem of new customers and partners." His deck ultimately concluded that these factors were "[t]ransforming Qualcomm into a diversified growth leader.").

████████████████████████████

████████████████████████

*I want to quantify the long-term target for our diversification plan. We are targeting a mix of 50 over 50 by the end of the decade. For handset and non-handsets, and we believe this transformation will be highly value accretive.*[384]

154.    Qualcomm confirmed that it is on track to hit its aggressive diversification goal. As Mr. Amon described in July 2025: "Another quarter of strong growth in QCT Automotive and IoT revenues further validates our diversification strategy and confidence in achieving our long-term revenue targets[.]"[385]

155.    Qualcomm's recent success and expected future growth in these non-smartphone applications benefits Arm in at least two ways. First, in some cases—such as virtual reality devices—Qualcomm is expanding into application areas where, absent its involvement, the volume of trade would be smaller or the speed of progress slower.[386] ████████████████████

---

[384] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 27, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/QCOM_Investor-Day-2024_transcript_11-19-24_FINAL.pdf. *See also* "Qualcomm Sets New Growth Targets, Showcasing Company's Opportunity as On-Device AI Accelerates Demand for its Technologies," Qualcomm Inc., Press Release, November 19, 2024, https://investor.qualcomm.com/news-events/press-releases/news-details/2024/Qualcomm-Sets-New-Growth-Targets-Showcasing-Companys-Opportunity-as-On-Device-AI-Accelerates-Demand-for-its-Technologies/default.aspx ("Qualcomm Incorporated (NASDAQ: QCOM), a connected computing leader, today outlined its significant opportunities for growth and diversification at its 2024 Investor Day. The company's unique position at the edge is driving access to an expanded TAM [Total Addressable Market] of approximately $900 billion by 2030, with more than 50 billion cumulative connected edge device shipments expected from 2024 through 2030. 'Qualcomm's focus on diversification and industry-leading technology roadmap has significantly strengthened the Company's growth profile,' said Cristiano Amon, President & CEO, Qualcomm Incorporated. 'As generative AI accelerates demand for our technology and we become increasingly relevant across multiple industries, Qualcomm is well positioned to address a $900 billion opportunity by 2030 across an expanding ecosystem of new customers and partners.'"). *See* Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 26, 2021, p. 11, https://s204.q4cdn.com/645488518/files/doc_financials/2022/q1/0001728949-22-000012.pdf (Qualcomm QCT revenue by segment reported for Q4 2021).

[385] "Qualcomm Announces Third Quarter Fiscal 2025 Results," Qualcomm, July 30, 2025, p. 1, https://s204.q4cdn.com/645488518/files/doc_financials/2025/q3/FY2025-3rd-Quarter-Earnings-Release.pdf. *See also*, "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, pp. 2, 12, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon stating: "Our chipset business delivered revenues of $9 billion, reflecting strength in Automotive and IoT and ongoing growth in Handsets. Automotive and IoT revenues increased 21% and 24% year over year, respectively. […] Our momentum in Automotive and IoT is the result of strong execution of our growth and diversification strategy. We remain on track to meet our fiscal 2029 target for combined Automotive and IoT revenues of $22 billion. […] We feel that the company is on the right trajectory, especially as we look for growth and diversification beyond Handsets and AI continues to be a great opportunity for us.").

[386] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 4:23, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational

██████████████

[387] In both scenarios, Arm benefits significantly from its partnership with Qualcomm—whether through expanded market opportunities in emerging applications or through retained volume that might otherwise shift to competing ISAs. Foreclosing Qualcomm would mean forfeiting these growing advantages, making such a strategy economically costly for Arm, particularly in the long term.

### 3. Prof. Posner's Diversion Analysis Is Incomplete and Ignores Important Foreclosure Costs that Arm Would Incur

156.    Prof. Posner analyzes diversion briefly and incompletely.[388] He ignores important competitive constraints that Arm faces (as discussed above in Section V) as well as important foreclosure costs that Arm would incur if it were to pursue the strategy he hypothesizes.

157.    As an initial matter, Prof. Posner focuses his diversion analysis only on the supply of chips in the data center segment, as shown in his Figure 3. In his diversion setup, he presents a scenario where Qualcomm effectively is already in the "market" for data center chips, and "Arm enters the data center chip sector [by] licensing itself to manufacture Arm-compliant chips" and thereby "competes with Qualcomm."[389] In reality, Arm is about 1.5 to two years ahead of Qualcomm in developing a data center chip.[390] This means that Arm can expect to earn profits from data center chips well before Qualcomm even enters (if ever) with its own chip.[391] As a result, Arm can earn

---

(Ziad Asghar (Qualcomm) stating: "if you pick up any device that does virtual reality, and a device that matters, it's actually based on Snapdragon.").

[387] ███████████████████████████████

[388] Posner Report, ¶ 70 and Figure 3.

[389] Posner Report, ¶ 69.

[390] Section VIII.B.1.

███████████████

profits without any diversion from Qualcomm over this period. In other words, Arm's ability to earn profits from its data center chip does not depend on any purported foreclosure of Qualcomm.

158.    Further, Prof. Posner's Figure 3 completely disregards diversion from Qualcomm's Arm-based data center chips to chips based on non-Arm ISAs, such as Intel's x86 ISA. This is a critical oversight since x86 is the dominant architecture in data centers. Diversion to data center chips based on x86 would represent a significant cost to Arm, as Arm would lose the margin it earns on Qualcomm's Arm-based chips.[392] Prof. Posner completely ignores this cost. In **Exhibit 3**, I modify Prof. Posner's Figure 3 to properly account for diversion to x86, illustrating the lost profits that Arm would suffer.[393] The revised exhibit shows that, if Arm were to cut off Qualcomm's access to Arm's ISA, OEMs would likely respond by not only purchasing other Arm-based data center chips (if available) but also by purchasing more x86-based chips, on which Arm earns no profit at all.



[393] The logic represented in Prof. Posner's Figure 3 suffers from other infirmities which are addressed elsewhere in my report. My modification to his figure is simply done to highlight a critical oversight related to his representation of diversion.

**Exhibit 3: Diversion in Data Centers (Modified Prof. Posner Figure 3)**



Red boxes and red text have been added to Prof. Posner's original Figure 3.

159.    More generally, if Arm were to foreclose Qualcomm "completely" by "cutting off" access to the Arm ISA,[394] as Prof. Posner considers in his Figure 3, then Qualcomm would be foreclosed from using Arm-based technology for data centers, as well as all other downstream applications, including smartphones and personal computers.[395] To properly account for this, in my **Exhibit 4**, I expand Prof. Posner's Figure 3 to account for additional paths of Qualcomm's diverted sales. By excluding diversion to these additional paths, Prof. Posner's analysis overstates Arm's ability to profitably recapture Qualcomm's volume and understates the full foreclosure cost to Arm. These additional diversion paths include:

---

[394] Posner Report, ¶ 70 and Figure 3 ("If Arm is able to cut off technology supply for Qualcomm completely, then Arm loses its upstream margins on the Qualcomm license. However, Arm would gain downstream sales and the downstream margins that they produce, assuming that Arm is a viable competitor in the downstream market either through organic entry or through acquisitions. Figure 3 illustrates these dynamics."). As noted above in Section VII, Prof. Posner also considers partial foreclosure of Qualcomm. Regardless of whether the alleged foreclosure is full or partial, the lost profits from diversion that I depict in **Exhibit 4** properly apply.

[395] The Snapdragon 8 Elite for mobile (i.e. smartphone) and Snapdragon X Elite for PC are also developed based on the customized Arm-based Oryon CPU. *See* "Qualcomm Oryon CPU," Qualcomm, https://www.qualcomm.com/products/technology/processors/oryon, accessed August 20, 2025.

- *Qualcomm sales diverted to x86 and RISC-V:* For these sales, Arm would forfeit its entire royalty fees from Qualcomm, with no opportunity for recapture.[396] In reality, OEMs facing reduced access to Qualcomm's Arm-based chips are likely to consider switching to x86 or RISC-V solutions, especially in segments where those architectures are established (e.g., x86 in data centers and PC and RISC-V in IoT).[397] Such diversion is particularly relevant given Qualcomm's stated plans to transition away from Arm ISA to RISC-V (discussed in Section VIII.D.3).

- *Qualcomm sales diverted to Apple:* For those Qualcomm sales lost to Apple, Arm may earn less depending on the difference between the royalty it earned from Qualcomm and the royalty it earns from Apple. Prof. Posner does not consider this possibility.

- *Qualcomm sales diverted to chips for lower-end smartphones:* Qualcomm accounts for a high share (70%) of premium-tier Android smartphones,[398] which typically generate higher royalties for Arm.[399] Thus, Qualcomm smartphone chip sales diverted to chip sales for lower-end smartphones would result in lower royalties for Arm.

- *Qualcomm sales for innovative customer products that are lost:* Qualcomm touts that its industry-leading chips are used in cutting-edge innovative customer products such as virtual reality devices.[400] If Qualcomm were foreclosed, some of these products may be

---

[396] In addition, as discussed in Section VII.C.1, any attempt by Arm to foreclose Qualcomm could damage Arm's reputation and ecosystem, leading to additional lost sales with its other customers, as these customers pivot instead to x86 or RISC-V. These additional lost sales are not shown in **Exhibit 4**.

[397] "Why RISC-V is Inevitable, Calista Redmond, RISC-V International," RISC-V International, April 6, 2023, at 8:33, https://www.youtube.com/watch?v=ktjSvIeIKPk&ab_channel=RISC-VInternational ("So, consumer and IoT devices, this is again one of the areas that has been home to RISC-V for some time. The Android open source project, as far as other companies who've been bringing RISC-V into earbuds and other consumer devices. Microchip you know coming through with their portfolio. SiFive on wearables, smart home, VR, industrial IoT.").

[398] "Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/ ("Qualcomm's share in the >$500 band increased from 47% in Q1 2020 to 71% in Q1 2022").

[399] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025.

[400] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 4:23, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational (Ziad Asghar (Qualcomm) stating: "if you pick up any device that does virtual reality, and a device that matters, it's actually based on Snapdragon."); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update,"

delayed in coming to market or come to market with lower quality—resulting in lost sales (i.e., the volume of trade would be smaller). For these lost sales, Arm would forfeit its entire royalty fees from Qualcomm, with no opportunity for recapture.

## Exhibit 4: Diversion in All Applications (Modified Prof. Posner Figure 3)



Red boxes and red text have been added to Prof. Posner's original Figure 3.

Cristiano Amon, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, pp. 3, 5, 6 ("We're incredibly proud in this company about the technology roadmap of Qualcomm. […] It is the industry leading technology roadmap for both at the system level and semiconductors at the edge. […] The next one is what is happening with XR [extended reality devices]. […] And we have now every single design win across everyone that is building those [smart glasses] devices. […] I want to talk about AI at the edge. […] It's a generation opportunity for Qualcomm. […] We built a platform in mobile, but now with AI, we believe we can further differentiate. We're uniquely positioned to have AI and automotive."). *See also* Posner Report, ¶ 62 ("OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers.") and ¶ 77 (describing Qualcomm's experience in developing "leading edge" chips.); "Virtual Reality: Transforming the way we experience reality," Qualcomm, https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar/virtual-reality-vr ("The Snapdragon XR2 Gen 2 Platform powers next-generation MR and VR for all with amazing performance and groundbreaking on-device AI"); "The 5 Best Features of the Meta Quest 3," Qualcomm, January 12, 2024, https://www.qualcomm.com/snapdragon/news/the-5-best-features-of-the-meta-quest-3.

160.    Prof. Posner states that Arm has an incentive to foreclose Qualcomm because the "short term" costs from foreclosure are more than outweighed by the "long term" benefits.[401] He does not explain why costs are incurred in the short run and benefits materialize in the long run. In fact, a number of costs are incurred in the long run, e.g., the loss of Arm's reputation, harm to Arm's ecosystem, and the fact that an attempt by Arm to foreclose customers would accelerate the development of alternatives such as RISC-V. Similarly, benefits to Arm may occur at the same time as its loss of Qualcomm royalty. For example, if Samsung were to switch from Qualcomm chips to MediaTek chips, the increase in royalty payments from MediaTek may very well occur at the time the lost royalty payments from Qualcomm would have occurred. Therefore, the alleged anticompetitive effects may very well have net benefits or be neutral in the "short term" and have net costs in the "long term."

161.    In conclusion, Prof. Posner's diversion analysis fails to account for critical economic realities that undermine his foreclosure theory. His narrow focus on data center chips overlooks diversion to competing ISAs such as x86 and RISC-V, which would result in lost royalties for Arm. He disregards the timing mismatch between Arm's and Qualcomm's chip launches. Moreover, when extended to other applications, the analysis omits additional diversion paths—including sales lost to Apple and lower-tier devices, and lost sales of innovative products—all of which may further increase the cost of foreclosure. By excluding these factors, Prof. Posner overstates Arm's ability to recapture Qualcomm's volume and understates the economic costs Arm would incur, rendering his analysis incomplete and unreliable.

---

[401] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the short term, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the long term than the margins on existing ALA licenses—and Arm is unhappy with the level of royalties that Qualcomm is required to pay under the ALA. Moreover, although Qualcomm has historically been one of Arm's most important customers, it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 87 ("As customers flee Qualcomm to Arm, Arm will lose money in foregone royalties in the short term. But, Arm hopes to obtain larger margins in the long term as it takes over Qualcomm's business or Qualcomm is pushed to increasingly make use of Arm's OTS cores.").

105

### D. Foreclosure of Qualcomm Alone Would Unlikely Be Profitable for Arm

162.    While Qualcomm is a large customer, it accounts for only about 10% of Arm's total revenue.[402] A foreclosure strategy aimed solely at Qualcomm is unlikely to be effective, as the potential benefits are tied specifically to Qualcomm's sales, whereas the costs (reputational and other) would affect the broader Arm business.

163.    As discussed in the previous sections:

   i.    The benefits from the alleged foreclosure of Qualcomm are the incremental profits that Arm makes on the recaptured sales, i.e., the sales that divert from Qualcomm custom chips to Arm's OTS cores and Arm's own chips, compared to the profits that Arm would have made on those diverted sales in the absence of foreclosure.

   ii.   The costs are the profits lost by Arm on sales that divert to another ISA (e.g., x86 and RISC-V) or to lower margin Arm-based chips (e.g., low-end Android smartphones), the loss of ecosystem benefits due to Qualcomm not making custom cores using Arm's ISA, and Arm's loss of reputation as a reliable partner. The first cost affects a portion of Arm's sales to Qualcomm, but the other two costs affect Arm's entire business, i.e., go beyond Qualcomm's sales.

164.    Quantifying these benefits and costs is hard (and neither I nor Prof. Posner attempt to quantify them), but they are no less real to the profitability of Arm's business than the costs that Prof. Posner discusses in his report. By omitting these costs from his analysis, Prof. Posner reaches a biased and unreliable conclusion.

### VIII.  PROF. POSNER HAS NOT DEMONSTRATED THAT ARM'S CONDUCT IS ANTICOMPETITIVE

165.    Prof. Posner claims that Arm's conduct towards Qualcomm constitutes anticompetitive behavior. He states that "it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long

---

[402] SAC, ¶ 57 ("Qualcomm is today one of Arm's largest licensees—it 'accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024.'"). *See also* ARMQC_00000640 at '646.

term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties."[403] However, Prof. Posner provides no evidence for his claims and bases his conclusion on stylized theoretical models of vertical interactions without linking them to the industry at issue or the facts in this case.

## A. Arm Protecting the Terms of Its Contracts Is Procompetitive

166.    The SAC states that "[s]ome of Arm's maneuvers resulted in a trial that took place last year before this Court. […] That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA."[404] Prof. Posner hardly mentions the Nuvia acquisition despite its central role in this dispute, but does state that "Qualcomm contends that Arm has engaged in a number of unfair acts and practices, including threatening to terminate Qualcomm's ALA […]."[405]

167.    Arm's conduct—including its decision to initiate litigation against Qualcomm and its use of consent provisions in licensing agreements with Nuvia—reflects a commercially reasonable and procompetitive effort to protect its IP and clarify contractual obligations. In innovation-driven industries, legal enforcement is a standard mechanism for resolving disputes and preserving incentives for investment and cooperation. Whereas Qualcomm's claims conflate ordinary commercial disagreement with anticompetitive behavior, Arm's business practices reinforce the integrity of its licensing model and support the continued growth of its ecosystem.[406]

### 1.    Contract Enforcement Is a Legitimate Procompetitive Action

168.    There is no evidence that Arm initiated the *Arm v. Qualcomm* litigation for anticompetitive purposes. Rather, evidence shows that Arm acted to protect its IP and the associated revenue potential. I do not opine on whether Qualcomm or Arm breached the Qualcomm and Nuvia

---

[403] Posner Report, ¶ 13.

[404] SAC, ¶ 6.

[405] Posner Report, ¶ 13.

[406] Qualcomm itself aggressively protects its IP through lawsuits and requests of injunctive relief. *See* footnote 350.

███████████████████████████████████████

████████████████████████████

agreements with Arm, and I have been instructed by Counsel for Arm to assume the disagreement with Qualcomm concerning the correct interpretation of various terms of Qualcomm and Nuvia agreements with Arm reflects Arm's genuine views of Arm's, Qualcomm's, and Nuvia's contractual obligations. In that context, pursuing legal action is a standard and appropriate means of resolving commercial disputes. The conduct that Qualcomm characterizes as anticompetitive is, in fact, consistent with a firm seeking to protect its IP and enforce its rights under the terms of its agreements.

169.    Clarity on contractual terms is essential in industries where IP and licensing frameworks are central to innovation—particularly in high-technology sectors. Enforcing and interpreting contracts through the legal system is not only lawful but also promotes investment, cooperation among firms, and long-term ecosystem stability.[407] If licensees were permitted to disregard contractual obligations, it would undermine the value of IP, weaken incentives for future investment in ISA development, and ultimately harm innovation and consumer welfare.[408]

---

[407] Spulber, Daniel F., "How do Competitive Pressures Affect Incentives to Innovate When There Is a Market for Inventions?," Journal of Political Economy, 2013 Vol. 121, No. 6, pp. 1007-1054, at p. 1007 ("When IP is not fully appropriable, markets for inventions are limited and competitive pressures can decrease incentives to innovate."). *See also* Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007, pp. 8-10, https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451 ("Economists have long recognized that certainty of contract is essential to a healthy economy. […] Those contracts can only accomplish that goal, however, if parties know the contracts will be enforced. […] The 'fundamental function of contract law' is to 'encourage the optimal timing of economic activity' by 'deter[ring] people from behaving opportunistically toward their contracting parties.' Richard A. Posner, *Economic Analysis of Law* 91 (4th ed. 1992). […] That function cannot be accomplished without effective means for enforcement. As this Court has stated: 'Market efficiency requires effective means to enforce private agreements.' *Am. Airlines, Inc.* v. *Wolens*, 513 U.S. 219, 230 (1995).").

[408] Qualcomm has publicly emphasized the importance of strong IP rights in driving innovation. As stated on its website, robust IP protections "[encourage] investment in research and development by companies and individuals." *See* "Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025. Robert Giles, Senior Vice President and Chief Intellectual Property Counsel of Qualcomm similarly testified before the U.S. Senate that courts should be empowered to grant injunctions in appropriate cases to deter "efficient infringement"—a strategy where companies knowingly use patented inventions without seeking a license, assuming they will only be liable for royalties if sued. "Statement of Robert Giles Senior Vice President and Chief Intellectual Property Counsel Qualcomm Incorporated On Behalf of the Innovation Alliance," Hearing on The Patent Trial and Appeal Board: Examining Proposals to Address Predictability, Certainty, and Fairness, Before the Subcommittee on Intellectual Property, Committee of the Judiciary, United States Senate, pp. 3 and 7, June 22, 2022, https://www.judiciary.senate.gov/imo/media/doc/Testimony%20-%20Giles%20-%202022-06-22.pdf.

108

## 2. Clause 16.3 of Arm's Agreement with Nuvia Has Procompetitive Justifications

170. Arm's decision to grant Nuvia a license with specific terms is based on careful consideration of the benefits and costs to Arm and the broader impact on its ecosystem. Clause 16.3 of Arm's agreement with Nuvia, which required Arm's consent before any transfer of Nuvia's technology to Qualcomm (or any other acquiring firm), allowed Arm to evaluate the implications of a potential acquisition and ensure that its IP would continue to be used in a manner consistent with its licensing strategy, ecosystem goals, and revenue objectives.[409]

171. It is possible that, in a but-for world without clause 16.3, a mutually beneficial agreement could not have been reached. The clause provided Arm with a mechanism to assess the implications of a potential acquisition and mitigate risks to its ecosystem and profitability. Without this safeguard, Arm may have been unwilling to accept the lower upfront fees and higher running royalties that characterized the Nuvia agreement. In turn, this could have led to less innovation and fewer competitive CPU designs, particularly if Arm were unwilling to license to startups like Nuvia. The clause is therefore procompetitive.[410]

## B. Arm's Entry into the Chip Design Stage of the Value Chain Is Procompetitive

172. Qualcomm claims that Arm has shifted from a neutral licensing model to becoming a direct chip competitor. The SAC and Prof. Posner argue that "[f]or years, Arm expressed its commitment to an open, neutral model for licensing the use of its ISA," and this model "benefited the software developers, which could develop software that would be interoperable across Arm-compatible devices, and ultimately benefited customers" and "also benefited Arm, leading to widespread

---

[409] Arm's CEO testified that such a clause is "standard." *See* Rene Haas (Arm) testimony in *Arm v. Qualcomm*, Trial Transcript Vol 2.1, December 16, 2024, 165:7-19.

[410] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025, explaining that the clause protects the value of Arm's IP investment and that, without the clause, Arm would need to develop an alternative licensing model to ensure the returns Arm needs to continue investing to address the expanding demand for increasingly complex uses of its ISA. Without the clause, Arm may have also found it necessary to shorten the length of its ALA contracts and become more vertically integrated.



adoption of the ISA."[411] Qualcomm also argues that, more recently, "Arm has pivoted away from that model," transforming itself "from licensing intellectual property to positioning itself primarily as a chip designer," including by "planning to launch its own chip by as early as this summer [in 2025]."[412] These claims are unfounded, as I explain below.

### 1. The Start of the Alleged Foreclosure Significantly Predates Arm's Data Center Chip Launch

173.     Qualcomm and Prof. Posner argue that Arm's entry into chip design for data centers exacerbates Arm's incentive to foreclose Qualcomm,[413] suggesting that Arm seeks to divert Qualcomm's volume to its own, more profitable chips.[414] The timing and uncertainty surrounding Arm's chip launch undermine this claim.

174.     Arm has not yet begun delivering its data center chips and its ultimate commercial success remains uncertain.[415]



The alleged foreclosure also began four years before Qualcomm even

---

[411] SAC, ¶ 68. *See also* Posner Report, ¶¶ 80-90.

[412] SAC, ¶¶ 69-70. *See also* Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008. *See also* QCVARM_0600104 at '122, "Complaint Against Arm Holdings Plc by Qualcomm Incorporated," Paul Weiss, December 19, 2024, discussing Arm's strategic decision to increase investments in compute subsystems and to "move up the semiconductor food chain and become a chip maker itself."

[413] SAC, ¶ 35 (stating that "[t]o facilitate its entry into selling its own chips, Arm now seeks to force Qualcomm— which would otherwise be a competitor—out from the marketplace."); *Id.*, ¶ 71.

[414] Posner Report, ¶ 71 ("[I]f Arm is a viable competitor downstream and is able to capture even some small portion of diverted sales from Qualcomm, that creates additional incentive to foreclose Qualcomm. This is because downstream margins on chip sales to data centers are likely to be higher than upstream margins for licensing. The more of Qualcomm's potential share that Arm can capture after foreclosing Qualcomm, the stronger its incentive to foreclose Qualcomm.").

[415] Will Abbey (Arm) describes the inherent uncertainty in R&D timing, particularly in the context of the v10 ALA. He explained that "the reality of engineering milestones is, six months could become eight months, could become a year, it could become two years. All that needs to happen is, during verification, there's a defect. And so if you're building a product and a business around engineering delivering a given product in a given time, I'd say, start with what we've got. And so I would be cautious about entering into those conversations early." *See* Abbey (Arm) June 2025 Deposition, 34:16-24.

[416] Qualcomm finalized Nuvia's acquisition in March 2021. *See* "Qualcomm Completes Acquisition of NUVIA," Qualcomm, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-

110

announced its *intention* to produce a data center chip.[417] The significant time gap and the uncertainty about outcomes are further evidence that Arm's potential launch of its own data center chip is unlikely to be part of a purported "broad scheme" to foreclose Qualcomm, or that it created any incentives to foreclose Qualcomm years before Arm's chips reached the market.[418] Indeed, Prof. Posner does not identify *any* document linking the launch of Arm's chip designs to the alleged foreclosure of Qualcomm. The absence of such evidence reinforces the conclusion that Arm's entry into chip design was a procompetitive response to evolving customer demand.

### 2. Vertical Integration Is Common and Typically Beneficial

175.     Prof. Posner claims that Arm's entry into chip design reflects a strategy to "drive Qualcomm away from designing custom cores, or to drive Qualcomm out of selling chips and SoCs entirely."[419] However, this interpretation ignores the widespread and often procompetitive nature of vertical integration in technology markets.

176.     Vertical integration—where a firm operates at multiple levels of the supply chain—is widespread and typically beneficial. Qualcomm itself is vertically integrated, licensing its IP while also selling its own chips. ████████ Arm's model, which

nuvia;

---

[417] In May 2025 Qualcomm announced its first data center chip in partnership with NVIDIA. *See* Sebastian Moss, "Qualcomm Announces Data Center CPUs, Will Support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025, https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/. As described later in this Section, Qualcomm's data center chip won't arrive until fiscal year 2028, about seven years after the alleged foreclosure began.

[418] As described later in this Section, Arm's data center chip won't arrive until 2026, a full five years after the alleged foreclosure began.

[419] Posner Report, ¶ 13.

[420] "Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, p. 10, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf. *See also* "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, p. 6 https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf, and

111

involves licensing its ISA and now designing chips for data center applications, mirrors this dynamic and is consistent with industry norms.

177.    Vertical integration is commonplace in a variety of industries, with upstream firms often competing in the downstream markets with their own customers, without foreclosing them. The commonplace nature of benign vertical integration is described in a recent academic paper: "Examples include Apple and Microsoft, selling their products directly in their stores in addition to using retailers such as Best Buy and Walmart; Nike and Adidas, selling their products directly online in addition to using retailers such as Foot Locker and Macy's; and television networks, like HBO and ESPN, selling their content directly through their online platforms, HBO Now and ESPN+, in addition of selling their content to cable companies such as Comcast and Time Warner Cable."[421]

178.    This blend of competition and cooperation is commonly referred to as "coopetition,"[422] and is a widespread phenomenon in modern business.[423] For example, Samsung and Apple are "fierce" rivals in the smartphone industry, yet Samsung—one of the leading screen manufacturers—has supplied screens for iPhones for years, dating back to the iPhone 4.[424] Despite

---

Kwon, Yona, Dahee Kang, Sinji Kim, and Seungho Choi, "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," Journal of Open Innovation: Technology, Market, and Complexity, 2020, Vol. 6, No. 1, p. 1 ("Although most of the firms seem to compete against each other to maintain their advantage continuously, firms also often cooperate with their competitors even while competing. Especially in a high-tech industry where technological innovation and change in products are fast, it is difficult to cope with global competitors with a single, static strategy. In other words, a dynamic competition and cooperation between firms is necessary to sustain a firm's competitive advantage. […] The competitive behavior of Qualcomm thus should be understood as dynamic interactions in which Qualcomm both competes with and cooperates with its rivals. These interactions with their rivals do not occur alone but are intertwined and interrelated with one another.").

[421] Donna, Javier D., Pedro Pereira, Yun Pu, Andre Trindade, and Renan C. Yoshida, "Direct sales and bargaining," RAND Journal of Economics, 2024, Vol. 55, No. 4, pp. 749–787.

[422] See Brandenburger, Adam M. and Barry J. Nalebuff, "The Rules of Co-opetition," Harvard Business Review, 2021.

[423] Richard Grisenthwaite, Chief Architect at Arm, testified that "as is common with many companies in this industry, we have elements in which we cooperate and then elements in which we compete with companies that we work with. […] [S]ome elements of ARM very actively cooperate with its ALA customers and some elements of ARM more clearly compete with them, yes. […] ARM creates its own core implementations consistent with the ARM architecture and those cores end up competing with cores created by our ALA customers." See Grisenthwaite (Arm) Deposition, 23:15-24:10.

[424] Imogen Beech, "6 real-life coopetition examples," Breezy, September 6, 2023, https://breezy.io/blog/coopetition-examples. See also Haroun Adamu, "Did you know: Samsung makes a lot of

██████████████████████

████████████████

competing directly in end products, the two companies continue to collaborate where it is mutually beneficial.

179.   There are many procompetitive effects from vertical integration. *First*, vertical integration may allow an input supplier to gain valuable implementation experience that helps them improve their own products, benefiting consumers.[425] Arm's CEO, Rene Haas, recently made this very point. Addressing speculation about Arm's potential entry into AI chip design, Mr. Haas explained that an important reason for Arm's integration into chip design is to gain a better understanding of the link between hardware and software: "it's easier to do if you're building something than if you're licensing IP" where "you're much closer to that interlock and have a much better perspective in terms of the design tradeoffs to make. So, if we were to do something, that would be one of the reasons."[426]

---

money from iPhones," Android Authority, June 11, 2025, https://www.androidauthority.com/did-you-know-samsung-apple-partnership-3426411/.

[425] *See*, for example, "Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, p. 4, https://hbsp.harvard.edu/product/711463-PDF-ENG ("Qualcomm has been willing to move downstream into end products in order to demonstrate proof of concept. While other IP firms only do technology (which sometimes creates problems in implementation, such as Rambus), Qualcomm repeatedly created end-user products and systems to show that the technology could really work."); Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, November 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/ ("Making its own mobile processors has helped Apple innovate with such features as facial recognition and augmented reality on the iPhone. Designing its own chips for devices like the MacBooks and Mac Mini announced Tuesday should also allow Apple to be more creative with PCs. [...] When chip, device, and software engineers work closely together they can squeeze more performance out of a device than is possible with an off-the-shelf chip."). *See also* Khadija Khartit, "When Does It Make Sense for a Company to Pursue Vertical Integration?" Investopedia, February 6, 2025, https://www.investopedia.com/ask/answers/012715/when-does-it-makes-sense-company-pursue-vertical-integration.asp ("Vertical integration makes sense as a strategy, as it allows a company to reduce costs across various parts of production, ensures tighter quality control, and ensures a better flow and control of information across the supply chain."). *See also* Yang, Chenyu, "Vertical Structure and Innovation: A Study of the SoC and Smartphone Industries," The RAND Journal of Economics, 2022, Vol. 51, No. 3, pp. 739–785 (Studying a hypothetical vertical merger between Qualcomm and HTC (a smartphone manufacturer) finding that it "can increase innovation and welfare, mainly driven by the investment coordination of the merged firms.").

[426] Exhibit 10 of Haas (Arm) Deposition ("If you are defining a computer architecture and you're building the future of computing, one of the things you need to be very mindful of is that link between hardware and software. You need to understand where the trade-offs are being made, where the optimizations are being made, and what are the ultimate benefits to consumers from a chip that has that type of integration. That is easier to do if you're building something than if you're licensing IP. This is from the standpoint where if you're building something, you're much closer to that interlock and you have a much better perspective in terms of the design trade-offs to make. So, if we were to do something, that would be one of the reasons we might.").



180.     *Second*, Arm's entry into chip design increases competition, expanding product variety and potentially leading to lower prices and more rapid innovation, which in turn benefits consumers. While Arm's entry into data center chip design has the potential to harm Qualcomm by "stealing" volume from Qualcomm, this "stealing," if it in fact occurs, is the essence of competition.[427,428] Qualcomm points to a chat among Arm managers where Mr. Haas commented that Arm's competitors would be "hosed" if Arm were to build its own chips.[429] While framed in colloquial terms, the statement reflects the essence of competition, which is striving to create a product that customers prefer to the alternatives produced by rivals.

181.     *Third*, Qualcomm and Prof. Posner provide no evidence to support their claims that Arm moved into chip design for anticompetitive reasons (seeking profit is not inherently anticompetitive).

[427] Competition on the merits may harm to rivals. In *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945), Judge Hand famously captured the idea that competition harms rivals by stating that it would be contrary to the spirit of the antitrust laws to punish a firm that led to the exit of its rivals as a result of its "superior skill, foresight and industry."

[428] Qualcomm has until now not been successful in the data center space. However, as "part of a broader strategy from Qualcomm to diversify its business," in May 2025, it announced its plans "to launch a custom CPU for the data center that can connect to Nvidia's GPUs and software." *See* Arjun Kharpal, "Qualcomm to launch data center processors that link to Nvidia chips," CNBC, May 19, 2025, https://www.cnbc.com/2025/05/19/qualcomm-to-launch-data-center-processors-that-link-to-nvidia-chips.html. Qualcomm's recent acquisition of Alphawave Semi is also part of its strategy to expand in the data center space. *See* Majeed Kamran, "Qualcomm's Alphawave Acquisition Targets Data Centers and AI, But What's Next?" EE Times, June 9, 2025, https://www.eetimes.com/qualcomms-alphawave-acquisition-targets-data-centers-and-ai-but-whats-next/.

[429]



114

███████████████████████████████████
███████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

██    █████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████ █ █████████████████████████████████████
████████████████████████████████████████████

─────────────────────────

███████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
██  █████████████████████████████████
██████████████████████████████████████
███████████████

[432] "Infrastructure" refers to data centers.



183. *Fourth*, Arm's chip design is currently focused on data centers, where Arm-based chips have a very low share. This is consistent with Mr. Awad's testimony and suggests that foreclosure of Qualcomm was not a motive for the decision to move into chip design.[435] Furthermore, Qualcomm has indicated that it is not expected to begin selling data center chips until fiscal year 2028.[436] Prof. Posner does not explain why, if foreclosure of Qualcomm was indeed a motivating factor behind Arm's integration into chip design, Arm would not have begun with segments where Qualcomm has a larger presence. In other words, starting its "broad scheme" to harm Qualcomm in a segment where Qualcomm does not currently generate any revenue seems ineffective and irrational.

184. *Fifth*, other firms in the industry have similarly engaged in verticalization. For example, as Paul Williamson testified, "AWS as a cloud vendor now build[s] their own silicon, rather than purchasing off-the-shelf silicon from other vendors. So that has been a verticalization trend in the

---

■ ████████████████████████████

■ ████████████████████████████████████████████████████████████

■ ████

[435] Prof. Posner acknowledges that "the requirements of each sector are unique." Posner Report, ¶ 60. This implies that Arm entry in a given application does not affect competition in other applications.

[436] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [data center] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. If successful, we expect revenues to begin in the fiscal '28 timeframe.").

infrastructure market."[437] Similarly, Apple in 2020 vertically integrated upstream into computer chip design with the launch of its Arm-based M1 chip.[438]

185.    Prof. Posner further alleges that Arm's entry might discourage customers from sharing confidential information.[439] These claims are speculative and unsupported. He does not provide any evidence on the existence or extent of this issue but instead simply cites the FTC's complaint on Nvidia's acquisition of Arm.[440] However, the FTC's opinion in that case did not result in a Court decision and thus is not evidence.[441] On this claim, I further note the following:

- *First*, Prof. Posner does not provide any quantification, i.e., he does not explain how much less confidential information would be shared in a world where Arm engages in chip design for data centers compared to a world where Arm only designs OTS cores and CSS, nor does he identify the impact on product development.

---

[437] Williamson (Arm) Deposition, 96:3-9.

[438] "Apple announces Mac transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/; "Apple unleashes M1," Apple Newsroom, November 10, 2020, https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/. Abbey (Arm) June 2025 Deposition, 152:11-25 (Abbey testified to the trend of OEMs vertically integrating into chip production: "The market is shifting the same way that we know that a company like Apple has a vertical integration and a Silicon team that has the ability to produce chips. The market is shifting. And so Apple is a good example. Tesla is a good example. Xiaomi is an example. And so if you do have a silicon team that's enthused within the OEM – […] -- then, you know, who is paying royalties? It's the OEM. So as the -- as the marketplace shift, as the world shifts, we adapt to the changes that we are seeing in the marketplace. We simply want to broaden. We want to broaden the engagements that we have with all customers that consume ARM technology.").

[439] Posner Report, ¶ 19 ("As part of its traditional business model, Arm meets with its chipmaker customers to learn their business plans and technological needs so that it can improve the ISA. […] But if those customers believe that Arm may start competing with them in their line of business, they will be reluctant to share confidential information, which in turn will retard the development of Arm's ISA.").

[440] Posner Report, ¶ 89.

[441] The FTC has lost various vertical merger litigations, indicating that the FTC is not infallible in its conclusions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc*., U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, January 31, 2025, Case 4:24-cv-02508, Dkt. Entry 511 ("For the reasons specified below, the motion for a preliminary injunction is denied. […] The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns."); Swagath Bandhakavi, "FTC ends legal challenge against Microsoft's $69bn Activision Blizzard acquisition," Tech Monitor, May 23, 2025, https://www.techmonitor.ai/digital-economy/big-tech/ftc-microsoft-activision-blizzard-deal ("The FTC decided to drop the case following the dismissal of its appeal for a preliminary injunction, concluding that continuing the challenge against the already completed acquisition would not align with public interest objectives.").

- *Second*, Prof. Posner does not address why the same concerns he raises wouldn't apply to Arm's OTS cores or CSS. He does not explain why Arm's ALA customers would not already be reluctant to share confidential information that Arm could potentially use to develop its OTS cores, that indirectly compete with Qualcomm's custom cores. The absence of any evidence indicating such reluctance suggests that ALA customers are currently willing to share information and are likely to continue doing so even after Arm begins selling its own chips.[442]

- *Third,* even assuming that Prof. Posner is correct about partners becoming more reluctant to share confidential information, that would not make Arm's entry at the chip design stage anticompetitive. Prof. Posner fails to acknowledge that Arm's entry increases competition and improves Arm's ecosystem (by demonstrating that Arm-based chips are

---

[442] A possible reason why Prof. Posner's concern does not appear to affect transactions is that Arm limits the transmission of confidential information across the ALA and TLA teams. Ms. Bhattacharya, Senior Director of Engineering within the Architecture and Technology Group at Arm, stated that there are "concerns about sharing confidential information between parties."

a viable alternative to x86), which is procompetitive. He would need to balance any alleged anticompetitive effect with the procompetitive effects of entry.[443]

- *Fourth*, if Prof. Posner is correct that Arm's entry into chip design would "retard the development of Arm's ISA,"[444] that would represent a cost to Arm, who would risk losing sales to x86 and RISC-V. Prof. Posner acknowledges this cost, but fails to draw its implications in terms of reducing the profitability of foreclosure, and thus on Arm's incentive to foreclose. This cost would be particularly high if Prof. Posner is correct that "[t]he functionality of chips depends more on the microengineering choices of chip designers like Qualcomm than on the underlying ISA."[445] Regardless, contrary to Prof. Posner's claim, there is no evidence that Arm's entry into data center chip design has "retarded" the development of Arm's ISA.

- *Fifth*, Arm is developing chips for data centers,[446] and is experimenting with chips for automotive applications,[447] but it does not plan to develop chips for smartphones or PCs.[448] Qualcomm and Apple are already active and successful in producing chips for mobile and PC, limiting Arm's incentive to sell chips for those applications. Prof. Posner does not explain why the concern he raises is significant in light of the fact that Arm is

---

[443] This is the balancing that is generally done for mergers, both horizontal and vertical. For example, the upward pricing pressure from a horizontal merger would need to be compared to merger-specific efficiencies before a conclusion that a merger harms consumers can be reached. In the case of vertical mergers, the elimination of double marginalization and other merger-specific efficiencies need to be assessed before one can conclude that they are insufficient to eliminate any potential harm to competition.

[444] Posner Report, ¶ 19.

[445] Posner Report, ¶ 22. The only basis Prof. Posner offers for this definitive statement is the testimony of a Qualcomm employee, "Gerard Williams, Qualcomm Senior VP Engineering."

[447] Williamson (Arm) Deposition, 125:18-22 ("[W]e've engaged and considered building for a lead partner in the automotive division, silicon for the ADAS [Advanced Driver Assistance Systems] market for a potential lead customer called Waymo.").

[448] Williamson (Arm) Deposition, 125:18-126:4, 128:15-132:2, 175:11-25 (explaining that there are "[n]o active chips or silicon support development in the PC market" and that discussions by Arm with OEM mobile vendors have not extended to providing them a completed chip, but that "[Arm's] focus has been what we call compute subsystems.").

not planning to enter segments representing the large majority (70%) of Qualcomm's revenue.[449]

186.    Finally, I highlight that there is a significant difference between a vertical merger and the entry of an existing supplier into stages of the value chain that are further downstream. Antitrust agencies generally see a firm's organic entry into downstream stages of the supply chain as procompetitive because it adds a new competitor which tends to increase competition, increase variety, and eliminate double marginalization even if it can create incentives to raise rival input costs.[450]

187.    In summary, vertical integration is a widely adopted and often procompetitive strategy across many industries. Arm's entry into chip design mirrors similar moves by firms like AWS, Apple, and Qualcomm, which operate at multiple levels of the supply chain. Such integration can enhance innovation, increase product variety, and eliminate inefficiencies like double marginalization. Rather than harming competition, Arm's expansion reflects standard industry practice and is a natural response to evolving customer needs.

### 3.    Arm's Ecosystem Remains Open

188.    Prof. Posner wrongly claims that Arm recently pivoted from a "longstanding business model" that is "open" and "neutral" to a "different model, one in which it forecloses customers in

---

[449] Posner Report, ¶¶ 25, 64 ("Though mobile handsets comprise around 70% of Qualcomm's revenue, Qualcomm has penetrated the other chip sectors to varying degrees, including automotive, virtual reality (VR) and augmented reality (AR) devices, wearables (e.g., smartwatches and smartglasses), and IoT."). Prof. Posner states that "[f]or *illustrative* purposes, I focus on the data center sector, though Arm's intentions to sell SoCs extend beyond the data center sector," but provides no support for this claim (emphasis added)).

[450] For example, an FTC press release on legislations prohibiting direct sales to consumers by auto manufacturers stated: "According to the comments by staff from the FTC's Office of Policy Planning, Bureau of Competition, and Bureau of Economics, current laws in both jurisdictions 'operate as a special protection for [independent motor vehicle dealers] – a protection that is likely harming both competition and consumers.' […] 'FTC staff offer no opinion on whether automobile distribution through independent dealerships is superior or inferior to direct distribution by manufacturers. […] [C]onsumers are the ones best situated to choose for themselves both the cars they want to buy and how they want to buy them.'" *See* "Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers," Federal Trade Commission, Press Release, May 16, 2014, https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibitions-direct-consumer-auto-sales.



sectors that Arm seeks to enter."[451]

As described below, Prof. Posner also ignores important evidence that Arm continues to maintain an open business model and its entry into data center chips is procompetitive.

189.    *First*, contrary to Prof. Posner's claim, there is no evidence that Arm will not negotiate ALA licenses. In fact, Arm has several such existing agreements. Arm has recently signed an ALA with Nuvia in 2019, and since then with large, sophisticated customers such as Apple, IBM, and Google.[453] Prof. Posner provides no evidence, and in fact makes no claim, that Arm had ceased offering ALAs to other existing ALA customers. Even for Qualcomm, as recently as August 29, 2025, Arm responded to Qualcomm's August 8, 2025, letter with a set of "initial questions" regarding the terms outlined in Qualcomm's "proposed Annex 1 to the ALA for Arm's unreleased

---

[451] Posner Report, ¶ 66 ("Arm is pivoting from its open, neutral model—where it treats its customers in a nondiscriminatory manner, benefits from attracting as many licensees as possible, and therefore provides adequate support to its licensees—to a different model, one in which it forecloses customers in sectors that Arm seeks to enter."), ¶ 19 ("Arm will no longer keep its commitment to neutrality and openness"), ¶ 86 ("More than a decade later, Arm's ISA has reached such a level of dominance that licensees can no longer easily walk away. Now Arm seeks not only to raise royalty rates, but to design and manufacture SoCs, in a "dramatic departure from its traditional business model."), ¶ 87 ("Arm has already threatened to terminate Qualcomm's ALA, reversing its longstanding business model as the 'Switzerland of chips,' so that it can both increase the royalty rate, as it has done for the TLA, and take Qualcomm's SoC business.").

[453] Ehab Youssef identified IBM and Apple as partners that signed an ALA since 2019. *See* (Youssef (Arm) Deposition, 31:1-22); Google signed an ALA in June 2021 (ARM_01428339). *See also* ARM_00119603. Prof. Posner himself recognizes that "[i]n addition to Qualcomm, Arm licenses its architecture to a dozen or so other firms, including Apple, HiSilicon, IBM, Fujitsu, Ampere, T-Head, and BRJX." Posner Report, ¶ 24.

v10," and reaffirmed its intention to "move the negotiations forward."[454] As of the submission of this report, Qualcomm maintains both a TLA and an ALA with Arm.[455]

190.    *Second*, in paragraph 88 of his expert report, Prof. Posner wildly mischaracterizes a statement made by Mr. Haas, claiming that Mr. Haas stated that Arm no longer wished to keep its prior commitments to customers and instead planned to "cut off" ALA licensees. Prof. Posner states:

> *Arm's CEO, **Rene Haas, has recently confirmed that Arm no longer wishes to keep its prior commitments and instead plans to cut off ALA licensees** and sell SoCs directly to OEMs, such as data centers, automobile companies, and mobile phone manufacturers. Rene Haas said that Arm's interest in whether to accept a prospective customer depends on "whether your business is a chip business [such as Qualcomm] or a product business."[456]*

191.    To support his claim—which is critical to his antitrust narrative—Prof. Posner cites to a *single source*: a YouTube interview of Mr. Haas conducted in October 2024.[457] Contrary to Prof. Posner's characterization, the interview he cited makes no mention of ALAs or any licensing agreements whatsoever. Mr. Haas certainly did not state that Arm broke prior commitments or cut off ALA licenses. Prof. Posner's claims are simply disconnected from the plain language of Mr. Haas' answer. Below is the full quote cited by Prof. Posner, with the portion that he directly quotes in bold:

---

[454] ARMQC_02785287 (August 29, 2025, letter from Spencer Collins (Arm) to Ann Chaplin (Qualcomm)) at '287 – '290. In the same letter, Arm reiterated its offer of "an in-person meeting between the commercial teams," noting that "we have now offered [the meeting] three separate times." *Id.* at '290. On June 13, 2025, Arm reiterated to Qualcomm that "Arm remains prepared to negotiate in good faith over the terms of a license to the v10 architecture." *See* ARMQC_02771127. In the same letter, Arm further told Qualcomm that its "offer to meet remains open and Arm continues to believe that such a meeting would be the most efficient path forward in response to Qualcomm's request [for a v10 license]. Please have the relevant business personnel respond to Mr. Abbey with dates that Qualcomm is available for such a meeting."

[455] QCVARM_1014030; QCARM_3474751.

[456] Posner Report, ¶ 88 (emphasis added).

[457] "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY, at 15:20-16:00.

███████████████████████████████████

█████████████████████

> *You know, first thing on, competing with our customers, you know, it's rather complicated because if you look at some of our customers, our customers are Amazon. Our customers are Microsoft. Our customers are Apple. Our customers are Tesla. They all build chips using ARM. I'm not going to build an electric car. I'm not going to build a phone. I'm not going to build a data center. So, to look at the value chain relative to who builds chips, relative to **whether your end business is a chip business or a product business**. It's gotten a lot more gray. We follow what the industry is demanding, and what the industry wants to see is solutions getting to market faster. And that's what we're focused on.*[458]

192.    In fact, two of the four Arm customers that Mr. Haas mentioned (Apple and Microsoft) have ALAs with Arm.[459] So not only does Mr. Haas not talk about cutting off access to Arm's ISA, he highlights two customers that have active and ongoing access to Arm's ISA.

193.    ███████████████████████████████████

███████████████████████████████████

████████████████████████ For example, Android remains an open-source mobile operating system even though Google—the owner and primary developer of Android—also makes and sells Android Pixel phones.[460] Arm has long supplied customers at multiple levels of the supply chain. For over a decade, Arm has offered OTS cores (through its TLAs) to customers such as Qualcomm, and more recently Arm has entered CSS agreements with Samsung, MediaTek, and Nvidia.[461] Prof. Posner makes no claims that Arm's sale of OTS cores and CSS is inherently anticompetitive. In fact, although Prof. Posner seeks to conflate vertical integration with the shift

---

[458] "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY, at 15:20-16:00. For completeness, I include a full transcript of Mr. Haas' interview in **Appendix C**.

[459] Weidmann (Arm) Deposition, 35:9-36:14 (identifying eight ALA customers: Qualcomm, Apple, HiSilicon, IBM, Fujitsu, Ampere, T-HEAD and BRJX). *See also* ARM_00119603. Microsoft also has an ALA; *see* ARM_01427719 (Microsoft ALA dated May 19, 2010), ARM_01427776 (Microsoft ALA dated March 23, 2017), ARM_01427796 (Microsoft ALA dated September 3, 2020).

[460] *See* Ben Schoon, "Google Pixel grows in US, settling into top 4 spot ahead of Pixel 10 launch," 9to5google, July 28, 2025, https://9to5google.com/2025/07/28/google-pixel-us-market-share-q2-2025/; "Understanding Android," Android, https://www.android.com/everyone/facts/, accessed August 29, 2025.

[461] *See* Rene Haas, "Arm Holdings Plc Q3 2025 Earnings Call," February 5, 2025, https://investors.arm.com/static-files/f1190d81-408d-4276-a30c-b27c1ce5a30a, p. 4 and Rene Haas, "Arm Holdings Plc Q1 2026 Earnings Call," July 30, 2025, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008, p. 3.

to a closed business model, Arm has never stated that it intends to close off access to its ISA, and Prof. Posner provides no evidence that Arm intends to do so.

194.    *Fourth*, Arm has recently entered data centers with its own chip—not because Arm intends to close its ecosystem— ███████████████████████[462] a large potential data center customer that historically purchased only x86-based data center chips.[463] T███████████████████████████████

████████ Arm's entry to meet the unmet need of a potential large customer is procompetitive and is in no way evidence that Arm intends to close its ecosystem.

195.    *Fifth*, if Arm intended to close its ecosystem by foreclosing Qualcomm and other customers, then Arm's decision to enter with its own chip in data centers first would be an ineffective and irrational approach. As described earlier, Qualcomm currently has no chip in data centers,[465] and thus *zero share,* and is not expected to begin selling data center chips until fiscal year 2028, if at all.[466] ████████████████████████████████

---

[462] *See* Section VIII.B.2.

[463] Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008.

[464] *See* Section VIII.B.2.

██ █████████████████████████████████████

[466] Qualcomm's fiscal year ends in September, and as such Qualcomm's entry is expected between October 2027 and September 2028. *See* "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [datacenter] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. **If successful, we expect revenues to begin in the fiscal '28 timeframe.**" (emphasis added)). ████████████████████████████



And yet, Prof. Posner claims that Arm is behaving anticompetitively because "Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the *short term*."[469] Yet, in effect, Prof. Posner actually suggests the opposite—that Arm should sacrifice its own short term profits in data centers by not entering, simply to accommodate Qualcomm's lagging and uncertain entry. Contrary to Prof. Posner's claim, Arm's entry is not economic foreclosure; instead, it is a response to customer demand.

---



[469] Posner Report, ¶ 13 (emphasis added).

196.     Moreover, as Prof. Posner highlights, "Intel's x86 still dominates the data center sector a with [sic] roughly 84% share," despite recent growth in Arm-based chips.[470] In the short term, Arm's entry is more likely to divert sales from x86 than to cannibalize sales of other Arm-based chips. For this reason, entering with data center chips first would be an ineffective and irrational strategy if Arm's goal were to close its ecosystem and foreclose its customers.

197.     Relatedly, Prof. Posner suggests that the success of the Arm ISA was somewhat arbitrary, due simply more to its "open, neutral model" than its technological capabilities and advantages.[471] Although I do not opine on the accuracy of Prof. Posner's claim, I understand from Dr. Brogioli that an important aspect of the success of the Arm ISA was its superior design and functionality, particularly with respect to lower power implementations.[472] I do note, moreover, that Prof. Posner acknowledges that the Arm ISA had advantages over available alternatives. For example, he states that "[o]ther companies and groups developed ISAs but their ISA found few followers because of concerns about openness or **dissatisfaction with the design choices embedded in those other ISAs**, or because they were designed for niche devices," and that "Arm's ISA was the more attractive in part because it had **properties that better fit the needs of chipmakers**."[473] In other words, Prof. Posner seems to suggest that Arm has both a superior product and a superior business model.[474] It is therefore not surprising that Arm has succeeded over available alternatives, including the chips supplied by Intel, which has historically been a very well established and

---

[470] Posner Report, ¶ 64.

[471] Posner Report, ¶ 22 (stating that Arm's ISA was "more attractive" to chipmakers than other ISAs at the time, "but it is not clear that Arm's ISA was technically superior to other ISAs, in the sense of being essential to the design of higher quality chips. […] The most important factor in the success of Arm's ISA appears to be that its open, neutral model appealed to chip designers and manufacturers […] As has often been pointed out, it is important that people agree to drive on the left side or the right side of the road; it is not important which side is chosen as long as everyone agrees on the same side. A common ISA solves a coordination problem in the industry, but it may not matter much which ISA is used." Prof. Posner does acknowledge that "Arm's ISA was the more attractive in part because it had properties that better fit the needs of chipmakers at the time than other ISAs did[.]").

[472] Expert Report of Dr. Michael C. Brogioli, September 5, 2025, Section VIII.A.3.c; Conversation with Dr. Michael C. Brogioli, September 2, 2025.

[473] Posner Report, ¶ 22 (emphasis added).

[474] Richard Grisenthwaite's (Chief Architect at Arm), testimony is consistent with this view. *See* Grisenthwaite (Arm) Deposition, 17:10-14 ("ARM has been successful, hence the large number of units shipped. No small part of that has been our technology, but some of it has also been because of the business model.").

successful firm.[475] Prof. Posner provides no evidence that Arm's "open, neutral model" was "the most important factor in the success of Arm's ISA" other than the opinion of a single Qualcomm employee (his sources are a "[c]onversation with Gerard Williams, Qualcomm Senior VP Engineering" and testimony by the same Gerard Williams stating that he does not think Arm had any "inherent advantages" over alternative architectures.").[476] The continued success of Arm over many years and the fact that it continues to invest in R&D and improve its technology, recently leading to share gains from x86 in various applications historically dominated by Intel, suggests that Arm's success is not arbitrary.[477]

## C. Increases in Royalty Rates Are Not Inherently Anticompetitive

198.    Qualcomm criticizes the royalty rate increase that Arm implemented when it introduced Arm v9.[478] For example, the SAC states that "[a]fter releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to 'upgrade' their licenses to v9 by not releasing or supporting older v8 cores."[479] Prof. Posner makes a different royalty claim, saying that "Arm has increased royalty rates under the TLA in a way that does not appear to be based on the underlying costs of maintaining the Arm ecosystem, and even as Arm's

---

[475] "Too Good to Lose: America's Stake in Intel," Center for Strategic and International Studies, November 12, 2024, https://www.csis.org/analysis/too-good-lose-americas-stake-intel (Intel is the "largest and most advanced U.S.-headquartered manufacturer [of chips]" and "has an unmatched history of breakthrough semiconductor innovations—including the first programmable microprocessor and the x86 architecture—which have together made an indelible impact on the world of computing [that] continues to shape the digital landscape of the modern world... The company has made massive commitments to invest heavily—more than $100 billion over the next five years— in new chipmaking capability and capacity on domestic soil, aiming to develop and manufacture chips at the most advanced process nodes of 2 nanometers (nm) and below. Recognizing the importance of this, the U.S. government has announced plans to award Intel the largest share of federal support under the CHIPS Act.").

[476] Posner Report, footnotes 23-25.

[477] *See* Sections V and VIII.D.1.

[478] "Arm Holdings plc Q3 FYE24 Results Presentation," Arm Holdings, February 7, 2024, https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (reporting that "[o]ur v9 product garners roughly 2x the royalty rate of the equivalent v8 product" but "in some cases it's quite a bit more," and that "[r]oyalty revenue sequential growth is mainly coming from increasing penetration of ARM v9, where royalty rates are, on average, at least double the rates on equivalent ARM v8 products.").

[479] SAC, ¶ 70. I do not have an opinion on whether the characterization of v9 as only modestly better than v8 is appropriate.

OTS cores fall further behind custom cores in terms of quality."[480] The SAC similarly contends that Arm's October 2024 offer to Qualcomm for Arm's "core designs" was "extreme and clearly not commercially feasible for Qualcomm."[481] These claims ignore fundamental differences in Arm's and Qualcomm's licensing models and the economic realities of their positions in the value chain. Even after Arm's recent rate adjustments, its share of the overall chip "stack"—the total profit derived from chip sales—remains smaller than Qualcomm's. Moreover, price increases alone do not indicate anticompetitive conduct. In innovation-driven industries, royalty adjustments often reflect the value of new technology, or the increased value of existing technology, and the need to recover R&D investments. I discuss these arguments in detail below.

199.    While I do not opine on the improvements of v9 relative to v8 of the ARM ISA, Qualcomm's internal documents show █████████████████████████████████████████

---

[480] Posner Report, ¶ 58.

██████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████████
██████████████████████████████████████ ██

### 1. Arm's Share of the Chip "Stack" Is Smaller than Qualcomm's

200.    Arm and Qualcomm both hold key IP in the wireless space, but their licensing models differ significantly. Arm primarily licenses to chip manufacturers, such as Qualcomm and MediaTek, and also companies further downstream in the supply chain that design their own chips, such as Apple, Amazon, and Google. Arm's royalties are typically calculated as a percentage of the average selling price ("ASP") of the chip itself, rather than the much higher price of the final product (e.g., a Samsung Galaxy smartphone). In contrast, Qualcomm licenses its patent portfolio to device manufacturers, such as Apple and Samsung, and typically calculates royalties as a percentage of the ASP of the entire device—often several times higher than the chip's ASP.[485] Qualcomm does not license its IP portfolio to rival suppliers of modem chips, such as Broadcom and MediaTek.[486]

201.    Industry commentators have stated that Arm's IP is underpriced relative to Qualcomm. For example, SemiAnalysis, a research firm specializing in the Semiconductor and AI industries,



---

[485] *See*, for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International. According to the SAC, Arm was unsuccessful in its attempt "to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made." *See also,* SAC, ¶ 70.

[486] *See*, for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International.

observed that Qualcomm charges $13 per device for wireless transmission IP and another $25 for the baseband chip, while Arm's ISA—also essential to smartphone functionality—commands far lower royalties. The analysis questioned why Arm couldn't charge similar rates, given the critical nature of its technology.[487]

202.    A comparison of Arm's and Qualcomm's aggregate royalty revenues highlights the same disparity. Both Arm and Qualcomm IP is embedded in virtually every mobile device sold globally. Yet, Qualcomm's royalty revenue significantly exceeds Arm's. Arm's total revenue in the 12-month period ending in March 2025 was $4.0 billion, with approximately 46%, representing about $1.85 billion, attributed to the mobile segment.[488] Over the same period, Qualcomm's QTL division generated $5.6 billion total revenue, "principally from royalties generated through [Qualcomm's] licensees' sales of mobile handsets."[489]

203.    Even after the rate increases reflected in the October 2024 offer, Arm's share of the chip stack (i.e., of the overall profit from the sale of a chip) remains smaller than Qualcomm's share. Arm's highest proposed royalty rate in its October 2024 offer to Qualcomm was ▮

---

[487] "How would we value an essential piece of IP that every smartphone needs, with virtually no alternative? $1, $2, maybe $3 per handset? We propose it could be as much as $13 per phone. This is 24 times higher compared to current pricing! […] Apple pays Qualcomm $13 in royalties per device (not just for smartphones but also for wireless enabled iPads and watches) for the use of wireless transmission IP, and another $25 for the actual baseband chip. Effectively, $13 per device this is what Qualcomm gets away with charging for a technology that is essential to the operation of a smartphone against the company with arguably the strongest bargaining power globally. The Arm ISA is also essential to the operation of a smartphone, why couldn't they charge as much as Qualcomm? Why not more?" *See* Dylan Patel, Myron Xie, Afzal Ahmad, and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/. Even as far back as 2013, analysts were commenting, "[g]iven how many ARM designs exist in the market (and the size of some of ARM's biggest customers), it almost seems like ARM should be raising its royalty rates a bit." Anand Lal Shimpi, "The ARM Diaries, Part 1: How ARM's Business Model Works," AnandTech, June 28, 2013, https://web.archive.org/web/20130701165406/http://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works/2.

[488] Arm 2025 Form 20-F, pp. 60 ("Our royalty revenue from the mobile applications processors market constituted approximately 46% of our total royalty revenue for the fiscal year ended March 31, 2025."), 72 (reporting total revenue of $4,007M). Arm's total revenue includes revenue earned from the sale of its OTS implementation cores and CSSs. For this reason, the $1.85 billion in revenue for the mobile segment is conservatively high because it includes much more than just mobile licensing royalties for the Arm ISA.

[489] Qualcomm Financial Summary downloaded from LSEG Data & Analytics. Qualcomm 2024 Form 10-K, p. F-16.



. [490] In contrast, the *FTC v. Qualcomm* trial revealed that Qualcomm "currently charges smartphone makers a 5% [of the ASP of the smartphone] royalty for its whole cellular patent portfolio, capped at $20/handset, or 3.25% for LTE-only devices (capped at $13/handset)." [491] Therefore, the lowest royalty rate that Qualcomm charges is 3.25% of the smartphone's ASP, while Arm's highest rate is ████████████████. With some simple math, Arm's ████████████████████████████████████████

████████████████████████████████

204.   I do not opine on whether the royalty rates that Arm and Qualcomm charge for their IP are "excessive" or appropriate. However, the large disparity in royalty payments per device for two technologies that are both essential to the development of a smartphone suggests that Arm's IP is

---

[490] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████

[491] "Trial Sheds Light on Q'comm Patent Holdings, Royalty Rates," EETimes, January 21, 2019, https://www.eetimes.com/trial-sheds-light-on-qcomm-patent-holdings-royalty-rates. *See also* "Qualcomm 5G NR Royalty Terms Statement," November 19, 2017, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm-5g-nr-royalty-terms-statement.pdf ("Qualcomm Incorporated today disclosed a framework for industry participants to access Qualcomm's patented inventions used in the upcoming 3rd Generation Partnership Project (3GPP) 5G New Radio (NR) standards. […] Under Qualcomm's licensing program for cellular essential patents, the following royalty terms will apply on a worldwide basis to a license for Original Equipment Manufacturer (OEM) branded mobile handsets that implement the 5G NR standard, up to and including release 15 of the 3GPP specifications: (i) An effective running royalty rate of 2.275% of the selling price of branded single-mode 5G handsets; and (ii) An effective running royalty rate of 3.25% of the selling price of branded multi-mode (3G/4G/5G) handsets. […] In addition, Qualcomm will continue to offer licenses for OEM branded mobile handsets that include both Qualcomm's cellular standard essential patents as well as those patents not essential to the standard, a total portfolio of over 130,000 patents and pending applications worldwide at royalty rates of 4% of the selling price for branded single-mode handsets and 5% of the selling price for branded multi-mode handsets.").

[492] ████████████████████████████████████████████████

[493] 

priced cheaply compared to Qualcomm's IP, contrary to claims that Arm's royalty demands are "unreasonable" or "exorbitant," as Qualcomm claims.[494]

### 2. Price Increases Are Not Inherently Anticompetitive

205.    In high-tech industries, competition is often driven by R&D aimed at improving the quality and performance of products offered in the marketplace. The incentive to invest in costly and risky R&D stems from the expectation of earning profits from sales.[495] When a firm successfully innovates, raising prices to reflect the value of its improved technology is not anticompetitive but a standard commercial response to successful innovation.[496] In the same way, a firm may raise its price in response to an increase in demand, and it is certainly true that with the advent and recent growth of AI, the demand for Arm-based chips has never been higher.[497] Such a price increase is common in business and occurs even in the absence of any incentive to foreclose.

206.    Furthermore, it is important to interpret any price increases in light of the "starting point," i.e., the price before the increase.

---

[494] "Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, July 11, 2025, p. 10. I use "essential" in its colloquial meaning of necessary (in the short run).

[495] "Patents are rewards for those who have contributed to economic growth through their inventions. Any resulting market power enjoyed by a patent holder is typically considered a social cost that is necessary to stimulate innovation and provide a return on R&D expenditures." Lemley, Mark A. and Carl Shapiro, "Probabilistic Patents," Journal of Economic Perspectives, 2005, Vol. 19, No. 2, pp.75–98.

[496] In its Reply Brief to the U.S. Court of Appeals, Qualcomm stated that "Qualcomm has the right to earn a return on its investment in developing patented technologies by licensing at the OEM level and not making exhaustive sales of modem chips. And Qualcomm has a valid interest in protecting its investments in innovation and R&D and its OEM licensing program." *Federal Trade Commission v. Qualcomm Incorporated*, "Reply brief for appellant Qualcomm Incorporated (Redacted)," December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit, pp. 48-49.

[497] Rene Haas, "Arm Holding Plc Q4 2025 Earnings Call," May 7, 2025, https://investors.arm.com/static-files/181d5019-29bd-4ba5-af29-45888e25c637, p. 14 ("Arm is everywhere. Increasingly, demand for the Arm architecture is requiring us to deliver more. We're seeing that with our compute subsystems and with the advent of AI workloads running in the data center, running on a PC, running on a smartphone, running on your automobile, or even running in the earbuds, the demand for Arm technology has never been greater. So, we are incredibly excited about the future. AI is changing everything and you can't run AI without Arm."); Rene Haas, "Arm Holdings Q2 FYE25 Investor Presentation," Arm Holdings, November 6, 2024, https://investors.arm.com/static-files/623fece0-c947-4d93-94eb-e08e8dfad61b, pp. 2-3 ("I am very proud to tell you that in that year, we have exceeded all of our expectations on execution of our growth strategies. The demand for AI everywhere is increasing the demand for Arm's compute platform. [...] It goes without saying that AI is everywhere. Arm is the only compute platform that can run AI from the edge to the cloud. AI is driving demand for our performance and power-efficient compute platform everywhere.").



This context matters: a price increase from a low baseline may simply reflect a correction toward a price level that reflects a technology's value.[499]

207. While Qualcomm seeks to extend the favorable terms of its 2013 ALA deal far into the future, it is not anticompetitive for Arm to adjust its pricing to reflect the value of its R&D investments. Forcing Arm to maintain outdated pricing risks significantly diminishing its incentives to innovate and develop higher quality technologies.[500] Qualcomm itself has reportedly increased the price of its chips following the launch of a new higher-performance version of its Snapdragon chip.[501] As discussed above, industry analysts have noted that Arm's IP has

[498]


[499] *See also* Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025, explaining that the royalty rate structure contained in Qualcomm's May 2013 ALA did not anticipate the extensive customer demand for increased chip capabilities and the expansion of application use cases observed since then. As an illustration, at the time of the 2013 agreement Qualcomm was primarily making smartphone chips and such chips had a small number of cores, typically just one or two. The $1.88 royalty cap per-chip in Qualcomm's ALA (see footnote 128128) was set based on the expectation that the number of cores would remain limited and did not anticipate the large increase in the number of cores per smartphone chip that eventually occurred. Furthermore, the Qualcomm agreement with Arm does not have a field of use restriction, and at the time of the agreement Arm was not even present in that segment. And yet today, data center chips often have over 100 cores, a scenario that the $1.88 royalty cap per chip was clearly never intended to cover.

[500] On the importance of appropriating returns to investment, *see* Shapiro, Carl, "Premiums for high quality products as returns to reputations," The Quarterly Journal of Economics, 1983, Vol. 98, No. 4., pp. 659-679.

[501] Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo! Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html ("Qualcomm's Snapdragon 8 Elite offers a notable improvement in performance and efficiency over previous Snapdragon chips, promising next-gen Android phones with even more impressive features and longer battery life. However, this comes at a cost, with reports suggesting manufacturers are paying Qualcomm as much as $190 for the chip — 20% more than the previous models. With such a steep price rise this year, you might expect Qualcomm not to hike the price of its next flagship SoC. Early reports suggest that might not be the case, though."). I do not have data to check if the reported price increase actually occurred; my point is that the price increase would be perfectly understandable and not anticompetitive.

133

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

historically been underpriced. It is therefore not surprising that Arm increased the royalty rate of v9.[502]

208.  ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████  █  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

█ ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████

209.    While I do not have detailed data to compare terms offered to Qualcomm to other comparable deals, ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

---

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[506] Youssef (Arm) Deposition, 66:7-71:3.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

210.    In summary, Arm's royalty rate increases are consistent with standard commercial practices in innovation-driven industries and do not reflect anticompetitive conduct. Arm's pricing remains modest relative to Qualcomm's, its share of the chip stack is smaller, and its licensing model continues to support broad access to its ISA. There is no evidence that Arm's royalty adjustments reflect a broad scheme to foreclose rivals rather than simply competitive dynamics in an industry where R&D investments are costly and necessary to preserve a firm's ability to compete.

### D.  "Dominant" Shares Do Not Imply a Lack of Competitive Pressure

211.    Prof. Posner states that Arm "dominates the Arm ISA ecosystem through its control of the Arm ISA technology," with a "99% [share] of all smartphones."[508] However, Prof. Posner fails to consider that Arm's large share in smartphones (and much lower share in other applications) does not imply a lack of competitive pressure.

####    1.   Arm Continues to Invest a Significant Portion of Its Revenue

212.    Prof. Posner claims that "by reducing competition in designing and selling chips, Arm (and any remaining competitors) will be able to raise prices and *skimp on innovation* without fear of being undercut or outperformed by Qualcomm or other licensees that make SoCs using custom cores that deliver higher performance."[509]

213.    I addressed the claim regarding royalty rates in Section VIII.C.2 and do not opine on whether the quality of Arm's OTS cores has decreased, relative to other custom cores. In this Section, I focus on Prof. Posner's assertion that Arm is skimping on innovation.  Prof. Posner fails

[508] Posner Report, ¶¶ 55-56.

[509] Posner Report, ¶ 16 (emphasis added).

to explain why, as a "monopolist" protected by high "barriers to entry,"[510] Arm would continue to invest a significant portion of its revenue in R&D.[511] Prof. Posner also does not consider that Arm's sustained investment is more consistent with a firm responding to competitive pressure—particularly from x86 and RISC-V—than with one exercising unchecked market power.[512]

214.    Arm's high share of smartphone chips reflects Arm's innovation and continued investment in R&D. There is no evidence that Arm is underinvesting or that Arm's focus on innovation and R&D has been declining over time.[513]

- *Arm Invests a Much Higher Share of Revenue than Qualcomm:* A common measure of the intensity of R&D investment is a firm's R&D expenditure as a share of revenue. As I show in **Exhibit 5** below, since 2019, Arm has reinvested a much higher share of its revenue in R&D than Qualcomm every year.[514] Arm's average R&D share over this period has been

---

[510] Posner Report, ¶¶ 18, 58.

[511] "Monopolies may also fail to innovate, as they are loath to cannibalize their own products. They may even fail to adopt minor innovations. […] The virtues of competition in action." Tirole, Jean, "Competition and the Industrial Challenge for the Digital Age," Annual Review of Economics, 2020, Vol. 156. *See also* Shapiro, Carl, "Competition and Innovation Did Arrow Hit the Bull's Eye?" in The Rate and Direction of Inventive Activity Revisited (ed. Josh Lerner and Scott Stern), 2012, University of Chicago Press ("The unifying principle, richly supported by the empirical literature, is that innovation, broadly defined, is spurred if the market is contestable; that is, if multiple firms are vying to win profitable future sales.").

[512] The SAC provides further evidence of Arm's inability to exercise its purported monopoly power: Arm was unsuccessful in its attempt to "to renegotiate [Apple's] royalty rates notwithstanding the parties' existing contract." SAC, ¶ 70. *See also* Wayne Ma & Cory Weinberg, "How a Lopsided Apple Deal Got Under Arm's Skin," The Information, November 29, 2023, https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin ("At one point, Son called Apple CEO Tim Cook to tell him Arm would be raising prices for all its major smartphone and chip customers. Cook's team reassured him that Arm couldn't raise fees, because the companies' contract at the time lasted through 2028. Son backed off. Since then Apple and Arm have been through several rounds of negotiations that have kept the financial terms of Apple's deal largely in place, people familiar with the matter said.").

[513] ARMQC_02731630 (an Arm internal email dated June 1, 2023, with subject "Android and RISC-V: Internal Talking Points." While acknowledging the limitations of RISC-V, it states that "we will likely see productized implementations within 5 years. The first products will not be mobile handsets and it remains to be seen if the industry has any appetite at all, or the funds, to undertake the monumental task of moving this category of devices and its millions of applications to R-V. […] there is still a lot of work to do to get all of the Architecture, Security and System IP standardized and in place." It concluded that "we cannot be complacent; Arm needs to continue to outpace the competition with both architecture features for real-world compute loads and micro-architecture innovations along with addressing security challenges of the future.").

[514] I acknowledge that cross company comparisons may suffer from issues such as different accounting conventions. I also acknowledge that the increase in Arm's R&D expenditure does not fully reflect an increase in R&D "effort," as Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2024, https://investors.arm.com/static-

47%, reaching 52% in the year ending March 2025.[515],[516] By contrast, Qualcomm's R&D as a percentage of total revenue was always below 30% over the same period. Arm also invested a higher share than Intel whose R&D as a percentage of total revenue over the same period was approximately 23%.[517]

---

files/dcdd6629-24bb-40ef-ba55-8aca1362205a, explains at p. 71: "Research and development expenses increased by $846 million, or 75%, during the fiscal year ended March 31, 2024 as compared to the fiscal year ended March 31, 2023, primarily due to the impact of the incremental share-based compensation costs and associated employer taxes arising in connection with the IPO and new awards […]. Other factors contributing to the increase included salaries and related expenses due to headcount increases from hiring as well as increases in third-party engineering expenses, IT expenses including cloud services, and allocated facility overhead expenses, partially offset by increases in research and development tax incentives and gains from cash flow hedge activity." While not perfect, the comparison of Arm and Qualcomm R&D is informative in suggesting that Arm continues to engage in intensive R&D efforts.

[515] ARM_00000510 at '535; ARM_00000382 at '416; ARM_01259705 at '927; Arm 2025 Form 20-F, p. 72 and Arm 2023 Form F-1, p. 99. In its most recent quarter ending June 30, 2025, Arm reinvested 62% of its revenue into R&D. See "FYE26 Q1 (30-Jun-25) Historical Quarters Datasheet.xlsx," Arm Holdings, July 30, 2025, https://investors.arm.com/financials/quarterly-annual-results. "R&D expenses consist primarily of employee-related expenses, including salaries, bonuses, share-based compensation, and benefits associated with employees in research and development functions, along with project materials costs, third-party fees paid to consultants, depreciation and amortization, allocated overhead, information technology and other development expenses. We receive government grants to compensate for certain research activities and we recognize the benefit as a reduction of the related expenses included in R&D expenses." See Arm 2023 Form F-1, p. 98.

[516] See also ARM_01282304 at '314, a 2018 Arm presentation reporting R&D as a percentage of revenue going back to 2005 and showing an increase in 2016-2017 compared to prior years.

[517] Intel Corporation, 2021 Form 10-K, for the fiscal year ended December 25, 2021, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-22-000007/0000050863-22-000007.pdf, p. 37, and Intel Corporation, 2024 Form 10-K, for the fiscal year ended December 28, 2024, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000009/0000050863-25-000009.pdf, p. 23. The highest ratio, 31.2% was in 2024 and the lowest, 17.4%, was in 2020.

138



**Exhibit 5: R&D Expenditure as Percentage of Total Revenue**[518]



12-Month Period Ending in March of the Reported Year

- *Arm Has Increased Its R&D Investment Faster than Qualcomm:* From 2019 to 2025, Arm's R&D expenditure increased by about 150% while Qualcomm's R&D increased by

---

[518] Arm: ARM_00000510 at '535 and Exchange Rates, "British Pound to US Dollar History: 2019," https://www.exchangerates.org.uk/GBP-USD-spot-exchange-rates-history-2019.html for 2019, ARM_00000382 at '416 for 2020; Arm 2023 Form F-1, Arm Holdings plc, August 21, 2023, p. 99 for 2021-2022; and Arm 2025 Form 20-F, p. 72 for 2023-2025. Qualcomm: MacroTrends, "QUALCOMM Research and Development Expenses 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/research-development-expenses, MacroTrends, "QUALCOMM Revenue 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/revenue. For Arm, total revenue is the sum of "Revenue from external customers" and "Revenue from related parties;" for Qualcomm, total revenue is the sum of revenue from "Equipment and services" and from "Licensing." For each year, I use the revenue and R&D expenditure figures from the latest available source.

████████████████████████████████████

████████████████████████████

only around 65%.[519] Some of the recent increases in Arm's investment is due to investments Arm is making to develop its own data center chips.[520]

215.   Arm executives testified that Arm sees competitive threats to "[a]ll parts of our business,"[521] e.g., from RISC-V, which pushes Arm to innovate and meet its customers' requirements to maintain its technological leadership.[522]

216.   Prof. Posner overlooks the fact that Arm's sustained R&D investment is both a response to competitive dynamics and a key driver of its success. Far from skimping on innovation, Arm's behavior reflects a firm actively investing to maintain and grow its position in a rapidly evolving industry.[523]

---

[519] Qualcomm Incorporated, Form 10-K, for fiscal years 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx, and Qualcomm Incorporated, Form 10-Q, for quarterly periods 2019 - 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx, ARM_00000510 at '535, ARM_00000382 at '416. Qualcomm's fiscal year ends in September; for purposes of comparison, I aggregate quarterly data to match Arm's fiscal year, which ends in March. From 2019 to 2025, Arm's R&D expenditure increased from $840 million to $2.1 billion, while Qualcomm's expenditure increased from $5.4 billion to $9.0 Billion.

[520] Rene Haas, "Arm Holdings Plc Q1 2026 Earnings Call," July 30, 2025, p. 4, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008 (In the most recent Arm earnings call, Mr. Haas described Arm's accelerate R&D investments: "We are continuing to explore the possibility of moving beyond our current platform into additional compute to subsystems, chiplets and potentially full end solutions. To ensure these opportunities are executed successfully, we have accelerated the investment into our R&D. These investments include expanding engineering delivery across multiple – levels, adding to the already significant product investments we have made to-date.").

[521] Williamson (Arm) Deposition, 102:2-10.

[522] Even when Arm innovates to meet its clients' needs, they may still choose to use a competing ISA. *See* ARMQC_02740386 at '387 ("We are on track to intercept this requirement. But they still want to bring in RISC-V").

[523] An internal Arm presentation from June 2023 outlines the company's strategic emphasis on advancing CPU technology, aligning with broader industry trends toward enhanced performance. The presentation highlights Arm's increased cadence of CPU product releases, an expansion in the number of CPUs offered, and sustained growth in both architectural complexity and engineering headcount. *See* ARM_01314793 at '797 (discussing the focus on better technology: "CPU Performance State of the Industry," […] everyone is working through the same playbook: Wider, deeper, better predictors, better prefetchers, more MHz, more datapaths, lower latency to L1/L2, larger caches,"), at '824 (characterizing its goal for the CPU Roadmap as an "[e]xplosion" with increase in the number of CPUs); at '826 (discussing that Arm's "average number of product releases [to partners] increased by ~1.8x"; at '827 (discusses growth in architecture complexity from 2000 to 2023, "~ 13% CAGR in Arch complexity from ~2015-23"), at '828 (discussing sustained growth in its CPU team over the years, "CPU has grown ~3.3x since `15 (~16% CAGR)."). *See also* ARM_01293447 at '448.

### 2. Current High Shares Do Not Guarantee Future High Shares

217. Prof. Posner does not consider that current high shares do not guarantee future high shares. There are many examples of once "dominant" firms that lost significant shares to rivals.

- *PC Segment:* In the PC segment, Intel's x86 had a share of nearly 100% in 2019.[524] However, the x86 share has recently come under significant competitive attack. In June 2020, Apple announced its plan to fully transition all Apple computer products from x86 to its own Arm-based chips, and by June 2023, Apple's transition was complete.[525] Then, as explained above, Qualcomm followed with Arm-based chips for Windows PCs in 2023, quickly gaining traction and further reducing the share of x86. These chips currently represent 9% of new Windows PC sales priced at $600 and above in the U.S. and the top five European countries.[526] Counterpoint Research estimated that Arm-based chips have reached 12.8% share in 2022, not accounting for Qualcomm's recent growth.[527] Looking

[524] Based on Counterpoint Research estimates, Intel's share was 84% and AMD share was 15.1%, with Arm at less than 1%. *See* Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027.

[525] *See* "Apple announces transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/ (Apple announced the transition away from Intel and towards silicon would occur over the next two years). *See also* Charles Martin and Malcom Owen, "The history—and triumph —of Arm and Apple Silicon," Apple Insider, April 22, 2024, https://appleinsider.com/articles/24/04/22/the-history----and-triumph----of-arm-and-apple-silicon (As part of the transition to silicon, Apple's Macs would use chips based on Arm designs. The Mac Pro was the last machine to make the transition in June 2023.). Apple also uses its own Arm-based chips for its iPhone pursuant to its ALA with Arm. *See* Mike Wuerthele, "Apple & ARM's iPhone & Mac chip partnership will continue for decades," Apple Insider, September 5, 2023, https://appleinsider.com/articles/23/09/05/apple-arms-iphone-mac-chip-partnership-will-continue-for-decades.

[526] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf, p.3 (Qualcomm states its goal is to achieve $4 billion in PC chip revenue by fiscal year 2029); "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf, p. 7. It's estimated that Qualcomm captured just 0.8% of the total PC market in Q3 2024. *See* Jowi Morales, "Qualcomm claims it owns 10% of U.S. Windows PC retail market for devices priced $800 and up," Tom's Hardware, February 6, 2025, https://www.tomshardware.com/tech-industry/qualcomm-claims-it-owns-10-percent-of-u-s-windows-pc-retail-market-for-devices-priced-usd800-and-up.

[527] Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027.

forward, Qualcomm targets 12% of the overall PC segment,[528] and Arm aims to reach 50% share in the Windows PC segment by 2029.[529]

- *Server Processor Segment:* In 2018, Intel held a 98% share of server processors and x86 had a 98.9% share in Q4 2019.[530] However, with the recent successes from Arm-based processors, such as AWS Graviton, Google Axion, Microsoft Azure Cobalt, and Nvidia Grace, Arm-based products have gained a share of roughly 15% as of 2024.[531] AWS estimated that "over 50% of new CPU capacity added by AWS in the last 2 years is on Arm-powered Graviton."[532] As with the PC segment, a historically dominant ISA is not guaranteed to maintain its lead over time.

- *Other industries:* The fall of MySpace, AOL, and Blockbuster further illustrates that dominance can erode quickly. A 2007 article in *The Guardian* wondered: "will [social networking service] MySpace ever lose its monopoly?"[533] Less than 5 years later MySpace was "sold for $35m in spectacular fall from $12bn heyday."[534] A similar destiny befell

---

[528] "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, pp. 11-12, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf.

[529] Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, June 3, 2024, https://www.reuters.com/technology/arm-aims-capture-50-pc-market-five-years-ceo-says-2024-06-03/.

[530] Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html; Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market.

[531] Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, March 31, 2025, https://www.reuters.com/technology/arm-expects-its-share-data-center-cpu-market-sales-rocket-50-this-year-2025-03-31/. Arm estimates that its share of "Cloud Compute" is 20%. "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553.

[532] "AWS and Arm," Arm, https://www.arm.com/markets/computing-infrastructure/cloud-computing/aws#1, accessed August 29, 2025. *See also* "AWS re: Invent 2024 - Monday Night Live with Peter DeSantis," AWS, YouTube.com, December 3, 2024, https://www.youtube.com/watch?v=vx36tyJ47ps&t=1041s;.

[533] Victor Keegan, "Will MySpace ever lose its monopoly?" The Guardian, February 8, 2007, https://www.theguardian.com/technology/2007/feb/08/business.comment.

[534] Dominic Rushe, "Myspace sold for $35m in spectacular fall from $12bn heyday," The Guardian, June 30, 2011, https://www.theguardian.com/technology/2011/jun/30/myspace-sold-35-million-news.

142

instant messaging AOL.[535] Blockbuster dominated the video rental space, but failed to recognize the threat posed by Netflix and other streaming services, even turning down an opportunity to acquire Netflix for $50 million in 2000.[536]

218.    Prof. Posner argues that, due to "network effects," Arm's ecosystem is protected by "entry barriers."[537] While "network effects" are a feature of this industry and "entry barriers" exist, as they do in many industries, Prof. Posner provides no evidence about how "high" they are, much less that they are insurmountable. He does not attempt to quantify the strength of the effects or demonstrate that the "entry barriers" are so high to isolate Arm from competition.[538] In fact, Arm's recent success in segments previously dominated by x86 shows that "network effects" are not insurmountable (i.e., network effects did not protect x86's shares). The very fact that Qualcomm views RISC-V as a potentially viable alternative to Arm—even for high performance applications—suggests that Qualcomm does not view this existing "barrier to entry" as insurmountable.[539]

219.    Moreover, contrary to Prof. Posner's suggestion, the presence of even strong "network effects" does not imply that an industry can only accommodate a single "ecosystem." Multiple ecosystems coexist in other industries with "strong" network effects such as smartphones (where iOS and Android compete by developing ecosystems of compatible hardware and software), credit

---

[535] Mike Wehner, "AIM is officially dead, and your childhood means nothing," Yahoo!News, October 6, 2017, https://www.yahoo.com/news/aim-officially-dead-childhood-means-nothing-174900787.html.

[536] Steve Mollman, "Blockbuster 'laughed us out of the room,' recalls Netflix cofounder on trying to sell company now worth over $150 billion for $50 million," Fortune, October 22, 2024, https://finance.yahoo.com/news/blockbuster-laughed-us-room-recalls-174322621.html. Currently, Blockbuster has a single store still operating, in Bend, Oregon. *See*, Saul Sugarman, "So I visited the last Blockbuster on the planet, and all I got was this t-shirt," The Bold Italic, December 8, 2023, https://thebolditalic.com/so-i-visited-the-last-blockbuster-on-the-planet-and-all-i-got-was-this-t-shirt-ffc6d2ed414d.

[537] Posner Report, ¶ 11 ("Arm's ISA ecosystem exhibits strong network effects"), 34 ("An ISA ecosystem is characterized by significant entry barriers"), ¶ 57 ("Arm's ecosystem is protected by entry barriers. Because so many companies specialize in Arm-compliant products, a firm that sought to develop a new ISA would have to not only produce a superior ISA. It would also have to persuade firms in the Arm ecosystem to give up their existing customers and develop products for a not-yet-existing set of customers.").

[538] Posner Report, ¶¶ 34-35, discussing features of an industry that, Prof. Posner argues, lead to "significant entry barriers" but not providing any empirical evidence. *See also* ARMQC_02770485.

[539] *See* Section V.

143

███████████████████████████

█████████████████████

cards (where multiple networks coexist), and ride share platforms (where Uber and Lyft coexist with their own ecosystems).[540]

### 3. Any Attempt by Arm to Foreclose Customers Would Accelerate Development of Alternatives such as RISC-V

220.    Prof. Posner opines that Arm's actions "may" impede the development of alternative ISAs, such as RISC-V.[541] He claims that "if Arm […] weakens" the firms that would otherwise support such alternatives, such alternatives "will have trouble attracting chipmakers and thus face greater barriers to entry."[542] He also claims that, "[i]f Qualcomm is badly wounded, then it may not be able to continue to support or boost RISC-V."[543] However, this claim is vague and unsupported. Prof. Posner does not define what "badly wounded" means, nor does he explain how such a condition would materially limit Qualcomm's ability to invest in RISC-V development. Moreover, he fails to weigh the countervailing incentive: that foreclosure would likely increase, not reduce, Qualcomm's motivation to support competing ISAs.

221.    Prof. Posner's "badly wounded" claim seems to reflect the idea that, even if foreclosure increases incentives for Arm's customers to invest in other ISAs, those customers would have fewer financial resources to make those investments. This conjecture is highly speculative, however, and it implicitly assumes that the financial costs of foreclosure would outweigh the increased incentives to invest in alternative ISAs. In practice, many of Arm's customers— including Apple, Google, Meta, and Samsung—are large, well-capitalize enterprises with ample

---

[540] Bumblebees fly even if it was once believed that this defied the law of physics (*see* Joseph Calamia, Explained: The Physics-Defying Flight of the Bumblebee, Live Science, February 25, 2011 https://www.livescience.com/33075-how-bees-fly.html). Similarly, platforms that, in theory, are protected by network externalities and barriers to entry are displaced by new entrants, as the examples discussed above illustrate. For various other examples, *see* Ryan Bourne, "Is This Time Different? Schumpeter, the Tech Giants, and Monopoly Fatalism," Cato Institute, June 18, 2019 https://www.cato.org/publications/policy-analysis/time-different-schumpeter-tech-giants-monopoly-fatalism. Prof. Posner remains in the realm of theories and does not contend with reality; he does not explain, for example, why the barriers to entry that "defend" Arm are more impenetrable that the barriers to entry that, for example, defended MySpace. Prof. Posner behaves as a scientist that disregards the reality of bees flying because the theory does not explain the observed empirical evidence, rather than challenging and modifying the theory to accommodate the empirical evidence.

[541] Posner Report, ¶ 18.

[542] Posner Report, ¶ 18.

[543] Posner Report, ¶ 78. See *also id.*, ¶ 18.

144

resources to invest in alternative ISAs,[544] and evidence shows that the dispute with Arm has further increased, rather than retreating, Qualcomm's efforts to develop RISC-V. [545] Industry commentators have also noted that any attempt by Arm to restrict access to its ISA is likely to accelerate efforts to develop RISC-V as a viable, open-source alternative to Arm in the smartphone segment and other applications.[546] Faced with foreclosure, a strong and innovative company such as Qualcomm would not remain idle; it would have a strong incentive to invest in and support an alternative to Arm's ISA.

222.    In reality, Qualcomm has been investing in the RISC-V ISA ecosystem and has successfully shipped over a billion low-end RISC-V applications as of 2023.[547] As of June 2024,

---

[544] For example, Apple, Alphabet (Google's parent company), and Meta are among the top 10 companies in the world in terms of market capitalization, each with a capitalization of $1.9 trillion or more (*see* Lyle Daly, "The Largest Companies by Market Cap in August 2025," The Motley Fool, August 4, 2025 https://www.fool.com/research/largest-companies-by-market-cap/) compared to a market capitalization of about $145 billion for Arm as of August 29, 2025 ("Market Capitalization of Arm Holdings," Companies Market Cap, https://companiesmarketcap.com/arm-holdings/marketcap/, accessed August 29, 2025). Samsung and Qualcomm have a capitalization of about $330 billion as of August 29, 2025 ("Market Capitalization of Samsung," Companies Market Cap, https://companiesmarketcap.com/samsung/marketcap/, accessed August 29, 2025) and $170 billion as of August 2025 ("Market Capitalization of Qualcomm," Companies Market Cap, https://companiesmarketcap.com/qualcomm/marketcap/, accessed August 29, 2025).

[545] *See* Section V.A above.

[546] *See*, for example, Abner Li, "Report: Arm cancels Qualcomm's instruction set, IP license for chip design," 9to5Google, October 22, 2024, https://9to5google.com/2024/10/22/report-qualcomm-arm-chip-design/ ("Looking ahead, this Arm uncertainty could lead to the adoption of the open source RISC-V instruction set. Back in October of 2023, Qualcomm and Google announced work on a RISC-V Wear OS chip. The Android team is actively working on adding OS support with a focus on ensuring that "any CPU running RISC-V will have all of the features we expect to achieve high performance."). *See also* Linley Gwennap, "Editorial: Arm's No-Win Legal Fight," Tech Insights, https://www.techinsights.com/blog/editorial-arms-no-win-legal-fight, accessed August 29, 2025 ("Arm and Qualcomm are locked in an ugly public spat over the rights to Nuvia's CPU. Unresolved, this conflict could hamper Arm's progress in the PC market and foment interest in RISC-V.").

[547] In November 2023, Ziad Asghar, VP of product management at Qualcomm, spoke at the RISC-V Summit about Qualcomm's efforts to develop RISC-V applications, highlighting that Qualcomm had shipped 650 million devices with RISC-V in 2022 and over a billion devices in total since then. "By 2022, just like we showed last year, we had shipped 650 million devices with RISC-V, that is an amazing number. […] What has happened since then, today we are in excess of a billion devices that have RISC-V integrated microcontrollers in them. That's a massive number." *See* "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, @ 4:37, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational. *See also* "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential ("To date, Qualcomm Technologies has shipped in excess of 650 million RISC-V cores.");



Qualcomm has various ongoing development efforts, including support for high performance RISC-V CPU and handset applications,[548] ███████████████████████████████████████ █████████████████████████[549] This is contrary to Prof. Posner's claim that Qualcomm "may not be able to continue to support or boost RISC-V."[550]

223.    While RISC-V's current commercialization is concentrated in low-end applications such as microcontrollers and IoT, it is generally regarded as having high potential,[551] with various firms investing in its development.[552] Qualcomm's leadership has repeatedly emphasized this view,

---

[548] ████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████████████████████

[549] ██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████ Cortex-A78 is categorized as a "High-Performance CPU" on Arm's product listing. "CPU Cortex-A78," Arm https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78, accessed August 29, 2025 ("Designed for high-end performance at best efficiency, Cortex-A78 enables superior immersive experiences, bridging the gap between mobile and laptop performance. Optimized for new form factors and foldables, Cortex-A78 is ready for the next wave of mobile innovation and continues Arm's industry-leading mobile performance and efficiency with 5G device architecture."). ███████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████████████████████

[550] Posner Report, ¶ 78.

[551] ███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
███████████████████████████████████

[552] NVIDIA uses RISC-V in its microcontroller. *See* "How NVIDIA Shipped One Billion RISC-V Cores In 2024," RISC-V International, February 25, 2025, https://riscv.org/blog/2025/02/how-nvidia-shipped-one-billion-risc-v-cores-in-2024/. ███████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

146

highlighting RISC-V's properties in terms of performance, power efficiency, and customization.[553] In 2023, Qualcomm reported that over a billion of its devices already include RISC-V microcontrollers, and it continues to expand its RISC-V roadmap across mobile, automotive, and industrial applications.[554]

224.    Apart from Qualcomm, various efforts within the industry are already underway to advance RISC-V for use in higher-end applications.[555] For example, AheadComputing—a startup founded

---

█████████████████████████████████ Andrew Howard, Vice President of Partner Success and Licensing at Arm, testified that he sees RISC-V as a significant competitor in "in low-end markets […] I believe RISC-V is a viable substitute for Cortex M -- ARM M Profile CPUs" and that he has "knowledge that we did not achieve licenses with some customers. And sales documented it was due to RISC-V being chosen." *See* Howard (Arm) Deposition, 161:20-162:25. Similarly, Peter Greenhalgh, SVP of technology at Arm, stated that "There are markets today where RISC-V is a totally viable alternative and is being favored over ARM. […] An example would be Hardware Security Modules -- so we call them HSMs -- where they tend to use RISC-V CPUs instead of ARM CPUs. That would be one of the examples. There are other cases where in terms of sudden microcontroller functionality, which is on the larger applications processor, people will favor using a RISC-V CPU, rather than an ARM CPU. […] And another example would be the controller functions which are embedded on our applications processor." *See* Greenhalgh (Arm) Deposition, 100:3-23. *See also* ARMQC_02740205 at '214, a May 2024 presentation on assumptions about RISC-V's effect on Arm's IoT sales.



[553] ███████████████████████████████████████████████

[554] ████████████████████████████████████████████ In November 2023, Mr. Asghar spoke at the RISC-V Summit, touting RICS-V's "many advantages," "massive opportunity," and momentum, as well as its deployment in over a billion Qualcomm devices that have RISC-V microcontrollers: "I think one thing is very clear – we are at a great point where RISC-V is really gaining momentum […] we have multitude of products that are coming out that are all able to use many of the advantages that RISC-V brings. [@ 0:36] […] When you look at what we have from mobile perspective and from the side of automotive and industrial IoT, AR and VR devices. It's a massive opportunity. [@ 1:00] […] [A] product that has better performance […] better power consumption […] Those are all areas where RISC-V can really excel and differentiate itself. […] the opportunity is just massive for RISC-V. [@ 2:19] […] We just launched our latest platforms – the Snapdragon 8 Gen 3 and also the Snapdragon X Elite for PC side – but we have the ability to be able to do even better with RISC-V […]  the breadth and the momentum […] the full scale of what RISC-V ecosystem looks like and that's amazingly promising. [@3:10] […] By 2022, just like we showed last year, we had shipped 650 million devices with RISC-V, that is an amazing number. […] What has happened since then, today we are in excess of a billion devices that have RISC-V integrated microcontrollers in them. That's a massive number. [@4:37]" "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational.

[555] RISC-V has features of a disruptive innovator, as discussed, for example, in Gans, Joshua "The Disruption Dilemma," MIT Press, 2016.

by former Intel chip architects—is developing RISC-V for "high-performance cores for servers and data centers" and "scalable solutions for mobile and edge applications" using RISC-V.[556] Arm has itself acknowledged in a January 2024 presentation that RISC-V has gained traction as the "preferred arch[itecture]" in certain data center products and with competitors like Tenstorrent and Ventana building full-stack RISC-V systems.[557]

225.    Therefore, contrary to Prof. Posner's claims, Arm's alleged conduct and associated effect on Arm's reputation could lead to faster erosion of its share in favor of RISC-V.

226.    In summary, Qualcomm's early and ongoing investment in RISC-V, and the recognition within the industry, demonstrates that RISC-V ISA is a growing and credible competitor to the Arm ISA. While RISC-V's commercialization has been limited to low-end applications thus far, sustained development efforts—by Qualcomm and various firms—are expanding its viability to be adopted in higher-end CPU products and other applications. Contrary to Prof. Posner's claim that, facing the alleged foreclosure by Arm, Qualcomm "may not be able to continue to support or boost RISC-V," [558] the evidence shows the opposite: the dispute has only strengthened Qualcomm's incentive to accelerate RISC-V development, thereby increasing—not reducing—ISA competition.

---

[556] Skye Jacobs, "Former Intel engineers from AheadComputing to break CPU performance limits with RISC-V design," TechSpot, June 12, 2025, https://www.techspot.com/news/108281-former-intel-engineers-form-aheadcomputing-break-cpu-performance.html. *See also* QCARM_7484882. Similarly, Qualcomm, NXP, Infineon, Bosch, and Nordic Semiconductor formed a joint venture named Quintauris to accelerate the adoption of RISC-V technology. Financial services company CGS International commented that: "For most other low power markets, Arm remains the ISA of choice, due to its history, vastly superior software ecosystem, and strong product offerings. The joint venture by Qualcomm/NXP/Infineon/Bosch/Nordic to develop RISC-V hardware modestly increases competitive pressure on Arm, but JV product timelines are still uncertain and initial designs will be limited to auto." CGS International, "Arm Holdings pcl - Initiate at Outperform and $160 PT; Content Story in Early Innings," US Equity Research, Sept 12, 2024, p. 9.

[557] "RV [RISC-V] competitors (Tenstorrent, Ventana, …) have developed full (CPU + Mesh + AI accl[elerator] + IO hub) systems targeted towards datacenters/6G," where Arm needs to actively bring business in early versus RISC-V and "formally communicate details on competition." ARMQC_02726982 at '989.

[558] Posner Report, ¶ 78.

4. There Is No Evidence that Arm's Purported Decision to Stop Supporting v8 Is Anticompetitive

227.    Qualcomm argues that "Arm has pressured existing v8 licensees to 'upgrade' their licenses to v9 by not releasing or supporting older v8 cores."[559] However, I have seen no evidence of the alleged pressure, and Qualcomm and Prof. Posner do not provide any.

228.    To assess this claim, I compare the transition from v8 to v9 with the earlier transition from v7 to v8.[560] If Qualcomm's claim were accurate, one would expect the shift from v8 to v9 to be faster than the shift from v7 to v8. Yet, the data do not support this conclusion: there is no evidence that the ongoing transition from v8 to v9 is faster.[561] The speed of penetration of v8, reflected in the expansion of the darker blue section at the top of the bars in the red box on the left, is similar to the speed of penetration of v9, reflected in the expansion of the darkest blue section at the top of the bars in the red box on the right.

229.    Although this test is admittedly rudimentary and not without limitations, it nonetheless provides more substantive insight than the speculative claims and absence of supporting evidence offered by Qualcomm and Prof. Posner.[562]

**Exhibit 6: Royalty Revenue by Technology**[563]



230.    It is, moreover, standard commercial practice for firms to promote newer versions of their technology. What Qualcomm characterizes as "pressure to upgrade" is better understood as Arm encouraging its customers to adopt improved products and highlighting that the benefits of switching to its newer technology outweigh the costs.[564]

231.    In conclusion, Arm faces real and growing competition from x86 and RISC-V, continues to invest heavily in R&D, and operates in a dynamic ecosystem where sustained success is not guaranteed. The evidence shows that Arm's conduct—including its licensing practices, pricing, and product transitions—is consistent with standard commercial behavior. Attempts to foreclose customers like Qualcomm would likely accelerate the development of competing ISAs, undermining Arm's own ecosystem. Prof. Posner's analysis fails to account for these constraints and costs, rendering his conclusions speculative and incomplete.

## IX. PROF. POSNER HAS NOT DEMONSTRATED THAT ARM'S CONDUCT HARMED COMPETITION AND CONSUMERS

232.    Qualcomm claims that it suffered harm as a result of Arm's conduct.[565] Prof. Posner claims that, because of Arm's conduct, "the downstream OEMs will either pay more for chips or be required to settle for lower-quality chips, to the detriment of the ultimate consumer."[566] However, even if these unsubstantiated claims were true, harm to Qualcomm is not the same as (and does

---

[559] SAC, ¶ 70.

[560] David Brash, "The ARMv8-A architecture and its ongoing development," Arm Community, December 2, 2014 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development.

[561] For example, v8's share increased from a few percentage points in FY2014 to about 30% in FY2016, while v9's share increased from essentially zero in FY2022 to about 20% in the last quarter of FY2024.

[562] One reason why the test is imperfect is that many factors may be different between the two transitions, in addition to the alleged lack of support for v8. For example, the relative improvement of v9 over v8 and v8 over v7 can be a factor.

[563] Source: "Arm Holdings plc Q4 FYE24 Results Presentation," Arm Holdings, May 8, 2024, https://investors.arm.com/static-files/4f2fc46b-34a5-4bc5-94af-f13fbc348f0e (left chart); "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553 (right chart).

[564] For example, when Apple introduces a new iPhone, it generally "pushes" customers to upgrade through advertising.

[565] SAC, ¶ 34.

[566] Posner Report, ¶ 72.

not imply) harm to competition or consumers.[567] As a simple application of this general principle, entry into the supply of custom chips, including by Qualcomm's customers that start to develop their own custom chips for their own consumption or for supply to third parties, would harm Qualcomm but is likely to benefit competition and consumers.

233.    As an example of harm to Qualcomm that is not harm to competition, Qualcomm argues that Arm's conduct allowed Qualcomm's customers to receive better financial terms (i.e., Qualcomm charged its customers less).[568] This is wholly unsubstantiated, but even if true, it may represent a benefit rather than harm to consumers because the lower cost to Qualcomm's customers can, to some extent, be passed-through to their own customers.

234.    Qualcomm and Prof. Posner have neither shown that Qualcomm suffered competitive injury, nor, more importantly, have they shown that any such claimed harm caused harm to competition and consumers.

---

[567] This basic economic principle has been embraced by the Supreme Court, which, in discussing price reductions that harm competitors, stated: "To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for '[i]t is in the interest of competition to permit dominant firms to engage in vigorous price competition, including price competition." The Court went on emphasized that reducing prices in order to expand sales is often "the very essence of competition" and that "mistaken inferences . . . are especially costly because they chill the very conduct the antitrust laws are designed to protect." *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986). In another matter, the Supreme Court succinctly held that antitrust laws protect "competition, not competitors" (*Brown Shoe Co., Inc. v. United States*, 370 U.S. 294 (1962) at 370 U. S. 344). The Supreme Court reiterated this conclusion in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977) at 429 U. S. 488. ("The antitrust laws, however, were enacted for 'the protection of competition, not competitors'").

Economists have explained why competition rather than competitors must be protected. Disruptive innovations and creative destruction can harm competitors but more importantly benefit consumers. "The goal of antitrust policy is to protect and promote a vigorous competitive process. Effective rivalry spurs firms to introduce new and innovative products, as they seek to capture profitable sales from their competitors and to protect their existing sales from future challengers." Federico, Giulio, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," Innovation Policy and the Economy, 2020, Vol. 20, pp. 125-190. On "creative destruction," *see* Schumpeter, Joseph, "Capitalism, Socialism, and Democracy," Harper & Brothers Publishers, 1942.

235.    As I discuss above, Arm's strategy is to work with its customers to promote and expand the ecosystem of Arm-based technology.[569] I also discuss above that Arm profits from the success of its customers, and their success in developing Arm-based rather than, e.g., RISC-V-based, technologies.[570]  It is therefore natural and unsurprising that there is no evidence of Arm attempting to harm its customers.

## A.  Qualcomm Has Not Demonstrated that Arm Had Anticompetitive Intent

236.    Qualcomm's SAC claims—without evidence—that Arm started the *Arm v. Qualcomm* litigation for anticompetitive reasons and that its conduct had the objective to harm Qualcomm.[571] Prof. Posner offers no evidence that Arm's conduct was anything other than a legitimate effort to protect its contractual rights and business model.

237.    I do not opine on Arm's intent, which is a fact question for the Court to decide. Counsel for Arm has instructed me to assume that Arm started the *Arm v. Qualcomm* litigation to exercise its contractual rights, not to foreclose Qualcomm.  However, I note that various factors suggest that Arm's actions were not aimed at harming Qualcomm, one of its main customers.

    i.    The *Arm v. Qualcomm* litigation is the first and only time Arm has filed a lawsuit against a customer.[572] This underscores the rarity and exceptional nature of the dispute. A one-off lawsuit is not indicative of a pattern of exclusionary conduct against customers or a broader strategy to suppress competition. Arm's strategy consists of working with its licensees to

---

[569] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023 https://newsroom.arm.com/blog/arm-licensing-models. (Abbey stated that "[t]hirty years on, a core philosophical tenet of Arm's original IP licensing model underpins its expanded subscription strategy to foster innovation: Arm only succeeds when partners succeed." *See also* ARMQC_02725050 at '068 (A September 2020 presentation discusses partner efforts on the Windows-on-Arm ecosystem and details partner collaborations to provide developer support and expand enterprise application readiness).

[570] Section VII.C. *See also* Chloe Ma's (Chief Business Officer at Arm) statement on leveraging Arm's partners, rather than focusing on RISC-V-based technologies, to drive success. ARMQC_02600713 at '719; Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships.

[571] SAC, ¶ 207.

[572] Rene Haas' trial testimony in *Arm v. Qualcomm*, 272:1-15 ("[In August 2022,] we were at a fork in the road, we were either going to continue for another 18-months plus to look the other way, or do something we had never done in our history and that was to file a claim, a lawsuit against a customer. But we made the choice to file the claim.").

███████████████████████████████

█████████████████████████

build out the network of Arm-based technology and suing a customer runs counter to Arm's collaborative strategy. This exceptional case highlights that Arm has thus far been able to work productively with its licensees in furthering the use cases and value of its ecosystem, but it considered that it had to take action in view of a perceived breach of contract after Qualcomm's acquisition of Nuvia.

ii. While Qualcomm claims that the lawsuit was "meritless,"[573] Qualcomm ignores the fact that it did pass key pretrial motions, including a summary judgment motion.[574] These procedural outcomes indicate that Arm's claims were sufficiently substantiated to warrant a trial. Filing a lawsuit is a standard and legitimate recourse when parties are unable to reach a resolution through private negotiations. Such action cannot be considered anticompetitive per se; on the contrary, judicial resolution of uncertainty can promote clarity, expand trade, and strengthen incentives to innovate.[575]

## B. Arm's Litigation Position Was Public and Transparent from as Early as 2022

238.    Qualcomm claims that "[a]pparently seeking to ratchet up pressure on Qualcomm before trial in *Arm v. Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter […] asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing 'unlicensed cores,' and claiming that Arm will be entitled to terminate the [Qualcomm] ALA if Qualcomm does not capitulate to Arm's demands for a 'cure' within 60

---

[573] SAC, ¶ 8.

[574] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3 ("On October 30, 2024, the Court [in the *Arm v . Qualcomm* case] denied Qualcomm's and Arm's motions for summary judgment, holding that genuine issues of material fact remained for the jury.").

[575] Contractual disputes arising from honest disagreements over the correct interpretation of contractual terms are common. They can arise for a variety of reasons such as ambiguous or unclear language, and incomplete or imprecise terminology, which in turn may lead to the parties having different understandings and diverging interpretations. *See* Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581 ("[S]ignificant interpretive questions often arise in contract litigation. The obvious but not the only reason, besides clumsiness in the use of words, against which the legal linguists warn us, is that contractual performance generally occurs over time rather than being complete at the instant the contract is signed. This is a central rather than an accidental feature of the institution of contract.").

████████████████████████████████████

████████████████████████

days."[576] Qualcomm also claims that the Breach Letter was "timed and publicly released in an effort to damage Qualcomm's business," because it coincided with "Qualcomm's annual Snapdragon® Summit."[577] Prof. Posner claims that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers by sowing doubts about Qualcomm's continued ability to sell Arm-compliant chips."[578]

239.    Prof. Posner and Qualcomm do not explain how Arm's October 2024 letter and its publication could interfere with Qualcomm's business opportunities given that, as early as 2022, Arm repeatedly, clearly, and publicly stated that (a) Qualcomm was in breach of the Qualcomm ALA and (b) Arm had the right to terminate the ALA as a result.[579] As discussed earlier, Qualcomm also recognized that Arm's October 2024 Breach Letter was not "new news."[580] Nor do they explain how the notice could have harmed the competitive process.

240.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[576] SAC, ¶ 29.

[577] SAC, ¶ 33.

[578] Posner Report, ¶¶ 45, 65.

[579] I understand that Arm has also maintained that it retains the right to terminate the agreement if Qualcomm is found to have breached its terms. ████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████

[580] In *Arm v. Qualcomm*, Qualcomm's counsel acknowledged during the November 20, 2024 pre-trial conference that Arm's allegation of breach of the Qualcomm ALA has been part of the case "starting at the very beginning" and that "the letter on October 22nd [was] actually not new news in the sense of alleging [Qualcomm's] breaches" of the Qualcomm ALA because that claim was in the case "starting at the very beginning." *See also Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024, pp. 13, 14 ("And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed.").

████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████

241.    Arm filed the *Arm v. Qualcomm* litigation on August 31, 2022.[582]  The lawsuit was widely reported in the press.[583]  In a publicly available filing dated November 15, 2022, submitted in the context of the *Arm v. Qualcomm* litigation, Arm reiterated and clarified its position.[584] The filing was also reported in detail in the press.[585]



---

[582] *Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146* (D. Del. filed August 31, 2022), Dkt. No. 1.

[583] For example, an article on the same day the lawsuit was filed reported: "Arm is suing Qualcomm, one of its key customers, in a row over the latter's Nuvia custom CPU cores. [...] Arm has accused Qualcomm of being in breach of its licenses, and it wants the American giant to fulfill its obligations under those agreements, such as destroying its Nuvia CPU designs, plus cough up compensation." The article further reported: "According to Arm [...] the licenses it granted Nuvia could not be transferred to and used by its new parent Qualcomm without Arm's permission. Arm says Qualcomm did not, even after months of negotiations, obtain this consent, and that Qualcomm appeared to be focused on putting Nuvia's custom CPU designs into its own line of chips without permission. That led to Arm terminating its licenses with Nuvia in early 2022, requiring Qualcomm to destroy and stop using Nuvia's designs derived from those agreements." *See* Chris Williams, "Arm sues Qualcomm over custom Nuvia CPU cores, wants designs destroyed," The Register, August 31, 2022, https://www.theregister.com/2022/08/31/arm_sues_qualcomm/. *See also* Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31.

[584] *See Arm Ltd. v. Qualcomm Inc.*, No. 1:22-cv-01146-MN, Dkt. No. 1 (D. Del. August 31, 2022, filed November 15, 2022), at pp. 2-3 and ¶¶ 41, 230, 237, 250, ("Qualcomm is not only trying to develop an unlicensed product, but is also materially breaching its ALA with Arm. [...] Within days after Qualcomm first contacted Arm about its planned acquisition of Nuvia, Arm informed Qualcomm in writing that it would need to enter into a new agreement if it wished to continue using the designs and technology that had been created pursuant to the Nuvia ALA. Arm did not wait in the weeds; it openly and promptly identified and communicated Nuvia's and Qualcomm's obligations. [...] Qualcomm and Nuvia must stop using and destroy any Arm-based technology developed under Nuvia's ALA, and that neither Qualcomm nor Nuvia is licensed to continue developing this technology. [...] Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the NuVia [sic] technology. [...] Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology.").

[585] *See*, for example, Dylan Patel, "Arm's Nuclear Option – Qualcomm Must Cancel Next-Generation Products If Arm Succeeds," SemiAnalysis, November 16, 2022, https://semianalysis.com/2022/11/16/arms-nuclear-option-

242.    Arm's first communication with Qualcomm's customers who use products that embed Arm's technology occurred soon after filing the *Arm v. Qualcomm* litigation.[586] Arm had a legitimate reason to make its position known to users of its technology, to confirm and clarify the accounts in the public press, and to reassure customers of its lawful commitment to protect its IP.[587] Prof. Posner does not explain why that would generate harm for Qualcomm that is incremental to the alleged harm from the filing itself.

243.    Similarly, Prof. Posner does not explain why the October 2024 Breach Letter would affect customer expectations or behavior given that for over two years Arm had repeatedly and publicly stated its belief that Qualcomm was in breach if its ALA, and a decision in the *Arm v. Qualcomm* litigation was expected only two months after the October 2024 Breach Letter.[588]

---

qualcomm-must/. *See also* Chris Williams, "Arm shells Qualcomm's Snapdragon launch party with latest salvo in license war," The Register, November 16, 2022, https://www.theregister.com/2022/11/16/arm_qualcomm_licensing_latest/.

[588] With a letter sent to Qualcomm on January 8, 2025, following the decision in the *Arm v. Qualcomm* litigation, Arm withdrew the Breach Letter.

█████████████████████████████████████████████████

█████████████████████████████

244.    Qualcomm and Prof. Posner also take issue with the "timing" of the letter and associated "leak."[589] However, Qualcomm and Prof. Posner do not explain why the alleged harm was increased by the fact that the notice was sent at the time of Qualcomm's annual Snapdragon Summit.[590] This is speculative and unsupported by evidence.

245.    Arm had legitimate reasons to inform its customers of the dispute with Qualcomm and its view that Qualcomm was in breach of its ALA, and to clarify its position with users of its technology. Arm's outreach to Qualcomm's customers who use products that embed Arm's technology was a reasonable and commercially justified response to an ongoing contractual dispute, not anticompetitive conduct. First, Arm had a legitimate interest in ensuring that customers were aware of potential legal and licensing risks associated with Qualcomm's Nuvia-



[589] ██████████████████████████████████████████████████
████████████████████████████ However, Arm filed the *Arm v. Qualcomm* litigation on August 31, 2022; and the 2022 Snapdragon Summit occurred during November 15-17 in Hawaii. *See* Ben Schoon, "Qualcomm confirms November 15–17 event to reveal its next Snapdragon flagship," 9to5Google, July 19, 2022, https://9to5google.com/2022/07/19/snapdragon-summit-2022. Therefore, the Snapdragon Summit appears to have occurred over two months after the filing of the lawsuit. It is unclear how an event that took place two months before the Snapdragon Summit could have "coincided" with the timing of the Snapdragon Summit.

[590] Spencer Collins, a member of Arm's executive committee, was asked about the timing of the letter at his deposition. He explained that the letter was timed so that the ███████████████████████████ would end just after the decision for the *Arm v. Qualcomm* trial was expected, to give Arm the option to terminate the agreement at that time, if the jury had decided in Arm's favor. *See* Collins (Arm) Deposition, 75:4-78:3 ("Q. Why at this time was it appropriate? A. We had tried via numerous avenues to stop Qualcomm from breaching our agreement. So we sent letters. That didn't work. We were then left with no choice but to issue a claim, which we've never done in our 35-year history, to a customer of ours. Then we asked for certification of their adherence to the █████████████. We believed they continued to be breached. Nothing was working. We were approaching trial. This was sent on the 22nd of October 2024. We were approaching trial. And nothing was working. This was not about money for us. This was about respecting our contracts and protecting our IP. We wanted -- our ultimate goal in this dispute was for Qualcomm to remedy the breach. We decided between me, my team and outside counsel that the appropriate thing to do is to send ████████████████████████████████
██████████████████████████████████████████. We felt, given we're approaching trial and we were making no progress with Qualcomm, that was the appropriate thing to do."), 78:17-79:13 ("Q. So you wanted to have the ability to terminate the Qualcomm ALA as soon as the jury came back if, in fact, you had won the trial in December; is that fair? A. We hadn't decided as to whether or not we would terminate the ALA. But we wanted the option. We wanted to be in business with customers respect our contracts."), and 80:2-8 (Mr. Collins also indicated he was unaware that the timing of the letter coincided with the timing of the Snapdragon Summit, but that "the ███████ period coincided with the trial date from our standpoint as opposed to the Snapdragon conference.").

157

based CPUs that were at the center of the contractual dispute.[591] This kind of communication is common.[592] Second, maintaining transparency with customers helps preserve the integrity of Arm's licensing model. Failure to communicate could have created confusion or undermined confidence in Arm's IP rights, particularly given the public nature of the dispute.

246.    High-tech companies operate in dynamic and uncertain environments, where well-managed firms routinely assess and mitigate risk. Arm's decision to protect its IP and seek judicial resolution of its dispute with Qualcomm is not anticompetitive. Even if this prompted some Qualcomm customers to seek "reassurance" or pause to evaluate the situation, such responses are typical in commercial settings and do not constitute harm to competition.   This is not different from a firm suing for patent violation, which may also induce customers of the allegedly violating firm to require "assurance."   In fact, Qualcomm agrees that protection of IP is important. For example, Qualcomm stated that "[t]he drive to invent is a core value of Qualcomm's identity, and protection of inventors' rights is important to both the company and our business model. Economists and historians agree there has been no greater incentive to invent than protection of inventors' rights to the IP produced by their hard work and creativity. Patents are the primary means of protecting IP and represent a rule-of-law guarantee akin to a deed's role in protecting the ownership of land. […] Strong patent protection in the United States and other economies

---

[591] Philip Hughes, VP for external communications at Arm, testified that the purpose of the communications to Qualcomm's customers who use products that embed Arm's technology was "just to inform customers why [Arm had] taken these actions." Deposition of Phil Hughes, June 17, 2025 (hereinafter "Hughes (Arm) Deposition"), 7:17-20; 27:4-18 ("Q. All right. And what was your understanding of the purpose of the communications to Qualcomm customers? A. Okay. Again, I think it – as I recall, it was more just to inform customers why we'd taken these actions. Q. And when you say, "to inform customers why we'd taken these actions," what actions are you referring to? A. The – the lawsuit."). Concerning the publication of the October 2024 Breach Letter, Ami Badani, Chief Marketing Officer at Arm, testified that "our goal was to make sure that our customers and partners were informed, and that was our singular goal. […] our goal was to inform our partners and customers because they would have found out anyways. So we wanted to make sure that we were getting in front of it with the right facts." Deposition of Ami Badani, August 1, 2025 (hereinafter "Badani (Arm) Deposition"), 7:20-22; 49:23-50:18.

[592] For example, during the *SCO v. IBM* litigation, the SCO Group sent letters to about 1,500 companies alleging that the use of Linux may infringe a copyright it holds on the original UNIX source code. "SCO Sends Warning Letters To Linux Users," InformationWeek, December 22, 2003, https://www.informationweek.com/it-leadership/sco-sends-warning-letters-to-linux-users; Stephen Shankland, "SCO targets Linux customers," CNET, May 14, 2003, https://www.cnet.com/tech/services-and-software/sco-targets-linux-customers/. Qualcomm also issued statements informing the broad public of lawsuits it files against other companies. For example, *see* "Qualcomm Files Lawsuit Against Motorola," Qualcomm, March 5, 1997 https://www.qualcomm.com/news/releases/1997/03/qualcomm-files-lawsuit-against-motorola, "Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm, November 6, 2005 https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia.

████████████████████████████████████████

████████████████████████████

encourages investment in research and development by companies and individuals that has resulted in life-changing technologies, including the technologies that make possible the wireless communications that define our world today."[593] It is therefore not surprising that Qualcomm carefully protects its IP.[594]

247.    In conclusion, the evidence demonstrates that Arm's litigation position was consistently public and transparent from the outset of its dispute with Qualcomm. Arm did not conceal its views or engage in a misinformation campaign; rather, it communicated its contractual concerns openly through legal filings and public statements beginning in 2022. The October 2024 Breach Letter did not introduce new information or disrupt Qualcomm's relationship with its customers, but instead reiterated Arm's long-standing position. There is no evidence that Arm's communications were a strategic attempt to harm competition rather than a commercially reasonable response to an unresolved contractual disagreement. These facts collectively undermine Qualcomm's and Prof. Posner's allegations and support the conclusion that Arm's conduct aligns with standard industry practice and reflects procompetitive behavior.

## C. There Is No Evidence of Harm to Competition

248.    Qualcomm's claim of harm is inconsistent with its market performance. Since the onset of the dispute, Qualcomm has expanded its product portfolio, entered new segments, and maintained strong financial performance—indicators of a firm that is competing successfully.[595] These facts undermine the allegation that Arm's conduct harmed Qualcomm in any meaningful way. Moreover, even if Qualcomm had demonstrated that it suffered harm, such harm to Qualcomm

---

[593] "Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025.

[594] *See* footnote 350350.

[595] *See* Section VI.

████████████████████████████████████████

██████████████████████████████████

does not equate to harm to competition. Antitrust analysis focuses on the impact to the competitive process and consumer welfare, not on the fortunes of individual firms.[596]

249.    *First*, there is no evidence that Arm's decision to file its lawsuit against Qualcomm harmed competition. The legal process is a standard and legitimate mechanism for resolving genuine disputes about the terms of an agreement. While litigation may impose costs or harm upon both parties involved as well as their partners, it also serves to clarify contractual obligations, allow the parties to move forward with their businesses, and unlock the potential gains from trade that the dispute may have stalled.[597] Arm's decision to protect its IP and exercise its contractual rights reflects a lawful and commercially reasonable approach, not anticompetitive conduct, even if Qualcomm perceives harm to its own interests.

250.    *Second*, Qualcomm's criticism of Arm's organic entry into chip design overlooks the procompetitive nature of such expansion. Entry by Arm introduces additional product variety and increases competitive pressure, which can benefit consumers through improved innovation and pricing. Prof. Posner fails to even consider this possibility, offering no analysis of the potential consumer benefits or efficiencies associated with Arm's organic vertical expansion. Rather than harming competition, Arm's entry reflects a natural evolution in response to customer demand and industry dynamics.

251.    ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ ██ ████████████████████████████████

---

[596] Congressional Research Service, "Antitrust Law: An Introduction," May 1, 2025, https://www.congress.gov/crs_external_products/IF/PDF/IF11234/IF11234.8.pdf ("The Goals of Antitrust: The federal antitrust laws seek to protect economic competition…. Antitrust cases generally turn on whether the conduct or transaction at issue enables the exercise of market power in ways that diminish consumer welfare, total welfare, or innovation.").

[597] *See*, for example, Seitz, Michael and Martin Watzinger, "Contract enforcement and R&D investment," Research Policy, 2017, Volume 46, Issue 1 ("Motivated by the differences in innovation across countries, this paper evaluates the role of contract enforcement for R&D investments. We find empirical evidence that weak contract enforcement is associated with lower R&D investment: R&D intensity in an industry increases with the quality of the judicial system. This effect is particularly strong in industries that cannot buy inputs on competitive markets and thus depend more on contracts to acquire inputs. In line with this, we show that contract enforcement is particularly important in industries in which vertical integration is not a viable option.").

[598] *See* Section VIII.B.2.



252.     *Fourth*, as discussed above, Arm's licensing practices remain open and widely accepted.[601] Arm continues to offer ALAs to a broad range of partners, including Apple, Google, and IBM, and TLAs to companies such as Microsoft, Samsung, and Texas Instruments.[602]  Qualcomm and Prof. Posner provide no evidence that Arm has refused to license its ISA to other firms or restricted access in a manner that would harm competition.

253.     *Fifth*, Qualcomm and Prof. Posner have not provided any evidence to show that Arm's action adversely affected any other ALA or TLA partner. The absence of harm to other licensees undermines Qualcomm's argument that Arm's actions have harmed competition, rather than simply impacting a single commercial relationship.

254.     In summary, Qualcomm's allegations of competitive harm are not supported by evidence. Qualcomm's continued growth and diversification contradict the notion that Arm's conduct has harmed Qualcomm. Each of the specific actions attributed to Arm—whether enforcing its contractual rights, entering chip design, responding to customer needs, or maintaining open licensing practices—reflect standard commercial behavior, not harm to the competitive process or

---

[599] Awad (Arm) Deposition, 48:12-51:17.

[600] Posner Report, ¶ 66.

[601] Arm remains open through its extension of licensing agreements to various customers. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

consumer welfare. The absence of harm to other licensees further reinforces the conclusion that this is a bilateral dispute, not a threat to competition.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Timothy S. Simcoe

September 5, 2025

162

**X. APPENDICES**

**APPENDIX A: PROFESSOR TIMOTHY S. SIMCOE'S CV**

# Timothy S. Simcoe

| | | |
|---|---|---|
| CONTACT | Boston University Questrom School of Business | (510) 685-2020 |
| | 595 Commonwealth Avenue | tsimcoe@bu.edu |
| | Boston, MA 02215 | http://people.bu.edu/tsimcoe |

ACADEMIC
EMPLOYMENT

**Boston University, Questrom School of Business**
- David J. McGrath Jr. Professor in Strategy & Innovation, 2024-*present*.
- Professor of Strategy & Innovation, 2022-2024.
- Associate Professor of Strategy & Innovation, 2013-2022.
- Assistant Professor of Strategy & Innovation, 2009-2013.

**University of Toronto, Joseph L. Rotman School of Management**
- Assistant Professor of Strategic Management, 2004-2009.

APPOINTMENTS

**President's Council of Economic Advisers**
- Senior Economist, 2014-2015.

**National Bureau of Economic Research**
- Research Associate, Productivity Program, 2016-*present*.
- Faculty Research Fellow, Productivity Program, 2009-2016.

**BU Technology & Policy Research Initiative**
- Faculty Director, 2020-*present*.

EDUCATION

**University of California at Berkeley**
- Ph.D., Business Administration, 2004
- M.A., Economics, 2003

**Harvard University**
- A.B., Applied Math & Economics, 1996

PUBLICATIONS

**Refereed Articles**

Mezzanotti, F. and T. Simcoe. Innovation, Patenting and Appropriability: Survey Evidence from a Nationally Representative Sample of U.S. Firms, *Review of Economics and Statistics*, forthcoming.

R. A. Gibbs, T. Simcoe and D. Waguespack. Does Earnings Management Matter for Strategy Research *Strategic Management Journal*, forthcoming.

B. Ganglmair, E. Tarantino and T. Simcoe. Learning When to Quit: An Empirical Model of Experimentation in Standards Development. *AEJ: Microeconomics*, 17(3):164–190, August 2025.

C. Righi and T. Simcoe. Patenting Inventions or Inventing Patents? Continuation Practice at the USPTO. *RAND Journal of Economics*, 54(3):416–442, Fall 2023.

J. Baron, B. Ganglmair, N. Persico, T. Simcoe and E. Tarantino. Representation is Not Sufficient for Selecting Gender Diversity. *Research Policy*, 53(6):104994, July 2024.

R. Bekkers, C. Catalini, A. Martinelli, C. Righi and T. Simcoe. Disclosure Rules and Declared Essential Patents. *Research Policy*, 52(1):104618, January 2023.

E. Basker and T. Simcoe. Upstream, Downstream: Diffusion and Impact of the Universal Product Code. *Journal of Political Economy*, 129(4):1252–1286, April 2021.

A. King, B. Goldfarb and T. Simcoe. Learning from Testimony on Quantitative Research in Management. *Academy of Management Review*, 46(3):465–488, July 2021.

X. Li and T. Simcoe. Competing or Complementary Labels? Estimating Spillovers in Chinese Green Building Certification. *Strategic Management Journal*, 42(13): 2451–2476, December 2021.

A. Agrawal, C. Rosell and T. Simcoe. Tax Credits and Small Firm R&D Spending. *American Economic Journal: Economic Policy*, 12(1): 1–21. Lead Article, May 2020.

M. Rysman, T. Simcoe and Y. Wang. Differentiation Strategies in the Adoption of Environmental Standards: LEED from 2000 to 2014. *Management Science*, 66(9): 4173–4192, September 2020.

T. Simcoe and J. Watson. Forking, Fragmentation and Splintering. *Strategy Science*, 4(4):251–342, December 2019.

F. Mezzanotti and T. Simcoe. Patent Policy and American Innovation After eBay: An Empirical Examination. *Research Policy*, 48(5): 1271–1281, June 2019.

C. Righi and T. Simcoe. Patent Examiner Specialization. *Research Policy*, 48(1):137–148, February 2019.

M. Lemley and T. Simcoe. How Essential are Standard Essential Patents? *Cornell Law Review*, 104(3): 607–642, March 2019 .

M. Catillon, P. Gertler and T. Simcoe. Who Benefits Most in Disease Management Programs?: Improving Target Efficiency. *Health Economics*, 28(2): 189–203, February 2019.

L. Freedman, I. Cockburn and T. Simcoe. The Economics of Reproducibility in Preclinical Research. *PLoS Biology*, 13(6): e1002165, June 2015.

T. Simcoe and M. Toffel. Government Green Procurement Spillovers: Evidence from Municipal Building Policies in California. *Journal of Environmental Economics and Management*, 68(3):411–434. Lead article, November 2014.

E. Rawley and T. Simcoe. Information, Knowledge and Asset Ownership in Taxicab Fleets. *Organization Science*, 24(3): 831–845, May-June 2013.

J. Farrell and T. Simcoe. Choosing the Rules for Consensus Standardization. *The RAND Journal of Economics*, 43(2): 235–252, Summer 2012.

T. Simcoe. Standard Setting Committees: Consensus Governance for Shared Technology Platforms. *American Economic Review*, 102(1): 305–336, February 2012.

M. Rysman and T. Simcoe. A NAASTy Alternative to RAND Pricing Commitments. *Telecommunications Policy*, 35(11): 1010–1017, December 2011.

A. Galasso and T. Simcoe. CEO Overconfidence and Innovation. *Management Science*, 57(8): 1469–1484, August 2011.

T. Simcoe and D. Waguespack. Status, Quality and Attention: What's in a (Missing) Name? *Management Science*, 57(2): 274–290, February 2011.

A. Mehta, M. Rysman and T. Simcoe. Identifying the Age Profile of Patent Citations: New Estimates of Knowledge Diffusion. *Journal of Applied Econometrics*, 25 (7): 1073–1222, November/December 2010.

E. Rawley and T. Simcoe. Diversification, Vertical Contracting and Diseconomies of

Scope: Evidence from the Taxicab Industry. *Management Science*, 56(9): 1534–1550, September 2010.

T. Simcoe, S. J. Graham and M. Feldman. Competing on Standards? Entrepreneurship, Intellectual Property and Platform Technologies. *Journal of Economics and Management Strategy*, 18(3): 775–816, Fall 2009.

M. Rysman and T. Simcoe. Patents and the Performance of Voluntary Standard Setting Organizations. *Management Science*, 54(11): 1920–1934, November 2008.

D. Mowery and T. Simcoe. Is the Internet a US Invention? An Economic and Technological History of Computer Networking. *Research Policy*, 31(8-9): 1369–1387, 2002.

J. Macher, D. Mowery and T. Simcoe. eBusiness and the Semiconductor Industry Value Chain: Implications for Vertical Specialization and Integrated Semiconductor Manufacturers. *Industry and Innovation*, 9:155–181, 2002.

## Working Papers

Mezzanotti, F. and T. Simcoe. Research and/or Development: Financial Frictions and Innovation Investment. R&R at *Journal of Finance*

N. Sahoo, T. Simcoe and X. Yang. Effects of Content Sourcing Strategy on Online News Subscription. R&R at *MIS Quarterly*.

D-S. Jeon, Y. Lefouili, Y. Li and T. Simcoe. Ecosystems and Complementary Platforms.

## Other Publications

T. Simcoe. Standard Setting Organizations. Chapter in the *Elgar Encyclopedia on the Economics of Competition and Regulation*, forthcoming.

K. Blind, M. Kenney, A. Leiponen and T. Simcoe. Standards and Innovation: A Review and Introduction to the Special Issue. *Research Policy*, 52(8), October 2023.

J. Contreras, T. Simcoe et al. Preserving the Royalty-Free Standards Ecosystem. *European Intellectual Property Review*, 45(7): 371-375, June 2023.

E. Hovenkamp and T. Simcoe. Tying and Exclusion in FRAND Licensing: Evaluating Qualcomm. *The Antitrust Source*, February 2020.

A. Sesia, T. Simcoe and M. Toffel. Platform LEEDership at the U.S. Green Building Council. Harvard Business School Case 619-027, May 2018.

B. Goldfarb, A. King and T. Simcoe. Heritability of Trust and Distrust Remains Unknown. Letter to *Proceedings of the National Academy of Sciences*, January 2018.

S. Graham, P. Menell, C. Shapiro and T. Simcoe. Final Report of the Berkeley Center for Law & Technology Patent Damages Workshop. *Texas Intellectual Property Law Journal*, 25 (1): 115–142, 2017.

A. Shampine and T. Simcoe. Economics of Patents and Standardization: Network Effects, Hold-up, Hold-out, Stacking. The Cambridge Handbook of Technical Standardization Law, Vol. 1. Cambridge University Press, 2017.

T. Simcoe and C. Righi. Standards, Patents and Innovation. Handbook of Standards and Innovation. Edward Elgar, 2017.

T. Simcoe. How to Make and Keep a Patent Pledge. Pages 285–290 in *Patent Pledges: Global Perspectives on Patent Law's Private Ordering Frontier*. Edward Elgar, 2017.

T. Simcoe. Modularity and the Evolution of the Internet. Chapter 1 in *Economic Analysis of the Digital Economy*. University of Chicago Press, 2015.

A. Agrawal, S.J. Graham, M. Rysman and T. Simcoe. Industry Standards, Intellectual Property and Innovation: Introduction to the Special Issue. *International Journal of Industrial Organization*, 36:1-3 (September 2014).

T. Simcoe. Governing the Anti-commons: Institutional Design for Standard Setting Organizations. In *Innovation Policy and the Economy*, 14:99–128, 2014.

T. Simcoe. Private and Public Approaches to Patent Holdup in Industry Standard-Setting. *Antitrust Bulletin*, 57(1): 59–88, Spring 2012.

J. Farrell and T. Simcoe. Four Paths to Compatibility. pages 34–58 in the *Oxford Handbook of the Digital Economy*. Oxford University Press, 2012.

T. Simcoe. Delay and *de jure* Standardization: Exploring the Slowdown in Internet Standards Development. Pages 260–295 in *Standards and Public Policy*. Cambridge University Press, 2007.

T. Simcoe. Explaining the Increase in Intellectual Property Disclosure. Pages 260–295 in *Standards Edge: The Golden Mean*. Bolin Group, 2007.

T. Simcoe. Open standards and Intellectual Property Rights. Pages 161–183 in *Open Innovation: Researching a New Paradigm*. Oxford University Press, 2006.

D. Mowery and T. Simcoe. Public and Private Participation in the Development and Governance of the Internet. Pages 259–294 in *The Limits of Market Organization*. Russell Sage, 2005.

D. Mowery and T. Simcoe. The Origins and Evolution of the Internet. Pages 229–265 in *Technological Innovation and Economic Performance*. Princeton University Press, 2002.

M. Rysman and T. Simcoe. Measuring the Performance of Standard Setting Organizations. Pages 81–94 in *International Standardization as a Strategic Tool: Commended Papers from the IEC Centenary Challenge 2006*. International Electrotechnical Commission, 2006.

TEACHING        **Boston University Questrom School of Business**
                Technology Strategy (MBA and Executive MBA)
                Strategy and Innovation (Undergraduate)
                Competition, Innovation and Strategy (MBA)
                Data Analysis (Executive MBA)
                Causal Inference in Management Research (PhD)

                **University of Toronto, Rotman School of Management**
                Fundamentals of Competitive Strategy (MBA)
                Entrepreneurship & Small Business Management (Undergraduate)
                Models & Methods in Strategic Management (PhD)

                **University of California, Berkeley**
                Economic Analysis for Business Decisions, Teaching Assistant (MBA)

CONSULTING                **Expert Reports, Depositions and Testimony**

United States of America *et al.* (client) v. Google LLC. Eastern District of Virginia. Case No. 1:23-cv-00108.

Apple (client) v. Qualcomm. Southern District of California. Case No. 3:17-CV-0108.

Microsoft (client) v. Motorola. Western District of Washington. Case No. C10-1823-JLR.

HTC Corporation (client) v. Ericsson. Eastern District of Texas. Case No. 6:18-CV-00243-JRG.

ViiV Healthcare, (client) v. Gilead Sciences. District of Delaware. Case No. 1:18-CV-0224-VAC-CJB.

In Re: Qualcomm Securities Class Action Litigation (plaintiff client). Southern District of California. Case No. 3:17-CV-00121-JO-MSB

Fujitsu v. Tellabs (client). Northern District of Illinois, Eastern Division. Civil Action No. 09 CV 04530.

In the Matter of Certain Video Capable Electronic Devices, Including Computers, Streaming Devices, Televisions, Cameras, and Components and Modules Thereof (clients Amazon and Hewlett Packard). U.S. International Trade Commission Investigations Nos. 337-1379 and 337-1380.

In the Matter of Video-Capable Laptop, Desktop Computers, Handheld Computers, Tablets, Televisions, Projectors, and Components and Modules Thereof (clients Acer, AsusTek and HiSense). U.S. International Trade Commission Investigation No. 337-TA-448.

Apple (client) v. Motorola. Western District of Wisconsin. Case No. 11-CV-178.

Lenovo (client) and Motorola Mobility v. InterDigital Technology Corporation et al. District of Delaware. Case No. 19-1590-LPS

3G Licensing, Koninklijke KPN and Orange v. LG Electronics (client). District of Delaware. Case No. 17-cv-85-LPS.

Global Communications (client) v. Direct TV, et al. Northern District of Florida. Case No. 4:12-CV-00651-RH-CAS.

Zenith Electronics, Panasonic, U.S. Philips and The Trustees of Columbia University v. Craig Electronics (client). Southern District of Florida. Case No. 13-CV-80567.

**Other Consulting**

Wireless standards developer (client). Review of bylaws and procedures.

Boston Toronto Group (client). Executive education.


SERVICE                   **University Governance**

Strategy & Innovation Department Chair, 2024-*present*

PhD Program Director (2015-2017, 2018-2022.)

**Editorial and Advisory Positions**

American Economic Journal: Economic Policy, Board of Editors, 2021.

Management Science, Associate Editor in Innovation and Entrepreneurship, 2014-present.

Journal of Industrial Economics, Associate Editor, 2013-present.

Management Science, Associate Editor in Business Strategy, 2012-present.

NIST Visiting Expert Committee on US National Standards Strategy for Critical and Emerging Technologies, 2023-24.

National Academy of Sciences, Member of Committee on Intellectual Property Management Practices of Standard Setting Organizations, 2012-2013.

National Academy of Sciences, Member of Committee on the Review of the Small Business Innovation Research and Small Business Technology Transfer Programs at the National Science Foundation, 2019-2021.

Co-founder, Sloan Management Review Strategy Forum, 2018-2023.

Scientific Advisory Board, Global Biological Standards Institute, 2015-2018.

**Doctoral Advising & Committees**

Xia Li, London Business School (Primary Advisor, 2023).

Jeremy Watson, University of Minnesota (Primary Advisor, 2018).

Cesare Righi, Pompeu Fabra University (Primary Advisor, 2017).

Jane Wu, UCLA (Committee Member, 2022).

Sophie Wang, UIBE Beijing (Committee Member, 2021).

Christian Catalini, MIT Sloan School (Committee Member, 2013)

Paul Seaborn, University of Denver (Primary Advisor, 2011)

Jay Horwitz, University of Bocconi (Committee Member, 2011)

Elena Kulchina, Duke University (Committee Member, 2012)

Justus Baron, Ecole des Mines / ParisTech (Committee Member, 2012)

AWARDS

Innovators Network Foundation Intellectual Property Fellow, 2021-2023

Broderick Award for Excellence in Research, 2022.

Dean's Research Scholar, 2015-2018, 2020-2022

Outstanding Contribution to Questrom Doctoral Programs, 2018

Questrom Full-time MBA Favorite Elective Professor, 2016

BU Questrom Doctoral Student's Association, Distinguished Mentor Award, 2016

John R. Russell Excellence in Teaching Award, Executive MBA, 2013

Management Science Meritorious Service Award (Reviewer), 2010

Rotman Excellence in Teaching Award, Commerce Program, 2008

Glueck Best Paper Award, Academy of Management BPS Division, 2008

Finalist, IEC Centenary Challenge, 2006

Finalist, Organization Science Dissertation Proposal Competition, 2003

GRANTS

Intel Corporation Research Gift, 2017-2020

Bell Canada University Labs, 2007-2008

Connaught New Faculty Start-Up Award, 2004-2008

Berkeley Center for I.T. Research in the Interest of Society, 2003-2004

Intel Corporation Robert M. Noyce Memorial Fellowship, 2001-2002

Haas School of Business Ph.D. Fellowship, 1999-2000

Harvard College Fellowship, 1992-1995

| PRIOR WORK EXPERIENCE | **Ernst & Young LLP** |
|---|---|
| | Senior Consultant, Center for Business Innovation, Boston MA, 1998-1999 |
| | Consultant, E&Y Economics Consulting, Washington DC, 1996-1998 |

| OTHER | **Professional Societies** |
|---|---|
| | American Economics Association, Academy of Management, Strategy Research Forum, International Society for New Institutional Economics |
| | **Computer Code** |
| | STATA xtpqml: Robust inference in fixed-effects poisson regression |
| | STATA mtad: Multinomial test of agglomeration and dispersion |

| PERSONAL | Married: Stephanie Tobias Gates (August 2002) |
|---|---|
| | Children: Katherine, Anne and Theodore |
| | Interests: Michigan Sailing, North Haven Golf Club, Harvard Alumni Jazz Band |

███████████████████████████

██████████████████████

**APPENDIX B: MATERIALS RELIED UPON**

[redacted]

## Legal Documents

"Arm's First (Corrected) Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-11)," Arm Ltd., March 1, 2024

"Arm's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3)," Arm Holdings, July 11, 2025

"Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3," Arm Holdings, July 11, 2025

"Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11)," Arm Holdings, July 11, 2025

"Arm's First Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 12)," Arm Holdings, July 11, 2025

"Arm's Responses & Objections to Qualcomm's First Set of Request for Admissions (Nos. 1-28)," Arm Holdings, July 11, 2025

"Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, March 10, 2025

"Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, July 11, 2025

"Plaintiffs' Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, August 8, 2025

"Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13)," Qualcomm, July 11, 2025

"Plaintiffs' Second Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13)," Qualcomm, August 8, 2025

"Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, July 11, 2025

"Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, August 8, 2025

"Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission (Nos. 1-30)," Qualcomm, July 11, 2025

████████████████████████████████████████

████████████████████████████

*Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. Nos. 137; 137-1 (Ex. A) (June 3, 2025)

*Arm Ltd. v. Qualcomm Inc.*, No. 1:22-cv-01146 (D. Del. filed August 31, 2022), Dkt. Nos. 571, 572

*Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146* (D. Del. filed August 31, 2022), Dkt. No. 1

*Arm v. Qualcomm*, No. 22-1146 (MN), Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim, D.I. 21, November 15, 2022

*Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024

*Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025

Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007

Complaint for Patent Infringement, *Qualcomm Inc. v. Apple Inc.,* No. 3:17-cv-01375-JAH-AGS (S.D. Cal. filed July 6, 2017), https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/2017-07-06_complaint.pdf

*eBay Inc. and Half.com v. MercExchange, L.L.C.*, Brief of Amici Curiae Qualcomm Inc. & Tessera, Inc. in Support of Respondent, 547 U.S. 388 (2006) (No. 05-130)

Expert Report of Dr. Michael C. Brogioli, September 5, 2025

Expert Report of Mr. Steven Richards, CPA, September 5, 2025

Expert Report of Eric A. Posner, August 8, 2025

Expert Report of Patrick F. Kennedy, August 8, 2025

Expert Report of Patrick F. Kennedy, February 27, 2024

*Federal Trade Commission v. Qualcomm Incorporated,* "Reply brief for appellant Qualcomm Incorporated (Redacted)," Qualcomm Incorporated, December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit

Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10–13)," Qualcomm, July 11, 2025

I incorporate by reference all documents cited in ARM's and Qualcomm's discovery responses, and all materials relied upon by Prof. Posner and Dr. Kennedy.

## Case Law

*Brown Shoe Co., Inc. v. United States,* 370 U.S. 294 (1962)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)

*Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104 (1986)

*Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc*., U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, Case 4:24-cv-02508, Dkt. Entry 511 (S.D. Tex. Jan. 31, 2025)

*United States v. Aluminum Co. of Am.,* 148 F.2d 416, 430 (2d Cir. 1945)

*United States v. Microsoft Corp.,* 253 F.3d 59 (2001)

## Deposition Testimony and Associated Exhibits

*Arm v. Qualcomm,* Trial Transcript, Vol 2.1, December 16, 2024

*Arm v. Qualcomm,* Trial Transcript, Vol 3.1, December 17, 2024

*Arm v. Qualcomm,* Trial Transcript, Vol. 4.1, December 18, 2024

Deposition of Akshay Bhatnagar, July 10, 2025

Deposition of Ami Badani, August 1, 2025

Deposition of Andrew Howard, July 1, 2025

Deposition of Ann Chaplin, July 11, 2025

Deposition of Anupa George, July 30, 2025

Deposition of Aparajita Bhattacharya, July 7, 2025

Deposition of Christine Tran, July 10, 2025

Deposition of Christopher Patrick, July 2, 2025

Deposition of Cristiano Amon, July 3, 2025

Deposition of Durga Malladi, July 10, 2025

Deposition of Ehab Youssef, June 26, 2025

Deposition of Gerard Williams, June 25, 2025

Deposition of Gerard Williams, November 3, 2023

Deposition of James Jeon, July 11, 2025

Deposition of James Thompson, November 28, 2023

Deposition of Jannik Nelson, July 10, 2025

Deposition of Jean-Francois (Jeff) Vidon, July 1, 2025

Deposition of Jeff Golden, July 3, 2025

Deposition of Jeffrey M. Fonseca, July 9, 2025

Deposition of Jignesh Trivedi, July 9, 2025

Deposition of John Horley, July 8, 2025

Deposition of Jonathan Weiser, July 11, 2025

Deposition of Karl M. Whealton, June 18, 2025

Deposition of Karthik Shivashankar, June 20, 2025

Deposition of Kenneth Siegel, July 4, 2025

Deposition of Kurt Wolf, June 25, 2025

Deposition of Larissa Cochron, July 11, 2025

Deposition of Laura Sand, July 8, 2025

Deposition of Lynn Couillard, July 3, 2025

Deposition of Manju Varma, June 24, 2025

Deposition of Mark Dragicevich, June 27, 2025

Deposition of Martin Weidmann, June 20, 2025

Deposition of Michael Williams, June 27, 2025

Deposition of Mohamed Awad, July 29, 2025

████████████████████████

██████████████████████

Deposition of Paul Kranhold, July 17, 2025

Deposition of Paul Williamson, July 2, 2025

Deposition of Pavankumar (Pavan) Mulabagal, July 1, 2025

Deposition of Peter Greenhalgh, July 4, 2025

Deposition of Philip Hughes, June 17, 2025

Deposition of Rene Haas, July 7, 2025

Deposition of Richard Grisenthwaite, July 2, 2025

Deposition of Richard Meacham, June 27, 2025

Deposition of Selena LaCroix, August 1, 2025

Deposition of Simon Segars, November 16, 2023

Deposition of Spencer Collins, June 30, 2025

Deposition of Sudeep Holla, June 17, 2025

Deposition of Tim Herbert, October 25, 2023

Deposition of Vivek Agrawal, July 11, 2025

Deposition of Will Abbey, June 26, 2025

Deposition of Will Abbey, October 27, 2023

Deposition of Ziad Asghar, July 7, 2025

## Conversations

Conversation with Dr. Michael C. Brogioli, September 2, 2025

Conversation with Mohamed Awad, August 29, 2025

Conversation with Paul Williamson, September 2, 2025

## SEC Filings

Arm Holdings plc, Form F-1, August 21, 2023,
https://www.sec.gov/Archives/edgar/data/1973239/000119312523216983/d393891df1.htm

Arm Holdings plc, Amendment No. 2 to Form F-1, September 5, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm

Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2024, https://investors.arm.com/static-files/dcdd6629-24bb-40ef-ba55-8aca1362205a

Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2025, https://investors.arm.com/static-files/9be77c9d-75ee-4639-bfe4-17efd23c56b5

Intel Corporation, 2021 Form 10-K, for the fiscal year ended December 25, 2021, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-22-000007/0000050863-22-000007.pdf

Intel Corporation, 2024 Form 10-K, for the fiscal year ended December 28, 2024, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000009/0000050863-25-000009.pdf

Qualcomm Incorporated, Form 10-K, for the fiscal year ended September 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/fd08c4f6-61ba-4a6a-a339-0e3b522ed739.pdf

Qualcomm Incorporated, Form 10-K, for fiscal years 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx

Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 26, 2021, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/c91b841c-1f3f-4762-9c0d-c379f1554455.pdf

Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/1b687286-85e9-44e6-a579-d19d089eacfb.pdf

Qualcomm Incorporated, Form 10-Q, for the quarterly periods 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx

## Bates Numbered Documents

ARM_00000003

ARM_00000016

ARM_00000017

ARM_00000382

ARM_00000510

ARM_00002955

ARM_00004029

ARM_00026351

ARM_00032601

ARM_00032602

ARM_00045266

ARM_00055357

ARM_00057511

ARM_00057560

ARM_00076604

ARM_00080472

ARM_00081203

ARM_00081461

ARM_00081462

ARM_00081753

ARM_00086285

ARM_00087465

ARM_00088600

ARM_00092788

ARM_00095947

ARM_00097388

ARM_00103918

ARM_00104733

ARM_00110511

ARM_00113179

ARM_00115827

ARM_00117493

ARM_00118635

ARM_00119602

ARM_00119603

ARM_01215409

ARM_01215878

ARM_01215886

ARM_01230861

ARM_01230977

ARM_01230978

ARM_01238895

ARM_01239056

ARM_01246942

ARM_01249629

ARM_01259705

ARM_01282304

ARM_01293447

ARM_01294236

ARM_01305915

ARM_01311208

ARM_01314793

ARM_01426938

ARM_01427719

ARM_01427776

ARM_01427796

ARM_01428339

ARMQC_00000640

ARMQC_02600713

ARMQC_02601118

ARMQC_02725050

ARMQC_02726982

ARMQC_02727610

ARMQC_02729412

ARMQC_02731630

ARMQC_02739661

ARMQC_02740205

ARMQC_02740386

ARMQC_02748499

ARMQC_02749177

ARMQC_02762992

ARMQC_02770485

ARMQC_02770649

ARMQC_02770676

ARMQC_02771127

ARMQC_02771946

ARMQC_02772366

ARMQC_02779314

ARMQC_02779364

ARMQC_02779391

ARMQC_02779433

ARMQC_02779483

ARMQC_02783619

ARMQC_02785287

QCARM_0020011

QCARM_0020012

QCARM_0027980

QCARM_0222737

QCARM_0275743

QCARM_0332490

QCARM_0337839

QCARM_0338297

QCARM_0338573

QCARM_0338883

QCARM_0343120

QCARM_0343954

QCARM_0353229

QCARM_0550516

QCARM_0550518

QCARM_0589823

QCARM_0591733

QCARM_3460234

QCARM_3474751

QCARM_3839896

QCARM_3972031

QCARM_7401071

QCARM_7484882

QCVARM_0449658

QCVARM_0451587

QCVARM_0455391

QCVARM_0463558

QCVARM_0463837

QCVARM_0464076

QCVARM_0464648

QCVARM_0465090

QCVARM_0526828

QCVARM_0527544

QCVARM_0528956

QCVARM_0532239

QCVARM_0534597

QCVARM_0537065

QCVARM_0538870

QCVARM_0538873

QCVARM_0541454

QCVARM_0573677

QCVARM_0600104

QCVARM_0608391

QCVARM_0621447

QCVARM_0621448

QCVARM_0847188

QCVARM_0851120

QCVARM_0851449

QCVARM_0855438

QCVARM_0856270

QCVARM_0856888

QCVARM_0857113

QCVARM_0857152

QCVARM_0863181

QCVARM_0863573

QCVARM_0863641

QCVARM_0864713

QCVARM_0864833

QCVARM_0864924

QCVARM_0865022

QCVARM_0865236

QCVARM_0865274

QCVARM_0865311

QCVARM_1014030

QCVARM_1024852

Case 1:24-cv-00490-MN    Document 56281    Filed 01/27/25    Page 193 of 337 PageID #: 26986

QCVARM_1031097

QCVARM_1066820

QCVARM_1069058

QCVARM_1069082

QCVARM_1069106

QCVARM_1069760

QCVARM_1120481

QCVARM_1120999

QCVARM_1121176

QCVARM_112154

QCVARM_1121674

QCVARM_1151565

QCVARM_1151573

QCVARM_1151615

## Articles and Books

"AI Flywheel Gathering Momentum - Initiate Buy," UBS Global Research, November 24, 2024

"Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011

Aberra, Adam and Matthieu Chemin, "Does legal representation increase investment? Evidence from a field experiment in Kenya," 2021, Journal of Development Economics, Vol. 150

Armstrong, Mark, "Competition in Two-Sided Markets," 2006, RAND Journal of Economics, Vol. 37, No. 3

Babcock, Linda, George Loewenstein, S. Issacharoff, and Colin Camerer, "Biased Judgements of Fairness in Bargaining," American Economic Review, 1995, Vol. 85, No. 5

Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59

B - 13

Benjamin E. Hermalin et al., "Contract Law," in Handbook of Law & Economics, 2007, Vol. 3, No. 68 (ed. A. Mitchell Polinsky & Steven Shavell)

Blair, Roger D., Christine S. Wilson, D. Daniel Sokol, Keith Klovers and Jeremy A. Sandford, "Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies," George Mason Law Review, 2020, Vol. 27, No. 3

Bloom, Nick, Stephen Bond, and John Van Reenen, "Uncertainty and Investment Dynamics," The Review of Economic Studies, 2007, Vol. 74, No. 2

Brandenburger, Adam M. and Barry J. Nalebuff, "The Rules of Co-opetition," Harvard Business Review, 2021

CGS International, "Arm Holdings pcl - Initiate at Outperform and $160 PT; Content Story in Early Innings," US Equity Research, Sept 12, 2024

De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1

Donna, Javier D., Pedro Pereira, Yun Pu, Andre Trindade, and Renan C. Yoshida, "Direct sales and bargaining," RAND Journal of Economics, 2024, Vol. 55, No. 4

Federico, Giulio, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," Innovation Policy and the Economy, 2020, Vol. 20, pp. 125-190

Gans, Joshua "The Disruption Dilemma," MIT Press, 2016

Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," Proceedings of the National Academy of Sciences U.S.A., 1996, Vol. 3

Kwon, Yona, Dahee Kang, Sinji Kim, and Seungho Choi, "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," Journal of Open Innovation: Technology, Market, and Complexity, 2020, Vol. 6, No. 1

Lemley, Mark A. and Carl Shapiro, "Probabilistic Patents," Journal of Economic Perspectives, 2005, Vol. 19, No. 2

Lianos, Ioannis and Pierre Regibeau, "'Vexatious'/'Sham' Litigation: When Can It Arise and How Can It Be Reduced?," The Antitrust Bulletin, 2017, Vol. 62, No. 4

Lu, Shihua, Serge Moresi, and Steven C. Salop, "A Note on Vertical Mergers with an Upstream Monopolist: Foreclosure and Welfare Effects," 2007, Working Paper

Muthoo, Abhinay, "A Non-Technical Introduction to Bargaining Theory," World Economics, April-June 2020, Vol. 1, No. 2

Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581

Priest, George L. & Benjamin Klein, "The Selection of Disputes for Litigation," Journal of Legal Studies, 1984, Vol. 13

Schumpeter, Joseph, "Capitalism, Socialism, and Democracy," Harper & Brothers Publishers, 1942

Seitz, Michael and Martin Watzinger, "Contract enforcement and R&D investment," Research Policy, 2017, Volume 46, Issue 1

Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International

Shapiro, Carl, "Competition and Innovation Did Arrow Hit the Bull's Eye?" in The Rate and Direction of Inventive Activity Revisited (ed. Josh Lerner and Scott Stern), 2012, University of Chicago Press

Shapiro, Carl, "Premiums for high quality products as returns to reputations," The Quarterly Journal of Economics, 1983, Vol. 98, No. 4

Shapiro, Carl, "Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case," Review of Industrial Organization, 2021, Vol. 59, pp. 303–341

Spulber, Daniel F., "How Do Competitive Pressures Affect Incentives to Innovate When There is a Market for Inventions?" Journal of Political Economy, 2013, Vol. 121, No. 6, pp. 1007-1054

Tirole, Jean, "Competition and the Industrial Challenge for the Digital Age," Annual Review of Economics, 2020, Vol. 156

Yang, Chenyu, "Vertical Structure and Innovation: A Study of the SoC and Smartphone Industries," The RAND Journal of Economics, 2022, Vol. 51, No. 3, pp. 739–785

## Websites and Other Public Sources

"2023 Patent Litigation Report," Bloomberg Law, https://pro.bloomberglaw.com/insights/intellectual-property/2023-patent-litigation-report/

"4 Reasons Qualcomm's Data Center Business Failed," The Motley Fool, December 21, 2018, https://www.nasdaq.com/articles/4-reasons-qualcomms-data-center-business-failed-2018-12-21

"4Q24 Global Top 10 Foundries Set New Revenue Record, TSMC Leads in Advanced Process Nodes," TechPowerUp, March 10, 2025, https://www.techpowerup.com/333868/4q24-global-top-10-foundries-set-new-revenue-record-tsmc-leads-in-advanced-process-nodes

"About RISC-V," RISC-V International, https://riscv.org/about/, accessed  August 15, 2025

"Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025

"AI Accelerator Chips Overview and Comparison," HardwareBee, https://hardwarebee.com/ai-accelerator-chips-overview-and-comparison/, accessed on August 22, 2025

"Apple announces Mac transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/

"Apple unleashes M1," Apple Newsroom, November 10, 2020, https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/

"Arm Approved Design Partners," Arm, https://www.arm.com/partners/arm-approved-program/design-partners, accessed September 4, 2025

"Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY

"Arm Compute Subsystems (CSS) for Client," Arm, https://www.arm.com/products/compute-subsystems-for-client, accessed September 4, 2025

"Arm CoreLink GIC-700 Generic Interrupt Controller Technical Reference Manual," Arm Developer,  https://developer.arm.com/documentation/101516/latest/, accessed September 4, 2025

"Arm Cortex-A Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102826/latest/, accessed September 4, 2025

"Arm Cortex-M Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102787/latest/, accessed September 4, 2025

"Arm Cortex-R Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102788/latest/, accessed September 4, 2025

"Arm CPU Architecture: A Foundation for Computing Everywhere," Arm, https://www.arm.com/architecture/cpu, accessed September 4, 2025

"Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement

"Arm Flexible Access," Arm, https://www.arm.com/products/flexible-access

"Arm Holdings plc Q1 2026 Earnings Call," July 30, 2025, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008

"Arm Holdings plc Q3 2025 Earnings Call," February 5, 2025, https://investors.arm.com/static-files/f1190d81-408d-4276-a30c-b27c1ce5a30a

"Arm Holdings plc Q4 2025 Earnings Call," May 7, 2025, https://investors.arm.com/static-files/181d5019-29bd-4ba5-af29-45888e25c637

"Arm Holdings plc Q3 FYE24 Results Presentation," Arm Holdings, February 7, 2024, https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06

"Arm Holdings plc Q4 FYE24 Results Presentation," Arm Holdings, May 8, 2024, https://investors.arm.com/static-files/4f2fc46b-34a5-4bc5-94af-f13fbc348f0e

"Arm Holdings Q2 FYE25 Investor Presentation," Arm Holdings, November 6, 2024, https://investors.arm.com/static-files/623fece0-c947-4d'93-94eb-e08e8dfad61b

"Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274

"Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553

"Arm Total Access," Arm, https://www.arm.com/products/licensing/arm-total-access, accessed August 30, 202

"At Qualcomm Trial, Apple COO Said $7.50 Per-iPhone Fee Cost Company $1 Billion a Year," Bloomberg, January 14, 2019, https://fortune.com/2019/01/14/qualcomm-trial-apple-7-50-iphone-fee-billion/

"Automated Driving | Snapdragon Ride ADAS Tech for Smart Cars," Qualcomm, https://www.qualcomm.com/products/automotive/automated-driving, accessed September 4, 2025

"AWS and Arm," Arm, https://www.arm.com/markets/computing-infrastructure/cloud-computing/aws#1, accessed August 29, 2025

"AWS re: Invent 2024 - Monday Night Live with Peter DeSantis," AWS, YouTube.com, December 3, 2024, https://www.youtube.com/watch?v=vx36tyJ47ps&t=1041s

"BoM Analysis: Samsung Galaxy S23 Ultra Costs $469 to Make," Counterpoint, May 31, 2023, https://www.counterpointresearch.com/insight/bom-analysis-samsung-galaxy-s23-ultra

"CMN-600 Coherent Mesh: Scalable Network for Smart Systems," Arm, https://www.arm.com/products/silicon-ip-system/corelink-interconnect/cmn-600, accessed September 4, 2025

"CoreSight ELA-600," Arm Developer, https://developer.arm.com/Processors/CoreSight%20ELA-600, accessed September 4, 2025

"CPU Cortex-A78", Arm https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78, accessed August 29, 2025

"Exynos Mobile Processor," Samsung Semiconductor Global, https://semiconductor.samsung.com/processor/mobile-processor/, accessed September 4, 2025

"Fastest Path to Production Silicon with World-Leading Performance, on Leading-Edge Technology," Arm, https://www.arm.com/products/neoverse-compute-subsystems, accessed September 4, 2025

"FYE26 Q1 (30-Jun-25) Historical Quarters Datasheet.xlsx," Arm Holdings, July 30, 2025, https://investors.arm.com/financials/quarterly-annual-results

"Gartner Says Worldwide Semiconductor Revenue Grew 21% in 2024," Gartner, April 10, 2025, https://www.gartner.com/en/newsroom/press-releases/2025-04-10-gartner-says-worldwide-semiconductor-revenue-grew-21-percent-in-2024

"Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/cpu-core/, accessed September 4, 2025

"Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 3, 2025

"Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025

"Here's How Much Apple Was Paying Qualcomm in Royalties," The Motley Fool, January 14, 2019, https://www.nasdaq.com/articles/heres-how-much-apple-was-paying-qualcomm-royalties-2019-01-14

"How NVIDIA Shipped One Billion RISC-V Cores In 2024," RISC-V International, February 25, 2025, https://riscv.org/blog/2025/02/how-nvidia-shipped-one-billion-risc-v-cores-in-2024/

"Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025

"Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025

"Is Snapdragon an ARM Processor? Understanding the Core Technology Behind Qualcomm's Mobile Chipsets," Indian Institute of Embedded Systems, https://iies.in/blog/is-snapdragon-an-arm-processor-understanding-the-core-technology-behind-qualcomms-mobile-chipsets

"Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC- Vinternational

"Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, @ 4:37, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-Vinternational

"Market Capitalization of Arm Holdings," Companies Market Cap, https://companiesmarketcap.com/arm-holdings/marketcap/, accessed August 29, 2025

"Market Capitalization of Qualcomm," Companies Market Cap, https://companiesmarketcap.com/qualcomm/marketcap/, accessed August 29, 2025

"Market Capitalization of Samsung," Companies Market Cap, https://companiesmarketcap.com/samsung/marketcap/, accessed August 29, 2025

"Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers," Federal Trade Commission, Press Release May 16, 2014, https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibitions-direct-consumer-auto-sales

"Neoverse N1 | CPU for Next-Gen Cloud Infrastructure," Arm, https://www.arm.com/products/silicon-ip-cpu/neoverse/neoverse-n1, accessed September 4, 2025

"Next-Gen flagship Snapdragon chip 'Pakala' & reference device slip in new Qualcomm video," March 21, 2024, https://www.gizmochina.com/2024/03/21/next-gen-snapdragon-pakala-reference-device/

"NUVIA Raises $53 Million to Reimagine Silicon Design for the Data Center," Globe News Wire, November 15, 2019, https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.htm

"Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, August 5, 2025

"PPA analysis overview," Arm Developer, https://developer.arm.com/documentation/102738/0100/Power--performance--and-area-analysis, accessed September 4, 2025

"Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025,
https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf

"Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025,
https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf

"Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025,
https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf

"Q4 2024 Qualcomm Inc. Earnings Call," Qualcomm, November 6, 2024,
https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/06/QCOM_Q4FY24EC_Transcript_11-7-24.pdf

"Qualcomm 5G NR Royalty Terms Statement," November 19, 2017,
https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm-5g-nr-royalty-terms-statement.pdf

"Qualcomm Announces Third Quarter Fiscal 2025 Results," Qualcomm, July 30, 2025,
https://s204.q4cdn.com/645488518/files/doc_financials/2025/q3/FY2025-3rd-Quarter-Earnings-Release.pdf

"Qualcomm Cellular IoT Licensing Program," Qualcomm,
https://www.qualcomm.com/licensing/cellular-iot-licensing-program, accessed September 4, 2025

"Qualcomm Completes Acquisition of NUVIA," Qualcomm Press Release, March 15, 2021,
https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia

"Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/

"Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm Press Release, November 6, 2005, https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia

"Qualcomm Files Lawsuit Against Motorola," Qualcomm, Mar 5, 1997
https://www.qualcomm.com/news/releases/1997/03/qualcomm-files-lawsuit-against-motorola

"Qualcomm Implements New Corporate Structure," Qualcomm Press Release, October 1, 2012,
https://www.qualcomm.com/news/releases/2012/10/qualcomm-implements-new-corporate-structure

██████████████████████████████████

████████████████████████████

"Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf

"Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf

"Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, https://hbsp.harvard.edu/product/711463-PDF-ENG

"Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf

"Qualcomm Oryon CPU," Qualcomm, https://www.qualcomm.com/products/technology/processors/oryon, accessed August 20, 202

"Qualcomm Sets New Growth Targets, Showcasing Company's Opportunity as On-Device AI Accelerates Demand for its Technologies," Qualcomm Inc., Press Release, November 19, 2024 https://investor.qualcomm.com/news-events/press-releases/news-details/2024/Qualcomm-Sets-New-Growth-Targets-Showcasing-Companys-Opportunity-as-On-Device-AI-Accelerates-Demand-for-its-Technologies/default.aspx

"Qualcomm to Acquire Alphawave Semi," Qualcomm, June 9, 2025, https://www.qualcomm.com/news/releases/2025/06/qualcomm-to-acquire-alphawave-semi

"Qualcomm to Bring RISC-V Based Wearable Platform to Wear OS by Google," Qualcomm, October 17, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-to-bring-risc-v-based-wearable-platform-to--wear-os-by-

"Quintauris: Accelerating RISC-V Innovation for next-gen Hardware ," November 4, 2024, https://www.quintauris.com/quintauris-accelerating-risc-v-innovation-for-next-gen-hardware

"RISC-V International Governance," RISC-V, https://riscv.org/about/board/, accessed August 13, 2025

"Samsung Apologizes for Falling Behind in AI Chips Race," Wall Street Journal, October 8, 2024, https://www.wsj.com/tech/samsungs-chip-technologies-fall-behind-in-early-innings-of-ai-game-67f0f9af

"Samsung Electronics Co. Ltd.," Wall Street Journal, https://www.wsj.com/market-data/quotes/kr/xkrx/005930, accessed August 26, 2025

"SCO Sends Warning Letters To Linux Users," InformationWeek, December 22, 2003, https://www.informationweek.com/it-leadership/sco-sends-warning-letters-to-linux-users

"Silicon Design Reimagined," Nuvia, Inc., January 15, 2021,
https://web.archive.org/web/20210115193713/https://nuviainc.com/

"Snapdragon Summit," SixFiveMedia, https://www.sixfivemedia.com/our-events/snapdragon-summit, accessed September 4, 2025

"Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007,
https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451

"The 5 Best Features of the Meta Quest 3," Qualcomm, January 12, 2024,
https://www.qualcomm.com/snapdragon/news/the-5-best-features-of-the-meta-quest-3

"The Largest Companies by Market Cap in August 2025," The Motley Fool, August 4, 2025
https://www.fool.com/research/largest-companies-by-market-cap/

"The Value of Making Concessions In Negotiation," Red Bear, November 12, 2024,
https://www.redbearnegotiation.com/blog/making-concessions-in-negotiation

"Too Good to Lose: America's Stake in Intel," Center for Strategic and International Studies, November 12, 2024, https://www.csis.org/analysis/too-good-lose-americas-stake-intel

"Top 10 Semiconductor Foundries in the World," Cytech Systems, March 13, 2024
https://www.cytechsystems.com/news/top-10-semiconductor-foundries

"Trial Sheds Light on Q'comm Patent Holdings, Royalty Rates," EETimes, January 21, 2019,
https://www.eetimes.com/trial-sheds-light-on-qcomm-patent-holdings-royalty-rates

"Understanding Android," Android, https://www.android.com/everyone/facts/, accessed August 29, 2025

"Virtual Reality: Transforming the way we experience reality," Qualcomm,
https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar/virtual-reality-vr

"What are IP Cores in Semiconductor Design: Types & Advantages," Techovedas, April 21, 2024, https://techovedas.com/what-are-ip-cores-in-semiconductor-design-types-advantages/

"What is Windows on Arm (WoA)?" Arm, https://www.arm.com/glossary/windows-on-arm, accessed September 4, 2025

"Why RISC-V is Inevitable, Calista Redmond, RISC-V International," RISC-V International, April 6, 2023, at 8:33, https://www.youtube.com/watch?v=ktjSvlelKPk&ab_channel=RISC-VInternational

"XR/VR/AR Reimagining reality as we know it," Qualcomm,
https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar, accessed September 4, 2025

"Your Negotiation Challenges," Karrass, June 17, 2025, https://www.karrass.com/blog/your-negotiation-challenges

Abner Li, "Report: Arm cancels Qualcomm's instruction set, IP license for chip design," 9to5Google, October 22, 2024, https://9to5google.com/2024/10/22/report-qualcomm-arm-chip-design/

Aditya Bedi, "The foundation of Total Compute: First Armv9 Cortex CPUs," Arm Community, May 25, 2021 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/first-armv9-cpu-cores

Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf

Anand Lal Shimpi, "The ARM Diaries, Part 1: How ARM's Business Model Works," AnandTech, June 28, 2013, https://web.archive.org/web/20130701165406/http://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works/2

Andy Patrizio, "Qualcomm makes it official; no more data center chip," Network World, December 12, 2018, https://www.networkworld.com/article/966778/qualcomm-makes-it-official-no-more-data-center-chip.html

Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027

Arjun Kharpal, "Qualcomm to launch data center processors that link to Nvidia chips," CNBC, May 19, 2025, https://www.cnbc.com/2025/05/19/qualcomm-to-launch-data-center-processors-that-link-to-nvidia-chips.html

Arm, "The ARM processor business model," https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model, accessed August 22, 2025

Ben Schoon, "Google Pixel grows in US, settling into top 4 spot ahead of Pixel 10 launch," 9to5google, July 28, 2025, https://9to5google.com/2025/07/28/google-pixel-us-market-share-q2-2025/

Ben Schoon, "Qualcomm confirms November 15–17 event to reveal its next Snapdragon flagship," 9to5Google, July 19, 2022, https://9to5google.com/2022/07/19/snapdragon-summit-2022

Ben Schoon, "Qualcomm is suing Transsion, the largest smartphone maker that doesn't use Snapdragon," 9to5Google, July 12, 2024, https://9to5google.com/2024/07/12/qualcomm-transsion-lawsuit-report

Beth Kindig, "Arm Stock: AI Chip Favorite Is Overpriced," Forbes, Mar 21, 2024, https://www.forbes.com/sites/bethkindig/2024/03/21/arm-stock-ai-chip-favorite-is-overpriced/

Briana Watson, "SOC vs CPU: Breaking Down the Differences and their Optimal Usage," November 15, 2023, https://www.totalphase.com/blog/2023/11/soc-vs-cpu-breaking-down-the-differences-and-their-optimal-usage/

Charles Martin and Malcom Owen, "The history—and triumph —of Arm and Apple Silicon", Apple Insider, April 22, 2024, https://appleinsider.com/articles/24/04/22/the-history----and-triumph----of-arm-and-apple-silicon

Chris Williams, "Arm shells Qualcomm's Snapdragon launch party with latest salvo in license war," The Register, November 16, 2022, https://www.theregister.com/2022/11/16/arm_qualcomm_licensing_latest/

Chris Williams, "Arm sues Qualcomm over custom Nuvia CPU cores, wants designs destroyed," The Register, August 31, 2022, https://www.theregister.com/2022/08/31/arm_sues_qualcomm/

Chris Williams, "Up in arms! Arm kills off its anti-RISC-V smear site after own staff revolt," The Register, July 10, 2018, https://www.theregister.com/2018/07/10/arm_riscv_website/

Congressional Research Service, "Antitrust Law: An Introduction," May 1, 2025, https://www.congress.gov/crs_external_products/IF/PDF/IF11234/IF11234.8.pdf

David Brash, "The ARMv8-A architecture and its ongoing development," Arm Community, December 2, 2014  https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development

David Manners, "Qualcomm data centre business withers away," Electronics Weekly, December 11, 2018, https://www.electronicsweekly.com/news/business/qualcomm-datacentre-business-withers-away-2018-12/

Deepa Prahalad, "Why Trust Matters More Than Ever for Brands," Harvard Business Review, December 8, 2011 https://hbr.org/2011/12/why-trust-matters-more-than-ev

Dominic Rushe, "Myspace sold for $35m in spectacular fall from $12bn heyday," The Guardian, June 30, 2011,  https://www.theguardian.com/technology/2011/jun/30/myspace-sold-35-million-news

Don Fancher, Jennifer Lee, and Debbie McCormack, "Trust: A Critical Asset," Harvard Law School Forum on Corporate Governance, June 17, 2021, https://corpgov.law.harvard.edu/2021/06/17/trust-a-critical-asset/

███████████████████████

█████████████████

Dylan Patel, "Arm's Nuclear Option – Qualcomm Must Cancel Next-Generation Products If Arm Succeeds," SemiAnalysis, November 16, 2022, https://semianalysis.com/2022/11/16/arms-nuclear-option-qualcomm-must/

Dylan Patel, Myron Xie, Afzal Ahmad and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/

Exchange Rates, "British Pound to US Dollar History: 2019," https://www.exchangerates.org.uk/GBP-USD-spot-exchange-rates-history-2019.html

Florian Mueller, "BREAKING: Qualcomm settles with China's Transsion (Africa's smartphone market leader): Indian patent lawsuit withdrawn," ip fray, January 16, 2025, https://ipfray.com/breaking-qualcomm-settles-with-chinas-transsion-africas-smartphone-market-leader-indian-patent-lawsuit-withdrawn/

Francisco Cheng, "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential

Greg Tang, "Intel and the x86 Architecture: A Legal Perspective," The Harvard Journal of Law & Technology, January 4, 2011, https://jolt.law.harvard.edu/digest/intel-and-the-x86-architecture-a-legal-perspective

Gyana Swain, "Arm secures Meta as first customer in chip push, challenging industry giants," ComputerWorld, February 14, 2025, https://www.computerworld.com/article/3825123/arm-secures-meta-as-first-customer-in-chip-push-challenging-industry-giants.html.

Haroun Adamu, "Did you know: Samsung makes a lot of money from iPhones," Android Authority, June 11, 2025, https://www.androidauthority.com/did-you-know-samsung-apple-partnership-3426411/

Herbert Hovenkamp, "Antitrust Market Definition: the Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, https://www.networklawreview.org/hovenkamp-market-definition/

Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud

Ian King, "Qualcomm Plans Exit From Server Chips," Bloomberg, May 7, 2018 https://www.bloomberg.com/news/articles/2018-05-07/qualcomm-is-said-to-plan-exit-from-server-chips-amid-cost-cuts

Imogen Beech, "6 real-life coopetition examples," Breezy, September 6, 2023, https://breezy.io/blog/coopetition-examples

Jeffrey Mervis, "To beat China, new U.S. law offers billions for microchip research and training," Science, September 6, 2022, https://www.science.org/content/article/beat-china-new-u-s-law-offers-billions-microchip-research-and-training

Jessica Coacci, "Here's the one-page memo Warren Buffett sent to his managers every two years for over 25 years," Yahoo! Finance, August 6, 2025 https://finance.yahoo.com/news/one-page-memo-warren-buffett-140107224.html

Jim McGregor, "Arm Squares Off Against Qualcomm: Day 2," December 18, 2024, https://www.forbes.com/sites/tiriasresearch/2024/12/18/arm-squares-off-against-qualcomm-day-2/

Joseph Calamia, Explained: The Physics-Defying Flight of the Bumblebee, Live Science, February 25, 2011 https://www.livescience.com/33075-how-bees-fly.html

Jowi Morales, "Qualcomm claims it owns 10% of U.S. Windows PC retail market for devices priced $800 and up," Tom's Hardware, February 6, 2025, https://www.tomshardware.com/tech-industry/qualcomm-claims-it-owns-10-percent-of-u-s-windows-pc-retail-market-for-devices-priced-usd800-and-up

Kelsey Ziser, "MediaTek and Qualcomm's rivalry heats up in 5G smartphone market – Omdia," Light Reading, July 16, 2024, https://www.lightreading.com/smartphones-devices/mediatek-and-qualcomm-s-rivalry-heats-up-in-5g-smartphone-market-omdia

Khadija Khartit, "When Does It Make Sense for a Company to Pursue Vertical Integration?" Investopedia, February 6, 2025, https://www.investopedia.com/ask/answers/012715/when-does-it-makes-sense-company-pursue-vertical-integration.asp

Linley Gwennap, "Editorial: Arm's No-Win Legal Fight," Tech Insights, https://www.techinsights.com/blog/editorial-arms-no-win-legal-fight, accessed August 29, 2025

MacroTrends, "QUALCOMM Research and Development Expenses 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/research-development-expenses

MacroTrends, "QUALCOMM Revenue 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/revenue

Majeed Kamran, "Qualcomm's Alphawave Acquisition Targets Data Centers and AI, But What's Next?" EE Times, June 9, 2025, https://www.eetimes.com/qualcomms-alphawave-acquisition-targets-data-centers-and-ai-but-whats-next/

Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html

███████████████████████████████

███████████████████████████

Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008

Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, June 3, 2024, https://www.reuters.com/technology/arm-aims-capture-50-pc-market-five-years-ceo-says-2024-06-03/

Melissa Riofrio, "Surface Pro X revealed: Thin, light, and supercharged with a custom SQ1 ARM chip," PC World, October 2, 2019, https://www.pcworld.com/article/398146/microsofts-surface-pro-x-is-thin-light-and-supercharged-with-a-custom-sq1-arm-chip.html

Mike Freeman, "Qualcomm laying off more workers in San Diego, North Carolina to cut costs," The San Diego Union-Tribune, December 8, 2018, https://www.sandiegouniontribune.com/2018/12/07/qualcomm-laying-off-more-workers-in-san-diego-north-carolina-to-cut-costs/

Mike Wehner, "AIM is officially dead, and your childhood means nothing," Yahoo!News, October 6, 2017, https://www.yahoo.com/news/aim-officially-dead-childhood-means-nothing-174900787.html

Mike Wuerthele, "Apple & ARM's iPhone & Mac chip partnership will continue for decades," Apple Insider, September 5, 2023, https://appleinsider.com/articles/23/09/05/apple-arms-iphone-mac-chip-partnership-will-continue-for-decades

Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025, https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation

Patent Dispute Report: 2024 Mid-Year Report," Unified Patents, July 22, 2024, https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report

Paul Alcorn, "Intel and AMD are unlikely allies in new x86 ecosystem advisory group," Tom's Hardware, October 15, 2024, https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward

Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships

Phill Powell, "Types of central processing units (CPUs)," https://www.ibm.com/think/topics/central-processing-unit-types

Qualcomm Financial Summary downloaded from LSEG Data & Analytics

Rajeev Dhir, "Negotiation: Stages and Strategies," Investopedia, June 04, 2024, https://www.investopedia.com/terms/n/negotiation.asp

Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html

Rashika Singh, "Qualcomm shares slide as Apple modem shift, tariffs raise growth concerns," Yahoo Finance, July 31, 2025, https://finance.yahoo.com/news/qualcomm-shares-slide-apple-modem-085843911.html

Robert Triggs, "Arm vs x86: Instruction sets, architecture, and all key differences explained", Android Authority, December 20, 2023 https://www.androidauthority.com/arm-vs-x86-key-differences-explained-568718/

Roddy Urquhart, "Systems & Design: Opinion, Semiconductor Engineering," March 29, 2021, https://semiengineering.com/what-does-risc-v-stand-for/

Ryan Bourne, "Is This Time Different? Schumpeter, the Tech Giants, and Monopoly Fatalism," Cato Institute, June 18, 2019 https://www.cato.org/publications/policy-analysis/time-different-schumpeter-tech-giants-monopoly-fatalism

Saul Sugarman, "So I visited the last Blockbuster on the planet, and all I got was this t-shirt," The Bold Italic, December 8, 2023, https://thebolditalic.com/so-i-visited-the-last-blockbuster-on-the-planet-and-all-i-got-was-this-t-shirt-ffc6d2ed414d

Sebastian Moss, "Qualcomm announces data center CPUs, will support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025 https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/

Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf

Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1 2022 https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf

Simon Sharwood, "Arm gives up on killing off Qualcomm's vital chip license," The Register, February 6, 2025, https://www.theregister.com/2025/02/06/arm_qualcomm_nuvia/

Skye Jacobs, "Former Intel engineers from AheadComputing to break CPU performance limits with RISC-V design," TechSpot, June 12, 2025, https://www.techspot.com/news/108281-former-intel-engineers-form-aheadcomputing-break-cpu-performance.html

Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market

Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31

Stephen Nellis, "Apple inks new long-term deal with Arm for chip technology, according to filing," Reuters, September 5, 2023 https://www.reuters.com/technology/apple-inks-new-long-term-deal-with-arm-chip-technology-filing-2023-09-05/

Stephen Shankland, "SCO targets Linux customers," CNET, May 14, 2003, https://www.cnet.com/tech/services-and-software/sco-targets-linux-customers/

Steve McDowell, "Qualcomm's Game-Changing Move Into Automotive And Industrial IoT," Forbes, January 28, 2025, https://www.forbes.com/sites/stevemcdowell/2025/01/28/qualcomms-game-changing-move-into-automotive-and-industrial-iot/

Steve Mollman, "Blockbuster 'laughed us out of the room,' recalls Netflix cofounder on trying to sell company now worth over $150 billion for $50 million," Fortune, October 22, 2024, https://finance.yahoo.com/news/blockbuster-laughed-us-room-recalls-174322621.html

Swagath Bandhakavi, "FTC ends legal challenge against Microsoft's $69bn Activision Blizzard acquisition," Tech Monitor, May 23, 2025 https://www.techmonitor.ai/digital-economy/big-tech/ftc-microsoft-activision-blizzard-deal

Timothy Green, "Qualcomm is Going After Intel and AMD in This Lucrative Market," January 16, 2025, https://finance.yahoo.com/news/qualcomm-going-intel-amd-lucrative-101500205.html

Tobias Mann, "Jury spares Qualcomm's AI PC ambitions, but Arm eyes a retrial," The Register, December 23, 2024, https://www.theregister.com/2024/12/23/qualcomm_arm_trial/

Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, Nov 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/

U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf

U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, https://www.justice.gov/d9/383663.pdf

U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf

Victor Keegan, "Will MySpace ever lose its monopoly?" The Guardian, February 8, 2007, https://www.theguardian.com/technology/2007/feb/08/business.comment

███████████████████████████████

██████████████████████████

Wayne Ma & Cory Weinberg, "How a Lopsided Apple Deal Got Under Arm's Skin," The Information, November 29, 2023, https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin

Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models

Young Hyun Jun, "Dearvalued [sic] customers, investors, and employees of Samsung Electronics," Samsung, October 8, 2024, https://www.samsung.com/global/ir/reports-disclosures/public-disclosure-view.84206/

Zac Hall, "Apple makes up less than 5% of Arm's revenue, and Arm can't do anything about it," 9to5mac, November 29, 2023, https://9to5mac.com/2023/11/29/apple-arm-licensing-revenue/

**APPENDIX C: TRANSCRIPT OF INTERVIEW OF RENE HAAS, ARM'S CEO, OCTOBER 22, 2024**

████████████████████████

████████████████

**Source: "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, https://www.youtube.com/watch?v=6FnBz8rxWUY**

*Peter Elstrom (Executive Editor Technology Bloomberg, PE): That's why I have you. And thank you all for joining us. We have a lot of questions for you, so we'll go ahead and get started. First, I begin. You are not just the of Arm you're now a podcaster. You began in your spare time I guess. You began a new podcast is called 'Tech Unheard' and your first interview was was with Jensen Huang. That's right which I gave a listen to. First of all, what gave you the idea to start a podcast? And secondly, how do you find the time as CEO to do something like that too?*

Rene Haas (Arm CEO): Yeah. So first off, thank you again for for having me here. I'm an amateur at this, so you don't have to worry about your day job as far as podcasting goes. You know, we were talking with some of our board members about how to use a unique medium to talk to two leaders, talk about the Arm story. And one of the ideas that was suggested was was a podcast. I was a radio disc jockey actually spinning records in university. So, I had a little bit of experience and aspirations to do that kind of work early in my life. So, in talking with some folks, you know, around the team, we said, you know, let's let's try this and let's do something a little bit more innovative and talk to other leaders and give them a perspective of maybe a conversation that they may not naturally have with someone who's professional like you are. So, yeah, we kicked it off. Please listen, it's on Apple Music, Spotify and Jensen was my first guest.

*Peter Elstrom: Great, Great. Congratulations. And, you know, in terms of the business Arm was acquired by SoftBank for about three two billion dollars. At some point, SoftBank agreed to sell it for about 40 billion dollars. That deal didn't go through, of course, NVIDIA was supposed to buy it. That deal didn't go through. Now, you went public just over a year ago, companies worth roughly 160 billion dollars, which seems like a successful IPO. But could you talk to us about what the business model for Arm has been and how it's evolved over time, over that period of time? And especially, what's the strategy going forward?*

Rene Haas: Yeah, well, thank you for the you know, for the nice words. 30-year-old plus company. Our business model for most of our time on earth, if you will, was very horizontal in that we had a licensing model. We develop IP. Our products are primarily CPUs. The business model is very horizontal in nature, meaning that we designed a very general-purpose product,

very power efficient product, and then license it to customers independent of the vertical market. And in other words, we didn't really target a certain vertical. I took over the core IP business right after SoftBank bought Arm and we pivoted to a more of a vertical approach, meaning that we now have products very specific for the data center, very specific for automotive, very specific for IoT. Smartphones we were born. And that diversification really allowed us to expand into many new markets with brand new products. SoftBank buying Arm in 2016 allowed us to invest in those new areas. So fast forward the result. What you're seeing now in terms of performance is that strategy. You know, going forward as we think about the next number of years, what we're seeing in the marketplace is a need for more solutions. Chips are getting increasingly more difficult to build. It takes a long time to design a chip, takes even longer to fabricate the chip. So, the more that Arm can do to help customers get to market faster is helpful. So, we're now developing solutions, what we call "CSSs" that get people to market sooner and allow them to get more profitably in a sooner way.

*Peter Elstrom: Mm hmm. Okay. I want to talk about AI. And in particular, the opportunities in AI. There is some debate, as we've referred to, I think, in a couple of these sessions about whether there's a bubble in AI. And I I'm going to assume that you think that there are real opportunities there. But can you talk about what Arm's role is there and how you see the company evolving to take advantage of those opportunities?*

Rene Haas: So, one of the most unique things about our company is the fact that the device that we build, the CPU, we estimate that 70% of the world's population touches Arm in some way. We're in security cameras, automobiles, PCs, smartphones, data center. And what that means is every workload, whether it's an application, an operating system or AI, runs through Arm in some way. So, that means AI. is going to run on Arm, period. And we're the only company on the planet that can run those AI workloads from the smallest devices on the edge. Again, a wearable, glasses, watch, phone to the data center. So, for us, AI is a gigantic opportunity in terms of growth going forward because AI is going to be everywhere. And as far as a bubble goes, I just don't ascribe to that. I look at things such as when people say, Gosh, is it overhyped? Or the stocks have gone down last quarter. That's almost like saying should I short AT&T in 2000 because the Internet is not going to happen. Or if Ford was a stock in 1907, would I short them? Because the automobile is not going to happen. It's just not. I mean, AI is we've seen such

advancement across the AI in the last couple of years that the amount of innovation that it's going to drive is just going to be incredible.

*Peter Elstrom: Okay. Okay. The chip company that probably has taken the most opportunity that has been able to capitalize the most on AI so far is NVIDIA. Chip maker in your space. They now have a near monopoly in terms of the highest end AI accelerators. How do you see that evolving in the future? And are there opportunities for Arm in particular to be able to play in that space and drive real revenue from?*

Rene Haas: Yeah. So, we're there already. NVIDIA's most advanced chip called the GB200, which is Grace Blackwell. Microsoft just announced that they're going to be deploying Grace Blackwell, the most advanced NVIDIA chip in their data centers that uses the Arm CPU. So, Grace is the Arm CPU. Blackwell Is the Nvidia GPU. So, Arm is there already. So, we are going to play in the most advanced data centers using AI. Arm, Arm will be there. I think what's most exciting for us, as I mentioned though, is the fact that not only will we be in the data center for training these algorithms, ultimately the training has to be transferred into inference, and training is the teacher inference is the student. Inference is actually running the workload and inference actually running that AI agent that's going to happen in the data center, that's going to happen in the car, that's going to happen on your watch. That's going to happen in glasses, that's going to happen in phones, and everywhere it happens, it's going to run on Arm. So, it's going to be a gigantic opportunity for us. The data center is just one place.

*Peter Elstrom: Mm hmm. Okay. So, you see Arm having opportunities kind of from the beginning to the end.*

Rene Haas: More than, more than opportunities. The agents will run locally. And the reason for that is you'll have a hybrid situation where some of that will run in the cloud. Some of it will run in your local device. Again, your glasses, your wearable, your phone. But locally, what you'll be able to add is security, things that can make sure it's private to you that not all your data is being passed to the cloud and vice versa. So yeah for for Arm I think it's going to be just an amazingly large opportunity.

*Peter Elstrom: Okay. As we were talking about before, I just moved from Japan where we spent a lot of time looking at SoftBank and especially Masayoshi Son's ambitions. We've written stories*

C - 3

*about how SoftBank is looking at ways to enter the AI chip market and particularly to compete with NVIDIA, quite directly in GPUs. He has a secret plan "Izanagi" that we've written about in the past. How does Arm isn't still 90% owned by SoftBank? How does Arm fit into that equation?*

Rene Haas: Yeah, so no, no product launch announcements today. So, nothing I can say about products coming out that you've written about. I can say that on the SoftBank board member, I do advisory work for SoftBank. I talked to Masa all the time. It's no secret that he is a big believer in AI has been for quite some time. He's talked about it actually, probably as long as any of the folks out there. I think his vision in terms of where it's all coming together now, you can start to see the pieces of it as I just described. Where does Arm fit - all those AI workloads are going to run on Arm somewhere somehow. So that's the reason that we spend a lot of time talking to SoftBank about the future.

*Peter Elstrom: Okay. Okay. Earlier we had the ASML CEO on and he was talking about some of the challenges that they're facing in the market. They surprised investors last week as we talked about. And it does seem that there's a little bit of a disconnect in the market where many people see opportunities. ASML reported that their orders were about half what analysts had thought they were going to be. Seems there are certain areas of the chip industry that are struggling quite a bit. And on the other end you have Sam Altman talking about how we need more capacity in the chip industry. We need billions of dollars, maybe trillions of dollars of investment. What is the disconnect and how does that get resolved?*

Rene Haas: Yeah, so there's a lot to unpack there. Where Arm plays, as I mentioned because 70 % of the world's population uses Arm. And I think 300 billion chips have shipped since we were started that have Arm inside. And every year about 30 billion chips. We have a unique view into the industry because just about every digital device uses Arm. There are some markets that aren't accelerating as fast as others and candidly those are the ones that aren't using AI in a very large way. But in areas that can use AI and will use AI, people can't go fast enough. And I'll give you an example. Many of the hardware devices that are being introduced today were designed two or three years ago. That means the chips were designed two or three years ago. The chips that are going in your phones or your wearables. Those were all invented before ChatGPT was released

or before Lamo was released. So what we're seeing on one end of the industry is just a rush to develop more and more chips that have this AI capability. Now it takes time. You know, chips aren't built overnight. In fact, it takes from the time we engage a partner, you know, two or three years at least until that comes to market. So I think you'll see some of these new products coming out. I think what Sam is talking about is just generally the ceiling to get to AGI. Artificial general intelligence requires more compute. And the more compute you have, the better the models get. So, I see. I see both. But generally speaking, I'm pretty optimistic about the growth for our industry.

*Peter Elstrom: Okay. Okay. We were talking about this a bit before. One of the gating factors is making sure that you have chip manufacturers who can make the most advanced chips. TSMC seems to be gaining market share right now as a couple of the key competitors struggle, Intel in particular. And Samsung also has been struggling a bit. They're both trying to move into the foundry business a bit in competition with TSMC. What what are the dangers around having TSMC garner so much market share in foundry? And is it good for the industry or would it be better if there's a more diversified manufacturing base for the industry?*

Rene Haas: Yeah, TSMC is an amazing company. They've just done so much for the industry relative to the innovation, how they work with partners, etc. etc. If you remove semiconductor manufacturing or foundry for a moment and just step back and say, is it healthy for any industry to have a one dominant supplier and then add on top of that a dominant supplier that's largely concentrated in one part of the world? Not, not really. So as a result, I think it's necessary just in terms of diversity of supply base, to have more and more advanced manufacturing and geographic diversity. Fabs in the United States. Fabs in Europe. Fabs in India. Fabs in Saudi Arabia. I think over time, we're going to see not only more suppliers, but geographic diversity as well.

*Peter Elstrom: Okay. Governments obviously are investing a lot in that very question. You're seeing the United States do it. You're seeing Europe do it. Japan has spent a lot of money on it, too. Do you think that's making progress at this point? Do you see light at the end of that tunnel?*

Rene Haas: It's the the capital expenditures required for these fabs are enormous. TSMC, Intel, Samsung, I think their CapEx is anywhere between 30 to 35 billion dollars a year in new

factories. And if you start looking at the revenues that these companies produce, you start very quickly looking at, oh my gosh, that is a lot of money to invest. Now, on one hand, you can look at it and say, well, the demand will be there, AI, etc., etc.. But it doesn't take much in terms of a year slowdown in demand and the companies have a really negative financial outcome. So, yes, governments have been involved, I think should be involved in my opinion. We saw in the U.S. for the very first time a policy act around CHIPS Act to put funding into the fabs, which I generally a big supporter of. I think it's necessary.

*Peter Elstrom: Okay. Let's talk a little bit more about Intel and their struggles. You grew up in a chip industry where Intel was really the dominant player, kind of set the pace for technology evolution over time. Now we're openly talking about whether Intel is going to be broken up, maybe sold into pieces. What kind of opportunities are there for Arm within that space as Intel goes through these struggles?*

Rene Haas: Yes, we work very closely with Intel. It's a bit of strange bedfellows. Many folks would consider Arm and Intel to be natural competitors on the product space. But what's very important to us, back to this discussion around supply base is that "Intel Foundry Services" IFS is successful. We do a lot of work with Intel as we do with Samsung and TSMC to ensure that our products can be manufactured there. We work very closely with their engineers to ensure that the leading edge technology can can run on Arm. So, we want to see Intel successful and we want to see IFS successful. I think it might be strange to hear the Arm CEO say that, but we want Intel manufacturing to be successful.

*Peter Elstrom: Okay. Bloomberg reported that Arm took a pretty close look at buying a part of Intel. Would you like to comment?*

Rene Haas: Nothing I can say on that one.

*Peter Elstrom: "Okay. All right.  Thank you. Thank you. I wanted to turn. You talked about are moving up the value stack kind of moving beyond its traditional place in the industry. And as you have moved up the value chain, you've gotten closer to doing what some of your customers do."*

Rene Haas: "Right."

*Peter Elstrom: "Getting closer to being able to do these complete designs. And. Yes. It speeds up innovation, as you were alluding to, but it also puts you in closer competition with some of your customers. You have a lawsuit with Qualcomm in particular."*

Rene Haas: "Yeah."

*Peter Elstrom: "Isn't it in both companies interest to settle that and to resolve the legal dispute at this point? Or what would you say?"*

Rene Haas: "These are these are tough questions. It's a good thing I'm a podcaster, so I know what's coming. You know, first thing on, competing with our customers, you know, it's rather complicated because if you look at some of our customers, our customers are Amazon. Our customers are Microsoft. Our customers are Apple. Our customers are Tesla. They all build chips using Arm. I'm not going to build an electric car. I'm not going to build a phone. I'm not going to build a data center. So, to look at the value chain relative to who builds chips, relative to whether you're end business is a chip business or a product business. It's gotten a lot more gray. We follow what the industry is demanding, and what the industry wants to see is solutions getting to market faster. And that's what we're focused on. Qualcomm. Not much I can say on that, other than we're headed to a trial. I think it's the third week in December. We feel very good about our case. We think our case is quite simple and straightforward. And as I said, December, we'll find out."

*Peter Elstrom: "Okay. So, you head to the courtroom then. One last question. I think we have time for this. In this audience in particular, there's a lot of interest in whether Arm, which is historically a British company, whether they would ever look at doing some sort of dual listing. Of course, we've heard about this many times in the past. A year ago when you did your IPO, you decided you would do it in the U.S. instead. One of the opportunities for listing here, what are the pluses and minuses of that sort of thing?"*

Rene Haas: "Yeah, we did. We listed in New York over over a year ago. And at that time our comments were we would look at a secondary listing. We're still open to it. It's not something that's top of mind right now, quite candidly. But we'll continue to have discussions with both stakeholders in the government and in the local exchange. We'd love to find a way at some point

in time, but also at the same time, there's a lot of other things that keep me busy relative to my day job."

*Peter Elstrom: "Okay. All right. Rene Haas, thank you very much. Please join me in welcoming. Thank you. Thank you."*

**APPENDIX A: PROFESSOR TIMOTHY S. SIMCOE'S CV**

# Timothy S. Simcoe

<table>
<tr><td>CONTACT</td><td>Boston University Questrom School of Business<br>595 Commonwealth Avenue<br>Boston, MA 02215</td><td>(510) 685-2020<br>tsimcoe@bu.edu<br>http://people.bu.edu/tsimcoe</td></tr>
</table>

ACADEMIC
EMPLOYMENT

**Boston University, Questrom School of Business**
- David J. McGrath Jr. Professor in Strategy & Innovation, 2024-*present*.
- Professor of Strategy & Innovation, 2022-2024.
- Associate Professor of Strategy & Innovation, 2013-2022.
- Assistant Professor of Strategy & Innovation, 2009-2013.

**University of Toronto, Joseph L. Rotman School of Management**
- Assistant Professor of Strategic Management, 2004-2009.

APPOINTMENTS

**President's Council of Economic Advisers**
- Senior Economist, 2014-2015.

**National Bureau of Economic Research**
- Research Associate, Productivity Program, 2016-*present*.
- Faculty Research Fellow, Productivity Program, 2009-2016.

**BU Technology & Policy Research Initiative**
- Faculty Director, 2020-*present*.

EDUCATION

**University of California at Berkeley**
- Ph.D., Business Administration, 2004
- M.A., Economics, 2003

**Harvard University**
- A.B., Applied Math & Economics, 1996

PUBLICATIONS

**Refereed Articles**

Mezzanotti, F. and T. Simcoe. Innovation, Patenting and Appropriability: Survey Evidence from a Nationally Representative Sample of U.S. Firms, *Review of Economics and Statistics*, forthcoming.

R. A. Gibbs, T. Simcoe and D. Waguespack. Does Earnings Management Matter for Strategy Research *Strategic Management Journal*, forthcoming.

B. Ganglmair, E. Tarantino and T. Simcoe. Learning When to Quit: An Empirical Model of Experimentation in Standards Development. *AEJ: Microeconomics*, 17(3):164–190, August 2025.

C. Righi and T. Simcoe. Patenting Inventions or Inventing Patents? Continuation Practice at the USPTO. *RAND Journal of Economics*, 54(3):416–442, Fall 2023.

J. Baron, B. Ganglmair, N. Persico, T. Simcoe and E. Tarantino. Representation is Not Sufficient for Selecting Gender Diversity. *Research Policy*, 53(6):104994, July 2024.

R. Bekkers, C. Catalini, A. Martinelli, C. Righi and T. Simcoe. Disclosure Rules and Declared Essential Patents. *Research Policy*, 52(1):104618, January 2023.

E. Basker and T. Simcoe. Upstream, Downstream: Diffusion and Impact of the Universal Product Code. *Journal of Political Economy*, 129(4):1252–1286, April 2021.

A. King, B. Goldfarb and T. Simcoe. Learning from Testimony on Quantitative Research in Management. *Academy of Management Review*, 46(3):465–488, July 2021.

X. Li and T. Simcoe. Competing or Complementary Labels? Estimating Spillovers in Chinese Green Building Certification. *Strategic Management Journal*, 42(13): 2451–2476, December 2021.

A. Agrawal, C. Rosell and T. Simcoe. Tax Credits and Small Firm R&D Spending. *American Economic Journal: Economic Policy*, 12(1): 1–21. Lead Article, May 2020.

M. Rysman, T. Simcoe and Y. Wang. Differentiation Strategies in the Adoption of Environmental Standards: LEED from 2000 to 2014. *Management Science*, 66(9): 4173–4192, September 2020.

T. Simcoe and J. Watson. Forking, Fragmentation and Splintering. *Strategy Science*, 4(4):251–342, December 2019.

F. Mezzanotti and T. Simcoe. Patent Policy and American Innovation After eBay: An Empirical Examination. *Research Policy*, 48(5): 1271–1281, June 2019.

C. Righi and T. Simcoe. Patent Examiner Specialization. *Research Policy*, 48(1):137–148, February 2019.

M. Lemley and T. Simcoe. How Essential are Standard Essential Patents? *Cornell Law Review*, 104(3): 607–642, March 2019 .

M. Catillon, P. Gertler and T. Simcoe. Who Benefits Most in Disease Management Programs?: Improving Target Efficiency. *Health Economics*, 28(2): 189–203, February 2019.

L. Freedman, I. Cockburn and T. Simcoe. The Economics of Reproducibility in Preclinical Research. *PLoS Biology*, 13(6): e1002165, June 2015.

T. Simcoe and M. Toffel. Government Green Procurement Spillovers: Evidence from Municipal Building Policies in California. *Journal of Environmental Economics and Management*, 68(3):411–434. Lead article, November 2014.

E. Rawley and T. Simcoe. Information, Knowledge and Asset Ownership in Taxicab Fleets. *Organization Science*, 24(3): 831–845, May-June 2013.

J. Farrell and T. Simcoe. Choosing the Rules for Consensus Standardization. *The RAND Journal of Economics*, 43(2): 235–252, Summer 2012.

T. Simcoe. Standard Setting Committees: Consensus Governance for Shared Technology Platforms. *American Economic Review*, 102(1): 305–336, February 2012.

M. Rysman and T. Simcoe. A NAASTy Alternative to RAND Pricing Commitments. *Telecommunications Policy*, 35(11): 1010–1017, December 2011.

A. Galasso and T. Simcoe. CEO Overconfidence and Innovation. *Management Science*, 57(8): 1469–1484, August 2011.

T. Simcoe and D. Waguespack. Status, Quality and Attention: What's in a (Missing) Name? *Management Science*, 57(2): 274–290, February 2011.

A. Mehta, M. Rysman and T. Simcoe. Identifying the Age Profile of Patent Citations: New Estimates of Knowledge Diffusion. *Journal of Applied Econometrics*, 25 (7): 1073–1222, November/December 2010.

E. Rawley and T. Simcoe. Diversification, Vertical Contracting and Diseconomies of

Scope: Evidence from the Taxicab Industry. *Management Science*, 56(9): 1534–1550, September 2010.

T. Simcoe, S. J. Graham and M. Feldman. Competing on Standards? Entrepreneurship, Intellectual Property and Platform Technologies. *Journal of Economics and Management Strategy*, 18(3): 775–816, Fall 2009.

M. Rysman and T. Simcoe. Patents and the Performance of Voluntary Standard Setting Organizations. *Management Science*, 54(11): 1920–1934, November 2008.

D. Mowery and T. Simcoe. Is the Internet a US Invention? An Economic and Technological History of Computer Networking. *Research Policy*, 31(8-9): 1369–1387, 2002.

J. Macher, D. Mowery and T. Simcoe. eBusiness and the Semiconductor Industry Value Chain: Implications for Vertical Specialization and Integrated Semiconductor Manufacturers. *Industry and Innovation*, 9:155–181, 2002.

**Working Papers**

Mezzanotti, F. and T. Simcoe. Research and/or Development: Financial Frictions and Innovation Investment. R&R at *Journal of Finance*

N. Sahoo, T. Simcoe and X. Yang. Effects of Content Sourcing Strategy on Online News Subscription. R&R at *MIS Quarterly*.

D-S. Jeon, Y. Lefouili, Y. Li and T. Simcoe. Ecosystems and Complementary Platforms.

**Other Publications**

T. Simcoe. Standard Setting Organizations. Chapter in the *Elgar Encyclopedia on the Economics of Competition and Regulation*, forthcoming.

K. Blind, M. Kenney, A. Leiponen and T. Simcoe. Standards and Innovation: A Review and Introduction to the Special Issue. *Research Policy*, 52(8), October 2023.

J. Contreras, T. Simcoe et al. Preserving the Royalty-Free Standards Ecosystem. *European Intellectual Property Review*, 45(7): 371-375, June 2023.

E. Hovenkamp and T. Simcoe. Tying and Exclusion in FRAND Licensing: Evaluating Qualcomm. *The Antitrust Source*, February 2020.

A. Sesia, T. Simcoe and M. Toffel. Platform LEEDership at the U.S. Green Building Council. Harvard Business School Case 619-027, May 2018.

B. Goldfarb, A. King and T. Simcoe. Heritability of Trust and Distrust Remains Unknown. Letter to *Proceedings of the National Academy of Sciences*, January 2018.

S. Graham, P. Menell, C. Shapiro and T. Simcoe. Final Report of the Berkeley Center for Law & Technology Patent Damages Workshop. *Texas Intellectual Property Law Journal*, 25 (1): 115–142, 2017.

A. Shampine and T. Simcoe. Economics of Patents and Standardization: Network Effects, Hold-up, Hold-out, Stacking. The Cambridge Handbook of Technical Standardization Law, Vol. 1. Cambridge University Press, 2017.

T. Simcoe and C. Righi. Standards, Patents and Innovation. Handbook of Standards and Innovation. Edward Elgar, 2017.

T. Simcoe. How to Make and Keep a Patent Pledge. Pages 285–290 in *Patent Pledges: Global Perspectives on Patent Law's Private Ordering Frontier*. Edward Elgar, 2017.

T. Simcoe. Modularity and the Evolution of the Internet. Chapter 1 in *Economic Analysis of the Digital Economy*. University of Chicago Press, 2015.

A. Agrawal, S.J. Graham, M. Rysman and T. Simcoe. Industry Standards, Intellectual Property and Innovation: Introduction to the Special Issue. *International Journal of Industrial Organization*, 36:1-3 (September 2014).

T. Simcoe. Governing the Anti-commons: Institutional Design for Standard Setting Organizations. In *Innovation Policy and the Economy*, 14:99–128, 2014.

T. Simcoe. Private and Public Approaches to Patent Holdup in Industry Standard-Setting. *Antitrust Bulletin*, 57(1): 59–88, Spring 2012.

J. Farrell and T. Simcoe. Four Paths to Compatibility. pages 34–58 in the *Oxford Handbook of the Digital Economy*. Oxford University Press, 2012.

T. Simcoe. Delay and *de jure* Standardization: Exploring the Slowdown in Internet Standards Development. Pages 260–295 in *Standards and Public Policy*. Cambridge University Press, 2007.

T. Simcoe. Explaining the Increase in Intellectual Property Disclosure. Pages 260–295 in *Standards Edge: The Golden Mean*. Bolin Group, 2007.

T. Simcoe. Open standards and Intellectual Property Rights. Pages 161–183 in *Open Innovation: Researching a New Paradigm*. Oxford University Press, 2006.

D. Mowery and T. Simcoe. Public and Private Participation in the Development and Governance of the Internet. Pages 259–294 in *The Limits of Market Organization*. Russell Sage, 2005.

D. Mowery and T. Simcoe. The Origins and Evolution of the Internet. Pages 229–265 in *Technological Innovation and Economic Performance*. Princeton University Press, 2002.

M. Rysman and T. Simcoe. Measuring the Performance of Standard Setting Organizations. Pages 81–94 in *International Standardization as a Strategic Tool: Commended Papers from the IEC Centenary Challenge 2006*. International Electrotechnical Commission, 2006.

TEACHING        **Boston University Questrom School of Business**
Technology Strategy (MBA and Executive MBA)
Strategy and Innovation (Undergraduate)
Competition, Innovation and Strategy (MBA)
Data Analysis (Executive MBA)
Causal Inference in Management Research (PhD)

**University of Toronto, Rotman School of Management**
Fundamentals of Competitive Strategy (MBA)
Entrepreneurship & Small Business Management (Undergraduate)
Models & Methods in Strategic Management (PhD)

**University of California, Berkeley**
Economic Analysis for Business Decisions, Teaching Assistant (MBA)

CONSULTING

**Expert Reports, Depositions and Testimony**

United States of America *et al.* (client) v. Google LLC. Eastern District of Virginia. Case No. 1:23-cv-00108.

Apple (client) v. Qualcomm. Southern District of California. Case No. 3:17-CV-0108.

Microsoft (client) v. Motorola. Western District of Washington. Case No. C10-1823-JLR.

HTC Corporation (client) v. Ericsson. Eastern District of Texas. Case No. 6:18-CV-00243-JRG.

ViiV Healthcare, (client) v. Gilead Sciences. District of Delaware. Case No. 1:18-CV-0224-VAC-CJB.

In Re: Qualcomm Securities Class Action Litigation (plaintiff client). Southern District of California. Case No. 3:17-CV-00121-JO-MSB

Fujitsu v. Tellabs (client). Northern District of Illinois, Eastern Division. Civil Action No. 09 CV 04530.

In the Matter of Certain Video Capable Electronic Devices, Including Computers, Streaming Devices, Televisions, Cameras, and Components and Modules Thereof (clients Amazon and Hewlett Packard). U.S. International Trade Commission Investigations Nos. 337-1379 and 337-1380.

In the Matter of Video-Capable Laptop, Desktop Computers, Handheld Computers, Tablets, Televisions, Projectors, and Components and Modules Thereof (clients Acer, AsusTek and HiSense). U.S. International Trade Commission Investigation No. 337-TA-448.

Apple (client) v. Motorola. Western District of Wisconsin. Case No. 11-CV-178.

Lenovo (client) and Motorola Mobility v. InterDigital Technology Corporation et al. District of Delaware. Case No. 19-1590-LPS

3G Licensing, Koninklijke KPN and Orange v. LG Electronics (client). District of Delaware. Case No. 17-cv-85-LPS.

Global Communications (client) v. Direct TV, et al. Northern District of Florida. Case No. 4:12-CV-00651-RH-CAS.

Zenith Electronics, Panasonic, U.S. Philips and The Trustees of Columbia University v. Craig Electronics (client). Southern District of Florida. Case No. 13-CV-80567.

**Other Consulting**

Wireless standards developer (client). Review of bylaws and procedures.

Boston Toronto Group (client). Executive education.

SERVICE

**University Governance**

Strategy & Innovation Department Chair, 2024-*present*

PhD Program Director (2015-2017, 2018-2022.)

**Editorial and Advisory Positions**

American Economic Journal: Economic Policy, Board of Editors, 2021.

Management Science, Associate Editor in Innovation and Entrepreneurship, 2014-present.

Journal of Industrial Economics, Associate Editor, 2013-present.

Management Science, Associate Editor in Business Strategy, 2012-present.

NIST Visiting Expert Committee on US National Standards Strategy for Critical and Emerging Technologies, 2023-24.

National Academy of Sciences, Member of Committee on Intellectual Property Management Practices of Standard Setting Organizations, 2012-2013.

National Academy of Sciences, Member of Committee on the Review of the Small Business Innovation Research and Small Business Technology Transfer Programs at the National Science Foundation, 2019-2021.

Co-founder, Sloan Management Review Strategy Forum, 2018-2023.

Scientific Advisory Board, Global Biological Standards Institute, 2015-2018.

**Doctoral Advising & Committees**

Xia Li, London Business School (Primary Advisor, 2023).

Jeremy Watson, University of Minnesota (Primary Advisor, 2018).

Cesare Righi, Pompeu Fabra University (Primary Advisor, 2017).

Jane Wu, UCLA (Committee Member, 2022).

Sophie Wang, UIBE Beijing (Committee Member, 2021).

Christian Catalini, MIT Sloan School (Committee Member, 2013)

Paul Seaborn, University of Denver (Primary Advisor, 2011)

Jay Horwitz, University of Bocconi (Committee Member, 2011)

Elena Kulchina, Duke University (Committee Member, 2012)

Justus Baron, Ecole des Mines / ParisTech (Committee Member, 2012)

Awards
: Innovators Network Foundation Intellectual Property Fellow, 2021-2023
Broderick Award for Excellence in Research, 2022.
Dean's Research Scholar, 2015-2018, 2020-2022
Outstanding Contribution to Questrom Doctoral Programs, 2018
Questrom Full-time MBA Favorite Elective Professor, 2016
BU Questrom Doctoral Student's Association, Distinguished Mentor Award, 2016
John R. Russell Excellence in Teaching Award, Executive MBA, 2013
Management Science Meritorious Service Award (Reviewer), 2010
Rotman Excellence in Teaching Award, Commerce Program, 2008
Glueck Best Paper Award, Academy of Management BPS Division, 2008
Finalist, IEC Centenary Challenge, 2006
Finalist, Organization Science Dissertation Proposal Competition, 2003

Grants
: Intel Corporation Research Gift, 2017-2020
Bell Canada University Labs, 2007-2008
Connaught New Faculty Start-Up Award, 2004-2008
Berkeley Center for I.T. Research in the Interest of Society, 2003-2004
Intel Corporation Robert M. Noyce Memorial Fellowship, 2001-2002
Haas School of Business Ph.D. Fellowship, 1999-2000
Harvard College Fellowship, 1992-1995

| | |
|---|---|
| PRIOR WORK EXPERIENCE | **Ernst & Young LLP** |
| | Senior Consultant, Center for Business Innovation, Boston MA, 1998-1999 |
| | Consultant, E&Y Economics Consulting, Washington DC, 1996-1998 |
| | |
| OTHER | **Professional Societies** |
| | American Economics Association, Academy of Management, Strategy Research Forum, International Society for New Institutional Economics |
| | **Computer Code** |
| | STATA xtpqml: Robust inference in fixed-effects poisson regression |
| | STATA mtad: Multinomial test of agglomeration and dispersion |
| | |
| PERSONAL | Married: Stephanie Tobias Gates (August 2002) |
| | Children: Katherine, Anne and Theodore |
| | Interests: Michigan Sailing, North Haven Golf Club, Harvard Alumni Jazz Band |

██████████████████████████

████████████████

**APPENDIX B: MATERIALS RELIED UPON**

## Legal Documents

"Arm's First (Corrected) Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-11)," Arm Ltd., March 1, 2024

"Arm's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3)," Arm Holdings, July 11, 2025

"Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3," Arm Holdings, July 11, 2025

"Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11)," Arm Holdings, July 11, 2025

"Arm's First Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 12), Arm Holdings, July 11, 2025

"Arm's Responses & Objections to Qualcomm's First Set of Request for Admissions (Nos. 1-28)," Arm Holdings, July 11, 2025

"Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, March 10, 2025

"Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, July 11, 2025

"Plaintiffs' Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," Qualcomm, August 8, 2025

"Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13)," Qualcomm, July 11, 2025

"Plaintiffs' Second Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13)," Qualcomm, August 8, 2025

"Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, July 11, 2025

"Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, August 8, 2025

"Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission (Nos. 1-30)," Qualcomm, July 11, 2025

*Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. Nos. 137; 137-1 (Ex. A) (June 3, 2025)

*Arm Ltd. v. Qualcomm Inc.,* No. 1:22-cv-01146 (D. Del. filed August 31, 2022), Dkt. Nos. 571, 572

*Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146* (D. Del. filed August 31, 2022), Dkt. No. 1

*Arm v. Qualcomm*, No. 22-1146 (MN), Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim, D.I. 21, November 15, 2022

*Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024

*Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025

Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007

Complaint for Patent Infringement, *Qualcomm Inc. v. Apple Inc.,* No. 3:17-cv-01375-JAH-AGS (S.D. Cal. filed July 6, 2017), https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/2017-07-06_complaint.pdf

*eBay Inc. and Half.com v. MercExchange, L.L.C.*, Brief of Amici Curiae Qualcomm Inc. & Tessera, Inc. in Support of Respondent, 547 U.S. 388 (2006) (No. 05-130)

Expert Report of Dr. Michael C. Brogioli, September 5, 2025

Expert Report of Mr. Steven Richards, CPA, September 5, 2025

Expert Report of Eric A. Posner, August 8, 2025

Expert Report of Patrick F. Kennedy, August 8, 2025

Expert Report of Patrick F. Kennedy, February 27, 2024

*Federal Trade Commission v. Qualcomm Incorporated,* "Reply brief for appellant Qualcomm Incorporated (Redacted)," Qualcomm Incorporated, December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit

Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10–13)," Qualcomm, July 11, 2025

I incorporate by reference all documents cited in ARM's and Qualcomm's discovery responses, and all materials relied upon by Prof. Posner and Dr. Kennedy.

## Case Law

*Brown Shoe Co., Inc. v. United States,* 370 U.S. 294 (1962)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)

*Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104 (1986)

*Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc*., U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction,  Case 4:24-cv-02508, Dkt. Entry 511 (S.D. Tex. Jan. 31, 2025)

*United States v. Aluminum Co. of Am.,* 148 F.2d 416, 430 (2d Cir. 1945)

*United States v. Microsoft Corp.,* 253 F.3d 59 (2001)

## Deposition Testimony and Associated Exhibits

*Arm v. Qualcomm,* Trial Transcript, Vol 2.1, December 16, 2024

*Arm v. Qualcomm,* Trial Transcript, Vol 3.1, December 17, 2024

*Arm v. Qualcomm,* Trial Transcript, Vol. 4.1, December 18, 2024

Deposition of Akshay Bhatnagar, July 10, 2025

Deposition of Ami Badani, August 1, 2025

Deposition of Andrew Howard, July 1, 2025

Deposition of Ann Chaplin, July 11, 2025

Deposition of Anupa George, July 30, 2025

Deposition of Aparajita Bhattacharya, July 7, 2025

Deposition of Christine Tran, July 10, 2025

Deposition of Christopher Patrick, July 2, 2025

Deposition of Cristiano Amon, July 3, 2025

Deposition of Durga Malladi, July 10, 2025

Deposition of Ehab Youssef, June 26, 2025

Deposition of Gerard Williams, June 25, 2025

Deposition of Gerard Williams, November 3, 2023

Deposition of James Jeon, July 11, 2025

Deposition of James Thompson, November 28, 2023

Deposition of Jannik Nelson, July 10, 2025

Deposition of Jean-Francois (Jeff) Vidon, July 1, 2025

Deposition of Jeff Golden, July 3, 2025

Deposition of Jeffrey M. Fonseca, July 9, 2025

Deposition of Jignesh Trivedi, July 9, 2025

Deposition of John Horley, July 8, 2025

Deposition of Jonathan Weiser, July 11, 2025

Deposition of Karl M. Whealton, June 18, 2025

Deposition of Karthik Shivashankar, June 20, 2025

Deposition of Kenneth Siegel, July 4, 2025

Deposition of Kurt Wolf, June 25, 2025

Deposition of Larissa Cochron, July 11, 2025

Deposition of Laura Sand, July 8, 2025

Deposition of Lynn Couillard, July 3, 2025

Deposition of Manju Varma, June 24, 2025

Deposition of Mark Dragicevich, June 27, 2025

Deposition of Martin Weidmann, June 20, 2025

Deposition of Michael Williams, June 27, 2025

Deposition of Mohamed Awad, July 29, 2025

Deposition of Paul Kranhold, July 17, 2025

Deposition of Paul Williamson, July 2, 2025

Deposition of Pavankumar (Pavan) Mulabagal, July 1, 2025

Deposition of Peter Greenhalgh, July 4, 2025

Deposition of Philip Hughes, June 17, 2025

Deposition of Rene Haas, July 7, 2025

Deposition of Richard Grisenthwaite, July 2, 2025

Deposition of Richard Meacham, June 27, 2025

Deposition of Selena LaCroix, August 1, 2025

Deposition of Simon Segars, November 16, 2023

Deposition of Spencer Collins, June 30, 2025

Deposition of Sudeep Holla, June 17, 2025

Deposition of Tim Herbert, October 25, 2023

Deposition of Vivek Agrawal, July 11, 2025

Deposition of Will Abbey, June 26, 2025

Deposition of Will Abbey, October 27, 2023

Deposition of Ziad Asghar, July 7, 2025

## Conversations

Conversation with Dr. Michael C. Brogioli, September 2, 2025

Conversation with Mohamed Awad, August 29, 2025

Conversation with Paul Williamson, September 2, 2025

## SEC Filings

Arm Holdings plc, Form F-1, August 21, 2023,
https://www.sec.gov/Archives/edgar/data/1973239/000119312523216983/d393891df1.htm

Arm Holdings plc, Amendment No. 2 to Form F-1, September 5, 2023,
https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm

Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2024,
https://investors.arm.com/static-files/dcdd6629-24bb-40ef-ba55-8aca1362205a

Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2025,
https://investors.arm.com/static-files/9be77c9d-75ee-4639-bfe4-17efd23c56b5

Intel Corporation, 2021 Form 10-K, for the fiscal year ended December 25, 2021,
https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-22-000007/0000050863-22-000007.pdf

Intel Corporation, 2024 Form 10-K, for the fiscal year ended December 28, 2024,
https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000009/0000050863-25-000009.pdf

Qualcomm Incorporated, Form 10-K, for the fiscal year ended September 29, 2024,
https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/fd08c4f6-61ba-4a6a-a339-0e3b522ed739.pdf

Qualcomm Incorporated, Form 10-K, for fiscal years 2019 – 2024,
https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx

Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 26, 2021,
https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/c91b841c-1f3f-4762-9c0d-c379f1554455.pdf

Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 29, 2024,
https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/1b687286-85e9-44e6-a579-d19d089eacfb.pdf

Qualcomm Incorporated, Form 10-Q, for the quarterly periods 2019 – 2024,
https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx

## Bates Numbered Documents

ARM_00000003

ARM_00000016

ARM_00000017

ARM_00000382

ARM_00000510

ARM_00002955

ARM_00004029

ARM_00026351

ARM_00032601

ARM_00032602

ARM_00045266

ARM_00055357

ARM_00057511

ARM_00057560

ARM_00076604

ARM_00080472

ARM_00081203

ARM_00081461

ARM_00081462

ARM_00081753

ARM_00086285

ARM_00087465

ARM_00088600

ARM_00092788

ARM_00095947

ARM_00097388

ARM_00103918

ARM_00104733

ARM_00110511

ARM_00113179

ARM_00115827

ARM_00117493

ARM_00118635

ARM_00119602

ARM_00119603

ARM_01215409

ARM_01215878

ARM_01215886

ARM_01230861

ARM_01230977

ARM_01230978

ARM_01238895

ARM_01239056

ARM_01246942

ARM_01249629

ARM_01259705

ARM_01282304

ARM_01293447

ARM_01294236

ARM_01305915

ARM_01311208

ARM_01314793

ARM_01426938

ARM_01427719

ARM_01427776

ARM_01427796

ARM_01428339

ARMQC_00000640

ARMQC_02600713

ARMQC_02601118

ARMQC_02725050

ARMQC_02726982

ARMQC_02727610

ARMQC_02729412

ARMQC_02731630

ARMQC_02739661

ARMQC_02740205

ARMQC_02740386

ARMQC_02748499

ARMQC_02749177

ARMQC_02762992

ARMQC_02770485

ARMQC_02770649

ARMQC_02770676

ARMQC_02771127

ARMQC_02771946

ARMQC_02772366

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■

ARMQC_02779314

ARMQC_02779364

ARMQC_02779391

ARMQC_02779433

ARMQC_02779483

ARMQC_02783619

ARMQC_02785287

QCARM_0020011

QCARM_0020012

QCARM_0027980

QCARM_0222737

QCARM_0275743

QCARM_0332490

QCARM_0337839

QCARM_0338297

QCARM_0338573

QCARM_0338883

QCARM_0343120

QCARM_0343954

QCARM_0353229

QCARM_0550516

QCARM_0550518

QCARM_0589823

QCARM_0591733

QCARM_3460234

QCARM_3474751

QCARM_3839896

QCARM_3972031

QCARM_7401071

QCARM_7484882

QCVARM_0449658

QCVARM_0451587

QCVARM_0455391

QCVARM_0463558

QCVARM_0463837

QCVARM_0464076

QCVARM_0464648

QCVARM_0465090

QCVARM_0526828

QCVARM_0527544

QCVARM_0528956

QCVARM_0532239

QCVARM_0534597

QCVARM_0537065

QCVARM_0538870

QCVARM_0538873

QCVARM_0541454

QCVARM_0573677

QCVARM_0600104

QCVARM_0608391

QCVARM_0621447

QCVARM_0621448

QCVARM_0847188

QCVARM_0851120

QCVARM_0851449

QCVARM_0855438

QCVARM_0856270

QCVARM_0856888

QCVARM_0857113

QCVARM_0857152

QCVARM_0863181

QCVARM_0863573

QCVARM_0863641

QCVARM_0864713

QCVARM_0864833

QCVARM_0864924

QCVARM_0865022

QCVARM_0865236

QCVARM_0865274

QCVARM_0865311

QCVARM_1014030

QCVARM_1024852

████████████████████

████████████████

QCVARM_1031097

QCVARM_1066820

QCVARM_1069058

QCVARM_1069082

QCVARM_1069106

QCVARM_1069760

QCVARM_1120481

QCVARM_1120999

QCVARM_1121176

QCVARM_112154

QCVARM_1121674

QCVARM_1151565

QCVARM_1151573

QCVARM_1151615

## Articles and Books

"AI Flywheel Gathering Momentum - Initiate Buy," UBS Global Research, November 24, 2024

"Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011

Aberra, Adam and Matthieu Chemin, "Does legal representation increase investment? Evidence from a field experiment in Kenya," 2021, Journal of Development Economics, Vol. 150

Armstrong, Mark, "Competition in Two-Sided Markets," 2006, RAND Journal of Economics, Vol. 37, No. 3

Babcock, Linda, George Loewenstein, S. Issacharoff, and Colin Camerer, "Biased Judgements of Fairness in Bargaining," American Economic Review, 1995, Vol. 85, No. 5

Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59

B - 13

Benjamin E. Hermalin et al., "Contract Law," in Handbook of Law & Economics, 2007, Vol. 3, No. 68 (ed. A. Mitchell Polinsky & Steven Shavell)

Blair, Roger D., Christine S. Wilson, D. Daniel Sokol, Keith Klovers and Jeremy A. Sandford, "Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies," George Mason Law Review, 2020, Vol. 27, No. 3

Bloom, Nick, Stephen Bond, and John Van Reenen, "Uncertainty and Investment Dynamics," The Review of Economic Studies, 2007, Vol. 74, No. 2

Brandenburger, Adam M. and Barry J. Nalebuff, "The Rules of Co-opetition," Harvard Business Review, 2021

CGS International, "Arm Holdings pcl - Initiate at Outperform and $160 PT; Content Story in Early Innings," US Equity Research, Sept 12, 2024

De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1

Donna, Javier D., Pedro Pereira, Yun Pu, Andre Trindade, and Renan C. Yoshida, "Direct sales and bargaining," RAND Journal of Economics, 2024, Vol. 55, No. 4

Federico, Giulio, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," Innovation Policy and the Economy, 2020, Vol. 20, pp. 125-190

Gans, Joshua "The Disruption Dilemma," MIT Press, 2016

Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," Proceedings of the National Academy of Sciences U.S.A., 1996, Vol. 3

Kwon, Yona, Dahee Kang, Sinji Kim, and Seungho Choi, "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," Journal of Open Innovation: Technology, Market, and Complexity, 2020, Vol. 6, No. 1

Lemley, Mark A. and Carl Shapiro, "Probabilistic Patents," Journal of Economic Perspectives, 2005, Vol. 19, No. 2

Lianos, Ioannis and Pierre Regibeau, "'Vexatious'/'Sham' Litigation: When Can It Arise and How Can It Be Reduced?," The Antitrust Bulletin, 2017, Vol. 62, No. 4

Lu, Shihua, Serge Moresi, and Steven C. Salop, "A Note on Vertical Mergers with an Upstream Monopolist: Foreclosure and Welfare Effects," 2007, Working Paper

Muthoo, Abhinay, "A Non-Technical Introduction to Bargaining Theory," World Economics, April-June 2020, Vol. 1, No. 2

Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581

Priest, George L. & Benjamin Klein, "The Selection of Disputes for Litigation," Journal of Legal Studies, 1984, Vol. 13

Schumpeter, Joseph, "Capitalism, Socialism, and Democracy," Harper & Brothers Publishers, 1942

Seitz, Michael and Martin Watzinger, "Contract enforcement and R&D investment," Research Policy, 2017, Volume 46, Issue 1

Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International

Shapiro, Carl, "Competition and Innovation Did Arrow Hit the Bull's Eye?" in The Rate and Direction of Inventive Activity Revisited (ed. Josh Lerner and Scott Stern), 2012, University of Chicago Press

Shapiro, Carl, "Premiums for high quality products as returns to reputations," The Quarterly Journal of Economics, 1983, Vol. 98, No. 4

Shapiro, Carl, "Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case," Review of Industrial Organization, 2021, Vol. 59, pp. 303–341

Spulber, Daniel F., "How Do Competitive Pressures Affect Incentives to Innovate When There is a Market for Inventions?" Journal of Political Economy, 2013, Vol. 121, No. 6, pp. 1007-1054

Tirole, Jean, "Competition and the Industrial Challenge for the Digital Age," Annual Review of Economics, 2020, Vol. 156

Yang, Chenyu, "Vertical Structure and Innovation: A Study of the SoC and Smartphone Industries," The RAND Journal of Economics, 2022, Vol. 51, No. 3, pp. 739–785

## Websites and Other Public Sources

"2023 Patent Litigation Report," Bloomberg Law, https://pro.bloomberglaw.com/insights/intellectual-property/2023-patent-litigation-report/

"4 Reasons Qualcomm's Data Center Business Failed," The Motley Fool, December 21, 2018, https://www.nasdaq.com/articles/4-reasons-qualcomms-data-center-business-failed-2018-12-21

"4Q24 Global Top 10 Foundries Set New Revenue Record, TSMC Leads in Advanced Process Nodes," TechPowerUp, March 10, 2025, https://www.techpowerup.com/333868/4q24-global-top-10-foundries-set-new-revenue-record-tsmc-leads-in-advanced-process-nodes

"About RISC-V," RISC-V International, https://riscv.org/about/, accessed  August 15, 2025

"Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025

"AI Accelerator Chips Overview and Comparison," HardwareBee, https://hardwarebee.com/ai-accelerator-chips-overview-and-comparison/, accessed on August 22, 2025

"Apple announces Mac transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/

"Apple unleashes M1," Apple Newsroom, November 10, 2020, https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/

"Arm Approved Design Partners," Arm, https://www.arm.com/partners/arm-approved-program/design-partners, accessed September 4, 2025

"Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY

"Arm Compute Subsystems (CSS) for Client," Arm, https://www.arm.com/products/compute-subsystems-for-client, accessed September 4, 2025

"Arm CoreLink GIC-700 Generic Interrupt Controller Technical Reference Manual," Arm Developer,  https://developer.arm.com/documentation/101516/latest/, accessed September 4, 2025

"Arm Cortex-A Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102826/latest/, accessed September 4, 2025

"Arm Cortex-M Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102787/latest/, accessed September 4, 2025

"Arm Cortex-R Processor Comparison Table," Arm Developer, https://developer.arm.com/documentation/102788/latest/, accessed September 4, 2025

"Arm CPU Architecture: A Foundation for Computing Everywhere," Arm, https://www.arm.com/architecture/cpu, accessed September 4, 2025

"Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement

"Arm Flexible Access," Arm, https://www.arm.com/products/flexible-access

"Arm Holdings plc Q1 2026 Earnings Call," July 30, 2025, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008

"Arm Holdings plc Q3 2025 Earnings Call," February 5, 2025, https://investors.arm.com/static-files/f1190d81-408d-4276-a30c-b27c1ce5a30a

"Arm Holdings plc Q4 2025 Earnings Call," May 7, 2025, https://investors.arm.com/static-files/181d5019-29bd-4ba5-af29-45888e25c637

"Arm Holdings plc Q3 FYE24 Results Presentation," Arm Holdings, February 7, 2024, https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06

"Arm Holdings plc Q4 FYE24 Results Presentation," Arm Holdings, May 8, 2024, https://investors.arm.com/static-files/4f2fc46b-34a5-4bc5-94af-f13fbc348f0e

"Arm Holdings Q2 FYE25 Investor Presentation," Arm Holdings, November 6, 2024, https://investors.arm.com/static-files/623fece0-c947-4d'93-94eb-e08e8dfad61b

"Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274

"Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553

"Arm Total Access," Arm, https://www.arm.com/products/licensing/arm-total-access, accessed August 30, 202

"At Qualcomm Trial, Apple COO Said $7.50 Per-iPhone Fee Cost Company $1 Billion a Year," Bloomberg, January 14, 2019, https://fortune.com/2019/01/14/qualcomm-trial-apple-7-50-iphone-fee-billion/

"Automated Driving | Snapdragon Ride ADAS Tech for Smart Cars," Qualcomm, https://www.qualcomm.com/products/automotive/automated-driving, accessed September 4, 2025

"AWS and Arm," Arm, https://www.arm.com/markets/computing-infrastructure/cloud-computing/aws#1, accessed August 29, 2025

"AWS re: Invent 2024 - Monday Night Live with Peter DeSantis," AWS, YouTube.com, December 3, 2024, https://www.youtube.com/watch?v=vx36tyJ47ps&t=1041s

"BoM Analysis: Samsung Galaxy S23 Ultra Costs $469 to Make," Counterpoint, May 31, 2023, https://www.counterpointresearch.com/insight/bom-analysis-samsung-galaxy-s23-ultra

███████████████████████████████████

████████████████████████████

"CMN-600 Coherent Mesh: Scalable Network for Smart Systems," Arm, https://www.arm.com/products/silicon-ip-system/corelink-interconnect/cmn-600, accessed September 4, 2025

"CoreSight ELA-600," Arm Developer, https://developer.arm.com/Processors/CoreSight%20ELA-600, accessed September 4, 2025

"CPU Cortex-A78", Arm https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78, accessed August 29, 2025

"Exynos Mobile Processor," Samsung Semiconductor Global, https://semiconductor.samsung.com/processor/mobile-processor/, accessed September 4, 2025

"Fastest Path to Production Silicon with World-Leading Performance, on Leading-Edge Technology," Arm, https://www.arm.com/products/neoverse-compute-subsystems, accessed September 4, 2025

"FYE26 Q1 (30-Jun-25) Historical Quarters Datasheet.xlsx," Arm Holdings, July 30, 2025, https://investors.arm.com/financials/quarterly-annual-results

"Gartner Says Worldwide Semiconductor Revenue Grew 21% in 2024," Gartner, April 10, 2025, https://www.gartner.com/en/newsroom/press-releases/2025-04-10-gartner-says-worldwide-semiconductor-revenue-grew-21-percent-in-2024

"Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/cpu-core/, accessed September 4, 2025

"Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 3, 2025

"Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025

"Here's How Much Apple Was Paying Qualcomm in Royalties," The Motley Fool, January 14, 2019, https://www.nasdaq.com/articles/heres-how-much-apple-was-paying-qualcomm-royalties-2019-01-14

"How NVIDIA Shipped One Billion RISC-V Cores In 2024," RISC-V International, February 25, 2025, https://riscv.org/blog/2025/02/how-nvidia-shipped-one-billion-risc-v-cores-in-2024/

"Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025

"Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025

"Is Snapdragon an ARM Processor? Understanding the Core Technology Behind Qualcomm's Mobile Chipsets," Indian Institute of Embedded Systems, https://iies.in/blog/is-snapdragon-an-arm-processor-understanding-the-core-technology-behind-qualcomms-mobile-chipsets

"Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC- Vinternational

"Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, @ 4:37, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-Vinternational

"Market Capitalization of Arm Holdings," Companies Market Cap, https://companiesmarketcap.com/arm-holdings/marketcap/, accessed August 29, 2025

"Market Capitalization of Qualcomm," Companies Market Cap, https://companiesmarketcap.com/qualcomm/marketcap/, accessed August 29, 2025

"Market Capitalization of Samsung," Companies Market Cap, https://companiesmarketcap.com/samsung/marketcap/, accessed August 29, 2025

"Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers," Federal Trade Commission, Press Release May 16, 2014, https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibitions-direct-consumer-auto-sales

"Neoverse N1 | CPU for Next-Gen Cloud Infrastructure," Arm, https://www.arm.com/products/silicon-ip-cpu/neoverse/neoverse-n1, accessed September 4, 2025

"Next-Gen flagship Snapdragon chip 'Pakala' & reference device slip in new Qualcomm video," March 21, 2024, https://www.gizmochina.com/2024/03/21/next-gen-snapdragon-pakala-reference-device/

"NUVIA Raises $53 Million to Reimagine Silicon Design for the Data Center," Globe News Wire, November 15, 2019, https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.htm

"Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, August 5, 2025

"PPA analysis overview," Arm Developer, https://developer.arm.com/documentation/102738/0100/Power--performance--and-area-analysis, accessed September 4, 2025

"Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf

"Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf

"Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf

"Q4 2024 Qualcomm Inc. Earnings Call," Qualcomm, November 6, 2024, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/06/QCOM_Q4FY24EC_Transcript_11-7-24.pdf

"Qualcomm 5G NR Royalty Terms Statement," November 19, 2017, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm-5g-nr-royalty-terms-statement.pdf

"Qualcomm Announces Third Quarter Fiscal 2025 Results," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_financials/2025/q3/FY2025-3rd-Quarter-Earnings-Release.pdf

"Qualcomm Cellular IoT Licensing Program," Qualcomm, https://www.qualcomm.com/licensing/cellular-iot-licensing-program, accessed September 4, 2025

"Qualcomm Completes Acquisition of NUVIA," Qualcomm Press Release, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia

"Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/

"Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm Press Release, November 6, 2005, https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia

"Qualcomm Files Lawsuit Against Motorola," Qualcomm, Mar 5, 1997 https://www.qualcomm.com/news/releases/1997/03/qualcomm-files-lawsuit-against-motorola

"Qualcomm Implements New Corporate Structure," Qualcomm Press Release, October 1, 2012, https://www.qualcomm.com/news/releases/2012/10/qualcomm-implements-new-corporate-structure

"Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf

"Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf

"Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, https://hbsp.harvard.edu/product/711463-PDF-ENG

"Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf

"Qualcomm Oryon CPU," Qualcomm, https://www.qualcomm.com/products/technology/processors/oryon, accessed August 20, 202

"Qualcomm Sets New Growth Targets, Showcasing Company's Opportunity as On-Device AI Accelerates Demand for its Technologies," Qualcomm Inc., Press Release, November 19, 2024 https://investor.qualcomm.com/news-events/press-releases/news-details/2024/Qualcomm-Sets-New-Growth-Targets-Showcasing-Companys-Opportunity-as-On-Device-AI-Accelerates-Demand-for-its-Technologies/default.aspx

"Qualcomm to Acquire Alphawave Semi," Qualcomm, June 9, 2025, https://www.qualcomm.com/news/releases/2025/06/qualcomm-to-acquire-alphawave-semi

"Qualcomm to Bring RISC-V Based Wearable Platform to Wear OS by Google," Qualcomm, October 17, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-to-bring-risc-v-based-wearable-platform-to--wear-os-by-

"Quintauris: Accelerating RISC-V Innovation for next-gen Hardware ," November 4, 2024, https://www.quintauris.com/quintauris-accelerating-risc-v-innovation-for-next-gen-hardware

"RISC-V International Governance," RISC-V, https://riscv.org/about/board/, accessed August 13, 2025

"Samsung Apologizes for Falling Behind in AI Chips Race," Wall Street Journal, October 8, 2024, https://www.wsj.com/tech/samsungs-chip-technologies-fall-behind-in-early-innings-of-ai-game-67f0f9af

"Samsung Electronics Co. Ltd.," Wall Street Journal, https://www.wsj.com/market-data/quotes/kr/xkrx/005930, accessed August 26, 2025

"SCO Sends Warning Letters To Linux Users," InformationWeek, December 22, 2003, https://www.informationweek.com/it-leadership/sco-sends-warning-letters-to-linux-users

███████████████████████████████

████████████████████

"Silicon Design Reimagined," Nuvia, Inc., January 15, 2021,
https://web.archive.org/web/20210115193713/https://nuviainc.com/

"Snapdragon Summit," SixFiveMedia, https://www.sixfivemedia.com/our-events/snapdragon-summit, accessed September 4, 2025

"Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007,
https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451

"The 5 Best Features of the Meta Quest 3," Qualcomm, January 12, 2024,
https://www.qualcomm.com/snapdragon/news/the-5-best-features-of-the-meta-quest-3

"The Largest Companies by Market Cap in August 2025," The Motley Fool, August 4, 2025
https://www.fool.com/research/largest-companies-by-market-cap/

"The Value of Making Concessions In Negotiation," Red Bear, November 12, 2024,
https://www.redbearnegotiation.com/blog/making-concessions-in-negotiation

"Too Good to Lose: America's Stake in Intel," Center for Strategic and International Studies, November 12, 2024, https://www.csis.org/analysis/too-good-lose-americas-stake-intel

"Top 10 Semiconductor Foundries in the World," Cytech Systems, March 13, 2024
https://www.cytechsystems.com/news/top-10-semiconductor-foundries

"Trial Sheds Light on Q'comm Patent Holdings, Royalty Rates," EETimes, January 21, 2019,
https://www.eetimes.com/trial-sheds-light-on-qcomm-patent-holdings-royalty-rates

"Understanding Android," Android, https://www.android.com/everyone/facts/, accessed August 29, 2025

"Virtual Reality: Transforming the way we experience reality," Qualcomm,
https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar/virtual-reality-vr

"What are IP Cores in Semiconductor Design: Types & Advantages," Techovedas, April 21, 2024, https://techovedas.com/what-are-ip-cores-in-semiconductor-design-types-advantages/

"What is Windows on Arm (WoA)?" Arm, https://www.arm.com/glossary/windows-on-arm, accessed September 4, 2025

"Why RISC-V is Inevitable, Calista Redmond, RISC-V International," RISC-V International, April 6, 2023, at 8:33, https://www.youtube.com/watch?v=ktjSvlelKPk&ab_channel=RISC-VInternational

"XR/VR/AR Reimagining reality as we know it," Qualcomm,
https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar, accessed September 4, 2025

"Your Negotiation Challenges," Karrass, June 17, 2025, https://www.karrass.com/blog/your-negotiation-challenges

Abner Li, "Report: Arm cancels Qualcomm's instruction set, IP license for chip design," 9to5Google, October 22, 2024, https://9to5google.com/2024/10/22/report-qualcomm-arm-chip-design/

Aditya Bedi, "The foundation of Total Compute: First Armv9 Cortex CPUs," Arm Community, May 25, 2021 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/first-armv9-cpu-cores

Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf

Anand Lal Shimpi, "The ARM Diaries, Part 1: How ARM's Business Model Works," AnandTech, June 28, 2013, https://web.archive.org/web/20130701165406/http://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works/2

Andy Patrizio, "Qualcomm makes it official; no more data center chip," Network World, December 12, 2018, https://www.networkworld.com/article/966778/qualcomm-makes-it-official-no-more-data-center-chip.html

Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027

Arjun Kharpal, "Qualcomm to launch data center processors that link to Nvidia chips," CNBC, May 19, 2025, https://www.cnbc.com/2025/05/19/qualcomm-to-launch-data-center-processors-that-link-to-nvidia-chips.html

Arm, "The ARM processor business model," https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model, accessed August 22, 2025

Ben Schoon, "Google Pixel grows in US, settling into top 4 spot ahead of Pixel 10 launch," 9to5google, July 28, 2025, https://9to5google.com/2025/07/28/google-pixel-us-market-share-q2-2025/

Ben Schoon, "Qualcomm confirms November 15–17 event to reveal its next Snapdragon flagship," 9to5Google, July 19, 2022, https://9to5google.com/2022/07/19/snapdragon-summit-2022

Ben Schoon, "Qualcomm is suing Transsion, the largest smartphone maker that doesn't use Snapdragon," 9to5Google, July 12, 2024, https://9to5google.com/2024/07/12/qualcomm-transsion-lawsuit-report

Beth Kindig, "Arm Stock: AI Chip Favorite Is Overpriced," Forbes, Mar 21, 2024, https://www.forbes.com/sites/bethkindig/2024/03/21/arm-stock-ai-chip-favorite-is-overpriced/

Briana Watson, "SOC vs CPU: Breaking Down the Differences and their Optimal Usage," November 15, 2023, https://www.totalphase.com/blog/2023/11/soc-vs-cpu-breaking-down-the-differences-and-their-optimal-usage/

Charles Martin and Malcom Owen, "The history—and triumph —of Arm and Apple Silicon", Apple Insider, April 22, 2024, https://appleinsider.com/articles/24/04/22/the-history----and-triumph----of-arm-and-apple-silicon

Chris Williams, "Arm shells Qualcomm's Snapdragon launch party with latest salvo in license war," The Register, November 16, 2022, https://www.theregister.com/2022/11/16/arm_qualcomm_licensing_latest/

Chris Williams, "Arm sues Qualcomm over custom Nuvia CPU cores, wants designs destroyed," The Register, August 31, 2022, https://www.theregister.com/2022/08/31/arm_sues_qualcomm/

Chris Williams, "Up in arms! Arm kills off its anti-RISC-V smear site after own staff revolt," The Register, July 10, 2018, https://www.theregister.com/2018/07/10/arm_riscv_website/

Congressional Research Service, "Antitrust Law: An Introduction," May 1, 2025, https://www.congress.gov/crs_external_products/IF/PDF/IF11234/IF11234.8.pdf

David Brash, "The ARMv8-A architecture and its ongoing development," Arm Community, December 2, 2014  https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development

David Manners, "Qualcomm data centre business withers away," Electronics Weekly, December 11, 2018, https://www.electronicsweekly.com/news/business/qualcomm-datacentre-business-withers-away-2018-12/

Deepa Prahalad, "Why Trust Matters More Than Ever for Brands," Harvard Business Review, December 8, 2011 https://hbr.org/2011/12/why-trust-matters-more-than-ev

Dominic Rushe, "Myspace sold for $35m in spectacular fall from $12bn heyday," The Guardian, June 30, 2011,  https://www.theguardian.com/technology/2011/jun/30/myspace-sold-35-million-news

Don Fancher, Jennifer Lee, and Debbie McCormack, "Trust: A Critical Asset," Harvard Law School Forum on Corporate Governance, June 17, 2021, https://corpgov.law.harvard.edu/2021/06/17/trust-a-critical-asset/

Dylan Patel, "Arm's Nuclear Option – Qualcomm Must Cancel Next-Generation Products If Arm Succeeds," SemiAnalysis, November 16, 2022, https://semianalysis.com/2022/11/16/arms-nuclear-option-qualcomm-must/

Dylan Patel, Myron Xie, Afzal Ahmad and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/

Exchange Rates, "British Pound to US Dollar History: 2019," https://www.exchangerates.org.uk/GBP-USD-spot-exchange-rates-history-2019.html

Florian Mueller, "BREAKING: Qualcomm settles with China's Transsion (Africa's smartphone market leader): Indian patent lawsuit withdrawn," ip fray, January 16, 2025, https://ipfray.com/breaking-qualcomm-settles-with-chinas-transsion-africas-smartphone-market-leader-indian-patent-lawsuit-withdrawn/

Francisco Cheng, "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential

Greg Tang, "Intel and the x86 Architecture: A Legal Perspective," The Harvard Journal of Law & Technology, January 4, 2011, https://jolt.law.harvard.edu/digest/intel-and-the-x86-architecture-a-legal-perspective

Gyana Swain, "Arm secures Meta as first customer in chip push, challenging industry giants," ComputerWorld, February 14, 2025, https://www.computerworld.com/article/3825123/arm-secures-meta-as-first-customer-in-chip-push-challenging-industry-giants.html.

Haroun Adamu, "Did you know: Samsung makes a lot of money from iPhones," Android Authority, June 11, 2025, https://www.androidauthority.com/did-you-know-samsung-apple-partnership-3426411/

Herbert Hovenkamp, "Antitrust Market Definition: the Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, https://www.networklawreview.org/hovenkamp-market-definition/

Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud

Ian King, "Qualcomm Plans Exit From Server Chips," Bloomberg, May 7, 2018 https://www.bloomberg.com/news/articles/2018-05-07/qualcomm-is-said-to-plan-exit-from-server-chips-amid-cost-cuts

Imogen Beech, "6 real-life coopetition examples," Breezy, September 6, 2023, https://breezy.io/blog/coopetition-examples

████████████████████████████

████████████████████████████

Jeffrey Mervis, "To beat China, new U.S. law offers billions for microchip research and training," Science, September 6, 2022, https://www.science.org/content/article/beat-china-new-u-s-law-offers-billions-microchip-research-and-training

Jessica Coacci, "Here's the one-page memo Warren Buffett sent to his managers every two years for over 25 years," Yahoo! Finance, August 6, 2025 https://finance.yahoo.com/news/one-page-memo-warren-buffett-140107224.html

Jim McGregor, "Arm Squares Off Against Qualcomm: Day 2," December 18, 2024, https://www.forbes.com/sites/tiriasresearch/2024/12/18/arm-squares-off-against-qualcomm-day-2/

Joseph Calamia, Explained: The Physics-Defying Flight of the Bumblebee, Live Science, February 25, 2011 https://www.livescience.com/33075-how-bees-fly.html

Jowi Morales, "Qualcomm claims it owns 10% of U.S. Windows PC retail market for devices priced $800 and up," Tom's Hardware, February 6, 2025, https://www.tomshardware.com/tech-industry/qualcomm-claims-it-owns-10-percent-of-u-s-windows-pc-retail-market-for-devices-priced-usd800-and-up

Kelsey Ziser, "MediaTek and Qualcomm's rivalry heats up in 5G smartphone market – Omdia," Light Reading, July 16, 2024, https://www.lightreading.com/smartphones-devices/mediatek-and-qualcomm-s-rivalry-heats-up-in-5g-smartphone-market-omdia

Khadija Khartit, "When Does It Make Sense for a Company to Pursue Vertical Integration?" Investopedia, February 6, 2025, https://www.investopedia.com/ask/answers/012715/when-does-it-makes-sense-company-pursue-vertical-integration.asp

Linley Gwennap, "Editorial: Arm's No-Win Legal Fight," Tech Insights, https://www.techinsights.com/blog/editorial-arms-no-win-legal-fight, accessed August 29, 2025

MacroTrends, "QUALCOMM Research and Development Expenses 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/research-development-expenses

MacroTrends, "QUALCOMM Revenue 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/revenue

Majeed Kamran, "Qualcomm's Alphawave Acquisition Targets Data Centers and AI, But What's Next?" EE Times, June 9, 2025, https://www.eetimes.com/qualcomms-alphawave-acquisition-targets-data-centers-and-ai-but-whats-next/

Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html

███████████████████████████████

██████████████████████

Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008

Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, June 3, 2024, https://www.reuters.com/technology/arm-aims-capture-50-pc-market-five-years-ceo-says-2024-06-03/

Melissa Riofrio, "Surface Pro X revealed: Thin, light, and supercharged with a custom SQ1 ARM chip," PC World, October 2, 2019, https://www.pcworld.com/article/398146/microsofts-surface-pro-x-is-thin-light-and-supercharged-with-a-custom-sq1-arm-chip.html

Mike Freeman, "Qualcomm laying off more workers in San Diego, North Carolina to cut costs," The San Diego Union-Tribune, December 8, 2018, https://www.sandiegouniontribune.com/2018/12/07/qualcomm-laying-off-more-workers-in-san-diego-north-carolina-to-cut-costs/

Mike Wehner, "AIM is officially dead, and your childhood means nothing," Yahoo!News, October 6, 2017, https://www.yahoo.com/news/aim-officially-dead-childhood-means-nothing-174900787.html

Mike Wuerthele, "Apple & ARM's iPhone & Mac chip partnership will continue for decades," Apple Insider, September 5, 2023, https://appleinsider.com/articles/23/09/05/apple-arms-iphone-mac-chip-partnership-will-continue-for-decades

Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025, https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation

Patent Dispute Report: 2024 Mid-Year Report," Unified Patents, July 22, 2024, https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report

Paul Alcorn, "Intel and AMD are unlikely allies in new x86 ecosystem advisory group," Tom's Hardware, October 15, 2024, https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward

Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships

Phill Powell, "Types of central processing units (CPUs)," https://www.ibm.com/think/topics/central-processing-unit-types

Qualcomm Financial Summary downloaded from LSEG Data & Analytics

Rajeev Dhir, "Negotiation: Stages and Strategies," Investopedia, June 04, 2024, https://www.investopedia.com/terms/n/negotiation.asp

Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html

Rashika Singh, "Qualcomm shares slide as Apple modem shift, tariffs raise growth concerns," Yahoo Finance, July 31, 2025, https://finance.yahoo.com/news/qualcomm-shares-slide-apple-modem-085843911.html

Robert Triggs, "Arm vs x86: Instruction sets, architecture, and all key differences explained", Android Authority, December 20, 2023 https://www.androidauthority.com/arm-vs-x86-key-differences-explained-568718/

Roddy Urquhart, "Systems & Design: Opinion, Semiconductor Engineering," March 29, 2021, https://semiengineering.com/what-does-risc-v-stand-for/

Ryan Bourne, "Is This Time Different? Schumpeter, the Tech Giants, and Monopoly Fatalism," Cato Institute, June 18, 2019 https://www.cato.org/publications/policy-analysis/time-different-schumpeter-tech-giants-monopoly-fatalism

Saul Sugarman, "So I visited the last Blockbuster on the planet, and all I got was this t-shirt," The Bold Italic, December 8, 2023, https://thebolditalic.com/so-i-visited-the-last-blockbuster-on-the-planet-and-all-i-got-was-this-t-shirt-ffc6d2ed414d

Sebastian Moss, "Qualcomm announces data center CPUs, will support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025 https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/

Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf

Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1 2022 https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf

Simon Sharwood, "Arm gives up on killing off Qualcomm's vital chip license," The Register, February 6, 2025, https://www.theregister.com/2025/02/06/arm_qualcomm_nuvia/

Skye Jacobs, "Former Intel engineers from AheadComputing to break CPU performance limits with RISC-V design," TechSpot, June 12, 2025, https://www.techspot.com/news/108281-former-intel-engineers-form-aheadcomputing-break-cpu-performance.html

Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market

Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31

Stephen Nellis, "Apple inks new long-term deal with Arm for chip technology, according to filing," Reuters, September 5, 2023 https://www.reuters.com/technology/apple-inks-new-long-term-deal-with-arm-chip-technology-filing-2023-09-05/

Stephen Shankland, "SCO targets Linux customers," CNET, May 14, 2003, https://www.cnet.com/tech/services-and-software/sco-targets-linux-customers/

Steve McDowell, "Qualcomm's Game-Changing Move Into Automotive And Industrial IoT," Forbes, January 28, 2025, https://www.forbes.com/sites/stevemcdowell/2025/01/28/qualcomms-game-changing-move-into-automotive-and-industrial-iot/

Steve Mollman, "Blockbuster 'laughed us out of the room,' recalls Netflix cofounder on trying to sell company now worth over $150 billion for $50 million," Fortune, October 22, 2024, https://finance.yahoo.com/news/blockbuster-laughed-us-room-recalls-174322621.html

Swagath Bandhakavi, "FTC ends legal challenge against Microsoft's $69bn Activision Blizzard acquisition," Tech Monitor, May 23, 2025 https://www.techmonitor.ai/digital-economy/big-tech/ftc-microsoft-activision-blizzard-deal

Timothy Green, "Qualcomm is Going After Intel and AMD in This Lucrative Market," January 16, 2025, https://finance.yahoo.com/news/qualcomm-going-intel-amd-lucrative-101500205.html

Tobias Mann, "Jury spares Qualcomm's AI PC ambitions, but Arm eyes a retrial," The Register, December 23, 2024, https://www.theregister.com/2024/12/23/qualcomm_arm_trial/

Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, Nov 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/

U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf

U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, https://www.justice.gov/d9/383663.pdf

U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf

Victor Keegan, "Will MySpace ever lose its monopoly?" The Guardian, February 8, 2007, https://www.theguardian.com/technology/2007/feb/08/business.comment

Wayne Ma & Cory Weinberg, "How a Lopsided Apple Deal Got Under Arm's Skin," The Information, November 29, 2023, https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin

Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models

Young Hyun Jun, "Dear valued [sic] customers, investors, and employees of Samsung Electronics," Samsung, October 8, 2024, https://www.samsung.com/global/ir/reports-disclosures/public-disclosure-view.84206/

Zac Hall, "Apple makes up less than 5% of Arm's revenue, and Arm can't do anything about it," 9to5mac, November 29, 2023, https://9to5mac.com/2023/11/29/apple-arm-licensing-revenue/

**APPENDIX C: TRANSCRIPT OF INTERVIEW OF RENE HAAS, ARM'S CEO, OCTOBER 22, 2024**

**Source: "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, https://www.youtube.com/watch?v=6FnBz8rxWUY**

*Peter Elstrom (Executive Editor Technology Bloomberg, PE): That's why I have you. And thank you all for joining us. We have a lot of questions for you, so we'll go ahead and get started. First, I begin. You are not just the of Arm you're now a podcaster. You began in your spare time I guess. You began a new podcast is called 'Tech Unheard' and your first interview was was with Jensen Huang. That's right which I gave a listen to. First of all, what gave you the idea to start a podcast? And secondly, how do you find the time as CEO to do something like that too?*

Rene Haas (Arm CEO): Yeah. So first off, thank you again for for having me here. I'm an amateur at this, so you don't have to worry about your day job as far as podcasting goes. You know, we were talking with some of our board members about how to use a unique medium to talk to two leaders, talk about the Arm story. And one of the ideas that was suggested was was a podcast. I was a radio disc jockey actually spinning records in university. So, I had a little bit of experience and aspirations to do that kind of work early in my life. So, in talking with some folks, you know, around the team, we said, you know, let's let's try this and let's do something a little bit more innovative and talk to other leaders and give them a perspective of maybe a conversation that they may not naturally have with someone who's professional like you are. So, yeah, we kicked it off. Please listen, it's on Apple Music, Spotify and Jensen was my first guest.

*Peter Elstrom: Great, Great. Congratulations. And, you know, in terms of the business Arm was acquired by SoftBank for about three two billion dollars. At some point, SoftBank agreed to sell it for about 40 billion dollars. That deal didn't go through, of course, NVIDIA was supposed to buy it. That deal didn't go through. Now, you went public just over a year ago, companies worth roughly 160 billion dollars, which seems like a successful IPO. But could you talk to us about what the business model for Arm has been and how it's evolved over time, over that period of time? And especially, what's the strategy going forward?*

Rene Haas: Yeah, well, thank you for the you know, for the nice words. 30-year-old plus company. Our business model for most of our time on earth, if you will, was very horizontal in that we had a licensing model. We develop IP. Our products are primarily CPUs. The business model is very horizontal in nature, meaning that we designed a very general-purpose product,

very power efficient product, and then license it to customers independent of the vertical market. And in other words, we didn't really target a certain vertical. I took over the core IP business right after SoftBank bought Arm and we pivoted to a more of a vertical approach, meaning that we now have products very specific for the data center, very specific for automotive, very specific for IoT. Smartphones we were born. And that diversification really allowed us to expand into many new markets with brand new products. SoftBank buying Arm in 2016 allowed us to invest in those new areas. So fast forward the result. What you're seeing now in terms of performance is that strategy. You know, going forward as we think about the next number of years, what we're seeing in the marketplace is a need for more solutions. Chips are getting increasingly more difficult to build. It takes a long time to design a chip, takes even longer to fabricate the chip. So, the more that Arm can do to help customers get to market faster is helpful. So, we're now developing solutions, what we call "CSSs" that get people to market sooner and allow them to get more profitably in a sooner way.

*Peter Elstrom: Mm hmm. Okay. I want to talk about AI. And in particular, the opportunities in AI. There is some debate, as we've referred to, I think, in a couple of these sessions about whether there's a bubble in AI. And I I'm going to assume that you think that there are real opportunities there. But can you talk about what Arm's role is there and how you see the company evolving to take advantage of those opportunities?*

Rene Haas: So, one of the most unique things about our company is the fact that the device that we build, the CPU, we estimate that 70% of the world's population touches Arm in some way. We're in security cameras, automobiles, PCs, smartphones, data center. And what that means is every workload, whether it's an application, an operating system or AI, runs through Arm in some way. So, that means AI. is going to run on Arm, period. And we're the only company on the planet that can run those AI workloads from the smallest devices on the edge. Again, a wearable, glasses, watch, phone to the data center. So, for us, AI is a gigantic opportunity in terms of growth going forward because AI is going to be everywhere. And as far as a bubble goes, I just don't ascribe to that. I look at things such as when people say, Gosh, is it overhyped? Or the stocks have gone down last quarter. That's almost like saying should I short AT&T in 2000 because the Internet is not going to happen. Or if Ford was a stock in 1907, would I short them? Because the automobile is not going to happen. It's just not. I mean, AI is we've seen such

C - 2

advancement across the AI in the last couple of years that the amount of innovation that it's going to drive is just going to be incredible.

*Peter Elstrom: Okay. Okay. The chip company that probably has taken the most opportunity that has been able to capitalize the most on AI so far is NVIDIA. Chip maker in your space. They now have a near monopoly in terms of the highest end AI accelerators. How do you see that evolving in the future? And are there opportunities for Arm in particular to be able to play in that space and drive real revenue from?*

Rene Haas: Yeah. So, we're there already. NVIDIA's most advanced chip called the GB200, which is Grace Blackwell. Microsoft just announced that they're going to be deploying Grace Blackwell, the most advanced NVIDIA chip in their data centers that uses the Arm CPU. So, Grace is the Arm CPU. Blackwell Is the Nvidia GPU. So, Arm is there already. So, we are going to play in the most advanced data centers using AI. Arm, Arm will be there. I think what's most exciting for us, as I mentioned though, is the fact that not only will we be in the data center for training these algorithms, ultimately the training has to be transferred into inference, and training is the teacher inference is the student. Inference is actually running the workload and inference actually running that AI agent that's going to happen in the data center, that's going to happen in the car, that's going to happen on your watch. That's going to happen in glasses, that's going to happen in phones, and everywhere it happens, it's going to run on Arm. So, it's going to be a gigantic opportunity for us. The data center is just one place.

*Peter Elstrom: Mm hmm. Okay. So, you see Arm having opportunities kind of from the beginning to the end.*

Rene Haas: More than, more than opportunities. The agents will run locally. And the reason for that is you'll have a hybrid situation where some of that will run in the cloud. Some of it will run in your local device. Again, your glasses, your wearable, your phone. But locally, what you'll be able to add is security, things that can make sure it's private to you that not all your data is being passed to the cloud and vice versa. So yeah for for Arm I think it's going to be just an amazingly large opportunity.

*Peter Elstrom: Okay. As we were talking about before, I just moved from Japan where we spent a lot of time looking at SoftBank and especially Masayoshi Son's ambitions. We've written stories*

C - 3

*about how SoftBank is looking at ways to enter the AI chip market and particularly to compete with NVIDIA, quite directly in GPUs. He has a secret plan "Izanagi" that we've written about in the past. How does* Arm *isn't still 90% owned by SoftBank? How does* Arm *fit into that equation?*

Rene Haas: Yeah, so no, no product launch announcements today. So, nothing I can say about products coming out that you've written about. I can say that on the SoftBank board member, I do advisory work for SoftBank. I talked to Masa all the time. It's no secret that he is a big believer in AI has been for quite some time. He's talked about it actually, probably as long as any of the folks out there. I think his vision in terms of where it's all coming together now, you can start to see the pieces of it as I just described. Where does Arm fit  - all those AI workloads are going to run on Arm somewhere somehow. So that's the reason that we spend a lot of time talking to SoftBank about the future.

*Peter Elstrom: Okay. Okay. Earlier we had the ASML CEO on and he was talking about some of the challenges that they're facing in the market. They surprised investors last week as we talked about. And it does seem that there's a little bit of a disconnect in the market where many people see opportunities. ASML reported that their orders were about half what analysts had thought they were going to be. Seems there are certain areas of the chip industry that are struggling quite a bit. And on the other end you have Sam Altman talking about how we need more capacity in the chip industry. We need billions of dollars, maybe trillions of dollars of investment. What is the disconnect and how does that get resolved?*

Rene Haas: Yeah, so there's a lot to unpack there. Where Arm plays, as I mentioned because 70 % of the world's population uses Arm. And I think 300 billion chips have shipped since we were started that have Arm inside. And every year about 30 billion chips. We have a unique view into the industry because just about every digital device uses Arm. There are some markets that aren't accelerating as fast as others and candidly those are the ones that aren't using AI in a very large way. But in areas that can use AI and will use AI, people can't go fast enough. And I'll give you an example. Many of the hardware devices that are being introduced today were designed two or three years ago. That means the chips were designed two or three years ago. The chips that are going in your phones or your wearables. Those were all invented before ChatGPT was released

or before Lamo was released. So what we're seeing on one end of the industry is just a rush to develop more and more chips that have this AI capability. Now it takes time. You know, chips aren't built overnight. In fact, it takes from the time we engage a partner, you know, two or three years at least until that comes to market. So I think you'll see some of these new products coming out. I think what Sam is talking about is just generally the ceiling to get to AGI. Artificial general intelligence requires more compute. And the more compute you have, the better the models get. So, I see. I see both. But generally speaking, I'm pretty optimistic about the growth for our industry.

*Peter Elstrom: Okay. Okay. We were talking about this a bit before. One of the gating factors is making sure that you have chip manufacturers who can make the most advanced chips. TSMC seems to be gaining market share right now as a couple of the key competitors struggle, Intel in particular. And Samsung also has been struggling a bit. They're both trying to move into the foundry business a bit in competition with TSMC. What what are the dangers around having TSMC garner so much market share in foundry? And is it good for the industry or would it be better if there's a more diversified manufacturing base for the industry?*

Rene Haas: Yeah, TSMC is an amazing company. They've just done so much for the industry relative to the innovation, how they work with partners, etc. etc. If you remove semiconductor manufacturing or foundry for a moment and just step back and say, is it healthy for any industry to have a one dominant supplier and then add on top of that a dominant supplier that's largely concentrated in one part of the world? Not, not really. So as a result, I think it's necessary just in terms of diversity of supply base, to have more and more advanced manufacturing and geographic diversity. Fabs in the United States. Fabs in Europe. Fabs in India. Fabs in Saudi Arabia. I think over time, we're going to see not only more suppliers, but geographic diversity as well.

*Peter Elstrom: Okay. Governments obviously are investing a lot in that very question. You're seeing the United States do it. You're seeing Europe do it. Japan has spent a lot of money on it, too. Do you think that's making progress at this point? Do you see light at the end of that tunnel?*

Rene Haas: It's the the capital expenditures required for these fabs are enormous. TSMC, Intel, Samsung, I think their CapEx is anywhere between 30 to 35 billion dollars a year in new

factories. And if you start looking at the revenues that these companies produce, you start very quickly looking at, oh my gosh, that is a lot of money to invest. Now, on one hand, you can look at it and say, well, the demand will be there, AI, etc., etc.. But it doesn't take much in terms of a year slowdown in demand and the companies have a really negative financial outcome. So, yes, governments have been involved, I think should be involved in my opinion. We saw in the U.S. for the very first time a policy act around CHIPS Act to put funding into the fabs, which I generally a big supporter of. I think it's necessary.

*Peter Elstrom: Okay. Let's talk a little bit more about Intel and their struggles. You grew up in a chip industry where Intel was really the dominant player, kind of set the pace for technology evolution over time. Now we're openly talking about whether Intel is going to be broken up, maybe sold into pieces. What kind of opportunities are there for* Arm *within that space as Intel goes through these struggles?*

Rene Haas: Yes, we work very closely with Intel. It's a bit of strange bedfellows. Many folks would consider Arm and Intel to be natural competitors on the product space. But what's very important to us, back to this discussion around supply base is that "Intel Foundry Services" IFS is successful. We do a lot of work with Intel as we do with Samsung and TSMC to ensure that our products can be manufactured there. We work very closely with their engineers to ensure that the leading edge technology can can run on Arm. So, we want to see Intel successful and we want to see IFS successful. I think it might be strange to hear the Arm CEO say that, but we want Intel manufacturing to be successful.

*Peter Elstrom: Okay. Bloomberg reported that* Arm *took a pretty close look at buying a part of Intel. Would you like to comment?*

Rene Haas: Nothing I can say on that one.

*Peter Elstrom: "Okay. All right.  Thank you. Thank you. I wanted to turn. You talked about are moving up the value stack kind of moving beyond its traditional place in the industry. And as you have moved up the value chain, you've gotten closer to doing what some of your customers do."*

Rene Haas: "Right."

*Peter Elstrom: "Getting closer to being able to do these complete designs. And. Yes. It speeds up innovation, as you were alluding to, but it also puts you in closer competition with some of your customers. You have a lawsuit with Qualcomm in particular."*

Rene Haas: "Yeah."

*Peter Elstrom: "Isn't it in both companies interest to settle that and to resolve the legal dispute at this point? Or what would you say?"*

Rene Haas: "These are these are tough questions. It's a good thing I'm a podcaster, so I know what's coming. You know, first thing on, competing with our customers, you know, it's rather complicated because if you look at some of our customers, our customers are Amazon. Our customers are Microsoft. Our customers are Apple. Our customers are Tesla. They all build chips using Arm. I'm not going to build an electric car. I'm not going to build a phone. I'm not going to build a data center. So, to look at the value chain relative to who builds chips, relative to whether you're end business is a chip business or a product business. It's gotten a lot more gray. We follow what the industry is demanding, and what the industry wants to see is solutions getting to market faster. And that's what we're focused on. Qualcomm. Not much I can say on that, other than we're headed to a trial. I think it's the third week in December. We feel very good about our case. We think our case is quite simple and straightforward. And as I said, December, we'll find out."

*Peter Elstrom: "Okay. So, you head to the courtroom then. One last question. I think we have time for this. In this audience in particular, there's a lot of interest in whether* Arm*, which is historically a British company, whether they would ever look at doing some sort of dual listing. Of course, we've heard about this many times in the past. A year ago when you did your IPO, you decided you would do it in the U.S. instead. One of the opportunities for listing here, what are the pluses and minuses of that sort of thing?"*

Rene Haas: "Yeah, we did. We listed in New York over over a year ago. And at that time our comments were we would look at a secondary listing. We're still open to it. It's not something that's top of mind right now, quite candidly. But we'll continue to have discussions with both stakeholders in the government and in the local exchange. We'd love to find a way at some point

in time, but also at the same time, there's a lot of other things that keep me busy relative to my day job."

*Peter Elstrom: "Okay. All right. Rene Haas, thank you very much. Please join me in welcoming. Thank you. Thank you."*

# Exhibit 4

United States District Court

District of Delaware

Civil Action No. 1:24-cv-00490-MN

Qualcomm Incorporated and

Qualcomm Technologies, Inc.

v.

Arm Holdings plc

Expert Report of Eric A. Posner

August 8, 2025

## I. Qualifications and Testimony

1.      I am the Kirkland and Ellis Distinguished Service Professor at the University of Chicago Law School. Before joining the Chicago faculty in 1998, I taught at the University of Pennsylvania Law School. I was educated at Yale College and Harvard Law School.

2.      I have specialized in economic analysis of law since the start of my academic career in 1993. Law and economics is an interdisciplinary field in which economic principles, models, and theories are used to analyze the law. It is a field in which both law professors and economics professors are active. My particular specialty is the application of economic principles to problems of market competition, including problems addressed by antitrust law and other areas of U.S. law and policy.

3.      I have extensive academic experience in the economics of competition. I have taught classes, given lectures, and written frequently about this topic. I have published numerous articles and one book on antitrust and competition policy. I have published in peer-reviewed economics journals, peer-reviewed law and economics journals, and law reviews. I was the editor of a peer-reviewed law and economics journal, the Journal of Legal Studies, for twelve years. I have written dozens of referee reports for peer-reviewed economics journals, and been an active member of the American Law and Economics Association, having served two terms on the board of directors.

4.      I worked on antitrust and competition issues while serving as Counsel to the Assistant Attorney General of the Antitrust Division in the Department of Justice from 2022 to 2023.

5.      I have testified or made presentations on competition policy and economics before the Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law, U.S. House of Representatives (on the economics of labor market competition); the Federal Trade Commission (on competition in labor markets); the Department of Justice, Antitrust Division (on merger policy); the National Association of Attorneys General (on the economics of labor competition); the Organization for Economic Co-operation and Development (on labor competition); and numerous practitioner and academic groups.

6.      I am a member of the American Academy of Arts and Sciences.

7.      A list of my recent expert engagements can be found at Annex 1.

8.      My curriculum vitae can be found at Annex 2.

## II. Materials Considered

9.      I have consulted the materials listed in Annex 3.

## III. Introduction and Summary

10.     I have reached the following conclusions.

1

■■■■■■■■■■■■■■■■■■■■■■■■■■■

11.    Arm licenses an instruction set architecture (ISA), which is an abstract model that enables computer software to interface with the central processing units (CPUs) in a computer.[1] As Arm describes it, the "ISA provides the only way through which a user is able to interact with the hardware."[2] Arm's ISA allows developers to produce software that works on different devices and is consulted in connection with the construction of devices from components manufactured by different companies.[3] The Arm ISA has been widely adopted by software developers and hardware designers and manufacturers.[4]  There are a limited number of different ISAs that are in common use, including, for example Intel's x86, ■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■ and which is used in Intel's own chips: Intel does not license the x86 architecture to third parties.[6] The Arm ISA has achieved dominance in other sectors of the semiconductor industry, including the chips for mobile devices like smartphones, consumer electronics, and "internet of things" (IoT) devices. As a result, Arm has a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA. An SoC is an integrated circuit that combines one or more CPUs with memory, input/output, and other features, and is installed in mobile devices and other products.[7] Arm's ISA ecosystem exhibits strong network effects. According to Arm, its ISA is the "most ubiquitous computer architecture on the planet."[8]

12.    Qualcomm designs and markets SoCs that are used in a range of products, including mobile phones, laptops, automobiles, data centers, and IoT devices.  Qualcomm designs SOCs that are compatible with the Arm ISA.  Qualcomm uses Arm's ISA through two types of licenses. Under an Architecture License Agreement (ALA), Qualcomm designs Arm-compliant custom cores and incorporates them in SoCs. Qualcomm (or any other SoC designer) needs an Arm license to sell SoCs that are compatible with the Arm ISA, and Arm is the only licensor of the Arm ISA. Under Technology License Agreements (TLAs), Qualcomm uses "off-

---

[1] Arm.com, *Glossary: Instruction Set Architecture (ISA)*, https://www.arm.com/glossary/isa (last visited August 5, 2025).

[2] *Id.*

[3] Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture  (last visited August 5, 2025) ("All Arm-based CPU designs are built on the same architecture, ensuring software compatibility while enabling market or usage- specific innovation").

[4] Mike Johnson, *Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025*, WebProNews (July 31, 2025), https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/; *see also* Mohamed Awad, *Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm-based*, Arm Newsroom (April 1, 2025), https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■
■ Grisenthwaite Tr. at 36:3-14 ("Q. And I think you mentioned this, but just to be clear, Intel does not make x86 available for license; correct? A. I'm not entirely sure what Intel's model has been. They certainly don't have a wide licensing base, but there's a relationship in some way between Intel and AMD and I believe there are some x86 implementations in China. I have no idea what the licensing arrangements from for Intel, so I can't speak definitively for Intel's business model.").

[7] Arm.com, *Glossary: SoC Development*, https://www.arm.com/glossary/soc-development (last visited August 5, 2025), ("An SoC (System-on-a-Chip) is a complete processing system contained in a single package that contains multiple processing parts. The main components of an SoC typically include a central processing unit, memory, input and output ports, peripheral interfaces and secondary storage devices.").

[8] Tim Bradshaw, *Rene Haas: 'Arm has the most ubiquitous computer architecture on the planet,'* Financial Times (June 7, 2024) https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d.

2

the-shelf" (OTS) cores designed by Arm. Qualcomm incorporates custom cores or OTS cores in SoCs, which it sells to Original Equipment Manufacturers (OEMs) of various computing devices. Other firms compete with Qualcomm by offering SoCs or other chips that are also compatible with the Arm ISA. Within the Arm ISA ecosystem, there are multiple SoC sectors because the OEMs demand different kinds of SoCs for their different computing products. Qualcomm sells SoCs to OEMs of cell phones, cars, laptops, data center, VR/AR, wearables, audio, wireless networks, IoT devices, cameras, and smart homes.[9]

      13.    Qualcomm contends that Arm has engaged in a number of unfair acts and practices, including threatening to terminate Qualcomm's ALA, breaching existing contracts (including by refusing to provide technology necessary for Qualcomm to ensure the architectural compliance of its custom core designs and by refusing to provide commercially reasonable offers for licenses to Arm OTS cores), and refusing to engage in ▮▮▮▮▮▮▮▮ negotiations for Qualcomm's licenses. Qualcomm contends that Arm's conduct is part of a broader scheme to undermine Qualcomm's ability to compete with Arm's products. First, Arm is obstructing or attempting to obstruct Qualcomm from designing and marketing products that use Qualcomm custom core designs, in order to inhibit Qualcomm from competing with Arm's OTS core designs. Second, Arm is actively attempting to sell its own SoC designs at the expense of its own licensees, including Qualcomm.[10] To that end, Qualcomm contends, Arm seeks to design and manufacture its own chips and SoCs, and seeks to drive Qualcomm away from designing custom cores, or to drive Qualcomm out of selling chips and SoCs entirely. Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the short term, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the long term than the margins on existing ALA licenses—and Arm is unhappy with the level of royalties that Qualcomm is required to pay under the ALA. Moreover, although Qualcomm has historically been one of Arm's most important customers, it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.

      14.    If Arm succeeds, it will have extended its dominance over the Arm ISA ecosystem, leaving it with not only control of the ISA itself and the design and sale of its own cores, but also with a significant role in designing and selling SoCs. These actions are anticompetitive and amount to unfair competition for several reasons.

      15.    First, Arm will be able to use its control of the ISA, such as by cutting off the ability to sell Arm-compliant chips, to disadvantage or eliminate any competitor—not just Qualcomm—in the ISA ecosystem, including the portion of the ecosystem that encompasses the design, manufacture, and sale of SoCs directly to OEMs, and to strengthen entry barriers in the ISA ecosystem. Because competitors and entrants who design and sell chips need access to the ISA licenses, and they require Arm's consent and cooperation to achieve access to Arm

---

[9] Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025).

[10] Michael Acton, *Arm to explore designing its own chips, chief executive says*, Financial Times (July 30, 2025) Accessed August 5, 2025. https://www.ft.com/content/735c8a2d-0ce0-49d6-934f-8aee3e927108?shareType=nongift.

3

technology and maintain a strong competitive position, they will be at a competitive disadvantage to Arm. Arm will be able to delay or prevent entry of new chip designers and manufacturers because even highly sophisticated firms that can develop new chips will not be able to access the ISA ecosystem without Arm's cooperation. In addition, because of the high margins on chips and Arm's technological sophistication, it is likely that Arm has an incentive to eliminate chip competitors.[11] This behavior is known among economists as "input foreclosure."

16.      Second, by reducing competition in designing and selling chips, Arm (and any remaining competitors) will be able to raise prices and skimp on innovation without fear of being undercut or outperformed by Qualcomm or other licensees that make SoCs using custom cores that deliver higher performance. Because many OEMs depend on Arm-compliant chips, they will be forced to accept less impressive performance while paying higher prices—and likely passing on their costs to consumers in the form of higher prices.

17.      Third, Arm is attempting to escape its ALA with Qualcomm so it can eliminate Qualcomm as a competing CPU developer, rather than compete on the merits with Qualcomm CPUs. Arm is unhappy with the royalty rate under the ALA that it negotiated with Qualcomm. Because Arm earns a higher royalty under the TLA, Arm would profit in the long term by forcing Qualcomm to stop designing custom cores and putting its resources into using OTS cores, even if it means Arm loses royalties on ALA cores in the short term. Having failed so far to terminate the ALA—despite attempts to do so—Arm can achieve roughly the same result by undermining Qualcomm's ability to design custom Arm-compliant cores. If Arm succeeds, it will have achieved the same result as license termination. This is bad-faith behavior and a form of unfair competition because it is not competition on the merits—through pricing and innovation.

18.      Fourth, Arm's conduct described in this report may reduce the likelihood that more efficient and innovative ISAs will take root and displace Arm's ISA. Under the status quo, Arm's chipmaker customers have an incentive to move from Arm's ISA if Arm raises prices and degrades quality and service. But if Arm itself takes over a portion of those customers' business, and either weakens them or drives them out of business, then they will have less ability to support the development of a new ISA. As a result, new ISAs will have trouble attracting chipmakers and thus face greater barriers to entry.

19.      Fifth, Arm's attempts to extend its dominance of the ecosystem will spook even chipmakers who are not pushed out of designing SoCs, by revealing that Arm will no longer keep its commitment to neutrality and openness. This could have immediate anticompetitive consequences. As part of its traditional business model, Arm meets with its chipmaker customers to learn their business plans and technological needs so that it can improve the ISA. But if those customers believe that Arm may start competing with them in their line of business, they will be reluctant to share confidential information, which in turn will retard the development of Arm's ISA.

## IV.    Factual Background

---

[11] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

4

## A. Relevant Parties and Industry

20.    Arm is a technology company that licenses the Arm ISA to other companies, including Qualcomm. The Arm ISA is a set of instructions that define how software should communicate with the CPU or the cores that compose the CPU.[12] Companies that make devices, or hardware for devices, must use chips that are compatible with the Arm ISA so that their devices will run common software programs written for the Arm ecosystem.[13] Arm also designs OTS cores that a licensee can incorporate into SoC designs. An SoC is an integrated circuit that contains the CPU and other technologies.[14] By integrating multiple cores and other components (CPU, modem, camera, etc.) on a common SoC, manufacturers can increase the efficiency of their chips and improve the functionality of the devices they power, compared to devices in which chips are not integrated.[15]

21.    Arm's longstanding business model was to license the ISA and certain Arm-compliant technology to customers on a neutral and open basis.[16]  That meant that Arm would license all qualified chipmakers while providing them with technological support, and give them the freedom to design and sell architecturally compliant chips for new or developing sectors of the semiconductor industry.[17] The more devices that use Arm-based chips, the stronger the incentives for chip and core designers to obtain licenses from Arm so that they can produce Arm-compliant hardware for those devices that run the software widely developed for the Arm ecosystem. And the more Arm-complaint devices there are, the greater the incentive for software

---

[12] Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture (last visited August 7, 2025) ("The Arm CPU Architecture defines what a CPU must do when software runs on it").

[13] *Id.* ("Arm's architecture specifications are licensed by partners, who create compliant silicon chips based on them.").

[14] Arm.com, *Glossary: SoC Development*, https://www.arm.com/glossary/soc-development (last visited August 7, 2025) ("An SoC (System-on-a-Chip) is a complete processing system contained in a single package that contains multiple processing parts. The main components of an SoC typically include a central processing unit, memory, input and output ports, peripheral interfaces and secondary storage devices.").

[15] *Id.* ("While the initial costs of designing and developing an SoC may be higher, many developers choose this approach to minimize power consumption and provide significantly more differentiation. Traditionally, the vast majority of energy is spent on data and bus address cabling. With SoCs, components are internally connected on a single chip which reduces cabling requirements and minimizes power consumption. Proprietary IPs and accelerators can also be integrated onto custom SoCs to enhance performance and power efficiency.  Other advantages of the SoC include faster execution due to high-speed processor and memory, smaller, more compact chips, improved performance and efficiency, simpler system designs, faster time to market and greater security at both the firmware and hardware levels.  Solutions on the market today offer SoC developers the ability to design faster. They offer a range of configurable, modifiable subsystems for a wide range of system types. The systems pre-integrate the processor and interconnect IP with the most relevant system components.").

[16] *See e.g.,* QCVARM_1066811, at -813 (According to Arm's CEO, Arm's business model "largely stems around neutrality" and it's "a highly neutral platform, in terms of customer access, and that neutrality allows customers to not only feel that they're not being disadvantaged."); QCVARM_0717008, at -009 (According to Arm's co-founder, the "whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees"); QCVARM_0717291, at -291 (Arm "is built on a foundation of neutrality.  Rather than build chips, Arm merely designs their blueprints. The company then licenses the IP to almost every major semiconductor maker without directly competing against them."); Arm's "what is" series, *What is… CPU architecture*, (August 18, 2021) www.youtube.com/watch?v=KGHdDVLnKJM&t=144s (Arm's "widely licensed architecture that everyone can make use of" and that "is easy to access" has been "a big part of the secret to Arm's success"); M. Williams Tr. at 54:11-19; Grisenthwaite Tr. at 18:2-23:5; Haas Tr. at 231:22-234:23; Hughes Tr. at 78:16-80:21.

[17] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

5

developers to develop software that runs on Arm-compliant devices—which in turns increases customer demand for those devices and thus the incentive of OEMs to manufacture those devices, in a virtuous circle. As explained by Arm, "[e]verything has to be able to run everywhere" and a "strong ecosystem of users is vital."[18] Thus, "Arm's success has come from the wide accessibility of its architecture" and Arm's "fostering of an enormous ecosystem of developers."[19] As the quantity and variety of software increases, device manufacturers benefit more from using Arm-compliant chips. A common ISA also facilitates the integration of hardware components supplied by different vendors.[20]

22.     When Arm began developing the Arm ISA, other ISAs existed or were in development.[21] Intel's x86 was the most prominent, and still holds significant share in the personal computing and data center sectors, but Intel did not license x86 to other companies because it did not want to compete with other chipmakers.[22] Other companies and groups developed ISAs but their ISA found few followers because of concerns about openness or dissatisfaction with the design choices embedded in those other ISAs, or because they were designed for niche devices.[23] Arm's ISA was the more attractive in part because it had properties that better fit the needs of chipmakers at the time than other ISAs did, but it is not clear that Arm's ISA was technically superior to other ISAs, in the sense of being essential to the design of higher quality chips.[24] The functionality of chips depends more on the microengineering choices of chip designers like Qualcomm than on the underlying ISA.[25] The most important factor in the success of Arm's ISA appears to be that its open, neutral model appealed to chip designers and manufacturers, as it greatly increased the likelihood that many companies would use it, allowing every licensee to interact with other licensees and software developers.[26] As Arm CEO Rene Haas said in response to a question about Arm's advantages over Intel, "There's a lot of things in our favor, one of them is quite frankly the fact that we have an open model, where our products can be built at any fab by any company. If you're looking at x86, you're looking at two people

---

[18] ARMQC_02727610 at -617.

[19] *Id.*; ███████████████████████████████████████████████████
████████████████████████████████████████████████████████

[20] Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture (last visited August 7, 2025) ("All Arm-based CPU designs are built on the same architecture, ensuring software compatibility while enabling market or usage- specific innovation"); conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[21] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[22] ███████████████████████████████████████████████████    The only known x86 licensee is AMD who received their license as part of a settlement agreement. *See e.g.*, Amd.com, *Intel Antitrust Rulings*, https://www.amd.com/en/legal/notices/antitrust-ruling.html, (last visited August 7, 2025); QCVARM_0716360 at -382 (quoting Rene Haas: "Intel would have a license x86, and they did to one guy, AMD, because they were forced to."); Grisenthwaite Tr. at 36:3-14 ("Q. And I think you mentioned this, but just to be clear, Intel does not make x86 available for license; correct? A. I'm not entirely sure what Intel's model has been. They certainly don't have a wide licensing base, but there's a relationship in some way between Intel and AMD and I believe there are some x86 implementations in China. I have no idea what the licensing arrangements from for Intel, so I can't speak definitively for Intel's business model.").

[23] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[24] *Id.*; *see also* ███████████████████████████████████████████████
████████████████████████████████████████████████████████

[25] *Id.*

[26] *Id.*; M. Williams Tr. at 54:11-19; Grisenthwaite Tr. at 18:2-23:5; Haas Tr. at 231:22-234:23; Hughes Tr. at 78:16-80:21.

6

███████████████████████████████

who build it."[27] As has often been pointed out, it is important that people agree to drive on the left side or the right of the road; it is not important which side is chosen as long as everyone agrees on the same side. A common ISA solves a coordination problem in the industry, but it may not matter much which ISA is used.

23.     In return, chipmakers obtained Arm licenses and collaborated with Arm to develop new products. Arm provided support to its licensees by sharing business plans with them, and convening meetings in which Arm and licensees exchange business and technological ideas.[28] In the course of collaboration, licensees would share confidential business information with Arm. According to the Federal Trade Commission, this confidential information included "strategic plans, project timelines and development schedules, manufacturing process plans, use cases, customer requirements, and product bugs or challenges."[29] Arm has issued licenses to hundreds of companies.[30] As a result, the Arm ISA is now a de facto standard used in "virtually all" mobile phones and internet of things (IoT) products, among other products.[31]

24.     Arm has marketed the Arm ISA technology through two kinds of licenses. Under the ALA, the licensee is authorized to sell its own custom designed cores that are compatible with the Arm ISA ("custom cores"). Under the TLA, the customer licenses Arm's OTS cores. Under both licenses, the licensee both designs and (usually via outsourcing to a semiconductor foundry) manufactures the physical chip that is in turn sold to OEMs. In addition to Qualcomm, Arm licenses its architecture to a dozen or so other firms, including ███████████████ ███████████████.[32] Qualcomm does not directly compete with all of these firms as some are not merchant silicon vendors. For example, Apple manufactures the end product, including the iPhone, and incorporates its custom chips into its own end products, and does not sell its chips to other OEMs.

25.     Qualcomm designs both custom cores and SoCs. Qualcomm incorporates into its SoC designs both its own custom-made cores that are compliant with the Arm ISA under the ALA and Arm's OTS cores under the TLA, depending on the technological and economic needs of its OEM customers. Qualcomm's SoCs thus reflect both Qualcomm's engineering contributions, while also being Arm-based.[33] Qualcomm's SoCs are used by OEMs, which manufacture various devices including smartphones, automobiles, IoT devices, personal computers, automobiles, and data center servers.[34] ████████████████████████

---

[27] QCVARM_0716360 at -389 (Haas referring to Intel and Amd).
[28] ARM_00103918 (Qualcomm TLA); ARM_00055357 (Qualcomm ALA); ARMQC_02729064; *see also* M. Williams Tr. at 31:10-16, 58:13-59:13.
[29] *In re Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 ¶ 27 (FTC filed Dec. 6, 2021) (hereinafter "FTC Compl.").
[30] *See e.g.*, QCVARM_1066820 at 149; QCVARM_1066811 at -813.
[31] Annual Report and Consolidated Financial Statements For the year ended 31 March 2024, p. 1, Arm Holdings Limited (May 29, 2024) https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; QCVARM_1070993; QCVARM_1012343 at -352, -358, -379, -382 (Arm has "maintained market share in the mobile applications processor market of greater than 99% for many years, by virtue of all key mobile operating systems depending on Arm processors.").
[32] Weidmann Tr. at 35:9-36:14 (identifying only ██████████ other competitors). Arm also licenses its architecture to other firms through its Arm Total Access Subscriptions. *See* Awad Tr. at 30:2-31:5. The evidence on the number of other competitors is conflicting, but there appear to be fewer than ██ and as few as ██████.
[33] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.
[34] Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025).



26.     Qualcomm began licensing the Arm ISA in 1997.[37] Qualcomm and Arm first agreed to an ALA in 2003.[38] That licensing agreement was renegotiated in 2013, and includes annexes for different versions of the ISA and related technology.[39] ████████████ In turn, Arm has profited significantly from its relationship with Qualcomm. For example, in 2024 Qualcomm accounted for 10% of Arm's $3.2 billion revenue.[41]

27.     This relationship has been mutually profitable. Qualcomm benefited from its access to the Arm ISA and related technology, which enabled it to make chips for mobile phones and many other devices. In addition to receiving royalties and other payments from Qualcomm, Arm benefited from the expansion of the Arm ISA network that occurred as Qualcomm penetrated various chip sectors. Software developers, OEMs, consumers, and others benefited as more and more devices powered by Qualcomm chips were manufactured and marketed—in a classic illustration of the power of network effects, where the value of a good or service to a user increases as more people use it.[42] This long-term course of dealing between Qualcomm and Arm relied on Arm's initial business model of openness and neutrality, as Qualcomm and other chip designers were willing to make a long-term commitment to the Arm ISA because of this promise of neutrality.

28.     In March 2021, Qualcomm acquired Nuvia, a startup with expertise in CPU and SoC development for the data center sector.[43] After acquiring Nuvia, Qualcomm renewed its development of custom CPU cores and SoCs that enabled it to further strengthen and expand its share of the ISA ecosystem for mobile and other segments. ████████████████

---

████████████████ Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025); QCVARM_1120267 at -308; QCVARM_0848033.
[37] Second Amended Complaint, D.I. 137 (SAC) ¶¶ 3, 55.
[38] *Id.*
[39] ARM_00055357 (QC ALA); QCARM_0343120 (Annex 1 Armv8-A Architecture); QCARM_0338573 (Annex 1 V8 Next Architecture); QCARM_0343954 (Annex 1 ArmV9-A Architecture).
[41] ARMQC_00000640 at -643, -646 (the 10% calculation includes ALA, TLA, and peripheral license revenue).
[42] Joseph Farrell & Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, Handbook of Industrial Organization, Chapter 31 at 1971 (2007).
[43] SAC ¶ 59.

███████████████████████████████████

29.     At around this time, Arm apparently decided that it should reorient its business toward SoC design. That would mean competing with its own customers, including Qualcomm.[45] At the same time, and apparently in furtherance of its goal to shift its business model, Arm sought to merge with Nvidia, a highly successfully technology company that manufactured chips for a variety of sectors.[46] Regulators in Europe, the United Kingdom, and the United States expressed concern because Nvidia competed with other Arm licensees.[47] The Federal Trade Commission, for example, observed that the merged firm would have the ability to reduce competition "through various mechanisms, including by manipulating levers such as Arm's pricing, the terms and timing of access to Arm's Processor Technology (including withholding or delaying access), Arm's technological developments and features, and Arm's provision of service and support, among other mechanisms."[48]  The FTC further argued that the merged firm would have "strong incentives" to undermine rivals because the "profits on additional sales that Nvidia would earn as a chip supplier are generally higher than the profits that Arm would earn from licensing its Processor Technology to Nvidia's rivals."[49] This "ability/incentive framework" is a standard method for evaluating the competitive effects of vertical mergers.[50]

30.     The FTC further noted that the merger would reduce the value of Arm's ISA for the industry as the industry learned that it could not rely on Arm to maintain its policy of openness and neutrality, and this in return would reduce innovation in the sector.[51] The merger would result in "a critical loss of trust in Arm by its own licensees" who will be "less likely to share competitive sensitive information with Arm" because Nvidia would be able to use this information for its chip design.[52] In the course of its analysis, the FTC noted that there are no close substitutes for ARM's ISA, and even if there were, switching among ISAs is costly and

---



---

[45] SAC ¶ 70; *see generally* FTC Compl.; *see also* Michael Acton, *Arm To Explore Designing Its Own Chips, Chief Executive Says*, Financial Times, Jul. 30, 2025, https://www.ft.com/content/735c8a2d-0ce0-49d6-934f-8aee3e927108 (Accessed Aug. 5, 2025).

[46] *See* QCVARM_1018853; QCVARM_1071021; ████████████████████████████████████████
██████████████████████

[47] *See generally* FTC Compl.; QCVARM_1018853 (Competition & Mkts. Auth., Nvidia - Arm: A Report to the Secretary of State for Digital, Culture, Media & Sport on the Anticipated Acquisition by NVIDIA Corp. of Arm Ltd. (Jul. 20, 2021)) ¶¶ 1.6-1.9 (finding competition concerns); QCVARM_0715414 at -414 (European Commission Press Release IP/21/5624, Mergers: Commission Opens In-Depth Investigation Into Proposed Acquisition of Arm by NVIDIA (Oct. 27, 2021)) ("the Commission has concerns that the merged entity would have the ability to restrict or degrade access to Arm's technology by providers of processor products NVIDIA may compete with").

[48] FTC Compl. ¶ 8.

[49] *Id.* ¶ 9.

[50] *See, e.g.*, Carl Shapiro, *Vertical Mergers and Input Foreclosure Lessons from the* AT&T/Time Warner *Case*, 59 Rev. of Indus. Org. 303, 305-06 (2021).

[51] FTC Compl. ¶¶ 10-11.

[52] *Id.* ¶ 10.

███████████████████████████████████████████████

time-consuming.[53] To prevent these and other anticompetitive harms, the FTC sued to block the merger.[54]

31.    Arm and Nvidia abandoned the merger amid the opposition from the FTC and other antitrust regulators. But the FTC's criticisms of the merger reflected a broader concern that Arm would and could abuse its power over its ecosystem by entering the SoC business, whether through acquisition of a downstream firm or through other means. If Arm could not increase its margins by merging with Nvidia, it could do so by expanding into the design and manufacture of chips unilaterally. By simultaneously undercutting or eliminating its ALA licenses, Arm would give itself a competitive advantage and force its customers to use OTS cores through TLAs.[55] To do so in a procompetitive manner (e.g., by innovation, competition on price and quality), Arm would need to develop its own chips and improve the OTS cores that were being overtaken by Qualcomm's custom cores.[56] But, consistent with the FTC's logic, Arm had the incentive, and apparently the will, to facilitate its entry into the chip sectors by undermining its profitable relationship with Qualcomm. Arm put this strategy into operation by degrading service under the ALA, for example by failing to provide Arm technology, or negotiate in good faith, while, as an initial step, entering into a contract to supply data center chips for Meta, beginning this year.[57] Arm also increased licensing fees and royalties due under the TLA.[58]

## B. Industry Context

32.    The Arm ISA ecosystem encompasses all of the companies, devices, and software that make use of the Arm ISA.  According to Arm, "[n]o other business ecosystem comes close to this group of silicon, system and software companies" which has shipped more than 310

---

[53] FTC Comp. ¶ 67; ██████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████ effects, *see* Helena Perrone, *Chips in on a Merger: The Arm-Nvidia Case*, 98 Int'l J. of Indus. Org. 103130 (Jan. 2025).

[55] Haas Tr. at 234:10-240:23; Williamson Tr. at 120:18-130:22; Abbey Tr. at 125:7-134:25; ARMQC_02739661.

[56] SAC ¶ 152; QCVARM_1018853; ████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

[57] QCVARM_1012399; ARMQC_02762992; *see also* SAC ¶¶ 12-19, Grisenthwaite Tr. at 157:2-10; Weidmann Tr. at 171:14-72:17, 174:6-22.

[58] For example, *compare* QCVARM_1019083 at -097 (2019 licensing fees for ████████████████
████████████████) *with* QCVARM_0526828 at -829 (2024 licensing fees offer for ████████
████████████ with increased rates).  *See also,* QCVARM_0618354 (Qualcomm's acceptance of increased rates); QCVARM_0618382; QCVARM_0618384 (Arm's further increase of rates for ████████
████████████);
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████

billion Arm-compliant chips to date and includes "over 22 million developers building on Arm."[59] At the top level of the Arm ISA ecosystem is the Arm ISA, which Arm controls.

33.     The Arm ISA. The ISA is a set of instructions that a computer's processor uses to control hardware.[60] Technology companies compete to develop ISAs, some of which are then licensed to chip designers and other companies. There are a limited number of different ISAs that are in common use, including, for example Intel's x86, but, Intel does not license the x86 architecture to third parties, and Intel's chips are less suitable than Arm-compliant chips for a range of devices, especially mobile devices.[61] The Arm ISA has achieved dominance in other sectors of the semiconductor industry, including the chips for mobile devices like smartphones,[62] consumer electronics, and IoT devices.[63] Chip designers who make Arm-compliant chips for mobile phones and certain other products do not treat non-Arm ISAs as substitutes for the Arm ISA. If a company switches to a non-Arm ISA, it would not be able to sell its products in the Arm ecosystem or use the software of the "22 million developers building on Arm."[64] Because many sectors, for example, mobile, are dominated by Arm-compliant products, the developer would be excluded from large sectors. The relevant ecosystem is thus limited to the Arm ISA. Arm alone sells Arm ISA licenses to customers, while, as noted, Qualcomm and many other companies license the Arm ISA. The term "ecosystem" is used by Arm and the industry to describe these relationships because the term evokes multiple companies of different types organizing their businesses around a single technology, one which provides value by coordinating the behavior of the disparate groups or entities.

34.     An ISA ecosystem is characterized by significant entry barriers. Like most intellectual property, an ISA ecosystem features high fixed costs and low marginal costs. An ISA developer must invest significant resources to create the ISA and encourage other firms and software developers to join the ecosystem; once that has occurred, the major variable cost is the

---

[59] ARMQC_02720799 at -799; Arm Ed. Team, *The Arm Ecosystem: Powering AI Everywhere – From Cloud to Edge* (May 19, 2025), https://newsroom.arm.com/blog/arm-computex-2025 (last visited Aug. 5, 2025).
[60] SAC ¶ 46. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Grisenthwaite Tr. at 36:3-14 ("Q. And I think you mentioned this, but just to be clear, Intel does not make x86 available for license; correct? A. I'm not entirely sure what Intel's model has been. They certainly don't have a wide licensing base, but there's a relationship in some way between Intel and AMD and I believe there are some x86 implementations in China. I have no idea what the licensing arrangements from for Intel, so I can't speak definitively for Intel's business model.").
[62] *See* Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025) ("99% of all Smartphones Powered by Arm").
[63] ARMQC_00001136 at -146.
[64] *See supra* note 59; ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
ARM_00089058 at -058 ("Switching that entire world to RISC-V will take a LOT of investment and time, and I am sceptical that ■■■■■ has the patience for such a play[.]"); ARM_00110020 at -029 (switching to a new ISA "[s]eems unlikely," and would require, among other things, "coalesc[ing] an entire hardware architecture at the same times [sic] as building implementations," an "entire software ecosystem of operating system, hypervisors, security compilers, tools, debug, etc. must be created," entire ecosystem "has to make a hard switch from Arm," and loss of "cross-platform opportunity").

virtually costless process of issuing licenses, along with support and the development of
updates.[65]

35.      Other technology companies would have difficulty displacing a dominant ISA
like Arm because they would be required to make an upfront investment in order to develop a
superior ISA, and then would have to pay large sums (or give large discounts off fees and
royalties) to firms in the Arm ecosystem to abandon Arm's ISA for a new ISA that other firms
might never join.[66] Among other things, software companies lack any incentives to produce
software for a competing ISA because Arm does not charge software companies royalties.
Software vendors will want to see significant scale before they invest in a new architecture so
that they will be able to sell to a large customer base.  Additionally, if Arm's anticompetitive
actions are successful and unchecked, firms may be reluctant to risk retaliation by Arm and join
a new ISA whose sponsor may similarly lock firms into a controlled ecosystem only to later
increase rates. Until the new ISA entrant obtains a sufficient ecosystem share, which it might
never accomplish, the entrant may be forced by competition to charge a low price close to
marginal cost, which is to say close to zero. If the ISA entrant does not obtain a large share, the
firm will almost certainly be unable to recover its investment. For that reason, entry will be rare
or nonexistent. Some companies have worked to develop an alternative, open-source ISA known
as RISC-V. ███████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████

36.      <u>Arm-compliant hardware and software</u>. A number of firms that license the Arm
ISA are sellers of Arm-compliant SoCs within the Arm ecosystem. These firms license the right
to sell Arm-compliant cores under the ALA, license Arm designed cores under the TLA, or both.
A licensee may use a combination of its custom designs and Arm's designs in its product.
Qualcomm incorporates both its custom cores and Arm's OTS cores into SoCs. Because the

---

[65] ██████████████████████████████████████████████████████████

██████████ ARM_00110020 at -029 (switching to a new ISA "[s]eems unlikely," and would
require, among other things, "coalesc[ing] an entire hardware architecture at the same times as building
implementations," an "entire software ecosystem of operating system, hypervisors, security compilers, tools, debug,
etc. must be created," entire ecosystem "has to make a hard switch from Arm," and loss of "cross-platform
opportunity"); ARM_00094099 at -113 (describing "Arm's Key Moats").
[66] *See* sources cited *supra* note 65.
[67] *See* sources cited *supra* note 65; *see also* ████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████

███████████████████████

SoCs have different designs and purposes, they serve different sectors. A mobile phone OEM would not treat a data server SoC as a substitute for a mobile phone SoC.[68]

37.    The Arm-compliant SoC ecosystem is complex for another reason. Some firms, like Apple, design CPUs and SoCs for its own devices, like the iPhone. Apple, however, does not sell SoCs to OEMs. Other firms, like Samsung, both develop their own chips internally and buy SoCs from suppliers like Qualcomm. Qualcomm and other firms, for example, MediaTek, sell their chips to downstream OEMs. An OEM thus might regard a chip containing an OTS Arm CPU and a Qualcomm chip containing a Qualcomm custom CPU as substitutes or near substitutes.

38.    

39.    Until recently, Arm did not produce SoCs, and hence did not sell products that compete with Qualcomm's SoCs or those of other chip designers.

40.    SoC designs are highly complex forms of intellectual property. Firms that produce SoCs must invest significant resources to employ engineers and to develop knowhow over time. Qualcomm began manufacturing chips in the 1990s.[71] Today, the major SoC providers are large firms with significant resources.

41.    OEMs buy Arm-compliant SoCs from Qualcomm and Qualcomm's competitors, and incorporate them into the devices they manufacture and sell to customers. Because different Arm-compliant SoCs are designed for different sectors, they are not generally substitutable across sectors. Thus, there is an Arm-compliant mobile phone sector, an Arm-compliant data server sector, and so on. 

42.    Generally, unlike hardware, Arm-compliant software does not require a license from Arm.  Instead, the Arm ecosystem benefits from the widespread adoption of the Arm ISA

---

[71] Nell Walker, *Qualcomm: A History*, Manufacturing Digital (May 16, 2020),
https://manufacturingdigital.com/technology/qualcomm-history (last visited Aug. 5, 2025).
[72] QCVARM_0847188 at -191.
[73] QCVARM_1120153 at -160-161.
[74] *Id.* at -160; *see also id.* at -161 for mobile SoC provider share by revenue.
[75] *Id.* at 40.

to allow developers to design software that functions across Arm-compliant devices.  Arm estimates that today "over 22 million developers" are building on Arm.  According to Arm, "[o]ne of the benefits of the variety of Arm-based chips is the wide range of commercial and open source software the supports them" and that "many engineers have experience working with Arm-based devices."[76]  This robust network for Arm-compliant software further entrenches the Arm ISA ecosystem because OEMs who leave the ecosystem, and their customers, will not be able to take advantage of the software offerings of the millions of developers of software that operates on the Arm ISA.

43.      The dominance of the Arm ecosystem is hard to overstate. In addition to the 22 million developers, virtually every major technology company is involved in manufacturing Arm-compliant chips, installing those chips in devices or infrastructure, or developing software for those devices. More familiar ecosystems like Apple's and Android's are dwarfed by comparison. Indeed, Apple and high-end Android devices use Arm-compliant chips, and so the vast communities of developers for Apple and Android write software that uses Arm's ISA. Intel's better-known x86 system, which is still used on most laptops, powers only a fraction of the devices that rely on Arm's ISA. In 2024, an estimated 29 billion Arm-compliant chips were shipped in various devices, vastly more than the 200 million laptops that were shipped that year.[77] In the interview in which he discussed those numbers, Arm CEO Rene Haas illustrated Arm's ubiquity by identifying all the everyday objects that contain Arm-compliant chips— including automobiles, refrigerators, stoves, thermostats, televisions, gaming consols, smartphones, tablets.[78]  Arm reports that more than 310 billion Arm-based chips have shipped since the 1990s, making Arm's ecosystem "the largest ecosystem in the semiconductor industry."[79] Figure 1 below provides a schematic version of the Arm ecosystem that illustrates the magnitude of its reach.

---

[76] *See The Arm Ecosystem: Powering AI Everywhere – From Cloud to Edge*, Arm Newsroom (May 19, 2025), https://newsroom.arm.com/blog/arm-computex-2025; *Software ecosystems*, Arm Developer, https://developer.arm.com/documentation/102252/0100/Software-ecosystems (last visited August 5, 2025).
[77] QCVARM_0716360 at 5-6.
[78] *Id.* at 4-5.
[79] ARMQC_00001163 at 4.

14

Figure 1. The Arm Ecosystem



## C. Arm's Recent Conduct Relating to Qualcomm

44.    In recent years, Arm has sought to design and sell its own SoCs. For example, it recently finalized a deal to design a data center chip for Meta.[80] In doing so, Arm has become a competitor or potential competitor of its customers. ███████████████████████████
███████████████████████████

45.    In 2024, Arm threatened to cancel Qualcomm's ALA on the grounds that Qualcomm had breached its obligations under the ALA.[82] While Arm withdrew the notice letter after an adverse jury verdict, Qualcomm has alleged that Arm has also engaged in other tactics to undermine Qualcomm, going back multiple years. In particular, Qualcomm alleges that Arm has

---

[80] ARMQC_02762991; ARMQC_02762992; ARMQC_02763016; QCVARM_1012399; Abbey Tr. at 136:20-25 ("████████████████████████████████████████████████████████████."); Couillard Tr. at 122:13-126:24; Williamson Tr. at 121:8-17.  Arm is also in the process of marketing deals to supply chips directly to other OEMs, including ██████.  *See* Williamson Tr. at 125:9-22, 128:16-24; *see also* Haas Tr. at 186:13-198:4. ████████████████████████████████████████████████████

[82] SAC ¶¶ 1, 29-31; QCVARM_1030816.

withheld deliverables under the Qualcomm ALA, refused to negotiate ▮▮▮▮▮▮ an extension to the Qualcomm ALA to cover future version of the architecture, and leaked the notice letter, including to Qualcomm's customers and competitors. In these and other ways, Arm has interfered with Qualcomm's relationship with its customers by sowing doubts about Qualcomm's continued ability to sell Arm-compliant chips.[83] Collectively, these tactics appear to be part of an effort to push Qualcomm away from designing and selling custom chips, with the goal of forcing Qualcomm to rely on Arm's OTS chips or to quit selling SoCs entirely or in particular sectors.

46.     The Meta contract may be only the first step in a longer-term plan to enter other SoC sectors. Indeed, that appears to be the vision of Arm's executives.[84] As Arm develops experience, know-how, and customer relationships in the data center chip sector, it will likely attempt to enter other chip sectors as well, including the lucrative mobile sectors. Qualcomm, which is a significant competitor in the mobile sector, stands in the way.[85]

## V.     Relevant Economic Principles

47.     Economists have developed a framework for determining whether corporate behavior is anticompetitive. While this framework is frequently used in antitrust cases, the framework itself is based on economics, not law. Below I sketch the relevant economic principles on which I rely in order to evaluate Arm's conduct vis-à-vis Qualcomm.

### A.     Competition

48.     Competition means rivalry among sellers for the business of buyers.[86] Competition typically increases with the number of sellers because buyers have more opportunities to switch from one seller to another if the first raises prices. Collusion, coordination, and other forms of anticompetitive conduct also become more difficult to orchestrate as the number of sellers increase. Competition also increases as sellers expand effort to poach buyers from one another, for example, by lowering prices or improving the quality of products. As a general principle, economists favor competition because competition usually results in lower prices and greater output.[87] When competition prevails, sellers vie for business from buyers by lowering prices to marginal cost. Anticompetitive behavior refers to behavior by a firm to reduce competition.

---

[83] SAC ¶¶ 29-37; *see also, e.g.*, ARM_01241585;QCARM_7484477; ARM_01241565; ARM_01241577; QCARM_7484481; QCARM_7477120; QCARM_7484471; ARM_01241285; QCARM_7509431; QCVARM_0857152; ARMQC_02778180; ARMQC_02771126; QCVARM_1120481; QCVARM_1119108; ARM_00110511; ARM_01215564; ARM_01215886; ARM_00079520; ARM_00079530; ARM_00082009; ARM_00094197; ARM_00094200; ARM_00094204; ARM_01215888; ARM_01215889; ARM_01215486; ARM_01231038; ARM_01215885; ARM_00110513; ARM_01215887; QCVARM_0847094.
[84] Michael Acton, *Arm to explore designing its own chips, CEO says*, Financial Times (July 30, 2025), https://www.ft.com/content/735c8a2d-0ce0-49d6-934f-8aee3e927108.
[85] QCVARM_1120153 at 12-14.
[86] *See* John Vickers, *Concepts of Competition*, 47 Oxford Economic Papers 1, 3 (1995).
[87] *Id.* at 4-7.

16

49.    Firms that compete with each other for customers do so by offering similar goods and services. When goods are identical, they are referred to as "substitutes," and firms that sell substitutes can obtain a competitive advantage only by offering lower prices. Many goods are similar but not identical; they can be called "near substitutes." Firms may compete with each other by offering near substitutes that have somewhat different prices and/or characteristics. This process is known as "differentiation." Differentiation of products takes place as firms compete with one another by innovating, improving the quality of products, and varying the characteristics of products so as to attract customers from the firms' rivals. Generally speaking, when products are closer substitutes, competition is more intense; but competition can exist even when products are near substitutes because some customers may be indifferent between near substitutes despite their different attributes or qualities. A characteristic way of identifying a monopolist is to determinate that it is the only firm (or a large firm with only a few small competitors) that sells a product for which there are no substitutes or no or few near substitutes. Such a firm has monopoly power, meaning the ability to profitably charge prices above marginal cost.

## B.  Input Foreclosure

50.    Input foreclose is a kind of anticompetitive behavior that takes place when a firm has both a "vertical" (buyer-seller) relationship and a competitive relationship with the counterparty. Input foreclosure may be defined as a dominant firm's denial of access to a critical input that another firm needs to buy in order to sustain its business, with the intent or effect of achieving monopoly power in that downstream sector.[88] In a common scenario, Firm A sells goods or services ("inputs") downstream to a group of buyers. Firm A faces no or little competition so it can set the price above marginal cost. Buyers must pay this higher price because the input is critical to their business and they cannot turn to another supplier. Firm A can raise the production costs of downstream buyers by raising the price of the inputs, reducing their quality, or cutting off (or reducing) the supply of inputs. Firm A thus can be thought of as a bottleneck from the standpoint of customers.

51.    Rather than charge buyers the same monopoly price, Firm A may be able to increase its profits by discriminating against certain downstream firms and favoring other downstream firms with the goal of driving the first group out of business. Facing no competition from the disfavored firms, the favored firms can increase the prices they charge their own buyers, as those buyers will no longer be able to buy from the disfavored firms. In some settings, Firm A might demand a cut of the monopoly profits of the favored downstream firms. In other settings, Firm A might actually own the downstream firm—that is, the upstream seller and the downstream buyer are two divisions of the same Firm A. Firm A might have acquired the downstream firm through a vertical acquisition or expanded downstream unilaterally.[89]

---

[88] *See* Patrick Rey & Jean Tirole, *A Primer on Foreclosure*, 3 Handbook of Industrial Organization 2147, 2148 (2007).  Some scholars use the term "foreclosure" to refer only to complete denial of access to inputs.  Other terms, including "raising rivals' costs," may be used to refer to the practice of raising the price or reducing the quality of inputs.  I will refer to both types of activity as foreclosure, and will distinguish the latter where context requires as "partial foreclosure."

[89] The economic literature on vertical foreclosure is very large.  At one time, it was frequently asserted that vertical integration by a monopolist rarely causes harm.  But that view has been decisively rebutted by a wave of literature

17

52.     In the latter case, where Firm A both controls the upstream input and does business downstream in competition with other downstream firms, Firm A may have an incentive to disadvantage the downstream firms as described above. In some cases, Firm A might engage in such burdensome discrimination (for example, higher prices, lower quality, worse service) that the downstream firms will be completely foreclosed, leaving Firm A with a dominant position both downstream and upstream. But input foreclosure can cause anticompetitive harm even if the downstream firms are not foreclosed entirely. Firm A might choose to raise prices or reduce quality sufficiently to give its downstream division a competitive advantage over the other firms, but not so much as to drive those firms out of business. Partial foreclosure of this type may be more profitable than complete foreclosure because some of the downstream firms have competitive advantages that Firm A's downstream division cannot defeat in the short term—for example, the ability to manufacture end products that are preferred by niche customers. In such a case, differentiation exists: some customers prefer the product even if its price is higher than Firm A's downstream product because they benefit from the distinguishing characteristics of that product. But the outcome is still anticompetitive. Firm A benefits in two ways: It continues to receive royalties from the remaining downstream firms; and, facing less downstream competition, Firm A can charge higher prices to all other downstream customers.

53.     Economists have developed a standard framework for determining whether input foreclosure is anticompetitive. First, one determines whether the firm in question has the ability to raise prices for or otherwise harm the downstream buyers. Second, one determines whether the firm has an incentive to raise prices for the downstream buyers. The firm has an incentive to raise prices if it gains more by obtaining the business of the crowded-out downstream buyers than it loses from the loss of downstream buyers' purchases of inputs from the firm. If the answer to both questions is yes, then the firm's behavior is likely anticompetitive, though the anticompetitive impact may be mitigated if vertical integration produces efficiencies. This mode of analysis is typically called the ability/incentive framework.[90]

54.     Upstream monopolists can cause other types of anticompetitive harm. For example, when a monopolist displaces downstream competition, it can reduce the risk it faces that a downstream firm will integrate upstream. Vertical integration thus may not only result in a downstream reduction in competition. It may also result in greater protection of the upstream monopolist from upstream competition.[91] And where an upstream monopolist obtains a downstream monopoly, it may raise entry barriers at both levels of the supply chain. Since the upstream division can refuse to sell to a downstream entrant, and the downstream division can refuse to buy from an upstream entrant, firms that seek to enter either market must enter both— which will be riskier and more expensive. Finally, an integrated firm with monopoly power in one or more of the two markets may abuse its access to information that it obtains from counterparties so as to improve its market power and save costs.[92] If this behavior takes place,

---

reaching back decades. *See, e.g.*, Oliver Hart et al., *Vertical Integration and Market Foreclosure*, 1990 Brookings Papers on Economic Activity: Microeconomics, 205–285 (1990); Janusz A. Ordover et al., *Equilibrium Vertical Foreclosure*, 80 American Economic Review, 127–142 (1990).  Rey & Tirole, *supra* n. 88.

[90] Shapiro, *supra* n. 50.

[91] Chiara Fumagalli & Massimo Motta, *Dynamic Vertical Foreclosure*, 63 J. of L. and Econ. 763-812 (2020).

[92] *See* Marie-Laure Allain et al., *Vertical Integration as a Source of Hold-up*, Toulouse School of Economics, Working Paper n. 14-525 (2014).

then firms will be reluctant to enter and compete in the market, resulting in higher prices and less innovation.

## VI.   Economic Analysis of Arm's Conduct

### A.  Arm's Dominance of the ISA Technology

55.    Arm dominates the Arm ISA ecosystem through its control of the Arm ISA technology. Arm alone controls access to design, manufacture and sale of Arm-compliant hardware. It grants access by issuing licenses, which either permit licensees to design and sell custom CPUs or permit licensees to use Arm's OTS hardware in Arm-based SoCs.  Firms that produce Arm-compliant SoCs and cores under one of the Arm licenses cannot substitute to non-Arm ISA licenses if Arm raises the price of its licenses substantially above marginal cost.[93] If, for example, Qualcomm lost its licenses with Arm, Arm would likely litigate to prevent Qualcomm from selling Arm-based chips. Customers may refuse to buy chips from Qualcomm if Qualcomm built on another ISA because Qualcomm's new chips would no longer be Arm-compliant and compatible with other devices and software in the Arm ecosystem.  Arm-based software developed by the robust network of "over 22 million developers," would not run on non-Arm-compliant chips. Rather than lose its business, Qualcomm would pay a higher price to Arm.

56.    Arm's dominance developed out of its open and neutral licensing policy, which encouraged widespread adoption.  As a result of that widespread adoption, Arm is now entrenched. Licensees are not willing to give up Arm licenses because if they did, then they would not be able to sell Arm-compliant products across the ecosystem. The Arm ecosystem includes both the hardware producers who design and sell Arm-compliant cores and SoCs and millions of developers working on software for the Arm ecosystem.

57.    Arm's ecosystem is protected by entry barriers. Because so many companies specialize in Arm-compliant products, a firm that sought to develop a new ISA would have to not only produce a superior ISA. It would also have to persuade firms in the Arm ecosystem to give up their existing customers and develop products for a not-yet-existing set of customers. Existing ISAs, like Intel's x86, are not as well suited to the sectors that are dominated by the Arm ISA, such as mobile which benefits from the Arm ISA's power-efficient qualities. ██████

---

[93] ARMQC_02727610 at -617 (As explained by Arm, "[e]verything has to be able to run everywhere" and a "strong eco-system of users is vital." Thus, "Arm's success has come from the wide accessibility of its architecture" and Arm's "fostering of an enormous ecosystem of developers."); ████████████████████████████████

[94] Conversation with Durga Malladi, Qualcomm's Senior VP & GM of Technology Planning, Edge Solutions & Data Center.

██████████████████████████████████████

58.     Arm's dominance is widely recognized by the industry.[95] Arm itself says that "99% of all smartphones [are] powered by Arm."[96] Arm's ISA has no rivals at all in the Arm ecosystem for the simple reason that Arm demands that a license is necessary to design and sell Arm-compliant SoCs or cores. Arm's behavior also exhibits characteristics of a monopolist. For example, Arm has increased royalty rates under the TLA in a way that does not appear to be based on the underlying costs of maintaining the Arm ecosystem,[97] ████████████████████████████████████ To be sure, in some sectors, like data centers and compute, OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips. But the Arm ISA is rapidly gaining share in some of those sectors, including data centers.[99]

## B.  Qualcomm's Role in Arm-Compliant Hardware

59.     Qualcomm designs Arm-compliant SoCs that are used in various technology sectors. In designing the SoCs, it uses its own custom core designs under the ALA, Arm's OTS cores and other IP under the TLA, and Qualcomm's proprietary intellectual property. Fabrication is outsourced. Qualcomm sells the SoCs to OEMs.

60.     Qualcomm's SoCs are designed for specific technology sectors, including mobile, compute, wearables, AR/VR, and data servers. ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[95] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

[96] *Id., see also* Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025); ARMQC_00001038 at -067.

██████████████████████████████████████████████

[98] QCVARM_1018853; ████████████████████████████████████████

███████████████████████ Conversation with Durga Malladi, Qualcomm's Senior VP & GM of Technology Planning, Edge Solutions & Data Center; Mike Johnson, *Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025*, WebProNews (July 31, 2025), https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/; *see also* Mohamed Awad, *Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm-based*, Arm Newsroom (April 1, 2025), https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based.

████████████████████████████████

[102] QCVARM_1120153 at 40.

[REDACTED]

[REDACTED] [4]

61.     In each sector, Qualcomm faces varying degrees of competition from other chip makers. [REDACTED]

[REDACTED]

62.     Many OEMs depend on Arm-compliant chips. In the mobile sector, for example, according to Arm "99% of all Smartphones [are] Powered by Arm."[108] In other sectors, the Arm ISA is used to varying degrees, including 32% of consumer electronics, 10% of cloud compute, 26% of networking equipment and 16% of other infrastructure, 41% of automotive, 65% of IoT and embedded products.[109] OEMs cannot realistically switch to other ISAs where Arm's ISA has become the de facto standard, for example, in the mobile sector.[110] [REDACTED]

[REDACTED] OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers.[112]

---

[103] QCVARM_0847548 at 6.

[104] *Id.*

[105] QCVARM_1120153 at 8.

[106] *Id.* at 7-14; [REDACTED]

[REDACTED]

[108] *See* Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025).

[109] ARMQC_00001038 at -067.

[110] *Id.*

[111] [REDACTED]

[112] *See e.g.*, *Arm Ltd. v. Qualcomm Inc.*, DTX_000936 ("Snapdragon X Elite gets benchmarked, completely dunks on Apple's M2 processor"), *Arm Ltd. v. Qualcomm Inc.*, DTX_000937 ("[p]ound-for-pound, the Snapdragon X platform powered by the Qualcomm Oryon CPU can take on and beat Apple's M series chips at its own game.");

███████████████████████████████████

63.     Qualcomm is one of Arm's largest customers. It paid 10% of Arm's revenues in the fiscal year ending in 2024.[113]

### C. Arm's Strategy of Input Foreclosure

64.     Arm has taken steps to design and sell its own SoCs. For illustrative purposes, I focus on the data center sector, though Arm's intentions to sell SoCs extend beyond the data center sector. Arm has already entered into a contract to supply data center chips for Meta, beginning this year.[114] ████████████████████████████████████
████████████████████████████████████████████████████ ██████████████
According to Arm, it currently has a ████████████████████████████████
████████████████████████[116]  At the same time, Arm has taken steps to undermine Qualcomm's position in the broader SoC ecosystem as well as the data center-specific SoC sector. Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector.

### 1) Ability

65.     Arm has the ability to foreclose Qualcomm from the Arm-compliant data center-specific SoC sector as well as other sectors. The reason is that these sectors are part of the Arm ecosystem, and Arm's control over its ecosystem allows it to discriminate against firms that participate in the ecosystem despite Arm's earlier promises to keep the system open. Firms can survive in the Arm ecosystem, or in Arm-compliant sectors only as long as they are able to make Arm-compliant products under one of Arm's licenses. Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm. There is evidence of several such actions.

- *Failure to provide Qualcomm with certain deliverables in violation of the ALA.* Arm failed to provide certain technology related to verifying compliance with the Arm ISA.[117] Arm withheld sets of reference reports, known as the "OOB," providing the specific compliance tests needed by Qualcomm to verify compliance, as well as information on expected test failures that are also used in the verification process.[118]  Arm has also withheld replacement tests, known as "ACK patches," that fix defective tests used in the compliance testing process.[119] Arm's failure to provide deliverables, even if remedied, shows that Arm is committed to finding ways of

---

█████████████████████████████████████████████████████████████████████
████████████████████████████████████████

[113] ARMQC_00000640 at -646 (ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024).
[114] QCVARM_1012399; ARMQC_02762992.

██ ████████████████████████████████████████████████████████████████████

[116] ARMQC_02739661 at -666.
[117] *See, e.g.,* SAC ¶¶ 78-80, *see also* ¶¶ 81-101; ARM_01241585;QCARM_7484477; ARM_01241565; ARM_01241577; QCARM_7484481; QCARM_7477120; QCARM_7484471; ARM_01241285.
[118] *Id., see also,* ██████████████████
[119] *Id.*

22

██████████████████████████████

underperforming its contract, and in so doing degrading Qualcomm's ability to commercialize Arm-compliant products. Finally, Arm's failure to cure and related actions indicate that Arm may be acting in bad faith.

- *Failure to provide Qualcomm with* ██████ *licensing proposals under the TLA*. Arm failed to respond, sometimes for months, to requests for TLA licenses for OTS cores, and then made only ██████ proposals (with unreasonable price terms, among other things).[120] For example, Qualcomm requested licenses to OTS cores named ██████ ███████████████ as well as peripheral IP at least as early as April 2024, but did not receive an offer from Arm until October 24, 2024 ██████████████████████████ ██████████████████████████████████████████████. Qualcomm may accordingly find it difficult to believe, or to convince its customers, that it can continue to rely on Arm to comply with the licenses in good faith.

- *Refusal to negotiate an extension of the ALA to cover future versions of Arm's ISA*. In 2020, Qualcomm informed Arm that it sought to extend its license to cover future versions of the ISA over the next ██████████████.[122] Arm did not respond until after Qualcomm followed up with an additional request in 2024, during the pendency of this litigation and after Qualcomm learned Arm had been showcasing v10, a future version of the Arm ISA.[123]  Even now, Arm has not provided a ██████ proposal to Qualcomm for a license to v10.[124]

- *Misinformation campaign*. Arm conducted a misinformation campaign designed to undermine customers' confidence in Qualcomm.[125] The campaign included leaking the notice letter that Arm sent to Qualcomm and sending "confusing" and "misleading"

---

[120] QCVARM_0526828; ████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ *See also, e.g.,* QCARM_3460976; QCARM_3460981; QCARM_3424399; QCARM_3424873; QCARM_3424233; QCARM_3433633; QCARM_3428243; QCARM_3522626; QCARM_7517677.
[121] QCVARM_0616970 at -974; QCVARM_0526828; ███████████████████████
[122] QCARM_7509431.
[123] QCVARM_0857149; QCVARM_0857152.
[124] ARMQC_02778180; ARMQC_02771126; QCVARM_1120481; QCVARM_1119108.
[125] ARM_00110511; ARM_01215564; ARM_01215886; ARM_00079520; ARM_00079530; ARM_00082009; ARM_00094197; ARM_00094200; ARM_00094204; ARM_01215888; ARM_01215889; ARM_01215486; ARM_01231038; ARM_01215885; ARM_00110513; ARM_01215887.

messages to customers of Arm and Qualcomm that suggested that they faced legal jeopardy if they used Qualcomm products.[126]

- *Reduction in general support*. Because Arm and its licensees all benefit from a vibrant ecosystem, Arm has traditionally arranged various forms of support, including meetings during which employees of Arm and its licensees exchange ideas. Arm has in recent years disinvited Qualcomm employees from these meetings.[127]

66.    These actions have demonstrated that Arm has the ability to foreclose.  Arm is pivoting from its open, neutral model—where it treats its customers in a nondiscriminatory manner, benefits from attracting as many licensees as possible, and therefore provides adequate support to its licensees—to a different model, one in which it forecloses customers in sectors that Arm seeks to enter.

### 2)    Incentive

67.    Arm has an incentive to engage in input foreclosure in sectors where the potential long-term gains from taking business from licensees exceed the short-term loss of royalties on the products that the licensees no longer sell.

68.    Figure 2 provides a simplified diagram of Arm's and Qualcomm's position in the ecosystem under Arm's earlier model of being a neutral sponsor of its ISA (left panel), and of Arm's apparent goal of entering the downstream chip design and manufacture level of the supply chain (right panel). As is immediately apparent, Arm's entry converts it into Qualcomm's competitor in high-tier chip design and manufacture. Arm is now both supplier and competitor: Qualcomm must both depend on Arm for an essential input—the ISA license and support—and compete with Arm to produce the best chips. Arm's incentive is no longer to sell as many licenses as possible, as it was when it could make money from Qualcomm only from license fees and royalties. It will balance the gains from selling an additional license against the gains from eliminating competition downstream.

---

[126] *Id. see also* QCVARM_0847094; December 12, 2023 Haas Tr. at 237:24-238:5; December 16, 2024 *Arm Ltd. v. Qualcomm, Inc.* CA No. 22-1146 Trial Tr. at 328:15-329:22 (Cross examination of Rene Haas).
[127]

Figure 2. Input Foreclosure



69.     For illustrative purposes, I focus on the data center sector. Arm supplies an essential input to chipmakers in the form of Arm ISA licenses. Arm earns an upstream margin on those licenses roughly equal to the royalty rate that licensees pay. Qualcomm is one such licensee, and it in turn earns (or will earn) a downstream margin on sales of Arm-compliant data center chips to data centers. Arm enters the data center chip sector—in effect, licensing itself to manufacture Arm-compliant chips—and competes with Qualcomm. Arm earns a downstream margin, based on the royalties it earns from OEMs ▮▮▮▮▮▮.

70.     If Arm is able to cut off technology supply for Qualcomm completely, then Arm loses its upstream margins on the Qualcomm license. However, Arm would gain downstream sales and the downstream margins that they produce, assuming that Arm is a viable competitor in the downstream market either through organic entry or through acquisitions. Figure 3 illustrates these dynamics. By degrading Qualcomm's access to the ISA and related technology (1), Arm forces Qualcomm to raise prices or reduce quality of chips it sells to OEMs. OEMs respond by shifting some of their supply to Arm in a process economists call "diversion." Arm gains revenues from diversion even as it potentially loses revenues as Qualcomm pays less in royalties on fewer sales (2). Because of Qualcomm's weaker competitive position, Arm can also raise prices or reduce quality in sales to OEMs (3).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Figure 3. Diversion



71.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮.[128] Even if Qualcomm's sales are not diverted to Arm, but to other competitors using OTS cores, Arm will still make more upstream margin from licensing to those other competitors than from licensing to Qualcomm under the ALA. Further, if Arm is a viable competitor downstream and is able to capture even some small portion of diverted sales from Qualcomm, that creates additional incentive to foreclose Qualcomm. This is because downstream margins on chip sales to data centers are likely to be higher than upstream margins for licensing.  The more of Qualcomm's potential share that Arm can capture after foreclosing Qualcomm, the stronger its incentive to foreclose Qualcomm.

72.  It is possible that Arm would maximize profits by completely destroying Qualcomm's business opportunities in certain sectors even though it would suffer a short-term loss of royalties. If Arm had been able to follow through on its threat to cancel the ALA, that is what would have happened. But even if Arm does not succeed in foreclosing Qualcomm entirely, Arm would still benefit from partially foreclosing Qualcomm in certain sectors. For example, if Qualcomm has special relationships with some of its customers, a good reputation in a sector, niche abilities, and other advantages, Arm might continue to benefit from Qualcomm as a chip supplier of Arm-compliant chips for certain sectors for the time being while displacing

---

[128] ARMQC_02727610 at -619 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); QCARM_0343120 at -139; QCARM_0338573 at -576 (Over a 15-year term under the Qualcomm ALA Annexes for the v8 and v8 Next architectures, Qualcomm agreed to pay ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮);
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ Grisenthwaite Tr. at 26:20-30:21. The industry view appears to be the same. *See* ARM_01424394 at -395 ("All else being equal, TLAs are more expensive with higher royalty rates than ALAs as TLAs offer greater value add and relieve the chip design companies of significant design work").

Qualcomm in other sectors. In that way, Arm continues to benefit from royalties in some sectors while taking over other sectors by degrading Qualcomm's ability to compete in those sectors. Whichever the case, the downstream OEMs will either pay more for chips or be required to settle for lower-quality chips, to the detriment of the ultimate consumer.

73.     Other factors highlight the anticompetitive risk of Arm's conduct.

74.     First, Arm has a strong incentive to foreclose Qualcomm from selling custom cores under the ALA because Qualcomm will both be forced to switch to higher-royalty OTS cores and will lose downstream SoC business to Arm.[129] Arm thus gains in two ways—through higher upstream TLA royalties from Qualcomm (for example, from the sale of undifferentiated SoCs that incorporate the OTS cores) and higher downstream chip sales at the expense of Qualcomm (as Arm captures diverted sales in the higher-tier SoC business).

75.     Second, where the downstream portion of the ecosystem is already concentrated (e.g., mobile), input foreclosure would likely give Arm substantial downstream power, enabling it to raise prices both unilaterally and potentially through coordination or collusion with any remaining downstream competitors.

76.     Third, Arm's input foreclosure is likely to reduce entry to the chip design and manufacture ecosystem. Entry is possible only if Arm grants licenses to the firms and refrains from degrading support to firms that already have licenses. Arm would have no reason to do so because that behavior would reduce its power in the lucrative downstream portion of the ISA ecosystem. This will ultimately prevent other firms from being able to compete away Arm's downstream margin.

77.     Fourth, foreclosure of the Arm ISA may impede innovation. ███████████████████████
███████████████████████████████████████████████████████ Moreover, if Arm's chips were superior, then Arm would not need to undermine Qualcomm's access to the ISA. Fair competition allows one firm to prevail over another through innovation— and thus encourages innovation.

78.     Fifth, if Arm substantially weakens Qualcomm's ability to participate in Arm's ecosystem, as it tried to do by terminating Qualcomm's ALA, then it may raise upstream barriers

---

[129] If Arm keeps its most advanced cores to itself and only uses them in its own SoCs rather than supply them to TLA licensees, the only SoC supplier that can differentiate is Arm.

[130] *See e.g.,* ████████████████████████████████████████████

of entry against upstarts like RISC-V.[131] RISC-V is a threat to Arm's dominance, as Arm is well aware.[132] According to James Ashton's book, *The Everything Blueprint*, Arm has attempted to spread "fear, uncertainty, and doubt" about RISC-V.[133] Among other things, Arm launched a website with the web address "riscv-basics.com," which was "designed to plant seeds of doubt in the minds of developers who might use RISC-V as their processor architecture instead of Arm."[134] ███████████████████████████████████████ ████████████████████████████ ████ ███████████ ██████████████████████████████████████ Moreover, other licensees will have an incentive to reduce their investment in the Arm ecosystem as they see Arm abuse its own licensees. While the firms might manage to migrate to RISC-V in the long term, in the short term there will be disruption and loss of innovation.

79.    Some economists believe that input foreclosure is justified if the dominant firm charges lower prices to the customers that it obtains from the foreclosed firm.[136] This is a controversial view, as it would justify the monopolization of downstream markets, which is anticompetitive behavior regardless of the impact on prices, not to mention the harm to innovation and quality. And if Arm dominates the downstream portion of the ecosystem as well as the ISA itself, entry will be extremely difficult.

### D. Arm's Violations of Its Neutrality

80.    From its founding, Arm branded itself the "Switzerland of chips" by committing itself to license the Arm ISA to companies on an "open, neutral" basis.[137]  Arm believed that it could establish the ARM ISA as a global standard through a model of open licensing. Arm "introduced the IP business model, which was not common at the time. This meant the Arm processor was available to be licensed to many different companies for an upfront license fee and

---

[131] Chiara Fumagalli & Massimo Motta, *Dynamic Vertical Foreclosure*, 63 J. of L. and Econ. 763–812 (2020)..

[132] *See* QCVARM_1066820 at -164-165 (describing Arm's efforts to spread "fear, uncertainty, and doubt" about RISC-V).

[133] *See* QCVARM_1066820 at 164-165 (describing Arm's efforts to spread "fear, uncertainty, and doubt" about RISC-V).

[134] *Id.*

[135] RISC-V, *Members*,  https://riscv.org/members/ (last visited August 5, 2025); Conversation with Durga Malladi, Qualcomm's Senior VP & GM of Technology Planning, Edge Solutions & Data Center.

[136] *See, e.g.*, Shapiro, *supra* n. 50.

[137] FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees"); ███████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████

28

then royalties based on the amount of silicon produced."[138] Sir Ron Saxby, a former Arm CEO explained: "We also bet everything on assembling a worldwide customer base, creating a global standard with companies who traditionally competed with each other, molding them into a partnership, pulling in the same direction, and united around one architecture that evolved over time.  This unique combination made us into a force much larger than the sum of the parts."[139] Likewise,  Hermann Hauser the co-founder of Arm stated:  "The whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees.  That wasn't lost on the regulators in the UK, the U.S., EU and China."[140]

81.    As recently explained by Arm's former Vice President for External Communications:[141]

So yes, we often -- that phrase, you know, We are a neutral player, we are the Switzerland semiconductors, often was something that the company spokespeople would -- would regularly repeat. It wasn't a new thing. Licensing technology to anyone who wanted to pay for it.

. . .

Q. The -- you say that that phrase, "neutral player," and "Switzerland of semiconductors" was something you were familiar with and the company spokespersons use. Was that throughout your time --

A. Yes.

Q. -- at Arm?

A. Yes.

Q. Okay. And when you refer to "company spokesmen" in that context, that would include external communications?

A. Yes.

. . .

Q. Okay. And when you say, "company spokesmen," using that phrase, "Switzerland of semiconductors" or "neutral player," are you referring to any company spokesperson, generally, categories of spokespeople other than external communications?

---

[138] Arm.com, *The Official History of Arm*, https://newsroom.arm.com/blog/arm-official-history (last visited August 8, 2025).
[139] Mobile Unleashed, *The Origin and Evolution of ARM Processors In Our Devices*, (December 2015) semiwiki.com/books/Mobile%20Unleashed%20-%20front%20to%20back.pdf, at vii.
[140] Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-08/.
[141] Hughes Tr. at 78:23-81:3.

A. That would be -- again, in my role, I heard that phrase often repeated by company spokespeople or executives in press interviews.

Q. Okay. And you would have heard that from high-level executives of Arm in press interviews; is that right?

A. Of course, over the years. I mean, again, from when I started in 2013, that was a phrase that was often repeated. I don't know exactly who, when, but it was often repeated.

82.    This commitment meant that Arm would allow its licensees to rely on the Arm ISA as they expanded into new sectors of the semiconductor industry without worrying that Arm would ultimately withdraw support or enter those same sectors as a competitor.[142] Arm apparently believed that this strategy served its own interests as well as those of its licensees, as it would ensure that the Arm ISA would prevail over competing ISAs that might be developed by other technology firms.[143]

83.    The industry responded favorably to Arm's novel business model. And as more and more firms joined the Arm ecosystem, network effects kicked in. The Arm ecosystem became more valuable and then essential for a large portion of the semiconductor industry.[144] Today, having spent decades investing in an ecosystem of software and hardware surrounding the Arm ISA, industry members are effectively "locked-in" to the Arm ISA, thereby putting Arm in a position to "hold-up" participants needing its ISA.

84.    Arm, meanwhile, benefited from the fees and royalties it received from its licensees who, by successfully penetrating new sectors of the semiconductor industry, carried the Arm ISA with them. The licensees establish the dominance of the Arm ISA as they attracted more and more software developers to produce software that ran on Arm-based chips, who in turn attracted to Arm's ISA more hardware manufactures whose devices could run on that software.

85.    Arm's revenues increased as it gained more licensees and those licensees sold more chips and paid more royalties.  But despite the increasing demand for Arm ISA licenses,

---

[142] Conversation with Gerard Williams, Qualcomm Senior VP Engineering; *see also* Arm, *The Official History of Arm* (August 16, 2023), newsroom.arm.com/blog/arm-official-history ("In 1993, the Apple Newton was launched on the Arm architecture. However, the product was not a commercial success, which led to Saxby realizing that Arm as a company could not be sustained on single products. He introduced the IP business model, which was not common at the time. This meant the Arm processor was available to be licensed to many different companies for an upfront license fee and then royalties based on the amount of silicon produced.").

[143] *See* Mobile Unleashed, *The Origin and Evolution of ARM Processors In Our Devices*, (December 2015) semiwiki.com/books/Mobile%20Unleashed%20-%20front%20to%20back.pdf, at vii (Arm "bet everything on assembling a worldwide customer base, creating a global standard with companies who traditionally competed with each other, molding them into a partnership, pulling in the same direction, and united around one architecture that evolved over time."); Rene Haas in ACQ2 by Acquired Podcast, *How Arm became the worlds default chip architecture with ARM CEO Rene Haas* (December 2, 2024),
https://open.spotify.com/episode/2sxLw7ti6tC7xr3NQnphXG?si=KMdhxFHlQMqtGupg_c6kjA&nd=1&dlsi=ba9cf1c344524296, at 50:00 (According to Arm's CEO, one of the things in Arm's "favor" is that Arm "has an open model, that [Arm's] products can be built by any fab, by any company.").

[144] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

Arm could not push up royalty rates. As related in James Ashton's book, *The Everything Blueprint*:

> The question of why Arm did not push up its royalty rates was not a new one. Quizzed on the subject around the time he became chief executive in 2013, [then-CEO Simon] Segars responded: "We could do that and we could probably enjoy some more revenue for some time, but our customers would go off and do something else or have less healthy businesses. If we tried to extract lots of money out of the ecosystem, we'd have less companies supporting the Arm architecture and that would limit where it could go."[145]

86.     That appears to be no longer true today. More than a decade later, Arm's ISA has reached such a level of dominance that licensees can no longer easily walk away. Now Arm seeks not only to raise royalty rates, but to design and manufacture SoCs, in a "dramatic departure from its traditional business model."[146] Its behavior has alarmed Qualcomm because Qualcomm will be required to compete with the supplier of a vital input—the licenses that allow Qualcomm to manufacture Arm-compliant chips.

87.     Arm has already threatened to terminate Qualcomm's ALA, reversing its longstanding business model as the "Switzerland of chips," so that it can both increase the royalty rate, as it has done for the TLA, and take Qualcomm's SoC business.[147] Having failed to persuade a court or jury that Qualcomm's CPU products were not covered by its ALA, Arm has adopted the indirect strategy of driving Qualcomm out of business and taking its margins. As customers flee Qualcomm to Arm, Arm will lose money in foregone royalties in the short term. But, Arm hopes to obtain larger margins in the long term as it takes over Qualcomm's business or Qualcomm is pushed to increasingly make use of Arm's OTS cores.

88.     Arm's CEO, Rene Haas, has recently confirmed that Arm no longer wishes to keep its prior commitments and instead plans to cut off ALA licensees and sell SoCs directly to OEMs, such as data centers, automobile companies, and mobile phone manufacturers.   Rene Haas said that Arm's interest in whether to accept a prospective customer depends on "whether your business is a chip business [such as Qualcomm] or a product business." [148]

89.     Arm's conduct portends significant competitive harm to the semiconductor industry that has so heavily relied on Arm's original open business model. As the FTC explained in opposing Arm's merger with Nvidia, competition between Arm and its licensees would result in "a critical loss of trust in Arm by its own licensees" who will be "less likely to share competitive sensitive information with Arm" because Nvidia would be able to use this information for its chip design.[149]

---

[145] QCVARM_1066820 at -6942, -7154.
[146] Financial Times, *How Arm could be the unexpected winner of the AI investment boom* (October 30, 2024), www.ft.com/content/80a1e79e-b662-40e9-9b41-6d1070f694a8?FTCamp=engage/CAPI/website/Channel_muckrack//B2B.
[147] QCVARM_1030816; QCVARM_0847094.
[148] Bloomberg Technology, *Arm CEO on Intel, Chips, AI, Listing in US* (October 22, 2024), www.youtube.com/watch?v=6FnBz8rxWUY, at 15:20-16:00.
[149] FTC Compl. ¶ 10, as discussed *supra*, ¶ 30.

90.     As the industry observes Arm's mistreatment of Qualcomm, firms will become less willing to invest in the Arm ecosystem. Their incentives to invest are reduced because the more successful they are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them. Arm will have a greater incentive to enter those sectors by degrading the licensees' access to the Arm technology while producing its own chips for those sectors. Rather than invest in new Arm-compliant products, firms will look for ways to escape the Arm ecosystem, for example, by collaboratively or unilaterally developing an alternative ISA. The early development of the open-source ISA, RISC-V, may reflect this concern. But in the meantime, Arm's licensees will become "less healthy," to use Mr. Ashton's term, as they cut back on sharing information with and cooperating with Arm. Arm's ISA will degrade in the short term, while a shift to another ISA ecosystem in the longer term will require massive new investment and delay further development of high-quality chips at a time of significant public concern about America's competitiveness in the technology industry.

I declare under penalty of perjury that the foregoing is true and correct.

_____                                8/8/2025

_____                                _____

Eric A. Posner                                           Executed on

**Annex 1. Consulting Engagements Since 2020**

- Stephens v. American Arbitration Association (2025). Advised defendant on antitrust litigation.
- In re Broadcom (2025). Submitted report on anticompetitive behavior of employer relating to its employees. Retained by Seppinni Law, counsel for plaintiff employees.
- Sona Asset Management (2025). Advised financial institution about legal issues relating to challenges to tariffs.
- Le v. Zuffa (2024). Provided expert report supporting a proposal to settle a lawsuit brought by employees of mixed martial arts league against their employer. Retained by Berger Montague, attorney for plaintiffs.
- Department of Justice (2024). Advised on investigation of a potential merger between two entertainment-related entities. The facts are confidential.
- Sona Asset Management (2024). Advised financial institution about legal issues in Tapestry/Capri merger litigation.
- Ford Motor Co. (2021-2022). Advised automobile manufacture on antitrust strategy relating to distribution.
- Difederico v Amazon.com, Inc. et al., No. T-445-20 (Federal Court, Canada) (2021). Advised on arbitration issues relating to class action lawsuit against Amazon in Canada. Served as expert; retained by Orr Taylor LLP and Strosberg Sasso Sutts LLP.
- Latham & Watkins (2020). Advised law firm on draft commercial code for proposed foreign development zone in middle east.

## Annex 2. Curriculum Vitae

**Eric A. Posner**                                                          **August 2025**

**Address**         University of Chicago Law School
                    1111 E. 60th St.
                    Chicago, IL 60637
                    (773)702-0425
                    eposner@uchicago.edu

**Professional Experience**

2013-present    Kirkland & Ellis Distinguished Service Professor of Law, University of Chicago
Fall 2024       Visiting Professor, Yale Law School
2022-2023       Counsel to the Assistant Attorney General, Antitrust Division, Department of Justice
Fall 2016       Visiting Professor, Columbia Law School
2003-2012       Kirkland & Ellis Professor of Law, University of Chicago
Fall 2008       Visiting Professor, NYU Law School
1998-2003       Professor of Law, University of Chicago
1998            Professor of Law, University of Pennsylvania
Fall 1997       Visiting Assistant Professor of Law, University of Chicago
1993-1998       Assistant Professor of Law, University of Pennsylvania
1992-1993       Attorney Adviser, Office of Legal Counsel, U.S. Department of Justice
1991-1992       Law Clerk, Judge Stephen F. Williams, U.S. Court of Appeals, D.C. Circuit

**Books**

Law and Social Norms: Harvard University Press (2000)
        Japanese edition (Bokutakusha, 2002)
        Chinese edition (China University of Political Science and Law Publishing House, 2005)
        Taiwanese edition (Angle Publishing Company, 2006)
        South Asia edition (Universal Law Publishing Company, 2009)

Chicago Lectures in Law and Economics (editor): Foundation Press (2000)

Cost-Benefit Analysis: Legal, Philosophical, and Economic Perspectives (editor, with Matthew Adler): University of Chicago Press (2001)

The Limits of International Law (with Jack Goldsmith): Oxford University Press (2005)
        Chinese edition (Law Press of Beijing)
        Macedonian edition

New Foundations of Cost-Benefit Analysis (with Matthew Adler): Harvard University Press (2006)
        Arabic edition (Institute of Public Administration, Saudi Arabia, 2010)

Terror in the Balance: Security, Liberty and the Courts (with Adrian Vermeule): Oxford University Press (2007)

Social Norms, Nonlegal Sanctions, and the Law (editor): Edward Elgar (2007)

The Perils of Global Legalism: University of Chicago Press (2009)
        Chinese edition (Law Press China, 2016)

Climate Change Justice (with David Weisbach): Princeton University Press (2010)
        Korean edition (Sogan Hawoo, 2016)

Law and Happiness (editor, with Cass R. Sunstein): University of Chicago Press (2010)

The Economics of Public International Law (editor): Edward Elgar (2010)

The Executive Unbound: After the Madisonian Republic (with Adrian Vermeule): Oxford University Press (2011)
     German edition (Duncker & Humblot, 2014)

Contract Law and Theory: Aspen (2011)
     Second edition (2016)

Economic Foundations of International Law (with Alan Sykes): Harvard University Press (2013)
     Georgian edition (Labyrinth Publishing House, 2014)
     Persian edition (Hoosheedar Legal Publication, forthcoming)

The Twilight of Human Rights Law: Oxford University Press (2014)
     Excerpt republished in Harper's, October 2014

Last Resort: The Financial Crisis and the Future of Bailouts: University of Chicago Press (2018)
     Chinese edition (Truth and Wisdom Press, 2022)
     A Financial Times Book of the Year, 2018

Radical Markets: Uprooting Property and Democracy for a Just Society (with E. Glen Weyl): Princeton University Press (2018)
     Korean edition (Bookie Publishing House)
     Japanese edition (Toyo Keizai)
     Chinese edition (Beijing Huazhang Graphics and Information Co. Ltd.)
     Spanish edition (Antoni Bosch, 2019)
     Brazilian edition (Companhia das Letras)
     German edition (WBG, 2019 )
     Chinese (complex) edition (Gusa Press)
     Italian edition (LUISS University Press)
     Paperback edition, 2019
     An Economist Book of the Year, 2018

The Demagogue's Playbook: All Points Books (2020)
     Chinese edition (Truth and Wisdom Press)

How Antitrust Failed Workers: Oxford University Press (2021)
     Chinese edition (Ghezi Press, forthcoming)

**Articles and Book Chapters**

Contract Law in the Welfare State: A Defense of Usury Laws, the Unconscionability Doctrine, and Related Limitations on the Freedom to Contract, 24 J. Legal Stud. 283 (1995)

The Regulation of Groups: The Influence of Legal and Nonlegal Sanctions on Collective Action, 63 U. Chi. L. Rev. 133 (1996)

Law, Economics, and Inefficient Norms, 144 U. Pa. L. Rev. 1697 (1996)

The Legal Regulation of Religious Groups, 2 Legal Theory 33 (1996)

Altruism, Status, and Trust in the Law of Gifts and Gratuitous Promises, 1997 Wisc. L. Rev. 567 (1997)

The Political Economy of the Bankruptcy Reform Act of 1978, 96 Mich. L. Rev. 47 (1997) (reprinted in part in Bankruptcy Anthology (Charles J. Tabb ed. 2001)

The Parol Evidence Rule, the Plain Meaning Rule, and the Principles of Contractual Interpretation, 146 U. Pa. L. Rev. 533 (1998)

Symbols, Signals, and Social Norms in Politics and the Law, 27 J. Legal Stud. 765 (1998) (reprinted in Law and Economics (Nicholas Mercuro ed., Routledge Press, 2007); Foundations of Law and Economics (Robert Cooter & Francesco Parisi, eds., Edward Elgar, 2010))

The Strategic Basis of Principled Behavior: A Critique of the Incommensurability Thesis, 146 U. Pa. L. Rev. 1185 (1998)

The Demand for Human Cloning, in Clones and Clones: Facts and Fantasies About Human Cloning (Martha C. Nussbaum and Cass R. Sunstein, eds.): W.W. Norton (1998) (with Richard A. Posner) (Reprinted, with a postscript, in 27 Hofstra L. Rev. 579 (1999))

A Positive Theory of Chapter 11, 74 NYU Law Rev. 161 (1999) (with Kevin A. Kordana)

The Decline of Formality in Contract Law, in The Fall and Rise of Freedom of Contract (Frank Buckley, ed.): Duke University Press (1999)

Family Law and Social Norms, in The Fall and Rise of Freedom of Contract (Frank Buckley, ed.): Duke University Press (1999)

Shaming White Collar Criminals under the Federal Sentencing Guidelines, 42 J. Law & Econ. 365 (1999) (With Dan M. Kahan)

Arbitration and the Harmonization of International Commercial Law: A Defense of *Mitsubishi*, 39 Va. J. Inter'l Law 647 (1999)

Should Debtors Be Forced into Chapter 13?, 32 Loyola of Los Angeles L. Rev. 965 (1999)

A Theory of Customary International Law, 66 U. Chi. L. Rev. 1113 (1999) (with Jack L. Goldsmith)

Rethinking Cost-Benefit Analysis, 109 Yale L.J. 165 (1999) (with Matthew Adler) (Reprinted in part in Jurisprudence: Contemporary Readings, Narratives, and Problems (Robert Hayman et al., ed., 2d ed. 2002))

Contract Remedies: Foreseeability, Precaution, Causation, and Mitigation, in The Encyclopedia of Law and Economics (Boudewijn Bouckaert and Gerrit De Geest, eds.): Edward Elgar (2000)

A Theory of Contract Law Under Conditions of Radical Judicial Error, 94 Nw. U. L. Rev. 749 (2000)

Understanding the Resemblance Between Modern and Traditional Customary International Law, 40 Va. J. Int'l Law 639 (2000) (with Jack L. Goldsmith), excerpted in Edward M. Wise, International Criminal Law: Cases and Materials (3d ed. 2009)

Implementing Cost-Benefit Analysis When Preferences Are Distorted, 29 J. Legal Stud. 1105 (2000) (with Matthew Adler)

Introduction to the Conference on Cost-Benefit Analysis, 29 J. Legal Stud. 837 (2000) (with Matthew Adler)

Agency Models in Law and Economics, in *Chicago Lectures in Law and Economic* (Eric A. Posner ed., 2000), reprinted in *Game Theory and the Law* (Eric B. Rasmussen ed., 2007)

The Design and Interpretation of Contracts: Why Complexity Matters, 95 Nw. U.L. Rev. 91 (2000) (with Karen Eggleston and Richard Zeckhauser)

Law and Social Norms: The Case of Tax Compliance, 86 Va. L. Rev. 1781 (2000), excerpt reprinted in *Tax Controversies: Practice and Procedure* (forthcoming)

Cost-Benefit Analysis as a Solution to a Principal-Agent Problem, 53 Admin. L. Rev. 289 (2001)

Law and the Emotions, 89 Georgetown L.J. 1977 (2001), reprinted in Law and Neuroscience (Owen D. Jones, Jeffrey D. Schall, and Francis X. Shen, eds., Wolters Kluwer, 2nd ed. forthcoming)

Controlling Agencies with Cost-Benefit Analysis: A Positive Political Theory Perspective, 68 U. Chi. L. Rev. 1137 (2001)

The Law and Economics of Consumer Finance, 4 Amer. Law & Econ. Rev. 162 (2002) (with Richard Hynes)

Legislative Entrenchment: A Reappraisal, 111 Yale L.J. 1665 (2002) (with Adrian Vermeule)

Fear and the Regulatory Model of Counterterrorism, 25 Harv. J.L. & Pub. Pol. 681 (2002)

Controlling Agencies with Net Benefit Accounts: A Thought Experiment, 150 U. Pa. L. Rev. 1473 (2002)

Moral and Legal Rhetoric in International Relations: A Rational Choice Perspective , 31 J. Legal Stud. S115 (2002) (with Jack Goldsmith)

Interring the Nondelegation Doctrine, 69 U. Chi. L. Rev. 1721 (2002) (with Adrian Vermeule), republished in translation, Revista De Direito Administrativo, 282(1), 15–61 (2023)

Economic Analysis of Contract Law After Three Decades: Success or Failure?, 112 Yale L.J. 829 (2003), reprinted in Economics of Contract Law (Douglas Baird ed. 2007) and Law in Society: Nature, Functions and Limits (Robert Hillman ed., forthcoming)

Four Economic Perspectives on American Labor Law and the Problem of Social Conflict, 159 J. Inst'l & Theoretical Econ. 101 (2003)

The Jurisprudence of Greed, 151 U. Pa. L. Rev. 1097 (2003)

International Agreement: A Rational Choice Approach, 44 Va. J. Int'l L. 113 (2003) (with Jack Goldsmith)

Reparations for Slavery and Other Historical Injustices, 103 Colum. L. Rev. 689 (2003) (with Adrian Vermeule)

A Theory of the Laws of War, 70 U. Chi. L. Rev. 297 (2003)

Do States Have a Moral Obligation to Comply with International Law?, 55 Stan. L. Rev. 1901 (2003)

Accommodating Emergencies, 56 Stan. L. Rev. 605 (2003) (with Adrian Vermeule), reprinted in The Constitution in Wartime 55 (Mark Tushnet, editor, 2005)

Transfer Regulations and Cost-Effectiveness Analysis, 53 Duke L.J. 1067 (2003)

Probability Errors: Implications for Tort and Contract Law, 11 Sup. Ct. Econ. Rev. 125 (2004), reprinted in The Law and Economics of Irrational Behavior 456 (Francesco Parisi and Vernon Smith, eds., 2005); and in Law and Economics of Uncertainty (Joshua C. Teitelbaum, ed., forthcoming)

Transitional Justice as Ordinary Justice, 117 Harv. L. Rev. 761 (2004) (with Adrian Vermeule)

The Political Economy of State Bankruptcy Exemptions, 47 J. Law & Econ. 19 (2004) (with Richard Hynes and Anup Malani)

Judicial Independence in International Tribunals, 93 Calif. L. Rev. 1 (2005) (with John Yoo)

Optimal War and *Jus ad Bellum*, 93 Georgetown L.J. 993 (2005) (with Alan Sykes)

International Law and the Disaggregated State, 32 Fla. St. U. L. Rev. 797 (2005)

Dollars and Death, 72 U. Chi. L. Rev. 537 (2005) (with Cass Sunstein)

Is the International Court of Justice Biased?, 34 J. Legal Stud. 599 (2005) (with Miguel de Figueiredo)

Political Trials in Domestic and International Law, 55 Duke L. J. 75 (2005)

Should Coercive Interrogation Be Legal?, 104 Mich. L. Rev. 671 (2006) (with Adrian Vermeule)

Holding Internet Service Providers Accountable, 14 Sup. Ct. Econ. Rev. 221 (2006) (with Douglas Lichtman), reprinted in The Law and Economics of Cybersecurity (Mark F. Grady and Francesco Parisi eds. 2006)

The Decline of the International Court of Justice, in International Conflict Resolution 111 (Stefan Voigt, Max Albert, and Dieter Schmidtchen eds. 2006).

International Law: A Welfarist Approach, 73 U. Chi. L. Rev. 487 (2006)

International Law and the Rise of China, 7 Chi. J. Int'l L. 1 (2006) (with John Yoo)

Emergencies and Democratic Failure, 92 Va. L. Rev. 1091 (2006) (with Adrian Vermeule)

There Are No Penalty Default Rules in Contract Law, 33 Fla. St. U. L. Rev. 563 (2006)

The Law of Other States, 59 Stan. L. Rev. 131 (2006) (with Cass Sunstein), reprinted in *Comparative Constitutional Law*, edited by Mark Tushnet (Edward Elgar, forthcoming)

Chevronizing Foreign Relations, 116 Yale L.J. 1171 (2007) (with Cass Sunstein), reprinted in Curtis A. Bradley, Foreign Relations Law (Edward Elgar, forthcoming)

Signing Statements and Executive Power, 23 Constitutional Commentary 307 (2007) (with Curtis Bradley)

The Second-Order Structure of Immigration Law, 59 Stan. L. Rev. 809 (2007) (with Adam Cox)

Social Norms and Economic Analysis of the Law, in Economic Analysis of Law: A European Perspective (Aristides N. Hatzis ed., 2007)

An Economic Analysis of State and Individual Responsibility Under International Law, 9 Amer. L. & Econ. Rev. 72 (2007) (with Alan Sykes)

The Credible Executive, 74 U. Chi. L. Rev. 865 (2007) (with Adrian Vermeule)

The Case for For-Profit Charities, 93 Va. L. Rev. 2017 (2007) (with Anup Malani)

Timing Rules and Legislative Action, 121 Harv. L. Rev. 543 (2007) (with Jacob Gersen)

Climate Change and International Human Rights Litigation: A Critical Appraisal, 155 U. Pa. L. Rev. 1925 (2007), reprinted in Human Rights and the Environment (Svitlana Kravchenko, John E. Bonine, & Don Anton eds., 2008); Environment and Health: Issues and Implications (L. Lakshmi ed., 2008)

A Critique of the Odious Debt Doctrine, 70 Law & Contemp. Probs. 33 (2007) (with Albert Choi)

The International Protection of Cultural Property: Some Skeptical Observations, 8 Chi. J. Int'l L. 213 (2007)

Constitutional Showdowns, 156 U. Pa. L. Rev. 991 (2008) (with Adrian Vermeule)

Climate Change Justice, 96 Georgetown L.J. 1565 (2008) (with Cass Sunstein), excerpted or reprinted in Cases and Materials on Environmental Law (Daniel A. Farber, ed., forthcoming); Reflecting on Nature: Readings in Environmental Ethics and Philosophy (Lori Gruen, Dale Jamieson, and Christopher Schlottmann eds., 2d ed., Oxford, 2012); Ethics, Environmental Justice and Climate Change (by Paul G. Harris ed., Edward Elgar, forthcoming); The Ethical Life, by Russ Shafer-Landau (Oxford, forthcoming); Introducing Ethics and Contemporary Moral Issues, by Russ Shafer-Landau (Oxford, forthcoming)

Does Political Bias in the Judiciary Matter?: Implications of Judicial Bias Studies for Legal Reform, 75 U. Chi. L. Rev. 853 (2008)

Happiness Research and Cost-Benefit Analysis, 37 J. Legal Stud. S253 (2008) (with Matthew Adler)

Human Welfare, Not Human Rights, 108 Colum. L. Rev. 1758 (2008)

Soft Law: Lessons from Congressional Practice, 61 Stanford L. Rev. 573 (2008) (with Jacob E. Gersen)

Should Greenhouse Gas Permits Be Allocated on a Per Capita Basis?, 97 Calif. L. Rev. 51 (2009) (with Cass R. Sunstein), republished with modifications in Post-Kyoto International Climate Policy 343 (Joseph E. Aldy and Robert N. Stavins, eds. 2010).

Are Judges Overpaid?, 1 J. Legal Analysis 47 (2009) (with Stephen J. Choi and G. Mitu Gulati)

Erga Omnes Norms, Institutionalization, and Constitutionalism in International Law, 165 J. Institutional & Theoretical Econ. 5 (2009)

Judicial Evaluations and Information Forcing: Ranking State High Courts and Their Judges, 58 Duke L.J. 1313 (2009) (with Stephen J. Choi and Mitu Gulati)

Fault in Contract Law, 107 Mich. L. Rev. 1431 (2009), reprinted in Fault in American Contract Law (Omri Ben-Shahar & Ariel Porat eds., 2010)

Crisis Governance in the Administrative State: 9/11 and the Financial Meltdown of 2008, 76 U. Chi. L. Rev. 1613 (2009) (with Adrian Vermeule)

A Loan Modification Approach to the Housing Crisis, 11 Amer. L. & Econ. Rev. 579 (2009) (with Luigi Zingales)

The Rights of Migrants: An Optimal Contract Framework, 84 NYU L. Rev. 1403 (2009) (with Adam B. Cox), reprinted in Immigration and Nationality Law Review (forthcoming); reprinted in Law and Economics of Migration (Howard F. Chang, ed., forthcoming)

Professionals or Politicians?: The Uncertain Empirical Case for an Elected Judiciary, 26 J. Law, Econ., & Org. 290 (2010) (with Stephen Choi and Mitu Gulati)

Against Feasibility Analysis, 77 U. Chicago L. Rev. 657 (2010) (with Jonathan Masur)

Subconstitutionalism, 62 Stanford L. Rev. 1583 (2010) (with Tom Ginsburg)

*ProCD v. Zeidenberg* and Cognitive Overload in Contractual Bargaining, 77 U. Chicago L. Rev. 1181 (2010)

Economic Foundations of the Law of the Sea, 104 Amer. J. Inter'l L. 569 (2010) (with Alan Sykes)

Divide and Conquer, 2 J. Legal Analysis 417 (2010) (with Kathryn Spier and Adrian Vermeule)

Universal Exceptionalism in International Law, 52 Harv. J. Int'l L. 1 (2011) (with Anu Bradford)

The Limits of Constitutional Convergence, 11 Chicago J. Int'l L. 399 (2011) (with Rosalind Dixon)

The Right to Withdraw in Contract Law, 40 J. Legal Stud. 115 (2011) (with Omri Ben-Shahar)

The Flaws of Foreign Affairs Legalism, 51 Va. J. Int'l L. 507 (2011) (with Daniel Abebe)

Constitutional Possibility and Constitutional Evolution, in Law, Economics and Evolutionary Theory (Peer Zumbansen and Gralf-Peter Calliess eds. 2011)

Judging Women, 8 J. Empirical Legal Stud. 504 (2011) (with Stephen J. Choi, Mitu Gulati, and Mirya Holman)

Pricing Terms in Sovereign Debt Contracts: A Greek Case Study With Implications for the European Crisis Resolution Mechanism, 6 Capital Markets L.J. 163 (2011) (with Stephen J. Choi and Mitu Gulati)

Climate Regulation and the Limits of Cost-Benefit Analysis, 99 California L. Rev. 1557 (2011) (with Jonathan Masur)

Efficient Breach of International Law: Optimal Remedies, "Legalized Noncompliance," and Related Issues, 110 Mich. L. Rev. 243 (2011) (with Alan Sykes)

Deference to The Executive in the United States After September 11: Congress, the Courts, and the Office of Legal Counsel, 35 Harv. J.L. & Pub. Pol'y 213 (2012)

Tyrannophobia, in *Comparative Constitutional Design* (Tom Ginsburg, ed. 2012) (with Adrian Vermeule)

What Do Federal District Judges Want?: An Analysis of Publications, Citations, and Reversals, 28 J. Law, Econ., & Org. 518 (2012) (with Stephen J. Choi and Mitu Gulati)

The Evolution of Contractual Terms in Sovereign Bonds, 4 J. Legal Analysis 131 (2012) (with Stephen J. Choi and Mitu Gulati)

Unemployment, Regulation, and Cost-Benefit Analysis, 98 Va. L. Rev. 579 (2012) (with Jonathan Masur)

Aggregation and the Law, 122 Yale L.J. 2 (2012) (with Ariel Porat)

Human Rights, the Laws of War, and Reciprocity, 6 L. & Ethics of Human Rights 148 (2012)

Delegation in Immigration Law, 79 U. Chicago L. Rev. 1285 (2012) (with Adam Cox)

International Paretianism: A Defense, 13 Chicago J. Int'l L. 347 (2013) (with David Weisbach)

The Questionable Basis of the Common European Sales Law: The Role of an Optional Instrument in Jurisdictional Competition, 50 Common Market L. Rev. 261 (2013)

The Institutional Structure of Immigration Law, 80 U. Chicago L. Rev. 289 (2013)

Benefit-Cost Analysis for Financial Regulation, 103 Amer. Econ. Rev.: Papers & Proceedings 393 (2013) (with E. Glen Weyl), reprinted in Economics of Financial Law (Geoffrey P. Miller, ed., Edward Elgar, forthcoming)

The Law and Policy of Judicial Retirement: An Empirical Study, 42 J. Legal Stud. 111 (2013) (with Stephen J. Choi and Mitu Gulati)

The Dynamics of Contract Evolution, 88 NYU L. Rev. 1 (2013) (with Stephen J. Choi and Mitu Gulati)

An FDA for Financial Innovation: Applying the Insurable Interest Doctrine to 21st-Century Financial Markets, 107 Northwestern U. L. Rev. 1307 (2013) (with E. Glen Weyl)

International Law and the Limits of Macroeconomic Cooperation, 86 S. Cal. L. Rev. 1025 (2013) (with Alan Sykes)

Inside or Outside the System?, 80 U. Chicago L. Rev. 1743 (2013) (with Adrian Vermeule)

How Well Do Measures of Judicial Ability Predict Judicial Performance?: A Case Study Using Securities Class Actions, 33 Inter'l Rev. L. & Econ. 37 (2013) (with Stephen J. Choi and Mitu Gulati)

Quadratic Voting as Efficient Corporate Governance, 81 U. Chicago L. Rev. 251 (2014) (with E. Glen Weyl)

Voting Rules in International Organizations,15  Chicago J. Int'l L. 195 (2014) (with Alan O. Sykes), reprinted in The Law and Politics of International Organizations (Kenneth W. Abbott, ed., Edward Elgar, forthcoming)

Offsetting Benefits, 100 Va. L. Rev. 1165 (2014) (with Ariel Porat)

Unemployment and Regulatory Policy, in *Does Regulation Kill Jobs?* (edited by Cary Coglianese and Adam M. Finkel, 2014) (with Jonathan Masur)

Benefit-Cost Paradigms in Financial Regulation, 43 J. Legal Stud. S1 (2014) (with E. Glen Weyl)

Altruism Exchanges and the Kidney Shortage, 77 Law & Contemp. Probs. 289 (2014) (with Mitu Gulati & Stephen J. Choi), excerpted in part in The Law of Bioethics: Individual Autonomy and Social Regulation (Marsha Garrison, ed., West Publishing, 3d ed., forthcoming 2015)

Voting Squared: Quadratic Voting in Democratic Politics, 68 Vand. L. Rev. 441 (2015) (with E. Glen Weyl)

Cost-Benefit Analysis of Financial Regulations: A Response to Criticisms, 124 Yale L.J. F. 246 (2015) (with E. Glen Weyl)

The Role of Competence in Promotions from the Lower Federal Courts, 44 J. Legal Stud. S107 (2015) (with Stephen J. Choi and Mitu Gulati)

How Do Bank Regulators Determine Capital-Adequacy Requirements?, 82 U. Chicago L. Rev. 1853 (2015)

An Empirical Study of Political Bias in Legal Scholarship, 44 J. Legal Stud. 277 (2015) (with Adam Chilton)

A Framework for Bailout Regulation, 91 Notre Dame L. Rev. 479 (2015) (with Anthony Casey)

Toward a Pigouvian State, 164 U. Penn. L. Rev. 93 (2015) (with Jonathan Masur)

Institutional Flip-Flops, 94 Tex. L. Rev. 485 (2016) (with Cass Sunstein)

The Law, Economics, and Psychology of Manipulation, 1 J. Marketing Behavior 267 (2016)

Should Human Rights Law Play a Role in Development?, World Bank Econ. Rev. (2016)

The Votes of Other Judges, 105 Georgetown L.J. 159 (2016) (with Adrian Vermeule)

The Influence of History on States' Compliance with Human Rights Obligations, 56 Va. J. Int'l L. 216 (2016) (with Adam Chilton)

The Constitution of the Roman Republic, in Roman Law and Economics (Giuseppe Dari-Mattiacci ed., Oxford University Press, 2020).

███████████████████████████████

Unquantified Benefits, 102 Cornell L. Rev. 87 (2016) (with Jonathan Masur)

Supreme Court Justices' Loyalty to the President, 45 J. Legal Stud. 401 (2016) (with Lee Epstein)

What Legal Authority Does the Fed Need During a Financial Crisis?, 101 Minn. L. Rev. 1529 (2017)

Demystifying Schmitt, in the Oxford Handbook of Carl Schmitt (Jens Meierhenrich & Oliver Simons, eds., 2017) (with Adrian Vermeule)

Martti Koskenniemi on Human Rights: An Empirical Perspective, in The Law of International Lawyers 121 (Wouter Werner, Marieke de Hoon, & Alexi Galan eds. 2017)

Quadratic Election Law, 172 Public Choice 265 (2017) (with Nicholas Stephanopoulos)

Property Is Only Another Name for Monopoly, 9 J. Legal Analysis 51 (2017) (with Glen Weyl)

Moral Commitments in Cost-Benefit Analysis, 103 Va. L. Rev. 1809 (2017) (with Cass R. Sunstein)

A Proposal to Limit the Anticompetitive Power of Institutional Investors, 81 Antitrust L.J. 669 (2017) (with Fiona Scott Morton & Glen Weyl)

Should Regulation Be Countercyclical?, 34 Yale J. Reg. 857 (2018) (with Jonathan S. Masur)

The Dictator's Handbook, U.S. Edition, in Can It Happen Here?: Authoritarianism in America (Cass Sunstein ed., 2018)

Country-Specific Investments and the Rights of Non-Citizens, 57 Va. J. Int'l L. 575 (2018) (with Adam Chilton)

Cost-Benefit Analysis and the Judicial Role, 85 U. Chicago L. Rev. 935 (2018) (with Jonathan Masur)

The Decline of Supreme Court Deference to the President, 166 U. Pa. L. Rev. 829 (2018) (with Lee Epstein)

Presidential Obstruction of Justice, 106 Calif. L. Rev. 1277 (2018) (with Daniel J. Hemel)

The Trump Presidency: A Constitutional Crisis in the United States?, in Constitutional Democracy in Crisis? (Mark A. Grabler, Sanford Levinson, and Mark Tushnet, eds., Oxford University Press, 2018)

A Proposal for Protecting Low-Income Workers from Monopsony and Collusion, Hamilton Project (2018) (with Alan B. Krueger)

Antitrust Remedies for Labor Market Power, 132 Harvard L. Rev. 536 (2018) (with Suresh Naidu and E. Glen Weyl), winner Antitrust Writing Awards, Best Academic Article, 2019

Treaties and Human Rights: The Role of Long-Term Trends, 81 L. & Contemp. Probs. 1 (2018) (with Adam S. Chilton)

A Proposal to Enhance Antitrust Protection Against Labor Market Monopsony, Roosevelt Institute Working Paper (2019) (with Ioana Marinescu)

Norming in Administrative Law, 68 Duke L.J. 1383 (2019) (with Jonathan Masur)

Rule-of-Law Objections to the Lender of Last Resort, in *Constitutions in Times of Financial Crisis* (Tom Ginsburg, Mark D. Rosen, and Georg Vanberg, eds., 2019)

████████████████████

Why Has Antitrust Law Failed Workers?, 104 Cornell L. Rev. 1453 (2020) (with Ioana Marinescu), awarded Jerry S. Cohen Memorial Fund Writing Award for Best Article of 2020 on Labor Antitrust

Antitrust-Plus: Evaluating Additional Policies to Tackle Labor Monopsony, Roosevelt Institute (May 2020) (with Suresh Naidu)

The Antitrust Challenge to Covenants Not to Compete in Employment Contracts, 83 Antitrust L.J. 165 (2020)

Policy Implications of the Common Ownership Debate, 65 Antitrust Bulletin (2021)

Ownership and Rent Stigma: Two Experiments, 7 Behavioral Public Policy 353 (2020) (with Tamar Kricheli-Katz)

Labor Monopsony and European Competition Law, Concurrences, No. 4-2020 (2020) (with Cristina A. Volpin)

Chevronizing Around Cost-Benefit Analysis, 70 Duke Law Journal 1109 (2021) (with Jonathan Masur)

The Economic Basis of the Independent Contractor / Employee Distinction, 100 Texas L. Rev. 353 (2021)

The Boundaries of Normative Law and Economics, 38 Yale J. Reg. 657 (2021)

*The Limits of International Law* Fifteen Years Later, 22 Chicago J. Int'l L. 110 (2021) (with Jack L. Goldsmith)

Labor Monopsony and the Limits of the Law, 57 J. Hum. Resources S284 (2022) (with Suresh Naidu)

The Roberts Court and the Transformation of Constitutional Protections for Religion: A Statistical Portrait, 2022 Sup. Ct. Rev. 315 (forthcoming, 2022) (with Lee Epstein)

Antitrust and Labor Markets: A Reply to Richard Epstein, 15 NYU J. Law & Liberty 389 (2022)

Antitrust and Inequality, 2 Amer. J. L. & Equality 190 (2022) (with Cass R. Sunstein)

Constitutional Challenges to Public Health Orders in Federal Courts during the COVID-19 Pandemic, 102 B.U. L. Rev. 1729 (2022) (with Kenny Mok)

The Political Economy of the Decline of Antitrust Enforcement, 85 Antitrust L.J. 441 (2023) (with Filippo Lancieri and Luigi Zingales)

Horizontal Collusion and Parallel Wage-Setting in Labor Markets, 90 U. Chi. L. Rev. 545 (2023) (with Jonathan Masur), Winner, 2023 Antitrust Writing Awards: Academic Articles, Concerted Practices

The Real Political Question Doctrine, 75 Stanford L. Rev. 1031 (2023) (with Curtis Bradley)

Enforcement of U.S. Antitrust Law in Labour Markets, J. Antitrust Enforcement (2023)

No-poach Agreements: An Overview of EU and National Case Law, Concurrences (May 4, 2023) (with Cristina Volpin)

Market Power, Not Consumer Welfare: A Return to the Foundations of Merger Law, 86 Antitrust L.J. 205 (2024)

Labor Market Traps, Behavioural Public Policy 1 (2024)

The New Labor Antitrust, 86 Antitrust L.J. 503 (2024)

Trump's Lower Court Judges and Religion: An Initial Appraisal, 54 J. Legal Stud. 1 (2025) (with Steven Choi and Mitu Gulati)

The Common Political Foundations of Originalism and Cost-Benefit Analysis, 77 Administrative Law Review 65 (2025) (with Jonathan Masur)

The Tom Sawyer Effect: Invisible Work and Labor Market Power, 2024 Michigan State Law Review 551 (2024)

Merger Guidelines for the Labor Market, 153 J. Monetary Econ. (2025) (with David Berger, Thomas Hasenzagl, Kyle Herkenhoff, and Simon Mongey)

Market Share Liability and Anticompetitive Behavior: A Perspective from Antitrust Law, J. Law, Econ., & Policy (forthcoming)

Matching Markets and Labor Monopsony: A Comment on the Priest/Roth Debate, Yale J. Reg. (forthcoming)

Should Unions Play a Role in Merger Review?, Antitrust L.J. (forthcoming)

**Book Reviews, Comments, Opinion Pieces, Replies, and Other Short Pieces**

Norms, Formalities, and the Statute of Frauds: A Comment, 144 U. Pa. L. Rev. 1971 (1996)

Standards, Rules, and Social Norms, 21 Harv. J.L. & Pub. Policy 101 (1997)

Efficient Norms, in The New Palgrave Dictionary of Economics and the Law (Peter Newman, ed.): Macmillan (1998)

Notes Toward a Theory of Customary International Law, 92 ASIL Proceedings 53 (1998) (with Jack L. Goldsmith)

Law and Regret (Review of *Changing Your Mind* by E. Allan Farnsworth), 98 Mich. L. Rev. 1468 (2000)

Review of *The New Palgrave Dictionary of Economics and the Law*, edited by Peter Newman, 110 Econ J. 824 (2000)

Law and Economics for the Masses (Review of *Law's Order* by David Friedman), Jurist (2000)

Strategies of Constitutional Scholarship (Review of *The Strategic Constitution* by Robert D. Cooter), 26 Law & Social Inquiry 529 (2001)

Review of *The Jurisprudential Foundations of Corporate and Commercial Law*, edited by Jody S. Kraus and Steven D. Walt, 112 Ethics 626 (2002)

Review of *Law and Market Economy*, by Robin Paul Malloy, 18 Economics and Philosophy 183 (2002)

The Signaling Model of Social Norms: Further Thoughts, 36 U. Rich. L. Rev. 465 (2002)

Further Thoughts on Customary International Law, 23 Mich. J. Inter'l L. 191 (2002) (with Jack Goldsmith)

Introduction to a Conference on Rational Choice and International Law, 31 J. Legal Stud. S1 (2002)

Comment on Jean Braucher's Means Testing Consumer Bankruptcy, 7 Fordham J. Corp & Fin. L. 457 (2002)

When Reforming Accounting, Don't Forget Regulation. Policy Matters 02-35, AEI-Brookings Joint Center (August 2002)

Forward to the Japanese Edition of Law and Social Norms (Ota Shozo et al. trans. 2002)

Crimes and Punishment, Wall Street Journal, April 11, 2003, p. A10 (with Adrian Vermeule)

████████████████████████

Tobacco Regulation or Litigation? (Review of *Smoke-Filled Rooms* by W. Kip Viscusi), 70 U. Chi. L. Rev. 1141 (2003)

The Nondelegation Doctrine: A Postmortem, 70 U. Chi. L. Rev. 1331 (2003) (with Adrian Vermeule)

The Patriot Act Under Fire, Wall Street Journal, December 9, 2003, p. A10 (with John Yoo)

Bankruptcy Act of 1978, in Major Acts of Congress (Brian K. Landsberg ed., 2003), vol. 1, p. 59

Reign of Terror, Chicago Tribune, January 18, 2004 (with John Yoo)

Evaluating Transfer Regulations, 26 Regulation 42 (2004)

International Court of Hubris, Wall Street Journal, April 7, 2004, p. A18 (with John Yoo)

Bring Back the Baathists, The New York Times, April 28, 2004, p. A23

Emergencies and Political Change: A Reply to Tushnet, 56 Stan. L. Rev. 1593 (2004) (with Adrian Vermeule)

A "Torture" Memo and Its Tortuous Critics, The Wall Street Journal, July 6, 2004, p. A22 (with Adrian Vermeule)

Remarks on the Alien Tort Claims Act and Transitional Justice, 98 Am. Soc'y Int'l L. Proc. 56 (2004)

Transnational Legal Process and the Supreme Court's 2003-2004 Term: Some Skeptical Observations, 12 Tulsa Journal of Comparative and International Law 23 (2004)

Terrorism and the Laws of War, 5 Chi. J. Int'l L. 423 (2005)

Contract Theory, in The Blackwell Guide to the Philosophy of Law and Legal Theory 138 (Martin P. Golding and William A. Edmundson eds. 2005)

Law, in The Encyclopedia of Social Measurement 463 (Kimberly Kempf-Leonard ed. 2005)

All Justice, Too, Is Local, The New York Times, December 30, 2004, p. A23

All Hail...King George?, Foreign Policy Online, http://www.foreignpolicy.com/story/files/story2814.php (March 2005)

The International Court of Justice: Voting and Usage Statistics, ASIL Papers and Proceedings 130 (2005).

Where's the Old Bolton When We Need Him?, Los Angeles Times, April 19, 2005, p. B13 (with John Yoo)

Judicial Clichés On Terrorism, The Washington Post, August 8, 2005, p. A15 (with Adrian Vermeule)

Justice Within Limits, The New York Times, September 26, 2005, p. A20

The Politics of Saddam's Trial, openDemocracy.net, October 31, 2005, republished in German translation as Recht in Verlegenheit, Süddeutsche Zeitung, Nov. 28, 2005, p. 15

Reply to Helfer and Slaughter, 93 Cal. L. Rev. 957 (2005) (with John Yoo)

Sins of the Fatherland, The Boston Globe, March 5, 2006, E4

The New International Law Scholarship, 34 Ga. J. Inter'l & Comp. L. 463 (2006)

A Threat That Belongs Behind Bars, The New York Times, June 25, 2006, s. 4, p. 12

Apply the Golden Rule to al Qaeda?, The Wall Street Journal, July 15, 2006, p. A9

Signing Statements: It's a President's Right, The Boston Globe, August 3, 2006 (with Curtis Bradley)

A Better Way on Detainees, The Washington Post, August 4, 2006, p. A17 (with Jack Goldsmith)

Review of *Terrorism and the State: Rethinking the Rules of State Responsibility*, by Tal Becker, 121 Pol. Sci. Q. 505 (2006)

The Humanitarian War Myth, The Washington Post, October 1, 2006, p. B7

On Learning from Others, 59 Stan. L. Rev. 1309 (2007) (with Cass Sunstein)

What the Cold War Taught Us, The Wall Street Journal, April 21, 2007, p. A9

Agencies Should Ignore Distant-Future Generations, 74 U. Chi. L. Rev. 139 (2007)

Review of Robert E. Scott and Paul B. Stephan, *The Limits of Leviathan: Contract Theory and the Enforcement of International Law*, 101 Amer. J. Int'l L. 509 (2007)

The New Race for the Arctic, The Wall Street Journal, August 3, 2007, p. A8

Pay China to Cut Emissions, The Financial Times, August 5, 2007, p. 11 (with Cass Sunstein)

Originalism and Emergencies: A Reply to Lawson, 87 B.U. L. Rev. 313 (2007) (with Adrian Vermeule)

The Great Divide, The New Republic.com, December 20, 2007 http://tnr.com/politics/story.html?id=86d685dd-948a-43db-b496-260027868950 (with Cass Sunstein)

Review of *Law without Nations?: Why Constitutional Government Requires Sovereign States*, by Jeremy A. Rabkin, 4 Perspectives on Politics 432 (2007)

Out of Commission, Slate, February 13, 2008 (with Jack Goldsmith)

The Ethics of Climate Change, 31 Regulation 14 (2008) (with Cass Sunstein)

Policy by Reflex, Review of Stephen Holmes, *The Matador's Cape: America's Reckless Response to Terrorism*, 70 Review of Politics 513 (2008)

Diplomacy, Arbitration, and International Courts, in The Role of International Courts (Carl Baudenbacher & Erhard Busek eds., German Law Publishers, 2008)

Review of Benjamin Wittes, *Law and the Long War*, New York Post, July 27, 2008

Does Europe Believe in International Law?, Wall Street Journal, November 25, 2008 (with Jack Goldsmith)

Destructive Technologies Require Us to Reassess Civil Liberties, Boston Review, December 10, 2008

Introduction to the Conference on Law and Happiness, 37 J. Legal Stud. S1 (2008) (with Cass Sunstein)

An Argument Against Legal Extremism, Review of Philip K. Howard, *Life Without Lawyers: Liberating Americans From Too Much Law*, The Daily Beast, February 17, 2009 (with Robert Silver)

The Better, Cheaper Mortgage Fix, Slate, March 2, 2009 (with Luigi Zingales)

13

New Foundations of Cost–Benefit Analysis: A Reply to Professors Sinden, Kysar, and Driesen, 3 Regulation & Governance 72 (2009) (with Matthew Adler)

Outcomes, Outcomes, Review of Jack M. Balkin & Reva B. Siegel, eds., *The Constitution in 2020*, The New Republic, August 12, 2009, p. 43 (with Adrian Vermeule)

Do Women Make Better Judges?, Slate, October 2, 2009 (with Stephen Choi, Mitu Gulati, and Mirya Holman)

The Decider, Review of Frank J. Colluci, *Justice Kennedy's Jurisprudence: The Full and Necessary Meaning of Liberty*, The New Republic, The Book, January 11, 2010

Executive Decision, Review of Benjamin Kleinerman, *The Discretionary President: The Promise and Peril of Executive Power*, The New Republic, The Book, March 30, 2010

Garzon and the Trouble With International Law, Wall Street Journal, April 14, 2010

The Limits of Limits, Review of Kal Raustiala, *Does the Constitution Follow the Flag?: The Evolution of Territoriality in American Law*, The New Republic, May 5, 2010, p. 36

The Case for Electing Judges in Missouri, Newsweek, May 17, 2010

The Prudent and the Imprudent, Review of Gabriel Schoenfeld, *Necessary Secrets: National Security, the Media, and the Rule of Law*, The New Republic, The Book, May 17, 2010

Europe's Missing Identity, Wall Street Journal, European Edition, June 4, 2010

The Gaza Blockade and International Law, Wall Street Journal, June 4, 2010, p. A19

Echoes of Subprime Ring Out Across Greek Debt Crisis, Financial Times, June 28, 2010 (with Mitu Gulati)

The Four Tops, Review of Noah Feldman, *Scorpions: The Battles and Triumphs of FDR's Great Supreme Court Justices*, The New Republic, The Book, October 14, 2010

POTUS-Phobia, Review of Bruce Ackerman, *The Decline and Fall of the American Republic*, The New Republic November 11, 2010, p. 33

How Not To Solve the European Debt Crisis, Slate, December 2, 2010 (with Mitu Gulati)

Introduction, in The Economics of Public International Law (Eric A. Posner, ed.): Edward Elgar (2010)

Evaluating the Effects of International Law: Next Steps, 1 Global Policy 334 (2010),

One Side Now, Review of Erwin Chemerinsky, *The Conservative Assault on the Constitution*, The New Republic, The Book, January 2, 2011

Why Is Originalism So Popular?, The New Republic, January 14, 2011, online

Obama's Cost-Benefit Revolution, The New Republic, January 22, 2011, online

Huck and Jim and Law, Review of Ethan J. Leib, *Friend v. Friend: The Transformation of Friendship and What the Law Has to Do with it*, The New Republic, The Book, February 21, 2011

Dockets of War, The National Interest, March-April 2011

The Court of Literature, Review of Kenji Yoshino, *A Thousand Times More Fair: What Shakespeare's Plays Tell Us About Justice*, The New Republic, The Book, April 14, 2001

14

The Lying Game, Review of James Stewart, *Tangled Webs: How False Statements are Undermining America: From Martha Stewart to Bernie Madoff*, The New Republic, The Book, May 29, 2011

The Beginning and the End, Review of Elizabeth Price Foley, *The Law of Life and Death*, The New Republic, The Book, June 23, 2011

Libyan Legal Limbo, Slate, June 27, 2011 (with Adrian Vermeule)

Stop Complaining About Harold Koh's Interpretation of the War Powers Act, The New Republic, July 1, 2011

Shooting It Out, Review of Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America*, The New Republic, The Book, July 6, 2011

Obama Should Raise the Debt Ceiling on His Own, The New York Times, July 22, 2011 (with Adrian Vermeule)

Casual with the Court, Review of Kevin J. McMahon, *Nixon's Court: His Challenge to Judicial Liberalism and Its Political Consequences*, The New Republic, The Book, October 24, 2011

Outside the Law, Foreign Policy, October 25, 2011

Liberalism and Concealment, Review of Anita Allen, *Unpopular Privacy: What Must We Hide?*, The New Republic, The Book, December 13, 2011

Newt and His Surprising Liberal Allies, Slate, December 20, 2011

Review of Larry May, *Global Justice and Due Process*, 25 Ethics & Inter'l Aff. 481 (2011)

The Longest Battle, Review of Mary Dudziak, *War Time*, The New Republic, The Book, February 6, 2012

A Minimalist Reparations Regime for the International Criminal Court, Human Rights and International Criminal Law Online Forum, February 2012, reprinted in *Contemporary Issues Facing the International Criminal Court* (Richard H. Steinberg, ed., Brill Nijhoff)

An FDA for Securities Could Help Avert Crises, Bloomberg, April 2, 2012 (with Glen Weyl)

Not Worth the Gamble, Slate, April 4, 2012 (with Glen Weyl)

How Do We Know?, Review of Jim Manzi, Uncontrolled: The Surprising Payoff of Trial-and-Error for Business, Politics, and Society, The New Republic, The Book, April 25, 2012

How Low Can We Go?, Review of Daniel Gross, Better, Stronger, Faster: The Myth of American Decline ... and the Rise of a New Economy, The New Republic, The Book, May 17, 2012

Transitional Prudence: A Comment on David Dyzenhaus, *Leviathan as a Theory of Transitional Justice*, 51 NOMOS 218 (2012)

Perils and Privileges, Review of Ananda Rose, Showdown in the Sonoran Desert: Religion, Law, and the Immigration Controversy, The New Republic, The Book, June 11, 2012

The Absurd International Criminal Court, Wall Street Journal, June 11, 2012, at A13

The Imperial President of Arizona, Slate, June 26, 2012

Capitalism *Is* Regulation, Review of Edward Conard, Unintended Consequences: Why Everything You've Been Told about the Economy Is Wrong, The New Republic, The Book, July 5, 2012

Some Skeptical Comments on Beth Simmons's Mobilizing for Human Rights, 44 NYU J. Inter'l Law & Politics 819 (2012)

The Other Value of Life, Review of Kenneth R. Feinberg, Who Gets What: Fair Compensation After Tragedy and Financial Upheaval, The New Republic, The Book, July 31, 2012

Assange's London Bunker, Wall Street Journal, August 21, 2012, at A13

The Lincoln Laws, Review of John Fabian Witt, Lincoln's Code, Slate, August 28, 2012

The World Doesn't Love the First Amendment, Slate, September 25, 2012

Overruled: How Conservative Was Chief Justice Rehnquist?, Review of John A. Jenkins, The Partisan: The Life of William Rehnquist, The New Republic, The Book, October 2, 2012

Obama's Drone Dilemma, Slate, October 8, 2012

The Drones Are Coming to Libya, Slate, October 17, 2012

Why Amnesty Should Lose at the Supreme Court, Slate, October 26, 2012

Citizens United Is Still Worth Hating, Slate, November 9, 2012

Don't Worry About the Voting Rights Act, Slate, November 20, 2012 (with Nicholas Stephanopoulos)

Is Israel or Hamas Breaking International Law in Gaza?, Slate, November 27, 2012

The War on Terror Will Be Ever With Us, Slate, December 11, 2012

Why the U.S. Shouldn't Sign On to Empty Human Rights Treaties, Slate, December 21, 2012

Against Casino Finance, National Affairs, No. 14, p. 58, Winter 2013 (with Glen Weyl)

The President Has the Power to Raise the Debt Ceiling on His Own, Slate, January 4, 2013

The Danger Lurking Behind the Platinum Coin, Slate, January 10, 2013

How Aaron Swartz's Cause Wins in the End, Slate, January 22, 2013

There's No Such Thing as an Illegal Immigrant, Slate, February 4, 2013

Benefit-Cost Analysis for Financial Regulation, HLS Forum on Corporate Governance and Financial Regulation, February 4, 2013 (with Glen Weyl)

President Obama Can Do Anything He Wants To Fight Terrorism, Slate, February 5, 2013

Ronald Dworkin's Error, Slate, February 19, 2013

The Mother of DNA Databases, Slate, March 5, 2013

Indefinite Articles, Slate, March 19, 2013

The Real Problem With Law Schools, Slate, April 2, 2013

16

Introduction to Symposium on Immigration Law and Institution Design, 80 U. Chicago L. Rev. 1 (2013) (with Adam B. Cox and Richard A. Epstein)

Fool's Gold, Slate, April 11, 2013

The New Law We Need in Order to Deal With Dzhokhar Tsarnaev, Slate, April 22, 2013

The United States Can't Be the World's Courthouse, Slate, April 24, 2013

President Obama Can Shut Guantanamo Whenever He Wants, Slate, May 2, 2013

Shareholder Democracy Needs People To Pay for Their Votes, Financial Times, May 13, 2013 (with Glen Weyl)

The Killer Robot War Is Coming, Slate, May 15, 2013

Secrets and Scoops, Slate, May 17, 2013 (exchange with Emily Bazelon)

President Ruthless, Slate, May 23, 2013

The Good Way to Buy Votes, Slate, June 5, 2013

Quadratic Vote Buying, Square Root Voting, and Corporate Governance, HLS Forum on Corporate Governance and Financial Regulation, June 6, 2013 (with Glen Weyl)

Secrecy and Freedom, New York Times Room for Debate, June 9, 2013 (exchange with Jameel Jaffer)

Supreme Court 2013: Year in Review, Slate, June 20-27, 2013 (with Emily Bazelon, Walter Dellinger, and Richard Posner)

Why Won't Anyone Take Edward Snowden?, Slate, July 3, 2013

Wrong Number, Slate, July 9, 2013

How to Make Poison Pills Palatable, New York Times DealBook, July 17, 2013

Secrets and Scoops, Part 2, Slate, July 22, 2013 (exchange with Emily Bazelon)

The Best Rescue Plan for Detroit, Slate, July 23, 2013

Square Root Voting: A New Approach to Regulation of Chaebol, Keiretsu, and Other Conglomerate Organizations in Asia, The CLS Blue Sky Blog, July 24, 2013 (with E. Glen Weyl and Sang-Seung Yi)

The Virtues of Government Secrecy, Slate, August 5, 2013

Frisk Aversion, Slate, August 21, 2013

The U.S. Has No Legal Basis to Intervene in Syria, Slate, August 28, 2013

Obama Is Only Making His War Powers Mightier, Slate, September 3, 2013

The U.S. Ignores the U.N. Charter Because It's Broken, Slate, September 9, 2013

Assad and the Death of the International Criminal Court, Slate, September 19, 2013

On the Debt Ceiling, at Least, Congress Will Blink, Slate, September 30, 2013

██████████████████████

Emergency Powers Let the President Borrow, New York Times Room for Debate, October 2, 2013

Three Ways Obama Could Raise the Debt Ceiling On His Own, The New Republic, online, October 7, 2013

If He Has to, Obama Should Raise the Debt Ceiling Unilaterally, Slate, October 11, 2013 (with Emily Bazelon)

Never Again, Slate, October 16, 2013

A Solution to the Collective Action Problem in Corporate Reorganization, HLS Forum on Corporate Governance and Financial Regulation, October 23, 2013 (with Glen Weyl)

Is the Constitution Written Like the Da Vinci Code?, Slate, October 31, 2013

The Paradox of Secrecy, Review of Rahul Sagar, Secrets and Leaks, The New Republic, November 11, 2013, at p. 52

Keep Spying on Foreigners, NSA, Slate, November 14, 2014

You Can Have Either Climate Justice or a Climate Treaty, Slate, November 19, 2014

Benefit-Cost Paradigms in Financial Regulation, HLS Forum on Corporate Governance and Financial Regulation, November 20, 2013 (with Glen Weyl)

Centrists Should Mourn the Demise of the Filibuster, Slate, November 22, 2013

Bitcoin's Bandwagon Has Never Been More Crowded, The New Republic, online, December 3, 2013

How to Make Sure the Volcker Rule Survives in Court, Bloomberg View, December 10, 2013

Stop Fussing Over Personhood, Slate, December 11, 2013

The NSA's Metadata Program Is Perfectly Constitutional, Slate, December 30, 2013

Forget the Framers, Slate, January 8, 2014

The Case for Cost-Benefit Analysis in Financial Regulation, 36 Regulation 30, Winter 2013-2014

Make Journalists Testify, Slate, January 16, 2014

Let's Make a Deal with Snowden, Slate, January 27, 2014

A Powerful Tool to Use With Caution, New York Times, Room for Debate, January 29, 2014

The Presidency Comes With Executive Power. Deal With It, The New Republic, online, February 3, 2014

Socialized Law Would Be a Massive, Unworkable Nightmare, The New Republic, online, February 4, 2014

Now That Boehner Has Backed Down, Let's Fix The Debt Ceiling For Good, The New Republic, online, February 11, 2014

The Paranoid Libertarian and His Enemy, the Angry Liberal, Slate, February 14, 2014

Why Are China and Japan Inching Toward War Over Five Tiny Islands?, Slate, February 25, 2014

Let Crimea Go, Slate, March 10, 2014

What to Do About Crimea? Nothing, Slate, March 27, 2014

In Defense of GM, Slate, April 10, 2014

The Puzzle of Paying Amy, Slate, April 25, 2014

The U.S. Constitution Is Impossible to Amend, Slate, May 5, 2014

Sorry, America, the New World Order Is Dead, Foreign Policy, May 6, 2014

We All Have the Right to Be Forgotten, Slate, May 14, 2014

China Can Sink All the Boats in the South China Sea, Slate, May 28, 2014

Rappers v. Scotus, Slate, June 12, 2014

Supreme Court 2014: Year in Review, Slate, June 25-July 1, 2014 (with Emily Bazelon, Walter Dellinger, Dahlia Lithwick, Richard Posner, and Larry Tribe)

Boehner's Lawsuit Against Obama Is a Loser, Slate, July 11, 2014

Why and How the Government Should Assess the Costs and Benefits of Financial Regulations, 13 Review of Financial Regulation Studies 4 (Summer 2014) (with E. Glen Weyl)

We Don't Need to End "Too Big to Fail," Slate, July 28, 2014

Thomas Piketty Is Wrong: America Will Never Look Like a Jane Austen Novel, The New Republic, July 31, 2014

Obama Is Legally Allowed to Enforce—or Not Enforce—the Law, The New Republic, August 3, 2014

Yes, Obama Can Stop Millions of Deportations, Slate, August 12, 2014

Treaty-ish, Slate, August 28, 2014

Let Scotland Go Free, Slate, September 11, 2014

Obama Can Bomb Pretty Much Anything He Wants To, Slate, September 23, 2014

Eric Holder's Legacy, Slate, September 25, 2014

How Do Bank Regulators Determine Capital Adequacy Requirements?, Harvard Law School Forum on Corporate Governance and Financial Regulation, October 15, 2014

A Moral Market, Slate, October 17, 2014

Legacy Time, Slate, November 6, 2014

A Radical Solution to Global Income Inequality: Make the U.S. More Like Qatar, The New Republic, November 6, 2014 (with Glen Weyl)

The Human-Rights Charade, The Chronicle of Higher Education, November 17, 2014

The President's Constitutional Authority Is Clear, New York Times Room For Debate, November 18, 2014

Obama's Immigration Plan Is Perfectly Constitutional, Slate, November 20, 2014

19

████████████████████████

Obama's Immigration Order Is a Gift to Future Republican Presidents, The New Republic, November 23, 2014

The Twilight of Human Rights Law, openDemocracy.net, November 25, 2014

Prosecuting Dictators Is Futile, Slate, December 3, 2014

The Case Against Human Rights, The Guardian, December 4, 2014

Why Obama Won't Prosecute Torturers, Slate, December 9, 2014

The Year of the Dictator, Slate, December 22, 2014

Have Human Rights Treaties Failed?, New York Times Room for Debate, December 28, 2014 (with Kenneth Roth)

Why Uber Will—and Should—Be Regulated, Slate, January 5, 2015

Let's Admit It: Human Rights Law Is a Complete Failure, Washington Post, January 14, 2015

Why Do Judges and Politicians Flip-Flop?, Slate, January 26, 2015

Universities Are Right—and Within Their Rights—to Crack Down on Speech and Behavior, Slate, February 12, 2015

Faithfully Executed, Slate, February 19, 2015

Exchanges No One Can Use?, Slate, March 2, 2015

The Silence of the Law, Review of *Scrap of Paper: Breaking and Making International Law During the Great War*, by Isabel V. Hull, New Rambler Review, March 4, 2015

Should Charity Be Logical?, Slate, March 26, 2015

A Terrible Shame, Slate, April 9, 2015

Mutual Funds' Dark Side, Slate, April 16, 2015

Citizenship for Sale, Slate, May 13, 2015

A Fractious Majority, Slate, June 30, 2015

It's Not Donating. It's Selling, Slate, July 29, 2015

The Strangest Campaign Pledge, Slate, August 13, 2015

Trump Is the Only Candidate Talking About a Taboo Subject, Slate, August 25, 2015

The Spectrum of Suffering, Slate, September 8, 2015

Is America Heading Toward Dictatorship?, Slate, October 23, 2015

Bernanke's Biggest Blunder, Slate, October 29, 2015

Has Obama Upheld the Rule of Law, Slate, November 9, 2015

Why Are People So Scared of Syrian Refugees, Slate, November 20, 2015

[The Republican-Democratic Divide on Civil Liberties](#), Slate, December 7, 2015

[Potemkin Power?](#), New Rambler Review, December 9, 2015

[ISIS Gives Us No Choice but to Consider Limits on Speech](#), Slate, December 16, 2015

[How Can Banks Get Away With Charging Such High Fees?](#), Slate, January 7, 2016

[Campus Free Speech Problems Are Less Than Meets the Eye](#), Cato Unbound, January 8, 2016

[Warren's Wrong: Bank Rules Need Cost-Benefit Test](#), BloombergView, February 3, 2016

[Ted Cruz Is Not Eligible to Be President](#), Slate, February 8, 2016

[The Tragedy of Antonin Scalia](#), Slate, February 16, 2014

[Merrick Garland Would Shift the Court Decisively Leftward](#), Slate, March 17, 2016

[What Should We Expect From the Supreme Court's Showdown Over Immigration?](#), New York Times Magazine, April 18, 2016 (with Emily Bazelon)

Review of *The Future of Law and Economics: Essays in Reform and Recollection* by Guido Calabresi, 54 J. Econ. Lit. 600 (2016)

Presidential Leadership and the Separation of Powers, Daedalus 35 (summer 2016)

[Citizens Can't Sue the Government for Laws They Don't Like](#), The New York Times, May 23, 2016

[And if Elected: What President Trump Could or Couldn't Do](#), The New York Times, June 4, 2016

[New York Times Magazine Discussion of the Supreme Court at End of Term](#), Part I, June 24, 2016

[New York Times Magazine Discussion of the Supreme Court at End of Term](#), Part II, June 27, 2016

[Are There Limits to Trump's Power?](#), The New York Times, November 10, 2016

Review of *The Court and The World: American Law and the New Global Realities*, by Stephen Breyer, 126 Yale L.J. 504 (2016)

[A Monopoly Donald Trump Can Pop](#), The New York Times, December 7, 2016 (with Glen Weyl and Fiona Scott Morton)

[How Antonin Scalia's Ghost Could Block Donald Trump's Wall](#), The New York Times, January 25, 2017 (with Daniel Hemel and Jonathan Masur)

[Gorsuch Must Condemn Trump's Attack on Judge](#), The New York Times, February 4, 2017

[Judges v. Trump: Be Careful What You Wish For](#), The New York Times, February 15, 2017

Coase Theorem, in Economic Ideas You Should Forget (Bruno S. Frey & David Iselin, eds., 2017)

[The Government Gorsuch Wants to Undo](#), The New York Times, April 1, 2017 (with Emily Bazelon)

Introduction, in The Timing of Lawmaking (Frank Fagan & Saul Levmore, eds., 2017)

[Will the Presidency Survive this President?](#), The New York Times, May 21, 2017 (with Emily Bazelon)

The Case for Obstruction Charges, The New York Times, June 15, 2017 (with Daniel Hemel)

Quadratic Voting and the Public Good: Introduction, 172 Public Choice 1 (2017) (with E. Glen Weyl)

If Trump Pardons, It Could Be a Crime, The New York Times, July 21, 2017 (with Daniel Hemel)

The Obstruction of Justice Case Against Donald Trump, Slate, July 27, 2017 (with Daniel Hemel)

A Better Way to Protect Robert Mueller, The New York Times, August 7, 2017 (with Daniel Hemel)

Trump Could Be Removed for Political Incompetence—Using the 25th Amendment, The Washington Post, September 12, 2017

Why the Trump Team Should Fear the Logan Act, The New York Times, December 4, 2017 (with Daniel Hemel)

The Logan Act and its Limits, Lawfare, December 7, 2017 (with Daniel J. Hemel)

America Is Nowhere Near a Constitutional Crisis, Foreign Policy, December 16, 2017

It's Time to Audit America's Secrets, Foreign Policy, February 2, 2018

Trump Has Plenty of Bark. His Predecessors Had More Bite, Washington Post, February 2, 2018

How Congress Can Protect Mueller, The New York Times, February 4, 2018

Sponsor an Immigrant Yourself, Politico, February 13, 2018

Corporate America Is Suppressing Wages for Many Workers, The New York Times, February 28, 2018 (with Alan B. Krueger)

More and More Companies Have Monopoly Power Over Workers' Wages. That's Killing the Economy. Vox, April 6, 2018

Want Our Personal Data? Pay for It, The Wall Street Journal, April 20, 2018 (with E. Glen Weyl)

The Real Villain Behind Our New Gilded Age, The New York Times, May 1, 2018 (with Glen Weyl)

Neoliberalism and Human Rights, Lawfare, May 1, 2018

How Economists Became So Timid, Chronicle, May 7, 2018

A Radical Proposal for Resolving Cases Like Masterpiece Cakeshop—Outside The Courts, Vox, June 4, 2018

A Radical Proposal for Improving Capitalism, Barron's, June 15, 2018 (with E. Glen Weyl)

If the Supreme Court is Nakedly Political, Can It Be Just?, New York Times, July 9, 2018 (with Lee Epstein)

Who Is Brett Kavanaugh?, New York Times, September 3, 2018 (with Emily Bazelon)

The Far-Reaching Threats of a Conservative Court, New York Times, October 23, 2018

Why the FTC Should Focus on Labor Monopsony, Pro-Market, November 5, 2018

House Democrats Can Constrain Trump. They Can Also Overreach, New York Times, November 7, 2018

Liberty versus Monopoly, J. Amer. Affairs, November 20, 2018 (with Glen Weyl)

Bill Barr Just Argued Himself Out of a Job, New York Times, December 21, 2018 (with Daniel Hemel)

Yes, Bill Barr's Memo Really is Wrong About Obstruction of Justice, Lawfare, December 26, 2018 (with Daniel Hemel)

The President Is Still Subject to Generally Applicable Criminal Laws: A Response to Barr and Goldsmith, Lawfare, January 8, 2019 (with Daniel Hemel)

The Surprising Place Mueller Found Resistance to Trump, New York Times, April 23, 2019 (with Daniel Hemel)

Keep Increasing Pressure Against Noncompetes, Law360, May 7, 2019

The Anti-monopoly Backlash Reaches the Supreme Court, The Atlantic, May 15, 2019

What Antitrust Attorneys Need to Know About Labor Monpsony, Law360, May 24, 2019

House Democrats Have More Potent Options Than Impeachment, The Atlantic, May 29, 2019

The Administration's Plan to Redefine "Human Rights" Along Conservative Lines, Washington Post, June 14, 2019

The Trouble Starts If Facebook's New Currency Succeeds, The Atlantic, June 25, 2019

Milton Friedman Was Wrong, The Atlantic, August 22, 2019

The Meritocracy Muddle, Project Syndicate, September 13, 2019

The Impeachment Trap, Project Syndicate, October 1, 2019

The Anticompetitive Effects of Covenants Not to Compete, CPI Antitrust Chronicle, January 2020

The Executive Unbound, Pandemic Edition, Lawfare, March 23, 2020

Governors Might Not Be Able to Save Us, but They Can Raise Hell, New York Times, April 2, 2020 (with Emily Bazelon)

Public Health in the Balance: Judicial Review of Pandemic-Related Government Restrictions, Lawfare, April 20, 2020

Cost-Benefit Analysis Supports Continuing the National Shutdown, Regulatory Review, April 20, 2020 (with Jonathan Masur)

The Limits of the World Health Organization, Lawfare, April 21, 2020

You Can Sue to Stop Lockdowns, But You Can't Sue to Get Them, Washington Post, May 4, 2020

Protect the Justice Department From the President, New York Times, May 13, 2020 (with Emily Bazelon)

Why Some Republican Leaders Are Defecting to Biden, Newsweek, July 3, 2020

What Could Trump Do or Not Do in a Second Term?, New York Times, July 13, 2020

Trump Has the Worst Record at the Supreme Court of Any Modern President, Washington Post, July 20, 2020

Climate Change and Human Rights, in Climate Change, Justice and Human Rights 21 (David Ismangil, Karen van der Schaaf, and Lars van Troost, eds., Amnesty International, 2020)

Avoiding the Trump Trap, Project Syndicate, August 10, 2020

How the Religious Right Has Transformed the Supreme Court, New York Times, September 22, 2020

What the U.S. Election Is Really About, Project Syndicate, October 14, 2020

Legal Assaults on Coronavirus Shutdowns Threaten To Undermine the Liberal State, Washington Post, October 15, 2020

Is the Long-Awaited Constitutional Crisis at Hand?, Project Syndicate, October 21, 2020

Biden's Precarious Victory, Project Syndicate, November 6, 2020

Why Prosecuting Trump Is a Very Bad Idea, New York Times, December 3, 2020

America Passed the Trump Stress Test, Project Syndicate, December 7, 2020

The Trump Paradox, Project Syndicate, December 22, 2020

The Effort to Disqualify Trump Is Worth It, Project Syndicate, January 12, 2021

Why Joe Biden Must Not Shy Away From the Full Power of the Presidency, New York Times, January 21, 2021

Why Try Trump?, Project Syndicate, February 20, 2021

Antitrust Is Back in America, Project Syndicate, March 12, 2021

Senator Klobuchar's Antitrust Bill Doesn't Go Far Enough, ProMarket, March 22, 2021

The End of Amateur Hour for the NCAA, Project Syndicate, April 7, 2021

Long Live the Imperial President?, Project Syndicate, May 12, 2021

Biden's Antitrust Revolutionaries, Project Syndicate, June 18, 2021

The Supreme Court's NCAA Ruling Has Huge Implications Outside of Sports, Washington Post, June 22, 2021

The Antitrust War's Opening Salvo, Project Syndicate, July 21, 2021

COVID and the Conservative Economic Crack-up, Project Syndicate, August 24, 2021

In Emergencies, Judges Usually Defer to Politicians. Not during the Pandemic, Washington Post, August 24, 2021

America's Return to Realism, Project Syndicate, September 3, 2021

You Deserve a Bigger Paycheck. Here's How You Might Get It, New York Times, September 23, 2021

The Justices Doth Protest Too Much, Project Syndicate, October 7, 2021

Facebook's Foreign Disasters, Project Syndicate, November 5, 2021

Antitrust's Labor Market Problem, ProMarket, November 8, 2021

24

[The Rise of the Labor-Antitrust Movement](), Competition Policy International, November 29, 2021

[Introduction to the Conference on Labor Market Power](), 90 U. Chicago L. Rev. 261 (2023)

[Toward a Market Power Standard for Merger Review](), ProMarket, April 7, 2023

[The Whig History of the Merger Guidelines](), ProMarket, May 31, 2023

[The Trump Indictment and America's Political Order](), Project Syndicate, June 14, 2023

[The Revised Merger Guidelines Will Restore Principle of Competition to Merger Review](), ProMarket, July 20, 2023

[The Politics of the Trump Trials](), Project Syndicate, August 9, 2023

[Comment on Merger Guidelines Submitted to DOJ and FTC](), August 17, 2023 (with David W. Berger, Thomas Hasenzagl, Kyle F. Herkenhoff, Simon Mongey)

[The Role of Consumer Welfare in Merger Enforcement](), ProMarket, September 7, 2023

[Banning Trump](), Project Syndicate, September 18, 2023

[The Strange Case of Sam Bankman-Fried](), Project Syndicate, October 12, 2023

No-Poach Antitrust Litigation in the United States, Concurrences (November 2023) (with Sarah Roberts)

Review of *The Problem of Twelve: When a Few Financial Institutions Control Everything* by John Coates, Journal of Economic Literature (forthcoming)

[The Monopolists Fight Back](), Project Syndicate, November 24, 2023

[A Trump Dictatorship Won't Happen](), Project Syndicate, December 7, 2023

[The AI Octopus](), Project Syndicate, January 8, 2024

[Will Trump Be Disqualified?](), Project Syndicate, February 5, 2024

[The Future of Work in the AI Era](), Project Syndicate, April 11, 2024

[What to Look for in Trump's First Trial](), Project Syndicate, April 22, 2024

[Why Noncompete Clauses Should Be Banned](), Project Syndicate, May 3, 2024

[The FTC Noncompete Ban Is Legal](), ProMarket, May 8, 2024

[Rough Justice for Trump](), Project Syndicate, May 31, 2024

[Merger Review Should Incorporate a Role for Unions](), ProMarket, June 14, 2024

[Prosecutions and Politics Don't Mix](), Project Syndicate, July 29, 2024

[Is a Pro-Labor Republican Party Possible?](), Project Syndicate, August 29, 2024

[How Cultural Norms Help Companies Exploit Unpaid Workers](), ProMarket, September 25, 2024

[Is Labor Antitrust a Nonexistent Problem?](), ProMarket, October 24, 2024

Why Many Workers Now Vote Republican, Project Syndicate, October 29, 2024

The Business Interests That Promoted Cost-Benefit Analysis and Originalism Will Also Kill Them, ProMarket, December 2, 2024

Trump's Pro-Corporate Populism Cannot Last, Project Syndicate, December 11, 2024

What Happened to International Law?, Project Syndicate, January 16, 2024

Antitrust from Trump to Biden to Trump, ProMarket, March 11, 2025

**Testimony**

Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives: H.R. 833, The Bankruptcy Reform Act of 1999, March 16, 1999

Committee on the Judiciary, U.S. Senate: Special Counsels and the Separation of Powers, September 26, 2017

Federal Trade Commission, Competition and Consumer Protection in the 21st Century: Labor Markets and Antitrust Policy, October 16, 2018

Federal Trade Commission, Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, January 9, 2020

Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law, U.S. House of Representatives: Reviving Competition, Part 4: 21st Century Antitrust Reforms and the American Worker, September 28, 2021

Department of Justice and Federal Trade Commission Workshop on Draft Merger Guidelines, University of Chicago Law School, November 3, 2023

**Education**

Harvard Law School. J.D., magna cum laude, 1991

Yale University. B.A., M.A. in philosophy, summa cum laude, 1988

**Professional Organizations**

Maryland Bar Association (admitted 1991)

Illinois Bar Association (admitted 2018)

American Law and Economics Association (board member, various times)

American Law Institute

**Grants, Fellowships, and Awards**

John M. Olin fellowship, University of Southern California (3/95)

University Research Foundation grant, University of Pennsylvania (6/96)

Olin Fellow, University of Virginia Law School (9/02)

Simon Visiting Scholar, Florida State University College of Law (3/18/04)

Fellow, American Academy of Arts and Sciences (elected 2010)

Sloan Grant for Conference on Benefit-Cost Analysis and Financial Regulation (2013) (with Glen Weyl)

Economist Book of the Year, for *Radical Markets* (2018)

Financial Times Book of the Year, for *Last Resort* (2018)

Bloomberg 50, for *Radical Markets* (2018)

Antitrust Writing Award, for Antitrust Remedies for Labor Market Power (2019)

American Antitrust Institute Jerry S. Cohen Memorial Fund Writing Award, for Antitrust Remedies for Labor Market Power (2019)

Lawdragon 500 Leading Lawyers in America (2019, 2020)

**Teaching**

Contracts; Secured Transactions; Bankruptcy; Corporate Reorganization; Seminar on Contract Theory; Seminar on Game Theory and the Law; Employment and Labor Law; Public International Law; International Human Rights Law; Foreign Relations Law; International Law Workshop; European Union Law; Seminar on the Financial Crisis of 2008-2009; Banking Law; Financial Regulation; Seminar on the Federal Reserve Board; Seminar on Executive Power; Seminar on Originalism and Its Critics; Corporate Finance

**Other Professional Activities**

Counsel, MoloLamken (2018-2021; 2024-)

Counsel, Boies, Schiller & Flexner (2010-2016)

Cofounder and editor, New Rambler Review (2015-2017)

Member (elected 2014), Council Member (elected 2021); American Law Institute

Columnist, Slate Magazine (2012-2016)

Editor, Journal of Legal Studies (1998-2010)

Adviser, Restatement (Third) of Restitution, American Law Institute

Referee for Journal of Law and Economics, Journal of Economic Literature, Oxford University Press, Harvard University Press, Edward Elgar, Quarterly Journal of Economics, National Science Foundation, Law and Social Inquiry, American Economic Review, Journal of Law, Economics, & Organization, American Law and Economics Review, International Review of Law and Economics, American Journal of Political Science, Law and Society Review, Journal of Policy Analysis and Management, Journal of the European Economics Association, Health Affairs, University of Chicago Press, Canada Council for the Arts, World Politics, Supreme Court Economic Review, Law and Philosophy, Ethics and International Affairs, Institute of Medicine, Israel Science Foundation, Conflict Management and Peace Science, Smith Richardson Foundation, Yale University Press, Hart Publishing, Journal of Peace Research, British Journal of Political Science, National Academy of Sciences, Social Theory and Practice, Politics, Philosophy and Economics, Journal of Global Ethics, Climate Policy, Political Science Quarterly, Journal of Benefit-Cost Analysis, Journal of Legal Analysis, European Journal of International Law, Antitrust Law Journal, Journal of Antitrust Enforcement

Member, Editorial Board, Law & Social Inquiry (2000-2001)

Member, Board of Directors, American Law and Economics Association (2000-2003; 2013-2016)

Member, Board of University Publications, University of Chicago (2001-2004)

Member, Editorial Board, Review of Law and Economics (2004-)

Member, Oxford University Press Legal Education Advisory Board (2006-)

Member, Editorial Board, Journal of Benefit-Cost Analysis (2009-)

Short-Term Consultant, World Bank (2007)

Participant in Simulated Canada-United States Negotiation Over the Northwest Passage, sponsored by ArcticNet (Ottawa, February 2008)

Member, Faculty Steering Committee, Milton Friedman Institute (2008-2010)

Member, International Advisory Board, the Centre for Law, Economics and Society, University College London (2013-)

Member, Editorial Board, Economic Analysis of Law Review (2014-)

Sympatic Inc., Advisory Board (2019-)

Member, Committee on International Relations, University of Chicago (2003-)

**Consulting Relationships (since 2020)**

Le v. Zuffa (2024). Provided expert report supporting a proposal to settle a lawsuit brought by employees of mixed martial arts league against their employer. Retained by Berger Montague, attorney for plaintiffs.

Department of Justice (2024). Advised on investigation of a potential merger between two entertainment-related entities. The facts are confidential.

Sona Asset Management (2024). Advised financial institution about legal issues in Tapestry/Capri merger litigation.

Ford Motor Co. (2021-2022). Advised automobile manufacture on antitrust strategy relating to distribution.

Difederico v Amazon.com, Inc. et al., No. T-445-20 (Federal Court, Canada) (2021). Advised on arbitration issues relating to class action lawsuit against Amazon in Canada. Served as expert; retained by Orr Taylor LLP and Strosberg Sasso Sutts LLP.

Latham & Watkins (2020). Advised law firm on draft commercial code for proposed foreign development zone in middle east.

28

## Annex 3. Materials Considered

### Legal Pleadings

Plaintiff Qualcomm Inc.'s Second Amended Complaint. Case No. 1:24-cv-00490-MN. June 3, 2025.
DTX_00936, *Arm Ltd.* v. *Qualcomm, Inc.*. Case No. 1:22-cv-01146-MN.
DTX_00937, *Arm Ltd.* v. *Qualcomm, Inc.*. Case No. 1:22-cv-01146-MN.
Federal Trade Commission Complaint *In the Matter of Nvidia/Arm*. Case No. 9404. December 2, 2021.
December 16, 2024 *Arm Ltd. v. Qualcomm, Inc.* CA No. 22-1146 Trial Transcript

### Depositions

Deposition of Rene Haas. December 12, 2023
Deposition of Phil Hughes. June 17, 2025.
Deposition of Martin Weidmann. June 20, 2025.
Deposition of Gerard Williams. June 25, 2025.
Deposition of Will Abbey. June 26, 2025.
Deposition of Michael Williams. June 27, 2025.
Deposition of Richard Grisenthwaite. July 2, 2025.
Deposition of Chrisopher Patrick. July 2, 2025.
Deposition of Paul Williamson. July 2, 2025.
Deposition of Cristiano Amon. July 3, 2025.
Deposition of Lynn Couillard. July 3, 2025.
Deposition of Rene Haas. July 7, 2025.
Deposition of Ziad Asghar. July 7, 2025.
Deposition of Jignesh Trivedi.  July 9, 2025.
Deposition of Durga Malladi. July 10, 2025.
Deposition of Jonathan Weiser. July 11, 2025.
Deposition of Ann Chaplin. July 11, 2025.

### Literature

Marie-Laure Allain et al., *Vertical Integration as a Source of Hold-up*, Toulouse School of Economics, Working Paper n. 14-525 (2014).
Carl Shapiro, *Vertical Mergers and Input Foreclosure Lessons from the* AT&T/Time Warner *Case*, 59 Rev. of Indus. Org. 303 (2021).
Joseph Farrell & Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, Handbook of Industrial Organization, Chapter 31 (2007).
Chiara Fumagalli & Massimo Motta, *Dynamic Vertical Foreclosure*, 63 J. of L. and Econ (2020).
Oliver Hart et al., *Vertical Integration and Market Foreclosure*, 1990 Brookings Papers on Economic Activity: Microeconomics (1990).
Janusz A. Ordover et al., *Equilibrium Vertical Foreclosure*, 80 American Economic Review (1990).

1

Partrick Rey & Jean Tirole, A Primer on Foreclosure, 3 Handbook of Industrial Organization (2007).

Helena Perrone, *Chips in on a Merger: The Arm-Nvidia Case*, 98 Int'l J. of Indus. Org. 103130 (Jan. 2025).

John Vickers, *Concepts of Competition*, 47 Oxford Economic Papers 1 (1995).

**Other Documents**

Rene Haas in ACQ2 by Acquired Podcast, *How Arm became the worlds default chip architecture with ARM CEO Rene Haas* (December 2, 2024), https://open.spotify.com/episode/2sxLw7ti6tC7xr3NQnphXG?si=KMdhxFHlQMqtGupg_c6kjA&nd=1&dlsi=ba9cf1c344524296.

Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture (last visited August 5, 2025).

Annual Report and Consolidated Financial Statements For the year ended 31 March 2024, Arm Holdings Limited (May 29, 2024) https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9.

Bloomberg Technology, *Arm CEO on Intel, Chips, AI, Listing in US* (October 22, 2024), www.youtube.com/watch?v=6FnBz8rxWUY.

Arm,com, *Glossary: Instruction Set Architecture (ISA)*, https://www.arm.com/glossary/isa (last visited August 5, 2025).

Josh Horwitz, Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadealcollapses-2022-02-08/.

RISC-V, *Members*,  https://riscv.org/members/ (last visited August 5, 2025).

Michael Acton, *Arm to explore designing its own chips, chief executive says*, Financial Times (July 30, 2025) Accessed August 5, 2025, https://www.ft.com/content/735c8a2d-0ce0-49d6-934f-8aee3e927108?shareType=nongift.

Financial Times, *How Arm could be the unexpected winner of the AI investment boom* (October 30, 2024), www.ft.com/content/80a1e79e-b662-40e9-9b41-6d1070f694a8?FTCamp=engage/CAPI/website/Channel_muckrack//B2B.

Mike Johnson, *Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025*, WebProNews (July 31, 2025), https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/.

Mobile Unleashed, *The Origin and Evolution of ARM Processors In Our Devices*, (December 2015) semiwiki.com/books/Mobile%20Unleashed%20-%20front%20to%20back.pdf.

Mohamed Awad, *Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm-based*, Arm Newsroom (April 1, 2025), https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based.

Nell Walker, *Qualcomm: A History*, Manufacturing Digital (May 16, 2020), https://manufacturingdigital.com/technology/qualcomm-history (last visited Aug. 5, 2025).

Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025).

Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025).

Arm.com, *Glossary: SoC Development*, https://www.arm.com/glossary/soc-development (last visited August 5, 2025).

*Software ecosystems*, Arm Developer,
https://developer.arm.com/documentation/102252/0100/Software-ecosystems (last visited August 5, 2025).

*The Arm Ecosystem: Powering AI Everywhere – From Cloud to Edge*, Arm Newsroom (May 19, 2025), https://newsroom.arm.com/blog/arm-computex-2025.

Arm.com, *The Official History of Arm*, https://newsroom.arm.com/blog/arm-official-history (last visited August 8, 2025).

Tim Bradshaw, *Rene Haas: 'Arm has the most ubiquitous computer architecture on the planet,'* Financial Times (June 7, 2024) https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d.

Arm's "what is" series, *What is… CPU architecture*, (August 18, 2021)
www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.

Amd.com, *Intel Antitrust Rulings*, https://www.amd.com/en/legal/notices/antitrust-ruling.html, (last visited August 7, 2025).

## Bates Numbered Documents

ARM_00055357
ARM_00079520
ARM_00079530
ARM_00082009
ARM_00089058
ARM_00094099
ARM_00094197
ARM_00094200
ARM_00094204
ARM_00103918
ARM_00110020
ARM_00110511
ARM_00110513
ARM_01215486
ARM_01215564
ARM_01215885
ARM_01215886
ARM_01215887
ARM_01215888
ARM_01215889
ARM_01231038
ARM_01241285
ARM_01241565
ARM_01241577
ARM_01241585
ARM_01424394
ARMQC_00000640
ARMQC_00001038
ARMQC_00001136
ARMQC_00001163

ARMQC_02720799
ARMQC_02727610
ARMQC_02729064
ARMQC_02739661
ARMQC_02762991
ARMQC_02762992
ARMQC_02763016
ARMQC_02771126
ARMQC_02778180
QCARM_0338573
QCARM_0343120
QCARM_0343954
QCARM_3424233
QCARM_3424399
QCARM_3424873
QCARM_3428243
QCARM_3433633
QCARM_3460976
QCARM_3460981
QCARM_3522626
QCARM_7477120
QCARM_7484471
QCARM_7484477
QCARM_7484481
QCARM_7509431
QCARM_7517677
QCVARM_0465277
QCVARM_0526828
QCVARM_0607499
QCVARM_0616970
QCVARM_0618354
QCVARM_0618382
QCVARM_0618384
QCVARM_0714768
QCVARM_0715414
QCVARM_0716360
QCVARM_0717008
QCVARM_0717291
QCVARM_0847094
QCVARM_0847188
QCVARM_0847548
QCVARM_0848033
QCVARM_0851120
QCVARM_0857149
QCVARM_0857152
QCVARM_0866825

QCVARM_0867422
QCVARM_1012343
QCVARM_1012399
QCVARM_1014030
QCVARM_1014955
QCVARM_1018853
QCVARM_1019083
QCVARM_1030816
QCVARM_1066811
QCVARM_1066820
QCVARM_1070919
QCVARM_1070944
QCVARM_1070982
QCVARM_1070993
QCVARM_1071021
QCVARM_1071165
QCVARM_1119108
QCVARM_1120153
QCVARM_1120206
QCVARM_1120224
QCVARM_1120267
QCVARM_1120481

# Exhibit 5
## (REDACTED IN ITS ENTIRETY)