# Exhibit 6

# Judicial Council of California Civil Jury Instructions

## CACI*

\* Pronounced "Casey"

As approved at the
Judicial Council's Rules Committee October 2024 Meeting
and Judicial Council November 2024 Meeting

1

Judicial Council of California

## Series 100–2500



**Judicial Council of California
Advisory Committee on Civil Jury Instructions**

Hon. Adrienne M. Grover, Chair

LexisNexis Matthew Bender
Official Publisher



## QUESTIONS ABOUT THIS PUBLICATION?

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call or email:

Paul A. Ernest, J.D. at ....................................................................................................... (971) 270-8766

Email: .................................................................................................. paul.ernest@lexisnexis.com

For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at ..................................................... (800) 833-9844

Outside the United States and Canada, please call ........................... (518) 487-3385

Fax Number ....................................................................... (800) 828-8341

LexisNexis® Support Center ................... https://supportcenter.lexisnexis.com/app/home/

For information on other Matthew Bender publications, please call

Your account manager or ................................................................. (800) 223-1940

Outside the United States and Canada, please call ........................... (518) 487-3385

ISSN: 1549-7100
ISBN: 978-1-6633-9023-3 (print)

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. No copyright is claimed by Matthew Bender & Company to the jury instructions, verdict forms, Directions for Use, Sources and Authority, User's Guide, Life Expectancy Tables, or Disposition Table.


CITE THIS PUBLICATION: Judicial Council of California Civil Jury Instructions (2025 edition)
Cite these instructions: "CACI No. _____."
Cite these verdict forms: "CACI No. VF-_____."

Editorial Office
230 Park Ave., 7th Floor, New York, NY 10169 (800) 543-6862
www.lexisnexis.com

(12/2024–Pub.1283)

# *Preface to CACI Updates*

This edition of CACI includes a number of additions and changes to the instructions, which were first published in 2003. In providing these updates, the Judicial Council Advisory Committee on Civil Jury Instructions is fulfilling its charge to maintain CACI. The committee is also striving to add instructions in new areas of the law and to augment existing areas.

The impetus for the revisions came from several sources including CACI users who detected changes in the law or who simply sought to do a better job of explaining the law in plain English. Responding to feedback from users is consistent with the Advisory Committee's goal to act as a vehicle for maintaining CACI as the work product of the legal community. We hope that our hundreds of contributors view our role in the same way and that they will continue to support us.

November 2024

> Hon. Adrienne M. Grover
> Court of Appeal, Sixth District
> Chair, Advisory Committee on Civil Jury Instructions

---

**The Advisory Committee on Civil Jury Instructions welcomes comments. Send comments by email to: civiljuryinstructions@jud.ca.gov**

Or you may send print comments by regular mail to:

Advisory Committee on Civil Jury Instructions—Attn.
Eric Long
Legal Services Office
455 Golden Gate Avenue
San Francisco, CA 94102-3588

This version provided by LexisNexis® Matthew Bender®, Official Publisher, 800-533-1637, store.lexisnexis.com, for public and internal court use

## 2202. Intentional Interference With Prospective Economic Relations—Essential Factual Elements

---

[*Name of plaintiff*] **claims that** [*name of defendant*] **intentionally interfered with an economic relationship between** [**him/her**/*nonbinary pronoun*/**it**] **and** [*name of third party*] **that probably would have resulted in an economic benefit to** [*name of plaintiff*]**. To establish this claim,** [*name of plaintiff*] **must prove all of the following:**

1. **That** [*name of plaintiff*] **and** [*name of third party*] **were in an economic relationship that probably would have resulted in an economic benefit to** [*name of plaintiff*]**;**

2. **That** [*name of defendant*] **knew of the relationship;**

3. **That** [*name of defendant*] **engaged in** [*specify conduct determined by the court to be wrongful*]**;**

4. **That by engaging in this conduct,** [*name of defendant*] **[intended to disrupt the relationship/ [or] knew that disruption of the relationship was certain or substantially certain to occur];**

5. **That the relationship was disrupted;**

6. **That** [*name of plaintiff*] **was harmed; and**

7. **That** [*name of defendant*]**'s conduct was a substantial factor in causing** [*name of plaintiff*]**'s harm.**

---

*New September 2003; Revised June 2013, December 2013*

### Directions for Use

Regarding element 3, the interfering conduct must be wrongful by some legal measure other than the fact of the interference itself. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740].) This conduct must fall outside the privilege of fair competition. (*PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 603 [52 Cal.Rptr.2d 877], disapproved on other grounds in *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159 fn. 11 [131 Cal.Rptr.2d 29, 63 P.3d 937].) Whether the conduct alleged qualifies as wrongful if proven or falls within the privilege of fair competition is resolved by the court as a matter of law. If the court lets the case go to trial, the jury's role is not to determine wrongfulness, but simply to find whether or not the defendant engaged in the conduct. If the conduct is tortious, the judge should instruct on the elements of the tort.

### Sources and Authority

• "The tort of intentional or negligent interference with prospective economic

**CACI No. 2202**                    ECONOMIC INTERFERENCE

advantage imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition." (*Settimo Associates v. Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, 845 [17 Cal.Rptr.2d 757], internal citation omitted.)

- "The tort of interference with prospective economic advantage protects the same interest in stable economic relationships as does the tort of interference with contract, though interference with prospective advantage does not require proof of a legally binding contract. The chief practical distinction between interference with contract and interference with prospective economic advantage is that a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587], internal citations omitted.)

- "Intentional interference with prospective economic advantage has five elements: (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." (*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512 [213 Cal.Rptr.3d 568, 388 P.3d 800]].)

- "The tort's requirements 'presuppose the relationship existed at the time of the defendant's allegedly tortious acts lest liability be imposed for actually and intentionally disrupting a relationship which has yet to arise.' " (*Roy Allan Slurry Seal, Inc., supra*, 2 Cal.5th at p. 518.)

- "The question is whether a plaintiff must plead and prove that the defendant engaged in wrongful acts *with the specific intent* of interfering with the plaintiff's business expectancy. We conclude that specific intent is not a required element of the tort of interference with prospective economic advantage. While a plaintiff may satisfy the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiff's prospective economic advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." (*Korea Supply Co., supra*, 29 Cal.4th at p. 1154, original italics.)

- "[A] plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." (*Della Penna, supra*, 11 Cal.4th at p. 393.)

- "With respect to the third element, a plaintiff must show that the defendant engaged in an independently wrongful act. It is not necessary to prove that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's

prospective economic advantage. Instead, 'it is sufficient for the plaintiff to plead that the defendant "[knew] that the interference is certain or substantially certain to occur as a result of his action." ' '[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' '[A]n act must be wrongful by some legal measure, rather than merely a product of an improper, but lawful, purpose or motive.' " (*San Jose Construction, Inc. v. S.B.C.C., Inc.* (2007) 155 Cal.App.4th 1528, 1544–1545 [67 Cal.Rptr.3d 54], internal citations omitted.)

- "*Della Penna* did not specify what sort of conduct would qualify as 'wrongful' apart from the interference itself." (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 340 [60 Cal.Rptr.2d 539].)

- "Justice Mosk's concurring opinion in *Della Penna* advocates that proscribed conduct be limited to means that are independently tortious or a restraint of trade. The Oregon Supreme Court suggests that conduct may be wrongful if it violates 'a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.' . . . Our Supreme Court may later have occasion to clarify the meaning of 'wrongful conduct' or 'wrongfulness,' or it may be that a precise definition proves impossible." (*Arntz Contracting Co. v. St. Paul Fire and Marine Insurance Co.* (1996) 47 Cal.App.4th 464, 477–478 [54 Cal.Rptr.2d 888], internal citations omitted.)

- "Commonly included among improper means are actions which are independently actionable, violations of federal or state law or unethical business practices, e.g., violence, misrepresentation, unfounded litigation, defamation, trade libel or trade mark infringement." (*PMC, Inc., supra*, 45 Cal.App.4th at p. 603, internal citation omitted.)

- "[A] plaintiff need not allege the interference and a second act independent of the interference. Instead, a plaintiff must plead and prove that the conduct alleged to constitute the interference was independently wrongful, i.e., unlawful for reasons other than that it interfered with a prospective economic advantage. [Citations.]" (*Crown Imports, LLC v. Superior Court* (2014) 223 Cal.App.4th 1395, 1404 [168 Cal.Rptr.3d 228].)

- "The question has arisen as to whether, in order to be actionable as interference with prospective economic advantage, the interfering act must be independently wrongful *as to the plaintiff*. It need not be. There is 'no sound reason for requiring that a defendant's wrongful actions must be directed towards the plaintiff seeking to recover for this tort. The interfering party is liable to the interfered-with party [even] "when the independently tortious means the interfering party uses are independently tortious *only as to a third party*." ' " (*Crown Imports LLC, supra*, 223 Cal.App.4th at p. 1405, original italics.)

- "[T]o state a cause of action for intentional or negligent interference with prospective economic advantage, it is not necessary to also plead a separate, stand-alone tort cause of action." (*Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 1006 [230 Cal.Rptr.3d 98], internal citations omitted.)

**CACI No. 2202**          ECONOMIC INTERFERENCE

- "[O]ur focus for determining the wrongfulness of those intentional acts should be on the defendant's objective conduct, and evidence of motive or other subjective states of mind is relevant only to illuminating the nature of that conduct." (*Arntz Contracting Co., supra*, 47 Cal.App.4th at p. 477.)

- "[A]n essential element of the tort of intentional interference with prospective business advantage is the existence of a business relationship with which the tortfeasor interfered. Although this need not be a contractual relationship, an existing relationship is required." (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 546 [30 Cal.Rptr.2d 706], internal citations omitted.)

- "If a party has no liability in tort for refusing to perform an existing contract, no matter what the reason, he or she certainly should not have to bear a burden in tort for refusing to *enter into* a contract where he or she has no obligation to do so. If that same party cannot conspire with a third party to breach or interfere with his or her own contract then certainly the result should be no different where the 'conspiracy' is to disrupt a relationship which has not even risen to the dignity of an existing contract and the party to that relationship was entirely free to 'disrupt' it on his or her own without legal restraint or penalty." (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 266 [45 Cal.Rptr.2d 90], original italics.)

- "Although varying language has been used to express this threshold requirement, the cases generally agree it must be reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." (*Youst v. Longo* (1987) 43 Cal.3d 64, 71 [233 Cal.Rptr. 294, 729 P.2d 728], internal citations omitted.)

- "Under [the competition] privilege, ' "a competitor is free to divert business to himself as long as he uses fair and reasonable means.' [Citation.]' " (*I-CA Enterprises, Inc. v. Palram Americas, Inc.* (2015) 235 Cal.App.4th 257, 292–293 [185 Cal.Rptr.3d 24].)

- "Since the crux of the competition privilege is that one can interfere with a competitor's prospective contractual relationship with a third party as long as the interfering conduct is not independently wrongful (i.e., wrongful apart from the fact of the interference itself), *Della Penna*'s requirement that a plaintiff plead and prove such wrongful conduct in order to recover for intentional interference with prospective economic advantage has resulted in a shift of burden of proof. It is now the plaintiff's burden to prove, as an element of the cause of action itself, that the defendant's conduct was independently wrongful and, therefore, was not privileged rather than the defendant's burden to prove, as an affirmative defense, that it's [*sic*] conduct was not independently wrongful and therefore was privileged." (*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 881 [60 Cal.Rptr.2d 830].)

- "[I]n the absence of other evidence, timing alone *may be sufficient* to prove causation . . . . Thus, . . . the real issue is whether, in the circumstances of the case, the proximity of the alleged cause and effect tends to demonstrate some

relevant connection. If it does, then the issue is one for the fact finder to decide." (*Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1267 [119 Cal.Rptr.3d 127], original italics.)

• "There are three formulations of the manager's privilege: (1) absolute, (2) mixed motive, and (3) predominant motive." (*Halvorsen v. Aramark Uniform Services, Inc.* (1998) 65 Cal.App.4th 1383, 1391 [77 Cal.Rptr.2d 383].)

• "We conclude that a plaintiff seeking to state a claim for intentional interference with contract or prospective economic advantage because defendant induced another to undertake litigation, must allege that the litigation was brought without probable cause and that the litigation concluded in plaintiff's favor." (*Pacific Gas & Electric Co., supra*, 50 Cal.3d at p. 1137.)

### Secondary Sources

5 Witkin, Summary of California Law (11th ed. 2017) Torts, §§ 854–855, 875

Chin et al., California Practice Guide: Employment Litigation, Ch. 5(I)-F, *Intentional Interference With Contract Or Prospective Economic Advantage*, ¶¶ 5:463, 5:470 (The Rutter Group)

Croskey et al., California Practice Guide: Insurance Litigation, Ch. 11-G, *Intentional Interference With Contract Or Economic Advantage*, ¶ 11:138.5 (The Rutter Group)

3 Levy et al., California Torts, Ch. 40, *Fraud and Deceit and Other Business Torts*, §§ 40.100–40.105 (Matthew Bender)

49 California Forms of Pleading and Practice, Ch. 565, *Unfair Competition*, § 565.133 (Matthew Bender)

12 California Points and Authorities, Ch. 122, *Interference*, §§ 122.23, 122.32 (Matthew Bender)

## 2203.  Intent

---

*Revoked December 2013*

## 2204.  Negligent Interference With Prospective Economic Relations

[*Name of plaintiff*] **claims that** [*name of defendant*] **negligently interfered with a relationship between** [**him/her/***nonbinary pronoun***/it**] **and** [*name of third party*] **that probably would have resulted in an economic benefit to** [*name of plaintiff*]**. To establish this claim,** [*name of plaintiff*] **must prove all of the following:**

1. **That** [*name of plaintiff*] **and** [*name of third party*] **were in an economic relationship that probably would have resulted in a future economic benefit to** [*name of plaintiff*]**;**

2. **That** [*name of defendant*] **knew or should have known of this relationship;**

3. **That** [*name of defendant*] **knew or should have known that this relationship would be disrupted if** [**he/she/***nonbinary pronoun***/it**] **failed to act with reasonable care;**

4. **That** [*name of defendant*] **failed to act with reasonable care;**

5. **That** [*name of defendant*] **engaged in wrongful conduct through** [*insert grounds for wrongfulness, e.g., breach of contract with another, misrepresentation, fraud, violation of statute*]**;**

6. **That the relationship was disrupted;**

7. **That** [*name of plaintiff*] **was harmed; and**

8. **That** [*name of defendant*]**'s wrongful conduct was a substantial factor in causing** [*name of plaintiff*]**'s harm.**

*New September 2003; Revised November 2020*

### Directions for Use

Regarding the fifth element, the judge must specifically state for the jury the conduct that the judge has determined as a matter of law would satisfy the "wrongful conduct" standard. This conduct must fall outside the privilege of fair competition. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740]; *Settimo Associates v. Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, 845 [17 Cal.Rptr.2d 757].) The jury must then decide whether the defendant engaged in the conduct as defined by the judge. If the conduct is tortious, judge should instruct on the elements of the tort.

### Sources and Authority

- "The tort of intentional or negligent interference with prospective economic advantage imposes liability for improper methods of disrupting or diverting the

1333

**CACI No. 2204**          ECONOMIC INTERFERENCE

business relationship of another which fall outside the boundaries of fair
competition." (*Settimo Associates, supra*, 14 Cal.App.4th at p. 845, internal
citation omitted.)

- "The elements of negligent interference with prospective economic advantage are
  (1) the existence of an economic relationship between the plaintiff and a third
  party containing the probability of future economic benefit to the plaintiff; (2)
  the defendant's knowledge of the relationship; (3) the defendant's knowledge
  (actual or construed) that the relationship would be disrupted if the defendant
  failed to act with reasonable care; (4) the defendant's failure to act with
  reasonable care; (5) actual disruption of the relationship; (6) and economic harm
  proximately caused by the defendant's negligence." (*Redfearn v. Trader Joe's
  Co.* (2018) 20 Cal.App.5th 989, 1005 [230 Cal.Rptr.3d 98].)

- "The tort of negligent interference with prospective economic advantage is
  established where a plaintiff demonstrates that (1) an economic relationship
  existed between the plaintiff and a third party which contained a reasonably
  probable future economic benefit or advantage to plaintiff; (2) the defendant
  knew of the existence of the relationship and was aware or should have been
  aware that if it did not act with due care its actions would interfere with this
  relationship and cause plaintiff to lose in whole or in part the probable future
  economic benefit or advantage of the relationship; (3) the defendant was
  negligent; and (4) such negligence caused damage to plaintiff in that the
  relationship was actually interfered with or disrupted and plaintiff lost in whole
  or in part the economic benefits or advantage reasonably expected from the
  relationship." (*North American Chemical Co. v. Superior Court* (1997) 59
  Cal.App.4th 764, 786 [69 Cal.Rptr.2d 466].)

- " 'The tort of *negligent* interference with economic relationship arises only when
  the defendant owes the plaintiff a duty of care.' " (*LiMandri v. Judkins* (1997) 52
  Cal.App.4th 326, 348 [60 Cal.Rptr.2d 539], original italics, internal citation
  omitted.)

- "Where a special relationship exists between the parties, a plaintiff may recover
  for loss of expected economic advantage through the negligent performance of a
  contract although the parties were not in contractual privity." (*J'Aire Corp. v.
  Gregory* (1979) 24 Cal.3d 799, 804 [157 Cal.Rptr. 407, 598 P.2d 60].)

