IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) | |
| | ) | C.A. No. 24-490 (MN) |
| Plaintiffs, | ) | (CONSOLIDATED) |
| | ) | |
| v. | ) | ████████████████ |
| | ) | |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) ) | |
| | ) | REDACTED - PUBLIC VERSION |
| Defendant. | ) ) | |

**APPENDIX TO PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S JANUARY 22, 2026 ORDER (D.I. 604) DENYING PLAINTIFFS' MOTION TO STRIKE THE EXPERT REPORTS OF ARM'S EXPERTS MICHAEL C. BROGIOLI, PH.D. & STEVEN RICHARDS, CPA (VOL 1: A1-A637)**

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Erin J. Morgan
DUNN, ISAACSON, RHEE LLP
11 Park Place
New York, NY 10007
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

February 12, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

| Document | Page Range |
|---|---|
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Plaintiffs' Letter to Special Master Helena C. Rychlicki in Support of Their Motion to Strike the Expert Reports of Arm's Experts Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 16, 2025) | A0001 – A0006 |
| Qualcomm Exhibit 1 – Rebuttal Expert Report of Michael C. Brogioli, Ph.D. (Sept. 5, 2025) | A0007 – A0236 |
| Qualcomm Exhibit 2 – Rebuttal Report of Steven Richards, CPA (Sept. 5, 2025) | A0237 – A0283 |
| Qualcomm Exhibit 3 – Expert Report of Eric A. Posner Excerpt (Aug. 8, 2025) | A0284 – A0295 |
| Qualcomm Exhibit 4 – Expert Report of Patrick F. Kennedy, Ph.D. Excerpt (Aug. 8, 2025) | A0296 – A0304 |
| Qualcomm Exhibit 5 – Meet & Confer Transcript Excerpt (Sept. 15, 2025) | A0305 – A0316 |
| Qualcomm Exhibit 6 – Scheduling Order [Non-Patent; Jury Trial] | A0317 – A0326 |
| Qualcomm Exhibit 7 – Teleconference Transcript (Aug. 29, 2025) | A0327 – A0329 |
| Qualcomm Exhibit 8 – D.I. 572, Verdict Form (Dec. 20, 2024) | A0330 – A0333 |
| Qualcomm Exhibit 9 – Special Master Hearing Transcript Excerpt (Aug. 22, 2025) | A0334 – A0336 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Defendant Arm Holdings PLC's Letter Brief to Special Master Rychlicki Opposing Plaintiffs' Motion to Strike the Expert Reports of Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 23, 2025) | A0337 – A0343 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Declaration of Adam Janes in Support of Defendant Arm Holdings PLC's Letter Brief to Special Master Rychlicki Opposing Plaintiffs' Motion to Strike Expert Reports of Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 23, 2025) | A0344 – A0348 |

| | |
|---|---|
| Arm Exhibit 1 – D.I. 44, Scheduling Order (Jan. 31, 2025) | A0349 – A0360 |
| Arm Exhibit 2 – Rebuttal Report of Steven Richards, CPA (Sept. 5, 2025) | A0361 – A0407 |
| Arm Exhibit 3 – Rebuttal Expert Report of Michael C. Brogioli, Ph.D. (Sept. 5, 2025) | A0408 – A0637 |
| Arm Exhibit 4 – Reply Expert Report of Susan Markel (Sept. 19, 2025) | A0638 – A0660 |
| Arm Exhibit 5 – Reply Expert Report of Samuel J. Winer (Sept. 19, 2025) | A0661 – A0685 |
| Arm Exhibit 6 – Meet & Confer Transcript (Sept. 15, 2025) | A0686 – A0716 |
| Arm Exhibit 7 – Expert Report of Eric A. Posner (Aug. 8, 2025) | A0717 – A0785 |
| Arm Exhibit 8 – Arm Holdings PLC's Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) (Mar. 24, 2025) | A0786 – A0812 |
| Arm Exhibit 9 – Arm's Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11) (June 16, 2025) | A0813 – A0860 |
| Arm Exhibit 10 – Expert Report of Patrick F. Kennedy, Ph.D. (Aug. 8, 2025) | A0861 – A1076 |
| Arm Exhibit 11 – Rebuttal Expert Report of Professor Timothy S. Simcoe (Sept. 5, 2025) | A1077 – A1336 |
| Arm Exhibit 12 – Plaintiffs' Letter to Special Master Helena C. Rychlicki in Support of Their Motion to Strike the Expert Reports of Arm's Experts Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 16, 2025) | A1337 – A1343 |
| Arm Exhibit 13 – Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) (July 11, 2025) | A1344 – A1373 |
| Arm Exhibit 14 – Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3 (July 11, 2025) | A1374 – A1383 |
| Arm Exhibit 15 – Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11) (July 11, 2025) | A1384 – A1453 |

| | |
|---|---|
| Arm Exhibit 16 – Arm's First Supplemental Response to Qualcomm's Third Set of Interrogatories (No. 12) (July 11, 2025) | A1454 – A1469 |
| Arm Exhibit 17 – Expert Reply Report of Eric A. Posner (Sept. 19, 2025) | A1470 – A1498 |
| Arm Exhibit 18 – Reply Expert Report of Patrick F. Kennedy, Ph.D. (Sept. 19, 2025) | A1499 – A1636 |
| Arm Exhibit 19 – Defendant Arm Holdings PLC's Response to Qualcomm's September 15, 2025 Letter to Special Master Rychlicki (Sept. 19, 2025) | A1637 – A1643 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Special Master Hearing Transcript Excerpt (Oct. 1, 2025) | A1644 – A1654 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>  a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>  a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 24-490 (MN) |
| v. | ) ) ) | **SUBMITTED UNDER SEAL –<br>HIGHLY CONFIDENTIAL –<br>ATTORNEYS' EYES ONLY** |
| ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>  a U.K. corporation, | ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' LETTER TO SPECIAL MASTER HELENA C. RYCHLICKI IN SUPPORT OF THEIR MOTION TO STRIKE THE EXPERT REPORTS OF ARM'S EXPERTS MICHAEL C. BROGIOLI, PH.D. & STEVEN RICHARDS, CPA

OF COUNSEL:

Catherine Nyarady
Jacob A. Braly
Jacob Apkon
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Adam Basner
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
DUNN, ISAACSON, RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

Erin J. Morgan
DUNN, ISAACSON, RHEE LLP
11 Park Place
New York, NY 10007
(202) 240-2900

September 16, 2025

Dear Special Master Rychlicki:

Qualcomm submits this letter in support of its motion to strike the expert reports of Michael C. Brogioli, Ph.D. (Ex. 1) and Steven Richards, CPA (Ex. 2).

**I.     The Brogioli and Richards Reports Are Not Proper Rebuttal.**

On August 8, 2025, Qualcomm served two expert reports:  one from law professor Eric Posner relating to the anticompetitive effects of Arm's unfair competition (Ex. 3), and one from Dr. Patrick Kennedy, a damages expert (Ex. 4).  Arm served four expert reports on September 5, 2025, including the Brogioli and Richards reports.  Pursuant to the Scheduling Order, the only expert reports that could be properly served on that date were those that "contradict[ed] or rebut[ted] evidence on the same matter identified by another party."  D.I. 44 ¶ 7(g)(i).  But the Brogioli and Richards reports "do not directly contradict or rebut the actual contents of [the] prior report[s]" and accordingly "do not qualify as proper rebuttal or reply reports."  *See Withrow v. Spears*, 967 F. Supp. 2d 982, 1002 (D. Del. 2013).  Tellingly, on the parties' September 15 meet and confer, in response to repeated questions,



Ex. 5 at 37:19-39:11.  Indeed, the reports themselves indicate that they are not rebuttal.

Brogioli was

Ex. 1 ¶¶ 369-394.  But neither of Qualcomm's experts provided any "technical assessment" on any of these topics.[1]  Though Brogioli claims that his 419-paragraph report is responsive to one paragraph in the Kennedy report (Ex. 4 ¶ 32) and five paragraphs in the Posner report (Ex. 3 ¶¶ 22, 28, 61, 65, and 77), those paragraphs contain recitation of Qualcomm's factual allegations—not technical opinions.[2]  *See* Ex. 1 ¶¶ 22, 167-168, 396.  And entire sections of Brogioli's report on                                        do not reference Qualcomm's experts at all.  *See* Ex. 1 ¶¶ 369-394.

Richards was asked by Arm's counsel to opine on

Ex. 2 ¶ 2.  Again, neither of Qualcomm's experts provided any opinion regarding Qualcomm's public disclosures.  And, again, Richards's 94-paragraph report is not responsive to the three paragraphs in the Kennedy report (Ex. 4 ¶¶ 118, 124, and 125) and one paragraph in the Posner

---

[1]    Dr. Kennedy is an economist and Professor Posner is an attorney.  They did not (and could not) offer any "technical assessment."

[2]    The paragraph in Kennedy's report that Brogioli is purportedly responding to plainly begins:                                        Ex. 4 ¶ 32.

report (Ex. 3 ¶ 65) that he purportedly rebuts. *See id.* As in Brogioli, each Kennedy report paragraph Richards cites expressly says it is reciting what ███████████████ Ex. 2 ¶ 62. And the Posner report paragraph simply states, among other points unrelated to the October 22 letter, that ████████████████████████████████████████████████████████████████████████ Ex. 2 ¶ 63; Ex. 3 ¶ 65.

Under Rule 26, "rebuttal reports are intended to contradict or rebut evidence on the same subject matter in the opposing party's initial report…[I]t is insufficient for a report to 'simply address the same general subject matter as a previously-submitted report'; the report must contradict or rebut the actual contents of the initial report." *Wang v. Injective Labs Inc*., 2025 WL 775530, at *1 (D. Del. Mar. 11, 2025) (citation omitted).

Brogioli's and Richard's "scant mention[s]" of Qualcomm's experts and "discuss[ion of] different and largely distinct topics" confirm that these are not proper rebuttal reports. *Withrow*, 967 F. Supp. 2d at 1002-03. Where, as here, a purported rebuttal expert "does not engage with, or even cite to" an opening expert's opinions for entire sections of his report, his "opinions are not appropriate subject matter for a rebuttal report." *Wang*, 2025 WL 775530, at *2. The Brogioli and Richards reports offer new opinions that Arm cannot appropriately raise now.[3]

## II.     The Brogioli and Richards Reports Should Be Stricken

As the Brogioli and Richard reports are not appropriate rebuttal, the inquiry turns to whether Rule 37 and the *Pennypack* factors[4] favor exclusion. *Wang*, 2025 WL 775530, at *4 (analyzing non-rebuttal portions of expert reports under *Pennypack*). A party that fails to disclose information or identify a witness as required "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Third Circuit has accordingly "upheld the exclusion of expert witnesses as an appropriate sanction for a party's violation of a … pre-trial order." *Allen v. Parkland Sch. Dist*., 230 F. App'x 189, 194 (3d Cir. 2007) (quotation omitted).

---

[3]     On the meet and confer, Arm declined to take the position that its reports were served in support of any of its affirmative defenses. *See, e.g.*, Ex. 5 at 34:16-18 (████████████████████████████████ ████████████████████████████████████████████). This is not surprising, as any such opinions would have been due on August 8. *See* D.I. 44 ¶ 7(g)(i) ("For the party who has the initial burden of proof on the subject matter, the initial Federal Rule of Civil Procedure 26(a)(2) disclosure of expert testimony is due on or before August 8, 2025."); *Lucent Techs., Inc. v. Newbridge Networks Corp*., 168 F. Supp. 2d 181, 242 (D. Del. 2001) (party asserting an affirmative defense bears burden of proving it). Arm cannot now argue otherwise.

[4]     The *Pennypack* factors are: (1) the surprise or prejudice to the moving party; (2) the ability to cure such prejudice; (3) the extent to which the evidence would disrupt the order and efficiency of trial; (4) the offering party's bad faith or willfulness; and (5) the importance of the expert opinions at issue. *Wang*, 2025 WL 775530, at *2.

Where, as here, the party who breaches its obligations is engaged in sophisticated litigation and "represented by competent counsel," the District of Delaware has been "more willing to exclude evidence without a strict showing that each of the *Pennypack* factors has been satisfied." *Id.* at *3 (quotation omitted) (collecting cases). Arm and its sophisticated counsel should not be permitted to ignore Court orders, and each of the *Pennypack* factors favors exclusion here.

With respect to the first two *Pennypack* factors, Arm's improper reports have prejudicially left Qualcomm with "two bad options: either scramble to have an expert respond in an effort to preserve an expert opinion on the [] allegations if the Court allowed them into the case; or offer no response and risk not preserving an opinion for trial if the pending Motion to Strike was denied." *Galderma Lab'ys, L.P. v. Amneal Pharms., LLC*, 2018 WL 508876, at *2 (D. Del. Jan. 22, 2018) (quotation omitted).[5] Qualcomm is also prejudiced by "hav[ing] to spend additional time and money to refute [Arm's] new theories" if these reports are not stricken. *St. Clair Intell. Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co., Ltd.*, 2012 WL 1015993, at *8 (D. Del. Mar. 26, 2012), *aff'd*, 525 F. App'x 915 (3d Cir. 2013). Even where a prejudiced party can depose a late-disclosed expert and file a report rebutting his opinions, "it would be unjust to penalize [the moving party] for doing its best under difficult circumstances" such that the *Pennypack* factors concerned with prejudice can still favor exclusion. *Cirba Inc. v. VMware, Inc.*, 2023 WL 6799267, at *3 (D. Del. Mar. 30, 2023) (quotation omitted). Given that expert discovery is supposed to close in just 17 days (on October 3), with dispositive and *Daubert* motions to be filed just a few weeks later on October 24, the additional time that Qualcomm would have to spend addressing these improper reports would incurably take away from time "it would otherwise spend preparing dispositive [and *Daubert*] motions." *Wang*, 2025 WL 775530, at *4.

On the third *Pennypack* factor, the "further delay and prolonged disruption" necessitated by additional responsive expert reports and discovery prompted by inappropriately disclosed reports can satisfy concern for disruption to an orderly trial. *St. Clair*, 2012 WL 1015993, at *8. This applies even where a trial date has not been set, unlike here where trial has long been set for March 2026. Any delay to the quickly approaching end of expert discovery and dispositive motion dates resulting from Arm's failure to comply with the Scheduling Order will prejudice Qualcomm, as the Court seeks to close dispositive motion briefing approximately four months before the pretrial conference. *See* Ex. 6 (J. Noreika Form Scheduling Order ¶ 9); D.I. 44 ¶¶ 9(a), 12 (briefing on dispositive motions closes November 14; pretrial conference is March 2). Yet that may be precisely Arm's strategy: Arm does not want this trial to proceed as scheduled and raised with Judge Noreika at the August 29 hearing on the parties' motions for judgment as a matter of law in the *Arm v. Qualcomm* case its view that this trial should be delayed until the conclusion of yet-unfiled appeals in that prior case. Ex. 7 at 46:16-47:16. The Court declined to engage on Arm's efforts to delay this trial, and Qualcomm should not be forced to suffer a delay now because of Arm's non-compliant disclosures. Additionally, allowing these improper reports and associated testimony will disrupt the orderly and efficient progression of trial because Arm will put on

---

[5]    Unlike in *Withrow*, where the court did not find prejudice, Qualcomm did not "receive[] a preview of the content" of the Brogioli or Richards reports, 967 F. Supp. 2d at 1004, and had to start from scratch in considering its response.

3

purported rebuttal witnesses that are not actually contradicting anything the jury has heard from Qualcomm's witnesses.

With respect to the fourth factor, these improper rebuttal reports, along with Arm's late notification of third parties whose agreements with Arm are the subject of Qualcomm's document requests and late production of critical agreements it repeatedly represented it had already provided,[6] "are part of a developing pattern of untimeliness, which weighs in favor of excluding" the reports. *Wang*, 2025 WL 775530, at *4 (quotation omitted); *see also Cirba*, 2023 WL 6799267, at *3 (striking expert evidence where there was no direct evidence of bad faith or willfulness, but there were "previous instances in which [the late-disclosing party's] conduct was questioned"). Arm has not offered any excuse for its improper rebuttals, claiming instead that it complied with the Scheduling Order. Ex. 5 at 38:19-39:4. Ultimately, any justification Arm may volunteer for its improper reports is not dispositive as there need not be proof that Arm acted willfully or in bad faith to be subject to the exclusion of its inappropriately disclosed evidence. *See St. Clair*, 2012 WL 1015993, at *8 (excluding supplemental report without any allegation or evidence of bad faith or willfulness).

Finally, the opinions Arm seeks to introduce from the Brogioli and Richards reports are either unimportant or irrelevant to the overall case and Arm has other options for presenting similar evidence, if appropriate. Arm is the defendant in this case; it does not bear the initial burden of proof on anything besides the affirmative defenses it has chosen to assert and Arm did not claim on the parties' meet and confer that it needs Brogioli or Richards to support those defenses. *See Wang*, 2025 WL 775530, at *4 (excluding new opinions where not "genuinely critical" to case); Ex. 5.[7] Arm's fact witnesses can presumably explain Arm's own verification-related technology and v10 features to the jury in place of Brogioli (who has no direct experience with Arm's

---

[6]     *See* Qualcomm's 9/15/2025 Ltr. Regarding Newly-Discovered Facts and Subsequent Events.

[7]     Arm may try to change its position from the meet and confer and claim it needs Brogioli for its unclean hands defense premised on the theory that "Qualcomm continues to attempt to benefit from its improper acquisition of Nuvia technology and the related material breach of the Nuvia ALA by wrongly insisting that the unlicensed Nuvia technology is licensed under the Qualcomm ALA and seeking to enforce verification obligations as to that unlicensed technology." D.I. 234 at 43. Putting aside that Arm should not be allowed to assert a changed purported justification for its improper report and that this argument would not cure untimeliness, a jury already rejected Arm's defense when it found "that the Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA." Ex. 8.

As noted when Your Honor asked, ███████████████████████████████ ████████████████████ Arm believes that ██████████ ██████████████████████████████████████ Ex. 9 at 188:14-23. The Court has indicated that it will issue its post-trial opinion as soon as possible (Ex. 7 at 47:23-48:3), at which point Qualcomm expects Arm's unclean hands defense will become entirely precluded.

technology anyway[8]), and Arm's attorneys can make the legal arguments to the Court that Richards is proffering, if such evidence or arguments are not otherwise excluded.  Any claimed importance Arm ascribes to these reports cannot "outweigh" the prejudice they cause to Qualcomm.  *360Heros, Inc. v. GoPro, Inc*., 2022 WL 2063262, at *2 (D. Del. June 8, 2022) (denying requests to submit supplemental expert reports because they would necessitate additional depositions and "at least consideration of rebuttal reports" four months from trial).

Arm's improper disclosure of the non-rebuttal opinions in the Brogioli and Richards reports was not "substantially justified" or "harmless," and the reports should be stricken.


Respectfully,

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Words: 2,395

---

[8]    Brogioli states that ██████████████████████████████████████████
████████████ Ex. 1 ¶ 154.

5

A0006

# Exhibit 1

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QUALCOMM INC., a Delaware corporation, and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | |
| Plaintiffs, | |
| v. | C.A. No. 24-490-MN |
| ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K. corporation, | **HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY** |
| Defendant. | |

**REBUTTAL EXPERT REPORT OF MICHAEL C. BROGIOLI, PH.D.**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## TABLE OF CONTENTS

**Page**

I.  Introduction ........................................................................................................ 1

II.  Qualifications ...................................................................................................... 1

III.  Task and Compensation ..................................................................................... 5

IV.  Materials Considered .......................................................................................... 6

V.  Trial Exhibits ..................................................................................................... 6

VI.  Summary of Opinions ......................................................................................... 7

VII.  Background ......................................................................................................... 8

    A.  Parties ...................................................................................................... 8

        1.  Arm ................................................................................................ 8

        2.  Qualcomm ..................................................................................... 8

    B.  Litigation ................................................................................................ 11

        1.  The *Arm v. Qualcomm* Dispute .................................................. 11

        2.  The Current Dispute ................................................................... 13

    C.  Qualcomm's Allegations ....................................................................... 13

VIII.  Technology Background ................................................................................... 15

    A.  Instruction Set Architectures ................................................................ 16

        1.  What An ISA Is ........................................................................... 16

        2.  Why ISAs Are Important ............................................................ 17

        3.  Arm's Instruction Set Architecture ........................................... 21

        4.  Non-Arm ISAs ............................................................................ 34

    B.  Many Companies Design CPU Cores .................................................... 41

    C.  Many Companies Sell Silicon Chips ..................................................... 43

IX.  Relevant Agreements ........................................................................................ 44

i

A.      ████████████ In Section █ Of The v8 Annex 1 To The ALA ................... 45

     1.      ██████████████████ .................................. 45

     2.      ████████████████ ................................. 50

     3.      ███████████████ ................................. 52

     4.      █████████████████ ................................. 53

B.      ████████████ In Section █ Of The v9 Annex 1 To The ALA ................... 53

     1.      ████████████████████ ............................. 54

     2.      █████████████████████ ............................. 56

     3.      ██████████████████ ............................. 59

     4.      ██████████ ............................. 60

C.      How Arm Provides The ████████████ In Section █ Of The v8 And v9 Annex 1s To Partners, Including Qualcomm ................................. 60

**X.      The CPU Core Design Verification Process** ................................. **64**

A.      The Architecture Compliance Kit ................................. 66

**XI.      The Materials And Support That Qualcomm Contends Arm Withheld Were Not Necessary For Qualcomm To Complete The Verification Process** ................... **68**

A.      OOB Packages ................................. 71

     1.      Contents Of An OOB Package ................................. 72

     2.      OOB Packages Are Support Materials And Are Not Necessary For The Architecture Verification Process ................................. 75

B.      ACK Patches ................................. 84

     1.      ACK Patches Generally ................................. 85

     2.      ACK Patches Are Support Materials And Are Not Necessary For The Architecture Verification Process ................................. 88

C.      ETE Checker Support ................................. 100

     1.      The ETE Trace Function And The ETE Checker ................................. 101

2.      ETE Checker Support, Such As Answering Questions About The ETE Checker, Is Support And Is Not Necessary For The Architecture Verification Process ........................................... 103

XII.    **Qualcomm's Claims of Harm** ........................................................ **110**

A.      Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of OOB Packages, ACK Patches, And ETE Checker Support ..... 112

1.      Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of OOB Packages .................................... 114

2.      Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of ACK Patches.................................... 124

3.      Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of ETE Checker Support ..................... 132

B.      The Alleged ▮▮▮▮▮▮▮ To Qualcomm, If Any, Was Due To Qualcomm's Actions, Not Arm's ........................................................ 136

1.      The Alleged ▮▮▮▮▮▮ Risk Due To Arm's Alleged Withholding Of OOB Packages, If Any, Was Minimal ....................... 139

2.      The Alleged ▮▮▮▮▮▮ Risk Due To Arm's Alleged Withholding Of ACK Patches, If Any, Was Minimal ........................... 147

3.      The Alleged ▮▮▮▮▮▮ Risk Due To Arm's Alleged Withholding Of ETE Checker Support, If Any, Was Minimal .............. 151

XIII.   **The Phoenix-Based And Pegasus-Based Cores Are Nuvia-Based Cores** ................ **155**

XIV.    **Arm's ▮▮▮▮▮▮▮▮** ........................................................ **159**

XV.     **Incorrect Technical Assumptions In Mr. Posner's Report** ....................................... **168**

1.      The Evidence Shows That Arm's Implementation Cores Often Outperform Qualcomm's Custom Cores ................................ 170

2.      Many Factors Besides the RTL Affect Performance ............................. 174

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## I.      INTRODUCTION

1.      I have been retained as an independent consultant by the law firm of Kirkland & Ellis LLP ("Kirkland" or "Counsel") on behalf of ARM Holdings PLC ("ARM"), Defendant in the above-captioned litigation ("Litigation" or "Present Matter"). I submit this report in response to the expert reports authored by Eric Posner and Patrick Kennedy, which Qualcomm served in this case on August 8, 2025. I reserve the right to supplement or amend this Report as needed.

2.      My opinions and the bases for my opinions are provided in this Report. If I am called as a witness in the Litigation, I expect that I will testify at trial regarding the matters expressed in this Report and any supplemental reports or declarations that I may prepare in connection with this investigation. I expect that I may also testify as to additional matters, including, for example, matters addressed by Qualcomm's experts or by the parties' counsel.

## II.     QUALIFICATIONS

3.      I am currently an Adjunct Professor of Electrical and Computer engineering at Rice University in Houston, Texas, and Managing Director of Polymathic Consulting in Austin, Texas. I received my Bachelor of Electrical Engineering in 1999 from Rensselaer Polytechnic Institute. I received my Master of Science in Electrical and Computer Engineering in 2003 from Rice University. I received my Doctorate of Electrical and Computer Engineering in 2007 from Rice University. Much of the work in my Master of Science and Doctorate involved large scale simulation and modeling of CPU instruction sets, their applicability to various computing workloads, and the design of custom instructions within various ISAs as they targeted new application workloads. Some of this work also entailed reconfigurable computing, wherein the ISA that was supported by a CPU could change dynamically over time in relation to the application running on the silicon. My research during the 2003-2007 time frame also involved CPU simulation and design, and the verification that CPU instruction sets and models were compliant

1

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

with physical silicon or existing CPU instruction set simulation models, produced bit-true cycle accurate results with reference designs or ISA specifications, and were able to run compiled applications using off-the-shelf build tools targeted to an existing publicly available ISA.

4.      I am a named inventor on multiple U.S. patents as well as various pending applications.  I have also been a member of the RISC-V technical committee since 2018.

5.      I have held the position of Adjunct Professor at Rice University since 2009, and the position of Managing Director at Polymathic Consulting since 2011.  At Rice University, I instruct graduate level curricula in the areas of embedded and low-power computing, hardware and software systems and real time computing.  I also advise on university research and various design initiatives, including those in low power computing, including various CPU architectures and ISAs, and their application in various areas of computing.  At various points this curriculum has involved analysis of Arm architecture devices, and employees of Arm giving presentations to students relating to the Arm ISA, ecosystem and developer tools.  At Polymathic Consulting, I work with a range of technologists from early stage start-ups to Fortune 500 companies on similar technologies including, but not limited to, intellectual property.  From November 2009 to October 2011, I was Chief Architect, Senior Member Technical Staff at Freescale Semiconductor in Austin, TX (formerly Motorola), responsible for management of technology, engineering roadmaps, design lead on software infrastructure and next generation microprocessor architectures for embedded computing.   This work included ISA design for our custom proprietary CPU architectures, as well as development tools targeting Arm devices that it sold and supported.  These included digital signal processing systems, heterogeneous system on chip architectures, and low power devices.  From 2008 to 2009, I was Senior Engineer working in high performance compiler

2

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

design and next generation microprocessor and next generation microprocessor architecture at Freescale Semiconductor in Austin, TX.

6.      From June 2006 to August 2007, I worked as the Technical Co-Founder of Method Seven LLC, in Boston, MA, working with high performance software and hardware systems architecture.  I am currently a co-founder, co-inventor, and Chief Technology Officer of Network Native, an Internet of Things technology company.

7.      I have previously worked for Texas Instruments' Advanced Architecture and Chip Technology division in Houston, Texas in the areas of high performance mobile and low-power embedded systems design, at the hardware and systems software level specifically around heterogeneous computing, and high speed bus and interconnect technologies.  I also have worked at Intel Corporation's Microprocessor Research Labs in the areas of computer architecture and compiler technologies.

8.      In the late 1990s, I was a hardware and software developer at Vicarious Visions in New York, developing third-party titles for Nintendo's handheld consoles, in addition to various peripheral technologies.  This role specifically focused around battery operated, portable, low power computing hardware and software systems. During my career, I have served as Chief Technology Officer, often in co-founding roles.

9.      While at Rice University, I developed various computer architecture designs for embedded systems and microcontroller based SoC architectures and peripherals.  For example, from 2002 to 2004, I developed Spinach, a simulator design toolset for modeling programmable network interface architectures, which models system components common to all programmable computing environments as well as components specific to embedded.  From 2004 to 2009, I developed Spinach DSP-FPGA, a modular and composable simulator design infrastructure for

3

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

programmable and reconfigurable embedded SOC architectures specifically targeting mobile, low power, and embedded and portable computing devices. From 2005 to 2009, I developed and published a retargetable compiler infrastructure and hardware design space exploration toolkit for systems related to mobile and embedded computing technologies. Many of these tools have been used at U.S. universities in the area of electrical and computer engineering research. From 1999 – 2003, I worked in the area of low power dynamic computing, specifically focusing on dynamic power management of hardware components within various low power computer architectures.

10.    I have been recognized in various ways for my achievements and experience as an expert in the field of computer architecture, computer hardware and computer software systems as they relate to the subject matter at hand. I am a member of the Institute of Electrical and Electronics Engineers (IEEE). I am currently on the Steering Committee of Design Automation Conference in the areas of Embedded and Wireless Solutions. I have formerly held the position of Chair within this group. I have been a Program Committee member for the IEEE and ACM Design Automation Conference from 2011 to the present.

11.    Over the past 20+ years, I have authored approximately 30 peer-reviewed academic publications, as well as engineering books in the area of computer hardware and software design. Many of these publications involved aspects of CPU instruction sets, how they can be tailed and optimized, and how they related to alternatives such as hardware acceleration vs compiled languages executing on a given CPU core. A number of these references also discuss how to extract performance from various CPU ISAs when programming CPUs with lower level programming languages, and how to leverage developer tools, software optimization, and the CPU design itself to obtain the best performance for a given set of applications. These publications are disclosed in my attached curriculum vitae.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

12.     I have previously served as an engineering consultant and testifying witness on matters related to, and including, microcontrollers and related peripherals and interconnects and components common to the technology at hand.

13.     During my time in industry and as a consultant, I have worked extensively on, and submitted opinions on, issues relating to the development and deployment of embedded computing and low power and system management technologies.

14.     I have attached my curriculum vitae as Exhibit 1 to this Report.  It includes the above-listed credentials and additional information on my background and experience, as well as list of cases in which I have served as an expert witness within the past four years.

## III.    TASK AND COMPENSATION

15.     I understand that Qualcomm alleges Arm breached ███████ of the Arm-Qualcomm Architecture License Agreement (ALA), which ████████████████████████ ████████████████████████ SAC ¶¶ 13, 78–80, 173–180.  I further understand that Qualcomm's experts, Mr. Posner and Dr. Kennedy, have offered opinions regarding the allegedly withheld verification materials and support that are the alleged cause of the breach.  *See, e.g.*, Posner Rpt. ¶ 65; Kennedy Rpt. ¶ 32.  I have been asked by Arm's counsel to provide a technical assessment of these verification materials and support to assist the factfinder in understanding these materials and support that Arm provided to Qualcomm and their purpose, and to respond to Mr. Posner and Mr. Kennedy's opinions relating to the same.

16.     I am being compensated in the above task at my normal and customary rate of $750 per hour for my time working and testifying in this litigation.  I am also being reimbursed for reasonable and customary expenses associated with my work and testimony in this case.

17.     My opinions are objective and my compensation is not contingent on the outcome of this litigation or the specifics of my testimony in any way.

5

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## IV.    MATERIALS CONSIDERED

18.    In forming my opinions, I have considered and may rely upon all documents and information identified in this Report, as well as the documents and information listed in Exhibit 2. I have also used my education and my many years of experience in the field of computer architecture, CPU and System-on-Chip design, CPU ISAs and CPU optimization as well as architecture modeling and verification in forming my opinions expressed in this Report.

19.    I may also consider additional documents and information in forming any necessary opinions, including documents or information that may have not yet been produced in this action or were produced too late to be fully considered before my Report was due.

20.    My analysis of the materials produced in this case is ongoing and I will continue to review any new material as it is provided.  This Report represents only those opinions I have formed to date.  I reserve the right to revise, supplement, and/or amend my opinions stated herein based on new information and on my continuing analysis of the materials already provided.

21.    My opinions that follow are objective, independent, and based on information currently available to me at the time of completion of this Report.  If it may be necessary for me to supplement this Report based on material or information that subsequently comes to light in this case, I reserve the right to do so.  If it may be necessary for me to revise or supplement this Report, or submit a supplemental or responsive report, based upon any evidence Qualcomm may present, on any supplemental or responsive report of Qualcomm, or in light of any relevant orders from the Court or other authoritative body, I reserve the right to do so.

## V.    TRIAL EXHIBITS

22.    At trial, I may rely on visual aids and demonstratives that illustrate the bases for my opinions and assist in explaining the technical subject matter about which I anticipate testifying.  I may use documents referred to in my Report as demonstratives; for example, to

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

highlight or call out particular sections of documents, or may create my own demonstratives for use with my testimony.  I may create, for example, slides, illustrations, charts, figures, slides, and the like, or other information that may be helpful in explaining my opinions to the jury.  I may also use, as demonstrative exhibits, compilations of documents referred to in my Report or listed in my list of materials considered, as well as any exhibits to my Report.

## VI.    SUMMARY OF OPINIONS

23.    As explained in this Report, it is my opinion that:

(i)    The materials and support that Qualcomm contends Arm withheld were not necessary for Qualcomm to complete the architecture compliance verification process;

(ii)    Qualcomm alleged "extra" work due to Arm's alleged withholding of support materials was minimal and of a type that is a standard part of the verification process;

(iii)    The ▮▮▮▮▮▮▮ that Qualcomm contends it was subject to was due to Qualcomm's actions, not Arm's actions;

(iv)    The Phoenix-based and Pegasus-based cores incorporate code developed by Nuvia for its own purposes prior to the Qualcomm acquisition, consistent with industry practice regarding repurposing code;

(v)    The features proposed for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that provide technical solutions for Arm's customers;

(vi)    Mr. Posner and Dr. Kennedy rely on flawed technical assumptions.

7

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## VII.    BACKGROUND

### A.    Parties

#### 1.    Arm

24.    Defendant Arm, headquartered in Cambridge, UK, was founded in 1990 and is a global leader in technology regarding central processing units ("CPUs").[1] Arm develops computer architectures, and is the industry leader in the design of CPUs for semiconductors that implement those architectures.[2] Arm architects, develops, and licenses its high-performance, low-cost, and energy-efficient CPU technology to other companies, primarily by licensing Arm-designed CPU core implementations under what are known as TLAs, while also licensing the architecture itself so that certain companies can design their own custom CPU cores.[3] Arm's architecture and CPU core implementations are used around the world to power datacenters, mobile devices, cars, the Internet of Things (IoT), and many other consumer and commercial applications.[4]

#### 2.    Qualcomm

25.    Plaintiff Qualcomm, headquartered in San Diego, California, is a global technology company that offers semiconductor products for a variety of applications, including mobile, auto,

---

[1]    Arm Holdings plc Annual Report and Consolidated Financial Statements for the year ended 31 March 2024, at 87, available at https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; *see also* https://newsroom.arm.com/blog/arm-official-history.

[2]    Arm Holdings plc Annual Report and Consolidated Financial Statements for the year ended 31 March 2024, at 1, available at https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; *see also* https://www.arm.com/company.

[3]    *Id.*

[4]    *Id.*

8

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

and datacenter, among others.[5]   Qualcomm was founded in 1985 and originally focused on satellite-based communication systems for long-haul trucking, with a product called Omnitracs.[6]

26.    Qualcomm's business has changed and expanded repeatedly since its founding.  In the late 1980s and through the 1990s, Qualcomm's business changed to developing Code Division Multiple Access (CDMA) for cellular phones.[7]  In 2000, Qualcomm changed its business again. In February 2000, Qualcomm sold its CDMA consumer phone business to a Japanese company called Kyocera.[8]  In March 2000, Qualcomm announced that it was focusing on building "location-enabled mobile devices, including smart phones, PDAs and pagers," by acquiring a company called SnapTrak that was developing so-called Assisted GPS systems for mobile phones.[9]  In the mid-to-late 2000s, Qualcomm introduced the Snapdragon chipset and began providing chipsets for mobile devices.[10]  In 2011, Qualcomm shifted its business again by releasing a platform for Internet of Things technologies.[11]  In the 2010s, Qualcomm began attempting to develop its own custom CPUs intended for data centers.[12]  However, it was reported that Qualcomm's data center efforts were unsuccessful and Qualcomm cut these efforts short based on cost and legal

---

[5]    https://www.qualcomm.com/company

[6]    https://www.qualcomm.com/news/releases/1996/08/national-freight-selects-qualcomms-omnitracs-system-enhance-service-long#:~:text=Headquartered%20in%20San%20Diego%2C%20Qualcomm,(LEO)%20satellite%20communications%20system; https://semiwiki.com/general/7353-a-detailed-history-of-qualcomm/

[7]    https://semiwiki.com/general/7353-a-detailed-history-of-qualcomm/

[8]    https://www.qualcomm.com/news/releases/2000/02/qualcomm-and-kyocera-close-agreement-terrestrial-cdma-phone-business

[9]    https://www.qualcomm.com/news/releases/2000/03/qualcomm-completes-acquisition-wireless-location-leader-snaptrack.

[10]    https://www.qualcomm.com/research/cellphone-unseen-connections

[11]    *Id.*

[12]    https://datacentremagazine.com/technology-and-ai/qualcomms-return-to-the-data-centre-market-explained

9

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

challenges.[13]  In the 2020s, Qualcomm again shifted its business beyond the Internet of Things by developing chipsets for personal computers and automobiles.[14]  In 2021, Qualcomm shifted its business back to the data center space by acquiring Nuvia, a start-up company that was developing custom CPU cores for data centers under an Architecture License Agreement (ALA) with Arm.[15]  Despite acquiring Nuvia, Qualcomm then again cut its efforts to develop custom data center CPUs in late 2022.[16]  Qualcomm then ███████████████████████████████████████

███████.[17]  Recently, Qualcomm's CEO, Cristiano Amon testified that ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████[18]  Qualcomm is also ███████████████████████████████████████████

████████████████████████████████████████████[19]

27.     Presently, Qualcomm licenses Arm's architecture and CPU technology through both an Architecture License Agreement (ALA), under which Qualcomm can develop its own

---

[13]   *Id.*

[14]   https://www.qualcomm.com/news/onq/2025/03/qualcomm-celebrates-40-years-as-an-american-innovator#:~:text=Leveraging%20a%20legacy%20of%20breakthroughs,of%20industrial%20and%20embedded%20IoT.

[15]   https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia

[16]   *See* QCARM_2403478 (IM chain involving Qualcomm engineers mentioning that "Orion" (Nuvia's data-center custom core design) "and its follow-on is canceled," discussing whether Qualcomm could have "made this decision [a] few months back and fund … resources redirected towards Chiplet based on design and still be in Datacenter market?" and Qualcomm's decision "for various reasons to not pursue this option"); Trivedi Dep. Tr. at 36:13–24 ("████████████████████████████████████████████████████████████████ ████ )

[17]   *See* G. Williams Dep. Tr. at 18:15–19:5, 96:21–97:25.

[18]   Amon Dep. Tr. at 69:7–71:6.

[19]   Amon Dep. Tr. at 231:23–232:8

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

custom CPU cores that are compliant with Arm's architecture, and a Technology License Agreement (TLA), under which Qualcomm licenses CPU cores that Arm designs.[20]

### B.    Litigation

28.    I understand that Arm and Qualcomm have been involved in ongoing litigation since August 2022.[21]    I understand that the dispute began approximately around the time that Qualcomm acquired Nuvia, Inc., which, as described above, was a start-up CPU company that was designing a custom CPU core under an ALA between Arm and Nuvia.[22]

### 1.    The *Arm v. Qualcomm* Dispute

29.    I understand that Arm sued Qualcomm on August 31, 2022 (*Arm v. Qualcomm*, Case No. 1:22-cv-01146-MN (D. Del.)), asserting claims for specific performance and trademark infringement against Qualcomm.[23]    I understand that one issue in the *Arm v. Qualcomm* litigation was Qualcomm's use of code from Nuvia's custom CPU core designs that were developed at Nuvia under the Arm-Nuvia ALA prior to Nuvia's acquisition by Qualcomm.[24]    I understand that Arm's position in that case is that Qualcomm could not use code for custom cores that was developed

---

[20]    ARM_00055357 (2013 Arm-QC ALA); ARM_0103918 (2013 Arm-QC TLA).

[21]    Arm Holdings plc Annual Report and Consolidated Financial Statements for the year ended 31 March 2024, at 5, available at https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; *see also* https://www.arm.com/company.

[22]    *Id.*

[23]    *Id.*; *see also Arm Ltd. v. Qualcomm Inc. et al.*, Case No. 1:22-cv-01146-MN (D. Del.), Dkt. 1 (Complaint) at 16–26.

[24]    *Id.*

11

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

under the Nuvia ALA unless Arm consented.[25]  I understand that Qualcomm's position in that case is that the Arm-Qualcomm ALA allowed Qualcomm to do so.[26]

30.    I understand that Arm sent a letter to Qualcomm on October 22, 2024 notifying Qualcomm that, among other things, Qualcomm was in material breach of the Arm-Qualcomm ALA based on Qualcomm's use of Nuvia's designs, and that Qualcomm's material breach entitled Arm to terminate the ALA if Qualcomm did not cure the breach within 60 days.[27]

31.    I understand that a trial was held and a jury verdict was reached on December 20, 2024, but that jury verdict was incomplete.[28]  Specifically, I understand that the jury concluded that Qualcomm had not breached the Arm-Nuvia ALA and that Qualcomm's custom CPU designs that were based on the Nuvia custom CPU designs were licensed under the Qualcomm ALA.[29] However, I understand that the jury did not reach a conclusion on whether Nuvia had breached the Arm-Nuvia ALA.[30]  I understand that the parties have submitted post-trial briefing in that case, and that Arm seeks a retrial of, or judgement in its favor on, all claims in that case.[31]

32.    I further understand that, on January 8, 2025, Arm wrote to Qualcomm and █████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

---

[25]    *Id.*

[26]    *Arm Ltd. v. Qualcomm Inc. et al.*, Case No. 1:22-cv-01146-MN (D. Del.), Dkt. 15 (Public version of Qualcomm's Answer) ¶¶ 3, 43.

[27]    Arm's 1st Supp. Resps. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 19–20 (Interrog No. 2).

[28]    *Id.* at 20.

[29]    Verdict Form (Case No. 1:22-cv-01146-MN), December 20, 2024.

[30]    *Id.*

[31]    Arm's 1st Supp. Resps. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 9–10 (Interrog No. 1).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

███████ QCVARM_0847182. I understand that Arm then resumed providing support for the Nuvia-based cores. *See*, *e.g.*, Grisenthwaite Dep. Tr. at 155:2–7; Weidmann Dep. Tr. at 125:6–126:8.

### 2.    The Current Dispute

33.    I understand that this case, *Qualcomm v. Arm*, Case No. 1:24-cv-00490-MN (D. Del.), concerns claims that Qualcomm has brought against Arm for breach of contract, tortious interference, and unfair competition.[32]  I understand that the operative complaint is Qualcomm's Second Amended Complaint ("SAC"), which Qualcomm filed on June 3, 2025.[33]

### C.    Qualcomm's Allegations

34.    I understand that Qualcomm raises eight counts against Arm in this case.[34]

35.    I understand that Qualcomm's first count claims that Qualcomm is entitled to declaratory judgment that, among other things, Arm breached the Arm-Qualcomm ALA, Qualcomm is entitled to ████████████████████ under the Arm-Qualcomm ALA and TLA, Arm breached the Qualcomm TLA, Qualcomm is entitled to ██████████ ██████████ made pursuant to the TLA, Qualcomm has not breached the Arm-Qualcomm ALA, and Arm is not entitled to terminate the Arm-Qualcomm ALA.[35]

---

[32]    *See generally Qualcomm Inc. et al. v. Arm Holdings Plc., f/k/a Arm Ltd.*, Case No. 1:24-cv-490-MN (D. Del.), Dkt. 137 (Qualcomm's Second Amended Complaint).

[33]    *Id.*

[34]    *Id.*

[35]    *Id.* at 52–53 (Count I).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

36.    I understand that Qualcomm's second count claims that Arm breached ████████ of the Arm-Qualcomm ALA by allegedly ████████████████████████ ████████████████████████████ of the ALA.[36]

37.    I understand that Qualcomm's third count claims that Arm breached the implied covenant of good faith and fair dealing in the Arm-Qualcomm ALA and TLA by, among other things, allegedly withholding materials that Qualcomm contends are deliverables, allegedly asserting that Qualcomm breached the Arm-Qualcomm ALA, allegedly disclosing the October 22, 2024 letter to the media, allegedly failing to negotiate an extension of the Arm-Qualcomm ALA, and allegedly failing to provide licensing proposals for certain Arm implementation cores.[37]

38.    I understand that Qualcomm's fourth count claims that Arm intentionally interfered with Qualcomm's prospective economic advantage by, among other things, allegedly disclosing the October 22, 2024 letter to the media.[38]

39.    I understand that Qualcomm's fifth count claims that Arm negligently interfered with Qualcomm's prospective economic advantage by, among other things, allegedly disclosing the October 22, 2024 letter to the media.[39]

40.    I understand that Qualcomm's sixth count claims that Arm violated the California Unfair Competition Law (the "UCL") by, among other things, engaging in conduct that Qualcomm

---

[36]    *Id.* at 54–55 (Count II).

[37]    *Id.* at 55–56 (Count III).

[38]    *Id.* at 56–58 (Count IV).

[39]    *Id.* at 58–59 (Count V).

14

A0025

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

contends constitutes unfair competition, including the alleged withholding of materials that Qualcomm contends are deliverables and the alleged refusal to negotiate license terms.[40]



41.    I understand that Qualcomm's seventh count claims that Arm breached ▮▮▮ ▮▮ of the Arm-Qualcomm TLA by, among other things, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[41]

42.    I understand that Qualcomm's eighth count claims that Arm breached ▮▮▮ of the Arm-Qualcomm TLA by, among other things, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮.[42]

43.    I understand that Arm denies each and every count in Qualcomm's Second Amended Complaint and has asserted several affirmative defenses.[43]

## VIII.   TECHNOLOGY BACKGROUND

44.    In this section, I provide a high-level overview of what comprises an Instruction Set Architecture (ISA) as well as why the ISA is important for microprocessor designs. I also discuss various ISAs that are commercially available in the market, and relevant aspects of those ISAs.

---

[40]   *Id.* at 59–62 (Count VI).

[41]   *Id.* at 62–63 (Count VII).

[42]   *Id.* at 63–64 (Count VIII).

[43]   *See generally Qualcomm Inc. et al. v. Arm Holdings Plc., f/k/a Arm Ltd.*, Case No. 1:24-cv-490-MN (D. Del.), Dkt. 234 (Arm's Answer to Qualcomm's Second Amended Complaint).

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

A.    **Instruction Set Architectures**

1.    **What An ISA Is**

45.    In CPU design, an Instruction Set Architecture (ISA) is the formal specification of an interface that exists between software that runs on the computer, and the underlying hardware in the computing system.  Generally speaking, the ISA defines the set of machine (or CPU) level instructions that are available for a CPU to execute.  The ISA also defines, importantly, the format of those instructions.  In relation to the instructions, the ISA will also define the registers that are available within the CPU, which are temporary storage locations that the instructions within the ISA may use to perform.  The various types of memory addressing modes that the CPU can perform will also be embodied within the ISA.  Examples of memory addressing modes are the ability for the CPU to either access local register or the memory system, either via simple LOAD operations, or perhaps more complex LOAD/STORE operations that use various types of offsets, and combinations of registers within the CPU in conjunction immediate values.  Lastly, the ISA will also specify aspects of the overall system behavior in response to Interrupts and Exceptions that may occur in the system.  Examples of Interrupts are things like the pressing of a button on a keyboard, that may cause the CPU to take action in response to this external asynchronous event.  Examples of Exceptions are events that occur internal to the CPU itself, such as a division operation being performed creating a "divide by zero" operation, or an invalid instruction execution.

46.    The ISA serves as the interface between the CPU's hardware implementation and the software environment.  This is important to note, as it is becoming increasingly rare that software developers write software in bare metal Assembly, i.e., using the direct native instructions, that execute on the bare metal of the microprocessor itself.  Rather, modern software development and computing systems often employ Operating Systems (to operate the underlying

16

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

hardware and run applications), and possibly Hypervisors (to perform virtualization). In addition, modern high level programming languages such as C and C++ (to name a short few) rely on Compilers, Assemblers, Linkers and various other tools to create software executables and applications from these languages. Each and every one of these technologies are dependent on the ISA. As such, CPU ISA design factors heavily into how well these system and tools can perform, and their ability to take advantage of the features and functions of the CPU itself. At the same time, while the ISA defines this interface between the hardware and software, there is often a desirability to maintain compatibility across different implementations of the ISA for a given family of CPUs, even as the ISA evolves over time.

## 2.    Why ISAs Are Important

47.    One very important, and often critical aspect of the ISA, is the instruction set. The instruction set comprises the instructions that software and programmers can employ to execute functions on the CPU itself and is an embodiment of the set of operations the underlying CPU hardware is capable of directly performing. These operations are typically comprised of Arithmetic Operations (such as Add or Subtract), Logic Operations (such as logical AND and OR operations), Memory Access Operations (such as Loading and Storing to memory), Control Flow Operations (such as Branching execution from one program location to another), and System Level Operations (such as those related to Task Switching and Interrupt Handling), among others.

48.    In addition to the types of instructions described above, the ISA will also define the register model of the microprocessor. This comprises the number of registers within the CPU, the size of the registers (8/16/20/32/40/64-bit) and the purpose of those registers (which generally are small, high-speed memory units that temporarily hold information such as data and addresses). The ISA will also mandate certain aspects of the memory, such as the memory model that is used by the CPU which may include the endianness (order of bytes) and also how data is aligned within

17

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the memory. Addressing modes are also part of the ISA. These addressing modes will determine how operands used by the instructions of the ISA are located. Examples of this may be operands being directly in registers, such as an ADD operation using two inputs stored in two registers, or indirectly through memory addresses, such as a LOAD instruction that loads a value from memory through an address stored in a register. The addressing mode will also detail how immediate values are handled, as well as various modes of indirect addressing.

49.    The above aspects of the ISA, such as instructions, register model, and memory model form the expressiveness of the ISA. That is to say, a large and robust ISA provides a broader and oftentimes more functional ISA that benefits programmers, systems software, and development tools such as optimizing compilers for high level programming languages, optimizing assemblers, linkers and the like.

50.    Moving beyond just the instructions that comprise a given ISA, such ISAs will also define things such as privilege levels, exception handling, aspects of interrupts, and memory management mechanisms which are required for modern computing devices (note, some of these may vary for use in very low-end embedded systems). Modern ISAs also oftentimes have extensions added to them for specialized workloads. Examples of this may be vector or SIMD operations, such as Arm's NEON ISA extensions, or Intel's AVX extensions. These extensions are tailored to applications such as multimedia and scientific computing, other extensions may be tailored to functionality such as security and the like. These types of extensions, too, provide a consistent programming model, but can allow hardware vendors a way to distinguish and innovate in their CPU designs.

51.    As one can imagine, as ISAs have evolved over the decades, different philosophies have developed in terms of overall ISA design. Two prominent design philosophies that have

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

emerged over the years are Complex Instruction Set Computing (CISC), and Reduced Instruction Set Computing (RISC).  CISC ISAs have historically been characterized by offering a large and diverse set of instructions, most of those instructions often being capable of performing complex operations within a single atomic instruction within the ISA.  Examples of CISC ISAs over the years include Intel's x86 architecture, Motorola's 68000 architecture, and Digital Equipment Corporation's VAX architecture.  RISC architectures, in contrast, favor a smaller, more uniform set of instructions that oftentimes can be executed in a single, or very few clock cycles.  Examples of RISC instruction sets are those from Arm, MIPS, and more recently the RISC-V organization. The distinctions between CISC and RISC are complex and varied, but notable are the trade-offs between the two in terms of power efficiency, aspects of performance, and the overall complexity in silicon design that is required.  As such, each of CISC and RISC hold their respective places in certain of embedded systems, low power computing, to mobile and high-performance servers and data centers, though RISC ISAs like Arm continue to be used in broader contexts.

52.    A simple example of an instruction within an ISA would be an arithmetic ADD instruction.  The ADD instruction would consume two inputs that comprise two integer numbers to be added together, and produce a third output that is the result of the ADD operation.  The values of the two inputs, and the resulting output, would be stored in the registers of the CPU.  The ISA's ADD instruction would then be defined as ADD Ra, Rb, Rc, where registers Ra, Rb, and Rc are various registers within the CPU.  The instruction would take the value stored in register Ra, add it to the value stored in register Rb, and store the result in register Rc.  In practice, a modern CPU will have hundreds, if not thousands, of such types of instructions that comprise its overall ISA.

53.    The ISA will also define things such as memory addressing modes that are available within the microprocessor.  Addressing modes are the means by which registers can be accessed,

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

which have varying trade-offs and functionality. One addressing mode would be "Immediate Addressing," whereby the microprocessor can take a given register such as R1, and immediately add the number 5 to it with an Immediate Addressing instruction such as "ADD R1, #5." Register Addressing is another type of common Addressing Mode, whereby instead of adding the constant 5 to register R1, the microprocessor can add the contents of a second register to R1. An example of this would be "ADD R1, R3" whereby the contents of microprocessor register R1 is added to the contents of R3, with the result stored into R1 by overwriting the previous contents of R1. Another variant of Register Addressing is to perform the same ADD operation using three registers instead of two. An example of this would be "ADD R4, R1, R3" in which the contents of registers R1 and R3 are added, but now stored in the result of R4 rather than overwriting R1.

54. Similar to these arithmetic operations, the Addressing Modes are also used to load and store values from locations in memory. Examples of this are Direct (Absolute) Addressing, whereby a LOAD instruction can load the register R1 with the immediate value 1000 such as "LOAD R1, 1000." Other addressing modes such as Indirect Addressing are commonly available whereby the contents of a location in memory pointed to by a register can be loaded into another register for use. An example of this would be "LOAD R1, (R2)" whereby the contents of the memory address stored in register R2 is loaded into register R1. In practice there are a number of variants to these addressing modes that add functionality and complexity to the microprocessor architecture, but also benefit programmers, software developers and development tools writers in creating the best performing system possible.

20

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

### 3.    Arm's Instruction Set Architecture

#### a.    History of Arm's ISA

55.    Arm has been developing CPU technology for nearly 50 years.[44]  In 1978, Chris Curry and Hermann Hauser started Acorn Computers, a start-up that built the foundation for Arm's modern processor technology.[45]  Acorn secured the rights to build the BBC Micro, which was a UK government initiative that was intended to have every classroom in the UK equipped with a computer.[46]  Part of the work performed by Acorn's founders involved developing the first ever Arm processor, called the ARM1, which was built on Arm's first architecture.[47]

56.    ARM2 quickly followed, with the first product using the ARM2 processor being released in 1986.[48]  The ARM3 processor then followed in 1989 and introduced a 4 KB cache that further enhanced performance.[49]

57.    In November 1990, Arm was officially founded as Advanced RISC Machines Ltd, which was a joint venture that involved Acorn Computers, Apple Computer (now Apple Inc.) and VLSI Technology (now NXP Semiconductors N.V.).[50]  In 1991, Arm introduced the ARM6

---

[44]    *See* https://newsroom.arm.com/blog/arm-official-history; *see also* Arm Holdings Limited Form F-1 (filed with the Securities and Exchange Commission on August 21, 2023) at 3–4 ("Our Journey").

[45]    *Id.*

[46]    *Id.*

[47]    *See* https://newsroom.arm.com/blog/evolution-of-arm-architecture-evolution-40-years#:~:text=In%201987%2C%20Acorn%20Computers%20launched,was%20a%20huge%20commercial%20success.

[48]    *Id.*

[49]    https://en.wikichip.org/wiki/acorn/microarchitectures/arm3; *see also* https://www.techmonitor.ai/technology/acorn_computers_has_high_hopes_for_its_third_generation_risc_with_on_board_cache.

[50]    *See* https://newsroom.arm.com/blog/arm-official-history; *see also* Arm Holdings Limited Form F-1 (filed with the Securities and Exchange Commission on August 21, 2023) at 3–4 ("Our Journey").

A0032

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

architecture that fully supported 32-bit processing and included features like a memory management unit (MMU).[51]

58.    Around 1993, Arm began offering licenses to its cutting-edge processor technology.[52] Throughout the 1990s and into the 2000s, Arm diversified its product line through Cortex-A (high-performance and efficiency in mobile), Cortex-R (focusing on highly specialized, real-time requirements), and Cortex-M (extremely low-power, low-cost cores for microcontrollers) CPU processors.[53]

59.    In 2005, Arm introduced the ARMv7 version of the architecture, which added multimedia and security features for the next generation of mobile phones.[54] The advent of smartphones around 2007 further increased demand for high-performance processors that used a low amount of power to maintain a long battery life for the device. Arm's Cortex-A9 CPU multi-core processor excelled in this area, as did Arm's innovative "big.LITTLE" approach, released in 2011, which combined a powerful core for high-performance with a lower-power core for improved battery life.[55]

60.    Arm publicly announced the Armv8-A version of the Arm architecture in October 2011, which introduced new 64-bit operating capabilities, called AArch64, and defined a

---

[51]    https://en.wikichip.org/wiki/arm_holdings/microarchitectures/arm6

[52]    *See* https://newsroom.arm.com/blog/arm-official-history; *see also* Arm Holdings Limited Form F-1 (filed with the Securities and Exchange Commission on August 21, 2023) at 3–4 ("Our Journey").

[53]    *Id.*

[54]    *See* https://www.allaboutcircuits.com/news/happy-40th-birthday-to-the-arm-architecture/#:~:text=The%20Rise%20of%20ARM%20in%20Mobile%20The,cemented%20its%20role%20in%20the%20mobile%20industry.

[55]    *See* https://newsroom.arm.com/blog/arm-official-history; *see also* Arm Holdings Limited Form F-1 (filed with the Securities and Exchange Commission on August 21, 2023) at 3–4 ("Our Journey").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

relationship to the prior 32-bit operating stated, called AArch32.[56]  On March 30, 2021, Arm publicly announced the Armv9 architecture, which Arm described as being a "response to the global demand for ubiquitous specialized processing with increasingly capable security and artificial intelligence (AI)."[57]  ████████████████████████████████████████

████████  though, as I discuss in more detail in Section XIV below, ████████████████████

████████████████████████████████████████ .

**b.    Arm Makes Its ISA Available for Licensing**

61.    Arm internally develops and sells designs (including RTL) for Arm-compliant CPU cores to various companies, including Qualcomm.  However, Arm, through Architecture License Agreements (ALAs), also licenses certain companies, including Qualcomm, to design Arm-compliant CPU cores.  In my experience, this practice is unlike other ISA providers.  For example, Intel produces x86-compliant CPU cores but does not allow other companies (other than AMD) to design competing custom CPU cores that use Intel's x86 architecture.

62.    I have seen evidence and testimony from this case that supports my opinion.  For example, Qualcomm's CEO, Cristiano Amon testified that ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[56]  https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development#:~:text=ARMv8%2DA%2C%20the%20ARMv8%20A,partners%20as%20products%20are%20introduced; *see also* https://en.wikichip.org/wiki/arm/armv8.

[57]  https://newsroom.arm.com/news/arms-solution-to-the-future-needs-of-ai-security-and-specialized-computing-is-v9.

A0034

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

 As another example, Qualcomm's SVP & General Manager for XR and Spatial Computing, Ziad Asghar testified that

Mr. Meacham offered similar testimony.  Meacham Dep. Tr. at 8:25–9:4, 115:5–116:6.  Further, Arm's Chief Architect, Richard Grisenthwaite testified that,

### c.    Arm's ISA Has Many Technical Features and Benefits

63.    Qualcomm's expert, Mr. Posner, opines that "it may not matter much which ISA is used," and has equated the selection of an ISA to having "people agree to drive on the left side or the right side of the road; it is not important which side is chosen as long as everyone agrees on the same side."  Posner Rpt. ¶ 22.  I disagree.

64.    Arm's ISA has and continues to offer many technical features and benefits, particularly for certain use-cases such as mobile devices.  At a high level, it is well understood in the industry that Arm's processor architecture offers security benefits, performance benefits, energy-efficiency and low-heat benefits, scalability benefits, versatility benefits, simplicity benefits, size benefits, and cost benefits as compared with other processor architectures.[58]  For example, the Arm ISA has been used in mobile phones for many years.  Oftentimes the adaptability of the Arm ISA has allowed for very efficient power consumption by these devices that operate on battery power.  Other extensions to the Arm ISA have provided for increased computational

---

[58]    *See*, *e.g.*, *Arm CPU Architecture: A Foundation for Computing Everywhere*, available at: https://www.arm.com/architecture/cpu#:~:text=Arm%20CPU%20Architecture:%20A%20Foundation,Pervasive %20across%20markets%20and%20locations; *What are Arm-based processors?* Available at: https://cloud.google.com/discover/what-are-arm-based-processors

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

performance by the additional of various SIMD type instructions, targeting mobile or multimedia. Arm processors have also been used in laptop computing type scenarios where a significant amount of computational power is required to run modern operating systems, software, and frameworks. The adaptability of the Arm ISA, in conjunction with the software development tools that target the Arm ISA, has led to its success in various areas of computing for many years.

65.    The industry has recognized the technical features and benefits of Arm's architecture. For example, Google's Cloud business has written about these features and benefits in an article titled, "What are Arm-based processors?"[59]  In this article, Google Cloud describes Arm's architecture as offering many important technical features and benefits including:

- "increased energy efficiency," which Google Cloud described as "[a] fundamental strength of the RISC architecture," and that "translates to reduced operating costs, lower heat dissipation, and the ability to pack more processing power into a given thermal envelope," "smaller size and lower heat generation," which is "particularly beneficial in space-constrained environments and allows for more compact and efficient system designs," "versatile usage3 for different types of technology";

- "increasingly high performance";

- "significant performance per watt, making them a compelling choice for modern, power-conscious computing environments";

- "simpler instructions, which generally execute faster and require less power";

- providing a "streamlined approach" that "leads to lower power consumption because fewer transistors are active during each instruction cycle";

- the ability to "incorporate advanced features such as pipelining (overlapping instruction execution), superscalar execution (executing multiple instructions simultaneously), and sophisticated branch prediction to enhance performance while maintaining energy efficiency";

- "lower" cost and "cost-effectiveness and sustainability due to the processors' power efficiency, without compromising on the scalability and performance required by containerized environments";

---

[59]    ARMQC_02785607 (https://cloud.google.com/discover/what-are-arm-based-processors)

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

- the ability to run "complex operating systems and demanding applications";

- "scalability and adaptability" that allows the Arm architecture "to be implemented across a wide spectrum of devices, from tiny sensors to powerful server CPUs" and makes Arm's architecture "a foundational technology for the increasingly interconnected and diverse computing landscape"; and

- being "attractive for various business applications," including "cloud computing" and "edge computing."[60]

66.     In my opinion and based on my experience designing and working with processors that use a variety of different architectures, I agree that Arm's innovative architecture allows for each of those features and benefits.

67.     Google Cloud also compared Arm-based processors to processors that use Intel's x86 with the following table,[61] which also shows some of the technical benefits of the Arm architecture:

---

[60]   *Id.*

[61]   *Id.*

A0037

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

### How do Arm processors compare?

The landscape of processors includes several key architectures. Here's a comparison highlighting Arm-based processors:

| Feature | Arm-based processors | Intel (X86) processors |
|---|---|---|
| Architecture | RISC (Reduced Instruction Set Computing) | CISC (Complex Instruction Set Computing) |
| Energy efficiency | Generally higher, designed for low power consumption | Historically lower, but improving with newer designs |
| Performance | Progressing rapidly, now competitive in many areas | Historically strong in high-performance computing |
| Cost | Often lower, especially for embedded and mobile applications | Can be higher, particularly for high-end server CPUs |
| Market presence | Dominant in mobile, growing in embedded, IoT, and servers | Dominant in desktop and traditional server markets |
| Instruction set | Simpler, fixed-length instructions | Complex, variable-length instructions |

68.    Google Cloud also dispelled several "myths" regarding Arm's architecture as unsubstantiated, including the "Myth" that "Arm is only for low-power mobile devices," the "Myth" that "The software ecosystem for Arm in HPC isn't mature enough," and the "Myth" that "Getting started with Arm for HPC is too complex for students or developers new to the architecture."[62]

69.    LinkedIn has similarly written about the features and benefits of Arm's architecture. For example, in an article titled, "How can ARM instruction set architecture improve

---

[62]    *Id.*

27

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

machine learning applications?,"[63] LinkedIn identified several technical features and benefits of

Arm's architecture, including:

- "simpler and fewer instructions than other architectures, such as x86";

- "low-cost and low-power solutions";

- "support [for] high-performance computing (HPC) and ML applications"; and

- "enhance[d] computational efficiency"

70.    LinkedIn also identified several ways in which the Arm architecture offers technical

features and benefits that are particularly useful for machine learning applications,[64] including:

- "ARM ISA supports ML by providing several features and extensions that optimize the processing of ML workloads. For example, ARM ISA supports vector processing, which allows the processor to perform the same operation on multiple data elements at once, such as adding or multiplying arrays of numbers. This is useful for ML tasks that involve matrix operations, such as neural networks."

- "ARM ISA's Scalable Vector Extension (SVE) … enables the processor to adjust the vector length dynamically according to the data size and the available hardware resources. This improves the flexibility and efficiency of ML applications, as they can adapt to different scenarios and constrains."

- "Features like vector processing and the Scalable Vector Extension (SVE) showcase ARM's commitment to addressing the complex demands of ML workloads."

- "The dynamic adjustment of vector length aligns well with the adaptable nature of ML tasks, offering a versatile solution."

- "ARM's support for ML within its ISA demonstrates a proactive stance in facilitating high-performance computing for modern ML applications."

- Arm's ISA "can improve the performance of ML applications without compromising the energy efficiency."

---

[63]   ARMQC_02785614 (https://www.linkedin.com/advice/0/how-can-arm-instruction-set-architecture-improve-7r3oc#:~:text=from%202%20contributions.-
,1%20What%20is%20ARM%20ISA?,(HPC)%20and%20ML%20applications.&text=The%20ARM%20(Advanced%20RISC%20Machine,in%20their%20machine%20learning%20applications)

[64]   *Id.*

28

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

- "ARM processors can deliver high performance per watt, which means they can process more data with less power consumption. This is important for ML applications that run on battery-powered devices, such as smartphones or drones, or on large-scale systems, such as data centers or supercomputers, where energy costs are significant."

- Arm's ISA "can enable the scalability of ML applications, as it can support various levels of parallelism and heterogeneity."

- "ARM processors can work in parallel with other processors, such as GPUs or FPGAs, to accelerate ML tasks and distribute the workload."

- "ARM processors can … support different types of cores, such as big and little cores, to balance the performance and efficiency demands of ML applications."

71.    I agree that Arm's innovative architecture allows for each of those features and benefits.

72.    There is further evidence of industry recognition that Arm's processor architecture offers technical benefits.  For example, in February 2024, it was announced that Arm and Neuro, a leading autonomous technology company, entered into a "multi-year collaboration to drive a scalable approach to the commercialization of autonomous vehicles with AI built into their foundations," and "[a]s part of this partnership, Neuro is leveraging the leading-edge Arm® Automotive Enhanced (AE) technology to develop the next generation Nuro Driver$^{TM}$." ARMQC_02720214.

73.    As another example, in April 2024, it was announced that Google Cloud introduced custom Google Axion Processors for general-purpose compute and AI inference workloads based on the Armv9 architecture that "will power instances that deliver up to 60% better energy efficiency and up to 50% more performance than comparable current-generation x86-based instances."  ARMQC_02720220.

74.    As another example, Google announced that the Google Nest Audio smart home speaker "leverages the quad-core Arm Cortex-A53 processor, enabling some processing on-device instead of relying solely on data centers," which "makes it possible for Google Assistant to learn

A0040

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

the most common music commands and respond twice as fast than the original Google Home." ARMQC_02720226; *see also* ARMQC_02720310.

75.    As another example, it has been announced that Google's Fitbit Ace LTE is a "kid-friendly, feature-rich smartwatch" based on Arm's architecture technology, which allows it to "last more than 16 hours on one charge." ARMQC_02720303.

76.    As another example, in July 2022, it was announced that Arm had partnered with Cruise, the autonomous driving company, to help deliver "the first all-electric, driverless service to welcome public riders in a major US city." ARMQC_02720230.

77.    As another example, in January 2025, it was announced that Arm had partnered with the Aston Martin Aramco Formula One® Team as part of a "landmark multi-year partnership" in which Arm "join[ed] as the team's Official AI Compute Platform Partner." ARMQC_02720278; ARMQC_02720279.

78.    As another example, Arm has partnered with Meta Platforms, Inc. to support AI technology development. ARMQC_02720249. This has included Arm's collaboration with the PyTorch team at Meta on the new ExecuTorch Beta release which "bring[s] AI and machine learning (ML) capabilities to billions of edge devices, as well as millions of developers worldwide." ARMQC_02720251. A press release discussing the Arm-Meta partnership for the Llama AI models noted that Arm's technology "ensure[s] that Llama models operate seamlessly and efficiently across hardware platforms" and "enabl[es] optimizations that accelerate Llama model inference significantly." ARMQC_02720329 at -329–31.

79.    As another example, Arm has partnered with GitHub, a cloud-based platform for software developers, to accelerate and reduce the cost of development of, among other things, ML workflows.        ARMQC_02720258;        ARMQC_02720259;        ARMQC_02720284;

30

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ARMQC_02720291.  According to a February 2025 press release, the "GitHub Copilot increases coding speed by 55% and developer confidence by 85%," and the "Arm extension for GitHub Copilot has been specifically designed to simplify migration to the Arm architecture, reducing development time and costs."  ARMQC_02720284.

80.    As another example, in November 2024, it was announced that Arm had partnered with Panasonic Automotive Systems to "standardiz[e] automotive architecture for Software-Defined Vehicles (SDVs) … to meet the current and future needs for automotive." ARMQC_02720265.  According to the press release, this partnership involved "several key initiatives," including "Utilizing VirtIO-based Unified HMI to standardize zonal architecture," "Ensuring environmental parity from cloud to car," and "Expanding VirtIO Standardization." *Id.* at -265–66.

81.    As another example, in February 2025, it was announced that the Armv9 edge AI platform, featuring the Arm Cortex-A320 CPU and the Arm Ethos-U85 NPU, could "enabl[e] AI models of over one billion parameters to run on-device" and the platform's Armv9.2 architecture also brought "advanced security features like Pointer Authentication (PAC), Branch Target Authentication (BTI) and Memory Tagging Extension (MTE) to even the smallest Cortex-A devices."  ARMQC_02720292–94.

82.    As another example, in January 2025, it was announced that Arm-based NVIDIA Drive AGX Thor, a centralized compute system, would leverage "the power and advanced capabilities of the Arm compute platform" to "deliver[] the AI capabilities that the next-generation consumer and commercial fleets demand."  ARMQC_02720272.

83.    As another example, it has been announced that Arm has partnered with Simprints, a nonprofit company aiming to provide accurate, affordable solutions for providing biometric

systems for patient identification, to develop a portable scanner that could be used in an offline

mode and can securely upload new patient data when connectivity is restored, to assist the

approximately 1 billion people on Earth who lack formal proof of identity.  ARMQC_02720300.

84.    As another example, it has been announced that Fujitsu chose the Armv9

architecture for its FUJITSU-MONAKA processor "for its combination of adaptable hardware and

a unified software ecosystem that supports scalability and customization" and allows Fujitsu to

"build flexible, high-performance technology solutions that fuel rapid innovation and adapt to

evolving demands."  ARMQC_02720315.

85.    As another example, it has been announced that LG chose to build its OLED TVs

using Arm's architecture, which allows LG's OLED TVs to "offer a significant leap forward in

processing performance and picture quality for DTVs" and to leverage "AI workloads and

technologies."  ARMQC_02720320.

86.    As another example, it has been announced that Arm and Lotus, a global leader in

luxury electric vehicles, have partnered to improve driving safety and innovation by delivering

"groundbreaking innovations that prioritize safety while redefining the driving experience for

passionate enthusiasts," for which "Arm technology plays a crucial role in the safety of vehicles

both for autonomous driving and human driving."  ARMQC_02720324.  For example, the press

release notes that "Arm technology is integral to vehicle safety in both autonomous and human-

driven contexts" including because it "enabl[es] systems to detect, diagnose, and mitigate faults

effectively" with is "safety-certified IP and software test libraries."  *Id.* at -324-26.

87.    As another example, it has been announced that Arm and Rainforest Connection, a

non-profit technology startup, have partnered to develop acoustic monitoring systems, called

Guardians, that use Arm-powered CPUs and machine learning to detect illegal deforestation and

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

poaching, "act[ing] as ears in the heart of the rainforest," which Arm's architecture allows these systems to "run in AI/ML models both in the cloud and on the devices themselves, adapting in real time to real-world needs," and, in particular, the "Armv9 architecture can extend the power of specialized neural net processing, supporting the Rainforest Connection mission with even more capable tools to protect rainforests – and the health of the planet." ARMQC_02720333 at -333–34.

88.     As another example, Arm has announced that innovators at Beewise, a technology company, have used Arm's architecture to develop robotic beehives (named "Beehomes") to provide a safe haven for bees and offer "limitless flexibility for beekeepers," which has allowed bee mortality rates to "decreas[e] by as much as 80%" because Arm's "state-of-the-art architecture provides robotic brood box management and computer vision-based monitoring while it keeps track of automated honey harvesting, pest control, and thermoregulation." ARMQC_02720337 at -337–339.

89.     As another example, Arm has announced that Mercedes-Benz has chosen to use Arm's architecture technology as "a central piece of the compute of the core in our main partner chips that we're leveraging today" for software-defined vehicles, because Arm's architecture enables "[p]ower-efficient computing [that] is essential to maximizing the range of electric vehicles, reducing mass, and keeping overall vehicle costs low." ARMQC_02720342 at -342–44.

90.     As another example, Arm has announced that Arm's architecture has enabled applied VR platforms in many applications, including "[t]he world's first VR platform designed specifically for healthcare" that "provides patients with an escape from their everyday, as well as the tools that help them build skills for managing their pain." ARMQC_02720347.

33

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

91.     As another example, Arm has announced that Shanghai-based MegaHealth has chosen to use Arm's architecture to power the "MegaRing," which is "a medical pulse oximeter that can be worn on a finger to continuously monitor heart rate and oxygen saturation, and detect changes that might indicate early signs of hypoxemia, or less-than-safe levels of oxygen in the blood," because of the technical benefits of the Arm architecture, including because it "enables SpO2 signal acquisition and algorithm operation." ARMQC_02720352.

### 4.    Non-Arm ISAs

#### a.    Many ISAs Are Available

92.     There are several non-Arm ISAs in the market, including the RISC-V, MIPS, and Intel x86 ISAs I mentioned above. Many of these ISAs have seen great success in different areas of computing. For example, the MIPS ISA was widely used in high power workstations, gaming consoles such as the first Sony PlayStation and various Nintendo systems, as well as computer network switches and routers. The Intel x86 ISA has been widely successful in the area of desktop computing and laptops, as well as data centers and certain consumer electronics such as various Microsoft Xbox gaming consoles. The Sun Microsystems SPARC architecture, another RISC architecture design, targeted high performance workstations, the server market, as well as high performance computing and certain telecommunications applications. As I discuss elsewhere in this report, RISC-V too has shown traction in areas such as embedded computing and Internet of Things applications, as well as microcontroller design to name a few. These examples are a very select few, as there have been many companies that produce and offer their own CPU ISAs for areas such as high performance computing, embedded systems, multimedia and telecommunications to name a few.

93.     As one can imagine, a certain ISA may be well tailored to a certain type of computing application space, while not being as well suited to others. For example, an Intel x86

34

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ISA that is tailored for desktop and high performance computing may not be ideal for ultra low-power edge of network sensing applications.  Similarly, a multimedia and digital signal processing ISA that is tailored for video codecs or wireless telecommunications, for example, may not be suited for running Linux or the Microsoft Windows operating system.  Companies may choose to design their custom CPUs with these architectures, with each having certain benefits and drawbacks.  Both Arm and Qualcomm witnesses agree with my assessment.

94.    Arm's Chief Architect, Richard Grisenthwaite, testified that . As another example, Arm Distinguished Engineer, Michael Williams, testified that,

95.    Arm's SVP of Technology, Peter Greenhalgh testified that

, and Arm's Vice President of Partner Success and Licensing, Andrew Howard testified that

. Further, Arm's Senior Director of Engineering, Aparajita Bhattacharya testified that

35

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████████████████

████████████████████████████████████ and Arm's VP of Sales, Lynn Couillard

testified that ███████████████████████████████████████████████████

███████.

96.     Qualcomm's witnesses agree.  For example, Qualcomm's CEO, Cristiano Amon

testified that ██████████████████████████████████████████:



███████████████████.  As another example, Qualcomm's SVP & General Manager for XR

and Spatial Computing, Ziad Asghar testified that █████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████.  Further,  Richard  Meacham,

Qualcomm's Principal Engineer for Automotive CPUs, testified that ████████████████

███████████████████████████████████████████████████████████████

███████████, and Jean-Francois (Jeff) Vidon also testified that ██████████████████

██████████████████████████████████████████.

97.     This  is  consistent  with  my  experience  designing  and  verifying  architectural

compliance for CPU cores that used various types of computer architectures.  This testimony is

also  consistent  with  my  experience  researching  and  expanding  these  architectures  for  new

instructions or implementing the existing architecture and validating it in new environments (*e.g.*,

design simulation from a spec sheet definition of the ISA).

36

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

98.    I have worked on a number of experimental and academic instruction set architectures over the past 20+ years.  For example, I worked on MIPS Technologies' MIPS R4000, a high performance RISC based ISA used in both high-performance workstations and servers, as well as networking and embedded systems.  As another example, I worked on Texas Instruments' TMS3206200 ('C62x) ISA and Texas Instruments' TMS320C6400 ('C64x), which are a fixed-point, Very Long Instruction Word (VLIW) architectures tailored for high performance and power efficiency.  I have also worked on the Freescale/NXP StarCore SC3900 FP, a high performance, flexible vector processor for wireless infrastructure, targeting high performance and low power capabilities.  As another example, I have worked in Intel's Microprocessor Research Labs during the design of Itanium, an Explicitly Parallel instruction Computing (EPIC) architecture, and the relation of the ISA to programming languages and compilation technology.  These architectures were often tailored to different application spaces, ranging from embedded devices, wired and wireless digital networking, and multimedia and digital signal processing systems.

99.    I have also instructed, and worked hands on with various Arm based architectures and their CPU ISAs.  This has included both the development of software and applications for these architectures, as well as working on developer tools that target Arm architectures, such as optimizing C and C++ compilers.  I have also worked with various Intel architectures, both during my time at Intel Microprocessor Research labs on the Itanium family of processors, as well as the development of software and applications using the Intel x86 architecture.

**b.    RISC-V**

100.    In my opinion, RISC-V is one example of an alternative architecture to the Arm architecture and can be used to create custom CPU core designs.  I am a member of the RISC-V

37

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Foundation Technical Committee and have been since 2018.  RISC-V is an open CPU instruction set architecture based on established reduced instruction set computing (RISC) principles.

101.    RISC-V is a technology that can be available as an alternative to the ARM architecture.[65]  RISC-V is a free and open standard instruction set architecture that is used in both academic research as well as in industry.[66]  RISC-V and its ecosystem can be used as the basis for designing custom CPU architectures for a variety of computing workloads, while also leveraging the RISC-V developer tools ecosystem for the development of software applications and functionality on a given RISC-V implementation.[67]  The range of devices that have been designed using RISC-V include microcontrollers, embedded systems, computer hard drives and data center solutions.[68]

102.    Qualcomm has likewise recognized advantages of the RISC-V architecture.  For example, in a public 2023 Qualcomm article titled "What is RISC-V, and why we're unlocking its potential," Qualcomm stated that there are "3 main advantages of RISC-V": "[f]lexibility," "[c]ontrol," and "[v]isibility":

> **Flexibility**:  RISC-V offers a unique set of features that allow users to customize and optimize both software and hardware for specific use cases, resulting in faster development cycles and better design tradeoffs for performance, power and area.
>
> **Control**:  This open ISA provides designers and developers with greater control over their computing environments, allowing them to fine-tune their systems without relying on third parties or incurring additional license fees associated with proprietary architectures.

---

[65]  *See* https://riscv.org/about/

[66]  *Id*.

[67]  *Id*.

[68]  *Id*.

38

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Visibility**:  The open-standard nature of RISC-V also means that developers have more visibility into the codebase, making it easier to understand the roadmap and identify potential security risks before they become an issue.

Asghar Dep. Ex. 6 at 5.

103.    I have seen evidence that Qualcomm is investing in and considering using the RISC-V architecture for its custom CPU core designs.  I have also seen evidence that Qualcomm has considered fully transitioning its custom CPU core development to RISC-V, away from Arm's architecture.

104.    Several Qualcomm witnesses have testified about Qualcomm's RISC-V plans. Notably, Mr. Amon testified that " ███████████████████████████████████████ ███████████████████  Further, Mr. Vidon testified that ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████.  Mr. Vidon further testified that ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████  Mr. Vidon also testified that ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████

105.    As another example, Mr. Meacham testified that ████████████████ ████████████████████████████████████████████████████████████████

39

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Mr. Meacham also testified that ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ Further, Mr. Meacham testified ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

106.    As another example, Mr. Asghar testified that ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. Mr. Asghar also testified that ████

████████████████████████████████████████████████████

██████████████████████. Mr. Asghar likewise made public statements regarding Qualcomm's view of RISC-V. For example, in the public 2023 Qualcomm article titled "What is RISC-V, and why we're unlocking its potential," Mr. Asghar stated that "RISC-V makes sense for pretty much all use cases," that "we [Qualcomm] invested in multiple RISC-V based companies" and "have also been integrating these cores into our products since 2019." Asghar Dep. Ex. 6 at 7–8.

107.    Further, Qualcomm's Senior Vice President and General Manager of Technology Planning and Solutions and Data Center, Durga Malladi testified that ██████████████

████████████████████████████████████████████████████

40

A0051

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

108.    As another example, Qualcomm's Senior Director, CPU, DSP, Benchmarking, and AI Hardware, Karl Whealton testified that ███████████████████████████████████████

████████████████████████████████████████████████████ Further, Qualcomm's Director of Sourcing, Kurt Wolf testified that █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████.

109.    Further, additional Qualcomm documents suggest that Qualcomm is investing in and considering using the RISC-V architecture for its custom CPU core designs.  *See, e.g.,* QCVARM_0537065;  QCVARM_0527125;  QCVARM_0468422;  Asghar  Dep.  Ex.  7; QCVARM_0462995 at -004–005;  QCVARM_0463559  at  -562;  QCVARM_0449653; QCVARM_0534596; QCVARM_0534597 at -599, -603, -605–606, -609; QCVARM_0571333 at -334, -337, 338, -348;  QCVARM_0524775;  QCARM_3522895;  QCVARM_0449658; QCVARM_0608391;       QCVARM_0532239,       QCVARM_0529887       at       -900–902; QCARM_3430479; QCVARM_0537065 at -067–068; Malladi Dep. Exs. 3–4.

110.    This evidence is consistent with my understanding.  In my opinion, RISC-V is an alternative architecture to the Arm architecture and can be used to create custom CPU core designs.

### B.    Many Companies Design CPU Cores

111.    Arm is not the only company that designs CPU cores.  I am aware of several companies other than Arm that design their own CPU cores.  These companies include Qualcomm, Apple, Intel, AMD, SiFive, Akeana, Rivos, Ventana, Imagination Technologies, and Andes.

41

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

112.    I have seen evidence from this case that demonstrates this point.  For example, Qualcomm's SVP & General Manager for XR and Spatial Computing, Ziad Asghar testified that

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████.  As another example, Qualcomm's Principal Engineer for Automotive CPUs, Richard Meacham testified that

███████████████████████████████████████████████████

███████████████████████████████████████████████.  As another  example,  Qualcomm's  Senior  Director  of  Engineering,  Jean-Francois  (Jeff)  Vidon testified that ████████████████████████████████████████████

████████

113.    As noted, Arm licenses its instruction set architecture to companies under ALA agreements  that  allow  those  ALA  partners  to  design  their  own  custom  CPU  cores.   These companies  include ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

42

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

### C.    Many Companies Sell Silicon Chips

114.    Qualcomm's expert, Mr. Posner, has offered opinions about Arm's attempts to design and sell its own SoCs. *See*, *e.g.*, Posner Rpt. ¶¶ 44, 64, 67–79, 88. Based on my knowledge of the industry, I am aware of many companies that sell or vertically integrate SoCs, including Qualcomm, Intel, AMD, Apple, Infineon, Renesas, Samsung, MediaTek, Huawei, Texas Instruments, Analog Devices, NXP, and Broadcom.

115.    I have seen evidence from this case that demonstrates this point. For example, Qualcomm's SVP & General Manager for XR and Spatial Computing, Ziad Asghar testified that

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████. As another example, Qualcomm's Principal Engineer for Automotive CPUs, Richard Meacham testified that ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████. As another example, Qualcomm's Senior Director of Engineering, Jean-Francois (Jeff) Vidon testified that ████████████████

████████████████████████████████████████████

████████████████

43

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## IX.    RELEVANT AGREEMENTS

116.    I understand that one of the agreements at-issue in this case is an Architecture License Agreement (ALA) entered into between Arm Limited and Qualcomm Global Trading PTE., LTD on May 31, 2013.  ARM_00055357.  I am not an attorney and I offer no opinions regarding contract interpretation.  In my understanding, ALAs grant rights to certain Arm technology that ALA partners use to design their own custom CPU cores that are compatible with Arm's ISA.  This contrasts with a Technology License Agreement (TLA), through which a partner obtains a license to a core (including RTL) that Arm designed.

117.    I understand that there are several Annex 1s to the Arm-Qualcomm ALA. Specifically, I understand that there is an Annex 1 for the "Armv8-A Architecture." (ARM_00063298). I further understand that there is an Annex 1 for the "v8 Next Architecture" (QCARM_0338573), and an Annex 1 for the "Armv9-A Architecture" (QCARM_0343954), which states that it shall ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████    I understand these Annex 1s provide information regarding the parties' obligations under the ALA with respect to a particular version of Arm's architecture (e.g., the v8-A or the v9-A version).  For example, I understand the ALA defines ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ARM_00055357 at -357, § 1.3.  The cover of the v8 Annex 1 lists the ███████████████ ███████████.  ARM_00063298.  The cover of the v8 Next Annex 1 lists the "Annex Effective Date" as May 30, 2013.  QCARM_0338573.  The cover of the v9 Annex 1 lists the ████████ ██████████████████████████    QCARM_0343954.

44

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

118.    The v8 and v9 Annex 1s each contain a ███████████████████ ARM_00063298 at -299–300; QCARM_0343954 at -955–57.  These ███████████ █████████████████████████████ I provide my technical understanding of each of these technologies below.

**A.**    ███████████████    **In** ████████    **Of The v8 Annex 1 To The ALA**

119.    █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████  ARM_00063298 at -299–300.  ███████████████████████

Qualcomm's corporate representative on its custom core verification efforts, Jignesh Trivedi, testified that ████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████.  Trivedi Dep. Tr. at 85:2–19.  I therefore focus my discussion below in the parts listed in ████████████

120.    █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  ARM_00063298 at -299–300.

        **1.**    ███████████████████████████████

    ███  ████████████████████████████████████████████████████

██████████████████████████  ARM_00063298 at -299.  This is sometimes referred to as the Arm ARM.  Trivedi Dep. Tr. at 56:3–16.  The Arm ARM is



---

[69]   I understand that ███████████████ is a defined term in the ALA.  I offer no opinions regarding whether technologies are or are not █████████████" under the terms of the ALA.  My use of the term ████████ is based on my experience, not any particular contract language.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

available for download on Arm's website.[70]  While I have not reviewed all of the approximately 15,000 pages of the Arm ARM for A-profile architecture, I reviewed it generally and am familiar with it.  The Arm ARM describes the operation of an Armv8-A and Armv9-A Processing Element (PE) and includes descriptions of:

- The two Execution states, AArch64 and AArch32;

- The instruction sets;

- The states that determine how a PE operates;

- The Exception model;

- The interprocessing model;

- The memory model;

- The programmers' model;

- The Advanced SIMD and floating-point instructions;

- The security model;

- The virtualization model; and

- The Debug architecture.[71]

122.    The Arm ARM gives the assembler syntax for the instructions it describes, which means that it describes instructions in textual form.    As Arm's Chief Architect, Richard Grisenthwaite explained, "[t]he ARM ARM is written as the description of the behavior of an abstract machine to which the implementations must be compliant, must do the same as that machine." 11/15/2023 Grisenthwaite Dep. Tr. at 102:12–103:1.  The Arm ARM is referenced by

---

[70]    Arm Architecture Reference Manual for A-profile architecture (Doc No. ARM DDI 0487; issued April 30, 2025), available at https://developer.arm.com/documentation/ddi0487/latest/.  Older versions of the Arm ARM have been produced in this case.  *See, e.g.*, QCVARM_0986448, QCVARM_0999388, QCVARM_0973928.

[71]    *Id.*

46

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Arm and by Arm's ALA partners.  For example, Vivek Agrawal, an Arm engineer in Arm's architecture compliance kit support group, testified that ███████████████████

████████████████████████████████████████████████████████████

█████████████████████  And, Qualcomm's corporate representative on its custom core verification efforts, Jignesh Trivedi, testified that █████████████████████████

███████████████████████████  I have seen evidence showing that Arm made the Arm ARM available to Qualcomm.  To start, as I noted above, Arm makes the ARM available to access on its website (subject to limitations on its use, including the need for a license, as set forth in the Arm ARM itself).[73]  Further, the v8 Annex 1 █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████  Also, Martin Weidmann, Arm's corporate representative on Arm's provision of materials to Qualcomm, testified that █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[72]    I understand that some witnesses have been deposed on multiple occasions—in the *Arm v. Qualcomm* case and in this case.  In this report, all deposition citations are to the depositions taken in this case, unless a date is included in the citation, in which case it is a citation to their deposition from the *Arm v. Qualcomm* case.

[73]    Arm Architecture Reference Manual for A-profile architecture (Doc No. ARM DDI 0487; issued April 30, 2025), available at https://developer.arm.com/documentation/ddi0487/latest/.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    Further, Qualcomm does not contend that Arm withheld the

Armv8-A ████████████████████ from Qualcomm.  Trivedi Dep. Tr. at 65:7–20.

123.    The ██████████████████████████████████████

ARM_00063298  at  -299.    I  have  seen  evidence  showing  that  Arm  made  the ████████

████████████████  available to Qualcomm.  For example, the v8 Annex 1 lists the ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Further, Qualcomm does not contend that Arm withheld the ████████████████████

from Qualcomm.  *See* Trivedi Dep. Tr. at 68:8–14.

124.    The ██████████████████████████████████████

ARM_00063298  at  -299.    I  have  seen  evidence  showing  that  Arm  made  the ████████

████████████████  available to Qualcomm.  For example, the v8 Annex 1 lists the ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████). Further, Qualcomm does not contend that Arm withheld the ███████████████████ from Qualcomm. *See* Trivedi Dep. Tr. at 70:2–5.

125. The ████████████████████████████████ ARM_00063298 at -299. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ ██ ████████████████

██████████████████████.[75] Qualcomm does not contend that Arm withheld the ████████████████████ from Qualcomm. Trivedi Dep. Tr. at 70:16–20.

126. The ████████████████████████████████ ARM_00063298 at -299. Arm makes periodic updates to the ██████.[76] When Arm makes these updates, Arm typically includes release notes that describe the updates. *See* Trivedi Dep. Tr. at 71:1–4. Qualcomm does not contend that Arm withheld the ███████████ from Qualcomm. *Id.* at 71:5–7.

127. The ████████████████████████████████ ARM_00063298 at -299. This list identifies potential errors or limitations of the ███████

---

[74] █████████████████████████████████████
██████

[75] *See id.*; *see also* Trivedi Dep. Tr. at 70:6–15.

[76] ████████████████████████████████████
██████████████████████

A0060



**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Architecture. [77]  Qualcomm does not contend that Arm withheld the █████████████

████ from Qualcomm.  Trivedi Dep. Tr. at 71:17–21.

2.  ████████████████████

████  ████████████████████████████████. The

first is the ██████████████████████████  ARM_00063298 at -299.  The v8

Annex 1 defines ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████  ARM_00063298 at -302, █

████.  For the Armv9-A version of the Arm architecture, the name of the █████████

████████████████████████████████████.  Weidmann Dep. Tr. at 97:20–

99:2; ARM_01238132 at -132–133; ARMQC_02732558.  The ███████  is more commonly

referred to as the ACK.  Grisenthwaite Dep. Tr. at 144:8–16; ARMQC_02732558.  I describe the

ACK in more detail in Section X.A below.  I also explain how the ACK, which I consider a

technical deliverable in the context of Arm's architecture compliance verification process, differs

from an Out-of-Box package (OOB) and from an ACK patch, both of which I consider to be

support materials from a technical perspective.  *See* Sections XI.A and XI.B.

---

[77]  *See* https://developer.arm.com/documentation/ddi0440/c/introduction/about-the-etm-m4; https://developer.arm.com/documentation/102119/0200/Trace-components/Embedded-Trace-Macrocell-Trace-source; *see also* Trivedi Dep. Tr. at 71:12–16..

A0061

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

129.    I have seen evidence showing that Arm provided the Armv8 ACK, and each quarterly release of the Armv8 ACK, to Qualcomm.  For example, █████████████ ████████████████████████████████████████████████████████ :

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

51

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



130. Qualcomm does not dispute that ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████

131. The ██████████████████████████████████████████

███ ARM_00063298 at -299.  Arm ██████████████████████████, so the

evidence I have seen showing that Arm provided the Armv8-A ACK to Qualcomm also applies to

the ████████████████████. *See supra*; *see also* Trivedi Dep. Tr. at 82:7–13.

Qualcomm does not contend that Arm withheld the ██████████████████ from

Qualcomm. *Id.* at 82:14–17.

**3.** ████████████████████████

███ ████████████████████████████████████████████████████

████████████████████████████." ARM_00063298 at -300.  As I explained

above the ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████.[78] The ████████████████████████ is a

---

[78] *See* https://developer.arm.com/documentation/ddi0440/c/introduction/about-the-etm-m4;
https://developer.arm.com/documentation/102119/0200/Trace-components/Embedded-Trace-Macrocell-Trace-source

A0063

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

that confirms that the ▇▇▇ feature is functioning properly.[79]  Qualcomm does not contend that

Arm withheld the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ from Qualcomm.  Trivedi Dep. Tr.

at 83:11–13.

133.    The ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇ARM_00063298 at -300.  This list identifies potential errors or limitations of the ▇▇

▇▇[80]  Qualcomm does not contend that Arm withheld the ▇▇▇▇▇▇▇▇▇▇▇▇

▇▇ from Qualcomm.  Trivedi Dep. Tr. at 83:18–21.

4.    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇ Qualcomm does not contend that Arm withheld any of these ▇▇▇▇

in ▇▇▇▇ from Qualcomm.  Trivedi Dep. Tr. at 83:23–84:24.

B.    ▇▇▇▇▇▇▇▇▇▇▇ In ▇▇▇▇ Of The v9 Annex 1 To The ALA

135.    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ QCARM_0343954 at -955–

---

[79] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *see also* Trivedi Dep. Tr. at 83:5–10.

[80] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[81] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ G. Williams Dep. Tr. at 114:18–115:4.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

57. Within ██████████████████████. Within ████████████████████████

that, in turn, ██████████████ by ██████████████████████

     **1.** ████████████████████████

    136. ██████████████████████████████████████



QCARM_0343954 at -956. Richard Grisenthwaite testified that ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████ I have seen evidence showing that Arm made the Armv9-A ██████

██████████████ to Qualcomm. For example, the Armv9-A Annex 1 ████████████

██████████████████████████████████ QCARM_0343954

at -956. ██████████████████████████████████████████

██████████████████████████████████████

54

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



137.    Qualcomm does not contend that Arm withheld the ███████████████ ███████████ from Qualcomm.  Trivedi Dep. Tr. at 88:1–4.

138.    The ██████████████████████████████████████ ████████ QCARM_0343954 at -956.  I have seen evidence showing that Arm made the ████

55

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████ available to Qualcomm.  For example, the v9 Annex 1 lists the ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ At his deposition, Mr. Trivedi testified that ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Qualcomm does not contend that Arm withheld the ██████████████████████ from Qualcomm.

139. The ███████████████████████████████████████

██████████████ QCARM_0343954 at -956.  Arm typically provides information about new releases in release notes.  I have seen evidence showing that Arm made the Armv9-A █████████ ████████████ available to Qualcomm.  For example, the v9 Annex 1 ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████ Qualcomm does not contend that Arm withheld the ██████ ██████████████████ from Qualcomm.  Trivedi Dep. Tr. at 88:20–22.

140. Under ████████████ the v9 Annex 1 simply ████████████████████ QCARM_0343954 at -956.

**2.** ████████████████████████████████

141. The second ██████████████████████████████████████ ████ QCARM_0343954 at -956.  Under this ██████ heading is the ████████████████████

56

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████

███████████████████████████████████ *Id.* Under ████████████████ the v9 Annex

1 simply lists ████████████

142.    Under ████████████████████████████████████████

███████████████████████ The first is ███████████████████████████ *Id.*

This is ████████████████████████████████████████████

ARMQC_02732558. As I explain in more detail in Section X.A below, the ACK is a suite of tens of thousands of tests that, when run, each return one of three results: pass, fail, or skip. I have seen evidence showing that Arm provided the Armv9-A ACK and each quarterly release of the Armv9-A ACK to Qualcomm. For example, ████████████████████████████

████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

57

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███

143.    Qualcomm does not dispute that Arm provided what Qualcomm's corporate representative, Jignesh Trivedi, referred to as the ████████████████████████████ ████████████████████████████

144.    The ████████████████████████████████████████████ ██████████████████████ QCARM_0343954 at -956.  The Arm ETE is the ██████ ██████████, which has many similarities with the Arm ETMv4 architecture, which I described above with respect to the Armv8-A architecture.  It creates a trace programming and decode environment for the Armv9-A architecture.[82]  Qualcomm contends that Arm failed to provide Qualcomm with support for configuring the ETE Checker, which I disagree with and discuss in more detail in Section XI.C of this Report, however, Qualcomm does not contend that Arm withheld the ████████████████████████████████████ from Qualcomm, because ██ ███████████████████████████████████████████████

145.    The ████████████████████████████████████████████ █████████████████████ QCARM_0343954 at -956.  Like the █████████████ ████████████████, Qualcomm does not contend that Arm withheld the ███████████

---

[82]    *See* https://developer.arm.com/documentation/102856/0100/Embedded-Trace-Extension.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████ from Qualcomm, because ████████████████████████████

████████████████████████████

**3.**    ████████████████████████

146.    The ████████ ████████████████████████████████

QCARM_0343954 at -956.    Under this ██████ heading is the ████████████████████

████████████████████████████████████████

████████████████████████ *Id.*

147.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ *Id.*    These are the architecture

specifications and compliance kit for System Memory Management Unit (SMMU), which is a

hardware component that translates IO virtual addresses into physical addresses for devices

performing Direct Memory Access (DMA).[83] ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████    Qualcomm does not contend that Arm withheld either of these parts from

Qualcomm.    *See* Trivedi Dep. Tr. at 91:13–22.

---

[83]    *See* https://www.openeuler.org/en/blog/wxggg/2020-11-21-iommu-smmu-intro.html; *see also* https://developer.arm.com/documentation/109242/0100/What-an-SMMU-does.

A0070

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

     **4.** ████████████████████

148. ██████████████████████████████████████ QCARM_0343954

at -957.  I am not aware of any claim by Qualcomm alleging that Arm withheld anything relating

to ██████████████████.

     **C.**    **How Arm Provides The ██████████████████ Of The v8 And v9 Annex 1s To Partners, Including Qualcomm**

149. Arm provides the ██████████████████ of the v8 and v9 Annex 1s to all

ALA partners, including Qualcomm, through a centralized database called Product Download Hub

(PDH) (formerly, Arm Connect). ████████████████████████████████

███████████████   Further, Martin Weidmann testified that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████   Mr. Weidmann

further testified that ████████████████████████████████████

████████████████████████████   Mr. Weidmann further testified that ████████

████████████████████████████████████████████████

████████████████████████████████████   Similarly, Mr. Trivedi

testified that ██████████████████████████████████████

████████████████████████████████████████████████



────────────────

84 ██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

60

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

150.    Arm also operates a separate database, called Causeway (formerly DropZone), which Arm uses for partner-specific communications and for delivery of partner-specific support materials.  As I explain in more detail below, when Arm provides CPU-specific OOBs and ACK patches to partners, Arm generally does so through this partner-specific database.  For example,

61

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



A0073

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

151.    Additional witness testimony shows this as well.  For example, Mr. Trivedi testified

that ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Mr. Trivedi further testified that ███████████████████████████████████

█████████████████████████████████████████████████ Martin

Weidmann similarly testified that ██████████████████████████████

████████████████████████████████████████████████

██████████████████████

152.    In my experience, technical deliverables being provided through one channel and

by one deliverables team and support being provided through a different channel and by a different,

support team is fairly common.  Thus, Arm's approach of having the UK-based ATG team provide

a centralized delivery of what I would consider technical deliverables (e.g., the Arm ARM and the

ACK), and further having the India-based ACK support team provide technical support materials

(e.g., OOBs and ACK patches) through a different and partner-specific platform is consistent with

my experience.

63

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## X.    THE CPU CORE DESIGN VERIFICATION PROCESS

153.    Before a chip designer incorporates a custom CPU core design into a SoC for use with a product on the market, it is standard practice that the chip designer verifies that its CPU core design is complaint with the architecture.  This architecture compliance verification process is a common practice that is generally followed throughout the industry.

154.    I have completed the design process for CPU cores built on various architectures, including MIPS Corporation ISAs, Texas Instruments ISAs, and other academic open source frameworks for CPU ISA simulation and modeling.  To complete these designs, often times tests were created from scratch or adopted from legacy tests suites targeting prior iterations of the architecture.  Tests would be crafted to exercise portions of the CPU and confirm compliance with the ISA as documented in the ISA specification.  This may be for the design of proprietary closed source ISAs, or in some cases when designing models of publicly available ISA definitions.  ARM's provision of the ACK to its ALA partners provides an off the shelf solution that CPU designers can easily and readily leverage to bring their verification process online while tightly integrating with their particular CPU implementation.

155.    Arm provides tools and support[85] to assist an ALA partner with verification of custom CPU core designs.  I explain this process, and describe these tools and support, in more detail below.

156.    The Arm-Qualcomm ALA contains a ▮▮▮▮▮ provision.  Specifically, ▮▮▮▮ of the Arm-Qualcomm ALA, titled ▮▮▮▮▮ states:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[85]    I understand that ▮▮▮▮ of the Arm-Qualcomm ALA is directed to ▮▮▮▮▮▮ ARM_00055357 at -369–372.  I offer no opinions regarding whether Arm was obligated to provide any of the allegedly withheld support materials under ▮▮▮▮.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ARM_00055357 at -367.

157.

158.

65

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

A.    The Architecture Compliance Kit

159.    As noted above, the verification process described in the Arm-Qualcomm ALA involves the partner (in this case, Qualcomm) running the Architecture Compliance Suite (ACS) of tests that are part of the Architecture Compliance Kit (ACK).

160.    The ACK may be used to help verify the compliance of a partner's custom CPU core design with the Arm architecture. Grisenthwaite Dep. Tr. at 131:14–22. Different major versions of the Arm architecture (*e.g.*, v8 and v9) have a corresponding major version of the ACK.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

ARM_00063298 at -299. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████    QCARM_0343954 at -956. Like the other ███████████████████████    of the v8 (ARM_00063298 at -299–300) and v9 (QCARM_0343954 at -955–957) Annex 1s to the ALA, Arm delivers the v8 ACK and v9 ACK to all ALA partners, including Qualcomm, through a centralized database called Product Delivery Hub (PDH).[86] Weidmann Dep. Tr. at 19:16–20:10, 85:19–86:9, 149:17–150:4. Martin Weidmann, who is part of the Arm Technology Group (ATG group) and is located in the UK, is typically the Arm employee responsible for this. Weidmann Dep. Tr. at 18:11–19:6.

---

[86]    PDH was formerly known as "Arm Connect." Weidmann Dep. Tr. at 20:11–21:13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

161.    The Architecture Compliance Suites (ACS), which is sometimes referred to as the Architecture Validation Suites (AVS), is a suite of tens of thousands of tests called ACK tests. Grisenthwaite Dep. Tr. at 132:7–13, 133:9–13.  These "self-checking tests" correspond to various "features of the [Arm] architecture" and are used to test whether a particular implemented feature in a partner's custom CPU core is Arm architecture compliant.  QCVARM_1072199 at -217; QCVARM_1090346 at -366; *see also* Grisenthwaite Dep. Tr. at 132:14–18; *see also* QCVARM_1072199 at -217; QCVARM_1090346 at -366.  Running an ACK test generates three possible results: pass, fail, or skip.  Trivedi Dep. Tr. at 72:25–73:5; Bhattacharya Dep. Tr. at 31:20–32:7, 43:6–10; George Dep. Tr. at 20:23–21:19.

162.    If the test result is a pass, the partner's implementation of a particular feature is compliant with the Arm architecture.  ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████    When an issue with the ACK test itself is identified, Arm's practice is to

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

163.    Arm makes the Architecture Envelope Model (AEM) available for download with the ACK.  Weidmann Dep. Tr. at 149:17–150:4, 152:24–153:6.  Arm Architecture Envelope Models FVPs are fixed configuration virtual platforms, comprising the ARMv8-A, ARMv9-A and

67

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

ARMv8-R architectures.[87]  They are used for various aspects of compliance testing of the architecture.  As Arm has stated, "The Arm Architecture is the guarantee of software portability," ARMQC_02727610 at -616, and the AEM can be used by an Arm partner to run various ACK software tests on both their own design as well as the AEM to compare that the results of both designs are the same.  The AEM is a model that provides the expected results for a given ACK test, and assists partners in validating the results of their implementation.  Weidmann Dep. Tr. at 83:6–24.

164.    In my experience, other ISA developers did not provide similar tools or tests when I was verifying compliance with other architectures, such as MIPS Corporation ISAs, Texas Instruments ISAs, or other academic open source frameworks for CPU ISA simulation and modeling.  Also, when open source releasing simulation models for SoC designs including programmable and extensible CPU ISAs and related build tools, we did not provide tools and tests for verifying compliance.  Instead, my team and I developed our own compliance tests from scratch, which we ran to assess architectural compliance and verify the core designs.  In some cases, if silicon or simulation technology was available for a given design, that could also be used as part of the verification process in checking the flow of execution and results of the processor state when running various instructions.

## XI.    THE MATERIALS AND SUPPORT THAT QUALCOMM CONTENDS ARM WITHHELD WERE NOT NECESSARY FOR QUALCOMM TO COMPLETE THE VERIFICATION PROCESS

165.    In my opinion, from a technical perspective, the limited materials and support that Qualcomm contends Arm withheld were not necessary for Qualcomm to assess compliance with

---

[87]
https://developer.arm.com/Tools%20and%20Software/Fixed%20Virtual%20Platforms/Arm%20Architecture%20FVPs

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Arm's architecture as a technical matter.[88]  Based on my industry experience and understanding, these support materials are not what I would consider to be deliverables from a technical perspective.  Instead, they are partner-specific support materials that provide extra, but not necessary, assistance to specific partners during the verification process for a particular core.

166.    I understand that Qualcomm alleges Arm withheld OOB packages, ACK patches, and ETE checker support for Qualcomm's Nuvia-based CPUs.  SAC ¶¶ 173–180; Qualcomm's 3rd Suppl. R&O's to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&O's to Arm's 3rd Set of ROGs.  I also understand that, in response to Arm's Interrogatories seeking Qualcomm's basis for alleging Arm breached the Arm-Qualcomm ALA by withholding OOB packages or ACK patches, and Qualcomm's basis for alleging that it was harmed as a result of Arm's alleged withholding, Qualcomm has not identified any specific OOB packages or ACK patches it contends it was entitled to receive, but that Arm did not provide.  *See* SAC; Qualcomm's 3rd Suppl. R&O's to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&O's to Arm's 3rd Set of ROGs.

167.    Qualcomm's experts, Mr. Posner and Dr. Kennedy, have offered opinions regarding these allegedly withheld materials.  For example, Mr. Posner opines:

> Arm failed to provide certain technology related to verifying compliance with the Arm ISA. Arm withheld sets of reference reports, known as the "OOB," providing the specific compliance tests needed by Qualcomm to verify compliance, as well as information on expected test failures that are also used in the verification process. Arm has also withheld replacement tests, known as "ACK patches," that fix defective tests used in the compliance testing process. Arm's failure to provide deliverables, even if remedied, shows that Arm is committed to finding ways of

---

[88]    I have not been asked to opine on, nor do I offer any opinions regarding whether Qualcomm has satisfied its ▮▮▮▮▮▮▮▮▮▮▮ under Section ▮ of the Arm-Qualcomm ALA.

A0080

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

> underperforming its contract, and in so doing degrading Qualcomm's ability to commercialize Arm-compliant products. Finally, Arm's failure to cure and related actions indicate that Arm may be acting in bad faith.

Posner Rpt. ¶ 65 (internal footnotes omitted) (citing SAC ¶¶ 78-80, 81-101; ARM_01241585; QCARM_7484477; ARM_01241565; ARM_01241577; QCARM_7484481; QCARM_7477120; QCARM_7484471; ARM_01241285; Trivedi Dep. Tr. at 89:11-100:7).

168.    Dr. Kennedy opines:

> I understand that Qualcomm claims that Arm breached Section ▮ of the Qualcomm ALA because Arm failed to deliver to Qualcomm certain items that Qualcomm alleges constitute Arm Technology, including Architecture Compliance Kit ("ACK") patches and the OOB (which I understand stands for "out of box"). I understand that the OOB contains a list of ACK tests that enables a licensee to understand which tests it should run on its CPU to avoid generating incomprehensible failures for inapplicable tests. I understand further that the OOB also contains a failure analysis that identifies the cause of test failures and details whether a failure is attributable to an issue within Arm's environment ("AEM," also referred to as Arm reference model) or a defect in the ACK test itself. Qualcomm claims that Arm's failure to provide both the ACK patches and OOB resulted in extra effort that Qualcomm personnel had to spend above and beyond the normal course of operations.

Kennedy Rpt. ¶ 32 (internal footnotes omitted) (citing Trivedi Dep. Tr. at 18, 98–100, 157, 175, 177, 195; Golden Dep. Tr. at 89–91; SAC at 29, 32, 33; Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (nos. 1-9), July 11, 2025, at 8).

169.    For the reasons set forth in this Report, I disagree with Mr. Posner and Dr. Kennedy, and I disagree with their technical assumptions.

170.    During his deposition, Qualcomm's corporate representative regarding Arm's alleged withholding of ALA materials from Qualcomm and regarding Qualcomm's alleged resulting harm, Jignesh Trivedi testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

70

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

171.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████    Mr. Trivedi testified that    ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

172.    In my opinion, OOB packages, ACK patches, and ETE checker support are technical support provided in response to a particular partner's request, rather than technical deliverables made available to all licensees.

A.     **OOB Packages**

173.    I understand that, in response to Arm's Interrogatories seeking Qualcomm's basis for alleging Arm breached the Arm-Qualcomm ALA by withholding OOBs, and Qualcomm's

71

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

basis for alleging that it was harmed as a result of Arm's alleged withholding, ███████████████

████████████████████████████████████████████

*See* SAC; Qualcomm's 3rd Suppl. R&O's to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl.

R&O's to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&O's to Arm's 3rd Set of ROGs. Mr.

Trivedi testified that ████████████████████████████████

████████████████████████████████████████████

████████

174.    I understand that Arm did not provide OOB packages for the ████████████████

████████████████  CPUs because Arm believed that they incorporated unlicensed code

developed by Nuvia prior to the Qualcomm acquisition. *See* Arm's 1st Supp. Resp. to Qualcomm's

1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 9–10 (No. 1); *see also* ARM_01314327. As I

explain in Section XIII below, the evidence supports Arm's determination that these CPUs are

Nuvia-based. *See* § XIII.

### 1.    Contents Of An OOB Package

175.    An OOB package is a partner-specific and CPU core design-specific support

material that, upon request, Arm may generate for an ALA partner during the CPU verification

process. *See, e.g.*, Arm's 1st Suppl. R&O's to Qualcomm's 1st Set of ROGs at 13; Weidmann Dep.

Tr. at 86:23–87:13; Bhattacharya Dep. Tr. at 150:14–18; Trivedi Dep. Tr. at 101:23–102:6. I have

reviewed an exemplary OOB package, which contains two main components: a reference list of

ACK tests and a set of test results from running the listed ACK tests on a reference model called

the Architecture Envelope Model (AEM).[89]  Trivedi Dep. Tr. at 99:3–100:7; Grisenthwaite Dep.

---

[89]    Arm provides the AEM to ALA partners, including QC, as part of the ACK. Weidmann Dep. Tr. at 150:2–4. Qualcomm does not contend that Arm withheld the AEM.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Tr. at 135:9–22; QCVARM_0717964; QCVARM_1042776; QCVARM_1042773; QCVARM_1042780; QCVARM_1042777.

176.    As noted above, the ACK contains tens of thousands of pass-fail-skip tests that test CPU core compliance for various architectural features. *See* § X.A. However, custom CPU cores do not necessarily implement every feature that the Arm architecture enables. An ALA partner may ask Arm to generate a "reference list" that identifies the selection of ACK tests that are relevant to the specific features of that partner's CPU core design. Weidmann Dep. Tr. at 81:10–15; Grisenthwaite Dep. Tr. at 137:19–138:7. Partners provide Arm with a target configuration (targetconfig) file to generate the reference list. Trivedi Dep. Tr. at 32:15–33:14, 99:17–21. In this targetconfig file, the ALA partner identifies the features that the partner's CPU core is implementing. *Id.* Once Arm receives the targetconfig file, ███████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████ █████████████████████████████

177.    As I explain in more detail below, ALA partners, like Qualcomm, can similarly create their own reference list. ████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████

178.    The second main component of the OOB package is a list of test results that are automatically generated when Arm runs the partner-specific, CPU-core-specific OOB reference

---

[90]    Conversation with Vivek Agrawal.

[91]    *Id.*

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

list on the AEM.  Grisenthwaite Dep. Tr. at 135:9–22.  The AEM is a reference "model that embodies the correct behaviors of an implementation."  Grisenthwaite Dep. Tr. at 135:4–8.  Arm runs the reference list on the AEM "to help [Arm] check that [Arm] got that selection list correct." *Id*. at 135:9–22.  As I explained above, in doing so, an ALA partner can observe unintended differences in the results of their own design versus the reference behavior of the AEM.  These ALA partners can then correct their design in terms of the desired behavior.  *See* § X.A.  The AEM test results may help identify ACK tests that failed because of an issue with the AEM or a test defect.  Trivedi Dep. Tr. at 99:3–13; QCVARM_1042777; QCVARM_1042780.  Together, the OOB reference list and the OOB test result list comprise an OOB package, which the ALA partner can use to cross reference its own internally generated reference list of relevant ACK tests and AEM test results.

179.    The OOB package may also contain the targetconfig file provided by the partner, and may contain a "failure_analysis.txt" file that is an "[e]xplanation of known ACK failures on AEM."  QCVARM_0717964.  Along with the OOB package, Arm may also provide additional "documentation" that has already been made available to the partner as part of the ACK user guide, which Arm makes available to partners regardless of whether they request an OOB package or not. Agrawal Dep. Tr. at 30:20–37:20.  For example, Arm may provide a "README" file (QCVARM_1042776) and a "quick_start" file (QCVARM_1042773). QCVARM_0717964.  The "README" file identifies the "contents of OoB," QCVARM_0717964; QCVARM_1042776. The "quick_start" file provides support by assisting partners with step-by-step instructions to guide them through how to use ACK technology that Arm previously delivered by providing "the list of steps to setup, build and run the ACK Kit on ARM's AEM model … in Out-of-Box environment," QCVARM_1042773.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

180.    Arm's UK-based ATG group provides ███████████████ Section █ of the v8 (ARM_00063298 at -299–300) and v9 (QCARM_0343954 at -955–957) ALA Annex 1s to the ALA to all ALA partners through a centralized database called Product Delivery Hub (PDH).[92] Weidmann Dep. Tr. at 18:11–19:6, 19:16–20:10.  By contrast, Arm's India-based ACK support team provides OOB packages to specific ALA partners through a partner-specific portal called Causeway.[93]  Agrawal Dep. Tr. at 57:17–24; Weidmann Dep. Tr. at 158:13–20; Trivedi Dep. Tr. at 111:23–112:2; QCARM_3216178; QCVARM_0717964.

## 2.    OOB Packages Are Support Materials And Are Not Necessary For The Architecture Verification Process

181.    In my opinion, and from a technical perspective, Arm's OOB packages are support materials and not required for a partner to verify that their design complies with the Arm architecture.  Instead, OOB packages, which are sent by Arm's India-based ACK support team through Causeway, provide support that assists a partner with using the ACK verification technology that Arm's UK-based ATG team previously delivered to the partner through PDH.

182.    In my experience, verification can proceed without the equivalent of an OOB package.  An OOB package is a support material that may aid, or provide an off-the-shelf compliance testing framework, but is by no means required for compliance testing of a CPU design.  For example, on multiple occasions in my career, bit-true, cycle accurate implementations of various microprocessor ISA implementations were achieved without the use of an OOB package or similar supporting technology.  By taking the publicly disclosed ISA definition, and a reference CPU implementation either in silicon, or with vendor simulation technology, an implementation

---

[92]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

[93]    Causeway was formerly known as "DropZone."  Weidmann Dep. Tr. at 158:13–20

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

of the microprocessor was created, tested, and shown to be accurate in terms of binary compute and timing.  This new implementation of said microprocessor ISA was used to execute existing, pre-compiled binary executables that were targeted to the initial reference silicon and/or simulator and shown to run correctly in terms of computation and timing.

183.



184.    This testimony is consistent with my understanding and experience.

These companies are able to reference the Arm architecture, the ACK, and complete the verification process as a technical matter on their own.  They have access to Arm's entire suite of ACK tests, which Arm updates every quarter, and they are more than capable of identifying which ACK tests are relevant to the particular features used by their CPU core designs.

185.    As another example, consider the case in which an engineer wishes to test architecture compliance for a 32-bit arithmetic ADD operation.  One way to structure this test would be to initialize various arithmetic operations to be run, such as setting up vectors of input

76

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

operands to be computed on.  The test would also contain a results vector that stores the expected results of the various ADD operations performed over the input vectors.  Once the compliance test is Compiled, Assembled (and possibly Linked if external libraries are used), it would be run on the existing implementation of the target machine.  As the various ADD operations are executed over the input vectors, the result of each ADD operation could be stored in a dedicated CPU register and compared against the reference results vector via a compare instruction.  If the results match, then that particular ADD instruction's execution was correct for those particular input operands.  If instead, the comparison instruction did not show identical values in the result register and that of the test vector, that particular execution of the ADD instruction would be deemed as incorrect.  The engineer could then inspect the resultant value produced by that particular execution of the ADD instruction, with those particular input operands, and begin to analyze the cause of the error.  This is very much in line with my own personal experience in creating various types of unit tests relating to microprocessor design.  In this example, the engineer would not need to be told whether or not it should run this test.  If the engineer designed their CPU using a 32-bit arithmetic ADD operation, the engineer would know that a test regarding the 32-bit arithmetic ADD operation would be relevant and should be run to verify compliance with the architecture.  On the other hand, if the engineer did not design their CPU to use a 32-bit arithmetic ADD operation, the engineer could safely conclude that running a corresponding verification test would not be necessary.

186.    Qualcomm is an example of this.  █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

A0088

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



187.    Further, Qualcomm is capable of generating, and in fact does generate its own "OOB packages" as part of its normal practice.   Jignesh Trivedi, Qualcomm's corporate representative on several OOB-related topics, testified that ███████████████████ ██████████████████████████████████ ██████████████████████████████████ I have seen Qualcomm ███████████████" which Mr. Trivedi testified are ████████████████████████████████████ ███████████   ████████████   ████████████   ████████████ ████████████████████████████

188.    Mr. Trivedi further testified that ██████████████████████ ██████████████████████████████████████ █████████████████████████████████ ████████████████████████████ ████████████████████████

██████████    Qualcomm's use of Arm's OOB as a check to determine whether it correctly generated its own OOB is further evidence that OOBs are partner-specific support materials that assist a partner in using Arm's architecture verification deliverables for a particular CPU configuration.

78

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

189.    I have also seen evidence that, within a day of learning that Arm would not provide an OOB package for Qualcomm's Nuvia-based ██████ CPU, Mr. Trivedi ensured his superiors that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Mr. Trivedi also testified that ███████████

████████████████████████████████████████████████████████

███████████████████

190.    Accordingly, in my opinion, the reference list component of Arm's OOB package is not required to complete the verification process, and is instead a partner-specific support material that assists a partner in using Arm's architecture verification deliverables for a particular CPU configuration.  I have seen no evidence to the contrary.  Instead, Qualcomm can and does generate an OOB reference list on its own, and simply uses Arm's list as a "cross-reference," which is consistent with my personal experience and knowledge of the architectural verification process as a technical matter.

191.    With respect to the second component of the OOB package, in my opinion, Qualcomm can also generate its own AEM test result list without significant extra effort.  As I described above, the AEM is a reference model that is available for download with the ACK.  Weidmann Dep. Tr. at 150:2–4.  Arm made the v8 and v9 ACKs—including each quarterly v8 and v9 ACK release—available for download on PDH. █████████████████████████████

████████████████████████████████████████████████████████

79

**A0090**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

I am not aware of Qualcomm contending that it has not received the AEM.

192.     Thus, in my opinion, Qualcomm has everything it needs to generate its own AEM result list without significant extra effort.  Qualcomm could simply take its internally generated OOB reference list, apply it to the AEM that Arm delivered, and generate an AEM test result list. Arm's corporate representative, Martin Weidmann, testified that ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

193.     As I noted above, Arm may also provide a "failure_analysis.txt" file that is an "[e]xplanation of known ACK failures on AEM" along with an OOB package. QCVARM_0717964.  Mr. Trivedi testified that ████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ However, a "failure_analysis.txt" file is "shipped with the

---

[94]   Product code ██████ corresponds to the v8 ACK.  ARM_00063298 at -299; Weidmann Dep. Tr. at 169:8–20.

[95]   Product code ██████ corresponds to the v8 ACK.  Weidmann Dep. Tr. at 169:8–20.

[96]   Product code ██████ corresponds to the v9 ACK.  QCARM_0343954 at -956; Weidmann Dep. Tr. at 166:8–13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ACK."  QCVARM_0689117.  Mr. Agrawal testified that



This shows that Arm provided Qualcomm, ⬛⬛⬛⬛⬛⬛⬛⬛, with information about AEM failures and limitations, which Qualcomm could have referenced in analyzing its own ACK test results.

194.    Accordingly, in my opinion, Arm's OOB AEM test result list is also not required to complete the verification process.  Instead, the evidence shows that Qualcomm can generate an AEM test result list on its own without significant extra effort.  The evidence also shows that Qualcomm already had access to a list of known AEM limitations and issues, which further indicates that Arm's OOB AEM test result list is not required.  This, too, is consistent with my personal experience and knowledge of the architectural verification process.

195.    I also note that Qualcomm could have completed the verification process for each of its Nuvia-based CPUs by running the full suite of ACK tests against each configuration.  There are three possible ACK test results: pass, fail, or skip.  Trivedi Dep. Tr. at 73:3–9; George Dep. Tr. at 20:23–21:19.  Test skips occur when a test does not correspond to any feature that is present in a partner's CPU.  Bhattacharya Dep. Tr. at 43:6–10; George Dep. Tr. at 20:23–21:19.  Thus, had Qualcomm run the entire ACK suite against their Nuvia-based CPUs, any irrelevant test would have simply shown up as a skip on the test report, and Qualcomm could have disregarded those results.  *Id.*  Running the full suite of ACK tests would have required little additional computing

81

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

power and time.  For example, I have seen evidence showing that ██████████████

████████████████████████████████████████████████████

████████████████ QCVARM_0602258.  I have also seen evidence showing that

████████████████████████████████████████████████████

██████████ QCVARM_0602295.  This is a minimal amount of testing time, in my experience.

An OOB reference list—whether created by Arm or by Qualcomm—would not be necessary for

this process.

196.    I have seen additional evidence that supports my opinion.  Documents and

testimony show that Arm and Qualcomm ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ QCARM_3216178.  In

the same email chain, Mr. Agrawal explains that ████████████████████████

████████████████████████ *Id*. at -184; *see also* ████████

████████████████████████████████████████████████████

████████████████████████████ Mr. Agrawal also notes that ████

████████████████████████ *Id*.

197.    As another example, in a 2022 email chain between Mr. Agrawal and Mr. Trivedi,

████████████████████████████████████████████████████

QCARM_3066477.  Including Arm's support email on communications is one of the ways

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ In the same email chain, Mr. Trivedi ████

████████████████████████████████████████████████████

82

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████████████████

████████████████████████████████████████████ ).

198.    In contrast, I have seen evidence that Arm communications regarding the delivery of the ACK itself are sent from a different Arm email.  *See*, *e.g.*, QCVARM_0613083 at -083–084

( ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████ ).

199.    As another example, Mr. Agrawal sends ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████ ████ ████ ███ ██ ████████████ ██████████

████████ ██████████ ████████████ ██████████

████████████

200.    Further, Mr. Trivedi's testimony consistently associated Mr. Agrawal and OOB packages with support.  For example, Mr Trivedi agreed that ██████████████████

██████████████

        ██ █████████████████████████

        ████████████

████████████████████

201.    As another example, ████████████████████████████████

██████████████████████████████████████████████████████████████

83

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Additional testimony from Mr. Trivedi bolsters my opinion. *See, e.g.*, 10/25/2023 Trivedi Dep. Tr. at 46:3–5 ("Q. Who on the Arm side was working to **support** NuVia in this effort? A. It was Vivek Agrawal").

202.    Arm witnesses have also consistently testified that ██████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████

203.    Accordingly, in my opinion, Arm's OOB packages are support materials, are not required to run the ACK, and are not required to complete the architecture verification process. Further, in my opinion, Qualcomm is capable of generating the two main components of the OOB package (and in fact did generate those components) on its own.  Regardless, Qualcomm could have completed the verification process by running the full suite of ACK tests against their custom CPUs with minimal additional computing effort.  My opinion is further supported by evidence showing that both Arm and Qualcomm considered OOB packages to be support materials.

**B.    ACK Patches**

204.    I understand that, in response to Arm's Interrogatories seeking Qualcomm's basis for alleging Arm breached the Arm-Qualcomm ALA by withholding ACK patches, and Qualcomm's basis for alleging that it was harmed as a result of Arm's alleged withholding, Qualcomm has not identified any specific ACK patches it contends it was entitled to receive, but that Arm did not provide.  *See* SAC; Qualcomm's 3rd Suppl. R&O's to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&O's to Arm's 3rd Set of ROGs.  Mr. Trivedi testified that ████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

84

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



█████████████ However, Mr. Trivedi ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████ However, Mr. Trivedi estimated that ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

205.    I understand that Arm did not provide interim ACK patches for the ████ ████████████████████████ CPU cores because Arm determined that they are derived from what Arm believed to be unlicensed Nuvia developments.  *See* Arm's 1st Supp. Resp. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 9–10 (No. 1); *see also* ARM_01314327.  However, as I explain further below in this Report, Arm *did* still provide Qualcomm with the fixes to ACK test issues that were identified by incorporating the fixes into the next quarterly ACK release that Arm made available to all ALA partners, including Qualcomm.  As I explain in Section XIII below, the evidence supports Arm's determination that these CPUs are Nuvia-based.  *See* § XIII.

### 1.    ACK Patches Generally

206.    As I previously explained, the ACK includes a suite of tens of thousands of pass-fail-skip tests that test architectural compliance for various CPU features.  *See* § X.A.  Occasionally, issues arise with one or more ACK tests that should be fixed.  Arm's practice is to

████████████████████████████████████████████████████████████████████

---

[97]   As I discuss in Section XII.A.2, below.  I have seen evidence suggesting this figure likely overestimates the number of actual ACK test issues that occurred during this time.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

207.    I have seen evidence that, during the relevant period,[98] Qualcomm had access to the v8 and v9 ACK, including each quarterly v8 and v9 ACK release, via PDH.[99] █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████    I am not aware of Qualcomm contending otherwise.

208.    █████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████    The fixes that are incorporated

---

[98]    I understand that Qualcomm contends that the alleged withholding period is from May 2022, when Qualcomm contends Arm allegedly began withholding materials from Qualcomm, through January 8, 2025, which is the date that Arm sent a letter to Qualcomm stating that █████████████████████████████████ pending certain litigation between the parties.  *See* Qualcomm's Second Supplemental Responses and Objections to Arm's Second Set of Interrogatories (Nos. 10-13), July 11, 2025 at 22 (Qualcomm Response to Interrogatory No. 13); Arm's First Supplemental Reponses and Objections to Qualcomm's First Set of Interrogatories (Nos. 1-3), July 11, 2025 at 10–11 (Arm Response to Interrogatory No. 1).

[99]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

[100]    █████████████████████████████████████████████

█    ████████████████████████████████████

█    █████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

into the quarterly ACK releases are provided to all ALA partners via PDH.[103]  Weidmann Dep.

Tr. at 90:6–17. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ Unlike those materials, Arm provides ACK patches

███████████████████████████████████████████████████ █  Weidmann Dep.

Tr. at 90:18–91:5; Trivedi Dep. Tr. at 112:3–6. ███████████████████████████

███████████████████████████████████████████████████ Weidmann

Dep. Tr. at 18:11–19:6.  Unlike those materials, ACK patches are generally provided by Arm's

India-based support team via Causeway.    Agrawal Dep. Tr. at 11:7–11, 158:18–159:14;

12/14/2023 Agrawal Dep. Tr. at 14:16-15:4; QCARM_3216178.

209.    In my opinion, ACK patches are not new or additional ACK tests.  Instead, they are

interim corrections to existing tests.  Bhattacharya Dep. Tr. at 46:4–9.  But they do not create new

tests.  This is consistent with my understanding.  At a number of points in my career I have worked

with various types of unit tests and compliance tests.  Oftentimes, when creating a new test for a

new piece of functionality, an existing test was copied and altered to support the functionally.  This

then allowed the newly copied test to be quickly integrated with the test harness and environment,

outputting results in a manner identical to similar existing tests (such as self-testing), with a

minimal amount of software engineering effort.    Creating a new test for new functionality,

however, is different from correcting an error in an existing verification test.  ACK patches are not

new or additional tests; they are corrections to errors in existing tests, and as I explained above,

---

[103]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

[104]    Causeway was formerly known as "DropZone."  Weidmann Dep. Tr. at 158:13–20

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Arm includes these corrections in the quarterly ACK release that Arm provides to all ALA partners through PDH.

### 2. ACK Patches Are Support Materials And Are Not Necessary For The Architecture Verification Process

210. In my opinion, and from a technical perspective, ACK patches are support materials and not required for a partner to verify that their design complies with the Arm architecture as a technical matter. Instead, ACK patches, which Arm's India-based ACK support team sometimes provides to particular partners as a curtesy by through Causeway, provide an interim solution to an ACK test fix that Arm provides to all partners through quarterly ACK releases sent by Arm's UK-based ATG team through PDH.

211. As noted above, Arm generally incorporates ACK test fixes for each verified ACK test issue into subsequent quarterly ACK releases. Weidmann Dep. Tr. at 90:6–17; Bhattacharya Dep. Tr. at 50:13–18. During the period of Arm's alleged withholding, Arm continued to



212. Further, Qualcomm had access to each quarterly ACK release, which Qualcomm does not dispute. *Id.*; ARMQC_02604616; ARMQC_02779171; ARMQC_02779176; ARMQC_02779181. Accordingly, in my opinion, the delivery of an interim, courtesy ACK patch

88

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

was not required as a technical matter—Qualcomm had access to each ACK test fix for its legitimate ACK test issues in the subsequent quarterly ACK releases, which Qualcomm received at the same time as Arm's other ALA partners.

213.    I understand that Qualcomm contends it could not utilize the fixes in the quarterly ACK releases because ███████████████████████████████████████████████ ████████████████████████████████████████████ Trivedi Dep. Tr. at 94:15–97:22.  I understand that Qualcomm also contends ██████████████ ██████████████████████████████████████ *Id*. at 96:7–97:22. I disagree.

214.    In my opinion, Qualcomm could have moved from one quarterly release of the ACK to the next with minimal effort.  To start, Mr. Trivedi admits that ████████████ ███████████████████████████████ *Id*.  In fact, Mr. Weidmann testified that ███ ████████████████████████████████████████████████████████████ █████████████████████████████████

215.    Further, as I noted above, Qualcomm is a sophisticated company with a team of engineers working on the verification process.  Qualcomm is more than capable of quickly transitioning from one quarterly release of the ACK to the next.  I have seen evidence showing that Qualcomm was able to run ACK tests quickly.  For example, I have seen evidence showing that ████████████████████████████████████████████████████ ████████████████████████████████ QCVARM_0602258.  I have also seen evidence showing that ██████████████████████████████████ QCVARM_0602295.  This is a minimal amount of testing time, in my experience.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

216.    Moreover, in my experience, transitioning from one release of an ACK or similar compliance or testing framework to a newly updated version is merely an exercise in downloading and installing the new release, and re-running the compliance suite.  For example, to update to the latest software release, one would typically either download from a website, or use various version management tools such as Git, Subversion, CVS etc., to download the latest compliance or test suite.  Once downloaded, a user would either manually copy the compliance tests and tools to the appropriate directory, or use an installer program that comes with the update to automatically install on the target machine.

217.    Oftentimes, this is one of the first few tasks an engineer performs when starting a new position within a company, or if getting a new work machine that must be set up from scratch. In my experience, such compliance tests and tools often come with installation documentation in the form of a README.txt file or similar instructions.  In the case of tests and tools that my team and I may have created ourselves, documentation was created and often times put in an internal corporate Wiki type solution where other engineers could access it to install and update their compliance tests as needed.   In either case, the entire process could be performed by a junior engineer, and may only take at most a couple of hours often while the engineer could be working on other tasks in parallel.

218.    Further, Arm's quarterly ACK releases included the fixes for the ACK test issues that were identified during that quarter, including for any ACK test issues that Qualcomm identified.  Weidmann Dep. Tr. at 122:8–123:2.  Accordingly, in my opinion, moving to the new ACK release would have been trivial for a sophisticated company like Qualcomm, it would have addressed Qualcomm's ACK test issue concerns, and it would have further negated any alleged need for an ACK patch.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

219.    Further, in my opinion, even if Qualcomm did not move to a new quarterly release of the ACK, it could have selected only the relevant fixed ACK tests from the latest quarterly ACK release and retroactively applied those fixed tests to the release of the ACK that Qualcomm was using.  Arm's quarterly ACK releases are accompanied by release notes that identify sections of the ACK that have been updated to address ACK test issues.  *See*, *e.g.*, ARMQC_02761714 (exemplary, 45-page Armv9-A Architecture Compliance Kit Release Note); Conversation with Vivek Agrawal.  For example, the ████████████████████████████ includes information that Qualcomm could have used to understand what changes were made in the latest ACK release, including a chapter titled "Release information," and another chapter titled "Change history," which documents changes such as "Test updates."  ARMQC_02761714.  In my opinion, a sophisticated partner, like Qualcomm, would have been able to use these release notes to confirm their reported ACK test issues had been resolved.  Also, in my opinion, Qualcomm would have been able to locate and identify the specific fixed ACK tests.  Qualcomm could have then run these specific ACK tests against their CPU core configurations, and assessed CPU core compliance for the features those tests targeted.  This would have negated any alleged need for an Arm-provided ACK patch and it further supports my opinion that ACK patches are not required to complete the architecture verification process.

220.    Further, Arm continued to provide quarterly ACK releases to ████████████ including Qualcomm, during the relevant period, Weidmann Dep. Tr. at 122:8–123:2, and

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

91

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████ In my opinion, this is further

evidence that Arm ACK patches are not required for completing the architecture verification

process and are instead support materials.

221.    ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████ These companies are able to reference the Arm architecture, the ACK, and the

associated user guides and documentation to complete the verification process on their own.  They

have access to Arm's entire suite of ACK tests, which Arm updates every quarter.

222.    I have seen evidence suggesting that Qualcomm did in fact address what Qualcomm

considered to be ACK test issues during the period of Arm's alleged withholding of ACK patches.

For example, Mr. Trivedi estimated that ██████████████████████████████████

██████████████████████████████████████████████████████████████

██████ As I explain in detail below, in my opinion, this is likely an overestimate.  *See* § XII.A.2.

Regardless, Mr. Trivedi further testified that, ██████████████████████████████

██████████████████████████████████████████████████████████████

████████████

██████████████████████████████████████████

92

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



223.    Jeff Golden, a hardware engineer at Qualcomm who was involved in the custom

core architectural verification process, testified that ███████████████████████████

████████████████████████████████████████████

224.    Mr. Golden also testified that ████████████████████████████

████████████████████████████████████ Mr. Golden further testified that ███████████

93

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

███████████ Mr. Golden testified that ████████████████████████████

████████████████████████████████████████████████████████████████

███

225.    This is consistent with my understanding and experience.  As I noted above, Qualcomm is a sophisticated company with a team of verification engineers.  In my experience, developing compliance-test fixes or otherwise overcoming compliance-test issues is well within the wheelhouse of an architectural verification engineer, and often takes minimal additional effort, as these witnesses testified.  For example, numerous times in my career I have generated and run self-made architectural compliance tests.  This has included tests that were to be run in isolation, that is outside of any pre-existing framework, as well as those that were to be run within an existing compliance framework.  On many occasions this process would entail either writing a piece of source code from scratch, or copying of an existing compliance test and altering the logic and functionality of the test to perform a new compliance test.  In most cases, these tests comprised Assembly or low level C programming language code.  As I discussed earlier in Section VIII.A.2, in relation to the simple 32-bit *ADD* instruction example, the test was often times comprised of a set of input data vectors, and an output results vector.  The results of executing the 32-bit *ADD* instruction over various input operands were compared against the known results vector.

226.    In the case of a pre-existing compliance test framework, if I or my engineers wanted to add said test to the full compliance framework, we would either manually enter the new test into the existing set of master tests, or in the case of larger industry compliance testing whereby we had dedicated compliance testing engineers, I would email the source code and results for the test for them to insert into a master compliance test list.

94

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

227.    The evidence suggests that Qualcomm was able to quickly address ACK test issues on their own.  This would have negated any alleged need for an interim, Arm-provided ACK patch prior to Arm's quarterly releases.

228.    Arm witnesses have consistently testified that ████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
█████████████████████████

███████████████████████████████████████████

229.    As another example, Aparajita Bhattacharya, Arm's senior director of engineering, testified that ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████ In fact, Ms. Bhattacharya testified that ████████████████████████████████████

230.    As another example, Mr. Agrawal testified that ████████████████████
███████████████████████ and Mr. Grisenthwaite testified that ██████████████
████████████████████████████████████████████████████████████
Mr. Grisenthwaite also testified that ████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████ Another Arm verification engineer, Anupa George, testified that ████████████████████████████████████████

95

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

███████████████████████████████████ This is consistent with my understanding and my opinion.

231.    I have also seen additional evidence that supports my opinion.  Documents and testimony show that Arm and Qualcomm considered ACK patches to be support materials.  For example, in a 2020 email between Mr. Agrawal and Mr. Trivedi, ████████████████████

████████████████████████████████████████████████

QCARM_3216178.  In the same email chain, Mr. Agrawal explains that ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Mr. Agrawal also notes that ████████████████████████████████████

QCARM_3216178 at -184.  This is consistent with my opinion and understanding—what Mr. Agrawal's team provides to ALA partners, including ACK patches, are support; they are not technically necessary for the partner to complete the architecture verification process.

232.    In contrast, I have seen evidence that Arm communications regarding the delivery of the ACK itself are sent from a different Arm email.  *See*, *e.g.*, QCVARM_0613083 at -083–084

(████████████████████████████████████████████

████████████████████████████████████████████████

███████).

233.    As another example, in a 2022 email chain between Mr. Agrawal and Mr. Trivedi,

████████████████████████████████████████████████

QCARM_3066477 at -477–478.  ████████████████████████████████

████████████████████████████████████████████████

96

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████████

██████████████████████████████████ In the same email chain, Mr. Trivedi

██████████████████████████ QCARM_3066477; *see also* Trivedi Dep. Tr. at

122:2–14 (████████████████████████████████████████

████████████████████████████████████████████████).

234.    As another example, Mr. Agrawal sends ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████  ██████  ██████  ████  ███  ███████████  █████████████

████████████  ██████████████  ██████████████  █████████████

████████████

235.    Further, Mr. Trivedi's testimony consistently characterized what Mr. Agrawal

provides, including ACK patches, as support.  For example, Mr. Trivedi testified that ███████

███████████████████████████████████████████████████

██████████ Mr. Trivedi also agreed that █████████████████████████████

███

             ██████████████████████████████████████████

             ███████████████████████

████████████████

236.    As another example, ██████████████████████████████████

██████████████████████████████████████████  ████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Additional testimony from Mr. Trivedi further supports my opinion. *See*, *e.g.*, 10/25/2023 Trivedi Dep. Tr. at 46:3–5 ("Q. Who on the Arm side was working to **support** NuVia in this effort? A. It was Vivek Agrawal.").

237.    Arm witnesses have also consistently testified that ███████████████



238.    In addition, ████████ of the Arm-Qualcomm ALA is titled ████████ ███████████████ ARM_00055357 at -369–372.  I do not offer any opinions regarding any rights or obligations under the ALA, including whether ACK patches are covered by the ███████████ ███████████████ Qualcomm's corporate representative, Mr. Jonathan Weiser, however, testified that ███████████████

98

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



239.    Further, Mr. Trivedi testified ███████████████████████████████

240.    Qualcomm's corporate representatives' testimony that correcting errors to the ACK

is a ████████████████ function further bolsters my opinion that, from a technical

99

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

perspective, ACK patches are support materials that are not necessary to complete the verification process and are not what I would expect to be a deliverable as a technical matter.

241.    Accordingly, in my opinion, ACK patches are support materials.  Further, in my opinion, Qualcomm was capable of using subsequent quarterly ACK releases, which incorporated fixes for each Qualcomm-identified ACK test issue, during the architecture verification processes for the Nuvia-based cores.  No one forced Qualcomm to use an old version of the ACK for verification—that was Qualcomm's choice alone.  Even if Qualcomm did not move to the most recent quarterly ACK releases, Qualcomm was capable of identifying and selecting the relevant fixed ACK tests from those quarterly ACK releases.  Qualcomm could use those specific fixed tests to run additional compliance tests against their configurations.  In my opinion, Qualcomm also could have developed their own interim ACK test fixes for ACK test issues (that were resolved with Arm's provision of the next quarterly ACK release).  This is further evidence that, from a technical perspective, ACK patches are optional support materials that Arm may choose to provide as a courtesy.  My opinion is further supported by evidence showing that both Arm and Qualcomm considered ACK patches to be support materials.

**C.    ETE Checker Support**

242.    I understand that Qualcomm contends Arm withheld support for configuring the Embedded Trace Extension (ETE) checker[105] for the Nuvia-based ██████████ CPU cores, starting in May 2024, though it is not clear what support Qualcomm alleges was withheld. Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13, 18, 47; Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs at 22–23; Qualcomm's 1st Suppl. R&Os to Arm's 3rd Set of

---

[105]    The ETE checker is also known as the ETE instruction trace checker.  QCARM_0343954 at -956; Golden Dep. Tr. at 38:11–17.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ROGs at 24–25; Golden Dep. Tr. at 49:14–50:11; Trivedi Dep. Tr. at 132:14–134:4, 254:22–255:4; QCVARM_0618712.  I understand that Qualcomm does not contend that Arm withheld the ETE checker itself, nor does Qualcomm contend that Arm withheld any ACK patches relating to the ETE checker.  I have not seen Qualcomm clearly explain whether its Nuvia-based CPU cores implement the ETE trace feature.

243.    As I explain below, in my opinion, Arm provided some ETE checker support to Qualcomm and Qualcomm had the materials it needed to configure the ETE checker.  However, I also understand that Arm did not provide certain additional ETE checker support for the ███████ ████████ CPU cores because Arm determined that they are derived from what Arm believed to be unlicensed Nuvia developments.  *See* Arm's 1st Supp. Resp. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 9–10 (No. 1); *see also* ARM_01314327.  As I explain in Section XIII below, the evidence supports Arm's determination that these CPUs are Nuvia-based. *See* § XIII.

### 1.    The ETE Trace Function And The ETE Checker

244.    The ETE trace function is an optional Arm v9 architecture feature that a partner may choose to implement for their custom CPU cores.  Trivedi Dep. Tr. at 142:24–143:4, 143:19–144:2, 144:4–13.  The ETE trace feature enables advanced instruction tracing for debugging, performance analysis, and software validation.[106]    The Arm v9 ACK, which Arm provided to Qualcomm, contains specific ACK tests that test ETE trace compliance.  Trivedi Dep. Tr. at 142:14–22; Golden Dep. Tr. at 57:7–23.

---

[106]    *See* https://developer.arm.com/documentation/102856/0100/Embedded-Trace-Extension

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

245.    The ETE checker is a verification tool that helps verify that a CPU's implementation of the ETE trace feature complies with the Arm v9 architecture.  Trivedi Dep. Tr. at 142:14–22.

246.    

Like the ████████████ of the v8 (ARM_00063298 at -299–300) and v9 (QCARM_0343954 at -955–957) ALA Annex 1s to the ALA, Arm made the ████████████ available for Qualcomm to download (as part of the v9 ACK) via PDH.[107]  Weidmann Dep. Tr. at 90:6–17.

247.    I have seen evidence that Qualcomm had access to the v9 ACK, including each quarterly v9 ACK release, via PDH.  *Id*.; ████████████

████████████ I am not aware of Qualcomm contending it did not receive the quarterly release of the v9 ACK.  Qualcomm's witnesses ████████████

████████████ Further, Qualcomm does not contend that Arm withheld ETE trace-specific ACK tests.  Golden Dep. Tr. at 57:7–23.

248.    The exact ETE checker support Qualcomm contends it did not receive is vague and difficult to interpret.  It appears that Qualcomm contends it did not receive ████████████

████████████.  I understand that Qualcomm points to an email exchange between Mr.

---

[107]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

[108]    Product code ████ corresponds to the v9 ACK.  QCARM_0343954 at -956; Weidmann Dep. Tr. at 166:8–13.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Agrawal and Mr. Trivedi as evidence of this.  QCVARM_0618420.  In that email, █████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

**2.    ETE Checker Support, Such As █████████████████████, Is Support And Is Not Necessary For The Architecture Verification Process**

249.    In my opinion and from a technical perspective, the support that Qualcomm requested from Arm regarding configuring the ETE checker support, such as ██████████ ███████████████, is support and is not required to complete the verification process, nor is it required to implement the ETE trace feature.  I have seen several pieces of evidence that support my opinion.

250.    To start, ETE checker support that Qualcomm requested, as the name implies, is support.  I understand that Qualcomm frequently describes it as such.  *See, e.g.*, Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13 ("Qualcomm has also made repeated requests to Arm for ***assistance*** in configuring the ETE Checker and was not provided with any ***support***…"), 47 ("Additionally, Qualcomm made repeated requests to Arm for ***assistance*** in configuring the ETE Checker and was not provided with any ***support***…"), QC's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 22 ("In addition, Arm refused to provide ***support*** to allow Qualcomm to configure the

103

**A0114**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ETE Checker, a component of the ACK licensed by Qualcomm for Armv9 … because Arm refused to provide any ***support*** for configuring the ETE Checker, Qualcomm could not use it for testing compliance with the ETE feature."), 23 (noting that Arm failed "to provide ***support*** for the ETE Checker"); QC's 1ˢᵗ Suppl. R&Os to Arm's 3ʳᵈ Set of ROGs at 24 ("Additionally, Qualcomm made repeated requests to Arm for ***assistance*** in configuring the ETE Checker and was not provided with any ***support*** …").

251.    Qualcomm's witnesses have also testified that ████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████████████████████████

252.    Arm's witnesses have also consistently described ETE checker support as support.
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████

104

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

253.    The above evidence supports my opinion that ETE checker support is support.  It is not required to complete the architecture verification process, including because Qualcomm had everything it needed, as I explain below.

254.    Qualcomm was able to complete the verification process for its Nuvia-based ▉▉▉▉▉▉▉▉▉ CPU cores without the ETE checker support it alleges Arm withheld. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ In my opinion, this is further evidence that Arm ETE checker support is not required for completing the architecture verification process and is instead optional support.

255.    As noted above, it is unclear whether Qualcomm released its cores with or without the ETE trace feature enabled.  Regardless, in my opinion, Qualcomm had everything it needed to implement the ETE trace feature, and Arm provided ETE checker support to Qualcomm during the relevant period.  I explain this in detail below.

256.    ETE trace is an optional feature that a partner may choose to implement, but is not required to implement, in its CPU core designs.   For example, Mr. Trivedi testified that



**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████ This further supports my opinion that ETE checker support is an optional feature and not needed to complete the architecture verification process. Indeed, implementing the ETE trace function is not even required.

257. I also understand Qualcomm contends that, as a result of Arm's alleged withholding of ETE checker support, Qualcomm ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ However, Qualcomm does not dispute that Arm delivered all ACK tests related to the ETE trace feature, nor does Qualcomm dispute that Arm delivered the ETE checker.

258. In my opinion, Qualcomm had everything it needed to use the ETE checker. As noted above, Qualcomm had access to the v9 ACK (and each subsequent quarterly ACK release), which contained the full suite of ACK tests, including those directed to testing compliance for the ETE trace feature. *See supra* § IX.B.2. Qualcomm also had access to the ETE checker, which is made available for download along with the ACK. *See supra* § IX.B.2. Qualcomm also had access to all ACK-related documentation, including documentation regarding configuring the ETE checker. QCVARM_0618977 at -978; *see, e.g.*, QCVARM_1078822. As I explained, Qualcomm is a sophisticated company with sophisticated verification engineers. Qualcomm is able to reference the Arm architecture, the ACK, and the associated user guides and documentation to complete the verification process—including the ETE checker compliance process—on its own. Mr. Agrawal testified that ████████████████████████████████████ ████████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████ Thus, Arm's ETE checker support is not required.

259.     Regardless, I have seen evidence suggesting that Qualcomm did in fact receive ETE checker support from Arm.  For example, ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

260.     This is consistent with my understanding and Mr. Agrawal's testimony.   The evidence shows that the ETE checker "support" Mr. Agrawal provides is simply pointing Mr. Trivedi back to materials Mr. Trivedi already has.  Indeed, as Mr. Agrawal testified. ███████

████████████████████████████████████████████

█████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

██████████████████████ Mr. Agrawal further testified that █████████████████

████████████████████████████████████████████

107

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████

261.    I understand that Qualcomm points to an email exchange between Mr. Agrawal and Mr. Trivedi as evidence of Arm allegedly failing to provide ETE checker support. QCVARM_0618420. In my opinion, this email exchange shows that Mr. Trivedi did receive some support from Mr. Agrawal, and Mr. Trivedi already had the information that he needed. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████

262.    When questioned about QCVARM_0618420, Mr. Agrawal testified that █

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

████████████████████ Mr. Agrawal testified that, ████████████████████

████████████████████████████████████████████

263.    Mr. Agrawal responded to Mr. Trivedi's ETE checker questions via email in January 2025. QCVARM_0618420 at -420–422. Once again, as Mr. Agrawal testified, ██████

████████████████████████████████████████████

108

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



In fact, looking at the document shows that Mr. Agrawal was pointing Mr. Trivedi to the same "Armv9-A_ETE_BRBE_Compliance_Kit_User_Guide" that Mr. Agrawal pointed Mr. Trivedi to in 2023.  QCVARM_0618420 at -420–422; ARM_01020098; QCVARM_0618977 at -978; *see, e.g.*, QCVARM_1078822.

264.    Additional testimony supports my opinion.  Mr. Agrawal testified that

Mr. Agrawal further testified that

For example, one of

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

*Id.* I have reviewed a version of the ETE user guide. The sections Mr. Agrawal points Mr. Trivedi to do in fact answer Mr. Trivedi's question. QCVARM_1078822 at -850–851, -857–858.

265. Accordingly, in my opinion, ETE checker support is not required to run the ACK, not required to configure the ETE checker, and is not required to complete the architecture verification process for the optional ETE trace feature. Further, in my opinion, Qualcomm had all of the necessary materials and documentation to configure the ETE checker on its own. My opinion is further supported by evidence showing that both Arm and Qualcomm considered ETE checker support to be support.

## XII.   QUALCOMM'S CLAIMS OF HARM

266. As noted above, I understand that Qualcomm contends Arm withheld OOB packages, ACK patches, and ETE checker support for Qualcomm's Nuvia-based CPU cores. § X.I. In my opinion, these are optional support materials that are not required to complete the architecture verification process. § X.I.

267. I also understand Qualcomm contends that, due to Arm's withholding of OOB packages and ACK patches, its "burden in verification" was "increased" and it had to "expend extra time and resources" to complete the architecture verification process. SAC ¶¶ 95–101, 173–180; Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 7–20; Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 20–26; Trivedi Dep. Tr. at 33:17–21, 156:2–157:8, 172:1–178:9, 193:7–12; Golden Dep. Tr. at 82:20–85:18, 89:22–90:10, 91:6–19, 95:5–10. Specifically, Qualcomm contends that, "[b]y failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA." SAC ¶ 96. Qualcomm further contends that, "by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches … ." *Id.* ¶ 97.

110

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

268.    I also understand Qualcomm contends it was harmed due to Arm's alleged failure to provide ETE checker support.  Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13, 18, 47; Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 22–23; Qualcomm's 1st Suppl. R&Os to Arm's 3rd Set of ROGs at 24–25; Golden Dep. Tr. at 50:3–11.  Specifically, Qualcomm contends that it had to "expend additional engineering effort to verify its custom cores" due to Arm's alleged failure to provide "assistance in configuring the ETE Checker."  Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13, 18.

269.    Further, I understand Qualcomm contends it was harmed by Arm's alleged failure to provide OOB packages and ACK patches because of the ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

270.    I understand Qualcomm's witnesses have further contended that ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ Qualcomm has not described this

██████ theory of harm in any detail, it is not present in Qualcomm's Second Amended Complaint,

111

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

and it is mentioned in a single sentence in Qualcomm's Interrogatory responses. *See* SAC; Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 23–24. Qualcomm's corporate representative for architecture verification effort topics, Jignesh Trivedi, testified that ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ One of Qualcomm's engineers, Jeff Golden, testified that ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████

271.    As noted above, OOB packages and ACK patches are not required for a partner to verify that their design complies with the Arm architecture, but are instead support materials that, in some circumstances, Arm may provide to a requesting ALA partner. *See* §§ XI.A and XI.B. Further, as noted above, Qualcomm had everything it needed to use the ETE checker, and Arm provided support for using the ETE checker. *See* § XI.C. In my opinion, Qualcomm performed minimal "extra" work, if any, compared to if Arm had provided the allegedly withheld support (which, as Arm's witnesses testified, were provided as a "courtesy," and not as the usual practice *see* § XI.B). Also, in my opinion, any ████████████ to Qualcomm, to extent it exists, was due to Qualcomm's actions, not Arm's. Further, in my opinion, Qualcomm's alleged harm due to ██ ████ to the extent it can be understood, was not caused by Arm's alleged withholding of OOB packages, ACK patches, or ETE checker support.

**A.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of OOB Packages, ACK Patches, And ETE Checker Support**

272.    As noted above, Qualcomm alleges it had to expend additional time and resources due to Arm's alleged withholding of OOB packages, ACK patches, and ETE checker support. *See*

112

A0123

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

*supra* § XII.  I disagree.  In my opinion, Qualcomm's alleged "extra" work, if any, was minimal and was more typical of the type of work that is generally performed during the architecture compliance verification process.

273.   As an initial matter, despite claiming that it had to expend "extra" efforts as a result of Arm's alleged withholding, Qualcomm has not described its architecture compliance verification efforts from before the alleged withholding period in response to Arm's interrogatories, and I understand that Qualcomm has refused to produce documents in response to Arm's requests for production seeking documents showing these pre-alleged withholding period efforts.  *See, e.g.*, Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 20–26; Qualcomm's R&Os to Arm's 1st Set of RFPs at 4; Qualcomm's R&Os to Arm's 2nd Set of RFPs at 4–5; Qualcomm's R&Os to Arm's 3rd Set of RFPs at 4–5, 37–39; Qualcomm's R&Os to Arm's 4th Set of RFPs at 5; Qualcomm's R&Os to Arm's 5th Set of RFPs at 4–5; *see also* 05/28/2025 Meet and Confer at 92:13–103:18.  I reserve the right to supplement my opinions should Qualcomm produce this information.

274.   Based on my review of the evidence, in my opinion, any "extra" work that Qualcomm had to perform based on Arm's alleged withholding of OOB packages, ACK patches, and ETE checker support was minimal and is typical of the work expected during an architecture compliance verification process.

275.   For example, Qualcomm' witnesses have testified that 

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

276.    Further, as I explained above, ██████████████████████████████

277.    The fact that Qualcomm was able to complete the verification process for its Nuvia-based CPU cores (which it contends Arm withheld support materials for) on time or ahead of schedule and without hiring additional employees supports my opinion that the alleged extra work that Qualcomm claims it performed was minimal.

278.    As explained below, additional evidence and testimony supports my opinion.

### 1.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of OOB Packages

279.    I understand Qualcomm contends that, "[b]y failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA."  SAC ¶ 96.  As explained above, the OOB package contains two main components: a reference list of ACK tests and a set of test results from running the listed ACK tests on a reference model called the Architecture Envelope Model (AEM).[109]  Trivedi Dep. Tr. at 99:3–100:7; Grisenthwaite Dep. Tr. at 135:9–22; QCVARM_0717964;

---

[109]    Arm makes the AEM available to ALA partners, including QC, with the ACK.  Weidmann Dep. Tr. at 150:2–4.  Qualcomm does not contend that Arm withheld the AEM.

114

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

QCVARM_1042777.  In my opinion, Qualcomm performed minimal "extra" work, if any, due to Arm's alleged withholding of OOB packages.  I have seen several pieces of evidence that support my opinion.

280.    As I explained above, Qualcomm is capable of generating, and in fact does generate, its own "OOB packages" as part of its normal practice.  For example, Mr. Trivedi testified that ███████████████████████████████████████████████████████ ████████████████████ ███████████████████████████████████ ██████████████ In fact, ███████████████████████████ ███████████████████████████ ███████████████████████████████████████ ███████████████████ ████████████████ ███████████████████ ██████████



281.    Further, Arm and Qualcomm witnesses have testified that generating the OOB reference list takes minimal effort.  For example, Mr. Grisenthwaite testified that ██████████ ██████████████████████████████████ █████████████████████████████ ██ ████████████████████

282.    As another example, Mr. Agrawal testified that ████████████████████████ █████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



283.    Mr. Trivedi testified that

284.    I have also seen evidence that,

285.    Further, in my opinion, Qualcomm could have leveraged previously provided Arm OOB reference lists for Qualcomm's various Nuvia-based CPU core designs.

116

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ ██ ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ I agree that a sophisticated company, like Qualcomm, would be able to easily implement these OOB reference list changes on their own or at a minimum would have been able to leverage the OOBs that Arm previously delivered for the earlier Nuvia-based designs.

286.    I have seen additional evidence and testimony that bolsters my opinion.  For example, Qualcomm's witnesses have testified that ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

117

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Also, Mr. Golden testified that

Further, Mr. Trivedi testified that

In my opinion and experience, this would lead to at least some overlap in the CPU cores' features, the ACK tests used to test compliance with those features, and the OOB reference list identifying those ACK tests, which Qualcomm could have leveraged to expedite the architectural verification process.

287.    In particular, Qualcomm could have leveraged the several OOB packages that Arm had previously provided to Qualcomm for the Nuvia-based

, which, as explained above, are also Nuvia-based designs that overlap with the ⬛⬛⬛ design.

288.    Further, I have seen evidence showing that Qualcomm had access to the OOBs that Arm previously provided to Qualcomm for the Nuvia-based designs prior to the alleged withholding period.  For example, Mr. Trivedi testified that

118

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



289.    As another example, in a December 2023 IM chat between Mr. Golden and Shilpa Thakral (another verification engineer at Qualcomm), Mr. Golden wrote that ███████████

290.    Further, in a February 2023 IM chat between Mr. Trivedi and Mr. Golden, Mr. Golden wrote that ████████████████████████████████████████

---

[110] ████ refers to Qualcomm's ████████ design.  Golden Dep. Tr. at 75:19–21.

119

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

291.    This evidence further supports my opinion that a sophisticated company, like Qualcomm, would be able to easily implement OOB reference list changes on their own or at a minimum would have been able to leverage the OOBs that Arm previously provided for the earlier Nuvia-based designs.  This is also consistent with my experience.  For example, when working with large scale compliance testing, often times I and engineers on our team would elect to have only certain portions of the compliance testing suite run for a given compliance testing cycle.  In the case where an engineer was running a compliance testing suite locally on their workstation, one would simply edit various configuration files to either run or not-run a given portion of the compliance suite.  This was often done using a simple text editor on the appropriate configuration file.  If a larger scale compliance test was required, say on a compute farm that is managed by a different or remote compliance team, a simple email request detailing the compliance tests to be added (or skipped) for that compliance testing cycle was all that was required.

292.    Accordingly, in my opinion, Qualcomm performed minimal "extra" work, if any, due to Arm's alleged withholding of the OOB reference list.

293.    Further, in my opinion, Qualcomm also performed minimal "extra" work, if any, due to Arm's alleged withholding of the OOB test results from running the listed ACK tests on the AEM.  Qualcomm contends that



120

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



█████████████████████████    I disagree.

294.    As I explained above, in my opinion, Qualcomm can generate its own AEM test result list.  The AEM is a reference model that is made available for download with the ACK.  Weidmann Dep. Tr. at 150:2–4.  Arm made the v8 and v9 ACKs—including each quarterly v8 and v9 ACK release—available for download on PDH.  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

I am not aware of Qualcomm contending that it has not received the AEM.

295.    Thus, in my opinion, Qualcomm had everything it needed to generate its own AEM result list and could have done so with minimal "extra" work.  Qualcomm could simply take its internally generated OOB reference list, apply it to the AEM that Arm made available for download, and generate an AEM test result list.  Arm's corporate representative, Martin Weidmann, testified that ██████████████████████████████████████

---

[111]    Product code ██████ corresponds to the v8 ACK.  ARM_00063298 at -299; Weidmann Dep. Tr. at 169:8–20.

[112]    Product code ██████ corresponds to the v8 ACK.  Weidmann Dep. Tr. at 169:8–20.

[113]    Product code ██████ corresponds to the v9 ACK.  QCARM_0343954 at -956; Weidmann Dep. Tr. at 166:8–13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

296.    Further, a "failure_analysis.txt" file is "shipped with the ACK." QCVARM_0689117. Mr. Agrawal testified that ██████████████████████████ ████████████████████████████████████████████████ Mr. Agrawal further testified that ████████████████████████████████████████████████ ██████████████████ Mr. Agrawal ████████████████████████ This shows that Arm provided Qualcomm, ████████████████ with information about AEM failures and limitations, which Qualcomm could have referenced in analyzing its own ACK test results, and which would have reduced the ████████████ ████████████████████████████████████████████████ Trivedi Dep. Tr. at 173:11–174:5.

297.    Further, like the OOB reference list, Qualcomm could have leveraged Arm OOB test result lists for previous Nuvia-based cores for Qualcomm's subsequent Nuvia-based cores, including because ██████████████████████████████████████ ████████ Mr. Agrawal testified that ██████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

122

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



Mr. Agrawal also testified that

I agree that a sophisticated company, like Qualcomm, and an engineer such as Mr. Trivedi, would have been able to easily leverage previous OOB test result lists. This is consistent with my experience. For example, when I was bringing up a new microprocessor design that was not yet complete, but complete enough to begin running select instructions on, the prior compliance tests for the previous generation of microprocessor design were used. At early onset, it was often the case that only a very limited subset of the overall compliance test suite was run, such as simple load store instructions, simple arithmetic operations, etc. As the design progressed, additional tests from the previous generation's microprocessor test suite would be added back. Ultimately, additional new test suites specific to the currently in development microprocessor (i.e., not the previous generation microprocessor design) would be added to exercise newly added functionality. An example of this might be newly designed instructions or modes of operation that were not present in the previous generation of microprocessor. While this was an iterative and

123

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

incremental process over the design cycle of the microprocessor, these changes were easily and readily implemented by various engineers.

298.    Accordingly, in my opinion, Qualcomm performed minimal, if any, extra work due to Arm's alleged withholding of OOB packages for Qualcomm's Nuvia-based CPU cores. Qualcomm regularly generated the OOB reference list with ease and could have generated its own OOB test results list with ease.   Further, in my opinion, Qualcomm could have leveraged previously provided Arm OOB packages for use with its ███████████████████████ ██████ CPU cores.

### 2.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of ACK Patches

299.    I understand Qualcomm contends that, "by failing to deliver the [ACK] patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches … ."  SAC ¶ 97.  As noted above, Mr. Trivedi ████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████ However, Mr. Trivedi ████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

████████  As I explain below, in my opinion, this number of alleged ACK test issues is likely an overestimate.   Regardless, in my opinion, Qualcomm performed minimal "extra" work due to Arm's alleged withholding of ACK patches.  I have seen several pieces of evidence that support my opinion.

124

A0135

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

300.    To start, I have seen evidence suggesting that Mr. Trivedi's identification of 35-50 ACK test issues that allegedly needed an ACK patch (Trivedi Dep. Tr. at 176:15–177:24) is likely an overestimate of the actual ACK test issues that occurred during the alleged withholding period. For example,

301.

125

A0136

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



████████████████ This evidence supports my opinion that Mr. Trivedi's contention that ███████████████████████████████████████████ was an overestimate.

302.     Additional witness testimony further bolsters my opinion.  For example, Mr. Trivedi agreed that ████████████████████████████████████

303.     As another example, Mr. Golden agreed that ██████████████

304.     Moreover, in my opinion, any alleged "extra" work Qualcomm expended as a result of Arm allegedly withholding ACK patches was self-inflicted and unnecessary, at least because ACK patches are optional support materials and are not required to complete the verification

126

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

process.  *See* § XI.B.  As I explained above, ███████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████  Further, during the period of Arm's alleged withholding, Arm ██████

██████████████████████████████████████████████████████████

████████

████████████████████████████████████████

█████████████████████

305.    Thus, Qualcomm could have waited to receive a fix for its legitimate ACK test issue in a subsequent ACK quarterly release.  As noted above, I disagree with Qualcomm's contention that it could not utilize fixes in subsequent ACK quarterly releases.  *See* § XI.B.  This supports my opinion that any alleged "extra" work Qualcomm spent as a result of Arm allegedly withholding ACK patches was an optional choice Qualcomm chose to make.

306.    Regardless, in my opinion, Qualcomm's claimed "extra" work was minimal.  I understand that Qualcomm contends ██████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████

████████████████████████████████████████

127

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



307.    However,

This is consistent with my understanding and my opinion.   Sophisticated companies, like Qualcomm, perform thorough investigations into the cause of compliance test failures.   Any additional time Qualcomm spent on this analysis—compared to the time it would have spent if Arm provided the allegedly withheld materials—was minimal, and I have not seen any evidence suggesting otherwise.

308.    Additional evidence supports my opinion.   As explained above, Mr. Trivedi estimated that

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████

████████████████████████████████ In my opinion, this was likely an

overestimate, including based on the evidence I have discussed above, such as the ████████

reports and the testimony of Arm's and Qualcomm's engineers.  Further, Mr. Golden testified that



████████████████████████████████████████████

████████████

    309.    Regardless, Mr. Trivedi further testified that, ████████████████████████

████████████████████████████████████████████

████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

129

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



310.    Jeff Golden, a hardware engineer at Qualcomm who was involved in the custom core architectural verification process, testified that ▮▮▮▮▮▮▮▮▮▮

This is consistent with Mr. Trivedi's testimony:

311.    Based on my verification experience, the witnesses testimony, and Qualcomm's "extra" work claims, in my opinion, it would likely not have taken Qualcomm's entire verification team to address these alleged ACK test issues.  Rather, for a given test requiring a fix or update, it is more likely that a single engineer would be fractionally dedicated to this.  In my experience, this would entail working perhaps a few hours on this task over the course of a few days until a fix to the test was achieved.

312.    Mr. Golden also testified that ▮▮▮▮▮▮▮▮▮▮

130

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████

███████████████████████████████

████████ Mr. Golden testified that ████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████

313.    This is consistent with my understanding and experience.  As I noted above, Qualcomm is a sophisticated company with a team of verification engineers.  In my experience, developing compliance-test fixes or otherwise overcoming compliance-test issues is well within the wheelhouse of an architectural verification engineer, and often takes minimal additional effort, as these witnesses testified.

314.    Accordingly, in my opinion, Qualcomm performed minimal "extra" work as a result of Arm allegedly withholding optional, courtesy ACK patches.  Qualcomm chose to do this

131

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

work instead of waiting for a subsequent quarterly ACK release, which incorporated ACK test fixes for Qualcomm's legitimate ACK test issues. Further, regardless of whether Arm provided an optional ACK patch, Qualcomm regularly performed its own investigation of ACK test failures. Also, in my opinion, Mr. Trivedi's and Mr. Golden's testimony shows that Qualcomm spent minimal time and effort addressing ACK test issues that allegedly would have been solved by an ACK patch prior to the next quarterly release.

### 3. Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of ETE Checker Support

315. I understand Qualcomm contends it had to "expend additional engineering effort to verify its custom cores" due to Arm's alleged failure to provide "assistance in configuring the ETE Checker," Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13, and "additionally expended extra engineering time attempting to make the ETE checker functional while Arm refused to engage," *id*. at 18. *See also* █████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

However, I have not seen any evidence or testimony quantifying this alleged "extra engineering time," nor have I seen evidence or testimony suggesting that the extra work was significant.

316. The evidence I have seen suggests that any additional work Qualcomm expended due to Arm's alleged withholding of ETE checker support was minimal. As noted above, Qualcomm had everything it needed to use the ETE checker. *See* § XI.C. Qualcomm had access to the v9 ACK (and each subsequent quarterly ACK release), which contained the full suite of ACK tests, including those directed to testing compliance for the ETE trace feature. *Id*.

132

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Qualcomm also had access to the ETE checker, which is delivered with the ACK.  *Id*.  Qualcomm also had access to the relevant ACK-related documentation, including documentation regarding configuring the ETE checker.  *Id*.  As I explained, Qualcomm is a sophisticated company with sophisticated verification engineers.  Qualcomm is able to reference the Arm architecture, the ACK, and the associated user guides and documentation to complete the verification process—including the ETE checker compliance process—on its own.  *Id*.  Mr. Agrawal testified that



317.    My opinion is further supported by evidence suggesting that Qualcomm did in fact receive ETE checker support from Arm.  For example,

318.    This is consistent with my understanding of how the ETE checker is configured. The ETE checker "support" Mr. Agrawal provided to Qualcomm simply pointed Mr. Trivedi back

133

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

to materials Mr. Trivedi already had.  As Mr. Agrawal testified, ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████ Mr. Agrawal further testified that ████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

319.    I understand that Qualcomm points to an email exchange between Mr. Agrawal and Mr. Trivedi as evidence of Arm failing to provide ETE checker support.  Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs at 22–23; QCVARM_0618420.  In my opinion, this email exchange shows that Mr. Trivedi did receive some support from Mr. Agrawal regarding the configuration of the ETE checker, and it also shows that Mr. Trivedi already had the information that he requested.  ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

134

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

320.    When questioned about QCVARM_0618420, Mr. Agrawal testified that █

Mr. Agrawal testified that.

321.

As Mr. Agrawal testified,

135

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

322.    Additional testimony supports my opinion.  Mr. Agrawal testified that ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████    Mr. Agrawal further testified that █████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████

323.    Accordingly, based on the evidence that is available, it is my opinion that any alleged extra work Qualcomm expended as a result of Arm withholding ETE checker support was minimal.  Qualcomm had all the tools to use the ETE checker and was in fact receiving support on how to use it during the alleged withholding period.  I have not seen any evidence suggesting that the amount of extra work that Qualcomm claims it had to perform as a result of Arm's alleged withholding of support regarding the ETE checker was in any way significant.

**B.    The Alleged ████████████████ To Qualcomm, If Any, Was Due To Qualcomm's Actions, Not Arm's**

324.    As noted above, Qualcomm contends it █████████████ due to Arm's alleged withholding of OOB packages, ACK patches, and ETE checker support.  *See supra* § XII. Qualcomm's expert, Dr. Patrick Kennedy does not quantify █████████ 08/08/2025 Expert Report of Patrick F. Kennedy, Ph.D.  Regardless, in my opinion, any ████████████ to extent it exists, was due to Qualcomm's actions, not Arm's.

325.    As explained above, Arm provides tools, such as the ACK and its suite of tests, to help Qualcomm complete the verification process.  However, as Mr. Agrawal testified, █████████

█████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



326.    This is consistent with my understanding and opinion.  In my experience, the company designing the custom CPU core and completing the verification process (*e.g.*, Qualcomm) decides when they are ready to tape out their product as a technical matter.  The developer of the CPU, not the developer of the architecture, knows the exact details and features of the custom implementation.

327.    

For example, an ALA partner may submit "waivers" to Arm for ACK tests that failed on the partner's implementation.  Grisenthwaite Dep. Tr. at 138:22–139:10.

328.

Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 22–23; Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 17–18.

329.    I understand Qualcomm contends it

137

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████ The evidence and testimony support my opinion.  For example, Mr. Golden testified that ██████████████████████ However, Mr. Trivedi testified that ████████████████████████████████████ ████████████████████████████████████ ██████████████ An April 2025 communication between Mr. Trivedi and Mr. Agrawal is consistent with Mr. Trivedi's testimony.  ██████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████

330.    Further, ██████ are common in custom CPU core design industry.  For example, an

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

138

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

331.    Regardless, I have seen no evidence that Qualcomm's ███████████████ ███████████████████████████████████████████████████. Mr. Trivedi testified that ███████████████████████████████████



332.    As explained below, additional evidence related to each allegedly withheld support material or service bolsters my opinion.

        **1.**      **The Alleged** ████████████ **Due To Arm's Alleged Withholding Of OOB Packages, If Any, Was Minimal**

333.    I understand Qualcomm contends that, "[w]ithout OOBs from Arm," Qualcomm



Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 22–23.  As I explained above, any ████████████, to the extent it existed, was due to Qualcomm's actions, not Arm's.  *See supra* XII.B.  Further, Arm-provided OOB packages are optional support materials that are not required

139

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

for the verification process, and therefore any alleged withholding by Arm is unrelated to Qualcomm's alleged ▮▮▮▮  *See* § XI.A.  Regardless, in my opinion, any ▮▮▮▮ due to Arm's alleged withholding of OOB packages was minimal.

334.    As noted above, Qualcomm produces its own internal reference list as part of its normal verification process.  *See* § XI.A.  For example, Mr. Trivedi testified that ▮▮▮▮



335.    Qualcomm uses its reference list to "cross-reference" and "bless" Qualcomm's internally generated OOB reference list:



336.    Contrary to Qualcomm's assertions, I have seen evidence that ▮▮▮▮

▮▮▮▮ For example, ▮▮▮▮



140

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

337.    As another example, Qualcomm was ███████████████████

338.    Thus, at least in this instance, ████████████████████

141

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

339.     In my opinion, this is further evidence that Qualcomm was capable of generating a very accurate OOB reference list on its own. ████████████████████████████████████ ████████████████████████████████████████████

340.     As another example, Arm provided some OOB reference list support to Qualcomm during the alleged withholding period. ████████████████████████████████

I disagree with Mr. Trivedi that ████████████████████████████████████

142

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

341.    A "per-suite" count of OOB tests is as its name suggests; for each of the suites of ACK tests (which generally concern related functionality), it is the number of ACK tests in that suite. Conversation with Vivek Agrawal. It is not simply the total number of ACK tests included in a reference list for a given configuration, but it provides much more helpful detail than that. *Id*. I understand from Vivek Agrawal that the number of ACK tests in a given suite can vary, with some suites having as few as 50 tests, and others may be as high as 8,000. *Id*. A verification engineer, like Mr. Trivedi, would have been able to use this detailed information to ███████

████████████████████████████████████████████████████████████

███████████████████████████

342.    As I described above, Qualcomm had access to Arm-provided OOBs for Nuvia-based cores and would have been able to leverage those OOBs for subsequent versions or variations of those cores. *See* § XII.A.1. For example, ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████    I agree that a sophisticated company, like Qualcomm, would be able to easily implement these OOB reference list changes on their own or at a minimum would have been able to leverage the OOBs that Arm previously delivered for the earlier Nuvia-based designs.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

343.    I have seen additional evidence and testimony that further supports my opinion. For example, Qualcomm's witnesses have testified that ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████    Further, Mr. Trivedi testified ████████████████

██████████████████████████████████████████████    In my opinion and experience, this would lead to at least some overlap in the CPU cores' features, the ACK tests used to test compliance with those features, and the OOB reference list identifying those ACK tests, which Qualcomm could have leveraged to expedite the architectural verification process and ████████████████████████████████████

144

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

344.    Further, I have seen evidence showing that Qualcomm had access to the OOBs that Arm previously provided to Qualcomm for the Nuvia-based designs prior to the alleged withholding period.  For example, Mr. Trivedi testified that ██████████████████████ █████████████████████████████████ ███████████████████████████████████████████ ████████████████████ ████████████ Mr. Trivedi also testified that ███████████████ ████████████████████████ ███████████████████████████████████████████ ████████████████████████████████ ██████████████████

345.    As another example, ████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████ ████████████████████████████ When questioned about this document, Mr. Golden agreed that ███████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████

---

[114]    ██████ refers to Qualcomm's ████████ design.  Golden Dep. Tr. at 75:19–21.

145

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████ Mr. Trivedi was questioned about this same document, and agreed that ██████████████████████████████████████████ ███████████████████████████████████████████████

346.    Further, in a February 2023 IM chat between Mr. Trivedi and Mr. Golden, Mr. Golden wrote that ████████████████████████████████████████ █████████████████████████████████████ Mr. Golden also wrote that ████████████████████████████████████████████████ ██████████████████████████████ Accordingly, in my opinion, Qualcomm would have been able to leverage previous Arm-provided OOBs for its Nuvia-based cores, which would have ████████████████████ that resulted from Arm's alleged withholding of OOB packages.

347.    Additional evidence supports my opinion.  As I explained above, there are three possible ACK test results: pass, fail, or skip.  *See* § X.A; Trivedi Dep. Tr. at 73:3–9; George Dep. Tr. at 20:23–21:19.  Test skips occur when a test does not correspond to any feature that is present in a partner's CPU.  Bhattacharya Dep. Tr. at 43:6–10; George Dep. Tr. at 20:23–21:19.  Thus, had Qualcomm run the entire ACK suite against their Nuvia-based CPUs, any irrelevant test would have simply shown up as a skip on the test report, and Qualcomm could have disregarded those results.  *Id*.  Running the full suite of ACK tests would have required little additional computing power and time.  For example, I have seen evidence showing that ███████████████████ █████████████████████████████████████████████████ ████████████████████████████████ I have also seen evidence showing that ██████████████████████████████████████████████████ ████████████████████████ This is a minimal amount of testing time, in my experience.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

An OOB reference list—whether created by Arm or by Qualcomm—would not be necessary for this process.  This would have mitigated any ██ that Qualcomm contends it was subject to, and further supports my opinion.

348.    As noted above, the ████████ Qualcomm contends resulted from Arm's alleged withholding of OOB packages is attributable to Qualcomm, not Arm.  Regardless, in my opinion, any ████████ with Arm's alleged withholding of OOB packages was minimal.

**2.    The Alleged ████████ Due To Arm's Alleged Withholding Of ACK Patches, If Any, Was Minimal**

349.    I understand Qualcomm contends that "Arm's failure to provide ACK patches … ████████████████████████████████████████ Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 17–18.  As I explained above, any alleged ████████████████████████, was due to Qualcomm's actions, not Arm's.  *See supra* § XII.B.  Further, ACK patches are optional support materials that are not required for the verification process, and therefore any alleged withholding by Arm is unrelated to Qualcomm's ████████  *See* § XI.B.  Regardless, in my opinion, any ████████ due to Arm's alleged withholding of ACK patches was minimal.

350.    As noted above, Arm incorporates ACK test fixes into subsequent quarterly releases of the ACK.  *See* § XI.B; Weidmann Dep. Tr. at 90:6–17; Bhattacharya Dep. Tr. at 50:13–18.  Further, the quarterly ACK releases are made available to "all partners with a relevant license, including Qualcomm."  Weidmann Dep. Tr. at 122:8–123:2.  I have seen evidence that, during the alleged withholding period, Qualcomm had access to the v8 and v9 ACK, including each quarterly v8 and v9 ACK release, via PDH.[115]  *Id*.; ████████████████████████████████

---

[115]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

I am not aware of Qualcomm contending otherwise.

      351.    Also, during the period of Arm's alleged withholding, Arm ████████

████████████████████████████████████████████

██████

████████████████████████████████

██████████████████████████

██████████████████████████

██████████████████████████

████████████████████

      352.    Accordingly, in my opinion, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

---

[116]   Product code ████ corresponds to the v8 ACK.  ARM_00063298 at -299; Weidmann Dep. Tr. at 169:8–20.

[117]   Product code ████ corresponds to the v8 ACK.  Weidmann Dep. Tr. at 169:8–20.

[118]   Product code ████ corresponds to the v9 ACK.  QCARM_0343954 at -956; Weidmann Dep. Tr. at 166:8–13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

353.    I understand that Qualcomm contends it could not use the ACK test fixes in the ACK quarterly releases because ███████████████████████████████████

███████████████████████████████████████████████████████

████████████████████    I understand that Qualcomm also contends ████████

████████████████████████████████████████████████

██████████████████    I disagree.

354.    As I explained above, ███████████████████████████████████

██████████████████████████████████████    *See* § XI.B.

Further, Mr. Trivedi admits that ███████████████████████████████

███████████████████████████    In fact, Mr. Weidmann testified that ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

355.    Further, as noted above, ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████    Conversation with Vivek Agrawal.  Arm's quarterly ACK releases are accompanied by release notes that identify sections of the ACK that have been updated to address ACK test issues. Conversation with Vivek Agrawal.  In my opinion, a sophisticated partner, like Qualcomm, ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████    . Conversation with Vivek Agrawal; ARMQC_02761714. ████████

149

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

356.    Further, Arm's alleged withholding of ACK patches did not put any ████████ on Qualcomm relative to Arm's other ALA partners. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████    The fixes that are incorporated into the quarterly ACK releases are provided to all ALA partners via PDH.[119]  Weidmann Dep. Tr. at 90:6–17. ████████████

████████████████████    In fact, Ms. Bhattacharya testified that ████████████

████████████████████████████████    I have not seen evidence of an ALA partner receiving an ACK patch for an ACK test issue that Qualcomm reported, but that Qualcomm allegedly did not receive.  Qualcomm, ████████████ did not receive the fix until the next quarterly ACK release.  Thus, ████████████████████

████████████████████████████████████████████████████

████████████

357.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[119]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

150

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



358.    As noted above, the ██████████ Qualcomm contends resulted from Arm's alleged withholding of ACK patches is attributable to Qualcomm, not Arm.  Regardless, in my opinion, any ███ associated with Arm's alleged withholding of ACK patches was minimal.

###    3.    The Alleged ██████████████ Due To Arm's Alleged Withholding Of ETE Checker Support, If Any, Was Minimal

359.    I understand that Qualcomm has not identified ██████████ that it alleges is due to Arm's alleged withholding of ETE checker support.  Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&Os to Arm's 3rd Set of ROGs; SAC.  Mr. Trivedi provided some testimony related to ETE checker ███ but was not specific:



360.    As I explained above, any ██████████, to the extent it existed, was due to Qualcomm's actions, not Arm's.  *See supra* XII.B.  Further, ETE checker support is an optional support service that is not required for the verification process, and therefore any alleged withholding by Arm is unrelated to Qualcomm's alleged ████  *See* § XI.C.  Regardless, in my opinion, any ███ due to Arm's alleged withholding of ETE checker support was minimal.

361.    As noted above, Qualcomm had everything it needed to use the ETE checker.  *See* § XI.C.  Qualcomm had access to the v9 ACK (and each subsequent quarterly ACK release), which

151

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

contained the full suite of ACK tests, including those directed to testing compliance for the ETE trace feature. *Id.* Qualcomm also had access to the ETE checker, which is delivered with the ACK. *Id.* Qualcomm also had access to all ACK-related documentation, including documentation regarding configuring the ETE checker. *Id.* As I explained, Qualcomm is a sophisticated company with sophisticated verification engineers. Qualcomm is able to reference the Arm architecture, the ACK, and the associated user guides and documentation to complete the verification process—including the ETE checker compliance process—on its own. *Id.* Mr. Agrawal testified that



362.    My opinion is further supported by evidence suggesting that Qualcomm did in fact receive ETE checker support from Arm. For example,

363.    This is consistent with my understanding of how the ETE checker is configured. The ETE checker "support" Mr. Agrawal provided to Qualcomm simply pointed Mr. Trivedi back

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

to materials Mr. Trivedi already had.  As Mr. Agrawal testified, █████████████



Mr. Agrawal further testified that ██████████

364.    I understand that Qualcomm points to an email exchange between Mr. Agrawal and Mr. Trivedi as evidence of Arm failing to provide ETE checker support.  Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs at 22–23; QCVARM_0618420.  In my opinion, this email exchange shows that Mr. Trivedi did receive some support from Mr. Agrawal regarding the configuration of the ETE checker, and it also shows that Mr. Trivedi already had the information that he needed.

153

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

365.    When questioned about QCVARM_0618420, Mr. Agrawal testified ███



Mr. Agrawal testified that, ███

366.    Mr. Agrawal responded to Mr. Trivedi's ETE checker questions via email in January 2025, after Arm had decided to resume supporting Qualcomm regarding the cores Arm contends are unlicensed Nuvia-based cores. QCVARM_0618420 at -420–422. As Mr. Agrawal testified,

154

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

367.    Additional testimony supports my opinion.  Mr. Agrawal testified that ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  Mr. Agrawal further testified that ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

368.    Accordingly, based on the evidence that is available, it is my opinion that any alleged ████████ due to Arm's alleged withholding of ETE checker support was minimal. Qualcomm had all the tools to use the ETE checker and was in fact receiving support on how to use it during the alleged withholding period.  I have not seen any evidence suggesting that the amount of ███ Qualcomm faced as a result of Arm's alleged withholding of support regarding the ETE checker was in any way significant.

## XIII.    THE PHOENIX-BASED AND PEGASUS-BASED CORES ARE NUVIA-BASED CORES

369.    I understand that a dispute in the first case concerned whether the Phoenix-based and Pegasus-based cores were Nuvia-based cores that used code developed at Nuvia under the Nuvia ALA prior to the Qualcomm acquisition.  In my opinion, the relevant Qualcomm custom CPU cores incorporate pre-acquisition Nuvia code and are based on Nuvia designs.  I have seen several pieces of evidence that support my opinion.

370.    I have seen internal Arm communications that support my opinion.  For example, I have seen ██████████████████████████████████████████████

████████████████████████████████      ████████████████

155

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████

██████████████

371. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ I

agree that the minor configuration changes between these cores is an indicator that they utilized

code from the Nuvia CPU cores developed at Nuvia.

372.    Further, Qualcomm's counsel stated that, "[a]t trial in *Arm Ltd. v. Qualcomm Inc.*,

Qualcomm witnesses repeatedly acknowledged that Qualcomm continued using Nuvia

Technology."  Qualcomm's Opposition to Arm's August 11, 2025 Motion to Compel at 5.  For

example, Gerard Williams, the former co-founder of Nuvia, testified that Qualcomm did not start

over with a new CPU core design after acquiring Nuvia:

> **Q.**  Okay. You didn't start over with a new design, right?
> **A.**  You're talking about CPU core?
> **Q.**  Yes.
> **A.**  No, because that was not believed to be Arm technology, that
> was Nuvia technology.
> **Q.**  So you kept working on the same code base that you had been
> working on at Nuvia, right?
> **A.**  Yes, because that was Nuvia technology, that's why that was
> done.

156

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Qualcomm's Opposition to Arm's August 11, 2025 Motion to Compel, Ex. 26 at 401:9–18.  Mr. Williams also agreed that Qualcomm "didn't swap out the RTL that Nuvia had written" and "incorporated Nuvia's technology into Qualcomm products."  *Id*. at 409:16–21; *see also id*. at 412:9–19 (Mr. Williams agreeing that Qualcomm kept using "Phoenix code" "after Qualcomm acquired Nuvia" and that "elements of that Nuvia Phoenix code [are] in the compute and mobile platforms at Qualcomm").

373.    As another example, Cristiano Amon, Qualcomm's CEO, testified that "[t]he Qualcomm designs may include Nuvia technology," *id*. at 808:1–4, agreed that Qualcomm used the Nuvia CPUs for Qualcomm's Pakala, Hamoa, and Nordschleife Snapdragon chips, *id*. at 809:1–12, and agreed that, "[t]o this day, there is Nuvia code that was created under the Nuvia ALA that is in Qualcomm products," *id*. at 824:21–24.

374.    Qualcomm engineer, Jeff Golden, also testified that



Further, Mr. Trivedi testified that

375.    I have also seen evidence that Qualcomm used Nuvia abbreviations to refer Qualcomm's custom CPU team and cores it alleges are Qualcomm designs.  For example, a

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



Mr. Golden testified that

Mr. Trivedi also testified that

376.    Further, in a November 2022 IM chat between Jean-Francois Vidon, Qualcomm's Senior Director of Engineering, and Manju Varma, Qualcomm's Senior Director of CPU Product Management, Mr. Vidon noted that

Specifically, Mr. Vidon noted that

Mr. Vidon also suggested that

377.    Accordingly, the evidence supports my opinion that Qualcomm's

cores contain code developed from Nuvia developments. Even if the at-issue custom CPU core designs include code developed after Qualcomm purchased

158

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Nuvia, they appear to likewise have lines of code that were originally developed by Nuvia, at Nuvia, and for Nuvia's custom CPU core designs.

## XIV.    ARM'S ███████████████

378.    In my opinion, ██████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

███    ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

380.    ████  which stands for ████████████████████  is the ████

████████████████████████████████  Weidmann Dep. Tr. at

58:12–21. ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

159

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



381.

160

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



at -178.

383. ████████████████████████████████████████

████████

161

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



ARMQC_02771168 at -179.



ARMQC_02771168 at -180.

384.

**A0173**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

385.



ARMQC_02771168 at -181.

A0174

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



**A0176**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



ARMQC_02771168 at -185.

390.    Arm's Chief Architect, Richard Grisenthwaite, has described ███████████ as ███████████████████████████████ Further, Arm's Director of Product Management, Martin Weidmann described ████████████████████████



This testimony further supports my opinion that the ████████████████████ ███████

391.    ████████████████████████████████████ ███████████████████████████████████

166

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



ARMQC_02771168 at -187.

392.    Further, for 

 Weidmann Dep. Tr. at 60:7–20.

393.    





ARMQC_02771168 at -172.

167

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

394. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

## XV.    INCORRECT TECHNICAL ASSUMPTIONS IN MR. POSNER'S REPORT

395.    In my opinion, Qualcomm's experts rely on technical assumptions that are unfounded or simply incorrect.  Specifically, Qualcomm's expert, Eric Posner, relies on the assumption that Arm's implementation cores, sometimes called "off-the-shelf" (OTS) cores, offer lower-quality performance than Qualcomm's Nuvia-based custom cores.  In my opinion, this is an incorrect assumption that is rebutted by the evidence in this case.

**Mr. Posner's Assumption That Arm's Implementation Cores Underperform Qualcomm's Custom Cores Is Unsupported**

396.    Qualcomm's expert, Eric Posner, repeatedly relies on the assumption that "Arm's OTS [off-the-shelf] cores … are more expensive and offer lower-quality performance" than Qualcomm's custom cores and that Arm's OTS cores are used in the "lower-tier" portion of the market.  Posner Rpt. ¶¶ 28, 61, 77.[134]  I disagree.

---

[134]    Mr. Posner also opines that "[a]n OEM … might regard a chip containing an OTS Arm CPU and a Qualcomm chip containing a Qualcomm custom CPU as substitutes or near substitutes," Posner Rpt. ¶ 37, which seems to

168

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

397.    Mr. Posner bases his assumption on the testimony of Qualcomm's own witnesses. First, Mr. Posner relies on Ziad Asghar, Qualcomm's SVP & General Manager for XR and Spatial Computing, who testified as follows:



398.    Second, Mr. Posner relies on Cristiano Amon, Qualcomm's CEO, who testified as follows:



---

contradict his technical assumption that Arm's OTS cores are more expensive and offer lower-quality performance.

169

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



399.    Third, Mr. Poser cites paragraph 51 of the SAC, which, in turn, cites Arm Holdings, Ltd.'s Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.  However, neither paragraph 51 of the SAC or the cited portions of the Form F-1 support Posner's assumption.  Instead, these materials discuss Arm's business as including ALA and TLA licenses.

400.    In my opinion, the evidence in this case, including Qualcomm's own documents and witness testimony, shows that Arm's implementation cores often outperform Qualcomm's custom cores, and that many factors other than the RTL can affect performance.

### 1.    The Evidence Shows That Arm's Implementation Cores Often Outperform Qualcomm's Custom Cores

401.    In my opinion, the evidence in this case, including Qualcomm's own documents and witness testimony, shows that Arm's implementation cores frequently outperform Qualcomm's custom cores.

402.    The testimony of Qualcomm's Senior Director of Engineering, Jean-Francois (Jeff) Vidon supports my opinion.  Mr. Vidon is █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Mr. Vidon testified regarding numerous instances in which Arm's TLA cores offered better PPA than Qualcomm's custom cores.

403.    For example, Mr. Vidon testified about ██████████████████████ ████████████████████████████████████████████████████ In this

170

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

IM chain, 

404.    As another example, Mr. Vidon further testified that

405.    As another example, Mr. Vidon further testified that

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



406.    As another example, Mr. Vidon further testified that

407.    As another example, Mr. Vidon testified about

172

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████ Mr.

Vidon testified that ████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████



███████████████████

408.    The testimony of Qualcomm's Principal Engineer for Automotive CPUs, Richard Meacham, also supports my opinion.  For example, Mr. Meacham testified that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

409.    The testimony of Qualcomm's Senior Director of Qualcomm engineering over the CPU design team, Gerard Williams, also supports my opinion.  For example, Mr. Williams testified that ███████████████████████████████████████████

████████████████████████████████████

410.    Thus, while Mr. Posner relies exclusively on the unsupported and biased testimony of Qualcomm's CEO and a Qualcomm category general manager to support his assumption that

173

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Qualcomm's Nuvia-based custom cores outperform Arm's implementation cores, Mr. Posner ignores the testimony and statements of Qualcomm's engineers who are actually performing the relative performance assessments. These Qualcomm engineers' own testing data shows that Arm implementation cores are "hard to beat in any aspect" and in fact significantly outperform Qualcomm's Nuvia-based custom cores "on a performance and power basis," as explained above.

### 2.    Many Factors Besides the RTL Affect Performance

411.    In my opinion, Mr. Posner's assumption that Qualcomm's Nuvia-based custom cores outperform Arm's implementation cores is also flawed because it does not account for the fact that many aspects other than the RTL or design for a core can affect the performance of a SoC. For example, the foundry that is used to create the silicon can affect performance, the trade-offs and constraints made during the SoC design process can affect performance, and so can the size of the cache, the location of the cache relative to the CPU, the interconnects being used, the width of the bus being used, and the specific materials used in the design process, such as the thickness of the silicon or the oxide layers, which can limit clock frequency.

412.    Consider the case of two equivalent SoC designs with identical CPU cores that are implemented at different process nodes may have varying characteristics, such as the frequency that the device can be safely operated at, the thermal characteristics of the device, or the amount of power that the device consumes. Even in the case when the two devices are implemented using identical process nodes, there are still other factors within the SoC itself that may impact various aspects of system performance. One example of this is the memory system. While the CPU cores of the two designs may be identical, they may utilize differing memory systems. The amount of cache in the CPU and SoC design, the cache hierarchy and bandwidth of the cache(s), or the memory system overall may impact the performance of the device in terms of computational throughput, power consumption, and chip area. There are any number of factors in the overall

174

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

SoC design that may impact the overall performance, beyond just that of the CPUs themselves, even for identical process nodes. When these designs are manufactured at differing process nodes, the differences in power, performance and other characteristics are even further varied.

413.    Chip designers may choose to implement only certain features that they deem important to their intended use-case and disregard other, non-essential features, which can result in different levels of performance. One example of this would be removing the floating point ISA functionality, which is not needed 99.9% of the time. If a chip designer truly needed this functionality for a one-off use case, the functionality could be emulated in software with performance penalty overhead.

414.    In the automotive segment, I understand that some chip designers may want (or can live with) lower performance and thus manufacture their chips at 45 nm instead of using bleeding edge manufacturing technology. This plays into the lifetime of the part, including by increasing the part's durability in the hostile environment of automobile, as well as reductions in things like soft error rates, among others.

415.    A chip designer may also want to intentionally design a lower performance chip in terms of compute because it consumes less power and current. This reduces thermal problems and/or increases the ability to run on battery or other limited power resources.

416.    My opinion is consistent with the evidence I have reviewed from this case. For example, Qualcomm's CEO, Cristiano Amon testified that ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Mr. Amon further testified that ████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███

417.    As another example, Arm's Senior Vice President and General Manager of the IoT line of business, Paul Williamson testified that ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

418.    As another example, Arm's SVP of Technology, Peter Greenhalgh testified that

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

419.    Thus, in my opinion, Mr. Posner's assumption that Arm's implementation cores underperform Qualcomm's Nuvia-based custom cores is flawed for the additional reason that Mr. Posner does not account for the many factors, besides the RTL, that can affect the performance of an SoC.

176

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

**RESERVATION OF RIGHTS**

This expert report reflects my opinions given in good faith with respect to the information available to me as of the date I executed it. I respectfully reserve the right to supplement or amend my opinions in response to opinions expressed by Qualcomm's experts, or in light of any additional evidence, testimony, or other information that may be provided to me after the date of this expert report, including at trial. In addition, I expect that I may be asked to testify in rebuttal as to issues that may be raised in the expert reports of Qualcomm's experts, or to issues that may be raised by Qualcomm's fact witnesses and experts at trial.

Should additional information be produced that may require me to amend or supplement my opinions, I reserve the right to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: September 5, 2025

By: _____

Michael C. Brogioli, Ph.D.

# Exhibit 1

# Michael C. Brogioli, Ph.D.

**Contact Information**

Michael C. Brogioli, Ph.D.
Polymathic Consulting
111 Congress Avenue, Suite 500
Austin, TX 78701 USA

*Office:* (737) 317-2301
*Cell (preferred):* (713) 732-0217
*Fax:* (512) 469-6306
*E-mail:* michael@polymathicconsulting.com

**Education**

**Rice University**, Houston, Texas USA

Ph.D., Electrical and Computer Engineering, 2007

- Dissertation Topic: "Reconfigurable Heterogeneous DSP/FPGA Based Embedded Architectures for Numerically Intensive Embedded Computing Workloads."
- Advising Committee: Dr. Joseph R. Cavallaro, Dr. Keith D. Cooper, Dr. Scott Rixner

**Rice University**, Houston, Texas USA

M.S., Electrical and Computer Engineering, 2003

- Dissertation Topic: "Dynamically Reconfigurable Data Caches in Low Power Computing."
- Advising Committee: Dr. Keith D. Cooper, Dr. Scott Rixner, Dr. Robert Jump

**Rensselaer Polytechnic Institute**, Troy, New York USA

B.S., Electrical Engineering, Cum Laude, 1999

- Advisor: Dr. William Pearlman

**Certificates**

**Harvard Business School**, Boston, Massachusetts, USA

Certificate in Investment Portfolios with Alternate Investments, 2022

- Venture Capital, Growth Equity, Distress Investing, Private Debt, Hedge Funds, Portfolio Construction.

**Professional Experience**

**Polymathic Consulting**, TX USA
*Managing Director*                                          **2011 - Present**
Founder and managing director of Polymathic Consulting, servicing clients ranging from early stage technology start-up endeavors to Fortune 100 and beyond. Clients turn to Polymathic for expansive, proven engineering, research and development, intellectual property and technical leadership to effectively advance their real world business needs.

**IEEE and ACM Design Automation Conference**, USA
*Steering Committee*
*Conference Chair, Embedded Systems and Software Track*      **2016 - Present**
Design Automation Conference is the premiere technical conference and trade show specializing in Hardware, Software, Internet of Things, Embedded Systems and related Design Methodologies. Conference chair, responsible for the review, critique, and acceptance of academia and industry based publications in the areas of embedded systems, embedded software, and embedded system design.

**Rice University**, TX USA
*Adjunct Professor, Electrical and Computer Engineering*      **2009 - Present**
Professor of Ph.D. candidate level courses in wireless telecommunications, embedded computing software, embedded computing hardware, and software/hardware optimization in modern computing systems utilizing modern high level programming languages. Advisor of senior and graduate student based projects revolving around multi-core heterogeneous systems as they pertain to wireless telecommunications, medical and video.

**University of Texas, Austin**, TX USA
*Guest Lecturer, School of Engineering*                                        **2021 - Present**
Guest lecturer in "Legal Issues and Technology Management", on subjects relating to technology, management, financial and fund raising matters, technology transfer, and certain legal issues. Students are primarily comprised of those with existing degrees, and a number of years of industry experience.

**RISC-V Foundation**, Berkeley, CA USA
*Technical Committee*                                                          **2018 - Present**
RISC-V is an open CPU instruction set architecture (ISA) based on established reduced instruction set computing (RISC) principles. The RISC-V Foundation is a non-profit consortium chartered to standardize, protect, and promote the free and open RISC-V instruction set architecture together with its hardware and software ecosystem for use in all computing devices.

**Freescale Semiconductor**, TX USA
*Chief Architect, Senior Member Technical Staff*                              **2009 - 2011**
Technical architect of Freescale's DSP compilers and related technology. Responsible for management of technology, engineering roadmaps, design lead on compiler infrastructure and optimizations (high level and low level), next generation ABI definitions and next generation architecture solutions. Technical lead on multi-year engagement with processor architects in design of next generation DSP cores. Developed software infrastructure for migrating OEM competitor software stacks to Freescale solutions, tools generation, software packages, migration strategies and white papers. Technical lead on Tier-1 OEM customer relationships, evaluations of 3rd party technologies for potential partnerships and acquisitions, led various university research collaborations on behalf of Freescale. Development and deployment of internal software engineering policies and practices.

**Freescale Semiconductor**, TX USA
**Senior Compiler Engineer V**
*High Performance Compiler Design, Processor Architecture*                     **2007 - 2009**
Team leader on compiler engineering effort to provide intuitive, interactive end user experience for DSP compiler tool suite. Designed a framework to guide users in achieving highly optimized compiled VLIW code. Assembly listing reports for optimization failure advice, porting advice when migrating from competitor architectures, advice on code modifications for optimization enablement. Lead designer, engineering effort director, project planning and scoping, release schedule, and drafting of specification. Development of various compiler optimizations for VLIW processing as well as software emulation layers for running competitor software solutions on Freescale silicon.

Advising of next-gen DSP core architecture team in creating a highly orthogonal, compiler targetable multi-clustered VLIW based digital signal processor architecture. Work with future basestation architecture teams on designing next-gen basestation architecture for 4G LTE incorporating control and data plane processing with appropriate programming models.

**Method Seven**, MA USA
**Technical Co-Founder**
*High Performance Software and Hardware Systems Architecture*                  **2006 - 2007**
Founded Method Seven, a financial engineering company applying biologically inspired machine learning to financial market analysis. Principal software systems architect and hardware systems architect for both research and deployment platforms. Led research and development of platform for scans and overlays covering the NASDAQ, NYSE, and AMEX markets using proprietary technologies.

**Texas Instruments**, TX USA
**Advanced Architecture and Chip Technologies**
*Microprocessor and Systems Architecture*                                     **2005**

System modelling and architectural exploration of Davinci<sup>TM</sup>system-on-chip (SOC) architecture designed for embedded video processing. SystemC based simulation models of on–chip crossbars, bus arbitration and bridge technology, as well as on–chip and off–chip memory controllers within application specific heterogeneous SOC architectures.

**Fulbright and Jaworski LLP**, TX USA
*Scientific Advisor, Intellectual Property*
*Electrical, Computer Engineering and Computer Science*                                           **2005 - 2007**
Intellectual property consultant and technology advisor on litigation and prosecution work including, but not limited to: CDMA2000 3G wireless standards, wireless communications systems, embedded computing, and large scale modular software systems. Reverse engineering of source code varying from VHDL to high level object oriented applications, as well at patent prosecution and litigation work.

**Intel Corporation**, CA USA
**Microprocessor Research Labs**
*Compiler Engineering*                                                                            **2000**
Implemented speculative multi–threading support in Intel's IA–64 compiler. Developed new program analysis and back end code generation phases to support speculatively launching threads at runtime. Analyzed the performance potentials of SPEC95 benchmarks with respect to speculatively multi–threaded execution.

**Rice University**, TX USA
*Computer Architecture and Circuit Design (Instructor)*                                           **2000 - 2003**
Graduate instructor of graduate and undergraduate curriculum in the areas of Electrical and Computer Engineering, specifically relating to Computer Architecture and Circuit Design. Advised student projects, instructed classes and led laboratory work.

**Vicarious Visions**, NY USA
*Lead Software Engineer*                                                                          **1999**
Principal engineer on Activision's "AMF Extreme Bowling" for Nintendo's Color Gameboy gaming console. Developed PC based audio and graphics development tools suite for use with Color Gameboy game production. Coded innovative, highly optimized assembly routines for real time speech and full motion video on the console's limited Zilog Z80 processor resources.

**Stratus Computer**, MA USA
*Hardware Engineering*                                                                            **1997 - 1998**
Debugged locked step CPU operation and memory management issues in Stratus' fault tolerant UNIX release 3.4. Qualified Hewlett Packard PA–8000 series CPU modules under Stratus' proprietary OS release, VOS 14.0, during alpha and beta test phases. Wrote C code and UNIX shell scripts for recreating documented system failures, and to automate remote kernel updates and OS installs as well as data logging.

**Rensselaer Polytechnic Institute**, NY USA
*Digital Microelectronics Design (Instructor)*                                                    **1997 - 1998**
Undergraduate instructor of undergraduate courses in digital microelectronics and circuit design. Instructed weekly lessons, computer design labs, graded exams and problem sets.

**Rensselaer Electric Motor Sports**, NY USA
*Hardware and Software Engineering*                                                               **1995 - 1997**
This project was funded by, and led by, General Motors Corporation and Honda of America. Hardware and software co-design of embedded operating system and hardware platform for electrical vehicle prototypes, running on 16-bit Motorola 68K dual processor platform. Designed power engineering test platform for dynamometers, including hardware and user interface software.

| | |
|---|---|
| **Appointed Conference Committees and Organizations** | **IEEE International Conference on Communications**, USA |

**IEEE International Conference on Communications**, USA
*Technical Review Committee, Machine Learning for Communications Track*     **2021 - Present**
Technical committee member responsible for the review, critique, and acceptance of academia and industry based publications and research in the areas of machine learning for communications systems.

**IEEE International Symposium on Circuits and Systems**, USA
*Technical Review Committee*     **2021 - Present**
Technical committee member responsible for the review, critique, and acceptance of academia and industry based publications and research in the areas of computing, including energy aware systems, multicore processing, and adaptive computing.

**IEEE and ACM Design Automation Conference**, USA
*Technical Steering Committee, Embedded Computing Track*     **2019 - Present**
Technical Steering Committee member responsible for the review, critique, and acceptance of academia and industry based publications and research in the area of embedded computing and related systems, including embedded hardware, embedded software, firmware and tools.

**IEEE and ACM Design Automation Conference**, USA
*Co-chair, Program Committee, Embedded Systems and Software Track*     **2014 - 2019**
Co-chair and Program Committee member responsible for the review, critique, and acceptance of academia and industry based publications in the areas of embedded systems, embedded software, and embedded system design. Design Automation Conference is an annual technical conference and trade show specializing in electronic systems.

**IEEE and ACM Design Automation Conference**, USA
*Program Committee, Designer and User Track*     **2011 - Present**
Program Committee member responsible for the review, critique, and acceptance of academia and industry based publications in the areas of automated system design, both of hardware, software, and system analysis. Design Automation Conference is an annual technical conference and trade show specializing in electronic systems.

**ACM Great Lakes Symposium on VLSI**, Stresa-Lago Maggiore, Italy
*Program Committee*     **2007**
Reviewer and committee member in the area of system-on-chip architectures, VLSI design, and compiler driven architecture design space exploration.

**IEEE International Symposium on Personal Indoor and Mobile Radio Communications**, Helsinki, Finland
*Program Committee*     **2006**
Reviewer and committee member in the area of personal and mobile area radio communications and related systems.

**ACM International Conference on Parallel Architectures and Compilation Techniques**, Charlottesville, VA, USA
*Program Committee*     **2002**
Reviewer and committee member in the area of parallel computer architectures, programming languages and related compiler technologies.

**Books and Contributed Chapters**     Brogioli, Michael C., and Kraeling, Mark B., *Internet of Things - A Synopsis of the Internet of Things, its History, Application, Technology, Architecture, and Challenges Moving Forward*, Software Engineering for Embedded Systems - Methods, Practical Techniques and Applications, 2nd Edition, Elsevier Publishing, 2019.

Brogioli, Michael C., *Software and Compiler Optimization for Microcontrollers, Embedded Processors and DSPs*, Software Engineering for Embedded Systems - Methods, Practical Techniques and Applications, 2nd Edition, Elsevier Publishing, 2019.

Brogioli, Michael C., *Embedded and Multicore System Architecture - Design and Optimization*, Software Engineering for Embedded Systems - Methods, Practical Techniques and Applications, 2nd Edition, Elsevier Publishing, 2019.

Leotescu, Florin, and Cristian, Marius and Brogioli, Michael C., *Performance Analysis using NXP's i.MX RT1050 Crossover Processor and the Zephyr Real-Time Operating System*, Software Engineering for Embedded Systems - Methods, Practical Techniques and Applications, 2nd Edition, Elsevier Publishing, 2019.

Wu, Michael and Sun, Yang and Wang, Guohui and Brogioli, Michael C. and Cavallaro, J. R., *Implementation of a High Throughput 3GPP Turbo Decoder on GPU Architectures*, Software Development for Networking Applications – Expert Guides Series, Elsevier Publishing, Atlanta, GA, 2018.

Brogioli, M. C., *On The C++ Programming Language for Embedded Software, Systems, and Platforms*, Software Engineering for Embedded Systems – Expert Guides Series, Elsevier Publishing, Atlanta, GA, 2013.

Brogioli, M. C., *Software Optimizations for Memory Performance in Embedded Systems*, Software Engineering for Embedded Systems – Expert Guides Series, Elsevier Publishing, Atlanta, GA, 2013.

Invited Co-Author, *Signal Processing Systems Handbook, Second Edition*, Springer Publishing Company, 11 West 42nd Street, New York, NY, 2012.

Brogioli, M. C., *Software Programmable DSP Architectures*, Expert Guide DSP for Embedded and Real-Time Systems, pp. 63-75, Elsevier Publishing, Atlanta, GA, 2012.

Brogioli, M. C., *The DSP Hardware / Software Continuum*, Expert Guide DSP for Embedded and Real-Time Systems, pp. 103-113, Elsevier Publishing, Atlanta, GA, 2012.

Brogioli, M. C., *DSP Optimization - Memory Optimization*, Expert Guide DSP for Embedded and Real-Time Systems, pp. 217-241, Elsevier Publishing, Atlanta, GA, 2012.

Brogioli, M. C. and Dew, Stephen, *Optimizing DSP Software - High level Languages and Programming Models*, Expert Guide DSP for Embedded and Real-Time Systems, pp. 167-179, Elsevier Publishing, Atlanta, GA, 2012.

Sun, Yang, Amiri, Kiarash, Brogioli, Michael, Wang, Guohui, and Cavallaro, Joseph R., *DSP Hardware Accelerator Architectures for Communication Applications*, Springer Publishing, New York, NY, Spring 2012.

Sun, Yang, and Amiri, Kiarash, and Brogioli, Michael C., and Cavallaro, Joseph, *Application-Specific Accelerators for Communications*, Springer Publishing Company, 11 West 42nd Street, New York, NY, 2010.

Invited Co-Author, *Signal Processing Systems Handbook, First Edition*, Springer Publishing Company, 11 West 42nd Street, New York, NY, 2010.

**Publications and Invited Papers**   Brogioli, Michael, C., and Games, William, and Moats, Richard, *Current and Future Challenges in Internet of Things (IoT) Development Silos (Part I)*, Embedded Computing Design Magazine,

USA, 2020.

Brogioli, Michael, C., and Games, William, and Moats, Richard, *On Solving the IoT Development Silo Problem* IEEE Real-Time and Embedded Technology and Applications Symposium, Tools and Demos Session, Montreal, Canada, 2019.

Moats, Richard, and Games, Bill, and Brogioli, M. C., *Arch - A New Language For The Next Wave of Network-Connected Embedded Development*, Design Automation Conference, Austin, Texas, 2017.

Moats, Richard, and Games, Bill, and Brogioli, M. C., *Network Native - The Next Wave of Connected Embedded Development*, Network Native Inc., Austin, Texas, 2017.

Invited Paper, Arokia I, Brogioli, Michael, Jain, Nitjin and Garg, Umang, *LTE Layer 1 Software Design on Heterogeneous Multicore DSP Platforms*, IEEE 45th Asilomar Conference on Signals, Systems and Computers, Pacific Grove, CA, 2011.

Kyriakopoulous, Konstantinos, Brogioli, Michael C., and Zhang, Ruihao, *Improving Software Systems Quality through Well Defined Development Methodologies*, 2011 Test Methodology and Efficiency Symposium, Freescale Semiconductor, Austin, TX, USA, 2011.

Brogioli, Michael C., and Cavallaro, J.R., *Compiler Driven Architecture Design Space Exploration for Embedded DSP Workloads: A Study in Software Programmability Versus Hardware Acceleration*, IEEE 43rd Asilomar Conference on Signals, Systems and Computers, Pacific Grove, CA, 2009.

Brogioli, Michael C., and Zhang, Ruihao, *Compiler Feedback: Guiding Performance of Compiled C Code*, Freescale Semiconductor White Paper, Austin, TX, 2009.

Brogioli, M.C., and Cavallaro, J., *RISD: A Retargetable Compiler Infrastructure for Scalable Multi-Clustered VLIW DSP Architectures*, IEEE 5th Dallas Circuits and Systems Workshop, Dallas, TX, 2007.

Brogioli, Michael C., Radosavljevic, P., and Cavallaro, J., *A General Hardware/Software Codesign Methodology for Embedded Signal Processing and Multimedia Workloads*, IEEE 40th Asilomar Conference on Signals, Systems, and Computers, Pacific Grove, CA, 2006.

Brogioli, Michael C., Radosavljevic, P., and Cavallaro, J., *Hardware/Software Co-design Methodology for DSP/FPGA Partitioning: A Case Study for Meeting Real-Time Processing Deadlines in 3.5G Mobile Receivers*, 49th IEEE International Midwest Symposium on Circuits and Systems, San Juan, Puerto Rico, 2006.

Brogioli, Michael C., Willmann, P.D., and Rixner, S., *Parallelization Strategies for Network Interface Firmware*, IEEE/ACM 4th Annual Workshop on Optimizations for DSP and Embedded Systems (In Conjunction with IEEE/ACM International Symposium on Code Generation and Optimization), Manhattan, NY, 2006.

Brogioli, Michael C., Gadhiok, M., and Cavallaro, J., *Design and Analysis of Heterogeneous DSP/FPGA Based Architectures for 3GPP Wireless Systems*, IEEE Real-Time and Embedded Technology and Applications Symposium Work-in-Progress Sessions, San Jose, CA, 2006.

Brogioli, Michael C., and Cavallaro, J., *Modelling Heterogeneous DSP-FPGA Based System Partitioning with Extensions to the Spinach Simulation Environment*, IEEE 39th Asilomar Conference on Signals, Systems, and Computers, Pacific Grove, CA, 2005.

Joseph R. Cavallaro, Michael C. Brogioli, Alexandre de Baynast, and Predrag, Radosavljevic, *Re-

*configurable Architectures for Wireless Systems: Design Exploration and Integration Challenges*, Wireless World Research Forum, Toronto, CA, 2004.

Brogioli, Michael C., Pai, V.S., Willmann, P.D., *Spinach: A Liberty–Based Simulator For Programmable Network Interface Architectures*, ACM SIGPLAN/SIGBED Conference on Languages Compilers and Tools for Embedded Systems, San Diego, CA, 2004.

Brogioli, Michael C., *Dynamically Reconfigurable Data Caches in Low Power Computing*, Masters Thesis, Rice University, Houston Texas, 2002.

Brogioli, Michael C., and Jones, Bryan, *Dynamically Configurable Caches in Low Power Computing*, Internal White Paper, Rice University, Houston Texas, 2001.

**Patents**

Gregory D. Chiocco and Michael C. Brogioli, *Generalized, Hierarcical, Multimodal Event Detection*, U.S. Provisional Patent Application 63/801,591.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Connected Computation in Network Constrained Systems*, U.S. Patent Application 19/065,739.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Connected Computation in Network Constrained Systems*, U.S. Patent Application 18/242,483.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Obtaining Location Data*, U.S. Patent Application 18/807,970.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Aggregating Harvest Yield Data*, U.S. Patent No. 11,854,094.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Obtaining Location Data*, U.S. Patent No. 12,066,838.

Donald W. Games, Michael C. Brogioli Ph.D., Richard Moats, *System And Method for Holistic Application Development and Deployment in a Distributed Heterogeneous Computing Environment*, U.S. Patent Application 17/745,792, filed May 2022. Patent Pending.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Connected Computation in Network Contstrained Systems*, U.S. Patent No. 11,750,701.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Traversing A Three Dimensional Space*, U.S. Patent No. 11,526,180.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Aggregating Harvest Yield Data*, U.S. Patent No. 11,354,757.

Donald W. Games, Michael C. Brogioli Ph.D., Richard Moats, *System And Method for Holistic Application Development and Deployment in a Distributed Heterogeneous Computing Environment*, U.S. Patent No. 11,340,887.

Michael C. Brogioli, Ph.D., Cesar Taylor M.D., and Howard Roberts, *Location Agnostic Platform for Medical Condition Monitoring and Prediction and Method of Use Thereof*, Patent No: 147145.010100/US, 2014.

Cesar Taylor M.D., and Michael C. Brogioli Ph.D., and Howard Roberts, *System for Holistic Pain Monitoring and Prediction and Method of User Thereof*, Patent No: 147145.010200/US, 2014.

Cesar Taylor M.D., and Michael C. Brogioli Ph.D., and Howard Roberts, *System for Prevention of Narcotic Diversion and Method of Use Thereof*, Patent No: 147145.010300/US, 2014.

Howard Roberts, Cesar Taylor M.D., and Michael C. Brogioli Ph.D., *Magnetometer Breathing Sensor and Method of User Thereof*, Patent No: 147145.010400/US, 2014.

**Leadership and Board Membership**

**Tandem Motion Company** FL, USA
*Advisory Board*                                                         **2021 - 2023**
Advisory board member on intellectual property strategy, fundraising, finance and select technologies. Tandem is building hybrid solutions for heavy duty internal combustion engine vehicles.

**AgCompute** CA USA
*Advisory Board, Co-Inventor*                                          **2019 - Present**
Advisory board and co-inventor of patent pending technology for the advancement of Agriculture Technology in areas of low network connectivity and adverse conditions. Innovative sensor, edge and cloud computing solutions for in-field real time asset management.

**MIT MassChallenge** USA
*Mentor, Speaker*                                                      **2017 - Present**
MassChallenge is a global startup accelerator with a focus on high-impact, early-stage entrepreneurs. Through its global network of accelerators in Boston, London, Mexico City, Geneva, Jerusalem and Texas, coupled with unrivaled access to our corporate partners, MassChallenge has driven growth and created value the world over. To date, MassChallenge has raised over $2B in funding, generated over $900M in revenue, and created over 65,000 jobs.

**ScribeSense**, TX USA
*Board of Directors*                                                          **2017**
ScribeSense is a *patented* cloud-based grading platform for schools and the only solution for grading free-form paper tests. ScribeSense automatically grades handwritten tests with 99% accuracy. Teachers scan and upload their own tests using a standard school scanner. ScribeSense's visual analytics enables data-driven decision making so schools can improve student learning and retain top teacher talent.

**Southwest Angel Network for Social Impact**, TX USA
*Board of Directors*                                                     **2015 - 2019**
The Southwest Angel Network for Social Impact ( SWAN Impact ) is a community of like-minded investors who enjoy working together to *Make the world a better place, one company at a time*. We believe that we can have the most significant impact by funding for-profit start-up companies who are building sustainable businesses.

**Network Native**, TX USA
*Board of Directors, Co-Founder, CTO*                                  **2015 - Present**
Board member and co-inventor, advising in the areas of Internet of Things technologies, specifically related to product developer solutions, programming languages and platforms, security and infrastrucure. Business development, marketing, and fund raising. Have held various roles, including but not limited to CTO.

**NewCrew**, TX USA
*Advisory Board*                                                        **2015 - 2016**
Board member advising in the areas of mobile computing, social computing, and geofencing technologies. Business development, marketing, and fund raising.

**AngelSpan**, TX USA
*Advisory Board*                                                        **2015 - 2016**

Board member advising in the areas of professional investor relations to start-ups, resource allocation, and a platform for increased efficiency and valuation of early stage companies and venture capital portfolios.

**Vault (acquired by Summer PBC)**, TX USA
*Advisory Board, Interim CTO*                                                    **2013 - 2015**
Advisory board member and interim CTO advising in the areas of financial transactions systems and enterprise software, as they pertain to solving the student loan debt crisis for early stage science, technology, engineering and medicine (STEM) employees. Technology, recruiting, fund raising. Vault was acquired by Summer PBC in 2024.

**HealthBits**, TX USA
*Board Member, Co-Inventor*                                                      **2013 - 2014**
Board member advising in the areas of large scale enterprise software systems, real-time computing and medical sensing devices across complex event processing systems.

**Osmek**, TX USA
*Interim CTO, Advisory Board*                                                    **2012 - 2014**
Interim CTO and board member advising in the areas of large scale cloud based content management software systems. Providing innovative media content management for heterogeneous web enabled devices with geolocational services, primarily using PHP and Python programming languages.

Academia

**Rice University**, Houston, Texas USA
*DSP Compiler Design*                                                            **2005 - 2009**
Developed *RISD*, a retargetable compiler infrastructure for clustered VLIW DSP architectures. By taking pre-existing code schedules and binaries for existing DSP applications, RISD takes a flexible machine definition for which the code should be recompiled. Users can specify the number of VLIW clusters, functional units per VLIW cluster, functional unit mix per VLIW cluster, register file sizes, cluster interconnect topology (point-to-point versus 2d mesh network), multi-cluster scheduling algorithms, and inter-cluster cross-register file bandwidth and latencies.

Compiler framework was used to perform compiler driven design space exploration of massively multi-clustered VLIW based architectures versus FPGA and ASIP implementations of software kernels. RISD was used in studies comparing tradeoffs in computational throughput versus gates required to implement programmable DSP cores containing many register files and VLIW compute clusters, versus FPGA efficiency when including routing overhead for large scale problems.

**Rice University**, Houston, Texas USA
*DSP/FPGA Based System-On-Chip Architectural Simulator Design*                   **2004 - 2009**
Developed *Spinach DSP-FPGA*, a modular and composable simulator design infrastructure for programmable and reconfigurable embedded SOC architectures. Designed and developed modular and composable software modules to bit-true, cycle accurately simulate Texas Instruments C62x and C64x DSPs and MIPS style processors. Additionally, designed and developed support for SRAM and DRAM style memories, heterogeneous memory systems, heterogeneous clock domains, as well as runtime reconfigurable Xilinx Virtex II based FPGA computing elements, cache and memory controllers, bus arbiters, and on-chip interconnect fabric.

System was validated against compiled code DSP firmware from Texas Instruments' Code Composer Studio running on the simulator versus actual hardware benchmarks. Simulation platform was used to investigate highly heterogeneous multi-processor DSP based SOC architectures containing one or more Xilinx style FPGA based hardware coprocessors. Studies in 3.5G wireless telecommunications as well as H.26x video processing were performed to gain insight into overall system bottlenecks, hardware and software partitioning strategies, and tradeoffs of overall system design.

**Rice University**, Houston, Texas USA
*Programmable Network Interface Architecture Simulator Design*                    **2002 - 2004**
*National Science Foundation Grant Nos. CCF-0532448 and CNS-0532452*
Developed *Spinach*, a simulator design toolset for modelling programmable network interface architectures. Spinach models system components common to all programmable environments (ALUs, control and data paths, register files, instruction processing), as well as components specific to embedded computing (software controlled SRAM scratchpad memory, hardware assists for DMA and medium access control). Spinach is a simulator design infrastructure, rather than a simulator per se. As such, the same underlying C code framework is used to model a uniprocessor Gigabit network interface, a multi-processor Gigabit network interface, or a 10 Gigabit multi-processor network interface with highly heterogeneous memory systems. Only a small number of lines of high level scripting language code is required to describe each of the various systems.

Spinach was validated by modeling the Tigon-2 programmable Ethernet controller by Alteon Websystems, running actual compiled code Ethernet processing firmware and by comparing the reported results to actual hardware benchmarks. Spinach was also used to obtain new insights into the performance of Gigabit and 10 Gigabit network interfaces both in terms of hardware architecture and firmware parallelization strategies. *Public Website: https://sourceforge.net/projects/spinach/*

**Rice University**, Houston, Texas USA
*Software Engineering and Consulting*                                          **2000**
Implemented instruction selection and register allocation optimizations in UHFFT, an adaptive and portable software library for the Fast Fourier Transform. Performed in depth analysis of register pressure, compiler generated spill code, memory hierarchy utilization, and instruction selection for non–trivially sized FFT matrices running on commercially available hardware platforms. Utilized reverse Cuthill–McKee technique to achieve near optimal computation orderings and minimize live data set sizes, as well as optimize register allocation and instruction selection phases of compilation.

| | |
|---|---|
| **Select Expert Witness, Consultant Engagements** | **RFCyber Corp.[*] v. Starbucks Corporation**<br>**RFCyber Corp.[*] v. The Kroger Co**<br>**RFCyber Corp.[*] v. Volkswagen Ag, et al.**<br>**Fabricant LLP**, NY, USA |

**Expert Witness in Mobile Devices, Payments and Security**          **2025 - Present**
Case Subject Matter - Mobile devices and network communications in a multi-tier security model relating to mobile payments.
Work Performed - Expert consulting, claim construction declaration (to date).

**Yealink (USA) Network Technology Co. Ltd., and Yealink Network Technology Co. Ltd v. Barco, Inc. et al.[*]**
**K&L Gates LLP, CA, USA**
**Expert Witness in Wireless Communications Systems**          **2025 - Present**
Case Subject Matter - Wireless communications systems and computer peripherals for content sharing.
Work Performed - Expert consulting, IPR declarations (to date).

**Qualcomm Inc. v. Arm Holdings PLC[*]**
**Kirkland & Ellis LLP**, USA
**Expert Witness in Microprocessor Design and Validation**          **2025 - Present**
Case Subject Matter - Computer microprocessor design and validation.
Work Performed - Expert consulting (to date).

**Netlist, Inc.[*] v. Micron Technology, Inc., Micron Semiconductor Products, Inc., Micron Technology Texas LLC**
**Irell & Manella LLP**, CA, USA

**Expert Witness in HBM Computer Memory Technology**          **2025 - Present**
Case Subject Matter - Expert Witness in computer memory modules and high storage capacity HBM memory technology.
Work Performed - Expert consulting (to date).

**BMW of North America LLC**\* **v. Foras Technologies Ltd.**
**Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, GA, USA**
**Expert Witness in Fault Tolerant Multiprocessor Systems**          **2024 - Present**
Case Subject Matter - Fault tolerant recovery in multiprocessor system architectures.
Work Performed - Expert consulting, multiple IPR declarations and depositions (to date).

**Barco, Inc. et al.**\* **v. Yealink (USA) Network Technology Co. Ltd**
**K&L Gates LLP, CA, USA**
**Expert Witness in Wireless Communications Systems**          **2024 - Present**
Case Subject Matter - Wireless communications systems and computer peripherals for content sharing.
Work Performed - Expert consulting, claim construction declarations, depositions (to date).

**HL Klemove Corp.**\* **v. Foras Technologies Ltd.**
**Arnold & Porter Kaye Scholar LLP, CA, USA**
**Expert Witness in Multiprocessor Systems**          **2024**
Case Subject Matter - Fault tolerant recovery in multiprocessor system architectures.
Work Performed - Expert consulting, expert declaration.

**Labrador Diagnostics LLC**\* **v. Biofire Diagnostics, LLC and Biomerieux, S.A.**
**Irell & Manella LLP**, CA, USA
**Expert Consulting in Medical Device Software and Systems**          **2024 - Present**
Case Subject Matter - Consultant in medical testing equipement hardware, software and computer networking technology.
Work Performed - Expert consulting, reverse engineering, declarations (to date).

**Mercedes-Benz USA, LLC v. Daedalus Prime LLC**\*
**Ascenda Law Group, CA, USA**
**Expert Witness in Multicore Systems, Memory and Power Mgmt**          **2024 - 2025**
Case Subject Matter - Dynamic power management in heterogeneous CPU/GPU systems, interconnects and memory systems.
Work Performed - Expert consulting, multiple IPR declarations, multiple depositions.

**Samsung Electronics Co., LTD v. Headwater Research LLC**\*
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Computer Networking Technology**          **2024 - Present**
Case Subject Matter - Wireless/cellular networking technology as it relates to mobile devices and messaging.
Work Performed - Expert consulting, IPR declaration, depositions.

**Samsung Electronics Co., LTD v. Headwater Research LLC**\*
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Wireless Networking Technology**          **2024**
Case Subject Matter - Wireless networking technology as it relates to mobile devices and secure communication.
Work Performed - Expert consulting, IPR declaration.

**SEVEN Networks, Inc.**\* **v. Motolola Mobility LLC**
**McKool Smith LLP, NY, USA**

**Expert Witness in Mobile Device Power Management**      **2023 - 2024**
Case Subject Matter - Power management hardware and software systems in mobile devices.
Work Performed - Expert consulting, expert reports, deposition.

**Viasat, Inc. v. Western Digital Techs., Inc**[*]
**Gibson, Dunn & Crutcher, LLP, CA, USA**
**Expert Witness in Computer Memory Technology**      **2023 - 2024**
Case Subject Matter - Error correction technology for non-volatile memory, and non-volatile memory system design.
Work Performed - Expert consulting.

**Valtrus Innovations LTD**[*] **v. SAP America, Inc. and SAP, SE**
**Reichman Jorgensen LLP, CA, USA**
**Expert Witness in Multiprocessor Systems and Caching Technology**      **2023 - 2025**
Case Subject Matter - Multiprocessor systems, computer architecture, cache and memory systems, secure computing.
Work Performed - Expert consulting, expert declarations, depositions.

**Valtrus Innovations LTD**[*] **v. AT&T Inc., et al**
**Reichman Jorgensen LLP, CA, USA**
**Expert Witness in Multiprocessor Systems and Caching Technology**      **2023 - 2024**
Case Subject Matter - Multiprocessor systems, dynamic cache partitioning and related technology.
Work Performed - Expert consulting, claim construction declarations, deposition, Markman hearing tutorials.

**BMW of North America LLC**[*] **and Robert Bosch LLC**[*] **v. Foras Technologies Ltd.**
**Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, GA, USA**
**Expert Witness in Multiprocessor Systems**      **2023 - Present**
Case Subject Matter - Fault tolerant recovery in multiprocessor system architectures, including firmware related functionality.
Work Performed - Expert consulting, expert IPR declarations, depositions (to date).

**Sonrai Memory Limited**[*] **v. Micron Technology, Inc.**
**BC Law Group PC, NY**, USA
**Expert Witness in Volatile and Non-Volatile Memory Technology**      **2023 - 2024**
Case Subject Matter - Expert Witness in volatile and non-volatile memory technology, including power systems.
Work Performed - Expert consulting, expert reports, depositions.

**Micron Technology Inc. v. Sonrai Memory Limited**[*]
**BC Law Group PC, NY**, USA
**Expert Witness in Volatile and Non-Volatile Memory Technology**      **2023 - 2024**
Case Subject Matter - Expert Witness in volatile and non-volatile memory technology, including power systems.
Work Performed - Expert consulting, multiple IPR declarations, multiple depositions.

**AGIS Software Development, LLC**[*] **v. Samsung Electronics Co., Ltd. et. al**
**Fabricant LLP**, NY, USA
**Expert Witness in Mobile Devices and Systems**      **2023 - 2024**
Case Subject Matter - Expert Witness in mobile devices and location tracking software and systems.
Work Performed - Expert consulting.

**Samsung Electronics Co. Ltd. and Samsung Semiconductor, Inc. v. Netlist, Inc.**[*]
**Netlist, Inc.**[*] **v. Google LLC, Alphabet Inc., Samsung Electronics Co., Ltd.**

and Samsung Semiconductor, Inc.
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory and Module Architecture**            **2023**
Case Subject Matter - Expert Witness in computer memory module architecture, self testing, DRAM and related technologies.
Work Performed - Expert consulting, claim construction declaration, deposition.

**Netlist, Inc.[*] v. Micron Technology, Inc.; Micron Semiconductor Products, Inc.; Micron Technology Texas LLC**
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory and Module Architecture**       **2023 - Present**
Case Subject Matter - Expert Witness in computer memory modules, high capacity HBM technology, and issues relating to performance and power.
Work Performed - Expert consulting, expert reports, depositions (to date).

**Samsung Electronics Co., Ltd v. Netlist, Inc[*]**
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory**                                   **2022 - 2023**
Case Subject Matter - Expert Witness in multiple IPRs related to high bandwidth stacked memory architectures.
Work Performed - Expert consulting, IPR declarations, depositions.

**Daedalus Prime LLC[*] v. Samsung Electronics Co., Ltd. et. al**
**Bluepeak Law Group LLP**, NY, USA
**Expert Witness in Dynamic Power Management**                          **2023**
Case Subject Matter - Dynamic power management of multicore processors, memory systems and related domains.
Work Performed - Expert consulting.

**Certain Semiconductors and Devices and Products Containing the Same, Including Printed Circuit Boards, Automotive Parts, and Automobiles, Inv. No. 337-TA-1332**
**Daedalus Prime LLC[*]**
**Reichman Jorgensen LLP**, CA, USA
**Expert Witness in Dynamic Power Management**                          **2022**
Case Subject Matter - Dynamic power management of multicore processors, memory systems and related domains.
Work Performed - Expert consulting.

**Definitive Holdings LLC v. Powerteq LLC[*]**
**Proskauer Rose LLP**, NY, USA
**Expert Witness in Automotive Software and Hardware**                  **2022 - 2023**
Case Subject Matter - Automotive engine control software, hardware and related technology.
Work Performed - Expert consulting, declarations.

**Aire Technology Ltd.[*] v. Apple Inc.**
**Aire Technology Ltd.[*] v. Google LLC**
**Aire Technology Ltd.[*] v. Samsung Electronics Co., Ltd. et. al**
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Computer Hardware Design**                          **2022**
Case Subject Matter - Computer hardware design as it relates to Near Field Communication.
Work Performed - Expert consulting, declarations, deposition testimony.

**WSOU Investments, LLC[*] v. ZTE Corporation et. al**
**Kasowitz Benson Torres LLP**, NY, USA

**Expert Witness in Video and Telecommunications Computing**    **2022 - 2023**
Case Subject Matter - Expert Witness in hardware and software design as it relates to video codec technologies and telecommunications processing.
Work Performed - Expert consulting and expert declaration.

**Robert Zeidman* v. Lindell Management LLC**
**Bailey Glasser LLP**, Washington DC, USA
**Expert Witness in Computer Software and Networking**    **2022 - 2023**
Case Subject Matter - Expert Witness in computer software and networking as it pertains to voting machines used in the United States 2020 Presidential Election.
Work Performed - Expert consulting, expert reports, testimony at hearing.

**Netlist, Inc.* v. Samsung Electronics Co., Ltd. et. al**
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory and Module Architecture**    **2022 - 2023**
Case Subject Matter - Expert Witness in computer memory modules, high capacity HBM technology, and issues relating to performance and power.
Work Performed - Expert consulting, expert reports, depositions, trial testimony.

**Samsung Electronics Co., Ltd v. Netlist, Inc***
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory**    **2022 - 2023**
Case Subject Matter - Expert Witness in multiple IPRs related to computer memory module architecture, including DRAM and related technologies.
Work Performed - Expert consulting, IPR declarations, depositions.

**Scott and White Health Plan and SHA, LCC d/b/a FirstCare* v. Actian, Corporation**
**Germer, Beaman & Brown PLLC**, TX, USA
**Expert Witness in Computer Software**    **2022 - Present**
Case Subject Matter - Expert Witness in computer software and related licensing and copyright matters.
Work Performed - Expert consulting (to date).

**Idan Bar-Asher et. al v. Playtika Holding Corp., et. al Ltd***
**Labaton Sucharow LLP**, Washington D.C., USA
**Expert Witness in Mobile Software and Systems**    **2022 - 2024**
Case Subject Matter - Expert witness in mobile gaming software and systems development as it relates to federal securities laws and Initial Public Offerings (IPOs).
Work Performed - Expert consulting.

**Maxell Ltd* v. Lenovo Group Ltd., et. al**
**Mayer Brown LLP**, Washington D.C., USA
**Expert Witness in Power Management**    **2022 - 2023**
Case Subject Matter - Expert Witness in the area of mobile devices, microprocessors and power management.
Work Performed - Expert consulting.

**Q Technologies, Inc.* v. Walmart, Inc.**
**Q Technologies, Inc.* v. Neutron Holdings, Inc. d/b/a/ LIME**
**Kane Russell Coleman & Logan PC**, TX, USA
**Expert Witness in Mobile Payments Systems**    **2021 - 2024**
Case Subject Matter - Expert Witness in the area of mobile payments processing systems.
Work Performed - Expert consulting, infringement expert reports, depositions.

**Samsung Electronics Co., Ltd v. Netlist, Inc***
**Gibson Dunn & Crutcher LLP**, CA, USA
**Expert Witness in Computer Memory**                                    **2021 - 2022**
Case Subject Matter - Expert Witness in computer memory module architecture, self testing, DRAM and related technologies.
Work Performed - Expert consulting, IPR declarations, depositions.

**Sonrai Memory Limited* v. Oracle Corporation**
**Russ, August, and Kabat LLP**, Los Angeles, CA, USA
**Expert Witness in Memory and Compression Technology**                  **2021 - 2022**
Case Subject Matter - Memory controllers, memory technology and data compression technology.
Work Performed - Expert consulting, claim construction, declarations, depositions.

**Certain Laptops, Desktops, Servers, Mobile Phones, Tablets, and Components Thereof, Inv. No. 337-TA-1280**
**Sonrai Memory Limited***
**Russ, August, and Kabat LLP**, Los Angeles, CA, USA
**Expert Witness in Low Power Systems**                                  **2021 - 2022**
Case Subject Matter - System on chips, operating systems and system components related power consumption in computing devices.
Work Performed - Expert consulting, claim construction declarations, expert reports, depositions.

**Future Link Systems LLC* v. Advanced Microdevices, Inc.**
**Future Link Systems LLC* v. Apple, Inc**
**Future Link Systems LLC* v. Broadcom, Inc; Broadcom Corp.**
**Future Link Systems LLC* v. Qualcomm, Inc.; Qualcomm Technologies**
**Future Link Systems LLC* v. Realtek Semiconductor Corp.**
**Russ, August, and Kabat LLP**, Los Angeles, CA, USA
**Expert Witness in Circuit Design, Interconnects and Test**            **2021 - 2022**
Case Subject Matter - Semiconductor circuit design and reuse, memory design and test, PCI Express and related interconnect technologies.
Work Performed - Expert consulting, claim construction, declarations, depositions.

**Certain UMTS and LTE Cellular Communications Modules and Products and Products Containing the Same, Inv. No. 337-TA-1240**
**Philips RS North America LLC and Koninklijke Philips N.V.***
**Foley & Lardner LLP**, MA, USA
**Expert Witness in Wireless Computing Technology**                     **2020 - 2021**
Case Subject Matter - Embedded computing technology related to wireless mobile devices, including 3GPP standards based functionality.
Work Performed - Expert consulting, expert reports, deposition, trial testimony.

**Acqis* v. Samsung Electronics Co., LTD**
**Robins Kaplan LLP**, USA
**Expert Witness in Mobile Devices and Interconnects**                         **2021**
Case Subject Matter - Chip and chipset interconnect technology relating to mobile and non-mobile devices.
Work Performed - Expert consulting, expert reports, depositions.

**Neodron Limited* v. Texas Instruments, Inc**
**Neodron Limited* v. Cypress Semiconductor Corp**
**Neodron Limited* v. Renesas Electronics Corp**
**Neodron Limited* v. ST Microelectronics N.V.**
**Russ, August, and Kabat LLP**, Los Angeles, CA, USA

**Expert Witness in Touch Screen Technology and Related Systems**          **2020 - 2021**
Case Subject Matter - Expert witness in hardware/software systems for touch screen technology, including analog and digital signaling and processing.
Work Performed - Expert consulting, declarations.

**Qualcomm Inc. v. Monterey Research LLC**[*]
**Desmarais LLP, NY, USA**
**Expert Witness in Memory Systems Technology**          **2021**
Case Subject Matter - SRAM and DRAM technology, memory system burst functionality and related matters.
Work Performed - Expert consulting, IPR declarations, depositions.

**Advanced Micro Devices Inc. v. Monterey Research LLC**[*]
**Desmarais LLP, NY, USA**
**Expert Witness in Memory Systems, Interconnects**          **2021**
Case Subject Matter - SRAM and DRAM technology, multi-ported memory systems, boot technology and related technologies.
Work Performed - Expert consulting, IPR declarations, depositions.

**Analog Devices Inc. v. Xilinx Inc.**[*]
**Morrison & Foerster** LLP, CA, USA
**Expert Witness in FPGAs and Configurable Computing**          **2020 - 2021**
Case Subject Matter - FPGAs and solutions related to crossbar interconnects, high speed transceivers, and configurable computing.
Work Performed - Expert consulting, IPR declarations, depositions.

**TriOptima AB v. Quantile Technologies Limited**[*]
**Caldwalader Wickersham & Taft**, New York, USA
**Expert Witness in Source Code for FinTech Systems**          **2020**
Case Subject Matter - Software technology implementations of financial services related to compression and derivatives markets.
Work Performed - Expert consulting, source code review.

**Unified Patents LLC v. JustService.net LLC**[*]
**Sheridan Ross P.C.**, Colorado, USA
**Expert Witness in Virtual Data Storage Systems**          **2020 - 2021**
Case Subject Matter - Web enabled virtual data storage systems for backup, storing and transferring of data.
Work Performed - Expert consulting, declarations, depositions.

**Karya Property Management, LLC**[*] **v. ResMan, LLC**
**Baker Botts LLP**, Houston, Texas, USA
**Expert Witness in Distributed Software Systems**          **2020 - 2021**
Case Subject Matter - Expert witness in the areas of distributed software systems, including data base technologies, as they relate to property management software and related systems.
Work Performed - Expert consulting, claim construction, IPR declarations, CBM declarations, depositions, expert reports.

**Certain Touch-Controlled Mobile Devices, Computers, and Components Thereof, Inv. No. 337-TA-1193**
**Neodron Limited**[*]
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Touch Screen Technology and Related Systems**          **2020**
Case Subject Matter - Expert witness in hardware/software systems for touch screen technology in

mobile devices.
Work Performed - Expert consulting.

**VLSI Technology LLC\* v. Intel Corporation**
**Irell & Manella LLP**, Los Angeles, CA USA
**Expert Witness in Computer Architecture**                      **2020 - 2021**
Case Subject Matter - Expert witness in the area of computer architecture, microprocessors and power management.
Work Performed - Expert consulting and source code review, expert reports, depositions, trial testimony.

**Optimum Imaging Technologies LLC\* v. Canon Inc.**
**Ruyak Cherian LLP**, Washington D.C., USA
**Expert Witness in FPGA Based Image Processing Systems**         **2019 - 2021**
Case Subject Matter - Expert witness and consultant in the area of heterogeneous FPGA/DSP/CPU based systems as applied to image and video processing technology.
Work Performed - Expert consulting, claim construction declarations, expert reports, depositions, IPR declarations.

**Dish Network, LLC v. Contemporary Display LLC\***
**Toler Law Group, P.C.**, Texas., USA
**Expert Witness in Real Time Video Processing**                      **2020**
Case Subject Matter - Expert Witness in real-time video processing technology over the Internet, including related user interfaces and quality of service.
Work Performed - Consulting, IPR declarations, deposition.

**Dish Network, LLC v. Contemporary Display LLC\***
**Toler Law Group, P.C.**, Texas., USA
**Expert Witness in Real Time Video Processing**                      **2020**
Case Subject Matter - Expert Witness in real-time video processing technology over Internet, including related user interfaces and quality of service.
Work Performed - Consulting, IPR declarations, deposition.

**Multimedia Content Management LLC\* v. Dish Network LLC**
**Sheridan Ross P.C.**, Colorado, USA
**Expert Witness in Real Time Video Processing**                      **2019 - 2020**
Case Subject Matter - Expert Witness in Internet based real-time video processing set top boxes, and related content processing and distribution.
Work Performed - Expert consulting.

**Exegy Inc. et al v. ACTIV Financial Systems, Inc.\***
**Wolf Greenfield & Sachs P.C.**, USA
**Expert Witness High Speed Computing for Financial Services**        **2019 - 2021**
Case Subject Matter - Expert Witness in microprocessor and FPGA based system design for high speed financial services, high speed RDMA systems, and related technology.
Work Performed - Expert consulting, IPR declarations, depositions.

**Certain Touch-Controlled Mobile Devices, Computers, and Components Thereof, Inv. No. 337-TA-1162**
**Neodron Limited\***
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Touch Screen Technology and Related Systems**     **2019 - 2020**
Case Subject Matter - Expert witness in hardware/software systems for touch screen technology in mobile devices.

Work Performed - Expert consulting, claim construction declaration, expert reports, depositions.

**Maxell, Ltd., et al.,* v. Apple Inc.**
**Mayer Brown LLP**, Washington D.C., USA
**Expert Witness in Embedded Computer Architecture**                    **2019 - 2021**
Case Subject Matter - Expert witness and consulting engineer in low power computing and power management.
Work Performed - Expert consulting, claim construction declaration, claim construction deposition, expert reports, infringement and validity depositions.

**Nuvoton Technology Corporation* v. Microchip Technology Inc.**
**Finnegan, Henderson, Farabow, Garrett & Dunner**, Washington D.C., USA
**Expert Witness in Embedded Computer Architecture**                    **2019 - 2020**
Case Subject Matter - Expert witness in embedded memory system hardware, direct memory access engines, memory controllers, and analog/digital and digital/analog ASICs.
Work Performed - Expert consulting, declarations, claim construction deposition, IPR declarations, deposition.

**Shuttlewagon Inc.*, v. Innovative Quality Solutions, LLC**
**Stroz Friedberg**, Massachusetts, USA
**Expert Witness in Embedded Computing**                    **2019**
Case Subject Matter - Expert witness in Programmable Logic Controllers (PLCs), IEC 61131 IE / CodeSys and real-time computing as it pertains to industrial equipment, as well as misappropriation of proprietary technology.
Work Performed - Expert consulting.

**RDM, Inc. v. Citoc Inc.***
**Citoc Incorporated**, Texas, USA
**Expert Witness in Cloud / Web Based Computing**                    **2019**
Case Subject Matter - Expert witness cloud deployed, web based, infrastructure management software and software solutions deployment. Work Performed - Expert consulting.

**ResMan, LLC v. Karya Property Management, LLC et al.***
**Beck Redden LLP**, Texas, USA
**Expert Witness in Software Design**                    **2019 - 2021**
Case Subject Matter - Expert witness in trade secret matters related to design and architecture of consumer facing software products.
Work Performed - Expert consulting, expert reports, depositions, trial testimony.

**Qualcomm* v. Apple Inc.**
**Case No. 3:17-cv-02398-DMS-MDD**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Expert Witness in Mobile Devices and Computer Architecture**                    **2019**
Case Subject Matter - Expert witness in mobile devices, computer architecture, and software system design for wireless communications.
Work Performed - Expert consulting.

**Vasu Networks Corporation***
**Skiermont Derby**, Texas, USA
**Consulting Expert in Cellular Network Technologies**                    **2019**
Case Subject Matter - Consulting expert in matters related to Single Radio Voice Call Continuity, Dual Radio Voice Call Continuity, and various heterogeneous wireless technologies and standards committees related to seamless connectivity.
Work Performed - Consulting expert.

**Qualcomm\* v. Apple Inc.**
**Case No. 37-2017-00041389-CU-BC-NC**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Expert Witness in Mobile Devices and Computer Architecture**        **2018 - 2019**
Case Subject Matter - Expert witness in mobile devices, computer architecture, and software system design for wireless communications.
Work Performed - Expert consulting.

**Qualcomm\* v. Apple Inc.**
**Inv No. 337-TA-1093**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Expert Witness in Mobile Devices and Computer Architecture**        **2017 - 2018**
Case Subject Matter - Expert witness in mobile devices, computer architecture, and software system design for wireless communications.
Work Performed - Expert consulting, expert reports, depositions, trial testimony.

**Qualcomm\* v. Apple Inc.**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Case No.** 3:17-CV-1375-DMS-MDD
**Expert Witness in Mobile Devices and Computer Architecture**        **2018 - 2019**
Case Subject Matter - Expert witness in wireless mobile devices, computer architecture, and software system design.
Work Performed - Expert consulting, expert reports, depositions, trial testimony.

**Redzone Wireless LLC v. Netgear Inc.\***
**Bird Marella**, CA, USA
**Expert Witness in Wireless Hardware/Software Systems**        **2018 - 2019**
Case Subject Matter - Manufacturing of software and hardware used in wireless routers and base stations, including chipsets and software solutions.
Work Performed - Expert consulting, expert reports, depositions.

**Nvidia\* v. ZiiLabs Corporation**
**Quinn Emanuel Urquhart & Sullivan**, NY, USA
**Expert Witness in GPU Architecture, Computer Architecture**        **2018**
Case Subject Matter - Expert witness in the areas of Graphics Processor (GPU) architectures, memory systems architectures, and microprocessor design.
Work Performed - Expert consulting.

**Acqis\* v. EMC Corporation**
**Cooley LLP**, CA, USA
**Expert Witness in Computer Architecture**        **2017 - 2018**
Case Subject Matter - Expert witness in the areas of PCI, PCI-Express, system-on-chip technology, and computer memory technologies.
Work Performed - Expert consulting.

**Qualcomm\* v. Apple Inc.**
**Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof, Inv No. 337-TA-1065**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Expert Witness in Mobile Devices and Computer Architecture**        **2017 - 2018**
Case Subject Matter - Expert witness in mobile devices, computer architecture, and software system design.

Work Performed - Expert consulting, expert reports, depositions.

**Network Management Solutions\* v. AT&T Mobility et. al**
**IP Law Leaders**, Washington DC, USA
**Expert Witness in Cellular Network Management**                    **2017**
Case Subject Matter - Expert witness in mobile devices, wireless technology, 3GPP standards, and alarm management.
Work Performed - Expert consulting.

**Certain Memory Modules and Components Thereof, and Products Containing Same, Investigation No. 337-TA-1023**
**Netlist\* v. S.K. Hynix**
**Mintz Levin Cohn Ferris Glovsky and Popeo PC**, Boston, MA, USA
**Expert Witness in Computer Architecture and Memory Systems**       **2016 - 2017**
Case Subject Matter - Expert witness in the area of JEDEC standards essential DRAM memory module technology, relating to DIMM, R-DIMM and LR-DIMM as it applies to server based computing.
Work Performed - Expert consulting, source code review, declarations, expert reports, depositions, ITC trial testimony.

**Certain Audio Processing Hardware, Software, and Products Containing Same, Inv. No. 337-TA-1026**
**Andrea Electronics Corporation\***
**Pepper Hamilton, LLP**, Washington, DC, USA
**Expert Witness in Audio Processing Hardware and Software**          **2017**
Case Subject Matter - Expert witness in hardware/software based digital signal processing systems audio processing and noise cancellation technology.
Work Performed - Expert consulting.

**Specialized Monitoring Solutions, LLC v. Lutron Electronics Co., Inc.\***
**Vinson & Elkins LLP**, Texas USA
**Expert Witness in Embedded and Distributed Software Systems**        **2017**
Case Subject Matter - Expert witness in embedded software and hardware systems, as well as distributed data storage and sensing.
Work Performed - Expert consulting.

**Huawei Technologies Co., Ltd.\*, v. Samsung Electronics America, Inc. et al**
**Sidley Austin LLP**, California USA
**Expert Witness in 4G and Legacy Cellular Technologies**             **2016 - 2017**
Case Subject Matter - Expert witness in 4G and legacy cellular technologies.
Work Performed - Expert consulting, affidavits, claim construction.

**Godo Kaisha IP Bridge 1\* v. Broadcom Limited et. al**
**Ropes & Gray LLP**, New York USA
**Expert Witness in Computer Architecture**                           **2016 - 2017**
Case Subject Matter - Consultant in the area of ARM based embedded computing architecture and system on-chip technology. Reverse engineering of VHDL, Verilog and RTL based technologies, as it pertains to multicore system architectures.
Work Performed - Expert consulting, source code review, claim construction.

**Huawei Technologies Co. Ltd.\* v. T-Mobile US, Inc. and T-Mobile USA, Inc.**
**Fish & Richardson P.C.**, Texas USA
**Expert Witness in 4G and Legacy Cellular Technologies**             **2016 - 2017**
Case Subject Matter - Expert witness in 4G and legacy cellular technologies.

Work Performed - Expert consulting, claim construction, affidavits.

**ACI Worldwide Corp. v. Mastercard International Incorporated**[*]
**Armstrong Teasdale LLP**, Missouri, USA
**Expert witness regarding financial transaction systems**                    **2016 - 2017**
Case Subject Matter - Expert witness in trade secret misappropriation as it pertains to middleware message passing systems and financial transaction networks.
Work Performed - Expert consulting, source code review, declarations, expert reports, depositions.

**Sony Computer Entertainment America v. Rothschild Digital Media Innovations**[*]
**Carey Rodriguez Milian Gonya, LLP**, Florida, USA
**Expert witness regarding distributed multimedia systems**                    **2016**
Case Subject Matter - Expert witness in the area of distributed computing systems and multimedia technologies.
Work Performed - Expert consulting, declarations, expert reports, depositions.

**DTS, Inc., et al. v. Nero AG, et al.**[*]
**Glaser Weil Fink Jacobs Howard Avchen & Shapiro**, Los Angeles CA, USA
**Expert witness regarding distributed multimedia systems**                    **2016**
Case Subject Matter - Expert witness in the area of software solutions for audio and video codecs.
Work Performed - Expert consulting, source code review, experimental analysis, expert reports, depositions.

**Advanced Silicon Technologies**[*]
**Mintz Levin Cohn Ferris Glovsky and Popeo PC**, Boston, MA, USA
**Expert Consultant in Microprocessor Architecture, Intellectual Property**  **2015 - 2016**
Case Subject Matter - Consultant in the area of computer architecture and microprocessor technologies, specifically related to memory systems.
Work Performed - Expert consulting.

**Certain Audio Processing Hardware and Software and Products Containing the Same, ITC Inv. No. 337-TA-949**
**Lenovo (United States), Inc.**[*]
**Toshiba Corp**
**Akin Gump Strauss Hauer & Feld LLP**, Philadelphia, PA, USA
**Expert Witness in Digital Signal Processing, Intellectual Property**    **2015 - 2016**
Case Subject Matter - Expert witness in hardware/software based digital signal processing systems tailored for noise cancellation technology.
Work Performed - Expert consulting, source code review, claim construction, expert reports, deposition.

**Intel Corporation v. Future Link Systems**[*]
**Irell & Manella LLP**, Los Angeles, CA USA
**Expert Witness in Computer Architecture**                    **2015 - 2018**
Case Subject Matter - Expert witness in the areas of PCI, PCI-Express, system-on-chip technology, and computer memory technologies.
Work Performed - Expert consulting, source code review, declarations, expert reports, deposition.

**Advanced Touchscreen and Gesture Technologies, LLC**[*] **v. Samsung Electronics, America, Inc., et al.**
**Robins Kaplan LLP, Intellectual Property**, Minnesota, USA
**Expert Witness in Mobile Devices and User Interfaces**                    **2015 - 2017**
Case Subject Matter - Expert witness in the analysis and reverse engineering of software systems pertaining to mobile devices, and human computer interfaces.

Work Performed - Expert consulting, declarations, expert reports.

**Intellectual Ventures\* v. Ericsson et al.**
**Dechert LLP**, Los Angeles, CA, USA
**Expert Witness in 3GPP standards and LTE Technologies, Intellectual Property 2014 - 2016**
Case Subject Matter - Expert witness in 3GPP standards as they pertain to LTE cellular communications networks, in addition to system hardware and software design.
Work Performed - Expert consulting, source code review, declarations, claim construction, tutorials.

**Papst Licensing GMBH & Co. KG.\***
**DiNovo & Price Ellwanger Hardy**, Austin, TX USA
**Expert Witness in FPGA Technologies, Intellectual Property        2014 - 2016**
Case Subject Matter - Consultant in FPGA computing platforms and design flow processes, prior art, and infringement analysis.
Work Performed - Expert consulting, claim construction.

**Locata LBS\* v. Paypal Inc., et al.**
**Glaser Weil Fink Jacobs Howard Avchen & Shapiro**, Los Angeles, CA, USA
**Expert Witness in Geofencing Systems, Intellectual Property        2014 - 2015**
Case Subject Matter - Expert witness in geofencing technology, geolocational technology, and systems architecture as it pertains to mobile cellular telecommunications and enterprise software systems.
Work Performed - Expert consulting, claim construction, expert reports, deposition testimony.

**Cell and Network Selection LLC v. ZTE\***
**Pillsbury, Winthrop Shaw & Pittman**, San Diego, CA, USA
**Expert Witness in 3G/4G Cellular Technology, Intellectual Property        2014 - 2015**
Case Subject Matter - Expert witness in technology pertaining to 3G, 3.5G, 3.75G and 4G wireless handset technology.
Work Performed - Expert consulting, claim construction, expert reports, deposition testimony.

**CA Inc. D/B/A CA Technologies\* v. AppDynamics, Inc.**
**Bracewell & Giuliani**, Houston, TX, USA
**Holland & Knight**, Boston MA USA
**Expert Witness in Enterprise Software Monitoring, Intellectual Property  2014 - 2015**
Case Subject Matter - Expert witness in technology pertaining to dynamic runtime profiling of distributed software applications, specifically around Java and .NET technologies.
Work Performed - Expert consulting, source code review, declarations, expert reports, deposition testimony.

**M Seven System Limited v. Leap Wireless International, Inc.\* et al.**
**Glaser Weil Fink Jacobs Howard Avchen & Shapiro**, Los Angeles, CA, USA
**Expert Witness in 3G/4G Feature Phone Software Systems, Intellectual Property 2014**
Case Subject Matter - Expert witness in the area of mobile telecommunications technology, particularly cellular handset hardware and software design.
Work Performed - Expert consulting, source code review.

**Lunareye v. Passtime\*.**
**Conley Rose, P.C.**, Austin, TX, USA
**Expert Witness in GPS Tracking Solutions        2014**
Case Subject Matter - Expert witness in the area of mobile GPS tracking solutions software and hardware systems.
Work Performed - Expert consulting.

**Certain Wireless Devices With 3G and/or 4G Capabilities and Components Thereof, ITC Inv. No. 337-TA-868**
**Interdigital, Inc.**[*]
**Wilson, Sonsini, Goodrich & Rosati LLP**, Austin, TX, USA
**Expert Witness in 3G/4G Cellular Technology, Intellecutal Property      2013 - 2015**
Case Subject Matter - Expert witness in software systems and hardware systems, as they pertain to 3G/4G cellular communications and standards.
Work Performed - Expert consulting, source code review, claim construction, declarations, expert report, depositions, ITC trial testimony.

**Investment Technology Group**[*] **v. United States Internal Revenue Services**
**Expert Witness in Financial Services Technology                                      2013**
Case Subject Matter - Expert witness in the area of high performance software systems targeting financial market services.
Work Performed - Expert consulting, source code review, declarations, depositions, testimony at hearing.

**Carrier Corporation v. Goodman Manufacturing**[*]**, et al.**
**Baker Botts LLP**, Houston, TX USA
**Expert Witness in Software and Hardware Systems, Intellectual Property  2013 - 2014**
Case Subject Matter - Expert witness in the area of microprocessor based, serial distributed communications systems.
Work Performed - Expert consulting, source code review.

**Gametek LLC**[*] **v. Facebook Inc. et al.**
**Collins, Edmonds, Porgorzelski, Schlather & Tower PLLC**, Houston, TX USA
*Expert Witness in Mobile Gaming Technologies, Intellectual Property*          **2013**
Case Subject Matter - Expert witness in internet based client-server software systems for mobile and web browser based gaming technology.
Work Performed - Expert consulting, source code review.

**Ultimate Pointer LLC**[*] **v. Nintendo Co. LTD et al.**
**Conley Rose P.C.**, Houston, TX USA
**Expert Witness in Console Based Video Game Technology, Intellectual Property 2013 - 2015**
Case Subject Matter - Expert witness in hardware and software systems for console based video game technology.
Work Performed - Expert consulting, source code review, declarations, expert reports, deposition testimony.

**Alliantgroup, L.P. v. Tax Point Advisors**[*]
**Jeffrey Feingold and Tax Point Advisors**, Houston, TX USA
**Expert Witness in Internet Technology                                                      2013**
Case Subject Matter - Expert witness in IP based internet technology, packet spoofing and information systems.
Work Performed - Expert consulting, declarations.

**Kerry T. Thibodeaux, M.D. v. American Lifecare Inc.**[*]
**Cox, Cox Filo, Camel & Wilson**, Lake Charles, LA USA
**Expert Witness in Medical Software Systems                                              2013**
Case Subject Matter - Expert witness in medical billing and expense recording enterprise software systems.
Work Performed - Expert consulting.

**Opelousas General Hospital Authority et al v. Fairpay Solutions Inc**[*]
**Cox, Cox Filo, Camel & Wilson**, Lake Charles, LA USA
**Expert Witness in Medical Software Systems**                                 **2013**
Case Subject Matter - Expert witness in medical billing and expense recording enterprise software systems.
Work Performed - Expert consulting.

**Wi-LAN USA, Inc. and Wi-LAN, Inc.**[*] **v. Alcatel-Lucent USA Inc.**
**Vinson Elkins LLP**, Dallas, TX USA
**Expert Witness in 3GPP LTE Technology, Intellectual Property**       **2012 - 2013**
Case Subject Matter - Reverse engineering, analysis and education of counsel in the 3GPP LTE specification, and related software and hardware systems.
Work Performed - Expert consulting, source code review, claim construction, expert declarations.

**Wi-LAN USA, Inc. and Wi-LAN, Inc.**[*] **v. Ericsson Inc., and Telefonaktiebolaget LM Ericsson**
**Vinson Elkins LLP**, Dallas, TX USA
**Expert Witness in 3GPP LTE Technology, Intellectual Property**       **2012 - 2013**
Case Subject Matter - Reverse engineering, analysis and education of counsel in the 3GPP LTE specification, and related software and hardware systems.
Work Performed - Expert consulting, source code review, claim construction, expert declarations.

**E-Contact Technologies, LLC v. Dell Inc.**[*]**, et al.**
**Baker Botts LLP**, Houston, TX USA
**Expert Witness in Mobile Operating Systems, Intellectual Property**       **2012**
Case Subject Matter - Reverse engineering and analysis of the Android operating system as it pertained to mobile and tablet computing devices. Source code reverse engineering, system architecture and related analysis.
Work Performed - Expert consulting, source code review.

**CheckFree Corporation* and CashEdge, Inc.* v. Metavante Corporation and Fidelity National Information Services, Inc.**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**, New York, NY USA
**Expert Witness in Banking and Billing Software Systems, Intellectual Property**   **2012**
Case Subject Matter - Software systems analysis and reverse engineering of large scale software based financial billing systems. Source code reverse engineering, claim chart generation, expert report generation and testimony.
Work Performed - Expert consulting, source code review.

**Realtime Data, LLC v. NASDAQ**[*]**, Chase Bank**[*]**, Goldman Sachs**[*] **et al.**
**Proskauer Rose LLP**, New York, NY USA
**Expert Witness High Performance Software Systems, Intellectual Property**       **2012**
Case Subject Matter - Expert witness for joint defense counsel in the matter of large scale high frequency financial data aggregation platforms.
Work Performed - Expert consulting, claim construction, technical tutorials, declaration, expert reports, deposition testimony.

**Realtime Data, LLC v. Thomson Reuters**[*] **et al.**
**Vinson & Elkins LLP**, Austin, TX USA
**Consultant in High Performance Software Systems, Intellectual Property**  **2011 - 2012**
Case Subject Matter - Expert witness for joint defense counsel in the matter of large scale high frequency financial data aggregation platforms.
Work Performed - Expert consulting, claim construction, technical tutorials, declaration, expert reports, deposition testimony.

**General Electric Co.* v. Mitsubishi Heavy Industries Ltd.**
**Weil, Gotshal & Manges LLP**, Dallas, TX USA
**Expert Witness in Hardware/Software Analysis, Intellectual Property      2010 - 2011**
Case Subject Matter - Reverse engineering of real-time embedded system software source code and hardware system architecture pertaining to variable speed wind turbines and FPGA based subsystems.
Work Performed - Expert consulting, declarations, source code review.

**Atlantic Specialty Insurance et al v. AE Outfitters Retail Company*, et al**
**Smith Mazure Director Wilkins Young & Yagerman, P.C.**, NY USA
**Expert Witness in Embedded Hardware/Software Systems      2011**
Case Subject Matter - Hardware and software system analysis of real-time networked embedded computing systems as it pertains to fire alarm infrastructure and fault handling.
Work Performed - Expert consulting, technical tutorial, expert declarations.

**Gamestop*, Inc v. Bexar Appraisal**
**Brusniak and Blackwell PC**, Dallas, TX USA
**Expert Witness in Software Analysis, Intellectual Property Litigation      2011**
Case Subject Matter - Expert witness on the tangibility of software as it pertains to embedded computing, networking, and gaming platforms.
Work Performed - Expert consulting, expert declarations.

**Quality Analytic Systems, Inc. v. Zebec Data Systems***
**Rymer, Moore, Jackson & Echols, P.C.**, Houston, TX USA
**Expert Witness in Software Systems      2011**
Case Subject Matter - Reverse engineering and software analysis of enterprise level internet based medical billing software systems.
Work Performed - Expert consulting, source code review, declarations, arbitration.

**Passlogix, Inc. v. 2FA Inc.***
**Expert Witness in Smart Card Middleware Solutions, Trade Secret Exposure      2010**
Case Subject Matter - Trade secret analysis of software and systems architecture as it pertains to optimal selection of smart card middleware solutions on a given computer system.
Work Performed - Expert consulting, expert declarations.

**Terra Nova Sciences*. v. JOA Oil and Gas, B. V. et al.**
**Abraham & Watkins et al. LLP**, Houston, TX USA
**Expert Witness in Software Systems, Intellectual Property Litigation      2010**
Case Subject Matter - Expert software analyst of algorithms and geomechanics modeling systems as they pertain to oil well reservoirs.
Work Performed - Expert consulting, source code review.

**Paltalk Holdings, Inc.* v. Sony Computer Entertainment America Inc. et al.**
**Heim Payne & Chorush LLP**, Houston, TX USA
*Software Analysis Expert, Intellectual Property Litigation*      **2010**
Case Subject Matter - Reverse engineering of internet based client-server video game console and server software architecture.
Work Performed - Expert consulting, source code review, infringement analysis.

**Technomedia International, Inc.* v. International Training Services, Inc., et al.**
**Bracewell & Giuliani, LLP**, Houston, TX USA
**Expert Witness in Software Analysis, Contract Dispute      2010**
Case Subject Matter - Web enabled teaching materials as it pertains to oil well drilling. Analysis of internet based audio and video content delivery mechanisms and related website architecture.

Work Performed - Expert consulting, expert reports.

**Gamestop, Inc\* v. Bexar Appraisal**
**Brusniak and Blackwell PC**, Dallas, TX USA
**Expert Witness in Software Analysis, Tax Dispute**                    **2009 - 2010**
Case Subject Matter - On the tangibility of software as it pertains to embedded computing, networking, and gaming platforms.
Work Performed - Expert consulting, expert reports.

**Whetstone Electronics, LLC\* v. Epson America, et al.**
**DiNovo & Price Ellwanger Hardy**, Austin, TX USA
**Expert Witness in System Analysis, Intellectual Property Litigation**        **2009 - 2011**
Case Subject Matter - Embedded computing systems pertaining to printer technology and computer hardware acceleration (microprocessors, DSP, FPGA and CPLD).
Work Performed - Expert consulting.

**Whetstone Electronics, LLC\* v. Xerox Corporation, et al**
**DiNovo & Price Ellwanger Hardy**, Austin, TX USA
**Expert Witness in System Analysis, Intellectual Property Litigation**        **2009 - 2011**
Case Subject Matter - Embedded computing systems pertaining to printer technology and computer hardware acceleration (microprocessors, DSP, FPGA and CPLD).
Work Performed - Expert consulting.

**General Electric, Inc.\* v. Mitsubishi Heavy Industries, Inc.**
**Vinson & Elkins LLP**, Austin, TX USA
**Expert Witness in Hardware and Software Analysis, Intellectual Property 2008 - 2009**
Case Subject Matter - Real time embedded computing and hardware/software designs for variable speed wind turbines, including digital signal processing DSP and FPGA based subsystems.
Work Performed - Expert consulting, source code review, technical tutorials, declarations, expert reports, depositions, ITC trial preparation.

**Paltalk Holdings, Inc.\* v. Microsoft Corporation**
**Heim Payne & Chorush LLP**, Houston, TX USA
**Technical Expert, Intellectual Property Litigation**                    **2007 - 2008**
Case Subject Matter - Internet based client server console gaming architecture for real time experience.
Work Performed - Expert consulting, source code review, technical tutorials.

**SuperSpeed Software, LLC\* v. IBM Corporation**
**Heim Payne & Chorush LLP**, Houston, TX USA
**Technical Expert in Software Analysis, Intellectual Property Litigation**    **2007 - 2008**
Case Subject Matter - Computer database technology, parallel file systems and clustered computing.
Work Performed - Expert consulting, technical tutorial, source code review.

**QPSX Developments 5 Pty Ltd.\* v. Juniper Networks, Inc.**
**Fulbright and Jaworski LLP**, Houston, TX USA
*Technical Consultant, Intellectual Property Litigation*                    **2006 - 2007**
Case Subject Matter - Data transmission algorithms for computer networks.
Work Performed - Consulting, claim construction, claim chart preparation, technical tutorials.

**Commonwealth Scientific and Indus. Research Org.\* v. Buffalo Tech. Inc.**
**Fulbright and Jaworski LLP**, Houston, TX USA
**Technical Consultant, Intellectual Property Litigation**                    **2006 - 2007**
Case Subject Matter - High speed data rate network for wireless local area networks.

Work Performed - Consulting, claim construction, claim chart preparation, technical tutorials.

**Microsoft Corporation v. Commonweatlh Scientific and Indus. Research Org.**[*]
**Fulbright and Jaworski LLP**, Houston, TX USA
**Technical Consultant, Intellectual Property Litigation**                2006 - 2007
Case Subject Matter - High speed data rate communications for wireless local area networks.
Work Performed - Consulting, claim construction, claim chart preparation, technical tutorials.

**Tantivy Communications, Inc.**[*] **v. Lucent Technologies, Inc.**
**Fulbright and Jaworski LLP**, Houston, TX USA
**Technical Consultant, Intellectual Property Litigation**                2004 - 2005
Case Subject Matter - CDMA2000 based cellular networks, including data retransmission algorithms at multiple layers.
Work Performed - Consulting, claim construction, claim chart preparation, technical tutorials.

**Volunteer Organizations**

**Rice Alliance for Technology and Entrepreneurship** Austin, Texas, USA
*Executive Committee*                2009 - Present
The Rice Alliance for Technology and Entrepreneurship strives to improve the entrepreneurial ecosystem of Central Texas by: helping entrepreneurs successfully found, fund, grow and exit new companies, helping investors successfully identify and engage with promising new ventures, and showcasing emerging technologies and business models to further educate and engage the community.

**Capital Factory**, TX USA
*Mentor*                2014 - Present
Mentor, advisor and investor in one of the most successful start-up accelerators in the United States.

**OwlSpark - Rice University**, Houston, Texas, USA
*Mentor*                2014
Mentor and advisor to university based early stage technology companies within Rice University's accelerator program.

**Incubation Station**, TX USA
*Mentor*                2013
Incubation Station is an accelerator that brings together a consortium of Austins notable entrepreneurs, investors and advisors for the purpose of mentoring high-potential, market-validated consumer product companies to more effectively manufacture, distribute, market and grow their products and services.

**Honors and Awards**

Texas Instruments Fellowship Recipient
Nokia Grant Recipient
National Science Foundation Grant Recipient
Rice University Fellowship Recipient
Rensselaer Alumni Scholarship Recipient
Linear Tech / Mueller Scholarship Recipient
Rensselaer Polytechnic Institute: Graduated Cum Laude, Deans List All Semesters
Eta Kappa Nu - National Electrical and Computer Engineering Honors Society
IEEE Member - Institute of Electrical and Electronics Engineers
ACM Member - Association For Computing Machinery

# Exhibit 2

## MATERIALS CONSIDERED
### Dr. Michael C. Brogioli

| PRODUCTION DOCUMENTS | | |
|---|---|---|
| ARM_00000634; (132241) | QCARM_7517677 | QCVARM_1069941 |
| ARM_00001067 | QCARM_7622616 | QCVARM_1069945 |
| ARM_00001192 | QCVARM_0000061 | QCVARM_1069949 |
| ARM_00001195 | QCVARM_0000085 | QCVARM_1070034 |
| ARM_00001198 | QCVARM_0000092 | QCVARM_1070271 |
| ARM_00001495 | QCVARM_0000114 | QCVARM_1070919 |
| ARM_00001512 | QCVARM_0000123 | QCVARM_1070944 |
| ARM_00001777 | QCVARM_0000135 | QCVARM_1070982 |
| ARM_00002045 | QCVARM_0000142 | QCVARM_1070993 |
| ARM_00003305 | QCVARM_0000180 | QCVARM_1071021 |
| ARM_00005340 | QCVARM_0000218 | QCVARM_1071165 |
| ARM_00025401 | QCVARM_0000269 | QCVARM_1071192 |
| ARM_00025402 | QCVARM_0000395 | QCVARM_1071193 |
| ARM_00025403 | QCVARM_0003565 | QCVARM_1071194 |
| ARM_00036346 | QCVARM_0008126 | QCVARM_1072199 |
| ARM_00055357 | QCVARM_0447175 | QCVARM_1078822 |
| ARM_00056571 | QCVARM_0447248 | QCVARM_1090346 |
| ARM_00062441 | QCVARM_0447252 | QCVARM_1117866 |
| ARM_00062474 | QCVARM_0448361 | QCVARM_1117873 |
| ARM_00063298 | QCVARM_0448757 | QCVARM_1117891 |
| ARM_00067349 | QCVARM_0448842 | QCVARM_1117901 |
| ARM_00068087 | QCVARM_0449653 | QCVARM_1117934 |

| | | |
|---|---|---|
| ARM_00068131 | QCVARM_0449658 | QCVARM_1117938 |
| ARM_00068459 | QCVARM_0449970 | QCVARM_1117942 |
| ARM_00068504 | QCVARM_0451824 | QCVARM_1117977 |
| ARM_00075096 | QCVARM_0452199 | QCVARM_1117981 |
| ARM_00075098 | QCVARM_0452296 | QCVARM_1118003 |
| ARM_00075343 | QCVARM_0452598 | QCVARM_1118012 |
| ARM_00076113 | QCVARM_0453724 | QCVARM_1118024 |
| ARM_00079520 | QCVARM_0454071 | QCVARM_1118029 |
| ARM_00079530 | QCVARM_0454629 | QCVARM_1118043 |
| ARM_00079722 | QCVARM_0457029 | QCVARM_1118059 |
| ARM_00082009 | QCVARM_0463558 | QCVARM_1118067 |
| ARM_00085567 | QCVARM_0467659 | QCVARM_1118081 |
| ARM_00086164 | QCVARM_0467852 | QCVARM_1118085 |
| ARM_00087844 | QCVARM_0468148 | QCVARM_1118089 |
| ARM_00089058 | QCVARM_0468174 | QCVARM_1118481 |
| ARM_00090791 | QCVARM_0468422 | QCVARM_1118510 |
| ARM_00091389 | QCVARM_0468612 | QCVARM_1118515 |
| ARM_00091657 | QCVARM_0523656 | QCVARM_1118518 |
| ARM_00091659 | QCVARM_0523826 | QCVARM_1118524 |
| ARM_00091714 | QCVARM_0523837 | QCVARM_1118528 |
| ARM_00091768 | QCVARM_0524007 | QCVARM_1118531 |
| ARM_00091799 | QCVARM_0524624 | QCVARM_1118534 |
| ARM_00091834 | QCVARM_0525344 | QCVARM_1118538 |
| ARM_00091869 | QCVARM_0526828 | QCVARM_1118543 |

| | | |
|---|---|---|
| ARM_00091903 | QCVARM_0527125 | QCVARM_1118546 |
| ARM_00094099 | QCVARM_0527544 | QCVARM_1118549 |
| ARM_00094197 | QCVARM_0527546 | QCVARM_1118552 |
| ARM_00094200 | QCVARM_0528119 | QCVARM_1118555 |
| ARM_00094204 | QCVARM_0528955 | QCVARM_1118559 |
| ARM_00100013 | QCVARM_0528956 | QCVARM_1118565 |
| ARM_00102683 | QCVARM_0529072 | QCVARM_1119008 |
| ARM_00103566 | QCVARM_0529887 | QCVARM_1119108 |
| ARM_00103635 | QCVARM_0531350 | QCVARM_1120024 |
| ARM_00103918 | QCVARM_0531892 | QCVARM_1120153 |
| ARM_00110020 | QCVARM_0532239 | QCVARM_1120206 |
| ARM_00110507 | QCVARM_0534596 | QCVARM_1120224 |
| ARM_00110511 | QCVARM_0534597 | QCVARM_1120267 |
| ARM_00110513 | QCVARM_0535116 | QCVARM_1120481 |
| ARM_00114880 | QCVARM_0537065 | QCVARM_1120482 |
| ARM_00118835 | QCVARM_0540468 | QCVARM_1120486 |
| ARM_00132256 | QCVARM_0573056 | QCVARM_1120490 |
| ARM_01020098 | QCVARM_0573677 | QCVARM_1120495 |
| ARM_01020186 | QCVARM_0575611 | QCVARM_1120497 |
| ARM_01020195 | QCVARM_0575613 | QCVARM_1120535 |
| ARM_01215486 | QCVARM_0575616 | QCVARM_1120540 |
| ARM_01215564 | QCVARM_0575617 | QCVARM_1120546 |
| ARM_01215878 | QCVARM_0577503 | QCVARM_1120548 |
| ARM_01215885 | QCVARM_0595815 | QCVARM_1120549 |

3

| | | |
|---|---|---|
| ARM_01215886 | QCVARM_0599801 | QCVARM_1120550 |
| ARM_01215887 | QCVARM_0600038 | QCVARM_1120551 |
| ARM_01215888 | QCVARM_0600039 | QCVARM_1120552 |
| ARM_01215889 | QCVARM_0600040 | QCVARM_1120553 |
| ARM_01215997 | QCVARM_0600041 | QCVARM_1120554 |
| ARM_01216002 | QCVARM_0600042 | QCVARM_1120555 |
| ARM_01216178 | QCVARM_0600043 | QCVARM_1120556 |
| ARM_01230076 | QCVARM_0600044 | QCVARM_1120557 |
| ARM_01230110 | QCVARM_0600045 | QCVARM_1120558 |
| ARM_01230123 | QCVARM_0600046 | QCVARM_1120559 |
| ARM_01230402 | QCVARM_0600047 | QCVARM_1120560 |
| ARM_01231025 | QCVARM_0600048 | QCVARM_1120561 |
| ARM_01231038 | QCVARM_0600049 | QCVARM_1120562 |
| ARM_01231394 | QCVARM_0600050 | QCVARM_1120563 |
| ARM_01235323 | QCVARM_0600051 | QCVARM_1120564 |
| ARM_01238384 | QCVARM_0600052 | QCVARM_1120565 |
| ARM_01241285 | QCVARM_0600053 | QCVARM_1120566 |
| ARM_01241565 | QCVARM_0600054 | QCVARM_1120567 |
| ARM_01241577 | QCVARM_0600055 | QCVARM_1120568 |
| ARM_01241585 | QCVARM_0600056 | QCVARM_1120569 |
| ARM_01249519 | QCVARM_0600057 | QCVARM_1120570 |
| ARM_01282655 | QCVARM_0600058 | QCVARM_1120571 |
| ARM_01293447 | QCVARM_0600059 | QCVARM_1120572 |
| ARM_01308019 | QCVARM_0600060 | QCVARM_1120573 |

A0221

| | | |
|---|---|---|
| ARM_01314327 | QCVARM_0600061 | QCVARM_1120574 |
| ARM_01314329 | QCVARM_0600062 | QCVARM_1120575 |
| ARM_01423632 | QCVARM_0600063 | QCVARM_1120576 |
| ARM_01424394 | QCVARM_0600064 | QCVARM_1120577 |
| ARM_01427450 | QCVARM_0600065 | QCVARM_1120578 |
| ARMQC_00000640 | QCVARM_0600066 | QCVARM_1120579 |
| ARMQC_00001038 | QCVARM_0600067 | QCVARM_1120580 |
| ARMQC_00001136 | QCVARM_0600068 | QCVARM_1120581 |
| ARMQC_00001163 | QCVARM_0600069 | QCVARM_1120582 |
| ARMQC_00027166 | QCVARM_0600070 | QCVARM_1120583 |
| ARMQC_00103710 | QCVARM_0600071 | QCVARM_1120584 |
| ARMQC_00103718 | QCVARM_0600072 | QCVARM_1120585 |
| ARMQC_02600838 | QCVARM_0600073 | QCVARM_1120586 |
| ARMQC_02601067 | QCVARM_0600074 | QCVARM_1120587 |
| ARMQC_02602445 | QCVARM_0600075 | QCVARM_1120588 |
| ARMQC_02602450 | QCVARM_0600076 | QCVARM_1120589 |
| ARMQC_02602454 | QCVARM_0600077 | QCVARM_1120590 |
| ARMQC_02602458 | QCVARM_0600078 | QCVARM_1120591 |
| ARMQC_02602462 | QCVARM_0600079 | QCVARM_1120592 |
| ARMQC_02602466 | QCVARM_0600080 | QCVARM_1120593 |
| ARMQC_02602472 | QCVARM_0600081 | QCVARM_1120594 |
| ARMQC_02602528 | QCVARM_0600082 | QCVARM_1120595 |
| ARMQC_02602531 | QCVARM_0600083 | QCVARM_1120596 |
| ARMQC_02602547 | QCVARM_0600084 | QCVARM_1120597 |

| | | |
|---|---|---|
| ARMQC_02602550 | QCVARM_0600085 | QCVARM_1120598 |
| ARMQC_02602646 | QCVARM_0600086 | QCVARM_1120599 |
| ARMQC_02603587 | QCVARM_0600087 | QCVARM_1120600 |
| ARMQC_026046020 | QCVARM_0600088 | QCVARM_1120601 |
| ARMQC_02604609 | QCVARM_0600089 | QCVARM_1120602 |
| ARMQC_02604610 | QCVARM_0600090 | QCVARM_1120603 |
| ARMQC_02604611 | QCVARM_0600091 | QCVARM_1120604 |
| ARMQC_02604612 | QCVARM_0600092 | QCVARM_1120605 |
| ARMQC_02604613 | QCVARM_0600093 | QCVARM_1120606 |
| ARMQC_02604614 | QCVARM_0600094 | QCVARM_1120607 |
| ARMQC_02604615 | QCVARM_0600095 | QCVARM_1120608 |
| ARMQC_02604616 | QCVARM_0600096 | QCVARM_1120609 |
| ARMQC_02604617 | QCVARM_0600097 | QCVARM_1120610 |
| ARMQC_02604618 | QCVARM_0600098 | QCVARM_1120611 |
| ARMQC_02604619 | QCVARM_0600101 | QCVARM_1120612 |
| ARMQC_02604620 | QCVARM_0602198 | QCVARM_1120613 |
| ARMQC_02604621 | QCVARM_0602227 | QCVARM_1120614 |
| ARMQC_02604622 | QCVARM_0602258 | QCVARM_1120615 |
| ARMQC_02604623 | QCVARM_0602295 | QCVARM_1120616 |
| ARMQC_02627275 | QCVARM_0602359 | QCVARM_1120617 |
| ARMQC_02720214 | QCVARM_0602404 | QCVARM_1120618 |
| ARMQC_02720220 | QCVARM_0602564 | QCVARM_1120619 |
| ARMQC_02720226 | QCVARM_0602952 | QCVARM_1120620 |
| ARMQC_02720230 | QCVARM_0605502 | QCVARM_1120621 |

6

| ARMQC_02720249 | QCVARM_0607060 | QCVARM_1120622 |
| ARMQC_02720251 | QCVARM_0608131 | QCVARM_1120623 |
| ARMQC_02720258 | QCVARM_0608391 | QCVARM_1120624 |
| ARMQC_02720259 | QCVARM_0608423 | QCVARM_1120625 |
| ARMQC_02720265 | QCVARM_0613037 | QCVARM_1120626 |
| ARMQC_02720272 | QCVARM_0613083 | QCVARM_1120627 |
| ARMQC_02720278 | QCVARM_0613160 | QCVARM_1120628 |
| ARMQC_02720279 | QCVARM_0616871 | QCVARM_1120629 |
| ARMQC_02720284 | QCVARM_0616912 | QCVARM_1120630 |
| ARMQC_02720291 | QCVARM_0616916 | QCVARM_1120631 |
| ARMQC_02720292 | QCVARM_0616935 | QCVARM_1120632 |
| ARMQC_02720300 | QCVARM_0616952 | QCVARM_1120633 |
| ARMQC_02720303 | QCVARM_0616967 | QCVARM_1120634 |
| ARMQC_02720310 | QCVARM_0616970 | QCVARM_1120635 |
| ARMQC_02720315 | QCVARM_0617730 | QCVARM_1120636 |
| ARMQC_02720320 | QCVARM_0617948 | QCVARM_1120637 |
| ARMQC_02720324 | QCVARM_0617951 | QCVARM_1120638 |
| ARMQC_02720329 | QCVARM_0617954 | QCVARM_1120639 |
| ARMQC_02720333 | QCVARM_0617961 | QCVARM_1120640 |
| ARMQC_02720337 | QCVARM_0617964 | QCVARM_1120641 |
| ARMQC_02720342 | QCVARM_0618338 | QCVARM_1120642 |
| ARMQC_02720347 | QCVARM_0618354 | QCVARM_1120643 |
| ARMQC_02720352 | QCVARM_0618382 | QCVARM_1120644 |
| ARMQC_02720799 | QCVARM_0618384 | QCVARM_1120645 |

A0224

| | | |
|---|---|---|
| ARMQC_02727610 | QCVARM_0618420 | QCVARM_1120646 |
| ARMQC_02729064 | QCVARM_0618453 | QCVARM_1120647 |
| ARMQC_02731051 | QCVARM_0618712 | QCVARM_1120648 |
| ARMQC_02732393 | QCVARM_0618741 | QCVARM_1120649 |
| ARMQC_02732558 | QCVARM_0618977 | QCVARM_1120650 |
| ARMQC_02739661 | QCVARM_0621447 | QCVARM_1120651 |
| ARMQC_02741466 | QCVARM_0621448 | QCVARM_1120652 |
| ARMQC_02742804 | QCVARM_0621692 | QCVARM_1120653 |
| ARMQC_02742823 | QCVARM_0626519 | QCVARM_1120654 |
| ARMQC_02742861 | QCVARM_0626590 | QCVARM_1120655 |
| ARMQC_02745725 | QCVARM_0626603 | QCVARM_1120656 |
| ARMQC_02746634 | QCVARM_0685544 | QCVARM_1120657 |
| ARMQC_02746871 | QCVARM_0685578 | QCVARM_1120658 |
| ARMQC_02747093 | QCVARM_0687476 | QCVARM_1120659 |
| ARMQC_02747097 | QCVARM_0687479 | QCVARM_1120660 |
| ARMQC_02747103 | QCVARM_0688777 | QCVARM_1120661 |
| ARMQC_02747104 | QCVARM_0688932 | QCVARM_1120662 |
| ARMQC_02747567 | QCVARM_0689117 | QCVARM_1120663 |
| ARMQC_02747848 | QCVARM_0691521 | QCVARM_1120664 |
| ARMQC_02755397 | QCVARM_0691526 | QCVARM_1120665 |
| ARMQC_02755446 | QCVARM_0691853 | QCVARM_1120666 |
| ARMQC_02755490 | QCVARM_0692665 | QCVARM_1120667 |
| ARMQC_02755534 | QCVARM_0699176 | QCVARM_1120668 |
| ARMQC_02755580 | QCVARM_0699179 | QCVARM_1120669 |

8

| | | |
|---|---|---|
| ARMQC_02755624 | QCVARM_0699275 | QCVARM_1120670 |
| ARMQC_02755674 | QCVARM_0699278 | QCVARM_1120671 |
| ARMQC_02755903 | QCVARM_0707732 | QCVARM_1120672 |
| ARMQC_02755905 | QCVARM_0707997 | QCVARM_1120673 |
| ARMQC_02756148 | QCVARM_0708086 | QCVARM_1120674 |
| ARMQC_02756208 | QCVARM_0708107 | QCVARM_1120675 |
| ARMQC_02756245 | QCVARM_0708118 | QCVARM_1120676 |
| ARMQC_02756246 | QCVARM_0710047 | QCVARM_1120677 |
| ARMQC_02756344 | QCVARM_0713513 | QCVARM_1120678 |
| ARMQC_02756542 | QCVARM_0713516 | QCVARM_1120679 |
| ARMQC_02756544 | QCVARM_0713528 | QCVARM_1120680 |
| ARMQC_02756860 | QCVARM_0713530 | QCVARM_1120681 |
| ARMQC_02760525 | QCVARM_0713532 | QCVARM_1120682 |
| ARMQC_02762974 | QCVARM_0713535 | QCVARM_1120683 |
| ARMQC_02762991 | QCVARM_0713538 | QCVARM_1120684 |
| ARMQC_02762992 | QCVARM_0713652 | QCVARM_1120685 |
| ARMQC_02763016 | QCVARM_0713665 | QCVARM_1120686 |
| ARMQC_02770599 | QCVARM_0713840 | QCVARM_1120687 |
| ARMQC_02771125 | QCVARM_0715414 | QCVARM_1120688 |
| ARMQC_02771126 | QCVARM_0716360 | QCVARM_1120689 |
| ARMQC_02771127 | QCVARM_0716389 | QCVARM_1120690 |
| ARMQC_02771128 | QCVARM_0717008 | QCVARM_1120691 |
| ARMQC_02771129 | QCVARM_0717291 | QCVARM_1120692 |
| ARMQC_02771151 | QCVARM_0717359 | QCVARM_1120693 |

9

| ARMQC_02771168 | QCVARM_0717757 | QCVARM_1120694 |
| ARMQC_02772241 | QCVARM_0717964 | QCVARM_1120695 |
| ARMQC_02772246 | QCVARM_0846761 | QCVARM_1120696 |
| ARMQC_02773656 | QCVARM_0846871 | QCVARM_1120697 |
| ARMQC_02774029 | QCVARM_0847000 | QCVARM_1120698 |
| ARMQC_02774378 | QCVARM_0847094 | QCVARM_1120699 |
| ARMQC_02774539 | QCVARM_0847188 | QCVARM_1120700 |
| ARMQC_02774642 | QCVARM_0847548 | QCVARM_1120701 |
| ARMQC_02774767 | QCVARM_0848033 | QCVARM_1120702 |
| ARMQC_02774844 | QCVARM_0851120 | QCVARM_1120703 |
| ARMQC_02778180 | QCVARM_0851333 | QCVARM_1120704 |
| ARMQC_02779064 | QCVARM_0851410 | QCVARM_1120705 |
| ARMQC_02779076 | QCVARM_0851449 | QCVARM_1120706 |
| ARMQC_02779099 | QCVARM_0851511 | QCVARM_1120707 |
| ARMQC_02779107 | QCVARM_0851876 | QCVARM_1120708 |
| ARMQC_02779116 | QCVARM_0852203 | QCVARM_1120709 |
| ARMQC_02779122 | QCVARM_0854027 | QCVARM_1120710 |
| ARMQC_02779133 | QCVARM_0855474 | QCVARM_1120711 |
| ARMQC_02779171 | QCVARM_0857113 | QCVARM_1120712 |
| ARMQC_02779174 | QCVARM_0857149 | QCVARM_1120713 |
| ARMQC_02779176 | QCVARM_0857152 | QCVARM_1120714 |
| ARMQC_02779179 | QCVARM_0863181 | QCVARM_1120715 |
| ARMQC_02779181 | QCVARM_0863435 | QCVARM_1120716 |
| ARMQC_02783473 | QCVARM_0863641 | QCVARM_1120717 |

A0227

| | | |
|---|---|---|
| ARMQC_02783618 | QCVARM_0863644 | QCVARM_1120718 |
| ARMQC_02783619 | QCVARM_0864030 | QCVARM_1120719 |
| ARMQC_02784120 | QCVARM_0864277 | QCVARM_1120720 |
| ARMQC_02784199 | QCVARM_0864833 | QCVARM_1120721 |
| ARMQC_02784204 | QCVARM_0864834 | QCVARM_1120722 |
| ARMQC_02784227 | QCVARM_0864838 | QCVARM_1120723 |
| FGS_0000162 | QCVARM_0864924 | QCVARM_1120724 |
| FGS_0000395 | QCVARM_0864967 | QCVARM_1120725 |
| FGS_0000409 | QCVARM_0864969 | QCVARM_1120726 |
| FGS_0000446 | QCVARM_0865344 | QCVARM_1120727 |
| FGS_0000458 | QCVARM_0865345 | QCVARM_1120728 |
| FGS_0000525 | QCVARM_0865370 | QCVARM_1120999 |
| QCARM_0027985 | QCVARM_0865490 | QCVARM_1121337 |
| QCARM_00343954 | QCVARM_0866177 | QCVARM_1121338 |
| QCARM_0337838 | QCVARM_0867422 | QCVARM_1121341 |
| QCARM_0338573 | QCVARM_1012343 | QCVARM_1121346 |
| QCARM_0340017 | QCVARM_1012399 | QCVARM_1121350 |
| QCARM_0343120 | QCVARM_1014030 | QCVARM_1121359 |
| QCARM_0343533 | QCVARM_1014307 | QCVARM_1121930 |
| QCARM_0343954 | QCVARM_1014955 | QCVARM_1121931 |
| QCARM_0562765 | QCVARM_1015821 | QCVARM_1122733 |
| QCARM_0566625 | QCVARM_1018853 | QCVARM_1122742 |
| QCARM_2412907 | QCVARM_1019083 | QCVARM_1122745 |
| QCARM_2430181 | QCVARM_1022267 | QCVARM_1126209 |

11

| | | |
|---|---|---|
| QCARM_3059661 | QCVARM_1022268 | QCVARM_1129673 |
| QCARM_3066477 | QCVARM_1024852 | QCVARM_1129695 |
| QCARM_3215122 | QCVARM_1028388 | QCVARM_1129711 |
| QCARM_3216178 | QCVARM_1028750 | QCVARM_1130170 |
| QCARM_3337526 | QCVARM_1029757 | QCVARM_1133205 |
| QCARM_3337900 | QCVARM_1029911 | QCVARM_1133211 |
| QCARM_3338108 | QCVARM_1030509 | QCVARM_1133757 |
| QCARM_3339493 | QCVARM_1030813 | QCVARM_1137360 |
| QCARM_3352796 | QCVARM_1030816 | QCVARM_1140735 |
| QCARM_3353006 | QCVARM_1031097 | QCVARM_1140739 |
| QCARM_3353040 | QCVARM_1042773 | QCVARM_1140742 |
| QCARM_3353126 | QCVARM_1042776 | QCVARM_1141284 |
| QCARM_3424233 | QCVARM_1042777 | QCVARM_1146697 |
| QCARM_3424399 | QCVARM_1066278 | QCVARM_1149389 |
| QCARM_3424873 | QCVARM_1066811 | QCVARM_1149435 |
| QCARM_3428243 | QCVARM_1066820 | QCVARM_1149528 |
| QCARM_3430479 | QCVARM_1067283 | QCVARM_1151573 |
| QCARM_3433633 | QCVARM_1067284 | QCVARM_1151597 |
| QCARM_3460976 | QCVARM_1068222 | QCVARM_1151603 |
| QCARM_3460981 | QCVARM_1068388 | QCVARM_1151620 |
| QCARM_3522626 | QCVARM_1068512 | QCVARM_1151672 |
| QCARM_3537383 | QCVARM_1068516 | QCVARM_1151710 |
| QCARM_3537716 | QCVARM_1068521 | QCVARM_1151907 |
| QCARM_7474253 | QCVARM_1068525 | QCVARM_1151964 |

12

| | | |
|---|---|---|
| QCARM_7477120 | QCVARM_1068603 | QCVARM_1151965 |
| QCARM_7484471 | QCVARM_1068612 | QCVARM_1151966 |
| QCARM_7484477 | QCVARM_1068666 | QCVARM_1151967 |
| QCARM_7484481 | QCVARM_1068922 | QCVARM_1151968 |
| QCARM_7509431 | | |

**Pleadings from C.A. No. 1:24-cv-00490-MN:**
- [Dkt. 02] Plaintiff Qualcomm's Original Complaint (FILED UNDER SEAL)
- [Dkt. 36] QC First Amended Complaint & Exhibit A (FILED UNDER SEAL)
- [Dkt. 39] QC First Amended Complaint & Exhibit A (Public)
- [Dkt. 137] Plaintiff Qualcomm's Second Amended Complaint (FILED UNDER SEAL)
- [Dkt. 137-01] Exhibit A to Plaintiff Qualcomm's Second Amended Complaint (FILED UNDER SEAL)
- [Dkt. 378] Plaintiffs' Letter in Response to Defendant's August 11 Letter to Special Master Helena C. Rychlicki & Docket Entries and Cited Exhibits Therein

**Pleadings from C.A. No. 1:22-cv-01146-MN:**
- [Dkt. 001] Plaintiff Arm LTD's Complaint
- [Dkt. 018] Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim (FILED UNDER SEAL)
- [Dkt. 018ECF] Notice of Electronic Filing re [Dkt. 018]
- 2022.11.15 [Dkt. 21] Arm's Answer and Affirmative Defenses to Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim
- [Dkt. 303] Plaintiff's Letter to the Honorable Laura D. Hatcher Regarding Redactions to the March 6, 2024 Memorandum Order (with Exhibits)
- [Dkt. 312-01] Exhibit B to R. Calico Declaration (Hearing Transcript re Motion to Amend)
- [Dkt. 596] Opening Brief in Support of Plaintiff Arm LTD.'s Motion for Judgment as a Matter of Law or a New Trial (FILED UNDER SEAL)
- [Dkt. 596ECF] Notice of Electronic Filing re [Dkt. 596]
- [Dkt. 571 ECF] Jury Verdict
- [Dkt. 572] Verdict Form
- [Dkt. 595] Arm's Motion for Judgement as a Matter of Law or a New Trial
- [Dkt. 597] Nuvia, Inc.'s Renewed motions for Judgment as a Matter of Law
- [Dkt. 602] Qualcomm's Post-Trial Brief Regarding Equitable Defenses
- [Dkt. 614] Reply Brief in Support of Plaintiff Arm LTD.'s Motion for Judgment as a Matter of Law or a New Trial (FILED UNDER SEAL)
- DTX-0936 (Qualcomm Brings Receipts: Snapdragon X Elite Gets Benchmarked, Completely Dunks on Apple's M2 Processor)
- DTX-0937 (Windows Finally Has its Apple Mac Moment, and I'm More Excited About the Future of Laptops Than Ever Before)

13

- JTX-0001 (Nuvia ALA)
- JTX-0002 (Nuvia ALA v8 Annex – September 2019)
- JTX-0005 (Nuvia ALA v8 Annex – March 2020)
- JTX-0010 (QC ALA)
- JTX-0011 (QC ALA v8 Annex)
- JTX-0012 (QC ALA v8-Next Annex)
- JTX-0013 (QC ALA v9 Annex)

**Depositions (and Exhibits thereto):**
- 2023.10.25 Deposition Transcript of Jignesh Trivedi
- 2023.12.12 Deposition Transcript of Rene Haas
- 2023.12.14 Deposition Transcript of Vivek Agrawal (Corrected)
- 2023.11.15 Deposition Transcript of Richard Grisenthwaite
- 2025.06.17 Deposition Transcript of Phil Hughes
- 2025.06.18 Deposition Transcript of Karl Whealton
- 2025.06.20 Deposition Transcript of Martin Weidmann
- 2025.06.20 Deposition Transcript of Karthik Shivashankar
- 2025.06.25 Deposition Transcript of Gerard Williams
- 2025.06.25 Deposition Transcript of Kurt Wolf
- 2025.06.26 Deposition Transcript of William Abbey
- 2025.06.27 Deposition Transcript of Michael Williams
- 2025.06.27 Deposition Transcript of Richard Meacham
- 2025.07.01 Deposition Transcript of Jean Francois Vidon
- 2025.07.01 Deposition Transcript of Andrew Howard
- 2025.07.02 Deposition Transcript of Richard Grisenthwaite
- 2025.07.02 Deposition Transcript of Christopher Patrick
- 2025.07.02 Deposition Transcript of Paul Williamson
- 2025.07.03 Deposition Transcript of Jeffrey Golden
- 2025.07.03 Deposition Transcript of Cristiano Amon
- 2025.07.03 Deposition Transcript of Lynn Couillard
- 2025.07.04 Deposition Transcript of Peter Greenhalgh
- 2025.07.07 Deposition Transcript of Ziad Asghar
- 2025.07.07 Deposition Transcript of Aparajita Bhattacharya
- 2025.07.09 Deposition Transcript of Jignesh Trivedi
- 2025.07.09 Deposition Transcript of Jeffrey Fonseca
- 2025.07.10 Deposition Transcript of Durga Malladi
- 2025.07.10 Deposition Transcript of Akshay Bhatnagar
- 2025.07.11 Deposition Transcript of Larissa Cochron
- 2025.07.11 Deposition Transcript of James Jeon
- 2025.07.11 Deposition Transcript of Jonathan Weiser
- 2025.07.11 Deposition Transcript of Vivek Agrawal
- 2025.07.29 Deposition Transcript of Mohamed Awad
- 2025.07.30 Deposition Transcript of Anupa George

**Expert Reports:**
- Opening Expert Report of Patrick F. Kennedy, Ph.D., dated August 8, 2025
- Opening Expert Report of Eric A. Posner, dated August 8, 2025

**Discovery Requests and Responses:**
- 2025.03.10 QC Responses & Objections to Arm's 1st Set of ROGs (Nos. 1-9) (Highly Confidential – Attorneys' Eyes Only)
- 2025.05.09 QC Responses & Objections to Arm's 2nd Set of ROGs (Nos. 10-13) (Highly Confidential – Attorneys' Eyes Only)
- 2025.03.24 Arm Responses & Objections to QC's 1st Set of ROGs (Nos. 1-3) (Highly Confidential – Attorneys' Eyes Only)
- 2025.05.12 Arm's Responses and Objections to QC's Amended ROG No. 3 (Highly Confidential – Attorneys' Eyes Only)
- 2025.06.25 QC's 1st Supplemental Responses and Objections to Arm's 1st Set of ROGs (Nos. 1-5, 7, & 9) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 Arm's 1st Supplemental Responses and Objections to QC's 1st Set of ROGs (Nos. 1-3) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 Arm's 1st Supplemental Responses and Objections to QC's 1st Set of Amended ROG No. 3 (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 Arm's 1st Supplemental Responses and Objections to QC's 2nd Set of ROGs (Nos. 4-11) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 Arm's 1st Supplemental Responses and Objections to QC's 3rd Set of ROGs (No. 12) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 QC's 2nd Supplemental Responses and Objection to Arm's 1st Set of ROGs (Nos. 1-9) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 QC's Responses and Objections to Arm's 2nd Set of ROGs (Nos. 10-13) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 QC's Responses and Objections to Arm's 3rd Set of ROGs (Nos. 14-24) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 QC's Responses and Objections to Arm's 1st Set of RFAs (Nos. 1-30) (Confidential)
- 2025.08.08 QC's 1st Supplemental Responses and Objections to Arm's 3rd Set of Interrogatories (Nos. 14-24) (Highly Confidential)
- 2025.08.08 QC's 2nd Supplemental Responses and Objections to Arm's 2nd Set of Interrogatories (Nos. 10-13) (Highly Confidential)
- 2025.08.08 QC's 3rd Supplemental Responses and Objections to Arm's 1st Set of ROGs (Nos. 1-9) (Highly Confidential)

**Websites and Articles:**
- Allain & Rey, "Vertical Integration as a Source of Hold-up," TSE-525, Sept. 2014
- "A Detailed History of Qualcomm" Available at https://semiwiki.com/general/7353-a-detailed-history-of-qualcomm/
- Arm Holdings plc Annual Report and Consolidated Financial Statements for the Year Ended March 31, 2024

15

- "Arm Architecture Reference Manual for A-profile architecture (Doc No. ARM DDI 0487; issued April 30, 2025)," available at https://developer.arm.com/documentation/ddi0487/latest/.
- Farrell, et al., *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, 2007
- Hart, et al., *Vertical Integration and Market Foreclosure*
- "Innovation starts with Qualcomm products," available at https://www.qualcomm.com/prodcuts
- "Arm Architecture for the Digital World," available at https://www.arm.com/architecture
- "Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025," available at https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/
- "Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm=based," https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based
- ISA, commonality and differentiation, available at https://developer.arm.com/documentation/102252/0100/Software-ecosystems
- Intel Antitrust Rulings, available at https://www.amd.com/en/legal/notices/antitrust-ruling.html
- Instruction Set Architecture (ISA), available at https://www.arm.com/glossary/isa
- "The Official History of Arm," available at https://newsroom.arm.com/blog/arm-official-history
- "The Arm Ecosystem: Powering AI Everywhere – From Cloud to Edge," available at https://newsroom.arm.com/blog/arm-computex-2025
- "National Freight Selects Qualcomm's OmniTRACS System to Enhance Service for Long-haul and Short-Haul Customers" Available at https://www.qualcomm.com/news/releases/1996/08/national-freight-selects-qualcomms-omnitracs-system-enhance-service-long#:~:text=Headquartered%20in%20San%20Diego%2C%20Qualcomm,(LEO)%20satellite%20communications%20system
- Nenni, et al., *Mobile Unleashed, The Origin and Evolution of ARM Processors in Our Devices*, Dec. 2015
- Smartphones-Arm, available at https://www.arm.com/markets/consumer-technologies/smartphones
- Qualcomm: a history, available at https://manufacturingdigital.com/technology/qualcomm-history
- "Relief and challenges for chipmakers as Nvidia-Arm megadeal collapses," available at https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/
- "What Is SoC Development?," available at https://www.arm.com/glossary/soc-development
- "About Arm. Company Value and History – Arm," available at https://www.arm.com/company
- Intel, "What is a Microprocessor?"
- Subsidiaries of Registrant, Subsidiaries of Qualcomm Incorporated

16

- Newsroom, "The Arm Ecosystem: Powering AI Everywhere-From Cloud to Edge," May 19, 2025
- "Message from Arm CEO – SoftBank Group Report, 2025," available at https://group.softbank/en/ir/financials/annual_reports/2025/message/arm
- "Rene Haas: 'Arm has the Most Ubiquitous Computer Architecture on the Planet' – Chip Designer's Chief Executive Talks About Diversification and how AI is Changing the Devices We Use," available at https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d
- "Arm to Launch its Own Chip in Move that could Upend Semiconductor Industry – SoftBank-Owned Group Secures Meta as One of its First Customers for New Initiative," available at https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008
- The Armory Show: "Arm to Explore Designing its Own Chips, Chief Executive Says – SoftBank-Owned UK Group's Strategic Shift Would Upend Chip Ecosystem," July 30, 2025
- Fumagalli, et al., *Dynamic Vertical Foreclosure*, November 2020
- Vickers, *Concepts of Competition*, Oxford Economic Papers 47 (1995), 1-23
- "How Arm Could be the Unexpected Winner of the AI Investment Boom," October 30, 2024
- Ordover, et al., *Equilibrium Vertical Foreclosure*, The American Economic Review, March 1990, Vol. 80, No. 1 (1990), 127-142
- Rey, et al., *A Primer on Foreclosure*, Handbook of Industrial Organization, Vol. 3 (2007) Chapter 33
- RISC-V Members – About Members Page
- "Cellphone: Unseen Connections Exhibits." Available at https://www.qualcomm.com/research/cellphone-unseen-connections
- "Qualcomm celebrates 40 years as an American innovator" available at https://www.qualcomm.com/news/onq/2025/03/qualcomm-celebrates-40-years-as-an-american-innovator#:~:text=Leveraging%20a%20legacy%20of%20breakthroughs,of%20industrial%20and%20embedded%20IoT.
- "The Relentless Evolution of the Arm Architecture" available at https://newsroom.arm.com/blog/evolution-of-arm-architecture-evolution-40-years#:~:text=In%201987%2C%20Acorn%20Computers%20launched,was%20a%20huge%20commercial%20success.
- "Happy 40th Birthday to the Arm Architecture" available at https://www.allaboutcircuits.com/news/happy-40th-birthday-to-the-arm-architecture/#:~:text=The%20Rise%20of%20ARM%20in%20Mobile%20The,cemented%20its%20role%20in%20the%20mobile%20industry.
- "The ARMv8-A architecture and its ongoing development" available at https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development#:~:text=ARMv8%2DA%2C%20the%20ARMv8%20A,partners%20as%20products%20are%20introduced
- "WikiChip: Semiconductor & Computer Engineering" available at https://en.wikichip.org/wiki/arm/armv8

17

- "Arm's Solution to the Future Needs of AI, Security and Specialized Computing is v9" available at https://newsroom.arm.com/news/arms-solution-to-the-future-needs-of-ai-security-and-specialized-computing-is-v9.
- "About the ETM-M4" available at https://developer.arm.com/documentation/ddi0440/c/introduction/about-the-etm-m4
- "Embedded Trace Macrocell Trace source" available at https://developer.arm.com/documentation/102119/0200/Trace-components/Embedded-Trace-Macrocell-Trace-source
- "Advanced debug with ETM trace" available at https://learn.arm.com/learning-paths/embedded-and-microcontrollers/uv_debug/5_etm_trace/
- "About the Cryptographic Extension" available at https://developer.arm.com/documentation/101432/r1p2/Functional-description/About-the-Cryptographic-Extension
- "Learn the architecture - Understanding Armv9-A trace guide Version 1.0 Release information" available at https://developer.arm.com/documentation/102856/0100/Embedded-Trace-Extension.
- "Introduction to the IOMMU" available at https://www.openeuler.org/en/blog/wxggg/2020-11-21-iommu-smmu-intro.html
- "Learn the Architecture - SMMU Software Guide Version 1.0 Release information" available at https://developer.arm.com/documentation/109242/0100/What-an-SMMU-does.
- "Introduction to the Memory Tagging Extension," available at https://developer.arm.com/documentation/108035/latest/Introduction-to-the-Memory-Tagging-Extension#:~:text=Arm%20introduced%20the%20Memory%20Tagging,and%20mitigating%20memory-related%20vulnerabilities
- "Permission Indirection and Permission Overlay Extensions," available at https://developer.arm.com/documentation/102376/latest/Permission-indirection-and-permission-overlay-extensions#:~:text=Permission%20overlays%20allow%20permissions%20to,Lookaside%20Buffer%20(TLB)%20maintenance
- "Arm A-Profile Architecture Developments 2022," available at https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/arm-a-profile-architecture-2022#:~:text=The%20base%20permission%20is%20permitted,but%20interpret%20the%20permissions%20differently
- "An Example of Using Permission Indirection and Permission Overlay Features," available at https://developer.arm.com/documentation/102376/0200/Permission-indirection-and-permission-overlay-extensions/An-example-of-using-permission-indirection-and-permission-overlay-features
- "Summary," Arm Developer Article ID: KA005620, available at https://developer.arm.com/documentation/ka005620/latest/#:~:text=Summary,on%20a%20real%20hardware%20platform
- "Arm Memory Tagging Extension," available at https://source.android.com/docs/security/test/memory-safety/arm-

mte#:~:text=Note:%20This%20document%20covers%20using,on%20each%20load%20and%20store
- "Build and Run an Example Application to Learn about MTE," available at https://learn.arm.com/learning-paths/mobile-graphics-and-gaming/mte/mte/#:~:text=Log%20an%20issue-,Learn%20about%20the%20Arm%20Memory%20Tagging%20Extension,versions%20of%20Linux%20can%20work
- "Arm Memory Tagging Extension (MTE)," available at https://developer.android.com/ndk/guides/arm-mte#:~:text=Pixel%209a%20(Tegu)-,MTE%20operating%20modes,switch%20execution%20to%20SYNC%20mode
- "Armv8.5-A Memory Tagging Extension," available at https://developer.arm.com/-/media/Arm%20Developer%20Community/PDF/Arm_Memory_Tagging_Extension_Whitepaper.pdf
- "Back to the Building Blocks: A Path Toward Secure and Measurable Software," available at https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/02/Final-ONCD-Technical-Report.pdf
- "What are Arm-based processors?," available at: https://cloud.google.com/discover/what-are-arm-based-processors
- "How can ARM instruction set architecture improve machine learning applications?," available at: https://www.linkedin.com/advice/0/how-can-arm-instruction-set-architecture-improve-7r3oc#:~:text=from%202%20contributions.-,1%20What%20is%20ARM%20ISA?,(HPC)%20and%20ML%20applications.&text=The%20ARM%20(Advanced%20RISC%20Machine,in%20their%20machine%20learning%20applications.
- "Back to the Building Blocks: A Path Toward Secure and Measurable Software," available at: https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/02/Final-ONCD-Technical-Report.pdf

**Additional Documents:**
- 2025.01.08 Letter from S. Collins to A. Chaplin re QC Architecture License Agreement
- Qualcomm Incorporated Form 10-K for the Fiscal Year Ended September 29, 2024
- Arm Holdings PLC Form 20-F for the Fiscal Year Ended March 31, 2025
- Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023)

19

# Exhibit 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO STIPULATION AND ORDER
FOR THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

QUALCOMM INCORPORATED A DELAWARE
CORPORATION,
QUALCOMM TECHNOLOGIES, INC.,

                Plaintiff,

      -against-

ARM HOLDINGS PLC., f/k/a ARM LTD.,
a U.K. corporation,

                Defendants.        c.a. No. 24-490-MN

**REBUTTAL REPORT OF**

**STEVEN RICHARDS, CPA**

**September 5, 2025**

## Table of Contents

I. Expert Disclosures ................................................................................................................. 1

   A. Nature of Assignment ................................................................................................... 1

   B. Qualifications ................................................................................................................ 2

   C. Documents and Materials Considered ......................................................................... 4

   D. Compensation ............................................................................................................... 4

   E. Standards Governing my Work ..................................................................................... 4

II. Summary of Opinions ........................................................................................................... 4

III. Relevant Factual and Regulatory Background ..................................................................... 6

   A. Background to the Parties ............................................................................................. 6

   B. Breach Letter ................................................................................................................ 7

   C. Background to the Dispute ............................................................................................ 8

   D. Public Company Disclosure Obligations ................................................................... 11

   E. Investor Events ........................................................................................................... 17

IV. Basis for Opinions and Analysis ........................................................................................ 19

   A. Qualcomm was required to disclose the Breach Letter within its 2024 Form 10-K regardless of the publication of its contents in the Bloomberg Article. ........................... 19

   B. Qualcomm's public disclosures do not convey the significant harm resulting from the Breach Letter as alleged in the Second Amended Complaint. ............................................ 21

V. Opinions and Conclusion .................................................................................................... 30

VI. SIGNATURE AND RIGHT TO MODIFY ....................................................................... 31

REBUTTAL REPORT OF STEVEN RICHARDS

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# I.  Expert Disclosures

## A.  Nature of Assignment

1.  I have been retained by Kirkland and Ellis LLP ("Counsel") for the defendant Arm Holdings PLC ("Arm") in the civil case bearing the caption C.A. No. 24-490-MN pending in District Court for the District of Delaware brought by Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm").

2.  I have been asked by Counsel to review the documents provided, including publicly available information, and to provide my expert opinion on (1) whether Qualcomm was required to disclose the October 22, 2024 letter from Arm notifying it of a material breach of the Qualcomm Architecture License Agreement (LES-TLA-20039) ("the QC ALA") ("the Breach Letter") in its Form 10-K for the fiscal period ending September 29, 2024 ("2024 Form 10-K")  regardless of the publication of its contents in the Bloomberg Article;[1] (2) whether Qualcomm's public disclosures convey the significant harm resulting from the Breach Letter or its publication in the Bloomberg Article as alleged in the Second Amended Complaint.[2] In addition, I was retained to consider and analyze the basis of the analysis expressed in paragraphs 118, 124 and 125 of the Expert Report of Dr. Patrick F. Kennedy, submitted on August 8, 2025 (the "Kennedy Report"). My analysis was limited only to those bases expressed in those paragraphs as they relate to his opinion.   Further, I was retained to consider and analyze paragraph 65 of the Expert Report of Eric E. Posner submitted on August 8, 2025 (the "Posner Report"). My analysis was limited only to those bases expressed in the paragraph as it relates to his opinion.

3.  To fairly evaluate Qualcomm's public disclosures regarding the Breach Letter[3] in respect of this opinion, it is necessary to assess Qualcomm's disclosures against the Securities and Exchange Commission ("SEC") public disclosure regulations and relevant generally accepted accounting principles ("US GAAP"). It is necessary to perform this evaluation from the perspective of Qualcomm at the time, in consideration of the facts it understood at the time, and without the benefit of hindsight.

---

[1] The article titled "ARM to scrap Qualcomm Chip Design License in Feud Escalation" published by Bloomberg on October 22, 2024, hereinafter referred to in this report as "The Bloomberg Article." The article was updated on October 23, 2024. https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud?srnd=homepage-europe.

[2] On June 3, 2025, Qualcomm filed a second amendment to its complaint filed in April 2022 hereinafter referred to in this report as the "Second Amended Complaint".

REBUTTAL REPORT OF STEVEN RICHARDS                                                          Page | 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## B. Qualifications

4.    I am a Senior Managing Director in the Risk Advisory practice of Ankura Consulting Group, LLC ("Ankura"), where I specialize in complex accounting, auditing, and financial reporting and disclosure matters. I also lead Ankura's Audit Advisory service offering, which advises auditors and law firms on audit and related regulatory matters including the assessment of compliance with auditing standards. I have over 28 years of experience as an accountant, auditor, regulator, forensic accountant, and accounting consultant. I provide a broad range of expert and consulting services involving corporate investigations, audit liability, accounting advisory, fraud examinations, dispute resolution, corporate governance and other services. I am a Certified Public Accountant ("CPA").

5.    Prior to joining Ankura in November 2016, I was a Partner in the Forensic Advisory practice at Deloitte LLP ("Deloitte"). I also served as a Senior Advisory Partner to Deloitte leadership and its Office of General Counsel regarding audit regulation, public policy matters, and regulatory enforcement matters. During my time at Deloitte, I provided advice on government, regulatory, and professional matters involving the audit practice. I also advised on audit regulatory issues involving public policy, inspections, standards, rules, litigation, and enforcement matters involving the Public Company Accounting Oversight Board ("PCAOB"), the Securities and Exchange Commission ("SEC"), and foreign audit and securities regulators.

6.    Prior to joining Deloitte in 2015, I worked at the PCAOB, from March 2011 to February 2015. As the Special Adviser to Chairman James Doty, I provided advice on policy and operations for all aspects of PCAOB oversight, including the enforcement program, adjudication proceedings, standard setting, the domestic and international inspections program, the broker-dealer inspection program, and risk analysis. In this role, I advised the Chairman on auditors' compliance or non-compliance with professional standards, including PCAOB Auditing Standards.

7.    During my tenure at the PCAOB, I also served as Senior Adviser to Claudius Modesti, the Director of Enforcement and Investigations. I provided advice on all aspects of policy and operations for the enforcement program, including coordination with other domestic financial regulators, division-wide initiatives, division priorities, case assessment, and management.

8.    From May 2004 until July 2008, I served as an Assistant Chief Accountant in the SEC's Division of Enforcement Office of Chief Accountant in Washington, D.C. During my tenure at the SEC, I performed numerous fraud and financial reporting investigations involving SEC registrants, senior executives, external auditors, and other third parties. I routinely assessed auditors' compliance with professional

REBUTTAL REPORT OF STEVEN RICHARDS    Page | 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

standards, including PCAOB Auditing Standards, and provided advice on recommendations on enforcement matters under the SEC Rules of Practice, including Rule 102(e).[4]

9.      Before and after my work at the SEC, from April 2002 to May 2004 and from July 2008 to March 2011, I worked in the Forensic and Litigation Consulting practice at FTI Consulting, Inc. ("FTI"). During my time at FTI, I managed numerous multidisciplinary teams on high-profile matters, including one of the largest Ponzi schemes in history. During my tenure at FTI, I performed numerous forensic and internal investigations involving SEC registrants and regulated entities, privately-held companies, senior executives, external auditors, and other third parties. As part of these investigations, I routinely interacted with external auditors and assessed their compliance with professional obligations.

10.     I started my career as an auditor at Arthur Andersen LLP, where, from June 1998 to April 2002, I performed financial statement audits of both publicly-traded and privately-held companies in a variety of industries.

11.     I have also served as a member of accounting and auditing committees concerning fraud, including:

- In 2015, I was named the Deloitte representative to the Center for Audit Quality ("CAQ") – Anti-Fraud Collaboration ("AFC").[5] The mission of the CAQ's AFC is to enhance the effectiveness of financial fraud risk management by promoting anti-fraud policies, procedures, controls, and practices, including those enhanced or enabled by technology.

- From 2018 through 2021, I was a member of the American Institute of Certified Public Accountants ("AICPA") Forensic and Litigation Services Fraud Task Force. The Fraud Task Force provides information to AICPA members regarding fraud detection, investigation, and prevention.

12.     I am a frequent speaker at auditing, forensic accounting, and SEC and PCAOB enforcement conferences.

13.     I received my bachelor's degree in accounting from Washington & Jefferson College. I have been a CPA since 2002. I have an active CPA license in the state of Pennsylvania. I am a member of the AICPA and the Pennsylvania Institute of Certified Public Accountants. Consistent with the professional requirements, I have continued my professional education since becoming a CPA.

---

[4] Specifically, the Suspension and Disbarment provisions of Rule 102(e) which provide the SEC with authority to, among other things, permanently or temporarily bar an accountant from appearing or practicing before the SEC for engaging in improper professional conduct involving failure to comply with applicable professional standards.

[5] The AFC was formed in October 2010 by the CAQ, Financial Executives International ("FEI"), The Institute of Internal Auditors ("IIA") and the National Association of Corporate Directors ("NACD"). The four organizations represent the significant components of the financial reporting supply chain: external auditors (through CAQ), company financial management (through FEI), internal audits (through IIA) and audit committees (through NACD).

REBUTTAL REPORT OF STEVEN RICHARDS                                          Page | 3

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

14.    A copy of my curriculum vitae is attached as Exhibit 1 to this report.

15.    Based on my knowledge, skills, experience, training, and education, I am qualified to provide an expert opinion on the above question presented in this case.

## C. Documents and Materials Considered

16.    I, and Ankura staff members working under my direct supervision, considered the documents, testimony transcripts, and other materials set forth in Exhibit 2 to this report. The opinions and conclusions in this report are based on review of the documents, testimony transcripts, and other materials I considered, as well as my knowledge, training, and experience.[6]

17.    My opinions are based on information available to me as of the date of this report. It is possible that additional information may affect my opinions herein. I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

## D. Compensation

18.    Ankura bills fees and expenses in this matter based on hourly rates and expenses incurred. Ankura is being compensated for my time at a rate of $1,050 per hour and for the time of other staff members assisting on this engagement at hourly rates ranging from $1,050 to $410. No portion of my firm's compensation (or my compensation) is dependent on my opinions or testimony or on the outcome of this matter.

## E. Standards Governing my Work

19.    I performed this engagement in accordance with the AICPA Statement on Standards for Forensic Services No. 1[7] and the AICPA Code of Professional Conduct.[8]

20.    This report should not be construed as expressing opinions on matters of law, which are outside of my expertise. However, to the extent I have interpreted conduct and evidence, those interpretations reflect my understanding from an accountant's perspective.

## II.    Summary of Opinions

21.    **Qualcomm was required to disclose the Breach Letter in its 2024 Form 10-K regardless of the publication of the Breach Letter's contents in the Bloomberg Article.**  Qualcomm disclosed the

---

[6] There was no restriction on what documents and testimony I was able to review and consider.
[7] Statement on Standards for Forensic Services No. 1.
[8] AICPA Code of Professional Conduct, Effective December 15, 2014; Updated for all official releases through March 2025.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Breach Letter, for the first time in the Consolidated Financial Statements filed in its 2024 Form 10-K within Note 7. Commitments and Contingencies – Legal and Regulatory Proceedings in the Notes to Consolidated Financial Statements ("Note 7")[9] as required by US GAAP.[10] As disclosed: "On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA[11]…Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice. We disagree with Arm's allegations, including that we are in breach of the Qualcomm ALA."[12] In substance, both US GAAP and Qualcomm's own disclosure position requires that "[i]f there is at least a reasonable possibility that a material loss may have been incurred ... we disclose such fact."[13,14] ██████████████████████████████████████

██████████████ "[15] Because Qualcomm █████████████████████████████████████ ██ and determined that there was "at least a reasonable possibility"[17] [defined in US GAAP as more than remote and less than probable][18] that a "material loss"[19] [the Breach Letter asserts the right to terminate the Qualcomm ALA if not cured in 60 days][20] "may have been incurred,"[21] the Breach Letter was required to be disclosed by both US GAAP and Qualcomm's own disclosure position, in 2024 Form 10-K, irrespective of the reporting of the Breach Letter within the Bloomberg Article.

22. **Qualcomm's public disclosures do not convey the significant harm resulting from the Breach Letter or its publication in the Bloomberg Article as alleged in the Second Amended Complaint.**

Qualcomm disclosed the Breach Letter, for the first time in the Consolidated Financial Statements filed in its 2024 Form 10-K within Note 7, as required by US GAAP. As disclosed: "On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA…Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice. We disagree with Arm's allegations, including that we are in breach of the

---

[9] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-23.
[10] ASC 450-20, Loss Contingencies.
[11] This refers to the architecture license agreement between Arm and Qualcomm, the Qualcomm Architecture License Agreement (LES-TLA- 20039), which is the subject of the Breach Letter dated October 22, 2024 and is defined within the Breach Letter as the "Qualcomm ALA.". Hereinafter referred to in this report, any reference to this architectural license agreement will be referred to as the "QC ALA" unless referred to otherwise in the documentation quoted in this report.
[12] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, p. F-24.
[13] FASB ASC. 450-20-50-5, Loss Contingencies, Unrecognized Contingencies.
[14] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, p. F-13.
[15] █████████████████████████████████████████
[17] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-13.
[18] FASB ASC. 450-20, Loss Contingencies, Glossary.
[19] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-13.
[20] The Breach Letter, October 22, 2024.
[21] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Qualcomm ALA."[22]  Qualcomm included risk factors specific to Regulatory and Legal Challenges and Intellectual Property in the Item 1A. Risk Factors section of the 2024 Form 10-K that referenced to the matters disclosed in Note 7.[23]  With respect to these matters, Qualcomm disclosed: "[u]nfavorable resolution of one or more of these matters could have a material adverse effect on our business, results of operations, financial condition or cash flows."[24]  Qualcomm also disclosed: "[a]ny claims, regardless of their merit, could be time consuming to address, result in costly litigation, divert the efforts of our technical and management personnel, cause product release or shipment delays and/or damage to our customer relationships, any of which could have an adverse effect on our results of operations and cash flows."[25] However, these disclosures were general disclosures that were similarly provided in Qualcomm's SEC filings before and after the Breach Letter, including disclosure after the Breach Letter had been withdrawn.  Qualcomm did not disclose the nature of the material adverse effects, such as the effect on its business or customer relationships resulting from the Breach Letter or its publication in the Bloomberg Article that Qualcomm alleges it suffered in the Second Amended Complaint.  This information was not disclosed in the 2024 Form 10-K or at any time after it was filed on November 6, 2024, including in its Q4 2024 Conference Call on November 6, 2024;[26] Investor Day 2024: IoT and Automotive Diversification Update on November 19, 2024;[27] UBS Global Technology and AI Conference on December 4, 2024,[28] or Q1 2025 Form 10-Q filed on February 5, 2025,[29] and its related earnings call.  Based on my experience, I would have expected this information to have been disclosed if the material adverse impact was as alleged.

## III.    Relevant Factual and Regulatory Background

### A.  Background to the Parties

23.   Qualcomm is a Delaware corporation with its principal place of business in California. Qualcomm is a Nasdaq stock market registrant and files periodic and other reporting pursuant to Section 13 of the Securities Exchange Act of 1934 ("Exchange Act").[30] In its 2024 Form 10-K, Qualcomm describes itself as "a global technology leader, helping to bring intelligent computing everywhere through the development and commercialization of foundational technologies…. We innovate and collaborate across

---

[22] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, p. F-24.
[23] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, pp. 29, 30, 31, 32, 33, 34.
[24] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 29.
[25] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 34.
[26] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[27] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[28] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.
[29] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024.
[30] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

many ecosystems, including with manufacturers, operators, developers, system integrators, cloud providers, test tool vendors, service providers, governments and industry standards organizations, to enable next-generation digital transformation."[31]

24. Arm is a corporation organized under the laws of the United Kingdom and has its principal place of business in Cambridge, United Kingdom.[32] Arm is a Nasdaq stock market registrant and files periodic and other reporting as a foreign private issuer, pursuant to Section 13 of the Exchange Act.[33]  In Arm's annual report for the year ending March 31, 2024, it describes itself as "the industry leader in the design of CPUs for semiconductor chips. The CPU is the brain chip, and we architect, develop, and license high-performance, low-cost, and energy-efficient CPU products and related technology, on which many of the world's leading semiconductor companies and OEMs rely to develop their products."[34]

25. The current operative QC ALA was entered into on May 30, 2013 [35] and licensed Qualcomm to develop and sell custom-designed CPUs that are compatible with Arm's Instruction Set Architecture ("ISA").[36]

26. On March 15, 2021, Qualcomm issued a press note that it had completed the acquisition of Nuvia Inc. ("Nuvia"),[37] which it had previously disclosed via Form 8-K with the SEC on January 12, 2021.[38]  The press note described Nuvia as a "world-class CPU and technology design company."[39] At the time of the acquisition, Nuvia held an architecture license agreement with Arm ("the Nuvia ALA").[40]

## B. Breach Letter

27. On October 22, 2024, Arm served Qualcomm the Breach Letter.[41]  The first paragraph of the Breach Letter stated:

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[31] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 6.
[32] Arm Holdings PLC, Form 20-F, for the year ended March 31, 2025, p. 1.
[33] Arm Holdings PLC, Form 20-F, for the year ended March 31, 2025, p. 2.
[34] Arm Holdings PLC Financial Statements for year ended as of March 31, 2024, p. 1.
[35] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 21.
[36] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, pp. 3-4.
[37] Qualcomm Press Announcement, March 15, 2021.
https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia
[38] Qualcomm Inc., Form 8-K, January 12, 2021.
[39] Qualcomm Press Announcement, March 15, 2021.
https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia .
[40] Complaint, Arm LTD v. Qualcomm Inc., et.al, August 31, 2022, pp. 5-7.
[41] The Breach Letter, October 22, 2024.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



29. The Bloomberg Article stated that Arm had given Qualcomm "a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a document seen by Bloomberg. The contract allows Qualcomm to create its own chips based on standards owned by Arm."[44]

30. On January 8, 2025, Arm notified Qualcomm that it was withdrawing its notice of breach as per the Breach Letter.[45]

## C. Background to the Dispute

31. On August 31, 2022, Arm filed a complaint against Qualcomm in the United States District Court for the District of Delaware ("the Arm Complaint").[46] Arm alleged that Qualcomm and Nuvia breached the terms of the Nuvia ALA by failing to comply with the termination provisions of that agreement.[47]

32. On September 30, 2022, Qualcomm filed its answer to the Arm Complaint and its counterclaim.[48] Qualcomm subsequently filed two amended counterclaims on October 26, 2022, and March 22, 2024, seeking declaratory relief and damages. [49] On November 15, 2022, Arm answered Qualcomm and Nuvia's amended counterclaims, asserting that, among other things, Qualcomm breached the QC ALA.[50]

33. On April 18, 2024, Qualcomm filed a separate complaint against Arm in the United States District Court for the District of Delaware alleging that Arm had breached the QC ALA.[51]  Qualcomm amended the

---

[42] The Breach Letter, October 22, 2024.

[43] The Breach Letter, October 22, 2024.

[44] Bloomberg, ARM to scrap Qualcomm Chip Design License in Feud Escalation, October 22, 2024.

[45] Qualcomm Inc., Form 10-Q, for the quarter ended December 29, 2024, p. 13.

[46] Complaint, Arm LTD v. Qualcomm Inc., et.al, August 31, 2022, p. 1.

[47] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-23.

[48] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-24.

[49] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-24.

[50] *Arm Ltd. v. Qualcomm Inc. et al.*, No. 22-1146 (MN), Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim, D.I. 21 at 2 ("Qualcomm is not only trying to develop an unlicensed product, but is also materially breaching its ALA with Arm."); 37 ("Qualcomm is materially breaching its ALA, giving Arm the right to terminate . . . ."); 39 ("Arm is entitled to terminate Qualcomm's ALA based on Qualcomm's material breaches . . . ."); 42 (claiming that Qualcomm "materially breach[ed] the [Qualcomm ALA's] terms and implied covenant of good faith and fair dealing . . . entitling Arm to terminate the Qualcomm ALA under Section 14.2").

[51] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

April 2024 complaint for a second time on June 3, 2025[52]; this Second Amended Complaint alleges, amongst other things:

a. "Arm's Breach Letter was the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers."[53]

b. "More recently, Arm began 'ratcheting up the pressure' on Qualcomm in *Arm v. Qualcomm*, and Arm continued this misinformation campaign by declaring without basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter. By doing so, Arm has caused tangible harm to Qualcomm's customer relationships."[54]

c. "[S]everal Qualcomm customers have deferred finalizing pending business agreements pending resolution of the *Arm v. Qualcomm* litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products."[55]

d. "[A] major customer (the 'Smartphone Company') … [a]fter learning that Arm was threatening to terminate the QC ALA… informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm. The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm." [56]

e. "[A] potential customer (the 'AI and Ecosystem Company') that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm…[a]fter the Breach Letter was published… stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question. As a result of the uncertainty stemming from Arm's assertion and leak of the

---

[52] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 1.
[53] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 12.
[54] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 42.
[55] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 49.
[56] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 49.

REBUTTAL REPORT OF STEVEN RICHARDS                                    Page | 9

A0248

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity."[57]

34. Count IV of the Second Amended Complaint, Intentional Interference with Prospective Economic Advantage, summarizes the above:

    a.  "Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above."[58]

    b.  "Absent Arm's interference, these relationships would likely result or would have likely resulted in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations. These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship."[59]

    c.  "As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm."[60]

35. Further, in Count VI of the Second Amended Complaint, Violations of the California Unfair Competition Law ("UCL"), Qualcomm alleges that:

    a.  "Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL.  These unfair business acts or practices include . . . repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's customers and prospective customer; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and

---

[57] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 49-50.
[58] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 57.
[59] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 57.
[60] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 58.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA[.]"[61]

b. "Arm's actions are part of a broader campaign to harm or threaten to harm competition" by "employing a variety of unfair acts and practices" "includ[ing]" making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of precenting Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores."[62]

c. "it has suffered or faces the threat of loss of profits, customers, and potential customers," and has "standing to bring this UCL claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct."[63]

## D. Public Company Disclosure Obligations

### a) Definition of Materiality in Public Company Disclosure Obligations

36. This report highlights regulatory requirements for public companies to disclose occurrences classified as "material" under SEC guidelines. The SEC has issued the following guidance on the concept of materiality and disclosure:

a. SEC Staff Accounting Bulletin No. 99, Materiality states a matter is material "if there is a substantial likelihood that a reasonable person would consider it important."[64]

b. The SEC's Acting Chief Accountant has referenced the Supreme Court precedent which held that a fact is material if there is, "a substantial likelihood that the … fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[65]

---

[61] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 59.
[62] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC,*, June 03, 2025, p. 60.
[63] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC,*, June 03, 2025, p. 61.
[64] SEC Staff Accounting Bulletin: No 99 – Materiality.
[65] SEC Statement, Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

    c. The Director of Corporate Finance stated "materiality is not an easily applied litmus test. If there any gray areas — and as disclosure lawyers I would suspect that you more frequently see shades of gray, rather than black and white — the company is likely to include the disclosure in its filing. And why wouldn't you? Why would you take the risk of omitting disclosure that might be material?"[66]

### b) Form 10-K

37. Domestic, publicly traded companies are required by law to disclose annual reports which include audited financial statements on Form 10-K.[67] Form 10-K offers a detailed picture of a company's business, the risks it faces, and the operating and financial results for the fiscal year.[68] Companies are prohibited from omitting material information that is needed to make the disclosure not misleading.[69] Company management also discusses its perspective on the business results and what is driving them.[70] Large, accelerated filers must file a Form 10-K within 60 days from the end of the fiscal year.[71] The following sections of Form 10-K are relevant to this report:

### (1) Item 1A. Risk Factors

38. Item 1A requires companies to discuss material factors that make an investment in the registrant or offering speculative or risky under the caption of "Risk Factors."[72] Companies should explain how each risk affects the registrant or the securities being offered.[73] Risk Factors include information about the most significant risks that apply to the company.[74] Risk Factors should not be "boilerplate" but should be concise and focused disclosure explaining how each risk affects the company is most useful for investors.[75]

---

[66] SEC Speech, Disclosure Effectiveness: Remarks Before the American Bar Association Business Law Section Spring Meeting, April 11, 2014.
[67] SEC Introduction to Investing Glossary, Form 10-K.
[68] SEC Introduction to Investing Glossary, Form 10-K.
[69] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[70] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[71] SEC Glossary, Form 10-K.
[72] 17 CFR § 229.105 (a) (Item 105) Risk factors, Regulation S-K.
[73] 17 CFR § 229.105 (a) (Item 105) Risk factors, Regulation S-K.
[74] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021, at 1.
[75] SEC Speech, Applying a Principles-Based Approach to Disclosing Complex, Uncertain and Evolving Risks, March 15, 2019.

REBUTTAL REPORT OF STEVEN RICHARDS          Page | 12

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### (2) Item 3. Legal Proceedings

39.   Item 3 requires companies to describe significant[76] pending lawsuits or other legal proceedings, other than ordinary routine litigation incidental to the business.[77] Information can be cross-referenced to legal proceedings disclosure elsewhere in the document.[78]

### (3) Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

40.   The management's discussion and analysis of financial condition and results of operations ("MDA") provides the company's perspective on the business results of the past fiscal year[79] and "any known trends or uncertainties that could materially affect the company's results."[80]

41.   The MDA must "focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."[81] This includes descriptions and amounts of matters that are reasonably likely based on management's assessment to have a material impact on future operations.[82] The SEC indicates that "reasonably likely" is a lower threshold than "more likely than not" but a higher threshold than "remote."[83] Companies are required to consider whether an event or uncertainty is likely to come to fruition when applying the "reasonably likely" threshold.[84]

42.   A disclosure duty exists where an event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.[85] Further, if management is unable to determine whether an event or uncertainty will come to fruition, but it

---

[76] SEC Investor Bulletin, How to Read a 10-K January 25, 2021.
[77] 17 CFR § 229.103 (a) (Item 103) Legal proceedings, Regulation S-K.
[78] 17 CFR § 229.103 (a) (Item 103) Legal proceedings, Regulation S-K.
[79] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021, at 2.
[80] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021, at 3.
[81] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, p. 182.
[82] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, p. 163.
[83] SEC Financial Reporting Manual, Topic 9, Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), 9200 General Requirements, 9220.11.
[84] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, p. 47.
[85] SEC Interpretive Rule, Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, p. 5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

could significantly impact the company's future results or financial condition, they should disclose it if not doing so would mislead a reasonable investor about the available information.[86]

43.  This analysis should be made objectively and with a view to providing investors with a clearer understanding of the potential material consequences of such known forward-looking events or uncertainties.[87]

### (4)  Item 8. Financial Statements and Supplementary Data

44.  Companies must include audited financial statements in line with US GAAP within the Item 8 section of Form 10-K.[88]  This includes the company's income statement, balance sheets, statement of cash flows and statement of stockholders' equity.[89] The financial statements are accompanied by notes that explain the information presented in the financial statements.[90]

####   i.   Contingent Liabilities

45.  Companies are required to make a disclosure on loss contingencies which are defined as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[91] Pending or threatened litigation is an example of a loss contingency.[92]

46.  An estimated loss resulting from a loss contingency should be accrued by a charge to income if information available before the financial statements are issued or are available to be issued indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated.[93] "Probable" means the future event or events are likely to occur.[94]

47.  For loss contingencies that are not recorded in the financial statements, a disclosure of the contingency is still required if there is at least a reasonable possibility that a loss or an additional loss may have been incurred, and: a) where an accrual is not made for a loss contingency because the amount cannot be

---

[86] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, pp. 47.

[87] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, p. 47.

[88] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

[89] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

[90] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

[91] FASB ASC. 450-20, Loss Contingencies, Glossary.

[92] FASB ASC. 450-20-05-10, Loss Contingencies, Type of Loss Contingencies.

[93] FASB AC. 450-20-25-2, Loss Contingencies, General Note.

[94] FASB ASC. 450-20, Loss Contingencies, Glossary.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reasonably estimated or the loss is not probable, or b) an exposure to loss exists in excess of an amount already accrued.[95] "Reasonably possible" means that the chance of the future event or events occurring is more than remote but less than likely.[96] The disclosures are usually made in the notes to the financial statements but in some cases, disclosure may relate to disclosure on the face of the financial statements.[97] The disclosure should include the nature of the contingency and an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made.[98]

       ii.  Subsequent Events

48.  Subsequent events are events or transactions that occur after the balance sheet date but before the financial statements are issued or available to be issued.[99] They can either 1) consists of events or transactions that provide additional evidence about conditions that existed at the date of the balance sheet, or 2) consists of events or transactions that provide evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to that date. [100]

49.  The financial statements submitted in Form 10-K must not be misleading as of the date they are filed with the Commission. [101]  Some subsequent events that did not exist at the date of the balance sheet may be of such a nature that they must be disclosed to keep the financial statements from being misleading.[102] For such events, an entity shall disclose the nature of the event and an estimate of its financial effect, or a statement that such an estimate cannot be made.[103]

**(5)  Item 9A. Disclosure Controls & Procedures**

50.  Companies are required to assess and disclose their evaluation of the effectiveness of the company's disclosure controls and procedures. This assessment is typically made as of the end of each quarter.[104] A registered external auditor must attest to the management assertion that internal accounting controls are in place, operational and effective.[105]

---

[95] FASB ASC. 450-20-50-5, Loss Contingencies, Unrecognized Contingencies.
[96] FASB ASC. 450-20, Loss Contingencies, Glossary.
[97] FASB ASC. 450-20-50, Loss Contingencies, General Note.
[98] FASB ASC. 450-20-50-4, Loss Contingencies, Unrecognized Contingencies.
[99] FASB ASC. 855-10-20, Subsequent Events, Glossary.
[100] FASB ASC. 855-10-20, Subsequent Events, Glossary.
[101] FASB ASC. 855-10-S99-2, Subsequent Events, General, SEC Staff Guidance.
[102] FASB ASC. 855-10-50-2, Subsequent Events, Nonrecognized Subsequent Events.
[103] FASB ASC. 855-10-50-2, Subsequent Events, Nonrecognized Subsequent Events.
[104] 17 CFR § 240.13a-15 (b)- Controls and procedures.
[105] Sarbanes-Oxley Act of 2002, § 404(b).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

51.   Disclosure controls and procedures are defined as controls and other procedures designed to ensure that information required to be disclosed by the company in its reports is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.[106] Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.[107]

52.   Companies must disclose management assessment of the company's internal control over financial reporting in management's annual report.[108] This report should include a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting; an assessment of the effectiveness of the company's internal control over financial reporting as of the end of the most recent fiscal year; and a statement identifying the framework used by management to evaluate the effectiveness of the internal control over financial reporting.[109] Companies must disclose any change in their internal control over financial reporting that occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.[110]

53.   Qualcomm filed its Form 10-K for the fiscal year ending September 29, 2024 on November 6, 2024.[111]

### c)   Form 10-Q

54.   Domestic, publicly traded companies are required by law to file quarterly reports on Form 10-Q.[112] The Form 10-Q includes unaudited interim financial statements and provides a continuing view of the company's financial position during the year. The report must be filed for each of the first three fiscal quarters of the company's fiscal year.[113]

---

[106] 17 CFR § 240.13a-15 (e)- Controls and procedures.
[107] 17 CFR § 240.13a-15 (e)- Controls and procedures.
[108] 17 CFR § 229.308 (a) - (Item 308) Internal control over financial reporting.
[109] 17 CFR § 229.308 (a) - (Item 308) Internal control over financial reporting.
[110] 17 CFR § 229.308 (c) - (Item 308) Internal control over financial reporting.
[111] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 1.
[112] SEC Introduction to Investing Glossary, Form 10-Q.
[113] SEC Introduction to Investing Glossary Form 10-Q.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

55. Under a Form 10-Q companies must disclose information under topics such as legal proceedings, risk factors, MDA, and disclosure controls and procedures as per the requirements discussed above for Form 10-K.[114]

56. Unlike Form 10-K, the financial statements and management's disclosure of controls and procedures under Form 10-Q are not required to be audited by independent auditors.[115] [116] Under Form 10-Q, the signing officers for these periodic reports are required to have evaluated the effectiveness of internal controls and indicate whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.[117]

57. Within Form 10-Q, a company must disclose any material changes in risk factors previously disclosed within its Form 10-K filing for Item 1A Risk Factors.[118] Further, if there are any material changes in financial condition and results of operations, as well as any changes in performance trends or uncertainties that could materially affect the company from the end of the preceding fiscal year to the date of the quarterly report, they must be disclosed in the Management Discussion and Analysis section in Item 2. [119] With respect to legal proceedings, the matters that must be reported in the 10-Q are matters that first became a reportable event in the quarter or if there have been material developments in a matter.[120] Subsequent Form 10-Q filings in which a legal proceeding or a material development is reported should reference any previous reports from that year that discuss the same legal proceeding.[121]

58. Qualcomm filed its first Form 10-Q following receipt of the Breach Letter on February 5, 2025 in relation to its first quarter of the 2025 fiscal year.[122]

## E. Investor Events

59. Investor events and investor calls (also known as earnings calls or conference calls) allow "publicly traded companies to discuss their performance with investors and analysts"[123]. These are "usually

---

[114] SEC General Instructions, Form 10-Q.
[115] Sarbanes-Oxley Act of 2002, § 404(a)(b).
[116] SEC Financial Reporting Manual, Topic 1 Registrant's Financial Statements, 1110.1 and 1120.
[117] Sarbanes-Oxley Act of 2002, § 302 4(a-d), 6.
[118] SEC General Instructions, Form 10-Q.
[119] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, pp. 169-170.
[120] SEC General Instructions, Form 10-Q.
[121] SEC General Instructions, Form 10-Q.
[122] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 1.
[123] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

conducted by the chief executive officer ("CEO") and chief financial officer ("CFO")."[124] and other executives.[125] Investor's often "use information from earnings calls to make more informed investment decisions".[126] Companies usually conduct investor calls "immediately following the release of financial results, typically at the end of each quarter. These are known as quarterly earnings results conference calls."[127]

60.  Companies must comply with the SEC's Regulation Fair Disclosure ("Regulation FD") which requires that companies make public rather than selective disclosure of any material nonpublic information. [128] Regulation FD applies to communications where it is reasonably foreseeable that the security holder will trade on the basis of the information.[129] In its guidance on Regulation FD, one of the SEC's suggestions for making a planned disclosure of material information includes holding a conference call in an open manner, permitting investors to listen in either by telephonic means or through internet webcasting.[130] The SEC notes that some types of information or events that should be reviewed carefully to determine whether they are material: (1) earnings information; (2) mergers, acquisitions, tender offers, joint ventures, or changes in assets; (3) new products or discoveries, or developments regarding customers or suppliers (e.g., the acquisition or loss of a contract); (4) changes in control or in management; (5) change in auditors or auditor notification that the issuer may no longer rely on an auditor's audit report; (6) events regarding the issuer's securities; and (7) bankruptcies or receiverships. [131]  These events must be assessed for their materiality to inform what is required to be disclosed.[132]

61.  Qualcomm participated in three investor events in the period following receipt of the Breach Letter[133]: Q4 2024 Earnings Conference Call on November 6, 2024[134]; Investor Day 2024: IoT and Automotive Diversification Update on November 19, 2024;[135] and UBS Global Technology and AI Conference on December 4, 2024.[136]

---

[124] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[125] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[126] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[127] Investopedia, Earnings Conference Call: What it is, How it Works, September 11, 2022.
[128] 17 CFR Part 243.100(a), Regulation Fair Disclosure.
[129] 17 CFR Part 243.100(b)(iv), Regulation Fair Disclosure.
[130] SEC Final Rule: Selective Disclosure and Insider Trading, p. 17.
[131] SEC Final Rule: Selective Disclosure and Insider Trading, p. 9.
[132] SEC Final Rule: Selective Disclosure and Insider Trading, p. 9.
[133] Qualcomm Press Announcement, December 20, 2024.
   https://www.qualcomm.com/news/releases/2024/12/qualcomm-statement-on-trial-verdict-win#:~:text=We%20are%20pleased%20with%20today's,by%20Qualcomm's%20contract%20with%20ARM.
[134] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[135] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[136] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.

REBUTTAL REPORT OF STEVEN RICHARDS

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## IV.    Basis for Opinions and Analysis

62.    The Kennedy Report opines that Qualcomm suffered damage due to the Breach Letter and its alleged leak among other allegations posed by Qualcomm.[137] He states:

    a.    "Qualcomm alleges that the Notice Letter was leaked to the media by Arm as an attempt to interfere with Qualcomm's current and potential business relationships"[138]

    b.    "Qualcomm alleges that, as a result of the Notice Letter, as well as the prior communications discussed above, its business with certain customers, including ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ has been impacted."[139]

    c.    "I understand that Qualcomm alleges that due to Arm's leak of the Notice Letter, ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ I have been asked by Qualcomm's counsel to analyze the economic and financial impact to Qualcomm regarding ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ prior to Arm's leak of the Notice Letter versus the most recent version of ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ into after the leak of the Notice Letter."[140]

63.    The Posner Report opines that "Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm," including "leaking the [Breach Letter]" to "undermine customers' confidence in Qualcomm."[141]

### A. Qualcomm was required to disclose the Breach Letter within its 2024 Form 10-K regardless of the publication of its contents in the Bloomberg Article.

64.    A Form 10-K is a mandatory annual disclosure for publicly traded domestic companies.[142] It offers " a detailed picture of a company's business, the risks it faces, and the operating and financial results for the fiscal year."[143]  In addition to the information expressly required to be included in a Form 10-K, further

---

[137] Expert Report of Mr. Kennedy, paragraph 68,80, Figure 27.
[138] Expert Report of Mr. Kennedy, paragraph 118.
[139] Expert Report of Mr. Kennedy, paragraph 124.
[140] Expert Report of Mr. Kennedy, paragraph 125.
[141] Expert Report of Mr. Posner, paragraph 65.
[142] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[143] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

REBUTTAL REPORT OF STEVEN RICHARDS

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

"material" information (as defined above) should be added to ensure the disclosures are "not misleading." [144] Included within this "material" information are Loss Contingencies, the disclosures for which are governed by Accounting Standards Codification 450-20 ("ASC 450-20"). Companies are required to make a disclosure on contingent losses which are defined as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." [145]

65. How a loss contingency is disclosed depends on the probability of the loss occurring and whether the loss can be measured. ASC 450-20 categorizes levels of probability as 1) **remote** - the chance of the future event or events occurring is slight, 2) **reasonably possible** - the chance of the future event or events occurring is more than remote but less than likely, and 3) **probable** - the future event or events are likely to occur. [146] The loss can be measured if the amount of loss can be reasonably estimated. [147] Disclosure of the contingency is made if there is "at least a reasonable possibility" that a loss or an additional loss "may have been incurred" and an accrual in the financial statement is not made. [148]

66. Disclosure of a loss contingency arising after the date of an entity's financial statements but before those financial statements are issued, may be necessary to keep the financial statements from being misleading if an accrual is not required. [149] If disclosure is deemed necessary, the financial statements shall include the nature of the loss or loss contingency and an estimate of the amount or range of loss or possible loss or a statement that such an estimate cannot be made. [150]

67. Deposition testimony shows Qualcomm perceived the Breach Letter was a "material business event" and the relevant content states that "[u]nless Qualcomm cures its material breach within 60 days, Arm shall be entitled to immediately terminate the ALA." [151] The loss contingency related to the Breach Letter was required to be disclosed as the deposition testimony shows Qualcomm perceived that it was reasonably possible that a loss may have been incurred if Qualcomm did not cure the alleged material breach within 60 days. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[144] SEC Form 10-K, General Instructions, p. 2.
[145] FASB ASC. 450-20, Loss Contingencies, Glossary.
[146] FASB ASC. 450-20, Loss Contingencies, Glossary.
[147] FASB ASC. 450-20-25-2b, Loss Contingencies, Recognition.
[148] FASB ASC. 450-20-50-3, Loss Contingencies, Disclosure, Unrecognized Contingencies.
[149] FASB ASC. 450-20-50-9, Loss Contingencies, Losses Arising After the Date of the Financial Statements.
[150] FASB ASC. 450-20-50-9, Loss Contingencies, Losses Arising After the Date of the Financial Statements.
[151] The Breach Letter, October 22, 2024.
██████████████████████████████████████

REBUTTAL REPORT OF STEVEN RICHARDS                                    Page | 20

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ [153]

68.    Based on my review of the relevant accounting standards, depositions and related documents, as well as experience in evaluating such disclosures, Qualcomm was required to disclose the Breach Letter in the 2024 Form 10-K as Qualcomm determined that it was reasonably possible that a material loss contingency may have been incurred related to the potential termination of the QC ALA. Qualcomm would have been obliged to make this disclosure irrespective of the reporting of the contents of the Breach Letter within the Bloomberg Article.

## B. Qualcomm's public disclosures do not convey the significant harm resulting from the Breach Letter as alleged in the Second Amended Complaint.

### a)  Qualcomm's Allegations in the Second Amended Complaint

69.    In its Second Amended Complaint, Qualcomm alleges that:

   a.    "Absent Arm's interference, these relationships [Smartphone Company and AI and Ecosystem Company] would likely result or would have likely resulted in profitable business opportunities for Qualcomm... These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship."[154]

   b.    "As a result of that conduct, these relationships have in fact been disrupted. The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a substitute contract with Arm instead, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional

---

[153] ████████████████████████████████████████████

[154] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 56.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

assurances. As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm."[155]

c.   "Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL.  These unfair business acts or practices include . . . repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's current and prospective customers; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA." [156]

d.   "Arm's actions are part of a broader campaign to harm or threaten to harm competition" by "employing a variety of unfair acts and practices" "includ[ing]" making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of preventing Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores." [157]

e.   "[I]t has suffered or faces the threat of loss of profits, customers, and potential customers," and has "standing to bring this [UCL] claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct."[158]

---

[155] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 58.

[156] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 59-60.

[157] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 60.

[158] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 61.

REBUTTAL REPORT OF STEVEN RICHARDS                                    Page | 22

**A0261**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### b) Disclosure in Qualcomm's 2024 Form 10-K following the receipt of the Breach Letter

70. As mentioned above, a Form 10-K is a mandatory annual disclosure for publicly traded domestic companies.[159] It offers " a detailed picture of a company's business, the risks it faces, and the operating and financial results for the fiscal year."[160]  In addition to the information expressly required to be included in a Form 10-K, further "material" information (as defined above) should be added to make the disclosures "not misleading." [161]

71. Large, accelerated filers, such as Qualcomm, must file a Form 10-K within 60 days from the end of the fiscal year.[162][163] Qualcomm's first periodic report following the Breach Letter was their 2024 Form 10-K, for the fiscal year ended September 29, 2024, filed on November 6, 2024.[164]

72. Qualcomm's first public disclosure of the Breach Letter and the only direct reference within its 2024 Form 10-K to the Breach Letter was made under Note 7[165] in line with ASC 450-20 as described above:

> "On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA... Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice. We disagree with Arm's allegations, including that we are in breach of the Qualcomm ALA."[166]

73. Qualcomm disclosed in the Consolidated Financial Statements filed in its 2024 Form 10-K within Note 1. Significant Accounting Policies – Legal and Regulatory Proceedings that, "if there is at least a reasonable possibility that a material loss may have been incurred associated with pending legal and regulatory proceedings, we disclose such fact..."[167]

74. Beyond creating a contingency as described in Note 7, two of Qualcomm's employees characterized the Breach Letter in deposition as a "material business event"[168] and "risk factor."[169] ██████████ ███████████████████████████████████████████████████

---

[159] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[160] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[161] SEC Form 10-K, General Instructions, p. 2.
[162] SEC Glossary, Form 10-K.
[163] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 2
[164] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 1.
[165] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. F-23.
[166] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. F-24.
[167] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. F-13.
[168] ██ ███████████████████████████████████████████

A0262

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



75. The Form 10-K requires disclosure of "material pending legal proceedings."[172] Qualcomm references that it describes "certain legal matters" in Note 7 under other topics within its 2024 Form 10-K, including in its disclosures of "Risk Factors" impacting its business.[173]

76. Qualcomm included risk factors specific to:

a.  Risks Related to our Operating Businesses notes "We derive a significant portion of our revenues from a small number of customers and licensees, and particularly from their sale of premium tier handset devices. If revenues derived from these customers or licensees decrease or the timing of such revenues fluctuates, our business and results of operations could be negatively affected."[174] Within this note, Qualcomm refers to "The loss of any one of our significant customers, a reduction in the purchases of our products by any of these customers or the cancellation of significant purchases by any of these customers, whether due to the use of their own integrated circuit products or our competitors' integrated circuit products, government restrictions, a decline in global, regional or local economic conditions, a decline in consumer demand (or a shift in consumer demand away from new devices in favor of refurbished or secondhand devices), elevated inventory levels at our customers or otherwise, would reduce our revenues and could harm our ability to achieve or sustain expected results of operations. A delay of significant purchases, even if only temporary, would reduce our revenues in the period of the delay."[175]

---

[170] ███████████████████████████████████████ .
[172] 17 CFR § 229.103 (Item 103) Legal proceedings, Regulation S-K.
[173] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, pp. 29-36.
[174] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 18 (emphasis omitted).
[175] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 18.

REBUTTAL REPORT OF STEVEN RICHARDS                                      Page | 24

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

      b.  Risks Related to Regulatory and Legal Challenges states "Our business may suffer as a result of adverse rulings in governmental investigations or proceedings or other legal proceedings."[176] Within this note Qualcomm states "We have been in the past and currently are subject to various governmental investigations and/or legal proceedings. Certain of these matters are described in this Annual Report in 'Notes to Consolidated Financial Statements, Note 7. Commitments and Contingencies'… Unfavorable resolutions of one or more of these matters have had and could in the future have a material adverse effect on our business, revenues, results of operations, cash flows and financial condition."[177]

      c.  Risks Related to Intellectual Property states: "Claims by other companies that we infringe their intellectual property could adversely affect our business."[178] Within this note Qualcomm states "From time to time, companies have asserted, and may again assert, patent, copyright, trademark or other intellectual property claims against us relating to our technologies or products, including those we have acquired from other companies. These claims have resulted and may again result in our involvement in litigation, and we are currently involved in such litigation, including certain matters described in this Annual Report in "Notes to Consolidated Financial Statements, Note 7. Commitments and Contingencies."[179] It goes on to say "Furthermore, litigation could severely disrupt the supply of our products and the businesses of our chipset customers and their customers, which in turn could harm our relationships with them and could result in a decline in our chipset sales or a reduction in our licensees' sales, causing a corresponding decline in our chipset or licensing revenues. Any claims, regardless of their merit, could be time consuming to address, result in costly litigation, divert the efforts of our technical and management personnel, cause product release or shipment delays and/or damage to our customer relationships, any of which could have an adverse effect on our results of operations and cash flows."[180]

77.    However, these risk factor disclosures were general disclosures that were similarly provided in Qualcomm's SEC filings before and after the Breach Letter, including disclosure after the Breach Letter

---

[176] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 29 (emphasis omitted).
[177] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 29.
[178] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 33 (emphasis omitted).
[179] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 33.
[180] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 34.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

was withdrawn.[181]  Qualcomm does not discuss any incremental material adverse impact stemming from the Breach Letter or its publication by Bloomberg.

78. Item 3 Legal Proceedings is Qualcomm's opportunity to describe significant[182] pending lawsuits or other legal proceedings, other than ordinary routine litigation incidental to the business in its Form 10-K. [183] Qualcomm's Item 3 cross refers to "Notes to Consolidated Financial Statements, Note 7."[184] As noted above, Note 7 is Qualcomm's first public disclosure of the Breach Letter and no incremental commercial risk anticipated because of the Breach Letter or its publication by Bloomberg is discussed within Note 7.[185]

79. Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operations, contains the section "Looking Forward."[186] While there is disclosure of potential "material adverse effect on our business, revenues, results of operations, financial condition and cash flows,"[187] as a result of unfavorable resolutions to the legal proceedings described in Note 7,  I observe this statement relates to the fact that  the Arm litigation was due to conclude at the end of the 2024 calendar year and the risk associated with that litigation may materialize in the coming period. It does not discuss any interim incremental adverse impact stemming from the Breach Letter or its publication by Bloomberg.

80. Qualcomm's 2024 Form10-K Item 9A Controls and Procedures specifically discusses Qualcomm's Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures[188]:

"Under the supervision and with the participation of our management, including our principal executive officer and our principal financial officer, we conducted an evaluation of our disclosure controls and procedures... [and] [b]ased on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report."[189]

---

[181] According to Qualcomm Inc. Form 10-Q, for the quarterly period quarter ended December 29, 2024, the Breach Letter was withdrawn by Arm on January 8, 2025.
[182] SEC Investor Bulletin, How to Read a 10-K January 25, 2021.
[183] 17 CFR § 229.103 (a) (Item 103) Legal proceedings, Regulation S-K.
[184] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 38.
[185] Qualcomm Inc., Form 10-K, for fiscal year ended September 24, 2023, p. F-23.
[186] Qualcomm Inc., Form 10-K, for fiscal year ended September 24, 2023, p. 45.
[187] Qualcomm Inc., Form 10-K, for fiscal year ended September 24, 2023, p. 47.
[188] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 49.
[189] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 49.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

81. Qualcomm's disclosure controls and procedures were determined to be effective.[190]  However, Qualcomm did not disclose the nature of the material adverse effects resulting from the Breach Letter or its publication in the Bloomberg Article that Qualcomm alleged it suffered in the Second Amended Complaint. Further, Qualcomm was required to, and did, disclose the Breach Letter in its 2024 Form 10-K, and Qualcomm would have been obligated to do so absent the Bloomberg Article.

### c)  Discussion of the Breach Letter in Subsequent Investor Events

82. Qualcomm participated in three investor events in the period following receipt of the Breach Letter and the release of the verdict of the Arm Complaint [191]: Q4 2024 Earnings Conference Call on November 6, 2024;[192] Investor Day 2024: IoT and Automotive Diversification Update on November 19, 2024;[193] and UBS Global Technology and AI Conference on December 4, 2024.[194]

83. According to the transcripts of these events available on Qualcomm's website, Qualcomm discussed the Breach Letter in two out of three of these investor events. In both instances the cancellation of the QC ALA was discussed by Qualcomm executives only in response to questions raised by participants and there was no mention of any material adverse impacts on business relationships, despite the analysts' direct questions regarding the stakes and impacted business lines:

> a.  During the Q4 2024 Qualcomm Earnings Conference Call, held on the same date the 2024 Form 10-K was filed, November 6, 2024, there was an exchange about the Arm Complaint.  Joe Moore, a Morgan Stanley Analyst, asked, "And then I don't think you mentioned it. Anything you could say about the Arm dispute?  Because that would help us understand what's the stake there."[195] to which Akash Palkhiwala (Qualcomm's Chief Financial Officer and Chief Operating Officer) ("AP") replied, "we have a very broad, well-established license rights…we are very confident that those rights will be affirmed. The trial is scheduled for December, and so we're looking forward to addressing Arm's claims at that point."[196]  There was no other reference to the ongoing legal proceedings with ARM, the cancellation of the QC ALA, or to the Breach Letter having an impact on

---

[190] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 49.
[191] Qualcomm Press Announcement, December 20, 2024.
https://www.qualcomm.com/news/releases/2024/12/qualcomm-statement-on-trial-verdict-win#:~:text=We%20are%20pleased%20with%20today's,by%20Qualcomm's%20contract%20with%20ARM.
[192] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[193] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[194] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.
[195] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024, p. 7.
[196] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024, p. 7.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

customer relationships or a potential impact on or creating uncertainty about earnings identified from the transcript.[197]

    b.   At the Qualcomm Investor Day on November 19, 2024, AP responded to a question in relation to Arm potentially cancelling licenses and whether Qualcomm had considered moving to another instruction set architecture ("ISA") by saying, "we have broad rights under the license that we have with ARM for custom design course, and we're very comfortable that those will be affirmed. Trial starts next month."[198] There was no other reference to the ongoing legal proceedings with ARM, the cancellation of the QC ALA, or to the Breach Letter having an impact on business relationships or a potential impact on or creating uncertainty about earnings identified from the transcript. [199] Qualcomm received follow-up questions to clarify whether Qualcomm could move the Oryon core, underpinned by Arm architecture, and use the Nuvia platform on another ISA.[200]

84.    There was no reference to the ongoing legal proceedings with ARM, the cancellation of the QC ALA, the Breach Letter, or the Bloomberg Article in the transcript for the UBS Global Technology and AI Conference held on December 4, 2024.[201]

85.    Qualcomm did not disclose the nature of any material adverse impact resulting from the Breach Letter or its publication in the Bloomberg Article as alleged in the Second Amended Complaint.

### d) Discussion of the Breach Letter in Q1 2025 Form 10-Q and its related Investor Event

86.    Qualcomm's Q1 2025 Form 10-Q for the quarterly period ended December 29, 2024, was the first filing for which underlying performance could have been impacted by the Breach Letter. The Q1 2025 Form 10-Q made no reference to any materialized loss of customers, transactions or increased costs because of the Breach Letter or its publication in the Bloomberg Article as alleged in Qualcomm's Second Amended Complaint.[202] The only reference to the Breach Letter was an update to the "Notes to Condensed Consolidated Financial Statements, Note 5. Commitments and Contingencies – Legal and Regulatory Proceedings" ("Note 5") where it states: "On January 8, 2025 Arm notified us that it was withdrawing its

---

[197] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[198] Qualcomm Investor Day 2024 Transcript, November 19, 2024, p. 29.
[199] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[200] Qualcomm Investor Day 2024 Transcript, November 19, 2024, p. 29.
[201] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.
[202] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm ALA, while reserving its rights pending the outcome of the ongoing litigation."[203] The Q1 2025 Form 10-Q makes no reference to the Bloomberg Article.[204]

87.    In Item 2. MDA of the Q1 2025 Form 10-Q, when referencing Note 5 Qualcomm states "Litigation is inherently uncertain, and, while we intend to continue to vigorously defend ourselves in such matters, the unfavorable resolution of one or more of these matters could have a material adverse effect on our business, results of operations, financial condition or cash flows."[205]  These general disclosures were similarly provided in 2024 Form 10-K prior to the Breach Letter being withdrawn.

88.    In fact, in the Q1 2025 earnings call on February 5, 2025, Mr. Amon opens the call stating, "In fiscal Q1, we delivered record revenues of $11.7 billion in non-GAAP earnings per share of $3.41."[206]

89.    Later in the same call, Mr. Amon states: "Before I turn the call over to Akash, I would like to provide an update on the Arm versus Qualcomm trial from December 2024. The jury's verdict vindicated Qualcomm's CPU innovations and affirmed the Qualcomm's contract with Arm provides a license for Qualcomm's products containing our proprietary Orion CPUs in industries such as smartphones, automotive, next-generation PCs, IoT, and data center. In addition, Arm recently notified us that it was withdrawing its October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm architecture license agreement. We're excited to continue to develop performance-leading, world-class products that benefit consumers worldwide that include our incredible Orion custom CPUs."[207]

90.    Despite the allegations detailed above that the Breach Letter caused harm, the only reference to it in the 2024 Form 10-K was in Note 7,[208] where it is noted as an update to ongoing litigation, not as a separate material event having an impact on customer relationships or a potential impact on or creating uncertainty about earnings. There are no references in any investor events held by Qualcomm from the receipt of the Breach Letter to the date of its withdrawal as to the Breach Letter or its publication in the Bloomberg

---

[203] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 13.
[204] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024.
[205] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 20.
[206] Qualcomm Q1 2025 Earnings Transcript, February 05, 2025, p. 3; *see also* Qualcomm Q3 2025 Earnings Call Transcript, July 30, 2025, p. 4–6 (Mr. Amon said, "While we are in the early stages of this expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. If successful, we expect revenues to begin in the fiscal '28 timeframe. . .. We have been executing on a product.").
[207] Qualcomm Q1 2025 Earnings Transcript, February 05, 2025, p. 5
[208] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, pp. F-23–24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Article as having an impact on customer relationships or a potential impact on or creating uncertainty about earnings. In the Q1 2025 Form 10-Q, there is reference to the Breach Letter being withdrawn.[209] There is no reference to the Breach Letter or its publication in the Bloomberg Article having caused or potentially caused any harm to customer relationships since it was received, and there is no reference to it having any potential impact on or creating uncertainty about earnings on future revenue or earnings as alleged in Qualcomm's Second Amended Complaint.

91.     In my experience, if the Breach Letter or its publication in the Bloomberg Article had any or all of the material adverse impact set out in Qualcomm's Second Amended Complaint—i.e., interfering, interrupting or causing delays with Qualcomm's business relationships with the "major customer" or the "large buyer" or sabotaging its business relationships, resulting in actual harm—these impacts would have been mentioned somewhere within Qualcomm's periodic reporting and related investor events, if they were material. Qualcomm's failure to make any mention of the nature of any adverse or incremental adverse impact on any business relationship because of the Breach Letter or its publication in the Bloomberg Article within in its 2024 Form 10-K, during investor events, investor calls or its first quarter Form10-Q for the 2025 fiscal year[210] suggest to me, based on my experience evaluating these types of disclosures, that Qualcomm did not consider that the Breach Letter or its publication in the Bloomberg Article had a material adverse impact as alleged in Qualcomm's Second Amended Complaint.

## V.     Opinions and Conclusion

92.     It is my opinion that Qualcomm was required to disclose the Breach Letter in the 2024 Form 10-K as it was reasonably possible that a material loss contingency may have been incurred related to the potential termination of Qualcomm's ALA. Qualcomm would have been obligated to make this disclosure irrespective of the reporting of the contents of the Breach Letter within the Bloomberg Article.

93.     For all the reasons stated above, it is my opinion that the Breach Letter and its publication in the Bloomberg Article did not have the material adverse impact on Qualcomm that Qualcomm described in the Second Amended Complaint, as there was no disclosure whatsoever from receipt of the Breach Letter to Qualcomm's Q1 2025 earnings call on February 5, 2025 that indicates that the Breach Letter or its publication in the Bloomberg Article had any material adverse impact relating to interfering, interrupting or causing delays with Qualcomm's business relationships with the "major customer" or "large buyer" or

---

[209] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 13.
[210] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 1.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

sabotaging its business relationships resulting in actual harm as alleged in the Second Amended Complaint.

## VI.    SIGNATURE AND RIGHT TO MODIFY

94.  My opinions are based upon the information available to me as of the date of this report. It is possible that additional information may affect my opinions herein. I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

*****

Signed this 5th day of September 2025

_____

Steven Richards, CPA

# Exhibit 1



**Expert Report of Steven Richards**
**Exhibit 1 – Steven Richards Curriculum Vitae**

# Steven E. Richards

## Senior Managing Director

2000 K Street NW 12th Floor | Washington, DC 20006



## Contact

| | |
|---|---|
| Main | +1.202.797.1111 |
| Direct | +1.202.507.6941 |
| Mobile | +1.202.412.6685 |

steven.richards@ankura.com

### Education

BA, Accounting, Washington & Jefferson College

### Certifications

Certified Public Accountant

### Affiliations

American Institute of Certified Public Accountants

Pennsylvania Institute of Certified Public Accountants

Association of Securities and Exchange Commission Alumni

Steven Richards is a Senior Managing Director at Ankura in the Washington, DC office. Steven has over 27 years of experience in forensic accounting.

Steven provides a broad range of expert and consulting services involving financial reporting and disclosure, accounting advisory, and auditor liability. He is the Global Business Group Leader for the Risk, Forensic and Compliance practice. He advises law firms, Audit committees, C-Suite Executives and auditors on corporate governance, internal investigations, and audit and regulatory matters, including the assessment of compliance with SEC, PCAOB and other regulatory requirements. He has worked with both public and private companies from start-ups to multinational enterprises.

Prior to joining Ankura in 2016, Steven was a Partner in the Forensic Advisory practice at Deloitte LLP ("Deloitte"), where he conducted numerous internal investigations of SEC registrants and regulated entities. He also served as a Senior Advisory Partner to Deloitte leadership and its Office of General Counsel regarding audit regulation, public policy matters, and regulatory enforcement matters. During his time at Deloitte, Steven provided advice on government, regulatory, and professional matters involving the audit practice, advised on audit regulatory issues involving public policy, inspections, standards, rules, litigation, and enforcement matters involving the Public Company Accounting Oversight Board ("PCAOB"), the Securities and Exchange Commission ("SEC"), and foreign audit and securities regulators.

From 2011 through 2014 Steven was the former Special Advisor to PCAOB Chairman, James Doty, where he was involved in policy and operations for all aspects of PCAOB oversight, including the enforcement program, adjudication proceedings, standard setting, evolution of the domestic and international inspections program, development of the broker-dealer inspection program, and risk analysis.

From 2014 through 2015, Steven was the former Senior Advisor to the PCAOB's Director of the Division of Enforcement and Investigations, including work on all aspects of policy and operations for the Enforcement program, evaluation of investigations to determine if there were violations of professional standards or rules, coordination with other domestic financial regulators, division-wide initiatives, division priorities, and case management.

Steven has served as a former Assistant Chief Accountant at the Securities and Exchange Commission, Division of Enforcement's Office of Chief Accountant from 2004 through 2008. During his tenure at the SEC, Steven performed numerous fraud and financial reporting investigations involving SEC registrants, senior executives, external auditors, and other third parties. Steven routinely assessed a variety of technical accounting, disclosure, and internal control matters, as well as auditor compliance with professional standards, including PCAOB standards, and provided advice on recommendations of enforcement matters under SEC Rules of Practice including Rule 102(e).



Steven E. Richards

Steve worked closely with both the SEC's trial counsel and other law enforcement authorities during the investigation and litigation of high-profile matters.

Before and after his work at the SEC, from April 2002 to May 2004 and from July 2008 to March 2011, Steven worked in the Forensic and Litigation Consulting practice at FTI Consulting, Inc. ("FTI"). During his time at FTI, Steven managed numerous multidisciplinary teams on high-profile matters including one of the largest Ponzi schemes in history. He also performed numerous forensic and internal investigations involving SEC registrants and regulated entities, privately held companies, senior executives, external auditors, and other third parties, including interacting with external auditors and assessed their compliance with professional obligations.

Steven started his career as an auditor at Arthur Andersen LLP, where he performed financial statement audits of both publicly traded and privately held companies in a variety of industries.

In 2018, Steven became a member of the American Institute of Certified Public Accountants ("AICPA") Forensic and Litigation Services Fraud Task Force. The Fraud Task Force provides information to AICPA members regarding fraud detection, investigation, and prevention.

In 2015, Steven was named the Deloitte representative to the Center for Audit Quality ("CAQ") – Anti-Fraud Collaboration ("AFC"). The CAQ's AFC promotes the deterrence and detection of financial reporting fraud through the development of thought leadership, awareness programs, and educational opportunities for the primary participants in the financial reporting supply chain.

**Selected Professional Experience**

<u>Expert/Consultant – SEC Matters</u>

• **Investigation of Percentage of Completion and Expect Cost for Long-Term Defense Contracts – For Aerospace and Defense Multinational –** Retained by counsel of a multinational Aerospace and Defense contractor to perform an internal investigation of the revenue recognition under the percentage of completion method for multi-year multibillion dollar contracts, the related estimate of the cost to complete and the basis of changes to those estimates over time, as well as the related disclosures. Further, evaluated related corporate governance matters. Participated in multiple meetings with the Department of Justice and SEC's Home Office.

• **Investigation of Internal Control Whistleblower Allegations of Internal Audit Director -** Retained by counsel to audit committee of a Latin American financial institution and money transfer entity to perform an internal investigation into whistleblower allegations related to undue pressure on Internal Audit and other internal control circumventions.

• **Investigation of Short seller Allegations of Financial Institution -** Retained by counsel to the audit committee of a Latin American start up financial technology and money transfer entity to perform and internal investigation into allegations related, control and segregation of merchant funds, related party transactions, accuracy and completeness of disclosure, revenue recognition and appropriateness of reporting to safety and soundness regulator.

• **Investigation of Revenue Recognition and Inventory Issues -** Retained by counsel to audit committee of a global mobile technology and accessories company to perform and internal investigation into whistleblower allegations related to sales return reserve accruals and excess and obsolete inventory. Participated in multiple meetings with SEC's Salt Lake City, UT Office.

• **Investigation of Revenue Recognition and Internal Control -** Retained by counsel to start-up mobile technology company to perform and internal investigation into revenue recognition and related governance and internal control issues. Participated in multiple meetings with SEC's Washington, DC Office.

• **Investigation of Revenue Recognition Issues –** Retained by counsel of a large electric utility and distribution company to perform an internal investigation of whistleblower allegations related to estimates in the revenue recognition process and related impacts on internal controls, disclosure and other reporting obligations. Participated in multiple meetings with auditors and the SEC's Boston, MA Office.

• **Investigation of Revenue Recognition Issues -** Retained by counsel for audit committee of pharmaceutical company to perform internal investigation of various revenue recognition practices. Led a team of more than 20 forensic professionals in an internal investigation into allegations of undisclosed relationships, financial reporting, and disclosure violations and the use of an undisclosed affiliate to accelerate revenue recognition and related corporate governance maters. Participated in multiple meetings with SEC's Washington, DC Office.

ankura.com

2



Steven E. Richards

• **Investigation of Executive Perquisites, Revenue Recognition and Related Party Transactions -** Retained by counsel for company of multinational energy infrastructure manufacturing company to perform internal investigation of whistleblower allegations including executive perquisites, revenue recognition and related party transactions at largest subsidiary post acquisition. Led a team of more than 20 forensic professionals in an internal investigation into allegations of undisclosed relationships, financial reporting, and disclosure violations and the use of an undisclosed affiliate to accelerate revenue recognition, as well as related corporate governance matters.

• **Investigation of Percentage of Completion and Expect Cost to Construct Energy Facilities –** Retained by counsel to the audit committee of a multinational energy infrastructure company to perform an internal investigation of the construction of several multibillion dollar power plants and the related impact on revenue recognition, loss contracts, the related estimate of the cost to complete and related disclosures. Further, evaluated related corporate governance matters. Participated in multiple meetings with the SEC's Miami, FL Office.

• **Investigation of Restructuring and non-GAAP measures -** Assisted counsel in the representation of a public global manufacturer in an SEC enforcement inquiry relating to the accounting and disclosure of restructuring cost and non-GAAP measures. Participated in multiple meetings and presentations to the SEC's Washington, DC Office.

• **Investigation of Revenue Recognition and Related Changes in Estimates -** Retained by counsel for a large energy infrastructure company relating to allegations that there were changes in estimates to complete that had an impact on amount and timing of revenue recognition and total loss recognized on loss contracts. Supported counsel in interactions with SEC's Washington, DC Office.

• **Investigation of Revenue Recognition and non-GAAP measures -** Assisted counsel in the representation of a public global manufacturer of industrial products in an SEC enforcement inquiry relating to the accounting and disclosure of revenue recognition and non-GAAP measures. Participated in multiple meetings and presentations to the SEC's Washington, DC Office.

• **Investigation of Revenue Recognition and Disclosure –** Retained by counsel for the audit committee of a public animal health products and pharmaceutical company to perform an internal investigation into whistleblower concerns related to irregularities in revenue recognition, including allegations of channel stuffing and bill-and-hold transactions. Further, reviewed related corporate governance matters. Participated in multiple meetings and presentations to the SEC's Forth Worth, TX Office.

• **Investigation into Structured Financial Instruments –** Retained by counsel for the audit committee of a Fortune 50 financial institution to perform an internal investigation of accounting and reporting issues relating to derivatives, securitizations, and other structured financial instruments. Evaluated related internal controls and corporate governance. Participated in Congressional hearings, multiple meetings and presentations to the SEC's Washington, DC Office, as well as several other Federal Regulators.

• **Investigation into Perquisites, Related Parties, and Revenue Recognition Issues –** Retained by counsel for that audit committee of a body armor manufacturer to conduct an internal investigation focused on the existence of undisclosed personal expenses of senior management, revenue recognition, and related-party transactions. Participated in multiple meetings with the SEC's Miami, FL Office.

• **Revenue Recognition and Translation Accounting Expert –** Retained as accounting expert and consultant by counsel in the representation of a Chief Financial Officer for a large multinational manufacturer relating to the accounting for revenue recognition and intercompany loans and related translation adjustments, which was being investigated by and SEC's Philadelphia, PA Office

• **Revenue Recognition and Disclosure Expert –** Assisted counsel in the representation of a Chief Executive Officer of a technology and data measurement company related to whistleblower allegations around revenue recognition, including multiple element arrangements and disclosure issues conducted by the SEC's Washington, DC Office.

• **Revenue Recognition and Gain on Sale Accounting Expert -** Retained as expert and consultant by counsel to assist in the representation of a Chief Executive Officer of a retail brand company in connection with an SEC investigation by SEC's Washington, DC office, as well as the Department of Justice's New York Office. Evaluated revenue recognition and gain on sale transaction.

• **Revenue Recognition and Inventory Accounting Expert -** Retained as accounting consulting expert by counsel to assist a large technology equipment reseller in connection with an SEC investigation by the Washington, DC office. Evaluated revenue recognition, sales practices and internal controls as well as inventory transactions and related disclosures.

• **Investigation of Percentage of Completion and Expect Cost to Construct Energy Facilities –** Retained by counsel to a large energy infrastructure company to assist in an investigation by the SEC's Fort Worth office related to the construction of multibillion-dollar natural gas infrastructure projects. The issues in question involved revenue recognition and the related estimate of the cost to complete and related disclosures.

ankura.com

3



Steven E. Richards

## Expert/Consultant – Other Matters

• **Investigation of Ponzi Scheme -** Retained as consulting expert by counsel representing SIPC trustee in the largest ever ponzi scheme of a Registered Investment Advisor.  Investigated trading false trading records, determined who knew of the false trading, or should have, evaluated fake compliance records and related process to mislead regulators.  Lead team of more than 80 personnel in investigation.

• **Investigation of Executive Perquisites, Insider Transactions and Related Party Issues -** Retained by counsel of a start-up life sciences company to perform internal investigation of whistleblower allegations related to insider perquisites, insider transactions, compensation arrangement, related party transactions and the related internal control and corporate governance.

• **Investigation of Revenue Recognition and Deferred Expense Recognition -** Retained by counsel for that audit committee of a large insurance company focused on whistleblower allegations related to changes in estimates effecting revenue recognition and the deferral of expenses.

• **Investigation of Perquisites and Related Party Transactions –** Retained to assist counsel in an internal investigation related to undisclosed perquisites and related party transactions at a start-up media and content company.

• **Investigation of Inventory Losses –** Retained to assist counsel in an internal investigation related to inventory losses, as well as undisclosed inappropriate personal expenses reimbursement for large national material retailer.

• **Post-Acquisition Accounting Dispute -** Retained as accounting expert by counsel for large multinational technology company in an arbitration involving revenue recognition, impairment and capitalization of costs under US GAAP.

• **Post-Acquisition Accounting Dispute -** Retained as accounting expert by counsel for large multinational chemical and compound manufacture in an arbitration involving the viability of technology assets and related impairment, as well as expense recognition under US GAAP.

## Internal Controls

• **Internal Controls Consulting -** Retained by counsel for energy company to assist with enhancing the company's internal controls, corporate governance and related conclusions surrounding material weaknesses.

• **Internal Controls Consulting –** Retained by counsel to assist multinational energy company in improving its internal controls over estimates to complete construction projects.

• **Internal Controls Consulting –** Retained by counsel to assist mortgage finance company its internal controls over compliance with accounting policy and changes in policy.

## Expert/Consultant - Auditor Liability – Civil Matters

• **Audit Firm Defense Expert for National Audit Firm in Civil Litigation -** Retained as consulting expert by counsel an auditing firm defending a civil lawsuit filed by a former client in the energy industry.  Assist in drafting expert report in defense of claims of alleged violations of auditing standards.

• **Audit Firm Defense Expert for National Audit Firm in Civil Litigation –** Retained as consulting expert by an auditing firm defending a lawsuit filed by a former audit client.  Expert report and deposition testimony pending.

## Expert/Consultant - Auditor Liability – PCAOB/SEC

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related to the evaluation of a specialist, supervision, evaluation of audit evidence and professional skepticism in the audit revenue recognition and deferred tax assets in the construction industry.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in presentations to PCAOB enforcement staff.  Matter closed after Statement of Position.

• **PCAOB Auditor Investigation -** Retained as an accounting/audit expert and consultant by foreign audit firm in connection with a PCAOB investigation related to supervision, sampling, work of another auditor, evaluation of audit evidence and professional skepticism in the audit relating to extrapolated errors, revenue recognition and assessment of internal controls of a telecommunications company.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and made presentation to PCAOB enforcement staff.  Assisted in drafting of Statement of Position.



Steven E. Richards

• **PCAOB Auditor Investigation -** Retained as consulting expert by counsel representing senior manager in connection with a PCAOB investigation related to evaluation of alteration of workpapers and related areas of inquiry in the firm's system of quality control.

• **PCAOB Auditor Investigation -** Retained as consulting expert by counsel representing audit firm in connection with a PCAOB investigation related to evaluation of revenue recognition and related areas of inquiry in the firm's system of quality control.

• **PCAOB Auditor Investigation -** Retained as consulting expert by audit firm in connection with a PCAOB investigation related to evaluation of workpaper retention requirement and related quality system of quality control.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related to the supervision of the audit, risk assessment, evaluation of audit evidence and professional skepticism in the audit of loan loss reserves at a financial institution.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related to revenue recognition at a software company.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position.  Matter closed after Statement of Position.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for a an audit firm in connection with a PCAOB investigation related to revenue recognition at a software company.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position.  Matter closed after Statement of Position.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related the audit of broker-dealer net capital calculation and qualifying assets.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and made presentation to PCAOB enforcement staff.  Matter subsequently closed.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related the audit of related party and significant unusual transactions at a Chinese based technology company.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position.

• **SEC Auditor Investigation -** Retained by counsel for auditing firm as a technical accounting and auditing consultant in connection with investigation by the SEC's Washington, DC Office involving revenue recognition issues and compliance with PCAOB Auditing Standards.

• **SEC Auditor Investigation -** Retained as consulting expert by counsel representing regional audit firm in connection with an SEC investigation of Registered Investment Advisor regarding use of a specialist and valuation of securities and related haircuts, as well as related areas of inquiry in the firm's system of quality control.

 • **SEC Auditor Investigation -** Retained as consulting expert by counsel representing audit firm in connection with an SEC investigation of national audit firm regarding use the auditing of revenue, as well as related areas of inquiry in the firm's system of quality control.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related the audit of related party transactions and allowance for loan losses at a US based alternative financing company.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related the capitalization of assets for a mining company.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting responses to PCAOB inquiries.

Expert/Consultant - Auditor Liability – Independence

• **SEC Auditor Investigation -** Retained as accounting expert and consultant by counsel for an audit firm in connection with an investigation by the SEC's Washington, DC Office involving auditor independence.  Participated in meetings and drafting Wells Response.  Matter closed with no action.

ankura.com

5



Steven E. Richards

• **PCAOB Auditor Investigation -** Retained by counsel for an audit firm as a technical accounting and auditing consultant in connection with investigations by the PCAOB involving auditor independence and qualifications issues.

• **PCAOB Auditor Investigation -** Retained by counsel for auditing firm as a technical accounting and auditing consultant in connection with investigations by the PCAOB involving auditor independence relating to the firm's system of quality control for former employees obtained financial reporting oversight roles at audit clients.

Expert/Consultant - Auditor Liability – Independent Consultants/Monitor

• **Assisted in Preparation for Independent Monitor –** Retained as consultant by counsel for an audit firm in connection with an SEC Order that required an Independent Consultant to evaluate the audit firm audit methodology relating to several specific areas. Consulted with firm quality control leadership and did a preliminary evaluation of the audit methodology and related system of quality control and identified enhancement in advance of the Independent Consultant. Assist the firm in drafting a report covering enhancements identified and the assessment of the system of quality control.

• **Independent Consultant under and SEC Order –** Retained an Independent Consultant for an audit firm subject to an SEC Order requiring an Independent Consultant to review the audit firm's system of quality control around independence. Evaluated all elements of Independence compliance and issued report to the firm and SEC's Chicago Regional Office identifying enhancements to the firm's system of quality control.

Transactional Tracing

• **Cash Tracing Investigation** - Managed a multidisciplinary investigation team retained by the Securities Investor Protection Act Trustee for the global liquidation of Bernard L. Madoff Investment Securities LLC, one of the largest financial frauds in US history. Oversaw the forensic investigation and data analysis work streams, including the supervision of forensic accountants, economists, market structure experts, and data analysts to identify the flow of funds and related customer account activity.

• **Campaign Finance Matter –** Retained as forensic accounting expert by counsel in connection with an embezzlement investigation related to campaign donations misappropriated by the campaign treasurer and related false campaign finance filings. Participated in meetings with the State Attorney's Office investigators.

• **Cash Tracing Investigation –** Led internal investigation, on behalf of Reinsurance Company, into $80 million fraud relating to misappropriated policy premiums by sub-insurer. The investigation involved tracing significant flows of funds among many different financial institutions and related entities.

• **Intercompany Transaction Tracing -** Retained by counsel as the forensic expert for the Independent Board Members for a communications company in a bankruptcy proceeding in response to potential claims relating to intercompany transactions.

• **Transactional Tracing –** Retained by counsel for registered investment advisor to perform tracing analysis of investor contributions, use of funds and withdrawals.

• **Cash Tracing Investigation –** Retained by counsel for Investment Advisor to perform cash-tracing analyses to identify and summarize sources and uses of funds over a multi-year period.

• **Transactional Tracing -** Retained by counsel for alternative investment fund to perform tracing analysis of investor contributions, use of funds and withdrawals and related rates of returns.

Litigation Engagements - Testified as an Expert at Trial or by Deposition – Last Four Years

• **Deposed as an auditing standards and external audit expert in a State Supreme Court Action (N.Y. Sup Ct., Index No. 160830/2022; 160834/2022; and 160964/2022).** Retained to offer expert opinions and testimony relating to an external auditor's compliance with auditing standards. Further testified as to the responsibilities and related professional obligations of an external auditor with regard to fraud perpetrated by management.

• **Deposed as a financial reporting, disclosure, internal audit and external audit expert in a District Court Action (S.D. of TX, Houston Division, Case No. 4:18-CV-4330).** Retained to offer expert opinions and testimony relating to the revenue and costs for large infrastructure projects under percentage-of-completion accounting, as well as their related disclosure. Further testified to the role of Internal Audit in an enterprise and as it related to financial reporting. Also testified as an expert covering business combinations including subsequent purchase price adjustments. Further testified as to the role and purpose of an audit of financial statements, as well as



Steven E. Richards

auditor's professional standards and related professional obligations with the above subjects.

• **Deposed as an accounting standards expert in a State Supreme Court Action (N.Y. Sup. Ct., Index No. 654977/2022).** Retained to offer expert opinions and testimony relating to capital expenditure reserves and the associated reporting and disclosure of restricted cash balances on financial statements filed with the United States Securities and Exchange Commission. Further testified as to the responsibilities and activities of auditors as they relate to the reporting and disclosure of restricted cash balances.

• **Deposed as a financial reporting and audit expert in a District Court Action (N.D. Ill, Case No. 19-CV-6473).** Retained as an expert covering the roles and responsibilities of management and the auditor relating to the financial statement audit. Further testified as to the purpose of an audit of financial statements. Also testified about the auditor's professional standards and related professional obligations with regard to when an auditor discovers newly identified information not known to them at the time of the audit.

<u>Speaking Engagements</u>

- Ankura Podcast – "High Stakes Investigations: Spotlight on Auditors" (May 7, 2025)
- Securities Docket – Securities Enforcement Forum Central 2024: "Financial Disclosure and Accounting Fraud" (September 24, 2024)
- American Law Institute – Accountant Liability Conference 2023: "Facing Two (or More) Fronts: Responding to Parallel Investigations" (May 17, 2024)
- University of Texas School of Law Government Enforcement Institute: "SEC Developments and Current Priorities" (September 29, 2023)
- Securities Docket – Securities Enforcement Forum Central 2023: "Financial Disclosure and Accounting Fraud" (September 19, 2023)
- American Law Institute – Accountant Liability Conference 2023: "Quality Control and Other Emerging Regulatory Issues" (May 5, 2023)
- American Law Institute – Accountant Liability Conference 2022: "Developing and Executing an Effective Expert Strategy" (June 10, 2022)
- Securities Docket – Securities Enforcement Forum 2022: "Financial Disclosure and Accounting Fraud" (November 15, 2022)
- The Texas Lawbook: "Key Developments in SEC Enforcement" (April 3, 2022)
- Securities Docket – Securities Enforcement Forum 2021: "Financial Disclosure and Accounting Fraud" (November 4, 2021)
- Securities Docket – Webcast: "Securities Enforcement: A Look Back at 2021, and What to Expect in 2022" (February 1, 2021)
- Securities Docket – Webcast: "Securities Enforcement: A Look Back at 2020, and What to Expect in 2021" (January 12, 2021)
- Securities Docket – Securities Enforcement Forum 2020: "Financial Disclosure and Accounting Fraud" (November 4, 2021)
- University of Texas School of Law Government Enforcement Institute: "SEC Developments and Current Priorities" (October 1, 2021)
- Lemme Best Practices (Virtual) – "*The Regulatory Environment for Firms in the Biden Era" (September 9, 2021)*
- Securities Docket – Webcast: "SEC Enforcement: Current Developments and What's Ahead for 2019" (March 1, 2019)
- A Look Back at 2020, and What to Expect in 2021" (January 12, 2021)
- Securities Docket – Webcast: "A Review of SEC Enforcement in 2017 and What's Ahead for 2018" (January 18, 2018)
- Securities Docket – Securities Enforcement Forum West: "Financial and Accounting Fraud" (May 10, 2018)
- Securities Docket – Securities Enforcement Forum 2021: "Financial Disclosure and Accounting Fraud" (October 26, 2017)
- Securities Docket – Webcast: "Today and Tomorrow – Key Developments for 2016 and Expectations for 2017" (January 17, 2017)
- A Review of SEC Enforcement in 2017 and What's Ahead for 2018" (January 18, 2018)
- AICPA Forensic and Valuation Services Conference: "Don't Get Left Behind: New Revenue GAAP Will change All Financial Statements" (November 7, 2018)
- AICPA Forensic and Valuation Services Conference: "Forensic Accounting Evidence – Know Your Audience and the Expectations" (November 7, 2018)
- AICPA Forensic and Valuation Services Conference: "Fraud Scheme: Exposed Behind the Curtain" (November 13, 2017)

<u>Publications</u>

- Accounting Today: "The Regulatory Forecast: Less, and lighter (February 18, 2025)
- Law360: "A New PCAOB Board Sets New Enforcement Practices" (January 27, 2023)
- Bloomberg Tax: "Watergate Era Audit Fraud Rules Face Post- Wells Fargo Revamp" (October 24, 2022)
- Law360: "Expect More Robust PCAOB Enforcement This Year" (February 9, 2022)
- Ankura: "SPACS and Warrant Accounting" (April 20, 2021)
- Law360: "PCAOB Enforcement Activity Likely to Increase in 2021" (February 1, 2021)

# Exhibit 2

# Expert Report of Steven Richards
## Exhibit 2 – Documents and Materials Considered

In addition to the documents cited throughout my report, I considered the following documents in preparing my report:

**Accounting Guidance, Authoritative Literature, SEC Guidance and Professional Standards**

- AICPA Code of Conduct
- AICPA Statement on Standards for Forensic Services No. 1
- FASB ASC Topic 450-20, Loss Contingencies
- FASB ASC Topic 855, Subsequent Events
- AU Section 560 Subsequent Events
- AU Section 561 Subsequent Discovery of Facts Existing at the Date of the Auditor's Report
- General Rules and Regulations, Part 230.405, of Securities Act of 1933
- Sarbanes Oxley Act of 2002, Section 404: Management Assessment of Internal Controls
- Sarbanes Oxley Act of 2002, Section 302: Corporate Responsibility for Financial Reports
- SEC Answers, Form 8-K
- SEC Commission, General Rules of Regulation FD
- SEC Commission Rule, Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, December 29, 2003
- SEC Commission Rule, Disclosure in Management's Discussion and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations, February 5, 2003
- SEC Notice, Commission Statement About Management's Discussion and Analysis of Financial Condition and Results of Operations, January 25, 2002.
- SEC Final Rule, Selective Disclosure and Insider Trading, Regulation FD
- SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information
- SEC Final Rule, Disclosure in Management's Discussion and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations
- SEC Financial Reporting Manual, Topic 1 Registrant's Financial Statements,
- SEC Financial Reporting Manual, Topic 9 SEC Financial Reporting Manual, Topic 9, Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), 9100 MD&A Objectives
- SEC Form Summary, Form 8-K
- SEC Frequently Asked Questions, Form 8-K
- SEC General Instructions, Form 8-K
- SEC General Instructions, Form 10-K
- SEC General Instructions, Form 10-Q
- SEC Investor Bulletin, How to Read an 8-K, May 2012
- SEC Investor Bulletin, How to Read a 10-K/10-Q, January 25, 2021
- SEC Investor Bulletin, How to Read a 10-K, September 11, 2011
- SEC Interpretive Rule, Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, May 18, 1989.
- SEC Questions and Answers of General Applicability, Exchange Act Form 8-K, Compliance and Disclosure Interpretations, June 24, 2024
- SEC Questions and Answers of General Applicability, Exchange Act Form 8-K, Compliance and Disclosure Interpretations, November 23, 2004
- SEC Consolidated Compliance and Disclosure Interpretations
- SEC Staff Accounting Bulletin: No. 99 – Materiality

# Expert Report of Steven Richards
# Exhibit 2 – Documents and Materials Considered

- 17 CFR § 229.103 - (Item 103) Risk factors, Regulation S-K.
- 17 CFR § 229.105 - (Item 105) Risk factors, Regulation S-K.
- 17 CFR § 229.307 – (Item 307) Disclosure controls and procedures.
- 17 CFR § 229.308 - (Item 308) Internal control over financial reporting.
- 17 CFR § 230.405 – Definitions of terms.
- 17 CFR § 240.13a-15- Controls and procedures
- 17 CFR Part 243.100, Regulation Fair Disclosure.

**Expert Reports**

- Expert Report of Dr. Patrick F. Kennedy dated August 8, 2025
- Expert Report of Eric E. Posner dated August 8, 2025

**Qualcomm SEC Filings - 8-K**

- Qualcomm, Inc. Form 8-K, March 12, 2018
- Qualcomm, Inc. Form 8-K, January 12, 2021
- Qualcomm, Inc. Form 8-K, November 06, 2024

**Qualcomm SEC Filings - 10-K**

- Qualcomm Inc., Form 10-K, for the year ended September 24, 2023
- Qualcomm Inc., Form 10-K, for the year ended September 29, 2024

**Qualcomm SEC Filings - 10-Q**

- Qualcomm, Inc. Form 10-Q for quarter ended September 25, 2022
- Qualcomm, Inc. Form 10-Q for quarter ended December 25, 2022
- Qualcomm, Inc. Form 10-Q for quarter ended March 26, 2023
- Qualcomm, Inc. Form 10-Q for quarter ended June 25, 2023
- Qualcomm, Inc. Form 10-Q for quarter ended September 24, 2023
- Qualcomm, Inc. Form 10-Q for quarter ended December 24, 2023
- Qualcomm, Inc. Form 10-Q for quarter ended March 24, 2024
- Qualcomm, Inc. Form 10-Q for quarter ended June 23, 2024
- Qualcomm, Inc. Form 10-Q for quarter ended December 29, 2024
- Qualcomm, Inc. Form 10-Q for quarter ended March 30, 2025
- Qualcomm, Inc. Form 10-Q for quarter ended June 29, 2025

**Other SEC Filings**

- Arm Holdings PLC, Form 20-F, for the year ended March 31, 2025
- Arm Holdings PLC, Form 6-K, November 2024
- Qualcomm Inc., Form 8-K, Exhibit 99.1

**Depositions and Related Exhibits**

- Deposition of Cristiano Amon dated July 03, 2025, and Exhibits (1-17)

# Expert Report of Steven Richards
## Exhibit 2 – Documents and Materials Considered

- Deposition of Ann Chaplin dated July 11, 2025, and Exhibits (1-25)
- Deposition of Spencer Collins dated June 30, 2025, and Exhibits (75-92)
- Deposition of Rene Haas dated July 07, 2025, and Exhibits (1-15)
- Deposition of Pavankumar Mulabagal dated July 01, 2025, and Exhibits (1-14)
- Deposition of Kenneth Siegel dated July 04, 2025, and Exhibits (1-14)
- Deposition of Jonathan Weiser dated July 11, 2025, and Exhibits (1-8)

**Complaints and Court Filings**

- Complaint, Arm LTD v. Qualcomm Inc., et.al , August 31, 2022
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 1, p. 1
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 1
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 12
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 18.
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 306.
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN) Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim
- First Amended Complaint, Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC, December 16, 2024
- Second Amended Complaint, Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC, June 03, 2025
- Redacted Second Amended Complaint, Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC, June 03, 2025 (Filed 06/09/25).

**Transcripts**
- Qualcomm Inc Q1 2024 Earnings Call Transcript, January 31, 2024
- Qualcomm Inc Q2 2024 Earnings Call Transcript, May 01, 2024
- Qualcomm Inc Q3 2024 Earnings Call Transcript, July 31, 2024
- Qualcomm Inc Q4 2024 Earnings Call Transcript, November 06, 2024
- Qualcomm Inc Q1 2025 Earnings Call Transcript, February 05, 2025
- Qualcomm Inc Q2 2025 Earnings Call Transcript, April 30, 2025
- Qualcomm Inc Q3 2025 Earnings Call Transcript, July 30, 2025
- Qualcomm Deutsche Bank Technology Conference, August 29, 2024
- Qualcomm Investor Day 2024 Transcript, November 19, 2024
- Qualcomm Inc UBS Global Tech Conference Transcript, December 04, 2024
- Qualcomm at Nasdaq London Investor Conference, June 11, 2025
- Qualcomm Inc at JPMorgan Global Technology, Media and Communications Conference, May 14, 2025
- Qualcomm Inc Annual Shareholders Meeting, March 18, 2025
- Qualcomm Inc at Bernstein Strategic Decisions Conference, May 28, 2025
- Bernstein's 40th Annual Strategic Decisions Conference, May 29, 2024
- Bernstein Annual Strategic Decisions Conference, May 29, 2024

**Other**

- Breach Letter, October 22, 2024

# Expert Report of Steven Richards
## Exhibit 2 – Documents and Materials Considered

- Bloomberg, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation", October 22, 2024
- Bloomberg, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation", October 23, 2024
- NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024
- Investopedia, Earnings Conference Call: What it is, How it Works, September 11, 2022
- Qualcomm Press Announcement, March 15, 2021.
- Qualcomm Press Announcement, December 20, 2024.
- Arm Holdings PLC Financial Statements for year ended as of March 31, 2024
- SEC Introduction to Investing Glossary, Form 10-K.
- SEC Introduction to Investing Glossary, Form 10-Q.
- SEC Speech, Disclosure Effectiveness: Remarks Before the American Bar Association Business Law Section Spring Meeting, April 11, 2014
- Regulation Fair Disclosure and New Insider Trading Rules Fact Sheet, August 10, 2000
- SEC Statement, Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors, March 09, 2022
- SEC Search, Qualcomm Filings Between January 1, 2024 and August 24, 2025
- SEC Speech, Applying a Principles-Based Approach to Disclosing Complex, Uncertain and Evolving Risks, March 15, 2019.
- SEC.gov EDGAR Full Text Search
- SEC.gov EDGAR Qualcomm 10-K and 10-Q Filing Dates

# Exhibit 3

**United States District Court**

**District of Delaware**

**Civil Action No. 1:24-cv-00490-MN**

**Qualcomm Incorporated and**

**Qualcomm Technologies, Inc.**

**v.**

**Arm Holdings plc**

**Expert Report of Eric A. Posner**

**August 8, 2025**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## I. Qualifications and Testimony

1.      I am the Kirkland and Ellis Distinguished Service Professor at the University of Chicago Law School. Before joining the Chicago faculty in 1998, I taught at the University of Pennsylvania Law School. I was educated at Yale College and Harvard Law School.

2.      I have specialized in economic analysis of law since the start of my academic career in 1993. Law and economics is an interdisciplinary field in which economic principles, models, and theories are used to analyze the law. It is a field in which both law professors and economics professors are active. My particular specialty is the application of economic principles to problems of market competition, including problems addressed by antitrust law and other areas of U.S. law and policy.

3.      I have extensive academic experience in the economics of competition. I have taught classes, given lectures, and written frequently about this topic. I have published numerous articles and one book on antitrust and competition policy. I have published in peer-reviewed economics journals, peer-reviewed law and economics journals, and law reviews. I was the editor of a peer-reviewed law and economics journal, the Journal of Legal Studies, for twelve years. I have written dozens of referee reports for peer-reviewed economics journals, and been an active member of the American Law and Economics Association, having served two terms on the board of directors.

4.      I worked on antitrust and competition issues while serving as Counsel to the Assistant Attorney General of the Antitrust Division in the Department of Justice from 2022 to 2023.

5.      I have testified or made presentations on competition policy and economics before the Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law, U.S. House of Representatives (on the economics of labor market competition); the Federal Trade Commission (on competition in labor markets); the Department of Justice, Antitrust Division (on merger policy); the National Association of Attorneys General (on the economics of labor competition); the Organization for Economic Co-operation and Development (on labor competition); and numerous practitioner and academic groups.

6.      I am a member of the American Academy of Arts and Sciences.

7.      A list of my recent expert engagements can be found at Annex 1.

8.      My curriculum vitae can be found at Annex 2.

## II. Materials Considered

9.      I have consulted the materials listed in Annex 3.

## III. Introduction and Summary

10.      I have reached the following conclusions.

1

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

developers to develop software that runs on Arm-compliant devices—which in turns increases customer demand for those devices and thus the incentive of OEMs to manufacture those devices, in a virtuous circle. As explained by Arm, "[e]verything has to be able to run everywhere" and a "strong ecosystem of users is vital."[18] Thus, "Arm's success has come from the wide accessibility of its architecture" and Arm's "fostering of an enormous ecosystem of developers."[19] As the quantity and variety of software increases, device manufacturers benefit more from using Arm-compliant chips. A common ISA also facilitates the integration of hardware components supplied by different vendors.[20]

22.    When Arm began developing the Arm ISA, other ISAs existed or were in development.[21] Intel's x86 was the most prominent, and still holds significant share in the personal computing and data center sectors, but Intel did not license x86 to other companies because it did not want to compete with other chipmakers.[22] Other companies and groups developed ISAs but their ISA found few followers because of concerns about openness or dissatisfaction with the design choices embedded in those other ISAs, or because they were designed for niche devices.[23] Arm's ISA was the more attractive in part because it had properties that better fit the needs of chipmakers at the time than other ISAs did, but it is not clear that Arm's ISA was technically superior to other ISAs, in the sense of being essential to the design of higher quality chips.[24] The functionality of chips depends more on the microengineering choices of chip designers like Qualcomm than on the underlying ISA.[25] The most important factor in the success of Arm's ISA appears to be that its open, neutral model appealed to chip designers and manufacturers, as it greatly increased the likelihood that many companies would use it, allowing every licensee to interact with other licensees and software developers.[26] As Arm CEO Rene Haas said in response to a question about Arm's advantages over Intel, "There's a lot of things in our favor, one of them is quite frankly the fact that we have an open model, where our products can be built at any fab by any company. If you're looking at x86, you're looking at two people

---

[18] ARMQC_02727610 at -617.

[19] *Id.*; ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

[20] Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture (last visited August 7, 2025) ("All Arm-based CPU designs are built on the same architecture, ensuring software compatibility while enabling market or usage- specific innovation"); conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[21] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[22] ████████████████████████████████████████████████████████    The only known x86 licensee is AMD who received their license as part of a settlement agreement. *See e.g.*, Amd.com, *Intel Antitrust Rulings*, https://www.amd.com/en/legal/notices/antitrust-ruling.html, (last visited August 7, 2025); QCVARM_0716360 at -382 (quoting Rene Haas: "Intel would have a license x86, and they did to one guy, AMD, because they were forced to."); Grisenthwaite Tr. at 36:3-14 ("Q. And I think you mentioned this, but just to be clear, Intel does not make x86 available for license; correct? A. I'm not entirely sure what Intel's model has been. They certainly don't have a wide licensing base, but there's a relationship in some way between Intel and AMD and I believe there are some x86 implementations in China. I have no idea what the licensing arrangements from for Intel, so I can't speak definitively for Intel's business model.").

[23] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[24] *Id.*; *see also* ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

[25] *Id.*

[26] *Id.*; M. Williams Tr. at 54:11-19; Grisenthwaite Tr. at 18:2-23:5; Haas Tr. at 231:22-234:23; Hughes Tr. at 78:16-80:21.

6

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

who build it."[27] As has often been pointed out, it is important that people agree to drive on the left side or the right of the road; it is not important which side is chosen as long as everyone agrees on the same side. A common ISA solves a coordination problem in the industry, but it may not matter much which ISA is used.

23.      In return, chipmakers obtained Arm licenses and collaborated with Arm to develop new products. Arm provided support to its licensees by sharing business plans with them, and convening meetings in which Arm and licensees exchange business and technological ideas.[28] In the course of collaboration, licensees would share confidential business information with Arm. According to the Federal Trade Commission, this confidential information included "strategic plans, project timelines and development schedules, manufacturing process plans, use cases, customer requirements, and product bugs or challenges."[29] Arm has issued licenses to hundreds of companies.[30] As a result, the Arm ISA is now a de facto standard used in "virtually all" mobile phones and internet of things (IoT) products, among other products.[31]

24.      Arm has marketed the Arm ISA technology through two kinds of licenses. Under the ALA, the licensee is authorized to sell its own custom designed cores that are compatible with the Arm ISA ("custom cores"). Under the TLA, the customer licenses Arm's OTS cores. Under both licenses, the licensee both designs and (usually via outsourcing to a semiconductor foundry) manufactures the physical chip that is in turn sold to OEMs. In addition to Qualcomm, Arm licenses its architecture to a dozen or so other firms, including ██████████ ██████████████████.[32] Qualcomm does not directly compete with all of these firms as some are not merchant silicon vendors. For example, Apple manufactures the end product, including the iPhone, and incorporates its custom chips into its own end products, and does not sell its chips to other OEMs.

25.      Qualcomm designs both custom cores and SoCs. Qualcomm incorporates into its SoC designs both its own custom-made cores that are compliant with the Arm ISA under the ALA and Arm's OTS cores under the TLA, depending on the technological and economic needs of its OEM customers. Qualcomm's SoCs thus reflect both Qualcomm's engineering contributions, while also being Arm-based.[33] Qualcomm's SoCs are used by OEMs, which manufacture various devices including smartphones, automobiles, IoT devices, personal computers, automobiles, and data center servers.[34] █████████████████████

---

[27] QCVARM_0716360 at -389 (Haas referring to Intel and Amd).
[28] ARM_00103918 (Qualcomm TLA); ARM_00055357 (Qualcomm ALA); ARMQC_02729064; *see also* M. Williams Tr. at 31:10-16, 58:13-59:13.
[29] *In re Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 ¶ 27 (FTC filed Dec. 6, 2021) (hereinafter "FTC Compl.").
[30] *See e.g.*, QCVARM_1066820 at 149; QCVARM_1066811 at -813.
[31] Annual Report and Consolidated Financial Statements For the year ended 31 March 2024, p. 1, Arm Holdings Limited (May 29, 2024) https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; QCVARM_1070993; QCVARM_1012343 at -352, -358, -379, -382 (Arm has "maintained market share in the mobile applications processor market of greater than 99% for many years, by virtue of all key mobile operating systems depending on Arm processors.").
[32] Weidmann Tr. at 35:9-36:14 (identifying only █████████████ other competitors). Arm also licenses its architecture to other firms through its Arm Total Access Subscriptions. *See* Awad Tr. at 30:2-31:5. The evidence on the number of other competitors is conflicting, but there appear to be fewer than ██ and as few as ████████.
[33] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.
[34] Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025).

7

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



26.     Qualcomm began licensing the Arm ISA in 1997.[37] Qualcomm and Arm first agreed to an ALA in 2003.[38] That licensing agreement was renegotiated in 2013, and includes annexes for different versions of the ISA and related technology.[39] ██████████████ In turn, Arm has profited significantly from its relationship with Qualcomm. For example, in 2024 Qualcomm accounted for 10% of Arm's $3.2 billion revenue.[41]

27.     This relationship has been mutually profitable. Qualcomm benefited from its access to the Arm ISA and related technology, which enabled it to make chips for mobile phones and many other devices. In addition to receiving royalties and other payments from Qualcomm, Arm benefited from the expansion of the Arm ISA network that occurred as Qualcomm penetrated various chip sectors. Software developers, OEMs, consumers, and others benefited as more and more devices powered by Qualcomm chips were manufactured and marketed—in a classic illustration of the power of network effects, where the value of a good or service to a user increases as more people use it.[42] This long-term course of dealing between Qualcomm and Arm relied on Arm's initial business model of openness and neutrality, as Qualcomm and other chip designers were willing to make a long-term commitment to the Arm ISA because of this promise of neutrality.

28.     In March 2021, Qualcomm acquired Nuvia, a startup with expertise in CPU and SoC development for the data center sector.[43] After acquiring Nuvia, Qualcomm renewed its development of custom CPU cores and SoCs that enabled it to further strengthen and expand its share of the ISA ecosystem for mobile and other segments. ████████████████████

---

██ ████████████████████ Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025); QCVARM_1120267 at -308; QCVARM_0848033.

[37] Second Amended Complaint, D.I. 137 (SAC) ¶¶ 3, 55.

[38] *Id.*

[39] ARM_00055357 (QC ALA); QCARM_0343120 (Annex 1 Armv8-A Architecture); QCARM_0338573 (Annex 1 V8 Next Architecture); QCARM_0343954 (Annex 1 ArmV9-A Architecture).

[41] ARMQC_00000640 at -643, -646 (the 10% calculation includes ALA, TLA, and peripheral license revenue).

[42] Joseph Farrell & Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, Handbook of Industrial Organization, Chapter 31 at 1971 (2007).

[43] SAC ¶ 59.

8

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

58.    Arm's dominance is widely recognized by the industry.[95] Arm itself says that "99% of all smartphones [are] powered by Arm."[96] Arm's ISA has no rivals at all in the Arm ecosystem for the simple reason that Arm demands that a license is necessary to design and sell Arm-compliant SoCs or cores. Arm's behavior also exhibits characteristics of a monopolist. For example, Arm has increased royalty rates under the TLA in a way that does not appear to be based on the underlying costs of maintaining the Arm ecosystem,[97] ███████████████████████████████████████████████████████ To be sure, in some sectors, like data centers and compute, OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips. But the Arm ISA is rapidly gaining share in some of those sectors, including data centers.[99]

### B. Qualcomm's Role in Arm-Compliant Hardware

59.    Qualcomm designs Arm-compliant SoCs that are used in various technology sectors. In designing the SoCs, it uses its own custom core designs under the ALA, Arm's OTS cores and other IP under the TLA, and Qualcomm's proprietary intellectual property. Fabrication is outsourced. Qualcomm sells the SoCs to OEMs.

60.    Qualcomm's SoCs are designed for specific technology sectors, including mobile, compute, wearables, AR/VR, and data servers.



[95] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[96] *Id., see also* Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025); ARMQC_00001038 at -067.

█████████████████████████████████████████████████████████████████████████████

[98] QCVARM_1018853 ███████████████████████████████████████████████████████████

████████████████████

[99] ████████████████████████████████████████ Conversation with Durga Malladi, Qualcomm's Senior VP & GM of Technology Planning, Edge Solutions & Data Center; Mike Johnson, *Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025*, WebProNews (July 31, 2025), https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/; *see also* Mohamed Awad, *Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm-based*, Arm Newsroom (April 1, 2025), https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based.

██ █████████████████████████████████

[102] QCVARM_1120153 at 40.

20

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



61.     In each sector, Qualcomm faces varying degrees of competition from other chip makers.

62.     Many OEMs depend on Arm-compliant chips. In the mobile sector, for example, according to Arm "99% of all Smartphones [are] Powered by Arm."[108] In other sectors, the Arm ISA is used to varying degrees, including 32% of consumer electronics, 10% of cloud compute, 26% of networking equipment and 16% of other infrastructure, 41% of automotive, 65% of IoT and embedded products.[109] OEMs cannot realistically switch to other ISAs where Arm's ISA has become the de facto standard, for example, in the mobile sector.[110]                     OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers.[112]

---

[103] QCVARM_0847548 at 6.

[104] *Id.*

[105] QCVARM_1120153 at 8.

[106] *Id.* at 7-14;

[108] *See* Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025).

[109] ARMQC_00001038 at -067.

[110] *Id.*

[111]

[112] *See e.g.*, *Arm Ltd. v. Qualcomm Inc.*, DTX_000936 ("Snapdragon X Elite gets benchmarked, completely dunks on Apple's M2 processor"), *Arm Ltd. v. Qualcomm Inc.*, DTX_000937 ("[p]ound-for-pound, the Snapdragon X platform powered by the Qualcomm Oryon CPU can take on and beat Apple's M series chips at its own game.");

21

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

63.    Qualcomm is one of Arm's largest customers. It paid 10% of Arm's revenues in the fiscal year ending in 2024.[113]

### C.    Arm's Strategy of Input Foreclosure

64.    Arm has taken steps to design and sell its own SoCs. For illustrative purposes, I focus on the data center sector, though Arm's intentions to sell SoCs extend beyond the data center sector. Arm has already entered into a contract to supply data center chips for Meta, beginning this year.[114] ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ According to Arm, it currently has a ███████████████████████████████████ ████████████████████████████████████[116] At the same time, Arm has taken steps to undermine Qualcomm's position in the broader SoC ecosystem as well as the data center-specific SoC sector. Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector.

### 1)    Ability

65.    Arm has the ability to foreclose Qualcomm from the Arm-compliant data center-specific SoC sector as well as other sectors. The reason is that these sectors are part of the Arm ecosystem, and Arm's control over its ecosystem allows it to discriminate against firms that participate in the ecosystem despite Arm's earlier promises to keep the system open. Firms can survive in the Arm ecosystem, or in Arm-compliant sectors only as long as they are able to make Arm-compliant products under one of Arm's licenses. Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm. There is evidence of several such actions.

- *Failure to provide Qualcomm with certain deliverables in violation of the ALA*. Arm failed to provide certain technology related to verifying compliance with the Arm ISA.[117] Arm withheld sets of reference reports, known as the "OOB," providing the specific compliance tests needed by Qualcomm to verify compliance, as well as information on expected test failures that are also used in the verification process.[118] Arm has also withheld replacement tests, known as "ACK patches," that fix defective tests used in the compliance testing process.[119] Arm's failure to provide deliverables, even if remedied, shows that Arm is committed to finding ways of

---

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████

[113] ARMQC_00000640 at -646 (ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024).
[114] QCVARM_1012399; ARMQC_02762992.

██████████████████████████████████████████████████████████

[116] ARMQC_02739661 at -666.
[117] *See, e.g.*, SAC ¶¶ 78-80, *see also* ¶¶ 81-101; ARM_01241585;QCARM_7484477; ARM_01241565; ARM_01241577; QCARM_7484481; QCARM_7477120; QCARM_7484471; ARM_01241285.
[118] *Id., see also,* ████████████████████████
[119] *Id.*

22

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

underperforming its contract, and in so doing degrading Qualcomm's ability to commercialize Arm-compliant products. Finally, Arm's failure to cure and related actions indicate that Arm may be acting in bad faith.

- *Failure to provide Qualcomm with* ▮▮▮▮ *licensing proposals under the TLA*. Arm failed to respond, sometimes for months, to requests for TLA licenses for OTS cores, and then made only ▮▮▮▮ proposals (with unreasonable price terms, among other things).[120] For example, Qualcomm requested licenses to OTS cores named ▮▮▮▮ ▮▮▮▮▮▮▮▮▮ as well as peripheral IP at least as early as April 2024, but did not receive an offer from Arm until October 24, 2024 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Qualcomm may accordingly find it difficult to believe, or to convince its customers, that it can continue to rely on Arm to comply with the licenses in good faith.

- *Refusal to negotiate an extension of the ALA to cover future versions of Arm's ISA*. In 2020, Qualcomm informed Arm that it sought to extend its license to cover future versions of the ISA over the next ▮▮▮▮▮▮[122] Arm did not respond until after Qualcomm followed up with an additional request in 2024, during the pendency of this litigation and after Qualcomm learned Arm had been showcasing v10, a future version of the Arm ISA.[123] Even now, Arm has not provided a ▮▮▮▮ proposal to Qualcomm for a license to v10.[124]

- *Misinformation campaign*. Arm conducted a misinformation campaign designed to undermine customers' confidence in Qualcomm.[125] The campaign included leaking the notice letter that Arm sent to Qualcomm and sending "confusing" and "misleading"

---

[120] QCVARM_0526828; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also, e.g.,* QCARM_3460976; QCARM_3460981; QCARM_3424399; QCARM_3424873; QCARM_3424233; QCARM_3433633; QCARM_3428243; QCARM_3522626; QCARM_7517677.
[121] QCVARM_0616970 at -974; QCVARM_0526828; ▮▮▮▮▮▮▮▮▮▮
[122] QCARM_7509431.
[123] QCVARM_0857149; QCVARM_0857152.
[124] ARMQC_02778180; ARMQC_02771126; QCVARM_1120481; QCVARM_1119108.
[125] ARM_00110511; ARM_01215564; ARM_01215886; ARM_00079520; ARM_00079530; ARM_00082009; ARM_00094197; ARM_00094200; ARM_00094204; ARM_01215888; ARM_01215889; ARM_01215486; ARM_01231038; ARM_01215885; ARM_00110513; ARM_01215887.

23

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

messages to customers of Arm and Qualcomm that suggested that they faced legal jeopardy if they used Qualcomm products.[126]

- *Reduction in general support*. Because Arm and its licensees all benefit from a vibrant ecosystem, Arm has traditionally arranged various forms of support, including meetings during which employees of Arm and its licensees exchange ideas. Arm has in recent years disinvited Qualcomm employees from these meetings.[127]

66.    These actions have demonstrated that Arm has the ability to foreclose.  Arm is pivoting from its open, neutral model—where it treats its customers in a nondiscriminatory manner, benefits from attracting as many licensees as possible, and therefore provides adequate support to its licensees—to a different model, one in which it forecloses customers in sectors that Arm seeks to enter.

### 2)    Incentive

67.    Arm has an incentive to engage in input foreclosure in sectors where the potential long-term gains from taking business from licensees exceed the short-term loss of royalties on the products that the licensees no longer sell.

68.    Figure 2 provides a simplified diagram of Arm's and Qualcomm's position in the ecosystem under Arm's earlier model of being a neutral sponsor of its ISA (left panel), and of Arm's apparent goal of entering the downstream chip design and manufacture level of the supply chain (right panel). As is immediately apparent, Arm's entry converts it into Qualcomm's competitor in high-tier chip design and manufacture. Arm is now both supplier and competitor: Qualcomm must both depend on Arm for an essential input—the ISA license and support—and compete with Arm to produce the best chips. Arm's incentive is no longer to sell as many licenses as possible, as it was when it could make money from Qualcomm only from license fees and royalties. It will balance the gains from selling an additional license against the gains from eliminating competition downstream.

---

[126] *Id. see also* QCVARM_0847094; December 12, 2023 Haas Tr. at 237:24-238:5; December 16, 2024 *Arm Ltd. v. Qualcomm, Inc.* CA No. 22-1146 Trial Tr. at 328:15-329:22 (Cross examination of Rene Haas).

[127] ███████████████████████████████████████████████████████

24

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Qualcomm in other sectors. In that way, Arm continues to benefit from royalties in some sectors while taking over other sectors by degrading Qualcomm's ability to compete in those sectors. Whichever the case, the downstream OEMs will either pay more for chips or be required to settle for lower-quality chips, to the detriment of the ultimate consumer.

73.    Other factors highlight the anticompetitive risk of Arm's conduct.

74.    First, Arm has a strong incentive to foreclose Qualcomm from selling custom cores under the ALA because Qualcomm will both be forced to switch to higher-royalty OTS cores and will lose downstream SoC business to Arm.[129] Arm thus gains in two ways—through higher upstream TLA royalties from Qualcomm (for example, from the sale of undifferentiated SoCs that incorporate the OTS cores) and higher downstream chip sales at the expense of Qualcomm (as Arm captures diverted sales in the higher-tier SoC business).

75.    Second, where the downstream portion of the ecosystem is already concentrated (e.g., mobile), input foreclosure would likely give Arm substantial downstream power, enabling it to raise prices both unilaterally and potentially through coordination or collusion with any remaining downstream competitors.

76.    Third, Arm's input foreclosure is likely to reduce entry to the chip design and manufacture ecosystem. Entry is possible only if Arm grants licenses to the firms and refrains from degrading support to firms that already have licenses. Arm would have no reason to do so because that behavior would reduce its power in the lucrative downstream portion of the ISA ecosystem. This will ultimately prevent other firms from being able to compete away Arm's downstream margin.

77.    Fourth, foreclosure of the Arm ISA may impede innovation. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, if Arm's chips were superior, then Arm would not need to undermine Qualcomm's access to the ISA. Fair competition allows one firm to prevail over another through innovation—and thus encourages innovation.

78.    Fifth, if Arm substantially weakens Qualcomm's ability to participate in Arm's ecosystem, as it tried to do by terminating Qualcomm's ALA, then it may raise upstream barriers

---

[129] If Arm keeps its most advanced cores to itself and only uses them in its own SoCs rather than supply them to TLA licensees, the only SoC supplier that can differentiate is Arm.

[130] *See e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27

# Exhibit 4

**United States District Court**

**District of Delaware**

**Civil Action No. 1:24-cv-00490-MN**

**Qualcomm Incorporated and**

**Qualcomm Technologies, Inc.**

**v.**

**Arm Holdings plc**

**Expert Report of Patrick F. Kennedy, Ph.D.**

**August 8, 2025**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.**
**V. ARM HOLDINGS PLC**

## I.    INTRODUCTION

1.    I have been retained by Counsel representing Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively referred to in this report as "Plaintiffs" or "Qualcomm") to evaluate damages related to certain claims asserted by Qualcomm against Arm Holdings plc ("Arm" or "Defendant")[1] related to the alleged wrongful conduct described in Qualcomm's Second Amended Complaint in this action.[2]  The purpose of my report is to disclose my professional background and experience, the materials subject to my review, and my expert opinions associated with Qualcomm's claims regarding damages in this matter.

2.    This report summarizes my opinions given the information available to me at this time.  If I receive additional relevant information, I reserve the right to prepare a supplemental report incorporating this new information.

## II.    QUALIFICATIONS AND TESTIMONY

3.    I am an economist and Managing Director with Stout Risius Ross, LLC ("Stout"). Stout is a professional services firm that provides independent expert testimony, analysis, valuation, and strategic consulting services to clients, along with financial services such as investment banking, advisory, and valuation services.  I hold a bachelor's degree in Economics from the University of California, San Diego and a doctorate in Economics from Stanford University.  Prior to joining Stout, I was a Managing Director with Torrey Partners, a Managing

---

[1]    I am aware that there is a pending motion to amend Qualcomm's Second Amended Complaint to name both Arm Holdings plc and Arm Ltd. as Defendants.  Nothing in my analysis and quantification of certain categories of Qualcomm's claimed damages is dependent on which Arm corporate entity(ies) are named Defendant(s).  *See* Plaintiffs' Motion for Leave to Amend the Complaint to Name Arm Holdings Plc. And Arm Ltd. as Individual Defendants, August 1, 2025.

[2]    Second Amended Complaint, *Qualcomm Inc. and Qualcomm Technologies, Inc. v. Arm Holdings plc f/k/a Arm Ltd.*, Civil Action No. 1:24-cv-00490-MN, June 3, 2025 ("Second Amended Complaint"), pp. 1-6.

---

**STOUT RISIUS ROSS, LLC**                                                                1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC**

Director with LECG, a Shareholder with Mack|Barclay, Inc., a Director of Economic Research with International Securities Group, and an Economist with the Board of Governors of the Federal Reserve System in Washington, D.C.   Attached at **Exhibit A** is my curriculum vitae, which summarizes my educational and professional background.

4.      My professional experience includes assessing economic damages within and outside of the litigation environment; many of these matters have required my presentation of qualified expert testimony in state and federal courts.   Attached at **Exhibit B** is a list of my deposition, arbitration, and trial testimony for the last five years.

5.      In this case, Stout is being compensated for my analysis and testimony at a rate of $950 per hour.   In preparing the analysis reflected in this report, I have been assisted by consultants employed by Stout, who performed work under my direction.  My compensation is not contingent upon the outcome of this litigation or my opinions.

## III.    MATERIALS CONSIDERED

6.      In connection with my continuing review and analysis, I have considered, reviewed, and relied upon materials and information that may be cited directly in this report and are generally summarized at the attached **Exhibit C**.   This information includes pleadings, depositions, documents produced by the parties, third party information, interviews, and other expert reports, all of which I incorporate herein by reference, even if not specifically stated.

**STOUT RISIUS ROSS, LLC**                                                                                    2
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### F. Qualcomm's Damages Related to Arm's Alleged Intentional Interference and Negligent Interference with Prospective Economic Advantage[293]

118.    I understand that Qualcomm claims intentional interference and negligent interference with prospective economic advantage against Arm as a result of a letter that Arm sent Qualcomm on October 22, 2024 (the "Notice Letter") and prior allegedly misleading communications by Arm to Qualcomm's customers.[294]   In the Notice Letter, Arm alleged that Qualcomm was in material breach of the Qualcomm ALA for the development and marketing of "unlicensed cores" and claimed that Arm would be entitled to terminate the Qualcomm ALA in 60 days if Qualcomm did not meet Arm's demands for a "cure" to its alleged breach.[295]   Qualcomm alleges that the Notice Letter was leaked to the media by Arm as an attempt to interfere with Qualcomm's current and potential business relationships and incite uncertainty about Qualcomm's ability to deliver Arm-compatible products.[296]

119.    In addition to the Notice Letter, I understand that Arm had previous communications with Qualcomm's customers, including via letters sent to over ■ Qualcomm customers in August 2022 and early September 2022 and to ■ customers in May 2023, as well as via meetings with executives of Samsung, Qualcomm's largest customer in its mobile segment.[297]   In an October 4, 2022 meeting with Samsung executives, I understand that the

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

and Objections to Defendant's First Set of Interrogatories (nos. 1-9), July 11, 2025, pp. 22-24, 30-31, 40.
295   Second Amended Complaint, pp. 11, 45-46.
296   Second Amended Complaint, pp. 47-48.
297   *See, e.g.,* ARM_00110507; ARM_01215885; ARM_01231025; ARM_01215878; Deposition of Ziad Asghar, July 7, 2025, p. 118; Deposition of Rene Haas, July 7, 2025, pp. 22-25; Second Amended Complaint, pp. 42-43.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

customer[s], they have a lot of questions…it depends on who the customer is and what business they're doing with us."[306]    For example, I understand that certain Qualcomm customers communicated concerns regarding future availability of products. ████████████████

████████████████████████████████████████████████████████ ████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████ ████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████████████ ████████████████████████████████████████

████████████████ ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████ █

███████████████████████████████████████████████████████████████

██████████ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████

---

[306]    Deposition of James Jeon, July 11, 2025, p. 46.
[307]    <https://www.linkedin.com/in/%E6%99%93%E6%B0%91-%E9%A9%AC-9381bb15a/>.
[308]    QCVARM_0454071-072 at '071.
[309]    QCVARM_0713516-518 at '517.
[310]    QCVARM_0713516-518 at '516.
[311]    <https://www.linkedin.com/in/mike-neilio-5358141/>.
[312]    QCVARM_0713516-518 at '516.
[313]    QCVARM_1028750-751 at '751.
[314]    Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (nos. 1-9), July 11, 2025, pp. 8-9, 22-23.

---

STOUT RISIUS ROSS, LLC                                                                    70
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Exhibit 5

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF DELAWARE

4    ----------------------------------x

     QUALCOMM INCORPORATED, a Delaware

5    corporation, QUALCOMM TECHNOLOGIES,

     INC., a Delaware  corporation,

6

             Plaintiffs,

7

8

        - against -

9

10

     ARM HOLDINGS PLC, f/k/a, ARM LTD.

11   a U.K. corporation,

12           Defendants.

     ----------------------------------x

13               Zoom videoconference

14               September 15, 2025

                 4:02 p.m.

15

16

17           MEET & CONFER

18

19

20

21

22

23

24

25

Page 2

```
1
2  A P P E A R A N C E S :
3  PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     1285 Avenue of the Americas
4  New York New York 10019
     BY: JAKE BRALY, ESQ.
5    JACOB APKON, ESQ.
     STEPHANIE CHIN, ESQ.
6    ADAM BASNER, ESQ.
7
8
9  MORRIS NICHOLS ARSHT & TUNNELL LLP
     1201 North Market Street
10 16th Floor
     Wilmington, Delaware 19899
11 BY: JENNIFER YING, ESQ.
12
13
14
     KIRKLAND & ELLIS LLP
15 333 West Wolf Point Plaza
     Chicago, Illinois 60654
16 BY: JAY EMERICK, ESQ.
     PETER EVANGELATOS, ESQ.
17   ADAM JANES, ESQ.
     MARY BARNETT, ESQ.
18   MEREDITH POHL, ESQ.
     MICHAEL A. PRONIN, ESQ.
19
20
21
22
23
24
25
```

Page 3

```
1
2  A P P E A R A N C E S : (Continued)
3  YOUNG CONAWAY STARGATT & TAYLOR LLP
     1000 North King Street
4  Rodney Square
     Wilmington, Delaware 19801
5  BY: ANNE GAZA, ESQ.
     ROBERT VRANA, ESQ.
6
7
8
9  MORRISON & FOERSTER LLP
     425 Market Street
10 San Francisco, California 94105
     BY: CATHARINE MCWILLIAMS, ESQ.
11   HENRY HUTTINGER, ESQ.
     NICHOLAS FUNG, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        MEET & CONFER
2        MR. BRALY:  So I think we have
3  a couple of items on the agenda.  What we
4  would like to start with is Arm's rebuttal
5  reports for Dr. Brogioli and Mr. Richards.
6        So we wrote to you about both
7  of those reports.  We asked you to withdraw
8  the reports, you said that you were not
9  withdrawing either of the reports, and so I
10 think our question to you is why do you
11 believe that these are proper rebuttal
12 reports?  What are they responding to that
13 was expert opinion?
14       MR. EMERICK:  Hey Jake, this is
15 Jay from Kirkland.  Is it Qualcomm's
16 position that we should have served the
17 Brogioli and Richards reports as
18 opening reports on September 5?
19       MR. BRALY:  September 5, isn't
20 that when you served them?
21       MR. EMERICK:  Sorry, is it
22 Qualcomm's position that Arm should
23 have served the Brogioli and Richards
24 reports at the opening report deadline?
25       MR. BRALY:  Well, I think we're
```

Page 5

```
1        MEET & CONFER
2  trying to figure out why you think
3  these are proper rebuttal reports.
4        MR. EMERICK:  And I'm trying to
5  understand your position as to why
6  they're in violation of the scheduling
7  order.  That's what you guys mentioned
8  in the e-mail.  So is it your position
9  that these should have gone in on
10 opening?
11       MR. BRALY:  Well, do these go
12 to affirmative defenses that you have
13 or these are rebuttal to expert
14 opinions in the Kennedy and Posner
15 reports?
16       MR. EMERICK:  Is it Qualcomm's
17 position that Arm should have served
18 the Brogioli and Richards reports at
19 the opening report deadline?
20       MR. BRALY:  What I'm trying to
21 figure out is why you are saying that
22 these are proper rebuttal reports.  Are
23 you saying that they are related to
24 affirmative defenses, in which case
25 then you should have served them as
```

2 (Pages 2 - 5)

Page 6

MEET & CONFER
1       MEET & CONFER
2   opening reports, or are you saying
3   these are proper rebuttal reports to
4   expert opinion that was offered in
5   Kennedy and Posner's reports?
6       MR. EMERICK: So I'm not sure
7   what you just said. I'm trying to
8   understand your position as to when you
9   think they should have been served.
10       MR. BRALY: Well, Jay, I don't
11   think you are answering my question.
12   Is it your position that these are
13   rebutting --
14       MR. EMERICK: You guys are
15   saying these are untimely. So I think
16   based on that assertion, we're entitled
17   to an answer as to whether you think
18   these should have gone in on opening or
19   not.
20       MR. EMERICK: We also think
21   that they are improper because they
22   don't respond to expert opinion in the
23   Kennedy and Posner reports.
24       MR. EMERICK: So I'm asking you
25   if these are reports, because that's

Page 7

1       MEET & CONFER
2   your position with respect to them, if
3   they should have gone in on opening or
4   not?
5       MR. BRALY: So I have responded
6   to you. If your position is that these
7   go to affirmative defenses raised by
8   Arm and are in fact not supposed to be
9   responding to expert opinion in the
10   Kennedy and Posner report, then yes,
11   they should have gone in in opening.
12   If instead your position is these are
13   responding to expert opinion in the
14   Kennedy and Posner report, we don't see
15   how that could be the case, and I'm
16   asking you what is the expert opinion
17   that both of these experts are
18   responding to?
19       MR. EMERICK: You guys are
20   making an assertion as to untimeliness
21   and impropriety, and I'm trying to
22   understand it, and if you don't want to
23   tell me, I get it, that's what it
24   sounds like. But I'm just trying to
25   get an understanding as to why you

Page 8

1       MEET & CONFER
2   think these are untimely.
3       So I'm asking, you know, is
4   this something that you guys think
5   should have gone in on opening? Maybe
6   you're not able to answer that one way
7   or the other. But I'm just trying to
8   get an understanding of why you think
9   they are untimely.
10       MR. BRALY: I think I have
11   answered that multiple times now. I'm
12   not sure where the confusion lies. You
13   still have not answered me when I asked
14   you what expert opinion in the Kennedy
15   and Posner reports you believe the
16   Brogioli and Richards reports are
17   rebutting.
18       MR. EMERICK: So you're not
19   able to say one way or another whether
20   Qualcomm's position is that these
21   should have gone in on opening?
22       MR. BRALY: Jay, I have
23   answered this multiple times now.
24       MR. EMERICK: So what's the
25   answer?

Page 9

1       MEET & CONFER
2       MR. BRALY: The answer is to
3   the extent that you are saying these
4   reports are responding to Kennedy and
5   Posner, we would like to know what you
6   are saying they are responding to.
7       MR. EMERICK: So Qualcomm's
8   position as to whether or not these
9   reports should have gone in on opening
10   hinges on how we characterize the
11   reports? That's your position?
12       MR. BRALY: We think the
13   reports are improper regardless.
14       MR. EMERICK: So let me
15   understand that statement. You think
16   the Brogioli and Richards reports are
17   improper even if they were submitted at
18   the opening report deadline?
19       MR. BRALY: No, if you had
20   submitted them at the opening report,
21   if you are saying they relate to
22   affirmative defenses, then yes, you
23   should have submitted them at the
24   opening report deadline. If instead
25   you are claiming that this is purely

3 (Pages 6 - 9)

Page 10

MEET & CONFER

1
2  rebuttal to expert opinions that were
3  offered in Kennedy and Posner's
4  reports, then it's improper.
5      MR. EMERICK:  So Qualcomm's
6  position as to whether or not the
7  Brogioli and Richards reports should
8  have been submitted as opening reports
9  depends on how Arm chooses to
10  characterize them?
11      MR. BRALY:  Can you answer my
12  question as to what expert opinion in
13  Kennedy and Posner's reports Brogioli
14  and Richards are responding to?
15      MR. EMERICK:  I can't even get
16  you to answer a question as to your
17  assertions that these are untimely.  So
18  I'm trying to understand the basis for
19  the untimeliness and when, if at all,
20  during the case you think, Qualcomm
21  thinks, these should have been
22  submitted.
23      If your position is these
24  reports never would have been proper
25  regardless of when Arm submitted them,

Page 11

MEET & CONFER

1
2  I'm trying to understand that, and I
3  can't get an answer on that.  If the
4  answer is we don't dispute that these
5  reports would have been proper had you
6  submitted them on opening, just say
7  that.  Or I think what I'm hearing from
8  you is you just can't say either way
9  because the answer to that question
10  depends on how Arm chooses to
11  characterize them in your view.  So
12  which one is it?  I just need to know
13  which one.
14      MR. BRALY:  We have
15  characterized them as rebuttal reports,
16  which is where the confusion lies,
17  because you are characterizing them as
18  rebuttal reports.  They purportedly
19  cite to paragraphs in the Kennedy and
20  Posner reports that they are rebutting.
21  We don't understand what expert opinion
22  they are purportedly rebutting.
23      If instead these are reports
24  that should have been served as opening
25  reports, which I can't tell if that's

Page 12

MEET & CONFER

1
2  what you're saying, maybe that's the
3  case, if you had served them as opening
4  reports, then that would be different.
5  That's a totally different situation.
6  We're not saying that's improper in
7  that case.
8      MR. EMERICK:  Okay.  So your
9  position is that these reports should
10  have been served on opening and that
11  because they were served at the
12  rebuttal deadline -- they would have
13  been okay if they were served on
14  opening, that's your position?
15      MR. BRALY:  They are framed as
16  rebuttal reports and they are
17  purportedly rebutting Kennedy and
18  Posner.  So I don't know why you keep
19  saying that as though that doesn't
20  exist, and they are framed as rebuttal
21  reports and you still have not answered
22  the question I have asked repeatedly
23  now, which is what expert opinion are
24  they rebutting?
25      MR. EMERICK:  You guys are

Page 13

MEET & CONFER

1
2  alleging a violation of the scheduling
3  order and so I think it's a fair
4  question for us to ask that are these
5  untimely because they were served at
6  the rebuttal deadline rather than the
7  opening deadline?
8      MR. BRALY:  Again, to the
9  extent that this is you submitting
10  expert reports that go to affirmative
11  defenses, then yes, they should have
12  been served at opening.  Instead if you
13  are saying you received our opening
14  reports and you were saying this is
15  supposed to be rebuttal, we're saying
16  this is improper rebuttal because it's
17  not actually rebutting any expert
18  opinion in Kennedy and Posner's
19  reports.
20      MR. EMERICK:  Is it Qualcomm's
21  position that Arm bears the initial
22  burden with respect to any of the
23  issues in the Brogioli and Richards
24  reports?
25      MR. BRALY:  What expert opinion

4 (Pages 10 - 13)

Page 14

MEET & CONFER

1        MEET & CONFER
2  were Brogioli and Richards responding
3  to?
4        MR. EMERICK: You guys are
5  alleging a violation of the scheduling
6  order and so I want to make sure that I
7  understand what the alleged violation
8  is and what the contours of that are,
9  what you are alleging there is a
10  violation with respect to, what you are
11  not alleging there is a violation with
12  respect to.
13     So that's why I'm asking about
14  the initial deadline, and now I'm
15  asking about, frankly, it is related
16  almost to one in the same issue, is the
17  burden issue. So is it Qualcomm's
18  position that Arm bears the burden with
19  respect to any or all of the issues in
20  the Brogioli and Richards reports?
21        MR. BRALY: It is our position
22  that the scheduling order states that
23  expert reports that contradict or rebut
24  evidence on the same matter are due on
25  September 5th, and that's when you

Page 15

1        MEET & CONFER
2  served these reports, and that's why
3  I'm asking you what expert opinion they
4  were rebutting or contradicting. You
5  haven't answered that question. I have
6  asked it to you repeatedly now. You
7  have not answered that question.
8        MR. EMERICK: I'm not the one
9  alleging a scheduling order violation,
10  you guys are. So I have questions
11  about the alleged violation that you
12  are alleging and I think we're entitled
13  to understand the contours of it. So
14  are you able to identify --
15        MR. BRALY: Are you going to
16  answer my question, Jay?
17        MR. EMERICK: Jake, are you
18  able to identify any issues in the
19  Brogioli and Richards reports on which
20  Arm bears the initial burden? I just
21  want to know if you have a view on
22  that, if you are able to identify
23  anything.
24        MR. BRALY: I don't understand
25  the question. I'm asking you about the

Page 16

1        MEET & CONFER
2  expert opinion that was supposedly
3  contradicted or rebutted in the
4  rebuttal reports that were served on
5  September 5th.
6        MR. EMERICK: So I take it the
7  answer is no, you're not able to
8  identify any issues in the Brogioli or
9  Richards reports on which Arm bears the
10  initial burden?
11        MR. BRALY: It's like we're
12  talking past each other. I'm saying to
13  you, you served these as rebuttal
14  reports, you claim that they responded
15  and contradicted or rebutted expert
16  opinion in Kennedy and Posner's
17  reports. We don't see how that's the
18  case. We think that they are improper
19  rebuttal reports.
20     If you are saying instead that
21  they relate to affirmative opinions or
22  defenses that you had, they should have
23  been served as openings and not as
24  rebuttal reports. What is Arm's
25  position on the timing of the rebuttal

Page 17

1        MEET & CONFER
2  reports that it served?
3        MR. EMERICK: Why is Qualcomm
4  refusing to provide us any information
5  about the allegations that we violated
6  the scheduling order? I'm asking when
7  these reports should have been served.
8  I'm asking if you have identified any
9  issues in these reports that are
10  initial burden issues. Are you able to
11  identify any?
12        MR. BRALY: Jay, our role is
13  not to identify for you where you think
14  there's a need for affirmative defenses
15  to be disclosed or have reports
16  submitted. You served these as
17  rebuttal reports. You said that they
18  were contradicting or rebutting expert
19  opinion in the Kennedy and Posner
20  reports. I have asked you to identify
21  what that is multiple times now. You
22  have not done so. You have refused to
23  do so. I'm asking you to identify
24  that.
25     It is not clear what your

5 (Pages 14 - 17)

MEET & CONFER

1  position is here that there is
2  essentially no deadline and Arm can
3  just submit reports on this at any
4  point in time that it considers to be
5  fit?
6      MR. EMERICK: Jake, you're not
7  even providing the contours of the
8  alleged scheduling order violation, and
9  so this is obviously not productive. I
10  would ask that you guys give us your
11  position as to why this is a violation
12  of the scheduling order and as part of
13  that, let us know whether you think Arm
14  should have served these reports as
15  opening reports and whether there are
16  any issues that these opinions go to or
17  any issues on which we bear the initial
18  burden. Because I think that's a fair
19  question when you guys are alleging
20  scheduling order violation.
21      MR. BRALY: Jay, are you
22  admitting that these are not rebuttal
23  reports, is that what you're saying?
24      MR. EMERICK: I'm glad we have

MEET & CONFER

1  a court reporter recording this because
2  I think the transcript will clearly
3  show that I'm not making any such
4  admission that these are not rebuttal
5  reports. I'm asking you a question as
6  to your position that these are
7  untimely and we're trying to understand
8  the contours of that position.
9      If you want to just tell me
10  hey, Jay, these are untimely because
11  they should have been served as
12  openings, that would cut through this
13  and streamline it and we can move on
14  from that question. But I think it's
15  fair for us to know what the alleged
16  scheduling order violation is.
17      MR. BRALY: I have now
18  explained that repeatedly. You now say
19  the transcript is clear. I don't think
20  it is. I have asked you what it is
21  that these are rebutting, what Brogioli
22  and Richards are rebutting. I have not
23  heard an answer from you.
24      MR. EMERICK: I have not heard

MEET & CONFER

1  an answer as to how there is an alleged
2  scheduling order violation or whether
3  these should have gone in as initial
4  reports and whether we bear any of the
5  burden with respect to the issues
6  raised by Brogioli and Richards.
7      MR. BRALY: I'm saying to you
8  it is not our responsibility to
9  identify the issues that you needed to
10  serve expert reports for. These are
11  not rebuttal reports and the reports
12  that are served on September 5th are
13  reports that contradict or rebut
14  reports that were served in opening.
15  We do not see how these do so. I have
16  asked you repeatedly now to identify
17  what they are rebutting. You have not
18  done so.
19      MR. EMERICK: Are they opening
20  reports? Should they have gone in on
21  opening? I want to understand your
22  position on that. If the answer is I
23  don't know, I understand and we can
24  move on.

MEET & CONFER

1      MR. BRALY: Right. And what
2  I'm saying to you is we are not telling
3  you what you have a burden on. These
4  are not rebuttal reports.
5      MR. EMERICK: So are they
6  opening reports, is that your position,
7  if they're not rebuttal reports in your
8  view?
9      MR. BRALY: I'm not sure I even
10  understand your question. They are not
11  opening reports because you served them
12  on September 5th as rebuttal reports.
13      MR. EMERICK: Right. And I'm
14  asking you are these reports that we
15  should have served at the opening
16  report deadline?
17      MR. BRALY: That is not our
18  responsibility, Jay, and you won't tell
19  me what you think they are rebutting or
20  contradicting.
21      MR. EMERICK: And you're not
22  telling me why you think there is a
23  scheduling order violation here. So I
24  do think we can move on from this, but

6 (Pages 18 - 21)

Page 22

MEET & CONFER

1    MEET & CONFER
2    I think it is a fair question --
3         MR. BRALY:  I have told you
4    repeatedly now.
5         MR. EMERICK:  What is the
6    answer?
7         MR. BRALY:  These reports were
8    entered on September 5th as rebuttal
9    reports and they are not rebuttal
10   reports.  That is a violation.
11        MR. EMERICK:  That is a
12   nonresponsive answer.  So my question
13   is should they have been served at the
14   opening report deadline?  I think that
15   is a fair question.  If these are
16   untimely, tell me when we should have
17   served them.  That's a fair question,
18   Jake.
19        MR. BRALY:  Jay, you haven't
20   answered what you think these rebut or
21   contradict, which I have now asked you
22   repeatedly.  It's not our position to
23   advise you on what you should have
24   served at opening or not.
25        MR. EMERICK:  You are saying

Page 23

MEET & CONFER

1    MEET & CONFER
2    these are untimely.  Do you understand
3    that?
4         MR. BRALY:  We are saying they
5    are improper.  They don't rebut or
6    contradict expert opinion.
7         MR. EMERICK:  So you are not
8    saying they are untimely?  They are not
9    untimely, is that your position?
10        MR. BRALY:  It is unclear why
11   you served these reports.  If you are
12   saying they go to affirmative defenses
13   or you say that they are responding to
14   Kennedy and Posner, when I have asked
15   you what they are responding to, you
16   have not answered me.
17        If you provide us with that, we
18   can determine whether you consider
19   these to be opening reports that were
20   filed at the wrong time or if you are
21   saying these are actually proper
22   rebuttal reports and in fact there is
23   expert opinion in the Kennedy and
24   Posner reports that you purport they
25   are rebutting.

Page 24

MEET & CONFER

1    MEET & CONFER
2         MR. EMERICK:  Our position is
3    that these are proper reports for the
4    rebuttal deadline.  So that our
5    position is clear on.
6         Now, can I get your position
7    with respect to whether these should
8    have been served at the opening report
9    deadline or not?
10        Let me ask a different
11   question.  Are you guys alleging that
12   these are untimely or not?
13        MR. BRALY:  They may be
14   untimely if they are not rebutting or
15   responding to our expert reports.  They
16   were filed on September 5th, which is
17   when rebuttal reports were to be filed,
18   which are rebutting or contradicting
19   opening reports.  They are offering
20   affirmative defenses, if that's what
21   the expert reports go to, yes, they are
22   untimely and they should have been
23   filed as opening reports.
24        MR. EMERICK:  So what portion,
25   or maybe it's the entirety, what

Page 25

MEET & CONFER

1    MEET & CONFER
2    portions or whole of the Brogioli and
3    Richards reports in Qualcomm's view
4    should have been served on the opening
5    report deadline?
6         MR. BRALY:  Our position is
7    that the entirety of the Brogioli and
8    Richards reports do not respond or
9    contradict anything that was served in
10   the Kennedy and Posner reports.
11        MR. EMERICK:  Do you have a
12   position as to whether any or all of
13   the opinions in the Brogioli and
14   Richards reports should have been
15   served on the opening report deadline?
16        MR. BRALY:  Jay, it's not our
17   place to be giving you advice on --
18        MR. EMERICK:  I'm not seeking
19   advice.  I'm seeking your position as
20   to your allegations that these are in
21   violation of the scheduling order.
22        MR. BRALY:  And our position is
23   that these are improper rebuttal
24   reports.
25        MR. EMERICK:  So you don't

7 (Pages 22 - 25)

MEET & CONFER
1
2  allege that they are untimely?
3      MR. BRALY:  To the extent that
4  you are using them as opening reports
5  instead of as rebuttal reports, yes,
6  they are untimely and they should have
7  been filed as opening reports.
8      MR. EMERICK:  What do you mean,
9  how we are using them?  What is your
10  position on how we are using them?
11     MR. BRALY:  If they aren't
12  actually rebutting or contradicting
13  anything in the Kennedy or Posner
14  reports and instead you are offering in
15  expert opinion on affirmative defenses,
16  then they are untimely.
17     MR. EMERICK:  And are you
18  alleging that we are doing that?
19     MR. BRALY:  That's why I'm
20  asking you whether they are proper or
21  not.  It seems like you may be doing
22  that.
23     MR. EMERICK:  Are you alleging
24  that we are doing that or not?  This is
25  your allegation and your meet and

MEET & CONFER
1
2  confer on this issue.  Tell me what
3  your problem is with the timing of
4  these or whether you have one, because
5  I'm still not clear.  I have heard
6  multiple responses as to they are
7  untimely, they are not untimely, they
8  are untimely if certain
9  characterizations or Arm takes a
10  certain position.  So just tell me
11  straight up what's your position on the
12  timeliness of these.
13     MR. BRALY:  Yeah, they are
14  untimely if they are served on
15  September 5th as rebuttal reports that
16  are not actually rebutting or
17  contradicting anything in opening
18  reports and instead are providing
19  opinion on Arm's affirmative defenses.
20     MR. EMERICK:  I think factually
21  we can agree on when they were served.
22  I don't think there is a dispute there.
23  With respect to the characterization of
24  them of not properly rebutting, we have
25  different views on that, and so are

MEET & CONFER
1
2  these untimely or not under Qualcomm's
3  view?
4      MR. BRALY:  What is your view
5  on what these are rebutting or
6  contradicting?  I have not heard that
7  from you.
8      MR. EMERICK:  What is
9  Qualcomm's view as to whether these are
10  timely or not?
11     MR. BRALY:  I don't understand
12  why we are going in circles around
13  this.
14     MR. EMERICK:  Because you guys
15  are alleging a violation of the
16  scheduling order but you won't even
17  tell me whether you think the reports
18  we served are untimely or not.
19     Can I just get an answer on
20  that so we can know what dispute we
21  have for the Court?  We are potentially
22  going to have to brief this issue and
23  in that briefing Qualcomm will be
24  taking a position with respect to
25  timeliness and we are going to have to

MEET & CONFER
1
2  discuss timeliness in the briefing
3  should we have to burden the Court with
4  this.  And so I think it's a fair
5  question on the meet and confer in
6  which you are alleging a scheduling
7  order violation for us to get your
8  position on the timeliness of this.
9      MR. BRALY:  I think I have
10  answered your question.
11     MR. EMERICK:  You haven't.
12     MR. BRALY:  Jay, I don't know
13  what to say.  I think I have answered
14  your question on this.
15     MR. EMERICK:  What I would like
16  you to say is for you to give me your
17  position, Qualcomm's position, on the
18  timeliness or untimeliness of the
19  Brogioli and Richards reports in
20  Qualcomm's view, based on Qualcomm's
21  view, Qualcomm's position, I would like
22  to hear what that is.
23     MR. BRALY:  Yes, and as I have
24  said, we do not believe that these are
25  proper rebuttal reports.  They do not

8 (Pages 26 - 29)

Page 30

MEET & CONFER

1  MEET & CONFER
2  contradict or rebut expert opinion in
3  the Kennedy or Posner reports. I have
4  asked you about that repeatedly what
5  you say they are rebutting. You will
6  not give me an answer.
7      MR. EMERICK: The question I
8  keep going back to, I understand your
9  position that you don't think they are
10 proper rebuttal reports. Are they not
11 proper rebuttal reports because of the
12 timeliness issue in Qualcomm's view?
13     MR. BRALY: We think they are
14 not proper rebuttal reports because
15 they are not rebutting or contradicting
16 the opening reports.
17     MR. EMERICK: So is there a
18 timeliness issue or not? It sounds
19 like this is a scope issue and not a
20 timing issue in your view. So I just
21 need to understand that.
22     MR. BRALY: I mean, I think
23 it's one in the same. This is an
24 expert report that's an opening expert
25 report that you have filed as a

Page 31

1  MEET & CONFER
2  rebuttal report that doesn't actually
3  contradict or rebut anything that was
4  in the Kennedy and Posner reports.
5      MR. EMERICK: Okay. So is it
6  Qualcomm's position that these should
7  have gone in, the Brogioli and Richards
8  reports, at the opening report
9  deadline?
10     MR. BRALY: It is not our place
11 to advise you of this.
12     MR. EMERICK: I'm not asking
13 for advice. I'm asking you what your
14 position is going to be if you file a
15 motion and burden the Court or the
16 Special Master with this. Is it your
17 position that these should have gone in
18 at opening?
19     MR. BRALY: Jay, and it seems
20 like we are not resolving this. We are
21 going to file a motion. We think these
22 are improper rebuttal reports because
23 they do not contradict or rebut expert
24 opinion in the Kennedy or Posner
25 reports.

Page 32

1  MEET & CONFER
2      MR. EMERICK: Right. And so as
3  a result, is it your view that these
4  should have gone in on opening?
5      MR. BRALY: It's our view that
6  these are not proper to serve as
7  rebuttal reports.
8      MR. EMERICK: Okay. So my
9  question is, is there any other point
10 in the case at which we could have
11 served these or is it your view that
12 no, these could never -- these can
13 never go into the case, you should have
14 been able to serve them at opening, you
15 can't serve them now?
16     I'm just trying to understand
17 when, if at all, do you think it would
18 have been okay for Arm to serve these.
19 If the answer is never, I am just
20 trying to get an understanding of how
21 there is a scheduling order violation
22 and when should we have put these in in
23 your view?
24     MR. BRALY: Right. I'm saying
25 that is irrelevant to the issue here

Page 33

1  MEET & CONFER
2  which is --
3      MR. EMERICK: It is directly
4  relevant.
5      MR. BRALY: It's not.
6      MR. EMERICK: That is exactly
7  the point, right? It is still unclear
8  to me if you are saying there is a
9  timeliness issue or if it is just a you
10 should never be allowed to have these
11 in the case. I just want to know one
12 way or another so we know what target
13 we are shooting at in the briefing.
14 I'm not sure why you guys are refusing
15 to say this, because you are going to
16 have to say it in the briefing one way
17 or another.
18     So if you don't have
19 authorization from your team to take a
20 position and you have to talk to your
21 client, I understand that, and we can
22 have a subsequent meet and confer on
23 that. But I think it is a fair
24 question going into the briefing for us
25 to get your position as to when we

9 (Pages 30 - 33)

Page 34

MEET & CONFER

1    MEET & CONFER
2 should have served these, if any time.
3        MR. BRALY:  That's not actually
4 what is relevant here.  What is
5 relevant is you did serve these as
6 rebuttal reports on September 5th.
7 They do not contradict or rebut expert
8 opinion in the Kennedy or Posner
9 reports.
10       MR. EMERICK:  You are telling
11 me that --
12       MR. BRALY:  That is the point.
13 Are you saying you are going to
14 withdraw the opinions?
15       MR. EMERICK:  No.
16       MR. BRALY:  So you think they
17 are appropriate rebuttal reports?
18       MR. EMERICK:  Jake, yes.
19       MR. BRALY:  Why?
20       MR. EMERICK:  Because they are
21 fully in compliance with the scheduling
22 order on this.
23       MR. BRALY:  What are they
24 rebutting?
25       MR. EMERICK:  I think we have

Page 35

1    MEET & CONFER
2 got to get back to you said that the
3 timing of these is not relevant or my
4 question on the timing of these is not
5 relevant.  Is it irrelevant because you
6 guys are not making a timeliness
7 challenge to these but are instead just
8 limiting the challenge to the scope of
9 the subject matter in the reports?
10       MR. BRALY:  I guess I'm not
11 seeing how you are divorcing those two
12 issues.  There is a timing issue in the
13 sense that you served this as a
14 rebuttal report to the Kennedy and
15 Posner reports and they don't rebut
16 those opinions.  So they were served as
17 rebuttal reports when they should not
18 have been because they are improper
19 rebuttal reports.  You just shouldn't
20 have served them.
21       MR. EMERICK:  At any point in
22 the case?
23       MR. BRALY:  Jay, I'm not
24 talking about what your determination
25 of your affirmative obligations is.

Page 36

1    MEET & CONFER
2        MR. EMERICK:  Nor am I asking
3 you about it.  I'm asking you about
4 Qualcomm's position -- I'm asking you
5 about Qualcomm's position with respect
6 to, and, again, I can't quite tell if
7 Qualcomm has a position or not on this,
8 but if Qualcomm has a position as to
9 whether or not these should have been
10 served at opening.
11       MR. BRALY:  Again, I think it's
12 irrelevant what we consider to be
13 appropriate for you to serve these as
14 opening reports or not.  You did not
15 serve them as opening reports.  You
16 served them as rebuttal reports that
17 you contend contradict or rebut expert
18 opinion in the Kennedy and Posner
19 reports.  You have not identified what
20 it is you believe that they are
21 rebutting or contradicting.  We believe
22 that they are improper.
23       We have asked you if you will
24 withdraw them.  You are saying you will
25 not withdraw them.  I think we're done.

Page 37

1    MEET & CONFER
2 I mean, I think we have basically
3 covered this.
4        MR. EMERICK:  So I actually
5 think the first part of your statement
6 there like sheds all the light on this
7 we need.  So yes, we can move on.
8        MR. BRALY:  Okay.
9        MR. EMERICK:  So, look, on your
10 complaint about this, we disagree with
11 the complaint that you raised.  Again,
12 there is some lack of clarity in your
13 position, but we disagree with your
14 reading of the scheduling order,
15 disagree with your interpretation of
16 the law on this.  We think we are fully
17 in compliance with the scheduling
18 order.
19       MR. BRALY:  Okay.  And just for
20 the record, you have refused to
21 identify what expert opinions you think
22 Brogioli and Richards were rebutting in
23 their rebuttal reports?
24       MR. EMERICK:  I think at a
25 minimum the reports speak for

10 (Pages 34 - 37)

Page 38

MEET & CONFER

1    MEET & CONFER
2    themselves on that.  But the two
3    reports that you guys put in, the
4    Posner and Kennedy reports, there are
5    certainly opinions that we are
6    rebutting in that.  And we talk about
7    that -- not we -- but the experts talk
8    about that in their reports at a
9    minimum.
10        MR. BRALY:  Okay.  I mean, I
11   have asked you repeatedly to identify
12   what expert opinions you say that they
13   are rebutting.  You haven't done so.
14   You are just pointing me back to the
15   report which we don't believe actually
16   is rebutting any expert opinions in the
17   Kennedy or Posner report.  We are going
18   to move to strike those reports.
19        MR. EMERICK:  So I think in
20   addition to that, you know, just to get
21   back to the scheduling order itself --
22   just give me one second.  Yeah, we
23   think the Brogioli and Richards reports
24   contradict and rebut evidence on the
25   same subject matter identified by

Page 39

MEET & CONFER

1    MEET & CONFER
2    another party here, Qualcomm.  So we
3    think we are fully in compliance with
4    the scheduling order.
5        With that, I'm happy to move on
6    to the next topic.  I know we have
7    spent a long time on this.
8        MR. BRALY:  Okay.  That still
9    doesn't identify anything specifically,
10   but it seems like we are not going to
11   resolve that.
12       The next topic is the
13   production of various TLA agreements
14   that seems to be ongoing.  There was a
15   production that you made today.  So I
16   think we have a number of questions
17   about the production of these
18   agreements.  I think the first one is
19   are there more that we should be
20   anticipating, and, if so, how many more
21   should we be anticipating that you will
22   be producing and when will you be
23   producing then?
24       MR. EVANGELATOS:  So this is
25   Peter.  A couple of questions there.  I

Page 40

MEET & CONFER

1    MEET & CONFER
2    think you are asking if you are going
3    to get more of them.  I think we have a
4    handful more to get out to you tomorrow
5    and then I think you are aware of a
6    couple of PO disputes that were filed
7    last week.  Obviously those are going
8    to be out there until that gets decided
9    by the Court or the Special Master.
10       MR. BRALY:  When you say a
11   handful, does that mean five?
12       MR. EVANGELATOS:  I don't know
13   the specific number of documents off
14   the top of my head.  I think there is
15   maybe one or two additional third
16   parties where we have to produce the
17   documents to you.  I think that they
18   are coming and that's all I know.  I
19   don't know when exactly the production
20   is going to go out the door.
21       MR. BRALY:  So are you saying
22   that with this next production that is
23   coming, that will be all of them, or
24   will there be more after the next
25   production?

Page 41

MEET & CONFER

1    MEET & CONFER
2        MR. EVANGELATOS:  Again,
3    excluding any that are subject to
4    third-party disputes where the third
5    party has objected to the production of
6    their agreements, I believe that's the
7    case.  If not, maybe there is one more.
8    I'm not sure off the top of my head,
9    but I believe that should be the case.
10       MR. BRALY:  Okay.  Are you
11   still looking for agreements or have
12   you identified all of them?
13       MR. EVANGELATOS:  My
14   understanding is that they were, and
15   this is what we told you in an e-mail
16   several times, that notice was sent out
17   for the additional agreements that
18   needed to be produced and that is what
19   you are receiving.
20       MR. BRALY:  Okay.  When did you
21   send these notices?
22       MR. EVANGELATOS:  I don't have
23   a date off the top of my head.  This
24   was quite a while ago, maybe several
25   weeks ago.  At least the period for the

11 (Pages 38 - 41)

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| [INSERT PLAINTIFF NAME], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 00-0000 (MN) |
| | ) | |
| [INSERT DEFENDANT NAME], | ) | |
| | ) | |
| Defendant. | ) | |

## SCHEDULING ORDER [NON-PATENT; JURY TRIAL]

This _____ day of _____, 20___, the Court having conducted an initial

Rule 16(b) scheduling conference pursuant to Local Rule 16.1(b), and the parties having

determined after discussion that the matter cannot be resolved at this juncture by settlement,

voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1.    Rule 26(a)(1) Initial Disclosures and E-Discovery Default Standard.

Unless otherwise agreed to by the parties, the parties shall make their initial

disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) within five (5) days of the date

the Court entered this Order.  If they have not already done so, the parties are to review the Court's

Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"),

which is posted at http://www.ded.uscourts.gov (*see* Other Resources, Default Standard for

Discovery) and is incorporated herein by reference.

2.    Joinder of Other Parties and Amendment of Pleadings.  All motions to join other

parties, and to amend or supplement the pleadings, shall be filed on or before **[DATE]**.  Unless

otherwise ordered by the Court, any motion to join a party or motion to amend the pleadings shall

be made pursuant to the procedures set forth in Paragraphs 7(g) and 8.

3.    <u>Application to Court for Protective Order.</u>  Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten (10) days from the date the Court enters this Order.  Should counsel be unable to reach an agreement on a proposed form of order, counsel must follow the provisions of Paragraph 7(g) below.

Any proposed protective order must include the following paragraph:

<u>Other Proceedings.</u>  By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "confidential" [the parties should list any other level of designation, such as "highly confidential," which may be provided for in the protective order] pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

4.    <u>Papers Filed Under Seal.</u> In accordance with section G of the Revised Administrative Procedures Governing Filing and Service by Electronic Means, a redacted version of any sealed document shall be filed electronically within seven (7) days of the filing of the sealed document.

5.    <u>Courtesy Copies.</u>  The parties shall provide to the Court two (2) courtesy copies of all briefs and any other document filed in support of any briefs (*i.e.*, appendices, exhibits, declarations, affidavits etc.).  This provision also applies to papers filed under seal.  All courtesy copies shall be double-sided.

6.    <u>ADR Process.</u>  This matter is referred to a magistrate judge to explore the possibility of alternative dispute resolution.

7.    <u>Discovery.</u>  Unless otherwise ordered by the Court or agreed to by parties, the limitations on discovery set forth in the Federal Rules shall be strictly observed.

(a)    <u>Fact Discovery Cut Off.</u>  All fact discovery in this case shall be initiated so that it will be completed on or before **[DATE]**.

(b)    <u>Document Production.</u>  Document production shall be substantially complete by **[DATE]**.

(c)    <u>Requests for Admission.</u>  A maximum of ___ requests for admission are permitted for each side.

(d)    <u>Interrogatories.</u>

i.    A maximum of ___ interrogatories, including contention interrogatories, are permitted for each side.

ii.    The Court encourages the parties to serve and respond to contention interrogatories early in the case. In the absence of agreement among the parties, contention interrogatories, if filed, shall first be addressed by the party with the burden of proof. The adequacy of all interrogatory answers shall be judged by the level of detail each party provides (*i.e.*, the more detail a party provides, the more detail a party shall receive).

(e)    <u>Depositions.</u>

i.    <u>Limitation on Hours for Deposition Discovery.</u>  Each side is limited to a total of ___ hours of taking testimony by deposition upon oral examination.

ii.    <u>Location of Depositions.</u>  Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district. Exceptions to this general rule may be made by order of the Court.  A defendant who becomes a

counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

(f)    <u>Disclosure of Expert Testimony.</u>

i.    <u>Expert Reports.</u>  For the party who has the initial burden of proof on the subject matter, the initial Federal Rule of Civil Procedure 26(a)(2) disclosure of expert testimony is due on or before **[DATE]**.  The supplemental disclosure to contradict or rebut evidence on the same matter identified by another party is due on or before **[DATE]**.  Reply expert reports from the party with the initial burden of proof are due on or before **[DATE]**.  No other expert reports will be permitted without either the consent of all parties or leave of the Court.  Along with the submissions of the expert reports, the parties shall advise of the dates and times of their experts' availability for deposition.

ii.    <u>Objections to Expert Testimony.</u>  To the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as incorporated in Federal Rule of Evidence 702, it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

iii.    <u>Expert Discovery Cut Off.</u>  All expert discovery in this case shall be initiated so that it will be completed on or before **[DATE]**.

(g)    <u>Discovery Matters and Disputes Relating to Protective Orders.</u>

i.    Any discovery motion filed without first complying with the following procedures will be denied without prejudice to renew pursuant to these procedures.

ii.    Should counsel find, after a reasonable effort pursuant to Local Rule 7.1.1 that they are unable to resolve a discovery matter or a dispute relating to a protective

order, the parties involved in the discovery matter or protective order dispute shall contact the Court's Judicial Administrator to schedule an argument.

iii.    On a date to be set by separate order, generally not less than four (4) days prior to the conference, the party seeking relief shall file with the Court a letter, not to exceed three (3) pages, outlining the issues in dispute and its position on those issues.  On a date to be set by separate order, but generally not less than three (3) days prior to the conference, any party opposing the application for relief may file a letter, not to exceed three (3) pages, outlining that party's reasons for its opposition.

iv.    The parties shall provide to the Court two (2) courtesy copies of its discovery letter and any other document filed in support of any letter (*i.e.*, appendices, exhibits, declarations, affidavits etc.).  This provision also applies to papers filed under seal.  All courtesy copies shall be double-sided.

v.    Should the Court find further briefing necessary upon conclusion of the conference, the Court will order it.  Alternatively, the Court may choose to resolve the dispute prior to the conference and will, in that event, cancel the conference.

8.    <u>Motions to Amend / Motions to Strike.</u>

(a)    Any motion to amend (including a motion for leave to amend) a pleading or any motion to strike any pleading or other document shall be made pursuant to the discovery dispute procedure set forth in Paragraph 7(g) above.

(b)    Any such motion shall attach the proposed amended pleading as well as a "redline" comparison to the prior pleading or attach the document to be stricken.

9.     <u>Case Dispositive Motions.</u>

(a)     All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before **[DATE]** [a date approximately four months prior to the pretrial conference, the four months being calculated from the conclusion of the briefing]. Briefing will be presented pursuant to the Court's Local Rules. No case dispositive motion under Rule 56 may be filed more than ten (10) days before the above date without leave of the Court.

(b)     <u>Concise Statement of Facts Requirement.</u>   Any motion for summary judgment shall be accompanied by a separate concise statement, not to exceed six (6) pages, which details each material fact which the moving party contends is essential for the Court's resolution of the summary judgment motion (not the entire case) and as to which the moving party contends there is no genuine issue to be tried. Each fact shall be set forth in a separate numbered paragraph and shall be supported by specific citation(s) to the record.

Any party opposing the motion shall include with its opposing papers a response to the moving party's concise statement, not to exceed six (6) pages, which admits or disputes the facts set forth in the moving party's concise statement on a paragraph-by-paragraph basis. To the extent a fact is disputed, the basis of the dispute shall be supported by specific citation(s) to the record. Failure to respond to a fact presented in the moving party's concise statement of facts shall indicate that fact is not in dispute for purposes of summary judgment. The party opposing the motion may also include with its opposing papers a separate concise statement, not to exceed four (4) pages, which sets forth material facts as to which the opposing party contends there is a genuine issue to be tried. Each fact asserted by the opposing party shall also be set forth in a separate numbered paragraph and shall be supported by specific citation(s) to the record.

The moving party shall include with its reply papers a response to the opposing party's concise statement of facts, not to exceed four (4) pages, on a paragraph-by-paragraph basis. Failure to respond to a fact presented in the opposing party's concise statement of facts shall indicate that fact remains in dispute for purposes of summary judgment.

10.    <u>Applications by Motion.</u>  Except as otherwise specified herein, any application to the Court shall be by written motion.  Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

11.    <u>Motions *in Limine*.</u>  Motions *in limine* shall not be separately filed.  All *in limine* requests and responses thereto shall be set forth in the proposed pretrial order.  Each party shall be limited to three (3) *in limine* requests, unless otherwise permitted by the Court.  The *in limine* request and any response shall contain the authorities relied upon; each *in limine* request may be supported by a maximum of three (3) pages of argument, may be opposed by a maximum of three (3) pages of argument, and the party making the *in limine* request may add a maximum of one (1) additional page in reply in support of its request.  If more than one party is supporting or opposing an *in limine* request, such support or opposition shall be combined in a single three (3) page submission (and, if the moving party, a single one (1) page reply), unless otherwise ordered by the Court.  No separate briefing shall be submitted on *in limine* requests, unless otherwise permitted by the Court.

12.    <u>Pretrial Conference.</u>  On **[DATE]**, the Court will hold a pretrial conference in Court with counsel beginning at _____.  The parties shall file with the Court the joint proposed final pretrial order in compliance with Local Rule 16.3(c) and the Court's Preferences and Procedures for Civil Cases not later than seven (7) days before the pretrial conference.  Unless otherwise ordered by the Court, the parties shall comply with the timeframes set forth in Local

Rule 16.3(d)(1)-(3) for the preparation of the joint proposed final pretrial order.  The Court will advise the parties at or before the above-scheduled pretrial conference whether an additional pretrial conference will be necessary.

The parties shall provide the Court two (2) double-sided courtesy copies of the joint proposed final pretrial order and all attachments.  The proposed final pretrial order shall contain a table of contents and the paragraphs shall be numbered.

13.    <u>Jury Instructions, Voir Dire, and Special Verdict Forms.</u>  Where a case is to be tried to a jury, pursuant to Local Rules 47.1(a)(2) and 51.1 the parties should file (i) proposed voir dire, (ii) preliminary jury instructions, (iii) final jury instructions, and (iv) special verdict forms seven (7) full business days before the final pretrial conference.  This submission shall be accompanied by a courtesy copy containing electronic files of these documents, in Microsoft Word format, which may be submitted by e-mail to mn_civil@ded.uscourts.gov.

14.    <u>Trial.</u>  This matter is scheduled for a _____ day jury trial beginning at 9:30 a.m. on **[DATE]**, with the subsequent trial days beginning at 9:00 a.m.  Until the case is submitted to the jury for deliberations, the jury will be excused each day at 4:30 p.m.  The trial will be timed, as counsel will be allocated a total number of hours in which to present their respective cases.

_____
The Honorable Maryellen Noreika
United States District Judge

Counsel Shall Provide a Chart of All Relevant Deadlines

| EVENT | DEADLINE |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# Exhibit 7

1

```
08:12:43  1          IN THE UNITED STATES DISTRICT COURT

        2            FOR THE DISTRICT OF DELAWARE

        3

        4
          ARM LTD.,                    )
        5 a U.K. corporation,          )
                                       )
        6          Plaintiff,          )
                                       ) C.A. No. 22-1146(MN)
        7 v.                           )
                                       )
        8 QUALCOMM, INC.,              )
          a Delaware corporation,      )
        9 et al.,                      )
                                       )
       10          Defendants.         )

       11

       12
                   Friday, August 29, 2025
       13          12:00 p.m.
                   Teleconference
       14

       15          844 King Street
                   Wilmington, Delaware
       16

       17

       18 BEFORE:  THE HONORABLE MARYELLEN NOREIKA
                   United States District Court Judge
       19

       20

       21

       22 APPEARANCES:

       23          YOUNG CONAWAY STARGATT & TAYLOR
                   BY:  ANNE SHEA GAZA, ESQ.
       24
                   -and-
       25
```

2

```
 1   APPEARANCES (Cont'd):

 2

 3       MORRISON FOERSTER, LLP
         BY:  ERIK OLSON, ESQ.
         BY:  SCOTT LLEWELLYN, ESQ.
 4       BY:  SHAELYN DAWSON, ESQ.
         BY:  NICHOLAS FUNG, ESQ.
 5
         -and-
 6
         KIRKLAND & ELLIS LLP
 7       BY:  GREGG F. LoCASCIO, ESQ.
         BY:  JASON WILCOX, ESQ.
 8       BY:  JAY EMERICK, ESQ.

 9
              Counsel for the Plaintiff
10

11

12       MORRIS NICHOLS ARSHT & TUNNELL LLP
         BY:  JENNIFER YING, ESQ.
13
         -and-
14
         PAUL WEISS
15       BY:  CATHERINE NYARDY, ESQ.
         BY:  JACOB BRALY, ESQ.
16
         -and-
17
         DUNN ISAACSON RHEE LLP
18       BY:  KAREN L. DUNN, ESQ.
         BY:  WILLIAM ISAACSON, ESQ.
19       BY:  ERIN J. MORGAN, ESQ.

20            Counsel for the Defendants

21

22

23
11:51:50        - - - - - - - - - - - - -
12:01:15 24

12:01:15 25
```

3

```
12:01:16  1          THE COURT:  Good afternoon, counsel.  Who is

12:01:18  2   there, please?

12:01:19  3          MS. GAZA:  Good afternoon, Your Honor.  Anne

12:01:24  4   Gaza from Young Conaway on behalf of Arm, Ltd.  Would you

12:01:27  5   like me to do announcements for everyone on the Arm's side

12:01:31  6   first?

12:01:31  7          THE COURT:  Yes, please.

12:01:33  8          MS. GAZA:  Thank you, Your Honor.

12:01:34  9   Unfortunately, Ms. Durie is not able to join us this

12:01:39 10   afternoon as she is presenting closing arguments in another

12:01:41 11   courtroom, but we are joined by he colleagues from Morrison

12:01:43 12   Foerster, Erik Olson, Scott Llewellyn, Shaelyn Dawson, and

12:01:49 13   Nicholas Fung, as well as from Kirkland & Ellis, Gregg

12:01:53 14   LoCascio, Jason Wilcox, and Jay Emerick, as well as from

12:01:57 15   Arm, Limited, Your Honor, we're joined by Nella Frank.

12:02:00 16          THE COURT:  All right.  Good afternoon to all of

12:02:02 17   you.

12:02:05 18          And for Qualcomm.

12:02:08 19          MS. YING:  Good afternoon, Your Honor.  This is

12:02:10 20   Jennifer Ying from Morris Nichols Arsht & Tunnell.  I have

12:02:14 21   with me on the line from Paul Weiss, Catherine Nyardy and

12:02:19 22   Jacob Braly.  And then from Dunn Isaacson Rhee, we have

12:02:23 23   Karen Dunn, Bill Isaacson, and Erin Morgan.

12:02:27 24          THE COURT:  Good afternoon to all of you as

12:02:29 25   well.  I want to thank you guys for getting on the phone so
```

4

```
12:02:32  1   quickly.  We're going through the papers and I have some

12:02:37  2   questions and thought it would be good to try and get

12:02:41  3   answers as quickly as possible.

12:02:43  4          So with respect to Question 3, which is the

12:02:49  5   Qualcomm licensing issue, was Qualcomm licensed for the

12:03:00  6   Nuvia and other products under the agreement.  What I had

12:03:06  7   understood was the issue and the reason that I denied

12:03:11  8   summary judgment was there was a factual issue as to whether

12:03:20  9   those products met the -- I'm just to trying to pull up the

12:03:30 10   document here so I have the right language.  But if those

12:03:35 11   product contains an architecture compliant core under

12:03:40 12   Section 286 of the Annex.

12:03:47 13          And when I went back and I looked at the

12:03:53 14   pretrial order, nobody had any issues with contract

12:03:56 15   interpretation in there, but when I was reading Qualcomm's

12:04:03 16   response to Arm's motion for judgment as a matter of law on

12:04:13 17   that issue, I understood the first part of the response

12:04:15 18   which was there was plenty of evidence that showed that

12:04:23 19   these were, you know, microprocessors designed by or

12:04:29 20   developed by Qualcomm and that they were alike.  But then in

12:04:36 21   the next section it starts talking about the jury was

12:04:38 22   entitled to believe Qualcomm's interpretation of the

12:04:44 23   contracts.  And I just got a little bit lost.  Like are you

12:04:49 24   suggesting that somewhere someone said that this was

12:04:55 25   ambiguous?
```

45

```
13:15:32   1        THE COURT:  Okay.
13:15:33   2        MS. DUNN:  And just two points I'll make.
13:15:37   3    Obviously this was in the context of the discussion of Arm's
13:15:42   4    refusal to produce the agreements.  And so I want to just
13:15:46   5    make the point that it's not like Arm got nothing out of
13:15:50   6    this.  Right?  It had taken a position and the reason the
13:15:54   7    Court was saying what the Court said was because of the
13:15:57   8    position that Arm took.  So even if it were acceptable,
13:16:01   9    which it isn't for Arm to come back with these arguments now
13:16:06  10    after failing to respond to what the Court told that it had
13:16:09  11    to do.  It's especially unacceptable because this was the
13:16:12  12    result of the positions that Arm itself took.
13:16:15  13        The second thing I would say is that as Your
13:16:19  14    Honor knows, the way that this works is that, you know,
13:16:24  15    vague interrogatory responses well before trial are not the
13:16:29  16    same as putting forward your theory of harm and your theory
13:16:33  17    of damages and what you're actually going to do at the
13:16:36  18    trial.  And every plaintiff is expected to do that just as
13:16:40  19    the Court expected for Arm to do that in this case.
13:16:43  20        And this saga of harm and damages with Arm has
13:16:49  21    shifted almost every single hearing that we had.  And it
13:16:52  22    continues to shift post-trial.  But this was a challenge
13:16:55  23    throughout the entire litigation.
13:16:57  24        And so one of the other things Your Honor said
13:17:00  25    in that same colloquy when the idea of royalty rates came up
```

46

```
13:17:05   1    in the first place was that Arm was shifting the playing
13:17:09   2    field.  So what this sounds like is frankly more of that
13:17:15   3    because this was obviously not a theory that they disclosed
13:17:19   4    with any clarity.  It was discussed and expressly, you know,
13:17:25   5    told to them that they couldn't rely on it to prove harm.
13:17:31   6    They never did anything about that.  Trial went by.  And I
13:17:36   7    could go through the lack of evidence again, but I won't.
13:17:39   8    And now here we are and they're saying oh, this was our
13:17:42   9    theory.  I think there are multiple bases for the Court to
13:17:45  10    dismiss that.
13:17:48  11        THE COURT:  Okay.  I think I understand all of a
13:17:51  12    that.  And with that, I -- unless somebody else has
13:17:58  13    something they want to say, I think that is most of my
13:18:00  14    questions.  Anything else before I let you go?
13:18:04  15        Plaintiff?
13:18:07  16        MR. LoCASCIO:  This is Gregg LoCascio.  I do
13:18:10  17    have one thing.  I appreciate you asking.  As you know, we
13:18:12  18    have got the two cases here.  And the second case has been
13:18:15  19    moving along.  The special master has a host of issues in
13:18:19  20    front of her.  We're in expert reports and we're going to
13:18:24  21    have dispositive motions in October.  I think there a core
13:18:27  22    question, putting aside whether the Special Master allows
13:18:31  23    discovery, both sides are asking for more, and what that
13:18:34  24    could do to some scheduling issues.  I think we all have
13:18:37  25    seen it in our end, this issue of a retrial and potentially
```

47

```
13:18:42   1    on all claims or on just Count I would be a predicate issue
13:18:46   2    and run through at least some of the claims in the second
13:18:49   3    case.  And some ordering of that and how that ought to
13:18:53   4    apply.  And so while immature in some respects because Your
13:18:58   5    Honor has not ruled, this issue is brewing and given the
13:19:01   6    other deadlines and the other dates, obviously any retrial
13:19:05   7    should happen first.  And in the event there is multiple
13:19:09   8    permutations we could either put a couple page letter in or
13:19:13   9    just ride this out up depending on the permutations and how
13:19:15  10    you come out, it will impact the second case and the timing
13:19:18  11    of it.
13:19:18  12        In our view we have already had one trial that
13:19:21  13    needs to be partially if not fully redone.  To have a second
13:19:25  14    trial that would be unwound potentially by an appeal or Your
13:19:28  15    Honor's ruling seems additional efficient to at least now
13:19:31  16    raise that issue.
13:19:31  17        THE COURT:  Okay.  Anything else?  All right.
13:19:39  18        MS. DUNN:  Your Honor, I feel like I should at
13:19:42  19    least say for the record the issue just raised by counsel
13:19:44  20    was not raised with us beforehand, so we are fine with the
13:19:48  21    existing schedule and have nothing else at this point to
13:19:50  22    say.
13:19:51  23        THE COURT:  Okay.  Well, we're going to get an
13:19:54  24    opinion out as soon as we can, and hopefully that will
13:20:00  25    address some of these issues, but you have given us -- both
```

48

```
13:20:05   1    sides have given us a lot of things to think about and look
13:20:09   2    up, so it may take us a little while.  But we'll try to do
13:20:13   3    so when we can.
13:20:16   4        All right.  Thanks everyone.  Have a good
13:20:18   5    weekend.
           6        (Teleconference concluded at 1:20 p.m.)
           7
           8        I hereby certify the foregoing is a true and
              accurate transcript from my stenographic notes in the proceeding.
           9
          10             /s/ Dale C. Hawkins
                        Official Court Reporter
          11             U.S. District Court
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARM LTD.,                              )
                                       )
              Plaintiff,               )
                                       )
       v.                              )    C.A. No. 22-1146 (MN)
                                       )
QUALCOMM INC., QUALCOMM                )
TECHNOLOGIES, INC. and NUVIA, INC.,    )
                                       )
              Defendants.              )

## **VERDICT FORM**

In answering the following questions and filling out this Verdict Form, you are to

follow all of the instructions I have given you in the Court's charge. Your answer to each

question must be unanimous.

We, the jury in this case, find the following answers to the following questions:

## Arm's Claims for Breach of Contract

**Question 1:** Did Arm prove by a preponderance of the evidence that Nuvia breached Section 15.1(a) of the Nuvia ALA?

|       YES        |       NO        |
|------------------|-----------------|
|    **For Arm**   |  **For Nuvia**  |

YES _____     NO _____

**Question 2:** Did Arm prove by a preponderance of the evidence that Qualcomm breached Section 15.1(a) of the Nuvia ALA?

|       YES        |        NO         |
|------------------|-------------------|
|    **For Arm**   |  **For Qualcomm** |

YES _____     NO ____✓_____

## Qualcomm's Claim

**Question 3:** Did Qualcomm prove by a preponderance of the evidence that the Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA?

|       YES          |       NO        |
|--------------------|-----------------|
| **For Qualcomm**   |  **For Arm**    |

YES ____✓_____     NO _____

1

A0332

## CONCLUSION

You have reached the end of the verdict form. Review the completed form to ensure that it accurately reflects your unanimous determinations. All jurors should then sign and date the Verdict Form in the space below and notify the Court Security Officer that you have reached a verdict.

Date: 12/20/24



# Exhibit 9





**Defendant Arm Holdings PLC's Letter Brief to Special Master Rychlicki Opposing Plaintiffs' Motion to Strike the Expert Reports of Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 23, 2025) (REDACTED IN ITS ENTIRETY)**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., a Delaware corporation, and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

        Plaintiffs,

    v.

ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K. corporation,

        Defendant.

C.A. No. 24-490-MN

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FILED UNDER SEAL**

## DECLARATION OF ADAM JANES IN SUPPORT OF DEFENDANT ARM HOLDINGS PLC'S LETTER BRIEF TO SPECIAL MASTER RYCHLICKI OPPOSING PLAINTIFFS' MOTION TO STRIKE THE EXPERT REPORTS OF MICHAEL C. BROGIOLI, PH.D. & STEVEN RICHARDS, CPA

Dated: September 23, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Meredith Pohl
Matthew J. McIntee
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
meredith.pohl@kirkland.com
matt.mcintee@kirkland.com

Jay Emerick
Reid McEllrath
Adam M. Janes
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

jay.emerick@kirkland.com
reid.mcellrath@kirkland.com
adam.janes@kirkland.com

Nathaniel Louis DeLucia
Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
nathaniel.delucia@kirkland.com
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

A0345

I, Adam Janes, declare as follows:

I am an attorney with the law firm of Kirkland & Ellis LLP, counsel for Arm Holdings PLC ("Arm") in the above referenced action.  I submit this declaration in support of Arm's Letter Brief to Special Master Rychlicki Opposing Plaintiffs' Motion to Strike the Expert Reports of Michael C. Brogioli, Ph.D. & Steven Richards, CPA.

1.      Attached as Exhibit 1 is true and correct copy of the D.I. 44 Scheduling Order, dated January 31, 2025.

2.      Attached as Exhibit 2 is a true and correct copy of the Expert Rebuttal Report of Steven Richards, CPA, dated September 5, 2025. [Highly Confidential – Attorneys' Eyes Only]

3.      Attached as Exhibit 3 is a true and correct copy of the Expert Rebuttal Report of Michael C. Brogioli, Ph.D., dated September 5, 2025. [Highly Confidential – Attorneys' Eyes Only]

4.      Attached as Exhibit 4 is a true and correct copy of the Expert Reply Report of Susan Markel, dated September 19, 2025. [Highly Confidential – Attorneys' Eyes Only]

5.      Attached as Exhibit 5 is a true and correct copy of the Expert Reply Report of Samuel J. Winer, dated September 19, 2025. [Highly Confidential – Attorneys' Eyes Only]

6.      Attached as Exhibit 6 is a true and correct copy of the parties' meet & confer transcript, dated September 15, 2025.

7.      Attached as Exhibit 7 is a true and correct copy of the Expert Opening Report of Eric Posner, dated August 8, 2025. [Highly Confidential – Attorneys' Eyes Only]

8.      Attached as Exhibit 8 is a true and correct copy of Arm's Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), dated March 24, 2025. [Highly Confidential – Attorneys' Eyes Only]

9.      Attached as Exhibit 9 is a true and correct copy of Arm's Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), dated June 16, 2025. [Highly Confidential – Attorneys' Eyes Only]

10.     Attached as Exhibit 10 is a true and correct copy of the Expert Opening Report of Patrick Kennedy, dated August 8, 2025. [Highly Confidential – Attorneys' Eyes Only]

11.     Attached as Exhibit 11 is a true and correct copy of the Expert Rebuttal Report of Timothy Simcoe, dated September 5, 2025. [Highly Confidential – Attorneys' Eyes Only]

12.     Attached as Exhibit 12 is a true and correct copy of Qualcomm's Letter to Special Master Helena C. Rychlicki in Support of their Motion to Strike the Expert Reports of Arm's Experts Michael C. Brogioli, Ph.D. & Steven Richards, CPA, dated September 16, 2025. [Highly Confidential – Attorneys' Eyes Only]

13.     Attached as Exhibit 13 is a true and correct copy of Arm's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), dated September 11, 2025. [Highly Confidential – Attorneys' Eyes Only]

14.     Attached as Exhibit 14 is a true and correct copy of Arm's First Supplemental Objections and Responses to Qualcomm's Amended Interrogatory No. 3, dated September 11, 2025. [Highly Confidential – Attorneys' Eyes Only]

15.     Attached as Exhibit 15 is a true and correct copy of Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), dated September 11, 2025. [Highly Confidential – Attorneys' Eyes Only]

16.     Attached as Exhibit 16 is a true and correct copy of Arm's First Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 12), dated September 11, 2025. [Highly Confidential – Attorneys' Eyes Only]

17.     Attached as Exhibit 17 is a true and correct copy of the Expert Reply Report of Eric Posner, dated September 19, 2025. [Highly Confidential – Attorneys' Eyes Only]

18.     Attached as Exhibit 18 is a true and correct copy of the Expert Reply Report of Patrick Kennedy, dated September 19, 2025. [Highly Confidential – Attorneys' Eyes Only]

19.     Attached as Exhibit 19 is a true and correct copy of Arm's Response to Qualcomm's September 15, 2025 Letter to Special Master Rychlicki, dated September 19, 2025. [Highly Confidential – Attorneys' Eyes Only]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of September 2025 at Chicago, Illinois.

*/s/ Adam Janes*
Adam Janes

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUALCOMM INCORPORATED,<br>  a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>  a Delaware corporation,<br><br>              Plaintiffs,<br><br>      v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>  a U.K. corporation,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   C.A. No. 24-490 (MN)<br>)<br>)<br>)<br>)<br>) |

## SCHEDULING ORDER

This 31st day of January 2025, the Court having conducted an initial Rule 16(b) scheduling conference pursuant to Local Rule 16.1(b), and the parties having determined after discussion that the matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1.    <u>Rule 26(a)(1) Initial Disclosures and E-Discovery Order</u>.

Unless otherwise agreed to by the parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) and Paragraph 3 of the Delaware Default Standard for Discovery on or before February 7, 2025. The parties shall submit a proposed E-Discovery protocol and order by January 31, 2025.

2.    <u>Joinder of Other Parties and Amendment of Pleadings</u>. All motions to join other parties, and to amend or supplement the pleadings, shall be filed on or before March 14, 2025. Unless otherwise ordered by the Court, any motion to join a party or motion to amend the pleadings shall be made pursuant to the procedures set forth in Paragraphs 7(g) and 8.

3.     <u>Application to Court for Protective Order</u>.  Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court on or before January 31, 2025.  Should counsel be unable to reach an agreement on a proposed form of order, counsel must follow the provisions of Paragraph 7(g) below.

Any proposed protective order must include the following paragraph:

<u>Other Proceedings</u>.  By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "confidential" [the parties should list any other level of designation, such as "highly confidential," which may be provided for in the protective order] pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

4.     <u>Papers Filed Under Seal</u>.   In accordance with section G of the Revised Administrative Procedures Governing Filing and Service by Electronic Means, a redacted version of any sealed document shall be filed electronically within seven (7) days of the filing of the sealed document.

5.     <u>Courtesy Copies</u>.  The parties shall provide to the Court two (2) courtesy copies of all briefs and any other document filed in support of any briefs (*i.e.*, appendices, exhibits, declarations, affidavits etc.).  This provision also applies to papers filed under seal.  All courtesy copies shall be double-sided.

6.     <u>ADR Process</u>.  This matter is NOT referred to a magistrate judge to explore the possibility of alternative dispute resolution.

7.   <u>Discovery</u>.  Unless otherwise ordered by the Court or agreed to by parties, the limitations on discovery set forth in the Federal Rules shall be strictly observed.

(a)   <u>Fact Discovery Cut Off</u>.  All fact discovery in this case shall be initiated so that it will be completed on or before July 11, 2025.

(b)   <u>Document Production</u>.  The parties agree to produce documents on a rolling basis and will not wait until the substantial completion of document production deadline before producing documents.  Document production shall be substantially complete by [**Qualcomm's proposal:** April 11, 2025][1] [**Arm's proposal**: May 22, 2025]. May 1, 2025.

(c)   The parties have agreed to discuss and include provisions in the Protective Order concerning re-use and production in this case of materials produced in *Arm Ltd v. Qualcomm et al.*, C.A. No. 22-1146 (D. Del.), excluding source code.

(d)   <u>Requests for Admission</u>.  A maximum of **<u>thirty (30)</u>** requests for admission are permitted for each side.  The parties shall separately meet and confer to discuss any stipulations regarding the authenticity of any documents to be offered as exhibits in this case.

(e)   <u>Interrogatories.</u>

i.    A maximum of **<u>twenty-five (25)</u>** interrogatories, including contention interrogatories, are permitted for each side.

ii.    The Court encourages the parties to serve and respond to contention interrogatories early in the case.  In the absence of agreement among the parties, contention interrogatories, if filed, shall first be addressed by the party with the burden of proof.  The adequacy

---

[1] Given scheduling and production difficulties in the prior case, Qualcomm believes that its earlier substantial completion deadline is necessary to ensure sufficient time to complete depositions.

of all interrogatory answers shall be judged by the level of detail each party provides (*i.e.*, the more detail a party provides, the more detail a party shall receive).

        (f)    <u>Depositions</u>.

        i.    <u>Limitation on Deposition Discovery</u>.  Each side is limited to a total of seventy (70) hours of taking testimony by deposition upon oral examination.  This limitation does not apply to third party or expert depositions.  For purposes of this provision, former employees shall not be considered third parties.

        ii.    <u>Location of Depositions</u>.  [**Qualcomm's proposal:** Given that there are witnesses located outside of the United States that are expected to testify at trial, the parties agree that all depositions shall take place within the continental United States.] [**Arm's proposal**: Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place within 100 miles of that party or representative's place of residence. The parties will meet and confer regarding each deposition to determine whether a deposition by remote means is an acceptable alternative to an in-person deposition. A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.][2] [3]

---

[2] Arm's proposal for the location of depositions is identical to the language agreed to between the parties in the scheduling order for *Arm Ltd v. Qualcomm et al.*, C.A. No. 22-1146 (D. Del.), which the Court entered on Dec. 19, 2022 (D.I. 26) and pursuant to which the parties completed discovery in a timely manner.

[3] Qualcomm disagrees that the parties "completed discovery in a timely manner" in the prior case. The parties needed to extend fact discovery to account for travel to India and the UK for depositions of Arm's witnesses. D.I. 87.

(g)    <u>Disclosure of Expert Testimony</u>.

i.    <u>Expert Reports</u>.  For the party who has the initial burden of proof on the subject matter, the initial Federal Rule of Civil Procedure 26(a)(2) disclosure of expert testimony is due on or before August 8, 2025.  The supplemental disclosure to contradict or rebut evidence on the same matter identified by another party is due on or before September 5, 2025.  Reply expert reports from the party with the initial burden of proof are due on or before September 19, 2025.  No other expert reports will be permitted without either the consent of all parties or leave of the Court.  The parties shall advise of the dates and times of their experts' availability for deposition no later than two weeks after service of rebuttal reports.

ii.    <u>Objections to Expert Testimony</u>.  To the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as incorporated in Federal Rule of Evidence 702, it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

iii.    <u>Expert Discovery Cut Off</u>.  All expert discovery in this case shall be initiated so that it will be completed on or before October 3, 2025.

(h)    <u>Discovery Matters and Disputes Relating to Protective Orders</u>.

i.    Any discovery motion filed without first complying with the following procedures will be denied without prejudice to renew pursuant to these procedures.

ii.    Should counsel find, after a reasonable effort pursuant to Local Rule 7.1.1 that they are unable to resolve a discovery matter or a dispute relating to a protective order, the parties involved in the discovery matter or protective order dispute shall contact the Court's Judicial Administrator to schedule an argument.

5

iii.　　On a date to be set by separate order, generally not less than four (4) days prior to the conference, the party seeking relief shall file with the Court a letter, not to exceed three (3) pages, outlining the issues in dispute and its position on those issues.  On a date to be set by separate order, but generally not less than three (3) days prior to the conference, any party opposing the application for relief may file a letter, not to exceed three (3) pages, outlining that party's reasons for its opposition.

iv.　　The parties shall provide to the Court two (2) courtesy copies of its discovery letter and any other document filed in support of any letter (*i.e.*, appendices, exhibits, declarations, affidavits etc.).  This provision also applies to papers filed under seal.  All courtesy copies shall be double-sided.

v.　　Should the Court find further briefing necessary upon conclusion of the conference, the Court will order it.  Alternatively, the Court may choose to resolve the dispute prior to the conference and will, in that event, cancel the conference.

8.　　<u>Motions to Amend / Motions to Strike</u>.

(a)　　Any motion to amend (including a motion for leave to amend) a pleading or any motion to strike any pleading or other document shall be made pursuant to the discovery dispute procedure set forth in Paragraph 7(g) above.

(b)　　Any such motion shall attach the proposed amended pleading as well as a "redline" comparison to the prior pleading or attach the document to be stricken.

9.　　<u>Case Dispositive Motions</u>.

(a)　　All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before October 24, 2025.  Answering briefs shall be due on or before November 7, 2025, and reply briefs shall be due on or before November

6

14, 2025. Briefing will be presented pursuant to the Court's Local Rules. No case dispositive motion under Rule 56 may be filed more than ten (10) days before the above date without leave of the Court.

      (b)    <u>Concise Statement of Facts Requirement</u>. Any motion for summary judgment shall be accompanied by a separate concise statement, not to exceed six (6) pages, which details each material fact which the moving party contends is essential for the Court's resolution of the summary judgment motion (not the entire case) and as to which the moving party contends there is no genuine issue to be tried. Each fact shall be set forth in a separate numbered paragraph and shall be supported by specific citation(s) to the record.

      Any party opposing the motion shall include with its opposing papers a response to the moving party's concise statement, not to exceed six (6) pages, which admits or disputes the facts set forth in the moving party's concise statement on a paragraph-by-paragraph basis. To the extent a fact is disputed, the basis of the dispute shall be supported by specific citation(s) to the record. Failure to respond to a fact presented in the moving party's concise statement of facts shall indicate that fact is not in dispute for purposes of summary judgment. The party opposing the motion may also include with its opposing papers a separate concise statement, not to exceed four (4) pages, which sets forth material facts as to which the opposing party contends there is a genuine issue to be tried. Each fact asserted by the opposing party shall also be set forth in a separate numbered paragraph and shall be supported by specific citation(s) to the record.

      The moving party shall include with its reply papers a response to the opposing party's concise statement of facts, not to exceed four (4) pages, on a paragraph-by-paragraph basis. Failure to respond to a fact presented in the opposing party's concise statement of facts shall indicate that fact remains in dispute for purposes of summary judgment.

(c)   <u>Page limits combined with *Daubert* motion page limits</u>.  Each party is permitted to file as many case dispositive motions as desired provided, however, that each SIDE will be limited to a combined total of 40 pages for all opening briefs, a combined total of 40 pages for all answering briefs, and a combined total of 20 pages for all reply briefs regardless of the number of case dispositive motions that are filed. In the event that a party files, in addition to a case dispositive motion, a *Daubert* motion to exclude or preclude all or any portion of an expert's testimony, the total amount of pages permitted for all case dispositive and *Daubert* motions shall be increased to 50 pages for all opening briefs, 50 pages for all answering briefs, and 25 pages for all reply briefs for each SIDE.

10.   <u>Applications by Motion</u>.  Except as otherwise specified herein, any application to the Court shall be by written motion.  Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

11.   <u>Motions *in Limine*</u>.  Motions *in limine* shall not be separately filed.  All *in limine* requests and responses thereto shall be set forth in the proposed pretrial order.  Each party shall be limited to three (3) *in limine* requests, unless otherwise permitted by the Court.  The *in limine* request and any response shall contain the authorities relied upon; each *in limine* request may be supported by a maximum of three (3) pages of argument, may be opposed by a maximum of three (3) pages of argument, and the party making the *in limine* request may add a maximum of one (1) additional page in reply in support of its request.  If more than one party is supporting or opposing an *in limine* request, such support or opposition shall be combined in a single three (3) page submission (and, if the moving party, a single one (1) page reply), unless otherwise ordered by the Court.  No separate briefing shall be submitted on *in limine* requests, unless otherwise permitted by the Court.

12.     <u>Pretrial Conference</u>.  On March 2, 2026, the Court will hold a pretrial conference in Court with counsel beginning at 4:30 PM.  The parties shall file with the Court the joint proposed final pretrial order in compliance with Local Rule 16.3(c) and the Court's Preferences and Procedures for Civil Cases not later than seven (7) days before the pretrial conference.  Unless otherwise ordered by the Court, the parties shall comply with the timeframes set forth in Local Rule 16.3(d)(1)-(3) for the preparation of the joint proposed final pretrial order.  The Court will advise the parties at or before the above-scheduled pretrial conference whether an additional pretrial conference will be necessary.

The parties shall provide the Court two (2) double-sided courtesy copies of the joint proposed final pretrial order and all attachments.  The proposed final pretrial order shall contain a table of contents and the paragraphs shall be numbered.

13.     <u>Jury Instructions, Voir Dire, and Special Verdict Forms</u>.  Where a case is to be tried to a jury, pursuant to Local Rules 47.1(a)(2) and 51.1 the parties should file (i) proposed voir dire, (ii) preliminary jury instructions, (iii) final jury instructions, and (iv) special verdict forms seven (7) full days before the final pretrial conference.  This submission shall be accompanied by a courtesy copy containing electronic files of these documents, in Microsoft Word format, which may be submitted by e-mail to mn_civil@ded.uscourts.gov.

14.     <u>Trial</u>.  This matter is scheduled for a five (5) day jury trial beginning at 9:30 a.m. on March 9, 2026, with the subsequent trial days beginning at 9:00 a.m.  Until the case is submitted to the jury for deliberations, the jury will be excused each day at 4:30 p.m.  The trial will be timed, as counsel will be allocated a total number of hours in which to present their respective cases.

The Honorable Maryellen Noreika
United States District Judge

9

Counsel Shall Provide a Chart of All Relevant Deadlines

| EVENT | QUALCOMM'S PROPOSED DEADLINE | ARM'S PROPOSED DEADLINE |
|---|---|---|
| Parties to submit proposed ESI Order | January 31, 2025 | |
| Parties to submit proposed Protective Order | January 31, 2025 | |
| Rule 26(a)(1) Initial Disclosures | February 7, 2025 | |
| Delaware Default Standard for Discovery Paragraph 3 Disclosures | February 7, 2025 | |
| Joinder of parties and amendment of pleadings | March 14, 2025 | |
| Substantial completion of document production | ~~April 11, 2025~~ | ~~May 22, 2025~~ May 1, 2025 |
| Fact discovery cutoff | July 11, 2025 | |
| Initial expert reports | August 8, 2025 | |
| Rebuttal expert reports | September 5, 2025 | |
| Reply expert reports | September 19, 2025 | |
| Expert discovery cutoff | October 3, 2025 | |
| Opening Briefs for case dispositive motions and *Daubert* motions | October 24, 2025 | |
| Answering Briefs for case dispositive motions and *Daubert* motions | November 7, 2025 | |
| Reply Briefs for case dispositive motions and *Daubert* motions | November 14, 2025 | |

A0359

| Event | Qualcomm's Proposed Deadline | Arm's proposed deadline |
|---|---|---|
| Pretrial conference | March 2, 2026 at 4:30 p.m. | |
| 5-day Jury trial | March 9, 2026 | |

A0360

# Exhibit 2

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO STIPULATION AND ORDER**
**FOR THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

QUALCOMM INCORPORATED A DELAWARE
CORPORATION,
QUALCOMM TECHNOLOGIES, INC.,

                Plaintiff,

    -against-

ARM HOLDINGS PLC., f/k/a ARM LTD.,
a U.K. corporation,

                Defendants.          c.a. No. 24-490-MN

**REBUTTAL REPORT OF**

**STEVEN RICHARDS, CPA**

**September 5, 2025**

## Table of Contents

I. Expert Disclosures ................................................................................................................ 1

   A. Nature of Assignment ................................................................................................... 1

   B. Qualifications ................................................................................................................ 2

   C. Documents and Materials Considered ......................................................................... 4

   D. Compensation ............................................................................................................... 4

   E. Standards Governing my Work ..................................................................................... 4

II. Summary of Opinions ........................................................................................................ 4

III. Relevant Factual and Regulatory Background ................................................................. 6

   A. Background to the Parties ............................................................................................. 6

   B. Breach Letter ................................................................................................................ 7

   C. Background to the Dispute ........................................................................................... 8

   D. Public Company Disclosure Obligations ................................................................... 11

   E. Investor Events ........................................................................................................... 17

IV. Basis for Opinions and Analysis .................................................................................... 19

   A. Qualcomm was required to disclose the Breach Letter within its 2024 Form 10-K regardless of the publication of its contents in the Bloomberg Article. ........................ 19

   B. Qualcomm's public disclosures do not convey the significant harm resulting from the Breach Letter as alleged in the Second Amended Complaint. .......................... 21

V. Opinions and Conclusion ................................................................................................. 30

VI. SIGNATURE AND RIGHT TO MODIFY .................................................................... 31

REBUTTAL REPORT OF STEVEN RICHARDS

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

# I.    Expert Disclosures

## A.  Nature of Assignment

1.    I have been retained by Kirkland and Ellis LLP ("Counsel") for the defendant Arm Holdings PLC ("Arm") in the civil case bearing the caption C.A. No. 24-490-MN pending in District Court for the District of Delaware brought by Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm").

2.    I have been asked by Counsel to review the documents provided, including publicly available information, and to provide my expert opinion on (1) whether Qualcomm was required to disclose the October 22, 2024 letter from Arm notifying it of a material breach of the Qualcomm Architecture License Agreement (LES-TLA-20039) ("the QC ALA") ("the Breach Letter") in its Form 10-K for the fiscal period ending September 29, 2024 ("2024 Form 10-K")  regardless of the publication of its contents in the Bloomberg Article;[1] (2) whether Qualcomm's public disclosures convey the significant harm resulting from the Breach Letter or its publication in the Bloomberg Article as alleged in the Second Amended Complaint.[2] In addition, I was retained to consider and analyze the basis of the analysis expressed in paragraphs 118, 124 and 125 of the Expert Report of Dr. Patrick F. Kennedy, submitted on August 8, 2025 (the "Kennedy Report"). My analysis was limited only to those bases expressed in those paragraphs as they relate to his opinion.   Further, I was retained to consider and analyze paragraph 65 of the Expert Report of Eric E. Posner submitted on August 8, 2025 (the "Posner Report"). My analysis was limited only to those bases expressed in the paragraph as it relates to his opinion.

3.    To fairly evaluate Qualcomm's public disclosures regarding the Breach Letter[3] in respect of this opinion, it is necessary to assess Qualcomm's disclosures against the Securities and Exchange Commission ("SEC") public disclosure regulations and relevant generally accepted accounting principles ("US GAAP"). It is necessary to perform this evaluation from the perspective of Qualcomm at the time, in consideration of the facts it understood at the time, and without the benefit of hindsight.

---

[1] The article titled "ARM to scrap Qualcomm Chip Design License in Feud Escalation" published by Bloomberg on October 22, 2024, hereinafter referred to in this report as "The Bloomberg Article." The article was updated on October 23, 2024. https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud?srnd=homepage-europe.

[2] On June 3, 2025, Qualcomm filed a second amendment to its complaint filed in April 2022 hereinafter referred to in this report as the "Second Amended Complaint".

REBUTTAL REPORT OF STEVEN RICHARDS                                    Page | 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## B.  Qualifications

4.    I am a Senior Managing Director in the Risk Advisory practice of Ankura Consulting Group, LLC ("Ankura"), where I specialize in complex accounting, auditing, and financial reporting and disclosure matters. I also lead Ankura's Audit Advisory service offering, which advises auditors and law firms on audit and related regulatory matters including the assessment of compliance with auditing standards. I have over 28 years of experience as an accountant, auditor, regulator, forensic accountant, and accounting consultant. I provide a broad range of expert and consulting services involving corporate investigations, audit liability, accounting advisory, fraud examinations, dispute resolution, corporate governance and other services. I am a Certified Public Accountant ("CPA").

5.    Prior to joining Ankura in November 2016, I was a Partner in the Forensic Advisory practice at Deloitte LLP ("Deloitte"). I also served as a Senior Advisory Partner to Deloitte leadership and its Office of General Counsel regarding audit regulation, public policy matters, and regulatory enforcement matters. During my time at Deloitte, I provided advice on government, regulatory, and professional matters involving the audit practice. I also advised on audit regulatory issues involving public policy, inspections, standards, rules, litigation, and enforcement matters involving the Public Company Accounting Oversight Board ("PCAOB"), the Securities and Exchange Commission ("SEC"), and foreign audit and securities regulators.

6.    Prior to joining Deloitte in 2015, I worked at the PCAOB, from March 2011 to February 2015. As the Special Adviser to Chairman James Doty, I provided advice on policy and operations for all aspects of PCAOB oversight, including the enforcement program, adjudication proceedings, standard setting, the domestic and international inspections program, the broker-dealer inspection program, and risk analysis. In this role, I advised the Chairman on auditors' compliance or non-compliance with professional standards, including PCAOB Auditing Standards.

7.    During my tenure at the PCAOB, I also served as Senior Adviser to Claudius Modesti, the Director of Enforcement and Investigations. I provided advice on all aspects of policy and operations for the enforcement program, including coordination with other domestic financial regulators, division-wide initiatives, division priorities, case assessment, and management.

8.    From May 2004 until July 2008, I served as an Assistant Chief Accountant in the SEC's Division of Enforcement Office of Chief Accountant in Washington, D.C. During my tenure at the SEC, I performed numerous fraud and financial reporting investigations involving SEC registrants, senior executives, external auditors, and other third parties. I routinely assessed auditors' compliance with professional

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

standards, including PCAOB Auditing Standards, and provided advice on recommendations on enforcement matters under the SEC Rules of Practice, including Rule 102(e).[4]

9.   Before and after my work at the SEC, from April 2002 to May 2004 and from July 2008 to March 2011, I worked in the Forensic and Litigation Consulting practice at FTI Consulting, Inc. ("FTI"). During my time at FTI, I managed numerous multidisciplinary teams on high-profile matters, including one of the largest Ponzi schemes in history. During my tenure at FTI, I performed numerous forensic and internal investigations involving SEC registrants and regulated entities, privately-held companies, senior executives, external auditors, and other third parties. As part of these investigations, I routinely interacted with external auditors and assessed their compliance with professional obligations.

10.  I started my career as an auditor at Arthur Andersen LLP, where, from June 1998 to April 2002, I performed financial statement audits of both publicly-traded and privately-held companies in a variety of industries.

11.  I have also served as a member of accounting and auditing committees concerning fraud, including:

- In 2015, I was named the Deloitte representative to the Center for Audit Quality ("CAQ") – Anti-Fraud Collaboration ("AFC").[5] The mission of the CAQ's AFC is to enhance the effectiveness of financial fraud risk management by promoting anti-fraud policies, procedures, controls, and practices, including those enhanced or enabled by technology.

- From 2018 through 2021, I was a member of the American Institute of Certified Public Accountants ("AICPA") Forensic and Litigation Services Fraud Task Force. The Fraud Task Force provides information to AICPA members regarding fraud detection, investigation, and prevention.

12.  I am a frequent speaker at auditing, forensic accounting, and SEC and PCAOB enforcement conferences.

13.  I received my bachelor's degree in accounting from Washington & Jefferson College. I have been a CPA since 2002. I have an active CPA license in the state of Pennsylvania. I am a member of the AICPA and the Pennsylvania Institute of Certified Public Accountants. Consistent with the professional requirements, I have continued my professional education since becoming a CPA.

---

[4] Specifically, the Suspension and Disbarment provisions of Rule 102(e) which provide the SEC with authority to, among other things, permanently or temporarily bar an accountant from appearing or practicing before the SEC for engaging in improper professional conduct involving failure to comply with applicable professional standards.

[5] The AFC was formed in October 2010 by the CAQ, Financial Executives International ("FEI"), The Institute of Internal Auditors ("IIA") and the National Association of Corporate Directors ("NACD"). The four organizations represent the significant components of the financial reporting supply chain: external auditors (through CAQ), company financial management (through FEI), internal audits (through IIA) and audit committees (through NACD).

REBUTTAL REPORT OF STEVEN RICHARDS                                      Page | 3

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

14. A copy of my curriculum vitae is attached as Exhibit 1 to this report.

15. Based on my knowledge, skills, experience, training, and education, I am qualified to provide an expert opinion on the above question presented in this case.

## C.  Documents and Materials Considered

16. I, and Ankura staff members working under my direct supervision, considered the documents, testimony transcripts, and other materials set forth in Exhibit 2 to this report. The opinions and conclusions in this report are based on review of the documents, testimony transcripts, and other materials I considered, as well as my knowledge, training, and experience.[6]

17. My opinions are based on information available to me as of the date of this report. It is possible that additional information may affect my opinions herein. I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

## D.  Compensation

18. Ankura bills fees and expenses in this matter based on hourly rates and expenses incurred. Ankura is being compensated for my time at a rate of $1,050 per hour and for the time of other staff members assisting on this engagement at hourly rates ranging from $1,050 to $410. No portion of my firm's compensation (or my compensation) is dependent on my opinions or testimony or on the outcome of this matter.

## E.  Standards Governing my Work

19. I performed this engagement in accordance with the AICPA Statement on Standards for Forensic Services No. 1[7] and the AICPA Code of Professional Conduct.[8]

20. This report should not be construed as expressing opinions on matters of law, which are outside of my expertise. However, to the extent I have interpreted conduct and evidence, those interpretations reflect my understanding from an accountant's perspective.

## II.    Summary of Opinions

21. **Qualcomm was required to disclose the Breach Letter in its 2024 Form 10-K regardless of the publication of the Breach Letter's contents in the Bloomberg Article.**  Qualcomm disclosed the

---

[6] There was no restriction on what documents and testimony I was able to review and consider.
[7] Statement on Standards for Forensic Services No. 1.
[8] AICPA Code of Professional Conduct, Effective December 15, 2014; Updated for all official releases through March 2025.

REBUTTAL REPORT OF STEVEN RICHARDS                                             Page | 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Breach Letter, for the first time in the Consolidated Financial Statements filed in its 2024 Form 10-K within Note 7. Commitments and Contingencies – Legal and Regulatory Proceedings in the Notes to Consolidated Financial Statements ("Note 7")[9] as required by US GAAP.[10] As disclosed: "On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA[11]…Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice. We disagree with Arm's allegations, including that we are in breach of the Qualcomm ALA."[12] In substance, both US GAAP and Qualcomm's own disclosure position requires that "[i]f there is at least a reasonable possibility that a material loss may have been incurred ... we disclose such fact."[13,14] ████████████████████████████████████████████ ████████████████████[15] Because Qualcomm ███████████████████████████████████████████████ ■ and determined that there was "at least a reasonable possibility"[17] [defined in US GAAP as more than remote and less than probable] [18] that a "material loss"[19] [the Breach Letter asserts the right to terminate the Qualcomm ALA if not cured in 60 days][20] "may have been incurred,"[21] the Breach Letter was required to be disclosed by both US GAAP and Qualcomm's own disclosure position, in 2024 Form 10-K, irrespective of the reporting of the Breach Letter within the Bloomberg Article.

22. **Qualcomm's public disclosures do not convey the significant harm resulting from the Breach Letter or its publication in the Bloomberg Article as alleged in the Second Amended Complaint.**

Qualcomm disclosed the Breach Letter, for the first time in the Consolidated Financial Statements filed in its 2024 Form 10-K within Note 7, as required by US GAAP. As disclosed: "On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA…Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice. We disagree with Arm's allegations, including that we are in breach of the

---

[9] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-23.

[10] ASC 450-20, Loss Contingencies.

[11] This refers to the architecture license agreement between Arm and Qualcomm, the Qualcomm Architecture License Agreement (LES-TLA- 20039), which is the subject of the Breach Letter dated October 22, 2024 and is defined within the Breach Letter as the "Qualcomm ALA.". Hereinafter referred to in this report, any reference to this architectural license agreement will be referred to as the "QC ALA" unless referred to otherwise in the documentation quoted in this report.

[12] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, p. F-24.

[13] FASB ASC. 450-20-50-5, Loss Contingencies, Unrecognized Contingencies.

[14] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, p. F-13.

[15] ■████████████████████████████████████████

[17] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-13.

[18] FASB ASC. 450-20, Loss Contingencies, Glossary.

[19] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-13.

[20] The Breach Letter, October 22, 2024.

[21] Qualcomm Inc., Form 10-K for the fiscal year ended September 29, 2024, p. F-13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Qualcomm ALA."[22]  Qualcomm included risk factors specific to Regulatory and Legal Challenges and Intellectual Property in the Item 1A. Risk Factors section of the 2024 Form 10-K that referenced to the matters disclosed in Note 7.[23]  With respect to these matters, Qualcomm disclosed: "[u]nfavorable resolution of one or more of these matters could have a material adverse effect on our business, results of operations, financial condition or cash flows."[24]  Qualcomm also disclosed: "[a]ny claims, regardless of their merit, could be time consuming to address, result in costly litigation, divert the efforts of our technical and management personnel, cause product release or shipment delays and/or damage to our customer relationships, any of which could have an adverse effect on our results of operations and cash flows."[25] However, these disclosures were general disclosures that were similarly provided in Qualcomm's SEC filings before and after the Breach Letter, including disclosure after the Breach Letter had been withdrawn.  Qualcomm did not disclose the nature of the material adverse effects, such as the effect on its business or customer relationships resulting from the Breach Letter or its publication in the Bloomberg Article that Qualcomm alleges it suffered in the Second Amended Complaint.  This information was not disclosed in the 2024 Form 10-K or at any time after it was filed on November 6, 2024, including in its Q4 2024 Conference Call on November 6, 2024;[26] Investor Day 2024: IoT and Automotive Diversification Update on November 19, 2024;[27] UBS Global Technology and AI Conference on December 4, 2024,[28] or Q1 2025 Form 10-Q filed on February 5, 2025,[29] and its related earnings call.  Based on my experience, I would have expected this information to have been disclosed if the material adverse impact was as alleged.

# III.  Relevant Factual and Regulatory Background

## A.  Background to the Parties

23.  Qualcomm is a Delaware corporation with its principal place of business in California. Qualcomm is a Nasdaq stock market registrant and files periodic and other reporting pursuant to Section 13 of the Securities Exchange Act of 1934 ("Exchange Act").[30] In its 2024 Form 10-K, Qualcomm describes itself as "a global technology leader, helping to bring intelligent computing everywhere through the development and commercialization of foundational technologies…. We innovate and collaborate across

---

[22] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, p. F-24.
[23] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, pp. 29, 30, 31, 32, 33, 34.
[24] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 29.
[25] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 34.
[26] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[27] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[28] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.
[29] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024.
[30] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

many ecosystems, including with manufacturers, operators, developers, system integrators, cloud providers, test tool vendors, service providers, governments and industry standards organizations, to enable next-generation digital transformation."[31]

24.   Arm is a corporation organized under the laws of the United Kingdom and has its principal place of business in Cambridge, United Kingdom.[32] Arm is a Nasdaq stock market registrant and files periodic and other reporting as a foreign private issuer, pursuant to Section 13 of the Exchange Act.[33]  In Arm's annual report for the year ending March 31, 2024, it describes itself as "the industry leader in the design of CPUs for semiconductor chips. The CPU is the brain chip, and we architect, develop, and license high-performance, low-cost, and energy-efficient CPU products and related technology, on which many of the world's leading semiconductor companies and OEMs rely to develop their products."[34]

25.   The current operative QC ALA was entered into on May 30, 2013 [35] and licensed Qualcomm to develop and sell custom-designed CPUs that are compatible with Arm's Instruction Set Architecture ("ISA").[36]

26.   On March 15, 2021, Qualcomm issued a press note that it had completed the acquisition of Nuvia Inc. ("Nuvia"),[37] which it had previously disclosed via Form 8-K with the SEC on January 12, 2021.[38]  The press note described Nuvia as a "world-class CPU and technology design company."[39] At the time of the acquisition, Nuvia held an architecture license agreement with Arm ("the Nuvia ALA").[40]

## B.  Breach Letter

27.   On October 22, 2024, Arm served Qualcomm the Breach Letter.[41]  The first paragraph of the Breach Letter stated:

"████████████████████████████████████████
████████████████████████████████████████

---

[31] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 6.
[32] Arm Holdings PLC, Form 20-F, for the year ended March 31, 2025, p. 1.
[33] Arm Holdings PLC, Form 20-F, for the year ended March 31, 2025, p. 2.
[34] Arm Holdings PLC Financial Statements for year ended as of March 31, 2024, p. 1.
[35] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 21.
[36] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, pp. 3-4.
[37] Qualcomm Press Announcement, March 15, 2021. https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia
[38] Qualcomm Inc., Form 8-K, January 12, 2021.
[39] Qualcomm Press Announcement, March 15, 2021. https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia .
[40] Complaint, Arm LTD v. Qualcomm Inc., et.al, August 31, 2022, pp. 5-7.
[41] The Breach Letter, October 22, 2024.

REBUTTAL REPORT OF STEVEN RICHARDS                                      Page | 7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



29. The Bloomberg Article stated that Arm had given Qualcomm "a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a document seen by Bloomberg. The contract allows Qualcomm to create its own chips based on standards owned by Arm."[44]

30. On January 8, 2025, Arm notified Qualcomm that it was withdrawing its notice of breach as per the Breach Letter.[45]

## C. Background to the Dispute

31. On August 31, 2022, Arm filed a complaint against Qualcomm in the United States District Court for the District of Delaware ("the Arm Complaint").[46] Arm alleged that Qualcomm and Nuvia breached the terms of the Nuvia ALA by failing to comply with the termination provisions of that agreement.[47]

32. On September 30, 2022, Qualcomm filed its answer to the Arm Complaint and its counterclaim.[48] Qualcomm subsequently filed two amended counterclaims on October 26, 2022, and March 22, 2024, seeking declaratory relief and damages.[49] On November 15, 2022, Arm answered Qualcomm and Nuvia's amended counterclaims, asserting that, among other things, Qualcomm breached the QC ALA.[50]

33. On April 18, 2024, Qualcomm filed a separate complaint against Arm in the United States District Court for the District of Delaware alleging that Arm had breached the QC ALA.[51] Qualcomm amended the

---

[42] The Breach Letter, October 22, 2024.

[43] The Breach Letter, October 22, 2024.

[44] Bloomberg, ARM to scrap Qualcomm Chip Design License in Feud Escalation, October 22, 2024.

[45] Qualcomm Inc., Form 10-Q, for the quarter ended December 29, 2024, p. 13.

[46] Complaint, Arm LTD v. Qualcomm Inc., et.al, August 31, 2022, p. 1.

[47] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-23.

[48] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-24.

[49] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-24.

[50] *Arm Ltd. v. Qualcomm Inc. et al.*, No. 22-1146 (MN), Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim, D.I. 21 at 2 ("Qualcomm is not only trying to develop an unlicensed product, but is also materially breaching its ALA with Arm."); 37 ("Qualcomm is materially breaching its ALA, giving Arm the right to terminate . . . ."); 39 ("Arm is entitled to terminate Qualcomm's ALA based on Qualcomm's material breaches . . . ."); 42 (claiming that Qualcomm "materially breach[ed] the [Qualcomm ALA's] terms and implied covenant of good faith and fair dealing . . . entitling Arm to terminate the Qualcomm ALA under Section 14.2").

[51] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. F-24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

April 2024 complaint for a second time on June 3, 2025[52]; this Second Amended Complaint alleges, amongst other things:

a. "Arm's Breach Letter was the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers."[53]

b. "More recently, Arm began 'ratcheting up the pressure' on Qualcomm in *Arm v. Qualcomm*, and Arm continued this misinformation campaign by declaring without basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter. By doing so, Arm has caused tangible harm to Qualcomm's customer relationships."[54]

c. "[S]everal Qualcomm customers have deferred finalizing pending business agreements pending resolution of the *Arm v. Qualcomm* litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products."[55]

d. "[A] major customer (the 'Smartphone Company') … [a]fter learning that Arm was threatening to terminate the QC ALA… informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm. The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm." [56]

e. "[A] potential customer (the 'AI and Ecosystem Company') that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm…[a]fter the Breach Letter was published… stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question. As a result of the uncertainty stemming from Arm's assertion and leak of the

---

[52] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 1.
[53] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 12.
[54] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 42.
[55] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 49.
[56] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 49.

REBUTTAL REPORT OF STEVEN RICHARDS                                    Page | 9

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity."[57]

34. Count IV of the Second Amended Complaint, Intentional Interference with Prospective Economic Advantage, summarizes the above:

    a. "Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above."[58]

    b. "Absent Arm's interference, these relationships would likely result or would have likely resulted in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations. These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship."[59]

    c. "As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm."[60]

35. Further, in Count VI of the Second Amended Complaint, Violations of the California Unfair Competition Law ("UCL"), Qualcomm alleges that:

    a. "Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL. These unfair business acts or practices include . . . repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's customers and prospective customer; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and

---

[57] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 49-50.
[58] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 57.
[59] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 57.
[60] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 58.

REBUTTAL REPORT OF STEVEN RICHARDS                                    Page | 10

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA[.]"[61]

b.  "Arm's actions are part of a broader campaign to harm or threaten to harm competition" by "employing a variety of unfair acts and practices" "includ[ing]" making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of precenting Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores."[62]

c.  "it has suffered or faces the threat of loss of profits, customers, and potential customers," and has "standing to bring this UCL claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct."[63]

## D.  Public Company Disclosure Obligations

### a)  Definition of Materiality in Public Company Disclosure Obligations

36.  This report highlights regulatory requirements for public companies to disclose occurrences classified as "material" under SEC guidelines. The SEC has issued the following guidance on the concept of materiality and disclosure:

a.  SEC Staff Accounting Bulletin No. 99, Materiality states a matter is material "if there is a substantial likelihood that a reasonable person would consider it important."[64]

b.  The SEC's Acting Chief Accountant has referenced the Supreme Court precedent which held that a fact is material if there is, "a substantial likelihood that the … fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[65]

---

[61] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 59.
[62] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC,*, June 03, 2025, p. 60.
[63] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC,*, June 03, 2025, p. 61.
[64] SEC Staff Accounting Bulletin: No 99 – Materiality.
[65] SEC Statement, Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

    c.   The Director of Corporate Finance stated "materiality is not an easily applied litmus test. If there any gray areas — and as disclosure lawyers I would suspect that you more frequently see shades of gray, rather than black and white — the company is likely to include the disclosure in its filing. And why wouldn't you? Why would you take the risk of omitting disclosure that might be material?"[66]

### b)  Form 10-K

37.    Domestic, publicly traded companies are required by law to disclose annual reports which include audited financial statements on Form 10-K.[67] Form 10-K offers a detailed picture of a company's business, the risks it faces, and the operating and financial results for the fiscal year.[68] Companies are prohibited from omitting material information that is needed to make the disclosure not misleading.[69] Company management also discusses its perspective on the business results and what is driving them.[70] Large, accelerated filers must file a Form 10-K within 60 days from the end of the fiscal year.[71] The following sections of Form 10-K are relevant to this report:

#### (1)  Item 1A. Risk Factors

38.    Item 1A requires companies to discuss material factors that make an investment in the registrant or offering speculative or risky under the caption of "Risk Factors."[72] Companies should explain how each risk affects the registrant or the securities being offered.[73]  Risk Factors include information about the most significant risks that apply to the company.[74]  Risk Factors should not be "boilerplate" but should be concise and focused disclosure explaining how each risk affects the company is most useful for investors.[75]

---

[66] SEC Speech, Disclosure Effectiveness: Remarks Before the American Bar Association Business Law Section Spring Meeting, April 11, 2014.
[67] SEC Introduction to Investing Glossary, Form 10-K.
[68] SEC Introduction to Investing Glossary, Form 10-K.
[69] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[70] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[71] SEC Glossary, Form 10-K.
[72] 17 CFR § 229.105 (a) (Item 105) Risk factors, Regulation S-K.
[73] 17 CFR § 229.105 (a) (Item 105) Risk factors, Regulation S-K.
[74] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021, at 1.
[75] SEC Speech, Applying a Principles-Based Approach to Disclosing Complex, Uncertain and Evolving Risks, March 15, 2019.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### (2) Item 3. Legal Proceedings

39.   Item 3 requires companies to describe significant[76] pending lawsuits or other legal proceedings, other than ordinary routine litigation incidental to the business.[77] Information can be cross-referenced to legal proceedings disclosure elsewhere in the document.[78]

### (3) Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

40.   The management's discussion and analysis of financial condition and results of operations ("MDA") provides the company's perspective on the business results of the past fiscal year[79] and "any known trends or uncertainties that could materially affect the company's results."[80]

41.   The MDA must "focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."[81] This includes descriptions and amounts of matters that are reasonably likely based on management's assessment to have a material impact on future operations.[82] The SEC indicates that "reasonably likely" is a lower threshold than "more likely than not" but a higher threshold than "remote."[83] Companies are required to consider whether an event or uncertainty is likely to come to fruition when applying the "reasonably likely" threshold.[84]

42.   A disclosure duty exists where an event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.[85] Further, if management is unable to determine whether an event or uncertainty will come to fruition, but it

---

[76] SEC Investor Bulletin, How to Read a 10-K January 25, 2021.
[77] 17 CFR § 229.103 (a) (Item 103) Legal proceedings, Regulation S-K.
[78] 17 CFR § 229.103 (a) (Item 103) Legal proceedings, Regulation S-K.
[79] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021, at 2.
[80] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021, at 3.
[81] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, p. 182.
[82] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, p. 163.
[83] SEC Financial Reporting Manual, Topic 9, Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), 9200 General Requirements, 9220.11.
[84] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, p. 47.
[85] SEC Interpretive Rule, Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, p. 5.

REBUTTAL REPORT OF STEVEN RICHARDS                                          Page | 13

A0376

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

could significantly impact the company's future results or financial condition, they should disclose it if not doing so would mislead a reasonable investor about the available information.[86]

43. This analysis should be made objectively and with a view to providing investors with a clearer understanding of the potential material consequences of such known forward-looking events or uncertainties.[87]

### (4) Item 8. Financial Statements and Supplementary Data

44. Companies must include audited financial statements in line with US GAAP within the Item 8 section of Form 10-K.[88] This includes the company's income statement, balance sheets, statement of cash flows and statement of stockholders' equity.[89] The financial statements are accompanied by notes that explain the information presented in the financial statements.[90]

#### i. Contingent Liabilities

45. Companies are required to make a disclosure on loss contingencies which are defined as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[91] Pending or threatened litigation is an example of a loss contingency.[92]

46. An estimated loss resulting from a loss contingency should be accrued by a charge to income if information available before the financial statements are issued or are available to be issued indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated.[93] "Probable" means the future event or events are likely to occur.[94]

47. For loss contingencies that are not recorded in the financial statements, a disclosure of the contingency is still required if there is at least a reasonable possibility that a loss or an additional loss may have been incurred, and: a) where an accrual is not made for a loss contingency because the amount cannot be

---

[86] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, pp. 47.

[87] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, p. 47.

[88] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

[89] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

[90] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

[91] FASB ASC. 450-20, Loss Contingencies, Glossary.

[92] FASB ASC. 450-20-05-10, Loss Contingencies, Type of Loss Contingencies.

[93] FASB AC. 450-20-25-2, Loss Contingencies, General Note.

[94] FASB ASC. 450-20, Loss Contingencies, Glossary.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

reasonably estimated or the loss is not probable, or b) an exposure to loss exists in excess of an amount already accrued.[95] "Reasonably possible" means that the chance of the future event or events occurring is more than remote but less than likely.[96] The disclosures are usually made in the notes to the financial statements but in some cases, disclosure may relate to disclosure on the face of the financial statements.[97] The disclosure should include the nature of the contingency and an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made.[98]

       ii.  Subsequent Events

48.  Subsequent events are events or transactions that occur after the balance sheet date but before the financial statements are issued or available to be issued.[99] They can either 1) consists of events or transactions that provide additional evidence about conditions that existed at the date of the balance sheet, or 2) consists of events or transactions that provide evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to that date. [100]

49.  The financial statements submitted in Form 10-K must not be misleading as of the date they are filed with the Commission. [101]  Some subsequent events that did not exist at the date of the balance sheet may be of such a nature that they must be disclosed to keep the financial statements from being misleading.[102] For such events, an entity shall disclose the nature of the event and an estimate of its financial effect, or a statement that such an estimate cannot be made.[103]

### (5)  Item 9A. Disclosure Controls & Procedures

50.  Companies are required to assess and disclose their evaluation of the effectiveness of the company's disclosure controls and procedures. This assessment is typically made as of the end of each quarter.[104] A registered external auditor must attest to the management assertion that internal accounting controls are in place, operational and effective. [105]

---

[95] FASB ASC. 450-20-50-5, Loss Contingencies, Unrecognized Contingencies.
[96] FASB ASC. 450-20, Loss Contingencies, Glossary.
[97] FASB ASC. 450-20-50, Loss Contingencies, General Note.
[98] FASB ASC. 450-20-50-4, Loss Contingencies, Unrecognized Contingencies.
[99] FASB ASC. 855-10-20, Subsequent Events, Glossary.
[100] FASB ASC. 855-10-20, Subsequent Events, Glossary.
[101] FASB ASC. 855-10-S99-2, Subsequent Events, General, SEC Staff Guidance.
[102] FASB ASC. 855-10-50-2, Subsequent Events, Nonrecognized Subsequent Events.
[103] FASB ASC. 855-10-50-2, Subsequent Events, Nonrecognized Subsequent Events.
[104] 17 CFR § 240.13a-15 (b)- Controls and procedures.
[105] Sarbanes-Oxley Act of 2002, § 404(b).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

51. Disclosure controls and procedures are defined as controls and other procedures designed to ensure that information required to be disclosed by the company in its reports is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.[106] Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.[107]

52. Companies must disclose management assessment of the company's internal control over financial reporting in management's annual report.[108] This report should include a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting; an assessment of the effectiveness of the company's internal control over financial reporting as of the end of the most recent fiscal year; and a statement identifying the framework used by management to evaluate the effectiveness of the internal control over financial reporting.[109] Companies must disclose any change in their internal control over financial reporting that occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.[110]

53. Qualcomm filed its Form 10-K for the fiscal year ending September 29, 2024 on November 6, 2024.[111]

c)  Form 10-Q

54. Domestic, publicly traded companies are required by law to file quarterly reports on Form 10-Q.[112] The Form 10-Q includes unaudited interim financial statements and provides a continuing view of the company's financial position during the year. The report must be filed for each of the first three fiscal quarters of the company's fiscal year.[113]

---

[106] 17 CFR § 240.13a-15 (e)- Controls and procedures.
[107] 17 CFR § 240.13a-15 (e)- Controls and procedures.
[108] 17 CFR § 229.308 (a) - (Item 308) Internal control over financial reporting.
[109] 17 CFR § 229.308 (a) - (Item 308) Internal control over financial reporting.
[110] 17 CFR § 229.308 (c) - (Item 308) Internal control over financial reporting.
[111] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 1.
[112] SEC Introduction to Investing Glossary, Form 10-Q.
[113] SEC Introduction to Investing Glossary Form 10-Q.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

55.  Under a Form 10-Q companies must disclose information under topics such as legal proceedings, risk factors, MDA, and disclosure controls and procedures as per the requirements discussed above for Form 10-K.[114]

56.  Unlike Form 10-K, the financial statements and management's disclosure of controls and procedures under Form 10-Q are not required to be audited by independent auditors.[115] [116] Under Form 10-Q, the signing officers for these periodic reports are required to have evaluated the effectiveness of internal controls and indicate whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.[117]

57.  Within Form 10-Q, a company must disclose any material changes in risk factors previously disclosed within its Form 10-K filing for Item 1A Risk Factors.[118]   Further, if there are any material changes in financial condition and results of operations, as well as any changes in performance trends or uncertainties that could materially affect the company from the end of the preceding fiscal year to the date of the quarterly report, they must be disclosed in the Management Discussion and Analysis section in Item 2. [119] With respect to legal proceedings, the matters that must be reported in the 10-Q are matters that first became a reportable event in the quarter or if there have been material developments in a matter.[120] Subsequent Form 10-Q filings in which a legal proceeding or a material development is reported should reference any previous reports from that year that discuss the same legal proceeding.[121]

58.  Qualcomm filed its first Form 10-Q following receipt of the Breach Letter on February 5, 2025 in relation to its first quarter of the 2025 fiscal year.[122]

## E.  Investor Events

59.  Investor events and investor calls (also known as earnings calls or conference calls) allow "publicly traded companies to discuss their performance with investors and analysts"[123]. These are "usually

---

[114] SEC General Instructions, Form 10-Q.
[115] Sarbanes-Oxley Act of 2002, § 404(a)(b).
[116] SEC Financial Reporting Manual, Topic 1 Registrant's Financial Statements, 1110.1 and 1120.
[117] Sarbanes-Oxley Act of 2002, § 302 4(a-d), 6.
[118] SEC General Instructions, Form 10-Q.
[119] SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, pp. 169-170.
[120] SEC General Instructions, Form 10-Q.
[121] SEC General Instructions, Form 10-Q.
[122] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 1.
[123] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

conducted by the chief executive officer ("CEO") and chief financial officer ("CFO")."[124] and other executives.[125] Investor's often "use information from earnings calls to make more informed investment decisions".[126] Companies usually conduct investor calls "immediately following the release of financial results, typically at the end of each quarter. These are known as quarterly earnings results conference calls."[127]

60.  Companies must comply with the SEC's Regulation Fair Disclosure ("Regulation FD") which requires that companies make public rather than selective disclosure of any material nonpublic information.[128] Regulation FD applies to communications where it is reasonably foreseeable that the security holder will trade on the basis of the information.[129] In its guidance on Regulation FD, one of the SEC's suggestions for making a planned disclosure of material information includes holding a conference call in an open manner, permitting investors to listen in either by telephonic means or through internet webcasting.[130] The SEC notes that some types of information or events that should be reviewed carefully to determine whether they are material: (1) earnings information; (2) mergers, acquisitions, tender offers, joint ventures, or changes in assets; (3) new products or discoveries, or developments regarding customers or suppliers (e.g., the acquisition or loss of a contract); (4) changes in control or in management; (5) change in auditors or auditor notification that the issuer may no longer rely on an auditor's audit report; (6) events regarding the issuer's securities; and (7) bankruptcies or receiverships.[131] These events must be assessed for their materiality to inform what is required to be disclosed.[132]

61.  Qualcomm participated in three investor events in the period following receipt of the Breach Letter[133]: Q4 2024 Earnings Conference Call on November 6, 2024[134]; Investor Day 2024: IoT and Automotive Diversification Update on November 19, 2024;[135] and UBS Global Technology and AI Conference on December 4, 2024.[136]

---

[124] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[125] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[126] NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024.
[127] Investopedia, Earnings Conference Call: What it is, How it Works, September 11, 2022.
[128] 17 CFR Part 243.100(a), Regulation Fair Disclosure.
[129] 17 CFR Part 243.100(b)(iv), Regulation Fair Disclosure.
[130] SEC Final Rule: Selective Disclosure and Insider Trading, p. 17.
[131] SEC Final Rule: Selective Disclosure and Insider Trading, p. 9.
[132] SEC Final Rule: Selective Disclosure and Insider Trading, p. 9.
[133] Qualcomm Press Announcement, December 20, 2024.
    https://www.qualcomm.com/news/releases/2024/12/qualcomm-statement-on-trial-verdict-win#:~:text=We%20are%20pleased%20with%20today's,by%20Qualcomm's%20contract%20with%20ARM.
[134] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[135] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[136] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## IV.    Basis for Opinions and Analysis

62.    The Kennedy Report opines that Qualcomm suffered damage due to the Breach Letter and its alleged leak among other allegations posed by Qualcomm.[137] He states:

   a.    "Qualcomm alleges that the Notice Letter was leaked to the media by Arm as an attempt to interfere with Qualcomm's current and potential business relationships"[138]

   b.    "Qualcomm alleges that, as a result of the Notice Letter, as well as the prior communications discussed above, its business with certain customers, including ███ ████████████████ has been impacted."[139]

   c.    "I understand that Qualcomm alleges that due to Arm's leak of the Notice Letter, ███



I have been asked by Qualcomm's counsel to analyze the economic and financial impact to Qualcomm regarding ███████████████████████████████████ prior to Arm's leak of the Notice Letter versus the most recent version of t██████████ ████████ after the leak of the Notice Letter."[140]

63.    The Posner Report opines that "Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm," including "leaking the [Breach Letter]" to "undermine customers' confidence in Qualcomm."[141]

### A.  Qualcomm was required to disclose the Breach Letter within its 2024 Form 10-K regardless of the publication of its contents in the Bloomberg Article.

64.    A Form 10-K is a mandatory annual disclosure for publicly traded domestic companies.[142] It offers " a detailed picture of a company's business, the risks it faces, and the operating and financial results for the fiscal year."[143]  In addition to the information expressly required to be included in a Form 10-K, further

---

[137] Expert Report of Mr. Kennedy, paragraph 68,80, Figure 27.
[138] Expert Report of Mr. Kennedy, paragraph 118.
[139] Expert Report of Mr. Kennedy, paragraph 124.
[140] Expert Report of Mr. Kennedy, paragraph 125.
[141] Expert Report of Mr. Posner, paragraph 65.
[142] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[143] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.

REBUTTAL REPORT OF STEVEN RICHARDS                                    Page | 19

**A0382**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

"material" information (as defined above) should be added to ensure the disclosures are "not misleading."[144] Included within this "material" information are Loss Contingencies, the disclosures for which are governed by Accounting Standards Codification 450-20 ("ASC 450-20"). Companies are required to make a disclosure on contingent losses which are defined as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[145]

65. How a loss contingency is disclosed depends on the probability of the loss occurring and whether the loss can be measured.  ASC 450-20 categorizes levels of probability as 1) **remote** - the chance of the future event or events occurring is slight, 2) **reasonably possible** - the chance of the future event or events occurring is more than remote but less than likely, and 3) **probable** - the future event or events are likely to occur.[146]  The loss can be measured if the amount of loss can be reasonably estimated.[147] Disclosure of the contingency is made if there is "at least a reasonable possibility" that a loss or an additional loss "may have been incurred" and an accrual in the financial statement is not made.[148]

66. Disclosure of a loss contingency arising after the date of an entity's financial statements but before those financial statements are issued, may be necessary to keep the financial statements from being misleading if an accrual is not required.[149] If disclosure is deemed necessary, the financial statements shall include the nature of the loss or loss contingency and an estimate of the amount or range of loss or possible loss or a statement that such an estimate cannot be made.[150]

67. Deposition testimony shows Qualcomm perceived the Breach Letter was a "material business event" and the relevant content states that "[u]nless Qualcomm cures its material breach within 60 days, Arm shall be entitled to immediately terminate the ALA."[151]  The loss contingency related to the Breach Letter was required to be disclosed as the deposition testimony shows Qualcomm perceived that it was reasonably possible that a loss may have been incurred if Qualcomm did not cure the alleged material breach within 60 days. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[144] SEC Form 10-K, General Instructions, p. 2.
[145] FASB ASC. 450-20, Loss Contingencies, Glossary.
[146] FASB ASC. 450-20, Loss Contingencies, Glossary.
[147] FASB ASC. 450-20-25-2b, Loss Contingencies, Recognition.
[148] FASB ASC. 450-20-50-3, Loss Contingencies, Disclosure, Unrecognized Contingencies.
[149] FASB ASC. 450-20-50-9, Loss Contingencies, Losses Arising After the Date of the Financial Statements.
[150] FASB ASC. 450-20-50-9, Loss Contingencies, Losses Arising After the Date of the Financial Statements.
[151]  The Breach Letter, October 22, 2024.
[152] ████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ .″[153]

68. Based on my review of the relevant accounting standards, depositions and related documents, as well as experience in evaluating such disclosures, Qualcomm was required to disclose the Breach Letter in the 2024 Form 10-K as Qualcomm determined that it was reasonably possible that a material loss contingency may have been incurred related to the potential termination of the QC ALA. Qualcomm would have been obliged to make this disclosure irrespective of the reporting of the contents of the Breach Letter within the Bloomberg Article.

## B. Qualcomm's public disclosures do not convey the significant harm resulting from the Breach Letter as alleged in the Second Amended Complaint.

### a) Qualcomm's Allegations in the Second Amended Complaint

69. In its Second Amended Complaint, Qualcomm alleges that:

    a.   "Absent Arm's interference, these relationships [Smartphone Company and AI and Ecosystem Company] would likely result or would have likely resulted in profitable business opportunities for Qualcomm... These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship."[154]

    b.   "As a result of that conduct, these relationships have in fact been disrupted. The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a substitute contract with Arm instead, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional

---

[153] ████████████████████████████████████████

[154] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 56.

REBUTTAL REPORT OF STEVEN RICHARDS                           Page | 21

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

assurances. As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm."[155]

c.    "Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL.  These unfair business acts or practices include . . . repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's current and prospective customers; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA." [156]

d.    "Arm's actions are part of a broader campaign to harm or threaten to harm competition" by "employing a variety of unfair acts and practices" "includ[ing]" making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of preventing Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores." [157]

e.    "[I]t has suffered or faces the threat of loss of profits, customers, and potential customers," and has "standing to bring this [UCL] claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct."[158]

---

[155] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 58.
[156] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 59-60.
[157] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 60.
[158] Second Amended Complaint, *Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC*, June 03, 2025, p. 61.

REBUTTAL REPORT OF STEVEN RICHARDS                                                    Page | 22

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

    **b) Disclosure in Qualcomm's 2024 Form 10-K following the receipt of the Breach Letter**

70.    As mentioned above, a Form 10-K is a mandatory annual disclosure for publicly traded domestic companies.[159] It offers " a detailed picture of a company's business, the risks it faces, and the operating and financial results for the fiscal year."[160]  In addition to the information expressly required to be included in a Form 10-K, further "material" information (as defined above) should be added to make the disclosures "not misleading." [161]

71.    Large, accelerated filers, such as Qualcomm, must file a Form 10-K within 60 days from the end of the fiscal year.[162][163] Qualcomm's first periodic report following the Breach Letter was their 2024 Form 10-K, for the fiscal year ended September 29, 2024, filed on November 6, 2024.[164]

72.    Qualcomm's first public disclosure of the Breach Letter and the only direct reference within its 2024 Form 10-K to the Breach Letter was made under Note 7[165] in line with ASC 450-20 as described above:

> "On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA... Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice. We disagree with Arm's allegations, including that we are in breach of the Qualcomm ALA."[166]

73.    Qualcomm disclosed in the Consolidated Financial Statements filed in its 2024 Form 10-K within Note 1. Significant Accounting Policies – Legal and Regulatory Proceedings that, "if there is at least a reasonable possibility that a material loss may have been incurred associated with pending legal and regulatory proceedings, we disclose such fact..."[167]

74.    Beyond creating a contingency as described in Note 7, two of Qualcomm's employees characterized the Breach Letter in deposition as a "material business event"[168] and "risk factor."[169] ████████████ ██████████████████████████████████████████████████████████

---

[159] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[160] SEC Investor Bulletin, How to Read a 10-K, January 25, 2021.
[161] SEC Form 10-K, General Instructions, p. 2.
[162] SEC Glossary, Form 10-K.
[163] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 2
[164] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 1.
[165] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. F-23.
[166] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. F-24.
[167] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. F-13.
[168] ██ ████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



171

75.    The Form 10-K requires disclosure of "material pending legal proceedings."[172] Qualcomm references that it describes "certain legal matters" in Note 7 under other topics within its 2024 Form 10-K, including in its disclosures of "Risk Factors" impacting its business.[173]

76.    Qualcomm included risk factors specific to:

a.   Risks Related to our Operating Businesses notes "We derive a significant portion of our revenues from a small number of customers and licensees, and particularly from their sale of premium tier handset devices. If revenues derived from these customers or licensees decrease or the timing of such revenues fluctuates, our business and results of operations could be negatively affected."[174] Within this note, Qualcomm refers to "The loss of any one of our significant customers, a reduction in the purchases of our products by any of these customers or the cancellation of significant purchases by any of these customers, whether due to the use of their own integrated circuit products or our competitors' integrated circuit products, government restrictions, a decline in global, regional or local economic conditions, a decline in consumer demand (or a shift in consumer demand away from new devices in favor of refurbished or secondhand devices), elevated inventory levels at our customers or otherwise, would reduce our revenues and could harm our ability to achieve or sustain expected results of operations. A delay of significant purchases, even if only temporary, would reduce our revenues in the period of the delay."[175]

---

[170] ███████████████████████████████████████████████

[172] 17 CFR § 229.103 (Item 103) Legal proceedings, Regulation S-K.

[173] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, pp. 29-36.

[174] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 18 (emphasis omitted).

[175] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 18.

REBUTTAL REPORT OF STEVEN RICHARDS                    Page | 24

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

      b.   Risks Related to Regulatory and Legal Challenges states "Our business may suffer as a result of adverse rulings in governmental investigations or proceedings or other legal proceedings."[176] Within this note Qualcomm states "We have been in the past and currently are subject to various governmental investigations and/or legal proceedings. Certain of these matters are described in this Annual Report in 'Notes to Consolidated Financial Statements, Note 7. Commitments and Contingencies'… Unfavorable resolutions of one or more of these matters have had and could in the future have a material adverse effect on our business, revenues, results of operations, cash flows and financial condition."[177]

      c.   Risks Related to Intellectual Property states: "Claims by other companies that we infringe their intellectual property could adversely affect our business."[178] Within this note Qualcomm states "From time to time, companies have asserted, and may again assert, patent, copyright, trademark or other intellectual property claims against us relating to our technologies or products, including those we have acquired from other companies. These claims have resulted and may again result in our involvement in litigation, and we are currently involved in such litigation, including certain matters described in this Annual Report in "Notes to Consolidated Financial Statements, Note 7. Commitments and Contingencies."[179] It goes on to say "Furthermore, litigation could severely disrupt the supply of our products and the businesses of our chipset customers and their customers, which in turn could harm our relationships with them and could result in a decline in our chipset sales or a reduction in our licensees' sales, causing a corresponding decline in our chipset or licensing revenues. Any claims, regardless of their merit, could be time consuming to address, result in costly litigation, divert the efforts of our technical and management personnel, cause product release or shipment delays and/or damage to our customer relationships, any of which could have an adverse effect on our results of operations and cash flows."[180]

77.    However, these risk factor disclosures were general disclosures that were similarly provided in Qualcomm's SEC filings before and after the Breach Letter, including disclosure after the Breach Letter

---

[176] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 29 (emphasis omitted).
[177] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 29.
[178] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 33 (emphasis omitted).
[179] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 33.
[180] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 34.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

was withdrawn.[181]  Qualcomm does not discuss any incremental material adverse impact stemming from the Breach Letter or its publication by Bloomberg.

78.   Item 3 Legal Proceedings is Qualcomm's opportunity to describe significant[182] pending lawsuits or other legal proceedings, other than ordinary routine litigation incidental to the business in its Form 10-K. [183] Qualcomm's Item 3 cross refers to "Notes to Consolidated Financial Statements, Note 7."[184] As noted above, Note 7 is Qualcomm's first public disclosure of the Breach Letter and no incremental commercial risk anticipated because of the Breach Letter or its publication by Bloomberg is discussed within Note 7.[185]

79.   Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operations, contains the section "Looking Forward."[186] While there is disclosure of potential "material adverse effect on our business, revenues, results of operations, financial condition and cash flows,"[187] as a result of unfavorable resolutions to the legal proceedings described in Note 7,  I observe this statement relates to the fact that  the Arm litigation was due to conclude at the end of the 2024 calendar year and the risk associated with that litigation may materialize in the coming period. It does not discuss any interim incremental adverse impact stemming from the Breach Letter or its publication by Bloomberg.

80.   Qualcomm's 2024 Form10-K Item 9A Controls and Procedures specifically discusses Qualcomm's Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures[188]:

"Under the supervision and with the participation of our management, including our principal executive officer and our principal financial officer, we conducted an evaluation of our disclosure controls and procedures... [and] [b]ased on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report."[189]

---

[181] According to Qualcomm Inc. Form 10-Q, for the quarterly period quarter ended December 29, 2024, the Breach Letter was withdrawn by Arm on January 8, 2025.
[182] SEC Investor Bulletin, How to Read a 10-K January 25, 2021.
[183] 17 CFR § 229.103 (a) (Item 103) Legal proceedings, Regulation S-K.
[184] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 38.
[185] Qualcomm Inc., Form 10-K, for fiscal year ended September 24, 2023, p. F-23.
[186] Qualcomm Inc., Form 10-K, for fiscal year ended September 24, 2023, p. 45.
[187] Qualcomm Inc., Form 10-K, for fiscal year ended September 24, 2023, p. 47.
[188] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 49.
[189] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, p. 49.

REBUTTAL REPORT OF STEVEN RICHARDS                                                        Page | 26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

81. Qualcomm's disclosure controls and procedures were determined to be effective.[190]  However, Qualcomm did not disclose the nature of the material adverse effects resulting from the Breach Letter or its publication in the Bloomberg Article that Qualcomm alleged it suffered in the Second Amended Complaint. Further, Qualcomm was required to, and did, disclose the Breach Letter in its 2024 Form 10-K, and Qualcomm would have been obligated to do so absent the Bloomberg Article.

### c) Discussion of the Breach Letter in Subsequent Investor Events

82. Qualcomm participated in three investor events in the period following receipt of the Breach Letter and the release of the verdict of the Arm Complaint [191]: Q4 2024 Earnings Conference Call on November 6, 2024;[192] Investor Day 2024: IoT and Automotive Diversification Update on November 19, 2024;[193] and UBS Global Technology and AI Conference on December 4, 2024.[194]

83. According to the transcripts of these events available on Qualcomm's website, Qualcomm discussed the Breach Letter in two out of three of these investor events. In both instances the cancellation of the QC ALA was discussed by Qualcomm executives only in response to questions raised by participants and there was no mention of any material adverse impacts on business relationships, despite the analysts' direct questions regarding the stakes and impacted business lines:

> a. During the Q4 2024 Qualcomm Earnings Conference Call, held on the same date the 2024 Form 10-K was filed, November 6, 2024, there was an exchange about the Arm Complaint.  Joe Moore, a Morgan Stanley Analyst, asked, "And then I don't think you mentioned it. Anything you could say about the Arm dispute?  Because that would help us understand what's the stake there."[195] to which Akash Palkhiwala (Qualcomm's Chief Financial Officer and Chief Operating Officer) ("AP") replied, "we have a very broad, well-established license rights…we are very confident that those rights will be affirmed. The trial is scheduled for December, and so we're looking forward to addressing Arm's claims at that point."[196]  There was no other reference to the ongoing legal proceedings with ARM, the cancellation of the QC ALA, or to the Breach Letter having an impact on

---

[190] Qualcomm Inc., Form 10-K, for the fiscal year ended September 29, 2024, p. 49.
[191] Qualcomm Press Announcement, December 20, 2024.
   https://www.qualcomm.com/news/releases/2024/12/qualcomm-statement-on-trial-verdict-win#:~:text=We%20are%20pleased%20with%20today's,by%20Qualcomm's%20contract%20with%20ARM.
[192] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[193] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[194] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.
[195] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024, p. 7.
[196] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024, p. 7.

A0390

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

customer relationships or a potential impact on or creating uncertainty about earnings identified from the transcript.[197]

    b.    At the Qualcomm Investor Day on November 19, 2024, AP responded to a question in relation to Arm potentially cancelling licenses and whether Qualcomm had considered moving to another instruction set architecture ("ISA") by saying, "we have broad rights under the license that we have with ARM for custom design course, and we're very comfortable that those will be affirmed. Trial starts next month."[198] There was no other reference to the ongoing legal proceedings with ARM, the cancellation of the QC ALA, or to the Breach Letter having an impact on business relationships or a potential impact on or creating uncertainty about earnings identified from the transcript. [199] Qualcomm received follow-up questions to clarify whether Qualcomm could move the Oryon core, underpinned by Arm architecture, and use the Nuvia platform on another ISA.[200]

84.    There was no reference to the ongoing legal proceedings with ARM, the cancellation of the QC ALA, the Breach Letter, or the Bloomberg Article in the transcript for the UBS Global Technology and AI Conference held on December 4, 2024.[201]

85.    Qualcomm did not disclose the nature of any material adverse impact resulting from the Breach Letter or its publication in the Bloomberg Article as alleged in the Second Amended Complaint.

### d) Discussion of the Breach Letter in Q1 2025 Form 10-Q and its related Investor Event

86.    Qualcomm's Q1 2025 Form 10-Q for the quarterly period ended December 29, 2024, was the first filing for which underlying performance could have been impacted by the Breach Letter. The Q1 2025 Form 10-Q made no reference to any materialized loss of customers, transactions or increased costs because of the Breach Letter or its publication in the Bloomberg Article as alleged in Qualcomm's Second Amended Complaint.[202] The only reference to the Breach Letter was an update to the "Notes to Condensed Consolidated Financial Statements, Note 5. Commitments and Contingencies – Legal and Regulatory Proceedings" ("Note 5") where it states: "On January 8, 2025 Arm notified us that it was withdrawing its

---

[197] Qualcomm Q4 2024 Earnings Call Transcript, November 06, 2024.
[198] Qualcomm Investor Day 2024 Transcript, November 19, 2024, p. 29.
[199] Qualcomm Investor Day 2024 Transcript, November 19, 2024.
[200] Qualcomm Investor Day 2024 Transcript, November 19, 2024, p. 29.
[201] Qualcomm UBS Global Tech Conference Transcript, December 04, 2024.
[202] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm ALA, while reserving its rights pending the outcome of the ongoing litigation."[203] The Q1 2025 Form 10-Q makes no reference to the Bloomberg Article.[204]

87.   In Item 2. MDA of the Q1 2025 Form 10-Q, when referencing Note 5 Qualcomm states "Litigation is inherently uncertain, and, while we intend to continue to vigorously defend ourselves in such matters, the unfavorable resolution of one or more of these matters could have a material adverse effect on our business, results of operations, financial condition or cash flows."[205]  These general disclosures were similarly provided in 2024 Form 10-K prior to the Breach Letter being withdrawn.

88.   In fact, in the Q1 2025 earnings call on February 5, 2025, Mr. Amon opens the call stating, "In fiscal Q1, we delivered record revenues of $11.7 billion in non-GAAP earnings per share of $3.41."[206]

89.   Later in the same call, Mr. Amon states: "Before I turn the call over to Akash, I would like to provide an update on the Arm versus Qualcomm trial from December 2024. The jury's verdict vindicated Qualcomm's CPU innovations and affirmed the Qualcomm's contract with Arm provides a license for Qualcomm's products containing our proprietary Orion CPUs in industries such as smartphones, automotive, next-generation PCs, IoT, and data center. In addition, Arm recently notified us that it was withdrawing its October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm architecture license agreement. We're excited to continue to develop performance-leading, world-class products that benefit consumers worldwide that include our incredible Orion custom CPUs."[207]

90.   Despite the allegations detailed above that the Breach Letter caused harm, the only reference to it in the 2024 Form 10-K was in Note 7,[208] where it is noted as an update to ongoing litigation, not as a separate material event having an impact on customer relationships or a potential impact on or creating uncertainty about earnings. There are no references in any investor events held by Qualcomm from the receipt of the Breach Letter to the date of its withdrawal as to the Breach Letter or its publication in the Bloomberg

---

[203] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 13.
[204] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024.
[205] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 20.
[206] Qualcomm Q1 2025 Earnings Transcript, February 05, 2025, p. 3; *see also* Qualcomm Q3 2025 Earnings Call Transcript, July 30, 2025, p. 4–6 (Mr. Amon said, "While we are in the early stages of this expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. If successful, we expect revenues to begin in the fiscal '28 timeframe. . .. We have been executing on a product.").
[207] Qualcomm Q1 2025 Earnings Transcript, February 05, 2025, p. 5
[208] Qualcomm Inc., Form 10-K, for fiscal year ended September 29, 2024, pp. F-23–24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Article as having an impact on customer relationships or a potential impact on or creating uncertainty about earnings. In the Q1 2025 Form 10-Q, there is reference to the Breach Letter being withdrawn.[209] There is no reference to the Breach Letter or its publication in the Bloomberg Article having caused or potentially caused any harm to customer relationships since it was received, and there is no reference to it having any potential impact on or creating uncertainty about earnings on future revenue or earnings as alleged in Qualcomm's Second Amended Complaint.

91.    In my experience, if the Breach Letter or its publication in the Bloomberg Article had any or all of the material adverse impact set out in Qualcomm's Second Amended Complaint—i.e., interfering, interrupting or causing delays with Qualcomm's business relationships with the "major customer" or the "large buyer" or sabotaging its business relationships, resulting in actual harm—these impacts would have been mentioned somewhere within Qualcomm's periodic reporting and related investor events, if they were material.  Qualcomm's failure to make any mention of the nature of any adverse or incremental adverse impact on any business relationship because of the Breach Letter or its publication in the Bloomberg Article within in its 2024 Form 10-K, during investor events, investor calls or its first quarter Form10-Q for the 2025 fiscal year[210] suggest to me, based on my experience evaluating these types of disclosures, that Qualcomm did not consider that the Breach Letter or its publication in the Bloomberg Article had a material adverse impact as alleged in Qualcomm's Second Amended Complaint.

## V.    Opinions and Conclusion

92.    It is my opinion that Qualcomm was required to disclose the Breach Letter in the 2024 Form 10-K as it was reasonably possible that a material loss contingency may have been incurred related to the potential termination of Qualcomm's ALA.  Qualcomm would have been obligated to make this disclosure irrespective of the reporting of the contents of the Breach Letter within the Bloomberg Article.

93.    For all the reasons stated above, it is my opinion that the Breach Letter and its publication in the Bloomberg Article did not have the material adverse impact on Qualcomm that Qualcomm described in the Second Amended Complaint, as there was no disclosure whatsoever from receipt of the Breach Letter to Qualcomm's Q1 2025 earnings call on February 5, 2025 that indicates that the Breach Letter or its publication in the Bloomberg Article had any material adverse impact relating to interfering, interrupting or causing delays with Qualcomm's business relationships with the "major customer" or "large buyer" or

---

[209] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 13.
[210] Qualcomm Inc., Form 10-Q, for the quarterly period ended December 29, 2024, p. 1.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

sabotaging its business relationships resulting in actual harm as alleged in the Second Amended Complaint.

## VI.    SIGNATURE AND RIGHT TO MODIFY

94.    My opinions are based upon the information available to me as of the date of this report. It is possible that additional information may affect my opinions herein. I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

*****

Signed this 5th day of September 2025

_____

Steven Richards, CPA

# Exhibit 1



**Expert Report of Steven Richards**
**Exhibit 1 – Steven Richards Curriculum Vitae**

# Steven E. Richards

## Senior Managing Director

2000 K Street NW 12th Floor | Washington, DC 20006



## Contact

| | |
|---|---|
| Main | +1.202.797.1111 |
| Direct | +1.202.507.6941 |
| Mobile | +1.202.412.6685 |

steven.richards@ankura.com

### Education

BA, Accounting, Washington & Jefferson College

### Certifications

Certified Public Accountant

### Affiliations

American Institute of Certified Public Accountants

Pennsylvania Institute of Certified Public Accountants

Association of Securities and Exchange Commission Alumni

Steven Richards is a Senior Managing Director at Ankura in the Washington, DC office. Steven has over 27 years of experience in forensic accounting.

Steven provides a broad range of expert and consulting services involving financial reporting and disclosure, accounting advisory, and auditor liability. He is the Global Business Group Leader for the Risk, Forensic and Compliance practice. He advises law firms, Audit committees, C-Suite Executives and auditors on corporate governance, internal investigations, and audit and regulatory matters, including the assessment of compliance with SEC, PCAOB and other regulatory requirements. He has worked with both public and private companies from start-ups to multinational enterprises.

Prior to joining Ankura in 2016, Steven was a Partner in the Forensic Advisory practice at Deloitte LLP ("Deloitte"), where he conducted numerous internal investigations of SEC registrants and regulated entities. He also served as a Senior Advisory Partner to Deloitte leadership and its Office of General Counsel regarding audit regulation, public policy matters, and regulatory enforcement matters. During his time at Deloitte, Steven provided advice on government, regulatory, and professional matters involving the audit practice, advised on audit regulatory issues involving public policy, inspections, standards, rules, litigation, and enforcement matters involving the Public Company Accounting Oversight Board ("PCAOB"), the Securities and Exchange Commission ("SEC"), and foreign audit and securities regulators.

From 2011 through 2014 Steven was the former Special Advisor to PCAOB Chairman, James Doty, where he was involved in policy and operations for all aspects of PCAOB oversight, including the enforcement program, adjudication proceedings, standard setting, evolution of the domestic and international inspections program, development of the broker-dealer inspection program, and risk analysis.

From 2014 through 2015, Steven was the former Senior Advisor to the PCAOB's Director of the Division of Enforcement and Investigations, including work on all aspects of policy and operations for the Enforcement program, evaluation of investigations to determine if there were violations of professional standards or rules, coordination with other domestic financial regulators, division-wide initiatives, division priorities, and case management.

Steven has served as a former Assistant Chief Accountant at the Securities and Exchange Commission, Division of Enforcement's Office of Chief Accountant from 2004 through 2008. During his tenure at the SEC, Steven performed numerous fraud and financial reporting investigations involving SEC registrants, senior executives, external auditors, and other third parties. Steven routinely assessed a variety of technical accounting, disclosure, and internal control matters, as well as auditor compliance with professional standards, including PCAOB standards, and provided advice on recommendations of enforcement matters under SEC Rules of Practice including Rule 102(e).



Steven E. Richards

Steve worked closely with both the SEC's trial counsel and other law enforcement authorities during the investigation and litigation of high-profile matters.

Before and after his work at the SEC, from April 2002 to May 2004 and from July 2008 to March 2011, Steven worked in the Forensic and Litigation Consulting practice at FTI Consulting, Inc. ("FTI"). During his time at FTI, Steven managed numerous multidisciplinary teams on high-profile matters including one of the largest Ponzi schemes in history. He also performed numerous forensic and internal investigations involving SEC registrants and regulated entities, privately held companies, senior executives, external auditors, and other third parties, including interacting with external auditors and assessed their compliance with professional obligations.

Steven started his career as an auditor at Arthur Andersen LLP, where he performed financial statement audits of both publicly traded and privately held companies in a variety of industries.

In 2018, Steven became a member of the American Institute of Certified Public Accountants ("AICPA") Forensic and Litigation Services Fraud Task Force. The Fraud Task Force provides information to AICPA members regarding fraud detection, investigation, and prevention.

In 2015, Steven was named the Deloitte representative to the Center for Audit Quality ("CAQ") – Anti-Fraud Collaboration ("AFC"). The CAQ's AFC promotes the deterrence and detection of financial reporting fraud through the development of thought leadership, awareness programs, and educational opportunities for the primary participants in the financial reporting supply chain.

**Selected Professional Experience**

Expert/Consultant – SEC Matters

• **Investigation of Percentage of Completion and Expect Cost for Long-Term Defense Contracts – For Aerospace and Defense Multinational –** Retained by counsel of a multinational Aerospace and Defense contractor to perform an internal investigation of the revenue recognition under the percentage of completion method for multi-year multibillion dollar contracts, the related estimate of the cost to complete and the basis of changes to those estimates over time, as well as the related disclosures. Further, evaluated related corporate governance matters. Participated in multiple meetings with the Department of Justice and SEC's Home Office.

• **Investigation of Internal Control Whistleblower Allegations of Internal Audit Director -** Retained by counsel to audit committee of a Latin American financial institution and money transfer entity to perform an internal investigation into whistleblower allegations related to undue pressure on Internal Audit and other internal control circumventions.

• **Investigation of Short seller Allegations of Financial Institution -** Retained by counsel to the audit committee of a Latin American start up financial technology and money transfer entity to perform and internal investigation into allegations related, control and segregation of merchant funds, related party transactions, accuracy and completeness of disclosure, revenue recognition and appropriateness of reporting to safety and soundness regulator.

• **Investigation of Revenue Recognition and Inventory Issues -** Retained by counsel to audit committee of a global mobile technology and accessories company to perform and internal investigation into whistleblower allegations related to sales return reserve accruals and excess and obsolete inventory. Participated in multiple meetings with SEC's Salt Lake City, UT Office.

• **Investigation of Revenue Recognition and Internal Control -** Retained by counsel to start-up mobile technology company to perform and internal investigation into revenue recognition and related governance and internal control issues. Participated in multiple meetings with SEC's Washington, DC Office.

• **Investigation of Revenue Recognition Issues –** Retained by counsel of a large electric utility and distribution company to perform an internal investigation of whistleblower allegations related to estimates in the revenue recognition process and related impacts on internal controls, disclosure and other reporting obligations. Participated in multiple meetings with auditors and the SEC's Boston, MA Office.

• **Investigation of Revenue Recognition Issues -** Retained by counsel for audit committee of pharmaceutical company to perform internal investigation of various revenue recognition practices. Led a team of more than 20 forensic professionals in an internal investigation into allegations of undisclosed relationships, financial reporting, and disclosure violations and the use of an undisclosed affiliate to accelerate revenue recognition and related corporate governance maters. Participated in multiple meetings with SEC's Washington, DC Office.



Steven E. Richards

• **Investigation of Executive Perquisites, Revenue Recognition and Related Party Transactions -** Retained by counsel for company of multinational energy infrastructure manufacturing company to perform internal investigation of whistleblower allegations including executive perquisites, revenue recognition and related party transactions at largest subsidiary post acquisition.  Led a team of more than 20 forensic professionals in an internal investigation into allegations of undisclosed relationships, financial reporting, and disclosure violations and the use of an undisclosed affiliate to accelerate revenue recognition, as well as related corporate governance matters.

• **Investigation of Percentage of Completion and Expect Cost to Construct Energy Facilities –** Retained by counsel to the audit committee of a multinational energy infrastructure company to perform an internal investigation of the construction of several multibillion dollar power plants and the related impact on revenue recognition, loss contracts, the related estimate of the cost to complete and related disclosures. Further, evaluated related corporate governance matters.  Participated in multiple meetings with the SEC's Miami, FL Office.

• **Investigation of Restructuring and non-GAAP measures -** Assisted counsel in the representation of a public global manufacturer in an SEC enforcement inquiry relating to the accounting and disclosure of restructuring cost and non-GAAP measures.  Participated in multiple meetings and presentations to the SEC's Washington, DC Office.

• **Investigation of Revenue Recognition and Related Changes in Estimates -** Retained by counsel for a large energy infrastructure company relating to allegations that there were changes in estimates to complete that had an impact on amount and timing of revenue recognition and total loss recognized on loss contracts.  Supported counsel in interactions with SEC's Washington, DC Office.

• **Investigation of Revenue Recognition and non-GAAP measures -** Assisted counsel in the representation of a public global manufacturer of industrial products in an SEC enforcement inquiry relating to the accounting and disclosure of revenue recognition and non-GAAP measures.  Participated in multiple meetings and presentations to the SEC's Washington, DC Office.

• **Investigation of Revenue Recognition and Disclosure –** Retained by counsel for the audit committee of a public animal health products and pharmaceutical company to perform an internal investigation into whistleblower concerns related to irregularities in revenue recognition, including allegations of channel stuffing and bill-and-hold transactions.  Further, reviewed related corporate governance  matters.  Participated in multiple meetings and presentations to the SEC's Forth Worth, TX Office.

• **Investigation into Structured Financial Instruments –** Retained by counsel for the audit committee of a Fortune 50 financial institution to perform an internal investigation of accounting and reporting issues relating to derivatives, securitizations, and other structured financial instruments. Evaluated related internal controls and corporate governance.  Participated in Congressional hearings, multiple meetings and presentations to the SEC's Washington, DC Office, as well as several other Federal Regulators.

• **Investigation into Perquisites, Related Parties, and Revenue Recognition Issues –** Retained by counsel for that audit committee of a body armor manufacturer to conduct an internal investigation focused on the existence of undisclosed personal expenses of senior management, revenue recognition, and related-party transactions.  Participated in multiple meetings with the SEC's Miami, FL Office.

• **Revenue Recognition and Translation Accounting Expert –** Retained as accounting expert and consultant by counsel in the representation of a Chief Financial Officer for a large multinational manufacturer relating to the accounting for revenue recognition and intercompany loans and related translation adjustments, which was being investigated by and SEC's Philadelphia, PA Office

• **Revenue Recognition and Disclosure Expert –** Assisted counsel in the representation of a Chief Executive Officer of a technology and data measurement company related to whistleblower allegations around revenue recognition, including multiple element arrangements and disclosure issues conducted by the SEC's Washington, DC Office.

• **Revenue Recognition and Gain on Sale Accounting Expert -** Retained as expert and consultant by counsel to assist in the representation of a Chief Executive Officer of a retail brand company in connection with an SEC investigation by SEC's Washington, DC office, as well as the Department of Justice's New York Office.  Evaluated revenue recognition and gain on sale transaction.

• **Revenue Recognition and Inventory Accounting Expert -** Retained as accounting consulting expert by counsel to assist a large technology equipment reseller in connection with an SEC investigation by the Washington, DC office.  Evaluated revenue recognition, sales practices and internal controls as well as inventory transactions and related disclosures.

 • **Investigation of Percentage of Completion and Expect Cost to Construct Energy Facilities –** Retained by counsel to a large energy infrastructure company to assist in an investigation by the SEC's Fort Worth office related to the construction of multibillion-dollar natural gas infrastructure projects.  The issues in question involved revenue recognition and the related estimate of the cost to complete and related disclosures.



Steven E. Richards

## Expert/Consultant – Other Matters

• **Investigation of Ponzi Scheme -** Retained as consulting expert by counsel representing SIPC trustee in the largest ever ponzi scheme of a Registered Investment Advisor. Investigated trading false trading records, determined who knew of the false trading, or should have, evaluated fake compliance records and related process to mislead regulators. Lead team of more than 80 personnel in investigation.

• **Investigation of Executive Perquisites, Insider Transactions and Related Party Issues -** Retained by counsel of a start-up life sciences company to perform internal investigation of whistleblower allegations related to insider perquisites, insider transactions, compensation arrangement, related party transactions and the related internal control and corporate governance.

• **Investigation of Revenue Recognition and Deferred Expense Recognition -** Retained by counsel for that audit committee of a large insurance company focused on whistleblower allegations related to changes in estimates effecting revenue recognition and the deferral of expenses.

• **Investigation of Perquisites and Related Party Transactions –** Retained to assist counsel in an internal investigation related to undisclosed perquisites and related party transactions at a start-up media and content company.

• **Investigation of Inventory Losses –** Retained to assist counsel in an internal investigation related to inventory losses, as well as undisclosed inappropriate personal expenses reimbursement for large national material retailer.

• **Post-Acquisition Accounting Dispute -** Retained as accounting expert by counsel for large multinational technology company in an arbitration involving revenue recognition, impairment and capitalization of costs under US GAAP.

• **Post-Acquisition Accounting Dispute -** Retained as accounting expert by counsel for large multinational chemical and compound manufacture in an arbitration involving the viability of technology assets and related impairment, as well as expense recognition under US GAAP.

## Internal Controls

• **Internal Controls Consulting -** Retained by counsel for energy company to assist with enhancing the company's internal controls, corporate governance and related conclusions surrounding material weaknesses.

• **Internal Controls Consulting –** Retained by counsel to assist multinational energy company in improving its internal controls over estimates to complete construction projects.

• **Internal Controls Consulting –** Retained by counsel to assist mortgage finance company its internal controls over compliance with accounting policy and changes in policy.

## Expert/Consultant - Auditor Liability – Civil Matters

• **Audit Firm Defense Expert for National Audit Firm in Civil Litigation -** Retained as consulting expert by counsel an auditing firm defending a civil lawsuit filed by a former client in the energy industry. Assist in drafting expert report in defense of claims of alleged violations of auditing standards.

• **Audit Firm Defense Expert for National Audit Firm in Civil Litigation –** Retained as consulting expert by an auditing firm defending a lawsuit filed by a former audit client. Expert report and deposition testimony pending.

## Expert/Consultant - Auditor Liability – PCAOB/SEC

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related to the evaluation of a specialist, supervision, evaluation of audit evidence and professional skepticism in the audit revenue recognition and deferred tax assets in the construction industry. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in presentations to PCAOB enforcement staff. Matter closed after Statement of Position.

• **PCAOB Auditor Investigation -** Retained as an accounting/audit expert and consultant by foreign audit firm in connection with a PCAOB investigation related to supervision, sampling, work of another auditor, evaluation of audit evidence and professional skepticism in the audit relating to extrapolated errors, revenue recognition and assessment of internal controls of a telecommunications company. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and made presentation to PCAOB enforcement staff. Assisted in drafting of Statement of Position.



Steven E. Richards

• **PCAOB Auditor Investigation -** Retained as consulting expert by counsel representing senior manager in connection with a PCAOB investigation related to evaluation of alteration of workpapers and related areas of inquiry in the firm's system of quality control.

• **PCAOB Auditor Investigation -** Retained as consulting expert by counsel representing audit firm in connection with a PCAOB investigation related to evaluation of revenue recognition and related areas of inquiry in the firm's system of quality control.

• **PCAOB Auditor Investigation -** Retained as consulting expert by audit firm in connection with a PCAOB investigation related to evaluation of workpaper retention requirement and related quality system of quality control.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related to the supervision of the audit, risk assessment, evaluation of audit evidence and professional skepticism in the audit of loan loss reserves at a financial institution. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related to revenue recognition at a software company. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position. Matter closed after Statement of Position.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for a an audit firm in connection with a PCAOB investigation related to revenue recognition at a software company. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position. Matter closed after Statement of Position.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related the audit of broker-dealer net capital calculation and qualifying assets. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and made presentation to PCAOB enforcement staff. Matter subsequently closed.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related the audit of related party and significant unusual transactions at a Chinese based technology company. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position.

• **SEC Auditor Investigation -** Retained by counsel for auditing firm as a technical accounting and auditing consultant in connection with investigation by the SEC's Washington, DC Office involving revenue recognition issues and compliance with PCAOB Auditing Standards.

• **SEC Auditor Investigation -** Retained as consulting expert by counsel representing regional audit firm in connection with an SEC investigation of Registered Investment Advisor regarding use of a specialist and valuation of securities and related haircuts, as well as related areas of inquiry in the firm's system of quality control.

• **SEC Auditor Investigation -** Retained as consulting expert by counsel representing audit firm in connection with an SEC investigation of national audit firm regarding use the auditing of revenue, as well as related areas of inquiry in the firm's system of quality control.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related the audit of related party transactions and allowance for loan losses at a US based alternative financing company. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting of Statement of Position.

• **PCAOB Auditor Investigation -** Retained as audit/accounting expert and consultant by counsel for an audit firm in connection with a PCAOB investigation related the capitalization of assets for a mining company. Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and assisted in drafting responses to PCAOB inquiries.

Expert/Consultant - Auditor Liability – Independence

• **SEC Auditor Investigation -** Retained as accounting expert and consultant by counsel for an audit firm in connection with an investigation by the SEC's Washington, DC Office involving auditor independence. Participated in meetings and drafting Wells Response. Matter closed with no action.

ankura.com

5



Steven E. Richards

• **PCAOB Auditor Investigation -** Retained by counsel for an audit firm as a technical accounting and auditing consultant in connection with investigations by the PCAOB involving auditor independence and qualifications issues.

• **PCAOB Auditor Investigation -** Retained by counsel for auditing firm as a technical accounting and auditing consultant in connection with investigations by the PCAOB involving auditor independence relating to the firm's system of quality control for former employees obtained financial reporting oversight roles at audit clients.

Expert/Consultant - Auditor Liability – Independent Consultants/Monitor

• **Assisted in Preparation for Independent Monitor –** Retained as consultant by counsel for an audit firm in connection with an SEC Order that required an Independent Consultant to evaluate the audit firm audit methodology relating to several specific areas. Consulted with firm quality control leadership and did a preliminary evaluation of the audit methodology and related system of quality control and identified enhancement in advance of the Independent Consultant. Assist the firm in drafting a report covering enhancements identified and the assessment of the system of quality control.

• **Independent Consultant under and SEC Order –** Retained an Independent Consultant for an audit firm subject to an SEC Order requiring an Independent Consultant to review the audit firm's system of quality control around independence. Evaluated all elements of Independence compliance and issued report to the firm and SEC's Chicago Regional Office identifying enhancements to the firm's system of quality control.

Transactional Tracing

• **Cash Tracing Investigation** - Managed a multidisciplinary investigation team retained by the Securities Investor Protection Act Trustee for the global liquidation of Bernard L. Madoff Investment Securities LLC, one of the largest financial frauds in US history. Oversaw the forensic investigation and data analysis work streams, including the supervision of forensic accountants, economists, market structure experts, and data analysts to identify the flow of funds and related customer account activity.

• **Campaign Finance Matter** – Retained as forensic accounting expert by counsel in connection with an embezzlement investigation related to campaign donations misappropriated by the campaign treasurer and related false campaign finance filings. Participated in meetings with the State Attorney's Office investigators.

• **Cash Tracing Investigation –** Led internal investigation, on behalf of Reinsurance Company, into $80 million fraud relating to misappropriated policy premiums by sub-insurer. The investigation involved tracing significant flows of funds among many different financial institutions and related entities.

• **Intercompany Transaction Tracing -** Retained by counsel as the forensic expert for the Independent Board Members for a communications company in a bankruptcy proceeding in response to potential claims relating to intercompany transactions.

• **Transactional Tracing –** Retained by counsel for registered investment advisor to perform tracing analysis of investor contributions, use of funds and withdrawals.

• **Cash Tracing Investigation –** Retained by counsel for Investment Advisor to perform cash-tracing analyses to identify and summarize sources and uses of funds over a multi-year period.

• **Transactional Tracing -** Retained by counsel for alternative investment fund to perform tracing analysis of investor contributions, use of funds and withdrawals and related rates of returns.

Litigation Engagements - Testified as an Expert at Trial or by Deposition – Last Four Years

• **Deposed as an auditing standards and external audit expert in a State Supreme Court Action (N.Y. Sup Ct., Index No. 160830/2022; 160834/2022; and 160964/2022).** Retained to offer expert opinions and testimony relating to an external auditor's compliance with auditing standards. Further testified as to the responsibilities and related professional obligations of an external auditor with regard to fraud perpetrated by management.

• **Deposed as a financial reporting, disclosure, internal audit and external audit expert in a District Court Action (S.D. of TX, Houston Division, Case No. 4:18-CV-4330).** Retained to offer expert opinions and testimony relating to the revenue and costs for large infrastructure projects under percentage-of-completion accounting, as well as their related disclosure. Further testified to the role of Internal Audit in an enterprise and as it related to financial reporting. Also testified as an expert covering business combinations including subsequent purchase price adjustments. Further testified as to the role and purpose of an audit of financial statements, as well as

**A0401**



Steven E. Richards

auditor's professional standards and related professional obligations with the above subjects.

• **Deposed as an accounting standards expert in a State Supreme Court Action (N.Y. Sup. Ct., Index No. 654977/2022).** Retained to offer expert opinions and testimony relating to capital expenditure reserves and the associated reporting and disclosure of restricted cash balances on financial statements filed with the United States Securities and Exchange Commission. Further testified as to the responsibilities and activities of auditors as they relate to the reporting and disclosure of restricted cash balances.

• **Deposed as a financial reporting and audit expert in a District Court Action (N.D. Ill, Case No. 19-CV-6473).** Retained as an expert covering the roles and responsibilities of management and the auditor relating to the financial statement audit. Further testified as to the purpose of an audit of financial statements. Also testified about the auditor's professional standards and related professional obligations with regard to when an auditor discovers newly identified information not known to them at the time of the audit.

Speaking Engagements

- Ankura Podcast – "High Stakes Investigations: Spotlight on Auditors" (May 7, 2025)
- Securities Docket – Securities Enforcement Forum Central 2024: "Financial Disclosure and Accounting Fraud" (September 24, 2024)
- American Law Institute – Accountant Liability Conference 2023: "Facing Two (or More) Fronts: Responding to Parallel Investigations" (May 17, 2024)
- University of Texas School of Law Government Enforcement Institute: "SEC Developments and Current Priorities" (September 29, 2023)
- Securities Docket – Securities Enforcement Forum Central 2023: "Financial Disclosure and Accounting Fraud" (September 19, 2023)
- American Law Institute – Accountant Liability Conference 2023: "Quality Control and Other Emerging Regulatory Issues" (May 5, 2023)
- American Law Institute – Accountant Liability Conference 2022: "Developing and Executing an Effective Expert Strategy" (June 10, 2022)
- Securities Docket – Securities Enforcement Forum 2022: "Financial Disclosure and Accounting Fraud" (November 15, 2022)
- The Texas Lawbook: "Key Developments in SEC Enforcement" (April 3, 2022)
- Securities Docket – Securities Enforcement Forum 2021: "Financial Disclosure and Accounting Fraud" (November 4, 2021)
- Securities Docket – Webcast: "Securities Enforcement: A Look Back at 2021, and What to Expect in 2022" (February 1, 2021)
- Securities Docket – Webcast: "Securities Enforcement: A Look Back at 2020, and What to Expect in 2021" (January 12, 2021)
- Securities Docket – Securities Enforcement Forum 2020: "Financial Disclosure and Accounting Fraud" (November 4, 2021)
- University of Texas School of Law Government Enforcement Institute: "SEC Developments and Current Priorities" (October 1, 2021)
- Lemme Best Practices (Virtual) – "*The Regulatory Environment for Firms in the Biden Era" (September 9, 2021)*
- Securities Docket – Webcast: "SEC Enforcement: Current Developments and What's Ahead for 2019" (March 1, 2019)
- A Look Back at 2020, and What to Expect in 2021" (January 12, 2021)
- Securities Docket – Webcast: "A Review of SEC Enforcement in 2017 and What's Ahead for 2018" (January 18, 2018)
- Securities Docket – Securities Enforcement Forum West: "Financial and Accounting Fraud" (May 10, 2018)
- Securities Docket – Securities Enforcement Forum 2021: "Financial Disclosure and Accounting Fraud" (October 26, 2017)
- Securities Docket – Webcast: "Today and Tomorrow – Key Developments for 2016 and Expectations for 2017" (January 17, 2017)
- A Review of SEC Enforcement in 2017 and What's Ahead for 2018" (January 18, 2018)
- AICPA Forensic and Valuation Services Conference: "Don't Get Left Behind: New Revenue GAAP Will change All Financial Statements" (November 7, 2018)
- AICPA Forensic and Valuation Services Conference: "Forensic Accounting Evidence – Know Your Audience and the Expectations" (November 7, 2018)
- AICPA Forensic and Valuation Services Conference: "Fraud Scheme: Exposed Behind the Curtain" (November 13, 2017)

Publications

- Accounting Today: "The Regulatory Forecast: Less, and lighter (February 18, 2025)
- Law360: "A New PCAOB Board Sets New Enforcement Practices" (January 27, 2023)
- Bloomberg Tax: "Watergate Era Audit Fraud Rules Face Post- Wells Fargo Revamp" (October 24, 2022)
- Law360: "Expect More Robust PCAOB Enforcement This Year" (February 9, 2022)
- Ankura: "SPACS and Warrant Accounting" (April 20, 2021)
- Law360: "PCAOB Enforcement Activity Likely to Increase in 2021" (February 1, 2021)

ankura.com

7

# Exhibit 2

# Expert Report of Steven Richards
# Exhibit 2 – Documents and Materials Considered

In addition to the documents cited throughout my report, I considered the following documents in preparing my report:

**Accounting Guidance, Authoritative Literature, SEC Guidance and Professional Standards**

- AICPA Code of Conduct
- AICPA Statement on Standards for Forensic Services No. 1
- FASB ASC Topic 450-20, Loss Contingencies
- FASB ASC Topic 855, Subsequent Events
- AU Section 560 Subsequent Events
- AU Section 561 Subsequent Discovery of Facts Existing at the Date of the Auditor's Report
- General Rules and Regulations, Part 230.405, of Securities Act of 1933
- Sarbanes Oxley Act of 2002, Section 404: Management Assessment of Internal Controls
- Sarbanes Oxley Act of 2002, Section 302: Corporate Responsibility for Financial Reports
- SEC Answers, Form 8-K
- SEC Commission, General Rules of Regulation FD
- SEC Commission Rule, Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, December 29, 2003
- SEC Commission Rule, Disclosure in Management's Discussion and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations, February 5, 2003
- SEC Notice, Commission Statement About Management's Discussion and Analysis of Financial Condition and Results of Operations, January 25, 2002.
- SEC Final Rule, Selective Disclosure and Insider Trading, Regulation FD
- SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information
- SEC Final Rule, Disclosure in Management's Discussion and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations
- SEC Financial Reporting Manual, Topic 1 Registrant's Financial Statements,
- SEC Financial Reporting Manual, Topic 9 SEC Financial Reporting Manual, Topic 9, Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), 9100 MD&A Objectives
- SEC Form Summary, Form 8-K
- SEC Frequently Asked Questions, Form 8-K
- SEC General Instructions, Form 8-K
- SEC General Instructions, Form 10-K
- SEC General Instructions, Form 10-Q
- SEC Investor Bulletin, How to Read an 8-K, May 2012
- SEC Investor Bulletin, How to Read a 10-K/10-Q, January 25, 2021
- SEC Investor Bulletin, How to Read a 10-K, September 11, 2011
- SEC Interpretive Rule, Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, May 18, 1989.
- SEC Questions and Answers of General Applicability, Exchange Act Form 8-K, Compliance and Disclosure Interpretations, June 24, 2024
- SEC Questions and Answers of General Applicability, Exchange Act Form 8-K, Compliance and Disclosure Interpretations, November 23, 2004
- SEC Consolidated Compliance and Disclosure Interpretations
- SEC Staff Accounting Bulletin: No. 99 – Materiality

# Expert Report of Steven Richards
## Exhibit 2 – Documents and Materials Considered

- 17 CFR § 229.103 - (Item 103) Risk factors, Regulation S-K.
- 17 CFR § 229.105 - (Item 105) Risk factors, Regulation S-K.
- 17 CFR § 229.307 – (Item 307) Disclosure controls and procedures.
- 17 CFR § 229.308 - (Item 308) Internal control over financial reporting.
- 17 CFR § 230.405 – Definitions of terms.
- 17 CFR § 240.13a-15- Controls and procedures
- 17 CFR Part 243.100, Regulation Fair Disclosure.

**Expert Reports**

- Expert Report of Dr. Patrick F. Kennedy dated August 8, 2025
- Expert Report of Eric E. Posner dated August 8, 2025

**Qualcomm SEC Filings - 8-K**

- Qualcomm, Inc. Form 8-K, March 12, 2018
- Qualcomm, Inc. Form 8-K, January 12, 2021
- Qualcomm, Inc. Form 8-K, November 06, 2024

**Qualcomm SEC Filings - 10-K**

- Qualcomm Inc., Form 10-K, for the year ended September 24, 2023
- Qualcomm Inc., Form 10-K, for the year ended September 29, 2024

**Qualcomm SEC Filings - 10-Q**

- Qualcomm, Inc. Form 10-Q for quarter ended September 25, 2022
- Qualcomm, Inc. Form 10-Q for quarter ended December 25, 2022
- Qualcomm, Inc. Form 10-Q for quarter ended March 26, 2023
- Qualcomm, Inc. Form 10-Q for quarter ended June 25, 2023
- Qualcomm, Inc. Form 10-Q for quarter ended September 24, 2023
- Qualcomm, Inc. Form 10-Q for quarter ended December 24, 2023
- Qualcomm, Inc. Form 10-Q for quarter ended March 24, 2024
- Qualcomm, Inc. Form 10-Q for quarter ended June 23, 2024
- Qualcomm, Inc. Form 10-Q for quarter ended December 29, 2024
- Qualcomm, Inc. Form 10-Q for quarter ended March 30, 2025
- Qualcomm, Inc. Form 10-Q for quarter ended June 29, 2025

**Other SEC Filings**

- Arm Holdings PLC, Form 20-F, for the year ended March 31, 2025
- Arm Holdings PLC, Form 6-K, November 2024
- Qualcomm Inc., Form 8-K, Exhibit 99.1

**Depositions and Related Exhibits**

- Deposition of Cristiano Amon dated July 03, 2025, and Exhibits (1-17)

## Expert Report of Steven Richards
## Exhibit 2 – Documents and Materials Considered

- Deposition of Ann Chaplin dated July 11, 2025, and Exhibits (1-25)
- Deposition of Spencer Collins dated June 30, 2025, and Exhibits (75-92)
- Deposition of Rene Haas dated July 07, 2025, and Exhibits (1-15)
- Deposition of Pavankumar Mulabagal dated July 01, 2025, and Exhibits (1-14)
- Deposition of Kenneth Siegel dated July 04, 2025, and Exhibits (1-14)
- Deposition of Jonathan Weiser dated July 11, 2025, and Exhibits (1-8)

**Complaints and Court Filings**

- Complaint, Arm LTD v. Qualcomm Inc., et.al , August 31, 2022
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 1, p. 1
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 1
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 12
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 18.
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 306.
- Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN) Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim
- First Amended Complaint, Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC, December 16, 2024
- Second Amended Complaint, Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC, June 03, 2025
- Redacted Second Amended Complaint, Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm Holdings PLC, June 03, 2025 (Filed 06/09/25).

**Transcripts**

- Qualcomm Inc Q1 2024 Earnings Call Transcript, January 31, 2024
- Qualcomm Inc Q2 2024 Earnings Call Transcript, May 01, 2024
- Qualcomm Inc Q3 2024 Earnings Call Transcript, July 31, 2024
- Qualcomm Inc Q4 2024 Earnings Call Transcript, November 06, 2024
- Qualcomm Inc Q1 2025 Earnings Call Transcript, February 05, 2025
- Qualcomm Inc Q2 2025 Earnings Call Transcript, April 30, 2025
- Qualcomm Inc Q3 2025 Earnings Call Transcript, July 30, 2025
- Qualcomm Deutsche Bank Technology Conference, August 29, 2024
- Qualcomm Investor Day 2024 Transcript, November 19, 2024
- Qualcomm Inc UBS Global Tech Conference Transcript, December 04, 2024
- Qualcomm at Nasdaq London Investor Conference, June 11, 2025
- Qualcomm Inc at JPMorgan Global Technology, Media and Communications Conference, May 14, 2025
- Qualcomm Inc Annual Shareholders Meeting, March 18, 2025
- Qualcomm Inc at Bernstein Strategic Decisions Conference, May 28, 2025
- Bernstein's 40th Annual Strategic Decisions Conference, May 29, 2024
- Bernstein Annual Strategic Decisions Conference, May 29, 2024

**Other**

- Breach Letter, October 22, 2024

## Expert Report of Steven Richards
## Exhibit 2 – Documents and Materials Considered

- Bloomberg, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation", October 22, 2024
- Bloomberg, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation", October 23, 2024
- NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024
- Investopedia, Earnings Conference Call: What it is, How it Works, September 11, 2022
- Qualcomm Press Announcement, March 15, 2021.
- Qualcomm Press Announcement, December 20, 2024.
- Arm Holdings PLC Financial Statements for year ended as of March 31, 2024
- SEC Introduction to Investing Glossary, Form 10-K.
- SEC Introduction to Investing Glossary, Form 10-Q.
- SEC Speech, Disclosure Effectiveness: Remarks Before the American Bar Association Business Law Section Spring Meeting, April 11, 2014
- Regulation Fair Disclosure and New Insider Trading Rules Fact Sheet, August 10, 2000
- SEC Statement, Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors, March 09, 2022
- SEC Search, Qualcomm Filings Between January 1, 2024 and August 24, 2025
- SEC Speech, Applying a Principles-Based Approach to Disclosing Complex, Uncertain and Evolving Risks, March 15, 2019.
- SEC.gov EDGAR Full Text Search
- SEC.gov EDGAR Qualcomm 10-K and 10-Q Filing Dates

# Exhibit 3

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUALCOMM INC., a Delaware corporation, and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,<br><br>       Plaintiffs,<br><br>   v.<br><br>ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K. corporation,<br><br>       Defendant. | C.A. No. 24-490-MN<br><br>**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY** |

**REBUTTAL EXPERT REPORT OF MICHAEL C. BROGIOLI, PH.D.**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## TABLE OF CONTENTS

**Page**

I.  Introduction ................................................................................................ 1

II.  Qualifications ............................................................................................. 1

III.  Task and Compensation ............................................................................ 5

IV.  Materials Considered ................................................................................ 6

V.  Trial Exhibits ............................................................................................ 6

VI.  Summary of Opinions ............................................................................... 7

VII.  Background ................................................................................................ 8

    A.  Parties .............................................................................................. 8

        1.  Arm ....................................................................................... 8

        2.  Qualcomm ............................................................................. 8

    B.  Litigation ....................................................................................... 11

        1.  The *Arm v. Qualcomm* Dispute ........................................ 11

        2.  The Current Dispute ........................................................... 13

    C.  Qualcomm's Allegations ............................................................... 13

VIII.  Technology Background ........................................................................... 15

    A.  Instruction Set Architectures ........................................................ 16

        1.  What An ISA Is ................................................................... 16

        2.  Why ISAs Are Important ..................................................... 17

        3.  Arm's Instruction Set Architecture .................................... 21

        4.  Non-Arm ISAs ................................................................... 34

    B.  Many Companies Design CPU Cores ........................................... 41

    C.  Many Companies Sell Silicon Chips ............................................ 43

IX.  Relevant Agreements ............................................................................... 44

i

A. ██████████ In Section █ Of The v8 Annex 1 To The ALA ................... 45

    1. ████████████████████ ..................................... 45

    2. ██████████████ ................................................ 50

    3. █████████████ ................................................. 52

    4. ██████████████ ................................................ 53

B. ██████████ In Section █ Of The v9 Annex 1 To The ALA ................... 53

    1. ██████████████████████ ................................ 54

    2. ████████████████████████ .............................. 56

    3. ██████████████ ................................................ 59

    4. █████████ ......................................................... 60

C. How Arm Provides The ██████████ In Section █ Of The v8 And v9 Annex 1s To Partners, Including Qualcomm ................................ 60

**X. The CPU Core Design Verification Process** ...................................... **64**

  A. The Architecture Compliance Kit ...................................... 66

**XI. The Materials And Support That Qualcomm Contends Arm Withheld Were Not Necessary For Qualcomm To Complete The Verification Process** ...... **68**

  A. OOB Packages ...................................................... 71

    1. Contents Of An OOB Package ............................... 72

    2. OOB Packages Are Support Materials And Are Not Necessary For The Architecture Verification Process ...................... 75

  B. ACK Patches ....................................................... 84

    1. ACK Patches Generally ..................................... 85

    2. ACK Patches Are Support Materials And Are Not Necessary For The Architecture Verification Process ...................... 88

  C. ETE Checker Support ............................................... 100

    1. The ETE Trace Function And The ETE Checker .............. 101

ii

    2.    ETE Checker Support, Such As Answering Questions About The ETE Checker, Is Support And Is Not Necessary For The Architecture Verification Process ................................................................ 103

**XII.**    **Qualcomm's Claims of Harm** ................................................................ **110**

    A.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of OOB Packages, ACK Patches, And ETE Checker Support ..... 112

        1.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of OOB Packages ................................... 114

        2.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of ACK Patches .................................... 124

        3.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of ETE Checker Support ...................................... 132

    B.    The Alleged ▇▇▇▇▇▇ To Qualcomm, If Any, Was Due To Qualcomm's Actions, Not Arm's ........................................................ 136

        1.    The Alleged ▇▇▇▇▇ Due To Arm's Alleged Withholding Of OOB Packages, If Any, Was Minimal ........................ 139

        2.    The Alleged ▇▇▇▇▇ Due To Arm's Alleged Withholding Of ACK Patches, If Any, Was Minimal ............................ 147

        3.    The Alleged ▇▇▇▇▇ Due To Arm's Alleged Withholding Of ETE Checker Support, If Any, Was Minimal .............. 151

**XIII.**    **The Phoenix-Based And Pegasus-Based Cores Are Nuvia-Based Cores** ................. **155**

**XIV.**    **Arm's** ▇▇▇▇▇▇ .......................................................... **159**

**XV.**    **Incorrect Technical Assumptions In Mr. Posner's Report** ........................................ **168**

        1.    The Evidence Shows That Arm's Implementation Cores Often Outperform Qualcomm's Custom Cores ................................. 170

        2.    Many Factors Besides the RTL Affect Performance ............................ 174

iii

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## I.      INTRODUCTION

1.      I have been retained as an independent consultant by the law firm of Kirkland & Ellis LLP ("Kirkland" or "Counsel") on behalf of ARM Holdings PLC ("ARM"), Defendant in the above-captioned litigation ("Litigation" or "Present Matter").  I submit this report in response to the expert reports authored by Eric Posner and Patrick Kennedy, which Qualcomm served in this case on August 8, 2025.  I reserve the right to supplement or amend this Report as needed.

2.      My opinions and the bases for my opinions are provided in this Report.  If I am called as a witness in the Litigation, I expect that I will testify at trial regarding the matters expressed in this Report and any supplemental reports or declarations that I may prepare in connection with this investigation.  I expect that I may also testify as to additional matters, including, for example, matters addressed by Qualcomm's experts or by the parties' counsel.

## II.      QUALIFICATIONS

3.      I am currently an Adjunct Professor of Electrical and Computer engineering at Rice University in Houston, Texas, and Managing Director of Polymathic Consulting in Austin, Texas. I received my Bachelor of Electrical Engineering in 1999 from Rensselaer Polytechnic Institute.  I received my Master of Science in Electrical and Computer Engineering in 2003 from Rice University.  I received my Doctorate of Electrical and Computer Engineering in 2007 from Rice University.  Much of the work in my Master of Science and Doctorate involved large scale simulation and modeling of CPU instruction sets, their applicability to various computing workloads, and the design of custom instructions within various ISAs as they targeted new application workloads.  Some of this work also entailed reconfigurable computing, wherein the ISA that was supported by a CPU could change dynamically over time in relation to the application running on the silicon.  My research during the 2003-2007 time frame also involved CPU simulation and design, and the verification that CPU instruction sets and models were compliant

1

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

with physical silicon or existing CPU instruction set simulation models, produced bit-true cycle accurate results with reference designs or ISA specifications, and were able to run compiled applications using off-the-shelf build tools targeted to an existing publicly available ISA.

4.      I am a named inventor on multiple U.S. patents as well as various pending applications.  I have also been a member of the RISC-V technical committee since 2018.

5.      I have held the position of Adjunct Professor at Rice University since 2009, and the position of Managing Director at Polymathic Consulting since 2011.  At Rice University, I instruct graduate level curricula in the areas of embedded and low-power computing, hardware and software systems and real time computing.  I also advise on university research and various design initiatives, including those in low power computing, including various CPU architectures and ISAs, and their application in various areas of computing.  At various points this curriculum has involved analysis of Arm architecture devices, and employees of Arm giving presentations to students relating to the Arm ISA, ecosystem and developer tools.  At Polymathic Consulting, I work with a range of technologists from early stage start-ups to Fortune 500 companies on similar technologies including, but not limited to, intellectual property.  From November 2009 to October 2011, I was Chief Architect, Senior Member Technical Staff at Freescale Semiconductor in Austin, TX (formerly Motorola), responsible for management of technology, engineering roadmaps, design lead on software infrastructure and next generation microprocessor architectures for embedded computing.  This work included ISA design for our custom proprietary CPU architectures, as well as development tools targeting Arm devices that it sold and supported.  These included digital signal processing systems, heterogeneous system on chip architectures, and low power devices.  From 2008 to 2009, I was Senior Engineer working in high performance compiler

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

design and next generation microprocessor and next generation microprocessor architecture at Freescale Semiconductor in Austin, TX.

6.      From June 2006 to August 2007, I worked as the Technical Co-Founder of Method Seven LLC, in Boston, MA, working with high performance software and hardware systems architecture. I am currently a co-founder, co-inventor, and Chief Technology Officer of Network Native, an Internet of Things technology company.

7.      I have previously worked for Texas Instruments' Advanced Architecture and Chip Technology division in Houston, Texas in the areas of high performance mobile and low-power embedded systems design, at the hardware and systems software level specifically around heterogeneous computing, and high speed bus and interconnect technologies. I also have worked at Intel Corporation's Microprocessor Research Labs in the areas of computer architecture and compiler technologies.

8.      In the late 1990s, I was a hardware and software developer at Vicarious Visions in New York, developing third-party titles for Nintendo's handheld consoles, in addition to various peripheral technologies. This role specifically focused around battery operated, portable, low power computing hardware and software systems. During my career, I have served as Chief Technology Officer, often in co-founding roles.

9.      While at Rice University, I developed various computer architecture designs for embedded systems and microcontroller based SoC architectures and peripherals. For example, from 2002 to 2004, I developed Spinach, a simulator design toolset for modeling programmable network interface architectures, which models system components common to all programmable computing environments as well as components specific to embedded. From 2004 to 2009, I developed Spinach DSP-FPGA, a modular and composable simulator design infrastructure for

3

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

programmable and reconfigurable embedded SOC architectures specifically targeting mobile, low power, and embedded and portable computing devices.  From 2005 to 2009, I developed and published a retargetable compiler infrastructure and hardware design space exploration toolkit for systems related to mobile and embedded computing technologies.  Many of these tools have been used at U.S. universities in the area of electrical and computer engineering research.  From 1999 – 2003, I worked in the area of low power dynamic computing, specifically focusing on dynamic power management of hardware components within various low power computer architectures.

10.     I have been recognized in various ways for my achievements and experience as an expert in the field of computer architecture, computer hardware and computer software systems as they relate to the subject matter at hand.  I am a member of the Institute of Electrical and Electronics Engineers (IEEE).  I am currently on the Steering Committee of Design Automation Conference in the areas of Embedded and Wireless Solutions.  I have formerly held the position of Chair within this group.  I have been a Program Committee member for the IEEE and ACM Design Automation Conference from 2011 to the present.

11.     Over the past 20+ years, I have authored approximately 30 peer-reviewed academic publications, as well as engineering books in the area of computer hardware and software design.  Many of these publications involved aspects of CPU instruction sets, how they can be tailed and optimized, and how they related to alternatives such as hardware acceleration vs compiled languages executing on a given CPU core.  A number of these references also discuss how to extract performance from various CPU ISAs when programming CPUs with lower level programming languages, and how to leverage developer tools, software optimization, and the CPU design itself to obtain the best performance for a given set of applications.  These publications are disclosed in my attached curriculum vitae.

4

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

12.    I have previously served as an engineering consultant and testifying witness on matters related to, and including, microcontrollers and related peripherals and interconnects and components common to the technology at hand.

13.    During my time in industry and as a consultant, I have worked extensively on, and submitted opinions on, issues relating to the development and deployment of embedded computing and low power and system management technologies.

14.    I have attached my curriculum vitae as Exhibit 1 to this Report.  It includes the above-listed credentials and additional information on my background and experience, as well as list of cases in which I have served as an expert witness within the past four years.

## III.    TASK AND COMPENSATION

15.    I understand that Qualcomm alleges Arm breached ███████ of the Arm-Qualcomm Architecture License Agreement (ALA), which ████████████████████████████ ██████████████████████████    SAC ¶¶ 13, 78–80, 173–180.  I further understand that Qualcomm's experts, Mr. Posner and Dr. Kennedy, have offered opinions regarding the allegedly withheld verification materials and support that are the alleged cause of the breach.  *See*, *e.g.*, Posner Rpt. ¶ 65; Kennedy Rpt. ¶ 32.  I have been asked by Arm's counsel to provide a technical assessment of these verification materials and support to assist the factfinder in understanding these materials and support that Arm provided to Qualcomm and their purpose, and to respond to Mr. Posner and Mr. Kennedy's opinions relating to the same.

16.    I am being compensated in the above task at my normal and customary rate of $750 per hour for my time working and testifying in this litigation.  I am also being reimbursed for reasonable and customary expenses associated with my work and testimony in this case.

17.    My opinions are objective and my compensation is not contingent on the outcome of this litigation or the specifics of my testimony in any way.

5

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## IV.    MATERIALS CONSIDERED

18.    In forming my opinions, I have considered and may rely upon all documents and information identified in this Report, as well as the documents and information listed in Exhibit 2. I have also used my education and my many years of experience in the field of computer architecture, CPU and System-on-Chip design, CPU ISAs and CPU optimization as well as architecture modeling and verification in forming my opinions expressed in this Report.

19.    I may also consider additional documents and information in forming any necessary opinions, including documents or information that may have not yet been produced in this action or were produced too late to be fully considered before my Report was due.

20.    My analysis of the materials produced in this case is ongoing and I will continue to review any new material as it is provided.  This Report represents only those opinions I have formed to date.  I reserve the right to revise, supplement, and/or amend my opinions stated herein based on new information and on my continuing analysis of the materials already provided.

21.    My opinions that follow are objective, independent, and based on information currently available to me at the time of completion of this Report.  If it may be necessary for me to supplement this Report based on material or information that subsequently comes to light in this case, I reserve the right to do so.  If it may be necessary for me to revise or supplement this Report, or submit a supplemental or responsive report, based upon any evidence Qualcomm may present, on any supplemental or responsive report of Qualcomm, or in light of any relevant orders from the Court or other authoritative body, I reserve the right to do so.

## V.    TRIAL EXHIBITS

22.    At trial, I may rely on visual aids and demonstratives that illustrate the bases for my opinions and assist in explaining the technical subject matter about which I anticipate testifying.  I may use documents referred to in my Report as demonstratives; for example, to

6

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

highlight or call out particular sections of documents, or may create my own demonstratives for use with my testimony.  I may create, for example, slides, illustrations, charts, figures, slides, and the like, or other information that may be helpful in explaining my opinions to the jury.  I may also use, as demonstrative exhibits, compilations of documents referred to in my Report or listed in my list of materials considered, as well as any exhibits to my Report.

## VI.    SUMMARY OF OPINIONS

23.    As explained in this Report, it is my opinion that:

(i)    The materials and support that Qualcomm contends Arm withheld were not necessary for Qualcomm to complete the architecture compliance verification process;

(ii)    Qualcomm alleged "extra" work due to Arm's alleged withholding of support materials was minimal and of a type that is a standard part of the verification process;

(iii)    The ⬛⬛⬛⬛ that Qualcomm contends it was subject to was due to Qualcomm's actions, not Arm's actions;

(iv)    The Phoenix-based and Pegasus-based cores incorporate code developed by Nuvia for its own purposes prior to the Qualcomm acquisition, consistent with industry practice regarding repurposing code;

(v)    The features proposed for ⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ that provide technical solutions for Arm's customers;

(vi)    Mr. Posner and Dr. Kennedy rely on flawed technical assumptions.

7

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## VII.    BACKGROUND

### A.    Parties

#### 1.    Arm

24.    Defendant Arm, headquartered in Cambridge, UK, was founded in 1990 and is a global leader in technology regarding central processing units ("CPUs").[1] Arm develops computer architectures, and is the industry leader in the design of CPUs for semiconductors that implement those architectures.[2] Arm architects, develops, and licenses its high-performance, low-cost, and energy-efficient CPU technology to other companies, primarily by licensing Arm-designed CPU core implementations under what are known as TLAs, while also licensing the architecture itself so that certain companies can design their own custom CPU cores.[3] Arm's architecture and CPU core implementations are used around the world to power datacenters, mobile devices, cars, the Internet of Things (IoT), and many other consumer and commercial applications.[4]

#### 2.    Qualcomm

25.    Plaintiff Qualcomm, headquartered in San Diego, California, is a global technology company that offers semiconductor products for a variety of applications, including mobile, auto,

---

[1]    Arm Holdings plc Annual Report and Consolidated Financial Statements for the year ended 31 March 2024, at 87, available at https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; *see also* https://newsroom.arm.com/blog/arm-official-history.

[2]    Arm Holdings plc Annual Report and Consolidated Financial Statements for the year ended 31 March 2024, at 1, available at https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; *see also* https://www.arm.com/company.

[3]    *Id.*

[4]    *Id.*

8

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

and datacenter, among others.[5]   Qualcomm was founded in 1985 and originally focused on satellite-based communication systems for long-haul trucking, with a product called Omnitracs.[6]

26.     Qualcomm's business has changed and expanded repeatedly since its founding.  In the late 1980s and through the 1990s, Qualcomm's business changed to developing Code Division Multiple Access (CDMA) for cellular phones.[7]   In 2000, Qualcomm changed its business again.  In February 2000, Qualcomm sold its CDMA consumer phone business to a Japanese company called Kyocera.[8]   In March 2000, Qualcomm announced that it was focusing on building "location-enabled mobile devices, including smart phones, PDAs and pagers," by acquiring a company called SnapTrak that was developing so-called Assisted GPS systems for mobile phones.[9]   In the mid-to-late 2000s, Qualcomm introduced the Snapdragon chipset and began providing chipsets for mobile devices.[10]   In 2011, Qualcomm shifted its business again by releasing a platform for Internet of Things technologies.[11]   In the 2010s, Qualcomm began attempting to develop its own custom CPUs intended for data centers.[12]   However, it was reported that Qualcomm's data center efforts were unsuccessful and Qualcomm cut these efforts short based on cost and legal

---

[5]     https://www.qualcomm.com/company

[6]     https://www.qualcomm.com/news/releases/1996/08/national-freight-selects-qualcomms-omnitracs-system-enhance-service-long#:~:text=Headquartered%20in%20San%20Diego%2C%20Qualcomm,(LEO)%20satellite%20communications%20system; https://semiwiki.com/general/7353-a-detailed-history-of-qualcomm/

[7]     https://semiwiki.com/general/7353-a-detailed-history-of-qualcomm/

[8]     https://www.qualcomm.com/news/releases/2000/02/qualcomm-and-kyocera-close-agreement-terrestrial-cdma-phone-business

[9]     https://www.qualcomm.com/news/releases/2000/03/qualcomm-completes-acquisition-wireless-location-leader-snaptrack.

[10]     https://www.qualcomm.com/research/cellphone-unseen-connections

[11]     *Id.*

[12]     https://datacentremagazine.com/technology-and-ai/qualcomms-return-to-the-data-centre-market-explained

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

challenges.[13]  In the 2020s, Qualcomm again shifted its business beyond the Internet of Things by developing chipsets for personal computers and automobiles.[14]  In 2021, Qualcomm shifted its business back to the data center space by acquiring Nuvia, a start-up company that was developing custom CPU cores for data centers under an Architecture License Agreement (ALA) with Arm.[15]  Despite acquiring Nuvia, Qualcomm then again cut its efforts to develop custom data center CPUs in late 2022.[16]  Qualcomm then ███████████████████████████████████████ ████████████[17]  Recently, Qualcomm's CEO, Cristiano Amon testified that ██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████[18]  Qualcomm is also █████████████████████████████████████████ ████████████████████████████████████████████████████.[19]

27.     Presently, Qualcomm licenses Arm's architecture and CPU technology through both an Architecture License Agreement (ALA), under which Qualcomm can develop its own

---

[13]   *Id.*

[14]   https://www.qualcomm.com/news/onq/2025/03/qualcomm-celebrates-40-years-as-an-american-innovator#:~:text=Leveraging%20a%20legacy%20of%20breakthroughs,of%20industrial%20and%20embedded%20IoT.

[15]   https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia

[16]   *See* QCARM_2403478 (IM chain involving Qualcomm engineers mentioning that "Orion" (Nuvia's data-center custom core design) "and its follow-on is canceled," discussing whether Qualcomm could have "made this decision [a] few months back and fund … resources redirected towards Chiplet based on design and still be in Datacenter market?" and Qualcomm's decision "for various reasons to not pursue this option"); Trivedi Dep. Tr. at 36:13–24 ████████████████████████████████████████████████████████████ ████.

[17]   *See* G. Williams Dep. Tr. at 18:15–19:5, 96:21–97:25.

[18]   Amon Dep. Tr. at 69:7–71:6.

[19]   Amon Dep. Tr. at 231:23–232:8

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

custom CPU cores that are compliant with Arm's architecture, and a Technology License Agreement (TLA), under which Qualcomm licenses CPU cores that Arm designs.[20]

### B.    Litigation

28.    I understand that Arm and Qualcomm have been involved in ongoing litigation since August 2022.[21]  I understand that the dispute began approximately around the time that Qualcomm acquired Nuvia, Inc., which, as described above, was a start-up CPU company that was designing a custom CPU core under an ALA between Arm and Nuvia.[22]

### 1.    The *Arm v. Qualcomm* Dispute

29.    I understand that Arm sued Qualcomm on August 31, 2022 (*Arm v. Qualcomm*, Case No. 1:22-cv-01146-MN (D. Del.)), asserting claims for specific performance and trademark infringement against Qualcomm.[23]  I understand that one issue in the *Arm v. Qualcomm* litigation was Qualcomm's use of code from Nuvia's custom CPU core designs that were developed at Nuvia under the Arm-Nuvia ALA prior to Nuvia's acquisition by Qualcomm.[24]  I understand that Arm's position in that case is that Qualcomm could not use code for custom cores that was developed

---

[20]    ARM_00055357 (2013 Arm-QC ALA); ARM_0103918 (2013 Arm-QC TLA).

[21]    Arm Holdings plc Annual Report and Consolidated Financial Statements for the year ended 31 March 2024, at 5, available at https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; *see also* https://www.arm.com/company.

[22]    *Id.*

[23]    *Id.*; *see also Arm Ltd. v. Qualcomm Inc. et al.*, Case No. 1:22-cv-01146-MN (D. Del.), Dkt. 1 (Complaint) at 16–26.

[24]    *Id.*

11

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

under the Nuvia ALA unless Arm consented.[25] I understand that Qualcomm's position in that case is that the Arm-Qualcomm ALA allowed Qualcomm to do so.[26]

30.      I understand that Arm sent a letter to Qualcomm on October 22, 2024 notifying Qualcomm that, among other things, Qualcomm was in material breach of the Arm-Qualcomm ALA based on Qualcomm's use of Nuvia's designs, and that Qualcomm's material breach entitled Arm to terminate the ALA if Qualcomm did not cure the breach within 60 days.[27]

31.      I understand that a trial was held and a jury verdict was reached on December 20, 2024, but that jury verdict was incomplete.[28] Specifically, I understand that the jury concluded that Qualcomm had not breached the Arm-Nuvia ALA and that Qualcomm's custom CPU designs that were based on the Nuvia custom CPU designs were licensed under the Qualcomm ALA.[29] However, I understand that the jury did not reach a conclusion on whether Nuvia had breached the Arm-Nuvia ALA.[30] I understand that the parties have submitted post-trial briefing in that case, and that Arm seeks a retrial of, or judgement in its favor on, all claims in that case.[31]

32.      I further understand that, on January 8, 2025, Arm wrote to Qualcomm and ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[25]   *Id.*

[26]   *Arm Ltd. v. Qualcomm Inc. et al.*, Case No. 1:22-cv-01146-MN (D. Del.), Dkt. 15 (Public version of Qualcomm's Answer) ¶¶ 3, 43.

[27]   Arm's 1st Supp. Resps. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 19–20 (Interrog No. 2).

[28]   *Id.* at 20.

[29]   Verdict Form (Case No. 1:22-cv-01146-MN), December 20, 2024.

[30]   *Id.*

[31]   Arm's 1st Supp. Resps. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 9–10 (Interrog No. 1).

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████    QCVARM_0847182.  I understand that Arm then resumed providing support for the Nuvia-based cores.  *See*, *e.g.*, Grisenthwaite Dep. Tr. at 155:2–7; Weidmann Dep. Tr. at 125:6–126:8.

### 2.    The Current Dispute

33.    I understand that this case, *Qualcomm v. Arm*, Case No. 1:24-cv-00490-MN (D. Del.), concerns claims that Qualcomm has brought against Arm for breach of contract, tortious interference, and unfair competition.[32]  I understand that the operative complaint is Qualcomm's Second Amended Complaint ("SAC"), which Qualcomm filed on June 3, 2025.[33]

### C.    Qualcomm's Allegations

34.    I understand that Qualcomm raises eight counts against Arm in this case.[34]

35.    I understand that Qualcomm's first count claims that Qualcomm is entitled to declaratory judgment that, among other things, Arm breached the Arm-Qualcomm ALA, Qualcomm is entitled to ███████████████ under the Arm-Qualcomm ALA and TLA, Arm breached the Qualcomm TLA, Qualcomm is entitled to ███████ ████████ made pursuant to the TLA, Qualcomm has not breached the Arm-Qualcomm ALA, and Arm is not entitled to terminate the Arm-Qualcomm ALA.[35]

---

[32]    *See generally Qualcomm Inc. et al. v. Arm Holdings Plc., f/k/a Arm Ltd.*, Case No. 1:24-cv-490-MN (D. Del.), Dkt. 137 (Qualcomm's Second Amended Complaint).

[33]    *Id.*

[34]    *Id.*

[35]    *Id.* at 52–53 (Count I).

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

36.    I understand that Qualcomm's second count claims that Arm breached ████████ of the Arm-Qualcomm ALA by allegedly ████████████████████████████ ███████████████████████████ of the ALA.[36]

37.    I understand that Qualcomm's third count claims that Arm breached the implied covenant of good faith and fair dealing in the Arm-Qualcomm ALA and TLA by, among other things, allegedly withholding materials that Qualcomm contends are deliverables, allegedly asserting that Qualcomm breached the Arm-Qualcomm ALA, allegedly disclosing the October 22, 2024 letter to the media, allegedly failing to negotiate an extension of the Arm-Qualcomm ALA, and allegedly failing to provide licensing proposals for certain Arm implementation cores.[37]

38.    I understand that Qualcomm's fourth count claims that Arm intentionally interfered with Qualcomm's prospective economic advantage by, among other things, allegedly disclosing the October 22, 2024 letter to the media.[38]

39.    I understand that Qualcomm's fifth count claims that Arm negligently interfered with Qualcomm's prospective economic advantage by, among other things, allegedly disclosing the October 22, 2024 letter to the media.[39]

40.    I understand that Qualcomm's sixth count claims that Arm violated the California Unfair Competition Law (the "UCL") by, among other things, engaging in conduct that Qualcomm

---

[36]    *Id.* at 54–55 (Count II).

[37]    *Id.* at 55–56 (Count III).

[38]    *Id.* at 56–58 (Count IV).

[39]    *Id.* at 58–59 (Count V).

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

contends constitutes unfair competition, including the alleged withholding of materials that Qualcomm contends are deliverables and the alleged refusal to negotiate license terms.[40]

41.    I understand that Qualcomm's seventh count claims that Arm breached ███ ███ of the Arm-Qualcomm TLA by, among other things, ████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████.[41]

42.    I understand that Qualcomm's eighth count claims that Arm breached ████ of the Arm-Qualcomm TLA by, among other things, ██████████████████████ ███████████████████████████████████████████████████████ ██████.[42]

43.    I understand that Arm denies each and every count in Qualcomm's Second Amended Complaint and has asserted several affirmative defenses.[43]

## VIII.   TECHNOLOGY BACKGROUND

44.    In this section, I provide a high-level overview of what comprises an Instruction Set Architecture (ISA) as well as why the ISA is important for microprocessor designs. I also discuss various ISAs that are commercially available in the market, and relevant aspects of those ISAs.



---

[40]    *Id.* at 59–62 (Count VI).

[41]    *Id.* at 62–63 (Count VII).

[42]    *Id.* at 63–64 (Count VIII).

[43]    *See generally Qualcomm Inc. et al. v. Arm Holdings Plc., f/k/a Arm Ltd.*, Case No. 1:24-cv-490-MN (D. Del.), Dkt. 234 (Arm's Answer to Qualcomm's Second Amended Complaint).

A0427

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

A.    **Instruction Set Architectures**

1.    **What An ISA Is**

45.    In CPU design, an Instruction Set Architecture (ISA) is the formal specification of an interface that exists between software that runs on the computer, and the underlying hardware in the computing system.  Generally speaking, the ISA defines the set of machine (or CPU) level instructions that are available for a CPU to execute.  The ISA also defines, importantly, the format of those instructions.  In relation to the instructions, the ISA will also define the registers that are available within the CPU, which are temporary storage locations that the instructions within the ISA may use to perform.  The various types of memory addressing modes that the CPU can perform will also be embodied within the ISA.  Examples of memory addressing modes are the ability for the CPU to either access local register or the memory system, either via simple LOAD operations, or perhaps more complex LOAD/STORE operations that use various types of offsets, and combinations of registers within the CPU in conjunction immediate values.  Lastly, the ISA will also specify aspects of the overall system behavior in response to Interrupts and Exceptions that may occur in the system.  Examples of Interrupts are things like the pressing of a button on a keyboard, that may cause the CPU to take action in response to this external asynchronous event.  Examples of Exceptions are events that occur internal to the CPU itself, such as a division operation being performed creating a "divide by zero" operation, or an invalid instruction execution.

46.    The ISA serves as the interface between the CPU's hardware implementation and the software environment.  This is important to note, as it is becoming increasingly rare that software developers write software in bare metal Assembly, i.e., using the direct native instructions, that execute on the bare metal of the microprocessor itself.  Rather, modern software development and computing systems often employ Operating Systems (to operate the underlying

16

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

hardware and run applications), and possibly Hypervisors (to perform virtualization).  In addition, modern high level programming languages such as C and C++ (to name a short few) rely on Compilers, Assemblers, Linkers and various other tools to create software executables and applications from these languages.  Each and every one of these technologies are dependent on the ISA.  As such, CPU ISA design factors heavily into how well these system and tools can perform, and their ability to take advantage of the features and functions of the CPU itself.  At the same time, while the ISA defines this interface between the hardware and software, there is often a desirability to maintain compatibility across different implementations of the ISA for a given family of CPUs, even as the ISA evolves over time.

### 2.    Why ISAs Are Important

47.    One very important, and often critical aspect of the ISA, is the instruction set.  The instruction set comprises the instructions that software and programmers can employ to execute functions on the CPU itself and is an embodiment of the set of operations the underlying CPU hardware is capable of directly performing.   These operations are typically comprised of Arithmetic Operations (such as Add or Subtract), Logic Operations (such as logical AND and OR operations), Memory Access Operations (such as Loading and Storing to memory), Control Flow Operations (such as Branching execution from one program location to another), and System Level Operations (such as those related to Task Switching and Interrupt Handling), among others.

48.    In addition to the types of instructions described above, the ISA will also define the register model of the microprocessor.  This comprises the number of registers within the CPU, the size of the registers (8/16/20/32/40/64-bit) and the purpose of those registers (which generally are small, high-speed memory units that temporarily hold information such as data and addresses). The ISA will also mandate certain aspects of the memory, such as the memory model that is used by the CPU which may include the endianness (order of bytes) and also how data is aligned within

17

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the memory. Addressing modes are also part of the ISA. These addressing modes will determine

how operands used by the instructions of the ISA are located. Examples of this may be operands

being directly in registers, such as an ADD operation using two inputs stored in two registers, or

indirectly through memory addresses, such as a LOAD instruction that loads a value from memory

through an address stored in a register. The addressing mode will also detail how immediate values

are handled, as well as various modes of indirect addressing.

49.     The above aspects of the ISA, such as instructions, register model, and memory

model form the expressiveness of the ISA. That is to say, a large and robust ISA provides a broader

and oftentimes more functional ISA that benefits programmers, systems software, and

development tools such as optimizing compilers for high level programming languages,

optimizing assemblers, linkers and the like.

50.     Moving beyond just the instructions that comprise a given ISA, such ISAs will also

define things such as privilege levels, exception handling, aspects of interrupts, and memory

management mechanisms which are required for modern computing devices (note, some of these

may vary for use in very low-end embedded systems). Modern ISAs also oftentimes have

extensions added to them for specialized workloads. Examples of this may be vector or SIMD

operations, such as Arm's NEON ISA extensions, or Intel's AVX extensions. These extensions

are tailored to applications such as multimedia and scientific computing, other extensions may be

tailored to functionality such as security and the like. These types of extensions, too, provide a

consistent programming model, but can allow hardware vendors a way to distinguish and innovate

in their CPU designs.

51.     As one can imagine, as ISAs have evolved over the decades, different philosophies

have developed in terms of overall ISA design. Two prominent design philosophies that have

18

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

emerged over the years are Complex Instruction Set Computing (CISC), and Reduced Instruction Set Computing (RISC). CISC ISAs have historically been characterized by offering a large and diverse set of instructions, most of those instructions often being capable of performing complex operations within a single atomic instruction within the ISA. Examples of CISC ISAs over the years include Intel's x86 architecture, Motorola's 68000 architecture, and Digital Equipment Corporation's VAX architecture. RISC architectures, in contrast, favor a smaller, more uniform set of instructions that oftentimes can be executed in a single, or very few clock cycles. Examples of RISC instruction sets are those from Arm, MIPS, and more recently the RISC-V organization. The distinctions between CISC and RISC are complex and varied, but notable are the trade-offs between the two in terms of power efficiency, aspects of performance, and the overall complexity in silicon design that is required. As such, each of CISC and RISC hold their respective places in certain of embedded systems, low power computing, to mobile and high-performance servers and data centers, though RISC ISAs like Arm continue to be used in broader contexts.

52.    A simple example of an instruction within an ISA would be an arithmetic ADD instruction. The ADD instruction would consume two inputs that comprise two integer numbers to be added together, and produce a third output that is the result of the ADD operation. The values of the two inputs, and the resulting output, would be stored in the registers of the CPU. The ISA's ADD instruction would then be defined as ADD Ra, Rb, Rc, where registers Ra, Rb, and Rc are various registers within the CPU. The instruction would take the value stored in register Ra, add it to the value stored in register Rb, and store the result in register Rc. In practice, a modern CPU will have hundreds, if not thousands, of such types of instructions that comprise its overall ISA.

53.    The ISA will also define things such as memory addressing modes that are available within the microprocessor. Addressing modes are the means by which registers can be accessed,

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

which have varying trade-offs and functionality. One addressing mode would be "Immediate Addressing," whereby the microprocessor can take a given register such as R1, and immediately add the number 5 to it with an Immediate Addressing instruction such as "ADD R1, #5." Register Addressing is another type of common Addressing Mode, whereby instead of adding the constant 5 to register R1, the microprocessor can add the contents of a second register to R1. An example of this would be "ADD R1, R3" whereby the contents of microprocessor register R1 is added to the contents of R3, with the result stored into R1 by overwriting the previous contents of R1. Another variant of Register Addressing is to perform the same ADD operation using three registers instead of two. An example of this would be "ADD R4, R1, R3" in which the contents of registers R1 and R3 are added, but now stored in the result of R4 rather than overwriting R1.

54. Similar to these arithmetic operations, the Addressing Modes are also used to load and store values from locations in memory. Examples of this are Direct (Absolute) Addressing, whereby a LOAD instruction can load the register R1 with the immediate value 1000 such as "LOAD R1, 1000." Other addressing modes such as Indirect Addressing are commonly available whereby the contents of a location in memory pointed to by a register can be loaded into another register for use. An example of this would be "LOAD R1, (R2)" whereby the contents of the memory address stored in register R2 is loaded into register R1. In practice there are a number of variants to these addressing modes that add functionality and complexity to the microprocessor architecture, but also benefit programmers, software developers and development tools writers in creating the best performing system possible.

20

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

### 3. Arm's Instruction Set Architecture

#### a. History of Arm's ISA

55.     Arm has been developing CPU technology for nearly 50 years.[44]  In 1978, Chris Curry and Hermann Hauser started Acorn Computers, a start-up that built the foundation for Arm's modern processor technology.[45]  Acorn secured the rights to build the BBC Micro, which was a UK government initiative that was intended to have every classroom in the UK equipped with a computer.[46]  Part of the work performed by Acorn's founders involved developing the first ever Arm processor, called the ARM1, which was built on Arm's first architecture.[47]

56.     ARM2 quickly followed, with the first product using the ARM2 processor being released in 1986.[48]  The ARM3 processor then followed in 1989 and introduced a 4 KB cache that further enhanced performance.[49]

57.     In November 1990, Arm was officially founded as Advanced RISC Machines Ltd, which was a joint venture that involved Acorn Computers, Apple Computer (now Apple Inc.) and VLSI Technology (now NXP Semiconductors N.V.).[50]  In 1991, Arm introduced the ARM6

---

[44]   *See* https://newsroom.arm.com/blog/arm-official-history; *see also* Arm Holdings Limited Form F-1 (filed with the Securities and Exchange Commission on August 21, 2023) at 3–4 ("Our Journey").

[45]   *Id.*

[46]   *Id.*

[47]   *See* https://newsroom.arm.com/blog/evolution-of-arm-architecture-evolution-40-years#:~:text=In%201987%2C%20Acorn%20Computers%20launched,was%20a%20huge%20commercial%20success.

[48]   *Id.*

[49]   https://en.wikichip.org/wiki/acorn/microarchitectures/arm3; *see also* https://www.techmonitor.ai/technology/acorn_computers_has_high_hopes_for_its_third_generation_risc_with_on_board_cache.

[50]   *See* https://newsroom.arm.com/blog/arm-official-history; *see also* Arm Holdings Limited Form F-1 (filed with the Securities and Exchange Commission on August 21, 2023) at 3–4 ("Our Journey").

21

**A0433**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

architecture that fully supported 32-bit processing and included features like a memory management unit (MMU).[51]

58.    Around 1993, Arm began offering licenses to its cutting-edge processor technology.[52]  Throughout the 1990s and into the 2000s, Arm diversified its product line through Cortex-A (high-performance and efficiency in mobile), Cortex-R (focusing on highly specialized, real-time requirements), and Cortex-M (extremely low-power, low-cost cores for microcontrollers) CPU processors.[53]

59.    In 2005, Arm introduced the ARMv7 version of the architecture, which added multimedia and security features for the next generation of mobile phones.[54]  The advent of smartphones around 2007 further increased demand for high-performance processors that used a low amount of power to maintain a long battery life for the device.  Arm's Cortex-A9 CPU multi-core processor excelled in this area, as did Arm's innovative "big.LITTLE" approach, released in 2011, which combined a powerful core for high-performance with a lower-power core for improved battery life.[55]

60.    Arm publicly announced the Armv8-A version of the Arm architecture in October 2011, which introduced new 64-bit operating capabilities, called AArch64, and defined a

---

[51]    https://en.wikichip.org/wiki/arm_holdings/microarchitectures/arm6

[52]    *See* https://newsroom.arm.com/blog/arm-official-history; *see also* Arm Holdings Limited Form F-1 (filed with the Securities and Exchange Commission on August 21, 2023) at 3–4 ("Our Journey").

[53]    *Id.*

[54]    *See* https://www.allaboutcircuits.com/news/happy-40th-birthday-to-the-arm-architecture/#:~:text=The%20Rise%20of%20ARM%20in%20Mobile%20The,cemented%20its%20role%20in%20the%20mobile%20industry.

[55]    *See* https://newsroom.arm.com/blog/arm-official-history; *see also* Arm Holdings Limited Form F-1 (filed with the Securities and Exchange Commission on August 21, 2023) at 3–4 ("Our Journey").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

relationship to the prior 32-bit operating stated, called AArch32.[56]  On March 30, 2021, Arm publicly announced the Armv9 architecture, which Arm described as being a "response to the global demand for ubiquitous specialized processing with increasingly capable security and artificial intelligence (AI)."[57] ███████████████████████████████████████

███████████ though, as I discuss in more detail in Section XIV below, ████████████████████

██████████████████████████████████████████████████).

### b.    Arm Makes Its ISA Available for Licensing

61.    Arm internally develops and sells designs (including RTL) for Arm-compliant CPU cores to various companies, including Qualcomm.  However, Arm, through Architecture License Agreements (ALAs), also licenses certain companies, including Qualcomm, to design Arm-compliant CPU cores.  In my experience, this practice is unlike other ISA providers.  For example, Intel produces x86-compliant CPU cores but does not allow other companies (other than AMD) to design competing custom CPU cores that use Intel's x86 architecture.

62.    I have seen evidence and testimony from this case that supports my opinion.  For example, Qualcomm's CEO, Cristiano Amon testified that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[56]  https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development#:~:text=ARMv8%2DA%2C%20the%20ARMv8%20A,partners%20as%20products%20are%20introduced; *see also* https://en.wikichip.org/wiki/arm/armv8.

[57]  https://newsroom.arm.com/news/arms-solution-to-the-future-needs-of-ai-security-and-specialized-computing-is-v9.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



██████████████ As another example, Qualcomm's SVP & General Manager for XR and Spatial Computing, Ziad Asghar testified that ██████████████

████████████████████████████████████████████████████████████

██████████████ Mr. Meacham offered similar testimony. Meacham Dep. Tr. at 8:25–9:4, 115:5–116:6. Further, Arm's Chief Architect, Richard Grisenthwaite testified that,

████████████████████████████████████████████████████████████

██

### c.    Arm's ISA Has Many Technical Features and Benefits

63.    Qualcomm's expert, Mr. Posner, opines that "it may not matter much which ISA is used," and has equated the selection of an ISA to having "people agree to drive on the left side or the right side of the road; it is not important which side is chosen as long as everyone agrees on the same side." Posner Rpt. ¶ 22. I disagree.

64.    Arm's ISA has and continues to offer many technical features and benefits, particularly for certain use-cases such as mobile devices. At a high level, it is well understood in the industry that Arm's processor architecture offers security benefits, performance benefits, energy-efficiency and low-heat benefits, scalability benefits, versatility benefits, simplicity benefits, size benefits, and cost benefits as compared with other processor architectures.[58] For example, the Arm ISA has been used in mobile phones for many years. Oftentimes the adaptability of the Arm ISA has allowed for very efficient power consumption by these devices that operate on battery power. Other extensions to the Arm ISA have provided for increased computational

---

[58]    *See, e.g., Arm CPU Architecture: A Foundation for Computing Everywhere*, available at: https://www.arm.com/architecture/cpu#:~:text=Arm%20CPU%20Architecture:%20A%20Foundation,Pervasive%20across%20markets%20and%20locations; *What are Arm-based processors?* Available at: https://cloud.google.com/discover/what-are-arm-based-processors

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

performance by the additional of various SIMD type instructions, targeting mobile or multimedia. Arm processors have also been used in laptop computing type scenarios where a significant amount of computational power is required to run modern operating systems, software, and frameworks. The adaptability of the Arm ISA, in conjunction with the software development tools that target the Arm ISA, has led to its success in various areas of computing for many years.

65.    The industry has recognized the technical features and benefits of Arm's architecture. For example, Google's Cloud business has written about these features and benefits in an article titled, "What are Arm-based processors?"[59]  In this article, Google Cloud describes Arm's architecture as offering many important technical features and benefits including:

- "increased energy efficiency," which Google Cloud described as "[a] fundamental strength of the RISC architecture," and that "translates to reduced operating costs, lower heat dissipation, and the ability to pack more processing power into a given thermal envelope," "smaller size and lower heat generation," which is "particularly beneficial in space-constrained environments and allows for more compact and efficient system designs," "versatile usage3 for different types of technology";

- "increasingly high performance";

- "significant performance per watt, making them a compelling choice for modern, power-conscious computing environments";

- "simpler instructions, which generally execute faster and require less power";

- providing a "streamlined approach" that "leads to lower power consumption because fewer transistors are active during each instruction cycle";

- the ability to "incorporate advanced features such as pipelining (overlapping instruction execution), superscalar execution (executing multiple instructions simultaneously), and sophisticated branch prediction to enhance performance while maintaining energy efficiency";

- "lower" cost and "cost-effectiveness and sustainability due to the processors' power efficiency, without compromising on the scalability and performance required by containerized environments";

---

[59]    ARMQC_02785607 (https://cloud.google.com/discover/what-are-arm-based-processors)

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

- the ability to run "complex operating systems and demanding applications";

- "scalability and adaptability" that allows the Arm architecture "to be implemented across a wide spectrum of devices, from tiny sensors to powerful server CPUs" and makes Arm's architecture "a foundational technology for the increasingly interconnected and diverse computing landscape"; and

- being "attractive for various business applications," including "cloud computing" and "edge computing."[60]

66.    In my opinion and based on my experience designing and working with processors that use a variety of different architectures, I agree that Arm's innovative architecture allows for each of those features and benefits.

67.    Google Cloud also compared Arm-based processors to processors that use Intel's x86 with the following table,[61] which also shows some of the technical benefits of the Arm architecture:

---

[60]    *Id.*

[61]    *Id.*

26

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## How do Arm processors compare?

The landscape of processors includes several key architectures. Here's a comparison highlighting Arm-based processors:

| Feature | Arm-based processors | Intel (X86) processors |
| --- | --- | --- |
| Architecture | RISC (Reduced Instruction Set Computing) | CISC (Complex Instruction Set Computing) |
| Energy efficiency | Generally higher, designed for low power consumption | Historically lower, but improving with newer designs |
| Performance | Progressing rapidly, now competitive in many areas | Historically strong in high-performance computing |
| Cost | Often lower, especially for embedded and mobile applications | Can be higher, particularly for high-end server CPUs |
| Market presence | Dominant in mobile, growing in embedded, IoT, and servers | Dominant in desktop and traditional server markets |
| Instruction set | Simpler, fixed-length instructions | Complex, variable-length instructions |

68. Google Cloud also dispelled several "myths" regarding Arm's architecture as unsubstantiated, including the "Myth" that "Arm is only for low-power mobile devices," the "Myth" that "The software ecosystem for Arm in HPC isn't mature enough," and the "Myth" that "Getting started with Arm for HPC is too complex for students or developers new to the architecture."[62]

69. LinkedIn has similarly written about the features and benefits of Arm's architecture. For example, in an article titled, "How can ARM instruction set architecture improve

---

[62] *Id.*

27

**A0439**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

machine learning applications?,"[63] LinkedIn identified several technical features and benefits of

Arm's architecture, including:

- "simpler and fewer instructions than other architectures, such as x86";

- "low-cost and low-power solutions";

- "support [for] high-performance computing (HPC) and ML applications"; and

- "enhance[d] computational efficiency"

70.     LinkedIn also identified several ways in which the Arm architecture offers technical

features and benefits that are particularly useful for machine learning applications,[64] including:

- "ARM ISA supports ML by providing several features and extensions that optimize the processing of ML workloads. For example, ARM ISA supports vector processing, which allows the processor to perform the same operation on multiple data elements at once, such as adding or multiplying arrays of numbers. This is useful for ML tasks that involve matrix operations, such as neural networks."

- "ARM ISA's Scalable Vector Extension (SVE) … enables the processor to adjust the vector length dynamically according to the data size and the available hardware resources. This improves the flexibility and efficiency of ML applications, as they can adapt to different scenarios and constrains."

- "Features like vector processing and the Scalable Vector Extension (SVE) showcase ARM's commitment to addressing the complex demands of ML workloads."

- "The dynamic adjustment of vector length aligns well with the adaptable nature of ML tasks, offering a versatile solution."

- "ARM's support for ML within its ISA demonstrates a proactive stance in facilitating high-performance computing for modern ML applications."

- Arm's ISA "can improve the performance of ML applications without compromising the energy efficiency."

---

[63]    ARMQC_02785614 (https://www.linkedin.com/advice/0/how-can-arm-instruction-set-architecture-improve-7r3oc#:~:text=from%202%20contributions.-
,1%20What%20is%20ARM%20ISA?,(HPC)%20and%20ML%20applications.&text=The%20ARM%20(Advanced%20RISC%20Machine,in%20their%20machine%20learning%20applications)

[64]    *Id.*

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

- "ARM processors can deliver high performance per watt, which means they can process more data with less power consumption. This is important for ML applications that run on battery-powered devices, such as smartphones or drones, or on large-scale systems, such as data centers or supercomputers, where energy costs are significant."

- Arm's ISA "can enable the scalability of ML applications, as it can support various levels of parallelism and heterogeneity."

- "ARM processors can work in parallel with other processors, such as GPUs or FPGAs, to accelerate ML tasks and distribute the workload."

- "ARM processors can … support different types of cores, such as big and little cores, to balance the performance and efficiency demands of ML applications."

71.    I agree that Arm's innovative architecture allows for each of those features and benefits.

72.    There is further evidence of industry recognition that Arm's processor architecture offers technical benefits.  For example, in February 2024, it was announced that Arm and Neuro, a leading autonomous technology company, entered into a "multi-year collaboration to drive a scalable approach to the commercialization of autonomous vehicles with AI built into their foundations," and "[a]s part of this partnership, Neuro is leveraging the leading-edge Arm® Automotive Enhanced (AE) technology to develop the next generation Nuro Driver$^{TM}$." ARMQC_02720214.

73.    As another example, in April 2024, it was announced that Google Cloud introduced custom Google Axion Processors for general-purpose compute and AI inference workloads based on the Armv9 architecture that "will power instances that deliver up to 60% better energy efficiency and up to 50% more performance than comparable current-generation x86-based instances."  ARMQC_02720220.

74.    As another example, Google announced that the Google Nest Audio smart home speaker "leverages the quad-core Arm Cortex-A53 processor, enabling some processing on-device instead of relying solely on data centers," which "makes it possible for Google Assistant to learn

29

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the most common music commands and respond twice as fast than the original Google Home." ARMQC_02720226; *see also* ARMQC_02720310.

75.    As another example, it has been announced that Google's Fitbit Ace LTE is a "kid-friendly, feature-rich smartwatch" based on Arm's architecture technology, which allows it to "last more than 16 hours on one charge."  ARMQC_02720303.

76.    As another example, in July 2022, it was announced that Arm had partnered with Cruise, the autonomous driving company, to help deliver "the first all-electric, driverless service to welcome public riders in a major US city."  ARMQC_02720230.

77.    As another example, in January 2025, it was announced that Arm had partnered with the Aston Martin Aramco Formula One® Team as part of a "landmark multi-year partnership" in which Arm "join[ed] as the team's Official AI Compute Platform Partner." ARMQC_02720278; ARMQC_02720279.

78.    As another example, Arm has partnered with Meta Platforms, Inc. to support AI technology development.  ARMQC_02720249.  This has included Arm's collaboration with the PyTorch team at Meta on the new ExecuTorch Beta release which "bring[s] AI and machine learning (ML) capabilities to billions of edge devices, as well as millions of developers worldwide."  ARMQC_02720251.  A press release discussing the Arm-Meta partnership for the Llama AI models noted that Arm's technology "ensure[s] that Llama models operate seamlessly and efficiently across hardware platforms" and "enabl[es] optimizations that accelerate Llama model inference significantly."  ARMQC_02720329 at -329–31.

79.    As another example, Arm has partnered with GitHub, a cloud-based platform for software developers, to accelerate and reduce the cost of development of, among other things, ML workflows.                ARMQC_02720258;                ARMQC_02720259;                ARMQC_02720284;

30

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ARMQC_02720291.  According to a February 2025 press release, the "GitHub Copilot increases coding speed by 55% and developer confidence by 85%," and the "Arm extension for GitHub Copilot has been specifically designed to simplify migration to the Arm architecture, reducing development time and costs."  ARMQC_02720284.

80.    As another example, in November 2024, it was announced that Arm had partnered with Panasonic Automotive Systems to "standardiz[e] automotive architecture for Software-Defined Vehicles (SDVs) … to meet the current and future needs for automotive." ARMQC_02720265.  According to the press release, this partnership involved "several key initiatives," including "Utilizing VirtIO-based Unified HMI to standardize zonal architecture," "Ensuring environmental parity from cloud to car," and "Expanding VirtIO Standardization."  *Id.* at -265–66.

81.    As another example, in February 2025, it was announced that the Armv9 edge AI platform, featuring the Arm Cortex-A320 CPU and the Arm Ethos-U85 NPU, could "enabl[e] AI models of over one billion parameters to run on-device" and the platform's Armv9.2 architecture also brought "advanced security features like Pointer Authentication (PAC), Branch Target Authentication (BTI) and Memory Tagging Extension (MTE) to even the smallest Cortex-A devices."  ARMQC_02720292–94.

82.    As another example, in January 2025, it was announced that Arm-based NVIDIA Drive AGX Thor, a centralized compute system, would leverage "the power and advanced capabilities of the Arm compute platform" to "deliver[] the AI capabilities that the next-generation consumer and commercial fleets demand."  ARMQC_02720272.

83.    As another example, it has been announced that Arm has partnered with Simprints, a nonprofit company aiming to provide accurate, affordable solutions for providing biometric

31

**A0443**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

systems for patient identification, to develop a portable scanner that could be used in an offline mode and can securely upload new patient data when connectivity is restored, to assist the approximately 1 billion people on Earth who lack formal proof of identity. ARMQC_02720300.

84.    As another example, it has been announced that Fujitsu chose the Armv9 architecture for its FUJITSU-MONAKA processor "for its combination of adaptable hardware and a unified software ecosystem that supports scalability and customization" and allows Fujitsu to "build flexible, high-performance technology solutions that fuel rapid innovation and adapt to evolving demands." ARMQC_02720315.

85.    As another example, it has been announced that LG chose to build its OLED TVs using Arm's architecture, which allows LG's OLED TVs to "offer a significant leap forward in processing performance and picture quality for DTVs" and to leverage "AI workloads and technologies." ARMQC_02720320.

86.    As another example, it has been announced that Arm and Lotus, a global leader in luxury electric vehicles, have partnered to improve driving safety and innovation by delivering "groundbreaking innovations that prioritize safety while redefining the driving experience for passionate enthusiasts," for which "Arm technology plays a crucial role in the safety of vehicles both for autonomous driving and human driving." ARMQC_02720324. For example, the press release notes that "Arm technology is integral to vehicle safety in both autonomous and human-driven contexts" including because it "enabl[es] systems to detect, diagnose, and mitigate faults effectively" with is "safety-certified IP and software test libraries." *Id.* at -324-26.

87.    As another example, it has been announced that Arm and Rainforest Connection, a non-profit technology startup, have partnered to develop acoustic monitoring systems, called Guardians, that use Arm-powered CPUs and machine learning to detect illegal deforestation and

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

poaching, "act[ing] as ears in the heart of the rainforest," which Arm's architecture allows these systems to "run in AI/ML models both in the cloud and on the devices themselves, adapting in real time to real-world needs," and, in particular, the "Armv9 architecture can extend the power of specialized neural net processing, supporting the Rainforest Connection mission with even more capable tools to protect rainforests – and the health of the planet." ARMQC_02720333 at -333–34.

88.     As another example, Arm has announced that innovators at Beewise, a technology company, have used Arm's architecture to develop robotic beehives (named "Beehomes") to provide a safe haven for bees and offer "limitless flexibility for beekeepers," which has allowed bee mortality rates to "decreas[e] by as much as 80%" because Arm's "state-of-the-art architecture provides robotic brood box management and computer vision-based monitoring while it keeps track of automated honey harvesting, pest control, and thermoregulation." ARMQC_02720337 at -337–339.

89.     As another example, Arm has announced that Mercedes-Benz has chosen to use Arm's architecture technology as "a central piece of the compute of the core in our main partner chips that we're leveraging today" for software-defined vehicles, because Arm's architecture enables "[p]ower-efficient computing [that] is essential to maximizing the range of electric vehicles, reducing mass, and keeping overall vehicle costs low." ARMQC_02720342 at -342–44.

90.     As another example, Arm has announced that Arm's architecture has enabled applied VR platforms in many applications, including "[t]he world's first VR platform designed specifically for healthcare" that "provides patients with an escape from their everyday, as well as the tools that help them build skills for managing their pain." ARMQC_02720347.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

91.     As another example, Arm has announced that Shanghai-based MegaHealth has chosen to use Arm's architecture to power the "MegaRing," which is "a medical pulse oximeter that can be worn on a finger to continuously monitor heart rate and oxygen saturation, and detect changes that might indicate early signs of hypoxemia, or less-than-safe levels of oxygen in the blood," because of the technical benefits of the Arm architecture, including because it "enables SpO2 signal acquisition and algorithm operation."  ARMQC_02720352.

### 4.     Non-Arm ISAs

#### a.     Many ISAs Are Available

92.     There are several non-Arm ISAs in the market, including the RISC-V, MIPS, and Intel x86 ISAs I mentioned above.  Many of these ISAs have seen great success in different areas of computing.  For example, the MIPS ISA was widely used in high power workstations, gaming consoles such as the first Sony PlayStation and various Nintendo systems, as well as computer network switches and routers.  The Intel x86 ISA has been widely successful in the area of desktop computing and laptops, as well as data centers and certain consumer electronics such as various Microsoft Xbox gaming consoles.  The Sun Microsystems SPARC architecture, another RISC architecture design, targeted high performance workstations, the server market, as well as high performance computing and certain telecommunications applications.  As I discuss elsewhere in this report, RISC-V too has shown traction in areas such as embedded computing and Internet of Things applications, as well as microcontroller design to name a few.  These examples are a very select few, as there have been many companies that produce and offer their own CPU ISAs for areas such as high performance computing, embedded systems, multimedia and telecommunications to name a few.

93.     As one can imagine, a certain ISA may be well tailored to a certain type of computing application space, while not being as well suited to others.  For example, an Intel x86

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ISA that is tailored for desktop and high performance computing may not be ideal for ultra low-power edge of network sensing applications. Similarly, a multimedia and digital signal processing ISA that is tailored for video codecs or wireless telecommunications, for example, may not be suited for running Linux or the Microsoft Windows operating system. Companies may choose to design their custom CPUs with these architectures, with each having certain benefits and drawbacks. Both Arm and Qualcomm witnesses agree with my assessment.

94.    Arm's Chief Architect, Richard Grisenthwaite, testified that  As another example, Arm Distinguished Engineer, Michael Williams, testified that,

95.    Arm's SVP of Technology, Peter Greenhalgh testified that

and Arm's Vice President of Partner Success and Licensing, Andrew Howard testified that

Further, Arm's Senior Director of Engineering, Aparajita Bhattacharya testified that

35

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████████

██████████████████████████████████ and Arm's VP of Sales, Lynn Couillard

testified that ████████████████████████████████████████████

███████

96.    Qualcomm's witnesses agree.  For example, Qualcomm's CEO, Cristiano Amon

testified that ████████████████████████████████████



██████████████████ As another example, Qualcomm's SVP & General Manager for XR

and Spatial Computing, Ziad Asghar testified that ███████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████ Further, Richard Meacham,

Qualcomm's Principal Engineer for Automotive CPUs, testified that ███████████████

██████████████████████████████████████████████████████

██████████ and Jean-Francois (Jeff) Vidon also testified that ████████████████████

██████████████████████████████████████

97.    This is consistent with my experience designing and verifying architectural

compliance for CPU cores that used various types of computer architectures.  This testimony is

also consistent with my experience researching and expanding these architectures for new

instructions or implementing the existing architecture and validating it in new environments (*e.g.*,

design simulation from a spec sheet definition of the ISA).

36

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

98.      I have worked on a number of experimental and academic instruction set architectures over the past 20+ years.  For example, I worked on MIPS Technologies' MIPS R4000, a high performance RISC based ISA used in both high-performance workstations and servers, as well as networking and embedded systems.  As another example, I worked on Texas Instruments' TMS3206200 ('C62x) ISA and Texas Instruments' TMS320C6400 ('C64x), which are a fixed-point, Very Long Instruction Word (VLIW) architectures tailored for high performance and power efficiency.  I have also worked on the Freescale/NXP StarCore SC3900 FP, a high performance, flexible vector processor for wireless infrastructure, targeting high performance and low power capabilities.  As another example, I have worked in Intel's Microprocessor Research Labs during the design of Itanium, an Explicitly Parallel instruction Computing (EPIC) architecture, and the relation of the ISA to programming languages and compilation technology. These architectures were often tailored to different application spaces, ranging from embedded devices, wired and wireless digital networking, and multimedia and digital signal processing systems.

99.      I have also instructed, and worked hands on with various Arm based architectures and their CPU ISAs.  This has included both the development of software and applications for these architectures, as well as working on developer tools that target Arm architectures, such as optimizing C and C++ compilers.  I have also worked with various Intel architectures, both during my time at Intel Microprocessor Research labs on the Itanium family of processors, as well as the development of software and applications using the Intel x86 architecture.

### b.      RISC-V

100.     In my opinion, RISC-V is one example of an alternative architecture to the Arm architecture and can be used to create custom CPU core designs.  I am a member of the RISC-V

37

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Foundation Technical Committee and have been since 2018. RISC-V is an open CPU instruction set architecture based on established reduced instruction set computing (RISC) principles.

101.    RISC-V is a technology that can be available as an alternative to the ARM architecture.[65] RISC-V is a free and open standard instruction set architecture that is used in both academic research as well as in industry.[66] RISC-V and its ecosystem can be used as the basis for designing custom CPU architectures for a variety of computing workloads, while also leveraging the RISC-V developer tools ecosystem for the development of software applications and functionality on a given RISC-V implementation.[67] The range of devices that have been designed using RISC-V include microcontrollers, embedded systems, computer hard drives and data center solutions.[68]

102.    Qualcomm has likewise recognized advantages of the RISC-V architecture. For example, in a public 2023 Qualcomm article titled "What is RISC-V, and why we're unlocking its potential," Qualcomm stated that there are "3 main advantages of RISC-V": "[f]lexibility," "[c]ontrol," and "[v]isibility":

> **Flexibility**: RISC-V offers a unique set of features that allow users to customize and optimize both software and hardware for specific use cases, resulting in faster development cycles and better design tradeoffs for performance, power and area.
>
> **Control**: This open ISA provides designers and developers with greater control over their computing environments, allowing them to fine-tune their systems without relying on third parties or incurring additional license fees associated with proprietary architectures.

---

[65] *See* https://riscv.org/about/

[66] *Id.*

[67] *Id.*

[68] *Id.*

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

> **Visibility**:  The open-standard nature of RISC-V also means that developers have more visibility into the codebase, making it easier to understand the roadmap and identify potential security risks before they become an issue.

Asghar Dep. Ex. 6 at 5.

103.    I have seen evidence that Qualcomm is investing in and considering using the RISC-V architecture for its custom CPU core designs.  I have also seen evidence that Qualcomm has considered fully transitioning its custom CPU core development to RISC-V, away from Arm's architecture.

104.    Several Qualcomm witnesses have testified about Qualcomm's RISC-V plans.



105.    As another example, Mr. Meacham testified that

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███    Mr. Meacham also testified that ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████    Further, Mr. Meacham testified ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

106.    As another example, Mr. Asghar testified that ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████    Mr. Asghar also testified that

██████████████████████████████████████████████████████

███████████████████    Mr. Asghar likewise made public statements regarding Qualcomm's view of RISC-V.  For example, in the public 2023 Qualcomm article titled "What is RISC-V, and why we're unlocking its potential," Mr. Asghar stated that "RISC-V makes sense for pretty much all use cases," that "we [Qualcomm] invested in multiple RISC-V based companies" and "have also been integrating these cores into our products since 2019."  Asghar Dep. Ex. 6 at 7–8.

107.    Further, Qualcomm's Senior Vice President and General Manager of Technology Planning and Solutions and Data Center, Durga Malladi testified that ██████████████████

██████████████████████████████████████████████████████

40

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

108.    As another example, Qualcomm's Senior Director, CPU, DSP, Benchmarking, and AI Hardware, Karl Whealton testified that ████████████████████████████████████ ████████████████████████████████████████████████████████  Further, Qualcomm's Director of Sourcing, Kurt Wolf testified that ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

109.    Further, additional Qualcomm documents suggest that Qualcomm is investing in and considering using the RISC-V architecture for its custom CPU core designs.  *See, e.g.*, QCVARM_0537065;  QCVARM_0527125;  QCVARM_0468422;  Asghar  Dep.  Ex.  7; QCVARM_0462995  at  -004–005;  QCVARM_0463559  at  -562;  QCVARM_0449653; QCVARM_0534596; QCVARM_0534597 at -599, -603, -605–606, -609; QCVARM_0571333 at -334,  -337,  338,  -348;  QCVARM_0524775;  QCARM_3522895;  QCVARM_0449658; QCVARM_0608391;        QCVARM_0532239,        QCVARM_0529887        at        -900–902; QCARM_3430479; QCVARM_0537065 at -067–068; Malladi Dep. Exs. 3–4.

110.    This evidence is consistent with my understanding.  In my opinion, RISC-V is an alternative architecture to the Arm architecture and can be used to create custom CPU core designs.

**B.    Many Companies Design CPU Cores**

111.    Arm is not the only company that designs CPU cores.  I am aware of several companies other than Arm that design their own CPU cores.  These companies include Qualcomm, Apple, Intel, AMD, SiFive, Akeana, Rivos, Ventana, Imagination Technologies, and Andes.

41

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

112.    I have seen evidence from this case that demonstrates this point.  For example, Qualcomm's SVP & General Manager for XR and Spatial Computing, Ziad Asghar testified that

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████     As another example, Qualcomm's Principal Engineer for Automotive CPUs, Richard Meacham testified that

███████████████████████████████████████████████████████

██████████████████████████████████████████████     As another  example,  Qualcomm's  Senior  Director  of  Engineering,  Jean-Francois  (Jeff)  Vidon testified that ██████████████████████████████████████████

████████

113.    As noted, Arm licenses its instruction set architecture to companies under ALA agreements that allow those ALA partners to design their own custom CPU cores.  These companies  include  ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

42

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

### C.      Many Companies Sell Silicon Chips

114.     Qualcomm's expert, Mr. Posner, has offered opinions about Arm's attempts to design and sell its own SoCs.  *See*, *e.g.*, Posner Rpt. ¶¶ 44, 64, 67–79, 88. Based on my knowledge of the industry, I am aware of many companies that sell or vertically integrate SoCs, including Qualcomm, Intel, AMD, Apple, Infineon, Renesas, Samsung, MediaTek, Huawei, Texas Instruments, Analog Devices, NXP, and Broadcom.

115.     I have seen evidence from this case that demonstrates this point.  For example, Qualcomm's SVP & General Manager for XR and Spatial Computing, Ziad Asghar testified that

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████     As another example, Qualcomm's Principal Engineer for Automotive CPUs, Richard Meacham testified that ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████     As another example, Qualcomm's Senior Director of Engineering, Jean-Francois (Jeff) Vidon testified that ████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████

43

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## IX.    RELEVANT AGREEMENTS

116.    I understand that one of the agreements at-issue in this case is an Architecture License Agreement (ALA) entered into between Arm Limited and Qualcomm Global Trading PTE., LTD on May 31, 2013.  ARM_00055357.  I am not an attorney and I offer no opinions regarding contract interpretation.  In my understanding, ALAs grant rights to certain Arm technology that ALA partners use to design their own custom CPU cores that are compatible with Arm's ISA.  This contrasts with a Technology License Agreement (TLA), through which a partner obtains a license to a core (including RTL) that Arm designed.

117.    I understand that there are several Annex 1s to the Arm-Qualcomm ALA. Specifically, I understand that there is an Annex 1 for the "Armv8-A Architecture." (ARM_00063298). I further understand that there is an Annex 1 for the "v8 Next Architecture" (QCARM_0338573), and an Annex 1 for the "Armv9-A Architecture" (QCARM_0343954), which states that it shall ███████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████    I understand these Annex 1s provide information regarding the parties' obligations under the ALA with respect to a particular version of Arm's architecture (e.g., the v8-A or the v9-A version).  For example, I understand the ALA defines

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

ARM_00055357 at -357, § 1.3.  The cover of the v8 Annex 1 lists the ████████████

███████████.  ARM_00063298.  The cover of the v8 Next Annex 1 lists the ████████████

███████████████.  QCARM_0338573.  The cover of the v9 Annex 1 lists the █████████

██████████████████.  QCARM_0343954.

44

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

118.    The v8 and v9 Annex 1s each contain a ███████████████████████ ARM_00063298 at -299–300; QCARM_0343954 at -955–57.  These ██████████████ ███████████████████████████████ I provide my technical understanding of each of these technologies below.

**A.**    ██████████████████  **In**  █████████  **Of The v8 Annex 1 To The ALA**

119.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████  ARM_00063298 at -299–300.  ████████████████████████

Qualcomm's corporate representative on its custom core verification efforts, Jignesh Trivedi, testified that ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████.  Trivedi Dep. Tr. at 85:2–19.  I therefore focus my discussion below in the parts listed in ████████████

120.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████  ARM_00063298 at -299–300.

**1.**    ███████████████████████████████████

121.    ████████████████████████████████████████████████

███████████████████████████████████  ARM_00063298 at -299.  This is sometimes referred to as the Arm ARM.  Trivedi Dep. Tr. at 56:3–16.  The Arm ARM is

---

[69]    I understand that ████████████████ is a defined term in the ALA.  I offer no opinions regarding whether technologies are or are not ████████████████ under the terms of the ALA.  My use of the term ███████████ is based on my experience, not any particular contract language.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

available for download on Arm's website.[70]  While I have not reviewed all of the approximately

15,000 pages of the Arm ARM for A-profile architecture, I reviewed it generally and am familiar

with it.  The Arm ARM describes the operation of an Armv8-A and Armv9-A Processing Element

(PE) and includes descriptions of:

- The two Execution states, AArch64 and AArch32;

- The instruction sets;

- The states that determine how a PE operates;

- The Exception model;

- The interprocessing model;

- The memory model;

- The programmers' model;

- The Advanced SIMD and floating-point instructions;

- The security model;

- The virtualization model; and

- The Debug architecture.[71]

122.    The Arm ARM gives the assembler syntax for the instructions it describes, which

means that it describes instructions in textual form.    As Arm's Chief Architect, Richard

Grisenthwaite explained, "[t]he ARM ARM is written as the description of the behavior of an

abstract machine to which the implementations must be compliant, must do the same as that

machine."  11/15/2023 Grisenthwaite Dep. Tr. at 102:12–103:1.  The Arm ARM is referenced by

---

[70]    Arm Architecture Reference Manual for A-profile architecture (Doc No. ARM DDI 0487; issued April 30, 2025), available at https://developer.arm.com/documentation/ddi0487/latest/.  Older versions of the Arm ARM have been produced in this case.  *See*, *e.g.*, QCVARM_0986448, QCVARM_0999388, QCVARM_0973928.

[71]    *Id.*

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Arm and by Arm's ALA partners.  For example, Vivek Agrawal, an Arm engineer in Arm's architecture compliance kit support group, testified that ██████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████  And, Qualcomm's corporate representative on its custom core verification efforts, Jignesh Trivedi, testified that █████████████████████████████

██████████████████████████████  I have seen evidence showing that Arm made the Arm ARM available to Qualcomm.  To start, as I noted above, Arm makes the ARM available to access on its website (subject to limitations on its use, including the need for a license, as set forth in the Arm ARM itself).[73]  Further, the v8 Annex 1 ██████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████  Also, Martin Weidmann, Arm's corporate representative on Arm's provision of materials to Qualcomm, testified that ██████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

---

[72]  I understand that some witnesses have been deposed on multiple occasions—in the *Arm v. Qualcomm* case and in this case.  In this report, all deposition citations are to the depositions taken in this case, unless a date is included in the citation, in which case it is a citation to their deposition from the *Arm v. Qualcomm* case.

[73]  Arm Architecture Reference Manual for A-profile architecture (Doc No. ARM DDI 0487; issued April 30, 2025), available at https://developer.arm.com/documentation/ddi0487/latest/.

47

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████    Further, Qualcomm does not contend that Arm withheld the

Armv8-A ████████████████████ from Qualcomm.  Trivedi Dep. Tr. at 65:7–20.

    123.    The ████████████████████████████████████████████

ARM_00063298 at -299.   I have  seen  evidence  showing  that  Arm  made  the  ████████

████████████████    available to Qualcomm.  For example, the v8 Annex 1 ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

Further, Qualcomm does not contend that Arm withheld the █████████████████████████

from Qualcomm.  *See* Trivedi Dep. Tr. at 68:8–14.

    124.    The ████████████████████████████████████████████

ARM_00063298 at -299.   I have  seen  evidence  showing  that  Arm  made  the  ████████

████████████████    available to Qualcomm.  For example, the v8 Annex 1 ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

48

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████ Further, Qualcomm does not contend that Arm withheld the ██████████████████ from Qualcomm.  *See* Trivedi Dep. Tr. at 70:2–5.

125.    The ████████████████████████████████████ ARM_00063298 at -299. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ ██████████████████████.[75]  Qualcomm does not contend that Arm withheld the ██████████████████████ from Qualcomm.  Trivedi Dep. Tr. at 70:16–20.

126.    The ████████████████████████████████ ARM_00063298 at -299.  Arm makes periodic updates to the ████.[76]  When Arm makes these updates, Arm typically includes release notes that describe the updates.  *See* Trivedi Dep. Tr. at 71:1–4.  Qualcomm does not contend that Arm withheld the ████████████ from Qualcomm.  *Id.* at 71:5–7.

127.    The ████████████████████████████████ ARM_00063298 at -299.  This list identifies potential errors or limitations of the ████

---

█ ████████████████████████████████████████████████

[75]    *See id.*; *see also* Trivedi Dep. Tr. at 70:6–15.

█ ████████████████████████████████████████████████



**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



Architecture. [77]  Qualcomm does not contend that Arm withheld the ██████████

████ from Qualcomm.  Trivedi Dep. Tr. at 71:17–21.

        **2.**  ████████████████████

128.  ████████████████████████████ The

first is the ████████████████████ ARM_00063298 at -299.  The v8

Annex 1 defines ██████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████ ARM_00063298 at -302,█

████  For the Armv9-A version of the Arm architecture, the name of the ████████

████████████████████ Weidmann Dep. Tr. at 97:20–

99:2; ARM_01238132 at -132–133; ARMQC_02732558.  The ██████ is more commonly

referred to as the ACK.  Grisenthwaite Dep. Tr. at 144:8–16; ARMQC_02732558.  I describe the

ACK in more detail in Section X.A below.  I also explain how the ACK, which I consider a

technical deliverable in the context of Arm's architecture compliance verification process, differs

from an Out-of-Box package (OOB) and from an ACK patch, both of which I consider to be

support materials from a technical perspective.  *See* Sections XI.A and XI.B.

---

[77]  *See* https://developer.arm.com/documentation/ddi0440/c/introduction/about-the-etm-m4; https://developer.arm.com/documentation/102119/0200/Trace-components/Embedded-Trace-Macrocell-Trace-source; *see also* Trivedi Dep. Tr. at 71:12–16..

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

129.    I have seen evidence showing that Arm provided the Armv8 ACK, and each quarterly release of the Armv8 ACK, to Qualcomm.  For example, ████████████████

51

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

130.   Qualcomm does not dispute that ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

131.   The ████████████████████████████████████████████

███    ARM_00063298 at -299.  Arm ████████████████████████, so the

evidence I have seen showing that Arm provided the Armv8-A ACK to Qualcomm also applies to

the ████████████████████ *See supra*; *see also* Trivedi Dep. Tr. at 82:7–13.

Qualcomm does not contend that Arm withheld the ███████████████████ from

Qualcomm. *Id.* at 82:14–17.

   **3.**   ████████████████████████

132.   ████████████████████████████████████████████████

███████████████████████████████████    ARM_00063298 at -300.  As I explained

above the ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████[78] The ████████████████████████ is a ████████

<hr />

[78] ███████████████████████████████████████████████

███████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

that confirms that the ▮▮ feature is functioning properly.[79]  Qualcomm does not contend that

Arm withheld the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from Qualcomm.  Trivedi Dep. Tr.

at 83:11–13.

133.  The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ ARM_00063298 at -300.  This list identifies potential errors or limitations of the ▮▮▮

▮▮▮[80]  Qualcomm does not contend that Arm withheld the ▮▮▮▮▮▮▮▮▮

▮▮▮ from Qualcomm.  Trivedi Dep. Tr. at 83:18–21.

**4.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

134.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮.[81]  Qualcomm does not contend that Arm withheld any of these ▮▮▮▮

in ▮▮▮ from Qualcomm.  Trivedi Dep. Tr. at 83:23–84:24.

**B.** ▮▮▮▮▮▮▮▮ **In** ▮▮▮ **Of The v9 Annex 1 To The ALA**

135.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ QCARM_0343954 at -955–

---

[79] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Trivedi
Dep. Tr. at 83:5–10.

[80] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[81] ▮▮▮▮▮▮▮▮▮▮ G. Williams Dep. Tr. at 114:18–115:4.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

57. Within ███████████████████████. Within ████████████████████

that, in turn, ██████████████ by ███████████████████

1.    ████████████████████████



136. ████████████████████████████

QCARM_0343954 at -956.  Richard Grisenthwaite testified that ████████████

. I have seen evidence showing that Arm made the Armv9-A ███████

███████████ to Qualcomm.  For example, the Armv9-A Annex 1 ███████

████████████████████████████████ QCARM_0343954

at -956. ███████████████████████████

██████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



137.    Qualcomm does not contend that Arm withheld the ███████████

███████████ from Qualcomm.  Trivedi Dep. Tr. at 88:1–4.

138.    The ███████████████████████████████████████

███████ QCARM_0343954 at -956.  I have seen evidence showing that Arm made the ███

55

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████ available to Qualcomm.  For example, the v9 Annex 1 lists the ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  At his deposition, Mr. Trivedi testified that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Qualcomm does not contend that Arm withheld the ████████████████████ from Qualcomm.

139.    The ████████████████████████████████████████████

████████████  QCARM_0343954 at -956.  Arm typically provides information about new releases in release notes.  I have seen evidence showing that Arm made the Armv9-A ██████████

████████████ available to Qualcomm.  For example, the v9 Annex 1 ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  Qualcomm does not contend that Arm withheld the ██████

████████████████  from Qualcomm.  Trivedi Dep. Tr. at 88:20–22.

140.    Under ████████████ the  v9  Annex  1  simply ████████████████

QCARM_0343954 at -956.

**2.    ████████████████████████████████**

141.    The second ████████████████████████████████████████

████  QCARM_0343954 at -956.  Under this ██████ heading is the ████████████████

56

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████████████

██████████████████████████████████ *Id.* Under ████████████████ the v9 Annex

1 simply lists ████████████

142.   Under ████████████████████████████████████████████

██████████████████████████ The first is ██████████████████████████ *Id.*

This  is  ████████████████████████████████████████████████

ARMQC_02732558.  As I explain in more detail in Section X.A below, the ACK is a suite of tens of thousands of tests that, when run, each return one of three results: pass, fail, or skip.  I have seen evidence showing that Arm provided the Armv9-A ACK and each quarterly release of the Armv9-A ACK to Qualcomm. For example, █████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

57

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███

143.    Qualcomm does not dispute that Arm provided what Qualcomm's corporate representative, Jignesh Trivedi, referred to as the ████████████████████████ ████████████████████████████

144.    The ██████████████████████████████████████████████ ████████████████████ QCARM_0343954 at -956.  The Arm ETE is the ████████ ████████████, which has many similarities with the Arm ETMv4 architecture, which I described above with respect to the Armv8-A architecture.  It creates a trace programming and decode environment for the Armv9-A architecture.[82]  Qualcomm contends that Arm failed to provide Qualcomm with support for configuring the ETE Checker, which I disagree with and discuss in more detail in Section XI.C of this Report, however, Qualcomm does not contend that Arm withheld the ████████████████████████████████████ from Qualcomm, because ███ ██████████████████████████████████████████████

145.    The ████████████████████████████████████████████ ████████████████████ QCARM_0343954 at -956.  Like the ████████████████ ████████████████████ Qualcomm does not contend that Arm withheld the ████████████

---

[82]    *See* https://developer.arm.com/documentation/102856/0100/Embedded-Trace-Extension.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████ from Qualcomm, because ████████████████████████

████████████████████████████████

**3.** ██████████████████████████

146. The ██████████████████████████████

QCARM_0343954 at -956.  Under this ██████ heading is the ████████████████

████████████████████████████████

████████████████████████ *Id.*

147. ██████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████ *Id.*  These are the architecture

specifications and compliance kit for System Memory Management Unit (SMMU), which is a

hardware component that translates IO virtual addresses into physical addresses for devices

performing Direct Memory Access (DMA).[83] ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████  Qualcomm does not contend that Arm withheld either of these parts from

Qualcomm.  *See* Trivedi Dep. Tr. at 91:13–22.

---

[83] *See* https://www.openeuler.org/en/blog/wxggg/2020-11-21-iommu-smmu-intro.html; *see also* https://developer.arm.com/documentation/109242/0100/What-an-SMMU-does.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

**4.** ▮▮▮▮▮▮▮▮

148. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ QCARM_0343954

at -957.  I am not aware of any claim by Qualcomm alleging that Arm withheld anything relating

to ▮▮▮▮▮▮▮

**C.    How Arm Provides The** ▮▮▮▮▮▮▮ **Of The v8 And v9 Annex 1s To Partners, Including Qualcomm**

149.  Arm provides the ▮▮▮▮▮▮▮ of the v8 and v9 Annex 1s to all

ALA partners, including Qualcomm, through a centralized database called Product Download Hub

(PDH) (formerly, Arm Connect). ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ Further, Martin Weidmann testified that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Weidmann

further testified that ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ Mr. Weidmann further testified that ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ Similarly, Mr. Trivedi

testified  that ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**A0472**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

150.    Arm also operates a separate database, called Causeway (formerly DropZone), which Arm uses for partner-specific communications and for delivery of partner-specific support materials.  As I explain in more detail below, when Arm provides CPU-specific OOBs and ACK patches to partners, Arm generally does so through this partner-specific database.  For example,

61

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



62

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

151.    Additional witness testimony shows this as well.  For example, Mr. Trivedi testified that █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Mr. Trivedi further testified that ████████████████████████████████

████████████████████████████████████████████████████████ Martin

Weidmann similarly testified that ██████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████

152.    In my experience, technical deliverables being provided through one channel and by one deliverables team and support being provided through a different channel and by a different, support team is fairly common.  Thus, Arm's approach of having the UK-based ATG team provide a centralized delivery of what I would consider technical deliverables (e.g., the Arm ARM and the ACK), and further having the India-based ACK support team provide technical support materials (e.g., OOBs and ACK patches) through a different and partner-specific platform is consistent with my experience.

63

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## X.    THE CPU CORE DESIGN VERIFICATION PROCESS

153.    Before a chip designer incorporates a custom CPU core design into a SoC for use with a product on the market, it is standard practice that the chip designer verifies that its CPU core design is complaint with the architecture.  This architecture compliance verification process is a common practice that is generally followed throughout the industry.

154.    I have completed the design process for CPU cores built on various architectures, including MIPS Corporation ISAs, Texas Instruments ISAs, and other academic open source frameworks for CPU ISA simulation and modeling.  To complete these designs, often times tests were created from scratch or adopted from legacy tests suites targeting prior iterations of the architecture.  Tests would be crafted to exercise portions of the CPU and confirm compliance with the ISA as documented in the ISA specification.  This may be for the design of proprietary closed source ISAs, or in some cases when designing models of publicly available ISA definitions.  ARM's provision of the ACK to its ALA partners provides an off the shelf solution that CPU designers can easily and readily leverage to bring their verification process online while tightly integrating with their particular CPU implementation.

155.    Arm provides tools and support[85] to assist an ALA partner with verification of custom CPU core designs.  I explain this process, and describe these tools and support, in more detail below.

156.    The Arm-Qualcomm ALA contains a ▮▮▮▮▮▮ provision.  Specifically, ▮▮▮▮▮ of the Arm-Qualcomm ALA, titled ▮▮▮▮▮▮ states:



---

[85]    I understand that ▮▮▮▮▮ of the Arm-Qualcomm ALA is directed to ▮▮▮▮▮▮▮▮▮ ARM_00055357 at -369–372.  I offer no opinions regarding whether Arm was obligated to provide any of the allegedly withheld support materials under ▮▮▮▮▮.

**A0476**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ARM_00055357 at -367.

157.

158.

65

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

A. **The Architecture Compliance Kit**

159.    As noted above, the verification process described in the Arm-Qualcomm ALA involves the partner (in this case, Qualcomm) running the Architecture Compliance Suite (ACS) of tests that are part of the Architecture Compliance Kit (ACK).

160.    The ACK may be used to help verify the compliance of a partner's custom CPU core design with the Arm architecture.  Grisenthwaite Dep. Tr. at 131:14–22.  Different major versions of the Arm architecture (*e.g.*, v8 and v9) have a corresponding major version of the ACK.



ARM_00063298 at -299.

QCARM_0343954 at -956.  Like the other                              of the v8 (ARM_00063298 at -299–300) and v9 (QCARM_0343954 at -955–957) Annex 1s to the ALA, Arm delivers the v8 ACK and v9 ACK to all ALA partners, including Qualcomm, through a centralized database called Product Delivery Hub (PDH).[86]  Weidmann Dep. Tr. at 19:16–20:10, 85:19–86:9, 149:17–150:4.  Martin Weidmann, who is part of the Arm Technology Group (ATG group) and is located in the UK, is typically the Arm employee responsible for this.  Weidmann Dep. Tr. at 18:11–19:6.

---

[86]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

66

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

161.    The Architecture Compliance Suites (ACS), which is sometimes referred to as the Architecture Validation Suites (AVS), is a suite of tens of thousands of tests called ACK tests. Grisenthwaite Dep. Tr. at 132:7–13, 133:9–13.  These "self-checking tests" correspond to various "features of the [Arm] architecture" and are used to test whether a particular implemented feature in a partner's custom CPU core is Arm architecture compliant.   QCVARM_1072199 at -217; QCVARM_1090346 at -366; *see also* Grisenthwaite Dep. Tr. at 132:14–18; *see also* QCVARM_1072199 at -217; QCVARM_1090346 at -366.  Running an ACK test generates three possible results: pass, fail, or skip.  Trivedi Dep. Tr. at 72:25–73:5; Bhattacharya Dep. Tr. at 31:20–32:7, 43:6–10; George Dep. Tr. at 20:23–21:19.

162.    If the test result is a pass, the partner's implementation of a particular feature is compliant with the Arm architecture.  ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████    When an issue with the ACK test itself is identified, Arm's practice is to

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

163.    Arm makes the Architecture Envelope Model (AEM) available for download with the ACK.  Weidmann Dep. Tr. at 149:17–150:4, 152:24–153:6.  Arm Architecture Envelope Models FVPs are fixed configuration virtual platforms, comprising the ARMv8-A, ARMv9-A and

67

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

ARMv8-R architectures.[87]  They are used for various aspects of compliance testing of the architecture.  As Arm has stated, "The Arm Architecture is the guarantee of software portability," ARMQC_02727610 at -616, and the AEM can be used by an Arm partner to run various ACK software tests on both their own design as well as the AEM to compare that the results of both designs are the same.  The AEM is a model that provides the expected results for a given ACK test, and assists partners in validating the results of their implementation.  Weidmann Dep. Tr. at 83:6–24.

164.    In my experience, other ISA developers did not provide similar tools or tests when I was verifying compliance with other architectures, such as MIPS Corporation ISAs, Texas Instruments ISAs, or other academic open source frameworks for CPU ISA simulation and modeling.  Also, when open source releasing simulation models for SoC designs including programmable and extensible CPU ISAs and related build tools, we did not provide tools and tests for verifying compliance.  Instead, my team and I developed our own compliance tests from scratch, which we ran to assess architectural compliance and verify the core designs.  In some cases, if silicon or simulation technology was available for a given design, that could also be used as part of the verification process in checking the flow of execution and results of the processor state when running various instructions.

XI.    **THE MATERIALS AND SUPPORT THAT QUALCOMM CONTENDS ARM WITHHELD WERE NOT NECESSARY FOR QUALCOMM TO COMPLETE THE VERIFICATION PROCESS**

165.    In my opinion, from a technical perspective, the limited materials and support that Qualcomm contends Arm withheld were not necessary for Qualcomm to assess compliance with

---

[87]

https://developer.arm.com/Tools%20and%20Software/Fixed%20Virtual%20Platforms/Arm%20Architecture%20FVPs

A0480

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Arm's architecture as a technical matter.[88]  Based on my industry experience and understanding, these support materials are not what I would consider to be deliverables from a technical perspective.  Instead, they are partner-specific support materials that provide extra, but not necessary, assistance to specific partners during the verification process for a particular core.

166.    I understand that Qualcomm alleges Arm withheld OOB packages, ACK patches, and ETE checker support for Qualcomm's Nuvia-based CPUs.  SAC ¶¶ 173–180; Qualcomm's 3rd Suppl. R&O's to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&O's to Arm's 3rd Set of ROGs.  I also understand that, in response to Arm's Interrogatories seeking Qualcomm's basis for alleging Arm breached the Arm-Qualcomm ALA by withholding OOB packages or ACK patches, and Qualcomm's basis for alleging that it was harmed as a result of Arm's alleged withholding, Qualcomm has not identified any specific OOB packages or ACK patches it contends it was entitled to receive, but that Arm did not provide.  *See* SAC; Qualcomm's 3rd Suppl. R&O's to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&O's to Arm's 3rd Set of ROGs.

167.    Qualcomm's experts, Mr. Posner and Dr. Kennedy, have offered opinions regarding these allegedly withheld materials.  For example, Mr. Posner opines:

> Arm failed to provide certain technology related to verifying compliance with the Arm ISA. Arm withheld sets of reference reports, known as the "OOB," providing the specific compliance tests needed by Qualcomm to verify compliance, as well as information on expected test failures that are also used in the verification process. Arm has also withheld replacement tests, known as "ACK patches," that fix defective tests used in the compliance testing process. Arm's failure to provide deliverables, even if remedied, shows that Arm is committed to finding ways of

---

[88]    I have not been asked to opine on, nor do I offer any opinions regarding whether Qualcomm has satisfied its ██████████████████ under Section █ of the Arm-Qualcomm ALA.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

underperforming its contract, and in so doing degrading Qualcomm's ability to commercialize Arm-compliant products. Finally, Arm's failure to cure and related actions indicate that Arm may be acting in bad faith.

Posner Rpt. ¶ 65 (internal footnotes omitted) (citing SAC ¶¶ 78-80, 81-101; ARM_01241585; QCARM_7484477; ARM_01241565; ARM_01241577; QCARM_7484481; QCARM_7477120; QCARM_7484471; ARM_01241285; Trivedi Dep. Tr. at 89:11-100:7).

168.    Dr. Kennedy opines:

I understand that Qualcomm claims that Arm breached Section ▮ of the Qualcomm ALA because Arm failed to deliver to Qualcomm certain items that Qualcomm alleges constitute Arm Technology, including Architecture Compliance Kit ("ACK") patches and the OOB (which I understand stands for "out of box"). I understand that the OOB contains a list of ACK tests that enables a licensee to understand which tests it should run on its CPU to avoid generating incomprehensible failures for inapplicable tests. I understand further that the OOB also contains a failure analysis that identifies the cause of test failures and details whether a failure is attributable to an issue within Arm's environment ("AEM," also referred to as Arm reference model) or a defect in the ACK test itself. Qualcomm claims that Arm's failure to provide both the ACK patches and OOB resulted in extra effort that Qualcomm personnel had to spend above and beyond the normal course of operations.

Kennedy Rpt. ¶ 32 (internal footnotes omitted) (citing Trivedi Dep. Tr. at 18, 98–100, 157, 175, 177, 195; Golden Dep. Tr. at 89–91; SAC at 29, 32, 33; Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (nos. 1-9), July 11, 2025, at 8).

169.    For the reasons set forth in this Report, I disagree with Mr. Posner and Dr. Kennedy, and I disagree with their technical assumptions.

170.    During his deposition, Qualcomm's corporate representative regarding Arm's alleged withholding of ALA materials from Qualcomm and regarding Qualcomm's alleged resulting harm, Jignesh Trivedi testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

70

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

171.

Mr. Trivedi testified that

172.    In my opinion, OOB packages, ACK patches, and ETE checker support are technical support provided in response to a particular partner's request, rather than technical deliverables made available to all licensees.

A.    **OOB Packages**

173.    I understand that, in response to Arm's Interrogatories seeking Qualcomm's basis for alleging Arm breached the Arm-Qualcomm ALA by withholding OOBs, and Qualcomm's

71

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

basis for alleging that it was harmed as a result of Arm's alleged withholding, ████████████

████████████████████████████████████████████████████

*See* SAC; Qualcomm's 3rd Suppl. R&O's to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&O's to Arm's 3rd Set of ROGs.  Mr. Trivedi testified that ████████████████████████████████████

████████████████████████████████████████████████████

████

174.    I understand that Arm did not provide OOB packages for the ████████████ ████████████████  CPUs because Arm believed that they incorporated unlicensed code developed by Nuvia prior to the Qualcomm acquisition.  *See* Arm's 1st Supp. Resp. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 9–10 (No. 1); *see also* ARM_01314327.  As I explain in Section XIII below, the evidence supports Arm's determination that these CPUs are Nuvia-based.  *See* § XIII.

### 1.    Contents Of An OOB Package

175.    An OOB package is a partner-specific and CPU core design-specific support material that, upon request, Arm may generate for an ALA partner during the CPU verification process.  *See, e.g.*, Arm's 1st Suppl. R&O's to Qualcomm's 1st Set of ROGs at 13; Weidmann Dep. Tr. at 86:23–87:13; Bhattacharya Dep. Tr. at 150:14–18; Trivedi Dep. Tr. at 101:23–102:6.  I have reviewed an exemplary OOB package, which contains two main components: a reference list of ACK tests and a set of test results from running the listed ACK tests on a reference model called the Architecture Envelope Model (AEM).[89]  Trivedi Dep. Tr. at 99:3–100:7; Grisenthwaite Dep.

---

[89]    Arm provides the AEM to ALA partners, including QC, as part of the ACK.  Weidmann Dep. Tr. at 150:2–4.  Qualcomm does not contend that Arm withheld the AEM.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Tr. at 135:9–22; QCVARM_0717964; QCVARM_1042776; QCVARM_1042773; QCVARM_1042780; QCVARM_1042777.

176.    As noted above, the ACK contains tens of thousands of pass-fail-skip tests that test CPU core compliance for various architectural features. *See* § X.A.  However, custom CPU cores do not necessarily implement every feature that the Arm architecture enables.  An ALA partner may ask Arm to generate a "reference list" that identifies the selection of ACK tests that are relevant to the specific features of that partner's CPU core design.  Weidmann Dep. Tr. at 81:10–15; Grisenthwaite Dep. Tr. at 137:19–138:7.  Partners provide Arm with a target configuration (targetconfig) file to generate the reference list. Trivedi Dep. Tr. at 32:15–33:14, 99:17–21.  In this targetconfig file, the ALA partner identifies the features that the partner's CPU core is implementing.  *Id.*  Once Arm receives the targetconfig file, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

177.    As I explain in more detail below, ALA partners, like Qualcomm, can similarly create their own reference list. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

178.    The second main component of the OOB package is a list of test results that are automatically generated when Arm runs the partner-specific, CPU-core-specific OOB reference

---

[90]    Conversation with Vivek Agrawal.

[91]    *Id.*

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

list on the AEM.  Grisenthwaite Dep. Tr. at 135:9–22.  The AEM is a reference "model that embodies the correct behaviors of an implementation."  Grisenthwaite Dep. Tr. at 135:4–8.  Arm runs the reference list on the AEM "to help [Arm] check that [Arm] got that selection list correct." *Id*. at 135:9–22.  As I explained above, in doing so, an ALA partner can observe unintended differences in the results of their own design versus the reference behavior of the AEM.  These ALA partners can then correct their design in terms of the desired behavior.  *See* § X.A.  The AEM test results may help identify ACK tests that failed because of an issue with the AEM or a test defect.  Trivedi Dep. Tr. at 99:3–13; QCVARM_1042777; QCVARM_1042780.  Together, the OOB reference list and the OOB test result list comprise an OOB package, which the ALA partner can use to cross reference its own internally generated reference list of relevant ACK tests and AEM test results.

179.    The OOB package may also contain the targetconfig file provided by the partner, and may contain a "failure_analysis.txt" file that is an "[e]xplanation of known ACK failures on AEM."  QCVARM_0717964.  Along with the OOB package, Arm may also provide additional "documentation" that has already been made available to the partner as part of the ACK user guide, which Arm makes available to partners regardless of whether they request an OOB package or not. Agrawal Dep. Tr. at 30:20–37:20.  For example, Arm may provide a "README" file (QCVARM_1042776) and a "quick_start" file (QCVARM_1042773).  QCVARM_0717964.  The "README" file identifies the "contents of OoB," QCVARM_0717964; QCVARM_1042776. The "quick_start" file provides support by assisting partners with step-by-step instructions to guide them through how to use ACK technology that Arm previously delivered by providing "the list of steps to setup, build and run the ACK Kit on ARM's AEM model … in Out-of-Box environment," QCVARM_1042773.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

180.    Arm's UK-based ATG group provides ███████████ Section █ of the v8 (ARM_00063298 at -299–300) and v9 (QCARM_0343954 at -955–957) ALA Annex 1s to the ALA to all ALA partners through a centralized database called Product Delivery Hub (PDH).[92] Weidmann Dep. Tr. at 18:11–19:6, 19:16–20:10.  By contrast, Arm's India-based ACK support team provides OOB packages to specific ALA partners through a partner-specific portal called Causeway.[93]  Agrawal Dep. Tr. at 57:17–24; Weidmann Dep. Tr. at 158:13–20; Trivedi Dep. Tr. at 111:23–112:2; QCARM_3216178; QCVARM_0717964.

### 2.    OOB Packages Are Support Materials And Are Not Necessary For The Architecture Verification Process

181.    In my opinion, and from a technical perspective, Arm's OOB packages are support materials and not required for a partner to verify that their design complies with the Arm architecture.  Instead, OOB packages, which are sent by Arm's India-based ACK support team through Causeway, provide support that assists a partner with using the ACK verification technology that Arm's UK-based ATG team previously delivered to the partner through PDH.

182.    In my experience, verification can proceed without the equivalent of an OOB package.  An OOB package is a support material that may aid, or provide an off-the-shelf compliance testing framework, but is by no means required for compliance testing of a CPU design.  For example, on multiple occasions in my career, bit-true, cycle accurate implementations of various microprocessor ISA implementations were achieved without the use of an OOB package or similar supporting technology.  By taking the publicly disclosed ISA definition, and a reference CPU implementation either in silicon, or with vendor simulation technology, an implementation

---

[92]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

[93]    Causeway was formerly known as "DropZone."  Weidmann Dep. Tr. at 158:13–20

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

of the microprocessor was created, tested, and shown to be accurate in terms of binary compute and timing. This new implementation of said microprocessor ISA was used to execute existing, pre-compiled binary executables that were targeted to the initial reference silicon and/or simulator and shown to run correctly in terms of computation and timing.

183. 

184. This testimony is consistent with my understanding and experience.

These companies are able to reference the Arm architecture, the ACK, and complete the verification process as a technical matter on their own. They have access to Arm's entire suite of ACK tests, which Arm updates every quarter, and they are more than capable of identifying which ACK tests are relevant to the particular features used by their CPU core designs.

185. As another example, consider the case in which an engineer wishes to test architecture compliance for a 32-bit arithmetic ADD operation. One way to structure this test would be to initialize various arithmetic operations to be run, such as setting up vectors of input

76

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

operands to be computed on. The test would also contain a results vector that stores the expected results of the various ADD operations performed over the input vectors. Once the compliance test is Compiled, Assembled (and possibly Linked if external libraries are used), it would be run on the existing implementation of the target machine. As the various ADD operations are executed over the input vectors, the result of each ADD operation could be stored in a dedicated CPU register and compared against the reference results vector via a compare instruction. If the results match, then that particular ADD instruction's execution was correct for those particular input operands. If instead, the comparison instruction did not show identical values in the result register and that of the test vector, that particular execution of the ADD instruction would be deemed as incorrect. The engineer could then inspect the resultant value produced by that particular execution of the ADD instruction, with those particular input operands, and begin to analyze the cause of the error. This is very much in line with my own personal experience in creating various types of unit tests relating to microprocessor design. In this example, the engineer would not need to be told whether or not it should run this test. If the engineer designed their CPU using a 32-bit arithmetic ADD operation, the engineer would know that a test regarding the 32-bit arithmetic ADD operation would be relevant and should be run to verify compliance with the architecture. On the other hand, if the engineer did not design their CPU to use a 32-bit arithmetic ADD operation, the engineer could safely conclude that running a corresponding verification test would not be necessary.

186.    Qualcomm is an example of this. ███████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

77

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



187.    Further, Qualcomm is capable of generating, and in fact does generate its own "OOB packages" as part of its normal practice.  Jignesh Trivedi, Qualcomm's corporate representative on several OOB-related topics, testified that ███████████████████ ██████████████████████████████████ ████████████████████████████ ████████████████ I have seen Qualcomm ██████████████ which Mr. Trivedi testified are ████████████████████████████████ ██████████████ ██████████████ ████████████████ ██████████████ ████████████████████████████

188.    Mr. Trivedi further testified that ██████████████████████████ ██████████████████████████████████

██████████████ Qualcomm's use of Arm's OOB as a check to determine whether it correctly generated its own OOB is further evidence that OOBs are partner-specific support materials that assist a partner in using Arm's architecture verification deliverables for a particular CPU configuration.

78

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

189.    I have also seen evidence that, within a day of learning that Arm would not provide an OOB package for Qualcomm's Nuvia-based ███ CPU, Mr. Trivedi ensured his superiors that ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████ Mr. Trivedi also testified that ███████████████

████████████████████████████████████████████████████

███████████████████

190.    Accordingly, in my opinion, the reference list component of Arm's OOB package is not required to complete the verification process, and is instead a partner-specific support material that assists a partner in using Arm's architecture verification deliverables for a particular CPU configuration.  I have seen no evidence to the contrary.  Instead, Qualcomm can and does generate an OOB reference list on its own, and simply uses Arm's list as a "cross-reference," which is consistent with my personal experience and knowledge of the architectural verification process as a technical matter.

191.    With respect to the second component of the OOB package, in my opinion, Qualcomm can also generate its own AEM test result list without significant extra effort.  As I described above, the AEM is a reference model that is available for download with the ACK. Weidmann Dep. Tr. at 150:2–4.  Arm made the v8 and v9 ACKs—including each quarterly v8 and v9 ACK release—available for download on PDH.  ████████████████████████████

████████████████████████████████████████████████████

79

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

I am not aware of Qualcomm contending that it has not received the AEM.

192.    Thus, in my opinion, Qualcomm has everything it needs to generate its own AEM result list without significant extra effort.  Qualcomm could simply take its internally generated OOB reference list, apply it to the AEM that Arm delivered, and generate an AEM test result list. Arm's corporate representative, Martin Weidmann, testified that ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

193.    As I noted above, Arm may also provide a "failure_analysis.txt" file that is an "[e]xplanation of known ACK failures on AEM" along with an OOB package. QCVARM_0717964.  Mr. Trivedi testified that ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████    However, a "failure_analysis.txt" file is "shipped with the

---

94    Product code ██████ corresponds to the v8 ACK.  ARM_00063298 at -299; Weidmann Dep. Tr. at 169:8–20.

95    Product code ██████ corresponds to the v8 ACK.  Weidmann Dep. Tr. at 169:8–20.

96    Product code ██████ corresponds to the v9 ACK.  QCARM_0343954 at -956; Weidmann Dep. Tr. at 166:8–13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ACK." QCVARM_0689117. Mr. Agrawal testified that



This shows that Arm provided Qualcomm, ████████████, with information about AEM failures and limitations, which Qualcomm could have referenced in analyzing its own ACK test results.

194.    Accordingly, in my opinion, Arm's OOB AEM test result list is also not required to complete the verification process. Instead, the evidence shows that Qualcomm can generate an AEM test result list on its own without significant extra effort. The evidence also shows that Qualcomm already had access to a list of known AEM limitations and issues, which further indicates that Arm's OOB AEM test result list is not required. This, too, is consistent with my personal experience and knowledge of the architectural verification process.

195.    I also note that Qualcomm could have completed the verification process for each of its Nuvia-based CPUs by running the full suite of ACK tests against each configuration. There are three possible ACK test results: pass, fail, or skip. Trivedi Dep. Tr. at 73:3–9; George Dep. Tr. at 20:23–21:19. Test skips occur when a test does not correspond to any feature that is present in a partner's CPU. Bhattacharya Dep. Tr. at 43:6–10; George Dep. Tr. at 20:23–21:19. Thus, had Qualcomm run the entire ACK suite against their Nuvia-based CPUs, any irrelevant test would have simply shown up as a skip on the test report, and Qualcomm could have disregarded those results. *Id.* Running the full suite of ACK tests would have required little additional computing

81

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

power and time.  For example, I have seen evidence showing that ████████████████

█████████████████████████████████████████████████████████████

█████████████████ QCVARM_0602258.  I have also seen evidence showing that

█████████████████████████████████████████████████████████████

████████ QCVARM_0602295.  This is a minimal amount of testing time, in my experience.

An OOB reference list—whether created by Arm or by Qualcomm—would not be necessary for

this process.

196.    I have seen additional evidence that supports my opinion.  Documents and

testimony show that Arm and Qualcomm █████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████ QCARM_3216178.  In

the same email chain, Mr. Agrawal explains that ████████████████████████

████████████████████████████ *Id*. at -184; *see also* ████████

█████████████████████████████████████████████████████████████

█████████████████████████████ Mr. Agrawal also notes that ████

████████████████████████████ *Id*.

197.    As another example, in a 2022 email chain between Mr. Agrawal and Mr. Trivedi,

█████████████████████████████████████████████████████████████

QCARM_3066477.  Including Arm's support email on communications is one of the ways

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████ In the same email chain, Mr. Trivedi ████

█████████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.

198.    In contrast, I have seen evidence that Arm communications regarding the delivery of the ACK itself are sent from a different Arm email.  *See*, *e.g.*, QCVARM_0613083 at -083–084

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████

199.    As another example, Mr. Agrawal sends ████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████  ██████  ██████  ████  ███  ███████████  █████████████

██████████  █████████████  ████████████  █████████████

██████████████

200.    Further, Mr. Trivedi's testimony consistently associated Mr. Agrawal and OOB packages with support.  For example, Mr Trivedi agreed that ████████████████████████

██████████████████

█████████████████████████████████

███████████████

██████████████████████████

201.    As another example, █████████████████████████████████████████

███████████████████████████████████████████████████████████████████

83

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Additional testimony from Mr. Trivedi bolsters my opinion.  *See, e.g.*, 10/25/2023 Trivedi Dep.

Tr. at 46:3–5 ("Q. Who on the Arm side was working to *support* NuVia in this effort? A. It was

Vivek Agrawal").

202.    Arm witnesses have also consistently testified that



203.    Accordingly, in my opinion, Arm's OOB packages are support materials, are not

required to run the ACK, and are not required to complete the architecture verification process.

Further, in my opinion, Qualcomm is capable of generating the two main components of the OOB

package (and in fact did generate those components) on its own.  Regardless, Qualcomm could

have completed the verification process by running the full suite of ACK tests against their custom

CPUs with minimal additional computing effort.  My opinion is further supported by evidence

showing that both Arm and Qualcomm considered OOB packages to be support materials.

**B.    ACK Patches**

204.    I understand that, in response to Arm's Interrogatories seeking Qualcomm's basis

for alleging Arm breached the Arm-Qualcomm ALA by withholding ACK patches, and

Qualcomm's basis for alleging that it was harmed as a result of Arm's alleged withholding,

Qualcomm has not identified any specific ACK patches it contends it was entitled to receive, but

that Arm did not provide.  *See* SAC; Qualcomm's 3rd Suppl. R&O's to Arm's 1st Set of ROGs;

Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&O's to Arm's

3rd Set of ROGs.  Mr. Trivedi testified that

84

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



205.    I understand that Arm did not provide interim ACK patches for the ███ ███████████████████ CPU cores because Arm determined that they are derived from what Arm believed to be unlicensed Nuvia developments.  *See* Arm's 1st Supp. Resp. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 9–10 (No. 1); *see also* ARM_01314327.   However, as I explain further below in this Report, Arm *did* still provide Qualcomm with the fixes to ACK test issues that were identified by incorporating the fixes into the next quarterly ACK release that Arm made available to all ALA partners, including Qualcomm. As I explain in Section XIII below, the evidence supports Arm's determination that these CPUs are Nuvia-based.  *See* § XIII.

### 1.    ACK Patches Generally

206.    As I previously explained, the ACK includes a suite of tens of thousands of pass-fail-skip tests that test architectural compliance for various CPU features.   *See* § X.A. Occasionally, issues arise with one or more ACK tests that should be fixed.  Arm's practice is to

_____

97   As I discuss in Section XII.A.2, below.  I have seen evidence suggesting this figure likely overestimates the number of actual ACK test issues that occurred during this time.

85

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

207.    I have seen evidence that, during the relevant period,[98] Qualcomm had access to the v8 and v9 ACK, including each quarterly v8 and v9 ACK release, via PDH.[99] ██

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ I am not aware of Qualcomm contending otherwise.

208.    █████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ The fixes that are incorporated

---

[98]    I understand that Qualcomm contends that the alleged withholding period is from May 2022, when Qualcomm contends Arm allegedly began withholding materials from Qualcomm, through January 8, 2025, which is the date that Arm sent a letter to Qualcomm stating that ████████████████████████████ ████████████████████ pending certain litigation between the parties. *See* Qualcomm's Second Supplemental Responses and Objections to Arm's Second Set of Interrogatories (Nos. 10-13), July 11, 2025 at 22 (Qualcomm Response to Interrogatory No. 13); Arm's First Supplemental Reponses and Objections to Qualcomm's First Set of Interrogatories (Nos. 1-3), July 11, 2025 at 10–11 (Arm Response to Interrogatory No. 1).

[99]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

[100]  ████████████████████████████████████████████████

██ ████████████████████████████████████████

██ ██████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

into the quarterly ACK releases are provided to all ALA partners via PDH.[103]  Weidmann Dep.

Tr. at 90:6–17. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ Unlike those materials, Arm provides ACK patches

████████████████████████████████████████████████ ██  Weidmann Dep.

Tr. at 90:18–91:5; Trivedi Dep. Tr. at 112:3–6. █████████████████████████████

████████████████████████████████████████████████████████ Weidmann

Dep. Tr. at 18:11–19:6.  Unlike those materials, ACK patches are generally provided by Arm's

India-based support team via Causeway.   Agrawal Dep. Tr. at 11:7–11, 158:18–159:14;

12/14/2023 Agrawal Dep. Tr. at 14:16-15:4; QCARM_3216178.

209.    In my opinion, ACK patches are not new or additional ACK tests.  Instead, they are

interim corrections to existing tests.  Bhattacharya Dep. Tr. at 46:4–9.  But they do not create new

tests.  This is consistent with my understanding.  At a number of points in my career I have worked

with various types of unit tests and compliance tests.  Oftentimes, when creating a new test for a

new piece of functionality, an existing test was copied and altered to support the functionally.  This

then allowed the newly copied test to be quickly integrated with the test harness and environment,

outputting results in a manner identical to similar existing tests (such as self-testing), with a

minimal amount of software engineering effort.   Creating a new test for new functionality,

however, is different from correcting an error in an existing verification test.  ACK patches are not

new or additional tests; they are corrections to errors in existing tests, and as I explained above,

---

[103]  PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

[104]  Causeway was formerly known as "DropZone."  Weidmann Dep. Tr. at 158:13–20

**HIGHLIGHTED CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Arm includes these corrections in the quarterly ACK release that Arm provides to all ALA partners

through PDH.

### 2. ACK Patches Are Support Materials And Are Not Necessary For The Architecture Verification Process

210.    In my opinion, and from a technical perspective, ACK patches are support materials

and not required for a partner to verify that their design complies with the Arm architecture as a

technical matter.  Instead, ACK patches, which Arm's India-based ACK support team sometimes

provides to particular partners as a curtesy by through Causeway, provide an interim solution to

an ACK test fix that Arm provides to all partners through quarterly ACK releases sent by Arm's

UK-based ATG team through PDH.

211.    As noted above, Arm generally incorporates ACK test fixes for each verified ACK

test issue into subsequent quarterly ACK releases.  Weidmann Dep. Tr. at 90:6–17; Bhattacharya

Dep. Tr. at 50:13–18.   During the period of Arm's alleged withholding, Arm continued to



212.    Further, Qualcomm had access to each quarterly ACK release, which Qualcomm

does not dispute.   *Id*.; ARMQC_02604616;  ARMQC_02779171;  ARMQC_02779176;

ARMQC_02779181.  Accordingly, in my opinion, the delivery of an interim, courtesy ACK patch

88

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

was not required as a technical matter—Qualcomm had access to each ACK test fix for its legitimate ACK test issues in the subsequent quarterly ACK releases, which Qualcomm received at the same time as Arm's other ALA partners.

213.    I understand that Qualcomm contends it could not utilize the fixes in the quarterly ACK releases because ██████████████████████████████████████████ ███████████████████████████████████████ Trivedi Dep. Tr. at 94:15–97:22.  I understand that Qualcomm also contends ███████████████ ███████████████████████████████ *Id*. at 96:7–97:22. I disagree.

214.    In my opinion, Qualcomm could have moved from one quarterly release of the ACK to the next with minimal effort.  To start, Mr. Trivedi admits that ███████████████ ██████████████████████████████ *Id*.  In fact, Mr. Weidmann testified that ████ ████████████████████████████████████████████████████ ███████████████████████████████

215.    Further, as I noted above, Qualcomm is a sophisticated company with a team of engineers working on the verification process.  Qualcomm is more than capable of quickly transitioning from one quarterly release of the ACK to the next.  I have seen evidence showing that Qualcomm was able to run ACK tests quickly.  For example, I have seen evidence showing that ████████████████████████████████████████████████ ███████████████████████████████ QCVARM_0602258.  I have also seen evidence showing that ████████████████████████████ ████████████████████ QCVARM_0602295.  This is a minimal amount of testing time, in my experience.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

216.    Moreover, in my experience, transitioning from one release of an ACK or similar compliance or testing framework to a newly updated version is merely an exercise in downloading and installing the new release, and re-running the compliance suite.  For example, to update to the latest software release, one would typically either download from a website, or use various version management tools such as Git, Subversion, CVS etc., to download the latest compliance or test suite.  Once downloaded, a user would either manually copy the compliance tests and tools to the appropriate directory, or use an installer program that comes with the update to automatically install on the target machine.

217.    Oftentimes, this is one of the first few tasks an engineer performs when starting a new position within a company, or if getting a new work machine that must be set up from scratch. In my experience, such compliance tests and tools often come with installation documentation in the form of a README.txt file or similar instructions.  In the case of tests and tools that my team and I may have created ourselves, documentation was created and often times put in an internal corporate Wiki type solution where other engineers could access it to install and update their compliance tests as needed.  In either case, the entire process could be performed by a junior engineer, and may only take at most a couple of hours often while the engineer could be working on other tasks in parallel.

218.    Further, Arm's quarterly ACK releases included the fixes for the ACK test issues that were identified during that quarter, including for any ACK test issues that Qualcomm identified.  Weidmann Dep. Tr. at 122:8–123:2.  Accordingly, in my opinion, moving to the new ACK release would have been trivial for a sophisticated company like Qualcomm, it would have addressed Qualcomm's ACK test issue concerns, and it would have further negated any alleged need for an ACK patch.

90

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

219.    Further, in my opinion, even if Qualcomm did not move to a new quarterly release of the ACK, it could have selected only the relevant fixed ACK tests from the latest quarterly ACK release and retroactively applied those fixed tests to the release of the ACK that Qualcomm was using. Arm's quarterly ACK releases are accompanied by release notes that identify sections of the ACK that have been updated to address ACK test issues. *See*, *e.g.*, ARMQC_02761714 (exemplary, 45-page Armv9-A Architecture Compliance Kit Release Note); Conversation with Vivek Agrawal. For example, the ███████████████████████ includes information that Qualcomm could have used to understand what changes were made in the latest ACK release, including a chapter titled "Release information," and another chapter titled "Change history," which documents changes such as "Test updates." ARMQC_02761714. In my opinion, a sophisticated partner, like Qualcomm, would have been able to use these release notes to confirm their reported ACK test issues had been resolved. Also, in my opinion, Qualcomm would have been able to locate and identify the specific fixed ACK tests. Qualcomm could have then run these specific ACK tests against their CPU core configurations, and assessed CPU core compliance for the features those tests targeted. This would have negated any alleged need for an Arm-provided ACK patch and it further supports my opinion that ACK patches are not required to complete the architecture verification process.

220.    Further, Arm continued to provide quarterly ACK releases to all ███████ including Qualcomm, during the relevant period, Weidmann Dep. Tr. at 122:8–123:2, and

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

91

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ In my opinion, this is further

evidence that Arm ACK patches are not required for completing the architecture verification

process and are instead support materials.

221. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████ These companies are able to reference the Arm architecture, the ACK, and the

associated user guides and documentation to complete the verification process on their own. They

have access to Arm's entire suite of ACK tests, which Arm updates every quarter.

222. I have seen evidence suggesting that Qualcomm did in fact address what Qualcomm

considered to be ACK test issues during the period of Arm's alleged withholding of ACK patches.

For example, Mr. Trivedi estimated that █████████████████████████████████████████

████████████████████████████████████████████████████████████

█████ As I explain in detail below, in my opinion, this is likely an overestimate. *See* § XII.A.2.

Regardless, Mr. Trivedi further testified that, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████

████████████████████████████████████████

92

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

223.    Jeff Golden, a hardware engineer at Qualcomm who was involved in the custom core architectural verification process, testified that

224.    Mr. Golden also testified that

Mr. Golden further testified that

93

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

██████████████ Mr. Golden testified that █████████████████████████████

██████████████████████████████████████████████████████████████████████

██

225.    This is consistent with my understanding and experience.  As I noted above, Qualcomm is a sophisticated company with a team of verification engineers.  In my experience, developing compliance-test fixes or otherwise overcoming compliance-test issues is well within the wheelhouse of an architectural verification engineer, and often takes minimal additional effort, as these witnesses testified.  For example, numerous times in my career I have generated and run self-made architectural compliance tests.  This has included tests that were to be run in isolation, that is outside of any pre-existing framework, as well as those that were to be run within an existing compliance framework.  On many occasions this process would entail either writing a piece of source code from scratch, or copying of an existing compliance test and altering the logic and functionality of the test to perform a new compliance test.  In most cases, these tests comprised Assembly or low level C programming language code.  As I discussed earlier in Section VIII.A.2, in relation to the simple 32-bit *ADD* instruction example, the test was often times comprised of a set of input data vectors, and an output results vector.  The results of executing the 32-bit *ADD* instruction over various input operands were compared against the known results vector.

226.    In the case of a pre-existing compliance test framework, if I or my engineers wanted to add said test to the full compliance framework, we would either manually enter the new test into the existing set of master tests, or in the case of larger industry compliance testing whereby we had dedicated compliance testing engineers, I would email the source code and results for the test for them to insert into a master compliance test list.

94

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

227.    The evidence suggests that Qualcomm was able to quickly address ACK test issues on their own.  This would have negated any alleged need for an interim, Arm-provided ACK patch prior to Arm's quarterly releases.

228.    Arm witnesses have consistently testified that ███████████████



229.    As another example, Aparajita Bhattacharya, Arm's senior director of engineering, testified that ████████████████

████████████████

████████████████

████████████████ In fact, Ms. Bhattacharya testified that ████████████████

230.    As another example, Mr. Agrawal testified that ████████████



████████████ and Mr. Grisenthwaite testified that ████████

████████████████

Mr. Grisenthwaite also testified that ████████████

████████████████

████████████ Another Arm verification engineer, Anupa George, testified that ████████████████

95

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████ This is consistent with my understanding and my opinion.

231.    I have also seen additional evidence that supports my opinion.  Documents and testimony show that Arm and Qualcomm considered ACK patches to be support materials.  For example, in a 2020 email between Mr. Agrawal and Mr. Trivedi, ████████████████

████████████████████████████████████████████

QCARM_3216178.  In the same email chain, Mr. Agrawal explains that ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Mr. Agrawal also notes that ████████████████████████████████

QCARM_3216178 at -184.  This is consistent with my opinion and understanding—what Mr. Agrawal's team provides to ALA partners, including ACK patches, are support; they are not technically necessary for the partner to complete the architecture verification process.

232.    In contrast, I have seen evidence that Arm communications regarding the delivery of the ACK itself are sent from a different Arm email.  *See, e.g.*, QCVARM_0613083 at -083–084

████████████████████████████████████████████

████████████████████████████████████████████

████████████

233.    As another example, in a 2022 email chain between Mr. Agrawal and Mr. Trivedi,

████████████████████████████████████████████

QCARM_3066477 at -477–478.  ████████████████████████████

████████████████████████████████████████████

96

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████████████

██████████████████████████████  In the same email chain, Mr. Trivedi

████████████████████████  QCARM_3066477; *see also* Trivedi Dep. Tr. at

122:2–14 ████████████████████████████████████████████

██████████████████████████████████████████████████████████

234.    As another example, Mr. Agrawal sends █████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████  ████████  ████████  ████  ████  ████████████  ████████████

██████████████  ██████████████  ████████████  ████████████

████████████

235.    Further, Mr. Trivedi's testimony consistently characterized what Mr. Agrawal

provides, including ACK patches, as support.  For example, Mr. Trivedi testified that ████████

██████████████████████████████████████████████████████████

████████  Mr. Trivedi also agreed that ████████████████████████████████

██████

    ██████████████████████████████████████

████████████████████████

████████████████

236.    As another example, ████████████████████████████████████████

██████████████████████████████████████  ████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Additional testimony from Mr. Trivedi further supports my opinion. *See*, *e.g.*, 10/25/2023 Trivedi

Dep. Tr. at 46:3–5 ("Q. Who on the Arm side was working to ***support*** NuVia in this effort? A. It

was Vivek Agrawal.").

237. Arm witnesses have also consistently testified that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

238. In addition, ██████████ of the Arm-Qualcomm ALA is titled ██████████

████████████████████████████████████████████████

██████████ ARM_00055357 at -369–372. I do not offer any opinions regarding any rights or

obligations under the ALA, including whether ACK patches are covered by the ██████████

████████████████████████ Qualcomm's corporate representative, Mr.

Jonathan Weiser, however, testified that ████████████████████████

██████████████████████████

████████████████████████████████████████



98

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



239. Further, Mr. Trivedi testified ███████████████████████████

240. Qualcomm's corporate representatives' testimony that correcting errors to the ACK is a ███████████████ function further bolsters my opinion that, from a technical

99

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

perspective, ACK patches are support materials that are not necessary to complete the verification process and are not what I would expect to be a deliverable as a technical matter.

241.    Accordingly, in my opinion, ACK patches are support materials.  Further, in my opinion, Qualcomm was capable of using subsequent quarterly ACK releases, which incorporated fixes for each Qualcomm-identified ACK test issue, during the architecture verification processes for the Nuvia-based cores.  No one forced Qualcomm to use an old version of the ACK for verification—that was Qualcomm's choice alone.  Even if Qualcomm did not move to the most recent quarterly ACK releases, Qualcomm was capable of identifying and selecting the relevant fixed ACK tests from those quarterly ACK releases.  Qualcomm could use those specific fixed tests to run additional compliance tests against their configurations.  In my opinion, Qualcomm also could have developed their own interim ACK test fixes for ACK test issues (that were resolved with Arm's provision of the next quarterly ACK release).  This is further evidence that, from a technical perspective, ACK patches are optional support materials that Arm may choose to provide as a courtesy.  My opinion is further supported by evidence showing that both Arm and Qualcomm considered ACK patches to be support materials.

### C.    ETE Checker Support

242.    I understand that Qualcomm contends Arm withheld support for configuring the Embedded Trace Extension (ETE) checker[105] for the Nuvia-based ████████████ CPU cores, starting in May 2024, though it is not clear what support Qualcomm alleges was withheld. Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13, 18, 47; Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs at 22–23; Qualcomm's 1st Suppl. R&Os to Arm's 3rd Set of

---

[105]    The ETE checker is also known as the ETE instruction trace checker.  QCARM_0343954 at -956; Golden Dep. Tr. at 38:11–17.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

ROGs at 24–25; Golden Dep. Tr. at 49:14–50:11; Trivedi Dep. Tr. at 132:14–134:4, 254:22–255:4; QCVARM_0618712.  I understand that Qualcomm does not contend that Arm withheld the ETE checker itself, nor does Qualcomm contend that Arm withheld any ACK patches relating to the ETE checker.  I have not seen Qualcomm clearly explain whether its Nuvia-based CPU cores implement the ETE trace feature.

243.    As I explain below, in my opinion, Arm provided some ETE checker support to Qualcomm and Qualcomm had the materials it needed to configure the ETE checker.  However, I also understand that Arm did not provide certain additional ETE checker support for the ███████

████████ CPU cores because Arm determined that they are derived from what Arm believed to be unlicensed Nuvia developments.  *See* Arm's 1st Supp. Resp. to Qualcomm's 1st Set of Interrogs. (Nos. 1–3) (July 11, 2025) at 9–10 (No. 1); *see also* ARM_01314327.  As I explain in Section XIII below, the evidence supports Arm's determination that these CPUs are Nuvia-based. *See* § XIII.

### 1.    The ETE Trace Function And The ETE Checker

244.    The ETE trace function is an optional Arm v9 architecture feature that a partner may choose to implement for their custom CPU cores.  Trivedi Dep. Tr. at 142:24–143:4, 143:19–144:2, 144:4–13.  The ETE trace feature enables advanced instruction tracing for debugging, performance analysis, and software validation.[106]    The Arm v9 ACK, which Arm provided to Qualcomm, contains specific ACK tests that test ETE trace compliance.  Trivedi Dep. Tr. at 142:14–22; Golden Dep. Tr. at 57:7–23.

---

[106]    *See* https://developer.arm.com/documentation/102856/0100/Embedded-Trace-Extension

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

245. The ETE checker is a verification tool that helps verify that a CPU's implementation of the ETE trace feature complies with the Arm v9 architecture. Trivedi Dep. Tr. at 142:14–22.

246. ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████ Like the ██████████████████████ of the v8 (ARM_00063298 at -299–300) and v9 (QCARM_0343954 at -955–957) ALA Annex 1s to the ALA, Arm made the ████████████████████ available for Qualcomm to download (as part of the v9 ACK) via PDH.[107] Weidmann Dep. Tr. at 90:6–17.

247. I have seen evidence that Qualcomm had access to the v9 ACK, including each quarterly v9 ACK release, via PDH. *Id*.; ██████████████████████████ ██████████████████████████████████████ I am not aware of Qualcomm contending it did not receive the quarterly release of the v9 ACK. Qualcomm's witnesses ████ ██████████████████████████████████████████████ ██████████████████████████ Further, Qualcomm does not contend that Arm withheld ETE trace-specific ACK tests. Golden Dep. Tr. at 57:7–23.

248. The exact ETE checker support Qualcomm contends it did not receive is vague and difficult to interpret. It appears that Qualcomm contends it did not receive ████████████ ██████████████████ I understand that Qualcomm points to an email exchange between Mr.

---

[107] PDH was formerly known as "Arm Connect." Weidmann Dep. Tr. at 20:11–21:13.

[108] Product code ████ corresponds to the v9 ACK. QCARM_0343954 at -956; Weidmann Dep. Tr. at 166:8–13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Agrawal and Mr. Trivedi as evidence of this.  QCVARM_0618420.  In that email, ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

      2.        **ETE Checker Support, Such As ███████████████████████, Is Support And Is Not Necessary For The Architecture Verification Process**

249.    In my opinion and from a technical perspective, the support that Qualcomm requested from Arm regarding configuring the ETE checker support, such as ███████████████ ██████████████, is support and is not required to complete the verification process, nor is it required to implement the ETE trace feature.  I have seen several pieces of evidence that support my opinion.

250.    To start, ETE checker support that Qualcomm requested, as the name implies, is support.  I understand that Qualcomm frequently describes it as such.  *See, e.g.*, Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13 ("Qualcomm has also made repeated requests to Arm for ***assistance*** in configuring the ETE Checker and was not provided with any ***support***…"), 47 ("Additionally, Qualcomm made repeated requests to Arm for ***assistance*** in configuring the ETE Checker and was not provided with any ***support***…"), QC's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 22 ("In addition, Arm refused to provide ***support*** to allow Qualcomm to configure the

103

**A0515**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

ETE Checker, a component of the ACK licensed by Qualcomm for Armv9 … because Arm refused to provide any ***support*** for configuring the ETE Checker, Qualcomm could not use it for testing compliance with the ETE feature."), 23 (noting that Arm failed "to provide ***support*** for the ETE Checker"); QC's 1st Suppl. R&Os to Arm's 3rd Set of ROGs at 24 ("Additionally, Qualcomm made repeated requests to Arm for ***assistance*** in configuring the ETE Checker and was not provided with any ***support*** …").

251.    Qualcomm's witnesses have also testified that ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

252.    Arm's witnesses have also consistently described ETE checker support as support.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

104

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

253.    The above evidence supports my opinion that ETE checker support is support.  It is not required to complete the architecture verification process, including because Qualcomm had everything it needed, as I explain below.

254.    Qualcomm was able to complete the verification process for its Nuvia-based ██████████████ CPU cores without the ETE checker support it alleges Arm withheld. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ In my opinion, this is further evidence that Arm ETE checker support is not required for completing the architecture verification process and is instead optional support.

255.    As noted above, it is unclear whether Qualcomm released its cores with or without the ETE trace feature enabled.  Regardless, in my opinion, Qualcomm had everything it needed to implement the ETE trace feature, and Arm provided ETE checker support to Qualcomm during the relevant period.  I explain this in detail below.

256.    ETE trace is an optional feature that a partner may choose to implement, but is not required to implement, in its CPU core designs.  For example, Mr. Trivedi testified that



105

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████. This further supports my opinion that ETE checker support is an optional feature and not needed to complete the architecture verification process. Indeed, implementing the ETE trace function is not even required.

257. I also understand Qualcomm contends that, as a result of Arm's alleged withholding of ETE checker support, Qualcomm ████████████████████████████████

████████████████████████████████████████████

███████████████████ However, Qualcomm does not dispute that Arm delivered all ACK tests related to the ETE trace feature, nor does Qualcomm dispute that Arm delivered the ETE checker.

258. In my opinion, Qualcomm had everything it needed to use the ETE checker. As noted above, Qualcomm had access to the v9 ACK (and each subsequent quarterly ACK release), which contained the full suite of ACK tests, including those directed to testing compliance for the ETE trace feature. *See supra* § IX.B.2. Qualcomm also had access to the ETE checker, which is made available for download along with the ACK. *See supra* § IX.B.2. Qualcomm also had access to all ACK-related documentation, including documentation regarding configuring the ETE checker. QCVARM_0618977 at -978; *see, e.g.*, QCVARM_1078822. As I explained, Qualcomm is a sophisticated company with sophisticated verification engineers. Qualcomm is able to reference the Arm architecture, the ACK, and the associated user guides and documentation to complete the verification process—including the ETE checker compliance process—on its own. Mr. Agrawal testified that ███████████████████████████████████



**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████ Thus, Arm's ETE checker support is not required.

259.    Regardless, I have seen evidence suggesting that Qualcomm did in fact receive ETE checker support from Arm.  For example, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

260.    This is consistent with my understanding and Mr. Agrawal's testimony.  The evidence shows that the ETE checker "support" Mr. Agrawal provides is simply pointing Mr. Trivedi back to materials Mr. Trivedi already has.  Indeed, as Mr. Agrawal testified.  ████████

████████████████████████████████████████████

████████████

████████████████████████ Mr. Agrawal further testified that ████████████████

████████████████████████████████████████████

107

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

261.    I understand that Qualcomm points to an email exchange between Mr. Agrawal and Mr. Trivedi as evidence of Arm allegedly failing to provide ETE checker support. QCVARM_0618420.  In my opinion, this email exchange shows that Mr. Trivedi did receive some support from Mr. Agrawal, and Mr. Trivedi already had the information that he needed. ▮

262.    When questioned about QCVARM_0618420, Mr. Agrawal testified that ▮

Mr. Agrawal testified that, ▮

263.    Mr. Agrawal responded to Mr. Trivedi's ETE checker questions via email in January 2025.  QCVARM_0618420 at -420–422.  Once again, as Mr. Agrawal testified, ▮

108

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



In fact, looking at the document shows that Mr. Agrawal was pointing Mr. Trivedi to the same "Armv9-A_ETE_BRBE_Compliance_Kit_User_Guide" that Mr. Agrawal pointed Mr. Trivedi to in 2023.  QCVARM_0618420 at -420–422; ARM_01020098; QCVARM_0618977 at -978; *see, e.g.*, QCVARM_1078822.

264.    Additional testimony supports my opinion.  Mr. Agrawal testified that

Mr. Agrawal further testified that

For example, one of

109

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

*Id.* I have reviewed a version of the ETE user guide. The sections Mr. Agrawal points Mr. Trivedi to do in fact answer Mr. Trivedi's question. QCVARM_1078822 at -850–851, -857–858.

265.    Accordingly, in my opinion, ETE checker support is not required to run the ACK, not required to configure the ETE checker, and is not required to complete the architecture verification process for the optional ETE trace feature. Further, in my opinion, Qualcomm had all of the necessary materials and documentation to configure the ETE checker on its own. My opinion is further supported by evidence showing that both Arm and Qualcomm considered ETE checker support to be support.

## XII.    QUALCOMM'S CLAIMS OF HARM

266.    As noted above, I understand that Qualcomm contends Arm withheld OOB packages, ACK patches, and ETE checker support for Qualcomm's Nuvia-based CPU cores. § X.I. In my opinion, these are optional support materials that are not required to complete the architecture verification process. § X.I.

267.    I also understand Qualcomm contends that, due to Arm's withholding of OOB packages and ACK patches, its "burden in verification" was "increased" and it had to "expend extra time and resources" to complete the architecture verification process. SAC ¶¶ 95–101, 173–180; Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 7–20; Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 20–26; Trivedi Dep. Tr. at 33:17–21, 156:2–157:8, 172:1–178:9, 193:7–12; Golden Dep. Tr. at 82:20–85:18, 89:22–90:10, 91:6–19, 95:5–10. Specifically, Qualcomm contends that, "[b]y failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA." SAC ¶ 96. Qualcomm further contends that, "by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches … ." *Id.* ¶ 97.

110

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

268.    I also understand Qualcomm contends it was harmed due to Arm's alleged failure to provide ETE checker support.  Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13, 18, 47; Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 22–23; Qualcomm's 1st Suppl. R&Os to Arm's 3rd Set of ROGs at 24–25; Golden Dep. Tr. at 50:3–11.  Specifically, Qualcomm contends that it had to "expend additional engineering effort to verify its custom cores" due to Arm's alleged failure to provide "assistance in configuring the ETE Checker."  Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13, 18.

269.    Further, I understand Qualcomm contends it was harmed by Arm's alleged failure to provide OOB packages and ACK patches because of the ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

270.    I understand Qualcomm's witnesses have further contended that ███████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ Qualcomm has not described this

███████ theory of harm in any detail, it is not present in Qualcomm's Second Amended Complaint,

111

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

and it is mentioned in a single sentence in Qualcomm's Interrogatory responses.  *See* SAC; Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 23–24.  Qualcomm's corporate representative for architecture verification effort topics, Jignesh Trivedi, testified that ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ One of Qualcomm's engineers, Jeff Golden, testified that ██████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████

271.     As noted above, OOB packages and ACK patches are not required for a partner to verify that their design complies with the Arm architecture, but are instead support materials that, in some circumstances, Arm may provide to a requesting ALA partner.  *See* §§ XI.A and XI.B. Further, as noted above, Qualcomm had everything it needed to use the ETE checker, and Arm provided support for using the ETE checker.  *See* § XI.C.  In my opinion, Qualcomm performed minimal "extra" work, if any, compared to if Arm had provided the allegedly withheld support (which, as Arm's witnesses testified, were provided as a "courtesy," and not as the usual practice *see* § XI.B).  Also, in my opinion, any ███████████ to Qualcomm, to extent it exists, was due to Qualcomm's actions, not Arm's.  Further, in my opinion, Qualcomm's alleged harm due to ██ ████ to the extent it can be understood, was not caused by Arm's alleged withholding of OOB packages, ACK patches, or ETE checker support.

### A.     Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of OOB Packages, ACK Patches, And ETE Checker Support

272.     As noted above, Qualcomm alleges it had to expend additional time and resources due to Arm's alleged withholding of OOB packages, ACK patches, and ETE checker support.  *See*

112

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

*supra* § XII.  I disagree.  In my opinion, Qualcomm's alleged "extra" work, if any, was minimal and was more typical of the type of work that is generally performed during the architecture compliance verification process.

273.    As an initial matter, despite claiming that it had to expend "extra" efforts as a result of Arm's alleged withholding, Qualcomm has not described its architecture compliance verification efforts from before the alleged withholding period in response to Arm's interrogatories, and I understand that Qualcomm has refused to produce documents in response to Arm's requests for production seeking documents showing these pre-alleged withholding period efforts.  *See, e.g.*, Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 20–26; Qualcomm's R&Os to Arm's 1st Set of RFPs at 4; Qualcomm's R&Os to Arm's 2nd Set of RFPs at 4–5; Qualcomm's R&Os to Arm's 3rd Set of RFPs at 4–5, 37–39; Qualcomm's R&Os to Arm's 4th Set of RFPs at 5; Qualcomm's R&Os to Arm's 5th Set of RFPs at 4–5; *see also* 05/28/2025 Meet and Confer at 92:13–103:18.  I reserve the right to supplement my opinions should Qualcomm produce this information.

274.    Based on my review of the evidence, in my opinion, any "extra" work that Qualcomm had to perform based on Arm's alleged withholding of OOB packages, ACK patches, and ETE checker support was minimal and is typical of the work expected during an architecture compliance verification process.

275.    For example, Qualcomm' witnesses have testified that



113

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

276.    Further, as I explained above, ████████████████████████████

277.    The fact that Qualcomm was able to complete the verification process for its Nuvia-based CPU cores (which it contends Arm withheld support materials for) on time or ahead of schedule and without hiring additional employees supports my opinion that the alleged extra work that Qualcomm claims it performed was minimal.

278.    As explained below, additional evidence and testimony supports my opinion.

**1.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of OOB Packages**

279.    I understand Qualcomm contends that, "[b]y failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA." SAC ¶ 96. As explained above, the OOB package contains two main components: a reference list of ACK tests and a set of test results from running the listed ACK tests on a reference model called the Architecture Envelope Model (AEM).[109] Trivedi Dep. Tr. at 99:3–100:7; Grisenthwaite Dep. Tr. at 135:9–22; QCVARM_0717964;

---

[109]    Arm makes the AEM available to ALA partners, including QC, with the ACK. Weidmann Dep. Tr. at 150:2–4. Qualcomm does not contend that Arm withheld the AEM.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

QCVARM_1042777.  In my opinion, Qualcomm performed minimal "extra" work, if any, due to Arm's alleged withholding of OOB packages.  I have seen several pieces of evidence that support my opinion.

280.    As I explained above, Qualcomm is capable of generating, and in fact does generate, its own "OOB packages" as part of its normal practice.  For example, Mr. Trivedi testified that ████████████████████████████████████████████████████

████████████████████

███████████████████████████████████████████

██████████████████ In fact, ████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

█████████████████████████████████████████████

█████████████████

281.    Further, Arm and Qualcomm witnesses have testified that generating the OOB reference list takes minimal effort.  For example, Mr. Grisenthwaite testified that ████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████

282.    As another example, Mr. Agrawal testified that ██████████████████████████

████████

115

A0527

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



283.    Mr. Trivedi testified that

284.    I have also seen evidence that,

285.    Further, in my opinion, Qualcomm could have leveraged previously provided Arm OOB reference lists for Qualcomm's various Nuvia-based CPU core designs.

116

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████

███████████████████████████████████████

████████████████████████ ██ █████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████ I agree that a sophisticated company, like Qualcomm, would be able to easily implement these OOB reference list changes on their own or at a minimum would have been able to leverage the OOBs that Arm previously delivered for the earlier Nuvia-based designs.

286.    I have seen additional evidence and testimony that bolsters my opinion.  For example, Qualcomm's witnesses have testified that ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

117

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████ Also, Mr. Golden testified that ███████

██████████████████████████████████████████████

███████████████████████ Further, Mr. Trivedi testified that ███████████████████

████████████████████████████████████████ In my opinion and experience, this would lead to at least some overlap in the CPU cores' features, the ACK tests used to test compliance with those features, and the OOB reference list identifying those ACK tests, which Qualcomm could have leveraged to expedite the architectural verification process.

287.    In particular, Qualcomm could have leveraged the several OOB packages that Arm had previously provided to Qualcomm for the Nuvia-based ████████████████████ ██████████████████████████████ which, as explained above, are also Nuvia-based designs that overlap with the ██████ design. ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

288.    Further, I have seen evidence showing that Qualcomm had access to the OOBs that Arm previously provided to Qualcomm for the Nuvia-based designs prior to the alleged withholding period.  For example, Mr. Trivedi testified that ████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████

118

A0530

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



289.    As another example, in a December 2023 IM chat between Mr. Golden and Shilpa Thakral (another verification engineer at Qualcomm), Mr. Golden wrote that ███████████

290.    Further, in a February 2023 IM chat between Mr. Trivedi and Mr. Golden, Mr. Golden wrote that ████████████████████████████

---

[110] ███████ refers to Qualcomm's ███████ design.  Golden Dep. Tr. at 75:19–21.

A0531

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

291.    This evidence further supports my opinion that a sophisticated company, like Qualcomm, would be able to easily implement OOB reference list changes on their own or at a minimum would have been able to leverage the OOBs that Arm previously provided for the earlier Nuvia-based designs.  This is also consistent with my experience.  For example, when working with large scale compliance testing, often times I and engineers on our team would elect to have only certain portions of the compliance testing suite run for a given compliance testing cycle.  In the case where an engineer was running a compliance testing suite locally on their workstation, one would simply edit various configuration files to either run or not-run a given portion of the compliance suite.  This was often done using a simple text editor on the appropriate configuration file.  If a larger scale compliance test was required, say on a compute farm that is managed by a different or remote compliance team, a simple email request detailing the compliance tests to be added (or skipped) for that compliance testing cycle was all that was required.

292.    Accordingly, in my opinion, Qualcomm performed minimal "extra" work, if any, due to Arm's alleged withholding of the OOB reference list.

293.    Further, in my opinion, Qualcomm also performed minimal "extra" work, if any, due to Arm's alleged withholding of the OOB test results from running the listed ACK tests on the AEM.  Qualcomm contends that



**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



I disagree.

294.    As I explained above, in my opinion, Qualcomm can generate its own AEM test result list.  The AEM is a reference model that is made available for download with the ACK.  Weidmann Dep. Tr. at 150:2–4.  Arm made the v8 and v9 ACKs—including each quarterly v8 and v9 ACK release—available for download on PDH.

I am not aware of Qualcomm contending that it has not received the AEM.

295.    Thus, in my opinion, Qualcomm had everything it needed to generate its own AEM result list and could have done so with minimal "extra" work.  Qualcomm could simply take its internally generated OOB reference list, apply it to the AEM that Arm made available for download, and generate an AEM test result list.  Arm's corporate representative, Martin Weidmann, testified that

---

[111]    Product code ███ corresponds to the v8 ACK.  ARM_00063298 at -299; Weidmann Dep. Tr. at 169:8–20.

[112]    Product code ███ corresponds to the v8 ACK.  Weidmann Dep. Tr. at 169:8–20.

[113]    Product code ███ corresponds to the v9 ACK.  QCARM_0343954 at -956; Weidmann Dep. Tr. at 166:8–13.

121

A0533

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

296.    Further,    a    "failure_analysis.txt"    file    is    "shipped    with    the    ACK."

QCVARM_0689117.  Mr. Agrawal testified that ████████████████████████████

███████████████████████████████████████████

██████████████████████████████████  Mr. Agrawal  further  testified  that

███████████████████████████████████████████

███████████████  Mr. Agrawal ████████████████████████████

████████████████  This shows that Arm provided Qualcomm, ██████████████

with information about AEM failures and limitations, which Qualcomm could have referenced in

analyzing its own ACK test results, and which would have reduced the ██████████████

███████████████████████████████████████████

Trivedi Dep. Tr. at 173:11–174:5.

297.    Further, like the OOB reference list, Qualcomm could have leveraged Arm OOB

test result lists for previous Nuvia-based cores for Qualcomm's subsequent Nuvia-based cores,

including because ████████████████████████████████████████

████████  Mr. Agrawal testified that ████████████████████████

███████████████████████████████████████████

████████████████████████████

████████████████████████████████████

███████████████████

122

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



Mr. Agrawal also testified that

I agree that a sophisticated company, like Qualcomm, and an engineer such as Mr. Trivedi, would have been able to easily leverage previous OOB test result lists. This is consistent with my experience. For example, when I was bringing up a new microprocessor design that was not yet complete, but complete enough to begin running select instructions on, the prior compliance tests for the previous generation of microprocessor design were used. At early onset, it was often the case that only a very limited subset of the overall compliance test suite was run, such as simple load store instructions, simple arithmetic operations, etc. As the design progressed, additional tests from the previous generation's microprocessor test suite would be added back. Ultimately, additional new test suites specific to the currently in development microprocessor (i.e., not the previous generation microprocessor design) would be added to exercise newly added functionality. An example of this might be newly designed instructions or modes of operation that were not present in the previous generation of microprocessor. While this was an iterative and

123

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

incremental process over the design cycle of the microprocessor, these changes were easily and readily implemented by various engineers.

298.    Accordingly, in my opinion, Qualcomm performed minimal, if any, extra work due to Arm's alleged withholding of OOB packages for Qualcomm's Nuvia-based CPU cores. Qualcomm regularly generated the OOB reference list with ease and could have generated its own OOB test results list with ease.   Further, in my opinion, Qualcomm could have leveraged previously provided Arm OOB packages for use with its ████████████████████ ████ CPU cores.

### 2.    Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of ACK Patches

299.    I understand Qualcomm contends that, "by failing to deliver the [ACK] patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches … ."  SAC ¶ 97.  As noted above, Mr. Trivedi ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ However, Mr. Trivedi ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████    As I explain below, in my opinion, this number of alleged ACK test issues is likely an overestimate.  Regardless, in my opinion, Qualcomm performed minimal "extra" work due to Arm's alleged withholding of ACK patches.  I have seen several pieces of evidence that support my opinion.

124

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

300.    To start, I have seen evidence suggesting that Mr. Trivedi's identification of 35-50

ACK test issues that allegedly needed an ACK patch (Trivedi Dep. Tr. at 176:15–177:24) is likely

an overestimate of the actual ACK test issues that occurred during the alleged withholding period.

For example,

301.

125

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



██████████████ This evidence supports my opinion that Mr. Trivedi's contention that ███████████████████████████████████████████ was an overestimate.

302.    Additional witness testimony further bolsters my opinion.  For example, Mr. Trivedi agreed that ████████████████████████████████████

303.    As another example, Mr. Golden agreed that ███████████████

304.    Moreover, in my opinion, any alleged "extra" work Qualcomm expended as a result of Arm allegedly withholding ACK patches was self-inflicted and unnecessary, at least because ACK patches are optional support materials and are not required to complete the verification

126

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

process.  *See* § XI.B.  As I explained above, ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████    Further, during the period of Arm's alleged withholding, Arm ███████

████████████████████████████████████████████████████████████████

███████

305.    Thus, Qualcomm could have waited to receive a fix for its legitimate ACK test issue in a subsequent ACK quarterly release.  As noted above, I disagree with Qualcomm's contention that it could not utilize fixes in subsequent ACK quarterly releases.  *See* § XI.B.  This supports my opinion that any alleged "extra" work Qualcomm spent as a result of Arm allegedly withholding ACK patches was an optional choice Qualcomm chose to make.

306.    Regardless, in my opinion, Qualcomm's claimed "extra" work was minimal.  I understand that Qualcomm contends ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

127

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



307.    However,

This is consistent with my understanding and my opinion. Sophisticated companies, like Qualcomm, perform thorough investigations into the cause of compliance test failures. Any additional time Qualcomm spent on this analysis—compared to the time it would have spent if Arm provided the allegedly withheld materials—was minimal, and I have not seen any evidence suggesting otherwise.

308.    Additional evidence supports my opinion. As explained above, Mr. Trivedi estimated that

128

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



In my opinion, this was likely an overestimate, including based on the evidence I have discussed above, such as the ▓▓▓▓▓ reports and the testimony of Arm's and Qualcomm's engineers.  Further, Mr. Golden testified that

309.    Regardless, Mr. Trivedi further testified that,

129

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████████████

████████████████████████

310.    Jeff Golden, a hardware engineer at Qualcomm who was involved in the custom core architectural verification process, testified that ███████████████████████████

███████████████████████████████████████████████████████

███████



████████████████████████ This is consistent with Mr. Trivedi's testimony:

████████████████████████

311.    Based on my verification experience, the witnesses testimony, and Qualcomm's "extra" work claims, in my opinion, it would likely not have taken Qualcomm's entire verification team to address these alleged ACK test issues.  Rather, for a given test requiring a fix or update, it is more likely that a single engineer would be fractionally dedicated to this.  In my experience, this would entail working perhaps a few hours on this task over the course of a few days until a fix to the test was achieved.

312.    Mr. Golden also testified that ██████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

130

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Mr. Golden testified that

313.    This is consistent with my understanding and experience.  As I noted above, Qualcomm is a sophisticated company with a team of verification engineers.  In my experience, developing compliance-test fixes or otherwise overcoming compliance-test issues is well within the wheelhouse of an architectural verification engineer, and often takes minimal additional effort, as these witnesses testified.

314.    Accordingly, in my opinion, Qualcomm performed minimal "extra" work as a result of Arm allegedly withholding optional, courtesy ACK patches.  Qualcomm chose to do this

131

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

work instead of waiting for a subsequent quarterly ACK release, which incorporated ACK test fixes for Qualcomm's legitimate ACK test issues.  Further, regardless of whether Arm provided an optional ACK patch, Qualcomm regularly performed its own investigation of ACK test failures. Also, in my opinion, Mr. Trivedi's and Mr. Golden's testimony shows that Qualcomm spent minimal time and effort addressing ACK test issues that allegedly would have been solved by an ACK patch prior to the next quarterly release.

### 3. Qualcomm Performed Minimal "Extra" Work Due To Arm's Alleged Withholding Of ETE Checker Support

315.    I understand Qualcomm contends it had to "expend additional engineering effort to verify its custom cores" due to Arm's alleged failure to provide "assistance in configuring the ETE Checker," Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 13, and "additionally expended extra engineering time attempting to make the ETE checker functional while Arm refused to engage," *id*. at 18.  *See also* ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

However, I have not seen any evidence or testimony quantifying this alleged "extra engineering time," nor have I seen evidence or testimony suggesting that the extra work was significant.

316.    The evidence I have seen suggests that any additional work Qualcomm expended due to Arm's alleged withholding of ETE checker support was minimal.  As noted above, Qualcomm had everything it needed to use the ETE checker.  *See* § XI.C.  Qualcomm had access to the v9 ACK (and each subsequent quarterly ACK release), which contained the full suite of ACK tests, including those directed to testing compliance for the ETE trace feature.  *Id*.

132

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Qualcomm also had access to the ETE checker, which is delivered with the ACK.  *Id.*  Qualcomm also had access to the relevant ACK-related documentation, including documentation regarding configuring the ETE checker.  *Id.*  As I explained, Qualcomm is a sophisticated company with sophisticated verification engineers.  Qualcomm is able to reference the Arm architecture, the ACK, and the associated user guides and documentation to complete the verification process—including the ETE checker compliance process—on its own.  *Id.*  Mr. Agrawal testified that



317.    My opinion is further supported by evidence suggesting that Qualcomm did in fact receive ETE checker support from Arm.  For example,

318.    This is consistent with my understanding of how the ETE checker is configured. The ETE checker "support" Mr. Agrawal provided to Qualcomm simply pointed Mr. Trivedi back

133

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

to materials Mr. Trivedi already had.  As Mr. Agrawal testified, ███████████████

██████████████████████████████████████████████████

██████████████████████████████████ Mr. Agrawal further testified that ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████

319.    I understand that Qualcomm points to an email exchange between Mr. Agrawal and Mr. Trivedi as evidence of Arm failing to provide ETE checker support.  Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs at 22–23; QCVARM_0618420.  In my opinion, this email exchange shows that Mr. Trivedi did receive some support from Mr. Agrawal regarding the configuration of the ETE checker, and it also shows that Mr. Trivedi already had the information that he requested.  ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

134

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



320.    When questioned about QCVARM_0618420, Mr. Agrawal testified that ███

███████████████████████████████

Mr. Agrawal testified that, ████████████████

321.    ████████████████████████████

████████████████████████████████████

As Mr. Agrawal testified, ████████████████████████

████

135

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

322.    Additional testimony supports my opinion.  Mr. Agrawal testified that ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████    Mr. Agrawal further testified that ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

323.    Accordingly, based on the evidence that is available, it is my opinion that any alleged extra work Qualcomm expended as a result of Arm withholding ETE checker support was minimal.  Qualcomm had all the tools to use the ETE checker and was in fact receiving support on how to use it during the alleged withholding period.  I have not seen any evidence suggesting that the amount of extra work that Qualcomm claims it had to perform as a result of Arm's alleged withholding of support regarding the ETE checker was in any way significant.

**B.    The Alleged ██████████████ To Qualcomm, If Any, Was Due To Qualcomm's Actions, Not Arm's**

324.    As noted above, Qualcomm contends it ████████████████ due to Arm's alleged withholding of OOB packages, ACK patches, and ETE checker support.  *See supra* § XII. Qualcomm's expert, Dr. Patrick Kennedy does not quantify ██████████████ 08/08/2025 Expert Report of Patrick F. Kennedy, Ph.D.  Regardless, in my opinion, any ████████████ to extent it exists, was due to Qualcomm's actions, not Arm's.

325.    As explained above, Arm provides tools, such as the ACK and its suite of tests, to help Qualcomm complete the verification process.  However, as Mr. Agrawal testified, ████████

██████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



326.    This is consistent with my understanding and opinion.  In my experience, the company designing the custom CPU core and completing the verification process (*e.g.*, Qualcomm) decides when they are ready to tape out their product as a technical matter.  The developer of the CPU, not the developer of the architecture, knows the exact details and features of the custom implementation.

327.    

For example, an ALA partner may submit "waivers" to Arm for ACK tests that failed on the partner's implementation.  Grisenthwaite Dep. Tr. at 138:22–139:10.

328.

Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 22–23; Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 17–18.

329.    I understand Qualcomm contends it

137

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████ The evidence and testimony support my opinion.  For example, Mr. Golden testified that ████████████████████████ ████████████████████████ However, Mr. Trivedi testified that ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████ An April 2025 communication between Mr. Trivedi and Mr. Agrawal is consistent with Mr. Trivedi's testimony.  ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████

330.    Further, ██████ are common in custom CPU core design industry.  For example, an ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



331.    Regardless, I have seen no evidence that Qualcomm's ██████████████████ ████████████████████████████████████████ Mr. Trivedi

testified that ████████████████████████████

██████████████████████████████

332.    As explained below, additional evidence related to each allegedly withheld support material or service bolsters my opinion.

       **1.**      **The Alleged █████████████ Due To Arm's Alleged Withholding Of OOB Packages, If Any, Was Minimal**

333.    I understand Qualcomm contends that, "[w]ithout OOBs from Arm," Qualcomm



Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs at 22–23.  As I explained above, any

██████████████, to the extent it existed, was due to Qualcomm's actions, not Arm's.  *See supra*

XII.B.  Further, Arm-provided OOB packages are optional support materials that are not required

139

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

for the verification process, and therefore any alleged withholding by Arm is unrelated to Qualcomm's alleged ███████ *See* § XI.A. Regardless, in my opinion, any ███ due to Arm's alleged withholding of OOB packages was minimal.

334.    As noted above, Qualcomm produces its own internal reference list as part of its normal verification process. *See* § XI.A. For example, Mr. Trivedi testified that ████████



335.    Qualcomm uses its reference list to "cross-reference" and "bless" Qualcomm's internally generated OOB reference list:



336.    Contrary to Qualcomm's assertions, I have seen evidence that ████████ ████████████████████████████████████████████████ ████████████████████████████████ For example, ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████    ████████████ ██████████ ████ ████ █ ██████  ████ ██████ ████████

140

**A0552**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

337.    As another example, Qualcomm was ███████████████████████

338.    Thus, at least in this instance, ████████████████████████████

141

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

339.    In my opinion, this is further evidence that Qualcomm was capable of generating a very accurate OOB reference list on its own. ██████████████████████████████

████████████████████████████████████████

340.    As another example, Arm provided some OOB reference list support to Qualcomm during the alleged withholding period. ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████ I disagree

with Mr. Trivedi that █████████████████████████████

██████████████████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

341.    A "per-suite" count of OOB tests is as its name suggests; for each of the suites of ACK tests (which generally concern related functionality), it is the number of ACK tests in that suite.  Conversation with Vivek Agrawal.  It is not simply the total number of ACK tests included in a reference list for a given configuration, but it provides much more helpful detail than that.  *Id.* I understand from Vivek Agrawal that the number of ACK tests in a given suite can vary, with some suites having as few as 50 tests, and others may be as high as 8,000.  *Id.*  A verification engineer, like Mr. Trivedi, would have been able to use this detailed information to ██████

████████████████████████████████████████████████████████████████

████████████████████████

342.    As I described above, Qualcomm had access to Arm-provided OOBs for Nuvia-based cores and would have been able to leverage those OOBs for subsequent versions or variations of those cores.  *See* § XII.A.1.  For example, ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████    I agree that a sophisticated company, like Qualcomm, would be able to easily implement these OOB reference list changes on their own or at a minimum would have been able to leverage the OOBs that Arm previously delivered for the earlier Nuvia-based designs.

143

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

343.    I have seen additional evidence and testimony that further supports my opinion. For example, Qualcomm's witnesses have testified that ██████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Further, Mr. Trivedi testified ██████████████████████

████████████████████████████████████████████████████████ In my opinion and experience, this would lead to at least some overlap in the CPU cores' features, the ACK tests used to test compliance with those features, and the OOB reference list identifying those ACK tests, which Qualcomm could have leveraged to expedite the architectural verification process and ████████████████████████████████████████

144

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

344.    Further, I have seen evidence showing that Qualcomm had access to the OOBs that Arm previously provided to Qualcomm for the Nuvia-based designs prior to the alleged withholding period.  For example, Mr. Trivedi testified that ███████████████████████

███████████████████████████

███████████████████████████████████

██████████████  Mr. Trivedi also testified that ████████████████████

████████████████████████

███████████████████████████████████████

██████████████

345.    As another example, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████  ████████████████  When questioned about this document, Mr. Golden agreed that ████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

---

[114]  ██████ refers to Qualcomm's ████████ design.  Golden Dep. Tr. at 75:19–21.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████ Mr. Trivedi was questioned about this same document, and agreed that ████████████████████████████████████████ ████████████████████████████████████████████████

346.    Further, in a February 2023 IM chat between Mr. Trivedi and Mr. Golden, Mr. Golden wrote that ████████████████████████████████████████ ████████████████████████████████████ Mr. Golden also wrote that ████████████████████████████████████████████████ ███████████████████████████ Accordingly, in my opinion, Qualcomm would have been able to leverage previous Arm-provided OOBs for its Nuvia-based cores, which would have █████████████████████ that resulted from Arm's alleged withholding of OOB packages.

347.    Additional evidence supports my opinion.  As I explained above, there are three possible ACK test results: pass, fail, or skip.  *See* § X.A; Trivedi Dep. Tr. at 73:3–9; George Dep. Tr. at 20:23–21:19.  Test skips occur when a test does not correspond to any feature that is present in a partner's CPU.  Bhattacharya Dep. Tr. at 43:6–10; George Dep. Tr. at 20:23–21:19.  Thus, had Qualcomm run the entire ACK suite against their Nuvia-based CPUs, any irrelevant test would have simply shown up as a skip on the test report, and Qualcomm could have disregarded those results.  *Id*.  Running the full suite of ACK tests would have required little additional computing power and time.  For example, I have seen evidence showing that ███████████████████ ████████████████████████████████████████████████ ███████████████████████████████ I have also seen evidence showing that ████████████████████████████████████████████████ ███████████████████████ This is a minimal amount of testing time, in my experience.

146

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

An OOB reference list—whether created by Arm or by Qualcomm—would not be necessary for this process. This would have mitigated any ██ that Qualcomm contends it was subject to, and further supports my opinion.

348.    As noted above, the ██████████ Qualcomm contends resulted from Arm's alleged withholding of OOB packages is attributable to Qualcomm, not Arm. Regardless, in my opinion, any ██████ with Arm's alleged withholding of OOB packages was minimal.

**2.    The Alleged ████████████ Due To Arm's Alleged Withholding Of ACK Patches, If Any, Was Minimal**

349.    I understand Qualcomm contends that "Arm's failure to provide ACK patches … ██████████████████████████████████████ Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs at 17–18. As I explained above, any alleged ██████████████████████, was due to Qualcomm's actions, not Arm's. *See supra* § XII.B. Further, ACK patches are optional support materials that are not required for the verification process, and therefore any alleged withholding by Arm is unrelated to Qualcomm's ██████████ *See* § XI.B. Regardless, in my opinion, any ████████ due to Arm's alleged withholding of ACK patches was minimal.

350.    As noted above, Arm incorporates ACK test fixes into subsequent quarterly releases of the ACK. *See* § XI.B; Weidmann Dep. Tr. at 90:6–17; Bhattacharya Dep. Tr. at 50:13–18. Further, the quarterly ACK releases are made available to "all partners with a relevant license, including Qualcomm." Weidmann Dep. Tr. at 122:8–123:2. I have seen evidence that, during the alleged withholding period, Qualcomm had access to the v8 and v9 ACK, including each quarterly v8 and v9 ACK release, via PDH.[115] *Id.*; ██████████████████████████████████

---

[115]    PDH was formerly known as "Arm Connect." Weidmann Dep. Tr. at 20:11–21:13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

I am not aware of Qualcomm contending otherwise.

351.    Also, during the period of Arm's alleged withholding, Arm ████████

████████████████████████████████████████████████████████

██████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

352.    Accordingly, in my opinion, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

---

Product code ██████ corresponds to the v8 ACK.  ARM_00063298 at -299; Weidmann Dep. Tr. at 169:8–20.

Product code ██████ corresponds to the v8 ACK.  Weidmann Dep. Tr. at 169:8–20.

Product code ██████ corresponds to the v9 ACK.  QCARM_0343954 at -956; Weidmann Dep. Tr. at 166:8–13.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

353.    I understand that Qualcomm contends it could not use the ACK test fixes in the ACK quarterly releases because ██████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████    I understand that Qualcomm also contends ██████████

████████████████████████████████████████████████████████

████████████████    I disagree.

354.    As I explained above, ██████████████████████████████████

███████████████████████████████████████    *See* § XI.B.

Further, Mr. Trivedi admits that ██████████████████████████████████

████████████████████████████    In fact, Mr. Weidmann testified that ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

355.    Further, as noted above, ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████    Conversation with Vivek Agrawal.  Arm's quarterly ACK releases are accompanied by release notes that identify sections of the ACK that have been updated to address ACK test issues. Conversation with Vivek Agrawal.  In my opinion, a sophisticated partner, like Qualcomm, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████    Conversation with Vivek Agrawal; ARMQC_02761714. ██████████████

149

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

356.    Further, Arm's alleged withholding of ACK patches did not put any ████████

on Qualcomm relative to Arm's other ALA partners. ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████    The fixes that are incorporated into the quarterly ACK releases are

provided to all ALA partners via PDH.[119]    Weidmann Dep. Tr. at 90:6–17. ████████████

████████████████████    In fact, Ms. Bhattacharya testified that ████████████████

████████████████████████████████    I have not seen

evidence of an ALA partner receiving an ACK patch for an ACK test issue that Qualcomm

reported, but that Qualcomm allegedly did not receive.  Qualcomm, ████████████ did not

receive the fix until the next quarterly ACK release.  Thus, ████████████████████████

██████████████████████████████████████████████████

████████████████

357.    ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[119]    PDH was formerly known as "Arm Connect."  Weidmann Dep. Tr. at 20:11–21:13.

A0562

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



358.    As noted above, the ████████████ Qualcomm contends resulted from Arm's alleged withholding of ACK patches is attributable to Qualcomm, not Arm.  Regardless, in my opinion, any ████ associated with Arm's alleged withholding of ACK patches was minimal.

   **3.    The Alleged ████████████████ Due To Arm's Alleged Withholding Of ETE Checker Support, If Any, Was Minimal**

359.    I understand that Qualcomm has not identified ██████████ that it alleges is due to Arm's alleged withholding of ETE checker support.  Qualcomm's 3rd Suppl. R&Os to Arm's 1st Set of ROGs; Qualcomm's 2nd Suppl. R&Os to Arm's 2nd Set of ROGs; Qualcomm's 1st Suppl. R&Os to Arm's 3rd Set of ROGs; SAC.  Mr. Trivedi provided some testimony related to ETE checker ████, but was not specific:



360.    As I explained above, any ████████████, to the extent it existed, was due to Qualcomm's actions, not Arm's.  *See supra* XII.B.  Further, ETE checker support is an optional support service that is not required for the verification process, and therefore any alleged withholding by Arm is unrelated to Qualcomm's alleged ████  *See* § XI.C.  Regardless, in my opinion, any ████ due to Arm's alleged withholding of ETE checker support was minimal.

361.    As noted above, Qualcomm had everything it needed to use the ETE checker.  *See* § XI.C.  Qualcomm had access to the v9 ACK (and each subsequent quarterly ACK release), which

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

contained the full suite of ACK tests, including those directed to testing compliance for the ETE trace feature. *Id.* Qualcomm also had access to the ETE checker, which is delivered with the ACK. *Id.* Qualcomm also had access to all ACK-related documentation, including documentation regarding configuring the ETE checker. *Id.* As I explained, Qualcomm is a sophisticated company with sophisticated verification engineers. Qualcomm is able to reference the Arm architecture, the ACK, and the associated user guides and documentation to complete the verification process—including the ETE checker compliance process—on its own. *Id.* Mr. Agrawal testified that



362.    My opinion is further supported by evidence suggesting that Qualcomm did in fact receive ETE checker support from Arm. For example,

363.    This is consistent with my understanding of how the ETE checker is configured. The ETE checker "support" Mr. Agrawal provided to Qualcomm simply pointed Mr. Trivedi back

152

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

to materials Mr. Trivedi already had.  As Mr. Agrawal testified, ███████████████



Mr. Agrawal further testified that ███████████████

364.    I understand that Qualcomm points to an email exchange between Mr. Agrawal and Mr. Trivedi as evidence of Arm failing to provide ETE checker support.  Qualcomm's 2nd Suppl. R&O's to Arm's 2nd Set of ROGs at 22–23; QCVARM_0618420.  In my opinion, this email exchange shows that Mr. Trivedi did receive some support from Mr. Agrawal regarding the configuration of the ETE checker, and it also shows that Mr. Trivedi already had the information that he needed. ███████████████

153

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

[REDACTED]

365.    When questioned about QCVARM_0618420, Mr. Agrawal testified [REDACTED]



[REDACTED] Mr. Agrawal testified that, [REDACTED]

366.    Mr. Agrawal responded to Mr. Trivedi's ETE checker questions via email in January 2025, after Arm had decided to resume supporting Qualcomm regarding the cores Arm contends are unlicensed Nuvia-based cores.  QCVARM_0618420 at -420–422.  As Mr. Agrawal testified, [REDACTED]

154

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

367.    Additional testimony supports my opinion.  Mr. Agrawal testified that ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████    Mr. Agrawal further testified that ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

368.    Accordingly, based on the evidence that is available, it is my opinion that any alleged ████████ due to Arm's alleged withholding of ETE checker support was minimal. Qualcomm had all the tools to use the ETE checker and was in fact receiving support on how to use it during the alleged withholding period.  I have not seen any evidence suggesting that the amount of ████ Qualcomm faced as a result of Arm's alleged withholding of support regarding the ETE checker was in any way significant.

## XIII.    THE PHOENIX-BASED AND PEGASUS-BASED CORES ARE NUVIA-BASED CORES

369.    I understand that a dispute in the first case concerned whether the Phoenix-based and Pegasus-based cores were Nuvia-based cores that used code developed at Nuvia under the Nuvia ALA prior to the Qualcomm acquisition.  In my opinion, the relevant Qualcomm custom CPU cores incorporate pre-acquisition Nuvia code and are based on Nuvia designs.  I have seen several pieces of evidence that support my opinion.

370.    I have seen internal Arm communications that support my opinion.  For example, I have seen ████████████████████████████████████████████████████

█████████████████████████████████    ██████████████████

155

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



I agree that the minor configuration changes between these cores is an indicator that they utilized code from the Nuvia CPU cores developed at Nuvia.

372.    Further, Qualcomm's counsel stated that, "[a]t trial in *Arm Ltd. v. Qualcomm Inc.*, Qualcomm witnesses repeatedly acknowledged that Qualcomm continued using Nuvia Technology."  Qualcomm's Opposition to Arm's August 11, 2025 Motion to Compel at 5.  For example, Gerard Williams, the former co-founder of Nuvia, testified that Qualcomm did not start over with a new CPU core design after acquiring Nuvia:

> Q.  Okay. You didn't start over with a new design, right?
> A.  You're talking about CPU core?
> Q.  Yes.
> A.  No, because that was not believed to be Arm technology, that was Nuvia technology.
> Q.  So you kept working on the same code base that you had been working on at Nuvia, right?
> A.  Yes, because that was Nuvia technology, that's why that was done.

156

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Qualcomm's Opposition to Arm's August 11, 2025 Motion to Compel, Ex. 26 at 401:9–18.  Mr. Williams also agreed that Qualcomm "didn't swap out the RTL that Nuvia had written" and "incorporated Nuvia's technology into Qualcomm products."  *Id*. at 409:16–21; *see also id*. at 412:9–19 (Mr. Williams agreeing that Qualcomm kept using "Phoenix code" "after Qualcomm acquired Nuvia" and that "elements of that Nuvia Phoenix code [are] in the compute and mobile platforms at Qualcomm").

373.    As another example, Cristiano Amon, Qualcomm's CEO, testified that "[t]he Qualcomm designs may include Nuvia technology," *id*. at 808:1–4, agreed that Qualcomm used the Nuvia CPUs for Qualcomm's Pakala, Hamoa, and Nordschleife Snapdragon chips, *id*. at 809:1–12, and agreed that, "[t]o this day, there is Nuvia code that was created under the Nuvia ALA that is in Qualcomm products," *id*. at 824:21–24.

374.    Qualcomm engineer, Jeff Golden, also testified that



Further, Mr. Trivedi testified that

375.    I have also seen evidence that Qualcomm used Nuvia abbreviations to refer Qualcomm's custom CPU team and cores it alleges are Qualcomm designs.  For example, a

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



█████████████████████████████████████████████████

███████████████████████████ Mr. Golden testified that █████████████

██████

████████████████████████

█████████████████ Mr. Trivedi also testified that █████████████████████

██████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████

376.    Further, in a November 2022 IM chat between Jean-Francois Vidon, Qualcomm's Senior Director of Engineering, and Manju Varma, Qualcomm's Senior Director of CPU Product Management, Mr. Vidon noted that ████████████████████████████████████ Specifically, Mr. Vidon noted that ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ Mr. Vidon also suggested that ██████████████████ ██████████████████████████████████████████████

377.    Accordingly, the evidence supports my opinion that Qualcomm's █████████████ █████████████████████ cores contain code developed from Nuvia developments. Even if the at-issue custom CPU core designs include code developed after Qualcomm purchased

158

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Nuvia, they appear to likewise have lines of code that were originally developed by Nuvia, at Nuvia, and for Nuvia's custom CPU core designs.

## XIV.   ARM'S ███████████

378.    In my opinion, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

        ██    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

380.    ████  which stands for ████████████████████████  is the  ████

████████████████████████████████████████  Weidmann Dep. Tr. at

58:12–21. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

159

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



381.

160

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

382. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████



████████████████ at -178.

383. ██████████████████████████████████

████

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



ARMQC_02771168 at -179.



ARMQC_02771168 at -180.

384. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

162

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



385.

ARMQC_02771168 at -181.

163

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



386.

387.

**A0576**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



165

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



ARMQC_02771168 at -185.

390.    Arm's Chief Architect, Richard Grisenthwaite, has described ▮▮▮▮▮▮▮▮ as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Further, Arm's Director of Product Management, Martin Weidmann described ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



This testimony further supports my opinion that the ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

391.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

166

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



ARMQC_02771168 at -187.

392.    Further, for ████, Arm is ██████████████████████████

████ Weidmann Dep. Tr. at 60:7–20.

393.    █████████████████████████████████████████

████    ████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████



ARMQC_02771168 at -172.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

394. █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

## XV.    INCORRECT TECHNICAL ASSUMPTIONS IN MR. POSNER'S REPORT

395.    In my opinion, Qualcomm's experts rely on technical assumptions that are unfounded or simply incorrect.  Specifically, Qualcomm's expert, Eric Posner, relies on the assumption that Arm's implementation cores, sometimes called "off-the-shelf" (OTS) cores, offer lower-quality performance than Qualcomm's Nuvia-based custom cores.  In my opinion, this is an incorrect assumption that is rebutted by the evidence in this case.

**Mr. Posner's Assumption That Arm's Implementation Cores Underperform Qualcomm's Custom Cores Is Unsupported**

396.    Qualcomm's expert, Eric Posner, repeatedly relies on the assumption that "Arm's OTS [off-the-shelf] cores … are more expensive and offer lower-quality performance" than Qualcomm's custom cores and that Arm's OTS cores are used in the "lower-tier" portion of the market.  Posner Rpt. ¶¶ 28, 61, 77.[134]  I disagree.

---

[134]    Mr. Posner also opines that "[a]n OEM … might regard a chip containing an OTS Arm CPU and a Qualcomm chip containing a Qualcomm custom CPU as substitutes or near substitutes," Posner Rpt. ¶ 37, which seems to

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

397.    Mr. Posner bases his assumption on the testimony of Qualcomm's own witnesses. First, Mr. Posner relies on Ziad Asghar, Qualcomm's SVP & General Manager for XR and Spatial Computing, who testified as follows:



398.    Second, Mr. Posner relies on Cristiano Amon, Qualcomm's CEO, who testified as follows:



_____

contradict his technical assumption that Arm's OTS cores are more expensive and offer lower-quality performance.

169

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



399.    Third, Mr. Poser cites paragraph 51 of the SAC, which, in turn, cites Arm Holdings, Ltd.'s Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.  However, neither paragraph 51 of the SAC or the cited portions of the Form F-1 support Posner's assumption.  Instead, these materials discuss Arm's business as including ALA and TLA licenses.

400.    In my opinion, the evidence in this case, including Qualcomm's own documents and witness testimony, shows that Arm's implementation cores often outperform Qualcomm's custom cores, and that many factors other than the RTL can affect performance.

### 1.    The Evidence Shows That Arm's Implementation Cores Often Outperform Qualcomm's Custom Cores

401.    In my opinion, the evidence in this case, including Qualcomm's own documents and witness testimony, shows that Arm's implementation cores frequently outperform Qualcomm's custom cores.

402.    The testimony of Qualcomm's Senior Director of Engineering, Jean-Francois (Jeff) Vidon supports my opinion.  Mr. Vidon is ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Mr. Vidon testified regarding numerous instances in which Arm's TLA cores offered better PPA than Qualcomm's custom cores.

403.    For example, Mr. Vidon testified about ████████████████████████████ ████████████████████████████████████████████████████████████ In this

170

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

IM chain, 

404.    As another example, Mr. Vidon further testified that

405.    As another example, Mr. Vidon further testified that

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**



406.    As another example, Mr. Vidon further testified that ███████████████

407.    As another example, Mr. Vidon testified about ███████████████

172

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

█████████████████████████████████████████████████ Mr. Vidon testified that ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████



408.    The testimony of Qualcomm's Principal Engineer for Automotive CPUs, Richard Meacham, also supports my opinion.  For example, Mr. Meacham testified that ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████

409.    The testimony of Qualcomm's Senior Director of Qualcomm engineering over the CPU design team, Gerard Williams, also supports my opinion.  For example, Mr. Williams testified that ████████████████████████████████████████████████████

██████████████████████████████████████████████

410.    Thus, while Mr. Posner relies exclusively on the unsupported and biased testimony of Qualcomm's CEO and a Qualcomm category general manager to support his assumption that

173

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Qualcomm's Nuvia-based custom cores outperform Arm's implementation cores, Mr. Posner ignores the testimony and statements of Qualcomm's engineers who are actually performing the relative performance assessments. These Qualcomm engineers' own testing data shows that Arm implementation cores are "hard to beat in any aspect" and in fact significantly outperform Qualcomm's Nuvia-based custom cores "on a performance and power basis," as explained above.

### 2.    Many Factors Besides the RTL Affect Performance

411.    In my opinion, Mr. Posner's assumption that Qualcomm's Nuvia-based custom cores outperform Arm's implementation cores is also flawed because it does not account for the fact that many aspects other than the RTL or design for a core can affect the performance of a SoC. For example, the foundry that is used to create the silicon can affect performance, the trade-offs and constraints made during the SoC design process can affect performance, and so can the size of the cache, the location of the cache relative to the CPU, the interconnects being used, the width of the bus being used, and the specific materials used in the design process, such as the thickness of the silicon or the oxide layers, which can limit clock frequency.

412.    Consider the case of two equivalent SoC designs with identical CPU cores that are implemented at different process nodes may have varying characteristics, such as the frequency that the device can be safely operated at, the thermal characteristics of the device, or the amount of power that the device consumes. Even in the case when the two devices are implemented using identical process nodes, there are still other factors within the SoC itself that may impact various aspects of system performance. One example of this is the memory system. While the CPU cores of the two designs may be identical, they may utilize differing memory systems. The amount of cache in the CPU and SoC design, the cache hierarchy and bandwidth of the cache(s), or the memory system overall may impact the performance of the device in terms of computational throughput, power consumption, and chip area. There are any number of factors in the overall

174

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

SoC design that may impact the overall performance, beyond just that of the CPUs themselves, even for identical process nodes. When these designs are manufactured at differing process nodes, the differences in power, performance and other characteristics are even further varied.

413.    Chip designers may choose to implement only certain features that they deem important to their intended use-case and disregard other, non-essential features, which can result in different levels of performance. One example of this would be removing the floating point ISA functionality, which is not needed 99.9% of the time. If a chip designer truly needed this functionality for a one-off use case, the functionality could be emulated in software with performance penalty overhead.

414.    In the automotive segment, I understand that some chip designers may want (or can live with) lower performance and thus manufacture their chips at 45 nm instead of using bleeding edge manufacturing technology. This plays into the lifetime of the part, including by increasing the part's durability in the hostile environment of automobile, as well as reductions in things like soft error rates, among others.

415.    A chip designer may also want to intentionally design a lower performance chip in terms of compute because it consumes less power and current. This reduces thermal problems and/or increases the ability to run on battery or other limited power resources.

416.    My opinion is consistent with the evidence I have reviewed from this case. For example, Qualcomm's CEO, Cristiano Amon testified that ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Mr. Amon further testified that ████████████████████████████████████████

175

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██

417.    As another example, Arm's Senior Vice President and General Manager of the IoT line of business, Paul Williamson testified that ████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████

418.    As another example, Arm's SVP of Technology, Peter Greenhalgh testified that

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████

419.    Thus, in my opinion, Mr. Posner's assumption that Arm's implementation cores underperform Qualcomm's Nuvia-based custom cores is flawed for the additional reason that Mr. Posner does not account for the many factors, besides the RTL, that can affect the performance of an SoC.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

**RESERVATION OF RIGHTS**

This expert report reflects my opinions given in good faith with respect to the information available to me as of the date I executed it. I respectfully reserve the right to supplement or amend my opinions in response to opinions expressed by Qualcomm's experts, or in light of any additional evidence, testimony, or other information that may be provided to me after the date of this expert report, including at trial. In addition, I expect that I may be asked to testify in rebuttal as to issues that may be raised in the expert reports of Qualcomm's experts, or to issues that may be raised by Qualcomm's fact witnesses and experts at trial.

Should additional information be produced that may require me to amend or supplement my opinions, I reserve the right to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: September 5, 2025

By: _____

Michael C. Brogioli, Ph.D.

177

# Exhibit 1

# Michael C. Brogioli, Ph.D.

**Contact Information**

Michael C. Brogioli, Ph.D.
Polymathic Consulting
111 Congress Avenue, Suite 500
Austin, TX 78701 USA

*Office:* (737) 317-2301
*Cell (preferred):* (713) 732-0217
*Fax:* (512) 469-6306
*E-mail:* michael@polymathicconsulting.com

**Education**

**Rice University**, Houston, Texas USA

Ph.D., Electrical and Computer Engineering, 2007

- Dissertation Topic: "Reconfigurable Heterogeneous DSP/FPGA Based Embedded Architectures for Numerically Intensive Embedded Computing Workloads."
- Advising Committee: Dr. Joseph R. Cavallaro, Dr. Keith D. Cooper, Dr. Scott Rixner

**Rice University**, Houston, Texas USA

M.S., Electrical and Computer Engineering, 2003

- Dissertation Topic: "Dynamically Reconfigurable Data Caches in Low Power Computing."
- Advising Committee: Dr. Keith D. Cooper, Dr. Scott Rixner, Dr. Robert Jump

**Rensselaer Polytechnic Institute**, Troy, New York USA

B.S., Electrical Engineering, Cum Laude, 1999

- Advisor: Dr. William Pearlman

**Certificates**

**Harvard Business School**, Boston, Massachusetts, USA

Certificate in Investment Portfolios with Alternate Investments, 2022

- Venture Capital, Growth Equity, Distress Investing, Private Debt, Hedge Funds, Portfolio Construction.

**Professional Experience**

**Polymathic Consulting**, TX USA
*Managing Director*                                                    **2011 - Present**
Founder and managing director of Polymathic Consulting, servicing clients ranging from early stage technology start-up endeavors to Fortune 100 and beyond. Clients turn to Polymathic for expansive, proven engineering, research and development, intellectual property and technical leadership to effectively advance their real world business needs.

**IEEE and ACM Design Automation Conference**, USA
*Steering Committee*
*Conference Chair, Embedded Systems and Software Track*                 **2016 - Present**
Design Automation Conference is the premiere technical conference and trade show specializing in Hardware, Software, Internet of Things, Embedded Systems and related Design Methodologies. Conference chair, responsible for the review, critique, and acceptance of academia and industry based publications in the areas of embedded systems, embedded software, and embedded system design.

**Rice University**, TX USA
*Adjunct Professor, Electrical and Computer Engineering*                **2009 - Present**
Professor of Ph.D. candidate level courses in wireless telecommunications, embedded computing software, embedded computing hardware, and software/hardware optimization in modern computing systems utilizing modern high level programming languages. Advisor of senior and graduate student based projects revolving around multi-core heterogeneous systems as they pertain to wireless telecommunications, medical and video.

**University of Texas, Austin**, TX USA

*Guest Lecturer, School of Engineering*                                    **2021 - Present**

Guest lecturer in "Legal Issues and Technology Management", on subjects relating to technology, management, financial and fund raising matters, technology transfer, and certain legal issues. Students are primarily comprised of those with existing degrees, and a number of years of industry experience.

**RISC-V Foundation**, Berkeley, CA USA

*Technical Committee*                                    **2018 - Present**

RISC-V is an open CPU instruction set architecture (ISA) based on established reduced instruction set computing (RISC) principles. The RISC-V Foundation is a non-profit consortium chartered to standardize, protect, and promote the free and open RISC-V instruction set architecture together with its hardware and software ecosystem for use in all computing devices.

**Freescale Semiconductor**, TX USA

*Chief Architect, Senior Member Technical Staff*                                    **2009 - 2011**

Technical architect of Freescale's DSP compilers and related technology. Responsible for management of technology, engineering roadmaps, design lead on compiler infrastructure and optimizations (high level and low level), next generation ABI definitions and next generation architecture solutions. Technical lead on multi-year engagement with processor architects in design of next generation DSP cores. Developed software infrastructure for migrating OEM competitor software stacks to Freescale solutions, tools generation, software packages, migration strategies and white papers. Technical lead on Tier-1 OEM customer relationships, evaluations of 3rd party technologies for potential partnerships and acquisitions, led various university research collaborations on behalf of Freescale. Development and deployment of internal software engineering policies and practices.

**Freescale Semiconductor**, TX USA
**Senior Compiler Engineer V**

*High Performance Compiler Design, Processor Architecture*                                    **2007 - 2009**

Team leader on compiler engineering effort to provide intuitive, interactive end user experience for DSP compiler tool suite. Designed a framework to guide users in achieving highly optimized compiled VLIW code. Assembly listing reports for optimization failure advice, porting advice when migrating from competitor architectures, advice on code modifications for optimization enablement. Lead designer, engineering effort director, project planning and scoping, release schedule, and drafting of specification. Development of various compiler optimizations for VLIW processing as well as software emulation layers for running competitor software solutions on Freescale silicon.

Advising of next-gen DSP core architecture team in creating a highly orthogonal, compiler targetable multi-clustered VLIW based digital signal processor architecture. Work with future basestation architecture teams on designing next-gen basestation architecture for 4G LTE incorporating control and data plane processing with appropriate programming models.

**Method Seven**, MA USA
**Technical Co-Founder**

*High Performance Software and Hardware Systems Architecture*                                    **2006 - 2007**

Founded Method Seven, a financial engineering company applying biologically inspired machine learning to financial market analysis. Principal software systems architect and hardware systems architect for both research and deployment platforms. Led research and development of platform for scans and overlays covering the NASDAQ, NYSE, and AMEX markets using proprietary technologies.

**Texas Instruments**, TX USA
**Advanced Architecture and Chip Technologies**
*Microprocessor and Systems Architecture*                                    **2005**

System modelling and architectural exploration of Davinci$^{TM}$system-on-chip (SOC) architecture designed for embedded video processing. SystemC based simulation models of on–chip crossbars, bus arbitration and bridge technology, as well as on–chip and off–chip memory controllers within application specific heterogeneous SOC architectures.

**Fulbright and Jaworski LLP**, TX USA
*Scientific Advisor, Intellectual Property*
*Electrical, Computer Engineering and Computer Science*                                **2005 - 2007**
Intellectual property consultant and technology advisor on litigation and prosecution work including, but not limited to: CDMA2000 3G wireless standards, wireless communications systems, embedded computing, and large scale modular software systems. Reverse engineering of source code varying from VHDL to high level object oriented applications, as well at patent prosecution and litigation work.

**Intel Corporation**, CA USA
**Microprocessor Research Labs**
*Compiler Engineering*                                                                **2000**
Implemented speculative multi–threading support in Intel's IA–64 compiler. Developed new program analysis and back end code generation phases to support speculatively launching threads at runtime. Analyzed the performance potentials of SPEC95 benchmarks with respect to speculatively multi–threaded execution.

**Rice University**, TX USA
*Computer Architecture and Circuit Design (Instructor)*                               **2000 - 2003**
Graduate instructor of graduate and undergraduate curriculum in the areas of Electrical and Computer Engineering, specifically relating to Computer Architecture and Circuit Design. Advised student projects, instructed classes and led laboratory work.

**Vicarious Visions**, NY USA
*Lead Software Engineer*                                                              **1999**
Principal engineer on Activision's "AMF Extreme Bowling" for Nintendo's Color Gameboy gaming console. Developed PC based audio and graphics development tools suite for use with Color Gameboy game production. Coded innovative, highly optimized assembly routines for real time speech and full motion video on the console's limited Zilog Z80 processor resources.

**Stratus Computer**, MA USA
*Hardware Engineering*                                                                **1997 - 1998**
Debugged locked step CPU operation and memory management issues in Stratus' fault tolerant UNIX release 3.4. Qualified Hewlett Packard PA–8000 series CPU modules under Stratus' proprietary OS release, VOS 14.0, during alpha and beta test phases. Wrote C code and UNIX shell scripts for recreating documented system failures, and to automate remote kernel updates and OS installs as well as data logging.

**Rensselaer Polytechnic Institute**, NY USA
*Digital Microelectronics Design (Instructor)*                                        **1997 - 1998**
Undergraduate instructor of undergraduate courses in digital microelectronics and circuit design. Instructed weekly lessons, computer design labs, graded exams and problem sets.

**Rensselaer Electric Motor Sports**, NY USA
*Hardware and Software Engineering*                                                   **1995 - 1997**
This project was funded by, and led by, General Motors Corporation and Honda of America. Hardware and software co-design of embedded operating system and hardware platform for electrical vehicle prototypes, running on 16-bit Motorola 68K dual processor platform. Designed power engineering test platform for dynamometers, including hardware and user interface software.

**Appointed Conference Committees and Organizations**

**IEEE International Conference on Communications**, USA
*Technical Review Committee, Machine Learning for Communications Track*    **2021 - Present**
Technical committee member responsible for the review, critique, and acceptance of academia and industry based publications and research in the areas of machine learning for communications systems.

**IEEE International Symposium on Circuits and Systems**, USA
*Technical Review Committee*    **2021 - Present**
Technical committee member responsible for the review, critique, and acceptance of academia and industry based publications and research in the areas of computing, including energy aware systems, multicore processing, and adaptive computing.

**IEEE and ACM Design Automation Conference**, USA
*Technical Steering Committee, Embedded Computing Track*    **2019 - Present**
Technical Steering Committee member responsible for the review, critique, and acceptance of academia and industry based publications and research in the area of embedded computing and related systems, including embedded hardware, embedded software, firmware and tools.

**IEEE and ACM Design Automation Conference**, USA
*Co-chair, Program Committee, Embedded Systems and Software Track*    **2014 - 2019**
Co-chair and Program Committee member responsible for the review, critique, and acceptance of academia and industry based publications in the areas of embedded systems, embedded software, and embedded system design. Design Automation Conference is an annual technical conference and trade show specializing in electronic systems.

**IEEE and ACM Design Automation Conference**, USA
*Program Committee, Designer and User Track*    **2011 - Present**
Program Committee member responsible for the review, critique, and acceptance of academia and industry based publications in the areas of automated system design, both of hardware, software, and system analysis. Design Automation Conference is an annual technical conference and trade show specializing in electronic systems.

**ACM Great Lakes Symposium on VLSI**, Stresa-Lago Maggiore, Italy
*Program Committee*    **2007**
Reviewer and committee member in the area of system-on-chip architectures, VLSI design, and compiler driven architecture design space exploration.

**IEEE International Symposium on Personal Indoor and Mobile Radio Communications**, Helsinki, Finland
*Program Committee*    **2006**
Reviewer and committee member in the area of personal and mobile area radio communications and related systems.

**ACM International Conference on Parallel Architectures and Compilation Techniques**, Charlottesville, VA, USA
*Program Committee*    **2002**
Reviewer and committee member in the area of parallel computer architectures, programming languages and related compiler technologies.

**Books and Contributed Chapters**

Brogioli, Michael C., and Kraeling, Mark B., *Internet of Things - A Synopsis of the Internet of Things, its History, Application, Technology, Architecture, and Challenges Moving Forward*, Software Engineering for Embedded Systems - Methods, Practical Techniques and Applications, 2nd Edition, Elsevier Publishing, 2019.

Brogioli, Michael C., *Software and Compiler Optimization for Microcontrollers, Embedded Processors and DSPs*, Software Engineering for Embedded Systems - Methods, Practical Techniques and Applications, 2nd Edition, Elsevier Publishing, 2019.

Brogioli, Michael C., *Embedded and Multicore System Architecture - Design and Optimization*, Software Engineering for Embedded Systems - Methods, Practical Techniques and Applications, 2nd Edition, Elsevier Publishing, 2019.

Leotescu, Florin, and Cristian, Marius and Brogioli, Michael C., *Performance Analysis using NXP's i.MX RT1050 Crossover Processor and the Zephyr Real-Time Operating System*, Software Engineering for Embedded Systems - Methods, Practical Techniques and Applications, 2nd Edition, Elsevier Publishing, 2019.

Wu, Michael and Sun, Yang and Wang, Guohui and Brogioli, Michael C. and Cavallaro, J. R., *Implementation of a High Throughput 3GPP Turbo Decoder on GPU Architectures*, Software Development for Networking Applications – Expert Guides Series, Elsevier Publishing, Atlanta, GA, 2018.

Brogioli, M. C., *On The C++ Programming Language for Embedded Software, Systems, and Platforms*, Software Engineering for Embedded Systems – Expert Guides Series, Elsevier Publishing, Atlanta, GA, 2013.

Brogioli, M. C., *Software Optimizations for Memory Performance in Embedded Systems*, Software Engineering for Embedded Systems – Expert Guides Series, Elsevier Publishing, Atlanta, GA, 2013.

Invited Co-Author, *Signal Processing Systems Handbook, Second Edition*, Springer Publishing Company, 11 West 42nd Street, New York, NY, 2012.

Brogioli, M. C., *Software Programmable DSP Architectures*, Expert Guide DSP for Embedded and Real-Time Systems, pp. 63-75, Elsevier Publishing, Atlanta, GA, 2012.

Brogioli, M. C., *The DSP Hardware / Software Continuum*, Expert Guide DSP for Embedded and Real-Time Systems, pp. 103-113, Elsevier Publishing, Atlanta, GA, 2012.

Brogioli, M. C., *DSP Optimization - Memory Optimization*, Expert Guide DSP for Embedded and Real-Time Systems, pp. 217-241, Elsevier Publishing, Atlanta, GA, 2012.

Brogioli, M. C. and Dew, Stephen, *Optimizing DSP Software - High level Languages and Programming Models*, Expert Guide DSP for Embedded and Real-Time Systems, pp. 167-179, Elsevier Publishing, Atlanta, GA, 2012.

Sun, Yang, Amiri, Kiarash, Brogioli, Michael, Wang, Guohui, and Cavallaro, Joseph R., *DSP Hardware Accelerator Architectures for Communication Applications*, Springer Publishing, New York, NY, Spring 2012.

Sun, Yang, and Amiri, Kiarash, and Brogioli, Michael C., and Cavallaro, Joseph, *Application-Specific Accelerators for Communications*, Springer Publishing Company, 11 West 42nd Street, New York, NY, 2010.

Invited Co-Author, *Signal Processing Systems Handbook, First Edition*, Springer Publishing Company, 11 West 42nd Street, New York, NY, 2010.

**Publications and Invited Papers**  Brogioli, Michael, C., and Games, William, and Moats, Richard, *Current and Future Challenges in Internet of Things (IoT) Development Silos (Part I)*, Embedded Computing Design Magazine,

USA, 2020.

Brogioli, Michael, C., and Games, William, and Moats, Richard, *On Solving the IoT Development Silo Problem* IEEE Real-Time and Embedded Technology and Applications Symposium, Tools and Demos Session, Montreal, Canada, 2019.

Moats, Richard, and Games, Bill, and Brogioli, M. C., *Arch - A New Language For The Next Wave of Network-Connected Embedded Development*, Design Automation Conference, Austin, Texas, 2017.

Moats, Richard, and Games, Bill, and Brogioli, M. C., *Network Native - The Next Wave of Connected Embedded Development*, Network Native Inc., Austin, Texas, 2017.

Invited Paper, Arokia I, Brogioli, Michael, Jain, Nitjin and Garg, Umang, *LTE Layer 1 Software Design on Heterogeneous Multicore DSP Platforms*, IEEE 45th Asilomar Conference on Signals, Systems and Computers, Pacific Grove, CA, 2011.

Kyriakopoulous, Konstantinos, Brogioli, Michael C., and Zhang, Ruihao, *Improving Software Systems Quality through Well Defined Development Methodologies*, 2011 Test Methodology and Efficiency Symposium, Freescale Semiconductor, Austin, TX, USA, 2011.

Brogioli, Michael C., and Cavallaro, J.R., *Compiler Driven Architecture Design Space Exploration for Embedded DSP Workloads: A Study in Software Programmability Versus Hardware Acceleration*, IEEE 43rd Asilomar Conference on Signals, Systems and Computers, Pacific Grove, CA, 2009.

Brogioli, Michael C., and Zhang, Ruihao, *Compiler Feedback: Guiding Performance of Compiled C Code*, Freescale Semiconductor White Paper, Austin, TX, 2009.

Brogioli, M.C., and Cavallaro, J., *RISD: A Retargetable Compiler Infrastructure for Scalable Multi-Clustered VLIW DSP Architectures*, IEEE 5th Dallas Circuits and Systems Workshop, Dallas, TX, 2007.

Brogioli, Michael C., Radosavljevic, P., and Cavallaro, J., *A General Hardware/Software Codesign Methodology for Embedded Signal Processing and Multimedia Workloads*, IEEE 40th Asilomar Conference on Signals, Systems, and Computers, Pacific Grove, CA, 2006.

Brogioli, Michael C., Radosavljevic, P., and Cavallaro, J., *Hardware/Software Co-design Methodology for DSP/FPGA Partitioning: A Case Study for Meeting Real-Time Processing Deadlines in 3.5G Mobile Receivers*, 49th IEEE International Midwest Symposium on Circuits and Systems, San Juan, Puerto Rico, 2006.

Brogioli, Michael C., Willmann, P.D., and Rixner, S., *Parallelization Strategies for Network Interface Firmware*, IEEE/ACM 4th Annual Workshop on Optimizations for DSP and Embedded Systems (In Conjunction with IEEE/ACM International Symposium on Code Generation and Optimization), Manhattan, NY, 2006.

Brogioli, Michael C., Gadhiok, M., and Cavallaro, J., *Design and Analysis of Heterogeneous DSP/FPGA Based Architectures for 3GPP Wireless Systems*, IEEE Real-Time and Embedded Technology and Applications Symposium Work-in-Progress Sessions, San Jose, CA, 2006.

Brogioli, Michael C., and Cavallaro, J., *Modelling Heterogeneous DSP-FPGA Based System Partitioning with Extensions to the Spinach Simulation Environment*, IEEE 39th Asilomar Conference on Signals, Systems, and Computers, Pacific Grove, CA, 2005.

Joseph R. Cavallaro, Michael C. Brogioli, Alexandre de Baynast, and Predrag, Radosavljevic, *Re-*

*configurable Architectures for Wireless Systems: Design Exploration and Integration Challenges*, Wireless World Research Forum, Toronto, CA, 2004.

Brogioli, Michael C., Pai, V.S., Willmann, P.D., *Spinach: A Liberty–Based Simulator For Programmable Network Interface Architectures*, ACM SIGPLAN/SIGBED Conference on Languages Compilers and Tools for Embedded Systems, San Diego, CA, 2004.

Brogioli, Michael C., *Dynamically Reconfigurable Data Caches in Low Power Computing*, Masters Thesis, Rice University, Houston Texas, 2002.

Brogioli, Michael C., and Jones, Bryan, *Dynamically Configurable Caches in Low Power Computing*, Internal White Paper, Rice University, Houston Texas, 2001.

**Patents**      Gregory D. Chiocco and Michael C. Brogioli, *Generalized, Hierarcical, Multimodal Event Detection*, U.S. Provisional Patent Application 63/801,591.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Connected Computation in Network Constrained Systems*, U.S. Patent Application 19/065,739.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Connected Computation in Network Constrained Systems*, U.S. Patent Application 18/242,483.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Obtaining Location Data*, U.S. Patent Application 18/807,970.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Aggregating Harvest Yield Data*, U.S. Patent No. 11,854,094.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Obtaining Location Data*, U.S. Patent No. 12,066,838.

Donald W. Games, Michael C. Brogioli Ph.D., Richard Moats, *System And Method for Holistic Application Development and Deployment in a Distributed Heterogeneous Computing Environment*, U.S. Patent Application 17/745,792, filed May 2022. Patent Pending.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Connected Computation in Network Contstrained Systems*, U.S. Patent No. 11,750,701.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Traversing A Three Dimensional Space*, U.S. Patent No. 11,526,180.

Gregory D. Chiocco and Michael C. Brogioli, *Systems and Methods for Aggregating Harvest Yield Data*, U.S. Patent No. 11,354,757.

Donald W. Games, Michael C. Brogioli Ph.D., Richard Moats, *System And Method for Holistic Application Development and Deployment in a Distributed Heterogeneous Computing Environment*, U.S. Patent No. 11,340,887.

Michael C. Brogioli, Ph.D., Cesar Taylor M.D., and Howard Roberts, *Location Agnostic Platform for Medical Condition Monitoring and Prediction and Method of Use Thereof*, Patent No: 147145.010100/US, 2014.

Cesar Taylor M.D., and Michael C. Brogioli Ph.D., and Howard Roberts, *System for Holistic Pain Monitoring and Prediction and Method of User Thereof*, Patent No: 147145.010200/US, 2014.

Cesar Taylor M.D., and Michael C. Brogioli Ph.D., and Howard Roberts, *System for Prevention of Narcotic Diversion and Method of Use Thereof*, Patent No: 147145.010300/US, 2014.

Howard Roberts, Cesar Taylor M.D., and Michael C. Brogioli Ph.D., *Magnetometer Breathing Sensor and Method of User Thereof*, Patent No: 147145.010400/US, 2014.

**Leadership and Board Membership**

**Tandem Motion Company** FL, USA
*Advisory Board*                                                                    **2021 - 2023**
Advisory board member on intellectual property strategy, fundraising, finance and select technologies. Tandem is building hybrid solutions for heavy duty internal combustion engine vehicles.

**AgCompute** CA USA
*Advisory Board, Co-Inventor*                                            **2019 - Present**
Advisory board and co-inventor of patent pending technology for the advancement of Agriculture Technology in areas of low network connectivity and adverse conditions. Innovative sensor, edge and cloud computing solutions for in-field real time asset management.

**MIT MassChallenge** USA
*Mentor, Speaker*                                                              **2017 - Present**
MassChallenge is a global startup accelerator with a focus on high-impact, early-stage entrepreneurs. Through its global network of accelerators in Boston, London, Mexico City, Geneva, Jerusalem and Texas, coupled with unrivaled access to our corporate partners, MassChallenge has driven growth and created value the world over. To date, MassChallenge has raised over $2B in funding, generated over $900M in revenue, and created over 65,000 jobs.

**ScribeSense**, TX USA
*Board of Directors*                                                                      **2017**
ScribeSense is a *patented* cloud-based grading platform for schools and the only solution for grading free-form paper tests. ScribeSense automatically grades handwritten tests with 99% accuracy. Teachers scan and upload their own tests using a standard school scanner. ScribeSense's visual analytics enables data-driven decision making so schools can improve student learning and retain top teacher talent.

**Southwest Angel Network for Social Impact**, TX USA
*Board of Directors*                                                              **2015 - 2019**
The Southwest Angel Network for Social Impact ( SWAN Impact ) is a community of like-minded investors who enjoy working together to *Make the world a better place, one company at a time*. We believe that we can have the most significant impact by funding for-profit start-up companies who are building sustainable businesses.

**Network Native**, TX USA
*Board of Directors, Co-Founder, CTO*                                **2015 - Present**
Board member and co-inventor, advising in the areas of Internet of Things technologies, specifically related to product developer solutions, programming languages and platforms, security and infrastrucure. Business development, marketing, and fund raising. Have held various roles, including but not limited to CTO.

**NewCrew**, TX USA
*Advisory Board*                                                                    **2015 - 2016**
Board member advising in the areas of mobile computing, social computing, and geofencing technologies. Business development, marketing, and fund raising.

**AngelSpan**, TX USA
*Advisory Board*                                                                    **2015 - 2016**

Board member advising in the areas of professional investor relations to start-ups, resource allocation, and a platform for increased efficiency and valuation of early stage companies and venture capital portfolios.

**Vault (acquired by Summer PBC)**, TX USA
*Advisory Board, Interim CTO*                                        **2013 - 2015**
Advisory board member and interim CTO advising in the areas of financial transactions systems and enterprise software, as they pertain to solving the student loan debt crisis for early stage science, technology, engineering and medicine (STEM) employees. Technology, recruiting, fund raising. Vault was acquired by Summer PBC in 2024.

**HealthBits**, TX USA
*Board Member, Co-Inventor*                                          **2013 - 2014**
Board member advising in the areas of large scale enterprise software systems, real-time computing and medical sensing devices across complex event processing systems.

**Osmek**, TX USA
*Interim CTO, Advisory Board*                                        **2012 - 2014**
Interim CTO and board member advising in the areas of large scale cloud based content management software systems. Providing innovative media content management for heterogeneous web enabled devices with geolocational services, primarily using PHP and Python programming languages.

**Academia**       **Rice University**, Houston, Texas USA
*DSP Compiler Design*                                                **2005 - 2009**
Developed *RISD*, a retargetable compiler infrastructure for clustered VLIW DSP architectures. By taking pre-existing code schedules and binaries for existing DSP applications, RISD takes a flexible machine definition for which the code should be recompiled. Users can specify the number of VLIW clusters, functional units per VLIW cluster, functional unit mix per VLIW cluster, register file sizes, cluster interconnect topology (point-to-point versus 2d mesh network), multi-cluster scheduling algorithms, and inter-cluster cross-register file bandwidth and latencies.

Compiler framework was used to perform compiler driven design space exploration of massively multi-clustered VLIW based architectures versus FPGA and ASIP implementations of software kernels. RISD was used in studies comparing tradeoffs in computational throughput versus gates required to implement programmable DSP cores containing many register files and VLIW compute clusters, versus FPGA efficiency when including routing overhead for large scale problems.

**Rice University**, Houston, Texas USA
*DSP/FPGA Based System-On-Chip Architectural Simulator Design*        **2004 - 2009**
Developed *Spinach DSP-FPGA*, a modular and composable simulator design infrastructure for programmable and reconfigurable embedded SOC architectures. Designed and developed modular and composable software modules to bit-true, cycle accurately simulate Texas Instruments C62x and C64x DSPs and MIPS style processors. Additionally, designed and developed support for SRAM and DRAM style memories, heterogeneous memory systems, heterogeneous clock domains, as well as runtime reconfigurable Xilinx Virtex II based FPGA computing elements, cache and memory controllers, bus arbiters, and on-chip interconnect fabric.

System was validated against compiled code DSP firmware from Texas Instruments' Code Composer Studio running on the simulator versus actual hardware benchmarks. Simulation platform was used to investigate highly heterogeneous multi-processor DSP based SOC architectures containing one or more Xilinx style FPGA based hardware coprocessors. Studies in 3.5G wireless telecommunications as well as H.26x video processing were performed to gain insight into overall system bottlenecks, hardware and software partitioning strategies, and tradeoffs of overall system design.

**Rice University**, Houston, Texas USA

*Programmable Network Interface Architecture Simulator Design*                    **2002 - 2004**

*National Science Foundation Grant Nos. CCF-0532448 and CNS-0532452*

Developed *Spinach*, a simulator design toolset for modelling programmable network interface archi-tectures. Spinach models system components common to all programmable environments (ALUs, control and data paths, register files, instruction processing), as well as components specific to em-bedded computing (software controlled SRAM scratchpad memory, hardware assists for DMA and medium access control). Spinach is a simulator design infrastructure, rather than a simulator per se. As such, the same underlying C code framework is used to model a uniprocessor Gigabit net-work interface, a multi-processor Gigabit network interface, or a 10 Gigabit multi-processor network interface with highly heterogeneous memory systems. Only a small number of lines of high level scripting language code is required to describe each of the various systems.

Spinach was validated by modeling the Tigon-2 programmable Ethernet controller by Alteon Web-systems, running actual compiled code Ethernet processing firmware and by comparing the reported results to actual hardware benchmarks. Spinach was also used to obtain new insights into the per-formance of Gigabit and 10 Gigabit network interfaces both in terms of hardware architecture and firmware parallelization strategies. *Public Website: https://sourceforge.net/projects/spinach/*

**Rice University**, Houston, Texas USA

*Software Engineering and Consulting*                                                  **2000**

Implemented instruction selection and register allocation optimizations in UHFFT, an adaptive and portable software library for the Fast Fourier Transform. Performed in depth analysis of register pressure, compiler generated spill code, memory hierarchy utilization, and instruction selection for non–trivially sized FFT matrices running on commercially available hardware platforms. Utilized reverse Cuthill–McKee technique to achieve near optimal computation orderings and minimize live data set sizes, as well as optimize register allocation and instruction selection phases of compilation.

| | |
|---|---|
| **Select Expert Witness, Consultant Engagements** | **RFCyber Corp.[*] v. Starbucks Corporation**<br>**RFCyber Corp.[*] v. The Kroger Co**<br>**RFCyber Corp.[*] v. Volkswagen Ag, et al.**<br>**Fabricant LLP**, NY, USA<br>**Expert Witness in Mobile Devices, Payments and Security**          **2025 - Present** |

Case Subject Matter - Mobile devices and network communications in a multi-tier security model relating to mobile payments.

Work Performed - Expert consulting, claim construction declaration (to date).

**Yealink (USA) Network Technology Co. Ltd., and Yealink Network Technology Co. Ltd v. Barco, Inc. et al.[*]**

**K&L Gates LLP**, CA, USA

**Expert Witness in Wireless Communications Systems**                    **2025 - Present**

Case Subject Matter - Wireless communications systems and computer peripherals for content shar-ing.

Work Performed - Expert consulting, IPR declarations (to date).

**Qualcomm Inc. v. Arm Holdings PLC[*]**

**Kirkland & Ellis LLP**, USA

**Expert Witness in Microprocessor Design and Validation**                    **2025 - Present**

Case Subject Matter - Computer microprocessor design and validation.

Work Performed - Expert consulting (to date).

**Netlist, Inc.[*] v. Micron Technology, Inc., Micron Semiconductor Products, Inc., Mi-cron Technology Texas LLC**

**Irell & Manella LLP**, CA, USA

**Expert Witness in HBM Computer Memory Technology**        **2025 - Present**
Case Subject Matter - Expert Witness in computer memory modules and high storage capacity HBM memory technology.
Work Performed - Expert consulting (to date).

**BMW of North America LLC\* v. Foras Technologies Ltd.**
**Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, GA, USA**
**Expert Witness in Fault Tolerant Multiprocessor Systems**        **2024 - Present**
Case Subject Matter - Fault tolerant recovery in multiprocessor system architectures.
Work Performed - Expert consulting, multiple IPR declarations and depositions (to date).

**Barco, Inc. et al.\* v. Yealink (USA) Network Technology Co. Ltd**
**K&L Gates LLP, CA, USA**
**Expert Witness in Wireless Communications Systems**        **2024 - Present**
Case Subject Matter - Wireless communications systems and computer peripherals for content sharing.
Work Performed - Expert consulting, claim construction declarations, depositions (to date).

**HL Klemove Corp.\* v. Foras Technologies Ltd.**
**Arnold & Porter Kaye Scholar LLP, CA, USA**
**Expert Witness in Multiprocessor Systems**        **2024**
Case Subject Matter - Fault tolerant recovery in multiprocessor system architectures.
Work Performed - Expert consulting, expert declaration.

**Labrador Diagnostics LLC\* v. Biofire Diagnostics, LLC and Biomerieux, S.A.**
**Irell & Manella LLP**, CA, USA
**Expert Consulting in Medical Device Software and Systems**        **2024 - Present**
Case Subject Matter - Consultant in medical testing equipement hardware, software and computer networking technology.
Work Performed - Expert consulting, reverse engineering, declarations (to date).

**Mercedes-Benz USA, LLC v. Daedalus Prime LLC\***
**Ascenda Law Group, CA, USA**
**Expert Witness in Multicore Systems, Memory and Power Mgmt**        **2024 - 2025**
Case Subject Matter - Dynamic power management in heterogeneous CPU/GPU systems, interconnects and memory systems.
Work Performed - Expert consulting, multiple IPR declarations, multiple depositions.

**Samsung Electronics Co., LTD v. Headwater Research LLC\***
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Computer Networking Technology**        **2024 - Present**
Case Subject Matter - Wireless/cellular networking technology as it relates to mobile devices and messaging.
Work Performed - Expert consulting, IPR declaration, depositions.

**Samsung Electronics Co., LTD v. Headwater Research LLC\***
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Wireless Networking Technology**        **2024**
Case Subject Matter - Wireless networking technology as it relates to mobile devices and secure communication.
Work Performed - Expert consulting, IPR declaration.

**SEVEN Networks, Inc.\* v. Motolola Mobility LLC**
**McKool Smith LLP, NY, USA**

**Expert Witness in Mobile Device Power Management**          2023 - 2024
Case Subject Matter - Power management hardware and software systems in mobile devices.
Work Performed - Expert consulting, expert reports, deposition.

**Viasat, Inc. v. Western Digital Techs., Inc***
**Gibson, Dunn & Crutcher, LLP, CA, USA**
**Expert Witness in Computer Memory Technology**          2023 - 2024
Case Subject Matter - Error correction technology for non-volatile memory, and non-volatile memory system design.
Work Performed - Expert consulting.

**Valtrus Innovations LTD* v. SAP America, Inc. and SAP, SE**
**Reichman Jorgensen LLP, CA, USA**
**Expert Witness in Multiprocessor Systems and Caching Technology**          2023 - 2025
Case Subject Matter - Multiprocessor systems, computer architecture, cache and memory systems, secure computing.
Work Performed - Expert consulting, expert declarations, depositions.

**Valtrus Innovations LTD* v. AT&T Inc., et al**
**Reichman Jorgensen LLP, CA, USA**
**Expert Witness in Multiprocessor Systems and Caching Technology**          2023 - 2024
Case Subject Matter - Multiprocessor systems, dynamic cache partitioning and related technology.
Work Performed - Expert consulting, claim construction declarations, deposition, Markman hearing tutorials.

**BMW of North America LLC* and Robert Bosch LLC* v. Foras Technologies Ltd.**
**Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, GA, USA**
**Expert Witness in Multiprocessor Systems**          2023 - Present
Case Subject Matter - Fault tolerant recovery in multiprocessor system architectures, including firmware related functionality.
Work Performed - Expert consulting, expert IPR declarations, depositions (to date).

**Sonrai Memory Limited* v. Micron Technology, Inc.**
**BC Law Group PC, NY**, USA
**Expert Witness in Volatile and Non-Volatile Memory Technology**          2023 - 2024
Case Subject Matter - Expert Witness in volatile and non-volatile memory technology, including power systems.
Work Performed - Expert consulting, expert reports, depositions.

**Micron Technology Inc. v. Sonrai Memory Limited***
**BC Law Group PC, NY**, USA
**Expert Witness in Volatile and Non-Volatile Memory Technology**          2023 - 2024
Case Subject Matter - Expert Witness in volatile and non-volatile memory technology, including power systems.
Work Performed - Expert consulting, multiple IPR declarations, multiple depositions.

**AGIS Software Development, LLC* v. Samsung Electronics Co., Ltd. et. al**
**Fabricant LLP**, NY, USA
**Expert Witness in Mobile Devices and Systems**          2023 - 2024
Case Subject Matter - Expert Witness in mobile devices and location tracking software and systems.
Work Performed - Expert consulting.

**Samsung Electronics Co. Ltd. and Samsung Semiconductor, Inc. v. Netlist, Inc.***
**Netlist, Inc.* v. Google LLC, Alphabet Inc., Samsung Electronics Co., Ltd.**

and Samsung Semiconductor, Inc.
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory and Module Architecture**          **2023**
Case Subject Matter - Expert Witness in computer memory module architecture, self testing, DRAM and related technologies.
Work Performed - Expert consulting, claim construction declaration, deposition.

**Netlist, Inc.\* v. Micron Technology, Inc.; Micron Semiconductor Products, Inc.; Micron Technology Texas LLC**
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory and Module Architecture**      **2023 - Present**
Case Subject Matter - Expert Witness in computer memory modules, high capacity HBM technology, and issues relating to performance and power.
Work Performed - Expert consulting, expert reports, depositions (to date).

**Samsung Electronics Co., Ltd v. Netlist, Inc\***
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory**                     **2022 - 2023**
Case Subject Matter - Expert Witness in multiple IPRs related to high bandwidth stacked memory architectures.
Work Performed - Expert consulting, IPR declarations, depositions.

**Daedalus Prime LLC\* v. Samsung Electronics Co., Ltd. et. al**
**Bluepeak Law Group LLP, NY, USA**
**Expert Witness in Dynamic Power Management**                  **2023**
Case Subject Matter - Dynamic power management of multicore processors, memory systems and related domains.
Work Performed - Expert consulting.

**Certain Semiconductors and Devices and Products Containing the Same, Including Printed Circuit Boards, Automotive Parts, and Automobiles, Inv. No. 337-TA-1332**
**Daedalus Prime LLC\***
**Reichman Jorgensen LLP, CA, USA**
**Expert Witness in Dynamic Power Management**                  **2022**
Case Subject Matter - Dynamic power management of multicore processors, memory systems and related domains.
Work Performed - Expert consulting.

**Definitive Holdings LLC v. Powerteq LLC\***
**Proskauer Rose LLP, NY, USA**
**Expert Witness in Automotive Software and Hardware**           **2022 - 2023**
Case Subject Matter - Automotive engine control software, hardware and related technology.
Work Performed - Expert consulting, declarations.

**Aire Technology Ltd.\* v. Apple Inc.**
**Aire Technology Ltd.\* v. Google LLC**
**Aire Technology Ltd.\* v. Samsung Electronics Co., Ltd. et. al**
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Computer Hardware Design**                  **2022**
Case Subject Matter - Computer hardware design as it relates to Near Field Communication.
Work Performed - Expert consulting, declarations, deposition testimony.

**WSOU Investments, LLC\* v. ZTE Corporation et. al**
**Kasowitz Benson Torres LLP**, NY, USA

**Expert Witness in Video and Telecommunications Computing**    **2022 - 2023**
Case Subject Matter - Expert Witness in hardware and software design as it relates to video codec technologies and telecommunications processing.
Work Performed - Expert consulting and expert declaration.

**Robert Zeidman* v. Lindell Management LLC**
**Bailey Glasser LLP**, Washington DC, USA
**Expert Witness in Computer Software and Networking**    **2022 - 2023**
Case Subject Matter - Expert Witness in computer software and networking as it pertains to voting machines used in the United States 2020 Presidential Election.
Work Performed - Expert consulting, expert reports, testimony at hearing.

**Netlist, Inc.* v. Samsung Electronics Co., Ltd. et. al**
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory and Module Architecture**    **2022 - 2023**
Case Subject Matter - Expert Witness in computer memory modules, high capacity HBM technology, and issues relating to performance and power.
Work Performed - Expert consulting, expert reports, depositions, trial testimony.

**Samsung Electronics Co., Ltd v. Netlist, Inc***
**Irell & Manella LLP**, CA, USA
**Expert Witness in Computer Memory**    **2022 - 2023**
Case Subject Matter - Expert Witness in multiple IPRs related to computer memory module architecture, including DRAM and related technologies.
Work Performed - Expert consulting, IPR declarations, depositions.

**Scott and White Health Plan and SHA, LCC d/b/a FirstCare* v. Actian, Corporation**
**Germer, Beaman & Brown PLLC**, TX, USA
**Expert Witness in Computer Software**    **2022 - Present**
Case Subject Matter - Expert Witness in computer software and related licensing and copyright matters.
Work Performed - Expert consulting (to date).

**Idan Bar-Asher et. al v. Playtika Holding Corp., et. al Ltd***
**Labaton Sucharow LLP**, Washington D.C., USA
**Expert Witness in Mobile Software and Systems**    **2022 - 2024**
Case Subject Matter - Expert witness in mobile gaming software and systems development as it relates to federal securities laws and Initial Public Offerings (IPOs).
Work Performed - Expert consulting.

**Maxell Ltd* v. Lenovo Group Ltd., et. al**
**Mayer Brown LLP**, Washington D.C., USA
**Expert Witness in Power Management**    **2022 - 2023**
Case Subject Matter - Expert Witness in the area of mobile devices, microprocessors and power management.
Work Performed - Expert consulting.

**Q Technologies, Inc.* v. Walmart, Inc.**
**Q Technologies, Inc.* v. Neutron Holdings, Inc. d/b/a/ LIME**
**Kane Russell Coleman & Logan PC**, TX, USA
**Expert Witness in Mobile Payments Systems**    **2021 - 2024**
Case Subject Matter - Expert Witness in the area of mobile payments processing systems.
Work Performed - Expert consulting, infringement expert reports, depositions.

**Samsung Electronics Co., Ltd v. Netlist, Inc**[*]
**Gibson Dunn & Crutcher LLP**, CA, USA
**Expert Witness in Computer Memory**                              **2021 - 2022**
Case Subject Matter - Expert Witness in computer memory module architecture, self testing, DRAM and related technologies.
Work Performed - Expert consulting, IPR declarations, depositions.

**Sonrai Memory Limited**[*] **v. Oracle Corporation**
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Memory and Compression Technology**           **2021 - 2022**
Case Subject Matter - Memory controllers, memory technology and data compression technology.
Work Performed - Expert consulting, claim construction, declarations, depositions.

**Certain Laptops, Desktops, Servers, Mobile Phones, Tablets, and Components Thereof, Inv. No. 337-TA-1280**
**Sonrai Memory Limited**[*]
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Low Power Systems**                           **2021 - 2022**
Case Subject Matter - System on chips, operating systems and system components related power consumption in computing devices.
Work Performed - Expert consulting, claim construction declarations, expert reports, depositions.

**Future Link Systems LLC**[*] **v. Advanced Microdevices, Inc.**
**Future Link Systems LLC**[*] **v. Apple, Inc**
**Future Link Systems LLC**[*] **v. Broadcom, Inc; Broadcom Corp.**
**Future Link Systems LLC**[*] **v. Qualcomm, Inc.; Qualcomm Technologies**
**Future Link Systems LLC**[*] **v. Realtek Semiconductor Corp.**
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Circuit Design, Interconnects and Test**      **2021 - 2022**
Case Subject Matter - Semiconductor circuit design and reuse, memory design and test, PCI Express and related interconnect technologies.
Work Performed - Expert consulting, claim construction, declarations, depositions.

**Certain UMTS and LTE Cellular Communications Modules and Products and Products Containing the Same, Inv. No. 337-TA-1240**
**Philips RS North America LLC and Koninklijke Philips N.V.**[*]
**Foley & Lardner LLP**, MA, USA
**Expert Witness in Wireless Computing Technology**               **2020 - 2021**
Case Subject Matter - Embedded computing technology related to wireless mobile devices, including 3GPP standards based functionality.
Work Performed - Expert consulting, expert reports, deposition, trial testimony.

**Acqis**[*] **v. Samsung Electronics Co., LTD**
**Robins Kaplan LLP, USA**
**Expert Witness in Mobile Devices and Interconnects**                   **2021**
Case Subject Matter - Chip and chipset interconnect technology relating to mobile and non-mobile devices.
Work Performed - Expert consulting, expert reports, depositions.

**Neodron Limited**[*] **v. Texas Instruments, Inc**
**Neodron Limited**[*] **v. Cypress Semiconductor Corp**
**Neodron Limited**[*] **v. Renesas Electronics Corp**
**Neodron Limited**[*] **v. ST Microelectronics N.V.**
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**

**Expert Witness in Touch Screen Technology and Related Systems**      **2020 - 2021**
Case Subject Matter - Expert witness in hardware/software systems for touch screen technology, including analog and digital signaling and processing.
Work Performed - Expert consulting, declarations.

**Qualcomm Inc. v. Monterey Research LLC**[*]
**Desmarais LLP, NY, USA**
**Expert Witness in Memory Systems Technology**      **2021**
Case Subject Matter - SRAM and DRAM technology, memory system burst functionality and related matters.
Work Performed - Expert consulting, IPR declarations, depositions.

**Advanced Micro Devices Inc. v. Monterey Research LLC**[*]
**Desmarais LLP, NY, USA**
**Expert Witness in Memory Systems, Interconnects**      **2021**
Case Subject Matter - SRAM and DRAM technology, multi-ported memory systems, boot technology and related technologies.
Work Performed - Expert consulting, IPR declarations, depositions.

**Analog Devices Inc. v. Xilinx Inc.**[*]
**Morrison & Foerster** LLP, CA, USA
**Expert Witness in FPGAs and Configurable Computing**      **2020 - 2021**
Case Subject Matter - FPGAs and solutions related to crossbar interconnects, high speed transceivers, and configurable computing.
Work Performed - Expert consulting, IPR declarations, depositions.

**TriOptima AB v. Quantile Technologies Limited**[*]
**Caldwalader Wickersham & Taft**, New York, USA
**Expert Witness in Source Code for FinTech Systems**      **2020**
Case Subject Matter - Software technology implementations of financial services related to compression and derivatives markets.
Work Performed - Expert consulting, source code review.

**Unified Patents LLC v. JustService.net LLC**[*]
**Sheridan Ross P.C.**, Colorado, USA
**Expert Witness in Virtual Data Storage Systems**      **2020 - 2021**
Case Subject Matter - Web enabled virtual data storage systems for backup, storing and transferring of data.
Work Performed - Expert consulting, declarations, depositions.

**Karya Property Management, LLC**[*] **v. ResMan, LLC**
**Baker Botts LLP**, Houston, Texas, USA
**Expert Witness in Distributed Software Systems**      **2020 - 2021**
Case Subject Matter - Expert witness in the areas of distributed software systems, including data base technologies, as they relate to property management software and related systems.
Work Performed - Expert consulting, claim construction, IPR declarations, CBM declarations, depositions, expert reports.

**Certain Touch-Controlled Mobile Devices, Computers, and Components Thereof, Inv. No. 337-TA-1193**
**Neodron Limited**[*]
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Touch Screen Technology and Related Systems**      **2020**
Case Subject Matter - Expert witness in hardware/software systems for touch screen technology in

mobile devices.
Work Performed - Expert consulting.

**VLSI Technology LLC\* v. Intel Corporation**
**Irell & Manella LLP**, Los Angeles, CA USA
**Expert Witness in Computer Architecture**                    **2020 - 2021**
Case Subject Matter - Expert witness in the area of computer architecture, microprocessors and power management.
Work Performed - Expert consulting and source code review, expert reports, depositions, trial testimony.

**Optimum Imaging Technologies LLC\* v. Canon Inc.**
**Ruyak Cherian LLP**, Washington D.C., USA
**Expert Witness in FPGA Based Image Processing Systems**          **2019 - 2021**
Case Subject Matter - Expert witness and consultant in the area of heterogeneous FPGA/DSP/CPU based systems as applied to image and video processing technology.
Work Performed - Expert consulting, claim construction declarations, expert reports, depositions, IPR declarations.

**Dish Network, LLC v. Contemporary Display LLC\***
**Toler Law Group, P.C.**, Texas., USA
**Expert Witness in Real Time Video Processing**                     **2020**
Case Subject Matter - Expert Witness in real-time video processing technology over the Internet, including related user interfaces and quality of service.
Work Performed - Consulting, IPR declarations, deposition.

**Dish Network, LLC v. Contemporary Display LLC\***
**Toler Law Group, P.C.**, Texas., USA
**Expert Witness in Real Time Video Processing**                     **2020**
Case Subject Matter - Expert Witness in real-time video processing technology over Internet, including related user interfaces and quality of service.
Work Performed - Consulting, IPR declarations, deposition.

**Multimedia Content Management LLC\* v. Dish Network LLC**
**Sheridan Ross P.C.**, Colorado, USA
**Expert Witness in Real Time Video Processing**                  **2019 - 2020**
Case Subject Matter - Expert Witness in Internet based real-time video processing set top boxes, and related content processing and distribution.
Work Performed - Expert consulting.

**Exegy Inc. et al v. ACTIV Financial Systems, Inc.\***
**Wolf Greenfield & Sachs P.C.**, USA
**Expert Witness High Speed Computing for Financial Services**       **2019 - 2021**
Case Subject Matter - Expert Witness in microprocessor and FPGA based system design for high speed financial services, high speed RDMA systems, and related technology.
Work Performed - Expert consulting, IPR declarations, depositions.

**Certain Touch-Controlled Mobile Devices, Computers, and Components Thereof, Inv. No. 337-TA-1162**
**Neodron Limited\***
**Russ, August, and Kabat LLP, Los Angeles, CA, USA**
**Expert Witness in Touch Screen Technology and Related Systems**    **2019 - 2020**
Case Subject Matter - Expert witness in hardware/software systems for touch screen technology in mobile devices.

Work Performed - Expert consulting, claim construction declaration, expert reports, depositions.

**Maxell, Ltd., et al.,\* v. Apple Inc.**
**Mayer Brown LLP**, Washington D.C., USA
**Expert Witness in Embedded Computer Architecture**              **2019 - 2021**
Case Subject Matter - Expert witness and consulting engineer in low power computing and power management.
Work Performed - Expert consulting, claim construction declaration, claim construction deposition, expert reports, infringement and validity depositions.

**Nuvoton Technology Corporation\* v. Microchip Technology Inc.**
**Finnegan, Henderson, Farabow, Garrett & Dunner**, Washington D.C., USA
**Expert Witness in Embedded Computer Architecture**              **2019 - 2020**
Case Subject Matter - Expert witness in embedded memory system hardware, direct memory access engines, memory controllers, and analog/digital and digital/analog ASICs.
Work Performed - Expert consulting, declarations, claim construction deposition, IPR declarations, deposition.

**Shuttlewagon Inc.\*, v. Innovative Quality Solutions, LLC**
**Stroz Friedberg**, Massachusetts, USA
**Expert Witness in Embedded Computing**                          **2019**
Case Subject Matter - Expert witness in Programmable Logic Controllers (PLCs), IEC 61131 IE / CodeSys and real-time computing as it pertains to industrial equipment, as well as misappropriation of proprietary technology.
Work Performed - Expert consulting.

**RDM, Inc. v. Citoc Inc.\***
**Citoc Incorporated**, Texas, USA
**Expert Witness in Cloud / Web Based Computing**                 **2019**
Case Subject Matter - Expert witness cloud deployed, web based, infrastructure management software and software solutions deployment. Work Performed - Expert consulting.

**ResMan, LLC v. Karya Property Management, LLC et al.\***
**Beck Redden LLP**, Texas, USA
**Expert Witness in Software Design**                             **2019 - 2021**
Case Subject Matter - Expert witness in trade secret matters related to design and architecture of consumer facing software products.
Work Performed - Expert consulting, expert reports, depositions, trial testimony.

**Qualcomm\* v. Apple Inc.**
**Case No. 3:17-cv-02398-DMS-MDD**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Expert Witness in Mobile Devices and Computer Architecture**    **2019**
Case Subject Matter - Expert witness in mobile devices, computer architecture, and software system design for wireless communications.
Work Performed - Expert consulting.

**Vasu Networks Corporation\***
**Skiermont Derby**, Texas, USA
**Consulting Expert in Cellular Network Technologies**            **2019**
Case Subject Matter - Consulting expert in matters related to Single Radio Voice Call Continuity, Dual Radio Voice Call Continuity, and various heterogeneous wireless technologies and standards committees related to seamless connectivity.
Work Performed - Consulting expert.

**Qualcomm\* v. Apple Inc.**
**Case No. 37-2017-00041389-CU-BC-NC**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Expert Witness in Mobile Devices and Computer Architecture**    **2018 - 2019**
Case Subject Matter - Expert witness in mobile devices, computer architecture, and software system design for wireless communications.
Work Performed - Expert consulting.

**Qualcomm\* v. Apple Inc.**
**Inv No. 337-TA-1093**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Expert Witness in Mobile Devices and Computer Architecture**    **2017 - 2018**
Case Subject Matter - Expert witness in mobile devices, computer architecture, and software system design for wireless communications.
Work Performed - Expert consulting, expert reports, depositions, trial testimony.

**Qualcomm\* v. Apple Inc.**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Case No.** 3:17-CV-1375-DMS-MDD
**Expert Witness in Mobile Devices and Computer Architecture**    **2018 - 2019**
Case Subject Matter - Expert witness in wireless mobile devices, computer architecture, and software system design.
Work Performed - Expert consulting, expert reports, depositions, trial testimony.

**Redzone Wireless LLC v. Netgear Inc.\***
**Bird Marella**, CA, USA
**Expert Witness in Wireless Hardware/Software Systems**    **2018 - 2019**
Case Subject Matter - Manufacturing of software and hardware used in wireless routers and base stations, including chipsets and software solutions.
Work Performed - Expert consulting, expert reports, depositions.

**Nvidia\* v. ZiiLabs Corporation**
**Quinn Emanuel Urquhart & Sullivan**, NY, USA
**Expert Witness in GPU Architecture, Computer Architecture**    **2018**
Case Subject Matter - Expert witness in the areas of Graphics Processor (GPU) architectures, memory systems architectures, and microprocessor design.
Work Performed - Expert consulting.

**Acqis\* v. EMC Corporation**
**Cooley LLP**, CA, USA
**Expert Witness in Computer Architecture**    **2017 - 2018**
Case Subject Matter - Expert witness in the areas of PCI, PCI-Express, system-on-chip technology, and computer memory technologies.
Work Performed - Expert consulting.

**Qualcomm\* v. Apple Inc.**
**Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof, Inv No. 337-TA-1065**
**Quinn Emanuel Urquhart & Sullivan**, CA, USA
**Expert Witness in Mobile Devices and Computer Architecture**    **2017 - 2018**
Case Subject Matter - Expert witness in mobile devices, computer architecture, and software system design.

Work Performed - Expert consulting, expert reports, depositions.

**Network Management Solutions*** v. AT&T Mobility et. al
**IP Law Leaders**, Washington DC, USA
**Expert Witness in Cellular Network Management**                    **2017**
Case Subject Matter - Expert witness in mobile devices, wireless technology, 3GPP standards, and alarm management.
Work Performed - Expert consulting.

**Certain Memory Modules and Components Thereof, and Products Containing Same, Investigation No. 337-TA-1023**
**Netlist*** v. S.K. Hynix
**Mintz Levin Cohn Ferris Glovsky and Popeo PC**, Boston, MA, USA
**Expert Witness in Computer Architecture and Memory Systems**          **2016 - 2017**
Case Subject Matter - Expert witness in the area of JEDEC standards essential DRAM memory module technology, relating to DIMM, R-DIMM and LR-DIMM as it applies to server based computing.
Work Performed - Expert consulting, source code review, declarations, expert reports, depositions, ITC trial testimony.

**Certain Audio Processing Hardware, Software, and Products Containing Same, Inv. No. 337-TA-1026**
**Andrea Electronics Corporation***
**Pepper Hamilton, LLP**, Washington, DC, USA
**Expert Witness in Audio Processing Hardware and Software**            **2017**
Case Subject Matter - Expert witness in hardware/software based digital signal processing systems audio processing and noise cancellation technology.
Work Performed - Expert consulting.

**Specialized Monitoring Solutions, LLC v. Lutron Electronics Co., Inc.***
**Vinson & Elkins LLP**, Texas USA
**Expert Witness in Embedded and Distributed Software Systems**          **2017**
Case Subject Matter - Expert witness in embedded software and hardware systems, as well as distributed data storage and sensing.
Work Performed - Expert consulting.

**Huawei Technologies Co., Ltd.***, v. Samsung Electronics America, Inc. et al
**Sidley Austin LLP**, California USA
**Expert Witness in 4G and Legacy Cellular Technologies**              **2016 - 2017**
Case Subject Matter - Expert witness in 4G and legacy cellular technologies.
Work Performed - Expert consulting, affidavits, claim construction.

**Godo Kaisha IP Bridge 1*** v. Broadcom Limited et. al
**Ropes & Gray LLP**, New York USA
**Expert Witness in Computer Architecture**                    **2016 - 2017**
Case Subject Matter - Consultant in the area of ARM based embedded computing architecture and system on-chip technology. Reverse engineering of VHDL, Verilog and RTL based technologies, as it pertains to multicore system architectures.
Work Performed - Expert consulting, source code review, claim construction.

**Huawei Technologies Co. Ltd.*** v. T-Mobile US, Inc. and T-Mobile USA, Inc.
**Fish & Richardson P.C.**, Texas USA
**Expert Witness in 4G and Legacy Cellular Technologies**              **2016 - 2017**
Case Subject Matter - Expert witness in 4G and legacy cellular technologies.

Work Performed - Expert consulting, claim construction, affidavits.

**ACI Worldwide Corp. v. Mastercard International Incorporated**\*
**Armstrong Teasdale LLP**, Missouri, USA
**Expert witness regarding financial transaction systems**                 **2016 - 2017**
Case Subject Matter - Expert witness in trade secret misappropriation as it pertains to middleware message passing systems and financial transaction networks.
Work Performed - Expert consulting, source code review, declarations, expert reports, depositions.

**Sony Computer Entertainment America v. Rothschild Digital Media Innovations**\*
**Carey Rodriguez Milian Gonya, LLP**, Florida, USA
**Expert witness regarding distributed multimedia systems**                        **2016**
Case Subject Matter - Expert witness in the area of distributed computing systems and multimedia technologies.
Work Performed - Expert consulting, declarations, expert reports, depositions.

**DTS, Inc., et al. v. Nero AG, et al.**\*
**Glaser Weil Fink Jacobs Howard Avchen & Shapiro**, Los Angeles CA, USA
**Expert witness regarding distributed multimedia systems**                        **2016**
Case Subject Matter - Expert witness in the area of software solutions for audio and video codecs.
Work Performed - Expert consulting, source code review, experimental analysis, expert reports, depositions.

**Advanced Silicon Technologies**\*
**Mintz Levin Cohn Ferris Glovsky and Popeo PC**, Boston, MA, USA
**Expert Consultant in Microprocessor Architecture, Intellectual Property**  **2015 - 2016**
Case Subject Matter - Consultant in the area of computer architecture and microprocessor technologies, specifically related to memory systems.
Work Performed - Expert consulting.

**Certain Audio Processing Hardware and Software and Products Containing the Same, ITC Inv. No. 337-TA-949**
**Lenovo (United States), Inc.**\*
**Toshiba Corp**
**Akin Gump Strauss Hauer & Feld LLP**, Philadelphia, PA, USA
**Expert Witness in Digital Signal Processing, Intellectual Property**       **2015 - 2016**
Case Subject Matter - Expert witness in hardware/software based digital signal processing systems tailored for noise cancellation technology.
Work Performed - Expert consulting, source code review, claim construction, expert reports, deposition.

**Intel Corporation v. Future Link Systems**\*
**Irell & Manella LLP**, Los Angeles, CA USA
**Expert Witness in Computer Architecture**                        **2015 - 2018**
Case Subject Matter - Expert witness in the areas of PCI, PCI-Express, system-on-chip technology, and computer memory technologies.
Work Performed - Expert consulting, source code review, declarations, expert reports, deposition.

**Advanced Touchscreen and Gesture Technologies, LLC**\* **v. Samsung Electronics, America, Inc., et al.**
**Robins Kaplan LLP, Intellectual Property**, Minnesota, USA
**Expert Witness in Mobile Devices and User Interfaces**               **2015 - 2017**
Case Subject Matter - Expert witness in the analysis and reverse engineering of software systems pertaining to mobile devices, and human computer interfaces.

Work Performed - Expert consulting, declarations, expert reports.

**Intellectual Ventures* v. Ericsson et al.**
**Dechert LLP**, Los Angeles, CA, USA
**Expert Witness in 3GPP standards and LTE Technologies, Intellectual Property 2014 - 2016**
Case Subject Matter - Expert witness in 3GPP standards as they pertain to LTE cellular communications networks, in addition to system hardware and software design.
Work Performed - Expert consulting, source code review, declarations, claim construction, tutorials.

**Papst Licensing GMBH & Co. KG.***
**DiNovo & Price Ellwanger Hardy**, Austin, TX USA
**Expert Witness in FPGA Technologies, Intellectual Property        2014 - 2016**
Case Subject Matter - Consultant in FPGA computing platforms and design flow processes, prior art, and infringement analysis.
Work Performed - Expert consulting, claim construction.

**Locata LBS* v. Paypal Inc., et al.**
**Glaser Weil Fink Jacobs Howard Avchen & Shapiro**, Los Angeles, CA, USA
**Expert Witness in Geofencing Systems, Intellectual Property        2014 - 2015**
Case Subject Matter - Expert witness in geofencing technology, geolocational technology, and systems architecture as it pertains to mobile cellular telecommunications and enterprise software systems.
Work Performed - Expert consulting, claim construction, expert reports, deposition testimony.

**Cell and Network Selection LLC v. ZTE***
**Pillsbury, Winthrop Shaw & Pittman**, San Diego, CA, USA
**Expert Witness in 3G/4G Cellular Technology, Intellectual Property      2014 - 2015**
Case Subject Matter - Expert witness in technology pertaining to 3G, 3.5G, 3.75G and 4G wireless handset technology.
Work Performed - Expert consulting, claim construction, expert reports, deposition testimony.

**CA Inc. D/B/A CA Technologies* v. AppDynamics, Inc.**
**Bracewell & Giuliani**, Houston, TX, USA
**Holland & Knight**, Boston MA USA
**Expert Witness in Enterprise Software Monitoring, Intellectual Property  2014 - 2015**
Case Subject Matter - Expert witness in technology pertaining to dynamic runtime profiling of distributed software applications, specifically around Java and .NET technologies.
Work Performed - Expert consulting, source code review, declarations, expert reports, deposition testimony.

**M Seven System Limited v. Leap Wireless International, Inc.* et al.**
**Glaser Weil Fink Jacobs Howard Avchen & Shapiro**, Los Angeles, CA, USA
**Expert Witness in 3G/4G Feature Phone Software Systems, Intellectual Property 2014**
Case Subject Matter - Expert witness in the area of mobile telecommunications technology, particularly cellular handset hardware and software design.
Work Performed - Expert consulting, source code review.

**Lunareye v. Passtime*.**
**Conley Rose, P.C.**, Austin, TX, USA
**Expert Witness in GPS Tracking Solutions                2014**
Case Subject Matter - Expert witness in the area of mobile GPS tracking solutions software and hardware systems.
Work Performed - Expert consulting.

**Certain Wireless Devices With 3G and/or 4G Capabilities and Components Thereof, ITC Inv. No. 337-TA-868**
**Interdigital, Inc.**[*]
**Wilson, Sonsini, Goodrich & Rosati LLP**, Austin, TX, USA
**Expert Witness in 3G/4G Cellular Technology, Intellecutal Property        2013 - 2015**
Case Subject Matter - Expert witness in software systems and hardware systems, as they pertain to 3G/4G cellular communications and standards.
Work Performed - Expert consulting, source code review, claim construction, declarations, expert report, depositions, ITC trial testimony.

**Investment Technology Group**[*] **v. United States Internal Revenue Services**
**Expert Witness in Financial Services Technology                        2013**
Case Subject Matter - Expert witness in the area of high performance software systems targeting financial market services.
Work Performed - Expert consulting, source code review, declarations, depositions, testimony at hearing.

**Carrier Corporation v. Goodman Manufacturing**[*]**, et al.**
**Baker Botts LLP**, Houston, TX USA
**Expert Witness in Software and Hardware Systems, Intellectual Property  2013 - 2014**
Case Subject Matter - Expert witness in the area of microprocessor based, serial distributed communications systems.
Work Performed - Expert consulting, source code review.

**Gametek LLC**[*] **v. Facebook Inc. et al.**
**Collins, Edmonds, Porgorzelski, Schlather & Tower PLLC**, Houston, TX USA
*Expert Witness in Mobile Gaming Technologies, Intellectual Property*        **2013**
Case Subject Matter - Expert witness in internet based client-server software systems for mobile and web browser based gaming technology.
Work Performed - Expert consulting, source code review.

**Ultimate Pointer LLC**[*] **v. Nintendo Co. LTD et al.**
**Conley Rose P.C.**, Houston, TX USA
**Expert Witness in Console Based Video Game Technology, Intellectual Property 2013 - 2015**
Case Subject Matter - Expert witness in hardware and software systems for console based video game technology.
Work Performed - Expert consulting, source code review, declarations, expert reports, deposition testimony.

**Alliantgroup, L.P. v. Tax Point Advisors**[*]
**Jeffrey Feingold and Tax Point Advisors**, Houston, TX USA
**Expert Witness in Internet Technology                                  2013**
Case Subject Matter - Expert witness in IP based internet technology, packet spoofing and information systems.
Work Performed - Expert consulting, declarations.

**Kerry T. Thibodeaux, M.D. v. American Lifecare Inc.**[*]
**Cox, Cox Filo, Camel & Wilson**, Lake Charles, LA USA
**Expert Witness in Medical Software Systems                             2013**
Case Subject Matter - Expert witness in medical billing and expense recording enterprise software systems.
Work Performed - Expert consulting.

**Opelousas General Hospital Authority et al v. Fairpay Solutions Inc**[*]
**Cox, Cox Filo, Camel & Wilson**, Lake Charles, LA USA
**Expert Witness in Medical Software Systems**                                    **2013**
Case Subject Matter - Expert witness in medical billing and expense recording enterprise software systems.
Work Performed - Expert consulting.

**Wi-LAN USA, Inc. and Wi-LAN, Inc.**[*] **v. Alcatel-Lucent USA Inc.**
**Vinson Elkins LLP**, Dallas, TX USA
**Expert Witness in 3GPP LTE Technology, Intellectual Property**        **2012 - 2013**
Case Subject Matter - Reverse engineering, analysis and education of counsel in the 3GPP LTE specification, and related software and hardware systems.
Work Performed - Expert consulting, source code review, claim construction, expert declarations.

**Wi-LAN USA, Inc. and Wi-LAN, Inc.**[*] **v. Ericsson Inc., and Telefonaktiebolaget LM Ericsson**
**Vinson Elkins LLP**, Dallas, TX USA
**Expert Witness in 3GPP LTE Technology, Intellectual Property**        **2012 - 2013**
Case Subject Matter - Reverse engineering, analysis and education of counsel in the 3GPP LTE specification, and related software and hardware systems.
Work Performed - Expert consulting, source code review, claim construction, expert declarations.

**E-Contact Technologies, LLC v. Dell Inc.**[*]**, et al.**
**Baker Botts LLP**, Houston, TX USA
**Expert Witness in Mobile Operating Systems, Intellectual Property**        **2012**
Case Subject Matter - Reverse engineering and analysis of the Android operating system as it pertained to mobile and tablet computing devices. Source code reverse engineering, system architecture and related analysis.
Work Performed - Expert consulting, source code review.

**CheckFree Corporation\* and CashEdge, Inc.\* v. Metavante Corporation and Fidelity National Information Services, Inc.**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**, New York, NY USA
**Expert Witness in Banking and Billing Software Systems, Intellectual Property**   **2012**
Case Subject Matter - Software systems analysis and reverse engineering of large scale software based financial billing systems. Source code reverse engineering, claim chart generation, expert report generation and testimony.
Work Performed - Expert consulting, source code review.

**Realtime Data, LLC v. NASDAQ**[*]**, Chase Bank**[*]**, Goldman Sachs**[*] **et al.**
**Proskauer Rose LLP**, New York, NY USA
**Expert Witness High Performance Software Systems, Intellectual Property**        **2012**
Case Subject Matter - Expert witness for joint defense counsel in the matter of large scale high frequency financial data aggregation platforms.
Work Performed - Expert consulting, claim construction, technical tutorials, declaration, expert reports, deposition testimony.

**Realtime Data, LLC v. Thomson Reuters**[*] **et al.**
**Vinson & Elkins LLP**, Austin, TX USA
**Consultant in High Performance Software Systems, Intellectual Property**  **2011 - 2012**
Case Subject Matter - Expert witness for joint defense counsel in the matter of large scale high frequency financial data aggregation platforms.
Work Performed - Expert consulting, claim construction, technical tutorials, declaration, expert reports, deposition testimony.

**General Electric Co.**<sup>*</sup> **v. Mitsubishi Heavy Industries Ltd.**
**Weil, Gotshal & Manges LLP**, Dallas, TX USA
**Expert Witness in Hardware/Software Analysis, Intellectual Property      2010 - 2011**
Case Subject Matter - Reverse engineering of real-time embedded system software source code and hardware system architecture pertaining to variable speed wind turbines and FPGA based subsystems.
Work Performed - Expert consulting, declarations, source code review.

**Atlantic Specialty Insurance et al v. AE Outfitters Retail Company**<sup>*</sup>**, et al**
**Smith Mazure Director Wilkins Young & Yagerman, P.C.**, NY USA
**Expert Witness in Embedded Hardware/Software Systems                     2011**
Case Subject Matter - Hardware and software system analysis of real-time networked embedded computing systems as it pertains to fire alarm infrastructure and fault handling.
Work Performed - Expert consulting, technical tutorial, expert declarations.

**Gamestop**<sup>*</sup>**, Inc v. Bexar Appraisal**
**Brusniak and Blackwell PC**, Dallas, TX USA
**Expert Witness in Software Analysis, Intellectual Property Litigation      2011**
Case Subject Matter - Expert witness on the tangibility of software as it pertains to embedded computing, networking, and gaming platforms.
Work Performed - Expert consulting, expert declarations.

**Quality Analytic Systems, Inc. v. Zebec Data Systems**<sup>*</sup>
**Rymer, Moore, Jackson & Echols, P.C.**, Houston, TX USA
**Expert Witness in Software Systems                                          2011**
Case Subject Matter - Reverse engineering and software analysis of enterprise level internet based medical billing software systems.
Work Performed - Expert consulting, source code review, declarations, arbitration.

**Passlogix, Inc. v. 2FA Inc.**<sup>*</sup>
**Expert Witness in Smart Card Middleware Solutions, Trade Secret Exposure   2010**
Case Subject Matter - Trade secret analysis of software and systems architecture as it pertains to optimal selection of smart card middleware solutions on a given computer system.
Work Performed - Expert consulting, expert declarations.

**Terra Nova Sciences**<sup>*</sup>**. v. JOA Oil and Gas, B. V. et al.**
**Abraham & Watkins et al. LLP**, Houston, TX USA
**Expert Witness in Software Systems, Intellectual Property Litigation       2010**
Case Subject Matter - Expert software analyst of algorithms and geomechanics modeling systems as they pertain to oil well reservoirs.
Work Performed - Expert consulting, source code review.

**Paltalk Holdings, Inc.**<sup>*</sup> **v. Sony Computer Entertainment America Inc. et al.**
**Heim Payne & Chorush LLP**, Houston, TX USA
*Software Analysis Expert, Intellectual Property Litigation*                 **2010**
Case Subject Matter - Reverse engineering of internet based client-server video game console and server software architecture.
Work Performed - Expert consulting, source code review, infringement analysis.

**Technomedia International, Inc.**<sup>*</sup> **v. International Training Services, Inc., et al.**
**Bracewell & Giuliani, LLP**, Houston, TX USA
**Expert Witness in Software Analysis, Contract Dispute                      2010**
Case Subject Matter - Web enabled teaching materials as it pertains to oil well drilling. Analysis of internet based audio and video content delivery mechanisms and related website architecture.

Work Performed - Expert consulting, expert reports.

**Gamestop, Inc* v. Bexar Appraisal**
**Brusniak and Blackwell PC**, Dallas, TX USA
**Expert Witness in Software Analysis, Tax Dispute**                          **2009 - 2010**
Case Subject Matter - On the tangibility of software as it pertains to embedded computing, networking, and gaming platforms.
Work Performed - Expert consulting, expert reports.

**Whetstone Electronics, LLC* v. Epson America, et al.**
**DiNovo & Price Ellwanger Hardy**, Austin, TX USA
**Expert Witness in System Analysis, Intellectual Property Litigation**       **2009 - 2011**
Case Subject Matter - Embedded computing systems pertaining to printer technology and computer hardware acceleration (microprocessors, DSP, FPGA and CPLD).
Work Performed - Expert consulting.

**Whetstone Electronics, LLC* v. Xerox Corporation, et al**
**DiNovo & Price Ellwanger Hardy**, Austin, TX USA
**Expert Witness in System Analysis, Intellectual Property Litigation**       **2009 - 2011**
Case Subject Matter - Embedded computing systems pertaining to printer technology and computer hardware acceleration (microprocessors, DSP, FPGA and CPLD).
Work Performed - Expert consulting.

**General Electric, Inc.* v. Mitsubishi Heavy Industries, Inc.**
**Vinson & Elkins LLP**, Austin, TX USA
**Expert Witness in Hardware and Software Analysis, Intellectual Property 2008 - 2009**
Case Subject Matter - Real time embedded computing and hardware/software designs for variable speed wind turbines, including digital signal processing DSP and FPGA based subsystems.
Work Performed - Expert consulting, source code review, technical tutorials, declarations, expert reports, depositions, ITC trial preparation.

**Paltalk Holdings, Inc.* v. Microsoft Corporation**
**Heim Payne & Chorush LLP**, Houston, TX USA
**Technical Expert, Intellectual Property Litigation**                        **2007 - 2008**
Case Subject Matter - Internet based client server console gaming architecture for real time experience.
Work Performed - Expert consulting, source code review, technical tutorials.

**SuperSpeed Software, LLC* v. IBM Corporation**
**Heim Payne & Chorush LLP**, Houston, TX USA
**Technical Expert in Software Analysis, Intellectual Property Litigation**    **2007 - 2008**
Case Subject Matter - Computer database technology, parallel file systems and clustered computing.
Work Performed - Expert consulting, technical tutorial, source code review.

**QPSX Developments 5 Pty Ltd.* v. Juniper Networks, Inc.**
**Fulbright and Jaworski LLP**, Houston, TX USA
*Technical Consultant, Intellectual Property Litigation*                      **2006 - 2007**
Case Subject Matter - Data transmission algorithms for computer networks.
Work Performed - Consulting, claim construction, claim chart preparation, technical tutorials.

**Commonwealth Scientific and Indus. Research Org.* v. Buffalo Tech. Inc.**
**Fulbright and Jaworski LLP**, Houston, TX USA
**Technical Consultant, Intellectual Property Litigation**                    **2006 - 2007**
Case Subject Matter - High speed data rate network for wireless local area networks.

Work Performed - Consulting, claim construction, claim chart preparation, technical tutorials.

**Microsoft Corporation v. Commonweatlh Scientific and Indus. Research Org.**[*]
**Fulbright and Jaworski LLP**, Houston, TX USA
**Technical Consultant, Intellectual Property Litigation**                    **2006 - 2007**
Case Subject Matter - High speed data rate communications for wireless local area networks.
Work Performed - Consulting, claim construction, claim chart preparation, technical tutorials.

**Tantivy Communications, Inc.**[*] **v. Lucent Technologies, Inc.**
**Fulbright and Jaworski LLP**, Houston, TX USA
**Technical Consultant, Intellectual Property Litigation**                    **2004 - 2005**
Case Subject Matter - CDMA2000 based cellular networks, including data retransmission algorithms at multiple layers.
Work Performed - Consulting, claim construction, claim chart preparation, technical tutorials.

**Volunteer Organizations**

**Rice Alliance for Technology and Entrepreneurship** Austin, Texas, USA
*Executive Committee*                    **2009 - Present**
The Rice Alliance for Technology and Entrepreneurship strives to improve the entrepreneurial ecosystem of Central Texas by: helping entrepreneurs successfully found, fund, grow and exit new companies, helping investors successfully identify and engage with promising new ventures, and showcasing emerging technologies and business models to further educate and engage the community.

**Capital Factory**, TX USA
*Mentor*                    **2014 - Present**
Mentor, advisor and investor in one of the most successful start-up accelerators in the United States.

**OwlSpark - Rice University**, Houston, Texas, USA
*Mentor*                    **2014**
Mentor and advisor to university based early stage technology companies within Rice University's accelerator program.

**Incubation Station**, TX USA
*Mentor*                    **2013**
Incubation Station is an accelerator that brings together a consortium of Austins notable entrepreneurs, investors and advisors for the purpose of mentoring high-potential, market-validated consumer product companies to more effectively manufacture, distribute, market and grow their products and services.

**Honors and Awards**

Texas Instruments Fellowship Recipient
Nokia Grant Recipient
National Science Foundation Grant Recipient
Rice University Fellowship Recipient
Rensselaer Alumni Scholarship Recipient
Linear Tech / Mueller Scholarship Recipient
Rensselaer Polytechnic Institute: Graduated Cum Laude, Deans List All Semesters
Eta Kappa Nu - National Electrical and Computer Engineering Honors Society
IEEE Member - Institute of Electrical and Electronics Engineers
ACM Member - Association For Computing Machinery

# Exhibit 2

**MATERIALS CONSIDERED**
**Dr. Michael C. Brogioli**

| PRODUCTION DOCUMENTS | | |
|---|---|---|
| ARM_00000634; (132241) | QCARM_7517677 | QCVARM_1069941 |
| ARM_00001067 | QCARM_7622616 | QCVARM_1069945 |
| ARM_00001192 | QCVARM_0000061 | QCVARM_1069949 |
| ARM_00001195 | QCVARM_0000085 | QCVARM_1070034 |
| ARM_00001198 | QCVARM_0000092 | QCVARM_1070271 |
| ARM_00001495 | QCVARM_0000114 | QCVARM_1070919 |
| ARM_00001512 | QCVARM_0000123 | QCVARM_1070944 |
| ARM_00001777 | QCVARM_0000135 | QCVARM_1070982 |
| ARM_00002045 | QCVARM_0000142 | QCVARM_1070993 |
| ARM_00003305 | QCVARM_0000180 | QCVARM_1071021 |
| ARM_00005340 | QCVARM_0000218 | QCVARM_1071165 |
| ARM_00025401 | QCVARM_0000269 | QCVARM_1071192 |
| ARM_00025402 | QCVARM_0000395 | QCVARM_1071193 |
| ARM_00025403 | QCVARM_0003565 | QCVARM_1071194 |
| ARM_00036346 | QCVARM_0008126 | QCVARM_1072199 |
| ARM_00055357 | QCVARM_0447175 | QCVARM_1078822 |
| ARM_00056571 | QCVARM_0447248 | QCVARM_1090346 |
| ARM_00062441 | QCVARM_0447252 | QCVARM_1117866 |
| ARM_00062474 | QCVARM_0448361 | QCVARM_1117873 |
| ARM_00063298 | QCVARM_0448757 | QCVARM_1117891 |
| ARM_00067349 | QCVARM_0448842 | QCVARM_1117901 |
| ARM_00068087 | QCVARM_0449653 | QCVARM_1117934 |

| ARM_00068131 | QCVARM_0449658 | QCVARM_1117938 |
| ARM_00068459 | QCVARM_0449970 | QCVARM_1117942 |
| ARM_00068504 | QCVARM_0451824 | QCVARM_1117977 |
| ARM_00075096 | QCVARM_0452199 | QCVARM_1117981 |
| ARM_00075098 | QCVARM_0452296 | QCVARM_1118003 |
| ARM_00075343 | QCVARM_0452598 | QCVARM_1118012 |
| ARM_00076113 | QCVARM_0453724 | QCVARM_1118024 |
| ARM_00079520 | QCVARM_0454071 | QCVARM_1118029 |
| ARM_00079530 | QCVARM_0454629 | QCVARM_1118043 |
| ARM_00079722 | QCVARM_0457029 | QCVARM_1118059 |
| ARM_00082009 | QCVARM_0463558 | QCVARM_1118067 |
| ARM_00085567 | QCVARM_0467659 | QCVARM_1118081 |
| ARM_00086164 | QCVARM_0467852 | QCVARM_1118085 |
| ARM_00087844 | QCVARM_0468148 | QCVARM_1118089 |
| ARM_00089058 | QCVARM_0468174 | QCVARM_1118481 |
| ARM_00090791 | QCVARM_0468422 | QCVARM_1118510 |
| ARM_00091389 | QCVARM_0468612 | QCVARM_1118515 |
| ARM_00091657 | QCVARM_0523656 | QCVARM_1118518 |
| ARM_00091659 | QCVARM_0523826 | QCVARM_1118524 |
| ARM_00091714 | QCVARM_0523837 | QCVARM_1118528 |
| ARM_00091768 | QCVARM_0524007 | QCVARM_1118531 |
| ARM_00091799 | QCVARM_0524624 | QCVARM_1118534 |
| ARM_00091834 | QCVARM_0525344 | QCVARM_1118538 |
| ARM_00091869 | QCVARM_0526828 | QCVARM_1118543 |

| | | |
|---|---|---|
| ARM_00091903 | QCVARM_0527125 | QCVARM_1118546 |
| ARM_00094099 | QCVARM_0527544 | QCVARM_1118549 |
| ARM_00094197 | QCVARM_0527546 | QCVARM_1118552 |
| ARM_00094200 | QCVARM_0528119 | QCVARM_1118555 |
| ARM_00094204 | QCVARM_0528955 | QCVARM_1118559 |
| ARM_00100013 | QCVARM_0528956 | QCVARM_1118565 |
| ARM_00102683 | QCVARM_0529072 | QCVARM_1119008 |
| ARM_00103566 | QCVARM_0529887 | QCVARM_1119108 |
| ARM_00103635 | QCVARM_0531350 | QCVARM_1120024 |
| ARM_00103918 | QCVARM_0531892 | QCVARM_1120153 |
| ARM_00110020 | QCVARM_0532239 | QCVARM_1120206 |
| ARM_00110507 | QCVARM_0534596 | QCVARM_1120224 |
| ARM_00110511 | QCVARM_0534597 | QCVARM_1120267 |
| ARM_00110513 | QCVARM_0535116 | QCVARM_1120481 |
| ARM_00114880 | QCVARM_0537065 | QCVARM_1120482 |
| ARM_00118835 | QCVARM_0540468 | QCVARM_1120486 |
| ARM_00132256 | QCVARM_0573056 | QCVARM_1120490 |
| ARM_01020098 | QCVARM_0573677 | QCVARM_1120495 |
| ARM_01020186 | QCVARM_0575611 | QCVARM_1120497 |
| ARM_01020195 | QCVARM_0575613 | QCVARM_1120535 |
| ARM_01215486 | QCVARM_0575616 | QCVARM_1120540 |
| ARM_01215564 | QCVARM_0575617 | QCVARM_1120546 |
| ARM_01215878 | QCVARM_0577503 | QCVARM_1120548 |
| ARM_01215885 | QCVARM_0595815 | QCVARM_1120549 |

3

| | | |
|---|---|---|
| ARM_01215886 | QCVARM_0599801 | QCVARM_1120550 |
| ARM_01215887 | QCVARM_0600038 | QCVARM_1120551 |
| ARM_01215888 | QCVARM_0600039 | QCVARM_1120552 |
| ARM_01215889 | QCVARM_0600040 | QCVARM_1120553 |
| ARM_01215997 | QCVARM_0600041 | QCVARM_1120554 |
| ARM_01216002 | QCVARM_0600042 | QCVARM_1120555 |
| ARM_01216178 | QCVARM_0600043 | QCVARM_1120556 |
| ARM_01230076 | QCVARM_0600044 | QCVARM_1120557 |
| ARM_01230110 | QCVARM_0600045 | QCVARM_1120558 |
| ARM_01230123 | QCVARM_0600046 | QCVARM_1120559 |
| ARM_01230402 | QCVARM_0600047 | QCVARM_1120560 |
| ARM_01231025 | QCVARM_0600048 | QCVARM_1120561 |
| ARM_01231038 | QCVARM_0600049 | QCVARM_1120562 |
| ARM_01231394 | QCVARM_0600050 | QCVARM_1120563 |
| ARM_01235323 | QCVARM_0600051 | QCVARM_1120564 |
| ARM_01238384 | QCVARM_0600052 | QCVARM_1120565 |
| ARM_01241285 | QCVARM_0600053 | QCVARM_1120566 |
| ARM_01241565 | QCVARM_0600054 | QCVARM_1120567 |
| ARM_01241577 | QCVARM_0600055 | QCVARM_1120568 |
| ARM_01241585 | QCVARM_0600056 | QCVARM_1120569 |
| ARM_01249519 | QCVARM_0600057 | QCVARM_1120570 |
| ARM_01282655 | QCVARM_0600058 | QCVARM_1120571 |
| ARM_01293447 | QCVARM_0600059 | QCVARM_1120572 |
| ARM_01308019 | QCVARM_0600060 | QCVARM_1120573 |

4

| | | |
|---|---|---|
| ARM_01314327 | QCVARM_0600061 | QCVARM_1120574 |
| ARM_01314329 | QCVARM_0600062 | QCVARM_1120575 |
| ARM_01423632 | QCVARM_0600063 | QCVARM_1120576 |
| ARM_01424394 | QCVARM_0600064 | QCVARM_1120577 |
| ARM_01427450 | QCVARM_0600065 | QCVARM_1120578 |
| ARMQC_00000640 | QCVARM_0600066 | QCVARM_1120579 |
| ARMQC_00001038 | QCVARM_0600067 | QCVARM_1120580 |
| ARMQC_00001136 | QCVARM_0600068 | QCVARM_1120581 |
| ARMQC_00001163 | QCVARM_0600069 | QCVARM_1120582 |
| ARMQC_00027166 | QCVARM_0600070 | QCVARM_1120583 |
| ARMQC_00103710 | QCVARM_0600071 | QCVARM_1120584 |
| ARMQC_00103718 | QCVARM_0600072 | QCVARM_1120585 |
| ARMQC_02600838 | QCVARM_0600073 | QCVARM_1120586 |
| ARMQC_02601067 | QCVARM_0600074 | QCVARM_1120587 |
| ARMQC_02602445 | QCVARM_0600075 | QCVARM_1120588 |
| ARMQC_02602450 | QCVARM_0600076 | QCVARM_1120589 |
| ARMQC_02602454 | QCVARM_0600077 | QCVARM_1120590 |
| ARMQC_02602458 | QCVARM_0600078 | QCVARM_1120591 |
| ARMQC_02602462 | QCVARM_0600079 | QCVARM_1120592 |
| ARMQC_02602466 | QCVARM_0600080 | QCVARM_1120593 |
| ARMQC_02602472 | QCVARM_0600081 | QCVARM_1120594 |
| ARMQC_02602528 | QCVARM_0600082 | QCVARM_1120595 |
| ARMQC_02602531 | QCVARM_0600083 | QCVARM_1120596 |
| ARMQC_02602547 | QCVARM_0600084 | QCVARM_1120597 |

| | | |
|---|---|---|
| ARMQC_02602550 | QCVARM_0600085 | QCVARM_1120598 |
| ARMQC_02602646 | QCVARM_0600086 | QCVARM_1120599 |
| ARMQC_02603587 | QCVARM_0600087 | QCVARM_1120600 |
| ARMQC_026046020 | QCVARM_0600088 | QCVARM_1120601 |
| ARMQC_02604609 | QCVARM_0600089 | QCVARM_1120602 |
| ARMQC_02604610 | QCVARM_0600090 | QCVARM_1120603 |
| ARMQC_02604611 | QCVARM_0600091 | QCVARM_1120604 |
| ARMQC_02604612 | QCVARM_0600092 | QCVARM_1120605 |
| ARMQC_02604613 | QCVARM_0600093 | QCVARM_1120606 |
| ARMQC_02604614 | QCVARM_0600094 | QCVARM_1120607 |
| ARMQC_02604615 | QCVARM_0600095 | QCVARM_1120608 |
| ARMQC_02604616 | QCVARM_0600096 | QCVARM_1120609 |
| ARMQC_02604617 | QCVARM_0600097 | QCVARM_1120610 |
| ARMQC_02604618 | QCVARM_0600098 | QCVARM_1120611 |
| ARMQC_02604619 | QCVARM_0600101 | QCVARM_1120612 |
| ARMQC_02604620 | QCVARM_0602198 | QCVARM_1120613 |
| ARMQC_02604621 | QCVARM_0602227 | QCVARM_1120614 |
| ARMQC_02604622 | QCVARM_0602258 | QCVARM_1120615 |
| ARMQC_02604623 | QCVARM_0602295 | QCVARM_1120616 |
| ARMQC_02627275 | QCVARM_0602359 | QCVARM_1120617 |
| ARMQC_02720214 | QCVARM_0602404 | QCVARM_1120618 |
| ARMQC_02720220 | QCVARM_0602564 | QCVARM_1120619 |
| ARMQC_02720226 | QCVARM_0602952 | QCVARM_1120620 |
| ARMQC_02720230 | QCVARM_0605502 | QCVARM_1120621 |

| ARMQC_02720249 | QCVARM_0607060 | QCVARM_1120622 |
| ARMQC_02720251 | QCVARM_0608131 | QCVARM_1120623 |
| ARMQC_02720258 | QCVARM_0608391 | QCVARM_1120624 |
| ARMQC_02720259 | QCVARM_0608423 | QCVARM_1120625 |
| ARMQC_02720265 | QCVARM_0613037 | QCVARM_1120626 |
| ARMQC_02720272 | QCVARM_0613083 | QCVARM_1120627 |
| ARMQC_02720278 | QCVARM_0613160 | QCVARM_1120628 |
| ARMQC_02720279 | QCVARM_0616871 | QCVARM_1120629 |
| ARMQC_02720284 | QCVARM_0616912 | QCVARM_1120630 |
| ARMQC_02720291 | QCVARM_0616916 | QCVARM_1120631 |
| ARMQC_02720292 | QCVARM_0616935 | QCVARM_1120632 |
| ARMQC_02720300 | QCVARM_0616952 | QCVARM_1120633 |
| ARMQC_02720303 | QCVARM_0616967 | QCVARM_1120634 |
| ARMQC_02720310 | QCVARM_0616970 | QCVARM_1120635 |
| ARMQC_02720315 | QCVARM_0617730 | QCVARM_1120636 |
| ARMQC_02720320 | QCVARM_0617948 | QCVARM_1120637 |
| ARMQC_02720324 | QCVARM_0617951 | QCVARM_1120638 |
| ARMQC_02720329 | QCVARM_0617954 | QCVARM_1120639 |
| ARMQC_02720333 | QCVARM_0617961 | QCVARM_1120640 |
| ARMQC_02720337 | QCVARM_0617964 | QCVARM_1120641 |
| ARMQC_02720342 | QCVARM_0618338 | QCVARM_1120642 |
| ARMQC_02720347 | QCVARM_0618354 | QCVARM_1120643 |
| ARMQC_02720352 | QCVARM_0618382 | QCVARM_1120644 |
| ARMQC_02720799 | QCVARM_0618384 | QCVARM_1120645 |

| ARMQC_02727610 | QCVARM_0618420 | QCVARM_1120646 |
| ARMQC_02729064 | QCVARM_0618453 | QCVARM_1120647 |
| ARMQC_02731051 | QCVARM_0618712 | QCVARM_1120648 |
| ARMQC_02732393 | QCVARM_0618741 | QCVARM_1120649 |
| ARMQC_02732558 | QCVARM_0618977 | QCVARM_1120650 |
| ARMQC_02739661 | QCVARM_0621447 | QCVARM_1120651 |
| ARMQC_02741466 | QCVARM_0621448 | QCVARM_1120652 |
| ARMQC_02742804 | QCVARM_0621692 | QCVARM_1120653 |
| ARMQC_02742823 | QCVARM_0626519 | QCVARM_1120654 |
| ARMQC_02742861 | QCVARM_0626590 | QCVARM_1120655 |
| ARMQC_02745725 | QCVARM_0626603 | QCVARM_1120656 |
| ARMQC_02746634 | QCVARM_0685544 | QCVARM_1120657 |
| ARMQC_02746871 | QCVARM_0685578 | QCVARM_1120658 |
| ARMQC_02747093 | QCVARM_0687476 | QCVARM_1120659 |
| ARMQC_02747097 | QCVARM_0687479 | QCVARM_1120660 |
| ARMQC_02747103 | QCVARM_0688777 | QCVARM_1120661 |
| ARMQC_02747104 | QCVARM_0688932 | QCVARM_1120662 |
| ARMQC_02747567 | QCVARM_0689117 | QCVARM_1120663 |
| ARMQC_02747848 | QCVARM_0691521 | QCVARM_1120664 |
| ARMQC_02755397 | QCVARM_0691526 | QCVARM_1120665 |
| ARMQC_02755446 | QCVARM_0691853 | QCVARM_1120666 |
| ARMQC_02755490 | QCVARM_0692665 | QCVARM_1120667 |
| ARMQC_02755534 | QCVARM_0699176 | QCVARM_1120668 |
| ARMQC_02755580 | QCVARM_0699179 | QCVARM_1120669 |

8

| ARMQC_02755624 | QCVARM_0699275 | QCVARM_1120670 |
|---|---|---|
| ARMQC_02755674 | QCVARM_0699278 | QCVARM_1120671 |
| ARMQC_02755903 | QCVARM_0707732 | QCVARM_1120672 |
| ARMQC_02755905 | QCVARM_0707997 | QCVARM_1120673 |
| ARMQC_02756148 | QCVARM_0708086 | QCVARM_1120674 |
| ARMQC_02756208 | QCVARM_0708107 | QCVARM_1120675 |
| ARMQC_02756245 | QCVARM_0708118 | QCVARM_1120676 |
| ARMQC_02756246 | QCVARM_0710047 | QCVARM_1120677 |
| ARMQC_02756344 | QCVARM_0713513 | QCVARM_1120678 |
| ARMQC_02756542 | QCVARM_0713516 | QCVARM_1120679 |
| ARMQC_02756544 | QCVARM_0713528 | QCVARM_1120680 |
| ARMQC_02756860 | QCVARM_0713530 | QCVARM_1120681 |
| ARMQC_02760525 | QCVARM_0713532 | QCVARM_1120682 |
| ARMQC_02762974 | QCVARM_0713535 | QCVARM_1120683 |
| ARMQC_02762991 | QCVARM_0713538 | QCVARM_1120684 |
| ARMQC_02762992 | QCVARM_0713652 | QCVARM_1120685 |
| ARMQC_02763016 | QCVARM_0713665 | QCVARM_1120686 |
| ARMQC_02770599 | QCVARM_0713840 | QCVARM_1120687 |
| ARMQC_02771125 | QCVARM_0715414 | QCVARM_1120688 |
| ARMQC_02771126 | QCVARM_0716360 | QCVARM_1120689 |
| ARMQC_02771127 | QCVARM_0716389 | QCVARM_1120690 |
| ARMQC_02771128 | QCVARM_0717008 | QCVARM_1120691 |
| ARMQC_02771129 | QCVARM_0717291 | QCVARM_1120692 |
| ARMQC_02771151 | QCVARM_0717359 | QCVARM_1120693 |

9

| | | |
|---|---|---|
| ARMQC_02771168 | QCVARM_0717757 | QCVARM_1120694 |
| ARMQC_02772241 | QCVARM_0717964 | QCVARM_1120695 |
| ARMQC_02772246 | QCVARM_0846761 | QCVARM_1120696 |
| ARMQC_02773656 | QCVARM_0846871 | QCVARM_1120697 |
| ARMQC_02774029 | QCVARM_0847000 | QCVARM_1120698 |
| ARMQC_02774378 | QCVARM_0847094 | QCVARM_1120699 |
| ARMQC_02774539 | QCVARM_0847188 | QCVARM_1120700 |
| ARMQC_02774642 | QCVARM_0847548 | QCVARM_1120701 |
| ARMQC_02774767 | QCVARM_0848033 | QCVARM_1120702 |
| ARMQC_02774844 | QCVARM_0851120 | QCVARM_1120703 |
| ARMQC_02778180 | QCVARM_0851333 | QCVARM_1120704 |
| ARMQC_02779064 | QCVARM_0851410 | QCVARM_1120705 |
| ARMQC_02779076 | QCVARM_0851449 | QCVARM_1120706 |
| ARMQC_02779099 | QCVARM_0851511 | QCVARM_1120707 |
| ARMQC_02779107 | QCVARM_0851876 | QCVARM_1120708 |
| ARMQC_02779116 | QCVARM_0852203 | QCVARM_1120709 |
| ARMQC_02779122 | QCVARM_0854027 | QCVARM_1120710 |
| ARMQC_02779133 | QCVARM_0855474 | QCVARM_1120711 |
| ARMQC_02779171 | QCVARM_0857113 | QCVARM_1120712 |
| ARMQC_02779174 | QCVARM_0857149 | QCVARM_1120713 |
| ARMQC_02779176 | QCVARM_0857152 | QCVARM_1120714 |
| ARMQC_02779179 | QCVARM_0863181 | QCVARM_1120715 |
| ARMQC_02779181 | QCVARM_0863435 | QCVARM_1120716 |
| ARMQC_02783473 | QCVARM_0863641 | QCVARM_1120717 |

| | | |
|---|---|---|
| ARMQC_02783618 | QCVARM_0863644 | QCVARM_1120718 |
| ARMQC_02783619 | QCVARM_0864030 | QCVARM_1120719 |
| ARMQC_02784120 | QCVARM_0864277 | QCVARM_1120720 |
| ARMQC_02784199 | QCVARM_0864833 | QCVARM_1120721 |
| ARMQC_02784204 | QCVARM_0864834 | QCVARM_1120722 |
| ARMQC_02784227 | QCVARM_0864838 | QCVARM_1120723 |
| FGS_0000162 | QCVARM_0864924 | QCVARM_1120724 |
| FGS_0000395 | QCVARM_0864967 | QCVARM_1120725 |
| FGS_0000409 | QCVARM_0864969 | QCVARM_1120726 |
| FGS_0000446 | QCVARM_0865344 | QCVARM_1120727 |
| FGS_0000458 | QCVARM_0865345 | QCVARM_1120728 |
| FGS_0000525 | QCVARM_0865370 | QCVARM_1120999 |
| QCARM_0027985 | QCVARM_0865490 | QCVARM_1121337 |
| QCARM_00343954 | QCVARM_0866177 | QCVARM_1121338 |
| QCARM_0337838 | QCVARM_0867422 | QCVARM_1121341 |
| QCARM_0338573 | QCVARM_1012343 | QCVARM_1121346 |
| QCARM_0340017 | QCVARM_1012399 | QCVARM_1121350 |
| QCARM_0343120 | QCVARM_1014030 | QCVARM_1121359 |
| QCARM_0343533 | QCVARM_1014307 | QCVARM_1121930 |
| QCARM_0343954 | QCVARM_1014955 | QCVARM_1121931 |
| QCARM_0562765 | QCVARM_1015821 | QCVARM_1122733 |
| QCARM_0566625 | QCVARM_1018853 | QCVARM_1122742 |
| QCARM_2412907 | QCVARM_1019083 | QCVARM_1122745 |
| QCARM_2430181 | QCVARM_1022267 | QCVARM_1126209 |

11

| | | |
|---|---|---|
| QCARM_3059661 | QCVARM_1022268 | QCVARM_1129673 |
| QCARM_3066477 | QCVARM_1024852 | QCVARM_1129695 |
| QCARM_3215122 | QCVARM_1028388 | QCVARM_1129711 |
| QCARM_3216178 | QCVARM_1028750 | QCVARM_1130170 |
| QCARM_3337526 | QCVARM_1029757 | QCVARM_1133205 |
| QCARM_3337900 | QCVARM_1029911 | QCVARM_1133211 |
| QCARM_3338108 | QCVARM_1030509 | QCVARM_1133757 |
| QCARM_3339493 | QCVARM_1030813 | QCVARM_1137360 |
| QCARM_3352796 | QCVARM_1030816 | QCVARM_1140735 |
| QCARM_3353006 | QCVARM_1031097 | QCVARM_1140739 |
| QCARM_3353040 | QCVARM_1042773 | QCVARM_1140742 |
| QCARM_3353126 | QCVARM_1042776 | QCVARM_1141284 |
| QCARM_3424233 | QCVARM_1042777 | QCVARM_1146697 |
| QCARM_3424399 | QCVARM_1066278 | QCVARM_1149389 |
| QCARM_3424873 | QCVARM_1066811 | QCVARM_1149435 |
| QCARM_3428243 | QCVARM_1066820 | QCVARM_1149528 |
| QCARM_3430479 | QCVARM_1067283 | QCVARM_1151573 |
| QCARM_3433633 | QCVARM_1067284 | QCVARM_1151597 |
| QCARM_3460976 | QCVARM_1068222 | QCVARM_1151603 |
| QCARM_3460981 | QCVARM_1068388 | QCVARM_1151620 |
| QCARM_3522626 | QCVARM_1068512 | QCVARM_1151672 |
| QCARM_3537383 | QCVARM_1068516 | QCVARM_1151710 |
| QCARM_3537716 | QCVARM_1068521 | QCVARM_1151907 |
| QCARM_7474253 | QCVARM_1068525 | QCVARM_1151964 |

| | | |
|---|---|---|
| QCARM_7477120 | QCVARM_1068603 | QCVARM_1151965 |
| QCARM_7484471 | QCVARM_1068612 | QCVARM_1151966 |
| QCARM_7484477 | QCVARM_1068666 | QCVARM_1151967 |
| QCARM_7484481 | QCVARM_1068922 | QCVARM_1151968 |
| QCARM_7509431 | | |

**Pleadings from C.A. No. 1:24-cv-00490-MN:**
- [Dkt. 02] Plaintiff Qualcomm's Original Complaint (FILED UNDER SEAL)
- [Dkt. 36] QC First Amended Complaint & Exhibit A (FILED UNDER SEAL)
- [Dkt. 39] QC First Amended Complaint & Exhibit A (Public)
- [Dkt. 137] Plaintiff Qualcomm's Second Amended Complaint (FILED UNDER SEAL)
- [Dkt. 137-01] Exhibit A to Plaintiff Qualcomm's Second Amended Complaint (FILED UNDER SEAL)
- [Dkt. 378] Plaintiffs' Letter in Response to Defendant's August 11 Letter to Special Master Helena C. Rychlicki & Docket Entries and Cited Exhibits Therein

**Pleadings from C.A. No. 1:22-cv-01146-MN:**
- [Dkt. 001] Plaintiff Arm LTD's Complaint
- [Dkt. 018] Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim (FILED UNDER SEAL)
- [Dkt. 018ECF] Notice of Electronic Filing re [Dkt. 018]
- 2022.11.15 [Dkt. 21] Arm's Answer and Affirmative Defenses to Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s Amended Counterclaim
- [Dkt. 303] Plaintiff's Letter to the Honorable Laura D. Hatcher Regarding Redactions to the March 6, 2024 Memorandum Order (with Exhibits)
- [Dkt. 312-01] Exhibit B to R. Calico Declaration (Hearing Transcript re Motion to Amend)
- [Dkt. 596] Opening Brief in Support of Plaintiff Arm LTD.'s Motion for Judgment as a Matter of Law or a New Trial (FILED UNDER SEAL)
- [Dkt. 596ECF] Notice of Electronic Filing re [Dkt. 596]
- [Dkt. 571 ECF] Jury Verdict
- [Dkt. 572] Verdict Form
- [Dkt. 595] Arm's Motion for Judgement as a Matter of Law or a New Trial
- [Dkt. 597] Nuvia, Inc.'s Renewed motions for Judgment as a Matter of Law
- [Dkt. 602] Qualcomm's Post-Trial Brief Regarding Equitable Defenses
- [Dkt. 614] Reply Brief in Support of Plaintiff Arm LTD.'s Motion for Judgment as a Matter of Law or a New Trial (FILED UNDER SEAL)
- DTX-0936 (Qualcomm Brings Receipts: Snapdragon X Elite Gets Benchmarked, Completely Dunks on Apple's M2 Processor)
- DTX-0937 (Windows Finally Has its Apple Mac Moment, and I'm More Excited About the Future of Laptops Than Ever Before)

13

- JTX-0001 (Nuvia ALA)
- JTX-0002 (Nuvia ALA v8 Annex – September 2019)
- JTX-0005 (Nuvia ALA v8 Annex – March 2020)
- JTX-0010 (QC ALA)
- JTX-0011 (QC ALA v8 Annex)
- JTX-0012 (QC ALA v8-Next Annex)
- JTX-0013 (QC ALA v9 Annex)

**Depositions (and Exhibits thereto):**
- 2023.10.25 Deposition Transcript of Jignesh Trivedi
- 2023.12.12 Deposition Transcript of Rene Haas
- 2023.12.14 Deposition Transcript of Vivek Agrawal (Corrected)
- 2023.11.15 Deposition Transcript of Richard Grisenthwaite
- 2025.06.17 Deposition Transcript of Phil Hughes
- 2025.06.18 Deposition Transcript of Karl Whealton
- 2025.06.20 Deposition Transcript of Martin Weidmann
- 2025.06.20 Deposition Transcript of Karthik Shivashankar
- 2025.06.25 Deposition Transcript of Gerard Williams
- 2025.06.25 Deposition Transcript of Kurt Wolf
- 2025.06.26 Deposition Transcript of William Abbey
- 2025.06.27 Deposition Transcript of Michael Williams
- 2025.06.27 Deposition Transcript of Richard Meacham
- 2025.07.01 Deposition Transcript of Jean Francois Vidon
- 2025.07.01 Deposition Transcript of Andrew Howard
- 2025.07.02 Deposition Transcript of Richard Grisenthwaite
- 2025.07.02 Deposition Transcript of Christopher Patrick
- 2025.07.02 Deposition Transcript of Paul Williamson
- 2025.07.03 Deposition Transcript of Jeffrey Golden
- 2025.07.03 Deposition Transcript of Cristiano Amon
- 2025.07.03 Deposition Transcript of Lynn Couillard
- 2025.07.04 Deposition Transcript of Peter Greenhalgh
- 2025.07.07 Deposition Transcript of Ziad Asghar
- 2025.07.07 Deposition Transcript of Aparajita Bhattacharya
- 2025.07.09 Deposition Transcript of Jignesh Trivedi
- 2025.07.09 Deposition Transcript of Jeffrey Fonseca
- 2025.07.10 Deposition Transcript of Durga Malladi
- 2025.07.10 Deposition Transcript of Akshay Bhatnagar
- 2025.07.11 Deposition Transcript of Larissa Cochron
- 2025.07.11 Deposition Transcript of James Jeon
- 2025.07.11 Deposition Transcript of Jonathan Weiser
- 2025.07.11 Deposition Transcript of Vivek Agrawal
- 2025.07.29 Deposition Transcript of Mohamed Awad
- 2025.07.30 Deposition Transcript of Anupa George

14

**A0632**

**Expert Reports:**
- Opening Expert Report of Patrick F. Kennedy, Ph.D., dated August 8, 2025
- Opening Expert Report of Eric A. Posner, dated August 8, 2025

**Discovery Requests and Responses:**
- 2025.03.10 QC Responses & Objections to Arm's 1st Set of ROGs (Nos. 1-9) (Highly Confidential – Attorneys' Eyes Only)
- 2025.05.09 QC Responses & Objections to Arm's 2nd Set of ROGs (Nos. 10-13) (Highly Confidential – Attorneys' Eyes Only)
- 2025.03.24 Arm Responses & Objections to QC's 1st Set of ROGs (Nos. 1-3) (Highly Confidential – Attorneys' Eyes Only)
- 2025.05.12 Arm's Responses and Objections to QC's Amended ROG No. 3 (Highly Confidential – Attorneys' Eyes Only)
- 2025.06.25 QC's 1st Supplemental Responses and Objections to Arm's 1st Set of ROGs (Nos. 1-5, 7, & 9) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 Arm's 1st Supplemental Responses and Objections to QC's 1st Set of ROGs (Nos. 1-3) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 Arm's 1st Supplemental Responses and Objections to QC's 1st Set of Amended ROG No. 3 (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 Arm's 1st Supplemental Responses and Objections to QC's 2nd Set of ROGs (Nos. 4-11) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 Arm's 1st Supplemental Responses and Objections to QC's 3rd Set of ROGs (No. 12) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 QC's 2nd Supplemental Responses and Objection to Arm's 1st Set of ROGs (Nos. 1-9) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 QC's Responses and Objections to Arm's 2nd Set of ROGs (Nos. 10-13) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 QC's Responses and Objections to Arm's 3rd Set of ROGs (Nos. 14-24) (Highly Confidential – Attorneys' Eyes Only) & Cited Documents
- 2025.07.11 QC's Responses and Objections to Arm's 1st Set of RFAs (Nos. 1-30) (Confidential)
- 2025.08.08 QC's 1st Supplemental Responses and Objections to Arm's 3rd Set of Interrogatories (Nos. 14-24) (Highly Confidential)
- 2025.08.08 QC's 2nd Supplemental Responses and Objections to Arm's 2nd Set of Interrogatories (Nos. 10-13) (Highly Confidential)
- 2025.08.08 QC's 3rd Supplemental Responses and Objections to Arm's 1st Set of ROGs (Nos. 1-9) (Highly Confidential)

**Websites and Articles:**
- Allain & Rey, "Vertical Integration as a Source of Hold-up," TSE-525, Sept. 2014
- "A Detailed History of Qualcomm" Available at https://semiwiki.com/general/7353-a-detailed-history-of-qualcomm/
- Arm Holdings plc Annual Report and Consolidated Financial Statements for the Year Ended March 31, 2024

15

**A0633**

- "Arm Architecture Reference Manual for A-profile architecture (Doc No. ARM DDI 0487; issued April 30, 2025)," available at https://developer.arm.com/documentation/ddi0487/latest/.
- Farrell, et al., *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, 2007
- Hart, et al., *Vertical Integration and Market Foreclosure*
- "Innovation starts with Qualcomm products," available at https://www.qualcomm.com/prodcuts
- "Arm Architecture for the Digital World," available at https://www.arm.com/architecture
- "Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025," available at https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/
- "Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm=based," https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based
- ISA, commonality and differentiation, available at https://developer.arm.com/documentation/102252/0100/Software-ecosystems
- Intel Antitrust Rulings, available at https://www.amd.com/en/legal/notices/antitrust-ruling.html
- Instruction Set Architecture (ISA), available at https://www.arm.com/glossary/isa
- "The Official History of Arm," available at https://newsroom.arm.com/blog/arm-official-history
- "The Arm Ecosystem: Powering AI Everywhere – From Cloud to Edge," available at https://newsroom.arm.com/blog/arm-computex-2025
- "National Freight Selects Qualcomm's OmniTRACS System to Enhance Service for Long-haul and Short-Haul Customers" Available at https://www.qualcomm.com/news/releases/1996/08/national-freight-selects-qualcomms-omnitracs-system-enhance-service-long#:~:text=Headquartered%20in%20San%20Diego%2C%20Qualcomm,(LEO)%20satellite%20communications%20system
- Nenni, et al., *Mobile Unleashed, The Origin and Evolution of ARM Processors in Our Devices*, Dec. 2015
- Smartphones-Arm, available at https://www.arm.com/markets/consumer-technologies/smartphones
- Qualcomm: a history, available at https://manufacturingdigital.com/technology/qualcomm-history
- "Relief and challenges for chipmakers as Nvidia-Arm megadeal collapses," available at https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/
- "What Is SoC Development?," available at https://www.arm.com/glossary/soc-development
- "About Arm. Company Value and History – Arm," available at https://www.arm.com/company
- Intel, "What is a Microprocessor?"
- Subsidiaries of Registrant, Subsidiaries of Qualcomm Incorporated

16

- Newsroom, "The Arm Ecosystem: Powering AI Everywhere-From Cloud to Edge," May 19, 2025
- "Message from Arm CEO – SoftBank Group Report, 2025," available at https://group.softbank/en/ir/financials/annual_reports/2025/message/arm
- "Rene Haas: 'Arm has the Most Ubiquitous Computer Architecture on the Planet' – Chip Designer's Chief Executive Talks About Diversification and how AI is Changing the Devices We Use," available at https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d
- "Arm to Launch its Own Chip in Move that could Upend Semiconductor Industry – SoftBank-Owned Group Secures Meta as One of its First Customers for New Initiative," available at https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008
- The Armory Show: "Arm to Explore Designing its Own Chips, Chief Executive Says – SoftBank-Owned UK Group's Strategic Shift Would Upend Chip Ecosystem," July 30, 2025
- Fumagalli, et al., *Dynamic Vertical Foreclosure*, November 2020
- Vickers, *Concepts of Competition*, Oxford Economic Papers 47 (1995), 1-23
- "How Arm Could be the Unexpected Winner of the AI Investment Boom," October 30, 2024
- Ordover, et al., *Equilibrium Vertical Foreclosure*, The American Economic Review, March 1990, Vol. 80, No. 1 (1990), 127-142
- Rey, et al., *A Primer on Foreclosure*, Handbook of Industrial Organization, Vol. 3 (2007) Chapter 33
- RISC-V Members – About Members Page
- "Cellphone: Unseen Connections Exhibits." Available at https://www.qualcomm.com/research/cellphone-unseen-connections
- "Qualcomm celebrates 40 years as an American innovator" available at https://www.qualcomm.com/news/onq/2025/03/qualcomm-celebrates-40-years-as-an-american-innovator#:~:text=Leveraging%20a%20legacy%20of%20breakthroughs,of%20industrial%20and%20embedded%20IoT.
- "The Relentless Evolution of the Arm Architecture" available at https://newsroom.arm.com/blog/evolution-of-arm-architecture-evolution-40-years#:~:text=In%201987%2C%20Acorn%20Computers%20launched,was%20a%20huge%20commercial%20success.
- "Happy 40th Birthday to the Arm Architecture" available at https://www.allaboutcircuits.com/news/happy-40th-birthday-to-the-arm-architecture/#:~:text=The%20Rise%20of%20ARM%20in%20Mobile%20The,cemented%20its%20role%20in%20the%20mobile%20industry.
- "The ARMv8-A architecture and its ongoing development" available at https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development#:~:text=ARMv8%2DA%2C%20the%20ARMv8%20A,partners%20as%20products%20are%20introduced
- "WikiChip: Semiconductor & Computer Engineering" available at https://en.wikichip.org/wiki/arm/armv8

- "Arm's Solution to the Future Needs of AI, Security and Specialized Computing is v9" available at https://newsroom.arm.com/news/arms-solution-to-the-future-needs-of-ai-security-and-specialized-computing-is-v9.
- "About the ETM-M4" available at https://developer.arm.com/documentation/ddi0440/c/introduction/about-the-etm-m4
- "Embedded Trace Macrocell Trace source" available at https://developer.arm.com/documentation/102119/0200/Trace-components/Embedded-Trace-Macrocell-Trace-source
- "Advanced debug with ETM trace" available at https://learn.arm.com/learning-paths/embedded-and-microcontrollers/uv_debug/5_etm_trace/
- "About the Cryptographic Extension" available at https://developer.arm.com/documentation/101432/r1p2/Functional-description/About-the-Cryptographic-Extension
- "Learn the architecture - Understanding Armv9-A trace guide Version 1.0 Release information" available at https://developer.arm.com/documentation/102856/0100/Embedded-Trace-Extension.
- "Introduction to the IOMMU" available at https://www.openeuler.org/en/blog/wxggg/2020-11-21-iommu-smmu-intro.html
- "Learn the Architecture - SMMU Software Guide Version 1.0 Release information" available at https://developer.arm.com/documentation/109242/0100/What-an-SMMU-does.
- "Introduction to the Memory Tagging Extension," available at https://developer.arm.com/documentation/108035/latest/Introduction-to-the-Memory-Tagging-Extension#:~:text=Arm%20introduced%20the%20Memory%20Tagging,and%20mitigating%20memory-related%20vulnerabilities
- "Permission Indirection and Permission Overlay Extensions," available at https://developer.arm.com/documentation/102376/latest/Permission-indirection-and-permission-overlay-extensions#:~:text=Permission%20overlays%20allow%20permissions%20to,Lookaside%20Buffer%20(TLB)%20maintenance
- "Arm A-Profile Architecture Developments 2022," available at https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/arm-a-profile-architecture-2022#:~:text=The%20base%20permission%20is%20permitted,but%20interpret%20the%20permissions%20differently
- "An Example of Using Permission Indirection and Permission Overlay Features," available at https://developer.arm.com/documentation/102376/0200/Permission-indirection-and-permission-overlay-extensions/An-example-of-using-permission-indirection-and-permission-overlay-features
- "Summary," Arm Developer Article ID: KA005620, available at https://developer.arm.com/documentation/ka005620/latest/#:~:text=Summary,on%20a%20real%20hardware%20platform
- "Arm Memory Tagging Extension," available at https://source.android.com/docs/security/test/memory-safety/arm-

mte#:~:text=Note:%20This%20document%20covers%20using,on%20each%20load%20and%20store

- "Build and Run an Example Application to Learn about MTE," available at https://learn.arm.com/learning-paths/mobile-graphics-and-gaming/mte/mte/#:~:text=Log%20an%20issue-,Learn%20about%20the%20Arm%20Memory%20Tagging%20Extension,versions%20of%20Linux%20can%20work
- "Arm Memory Tagging Extension (MTE)," available at https://developer.android.com/ndk/guides/arm-mte#:~:text=Pixel%209a%20(Tegu)-,MTE%20operating%20modes,switch%20execution%20to%20SYNC%20mode
- "Armv8.5-A Memory Tagging Extension," available at https://developer.arm.com/-/media/Arm%20Developer%20Community/PDF/Arm_Memory_Tagging_Extension_Whitepaper.pdf
- "Back to the Building Blocks: A Path Toward Secure and Measurable Software," available at https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/02/Final-ONCD-Technical-Report.pdf
- "What are Arm-based processors?," available at: https://cloud.google.com/discover/what-are-arm-based-processors
- "How can ARM instruction set architecture improve machine learning applications?," available at: https://www.linkedin.com/advice/0/how-can-arm-instruction-set-architecture-improve-7r3oc#:~:text=from%202%20contributions.-,1%20What%20is%20ARM%20ISA?,(HPC)%20and%20ML%20applications.&text=The%20ARM%20(Advanced%20RISC%20Machine,in%20their%20machine%20learning%20applications.
- "Back to the Building Blocks: A Path Toward Secure and Measurable Software," available at: https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/02/Final-ONCD-Technical-Report.pdf

**Additional Documents:**
- 2025.01.08 Letter from S. Collins to A. Chaplin re QC Architecture License Agreement
- Qualcomm Incorporated Form 10-K for the Fiscal Year Ended September 29, 2024
- Arm Holdings PLC Form 20-F for the Fiscal Year Ended March 31, 2025
- Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 12, 2026, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                           *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                                       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Sydney D. Gaskins, Esquire                                        *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Alexandra Corrinne Hottenrott, Esquire                            *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Daralyn J. Durie, Esquire                                         *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*

Lydia B. Cash, Esquire                                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                                   *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                                      *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                               *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*


                                          */s/ Jennifer Ying*
                                          _____
                                          Jennifer Ying (#5550)