- The trial court should instruct the jury on the "independently wrongful" element
  of the tort of negligent interference with prospective economic advantage.
  (*National Medical Transportation Network v. Deloitte & Touche* (1998) 62
  Cal.App.4th 412, 440 [72 Cal.Rptr.2d 720].)

- "Commonly included among improper means are actions which are
  independently actionable, violations of federal or state law or unethical business
  practices, e.g., violence, misrepresentation, unfounded litigation, defamation,
  trade libel or trade mark infringement." (*PMC, Inc. v. Saban Entertainment, Inc.*
  (1996) 45 Cal.App.4th 579, 603 [52 Cal.Rptr.2d 877], internal citation omitted,
  disapproved on other grounds in *Korea Supply Co. v. Lockheed Martin Corp.*

(2003) 29 Cal.4th 1134, 1159 fn. 11 [131 Cal.Rptr.2d 29, 63 P.3d 937].)

- "While the trial court and [defendant] are correct that a defendant incurs liability for interfering with another's prospective economic advantage only if the defendant's conduct was independently wrongful, we have been directed to no California authority, and have found none, for the trial court's conclusion that the wrongful conduct must be intentional or willful. The defendant's conduct must 'fall outside the boundaries of fair competition'. . . , but negligent misconduct or the violation of a statutory obligation suffice. The approved CACI No. 2204 does not indicate otherwise and, in fact, indicates that either a misrepresentation or 'violation of statute' is sufficient." (*Venhaus v. Shultz* (2007) 155 Cal.App.4th 1072, 1079–1080 [66 Cal.Rptr.3d 432], internal citations omitted.)

- "The fact that the defendant's conduct was independently wrongful is an element of the interference cause of action itself. In addition, the wrongful interfering act can be independently tortious only as to a third party; it need not be independently wrongful as to the plaintiff. Accordingly, . . . to state a cause of action for intentional or negligent interference with prospective economic advantage, it is not necessary to also plead a separate, stand-alone tort cause of action." (*Redfearn*, *supra*, 20 Cal.App.5th at p. 1006, internal citations omitted.)

- "[A]mong the criteria for establishing [the existence of] a duty of care is the 'blameworthiness' of the defendant's conduct. For negligent interference, a defendant's conduct is blameworthy only if it was independently wrongful apart from the interference itself." (*Lange v. TIG Ins. Co.* (1998) 68 Cal.App.4th 1179, 1187 [81 Cal.Rptr.2d 39], internal citations omitted.)

- "Under the privilege of free competition, a competitor is free to divert business to himself as long as he uses fair and reasonable means. Thus, the plaintiff must present facts indicating the defendant's interference is somehow wrongful—i.e., based on facts that take the defendant's actions out of the realm of legitimate business transactions." (*Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1153–1154 [265 Cal.Rptr. 330], internal citations omitted.)

- "Since the crux of the competition privilege is that one can interfere with a competitor's prospective contractual relationship with a third party as long as the interfering conduct is not independently wrongful (i.e., wrongful apart from the fact of the interference itself), *Della Penna*'s requirement that a plaintiff plead and prove such wrongful conduct in order to recover for intentional interference with prospective economic advantage has resulted in a shift of burden of proof. It is now the plaintiff's burden to prove, as an element of the cause of action itself, that the defendant's conduct was independently wrongful and, therefore, was not privileged rather than the defendant's burden to prove, as an affirmative defense, that it's [*sic*] conduct was not independently wrongful and therefore was privileged." (*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 881 [60 Cal.Rptr.2d 830].)

- "There are three formulations of the manager's privilege: (1) absolute, (2) mixed

**CACI No. 2204**     ECONOMIC INTERFERENCE

motive, and (3) predominant motive." (*Halvorsen v. Aramark Uniform Services, Inc.* (1998) 65 Cal.App.4th 1383, 1391 [77 Cal.Rptr.2d 383].)

### Secondary Sources

5 Witkin, Summary of California Law (11th ed. 2017) Torts, §§ 867–869

3 Levy et al., California Torts, Ch. 40, *Fraud and Deceit and Other Business Torts*, § 40.104 (Matthew Bender)

10 California Forms of Pleading and Practice, Ch. 103, *Brokers*, § 103.33 (Matthew Bender)

49 California Forms of Pleading and Practice, Ch. 565, *Unfair Competition*, § 565.135 (Matthew Bender)

12 California Points and Authorities, Ch. 122, *Interference*, § 122.70 (Matthew Bender)

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>  a Delaware corporation,<br>QUALCOMM TECHNOLOGIES, INC.,<br>  a Delaware corporation,<br><br>          Plaintiffs,<br><br>    v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>  a U.K. corporation,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 24-490-MN<br><br>████████████████████ |

**PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANT'S THIRD SET OF INTERROGATORIES (NO. 14)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiffs Qualcomm

Inc. and Qualcomm Technologies, Inc. (collectively "Qualcomm" or "Plaintiffs") by and through

their attorneys, hereby supplement their responses and objections to defendant Arm Holdings

PLC's ("Defendant" or "Arm") Interrogatories to Plaintiffs dated June 11, 2025, as follows:

## GENERAL OBJECTIONS

1.      Plaintiffs object to each Interrogatory to the extent that it seeks to impose greater

or different obligations on Plaintiffs than those provided for by the Federal Rules of Civil

Procedure, the Local Rules of the United States District Court for the District of Delaware, any

discovery orders entered into this case, any other applicable Court orders, or agreements reached

by the parties.

2.      Plaintiffs object to each Interrogatory to the extent that it seeks documents, things,

or information protected by the attorney-client privilege, the work-product doctrine, or any other

applicable privilege or immunity.  Nothing contained in these Responses and Objections is

intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or

protection.  Specific Objections on the grounds of privilege are provided for emphasis and clarity only, and the absence of a Specific Objection is neither intended, nor should be interpreted, as evidence that Plaintiffs do not object to an Interrogatory on the basis of an applicable privilege, immunity, or protection.  Any disclosure of any such privileged or protected material in responses to any Interrogatory is inadvertent and not intended to waive those privileges and protections.

3.      Plaintiffs object to each Interrogatory to the extent that it purports, or may be construed, to call for the identification of "any," "all," "each," or "every" document or thing pertaining to a specific subject, on the ground that such language is overbroad and unduly burdensome.  As used herein, the term overbroad includes Interrogatories that, so characterized, seek, at least in part, documents or information irrelevant in scope, subject matter or time period to this lawsuit or to the particular matters at issue in this lawsuit.

4.      Plaintiffs object to the Interrogatories to the extent that they call for discovery that is unreasonable or not proportional under the circumstances.  Plaintiffs further object to the Interrogatories to the extent they seek to re-litigate issues that were the subject of the jury verdict in *Arm* v. *Qualcomm*, C.A. No. 22-1146 (D. Del.).

5.      Plaintiffs object to the Interrogatories to the extent that they are not reasonably limited in time.  Plaintiffs will agree to respond from June 1, 2022 forward, unless specified.

6.      Plaintiffs object to the Interrogatories and each and every instruction and definition therein to the extent that any Interrogatory: (a) seeks the disclosure of information not relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence; (b) is overly broad, unduly burdensome, harassing, oppressive, or duplicative; (c) is vague or ambiguous; (d) calls for the disclosure of information not within Plaintiffs' possession, knowledge, custody, care, or control; (e) calls for the disclosure of information already in Defendant's possession,

knowledge, custody, care, or control; or (f) calls for the disclosure of information readily available to Defendant from public or third-party sources.

7.      Plaintiffs' election to respond to an Interrogatory, notwithstanding the objectionable nature of the Interrogatory, is not: (a) an acceptance of, or agreement with, any of the characterizations or purported descriptions of any facts, circumstances, events, or legal conclusions contained in the Interrogatories; (b) a concession or admission that the materials are relevant to this case or would be admissible at trial; (c) a waiver of the General Objections or the objections asserted in response to that specific Interrogatory; (d) an admission that any documents or things exist on the topic; (e) an agreement that requests for similar information or documents will be treated in a similar manner; or (f) an acceptance of, or agreement with, any of the definitions in the Interrogatories, to the extent that the definition or meaning of any defined term is at issue in this case.

8.      Plaintiffs' responses to the Interrogatories contain, provide, or refer to information that is protected under Delaware Local Rule 26.2 and the agreed upon provisions of the proposed Protective Order in this matter and should therefore be treated accordingly.  Plaintiffs reserve the right to amend or supplement their objections and/responses as appropriate once the Court enters a Protective Order and ESI Order in this matter.

9.      Plaintiffs' investigation of the facts in this proceeding and review of the relevant documents is ongoing.  Accordingly, the objections and responses herein are based on present knowledge, information, and belief.  Plaintiffs reserve the right to modify, supplement, or amend any response and objection, if necessary or appropriate, in any way and at any time.  Plaintiffs further reserve the right to object, at any hearing and any other proceeding in this litigation, to the use or admissibility into evidence of: (a) any documents produced in response to the interrogatories;

(b) any of the information contained in any such document; or (c) any other information provided in response to any interrogatory.

10. In the event that Plaintiffs produce a document that is privileged, protected under Federal Rule of Evidence 502, or otherwise immune from disclosure, it will have been produced through inadvertence and shall not constitute a waiver of any privilege or immunity applicable (a) to that or any other document or (b) to communications concerning the subject matter of that or any other document.

11. Plaintiffs object to the Interrogatories to the extent that they assume disputed facts or legal conclusions. Plaintiffs hereby deny any such disputed facts or legal conclusions. Any documents or information produced by Plaintiffs in response to the Interrogatories are without prejudice to this objection.

12. Plaintiffs' General Objections apply to each and every Interrogatory and are incorporated by reference into each of the responses set forth below, which responses are made without waiver of, and subject to, these General Objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Plaintiffs object to the "Definitions" to the extent that they attempt to define words beyond or inconsistent with their ordinary meaning.[1]

2. Plaintiffs object to the definition of "Arm" or "Defendant" as vague and ambiguous to the extent the scope of "related corporate entities" is unclear.

3. Plaintiffs object to the definition of "Qualcomm" as vague, ambiguous, overly broad, and unduly burdensome to the extent it is defined to include not only Qualcomm Incorporated and Qualcomm Technologies, Inc., but also persons or entities that are separate and

---

[1] To the extent not defined here, the definitions used by Plaintiffs in the responses below are consistent with the definitions contained in Plaintiffs' operative complaint.

distinct from Qualcomm Incorporated and Qualcomm Technologies, Inc., and over whom Plaintiffs exercise no control, such as but not limited to affiliates, consultants, independent contractors, experts, investigators, licensees, licensors, or collaborators.

4.      Plaintiffs object to the definitions of "You," "Your," and "Plaintiffs" as vague, ambiguous, overly broad, and unduly burdensome to the extent they seek information relating to persons or entities that are separate and distinct from Qualcomm Incorporated and Qualcomm Technologies, Inc. and over whom Plaintiffs exercise no control.   In responding to these Interrogatories, Plaintiffs interpret the terms "You," "Your," and "Plaintiffs" to refer only to the named parties in this action.   Plaintiffs also object to the definitions of "You," "Your," and "Plaintiffs" to the extent they purport to impose obligations on Plaintiffs beyond what is required by the Rules.  Plaintiffs will interpret the definition of "You," "Your," and "Plaintiffs" to impose no discovery obligation on any person or entity that is not a party to this litigation.

5.      Plaintiffs object to the definition of "ALA" as vague, ambiguous, and overbroad because it is not clear which agreement(s) "an Architecture License Agreement with Arm" refers to.  Plaintiffs will interpret "ALA" as synonymous with "Qualcomm ALA" and therefore to mean the Amended and Restated Architecture License Agreement No. LES-TLA-20039 dated May 30, 2013, and amendments and annexes thereto.

6.      Plaintiffs object to the definitions of "Document" and its plural to the extent they purport to impose any obligations beyond what is required by the Federal Rules.  Plaintiffs further object to the definition of "Document" to the extent that it implies that Plaintiffs must collect or produce, e.g., computer programs, testing data, electronic sound records, and other types of files that are typically not required to be collected or produced, as listed in the agreed upon proposed

ESI Protocol Schedule A.  Plaintiffs further object to the definition of "Document" because that term is not used in Defendant's Interrogatories.

7.      Plaintiffs object to the definitions of "Communication" and its plural form to the extent they purport to impose any obligations beyond what is required by the Federal Rules.

8.      Plaintiffs object to the definitions of "Thing" and its plural form to the extent they purport to impose any obligations beyond what is required by the Federal Rules.  Plaintiffs further object to the definition of "Thing" because that term is not used in Defendant's Interrogatories.

9.      Plaintiffs object to the definitions of "Identify," Identifying, or "Identification" to the extent they purport to impose any obligations beyond what is required by the Federal Rules. Plaintiffs also object to the definitions of "Identify," Identifying, or "Identification" to the extent they ask Plaintiffs to provide any information unknown to Plaintiffs or not within their possession, custody, or control, or beyond the scope of this litigation.

10.     Plaintiffs object to Instruction No. 2 on the ground that it imposes obligations beyond those provided for by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Delaware.

11.     Plaintiffs object to Instruction No. 4 as overbroad, unduly burdensome, and on the ground that it purports to impose requirements inconsistent with or more burdensome than those imposed by the Federal Rules, local rules, and applicable law.

12.     Plaintiffs object to Instruction 5, to the extent it imposes obligations beyond those required by the Federal Rules of Civil Procedure, and because it is premature and contrary to the agreed upon provisions in the proposed ESI Protocol or Protective Order.

██████████████████████████████████████████

13.    Plaintiffs object to Instruction No. 6 as overbroad, unduly burdensome, and on the ground that it purports to impose requirements inconsistent with or more burdensome than those imposed by the Federal Rules, local rules, and applicable law.

14.    Plaintiffs object to Instruction No. 7 to the extent it purports to require Plaintiffs to respond to Interrogatories that are not reasonably limited in time, including on subjects other than those for which such discovery is permitted under the Delaware Default Standard for Discovery or as agreed upon in the parties' anticipated agreement regarding electronic discovery.  Plaintiffs will agree to respond from June 1, 2022 forward, unless otherwise specified.

Subject to and without limiting the foregoing, Plaintiffs specifically object and respond as follows:

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 14:

Describe with specificity the complete legal and factual basis for Your contention(s) that Arm breached the Qualcomm TLA, including: (i) the identification of all section(s) of the TLA Qualcomm contends were allegedly breached by Arm, and how each such section(s) was allegedly breached by Arm; (ii) how Arm allegedly "███████████████████████████████████████ ██████████████████████ in violation of the QC TLA" (SAC ¶ 102, 118); (iii) how Arm allegedly proposed "terms so unreasonable that it was a constructive failure to license" (SAC ¶ 117); (iv) why you contend that ████████████████████████ ██████████ constitutes a breach of the TLA (SAC ¶ 118); and (v) the ██████████████████ ██████████████████████. Your response shall further include the identification of all documents supporting or refuting Qualcomm's contention(s), and the three witnesses most knowledgeable about Qualcomm's allegations.

### RESPONSE TO INTERROGATORY NO. 14:

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions.  Plaintiffs object to Interrogatory No. 14 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has

not been completed and Arm has not or has only recently produced documents relevant to these issues.  As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's breach.  Plaintiffs further object to the Interrogatory as improperly compound.  Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint and in Qualcomm's September 20, 2024 and September 27, 2024 letters, is readily within the possession of Defendant, or that is more easily available to it.  Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion.  Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 20-28 and 102-134 of the Second Amended Complaint (D.I. 137) and incorporate them by reference as if fully set forth herein.

Plaintiffs further state that Section ▮ of the Qualcomm TLA governs ▮▮▮▮▮▮

█████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

Under California law, every contract implies a covenant for each party not to do anything that will deprive the parties of the benefits of the contract. *E.g.*, *Tameny* v. *Atl. Richfield Co.*, 610 P.2d 1330, 1337 n.12 (Cal. 1980). ████████████████████████████

████████████████████████████████████

Arm breached the Qualcomm TLA and the implied covenant of good faith and fair dealing by ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████. Arm's actions have unfairly frustrated the essential purposes of the QC TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm.

█████████████████████████████████████████████

Specifically, ████████, Qualcomm sent Arm written requests to license both ██████ ████████. ██████████████████████████████, in violation of Section ███ of the QC TLA, and ignored continued outreach from Qualcomm in the subsequent months. In ████████████, Qualcomm submitted a written request for ██████ Arm ████████████████████████. Faced with Arm's continued non-compliance and the potential impact to its roadmap, Qualcomm sent Arm a notice of non-compliance with Section ███ of the QC TLA (including clauses █ and █ in ████████████. Qualcomm told Arm that the letter "serves as Qualcomm's written notice of ARM's breach of, and non-compliance with, Section ███ of the TLA." The letter asked that "ARM provide the requested core license immediately and in accordance with the terms and conditions of the TLA as required by Section ████ and █ of the TLA, or Qualcomm will be forced to exercise its remedies under the TLA." Once again, Arm failed to respond. A week later, Qualcomm wrote to Arm again, informing Arm of the "second written notice of breach and non-compliance in accordance with the notice process set forth in Section ███ of the TLA."

Arm finally responded in an ████████████ letter, writing that Arm "disagrees that any offers are currently due under Section ████". Instead, Arm stated that it did not "have any good faith obligation under the TLA to make ████████████ at this time," but provided ████████████ ████████████████████████████████████████████████████████████████

████ Contrary to Arm's statements, the financial terms that Arm provided for t████████ ████████████ were commercially unreasonable, exorbitant, and not in good faith. For example, Arm's ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████. Likewise, Arm's ████████████

████ contained ████████████████████████████████████████████.

In making this ████ Arm violated several provisions of Section █. Arm did not

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████. *E.g.* Transcript of Deposition of Karthik

Shivashankar ("Shivashankar Tr.") at 62:18–63:24, 67:12–24; Rough Transcript of Deposition of

Akshay Bhatnagar ("Bhatnagar Tr.") at 34:5–11; 40:25–43:11.

Arm also violated Section ████████ by constructively failing to offer a license to

Qualcomm for ████████████████. Although Arm ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ only in a

perfunctory attempt to escape liability under Section ████████ and avoid the associated agreed-

upon remedy for failing to supply set forth in under Section ██. In addition, Arm's ████████

violated the requirement under Section ████████████████████████████

██████████████████████████. ████████████████████████████.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████.

Qualcomm also made ████████████████████████████████

████████████████████ in August 2022 and February 2023, respectively. In

August and November 2022, Arm provided Qualcomm with a ████████████ proposal for



. *See* QCVARM_0450192; QCVARM_0449950.  In March 2023, Arm provided Qualcomm with a ██████████████████████████████████████████████████████████████████████. QCARM_03522626. ██████████████████████████████.

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained: QCVARM_0524362; QCVARM_0616913; QCVARM_0616916; ARMQC_02747993; ARMQC_02731284; QCVARM_0526828; QCVARM_0618354; QCVARM_0527544; QCVARM_1068969; QCARM_7484882; ARMQC_02783619.  Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Manju Varma; Deposition of Karl Whealton; Deposition of Karthik Shivashankar; Deposition of Akshay Bhatnagar ("Bhatnagar Tr."); Deposition of Jeff Fonseca.

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Kurt Wolf

████████████████████████████

- Larissa Cochron

- Manju Varma

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference the sections of the Expert Report of Patrick F. Kennedy, Ph.D. (dated August 8, 2025) entitled "████████████████████████████ ████████████████" and "Qualcomm's Damages Related to Arm's Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing in the Qualcomm TLA," along with their accompanying schedules. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P.

██████████████████████████████████████████████████████████

33(d).  In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Deposition of Kurt Wolf ("Wolf Dep.") 45:3-46:13 (testifying regarding Arm's delay in responding to Qualcomm's request ████████████████), 46:20-47:5, 47:17-48:12 (testifying regarding Arm's delay in responding to Qualcomm's request ██████████████████), 51:9-56:9, 132:4-133:3, 134:1-135:7, 139:22-141:17, 151:2-152:14, 154:3-156:6 (testifying regarding ████████████ ████████████████████████████████████), 188:15-178:7; Deposition of Larissa Cochron ("Cochron Dep.") 109:14-110:1, 110:14-111:4, 114:8-13, 116:15-120:20, 223:8-226:21, 154:17-156:14; Deposition of Karthik Shivashankar ("Shivashankar Dep.") 62:18–63:24, 67:12–24; Deposition of Akshay Bhatnagar ("Bhatnagar Dep.") 34:22-36:23, 37:18-22, 41:17-42:9, 42:24-43:4, 44:6-16, 47:24-48:6, 55:5-10, 70:8-21, 93:13-94:25; Deposition of Rene Haas ("Haas Dep.") 164:10-24; Deposition of Ehab Youssef ("Youssef Dep.") 97:14-98:3, 100:14-101:7; Deposition of Manju Varma ("Varma Dep.") 46:6-48:10, 50:4-22, 56:2-57:2, 81:16-83:7, 99:23-100:2, 100:20-101:2, 1103:11-21, 103:25-104:2, 142:6-20, 147:6-147:12; Deposition of Jeffrey Fonseca ("Fonseca Dep.") 25:21-29:5, 78:16-79:10; Deposition of Jean-Francois Vidon ("Vidon Dep.") 47:15-48:8; ARMQC_02783619 (████████████████ ████████); ARMQC_02784199 (Arm correspondence regarding Qualcomm's request for a license for ██████████████████████████████████████ ████████████████████████████); ARM_00062474; QCARM_0027985;    ARM_00062441;    QCVARM_0573056;    QCVARM_1121930; QCVARM_1121931; QCVARM_1118081; QCVARM_1118085.

14

███████████████████████████████████████████████

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, and further to their previous responses, Plaintiffs further respond as follows: Section ████ of the Qualcomm TLA requires ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████ Section ████████████ As noted in Qualcomm's First Supplemental Response, Arm violated this provision because ███████████████████████████████████████████ ████████████████████████████.

Deposition testimony from Arm's witnesses confirms that ███████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████████████████.

Akshay Bhatnagar testified that Karthik Shivashankar asked him to ███████████████ ██████████████████████████████████████████████. Bhatnagar Tr. at 34:22–37:22, 41:5–44:16.  Mr. Bhatnagar testified that ███████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████. *Id.* at 43:16–44:22.

███████████████████████████████████████████

Mr. Bhatnagar ████████████████████████████████████████. *Id.* at 37:18–38:5.

Karthik Shivashankar, in turn, ███████████████████████████████

████████████████████████████████████████████████████████

████████████. Shivashankar Tr. 86:11–90:14. Mr. Shivashankar did not acknowledge whether,

as Mr. Bhatnagar testified, Mr. Shivashankar himself ███████████████████████

██████. And although Mr. Shivashankar stated that ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████. *Id.* at 66:21–67:24, 85:20–86:10, 97:1–17. Jeff Fonseca—

testifying as a 30(b)(6) witness for Arm on topics related to Qualcomm's licensing requests after

having had a conversation with Mr. Shivashankar the day before—testified that Arm █████████

████████████████████████████████████████████████████████

████████████████████████. Fonseca Tr. at 21:19–24:9.

Arm's interrogatory responses and documents produced after the July 11 close of fact

discovery further indicate that Arm ████████████████████████████████

████████████████████████. Arm's First Supplemental Response to Qualcomm's

Interrogatory No. 11—which Arm served on the last day of fact discovery—states that █████

████████████████████████████████████████████████████████

████████████████████—a statement that is itself inconsistent with the deposition

testimony of Arm witnesses with personal knowledge of what Arm actually did, as described

above. On July 24, Arm represented in a letter to Qualcomm that ████████████████

████████████████████████████████████████████████████████

████████████████. 2025.07.24 Letter from J. Emerick to C. Nyarady. Yet after Qualcomm

identified ███████████████████████████████████████████

███████████████████████████████████████████

██████. 2025.07.30 Meet and Confer Tr. at 46:17–51:11.  As a result of that investigation, Arm

has since identified ██████████████████████████████████

███████████████████████████████████████████

██ ██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████.

    To the extent Arm did any investigation, it is apparent that Arm ████████████████████

████████████████████ as required by Section ██████ of the Qualcomm TLA.  For example,

Arm's expert—having personally participated in a group interview of Mr. Bhatnagar, Mr.

Shivashankar, and Mr. Youssef—testified that █████████████████████████████████

███████████████████████████████████████████.

Britven Tr. at 170:7–171:12.  And Qualcomm's ongoing review of █████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████. Reply Expert Report of Patrick F. Kennedy, Figure 5.  By contrast, Arm ██████████

███████████████████████████████████████████

---

[2] Several others that Arm identified after the July 30th meet and confer have not yet been produced.

██████████████████████████████████████

████████████████. *Id*; *Id.* ¶ 13.  Had Arm ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████.  ARMQC_02784204.

Arm's expert Thomas Britven claims that ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████  Rebuttal Expert Report of T. Britven ¶ 78.  This post-hoc rationalization cannot

excuse Arm's failure to ████████████████, for at least several

reasons.  This claim is not supported by the evidence.  Not a single Arm witness testified that Arm

████████████████████████████, nor did Arm respond

as such in its response to Interrogatory No. 11.  Had Arm in fact ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████.

Moreover, nothing in the TLA supports Arm's theory—as expressed in Mr. Britven's

report—████████████████████████████████████████

████████████████████████.  Section ████ states that ██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  The TLA's



reference to ███████████████████████████████████████████████████

██████████████████. Putting aside that Mr. Britven is not a lawyer and cannot opine

on the meaning of a contract, Britven Tr. 151:21–23, 154:15–16, 174:15–18, 204:3–7, 204:17–18,

to █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.

In addition to the testimony cited herein, Plaintiffs further incorporate by reference the

deposition testimony of Karthik Shivashankar, Akshay Bhatnagar, Ehab Youssef, and Jeffrey

Fonseca, the expert reports of Dr. Patrick Kennedy as well as any supplemental reports he may

provide. Plaintiffs reserve the right to supplement or amend their response based on any

documents produced after the date of this interrogatory response or any further analyses from Dr.

Kennedy.

**INTERROGATORY NO. 15:**

For each section of the Qualcomm TLA allegedly breached by Arm, describe with specificity any
and all remedies (monetary, non-monetary, and/or equitable) Qualcomm seeks for each such
alleged breach. Your response to this Interrogatory shall include a discussion of each such remedy
sought by Qualcomm and the legal and factual support for such remedies, including for: (i)
Qualcomm's allegations in paragraphs 121–122 of the SAC that Qualcomm was "forced to
proceed" in SoC development without knowing what CPUs it will use, conducted "reviews of its
planning roadmaps," and shifted or allocated resources; (ii) Qualcomm's alleged entitlement to
████████████████████████████ (SAC ¶ 127); and (iii) alleged
██████████ (SAC ¶ 107). Your response shall further include the identification of all documents
supporting or refuting Qualcomm's contention(s), and the three witnesses most knowledgeable
about Qualcomm's allegations.

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiffs incorporate their General Objections and Objections to Definitions and

Instructions. Plaintiffs object to Interrogatory No. 15 as premature at this stage of the litigation,

given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed.  As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's breach.  Plaintiffs further object to Interrogatory No. 15 the extent it seeks information duplicative of Interrogatory No. 2 and Interrogatory No. 9.  Plaintiffs further object to the Interrogatory as improperly compound.  Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint and in Qualcomm's September 20, 2024 and September 27, 2024 letters, is readily within the possession of Defendant, or that is more easily available to it.  Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion.  Plaintiffs further object to the Interrogatory to the extent that that the information sought is subject to the attorney-client privilege, the attorney work-product, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 204-212 of the Second Amended Complaint (D.I. 137), and incorporate them by reference as if fully set forth herein, for Plaintiffs' position.

Plaintiffs further state that Section ▮ of the Qualcomm TLA governs Arm's obligation to

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████. Section ▮ of the QC TLA provides ███████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████. Section ██ of the QC TLA further provides ███

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███.

In addition, due to Arm's breach of the implied covenant of good faith and fair dealing, Qualcomm also seeks damages for ████████████████████████████████████████████, as well as any other costs and expenditures it has incurred as a result of Arm's failure to respond to repeated licensing requests by Qualcomm and to provide Qualcomm with good faith licensing proposals for ████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████; and equitable relief in the form of revised offers at commercially reasonable terms for █████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

21

███████████████████████████████████████████

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following additional documents from which information responsive to this Interrogatory may be ascertained: *see, e.g.*, QCVARM_0524362; QCVARM_0616913; QCVARM_0616916; ARMQC_02747993; ARMQC_02731284; QCVARM_0526828; QCVARM_0618354; QCVARM_0527544; QCVARM_1068969; QCARM_7484882; QCVARM_1121541; QCVARM_1121674; QCVARM_1121930; QCVARM_1121931. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Manju Varma ("Varna Tr"); Deposition of Karl Whealton; Deposition of Karthik Shivashankar; Deposition of Akshay Bhatnagar ("Bhatnagar Tr."); Deposition of Jeff Fonseca.

Arm's failure to provide commercially reasonable terms for Arm Implementation Cores has caused harm to Qualcomm. ████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████    ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Varma Tr.

Likewise, Arm's failure to provide a commercially reasonable offer for ████████████

███████  █  ██████  ███████  ████████  ████████████  █████████  █  ██

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████.

Similarly, Arm's failure to provide commercially reasonable offers for the ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████. Transcript of Deposition of Cristiano Amon ("Amon Tr").

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. Varma Tr.



Likewise, Arm's refusal to license ████████████ to Qualcomm on reasonable terms ████████████████████████████████████████████████████████████ . Varma Tr.

Likewise, Arm's failure to provide Qualcomm with commercially reasonable offers for ████████████████████████████████████████████████ . *See* QCVARM_1121930; QCVARM_1121931.

Moreover, Arm has failed to provide Qualcomm with access to competitive CPUs, and as such Qualcomm ████████████████████████████████████ . Amon Tr.

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Cristiano Amon
- Jean-Francois Vidon
- Pradeep Kanapathipillai

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory,

███████████████████████████████████████

including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference their responses to Interrogatories Nos. 1 and 14; and the sections of the Expert Report of Patrick F. Kennedy, Ph.D. (dated August 8, 2025) entitled "████████████████ ███████████████████████████████████████" and "Qualcomm's Damages Related to Arm's Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing in the Qualcomm TLA," along with their accompanying schedules. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Amon Dep. 25:3-26:22, 145:19-146:12; Cochron Dep. 109:14-110:1, 110:14-111:4, 114:8-13, 116:15-120:20, 223:8-226:21, 154:17-156:14; Fonseca Dep. 25:21-29:5, 78:16-79:10; Varma Dep. 46:6-48:10, 56:2-57:2, 81:16-83:7, 99:23-100:2 (████████████████████████████████████), 100:20-101:2, 103:11-21 (██████████████████████████████

████████████████████████████████████████████

████████ ), 103:25-104:2, 142:6-20 (████████████████████████████

████████████████████████ );  147:6-147:12;  Wolf  Dep.  30:11-17,  31:25-33:8;

Shivashankar Dep. 62:18-63:24, 67:12-24; Bhatnagar Dep. 34:22-36:23, 37:18-22, 41:17-42:9,

42:24-43:4,  44:6-16,  47:24-48:6,  55:5-10,  70:8-21,  93:13-94:25;  QCVARM_1118081;

QCVARM_1118085;  QCVARM_1121930;  QCVARM_1121931;  ARM_00062474;

ARM_00062441; QCARM_0027985; ARMQC_02784204; ARMQC_02747567.


## INTERROGATORY NO. 16:

Describe with specificity the complete legal and factual basis for Qualcomm's contention that Arm breached the covenant of good faith and fair dealing of the Qualcomm ALA, including as set forth in Count III of the SAC (SAC ¶¶ 181–188), and any remedies (monetary, non-monetary, and/or equitable) Qualcomm seeks for any such breach. Your response shall include the identification of all documents supporting or refuting Qualcomm's contention(s), and the three witnesses most knowledgeable about Qualcomm's allegations.

## RESPONSE TO INTERROGATORY NO. 16:

Plaintiffs  incorporate  their  General  Objections  and  Objections  to  Definitions  and

Instructions.  Plaintiffs object to Interrogatory No. 16 as premature at this stage of the litigation,

given that (i) it involves an opinion or contention that relates to fact or the application of law to

fact, and (ii) discovery, including, without limitation, document production and depositions, has

not been completed.  As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of

the full scope of Arm's breach.  Plaintiffs further object to the Interrogatory as improperly

compound.  Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome

to the extent that it calls for the disclosure of information that was articulated in the Second

Amended Complaint, is readily within the possession of Defendant, or that is more easily available

to it.  Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion.

Plaintiffs further object to the Interrogatory to the extent that that the information sought is subject

to the attorney-client privilege, the attorney work-product, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 102, 181-188 of the Second Amended Complaint (D.I. 137), and incorporate them by reference as if fully set forth herein, for Plaintiffs' position.

Arm has breached the implied covenant of good faith and fair dealing by asserting, without a valid basis, that Qualcomm was in material breach of its ALA and by publicizing Arm's notice of termination of the ALA to the media where it served to unsettle Qualcomm's customers. Arm's October 22, 2024 notice of cancellation contains bad faith demands of Qualcomm that find no support in the ALA, including the demand that Qualcomm withdraw its own legal claims against Arm for breach of the ALA. *See* ARMQC_02749014. Arm collaborated with Bloomberg News on an article titled "Arm to Cancel Qualcomm Chip Design License in Escalation of Feud." ARMQC_02770389; *see also* Arm Holdings Plc's March 25, 2024 Responses & Objections to Qualcomm's First Set of Interrogatories at 19. That article further announced to the world that "Arm, based in the UK, has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a license agreement seen by Bloomberg." ARMQC_02770389; *see also* Transcript of Deposition of Rene Haas ("Haas Tr.") (█████████ ██████████████████). Arm continued to push for additional media coverage of its notice of cancellation in order to have as large of an impact on Qualcomm's business as possible. *See, e.g.*, ARMQC_02762974 (████████████); ARMQC_02742823 (███████ ████████████████████████████████████████ █████████████████████████).

████████████████████████████████

And before adopting this strategy of leaking its notice of cancellation to the media, Arm breached the implied covenant and good faith and fair dealing by reaching out to Qualcomm's customers directly about the status of Qualcomm's license, including in August 2022 and May 2023. More specifically, in May 2023, Arm's Will Abbey sent Qualcomm customers a letter that Arm's CEO Rene Haas has conceded was "misleading" about Qualcomm's contractual obligations. Haas Tr. In the more than fourteen months since those misleading communications to Qualcomm's customers, Mr. Haas is not aware of anything Arm has done to correct them. Haas Tr. Additionally, Masayoshi Son, Chairman of Arm's Board, told executives of Samsung on October 4, 2022 that Qualcomm's ALA would expire in 2025, when it would not actually expire until at least 2028. *Arm Ltd. v. Qualcomm, Inc.*, No. 1:22-cv-01146-MN, Joint Statement of Uncontested Facts ¶ 13. Mr. Haas ████████████████████████████████ ████████████████████. Haas Tr.

Qualcomm has been damaged by Arm's breach in that Arm's wrongful conduct has caused Qualcomm's customers to question Qualcomm's ability to meet their needs, to shift volume away from Qualcomm, and to require terms in their agreements that are less favorable to Qualcomm than they did before Arm's wrongful conduct. *See, e.g.*, QCVARM_1028388 (email from Qualcomm personnel on October 22, 2024: ██████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████); QCVARM_1070271 (email from Qualcomm personnel on October 25, 2024: "████████████████████████████████ ████████████████████████████████ QCVARM_1121350 (████████████████████████████

███████████

███████████████████████████████

███████████ ”); QCVARM_1121359 (███████████████

███████████████████████████████ Qualcomm

has had to expend resources responding to these customer concerns and has lost revenue from

customer deals that it did not get to execute or had to execute on less favorable terms due to Arm's

conduct.  Amon Tr.

Additionally, Qualcomm made repeated requests to Arm for assistance in configuring the

███████ and was not provided with any support, *see* QCVARM_0618712, requiring

Qualcomm to expend additional engineering effort to verify its custom cores.  The ███████

is a component of the ████ licensed to Qualcomm for ███ and is used to run certain ███

███████.  *See* Qualcomm ALA, Armv9 Annex 1 § 1.2, pt. E.

Furthermore, Plaintiffs state that Section ████ of the Qualcomm ALA governs term

extensions.  Section ████ states that █████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████ ” Qualcomm made its election pursuant to Section ████ of the Qualcomm

ALA on ██████, via email to Lynn Couillard, Rajiv Gupta, and Todd Lepinski at Arm.

ARM_00085567.  Lynn Couillard ████████████████████

██████████████████████ ARM_00085567. Yet,

Arm has refused to negotiate an extension of v10 with Qualcomm.

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained: *see, e.g.,* ARM_00085567; ARMQC_02771128; ARMQC_02771124; ARMQC_02771125; ARMQC_02771126; QCVARM_1120481; ARMQC_02771127; ARMQC_02732393; QCARM_7429297; QCARM_7476653; QCVARM_0599801, QCVARM_0600098, QCVARM_0602404, QCVARM_0618712, QCVARM_0575613, QCVARM_0575611, QCVARM_0618420, QCVARM_0616871, QCVARM_0600101, QCVARM_0707732, QCVARM_0707997, QCVARM_0708118, QCVARM_0602198; QCVARM_1070271; QCVARM_1028388; QCVARM_1121338; QCVARM_1121341; QCVARM_1121346; QCVARM_1121350; QCVARM_1121359; ARM_00110511; ARM_01215878; ARMQC_02749014; ARMQC_02770389; ARMQC_02762974; ARMQC_02742823. Subject to and without waiving any of its objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their initial response to this Interrogatory. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Jeff Golden; Deposition of Jignesh Trivedi; Deposition of Martin Weidmann; Deposition of Richard Grisenthwaite; Deposition of Rene Haas;

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Ann Chaplin

- Jonathan Weiser

- Larissa Cochran

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d).  In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Deposition of Vivek Agrawal ("Agrawal Dep.") 125:11-151:13, 153:17-156:18; Deposition of Jonathan Weiser ("Weiser Dep.") 82:4-15, 98:12-104:4, 167:12-24, 169:12-22, 171:15-174:7; Amon Dep. 45:9-18; 57:19-58:23 64:22-65:5, 297:18-298:15; Haas Dep. 17:20-18:13, 46:18-48:19, 52:17-53:10, 61:22-62:1, 63:2-5, 63:7-21, 75:14-17,

██████████████████████████████████████████

94:20-95:7, 96:25-97:3, 98:14-19, 99:18-100:1, 100:2-100:9, 101:12-20, 107:21-108:4, 109:10-13, 120:12-121:5, Deposition of Phil Hughes ("Hughes Dep.") 53:12-54:16; Deposition of Ann Chaplin ("Chaplin Dep.") 167:13-22; Deposition of James Jeon ("Jeon Dep.") 14:1-15:18, 16:19-23, 20:21-21:21, 22:11-23:1, 52:9-15, 53:3-56:14, 69:22-70:21, 72:1-21, 86:18-89:3, 98:24-99:100:9; Deposition of Martin Weidmann ("Weidmann Dep.") 67:15-69:11; Deposition of Aparajita Bhattacharya ("Bhattacharya Dep.") 19:9-21:24, 117:23-120:6, 127:24-129:7; Deposition of Jignesh Trivedi ("Trivedi Dep.") 143:11-18, 254:22-255:11; Deposition of Jeff Golden ("Golden Dep.") 43:12-44:3, 49:14-50:11, 57:24-61:7; Deposition of Paul Kranhold ("Kranhold Dep.") 107:25-113:7, 123:19-124:5, 125:5-10, 127:5-24, 133:16-136:24.

## INTERROGATORY NO. 17:

Describe with specificity the complete legal and factual basis for Your contention that Qualcomm is entitled to a license to v10 under the Qualcomm ALA. Your response to this Interrogatory shall include a discussion of Qualcomm's contention, if any, as to: (i) whether and how Qualcomm contends made a ███████████████ the Qualcomm ALA under Section ████████████████ of that agreement; and (ii) how v10 allegedly constitutes ██████████ ████████████████ under the Qualcomm ALA. Your response shall include the identification of all documents supporting or refuting Qualcomm's contention(s), and the three witnesses most knowledgeable about Qualcomm's allegations.

## RESPONSE TO INTERROGATORY NO. 17:

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs object to Interrogatory No. 17 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed. Plaintiffs further object to the Interrogatory as improperly compound. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended

Complaint, is readily within the possession of Defendant, or that is more easily available to it. Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to the Qualcomm ALA and paragraphs 128-134 of the Second Amended Complaint (D.I. 137), and incorporate them by reference as if fully set forth herein, for Plaintiffs' position.

Plaintiffs further state that Section ▮▮▮ of the Qualcomm ALA governs ▮▮▮▮▮▮. Section ▮▮▮▮ states that ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Qualcomm made its election pursuant to Section ▮▮▮ of the Qualcomm ALA on ▮▮▮▮▮, via email to Lynn Couillard, Rajiv Gupta, and Todd Lepinski at Arm. ARM_00085567. Lynn Couillard forwarded Qualcomm's ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ARM_00085567; Transcript of Deposition of Lynn Couillard ("Couillard Tr.") at 62:6-63:6. *See also* Deposition of Martin Weidmann at 187:11-22. The negotiating history of the parties makes clear that v10 constitutes ▮▮▮▮▮▮▮▮▮ under the Qualcomm ALA.

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained: *see, e.g.,*

ARM_00085567;   ARMQC_02771128;   ARMQC_02771124;   ARMQC_02771125; ARMQC_02771126;   ARMQC_02771127;   QCVARM_1120481;   ARMQC_02732393; QCARM_7429297; QCVARM_7476653; QCVARM_7475216.  Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Martin Weidmann; Deposition of Richard Grisenthwaite; Deposition of Gerard Williams.

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Ann Chaplin
- Jonathan Weiser
- Larissa Cochran

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

████████████████████████████

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in its initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d).  In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Weiser Dep. 82:4-15, 98:12-104:4, 167:12-24, 169:12-22, 171:15-174:7; Haas Dep. 154:17-22; Deposition of Christine Tran ("Tran Dep.") 26:18-27:4, 49:14-21, 92:17-94:20, 95:14-18; Weidmann Dep. 67:15-69:11; Bhattacharya Dep. 19:9-21:24, 117:23-120:6, 127:24-129:7; Deposition of Lynn Couillard ("Couillard Dep.") 55:9-61:13; 66:20-75:4; ARM_01235323; ARM_01308019; ARM_00079722.


**INTERROGATORY NO. 18:**

Describe with specificity how Arm allegedly has, can, or could "leverage its control over the ISA used in all premium smartphones and a large and growing share of other computing devices," SAC ¶ 207, including (i) the meaning of the term "control" and its significance, legal or otherwise, if any; (ii) the meaning of "other computing devices," including the identity of companies, competitors, products, and customers who engage with those products and in what market, submarket, or market segment, if any, they are included; (iii) the difference between leveraging "control over" the ISA used in the identified segments and leveraging a "monopoly" with respect to the ISA used in the identified segments; (iv) the size and geographic boundaries of the "competition" You allege was harmed with respect to each company, competitor, or customer identified in (ii); (viii) the relationship or connection between the companies, competitors, products, or customers identified in (ii) including with respect to products whether any other products are reasonably interchangeable and if so with what; (xi) why You contend Arm has

"control over the ISA" as used in each of the products or by the companies, competitors, or customers identified in (ii); and (xii) a detailed description of the specific acts or conduct by which You allege Arm leveraged its "control".

## RESPONSE TO INTERROGATORY NO. 18:

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs object to Interrogatory No. 18 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed. As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's anticompetitive and unfair acts. Plaintiffs further object to Interrogatory No. 19 the extent it seeks information duplicative of Interrogatory No. 8. Plaintiffs further object to the Interrogatory as improperly compound. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint, is readily within the possession of Defendant, or that is more easily available to it. Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Plaintiffs further object to the Interrogatory to the extent that it seeks information that is not relevant to any of the claims or defenses in this case. Plaintiffs can establish unfair competition where (1) Defendant "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, *or otherwise significantly threatens or harms competition*," *Epic Games, Inc.* v. *Apple, Inc.*,

67 F.4th 946, 1000 (9th Cir. 2023) (quoting *Cel-Tech Commc'ns, Inc.* v. *L.A. Cellular Tel. Co.*, 973 P.2d 527, 565 (Cal. 1999)) (emphasis added), or (2) "the utility of the defendant's conduct" is outweighed by "the gravity of the harm to the alleged victim," *id.* (quoting *Progressive W. Ins. Co.* v. *Super. Ct.*, 37 Cal. Rptr. 3d 434, 452 (Ct. App. 2005)).  Neither requires Plaintiffs to prove an antitrust violation.  *See id.* at 1002; *PeopleBrowsr, Inc.* v. *Twitter, Inc.*, 2013 WL 843032, at *4 (N.D. Cal. Mar. 6, 2013) (because "a violation of the unfair prong may be based on conduct that 'significantly threatens or harms competition,' . . . a violation of the unfair prong of the UCL does *not* necessarily require establishing a violation of the Sherman Act").

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 1-11, 32-34, 151-66, 206-212 of the Second Amended Complaint (D.I. 137), and incorporate them by reference as if fully set forth herein, for Plaintiffs' position.

Arm develops both an instruction set architecture ("ISA"), which allows for software compatibility across products compatible with the ISA, and its own off-the-shelf CPU designs compliant with that ISA.  Arm licenses its ISA through an Architecture License Agreement ("ALA") to permit a limited set of licensees to develop custom Arm-compatible CPUs.  But the Arm ISA does not tell a designer how to design or build a CPU, nor any of the internal design features that deliver superior performance and make a CPU competitive; a CPU designer developing a custom CPU designs how the core is built, how it performs, and how it executes the CPU's instructions.  In other words, the technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee.  Because "the creation of an optimized CPU is very costly and time consuming," Arm "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the customization often does not

provide a reasonable return on investment."  Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.  However, if an ALA licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, it may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.

Arm licenses its off-the-shelf CPU designs through a Technology License Agreement ("TLA").  Under a TLA, Arm delivers a complete processor core design that is compatible with the Arm ISA, saving the licensee the trouble and expense of designing its own CPU.  But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance.  Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it charges for a core that an ALA licensee develops.  Moreover, when a chip developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs.  And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing chips that can compete against those with more advanced custom CPUs.

Until recently, Arm's licensing model has been neutral and open, which enabled Arm to become the most ubiquitous computer architecture on the planet, used by practically every smartphone, most "internet of things" devices, many automobiles, and an increasing number of personal computers and datacenter servers.  *See* Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparksquick-backlash-in-chip-industry-idUSKBN2650GT/; Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024),

https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas);
*Consumer Technologies: Smartphones, Arm*, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Mar. 10, 2025). And at present, there is no viable, licensable alternative to the Arm architecture. *See* C.A. No. 22-1146, Trial Tr. 513:3-514:5 (Colwell). All told, Arm estimates that 270 billion Arm-compliant chips have shipped as of January 2024. *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

Following Arm's acquisition by SoftBank and its failed acquisition by Nvidia, Arm has changed its business model, seeking to bolster its revenue by increasing the royalty rates it demands to use the Arm ISA and capturing a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or by selling chips themselves). For example, Arm has announced that it will collect double the royalties for Armv9 as compared to Armv8, despite only modest, incremental improvements to the ISA, and has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores. *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas). Likewise, Arm has sought to leverage the Arm ISA's ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA—chips that "compete with" and "pose a threat to Arm's implementation IP business." Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7. Indeed, Rene Haas, Arm's CEO, has stated that Arm's competitors would be "hosed" if Arm were to build its own chips, ARM_01239056 at -061, something Arm now plans to do, Stephen Nellis and Max A. Cherney, *Arm Recruits from*

*Customers as It Plans to Sell Its Own Chips*, Reuters, https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (last visited Mar. 7, 2025).

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained:  *see, e.g.*, ARM_01239056; ARMQC_02600713; ARMQC_00027166; ARMQC_02729412.   Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Richard Grisenthwaite; Deposition of Cristiano Amon; Deposition of Manju Varma; Deposition of Karl Whealton.

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in its initial response to this Interrogatory.

███████████████████████████████████████

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference the Expert Report of Eric A. Posner (dated August 8, 2025), along with its accompanying exhibits.   Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d).   In particular, Plaintiffs direct Defendant's attention to, e.g.: Amon Dep. 96:17-20; Deposition of Karl Whealton ("Whealton Dep.") 149:20-22; Weidmann Dep. 35:9-36:14, 40:10-45:25;   Deposition   of   Richard   Grisenthwaite   ("Grisenthwaite   Dep.")   60:12-61:12; ARMQC_0272610;    QCVARM_1071021;    QCVARM_1070944;    QCVARM_1018853; QCVARM_0715414; ARMQC_02720799; QCVARM_0716360; ARMQC_00001163.

**INTERROGATORY NO. 19:**

Describe with specificity the complete legal and factual basis for Your contention that Arm has shifted its business model away from licensing its ISA towards any other goal, including towards licensing its own CPU designs and/or building and selling silicon chips to "vertically integrate and gain market share as a chip designer," *see* D.I. 158 at 4, and how any such shift in business model "threatens incipient violations of competition laws; violates the policy or spirit of those laws; threatens to significantly harm competition; is immoral, unethical, oppressive, and unscrupulous; and threatens to harm consumers and competition in a manner vastly disproportionate to whatever supposed benefits that behavior could possibly create."

**RESPONSE TO INTERROGATORY NO. 19:**

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions.  Plaintiffs object to Interrogatory No. 19 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has

not been completed.  As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's shifted business model.  Plaintiffs further object to Interrogatory No. 19 the extent it seeks information duplicative of Interrogatory No. 5.  Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent it seeks disclosure of information that was articulated in the Second Amended Complaint, is readily within the possession of Defendant, or that is more easily available to it.  Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion.  Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 1-9 and 68-72 of the Second Amended Complaint (D.I. 137) and incorporate them by reference as if fully set forth herein.

Arm develops both an instruction set architecture ("ISA"), which allows for software compatibility across products compatible with the ISA, and its own off-the-shelf CPU designs compliant with that ISA.  Arm licenses its ISA through an Architecture License Agreement ("ALA") to permit a limited set of licensees to develop custom Arm-compatible CPUs.  But the Arm ISA does not tell a designer how to design or build a CPU, nor any of the internal design features that deliver superior performance and make a CPU competitive; a CPU designer developing a custom CPU designs how the core is built, how it performs, and how it executes the CPU's instructions.  In other words, the technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee.  Because "the creation of an optimized CPU is very costly and

time consuming," Arm "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the customization often does not provide a reasonable return on investment." Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131. However, if an ALA licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, it may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.

Arm licenses its off-the-shelf CPU designs through a Technology License Agreement ("TLA"). Under a TLA, Arm delivers a complete processor core design that is compatible with the Arm ISA, saving the licensee the trouble and expense of designing its own CPU. But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance. Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it charges for a core that an ALA licensee develops. Moreover, when a chip developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs. And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing chips that can compete against those with more advanced custom CPUs.

Until recently, Arm's licensing model has been neutral and open, which enabled Arm to become the most ubiquitous computer architecture on the planet, used by practically every smartphone, most "internet of things" devices, many automobiles, and an increasing number of personal computers and datacenter servers. *See* Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparksquick-backlash-in-chip-

████████████████████████

industry-idUSKBN2650GT/; Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas); *Consumer Technologies: Smartphones, Arm*, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Mar. 10, 2025). And at present, there is no viable, licensable alternative to the Arm architecture. *See* C.A. No. 22-1146, Trial Tr. 513:3-514:5 (Colwell). All told, Arm estimates that 270 billion Arm-compliant chips have shipped as of January 2024. *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

Following Arm's acquisition by SoftBank and its failed acquisition by Nvidia, Arm has changed its business model, seeking to bolster its revenue by increasing the royalty rates it demands to use the Arm ISA and capturing a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or by selling chips themselves). For example, Arm has announced that it will collect double the royalties for Armv9 as compared to Armv8, despite only modest, incremental improvements to the ISA, and has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores. *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas). Likewise, Arm has sought to leverage the Arm ISA's ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA—chips that "compete with" and "pose a threat to Arm's implementation IP business." Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7. Indeed, Rene Haas, Arm's CEO, has stated that ████

████████████████████████████████████████████

competitors would be "hosed" if Arm were to build its own chips, ARM_01239056 at -061, something Arm now plans to do, Stephen Nellis and Max A. Cherney, *Arm Recruits from Customers as It Plans to Sell Its Own Chips*, Reuters, https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (last visited Mar. 7, 2025).

Arm's witnesses have confirmed this shift. Arm's CCO Will Abbey stated ████████ ████████████████████████████████████████████ ███████████████████████████████████. Rene Haas stated ████████ ████████████████████████████████████████. From March 2024 to today, the number of Arm engineers ███████████████████████████. Arm has discussed ████████████████████████████████. Rene Haas, Will Abbey, and Lynn Couillard confirmed █████████████████████████████ ████████████████████████. Rene Haas further confirmed that ███████████████ █████████████████████. Michael Williams stated ████████████████████ ████████████████████████.

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained:  *see, e.g.*, ARMQC_02752740;  ARMQC_02739661;  ARM_00087640;  KF00647;  ARMQC_02752632; ARMQC_02752343. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Lynn Couillard; Deposition of Rene Haas; Deposition

of Will Abbey; Deposition of Andrew Howard; Deposition of Michael Williams; Deposition of Cristiano Amon.

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in its initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference their responses to Interrogatories Nos. 5, 7, 8, and 20; and the Expert Report of Eric A. Posner (dated August 8, 2025), along with its accompanying exhibits. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Deposition of Will Abbey ("Abbey Dep.") 125:23-126:2, 130:17-131:8; Deposition of Mohamed Awad ("Awad Dep.") 10:23-13:14; Deposition of Ami

Badani ("Badani Dep.") 95:7-11; Haas Dep. 186:8-15, 191:20-24, 195:12-17, 196:24-197:11, 210:13-15, 212:21-213:22, 214:4-9, 214:18-215:1, 216:10-18, 225:12-15, 234:11-25, 235:9-20, 235:24-237:3, 238:8-11; Deposition of Andew Howard ("Howard Dep.") 168:22-171:8; Hughes Dep. 79:23-80:5, 80:14-81:6 (Arm used to tout its neutrality); Deposition of Paul Williamson ("Williamson Dep.") 124:23-125:22; Deposition of Peter Greenhalgh ("Greenhalgh Dep.") 73:12-76:16; Grisenthwaite Dep. 18:2-20:16; ARM_01230402.

## INTERROGATORY NO. 20:

Describe with specificity the complete legal and factual basis for Your contention in Paragraph 208 of Your Complaint that "Arm's conduct towards Qualcomm . . . threatens incipient violations of competition laws; violates the policy or spirit of those laws; threatens to significantly harm competition; is immoral, unethical, oppressive, and unscrupulous; and threatens to harm consumers and competition in a manner vastly disproportionate to whatever supposed benefits that behavior could possibly create," including (i) the meaning of the phrase "competition laws," and its legal significance, if any; (ii) any difference between "competition laws" and antitrust laws; and (3) enumerate with specificity which laws You allege Arm threatens an incipient violation of.

## RESPONSE TO INTERROGATORY NO. 20:

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs object to Interrogatory No. 20 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed. As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's anticompetitive and unfair actions. Plaintiffs further object to Interrogatory No. 20 the extent it seeks information duplicative of Interrogatory No. 5 and Interrogatory No. 19. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint. Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion.

Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Plaintiffs further object to the Interrogatory to the extent that it seeks information that is not relevant to any of the claims or defenses in this case. Plaintiffs can establish unfair competition where (1) Defendant "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, *or otherwise significantly threatens or harms competition*," *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) (quoting *Cel-Tech Commc'ns, Inc.* v. *L.A. Cellular Tel. Co.*, 973 P.2d 527, 565 (Cal. 1999)) (emphasis added), or (2) "the utility of the defendant's conduct" is outweighed by "the gravity of the harm to the alleged victim," *id.* (quoting *Progressive W. Ins. Co.* v. *Super. Ct.*, 37 Cal. Rptr. 3d 434, 452 (Ct. App. 2005)). Neither requires Plaintiffs to prove an antitrust violation. *See id.* at 1002; *PeopleBrowsr, Inc.* v. *Twitter, Inc.*, 2013 WL 843032, at *4 (N.D. Cal. Mar. 6, 2013) (because "a violation of the unfair prong may be based on conduct that 'significantly threatens or harms competition,' . . . a violation of the unfair prong of the UCL does *not* necessarily require establishing a violation of the Sherman Act").

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 73-166 and 204-212 of the Second Amended Complaint (D.I. 137), and incorporate them by reference as if fully set forth herein, for Plaintiffs' position.

Arm develops both an instruction set architecture ("ISA"), which allows for software compatibility across products compatible with the ISA, and its own off-the-shelf CPU designs compliant with that ISA. Arm licenses its ISA through an Architecture License Agreement ("ALA") to permit a limited set of licensees to develop custom Arm-compatible CPUs. But the

Arm ISA does not tell a designer how to design or build a CPU, nor any of the internal design features that deliver superior performance and make a CPU competitive; a CPU designer developing a custom CPU designs how the core is built, how it performs, and how it executes the CPU's instructions. In other words, the technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee. Because "the creation of an optimized CPU is very costly and time consuming," Arm "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the customization often does not provide a reasonable return on investment." Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131. However, if an ALA licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, it may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.

Arm licenses its off-the-shelf CPU designs through a Technology License Agreement ("TLA"). Under a TLA, Arm delivers a complete processor core design that is compatible with the Arm ISA, saving the licensee the trouble and expense of designing its own CPU. But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance. Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it charges for a core that an ALA licensee develops. Moreover, when a chip developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs. And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing chips that can compete against those with more advanced custom CPUs.

████████████████████████████

Until recently, Arm's licensing model has been neutral and open, which enabled Arm to become the most ubiquitous computer architecture on the planet, used by practically every smartphone, most "internet of things" devices, many automobiles, and an increasing number of personal computers and datacenter servers. *See* Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparksquick-backlash-in-chip-industry-idUSKBN2650GT/; Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas); *Consumer Technologies: Smartphones, Arm*, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Mar. 10, 2025). And at present, there is no viable, licensable alternative to the Arm architecture. *See* C.A. No. 22-1146, Trial Tr. 513:3–514:5 (Colwell). All told, Arm estimates that 270 billion Arm-compliant chips have shipped as of January 2024. *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

Following Arm's acquisition by SoftBank and its failed acquisition by Nvidia, Arm has changed its business model, seeking to bolster its revenue by increasing the royalty rates it demands to use the Arm ISA and capturing a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or by selling chips themselves). For example, Arm has announced that it will collect double the royalties for Armv9 as compared to Armv8, despite only modest, incremental improvements to the ISA, and has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores. *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7,

2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas).   Likewise, Arm has sought to leverage the Arm ISA's ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA—chips that "compete with" and "pose a threat to Arm's implementation IP business."   Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.  Indeed, Rene Haas, Arm's CEO, has stated that Arm's competitors would be "hosed" if Arm were to build its own chips, ARM_01239056 at -061, something Arm now plans to do, Stephen Nellis and Max A. Cherney, *Arm Recruits from Customers as It Plans to Sell Its Own Chips*, Reuters, https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (last visited Mar. 7, 2025).   In December 2021, the Federal Trade Commission sued to block Nvidia's acquisition of Arm, echoing Qualcomm's concerns if Arm were to begin making its own chips: "The proposed vertical deal would give one of the largest chip companies control over the computing technology and designs that rival firms rely on to develop their own competing chips.   The FTC's complaint alleges that the combined firm would have the means and incentive to stifle innovative next-generation technologies, including those used to run datacenters and driver-assistance systems in cars." FTC Press Release, *FTC Sues to Block $40 Billion Semiconductor Chip Merger*, FTC.gov, https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-sues-block-40-billion-semiconductor-chip-merger.

Because Qualcomm custom CPUs have outperformed Arm's, Arm has employed a series of wrongful tactics in an attempt to stifle Qualcomm's technological leaps in CPU design, to force Qualcomm to continue to use Arm's off-the-shelf CPUs, and to coerce Qualcomm into renegotiating the Qualcomm ALA.  For example, Arm engaged in a misinformation campaign to

████████████████████████████████

mislead Qualcomm's customers into believing that Qualcomm would not be able to deliver licensed Arm-compatible products after 2024, and that Qualcomm customers must obtain their own direct licenses from Arm. And on October 22, 2024, during Qualcomm's annual Snapdragon Summit where it announced its new Snapdragon 8 Elite Mobile Platform that delivers significant performance and efficiency improvements over competitors, including platforms that rely on Arm's off-the-shelf CPU designs, Arm baselessly declared that it was entitled to cancel Qualcomm's ALA because of a purported material breach of that ALA. Arm then leaked the notice of cancellation to Bloomberg, which published a story that same day. Ian King, *Arm to Cancel Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024, 8:17 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

Arm's leak interfered with Qualcomm's existing and prospective business relationships. For example, ████████████████████. insisted on additional reassurances before it would extend its existing business relationship with Plaintiffs. Likewise, ██████████████ refused to finalize a term sheet for an agreement under which Plaintiffs would design a custom chip until it could first understand the implications of termination of the Qualcomm ALA on Plaintiffs' ability to deliver the custom chips in question.

Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Richard Grisenthwaite; Deposition of Cristiano Amon; Deposition of Manju Varma; Deposition of Karl Whealton.

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference their response to Interrogatories Nos. 5, 7, and 19; and the Expert Report of Eric A. Posner (dated August 8, 2025), along with its accompanying exhibits. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs additionally

direct Defendant's attention to, e.g.: Amon Dep. 192:16-23, 195:7-24; Chaplin Dep. 120:3-15; Hughes Dep. 79:23-80:5, 80:14-81:6.

## INTERROGATORY NO. 21:

Describe with specificity the complete legal and factual basis for Your contention that "Qualcomm requires equitable relief under the UCL because it lacks adequate remedies at law to address Arm's anticompetitive and unfair actions, which are ongoing and which have caused or threaten to cause Qualcomm to suffer significant harm," as set forth in Paragraph 212 of Your Complaint.

## RESPONSE TO INTERROGATORY NO. 21:

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs object to Interrogatory No. 21 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production depositions, and expert discovery, has not been completed. As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's anticompetitive and unfair actions. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint, that is readily within the possession of Defendant, or that is more easily available to it. Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 11, 34, 137, 139, 144, 156-66, 206-207, and 212 of the Second Amended Complaint (D.I. 137), and incorporate them by reference as if fully set forth herein, for Plaintiffs' position.

Arm's engagement in persistent, systematic, and *ongoing* efforts to undermine Qualcomm's customer relationships and obstruct its development of custom CPUs and chips, including multiple instances in which Arm has sought to mislead Qualcomm's customers and leak confidential information, firmly established bases for equitable relief. *See*, *e.g.*, *CFTC* v. *Traders Glob. Grp.*, 2023 WL 7545316, at *1 (D.N.J. Nov. 14, 2023) ("likelihood of future violations may be inferred from systematic or ongoing violations"); *Sun Microsystems, Inc.* v. *Microsoft Corp.*, 87 F. Supp. 2d 992, 1004-05 (N.D. Cal. Jan. 24, 2000) ("past conduct demonstrat[ing] an ongoing strategy to compete" unfairly and unlawfully shows "threatened future harm or a continuing violation" of the UCL such as to warrant injunctive relief").

The potential harm of Arm's anticompetitive and unfair conduct, if left unchecked, was highlighted in the Federal Trade Commission's suit to block Nvidia's acquisition of Arm: "The proposed vertical deal would give one of the largest chip companies control over the computing technology and designs that rival firms rely on to develop their own competing chips. The FTC's complaint alleges that the combined firm would have the means and incentive to stifle innovative next-generation technologies, including those used to run datacenters and driver-assistance systems in cars." FTC Press Release, *FTC Sues to Block $40 Billion Semiconductor Chip Merger*, FTC.gov, https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-sues-block-40-billion-semiconductor-chip-merger;

https://www.ftc.gov/system/files/documents/cases/d09404_part_3_complaint_public_version.pdf

Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.*

Deposition of Richard Grisenthwaite; Deposition of Cristiano Amon; Deposition of Manju Varma; Deposition of Karl Whealton.

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference their responses to Interrogatories Nos. 1, 3, 5, 7, 8, 20, and 24 because Arm's market position and Qualcomm's lack of reasonably available alternatives drive Qualcomm's need for equitable relief under the UCL. Plaintiffs additionally incorporate by reference the section entitled "Economic Analysis of Arm's Conduct" in the Expert Report of Eric A. Posner (dated August 8, 2025), along with its accompanying exhibits. Arm's anti-competitive conduct impairs Qualcomm's current and future ability to conduct its business—including by precluding Qualcomm from licensing IP licensed under the TLA, precluding Qualcomm from accessing Arm Technology under the ALA, and precluding Qualcomm from licensing v10 of

████████████████████████████████████████

Arm's ISA.  Legal remedies that do not require Arm to comply with its contractual obligations to provide Qualcomm with ██████████████████ under the TLA; provide the ████ ████████ to which Qualcomm is entitled under the ALA; and negotiate with Qualcomm ████ ████ regarding a license to v10 are insufficient because they would not preclude Arm's anti-competitive efforts to impair Qualcomm's current and future ability to conduct its business. *Sanchez* v. *Sams West, Inc.*, 2022 WL 2035961, at *3 (C.D. Cal. Mar. 8, 2022) ("As a general matter, legal damages are typically inadequate to remedy the future harms from ongoing violations."); *see also In re Subaru Battery Drain Prods. Liab. Litig.,* 2021 WL 1207791, at *29 (D.N.J. Mar. 31, 2021) (finding injunction permitted under UCL where "required to prevent further harm"); *Heredia* v. *Sunrise Senior Living LLC*, 2021 WL 819159, at *8 (C.D. Cal. Feb. 10, 2021) (denying motion to dismiss UCL claim with respect to injunctive relief where plaintiffs "alleged ongoing violations of the law that pose a risk of continuing harm").

Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d).  In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Amon Dep. 192:16-192:23, 195:7-24; Howard Dep. 144:23-148:25; Deposition of Karl Whealton ("Whealton Dep.") 149:20-22; Wolf Dep. 49:25-50:5.

**INTERROGATORY NO. 22:**

Describe with specificity the complete business relationships between Qualcomm and ████ and Qualcomm and ████ from inception to present, including but not limited to all proposed, contemplated, and actual dealings including as all prior infrastructure dealings or discussions with ████, the persons involved in those business relationships and dealings, and provide a

complete explanation for why any proposed and contemplated dealings did or did not materialize including all prior dealings or discussions with ███ regarding infrastructure. Your response shall include the identification of all documents relevant to answering the complete Interrogatory, and the witnesses most knowledgeable about each respective relationship.

## RESPONSE TO INTERROGATORY NO. 22:

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions.  Plaintiffs further object to the Interrogatory as improperly compound.  Plaintiffs further object to the phrases "complete business relationships," "from inception to present," and "contemplated… dealings" as vague and ambiguous, overly broad, and unduly burdensome. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint, that is readily within the possession of Defendant, or that is more easily available to it. Plaintiffs further object to the Interrogatory to the extent that it seeks information that is not relevant to any of the claims or defenses in this case, including all communications and dealings between Qualcomm and ███ and Qualcomm and ███ prior to Arm's anticompetitive conduct.

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: █

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████.

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

███  ████  ███████████████████

████████████████

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained: *see*, *e.g.*, QCVARM_0713530, ARMQC_02600838, ARMQC_02601067, QCVARM_1068512, QCVARM_1068516, QCVARM_1068521, QCVARM_1068525, QCVARM_1068666, QCVARM_1069941, QCVARM_1069949, QCVARM_1118481, QCVARM_1069945, QCVARM_1068388, QCVARM_1068603, QCVARM_1068222, QCVARM_1068612, QCVARM_0864277, QCVARM_1029911, QCVARM_0865370, QCVARM_0866177, QCVARM_0863435, QCVARM_1029757, QCVARM_1030509, QCVARM_0864924. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Pavan Mulabagal, Cristiano Amon, and Chris Patrick.

███████████████████████████

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Pavan Mulabagal

- Cristiano Amon

- Chris Patrick

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22:</u>**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory.  Plaintiffs additionally incorporate by reference their response to Interrogatories Nos. 1 and 3.

As referenced in Plaintiffs' initial responses, Qualcomm's witnesses have testified extensively about Qualcomm's business relationships with each of ███████████ and the impact that Arm's conduct has had on those relationships. *See, e.g.*, with respect to ████, Amon

████████████████████████████████

Dep. 21:20-22:21, 229:8-235:12, 238:11-239:5, 251:19-253:10, 257:7-258:11, 271:8-272:8, 277:15-278:22; Mulabagal Dep. 24:18-26:3, 39:21-40:7, 42:13-43:19, 54:7-56:4, 111:9-113:21, Varma Dep. 243:22-240:20. *See, e.g.*, with respect to ██████, Amon Dep. 53:23-55:14, 119:13-21, 120:1-15, 157:21-158:4, 279:19-280:19, 281:5-286:21, 287:4-8, 289:4-294:5; Patrick Dep. 21:5-13, 23:1-12, 73:12-74:13, 75:25-76:8, 79:20-80:22, 81:7-83:10, 91:13-92:6, 110:10-20, 112:3-114:3; Jeon Dep. 53:3-56:14, 59:13-61:10.

Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Awad Dep. 12:21-14:8.

**INTERROGATORY NO. 23 (IDENTIFIED BY ARM AS SECOND INTERROGATORY 22):**

Identify and describe in detail when and why Qualcomm decided to ████████████ ██████, including the role of Nuvia's Arm-based CPU designs in that decision, the identities of key personnel involved in the decision-making process, any market analyses or financial projections relied upon, and any communications with third parties regarding Qualcomm's plans to develop or deploy ████████ CPUs from January 1, 2020, to the present.

**RESPONSE TO INTERROGATORY NO. 23:**

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs further object to Interrogatory No. 23 the extent it seeks information duplicative of Interrogatory No. 22. Plaintiffs further object to the Interrogatory as improperly compound. Plaintiffs further object to the phrase "re-enter," as vague and ambiguous, overly broad, and unduly burdensome. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the

███████████████████████████████

Second Amended Complaint, that is readily within the possession of Defendant, or that is more easily available to it.

Plaintiffs further object to the Interrogatory to the extent that it seeks information that is not relevant to any of the claims or defenses in this case, including "why Qualcomm decided to re-enter the ███████████████," and "the role of Nuvia's Arm-based CPU designs in that decision." Qualcomm's reasoning for "re-enter[ing] the ████████████" is not relevant to Arm's anticompetitive conduct or its effects on Qualcomm's business relationships. And Qualcomm's rights under the Qualcomm ALA with respect to Nuvia designs can no longer be disputed after a jury found that "Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA." *Arm Ltd. v. Qualcomm Inc.*, C.A. No. 22-1146 (MN), D.I. 572 at 1. Qualcomm will not relitigate the *Arm Ltd. v. Qualcomm Inc.* verdict in this case.

Subject to and without waiving the foregoing objections, Qualcomm states that it is a cutting edge, leading semiconductor company that regularly makes business decisions to enter new markets. The custom CPUs developed by Qualcomm were created at Qualcomm, by Qualcomm engineers.

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory regarding, and limited Qualcomm's communications with ████████████████, may be ascertained: *see, e.g.,* QCVARM_0713530, ARMQC_02600838, ARMQC_02601067, QCVARM_1068512, QCVARM_1068516, QCVARM_1068521, QCVARM_1068525, QCVARM_1068666, QCVARM_1069941, QCVARM_1069949, QCVARM_1118481, QCVARM_1069945, QCVARM_1068388, QCVARM_1068603, QCVARM_1068222, QCVARM_1068612,

████████████████████████████

QCVARM_0864277, QCVARM_1029911, QCVARM_0865370, QCVARM_0866177, QCVARM_0863435, QCVARM_1029757, QCVARM_1030509, QCVARM_0864924. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Pavan Mulabagal, Cristiano Amon, and Ziad Asghar.

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Pavan Mulabagal

- Cristiano Amon

- Ziad Asghar

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 23:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in its initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d).   In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Amon Dep. 86:16-87:2.

**INTERROGATORY NO. 24 (IDENTIFIED BY ARM AS INTERROGATORY 23):**

Describe with specificity the complete legal and factual basis for Your contention in paragraph 210 of Your Complaint that the Arm ISA does not have "readily available alternatives for certain applications," including a detailed description of (i) Qualcomm's use or planned use of ISAs provided by organizations other than Arm, including RISC-V International's RISC-V, Intel Corporation's x86, and Infineon Technologies AG's TriCore; (ii) any Communications between Qualcomm and any provider of ISAs other than Arm, including RISC-V International, Intel Corporation, and Infineon Technologies AG; and (iii) Qualcomm's involvement in the RISC-V Software Ecosystem Project.

**RESPONSE TO INTERROGATORY NO. 24:**

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions.  Plaintiffs object to Interrogatory No. 24 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production, depositions, and expert discovery, has not been completed.  Plaintiffs further object to the Interrogatory as

████████████████████████

improperly compound.  Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint, that is readily within the possession of Defendant, or that is more easily available to it.  Plaintiffs further object to the Interrogatory to the extent that it seeks information that is not relevant to any of the claims or defenses in this case, including "Qualcomm's use or planned use of ISAs provided by organizations other than Arm, including RISC-V International's RISC-V, Intel Corporation's x86, and Infineon Technologies AG's TriCore," "Communications between Qualcomm and any provider of ISAs other than Arm, including RISC-V International, Intel Corporation, and Infineon Technologies AG," and "Qualcomm's involvement in the RISC-V Software Ecosystem Project."

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: Arm's market share in the smartphone market is approximately 99 percent, which Arm's Executive Vice President and Chief Commercial Officer, Will Abbey, ████████ is a ██████████ ████████  Will Abbey Depo Tr. at 149:5-150:5.  Switching such a large number of devices from the Arm ISA to RISC-V ████████████████████████ Richard Grisenthwaite Depo Tr. at 39:11-24.  Gerard Williams and Jean-Francois Vidon both testified that RISC-V is not a competitor to the ARM ISA. Jean-Francois Vidon testified that that the RISC-V architecture "doesn't have the ecosystem and all the acceptance in the industry" like Arm's architecture does. Jean-Francois Vidon Depo Tr. at 17:1-8.  Gerard Williams testified that Arm's "mature ecosystem" is "ahead [of RISC-V] right now."  Gerard Williams Depo Tr. at 115:6-16.  *See also* Manju Varma Depo Tr. at 166:9–15 ("[W]e are concerned about how nascent RISC-V ecosystem is").

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory regarding, and limited to the

██████████████████████████████████████████

lack of "readily available alternatives for certain applications," to the Arm ISA, may be ascertained: *see*, *e.g.*, ARM_00110020 ("████████████████████████████ ████████████████████"); ARM_00089058 ("██████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████."); ARM_00094098; ARM_00094099; ARMQC_02600713 █████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████"). Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Gerard Williams, Jean-Francois Vidon, Manju Varma, and Will Abbey.

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Gerard Williams

- Jean-Francois Vidon

- Manju Varma

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 24:

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference the Expert Report of Eric A. Posner (dated August 8, 2025), along with its accompanying exhibits. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, e.g.: Amon Dep. 192:16-192:23, 193:10-23, 195:7-24; Howard Dep. 144:23-148:25; Whealton Dep. 149:20-22; G. Williams Dep. 53:15-17, 107:17-109:12, 115:6-14, 116:10-117:14; Grisenthwaite Dep. 36:3-14; Deposition of Michael Williams 60:15-20; Deposition of Ziad Asghar 106:6-23, 146:15-147:14; Weiser Dep. 11:5-17; Wolf Dep. 49:25-50:5; QCVARM_0716389.

███████████████████████

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Jenifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC  20004
(202) 240-2900

Erin J. Morgan
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10017
(202) 240-2900

Catherine Nyarady
Anish Desai
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA  94105
(628) 432-5100

October 9, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2025, copies of the foregoing were caused to be served

upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                  *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Karen E. Keller, Esquire                                 *VIA ELECTRONIC MAIL*
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                              *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                                *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
Sydney D. Gaskins, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Kyle W.K. Mooney, Esquire                                *VIA ELECTRONIC MAIL*
Alexandra Corrinne Hottenrott, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Erik J. Olson, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Defendant*

Daniel P. Muino, Esquire                        *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
*Attorneys for Defendant*

Brian M. Kramer, Esquire                        *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 200
San Diego, CA  92130
*Attorneys for Defendant*

William Frentzen, Esquire                       *VIA ELECTRONIC MAIL*
Daralyn J. Durie, Esquire
Shaelyn Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*

Lydia B. Cash, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                         *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                                         *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                                   *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*


*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)

# Exhibit 8

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR. (141757)
BONNY E. SWEENEY (176174)
THOMAS R. MERRICK (177987)
PAULA M. ROACH (254142)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
johns@csgrr.com
bonnys@csgrr.com
tmerrick@csgrr.com
proach@csgrr.com

THE KATRIEL LAW FIRM
ROY A. KATRIEL (*pro hac vice*)
1101 30th Street, N.W., Suite 500
Washington, DC  20007
Telephone:  202/625-4342
202/330-5593 (fax)
rak@katriellaw.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | Lead Case No. C-05-00037-JW(HRL) |
| | CLASS ACTION |
| This Document Relates To: | AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF SHERMAN ANTITRUST ACT, CLAYTON ACT, CARTWRIGHT ACT, CALIFORNIA UNFAIR COMPETITION LAW, CONSUMERS LEGAL REMEDIES ACT, AND CALIFORNIA COMMON LAW OF MONOPOLIZATION |
| ALL ACTIONS. | |
| | DEMAND FOR JURY TRIAL |

**NATURE OF THE ACTION**

1.      This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of Plaintiffs, defined more fully below.

2.      Defendant Apple, Inc. ("Apple" or "Defendant") has used its dominant market position in the markets for Audio Downloads and Portable Digital Media Players to stifle competition and strengthen its monopoly in these markets.  Apple engaged in systematic conduct to shut out rivals' competing Audio Downloads and Portable Digital Media Players by cutting off their access to the marketplace.  In the process, Apple deprived consumers of choice and innovation in the Audio Download Market and Portable Digital Media Player Market.   Apple used unneeded technological restrictions in conjunction with software updates to suppress new products that threatened its monopoly power in the relevant product markets.   This strategy succeeded in maintaining Apple's monopolies at the expense of consumers who have been denied access to potentially superior, non-Apple products and lower prices.

3.      As alleged in further detail below, Apple initially gained its monopoly power through the use of proprietary software on Audio Downloads purchased from Apple's iTunes Store ("iTS") and Apple's iPod, known as FairPlay.  FairPlay prevented iPods from playing Audio Downloads purchased from competitors of iTS and prevented Audio Downloads purchased through iTS from playing on Portable Digital Media Players other than iPod.  Thus, a purchaser who wished to play Audio Downloads purchased from iTS on a Portable Digital Media Player had to purchase an iPod and a purchaser of an iPod who wished to buy Audio Downloads for direct playback on the iPod had to purchase them from iTS.

4.      When competitors attempted to enter either market by selling products compatible with Apple's market-leading iPod or iTS files, Apple promptly issued software updates to end the compatibility.  This allowed Apple to further entrench its monopolization of both markets and enabled it to sell the iPod at prices far above those that would prevail in a competitive market for Portable Digital Media Players.

1     5.     Apple's use of software updates, intended to shut out competitors, constitutes a

2  violation of United States and California antitrust law.  None of the anticompetitive conduct

3  described in this complaint had a legitimate business justification.

4                   **PARTIES**

5     6.     Plaintiff Somtai Troy Charoensak is a resident of California.  During the Class

6  Period, Mr. Charoensak purchased Audio Downloads and an iPod directly from Apple.  The amount

7  paid to Apple for the iPod was supracompetitive; it was greater than he would have paid, but for the

8  antitrust violations alleged herein.  Mr. Charoensak thereby suffered injury in his property, in the

9  form of overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

10     7.     Plaintiff Mariana Rosen is a resident of New Jersey.  During the Class Period, Ms.

11  Rosen purchased Audio Downloads and an iPod directly from Apple.  The amount paid to Apple for

12  the iPod was supracompetitive; it was greater than she would have paid, but for the antitrust

13  violations alleged herein.  Ms. Rosen thereby suffered injury in her property, in the form of

14  overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

15     8.     Plaintiff Melanie Tucker is a resident of California.  During the Class Period, Ms.

16  Tucker purchased Audio Downloads and iPods directly from Apple.  The amount paid to Apple for

17  the iPods was supracompetitive; it was greater than she would have paid, but for the antitrust

18  violations alleged herein.  Ms. Tucker thereby suffered injury in her property, in the form of

19  overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

20     9.     Defendant Apple is a corporation organized under the laws of the State of California

21  and has its principal place of business in Cupertino, California.  Though best known as a computer

22  hardware and software company, the majority of Apple's revenues and profits now derive from its

23  Audio Downloads and Portable Digital Media Player businesses.  At all times during the Class

24  Period, Apple owned and operated the iTS and sold iPods directly to Mariana Rose, Melanie Tucker,

25  and Somtai Troy Charoensak (collectively, "Plaintiffs") and members of the Class.

26              **JURISDICTION AND VENUE**

27     10.    Jurisdiction is conferred upon this judicial district pursuant to 15 U.S.C. §§15 and 26,

28  and 28 U.S.C. §§1331 and 1337.

1     11.    Venue is proper in this district pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C.

2  §1391 because Defendant transacts business in this district, Defendant has its principle corporate

3  office in this district, and because thousands of Class members are located in this district.

4  Additionally, a substantial part of the interstate trade and commerce involved and affected by the

5  alleged violations of the antitrust laws was and is carried on in part within this district.  The acts

6  complained of have had, and will have, substantial anticompetitive effects in this district.  A

7  substantial number of putative plaintiffs reside in this district.

8                **TRADE AND COMMERCE**

9     12.    During the Class Period, Apple marketed, distributed, and sold Portable Digital

10  Media Players and Audio Downloads in a continuous and uninterrupted flow of intrastate and

11  interstate commerce throughout the United States.

12              **RELEVANT PRODUCT MARKETS**

13     13.    For the claims that may require market definition, the relevant product markets for

14  purposes of these allegations are as follows:

15  **Audio Download Market**

16     14.    The "Audio Download Market" is defined as the market for digital music, copies of

17  which can be legally purchased by the consumer by way of internet download.  In contrast to

18  streaming audio services that sell temporary downloads that self-destruct after a predetermined time

19  period or when a consumer stops paying for the service, the Audio Download Market consists of

20  permanent downloads of digital music files.  Audio Downloads present consumers enormous

21  advantages over purchasing music in compact disk ("CD") form at retail stores.  Audio Download

22  stores offer for sale hundreds of thousands of songs at once, many times more than even the largest

23  traditional music retailer.  Audio Downloads are attractive to consumers because they can be

24  purchased *a la carte* so that the purchaser gets only the songs that he/she wants rather than having to

25  buy an entire CD album in order to get only one or two desirable songs.  Audio Downloads remain

26  portable because they can be easily downloaded onto a portable device capable of playing digital

27  files.

28

15. Audio Downloads are also attractive because they are more convenient, reliable, and better for the environment. Consumers do not have to drive to a store to make their purchase, trucks do not have to transport the CDs from factory to warehouse to retailer, and there is no material or packaging produced only to be thrown away. Audio Downloads also promise superior audio fidelity over time because, unlike CDs, Audio Downloads last indefinitely and cannot wear out or break. Additionally, another appealing feature of Audio Downloads is that they can be easily stored and played in mass quantities on a Portable Digital Media Player.

16. Apple owns and operates iTS, formally known as the iTunes Music Store, an internet site that offers digital music and digital video computer files for online purchase and download. Unlike most internet sites, iTS is accessed with proprietary Apple software, known as iTunes, rather than with a web browser.

17. At all relevant times, Apple has been a competitor in the Audio Download Market. Throughout the Class Period, Apple has maintained a market share of the United States Audio Download Market of 70% or more.

18. Barriers to entry into the Audio Download Market are high. In addition to the barriers to entry into the Audio Download Market imposed by Apple's illegal monopolistic anticompetitive behavior, discussed in detail herein, other barriers to entry include: (a) Audio Downloads are protected by copyrights that any new entrant would have to obtain a license for or purchase at wholesale in order to legally sell; (b) the copyright holders are unlikely to license their copyrighted Audio Downloads to any new entrant unless that entrant can credibly show that it will be able to sell these files to a large audience; (c) any new entrant would have to offer an inventory of Audio Downloads comparable to that of existing music stores which would necessitate an inordinate investment of capital and resources; (d) purchasers are unlikely to switch to a new online Audio Download store because switching means learning a new software; (e) technological costs for things such as network fees are high; and (f) any new entrant would have to offer Audio Downloads that were operable on the most popular media players.

19. Consumers and merchants have come to recognize the Audio Download Market as a separate and distinct market from the market for music CDs.

20.     The Audio Download Market offers a number of features not readily available at traditional "brick and mortar" music stores, which help set it apart as a distinct market. For example, whereas shoppers at traditional "brick and mortar" music stores must typically purchase an entire album of the artist or group selected, online sales of Audio Downloads offer consumers the option to purchase only individual songs or tracks of music separately. This is borne out by sales statistics showing that on iTS, for every sale of a complete album online there are approximately 20 songs purchased individually. By contrast, according to statistics compiled by the Recording Industry Association of America, in the CD market in 2005, sales of CD albums were 705.4 million compared to sales of CD singles of 2.8 million units.

21.     Further, unlike "brick and mortar" music stores, the Audio Download Market offers consumers the ability to create their own customized "playlists" wherein consumers can, in effect, create their own customized collection of songs from different artists.

22.     In addition, the music selection available in the Audio Download Market is not coextensive with the music selection available at "brick and mortar" music stores. Audio Download sites provide a ready outlet for independent and less popular artists whose music is not readily available at "brick and mortar" music stores, which only have room to carry a small fraction of the inventory of Audio Download stores.

23.     In the eyes of consumers, the Audio Download Market and the "brick and mortar" market are not in price-competition with one another. The Audio Download Market focuses on selling individual tracks or songs while the "brick and mortar" market is focused on selling whole albums or CDs, thereby making price-comparison between these two distinct markets a *non sequitur*. Further, because of the ubiquitous nature of the internet, Audio Download sales are available to a whole host of consumers who do not have ready access to nearby "brick and mortar" music stores, let alone a nearby "brick and mortar" store stocking the particular recording desired by these consumers at any given time. Similarly, because search costs on the internet are a fraction of search costs involved in the "brick and mortar" market, consumers are not likely to and do not forego a purchase of a music recording online even if they hypothetically would believe that the same recording could be obtained somewhat less expensively at a traditional "brick and mortar" store.

AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                                    - 5 -

The costs associated with traveling to "brick and mortar" music stores, searching one or more such stores for a particular recording, and comparison shopping between these "brick and mortar" music stores and online stores dissuade consumers from foregoing a purchase made from the comfort of their own home or office for the same piece of music, even if doing the foregoing tasks could hypothetically result in a savings of a few cents per song. Put differently, consumers are not likely to and do not travel miles to their nearest "brick and mortar" music stores in the hopes of saving a few cents off a song purchase that they could make instantaneously on their home computer.

24. For these and other reasons, the Audio Download Market is and has been recognized as a separate relevant product market.

**Portable Digital Media Player Market**

25. The "Portable Digital Media Player Market" is defined as the market for portable consumer electronic battery-powered devices that can store and play large numbers of digital media files. Portable Digital Media Players are enormous improvements over portable CD players. While a traditional CD can hold no more than 15 to 25 songs, Portable Digital Media Players can store up to 40,000 songs. Even the largest Portable Digital Media Players are only a fraction of the size of a typical portable CD player. Portable Digital Media Players also dispense with the need to carry around CDs and allow consumers to organize, categorize, and play their digital media files in whatever manner or order they desire. Further advantages include superior skip protection and in many models the ability to play video games, video files, and store digital photographs.

26. At all relevant times, Apple has sold Portable Digital Media Players known as iPods. These include all generations of the iPod Classic, iPod Shuffle, iPod Nano, iPod Mini and iPod Touch (collectively, the "iPod").

27. During the Class Period, Apple has maintained a market share of the Portable Digital Media Player Market of 60% or more.

28. Barriers to entry in the Portable Digital Media Player Market are high. In addition to the barriers to entry into the Portable Digital Media Player Market imposed by Apple's illegal, anticompetitive conduct, discussed in detail herein, other barriers to entry include: (a) high fixed costs related to product development, production, manufacturing and marketing; (b) purchasers are

1  unlikely to switch to a new Portable Digital Media Player unless it is compatible with their existing

2  libraries of Audio Downloads; (c) new entrants were required to license Digital Rights Management

3  software ("DRM") so that their Portable Digital Media Players were capable of playing DRM-

4  encrypted Audio Downloads purchased from online stores; and (d) certain DRM's, including

5  FairPlay, were proprietary and not available to license.

6        29.    The relevant geographic market for the relevant product markets is the United States.

7  **CLASS ACTION ALLEGATIONS**

8        30.    Plaintiffs seek to represent the following Class:

9        31.    All persons or entities in the United States (excluding federal, state and local

10  governmental entities, Apple, its directors, officers and members of their families) who purchased an

11  iPod directly from Apple between October 1, 2004 and March 31, 2009 ("Class Period").

12        32.    The membership of the Class is so numerous that joinder of all members is

13  impractical.  There are millions of Class members who are geographically dispersed throughout the

14  United States.

15        33.    Plaintiffs' claims are typical of the claims of the members of the Class because

16  Plaintiffs and all Class members were damaged by the same wrongful conduct of the Defendant

17  alleged herein.

18        34.    There are questions of law and fact common to the Class which predominate over any

19  questions affecting only individual Class members.  Such common questions include:

20              (a)    The definition of the relevant product markets;

21              (b)    Apple's market power within the relevant product markets;

22              (c)    Whether Apple monopolized and continues to monopolize the relevant

23  product markets;

24              (d)    Whether Apple attempted to monopolize and continues to attempt to

25  monopolize the relevant product markets;

26              (e)    Whether the contractual conditions Apple imposes upon its customers are

27  unconscionable; and

28

1           (f)     Whether Apple's conduct caused damage to Plaintiffs and members of the

2    Class, including the degree to which prices paid by the Class are higher than the prices that would

3    have been paid in a market free from monopolization and other illegal conduct.

4           35.     The claims of Plaintiffs are typical of the claims of the Class, and Plaintiffs have no

5    interest adverse to the interest of other members of the Class.

6           36.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained

7    counsel experienced and competent in the prosecution of complex class actions and antitrust

8    litigation.

9           37.     A class action is superior to other available methods for the fair and efficient

10   adjudication of the controversy.  Such treatment will permit a large number of similarly situated

11   persons to prosecute their common claims in a single forum simultaneously, efficiently, and without

12   duplication of effort and expense that numerous individual actions would engender.  Class treatment

13   will also permit the adjudication of relatively small claims by many Class members who could not

14   afford on their own to individually litigate an antitrust claim against a large corporate defendant.

15   There are no difficulties likely to be encountered in the management of this class action that would

16   preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient

17   adjudication of the controversy.

18          **APPLE'S USE OF FAIRPLAY TO MAINTAIN MONOPOLY POWER**

19          38.     On January 9, 2001, Apple released a digital media player application known as

20   iTunes that is used for playing and organizing digital media files on a personal computer.  iTunes

21   allows the user to, *inter alia*, organize music, record CDs, and download the files onto a Portable

22   Digital Media Player.

23          39.     On October 23, 2001, Apple released the iPod, its first Portable Digital Media Player.

24   At the time, iPod was capable of playing only unprotected Audio Downloads in MP3 format either

25   downloaded from the internet or transferred from a user's CD ("burned").

26          40.     On April 28, 2003, Apple opened iTS, known at the time as the iTunes Music Store.

27   iTS offered over 200,000 songs from the major record labels for sale for 99 cents each.  This was the

28   largest online music store of its time.  iTS now offers more than 11,00,000 songs.  iTS is accessible

1    only through iTunes.  At the same time as the release of iTS, Apple also released a new generation of

2    iPod and updated the iTunes software so that iTunes and iPod software was compatible with

3    FairPlay.

4         41.    Traditionally, Audio Downloads have come in both unprotected and protected digital

5    file formats.  Unlike unprotected formats, protected formats include technological encumbrances,

6    commonly known as DRM, designed to restrict a consumer's use of the file and illegal unauthorized

7    copies of the digital file.

8         42.    From the inception of Apple's iTS, the major record labels, Sony, Universal, EMI,

9    Warner, and BMG, all required Audio Downloads to be sold in protected format.  Apple elected to

10   encode the Audio Downloads sold through the iTS with its own proprietary software, FairPlay.

11        43.    Because FairPlay was not licensed to any other manufacturers of Portable Digital

12   Media Players or sellers of Audio Downloads, songs purchased from iTS that were encoded with

13   FairPlay were incapable of being played by Portable Digital Media Players other than iPods.  Thus,

14   consumers who purchased Audio Downloads from Apple had no choice but to buy an iPod if they

15   wanted to play those songs directly on a Portable Digital Media Player.  Conversely, iPods were

16   unable to play any files encrypted with a DRM format other than FairPlay that were sold on

17   competing Audio Download stores.

18        44.    Apple encoded all Audio Downloads sold through the iTS with FairPlay even as to:

19   (a) public domain material; and (b) music that certain music labels and/or artists themselves

20   requested be sold DRM-free.

21        45.    Apple used its proprietary DRM to gain an overwhelming market share in the Audio

22   Download and Portable Digital Media Player markets.

23        46.    After purchasing their Audio Download library from the iTS, purchasers were locked

24   into making all future Portable Digital Media Player purchases from Apple.  They may have wanted

25   to buy a non-Apple Portable Digital Media Player to replace their iPod, but to do so would mean

26   they could not utilize any of the FairPlay-protected songs they purchased from the iTS on their new

27   Portable Digital Media Player.

28

47.     This quickly increased Apple's market share in both the Portable Digital Media Player and Audio Download Markets.  After the release of iTS in April 2003, Apple steadily maintained a 70% or more market share of the Audio Download Market.  Additionally, prior to release of iTS, Apple's iPod maintained about 11% of the market compared to up to 92% after the release of iTS.  As Josh Bernoff, principle analyst with Forrester Research stated, Apple's "overwhelming market share is based in large part on its ability to lock people into that device."

48.     Apple could have licensed its FairPlay software to other manufacturers of Portable Digital Media Players, so that music purchased from the iTS could be transferred directly to Portable Digital Media Players other than the iPod.  Additionally, Apple could have licensed its FairPlay to other Audio Download stores so that music files purchased from those stores could be played directly on iPods.

49.     However, Apple did not license or give access to FairPlay to any other Portable Digital Media Player manufacturer, thereby ensuring two results.  First, Apple ensured that the iPod was the only Portable Digital Media Player that could directly play songs purchased from the iTS.  Second, Apple ensured that owners of iPods who wanted to purchase Audio Downloads to be directly played on their iPod could only do so by purchasing these files at the iTS.

50.     But for Apple's anticompetitive intent, it would have been rational and profitable for Apple to license FairPlay to competing manufacturers of Portable Digital Media Players because it would have expanded the consumer base for iTS.  The more Portable Digital Media Players on the market that were interoperable with files purchased from iTS, the more profitable iTS would have been.

51.     Instead, Apple used its dominant position obtained as a result of FairPlay, to obtain monopoly power in the relevant product markets and to make substantial profits in the sale of iPods.  Indeed, Apple claims that it has operated the iTS at just above cost, instead taking its monopoly profits in the sale of iPods.  In the first quarter of 2008, Apple reported $9.6 billion in revenue, 42% of which came from the sale of iPods.  Instead, Apple took its anticompetitive profits from the sale of iPods.

**APPLE'S ANTICOMPETITIVE USE OF SOFTWARE UPDATES**

52.     In order to maintain its monopoly power in the market for Audio Downloads and the market for Portable Digital Media Players, Apple has used software updates to shut out competitors and cut off their access to the marketplace. Apple's anticompetitive tactics were intended to, and had the effect of, preventing and/or delaying entry of competitive products that threatened Apple's monopolies in the relevant product markets.

53.     On July 26, 2004, RealNetworks, a rival seller of Audio Downloads, announced that songs sold through its online store could be played on the iPod in addition to other competing Portable Digital Media Players. This gave iPod owners a competitive alternative to the iTS for their purchases of Audio Downloads. RealNetworks had independently analyzed the firmware within the iPod and was able to discern the required extra software code added by Apple to make downloaded songs playable on the iPod. Armed with this knowledge, RealNetworks was able to convert their Helix DRM into the necessary DRM so that Audio Downloads sold through RealNetworks' online store could be playable on Apple's iPod. This technology was known as Harmony. RealNetworks maintained that its conduct was legal.

54.     RealNetworks' Harmony was significant not only because it represented the first alternative to Apple's monopolistic stronghold of Audio Downloads for playback on the iPod, but also because RealNetworks began selling its Audio Downloads for as low as 49 cents per track, well below the 99 cents per track charged by Apple's iTS.

55.     At the time of RealNetworks' announcement, although there were several Portable Digital Media Players in the marketplace, the iPod was the number one seller and controlled 60% market share. Thus, in order to compete with Apple's iTS, which had 70% market share and was the only Audio Download store that sold downloads compatible with iPod, RealNetworks had to make its products compatible with iPods.

56.     Moreover, RealNetworks' announcement was met with approval from the major record labels. This was because RealNetworks sold its Audio Downloads with DRM protection that ensured the files could not be improperly copied but also allowed for compatibility with over 100 Portable Digital Media Players, including Apple's iPod.

57. Indeed, in its first three weeks of selling iPod-compatible music files, RealNetworks sold three million music files. RealNetworks alleged that with Harmony RealNetworks increased its market share in the Audio Download Market to 20% from 10% and decreased Apple's market share from 60% to 70%.

58. As Forrester Research pointed out about RealNetworks' actions at the time, "more compatibility means more competition."

59. Rather than embracing this competitive offering to iPod owners, Apple immediately threatened RealNetworks and iPod users. On July 29, 2004, merely four days after RealNetworks' announcement, Apple issued its own public statement warning RealNetworks and iPod users: "We strongly caution Real and their customers that *when we update our iPod software from time to time it is highly likely that Real's Harmony technology will cease to work with current and future iPods*." (emphasis added).

60. True to its threat, beginning in October 2004, Apple updated its iPod and iTunes software to prevent songs downloaded from RealNetworks' music store from being played on iPods. Unlike other software updates previously issued by Apple, purchasers were required to update the iTunes software in order to use iTS. This sent a clear message to other Apple competitors, that Apple was not willing to allow genuine competition in the relevant product markets and would take aggressive steps to prevent competition.

61. In the wake of this episode, RealNetworks and other companies were reluctant to invest the necessary capital to develop music stores that would allow them to adequately compete with Apple by selling Audio Downloads compatible with iPods. As RealNetworks stated in an SEC filing in August 2005: "There are other risks associated with our Harmony technology, including the risk that Apple will continue to modify its technology to 'break' the interoperability that Harmony provides to consumers, which Apple has done in connection with the release of certain new products. If Apple chooses to continue this course of action, Harmony may no longer work with Apple's products, which could harm our business and reputation, or we may be forced to incur additional development costs to refine Harmony to make it interoperate again."

62.     Because Apple was able to maintain its monopoly power in the Audio Download Market, competing manufacturers of Portable Digital Media Players were unable to compete with Apple's iPod because any media player they created would not be compatible with iTS. Consumers who purchased Audio Downloads from iTS would not purchase a Portable Digital Media Player unless those iTS files could be played on their Portable Digital Media Player. Because iTS maintained 70% or more of the Audio Download Market, interoperability with files purchased from iTS was critical. However, because Apple would not license FairPlay and issued software updates intended to prevent interoperability when achieved, competitors were unable to genuinely compete. Accordingly, Apple willfully maintained its monopoly of both the Audio Download Market and Portable Digital Media Player Market.

63.     Apple also issued several software updates intended to prevent Audio Downloads purchased from iTS from being played on competing Portable Digital Media Players.

64.     For example, in or about the beginning of 2005, a software program known as JHymn was developed so that Audio Downloads purchased from iTS could be played on any AAC-compatible music player, including Apple's iPod or any non-Apple device. This gave consumers a clear choice of using an iPod for playback of their iTS purchases or an alternative Portable Digital Media Player.

65.     Apple immediately began issuing software updates to prevent iTS files that were made interoperable with other Portable Digital Media Players using JHymn software from being played. In October 2005, iTunes 6.0 was released and included changes specifically intended to stop JHymn and other similar software programs.

66.     Again in September 2006, Apple released iTunes 7.0 intended to prevent JHymn and other programs from being used to create interoperability between Audio Downloads purchased from iTS and non-Apple Portable Digital Media Players. Throughout the Class Period, Apple issued software updates intended to prevent the use of other similar programs including QTFairUse and PlayFair.

67.     Apple continually redesigned its software even though it admitted that doing so served no genuine antipiracy purpose. In a web-posting dated February 6, 2007, Apple's CEO Steve

Jobs conceded that "DRMs haven't worked, and may never work, to halt music piracy." Moreover, the record companies that contractually required DRM did not require all of the anticompetitive software updates issued by Apple.

**Removal of FairPlay**

68.    On April 2, 2007, EMI began selling its entire catalog of music on iTS without DRM restrictions and hence no FairPlay. As Eric Nicoli, CEO of EMI Group stated, "[b]y providing DRM-free downloads, we aim to address the lack of interoperability which is frustrating for many music fans. We believe that offering consumers the opportunity to buy higher quality tracks and listen to them on the device or platform of their choice will boost sales of digital music." This represented only a fraction of the entire catalog available on iTS at the time.

69.    In January 2008, Amazon.com became the first music store to sell all Audio Downloads without DRM restrictions. Its initial catalog contained over 2 million songs. The current catalog now offers over 10 million songs.

70.    In January 2009, Apple announced that it would begin selling most Audio Downloads through iTS without FairPlay restrictions. Purchasers that previously bought Audio Downloads from iTS in the past could also upgrade these files to a FairPlay-free format for an additional cost of 30 cents per file or 30% of the original album price. By the end of March 2009, all Audio Downloads sold through iTS were FairPlay-free.

71.    This presented the first time when all iPod owners could freely purchase Audio Downloads from any online store for playback on their iPods. This also presented the first time when Apple could no longer re-design FairPlay software through software updates to control competition in the relevant product markets and restrict consumer choice. Indeed, in 2009, Apple's market share in the Audio Download Market began to slip for the first time since its creation. Apple's share in the Audio Download Market slipped from 68.3% to 67.1%, whereas, by comparison Amazon's MP3 Store jumped from 6.2% to 9.1%.

72.    Despite Apple's decision to sell Audio Downloads unencumbered by FairPlay on a going-forward basis, the impact of Apple's prior conduct did not end. The billions of songs already downloaded by consumers that remain locked by FairPlay continued to allow Apple to charge

1     monopoly prices for its iPod because it is the only Portable Digital Media Player that can play those

2     files.

3          **APPLE'S CONDUCT HAS BEEN THE TARGET OF FORMAL GOVERNMENT**
            **INVESTIGATIONS AND LEGISLATION IN EUROPE**

4

5         73.     In August 2006, France's government approved a law that was specifically designed

6     to force Apple to allow other companies to sell protected music files on the iPod, and to force Apple

7     to make music purchased on its iTS compatible with competing Portable Digital Media Players. In

8     an interview, a French official explained that his government believes that "[s]omeone who buys a

9     song has to be able to listen to it, no matter which device or the software of choice" and that Apple is

10     designing its products to prevent consumers from using other companies' products is "not in the

11     interest of the consumer, nor the interest of the creator. It only benefits the company and we're there

12     to defend the consumer, our citizens." Apple unsuccessfully lobbied against the law, calling it "state

13     sponsored piracy."

14         74.     In 2006, the consumer ombudsmen in Norway, the Netherlands, Finland, Sweden,

15     Denmark, and Germany began investigating Apple's use of FairPlay.

16         75.     On July 6, 2006, the Office of the Norwegian Consumer Ombudsman found "[t]he

17     way Apple uses DRM is illegal." Using language that echoes the American common law standard of

18     an unconscionable contract, Ombudsman Bjørn Erik Thon ruled:

19              [Apple] goes to great lengths to ensure that its standard customer contract
            protects the company's own interest. . . . "The contracts are both vague and hard to
20         understand for the customers, and they're clearly unbalanced to disfavor the
            customer. The consumers are clearly the inferior partner in the contract, and this in
21         itself is illegal . . . ." "[Apple's restrictive] technology renders the customers without
            rights in dealing with a company which on a whim can dictate what kind of access
22         customers will have to products they have already paid for . . . ."

23         76.     Similarly, in the Netherlands, the Consumer Ombudsman filed suit against what it

24     called Apple's "illegal practices" "abuse of dominant market position" noting that "[w]hat we want

25     from Apple is that they remove the limitations that prevent you from playing a song you download

26     from iTunes on any player other than an iPod . . . . When you buy a music CD it doesn't play only

27     on players made by Panasonic. People who download a song from iTunes shouldn't be bound to an

28     iPod for the rest of their lives."

77.     The European Union Consumer Affairs Commissioner criticized Apple on March 12, 2007, saying: "[d]o you think it's fine that a CD plays in all CD players but that an iTunes song only plays in an iPod?  I don't."

78.     Several of the above European governments issued a joint statement saying "[w]e believe consumers have a right to play material purchased online on a portable device of their own choice.  Contract clauses that make this impossible or too inconvenient are unfair and should be revoked."

79.     In 2008, with the support of other European countries, Norway brought a formal action against Apple.  In September 2008, Norway's Consumer Ombudsman, Bjørn Erik Thon, referred Apple to the Norwegian Market Council.  Bjørn Erick Thon indicated that since his last meeting with Apple in February 2008, when Apple stated that it shared the goal of complete interoperability, Apple had done nothing to advance that goal.

80.     Norway dropped its action against Apple in early 2009, when Apple announced that it would begin selling Audio Downloads through iTS without FairPlay so that they could be played on Portable Digital Media Players other than iPods.

**ANTITRUST INJURY TO CONSUMERS**

81.     Through the unlawful acts and practices described above, Apple has harmed competition and innovation by forcing out competitors in the relevant product markets and harmed consumers by causing them to pay supracompetitive prices for iPods.  Those practices, described herein, have also allowed Apple to obtain and maintain illegal monopolies in the relevant product markets.

82.     Apple engaged in willful anticompetitive conduct to maintain its monopoly in both the Audio Download Market and Portable Digital Media Player Market through the use of software updates intended to prevent competitors from selling Audio Downloads that were compatible with iPods.  As a result of this conduct and the technological link created by FairPlay, Apple was able to preserve its monopoly in both markets and charge purchasers of iPods a supracompetitive price.

83.     Likewise, by preventing owners of iPods from buying music from any Audio Downloads retailer other than iTS, Apple deterred consumers from even considering doing business

1   with its competitors' music stores, allowing it to monopolize the Audio Download Market, and

2   further exclude competing Portable Digital Media Players from the market, lock consumers into iPod

3   and iTunes, and charge supracompetitive prices for the iPod.

4       84.     Moreover, through the use of software updates intended to prevent interoperability

5   between Audio Downloads purchased through the iTS and competing Portable Digital Media

6   Players, Apple was able to discourage the purchase of competitors products, allowing it to

7   monopolize the Portable Digital Player Market and charge supracompetitive prices for iPods.

8       85.     Consumers have been further injured as innovative companies such as Dell, Olympus,

9   and Rio have withdrawn from the Portable Digital Media Player Market. These companies had little

10  choice but to give up and exit the market because Apple's anticompetitive conduct excluded them

11  from reaching the majority of their potential customers no matter how much cheaper or how much

12  better their products were from iPods. There could be no real competition in the Audio Download

13  and Portable Digital Media Player Market as long as Apple's conduct foreclosed even the possibility

14  of its competitors reaching most potential customers.

15      86.     Apple's anticompetitive conduct has deterred the development of competing

16  products, damaging consumers by depriving them of a choice of products with potentially different

17  and innovative features.

18      87.     Normally markets for consumer electronic goods such as Portable Digital Media

19  Players are characterized by intense competition and narrow profit margins. Apple's pricing in the

20  Portable Digital Media Player Market, by contrast, is exactly that of a monopolist, excessive and

21  arbitrary. For example, in June 2006 the only difference between the 1GB and 4GB models of the

22  iPod nano was the capacity of their NAND flash memory parts. At spot prices in the NAND flash

23  memory market at the time, the 1GB part cost approximately $4.15, while the 4GB part cost

24  approximately $9.67. Nonetheless, Apple charged an additional one hundred dollars for the 4GB

25  model.

26      88.     Plaintiffs and the Class have been injured by this anticompetitive conduct. As a direct

27  result of Apple's anticompetitive use of software updates, Plaintiffs and members of the Class paid

28  supracompetitive prices for iPods.

**COUNT I: MONOPOLIZATION**

**(For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)**

**Violations Resulting from the Unlawful Maintenance
of Monopoly Power in the Portable Digital Media Player Market**

89. Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

90. Apple has monopoly power in the Portable Digital Player Market.

91. Through the anticompetitive use of software updates described herein, Apple has willfully maintained its monopoly of the Portable Digital Media Player Market. This conduct has harmed competition in that market, and has caused injury to every buyer of an iPod from Apple during the Class Period. Prices in the Portable Digital Media Player Market were higher than they would have been in a competitive market; the supply and selection of products available was lower than it would have been in a competitive market; innovation has been stifled; and the number and effectiveness of competitors have been diminished by unlawful means.

92. As a result of this violation of law, Apple's prices for iPods paid by the Class and Plaintiffs were higher than they otherwise would have been.

93. There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Portable Digital Media Player Market.

94. The anticompetitive conduct described herein has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**Violations Resulting from the Unlawful Maintenance
of Monopoly Power in the Audio Download Market**

95. Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

96. Apple has monopoly power in the Audio Download Market.

97. Through Apple's anticompetitive use of software updates described herein, Apple has willfully maintained monopoly power in the Audio Download Market. This conduct has harmed competition in that market, making the supply and selection of products available lower in the Audio

AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)

Download Market than they would be in a competitive market. The number and effectiveness of competitors have also been diminished by Apple's unlawful conduct.

98.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Audio Download Market.

99.     The anticompetitive conduct described herein has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

## COUNT II: ATTEMPTED MONOPOLIZATION

### (For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)

#### Violations Resulting from Unlawful Attempted
#### Monopolization of the Portable Digital Media Player Market

100.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

101.     Apple has acted with specific intent to monopolize the Portable Digital Media Player Market by using software updates intended to stifle competition and restrict consumer choice.

102.     There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Portable Digital Media Player Market because Apple controls a large percentage of that market and has the ability, and actually does, exclude its competitors through use of anticompetitive technological restrictions on its products. Further success in excluding competitors from the Portable Digital Media Player Market will allow Apple to obtain an illegal monopoly over the Portable Digital Media Player Market.

103.     This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market. Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Portable Digital Media Player Market and forced consumers to pay higher prices in the Portable Digital Media Player Market than they would in a competitive market.

104.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Portable Digital Media Player Market.

105.     The anticompetitive conduct described herein, if not halted and abated, will damage Plaintiffs and the alleged Class, and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**Violations Resulting from the Unlawful Attempted**
**Monopolization of the Audio Download Market**

106.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

107.     Apple has acted with specific intent to monopolize the Audio Download Market by issuing software updates intended to stifle competition and restrict consumer choice.

108.     There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Audio Download Market because Apple controls a large percentage of that market and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products.  Further success in excluding competitors from the Audio Download Market will allow Apple to obtain an illegal monopoly over the Audio Download Market.

109.     This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market.  Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Audio Download Market.

110.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Audio Download Market.

111.     The anticompetitive conduct described herein has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**COUNT III**

**(For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§16270, *et seq.*)**

112.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

113.     Apple's actions as described above constituted an unreasonable restraint of trade or commerce throughout California and the rest of the United States in violation of the Cartwright Act, §§16270, *et seq.* of the California Business and Professions Code.

114.    The Class has been injured in their business and property as a result of Apple's illegal conduct, for which they seek damages (treble damages where appropriate) including pre-judgment interest.

## COUNT IV

### (For Violation of California Unfair Competition Law, Bus. & Prof. Code §§17200, *et seq.*)

115.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

116.    The conduct alleged herein constitutes unlawful and unfair business acts and practices within the meaning of the California Unfair Competition Law, §§17200, *et seq.* of the California Business and Professions Code ("UCL").  Plaintiffs have suffered injury in fact and lost money or property as a result of Apple's violations of law and wrongful conduct.

117.    Apple's actions are unlawful under the UCL because they violate, *inter alia*, the Sherman Antitrust Act, the Cartwright Act, the Consumers Legal Remedies Act and because Apple has monopolized the markets for Audio Downloads and Portable Digital Media Players in violation of California common law.

118.    Apple's actions are unfair under the UCL because, in its pursuit of monopoly pricing, it has shut out competitors who attempted to enter the relevant product markets thus preventing consumers from choosing which companies to do business with in the relevant product markets based on the merits of each company's products.  Such conduct is immoral, unethical, oppressive and/or unscrupulous and causes injury to consumers.  Moreover, there is no legitimate business justification for Apple's conduct, and any business justification is further outweighed by the harm Apple's conduct has caused to consumers and competitors.

119.    Accordingly, Apple has violated the UCL by engaging in unlawful and unfair business practices.

120.    As a result of this unlawful and unfair conduct, Apple has been unjustly enriched at the expense of Plaintiffs, other members of the Class, and the general public.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT V**

**(For Violation of the Consumers Legal Remedies Act,
Cal. Civil Code §§1750, *et seq.*)**

121.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

122.    Plaintiffs and each member of the Class are "consumers" within the meaning of Consumers Legal Remedies Act, California Civil Code §1761(d) ("CLRA").

123.    On July 7, 2006, Plaintiff Melanie Tucker sent a letter to Apple's general counsel demanding Apple cease its conduct in violation of the CLRA.

124.    The CLRA applies to Apple's actions and conduct, described herein, because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

125.    Apple is a monopolist with market shares of 70% or more in each of the relevant product markets and a stock market capitalization of more than fifty billion dollars.  Through the use of FairPlay, Apple has continued to shut out competitors at no benefit to consumers while preventing them from using any Apple product they have already bought from being used with a competitor's Portable Digital Media Player or iTS.

126.    Apple's size, completely dominates market share, and unreasonable and unfair technological restrictions along with its use of software updates, place it in a greatly unequal bargaining position relative to consumers in each of the relevant product markets.

127.    Apple unconscionably exploits this unequal bargaining power by imposing prices, contractual terms, and one sided technological restrictions into contracts with consumers in the Audio Download Market and Portable Digital Media Player Markets.  This behavior has violated and continues to violate the CLRA.

**COUNT VI**

**(For Common Law Monopolization Business Practices)**

128.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

1    129.    The conduct described herein is in violation of California common law prohibiting

2    monopolization.

PRESERVATION OF CLAIMS FOR APPEAL

4    130.    Plaintiffs expressly incorporate by reference from the April 19, 2007 Consolidated

5    Complaint all allegations in support of: Count 1 Tying (for violation of Section 1 of the Sherman

6    Antitrust Act, 15 U.S.C. §1) under both a *per se* and rule of reason analysis.  Plaintiffs likewise

7    incorporate Count II Monopolization and Count III Attempted Monopolization (for violations of

8    Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2) arising solely from the existence of a

9    technological tie between iTS and iPods prior to October 1, 2004.  Plaintiffs incorporate these

10   allegations out of an abundance of caution, solely for the purpose of preserving such claims for

11   appeal.  *See London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir. 1981) and *USS-POSCO*

12   *Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 812 (9th

13   Cir. 1994).

PRAYER FOR RELIEF

15   WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the putative Class, pray

16   that the Court declare, adjudge and decree the following:

17   A.    That this action may be maintained as a class action pursuant to Rule 23(b)(3) of the

18   Federal Rules of Civil Procedure with respect to the claims for damages and other monetary relief,

19   and declaring Plaintiffs as representatives of the Class and their counsel as counsel for the Class;

20   B.    That the conduct alleged herein constitutes unlawful monopolization and attempted

21   monopolization in violation of the Cartwright Act, California common law, and Section 2 of the

22   Sherman Antitrust Act;

23   C.    That the conduct alleged herein is in violation of the UCL and appropriate

24   restitutionary relief be granted pursuant thereto;

25   D.    That the conduct alleged herein is in violation of the CLRA; and appropriate damages

26   be granted thereto;

27   E.    That Plaintiffs and the Class are entitled to damages, penalties and other monetary

28   relief provided by applicable law, including treble damages;

1      F.     That Plaintiffs and the Class recover their costs of suit, including reasonable pre- and

2  post-judgment interest;

3      G.     For an order requiring full restitution of all funds acquired from Apple's unfair

4  business practices, including disgorgement of revenues and/or profits;

5      H.     Awarding Plaintiffs and the Class their expenses and costs of suit, including

6  reasonable attorneys' fees, to the extent provided by law; and

7      I.     That Plaintiffs and the Class are granted such other, further, and different relief as the

8  nature of the case may require or as may be determined to be just, equitable, and proper by this

9  Court.

10             **JURY DEMAND**

11      Plaintiffs respectfully demand a trial by jury on all issues so triable.

12  DATED: January 25, 2010         COUGHLIN STOIA GELLER
                            RUDMAN & ROBBINS LLP

13                          JOHN J. STOIA, JR.
                        BONNY E. SWEENEY

14                          THOMAS R. MERRICK
                        PAULA M. ROACH

15

16

17                              s/ Bonny E. Sweeney
                        BONNY E. SWEENEY

18                          655 West Broadway, Suite 1900
                        San Diego, CA 92101

19                          Telephone: 619/231-1058
                        619/231-7423 (fax)

20

21                          THE KATRIEL LAW FIRM
                        ROY A. KATRIEL

22                          1101 30th Street, N.W., Suite 500
                        Washington, DC 20007

23                          Telephone: 202/625-4342
                        202/330-5593 (fax)

24                          Co-Lead Counsel for Plaintiffs

25                          BONNETT, FAIRBOURN, FRIEDMAN
                          & BALINT, P.C.

26                          ANDREW S. FRIEDMAN
                        FRANCIS J. BALINT, JR.

27                          ELAINE A. RYAN
                        TODD D. CARPENTER

28                          2901 N. Central Avenue, Suite 1000

Case 4:05-cv-00037-YGR Document 332 Filed 02/06/26 Page 114 of 29 PageID #: 33937

1    Phoenix, AZ  85012
     Telephone:  602/274-1100
2    602/274-1199 (fax)

3    BRAUN LAW GROUP, P.C.
     MICHAEL D. BRAUN
4    12304 Santa Monica Blvd., Suite 109
     Los Angeles, CA  90025
5    Telephone:  310/442-7755
     310/442-7756 (fax)
6
     MURRAY, FRANK & SAILER LLP
7    BRIAN P. MURRAY
     JACQUELINE SAILER
8    275 Madison Avenue, Suite 801
     New York, NY  10016
9    Telephone:  212/682-1818
     212/682-1892 (fax)
10
     GLANCY BINKOW & GOLDBERG LLP
11   MICHAEL GOLDBERG
     1801 Avenue of the Stars, Suite 311
12   Los Angeles, CA  90067
     Telephone:  310/201-9150
13   310/201-9160 (fax)

14   Additional Counsel for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 26, 2010.

s/ Bonny E. Sweeney
BONNY E. SWEENEY

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail:BonnyS@csgrr.com

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com,clc@braunlawgroup.com

- **Todd David Carpenter**
  tcarpenter@bffb.com

- **Andrew S. Friedman**
  rcreech@bffb.com,afriedman@bffb.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com

- **Roy A. Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com,valdajani@jonesday.com

- **Thomas Robert Merrick**
  tmerrick@csgrr.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Paula Michelle Roach**
  proach@csgrr.com

- **Elaine A. Ryan**

Case 1:05-cv-00037-YGR   Document 321   Filed 02/07/26   Page 117 of 29   PageID #: 33940

eryan@bffb.com,pjohnson@bffb.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Michael Tedder Scott**
  michaelscott@jonesday.com,gwayte@jonesday.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **John J. Stoia , Jr**
  jstoia@csgrr.com

- **Bonny E. Sweeney**
  bonnys@csgrr.com,proach@csgrr.com,E_file_sd@csgrr.com,christinas@csgrr.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`