IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,       )
  a Delaware corporation; and    )
QUALCOMM TECHNOLOGIES, INC., )
  a Delaware corporation,        )
                          )     C.A. No. 24-490 (MN)
           Plaintiffs,    )     (CONSOLIDATED)
                          )
        v.            )
                          )
ARM HOLDINGS PLC., f/k/a ARM LTD., )
  a U.K. corporation,            )     REDACTED - PUBLIC VERSION
                          )
          Defendant.      )

**APPENDIX TO PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S
JANUARY 22, 2026 ORDER (D.I. 604) DENYING PLAINTIFFS' MOTION TO
STRIKE THE EXPERT REPORTS OF ARM'S EXPERTS MICHAEL C.
BROGIOLI, PH.D. & STEVEN RICHARDS, CPA (VOL 2: A637-A1239)**

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC  20004
(202) 240-2900

Erin J. Morgan
DUNN, ISAACSON, RHEE LLP
11 Park Place
New York, NY 10007
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

February 12, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

| Document | Page Range |
|---|---|
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Plaintiffs' Letter to Special Master Helena C. Rychlicki in Support of Their Motion to Strike the Expert Reports of Arm's Experts Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 16, 2025) | A0001 – A0006 |
| Qualcomm Exhibit 1 – Rebuttal Expert Report of Michael C. Brogioli, Ph.D. (Sept. 5, 2025) | A0007 – A0236 |
| Qualcomm Exhibit 2 – Rebuttal Report of Steven Richards, CPA (Sept. 5, 2025) | A0237 – A0283 |
| Qualcomm Exhibit 3 – Expert Report of Eric A. Posner Excerpt (Aug. 8, 2025) | A0284 – A0295 |
| Qualcomm Exhibit 4 – Expert Report of Patrick F. Kennedy, Ph.D. Excerpt (Aug. 8, 2025) | A0296 – A0304 |
| Qualcomm Exhibit 5 – Meet & Confer Transcript Excerpt (Sept. 15, 2025) | A0305 – A0316 |
| Qualcomm Exhibit 6 – Scheduling Order [Non-Patent; Jury Trial] | A0317 – A0326 |
| Qualcomm Exhibit 7 – Teleconference Transcript (Aug. 29, 2025) | A0327 – A0329 |
| Qualcomm Exhibit 8 – D.I. 572, Verdict Form (Dec. 20, 2024) | A0330 – A0333 |
| Qualcomm Exhibit 9 – Special Master Hearing Transcript Excerpt (Aug. 22, 2025) | A0334 – A0336 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Defendant Arm Holdings PLC's Letter Brief to Special Master Rychlicki Opposing Plaintiffs' Motion to Strike the Expert Reports of Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 23, 2025) | A0337 – A0343 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Declaration of Adam Janes in Support of Defendant Arm Holdings PLC's Letter Brief to Special Master Rychlicki Opposing Plaintiffs' Motion to Strike Expert Reports of Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 23, 2025) | A0344 – A0348 |

| | |
|---|---|
| Arm Exhibit 1 – D.I. 44, Scheduling Order (Jan. 31, 2025) | A0349 – A0360 |
| Arm Exhibit 2 – Rebuttal Report of Steven Richards, CPA (Sept. 5, 2025) | A0361 – A0407 |
| Arm Exhibit 3 – Rebuttal Expert Report of Michael C. Brogioli, Ph.D. (Sept. 5, 2025) | A0408 – A0637 |
| Arm Exhibit 4 – Reply Expert Report of Susan Markel (Sept. 19, 2025) | A0638 – A0660 |
| Arm Exhibit 5 – Reply Expert Report of Samuel J. Winer (Sept. 19, 2025) | A0661 – A0685 |
| Arm Exhibit 6 – Meet & Confer Transcript (Sept. 15, 2025) | A0686 – A0716 |
| Arm Exhibit 7 – Expert Report of Eric A. Posner (Aug. 8, 2025) | A0717 – A0785 |
| Arm Exhibit 8 – Arm Holdings PLC's Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) (Mar. 24, 2025) | A0786 – A0812 |
| Arm Exhibit 9 – Arm's Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11) (June 16, 2025) | A0813 – A0860 |
| Arm Exhibit 10 – Expert Report of Patrick F. Kennedy, Ph.D. (Aug. 8, 2025) | A0861 – A1076 |
| Arm Exhibit 11 – Rebuttal Expert Report of Professor Timothy S. Simcoe (Sept. 5, 2025) | A1077 – A1336 |
| Arm Exhibit 12 – Plaintiffs' Letter to Special Master Helena C. Rychlicki in Support of Their Motion to Strike the Expert Reports of Arm's Experts Michael C. Brogioli, Ph.D. & Steven Richards, CPA (Sept. 16, 2025) | A1337 – A1343 |
| Arm Exhibit 13 – Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) (July 11, 2025) | A1344 – A1373 |
| Arm Exhibit 14 – Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3 (July 11, 2025) | A1374 – A1383 |
| Arm Exhibit 15 – Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11) (July 11, 2025) | A1384 – A1453 |

| Arm Exhibit 16 – Arm's First Supplemental Response to Qualcomm's Third Set of Interrogatories (No. 12) (July 11, 2025) | A1454 – A1469 |
| --- | --- |
| Arm Exhibit 17 – Expert Reply Report of Eric A. Posner (Sept. 19, 2025) | A1470 – A1498 |
| Arm Exhibit 18 – Reply Expert Report of Patrick F. Kennedy, Ph.D. (Sept. 19, 2025) | A1499 – A1636 |
| Arm Exhibit 19 – Defendant Arm Holdings PLC's Response to Qualcomm's September 15, 2025 Letter to Special Master Rychlicki (Sept. 19, 2025) | A1637 – A1643 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Special Master Hearing Transcript Excerpt (Oct. 1, 2025) | A1644 – A1654 |

# Exhibit 4

**Confidential**

# UNITED STATES DISTRICT COURT

# DISTRICT OF DELAWARE

| | |
|---|---|
| **IN RE:** | |
| QUALCOMM INCORPORATED, A DELAWARE CORPORATION, QUALCOMM TECHNOLOGIES, INC., | C.A. No. 24-490-MN |
| **Plaintiffs,** | |
| **v.** | |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | |
| **Defendants.** | |

**REPLY EXPERT REPORT OF SUSAN MARKEL**

**September 19, 2025**

**Confidential**

## Contents

I.      Introduction ................................................................................................................. 3

II.     Qualifications .............................................................................................................. 3

III.    Information Considered ............................................................................................... 4

IV.     Standards Governing My Work ................................................................................... 4

V.      AlixPartners Compensation ........................................................................................ 4

VI.     Background ................................................................................................................. 4

    A.    Overview of Parties and Case Background .................................................................. 4

    B.    Steven Richards' Rebuttal Expert Report filed on September 5, 2025 ........................... 6

    C.    U.S. SEC Disclosure Requirements and US GAAP Reporting Standards ...................... 7

VII.    Summary of Opinions .................................................................................................. 8

    A.    The potential decline in prospective revenues resulting from the Notice Letter does not meet the definition of a loss contingency under ASC 450-20. ................................................. 8

    B.    The potential decline in prospective revenues resulting from the Notice Letter does not meet the definition of a liability. ........................................................................................ 8

VIII.   Analysis of Opinions .................................................................................................... 8

    A.    The potential decline in prospective revenues resulting from the Notice Letter does not meet the definition of a loss contingency under ASC 450-20. ................................................. 9

    B.    The potential decline in prospective revenues resulting from the Notice Letter does not meet the definition of a liability. ...................................................................................... 10

IX.     Conclusion ................................................................................................................ 11

**A0640**

Confidential

## I.    Introduction

1.    I have been engaged by Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), counsel to Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively referred to as "Qualcomm" or the "Company") to analyze and respond to certain statements, analyses and opinions of Steven Richards set forth in his rebuttal report dated September 5, 2025.

2.    More specifically, counsel has requested that I provide an opinion as to whether Qualcomm was required under U.S. Generally Accepted Accounting Principles ("US GAAP"), specifically the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 450-20 related to the presentation of loss contingencies, to disclose the October 22, 2024 letter from Arm notifying it of a material breach of the Qualcomm Architecture License Agreement (hereinafter referred to as the "Notice Letter") in its annual Form 10-K for the fiscal period ending September 29, 2024, irrespective of the publication of its contents in the Bloomberg Article published on the same date as the Company received the Notice Letter.[1]

## II.    Qualifications

3.    I am a Partner and Managing Director of AlixPartners, LLP ("AlixPartners"), a position I have held since January 2009. AlixPartners is a professional services firm, offering a broad range of consulting services, including corporate investigations, as well as valuation services, litigation consulting, and advisory services.

4.    I have more than 30 years of experience in a broad range of areas related to accounting, auditing, and corporate financial reporting. Since joining AlixPartners' Washington, D.C. office in January 2009, I have consulted on numerous corporate investigations and litigation matters concerning the application of generally accepted accounting principles ("GAAP") and reporting and disclosure requirements under federal securities laws. I have offered expert opinions concerning a variety of accounting and compliance-related issues, including auditor responsibilities, generally accepted auditing standards ("GAAS"), matters related to materiality, as well as compliance with internal controls and federal securities laws and regulations. My findings and expert opinions have been communicated in expert witness reports and presentations to various regulatory agencies, including the SEC, the Public Company Accounting Oversight Board, and the Department of Justice.

5.    Prior to joining AlixPartners, I was the Chief Accountant in the Division of Enforcement of the SEC. I joined the SEC in 1994 as a Staff Accountant in the Division of Enforcement, became Associate Chief Accountant in 2000, and became the Chief Accountant in 2003 and held that position until 2009. At the SEC, I focused on financial fraud and financial reporting investigations of public companies of various sizes and in various industries, as well as the associated conduct of auditors and accountants. As Chief Accountant, I oversaw and directed hundreds of financial reporting and fraud investigations involving complex GAAP and GAAS issues and became well-versed in the federal securities laws and regulations and how the SEC applies them. I participated in bringing many notable enforcement actions, including the Cendant, WorldCom, Xerox and Cardinal Health matters. I worked closely with the SEC's Office of the Chief Accountant on policy issues as well as

---

[1] *Rebuttal Report of Steven Richards* (dated September 5, 2025) at Para 21, see Footnote #10.

Confidential

specific enforcement cases. I was awarded the Andrew Barr Award in 2000 and the Commission's Distinguished Service Award in 2006, which recognized "success in overseeing the accounting staff central to investigations involving accounting and financial fraud—among the most challenging and important matters investigated by the Commission." I also was recognized by the FBI for my expert advice and assistance in the Cendant securities fraud case. I have also been recognized by Global Investigations Reporter ("GIR") as one of the top Women in Investigations and Top FCPA practitioners. Recently, I was recognized as an expert in Who's Who Legal Investigations 2024.

6. Prior to my employment with the SEC, I was an auditor with a major international public accounting firm and audited the financial statements of both public and non-public entities.

7. I hold a Bachelor of Science degree in Accounting from The University of Akron and a certified public accountant ("CPA") license in Ohio. **Exhibit 1** contains my curriculum vitae and a description of instances where I have provided testimony within the last four years, as well as a listing of my presentations and publications within the last ten years.

### III.    Information Considered

8. The opinions presented in this report are based on my review and analysis of the available information and my experience, education, and expertise as a forensic accountant. Documents, data, and other information that I considered in forming my opinions are cited throughout this report and /or listed in **Exhibit 2** to this report.

### IV.    Standards Governing My Work

9. I conducted this engagement in accordance with the American Institute of Certified Public Accountants ("AICPA") for Forensic Services No. 1[2] as well as the AICPA Code of Professional Conduct.[3]

### V.    AlixPartners Compensation

10. As part of performing my work, I utilized a team of professionals who worked under my direction and control. My hourly rate for services on this matter is $1,415, and professionals working under my direction range from $450-$1,150 hourly.

### VI.    Background

*A.  Overview of Parties and Case Background*

11. Qualcomm Incorporated and Qualcomm Technologies Incorporated (hereinafter referred to as "Qualcomm") are both incorporated in the State of Delaware with principal business operations

---

[2] AICPA, Statement on Standards for Forensic Services No. 1. (January 1, 2020).

[3] AICPA, Code of Professional Conduct, Effective December 15, 2014 (updated through September 2025).

Confidential

occurring in San Diego, California.[4] Qualcomm is a major innovator in mobile communications technology, specifically related to the "development, launch, and expansion of 5G technology."[5] Qualcomm Technologies Incorporated, a wholly owned subsidiary of Qualcomm Incorporated, is responsible for conducting nearly all of Qualcomm engineering, research and development activities as well as for managing nearly all of its product and service offerings.[6]

12. Arm Holdings PLC (hereinafter referred to as "Arm" or the "Defendant") is incorporated in the United Kingdom ("U.K."), with its corporate headquarters located in Cambridge, U.K.[7] Arm develops and licenses technology for processors utilized across various products, including mobile phones. In particular, two of Arm's license types are at issue in this case, ALAs and TLAs.[8]

13. On March 15, 2021, Qualcomm announced it had acquired NuVia, Inc. ("Nuvia") which was described as a "world-class CPU and technology design company" in its press release.[9]

14. On August 31, 2022, Arm filed a complaint against Qualcomm and its subsidiary Nuvia in the United States District Court for the District of Delaware, alleging that after its acquisition of Nuvia, "[Qualcomm] and Nuvia breached Nuvia's Architecture License Agreement with Arm (the Nuvia ALA) by failing to comply with the termination obligations under the Nuvia ALA."[10]

15. On September 30, 2022, Qualcomm filed its Answer and Counterclaim. As part of this filing, Qualcomm denied Arm's claim and sought a declaratory judgment that its CPU products were covered by Qualcomm's architecture license. On October 26, 2022, Qualcomm filed an Amended Counterclaim in which it sought additional declaratory relief. On March 22, 2024, Qualcomm filed a Second Amended Counterclaim. On July 10, 2024, Arm filed a motion for partial summary judgment. In response, Qualcomm filed a counter-motion for summary judgment. On October 30, 2024, the court denied both motions.[11] On December 20, 2024, a jury found that Qualcomm did not breach the terms of Nuvia's ALA and that Qualcomm's CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA.[12]

16. Separate from the above matter, on April 18, 2024, Qualcomm filed a complaint against Arm in the United States District Court for the District of Delaware, alleging that "Arm has breached the Qualcomm ALA by failing to provide certain deliverables that Arm is obligated to provide."[13]

---

[4] See *Second Amended Complaint, Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings PLC.,* C.A. No. 24-490-MN, Para 38-39 (Filed June 3, 2025).

[5] Id at Para 38.

[6] Id at Para 39.

[7] Id at Para 40.

[8] Id at Para 43.

[9] See Qualcomm Press Release titled, "Qualcomm Completes Acquisition of NUVIA" at, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.

[10] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, at F-23.

[11] Id at F-24.

[12] Verdict Form. C.A. No. 22-1146 (MN). Filed December 20, 2024.

[13] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, at F-24.

Confidential

17. On October 22, 2024, Arm provided Qualcomm with the Notice Letter.[14] As disclosed in its annual Form 10-K for the fiscal period ending on September 29, 2024, Arm alleged in the Notice Letter that the Company "breached the Qualcomm ALA by marketing products that contain CPUs that Arm alleges use designs, technology and code created by Nuvia employees prior to [Qualcomm's] acquisition of Nuvia; by seeking support and verification from Arm for additional products that use such alleged designs, technology and code; and by suing Arm for breach of the Qualcomm ALA. Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice."[15]

18. On October 22, 2024, the same date that Qualcomm received the Notice Letter, contents of the letter were leaked to Bloomberg who then published an article ("Bloomberg Article") titled, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation." This article was originally published on October 22, 2024, and subsequently updated on October 23, 2024.[16]

19. On January 8, 2025, Arm withdrew the Notice Letter previously sent to Qualcomm on October 22, 2024.[17]

B. *Steven Richards' Rebuttal Expert Report filed on September 5, 2025*

20. Steven Richards, Managing Director in Ankura Advisory Consulting Group L.L.C.'s Risk Practice, was engaged by Kirkland and Ellis L.L.P., counsel to Arm in civil case No. 24-490-MN. Mr. Richards is a CPA and a member AICPA.[18]

21. On September 5, 2025, Steven Richards issued a Rebuttal Expert report at the request of Kirkland and Ellis on behalf of the Defendant.[19] In issuing this report, Steven Richards reviewed publicly available information and relevant documentation to opine on the following:

   a. "Whether Qualcomm was required to disclose [the Notice Letter] in its Form 10-K for the fiscal period ending September 29, 2024 ("2024 Form 10-K") regardless of the publication of its contents in the Bloomberg Article"[20]; and

---

[14] QCVARM_1030011.

[15] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, at F-24.

[16] See Bloomberg's article titled, "ARM to Scrap Qualcomm Chip Design License in Feud Escalation", originally published on October 22, 2024, and subsequently updated on October 23, 2024. See, https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

[17] Qualcomm Inc., Form 10-Q for fiscal quarter ended December 29, 2024, at 13.

[18] *Rebuttal Report of Steven Richards*, dated September 5, 2025, at Para 1 and 13.

[19] Id at Para 1.

[20] See Bloomberg's article titled, "ARM to Scrap Qualcomm Chip Design License in Feud Escalation", originally published on October 22, 2024, and subsequently updated on October 23, 2024. See, https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

Confidential

     b. "Whether Qualcomm's public disclosures convey the significant harm resulting from the [Notice Letter] or its publication in the Bloomberg Article as alleged in the Second Amended Complaint.[21]"

   C. *U.S. SEC Disclosure Requirements and US GAAP Reporting Standards*

22. In accordance with United States ("U.S.") securities laws and regulations, the majority of publicly traded companies in the United States are to file an annual Form 10-K report as well as quarterly Form 10-Q reports for the first three quarters of the respective fiscal year with the U.S. Securities and Exchange Commission ("SEC").[22]

23. The U.S. SEC provides written instructions related to the Form 10-K, which reference Rule 12b-20: "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements… not misleading."[23] In addition, the instructions also reference several disclosures including "Item 8. Financial Statements and Supplementary Data."[24]

24. Regarding the required financial statements, in addition to the above disclosure requirements set forth by the U.S. SEC, the Financial Accounting Standards Board ("FASB") "establishes financial accounting and reporting standards… that follow Generally Accepted Accounting Principles."[25]

25. This includes accounting standards related to "loss contingencies" which are defined under ASC 450-20. Specifically, this term is defined as, "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[26] An example of a loss contingency is pending litigation.[27]

26. Paragraph 1 of FAS 5 (which was superseded by ASC 450-20) provides a similar explanation of how loss contingencies are resolved stating, "that [they] will ultimately be resolved when one or more future events occur or fail to occur. Resolution of uncertainty may confirm…the loss or impairment of an asset or the incurrence of a liability."[28]

27. ASC 450-20 sets forth the criteria for determining whether an accrual and/or disclosure is required in the financial statements. Per the standard, a loss contingency should be accrued if it meets the

---

[21] *Rebuttal Report of Steven Richards*, dated September 5, 2025, at Para 2.

[22] 17 CFR § 240.13a-1; 17 CFR § 240.13a-13 ; and U.S. Securities and Exchange Commission, Office of Investor Education and Advocacy. Investor Bulletin: How to Read a 10-K (dated January 25, 2021) at 1, *available at* (https://www.sec.gov/files/reada10k.pdf).

[23] U.S. Securities and Exchange Commission, Form 10-K – General Instructions at 2, *available at* https://www.sec.gov/files/form10-k.pdf.

[24] Id at 12.

[25] Financial Accounting Standards Board, "About the FASB.", *available at* https://www.fasb.org/about-us/about-the-fasb.

[26] FASB ASC 450-20-20.

[27] FASB ASC 450-20-05-10.

[28] Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, Accounting for Contingencies (Mar. 1975) at Para 1.

Confidential

following: (i) it is "probable" which is defined as "the future event or events are likely to occur"; and (ii) it is "reasonably estimable."[29] In evaluating the likelihood of an event, the standard provides a range of probable, reasonably possible and remote.[30]

28. In accordance with ASC 450-20, in some instances it may be necessary to disclose the nature of the accrual and/or the amount of the accrual if the omission of such information would result in making the financial statements "misleading."[31] Furthermore, in the event that an accrual is not made, a contingency should still be disclosed "if there is at least a reasonably possibility that a loss or an additional loss may have been incurred."[32] In the event a disclosure is warranted, it should describe the nature of the contingency and include either: (i) an estimate of the potential loss; (ii) or a statement that the loss cannot be estimated.[33]

29. In the event that a loss contingency occurs after the financial statement date but prior to its issuance, if an accrual is not required under ASC 450-20, an entity may still need to make a disclosure if its omission would result in the financial statements be "misleading." As stated above, this disclosure should describe the nature of the contingency and include either: (i) an estimate of the potential loss; (ii) or a statement that the loss cannot be estimated.[34]

## VII.    Summary of Opinions

A.    *The potential decline in prospective revenues resulting from the Notice Letter does not meet the definition of a loss contingency under ASC 450-20.*

B.    *The potential decline in prospective revenues resulting from the Notice Letter does not meet the definition of a liability.*

## VIII.    Analysis of Opinions

30. In Mr. Richards' report dated September 5, 2025, he opines that "Qualcomm was required to disclose the [Notice] Letter in its 2024 Form 10-K regardless of the publication of the [Notice] Letter's contents in the Bloomberg Article."[35] In support of this opinion, he states that this disclosure was required by U.S. GAAP, specifically ASC 450-20. [36]

31. In response to Mr. Richards' assertion, Paul, Weiss, counsel to Qualcomm, has requested that I provide an opinion as to the whether Qualcomm was required under U.S. Generally Accepted Accounting Principles ("US GAAP"), specifically ASC 450-20, to disclose the Notice Letter in its Form 10-K filed on November 6, 2024.

---

[29] FASB ASC 450-20-25-2.

[30] FASB ASC 450-20-25-1.

[31] FASB ASC 450-20-50-1.

[32] FASB ASC 450-20-50-3.

[33] FASB ASC 450-20-50-4.

[34] FASB ASC 450-20-50-9.

[35] *Rebuttal Report of Steven Richards*, dated September 5, 2025, at Para 21.

[36] Ibid.

Confidential

    A.   *The potential decline in prospective revenues resulting from the Notice Letter does not meet the definition of a loss contingency under ASC 450-20.*

32. Qualcomm initially disclosed the Notice Letter in its Consolidated Financial Statements for the fiscal year ended on September 29, 2024, specifically in *Note 7. Commitment Contingencies – Legal and Regulatory Proceedings.*[37] The financial statements were filed with the U.S. SEC on November 6, 2024.[38] With respect to the Notice Letter, the following was disclosed in Note 7:

> *"On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA by marketing products that contain CPUs that Arm alleges use designs, technology and code created by Nuvia employees prior to [Qualcomm's] acquisition of Nuvia; by seeking support and verification from Arm for additional products that use such alleged designs, technology and code; and by suing Arm for breach of the Qualcomm ALA. Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice. We disagree with Arm's allegations, including that we are in breach of the Qualcomm ALA."*

33. Mr. Richards' report describes the above disclosure as being "required by US GAAP" and cites to ASC 450-20, entitled "loss contingencies."[39] Separately, Mr. Richards states in his report that "Qualcomm was required to disclose the [Notice] Letter in the 2024 Form 10-K as Qualcomm determined that it was reasonably possible that a material loss contingency may have been incurred related to the potential termination of the QC ALA."[40]

34. Mr. Richards' cites to the definition of loss contingencies under ASC-450-20, specifically, as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[41]

35. While I do not dispute this definition, I do not agree that the application of this standard would necessarily require disclosure of the Notice Letter by Qualcomm in its Consolidated Financial Statements for the fiscal year ending on September 29, 2024. Qualcomm has included disclosures related to the litigation ongoing between Qualcomm and Arm in its filings since 2022.[42] The Notice Letter is consistent with the prior disclosures while also including the phrase [right to terminate in 60 days ...] That language and any additional harm to Qualcomm relates to the potential decline in

---

[37] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, at F-23 and F-24.

[38] Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, at F-2.

[39] *Rebuttal Report of Steven Richards* (dated September 5, 2025) at Para 21, see Footnote #10.

[40] *Rebuttal Report of Steven Richards* (dated September 5, 2025) at Para 68,

[41] *Rebuttal Report of Steven Richards* (dated September 5, 2025) at Para 64.

[42] Qualcomm Inc., Form 10-K for fiscal year ended September 25, 2022, at F-24 to F-25; Qualcomm Inc., Form 10-K for fiscal year ended September 24, 2023, at F-23 to F-24; Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024, at F-23 to F-24.

Confidential

future revenues from certain customers (prospective or current) that could be either (a) less than expected or (b) did not materialize.[43]

36. In my experience, a decline in future revenues would not constitute a contingent loss under ASC 450-20. Mr. Richards has not explained or demonstrated how such declines in revenues would constitute a loss contingency.

   *B. The potential decline in prospective revenues resulting from the Notice Letter does not meet the definition of a liability.*

37. Mr. Richards refers to 'contingent liabilities' in his report and states that pending or threatened litigation is an example of a loss contingency.[44] I agree with that statement as set forth in ASC 450-20. Mr. Richards fails, however, to articulate how a decline in prospective revenues meets the definition of a liability, contingent or otherwise.

38. The Financial Accounting Standards Board Concepts Statement No. 6 ("FASB's Concepts Statement") defines liabilities as "probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events."[45]

39. I am not aware of any allegations made by Qualcomm in which it claims to have been harmed by liabilities it has incurred as a result of the Notice Letter absent Arm's disclosure of the letter. Rather, I am only aware of prospective revenues from certain customers that could have been either (a) less than expected or (b) did not materialize.[46] Neither of these claims stem from a "future sacrifice" of Qualcomm's "economic benefits" (i.e. assets) nor do they represent an obligation of Qualcomm as is generally understood in the accounting world.

40. FASB Concepts Statement Number 6 also provides three key characteristics of a liability: (1) "it embodies a present duty or responsibility to one or more other entities that entails settlement by probable future transfer or use of assets at a specified or determinable date, on occurrence of a specified event, or on demand"; (2) "the duty or responsibility obligates a particular entity, leaving it little or no discretion to avoid the future sacrifice"; (3) "the transaction or other event obligating the entity has already happened."[47]

---

[43] See *Second Amended Complaint, Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings PLC.,* C.A. No. 24-490-MN, Para 188 and 210 (Filed June 3, 2025). For purposes of this report, any reference to the potential decline in future revenues relates to either a reduction in sales and/or an increase in the total amount of rebates related to future sales which Qualcomm accounts for as a reduction to revenue in the period that the related revenues are earned.

[44] *Rebuttal Report of Steven Richards,* dated September 5, 2025, at Para 45. Deloitte defines contingent liabilities as "Contingent liabilities are liabilities for which the possible loss outcome is unknown or uncertain, such as pending or threatened litigation, actual or possible claims, or product defects." See *Deloitte's Roadmap: Contingencies, Loss Recoveries, and Guarantees, Chapter 2 — Loss Contingencies and Commitments, Section 2.1: Overview*

[45] Financial Accounting Standards Board ("FASB"). Statement of Financial Accounting Concepts No. 6 (Revised): Elements of financial statements at Para 35.

[46] See *Second Amended Complaint, Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings PLC.,* C.A. No. 24-490-MN, Para 188 and 210  (Filed June 3, 2025).

[47] Id at Para 36.

Confidential

41. I am unaware of any assets that Qualcomm alleges it had used or transferred as a result of the Notice
Letter. As stated above, I am only aware of prospective revenues from certain customers
(prospective or current) that could have been either (a) less than expected or (b) did not materialize.
Neither of these events required Qualcomm to "transfer or use" assets.[48]

**IX.    Conclusion**

42. The opinions expressed herein are subject to change based upon any additional discovery related to
this case or information that I may receive after the date of this report. In rendering these opinions,
I relied in part on representations of counsel. As I continue to review the discovery record and other
materials, I will update this report, as necessary, based on any additional information I am provided.
If I am called upon to testify, I may prepare aids such as graphs, charts, or demonstratives.

Susan G. Markel

AlixPartners LLP

September 19, 2025

---

[48] See *Second Amended Complaint, Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings
PLC.,* C.A. No. 24-490-MN, Para 188 and 210  (Filed June 3, 2025).

11

**A0649**



# Susan Goetz Markel

smarkel@alixpartners.com
+1 (202)756-9016
+1 (703)659-5271
Washington, D.C

## EDUCATION

B.S Accounting- University of Akron

## PROFESSIONAL HISTORY

- Managing Director, AlixPartners
  Washington, DC (2009-present)
- U.S. Securities and Exchange Commission
  Chief Accountant, Division of Enforcement
  Washington, DC (2003-2009)
- U.S. Securities and Exchange Commission
  Division of Enforcement
  Washington, DC (1994-2003)
- Stewart and Stewart, LLP
  Economic Consultant on International Trade Matters
  Washington, DC (1990-1994)

- Arthur Andersen & Co.
  Staff to Manager – Audit and Litigation Support Practice
  Washington, DC (1987-1990)
  Cleveland, Ohio (1984-1987)

## PROFESSIONAL EXPERIENCE

Ms. Markel specializes in matters related to accounting, financial reporting, compliance matters and internal controls. Her professional career includes experience as a senior government official and financial consultant specializing in forensic investigations, controls reviews, monitorship engagements, auditing and expert witness services.

### SEC Enforcement Division

- worked in the Division of Enforcement at the Securities and Exchange Commission for nearly 15 years, focusing on financial fraud and financial reporting and internal controls investigations. During the last five years of her tenure with the SEC, she served as the Chief Accountant in the Division of Enforcement where she was involved in many significant enforcement actions, as well as significant policy decisions working closely with other Commission staff. These investigations spanned across all industries and dealt with a wide range of complex accounting, auditing, and internal controls issues.

- As Chief Accountant, Susan oversaw and directed financial fraud investigations and participated in decisions regarding the appropriate resolution of the matter as it pertained to corporations, corporate officers and employees, and independent auditors.

## PROFESSIONAL EXPERIENCE

### SEC Enforcement Division (Continued)

This involved close and frequent communication with various offices within the SEC and also external parties including opposing counsel and other regulators or law enforcement agencies.

### Forensic Accounting and Fraud Investigations

- Extensive investigative and forensic accounting analysis.
- Represented Boards of Directors, investors, corporate officers, auditors, and corporations in investigations and in conjunction with AML and FCPA monitorships.
- Among other matters, Ms. Markel's investigations have involved financial reporting errors and fraud, potential violations of the Foreign Corrupt Practices Act, post-acquisition reviews and accounting analysis and adequacy of MD&A and other disclosures. She has performed such services in connection with internal investigations, legal proceedings, regulatory investigations and M&A transactions.
- Reviewed accounting practices and internal controls in support of monitors in the FCPA and AML areas, including an FCPA monitorship of an oil and gas services company, and also as part of investigations.
- Consulted with clients on matters such as SEC reporting implications, restatements of previously issued financial information and adequacy of internal controls and has prepared and presented related reports to third parties. Since joining AlixPartners in 2009, she has been engaged in more than 50 matters involving a wide range of accounting and financial reporting issues.

- Provided consulting services in connection with numerous legal actions as well as proceedings involving issues such as fraud and auditor malpractice.
- Provided litigation consulting and expert witness testimony services with respect to a variety of industries including oil and gas services, manufacturing, energy, technology, financial services, retail, health care, hospitality, hedge funds and real estate

### Auditing Experience

- Auditing and accounting experience includes managing and directing financial statement audits for numerous public and private companies operating in a variety of industries including manufacturing, real estate, construction, telecommunications, technology, retail, and product distribution.
- Has conducted investigations related to financial reporting issues, in a wide range of industries, including accounting issues and compliance with the FCPA and AML rules. She has also been engaged as a consulting or testifying expert witness on numerous matters.

### Antidumping Related

- During a four year period, served as economic consultant on numerous antidumping matters before the US Department of Commerce and the ITC. Work included data analysis, report preparation, and advisory work. Also co-authored a publication related to the antidumping negotiations from the Uruguay Round.

AlixPartners Confidential

**Alix**Partners   2

## PROFESSIONAL EXPERIENCE

### FCPA Related

- Conducted forensic accounting investigation of a Fortune 500 company's compliance with the FCPA related to its operations in Asia. Required preparation of reports, in conjunction with counsel that were presented to the U.S. Securities and Exchange Commission and the U.S. Department of Justice.

- Consulting expert to the monitor related to a Deferred Prosecution Agreement on FCPA matters of an international oil and gas company. Term of monitorship was 2½ years and resulted in submissions of results and recommendations to the US Department of Justice.

- Consulting expert to the monitor related to a Deferred Prosecution Agreement on FCPA matters for an international transportation company.

- Conducted internal investigation of certain practices of an acquired company in SE Asia on behalf of an international technology company.

- Consulting expert retained by U.S. Department of Justice to assist the Fraud Section in the investigation of compliance with the FCPA of a major US corporation.

### Auditing Matters

- Testifying expert in a non-public PCAOB investigation and hearing regarding the conduct of an auditor for a pharmaceutical company. Decision received from Hearing Officer resulted in no charges being filed.

- Consulting expert in a non-public PCAOB investigation regarding the conduct of an auditor for a financial services company

- Consulting expert engaged by international accounting firms under investigation by the SEC related to potential errors and irregularities at an audit client.

- Testifying expert on auditor independence issues on behalf of an international accounting firm's audit of financial services company.

### Internal Investigations and Consulting Expert Roles

- Conducted internal investigation on behalf of Audit Committee for a technology company which involved issues related to revenue recognition and other potential accounting irregularities in operations in the US and Europe.

- Consulting expert retained in dispute over valuation of assets which were valued as Level 3 under FAS 157. Provided assistance during class action suits against company and SEC investigation. Provided accounting expertise in valuation and assistance with the restatement and litigation/regulatory matters.

- Consulting expert retained by Audit Committees in several engagements during review of revenue recognition and other accounting and disclosure matters in investigations by the SEC.

- Consulting expert retained on a matter under investigation by the SEC related to the valuation of intangible assets. Presentation made with counsel to SEC resulting in matter being closed without action.

- Conducted forensic accounting investigation on behalf of an Audit Committee of whistleblower tips related to percentage of completion accounting and internal control issues. Presentations made with counsel to the SEC and Audit Committee.

AlixPartners Confidential

**SUSAN MARKEL**

## PROFESSIONAL EXPERIENCE

### Internal Investigations and Consulting Expert Roles (Continued)

- Consulting expert related to an SEC inquiry into percentage of completion accounting practices in the defense industry. Presentation made on behalf of company; matter closed without action.

- Consulting expert engaged to review certain revenue recognition practices in response to a whistleblower complaint of an international technology company.

- Consulting expert retained in response to SEC Wells notice and supporting counsel in its defense of a financial services company. Authored white paper and made presentations to the SEC regarding same. Matter closed without action.

- Consulting accounting expert retained to provide assistance in an SEC enforcement division inquiry of a company in the healthcare industry regarding FAS 5 reserve calculations and disclosure issues. Presentations made to the SEC with company personnel. Matter closed without action.

- Conducted internal investigation on behalf of the Audit Committee of a healthcare company related to potential errors and irregularities and internal control issues. Presentations made to the Audit Committee and the SEC

## CERTIFICATIONS

Certified Public Accountant

## AFFILIATIONS

- Certified in Financial Forensics

- Member, American Institute of Certified Public Accountants

- Member, International Association of Independent Corporate Monitors

- Member, Ohio Society of Certified Public Accountants

- Trustee, SEC Historical Society

- Member, Society of Corporate Compliance & Ethics

- Board Member, Audit and Ethics Committee Member – National Industries for the Blind

- Advisory Board Member – University of Akron Accounting Department

## AWARDS

- Recipient of The National Law Journal's 2014 Governance, Risk & Compliance Trailblazers & Pioneers Award

- Recipient of The Global Investigation Review's "Women in Investigations" Award

- Recipient of the Global Investigation Review's "Top FCPA Practitioners" Award

- Recognized as an expert in Who's Who Legal Investigations 2024

AlixPartners Confidential

**Alix**Partners    4

CONFIDENTIAL
EXHIBIT 1

**SUSAN MARKEL**

## SPEECHES

Ms. Markel's public speaking engagements during the previous 10 years include the following:

- *"Is that a Whistleblower I Hear?,"* Association of Corporate Counsel Annual Conference, Washington, DC *

- *"Legal & Compliance as Gatekeepers: How Regulatory Agencies are Changing the Game,"* Women, Influence & Power in Law Conference, Washington, DC*

- *"On the Hunt for Fraud: Real Life Case Studies to Detect and Prevent Fraud,"* Financial Executives International Summit Leadership Conference, Boca Raton, FL*

- *"SEC Enforcement,"* RR Donnelly – SEC Hot Topics Institute, Cleveland, OH*

- *"Staying a Step Ahead: Strategies for Responding to Evolving Enterprise Risks,"* Women, Influence & Power in Law Conference, Washington, DC*

- *"Whistleblower Update: New Risks & Regulation in Europe and the United States,"* European American Chamber of Commerce, New York, NY*

- *"Current Issues at the SEC & PCAOB Through an Enforcement Lens,"* University of Washington Financial Reporting Conference, Seattle, WA

- *"Latest News in International Prosecution and Investigation Practices of US Authorities,"* Frankfurt, Germany*

- *"SEC 2014 Financial Reporting Initiatives – The Task Force, Big Data, and Admissions: What's on the Horizon?"* SEC Enforcement Seminar, Weil Gotshal and AIG, New York, NY*

- *"SEC Enforcement in China,"* CPE Inc., SEC Accounting and Reporting Conference, Beijing, China*

- *"SOX 404 Conference – Compliance & Regulatory Landscape Hot Topics,"* October 2013

- Moderator, *"SEC Enforcement 2014: A Preview,"* National Law Journal 2013 Regulatory Summit, Washington, DC

- *"SEC Enforcement – The Current Landscape,"* RR Donnelly SEC Hot Topics Institute, Cleveland, OH*

- *"SEC Enforcement – The Current Landscape,"* SEC Year-End Enforcement Conference 2013: An Accounting & Reporting Update for Public Companies, CPE Inc., Phoenix, AZ

- *"Whistleblower Laws and Investigations: Strategies and Practical Considerations"* C4CM Training and Professional Development Webinar, Online *

- *"Strategies for Keeping a Whistleblower Claim In-house,"* Association of Corporate Counsel Annual Conference *

- *"In Pursuit of Clean Earnings: Dodging an SEC Investigation or Litigation,"* SCCE's 15th Annual Compliance & Ethics Institute, September 2016

- *"The SEC's Focus on Private Equity Firms: How to Be Prepared,"* Hedge Fund Webinar, Covington & Burling, LLP

- *"Masterclass: Managing a True Corporate Crisis, Major Internal Investigation and/or Whistleblower",* Securities Enforcement Forum D.C., November 2024 *

*Panel discussion

### CO-AUTHOR

- The GATT Uruguay Round: Antidumping: A Negotiating History (1986-1992)

**Alix**Partners    5

**CONFIDENTIAL**
**Exhibit 2 – Materials Considered**

## 1. Legal Filings

Complaint, Arm LTD v. Qualcomm Inc., et.al , August 31, 2022
Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 1, p. 1
Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 1
Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 12
Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 18.
Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), D.I. 306.
Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN) Plaintiff Arm Ltd.'s Answer and
Affirmative Defenses to Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and
Nuvia, Inc.'s Amended Counterclaim
Arm Ltd. v. Qualcomm Inc. et al., No. 22-1146 (MN), Verdict Form (Filed December 20,
2024)
First Amended Complaint, Qualcomm Inc. And Qualcomm Technologies Inc. v. Arm
Holdings PLC, December 16, 2024
Second Amended Complaint, Qualcomm Incorporated and Qualcomm Technologies,
Inc. v. Arm Holdings PLC., C.A. No. 24-490-MN,  (Filed June 3, 2025).

## 2. Expert Reports

Expert Report of Patrick F. Kennedy, Ph. D. (dated August 8, 2025) [redacted version],
and related exhibits.
Rebuttal Report of Steven Richards (dated September 5, 2025), and related exhibits.

## 3. Depositions

Deposition of Cristiano R. Amon (dated July 3, 2025), and certain related exhibits.
Deposition of Ann Nathalie Cathcart Chaplin (dated July 11, 2025), and certain related
exhibits.
Deposition of Jonathan Weiser (dated July 11, 2025), and certain related exhibits.
Deposition of Pavan Kumar Mulabagal (dated July 1, 2025), and certain related exhibits.

## 4. SEC Filings

Qualcomm, Inc. Form 8-K, March 12, 2018
Qualcomm, Inc. Form 8-K, January 12, 2021
Qualcomm, Inc. Form 8-K, November 06, 2024
Qualcomm Inc., Form 10-K for fiscal year ended September 25, 2022.
Qualcomm Inc., Form 10-K for fiscal year ended September 24, 2023.
Qualcomm Inc., Form 10-K for fiscal year ended September 29, 2024.
Qualcomm, Inc. Form 10-Q for quarter ended September 25, 2022
Qualcomm, Inc. Form 10-Q for quarter ended December 25, 2022
Qualcomm, Inc. Form 10-Q for quarter ended March 26, 2023

Qualcomm, Inc. Form 10-Q for quarter ended June 25, 2023
Qualcomm, Inc. Form 10-Q for quarter ended September 24, 2023
Qualcomm, Inc. Form 10-Q for quarter ended December 24, 2023
Qualcomm, Inc. Form 10-Q for quarter ended March 24, 2024
Qualcomm, Inc. Form 10-Q for quarter ended June 23, 2024
Qualcomm Inc., Form 10-Q for fiscal quarter ended December 29, 2024.
Qualcomm, Inc. Form 10-Q for quarter ended March 30, 2025
Qualcomm, Inc. Form 10-Q for quarter ended June 29, 2025
Qualcomm Inc., Form 8-K, Exhibit 99.1
Arm Holdings PLC, Form 20-F, for the year ended March 31, 2025
Arm Holdings PLC, Form 6-K, November 2024


## 5.  SEC and US GAAP Accounting Guidance


AICPA, Statement on Standards for Forensic Services No. 1. (January 1, 2020).
AICPA, Code of Professional Conduct, Effective December 15, 2014 (updated through September 2025).
AICPA Code of Conduct
AICPA Statement on Standards for Forensic Services No. 1
Deloitte, Deloitte Account Research Tool. Chapter 2 - Loss Contingencies and Commitments.
FASB ASC 450-20.
FASB ASC Topic 450-20, Loss Contingencies
FASB ASC Topic 855, Subsequent Events
Financial Accounting Standards Board. Statement of Financial Accounting Concepts No. 6 (Revised): Elements of financial statements.
Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, Accounting for Contingencies (Mar. 1975).
AU Section 560 Subsequent Events
AU Section 561 Subsequent Discovery of Facts Existing at the Date of the Auditor's Report
General Rules and Regulations, Part 230.405, of Securities Act of 1933
Sarbanes Oxley Act of 2002, Section 404: Management Assessment of Internal Controls
Sarbanes Oxley Act of 2002, Section 302: Corporate Responsibility for Financial Reports
SEC Answers, Form 8-K
SEC Commission, General Rules of Regulation FD
SEC Commission Rule, Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, December 29, 2003
SEC Commission Rule, Disclosure in Management's Discussion and Analysis About Off- Balance Sheet Arrangements and Aggregate Contractual Obligations, February 5, 2003
SEC Notice, Commission Statement About Management's Discussion and Analysis of

Financial Condition and Results of Operations, January 25, 2002.
SEC Final Rule, Selective Disclosure and Insider Trading, Regulation FD
SEC Final Rule, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information
SEC Final Rule, Disclosure in Management's Discussion and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations
SEC Financial Reporting Manual, Topic 1 Registrant's Financial Statements,
SEC Financial Reporting Manual, Topic 9 SEC Financial Reporting Manual, Topic 9, Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), 9100 MD&A Objectives
SEC Form Summary, Form 8-K
SEC Frequently Asked Questions, Form 8-K
SEC General Instructions, Form 8-K
SEC General Instructions, Form 10-K
SEC General Instructions, Form 10-Q
SEC Investor Bulletin, How to Read an 8-K, May 2012
SEC Investor Bulletin, How to Read a 10-K/10-Q, January 25, 2021
SEC Investor Bulletin, How to Read a 10-K, September 11, 2011
SEC Interpretive Rule, Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, May 18, 1989.
SEC Questions and Answers of General Applicability, Exchange Act Form 8-K, Compliance and Disclosure Interpretations, June 24, 2024
SEC Questions and Answers of General Applicability, Exchange Act Form 8-K, Compliance and Disclosure Interpretations, November 23, 2004
SEC Consolidated Compliance and Disclosure Interpretations
SEC Staff Accounting Bulletin: No. 99 – Materiality
U.S. Securities and Exchange Commission, Office of Investor Education and Advocacy. Investor Bulletin: How to Read a 10-K (dated January 25, 2021).
17 CFR § 229.103 - (Item 103) Risk factors, Regulation S-K.
17 CFR § 229.105 - (Item 105) Risk factors, Regulation S-K.
17 CFR § 229.307 – (Item 307) Disclosure controls and procedures.
17 CFR § 229.308 - (Item 308) Internal control over financial reporting.
17 CFR § 230.405 – Definitions of terms.
17 CFR § 240.13a-15- Controls and procedures
17 CFR Part 243.100, Regulation Fair Disclosure.

**6.**    **Transcripts**

Qualcomm Inc Q1 2024 Earnings Call Transcript, January 31, 2024

Qualcomm Inc Q2 2024 Earnings Call Transcript, May 01, 2024

Qualcomm Inc Q3 2024 Earnings Call Transcript, July 31, 2024

Qualcomm Inc Q4 2024 Earnings Call Transcript, November 06, 2024

Qualcomm Inc Q1 2025 Earnings Call Transcript, February 05, 2025

Qualcomm Inc Q2 2025 Earnings Call Transcript, April 30, 2025

Qualcomm Inc Q3 2025 Earnings Call Transcript, July 30, 2025

Qualcomm Deutsche Bank Technology Conference, August 29, 2024

Qualcomm Investor Day 2024 Transcript, November 19, 2024

Qualcomm Inc UBS Global Tech Conference Transcript, December 04, 2024

Qualcomm at Nasdaq London Investor Conference, June 11, 2025

Qualcomm Inc at JPMorgan Global Technology, Media and Communications Conference, May 14, 2025

Qualcomm Inc Annual Shareholders Meeting, March 18, 2025

Qualcomm Inc at Bernstein Strategic Decisions Conference, May 28, 2025

Bernstein's 40th Annual Strategic Decisions Conference, May 29, 2024

Bernstein Annual Strategic Decisions Conference, May 29, 2024

**7.    Online Resources**

https://www.fasb.org/about-us/about-the-fasb_feud.

https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.

https://www.sec.gov/files/form10-k.pdf.

Bloomberg, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation", October 22, 2024

Bloomberg, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation", October 23, 2024

NASDAQ, What Is an Earnings Call? Here's What New Investors Should Know, April 27, 2024

Investopedia, Earnings Conference Call: What it is, How it Works, September 11, 2022

Qualcomm Press Announcement, March 15, 2021

Qualcomm Press Announcement, December 20, 2024.

Arm Holdings PLC Financial Statements for year ended as of March 31, 2024

SEC Introduction to Investing Glossary, Form 10-K.

SEC Introduction to Investing Glossary, Form 10-Q.

SEC Speech, Disclosure Effectiveness: Remarks Before the American Bar Association Business Law Section Spring Meeting, April 11, 2014

Regulation Fair Disclosure and New Insider Trading Rules Fact Sheet, August 10, 2000

SEC Statement, Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors, March 09, 2022

SEC Search, Qualcomm Filings Between January 1, 2024 and August 24, 2025

SEC Speech, Applying a Principles-Based Approach to Disclosing Complex, Uncertain and Evolving Risks, March 15, 2019.

**8.   Other**

Letter, Spencer Collins, EVP, Chief Legal Officer, Arm Limited to Ann Chaplin, General Counsel and Corporate Secretary, Qualcomm Incorporated (dated October 22, 2024). [QCVARM_1030011].

Letter, Ann Chaplin, General Counsel and Corporate Secretary, Qualcomm Incorporated to Spencer Collins, EVP, Chief Legal Officer, Arm Limited (dated October 28, 2024). [QCVARM_0617824].

Amon Exhibit 1 [Arm's Notice of Rule 30(b)(6) Deposition of Qualcomm

Amon Exhibit 5 [QCVARM_0847094]

Amon Exhibit 6 [Arm v. Qualcomm; Arm's Answer and Affirmative Defenses to Qualcomm's Amended Counterclaim]

Amon Exhibit 7 [Article: Qualcomm Takes Legal Fight With Arm to Global Antitrust Agencies]

Amon Exhibit 8 [Article: Arm recruits from customers as it plans to sell its own chips]

Amon Exhibit 9 [Qualcomm 10-K for fiscal year ended September 29, 2024]

Amon Exhibit 11 [QCARM_3425702]

Amon Exhibit 12 [QCVARM_0856270]

Amon Exhibit 13 [QCVARM_0885022]

Amon Exhibit 14 [QCVARM_1069106]

Amon Exhibit 15 [QCARM_3533982]

Amon Exhibit 16 [QCVARM_1068222]

Amon Exhibit 17 [QCVARM_1069945]

Chaplin Exhibit 2 [In re: Qualcomm Antitrust Litigation; Answering Brief of Defendant-Appellee Qualcomm Incorporated]

Chaplin Exhibit 3 [QCARM_0337838]

Chaplin Exhibit 4 [QCARM_7484465]

Chaplin Exhibit 8 [QCARM_0277129]

Chaplin Exhibit 11 [Article: Arm to Scrap Qualcomm Chip Design License in Feud Escalation]

Chaplin Exhibit 12 [QCVARM_0713535]

Chaplin Exhibit 14 [Qualcomm 10-K for fiscal year ended September 29, 2024]

Chaplin Exhibit 19 [Arm v. Qualcomm; Arm's Answer and Affirmative Defenses to Qualcomm's Amended Counterclaim]

Chaplin Exhibit 23 [Article: Qualcomm Takes Legal Fight With Arm to Global Antitrust Agencies]

Chaplin Exhibit 24 [Article: Arm recruits from customers as it plans to sell its own chips]

Chaplin Exhibit 25 [Article: Qualcomm Legal Chief Gets 26% Pay Bump After Chip Battle]

Mulabagal Exhibit 1 [QCVARM_0865022]

Mulabagal Exhibit 2 [QCVARM_0865730]

Mulabagal Exhibit 3 [QCVARM_0864924]

Mulabagal Exhibit 4 [QCVARM_0854933]

Mulabagal Exhibit 5 [QCVARM_0864833]

Mulabagal Exhibit 6 [QCVARM_0855438]

Mulabagal Exhibit 7 [QCVARM_0855344]

Mulabagal Exhibit 8 [QCVARM_0865279]

Mulabagal Exhibit 9 [QCVARM_0864713]

Mulabagal Exhibit 11 [QCVARM_1024873]

Mulabagal Exhibit 12 [QCVARM_0865420]

Mulabagal Exhibit 13 [QCVARM_0865236]

6

Mulabagal Exhibit 14 [QCVARM_0865430]
Weiser Exhibit 4 [QCARM_0343120]
Weiser Exhibit 5 [QCARM_0338573]
Weiser Exhibit 6 [QCARM_0343954]
Weiser Exhibit 8 [QCVARM_0617829]

# Exhibit 5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>    a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>    a Delaware corporation,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>    a U.K. corporation,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 24-490 (MN) |

**REPLY EXPERT REPORT OF SAMUEL J. WINER**

**September 19, 2025**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.    **Introduction** .................................................................................................. 1

II.   **Summary of Opinions** ................................................................................ 1

III.  **Basis for Opinions** .................................................................................... 2

IV.  **Background Facts and Timeline** ............................................................... 5

V.   **Mr. Richards Failed to Demonstrate the October 22, 2024 Letter Was Material** ............... 6

   A.  **Materiality Standard** ........................................................................ 7

   B.  **Witness Testimony Identified by Mr. Richards** ............................. 8

   C.  **Analyst Reports Regarding the Notice Letter** ............................... 10

   D.  **ASC 450-20** .................................................................................... 12

VI.  **Qualcomm's Disclosure of the October 22, 2024 Letter within Note 7 is Not Determinative of Materiality** ................................................................... 13

VII.  **Mr. Richards Assumes the Contents of the Notice Letter as Fact** ......... 14

VIII.  **Reservation of Rights** ............................................................................. 15

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.    Introduction

1.      My name is Samuel J. Winer. I have been retained by Paul, Weiss, Rifkind, Wharton & Garrison LLP as an expert in this action on behalf of Plaintiffs Qualcomm Inc. and Qualcomm Technologies (collectively, "Qualcomm").  The purpose of my report is to disclose my professional background and experience, the materials subject to my review, and my expert opinions associated with Arm Holding PLC's ("Arm") claims regarding Qualcomm's disclosure obligations under the federal securities laws.  Specifically, this report provides my rebuttal opinions to the expert report of Arm's expert Steven Richards, dated September 5, 2025.[1]

2.      I am being compensated for my work on this case at my standard consulting rate of $3,000 per hour. I am also being reimbursed for expenses that I may incur.  My compensation is not contingent upon the results of my analysis or the substance of my opinions or testimony.

## II.    Summary of Opinions

3.      It is my opinion that in his expert report, Mr. Richards did not establish that Arm's letter notifying Qualcomm that it was purportedly in breach of the Qualcomm Architecture Licensure Agreement (LES-TLA-20039) ("Qualcomm ALA") and that it was entitled to terminate the agreement after a 60-day cure period (the "Notice Letter")[2] constituted "material" information requiring disclosure in Qualcomm's periodic reports filed with the Securities and Exchange Commission ("SEC") in late 2024 and early 2025.

4.      It is also my opinion that Qualcomm's decision to include discussion of the Notice Letter in its 2024 Form 10-K is not determinative of the materiality of the Notice Letter in the absence

---

[1] Richards Rep.
[2] Letter from S. Collins to A. Chaplin, (Oct. 22, 2024) (hereinafter, the "Notice Letter").

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of Bloomberg's publication of the article entitled "ARM to Scrap Qualcomm Chip Design License in Feud Escalation" (the "Bloomberg Article").[3]

5.       It is further my opinion that Mr. Richards improperly assumes the contents of the Notice Letter as fact in his report and that his reliance on deposition testimony to support his opinion is misplaced.

## III.    Basis for Opinions

6.       I have been a partner in the Washington, D.C., office of the law firm of Foley & Lardner LLP for over thirty years.  I am a member of the firm's Securities Enforcement and Litigation Practice Group, a group that I previously chaired, and served on the firm's Management Committee for a number of years.

7.       During my career at Foley & Lardner LLP, I have represented numerous public companies, their audit and special committees, senior executives, accountants, external auditors, and lawyers in connection with SEC and internal investigations into the adequacy of public disclosures.  I have also represented many investment banks and investment advisers and their executives in SEC investigations into regulatory compliance.  I am often asked by public company clients for advice on the adequacy of their disclosure controls and disclosures made to the investing public in periodic reports filed with the SEC.  That advice includes consideration of whether the disclosures were materially accurate and complete.  In addition, since 1995, I have devoted substantial time to representing audit partners and audit firms in investigations and litigation conducted by the SEC, the Public Company Accounting Oversight Board, and state boards of accountancy relating to compliance with auditing standards and the application of generally accepted accounting principles.  I have also

---

[3] Ian King, *Arm to Scrap Qualcomm Chip Design License in Feud Escalation*, BLOOMBERG (Oct. 22, 2024) (updated Oct. 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

represented various audit partners and audit staff members in investigations by the American Institute of Certified Public Accountants.

8.      In 2011, I was engaged to serve for two years as the SEC Independent Consultant for NIC Inc., as part of that SEC registrant's settlement of an SEC enforcement proceeding, to evaluate, make recommendations, and report on the company's disclosure controls.  In 2017, I was engaged to serve for three years as the SEC/Department of Justice ("DOJ") Monitor of one of the country's largest publicly traded hedge funds pursuant to that firm's settlement of an SEC enforcement proceeding and potential charges by DOJ of alleged misconduct.  As the Monitor, on an annual basis, I evaluated, made recommendations, and reported to the SEC and DOJ on the firm's procedures governing regulatory compliance and accounting and disclosure controls.  I have served as an expert witness for a large investment bank on the evidentiary value of allegations made by the SEC in a prefiling settlement and for the SEC and DOJ in a criminal proceeding on disclosure obligations under the federal securities laws.

9.      I have been the co-author of a treatise on the SEC enforcement process from 2005 to the present.  I also have been a co-editor and a contributing author of PLI's Audit Committee Deskbook from 2022 to the present.  I have written numerous articles on the SEC enforcement process and am an adjunct professor at George Washington University Law School where I teach a course on the SEC enforcement process.

10.     I have spoken at numerous CLE programs on SEC regulation and enforcement.  Over the last several years, I have partnered with the audit firm PwC to conduct training programs around the country for members of public company audit committees – the committees responsible for oversight of the SEC reporting process. The National Association of Corporate Directors has sponsored the majority of these programs.

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

11.    Prior to joining Foley & Lardner LLP, I was a partner at the law firm of Arter & Hadden for ten years.  During my time at the firm, my practice focused on representing public companies and investment banks in SEC investigations and I led the Broker-Dealer Practice Group and served on the Management Committee of the firm.

12.    Prior to joining Arter & Hadden, I was a senior associate at the law firm of Jones, Day, Reavis & Pogue where I defended clients in securities litigation and SEC investigations.

13.    From April 1977 until August 1981, I was a member of the staff of the SEC Division of Enforcement, first as a staff attorney and later as a special counsel.  During my tenure at the agency, I conducted various investigations into the adequacy of disclosures of public companies in their periodic reports filed with the SEC and engaged in ensuing litigation arising out of certain of those investigations.

14.    I graduated from Wesleyan University in Middletown, Connecticut with a B.A. in economics, cum laude and from Boston University School of Law with a J.D. where I served as an editor on the Boston University Law Review.  After law school, I spent a year clerking for Justice Thomas Roberts, Chief Justice of the Rhode Island Supreme Court.

15.    Since September 1974, I have been a member of the bar of the Commonwealth of Massachusetts and since September 1975, I have been a member of the bar of the District of Columbia.

16.    My full curriculum vitae is attached as Appendix A to this report.

17.    As part of my preparation for writing this report, I, and Foley & Lardner LLP colleagues under my supervision, reviewed the materials listed in Appendix B to this report.

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IV.    Background Facts and Timeline

18.    On August 31, 2022, Arm filed a complaint against Qualcomm and Nuvia Inc. ("Nuvia") alleging breach of contract, trademark infringement, and false designation of origin, captioned Arm Ltd. v. Qualcomm Inc. et al., No. 1:22-cv-01146-MN (D. Del.).[4]

19.    On April 18, 2024, Qualcomm filed a complaint against Arm alleging breaches of the Qualcomm ALA, captioned Qualcomm Inc. et al. v. Arm Holdings PLC., Case No. 1:24-cv-00490-MN (D. Del.).[5]

20.    On October 22, 2024, Arm sent the Notice Letter to Qualcomm, claiming that Qualcomm was in breach of the Qualcomm ALA and that if Qualcomm did not cure its breach within a specified 60-day cure period, Arm would "be entitled to" terminate the agreement.[6]  That same day – October 22, 2024 – Bloomberg published an article reporting on the Notice Letter sent to Qualcomm.[7]  The Bloomberg reporter referenced having seen a document that stated that Arm had sent the letter to Qualcomm and that Arm "is cancelling" the Qualcomm ALA.[8]  Immediately thereafter, several other news outlets reported on Arm's Notice Letter.[9]

21.    In its November 6, 2024 Form 10-K, as part of its previous public disclosures regarding its ongoing litigation with Arm, Qualcomm disclosed that Arm provided it with the Notice Letter.[10]

---

[4] Complaint, *Arm Ltd.* v. *Qualcomm Inc. et al.*, Case No. 1:22-cv-01146-MN (D. Del., Aug. 31, 2022), Dkt. No. 1.

[5] Complaint, Dkt. No. 2.

[6] Notice Letter.

[7] Ian King, *Arm to Scrap Qualcomm Chip Design License in Feud Escalation*, BLOOMBERG (Oct. 22, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

[8] *Id*.

[9] *See e.g.*, David Lumb, *Arm Reportedly Cancels License Qualcomm Used to Design Its Chips*, CNET (Oct. 22, 2024) (updated Oct. 23, 2024), https://www.cnet.com/tech/mobile/arm-reportedly-cancels-license-qualcomm-used-to-design-its-chips/; *Arm Holdings to cancel Qualcomm chip design license, source says*, REUTERS (Oct. 23, 2024), https://www.reuters.com/technology/arm-holdings-cancel-qualcomm-chip-design-license-bloomberg-news-reports-2024-10-23/; Anton Shilov, *Arm to cancel Qualcomm's architecture license as feud intensifies*, YAHOO! FINANCE (Oct. 23, 2024), https://finance.yahoo.com/news/arm-cancel-qualcomms-architecture-license-100000903.html.

[10] Qualcomm Inc., Annual Report (Form 10-K) (Nov. 6, 2024).

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

22.    On December 20, 2024, the jury reached a verdict in *Arm* v. *Qualcomm*, finding that Arm failed to prove by a preponderance of the evidence that Qualcomm breached Section 15.1(a) of the Nuvia ALA and that Qualcomm proved by a preponderance of the evidence that the Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA.[11] The jury was hung as to whether Arm proved by a preponderance of the evidence that Nuvia breached Section 15.1(a) of the Nuvia ALA.[12]

23.    On January 8, 2025, following the jury's verdict, Arm notified Qualcomm in writing that Arm was withdrawing the Notice Letter.[13]

24.    In its February 5, 2025 Form 10-Q, Qualcomm updated its prior disclosure about the Notice Letter to reflect that Arm withdrew the letter.[14]

25.    On June 3, 2025, Qualcomm filed a Second Amended Complaint against Arm, alleging breaches of the Qualcomm ALA, breach of the implied covenant of good faith and fair dealing, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, violations of California unfair competition law, and breaches of the Qualcomm TLA.[15]

## V.    Mr. Richards Failed to Demonstrate the October 22, 2024 Letter Was Material

26.    In my opinion, in his report, Mr. Richards failed to demonstrate sufficient evidence to support the conclusion that the contents of the Notice Letter constituted material information under the federal securities laws requiring Qualcomm to disclose the contents of the letter in its periodic reports filed with the SEC.  As described below, my opinion is informed and supported by the relevant

---

[11] Verdict Form, *Arm Ltd.* v. *Qualcomm Inc. et al.*, Case No. 1:22-cv-01146-MN (D. Del., Dec. 20, 2024), Dkt. No. 572.
[12] *Id.*
[13] Letter from S. Collins to A. Chaplin, Jan. 8, 2025.
[14] Qualcomm Inc., Quarterly Report (Form 10-Q) (Feb. 5, 2025).
[15] Second Am. Compl., Dkt. No. 137.

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

law, SEC guidance, witness testimony, public coverage by the media and other public sources of information about the long-running tensions between Qualcomm and Arm, reports from third-party analysts, judicial proceedings, and my own expertise.

### A. Materiality Standard

27.     In support of his opinion that Qualcomm would have been obligated to disclose the contents of the Notice Letter regardless of Arm's conduct, Mr. Richards purportedly "highlights regulatory requirements for public companies to disclose occurrences classified as 'material' under SEC guidelines," by citing the following SEC policy "guidance": (1) SEC Staff Accounting Bulletin No. 99; (2) a statement by the SEC's Chief Accountant from 2022 regarding determining whether or not an error is material to historical financial statements; and (3) remarks by the Director of the SEC Division of Corporation Finance before the American Bar Association Business Law Section from 2014 in which the speaker advocated disclosing information that might not be "material" and expressly stated that his remarks reflected his own views and "do not necessarily reflect the views of the Commission" or his colleagues at the SEC.[16]  While Mr. Richards chose these three sources on which to base his view of materiality under the federal securities laws, he failed to apply the Supreme Court precedent specifically cited by the SEC's Chief Accountant in his statement from 2022, which takes priority over SEC staff interpretations.[17]

28.     I understand that in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976), the Supreme Court articulated the standard of materiality to be applied in federal securities law cases under Rule 14a–9 promulgated under Section 14a of the Securities Exchange Act of 1934 (the

---

[16] Keith F. Higgins, *Disclosure Effectiveness: Remarks Before the American Bar Association Business Law Section Spring Meeting*, SEC (Apr. 11, 2024), https://www.sec.gov/newsroom/speeches-statements/2014-spch041114kfh; Richards Rep. ¶ 36.
[17] Paul Munter, *Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors*, SEC (Mar. 9, 2022), https://www.sec.gov/newsroom/speeches-statements/munter-statement-assessing-materiality-030922.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Exchange Act"). The Court stated that for an omitted fact to be deemed material, there must be a substantial likelihood that the disclosure of the omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[18] I further understand that, in its decision in *Basic v. Levinson*, 485 U.S. 224 (1998), the Supreme Court expressly adopted the *TSC v. Northway* standard of materiality for actions brought under Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, which cover actions for non-disclosure of material information in a Form 10-K.

29.    In *TSC Industries,* the Supreme Court expressed the concern that too low a standard of materiality would subject corporations and their management "to liability for insignificant omissions or misstatements," and cause management "to bury shareholders in an avalanche of trivial information" in order to avoid liability.[19] The Supreme Court's decisions in *TSC Industries* and *Basic* govern disclosure obligations, regardless of any statements made by agency personnel throughout the years that may appear to suggest a lower standard for materiality, particularly after the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

**B.  Witness Testimony Identified by Mr. Richards**

30.    In support of his opinion that Qualcomm would have been obligated to disclose the contents of the Notice Letter absent Arm's leak of the letter to Bloomberg, Mr. Richards relies on selected excerpts of testimony from Cristiano Amon, Qualcomm's CEO, and Jonathan Weiser, a former in-house attorney at Qualcomm.[20] For the reasons stated below, I do not believe that these excerpts are sufficient to support a conclusion that a reasonable investor would have viewed the

---

[18] *TSC Industries, Inc.,* 426 U.S. at 449.
[19] *Id*. at 448.
[20] Richards Rep. ¶¶ 67-68, 74.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

contents of the Notice Letter as having "significantly altered the 'total mix' of information" already available to the investing public.

31.    Mr. Richards cites to a number of sentences from the testimony of both Mr. Amon and Mr. Weiser without expressly weighing the context in which those statements were made.[21]  First, Mr. Amon did not testify that ███████████████████████████████████████████████████████ ████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████."[23]  Bloomberg portrayed the Qualcomm ALA as having been "cancelled."[24]  The Notice Letter, in fact, did not say that the license agreement had been cancelled.[25]  It did not even say that Arm intended to cancel the license agreement.[26]  Rather, the letter stated that Arm was entitled to invoke its right to cancel the contract in 60 days based on a purported breach by Qualcomm.[27]  The remainder of Mr. Amon's testimony on this issue appears to be responding to the fallout from the Bloomberg Article resulting from Arm's leak, which Mr. Amon described as a █████████████████████████████████████████████████████ ████████████████████████████.[28]  While Mr. Amon paraphrased the Notice Letter by saying that Arm intended to cancel within 60 days,[29] the letter does not contain that statement[30] nor did analysts appear to believe Arm ever had that intent (see paragraphs 34-41 below for further discussion of

---

[21] *Id.*
[22] *See* Amon Tr.
[23] *Id.* at 218:23-24.
[24] Ian King, *Arm to Scrap Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024) (updated Oct. 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.
[25] *See* Notice Letter.
[26] *Id.*
[27] *Id.*
[28] Amon Tr. 219:5-221:3.
[29] *Id.* at 220:16-22.
[30] *See* Notice Letter.

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

analysts).  The gravamen of Mr. Amon's testimony on this point appears to be addressing the customer confusion resulting from the inaccurate reporting by Bloomberg.  As Paul, Weiss noted in the deposition, asking Mr. Amon, a non-attorney, to opine on the materiality of information may have been improper as the question was designed to elicit a legal conclusion of questionable evidentiary value.[31]

32.    Second, Mr. Weiser testified that he did not view the Notice Letter as material and thus subject to disclosure in Qualcomm's periodic reports filed with the SEC.  Rather, he said he ██████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████.[32]  In addition, he said that absent Arm's leak of the letter, "████████████████████████████████████████████████████████."[33]  Mr. Weiser further testified that he ██████████████████████████████████████████████.[34]

33.    I do not believe that the excerpts from the deposition testimony cited by Mr. Richards provide a sufficient basis on which to conclude that the contents of the Notice Letter in and of themselves would have assumed significance in the mind of a reasonable investor in light of the total mix of information already available as of October 22, 2024 absent Arm's disclosure.

**C.  Analyst Reports Regarding the Notice Letter**

34.    As I noted above, the Supreme Court's standard for materiality turns on whether disclosure of the omitted fact "would have been viewed by ***the reasonable investor*** as having significantly altered the '***total mix' of information made available*."[35]  Thus, in order to properly gauge the materiality of the Notice Letter had it remained confidential prior to Qualcomm's 2024

---

[31] Amon Tr. 219:23-220:4.
[32] Weiser Tr. 42:19-43:7; Qualcomm Inc., Annual Report (Form 10-K) (Nov. 1, 2023); Qualcomm Inc., Annual Report (Form 10-K) (Nov. 2, 2022).
[33] Weiser Tr. 43:4-7.
[34] *Id.*
[35] *TSC Industries,* 426 U.S. at 449 (emphasis added).

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Form 10-K, some analysis of information already available to investors would be required. I note that Mr. Richards provides no such analysis in his report.[36] Rather, Mr. Richards relies solely on his questionable assumptions about the perception of a senior executive and in-house attorney at Qualcomm of the Notice Letter.[37]

35.    I, and Foley & Lardner LLP colleagues under my supervision, have reviewed various analyst reports published contemporaneously with the leak of the Notice Letter, summarized below.

36.    As an initial matter, it is my opinion that reasonable investors might well have reacted to the information contained in the Notice Letter as did securities analysts who followed Qualcomm and viewed the Notice Letter as merely the latest unsurprising tactic in the broader years long legal dispute between Arm and Qualcomm. This view is reflected in conclusions contained in various analyst reports which discuss the details of Arm's long-running dispute with Qualcomm.[38]

37.    Immediately following the publication of the Bloomberg Article, multiple analysts reported on Arm's breach allegations and the unlikely possibility that Qualcomm's ALA would be terminated.[39] Nearly all these analysts appeared to believe that Arm's letter was a negotiating tactic rather than a true statement of intent to terminate.[40] In addition, these analysts expressed the view that the Notice Letter was an attempt to gain leverage that would lead to settlement and that Qualcomm's shipment of chips would not be halted.[41]

38.    For example, Bernstein stated that "the timing of the cancellation notice suggests to us an attempt to force a pre-trial settlement" and rated Qualcomm "Outperform" following the news.[42]

---

[36] *See* Richards Rep.
[37] Richards Rep. ¶¶ 67-68, 74.
[38] QCVARM_1152195; QCVARM_1152162; QCVARM_1152146; QCVARM_1152131; QCVARM_1152125.
[39] QCVARM_1029006; QCVARM_0623914; QCVARM_1029019; QCVARM_1031125; QCVARM_1152261.
[40] *See id.*
[41] *See id.*
[42] QCVARM_1029006.

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Qualcomm's stock price closed on October 22, 2024 at $173.18, and Bernstein also set Qualcomm's stock price target at $240,[43] a significant increase to Bernstein's target prices from earlier in the year.[44]

39.     Citi stated that it "[did] not expect Qualcomm to halt shipment of any chips," and believed the case "could potentially head to the courts and Qualcomm end up paying ARM a higher royalty."[45] Citi further stated that it "would not expect any such impact to be material to [Qualcomm]" and "[did] not expect Qualcomm to halt shipment of any chips as it would hurt ARM as well."[46] Citi was "Neutral-rated on Qualcomm" following the leak of the Notice Letter, listing Qualcomm's target stock price at $185,[47] which was consistent with Citi's prior reports in 2024.[48]

40.     Daiwa stated that it "would assume that Arm can't cancel [Qualcomm's] licensing in just '60' days" and that "this gets resolved with minimal impact to all."[49] Daiwa issued a rating of "2/Outperform" for Qualcomm.[50]

41.     JP Morgan stated that "[t]he cancellation and 60-day notice appears to be a negotiating tactic to put further pressure on Qualcomm" with "eventual settlement [] still [being] the most likely outcome."[51]

**D. ASC 450-20**

42.     Mr. Richards opines that the Notice Letter was required to be disclosed in Qualcomm's Form 10-K as a "Loss Contingency" under Accounting Standards Codification 450-20 ("ASC 450-

---

[43] *Id.*
[44] QCVARM_1152074 (Outperform, Target $170, July 31, 2023); QCVARM_1152097 (Outperform, Target $135.00, June 9, 2023).
[45] QCVARM_1152261.
[46] *Id.*
[47] *Id.*
[48] QCVARM_1152038 (Neutral, Target $170, May 2, 2024); QCVARM_1152056 (Neutral, Target $200, August 1, 2024).
[49] QCVARM_0623914.
[50] *Id.*
[51] QCVARM_1031125.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

20").[52]  More specifically, Mr. Richards concludes that "the loss contingency related to the Notice Letter was required to be disclosed as the deposition testimony shows Qualcomm perceived that it was reasonably possible that a loss may have been incurred if Qualcomm did not cure the alleged material breach within 60 days."[53]  He also concludes that "Qualcomm was required to disclose the [Notice] Letter in the 2024 Form 10-K as Qualcomm determined that it was reasonably possible that a material loss contingency may have been incurred related to the potential termination of the QC ALA."[54]  The failure by Mr. Richards to provide sufficient evidence to support his conclusion on the materiality of the contents of the Notice Letter raises serious questions as to the accuracy of his conclusion that under ASC 450-20 any loss incurred on the basis of the Notice Letter would have been "material" under the precedent established by the Supreme Court.  I would note that in her expert report, Susan Markel disagrees with Mr. Richards' conclusion that (1) ASC 450-20 governs disclosure of the Notice Letter and (2) such accounting guidance requires disclosure of that letter in Qualcomm's financial statements.[55]

## VI.    Qualcomm's Disclosure of the October 22, 2024 Letter within Note 7 is Not Determinative of Materiality

43.    In my opinion, Qualcomm's disclosure of the Notice Letter in its 2024 Form 10-K in Note 7 is not determinative of whether or not such a disclosure would have been required absent Arm's prior leaking of the Notice Letter to the media.  As of November 2024, the investing public was already aware of the Notice Letter because of Bloomberg's publication.[56]  With investors laboring under a

---

[52] Richards Rep. ¶¶ 64-68.
[53] *Id.* ¶ 67.
[54] *Id*. ¶ 68.
[55] *See* Markel Rep.
[56] *See* Ian King, *Arm to Scrap Qualcomm Chip Design License in Feud Escalation*, BLOOMBERG (Oct. 22, 2024) (updated Oct. 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

misimpression from inaccurate reporting by Bloomberg, it is unsurprising that Qualcomm chose to accurately disclose the actual contents of the Notice Letter for its investors.

44.    Testimony from Qualcomm witnesses confirms that disclosure of the contents of the Notice Letter in its SEC filing was in response to the leak of the Notice Letter by Arm.[57]  For example, Ann Chaplin, General Counsel and Corporate Secretary for Qualcomm, was asked at her deposition whether Arm's threat to terminate the Qualcomm ALA was public because of its inclusion in Qualcomm's SEC filings in November 2024.[58]  Ms. Chaplin answered that ████████████████ ████████████████████████████████████████████████"[59]  She further testified that Qualcomm had ████████████████████████████████████████"[60]

45.    The evidence I, and Foley & Lardner LLP colleagues under my supervision, have reviewed, and the expert report of Susan Markel, support the conclusion that the disclosure in Note 7 likely was in response to the misimpression of the facts created by the Bloomberg Article and the resulting confusion among Qualcomm's investors and customers.

## VII.    Mr. Richards Assumes the Contents of the Notice Letter as Fact

46.    Mr. Richards relies heavily on the Notice Letter's statement that "[u]nless Qualcomm cures its material breach within 60 days, Arm shall be entitled to immediately terminate the ALA"[61] to support his conclusion that the Notice Letter had to be disclosed.[62]  In my opinion, Mr. Richards cannot simply assume that Arm's litigation positions are facts.  Mr. Richards has not cited any evidence supporting the conclusion that the Notice Letter's assertion that Qualcomm was in breach

---

[57] *See e.g.*, Chaplin Tr. 139:3-5; Amon Tr. 219:5-221:3; Weiser Tr. 43:4-7.
[58] Chaplin Tr. 138:22-1.
[59] *Id.* at 139:3-5.
[60] *Id.* at 139:7-14.
[61] Notice Letter.
[62] Richards Rep. ¶ 67

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

was accurate.  Moreover, he has failed to cite to any evidence on which he bases his conclusion that Arm had a right to terminate and truly intended to terminate.[63]

47.    I understand that the issues presented in the Notice Letter were resolved at trial in Qualcomm's favor prior to expiration of the 60-day period.[64]  Moreover, after the trial, Arm withdrew the Notice Letter, indicating that Arm's litigation positions had been rejected.  Finally, on February 5, 2025, in Arm's quarterly earnings call, Arm's CFO, Jason Child, admitted that Arm "had forecasted really all the way back at IPO and continue to forecast as though 'we were not going to prevail in that lawsuit'" and "had assumed we will continue to receive the royalties at basically the same rates that [Qualcomm] have [sic] been paying for in the past and will continue to pay."[65]  Mr. Richards fails to address the bearing of these facts on his conclusion that disclosure of the Notice Letter was required[66] – facts that suggest that the threats contained in the Notice Letter may have lacked merit.

## VIII.    Reservation of Rights

48.    This report summarizes my opinions given the information available to me at this time. If I receive additional relevant information, I reserve the right to prepare a supplemental report incorporating this new information.

I declare under penalty of perjury that the foregoing is true and correct.

SAMUEL J. WINER

9/19/2025
Executed on

---

[63] See Richards Rep.
[64] Verdict Form, *Arm Ltd.* v. *Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del., Dec. 20, 2024), Dkt. No. 572.
[65] QCVARM_1152238; QCVARM_1152257.
[66] See Richards Rep.

15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appendix A. Curriculum Vitae**

# Samuel J. Winer

3000 K Street, NW, Suite 600
Washington, DC  20007
(202) 672-5508
swiner@foley.com

---

**Professional Experience**

**1995 - present     Partner, Foley & Lardner                                          Washington, DC**

- Represents public companies, their officers, board committees, and external auditors, investment banks, investment advisors, attorneys and others in SEC enforcement investigations, internal investigations, and related proceedings and advises clients on compliance with SEC regulations;
- Served as an SEC independent consultant and an SEC/DOJ monitor responsible for overseeing and evaluating compliance by companies sanctioned by the SEC including one of the largest publicly-held US hedge funds;
- Served as Chair of the firm's SEC Enforcement Practice Group and a member of the firms' Management Committee;
- Recognition:  AV Preeminent, Martindale-Hubbell; selected by peers for inclusion in Best Lawyers in America in Litigation Securities, Securities/Capital Markets, Law, Securities Regulation (2006-2023); named Washington D.C. Securities/Capital Markets Lawyer of the Year in 2015 and 2020 and Litigation-Securities Lawyer of the Year in 2017 and 2022; named one of the top securities regulation attorneys in the nation by Chambers USA for 2009-2023;
- Bar Admissions: District of Columbia, 1975, and Massachusetts, 1974.

**1985 – 1995     Partner, Arter & Hadden                                          Washington, DC**

- Represented public companies, their external auditors and investment banks in SEC enforcement investigations and advised clients on compliance with SEC regulations;
- Served as a member of the firm's Management Committee and Chair of the firm's Securities Broker-Dealer Practice Group.

**1981 – 1985     Associate, Jones, Day, Reavis & Pogue                     Washington, DC**

- Represented clients in SEC investigations and litigation, hostile takeovers and securities class action litigation.

**1977 – 1981     Staff Attorney/Special Counsel, SEC Division of Enforcement     Washington, DC**

- Conducted investigations of violations of federal securities laws and related litigation.
- Managed Summer Honors Program for law students and taught seminar on the federal securities laws.

**1975 – 1977     Associate, Sachs, Greenebaum & Taylor                     Washington, DC**

- Represented clients in litigation including various trials and motion practice.

**1974 – 1975     Law Clerk to Hon. Thomas H. Roberts, Chief Justice of the Supreme Court of Rhode Island**

**Education**

**1974           J.D., Boston University School of Law                          Boston, MA**

- Boston University Law Review, editor

**1971           B.A., cum laude, Wesleyan University                          Middletown, CT**

- Clark Fellowship (awarded to one senior annually for graduate study in law, medical, or business school)
- Chair of Economics Majors
- President of Cardinal Key Honor Society
- Varsity Swim Team

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Selected Publications**

- Co-author: "SEC Adopts Final Rules Mandating Compensation Clawback Policies," Insights: The Corporate & Securities Law Advisor, Vol. 36 No. 12 (December 2022)
- Co-author: "Treatise: Securities Enforcement: Counsel and Defense," *Lexis-Nexis* (2005-present)
- Contributing author: "SEC Compliance and Enforcement Answer Book, Practising Law Institute, edited by D. Stuart (2015-2021)
- Co-editor and contributing author: "Audit Committee Deskbook", Practising Law Institute (2022-present)
- Co-author: "Preparing to Meet with the Government Following a Whistleblower's Report," *BNA Insights*, Vol. 43, No. 35, p. 1790 (August 2011)
- Co-author: "A New Burr Under the SEC's Saddle: Changing Standards for SEC Enforcement Remedies," *BNA Insights*, Vol. 21, No. 7 (July 2007)
- Co-author: "Research Analyst Conflicts of Interest: Implementing the Rules," *Journal of Investment Compliance*, Vol. 4, No. 4, p. 82 (Spring 2004)
- Co-author: "SEC Enforcement Investigation: What You Need to Know," *ACC Docket*, Vol. 21, No. 10 (November/December 2003)
- Author: "Should I Stay or Should I Go? Deciding Whether to Serve on the Board of a Public Company," *D&O Advisor* (Fall 2003)
- Co-author: "Preliminary Steps to Establishing Research Analyst Independence," *Journal of Investment Compliance*, Vol. 4, No. 1, p. 13 (Summer 2003)
- Co-author: "What Directors Should Know about SEC Enforcement Investigations," *The Corporate Governance Advisor*, Vol. 10, No. 1 (January/February 2002)
- Co-author: "Questions You Are Likely to Be Asked When Your Corporation Becomes the Subject of an SEC Enforcement Inquiry," *BNA Corporate Practice Series* (2001)
- Co-author: "Effective Representation in the SEC Wells Process," *The Review of Securities & Commodities Regulation* Vol. 34, No. 6 (Standard & Poor's, March 28, 2001)
- Co-author: "Responding to an Inquiry from the SEC Division of Enforcement," *BNA Corporate Practice Series* (1998)
- Co-author: "Defending the Insider Trading Probe," *The Practical Lawyer* (September 1995)
- Author: "Reducing the Liability Exposure of Derivatives Dealers," *The Review of Securities and Commodities Regulation*, Vol. 27, No. 22 (Standard & Poor's Dec. 21, 1994)
- Co-author: "Ex Parte Contacts with Officers and Employees in SEC Investigations," 8 *Insights: The Corporate and Securities Law Advisor* 13 (Prentice Hall Law and Business, November 1994)
- Co-author: "When the SEC Comes Calling: A Step-by-Step Guide by Former Enforcers," 3 *Business Law Today* 13 (ABA July/August 1994), reprinted in *Bowne Digest*, Vol. 8, No. 10, p.5 (October 1994)
- Co-author: "Prompt Action Taken in Response to SEC Investigation May Ease Impact of Potentially Long, Burdensome Process," 9 *BNA's Corporate Counsel Weekly* 8 (February 2, 1994)
- Co-author: "Anticipating and Responding to an Inquiry by the SEC Enforcement Division's Working Group on Insurance Companies," 14 *Insurance Litigation Reporter* 581 (Shephard's, December 1992)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appendix B. Materials Considered**

**Expert Reports**
- Rebuttal Report of Steven Richards, CPA. September 5, 2025.
- Reply Report of Susan Markel, CPA. September 19, 2025.

**Legal Filings**
- Compl., Dkt. No. 2.
- Second Am. Compl., Dkt. No. 137.
- Complaint, *Arm Ltd.* v. *Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del. Aug. 31, 2022), Dkt. No. 1.
- Defendants' Opening Brief In Support Of Their Motion For Summary Judgment, *Arm Ltd.* v. *Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del. Jul. 22, 2024), Dkt. No. 410.
- Defendants' Answering Brief In Opposition To Arm's Motion For Partial Summary Judgment*, Arm Ltd.* v. *Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del. Aug. 16, 2024), Dkt. No. 441.
- Qualcomm Trial Closing Demonstratives, *Arm Ltd. v. Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del. Dec. 20, 2024).
- Verdict Form, *Arm Ltd.* v. *Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del. Dec. 20, 2024), Dkt. No. 572.
- Opening Brief In Support Of Defendant Nuvia, Inc.'S Renewed Motions For Judgment As A Matter Of Law*, Arm Ltd.* v. *Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del. Jan. 01, 2025), Dkt. No. 598.
- Defendants' Answering Brief in Opposition to Plaintiff Arm Ltd.'s*, Arm Ltd.* v. *Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del. Feb. 14, 2025), Dkt. No. 608.
- Reply Brief in Support of Defendant Nuvia, Inc.'s Renewed Motions For Judgment As A Matter Of Law*, Arm Ltd.* v. *Qualcomm Inc. et al.*, No. 1:22-cv-01146-MN (D. Del. Feb. 14, 2025), Dkt. No. 615.

**Deposition Transcripts**
- Deposition Transcript of Cristiano Amon, July 3, 2025.
- Deposition Transcript of Jonathan Weiser, July 11, 2025.
- Deposition Transcript of Ann Chaplin, July 11, 2025.

**Qualcomm's Periodic Reports Filed with the SEC**
- Qualcomm Inc., Annual Report (Form 10-K) (Nov. 6, 2024).
- Qualcomm Inc., Annual Report (Form 10-K) (Nov. 1, 2023).
- Qualcomm Inc., Annual Report (Form 10-K) (Nov. 2, 2022).
- Qualcomm Inc., Quarterly Report (Form 10-Q) (Feb. 5, 2025).

**Caselaw**
- *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976).
- *Basic v. Levinson,* 485 U.S. 224 (1988).

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

**SEC Guidance**
- Keith F. Higgins, *Disclosure Effectiveness: Remarks Before the American Bar Association Business Law Section Spring Meeting*, SEC (Apr. 11, 2024), https://www.sec.gov/newsroom/speeches-statements/2014-spch041114kfh.
- Paul Munter, *Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors*, SEC (Mar. 9, 2022), https://www.sec.gov/newsroom/speeches-statements/munter-statement-assessing-materiality-030922.

**Bates Numbered Documents (Analyst Reports)**
- QCVARM_1029006, Stacy A. Ragson et al., Qualcomm, Arm: Cancel culture?, BERNSTEIN SOCIETE GENERALE GROUP (Oct. 23, 2024).
- QCVARM_0623914, Louis Miscioscia, Battle of the Titans, license cancellation fears, DAIWA CAPITAL MARKETS (Oct. 23, 2024).
- QCVARM_1031125 Samik Chatterjee, Arm License Cancellation - Our Initial Reaction Is a Negotiation Set Up, JP MORGAN (Oct. 23, 2024).
- QCVARM_1029019, David O'Connor, *Escalation of licensing dispute*, BNP PARIBAS EXANE (Oct. 23, 2024).
- QCVARM_1152261, *ARM Givens QCOM a 60-Day Notice of Cancellation of Chip Design License. Minimal Impact, But Potential Drawn-Out Court Battle*, CITI (Oct. 23, 2024)
- QCVARM_1152125, Gary Mobley, *QCOM: Smartphone Weakness Likely Pressures Results/Outlook; China Is CY23 Wildcard,* WELLS FARGO (January 24, 2023).
- QCVARM_1152131, Matthew D. Ramsay et al., *Notes From The Road: Diversification Helping Offset Smartphone Cyclicality*, TD COWEN (March 5, 2023).
- QCVARM_1152146, Matthew D. Ramsay et al., *F2Q23 Preview: Macro Challenging, but Cautious Optimism in F2H23 Lies Ahead*, TD COWEN (April 13, 2023).
- QCVARM_1152074, Stacy A. Ragson et al., *Qualcomm (QCOM): Smartphones still bad but (slightly) less so in June, forward numbers unaggressive, is it enough? FQ323 preview*, BERNSTEIN (July 31, 2023).
- QCVARM_1152097, Stacy A. Ragson et al., *U.S. Semiconductors and Semicap Equipment: Conversations with 10 CEOs at Bernstein's 2023 Strategic Decisions Conference*, BERNSTEIN (Jun. 9, 2023).
- QCVARM_1152162, *Qualcomm Inc, Company Profile and SWOT Analysis*, INSIGHT PARTNERS (August 21, 2023)
- QCVARM_1152097, *QUALCOMM Incorporated (QCOM), Initiating with a Buy and $200 PT on Wireless Industry Leader Positioned to Lead Group in AI on Smartphones and PCs*, BENCHMARK (April 23, 2024).

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- QCVARM_1152038, *Qualcomm Inc (QCOM.O) Good Results and Guidance But We Think AI Handsets Are 2025 Driver Not 2024 So No Upgrade Cycle Yet. Reiterate Neutral*, CITI (May 2, 2024).
- QCVARM_1152056, *Qualcomm Inc (QCOM.O) Good Results and Guidance Driven by Apple and 14-Week Quarter. But We Don't Believe AI Refresh Cycle. Reiterate Neutral*, CITI (Aug. 24, 2024).

**Media Coverage**

- Ian King, *Arm to Scrap Qualcomm Chip Design License in Feud Escalation*, BLOOMBERG (Oct. 22, 2024) (updated Oct. 23, 2024), https://www.bloomberg.com/news/articles/2024-1023/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.
- Michael Action, *Chip groups Arm and Qualcomm square off in high-stakes US trial*, FINANCIAL TIMES (Dec. 16, 2024), https://www.reuters.com/legal/arm-qualcomm-trial-set-begin-over-chip-contract-dispute-2024-12-16/.
- Michael Acton, *Qualcomm Claims Trial Win in Dispute with Arm Over Chip Design Licenses*, FINANCIAL TIMES (Dec. 20, 2024), https://www.ft.com/content/ed93b933-5158-4bfd-928c-de4982159466.
- *Arm Holdings to cancel Qualcomm chip design license, source says*, REUTERS (Oct. 23, 2024), https://www.reuters.com/technology/arm-holdings-cancel-qualcomm-chip-design-license-bloomberg-news-reports-2024-10-23/
- Stevie Bonifield, *"We were not going to prevail in that lawsuit": Arm admits its legal feud with Qualcomm was a lost cause*, LAPTOP (Feb. 6, 2025), https://www.laptopmag.com/laptops/arm-lawsuit-qualcomm-earnings-oryon-chips.
- Max A. Cherney and Tom Hals, *Arm CEO Downplays Ambitions to Make Its Own Chip in Qualcomm Case*, REUTERS (Dec. 17, 2024), https://www.reuters.com/legal/arm-qualcomm-trial-set-begin-over-chip-contract-dispute-2024-12-16/.
- Jef Feeley And Ian King, *Qualcomm Defeats Arm's Claim Over Chip Design License Breach*, BLOOMBERG (Dec. 20, 2024), https://www.bloomberg.com/news/articles/2024-12-20/qualcomm-wins-licensing-fight-with-arm-over-chip-designs?sref=zzZnj7Fi.
- Asa Fitch, *Qualcomm Prevails On Key Issues In Arm Suit*, WALL STREET JOURNAL (Dec. 20, 2024) https://www.wsj.com/tech/qualcomm-prevails-on-key-issues-in-arm-suit-e98dbe2a.
- Tom Hals, *Qualcomm Secures Key Win In Chips Trial Against Arm*, REUTERS (Dec, 20, 2024), https://www.reuters.com/legal/us-jury-deadlocked-arm-trial-against-qualcomm-still-deliberating-2024-12-20/.
- David Lumb, *Arm Reportedly Cancels License Qualcomm Used to Design Its Chips*, CNET (Oct. 22, 2024), https://www.cnet.com/tech/mobile/arm-reportedly-cancels-license-qualcomm-used-to-design-its-chips/.
- Tobias Mann, *Jury Trial Kicks Off Arm's Wrestling Match with Qualcomm*, THE REGISTER (Dec. 16, 2024), https://www.theregister.com/2024/12/16/arm_qualcomm_trial/.

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Tobias Mann, *Jury spares Qualcomm's AI PC ambitions, but Arm eyes a retrial*, THE REGISTER (Dec. 26, 2024), https://www.theregister.com/2024/12/23/qualcomm_arm_trial/.
- Jim McGregor, *Arm Squares Off Against Qualcomm in a Case with Broad Implications*, FORBES (Dec. 16, 2024), https://www.forbes.com/sites/tiriasresearch/2024/12/16/arm-squares-off-against-qualcomm-in-a-case-with-broad-implications/.
- Jeff Montgomery, *Split Del. Jury Clears Qualcomm In Arm Ltd. Chip Fight*, LAW360 (Dec. 20, 2024), https://www.law360.com/articles/2277118/split-del-jury-clears-qualcomm-in-arm-ltd-chip-fight.
- Jowi Morales, *Arm to let Qualcomm keep its architecture license but may ask for a retrial on the Nuvia issue*, TOM'S HARDWARE (Feb. 7, 2025), https://www.tomshardware.com/tech-industry/arm-to-let-qualcomm-keep-its-architecture-license-but-may-ask-for-a-retrial-on-the-nuvia-issue.
- Stephen Nellis, *Qualcomm says Arm has withdrawn license breach notice*, REUTERS (Feb. 6, 2025), https://www.reuters.com/technology/qualcomm-says-arm-has-withdrawn-breach-claims-has-no-plans-terminate-license-2025-02-05/.
- Beatrice Nolan, *Why Arm and Qualcomm's Legal Battle Could Have Big Implications for the Chip World*, BUSINESS INSIDER (Dec. 16, 2024) https://www.businessinsider.com/arm-qualcomm-trial-delaware-nuvia-chip-license-2024-12.
- Madeline Ricchiuto, *Testimony by Arm CEO Rene Haas clashes with a new report that Arm intends to launch its own chips*, LAPTOP (Feb. 19, 2025), https://www.laptopmag.com/ai/copilot-pcs/arm-launching-chips-qualcomm-trial-transcript.
- Emma Roth, *Qualcomm wins a legal battle over Arm chip licensing*, THE VERGE (Dec. 20, 2024), https://www.theverge.com/2024/12/20/24326242/qualcomm-legal-battle-win-arm-chip-licensing.
- Prakash Sangam, *Arm vs. Qualcomm: The Legal Tussle Continues*, EE TIMES (Mar. 3, 2025), https://www.eetimes.com/arm-vs-qualcomm-the-legal-tussle-continues/.
- Simon Sharwood, *Arm gives up on killing off Qualcomm's vital chip license*, THE REGISTER (February 6, 2025), https://www.theregister.com/2025/02/06/arm_qualcomm_nuvia/.
- Anton Shilov, *Arm to cancel Qualcomm's architecture license as feud intensifies*, YAHOO! FINANCE (Oct. 23, 2024), https://finance.yahoo.com/news/arm-cancel-qualcomms-architecture-license-100000903.html
- Dean Takahashi, *Arm lawsuit against Qualcomm ends in mistrial and favorable ruling for Qualcomm*, VENTUREBEAT (Dec. 20, 2024), https://venturebeat.com/ai/arm-lawsuit-against-qualcomm-ends-in-mistrial-and-favorable-ruling-for-qualcomm.

**Other Documents**
- Letter from S. Collins to A. Chaplin, (Oct. 22, 2024).
- Letter from S. Collins to A. Chaplin (Jan. 8, 2025).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Christopher Danely et al., *ARM Gives QCOM a 60-Day Notice of Cancellation of Chip Design License. Minimal Impact, But Potential Drawn-Out Court Battle*, CITI (Oct. 23, 2024).
- Arm Holdings PLC (ARM) Q3 2025 Earnings Call Corrected Transcript at 8 (Feb. 5, 2025), https://investors.arm.com/static-files/f1190d81-408d-4276-a30c-b27c1ce5a30a.
- Edited Transcript QCOM.OQ - Q1 2025 Qualcomm Inc Earnings Call (Feb. 5, 2025).
- Edited Transcript QCOM.OQ - Q3 2025 Qualcomm Inc Earnings Call (Jul. 30, 2025).
- Edited Transcript QCOM.OQ - Q4 2024 Qualcomm Inc Earnings Call (Nov. 6, 2024).
- QUALCOMM, Inc. (QCOM) UBS Global Technology & AI Conference Corrected Transcript (Dec. 4, 2024).
- Qualcomm (NASDAQ: QCOM) investor Day 2024: IoT and Automotive Diversification Update transcript (Nov. 19, 2024).
- *Qualcomm Statement on Trial Verdict Win*, QUALCOMM (Dec. 20, 2024), https://www.qualcomm.com/news/releases/2024/12/qualcomm-statement-on-trial-verdict-win.
- *Qualcomm Completes Acquisition of NUVIA*, QUALCOMM (Mar. 15, 2021), https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.

5

# Exhibit 6

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF DELAWARE

4    -----------------------------------x

     QUALCOMM INCORPORATED, a Delaware

5    corporation, QUALCOMM TECHNOLOGIES,

     INC., a Delaware  corporation,

6

             Plaintiffs,

7

8

         - against -

9

10

     ARM HOLDINGS PLC, f/k/a, ARM LTD.

11   a U.K. corporation,

12           Defendants.

     -----------------------------------x

13               Zoom videoconference

14               September 15, 2025

                 4:02 p.m.

15

16

17           MEET & CONFER

18

19

20

21

22

23

24

25

Page 2

```
1
2  A P P E A R A N C E S :
3  PAUL WEISS RIFKIND WHARTON & GARRISON LLP
   1285 Avenue of the Americas
4  New York New York 10019
   BY: JAKE BRALY, ESQ.
5    JACOB APKON, ESQ.
     STEPHANIE CHIN, ESQ.
6    ADAM BASNER, ESQ.
7
8
9  MORRIS NICHOLS ARSHT & TUNNELL LLP
   1201 North Market Street
10 16th Floor
   Wilmington, Delaware 19899
11 BY: JENNIFER YING, ESQ.
12
13
14
   KIRKLAND & ELLIS LLP
15 333 West Wolf Point Plaza
   Chicago, Illinois 60654
16 BY: JAY EMERICK, ESQ.
   PETER EVANGELATOS, ESQ.
17  ADAM JANES, ESQ.
    MARY BARNETT, ESQ.
18  MEREDITH POHL, ESQ.
    MICHAEL A. PRONIN, ESQ.
19
20
21
22
23
24
25
```

Page 3

```
1
2  A P P E A R A N C E S : (Continued)
3  YOUNG CONAWAY STARGATT & TAYLOR LLP
   1000 North King Street
4  Rodney Square
   Wilmington, Delaware 19801
5  BY: ANNE GAZA, ESQ.
      ROBERT VRANA, ESQ.
6
7
8
9  MORRISON & FOERSTER LLP
   425 Market Street
10 San Francisco, California 94105
   BY: CATHARINE MCWILLIAMS, ESQ.
11  HENRY HUTTINGER, ESQ.
    NICHOLAS FUNG, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1           MEET & CONFER
2       MR. BRALY:  So I think we have
3  a couple of items on the agenda.  What we
4  would like to start with is Arm's rebuttal
5  reports for Dr. Brogioli and Mr. Richards.
6       So we wrote to you about both
7  of those reports.  We asked you to withdraw
8  the reports, you said that you were not
9  withdrawing either of the reports, and so I
10 think our question to you is why do you
11 believe that these are proper rebuttal
12 reports?  What are they responding to that
13 was expert opinion?
14      MR. EMERICK:  Hey Jake, this is
15 Jay from Kirkland.  Is it Qualcomm's
16 position that we should have served the
17 Brogioli and Richards reports as
18 opening reports on September 5?
19      MR. BRALY:  September 5, isn't
20 that when you served them?
21      MR. EMERICK:  Sorry, is it
22 Qualcomm's position that Arm should
23 have served the Brogioli and Richards
24 reports at the opening report deadline?
25      MR. BRALY:  Well, I think we're
```

Page 5

```
1           MEET & CONFER
2  trying to figure out why you think
3  these are proper rebuttal reports.
4       MR. EMERICK:  And I'm trying to
5  understand your position as to why
6  they're in violation of the scheduling
7  order.  That's what you guys mentioned
8  in the e-mail.  So is it your position
9  that these should have gone in on
10 opening?
11      MR. BRALY:  Well, do these go
12 to affirmative defenses that you have
13 or these are rebuttal to expert
14 opinions in the Kennedy and Posner
15 reports?
16      MR. EMERICK:  Is it Qualcomm's
17 position that Arm should have served
18 the Brogioli and Richards reports at
19 the opening report deadline?
20      MR. BRALY:  What I'm trying to
21 figure out is why you are saying that
22 these are proper rebuttal reports.  Are
23 you saying that they are related to
24 affirmative defenses, in which case
25 then you should have served them as
```

2 (Pages 2 - 5)

Page 6

MEET & CONFER

1  MEET & CONFER
2  opening reports, or are you saying
3  these are proper rebuttal reports to
4  expert opinion that was offered in
5  Kennedy and Posner's reports?
6      MR. EMERICK: So I'm not sure
7  what you just said. I'm trying to
8  understand your position as to when you
9  think they should have been served.
10     MR. BRALY: Well, Jay, I don't
11  think you are answering my question.
12  Is it your position that these are
13  rebutting --
14     MR. EMERICK: You guys are
15  saying these are untimely. So I think
16  based on that assertion, we're entitled
17  to an answer as to whether you think
18  these should have gone in on opening or
19  not.
20     MR. EMERICK: We also think
21  that they are improper because they
22  don't respond to expert opinion in the
23  Kennedy and Posner reports.
24     MR. EMERICK: So I'm asking you
25  if these are reports, because that's

Page 7

1  MEET & CONFER
2  your position with respect to them, if
3  they should have gone in on opening or
4  not?
5      MR. BRALY: So I have responded
6  to you. If your position is that these
7  go to affirmative defenses raised by
8  Arm and are in fact not supposed to be
9  responding to expert opinion in the
10  Kennedy and Posner report, then yes,
11  they should have gone in in opening.
12  If instead your position is these are
13  responding to expert opinion in the
14  Kennedy and Posner report, we don't see
15  how that could be the case, and I'm
16  asking you what is the expert opinion
17  that both of these experts are
18  responding to?
19     MR. EMERICK: You guys are
20  making an assertion as to untimeliness
21  and impropriety, and I'm trying to
22  understand it, and if you don't want to
23  tell me, I get it, that's what it
24  sounds like. But I'm just trying to
25  get an understanding as to why you

Page 8

1  MEET & CONFER
2  think these are untimely.
3      So I'm asking, you know, is
4  this something that you guys think
5  should have gone in on opening? Maybe
6  you're not able to answer that one way
7  or the other. But I'm just trying to
8  get an understanding of why you think
9  they are untimely.
10     MR. BRALY: I think I have
11  answered that multiple times now. I'm
12  not sure where the confusion lies. You
13  still have not answered me when I asked
14  you what expert opinion in the Kennedy
15  and Posner reports you believe the
16  Brogioli and Richards reports are
17  rebutting.
18     MR. EMERICK: So you're not
19  able to say one way or another whether
20  Qualcomm's position is that these
21  should have gone in on opening?
22     MR. BRALY: Jay, I have
23  answered this multiple times now.
24     MR. EMERICK: So what's the
25  answer?

Page 9

1  MEET & CONFER
2      MR. BRALY: The answer is to
3  the extent that you are saying these
4  reports are responding to Kennedy and
5  Posner, we would like to know what you
6  are saying they are responding to.
7      MR. EMERICK: So Qualcomm's
8  position as to whether or not these
9  reports should have gone in on opening
10  hinges on how we characterize the
11  reports? That's your position?
12     MR. BRALY: We think the
13  reports are improper regardless.
14     MR. EMERICK: So let me
15  understand that statement. You think
16  the Brogioli and Richards reports are
17  improper even if they were submitted at
18  the opening report deadline?
19     MR. BRALY: No, if you had
20  submitted them at the opening report,
21  if you are saying they relate to
22  affirmative defenses, then yes, you
23  should have submitted them at the
24  opening report deadline. If instead
25  you are claiming that this is purely

3 (Pages 6 - 9)

Page 10

MEET & CONFER
1
2  rebuttal to expert opinions that were
3  offered in Kennedy and Posner's
4  reports, then it's improper.
5      MR. EMERICK:  So Qualcomm's
6  position as to whether or not the
7  Brogioli and Richards reports should
8  have been submitted as opening reports
9  depends on how Arm chooses to
10  characterize them?
11      MR. BRALY:  Can you answer my
12  question as to what expert opinion in
13  Kennedy and Posner's reports Brogioli
14  and Richards are responding to?
15      MR. EMERICK:  I can't even get
16  you to answer a question as to your
17  assertions that these are untimely.  So
18  I'm trying to understand the basis for
19  the untimeliness and when, if at all,
20  during the case you think, Qualcomm
21  thinks, these should have been
22  submitted.
23      If your position is these
24  reports never would have been proper
25  regardless of when Arm submitted them,

Page 11

MEET & CONFER
1
2  I'm trying to understand that, and I
3  can't get an answer on that.  If the
4  answer is we don't dispute that these
5  reports would have been proper had you
6  submitted them on opening, just say
7  that.  Or I think what I'm hearing from
8  you is you just can't say either way
9  because the answer to that question
10  depends on how Arm chooses to
11  characterize them in your view.  So
12  which one is it?  I just need to know
13  which one.
14      MR. BRALY:  We have
15  characterized them as rebuttal reports,
16  which is where the confusion lies,
17  because you are characterizing them as
18  rebuttal reports.  They purportedly
19  cite to paragraphs in the Kennedy and
20  Posner reports that they are rebutting.
21  We don't understand what expert opinion
22  they are purportedly rebutting.
23      If instead these are reports
24  that should have been served as opening
25  reports, which I can't tell if that's

Page 12

MEET & CONFER
1
2  what you're saying, maybe that's the
3  case, if you had served them as opening
4  reports, then that would be different.
5  That's a totally different situation.
6  We're not saying that's improper in
7  that case.
8      MR. EMERICK:  Okay.  So your
9  position is that these reports should
10  have been served on opening and that
11  because they were served at the
12  rebuttal deadline -- they would have
13  been okay if they were served on
14  opening, that's your position?
15      MR. BRALY:  They are framed as
16  rebuttal reports and they are
17  purportedly rebutting Kennedy and
18  Posner.  So I don't know why you keep
19  saying that as though that doesn't
20  exist, and they are framed as rebuttal
21  reports and you still have not answered
22  the question I have asked repeatedly
23  now, which is what expert opinion are
24  they rebutting?
25      MR. EMERICK:  You guys are

Page 13

MEET & CONFER
1
2  alleging a violation of the scheduling
3  order and so I think it's a fair
4  question for us to ask that are these
5  untimely because they were served at
6  the rebuttal deadline rather than the
7  opening deadline?
8      MR. BRALY:  Again, to the
9  extent that this is you submitting
10  expert reports that go to affirmative
11  defenses, then yes, they should have
12  been served at opening.  Instead if you
13  are saying you received our opening
14  reports and you were saying this is
15  supposed to be rebuttal, we're saying
16  this is improper rebuttal because it's
17  not actually rebutting any expert
18  opinion in Kennedy and Posner's
19  reports.
20      MR. EMERICK:  Is it Qualcomm's
21  position that Arm bears the initial
22  burden with respect to any of the
23  issues in the Brogioli and Richards
24  reports?
25      MR. BRALY:  What expert opinion

4 (Pages 10 - 13)

Page 14

MEET & CONFER

1    were Brogioli and Richards responding
2    to?
3         MR. EMERICK: You guys are
4    alleging a violation of the scheduling
5    order and so I want to make sure that I
6    understand what the alleged violation
7    is and what the contours of that are,
8    what you are alleging there is a
9    violation with respect to, what you are
10   not alleging there is a violation with
11   respect to.
12        So that's why I'm asking about
13   the initial deadline, and now I'm
14   asking about, frankly, it is related
15   almost to one in the same issue, is the
16   burden issue. So is it Qualcomm's
17   position that Arm bears the burden with
18   respect to any or all of the issues in
19   the Brogioli and Richards reports?
20        MR. BRALY: It is our position
21   that the scheduling order states that
22   expert reports that contradict or rebut
23   evidence on the same matter are due on
24   September 5th, and that's when you

Page 15

MEET & CONFER

1    served these reports, and that's why
2    I'm asking you what expert opinion they
3    were rebutting or contradicting. You
4    haven't answered that question. I have
5    asked it to you repeatedly now. You
6    have not answered that question.
7         MR. EMERICK: I'm not the one
8    alleging a scheduling order violation,
9    you guys are. So I have questions
10   about the alleged violation that you
11   are alleging and I think we're entitled
12   to understand the contours of it. So
13   are you able to identify --
14        MR. BRALY: Are you going to
15   answer my question, Jay?
16        MR. EMERICK: Jake, are you
17   able to identify any issues in the
18   Brogioli and Richards reports on which
19   Arm bears the initial burden? I just
20   want to know if you have a view on
21   that, if you are able to identify
22   anything.
23        MR. BRALY: I don't understand
24   the question. I'm asking you about the

Page 16

MEET & CONFER

1    expert opinion that was supposedly
2    contradicted or rebutted in the
3    rebuttal reports that were served on
4    September 5th.
5         MR. EMERICK: So I take it the
6    answer is no, you're not able to
7    identify any issues in the Brogioli or
8    Richards reports on which Arm bears the
9    initial burden?
10        MR. BRALY: It's like we're
11   talking past each other. I'm saying to
12   you, you served these as rebuttal
13   reports, you claim that they responded
14   and contradicted or rebutted expert
15   opinion in Kennedy and Posner's
16   reports. We don't see how that's the
17   case. We think that they are improper
18   rebuttal reports.
19        If you are saying instead that
20   they relate to affirmative opinions or
21   defenses that you had, they should have
22   been served as openings and not as
23   rebuttal reports. What is Arm's
24   position on the timing of the rebuttal

Page 17

MEET & CONFER

1    reports that it served?
2         MR. EMERICK: Why is Qualcomm
3    refusing to provide us any information
4    about the allegations that we violated
5    the scheduling order? I'm asking when
6    these reports should have been served.
7    I'm asking if you have identified any
8    issues in these reports that are
9    initial burden issues. Are you able to
10   identify any?
11        MR. BRALY: Jay, our role is
12   not to identify for you where you think
13   there's a need for affirmative defenses
14   to be disclosed or have reports
15   submitted. You served these as
16   rebuttal reports. You said that they
17   were contradicting or rebutting expert
18   opinion in the Kennedy and Posner
19   reports. I have asked you to identify
20   what that is multiple times now. You
21   have not done so. You have refused to
22   do so. I'm asking you to identify
23   that.
24        It is not clear what your

5 (Pages 14 - 17)

Page 18

MEET & CONFER

1
2  position is here that there is
3  essentially no deadline and Arm can
4  just submit reports on this at any
5  point in time that it considers to be
6  fit?
7      MR. EMERICK: Jake, you're not
8  even providing the contours of the
9  alleged scheduling order violation, and
10  so this is obviously not productive. I
11  would ask that you guys give us your
12  position as to why this is a violation
13  of the scheduling order and as part of
14  that, let us know whether you think Arm
15  should have served these reports as
16  opening reports and whether there are
17  any issues that these opinions go to or
18  any issues on which we bear the initial
19  burden. Because I think that's a fair
20  question when you guys are alleging
21  scheduling order violation.
22      MR. BRALY: Jay, are you
23  admitting that these are not rebuttal
24  reports, is that what you're saying?
25      MR. EMERICK: I'm glad we have

Page 19

MEET & CONFER

1
2  a court reporter recording this because
3  I think the transcript will clearly
4  show that I'm not making any such
5  admission that these are not rebuttal
6  reports. I'm asking you a question as
7  to your position that these are
8  untimely and we're trying to understand
9  the contours of that position.
10      If you want to just tell me
11  hey, Jay, these are untimely because
12  they should have been served as
13  openings, that would cut through this
14  and streamline it and we can move on
15  from that question. But I think it's
16  fair for us to know what the alleged
17  scheduling order violation is.
18      MR. BRALY: I have now
19  explained that repeatedly. You now say
20  the transcript is clear. I don't think
21  it is. I have asked you what it is
22  that these are rebutting, what Brogioli
23  and Richards are rebutting. I have not
24  heard an answer from you.
25      MR. EMERICK: I have not heard

Page 20

MEET & CONFER

1
2  an answer as to how there is an alleged
3  scheduling order violation or whether
4  these should have gone in as initial
5  reports and whether we bear any of the
6  burden with respect to the issues
7  raised by Brogioli and Richards.
8      MR. BRALY: I'm saying to you
9  it is not our responsibility to
10  identify the issues that you needed to
11  serve expert reports for. These are
12  not rebuttal reports and the reports
13  that are served on September 5th are
14  reports that contradict or rebut
15  reports that were served in opening.
16  We do not see how these do so. I have
17  asked you repeatedly now to identify
18  what they are rebutting. You have not
19  done so.
20      MR. EMERICK: Are they opening
21  reports? Should they have gone in on
22  opening? I want to understand your
23  position on that. If the answer is I
24  don't know, I understand and we can
25  move on.

Page 21

MEET & CONFER

1
2      MR. BRALY: Right. And what
3  I'm saying to you is we are not telling
4  you what you have a burden on. These
5  are not rebuttal reports.
6      MR. EMERICK: So are they
7  opening reports, is that your position,
8  if they're not rebuttal reports in your
9  view?
10      MR. BRALY: I'm not sure I even
11  understand your question. They are not
12  opening reports because you served them
13  on September 5th as rebuttal reports.
14      MR. EMERICK: Right. And I'm
15  asking you are these reports that we
16  should have served at the opening
17  report deadline?
18      MR. BRALY: That is not our
19  responsibility, Jay, and you won't tell
20  me what you think they are rebutting or
21  contradicting.
22      MR. EMERICK: And you're not
23  telling me why you think there is a
24  scheduling order violation here. So I
25  do think we can move on from this, but

6 (Pages 18 - 21)

Page 22

MEET & CONFER

1     I think it is a fair question --
2
3          MR. BRALY:  I have told you
4     repeatedly now.
5          MR. EMERICK:  What is the
6     answer?
7          MR. BRALY:  These reports were
8     entered on September 5th as rebuttal
9     reports and they are not rebuttal
10    reports.  That is a violation.
11         MR. EMERICK:  That is a
12    nonresponsive answer.  So my question
13    is should these have been served at the
14    opening report deadline?  I think that
15    is a fair question.  If these are
16    untimely, tell me when we should have
17    served them.  That's a fair question,
18    Jake.
19         MR. BRALY:  Jay, you haven't
20    answered what you think these rebut or
21    contradict, which I have now asked you
22    repeatedly.  It's not our position to
23    advise you on what you should have
24    served at opening or not.
25         MR. EMERICK:  You are saying

Page 23

MEET & CONFER

1     these are untimely.  Do you understand
2     that?
3          MR. BRALY:  We are saying they
4     are improper.  They don't rebut or
5     contradict expert opinion.
6          MR. EMERICK:  So you are not
7     saying they are untimely?  They are not
8     untimely, is that your position?
9          MR. BRALY:  It is unclear why
10    you served these reports.  If you are
11    saying they go to affirmative defenses
12    or you say that they are responding to
13    Kennedy and Posner, when I have asked
14    you what they are responding to, you
15    have not answered me.
16         If you provide us with that, we
17    can determine whether you consider
18    these to be opening reports that were
19    filed at the wrong time or if you are
20    saying these are actually proper
21    rebuttal reports and in fact there is
22    expert opinion in the Kennedy and
23    Posner reports that you purport they
24    are rebutting.

Page 24

MEET & CONFER

1          MR. EMERICK:  Our position is
2     that these are proper reports for the
3     rebuttal deadline.  So that our
4     position is clear on.
5          Now, can I get your position
6     with respect to whether these should
7     have been served at the opening report
8     deadline or not?
9          Let me ask a different
10    question.  Are you guys alleging that
11    these are untimely or not?
12         MR. BRALY:  They may be
13    untimely if they are not rebutting or
14    responding to our expert reports.  They
15    were filed on September 5th, which is
16    when rebuttal reports were to be filed,
17    which are rebutting or contradicting
18    opening reports.  They are offering
19    affirmative defenses, if that's what
20    the expert reports go to, yes, they are
21    untimely and they should have been
22    filed as opening reports.
23         MR. EMERICK:  So what portion,
24    or maybe it's the entirety, what

Page 25

MEET & CONFER

1     portions or whole of the Brogioli and
2     Richards reports in Qualcomm's view
3     should have been served on the opening
4     report deadline?
5          MR. BRALY:  Our position is
6     that the entirety of the Brogioli and
7     Richards reports do not respond or
8     contradict anything that was served in
9     the Kennedy and Posner reports.
10         MR. EMERICK:  Do you have a
11    position as to whether any or all of
12    the opinions in the Brogioli and
13    Richards reports should have been
14    served on the opening report deadline?
15         MR. BRALY:  Jay, it's not our
16    place to be giving you advice on --
17         MR. EMERICK:  I'm not seeking
18    advice.  I'm seeking your position as
19    to your allegations that these are in
20    violation of the scheduling order.
21         MR. BRALY:  And our position is
22    that these are improper rebuttal
23    reports.
24         MR. EMERICK:  So you don't

7 (Pages 22 - 25)

Page 26

MEET & CONFER

1 MEET & CONFER
2 allege that they are untimely?
3     MR. BRALY:  To the extent that
4 you are using them as opening reports
5 instead of as rebuttal reports, yes,
6 they are untimely and they should have
7 been filed as opening reports.
8     MR. EMERICK:  What do you mean,
9 how we are using them?  What is your
10 position on how we are using them?
11     MR. BRALY:  If they aren't
12 actually rebutting or contradicting
13 anything in the Kennedy or Posner
14 reports and instead you are offering in
15 expert opinion on affirmative defenses,
16 then they are untimely.
17     MR. EMERICK:  And are you
18 alleging that we are doing that?
19     MR. BRALY:  That's why I'm
20 asking you whether they are proper or
21 not.  It seems like you may be doing
22 that.
23     MR. EMERICK:  Are you alleging
24 that we are doing that or not?  This is
25 your allegation and your meet and

Page 27

1 MEET & CONFER
2 confer on this issue.  Tell me what
3 your problem is with the timing of
4 these or whether you have one, because
5 I'm still not clear.  I have heard
6 multiple responses as to they are
7 untimely, they are not untimely, they
8 are untimely if certain
9 characterizations or Arm takes a
10 certain position.  So just tell me
11 straight up what's your position on the
12 timeliness of these.
13     MR. BRALY:  Yeah, they are
14 untimely if they are served on
15 September 5th as rebuttal reports that
16 are not actually rebutting or
17 contradicting anything in opening
18 reports and instead are providing
19 opinion on Arm's affirmative defenses.
20     MR. EMERICK:  I think factually
21 we can agree on when they were served.
22 I don't think there is a dispute there.
23 With respect to the characterization of
24 them of not properly rebutting, we have
25 different views on that, and so are

Page 28

1 MEET & CONFER
2 these untimely or not under Qualcomm's
3 view?
4     MR. BRALY:  What is your view
5 on what these are rebutting or
6 contradicting?  I have not heard that
7 from you.
8     MR. EMERICK:  What is
9 Qualcomm's view as to whether these are
10 timely or not?
11     MR. BRALY:  I don't understand
12 why we are going in circles around
13 this.
14     MR. EMERICK:  Because you guys
15 are alleging a violation of the
16 scheduling order but you won't even
17 tell me whether you think the reports
18 we served are untimely or not.
19     Can I just get an answer on
20 that so we can know what dispute we
21 have for the Court?  We are potentially
22 going to have to brief this issue and
23 in that briefing Qualcomm will be
24 taking a position with respect to
25 timeliness and we are going to have to

Page 29

1 MEET & CONFER
2 discuss timeliness in the briefing
3 should we have to burden the Court with
4 this.  And so I think it's a fair
5 question on the meet and confer in
6 which you are alleging a scheduling
7 order violation for us to get your
8 position on the timeliness of this.
9     MR. BRALY:  I think I have
10 answered your question.
11     MR. EMERICK:  You haven't.
12     MR. BRALY:  Jay, I don't know
13 what to say.  I think I have answered
14 your question on this.
15     MR. EMERICK:  What I would like
16 you to say is for you to give me your
17 position, Qualcomm's position, on the
18 timeliness or untimeliness of the
19 Brogioli and Richards reports in
20 Qualcomm's view, based on Qualcomm's
21 view, Qualcomm's position, I would like
22 to hear what that is.
23     MR. BRALY:  Yes, and as I have
24 said, we do not believe that these are
25 proper rebuttal reports.  They do not

8 (Pages 26 - 29)

Page 30

MEET & CONFER

1 contradict or rebut expert opinion in
2 the Kennedy or Posner reports. I have
3 asked you about that repeatedly what
4 you say they are rebutting. You will
5 not give me an answer.
6     MR. EMERICK: The question I
7 keep going back to, I understand your
8 position that you don't think they are
9 proper rebuttal reports. Are they not
10 proper rebuttal reports because of the
11 timeliness issue in Qualcomm's view?
12     MR. BRALY: We think they are
13 not proper rebuttal reports because
14 they are not rebutting or contradicting
15 the opening reports.
16     MR. EMERICK: So is there a
17 timeliness issue or not? It sounds
18 like this is a scope issue and not a
19 timing issue in your view. So I just
20 need to understand that.
21     MR. BRALY: I mean, I think
22 it's one in the same. This is an
23 expert report that's an opening expert
24 report that you have filed as a

Page 31

MEET & CONFER

1 rebuttal report that doesn't actually
2 contradict or rebut anything that was
3 in the Kennedy and Posner reports.
4     MR. EMERICK: Okay. So is it
5 Qualcomm's position that these should
6 have gone in, the Brogioli and Richards
7 reports, at the opening report
8 deadline?
9     MR. BRALY: It is not our place
10 to advise you of this.
11     MR. EMERICK: I'm not asking
12 for advice. I'm asking you what your
13 position is going to be if you file a
14 motion and burden the Court or the
15 Special Master with this. Is it your
16 position that these should have gone in
17 at opening?
18     MR. BRALY: Jay, and it seems
19 like we are not resolving this. We are
20 going to file a motion. We think these
21 are improper rebuttal reports because
22 they do not contradict or rebut expert
23 opinion in the Kennedy or Posner
24 reports.

Page 32

MEET & CONFER

1     MR. EMERICK: Right. And so as
2 a result, is it your view that these
3 should have gone in on opening?
4     MR. BRALY: It's our view that
5 these are not proper to serve as
6 rebuttal reports.
7     MR. EMERICK: Okay. So my
8 question is, is there any other point
9 in the case at which we could have
10 served these or is it your view that
11 no, these could never -- these can
12 never go into the case, you should have
13 been able to serve them at opening, you
14 can't serve them now?
15     I'm just trying to understand
16 when, if at all, do you think it would
17 have been okay for Arm to serve these.
18 If the answer is never, I am just
19 trying to get an understanding of how
20 there is a scheduling order violation
21 and when should we have put these in in
22 your view?
23     MR. BRALY: Right. I'm saying
24 that is irrelevant to the issue here

Page 33

MEET & CONFER

1 which is --
2     MR. EMERICK: It is directly
3 relevant.
4     MR. BRALY: It's not.
5     MR. EMERICK: That is exactly
6 the point, right? It is still unclear
7 to me if you are saying there is a
8 timeliness issue or if it is just a you
9 should never be allowed to have these
10 in the case. I just want to know one
11 way or another so we know what target
12 we are shooting at in the briefing.
13 I'm not sure why you guys are refusing
14 to say this, because you are going to
15 have to say it in the briefing one way
16 or another.
17     So if you don't have
18 authorization from your team to take a
19 position and you have to talk to your
20 client, I understand that, and we can
21 have a subsequent meet and confer on
22 that. But I think it is a fair
23 question going into the briefing for us
24 to get your position as to when we

9 (Pages 30 - 33)

Page 34

MEET & CONFER
1
2    should have served these, if any time.
3        MR. BRALY:  That's not actually
4    what is relevant here.  What is
5    relevant is you did serve these as
6    rebuttal reports on September 5th.
7    They do not contradict or rebut expert
8    opinion in the Kennedy or Posner
9    reports.
10        MR. EMERICK:  You are telling
11    me that --
12        MR. BRALY:  That is the point.
13    Are you saying you are going to
14    withdraw the opinions?
15        MR. EMERICK:  No.
16        MR. BRALY:  So you think they
17    are appropriate rebuttal reports?
18        MR. EMERICK:  Jake, yes.
19        MR. BRALY:  Why?
20        MR. EMERICK:  Because they are
21    fully in compliance with the scheduling
22    order on this.
23        MR. BRALY:  What are they
24    rebutting?
25        MR. EMERICK:  I think we have

Page 35

MEET & CONFER
1
2    got to get back to you said that the
3    timing of these is not relevant or my
4    question on the timing of these is not
5    relevant.  Is it irrelevant because you
6    guys are not making a timeliness
7    challenge to these but are instead just
8    limiting the challenge to the scope of
9    the subject matter in the reports?
10        MR. BRALY:  I guess I'm not
11    seeing how you are divorcing those two
12    issues.  There is a timing issue in the
13    sense that you served this as a
14    rebuttal report to the Kennedy and
15    Posner reports and they don't rebut
16    those opinions.  So they were served as
17    rebuttal reports when they should not
18    have been because they are improper
19    rebuttal reports.  You just shouldn't
20    have served them.
21        MR. EMERICK:  At any point in
22    the case?
23        MR. BRALY:  Jay, I'm not
24    talking about what your determination
25    of your affirmative obligations is.

Page 36

MEET & CONFER
1
2        MR. EMERICK:  Nor am I asking
3    you about it.  I'm asking you about
4    Qualcomm's position -- I'm asking you
5    about Qualcomm's position with respect
6    to, and, again, I can't quite tell if
7    Qualcomm has a position or not on this,
8    but if Qualcomm has a position as to
9    whether or not these should have been
10    served at opening.
11        MR. BRALY:  Again, I think it's
12    irrelevant what we consider to be
13    appropriate for you to serve these as
14    opening reports or not.  You did not
15    serve them as opening reports.  You
16    served them as rebuttal reports that
17    you contend contradict or rebut expert
18    opinion in the Kennedy and Posner
19    reports.  You have not identified what
20    it is you believe that they are
21    rebutting or contradicting.  We believe
22    that they are improper.
23        We have asked you if you will
24    withdraw them.  You are saying you will
25    not withdraw them.  I think we're done.

Page 37

MEET & CONFER
1
2    I mean, I think we have basically
3    covered this.
4        MR. EMERICK:  So I actually
5    think the first part of your statement
6    there like sheds all the light on this
7    we need.  So yes, we can move on.
8        MR. BRALY:  Okay.
9        MR. EMERICK:  So, look, on your
10    complaint about this, we disagree with
11    the complaint that you raised.  Again,
12    there is some lack of clarity in your
13    position, but we disagree with your
14    reading of the scheduling order,
15    disagree with your interpretation of
16    the law on this.  We think we are fully
17    in compliance with the scheduling
18    order.
19        MR. BRALY:  Okay.  And just for
20    the record, you have refused to
21    identify what expert opinions you think
22    Brogioli and Richards were rebutting in
23    their rebuttal reports?
24        MR. EMERICK:  I think at a
25    minimum the reports speak for

10 (Pages 34 - 37)

Page 38

MEET & CONFER

1       MEET & CONFER
2 themselves on that. But the two
3 reports that you guys put in, the
4 Posner and Kennedy reports, there are
5 certainly opinions that we are
6 rebutting in that. And we talk about
7 that -- not we -- but the experts talk
8 about that in their reports at a
9 minimum.
10       MR. BRALY: Okay. I mean, I
11 have asked you repeatedly to identify
12 what expert opinions you say that they
13 are rebutting. You haven't done so.
14 You are just pointing me back to the
15 report which we don't believe actually
16 is rebutting any expert opinions in the
17 Kennedy or Posner report. We are going
18 to move to strike those reports.
19       MR. EMERICK: So I think in
20 addition to that, you know, just to get
21 back to the scheduling order itself --
22 just give me one second. Yeah, we
23 think the Brogioli and Richards reports
24 contradict and rebut evidence on the
25 same subject matter identified by

Page 39

MEET & CONFER

1       MEET & CONFER
2 another party here, Qualcomm. So we
3 think we are fully in compliance with
4 the scheduling order.
5       With that, I'm happy to move on
6 to the next topic. I know we have
7 spent a long time on this.
8       MR. BRALY: Okay. That still
9 doesn't identify anything specifically,
10 but it seems like we are not going to
11 resolve that.
12       The next topic is the
13 production of various TLA agreements
14 that seems to be ongoing. There was a
15 production that you made today. So I
16 think we have a number of questions
17 about the production of these
18 agreements. I think the first one is
19 are there more that we should be
20 anticipating, and, if so, how many more
21 should we be anticipating that you will
22 be producing and when will you be
23 producing them?
24       MR. EVANGELATOS: So this is
25 Peter. A couple of questions there. I

Page 40

MEET & CONFER

1       MEET & CONFER
2 think you are asking if you are going
3 to get more of them. I think we have a
4 handful more to get out to you tomorrow
5 and then I think you are aware of a
6 couple of PO disputes that were filed
7 last week. Obviously those are going
8 to be out there until that gets decided
9 by the Court or the Special Master.
10       MR. BRALY: When you say a
11 handful, does that mean five?
12       MR. EVANGELATOS: I don't know
13 the specific number of documents off
14 the top of my head. I think there is
15 maybe one or two additional third
16 parties where we have to produce the
17 documents to you. I think that they
18 are coming and that's all I know. I
19 don't know when exactly the production
20 is going to go out the door.
21       MR. BRALY: So are you saying
22 that with this next production that is
23 coming, that will be all of them, or
24 will there be more after the next
25 production?

Page 41

MEET & CONFER

1       MEET & CONFER
2       MR. EVANGELATOS: Again,
3 excluding any that are subject to
4 third-party disputes where the third
5 party has objected to the production of
6 their agreements, I believe that's the
7 case. If not, maybe there is one more.
8 I'm not sure off the top of my head,
9 but I believe that should be the case.
10       MR. BRALY: Okay. Are you
11 still looking for agreements or have
12 you identified all of them?
13       MR. EVANGELATOS: My
14 understanding is that they were, and
15 this is what we told you in an e-mail
16 several times, that notice was sent out
17 for the additional agreements that
18 needed to be produced and that is what
19 you are receiving.
20       MR. BRALY: Okay. When did you
21 send these notices?
22       MR. EVANGELATOS: I don't have
23 a date off the top of my head. This
24 was quite a while ago, maybe several
25 weeks ago. At least the period for the

11 (Pages 38 - 41)

Page 42

MEET & CONFER

1  MEET & CONFER
2  PO is 21 days, so at least 21 days ago,
3  now that you have received several of
4  them.
5      MR. BRALY: And are you still
6  sending notices? I guess what we're
7  trying to figure out is, I know you
8  said there is going to be a handful
9  that are coming tomorrow but it is just
10  unclear if there is identification of
11  third parties that have licenses to
12  these cores or if you have identified
13  them, you're in the process of
14  notifying them, or if you have
15  identified them and you sent notices
16  before. Where are we in that
17  timeframe?
18      MR. EVANGELATOS: I'm not going
19  to get into identifying certain third
20  parties, because clearly you are going
21  to try to use that as some admission
22  against Arm someday. That's not what
23  is going on here. We have said to you
24  several times now that there were
25  documents omitted from the production.

Page 43

1  MEET & CONFER
2  We notified the third parties that
3  needed to be notified of their
4  agreements being produced. That notice
5  was provided several weeks ago now. We
6  produced some of those agreements I
7  believe on the 4th, on the 11th, today.
8  There is a handful more you have got to
9  receive and then that is wrapped up.
10  So I don't know what else I can tell
11  you about that.
12      MR. BRALY: And all the notices
13  have been sent at this point in time?
14  I understand that there are companies
15  that may be filing protective order
16  motions, but everyone has notice at
17  this point?
18      MR. EVANGELATOS: My
19  understanding is yes, that everyone has
20  notice, and there may be a couple going
21  out tomorrow, maybe one or two
22  stragglers, but my understanding is it
23  should be done after that.
24      MR. BRALY: Okay. And is there
25  a reason that these all came in so

Page 44

1  MEET & CONFER
2  late? We had understood you said that
3  everything was complete before and now
4  we have received a bunch more, and it
5  sounds like we are going to receive
6  another handful tomorrow.
7      MR. EVANGELATOS: I'm not going
8  to get into what I discussed with my
9  client. But I will say that you asked
10  us to look into this on a July 30th
11  meet and confer, and we did. So that's
12  where this came from. You asked us to
13  do this.
14      MR. EMERICK: So you had not
15  looked for these prior to that meet and
16  confer?
17      MR. EVANGELATOS: No, and that
18  is misconstruing what I'm saying.
19      MR. BRALY: What are you
20  saying?
21      MR. EVANGELATOS: I said I'm
22  not going to get into what I discussed
23  with my client, that is privileged
24  information, but you asked us during
25  that meet and confer to investigate the

Page 45

1  MEET & CONFER
2  existence of other TLA agreements that
3  you found online, your reference is to
4  online, you refused to provide that
5  information until you submitted it two
6  days later in your Special Master
7  briefing, and then we went and
8  conducted, you know, and made sure that
9  we didn't miss anything in the
10  production.
11      So that's where this came from.
12  So I'm not sure why you're asking that
13  question to begin with. This is
14  something you asked for.
15      MR. BRALY: The reason I'm
16  asking is because we had asked way
17  earlier for production of the
18  agreements related to ████████████
19  ████ ████████, we identified those three just
20  from a quick Google search online, and
21  now a bunch more have been produced.
22      So it is confusing because you
23  previously represented that everything
24  was complete, you have run all of this
25  to ground. The fact that you

12 (Pages 42 - 45)

Page 46

MEET & CONFER

1    MEET & CONFER
2    identified these after we identified
3    them for you and you are saying we
4    didn't tell you until it was in the
5    Special Master briefing also doesn't
6    make sense because you have the
7    licensing agreement, so you can figure
8    that out on your own.
9        MR. EVANGELATOS: Obviously we
10   agree to disagree on that.
11       MR. EMERICK: Jake, you are not
12   getting a different answer from us on
13   this. You are not getting privileged
14   communication on a meet and confer.
15       MR. BRALY: I'm not asking for
16   privileged communication. I'm asking
17   for clarification given the
18   conversations that we have previously
19   had.
20       MR. EMERICK: And we gave you
21   that.
22       MR. BRALY: So you are saying
23   that we raised this at the July 30th
24   meet and confer, you went back, you
25   have identified everyone, everyone has

Page 47

1    MEET & CONFER
2    been identified now, we have one more
3    production that is coming with a
4    handful of documents, potentially
5    another straggler, and at this point
6    everyone that has moved for a
7    protective order, that will potentially
8    move for a protective order, has moved
9    for a protective order?
10       MR. EVANGELATOS: I'm not going
11   to agree to that characterization. I
12   will stand on what I have said several
13   times now and that's that. You also
14   submitted your letter to the Special
15   Master already. You jumped the gun, as
16   seems to be the case with what you guys
17   like to do. You went to the Special
18   Master and submitted your letter and we
19   will respond to that. A lot of this we
20   have already told you repeatedly, not
21   only in correspondence, but also in the
22   prior briefing as well. So we will
23   respond.
24       MR. BRALY: Okay. I mean, I
25   think we disagree with that. Will you

Page 48

1    MEET & CONFER
2    also produce the notice letters that
3    you have provided to the third parties?
4        MR. EVANGELATOS: Yeah, I saw
5    your note on that. Can you explain the
6    relevance of that to me?
7        MR. BRALY: Well, it is unclear
8    when notice was provided to these third
9    parties.
10       MR. EVANGELATOS: How does
11   notice and when notice was provided to
12   the third parties bear on the claims or
13   defenses regarding the TLA obligations?
14       MR. BRALY: We are trying to
15   figure out whether there was compliance
16   with the protective order obligations.
17       MR. EVANGELATOS: So that
18   doesn't relate to the claims and
19   defenses of the parties. So how does
20   compliance with the PO, how is that
21   relevant and why are you policing that?
22   Isn't that a third-party
23   confidentiality problem?
24       MR. EMERICK: Jake, who are you
25   saying violated the PO?

Page 49

1    MEET & CONFER
2        MR. BRALY: No one is alleging
3    that you have. We are trying to figure
4    out what is going on and why all of
5    these agreements were not provided
6    after a representation that production
7    was complete.
8        MR. EMERICK: I just want a
9    clear record then. You are not
10   accusing anyone of violating the
11   protective order?
12       MR. BRALY: No. We don't
13   know --
14       MR. EVANGELATOS: So what is
15   the relevance of the agreements, or,
16   excuse me, of the notice letters? You
17   just said they are relevant to the PO.
18   What is the other relevance? If you
19   are not alleging a PO violation, what
20   is the relevance of the notice letters?
21   I haven't heard anything, any reason to
22   produce those.
23       MR. BRALY: We are trying to
24   figure out when third parties were
25   notified. There is a period of time

13 (Pages 46 - 49)

Page 50

MEET & CONFER

1       MEET & CONFER
2  that lapses when third parties can
3  raise protective order motions.
4       MR. EVANGELATOS:  So how is
5  that relevant to Arm's actions a year
6  ago now that led up to the October 2024
7  offer that's in dispute?  I'm not
8  hearing any connection between the two.
9  Without that, I mean, I don't hear any
10  basis to produce those documents.
11      MR. BRALY:  The relevance is
12  the agreements themselves are relevant
13  and this has to do with getting the
14  agreements themselves and whether
15  third-party motions are timely and
16  whether there was improper delay in
17  producing these documents.
18      MR. EVANGELATOS:  That is
19  totally irrelevant to the claims and
20  defenses in the case.  You seem to be
21  on some sort of witch hunt to find some
22  sort of violation without any sort of
23  basis or relevance.  I just don't see a
24  reason to produce those.  But we will
25  consider it.

Page 51

MEET & CONFER

1       MEET & CONFER
2      MR. BRALY:  Okay.  I don't
3  think it is a witch hunt, now that you
4  have produced --
5      MR. EVANGELATOS:  Exactly, you
6  have the agreements, so what do you
7  need the notice letters for?  Or you
8  are about to have the remaining
9  agreements.  So, again, you are kind of
10  going in circles here.  I'm not really
11  hearing a basis for why you need the
12  notice letters.  But we can move on.
13     One clarifying question I had
14  for you, Jake, was you seemed to be
15  taking conflicting positions on what
16  exactly the relief is that you are
17  asking for.  Can you just confirm what
18  you put in your letter today that you
19  are looking for -- what exactly the
20  relief is that you are looking for?
21      MR. BRALY:  I mean, I think at
22  a minimum we would want to be able to
23  supplement expert reports.  We want
24  relief on the request that we have
25  submitted before the Special Master and

Page 52

MEET & CONFER

1       MEET & CONFER
2  a resolution of the pending disputes
3  before the Special Master, and there
4  may be additional relief that we're
5  seeking depending on, presumably she is
6  going to have a hearing, depending on
7  the information that we see in the
8  reports.
9      MR. EVANGELATOS:  So are you
10  saying that the relief that you put in
11  the letter today is not all that you
12  are seeking?  So what else are you
13  going to seek?
14      MS. YING:  Peter, just to
15  clarify, the letter that we submitted
16  was a notice of newly learned facts and
17  subsequent events.  It was in further
18  support of our motion to compel which
19  is pending before the Special Master.
20  So we didn't file a new motion or
21  anything like that.  This was to update
22  the Special Master on additional facts
23  that are relevant to the pending
24  motions that are before her.
25      MR. EVANGELATOS:  Jen, at the

Page 53

MEET & CONFER

1       MEET & CONFER
2  end of your letter you have a paragraph
3  of something that says to the effect
4  you want a 30(b)(6) witness and you
5  want supplemental interrogatory
6  responses.  So what I'm trying to
7  understand, is that all you're asking
8  for here or do you intend to file
9  something else and ask for additional
10  relief?
11     Yesterday you are telling us
12  you basically want a complete verdict
13  in your direction because some
14  documents were omitted from our
15  production.
16      MS. YING:  So the supplemental
17  interrogatory responses and the
18  30(b)(6) testimony were all part of the
19  original motion to compel.  That's what
20  we were telling the Court, which is --
21  that was part of our motion that we
22  filed with her and that we're telling
23  her that those requests are still live.
24  Nothing has happened to change the fact
25  that we still want that discovery.

14 (Pages 50 - 53)

Page 54

MEET & CONFER

1       MEET & CONFER
2       So I'm not sure -- beyond that
3  we haven't filed a separate motion with
4  respect to, you know, everything else
5  that has happened, the timing of what
6  happened and things like that.  We have
7  not yet filed anything on that.
8       MR. EVANGELATOS:  Okay.  So I
9  will restate my question, and I don't
10  want to talk past each other here, is
11  there additional relief that you are
12  asking for as it relates to the TLA
13  agreements that we can hear you out on
14  and take into consideration?
15      I mean, I understand you are
16  reupping your request from before.  We
17  disagree with those and we responded to
18  those at the hearing and we will
19  respond to your letter.  But is there
20  something else that you are asking for
21  that we should work out or talk about
22  and we can at least take back and
23  consider?  If you want to tell us that,
24  we are happy to hear you out on that.
25  But I'm not hearing that, so please.

Page 55

1       MEET & CONFER
2       MS. YING:  I don't know if we
3  have run that to ground yet.  I don't
4  think, based upon what you have told
5  us, we don't have all the agreements
6  yet of the ones that you will be
7  producing.  Let's put the ones that are
8  potentially the subject of a protective
9  order dispute to a separate bucket.
10  But we don't have the full universe of
11  what, you know, you guys say we are
12  getting.  So I don't know if we can
13  answer that question right now.
14      I'm happy to let Jake and his
15  folks chime in as well.  But I think we
16  don't even know what the full universe
17  looks like yet.  So I don't know if I'm
18  in a position to answer that at this
19  time.
20      MR. EVANGELATOS:  Well, I mean,
21  unless anything further on that, Jake,
22  I don't know if you have any questions,
23  but I think we can move on to the third
24  deposition issue, if not.
25      MR. BRALY:  I think that is

Page 56

1       MEET & CONFER
2  everything.
3       MR. EMERICK:  On the last
4  deposition issue, look, with respect to
5  Pradeep and the two other India
6  witnesses, I know I put this in e-mail,
7  but we told you what we intended to do
8  with our dep hours as a courtesy and
9  convenience to you guys so we are
10  scheduling things efficiently and so
11  that we're not bringing folks from
12  India to the U.S. whose deps will get
13  dropped if we got the time for Pradeep.
14      So the goal was to try to be
15  helpful here.  It is unfortunate that
16  you guys have gone in a different
17  direction with it.  But I think maybe
18  more fundamentally from sort of a where
19  do we go from here in light of the
20  parties' positions, the dates you guys
21  proposed are within the really limited
22  expert discovery window, and we have
23  sent you guys expert dates that overlap
24  with the proposed India-based fact
25  witness depositions.  We also don't

Page 57

1       MEET & CONFER
2  have your expert dep dates.
3       So I think to move this thing
4  along, send us your expert dates as
5  soon as you can and let us know on our
6  expert dates as soon as we can so that
7  we can make some progress on scheduling
8  these two other folks.
9       MR. BRALY:  Okay.  I mean, we
10  plan to send you our expert dates, I
11  think we are just nailing them down,
12  but we should be able to send them to
13  you shortly.
14      I think you know our position
15  on these two.  We gave you dates and
16  you waited a week and a half to
17  respond.  We can't have these people
18  hanging out indefinitely.  So you know
19  our position on this.
20      MR. EMERICK:  Then state
21  clearly what your position is.  Are you
22  not going to give us new dates for
23  them?
24      MR. BRALY:  We are not going to
25  have them hold out indefinitely.  So

15 (Pages 54 - 57)

Page 58

MEET & CONFER

1
2  no, we are not providing new dates if
3  you are rejecting the dates, which you
4  have, for their deposition.
5      MR. EMERICK:  I'm asking you to
6  send us your expert dates and tell us
7  your position on our expert dates
8  because you have put these people smack
9  dab in the middle of expert discovery.
10     So it is all one big puzzle as
11  we did in the first fact witness
12  deposition puzzle to put these things
13  together.  So send us your expert
14  dates, let us know on our expert dates,
15  so that we can schedule this, or just
16  tell me straight up I'm not giving you
17  any alternative date.
18     MR. BRALY:  We will send you
19  the dates.  We don't plan on giving
20  alternative dates.  We can't have them
21  hang out indefinitely.
22     MR. EMERICK:  I'm not asking
23  them to hang out indefinitely.  I'm
24  asking you if there are alternative
25  dates that you can give in light of the

Page 59

MEET & CONFER

1
2  fact that you have proposed these fact
3  witnesses for the tiny, tiny expert
4  discovery window we have.  If your
5  position is I'm not giving you an
6  alternative later date, just tell me
7  now.
8      MR. BRALY:  Yes, our position
9  is you had the dates for a week and a
10  half before you responded.  You don't
11  want them.  We are not doing anything
12  more.  We are done with them.
13     MR. EMERICK:  Okay.  We will
14  note your refusal to provide
15  alternative dates.  Understood.  All
16  right, I think that wraps it.
17     MR. BRALY:  I think that is
18  everything.  Thank you everyone.
19     (Time noted:  4:55 p.m.)
20
21
22
23
24
25

Page 60

1
2          C E R T I F I C A T I O N
3
4
5
6   I, TODD DeSIMONE, a Registered
7  Professional Reporter and a Notary Public,
8  do hereby certify that the foregoing is a
9  true and accurate transcription of my
10  stenographic notes.
11     I further certify that I am not
12  employed by nor related to any party to
13  this action.
14
15
16
17     *Todd DeSimone*
18  TODD DeSIMONE, RPR
19
20
21
22
23
24
25

16 (Pages 58 - 60)

**[& - answer]**                                                                                    Page 1

| & | 2 |
|---|---|
| **&**  1:17 2:3,9,14<br>3:3,9 4:1 5:1<br>6:1 7:1 8:1 9:1<br>10:1 11:1 12:1<br>13:1 14:1 15:1<br>16:1 17:1 18:1<br>19:1 20:1 21:1<br>22:1 23:1 24:1<br>25:1 26:1 27:1<br>28:1 29:1 30:1<br>31:1 32:1 33:1<br>34:1 35:1 36:1<br>37:1 38:1 39:1<br>40:1 41:1 42:1<br>43:1 44:1 45:1<br>46:1 47:1 48:1<br>49:1 50:1 51:1<br>52:1 53:1 54:1<br>55:1 56:1 57:1<br>58:1 59:1 | **2024**  50:6<br>**2025**  1:14<br>**21**  42:2,2 |

| | **3** |
|---|---|
| | **30**  53:4,18<br>**30th**  44:10<br>46:23<br>**333**  2:15<br>**3879**  60:17 |

**1**

| 1 | 4 |
|---|---|
| **1000**  3:3<br>**10019**  2:4<br>**11th**  43:7<br>**1201**  2:9<br>**1285**  2:3<br>**15**  1:14<br>**16th**  2:10<br>**19801**  3:4<br>**19899**  2:10 | **425**  3:9<br>**4:02**  1:14<br>**4:55**  59:19<br>**4th**  43:7 |

| 5 |
|---|
| **5**  4:18,19<br>**5th**  14:25 16:5<br>20:13 21:13<br>22:8 24:16<br>27:15 34:6 |

| 6 |
|---|
| **6**  53:4,18<br>**60654**  2:15 |

| 9 |
|---|
| **94105**  3:10 |

| a |
|---|
| **able**  8:6,19<br>15:14,18,22<br>16:7 17:10<br>32:14 51:22 |

57:12
**accurate**  60:9
**accusing**  49:10
**action**  60:13
**actions**  50:5
**actually**  13:17
23:21 26:12
27:16 31:2
34:3 37:4
38:15
**adam**  2:6,17
**addition**  38:20
**additional**
40:15 41:17
52:4,22 53:9
54:11
**admission**  19:5
42:21
**admitting**
18:23
**advice**  25:17,19
31:13
**advise**  22:23
31:11
**affirmative**
5:12,24 7:7
9:22 13:10
16:21 17:14
23:12 24:20
26:15 27:19
35:25
**agenda**  4:3
**ago**  41:24,25
42:2 43:5 50:6

**agree**  27:21
46:10 47:11
**agreement**  46:7
**agreements**
39:13,18 41:6
41:11,17 43:4
43:6 45:2,18
49:5,15 50:12
50:14 51:6,9
54:13 55:5
**allegation**
26:25
**allegations**
17:5 25:20
**allege**  26:2
**alleged**  14:7
15:11 18:9
19:16 20:2
**alleging**  13:2
14:5,9,11 15:9
15:12 18:20
24:11 26:18,23
28:15 29:6
49:2,19
**allowed**  33:10
**alternative**
58:17,20,24
59:6,15
**americas**  2:3
**anne**  3:5
**answer**  6:17
8:6,25 9:2
10:11,16 11:3
11:4,9 15:16

[answer - burden]                                                           Page 2

16:7 19:24
20:2,23 22:6
22:12 28:19
30:6 32:19
46:12 55:13,18
**answered** 8:11
8:13,23 12:21
15:5,7 22:20
23:16 29:10,13
**answering** 6:11
**anticipating**
39:20,21
**apkon** 2:5
**appropriate**
34:17 36:13
**arm** 1:10,10
4:22 5:17 7:8
10:9,25 11:10
13:21 14:18
15:20 16:9
18:3,14 27:9
32:18 42:22
**arm's** 4:4 16:24
27:19 50:5
**arsht** 2:9
**asked** 4:7 8:13
12:22 15:6
17:20 19:21
20:17 22:21
23:14 30:4
36:23 38:11
44:9,12,24
45:14,16

**asking** 6:24
7:16 8:3 14:13
14:15 15:3,25
17:6,8,23 19:6
21:15 26:20
31:12,13 36:2
36:3,4 40:2
45:12,16 46:15
46:16 51:17
53:7 54:12,20
58:5,22,24
**assertion** 6:16
7:20
**assertions**
10:17
**authorization**
33:19
**avenue** 2:3
**aware** 40:5

**b**

**b** 53:4,18
**back** 30:8 35:2
38:14,21 46:24
54:22
**barnett** 2:17
**based** 6:16
29:20 55:4
56:24
**basically** 37:2
53:12
**basis** 10:18
50:10,23 51:11

**basner** 2:6
**bear** 18:18 20:5
48:12
**bears** 13:21
14:18 15:20
16:9
**believe** 4:11
8:15 29:24
36:20,21 38:15
41:6,9 43:7
**beyond** 54:2
**big** 58:10
**braly** 2:4 4:2
4:19,25 5:11
5:20 6:10 7:5
8:10,22 9:2,12
9:19 10:11
11:14 12:15
13:8,25 14:21
15:15,24 16:11
17:12 18:22
19:18 20:8
21:2,10,18
22:3,7,19 23:4
23:10 24:13
25:6,16,22
26:3,11,19
27:13 28:4,11
29:9,12,23
30:13,22 31:10
31:19 32:5,24
33:5 34:3,12
34:16,19,23
35:10,23 36:11

37:8,19 38:10
39:8 40:10,21
41:10,20 42:5
43:12,24 44:19
45:15 46:15,22
47:24 48:7,14
49:2,12,23
50:11 51:2,21
55:25 57:9,24
58:18 59:8,17
**brief** 28:22
**briefing** 28:23
29:2 33:13,16
33:24 45:7
46:5 47:22
**bringing** 56:11
**brogioli** 4:5,17
4:23 5:18 8:16
9:16 10:7,13
13:23 14:2,20
15:19 16:8
19:22 20:7
25:2,7,13
29:19 31:7
37:22 38:23
**bucket** 55:9
**bunch** 44:4
45:21
**burden** 13:22
14:17,18 15:20
16:10 17:10
18:19 20:6
21:4 29:3
31:15

**[c - conversations]** Page 3

| c | | | |
| --- | --- | --- | --- |
| **c** 2:2 3:2 60:2,2 | **circles** 28:12 | **compliance** | **confusion** 8:12 |
| **california** 3:10 | 51:10 | 34:21 37:17 | 11:16 |
| **case** 5:24 7:15 | **cite** 11:19 | 39:3 48:15,20 | **connection** |
| 10:20 12:3,7 | **claim** 16:14 | **conaway** 3:3 | 50:8 |
| 16:18 32:10,13 | **claiming** 9:25 | **conducted** 45:8 | **consider** 23:18 |
| 33:11 35:22 | **claims** 48:12,18 | **confer** 1:17 4:1 | 36:12 50:25 |
| 41:7,9 47:16 | 50:19 | 5:1 6:1 7:1 8:1 | 54:23 |
| 50:20 | **clarification** | 9:1 10:1 11:1 | **consideration** |
| **catharine** 3:10 | 46:17 | 12:1 13:1 14:1 | 54:14 |
| **certain** 27:8,10 | **clarify** 52:15 | 15:1 16:1 17:1 | **considers** 18:5 |
| 42:19 | **clarifying** | 18:1 19:1 20:1 | **contend** 36:17 |
| **certainly** 38:5 | 51:13 | 21:1 22:1 23:1 | **continued** 3:2 |
| **certify** 60:8,11 | **clarity** 37:12 | 24:1 25:1 26:1 | **contours** 14:8 |
| **challenge** 35:7 | **clear** 17:25 | 27:1,2 28:1 | 15:13 18:8 |
| 35:8 | 19:20 24:5 | 29:1,5 30:1 | 19:9 |
| **change** 53:24 | 27:5 49:9 | 31:1 32:1 33:1 | **contradict** |
| **characterizati...** | **clearly** 19:3 | 33:22 34:1 | 14:23 20:14 |
| 27:23 47:11 | 42:20 57:21 | 35:1 36:1 37:1 | 22:21 23:6 |
| **characterizati...** | **client** 33:21 | 38:1 39:1 40:1 | 25:9 30:2 31:3 |
| 27:9 | 44:9,23 | 41:1 42:1 43:1 | 31:23 34:7 |
| **characterize** | **coming** 40:18 | 44:1,11,16,25 | 36:17 38:24 |
| 9:10 10:10 | 40:23 42:9 | 45:1 46:1,14 | **contradicted** |
| 11:11 | 47:3 | 46:24 47:1 | 16:3,15 |
| **characterized** | **communication** | 48:1 49:1 50:1 | **contradicting** |
| 11:15 | 46:14,16 | 51:1 52:1 53:1 | 15:4 17:18 |
| **characterizing** | **companies** | 54:1 55:1 56:1 | 21:21 24:18 |
| 11:17 | 43:14 | 57:1 58:1 59:1 | 26:12 27:17 |
| **chicago** 2:15 | **compel** 52:18 | **confidentiality** | 28:6 30:15 |
| **chime** 55:15 | 53:19 | 48:23 | 36:21 |
| **chin** 2:5 | **complaint** | **confirm** 51:17 | **convenience** |
| **chooses** 10:9 | 37:10,11 | **conflicting** | 56:9 |
| 11:10 | **complete** 44:3 | 51:15 | **conversations** |
| | 45:24 49:7 | **confusing** | 46:18 |
| | 53:12 | 45:22 | |

[cores - emerick]                                                            Page 4

| | | | |
|---|---|---|---|
| **cores** 42:12 | 31:9 | **direction** 53:13 | **e** |
| **corporation** | **decided** 40:8 | 56:17 | |
| 1:5,5,11 | **defendants** | **directly** 33:3 | **e** 2:2,2 3:2,2 5:8 |
| **corresponden...** | 1:12 | **disagree** 37:10 | 41:15 56:6 |
| 47:21 | **defenses** 5:12 | 37:13,15 46:10 | 60:2 |
| **couple** 4:3 | 5:24 7:7 9:22 | 47:25 54:17 | **earlier** 45:17 |
| 39:25 40:6 | 13:11 16:22 | **disclosed** 17:15 | **effect** 53:3 |
| 43:20 | 17:14 23:12 | **discovery** | **efficiently** |
| **court** 1:2 19:2 | 24:20 26:15 | 53:25 56:22 | 56:10 |
| 28:21 29:3 | 27:19 48:13,19 | 58:9 59:4 | **either** 4:9 11:8 |
| 31:15 40:9 | 50:20 | **discuss** 29:2 | **ellis** 2:14 |
| 53:20 | **delaware** 1:3,4 | **discussed** 44:8 | **emerick** 2:16 |
| **courtesy** 56:8 | 1:5 2:10 3:4 | 44:22 | 4:14,21 5:4,16 |
| **covered** 37:3 | **delay** 50:16 | **dispute** 11:4 | 6:6,14,20,24 |
| **cut** 19:13 | **dep** 56:8 57:2 | 27:22 28:20 | 7:19 8:18,24 |
| **d** | **depending** 52:5 | 50:7 55:9 | 9:7,14 10:5,15 |
| | 52:6 | **disputes** 40:6 | 12:8,25 13:20 |
| **dab** 58:9 | **depends** 10:9 | 41:4 52:2 | 14:4 15:8,17 |
| **date** 41:23 | 11:10 | **district** 1:2,3 | 16:6 17:3 18:7 |
| 58:17 59:6 | **deposition** | **divorcing** | 18:25 19:25 |
| **dates** 56:20,23 | 55:24 56:4 | 35:11 | 20:20 21:6,14 |
| 57:2,4,6,10,15 | 58:4,12 | **documents** | 21:22 22:5,11 |
| 57:22 58:2,3,6 | **depositions** | 40:13,17 42:25 | 22:25 23:7 |
| 58:7,14,14,19 | 56:25 | 47:4 50:10,17 | 24:2,24 25:11 |
| 58:20,25 59:9 | **deps** 56:12 | 53:14 | 25:18,25 26:8 |
| 59:15 | **desimone** 60:6 | **doing** 26:18,21 | 26:17,23 27:20 |
| **days** 42:2,2 | 60:18 | 26:24 59:11 | 28:8,14 29:11 |
| 45:6 | **determination** | **door** 40:20 | 29:15 30:7,17 |
| **deadline** 4:24 | 35:24 | **dr** 4:5 | 31:5,12 32:2,8 |
| 5:19 9:18,24 | **determine** | **dropped** 56:13 | 33:3,6 34:10 |
| 12:12 13:6,7 | 23:18 | **due** 14:24 | 34:15,18,20,25 |
| 14:14 18:3 | **different** 12:4,5 | | 35:21 36:2 |
| 21:17 22:14 | 24:10 27:25 | | 37:4,9,24 |
| 24:4,9 25:5,15 | 46:12 56:16 | | 38:19 44:14 |

46:11,20 48:24
49:8 56:3
57:20 58:5,22
59:13
**employed**
60:12
**entered** 22:8
**entirety** 24:25
25:7
**entitled** 6:16
15:12
**esq** 2:4,5,5,6,11
2:16,16,17,17
2:18,18 3:5,5
3:10,11,11
**essentially** 18:3
**evangelatos**
2:16 39:24
40:12 41:2,13
41:22 42:18
43:18 44:7,17
44:21 46:9
47:10 48:4,10
48:17 49:14
50:4,18 51:5
52:9,25 54:8
55:20
**events** 52:17
**evidence** 14:24
38:24
**exactly** 33:6
40:19 51:5,16
51:19

**excluding** 41:3
**excuse** 49:16
**exist** 12:20
**existence** 45:2
**expert** 4:13
5:13 6:4,22 7:9
7:13,16 8:14
10:2,12 11:21
12:23 13:10,17
13:25 14:23
15:3 16:2,15
17:18 20:11
23:6,23 24:15
24:21 26:15
30:2,24,24
31:23 34:7
36:17 37:21
38:12,16 51:23
56:22,23 57:2
57:4,6,10 58:6
58:7,9,13,14
59:3
**experts** 7:17
38:7
**explain** 48:5
**explained**
19:19
**extent** 9:3 13:9
26:3

**f**

**f** 1:10 60:2
**fact** 7:8 23:22
45:25 53:24

56:24 58:11
59:2,2
**facts** 52:16,22
**factually** 27:20
**fair** 13:3 18:19
19:16 22:2,15
22:17 29:4
33:23
**figure** 5:2,21
42:7 46:7
48:15 49:3,24
**file** 31:14,21
52:20 53:8
**filed** 23:20
24:16,17,23
26:7 30:25
40:6 53:22
54:3,7
**filing** 43:15
**find** 50:21
**first** 37:5 39:18
58:11
**fit** 18:6
**five** 40:11
**floor** 2:10
**foerster** 3:9
**folks** 55:15
56:11 57:8
**foregoing** 60:8
**found** 45:3
**framed** 12:15
12:20
**francisco** 3:10

**frankly** 14:15
**full** 55:10,16
**fully** 34:21
37:16 39:3
**fundamentally**
56:18
**fung** 3:11
**further** 52:17
55:21 60:11

**g**

**garrison** 2:3
**gaza** 3:5
**getting** 46:12
46:13 50:13
55:12
**give** 18:11
29:16 30:6
38:22 57:22
58:25
**given** 46:17
**giving** 25:17
58:16,19 59:5
**glad** 18:25
**go** 5:11 7:7
13:10 18:17
23:12 24:21
32:13 40:20
56:19
**goal** 56:14
**going** 15:15
28:12,22,25
30:8 31:14,21
33:15,24 34:13

[going - jay]                                                              Page 6

38:17 39:10
40:2,7,20 42:8
42:18,20,23
43:20 44:5,7
44:22 47:10
49:4 51:10
52:6,13 57:22
57:24
**google** 45:20
**ground** 45:25
55:3
**guess** 35:10
42:6
**gun** 47:15
**guys** 5:7 6:14
7:19 8:4 12:25
14:4 15:10
18:11,20 24:11
28:14 33:14
35:6 38:3
47:16 55:11
56:9,16,20,23

**h**

**half** 57:16
59:10
**handful** 40:4
40:11 42:8
43:8 44:6 47:4
**hang** 58:21,23
**hanging** 57:18
**happened**
53:24 54:5,6

**happy** 39:5
54:24 55:14
█████ 45:18
**head** 40:14
41:8,23
**hear** 29:22 50:9
54:13,24
**heard** 19:24,25
27:5 28:6
49:21
**hearing** 11:7
50:8 51:11
52:6 54:18,25
**helpful** 56:15
**henry** 3:11
**hey** 4:14 19:11
**hinges** 9:10
**hold** 57:25
**holdings** 1:10
**hours** 56:8
**hunt** 50:21
51:3
█████ 45:18
**huttinger** 3:11

**i**

**identification**
42:10
**identified** 17:8
36:19 38:25
41:12 42:12,15
45:19 46:2,2
46:25 47:2

**identify** 15:14
15:18,22 16:8
17:11,13,20,23
20:10,17 37:21
38:11 39:9
**identifying**
42:19
**illinois** 2:15
**improper** 6:21
9:13,17 10:4
12:6 13:16
16:18 23:5
25:23 31:22
35:18 36:22
50:16
**impropriety**
7:21
**incorporated**
1:4
**indefinitely**
57:18,25 58:21
58:23
**india** 56:5,12
56:24
**information**
17:4 44:24
45:5 52:7
**initial** 13:21
14:14 15:20
16:10 17:10
18:18 20:4
**intend** 53:8
**intended** 56:7

**interpretation**
37:15
**interrogatory**
53:5,17
**investigate**
44:25
**irrelevant**
32:25 35:5
36:12 50:19
**issue** 14:16,17
27:2 28:22
30:12,18,19,20
32:25 33:9
35:12 55:24
56:4
**issues** 13:23
14:19 15:18
16:8 17:9,10
18:17,18 20:6
20:10 35:12
**items** 4:3

**j**

**jacob** 2:5
**jake** 2:4 4:14
15:17 18:7
22:18 34:18
46:11 48:24
51:14 55:14,21
**janes** 2:17
**jay** 2:16 4:15
6:10 8:22
15:16 17:12
18:22 19:11

[jay - motion]                                                                          Page 7

21:19 22:19
25:16 29:12
31:19 35:23
**jen** 52:25
**jennifer** 2:11
**july** 44:10
46:23
**jumped** 47:15

**k**

**k** 1:10
**keep** 12:18 30:8
**kennedy** 5:14
6:5,23 7:10,14
8:14 9:4 10:3
10:13 11:19
12:17 13:18
16:16 17:19
23:14,23 25:10
26:13 30:3
31:4,24 34:8
35:14 36:18
38:4,17
**kind** 51:9
**king** 3:3
**kirkland** 2:14
4:15
**know** 8:3 9:5
11:12 12:18
15:21 18:14
19:16 20:24
28:20 29:12
33:11,12 38:20
39:6 40:12,18

40:19 42:7
43:10 45:8
49:13 54:4
55:2,11,12,16
55:17,22 56:6
57:5,14,18
58:14

**l**

**lack** 37:12
**lapses** 50:2
**late** 44:2
**law** 37:16
**learned** 52:16
**led** 50:6
**letter** 47:14,18
51:18 52:11,15
53:2 54:19
**letters** 48:2
49:16,20 51:7
51:12
**licenses** 42:11
**licensing** 46:7
**lies** 8:12 11:16
**light** 37:6 56:19
58:25
**limited** 56:21
**limiting** 35:8
**live** 53:23
**llp** 2:3,9,14 3:3
3:9
**long** 39:7
**look** 37:9 44:10
56:4

**looked** 44:15
**looking** 41:11
51:19,20
**looks** 55:17
**lot** 47:19

**m**

**made** 39:15
45:8
**mail** 5:8 41:15
56:6
**make** 14:6 46:6
57:7
**making** 7:20
19:4 35:6
**market** 2:9 3:9
**mary** 2:17
**master** 31:16
40:9 45:6 46:5
47:15,18 51:25
52:3,19,22
**matter** 14:24
35:9 38:25
**mcwilliams**
3:10
**mean** 26:8
30:22 37:2
38:10 40:11
47:24 50:9
51:21 54:15
55:20 57:9
**meet** 1:17 4:1
5:1 6:1 7:1 8:1
9:1 10:1 11:1

12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
26:25 27:1
28:1 29:1,5
30:1 31:1 32:1
33:1,22 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1,11,15,25
45:1 46:1,14
46:24 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
**mentioned** 5:7
**meredith** 2:18
**michael** 2:18
**middle** 58:9
**minimum**
37:25 38:9
51:22
**misconstruing**
44:18
**morris** 2:9
**morrison** 3:9
**motion** 31:15
31:21 52:18,20
53:19,21 54:3

[motions - paragraphs]                                                    Page 8

motions  43:16
  50:3,15 52:24
move  19:14
  20:25 21:25
  37:7 38:18
  39:5 47:8
  51:12 55:23
  57:3
moved  47:6,8
multiple  8:11
  8:23 17:21
  27:6

**n**

n  2:2 3:2 60:2
nailing  57:11
need  11:12
  17:14 30:21
  37:7 51:7,11
needed  20:10
  41:18 43:3
never  10:24
  32:12,13,19
  33:10
new  2:4,4 52:20
  57:22 58:2
newly  52:16
nicholas  3:11
nichols  2:9
nonresponsive
  22:12
north  2:9 3:3
notary  60:7

note  48:5 59:14
noted  59:19
notes  60:10
notice  41:16
  43:4,16,20
  48:2,8,11,11
  49:16,20 51:7
  51:12 52:16
notices  41:21
  42:6,15 43:12
notified  43:2,3
  49:25
notifying  42:14
number  39:16
  40:13

**o**

o  60:2
objected  41:5
obligations
  35:25 48:13,16
obviously
  18:10 40:7
  46:9
october  50:6
offer  50:7
offered  6:4
  10:3
offering  24:19
  26:14
okay  12:8,13
  31:5 32:8,18
  37:8,19 38:10
  39:8 41:10,20

43:24 47:24
  51:2 54:8 57:9
  59:13
omitted  42:25
  53:14
ones  55:6,7
ongoing  39:14
online  45:3,4
  45:20
opening  4:18
  4:24 5:10,19
  6:2,18 7:3,11
  8:5,21 9:9,18
  9:20,24 10:8
  11:6,24 12:3
  12:10,14 13:7
  13:12,13 18:16
  20:15,20,22
  21:7,12,16
  22:14,24 23:19
  24:8,19,23
  25:4,15 26:4,7
  27:17 30:16,24
  31:8,18 32:4
  32:14 36:10,14
  36:15
openings  16:23
  19:13
opinion  4:13
  6:4,22 7:9,13
  7:16 8:14
  10:12 11:21
  12:23 13:18,25
  15:3 16:2,16

17:19 23:6,23
  26:15 27:19
  30:2 31:24
  34:8 36:18
opinions  5:14
  10:2 16:21
  18:17 25:13
  34:14 35:16
  37:21 38:5,12
  38:16
order  5:7 13:3
  14:6,22 15:9
  17:6 18:9,13
  18:21 19:17
  20:3 21:24
  25:21 28:16
  29:7 32:21
  34:22 37:14,18
  38:21 39:4
  43:15 47:7,8,9
  48:16 49:11
  50:3 55:9
original  53:19
overlap  56:23
own  46:8

**p**

p  2:2,2 3:2,2
p.m.  1:14 59:19
paragraph
  53:2
paragraphs
  11:19

[part - public]                                                        Page 9

| | | | |
|---|---|---|---|
| **part** 18:13 37:5 53:18,21 | **point** 2:15 18:5 32:9 33:7 34:12 35:21 43:13,17 47:5 | 12:18 17:19 23:14,24 25:10 26:13 30:3 31:4,24 34:8 35:15 36:18 38:4,17 | **production** 39:13,15,17 40:19,22,25 41:5 42:25 45:10,17 47:3 49:6 53:15 |
| **parties** 40:16 42:11,20 43:2 48:3,9,12,19 49:24 50:2 56:20 | **pointing** 38:14 **policing** 48:21 **portion** 24:24 **portions** 25:2 **position** 4:16 | **posner's** 6:5 10:3,13 13:18 16:16 | **productive** 18:10 **professional** 60:7 |
| **party** 39:2 41:4 41:5 48:22 50:15 60:12 | 4:22 5:5,8,17 6:8,12 7:2,6,12 8:20 9:8,11 10:6,23 12:9 | **potentially** 28:21 47:4,7 55:8 | **progress** 57:7 **pronin** 2:18 **proper** 4:11 5:3 5:22 6:3 10:24 |
| **past** 16:12 54:10 | 12:14 13:21 14:18,21 16:25 | **pradeep** 56:5 56:13 **presumably** | 11:5 23:21 24:3 26:20 29:25 30:10,11 |
| **paul** 2:3 **pending** 52:2 52:19,23 | 18:2,12 19:7,9 20:23 21:7 22:22 23:9 | 52:5 **previously** 45:23 46:18 | 30:14 32:6 **properly** 27:24 **proposed** 56:21 |
| **people** 57:17 58:8 | 24:2,5,6 25:6 25:12,19,22 | **prior** 44:15 47:22 | 56:24 59:2 **protective** |
| **period** 41:25 49:25 | 26:10 27:10,11 28:24 29:8,17 | **privileged** 44:23 46:13,16 | 43:15 47:7,8,9 48:16 49:11 |
| **peter** 2:16 39:25 52:14 | 29:17,21 30:9 31:6,14,17 | **problem** 27:3 48:23 | 50:3 55:8 **provide** 17:4 |
| **place** 25:17 31:10 | 33:20,25 36:4 36:5,7,8 37:13 | **process** 42:13 **produce** 40:16 | 23:17 45:4 59:14 |
| **plaintiffs** 1:6 **plan** 57:10 58:19 | 55:18 57:14,19 57:21 58:7 59:5,8 | 48:2 49:22 50:10,24 **produced** | **provided** 43:5 48:3,8,11 49:5 **providing** 18:8 |
| **plaza** 2:15 **plc** 1:10 | **positions** 51:15 56:20 | 41:18 43:4,6 45:21 51:4 | 27:18 58:2 **public** 60:7 |
| **please** 54:25 **po** 40:6 42:2 48:20,25 49:17 49:19 | **posner** 5:14 6:23 7:10,14 8:15 9:5 11:20 | **producing** 39:22,23 50:17 55:7 | |
| **pohl** 2:18 | | | |

**[purely - report]**

**purely** 9:25
**purport** 23:24
**purportedly** 11:18,22 12:17
**put** 32:22 38:3 51:18 52:10 55:7 56:6 58:8 58:12
**puzzle** 58:10,12

**q**

**qualcomm** 1:4 1:5 10:20 17:3 28:23 36:7,8 39:2
**qualcomm's** 4:15,22 5:16 8:20 9:7 10:5 13:20 14:17 25:3 28:2,9 29:17,20,20,21 30:12 31:6 36:4,5
**question** 4:10 6:11 10:12,16 11:9 12:22 13:4 15:5,7,16 15:25 18:20 19:6,15 21:11 22:2,12,15,17 24:11 29:5,10 29:14 30:7 32:9 33:24 35:4 45:13

51:13 54:9 55:13
**questions** 15:10 39:16,25 55:22
**quick** 45:20
**quite** 36:6 41:24

**r**

**r** 2:2 3:2 60:2
**raise** 50:3
**raised** 7:7 20:7 37:11 46:23
**rather** 13:6
**reading** 37:14
**really** 51:10 56:21
**reason** 43:25 45:15 49:21 50:24
**rebut** 14:23 20:14 22:20 23:5 30:2 31:3 31:23 34:7 35:15 36:17 38:24
**rebuttal** 4:4,11 5:3,13,22 6:3 10:2 11:15,18 12:12,16,20 13:6,15,16 16:4,13,19,24 16:25 17:17 18:23 19:5

20:12 21:5,8 21:13 22:8,9 23:22 24:4,17 25:23 26:5 27:15 29:25 30:10,11,14 31:2,22 32:7 34:6,17 35:14 35:17,19 36:16 37:23
**rebutted** 16:3 16:15
**rebutting** 6:13 8:17 11:20,22 12:17,24 13:17 15:4 17:18 19:22,23 20:18 21:20 23:25 24:14,18 26:12 27:16,24 28:5 30:5,15 34:24 36:21 37:22 38:6,13,16
**receive** 43:9 44:5
**received** 13:13 42:3 44:4
**receiving** 41:19
**record** 37:20 49:9
**recording** 19:2
**reference** 45:3
**refusal** 59:14

**refused** 17:22 37:20 45:4
**refusing** 17:4 33:14
**regarding** 48:13
**regardless** 9:13 10:25
**registered** 60:6
**rejecting** 58:3
**relate** 9:21 16:21 48:18
**related** 5:23 14:15 45:18 60:12
**relates** 54:12
**relevance** 48:6 49:15,18,20 50:11,23
**relevant** 33:4 34:4,5 35:3,5 48:21 49:17 50:5,12 52:23
**relief** 51:16,20 51:24 52:4,10 53:10 54:11
**remaining** 51:8
**repeatedly** 12:22 15:6 19:19 20:17 22:4,22 30:4 38:11 47:20
**report** 4:24 5:19 7:10,14

**[report - see]**                                                    Page 11

| | | | |
|---|---|---|---|
| 9:18,20,24 | 26:4,5,7,14 | **responding** | **san** 3:10 |
| 21:17 22:14 | 27:15,18 28:17 | 4:12 7:9,13,18 | **saw** 48:4 |
| 24:8 25:5,15 | 29:19,25 30:3 | 9:4,6 10:14 | **saying** 5:21,23 |
| 30:24,25 31:2 | 30:10,11,14,16 | 14:2 23:13,15 | 6:2,15 9:3,6,21 |
| 31:8 35:14 | 31:4,8,22,25 | 24:15 | 12:2,6,19 |
| 38:15,17 | 32:7 34:6,9,17 | **responses** 27:6 | 13:13,14,15 |
| **reporter** 19:2 | 35:9,15,17,19 | 53:6,17 | 16:12,20 18:24 |
| 60:7 | 36:14,15,16,19 | **responsibility** | 20:8 21:3 |
| **reports** 4:5,7,8 | 37:23,25 38:3 | 20:9 21:19 | 22:25 23:4,8 |
| 4:9,12,17,18,24 | 38:4,8,18,23 | **restate** 54:9 | 23:12,21 32:24 |
| 5:3,15,18,22 | 51:23 52:8 | **result** 32:3 | 33:8 34:13 |
| 6:2,3,5,23,25 | **representation** | **reupping** 54:16 | 36:24 40:21 |
| 8:15,16 9:4,9 | 49:6 | **richards** 4:5,17 | 44:18,20 46:3 |
| 9:11,13,16 | **represented** | 4:23 5:18 8:16 | 46:22 48:25 |
| 10:4,7,8,13,24 | 45:23 | 9:16 10:7,14 | 52:10 |
| 11:5,15,18,20 | **request** 51:24 | 13:23 14:2,20 | **says** 53:3 |
| 11:23,25 12:4 | 54:16 | 15:19 16:9 | **schedule** 58:15 |
| 12:9,16,21 | **requests** 53:23 | 19:23 20:7 | **scheduling** 5:6 |
| 13:10,14,19,24 | **resolution** 52:2 | 25:3,8,14 | 13:2 14:5,22 |
| 14:20,23 15:2 | **resolve** 39:11 | 29:19 31:7 | 15:9 17:6 18:9 |
| 15:19 16:4,9 | **resolving** 31:20 | 37:22 38:23 | 18:13,21 19:17 |
| 16:14,17,19,24 | **respect** 7:2 | **rifkind** 2:3 | 20:3 21:24 |
| 17:2,7,9,15,17 | 13:22 14:10,12 | **right** 21:2,14 | 25:21 28:16 |
| 17:20 18:4,15 | 14:19 20:6 | 32:2,24 33:7 | 29:6 32:21 |
| 18:16,24 19:6 | 24:7 27:23 | 55:13 59:16 | 34:21 37:14,17 |
| 20:5,11,12,12 | 28:24 36:5 | **robert** 3:5 | 38:21 39:4 |
| 20:14,15,21 | 54:4 56:4 | **rodney** 3:4 | 56:10 57:7 |
| 21:5,7,8,12,13 | **respond** 6:22 | **role** 17:12 | **scope** 30:19 |
| 21:15 22:7,9 | 25:8 47:19,23 | **rpr** 60:18 | 35:8 |
| 22:10 23:11,19 | 54:19 57:17 | **run** 45:24 55:3 | **search** 45:20 |
| 23:22,24 24:3 | **responded** 7:5 | | **second** 38:22 |
| 24:15,17,19,21 | 16:14 54:17 | **s** | **see** 7:14 16:17 |
| 24:23 25:3,8 | 59:10 | **s** 2:2 3:2 | 20:16 50:23 |
| 25:10,14,24 | | | 52:7 |

[seeing - tell]                                                    Page 12

| | | | |
|---|---|---|---|
| **seeing** 35:11 | 16:4,13,23 | **specific** 40:13 | **submitting** |
| **seek** 52:13 | 17:2,7,16 | **specifically** | 13:9 |
| **seeking** 25:18 | 18:15 19:12 | 39:9 | **subsequent** |
| 25:19 52:5,12 | 20:13,15 21:12 | **spent** 39:7 | 33:22 52:17 |
| **seem** 50:20 | 21:16 22:13,17 | **square** 3:4 | **supplement** |
| **seemed** 51:14 | 22:24 23:11 | **stand** 47:12 | 51:23 |
| **seems** 26:21 | 24:8 25:4,9,15 | **stargatt** 3:3 | **supplemental** |
| 31:19 39:10,14 | 27:14,21 28:18 | **start** 4:4 | 53:5,16 |
| 47:16 | 32:11 34:2 | **state** 57:20 | **support** 52:18 |
| **send** 41:21 57:4 | 35:13,16,20 | **statement** 9:15 | **supposed** 7:8 |
| 57:10,12 58:6 | 36:10,16 | 37:5 | 13:15 |
| 58:13,18 | **several** 41:16 | **states** 1:2 14:22 | **supposedly** |
| **sending** 42:6 | 41:24 42:3,24 | **stenographic** | 16:2 |
| **sense** 35:13 | 43:5 47:12 | 60:10 | **sure** 6:6 8:12 |
| 46:6 | **sheds** 37:6 | **stephanie** 2:5 | 14:6 21:10 |
| **sent** 41:16 | **shooting** 33:13 | **straggler** 47:5 | 33:14 41:8 |
| 42:15 43:13 | **shortly** 57:13 | **stragglers** | 45:8,12 54:2 |
| 56:23 | **show** 19:4 | 43:22 | **t** |
| **separate** 54:3 | **signature** 60:17 | **straight** 27:11 | |
| 55:9 | **situation** 12:5 | 58:16 | **t** 60:2,2 |
| **september** 1:14 | **smack** 58:8 | **streamline** | **take** 16:6 33:19 |
| 4:18,19 14:25 | **someday** 42:22 | 19:14 | 54:14,22 |
| 16:5 20:13 | **soon** 57:5,6 | **street** 2:9 3:3,9 | **takes** 27:9 |
| 21:13 22:8 | **sorry** 4:21 | **strike** 38:18 | **talk** 33:20 38:6 |
| 24:16 27:15 | **sort** 50:21,22 | **subject** 35:9 | 38:7 54:10,21 |
| 34:6 | 50:22 56:18 | 38:25 41:3 | **talking** 16:12 |
| **serve** 20:11 | **sounds** 7:24 | 55:8 | 35:24 |
| 32:6,14,15,18 | 30:18 44:5 | **submit** 18:4 | **target** 33:12 |
| 34:5 36:13,15 | **speak** 37:25 | **submitted** 9:17 | **taylor** 3:3 |
| **served** 4:16,20 | **special** 31:16 | 9:20,23 10:8 | **team** 33:19 |
| 4:23 5:17,25 | 40:9 45:6 46:5 | 10:22,25 11:6 | **technologies** |
| 6:9 11:24 12:3 | 47:14,17 51:25 | 17:16 45:5 | 1:5 |
| 12:10,11,13 | 52:3,19,22 | 47:14,18 51:25 | **tell** 7:23 11:25 |
| 13:5,12 15:2 | | 52:15 | 19:10 21:19 |

**[tell - untimeliness]** Page 13

22:16 27:2,10
28:17 36:6
43:10 46:4
54:23 58:6,16
59:6
**telling** 21:3,23
34:10 53:11,20
53:22
**testimony**
53:18
**thank** 59:18
**thing** 57:3
**things** 54:6
56:10 58:12
**think** 4:2,10,25
5:2 6:9,11,15
6:17,20 8:2,4,8
8:10 9:12,15
10:20 11:7
13:3 15:12
16:18 17:13
18:14,19 19:3
19:15,20 21:20
21:23,25 22:2
22:14,20 27:20
27:22 28:17
29:4,9,13 30:9
30:13,22 31:21
32:17 33:23
34:16,25 36:11
36:25 37:2,5
37:16,21,24
38:19,23 39:3
39:16,18 40:2

40:3,5,14,17
47:25 51:3,21
55:4,15,23,25
56:17 57:3,11
57:14 59:16,17
**thinks** 10:21
**third** 40:15
41:4,4 42:11
42:19 43:2
48:3,8,12,22
49:24 50:2,15
55:23
**three** 45:19
**time** 18:5 23:20
34:2 39:7
43:13 49:25
55:19 56:13
59:19
**timeframe**
42:17
**timeliness**
27:12 28:25
29:2,8,18
30:12,18 33:9
35:6
**timely** 28:10
50:15
**times** 8:11,23
17:21 41:16
42:24 47:13
**timing** 16:25
27:3 30:20
35:3,4,12 54:5

**tiny** 59:3,3
**tla** 39:13 45:2
48:13 54:12
**today** 39:15
43:7 51:18
52:11
**todd** 60:6,18
**together** 58:13
**told** 22:3 41:15
47:20 55:4
56:7
**tomorrow** 40:4
42:9 43:21
44:6
**top** 40:14 41:8
41:23
**topic** 39:6,12
**totally** 12:5
50:19
**transcript** 19:3
19:20
**transcription**
60:9
**true** 60:9
**try** 42:21 56:14
**trying** 5:2,4,20
6:7 7:21,24 8:7
10:18 11:2
19:8 32:16,20
42:7 48:14
49:3,23 53:6
**tunnell** 2:9
**two** 35:11 38:2
40:15 43:21

45:5 50:8 56:5
57:8,15

**u**

**u.k.** 1:11
**u.s.** 56:12
**unclear** 23:10
33:7 42:10
48:7
**under** 28:2
**understand** 5:5
6:8 7:22 9:15
10:18 11:2,21
14:7 15:13,24
19:8 20:22,24
21:11 23:2
28:11 30:8,21
32:16 33:21
43:14 53:7
54:15
**understanding**
7:25 8:8 32:20
41:14 43:19,22
**understood**
44:2 59:15
**unfortunate**
56:15
**united** 1:2
**universe** 55:10
55:16
**untimeliness**
7:20 10:19
29:18

[untimely - zoom]                                                                     Page 14

| | | |
|---|---|---|
| **untimely** 6:15 | 29:7 32:21 | **witness** 53:4 |
| 8:2,9 10:17 | 49:19 50:22 | 56:25 58:11 |
| 13:5 19:8,11 | **vrana** 3:5 | **witnesses** 56:6 |
| 22:16 23:2,8,9 | | 59:3 |
| 24:12,14,22 | **w** | **wolf** 2:15 |
| 26:2,6,16 27:7 | **waited** 57:16 | **work** 54:21 |
| 27:7,8,14 28:2 | **want** 7:22 14:6 | **wrapped** 43:9 |
| 28:18 | 15:21 19:10 | **wraps** 59:16 |
| **update** 52:21 | 20:22 33:11 | **wrong** 23:20 |
| **use** 42:21 | 49:8 51:22,23 | **wrote** 4:6 |
| **using** 26:4,9,10 | 53:4,5,12,25 | **x** |
| | 54:10,23 59:11 | **x** 1:4,12 |
| **v** | **way** 8:6,19 11:8 | **y** |
| **various** 39:13 | 33:12,16 45:16 | ████ 45:19 |
| **verdict** 53:12 | **week** 40:7 | **yeah** 27:13 |
| **videoconfere...** | 57:16 59:9 | 38:22 48:4 |
| 1:13 | **weeks** 41:25 | **year** 50:5 |
| **view** 11:11 | 43:5 | **yesterday** |
| 15:21 21:9 | **weiss** 2:3 | 53:11 |
| 25:3 28:3,4,9 | **went** 45:7 | **ying** 2:11 52:14 |
| 29:20,21 30:12 | 46:24 47:17 | 53:16 55:2 |
| 30:20 32:3,5 | **west** 2:15 | **york** 2:4,4 |
| 32:11,23 | **wharton** 2:3 | **young** 3:3 |
| **views** 27:25 | **wilmington** | **z** |
| **violated** 17:5 | 2:10 3:4 | **zoom** 1:13 |
| 48:25 | **window** 56:22 | |
| **violating** 49:10 | 59:4 | |
| **violation** 5:6 | **witch** 50:21 | |
| 13:2 14:5,7,10 | 51:3 | |
| 14:11 15:9,11 | **withdraw** 4:7 | |
| 18:9,12,21 | 34:14 36:24,25 | |
| 19:17 20:3 | **withdrawing** | |
| 21:24 22:10 | 4:9 | |
| 25:21 28:15 | | |

# Exhibit 7

**United States District Court**

**District of Delaware**

**Civil Action No. 1:24-cv-00490-MN**

**Qualcomm Incorporated and**

**Qualcomm Technologies, Inc.**

**v.**

**Arm Holdings plc**

**Expert Report of Eric A. Posner**

**August 8, 2025**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### I.  Qualifications and Testimony

1.    I am the Kirkland and Ellis Distinguished Service Professor at the University of Chicago Law School. Before joining the Chicago faculty in 1998, I taught at the University of Pennsylvania Law School. I was educated at Yale College and Harvard Law School.

2.    I have specialized in economic analysis of law since the start of my academic career in 1993. Law and economics is an interdisciplinary field in which economic principles, models, and theories are used to analyze the law. It is a field in which both law professors and economics professors are active. My particular specialty is the application of economic principles to problems of market competition, including problems addressed by antitrust law and other areas of U.S. law and policy.

3.    I have extensive academic experience in the economics of competition. I have taught classes, given lectures, and written frequently about this topic. I have published numerous articles and one book on antitrust and competition policy. I have published in peer-reviewed economics journals, peer-reviewed law and economics journals, and law reviews. I was the editor of a peer-reviewed law and economics journal, the Journal of Legal Studies, for twelve years. I have written dozens of referee reports for peer-reviewed economics journals, and been an active member of the American Law and Economics Association, having served two terms on the board of directors.

4.    I worked on antitrust and competition issues while serving as Counsel to the Assistant Attorney General of the Antitrust Division in the Department of Justice from 2022 to 2023.

5.    I have testified or made presentations on competition policy and economics before the Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law, U.S. House of Representatives (on the economics of labor market competition); the Federal Trade Commission (on competition in labor markets); the Department of Justice, Antitrust Division (on merger policy); the National Association of Attorneys General (on the economics of labor competition); the Organization for Economic Co-operation and Development (on labor competition); and numerous practitioner and academic groups.

6.    I am a member of the American Academy of Arts and Sciences.

7.    A list of my recent expert engagements can be found at Annex 1.

8.    My curriculum vitae can be found at Annex 2.

### II.  Materials Considered

9.    I have consulted the materials listed in Annex 3.

### III.  Introduction and Summary

10.    I have reached the following conclusions.

1

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

11.     Arm licenses an instruction set architecture (ISA), which is an abstract model that enables computer software to interface with the central processing units (CPUs) in a computer.[1] As Arm describes it, the "ISA provides the only way through which a user is able to interact with the hardware."[2] Arm's ISA allows developers to produce software that works on different devices and is consulted in connection with the construction of devices from components manufactured by different companies.[3] The Arm ISA has been widely adopted by software developers and hardware designers and manufacturers.[4] There are a limited number of different ISAs that are in common use, including, for example Intel's x86, ███████████████████████ ████████████████████████████████████    ██████████ and which is used in Intel's own chips: Intel does not license the x86 architecture to third parties.[6] The Arm ISA has achieved dominance in other sectors of the semiconductor industry, including the chips for mobile devices like smartphones, consumer electronics, and "internet of things" (IoT) devices. As a result, Arm has a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA. An SoC is an integrated circuit that combines one or more CPUs with memory, input/output, and other features, and is installed in mobile devices and other products.[7] Arm's ISA ecosystem exhibits strong network effects. According to Arm, its ISA is the "most ubiquitous computer architecture on the planet."[8]

12.     Qualcomm designs and markets SoCs that are used in a range of products, including mobile phones, laptops, automobiles, data centers, and IoT devices. Qualcomm designs SOCs that are compatible with the Arm ISA. Qualcomm uses Arm's ISA through two types of licenses. Under an Architecture License Agreement (ALA), Qualcomm designs Arm-compliant custom cores and incorporates them in SoCs. Qualcomm (or any other SoC designer) needs an Arm license to sell SoCs that are compatible with the Arm ISA, and Arm is the only licensor of the Arm ISA. Under Technology License Agreements (TLAs), Qualcomm uses "off-

---

[1] Arm,com, *Glossary: Instruction Set Architecture (ISA)*, https://www.arm.com/glossary/isa (last visited August 5, 2025).

[2] *Id.*

[3] Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture (last visited August 5, 2025) ("All Arm-based CPU designs are built on the same architecture, ensuring software compatibility while enabling market or usage- specific innovation").

[4] Mike Johnson, *Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025*, WebProNews (July 31, 2025), https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/; *see also* Mohamed Awad, *Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm-based*, Arm Newsroom (April 1, 2025), https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based.

██████████████████████████████████████████████████████████
██████████████████████████████
████████████████████████████████████    Grisenthwaite Tr. at 36:3-14 ("Q. And I think you mentioned this, but just to be clear, Intel does not make x86 available for license; correct? A. I'm not entirely sure what Intel's model has been. They certainly don't have a wide licensing base, but there's a relationship in some way between Intel and AMD and I believe there are some x86 implementations in China. I have no idea what the licensing arrangements from for Intel, so I can't speak definitively for Intel's business model.").

[7] Arm.com, *Glossary: SoC Development*, https://www.arm.com/glossary/soc-development (last visited August 5, 2025), ("An SoC (System-on-a-Chip) is a complete processing system contained in a single package that contains multiple processing parts. The main components of an SoC typically include a central processing unit, memory, input and output ports, peripheral interfaces and secondary storage devices.").

[8] Tim Bradshaw, *Rene Haas: 'Arm has the most ubiquitous computer architecture on the planet,'* Financial Times (June 7, 2024) https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the-shelf" (OTS) cores designed by Arm. Qualcomm incorporates custom cores or OTS cores in SoCs, which it sells to Original Equipment Manufacturers (OEMs) of various computing devices. Other firms compete with Qualcomm by offering SoCs or other chips that are also compatible with the Arm ISA. Within the Arm ISA ecosystem, there are multiple SoC sectors because the OEMs demand different kinds of SoCs for their different computing products. Qualcomm sells SoCs to OEMs of cell phones, cars, laptops, data center, VR/AR, wearables, audio, wireless networks, IoT devices, cameras, and smart homes.[9]

13.    Qualcomm contends that Arm has engaged in a number of unfair acts and practices, including threatening to terminate Qualcomm's ALA, breaching existing contracts (including by refusing to provide technology necessary for Qualcomm to ensure the architectural compliance of its custom core designs and by refusing to provide commercially reasonable offers for licenses to Arm OTS cores), and refusing to engage in ████████ negotiations for Qualcomm's licenses.  Qualcomm contends that Arm's conduct is part of a broader scheme to undermine Qualcomm's ability to compete with Arm's products.  First, Arm is obstructing or attempting to obstruct Qualcomm from designing and marketing products that use Qualcomm custom core designs, in order to inhibit Qualcomm from competing with Arm's OTS core designs.  Second, Arm is actively attempting to sell its own SoC designs at the expense of its own licensees, including Qualcomm.[10]  To that end, Qualcomm contends, Arm seeks to design and manufacture its own chips and SoCs, and seeks to drive Qualcomm away from designing custom cores, or to drive Qualcomm out of selling chips and SoCs entirely. Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the short term, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the long term than the margins on existing ALA licenses—and Arm is unhappy with the level of royalties that Qualcomm is required to pay under the ALA. Moreover, although Qualcomm has historically been one of Arm's most important customers, it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.

14.    If Arm succeeds, it will have extended its dominance over the Arm ISA ecosystem, leaving it with not only control of the ISA itself and the design and sale of its own cores, but also with a significant role in designing and selling SoCs. These actions are anticompetitive and amount to unfair competition for several reasons.

15.    First, Arm will be able to use its control of the ISA, such as by cutting off the ability to sell Arm-compliant chips, to disadvantage or eliminate any competitor—not just Qualcomm—in the ISA ecosystem, including the portion of the ecosystem that encompasses the design, manufacture, and sale of SoCs directly to OEMs, and to strengthen entry barriers in the ISA ecosystem. Because competitors and entrants who design and sell chips need access to the ISA licenses, and they require Arm's consent and cooperation to achieve access to Arm

---

[9] Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025).
[10] Michael Acton, *Arm to explore designing its own chips, chief executive says*, Financial Times (July 30, 2025) Accessed August 5, 2025. https://www.ft.com/content/735c8a2d-0ce0-49d6-934f-8aee3e927108?shareType=nongift.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

technology and maintain a strong competitive position, they will be at a competitive disadvantage to Arm. Arm will be able to delay or prevent entry of new chip designers and manufacturers because even highly sophisticated firms that can develop new chips will not be able to access the ISA ecosystem without Arm's cooperation. In addition, because of the high margins on chips and Arm's technological sophistication, it is likely that Arm has an incentive to eliminate chip competitors.[11] This behavior is known among economists as "input foreclosure."

16.    Second, by reducing competition in designing and selling chips, Arm (and any remaining competitors) will be able to raise prices and skimp on innovation without fear of being undercut or outperformed by Qualcomm or other licensees that make SoCs using custom cores that deliver higher performance. Because many OEMs depend on Arm-compliant chips, they will be forced to accept less impressive performance while paying higher prices—and likely passing on their costs to consumers in the form of higher prices.

17.    Third, Arm is attempting to escape its ALA with Qualcomm so it can eliminate Qualcomm as a competing CPU developer, rather than compete on the merits with Qualcomm CPUs. Arm is unhappy with the royalty rate under the ALA that it negotiated with Qualcomm. Because Arm earns a higher royalty under the TLA, Arm would profit in the long term by forcing Qualcomm to stop designing custom cores and putting its resources into using OTS cores, even if it means Arm loses royalties on ALA cores in the short term. Having failed so far to terminate the ALA—despite attempts to do so—Arm can achieve roughly the same result by undermining Qualcomm's ability to design custom Arm-compliant cores. If Arm succeeds, it will have achieved the same result as license termination. This is bad-faith behavior and a form of unfair competition because it is not competition on the merits—through pricing and innovation.

18.    Fourth, Arm's conduct described in this report may reduce the likelihood that more efficient and innovative ISAs will take root and displace Arm's ISA. Under the status quo, Arm's chipmaker customers have an incentive to move from Arm's ISA if Arm raises prices and degrades quality and service. But if Arm itself takes over a portion of those customers' business, and either weakens them or drives them out of business, then they will have less ability to support the development of a new ISA. As a result, new ISAs will have trouble attracting chipmakers and thus face greater barriers to entry.

19.    Fifth, Arm's attempts to extend its dominance of the ecosystem will spook even chipmakers who are not pushed out of designing SoCs, by revealing that Arm will no longer keep its commitment to neutrality and openness. This could have immediate anticompetitive consequences. As part of its traditional business model, Arm meets with its chipmaker customers to learn their business plans and technological needs so that it can improve the ISA. But if those customers believe that Arm may start competing with them in their line of business, they will be reluctant to share confidential information, which in turn will retard the development of Arm's ISA.

## IV.    Factual Background

---

[11] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

4

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### A. Relevant Parties and Industry

20.    Arm is a technology company that licenses the Arm ISA to other companies, including Qualcomm. The Arm ISA is a set of instructions that define how software should communicate with the CPU or the cores that compose the CPU.[12] Companies that make devices, or hardware for devices, must use chips that are compatible with the Arm ISA so that their devices will run common software programs written for the Arm ecosystem.[13] Arm also designs OTS cores that a licensee can incorporate into SoC designs. An SoC is an integrated circuit that contains the CPU and other technologies.[14] By integrating multiple cores and other components (CPU, modem, camera, etc.) on a common SoC, manufacturers can increase the efficiency of their chips and improve the functionality of the devices they power, compared to devices in which chips are not integrated.[15]

21.    Arm's longstanding business model was to license the ISA and certain Arm-compliant technology to customers on a neutral and open basis.[16]  That meant that Arm would license all qualified chipmakers while providing them with technological support, and give them the freedom to design and sell architecturally compliant chips for new or developing sectors of the semiconductor industry.[17] The more devices that use Arm-based chips, the stronger the incentives for chip and core designers to obtain licenses from Arm so that they can produce Arm-compliant hardware for those devices that run the software widely developed for the Arm ecosystem. And the more Arm-complaint devices there are, the greater the incentive for software

---

[12] Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture (last visited August 7, 2025) ("The Arm CPU Architecture defines what a CPU must do when software runs on it").

[13] *Id.* ("Arm's architecture specifications are licensed by partners, who create compliant silicon chips based on them.").

[14] Arm.com, *Glossary: SoC Development*, https://www.arm.com/glossary/soc-development (last visited August 7, 2025) ("An SoC (System-on-a-Chip) is a complete processing system contained in a single package that contains multiple processing parts. The main components of an SoC typically include a central processing unit, memory, input and output ports, peripheral interfaces and secondary storage devices.").

[15] *Id.* ("While the initial costs of designing and developing an SoC may be higher, many developers choose this approach to minimize power consumption and provide significantly more differentiation. Traditionally, the vast majority of energy is spent on data and bus address cabling. With SoCs, components are internally connected on a single chip which reduces cabling requirements and minimizes power consumption. Proprietary IPs and accelerators can also be integrated onto custom SoCs to enhance performance and power efficiency.  Other advantages of the SoC include faster execution due to high-speed processor and memory, smaller, more compact chips, improved performance and efficiency, simpler system designs, faster time to market and greater security at both the firmware and hardware levels.  Solutions on the market today offer SoC developers the ability to design faster. They offer a range of configurable, modifiable subsystems for a wide range of system types. The systems pre-integrate the processor and interconnect IP with the most relevant system components.").

[16] *See e.g.,* QCVARM_1066811, at -813 (According to Arm's CEO, Arm's business model "largely stems around neutrality" and it's "a highly neutral platform, in terms of customer access, and that neutrality allows customers to not only feel that they're not being disadvantaged."); QCVARM_0717008, at -009 (According to Arm's co-founder, the "whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees"); QCVARM_0717291, at -291 (Arm "is built on a foundation of neutrality.  Rather than build chips, Arm merely designs their blueprints. The company then licenses the IP to almost every major semiconductor maker without directly competing against them."); Arm's "what is" series, *What is… CPU architecture*, (August 18, 2021) www.youtube.com/watch?v=KGHdDVLnKJM&t=144s (Arm's "widely licensed architecture that everyone can make use of" and that "is easy to access" has been "a big part of the secret to Arm's success"); M. Williams Tr. at 54:11-19; Grisenthwaite Tr. at 18:2-23:5; Haas Tr. at 231:22-234:23; Hughes Tr. at 78:16-80:21.

[17] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

5

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

developers to develop software that runs on Arm-compliant devices—which in turns increases customer demand for those devices and thus the incentive of OEMs to manufacture those devices, in a virtuous circle. As explained by Arm, "[e]verything has to be able to run everywhere" and a "strong ecosystem of users is vital."[18] Thus, "Arm's success has come from the wide accessibility of its architecture" and Arm's "fostering of an enormous ecosystem of developers."[19] As the quantity and variety of software increases, device manufacturers benefit more from using Arm-compliant chips. A common ISA also facilitates the integration of hardware components supplied by different vendors.[20]

22.    When Arm began developing the Arm ISA, other ISAs existed or were in development.[21] Intel's x86 was the most prominent, and still holds significant share in the personal computing and data center sectors, but Intel did not license x86 to other companies because it did not want to compete with other chipmakers.[22] Other companies and groups developed ISAs but their ISA found few followers because of concerns about openness or dissatisfaction with the design choices embedded in those other ISAs, or because they were designed for niche devices.[23] Arm's ISA was the more attractive in part because it had properties that better fit the needs of chipmakers at the time than other ISAs did, but it is not clear that Arm's ISA was technically superior to other ISAs, in the sense of being essential to the design of higher quality chips.[24] The functionality of chips depends more on the microengineering choices of chip designers like Qualcomm than on the underlying ISA.[25] The most important factor in the success of Arm's ISA appears to be that its open, neutral model appealed to chip designers and manufacturers, as it greatly increased the likelihood that many companies would use it, allowing every licensee to interact with other licensees and software developers.[26] As Arm CEO Rene Haas said in response to a question about Arm's advantages over Intel, "There's a lot of things in our favor, one of them is quite frankly the fact that we have an open model, where our products can be built at any fab by any company. If you're looking at x86, you're looking at two people

---

[18] ARMQC_02727610 at -617.

[19] *Id.*; ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████

[20] Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture (last visited August 7, 2025) ("All Arm-based CPU designs are built on the same architecture, ensuring software compatibility while enabling market or usage- specific innovation"); conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[21] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[22] ██████████████████████████████████████████████████    The only known x86 licensee is AMD who received their license as part of a settlement agreement. *See e.g.*, Amd.com, *Intel Antitrust Rulings*, https://www.amd.com/en/legal/notices/antitrust-ruling.html, (last visited August 7, 2025); QCVARM_0716360 at -382 (quoting Rene Haas: "Intel would have a license x86, and they did to one guy, AMD, because they were forced to."); Grisenthwaite Tr. at 36:3-14 ("Q. And I think you mentioned this, but just to be clear, Intel does not make x86 available for license; correct? A. I'm not entirely sure what Intel's model has been. They certainly don't have a wide licensing base, but there's a relationship in some way between Intel and AMD and I believe there are some x86 implementations in China. I have no idea what the licensing arrangements from for Intel, so I can't speak definitively for Intel's business model.").

[23] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[24] *Id.*; *see also* ████████████████████████████████████████████████████
████████████████████████████████████████████████

[25] *Id.*

[26] *Id.*; M. Williams Tr. at 54:11-19; Grisenthwaite Tr. at 18:2-23:5; Haas Tr. at 231:22-234:23; Hughes Tr. at 78:16-80:21.

6

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

who build it."[27] As has often been pointed out, it is important that people agree to drive on the left side or the right of the road; it is not important which side is chosen as long as everyone agrees on the same side. A common ISA solves a coordination problem in the industry, but it may not matter much which ISA is used.

23.     In return, chipmakers obtained Arm licenses and collaborated with Arm to develop new products. Arm provided support to its licensees by sharing business plans with them, and convening meetings in which Arm and licensees exchange business and technological ideas.[28] In the course of collaboration, licensees would share confidential business information with Arm. According to the Federal Trade Commission, this confidential information included "strategic plans, project timelines and development schedules, manufacturing process plans, use cases, customer requirements, and product bugs or challenges."[29] Arm has issued licenses to hundreds of companies.[30] As a result, the Arm ISA is now a de facto standard used in "virtually all" mobile phones and internet of things (IoT) products, among other products.[31]

24.     Arm has marketed the Arm ISA technology through two kinds of licenses. Under the ALA, the licensee is authorized to sell its own custom designed cores that are compatible with the Arm ISA ("custom cores"). Under the TLA, the customer licenses Arm's OTS cores. Under both licenses, the licensee both designs and (usually via outsourcing to a semiconductor foundry) manufactures the physical chip that is in turn sold to OEMs. In addition to Qualcomm, Arm licenses its architecture to a dozen or so other firms, including ████████████ ████████████████████.[32] Qualcomm does not directly compete with all of these firms as some are not merchant silicon vendors. For example, Apple manufactures the end product, including the iPhone, and incorporates its custom chips into its own end products, and does not sell its chips to other OEMs.

25.     Qualcomm designs both custom cores and SoCs. Qualcomm incorporates into its SoC designs both its own custom-made cores that are compliant with the Arm ISA under the ALA and Arm's OTS cores under the TLA, depending on the technological and economic needs of its OEM customers. Qualcomm's SoCs thus reflect both Qualcomm's engineering contributions, while also being Arm-based.[33] Qualcomm's SoCs are used by OEMs, which manufacture various devices including smartphones, automobiles, IoT devices, personal computers, automobiles, and data center servers.[34] ████████████████████████

---

[27] QCVARM_0716360 at -389 (Haas referring to Intel and Amd).

[28] ARM_00103918 (Qualcomm TLA); ARM_00055357 (Qualcomm ALA); ARMQC_02729064; *see also* M. Williams Tr. at 31:10-16, 58:13-59:13.

[29] *In re Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 ¶ 27 (FTC filed Dec. 6, 2021) (hereinafter "FTC Compl.").

[30] *See e.g.*, QCVARM_1066820 at 149; QCVARM_1066811 at -813.

[31] Annual Report and Consolidated Financial Statements For the year ended 31 March 2024, p. 1, Arm Holdings Limited (May 29, 2024) https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9; QCVARM_1070993; QCVARM_1012343 at -352, -358, -379, -382 (Arm has "maintained market share in the mobile applications processor market of greater than 99% for many years, by virtue of all key mobile operating systems depending on Arm processors.").

[32] Weidmann Tr. at 35:9-36:14 (identifying only █████████████ other competitors). Arm also licenses its architecture to other firms through its Arm Total Access Subscriptions. *See* Awad Tr. at 30:2-31:5. The evidence on the number of other competitors is conflicting, but there appear to be fewer than ██ and as few as ████████.

[33] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

[34] Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025).

7

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



26.     Qualcomm began licensing the Arm ISA in 1997.[37] Qualcomm and Arm first agreed to an ALA in 2003.[38] That licensing agreement was renegotiated in 2013, and includes annexes for different versions of the ISA and related technology.[39] ███████████████████████ In turn, Arm has profited significantly from its relationship with Qualcomm. For example, in 2024 Qualcomm accounted for 10% of Arm's $3.2 billion revenue.[41]

27.     This relationship has been mutually profitable. Qualcomm benefited from its access to the Arm ISA and related technology, which enabled it to make chips for mobile phones and many other devices. In addition to receiving royalties and other payments from Qualcomm, Arm benefited from the expansion of the Arm ISA network that occurred as Qualcomm penetrated various chip sectors. Software developers, OEMs, consumers, and others benefited as more and more devices powered by Qualcomm chips were manufactured and marketed—in a classic illustration of the power of network effects, where the value of a good or service to a user increases as more people use it.[42] This long-term course of dealing between Qualcomm and Arm relied on Arm's initial business model of openness and neutrality, as Qualcomm and other chip designers were willing to make a long-term commitment to the Arm ISA because of this promise of neutrality.

28.     In March 2021, Qualcomm acquired Nuvia, a startup with expertise in CPU and SoC development for the data center sector.[43] After acquiring Nuvia, Qualcomm renewed its development of custom CPU cores and SoCs that enabled it to further strengthen and expand its share of the ISA ecosystem for mobile and other segments. ███████████████



---

█████████████████████ Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025); QCVARM_1120267 at -308; QCVARM_0848033.
[37] Second Amended Complaint, D.I. 137 (SAC) ¶¶ 3, 55.
[38] *Id.*
[39] ARM_00055357 (QC ALA); QCARM_0343120 (Annex 1 Armv8-A Architecture); QCARM_0338573 (Annex 1 V8 Next Architecture); QCARM_0343954 (Annex 1 ArmV9-A Architecture).
[41] ARMQC_00000640 at -643, -646 (the 10% calculation includes ALA, TLA, and peripheral license revenue).
[42] Joseph Farrell & Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, Handbook of Industrial Organization, Chapter 31 at 1971 (2007).
[43] SAC ¶ 59.
████████████████████████

8

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

29.    At around this time, Arm apparently decided that it should reorient its business toward SoC design. That would mean competing with its own customers, including Qualcomm.[45] At the same time, and apparently in furtherance of its goal to shift its business model, Arm sought to merge with Nvidia, a highly successfully technology company that manufactured chips for a variety of sectors.[46] Regulators in Europe, the United Kingdom, and the United States expressed concern because Nvidia competed with other Arm licensees.[47] The Federal Trade Commission, for example, observed that the merged firm would have the ability to reduce competition "through various mechanisms, including by manipulating levers such as Arm's pricing, the terms and timing of access to Arm's Processor Technology (including withholding or delaying access), Arm's technological developments and features, and Arm's provision of service and support, among other mechanisms."[48] The FTC further argued that the merged firm would have "strong incentives" to undermine rivals because the "profits on additional sales that Nvidia would earn as a chip supplier are generally higher than the profits that Arm would earn from licensing its Processor Technology to Nvidia's rivals."[49] This "ability/incentive framework" is a standard method for evaluating the competitive effects of vertical mergers.[50]

30.    The FTC further noted that the merger would reduce the value of Arm's ISA for the industry as the industry learned that it could not rely on Arm to maintain its policy of openness and neutrality, and this in return would reduce innovation in the sector.[51] The merger would result in "a critical loss of trust in Arm by its own licensees" who will be "less likely to share competitive sensitive information with Arm" because Nvidia would be able to use this information for its chip design.[52] In the course of its analysis, the FTC noted that there are no close substitutes for ARM's ISA, and even if there were, switching among ISAs is costly and

---



[45] SAC ¶ 70; *see generally* FTC Compl.; *see also* Michael Acton, *Arm To Explore Designing Its Own Chips, Chief Executive Says*, Financial Times, Jul. 30, 2025, https://www.ft.com/content/735c8a2d-0ce0-49d6-934f-8aee3e927108 (Accessed Aug. 5, 2025).
[46] *See* QCVARM_1018853; QCVARM_1071021; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[47] *See generally* FTC Compl.; QCVARM_1018853 (Competition & Mkts. Auth., Nvidia - Arm: A Report to the Secretary of State for Digital, Culture, Media & Sport on the Anticipated Acquisition by NVIDIA Corp. of Arm Ltd. (Jul. 20, 2021)) ¶¶ 1.6-1.9 (finding competition concerns); QCVARM_0715414 at -414 (European Commission Press Release IP/21/5624, Mergers: Commission Opens In-Depth Investigation Into Proposed Acquisition of Arm by NVIDIA (Oct. 27, 2021)) ("the Commission has concerns that the merged entity would have the ability to restrict or degrade access to Arm's technology by providers of processor products NVIDIA may compete with").
[48] FTC Compl. ¶ 8.
[49] *Id.* ¶ 9.
[50] *See, e.g.*, Carl Shapiro, *Vertical Mergers and Input Foreclosure Lessons from the* AT&T/Time Warner *Case*, 59 Rev. of Indus. Org. 303, 305-06 (2021).
[51] FTC Compl. ¶¶ 10-11.
[52] *Id.* ¶ 10.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

time-consuming.[53] To prevent these and other anticompetitive harms, the FTC sued to block the merger.[54]

31.    Arm and Nvidia abandoned the merger amid the opposition from the FTC and other antitrust regulators. But the FTC's criticisms of the merger reflected a broader concern that Arm would and could abuse its power over its ecosystem by entering the SoC business, whether through acquisition of a downstream firm or through other means. If Arm could not increase its margins by merging with Nvidia, it could do so by expanding into the design and manufacture of chips unilaterally. By simultaneously undercutting or eliminating its ALA licenses, Arm would give itself a competitive advantage and force its customers to use OTS cores through TLAs.[55] To do so in a procompetitive manner (e.g., by innovation, competition on price and quality), Arm would need to develop its own chips and improve the OTS cores that were being overtaken by Qualcomm's custom cores.[56] But, consistent with the FTC's logic, Arm had the incentive, and apparently the will, to facilitate its entry into the chip sectors by undermining its profitable relationship with Qualcomm. Arm put this strategy into operation by degrading service under the ALA, for example by failing to provide Arm technology, or negotiate in good faith, while, as an initial step, entering into a contract to supply data center chips for Meta, beginning this year.[57] Arm also increased licensing fees and royalties due under the TLA.[58]

### B.  Industry Context

32.    The Arm ISA ecosystem encompasses all of the companies, devices, and software that make use of the Arm ISA.  According to Arm, "[n]o other business ecosystem comes close to this group of silicon, system and software companies" which has shipped more than 310



---

[53] FTC Comp. ¶ 67; ██████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ effects, *see* Helena Perrone, *Chips in on a Merger: The Arm-Nvidia Case*, 98 Int'l J. of Indus. Org. 103130 (Jan. 2025).

[55] Haas Tr. at 234:10-240:23; Williamson Tr. at 120:18-130:22; Abbey Tr. at 125:7-134:25; ARMQC_02739661.

[56] SAC ¶ 152; QCVARM_1018853; ████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

[57] QCVARM_1012399; ARMQC_02762992; *see also* SAC ¶¶ 12-19, Grisenthwaite Tr. at 157:2-10; Weidmann Tr. at 171:14-72:17, 174:6-22.

[58] For example, *compare* QCVARM_1019083 at -097 (2019 licensing fees for ████████████
████████████████████ *with* QCVARM_0526828 at -829 (2024 licensing fees offer for ███████
████████████████ with increased rates).  *See also,* QCVARM_0618354 (Qualcomm's acceptance of increased rates); QCVARM_0618382; QCVARM_0618384 (Arm's further increase of rates for ██████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

billion Arm-compliant chips to date and includes "over 22 million developers building on Arm."[59] At the top level of the Arm ISA ecosystem is the Arm ISA, which Arm controls.

33.    The Arm ISA. The ISA is a set of instructions that a computer's processor uses to control hardware.[60] Technology companies compete to develop ISAs, some of which are then licensed to chip designers and other companies. There are a limited number of different ISAs that are in common use, including, for example Intel's x86, but, Intel does not license the x86 architecture to third parties, and Intel's chips are less suitable than Arm-compliant chips for a range of devices, especially mobile devices.[61] The Arm ISA has achieved dominance in other sectors of the semiconductor industry, including the chips for mobile devices like smartphones,[62] consumer electronics, and IoT devices.[63] Chip designers who make Arm-compliant chips for mobile phones and certain other products do not treat non-Arm ISAs as substitutes for the Arm ISA. If a company switches to a non-Arm ISA, it would not be able to sell its products in the Arm ecosystem or use the software of the "22 million developers building on Arm."[64] Because many sectors, for example, mobile, are dominated by Arm-compliant products, the developer would be excluded from large sectors. The relevant ecosystem is thus limited to the Arm ISA. Arm alone sells Arm ISA licenses to customers, while, as noted, Qualcomm and many other companies license the Arm ISA. The term "ecosystem" is used by Arm and the industry to describe these relationships because the term evokes multiple companies of different types organizing their businesses around a single technology, one which provides value by coordinating the behavior of the disparate groups or entities.

34.    An ISA ecosystem is characterized by significant entry barriers. Like most intellectual property, an ISA ecosystem features high fixed costs and low marginal costs. An ISA developer must invest significant resources to create the ISA and encourage other firms and software developers to join the ecosystem; once that has occurred, the major variable cost is the

---

[59] ARMQC_02720799 at -799; Arm Ed. Team, *The Arm Ecosystem: Powering AI Everywhere – From Cloud to Edge* (May 19, 2025), https://newsroom.arm.com/blog/arm-computex-2025 (last visited Aug. 5, 2025).
[60] SAC ¶ 46.
▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Grisenthwaite Tr. at 36:3-14 ("Q. And I think you mentioned this, but just to be clear, Intel does not make x86 available for license; correct? A. I'm not entirely sure what Intel's model has been. They certainly don't have a wide licensing base, but there's a relationship in some way between Intel and AMD and I believe there are some x86 implementations in China. I have no idea what the licensing arrangements from for Intel, so I can't speak definitively for Intel's business model.").
[62] *See* Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025) ("99% of all Smartphones Powered by Arm").
[63] ARMQC_00001136 at -146.
[64] *See supra* note 59; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
ARM_00089058 at -058 ("Switching that entire world to RISC-V will take a LOT of investment and time, and I am sceptical that ▇▇▇▇▇▇ has the patience for such a play[.]"); ARM_00110020 at -029 (switching to a new ISA "[s]eems unlikely," and would require, among other things, "coalesc[ing] an entire hardware architecture at the same times [sic] as building implementations," an "entire software ecosystem of operating system, hypervisors, security compilers, tools, debug, etc. must be created," entire ecosystem "has to make a hard switch from Arm," and loss of "cross-platform opportunity").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

virtually costless process of issuing licenses, along with support and the development of updates.[65]

35.     Other technology companies would have difficulty displacing a dominant ISA like Arm because they would be required to make an upfront investment in order to develop a superior ISA, and then would have to pay large sums (or give large discounts off fees and royalties) to firms in the Arm ecosystem to abandon Arm's ISA for a new ISA that other firms might never join.[66] Among other things, software companies lack any incentives to produce software for a competing ISA because Arm does not charge software companies royalties. Software vendors will want to see significant scale before they invest in a new architecture so that they will be able to sell to a large customer base.  Additionally, if Arm's anticompetitive actions are successful and unchecked, firms may be reluctant to risk retaliation by Arm and join a new ISA whose sponsor may similarly lock firms into a controlled ecosystem only to later increase rates. Until the new ISA entrant obtains a sufficient ecosystem share, which it might never accomplish, the entrant may be forced by competition to charge a low price close to marginal cost, which is to say close to zero. If the ISA entrant does not obtain a large share, the firm will almost certainly be unable to recover its investment. For that reason, entry will be rare or nonexistent. Some companies have worked to develop an alternative, open-source ISA known as RISC-V. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████

36.     <u>Arm-compliant hardware and software</u>. A number of firms that license the Arm ISA are sellers of Arm-compliant SoCs within the Arm ecosystem. These firms license the right to sell Arm-compliant cores under the ALA, license Arm designed cores under the TLA, or both. A licensee may use a combination of its custom designs and Arm's designs in its product. Qualcomm incorporates both its custom cores and Arm's OTS cores into SoCs. Because the

---

[65] ████████████████████████████████████████████████████████
████████████ ARM_00110020 at -029 (switching to a new ISA "[s]eems unlikely," and would require, among other things, "coalesc[ing] an entire hardware architecture at the same times as building implementations," an "entire software ecosystem of operating system, hypervisors, security compilers, tools, debug, etc. must be created," entire ecosystem "has to make a hard switch from Arm," and loss of "cross-platform opportunity"); ARM_00094099 at -113 (describing "Arm's Key Moats").
[66] *See* sources cited *supra* note 65.
[67] *See* sources cited *supra* note 65; *see also* ██████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

SoCs have different designs and purposes, they serve different sectors. A mobile phone OEM would not treat a data server SoC as a substitute for a mobile phone SoC.[68]

37.    The Arm-compliant SoC ecosystem is complex for another reason. Some firms, like Apple, design CPUs and SoCs for its own devices, like the iPhone. Apple, however, does not sell SoCs to OEMs. Other firms, like Samsung, both develop their own chips internally and buy SoCs from suppliers like Qualcomm. Qualcomm and other firms, for example, MediaTek, sell their chips to downstream OEMs. An OEM thus might regard a chip containing an OTS Arm CPU and a Qualcomm chip containing a Qualcomm custom CPU as substitutes or near substitutes.

38.    

39.    Until recently, Arm did not produce SoCs, and hence did not sell products that compete with Qualcomm's SoCs or those of other chip designers.

40.    SoC designs are highly complex forms of intellectual property. Firms that produce SoCs must invest significant resources to employ engineers and to develop knowhow over time. Qualcomm began manufacturing chips in the 1990s.[71] Today, the major SoC providers are large firms with significant resources.

41.    OEMs buy Arm-compliant SoCs from Qualcomm and Qualcomm's competitors, and incorporate them into the devices they manufacture and sell to customers. Because different Arm-compliant SoCs are designed for different sectors, they are not generally substitutable across sectors. Thus, there is an Arm-compliant mobile phone sector, an Arm-compliant data server sector, and so on. 

42.    Generally, unlike hardware, Arm-compliant software does not require a license from Arm.  Instead, the Arm ecosystem benefits from the widespread adoption of the Arm ISA

---

[71] Nell Walker, *Qualcomm: A History*, Manufacturing Digital (May 16, 2020), https://manufacturingdigital.com/technology/qualcomm-history (last visited Aug. 5, 2025).
[72] QCVARM_0847188 at -191.
[73] QCVARM_1120153 at -160-161.
[74] *Id.* at -160; *see also id.* at -161 for mobile SoC provider share by revenue.
[75] *Id.* at 40.

13

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

to allow developers to design software that functions across Arm-compliant devices.  Arm estimates that today "over 22 million developers" are building on Arm.  According to Arm, "[o]ne of the benefits of the variety of Arm-based chips is the wide range of commercial and open source software the supports them" and that "many engineers have experience working with Arm-based devices."[76]  This robust network for Arm-compliant software further entrenches the Arm ISA ecosystem because OEMs who leave the ecosystem, and their customers, will not be able to take advantage of the software offerings of the millions of developers of software that operates on the Arm ISA.

43.     The dominance of the Arm ecosystem is hard to overstate. In addition to the 22 million developers, virtually every major technology company is involved in manufacturing Arm-compliant chips, installing those chips in devices or infrastructure, or developing software for those devices. More familiar ecosystems like Apple's and Android's are dwarfed by comparison. Indeed, Apple and high-end Android devices use Arm-compliant chips, and so the vast communities of developers for Apple and Android write software that uses Arm's ISA. Intel's better-known x86 system, which is still used on most laptops, powers only a fraction of the devices that rely on Arm's ISA. In 2024, an estimated 29 billion Arm-compliant chips were shipped in various devices, vastly more than the 200 million laptops that were shipped that year.[77] In the interview in which he discussed those numbers, Arm CEO Rene Haas illustrated Arm's ubiquity by identifying all the everyday objects that contain Arm-compliant chips—including automobiles, refrigerators, stoves, thermostats, televisions, gaming consols, smartphones, tablets.[78]  Arm reports that more than 310 billion Arm-based chips have shipped since the 1990s, making Arm's ecosystem "the largest ecosystem in the semiconductor industry."[79] Figure 1 below provides a schematic version of the Arm ecosystem that illustrates the magnitude of its reach.

---

[76] *See The Arm Ecosystem: Powering AI Everywhere – From Cloud to Edge*, Arm Newsroom (May 19, 2025), https://newsroom.arm.com/blog/arm-computex-2025*; Software ecosystems*, Arm Developer, https://developer.arm.com/documentation/102252/0100/Software-ecosystems (last visited August 5, 2025).
[77] QCVARM_0716360 at 5-6.
[78] *Id.* at 4-5.
[79] ARMQC_00001163 at 4.

14

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Figure 1. The Arm Ecosystem



## C. Arm's Recent Conduct Relating to Qualcomm

44.    In recent years, Arm has sought to design and sell its own SoCs. For example, it recently finalized a deal to design a data center chip for Meta.[80] In doing so, Arm has become a competitor or potential competitor of its customers. ███████████████████████████ ████████████████

45.    In 2024, Arm threatened to cancel Qualcomm's ALA on the grounds that Qualcomm had breached its obligations under the ALA.[82] While Arm withdrew the notice letter after an adverse jury verdict, Qualcomm has alleged that Arm has also engaged in other tactics to undermine Qualcomm, going back multiple years. In particular, Qualcomm alleges that Arm has

---

[80] ARMQC_02762991; ARMQC_02762992; ARMQC_02763016; QCVARM_1012399; Abbey Tr. at 136:20-25 ████████████████████); Couillard Tr. at 122:13-126:24; Williamson Tr. at 121:8-17.  Arm is also in the process of marketing deals to supply chips directly to other OEMs, including ████████.  *See* Williamson Tr. at 125:9-22, 128:16-24; *see also* Haas Tr. at 186:13-198:4. ████████████████████████████

[82] SAC ¶¶ 1, 29-31; QCVARM_1030816.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

withheld deliverables under the Qualcomm ALA, refused to negotiate ▓▓▓▓▓▓▓ an extension to the Qualcomm ALA to cover future version of the architecture, and leaked the notice letter, including to Qualcomm's customers and competitors. In these and other ways, Arm has interfered with Qualcomm's relationship with its customers by sowing doubts about Qualcomm's continued ability to sell Arm-compliant chips.[83] Collectively, these tactics appear to be part of an effort to push Qualcomm away from designing and selling custom chips, with the goal of forcing Qualcomm to rely on Arm's OTS chips or to quit selling SoCs entirely or in particular sectors.

46.     The Meta contract may be only the first step in a longer-term plan to enter other SoC sectors. Indeed, that appears to be the vision of Arm's executives.[84] As Arm develops experience, know-how, and customer relationships in the data center chip sector, it will likely attempt to enter other chip sectors as well, including the lucrative mobile sectors. Qualcomm, which is a significant competitor in the mobile sector, stands in the way.[85]

## V.    Relevant Economic Principles

47.     Economists have developed a framework for determining whether corporate behavior is anticompetitive. While this framework is frequently used in antitrust cases, the framework itself is based on economics, not law. Below I sketch the relevant economic principles on which I rely in order to evaluate Arm's conduct vis-à-vis Qualcomm.

### A.    Competition

48.     Competition means rivalry among sellers for the business of buyers.[86] Competition typically increases with the number of sellers because buyers have more opportunities to switch from one seller to another if the first raises prices. Collusion, coordination, and other forms of anticompetitive conduct also become more difficult to orchestrate as the number of sellers increase. Competition also increases as sellers expand effort to poach buyers from one another, for example, by lowering prices or improving the quality of products. As a general principle, economists favor competition because competition usually results in lower prices and greater output.[87] When competition prevails, sellers vie for business from buyers by lowering prices to marginal cost. Anticompetitive behavior refers to behavior by a firm to reduce competition.

---

[83] SAC ¶¶ 29-37; *see also, e.g.*, ARM_01241585;QCARM_7484477; ARM_01241565; ARM_01241577; QCARM_7484481; QCARM_7477120; QCARM_7484471; ARM_01241285; QCARM_7509431; QCVARM_0857152; ARMQC_02778180; ARMQC_02771126; QCVARM_1120481; QCVARM_1119108; ARM_00110511; ARM_01215564; ARM_01215886; ARM_00079520; ARM_00079530; ARM_00082009; ARM_00094197; ARM_00094200; ARM_00094204; ARM_01215888; ARM_01215889; ARM_01215486; ARM_01231038; ARM_01215885; ARM_00110513; ARM_01215887; QCVARM_0847094.
[84] Michael Acton, *Arm to explore designing its own chips, CEO says*, Financial Times (July 30, 2025), https://www.ft.com/content/735c8a2d-0ce0-49d6-934f-8aee3e927108.
[85] QCVARM_1120153 at 12-14.
[86] *See* John Vickers, *Concepts of Competition*, 47 Oxford Economic Papers 1, 3 (1995).
[87] *Id.* at 4-7.

16

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

49.    Firms that compete with each other for customers do so by offering similar goods and services. When goods are identical, they are referred to as "substitutes," and firms that sell substitutes can obtain a competitive advantage only by offering lower prices. Many goods are similar but not identical; they can be called "near substitutes." Firms may compete with each other by offering near substitutes that have somewhat different prices and/or characteristics. This process is known as "differentiation." Differentiation of products takes place as firms compete with one another by innovating, improving the quality of products, and varying the characteristics of products so as to attract customers from the firms' rivals. Generally speaking, when products are closer substitutes, competition is more intense; but competition can exist even when products are near substitutes because some customers may be indifferent between near substitutes despite their different attributes or qualities. A characteristic way of identifying a monopolist is to determinate that it is the only firm (or a large firm with only a few small competitors) that sells a product for which there are no substitutes or no or few near substitutes. Such a firm has monopoly power, meaning the ability to profitably charge prices above marginal cost.

## B. Input Foreclosure

50.    Input foreclose is a kind of anticompetitive behavior that takes place when a firm has both a "vertical" (buyer-seller) relationship and a competitive relationship with the counterparty. Input foreclosure may be defined as a dominant firm's denial of access to a critical input that another firm needs to buy in order to sustain its business, with the intent or effect of achieving monopoly power in that downstream sector.[88] In a common scenario, Firm A sells goods or services ("inputs") downstream to a group of buyers. Firm A faces no or little competition so it can set the price above marginal cost. Buyers must pay this higher price because the input is critical to their business and they cannot turn to another supplier. Firm A can raise the production costs of downstream buyers by raising the price of the inputs, reducing their quality, or cutting off (or reducing) the supply of inputs. Firm A thus can be thought of as a bottleneck from the standpoint of customers.

51.    Rather than charge buyers the same monopoly price, Firm A may be able to increase its profits by discriminating against certain downstream firms and favoring other downstream firms with the goal of driving the first group out of business. Facing no competition from the disfavored firms, the favored firms can increase the prices they charge their own buyers, as those buyers will no longer be able to buy from the disfavored firms. In some settings, Firm A might demand a cut of the monopoly profits of the favored downstream firms. In other settings, Firm A might actually own the downstream firm—that is, the upstream seller and the downstream buyer are two divisions of the same Firm A. Firm A might have acquired the downstream firm through a vertical acquisition or expanded downstream unilaterally.[89]

---

[88] *See* Patrick Rey & Jean Tirole, *A Primer on Foreclosure*, 3 Handbook of Industrial Organization 2147, 2148 (2007).  Some scholars use the term "foreclosure" to refer only to complete denial of access to inputs.  Other terms, including "raising rivals' costs," may be used to refer to the practice of raising the price or reducing the quality of inputs.  I will refer to both types of activity as foreclosure, and will distinguish the latter where context requires as "partial foreclosure."

[89] The economic literature on vertical foreclosure is very large.  At one time, it was frequently asserted that vertical integration by a monopolist rarely causes harm.  But that view has been decisively rebutted by a wave of literature

17

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

52.     In the latter case, where Firm A both controls the upstream input and does business downstream in competition with other downstream firms, Firm A may have an incentive to disadvantage the downstream firms as described above. In some cases, Firm A might engage in such burdensome discrimination (for example, higher prices, lower quality, worse service) that the downstream firms will be completely foreclosed, leaving Firm A with a dominant position both downstream and upstream. But input foreclosure can cause anticompetitive harm even if the downstream firms are not foreclosed entirely. Firm A might choose to raise prices or reduce quality sufficiently to give its downstream division a competitive advantage over the other firms, but not so much as to drive those firms out of business. Partial foreclosure of this type may be more profitable than complete foreclosure because some of the downstream firms have competitive advantages that Firm A's downstream division cannot defeat in the short term—for example, the ability to manufacture end products that are preferred by niche customers. In such a case, differentiation exists: some customers prefer the product even if its price is higher than Firm A's downstream product because they benefit from the distinguishing characteristics of that product. But the outcome is still anticompetitive. Firm A benefits in two ways: It continues to receive royalties from the remaining downstream firms; and, facing less downstream competition, Firm A can charge higher prices to all other downstream customers.

53.     Economists have developed a standard framework for determining whether input foreclosure is anticompetitive. First, one determines whether the firm in question has the ability to raise prices for or otherwise harm the downstream buyers. Second, one determines whether the firm has an incentive to raise prices for the downstream buyers. The firm has an incentive to raise prices if it gains more by obtaining the business of the crowded-out downstream buyers than it loses from the loss of downstream buyers' purchases of inputs from the firm. If the answer to both questions is yes, then the firm's behavior is likely anticompetitive, though the anticompetitive impact may be mitigated if vertical integration produces efficiencies. This mode of analysis is typically called the ability/incentive framework.[90]

54.     Upstream monopolists can cause other types of anticompetitive harm. For example, when a monopolist displaces downstream competition, it can reduce the risk it faces that a downstream firm will integrate upstream. Vertical integration thus may not only result in a downstream reduction in competition. It may also result in greater protection of the upstream monopolist from upstream competition.[91] And where an upstream monopolist obtains a downstream monopoly, it may raise entry barriers at both levels of the supply chain. Since the upstream division can refuse to sell to a downstream entrant, and the downstream division can refuse to buy from an upstream entrant, firms that seek to enter either market must enter both—which will be riskier and more expensive. Finally, an integrated firm with monopoly power in one or more of the two markets may abuse its access to information that it obtains from counterparties so as to improve its market power and save costs.[92] If this behavior takes place,

reaching back decades. *See, e.g.*, Oliver Hart et al., *Vertical Integration and Market Foreclosure*, 1990 Brookings Papers on Economic Activity: Microeconomics, 205–285 (1990); Janusz A. Ordover et al., *Equilibrium Vertical Foreclosure*, 80 American Economic Review, 127–142 (1990). Rey & Tirole, *supra* n. 88.
[90] Shapiro, *supra* n. 50.
[91] Chiara Fumagalli & Massimo Motta, *Dynamic Vertical Foreclosure*, 63 J. of L. and Econ. 763-812 (2020).
[92] *See* Marie-Laure Allain et al., *Vertical Integration as a Source of Hold-up*, Toulouse School of Economics, Working Paper n. 14-525 (2014).

18

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

then firms will be reluctant to enter and compete in the market, resulting in higher prices and less innovation.

## VI.    Economic Analysis of Arm's Conduct

### A.    Arm's Dominance of the ISA Technology

55.    Arm dominates the Arm ISA ecosystem through its control of the Arm ISA technology. Arm alone controls access to design, manufacture and sale of Arm-compliant hardware. It grants access by issuing licenses, which either permit licensees to design and sell custom CPUs or permit licensees to use Arm's OTS hardware in Arm-based SoCs.  Firms that produce Arm-compliant SoCs and cores under one of the Arm licenses cannot substitute to non-Arm ISA licenses if Arm raises the price of its licenses substantially above marginal cost.[93] If, for example, Qualcomm lost its licenses with Arm, Arm would likely litigate to prevent Qualcomm from selling Arm-based chips. Customers may refuse to buy chips from Qualcomm if Qualcomm built on another ISA because Qualcomm's new chips would no longer be Arm-compliant and compatible with other devices and software in the Arm ecosystem.  Arm-based software developed by the robust network of "over 22 million developers," would not run on non-Arm-compliant chips. Rather than lose its business, Qualcomm would pay a higher price to Arm.

56.    Arm's dominance developed out of its open and neutral licensing policy, which encouraged widespread adoption.  As a result of that widespread adoption, Arm is now entrenched. Licensees are not willing to give up Arm licenses because if they did, then they would not be able to sell Arm-compliant products across the ecosystem. The Arm ecosystem includes both the hardware producers who design and sell Arm-compliant cores and SoCs and millions of developers working on software for the Arm ecosystem.

57.    Arm's ecosystem is protected by entry barriers. Because so many companies specialize in Arm-compliant products, a firm that sought to develop a new ISA would have to not only produce a superior ISA. It would also have to persuade firms in the Arm ecosystem to give up their existing customers and develop products for a not-yet-existing set of customers. Existing ISAs, like Intel's x86, are not as well suited to the sectors that are dominated by the Arm ISA, such as mobile which benefits from the Arm ISA's power-efficient qualities. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[93] ARMQC_02727610 at -617 (As explained by Arm, "[e]verything has to be able to run everywhere" and a "strong eco-system of users is vital." Thus, "Arm's success has come from the wide accessibility of its architecture" and Arm's "fostering of an enormous ecosystem of developers."); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[94] Conversation with Durga Malladi, Qualcomm's Senior VP & GM of Technology Planning, Edge Solutions & Data Center.

19

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

58.    Arm's dominance is widely recognized by the industry.[95] Arm itself says that "99% of all smartphones [are] powered by Arm."[96] Arm's ISA has no rivals at all in the Arm ecosystem for the simple reason that Arm demands that a license is necessary to design and sell Arm-compliant SoCs or cores. Arm's behavior also exhibits characteristics of a monopolist. For example, Arm has increased royalty rates under the TLA in a way that does not appear to be based on the underlying costs of maintaining the Arm ecosystem,[97] ███████████████████████████████████████████████████ To be sure, in some sectors, like data centers and compute, OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips. But the Arm ISA is rapidly gaining share in some of those sectors, including data centers.[99]

### B.  Qualcomm's Role in Arm-Compliant Hardware

59.    Qualcomm designs Arm-compliant SoCs that are used in various technology sectors. In designing the SoCs, it uses its own custom core designs under the ALA, Arm's OTS cores and other IP under the TLA, and Qualcomm's proprietary intellectual property. Fabrication is outsourced. Qualcomm sells the SoCs to OEMs.

60.    Qualcomm's SoCs are designed for specific technology sectors, including mobile, compute, wearables, AR/VR, and data servers. ████████████████████████



[95] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[96] *Id., see also* Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025); ARMQC_00001038 at -067.

███████████████████████████████████████████████

[98] QCVARM_1018853; ████████████████████████████████████████████████████

[99] ████████████████████████████ Conversation with Durga Malladi, Qualcomm's Senior VP & GM of Technology Planning, Edge Solutions & Data Center; Mike Johnson, *Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025*, WebProNews (July 31, 2025), https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/; *see also* Mohamed Awad, *Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm-based*, Arm Newsroom (April 1, 2025), https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based.

███████████████████████████████

[102] QCVARM_1120153 at 40.

20

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



61.    In each sector, Qualcomm faces varying degrees of competition from other chip makers.

62.    Many OEMs depend on Arm-compliant chips. In the mobile sector, for example, according to Arm "99% of all Smartphones [are] Powered by Arm."[108] In other sectors, the Arm ISA is used to varying degrees, including 32% of consumer electronics, 10% of cloud compute, 26% of networking equipment and 16% of other infrastructure, 41% of automotive, 65% of IoT and embedded products.[109] OEMs cannot realistically switch to other ISAs where Arm's ISA has become the de facto standard, for example, in the mobile sector.[110]

OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers.[112]

---

[103] QCVARM_0847548 at 6.

[104] Id.

[105] QCVARM_1120153 at 8.

[106] Id. at 7-14;

[108] See Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025).

[109] ARMQC_00001038 at -067.

[110] Id.

[111]

[112] See e.g., Arm Ltd. v. Qualcomm Inc., DTX_000936 ("Snapdragon X Elite gets benchmarked, completely dunks on Apple's M2 processor"), Arm Ltd. v. Qualcomm Inc., DTX_000937 ("[p]ound-for-pound, the Snapdragon X platform powered by the Qualcomm Oryon CPU can take on and beat Apple's M series chips at its own game.");

21

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

63.     Qualcomm is one of Arm's largest customers. It paid 10% of Arm's revenues in the fiscal year ending in 2024.[113]

## C.     Arm's Strategy of Input Foreclosure

64.     Arm has taken steps to design and sell its own SoCs. For illustrative purposes, I focus on the data center sector, though Arm's intentions to sell SoCs extend beyond the data center sector. Arm has already entered into a contract to supply data center chips for Meta, beginning this year.[114] ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████ According to Arm, it currently has a █████████████████████████████████████████ ██████████████████████████████[116] At the same time, Arm has taken steps to undermine Qualcomm's position in the broader SoC ecosystem as well as the data center-specific SoC sector. Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector.

### 1)     Ability

65.     Arm has the ability to foreclose Qualcomm from the Arm-compliant data center-specific SoC sector as well as other sectors. The reason is that these sectors are part of the Arm ecosystem, and Arm's control over its ecosystem allows it to discriminate against firms that participate in the ecosystem despite Arm's earlier promises to keep the system open. Firms can survive in the Arm ecosystem, or in Arm-compliant sectors only as long as they are able to make Arm-compliant products under one of Arm's licenses. Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm. There is evidence of several such actions.

- *Failure to provide Qualcomm with certain deliverables in violation of the ALA*. Arm failed to provide certain technology related to verifying compliance with the Arm ISA.[117] Arm withheld sets of reference reports, known as the "OOB," providing the specific compliance tests needed by Qualcomm to verify compliance, as well as information on expected test failures that are also used in the verification process.[118] Arm has also withheld replacement tests, known as "ACK patches," that fix defective tests used in the compliance testing process.[119] Arm's failure to provide deliverables, even if remedied, shows that Arm is committed to finding ways of

---

███████████████████████████████████████████████████████████
███████████████████████████████████████████████

[113] ARMQC_00000640 at -646 (ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024).
[114] QCVARM_1012399; ARMQC_02762992.
██ ██████████████████████████████████████████████████████████
[116] ARMQC_02739661 at -666.
[117] *See, e.g.*, SAC ¶¶ 78-80, *see also* ¶¶ 81-101; ARM_01241585;QCARM_7484477; ARM_01241565; ARM_01241577; QCARM_7484481; QCARM_7477120; QCARM_7484471; ARM_01241285.
[118] *Id., see also,* ██████████████████████
[119] *Id.*

22

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

underperforming its contract, and in so doing degrading Qualcomm's ability to commercialize Arm-compliant products. Finally, Arm's failure to cure and related actions indicate that Arm may be acting in bad faith.

- *Failure to provide Qualcomm with* ███████ *licensing proposals under the TLA*. Arm failed to respond, sometimes for months, to requests for TLA licenses for OTS cores, and then made only ███████ proposals (with unreasonable price terms, among other things).[120] For example, Qualcomm requested licenses to OTS cores named ███████ ████████████ as well as peripheral IP at least as early as April 2024, but did not receive an offer from Arm until October 24, 2024 ███████████████████████ ████████████████████████████████████████████.█ Qualcomm may accordingly find it difficult to believe, or to convince its customers, that it can continue to rely on Arm to comply with the licenses in good faith.

- *Refusal to negotiate an extension of the ALA to cover future versions of Arm's ISA*. In 2020, Qualcomm informed Arm that it sought to extend its license to cover future versions of the ISA over the next ███████████.[122] Arm did not respond until after Qualcomm followed up with an additional request in 2024, during the pendency of this litigation and after Qualcomm learned Arm had been showcasing v10, a future version of the Arm ISA.[123]  Even now, Arm has not provided a ███████ proposal to Qualcomm for a license to v10.[124]

- *Misinformation campaign*. Arm conducted a misinformation campaign designed to undermine customers' confidence in Qualcomm.[125] The campaign included leaking the notice letter that Arm sent to Qualcomm and sending "confusing" and "misleading"

---

[120] QCVARM_0526828; ███████████████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ *See also, e.g.,* QCARM_3460976; QCARM_3460981; QCARM_3424399; QCARM_3424873; QCARM_3424233; QCARM_3433633; QCARM_3428243; QCARM_3522626; QCARM_7517677.
[121] QCVARM_0616970 at -974; QCVARM_0526828; ███████████████████
[122] QCARM_7509431.
[123] QCVARM_0857149; QCVARM_0857152.
[124] ARMQC_02778180; ARMQC_02771126; QCVARM_1120481; QCVARM_1119108.
[125] ARM_00110511; ARM_01215564; ARM_01215886; ARM_00079520; ARM_00079530; ARM_00082009; ARM_00094197; ARM_00094200; ARM_00094204; ARM_01215888; ARM_01215889; ARM_01215486; ARM_01231038; ARM_01215885; ARM_00110513; ARM_01215887.

23

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

messages to customers of Arm and Qualcomm that suggested that they faced legal jeopardy if they used Qualcomm products.[126]

- *Reduction in general support*. Because Arm and its licensees all benefit from a vibrant ecosystem, Arm has traditionally arranged various forms of support, including meetings during which employees of Arm and its licensees exchange ideas. Arm has in recent years disinvited Qualcomm employees from these meetings.[127]

66.    These actions have demonstrated that Arm has the ability to foreclose.  Arm is pivoting from its open, neutral model—where it treats its customers in a nondiscriminatory manner, benefits from attracting as many licensees as possible, and therefore provides adequate support to its licensees—to a different model, one in which it forecloses customers in sectors that Arm seeks to enter.

### 2)    Incentive

67.    Arm has an incentive to engage in input foreclosure in sectors where the potential long-term gains from taking business from licensees exceed the short-term loss of royalties on the products that the licensees no longer sell.

68.    Figure 2 provides a simplified diagram of Arm's and Qualcomm's position in the ecosystem under Arm's earlier model of being a neutral sponsor of its ISA (left panel), and of Arm's apparent goal of entering the downstream chip design and manufacture level of the supply chain (right panel). As is immediately apparent, Arm's entry converts it into Qualcomm's competitor in high-tier chip design and manufacture. Arm is now both supplier and competitor: Qualcomm must both depend on Arm for an essential input—the ISA license and support—and compete with Arm to produce the best chips. Arm's incentive is no longer to sell as many licenses as possible, as it was when it could make money from Qualcomm only from license fees and royalties. It will balance the gains from selling an additional license against the gains from eliminating competition downstream.

---

[126] *Id. see also* QCVARM_0847094; December 12, 2023 Haas Tr. at 237:24-238:5; December 16, 2024 *Arm Ltd. v. Qualcomm, Inc.* CA No. 22-1146 Trial Tr. at 328:15-329:22 (Cross examination of Rene Haas).
[127] ███████████████████████████████████████████████████

24

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Figure 2. Input Foreclosure



69.    For illustrative purposes, I focus on the data center sector. Arm supplies an essential input to chipmakers in the form of Arm ISA licenses. Arm earns an upstream margin on those licenses roughly equal to the royalty rate that licensees pay. Qualcomm is one such licensee, and it in turn earns (or will earn) a downstream margin on sales of Arm-compliant data center chips to data centers. Arm enters the data center chip sector—in effect, licensing itself to manufacture Arm-compliant chips—and competes with Qualcomm. Arm earns a downstream margin, based on the royalties it earns from OEMs ████████

70.    If Arm is able to cut off technology supply for Qualcomm completely, then Arm loses its upstream margins on the Qualcomm license. However, Arm would gain downstream sales and the downstream margins that they produce, assuming that Arm is a viable competitor in the downstream market either through organic entry or through acquisitions. Figure 3 illustrates these dynamics. By degrading Qualcomm's access to the ISA and related technology (1), Arm forces Qualcomm to raise prices or reduce quality of chips it sells to OEMs. OEMs respond by shifting some of their supply to Arm in a process economists call "diversion." Arm gains revenues from diversion even as it potentially loses revenues as Qualcomm pays less in royalties on fewer sales (2). Because of Qualcomm's weaker competitive position, Arm can also raise prices or reduce quality in sales to OEMs (3).

25

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Figure 3. Diversion



71.  ███████████████████████████████████████████████████████████[128] Even if Qualcomm's sales are not diverted to Arm, but to other ████████████████████ competitors using OTS cores, Arm will still make more upstream margin from licensing to those other competitors than from licensing to Qualcomm under the ALA. Further, if Arm is a viable competitor downstream and is able to capture even some small portion of diverted sales from Qualcomm, that creates additional incentive to foreclose Qualcomm. This is because downstream margins on chip sales to data centers are likely to be higher than upstream margins for licensing. The more of Qualcomm's potential share that Arm can capture after foreclosing Qualcomm, the stronger its incentive to foreclose Qualcomm.

72.  It is possible that Arm would maximize profits by completely destroying Qualcomm's business opportunities in certain sectors even though it would suffer a short-term loss of royalties. If Arm had been able to follow through on its threat to cancel the ALA, that is what would have happened. But even if Arm does not succeed in foreclosing Qualcomm entirely, Arm would still benefit from partially foreclosing Qualcomm in certain sectors. For example, if Qualcomm has special relationships with some of its customers, a good reputation in a sector, niche abilities, and other advantages, Arm might continue to benefit from Qualcomm as a chip supplier of Arm-compliant chips for certain sectors for the time being while displacing

---

[128]ARMQC_02727610 at -619 ████████████████████████████ QCARM_0343120 at -139; QCARM_0338573 at -576 (Over a 15-year term under the Qualcomm ALA Annexes for the v8 and v8 Next architectures, Qualcomm agreed to pay ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████
 Grisenthwaite Tr. at 26:20-30:21. The industry view appears to be the same. *See* ARM_01424394 at -395 ("All else being equal, TLAs are more expensive with higher royalty rates than ALAs as TLAs offer greater value add and relieve the chip design companies of significant design work").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Qualcomm in other sectors. In that way, Arm continues to benefit from royalties in some sectors while taking over other sectors by degrading Qualcomm's ability to compete in those sectors. Whichever the case, the downstream OEMs will either pay more for chips or be required to settle for lower-quality chips, to the detriment of the ultimate consumer.

73.     Other factors highlight the anticompetitive risk of Arm's conduct.

74.     First, Arm has a strong incentive to foreclose Qualcomm from selling custom cores under the ALA because Qualcomm will both be forced to switch to higher-royalty OTS cores and will lose downstream SoC business to Arm.[129] Arm thus gains in two ways—through higher upstream TLA royalties from Qualcomm (for example, from the sale of undifferentiated SoCs that incorporate the OTS cores) and higher downstream chip sales at the expense of Qualcomm (as Arm captures diverted sales in the higher-tier SoC business).

75.     Second, where the downstream portion of the ecosystem is already concentrated (e.g., mobile), input foreclosure would likely give Arm substantial downstream power, enabling it to raise prices both unilaterally and potentially through coordination or collusion with any remaining downstream competitors.

76.     Third, Arm's input foreclosure is likely to reduce entry to the chip design and manufacture ecosystem. Entry is possible only if Arm grants licenses to the firms and refrains from degrading support to firms that already have licenses. Arm would have no reason to do so because that behavior would reduce its power in the lucrative downstream portion of the ISA ecosystem. This will ultimately prevent other firms from being able to compete away Arm's downstream margin.

77.     Fourth, foreclosure of the Arm ISA may impede innovation. ███████████████
█████████████████████████████████████████████████████████
Moreover, if Arm's chips were superior, then Arm would not need to undermine Qualcomm's access to the ISA. Fair competition allows one firm to prevail over another through innovation—and thus encourages innovation.

78.     Fifth, if Arm substantially weakens Qualcomm's ability to participate in Arm's ecosystem, as it tried to do by terminating Qualcomm's ALA, then it may raise upstream barriers

---

[129] If Arm keeps its most advanced cores to itself and only uses them in its own SoCs rather than supply them to TLA licensees, the only SoC supplier that can differentiate is Arm.
[130] *See e.g.*, ████████████████████████████

27

A0745

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

of entry against upstarts like RISC-V.[131] RISC-V is a threat to Arm's dominance, as Arm is well aware.[132] According to James Ashton's book, *The Everything Blueprint*, Arm has attempted to spread "fear, uncertainty, and doubt" about RISC-V.[133] Among other things, Arm launched a website with the web address "riscv-basics.com," which was "designed to plant seeds of doubt in the minds of developers who might use RISC-V as their processor architecture instead of Arm."[134] ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ Moreover, other licensees will have an incentive to reduce their investment in the Arm ecosystem as they see Arm abuse its own licensees. While the firms might manage to migrate to RISC-V in the long term, in the short term there will be disruption and loss of innovation.

79.    Some economists believe that input foreclosure is justified if the dominant firm charges lower prices to the customers that it obtains from the foreclosed firm.[136] This is a controversial view, as it would justify the monopolization of downstream markets, which is anticompetitive behavior regardless of the impact on prices, not to mention the harm to innovation and quality. And if Arm dominates the downstream portion of the ecosystem as well as the ISA itself, entry will be extremely difficult.

### D.    Arm's Violations of Its Neutrality

80.    From its founding, Arm branded itself the "Switzerland of chips" by committing itself to license the Arm ISA to companies on an "open, neutral" basis.[137]  Arm believed that it could establish the ARM ISA as a global standard through a model of open licensing. Arm "introduced the IP business model, which was not common at the time. This meant the Arm processor was available to be licensed to many different companies for an upfront license fee and

---

[131] Chiara Fumagalli & Massimo Motta, *Dynamic Vertical Foreclosure*, 63 J. of L. and Econ. 763–812 (2020)..

[132] *See* QCVARM_1066820 at -164-165 (describing Arm's efforts to spread "fear, uncertainty, and doubt" about RISC-V).

[133] *See* QCVARM_1066820 at 164-165 (describing Arm's efforts to spread "fear, uncertainty, and doubt" about RISC-V).

[134] *Id.*

[135] RISC-V, *Members*,  https://riscv.org/members/ (last visited August 5, 2025); Conversation with Durga Malladi, Qualcomm's Senior VP & GM of Technology Planning, Edge Solutions & Data Center.

[136] *See, e.g.*, Shapiro, *supra* n. 50.

[137] FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees"); ███████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

then royalties based on the amount of silicon produced."[138] Sir Ron Saxby, a former Arm CEO explained: "We also bet everything on assembling a worldwide customer base, creating a global standard with companies who traditionally competed with each other, molding them into a partnership, pulling in the same direction, and united around one architecture that evolved over time.  This unique combination made us into a force much larger than the sum of the parts."[139] Likewise,  Hermann Hauser the co-founder of Arm stated:  "The whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees.  That wasn't lost on the regulators in the UK, the U.S., EU and China."[140]

81.    As recently explained by Arm's former Vice President for External Communications:[141]

> So yes, we often -- that phrase, you know, We are a neutral player, we are the Switzerland semiconductors, often was something that the company spokespeople would -- would regularly repeat. It wasn't a new thing. Licensing technology to anyone who wanted to pay for it.
>
> . . .
>
> Q. The -- you say that that phrase, "neutral player," and "Switzerland of semiconductors" was something you were familiar with and the company spokespersons use. Was that throughout your time --
>
> A. Yes.
>
> Q. -- at Arm?
>
> A. Yes.
>
> Q. Okay. And when you refer to "company spokesmen" in that context, that would include external communications?
>
> A. Yes.
>
> . . .
>
> Q. Okay. And when you say, "company spokesmen," using that phrase, "Switzerland of semiconductors" or "neutral player," are you referring to any company spokesperson, generally, categories of spokespeople other than external communications?

---

[138] Arm.com, *The Official History of Arm*, https://newsroom.arm.com/blog/arm-official-history (last visited August 8, 2025).

[139] Mobile Unleashed, *The Origin and Evolution of ARM Processors In Our Devices*, (December 2015) semiwiki.com/books/Mobile%20Unleashed%20-%20front%20to%20back.pdf, at vii.

[140] Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-08/.

[141] Hughes Tr. at 78:23-81:3.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

A. That would be -- again, in my role, I heard that phrase often repeated by company spokespeople or executives in press interviews.

Q. Okay. And you would have heard that from high-level executives of Arm in press interviews; is that right?

A. Of course, over the years. I mean, again, from when I started in 2013, that was a phrase that was often repeated. I don't know exactly who, when, but it was often repeated.

82.     This commitment meant that Arm would allow its licensees to rely on the Arm ISA as they expanded into new sectors of the semiconductor industry without worrying that Arm would ultimately withdraw support or enter those same sectors as a competitor.[142] Arm apparently believed that this strategy served its own interests as well as those of its licensees, as it would ensure that the Arm ISA would prevail over competing ISAs that might be developed by other technology firms.[143]

83.     The industry responded favorably to Arm's novel business model. And as more and more firms joined the Arm ecosystem, network effects kicked in. The Arm ecosystem became more valuable and then essential for a large portion of the semiconductor industry.[144] Today, having spent decades investing in an ecosystem of software and hardware surrounding the Arm ISA, industry members are effectively "locked-in" to the Arm ISA, thereby putting Arm in a position to "hold-up" participants needing its ISA.

84.     Arm, meanwhile, benefited from the fees and royalties it received from its licensees who, by successfully penetrating new sectors of the semiconductor industry, carried the Arm ISA with them. The licensees establish the dominance of the Arm ISA as they attracted more and more software developers to produce software that ran on Arm-based chips, who in turn attracted to Arm's ISA more hardware manufactures whose devices could run on that software.

85.     Arm's revenues increased as it gained more licensees and those licensees sold more chips and paid more royalties.  But despite the increasing demand for Arm ISA licenses,

---

[142] Conversation with Gerard Williams, Qualcomm Senior VP Engineering; *see also* Arm, *The Official History of Arm* (August 16, 2023), newsroom.arm.com/blog/arm-official-history ("In 1993, the Apple Newton was launched on the Arm architecture. However, the product was not a commercial success, which led to Saxby realizing that Arm as a company could not be sustained on single products. He introduced the IP business model, which was not common at the time. This meant the Arm processor was available to be licensed to many different companies for an upfront license fee and then royalties based on the amount of silicon produced.").

[143] *See* Mobile Unleashed, *The Origin and Evolution of ARM Processors In Our Devices*, (December 2015) semiwiki.com/books/Mobile%20Unleashed%20-%20front%20to%20back.pdf, at vii (Arm "bet everything on assembling a worldwide customer base, creating a global standard with companies who traditionally competed with each other, molding them into a partnership, pulling in the same direction, and united around one architecture that evolved over time."); Rene Haas in ACQ2 by Acquired Podcast, *How Arm became the worlds default chip architecture with ARM CEO Rene Haas* (December 2, 2024), https://open.spotify.com/episode/2sxLw7ti6tC7xr3NQnphXG?si=KMdhxFHlQMqtGupg_c6kjA&nd=1&dlsi=ba9cf 1c344524296, at 50:00 (According to Arm's CEO, one of the things in Arm's "favor" is that Arm "has an open model, that [Arm's] products can be built by any fab, by any company.").

[144] Conversation with Gerard Williams, Qualcomm Senior VP Engineering.

30

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Arm could not push up royalty rates. As related in James Ashton's book, *The Everything Blueprint*:

> The question of why Arm did not push up its royalty rates was not a new one. Quizzed on the subject around the time he became chief executive in 2013, [then-CEO Simon] Segars responded: "We could do that and we could probably enjoy some more revenue for some time, but our customers would go off and do something else or have less healthy businesses. If we tried to extract lots of money out of the ecosystem, we'd have less companies supporting the Arm architecture and that would limit where it could go."[145]

86.     That appears to be no longer true today. More than a decade later, Arm's ISA has reached such a level of dominance that licensees can no longer easily walk away. Now Arm seeks not only to raise royalty rates, but to design and manufacture SoCs, in a "dramatic departure from its traditional business model."[146] Its behavior has alarmed Qualcomm because Qualcomm will be required to compete with the supplier of a vital input—the licenses that allow Qualcomm to manufacture Arm-compliant chips.

87.     Arm has already threatened to terminate Qualcomm's ALA, reversing its longstanding business model as the "Switzerland of chips," so that it can both increase the royalty rate, as it has done for the TLA, and take Qualcomm's SoC business.[147] Having failed to persuade a court or jury that Qualcomm's CPU products were not covered by its ALA, Arm has adopted the indirect strategy of driving Qualcomm out of business and taking its margins. As customers flee Qualcomm to Arm, Arm will lose money in foregone royalties in the short term. But, Arm hopes to obtain larger margins in the long term as it takes over Qualcomm's business or Qualcomm is pushed to increasingly make use of Arm's OTS cores.

88.     Arm's CEO, Rene Haas, has recently confirmed that Arm no longer wishes to keep its prior commitments and instead plans to cut off ALA licensees and sell SoCs directly to OEMs, such as data centers, automobile companies, and mobile phone manufacturers.  Rene Haas said that Arm's interest in whether to accept a prospective customer depends on "whether your business is a chip business [such as Qualcomm] or a product business." [148]

89.     Arm's conduct portends significant competitive harm to the semiconductor industry that has so heavily relied on Arm's original open business model. As the FTC explained in opposing Arm's merger with Nvidia, competition between Arm and its licensees would result in "a critical loss of trust in Arm by its own licensees" who will be "less likely to share competitive sensitive information with Arm" because Nvidia would be able to use this information for its chip design.[149]

---

[145] QCVARM_1066820 at -6942, -7154.

[146] Financial Times, *How Arm could be the unexpected winner of the AI investment boom* (October 30, 2024), www.ft.com/content/80a1e79e-b662-40e9-9b41-6d1070f694a8?FTCamp=engage/CAPI/website/Channel_muckrack//B2B.

[147] QCVARM_1030816; QCVARM_0847094.

[148] Bloomberg Technology, *Arm CEO on Intel, Chips, AI, Listing in US* (October 22, 2024), www.youtube.com/watch?v=6FnBz8rxWUY, at 15:20-16:00.

[149] FTC Compl. ¶ 10, as discussed *supra*, ¶ 30.

31

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

90.     As the industry observes Arm's mistreatment of Qualcomm, firms will become less willing to invest in the Arm ecosystem. Their incentives to invest are reduced because the more successful they are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them. Arm will have a greater incentive to enter those sectors by degrading the licensees' access to the Arm technology while producing its own chips for those sectors. Rather than invest in new Arm-compliant products, firms will look for ways to escape the Arm ecosystem, for example, by collaboratively or unilaterally developing an alternative ISA. The early development of the open-source ISA, RISC-V, may reflect this concern. But in the meantime, Arm's licensees will become "less healthy," to use Mr. Ashton's term, as they cut back on sharing information with and cooperating with Arm. Arm's ISA will degrade in the short term, while a shift to another ISA ecosystem in the longer term will require massive new investment and delay further development of high-quality chips at a time of significant public concern about America's competitiveness in the technology industry.

32

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

I declare under penalty of perjury that the foregoing is true and correct.

8/8/2025

_____                                    _____

Eric A. Posner                                                        Executed on

33

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Annex 1. Consulting Engagements Since 2020**

- Stephens v. American Arbitration Association (2025). Advised defendant on antitrust litigation.
- In re Broadcom (2025). Submitted report on anticompetitive behavior of employer relating to its employees. Retained by Seppinni Law, counsel for plaintiff employees.
- Sona Asset Management (2025). Advised financial institution about legal issues relating to challenges to tariffs.
- Le v. Zuffa (2024). Provided expert report supporting a proposal to settle a lawsuit brought by employees of mixed martial arts league against their employer. Retained by Berger Montague, attorney for plaintiffs.
- Department of Justice (2024). Advised on investigation of a potential merger between two entertainment-related entities. The facts are confidential.
- Sona Asset Management (2024). Advised financial institution about legal issues in Tapestry/Capri merger litigation.
- Ford Motor Co. (2021-2022). Advised automobile manufacture on antitrust strategy relating to distribution.
- Difederico v Amazon.com, Inc. et al., No. T-445-20 (Federal Court, Canada) (2021). Advised on arbitration issues relating to class action lawsuit against Amazon in Canada. Served as expert; retained by Orr Taylor LLP and Strosberg Sasso Sutts LLP.
- Latham & Watkins (2020). Advised law firm on draft commercial code for proposed foreign development zone in middle east.

1

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## Annex 2. Curriculum Vitae

**Eric A. Posner**                                                                                           **August 2025**

| **Address** | University of Chicago Law School |
|---|---|
| | 1111 E. 60th St. |
| | Chicago, IL 60637 |
| | (773)702-0425 |
| | eposner@uchicago.edu |

**Professional Experience**

| 2013-present | Kirkland & Ellis Distinguished Service Professor of Law, University of Chicago |
|---|---|
| Fall 2024 | Visiting Professor, Yale Law School |
| 2022-2023 | Counsel to the Assistant Attorney General, Antitrust Division, Department of Justice |
| Fall 2016 | Visiting Professor, Columbia Law School |
| 2003-2012 | Kirkland & Ellis Professor of Law, University of Chicago |
| Fall 2008 | Visiting Professor, NYU Law School |
| 1998-2003 | Professor of Law, University of Chicago |
| 1998 | Professor of Law, University of Pennsylvania |
| Fall 1997 | Visiting Assistant Professor of Law, University of Chicago |
| 1993-1998 | Assistant Professor of Law, University of Pennsylvania |
| 1992-1993 | Attorney Adviser, Office of Legal Counsel, U.S. Department of Justice |
| 1991-1992 | Law Clerk, Judge Stephen F. Williams, U.S. Court of Appeals, D.C. Circuit |

**Books**

Law and Social Norms: Harvard University Press (2000)
      Japanese edition (Bokutakusha, 2002)
      Chinese edition (China University of Political Science and Law Publishing House, 2005)
      Taiwanese edition (Angle Publishing Company, 2006)
      South Asia edition (Universal Law Publishing Company, 2009)

Chicago Lectures in Law and Economics (editor): Foundation Press (2000)

Cost-Benefit Analysis: Legal, Philosophical, and Economic Perspectives (editor, with Matthew Adler): University of Chicago Press (2001)

The Limits of International Law (with Jack Goldsmith): Oxford University Press (2005)
      Chinese edition (Law Press of Beijing)
      Macedonian edition

New Foundations of Cost-Benefit Analysis (with Matthew Adler): Harvard University Press (2006)
      Arabic edition (Institute of Public Administration, Saudi Arabia, 2010)

Terror in the Balance: Security, Liberty and the Courts (with Adrian Vermeule): Oxford University Press (2007)

Social Norms, Nonlegal Sanctions, and the Law (editor): Edward Elgar (2007)

The Perils of Global Legalism: University of Chicago Press (2009)
      Chinese edition (Law Press China, 2016)

Climate Change Justice (with David Weisbach): Princeton University Press (2010)
      Korean edition (Sogan Hawoo, 2016)

1

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Law and Happiness (editor, with Cass R. Sunstein): University of Chicago Press (2010)

The Economics of Public International Law (editor): Edward Elgar (2010)

The Executive Unbound: After the Madisonian Republic (with Adrian Vermeule): Oxford University Press (2011)
    German edition (Duncker & Humblot, 2014)

Contract Law and Theory: Aspen (2011)
    Second edition (2016)

Economic Foundations of International Law (with Alan Sykes): Harvard University Press (2013)
    Georgian edition (Labyrinth Publishing House, 2014)
    Persian edition (Hoosheedar Legal Publication, forthcoming)

The Twilight of Human Rights Law: Oxford University Press (2014)
    Excerpt republished in Harper's, October 2014

Last Resort: The Financial Crisis and the Future of Bailouts: University of Chicago Press (2018)
    Chinese edition (Truth and Wisdom Press, 2022)
    A Financial Times Book of the Year, 2018

Radical Markets: Uprooting Property and Democracy for a Just Society (with E. Glen Weyl): Princeton University Press (2018)
    Korean edition (Bookie Publishing House)
    Japanese edition (Toyo Keizai)
    Chinese edition (Beijing Huazhang Graphics and Information Co. Ltd.)
    Spanish edition (Antoni Bosch, 2019)
    Brazilian edition (Companhia das Letras)
    German edition (WBG, 2019 )
    Chinese (complex) edition (Gusa Press)
    Italian edition (LUISS University Press)
    Paperback edition, 2019
    An Economist Book of the Year, 2018

The Demagogue's Playbook: All Points Books (2020)
    Chinese edition (Truth and Wisdom Press)

How Antitrust Failed Workers: Oxford University Press (2021)
    Chinese edition (Ghezi Press, forthcoming)

**Articles and Book Chapters**

Contract Law in the Welfare State: A Defense of Usury Laws, the Unconscionability Doctrine, and Related Limitations on the Freedom to Contract, 24 J. Legal Stud. 283 (1995)

The Regulation of Groups: The Influence of Legal and Nonlegal Sanctions on Collective Action, 63 U. Chi. L. Rev. 133 (1996)

Law, Economics, and Inefficient Norms, 144 U. Pa. L. Rev. 1697 (1996)

The Legal Regulation of Religious Groups, 2 Legal Theory 33 (1996)

Altruism, Status, and Trust in the Law of Gifts and Gratuitous Promises, 1997 Wisc. L. Rev. 567 (1997)

The Political Economy of the Bankruptcy Reform Act of 1978, 96 Mich. L. Rev. 47 (1997) (reprinted in part in Bankruptcy Anthology (Charles J. Tabb ed. 2001)

2

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

The Parol Evidence Rule, the Plain Meaning Rule, and the Principles of Contractual Interpretation, 146 U. Pa. L. Rev. 533 (1998)

Symbols, Signals, and Social Norms in Politics and the Law, 27 J. Legal Stud. 765 (1998) (reprinted in Law and Economics (Nicholas Mercuro ed., Routledge Press, 2007); Foundations of Law and Economics (Robert Cooter & Francesco Parisi, eds., Edward Elgar, 2010))

The Strategic Basis of Principled Behavior: A Critique of the Incommensurability Thesis, 146 U. Pa. L. Rev. 1185 (1998)

The Demand for Human Cloning, in Clones and Clones: Facts and Fantasies About Human Cloning (Martha C. Nussbaum and Cass R. Sunstein, eds.): W.W. Norton (1998) (with Richard A. Posner) (Reprinted, with a postscript, in 27 Hofstra L. Rev. 579 (1999))

A Positive Theory of Chapter 11, 74 NYU Law Rev. 161 (1999) (with Kevin A. Kordana)

The Decline of Formality in Contract Law, in The Fall and Rise of Freedom of Contract (Frank Buckley, ed.): Duke University Press (1999)

Family Law and Social Norms, in The Fall and Rise of Freedom of Contract (Frank Buckley, ed.): Duke University Press (1999)

Shaming White Collar Criminals under the Federal Sentencing Guidelines, 42 J. Law & Econ. 365 (1999) (With Dan M. Kahan)

Arbitration and the Harmonization of International Commercial Law: A Defense of *Mitsubishi*, 39 Va. J. Inter'l Law 647 (1999)

Should Debtors Be Forced into Chapter 13?, 32 Loyola of Los Angeles L. Rev. 965 (1999)

A Theory of Customary International Law, 66 U. Chi. L. Rev. 1113 (1999) (with Jack L. Goldsmith)

Rethinking Cost-Benefit Analysis, 109 Yale L.J. 165 (1999) (with Matthew Adler) (Reprinted in part in Jurisprudence: Contemporary Readings, Narratives, and Problems (Robert Hayman et al., ed., 2d ed. 2002))

Contract Remedies: Foreseeability, Precaution, Causation, and Mitigation, in The Encyclopedia of Law and Economics (Boudewijn Bouckaert and Gerrit De Geest, eds.): Edward Elgar (2000)

A Theory of Contract Law Under Conditions of Radical Judicial Error, 94 Nw. U. L. Rev. 749 (2000)

Understanding the Resemblance Between Modern and Traditional Customary International Law, 40 Va. J. Int'l Law 639 (2000) (with Jack L. Goldsmith), excerpted in Edward M. Wise, International Criminal Law: Cases and Materials (3d ed. 2009)

Implementing Cost-Benefit Analysis When Preferences Are Distorted, 29 J. Legal Stud. 1105 (2000) (with Matthew Adler)

Introduction to the Conference on Cost-Benefit Analysis, 29 J. Legal Stud. 837 (2000) (with Matthew Adler)

Agency Models in Law and Economics, in *Chicago Lectures in Law and Economic* (Eric A. Posner ed., 2000), reprinted in *Game Theory and the Law* (Eric B. Rasmussen ed., 2007)

The Design and Interpretation of Contracts: Why Complexity Matters, 95 Nw. U.L. Rev. 91 (2000) (with Karen Eggleston and Richard Zeckhauser)

3

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Law and Social Norms: The Case of Tax Compliance, 86 Va. L. Rev. 1781 (2000), excerpt reprinted in *Tax Controversies: Practice and Procedure* (forthcoming)

Cost-Benefit Analysis as a Solution to a Principal-Agent Problem, 53 Admin. L. Rev. 289 (2001)

Law and the Emotions, 89 Georgetown L.J. 1977 (2001), reprinted in Law and Neuroscience (Owen D. Jones, Jeffrey D. Schall, and Francis X. Shen, eds., Wolters Kluwer, 2nd ed. forthcoming)

Controlling Agencies with Cost-Benefit Analysis: A Positive Political Theory Perspective, 68 U. Chi. L. Rev. 1137 (2001)

The Law and Economics of Consumer Finance, 4 Amer. Law & Econ. Rev. 162 (2002) (with Richard Hynes)

Legislative Entrenchment: A Reappraisal, 111 Yale L.J. 1665 (2002) (with Adrian Vermeule)

Fear and the Regulatory Model of Counterterrorism, 25 Harv. J.L. & Pub. Pol. 681 (2002)

Controlling Agencies with Net Benefit Accounts: A Thought Experiment, 150 U. Pa. L. Rev. 1473 (2002)

Moral and Legal Rhetoric in International Relations: A Rational Choice Perspective , 31 J. Legal Stud. S115 (2002) (with Jack Goldsmith)

Interring the Nondelegation Doctrine, 69 U. Chi. L. Rev. 1721 (2002) (with Adrian Vermeule), republished in translation, Revista De Direito Administrativo, 282(1), 15–61 (2023)

Economic Analysis of Contract Law After Three Decades: Success or Failure?, 112 Yale L.J. 829 (2003), reprinted in Economics of Contract Law (Douglas Baird ed. 2007) and Law in Society: Nature, Functions and Limits (Robert Hillman ed., forthcoming)

Four Economic Perspectives on American Labor Law and the Problem of Social Conflict, 159 J. Inst'l & Theoretical Econ. 101 (2003)

The Jurisprudence of Greed, 151 U. Pa. L. Rev. 1097 (2003)

International Agreement: A Rational Choice Approach, 44 Va. J. Int'l L. 113 (2003) (with Jack Goldsmith)

Reparations for Slavery and Other Historical Injustices, 103 Colum. L. Rev. 689 (2003) (with Adrian Vermeule)

A Theory of the Laws of War, 70 U. Chi. L. Rev. 297 (2003)

Do States Have a Moral Obligation to Comply with International Law?, 55 Stan. L. Rev. 1901 (2003)

Accommodating Emergencies, 56 Stan. L. Rev. 605 (2003) (with Adrian Vermeule), reprinted in The Constitution in Wartime 55 (Mark Tushnet, editor, 2005)

Transfer Regulations and Cost-Effectiveness Analysis, 53 Duke L.J. 1067 (2003)

Probability Errors: Implications for Tort and Contract Law, 11 Sup. Ct. Econ. Rev. 125 (2004), reprinted in The Law and Economics of Irrational Behavior 456 (Francesco Parisi and Vernon Smith, eds., 2005); and in Law and Economics of Uncertainty (Joshua C. Teitelbaum, ed., forthcoming)

Transitional Justice as Ordinary Justice, 117 Harv. L. Rev. 761 (2004) (with Adrian Vermeule)

The Political Economy of State Bankruptcy Exemptions, 47 J. Law & Econ. 19 (2004) (with Richard Hynes and Anup Malani)

4

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Judicial Independence in International Tribunals, 93 Calif. L. Rev. 1 (2005) (with John Yoo)

Optimal War and *Jus ad Bellum*, 93 Georgetown L.J. 993 (2005) (with Alan Sykes)

International Law and the Disaggregated State, 32 Fla. St. U. L. Rev. 797 (2005)

Dollars and Death, 72 U. Chi. L. Rev. 537 (2005) (with Cass Sunstein)

Is the International Court of Justice Biased?, 34 J. Legal Stud. 599 (2005) (with Miguel de Figueiredo)

Political Trials in Domestic and International Law, 55 Duke L. J. 75 (2005)

Should Coercive Interrogation Be Legal?, 104 Mich. L. Rev. 671 (2006) (with Adrian Vermeule)

Holding Internet Service Providers Accountable, 14 Sup. Ct. Econ. Rev. 221 (2006) (with Douglas Lichtman), reprinted in The Law and Economics of Cybersecurity (Mark F. Grady and Francesco Parisi eds. 2006)

The Decline of the International Court of Justice, in International Conflict Resolution 111 (Stefan Voigt, Max Albert, and Dieter Schmidtchen eds. 2006).

International Law: A Welfarist Approach, 73 U. Chi. L. Rev. 487 (2006)

International Law and the Rise of China, 7 Chi. J. Int'l L. 1 (2006) (with John Yoo)

Emergencies and Democratic Failure, 92 Va. L. Rev. 1091 (2006) (with Adrian Vermeule)

There Are No Penalty Default Rules in Contract Law, 33 Fla. St. U. L. Rev. 563 (2006)

The Law of Other States, 59 Stan. L. Rev. 131 (2006) (with Cass Sunstein), reprinted in *Comparative Constitutional Law*, edited by Mark Tushnet (Edward Elgar, forthcoming)

Chevronizing Foreign Relations, 116 Yale L.J. 1171 (2007) (with Cass Sunstein), reprinted in Curtis A. Bradley, Foreign Relations Law (Edward Elgar, forthcoming)

Signing Statements and Executive Power, 23 Constitutional Commentary 307 (2007) (with Curtis Bradley)

The Second-Order Structure of Immigration Law, 59 Stan. L. Rev. 809 (2007) (with Adam Cox)

Social Norms and Economic Analysis of the Law, in Economic Analysis of Law: A European Perspective (Aristides N. Hatzis ed., 2007)

An Economic Analysis of State and Individual Responsibility Under International Law, 9 Amer. L. & Econ. Rev. 72 (2007) (with Alan Sykes)

The Credible Executive, 74 U. Chi. L. Rev. 865 (2007) (with Adrian Vermeule)

The Case for For-Profit Charities, 93 Va. L. Rev. 2017 (2007) (with Anup Malani)

Timing Rules and Legislative Action, 121 Harv. L. Rev. 543 (2007) (with Jacob Gersen)

Climate Change and International Human Rights Litigation: A Critical Appraisal, 155 U. Pa. L. Rev. 1925 (2007), reprinted in Human Rights and the Environment (Svitlana Kravchenko, John E. Bonine, & Don Anton eds., 2008); Environment and Health: Issues and Implications (L. Lakshmi ed., 2008)

A Critique of the Odious Debt Doctrine, 70 Law & Contemp. Probs. 33 (2007) (with Albert Choi)

5

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

The International Protection of Cultural Property: Some Skeptical Observations, 8 Chi. J. Int'l L. 213 (2007)

Constitutional Showdowns, 156 U. Pa. L. Rev. 991 (2008) (with Adrian Vermeule)

Climate Change Justice, 96 Georgetown L.J. 1565 (2008) (with Cass Sunstein), excerpted or reprinted in Cases and Materials on Environmental Law (Daniel A. Farber, ed., forthcoming); Reflecting on Nature: Readings in Environmental Ethics and Philosophy (Lori Gruen, Dale Jamieson, and Christopher Schlottmann eds., 2d ed., Oxford, 2012); Ethics, Environmental Justice and Climate Change (by Paul G. Harris ed., Edward Elgar, forthcoming); The Ethical Life, by Russ Shafer-Landau (Oxford, forthcoming); Introducing Ethics and Contemporary Moral Issues, by Russ Shafer-Landau (Oxford, forthcoming)

Does Political Bias in the Judiciary Matter?: Implications of Judicial Bias Studies for Legal Reform, 75 U. Chi. L. Rev. 853 (2008)

Happiness Research and Cost-Benefit Analysis, 37 J. Legal Stud. S253 (2008) (with Matthew Adler)

Human Welfare, Not Human Rights, 108 Colum. L. Rev. 1758 (2008)

Soft Law: Lessons from Congressional Practice, 61 Stanford L. Rev. 573 (2008) (with Jacob E. Gersen)

Should Greenhouse Gas Permits Be Allocated on a Per Capita Basis?, 97 Calif. L. Rev. 51 (2009) (with Cass R. Sunstein), republished with modifications in Post-Kyoto International Climate Policy 343 (Joseph E. Aldy and Robert N. Stavins, eds. 2010).

Are Judges Overpaid?, 1 J. Legal Analysis 47 (2009) (with Stephen J. Choi and G. Mitu Gulati)

Erga Omnes Norms, Institutionalization, and Constitutionalism in International Law, 165 J. Institutional & Theoretical Econ. 5 (2009)

Judicial Evaluations and Information Forcing: Ranking State High Courts and Their Judges, 58 Duke L.J. 1313 (2009) (with Stephen J. Choi and Mitu Gulati)

Fault in Contract Law, 107 Mich. L. Rev. 1431 (2009), reprinted in Fault in American Contract Law (Omri Ben-Shahar & Ariel Porat eds., 2010)

Crisis Governance in the Administrative State: 9/11 and the Financial Meltdown of 2008, 76 U. Chi. L. Rev. 1613 (2009) (with Adrian Vermeule)

A Loan Modification Approach to the Housing Crisis, 11 Amer. L. & Econ. Rev. 579 (2009) (with Luigi Zingales)

The Rights of Migrants: An Optimal Contract Framework, 84 NYU L. Rev. 1403 (2009) (with Adam B. Cox), reprinted in Immigration and Nationality Law Review (forthcoming); reprinted in Law and Economics of Migration (Howard F. Chang, ed., forthcoming)

Professionals or Politicians?: The Uncertain Empirical Case for an Elected Judiciary, 26 J. Law, Econ., & Org. 290 (2010) (with Stephen Choi and Mitu Gulati)

Against Feasibility Analysis, 77 U. Chicago L. Rev. 657 (2010) (with Jonathan Masur)

Subconstitutionalism, 62 Stanford L. Rev. 1583 (2010) (with Tom Ginsburg)

ProCD v. Zeidenberg and Cognitive Overload in Contractual Bargaining, 77 U. Chicago L. Rev. 1181 (2010)

Economic Foundations of the Law of the Sea, 104 Amer. J. Inter'l L. 569 (2010) (with Alan Sykes)

Divide and Conquer, 2 J. Legal Analysis 417 (2010) (with Kathryn Spier and Adrian Vermeule)

6

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Universal Exceptionalism in International Law, 52 Harv. J. Int'l L. 1 (2011) (with Anu Bradford)

The Limits of Constitutional Convergence, 11 Chicago J. Int'l L. 399 (2011) (with Rosalind Dixon)

The Right to Withdraw in Contract Law, 40 J. Legal Stud. 115 (2011) (with Omri Ben-Shahar)

The Flaws of Foreign Affairs Legalism, 51 Va. J. Int'l L. 507 (2011) (with Daniel Abebe)

Constitutional Possibility and Constitutional Evolution, in Law, Economics and Evolutionary Theory (Peer Zumbansen and Gralf-Peter Calliess eds. 2011)

Judging Women, 8 J. Empirical Legal Stud. 504 (2011) (with Stephen J. Choi, Mitu Gulati, and Mirya Holman)

Pricing Terms in Sovereign Debt Contracts: A Greek Case Study With Implications for the European Crisis Resolution Mechanism, 6 Capital Markets L.J. 163 (2011) (with Stephen J. Choi and Mitu Gulati)

Climate Regulation and the Limits of Cost-Benefit Analysis, 99 California L. Rev. 1557 (2011) (with Jonathan Masur)

Efficient Breach of International Law: Optimal Remedies, "Legalized Noncompliance," and Related Issues, 110 Mich. L. Rev. 243 (2011) (with Alan Sykes)

Deference to The Executive in the United States After September 11: Congress, the Courts, and the Office of Legal Counsel, 35 Harv. J.L. & Pub. Pol'y 213 (2012)

Tyrannophobia, in *Comparative Constitutional Design* (Tom Ginsburg, ed. 2012) (with Adrian Vermeule)

What Do Federal District Judges Want?: An Analysis of Publications, Citations, and Reversals, 28 J. Law, Econ., & Org. 518 (2012) (with Stephen J. Choi and Mitu Gulati)

The Evolution of Contractual Terms in Sovereign Bonds, 4 J. Legal Analysis 131 (2012) (with Stephen J. Choi and Mitu Gulati)

Unemployment, Regulation, and Cost-Benefit Analysis, 98 Va. L. Rev. 579 (2012) (with Jonathan Masur)

Aggregation and the Law, 122 Yale L.J. 2 (2012) (with Ariel Porat)

Human Rights, the Laws of War, and Reciprocity, 6 L. & Ethics of Human Rights 148 (2012)

Delegation in Immigration Law, 79 U. Chicago L. Rev. 1285 (2012) (with Adam Cox)

International Paretianism: A Defense, 13 Chicago J. Int'l L. 347 (2013) (with David Weisbach)

The Questionable Basis of the Common European Sales Law: The Role of an Optional Instrument in Jurisdictional Competition, 50 Common Market L. Rev. 261 (2013)

The Institutional Structure of Immigration Law, 80 U. Chicago L. Rev. 289 (2013)

Benefit-Cost Analysis for Financial Regulation,  103 Amer. Econ. Rev.: Papers & Proceedings 393 (2013) (with E. Glen Weyl), reprinted in Economics of Financial Law (Geoffrey P. Miller, ed., Edward Elgar, forthcoming)

The Law and Policy of Judicial Retirement: An Empirical Study, 42 J. Legal Stud. 111 (2013) (with Stephen J. Choi and Mitu Gulati)

The Dynamics of Contract Evolution, 88 NYU L. Rev. 1 (2013) (with Stephen J. Choi and Mitu Gulati)

7

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

An FDA for Financial Innovation: Applying the Insurable Interest Doctrine to 21st-Century Financial Markets, 107 Northwestern U. L. Rev. 1307 (2013) (with E. Glen Weyl)

International Law and the Limits of Macroeconomic Cooperation, 86 S. Cal. L. Rev. 1025 (2013) (with Alan Sykes)

Inside or Outside the System?, 80 U. Chicago L. Rev. 1743 (2013) (with Adrian Vermeule)

How Well Do Measures of Judicial Ability Predict Judicial Performance?: A Case Study Using Securities Class Actions, 33 Inter'l Rev. L. & Econ. 37 (2013) (with Stephen J. Choi and Mitu Gulati)

Quadratic Voting as Efficient Corporate Governance, 81 U. Chicago L. Rev. 251 (2014) (with E. Glen Weyl)

Voting Rules in International Organizations,15  Chicago J. Int'l L. 195 (2014) (with Alan O. Sykes), reprinted in The Law and Politics of International Organizations (Kenneth W. Abbott, ed., Edward Elgar, forthcoming)

Offsetting Benefits, 100 Va. L. Rev. 1165 (2014) (with Ariel Porat)

Unemployment and Regulatory Policy, in *Does Regulation Kill Jobs?* (edited by Cary Coglianese and Adam M. Finkel, 2014) (with Jonathan Masur)

Benefit-Cost Paradigms in Financial Regulation, 43 J. Legal Stud. S1 (2014) (with E. Glen Weyl)

Altruism Exchanges and the Kidney Shortage, 77 Law & Contemp. Probs. 289 (2014) (with Mitu Gulati & Stephen J. Choi), excerpted in part in The Law of Bioethics: Individual Autonomy and Social Regulation (Marsha Garrison, ed., West Publishing, 3d ed., forthcoming 2015)

Voting Squared: Quadratic Voting in Democratic Politics, 68 Vand. L. Rev. 441 (2015) (with E. Glen Weyl)

Cost-Benefit Analysis of Financial Regulations: A Response to Criticisms, 124 Yale L.J. F. 246 (2015) (with E. Glen Weyl)

The Role of Competence in Promotions from the Lower Federal Courts, 44 J. Legal Stud. S107 (2015) (with Stephen J. Choi and Mitu Gulati)

How Do Bank Regulators Determine Capital-Adequacy Requirements?, 82 U. Chicago L. Rev. 1853 (2015)

An Empirical Study of Political Bias in Legal Scholarship, 44 J. Legal Stud. 277 (2015) (with Adam Chilton)

A Framework for Bailout Regulation, 91 Notre Dame L. Rev. 479 (2015) (with Anthony Casey)

Toward a Pigouvian State, 164 U. Penn. L. Rev. 93 (2015) (with Jonathan Masur)

Institutional Flip-Flops, 94 Tex. L. Rev. 485 (2016) (with Cass Sunstein)

The Law, Economics, and Psychology of Manipulation, 1 J. Marketing Behavior 267 (2016)

Should Human Rights Law Play a Role in Development?, World Bank Econ. Rev. (2016)

The Votes of Other Judges, 105 Georgetown L.J. 159 (2016) (with Adrian Vermeule)

The Influence of History on States' Compliance with Human Rights Obligations, 56 Va. J. Int'l L. 216 (2016) (with Adam Chilton)

The Constitution of the Roman Republic, in Roman Law and Economics (Giuseppe Dari-Mattiacci ed., Oxford University Press, 2020).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Unquantified Benefits, 102 Cornell L. Rev. 87 (2016) (with Jonathan Masur)

Supreme Court Justices' Loyalty to the President, 45 J. Legal Stud. 401 (2016) (with Lee Epstein)

What Legal Authority Does the Fed Need During a Financial Crisis?, 101 Minn. L. Rev. 1529 (2017)

Demystifying Schmitt, in the Oxford Handbook of Carl Schmitt (Jens Meierhenrich & Oliver Simons, eds., 2017) (with Adrian Vermeule)

Martti Koskenniemi on Human Rights: An Empirical Perspective, in The Law of International Lawyers 121 (Wouter Werner, Marieke de Hoon, & Alexi Galan eds. 2017)

Quadratic Election Law, 172 Public Choice 265 (2017) (with Nicholas Stephanopoulos)

Property Is Only Another Name for Monopoly, 9 J. Legal Analysis 51 (2017) (with Glen Weyl)

Moral Commitments in Cost-Benefit Analysis, 103 Va. L. Rev. 1809 (2017) (with Cass R. Sunstein)

A Proposal to Limit the Anticompetitive Power of Institutional Investors, 81 Antitrust L.J. 669 (2017) (with Fiona Scott Morton & Glen Weyl)

Should Regulation Be Countercyclical?, 34 Yale J. Reg. 857 (2018) (with Jonathan S. Masur)

The Dictator's Handbook, U.S. Edition, in Can It Happen Here?: Authoritarianism in America (Cass Sunstein ed., 2018)

Country-Specific Investments and the Rights of Non-Citizens, 57 Va. J. Int'l L. 575 (2018) (with Adam Chilton)

Cost-Benefit Analysis and the Judicial Role, 85 U. Chicago L. Rev. 935 (2018) (with Jonathan Masur)

The Decline of Supreme Court Deference to the President, 166 U. Pa. L. Rev. 829 (2018) (with Lee Epstein)

Presidential Obstruction of Justice, 106 Calif. L. Rev. 1277 (2018) (with Daniel J. Hemel)

The Trump Presidency: A Constitutional Crisis in the United States?, in Constitutional Democracy in Crisis? (Mark A. Grabler, Sanford Levinson, and Mark Tushnet, eds., Oxford University Press, 2018)

A Proposal for Protecting Low-Income Workers from Monopsony and Collusion, Hamilton Project (2018) (with Alan B. Krueger)

Antitrust Remedies for Labor Market Power, 132 Harvard L. Rev. 536 (2018) (with Suresh Naidu and E. Glen Weyl), winner Antitrust Writing Awards, Best Academic Article, 2019

Treaties and Human Rights: The Role of Long-Term Trends, 81 L. & Contemp. Probs. 1 (2018) (with Adam S. Chilton)

A Proposal to Enhance Antitrust Protection Against Labor Market Monopsony, Roosevelt Institute Working Paper (2019) (with Ioana Marinescu)

Norming in Administrative Law, 68 Duke L.J. 1383 (2019) (with Jonathan Masur)

Rule-of-Law Objections to the Lender of Last Resort, in *Constitutions in Times of Financial Crisis* (Tom Ginsburg, Mark D. Rosen, and Georg Vanberg, eds., 2019)

9

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Why Has Antitrust Law Failed Workers?, 104 Cornell L. Rev. 1453 (2020) (with Ioana Marinescu), awarded Jerry S. Cohen Memorial Fund Writing Award for Best Article of 2020 on Labor Antitrust

Antitrust-Plus: Evaluating Additional Policies to Tackle Labor Monopsony, Roosevelt Institute (May 2020) (with Suresh Naidu)

The Antitrust Challenge to Covenants Not to Compete in Employment Contracts, 83 Antitrust L.J. 165 (2020)

Policy Implications of the Common Ownership Debate, 65 Antitrust Bulletin (2021)

Ownership and Rent Stigma: Two Experiments, 7 Behavioral Public Policy 353 (2020) (with Tamar Kricheli-Katz)

Labor Monopsony and European Competition Law, Concurrences, No. 4-2020 (2020) (with Cristina A. Volpin)

Chevronizing Around Cost-Benefit Analysis, 70 Duke Law Journal 1109 (2021) (with Jonathan Masur)

The Economic Basis of the Independent Contractor / Employee Distinction, 100 Texas L. Rev. 353 (2021)

The Boundaries of Normative Law and Economies, 38 Yale J. Reg. 657 (2021)

*The Limits of International Law* Fifteen Years Later, 22 Chicago J. Int'l L. 110 (2021) (with Jack L. Goldsmith)

Labor Monopsony and the Limits of the Law, 57 J. Hum. Resources S284 (2022) (with Suresh Naidu)

The Roberts Court and the Transformation of Constitutional Protections for Religion: A Statistical Portrait, 2022 Sup. Ct. Rev. 315 (forthcoming, 2022) (with Lee Epstein)

Antitrust and Labor Markets: A Reply to Richard Epstein, 15 NYU J. Law & Liberty 389 (2022)

Antitrust and Inequality, 2 Amer. J. L. & Equality 190 (2022) (with Cass R. Sunstein)

Constitutional Challenges to Public Health Orders in Federal Courts during the COVID-19 Pandemic, 102 B.U. L. Rev. 1729 (2022) (with Kenny Mok)

The Political Economy of the Decline of Antitrust Enforcement, 85 Antitrust L.J. 441 (2023) (with Filippo Lancieri and Luigi Zingales)

Horizontal Collusion and Parallel Wage-Setting in Labor Markets, 90 U. Chi. L. Rev. 545 (2023) (with Jonathan Masur), Winner, 2023 Antitrust Writing Awards: Academic Articles, Concerted Practices

The Real Political Question Doctrine, 75 Stanford L. Rev. 1031 (2023) (with Curtis Bradley)

Enforcement of U.S. Antitrust Law in Labour Markets, J. Antitrust Enforcement (2023)

No-poach Agreements: An Overview of EU and National Case Law, Concurrences (May 4, 2023) (with Cristina Volpin)

Market Power, Not Consumer Welfare: A Return to the Foundations of Merger Law, 86 Antitrust L.J. 205 (2024)

Labor Market Traps, Behavioural Public Policy 1 (2024)

The New Labor Antitrust, 86 Antitrust L.J. 503 (2024)

Trump's Lower Court Judges and Religion: An Initial Appraisal, 54 J. Legal Stud. 1 (2025) (with Steven Choi and Mitu Gulati)

10

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

The Common Political Foundations of Originalism and Cost-Benefit Analysis, 77 Administrative Law Review 65 (2025) (with Jonathan Masur)

The Tom Sawyer Effect: Invisible Work and Labor Market Power, 2024 Michigan State Law Review 551 (2024)

Merger Guidelines for the Labor Market, 153 J. Monetary Econ. (2025) (with David Berger, Thomas Hasenzagl, Kyle Herkenhoff, and Simon Mongey)

Market Share Liability and Anticompetitive Behavior: A Perspective from Antitrust Law, J. Law, Econ., & Policy (forthcoming)

Matching Markets and Labor Monopsony: A Comment on the Priest/Roth Debate, Yale J. Reg. (forthcoming)

Should Unions Play a Role in Merger Review?, Antitrust L.J. (forthcoming)

**Book Reviews, Comments, Opinion Pieces, Replies, and Other Short Pieces**

Norms, Formalities, and the Statute of Frauds: A Comment, 144 U. Pa. L. Rev. 1971 (1996)

Standards, Rules, and Social Norms, 21 Harv. J.L. & Pub. Policy 101 (1997)

Efficient Norms, in The New Palgrave Dictionary of Economics and the Law (Peter Newman, ed.): Macmillan (1998)

Notes Toward a Theory of Customary International Law, 92 ASIL Proceedings 53 (1998) (with Jack L. Goldsmith)

Law and Regret (Review of *Changing Your Mind* by E. Allan Farnsworth), 98 Mich. L. Rev. 1468 (2000)

Review of *The New Palgrave Dictionary of Economics and the Law*, edited by Peter Newman, 110 Econ J. 824 (2000)

Law and Economics for the Masses (Review of *Law's Order* by David Friedman), Jurist (2000)

Strategies of Constitutional Scholarship (Review of *The Strategic Constitution* by Robert D. Cooter), 26 Law & Social Inquiry 529 (2001)

Review of *The Jurisprudential Foundations of Corporate and Commercial Law*, edited by Jody S. Kraus and Steven D. Walt, 112 Ethics 626 (2002)

Review of *Law and Market Economy*, by Robin Paul Malloy, 18 Economics and Philosophy 183 (2002)

The Signaling Model of Social Norms: Further Thoughts, 36 U. Rich. L. Rev. 465 (2002)

Further Thoughts on Customary International Law, 23 Mich. J. Inter'l L. 191 (2002) (with Jack Goldsmith)

Introduction to a Conference on Rational Choice and International Law, 31 J. Legal Stud. S1 (2002)

Comment on Jean Braucher's Means Testing Consumer Bankruptcy, 7 Fordham J. Corp & Fin. L. 457 (2002)

When Reforming Accounting, Don't Forget Regulation. Policy Matters 02-35, AEI-Brookings Joint Center (August 2002)

Forward to the Japanese Edition of Law and Social Norms (Ota Shozo et al. trans. 2002)

Crimes and Punishment, Wall Street Journal, April 11, 2003, p. A10 (with Adrian Vermeule)

11

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Tobacco Regulation or Litigation? (Review of *Smoke-Filled Rooms* by W. Kip Viscusi), 70 U. Chi. L. Rev. 1141 (2003)

The Nondelegation Doctrine: A Postmortem, 70 U. Chi. L. Rev. 1331 (2003) (with Adrian Vermeule)

The Patriot Act Under Fire, Wall Street Journal, December 9, 2003, p. A10 (with John Yoo)

Bankruptcy Act of 1978, in Major Acts of Congress (Brian K. Landsberg ed., 2003), vol. 1, p. 59

Reign of Terror, Chicago Tribune, January 18, 2004 (with John Yoo)

Evaluating Transfer Regulations, 26 Regulation 42 (2004)

International Court of Hubris, Wall Street Journal, April 7, 2004, p. A18 (with John Yoo)

Bring Back the Baathists, The New York Times, April 28, 2004, p. A23

Emergencies and Political Change: A Reply to Tushnet, 56 Stan. L. Rev. 1593 (2004) (with Adrian Vermeule)

A "Torture" Memo and Its Tortuous Critics, The Wall Street Journal, July 6, 2004, p. A22 (with Adrian Vermeule)

Remarks on the Alien Tort Claims Act and Transitional Justice, 98 Am. Soc'y Int'l L. Proc. 56 (2004)

Transnational Legal Process and the Supreme Court's 2003-2004 Term: Some Skeptical Observations, 12 Tulsa Journal of Comparative and International Law 23 (2004)

Terrorism and the Laws of War, 5 Chi. J. Int'l L. 423 (2005)

Contract Theory, in The Blackwell Guide to the Philosophy of Law and Legal Theory 138 (Martin P. Golding and William A. Edmundson eds. 2005)

Law, in The Encyclopedia of Social Measurement 463 (Kimberly Kempf-Leonard ed. 2005)

All Justice, Too, Is Local, The New York Times, December 30, 2004, p. A23

All Hail...King George?, Foreign Policy Online, http://www.foreignpolicy.com/story/files/story2814.php (March 2005)

The International Court of Justice: Voting and Usage Statistics, ASIL Papers and Proceedings 130 (2005).

Where's the Old Bolton When We Need Him?, Los Angeles Times, April 19, 2005, p. B13 (with John Yoo)

Judicial Clichés On Terrorism, The Washington Post, August 8, 2005, p. A15 (with Adrian Vermeule)

Justice Within Limits, The New York Times, September 26, 2005, p. A20

The Politics of Saddam's Trial, openDemocracy.net, October 31, 2005, republished in German translation as Recht in Verlegenheit, Süddeutsche Zeitung, Nov. 28, 2005, p. 15

Reply to Helfer and Slaughter, 93 Cal. L. Rev. 957 (2005) (with John Yoo)

Sins of the Fatherland, The Boston Globe, March 5, 2006, E4

The New International Law Scholarship, 34 Ga. J. Inter'l & Comp. L. 463 (2006)

A Threat That Belongs Behind Bars, The New York Times, June 25, 2006, s. 4, p. 12

12

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Apply the Golden Rule to al Qaeda?, The Wall Street Journal, July 15, 2006, p. A9

Signing Statements: It's a President's Right, The Boston Globe, August 3, 2006 (with Curtis Bradley)

A Better Way on Detainees, The Washington Post, August 4, 2006, p. A17 (with Jack Goldsmith)

Review of *Terrorism and the State: Rethinking the Rules of State Responsibility*, by Tal Becker, 121 Pol. Sci. Q. 505 (2006)

The Humanitarian War Myth, The Washington Post, October 1, 2006, p. B7

On Learning from Others, 59 Stan. L. Rev. 1309 (2007) (with Cass Sunstein)

What the Cold War Taught Us, The Wall Street Journal, April 21, 2007, p. A9

Agencies Should Ignore Distant-Future Generations, 74 U. Chi. L. Rev. 139 (2007)

Review of Robert E. Scott and Paul B. Stephan, *The Limits of Leviathan: Contract Theory and the Enforcement of International Law*, 101 Amer. J. Int'l L. 509 (2007)

The New Race for the Arctic, The Wall Street Journal, August 3, 2007, p. A8

Pay China to Cut Emissions, The Financial Times, August 5, 2007, p. 11 (with Cass Sunstein)

Originalism and Emergencies: A Reply to Lawson, 87 B.U. L. Rev. 313 (2007) (with Adrian Vermeule)

The Great Divide, The New Republic.com, December 20, 2007 http://tnr.com/politics/story.html?id=86d685dd-948a-43db-b496-260027868950 (with Cass Sunstein)

Review of *Law without Nations?: Why Constitutional Government Requires Sovereign States*, by Jeremy A. Rabkin, 4 Perspectives on Politics 432 (2007)

Out of Commission, Slate, February 13, 2008 (with Jack Goldsmith)

The Ethics of Climate Change, 31 Regulation 14 (2008) (with Cass Sunstein)

Policy by Reflex, Review of Stephen Holmes, *The Matador's Cape: America's Reckless Response to Terrorism*, 70 Review of Politics 513 (2008)

Diplomacy, Arbitration, and International Courts, in The Role of International Courts (Carl Baudenbacher & Erhard Busek eds., German Law Publishers, 2008)

Review of Benjamin Wittes, *Law and the Long War*, New York Post, July 27, 2008

Does Europe Believe in International Law?, Wall Street Journal, November 25, 2008 (with Jack Goldsmith)

Destructive Technologies Require Us to Reassess Civil Liberties, Boston Review, December 10, 2008

Introduction to the Conference on Law and Happiness, 37 J. Legal Stud. S1 (2008) (with Cass Sunstein)

An Argument Against Legal Extremism, Review of Philip K. Howard, *Life Without Lawyers: Liberating Americans From Too Much Law*, The Daily Beast, February 17, 2009 (with Robert Silver)

The Better, Cheaper Mortgage Fix, Slate, March 2, 2009 (with Luigi Zingales)

13

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

New Foundations of Cost–Benefit Analysis: A Reply to Professors Sinden, Kysar, and Driesen, 3 Regulation & Governance 72 (2009) (with Matthew Adler)

Outcomes, Outcomes, Review of Jack M. Balkin & Reva B. Siegel, eds., *The Constitution in 2020*, The New Republic, August 12, 2009, p. 43 (with Adrian Vermeule)

Do Women Make Better Judges?, Slate, October 2, 2009 (with Stephen Choi, Mitu Gulati, and Mirya Holman)

The Decider, Review of Frank J. Colluci, *Justice Kennedy's Jurisprudence: The Full and Necessary Meaning of Liberty*, The New Republic, The Book, January 11, 2010

Executive Decision, Review of Benjamin Kleinerman, *The Discretionary President: The Promise and Peril of Executive Power*, The New Republic, The Book, March 30, 2010

Garzon and the Trouble With International Law, Wall Street Journal, April 14, 2010

The Limits of Limits, Review of Kal Raustiala, *Does the Constitution Follow the Flag?: The Evolution of Territoriality in American Law*, The New Republic, May 5, 2010, p. 36

The Case for Electing Judges in Missouri, Newsweek, May 17, 2010

The Prudent and the Imprudent, Review of Gabriel Schoenfeld, *Necessary Secrets: National Security, the Media, and the Rule of Law*, The New Republic, The Book, May 17, 2010

Europe's Missing Identity, Wall Street Journal, European Edition, June 4, 2010

The Gaza Blockade and International Law, Wall Street Journal, June 4, 2010, p. A19

Echoes of Subprime Ring Out Across Greek Debt Crisis, Financial Times, June 28, 2010 (with Mitu Gulati)

The Four Tops, Review of Noah Feldman, *Scorpions: The Battles and Triumphs of FDR's Great Supreme Court Justices*, The New Republic, The Book, October 14, 2010

POTUS-Phobia, Review of Bruce Ackerman, *The Decline and Fall of the American Republic*, The New Republic November 11, 2010, p. 33

How Not To Solve the European Debt Crisis, Slate, December 2, 2010 (with Mitu Gulati)

Introduction, in The Economics of Public International Law (Eric A. Posner, ed.): Edward Elgar (2010)

Evaluating the Effects of International Law: Next Steps, 1 Global Policy 334 (2010),

One Side Now, Review of Erwin Chemerinsky, *The Conservative Assault on the Constitution*, The New Republic, The Book, January 2, 2011

Why Is Originalism So Popular?, The New Republic, January 14, 2011, online

Obama's Cost-Benefit Revolution, The New Republic, January 22, 2011, online

Huck and Jim and Law, Review of Ethan J. Leib, *Friend v. Friend: The Transformation of Friendship and What the Law Has to Do with it*, The New Republic, The Book, February 21, 2011

Dockets of War, The National Interest, March-April 2011

The Court of Literature, Review of Kenji Yoshino, *A Thousand Times More Fair: What Shakespeare's Plays Tell Us About Justice*, The New Republic, The Book, April 14, 2001

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

The Lying Game, Review of James Stewart, *Tangled Webs: How False Statements are Undermining America: From Martha Stewart to Bernie Madoff*, The New Republic, The Book, May 29, 2011

The Beginning and the End, Review of Elizabeth Price Foley, *The Law of Life and Death*, The New Republic, The Book, June 23, 2011

Libyan Legal Limbo, Slate, June 27, 2011 (with Adrian Vermeule)

Stop Complaining About Harold Koh's Interpretation of the War Powers Act, The New Republic, July 1, 2011

Shooting It Out, Review of Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America*, The New Republic, The Book, July 6, 2011

Obama Should Raise the Debt Ceiling on His Own, The New York Times, July 22, 2011 (with Adrian Vermeule)

Casual with the Court, Review of Kevin J. McMahon, *Nixon's Court: His Challenge to Judicial Liberalism and Its Political Consequences*, The New Republic, The Book, October 24, 2011

Outside the Law, Foreign Policy, October 25, 2011

Liberalism and Concealment, Review of Anita Allen, *Unpopular Privacy: What Must We Hide?*, The New Republic, The Book, December 13, 2011

Newt and His Surprising Liberal Allies, Slate, December 20, 2011

Review of Larry May, *Global Justice and Due Process*, 25 Ethics & Inter'l Aff. 481 (2011)

The Longest Battle, Review of Mary Dudziak, *War Time*, The New Republic, The Book, February 6, 2012

A Minimalist Reparations Regime for the International Criminal Court, Human Rights and International Criminal Law Online Forum, February 2012, reprinted in *Contemporary Issues Facing the International Criminal Court* (Richard H. Steinberg ed., Brill Nijhoff)

An FDA for Securities Could Help Avert Crises, Bloomberg, April 2, 2012 (with Glen Weyl)

Not Worth the Gamble, Slate, April 4, 2012 (with Glen Weyl)

How Do We Know?, Review of Jim Manzi, Uncontrolled: The Surprising Payoff of Trial-and-Error for Business, Politics, and Society, The New Republic, The Book, April 25, 2012

How Low Can We Go?, Review of Daniel Gross, Better, Stronger, Faster: The Myth of American Decline ... and the Rise of a New Economy, The New Republic, The Book, May 17, 2012

Transitional Prudence: A Comment on David Dyzenhaus, *Leviathan as a Theory of Transitional Justice*, 51 NOMOS 218 (2012)

Perils and Privileges, Review of Ananda Rose, Showdown in the Sonoran Desert: Religion, Law, and the Immigration Controversy, The New Republic, The Book, June 11, 2012

The Absurd International Criminal Court, Wall Street Journal, June 11, 2012, at A13

The Imperial President of Arizona, Slate, June 26, 2012

Capitalism *Is* Regulation, Review of Edward Conard, Unintended Consequences: Why Everything You've Been Told about the Economy Is Wrong, The New Republic, The Book, July 5, 2012

15

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Some Skeptical Comments on Beth Simmons's Mobilizing for Human Rights, 44 NYU J. Inter'l Law & Politics 819 (2012)

The Other Value of Life, Review of Kenneth R. Feinberg, Who Gets What: Fair Compensation After Tragedy and Financial Upheaval, The New Republic, The Book, July 31, 2012

Assange's London Bunker, Wall Street Journal, August 21, 2012, at A13

The Lincoln Laws, Review of John Fabian Witt, Lincoln's Code, Slate, August 28, 2012

The World Doesn't Love the First Amendment, Slate, September 25, 2012

Overruled: How Conservative Was Chief Justice Rehnquist?, Review of John A. Jenkins, The Partisan: The Life of William Rehnquist, The New Republic, The Book, October 2, 2012

Obama's Drone Dilemma, Slate, October 8, 2012

The Drones Are Coming to Libya, Slate, October 17, 2012

Why Amnesty Should Lose at the Supreme Court, Slate, October 26, 2012

Citizens United Is Still Worth Hating, Slate, November 9, 2012

Don't Worry About the Voting Rights Act, Slate, November 20, 2012 (with Nicholas Stephanopoulos)

Is Israel or Hamas Breaking International Law in Gaza?, Slate, November 27, 2012

The War on Terror Will Be Ever With Us, Slate, December 11, 2012

Why the U.S. Shouldn't Sign On to Empty Human Rights Treaties, Slate, December 21, 2012

Against Casino Finance, National Affairs, No. 14, p. 58, Winter 2013 (with Glen Weyl)

The President Has the Power to Raise the Debt Ceiling on His Own, Slate, January 4, 2013

The Danger Lurking Behind the Platinum Coin, Slate, January 10, 2013

How Aaron Swartz's Cause Wins in the End, Slate, January 22, 2013

There's No Such Thing as an Illegal Immigrant, Slate, February 4, 2013

Benefit-Cost Analysis for Financial Regulation, HLS Forum on Corporate Governance and Financial Regulation, February 4, 2013 (with Glen Weyl)

President Obama Can Do Anything He Wants To Fight Terrorism, Slate, February 5, 2013

Ronald Dworkin's Error, Slate, February 19, 2013

The Mother of DNA Databases, Slate, March 5, 2013

Indefinite Articles, Slate, March 19, 2013

The Real Problem With Law Schools, Slate, April 2, 2013

16

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Introduction to Symposium on Immigration Law and Institution Design, 80 U. Chicago L. Rev. 1 (2013) (with Adam B. Cox and Richard A. Epstein)

Fool's Gold, Slate, April 11, 2013

The New Law We Need in Order to Deal With Dzhokhar Tsarnaev, Slate, April 22, 2013

The United States Can't Be the World's Courthouse, Slate, April 24, 2013

President Obama Can Shut Guantanamo Whenever He Wants, Slate, May 2, 2013

Shareholder Democracy Needs People To Pay for Their Votes, Financial Times, May 13, 2013 (with Glen Weyl)

The Killer Robot War Is Coming, Slate, May 15, 2013

Secrets and Scoops, Slate, May 17, 2013 (exchange with Emily Bazelon)

President Ruthless, Slate, May 23, 2013

The Good Way to Buy Votes, Slate, June 5, 2013

Quadratic Vote Buying, Square Root Voting, and Corporate Governance, HLS Forum on Corporate Governance and Financial Regulation, June 6, 2013 (with Glen Weyl)

Secrecy and Freedom, New York Times Room for Debate, June 9, 2013 (exchange with Jameel Jaffer)

Supreme Court 2013: Year in Review, Slate, June 20-27, 2013 (with Emily Bazelon, Walter Dellinger, and Richard Posner)

Why Won't Anyone Take Edward Snowden?, Slate, July 3, 2013

Wrong Number, Slate, July 9, 2013

How to Make Poison Pills Palatable, New York Times DealBook, July 17, 2013

Secrets and Scoops, Part 2, Slate, July 22, 2013 (exchange with Emily Bazelon)

The Best Rescue Plan for Detroit, Slate, July 23, 2013

Square Root Voting: A New Approach to Regulation of Chaebol, Keiretsu, and Other Conglomerate Organizations in Asia, The CLS Blue Sky Blog, July 24, 2013 (with E. Glen Weyl and Sang-Seung Yi)

The Virtues of Government Secrecy, Slate, August 5, 2013

Frisk Aversion, Slate, August 21, 2013

The U.S. Has No Legal Basis to Intervene in Syria, Slate, August 28, 2013

Obama Is Only Making His War Powers Mightier, Slate, September 3, 2013

The U.S. Ignores the U.N. Charter Because It's Broken, Slate, September 9, 2013

Assad and the Death of the International Criminal Court, Slate, September 19, 2013

On the Debt Ceiling, at Least, Congress Will Blink, Slate, September 30, 2013

17

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Emergency Powers Let the President Borrow, New York Times Room for Debate, October 2, 2013

Three Ways Obama Could Raise the Debt Ceiling On His Own, The New Republic, online, October 7, 2013

If He Has to, Obama Should Raise the Debt Ceiling Unilaterally, Slate, October 11, 2013 (with Emily Bazelon)

Never Again, Slate, October 16, 2013

A Solution to the Collective Action Problem in Corporate Reorganization, HLS Forum on Corporate Governance and Financial Regulation, October 23, 2013 (with Glen Weyl)

Is the Constitution Written Like the Da Vinci Code?, Slate, October 31, 2013

The Paradox of Secrecy, Review of Rahul Sagar, Secrets and Leaks, The New Republic, November 11, 2013, at p. 52

Keep Spying on Foreigners, NSA, Slate, November 14, 2014

You Can Have Either Climate Justice or a Climate Treaty, Slate, November 19, 2014

Benefit-Cost Paradigms in Financial Regulation, HLS Forum on Corporate Governance and Financial Regulation, November 20, 2013 (with Glen Weyl)

Centrists Should Mourn the Demise of the Filibuster, Slate, November 22, 2013

Bitcoin's Bandwagon Has Never Been More Crowded, The New Republic, online, December 3, 2013

How to Make Sure the Volcker Rule Survives in Court, Bloomberg View, December 10, 2013

Stop Fussing Over Personhood, Slate, December 11, 2013

The NSA's Metadata Program Is Perfectly Constitutional, Slate, December 30, 2013

Forget the Framers, Slate, January 8, 2014

The Case for Cost-Benefit Analysis in Financial Regulation, 36 Regulation 30, Winter 2013-2014

Make Journalists Testify, Slate, January 16, 2014

Let's Make a Deal with Snowden, Slate, January 27, 2014

A Powerful Tool to Use With Caution, New York Times, Room for Debate, January 29, 2014

The Presidency Comes With Executive Power. Deal With It, The New Republic, online, February 3, 2014

Socialized Law Would Be a Massive, Unworkable Nightmare, The New Republic, online, February 4, 2014

Now That Boehner Has Backed Down, Let's Fix The Debt Ceiling For Good, The New Republic, online, February 11, 2014

The Paranoid Libertarian and His Enemy, the Angry Liberal, Slate, February 14, 2014

Why Are China and Japan Inching Toward War Over Five Tiny Islands?, Slate, February 25, 2014

Let Crimea Go, Slate, March 10, 2014

18

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

What to Do About Crimea? Nothing, Slate, March 27, 2014

In Defense of GM, Slate, April 10, 2014

The Puzzle of Paying Amy, Slate, April 25, 2014

The U.S. Constitution Is Impossible to Amend, Slate, May 5, 2014

Sorry, America, the New World Order Is Dead, Foreign Policy, May 6, 2014

We All Have the Right to Be Forgotten, Slate, May 14, 2014

China Can Sink All the Boats in the South China Sea, Slate, May 28, 2014

Rappers v. Scotus, Slate, June 12, 2014

Supreme Court 2014: Year in Review, Slate, June 25-July 1, 2014 (with Emily Bazelon, Walter Dellinger, Dahlia Lithwick, Richard Posner, and Larry Tribe)

Boehner's Lawsuit Against Obama Is a Loser, Slate, July 11, 2014

Why and How the Government Should Assess the Costs and Benefits of Financial Regulations, 13 Review of Financial Regulation Studies 4 (Summer 2014) (with E. Glen Weyl)

We Don't Need to End "Too Big to Fail," Slate, July 28, 2014

Thomas Piketty Is Wrong: America Will Never Look Like a Jane Austen Novel, The New Republic, July 31, 2014

Obama Is Legally Allowed to Enforce—or Not Enforce—the Law, The New Republic, August 3, 2014

Yes, Obama Can Stop Millions of Deportations, Slate, August 12, 2014

Treaty-ish, Slate, August 28, 2014

Let Scotland Go Free, Slate, September 11, 2014

Obama Can Bomb Pretty Much Anything He Wants To, Slate, September 23, 2014

Eric Holder's Legacy, Slate, September 25, 2014

How Do Bank Regulators Determine Capital Adequacy Requirements?, Harvard Law School Forum on Corporate Governance and Financial Regulation, October 15, 2014

A Moral Market, Slate, October 17, 2014

Legacy Time, Slate, November 6, 2014

A Radical Solution to Global Income Inequality: Make the U.S. More Like Qatar, The New Republic, November 6, 2014 (with Glen Weyl)

The Human-Rights Charade, The Chronicle of Higher Education, November 17, 2014

The President's Constitutional Authority Is Clear, New York Times Room For Debate, November 18, 2014

Obama's Immigration Plan Is Perfectly Constitutional, Slate, November 20, 2014

19

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Obama's Immigration Order Is a Gift to Future Republican Presidents, The New Republic, November 23, 2014

The Twilight of Human Rights Law, openDemocracy.net, November 25, 2014

Prosecuting Dictators Is Futile, Slate, December 3, 2014

The Case Against Human Rights, The Guardian, December 4, 2014

Why Obama Won't Prosecute Torturers, Slate, December 9, 2014

The Year of the Dictator, Slate, December 22, 2014

Have Human Rights Treaties Failed?, New York Times Room for Debate, December 28, 2014 (with Kenneth Roth)

Why Uber Will—and Should—Be Regulated, Slate, January 5, 2015

Let's Admit It: Human Rights Law Is a Complete Failure, Washington Post, January 14, 2015

Why Do Judges and Politicians Flip-Flop?, Slate, January 26, 2015

Universities Are Right—and Within Their Rights—to Crack Down on Speech and Behavior, Slate, February 12, 2015

Faithfully Executed, Slate, February 19, 2015

Exchanges No One Can Use?, Slate, March 2, 2015

The Silence of the Law, Review of Scrap of Paper: Breaking and Making International Law During the Great War, by Isabel V. Hull, New Rambler Review, March 4, 2015

Should Charity Be Logical?, Slate, March 26, 2015

A Terrible Shame, Slate, April 9, 2015

Mutual Funds' Dark Side, Slate, April 16, 2015

Citizenship for Sale, Slate, May 13, 2015

A Fractious Majority, Slate, June 30, 2015

It's Not Donating. It's Selling, Slate, July 29, 2015

The Strangest Campaign Pledge, Slate, August 13, 2015

Trump Is the Only Candidate Talking About a Taboo Subject, Slate, August 25, 2015

The Spectrum of Suffering, Slate, September 8, 2015

Is America Heading Toward Dictatorship?, Slate, October 23, 2015

Bernanke's Biggest Blunder, Slate, October 29, 2015

Has Obama Upheld the Rule of Law, Slate, November 9, 2015

Why Are People So Scared of Syrian Refugees, Slate, November 20, 2015

20

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

The Republican-Democratic Divide on Civil Liberties, Slate, December 7, 2015

Potemkin Power?, New Rambler Review, December 9, 2015

ISIS Gives Us No Choice but to Consider Limits on Speech, Slate, December 16, 2015

How Can Banks Get Away With Charging Such High Fees?, Slate, January 7, 2016

Campus Free Speech Problems Are Less Than Meets the Eye, Cato Unbound, January 8, 2016

Warren's Wrong: Bank Rules Need Cost-Benefit Test, BloombergView, February 3, 2016

Ted Cruz Is Not Eligible to Be President, Slate, February 8, 2016

The Tragedy of Antonin Scalia, Slate, February 16, 2014

Merrick Garland Would Shift the Court Decisively Leftward, Slate, March 17, 2016

What Should We Expect From the Supreme Court's Showdown Over Immigration?, New York Times Magazine, April 18, 2016 (with Emily Bazelon)

Review of *The Future of Law and Economics: Essays in Reform and Recollection* by Guido Calabresi, 54 J. Econ. Lit. 600 (2016)

Presidential Leadership and the Separation of Powers, Daedalus 35 (summer 2016)

Citizens Can't Sue the Government for Laws They Don't Like, The New York Times, May 23, 2016

And if Elected: What President Trump Could or Couldn't Do, The New York Times, June 4, 2016

New York Times Magazine Discussion of the Supreme Court at End of Term, Part I, June 24, 2016

New York Times Magazine Discussion of the Supreme Court at End of Term, Part II, June 27, 2016

Are There Limits to Trump's Power?, The New York Times, November 10, 2016

Review of *The Court and The World: American Law and the New Global Realities*, by Stephen Breyer, 126 Yale L.J. 504 (2016)

A Monopoly Donald Trump Can Pop, The New York Times, December 7, 2016 (with Glen Weyl and Fiona Scott Morton)

How Antonin Scalia's Ghost Could Block Donald Trump's Wall, The New York Times, January 25, 2017 (with Daniel Hemel and Jonathan Masur)

Gorsuch Must Condemn Trump's Attack on Judge, The New York Times, February 4, 2017

Judges v. Trump: Be Careful What You Wish For, The New York Times, February 15, 2017

Coase Theorem, in Economic Ideas You Should Forget (Bruno S. Frey & David Iselin, eds., 2017)

The Government Gorsuch Wants to Undo, The New York Times, April 1, 2017 (with Emily Bazelon)

Introduction, in The Timing of Lawmaking (Frank Fagan & Saul Levmore, eds., 2017)

Will the Presidency Survive this President?, The New York Times, May 21, 2017 (with Emily Bazelon)

21

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

The Case for Obstruction Charges, The New York Times, June 15, 2017 (with Daniel Hemel)

Quadratic Voting and the Public Good: Introduction, 172 Public Choice 1 (2017) (with E. Glen Weyl)

If Trump Pardons, It Could Be a Crime, The New York Times, July 21, 2017 (with Daniel Hemel)

The Obstruction of Justice Case Against Donald Trump, Slate, July 27, 2017 (with Daniel Hemel)

A Better Way to Protect Robert Mueller, The New York Times, August 7, 2017 (with Daniel Hemel)

Trump Could Be Removed for Political Incompetence—Using the 25th Amendment, The Washington Post, September 12, 2017

Why the Trump Team Should Fear the Logan Act, The New York Times, December 4, 2017 (with Daniel Hemel)

The Logan Act and its Limits, Lawfare, December 7, 2017 (with Daniel J. Hemel)

America Is Nowhere Near a Constitutional Crisis, Foreign Policy, December 16, 2017

It's Time to Audit America's Secrets, Foreign Policy, February 2, 2018

Trump Has Plenty of Bark. His Predecessors Had More Bite, Washington Post, February 2, 2018

How Congress Can Protect Mueller, The New York Times, February 4, 2018

Sponsor an Immigrant Yourself, Politico, February 13, 2018

Corporate America Is Suppressing Wages for Many Workers, The New York Times, February 28, 2018 (with Alan B. Krueger)

More and More Companies Have Monopoly Power Over Workers' Wages. That's Killing the Economy. Vox, April 6, 2018

Want Our Personal Data? Pay for It, The Wall Street Journal, April 20, 2018 (with E. Glen Weyl)

The Real Villain Behind Our New Gilded Age, The New York Times, May 1, 2018 (with Glen Weyl)

Neoliberalism and Human Rights, Lawfare, May 1, 2018

How Economists Became So Timid, Chronicle, May 7, 2018

A Radical Proposal for Resolving Cases Like Masterpiece Cakeshop—Outside The Courts, Vox, June 4, 2018

A Radical Proposal for Improving Capitalism, Barron's, June 15, 2018 (with E. Glen Weyl)

If the Supreme Court is Nakedly Political, Can It Be Just?, New York Times, July 9, 2018 (with Lee Epstein)

Who Is Brett Kavanaugh?, New York Times, September 3, 2018 (with Emily Bazelon)

The Far-Reaching Threats of a Conservative Court, New York Times, October 23, 2018

Why the FTC Should Focus on Labor Monopsony, Pro-Market, November 5, 2018

House Democrats Can Constrain Trump. They Can Also Overreach, New York Times, November 7, 2018

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Liberty versus Monopoly, J. Amer. Affairs, November 20, 2018 (with Glen Weyl)

Bill Barr Just Argued Himself Out of a Job, New York Times, December 21, 2018 (with Daniel Hemel)

Yes, Bill Barr's Memo Really is Wrong About Obstruction of Justice, Lawfare, December 26, 2018 (with Daniel Hemel)

The President Is Still Subject to Generally Applicable Criminal Laws: A Response to Barr and Goldsmith, Lawfare, January 8, 2019 (with Daniel Hemel)

The Surprising Place Mueller Found Resistance to Trump, New York Times, April 23, 2019 (with Daniel Hemel)

Keep Increasing Pressure Against Noncompetes, Law360, May 7, 2019

The Anti-monopoly Backlash Reaches the Supreme Court, The Atlantic, May 15, 2019

What Antitrust Attorneys Need to Know About Labor Monpsony, Law360, May 24, 2019

House Democrats Have More Potent Options Than Impeachment, The Atlantic, May 29, 2019

The Administration's Plan to Redefine "Human Rights" Along Conservative Lines, Washington Post, June 14, 2019

The Trouble Starts If Facebook's New Currency Succeeds, The Atlantic, June 25, 2019

Milton Friedman Was Wrong, The Atlantic, August 22, 2019

The Meritocracy Muddle, Project Syndicate, September 13, 2019

The Impeachment Trap, Project Syndicate, October 1, 2019

The Anticompetitive Effects of Covenants Not to Compete, CPI Antitrust Chronicle, January 2020

The Executive Unbound, Pandemic Edition, Lawfare, March 23, 2020

Governors Might Not Be Able to Save Us, but They Can Raise Hell, New York Times, April 2, 2020 (with Emily Bazelon)

Public Health in the Balance: Judicial Review of Pandemic-Related Government Restrictions, Lawfare, April 20, 2020

Cost-Benefit Analysis Supports Continuing the National Shutdown, Regulatory Review, April 20, 2020 (with Jonathan Masur)

The Limits of the World Health Organization, Lawfare, April 21, 2020

You Can Sue to Stop Lockdowns, But You Can't Sue to Get Them, Washington Post, May 4, 2020

Protect the Justice Department From the President, New York Times, May 13, 2020 (with Emily Bazelon)

Why Some Republican Leaders Are Defecting to Biden, Newsweek, July 3, 2020

What Could Trump Do or Not Do in a Second Term?, New York Times, July 13, 2020

Trump Has the Worst Record at the Supreme Court of Any Modern President, Washington Post, July 20, 2020

23

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Climate Change and Human Rights, in Climate Change, Justice and Human Rights 21 (David Ismangil, Karen van der Schaaf, and Lars van Troost, eds., Amnesty International, 2020)

Avoiding the Trump Trap, Project Syndicate, August 10, 2020

How the Religious Right Has Transformed the Supreme Court, New York Times, September 22, 2020

What the U.S. Election Is Really About, Project Syndicate, October 14, 2020

Legal Assaults on Coronavirus Shutdowns Threaten To Undermine the Liberal State, Washington Post, October 15, 2020

Is the Long-Awaited Constitutional Crisis at Hand?, Project Syndicate, October 21, 2020

Biden's Precarious Victory, Project Syndicate, November 6, 2020

Why Prosecuting Trump Is a Very Bad Idea, New York Times, December 3, 2020

America Passed the Trump Stress Test, Project Syndicate, December 7, 2020

The Trump Paradox, Project Syndicate, December 22, 2020

The Effort to Disqualify Trump Is Worth It, Project Syndicate, January 12, 2021

Why Joe Biden Must Not Shy Away From the Full Power of the Presidency, New York Times, January 21, 2021

Why Try Trump?, Project Syndicate, February 20, 2021

Antitrust Is Back in America, Project Syndicate, March 12, 2021

Senator Klobuchar's Antitrust Bill Doesn't Go Far Enough, ProMarket, March 22, 2021

The End of Amateur Hour for the NCAA, Project Syndicate, April 7, 2021

Long Live the Imperial President?, Project Syndicate, May 12, 2021

Biden's Antitrust Revolutionaries, Project Syndicate, June 18, 2021

The Supreme Court's NCAA Ruling Has Huge Implications Outside of Sports, Washington Post, June 22, 2021

The Antitrust War's Opening Salvo, Project Syndicate, July 21, 2021

COVID and the Conservative Economic Crack-up, Project Syndicate, August 24, 2021

In Emergencies, Judges Usually Defer to Politicians. Not during the Pandemic, Washington Post, August 24, 2021

America's Return to Realism, Project Syndicate, September 3, 2021

You Deserve a Bigger Paycheck. Here's How You Might Get It, New York Times, September 23, 2021

The Justices Doth Protest Too Much, Project Syndicate, October 7, 2021

Facebook's Foreign Disasters, Project Syndicate, November 5, 2021

Antitrust's Labor Market Problem, ProMarket, November 8, 2021

24

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

The Rise of the Labor-Antitrust Movement, Competition Policy International, November 29, 2021

Introduction to the Conference on Labor Market Power, 90 U. Chicago L. Rev. 261 (2023)

Toward a Market Power Standard for Merger Review, ProMarket, April 7, 2023

The Whig History of the Merger Guidelines, ProMarket, May 31, 2023

The Trump Indictment and America's Political Order, Project Syndicate, June 14, 2023

The Revised Merger Guidelines Will Restore Principle of Competition to Merger Review, ProMarket, July 20, 2023

The Politics of the Trump Trials, Project Syndicate, August 9, 2023

Comment on Merger Guidelines Submitted to DOJ and FTC, August 17, 2023 (with David W. Berger, Thomas Hasenzagl, Kyle F. Herkenhoff, Simon Mongey)

The Role of Consumer Welfare in Merger Enforcement, ProMarket, September 7, 2023

Banning Trump, Project Syndicate, September 18, 2023

The Strange Case of Sam Bankman-Fried, Project Syndicate, October 12, 2023

No-Poach Antitrust Litigation in the United States, Concurrences (November 2023) (with Sarah Roberts)

Review of The Problem of Twelve: When a Few Financial Institutions Control Everything by John Coates, Journal of Economic Literature (forthcoming)

The Monopolists Fight Back, Project Syndicate, November 24, 2023

A Trump Dictatorship Won't Happen, Project Syndicate, December 7, 2023

The AI Octopus, Project Syndicate, January 8, 2024

Will Trump Be Disqualified?, Project Syndicate, February 5, 2024

The Future of Work in the AI Era, Project Syndicate, April 11, 2024

What to Look for in Trump's First Trial, Project Syndicate, April 22, 2024

Why Noncompete Clauses Should Be Banned, Project Syndicate, May 3, 2024

The FTC Noncompete Ban Is Legal, ProMarket, May 8, 2024

Rough Justice for Trump, Project Syndicate, May 31, 2024

Merger Review Should Incorporate a Role for Unions, ProMarket, June 14, 2024

Prosecutions and Politics Don't Mix, Project Syndicate, July 29, 2024

Is a Pro-Labor Republican Party Possible?, Project Syndicate, August 29, 2024

How Cultural Norms Help Companies Exploit Unpaid Workers, ProMarket, September 25, 2024

Is Labor Antitrust a Nonexistent Problem?, ProMarket, October 24, 2024

25

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Why Many Workers Now Vote Republican, Project Syndicate, October 29, 2024

The Business Interests That Promoted Cost-Benefit Analysis and Originalism Will Also Kill Them, ProMarket, December 2, 2024

Trump's Pro-Corporate Populism Cannot Last, Project Syndicate, December 11, 2024

What Happened to International Law?, Project Syndicate, January 16, 2024

Antitrust from Trump to Biden to Trump, ProMarket, March 11, 2025

**Testimony**

Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives: H.R. 833, The Bankruptcy Reform Act of 1999, March 16, 1999

Committee on the Judiciary, U.S. Senate: Special Counsels and the Separation of Powers, September 26, 2017

Federal Trade Commission, Competition and Consumer Protection in the 21st Century: Labor Markets and Antitrust Policy, October 16, 2018

Federal Trade Commission, Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, January 9, 2020

Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law, U.S. House of Representatives: Reviving Competition, Part 4: 21st Century Antitrust Reforms and the American Worker, September 28, 2021

Department of Justice and Federal Trade Commission Workshop on Draft Merger Guidelines, University of Chicago Law School, November 3, 2023

**Education**

Harvard Law School. J.D., magna cum laude, 1991

Yale University. B.A., M.A. in philosophy, summa cum laude, 1988

**Professional Organizations**

Maryland Bar Association (admitted 1991)

Illinois Bar Association (admitted 2018)

American Law and Economics Association (board member, various times)

American Law Institute

**Grants, Fellowships, and Awards**

John M. Olin fellowship, University of Southern California (3/95)

University Research Foundation grant, University of Pennsylvania (6/96)

Olin Fellow, University of Virginia Law School (9/02)

Simon Visiting Scholar, Florida State University College of Law (3/18/04)

26

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Fellow, American Academy of Arts and Sciences (elected 2010)

Sloan Grant for Conference on Benefit-Cost Analysis and Financial Regulation (2013) (with Glen Weyl)

Economist Book of the Year, for *Radical Markets* (2018)

Financial Times Book of the Year, for *Last Resort* (2018)

Bloomberg 50, for *Radical Markets* (2018)

Antitrust Writing Award, for Antitrust Remedies for Labor Market Power (2019)

American Antitrust Institute Jerry S. Cohen Memorial Fund Writing Award, for Antitrust Remedies for Labor Market Power (2019)

Lawdragon 500 Leading Lawyers in America (2019, 2020)


**Teaching**

Contracts; Secured Transactions; Bankruptcy; Corporate Reorganization; Seminar on Contract Theory; Seminar on Game Theory and the Law; Employment and Labor Law; Public International Law; International Human Rights Law; Foreign Relations Law; International Law Workshop; European Union Law; Seminar on the Financial Crisis of 2008-2009; Banking Law; Financial Regulation; Seminar on the Federal Reserve Board; Seminar on Executive Power; Seminar on Originalism and Its Critics; Corporate Finance

**Other Professional Activities**

Counsel, MoloLamken (2018-2021; 2024-)

Counsel, Boies, Schiller & Flexner (2010-2016)

Cofounder and editor, New Rambler Review (2015-2017)

Member (elected 2014), Council Member (elected 2021); American Law Institute

Columnist, Slate Magazine (2012-2016)

Editor, Journal of Legal Studies (1998-2010)

Adviser, Restatement (Third) of Restitution, American Law Institute

Referee for Journal of Law and Economics, Journal of Economic Literature, Oxford University Press, Harvard University Press, Edward Elgar, Quarterly Journal of Economics, National Science Foundation, Law and Social Inquiry, American Economic Review, Journal of Law, Economics, & Organization, American Law and Economics Review, International Review of Law and Economics, American Journal of Political Science, Law and Society Review, Journal of Policy Analysis and Management, Journal of the European Economics Association, Health Affairs, University of Chicago Press, Canada Council for the Arts, World Politics, Supreme Court Economic Review, Law and Philosophy, Ethics and International Affairs, Institute of Medicine, Israel Science Foundation, Conflict Management and Peace Science, Smith Richardson Foundation, Yale University Press, Hart Publishing, Journal of Peace Research, British Journal of Political Science, National Academy of Sciences, Social Theory and Practice, Politics, Philosophy and Economics, Journal of Global Ethics, Climate Policy, Political Science Quarterly, Journal of Benefit-Cost Analysis, Journal of Legal Analysis, European Journal of International Law, Antitrust Law Journal, Journal of Antitrust Enforcement

27

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Member, Editorial Board, Law & Social Inquiry (2000-2001)

Member, Board of Directors, American Law and Economics Association (2000-2003; 2013-2016)

Member, Board of University Publications, University of Chicago (2001-2004)

Member, Editorial Board, Review of Law and Economics (2004-)

Member, Oxford University Press Legal Education Advisory Board (2006-)

Member, Editorial Board, Journal of Benefit-Cost Analysis (2009-)

Short-Term Consultant, World Bank (2007)

Participant in Simulated Canada-United States Negotiation Over the Northwest Passage, sponsored by ArcticNet (Ottawa, February 2008)

Member, Faculty Steering Committee, Milton Friedman Institute (2008-2010)

Member, International Advisory Board, the Centre for Law, Economics and Society, University College London (2013-)

Member, Editorial Board, Economic Analysis of Law Review (2014-)

Sympatic Inc., Advisory Board (2019-)

Member, Committee on International Relations, University of Chicago (2003-)

**Consulting Relationships (since 2020)**

Le v. Zuffa (2024). Provided expert report supporting a proposal to settle a lawsuit brought by employees of mixed martial arts league against their employer. Retained by Berger Montague, attorney for plaintiffs.

Department of Justice (2024). Advised on investigation of a potential merger between two entertainment-related entities. The facts are confidential.

Sona Asset Management (2024). Advised financial institution about legal issues in Tapestry/Capri merger litigation.

Ford Motor Co. (2021-2022). Advised automobile manufacture on antitrust strategy relating to distribution.

Difederico v Amazon.com, Inc. et al., No. T-445-20 (Federal Court, Canada) (2021). Advised on arbitration issues relating to class action lawsuit against Amazon in Canada. Served as expert; retained by Orr Taylor LLP and Strosberg Sasso Sutts LLP.

Latham & Watkins (2020). Advised law firm on draft commercial code for proposed foreign development zone in middle east.

28

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Annex 3. Materials Considered**

<u>**Legal Pleadings**</u>

Plaintiff Qualcomm Inc.'s Second Amended Complaint. Case No. 1:24-cv-00490-MN. June 3, 2025.
DTX_00936, *Arm Ltd.* v. *Qualcomm, Inc.*. Case No. 1:22-cv-01146-MN.
DTX_00937, *Arm Ltd.* v. *Qualcomm, Inc.*. Case No. 1:22-cv-01146-MN.
Federal Trade Commission Complaint *In the Matter of Nvdia/Arm*. Case No. 9404. December 2, 2021.
December 16, 2024 *Arm Ltd. v. Qualcomm, Inc.* CA No. 22-1146 Trial Transcript

<u>**Depositions**</u>

Deposition of Rene Haas. December 12, 2023
Deposition of Phil Hughes. June 17, 2025.
Deposition of Martin Weidmann. June 20, 2025.
Deposition of Gerard Williams. June 25, 2025.
Deposition of Will Abbey. June 26, 2025.
Deposition of Michael Williams. June 27, 2025.
Deposition of Richard Grisenthwaite. July 2, 2025.
Deposition of Chrisopher Patrick. July 2, 2025.
Deposition of Paul Williamson. July 2, 2025.
Deposition of Cristiano Amon. July 3, 2025.
Deposition of Lynn Couillard. July 3, 2025.
Deposition of Rene Haas. July 7, 2025.
Deposition of Ziad Asghar. July 7, 2025.
Deposition of Jignesh Trivedi.  July 9, 2025.
Deposition of Durga Malladi. July 10, 2025.
Deposition of Jonathan Weiser. July 11, 2025.
Deposition of Ann Chaplin. July 11, 2025.

<u>**Literature**</u>

Marie-Laure Allain et al., *Vertical Integration as a Source of Hold-up*, Toulouse School of Economics, Working Paper n. 14-525 (2014).
Carl Shapiro, *Vertical Mergers and Input Foreclosure Lessons from the* AT&T/Time Warner *Case*, 59 Rev. of Indus. Org. 303 (2021).
Joseph Farrell & Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, Handbook of Industrial Organization, Chapter 31 (2007).
Chiara Fumagalli & Massimo Motta, *Dynamic Vertical Foreclosure*, 63 J. of L. and Econ (2020).
Oliver Hart et al., *Vertical Integration and Market Foreclosure*, 1990 Brookings Papers on Economic Activity: Microeconomics (1990).
Janusz A. Ordover et al., *Equilibrium Vertical Foreclosure*, 80 American Economic Review (1990).

1

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Partrick Rey & Jean Tirole, A Primer on Foreclosure, 3 Handbook of Industrial Organization (2007).

Helena Perrone, *Chips in on a Merger: The Arm-Nvidia Case*, 98 Int'l J. of Indus. Org. 103130 (Jan. 2025).

John Vickers, *Concepts of Competition*, 47 Oxford Economic Papers 1 (1995).


**Other Documents**

Rene Haas in ACQ2 by Acquired Podcast, *How Arm became the worlds default chip architecture with ARM CEO Rene Haas* (December 2, 2024), https://open.spotify.com/episode/2sxLw7ti6tC7xr3NQnphXG?si=KMdhxFHlQMqtGupg_c6kjA&nd=1&dlsi=ba9cf1c344524296.

Arm.com, *Architecture: The Basis for Innovation in the Digital World*, https://www.arm.com/architecture (last visited August 5, 2025).

Annual Report and Consolidated Financial Statements For the year ended 31 March 2024, Arm Holdings Limited (May 29, 2024) https://investors.arm.com/static-files/5e34983c-cbb5-461c-b6ca-5749f6d7efd9.

Bloomberg Technology, *Arm CEO on Intel, Chips, AI, Listing in US* (October 22, 2024), www.youtube.com/watch?v=6FnBz8rxWUY.

Arm,com, *Glossary: Instruction Set Architecture (ISA)*, https://www.arm.com/glossary/isa (last visited August 5, 2025).

Josh Horwitz, Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadealcollapses-2022-02-08/.

RISC-V, *Members*,  https://riscv.org/members/ (last visited August 5, 2025).

Michael Acton, *Arm to explore designing its own chips, chief executive says*, Financial Times (July 30, 2025) Accessed August 5, 2025, https://www.ft.com/content/735c8a2d-0ce0-49d6-934f-8aee3e927108?shareType=nongift.

Financial Times, *How Arm could be the unexpected winner of the AI investment boom* (October 30, 2024), www.ft.com/content/80a1e79e-b662-40e9-9b41-6d1070f694a8?FTCamp=engage/CAPI/website/Channel_muckrack//B2B.

Mike Johnson, *Arm Holdings CEO Predicts 50% Data Center CPU Market Share by 2025*, WebProNews (July 31, 2025), https://www.webpronews.com/arm-holdings-ceo-predicts-50-data-center-cpu-market-share-by-2025/.

Mobile Unleashed, *The Origin and Evolution of ARM Processors In Our Devices*, (December 2015) semiwiki.com/books/Mobile%20Unleashed%20-%20front%20to%20back.pdf.

Mohamed Awad, *Half of the Compute Shipped to Top Hyperscalers in 2025 will be Arm-based*, Arm Newsroom (April 1, 2025), https://newsroom.arm.com/blog/half-of-compute-shipped-to-top-hyperscalers-in-2025-will-be-arm-based.

Nell Walker, *Qualcomm: A History*, Manufacturing Digital (May 16, 2020), https://manufacturingdigital.com/technology/qualcomm-history (last visited Aug. 5, 2025).

Qualcomm, Inc., *Products*, https://www.qualcomm.com/products (last visited August 5, 2025).

Arm, Consumer Technologies: Smartphones, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Aug. 5, 2025).

Arm.com, *Glossary: SoC Development*, https://www.arm.com/glossary/soc-development (last visited August 5, 2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

*Software ecosystems*, Arm Developer,
https://developer.arm.com/documentation/102252/0100/Software-ecosystems (last visited
August 5, 2025).
*The Arm Ecosystem: Powering AI Everywhere – From Cloud to Edge*, Arm Newsroom (May 19,
2025), https://newsroom.arm.com/blog/arm-computex-2025.
Arm.com, *The Official History of Arm*, https://newsroom.arm.com/blog/arm-official-history (last
visited August 8, 2025).
Tim Bradshaw, *Rene Haas: 'Arm has the most ubiquitous computer architecture on the planet,'*
Financial Times (June 7, 2024) https://www.ft.com/content/5b191c4c-119f-4f97-bc61-
622d20bfa46d.
Arm's "what is" series, *What is… CPU architecture*, (August 18, 2021)
www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.
Amd.com, *Intel Antitrust Rulings*, https://www.amd.com/en/legal/notices/antitrust-ruling.html,
(last visited August 7, 2025).

**Bates Numbered Documents**

ARM_00055357
ARM_00079520
ARM_00079530
ARM_00082009
ARM_00089058
ARM_00094099
ARM_00094197
ARM_00094200
ARM_00094204
ARM_00103918
ARM_00110020
ARM_00110511
ARM_00110513
ARM_01215486
ARM_01215564
ARM_01215885
ARM_01215886
ARM_01215887
ARM_01215888
ARM_01215889
ARM_01231038
ARM_01241285
ARM_01241565
ARM_01241577
ARM_01241585
ARM_01424394
ARMQC_00000640
ARMQC_00001038
ARMQC_00001136
ARMQC_00001163

3

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

ARMQC_02720799
ARMQC_02727610
ARMQC_02729064
ARMQC_02739661
ARMQC_02762991
ARMQC_02762992
ARMQC_02763016
ARMQC_02771126
ARMQC_02778180
QCARM_0338573
QCARM_0343120
QCARM_0343954
QCARM_3424233
QCARM_3424399
QCARM_3424873
QCARM_3428243
QCARM_3433633
QCARM_3460976
QCARM_3460981
QCARM_3522626
QCARM_7477120
QCARM_7484471
QCARM_7484477
QCARM_7484481
QCARM_7509431
QCARM_7517677
QCVARM_0465277
QCVARM_0526828
QCVARM_0607499
QCVARM_0616970
QCVARM_0618354
QCVARM_0618382
QCVARM_0618384
QCVARM_0714768
QCVARM_0715414
QCVARM_0716360
QCVARM_0717008
QCVARM_0717291
QCVARM_0847094
QCVARM_0847188
QCVARM_0847548
QCVARM_0848033
QCVARM_0851120
QCVARM_0857149
QCVARM_0857152
QCVARM_0866825

4

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

QCVARM_0867422
QCVARM_1012343
QCVARM_1012399
QCVARM_1014030
QCVARM_1014955
QCVARM_1018853
QCVARM_1019083
QCVARM_1030816
QCVARM_1066811
QCVARM_1066820
QCVARM_1070919
QCVARM_1070944
QCVARM_1070982
QCVARM_1070993
QCVARM_1071021
QCVARM_1071165
QCVARM_1119108
QCVARM_1120153
QCVARM_1120206
QCVARM_1120224
QCVARM_1120267
QCVARM_1120481

5

# Exhibit 8

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| QUALCOMM INCORPORATED,<br>    a Delaware corporation,<br>QUALCOMM TECHNOLOGIES, INC., a<br>    Delaware corporation<br><br>        Plaintiffs,<br><br>   v.<br><br>ARM HOLDINGS PLC, f/k/a, ARM LTD.<br>    a U.K. corporation<br><br>        Defendant. | C.A. No. 24-490-MN<br><br>**HIGHLY CONFIDENTIAL -<br>ATTORNEYS EYES ONLY** |

## ARM HOLDINGS PLC'S OBJECTIONS AND RESPONSES TO
## QUALCOMM'S FIRST SET OF INTERROGATORIES (NOS. 1–3)

Pursuant to Rules 23 and 33 of the Federal Rules of Civil Procedure, and the applicable

Local Rules of the United States District Court for the District of Delaware, Defendant Arm

Holdings PLC ("Arm") hereby responds to Plaintiffs Qualcomm Incorporated and Qualcomm

Technologies, Inc. (collectively, "Qualcomm")'s First Set of Interrogatories (Nos. 1–3).

## GENERAL OBJECTIONS

Arm makes the following general objections, which are hereby incorporated by reference

and made part of its response to each and every Interrogatory.

1.      Arm objects to each Interrogatory to the extent it purports to impose upon Arm

discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Local Rules for the United States District Court for the District of Delaware, orders entered in this case, or agreements among the parties.

2.      Arm objects to the "Instructions" and "Definitions" sections to the extent they purport to alter the plain meaning and/or scope of any specific Interrogatory, on the ground that such alteration renders the Interrogatory vague, ambiguous, overly broad, and/or uncertain, by failing to adequately define terms or by using terms the meaning of which are not readily available or decipherable.  Arm's responses to such Interrogatories shall not be construed as an admission, agreement, or acquiescence to any such instruction or definition.  Arm further objects to the "Instructions" and "Definitions" sections to the extent they purport to impose upon Arm discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware, orders entered in this case, or agreements among the parties.

3.      Arm objects to the definitions of "Defendant," "Arm," "you," and "your" as overly broad and unduly burdensome to the extent they purport to require Arm to provide information that is not within the possession, custody, or control of Arm Holdings PLC, or to otherwise respond on behalf of third parties, at least because these definitions include entities that have no relation to the present litigation.

4.      Arm objects to the definitions of "ALA" and "TLA" as overbroad and vague and ambiguous to the extent they define Architecture License Agreement and Technology License Agreement to include "all amendments and annexes to any such agreement."

5.      Arm objects to the definition of "████████████" as overbroad and vague and ambiguous to the extent it defines the term by reference to the definition of that term in "████

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

████████████████████████████████████████████

████████████████████████ ."

     6.     Arm objects to the definition of "ACK" as overbroad and vague and ambiguous to the extent it defines the term as meaning "Arm's Architecture Compliance Kit or Arm's Architecture Validation Suite or Arm's Architecture Compliance Suite."

     7.     Arm objects to each Interrogatory, including the instructions and definitions that Qualcomm purports to incorporate therein, to the extent that each Interrogatory is overbroad, unduly burdensome, not limited to a reasonable time frame, vague and ambiguous, irrelevant, and/or not reasonably calculated to lead to the discovery of admissible evidence.

     8.     Arm objects to each Interrogatory to the extent it seeks information, documents, and/or things that are protected from disclosure by the attorney-client privilege, work-product doctrine, common-interest privilege, and/or any other applicable privilege, immunity, or protection (collectively, "privileged information"). Nothing contained in these responses should be considered a waiver of any attorney-client privilege, work-product protection, or any other applicable privilege or doctrine. Arm does not intend to produce information or documents that would divulge any privileged information. Any such disclosure is inadvertent and shall not be deemed a waiver of any applicable privilege or immunity.

     9.     Arm objects to any factual characterizations in Qualcomm's Interrogatories. By responding, Arm does not accept or admit any of Qualcomm's factual characterizations.

     10.     Arm objects to each Interrogatory to the extent it seeks "all" or "any" facts, documents, witness identifications, or things as overbroad and unduly burdensome.

     11.     Arm's discovery and investigation in connection with this case is ongoing. Arm's responses to these Interrogatories are based on its knowledge to date following a reasonable

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

investigation.  As a result, Arm's responses are provided without waiver of Arm's right to: (a) object to other interrogatories directed to the subject matter of these Interrogatories and responses; (b) make additional or supplementary objections to these Interrogatories; or (c) revise, amend, supplement, or clarify the contents of these responses.

Subject to and without wavier of these General Objections and the more specific objections set forth below, Arm responds as follows:

## SPECIFIC OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1**:

Identify and describe in detail all ████████████████ thereto, or any other downloads, releases, notes, publications, materials, support, or the like, including ACK patches and OOB tests, that Qualcomm is entitled to under the Qualcomm ALA that Arm has released, distributed, or otherwise made available since June 1, 2022 but not provided to Qualcomm. For each such item identified, your response should include (i) a description of the licensed item, (ii) the type of information (i.e., error corrections, ████████████, modifications, maintenance releases, or enhancements), (iii) the date(s) the item was made available by Arm, (iv) the names of any Arm licensee other than Qualcomm who received the item, (v) the date(s) of distribution to each Arm licensee other than Qualcomm, (vi) the terms and conditions, including cost, of each Arm licensee for each item identified in response to (iii)-(v), (vii) the three (3) Persons affiliated with Arm with the most knowledge of your response, and (viii) an identification of all documents (by Bates number) that support your response.

**RESPONSE TO INTERROGATORY NO. 1:**

Arm incorporates its General Objections as if fully asserted herein.  Arm objects to this Interrogatory to the extent it seeks to characterize "any other downloads, releases, notes, publications, materials, support, or the like, including ACK patches and OOB tests" as "████ ████████████████████" Arm objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case, including because it seeks the identification and description of "all … or any other" items, materials, or actions from a list of broad and undefined categories, including "notes, publications, materials, support, or the like." Arm objects to this Interrogatory to the extent it calls for a legal conclusion. Arm further objects

**HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY**

to this Interrogatory as seeking information that is more readily available to Qualcomm than it is to Arm. Arm further objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information regarding what Arm provided licensees other than Qualcomm under or relating to license agreements to which Qualcomm is not a party. Arm objects to this Interrogatory's use of the phrase "or the like," as vague and ambiguous. Arm objects to this Interrogatory to the extent it seeks privileged information. Arm additionally objects to this Interrogatory as compound and constituting several, discrete interrogatories.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

There are no "███████████████," as these terms are used in the Qualcomm ALA (including ███████████), and each Annex 1 thereto, or any downloads, releases, notes, publications, materials, support, or other materials, including ACK patches and OOBs, that Qualcomm is entitled to under the Qualcomm ALA that Arm has released, distributed, or otherwise made available since June 1, 2022 but not provided to Qualcomm.

Arm's Interrogatory No. 2 to Qualcomm seeks Qualcomm's "contention that Arm failed to meet any of its obligations under the Qualcomm ALA," and in response, Qualcomm alleges that Arm "failed to deliver (1) patches to the ACK and (2) the OOB," but does not specify any particular ACK patch or OOB that it contends Arm failed to deliver. Qualcomm's Responses and Objections to Arm's First Set of Interrogatories (Nos. 1-9) at 9-11 (March 10, 2025). However, (1) Qualcomm is not entitled to ACK patches and OOB ███████████ at least because ACK patches and OOB are not "███████████████s"; (2) Qualcomm is not entitled to any ACK patches or OOBs for Nuvia-based designs for the reasons explained in Arm's January 17, 2025

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Motion For Judgment As A Matter Of Law Or A New Trial (No. 22-1146, D.I. 596); (3) notwithstanding that Qualcomm is not entitled to any support for Nuvia-based designs, Arm has since January 8, 2025 committed to provide support to Qualcomm for Nuvia-based designs during the pendency of certain litigation between the parties; (4) Arm did not withhold any ACK patches that Qualcomm was entitled to; (5) Arm did not withhold any OOBs that Qualcomm was entitled to.

### Qualcomm Is Not Entitled To ACK Patches And OOB Under ███████ and ██ At Least Because ACK Patches And OOB Are Not "███████████" Or "██████"

Qualcomm is not entitled to ACK patches and OOB under ███████████ under the Qualcomm ALA at least because they are not "█████████████████."



The Qualcomm ALA, at ████████ states that "" ████████████████████

███████████████████████████████████████████████████████

███████████████████████ ARM_00055357 at ████.  The Qualcomm

ALA, ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ ARM_00063298 at -301, ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████ QCARM_0343954 at -959, ████.

The Qualcomm ALA, ████████████████████████

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY



ARM_00055357 at -359, █████.

The Qualcomm ALA, ██████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████).'' ARM_00055357 at -360, ████. The

Qualcomm ALA, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ ARM_00063298 at -301, ████.

████████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



QCARM_0343954 at -958, ▮

ACK patches are not ▮▮▮▮ under the Qualcomm ALA. An ACK patch is a partner-specific solution to a partner-specific ACK test issue, and when that solution is relevant to all ALA licensees, Arm typically incorporates the solution into its next quarterly ACK release, which is made available to all ALA partners, including Qualcomm. ACK patches are not "▮▮▮▮" at least because they are not ▮▮▮▮ ▮▮▮▮" as defined in the Qualcomm ALA, ARM_00055357 at ▮, and because ACK patches are not ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ to the Qualcomm ALA, ARM_00063298 at -301, ▮. ACK patches are also not "▮▮▮▮ ▮▮▮▮ *Id.* at -301, ▮ *id.* at -299–300, ▮▮▮▮. ACK patches are also not included in ▮▮▮▮ ▮▮▮▮ to the Qualcomm ALA. QCARM_00343954 at -955–58, ▮. None of the "▮▮▮▮" identified and listed by part number in ▮▮▮▮ Annex 1 to the Qualcomm ALA are ACK patches. ACK patches are not "▮▮▮▮" because they are not ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ as defined in the Qualcomm ALA. ARM_00055357 at -359, ▮. ACK patches are not ▮▮▮▮

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**



███████████████████████████████████████████████████████████

█████████ *Id.*

OOBs are not ███████████████████████████" under the Qualcomm ALA.  OOBs identify

which of the previously delivered ACK tests a partner should run and are based on the

configuration of the partner's design implementation.  OOBs are not "█████████████" at least

because they are not "██████████████████████████

██████████████" as defined in the Qualcomm ALA, ARM_00055357 at ████, and because

OOBs are not ████████████████████████████████

████████████████████████████████████████

████ to the Qualcomm ALA, ARM_00063298 at -301, ████.  OOBs are also not ████████

████████████████████████████████████." *Id.* at -301, ████ *id.* at -299–300,

█████████████████████.  OOBs are also not included in ████████████████████

█████████████████████ Annex 1 to the Qualcomm ALA.  QCARM_00343954 at

-955–58, ███████  OOBs are not ████████ because they are not ██████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████," as defined in the Qualcomm ALA.

ARM_00055357 at -359, ██████.  OOBs are not ████████████████████████

██████████████████████████ *Id.*

## Qualcomm Is Not Entitled To Any ACK Patches Or OOBs For Nuvia-Based Designs

Nuvia-based designs (including Qualcomm's Oryon CPU cores and the CPU cores used in

Qualcomm's ███████████████████ products) are unlicensed cores that fall

outside the Qualcomm ALA for the reasons explained in Arm's January 17, 2025 Motion For

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Judgment As A Matter Of Law Or A New Trial (No. 22-1146, D.I. 596) and Arm's February 28, 2025 Reply In Support Of Its Motion For Judgment As A Matter of Law Or A New Trial (No. 22-1146, D.I. 614). Qualcomm is not entitled to any ACK Patches or OOB for those unlicensed CPU cores. ARM_00055357 ███████████; ARM_00063298 ███. Under the Qualcomm ALA, Qualcomm is licensed and permitted only to develop, verify, and sell ███████████

████ ARM_00055357 ████████; ARM_00063298 ████ Such ███████

████ are limited to ████████████████████

████" ARM_00055357 ████ And those ████████████ are limited to CPU cores developed (1) under the licenses granted in the Qualcomm ALA, (2) by or for Qualcomm, and (3) based on ███████ that Arm delivered to Qualcomm. The pre-acquisition Nuvia designs do not satisfy any of those requirements for the reasons explained in Arm's January 17, 2025 Motion For Judgment As A Matter Of Law Or A New Trial (No. 22-1146, D.I. 596) and Arm's February 28, 2025 Reply In Support Of Its Motion For Judgment As A Matter of Law Or A New Trial (No. 22-1146, D.I. 614). The integrated circuits and central microprocessor units Qualcomm developed that incorporate or are based on the pre-acquisition Nuvia designs therefore fall outside the scope of the Qualcomm ALA and outside the scope of Arm's support obligations under that agreement. The Qualcomm ALA permits Qualcomm to seek support and verification solely for CPU designs created by Qualcomm employees, at a time when they were Qualcomm

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

employees, but does not permit Qualcomm to seek support and verification for designs from third parties such as Nuvia.

Because the Nuvia-based designs are not licensed under the Qualcomm ALA, Qualcomm is not entitled to any ACK patches or OOBs for them under the Qualcomm ALA.

### Notwithstanding That Qualcomm Is Not Entitled To Support For Nuvia-Based Designs, Arm Has Since January 8, 2025 Committed To Provide Support For Them

On January 8, 2025, Arm sent a letter to Qualcomm stating that " ███████████████████████ ██████████████████████████████████████████████████ pending certain litigation between the parties:



1/8/2025 Arm Letter to Qualcomm.

### Arm Did Not Withhold Any ACK Patches Qualcomm Was Entitled To

Qualcomm has not identified any specific ACK patch(es) that Qualcomm contends Arm improperly withheld from Qualcomm. For example, Qualcomm does not identify any specific ACK patches that Arm allegedly withheld from Qualcomm in its response to Arm's Interrogatory No. 2, which seeks, *inter alia*, "the complete legal and factual basis for [Qualcomm's] contention that Arm failed to meet any of its obligations under the Qualcomm ALA." Qualcomm's Responses and Objections to Arm's First Set of Interrogatories (Nos. 1-9) at 9-11 (March 10, 2025).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Qualcomm cites to its First Amended Complaint, where Qualcomm references Arm engineer Vivek Agrawal's deposition testimony and exhibit QX175 to his deposition (ARM_01314327) to allege that Arm "withheld from Qualcomm certain ACK 'patches.'" FAC ¶ 80 (citing Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5). Qualcomm does not, however, identify any specific ACK patches that Arm allegedly withheld from Qualcomm. *Id.*

Qualcomm's FAC cites to its November 3, 2022 and December 5, 2022 letters to Arm, however, those letters also did not specifically identify any allegedly withheld ACK patches. ARM_00025401–03. The cited requests for ACK patches in QX175 were for a product that Arm "believe[d] … to be using Nuvia technology," QX175 at ARM_01314329, and Qualcomm is not entitled to any ACK patches for Nuvia-based designs. Further, Arm continued to provide all of its ALA partners, including Qualcomm, the same quarterly ACK releases, which typically incorporate solutions to ACK test issues that are relevant to all ALA licensees. As Qualcomm acknowledged in its First Amended Complaint, Qualcomm did not need any ACK patches from Arm to run the validation tests that Arm had provided. FAC ¶ 86.

### Arm Did Not Withhold Any OOBs Qualcomm Was Entitled To

Qualcomm has not identified any specific OOBs that Qualcomm contends Arm improperly withheld from Qualcomm. For example, Arm's Interrogatory No. 2 seeks "the complete legal and factual basis for [Qualcomm's] contention that Arm failed to meet any of its obligations under the Qualcomm ALA." Qualcomm's Responses and Objections to Arm's First Set of Interrogatories (Nos. 1-9) at 9-11 (March 10, 2025). Qualcomm does not identify any specific OOBs that Arm

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

allegedly withheld.  Qualcomm cites to its First Amended Complaint, where Qualcomm references

Arm engineer Vivek Agrawal's deposition testimony and exhibit QX175 (ARM_01314327) to his

deposition, as well as an October 10, 2022 email that Mr. Agrawal sent to Qualcomm engineer

Jignesh Trivedi, produced at ARM_01020195. FAC ¶¶ 69, 79–80. However, neither the cited

testimony nor the cited documents reference any specific OOB that Qualcomm contends Arm

improperly withheld; they simply reference "OOB." Likewise, Qualcomm cites to its November

3, 2022 and December 5, 2022 letters to Arm, but those letters do not identify any allegedly

withheld OOB and instead simply reference "the OOB." ARM_00025401–03.  The cited requests

for OOBs were for a product that Arm "believe[d] … to be using Nuvia technology," QX175 at

ARM_01314329; *see also* ARM_01020195, and Qualcomm is not entitled to any OOBs for Nuvia-

based designs.

Further, OOBs identify which of the previously delivered tests a partner should run, and

Arm had already delivered those tests to Qualcomm in the ▮▮▮▮▮▮▮▮▮▮. *See*

Trivedi Dep. Tr. at 92:2–93:3 (



As

Qualcomm acknowledged in its First Amended Complaint, Qualcomm did not need any OOB from

Arm to run the validation tests that Arm had provided.  FAC ¶ 85; *see also* Agrawal Dep. Tr. at

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

54:18–55:2 ( ████████████████████████████████████████

████████████████████████████████████████████████

Further, because OOB is partner-specific, Arm has not "released, distributed, or otherwise made available since June 1, 2022 but not provided to Qualcomm" any OOB that would be relevant to Qualcomm. Agrawal Dep. Tr. at 29:1–21 ████████████████████████████

Further, by June 1, 2022, Arm had given Qualcomm several OOB packages, including for use with Nuvia-based designs. *See, e.g.*, Trivedi Dep. Tr. at 45:13–46:14, 54:16–57:18

████████████████████████████████████████████████

████████████ ARM_00001192 ( ████████████████████████

████ ; ARM_00001512 ████████████████████████████

ARM_00132256 ( ██████████████████████████ ). Qualcomm used these OOBs to successfully run ACK testing first for the Nuvia-based Phoenix implementation and then at least for the Nuvia-based Hamoa core design. ARM_00001495 at -495–96 ████████████████████████████████████████

████████████ ); ARM_00000634 ( ████████████████████████

████████████████████████████████████████████████

████████ .

Arm identifies the following individuals as knowledgeable regarding aspects of this subject matter: Vivek Agrawal is knowledgeable about OOBs, ACK releases, and ALA licensee support, and Richard Grisenthwaite is knowledgeable about the design, development, operation, and



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

purported verification of Arm-based technology and Arm's relationship with Nuvia and Qualcomm.

As discovery is ongoing, Arm reserves the right to supplement, amend, or modify its response to this Interrogatory, and reserves the right to rely upon any evidence subsequently discovered or which may otherwise come to light during discovery.

**INTERROGATORY NO. 2**:

With respect to Arm's October 22, 2024 letter to Qualcomm alleging that Qualcomm is in material breach of the QC ALA, state (i) a complete explanation for the timing of that letter and an identification of all Persons involved in the drafting of the letter, (ii) a complete list of all Third Parties that Arm shared the letter with or discussed the subject matter of the letter with or otherwise informed of Qualcomm's purported breach and an identification of all Persons affiliated with Arm involved in any communications with those Third Parties, and (iii) a list of the Persons affiliated with Arm with the most knowledge of Arm's decision to share the letter or information with Third Parties, and (iv) an identification of all documents (by Bates number) that support your response.

**RESPONSE TO INTERROGATORY NO. 2:**

Arm incorporates its General Objections as if fully asserted herein. Arm objects to this Interrogatory as it is overly broad, unduly burdensome, and disproportionate to the needs of the case. Arm further objects to this Interrogatory as seeking information that is not relevant to either Party's claims or defenses, and not reasonably calculated to lead to the discovery of relevant evidence. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**

privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality,

or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

Subject to and without wavier of its general and specific objections, Arm responds as

follows:

## Arm Repeatedly And Publicly Stated That Qualcomm Was In Breach Of The Qualcomm ALA As Early As 2022

On November 15, 2022 Arm filed a publicly-available Answer in *Arm Ltd. v. Qualcomm Inc. et al.*, No. 22-1146 (MN) ("*Arm v. Qualcomm*"), in which Arm publicly stated that "Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology," that "Qualcomm is breaching its ALA by improperly seeking to use the Qualcomm ALA to continue development of the relevant Nuvia technology, entitling Arm to terminate that ALA based on Qualcomm's material breaches," that "Arm is entitled to terminate Qualcomm's ALA based on Qualcomm's material breaches of the verification, delivery, and support and maintenance provisions," and that:

> "Qualcomm's allegations that it is exercising its rights with respect to the relevant Nuvia technology under Qualcomm's license agreements with Arm and is not in violation of those agreements fail because Arm has no such obligations with respect to the Nuvia technology, and Qualcomm is breaching the Qualcomm ALA by insisting otherwise. Under the Qualcomm ALA, Arm has no obligation to provide, and Qualcomm has no right to seek, verification, delivery, or support and maintenance in connection with technology developed under the now-terminated Nuvia ALA. The 'verification' provisions of ▮▮▮▮▮ of the Qualcomm ALA are limited to products manufactured [redacted] in the ALA. The delivery (▮▮▮▮▮) and support and maintenance (▮▮▮▮▮) obligations of the Qualcomm ALA are similarly limited to the defined [redacted] and therefore likewise do not extend to the relevant Nuvia technology, which embodies and was derived from Arm technology delivered by Arm to Nuvia under Nuvia's now-terminated ALA. Qualcomm's unreasonable, bad-faith demands that Arm comply with purported obligations for verification, delivery, and support and maintenance with respect to technology delivered and developed outside the scope of the Qualcomm ALA

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

are contrary to the parties' expectations and undermines the benefit to Arm from the Qualcomm ALA, thereby materially breaching that agreement's terms and implied covenant of good faith and fair dealing and entitling Arm to terminate the Qualcomm ALA under ███████."

No. 22-1146, D.I. 21 at 2, 37, 39, 41-42.

On April 11, 2024, Arm filed another publicly-available Answer that likewise included allegations that Qualcomm was in breach of its ALA, including that "Qualcomm is breaching its ALA by improperly seeking to use the Qualcomm ALA to continue development of the relevant Nuvia technology," and that "Qualcomm is materially breaching its ALA, giving Arm the right to terminate … ." D.I. 322 at 2, 42-45, 48-49. These materials were available to any member of the public, including online though the Court's public docket in *Arm v. Qualcomm*, No. 22-1146.

<u>**Arm and Qualcomm's Correspondence Regarding
Qualcomm's Breach of the Qualcomm ALA**</u>

On October 22, 2024 Arm sent a notice of material breach ("October 22 Notice") to Qualcomm that echoed its public statements in its November 15, 2022 and April 11, 2024 Answers, including that:

> "The Qualcomm ALA permits Qualcomm to seek support and verification solely for CPU designs created by Qualcomm employees, at a time when they were Qualcomm employees. Qualcomm is only permitted to market an ███████████████ ███ if Qualcomm has complied in all respects with the requirements of the Qualcomm ALA and completed the verification procedures provided therein. And Qualcomm is entitled to seek contractual remedies solely for CPU designs that fall within the scope of the ALA. These obligations are reflected in multiple places in the Qualcomm ALA, including but not limited to ███████ ███████████████████.
>
> Qualcomm has systematically and willfully breached these obligations, and its breaches have accelerated and expanded in recent months. Specifically, Qualcomm has developed CPUs and marketed multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party (hereinafter 'Nuvia designs'). Recently, Qualcomm has sought support and verification for additional designs that reuse the Nuvia designs. Qualcomm and Nuvia have willfully refused to discontinue use of the Nuvia designs despite the independent obligations provided by ██████████ of the Nuvia ALA

**HIGHLY CONFIDENTIAL 34909 ATTORNEYS' EYES ONLY**

> upon termination. And Qualcomm initiated and continues to prosecute contractual claims that arise from Qualcomm's improper conduct with respect to these unlicensed cores.
>
> Due to Qualcomm's willful, ongoing, and renewed actions, Qualcomm is in material breach of the Qualcomm ALA."

10/22/2024 Arm Breach Notice to Qualcomm. Arm's October 22 Notice was drafted by counsel and sent by ▮▮▮▮▮▮, Arm's Chief Legal Officer, to ▮▮▮▮▮▮, Qualcomm's General Counsel. Qualcomm responded on October 28, 2024. 10/28/2024 Qualcomm Ltr. to Arm. Qualcomm made a summary of the contents of both notices available to the public on November 6, 2024.

On January 8, 2025, Arm withdrew its October 22 Notice, stating that:



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1/8/2025 Arm Ltr. to Qualcomm.  Qualcomm and Arm exchanged further correspondence on January 22 and 30.  1/22/2025 Qualcomm Ltr. to Arm; 1/30/2025 Arm Ltr. to Qualcomm.

<u>**Arm and Qualcomm's Press Briefing Regarding**</u>
<u>**Qualcomm's Breach of the Qualcomm ALA**</u>

On October 22, 2024 ███████████████████████████████, and ██████████████, ██████████████████████████████████████████ and ██████████████████████████████ ████████████████████████ Ian King at Bloomberg, who reported on the Notice and upcoming trial on October 22.  Individuals knowledgeable about Arm's decision to discuss the Notice with Bloomberg are ██████████████ and ██████████████. On October 22 & 23, multiple news outlets reported that Qualcomm released a statement in response to the Bloomberg article. On October 22 or 23, Qualcomm released a statement to the media regarding Arm's October 22 Notice. On October 23, Arm released a statement to the media in response to Qualcomm's statement. On October 24, ██████████████████ confirmed for Ian King at Bloomberg that Arm had sent the letter to Qualcomm.  Arm did not send its October 22 Notice to any third-party companies or customers.

Following the publication of an article by Ian King on October 22, 2024, a statement by Arm regarding the October 22, 2024 letter was provided to the following persons: █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY**

████████████████████████████████████████████████████████████

██████████████████████████████████████████████).

On November 6, 2024 Qualcomm publicly described Arm's October 22 Notice in its Annual Report to investors:

> On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA by marketing products that contain CPUs that Arm alleges use designs, technology and code created by Nuvia employees prior to our acquisition of Nuvia; by seeking support and verification from Arm for additional products that use such alleged designs, technology and code; and by suing Arm for breach of the Qualcomm ALA. Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice.

Qualcomm 10-K Annual Report (November 6, 2024).

On December 16, 2024 Qualcomm filed a public version of its First Amended Complaint in this case in which it publicly described Arm's October 22, 2024 notice of material breach, stating that "Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license," described the contents of the letter, and publicly filed a redacted copy of the notice of material breach. A redacted copy of Arm's October 22, 2024 notice of material breach was and remains accessible to any member of the public, including online though the Court's public docket in *Arm v. Qualcomm*, No. 22-1146. D.I. 39 at 2, 8-9, 32-35; D.I. 39-1.

On January 22, 2025, Qualcomm wrote to Arm and stated that the parties' correspondence on this issue was not confidential, and that Qualcomm was "required by law" to publicly disclose the correspondence in its filings with the U.S. Securities & Exchange Commission, and that "in filings with the U.S. Securities & Exchange Commission, Qualcomm has disclosed Arm's October 22 notice":

> "Even if that [January 8, 2025] letter [withdrawing the October 22, 2024 notice of material breach] were itself 'Confidential'—and it is not—Qualcomm is nevertheless required by law to disclose the fact that Arm has withdrawn that notice and indicated that it has no current plan to terminate the Qualcomm ALA pending resolution of

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

challenges to the jury verdict. For instance, in filings with the U.S. Securities & Exchange Commission, Qualcomm has disclosed Arm's October 22 notice and Arm's threats to terminate the Qualcomm ALA. Qualcomm intends to update those disclosures in light of Arm's withdrawal of that notice and statement that it does not currently intend to terminate the Qualcomm ALA pending resolution of challenges to the jury verdict. We presume you have no objection to this legally required update."

1/22/2025 Qualcomm Ltr. to Arm.

On February 5, 2025 Qualcomm publicly described Arm's January 8, 2025 letter in its

Quarterly Report:

On January 8, 2025, Arm notified us that it was withdrawing its October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm ALA, while reserving its rights pending the outcome of the ongoing litigation.

Qualcomm 10-Q Quarterly Report (February 5, 2025). Christiano Amon also publicly described

Arm's communication in its public investor conference call on February 5, 2025.

### Qualcomm Recognized That Arm's October 22, 2024 Notice Of Material Breach "Is Actually Not New News"

In *Arm v. Qualcomm*, the Court held a pre-trial conference on November 20, 2024. During

that conference, Qualcomm's counsel stated that Arm's claim that Qualcomm is in breach of the

Qualcomm ALA has been in the case "starting at the very beginning," Nov. 11, 2024 Hearing Tr.

at 13:10-16, and that "[t]he letter on October 22nd is actually not new news in the sense of alleging

these breaches":

"And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed."

*Id.* at 14:18-24. Qualcomm's counsel stated earlier in that same hearing that "with respect to

Qualcomm's alleged breach under the Qualcomm ALA, Arm itself has put that in the case starting

at the very beginning" and that "[w]hen you go to their answer at DI 21, they say … [Qualcomm

is] also materially breaching its ALA with Arm." *Id.* at 13:10-16. Qualcomm candidly admitted

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

"as early as November 15, 2022, in DI 21, … they say Qualcomm is materially breaching its own ALA and giving ARM the right to terminate that agreement." *Id.* at 13:23-14:12.  Qualcomm also acknowledged "there is at least five or six references" to this same assertion that Arm has the right to terminate the Qualcomm ALA "throughout [Arm's] pleading" in November 2022.  *Id.*

As discovery is ongoing, Arm reserves the right to supplement, amend, or modify its response to this Interrogatory, and reserves the right to rely upon any evidence subsequently discovered or which may otherwise come to light during discovery.

**INTERROGATORY NO. 3**:

Describe, in detail, all facts and circumstances, including the status, of any development or plans to develop v10 of the Arm ISA and any licensing thereof. Your response should include (i) an identification of any features included in v10 of the Arm ISA that were not included in v9 of the Arm ISA and a description of the incremental value, if any, of each feature, (ii) the date(s) on which Arm began discussing development of v10 and any projected timelines for its development or release, (iii) the identity of any partners who have requested a license to v10 and (iv) the terms and conditions of any license proposal from Arm (v) a list of all Persons affiliated with Arm involved in such communications or negotiations, (vi) a list of the Persons affiliated with Arm with the most knowledge of the development or licensing of v10 of the Arm ISA, and (vii) an identification of all documents (by Bates number) that support your response.

**RESPONSE TO INTERROGATORY NO. 3:**

Arm incorporates its General Objections as if fully asserted herein.  Arm objects to this Interrogatory as it is overly broad, unduly burdensome, and disproportionate to the needs of the case. Arm further objects to this Interrogatory as seeking information that is not relevant to either Party's claims or defenses, and not reasonably calculated to lead to the discovery of relevant evidence. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

Subject to and without wavier of its general and specific objections, Arm responds as follows: Subject to its objections, Arm is willing to meet and confer with Qualcomm as to the relevance and appropriate scope of this Interrogatory, if any.

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

Dated: March 24, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP


  */s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings PLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 24, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Ruby J. Garrett
Erin J. Morgan
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
rjgarrett@paulweis.com
ejmorgan@paulweiss.com

Catherine Nyarady
Jacob A. Braly
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

swilson@ycst.com

*Attorneys for Arm Holdings plc*

2

# Exhibit 9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,
    a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC.,
    a Delaware corporation,

              Plaintiffs,

    v.

ARM HOLDINGS PLC., f/k/a ARM LTD.,
    a U.K. corporation,

              Defendant.

C.A. No. 24-490 (MN)

**HIGHLY CONFIDENTIAL -
ATTORNEYS EYES ONLY**

### ARM'S OBJECTIONS AND RESPONSES TO
### QUALCOMM'S SECOND SET OF INTERROGATORIES (NOS. 4-11)

Pursuant to Rules 23 and 33 of the Federal Rules of Civil Procedure, and the applicable Local Rules of the United States District Court for the District of Delaware, Defendant Arm Holdings PLC ("Arm") hereby responds to Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm")'s Second Set of Interrogatories (Nos. 4-11).

### GENERAL OBJECTIONS

Arm makes the following general objections, which are hereby incorporated by reference and made part of its response to each and every Interrogatory.

1.      Arm objects to each Interrogatory to the extent it purports to impose upon Arm discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware, orders entered in this case, or agreements among the parties.

2.      Arm objects to the "Instructions" and "Definitions" sections to the extent they purport to alter the plain meaning and/or scope of any specific Interrogatory, on the ground that such alteration renders the Interrogatory vague, ambiguous, overly broad, and/or uncertain, by

failing to adequately define terms or by using terms the meaning of which are not readily available or decipherable.  Arm's responses to such Interrogatories shall not be construed as an admission, agreement, or acquiescence to any such instruction or definition.  Arm further objects to the "Instructions" and "Definitions" sections to the extent they purport to impose upon Arm discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware, orders entered in this case, or agreements among the parties.

3.    Arm objects to the definitions of "Defendant," "Arm," "you," and "your" as overly broad and unduly burdensome to the extent they purport to require Arm to provide information that is not within the possession, custody, or control of Arm Holdings PLC, or to otherwise respond on behalf of third parties, at least because these definitions include entities that have no relation to the present litigation.

4.    Arm objects to the definitions of "ALA" and "TLA" as overbroad and vague and ambiguous to the extent they define Architecture License Agreement and Technology License Agreement to include "all amendments and annexes to any such agreement."

5.    Arm objects to the definition of "███████████" as overbroad and vague and ambiguous to the extent it defines the term by reference to the definition of that term in ██████ ███ of the Qualcomm ALA, ██████████ of the Qualcomm v8-A ALA Annex, or ███████████ of the Qualcomm v9-A ALA Annex."

6.    Arm objects to the definition of "ACK" as overbroad and vague and ambiguous to the extent it defines the term as meaning "Arm's Architecture Compliance Kit or Arm's Architecture Validation Suite or Arm's Architecture Compliance Suite."

7.    Arm objects to each Interrogatory, including the instructions and definitions that Qualcomm purports to incorporate therein, to the extent that each Interrogatory is overbroad,

unduly burdensome, not limited to a reasonable time frame, vague and ambiguous, irrelevant, and/or not reasonably calculated to lead to the discovery of admissible evidence.

8.      Arm objects to each Interrogatory to the extent it seeks information, documents, and/or things that are protected from disclosure by the attorney-client privilege, work-product doctrine, common-interest privilege, and/or any other applicable privilege, immunity, or protection (collectively, "privileged information").  Nothing contained in these responses should be considered a waiver of any attorney-client privilege, work-product protection, or any other applicable privilege or doctrine.  Arm does not intend to produce information or documents that would divulge any privileged information.  Any such disclosure is inadvertent and shall not be deemed a waiver of any applicable privilege or immunity.

9.      Arm objects to any factual characterizations in Qualcomm's Interrogatories.  By responding, Arm does not accept or admit any of Qualcomm's factual characterizations.

10.      Arm objects to each Interrogatory to the extent it seeks "all" or "any" facts, documents, witness identifications, or things as overbroad and unduly burdensome.

11.      Arm's discovery and investigation in connection with this case is ongoing.  Arm's responses to these Interrogatories are based on its knowledge to date following a reasonable investigation.  As a result, Arm's responses are provided without waiver of Arm's right to: (a) object to other interrogatories directed to the subject matter of these Interrogatories and responses; (b) make additional or supplementary objections to these Interrogatories; or (c) revise, amend, supplement, or clarify the contents of these responses.

Subject to and without wavier of these General Objections and the more specific objections set forth below, Arm responds as follows:

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 4:

Describe, in detail, Arm's reason(s), explanation, or justification for failing to respond to Qualcomm's May 2020 election under ███████████████████ to extend the initial term of the ALA. Your response should include (1) the names of any individuals involved in the decision not to respond to Qualcomm's election, (2) a description of any discussions regarding whether to respond to Qualcomm's election, including any discussions that occurred in subsequent years, (3) any factual or legal bases that Arm relied on in deciding not to respond to Qualcomm's election, and (4) an identification of any relevant documents by Bates number.

### RESPONSE TO INTERROGATORY NO. 4:

Arm incorporates its General Objections as if fully asserted herein. Arm objects to this Interrogatory as it is premature, overly broad, unduly burdensome, and disproportionate to the needs of the case, including, but not limited to, to the extent it seeks information regarding "the names of any individuals," "any discussions," "any factual or legal bases," and "any relevant documents," without limitation. Arm objects to this Interrogatory as vague and ambiguous and as mischaracterizing, as the terms "Qualcomm's May 2020 election under ██████████████ ████████████" and "the decision not to respond to Qualcomm's election" are unclear and inaccurate. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules. Arm objects to this Interrogatory to the extent it calls for a legal conclusion.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

### Arm Responded To Qualcomm's Purported Election Under Section ███████ In May 2020

Arm responded to Qualcomm's purported election under Section ███████ of the Qualcomm ALA in May 2020.

In response to outreach from Brett Bettesworth from Qualcomm to Lynn Couillard at Arm in April and May 2020, Lynn Couillard sent several responses to Qualcomm in response to its request for an extension of the ALA under ███████████ including on May 15, 2020 when she responded stating that "[t]he intent of ███████████ is to allow for an extension of the agreement as of this point in the term of the agreement.  If there is not desire from Qualcomm to negotiate terms of an extension at this point, but rather to have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire" and that "there is nothing that stops us from discussing next gen architecture or entering into an agreement anytime in the future regardless of the existing agreement":

---

**From:** Lynn Couillard <Lynn.Couillard@arm.com>
**Sent:** Friday, May 15, 2020 9:49 AM
**To:** Brett Bettesworth <betteswb@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>
**Cc:** Todd Lepinski <Todd.Lepinski@arm.com>
**Subject:** [EXT] Re: V10 -->V9 architecture follow-on

Hello Brett and Rajiv, (+Todd)

The intent of section ██████ is to allow for an extension of the agreement as of this point in term of the agreement.  If there is no desire from Qualcomm to negotiate terms of an extension at this point, but rather to have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire.  However, importantly, there is nothing that stops us from discussing next gen architecture or entering into an agreement anytime in the future regardless of the existing agreement.

Note that at the time of the v8 architecture closure, we also included ██████ which at the time had no definition, and eventually became v9.   We are in a similar situation here with regards to visibility on next generation architecture.

Please let us know if you'd like to discuss, we can set something up for next week.

Thanks
Lynn

---

ARM_00005340.  Mr. Bettesworth responded five days later.  He did not dispute any of Ms. Couillard's statements, including that "[t]he intent of ███████████ is to allow for an ***extension*** of the agreement ***as of this point in term of the agreement***," and that if Qualcomm desires to "have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire."  He elected to "go ahead and move forward with the extension":

| From: | Brett Bettesworth [betteswb@qti.qualcomm.com] |
|---|---|
| Sent: | 20/05/2020 20:05:11 |
| To: | Lynn Couillard [Lynn.Couillard@arm.com]; grajiv@qti.qualcomm.com |
| CC: | Todd Lepinski [Todd.Lepinski@arm.com] |
| Subject: | RE: V10 -->V9 architecture follow-on |

| Importance: | High |

Hi Lynn,

Thanks for your email and the note below.  We will go ahead and move forward with the extension at this point, per the ALA optional election.

███████████████████████████████████████████████████████████████

We can discuss further at some point in the near future, but wanted to ensure that we provided timely notification of our election here, as mentioned previously.

Sincerely,
Brett

*Id.*  Mr. Bettesworth's email also did not seek a response, and ended by stating that "[w]e can discuss further at some point in the near future …."  However, Mr. Bettesworth does not appear to have sent a follow-up email to arrange such discussions.  Qualcomm also failed to send any follow-up about v10 to Arm, including any formal correspondence in compliance with the ALA's notice provisions, for nearly five years.  Qualcomm further failed to send any notice of breach of the ALA to Arm for allegedly breaching ████████████

Arm identifies the following individuals as knowledgeable regarding aspects of this subject matter: Lynn Couillard.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

**INTERROGATORY NO. 5:**

Identify with specificity all ACK patches and OOBs developed or provided by Arm between July 2022 and February 2025 and their respective release schedule(s).  Your response should identify (1) the names of each partner who received an ACK patch or OOB, (2) the dates that each ACK patch and OOB was requested and by whom, (3) the date that each ACK patch and OOB was provided and to which partner, (4) information regarding whether any ACK patches and OOB were withheld from any partners during this time period, (5) the names of all Arm individuals with

relevant knowledge, and (6) identify any relevant documents by Bates number.

**RESPONSE TO INTERROGATORY NO. 5:**

Arm incorporates its General Objections as if fully asserted herein.  Arm objects to this Interrogatory as it is overly broad, unduly burdensome, and disproportionate to the needs of the case, including, but not limited to, because it seeks information regarding "all ACK patches and OOBs developed or provided by Arm between July 2022 and February 2025," "each partner," information about "each ACK patch and OOB," and "all Arm individuals," without limitation.  Arm further objects to this Interrogatory as it is overly broad, unduly burdensome, and disproportionate to the needs of the case because it seeks detailed information regarding Arm's development and provision of partner-specific OOBs and ACK patches for partners other than Qualcomm. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.  Arm further objects to this request to the extent it seeks information that Arm is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

Arm incorporates its response to Qualcomm's Interrogatory Number 1.

### Arm Provides The Content Of ACK Patches To All Partners, Including Qualcomm As Part Of Its Quarterly ACK Release

ACK patches are not ███████████████████ under the Qualcomm ALA, including because they are not architecture technology identified in the v8 Annex 1 or the v9 Annex 1 to the Qualcomm ALA, nor are they ████████████ thereto.  An ACK patch is a partner-specific solution to a partner-specific ACK test issue, and when that solution is relevant to all ALA

licensees, Arm typically incorporates the solution into its next quarterly ACK release, which is made available to all ALA partners, including Qualcomm.

Arm provided Qualcomm with the full suite of ACK tests for both the Arm v8 and Arm v9 architectures—the ARMv8-A Architecture Valid Suite Kit (AVS) and the Armv9-A Architecture Compliance Kit. *See*, *e.g.*, ARMQC_02604619 (spreadsheet showing Qualcomm downloaded certain Arm materials, including the Arm v8 ACK / AVS (███████████) and the Arm v9 ACK / ACS (███████████)); ARMQC_02604613 (spreadsheet showing when Qualcomm downloaded certain Arm materials, including Part Nos. ██████ (associated with the Arm v8 ACK / AVS) and ██████ (Arm v9 ACK)); ARMQC_02604617 (spreadsheet showing Arm deliveries of ██████ materials to Qualcomm between 2022 and 2024); ARMQC_02603587 (spreadsheet showing Arm making Product Nos. ████████████ available to Qualcomm between 05/11/2007 and 01/08/2025); *see also* ARMQC_02604612 (spreadsheet showing Arm made "New Arm Product Updates Available" to Qualcomm between 10/31/2022 and 01/29/2025); ARMQC_02604614 (spreadsheet showing Arm made "New Arm Products Available" to Qualcomm between 09/22/2022 and 03/27/2025); ARMQC_02604609 (document showing Arm materials made available to Qualcomm between 07/15/2010 and 06/24/2022); ARMQC_02604615 (spreadsheet showing Arm materials that Qualcomm downloaded, including "OOB" and "ACK patch[es]").  Arm therefore did not withhold any ACK tests from Qualcomm.

Arm provided all of its ALA partners, including Qualcomm, with quarterly ACK releases that incorporated ACK-patch solutions to ACK test issues relevant to all ALA partners.  *See*, *e.g.*, ARMQC_02747093 (document showing Arm providing quarterly v8 ACK releases to Qualcomm between 2021 and 2025); ARMQC_02747097 (document showing Arm providing quarterly v9 ACK releases to Qualcomm between 2021 and 2025); ARMQC_02747103 (document showing Qualcomm downloading Armv8 materials, including quarterly "Update[s]_for_ACK," between

2022 and 2024); ARMQC_02747104 (document showing Qualcomm downloading Armv9 materials, including "Update[s]_for_ACK" and "V9A_ACK_Release_Update[s]" between 2022 and 2025); ARMQC_02604611 (document showing Arm delivering quarterly Armv8 ACK releases to Qualcomm between 04/04/2011 and 07/28/2022); ARMQC_02604616 (document showing Arm delivering quarterly Armv9 ACK releases to Qualcomm between 05/27/2019 and 07/28/2022).

### OOBs Are Partner and Design-Specific, And OOBs Provided To Third Parties Are Not Relevant To Qualcomm

OOBs are not "███████████" or "██████" under the Qualcomm ALA, including because they are not architecture technology identified in the v8 Annex 1 or the v9 Annex 1 to the Qualcomm ALA, nor are they ████████████ thereto. OOBs identify which of the previously delivered ACK tests a partner should run and are based on the configuration of the partner's design implementation. Because OOBs are not just partner-specific, but implementation-specific, any OOB that Arm may have provided to a third-party ALA partner is not relevant to Qualcomm. *See* Agrawal Dep. Tr. at 29:1–21 ("██████████████████████████████ Further, as explained in Arm's response to Qualcomm Interrogatory No. 1, by July 2022, Arm had already given Qualcomm several OOB packages, including for use with Nuvia-based designs. *See* Arm Resp. to Qualcomm Interrog. No. 1.

Further, though Qualcomm is not entitled to any ACK patches or OOB for Nuvia-based designs, Arm made clear in its January 8, 2025 letter to Qualcomm that "Arm intends to provide support for the Nuvia CPUs, including support and verification services" pending certain litigation between the parties. QCVARM_0573677.

Arm identifies the following individual as knowledgeable regarding aspects of this subject matter: Vivek Agrawal.

Pursuant to Federal Rule of Civil Procedure 33(d), Arm identifies the following documents

from which information responsive to the non-objectionable scope of this Interrogatory may be derived: ARMQC_02603587, ARMQC_02604609, ARMQC_02604610, ARMQC_02604611, ARMQC_02604612, ARMQC_02604613, ARMQC_02604614, ARMQC_02604615, ARMQC_02604616, ARMQC_02604617, ARMQC_02604618, ARMQC_02604619, ARMQC_02747093, ARMQC_02747097, ARMQC_02747103, and ARMQC_02747104.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

**INTERROGATORY NO. 6:**

Describe in detail and provide a list of licensing terms that Arm has offered since 2019 for CortexA720 codenamed "████" Cortex-A520 codenamed "████," Cortex M55 codenamed "████," Cortex-X925 codenamed "████" the CPU codenamed "████," Cortex-A720AE codenamed "████", Cortex-A730 codenamed "████", and Cortex-A725 codenamed "████". Your response should identify (1) the names of each partner and which licensing offer(s) the partner received, (2) the date of each offer to each specific partner, (3) the licensing fee offered for each of the identified products, by partner (4) the royalty rate offered for each of the identified products, by partner (5) the licensing term offered for each of the identified products, by partner (6) any support and maintenance terms offered for each of the identified products, by partner (7) any restrictions imposed on engineering development efforts for each of the identified products, by partner (8) the names of all Arm individuals with relevant knowledge, and (9) all relevant documents identified by Bates number.

**RESPONSE TO INTERROGATORY NO. 6:**

Arm incorporates its General Objections as if fully asserted herein. Arm objects to this Interrogatory as it is premature, overly broad, unduly burdensome, and disproportionate to the needs of the case, including, but not limited to, to the extent it seeks information regarding "each partner," "each offer," "each of the identified products," without limitation. Arm further objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information regarding cores for which Qualcomm does not allege breach in its Second Amended Complaint, including "Cortex-X925," "████" "the CPU codenamed ████,'" "Cortex-A720AE codenamed '████,'" "Cortex-A730 codenamed ████'" and "Cortex-A725 codenamed ████'" Arm further objects to this Interrogatory to the extent it

A0823
10

seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules. Arm further objects to this Interrogatory as vague and ambiguous, as the term "restrictions" is unclear. Arm further objects to this Interrogatory as having multiple discrete subparts and therefore multiple interrogatories. Arm further objects to this request to the extent it seeks information that Arm is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties.

Subject to and without wavier of its general and specific objections, Arm responds as follows: Arm is willing to meet and confer with Qualcomm regarding a reasonable scope for this interrogatory.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

## INTERROGATORY NO. 7:

Describe, in detail, Arm's business strategy with respect to gaining a competitive advantage against other companies, including Qualcomm. Your response should include (1) any strategy related to unwinding or limiting ALAs, (2) any strategy related to increasing licensing prices for products offered under any license, (3) any strategy related to development of silicon, (4) any strategy related to acquiring other companies, (5) any strategy related to increasing pricing or limiting access to v10 or future versions of the Arm ISA, (6) the names of all Arm individuals with relevant knowledge, and (7) all relevant documents identified by Bates number.

## RESPONSE TO INTERROGATORY NO. 7:

Arm incorporates its General Objections as if fully asserted herein. Arm objects to this Interrogatory as it is premature, overly broad, unduly burdensome, and disproportionate to the needs of the case, including, but not limited to, because it seeks information regarding "any strategy" and "all Arm individuals," without limitation. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any

other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.  Arm further objects to this Interrogatory as vague and ambiguous, as the terms "Arm's business strategy with respect to gaining a competitive advantage," "unwinding or limiting ALAs," "development of silicon," and "increasing pricing or limiting access to v10 or future versions of the Arm ISA" are unclear.  Arm objects to Qualcomm's characterization of its business strategy.  Arm further objects to this Interrogatory as having multiple discrete subparts and therefore multiple interrogatories  Arm further objects to this request to the extent it seeks information that Arm is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties.

Subject to and without wavier of its general and specific objections, Arm responds as follows: Arm is willing to meet and confer with Qualcomm regarding a reasonable scope for this interrogatory, if any.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

## INTERROGATORY NO. 8:

Identify and describe in detail the complete factual and legal bases for Your contention, if any, that You did not interfere, either intentionally or negligently, with Qualcomm's business opportunities, including but not limited to Qualcomm's business opportunities with the Smartphone Company and the AI and Ecosystem Company identified in the operative Complaint. Your response should include an identification of all documents by Bates numbers that you intend to rely upon to support your contention.

## RESPONSE TO INTERROGATORY NO. 8:

Arm incorporates its General Objections as if fully asserted herein.  Arm objects to this Interrogatory as it is overly broad, unduly burdensome, and disproportionate to the needs of the case, including, but not limited to, because it seeks information regarding alleged interference with "Qualcomm's business opportunities," without limitation.  Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the

attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.  Arm further objects to this Interrogatory as vague and ambiguous, as the terms "Qualcomm's business opportunities," and "Qualcomm's business opportunities with the Smartphone Company and the AI and Ecosystem Company" are unclear.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

### Arm's October 2024 Letter And Its Publication Did Not Interfere With Qualcomm's Business Opportunities Because Arm Repeatedly And Publicly Stated That Qualcomm Was In Breach Of The Qualcomm ALA As Early As 2022

Arm's October 2024 letter stating that Qualcomm was in breach of the Qualcomm ALA, and the publication of the same, did not interfere with any of Qualcomm's business relationships because Arm repeatedly and publicly stated that Qualcomm was in breach of the Qualcomm ALA as early as 2022.

On November 15, 2022 Arm filed a publicly-available Answer in *Arm Ltd. v. Qualcomm Inc. et al.*, No. 22-1146 (MN) ("Arm v. Qualcomm"), in which Arm publicly stated that "Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology," that "Qualcomm is breaching its ALA by improperly seeking to use the Qualcomm ALA to continue development of the relevant Nuvia technology, entitling Arm to terminate that ALA based on Qualcomm's material breaches," that "Arm is entitled to terminate Qualcomm's ALA based on Qualcomm's material breaches of the verification, delivery, and support and maintenance provisions," and that:

> "Qualcomm's allegations that it is exercising its rights with respect to the relevant Nuvia technology under Qualcomm's license agreements with Arm and is not in

violation of those agreements fail because Arm has no such obligations with respect to the Nuvia technology, and Qualcomm is breaching the Qualcomm ALA by insisting otherwise. Under the Qualcomm ALA, Arm has no obligation to provide, and Qualcomm has no right to seek, verification, delivery, or support and maintenance in connection with technology developed under the now-terminated Nuvia ALA. The 'verification' provisions of ████████ of the Qualcomm ALA are limited to products manufactured [redacted] in the ALA. The delivery (██████ and support and maintenance (██████ obligations of the Qualcomm ALA are similarly limited to the defined [redacted] and therefore likewise do not extend to the relevant Nuvia technology, which embodies and was derived from Arm technology delivered by Arm to Nuvia under Nuvia's now-terminated ALA. Qualcomm's unreasonable, bad-faith demands that Arm comply with purported obligations for verification, delivery, and support and maintenance with respect to technology delivered and developed outside the scope of the Qualcomm ALA are contrary to the parties' expectations and undermines the benefit to Arm from the Qualcomm ALA, thereby materially breaching that agreement's terms and implied covenant of good faith and fair dealing and entitling Arm to terminate the Qualcomm ALA under ████████."

No. 22-1146, D.I. 21 at 2, 37, 39, 41-42.

On April 11, 2024, Arm filed another publicly-available Answer that likewise included allegations that Qualcomm was in breach of its ALA, including that "Qualcomm is breaching its ALA by improperly seeking to use the Qualcomm ALA to continue development of the relevant Nuvia technology," and that "Qualcomm is materially breaching its ALA, giving Arm the right to terminate …."  D.I. 322 at 2, 42-45, 48-49.  These materials were available to any member of the public, including online though the Court's public docket in *Arm v. Qualcomm*, No. 22-1146.

### Qualcomm Recognized That Arm's October 22, 2024 Notice Of Material Breach "Is Actually Not New News"

In *Arm v. Qualcomm*, the Court held a pre-trial conference on November 20, 2024. During that conference, Qualcomm's counsel stated that Arm's claim that Qualcomm is in breach of the Qualcomm ALA has been in the case "starting at the very beginning," Nov. 11, 2024 Hearing Tr. at 13:10-16, and that "[t]he letter on October 22nd is actually not new news in the sense of alleging these breaches":

"And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely

and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed."

*Id.* at 14:18-24.  Qualcomm's counsel stated earlier in that same hearing that "with respect to Qualcomm's alleged breach under the Qualcomm ALA, Arm itself has put that in the case starting at the very beginning" and that "[w]hen you go to their answer at DI 21, they say … [Qualcomm is] also materially breaching its ALA with Arm." *Id.* at 13:10-16. Qualcomm candidly admitted "as early as November 15, 2022, in DI 21, … they say Qualcomm is materially breaching its own ALA and giving ARM the right to terminate that agreement." *Id.* at 13:23-14:12.  Qualcomm also acknowledged "there is at least five or six references" to this same assertion that Arm has the right to terminate the Qualcomm ALA "throughout [Arm's] pleading" in November 2022. *Id.*

### Arm's Alleged Publication of Arm's October 2024 Letter Did Not Interfere With Qualcomm's Business Opportunities Because Qualcomm Admits It Had An Obligation To Publish—And Did Publish—Arm's October 2024 Letter

On October 22, 2024 Arm sent a notice of material breach ("October 22 Notice") to Qualcomm that echoed its public statements in its November 15, 2022 and April 11, 2024 Answers, including that:

> "The Qualcomm ALA permits Qualcomm to seek support and verification solely for CPU designs created by Qualcomm employees, at a time when they were Qualcomm employees. Qualcomm is only permitted to market an Architecture Compliant Core if Qualcomm has complied in all respects with the requirements of the Qualcomm ALA and completed the verification procedures provided therein. And Qualcomm is entitled to seek contractual remedies solely for CPU designs that fall within the scope of the ALA. These obligations are reflected in multiple places in the Qualcomm ALA, including but not limited to ██████████████████████ ████████████████████
>
> Qualcomm has systematically and willfully breached these obligations, and its breaches have accelerated and expanded in recent months. Specifically, Qualcomm has developed CPUs and marketed multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party (hereinafter 'Nuvia designs'). Recently, Qualcomm has sought support and verification for additional designs that reuse the Nuvia designs. Qualcomm and Nuvia have willfully refused to discontinue use of the Nuvia designs despite the independent obligations provided by Section 15.1 of the Nuvia ALA upon termination. And Qualcomm initiated and continues to prosecute contractual claims that arise from Qualcomm's improper conduct with respect to these

unlicensed cores.

Due to Qualcomm's willful, ongoing, and renewed actions, Qualcomm is in material breach of the Qualcomm ALA."

10/22/2024 Arm Breach Notice to Qualcomm (ARMQC_02749015). No terms or provisions of the Qualcomm ALA were quoted in Arm's notice of material breach. *Id.* Qualcomm responded on October 28, 2024. 10/28/2024 Qualcomm Ltr. to Arm. Qualcomm made a summary of the contents of both notices available to the public on November 6, 2024. Qualcomm 10-K Annual Report (November 6, 2024).

On January 8, 2025, Arm withdrew its October 22 Notice, stating that:

The Qualcomm ALA was the subject of an incomplete jury verdict on December 20 that found in Qualcomm's favor. That verdict is not final and is subject to a variety of legal challenges. Nonetheless, Arm respects and values the jury process and the Court's ongoing role in resolving the parties' disputes. As a result, and while Arm's ongoing legal challenges are pending, Arm will treat the Nuvia CPUs as falling within the scope of the Qualcomm ALA, and Arm therefore withdraws the pending October 22, 2024 notice of material breach. Arm has no current plan to terminate the Qualcomm ALA until the legal process resolves the parties' disputes over the Qualcomm ALA. Arm also conditionally accepts Qualcomm's one-time, five-year year extension under which the Qualcomm ALA will expire in 2033. Pursuant to separate correspondence, Arm intends to provide support for the Nuvia CPUs, including support and verification services, while the related legal challenges remain outstanding.

Arm's prior correspondence and relevant court filings in the Delaware litigation reflect Arm's legal position regarding the scope of the Qualcomm ALA and the required actions that Nuvia acting in concert with Qualcomm must take in light of the termination of the Nuvia ALA on March 1, 2022. Arm's future legal filing will reflect its legal position regarding the non-final verdict, a new trial and judgment in the legal case. Arm reserves all rights and none of Arm's conduct, support and verification reflects a waiver of Arm's present or future rights or claims.

1/8/2025 Arm Ltr. to Qualcomm (QCVARM_0847182). Qualcomm and Arm exchanged further correspondence on January 22 and 30. 1/22/2025 Qualcomm Ltr. to Arm (QCVARM_0847182); 1/30/2025 Arm Ltr. to Qualcomm (QCVARM_0847184).

On November 6, 2024 Qualcomm publicly described Arm's October 22 Notice in its Annual Report to investors:

On October 22, 2024, Arm provided us with a notice alleging that we have breached

the Qualcomm ALA by marketing products that contain CPUs that Arm alleges use designs, technology and code created by Nuvia employees prior to our acquisition of Nuvia; by seeking support and verification from Arm for additional products that use such alleged designs, technology and code; and by suing Arm for breach of the Qualcomm ALA. Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice.

Qualcomm 10-K Annual Report (November 6, 2024).

On December 16, 2024 Qualcomm filed a public version of its First Amended Complaint in this case in which it publicly described Arm's October 22, 2024 notice of material breach, stating that "Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license," described the contents of the letter, and publicly filed a redacted copy of the notice of material breach. A redacted copy of Arm's October 22, 2024 notice of material breach was and remains accessible to any member of the public, including online though the Court's public docket in *Arm v. Qualcomm*, No. 22-1146. D.I. 39 at 2, 8-9, 32-35; D.I. 39-1.

On January 22, 2025, Qualcomm wrote to Arm and stated that the parties' correspondence on this issue was not confidential, and that Qualcomm was "required by law" to publicly disclose the correspondence in its filings with the U.S. Securities & Exchange Commission, and that "in filings with the U.S. Securities & Exchange Commission, Qualcomm has disclosed Arm's October 22 notice":

> "Even if that [January 8, 2025] letter [withdrawing the October 22, 2024 notice of material breach] were itself 'Confidential'—and it is not—Qualcomm is nevertheless required by law to disclose the fact that Arm has withdrawn that notice and indicated that it has no current plan to terminate the Qualcomm ALA pending resolution of challenges to the jury verdict. For instance, in filings with the U.S. Securities & Exchange Commission, Qualcomm has disclosed Arm's October 22 notice and Arm's threats to terminate the Qualcomm ALA. Qualcomm intends to update those disclosures in light of Arm's withdrawal of that notice and statement that it does not currently intend to terminate the Qualcomm ALA pending resolution of challenges to the jury verdict. We presume you have no objection to this legally required update."

1/22/2025 Qualcomm Ltr. to Arm (QCVARM_0847182).

On February 5, 2025 Qualcomm publicly described Arm's January 8, 2025 letter in its

Quarterly Report:

> On January 8, 2025, Arm notified us that it was withdrawing its October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm ALA, while reserving its rights pending the outcome of the ongoing litigation.

Qualcomm 10-Q Quarterly Report (February 5, 2025). Cristiano Amon also publicly described Arm's communication in its public investor conference call on February 5, 2025.

### Arm's Actions Did Not Interfere With Any Of Qualcomm's Business Opportunities With █████████████

The business opportunities Qualcomm alleges it lost are not due to Arm's actions, and Arm's conduct did not amount to intentional or negligent interference with Qualcomm's business relationships with ████████████████████.

Regarding ████, Qualcomm contends that "[a]fter the Breach Letter was published, ████ delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities. ████ has stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question." SAC ¶ 159. Qualcomm has failed to identify the termsheet in question let alone any documents relevant to its theory that its business relationship with ████ was harmed by Arm. Further, any delay in the finalization of that termsheet is due to factors other than Arm's actions, including Qualcomm's own business practices.

Regarding ██████████, Qualcomm contends that "[██████] had informed Qualcomm that it was designing a new mobile phone that would rely on Qualcomm's innovative Snapdragon® 8-Elite SoC. After learning that Arm was threatening to terminate the QC ALA, however, a senior executive of [██████] informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm. ██████] has also insisted on Qualcomm's providing additional reassurances before

it will extend its existing business relationship with Qualcomm." SAC ¶ 158. Qualcomm has failed to identify any lost opportunity with ███████ and any loss of an "exten[sion]" to its relationship with ███████ is due to factors other than Arm's actions, including Qualcomm's own business practices.

## **Qualcomm's Claims Are Barred By *Noerr-Pennington* And California's Litigation Privilege**

As a matter of law, Arm's alleged conduct is related to litigation and therefore not actionable. *Noerr-Pennington* immunizes parties from liability "for engaging in conduct (including litigation) aimed at influencing decision making by the government." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 413 (3d Cir. 2016). The *Noerr-Pennington* doctrine protects "conduct incidental to the prosecution of [a] suit," *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934-35 (9th Cir. 2006), including "demand letter[s] or cease-and-desist letter[s]." *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1113 (C.D. Cal. 2015); *Sweet St. Desserts, Inc. v. Chudleigh's Ltd.*, 655 F. App'x 103, 111 (3d Cir. 2016) ("cease-and-desist letter" "protected under *Noerr-Pennington*"); *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, C.A. No. 07-127-LPS, 2011 WL 678707, at *2 (D. Del. Feb. 18, 2011) (similar).

Courts also apply *Noerr-Pennington* immunity when plaintiffs bring tortious interference and other claims based on purported communications about litigation to customers. *See, e.g.*, *Evanger's Dog & Cat Food Co. v. Env't Democracy Project*, No. CV 21-08489, 2022 WL 180205, at *1, *4 (C.D. Cal. Jan. 20, 2022) (dismissing claims arising out of letter to plaintiff's customer); *Fitbit, Inc. v. Laguna 2, LLC*, No. 17-cv-00079- EMC, 2018 WL 306724, at *10 (N.D. Cal. Jan. 5, 2018) (claims based on contacting customers regarding pre-suit demand letter barred by *Noerr-Pennington*).

California's litigation privilege also protects Arm's letter (and the alleged publicizing of that letter) from Qualcomm's tortious interference claims. The "litigation privilege is … absolute

in nature," *Silberg v. Anderson*, 50 Cal. 3d 205, 215 (1990), and protects not only statements made in litigation, but also "out-of-court statements 'to nonparties who have a substantial interest in the outcome of the pending litigation,'" *Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp. 2d 1033, 1040-41 (S.D. Cal. Aug. 29, 2011); *see also Cargill v. Progressive Dairy Sols., Inc.*, No. CV-F-07-0349-LJO-SMS, 2008 WL 2235354, at \*6 (E.D. Cal. May 29, 2008) ("news release" "inform[ing] the recipients of the … claims asserted" protected by the privilege); *Designing Health, Inc. v. Erasmus*, No. CV-98-4758 LGB (CWx), 2001 WL 36239748, at \*3-4 (C.D. Cal. Apr. 24, 2001) (similar).  Arm's letter was made during litigation with Qualcomm regarding Arm's claims.  Such publications are protected under California law. *Cargill*, 2008 WL 2235354, at \*6.

### Qualcomm Has Not Identified Any Independently Wrongful Conduct

To plead intentional interference with prospective economic advantage, Qualcomm must allege "intentionally wrongful act(s) designed to disrupt the relationship." *See Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.,* 2 Cal. 5th 505, 512 (2017). This element requires "independently wrongful" conduct, defined as conduct "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.,* 19 Cal. 4th 1134, 1159 (2003). Even if a plaintiff alleges some sort of interference with economic advantage, courts dismiss intentional interference claims where the plaintiff still does not allege conduct "wrongful by some legal measure," *Golden v. Sound Inpatient Physicians Med. Grp., Inc.,* 93 F. Supp. 3d 1171, 1178 (E.D. Cal. 2015), or that the conduct "violated any other law, which is a necessary element of intentional interference with economic relations," *Republican Nat'l Comm. v. Google LLC,* 2024 WL 3595538, at \*1 (E.D. Cal. July 31, 2024).

Qualcomm has already conceded that breach-of-contract does *not* satisfy the independently-wrongful-acts requirement. D.I. 64 at 13; *see Block v. eBay, Inc.,* 2012 WL 1601471, at \*5 (N.D.

Cal. May 7, 2012).  Allegations that Arm leaked the breach letter or made statements to customers, SAC ¶ 192, likewise do not show violations of "other law," particularly where Qualcomm fails to plead UCL claims and where that conduct is protected by *Noerr-Pennington*.  Qualcomm's negligent tortious interference claim fails for the same reason: Arm has "failed to allege facts showing that defendants engaged in an act that is wrongful apart from the interference itself." *See TriCoast Builders, Inc. v. Lakeview Loan Servicing, LLC*, 2021 WL 248316, at *5 (Cal. Ct. App. Jan. 26, 2021) (quotations omitted).

### Qualcomm Has Not Established That Arm Owed Any Duties To Qualcomm

With respect to Qualcomm's negligent interference claim, Arm did not owe Qualcomm a duty of care.  California law imposes a duty of care via contract only if the contract itself contains that duty. *See, e.g.*, *Golick v. State of California*, 82 Cal. App. 5th 1127, 1150 (2022) (no duty where plaintiffs did not show contract included "duty to protect"); *Jane Doe No. 1 v. Uber Techs., Inc.*, 79 Cal. App. 5th 410, 423 (2022) (no duty where contract did not contain "express promise"). Even "[t]he implied covenant of good faith and fair dealing is a contractual relationship and does not give rise to an independent duty of care." *Ragland v. U.S. Bank*, 209 Cal. App. 4th 182, 206 (2012).

Qualcomm also cannot establish a duty of care where Qualcomm and Arm are allegedly competitors.  Qualcomm repeatedly alleges that Qualcomm and Arm have "competing CPU designs," and that Arm is seeking to "compete … with Qualcomm." SAC ¶¶ 1, 5; *see also id.* ¶¶ 35, 52, 70–74, 160, 165. But "[t]here is no duty of care between competitors under California law." *Singman v. NBA Props., Inc,* 2014 WL 7892049, at *5 (C.D. Cal. Jan. 17, 2014); *Stolz v. Wong Commc'ns Ltd. P'ship,* 25 Cal. App. 4th 1811, 1825 (1994).

### Qualcomm's Claims Are Barred By Unclean Hands

Qualcomm's allegations regarding Arm's interference with Qualcomm's customer

relationships is also barred by the equitable doctrine of unclean hands. "One who comes into equity must come with clean hands and keep those hands clean throughout the pendency of the litigation even to the time of ultimate disposition by an appellate court." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 398 F. Supp. 2d 305, 310 (D. Del. 2005) (quoting *Gaudiosi v. Mellon*, 269 F.2d 873, 881 (3d Cir. 1959)). "The clean hands maxim gives broad discretion to the court's equity power in refusing to aid an unclean hands litigant." *Id.* "Any willful act, which can rightfully be said to transgress equitable standards, is sufficient." *Id.* at 311.

"The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Kars 4 Kids Inc. v. Am. Can!*, 98 F.4th 436, 449 (3d Cir. 2024) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001)). "The misconduct must be rooted in 'fraud, unconscionable conduct, or bad faith ... that injures the other party and affects the balance of equities.'" *Id.* at 450 (quoting *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3d Cir. 1999)).

Courts have found unclean hands where the plaintiff engaged in the same (inequitable) conduct it accuses a defendant of. *See, e.g.*, *Emco, Inc. v. Obst*, No. CV03-6432-R (RZX), 2004 WL 1737355, at *4–6 (C.D. Cal. May 7, 2004) (in a Lanham Act case where plaintiff accused defendant of falsely advertising that its blades were manufactured in the United States, the court found that defendant had proven its affirmative defense of unclean hands as a matter of law because plaintiff's "Americut" blades—which plaintiff promoted with classic American symbols such as the American flag and Statue of Liberty—were similarly manufactured overseas); *Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F. Supp. 73, 75–76 (S.D.N.Y. 1980) (denying plaintiff's motion for a preliminary injunction due to plaintiff's unclean hands in accusing defendant of falsely using Swedish motifs to suggest that its products were not of domestic origin, when plaintiff had done

similarly).  Qualcomm published Arm's October 2024 letter just days after Arm did.  Further, on March 25, 2025, Bloomberg published a story concerning Qualcomm's non-public complaints of anticompetitive behavior at the European Commission, US Federal Trade Commission, and Korea Fair Trade Commission.  Josh Sisco & Ian King, *Qualcomm Takes Legal Fight with Arm to Global Antitrust Agencies*, Bloomberg News (Mar. 25, 2025, 3:55 PM CDT), https://www.bloomberg.com/news/articles/2025-03-25/qualcomm-takes-legal-fight-with-arm-to-global-antitrust-agencies.  Qualcomm's publication of Arm's letter, and non-public litigation materials to Bloomberg bar its claims against Arm under the doctrine of unclean hands.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

## INTERROGATORY NO. 9:

Identify and describe in detail the complete factual and legal bases for Your contention, if any, that Your conduct as identified in Paragraphs 204-212 of the Second Amended Complaint does not constitute a violation of unfair competition law under the California Unfair Competition Law. Your response should include an identification of all documents by Bates numbers that you intend to rely upon to support your contention.

## RESPONSE TO INTERROGATORY NO. 9:

Arm incorporates its General Objections as if fully asserted herein. Arm objects to this Interrogatory as it is premature, overly broad, and unduly burdensome.  Arm objects to this Interrogatory to the extent it calls for a legal conclusion.  Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any

other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

Qualcomm asserts that Arm violated the California Unfair Competition Law ("UCL") by allegedly (1) withholding deliverables under the Qualcomm ALA and TLA; (2) misrepresenting to Qualcomm that it was not withholding deliverables; (3) "wrongfully" asserting that it has the right to terminate the QC ALA; (4) refusing to negotiate licensing terms with Qualcomm in good faith; (5) threatening or attempting to cut off Qualcomm's access to Arm's ISA; (6) leaking its October 22, 2024 letter to the media; (7) interfering or attempting to interfere with Qualcomm's customer relationships; and (8) making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm.  SAC ¶¶ 206–07.  None of this conduct constitutes "a violation of unfair competition law" under the UCL.

To bring a claim under the UCL, Qualcomm must show that Arm engages in an "unfair, unlawful, or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Qualcomm has indicated its allegations implicate the "unfair" and "unlawful" prongs.  Arm's conduct is not unfair or unlawful.

There are two tests courts use to determine whether conduct is "unfair" under the UCL. First, when a business competitor brings a UCL claim, California courts apply a "tethering test" that examines whether the conduct "[1] threatens an incipient violation of an antitrust law, or [2] violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or [3] otherwise significantly threatens or harms competition."  *Cel-Tech Comm'ns, Inc. v. L.A. Cell. Tel. Co.,* 20 Cal.4th 163, 187 (1999).  The claim must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition."

*Zhejiang Yuanzheng Auto*, 2023 WL 4317189, at *12 (citing *Cel-Tech Comm'cns, Inc. v. L.A. Cell. Tel. Co.,* 20 Cal.4th 163, 186–87 (1999)).  A party's conduct "violates the policy or spirit of the antitrust laws" where "the effect of the conduct is comparable to or the same as a violation of the antitrust laws, [] or it otherwise significantly threatens or harms competition."  *People's Choice Wireless*, 131 Cal. App. 4th at 662 (citing *Cel-Tech*, 20 Cal. 4th at 187).  Second, in consumer actions, California courts apply a "balancing test" which "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Id.* (simplified).  Finally, the "unlawful" prong requires Qualcomm to prove that Arm violated a federal, state, or local law.  *See Olson v. World Fin. Grp. Ins. Agency, LLC*, 2024 WL 4668515, at *8 (N.D. Cal. Nov. 4, 2024).  Arm's alleged conduct does not violate the UCL under either the "unfair" prong—including under both the tethering and balancing tests—or "unlawful" prong.

## Arm's Alleged Conduct Does Not Violate the UCL Under The Tethering Test

As a threshold matter, Qualcomm's allegations about Arm's allegedly unfair conduct suffer from two fatal flaws.  For one, Qualcomm "does not identify an antitrust law or a policy or spirit of such a law."  *Roberson v. Pocker*, 2024 WL 2984026, at *10 (C.D. Cal. Apr. 3, 2024) (granting dismissal); *see also Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002) (affirming dismissal where "complaint allege[d] that Albertson's acted with a motive to secure an advantage over competitors" but did "not state a theory of unfair practice based on violation of specific anti-trust statutes or policies of anti-trust legislation").  Qualcomm cannot make the "unusual" showing that Arm somehow "violate[d] the 'policy and spirit' of the antitrust laws without violating the actual laws themselves."  *Synopsys, Inc. v. ATopTech, Inc.,* 2015 WL 4719048, at *10 (N.D. Cal. Aug. 7, 2015).  For another, Qualcomm fails to identify any relevant market in which Arm's conduct allegedly threatens competition and has affirmatively represented that it "does not intend to offer a market definition to support its" UCL claim.  4/9/25 Ltr. From C. Nyardy at 4.  But

"without a definition of [the] market there is no way to measure [Arm's] ability to lessen or destroy competition." *Ohio v. Am. Express*, 585 U.S. 529, 543 (2018); *Racek v. Rady Children's Hosp. of San Diego*, 2012 WL 2947881, *6 (Cal. App. July 20, 2012); *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992 (N.D. Cal. 2000); *Vox Network Sols., Inc. v. Gage Tech., Inc.*, 2025 WL 929939, *5 (N.D. Cal. Mar. 27, 2025) (dismissing claim under UCL's "unfair" prong, where plaintiff failed to identify relevant market); *Reilly v. Apple Inc.*, 578 F.Supp.3d 1098, 1106-1111 (N.D. Cal. 2022) (same where plaintiff alleged only implausible market). Qualcomm's allegations thus beg the question: "Competition" with what products, or with whom?

Although the legal inquiry should end there, Arm's conduct nevertheless does not satisfy any of the respective tests under the UCL or constitute a violation of that law. Qualcomm's continued refusal to identify the antitrust laws implicated by Arm's conduct or the relevant market(s) in which Arm's conduct allegedly threatens competition makes it impossible for Arm to provide the "complete factual and legal bases" supporting Arm's contention that its "conduct as identified in Paragraphs 204-212 of the Second Amended Complaint does not constitute a violation of unfair competition law under the California Unfair Competition Law." Arm's analysis is thus limited to Qualcomm's present allegations and representations, and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory to the extent Qualcomm clarifies its claim.

Qualcomm alleges that Arm acted unfairly by "withholding deliverables" it must provide "under the Qualcomm ALA and TLA," "misrepresenting to Qualcomm that it was not withholding deliverables," "asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions," and "refusing to negotiate license terms with Qualcomm in good faith." SAC ¶ 206. These allegations assert that Arm breached its contracts with Qualcomm, but corporate plaintiffs may not bootstrap contract claims into UCL violations. *See, e.g.*, *Martin Saturn of*

*Ontario, Inc. v. Suburu of Am. Inc.*, 2023 WL 9417499, *8 (C.D. Cal. July 21, 2023); *Dollar Tree Stores Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1083 (N.D. Cal. 2012); *Scripps Clinic v. Superior Court*, 108 Cal.App.4th 917, 940 (2003) (concluding harm was contractual, but not a UCL violation); *Mazal Grp. LLC v. Espana*, 2017 WL 6001721, at *4 (C.D. Cal. Dec. 5, 2017) (dismissing UCL claim when plaintiff did not include any specific allegations regarding the unfair prong and simply incorporated breach of contract allegations)). As Qualcomm itself has argued, it "makes little sense to hold that contract disputes between 'the world's most sophisticated companies,' [*Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 997 (9th Cir. 2020)], could give rise to an independent UCL claim." Qualcomm Answering Br., *Key v. Qualcomm*, No. 23-3354, D.I. 22.1 at 48 (Apr. 26, 2024) (citing *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008)). Qualcomm's assertion that Arm refused to negotiate license terms with Qualcomm in good faith is barred by the statute of limitations.

To the extent Qualcomm alleges that any of Arm's conduct was aimed at "threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA," SAC ¶ 207, such conduct still does not constitute a violation of the UCL. As Qualcomm itself has argued, "an antitrust duty to deal with" or license others is "far outside the mainstream of antitrust law." Qualcomm Answering Br., *Key v. Qualcomm*, No. 23-3354, D.I. 22.1 at 30 (Apr. 26, 2024); *see also Verizon Comm'cns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-411 (2004) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020) ("As the Supreme Court has repeatedly emphasized, there is no duty to deal under the terms and conditions preferred by [a competitor's] rivals."); *Simon and Simon, PC v. Align Tech., Inc.*, 2020 WL 1975139, *3-6 (D. Del. Apr. 24, 2020). It is completely beyond the reach of antitrust law here given Qualcomm has

disclaimed any argument that Arm is attempting to exercise monopoly power.  4/28/25 Ltr. From C. Nyardy at 1 ("As the … SAC make[s] clear, Qualcomm is not asserting a claim for monopolization under Section 2 of the Sherman Act; it is asserting a claim under the UCL's 'unfair' prong."); SAC ¶ 207 (striking monopoly allegation).  "[I]n the absence of any purpose to create or maintain a monopoly," antitrust law "does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."  *United States v. Colgate & Co.*, 250 U.S. 300, 308 (1919); *Trinko*, 540 U.S. at 408.  For that reason, California courts have consistently held a purported refusal to deal "is neither unlawful nor unfair" as a matter of law for purposes of the UCL.  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 367 (2001); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 254; *Beverage v. Apple Inc.*, 101 Cal. App. 5th 749-50, 753-56 (2024); *People's Choice Wireless, Inc. v. Verizon Wireless,* 131 Cal. App. 4th 656, 668 (2005) (explaining that though it is true an antitrust violation is not necessary under the UCL, "[t]he allegations here are simply too far removed from cognizable antitrust evils to warrant intervention by a California court").

Also, to the extent Qualcomm's allegation that Arm "refus[ed] to negotiate license terms with Qualcomm in good faith," SAC ¶ 206, refers to the claim that Arm violated the implied covenant of good faith and fair dealing by allegedly refusing to negotiate a license to v10 of the Arm ISA, both the breach of contract and "refusal to deal" principles explained above preclude UCL liability premised on such conduct.

Next, Arm did not violate the UCL by allegedly "interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's current and prospective customers," "leaking the Breach letter to the media," and "making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm."  SAC ¶¶ 206–07.  The policy and spirit

behind the antitrust laws protect against harm "to *competition itself*, not merely to competitors." *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 996 (9th Cir. 2020).  In its recent filings, Qualcomm indicated its view for the first time that Arm acted unfairly in order to "gain market share as a chip designer."  Qualcomm nowhere alleges or explains how this or any other alleged conduct broadly undermines a competitive market or consumers, or harms any alleged competitor other than Qualcomm.  And in any event, Arm has virtually no market share today in a so-called "chip design market."

Further, because Arm's statements in Arm's October 22, 2024 letter are true, they cannot serve as a basis for "unfair" or anticompetitive conduct.  *See Digene Corp. v. Third Wave Techs., Inc.*, 536 F. Supp. 996, 1006 (W.D. Wis. 2008), aff'd, 323 F. App'x 902 (Fed. Cir. 2009); *Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 421 F. Supp. 274, 290 (N.D. Cal. 1976) (holding that "salesman puff" does not violate antitrust laws).  The antitrust laws are generally unconcerned with the content of competitive speech, even critical or derogatory speech. *See Schachar v. Am. Acad. Of Ophthalmology*, 870 F.2d 397, 399 (7th Cir. 1989) ("Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law."); *cf. Mass. Sch. Of Law at Andover, Inc. v. Am. Bar Ass'n*, 937 F. Supp. 435 ("Antitrust laws do not exist to stifle speech … Thus, any stigma that MSL has suffered because of ABA's not listing MSL as an accredited school does not provide the necessary offensive *conduct* for antitrust liability.").

### Arm's Alleged Conduct Does Not Violate the UCL Under The Balancing Test

The balancing test asks "whether the challenged business practice is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *In re*

*Adobe Systems, Inc. Privacy Litigation*, 66 F. Supp. 1197, 1226 (N.D. Cal. 2014).  Qualcomm does not properly qualify as a consumer such that the consumer balancing test should apply.  Even if Qualcomm could constitute a consumer under the test, for the same reasons outlined above, Arm's business practices are pro-competitive, foster innovation, and benefit consumers, meaning they are not immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of Arm's conduct far outweighs any potential harm to Qualcomm.  *See Drum v. San Fernando Valley Bar Association.*, 182 Cal. App. 4th 247, 257 (2010).

Arm's business model is inherently pro-competitive and beneficial to consumers.  Arm's decision to license its ISA designs enables business partners to innovate, meet consumer demands across a diverse range of applications, and provide differentiated products.  That, in turn, increases consumer choice and competition—including against Arm's own CPUs—resulting in lower consumer prices.  And, Arm's licenses for its market-leading, ready-to-use CPUs offer partners an opportunity to bypass the enormous costs associated with CPU development and instead reallocate those resources towards innovating their products in other ways.  Arm's partners can thereby speed up their time-to-market and fill more areas of consumer need, all while passing along their savings to consumers.  Arm's practices are "reasonable and consistent with current industry practice," and "reduc[e] 'transaction costs and complexities'" for consumers.  Qualcomm Answering Br., *Key v. Qualcomm*, No. 23-3354, D.I. 22.1 at 47–48 (Apr. 26, 2024) (citing *FTC v. Qualcomm*, 969 F.3d 974, 996 n.17, 996 (9th Cir. 2020)).  Any alleged business-related harms Qualcomm may have suffered do not outweigh the pro-competitive benefits and practical utility of Arm's business practices.

### Arm's Alleged Conduct Does Not Violate the UCL Under The Unlawful Prong

To succeed under the "unlawful" prong of the UCL, Qualcomm must allege "a violation of another law [as a] predicate for stating a cause of action under the UCL's unlawful prong."

*Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007); *Gopher Media LLC v. Melone*, 2023 WL 8790266, at *15 (Dec. 19, 2023 S.D. Cal) ("To prevail on a claim under the unlawful prong of the [UCL], the plaintiff must show that a challenged [conduct] violates any federal or California statute or regulation." (citation omitted)).  Qualcomm alleges that "Arm's conduct is … unlawful because it violates California common law, including state law prohibiting intentional and negligent interference with prospective economic advantage." SAC ¶ 209.  But a common law claim cannot form the predicate for a UCL claim.  *See Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1044 (9th Cir. 2010), ("[A] common law violation such as breach of contract is insufficient … Because [plaintiff] does not go beyond alleging a violation of common law, he fails to state a claim under the unlawful prong of § 17200."); *Mazal Group, LLC v. Espana*, 2017 WL 6001721, at *4 (C.D. Cal. Dec. 4, 2017) (granting MTD on UCL claim when plaintiff did not go beyond alleging a violation of common law).  And, in any event, Qualcomm's argument is circular.  Qualcomm contends Arm's conduct is unlawful because it tortiously interfered with Qualcomm's economic advantage, SAC ¶ 209, and simultaneously contends Arm's conduct is wrongful for purposes of that tort because the conduct violates the UCL.  Such circular reasoning cannot satisfy the elements of either claim.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

**INTERROGATORY NO. 10:**

Identify and describe in detail the complete factual and legal bases for Your contention, if any, that You did not breach the Qualcomm ALA. Your response should include, but is not limited to, the complete factual and legal bases for any contention that you did not withhold ARM Technology or Updates or breach the implied covenant of good faith and fair dealing, and should include an identification of all documents by Bates numbers that you intend to rely upon to support your contention.

**RESPONSE TO INTERROGATORY NO. 10:**

Arm incorporates its General Objections as if fully asserted herein.  Arm objects to this

Interrogatory as it is premature, overly broad, unduly burdensome, and disproportionate to the needs of the case, including, but not limited to, to the extent it seeks "the complete factual and legal bases," without limitation.  Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.  Arm further objects to this Interrogatory to the extent it calls for a legal conclusion.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

### Qualcomm's Allegations

Qualcomm alleges in its Second Amended Complaint that Arm breached ███████ of the Qualcomm ALA by allegedly withholding OOB and ACK patches. Second Amended Complaint ¶¶ 78-94.  Qualcomm alleges in its Second Amended Complaint that Arm breached an implied covenant of good faith and fair dealing under the ALA by "with[olding] deliverables that it was required to provide Qualcomm under the QC ALA" and "fail[ing] to negotiate an extension to the QC ALA that would cover future version of the architecture, including v10."  Second Amended Complaint ¶ 184.

### Arm Did Not Breach The Qualcomm ALA Based On The Alleged Withholding Of ACK And OOB

For Qualcomm's allegations that Arm breached the Qualcomm ALA based on its alleged withholding of ACK and OOB, including based on an implied covenant of good faith and fair dealing, Arm incorporates by reference its response to Interrogatory No. 1.

Further, Qualcomm's implied covenant allegation is duplicative of Qualcomm's ███████ breach claim and fails for the same reasons.  *See, e.g.*, *USX Corp. v. Prime Leasing Inc.*, 988 F.2d

433, 439 (3d Cir. 1993) (holding that Plaintiff "cannot assert a claim for breach of implied covenants that is based on exactly the same acts which are said to be in breach of express covenants."); *Cision US, Inc. v. CapTech Ventures, Inc.*, No. CV 24-00063-MN-SRF, 2025 WL 1094318, at *5 (D. Del. Apr. 11, 2025) (dismissing Plaintiff's "claim for breach of the implied covenant of good faith and fair dealing … as impermissibly duplicative of its breach of contract and warranty claims.").

### Arm Did Not Breach Any Implied Covenant Of Good Faith And Fair Dealing For The Qualcomm ALA By Allegedly Failing To Negotiate A License To v10

Qualcomm alleges in its Second Amended Complaint that Arm breached an implied covenant of good faith and fair dealing under the ALA by "fail[ing] to negotiate an extension to the QC ALA that would cover future version of the architecture, including v10." Second Amended Complaint ¶ 184.

That is not true. On June 4, 2025, Will Abbey, Arm's Chief Commercial Officer, wrote to Qualcomm regarding its request for a v10 license, stating that Arm is prepared to negotiate in good faith for a v10 license and proposed a business meeting:

> Arm is prepared to negotiate in good faith over the terms of a license to the v10 architecture. As the first step in those negotiations, we propose a meeting between our commercial teams to better understand how Qualcomm intends to use the v10 architecture. That will help Arm put together an appropriately tailored licensing proposal. Please let us know a few dates Qualcomm is available for that meeting, and we will let you know our availability.

June 4, 2025 Will Abbey Letter to Roawen Chen. On June 9, Qualcomm responded, but did not address Mr. Abbey's request for a business meeting. Further, on June 13, 2025, Arm's Executive Vice President and Chief Legal Officer Spencer Collins sent Qualcomm another letter again stating that Arm is prepared to negotiate in good faith:

> On this basis, on June 4, 2025, Will Abbey, Arm's Chief Commercial Officer, proposed in good faith a business meeting regarding Qualcomm's request for a license to Arm's v.10 architecture. Mr. Abbey's offer to meet remains open and Arm continues to believe that such a meeting would be the most efficient path

forward in response to Qualcomm's request.  Please have the relevant business personnel respond to Mr. Abbey with dates that Qualcomm is available for such a meeting.

* * *

Despite these clear limits on Qualcomm's election rights under the ALA, as we told Qualcomm in 2020, nothing prevents Arm and Qualcomm from discussing a potential license to future versions of the Arm architecture as they become available. Arm remains prepared to negotiate in good faith over the terms of a license to the v.10 architecture.

June 13, 2025 Spencer Collins Letter to Ann Chaplin.

**<u>Arm Is Not Required To Negotiate The Terms And Conditions Of A V10 License Under The Qualcomm ALA Because Qualcomm Did Not Have The Right To Elect V10 In 2020</u>**

Qualcomm, in any event, Qualcomm does not allege that Arm breached ███████████ of the Qualcomm ALA. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ Qualcomm does not accuse Arm of breaching of this Section.  Any implied covenant claim based on ████████ thus improperly "seeks to impose" obligations "beyond those to which the parties actually agreed."  *Lamke v. Sunstate Equipment Co., LLC*, 387 F. Supp. 2d 1044, 1047 (N.D. Cal. 2004).

As an initial matter Arm had no obligation to negotiate an extension under █████████ based on Qualcomm's May 2020 email because v10 was not in development at that time, and there were no ████████████████████████████████████" to elect in 2020.   In May 2020, Arm's v10 was not in development, and the parties never reached any ████ ████████ regarding any future versions of ████████████ that would be covered by a purported election.  In April 2020, Qualcomm reached out to Arm asking if anyone is working on v10

Architecture in the context of seeking an extension to the ALA under ▮▮▮▮▮▮▮▮ ARM_00005340. Arm responded that "no one is working on v10." *Id.* Qualcomm responded, stating that "no meaningful discussions can currently be initiated around the terms and conditions for an extension of the ALA Term to cover v10 architecture" and sought to amend the ALA. *Id.*

On May 15, 2020 Lynn Couillard from Arm wrote to Qualcomm, stating that "[t]he intent of ▮▮▮▮▮▮▮ is to allow for an extension of the agreement as of this point in the term of the agreement. If there is not desire from Qualcomm to negotiate terms of an extension at this point, but rather to have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire" and that "there is nothing that stops us from discussing next gen architecture or entering into an agreement anytime in the future regardless of the existing agreement":

> **From:** Lynn Couillard <Lynn.Couillard@arm.com>
> **Sent:** Friday, May 15, 2020 9:49 AM
> **To:** Brett Bettesworth <betteswb@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>
> **Cc:** Todd Lepinski <Todd.Lepinski@arm.com>
> **Subject:** [EXT] Re: V10 -->V9 architecture follow-on
>
> Hello Brett and Rajiv, (+Todd)
>
> The intent of section ▮▮▮▮ s to allow for an extension of the agreement as of this point in term of the agreement. If there is no desire from Qualcomm to negotiate terms of an extension at this point, but rather to have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire. However, importantly, there is nothing that stops us from discussing next gen architecture or entering into an agreement anytime in the future regardless of the existing agreement.
>
> Note that at the time of the v8 architecture closure, we also included ▮▮▮▮▮ which at the time had no definition, and eventually became v9. We are in a similar situation here with regards to visibility on next generation architecture.
>
> Please let us know if you'd like to discuss, we can set something up for next week.
>
> Thanks
> Lynn

ARM_00005340. Mr. Bettesworth responded five days later. He did not dispute any of Ms. Couillard's statements, including that "[t]he intent of ▮▮▮▮▮▮ is to allow for an ***extension*** of the agreement ***as of this point in term of the agreement***," and that if Qualcomm desires to "have a discussion around licensing the next architecture sometime in the future, then this portion of the

agreement will expire." He elected to "go ahead and move forward with the extension":

| | |
|---|---|
| **From:** | Brett Bettesworth [betteswb@qti.qualcomm.com] |
| **Sent:** | 20/05/2020 20:05:11 |
| **To:** | Lynn Couillard [Lynn.Couillard@arm.com]; grajiv@qti.qualcomm.com |
| **CC:** | Todd Lepinski [Todd.Lepinski@arm.com] |
| **Subject:** | RE: V10 -->V9 architecture follow-on |
| **Importance:** | High |

Hi Lynn,

Thanks for your email and the note below. We will go ahead and move forward with the extension at this point, per the ALA optional election.

██████████████████████████████████████████████████████████████

We can discuss further at some point in the near future, but wanted to ensure that we provided timely notification of our election here, as mentioned previously.

Sincerely,
Brett

*Id.*

Arm and Qualcomm never reached any mutual agreement over what if any Arm Technology would be included in a purported extension. And to the extent any agreement was reached, it is that v10 would not be included: after Arm notified Qualcomm that v10 was not in development, Qualcomm acknowledged that "no meaningful discussions can currently be initiated around the terms and conditions for an extension of the ALA Term to cover v10 architecture" and Qualcomm did not dispute any of Ms. Couillard's statements, including that "[t]he intent of ████████ is to allow for an extension of the agreement as of this point in term of the agreement," and that if Qualcomm desires to "have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire." *Id.* Qualcomm did not follow up on that correspondence, and did not make any effort to follow up on its May 2020 correspondence until five years later, as discussed above. Instead, the parties proceeded with negotiating and finalizing an Annex 1 for v9, which was the only planned architecture at that time.

**Arm Is Not Required To Negotiate The Terms And Conditions Of A V10 License Under The Qualcomm ALA Because Qualcomm's May 2020 Emails Were Not A Valid Election**

Arm was not obligated to negotiate an extension of the Qualcomm ALA because Qualcomm's May 2020 emails in which Qualcomm purported to elect to extend the ALA were not a valid election.



does not include email as a valid or effective method of providing notice under the ALA. Qualcomm's May 20, 2020 email did not give Arm proper notice of its purported election under ████████████ rendering Qualcomm's purported "election" ineffective. Qualcomm did not send Arm follow-up correspondence in compliance with ████████ regarding its purported "election," and did not correspond with Arm again about its purported "election" for another five years. But even if Qualcomm had made a valid election, its assertion that Arm breached the implied covenant would be barred by the applicable statute of limitations.

**Arm Did Not Breach The Qualcomm ALA Based On The Alleged Withholding Of ETE Checker Support**

Qualcomm does not allege that Arm breached the Qualcomm ALA based on withholding ETE Checker support in its Second Amended Complaint or in its response to Arm's Interrogatory 2, which calls for "the complete legal and factual basis for [Qualcomm's] contention that Arm failed to meet any of its obligations under the Qualcomm ALA." Second Amended Complaint; Qualcomm's March 10, 2025 Response to Arm's Interrogatory No. 2. Nor did Qualcomm identify

any alleged withholding of ETE Checker support in its November 3, 2022 letter to Arm. ARM_01423632 at -634. Qualcomm states in its response to Arm Interrogatory No. 13 that "Arm violated the terms of the Qualcomm ALA by failing to … provide support for the ETE Checker," but does not specify the support that was allegedly withheld or identify any term of the ALA that Arm allegedly breached.

To the extent Qualcomm's statements can be understood, Arm did not breach the Qualcomm ALA based on any alleged withholding of support for the ETE Checker. Qualcomm states in its response to Arm Interrogatory No. 13 that "the ETE Checker [is] a component of the ACK licensed by Qualcomm for Armv9." However, Arm delivered the Armv9 ACK—including the ETE Checker—to Qualcomm at least as early as May 27, 2019, and Arm delivered all subsequent quarterly ACK releases to Qualcomm. *See, e.g.*, ARMQC_02604616 (showing Arm making available to Qualcomm "Product: ███ – Armv9-A Architecture Compliance Kit" and "Part: ███████ – Armv9-A Architecture Compliance Suite," and quarterly releases thereto, via the Arm Connect document delivery portal). Qualcomm's unexplained statement that Arm allegedly withheld unspecified support for the ETE Checker allegedly constitutes a breach of unspecified "terms of the Qualcomm ALA" fails to show any breach by Arm.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

**INTERROGATORY NO. 11:**

Identify and describe in detail the complete factual and legal bases for Your contention, if any, that You did not breach the Qualcomm TLA. Your response should include, but is not limited to, the complete legal and factual bases for any contention that you did not breach ███████ of the TLA or the implied covenant of good faith and fair dealing, and should include an identification of all documents by Bates numbers you intend to rely upon to support your contention.

**RESPONSE TO INTERROGATORY NO. 11:**

Arm incorporates its General Objections as if fully asserted herein. Arm objects to this Interrogatory as it is overly broad, unduly burdensome, and disproportionate to the needs of the

case, including, but not limited to, to the extent it seeks "the complete factual and legal bases," without limitation. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules. Arm further objects to this Interrogatory to the extent it calls for a legal conclusion. Arm further objects to this request to the extent it seeks information that Arm is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

### **Qualcomm's Allegations**

Qualcomm alleges that Arm breached ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ Second

Amended Complaint ¶ 184. Arm understands that Qualcomm's only allegations that Arm breached the Qualcomm TLA are based on licensing offers for the ████████████████ cores.

Arm denies Qualcomm's allegations that Arm breached the Qualcomm TLA. Arm has not breached the Qualcomm TLA, and Qualcomm has failed to show otherwise.

**<u>Arm Did Not Breach The Qualcomm TLA Because Arm's</u>**
**<u>Licensing Offers Satisfied The "</u>** ████████████ **<u>Term</u>**

Qualcomm alleges that Arm's licensing offer for ████████████████ "increased licensing fees and royalty rate percentages for each core by nearly five times from the prior terms licensed by Qualcomm" and thus ██████████████████████████████████████████ ████████████████████████████████████████████████████████████ Second Amended Complaint ¶¶ 118, 119.  To the extent ████████████ applies, Arm's licensing offer satisfied the " ████████████████ term, which is calculated based ████████████████████████

████████████████████████████████████████████████████████████

██████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

Arm's license offer to Qualcomm satisfied the ████████████████ term, to the extent it applies, which is calculated ████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████.

### Arm Did Not Breach The Qualcomm TLA Because It Made An Actual License Offer To Qualcomm

Qualcomm alleges that "Arm's proposal was a constructive failure to offer a license" because of its financial terms and that "[t]his constructive failure to offer a license to the requested cores violated the terms of the QC TLA." Second Amended Complaint ¶¶ 25, 118. Arm did not breach the Qualcomm TLA because, as Qualcomm admits, Arm made an *actual* license offer to Qualcomm. Second Amended Complaint ¶ 117. Further, as described above, the financial terms of that offer satisfied the " ███████████ " term and were in good faith and thus not a "constructive failure to offer a license."

### Arm Did Not Breach The Qualcomm TLA Because Its ███████████

Qualcomm alleges in its Second Amended Complaint that "Arm failed to fulfill its obligation under ██████████████████████████████████ ██████████████████████████████████ ██████████████████ including by excluding support and maintenance." Second Amended Complaint ¶ 223. Qualcomm does not identify any other alleged ██████████ ██████████████. Arm did not breach the Qualcomm TLA because its offer included support and maintenance for ██████████████.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

### Arm Did Not Breach The Qualcomm TLA Because Arm Was Not Obligated To Offer Licenses To ███████████████ To Qualcomm In 2024

Qualcomm alleges in its Second Amended Complaint that Qualcomm submitted requests to Arm for licenses to ████████ in April 2024 and for a license to ████ in August 2024, and that Qualcomm sent Arm two notices of breach of the Qualcomm TLA in September 2024 because Arm had not yet responded with license offers by that time.  Second Amended Complaint ¶¶ 21-24.

Arm had no obligation to offer Qualcomm licenses to the █████████ cores in 2024 because Qualcomm's ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ does not make reference to renewals.  Qualcomm first licensed the ███████████ cores in ██████████████████████████████████ and thus made its ██████████ no later than 2019.  *See, e.g.*, QCARM_0029040 at 29043.  Under ████████

████████████████████████████████████████████

████████████████████████████████████████████

Because Qualcomm did not request a license to the ███████████ cores within the ███████████████████, Arm was under no obligation with respect to

Qualcomm's 2024 request to license the ████████████████ cores. Qualcomm has not identified any other requests for licenses to those cores other than its communications in 2024.

**Arm Did Not Breach Any Obligation To Act In "███████**
**Or The Implied Covenant Of Good Faith An Fair Dealing**

Qualcomm alleges in its Second Amended Complaint that "[t]he financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and not in good faith" and that "Arm has breached the implied covenant of good faith and fair dealing" for the Qualcomm TLA. Second Amended Complaint ¶¶ 118, 187.

Arm did not breach either the express "███████" provisions of ████████ of the TLA or any implied covenant of good faith and fair dealing for the reasons described above: Arm did not breach the TLA, and made a good faith offer with financial terms that satisfied the "████████████ ████ team.

Further, any allegation that Arm breached the implied covenant of good faith and fair dealing is duplicative of the express "████████" provisions and is not actionable. *See, e.g.*, *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 439 (3d Cir. 1993) (holding that Plaintiff "cannot assert a claim for breach of implied covenants that is based on exactly the same acts which are said to be in breach of express covenants."); *Cision US, Inc. v. CapTech Ventures, Inc.*, No. CV 24-00063-MN-SRF, 2025 WL 1094318, at *5 (D. Del. Apr. 11, 2025) (dismissing Plaintiff's "claim for breach of the implied covenant of good faith and fair dealing … as impermissibly duplicative of its breach of contract and warranty claims.").

Arm identifies the following individuals as knowledgeable regarding aspects of this subject matter: Jeff Fonseca and Karthik Shivashankar.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Dated: June 16, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Matthew J. McIntee
Meredith Pohl
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
matt.mcintee@kirkland.com
meredith.pohl@kirkland.com

Jay Emerick
Adam Janes
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com
adam.janes@kirkland.com

Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304

YOUNG CONAWAY STARGATT &
TAYLOR, LLP


 */s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings PLC*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 16, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com

Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
mzappala@dirllp.com

Ruby J. Garrett
Erin J. Morgan
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
rjgarrett@paulweiss.com
ejmorgan@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
grp-qcvarm@paulweiss.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

A0859

agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings plc*

# Exhibit 10

**United States District Court**

**District of Delaware**

**Civil Action No. 1:24-cv-00490-MN**

**Qualcomm Incorporated and**

**Qualcomm Technologies, Inc.**

**v.**

**Arm Holdings plc**

**Expert Report of Patrick F. Kennedy, Ph.D.**

**August 8, 2025**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.**
**V. ARM HOLDINGS PLC**

## TABLE OF CONTENTS

I.    **Introduction** .......................................................................................... 1

II.   **Qualifications and Testimony** ............................................................. 1

III.  **Materials Considered** .......................................................................... 2

IV.  **Case Background** ................................................................................. 3

    A.    Relevant Parties ............................................................................ 3

          i.    Qualcomm ......................................................................... 3

          ii.   Arm Holdings plc ............................................................. 3

    B.    Litigation ....................................................................................... 7

    C.    Relevant Arm / Qualcomm Licenses ............................................ 8

          i.    Qualcomm ALA ............................................................... 9

          ii.   Qualcomm TLA .............................................................. 11

V.   **Damages Analysis** ............................................................................ 15

    A.    Framework for Available Remedies ............................................ 15

    B.    ██████████████████████████████████
          ██████████████████████████████████████

    C.    ██████████████████████████████████
          ██████████████████████████████████████

    D.    Comparison of Arm's Proposed License Fees and Royalty Rates for
          ████████████████ ................................................. 23

          i.    Proposed License Fees and Royalty Rates vs. Qualcomm's Existing
              License .............................................................................. 24

              a. License Fee Comparison ................................................ 24

              b. Royalty Rate Comparison .............................................. 31

          ii.   Proposed License Fees and Royalty Rates vs. ██████████ .... 33

              a. License Fee Comparison ................................................ 33

              b. Royalty Rate Comparison .............................................. 36

          iii.  Proposed License Fees and Royalty Rates vs. Third-Party Licenses ... 37

    E.    Qualcomm's Damages Related to Arm's Alleged Breach of the Implied
          Covenant of Good Faith and Fair Dealing in the Qualcomm TLA ................. 45

          i.    Qualcomm's Existing License to the Peripheral IP ............... 46

          ii.   Qualcomm's Requests for License Proposals ....................... 49

          iii.  Arm's ██████████████ ............................................. 52

**STOUT RISIUS ROSS, LLC**                                     i

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC**

iv.   Arm's ███████████ ............................................................. 54

v.   Comparison of License Fees for the Peripheral IP ............................. 56

    a. License Fees Proposed vs. Qualcomm's Existing License Fee ............. 56

    b. License Fees Proposed vs. ███████████ ................................... 60

vi.   Qualcomm's Alleged Peripheral IP License Fee Overpayment............ 63

F.   Qualcomm's Damages Related to Arm's Alleged Intentional Interference and Negligent Interference with Prospective Economic Advantage ............. 68

i.   ████████████████████████████████████████████

    ████████████████████████████████

    ████████████████████████████████████

    ████████████████████████████████████

    ████████████████████████████████████

    ████████████████████████████████████

G.   Conclusion ................................................................. 80

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

## TABLE OF FIGURES

██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ██████████████████████████████████████████
██████    ██████████████████████████████████████████
██████    ██████████████████████████████████████████
██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ██████████████████████████████████████████
██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ████████████████████████████████████████
          ██

██████    ████████████████████████████████████████
          ██

██████    ████████████████████████████████████████
          ██

██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ██████████████████████████████████████████
██████    ██████████████████████████████████████████
██████    ██████████████████████████████████████████
██████    ██████████████████████████████████████████
██████    ██████████████████████████████████████████
██████    ████████████████████████████████████████
          ██████████████████████████████████████████

██████    ████████████████████████████████████████
          ██████████████████████████████████████████

STOUT RISIUS ROSS, LLC                                    iii
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

## I.    INTRODUCTION

1.      I have been retained by Counsel representing Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively referred to in this report as "Plaintiffs" or "Qualcomm") to evaluate damages related to certain claims asserted by Qualcomm against Arm Holdings plc ("Arm" or "Defendant")[1] related to the alleged wrongful conduct described in Qualcomm's Second Amended Complaint in this action.[2]  The purpose of my report is to disclose my professional background and experience, the materials subject to my review, and my expert opinions associated with Qualcomm's claims regarding damages in this matter.

2.      This report summarizes my opinions given the information available to me at this time.  If I receive additional relevant information, I reserve the right to prepare a supplemental report incorporating this new information.

## II.    QUALIFICATIONS AND TESTIMONY

3.      I am an economist and Managing Director with Stout Risius Ross, LLC ("Stout"). Stout is a professional services firm that provides independent expert testimony, analysis, valuation, and strategic consulting services to clients, along with financial services such as investment banking, advisory, and valuation services.  I hold a bachelor's degree in Economics from the University of California, San Diego and a doctorate in Economics from Stanford University.  Prior to joining Stout, I was a Managing Director with Torrey Partners, a Managing

---

[1]    I am aware that there is a pending motion to amend Qualcomm's Second Amended Complaint to name both Arm Holdings plc and Arm Ltd. as Defendants.  Nothing in my analysis and quantification of certain categories of Qualcomm's claimed damages is dependent on which Arm corporate entity(ies) are named Defendant(s).  *See* Plaintiffs' Motion for Leave to Amend the Complaint to Name Arm Holdings Plc. And Arm Ltd. as Individual Defendants, August 1, 2025.

[2]    Second Amended Complaint, *Qualcomm Inc. and Qualcomm Technologies, Inc. v. Arm Holdings plc f/k/a Arm Ltd.*, Civil Action No. 1:24-cv-00490-MN, June 3, 2025 ("Second Amended Complaint"), pp. 1-6.

---

STOUT RISIUS ROSS, LLC                                                                                          1
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
V. ARM HOLDINGS PLC**

Director with LECG, a Shareholder with Mack|Barclay, Inc., a Director of Economic Research with International Securities Group, and an Economist with the Board of Governors of the Federal Reserve System in Washington, D.C. Attached at **Exhibit A** is my curriculum vitae, which summarizes my educational and professional background.

4.    My professional experience includes assessing economic damages within and outside of the litigation environment; many of these matters have required my presentation of qualified expert testimony in state and federal courts. Attached at **Exhibit B** is a list of my deposition, arbitration, and trial testimony for the last five years.

5.    In this case, Stout is being compensated for my analysis and testimony at a rate of $950 per hour. In preparing the analysis reflected in this report, I have been assisted by consultants employed by Stout, who performed work under my direction. My compensation is not contingent upon the outcome of this litigation or my opinions.

## III.    MATERIALS CONSIDERED

6.    In connection with my continuing review and analysis, I have considered, reviewed, and relied upon materials and information that may be cited directly in this report and are generally summarized at the attached **Exhibit C**. This information includes pleadings, depositions, documents produced by the parties, third party information, interviews, and other expert reports, all of which I incorporate herein by reference, even if not specifically stated.

---

**STOUT RISIUS ROSS, LLC**                                                    2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

## IV.    CASE BACKGROUND

### A. Relevant Parties

#### i.  Qualcomm

7.    Qualcomm was incorporated in 1985 and is headquartered in San Diego, California.[3]  Qualcomm is a global leader in the development and commercialization of technologies for the wireless telecommunications (e.g., 3G, 4G, and 5G wireless connectivity) and "high-performance and low-power computing and on-device artificial intelligence" markets.[4] Qualcomm also provides technologies to markets such as automotive (e.g., connectivity, digital cockpit, advanced driver assistance systems, and automated driving) and internet of things ("IoT"), (e.g., consumer computing, voice and music, extended reality, edge networking, and industrial).[5]  Qualcomm's handset/smartphone segment generated the majority of Qualcomm's revenue in FY 2024 (64% of total revenue) and fiscal 2025 year-to-date (63% of total revenue).[6]

#### ii.  Arm Holdings plc

8.    Arm was incorporated as Widelogic Limited in 1990 and is headquartered in Cambridge, United Kingdom.[7]  Arm develops and licenses central processing units ("CPUs" or "microprocessors"[8]) and architecture technologies for use in semiconductors and products such as cloud compute, networking equipment, mobile phones, mobile applications, and consumer

---

[3]    Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, pp. 6, 26.
[4]    Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, p. 6.
[5]    Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024, p. 6.
[6]    Handset Revenue / Total Revenue = $24,863 / $38,962 = 64% (revenue in millions, USD); see Qualcomm Incorporated, Form 10-K for the fiscal year ended September 29, 2024, pp. 41, 44. Handset Revenue / Total Revenue = $20,831 / $33,013 = 63% (revenue in million, USD); see Qualcomm Incorporated, Form 10-Q for the quarterly period ended June 29, 2025, pp. 5, 10.
[7]    Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, pp. 56, 66.  Arm Limited is a wholly owned subsidiary of Arm Holdings plc.
[8]    <https://download.intel.com/newsroom/kits/40thanniversary/pdfs/What_is_a_Microprocessor.pdf>.

---

STOUT RISIUS ROSS, LLC                                                                                            3
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC. V. ARM HOLDINGS PLC**

electronics (e.g., wearables, laptops).[9]  Arm states in its annual financial filing for its fiscal year ended March 31, 2025, that it "license[s] [its] products to semiconductor companies, OEMs [(Original Equipment Manufacturers)], and other organizations to design their chips."[10]  Arm further describes that its licenses have multiple components that generate revenue, including license fees, support and maintenance fees, and per-chip royalties.[11]

9.      Arm states that its "CPU products address diverse requirements for performance, power, and size."[12]  Arm also states that it offers complementary products such as graphic processing units ("GPUs") and neural processing units ("NPUs") that provide "computing acceleration," design components "that enable designers to create high-performance" and "secure" chips, and tools and software that support the "development and deployment" of Arm's products.[13]

10.      Arm's website states that "100% of the world's population uses Arm based products," with more than 310 billion Arm-based chips shipped to date.[14]  Arm's CEO, Rene Haas, has described Arm as having "the most ubiquitous computer architecture on the planet."[15] According to Arm's SEC filings, Arm has "maintained market share in the mobile applications processor market of greater than 99% for many years, by virtue of all key mobile operating systems depending on Arm processors."[16]

---

[9]   Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, pp. 57, 59-61.
[10]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, p. 61.
[11]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, pp. 68-69.
[12]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, p. 57.
[13]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, pp. 9, 58-59.
[14]  <https://www.arm.com/company>.
[15]  "Rene Haas: 'Arm has the most ubiquitous computer architecture on the planet,'" Financial Times, June 7, 2024, <https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d>.
[16]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, pp. 59.

---

**STOUT RISIUS ROSS, LLC**                                                          4
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.**
**V. ARM HOLDINGS PLC**

11.    Jonathan Weiser, Former Lead Attorney at QCT,[17] testified that he "believe[s] that Arm [has] a monopoly in the mobile space, wireless space, cell phone technology with regard to its adoption" of its instruction set architecture.[18]  In an Arm Global Finance Conference 2021 presentation, Arm stated that "Arm's success has come from the wide accessibility of its architecture" and "its fostering of an enormous ecosystem of developers."[19]  Arm further states that it has an "unparalleled software ecosystem" and that "no other business ecosystem comes close to this group of silicon, system and software companies."[20]  Arm claims that its ecosystem has "over 22 million developers building on Arm" as of May 2025.[21]

12.    However, Arm appears to be shifting its strategy to make chips in house, much like architecture license partners Qualcomm and NVIDIA.  In a February 2025 article, the *Financial Times* reported that "Arm plans to launch its own [semiconductor] chip…made in-house."[22]  The *Financial Times* described that Arm previously "design[ed] the basic building blocks of a chip" and that this move is a "radical change to the…business model of licensing its blueprints to the likes of Apple and Nvidia."[23]  Mr. Haas testified ██████████ ████████████ ███████████████

█████████████████████████████████████████████████████████████████

███████.[24]

13.    ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

---

[17]    Deposition of Jonathan Weiser, July 11, 2025, p. 55.  I understand that "QCT" refers to "Qualcomm CDMA Technologies" and is Qualcomm's "semiconductor business."  *See* Qualcomm Incorporated, Form 10-K for the fiscal year ended September 29, 2024, p. 7.
[18]    Deposition of Jonathan Weiser, July 11, 2025, pp. 8-9.
[19]    ARMQC_02727610-629 at '617.
[20]    ARMQC_02720799-800 at '799; ARMQC_00001136-163 at '142.
[21]    <https://newsroom.arm.com/blog/arm-computex-2025>.
[22]    <https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008>.
[23]    <https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008>.
[24]    Deposition of Rene Haas, July 7, 2025, pp. 221, 225.

**STOUT RISIUS ROSS, LLC**                                                                    5
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.**
**V. ARM HOLDINGS PLC**



---

25  Deposition of Rene Haas, July 7, 2025, pp. 221, 225; <https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008>.
26  Deposition of Rene Haas, July 7, 2025, pp. 209, 212.
27  Deposition of Lynn Couillard, July 3, 2025, p. 13.
28  Deposition of Lynn Couillard, July 3, 2025, pp. 122, 132.
29  Deposition of Lynn Couillard, July 3, 2025, pp. 122-124.
30  Deposition of Lynn Couillard, July 3, 2025, pp. 125-126.
31  Deposition of Mohamed Awad, July 29, 2025, pp. 7-8.
32  Deposition of Mohamed Awad, July 29, 2025, pp. 40-41.
33  Deposition of Rene Haas, July 7, 2025, p. 186.

---

**STOUT RISIUS ROSS, LLC**                                                              6
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

██████  ██████████████████████████████████████████████████████

████████████████████████████████████████████████████

## B. Litigation

15.     On August 31, 2022, Arm filed a complaint against Qualcomm and NuVia, Inc. ("Nuvia") for breach of contract – specific performance, declaratory judgment and trademark infringement under 15 U.S.C § 1114, and declaratory judgment and false designation under 15 U.S.C § 1125 in the U.S. District Court for the District of Delaware.[36]  Qualcomm and Nuvia responded with an amended counterclaim filed on October 26, 2022, seeking a declaratory judgment that the defending parties did not breach Nuvia's license agreements with Arm.[37]  Qualcomm also sought a declaratory judgment that its custom CPU products were licensed under Qualcomm's architecture license agreement with Arm.[38]  The parties proceeded to a combined bench and jury trial from December 13, 2024 to December 20, 2024.[39]  The jury found that Qualcomm did not breach the architecture license agreement between Arm and Nuvia and that Qualcomm's CPUs that include designs acquired in the Nuvia acquisition are licensed under the architecture license agreement between Arm and Qualcomm.[40]  The jury did not reach a verdict on Arm's claim that Nuvia breached the architecture license agreement between Arm and Nuvia.[41]

---

[34]  Deposition of Rene Haas, July 7, 2025, pp. 190-191.
[35]  Deposition of Rene Haas, July 7, 2025, pp. 196-197.
[36]  Complaint, *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.*, Civil Action No. 1:22-cv-01146-MN, August 31, 2022.
[37]  Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim, October 26, 2022, p. 80.
[38]  Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim, October 26, 2022, p. 80.
[39]  Opening Brief in Support of Defendant NuVia, Inc.'s Renewed Motions for Judgment as a Matter of Law, January 17, 2025, p. 1.
[40]  Opening Brief in Support of Defendant NuVia, Inc.'s Renewed Motions for Judgment as a Matter of Law, January 17, 2025, p. 1.
[41]  Opening Brief in Support of Defendant NuVia, Inc.'s Renewed Motions for Judgment as a Matter of Law, January 17, 2025, p. 1.

---

STOUT RISIUS ROSS, LLC                                                                    7
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.**
**v. ARM HOLDINGS PLC**

16.  On April 18, 2024, Qualcomm filed a complaint (the "Complaint") against Arm for two counts, including declaratory judgment and breach of ███████████ of the parties' architecture license agreement.[42]  On December 16, 2024, Qualcomm filed a first amended complaint (the "First Amended Complaint") against Arm that added claims for breach of the implied covenant of good faith and fair dealing, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and violations of California unfair competition law under California Business and Professions Code §§ 17200 *et seq,* in addition to the aforementioned counts alleged in the Complaint.[43]  On June 3, 2025, Qualcomm filed its second amended complaint (the "Second Amended Complaint") against Arm that added claims for Arm's contractual breach of sections ██████████████ of the parties' technology license agreement.[44]

### C. Relevant Arm / Qualcomm Licenses

17.  I understand that Arm licenses its technology under agreements including architecture license agreements ("ALA") and technology licensing agreements ("TLA").[45]  Arm states that "architecture licensees [under an ALA] will often also license Arm CPU designs [under a TLA] to use either as a complementary processor alongside the licensee's Arm-compliant CPU design, or in other chips where the licensee's own design is unsuitable."[46]

---

[42]  Complaint, *Qualcomm Incorporated, Qualcomm Technologies, Inc., v. Arm Holdings Plc.,* Civil Action No. 24-490-MN, April 18, 2024 ("Complaint"), pp. 20-21, 23.

[43]  First Amended Complaint, *Qualcomm Incorporated, Qualcomm Technologies, Inc., v. Arm Holdings Plc.,* Civil Action No. 24-490-MN, December 16, 2024 ("First Amended Complaint"), pp. 39-47.

[44]  Second Amended Complaint, pp. 52-65.

[45]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, pp. 67-68.

[46]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, p. 68.

---

**STOUT RISIUS ROSS, LLC**                                                           8
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

18.     Under an Arm ALA, a licensee develops custom CPU designs that are compliant with the Arm instruction set architecture ("ISA") for a fixed architecture license fee.[47]  Under a TLA, Arm licenses a "single CPU design or other technology design to a customer in return for a fixed license fee."[48]  Arm also states that it "generate[s] the majority of [its] revenue from customers who enter into license agreements, pursuant to which [Arm] receive[s] royalty fees based on average selling price of the customer's Arm-based chip or a fixed fee per chip."[49]  Arm describes that the TLA "may be limited by term (i.e., the number of years during which the licensee is entitled to incorporate [Arm's] products in new chip designs, but licensees typically have the right to manufacture designs perpetually) and/or by number of uses (i.e., the number of concurrent chip designs that may use [Arm's] products)."[50]

i.   ████████████

██  █████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████    ████████  ████████████
████████████████████████████████████████████████████████
████████████████████████████████████  █  ████████████████
████████████████████████████████████████████████████████

---

[47]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, p. 68.
[48]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, p. 68; *see, e.g.,* ARMQC_02747848-867 at '866-867.
[49]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, p. 68.
[50]  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, p. 68.
[51]  I understand that Qualcomm Global Trading PTE Ltd. is a subsidiary of Qualcomm. *See* <https://www.sec.gov/Archives/edgar/data/804328/000080432824000075/qcom092924ex21.htm>. I refer to Qualcomm Global Trading PTE Ltd. as "Qualcomm" at times throughout my report.
[52]  ARM_00055357-399 at '357.
[53]  ARM_00055357-399 at '357, '360, '363; QCARM_0343120-142; QCARM_0338573-576; QCVARM_1015821-843. I understand that Arm refers to the "v8-A" architecture as "v8."

---

STOUT RISIUS ROSS, LLC                                                    9
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC



---

56  ARM_00055357-399 at '357, '368.
57  ARM_00055357-399 at '367-368.
58  ARM_00055357-399 at '372-373.

---



### ii. Qualcomm TLA



---

59  ARM_00055357-399 at '373.
60  QCVARM_1015821-843 at '821, '827.
61  QCVARM_1015821-843 at '834-835.
62  QCVARM_1015821-843 at '833.
63  QCARM_0343533-587 at '533.
64  QCARM_0343533-587 at '533, '535, '537.
65  QCARM_0343533-587 at '541.
66  QCARM_0343533-587 at '552.
67  QCARM_0343533-587 at '545-546.

---

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC



---

68    QCARM_0343533-587 at '545.
69    QCARM_0343533-587 at '546.

---

**STOUT RISIUS ROSS, LLC**                                                    12
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



---

70   QCARM_0343533-587 at '546.
71   QCARM_0343533-587 at '546.
72   ARMQC_02747848-867 at '848.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

**D.  Comparison of Arm's Proposed License Fees and Royalty Rates for** ██████
████████████████

48.    As part of the ████████████████████████████

██████████████████████████████████████████████████

████████ ████████████████████████████████████████

████████.[124] Each respective term license had the following proposed license fees for ██████

████████████████



_____

122  Second Amended Complaint, pp. 39-40.
123  QCVARM_0616967-969 at '968.
124  QCVARM_0616967-969 at '969.
125  QCVARM_0616967-969 at '968.



---

126    QCVARM_0616967-969 at '968.  Figure contains screen shot from ▮▮▮▮▮▮▮▮▮▮▮▮▮

### E. Qualcomm's Damages Related to Arm's Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing in the Qualcomm TLA

83.    I understand that Qualcomm asserts claims related to Arm's alleged breach of the implied covenant of good faith and fair dealing in the Qualcomm TLA due to, among other things, Arm's bad faith licensing proposals for IP including ████████████████████████

---

[191]  Second Amended Complaint, pp. 34-38.
[192]  Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, p. 60.
[193]  Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11), July 11, 2025, p. 60.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC



### ii. Qualcomm's Requests for License Proposals

87.    Qualcomm ███████████████████████████████████████████

██████████████ Qualcomm's current license to ███████████████ expires in ████, and

Qualcomm communicated to Arm that it wished to extend its license for an additional █ years

███.[213] On ████████████ Qualcomm also contacted Arm and stated ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ ████[214] On ████████████, Dawn Hill, former

Director of Global Sales at Arm and former "account manager for Qualcomm from Arm,"[215]

communicated to Qualcomm personnel that █████████████████████████████████

---

[211]  QCARM_0027985-986 at '985; ARM_00062474-493 at '488.
[212]  QCVARM_0608131-138 at '133-134.
[213]  QCVARM_0608131-138 at '133-134.
[214]  QCVARM_0613037-039 at '037-038.
[215]  <https://www.linkedin.com/in/dawn-hill-montemagni/>; 30(b)(6) Deposition of Jeffrey Fonseca, July 9, 2025, p. 81.

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.**

**V. ARM HOLDINGS PLC**

███████████████████████████████████████████████"[216]

Based on email correspondence between Qualcomm and Arm, the parties again discussed Arm

████████████████████████████████████████████████████

without an agreement.[217]

88.    In ████████, Kurt Wolf, Director of Strategic Sourcing and Licensing at

Qualcomm,[218] sent an email to Ms. Hill and stated "as requested by Arm, [Qualcomm] has waited

a while since our last discussions" ███████████████████████

████████████████████████████████████████████████████

█████████████[219]  In the same email, Mr. Wolf also expressed ███████████

████████████████████, which is also set to ███████████████████.[220]

89.    On ████████████ Qualcomm communicated its ███████████████

██████████ at the following weekly meeting with Arm.[221]  A week later, Qualcomm followed

up for proposed meeting times, as Arm did not respond to the previous email.[222]  Arm replied that

it was "waiting on the internal approval to proceed with this meeting.  As soon as [Arm has]

approval, [Arm] will reach out with day/time options."[223]  On ███████████ Qualcomm sent a third

follow-up email for proposed meeting times with Arm.[224]  In its communications, Qualcomm

requested a meeting with Will Abbey, Executive Vice President and Chief Commercial Officer at

Arm,[225] to discuss Qualcomm's ████████████████████████████

---

[216]  QCVARM_0608131-138 at '131.
[217]  QCVARM_0524007-011.
[218]  <https://www.linkedin.com/in/siliconip/>.
[219]  QCVARM_0616935.
[220]  QCVARM_0616935.
[221]  QCVARM_0618338-340 at '339.
[222]  QCVARM_0618338-340 at '339.
[223]  QCVARM_0618338-340 at '339.
[224]  QCVARM_0618338-340 at '338.
[225]  Deposition of Will Abbey, June 26, 2025, p. 8.

**STOUT RISIUS ROSS, LLC**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
V. ARM HOLDINGS PLC

██████████.[226] Qualcomm stated that Mr. Abbey should hear "why [Qualcomm] needs replies, consistent with [its] long-standing partnership, from Arm so [the parties] can continue to develop and deliver products to [Qualcomm] customers."[227]

90.     Qualcomm and Arm scheduled a meeting for ████████████, but postponed the meeting to the following week when Mr. Abbey would be able to provide a response on the ██████████████.[228]  Based on internal email correspondence between Qualcomm personnel, Mr. Wolf described Mr. Abbey's response as including the ████████████████ ████████████████████████████████████████████████████████████████████ ████████"[229]

91.     I understand from testimony of Qualcomm personnel that its products have relatively long development life cycles necessitating advance planning prior to tape out.   Kurt Wolf, Director of Strategic Sourcing and Licensing at Qualcomm,[230] testified that "it is typical to take at least three years from the beginning of a design to being able to ship silicon."[231] Larissa Cochron, Senior Director of Contracts at Qualcomm,[232] also testified that Qualcomm's "products have a relatively long life cycle," that Qualcomm's "products are on the roadmap about two to three years in advance," and mentioned the "design, manufacturing, the verification time" that needs to occur before a product launches.[233]  Ms. Cochron further testified, as an example, that Qualcomm signed a license agreement for ██████████████ 2019, "but ████████ were not even commercially available until 2022[,] … about a three-year timeframe."[234]  Ziad

---

[226]   QCVARM_0618338-340 at '338.
[227]   QCVARM_0618338-340 at '338.
[228]   QCVARM_0523826-831 at '826-827.
[229]   QCVARM_0525344-353 at '350-'351.
[230]   Deposition of Kurt Wolf, June 25, 2025, p. 16.
[231]   Deposition of Kurt Wolf, June 25, 2025, p. 28.
[232]   Deposition of Larissa Cochron, July 11, 2025, p. 11.
[233]   Deposition of Larissa Cochron, July 11, 2025, p. 113.
[234]   Deposition of Larissa Cochron, July 11, 2025, p. 114.

STOUT RISIUS ROSS, LLC                                                                       51
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

Asghar, Senior Vice President and General Manager of XR & Spatial Computing at Qualcomm,[235] similarly testified that "the product cycle in silicon is very long. So if it's ███, you're already planning for these parts in [2026]."[236] Jeffrey Fonseca, Director of Sales at Arm,[237] who is also the "partner manager for Qualcomm" at Arm, also testified that to his knowledge, Qualcomm planned its roadmaps "two years in advance."[238] Additionally, the "SoftBank Group Report 2025" included a "message from Arm CEO," Mr. Haas, which stated that "it takes Arm's customers time to develop the complex chips that contain Arm technology, with royalties typically materializing 2-3 years after licensing."[239]

92.    As noted above, on ███████████, Qualcomm provided Arm with written notice alleging Arm's breach of the Qualcomm TLA, including in relation to ███████████ ████████████████████████████████ ███████ Qualcomm stated in this letter that it had ████████████ ████████████████████████████████ ████████████████████████████[241]

iii. Arm's ███████████

93.    As discussed above, on ████████████████████████ ████████████████████████████ ██ ████████████ ████████████████████████████ ████████████████████████████

---

235    Exhibit 1 to Deposition of Ziad Asghar, July 7, 2025.
236    Deposition of Ziad Asghar, July 7, 2025, p. 99.
237    30(b)(6) Deposition of Jeffrey Fonseca, July 9, 2025, p. 11.
238    30(b)(6) Deposition of Jeffrey Fonseca, July 9, 2025, p. 88.
239    <https://group.softbank/en/ir/financials/annual_reports/2025/message/arm>.
240    QCVARM_0616952-954 at '953.
241    QCVARM_0616952-954 at '953-'954.
242    QCVARM_0616967-969.

STOUT RISIUS ROSS, LLC                                                    52
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



94.    On ███████████████████████████████████████████████████

███████████████████████████████[247]  In this letter, Qualcomm asked Arm to ███████████



███████████████████████████████████████████████[248]  According to testimony

from Larissa Cochron, Senior Director of Contracts at Qualcomm,[249] while Qualcomm "disagreed

that the price should increase" for the Peripheral IP, Qualcomm felt it "could absorb" the additional

cost associated with the ███████ license for a █ year term.[250]

---

[243]  QCVARM_0616967-969 at '968.
[244]  QCVARM_0616967-969 at '969.
[245]  QCVARM_0616967-969 at '968.
[246]  QCVARM_0616967-969 at '968.
[247]  QCVARM_0618354.
[248]  QCVARM_0618354.
[249]  Deposition of Larissa Cochron, July 11, 2025, p. 11.
[250]  Deposition of Larissa Cochron, July 11, 2025, p. 135.

---

STOUT RISIUS ROSS, LLC                                                          53
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### iv. Arm's ██████████████

95. ████████████████████████████████████



---

251 QCVARM_0527544-545 at '544.
252 QCVARM_0527544-545 at '544.
253 ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
_See_ Figure 15 and Figure 16.
254 QCVARM_0527546-548 at '547.

---

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.

V. ARM HOLDINGS PLC

**Figure 16:   Arm's Proposed License Fees for the Peripheral IP per the**  [255]



96.    Based on the documents discussed below, I understand that Qualcomm accepted

Arm's 

---

[255] QCVARM_0527546-548 at '547.
[256] QCVARM_0573056-057 at '056.
[257] QCVARM_0573056-057 at '056.
[258] QCVARM_0573056-057 at '056-057.
[259] QCVARM_0573056-057 at '056.
[260] QCVARM_0573056-057 at '057.

---

STOUT RISIUS ROSS, LLC                                                                 55

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

██████████████████████████████  ████████████████████

████████████████████████  ███████████

### v. Comparison of License Fees for the Peripheral IP

98.    As described below, ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

#### a. License Fees Proposed vs. Qualcomm's Existing License Fee

████    ████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████  ███████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[261]    QCVARM_1118081-084; QCVARM_1118085-088.

[262]    QCVARM_1121930; QCVARM_1121931.

[263]    ██████████████████████████████████████████████████████

[264]    Schedule 5.

---

STOUT RISIUS ROSS, LLC                                                56
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC



110.    As shown in the figure above, for each license option and for each Peripheral IP, Arm proposed significantly more than the ███████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ This comparison suggests that the █-year term Peripheral IP license fees Arm████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████

### vi. Qualcomm's Alleged Peripheral IP License Fee Overpayment

111.    As discussed above, Qualcomm alleges that Arm's proposals for the Peripheral IP are commercially unreasonable and made in bad faith.[283]  I have been asked by Qualcomm's counsel to calculate the amount that Qualcomm overpaid for its ████████████████████ ███████████████████    ███[284]  Qualcomm's alleged overpayment is based on a comparison of

---

[282]  Schedule 3.4.
[283]  Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (nos. 1-9), July 11, 2025, p. 13; Second Amended Complaint, p. 34.
[284]  QCVARM_0573056-057 at '056.

---

**STOUT RISIUS ROSS, LLC**                                                                 63
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

what Qualcomm paid versus a but-for price reflecting commercially reasonable license fees.  I

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████.  Further, I understand

that Qualcomm remains one of Arm's "major" customers and accounted for approximately $400

million of Arm's revenue in fiscal year 2025.[285]  Even with the reduced scope of licensing that

Qualcomm asserts is at least in part due to Arm's alleged wrongful conduct, Qualcomm remains

one of Arm's largest customers.  ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████

112.    Additionally, I understand that the Peripheral IP that Qualcomm ███████████

███████████████████████████████████████████████████████████

███████████████████████████████ █ ███████████████████████

███████████████████████████████████████████████████████████

---

[285] Arm states in its Form 20-F that Qualcomm "accounted for 10% of our total revenue for the fiscal year ended March 31, 2025," and Arm reported total revenue of approximately $4 billion.  $4,000,000,000 x 10% = $400,000,000.  *See* Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, pp. 29, 72.
[286] Conversation with Larissa Cochron.

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.**
**V. ARM HOLDINGS PLC**

consistent list price for the ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

113.    Further, as described above, Arm has produced only a limited set of license

agreements with incomplete information.  Without additional information, I cannot fully assess

whether there has been any change in Arm's ████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████     ███████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████

███     ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████     ███████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████

---

287  Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025, p. 29.
288  Schedule 5.

**STOUT RISIUS ROSS, LLC**                                                    65
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**A0931**

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

A0932



[291] Schedule 3.2.
[292] ███████████████████████ *See* Schedule 3.1.

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

### F. Qualcomm's Damages Related to Arm's Alleged Intentional Interference and Negligent Interference with Prospective Economic Advantage[293]

118.    I understand that Qualcomm claims intentional interference and negligent interference with prospective economic advantage against Arm as a result of a letter that Arm sent Qualcomm on October 22, 2024 (the "Notice Letter") and prior allegedly misleading communications by Arm to Qualcomm's customers.[294]    In the Notice Letter, Arm alleged that Qualcomm was in material breach of the Qualcomm ALA for the development and marketing of "unlicensed cores" and claimed that Arm would be entitled to terminate the Qualcomm ALA in 60 days if Qualcomm did not meet Arm's demands for a "cure" to its alleged breach.[295]    Qualcomm alleges that the Notice Letter was leaked to the media by Arm as an attempt to interfere with Qualcomm's current and potential business relationships and incite uncertainty about Qualcomm's ability to deliver Arm-compatible products.[296]

119.    In addition to the Notice Letter, I understand that Arm had previous communications with Qualcomm's customers, including via letters sent to over ■ Qualcomm customers in August 2022 and early September 2022 and to ■ customers in May 2023, as well as via meetings with executives of Samsung, Qualcomm's largest customer in its mobile segment.[297]    In an October 4, 2022 meeting with Samsung executives, I understand that the

---

[294]    Second Amended Complaint, pp. 11-14, 42-43, 47-50, 56-59; Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (nos. 1-9), July 11, 2025, pp. 22-24, 30-31, 40.
[295]    Second Amended Complaint, pp. 11, 45-46.
[296]    Second Amended Complaint, pp. 47-48.
[297]    *See, e.g.,* ARM_00110507; ARM_01215885; ARM_01231025; ARM_01215878; Deposition of Ziad Asghar, July 7, 2025, p. 118; Deposition of Rene Haas, July 7, 2025, pp. 22-25; Second Amended Complaint, pp. 42-43.

---

STOUT RISIUS ROSS, LLC                                                                68
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

chairman of the Board of Arm indicated that Qualcomm's ALA with Arm would expire in 2025, even though I understand that the parties agree that the ALA does not expire in 2025.[298]

120.    The letters that Arm sent in 2022 and 2023 to Qualcomm's customers alleged that Qualcomm breached the terms of its agreement with Arm, that certain unspecified Qualcomm products would not be covered under "▇▇▇▇▇▇▇▇▇▇▇▇," and that ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[299]

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

121.    James Jeon, Vice President of Global Commercial Operations at Qualcomm,[301] testified that Qualcomm's immediate response team ("IRT") developed an approved statement to be sent to Qualcomm's customers in response to the Notice Letter.[302]  In its statement, Qualcomm claimed that Arm's Notice Letter was "designed to strongarm a longtime partner" and "interfere with [Qualcomm's] performance-leading CPUs."[303]  Qualcomm further stated that Arm's Notice Letter "appear[ed] to be an attempt to disrupt the legal process, and its claim for termination is completely baseless."[304]

122.    Mr. Jeon testified that certain customers made follow-up inquiries regarding the Notice Letter.[305]  Specifically, Mr. Jeon stated that some customers replied that "they understand the situation, they get [Qualcomm's] message, and then they don't follow up.  But some of the

298  Trial Proceedings, *Arm v. Qualcomm*, C.A. No. 22-1146 (MN), Volume 2, December 16, 2024, pp. 145, 346.
299  *See, e.g.,* ARM_00110511; ARM_01215886.
300  Deposition of Jonathan Weiser, July 11, 2025, pp. 45-49.
301  Deposition of James Jeon, July 11, 2025, p. 23.
302  Deposition of James Jeon, July 11, 2025, pp. 24-25.
303  *See, e.g.,* QCVARM_1121337.
304  *See, e.g.,* QCVARM_1121337.
305  Deposition of James Jeon, July 11, 2025, *e.g.,* pp. 22, 45-46.

**QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.**
**V. ARM HOLDINGS PLC**

customer[s], they have a lot of questions…it depends on who the customer is and what business they're doing with us."[306]    For example, I understand that certain Qualcomm customers communicated concerns regarding future availability of products. ████████████

████████████████████████████████████ ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████ ████ ████ ████ ████ ████ ████ ████ ████ ████

████████████████████████████████████████████████

████████████████████████████████████ ████████████

████████████████████████████████████████████████

████████████████████ ████████████████████████████

████████████ ████████████████████████████████████

████████████████████████████████████████████████ █

████████████████████████████████████████████ █

████ ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

---

306   Deposition of James Jeon, July 11, 2025, p. 46.
307   <https://www.linkedin.com/in/%E6%99%93%E6%B0%91-%E9%A9%AC-9381bb15a/>.
308   QCVARM_0454071-072 at '071.
309   QCVARM_0713516-518 at '517.
310   QCVARM_0713516-518 at '516.
311   <https://www.linkedin.com/in/mike-neilio-5358141/>.
312   QCVARM_0713516-518 at '516.
313   QCVARM_1028750-751 at '751.
314   Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (nos. 1-9), July 11, 2025, pp. 8-9, 22-23.

---

**STOUT RISIUS ROSS, LLC**                                                      70
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

## G. Conclusion

141.    Based on the analyses described above, I calculate the ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ In addition, should the trier of fact determine that Arm's alleged wrongful conduct caused Qualcomm to overpay for ███████████████ ██████████, I quantify the amount of such overpayment.  Finally, I calculate Qualcomm's loss associated with the ████████████████████████████████████████████████, should the trier of fact determine that the change in terms was caused by Arm's alleged wrongful conduct. The figure below summarized the above-described calculations.

**Figure 27:   Summary of Qualcomm's Damages**[362]



---

[362]   Schedule 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUALCOMM INCORPORATED AND QUALCOMM TECHNOLOGIES, INC.
v. ARM HOLDINGS PLC

I declare under penalty of perjury that the foregoing is true and correct.

_____                    _____8/8/2025_____

Patrick F. Kennedy, Ph.D.                   Executed on

Managing Director

Stout Risius Ross, LLC

EXHIBIT A



# Patrick F. Kennedy, PhD
Managing Director

Patrick F. Kennedy is a Managing Director at Stout based in San Diego, CA.  Dr. Kennedy provides analysis, consultation, and expert opinions in business and dispute contexts.  In his more than 20 years of experience, Dr. Kennedy has testified as an expert in Federal Court, the U.S. Court of Claims, Bankruptcy Court, State Court,  and in private arbitrations throughout the country.

Dr. Kennedy has analyzed economic loss and damages in matters with causes of action including, but not limited to, patent, copyright, trademark and trade secret misappropriation, false advertising, breach of contract, product liability, fraud, professional malpractice, negligence, trespass, construction defect, antitrust and unfair competition, insurance bad faith, employment disputes and loss of earnings.

Dr. Kennedy has experience in a wide range of industries involving diverse technology.

### PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 2023 to present | **Stout** | Managing Director |
| 2011 to 2023 | **Torrey Partners** | Managing Director |
| 2006 to 2011 | **LECG** | Managing Director (2008) |
| 1996 to 2006 | **Mack\|Barclay, Inc.** | Shareholder (1998) |
| 1995 to 1996 | **International Securities Group, Inc.** | Director of Economic Research |
| 1992 to 1995 | **Board of the Governors of the Federal Reserve System, Washington, D.C.** | Economist |

### EDUCATION

**Doctorate in Economics**, Stanford University, 1992

> Awarded Stanford University Fellowship, Bradley Foundation Dissertation Fellowship, and Outstanding Teaching Award

**Bachelor of Arts in Economics**, University of California, San Diego, 1986

> Muir College Valedictorian, Summa Cum Laude and Phi Beta Kappa.  Awarded UC Regents Scholarship and the Seymour E. Harris Economics Award

### LICENSES AND PROFESSIONAL MEMBERSHIPS

Registered Securities Representative and Registered Principal
> (NASD Series 7, 24 and 63 – inactive)

American Economic Association
National Association for Business Economics
National Association for Forensic Economics
Licensing Executive Society

### BOARD MEMBERSHIPS

Torrey Pines Bank, Board of Directors
University of California San Diego, Economic Leadership Board Member

### AWARDS AND PUBLICATIONS

IAM Patent 1000

3390 Carmel Mountain Road, Suite 150 · San Diego, CA · 92121
www.stout.com

**SELECTED CASE AND INDUSTRY EXPERIENCE**

**INTELLECTUAL PROPERTY**

- Patent infringement claims including cellular handset technologies, various integrated circuits, medical devices, action cameras, digital image sensors and processing, network and device security, software, social media, unmanned aerial vehicles, advertising, LED backlighting, vehicle equipment and testing, electronic lottery systems, antibacterial products, DNA-based diagnostic testing, radio frequency identification systems, apparel and other products
- Trade secret misappropriation claims including medical devices, responsive website design, drug development, network security, systems integration, merchant services, financial services, fiber-reinforced polymer systems, manufacturing, cellular handsets, Bluetooth devices and other products
- Trademark and copyright infringement claims including cloud storage, luxury watches, musical composition, a nationally branded convention, wireless headsets, food products, fashion accessories, field marketing organizations, ceiling fans, jewelry, toys, apparel, retail and other products

**OTHER MATTERS**

- Breach of contract, intentional interference with prospective economic advantage, professional malpractice, insurance bad faith and other claims in industries including, but not limited to, oil wells and extraction, pharmaceutical clinical trials, reference microorganisms and cell lines, aircraft rescue and firefighting vehicles, wineries, gaming and casinos, satellite television, water purification filters, defense contracting, aerospace, aircraft charter, medical services, government contracts, veterans counseling services, advertising, national franchises, printing, paper and plastics, multilevel marketing, agriculture, footwear, financial services, insurance brokerage and real estate development
- Qui Tam cases involving overbilling by major systems integrators, faulty illuminating flares used in military aviation, improper testing of semiconductors used in military applications, and faulty design of a spacecraft intended to return solar wind samples to earth
- Foodborne illness and product recall
- Natural disaster business losses, including the Northern and Southern California wildfires
- Eminent domain matters involving real estate development and construction aggregates
- Valuing liabilities associated with future product liability claims for an automobile manufacturer in bankruptcy court
- Valuing technology related to motor vehicle engine diagnostics, drone anti-collision sensor technology and other products and services
- Multidistrict product liability litigation including pharmaceutical products and asbestos
- Consumer and business class actions related to solar panels, a natural gas facility blowout, automotive products, assisted living facilities, mobile home park relocation and cellular services
- Antitrust damages in convention services, telecommunications, and aircraft
- Personal loss including aviation, maritime and under the Vaccine Injury Compensation Program

# EXHIBIT B

**Patrick F. Kennedy, Ph.D.**
**Deposition and Trial Testimony**

| Date | Case Name | Venue | Testimony |
|---|---|---|---|
| 08/06/25 | Contour IP Holdings v. GoPro | CA Northern - Federal Court | Deposition |
| 07/08/25 | Carmack v. American Boat Works, Inc. and American Marine Corporation | HI Federal Court | Deposition |
| 06/18/25 | Chester v. The Belt Railway Company of Chicago | IL Federal Court | Deposition |
| 06/06/25 | Ikhana Group LLC v. Viking Air Limited | Arbitration | Trial |
| 05/15/25 | Quiroz v. Caltrans | Tulare Superior Court | Trial |
| 04/08/25 | Quiroz v. Caltrans | Tulare Superior Court | Deposition |
| 04/03/25 | Valeo Schalter und Sensoren GmbH v. Nvidia Corporation | CA Northern - Federal Court | Deposition |
| 04/01/25 | Blink Health Group, LLC  v. Susan Lang | American Arbitration Association | Deposition |
| 03/17/25 | Baker v. Secretary of Department of Health and Human Services | U.S. Court of Federal Claims | Hearing |
| 12/17/24 | Jubilant Draximage, Inc. v. Jubilant Radiopharmacies | CA Central - Federal Court | Deposition |
| 12/13/24 | Nasdaq, Inc. v. Miami International Holdings, Inc. | New Jersey - Federal Court | Deposition |
| 12/03/24 | Planner 5D v. Meta Platforms, Inc. | CA Northern - Federal Court | Deposition |
| 11/12/24 | Amyndas Pharmaceuticals, LLC v. Alexion Phrmaceuticals, Inc. | MA Federal Court | Deposition |
| 11/06/24 | Scientific Applications & Research Associates (SARA), Inc. v. Zipline International, Inc. | CA Northern - Federal Court | Deposition |
| 10/25/24 | Gardner Denver, Inc. v. Accurate Air Engineering, Inc. | CA Central - Federal Court | Deposition |
| 10/04/24 | Stiner, et al. v. Brookdale Senior Living Communities, Inc. | CA Northern - Federal Court | Deposition |
| 10/03/24 | Smartsky Networks, LLC  v. GOGO Business Aviation, LLC | Delaware - Federal Court | Deposition |
| 09/30/24 | Alorica, Inc. v. Fortinet, Inc. | Santa Clara Superior Court | Trial |
| 07/26/24 | Shadow Holdings, LLC v. John Paul Mitchell Systems | American Arbitration Association | Arbitration |
| 07/19/24 | Shadow Holdings, LLC v. John Paul Mitchell Systems | American Arbitration Association | Arbitration |
| 07/08/24 | ARM Ltd v. Qualcomm, Inc. | Delaware - Federal Court | Deposition |
| 06/25/24 | Shadow Holdings, LLC v. John Paul Mitchell Systems | American Arbitration Association | Deposition |
| 06/18/24 | Risk v. United Airlines, Inc. | Los Angeles Superior Court | Deposition |
| 04/17/24 | Heredia, et al. v. Sunrise Senior Living, LLC | CA Central - Federal Court | Declaration |
| 04/16/24 | Pliner v. Central Iowa Health System, et al. | IA Federal Court | Deposition |
| 04/12/24 | Rex Computing, Inc. v. Cerebras Systems, Inc. | Delaware - Federal Court | Deposition |
| 04/10/24 | Saint Paul Commodities, Inc. v. Oleo-X LLC | NY American Arbitration Association | Arbitration |
| 04/05/24 | NantWorks, LLC v. Bank of America Corporation | CA Central - Federal Court | Deposition |
| 03/01/24 | Palm Beach Tan, Inc. v. Sunless, Inc. | OH Northern - Federal Court | Deposition |
| 02/16/24 | Cocke  v. United States of America, et al. | GA Southern - Federal Court | Deposition |
| 01/19/24 | Saint Paul Commodities, Inc. v. Oleo-X LLC | NY American Arbitration Association | Deposition |
| 12/14/23 | Davis v. Secretary of Department of Health and Human Services | U.S. Court of Federal Claims | Hearing |
| 11/15/23 | Eilan v. Secretary of Department of Health and Human Services | U.S. Court of Federal Claims | Hearing |
| 10/19/23 | Stiner, et al. v. Brookdale Senior Living Communities, Inc. | CA Northern - Federal Court | Declaration |
| 10/16/23 | Jones v. Secretary of Department of Health and Human Services | U.S. Court of Federal Claims | Hearing |
| 09/12/23 | Pacific Steel Group v. Commerical Metals Company, et al. | CA Northern - Federal Court | Deposition |
| 09/07/23 | Bryan v. Secretary of Department of Health and Human Services | U.S. Court of Federal Claims | Hearing |
| 09/05/23 | Alorica, Inc. v. Fortinet, Inc. | Santa Clara Superior Court | Deposition |
| 08/31/23 | Alorica, Inc. v. Fortinet, Inc. | Santa Clara Superior Court | Deposition |
| 08/22/23 | Avila v. Joe Avis Farms | San Joaquin Superior Court | Trial |
| 06/26/23 | Bright v. Brookdale Senior Living Inc.; and Gunza v. Brookdale Senior Living Inc. | TN Middle - Federal Court | Deposition |
| 06/01/23 | Bright v. Brookdale Senior Living Inc.; and Gunza v. Brookdale Senior Living Inc. | TN Middle - Federal Court | Declaration |
| 05/17/23 | MicroVention, Inc. v. Balt USA, Inc. | CA Central - Federal Court | Deposition |
| 04/26/23 | Taction Technology, Inc. v. Apple Inc. | CA Southern - Federal Court | Deposition |
| 04/21/23 | Philips North America LLC, et al.  v. TEC Holdings, Inc. | NC Western - Federal Court | Trial |
| 04/14/23 | Philips North America LLC, et al.  v. TEC Holdings, Inc. | NC Western - Federal Court | Trial |
| 04/13/23 | PennyMac Loan Services, LLC v. Black Knight Servicing Technologies, LLC | American Arbitration Association | Arbitration |
| 03/09/23 | Raymond James Financial, Inc, et al. v. Deutsche Bank AG, et al. | FINRA Dispute Resolution | Arbitration |
| 03/02/23 | Wisk Aero LLC v. Archer Aviation, Inc. | CA Northern - Federal Court | Deposition |
| 02/22/23 | Raymond James Financial, Inc, et al. v. Deutsche Bank AG, et al. | FINRA Dispute Resolution | Deposition |
| 02/14/23 | Crysel v. American Equity | Orange County Superior Court | Trial |
| 01/19/23 | DexCom, Inc. v. Abbott Diabetes Care, Inc. | Delaware - Federal Court | Deposition |
| 12/29/22 | Crysel v. American Equity | Orange County Superior Court | Deposition |
| 12/27/22 | PennyMac Loan Services, LLC v. Black Knight Servicing Technologies, LLC | American Arbitration Association | Deposition |
| 10/19/22 | Avila v. Joe Avis Farms | San Joaquin Superior Court | Deposition |
| 09/22/22 | Alcon Vision, LLC v. Lens.com, Inc. | NY Eastern - Federal Court | Deposition |
| 08/17/22 | Vitalyte Sports Nutrition, Inc. v. Revitalyte, LLC | TX Western - Federal Court | Deposition |
| 08/11/22 | Sunstone Information Defense, Inc. v. International Business Machines Corporation | TX Western - Federal Court | Trial |
| 08/04/22 | Rodriguez, et al. v.  Sea Breeze Jet Ski, LLC | CA Northern - Federal Court | Deposition |
| 07/28/22 | Kurin, Inc. v. Magnolia Medical Technologies, Inc. | Delaware - Federal Court | Trial |
| 05/18/22 | Stiner, et al. v. Brookdale Senior Living Communities, Inc. | CA Northern - Federal Court | Declaration |
| 05/11/22 | CRF Frozen Foods v. Pictsweet, et al. | TN Middle - Federal Court | Deposition |
| 05/04/22 | Ayers v. The Penta Building Group | Riverside Cty Superior Court | Trial |
| 03/25/22 | The Waffle v. Tucker Investments | Los Angeles Superior Court | Trial |

Patrick F. Kennedy, Ph.D.
Deposition and Trial Testimony

| Date | Case Name | Venue | Testimony |
|------|-----------|-------|-----------|
| 02/17/22 | Sunstone Information Defense, Inc. v. International Business Machines Corporation | TX Western - Federal Court | Deposition |
| 01/27/22 | Chan v. Kimball, Tirey & St. John | San Diego Superior Court | Deposition |
| 01/17/22 | MedImpact Healthcare Systems, Inc. v. IQVIA, Inc. | CA Southern - Federal Court | Deposition |
| 01/14/22 | Nelson v. United States of America, et al. | OR - Federal Court | Trial |
| 01/05/22 | DeLeon-Piedra v. Ocean Angel V | CA Northern - Federal Court | Deposition |
| 12/14/21 | Stiner, et al. v. Brookdale Senior Living Communities, Inc. | CA Northern - Federal Court | Deposition |
| 12/01/21 | Contour IP Holdings v. GoPro | CA Northern - Federal Court | Deposition |
| 11/18/21 | Bellin Memorial Hospital v. Kinsey & Kinsey, Inc. | WI Federal Court | Trial |
| 11/15/21 | The Waffle v. Tucker Investments | Los Angeles Superior Court | Deposition |
| 10/21/21 | 7510 Hazard, LLC v. Connecticut General Life Insurance Company | San Diego Superior Court | Deposition |
| 10/18/21 | Philips North America LLC, et al. v. Dorow | NC Federal Court | Deposition |
| 10/18/21 | Philips North America LLC, et al. v. Zimmerman, et al. | NC Federal Court | Deposition |
| 10/12/21 | MicroVention, Inc. v. Balt USA, Inc. | CA Central - Federal Court | Deposition |
| 10/08/21 | In re: PFA Insurance Marketing | CA Northern - Federal Court | Declaration |
| 09/28/21 | Cuker v. Pilsbury | CA Southern - Federal Court | Deposition |
| 09/23/21 | LISCR, LLC v. Legality Holdings, S.A. | VA Eastern - Federal Court | Deposition |
| 0917/21 | TRC Operating Company, Inc. v. Chevron U.S.A., Inc. | Kern Cty Superior Court | Trial |
| 09/08/21 | Philips North America LLC, et al. v. TEC Holdings, Inc. | GA Northern - Federal Court | Deposition |
| 09/02/21 | 7510 Hazard, LLC v. Connecticut General Life Insurance Company | San Diego Superior Court | Deposition |
| 08/26/21 | TRC Operating Company, Inc. v. Chevron U.S.A., Inc. | Kern Cty Superior Court | Trial |
| 08/18/21 | Stiner, et al. v. Brookdale Senior Living Communities, Inc. | CA Northern - Federal Court | Declaration |
| 08/06/21 | Kiva Health Brands, LLC v. Kiva Brands, Inc. et al. | CA Northern - Federal Court | Deposition |

# EXHIBIT C

**Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings plc**                                                                                 **Exhibit C**
Documents Considered List

| Date | Description |
|---|---|
| *Legal* | |
| 08/31/22 | Complaint, Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc. and Nuvia, Inc., Civil Action No. 1:22-cv-01146-MN |
| 09/30/22 | Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Counterclaim |
| 10/26/22 | Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim |
| 04/18/24 | Complaint, Qualcomm Incorporated, Qualcomm Technologies, Inc., v. Arm Holdings Plc., Civil Action No. 24-490-MN |
| 12/16/24 | First Amended Complaint and Exhibits |
| 12/16/24 | Trial Proceedings, Arm v. Qualcomm, C.A. No. 22-1146 (MN), Volume 2 |
| 01/21/25 | Qualcomm's First Set of Requests for Production (Nos. 1–52) |
| 02/07/25 | Plaintiffs' Disclosures To Arm Holdings PLC. Pursuant to Delaware Default Standard Paragraph 3 |
| 02/07/25 | Defendant Arm Holdings Plc.'s Initial Disclosures Pursuant to Paragraph 3 of the Default Standard for Discovery |
| 02/07/25 | Defendant Arm Holdings Plc.'s Rule 26(a)(1) Initial Disclosures |
| 02/07/25 | Plaintiffs' Initial Disclosures Pursuant To Rule 26(a)(1) of the Federal Rules of Civil Procedure |
| 02/07/25 | Arm Holdings Plc's First Set of Requests for Production to Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (Nos. 1–58) |
| 02/07/25 | Arm Holdings Plc's First Set of Interrogatories to Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (Nos. 1–9) |
| 02/20/25 | Arm Ltd.'s Objections and Responses to Qualcomm's First Set of Requests for Production (Nos. 1–52) |
| 02/21/25 | Qualcomm's Second Set of Requests for Production (Nos. 53–120) |
| 02/21/25 | Qualcomm's First Set of Interrogatories To Arm (Nos. 1–3) |
| 03/10/25 | Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Production (Nos. 1–58) |
| 03/10/25 | Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9) |
| 03/14/25 | Arm Holdings Plc's Second Set of Requests for Production to Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (Nos. 59–122) |
| 03/24/25 | Arm Holdings Plc's Objections and Responses to Qualcomm's Second Set of Requests for Production (Nos. 53–120) |
| 03/24/25 | Arm Holdings Plc's Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3) |
| 03/27/25 | Plaintiffs' Motion for Leave To Amend the Complaint |
| 04/02/25 | Qualcomm's Third Set of Requests for Production (Nos. 121–156) |
| 04/04/25 | Defendant Arm Holdings Plc.'s Rule 26(a)(1) First Supplemental Initial Disclosures |
| 04/10/25 | Qualcomm's Amended Interrogatory No. 3 To Arm |
| 04/14/25 | Plaintiffs' Responses and Objections to Defendant's Second Set of Requests for Production (Nos. 59–122) |
| 04/16/25 | Qualcomm's Fourth Set of Requests for Production (Nos. 157–168) |
| 05/01/25 | Plaintiffs' Responses and Objections to Defendant's Third Set of Requests for Production (Nos. 123–173) |
| 05/09/25 | Qualcomm's Fifth Set of Requests for Production (Nos. 169–186) |
| 05/09/25 | Plaintiffs' Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10–13) |
| 05/12/25 | Arm Holdings Plc's Objections and Responses to Qualcomm's Amended Interrogatory No. 3 |
| 05/14/25 | Qualcomm's Second Set of Interrogatories to Arm (Nos. 4–11) |
| 05/16/25 | Arm Holdings Plc's Objections and Responses to Qualcomm's Fourth Set of Requests for Production (Nos. 157–168) |
| 05/22/25 | Qualcomm's Sixth Set of Requests for Production (Nos. 187–191) |
| 06/03/25 | Second Amended Complaint and Exhibits |
| 06/09/25 | Qualcomm's Seventh Set of Requests for Production (Nos. 192–195) |
| 06/09/25 | Arm Holdings Plc's Objections and Responses to Qualcomm's Fifth Set of Requests for Production (Nos. 169–186) |
| 06/09/25 | Qualcomm's Third Set of Interrogatories to Arm (No. 12) |
| 06/11/25 | Arm's Fifth Set of Requests for Production to Qualcomm (Nos. 228–287) |
| 06/11/25 | Arm's Third Set of Interrogatories to Qualcomm (Nos. 14–23) |
| 06/11/25 | Arm's First Set of Requests for Admission to Qualcomm (Nos. 1–30) |
| 06/11/25 | Plaintiffs' First Requests for Admissions to Defendant (Nos. 1–28) |
| 06/12/25 | Arm's Rule 26(a)(1) Second Supplemental Initial Disclosures |
| 06/13/25 | Plaintiffs' Supplemental Disclosures To Arm Holdings PLC. Pursuant to Delaware Default Standard Paragraph 3 |
| 06/13/25 | Plaintiffs' Supplemental Initial Disclosures Pursuant To Rule 26(a)(1) of the Federal Rules of Civil Procedure |
| 06/16/25 | Arm's Rule 26(a)(1) Third Supplemental Initial Disclosures |
| 06/16/25 | Arm's Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4–11) |
| 06/17/25 | Arm Ltd.'s First Supplemental Objections and Responses to Qualcomm's First Set of Requests for Production (Nos. 1–52) |
| 06/17/25 | Arm Ltd.'s First Supplemental Objections and Responses to Qualcomm's Second Set of Requests for Production (Nos. 53–120) |
| 06/17/25 | Arm Holdings Plc's First Supplemental Objections and Responses to Qualcomm's Third Set of Requests for Production (Nos. 121–156) |
| 06/18/25 | Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3 |
| 06/24/25 | Arm Holdings Plc's Objections and Responses to Qualcomm's Sixth Set of Requests for Production (Nos. 187–191) |
| 06/25/25 | Plaintiffs' First Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–4, 7, and 9) |
| 07/09/25 | Arm Holdings Plc's Objections and Responses to Qualcomm's Seventh Set of Requests for Production (Nos. 192–195) |
| 07/09/25 | Plaintiffs' Responses and Objections to Defendant's Fourth Set of Requests for Production (Nos. 174–227) |
| 07/09/25 | Arm's Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 12) |
| 07/11/25 | Plaintiffs' Responses and Objections to Defendant's Fifth Set of Requests for Production (Nos. 228–287) |
| 07/11/25 | Arm's First Supplemental Response to Qualcomm's Amended Interrogatory No. 3 |
| 07/11/25 | Arm's First Supplemental Response to Qualcomm's Third Set of Interrogatories (No. 12) |
| 07/11/25 | Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4–11) |
| 07/11/25 | Arm Holdings Plc's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3) |
| 07/11/25 | Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14–24) |
| 07/11/25 | Plaintiffs' Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10–13) |
| 07/11/25 | Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9) |
| 08/01/25 | Plaintiffs' Motion for Leave to Amend the Complaint to Name Arm Holdings Plc. And Arm Ltd. as Individual Defendants |

        HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
**A0955**

**Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings plc**                                                                 **Exhibit C**
Documents Considered List

| Date | Description | |
|------|-------------|---|
| *Depositions* | | |
| 06/17/25 | Deposition of Sudeep Holla and Exhibits | Principal Engineer at Arm |
| 06/17/25 | Deposition of Phil Hughes and Exhibits | Corporate Vice President and Chief Communications Officer at Advanced Micro Devices, Inc. |
| 06/18/25 | Deposition of Karl Whealton and Exhibits | Senior Director of CPU, DSP, Benchmarking, and AI H/W Product Management at Qualcomm |
| 06/20/25 | 30(b)(6) Deposition of Karthik Shivashankar and Exhibits | Senior Director of Commercial Strategy and Licensing at Arm |
| 06/20/25 | Deposition of Martin Weidmann and Exhibits | Director of Product Management at Arm |
| 06/24/25 | Deposition of Manju Varma and Exhibits | Senior Director of CPU Product Management at Qualcomm |
| 06/25/25 | Deposition of Kurt Wolf and Exhibits | Director of Sourcing at Qualcomm |
| 06/25/25 | Deposition of Gerard Williams and Exhibits | Senior Director of Engineering at Qualcomm |
| 06/26/25 | Deposition of Will Abbey and Exhibits | Executive Vice President and Chief Commercial Officer at Arm |
| 06/26/25 | Deposition of Ehab Youssef and Exhibits | Vice President and Deputy General Counsel of Licensing, Legal Ops, and Trade Compliance at Arm |
| 06/27/25 | Deposition of Richard Meacham and Exhibits | Principal Engineer Automotive CPU at Qualcomm |
| 06/27/25 | Deposition of Mark Dragicevich and Exhibits | Senior Director of Finance at Qualcomm |
| 06/27/25 | Deposition of Michael Williams and Exhibits | Lead Architect for Debug and RAS Architecture at Arm |
| 06/30/25 | Deposition of Spencer Collins and Exhibits | Executive Vice President and Chief Legal Officer at Arm |
| 07/01/25 | Deposition of Andrew Howard and Exhibits | Vice President of Partner Success and Licensing at Arm |
| 07/01/25 | Deposition of Jean-Francois Vidon and Exhibits | Senior Director of Engineering at Qualcomm |
| 07/01/25 | 30(b)(6) Deposition of Pavankumar Mulabagal and Exhibits | Senior Director of Sales and Business Development at Qualcomm |
| 07/02/25 | Deposition of Richard Grisenthwaite and Exhibits | Chief Architect and Fellow at Arm |
| 07/02/25 | Deposition of Paul Williamson and Exhibits | Senior Vice President and General Manager of IoT at Arm |
| 07/02/25 | 30(b)(6) Deposition of Cristiano Amon and Exhibits | President and CEO of Qualcomm at Qualcomm |
| 07/03/25 | Deposition of Jeffrey Golden and Exhibits | Hardware Engineer at Qualcomm |
| 07/03/25 | Deposition of Lynn Couillard and Exhibits | Vice President of Strategic Alliances at Arm |
| 07/04/25 | Deposition of Kenneth Siegel and Exhibits | Managing Partner at Morrison & Foerster |
| 07/04/25 | Deposition of Peter Greenhalgh and Exhibits | Senior Vice President of Technology at Arm |
| 07/07/25 | Deposition of Aparajita Bhattacharya and Exhibits | Senior Director of Engineering at Arm |
| 07/07/25 | Deposition of Rene Haas and Exhibits | CEO at Arm |
| 07/07/25 | Deposition of Ziad Asghar and Exhibits | Senior Vice President and General Manager of XR & Spatial Computing at Qualcomm |
| 07/08/25 | Deposition of Laura Sand and Exhibits | Senior Vice President, Legal Counsel at Qualcomm |
| 07/08/25 | Deposition of John Horley and Exhibits | Distinguished Engineer at Arm |
| 07/09/25 | Deposition of Jignesh Trivedi and Exhibits | Director of Engineering at Qualcomm |
| 07/09/25 | 30(b)(6) Deposition of Jeffrey Fonseca and Exhibits | Director of Sales at Arm |
| 07/10/25 | Deposition of Durga Malladi and Exhibits | Senior Vice President and General Manager of Technology Planning and Solutions and Data Center at Qualcomm |
| 07/10/25 | Deposition of Akshay Bhatnagar and Exhibits | Senior Manager of North America Licensing at Arm |
| 07/10/25 | 30(b)(6) Deposition of Jannik Nelson and Exhibits | VP of Revenue at Arm |
| 07/10/25 | 30(b)(6) Deposition of Christine Tran and Exhibits | Senior Director of Legal at Arm |
| 07/11/25 | Deposition of James Jeon and Exhibits | VP of Global Commercial Operations at Qualcomm |
| 07/11/25 | Deposition of Vivek Agrawal and Exhibits | Senior Principal Engineer at Arm |
| 07/11/25 | Deposition of Jonathan Weiser and Exhibits | Former Lead Attorney for QCT at Qualcomm |
| 07/11/25 | Deposition of Larissa Cochron and Exhibits | Senior Director of Contracts at Qualcomm |
| 07/11/25 | Deposition of Ann Chaplin and Exhibits | General Counsel and Corporate Secretary at Qualcomm |
| 07/29/25 | Deposition of Mohamed Awad and Exhibits | Senior Vice President and General Manager of Infrastructure Business |

Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings plc          Exhibit C
Documents Considered List

| Date | Description |
|------|-------------|

**Produced Documents**

*If the bates number referenced below is the beginning of a document/production, the bates reference is to the entire document.*

*I had access to documents produced by Qualcomm, Arm, and other third parties.*

| | | | |
|---|---|---|---|
| ARM_00000680 | QCVARM_0468074 | QCVARM_0618338 | QCVARM_1088375 |
| ARM_00009370 | QCVARM_0468076 | QCVARM_0618354 | QCVARM_1117815 |
| ARM_00025401 | QCVARM_0468082 | QCVARM_0618387 | QCVARM_1117818 |
| ARM_00052643 | QCVARM_0468164 | QCVARM_0618420 | QCVARM_1117821 |
| ARM_00055357 | QCVARM_0468212 | QCVARM_0618448 | QCVARM_1117825 |
| ARM_00056571 | QCVARM_0468426 | QCVARM_0618449 | QCVARM_1117836 |
| ARM_00062474 | QCVARM_0468623 | QCVARM_0618450 | QCVARM_1117839 |
| ARM_00069910 | QCVARM_0520480 | QCVARM_0618454 | QCVARM_1117843 |
| ARM_00076910 | QCVARM_0523656 | QCVARM_0618455 | QCVARM_1117847 |
| ARM_00083490 | QCVARM_0523730 | QCVARM_0618456 | QCVARM_1117851 |
| ARM_00083492 | QCVARM_0523754 | QCVARM_0618459 | QCVARM_1117866 |
| ARM_00083608 | QCVARM_0523826 | QCVARM_0618461 | QCVARM_1117873 |
| ARM_00086164 | QCVARM_0523837 | QCVARM_0618568 | QCVARM_1117877 |
| ARM_00103702 | QCVARM_0533995 | QCVARM_0618694 | QCVARM_1117880 |
| ARM_00103718 | QCVARM_0524007 | QCVARM_0618702 | QCVARM_1117884 |
| ARM_00103781 | QCVARM_0524237 | QCVARM_0618703 | QCVARM_1117891 |
| ARM_00110507 | QCVARM_0524718 | QCVARM_0618705 | QCVARM_1117898 |
| ARM_00110509 | QCVARM_0524739 | QCVARM_0618707 | QCVARM_1117901 |
| ARM_00110511 | QCVARM_0524900 | QCVARM_0618708 | QCVARM_1117905 |
| ARM_00110513 | QCVARM_0525167 | QCVARM_0618712 | QCVARM_1117909 |
| ARM_00110515 | QCVARM_0525344 | QCVARM_0618843 | QCVARM_1117934 |
| ARM_00110517 | QCVARM_0525354 | QCVARM_0618975 | QCVARM_1117938 |
| ARM_00114880 | QCVARM_0526038 | QCVARM_0624133 | QCVARM_1117942 |
| ARM_00118835 | QCVARM_0526286 | QCVARM_0626519 | QCVARM_1117948 |
| ARM_00119119 | QCVARM_0526828 | QCVARM_0626590 | QCVARM_1117956 |
| ARM_01014940 | QCVARM_0527427 | QCVARM_0626603 | QCVARM_1117960 |
| ARM_01215878 | QCVARM_0527470 | QCVARM_0667395 | QCVARM_1117971 |
| ARM_01215885 | QCVARM_0527544 | QCVARM_0685578 | QCVARM_1117977 |
| ARM_01215886 | QCVARM_0527546 | QCVARM_0687237 | QCVARM_1117981 |
| ARM_01215887 | QCVARM_0527863 | QCVARM_0687476 | QCVARM_1117985 |
| ARM_01215888 | QCVARM_0528119 | QCVARM_0687479 | QCVARM_1117989 |
| ARM_01215889 | QCVARM_0528956 | QCVARM_0687758 | QCVARM_1118003 |
| ARM_01215890 | QCVARM_0528981 | QCVARM_0687760 | QCVARM_1118009 |
| ARM_01216189 | QCVARM_0529021 | QCVARM_0688778 | QCVARM_1118012 |
| ARM_01200076 | QCVARM_0529438 | QCVARM_0688834 | QCVARM_1118016 |
| ARM_01231025 | QCVARM_0529703 | QCVARM_0688922 | QCVARM_1118020 |
| ARM_01231027 | QCVARM_0529842 | QCVARM_0688932 | QCVARM_1118024 |
| ARM_01231028 | QCVARM_0530133 | QCVARM_0689117 | QCVARM_1118029 |
| ARM_01231029 | QCVARM_0530245 | QCVARM_0691526 | QCVARM_1118036 |
| ARM_01231030 | QCVARM_0530447 | QCVARM_0691853 | QCVARM_1118040 |
| ARM_01231031 | QCVARM_0531270 | QCVARM_0692586 | QCVARM_1118043 |
| ARM_01231032 | QCVARM_0531350 | QCVARM_0692665 | QCVARM_1118051 |
| ARM_01231033 | QCVARM_0531368 | QCVARM_0692718 | QCVARM_1118055 |
| ARM_01231034 | QCVARM_0531514 | QCVARM_0699176 | QCVARM_1118059 |
| ARM_01231037 | QCVARM_0531658 | QCVARM_0699278 | QCVARM_1118064 |
| ARM_01231038 | QCVARM_0531817 | QCVARM_0707732 | QCVARM_1118067 |
| ARM_01231039 | QCVARM_0531821 | QCVARM_0707997 | QCVARM_1118081 |
| ARM_01231040 | QCVARM_0531864 | QCVARM_0708086 | QCVARM_1118085 |
| ARM_01231041 | QCVARM_0531919 | QCVARM_0708107 | QCVARM_1118089 |
| ARM_01231042 | QCVARM_0532274 | QCVARM_0708118 | QCVARM_1118093 |
| ARM_01231043 | QCVARM_0532413 | QCVARM_0709978 | QCVARM_1118097 |
| ARM_01231044 | QCVARM_0532997 | QCVARM_0710047 | QCVARM_1118100 |
| ARM_01231045 | QCVARM_0535154 | QCVARM_0710418 | QCVARM_1118104 |
| ARM_01231046 | QCVARM_0535481 | QCVARM_0711109 | QCVARM_1118146 |
| ARM_01231047 | QCVARM_0535654 | QCVARM_0711110 | QCVARM_1118481 |
| ARM_01231048 | QCVARM_0535721 | QCVARM_0713477 | QCVARM_1118510 |
| ARM_01231049 | QCVARM_0539180 | QCVARM_0713488 | QCVARM_1118515 |
| ARM_01231050 | QCVARM_0539482 | QCVARM_0713513 | QCVARM_1118518 |
| ARM_01231051 | QCVARM_0571705 | QCVARM_0713516 | QCVARM_1118524 |
| ARM_01231052 | QCVARM_0572833 | QCVARM_0713527 | QCVARM_1118528 |
| ARM_01231053 | QCVARM_0572851 | QCVARM_0713528 | QCVARM_1118531 |
| ARM_01231054 | QCVARM_0572936 | QCVARM_0713530 | QCVARM_1118534 |
| ARM_01231055 | QCVARM_0573056 | QCVARM_0713532 | QCVARM_1118538 |
| ARM_01231056 | QCVARM_0573528 | QCVARM_0713535 | QCVARM_1118543 |
| ARM_01231057 | QCVARM_0573677 | QCVARM_0713538 | QCVARM_1118546 |
| ARM_01231058 | QCVARM_0573684 | QCVARM_0713652 | QCVARM_1118549 |
| ARM_01231059 | QCVARM_0573685 | QCVARM_0713665 | QCVARM_1118552 |
| ARM_01231060 | QCVARM_0575290 | QCVARM_0713840 | QCVARM_1118555 |
| ARM_01231061 | QCVARM_0575607 | QCVARM_0717757 | QCVARM_1118559 |
| ARM_01231062 | QCVARM_0575611 | QCVARM_0846761 | QCVARM_1118565 |
| ARM_01231063 | QCVARM_0575613 | QCVARM_0847668 | QCVARM_1118596 |
| ARM_01231064 | QCVARM_0575615 | QCVARM_0847765 | QCVARM_1118779 |
| ARM_01231394 | QCVARM_0575616 | QCVARM_0848924 | QCVARM_1118787 |
| ARM_01233086 | QCVARM_0575617 | QCVARM_0850838 | QCVARM_1118795 |
| ARM_01233089 | QCVARM_0575634 | QCVARM_0850937 | QCVARM_1118800 |
| ARM_01238384 | QCVARM_0575636 | QCVARM_0851120 | QCVARM_1118820 |

Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings plc    Exhibit C
Documents Considered List

| Date | | | | |
|------|---|---|---|---|
| | ARM_01241379 | QCVARM 0577544 | QCVARM 0851183 | QCVARM 1118832 |
| | ARM_01241472 | QCVARM 0578265 | QCVARM 0851271 | QCVARM 1118836 |
| | ARM_01241581 | QCVARM 0579532 | QCVARM 0851410 | QCVARM 1118842 |
| | ARM_01241585 | QCVARM 0580173 | QCVARM 0851512 | QCVARM 1118844 |
| | ARM_01241587 | QCVARM 0580181 | QCVARM 0851782 | QCVARM 1118862 |
| | ARM_01249519 | QCVARM 0595522 | QCVARM 0851837 | QCVARM 1118865 |
| | ARM_01291148 | QCVARM 0595815 | QCVARM 0854985 | QCVARM 1118870 |
| | ARM_01314327 | QCVARM 0599620 | QCVARM 0855117 | QCVARM 1118884 |
| | ARMQC_00001136 | QCVARM 0599801 | QCVARM 0855455 | QCVARM 1118890 |
| | ARMQC_00027166 | QCVARM 0600037 | QCVARM 0855474 | QCVARM 1118894 |
| | ARMQC_02600059 | QCVARM 0600038 | QCVARM 0855614 | QCVARM 1118896 |
| | ARMQC_02600803 | QCVARM 0600039 | QCVARM 0856340 | QCVARM 1118898 |
| | ARMQC_02600838 | QCVARM 0600040 | QCVARM 0856754 | QCVARM 1118901 |
| | ARMQC_02601067 | QCVARM 0600041 | QCVARM 0856864 | QCVARM 1118926 |
| | ARMQC_02720799 | QCVARM 0600042 | QCVARM 0863300 | QCVARM 1118928 |
| | ARMQC_02727610 | QCVARM 0600043 | QCVARM 0863428 | QCVARM 1118929 |
| | ARMQC_02730917 | QCVARM 0600044 | QCVARM 0863435 | QCVARM 1118931 |
| | ARMQC_02731051 | QCVARM 0600045 | QCVARM 0863641 | QCVARM 1118933 |
| | ARMQC_02731250 | QCVARM 0600046 | QCVARM 0863644 | QCVARM 1118934 |
| | ARMQC_02731284 | QCVARM 0600047 | QCVARM 0863818 | QCVARM 1118945 |
| | ARMQC_02732393 | QCVARM 0600048 | QCVARM 0864030 | QCVARM 1118972 |
| | ARMQC_02741466 | QCVARM 0600049 | QCVARM 0864277 | QCVARM 1118976 |
| | ARMQC_02742804 | QCVARM 0600050 | QCVARM 0864713 | QCVARM 1118978 |
| | ARMQC_02742861 | QCVARM 0600051 | QCVARM 0864833 | QCVARM 1118980 |
| | ARMQC_02747567 | QCVARM 0600052 | QCVARM 0864834 | QCVARM 1118983 |
| | ARMQC_02747848 | QCVARM 0600053 | QCVARM 0864838 | QCVARM 1118986 |
| | ARMQC_02749702 | QCVARM 0600054 | QCVARM 0864839 | QCVARM 1118988 |
| | ARMQC_02750967 | QCVARM 0600055 | QCVARM 0864901 | QCVARM 1118990 |
| | ARMQC_02750999 | QCVARM 0600056 | QCVARM 0864924 | QCVARM 1118995 |
| | ARMQC_02771350 | QCVARM 0600057 | QCVARM 0864967 | QCVARM 1118997 |
| | ARMQC_02772241 | QCVARM 0600058 | QCVARM 0864969 | QCVARM 1118998 |
| | ARMQC_02772246 | QCVARM 0600059 | QCVARM 0865022 | QCVARM 1118999 |
| | ARMQC_02772333 | QCVARM 0600060 | QCVARM 0865065 | QCVARM 1119004 |
| | ARMQC_02774738 | QCVARM 0600061 | QCVARM 0865233 | QCVARM 1119005 |
| | ARMQC_02774748 | QCVARM 0600062 | QCVARM 0865343 | QCVARM 1119008 |
| | ARMQC_02774757 | QCVARM 0600063 | QCVARM 0865344 | QCVARM 1119015 |
| | ARMQC_02774767 | QCVARM 0600064 | QCVARM 0865345 | QCVARM 1119018 |
| | ARMQC_02774814 | QCVARM 0600065 | QCVARM 0865360 | QCVARM 1119020 |
| | ARMQC_02774816 | QCVARM 0600066 | QCVARM 0865367 | QCVARM 1119023 |
| | ARMQC_02774818 | QCVARM 0600067 | QCVARM 0865370 | QCVARM 1119025 |
| | ARMQC_02774844 | QCVARM 0600068 | QCVARM 0865412 | QCVARM 1119027 |
| | ARMQC_02775090 | QCVARM 0600069 | QCVARM 0865415 | QCVARM 1119030 |
| | ARMQC_02779269 | QCVARM 0600070 | QCVARM 0865435 | QCVARM 1119032 |
| | ARMQC_02779314 | QCVARM 0600071 | QCVARM 0865479 | QCVARM 1119070 |
| | ARMQC_02779364 | QCVARM 0600072 | QCVARM 0865488 | QCVARM 1119074 |
| | ARMQC_02779391 | QCVARM 0600073 | QCVARM 0865490 | QCVARM 1119120 |
| | ARMQC_02779412 | QCVARM 0600074 | QCVARM 0865603 | QCVARM 1120024 |
| | ARMQC_02779433 | QCVARM 0600075 | QCVARM 0866177 | QCVARM 1120466 |
| | ARMQC_02779483 | QCVARM 0600076 | QCVARM 0867422 | QCVARM 1120773 |
| | ARMQC_02783512 | QCVARM 0600077 | QCVARM 1014030 | QCVARM 1120811 |
| | ARMQC_02783533 | QCVARM 0600078 | QCVARM 1014186 | QCVARM 1120812 |
| | ARMQC_02783575 | QCVARM 0600079 | QCVARM 1014307 | QCVARM 1120999 |
| | ARMQC_02783595 | QCVARM 0600080 | QCVARM 1014424 | QCVARM 1121028 |
| | ARMQC_02783597 | QCVARM 0600081 | QCVARM 1014890 | QCVARM 1121029 |
| | ARMQC_02783599 | QCVARM 0600082 | QCVARM 1014891 | QCVARM 1121312 |
| | ARMQC_02783601 | QCVARM 0600083 | QCVARM 1014955 | QCVARM 1121313 |
| | ARMQC_02783603 | QCVARM 0600084 | QCVARM 1015219 | QCVARM 1121314 |
| | ARMQC_02783615 | QCVARM 0600085 | QCVARM 1015426 | QCVARM 1121315 |
| | ARMQC_02783618 | QCVARM 0600086 | QCVARM 1015438 | QCVARM 1121316 |
| | ARMQC_02783619 | QCVARM 0600087 | QCVARM 1015821 | QCVARM 1121317 |
| | ARMQC_02783731 | QCVARM 0600088 | QCVARM 1016051 | QCVARM 1121318 |
| | ARMQC_02783848 | QCVARM 0600089 | QCVARM 1016205 | QCVARM 1121319 |
| | ARMQC_02783967 | QCVARM 0600090 | QCVARM 1016218 | QCVARM 1121320 |
| | ARMQC_02784120 | QCVARM 0600091 | QCVARM 1017127 | QCVARM 1121321 |
| | ARMQC_02784199 | QCVARM 0600092 | QCVARM 1017149 | QCVARM 1121322 |
| | ARMQC_02784204 | QCVARM 0600093 | QCVARM 1017169 | QCVARM 1121323 |
| | QC_ARM_EC_0000128 | QCVARM 0600094 | QCVARM 1017295 | QCVARM 1121324 |
| | QC_ARM_EC_0001144 | QCVARM 0600095 | QCVARM 1017417 | QCVARM 1121325 |
| | QCARM_0016229 | QCVARM 0600096 | QCVARM 1017438 | QCVARM 1121326 |
| | QCARM_0027985 | QCVARM 0600097 | QCVARM 1017467 | QCVARM 1121327 |
| | QCARM_0169753 | QCVARM 0600098 | QCVARM 1017747 | QCVARM 1121328 |
| | QCARM_0169823 | QCVARM 0600101 | QCVARM 1019256 | QCVARM 1121329 |
| | QCARM_0208733 | QCVARM 0600533 | QCVARM 1020165 | QCVARM 1121330 |
| | QCARM_0218409 | QCVARM 0600801 | QCVARM 1022267 | QCVARM 1121331 |
| | QCARM_0314128 | QCVARM 0601671 | QCVARM 1022268 | QCVARM 1121332 |

**A0958**

Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings plc                                    **Exhibit C**
Documents Considered List

| Date | | Description | |
|------|------|------|------|
| QCARM 0333656 | QCVARM 0601718 | QCVARM 1022565 | QCVARM 1121333 |
| QCARM 0337857 | QCVARM 0601787 | QCVARM 1023593 | QCVARM 1121334 |
| QCARM 0338243 | QCVARM 0602168 | QCVARM 1024002 | QCVARM 1121335 |
| QCARM 0338573 | QCVARM 0602198 | QCVARM 1024617 | QCVARM 1121336 |
| QCARM 0339100 | QCVARM 0602317 | QCVARM 1024852 | QCVARM 1121337 |
| QCARM 0343120 | QCVARM 0602395 | QCVARM 1024874 | QCVARM 1121338 |
| QCARM 0343533 | QCVARM 0602404 | QCVARM 1024874 | QCVARM 1121341 |
| QCARM 0343954 | QCVARM 0602434 | QCVARM 1026209 | QCVARM 1121342 |
| QCARM 0345914 | QCVARM 0604150 | QCVARM 1028558 | QCVARM 1121344 |
| QCARM 0350039 | QCVARM 0604257 | QCVARM 1028750 | QCVARM 1121346 |
| QCARM 0360161 | QCVARM 0605658 | QCVARM 1029604 | QCVARM 1121348 |
| QCARM 0362108 | QCVARM 0605660 | QCVARM 1029757 | QCVARM 1121351 |
| QCARM 0483799 | QCVARM 0605661 | QCVARM 1029911 | QCVARM 1121354 |
| QCARM 0569125 | QCVARM 0605876 | QCVARM 1030509 | QCVARM 1121359 |
| QCARM 0573247 | QCVARM 0606806 | QCVARM 1030813 | QCVARM 1121362 |
| QCARM 0579579 | QCVARM 0607060 | QCVARM 1031251 | QCVARM 1121491 |
| QCARM 2412907 | QCVARM 0607506 | QCVARM 1031267 | QCVARM 1121493 |
| QCARM 2416747 | QCVARM 0607680 | QCVARM 1033335 | QCVARM 1121510 |
| QCARM 2423696 | QCVARM 0607691 | QCVARM 1034376 | QCVARM 1121514 |
| QCARM 2533808 | QCVARM 0608131 | QCVARM 1037652 | QCVARM 1121518 |
| QCARM 3004833 | QCVARM 0608423 | QCVARM 1055990 | QCVARM 1121519 |
| QCARM 3449986 | QCVARM 0608452 | QCVARM 1056140 | QCVARM 1121522 |
| QCARM 3473070 | QCVARM 0608501 | QCVARM 1056567 | QCVARM 1121528 |
| QCARM 3485264 | QCVARM 0608626 | QCVARM 1057229 | QCVARM 1121529 |
| QCARM 3489547 | QCVARM 0608764 | QCVARM 1066278 | QCVARM 1121531 |
| QCARM 3496803 | QCVARM 0609540 | QCVARM 1066761 | QCVARM 1121536 |
| QCARM 3509490 | QCVARM 0609541 | QCVARM 1067283 | QCVARM 1121538 |
| QCARM 3509521 | QCVARM 0609543 | QCVARM 1067284 | QCVARM 1121541 |
| QCARM 3961513 | QCVARM 0609881 | QCVARM 1067971 | QCVARM 1121674 |
| QCARM 7463823 | QCVARM 0613037 | QCVARM 1068133 | QCVARM 1121930 |
| QCARM 7464139 | QCVARM 0615918 | QCVARM 1068141 | QCVARM 1121931 |
| QCARM 7464653 | QCVARM 0616170 | QCVARM 1068152 | QCVARM 1121932 |
| QCARM 7464862 | QCVARM 0616348 | QCVARM 1068191 | QCVARM 1122336 |
| QCARM 7464969 | QCVARM 0616349 | QCVARM 1068222 | QCVARM 1122338 |
| QCARM 7465288 | QCVARM 0616636 | QCVARM 1068352 | QCVARM 1122342 |
| QCARM 7465644 | QCVARM 0616687 | QCVARM 1068388 | QCVARM 1122355 |
| QCARM 7465765 | QCVARM 0616871 | QCVARM 1068434 | QCVARM 1122406 |
| QCARM 7465962 | QCVARM 0616906 | QCVARM 1068512 | QCVARM 1122415 |
| QCARM 7466191 | QCVARM 0616907 | QCVARM 1068516 | QCVARM 1122429 |
| QCARM 7477117 | QCVARM 0616912 | QCVARM 1068521 | QCVARM 1122431 |
| QCARM 7492376 | QCVARM 0616914 | QCVARM 1068525 | QCVARM 1122434 |
| QCARM 7622616 | QCVARM 0616916 | QCVARM 1068603 | QCVARM 1122439 |
| QCVARM 0000218 | QCVARM 0616919 | QCVARM 1068661 | QCVARM 1122454 |
| QCVARM 0000482 | QCVARM 0616920 | QCVARM 1068666 | QCVARM 1122462 |
| QCVARM 0029611 | QCVARM 0616928 | QCVARM 1068739 | QCVARM 1122464 |
| QCVARM 0447242 | QCVARM 0616935 | QCVARM 1068905 | QCVARM 1122485 |
| QCVARM 0447252 | QCVARM 0616936 | QCVARM 1068922 | QCVARM 1122486 |
| QCVARM 0447464 | QCVARM 0616939 | QCVARM 1068986 | QCVARM 1122489 |
| QCVARM 0447871 | QCVARM 0616942 | QCVARM 1068988 | QCVARM 1122490 |
| QCVARM 0448066 | QCVARM 0616947 | QCVARM 1068990 | QCVARM 1122492 |
| QCVARM 0448362 | QCVARM 0616948 | QCVARM 1068995 | QCVARM 1122493 |
| QCVARM 0449561 | QCVARM 0616950 | QCVARM 1069077 | QCVARM 1122504 |
| QCVARM 0449883 | QCVARM 0616952 | QCVARM 1069112 | QCVARM 1122508 |
| QCVARM 0450016 | QCVARM 0616955 | QCVARM 1069129 | QCVARM 1122515 |
| QCVARM 0450317 | QCVARM 0616959 | QCVARM 1069363 | QCVARM 1122590 |
| QCVARM 0450320 | QCVARM 0616963 | QCVARM 1069483 | QCVARM 1122672 |
| QCVARM 0450425 | QCVARM 0616964 | QCVARM 1069555 | QCVARM 1122676 |
| QCVARM 0450438 | QCVARM 0616965 | QCVARM 1069674 | QCVARM 1122684 |
| QCVARM 0450606 | QCVARM 0616967 | QCVARM 1069705 | QCVARM 1122696 |
| QCVARM 0452200 | QCVARM 0616970 | QCVARM 1069708 | QCVARM 1122701 |
| QCVARM 0452326 | QCVARM 0616975 | QCVARM 1069710 | QCVARM 1122713 |
| QCVARM 0452397 | QCVARM 0617114 | QCVARM 1069941 | QCVARM 1122715 |
| QCVARM 0453129 | QCVARM 0617401 | QCVARM 1069945 | QCVARM 1122717 |
| QCVARM 0453334 | QCVARM 0617453 | QCVARM 1069949 | QCVARM 1122720 |
| QCVARM 0454071 | QCVARM 0617454 | QCVARM 1070014 | QCVARM 1122725 |
| QCVARM 0454821 | QCVARM 0617456 | QCVARM 1070027 | QCVARM 1122726 |
| QCVARM 0455016 | QCVARM 0617459 | QCVARM 1070034 | QCVARM 1122730 |
| QCVARM 0455212 | QCVARM 0617460 | QCVARM 1070077 | QCVARM 1122731 |
| QCVARM 0455341 | QCVARM 0617462 | QCVARM 1070081 | QCVARM 1122733 |
| QCVARM 0452283 | QCVARM 0617517 | QCVARM 1070271 | QCVARM 1122735 |
| QCVARM 0458346 | QCVARM 0617730 | QCVARM 1070640 | QCVARM 1122737 |
| QCVARM 0460408 | QCVARM 0617756 | QCVARM 1070831 | QCVARM 1151573 |
| QCVARM 0461296 | QCVARM 0617760 | QCVARM 1071192 | QCVARM 1151578 |
| QCVARM 0462995 | QCVARM 0617902 | QCVARM 1071193 | QCVARM 1151582 |
| QCVARM 0463153 | QCVARM 0617903 | QCVARM 1071194 | QCVARM 1151586 |
| QCVARM 0465188 | QCVARM 0617947 | QCVARM 1071199 | QCVARM 1151591 |
| QCVARM 0465502 | QCVARM 0617948 | QCVARM 1071201 | QCVARM 1151597 |
| QCVARM 0465566 | QCVARM 0617951 | QCVARM 1071232 | QCVARM 1151603 |
| QCVARM 0465730 | QCVARM 0617954 | QCVARM 1071244 | QCVARM 1151608 |
| QCVARM 0465917 | QCVARM 0617957 | QCVARM 1071246 | QCVARM 1151611 |
| QCVARM 0466056 | QCVARM 0617958 | QCVARM 1071248 | QCVARM 1151619 |
| QCVARM 0466177 | QCVARM 0617961 | QCVARM 1071500 | QCVARM 1151620 |
| QCVARM 0466366 | QCVARM 0617964 | QCVARM 1071502 | QCVARM 1151964 |
| QCVARM 0466478 | QCVARM 0617978 | QCVARM 1071972 | QCVARM 1151965 |
| QCVARM 0466936 | QCVARM 0618320 | QCVARM 1071980 | QCVARM 1151966 |
| QCVARM 0467171 | QCVARM 0618324 | QCVARM 1071993 | |
| QCVARM 0467529 | QCVARM 0618325 | QCVARM 1072199 | |
| QCVARM_0467601 | QCVARM_0618336 | QCVARM_1073895 | |

    HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**A0959**

**Qualcomm Incorporated and Qualcomm Technologies, Inc. v. Arm Holdings plc**           **Exhibit C**
**Documents Considered List**

| Date | Description |
|---|---|
| *Research* | |
| | Arm Holdings plc Form 20-F for the fiscal year ended March 31, 2025 |
| | NVIDIA Corporation Form 10-K for the fiscal year ended January 26, 2025 |
| | Qualcomm Incorporated Form 10-K for the fiscal year ended September 29, 2024 |
| | Qualcomm Incorporated, Form 10-Q for the quarterly period ended June 29, 2025 |
| | S&P Global Market Intelligence. 2025. WACC analysis: Qualcomm Inc. (QCOM). Capital IQ. |
| | SoftBank Group Annual Report 2024 |
| | Trial Proceedings, *Arm v. Qualcomm* , C.A. No. 22-1146 (MN), Volume 2, December 16, 2024 |
| | |
| | https://download.intel.com/newsroom/kits/40thanniversary/pdfs/What_is_a_Microprocessor.pdf |
| | https://group.softbank/en/ir/financials/annual_reports/2025/message/arm |
| | https://group.softbank/en/news/press/20160905 |
| | https://newsroom.arm.com/blog/arm-computex-2025 |
| | https://nvidianews.nvidia.com/news/nvidia-and-softbank-group-announce-termination-of-nvidias-acquisition-of-arm-limited |
| | https://nvidianews.nvidia.com/news/nvidia-to-acquire-arm-for-40-billion-creating-worlds-premier-computing-company-for-the-age-of-ai |
| | https://tech.facebook.com/reality-labs/ |
| | https://www.arm.com/company |
| | https://www.capitaliq.com |
| | https://www.cnbc.com/2023/09/14/arm-ipo-arm-starts-trading-on-the-nasdaq-in-win-for-softbank.html |
| | https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d |
| | https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008 |
| | https://www.lawinsider.com/dictionary/standard-margin |
| | https://www.linkedin.com/in/%E6%99%93%E6%B0%91-%E9%A9%AC-9381bb15a/ |
| | https://www.linkedin.com/in/dawn-hill-montemagni/ |
| | https://www.linkedin.com/in/mike-neilio-5358141/ |
| | https://www.linkedin.com/in/siliconip/ |
| | https://www.linkedin.com/in/tejas-krishnamohan-aa24a91/ |
| | https://www.linkedin.com/in/will-wyatt-ab6bb2b/ |
| | https://www.phonearena.com/galaxy-tab-s10-release-date-price-features-news |
| | https://www.sec.gov/Archives/edgar/data/804328/000080432824000075/qcom092924ex21.htm |

A0960

EXHIBIT D

# Exhibit 11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

**United States District Court**

**District of Delaware**

| | |
|---|---|
| Qualcomm Incorporated and Qualcomm Technologies, Inc., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:24-cv-00490-MN |
| Arm Holdings plc., f/k/a Arm Ltd., | |
| *Defendant.* | |

**Rebuttal Expert Report of Professor Timothy S. Simcoe**

**September 5, 2025**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I.      ASSIGNMENT AND QUALIFICATIONS..........................................................5

II.     SUMMARY OF OPINIONS ............................................................................7

III.    BACKGROUND AND INDUSTRY OVERVIEW ................................................19
        A. Overview of Semiconductor Technology and Value Chain ................................ 20
        B. Segments and Competitive Dynamics ........................................................ 23
        C. Arm's Business Model and Licensing Structure........................................... 25
        D. Qualcomm's Business Model .................................................................. 29

IV.     ORIGIN OF THE DISPUTE ..........................................................................33

V.      PROF. POSNER'S ANALYSIS OF THE RELEVANT MARKETS AND MARKET POWER IS
        INCOMPLETE AND IGNORES KEY FEATURES OF THE INDUSTRY ......................37
        A. Prof. Posner Improperly Disregards the Competitive Constraint from the x86
           and RISC-V Ecosystems...................................................................... 39
        B. Arm's ISA Share Varies Significantly Across Chip Application Segments ........ 45

VI.     PROF. POSNER AND DR. KENNEDY PROVIDE NO EVIDENCE THAT QUALCOMM HAS
        SUFFERED HARM FROM ARM'S ALLEGED ANTICOMPETITIVE CONDUCT .................47
        A. Qualcomm's Strong Financial Performance Since the Acquisition of Nuvia ..... 49
        B. No Evidence of Lost Business.............................................................. 55

        ████████████████████████████████████████

        ████████████████████████████████████████

        3. Qualcomm's Broader Customer Base Was Not Harmed......................67

VII.    PROF. POSNER'S CLAIM THAT ARM HAS THE ABILITY AND INCENTIVE TO FORECLOSE
        QUALCOMM IS BASED ON AN INCOMPLETE ANALYSIS THAT IGNORES KEY FACTS AND
        IS UNTETHERED FROM SOUND ECONOMIC ANALYSIS ......................................69
        A. Relevant Economic Framework .............................................................. 72
           1. Arm's Licensing Strategy Is Tailored to Partner-Specific Circumstances ........... 72
           2. The Nuvia Agreement Illustrates Arm's Legitimate Interest in Managing Risk and
              Securing Value.......................................................................... 76

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

3.  Qualcomm and Prof. Posner Have Not Demonstrated that Arm's Dispute with Qualcomm Is Anticompetitive Conduct Rather than a Standard Commercial Disagreement .................................................................................. 79

4.  Protecting Competition Does Not Require Arm to License Its ISA on Qualcomm's Preferred Terms ................................................................. 82

B.  **Prof. Posner's Opinions on Ability to Foreclose Are Flawed** ............................... 85

C.  **Prof. Posner Does Not Account for Costs that Arm Would Suffer from the Alleged Foreclosure of Qualcomm and Other Customers** ...................................... 88

1.  The Role of Qualcomm and Other Partners in Expanding Arm's Success and Ecosystem Against Alternative ISAs .................................................. 89

2.  Qualcomm's Successful Business Diversification Strategy Disincentivizes Arm from Foreclosing Qualcomm ................................................................. 97

3.  Prof. Posner's Diversion Analysis Is Incomplete and Ignores Important Foreclosure Costs that Arm Would Incur .............................................. 100

D.  **Foreclosure of Qualcomm Alone Would Unlikely Be Profitable for Arm** ........ 106

VIII.  **PROF. POSNER HAS NOT DEMONSTRATED THAT ARM'S CONDUCT IS ANTICOMPETITIVE** ................................................................................................ 106

A.  **Arm Protecting the Terms of Its Contracts Is Procompetitive** ........................... 107

1.  Contract Enforcement Is a Legitimate Procompetitive Action .......................... 107

B.  **Arm's Entry into the Chip Design Stage of the Value Chain Is Procompetitive** ................................................................................................ 109

1.  The Start of the Alleged Foreclosure Significantly Predates Arm's Data Center Chip Launch ................................................................................................ 110

2.  Vertical Integration Is Common and Typically Beneficial .................................. 111

3.  Arm's Ecosystem Remains Open .................................................................... 120

C.  **Increases in Royalty Rates Are Not Inherently Anticompetitive** ...................... 127

1.  Arm's Share of the Chip "Stack" Is Smaller than Qualcomm's ......................... 129

2.  Price Increases Are Not Inherently Anticompetitive ........................................ 132

D.  **"Dominant" Shares Do Not Imply a Lack of Competitive Pressure** .................. 136

1.  Arm Continues to Invest a Significant Portion of Its Revenue ........................... 136

2.  Current High Shares Do Not Guarantee Future High Shares ............................. 141

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

3.  Any Attempt by Arm to Foreclose Customers Would Accelerate Development of Alternatives such as RISC-V ........................................................................ 144

4.  There Is No Evidence that Arm's Purported Decision to Stop Supporting v8 Is Anticompetitive ................................................................................................ 149

IX.  **Prof. Posner Has Not Demonstrated that Arm's Conduct Harmed Competition and Consumers** ...................................................................... **150**

A.  **Qualcomm Has Not Demonstrated that Arm Had Anticompetitive Intent** ...... **152**

B.  **Arm's Litigation Position Was Public and Transparent from as Early as 2022** ........................................................................................................ **153**

C.  **There Is No Evidence of Harm to Competition** .................................... **159**

X.  **Appendices** ............................................................................................ **163**

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

## I.    ASSIGNMENT AND QUALIFICATIONS

1.    My name is Timothy S. Simcoe. I am the David J. McGrath Jr. Professor and Chair of the Strategy and Innovation department at the Boston University Questrom School of Business. I am also a faculty director of the Boston University Technology Policy Research Initiative, and a Research Associate at the National Bureau of Economic Research.

2.    I received my Bachelor's degree in Applied Math with Economics from Harvard College in 1995. I received a Master's degree in Economics in 2003, and a Doctorate in Business Administration in 2004, both from the University of California at Berkeley. During the 2014-2015 academic year, I served as a Senior Economist on the President's Council of Economic Advisers.

3.    As a professor at Boston University, I teach business strategy to students in both the Master of Business Administration program and the undergraduate business concentration. This business strategy course covers topics such as the commercialization of new technologies, industry evolution, industry structure, and strategic positioning. I also teach a Technology Strategy course to MBA and executive MBA students, a course in Data Analysis to executive MBA students, and a PhD-level class in research methods.

4.    I have published more than 25 peer reviewed academic articles, including in top academic economic journals such as the *American Economic Review, Management Science,* and the *RAND Journal of Economics*. I have also published numerous articles in other widely read outlets, such as policy and antitrust publications. My academic work primarily falls under the economic discipline of Industrial Organization, which studies topics including competition between firms, market power, monopolies, and antitrust issues. My research covers topics including technological interoperability, innovation, and intellectual property ("IP").

5.    A copy of my curriculum vitae, including a list of my prior testimony during the past five years, is attached as **Appendix A.**

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

6.      A list of materials that I relied upon in reaching the opinions expressed in this report is attached as **Appendix B**.[1]

7.      I have been asked by Counsel for Arm to provide an economic assessment of Qualcomm's claims that Arm has engaged in anticompetitive conduct that has caused economic harm to Qualcomm,[2] and that "Arm's actions are part of a broader campaign to harm or threaten to harm competition for central processing units ("CPUs") and other computer chip designs, in California and elsewhere."[3] I have also been asked to review and respond to the analysis and conclusions in the expert report of Prof. Posner, and to some aspects of Dr. Kennedy's analysis.[4]

8.      The opinions I offer in this report are based on my review of Qualcomm's Second Amended Complaint ("SAC"), Prof. Eric A. Posner's August 8, 2025 Expert Report (including supporting materials) (hereinafter "Posner Report"), and Prof. Patrick F. Kennedy's August 8, 2025 Expert Report (including supporting materials) (hereinafter "Kennedy Report"), as well as my review of depositions and documents produced both in this litigation and in the ongoing litigation that Arm filed against Qualcomm in Delaware federal court (hereinafter *Arm v. Qualcomm*).[5] I was given access to all material produced in the context of both these litigations.

---

[1] My analysis and conclusions are based on the information available to me at present. I reserve the right to update my opinions and analysis as appropriate if additional information or materials become available.  I also reserve the right to create and use demonstrative exhibits to assist in providing testimony.

[2] *See* for example, Qualcomm Inc. v. Arm Holdings, plc., C.A. No. 24-490-MN, Dkt. Nos. 137; 137-1 (Ex. A) (June 3, 2025) (hereinafter Qualcomm's Second Amended Complaint or "SAC"), ¶ 210 ("Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers.").

[3] SAC, ¶ 207.

[4] Expert Report of Eric A. Posner, August 8, 2025 (hereinafter "Posner Report") and Expert Report of Patrick F. Kennedy, August 8, 2025 (hereinafter "Kennedy Report").

[5] In *Arm v. Qualcomm,* the jury found that (i) Qualcomm did not breach the Nuvia ALA and (ii) Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA. The jury was unable to reach a verdict with respect to Arm's claim as to whether Nuvia breached the Nuvia ALA. *See,* Arm Ltd. v. Qualcomm Inc., No. 1:22-cv-01146 (D. Del. filed August 31, 2022), Dkt. Nos. 571, 572. *See also* Tobias Mann, "Jury spares Qualcomm's AI PC ambitions, but Arm eyes a retrial," The Register, December 23, 2024, https://www.theregister.com/2024/12/23/qualcomm_arm_trial/; ███████████████████████ ███████████████████████████████████████████  understand that Arm has filed post-trial briefing challenging the jury verdict, and that the final unresolved count will need to be retried in any event. Plaintiff Arm Ltd.'s Motion for Judgment as a Matter of Law or a New Trial, Case 1:22-cv-01146-MN, Dkt. No. 595.

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

9.     Counsel for Arm has instructed me to assume that the disagreement with Qualcomm concerning the correct interpretation of various terms of the relevant Qualcomm and Nuvia agreements with Arm, as set forth in the pleadings and other materials from the cases,[6] reflects Arm's genuine views of Arm's, Qualcomm's, and Nuvia's contractual obligations.

## II.    SUMMARY OF OPINIONS

10.     The origin of this litigation is a dispute over the interpretation of a set of contracts among Arm, Qualcomm, and Nuvia. The dispute was triggered by Qualcomm's acquisition of Nuvia in March 2021, and by Qualcomm's decision to incorporate Nuvia's technology into its own products. Arm has alleged that Qualcomm and Nuvia have breached their license agreements with Arm. In the present case, Qualcomm alleges that Arm has breached the Qualcomm Architecture License Agreement ("ALA"), breached the Qualcomm Technology License Agreement ("TLA"), tortiously interfered with Qualcomm's customers, and engaged in "unlawful, unfair or fraudulent" business acts or practices.[7]

11.     Qualcomm's unfair competition claims are based upon Arm's conduct after the parties were unable to reach an agreement over the terms of Nuvia's and Qualcomm's license to use Arm's IP. Specifically, Qualcomm alleges that by initiating litigation over Qualcomm's use of the CPU designs created at Nuvia, communicating about the ongoing litigation with Qualcomm customers that use products incorporating Arm's technology, and providing notice that Arm believes Qualcomm has breached the Qualcomm and Nuvia ALAs, Arm intends to "eliminate alternatives to Arm's own competing CPU designs."[8] Prof. Posner's report echoes these claims by arguing that Arm's conduct constitutes a "broad scheme" to foreclose Qualcomm's access to the Arm

---

[6] "Arm's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1–3)," Arm Holdings, July 11, 2025, pp. 4-17; "Arm's First (Corrected) Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-11)," Arm Ltd., March 1, 2024, pp. 3-17.

[7] SAC, ¶¶ 173-226 (Counts V-VIII).

[8] SAC, ¶ 1. In this report, I do not opine on the question of whether either party has violated any contractual commitments.

7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Instruction Set Architecture ("ISA") and its associated ecosystem of software developers and users.

12.    To support his opinions, Prof. Posner relies on a stylized economic model of the potential foreclosure effects of a vertical merger. He does not explain why this stylized model of a vertical *merger* is an appropriate tool for analyzing Arm's downstream *organic entry*, given that economists generally view entry as procompetitive. Even more importantly, Prof. Posner does not link the model or its underlying assumptions to the facts of this case.  His analysis simply ignores broad swaths of the factual record that point to a much simpler explanation for Arm's conduct: Arm seeks to protect its IP and earn a return on its investments. For example,

- Prof. Posner hardly mentions the Nuvia acquisition despite its central role in this dispute. I have seen no evidence that Arm's original lawsuit against Qualcomm and Nuvia was meritless. From an economic perspective, litigation is recognized as a widely accepted means of resolving contractual disputes that can produce a variety of procompetitive benefits.

- Prof. Posner claims that "Arm has interfered with Qualcomm's relationship with its customers by sowing doubts about Qualcomm's continued ability to sell Arm-compliant chips."[9] But the initial lawsuit between Arm and Qualcomm was public knowledge and widely discussed in the press. In that context, Arm's communication with Qualcomm's customers that use Arm-based chips reflects Arm's incentive to be transparent with users of its technology.

- Prof. Posner claims that Arm is pivoting to a business model that involves, "foreclos[ing] customers in sectors that Arm seeks to enter."[10] The only Arm customer that he specifically mentions is Qualcomm. Throughout its dispute with Arm, Qualcomm has maintained access to the Arm ISA under its ALA and TLA contracts. ████████████████████ ████████████████████████████████████████████████████████████████

Despite disagreeing about the interpretation of the ALA, Arm and Qualcomm have

---

[9] Posner Report, ¶ 45.

[10] Posner Report, ¶ 66.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

negotiated during the pendency of this litigation. The parties' failure so far to find mutually agreeable terms for amending the ALA is unremarkable (and does not preclude that an agreement will eventually be reached). Arm's proposal that Qualcomm ███████ ███████████████████████████████████ moreover, does not constitute evidence of a "scheme" to foreclose Qualcomm's (or any other customer's) access to Arm's ISA.

- Prof. Posner points to Arm's development of a chip for data centers as a key piece of evidence in favor of his foreclosure theory.[11]



He also fails to mention that in data centers, Qualcomm currently has no chip and thus zero share, ████████████ ███████████████████████████████ If Arm were pursuing the foreclosure strategy hypothesized by Prof. Posner, then data center chips would be a surprisingly poor choice for the initial application, because much of the demand served by Arm's existing customers would likely be diverted to an alternative ISA, Intel's x86, which currently has the highest share of data center chips.[14]

13. Economic models are useful in antitrust because they provide an internally consistent framework for analyzing the full range of costs and benefits associated with certain kinds of

---

[11] Posner Report, ¶¶ 46, 64. The term "foreclosure" can refer to either or both of partial foreclosure (whereby a firm worsens a customers' access to an input, e.g., by raising price or degrading quality) and full foreclosure (whereby a firm ends a customers' access to an input). I use foreclosure to encompass the possibilities of both partial and full foreclosure, unless specified.

[12] *See* Deposition of Mohamed Awad, July 29, 2025 (hereinafter "Awad (Arm) Deposition"), 37:11-20, 48:12-23, 49:4-51:17; Ian King, "Qualcomm Plans Exit From Server Chips," Bloomberg, May 7, 2018 https://www.bloomberg.com/news/articles/2018-05-07/qualcomm-is-said-to-plan-exit-from-server-chips-amid-cost-cuts.

[13] *See* ████████████████████████████████████████████████ "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf; ██████████████████████████████████████████████

[14] Arm estimates that its ISA has a 20 percent share in the data center segment (see Section V).

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

business activity.[15] This allows an economist to carefully compare (and measure, where possible) the relevant cost-benefit tradeoffs before reaching a conclusion about antitrust harm. That is not what Prof. Posner does. Instead, he simply claims that certain kinds of harm *might* occur when a firm is vertically integrated, and either ignores or dismisses the potential benefits of vertical integration to reach the conclusion that harm *must* have occurred. Since Prof. Posner's application of a stylized model of potential foreclosure effects under a vertical merger is superficial and untethered from the evidence, his opinions are highly speculative and lack evidentiary support. He alternates between definitive statements and non-committal language—such as "may," "could," "appears to," and "suggests"—in both cases without presenting concrete evidence of harm to Qualcomm or to competition. For example, the following statements are offered without supporting evidence:

- "Arm has adopted the indirect strategy of driving Qualcomm out of business and taking its margins."[16]

- "Arm no longer wishes to keep its prior commitments and instead plans to cut off ALA licensees and sell SoCs directly to OEMs,[17] such as data centers, automobile companies, and mobile phone manufacturers."[18]

---

[15] Stylized models are often used as a starting point by antitrust agencies in merger review. But those agencies also gather facts and adapt the model to account for industry institutions and case-specific evidence. For example, the U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, https://www.justice.gov/d9/383663.pdf states: "Investigations Are Intensively Fact-Driven, Iterative Processes. Merger analysis depends heavily on the specific facts of each case. […] In testing a particular postulated risk of competitive harm arising from a merger, the Agencies take into account pertinent characteristics of the market's competitive process using data, documents, and other information obtained from the parties, their competitors, their customers, databases of various sorts, and academic literature or private industry studies. […] The Agencies also carefully consider prospects for efficiencies that the proposed transaction may generate and evaluate the effects of any efficiencies on the outcome of the competitive process."

[16] Posner Report, ¶ 87.

[17] Original Equipment Manufacturers ("OEMs").

[18] Posner Report, ¶ 88. I note here that Prof. Posner mischaracterized a statement by Arm's CEO, Rene Haas, as his only support for this claim. As such, Prof. Posner effectively offers no evidence for this claim. *See* Section VIII.B.3 below.

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

- "[T]he more successful [Arm licensees] are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them."[19]

And here are several examples of non-committal language:

- "Arm […] **appears** to have the incentive to foreclose Qualcomm…"[20]

- "Arm **may** be acting in bad faith…"[21]

- "Arm **might** continue to benefit from Qualcomm…"[22]

- "Arm […] **may** raise upstream barriers…"[23]

- "Arm […] **may** impede innovation…"[24]

14.     Prof. Posner's overarching theory is that Arm is  (or "may" be) engaged in a "broad […] scheme" to "undermine Qualcomm's ability" to compete within the Arm ISA ecosystem.[25] He claims that Arm holds "a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA."[26] He alleges that Arm is attempting to "extend […] its dominance over the Arm ISA ecosystem"[27] by "obstructing" Qualcomm's ability to design custom cores under its ALA, thereby coercing Qualcomm into relying on Arm's "off-the-shelf" ("OTS") cores licensed under the TLA,[28] ███████████████████████████

---

[19] Posner Report, ¶ 90.

[20] Posner Report, ¶ 64 (emphasis added).

[21] Posner Report, ¶ 65 (emphasis added).

[22] Posner Report, ¶ 72 (emphasis added).

[23] Posner Report, ¶ 78 (emphasis added).

[24] Posner Report, ¶ 77 (emphasis added).

[25] Posner Report, ¶ 13.

[26] Posner Report, ¶ 11.

[27] Posner Report, ¶ 14.

[28] Posner Report, ¶ 13.

[29] Posner Report, ¶¶ 17, 71.

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

15.     This report provides a response to each of Prof. Posner's main claims. The remainder of this Section summarizes my opinions regarding the core elements of his theory.

**Prof. Posner's analysis of relevant markets and market power is incomplete and ignores key features of the industry.**

16.     Although Prof. Posner does not define relevant markets for his analysis, he implicitly assumes that Arm is a monopolist or has a "dominant position" in the market for a license to its own ISA.[30] Prof. Posner does not appear to define markets or analyze competition at other stages of the chip industry supply chain, such as central processing unit ("CPU") cores or chips.[31]

17.     This approach leads him to ignore (i) the current and future competitive constraint from the RISC-V ISA, a freely-available alternative; (ii) the fact that, if Qualcomm were foreclosed, Qualcomm's sales may divert to other ALA customers, such as Apple, rather than Arm cores sold under the TLA or Arm's own chips; and (iii) competitive constraints due to Original Equipment Manufacturer ("OEM") customers being able to choose among chips that use different ISAs.[32]

18.     While Prof. Posner discusses Arm's "monopoly" and "dominant position," economics does not condemn either, to the extent that they are the result of successful competition and innovation.[33] Furthermore, Prof. Posner does not consider that current high shares do not guarantee future high shares, as demonstrated by the many examples of once "dominant" firms that lost significant shares

---

[30] Posner Report, ¶ 11 ("[…] Arm has a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA.").

[31] For the purpose of my report, I consider the terms "chips," "System on a Chip" ("SoCs"), and "chipsets" to be synonymous. I will typically use the term "chip."

[32] Prof. Posner does acknowledge that "in some sectors, like data centers and compute, OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips." Posner Report, ¶ 58. However, he does not account for this competitive constraint on Arm's licensing strategy.

[33] Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1, 2022, https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf, p. 2 ("In many markets, the competitive process naturally results in a market structure with lots of suppliers. […] In many other markets, where economies of scale are sizeable, the competitive process naturally results in a market structure with just a few large firms. We typically see this outcome in the manufacturing of highly sophisticated equipment, from aircraft to farm machinery to advanced microprocessors. There is nothing inherently wrong with that outcome, so long as it results from legitimate competition rather than anticompetitive mergers or exclusionary conduct.").

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

to rivals.[34] Prof. Posner fails to explain why, as a "monopolist" protected by high "barriers to entry,"[35] Arm would continue to invest a significant portion of its revenue in research and development ("R&D"), and does not consider that Arm's sustained investment is more consistent with a firm responding to competitive pressure than with one exercising unchecked market power.

**Prof. Posner and Dr. Kennedy provide no evidence that Qualcomm has suffered harm from Arm's alleged anticompetitive conduct.**

19.    Prof. Posner claims that Qualcomm was harmed in various ways by Arm's conduct, but he provides no evidence of actual harm. I show that there is no real-world compelling evidence of harm to Qualcomm. Since its acquisition of Nuvia, in March 2021, Qualcomm's financial reports, statements to investors, and customer relationships show sustained growth and strong financial performance. Qualcomm also forecasts strong financial performance going forward.

20.    Neither Prof. Posner nor Dr. Kennedy demonstrate that Qualcomm suffered any harm in its relationship with specific customers. Specifically, neither Qualcomm nor its experts provide any evidence that the letter that Arm sent to Qualcomm on October 22, 2024, (hereinafter "Breach Letter") (which Arm withdrew on January 8, 2025) is the only factor, or even just a contributing factor,[36] for the change in the terms of a Qualcomm agreement with ▮▮▮. Negotiations, particularly between parties of that scale and sophistication, are a sequence of give and take, and there is nothing remarkable about the fact that Qualcomm did not ultimately receive the exact terms it proposed at an earlier stage in the process.

21.    More generally, negotiations between business partners involve constant back-and-forth communications, exchanges of requests and concessions, expected and unexpected challenges and roadblocks, and can be affected by internal frictions and changing external factors. The presence of "rough patches" in a relationship is not evidence of anticompetitive conduct. In fact,

---

[34] See Section VIII.D. For example, Arm estimates that Arm-based chips' share of data centers is currently 20 percent (see Section V), but it was essentially zero in 2018 (Awad (Arm) Deposition, 48-12:2).

[35] Posner Report, ¶¶ 18, 58.

[36] As I discuss in Section IX.B, Prof. Posner has also not explained how Arm's October 2024 notice and its publication could interfere with Qualcomm's business opportunities given that, as early as 2022, Arm repeatedly, clearly, and publicly stated that (a) Qualcomm was in breach of the Qualcomm ALA and (b) Arm had the right to terminate the ALA as a result.

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

it is not difficult to find examples of friction in Qualcomm's relationships with its customers that predate the filing of the *Arm v. Qualcomm* lawsuit, and that are thus unrelated to Arm's alleged anticompetitive conduct.

**Prof. Posner's claim that Arm has the ability and incentive to foreclose Qualcomm is based on an incomplete analysis that ignores key facts and is untethered from sound economic analysis.**

22.     Prof. Posner's claim that Arm is able to foreclose Qualcomm and other customers from Arm's ISA is incorrect.[37] First, his analysis does not distinguish among downstream sectors, even though the RISC-V architecture is currently a substitute in some applications, and OEMs can (and do) readily switch to x86 in others. Second, Qualcomm's ALA and TLA with Arm do not expire until ███ and many of Arm's other customers similarly have contractual commitments that extend many years into the future.[38] These long-term commitments provide time for chipmakers to invest in alternatives to the Arm ISA, thereby constraining Arm's ability to foreclose even in sectors like mobile where short-run substitutes to Arm's ISA are not currently available.

23.     Prof. Posner also claims that Arm has the incentive to foreclose Qualcomm's access to its ISA.[39] But his analysis is incomplete, and it is based on a static model that ignores various costs that Arm would incur if it pursued such a foreclosure strategy.  *First*, foreclosure would deprive Arm of the benefits of Qualcomm's and other ALA customers' investments in Arm-based chip design, which increase the value of Arm's ecosystem. *Second*, Arm would lose sales in downstream applications where chipmakers or OEMs can switch to an alternative ISA. *Third*, a "broad scheme" of foreclosure would carry reputational costs to Arm, and cause harm to the Arm ecosystem, by making it more difficult to migrate existing customers onto future versions of the Arm ISA. *Fourth*, industry leaders would respond to Arm's purported foreclosure scheme by accelerating investments in the development of the freely-available RISC-V ISA, thereby putting

---

[37] Posner Report, ¶¶ 65-66.

[38] For example, Apple has an ALA with Arm that "extends beyond 2040." *See* "Amendment No. 2 to Form F-1," Arm Holdings plc, September 5, 2023, p. 4, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm. *See also* ARM_00119603 (a list of agreements as of 2021).

[39] Posner Report, ¶¶ 72, 74.

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Arm's entire business at risk. As a matter of economics, these are real costs that Arm would bear if it foreclosed its customers and thus should be accounted for in an analysis of Arm's incentives to foreclose. By ignoring or downplaying these real costs, Prof. Posner systematically overstates Arm's incentive to engage in the foreclosure strategy that he hypothesizes.

**Prof. Posner has not demonstrated that Arm's conduct is anticompetitive.**

24.    Even in the context of Prof. Posner's stylized theoretical vertical merger model (i.e., a model of an upstream firm entering into downstream markets through acquisition of another firm already operating in those markets), a vertical merger does not *necessarily* lead to higher costs for downstream rivals.[40] Importantly, his model does not capture Arm's *organic entry* approach (i.e., *de novo* entry by designing its own chips). His analysis either ignores or dismisses the procompetitive effects of vertical integration (where a firm is present at multiple levels of the supply chain). Those benefits include the elimination of "double marginalization" (when an OEM passes the suppliers' markup on to its own customers) and implementation experience that helps a supplier learn how to improve its products.[41]

---

[40] As one recent paper concludes, "Vertical mergers may also allow a firm to engage in anticompetitive conduct, like raising rivals' costs ('RRC'), complete foreclosure, or misuse of information. Yet RRC and EDM [Elimination of Double Marginalization] are both inherent, unilateral competitive effects-two sides of the same coin-even if they do not necessarily share equal magnitude. As a result, the economic literature finds that a vertical merger's aggregate procompetitive benefits are likely to exceed its anticompetitive effects across a wide range of-but not all possible scenarios." Blair, Roger D., Christine S. Wilson, D. Daniel Sokol, Keith Klovers and Jeremy A. Sandford, "Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies," George Mason Law Review, 2020, Vol. 27, No. 3, p. 762. *See also* Lu, Shihua, Serge Moresi, and Steven C. Salop, "A Note on Vertical Mergers with an Upstream Monopolist: Foreclosure and Welfare Effects," 2007, Working Paper and De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1.

[41] *See*, for example, "Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, https://hbsp.harvard.edu/product/711463-PDF-ENG ("Qualcomm has been willing to move downstream into end product in order to demonstrate proof of concept. While other IP firms only do technology (which sometimes creates problem in implementation, such as Rambus), Qualcomm repeatedly created end-user products and systems to show that the technology could really work."); Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, November 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/ ("Making its own mobile processors has helped Apple innovate with such features as facial recognition and augmented reality on the iPhone. Designing its own chips for devices like the MacBooks and Mac Mini announced Tuesday should also allow Apple to be more creative with PCs. […] When chip, device, and software engineers work closely together they can squeeze more performance out of a device than is possible with an off-the-shelf chip.").

15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

25.    Prof. Posner also *assumes* that Arm's conduct is motivated by incentives to raise Qualcomm's input costs and divert sales to Arm, while ignoring more plausible alternative explanations. For example, Prof. Posner says almost nothing about the Nuvia acquisition and Arm's belief that Qualcomm breached the terms of that license. He does not consider any procompetitive benefits of Arm's efforts to exercise its contractual rights, or the possibility that Arm might seek to increase royalty rates to earn a return on its R&D investments, fund additional R&D investments, or simply respond to increased demand.[42]

26.    Prof. Posner provides no evidence that Arm's royalty adjustments are not simply a result of competitive dynamics in an industry where R&D investments are costly and necessary to a firm's ability to compete. As a general matter of economics, price increases are common in business and not inherently anticompetitive. Even in perfectly competitive markets, prices change when supply and demand conditions change. In fact, price increases can be procompetitive—particularly in high-tech industries—as they can lead to increased R&D investment and reward innovation. Such investment can enable a firm to improve existing products (such as Arm improving its ISA from v8 to v9), bring innovative products to market (such as Arm's successful launch of its compute subsystem ("CSS") offerings), or expand into new markets (such as Arm's recent organic entry into data center chip design). When a firm successfully innovates, raising prices to reflect the value of its improved technology is not anticompetitive but a standard commercial response.

27.    For evidence of incentives, Prof. Posner points to Arm's recent entry into data center chip design, which he argues is an indication that Arm is actively seeking to compete directly with its licensees, including Qualcomm.[43] It is unusual and economically counter-intuitive to claim that a firm's organic entry into a related market is evidence of anti-competitive conduct. Moreover, in this case, Arm entered at ███████████ (i.e., at a customer's behest), and only after Qualcomm abandoned its own effort to produce an Arm-based chip for that application. Despite Qualcomm and Prof. Posner's assertion of a "broad campaign" to harm Qualcomm, Prof. Posner points to no

---

[42] I also discuss in Section VIII.C.1 that a comparison of Arm's and Qualcomm's royalty revenues highlights that Arm's share of the chip "stack" is smaller than Qualcomm's.

[43] Posner Report, ¶¶ 13-14.

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

evidence that Arm has plans to enter the smartphone and personal computer ("PC") segments ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, nor am I aware of any.[44]

28.    Finally, Prof. Posner opines that Arm's actions "may" impede the development of alternative ISAs, such as RISC-V.[45] He claims that if Arm "weakens" the firms that would otherwise support such alternatives,[46] new ISAs "will have trouble attracting chipmakers and thus face greater barriers to entry."[47] This claim seems to reflect the idea that, even if foreclosure increases incentives for Arm's customers to invest in other ISAs (as the evidence I review in Section VIII.D.3 shows), they would have fewer financial resources to make those investments. Without measuring either effect, however, Prof. Posner can only speculate that the financial costs of foreclosure would outweigh the increased incentives to invest in other ISAs. In reality, many of Arm's customers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are huge enterprises with vast financial reserves and easy access to credit markets, which undermines the idea that they could not afford to invest in alternative ISAs.

**Prof. Posner's claim that Arm pivoted from a longstanding "open" and "neutral" business model "to a different model" in which it forecloses its customers is incorrect.**

29.    Prof. Posner claims Qualcomm and others invested in Arm's ecosystem because they trusted that Arm would remain "open" and "neutral."[48] He further asserts that Arm entering into chip design represents a "dramatic departure" from Arm's historically neutral licensing model.[49] Prof. Posner's claims that Arm's large and sophisticated customers rely on a vague promise of openness or neutrality are belied by the fact that their heavily negotiated ALA and TLA licenses provide long-term contractual guarantees of access to the Arm ISA and related Arm chip designs.

---

[44] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Qualcomm's Handsets revenue ($24.9 billion) is 75% of QCT revenue ($33.2 billion) and 63.8% of total revenue ($39.0 billion) in fiscal 2024. Qualcomm Incorporated, Form 10-K, for the fiscal year ended September 29, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000804328/fdf08c4f6-61ba-4a6a-a339-0e3b522ed739.pdf (hereinafter, "Qualcomm 2024 Form 10-K"), pp. 41, 44.

[45] Posner Report, ¶ 18.

[46] Posner Report, ¶ 18.

[47] Posner Report, ¶ 18.

[48] Posner Report, ¶ 66.

[49] Posner Report, ¶¶ 19, 66, 86.

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

30.    I have seen no evidence of a "dramatic" change in Arm's business model.  Arm has always been careful about the customers to whom it will grant an ALA (to ensure the growth of the Arm ecosystem and the success of both Arm and its customers); but it has recently signed an ALA with Nuvia in 2019, and since then with large, sophisticated customers such as Apple, IBM, and Google. For over a decade, Arm has also licensed core designs via TLAs to customers such as Qualcomm, and Prof. Posner makes no claims that Arm's TLA licensing practices are inherently anticompetitive. Thus, Arm was operating at multiple levels of the chip supply chain—by granting licenses to implement its ISA while also selling its own cores—well before the Nuvia acquisition and the start of its litigation with Qualcomm.

31.    Entry into chip design for data centers is simply an example of organic vertical expansion, which is an extremely common business strategy that does not necessarily represent evidence of attempted foreclosure or a "dramatic departure" from Arm's existing practices. Prof. Posner's use of a stylized theoretical model of vertical interaction, untethered from the facts in this case, could be used to show that any vertical expansion by a firm with market power at some stage in a supply chain (including through organic entry) must inherently be anticompetitive. That conclusion contradicts a large body of economic literature, as well as the established practice of accounting for the economic efficiencies of vertical integration in antitrust analysis.[50]

32.    Arm's entry into chip design for data centers is not surprising given (i) its long history of designing cores and other IP that is incorporated into chips, (ii) the Arm ISA's relatively small share of the rapidly growing data center segment, and (iii) ███████ request that Arm develop a chip.

---

[50] *See* for example, Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59 ("In theory, vertical mergers can have both procompetitive and anticompetitive effects. […] Overall, we find that the existing literature on vertical integration contains mixed results, with evidence of harm to competition as well as evidence of procompetitive effects.") The potential procompetitive benefit of vertical mergers is reflected in recent Court decisions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc.*, U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction,  Case 4:24-cv-02508, Dkt. Entry 511 (S.D. Tex. Jan. 31, 2025) ("The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns. […] [T]he inquiry must proceed with recognition that 'academics, courts, and antitrust enforcement authorities alike' have repeatedly recognized that vertical mergers may serve to benefit competition and consumers.").

18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

**Prof. Posner has not demonstrated that Arm's conduct has harmed competition and consumers.**

33.    Prof. Posner provides no real-world evidence that Qualcomm was harmed by Arm's alleged anticompetitive conduct. Even if it were true that Arm's conduct harmed Qualcomm, Prof. Posner does not demonstrate, or even attempt to demonstrate, that the conduct harmed competition and the competitive process. Economists, as well as U.S. antitrust laws, are concerned with "the protection of competition, not competitors."[51] Ultimately, Prof. Posner's claims that Arm has harmed competition or consumers rest on a flawed analysis that is unsubstantiated and inconsistent with the evidence as well as untethered from any standard economic analysis of harm to competition. Arm's decision to make substantial engineering investments that allow it to operate at stages of the value chain beyond the supply of its ISA—either via improved cores or CSSs or through selling chips—are best understood as procompetitive business strategy that will stimulate competition and innovation in a highly dynamic industry.

## III.    BACKGROUND AND INDUSTRY OVERVIEW

34.    This Section provides an overview of relevant semiconductor technologies and associated value chain, and it summarizes competitive dynamics across key segments, including smartphones, personal computers, data centers, automotives, and Internet of Things ("IoT"). I also describe Arm's and Qualcomm's business models, focusing on their licensing frameworks and strategic roles within the ecosystem. These elements establish the foundation for assessing the parties' incentives and the economic implications of the dispute.

---

[51] *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). (The Supreme Court stating: "The antitrust laws, however, were enacted for 'the protection of competition, not competitors.'"). *See also* Shapiro, Carl, "Competition and the Small Business Landscape: Fair Competition and a Level Playing Field," Opening Statement of Professor Carl Shapiro House Committee on Small Business March 1, 2022, https://www.congress.gov/117/meeting/house/114436/witnesses/HHRG-117-SM00-Wstate-ShapiroC-20220301.pdf, p. 2 ("Competition is messy. Competition can be rough-and-tumble. Competition can feel deeply unfair when one loses. […]  Promoting competition does not mean shielding any businesses from the buffeting winds of legitimate competition, be they large firms with outsize political influence or small firms that are struggling to compete against larger rivals with lower costs. As a champion of competition, I am instinctively skeptical of pleas by politically powerful businesses to be shielded from competition.").

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

## A. Overview of Semiconductor Technology and Value Chain

35.     Semiconductor "chips" are highly engineered components that power a wide range of digital devices, including smartphones, personal computers, data centers, automotives and IoT.[52] The global semiconductor industry generated approximately $655 billion in revenue in 2024—a 21% increase from the prior year—reflecting its central role in modern technology.[53] The largest suppliers of chips include Qualcomm, Samsung, Intel, Broadcom, NVIDIA, Micron, AMD, and MediaTek.[54]

36.     Chips are typically customized to suit the needs of various applications. For instance, efficient power consumption may be an important product characteristic in mobile, whereas performance and flexibility are more important in data centers, where the ability to perform large number of calculations in parallel is essential for training artificial intelligence ("AI") models.[55] These differing requirements influence chip design choices and the competitive landscape across application segments.

37.     Each chip contains multiple functioning units, including CPUs, graphics processing units ("GPUs"), and peripherals.[56] This case is primarily concerned with CPUs, which are the "computer's brain [that] handles the assignment and processing of tasks and manages operational

---

[52] In Qualcomm's documents, "data centers," "servers," and "infrastructure" appear to be used interchangeably.

[53] "Gartner Says Worldwide Semiconductor Revenue Grew 21% in 2024," Gartner, April 10, 2025, https://www.gartner.com/en/newsroom/press-releases/2025-04-10-gartner-says-worldwide-semiconductor-revenue-grew-21-percent-in-2024.

[54] *Ibid*.

[55] Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025 https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation. *See also*, "AI Accelerator Chips Overview and Comparison," HardwareBee, https://hardwarebee.com/ai-accelerator-chips-overview-and-comparison/, accessed August 22, 2025.

[56] Briana Watson, "SOC vs CPU: Breaking Down the Differences and their Optimal Usage," November 15, 2023, https://www.totalphase.com/blog/2023/11/soc-vs-cpu-breaking-down-the-differences-and-their-optimal-usage/. *See also* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 3, 2025 ("A chipset is a set of integrated circuits that work together to manage data flow between the processor, memory, and other components in the computer. It serves as the motherboard's 'traffic cop,' controlling how each component interacts and sending signals back and forth to manage operations. Chipsets handle data differently depending on its type. Whether it's audio or video, Internet protocol […] packets or system-level tasks.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

functions that all types of computers use."[57] Every CPU is built to follow a specific ISA, "which defines the software instructions that can be executed by the CPU. […] The ISA sets the foundation for a large library of compatible software which runs on those CPUs."[58]

38.     There are a few commercially deployed ISAs—the Arm ISA, the Intel x86 ISA, and the RISC-V ISA. Because software written for CPUs based on one of these ISAs is not compatible with CPUs based on a different ISA, each ISA has its own "ecosystem," i.e., the network of compatible software, hardware, developers, and users.

39.     Chips are complex products that incorporate significant IP, reflecting years of R&D investments conducted by many innovative companies, including Arm and Qualcomm, as well as institutions such as universities and government research labs.[59] Many companies specialize in specific stages of the production process—such as design, manufacturing, or systems integration—depending on their capabilities and strategic focus.[60]

---

[57] Phill Powell, "Types of central processing units (CPUs)," https://www.ibm.com/think/topics/central-processing-unit-types. *See also* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/what-is-a-chipset, accessed September 4, 2025 ("What is the difference between a Chipset and a processor? A chipset serves as a bridge between the processor, memory, and peripheral devices, while a processor is responsible for executing instructions and performing calculations. Think of the chipset as the traffic controller that manages the flow of data, while the processor is the worker that actually performs the tasks. The chipset plays a crucial role in the communication between the various components of a computer and is responsible for ensuring that data is transferred accurately and efficiently.").

[58] Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2025, https://investors.arm.com/static-files/9be77c9d-75ee-4639-bfe4-17efd23c56b5 (hereinafter, "Arm 2025 Form 20-F"), p. 56.

[59] Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, p. 9, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf ("Chip design is a complex process requiring highly trained engineers and scientists, advanced technology, and intellectual property to create the designs for the performance and functionality of the chip"); Jeffrey Mervis, "To beat China, new U.S. law offers billions for microchip research and training," Science, September 6, 2022, https://www.science.org/content/article/beat-china-new-u-s-law-offers-billions-microchip-research-and-training.

[60] Semiconductor Industry Association, "2022 State of the U.S. Semiconductor Industry," November 2022, p. 9, https://www.semiconductors.org/wp-content/uploads/2022/11/SIA_State-of-Industry-Report_Nov-2022.pdf ("[Fabless companies] companies focus exclusively on chip design, and partner with third-party merchant foundries to fabricate (that is, manufacture) their chips. [Integrated device manufacturers] both design and manufacture chips. Within IDMs, design and manufacturing teams work together to bring to market new chips usually at in-house fabrication facilities, or "fabs." [Original equipment manufacturers] like auto makers, use semiconductors as inputs for other products. Some OEMs have begun to design their own chips, primarily for their own products. [EDA/IP providers] are trusted intermediaries between design companies and foundries providing design tools, reference flows and some services. Third party IP providers design and license IP building blocks (processors, libraries, memories, interfaces, sensors, and security).").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

40.   The semiconductor value chain consists of four key steps:

- *ISA Development:* Arm develops and licenses its ISA to select partners through an ALA. The RISC-V ISA is an open-source alternative to the Arm ISA.[61] Intel and AMD sell chips that use Intel's proprietary x86 ISA.[62]

- *Core Design:* Arm and other firms design CPU cores that are compliant with a particular ISA.[63] A core is a re-usable component (or "building block") that can be incorporated into more complex and specialized chip designs.[64] Arm uses TLAs to provide customers with access to OTS cores, such as ██████████████████[65] Arm's ALA partners can choose to purchase an Arm OTS core or develop their own custom cores.[66] Firms can also choose to develop custom cores using the RISC-V ISA.[67]

---

[61] "About RISC-V," RISC-V International, https://riscv.org/about/, accessed August 15, 2025 ("At the base level, the RISC-V ISA and extensions ratified by RISC-V International are royalty free and open base building blocks for anyone to build their own solutions and services on.").

[62] On the difference between the Arm and x86 ISAs, see Robert Triggs, "Arm vs x86: Instruction sets, architecture, and all key differences explained," Android Authority, December 20, 2023, https://www.androidauthority.com/arm-vs-x86-key-differences-explained-568718/. Intel licenses x86 to AMD as the result of a settlement agreement. See "Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025.

[63] A CPU core is the "processing unit within the CPU that can execute instructions." A CPU can contain multiple cores and "the more cores a CPU has, the more tasks it can handle simultaneously. *See* "Glossary," Lenovo, https://www.lenovo.com/us/en/glossary/cpu-core/, accessed September 4, 2025.

[64] "What are IP Cores in Semiconductor Design: Types & Advantages," Techovedas, April 21, 2024, https://techovedas.com/what-are-ip-cores-in-semiconductor-design-types-advantages/ ("In semiconductor design, an IP core, short for Intellectual Property core, is a pre-designed and reusable block of logic or functionality that serves as a building block for creating complex chips.").

[65] Paul Williamson, Arm's Senior VP and general manager of IoT, explained that "our processes [Arm's CPU cores] come in three families or our process architectures: A class, R class and M class. […] M is typically for deeply embedded low power. This is at the high level. R is for real time control system, time critical systems. And A is for advanced application processes, typically." ████████████████████ For more details, see "Arm CPU Architecture: A Foundation for Computing Everywhere," Arm, https://www.arm.com/architecture/cpu, accessed September 4, 2025.



[67] "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential (reporting Ziad Asghar, Senior Vice President & General Manager - XR & Spatial Computing at Qualcomm, stating that "RISC-V clearly has amazing potential. For a product developer, it eliminates the issue of being tied to the limited portfolio of

22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

- *Subsystem Integration:*  Arm also offers CSS, which combine multiple cores—such as Arm's CPU and GPU cores—with other technologies to serve as the computing component of a larger chip.[68] These subsystems can help chip designers reduce development costs and shorten time-to-market.[69]

- *Chip Design and Manufacturing:* Chip designers can combine Arm's OTS cores, their own customized cores, or pre-integrated CSS with other technologies to design full chips, which are then produced by semiconductor fabrication plants (also known as "foundries" or "fabs").[70]  These chips are ultimately embedded in end products like smartphones, laptops, vehicles, and data center servers.

## B.  Segments and Competitive Dynamics

41.    The semiconductor industry spans a diverse set of application segments, each with distinct performance, power, and integration requirements. These differences shape the design and

---

cores available from a proprietary ISA […]  OEMs want to develop highly customized cores. And RISC-V really fits that bill […]  RISC-V makes sense for pretty much all use cases, because instead of having to choose from a given fixed number of processor cores, it allows you to optimize for specific use cases. This ability to customize the cores for what you need means the cores can be optimized for what you care most about whether that be power, performance, or area.").

[68] For more details, see "Fastest Path to Production Silicon with World-Leading Performance, on Leading-Edge Technology," Arm, https://www.arm.com/products/neoverse-compute-subsystems, accessed September 4, 2025. *See also* Deposition of Peter Greenhalgh, July 4, 2025 (hereinafter "Greenhalgh (Arm) Deposition"), 73:2-11 ("So the way we think of compute subsystems is not perfectly defined. There's not like only one way that they get created. But they're a combination of our own CPU, GPU, if it's relevant for that market, interconnect, other pieces of IP that are being brought together and proven to achieve a certain capability. So that's a compute subsystem.").

[69] Arm 2025 Form 20-F, p. 59, ("Compute Platform Products. Arm's CPU, GPU, and System IP products integrated into a foundational compute platform optimized for a specific end market. These CSSs are pre-integrated and pre-verified configurations of Arm technology that deliver significantly higher value to customers by reducing development costs and time-to-market.").

[70] Chip manufacturing is a complex and highly specialized process conducted at semiconductor fabrication plants, also called foundries or fabs.  "Top 10 Semiconductor Foundries in the World," Cytech Systems, March 13, 2024 https://www.cytechsystems.com/news/top-10-semiconductor-foundries.  The world's largest semiconductor foundry is Taiwan Semiconductor Manufacturing Company ("TSMC"), with a share well in excess of 50%.  Other large semiconductor foundries are Samsung, Semiconductor Manufacturing International Corporation ("SIMC"), and United Microelectronics Corporation ("UMC").  "4Q24 Global Top 10 Foundries Set New Revenue Record, TSMC Leads in Advanced Process Nodes," TechPowerUp, March 10, 2025, https://www.techpowerup.com/333868/4q24-global-top-10-foundries-set-new-revenue-record-tsmc-leads-in-advanced-process-nodes ("[TSMC] secured a 67% market share to maintain its leading position. Samsung Foundry ranked second, […] representing an 8.1% market share.").

23

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

deployment of CPUs,[71] chips, and solutions across applications such as smartphones, PCs, data centers, automotive systems, and connected devices (IoT).[72]

42.    In the smartphone segment, Arm's ISA is widely used because of its superior power efficiency and the depth of its ecosystem.[73] Arm-based chips are particularly suitable for mobile environments, where energy consumption and thermal performance are critical, and are supported by a mature suite of tools and developer resources.[74]

43.    In contrast, the PC and data center segments have historically been dominated by x86-based architectures, primarily from Intel and AMD. Recent advancements in Arm-based CPUs have begun to challenge this status quo. These custom Arm-based designs offer high performance and energy efficiency, making them increasingly viable in laptops and data servers.[75]

---

[71] Different CPUs are created to meet the specific computing and efficiency needs of the different applications. ██████████████████████████████████████████████████████████████

[72] Nikita Kumari, "From Idea to Silicon: How Custom Chip Design Drives Innovation," BISinfotech, July 16, 2025, https://www.bisinfotech.com/from-idea-to-silicon-how-custom-chip-design-drives-innovation.

[73] Beth Kindig, "Arm Stock: AI Chip Favorite Is Overpriced," Forbes, Mar 21, 2024, https://www.forbes.com/sites/bethkindig/2024/03/21/arm-stock-ai-chip-favorite-is-overpriced/.

[74] Arm 2025 Form 20-F, p. 59 ("The mobile applications processor is the primary chip in a smartphone and runs the operating system and applications in addition to controlling many of the device functions, including gaming, music, video, and any other applications. While high compute performance is required for today's applications, processors also must be highly energy efficient so that the smartphone's battery will last all day without needing to be recharged.").

[75] Melissa Riofrio, "Surface Pro X revealed: Thin, light, and supercharged with a custom SQ1 ARM chip," PC World, October 2, 2019, https://www.pcworld.com/article/398146/microsofts-surface-pro-x-is-thin-light-and-supercharged-with-a-custom-sq1-arm-chip.html ("'With SQ1 we pushed the boundary of an ARM-based 7-watt chipset,' Panay said. While ARM-based laptops PCWorld has tested so far have been lackluster, Panay claimed 'three times more performance per watt than then Surface Pro 6,' as well as over 2 teraflops of power from the custom GPU."). *See also* ARMQC_02749177 at '179.

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

44. The IoT and automotive segments present a broader range of requirements, including real-time processing, connectivity, and low power consumption.[76] Here, both Arm and its licensees, including Qualcomm, offer tailored solutions that address the specific needs of these segments.[77]

45. These segment-specific dynamics are central to understanding the parties' incentives. Qualcomm's diversification strategy targets growth in PCs, automotive, and IoT[78]—segments where Arm's position is evolving and competitive pressure from alternative ISAs, such as x86 and RISC-V, is more pronounced. As a result, the economic implications of Arm's licensing decisions and product strategy vary significantly across segments.

## C. Arm's Business Model and Licensing Structure

46. Arm's business model entails developing new technologies as well as the licensing and selling of those technologies. Unlike Intel, which does not license its technologies (except to AMD),[79] Arm has chosen to be more open.[80] Arm licenses its technology through two primary mechanisms, the ALA and the TLA. These agreements reflect different levels of customization and engineering responsibility for licensees and allow Arm to serve a broad range of customers—from those seeking turnkey solutions to those investing in differentiated, custom designs.

---

[76] Arm 2025 Form 20-F, p. 60-61 ("The industrial IoT and embedded semiconductor market includes chips used by a wide range of goods, including washing machines, thermostats, digital cameras, drones, sensors, surveillance cameras, manufacturing equipment, robotics, electric motor controllers and city infrastructure and building management equipment. […] The automotive market includes all chips with processors within vehicles. This includes chips used for in-vehicle-infotainment ("IVI"), advanced driver assistance systems ("ADAS"), engine management, and body and chassis control. Today, our market share in the automotive market is highest in more technologically advanced functional areas such as IVI and ADAS.").

[77] Arm estimated that in 2024 its share of the automotive segment was 41% (based on chip value). *See* "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 11.

[78] *See* Section VII.C.2.

[79] Intel licenses x86 to AMD as the result of a settlement agreement. See "Intel Antitrust Rulings," https://www.amd.com/en/legal/notices/antitrust-ruling.html, accessed September 4, 2025.

[80] Deposition of Richard Grisenthwaite, July 2, 2025 (hereinafter "Grisenthwaite (Arm) Deposition"), 16:17-17:6 ("[…] ARM, as I say in the slide itself, has been involved in the democratization of computing. We have made our technology available in many different ways. Unlike, for example, Intel, we haven't just said buy our chips, we've had architecture licenses, we've had implementations licenses, we've essentially allowed people to come up with their own competitive solutions competing with each other while removing unvaluable differences by having different architectures that are the same in essence but different in detail.").

25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

- *Architecture License Agreement ("ALA"):* Under an ALA, Arm licenses the right to use its ISA, allowing licensees to design their own custom CPU cores.[81] Different licensees engage in different stages of the supply chain. For instance, Apple uses the chips it makes in its own products (such as the iPhone), while Qualcomm sells chips to customers such as Samsung (who, in turn, for example, sells the Samsung Galaxy Android smartphones). These CPU cores must remain compliant with Arm's ISA, but the licensee is responsible for developing the implementation. This model allows for greater customization and flexibility but requires additional and significant engineering investment by the licensee.[82] Arm has historically been selective about granting ALA licenses because not all firms are capable of developing an Arm-compliant custom core,[83] and failed development efforts can be costly to both Arm and its customer.[84] Arm granted an ALA license to Nuvia in 2019, and currently has ALA licenses with Qualcomm, Apple, IBM, Google, Microsoft, and a few other customers.[85]

---

[81] Arm explains that developing own customized CPUs based on the ISA is very difficult: "Under an ALA, the licensee is allowed to develop their own highly customized CPU designs that is compliant with the Arm instruction set architecture ("ISA") for a fixed architecture license fee. As the creation of an optimized CPU is very costly and time consuming, architecture licensees will often also license Arm CPU designs to use either as a complementary processor alongside the licensee's Arm-compliant CPU design, or in other chips where the licensee's own design is unsuitable." Arm 2025 Form 20-F, p. 68. *See also,* Arm Holdings plc, Form F-1, August 21, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523216983/d393891df1.htm (hereinafter, "Arm 2023 Form F-1") p. 121 ("With the complexity of CPU design increasing exponentially, over the past decade no company has successfully designed a modern CPU from scratch.").

[82] *See* ARM_00055357 and QCARM_ 0338573 for Arm's 2013 ALA with Qualcomm.

[83] See, for example, Deposition of Rene Haas, July 7, 2025 (hereinafter "Haas (Arm) Deposition"), 185:10-22, explaining that, "[the auto industry is] a market that's been in transition where OEMs are developing chips, not chip companies. And OEMs need a lot of help in terms of developing SOCs because they're not very experienced. So I believe that going to subsystems, which is the amalgamation of all the IP blocks, would be more advantageous to us because it would get us and the customers to market faster."

[84] Deposition of Will Abbey, October 27, 2023 (hereinafter "Abbey (Arm) October 2023 Deposition"), 29:24-30:7 ("So there would be a technical conversation around capabilities because oftentimes just because somebody wants an architecture, they may not know what it takes to make the architecture successful into a product. And so we care passionately about the ecosystem, about making sure our partners are going to be successful, so we talk about capabilities, we talk about risks, we talk about the expertise of the team."). Mr. Grisenthwaite estimates that Arm currently has "between ten and twenty" ALAs but only "about six or seven" ALA partners actively build CPU designs under their ALA, *See* Grisenthwaite (Arm) Deposition, 49:11-24.

[85] *See* footnote 290.

26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

- *Technology License Agreement ("TLA"):* Under a TLA, Arm provides licensees with OTS CPU designs, also known as implementation cores.[86] Arm does the engineering work to implement the ISA, and licensees pay to use the pre-designed cores.[87] Because TLA OTS cores and CSS incorporate more Arm R&D, they generally command a higher royalty rate than the ALA. I understand that the vast majority of Arm's commercial relationships are governed by TLAs, which have historically been the standard licensing model adopted by most of Arm's partners.[88]

47.    Recently, Arm has expanded the range of licensing options it offers to customers. In 2019, Arm has also introduced Arm Flexible Access ("AFA"), a "pay-as-you-go" model that offers customers "a wide portfolio of […] Arm technology and tools" with the option of only paying "license fees for IP used in their final chip design and only at the point of manufacture."[89] In 2020, Arm began offering a subscription program called Arm Total Access ("ATA") that provides the "most comprehensive package of IP products, tools and models, support and training, software and physical design"[90] to maximize their customers' success.[91]

---

[86] CSS are generally licensed based on a license specific to a CSS or in the Annex of a broader agreement. Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025.

[87] *See* ARM_00103918 and ARMQC_02772366 for Arm's 2013 TLA with Qualcomm.

[88] ARM_01259705 at '794; Deposition of Simon Segars, November 16, 2023 (hereinafter "Simon Segars (formerly Arm) Deposition"), 29:24–30:7.

[89] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models. See also Deposition of Will Abbey, June 26, 2025 (hereinafter "Abbey (Arm) June 2025 Deposition"), 144:19-145:13 ("At the low end, through ARM Flexible Access, we're giving broader access to our partners because we want to deepen and broaden the ecosystem.").

[90] Abbey (Arm) June 2025 Deposition, 86:22-87:23; "Arm Total Access," Arm, https://www.arm.com/products/licensing/arm-total-access, accessed August 30, 2025 ("Arm Total Access provides the most comprehensive package of IP products, tools and models, support and training, software and physical design in an easy-to-access subscription. Ideal for organizations building complex systems that require multiple Arm products, including the latest Cortex and Neoverse CPUs, Mali GPUs, and CoreLink System IP. The annual subscription includes manufacture rights, as well as full support, training, and development tools.").

[91] ARM_00080472 at '480; ARMQC_02770676 at '677. See also ARM_01294236 at '237, a February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("Greater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time To Market]") and for Arm ("Deeper customer engagement, greater predictability, more design wins, more revenue").

27

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

48.    Arm's license agreements generally specify that Arm will be paid an upfront license fee and a running royalty based on the number of units sold by the licensee.[92] Royalty rates vary depending on the type of license, the product segment, and the level of customization.

49.    Unlike the x86 ISA, which is only used by Intel and AMD to develop CPUs,[93] Arm's ISA is broadly licensed across the industry. This licensing model has enabled a wide range of companies to build Arm-based chips for diverse applications.[94]  The RISC-V ISA is an open-source alternative that any implementer is free to use, modify, and deploy without the need to pay an upfront licensing fee or running royalty.[95]

---

[92] Running royalties can be either a dollar amount per-chip sold or a percentage of the chip's selling price. In fiscal year ending in March 2025, Arm had total revenue of $1,241 million, consisting of $607 million in running royalties ("up 18% YoY driven primarily by the continued adoption of the Armv9 architecture, the ramp of chips based on Arm CSS [compute subsystems], and increased usage of Arm-based chips in data centers") and $634 million in "license and other revenue" ("up 53% YoY due to normal fluctuations in the timing and size of multiple high-value license agreements and contributions from backlog"). *See* "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, p. 8, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274.

[93] Paul Alcorn, "Intel and AMD are unlikely allies in new x86 ecosystem advisory group," Tom's Hardware, October 15, 2024, https://www.tomshardware.com/pc-components/cpus/intel-and-amd-forge-x86-ecosystem-advisory-group-that-aims-to-ensure-a-unified-isa-moving-forward ("The 46-year-old x86 is the most prevalent ISA used for general computing for PCs and data centers, and Intel and AMD are the only two primary x86 architecture licensees that build new processors in high volumes, creating a duopoly." Recently, "Intel and AMD jointly announced the formation of a new x86 advisory group to ensure a unified x86 instruction set architecture (ISA) moving forward […] Cooperation between the two, with the input of a bevy of customers and end users, will help to build a more unified approach that reduces or even eliminates custom ISA implementations that can be problematic for the duopoly's hardware and software customers. That's becoming even more important as the x86 ecosystem faces intense pressure from Arm in both the consumer and data center markets, not to mention the continuing rise of RISC-V.").

[94] Arm, "The ARM processor business model," https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model, accessed August 22, 2025 ("ARM does not manufacture processor hardware. Instead, ARM creates microprocessor designs that are licensed to our customers, who integrate them into *System-on-Chip* (SoC) devices.").

[95] *See* Section VIII.D.3 for a discussion of current efforts by several large companies, including Qualcomm, to further develop and promote the adoption of RISC-V. RISC-V was developed in 2010 at the University of California, Berkeley as the fifth generation of RISC processors created at the university since 1981. See Roddy Urquhart, "Systems & Design: Opinion, Semiconductor Engineering," March 29, 2021, https://semiengineering.com/what-does-risc-v-stand-for/. In 2015, development and maintenance of the standard was transferred to RISC-V International, a non-profit organization based in Switzerland with more than 4,500 members as of 2025. *See* "About RISC-V," RISC-V International, accessed August 3, 2025, https://riscv.org/about/.

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

### D. Qualcomm's Business Model

50.     Qualcomm is a leading semiconductor company that designs and develops chip solutions and other software and services for a wide range of applications, including smartphones, personal computers, automotives, wearables, and other connected systems.[96] The company is also a key contributor to the development and deployment of wireless technology, and owns an extensive portfolio of patents.[97] In fiscal year 2024 (ending in September), Qualcomm had total annual revenues of $39 billion, more than 10 times the revenue earned by Arm during the same period.[98]

51.     Qualcomm operates primarily through two business segments:[99]

- *Qualcomm CDMA Technologies ("QCT"):* This segment designs and supplies both chips and system-level solutions.[100] Its portfolio includes products for mobile, automotive, personal computing, extended reality, industrial IoT, and networking applications.[101]

- *Qualcomm Technology Licensing ("QTL"):* This segment manages Qualcomm's IP portfolio, licensing both standard-essential patents ("SEPs") related to cellular technologies such as 3G, 4G, and 5G and non-SEPs to device manufacturers.[102] Qualcomm does not offer licenses to rival suppliers of modem chips, such as Broadcom and MediaTek.[103]

---

[96] SAC, ¶¶ 53-54.

[97] SAC, ¶¶ 53-54. *See also,* Qualcomm 2024 Form 10-K, p. 7.

[98] In the fiscal year ending September 2024, Qualcomm generated $39.0 billion in total revenue, consisting of $32.8 billion from the sale of equipment and services and $6.2 billion in licensing revenue. Qualcomm 2024 Form 10-K, p. 41. During the same period, Arm generated $3.5 billion in total revenue. Arm Holdings plc, Quarterly Results, https://investors.arm.com/financials/quarterly-annual-results.

[99] "Qualcomm Implements New Corporate Structure," Qualcomm Press Release, October 1, 2012, https://www.qualcomm.com/news/releases/2012/10/qualcomm-implements-new-corporate-structure.

[100] Qualcomm 2024 Form 10-K, p. 7.

[101] Qualcomm 2024 Form 10-K, p. 11 ("QCT utilizes a fabless production model, which means that we do not own or operate foundries for the production of silicon wafers from which our integrated circuits are made. Therefore, we primarily rely on third parties to perform the manufacturing and assembly, and most of the testing, of our integrated circuits based primarily on our proprietary designs and test programs.").

[102] Qualcomm 2024 Form 10-K, p. 7.

[103] *See,* for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy

29

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

52.     According to Qualcomm's most recent Form 10-K, "QCT's current competitors include, but are not limited to, companies such as Broadcom, HiSilicon, MediaTek, Mobileye, Nvidia, NXP Semiconductors, Qorvo, Samsung, Skyworks, Texas Instruments and UNISOC. QCT also faces competition, which may intensify in the future, from products internally developed by [Qualcomm's] customers, including some of [Qualcomm's] largest customers, such as Apple and Samsung, to early-stage companies."[104] The relative strength of rival firms varies by segment.[105]

53.     Qualcomm's chips, including its well-known Snapdragon products, typically integrate Arm-based cores—either custom cores designed under an ALA or OTS cores licensed under a TLA—with Qualcomm's own cellular and wireless networking technology.[106]  Qualcomm has

---

Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International. ("Qualcomm licensed its SEPs to original equipment manufacturers ("OEMs") of mobile devices, such Apple and Samsung. Qualcomm did not offer licenses to its SEPs to rival suppliers of modem chips, such as Intel, Broadcom, and MediaTek. Nor did Qualcomm enforce its patents against these rivals, even though their products infringed Qualcomm's SEPs. Instead, Qualcomm chose to collect its SEP royalties further downstream, from OEMs.")  Qualcomm's policy of licensing device manufacturers is aimed at collecting higher royalty revenue. See *FTC v. Qualcomm*, Case 17-CV-00220-LHK, Judge Lucy H. Koh, Findings of Fact and Conclusions of Law, pp. 129-130 (reporting that Eric Reifschneider (QTL Senior Vice President and General Manager) "told the IRS that Qualcomm decided to 'concentrate our licensing program and our licensing negotiations on the guys who make the cell phones and the base stations and the test equipment, because that's where the real money is.' […] Thus, when the IRS asked whether Qualcomm's decision to stop licensing its SEPs to rivals was a "business decision," Marv Blecker (QTL Senior Vice President) agreed: 'Oh it's more than that, it's more than that. That's an understatement.' […] Blecker told the IRS that to license rivals would have 'the potential of threatening our entire revenue stream at the handset level.' […] Fabian Gonell (now QTL Legal Counsel and Senior Vice President, Licensing Strategy) agreed that Qualcomm stopped licensing rival modem chip suppliers because Qualcomm had to choose between licensing rivals and OEMs, and licensing OEMs is far more lucrative: 'But having – having to choose between one or the other then you're right, obviously the handset is humongously more . . . lucrative for a bunch of – a bunch of reasons.'").

[104] Qualcomm 2024 Form 10-K, p. 12.

[105] For example, MediaTek is a strong rival in the mobile segment, and Intel and AMD are strong rivals in PC and data centers. *See* Kelsey Ziser, "MediaTek and Qualcomm's rivalry heats up in 5G smartphone market – Omdia," Light Reading, July 16, 2024, https://www.lightreading.com/smartphones-devices/mediatek-and-qualcomm-s-rivalry-heats-up-in-5g-smartphone-market-omdia (citing MediaTek as "Qualcomm's biggest industry challenger."). *See also* Timothy Green, "Qualcomm is Going After Intel and AMD in This Lucrative Market," January 16, 2025, https://finance.yahoo.com/news/qualcomm-going-intel-amd-lucrative-101500205.html.

[106] *See* "Is Snapdragon an ARM Processor? Understanding the Core Technology Behind Qualcomm's Mobile Chipsets," Indian Institute of Embedded Systems, https://iies.in/blog/is-snapdragon-an-arm-processor-understanding-the-core-technology-behind-qualcomms-mobile-chipsets/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

licensed Arm technology since 1997.[107] This includes an ALA signed in 2003, and the current ALA and TLA, both dated May 30, 2013.[108]

54.    Although QCT has traditionally focused on the smartphone segment, it is currently pursuing a diversification strategy to expand its sales presence in other applications and end uses.[109] Qualcomm's chips are currently used or are at the development stage in the following segments:

- *Handsets:* Qualcomm chips are widely used in premium and mid-range smartphones, offering integrated connectivity, AI acceleration, and multimedia processing.[110]

- *Automotive:* Qualcomm provides connectivity, infotainment, and advanced driver-assistance systems ("ADAS") solutions.[111]

- *IoT:* Qualcomm supports a diverse set of IoT applications, including PCs, wearables, virtual reality, and industrial IoT.[112]

- *Data center:* Qualcomm's initial effort to supply chips for data center servers was halted in 2018.[113] More recently, Qualcomm has explored Arm-based server processors, particularly through its custom CPU initiatives. In May 2025, Qualcomm announced its

---

[107] Qualcomm is currently one of Arm's largest customers and "accounted for 10% of our total revenue for the fiscal year ended March 31, 2025." *See* Arm 2025 Form 20-F, p. 28.

[108] SAC, ¶¶ 3, 53.

[109] *See* Qualcomm 2024 Form 10-K, p. 44. *See also* "Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, pp. 3-4, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf; "Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, , pp. 2-3, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf.

[110] "Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, accessed August 5, 2025.

[111] Steve McDowell, "Qualcomm's Game-Changing Move Into Automotive And Industrial IoT," Forbes, January 28, 2025, https://www.forbes.com/sites/stevemcdowell/2025/01/28/qualcomms-game-changing-move-into-automotive-and-industrial-iot/.

[112] "Our Businesses," Qualcomm, https://www.qualcomm.com/our-businesses, accessed August 5, 2025.

[113] *See* "4 Reasons Qualcomm's Data Center Business Failed," The Motley Fool, December 21, 2018, https://www.nasdaq.com/articles/4-reasons-qualcomms-data-center-business-failed-2018-12-21 ("Qualcomm downsized its data center unit in June but denied that it was exiting the market. However, several rounds of layoffs, including one in early December, reduced the size of Qualcomm's data center technologies group from roughly 1,000 employees to about 50.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

first data center chip in partnership with NVIDIA.[114] In July 2025, Qualcomm signed a term sheet with ███ that included plans for a data center chip.[115] According to Qualcomm's most recent July 2025 earnings call, however, it appears that Qualcomm will not begin selling any data center chips before fiscal year 2028.[116]

55.    In March 2021, Qualcomm acquired Nuvia, a startup founded by former Apple and Google chip designers, for $1.4 billion.[117] Founded in 2019, Nuvia was developing high-performance custom CPU cores for data center applications based on the Arm ISA.[118] The custom CPUs based on Nuvia technology are expected to power current and future generations of Snapdragon platforms, particularly in premium smartphones, PCs, ██████████████████████

---

[114] Sebastian Moss, "Qualcomm Announces Data Center CPUs, Will Support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025, https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/. In June 2025, Qualcomm announced its intention to acquire Alphawave Semi aiming "to further accelerate, and provide key assets for, Qualcomm's expansion into data centers." *See* "Qualcomm to Acquire Alphawave Semi," Qualcomm, June 9, 2025, https://www.qualcomm.com/news/releases/2025/06/qualcomm-to-acquire-alphawave-semi.

[115] ████████████████████████████████████████████

[116] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [datacenter] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. If successful, we expect revenues to begin in the fiscal '28 timeframe.").

[117] "Qualcomm Completes Acquisition of NUVIA," Qualcomm Press Release, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.

[118] "NUVIA Raises $53 Million to Reimagine Silicon Design for the Data Center," Globe News Wire, November 15, 2019, https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.html.

[119] ████████████████████████████████████████████████████

32

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

## IV.  ORIGIN OF THE DISPUTE

56.    The origin of the dispute between Arm and Qualcomm is a contractual disagreement triggered by Qualcomm's acquisition of Nuvia in March 2021.[120] Arm filed a breach of contract lawsuit against Qualcomm in August 2022.[121] The present litigation is a closely related follow-on complaint that Qualcomm and Nuvia filed in April 2024.[122] As part of its UCL claim, Qualcomm argues, among other things, that the lawsuit that Arm filed in August 2022 is part of a broad "campaign" to undermine Qualcomm that also involves various other Arm actions (e.g., "making misleading statements to Qualcomm's customers […].").[123]

57.    In September 2019, Arm entered into an ALA with Nuvia, a start-up that designed chips for data centers.[124] ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

---

[120] The contracts at issue are Arm's ALAs with Qualcomm and Nuvia.

[121] "Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement.

[122] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3.

[123] SAC, ¶ 207.

[124] ██████████████████████████████████████████████████████████████████████████

33

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



██████ Nuvia and Arm also entered into a TLA.[127]

58.    ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████  Qualcomm's internal calculations support

127 *See* QCARM_0338297 and QCARM_0275743.

34

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████ Arm and Qualcomm also have a TLA.[130]

59.   The different terms in the Nuvia and Qualcomm ALA licenses reflect Arm's approach to licensing, where each license agreement is considered "individually and in the context of the specific needs of the partner, market segment, and end-users, resulting in various license structures."[131] Arm's contracts with customers "are all unique, given the terms, […] the length of the license, the rights that are granted, so they're […] typically custom,"[132] such that "every different contract is somewhat bespoke."[133]

60.   According to Arm, ████████████████████████████████████



---

[130] The 2013 TLA superseded the original TLA from September 30, 1997. ██████████████████████████████████

[131] See "Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (No 4-11)," Arm Holdings, July 11, 2025, p. 18.

[132] Haas (Arm) Deposition, 169:20-22.

[133] Haas (Arm) Deposition, 169:7-8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

61.     Qualcomm completed the acquisition of Nuvia in March 2021. Arm contends that the license it granted Nuvia could not be "transferred" to Qualcomm without Arm's consent and that Qualcomm could not use Nuvia's designs built using the Nuvia ALA without Arm's prior consent.[136] Arm further contends that Qualcomm incorporated Nuvia's technology in its custom CPUs without obtaining Arm's consent. Qualcomm disputes that Arm's consent was required, and it also claims that the royalty it should pay on those CPUs is the much lower royalty rate in Qualcomm's ALA (a claim that Arm has disputed), rather than the significantly higher rate in Nuvia's ALA.

62.     Unable to reach an agreement with Qualcomm on the transfer of Nuvia's Arm-based technology, Arm terminated its licenses with Nuvia on February 1, 2022, and requested that Qualcomm destroy and stop using custom chips based on Nuvia's technology pursuant to the terms of the Nuvia ALA.[137] On August 31, 2022, Arm filed the *Arm v. Qualcomm* litigation.[138] After filing the lawsuit, Arm made public statements and corresponded with customers informing them of the lawsuit, explaining its reason for initiating the litigation and its belief that Qualcomm was in breach of Nuvia ALA.[139] Qualcomm initially filed a lawsuit concerning the Qualcomm ALA in

---

[135] Arm's Opening Statement in *Arm v. Qualcomm*, December 16, 2024, 109:4-12.

[137] QCARM_0338883.

[138] "Arm Files Lawsuit Against Qualcomm and Nuvia for Breach of License Agreements and Trademark Infringement," Arm, August 31, 2022, https://newsroom.arm.com/news/arm-files-lawsuit-against-qualcomm-and-nuvia-for-breach-of-license-agreements-and-trademark-infringement.

[139] *Ibid. See also,* examples of Arm's correspondence with customers about the lawsuit, ARM_01238895, ARM_01230977, ARM_00110511.

36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

April 2024.[140] Qualcomm amended its claims to add the claims addressed by Prof. Posner in December 2024 and April 2025.

## V.   PROF. POSNER'S ANALYSIS OF THE RELEVANT MARKETS AND MARKET POWER IS INCOMPLETE AND IGNORES KEY FEATURES OF THE INDUSTRY

63.     Prof. Posner does not explicitly conduct a "market definition" exercise, nor does he explicitly define the relevant product or geographic market, as for example specified in the U.S. merger guidelines. [141] His perfunctory analysis is superficial, and while he mentions some analytical tools that economists generally employ to delineate the relevant antitrust markets, he does not undertake those analyses himself. [142] The methods that economists use to define a relevant antitrust market receive little more than a sentence in his report, yielding an analysis that is insufficiently connected to the facts to produce a reliable conclusion.[143]

---

[140] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3.

[141] *See,* for example, U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf, § 3, p.3 ("In any merger enforcement action involving a vertical merger, the Agencies will normally identify one or more relevant markets in which the merger may substantially lessen competition.").

[142] Prof. Posner does not use the Hypothetical Monopolist Test or the "Small but Significant Non-transitory Increase in Price" ("SSNIP") Test, which are common methods used by economists to identify a group of products that constitute a relevant antitrust market. *See* U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, § 4.3.A (explaining that the Hypothetical Monopolist Test "is a method by which the Agencies often define relevant antitrust markets," and describing the SSNIP Test.).

[143] For example, in paragraph 58, Prof. Posner states that "Arm's dominance is widely recognized by the industry," which may be a hint to the "industry or public recognition of the submarket as a separate economic entity" discussed in the U.S. merger guidelines (U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, p. 41). However, Prof. Posner does not consider that, as recently discussed by Prof. Hovenkamp, "industry recognition, might be right depending on what the industry is recognizing. If they are looking at their closest price competitors, then this factor might provide a crude metric but certainly not as precise as the HMT. Other factors, such as a product's 'peculiar characteristics and uses' are so generic that they do not provide much guidance." Herbert Hovenkamp, "Antitrust Market Definition: the Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, https://www.networklawreview.org/hovenkamp-market-definition/. Prof. Posner's mention of an article on the CNBC website stating that "Arm has become the dominant company making this chip architecture, and it powers nearly every smartphone today" (Posner Report, footnote 95) falls far short of the fact-intensive investigation

37

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

64.    Prof. Posner seems to posit a market for the supply of Arm's ISA, reaching the conclusion that Arm "has a monopoly or a dominant position" because Arm is the only supplier of its own ISA.[144] For example, he states:

- "Arm has a monopoly or a dominant position as the supplier of the Arm ISA to companies that design and manufacture CPUs for Systems-on-a-Chip (SoCs) that are compatible with the Arm ISA."[145]

- "Chip designers who make Arm-compliant chips for mobile phones and certain other products do not treat non-Arm ISAs as substitutes for the Arm ISA."[146]

- "Arm's ISA has no rivals at all in the Arm ecosystem for the simple reason that Arm demands that a license is necessary to design and sell Arm-compliant SoCs or cores."[147]

65.    Prof. Posner is non-committal and vague about whether he concludes that there is a single market for the supply of the Arm ISA as opposed to separate markets for different applications. Concerning the chip applications, he appears to define multiple markets because different applications have different requirements.

66.    In Prof. Posner's theory, Arm can exercise its "monopoly power" to foreclose Qualcomm (and any other customers), potentially leading to higher prices or lower quality for Arm-based chips.[148]  This Section of my report explains how Prof. Posner's market definition provides a biased view that ignores important competitive constraints that Arm faces.

---

underlying reliable market definition exercises. *See*, for example, U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, 2006, https://www.justice.gov/d9/383663.pdf, at p. 3 ("Investigations Are Intensively Fact-Driven, Iterative Processes."). Further, in the very same paragraph 58, as well as again in his paragraphs 11 and 64, Prof. Posner in fact acknowledges that Intel x86—not the Arm ISA—is dominant in key chip applications including data center and personal computers, directly undermining his sweeping claim that "Arm's dominance is widely recognized by the industry."

[144] Posner Report, ¶ 11.

[145] Posner Report, ¶ 11.

[146] Posner Report, ¶ 33. Prof. Posner does not identify these "certain other products." *See* also *id.*, ¶ 30 ("In the course of its analysis [of the proposed Nvidia acquisition of Arm], the FTC noted that there are no close substitutes for ARM's ISA.") and ¶ 55 ("Firms that produce Arm-compliant SoCs and cores under one of the Arm licenses cannot substitute to non-Arm ISA licenses if Arm raises the price of its licenses substantially above marginal cost.").

[147] Posner Report, ¶ 58.

[148] Posner Report, ¶ 70.

38

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

## A. Prof. Posner Improperly Disregards the Competitive Constraint from the x86 and RISC-V Ecosystems

67.     Prof. Posner's analysis completely disregards competition from the x86 and RISC-V ecosystems. He appears to exclude Intel's x86 because it is not licensed to third parties.[149] Despite acknowledging that "RISC-V is a threat to Arm's dominance,"[150] he excludes RISC-V due to its current limitations.[151]

68.     Prof. Posner's analysis is incomplete and misleading. Irrespective of whether Arm is a "monopolist" in a purported upstream market for the supply of Arm's ISA (as Prof. Posner asserts, without any analysis), the Arm ecosystem does in fact face competition from the x86 and RISC-V ecosystems. Any material deterioration in the value provided by the Arm ecosystem will disincentivize the development of Arm-based technologies for current and future applications, incentivize the development of alternative ecosystems, and push companies towards alternative ecosystems so that Arm-based chips can be displaced by non-Arm-based chips.[152] Prof. Posner recognizes this in his report but ignores its implications for his analysis.[153] While Prof. Posner

---

[149] Posner Report, ¶ 55 ("Firms that produce Arm-compliant SoCs and cores under one of the Arm licenses cannot substitute to non-Arm ISA licenses if Arm raises the price of its licenses substantially above marginal cost.").

[150] Posner Report, ¶ 78. I note that Prof. Posner asserts that Arm "may raise upstream barriers of entry against upstarts like RISC-V" and as evidence he claims "Arm has attempted to spread 'fear, uncertainty, and doubt' about RISC-V. Among other things, Arm launched a website with the web address 'riscv-basics.com,' which was 'designed to plant seeds of doubt in the minds of developers who might use RISC-V as their processor architecture instead of Arm.'" What Prof. Posner failed to mention is that the source document he cites makes clear the website was only live for a single day: "The website was taken down a day later, after uproar from angry Arm engineers in Cambridge." *See* QCVARM_1066820 at 7165 (document cited by Prof. Posner). *See also* Chris Williams, "Up in arms! Arm kills off its anti-RISC-V smear site after own staff revolt," The Register, July 10, 2018, https://www.theregister.com/2018/07/10/arm_riscv_website/ ("Arm has taken offline its website attacking rival processor architecture RISC-V within days of it going live – after its own staff objected to the underhand tactic. […] If anything, the site made RISC-V sound like a viable alternative to Arm's crown, giving the upstart architecture more credibility."

[151] Posner Report, ¶ 35 ("because of the enormous complexity of coordination among multiple firms necessary to move from one network to another, RISC-V is unlikely to displace Arm's ISA in most sectors, including mobile and other sectors that require high-level operating systems, for many years, if ever.").

[152] *See,* for example, Armstrong, Mark, "Competition in Two-Sided Markets," 2006, RAND Journal of Economics, Vol. 37, No. 3.

[153] Posner Report, ¶ 90 ("As the industry observes Arm's mistreatment of Qualcomm, firms will become less willing to invest in the Arm ecosystem. Their incentives to invest are reduced because the more successful they are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them. […] Rather than invest in new Arm-compliant products, firms will look for ways to escape the Arm ecosystem, for example, by

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

acknowledges that "RISC-V is a threat to Arm's dominance, as Arm is well-aware,"[154] he fails to account for it as a current and future competitive constraint.[155] ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ Evidence also shows that Qualcomm has already adopted RISC-V in some applications, such as microcontrollers, and it has announced developing a RISC-V application processor for wearables.[159]

---

[154] Posner Report, ¶ 78.

[155] The inference that Prof. Posner seems to draw from the fact that Arm sees RISC-V as a threat is that this creates an incentive for Arm to anticompetitively harm RISC-V. However, he provides no evidence. In the absence of evidence, the most likely scenario is that harm to rivals is just competition at work. In *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945), Judge Hand famously captured the idea that competition harms rivals by stating that it would be contrary to the spirit of the antitrust laws to punish a firm that led to the exit of its rivals as a result of its "superior skill, foresight and industry. […] The successful competitor, having been urged to compete, must not be turned upon when he wins."



[156] ██████████████████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████

[159] *See* Section VIII.D.3. *See also* Francisco Cheng, "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential; "Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC-VInternational (Manju Varma (Qualcomm) stating: "To date, we have shipped over 650 million RISC-V cores in the market and this number just keeps growing. […] We have shipped RISC-V cores in PC, mobile, automotive, XR, and wearable segments."); "Qualcomm to Bring RISC-V Based Wearable Platform to Wear OS by Google," Qualcomm, October 17, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-to-bring-risc-v-based-wearable-platform-to--wear-os-by-; "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 8:59, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational (Ziad Asghar (Qualcomm) stating: "[T]his was a couple of weeks ago where we talked about our engagement with Google. What we're going to be doing is to be creating a product for wearables which is a smartwatch that actually uses RISC-V as the application processor.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

69.    Furthermore, Qualcomm has been "very active in development" of RISC-V and has invested in it,[160] stating internally, ███████████████████████████████████ ██████████████████████████████████████████ [161] For example, the current Chair of the Board of Directors for RISC-V International is Lu Dai, Qualcomm's Senior Director of Engineering,[162] and Qualcomm is a founding member of Quintauris, a joint venture formed with other major semiconductor companies (Bosch, Infineon, Nordic Semiconductor, NXP, and STMicroelectronics) "to accelerate the development and commercialization of RISC-V–based products."[163] In addition, many of the largest firms in the tech sector collaborate to develop software for the RISC-V ISA through the RISC-V Software Ecosystem, or "RISE," which "is a collaborative effort led by industry leaders with a mission to accelerate the development of open source software for the RISC-V architecture."[164] Members of RISE include Nvidia, Samsung, Qualcomm, Google, MediaTek, Red Hat, Alibaba, and others.[165]

---

[160] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, p. 29 (Amon touting Qualcomm's role in the development of RISC-V: "Look, there has been quite a bit of development on RISC-V. I think also, there was a desire to actually drive RISC-V towards high performance and commercialization. As a matter of fact, I think we've been very pleased at Qualcomm being elected to chair, I think the standard body right now, we have been very active in development. There's a number of other companies and ecosystems. I think we have a joint venture called Qu[i]enta[u]ris, which is a really focus of that with some of the European semiconductor company. It will take time, but I think it's encouraging to see development on RISC-V, especially as not a lot of love, I think, to semiconductor companies from the other ecosystem [Arm]. I think that's an accelerate, accelerating. I think the R&D on RISC-v [sic] across the board.").

[161] ████████████████████████████

[162] "RISC-V International Governance," RISC-V, https://riscv.org/about/board/, accessed August 13, 2025. In addition, Larry Wikelius, Senior Director at Qualcomm, is a member of the Governing Board of RISC-V Software Ecosystem industry consortium (according to "Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025.). "The RISC-V Software Ecosystem (RISE) project is a collaborative effort led by industry leaders with a mission to accelerate the development of open source software for the RISC-V architecture" (see "Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025.).

[163] "Quintauris: Accelerating RISC-V Innovation for next-gen Hardware ," November 4, 2024, https://www.quintauris.eu/quintauris-accelerating-risc-v-innovation-for-next-gen-hardware.

[164] "Accelerating the RISC-V Software Ecosystem," RISE, The Linux Foundation Projects, https://riseproject.dev/, accessed August 26, 2025.

[165] "Governing Board," RISE, The Linux Foundation Projects, https://riseproject.dev/leadership/, accessed August 26, 2025.

41

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

70.    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ ██ ████████████████

████████████████████[167]

71.    Qualcomm's dispute with Arm seems to have increased Qualcomm's effort to support RISC-V.[168] ██████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████[169] While RISC-V does not appear to currently compete in certain applications, such as mobile, it may become a viable alternative in the future.[170] ██████████████████

████████████████████████████████████████████████

---

[166] ██████████████████████████████

██ ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[168] *See* Section VIII.D.3.

[169] ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████

[170] ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

The relevance of future competition is acknowledged in the U.S. Merger Guidelines, which state that "[f]irms not currently supplying products in the relevant market, but that have committed to entering the market in the near future, are also considered market participants." U.S. Department of Justice & The Federal Trade Commission, Merger Guidelines, December 18, 2023, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, § 4.4.A.

42

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

██████████████████████████████ This threat of future competition is particularly relevant since Prof. Posner's foreclosure story relies on a claim that Arm aims to steer Qualcomm away from designing custom cores, accepting "short term" royalty losses in favor of higher "long term" margins from licensing or selling its own cores and chips.[172] Prof. Posner does not consider that these "long term" benefits may not materialize because of competition from RISC-V or x86. [173]



[172] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the **short term**, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the **long term** than the margins on existing ALA licenses." (emphasis added)).

[173] *See*, for example, ARMQC_02726982, a January 2024 presentation from Arm tracking RISC-V progress as well as the "risks [that] RISC-V poses to Arm" and "key market problems" arising from the adoption of RISC-V. The presentation shows evidence that the RISC-V ISA competes with Arm ISA in several lines of business. For example, at '985 to '989, it highlights in automotives, RISC-V is "encroaching R & M for all automotive" and "SIPs [silicon providers] building their own ecosystem making RISC-V credible," in IoT, Arm needs to "continue investing in the Ecosystem to maintain its leadership" in response to the "growing [RISC-V] ecosystem," and in data center, "RISC-V has gained traction as preferred arch[itecture] amongst CPSs and Infra startups to build custom datacenter class AI hardware accelerators for training/inference," where RISC-V competitors have developed full systems targeted towards data centers. At '991, Arm further identifies "[l]oss of [s]martwatch [m]arket" and "[p]artnership between Google and QCOM" where Arm needs to "[u]nderstand why the customer is migrating to RISC-V." ARMQC_02748499 at '501, a September 2021 presentation titled "IPG Risk Profile," identifying the risk that "x86 architecture leverages its dominant position in servers and PCs to compete against ARM in core or growth markets."; ARM_00076604 at '605 and '637 (October 2021 presentation titled "Infrastructure LoB: Business and Strategy Review," identifying a "[t]echnology gap with Intel and AMD" in data centers, and stating that "[e]xecution of planned technology roadmap with speed of light integration of customer feedback is important - depending on our customers to bring much of the innovation AMD and Intel are trying to bring to the market.").

43

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

72.     In reality, the critical threat of future competition from RISC-V, which has the benefit of being a freely available open source ISA, acts as a constraint on Arm today.[174] To illustrate the flaw in Prof. Posner's reasoning, consider that—by his logic—Intel would be a vertically integrated monopolist supplier of the x86 ISA.[175] Yet,  this has not protected the x86 ecosystem from Arm's expansion in applications such as PCs and data centers where x86 once accounted for nearly 100 percent of sales.[176]

73.     Regardless of whether Prof. Posner is correct in calling Arm the "monopolist" supplier of its own ISA, his failure to account for competitive constraints from non-Arm ISAs is a fatal flaw. It matters little whether x86 and RISC-V ISAs are, formalistically, included in the same market as

---

[174] *See* ARMQC_02600713 at '716 (In the context of a December 2022 Arm internal discussion about RISC-V, Peter Greenhalgh, SVP of Technology at Arm, stated: "In the IoT and Embedded world, the quality and PPA [Price, Performance, Area] of our [Arm's] CPU offerings will not be sufficient to offset the massive pricing pressure we would come under the myriad of small RISC-V IP companies and internal developments."). Arm has recognized that the competitive threat from RISC-V is related to Arm's own strategic business decisions. For example, when Arm was considering a "direct-to-OEM business model," it was concerned that such an approach would lead to increased RISC-V adoption. *See* ARMQC_02739661 at '661 and '671 (A 2021 Arm "[w]orking draft strategic narrative to support the FY22-FY25 financial plan which is the cornerstone of our Initial Public Offering" highlights "Key risks to the plan[:] [...] In this section, we dive into the risk that the drive by Arm to a direct-to-OEM business model will push OEMs to look elsewhere, either to competing Arm-architecture products (e.g., Qualcomm's own designs), or products based on the x86 or RISC-V architectures. If this happens in a material way, it can be catastrophic to Arm delivering on its business goals, valuation and growth plans. The direct-to-OEM business model project needs to monitor for signs that companies are seriously considering alternate investments. The 'stickiness' of Arm's architecture and ecosystem mitigates this risk somewhat, but we estimate that the industry would only need to spend $5Bn to create a credible Android smartphone alternative to Arm from RISC-V.").

[175] Or a duopoly if accounting for AMD, who receives a license to x86 as part of a settlement agreement. *See* Greg Tang, "Intel and the x86 Architecture: A Legal Perspective," The Harvard Journal of Law & Technology, January 4, 2011, https://jolt.law.harvard.edu/digest/intel-and-the-x86-architecture-a-legal-perspective. In either case, Arm would not be part of the market that Prof. Posner's approach would imply.

[176] Based on Counterpoint Research estimates, x86's PC share in 2019 was 99% (with Intel at 84% and AMD at 15.1%), with Arm at less than 1%. *See* Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027. For data centers, *see* Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html; Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market. Prof. Posner claims that "Arm's ecosystem is protected by entry barriers." *See* Posner Report, ¶ 57. However, as I describe in detail in Section VIII.D.2 below, even in industries that are, in "theory," characterized by network effects and entry barriers, incumbent monopolists often face competition from entrants, as Arm's recent entry into data centers and PCs illustrates.

44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Arm's ISA or treated as competitive constraints outside of that market.[177] The bottom line is the same. The x86 and RISC-V ecosystems competitively constrain Arm.

74.    In data centers, Prof. Posner acknowledges competition among chip suppliers using alternative ISAs. He reports that "Intel's x86 still dominates the data center sector a with [sic] roughly 84% share"[178] and acknowledges that "in some sectors, like data centers and compute [PCs], OEMs can still choose between using Intel chips under the x86 ISA and Arm-compliant chips." [179] However, as I discuss in Section VII.C, he fails to consider the implication of competition between chips that use x86 and RISC-V architecture on Arm's incentives to foreclose its customers of its ISA. Prof. Posner's failure to account for competitive pressure from the x86 and RISC-V ecosystems undermines the credibility of his analysis.

**B.  Arm's ISA Share Varies Significantly Across Chip Application Segments**

75.    Prof. Posner is non-committal and vague about whether he concludes that there is a single market for the supply of the Arm ISA as opposed to separate markets for different applications. Concerning the chip applications, he appears to define multiple markets because different applications have different requirements.[180]

76.    Prof. Posner does not account for the fact that Arm's share varies significantly across application segments. Arm is very successful in smartphones, but it has a much lower share in other segments such as PCs, data centers, and IoT. The chart below shows that Arm estimates the current share of Arm-based technology for the "mobile applications" segment (i.e., smartphones)

---

[177] For example, *see* Shapiro, Carl, "Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case," Review of Industrial Organization, 2021, Vol. 59, pp. 303–341 (at 306, "Readers who are accustomed to studying horizontal mergers may wonder where market definition and market shares fit into this framework. The short answer is that market shares are less informative for studying vertical mergers than they are for studying horizontal mergers, so using market shares as a screen does not work well." (emphasis in original)).

[178] Posner Report, ¶ 64.

[179] Posner Report, ¶ 58. Posner further acknowledges competition in those sectors, recognizing that "the Arm ISA is rapidly gaining share in some of those sectors, including data centers."

[180] Posner Report, ¶ 12 ("Within the Arm ISA ecosystem, there are multiple SoC sectors because the OEMs demand different kinds of SoCs for their different computing products."), ¶¶ 60-61 ("As the requirements of each sector are unique, the SoCs are sector-specific. [...] In each sector, Qualcomm faces varying degrees of competition from other chip makers.").

45

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

to be nearly 100%.[181] Excluding "Other Mobile" applications,[182] Arm's average share across other segments is 37%,[183] ranging from 15% in "Other Infrastructure" to 50% in "IoT & Embedded."[184] Smartphones and "Other Mobile" segments, where Arm has a share in excess of 50%, represent only 24% of all of Arm's segments ("Total Opportunity").



---

[181] "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, p. 11, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553. For a definition of the various segments, see Arm 2025 Form 20-F, pp. 59-61.

[182] Arm explained that "mobile phones contain many chips beyond the main applications processor, including the modem, Wi-Fi, Bluetooth and NFC connectivity chips, GPS chips, touchscreen controllers, power management chips, camera chips, audio chips and more, which we refer to collectively as the 'other mobile chips market.'" Arm 2025 Form 20-F, p. 60.

[183] This average share is weighed by dollars.

[184] Including "Other Mobile," Arm's average share across all segments other than smartphones is 40%. Concerning definitions: "Other Infrastructure refers to the technological components and systems that support various aspects of computing, networking, and data processing and include chips deployed into HPC systems, enterprise servers, and edge networking equipment," and "[t]he industrial IoT and embedded semiconductor market includes chips used by a wide range of goods, including washing machines, thermostats, digital cameras, drones, sensors, surveillance cameras, manufacturing equipment, robotics, electric motor controllers and city infrastructure and building management equipment." Arm 2025 Form 20-F, p. 60.

46

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

77.     Prof. Posner notes that the "Arm ISA is rapidly gaining share in certain sectors, including data centers."[185] Such growth reflects competitive success. Arm is not being handed market share by competitors such as Intel's x86; instead Arm is gaining share through sustained R&D investment and innovation by Arm and its partners.[186] As I discuss in Section VIII.D.1, Arm invests a larger share of its revenue in R&D than either Qualcomm or Intel.  Furthermore, Prof. Posner does not explain why Arm's growth in these applications would not put more pressure on rivals to innovate in seeking to preserve their sales, and why Arm's growth would thus not be procompetitive.

78.     In summary, Prof. Posner's analysis rests on an incomplete and speculative framework that ignores competitive constraints due to OEM customers being able to choose among chips that rely on different ISA ecosystems. He does not adequately address the significant variation in Arm's market share across application segments, nor does he explain how Arm's competitive gains— particularly in areas like data centers—reflect innovation and investment rather than market power. By overlooking these dynamics, Prof. Posner fails to account for the procompetitive implications of Arm's growth and the ongoing pressure it places on rivals to innovate, which undermines any suggestion of dominance or lack of competition in the broader ISA landscape.


## VI. Prof. Posner and Dr. Kennedy Provide No Evidence that Qualcomm Has Suffered Harm from Arm's Alleged Anticompetitive Conduct

79.     Prof. Posner claims that Qualcomm was harmed in various ways by Arm's conduct.[187] The SAC states that, as a result of Arm's "unlawful and unfair business acts and practices," Qualcomm

---

[185] Posner Report, ¶ 58.

[186] ARM_00118635 at '641 (April 2020 internal Arm presentation discussing that it has "proactively increased its R&D investments to capture market share in new markets such as Servers, Cloud & Edge, Networking, AI/ML; Automotive, IoT, etc.") and ARM_01282304 at '314 (a 2018 Arm presentation reporting R&D as a percentage of revenue going back to 2005 and showing an increase in 2016-2017 compared to prior years.).

[187]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

"has suffered or faces the threat of loss of profits, customers, and potential customers" and "has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct."[188]

80.    Neither Prof. Posner nor Dr. Kennedy provide any supporting evidence of lost business opportunities. Prof. Posner claims that, due to Arm's conduct, "Qualcomm *may* […] find it difficult to believe, or to convince its customers, that it can continue to rely on Arm to comply with the licenses in good faith."[189] His statement is a theoretical possibility for which he provides no evidence. Dr. Kennedy purports to estimate Qualcomm's lost profit from a change in the Qualcomm ███████████████████████████████████████████████████[190] However, Dr. Kennedy merely compares the term sheets before and after the Breach Letter and, as he himself acknowledges, his analysis does not causally link the changes in the terms to Arm's allegedly anticompetitive conduct.[191]

81.    In this Section, I show that there is no real-world compelling evidence of harm to Qualcomm. Qualcomm has continued to grow and experience strong financial performance since its acquisition of Nuvia in March 2021 and public awareness of the lawsuit in August 2022, and it forecasts strong financial performance going forward. As a general matter, to the extent possible, economists determine damages based on a comparison between the actual world with the alleged anticompetitive conduct and the counterfactual or "but-for" world without that conduct.[192] While my analysis tracks the evolution of Qualcomm's profitability over time and does not construct a but-for scenario, it does provide real world evidence that, contrary to Prof. Posner's claim that Arm's conduct would cause Qualcomm to be "badly wounded,"[193] Qualcomm's profitability

---

[188] SAC, ¶¶ 210-211.

[189] Posner Report, ¶ 65 (emphasis added).

[190] Kennedy Report, ¶¶ 130-137.

[191] Kennedy Report, footnote 317 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[192] Damages reflect the reduction in profits caused by the alleged anticompetitive conduct.

[193] Posner Report, ¶ 78.

48

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

improved. In these situations, Plaintiff experts often raise the possibility that the Plaintiff's profitability would have improved even more in the absence of the allegedly anticompetitive conduct (and that thus the Plaintiff was harmed even while its performance improved over time). In this case, however, neither Prof. Posner nor Dr. Kennedy construct a but-for world or provide any evidence based on market prices or terms and conditions for an actual license (as opposed to a term sheet that merely reflects Qualcomm's aspirations at a certain point in the negotiating process).[194]

## A.  Qualcomm's Strong Financial Performance Since the Acquisition of Nuvia

82.    Prof. Posner opines that Arm has engaged in a "broad [] scheme" to "undermine Qualcomm's ability" to compete within the Arm ISA ecosystem.[195] He claims that Arm is "obstructing" Qualcomm's ability to design custom cores under its ALA, thereby coercing Qualcomm into relying on Arm's OTS cores licensed under the TLA, which carry higher royalty rates and margins. He further alleges that, if successful, Arm will be able to "extend [] its dominance over the Arm ISA ecosystem, leaving it with not only control of the ISA itself and the design and sale of its own cores, but also with a significant role in designing and selling SoCs."[196] This claim is unsupported by evidence.

83.    Qualcomm has grown dramatically since it acquired Nuvia in March 2021. Qualcomm's total revenue increased more than 38% from Q1 2021 to Q1 2025, while its operating profit increased by 44%, as shown in **Exhibit 1** and **Exhibit 2** below. In the QCT segment, Qualcomm's

---

[194] To be clear, I do acknowledge that a number of factors impact how Qualcomm's profits evolve over time, and that thus my analysis does not isolate the effect of Arm's conduct. However, the lack of any evidence of harm to Qualcomm in the data I do analyze contrasts with the lack of any compelling, real-world evidence in Prof. Posner and Dr. Kennedy's analyses.

[195] Posner Report, ¶¶ 13-14.

[196] Posner Report, ¶¶ 13-14, 17, 71.

49

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

revenue increased over 50% and its net income before taxes increased 80% over the same time period.[197]

## Exhibit 1: Qualcomm Revenue (USD in billions)[198]

### By Business Segment, 2019-2025Q2



---

[197] Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

[198] Note: Excludes a *de minimis* amount of Qualcomm Strategic Initiatives (QSI) revenue and other revenue. Source: Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

50

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

**Exhibit 2: Qualcomm Operating Profit (USD in billions)**[199]

**2019-2025Q2**



84.    Moreover, over the past two years, Qualcomm repeatedly and publicly touted its robust current and forecasted financial performance, particularly in its QCT segment (which includes its chip business). In a series of recent earnings calls, Qualcomm's senior executives described the

---

[199] Source: Qualcomm Financial Summary downloaded from LSEG Data & Analytics.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

company's strong financials.[200,201,202,203]  To cite just one example, in its February 2025 earnings

call, Cristiano Amon, Qualcomm's President and Chief Executive Officer, said:

> *In fiscal Q1, we delivered record revenues of $11.7 billion in non-GAAP earnings per*
> *share of $3.41. Our chipset business achieved record revenues of $10.1 billion, the first*

---

[200] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, pp. 1, 23-24, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf. (Akash Palkhiwala, Qualcomm's Chief Financial Officer and Chief Operating Officer, described Qualcomm's strong growth over the past five years: "So we picked fiscal [year] [20]19 as the starting point so we can get rid of the Covid. Complexity and the ups and downs inventory, build bleed that it introduced. So over the last five years, how have we done our revenues have doubled EPs has tripled very strong performance. This performance validates our strategy and it provides a strong foundation to accelerate growth and diversification. From this point on. Now if you look at Qct [sic], our chip business, for the same metrics, we've more than doubled revenue. There and we've increased our operating margins from 15% to 29%, very closely aligned with the long term target of 30% that we've set. We also saw very strong growth in our revenue streams, 31% CAGR in automotive, double digit growth in handset and IoT, as well in handsets. If you abstract out the share gain at Apple and look at Android, we grew low double digits in Android as well. So very strong performance across the board, across our portfolio." He similarly described Qualcomm's strong growth in fiscal year 2024 (i.e., October 2023 through September 2024): "So fiscal [year] 24, we delivered very strong results, very strong execution. Revenue grew by 9%, EPs grew by 21%. And that shows the operating leverage in the business.").

[201] "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025,  pp. 5-6, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf. (Mr. Palkhiwala stated: "We are pleased to announce revenues of $11.7 billion and non-GAAP EPS of $3.41, both of which were above the high end of our guidance. […] QCT delivered record revenues of $10.1 billion, which was above the high end of our guidance on outperformance across Android handsets, IoT, and automotive. QCT handset revenues were a record $7.6 billion with 13% year-over-year growth, reflecting higher volume and content increase in Android premium tier, driven by industry-leading performance of our newly launched Snapdragon 8 Elite platform. […] Lastly, we returned $2.7 billion to stockholders, including $1.8 billion in stock repurchases and $942 million in dividends. […] In closing, we are very pleased with our strong first-quarter results with new records across the following metrics: total company revenue, non-GAAP EPS, QCT revenues, QCT Handset revenues, and QCT Automotive revenues.").

[202] "Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, pp. 2-3 and 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf. (Mr. Amon stated: "In fiscal Q2, we delivered non-GAAP revenues of $10.8 billion and non-GAAP earnings per share of $2.85. Revenues of $9.5 billion from our chipset business were driven by strength across handsets, automotive and IoT, all exceeding revenue expectations. Automotive and IoT revenues increased 59% and 27% year-over-year, respectively. Licensing business revenues were $1.3 billion. Demand for our industry-leading platforms continues to expand as high-performance connectivity and processing at the edge are increasingly important, and AI becomes more pervasive across industries. We have the industry's broadest product and IP portfolio, a strong track record of establishing a technology leadership position in every industry we enter and a clear vision for the future." Mr. Palkhiwala further described Qualcomm's strong overall financial performance: "In closing, we are very pleased with our strong results in the first half of fiscal '25, with revenue and non-GAAP EPS growth of 17% and 21%, respectively, versus a year ago period.").

[203] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 5, 9, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Palkhiwala stated: "QCT Handset revenues increased 7% year over year to $6.3 billion, reflecting

52

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

*$10 billion quarter for QCT, including record quarterly Handset and Automotive revenues. Licensing business revenues were $1.5 billion. We're off to a great start in fiscal '25. Our mobile roadmap is the strongest in our history, with exceptional traction for Snapdragon in premium tier handsets, and we are delivering growth across our diversification initiatives. This quarter, Automotive and IoT revenues grew 61% year over year and 36% year over year, respectively. We're committed to achieving $22 billion on non-handset revenues by 2029 as outlined in our 2024 Investor Day.*[204]

85.    Over the longer term, Qualcomm forecasts that its IoT (i.e., PCs, mixed and virtual reality, industrial, networking, and tablets, headphones, and smartwatches)[205] revenue will increase from $5.4 billion to $14.0 billion by fiscal year 2029, an increase of over 150%.[206] For automotive,

---

[204] strong demand for premium tier handsets, enabled by our Snapdragon 8 Elite platform. QCT IoT revenues grew 24% year over year to $1.7 billion. The outperformance, relative to expectations, was driven by increased demand for our Snapdragon AR1 chipset, the clear industry leader in emerging AI smart glasses category. We delivered another record quarter in QCT Automotive with revenues of $984 million, an increase of 21% year over year, driven by content growth in new vehicle launches with our Snapdragon Digital Chassis platform. […] [W]e are very pleased with our performance in fiscal '25 […] [Y]ou should think of this as a very strong quarter for us." Looking forward to the next quarter (Q3 2025), Mr. Palkhiwala forecasted strong Qualcomm growth in the QCT segment, stating: "We are forecasting fiscal '25 to be the second consecutive year of greater than 15% year over year growth in total QCT non-Apple revenues. We anticipate QCT IoT and Automotive revenues to grow by approximately 20% and 35%, respectively, reinforcing our confidence in achieving our fiscal '29 target of $22 billion in combined Automotive and IoT revenues. We are pleased to see our customer relationships strengthening[.]"). Similarly, *see also* "Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, p. 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf.

[204] "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, pp. 3 and 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf. (Mr. Amon also discussed the strong performance of Qualcomm's licensing business: "Finally, we remain very pleased with the execution of our QTL business in recent years, and we're well positioned to maintain fiscal '24 revenue scale going forward. Over the past year, we have extended key agreements with major OEMs, and we're poised to shortly execute new long-term license agreements with two additional large OEMs.").

[205] Qualcomm defines IoT as follows: "In IoT, our inventions have helped power growth in industries and applications such as consumer (including personal computers (PCs), tablets, voice and music and extended reality (XR)), edge networking (including mobile broadband and wireless access points) and industrial (including handhelds, retail, tracking and logistics and utilities)." *See* Qualcomm 2024 Form 10-K, p. 6.

[206] Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, p. 20, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Qualcomm is forecasting "strong revenue growth" with revenue increasing from $2.9 billion to $8.0 billion by fiscal year 2029, an increase of approximately 175%.[207]

86.    Prof. Posner and the SAC do not discuss this real-world evidence. Qualcomm's success in the marketplace undermines its claim that it was "harmed" by Arm's communications with its customers.[208] It also casts doubt on Qualcomm's claim that it suffered harm due to Arm's alleged failure to provide certain "deliverables" that Qualcomm was allegedly entitled to receive.[209] Even

---

[207] Akash Palkhiwala, "Qualcomm Investor Day 2024 Financial Update Presentation," Qualcomm, November 19, 2024, p. 12, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/Qualcomm-Investor-Day-2024_Akash_FinancialUpdate.pdf. Qualcomm does not appear to have provided long-term forecasts for handsets. Apple is transitioning to its own in-house modem, which may lead to a reduction in Qualcomm revenue, although in its latest earnings call Qualcomm still forecasted growing handset revenue. *See* "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 5, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf ("We anticipate QCT Handset revenues to grow approximately 5% sequentially, consistent with typical historical trends, despite lower Apple revenues."). *See* Rashika Singh, "Qualcomm shares slide as Apple modem shift, tariffs raise growth concerns," Yahoo Finance, July 31, 2025, https://finance.yahoo.com/news/qualcomm-shares-slide-apple-modem-085843911.html ("The San Diego-based chip supplier warned investors that Apple's move to depend on in-house modems, starting with the February launch of the iPhone 16e would hit future chip revenue.").

[208] SAC, ¶ 34.

[209] *See* SAC, ¶ 184 ("Arm withheld deliverables that it was required to provide Qualcomm under the QC ALA") and



54

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

if those claims were true, there is no evidence that Qualcomm's performance and market success were adversely affected in meaningful ways.[210]

## B. No Evidence of Lost Business

87.     The SAC claims that Arm's communications regarding Qualcomm, particularly the October 2024 Breach Letter, have "harmed Qualcomm."[211] Specifically, Qualcomm claims that "important Qualcomm customers delayed entering into new (or renewing existing) contracts with Qualcomm or have insisted that Qualcomm provide them with additional commitments regarding its ability to deliver licensed products."[212] ███████████████████████████████

████████████████████████████████████████████████████████

88.     Prof. Posner provides no evidence to support Qualcomm's claims and ignores the fact that there is no evidence of lost business. As I discuss below, Qualcomm continues to expand business with key customers despite what Qualcomm characterizes as a "misinformation campaign."[214]



[210] ████████████████████████████████████████████████

[211] SAC, ¶ 34.

[212] SAC, ¶ 34. Prof. Posner also claims that "Arm conducted a misinformation campaign designed to undermine customers' confidence in Qualcomm" and that "[t]he campaign included leaking the notice letter that Arm sent to Qualcomm and sending 'confusing' and 'misleading' messages to customers of Arm and Qualcomm that suggested that they faced legal jeopardy if they used Qualcomm products." Posner Report, ¶¶ 65-66.

[213] "Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–9)," July 11, 2025, Qualcomm, p. 14.

[214] Posner Report, ¶ 65.

55

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



1. ███████████████████████████████████

89. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ Prof. Posner also claims that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers" (though he does not specifically discuss any purported harm to Qualcomm's relationship with ███████.[217] ████████████████████

████████████████████████████

90. ████████████████████████████████████

████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

91. Even though ████████ "insisted" on additional reassurances,[219] this type of "reassurance" to customers and investors is common and therefore is not the type of evidence that economists consider to form conclusions on anticompetitive harm. For example, contracts often include indemnification provisions to protect parties against supply disruptions, disputes over the assignment of IP rights, and other sources of uncertainty that are endemic to most business

---

[215] Referred to as the "Smartphone Company" in the SAC.

[216] SAC, ¶¶ 158, 195.

[217] Posner Report, ¶ 45.

[218] ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[219] SAC, ¶ 158.

56

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

endeavors.[220] These terms are a widespread and completely unremarkable way for a supplier to share risk with its customers.

92.    More generally, negotiations between business partners involve constant back-and-forth communications, exchanges of requests and concessions, expected and unexpected challenges and roadblocks, and can be affected by internal frictions and changing external factors.[221] This process can last for many months, and with that context in mind, there is nothing unusual about the alleged "delays" that Qualcomm perceived in its negotiation with ██████.[222]

93.



---

[220]



[221] For example, ██████

██████ *See also* "Your Negotiation Challenges," Karrass, June 17, 2025, https://www.karrass.com/blog/your-negotiation-challenges ("Negotiation presents a wide range of challenges that can derail even the most prepared professionals. From misaligned goals to emotional tension, each situation brings unique hurdles. One common issue in negotiation is conflicting objectives between parties. These misalignments can create impasses that feel insurmountable without a clear strategy to resolve them. Additionally, ambiguity in roles, expectations, or desired outcomes often leads to confusion and delays in decision-making. […] Finally, power imbalances can distort the negotiation process. When one party feels they hold all the leverage, they may pressure the other side into agreements that aren't sustainable.").

[222] ██████

[223] ██████

[224] ██████

57

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



94.    Additionally, in an internal Qualcomm chat in February 2024, Christopher Patrick, Senior Vice President and General Manager of the Mobile and Wearables Business at Qualcomm, lamented that it is ▌

2.    ▌

95.    Qualcomm also points to ▌ as a customer whose relationship with Qualcomm was harmed by Arm's conduct. Qualcomm claims that, as a result of Arm's October 2024 Breach

---

[226] QCVARM_0463837 at '839.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Letter, ███████████████████████████████████████████

███████████████████████████████████████████████████

Prof. Posner makes similar claims.[229]

96.    However, evidence shows that ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

_____

████████████████████████████████████████████████

████████████████████████████████████████████████

_____

[228] SAC, ¶ 159 (discussing "a potential customer (the 'AI and Ecosystem Company') that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU. After the Breach Letter was published, the customer delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities. […] As a result of the uncertainty stemming from Arm's assertion and the leak of the Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity."). ██████████████████████████████

███████████

[229] Posner Report, ¶ 45 (claiming that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers.").

59

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



97.

60

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



61

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████████████

████████████████████████████████████

█ ████████████████████████████████████████████████████

████████████████████████████████ █ Complex negotiations often occur over many months, and a protracted negotiation is not evidence of anticompetitive effects.[241] A brief delay is unlikely to be a material disruption to the business relationship.[242] In any case, even if a delay did occur because of the Breach Letter, that would not imply that Arm's conduct was anticompetitive. Firms are routinely harmed by the actions of their competitors or suppliers when, for example, competitors reduce prices or introduce an improved product or when suppliers delay negotiations or raise prices. Harm to a competitor does not automatically translate into harm to competition.[243]

100. ████████████████████████████████████████████████

██████████████████████████████████████████████████████████



[240] In the ordinary course of business, delays in negotiations can occur for various reasons. ██████████████████████████████████████████

[241] ████████████████████████████████████████████████████████

[242] ████████████████████████████████████████████████████████

[243] *See*, for example, U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (now withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-

62

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



ii.   *Second*, Qualcomm has provided no evidence that the October 2024 Breach Letter (which

Arm withdrew on January 8, 2025)[246] is the only factor, or even a contributing factor, for

---

trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf. ("The Agencies are concerned with harm to competition, not to competitors."). This basic and important economic principle has been adopted by the Courts. For example, the DC Circuit has stated that an antitrust plaintiff "must demonstrate that the monopolist's conduct harmed competition, not just a competitor." *United States v. Microsoft Corp.*, 253 F.3d 59 (2001).



[245]

[246] *See* Simon Sharwood, "Arm gives up on killing off Qualcomm's vital chip license," The Register, February 6, 2025, https://www.theregister.com/2025/02/06/arm_qualcomm_nuvia/ ("Arm has given up on terminating one of its key licenses with Qualcomm, leaving the latter free to continue producing homegrown Arm-compatible chips for PCs, phones, and servers. […] During Qualcomm's Q1 2025 earnings conference call with Wall Street, CEO Cristiano Amon confirmed Arm 'has no current plan to terminate the Qualcomm Architecture License Agreement. We're excited to develop performance leading, world-class products that benefit consumers worldwide that include our incredible Oryon custom CPUs.'"). *See also* Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 29, 2024, p. 13, https://d18m0p25nwr6d.cloudfront.net/CIK-0000804328/1b687286-85e9-44e6-a579-d19d089eacfb.pdf ("On January 8, 2025, Arm notified us that it was withdrawing its October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm ALA, while serving its rights pending the outcome of the ongoing litigation."). Spencer Collins, a member of Arm's executive committee, indicated that Arm issued the letter because "we felt it was appropriate to send a notice to Qualcomm, making it clear that we respect – whilst we don't agree with the outcome from the court and the jury verdict, we respect it. And on that basis, we wanted to retract the breach notification and also make it clear that we have no intention to terminate the Qualcomm ALA." Deposition of Spencer Collins, June 30, 2025 (hereinafter "Collins (Arm) Deposition"), 111:22-112:7.

63

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

the change in terms. Negotiations are a sequence of give and take, and proposed terms are modified in subsequent counteroffers.[247]

iii.  *Third*, the *Arm v. Qualcomm* litigation, which was filed on August 31, 2022, was public and widely discussed in the press.[248] Qualcomm also recognized that Arm's October 2024 Breach Letter was not "new news." In *Arm v. Qualcomm*, Qualcomm's counsel acknowledged during the November 20, 2024 pre-trial conference that Arm's allegation of breach of the Qualcomm ALA has been part of the case "starting at the very beginning" and that "the letter on October 22nd [was] actually not new news in the sense of alleging these breaches."[249] ███████

iv.  *Fourth*, terms less favorable to Qualcomm could simply be due to 

---

[247] ███████████████

[248] *See*, for example, Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31/.

[249] *See Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024, pp. 13, 14 ("And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed.").



64

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



v.    *Fifth*, even if it were true that Qualcomm was harmed, harm to Qualcomm is not the same as harm to competition. I discuss this in more detail in Section IX below.

101.



[254] Kennedy Report, ¶ 125.

65

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

102. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████ His
calculations are unreliable for determining damages because they cannot isolate the effect of Arm's
alleged conduct from other potential explanatory factors. He conjectures, without support, that
changes in contractual terms between the first (unaccepted) proposed term sheet and the last term
sheet are due to the Breach Letter alone, rather than the normal evolution of offers and
counteroffers in the context of complex negotiations.[257] In reality, changes in contractual terms are
a normal part of negotiations and an initial proposed term sheet is often not the final accepted term
sheet.[258] For example, the negotiation between Arm and Nuvia had multiple turns of offers and
counteroffers, and the fact that the final term sheet was not the same as the initial is not evidence
of harm, as none existed or is alleged in the case of the Nuvia negotiation.[259]

103. In fact, even though Qualcomm ███████████████████████████ both parties
understood from the outset that detailed negotiations would follow—and indeed, they continued
well beyond the trial decision.[260] ████████████████████████████████████████

---

[256] Kennedy Report, ¶ 135.

[257] Kennedy Report, ¶ 132.

[258] *See*, for example, "The Value of Making Concessions In Negotiation," Red Bear, November 12, 2024, https://www.redbearnegotiation.com/blog/making-concessions-in-negotiation ("Effective negotiation requires a strategic balance of give and take if you want to achieve a successful outcome for two or more parties. In other words, you need to make a concession every once in a while. Effective concessions are built on strategic planning, and a well-executed concession strategy can significantly impact the outcome of a deal, bringing you closer to a mutually beneficial agreement."); Rajeev Dhir, "Negotiation: Stages and Strategies," Investopedia, June 04, 2024, https://www.investopedia.com/terms/n/negotiation.asp ("Negotiation is a strategic discussion intended to resolve an issue that both parties find acceptable. Negotiations involve give and take, where one or both parties will usually need to make some concessions.").

[260]

66

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



### 3. Qualcomm's Broader Customer Base Was Not Harmed

104.    Qualcomm claims that the *Bloomberg* article reporting Arm's October 2024 Breach Letter to Qualcomm,[264] hampered Qualcomm's ability to negotiate business opportunities ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Prof. Posner also claims that Arm sent "'confusing' and 'misleading' messages to customers of Arm and Qualcomm that suggested that they faced legal jeopardy if they used Qualcomm products."[266]

105.    Prof. Posner conflates transparency with anticompetitive intent. It is rational for users of a technology under litigation to collect more information that may help them assess and manage

---

[261] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[262] The Bloomberg article discussing the Breach Letter was published on October 22, 2024 (Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud) and ▮▮▮▮▮▮▮▮▮▮▮▮



[264] Ian King, "Arm to Scrap Qualcomm Chip Design License in Feud Escalation," Bloomberg, October 22, 2024 (updated on October 23, 2024), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.



[266] Posner Report, ¶ 65.

67

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

risks to their businesses. Qualcomm argues it was harmed because Arm disclosed the risk of a potential supply disruption to users of chips embedding Arm's technology. However, this disclosure stemmed from Arm's legitimate effort to resolve a contractual dispute through litigation. If firms faced antitrust liability simply for trying to exercise their contractual rights or protect their IP rights—on the basis that doing so might disadvantage a counterparty—it would create perverse incentives for counterparties to breach and infringe, ultimately diminishing the value of contracts, harming firms' incentives to cooperate, innovate, and create economic value.[267],[268]

106.  This implies that any harm to Qualcomm after November 6, 2024 was not *caused* by the publication of the Bloomberg article (                                                  ), but rather by the existence of the dispute. It is Qualcomm's conduct, as much as Arm's decision to initiate litigation,

---

[267] The legal system attempts to root out "sham" litigation but reaffirms the value of litigations based on genuine disagreements. *See* Lianos, Ioannis and Pierre Regibeau, "'Vexatious'/'Sham' Litigation: When Can It Arise and How Can It Be Reduced?," The Antitrust Bulletin, 2017, Vol. 62, No. 4, pp. 2-4 ("The regulatory and judicial system is often the theatre of intense business conflict, sometimes resulting from 'genuine' disputes between the parties over the interpretation of the law, or the application of the law to the specific fact pattern, each of the parties seeking to secure governmental action in its favour but sometimes also, or uniquely, motivated by the motive of directly harming competitors. […] [I]n practice, the use of the regulatory and/or litigation process stays presumptively outside the scope of competition law, through the operation of some form of antitrust immunity, in both the US and in Europe. […] However, […] the immunity does not cover the abuse of such regulatory and litigation processes, when these are used for foreign purposes than those they have been put in place to serve at the first place. […] The key piece of evidence in identifying sham litigation is the absence of genuine interest in receiving judicial relief.").

[268] For similar reasons, antitrust laws protect competition and the competitive process, but not individual rivals. Protecting rivals would create incentives to start litigations that ultimately reduce the incentive to compete and thus harm customers.

[269] Mr. Richards also opines that Qualcomm was obligated to make this disclosure regardless of the publication of the Breach Letter's contents in the Bloomberg Article. Moreover, I understand that Mr. Richards opines that Qualcomm's public disclosures do not convey the significant or material harm resulting from the Breach Letter that Qualcomm alleges it suffered in the Second Amended Complaint. *See* Expert Report of Mr. Steven Richards, CPA, September 5, 2025. *See also* Qualcomm 2024 Form 10-K, pp. 13, F-24 (Qualcomm disclosed the Breach Letter in its Annual Report issued on November 6, 2024.).

68

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

that led to the dispute, and for that reason it is improper for Prof. Posner to treat the litigation and successive communications as a form of anticompetitive conduct.

## VII.    PROF. POSNER'S CLAIM THAT ARM HAS THE ABILITY AND INCENTIVE TO FORECLOSE QUALCOMM IS BASED ON AN INCOMPLETE ANALYSIS THAT IGNORES KEY FACTS AND IS UNTETHERED FROM SOUND ECONOMIC ANALYSIS

107.    Prof. Posner claims to use a "standard framework for determining whether input foreclosure is anticompetitive," and purports to conduct an "ability/incentive framework" analysis.[270] In practice, Prof. Posner relies on a stylized model of vertical interaction that is designed to isolate specific effects from a vertical merger and does not fully capture marketplace realities.[271] For example, the model is static and does not account for dynamic effects such as Arm's loss of reputation from foreclosure and any increased incentive of Arm's customers to invest in or switch to an alternative ISA. As a matter of economics, these are real costs that Arm

---

[270] Posner Report, ¶ 53.

[271] Antitrust agencies typically use this framework as a starting point. However, agencies then conduct a fact intense investigation to verify what conclusions the evidence supports. In explaining "How to Use These Guidelines," the U.S. Department of Justice & The Federal Trade Commission 2023 Merger Guidelines explain, "When companies propose a merger that raises concerns under one or more Guidelines, the Agencies closely examine the evidence to determine if the facts are sufficient to infer that the effect of the merger may be to substantially lessen competition or to tend to create a monopoly (sometimes referred to as a "prima facie case")." U.S. Department of Justice and the Federal Trade Commission, *Merger Guidelines*, Issued: December 18, 2023, p. 2, https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf. The Guidelines further explain, "The Agencies follow the facts and the law in analyzing mergers as they do in other areas of law enforcement." (*Id.*, p. 4.) The 2020 vertical merger guidelines state that "[f]or mergers that warrant scrutiny, the Agencies will determine whether, based on an evaluation of the facts and circumstances of the relevant market, the merger may substantially lessen competition. […] To determine whether the merger may substantially lessen competition, the Agencies would analyze the specific facts and circumstances, including in particular the relative magnitude of these offsetting incentives." U.S. Department of Justice & The Federal Trade Commission, "Vertical Merger Guidelines," June 30, 2020 (withdrawn), https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf, § 4. *See also* U.S. Department of Justice & The Federal Trade Commission, Commentary on the Horizontal Merger Guidelines, March 2006, p. 3, https://www.justice.gov/d9/383663.pdf ("Investigations Are Intensively Fact-Driven, Iterative Processes. Merger analysis depends heavily on the specific facts of each case. […] In testing a particular postulated risk of competitive harm arising from a merger, the Agencies take into account pertinent characteristics of the market's competitive process using data, documents, and other information obtained from the parties, their competitors, their customers, databases of various sorts, and academic literature or private industry studies. […] The Agencies also carefully consider prospects for efficiencies that the proposed transaction may generate and evaluate the effects of any efficiencies on the outcome of the competitive process.").

69

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

would bear if it foreclosed its customers and thus should be accounted for in an analysis of Arm's incentives to foreclose.

108.     Prof. Posner and Qualcomm's SAC argue that Arm, "appears to have an incentive to foreclose Qualcomm,"[272] a customer that licenses OTS cores and an ISA from Arm, in order to reduce Qualcomm's ability to compete for the sales of chips.[273]  According to their argument, this foreclosure would divert sales from Qualcomm's custom cores (which are all based on Nuvia technology), on which Arm makes a relatively small profit, to (i) Arm OTS cores and CSS customers, on which Arm makes a larger profit, and (ii) Arm's own chips, which are not yet on the market.[274] But Prof. Posner's claims about Arm's incentives to foreclose Qualcomm are incomplete, speculative, ignore real-world realities of the ecosystem, and are not tied to sound economic analysis.

109.     According to Prof. Posner, this purported foreclosure can be either full foreclosure or partial foreclosure.[275] While Prof. Posner is vague about the exact foreclosure mechanism he envisions, I understand his theory to suggest that: (i) full foreclosure involves cutting off Qualcomm's access to both the ALA and the TLA;[276,277] or (ii) partial foreclosure involves cutting off Qualcomm's access to the ALA, but allowing Qualcomm's continued access to the TLA,

---

[272] Posner Report, ¶ 64 ("Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector.").

[273] Posner Report, ¶¶ 11, 13 ("First, Arm is obstructing or attempting to obstruct Qualcomm from designing and marketing products that use Qualcomm custom core designs, in order to inhibit Qualcomm from competing with Arm's OTS core designs. Second, Arm is actively attempting to sell its own SoC designs at the expense of its own licensees, including Qualcomm. To that end, Qualcomm contends, Arm seeks to design and manufacture its own chips and SoCs, and seeks to drive Qualcomm away from designing custom cores, or to drive Qualcomm out of selling chips and SoCs entirely."), ¶ 64 ("Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector."); SAC, ¶¶ 206-208.

[274] See, for example, Posner Report, ¶¶ 70-71.

[275] Posner Report, footnote 88.

[276] Posner Report, ¶ 71 ("If Arm is able to cut off technology supply for Qualcomm completely, then Arm loses its upstream margins on the Qualcomm license. However, Arm would gain downstream sales and the downstream margins that they produce, assuming that Arm is a viable competitor in the downstream market either through organic entry or through acquisitions.").

[277] As a matter of economics, refusing supply to a customer is equivalent to raising the price to a high enough level to make it unprofitable for the customer to buy a positive quantity.

70

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

potentially at an elevated price.[278] As such, both of Prof. Posner's alleged mechanisms of foreclosure suggest Arm completely removing Qualcomm's access to its current ALA.[279]

110.     Prof. Posner assumes that foreclosure of Qualcomm has two countervailing effects on Arm's profit: (i) it has a negative effect (a "cost" for Arm) in the "short term" due to the reduction of Qualcomm's sales and associated loss of royalty revenue for Arm; and (ii) it has a positive effect (a "benefit" for Arm) in the "long term" because the sales lost by Qualcomm divert to Arm OTS cores and chips, with an associated increase in profit for Arm. He states that Arm has an incentive to foreclose Qualcomm because the "short term" costs from foreclosure are more than outweighed by the "long term" benefits.[280]

111.     Prof. Posner's analysis is simplistic, incomplete, and inconsistent with standard economic analysis. It fails to account for a variety of "costs" Arm would suffer, both in the short and long term, if it foreclosed Qualcomm (or its other ALA customers).[281] Due to this failure, Prof. Posner's

---

[278] Posner Report, ¶ 13 ("[I]n the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 17 ("Arm is attempting to escape its ALA with Qualcomm so it can eliminate Qualcomm as a competing CPU developer. […] Because Arm earns a higher royalty under the TLA, Arm would profit in the long term by forcing Qualcomm to stop designing custom cores and putting its resources into using OTS cores, even if it means Arm loses royalties on ALA cores in the short term.").

[279] Prof. Posner may also have in mind a foreclosure mechanism whereby Arm maintains Qualcomm's ALA but either raises the royalty rate on the ALA or degrades the ALA service. *See* Posner Report, Figure 3 (It is not clear whether Prof. Posner's vague reference to "raising prices" refers to the price of Arm's ALA and/or TLA.) and ¶ 31 (Prof. Posner asserts that Arm's strategy includes "degrading [Qualcomm's] service under the ALA[.]").

[280] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the short term, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the long term than the margins on existing ALA licenses— and Arm is unhappy with the level of royalties that Qualcomm is required to pay under the ALA. Moreover, although Qualcomm has historically been one of Arm's most important customers, it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 87 ("As customers flee Qualcomm to Arm, Arm will lose money in foregone royalties in the short term. But, Arm hopes to obtain larger margins in the long term as it takes over Qualcomm's business or Qualcomm is pushed to increasingly make use of Arm's OTS cores.").

[281] Even in the context of the stylized model underlying Prof. Posner's analysis, the academic literature has highlighted "the interaction among often offsetting effects that complicate predicting that a vertical merger will result in consumer harm or even an increase in the price of the input to the competing downstream firm." (De Stefano, Martino and Michael Salinger, "The Complicated Simple Economics of Vertical Mergers," The Journal of Law and Economics, 2025, Vol. 68, No. 1). On the one hand, a vertical merger can create incentives for the merged firm to raise its wholesale price to downstream competitors that buy inputs from it to impair their competitiveness

71

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

analysis is unreliable and prone to overstating Arm's purported benefits from foreclosing Qualcomm (and other ALA customers).

## A. Relevant Economic Framework

112.    I now outline the economic framework that informs my assessment of Arm's licensing strategy and incentives. I explain how Arm's conduct—particularly its approach to ALAs and TLAs—reflects standard commercial behavior shaped by partner-specific circumstances, competitive dynamics, and the need to balance incentives to innovate with incentives to develop the ecosystem. This framework provides necessary context for evaluating Qualcomm's claims and Prof. Posner's foreclosure theory.

### 1.    Arm's Licensing Strategy Is Tailored to Partner-Specific Circumstances

113.    Arm licenses OTS cores, CSS, and its ISA to customers. In particular, Arm licenses its ISA on a standalone basis through ALAs as well as embedded into OTS cores and CSS through TLAs or other agreements.[282] More recently, Arm has decided to develop its own chip for data center

---

(raising rivals' costs). On the other hand, a vertical merger eliminates double marginalization between the upstream and downstream merging firms which can reduce downstream prices. It is therefore not surprising that a recent review of the empirical literature on the impact of vertical integration concludes: "overall, we find that the existing literature on vertical integration contains mixed results, with evidence of harm to competition as well as evidence of procompetitive effects." Beck, Marissa and Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," Review of Industrial Organization, 2021, Vol. 59. Note that the simple models studied in academic settings typically abstract from the various costs of foreclosure listed subsequently in Section VII. The potential overall procompetitive benefit of vertical mergers is reflected in some recent Court decisions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc.*, U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, January 31, 2025, Case 4:24-cv-02508, Dkt. Entry 511 ("The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns. […] [T]he inquiry must proceed with recognition that 'academics, courts, and antitrust enforcement authorities alike' have repeatedly recognized that vertical mergers may serve to benefit competition and consumers.").

[282] *See* Section III.C. Most customers have difficulties in building their own cores and therefore, Arm supports them by building cores itself rather than providing just the ALA. *See* Haas (Arm) Deposition, 185:7-22 ("[I]t's a market [the automotive market] that's been in transition where OEMs are developing chips, not chip companies. And OEMs need a lot of help in terms of developing SOCs because they're not very experienced. So I believe that going to subsystems, which is the amalgamation of all the IP blocks, would be more advantageous to us because it would get us and the customers to market faster. So "licensing IP and only sell systems" is referring to individual components versus what we call our compute subsystems, which are the combinations of all the IP blocks.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

applications and has reached a supply agreement with Meta.[283] In addition, Arm is conducting chip design R&D for auto applications, explaining that "we've engaged and considered building for a lead partner in the automotive division, silicon for the ADAS market for a potential lead customer called Waymo."[284] In contrast, Arm is not engaging in chip design R&D for other applications, such as PCs or mobile.[285]

114.    As an ISA provider, Arm competes with other ISAs, in particular x86 and RISC-V, and their respective ecosystems. Due to its advantages in terms of power efficiency, the Arm ISA currently accounts for a large share of the mobile sector.[286] This success is no happenstance but the result of Arm's R&D investment in the development of a high-quality product that customers demand. Arm continues to invest about 40% of its revenue in R&D.[287] In other applications, Arm's ISA share is smaller.[288]

115.    Arm carefully negotiates the terms of its ALAs (and TLAs) to maintain its success and grow the value of its ecosystem and its profits in the marketplace.[289] Contrary to Qualcomm's claim, there is no evidence that Arm opposes negotiating ALA licenses, given that it has several ALAs, including some signed after the Nuvia agreement.[290] Any such agreement needs to be

---

[283] Gyana Swain, "Arm secures Meta as first customer in chip push, challenging industry giants," ComputerWorld, February 14, 2025, https://www.computerworld.com/article/3825123/arm-secures-meta-as-first-customer-in-chip-push-challenging-industry-giants.html.

[284] Williamson (Arm) Deposition, 125:18-22.

[285] Abbey (Arm) June 2025 Deposition, 128:21-129:10, Williamson (Arm) Deposition, 126:2-4, 175:14-25 (There are "[n]o active chips or silicon support development in the PC market." Arm discussions with OEM mobile vendors have not extended to providing them a completed chip, "Our focus has been what we call compute subsystems.").

[286] "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, p. 11, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553.

[287] Arm 2023 Form F-1, p. 99.

[288] See "Arm Holdings plc, Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, p. 11, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274.

[289] See, for example, ARM_00095947 at '955 (Arm's CEO discussing a possible offer to Google that "has many unprecedented components to it, but at the same time I also acknowledge that Google and our relationship is an unprecedented model.").

[290] Ehab Youssef identified IBM and Apple as partners that signed an ALA since 2019. See Deposition of Ehab Youssef, June 26, 2025 (hereinafter "Youssef (Arm) Deposition"), 31:18-22; Google signed an ALA in June 2021 (ARM_01428339); Deposition of Martin Weidmann, June 20, 2025 (hereinafter "Weidmann (Arm) Deposition"), 35:9-36:14 (identifying eight ALA customers: Qualcomm, Apple, HiSilicon, IBM, Fujitsu, Ampere, T-HEAD and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

mutually beneficial to both Arm and its licensee. The presence of mutual gain is a basic economic principle that applies to any negotiation that Arm and Qualcomm might have, including with other firms or for different products.

116.    Importantly, when buyers or licensees have differing goals, needs, and strategic priorities, a standardized agreement may not be effective. To ensure that both parties in a negotiation benefit, Arm tailors the terms of agreement to each individual customer, reflecting that customer's specific circumstances and requirements.[291] If there is a potential agreement that would benefit both seller and buyer—i.e., there are mutually beneficial gains from trade—the involved parties try to discover it through the negotiating process.[292] How the gains from trade are divided between the buyer and the seller depends on various factors, such as the negotiating parties' bargaining strength (or skills), the alternatives available to them in case the parties are unable to reach an agreement, and the parties' degree of impatience.[293] Not all buyers will receive the same deal, instead the terms of their deals will vary depending on factors such as application, potential for innovation, and expected revenue.[294]

---

BRJX). █████████████████████████████████████

[291] Weidmann (Arm) Deposition, 199:5-8 ("But each contract is tailored to the desires of a particular partner. Different partners work in different markets.").

[292] Unrealized gains from trade may occur in certain situations (for example, when only simple linear prices can be used, instead of more complex pricing schemes; or when the parties have largely different expectations). *See* for example, Muthoo, Abhinay, "A Non-Technical Introduction to Bargaining Theory," World Economics, April-June 2020, Vol. 1, No. 2. ("The main issue that confronts the players in a bargaining situation is the need to reach agreement over exactly how to co-operate. Each player would like to reach some agreement rather than to disagree and not reach any agreement, but each player would also like to reach an agreement that is as favorable to her as possible. It is thus possible that the players will strike an agreement only after some costly delay, or indeed fail to reach any agreement—as is witnessed by the history of disagreements and costly delayed agreements in many real-life situations (as exemplified by the occurrences of trade wars, military wars, strikes and divorce).").



74

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

117.    Arm agrees to deals that allow it to protect and expand its IP, ecosystem, and revenue potential, and to foster its ability to continue investing in R&D to effectively compete with alternatives currently available in the marketplace or that can become available in the future.[295]

118.    Consistent with this framework, Arm has not historically provided an ALA to every incumbent or entrant chip producer that requests one.[296] When evaluating any potential agreement, Arm needs to trade-off different effects of licensing its ISA. For example, a new ALA may reduce Arm's revenue from the sale of OTS cores or its own chips (when they eventually become available). This effect needs to be weighed against the risk of not reaching an agreement, which

[295] ARMQC_02739661 (an Arm "working draft strategic narrative to support the FY22-FY25 financial plan" identifying Arm's "North Star" as "[t]he demand for high-performance, highly efficient compute is increasing exponentially. That means there is an opportunity to build new solutions, grow our business, and for the future of computing to be built on Arm - because Arm is the best way to build these new solutions. We don't and won't accomplish this alone. We work together within Arm and with our broader ecosystem to share knowledge, solve complex problems, and win together."). See also Abbey (Arm) June 2025 Deposition, 145:19-23 ("[W]e continue to look to enhance our business model […] so that the ecosystem can have broader access to ARM technology.").

[296] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025. Mr. Williamson explained that the development of a chip has a high risk of failure and is very expensive (needing large teams of engineers working on the development for multiple years), and that supporting an ALA customer's effort requires significant Arm commitment in terms of resources. In a 2021 presentation, Richard Grisenthwaite, Chief Architect at Arm, stated that Arm "strongly prefers" TLA over ALA. See ARMQC_02727610 at '619. He explained that the statement reflected the fact that firms may overstate their ability to develop a chip starting from Arm's architecture, not Arm's alleged anticompetitive intent: "ARM as a whole prefers people to take implementation licenses simply because we have seen too many people take an architecture license out of a belief they can do better, fail to do better, waste a great deal of money, and that money could have been spent better furthering the ARM ecosystem […] [and] investing in increasing the software ecosystem or producing products where the companies are specializing in their own areas of expertise and just taking an ARM […] TLA core as the basis and bringing their own skills and experience in some other area of the system." See also Grisenthwaite (Arm) Deposition, 27:4-23. See also Abbey (Arm) June 2025 Deposition, 46:14-18 (explaining "There's never a can you give it to me, I just give it to you. There's always a good-faith discussion and negotiation around rights and what partners are trying to achieve with the architecture."); 46:25-47:4 ("In the -- in the seven, eight years that I led the team, negotiations -- I'm sorry -- good-faith negotiations always precede any proposal that's given. Common sense, alignment around outcomes, terms, markets."). As an example of the complexity to develop a custom core, before acquiring Nuvia, Qualcomm worked on a custom core for servers which was abandoned because it was "a money sync [sic] basically" and "too expensive, and we looked at it as -- you know, our yearly cost was very high, and we didn't see it turning into significant business for many years. So we decided we could not afford the spend."

75

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

would entail the loss of ALA royalty revenue as well as the loss of the benefits in terms of a customer's complementary investments and the associated increase in the value of the Arm's ecosystem compared to alternative ecosystems.

119.    The economic framework outlined above explains the benefits of Arm's two-tier licensing structure (ALA and TLA), which provides room for ALA licensees with the requisite design capabilities to differentiate their products by making investments that benefit both Arm and the licensee, while preserving widespread access to Arm's ISA via TLAs where Arm itself invests in core designs that benefit licensees.

> 2.    The Nuvia Agreement Illustrates Arm's Legitimate Interest in Managing Risk and Securing Value

120.    A good example of the economic incentives to reach an agreement that is mutually beneficial is Arm's negotiation with Nuvia. As discussed above, at the time of its ALA with Arm, Nuvia was a start-up company that had significant potential but limited financial means.



I note that this characterization fits the economic framework outlined above. There were mutual gains from trade that could be realized by structuring the deal in a specific way that would benefit both Arm and



76

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Nuvia. Furthermore, Nuvia was planning to develop a chip for data center applications.[298] This made the deal particularly appealing to Arm, given that Arm's ISA had not historically gained traction in data centers.[299]

121.    Arm entered the negotiation understanding that Nuvia could be acquired,[300] and that a new owner might leverage Nuvia's technology in ways that would reduce the benefit to Arm. To protect its IP and revenue stream from potential negative effects in case Nuvia were acquired, █████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ This

---

[298] "Silicon Design Reimagined," Nuvia, Inc., January 15, 2021, https://web.archive.org/web/20210115193713/https://nuviainc.com/ ("Our Mission [-] Is to reimagine silicon in a new way, and create computing platforms that redefine performance for the modern data center.").

[299] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025. In a December 2020 report, research firm Gartner stated that Arm-based vendors in the data center space "have [not] achieved significant success, and many have had to reevaluate their developments or fallen by the wayside. […] challenges still remain as [Arm-based] vendors have to compete with the incumbent x86 architecture, which has significant investments in both CPU development and software ecosystems." *See* ARM_00045266 at '267-268. *See also* Awad (Arm) Deposition, 48:12-23 (Reporting that in late 2018 "Arm's market share was approximately zero.") and 50:9-51:12.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

provision is logical and easily explained by the economic framework outlined above: changing economic conditions require different contractual terms, and an agreement that creates mutual gain for Arm when negotiating with one potential licensee may not work when negotiating with another potential licensee.



122. ███████████████████████████████████████████████████████
███████████████████████████████ Arm's willingness to enter into an ALA with a start-up enabled more competition in the data center market. But this approach is only feasible if parties can later seek to enforce their understanding of the counterparties' contractual commitments, as I discuss below.

123. ███████████████████████████████████████████████████████
█████████████████ Nevertheless, the economic framework outlined above suggests that the terms of the 2013 ALA with Qualcomm allowed both parties to benefit, based on the actual and expected competitive landscape at the time.

────────────────────

302 ████████████████████████████████████████████

78

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

3.  Qualcomm and Prof. Posner Have Not Demonstrated that Arm's Dispute with Qualcomm Is Anticompetitive Conduct Rather than a Standard Commercial Disagreement

124.    I do not opine whether there was a breach of contract by either Arm or Qualcomm. I have been asked by Counsel for Arm to assume that the disagreement with Qualcomm reflects Arm's genuine views of Qualcomm's and Nuvia's contractual obligations rather than an intent to harm Qualcomm.[304]  I do note, as I further discuss below, that contractual disputes are common and the legal system provides the appropriate venue to resolve disputes. The reduction in uncertainty resulting from a legal resolution of disputes promotes investments and competition.[305] Legal disputes do have disruptive effects on both parties involved and their partners, but this is the cost of moving past the dispute and unlocking the gains that the dispute is holding back.[306]

---

[304] *See* ARM_00081753 (August 31, 2022 email from Rene Haas to Arm's employees. Mr. Haas states: "[Arm has] filed a lawsuit against Qualcomm and its subsidiary Nuvia for breach of contract with Arm and trademark infringement. Protecting intellectual property is something that is extremely important to Arm's fundamental business, and crucial for us to succeed. Our world-class semiconductor IP is the result of years of research by our people and should be recognized and respected — it is incumbent upon us to protect our rights and the rights of our ecosystem. When Qualcomm acquired Nuvia, neither Qualcomm nor Nuvia obtained our consent for the resulting assignment of Nuvia's Arm licenses to Qualcomm and the rights thereunder. This is a standard term in our licenses that protects Arm, our partners, and our ecosystem. We tried to work the issue out with Qualcomm, but those discussions failed. In March, we terminated the Nuvia license. As a result, Nuvia and Qualcomm were obligated to stop using and destroy the technology created under that license. Since Qualcomm continues to use the license, we have filed a lawsuit to enforce the contractual obligation and to prevent the use of Arm's trademarks with unlicensed products. It is unprecedented for us to take this type of action, and it's unfortunate that it has come to this point. But I feel very strongly that we can't look the other way, and need to protect our IP, our investment, our partners, our ecosystem, and our company. This is the right thing for us to do."

[305] Uncertainty is a factor holding back firms' investments. *See* Bloom, Nick, Stephen Bond, and John Van Reenen, "Uncertainty and Investment Dynamics," The Review of Economic Studies, 2007, Vol. 74, No. 2, pp. 391-415. *See also* Aberra, Adam and Matthieu Chemin, "Does legal representation increase investment? Evidence from a field experiment in Kenya," 2021, Journal of Development Economics, Vol. 150, providing evidence of the positive effects of access to the legal system on economic activity.

[306] *See*, for example, Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007, https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451 ("Economists have long recognized that certainty of contract is essential to a healthy economy. [...] Those contracts can only accomplish that goal, however, if parties know the contracts will be enforced. [...] The 'fundamental function of contract law' is to 'encourage the optimal timing of economic activity' by 'deter[ring] people from behaving opportunistically toward their contracting parties.' Richard A. Posner, *Economic Analysis of Law* 91 (4th ed. 1992). [...] That function cannot be accomplished without effective means for enforcement. As this Court has stated: "Market efficiency requires effective means to enforce private agreements." *Am. Airlines, Inc.* v. *Wolens*, 513 U.S. 219, 230 (1995).").

79

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

125.    Within the economic framework discussed above, the dispute between Qualcomm and Arm can be interpreted as a dispute about the terms by which Nuvia could create a new design for a CPU and the terms under which Qualcomm could incorporate into its custom cores the designs that Nuvia developed under Nuvia's 2019 ALA with Arm. Qualcomm argues that it can use designs created by Nuvia using the Nuvia ALA without having to pay the royalty rates that Nuvia negotiated with Arm, and insists that it can pay the lower royalty rate in the Qualcomm-Arm ALA instead.[307] Arm contends that Arm needs to be appropriately compensated to allow the transfer of the designs created by Nuvia using the Nuvia ALA to Qualcomm.[308] There are likely gains from trade, but the parties disagree on the terms of a mutually beneficial agreement.[309] In fact, the parties did attempt to reach an agreement, but failed to do so.[310,311] Arm's and Qualcomm's unsuccessful attempt to resolve their dispute lasted for about a year.[312] After becoming aware that Qualcomm

---

[307] SAC, ¶ 7.

[308] 

[309] Abbey (Arm) October 2023 Deposition, 275:16-278:13.

[310] *See* ARM_00081461 (August 25, 2021, email from Rene Haas references the back and forth that Arm and Qualcomm had, stating to internal Arm leadership that "there has been so much back and forth [with Qualcomm] repositioning their asks.").

[311] Priest, George L. & Benjamin Klein, "The Selection of Disputes for Litigation," Journal of Legal Studies, 1984, Vol. 13, pp. 1-55, build a model predicting that disputes that settle out of court generally reflect similar expectations between the disputing parties, whereas those that proceed to trial often involve greater uncertainty and divergent expectations about the likely outcome of litigation. Other papers have highlighted parties' excessive optimism as a possible explanation for why a negotiation may fail to reach an agreement even though a compromise could be mutually beneficial. *See*, for example, Babcock, Linda, George Loewenstein, S. Issacharoff, and Colin Camerer, "Biased Judgements of Fairness in Bargaining," American Economic Review, 1995, Vol. 85, No. 5., pp. 1337-1343.

80

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

had started to use Nuvia technology in its custom cores, Arm filed the *Arm v. Qualcomm* litigation in August 2022.[313]

126.



[314,315] Setting aside the contractual dispute, and within the framework outlined above, the question is whether there are potential gains from trade and, if so, what terms of the agreement would benefit both parties.[316] Qualcomm has historically been an ALA customer, and there is presumably some gain from trade, and thus a license fee and royalty rate at which Arm would be willing to grant Qualcomm the license it seeks. But in the context of this bilateral negotiation, there is nothing anticompetitive about Arm seeking



[313] Posner Report, ¶ 136.

[314]

[315] SAC, ¶¶ 131-133.

[316] The legal dispute is an issue on which I do not offer an opinion.

81

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

a higher price for a license to its newly created IP at a time that is years after the 2013 ALA with Qualcomm.[317]

### 4. Protecting Competition Does Not Require Arm to License Its ISA on Qualcomm's Preferred Terms

127.    Protecting competition—rather than specific competitors—does not require imposing on Arm a duty to grant Qualcomm an ALA license at terms that Qualcomm prefers. Even if Arm decided that it is not in its interest to license at terms that Qualcomm, subjectively, considers "reasonable,"[318] that would not be in itself anticompetitive. As a matter of economics, a duty to deal creates inefficiencies that Qualcomm and Prof. Posner ignore. For example, a duty to license may undermine incentives for R&D by reducing the value of an innovation to the inventor. As two leading scholars in industrial organization explained,

> *An obligation to deal does not necessarily increase economic welfare even in the short run. In the long run, obligations to deal can have profound adverse incentives for investment and for the creation of intellectual property. Although there is no obvious economic reason why intellectual property should be immune from an obligation to deal, the crucial role of incentives for the creation of intellectual property is reason enough to justify skepticism toward policies that call for compulsory licensing. Equal access (compulsory licensing in the case of intellectual property) is an efficient remedy only if*

---

[317] 

[318] SAC, ¶ 20 ("Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses to its off-the-shelf cores at commercially reasonable prices to Qualcomm."); Posner Report, ¶ 13.

82

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

*the benefits of equal access outweigh the regulatory costs and the long run disincentives for investment and innovation. This is a high threshold, particularly in the case of intellectual property.*[319]

128.    Indeed, undermining an innovator's ability to appropriate the returns to its R&D undermines the innovator's incentive to innovate in the first place.[320] Protecting IP is, therefore, crucial in incentivizing the creation and diffusion of many types of innovations.[321,322]

129.    Furthermore, there is no evidence that Arm is refusing to deal with Qualcomm. In fact, as recently as August 29, 2025, Arm responded to Qualcomm's August 8, 2025, letter with a set of "initial questions" regarding the terms outlined in Qualcomm's "proposed Annex 1 to the ALA for Arm's unreleased v10," and reaffirmed its intention to "move the negotiations forward."[323] But Qualcomm appears to seek a v10 license on the same royalty rate as v8 and v9, which were set twelve years ago in 2013.[324] It is not anticompetitive for Arm to negotiate a higher royalty rate for

---

[319] Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," Proceedings of the National Academy of Sciences U.S.A., 1996, Vol. 3, pp. 12749–12755. (The authors conclude that "the welfare consequences of a refusal to deal are ambiguous and that the requirement of mandatory access may lower economic welfare in the short run as well as in the long run." They also state: "A refusal to deal by a vertically integrated firm appears on its face to adversely affect competition by denying rivals a product or service that is a necessary input for effective competition. This is hardly a complete analysis, however, because it does not account for the incentives to create the essential input or the price at which that input can optimally be sold. Clearly, the mere fact that a firm controls an input that is valuable to its competitors cannot be sufficient to compel a duty to deal, as a firm can have many innocent reasons for refusing to supply a rival.").

[320] Spulber, Daniel F., "How Do Competitive Pressures Affect Incentives to Innovate When There is a Market for Inventions?" Journal of Political Economy, 2013, Vol. 121, No. 6, pp. 1007-1054 ("When IP is not fully appropriable, markets for inventions are limited and competitive pressures can decrease incentives to innovate.").

[321] *Ibid*. ("Appropriability of IP stimulates innovation by supporting the formation of a market for inventions. The market for inventions is a critical source of incentives for innovation in the economy.").

[322] A draft letter by Arm explains, "technological achievements have required years of research and significant costs, they must be recognized and respected." *See* ARM_01230978 at '978. Without being compensated for the fruits of R&D efforts, Arm would be disincentivized from pursuing R&D.

[323] ARMQC_02785287 at '287 – '290 (August 29, 2025, letter from Spencer Collins (Arm) to Ann Chaplin (Qualcomm)). On June 13, 2025, Arm reiterated to Qualcomm that "Arm remains prepared to negotiate in good faith over the terms of a license to the v10 architecture." *See* ARMQC_02771127. In the that same letter, Arm further told Qualcomm that its "offer to meet remains open and Arm continues to believe that such a meeting would be the most efficient path forward in response to Qualcomm's request [for a v10 license]. Please have the relevant business personnel respond to Mr. Abbey with dates that Qualcomm is available for such a meeting."

[324] ████████████████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

its innovations; no more anticompetitive than for Qualcomm to negotiate a higher price for its new chips.[325] On the contrary, imposing on a firm a duty to license a new and improved version of a technology at the same royalty rate as the previous version poses a clear risk of severely dampening incentives to innovate.[326] This risk is enhanced when the initial royalty rate, and thus profit margin for the innovator, is low, as it appears to be the case with the royalty rates in Qualcomm's 2013 ALA.[327]

130.    In other contexts, Qualcomm seems strongly opposed to imposing any duty to deal on IP owners. For example, in its Reply Brief to the U.S. Court of Appeals, Qualcomm forcefully argued that "[u]nder settled precedent, the default rule is that even a monopolist has the right to determine with whom it will do business, and on what terms."[328] Similarly, in its Amici Brief to the Supreme Court in the *eBay* case, Qualcomm stated that "[f]inal injunctions are an established part of the relief in successful patent infringement suits because the essence of the patent is the right to exclude others from practicing the patented invention […]."[329]

---

compensation for v10 on terms no other party had actually secured and would continue to pay below-market compensation for the next twenty-three years." *See* ARMQC_02785287 at '288 (August 29, 2025 letter from to Spencer Collins (Arm) Ann Chaplin (Qualcomm)).

[325] Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html ("Qualcomm's Snapdragon 8 Elite offers a notable improvement in performance and efficiency over previous Snapdragon chips, promising next-gen Android phones with even more impressive features and longer battery life. However, this comes at a cost, with reports suggesting manufacturers are paying Qualcomm as much as $190 for the chip — 20% more than the previous models.").

[326] Ann Chaplin, Qualcomm's General Counsel and Corporate Secretary, testified that Qualcomm believed that a "royalty rate that's the same as our v9 license would be a fair rate for v10." ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[327] See Section VIII.C.

[328] *Federal Trade Commission v. Qualcomm Incorporated*, "Reply brief for appellant Qualcomm Incorporated (Redacted)," December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit, p. 8.

[329] *eBay Inc. and Half.com v. MercExchange, L.L.C.*, "Brief of Amici Curiae Qualcomm Inc. & Tessera, Inc. in Support of Respondent," 547 U.S. 388 (2006) (No. 05-130), p. 4. The Brief also states (p. 2) "[t]he viability of high technology industries depends in significant part on the maintenance of strong patent laws. The *amici* believe the well-established presumption in favor of permanent injunctive relief to implement a final judgment of infringement is essential to the ability of patent holders to enforce their patents."

84

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

### B.  Prof. Posner's Opinions on Ability to Foreclose Are Flawed

131.    Prof. Posner says he investigates Arm's conduct within an "ability/incentive framework," which "is a standard method for evaluating the competitive effects of vertical mergers."[330] He opines that "Arm both has the ability and appears to have the incentive to foreclose Qualcomm and other firms from all sectors, particularly the data center-specific SoC sector."[331] I address Prof. Posner's conclusion about ability in this Section and address his conclusion about incentives in Section VII.C.

132.    Prof. Posner concludes that "Arm has the ability to foreclose Qualcomm from the Arm-compliant data center-specific SoC sector as well as other sectors" and that Arm has such ability because "Arm's control over its ecosystem allows it to discriminate against firms that participate in the ecosystem despite Arm's earlier promises to keep the system open."[332] Prof. Posner's analysis omits crucial factors and his blanket statements are oversimplifications that bely a more complex reality.

133.    *First*, unless Qualcomm breaches the terms of its ALA in a way supporting termination, Arm does not have the ability to foreclose Qualcomm's access at all until ███████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

134.    *Second*, with approximately eight years to go until the expiration of its ALA and TLA, Qualcomm has ample time to further invest in RISC-V as an alternative to Arm's ISA and cores.

---

[330] Posner Report, ¶ 29.

[331] Posner Report, ¶ 64.

[332] Posner Report, ¶ 65. Prof. Posner further claims that there exists evidence of Arm's ability to foreclose Qualcomm's access to Arm's ISA and that "Arm's ability to degrade firms' access to the Arm ISA has been demonstrated by Arm's actions against Qualcomm," such as Arm's "[f]ailure" to provide Qualcomm "with certain deliverables in violation of the ALA," Arm's "[f]ailure" to provide Qualcomm with good-faith licensing proposals under the TLA," Arm's "[r]efusal to negotiate an extension of the ALA to cover future versions of Arm's ISA," Arm's "[m]isinformation campaign […] designed to undermine customers' confidence in Qualcomm," and Arm's "[r]eduction in general support."

[333] █████████████████████████████████

[334] ███████████████████████████████████████████████████████ ████████████████████████████████████████████

85

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Qualcomm can innovate to expand RISC-V's use cases and improve its performance.[335] This fact has indeed been recognized by Qualcomm. ███████████████████



135.    *Third*, Prof. Posner ignores differences in competitive conditions across applications. Whereas currently RISC-V is not ready to replace Arm in high-performance chips for smartphones, Qualcomm already uses RISC-V in microcontrollers for low-end applications.[338] In fact, Qualcomm touts that there "are in excess of a billion devices that have [Qualcomm] RISC-V integrated microcontrollers in them."[339] ███████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████ ██  which is categorized as a "High-

---

[335] *See* Section VIII.D.3 for a discussion of RISC-V and Qualcomm's efforts to develop it.

[336] ██████████████████████████████

[337] ██████████████████████████████

[338] *See* Section VIII.D.3. *See also* "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential; "Keynote: Accelerating Innovation with RISC-V: Past, Present and Future - Manju Varma," RISC-V International, YouTube, December 29, 2022, at 1:01, https://www.youtube.com/watch?v=t6_9pbgg1LI&ab_channel=RISC-VInternational (Manju Varma (Qualcomm) stating: "To date, we have shipped over 650 million RISC-V cores in the market and this number just keeps growing. […] We have shipped RISC-V cores in PC, mobile, automotive, XR, and wearable segments.").

[339] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational, at 4:50.

[340] ███████████████████

86

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Performance CPU" on Arm's product listing.[341] Therefore, Prof. Posner's blanket statement that Arm can foreclose "Qualcomm and other firms from all sectors" is incorrect.[342]

136.    Overall, a more nuanced conclusion on whether Arm can foreclose Qualcomm's access to its ISA and cores is that Arm's ability varies by use case—for some use cases, Qualcomm already uses RISC-V—and in any event such ability to foreclose would be far in the future █████████ ██████  providing Qualcomm and others ample time to further develop a free open-source competitor to Arm.

137.    Prof. Posner also suggests that Arm could foreclose Qualcomm for some applications, but not for others, allowing Arm to continue benefiting from the partnership with Qualcomm in segments where "Qualcomm has special relationships with some of its customers, a good reputation in a sector, niche abilities, and other advantages."[343] But Prof. Posner does not address the fact that Qualcomm's ALA with Arm █████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ ████████████████████

█████████████████████████████████████████████

███████████████████

---

[341] "CPU Cortex-A78," Arm, https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78 ("Fourth-Generation, High-Performance CPU Based on DynamIQ Technology. Designed for high-end performance at best efficiency, Cortex-A78 enables superior immersive experiences, bridging the gap between mobile and laptop performance. Optimized for new form factors and foldables, Cortex-A78 is ready for the next wave of mobile innovation and continues Arm's industry-leading mobile performance and efficiency with 5G device architecture.").

[342] Posner Report, ¶ 64.

[343] Posner Report, ¶ 72 ("But even if Arm does not succeed in foreclosing Qualcomm entirely, Arm would still benefit from partially foreclosing Qualcomm in certain sectors. For example, if Qualcomm has special relationships with some of its customers, a good reputation in a sector, niche abilities, and other advantages, Arm might continue to benefit from Qualcomm as a chip supplier of Arm-compliant chips for certain sectors for the time being while displacing Qualcomm in other sectors. In that way, Arm continues to benefit from royalties in some sectors while taking over other sectors by degrading Qualcomm's ability to compete in those sectors.").

[344] ████████████████████████████████████████████████ █████████████████████████████████████████

[345] For example, Arm introduced v9 in 2021. See Aditya Bedi, "The Foundation of Total Compute: First Armv9 Cortex CPUs," Arm Community, May 25, 2021, https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/first-armv9-cpu-cores ████████████

87

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

## C. Prof. Posner Does Not Account for Costs that Arm Would Suffer from the Alleged Foreclosure of Qualcomm and Other Customers

138.    A key issue is whether Arm's allegedly anticompetitive conduct was adopted to foreclose Qualcomm to benefit Arm's TLA business and Arm's own chips. Prof. Posner claims that "Arm has an incentive to engage in input foreclosure in sectors where the potential long-term gains from taking business from licensees exceed the short-term loss of royalties on the products that the licensees no longer sell."[346] He also states that "[i]t is possible that Arm would maximize profits by completely destroying Qualcomm's business opportunities in certain sectors even though it would suffer a short-term loss of royalties. […] But even if Arm does not succeed in foreclosing Qualcomm entirely, Arm would still benefit from partially foreclosing Qualcomm in certain sectors."[347] Remarkably, no evidence is provided to support these sweeping statements, other than the observation that Arm's margin from an ALA license is lower than the margin from a TLA license and from the sales of Arm's own chips.[348]

139.    In this Section, I show that foreclosure of Qualcomm would have significant costs for Arm that Prof. Posner's analysis does not account for, thus rendering his analysis unreliable. In light of these significant costs, the various events that Qualcomm alleges as anticompetitive have a benign, procompetitive interpretation: in the presence of uncertainty about contractual terms, Arm was simply attempting to preserve the value of its contractual agreements. Although I do not offer an opinion on breach of contract, I do note that disagreements among firms about the right interpretation of the terms of an agreement between them are very common, especially in dynamic

---

[346] Posner Report, ¶ 67.

[347] Posner Report, ¶ 72.

[348] Posner Report, ¶ 74. The highly theoretical and wholly unsubstantiated nature of Prof. Posner's report is illustrated by his claim that "input foreclosure would likely give Arm substantial downstream power, enabling it to raise prices both unilaterally and potentially through coordination or collusion with any remaining downstream competitors." See id., ¶ 75. Not a single piece of evidence, not even the "conversations" with Qualcomm employees that are the only support for some of his other claims, is provided for the claim that Arm's conduct would lead to "coordination or collusion." Such a claim is not even in the SAC or any of Qualcomm's interrogatory responses.

88

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

high-tech industries.[349] Qualcomm itself aggressively protects its IP through lawsuits and requests for injunctive relief.[350]

> 1. The Role of Qualcomm and Other Partners in Expanding Arm's Success and Ecosystem Against Alternative ISAs

140.    Prof. Posner states that "Qualcomm uses its own custom cores in its premium tier SoCs because Arm does not sell an alternative that provides comparable functionality" and that "OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers."[351] Prof. Posner further states that "Arm benefited from the expansion of the Arm ISA network that occurred as Qualcomm penetrated various chip sectors."[352] However, he fails to recognize the implication for Arm's incentive to foreclose.

141.    Qualcomm's development of custom CPU cores has allowed Arm to access new applications that were traditionally dominated by x86. For example, in the context of the *Arm v. Qualcomm* litigation, Qualcomm's expert Dr. Kennedy stated, "Qualcomm's development of

---

[349] *See*, for example, "2023 Patent Litigation Report," Bloomberg Law, https://pro.bloomberglaw.com/insights/intellectual-property/2023-patent-litigation-report/ (reporting that "more than 400 patent claims [were] filed in federal district courts and alternative venues in 2022."). *See also* "Patent Dispute Report: 2024 Mid-Year Report," Unified Patents, July 22, 2024, https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report; and Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581 ("[S]ignificant interpretive questions often arise in contract litigation."); Benjamin E. Hermalin et al., "Contract Law," in Handbook of Law & Economics, 2007, Vol. 3, No. 68 (ed. A. Mitchell Polinsky & Steven Shavell) ("Probably the most common source of contractual disputes is differences in interpretation […]").

[350] For example, in 2005 Qualcomm sued Nokia for patent infringement seeking an injunction and monetary damages. *See* "Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm Press Release, November 6, 2005, https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia. In 2017, Qualcomm brought a patent infringement lawsuit against Apple asking for damages and a permanent injunction enjoining Apple from infringing the patents at issue. *See* Complaint, *Qualcomm Inc. v. Apple Inc.*, No. 3:17-cv-01375-JAH-AGS (S.D. Cal. July 6, 2017), https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/2017-07-06_complaint.pdf). More recently, Qualcomm sued Transsion, one of the world's largest smartphone makers, for patent infringement. *See* Ben Schoon, "Qualcomm is suing Transsion, the largest smartphone maker that doesn't use Snapdragon," 9to5Google, July 12, 2024, https://9to5google.com/2024/07/12/qualcomm-transsion-lawsuit-report. Qualcomm's lawsuit with Transsion was settled in January 2025. *See* Florian Mueller, "BREAKING: Qualcomm settles with China's Transsion (Africa's smartphone market leader): Indian patent lawsuit withdrawn," ip fray, January 16, 2025, https://ipfray.com/breaking-qualcomm-settles-with-chinas-transsion-africas-smartphone-market-leader-indian-patent-lawsuit-withdrawn/.

[351] Posner Report, ¶¶ 38, 62.

[352] Posner Report, ¶ 27.

89

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

custom CPUs [based on Nuvia technology] should benefit Arm by contributing to the expansion of Arm-compliant products into new segments and markets at the expense of non-Arm competition."[353] In particular, he highlights "Qualcomm's development efforts of its Arm-compatible Oryon CPU cores (the 'Oryon™ Cores')," which is opening up the PC segment, traditionally dominated by x86 chips, to Arm-compliant chips.[354] He concludes that "[a]ny market share that Qualcomm gains in the PC market is market share gained for Arm versus x86 alternatives. Further, Qualcomm's sales of Oryon™ Cores will generate royalties for Arm under the Arm / Qualcomm ALA. Therefore, Qualcomm's development of the Oryon™ Cores will generate additional royalties for Arm from an increased volume of shipments for the PC market."[355]

142.    Similarly, the SAC states that "Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86)."[356]

143.    More broadly, Arm benefits from partnering with ALA customers because a partner's innovation, R&D investment, and marketing efforts expand Arm's ecosystem[357] and increase the

---

[353] Expert Report of Patrick F. Kennedy, February 27, 2024 (hereinafter Kennedy *Arm v. Qualcomm* Report), ¶ 33. *See also id.*, ¶ 56 ("Qualcomm's development efforts and business plans related to the development of custom Arm-compliant CPUs in certain markets will actually benefit Arm.").

[354] Kennedy *Arm v. Qualcomm* Report, ¶ 56. *See also id.*, ¶ 63 ("Arm itself recognized that Qualcomm's innovative product could expand Arm's presence in the Windows-based PC market. Upon seeing initial performance reports for Hamoa, Arm concluded that Qualcomm had indeed "invested sufficiently to meaningfully grow the [Windows on Arm] market.").

[355] *Id.*, ¶ 64.

[356] SAC, ¶ 61.

[357] *See* ARM_01294236 at '237 (February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("[g]reater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time to Market] ") and for Arm ("[d]eeper customer engagement, greater predictability, more design wins, more revenue"). *See also* Abbey (Arm) June 2025 Deposition, 29:24-30:7 ("So there would be a technical conversation around capabilities because oftentimes just because somebody wants an architecture, they may not know what it takes to make the architecture successful into a product. And so we care passionately about the ecosystem, about making sure our partners are going to be successful, so we talk about capabilities, we talk about risks, we talk about the expertise of the team."). *See also* Abbey (Arm) June 2025 Deposition, 145:8-23; ARMQC_02783619 at '620 ("Landing subscription deals is the first step in a closer engagement with our partners to increase their consumption of Arm technology and share in increased long-term success through royalties.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

variety of Arm products available to customers.[358] Will Abbey stated in November 2023 that "[t]hirty years on, a core philosophical tenet of Arm's original IP licensing model underpins its expanded subscription strategy to foster innovation: Arm only succeeds when partners succeed."[359] Arm monitors partner investment efforts across the ecosystem and collaborates with its partners to strengthen developer support and education.[360] The flipside is that, should Arm foreclose a partner, Arm's ecosystem would suffer. In fact, Cristiano Amon, Qualcomm's CEO, alleges that Arm's conduct harmed Qualcomm and acknowledged that, as a result, there was harm to Arm's ecosystem.[361]

144.    In smartphone applications, Qualcomm is by far the leading chip supplier for premium-tier Android phones.[362] In recent public statements, Qualcomm executives tout that, for premium-tier

---

[358] For example, Apple helped opening the PC segment to Arm. *See* "AI Flywheel Gathering Momentum," UBS Global Research, November 24, 2024 ("Arm's moment on the PC arrived in 2020 with Apple's M1 processor-based Mac family. The initial Arm vs x86 compatibility issues were mitigated by Apple's control of its ecosystem and by the Rosetta binary translation software, while Apple iterated on the hardware design with three further M-series generations. After almost four years, Apple was joined by the launch of Qualcomm-powered PCs from several major brands this year, and with an Nvidia-MediaTek partnership expected to follow into volume production next year. Arm currently holds a 10% unit market share and 17% revenue market share, almost all owing to Apple.").

[359] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models.

[360] ARMQC_02725050 at '068 (A September 2020 presentation discusses partner efforts on the Windows-on-Arm ecosystem and details partner collaborations to provide developer support, including initiatives to facilitate app migration to arm64, engage OEMs, and expand enterprise application readiness).



[361]

[362] Qualcomm's smartphone chips are currently custom-made.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Android phones, Qualcomm's revenues are five times as large as its next largest rival.[363] Accordingly, reports indicate that Qualcomm's share of premium-tier Android smartphones is as high as about 70%.[364] If Arm were to foreclose Qualcomm, it would cause diversion of premium-tier demand to Apple iPhones and also lead to more lower tier Android phones being sold.[365] Since Arm's royalty revenue per unit sold tends to be higher for higher-end chips, a shift towards less expensive Android phones could reduce Arm's royalty revenue. Such a shift would represent a cost to Arm in any attempt to foreclose Qualcomm. Prof. Posner does not account for these costs in his analysis. Nor does Prof. Posner consider whether Apple has a more favorable ALA deal than

---

[363] "Q4 2024 Qualcomm Inc. Earnings Call," Qualcomm, November 6, 2024, pp. 11-12, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/06/QCOM_Q4FY24EC_Transcript_11-7-24.pdf (Mr. Amon stated: "[W]hen we compare with our closest competitor, for example, in Android, our premium tier, we get greater than 5x premium-tier revenue."); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 4, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf (Mr. Amon stated: "On handsets as we move on to the next conversations, Snapdragon eight elite, we're incredibly proud of it. It's one of the most powerful processors we've ever done in mobile, is now the industry leader in handsets across every performance category. The world's fastest mobile CPU, world's fastest 5G and Wi-Fi technology, the fastest NPU [Neural Processing Unit]. But I wanted to show you this metric. We have 5X the premium tier revenues on Android relative to the primary competitor[.]"); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, p. 24 (Mr. Palkhiwala, Qualcomm's Chief Financial Officer and Chief Operating Officer, stated: "Qualcomm has a very strong presence. If you compare us to our closest competitor, we are two X, the revenue overall and we are more than five X revenue in the premium tier. Snapdragon eight chip is the performance benchmark chip in premium tier in handsets. So we're very happy about that.").

[364] "Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/ ("Qualcomm's share in the >$500 band increased from 47% in Q1 2020 to 71% in Q1 2022"). *See also* Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo! Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-092330024.html ("Android device makers have no choice but to rely on Qualcomm for sourcing flagship SoCs for their phones and tablets. MediaTek is the only other notable SoC supplier, but its flagship chips are typically behind those of Snapdragon. Its latest Dimensity 9400 changes this, rivaling or coming close to the Snapdragon 8 Elite in most benchmarks and workloads. However, the company needs to prove it can keep this momentum up to win the trust of device makers and consumers. Samsung also has its in-house Exynos division, but its SoCs have been significantly behind the competition in power efficiency and performance. The gap is so big now that Samsung might go all-in with the Snapdragon 8 Elite for the Galaxy S25 series.").

[365]


HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Qualcomm, such that diversion to Apple would lead to a reduction in Arm's margin on the diverted sales.[366]

145.    Arm has acknowledged the importance of partners to Arm's success in competing against other ISAs, such as RISC-V. For example, Chloe Ma, Chief Business Officer at Arm, explained in December 2022 that, in targeting development of IoT applications, "we [Arm] also need to leverage our design partners (AADPs [Arm Approved Design Partners], software design services, ISVs [Independent Software Vendor]) as much as possible realizing that we don't have endless resources and we are focusing our resources on client/infrastructure. We need to hold ourselves accountable for proof of concept for the solution approach with the appropriate design point, making sure this approach can deliver the desired benefits for our target customers. But we also need to start thinking about how we can scale this approach to mobilize our large number of partners so that they are also building, promoting and benefiting from this solution-based approach and staying busy on Arm (less time on RISC-V)."[367]

146.    To further the adoption of Arm technologies, Arm has also designed contracting models that provide customers with broader access to its IP portfolio, enabling them to innovate more effectively and contribute to growing the Arm ecosystem. Arm observed that some customers encountered challenges after licensing specific cores, often realizing mid-design that the selected core is "not the right fit."[368] In response, Arm transitioned to a more flexible, subscription-based licensing model to better accommodate their customers' evolving design needs. As discussed

---

[366] Apple has an ALA with Arm that "extends beyond 2040." *See* "Amendment No. 2 to Form F-1," Arm Holdings plc, September 5, 2023, p. 4,
https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm. [PN00305]

[367] ARMQC_02600713 at '719. *See also* Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships. *See also* ARM_00087465, the abstract of a talk by Paul Williamson, Arm's Senior VP and general manager of the Internet of Things line of business, discussing "successful examples to share where we have engaged at a deeper level, worked hand-in-hand with the partner and their ecosystem in delivering on our roadmap, allowing them to enter new markets, become #1 and leverage their investment in Arm for future success."

[368] Abbey (Arm) June 2025 Deposition, 86:22-87:23 ([W]e had determined some time ago that the most ec -- equitable way to license our technology is through a subscription, a program which we call ARM Total Access. One of the frustrations that some partners have is, I license this particular core, and after I start a design or I give some considerations to that design, I decide that that's not the right fit. So we moved away from a, you know, sort of this product with this term to more of a broader subscription-based engagements.). *See also* Grisenthwaite (Arm) Deposition, 54:1-55:13.

93

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

previously, in 2020, Arm launched ATA, a subscription program offering customers a comprehensive package of IP, tools, models, support, training, software, and physical design resources to help them succeed.[369] In 2019, Arm introduced the AFA, a pay-as-you-go model that allowed customers to access a broad range of Arm technology and tools without paying upfront— only paying license fees for IP used in their final chip design at the point of manufacture.[370] Arm introduced these flexible licensing agreements with the strategic understanding that broader access to its IP would not only empower individual partners but also strengthen and expand the overall Arm ecosystem.[371] This is a procompetitive initiative aimed at expanding the Arm ecosystem.

147.    Qualcomm would be particularly important as a partner in growing the Arm ecosystem if, as Qualcomm contends, Arm's chip designs were falling behind alterative cores. For example, the SAC states that "[i]n recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for Arm-designed cores. In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical."[372] Prof. Posner similarly claims that "Arm's OTS cores [have fallen] further behind

---

[369] ARM_00080472 at '480; ARMQC_02770676 at '677; "Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 19 ("ATA licensees are typically long-term Arm partners and include more than half of our largest customers."). *See also* ARM_01294236 at '237, a February 2019 presentation describing the vision of the subscription model as a way to create "a business which truly enables customer innovation and focuses on Consumption and Partner success – making Arm the trusted default choice," with benefits for customers ("Greater freedom, better product decisions, fair pricing, lower risk & faster TTM [Time To Market]") and for Arm ("Deeper customer engagement, greater predictability, more design wins, more revenue").

[370] Abbey (Arm) June 2025 Deposition, 144:19-145:13 ("At the low end, through ARM Flexible Access, we're giving broader access to our partners because we want to deepen and broaden the ecosystem."); Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023, https://newsroom.arm.com/blog/arm-licensing-models; "Arm Holdings plc Q4 FYE25 Investor Presentation," Arm Holdings, May 7, 2025, https://investors.arm.com/static-files/6bb3def3-ddce-4588-bf81-b5a718973274, p. 19 ("[AFA] targeting early-stage companies developing products for markets such as AI accelerators, automotive applications, consumer electronics, robotics and smart sensors.").

[371] Abbey (Arm) June 2025 Deposition, 145:8-13; "Arm Flexible Access," Arm, https://www.arm.com/products/flexible-access ("Arm Flexible Access provides up-front, no-cost or low-cost access to a wide range of Arm IP, tools, and training. Experiment and design with the entire portfolio; license fees, if any, are only due at the point of manufacture and calculated only on the IP included in the final SoC design.").

[372] SAC, ¶ 58. ███████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

custom cores in terms of quality."[373] In such a situation, losing the benefit of Qualcomm's innovations would be particularly harmful, and would lead to Arm ceding share to alternative ISAs, such as x86 and RISC-V.[374]

148.    Furthermore, harming one of its largest customers without cause would harm Arm's reputation and damage Arm's relationships with other customers.[375] Prof. Posner agrees: "As the industry observes Arm's mistreatment of Qualcomm, firms will become less willing to invest in



[373] Posner Report, ¶ 58. *See also id.*, ¶ 38 ("Qualcomm's custom CPUs are 'at the top end of the performance' and 'blow away what's available from Arm on the TLA core site [sic].' Qualcomm uses its own custom cores in its premium tier SoCs because Arm does not sell an alternative that provides comparable functionality.").

[374] I do not opine on Arm's relative performance. I do note that Jeff Vidon, senior director of engineering at Qualcomm, testified that Arm "off-the-shelf" cores may have higher performance or power than Qualcomm custom cores.



[375] For Arm, as for most firms, reputation is key to its commercial success. *See* Arm 2023 Form F-1 ("Our brand and reputation are critical factors in our relationships with customers, employees, governments, suppliers, and other stakeholders. Our failure to address, or the appearance of our failure to address, issues that give rise to reputational risk […] could significantly harm our brand and reputation. Our reputation can be impacted by catastrophic events, incidents involving unethical behavior or misconduct, product quality, security, or safety issues, allegations of legal noncompliance, internal control failures, corporate governance issues, data breaches, workplace safety incidents, environmental issues, the use of our products for illegal or objectionable applications, including AI and ML or military applications that present ethical, regulatory, or other issues, marketing practices, media statements, the conduct of our suppliers or representatives, and other issues, incidents, or statements that, whether actual or perceived, result in adverse publicity."). *See also* Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581, https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=2893&context=journal_articles ("When a dispute over the contract's meaning arises, the parties will first try to resolve it themselves. They will do this not only because of the costs of litigation, but also because of the reputation factor […] the party demonstrably in the wrong on the interpretive issue will hesitate to force the issue to litigation; he is likely to lose and in any event may acquire a reputation as someone who does not honor his commitments.").

95

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

the Arm ecosystem. Their incentives to invest are reduced because the more successful they are at designing Arm-compliant chips, the more likely that Arm will try to take their business away from them."[376] However, he fails to recognize that this reduces Arm's incentive to foreclose, as a degraded Arm ecosystem will risk losing sales to x86 and RISC-V. It is important for Arm (as well as for Qualcomm or any firm) to avoid gaining a reputation as a firm that uses the legal system to circumvent or modify contractual commitments to its advantage and at the expense of its partners. Such a reputation would make negotiating future contracts more complex, more time-consuming, and would discourage relationship-specific investments by partners.[377]

---

[376] Posner Report, ¶ 90. *See also id.*, ¶ 78 ("[O]ther licensees will have an incentive to reduce their investment in the Arm ecosystem as they see Arm abuse its own licensees."), ¶ 19 ("Arm's attempts to extend its dominance of the ecosystem will spook even chipmakers who are not pushed out of designing SoCs, by revealing that Arm will no longer keep its commitment to neutrality and openness."). I note that there is no evidence, and Prof. Posner provides none, that "the more successful" an Arm customer is at designing Arm-compliant chips, "the more likely that Arm will try to take their business away from them." In particular, there is no evidence Arm is trying to "take away" Apple's business, which is one of the most successful Arm customers. Arm has recently extended Apple's agreement for many years. *See* Stephen Nellis, "Apple inks new long-term deal with Arm for chip technology, according to filing," Reuters, September 5, 2023, https://www.reuters.com/technology/apple-inks-new-long-term-deal-with-arm-chip-technology-filing-2023-09-05/ ("Apple (AAPL.O), has signed a new deal with Arm for chip technology that "extends beyond 2040," according to Arm's initial public offering documents filed on Tuesday. [...] The two companies have a long history - Apple was one of the initial companies that partnered to found the firm in 1990. [...] Apple was among a number of large technology companies that that on Tuesday invested $735 million in Arm's initial public offering. Reuters last week was the first to confirm that Apple was among the strategic investors who agreed to buy shares.").

[377] Williamson (Arm) Deposition, 246:4-9 ("ARM has a reputation of trust with its partners who build technology based on ARM's technology and services associated with it. Their success is a shared success business with ARM, and trust is an important element of that continuing business practice."). Warren Buffet highlighted the importance of reputation when he said: "We can afford to lose money—even a lot of money. But we can't afford to lose reputation—even a shred of reputation." *See* Jessica Coacci, "Here's the one-page memo Warren Buffett sent to his managers every two years for over 25 years," Yahoo! Finance, August 6, 2025, https://finance.yahoo.com/news/one-page-memo-warren-buffett-140107224.html. *See also* Deepa Prahalad, "Why Trust Matters More Than Ever for Brands," Harvard Business Review, December 8, 2011, https://hbr.org/2011/12/why-trust-matters-more-than-ev ("[To create value, companies] must create an environment in which people can work well together and where they are engaged with the mission of the firm. They must treat suppliers and collaborators well. They have to give freedom to ask tough questions and experiment with new ideas. Trust is a prerequisite for all of these."); Don Fancher, Jennifer Lee, and Debbie McCormack, "Trust: A Critical Asset," Harvard Law School Forum on Corporate Governance, June 17, 2021, https://corpgov.law.harvard.edu/2021/06/17/trust-a-critical-asset/ ("[Trust] is a critical asset, albeit one that is not reported on the balance sheet or otherwise in the financial statements, as it has no intrinsic value. [...] When invested by leaders in relationships with stakeholders, it enables activities and responses that can help build or rebuild an organization and enable an organization to achieve its intended purpose. Trust can also be created across various groups within the organization—between the board and management, employer-employee, among the workforce, organization and stakeholder, vendors and customers. Conversely, a breach of trust can cause a company to lose significant value.").

96

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

149.    Even though Arm's ecosystem partnerships are important to its business model, making foreclosure more costly than Prof. Posner suggests, that does not mean that Arm is or should be obligated or amenable to accept the terms of every proposed partnership. Arm may determine that the terms of a specific proposed agreement are unprofitable and therefore choose not to license its technology under those terms. As discussed earlier in this Section, while having Qualcomm as a partner benefits Arm, that does not mean that Arm should enter into any agreement that Qualcomm proposes: the price needs to be "right," in the sense that it allows both Arm and Qualcomm to benefit from the partnership.

## 2.    Qualcomm's Successful Business Diversification Strategy Disincentivizes Arm from Foreclosing Qualcomm

150.    As described above, foreclosing Qualcomm would harm Arm to the extent that Arm-based Qualcomm chips are diverted to non-Arm alternative ISAs (e.g., x86, RISC-V). This harm would include costs to Arm from losing any future growth related to Qualcomm entering new or growing non-smartphone applications with Arm-based Qualcomm chips sales.

151.    In November 2021, Qualcomm highlighted its new "diversification strategy" where it would diversify from its strong position in smartphones into other applications and end uses.[378] Qualcomm touted its strategy stating that it was "[u]niquely positioned to grow across multiple industries in addition to handsets" where the other industries included "Automotive," "Consumer IoT" (including personal computers, smartwatches and virtual reality devices), "Industrial IoT,"

---

[378] "Qualcomm Inc. Investor Day," Qualcomm, Cristiano Amon, November 16, 2021, pp. 3-4, https://d1io3yog0oux5.cloudfront.net/_9145a2f999cf4f4b2b0c08721e637935/qualcomm/db/703/7061/file/QCOM-USQ_Transcript_2021-11-16_Investor%20Day%20(1).pdf (Mr. Amon stated: "But the key message you're going to see is we're truly diversifying. There's so many new end markets for the company right now, and the market is really moving towards our technology. […] I want to show you that we'll always be the company defining the pace of innovation in mobile. You know us from mobile. But we're no longer defined by a single end-market and a single customer relationship. While we'll always going to be the company focused in driving innovation in mobile, there's more to Qualcomm."); "Qualcomm Inc., Investor Day," Qualcomm, Cristiano Amon, November 19, 2024, p. 2, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf (Mr. Amon stated: "[W]e outlined a new strategy for the company back in 2021. And we came here to kind of walk to what we have done since then and what we're going to be doing next. […] So, I want to start by highlighting what is our mission. Our mission is really to enable intelligent computing everywhere we have been on this trajectory, realizing that the technologies we have developed over the many years and continue to develop can be very relevant to a number of different industries beyond mobile. And that is the mission that we have been pursuing since we outlined our strategy back in 2021.").

97

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

and "IoT Edge Networking."[379] Qualcomm estimated that diversification would increase its addressable market from about $100 billion to $700 billion over the next decade.[380] This included Qualcomm's belief that it was "[p]ositioned to be the preferred platform for PCs in the inevitable transition to Arm."[381]

152.    As detailed above, Qualcomm has publicly reported very strong financial performance in its non-smartphone segments during 2024 and 2025.[382] In fact, in its most recent November 2024 Investor Day presentation, Qualcomm executives provided an update on its diversification strategy, which Mr. Amon summarized as follows:

> [I]n summary, this is how we feel about the incredible opportunity ahead for Qualcomm. We have put a [diversification] strategy in [20]21. We're not changing our strategy. We've just been busy executing on that strategy. And it's working.[383]

153.    Consistent with this, Mr. Palkhiwala stated at the 2024 Investor Day that by 2029 he expected Qualcomm's non-smartphone revenue to increase to 50% of its total revenue (up from 32% at the end of 2021):

---

[379] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, pp. 6, 58, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf.

[380] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, p. 8, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf, (">7X addressable market expansion over the next decade.") and p. 10 ("Expanding TAM and diversification while increasing margins and stockholder returns[.]").

[381] "Qualcomm Inc. Investor Day Presentation Deck," Qualcomm, Cristiano Amon, November 16, 2021, p. 38, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/+Investor_Day_2021_CAmon_PDF.pdf.

[382] *See* Section VI.A.

[383] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 3, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/QCOM_Investor-Day-2024_transcript_11-19-24_FINAL.pdf (Mr. Amon further stated that the goal was "to be continuing to transform Qualcomm into a diversified growth leader in the industry."). *See also* "Qualcomm Investor Day 2024 Presentation Deck," Qualcomm, Cristiano Amon, November 19, 2024, p. 27, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/Qualcomm-Investor-Day-2024_Cristiano_StrategicFramework_11-19-24.pdf (Further, the presentation deck used by Mr. Amon touted "key takeaways" such as "[s]uccessfully executing against our diversification strategy" with "[s]ignificant opportunity for growth across target industries" and "[g]rowing ecosystem of new customers and partners." His deck ultimately concluded that these factors were "[t]ransforming Qualcomm into a diversified growth leader.").

98

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

*I want to quantify the long-term target for our diversification plan. We are targeting a mix of 50 over 50 by the end of the decade. For handset and non-handsets, and we believe this transformation will be highly value accretive.*[384]

154.    Qualcomm confirmed that it is on track to hit its aggressive diversification goal. As Mr. Amon described in July 2025: "Another quarter of strong growth in QCT Automotive and IoT revenues further validates our diversification strategy and confidence in achieving our long-term revenue targets[.]"[385]

155.    Qualcomm's recent success and expected future growth in these non-smartphone applications benefits Arm in at least two ways. First, in some cases—such as virtual reality devices—Qualcomm is expanding into application areas where, absent its involvement, the volume of trade would be smaller or the speed of progress slower.[386] ██████████████████

---

[384] "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update," Qualcomm, November 19, 2024, p. 27, https://s204.q4cdn.com/645488518/files/doc_events/2024/Nov/19/QCOM_Investor-Day-2024_transcript_11-19-24_FINAL.pdf. *See also* "Qualcomm Sets New Growth Targets, Showcasing Company's Opportunity as On-Device AI Accelerates Demand for its Technologies," Qualcomm Inc., Press Release, November 19, 2024, https://investor.qualcomm.com/news-events/press-releases/news-details/2024/Qualcomm-Sets-New-Growth-Targets-Showcasing-Companys-Opportunity-as-On-Device-AI-Accelerates-Demand-for-its-Technologies/default.aspx ("Qualcomm Incorporated (NASDAQ: QCOM), a connected computing leader, today outlined its significant opportunities for growth and diversification at its 2024 Investor Day. The company's unique position at the edge is driving access to an expanded TAM [Total Addressable Market] of approximately $900 billion by 2030, with more than 50 billion cumulative connected edge device shipments expected from 2024 through 2030. 'Qualcomm's focus on diversification and industry-leading technology roadmap has significantly strengthened the Company's growth profile,' said Cristiano Amon, President & CEO, Qualcomm Incorporated. 'As generative AI accelerates demand for our technology and we become increasingly relevant across multiple industries, Qualcomm is well positioned to address a $900 billion opportunity by 2030 across an expanding ecosystem of new customers and partners.'"). *See* Qualcomm Incorporated, Form 10-Q, for the quarterly period ended December 26, 2021, p. 11, https://s204.q4cdn.com/645488518/files/doc_financials/2022/q1/0001728949-22-000012.pdf (Qualcomm QCT revenue by segment reported for Q4 2021).

[385] "Qualcomm Announces Third Quarter Fiscal 2025 Results," Qualcomm, July 30, 2025, p. 1, https://s204.q4cdn.com/645488518/files/doc_financials/2025/q3/FY2025-3rd-Quarter-Earnings-Release.pdf. *See also*, "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, pp. 2, 12, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon stating: "Our chipset business delivered revenues of $9 billion, reflecting strength in Automotive and IoT and ongoing growth in Handsets. Automotive and IoT revenues increased 21% and 24% year over year, respectively. […] Our momentum in Automotive and IoT is the result of strong execution of our growth and diversification strategy. We remain on track to meet our fiscal 2029 target for combined Automotive and IoT revenues of $22 billion. […] We feel that the company is on the right trajectory, especially as we look for growth and diversification beyond Handsets and AI continues to be a great opportunity for us.").

[386] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 4:23, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational

99

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████████

███████[387] In both scenarios, Arm benefits significantly from its partnership with Qualcomm—whether through expanded market opportunities in emerging applications or through retained volume that might otherwise shift to competing ISAs. Foreclosing Qualcomm would mean forfeiting these growing advantages, making such a strategy economically costly for Arm, particularly in the long term.

### 3. Prof. Posner's Diversion Analysis Is Incomplete and Ignores Important Foreclosure Costs that Arm Would Incur

156.    Prof. Posner analyzes diversion briefly and incompletely. [388] He ignores important competitive constraints that Arm faces (as discussed above in Section V) as well as important foreclosure costs that Arm would incur if it were to pursue the strategy he hypothesizes.

157.    As an initial matter, Prof. Posner focuses his diversion analysis only on the supply of chips in the data center segment, as shown in his Figure 3. In his diversion setup, he presents a scenario where Qualcomm effectively is already in the "market" for data center chips, and "Arm enters the data center chip sector [by] licensing itself to manufacture Arm-compliant chips" and thereby "competes with Qualcomm."[389] In reality, Arm is about 1.5 to two years ahead of Qualcomm in developing a data center chip.[390] This means that Arm can expect to earn profits from data center chips well before Qualcomm even enters (if ever) with its own chip.[391] As a result, Arm can earn

---

(Ziad Asghar (Qualcomm) stating: "if you pick up any device that does virtual reality, and a device that matters, it's actually based on Snapdragon.").

[387] 

[388] Posner Report, ¶ 70 and Figure 3.

[389] Posner Report, ¶ 69.

[390] Section VIII.B.1.

███████████████████████████████████████

100

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

profits without any diversion from Qualcomm over this period. In other words, Arm's ability to earn profits from its data center chip does not depend on any purported foreclosure of Qualcomm.

158.    Further, Prof. Posner's Figure 3 completely disregards diversion from Qualcomm's Arm-based data center chips to chips based on non-Arm ISAs, such as Intel's x86 ISA. This is a critical oversight since x86 is the dominant architecture in data centers. Diversion to data center chips based on x86 would represent a significant cost to Arm, as Arm would lose the margin it earns on Qualcomm's Arm-based chips.[392] Prof. Posner completely ignores this cost. In **Exhibit 3**, I modify Prof. Posner's Figure 3 to properly account for diversion to x86, illustrating the lost profits that Arm would suffer.[393] The revised exhibit shows that, if Arm were to cut off Qualcomm's access to Arm's ISA, OEMs would likely respond by not only purchasing other Arm-based data center chips (if available) but also by purchasing more x86-based chips, on which Arm earns no profit at all.



[393] The logic represented in Prof. Posner's Figure 3 suffers from other infirmities which are addressed elsewhere in my report. My modification to his figure is simply done to highlight a critical oversight related to his representation of diversion.

101

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

**Exhibit 3: Diversion in Data Centers (Modified Prof. Posner Figure 3)**



159.    More generally, if Arm were to foreclose Qualcomm "completely" by "cutting off" access to the Arm ISA,[394] as Prof. Posner considers in his Figure 3, then Qualcomm would be foreclosed from using Arm-based technology for data centers, as well as all other downstream applications, including smartphones and personal computers.[395] To properly account for this, in my **Exhibit 4**, I expand Prof. Posner's Figure 3 to account for additional paths of Qualcomm's diverted sales. By excluding diversion to these additional paths, Prof. Posner's analysis overstates Arm's ability to profitably recapture Qualcomm's volume and understates the full foreclosure cost to Arm. These additional diversion paths include:

---

[394] Posner Report, ¶ 70 and Figure 3 ("If Arm is able to cut off technology supply for Qualcomm completely, then Arm loses its upstream margins on the Qualcomm license. However, Arm would gain downstream sales and the downstream margins that they produce, assuming that Arm is a viable competitor in the downstream market either through organic entry or through acquisitions. Figure 3 illustrates these dynamics."). As noted above in Section VII, Prof. Posner also considers partial foreclosure of Qualcomm. Regardless of whether the alleged foreclosure is full or partial, the lost profits from diversion that I depict in **Exhibit 4** properly apply.

[395] The Snapdragon 8 Elite for mobile (i.e. smartphone) and Snapdragon X Elite for PC are also developed based on the customized Arm-based Oryon CPU. *See* "Qualcomm Oryon CPU," Qualcomm, https://www.qualcomm.com/products/technology/processors/oryon, accessed August 20, 2025.

102

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

- *Qualcomm sales diverted to x86 and RISC-V:* For these sales, Arm would forfeit its entire royalty fees from Qualcomm, with no opportunity for recapture.[396] In reality, OEMs facing reduced access to Qualcomm's Arm-based chips are likely to consider switching to x86 or RISC-V solutions, especially in segments where those architectures are established (e.g., x86 in data centers and PC and RISC-V in IoT).[397] Such diversion is particularly relevant given Qualcomm's stated plans to transition away from Arm ISA to RISC-V (discussed in Section VIII.D.3).

- *Qualcomm sales diverted to Apple:* For those Qualcomm sales lost to Apple, Arm may earn less depending on the difference between the royalty it earned from Qualcomm and the royalty it earns from Apple. Prof. Posner does not consider this possibility.

- *Qualcomm sales diverted to chips for lower-end smartphones:* Qualcomm accounts for a high share (70%) of premium-tier Android smartphones,[398] which typically generate higher royalties for Arm.[399] Thus, Qualcomm smartphone chip sales diverted to chip sales for lower-end smartphones would result in lower royalties for Arm.

- *Qualcomm sales for innovative customer products that are lost:* Qualcomm touts that its industry-leading chips are used in cutting-edge innovative customer products such as virtual reality devices.[400] If Qualcomm were foreclosed, some of these products may be

---

[396] In addition, as discussed in Section VII.C.1, any attempt by Arm to foreclose Qualcomm could damage Arm's reputation and ecosystem, leading to additional lost sales with its other customers, as these customers pivot instead to x86 or RISC-V. These additional lost sales are not shown in **Exhibit 4**.

[397] "Why RISC-V is Inevitable, Calista Redmond, RISC-V International," RISC-V International, April 6, 2023, at 8:33, https://www.youtube.com/watch?v=ktjSvleIKPk&ab_channel=RISC-VInternational ("So, consumer and IoT devices, this is again one of the areas that has been home to RISC-V for some time. The Android open source project, as far as other companies who've been bringing RISC-V into earbuds and other consumer devices. Microchip you know coming through with their portfolio. SiFive on wearables, smart home, VR, industrial IoT.").

[398] "Qualcomm Dominates Premium Android Smartphone Chip Market in Q1 2022," Cellit, May 19, 2022, https://cellit.in/qualcomm-dominates-premium-android-smartphone-chip-market-in-q1-2022/ ("Qualcomm's share in the >$500 band increased from 47% in Q1 2020 to 71% in Q1 2022").

[399] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025.

[400] "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, at 4:23, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational (Ziad Asghar (Qualcomm) stating: "if you pick up any device that does virtual reality, and a device that matters, it's actually based on Snapdragon."); "Qualcomm Investor Day 2024: IoT and Automotive Diversification Update,"

103

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

delayed in coming to market or come to market with lower quality—resulting in lost sales (i.e., the volume of trade would be smaller). For these lost sales, Arm would forfeit its entire royalty fees from Qualcomm, with no opportunity for recapture.

**Exhibit 4: Diversion in All Applications (Modified Prof. Posner Figure 3)**



Red boxes and red text have been added to Prof. Posner's original Figure 3.

---

Cristiano Amon, November 19, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/images/company/company/events/investor-day-2024/QCOM-Investor-Day-2024-transcript.pdf, pp. 3, 5, 6 ("We're incredibly proud in this company about the technology roadmap of Qualcomm. […] It is the industry leading technology roadmap for both at the system level and semiconductors at the edge. […] The next one is what is happening with XR [extended reality devices]. […] And we have now every single design win across everyone that is building those [smart glasses] devices. […] I want to talk about AI at the edge. […] It's a generation opportunity for Qualcomm. […] We built a platform in mobile, but now with AI, we believe we can further differentiate. We're uniquely positioned to have AI and automotive."). *See also* Posner Report, ¶ 62 ("OEMs also benefit from Qualcomm's chips, which are superior to the chips manufactured by other chipmakers.") and ¶ 77 (describing Qualcomm's experience in developing "leading edge" chips.); "Virtual Reality: Transforming the way we experience reality," Qualcomm, https://www.qualcomm.com/products/mobile/snapdragon/xr-vr-ar/virtual-reality-vr ("The Snapdragon XR2 Gen 2 Platform powers next-generation MR and VR for all with amazing performance and groundbreaking on-device AI"); "The 5 Best Features of the Meta Quest 3," Qualcomm, January 12, 2024, https://www.qualcomm.com/snapdragon/news/the-5-best-features-of-the-meta-quest-3.

104

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

160.    Prof. Posner states that Arm has an incentive to foreclose Qualcomm because the "short term" costs from foreclosure are more than outweighed by the "long term" benefits.[401]  He does not explain why costs are incurred in the short run and benefits materialize in the long run. In fact, a number of costs are incurred in the long run, e.g., the loss of Arm's reputation, harm to Arm's ecosystem, and the fact that an attempt by Arm to foreclose customers would accelerate the development of alternatives such as RISC-V. Similarly, benefits to Arm may occur at the same time as its loss of Qualcomm royalty. For example, if Samsung were to switch from Qualcomm chips to MediaTek chips, the increase in royalty payments from MediaTek may very well occur at the time the lost royalty payments from Qualcomm would have occurred.  Therefore, the alleged anticompetitive effects may very well have net benefits or be neutral in the "short term" and have net costs in the "long term."

161.    In conclusion, Prof. Posner's diversion analysis fails to account for critical economic realities that undermine his foreclosure theory. His narrow focus on data center chips overlooks diversion to competing ISAs such as x86 and RISC-V, which would result in lost royalties for Arm. He disregards the timing mismatch between Arm's and Qualcomm's chip launches. Moreover, when extended to other applications, the analysis omits additional diversion paths— including sales lost to Apple and lower-tier devices, and lost sales of innovative products—all of which may further increase the cost of foreclosure. By excluding these factors, Prof. Posner overstates Arm's ability to recapture Qualcomm's volume and understates the economic costs Arm would incur, rendering his analysis incomplete and unreliable.

---

[401] Posner Report, ¶ 13 ("Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the short term, because Arm's margins on selling and/or licensing its own cores, chips and SoCs would be higher in the long term than the margins on existing ALA licenses—and Arm is unhappy with the level of royalties that Qualcomm is required to pay under the ALA. Moreover, although Qualcomm has historically been one of Arm's most important customers, it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties.") and ¶ 87 ("As customers flee Qualcomm to Arm, Arm will lose money in foregone royalties in the short term. But, Arm hopes to obtain larger margins in the long term as it takes over Qualcomm's business or Qualcomm is pushed to increasingly make use of Arm's OTS cores.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

## D. Foreclosure of Qualcomm Alone Would Unlikely Be Profitable for Arm

162.    While Qualcomm is a large customer, it accounts for only about 10% of Arm's total revenue.[402] A foreclosure strategy aimed solely at Qualcomm is unlikely to be effective, as the potential benefits are tied specifically to Qualcomm's sales, whereas the costs (reputational and other) would affect the broader Arm business.

163.    As discussed in the previous sections:

i.    The benefits from the alleged foreclosure of Qualcomm are the incremental profits that Arm makes on the recaptured sales, i.e., the sales that divert from Qualcomm custom chips to Arm's OTS cores and Arm's own chips, compared to the profits that Arm would have made on those diverted sales in the absence of foreclosure.

ii.    The costs are the profits lost by Arm on sales that divert to another ISA (e.g., x86 and RISC-V) or to lower margin Arm-based chips (e.g., low-end Android smartphones), the loss of ecosystem benefits due to Qualcomm not making custom cores using Arm's ISA, and Arm's loss of reputation as a reliable partner. The first cost affects a portion of Arm's sales to Qualcomm, but the other two costs affect Arm's entire business, i.e., go beyond Qualcomm's sales.

164.    Quantifying these benefits and costs is hard (and neither I nor Prof. Posner attempt to quantify them), but they are no less real to the profitability of Arm's business than the costs that Prof. Posner discusses in his report. By omitting these costs from his analysis, Prof. Posner reaches a biased and unreliable conclusion.

## VIII.    PROF. POSNER HAS NOT DEMONSTRATED THAT ARM'S CONDUCT IS ANTICOMPETITIVE

165.    Prof. Posner claims that Arm's conduct towards Qualcomm constitutes anticompetitive behavior. He states that "it appears that Arm is willing to sacrifice the licensing fees and product royalties that it can obtain from supporting Qualcomm in launching products because, in the long

---

[402] SAC, ¶ 57 ("Qualcomm is today one of Arm's largest licensees—it 'accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024.'"). *See also* ARMQC_00000640 at '646.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

term, Arm believes that through engaging in anticompetitive conduct to push Qualcomm to rely on OTS cores, or out of the ecosystem entirely, it will gain more profits from either its own chips or from TLA royalties than it will lose in ALA royalties."[403] However, Prof. Posner provides no evidence for his claims and bases his conclusion on stylized theoretical models of vertical interactions without linking them to the industry at issue or the facts in this case.

## A. Arm Protecting the Terms of Its Contracts Is Procompetitive

166.    The SAC states that "[s]ome of Arm's maneuvers resulted in a trial that took place last year before this Court. […] That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA."[404] Prof. Posner hardly mentions the Nuvia acquisition despite its central role in this dispute, but does state that "Qualcomm contends that Arm has engaged in a number of unfair acts and practices, including threatening to terminate Qualcomm's ALA […]."[405]

167.    Arm's conduct—including its decision to initiate litigation against Qualcomm and its use of consent provisions in licensing agreements with Nuvia—reflects a commercially reasonable and procompetitive effort to protect its IP and clarify contractual obligations. In innovation-driven industries, legal enforcement is a standard mechanism for resolving disputes and preserving incentives for investment and cooperation. Whereas Qualcomm's claims conflate ordinary commercial disagreement with anticompetitive behavior, Arm's business practices reinforce the integrity of its licensing model and support the continued growth of its ecosystem.[406]

### 1.    Contract Enforcement Is a Legitimate Procompetitive Action

168.    There is no evidence that Arm initiated the *Arm v. Qualcomm* litigation for anticompetitive purposes. Rather, evidence shows that Arm acted to protect its IP and the associated revenue potential. I do not opine on whether Qualcomm or Arm breached the Qualcomm and Nuvia

---

[403] Posner Report, ¶ 13.

[404] SAC, ¶ 6.

[405] Posner Report, ¶ 13.

[406] Qualcomm itself aggressively protects its IP through lawsuits and requests of injunctive relief. *See* footnote 350.

107

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

agreements with Arm, and I have been instructed by Counsel for Arm to assume the disagreement with Qualcomm concerning the correct interpretation of various terms of Qualcomm and Nuvia agreements with Arm reflects Arm's genuine views of Arm's, Qualcomm's, and Nuvia's contractual obligations. In that context, pursuing legal action is a standard and appropriate means of resolving commercial disputes. The conduct that Qualcomm characterizes as anticompetitive is, in fact, consistent with a firm seeking to protect its IP and enforce its rights under the terms of its agreements.

169.    Clarity on contractual terms is essential in industries where IP and licensing frameworks are central to innovation—particularly in high-technology sectors. Enforcing and interpreting contracts through the legal system is not only lawful but also promotes investment, cooperation among firms, and long-term ecosystem stability.[407] If licensees were permitted to disregard contractual obligations, it would undermine the value of IP, weaken incentives for future investment in ISA development, and ultimately harm innovation and consumer welfare.[408]

---

[407] Spulber, Daniel F., "How do Competitive Pressures Affect Incentives to Innovate When There Is a Market for Inventions?," Journal of Political Economy, 2013 Vol. 121, No. 6, pp. 1007-1054, at p. 1007 ("When IP is not fully appropriable, markets for inventions are limited and competitive pressures can decrease incentives to innovate."). *See also* Baumol, William J. and 18 other leading economics scholars, "Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington," December 2007, pp. 8-10, https://appext.hks.harvard.edu/publications/getFile.aspx?Id=451 ("Economists have long recognized that certainty of contract is essential to a healthy economy. […] Those contracts can only accomplish that goal, however, if parties know the contracts will be enforced. […] The 'fundamental function of contract law' is to 'encourage the optimal timing of economic activity' by 'deter[ring] people from behaving opportunistically toward their contracting parties.' Richard A. Posner, *Economic Analysis of Law* 91 (4th ed. 1992). […] That function cannot be accomplished without effective means for enforcement. As this Court has stated: 'Market efficiency requires effective means to enforce private agreements.' *Am. Airlines, Inc.* v. *Wolens*, 513 U.S. 219, 230 (1995).").

[408] Qualcomm has publicly emphasized the importance of strong IP rights in driving innovation. As stated on its website, robust IP protections "[encourage] investment in research and development by companies and individuals." *See* "Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025. Robert Giles, Senior Vice President and Chief Intellectual Property Counsel of Qualcomm similarly testified before the U.S. Senate that courts should be empowered to grant injunctions in appropriate cases to deter "efficient infringement"—a strategy where companies knowingly use patented inventions without seeking a license, assuming they will only be liable for royalties if sued. "Statement of Robert Giles Senior Vice President and Chief Intellectual Property Counsel Qualcomm Incorporated On Behalf of the Innovation Alliance," Hearing on The Patent Trial and Appeal Board: Examining Proposals to Address Predictability, Certainty, and Fairness, Before the Subcommittee on Intellectual Property, Committee of the Judiciary, United States Senate, pp. 3 and 7, June 22, 2022, https://www.judiciary.senate.gov/imo/media/doc/Testimony%20-%20Giles%20-%202022-06-22.pdf.

108

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

2. Clause 16.3 of Arm's Agreement with Nuvia Has Procompetitive Justifications

170.    Arm's decision to grant Nuvia a license with specific terms is based on careful consideration of the benefits and costs to Arm and the broader impact on its ecosystem. Clause 16.3 of Arm's agreement with Nuvia, which required Arm's consent before any transfer of Nuvia's technology to Qualcomm (or any other acquiring firm), allowed Arm to evaluate the implications of a potential acquisition and ensure that its IP would continue to be used in a manner consistent with its licensing strategy, ecosystem goals, and revenue objectives.[409]

171.    It is possible that, in a but-for world without clause 16.3, a mutually beneficial agreement could not have been reached. The clause provided Arm with a mechanism to assess the implications of a potential acquisition and mitigate risks to its ecosystem and profitability. Without this safeguard, Arm may have been unwilling to accept the lower upfront fees and higher running royalties that characterized the Nuvia agreement. In turn, this could have led to less innovation and fewer competitive CPU designs, particularly if Arm were unwilling to license to startups like Nuvia. The clause is therefore procompetitive.[410]

**B. Arm's Entry into the Chip Design Stage of the Value Chain Is Procompetitive**

172.    Qualcomm claims that Arm has shifted from a neutral licensing model to becoming a direct chip competitor. The SAC and Prof. Posner argue that "[f]or years, Arm expressed its commitment to an open, neutral model for licensing the use of its ISA," and this model "benefited the software developers, which could develop software that would be interoperable across Arm-compatible devices, and ultimately benefited customers" and "also benefited Arm, leading to widespread

---

[409] Arm's CEO testified that such a clause is "standard." *See* Rene Haas (Arm) testimony in *Arm v. Qualcomm*, Trial Transcript Vol 2.1, December 16, 2024, 165:7-19. ██████████████████████████████████████

[410] Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line of Business), September 2, 2025, explaining that the clause protects the value of Arm's IP investment and that, without the clause, Arm would need to develop an alternative licensing model to ensure the returns Arm needs to continue investing to address the expanding demand for increasingly complex uses of its ISA. Without the clause, Arm may have also found it necessary to shorten the length of its ALA contracts and become more vertically integrated.

109

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

adoption of the ISA."[411] Qualcomm also argues that, more recently, "Arm has pivoted away from that model," transforming itself "from licensing intellectual property to positioning itself primarily as a chip designer," including by "planning to launch its own chip by as early as this summer [in 2025]."[412] These claims are unfounded, as I explain below.

1. <u>The Start of the Alleged Foreclosure Significantly Predates Arm's Data Center Chip Launch</u>

173.    Qualcomm and Prof. Posner argue that Arm's entry into chip design for data centers exacerbates Arm's incentive to foreclose Qualcomm,[413] suggesting that Arm seeks to divert Qualcomm's volume to its own, more profitable chips.[414] The timing and uncertainty surrounding Arm's chip launch undermine this claim.

174.    Arm has not yet begun delivering its data center chips and its ultimate commercial success remains uncertain.[415] ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ The alleged foreclosure also began four years before Qualcomm even

---

[411] SAC, ¶ 68. *See also* Posner Report, ¶¶ 80-90.

[412] SAC, ¶¶ 69-70. *See also* Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008. *See also* QCVARM_0600104 at '122, "Complaint Against Arm Holdings Plc by Qualcomm Incorporated," Paul Weiss, December 19, 2024, discussing Arm's strategic decision to increase investments in compute subsystems and to "move up the semiconductor food chain and become a chip maker itself."

[413] SAC, ¶ 35 (stating that "[t]o facilitate its entry into selling its own chips, Arm now seeks to force Qualcomm— which would otherwise be a competitor—out from the marketplace."); *Id.*, ¶ 71.

[414] Posner Report, ¶ 71 ("[I]f Arm is a viable competitor downstream and is able to capture even some small portion of diverted sales from Qualcomm, that creates additional incentive to foreclose Qualcomm. This is because downstream margins on chip sales to data centers are likely to be higher than upstream margins for licensing. The more of Qualcomm's potential share that Arm can capture after foreclosing Qualcomm, the stronger its incentive to foreclose Qualcomm.").

[415] Will Abbey (Arm) describes the inherent uncertainty in R&D timing, particularly in the context of the v10 ALA. He explained that "the reality of engineering milestones is, six months could become eight months, could become a year, it could become two years. All that needs to happen is, during verification, there's a defect. And so if you're building a product and a business around engineering delivering a given product in a given time, I'd say, start with what we've got. And so I would be cautious about entering into those conversations early." *See* Abbey (Arm) June 2025 Deposition, 34:16-24.

[416] Qualcomm finalized Nuvia's acquisition in March 2021. *See* "Qualcomm Completes Acquisition of NUVIA," Qualcomm, March 15, 2021, https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-

110

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

announced its *intention* to produce a data center chip.[417] The significant time gap and the uncertainty about outcomes are further evidence that Arm's potential launch of its own data center chip is unlikely to be part of a purported "broad scheme" to foreclose Qualcomm, or that it created any incentives to foreclose Qualcomm years before Arm's chips reached the market.[418] Indeed, Prof. Posner does not identify *any* document linking the launch of Arm's chip designs to the alleged foreclosure of Qualcomm. The absence of such evidence reinforces the conclusion that Arm's entry into chip design was a procompetitive response to evolving customer demand.

### 2. Vertical Integration Is Common and Typically Beneficial

175.    Prof. Posner claims that Arm's entry into chip design reflects a strategy to "drive Qualcomm away from designing custom cores, or to drive Qualcomm out of selling chips and SoCs entirely."[419] However, this interpretation ignores the widespread and often procompetitive nature of vertical integration in technology markets.

176.    Vertical integration—where a firm operates at multiple levels of the supply chain—is widespread and typically beneficial. Qualcomm itself is vertically integrated, licensing its IP while also selling its own chips. ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ■ Arm's model, which

nuvia;

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[417] In May 2025 Qualcomm announced its first data center chip in partnership with NVIDIA. *See* Sebastian Moss, "Qualcomm Announces Data Center CPUs, Will Support Nvidia's NVLink Fusion," Data Center Dynamics, May 20, 2025, https://www.datacenterdynamics.com/en/news/qualcomm-announces-data-center-cpus-will-support-nvidias-nvlink-fusion/. As described later in this Section, Qualcomm's data center chip won't arrive until fiscal year 2028, about seven years after the alleged foreclosure began.

[418] As described later in this Section, Arm's data center chip won't arrive until 2026, a full five years after the alleged foreclosure began.

[419] Posner Report, ¶ 13.

[420] "Q2 2025 Qualcomm Inc. Earnings Call," Qualcomm, April 30, 2025, p. 10, https://s204.q4cdn.com/645488518/files/doc_events/2025/Apr/30/QCOM_Q2FY25EC_Transcript_5-1-25.pdf. *See also* "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, p. 6 https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf, and

111

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

involves licensing its ISA and now designing chips for data center applications, mirrors this dynamic and is consistent with industry norms.

177.    Vertical integration is commonplace in a variety of industries, with upstream firms often competing in the downstream markets with their own customers, without foreclosing them. The commonplace nature of benign vertical integration is described in a recent academic paper: "Examples include Apple and Microsoft, selling their products directly in their stores in addition to using retailers such as Best Buy and Walmart; Nike and Adidas, selling their products directly online in addition to using retailers such as Foot Locker and Macy's; and television networks, like HBO and ESPN, selling their content directly through their online platforms, HBO Now and ESPN+, in addition of selling their content to cable companies such as Comcast and Time Warner Cable."[421]

178.    This blend of competition and cooperation is commonly referred to as "coopetition,"[422] and is a widespread phenomenon in modern business.[423] For example, Samsung and Apple are "fierce" rivals in the smartphone industry, yet Samsung—one of the leading screen manufacturers—has supplied screens for iPhones for years, dating back to the iPhone 4.[424]  Despite

---

Kwon, Yona, Dahee Kang, Sinji Kim, and Seungho Choi, "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," Journal of Open Innovation: Technology, Market, and Complexity, 2020, Vol. 6, No. 1, p. 1 ("Although most of the firms seem to compete against each other to maintain their advantage continuously, firms also often cooperate with their competitors even while competing. Especially in a high-tech industry where technological innovation and change in products are fast, it is difficult to cope with global competitors with a single, static strategy. In other words, a dynamic competition and cooperation between firms is necessary to sustain a firm's competitive advantage. […] The competitive behavior of Qualcomm thus should be understood as dynamic interactions in which Qualcomm both competes with and cooperates with its rivals. These interactions with their rivals do not occur alone but are intertwined and interrelated with one another.").

[421] Donna, Javier D., Pedro Pereira, Yun Pu, Andre Trindade, and Renan C. Yoshida, "Direct sales and bargaining," RAND Journal of Economics, 2024, Vol. 55, No. 4, pp. 749–787.

[422] See Brandenburger, Adam M. and Barry J. Nalebuff, "The Rules of Co-opetition," Harvard Business Review, 2021.

[423] Richard Grisenthwaite, Chief Architect at Arm, testified that "as is common with many companies in this industry, we have elements in which we cooperate and then elements in which we compete with companies that we work with. […] [S]ome elements of ARM very actively cooperate with its ALA customers and some elements of ARM more clearly compete with them, yes. […] ARM creates its own core implementations consistent with the ARM architecture and those cores end up competing with cores created by our ALA customers." See Grisenthwaite (Arm) Deposition, 23:15-24:10.

[424] Imogen Beech, "6 real-life coopetition examples," Breezy, September 6, 2023, https://breezy.io/blog/coopetition-examples. See also Haroun Adamu, "Did you know: Samsung makes a lot of

112

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

competing directly in end products, the two companies continue to collaborate where it is mutually beneficial.

179.    There are many procompetitive effects from vertical integration. *First*, vertical integration may allow an input supplier to gain valuable implementation experience that helps them improve their own products, benefiting consumers.[425] Arm's CEO, Rene Haas, recently made this very point. Addressing speculation about Arm's potential entry into AI chip design, Mr. Haas explained that an important reason for Arm's integration into chip design is to gain a better understanding of the link between hardware and software: "it's easier to do if you're building something than if you're licensing IP" where "you're much closer to that interlock and have a much better perspective in terms of the design tradeoffs to make. So, if we were to do something, that would be one of the reasons."[426]

---

money from iPhones," Android Authority, June 11, 2025, https://www.androidauthority.com/did-you-know-samsung-apple-partnership-3426411/.

[425] *See*, for example, "Qualcomm Incorporated 2009 and Qualcomm Incorporated 2011 Update," Harvard Business School Teaching Notes, May 25, 2011, p. 4, https://hbsp.harvard.edu/product/711463-PDF-ENG ("Qualcomm has been willing to move downstream into end products in order to demonstrate proof of concept. While other IP firms only do technology (which sometimes creates problems in implementation, such as Rambus), Qualcomm repeatedly created end-user products and systems to show that the technology could really work."); Tom Simonite, "With Its Own Chips, Apple Aims to Define the Future of PCs," Wired, November 10, 2020, https://www.wired.com/story/own-chips-apple-aims-define-future-pcs/ ("Making its own mobile processors has helped Apple innovate with such features as facial recognition and augmented reality on the iPhone. Designing its own chips for devices like the MacBooks and Mac Mini announced Tuesday should also allow Apple to be more creative with PCs. […] When chip, device, and software engineers work closely together they can squeeze more performance out of a device than is possible with an off-the-shelf chip."). *See also* Khadija Khartit, "When Does It Make Sense for a Company to Pursue Vertical Integration?" Investopedia, February 6, 2025, https://www.investopedia.com/ask/answers/012715/when-does-it-makes-sense-company-pursue-vertical-integration.asp ("Vertical integration makes sense as a strategy, as it allows a company to reduce costs across various parts of production, ensures tighter quality control, and ensures a better flow and control of information across the supply chain."). *See also* Yang, Chenyu, "Vertical Structure and Innovation: A Study of the SoC and Smartphone Industries," The RAND Journal of Economics, 2022, Vol. 51, No. 3, pp. 739–785 (Studying a hypothetical vertical merger between Qualcomm and HTC (a smartphone manufacturer) finding that it "can increase innovation and welfare, mainly driven by the investment coordination of the merged firms.").

[426] Exhibit 10 of Haas (Arm) Deposition ("If you are defining a computer architecture and you're building the future of computing, one of the things you need to be very mindful of is that link between hardware and software. You need to understand where the trade-offs are being made, where the optimizations are being made, and what are the ultimate benefits to consumers from a chip that has that type of integration. That is easier to do if you're building something than if you're licensing IP. This is from the standpoint where if you're building something, you're much closer to that interlock and you have a much better perspective in terms of the design trade-offs to make. So, if we were to do something, that would be one of the reasons we might.").

113

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

180.    *Second*, Arm's entry into chip design increases competition, expanding product variety and potentially leading to lower prices and more rapid innovation, which in turn benefits consumers. While Arm's entry into data center chip design has the potential to harm Qualcomm by "stealing" volume from Qualcomm, this "stealing," if it in fact occurs, is the essence of competition.[427,428] Qualcomm points to a chat among Arm managers where Mr. Haas commented that Arm's competitors would be "hosed" if Arm were to build its own chips.[429] While framed in colloquial terms, the statement reflects the essence of competition, which is striving to create a product that customers prefer to the alternatives produced by rivals.

181.    *Third*, Qualcomm and Prof. Posner provide no evidence to support their claims that Arm moved into chip design for anticompetitive reasons (seeking profit is not inherently anticompetitive).



---

[427] Competition on the merits may harm to rivals. In *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945), Judge Hand famously captured the idea that competition harms rivals by stating that it would be contrary to the spirit of the antitrust laws to punish a firm that led to the exit of its rivals as a result of its "superior skill, foresight and industry."

[428] Qualcomm has until now not been successful in the data center space. However, as "part of a broader strategy from Qualcomm to diversify its business," in May 2025, it announced its plans "to launch a custom CPU for the data center that can connect to Nvidia's GPUs and software." *See* Arjun Kharpal, "Qualcomm to launch data center processors that link to Nvidia chips," CNBC, May 19, 2025, https://www.cnbc.com/2025/05/19/qualcomm-to-launch-data-center-processors-that-link-to-nvidia-chips.html. Qualcomm's recent acquisition of Alphawave Semi is also part of its strategy to expand in the data center space. *See* Majeed Kamran, "Qualcomm's Alphawave Acquisition Targets Data Centers and AI, But What's Next?" EE Times, June 9, 2025, https://www.eetimes.com/qualcomms-alphawave-acquisition-targets-data-centers-and-ai-but-whats-next/.

[429]

114

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



[432] "Infrastructure" refers to data centers.

115

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



183.    *Fourth*, Arm's chip design is currently focused on data centers, where Arm-based chips have a very low share. This is consistent with Mr. Awad's testimony and suggests that foreclosure of Qualcomm was not a motive for the decision to move into chip design.[435] Furthermore, Qualcomm has indicated that it is not expected to begin selling data center chips until fiscal year 2028.[436] Prof. Posner does not explain why, if foreclosure of Qualcomm was indeed a motivating factor behind Arm's integration into chip design, Arm would not have begun with segments where Qualcomm has a larger presence. In other words, starting its "broad scheme" to harm Qualcomm in a segment where Qualcomm does not currently generate any revenue seems ineffective and irrational.

184.    *Fifth*, other firms in the industry have similarly engaged in verticalization. For example, as Paul Williamson testified, "AWS as a cloud vendor now build[s] their own silicon, rather than purchasing off-the-shelf silicon from other vendors. So that has been a verticalization trend in the



---

[435] Prof. Posner acknowledges that "the requirements of each sector are unique." Posner Report, ¶ 60. This implies that Arm entry in a given application does not affect competition in other applications.

[436] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [data center] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. If successful, we expect revenues to begin in the fiscal '28 timeframe.").

116

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

infrastructure market."[437] Similarly, Apple in 2020 vertically integrated upstream into computer chip design with the launch of its Arm-based M1 chip.[438]

185.    Prof. Posner further alleges that Arm's entry might discourage customers from sharing confidential information.[439] These claims are speculative and unsupported. He does not provide any evidence on the existence or extent of this issue but instead simply cites the FTC's complaint on Nvidia's acquisition of Arm.[440] However, the FTC's opinion in that case did not result in a Court decision and thus is not evidence.[441] On this claim, I further note the following:

- *First*, Prof. Posner does not provide any quantification, i.e., he does not explain how much less confidential information would be shared in a world where Arm engages in chip design for data centers compared to a world where Arm only designs OTS cores and CSS, nor does he identify the impact on product development.

---

[437] Williamson (Arm) Deposition, 96:3-9.

[438] "Apple announces Mac transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/; "Apple unleashes M1," Apple Newsroom, November 10, 2020, https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/. Abbey (Arm) June 2025 Deposition, 152:11-25 (Abbey testified to the trend of OEMs vertically integrating into chip production: "The market is shifting the same way that we know that a company like Apple has a vertical integration and a Silicon team that has the ability to produce chips. The market is shifting. And so Apple is a good example. Tesla is a good example. Xiaomi is an example. And so if you do have a silicon team that's enthoused within the OEM – […] -- then, you know, who is paying royalties? It's the OEM. So as the -- as the marketplace shift, as the world shifts, we adapt to the changes that we are seeing in the marketplace. We simply want to broaden. We want to broaden the engagements that we have with all customers that consume ARM technology.").

[439] Posner Report, ¶ 19 ("As part of its traditional business model, Arm meets with its chipmaker customers to learn their business plans and technological needs so that it can improve the ISA. […] But if those customers believe that Arm may start competing with them in their line of business, they will be reluctant to share confidential information, which in turn will retard the development of Arm's ISA.").

[440] Posner Report, ¶ 89.

[441] The FTC has lost various vertical merger litigations, indicating that the FTC is not infallible in its conclusions. *See*, for example, *Federal Trade Commission v. Tempur Sealy International and Mattress Firm Group Inc.*, U.S. District Court, Southern District of Texas, Civil Action No. 4:24-cv-02508, Opinion and Order Denying Motion for Preliminary Injunction, January 31, 2025, Case 4:24-cv-02508, Dkt. Entry 511 ("For the reasons specified below, the motion for a preliminary injunction is denied. […] The merger's effect here (like most vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns."); Swagath Bandhakavi, "FTC ends legal challenge against Microsoft's $69bn Activision Blizzard acquisition," Tech Monitor, May 23, 2025, https://www.techmonitor.ai/digital-economy/big-tech/ftc-microsoft-activision-blizzard-deal ("The FTC decided to drop the case following the dismissal of its appeal for a preliminary injunction, concluding that continuing the challenge against the already completed acquisition would not align with public interest objectives.").

117

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

- *Second*, Prof. Posner does not address why the same concerns he raises wouldn't apply to Arm's OTS cores or CSS. He does not explain why Arm's ALA customers would not already be reluctant to share confidential information that Arm could potentially use to develop its OTS cores, that indirectly compete with Qualcomm's custom cores. The absence of any evidence indicating such reluctance suggests that ALA customers are currently willing to share information and are likely to continue doing so even after Arm begins selling its own chips.[442]

- *Third,* even assuming that Prof. Posner is correct about partners becoming more reluctant to share confidential information, that would not make Arm's entry at the chip design stage anticompetitive. Prof. Posner fails to acknowledge that Arm's entry increases competition and improves Arm's ecosystem (by demonstrating that Arm-based chips are

---

[442] A possible reason why Prof. Posner's concern does not appear to affect transactions is that Arm limits the transmission of confidential information across the ALA and TLA teams. Ms. Bhattacharya, Senior Director of Engineering within the Architecture and Technology Group at Arm, stated that there are "concerns about sharing confidential information between parties."



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

a viable alternative to x86), which is procompetitive. He would need to balance any alleged anticompetitive effect with the procompetitive effects of entry.[443]

- *Fourth*, if Prof. Posner is correct that Arm's entry into chip design would "retard the development of Arm's ISA,"[444] that would represent a cost to Arm, who would risk losing sales to x86 and RISC-V. Prof. Posner acknowledges this cost, but fails to draw its implications in terms of reducing the profitability of foreclosure, and thus on Arm's incentive to foreclose. This cost would be particularly high if Prof. Posner is correct that "[t]he functionality of chips depends more on the microengineering choices of chip designers like Qualcomm than on the underlying ISA."[445] Regardless, contrary to Prof. Posner's claim, there is no evidence that Arm's entry into data center chip design has "retarded" the development of Arm's ISA.

- *Fifth*, Arm is developing chips for data centers,[446] and is experimenting with chips for automotive applications,[447] but it does not plan to develop chips for smartphones or PCs.[448] Qualcomm and Apple are already active and successful in producing chips for mobile and PC, limiting Arm's incentive to sell chips for those applications. Prof. Posner does not explain why the concern he raises is significant in light of the fact that Arm is

---

[443] This is the balancing that is generally done for mergers, both horizontal and vertical. For example, the upward pricing pressure from a horizontal merger would need to be compared to merger-specific efficiencies before a conclusion that a merger harms consumers can be reached. In the case of vertical mergers, the elimination of double marginalization and other merger-specific efficiencies need to be assessed before one can conclude that they are insufficient to eliminate any potential harm to competition.

[444] Posner Report, ¶ 19.

[445] Posner Report, ¶ 22. The only basis Prof. Posner offers for this definitive statement is the testimony of a Qualcomm employee, "Gerard Williams, Qualcomm Senior VP Engineering."

[446] ████████████████████████████████████████████████████████████████████████████████████

[447] Williamson (Arm) Deposition, 125:18-22 ("[W]e've engaged and considered building for a lead partner in the automotive division, silicon for the ADAS [Advanced Driver Assistance Systems] market for a potential lead customer called Waymo.").

[448] Williamson (Arm) Deposition, 125:18-126:4, 128:15-132:2, 175:11-25 (explaining that there are "[n]o active chips or silicon support development in the PC market" and that discussions by Arm with OEM mobile vendors have not extended to providing them a completed chip, but that "[Arm's] focus has been what we call compute subsystems.").

119

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

not planning to enter segments representing the large majority (70%) of Qualcomm's revenue.[449]

186.    Finally, I highlight that there is a significant difference between a vertical merger and the entry of an existing supplier into stages of the value chain that are further downstream. Antitrust agencies generally see a firm's organic entry into downstream stages of the supply chain as procompetitive because it adds a new competitor which tends to increase competition, increase variety, and eliminate double marginalization even if it can create incentives to raise rival input costs.[450]

187.    In summary, vertical integration is a widely adopted and often procompetitive strategy across many industries. Arm's entry into chip design mirrors similar moves by firms like AWS, Apple, and Qualcomm, which operate at multiple levels of the supply chain. Such integration can enhance innovation, increase product variety, and eliminate inefficiencies like double marginalization. Rather than harming competition, Arm's expansion reflects standard industry practice and is a natural response to evolving customer needs.

### 3.    Arm's Ecosystem Remains Open

188.    Prof. Posner wrongly claims that Arm recently pivoted from a "longstanding business model" that is "open" and "neutral" to a "different model, one in which it forecloses customers in

---

[449] Posner Report, ¶¶ 25, 64 ("Though mobile handsets comprise around 70% of Qualcomm's revenue, Qualcomm has penetrated the other chip sectors to varying degrees, including automotive, virtual reality (VR) and augmented reality (AR) devices, wearables (e.g., smartwatches and smartglasses), and IoT."). Prof. Posner states that "[f]or *illustrative* purposes, I focus on the data center sector, though Arm's intentions to sell SoCs extend beyond the data center sector," but provides no support for this claim (emphasis added)).

[450] For example, an FTC press release on legislations prohibiting direct sales to consumers by auto manufacturers stated: "According to the comments by staff from the FTC's Office of Policy Planning, Bureau of Competition, and Bureau of Economics, current laws in both jurisdictions 'operate as a special protection for [independent motor vehicle dealers] – a protection that is likely harming both competition and consumers.' […] 'FTC staff offer no opinion on whether automobile distribution through independent dealerships is superior or inferior to direct distribution by manufacturers. […] [C]onsumers are the ones best situated to choose for themselves both the cars they want to buy and how they want to buy them.'" *See* "Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers," Federal Trade Commission, Press Release, May 16, 2014, https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibitions-direct-consumer-auto-sales.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

sectors that Arm seeks to enter."[451] ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████    As described below, Prof. Posner also ignores important evidence that Arm

continues to maintain an open business model and its entry into data center chips is procompetitive.

189.    *First*, contrary to Prof. Posner's claim, there is no evidence that Arm will not negotiate

ALA licenses. In fact, Arm has several such existing agreements. Arm has recently signed an ALA

with Nuvia in 2019, and since then with large, sophisticated customers such as Apple, IBM, and

Google.[453] Prof. Posner provides no evidence, and in fact makes no claim, that Arm had ceased

offering ALAs to other existing ALA customers. Even for Qualcomm, as recently as August 29,

2025, Arm responded to Qualcomm's August 8, 2025, letter with a set of "initial questions"

regarding the terms outlined in Qualcomm's "proposed Annex 1 to the ALA for Arm's unreleased

---

[451] Posner Report, ¶ 66 ("Arm is pivoting from its open, neutral model—where it treats its customers in a nondiscriminatory manner, benefits from attracting as many licensees as possible, and therefore provides adequate support to its licensees—to a different model, one in which it forecloses customers in sectors that Arm seeks to enter."), ¶ 19 ("Arm will no longer keep its commitment to neutrality and openness"), ¶ 86 ("More than a decade later, Arm's ISA has reached such a level of dominance that licensees can no longer easily walk away. Now Arm seeks not only to raise royalty rates, but to design and manufacture SoCs, in a "dramatic departure from its traditional business model."), ¶ 87 ("Arm has already threatened to terminate Qualcomm's ALA, reversing its longstanding business model as the 'Switzerland of chips,' so that it can both increase the royalty rate, as it has done for the TLA, and take Qualcomm's SoC business.").



[453] Ehab Youssef identified IBM and Apple as partners that signed an ALA since 2019. *See* (Youssef (Arm) Deposition, 31:1-22); Google signed an ALA in June 2021 (ARM_01428339). *See also* ARM_00119603. Prof. Posner himself recognizes that "[i]n addition to Qualcomm, Arm licenses its architecture to a dozen or so other firms, including Apple, HiSilicon, IBM, Fujitsu, Ampere, T-Head, and BRJX." Posner Report, ¶ 24.

121

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

v10," and reaffirmed its intention to "move the negotiations forward."[454] As of the submission of this report, Qualcomm maintains both a TLA and an ALA with Arm.[455]

190.     *Second*, in paragraph 88 of his expert report, Prof. Posner wildly mischaracterizes a statement made by Mr. Haas, claiming that Mr. Haas stated that Arm no longer wished to keep its prior commitments to customers and instead planned to "cut off" ALA licensees. Prof. Posner states:

> *Arm's CEO,* **Rene Haas, has recently confirmed that Arm no longer wishes to keep its prior commitments and instead plans to cut off ALA licensees** *and sell SoCs directly to OEMs, such as data centers, automobile companies, and mobile phone manufacturers. Rene Haas said that Arm's interest in whether to accept a prospective customer depends on "whether your business is a chip business [such as Qualcomm] or a product business."*[456]

191.     To support his claim—which is critical to his antitrust narrative—Prof. Posner cites to a *single source*: a YouTube interview of Mr. Haas conducted in October 2024.[457] Contrary to Prof. Posner's characterization, the interview he cited makes no mention of ALAs or any licensing agreements whatsoever. Mr. Haas certainly did not state that Arm broke prior commitments or cut off ALA licenses. Prof. Posner's claims are simply disconnected from the plain language of Mr. Haas' answer. Below is the full quote cited by Prof. Posner, with the portion that he directly quotes in bold:

---

[454] ARMQC_02785287 (August 29, 2025, letter from Spencer Collins (Arm) to Ann Chaplin (Qualcomm)) at '287 – '290. In the same letter, Arm reiterated its offer of "an in-person meeting between the commercial teams," noting that "we have now offered [the meeting] three separate times." *Id.* at '290. On June 13, 2025, Arm reiterated to Qualcomm that "Arm remains prepared to negotiate in good faith over the terms of a license to the v10 architecture." *See* ARMQC_02771127. In the same letter, Arm further told Qualcomm that its "offer to meet remains open and Arm continues to believe that such a meeting would be the most efficient path forward in response to Qualcomm's request [for a v10 license]. Please have the relevant business personnel respond to Mr. Abbey with dates that Qualcomm is available for such a meeting."

[455] QCVARM_1014030; QCARM_3474751.

[456] Posner Report, ¶ 88 (emphasis added).

[457] "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY, at 15:20-16:00.

122

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

*You know, first thing on, competing with our customers, you know, it's rather complicated because if you look at some of our customers, our customers are Amazon. Our customers are Microsoft. Our customers are Apple. Our customers are Tesla. They all build chips using ARM. I'm not going to build an electric car. I'm not going to build a phone. I'm not going to build a data center. So, to look at the value chain relative to who builds chips, relative to* **whether your end business is a chip business or a product business**. *It's gotten a lot more gray. We follow what the industry is demanding, and what the industry wants to see is solutions getting to market faster. And that's what we're focused on.*[458]

192.    In fact, two of the four Arm customers that Mr. Haas mentioned (Apple and Microsoft) have ALAs with Arm.[459] So not only does Mr. Haas not talk about cutting off access to Arm's ISA, he highlights two customers that have active and ongoing access to Arm's ISA.

193.          For example, Android remains an open-source mobile operating system even though Google—the owner and primary developer of Android—also makes and sells Android Pixel phones.[460] Arm has long supplied customers at multiple levels of the supply chain. For over a decade, Arm has offered OTS cores (through its TLAs) to customers such as Qualcomm, and more recently Arm has entered CSS agreements with Samsung, MediaTek, and Nvidia.[461] Prof. Posner makes no claims that Arm's sale of OTS cores and CSS is inherently anticompetitive. In fact, although Prof. Posner seeks to conflate vertical integration with the shift

---

[458] "Arm CEO on Intel, Chips, AI, Listing in US," Bloomberg Technology, YouTube, October 22, 2024, www.youtube.com/watch?v=6FnBz8rxWUY, at 15:20-16:00. For completeness, I include a full transcript of Mr. Haas' interview in **Appendix C**.

[459] Weidmann (Arm) Deposition, 35:9-36:14 (identifying eight ALA customers: Qualcomm, Apple, HiSilicon, IBM, Fujitsu, Ampere, T-HEAD and BRJX). *See also* ARM_00119603. Microsoft also has an ALA; *see* ARM_01427719 (Microsoft ALA dated May 19, 2010), ARM_01427776 (Microsoft ALA dated March 23, 2017), ARM_01427796 (Microsoft ALA dated September 3, 2020).

[460] *See* Ben Schoon, "Google Pixel grows in US, settling into top 4 spot ahead of Pixel 10 launch," 9to5google, July 28, 2025, https://9to5google.com/2025/07/28/google-pixel-us-market-share-q2-2025/; "Understanding Android," Android, https://www.android.com/everyone/facts/, accessed August 29, 2025.

[461] *See* Rene Haas, "Arm Holdings Plc Q3 2025 Earnings Call," February 5, 2025, https://investors.arm.com/static-files/f1190d81-408d-4276-a30c-b27c1ce5a30a, p. 4 and Rene Haas, "Arm Holdings Plc Q1 2026 Earnings Call," July 30, 2025, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008, p. 3.

123

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

to a closed business model, Arm has never stated that it intends to close off access to its ISA, and Prof. Posner provides no evidence that Arm intends to do so.

194.    *Fourth*, Arm has recently entered data centers with its own chip—not because Arm intends to close its ecosystem— ████████████████████ [462] a large potential data center customer that historically purchased only x86-based data center chips.[463] ████████

████████████████████████████████████████████████████

████████ Arm's entry to meet the unmet need of a potential large customer is procompetitive and is in no way evidence that Arm intends to close its ecosystem.

195.    *Fifth*, if Arm intended to close its ecosystem by foreclosing Qualcomm and other customers, then Arm's decision to enter with its own chip in data centers first would be an ineffective and irrational approach. As described earlier, Qualcomm currently has no chip in data centers,[465] and thus *zero share,* and is not expected to begin selling data center chips until fiscal year 2028, if at all.[466] ████████████████████████████████████

████████████████████████████████████████████████

---

[462] *See* Section VIII.B.2.

[463] Matthew Garrahan, Tim Bradshaw, and David Keohane, "Arm to launch its own chip in move that could upend semiconductor Industry," Financial Times, February 13, 2025, https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008.

[464] *See* Section VIII.B.2.

[465] ████████████████████████████████████████████████

[466] Qualcomm's fiscal year ends in September, and as such Qualcomm's entry is expected between October 2027 and September 2028. *See* "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, p. 4, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf (Mr. Amon explained: "Now I would like to provide an update on our expansion into the data center. This represents a new growth opportunity for Qualcomm and is a logical extension of our diversification strategy as we continue to demonstrate leadership in CPU performance and NPU efficiency. […] While we are in the early stages of this [datacenter] expansion, we are engaged with multiple potential customers and are currently in advanced discussions with a leading hyper-scaler. **If successful, we expect revenues to begin in the fiscal '28 timeframe.**" (emphasis added)).

████████████████████████████████████████████████

████████████████████████████████████████████████

124

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



And yet, Prof. Posner claims that Arm is behaving anticompetitively because "Arm seeks to drive Qualcomm away from designing custom cores, even if it means Arm loses royalties on those custom cores in the *short term*."[469] Yet, in effect, Prof. Posner actually suggests the opposite—that Arm should sacrifice its own short term profits in data centers by not entering, simply to accommodate Qualcomm's lagging and uncertain entry. Contrary to Prof. Posner's claim, Arm's entry is not economic foreclosure; instead, it is a response to customer demand.

---



[469] Posner Report, ¶ 13 (emphasis added).

125

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

196.    Moreover, as Prof. Posner highlights, "Intel's x86 still dominates the data center sector a with [sic] roughly 84% share," despite recent growth in Arm-based chips.[470] In the short term, Arm's entry is more likely to divert sales from x86 than to cannibalize sales of other Arm-based chips. For this reason, entering with data center chips first would be an ineffective and irrational strategy if Arm's goal were to close its ecosystem and foreclose its customers.

197.    Relatedly, Prof. Posner suggests that the success of the Arm ISA was somewhat arbitrary, due simply more to its "open, neutral model" than its technological capabilities and advantages.[471] Although I do not opine on the accuracy of Prof. Posner's claim, I understand from Dr. Brogioli that an important aspect of the success of the Arm ISA was its superior design and functionality, particularly with respect to lower power implementations.[472] I do note, moreover, that Prof. Posner acknowledges that the Arm ISA had advantages over available alternatives. For example, he states that "[o]ther companies and groups developed ISAs but their ISA found few followers because of concerns about openness or **dissatisfaction with the design choices embedded in those other ISAs**, or because they were designed for niche devices," and that "Arm's ISA was the more attractive in part because it had **properties that better fit the needs of chipmakers**."[473] In other words, Prof. Posner seems to suggest that Arm has both a superior product and a superior business model.[474] It is therefore not surprising that Arm has succeeded over available alternatives, including the chips supplied by Intel, which has historically been a very well established and

---

[470] Posner Report, ¶ 64.

[471] Posner Report, ¶ 22 (stating that Arm's ISA was "more attractive" to chipmakers than other ISAs at the time, "but it is not clear that Arm's ISA was technically superior to other ISAs, in the sense of being essential to the design of higher quality chips. […] The most important factor in the success of Arm's ISA appears to be that its open, neutral model appealed to chip designers and manufacturers […] As has often been pointed out, it is important that people agree to drive on the left side or the right side of the road; it is not important which side is chosen as long as everyone agrees on the same side. A common ISA solves a coordination problem in the industry, but it may not matter much which ISA is used." Prof. Posner does acknowledge that "Arm's ISA was the more attractive in part because it had properties that better fit the needs of chipmakers at the time than other ISAs did[.]").

[472] Expert Report of Dr. Michael C. Brogioli, September 5, 2025,  Section VIII.A.3.c;  Conversation with Dr. Michael C. Brogioli, September 2, 2025.

[473] Posner Report, ¶ 22 (emphasis added).

[474] Richard Grisenthwaite's (Chief Architect at Arm), testimony is consistent with this view. *See* Grisenthwaite (Arm) Deposition, 17:10-14 ("ARM has been successful, hence the large number of units shipped. No small part of that has been our technology, but some of it has also been because of the business model.").

126

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

successful firm.[475] Prof. Posner provides no evidence that Arm's "open, neutral model" was "the most important factor in the success of Arm's ISA" other than the opinion of a single Qualcomm employee (his sources are a "[c]onversation with Gerard Williams, Qualcomm Senior VP Engineering" and testimony by the same Gerard Williams stating that he does not think Arm had any "inherent advantages" over alternative architectures.").[476] The continued success of Arm over many years and the fact that it continues to invest in R&D and improve its technology, recently leading to share gains from x86 in various applications historically dominated by Intel, suggests that Arm's success is not arbitrary.[477]

## C.  Increases in Royalty Rates Are Not Inherently Anticompetitive

198.    Qualcomm criticizes the royalty rate increase that Arm implemented when it introduced Arm v9.[478] For example, the SAC states that "[a]fter releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to 'upgrade' their licenses to v9 by not releasing or supporting older v8 cores."[479] Prof. Posner makes a different royalty claim, saying that "Arm has increased royalty rates under the TLA in a way that does not appear to be based on the underlying costs of maintaining the Arm ecosystem, and even as Arm's

---

[475] "Too Good to Lose: America's Stake in Intel," Center for Strategic and International Studies, November 12, 2024, https://www.csis.org/analysis/too-good-lose-americas-stake-intel (Intel is the "largest and most advanced U.S.-headquartered manufacturer [of chips]" and "has an unmatched history of breakthrough semiconductor innovations—including the first programmable microprocessor and the x86 architecture—which have together made an indelible impact on the world of computing [that] continues to shape the digital landscape of the modern world... The company has made massive commitments to invest heavily—more than $100 billion over the next five years—in new chipmaking capability and capacity on domestic soil, aiming to develop and manufacture chips at the most advanced process nodes of 2 nanometers (nm) and below. Recognizing the importance of this, the U.S. government has announced plans to award Intel the largest share of federal support under the CHIPS Act.").

[476] Posner Report, footnotes 23-25.

[477] See Sections V and VIII.D.1.

[478] "Arm Holdings plc Q3 FYE24 Results Presentation," Arm Holdings, February 7, 2024, https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (reporting that "[o]ur v9 product garners roughly 2x the royalty rate of the equivalent v8 product" but "in some cases it's quite a bit more," and that "[r]oyalty revenue sequential growth is mainly coming from increasing penetration of ARM v9, where royalty rates are, on average, at least double the rates on equivalent ARM v8 products.").

[479] SAC, ¶ 70. I do not have an opinion on whether the characterization of v9 as only modestly better than v8 is appropriate.

127

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

OTS cores fall further behind custom cores in terms of quality."[480] The SAC similarly contends that Arm's October 2024 offer to Qualcomm for Arm's "core designs" was "extreme and clearly not commercially feasible for Qualcomm."[481] These claims ignore fundamental differences in Arm's and Qualcomm's licensing models and the economic realities of their positions in the value chain. Even after Arm's recent rate adjustments, its share of the overall chip "stack"—the total profit derived from chip sales—remains smaller than Qualcomm's. Moreover, price increases alone do not indicate anticompetitive conduct. In innovation-driven industries, royalty adjustments often reflect the value of new technology, or the increased value of existing technology, and the need to recover R&D investments. I discuss these arguments in detail below.

199.    While I do not opine on the improvements of v9 relative to v8 of the ARM ISA, Qualcomm's internal documents show



---

[480] Posner Report, ¶ 58.

[481]

[482]

[483]

128

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

### 1. Arm's Share of the Chip "Stack" Is Smaller than Qualcomm's

200. Arm and Qualcomm both hold key IP in the wireless space, but their licensing models differ significantly. Arm primarily licenses to chip manufacturers, such as Qualcomm and MediaTek, and also companies further downstream in the supply chain that design their own chips, such as Apple, Amazon, and Google. Arm's royalties are typically calculated as a percentage of the average selling price ("ASP") of the chip itself, rather than the much higher price of the final product (e.g., a Samsung Galaxy smartphone). In contrast, Qualcomm licenses its patent portfolio to device manufacturers, such as Apple and Samsung, and typically calculates royalties as a percentage of the ASP of the entire device—often several times higher than the chip's ASP.[485] Qualcomm does not license its IP portfolio to rival suppliers of modem chips, such as Broadcom and MediaTek.[486]

201. Industry commentators have stated that Arm's IP is underpriced relative to Qualcomm. For example, SemiAnalysis, a research firm specializing in the Semiconductor and AI industries,



[484]

---

[485] *See*, for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International. According to the SAC, Arm was unsuccessful in its attempt "to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made." *See also*, SAC, ¶ 70.

[486] *See*, for example, Shapiro, Carl & Keith Waehrer, "Using and Misusing Microeconomics: Federal Trade Commission v. Qualcomm," Chapter 15, Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents (ed. John E. Kwoka, Jr., Tommaso M. Valletti & Lawrence J. White), 2023, Competition Policy International.

129

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

observed that Qualcomm charges $13 per device for wireless transmission IP and another $25 for the baseband chip, while Arm's ISA—also essential to smartphone functionality—commands far lower royalties. The analysis questioned why Arm couldn't charge similar rates, given the critical nature of its technology.[487]

202.    A comparison of Arm's and Qualcomm's aggregate royalty revenues highlights the same disparity. Both Arm and Qualcomm IP is embedded in virtually every mobile device sold globally. Yet, Qualcomm's royalty revenue significantly exceeds Arm's. Arm's total revenue in the 12-month period ending in March 2025 was $4.0 billion, with approximately 46%, representing about $1.85 billion, attributed to the mobile segment.[488] Over the same period, Qualcomm's QTL division generated $5.6 billion total revenue, "principally from royalties generated through [Qualcomm's] licensees' sales of mobile handsets."[489]

203.    Even after the rate increases reflected in the October 2024 offer, Arm's share of the chip stack (i.e., of the overall profit from the sale of a chip) remains smaller than Qualcomm's share. Arm's highest proposed royalty rate in its October 2024 offer to Qualcomm was █████████

---

[487] "How would we value an essential piece of IP that every smartphone needs, with virtually no alternative? $1, $2, maybe $3 per handset? We propose it could be as much as $13 per phone. This is 24 times higher compared to current pricing! […] Apple pays Qualcomm $13 in royalties per device (not just for smartphones but also for wireless enabled iPads and watches) for the use of wireless transmission IP, and another $25 for the actual baseband chip. Effectively, $13 per device this is what Qualcomm gets away with charging for a technology that is essential to the operation of a smartphone against the company with arguably the strongest bargaining power globally. The Arm ISA is also essential to the operation of a smartphone, why couldn't they charge as much as Qualcomm? Why not more?" *See* Dylan Patel, Myron Xie, Afzal Ahmad, and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/. Even as far back as 2013, analysts were commenting, "[g]iven how many ARM designs exist in the market (and the size of some of ARM's biggest customers), it almost seems like ARM should be raising its royalty rates a bit." Anand Lal Shimpi, "The ARM Diaries, Part 1: How ARM's Business Model Works," AnandTech, June 28, 2013, https://web.archive.org/web/20130701165406/http://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works/2.

[488] Arm 2025 Form 20-F, pp. 60 ("Our royalty revenue from the mobile applications processors market constituted approximately 46% of our total royalty revenue for the fiscal year ended March 31, 2025."), 72 (reporting total revenue of $4,007M). Arm's total revenue includes revenue earned from the sale of its OTS implementation cores and CSSs. For this reason, the $1.85 billion in revenue for the mobile segment is conservatively high because it includes much more than just mobile licensing royalties for the Arm ISA.

[489] Qualcomm Financial Summary downloaded from LSEG Data & Analytics. Qualcomm 2024 Form 10-K, p. F-16.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



In contrast, the *FTC v. Qualcomm* trial revealed that Qualcomm "currently charges smartphone makers a 5% [of the ASP of the smartphone] royalty for its whole cellular patent portfolio, capped at $20/handset, or 3.25% for LTE-only devices (capped at $13/handset)."[491] Therefore, the lowest royalty rate that Qualcomm charges is 3.25% of the smartphone's ASP, while Arm's highest rate is ████████████. With some simple math, Arm's ████████████████████████████████████████



204.    I do not opine on whether the royalty rates that Arm and Qualcomm charge for their IP are "excessive" or appropriate. However, the large disparity in royalty payments per device for two technologies that are both essential to the development of a smartphone suggests that Arm's IP is

---

[490] ████████████████████████████████████████████████████████

[491] "Trial Sheds Light on Q'comm Patent Holdings, Royalty Rates," EETimes, January 21, 2019, https://www.eetimes.com/trial-sheds-light-on-qcomm-patent-holdings-royalty-rates. *See also* "Qualcomm 5G NR Royalty Terms Statement," November 19, 2017, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm-5g-nr-royalty-terms-statement.pdf ("Qualcomm Incorporated today disclosed a framework for industry participants to access Qualcomm's patented inventions used in the upcoming 3rd Generation Partnership Project (3GPP) 5G New Radio (NR) standards. […] Under Qualcomm's licensing program for cellular essential patents, the following royalty terms will apply on a worldwide basis to a license for Original Equipment Manufacturer (OEM) branded mobile handsets that implement the 5G NR standard, up to and including release 15 of the 3GPP specifications: (i) An effective running royalty rate of 2.275% of the selling price of branded single-mode 5G handsets; and (ii) An effective running royalty rate of 3.25% of the selling price of branded multi-mode (3G/4G/5G) handsets. […] In addition, Qualcomm will continue to offer licenses for OEM branded mobile handsets that include both Qualcomm's cellular standard essential patents as well as those patents not essential to the standard, a total portfolio of over 130,000 patents and pending applications worldwide at royalty rates of 4% of the selling price for branded single-mode handsets and 5% of the selling price for branded multi-mode handsets.").

[492] ████████████████████████████████████████████████

[493]



131

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

priced cheaply compared to Qualcomm's IP, contrary to claims that Arm's royalty demands are "unreasonable" or "exorbitant," as Qualcomm claims.[494]

### 2. Price Increases Are Not Inherently Anticompetitive

205.    In high-tech industries, competition is often driven by R&D aimed at improving the quality and performance of products offered in the marketplace. The incentive to invest in costly and risky R&D stems from the expectation of earning profits from sales.[495] When a firm successfully innovates, raising prices to reflect the value of its improved technology is not anticompetitive but a standard commercial response to successful innovation.[496] In the same way, a firm may raise its price in response to an increase in demand, and it is certainly true that with the advent and recent growth of AI, the demand for Arm-based chips has never been higher.[497] Such a price increase is common in business and occurs even in the absence of any incentive to foreclose.

206.    Furthermore, it is important to interpret any price increases in light of the "starting point," i.e., the price before the increase. ███████████████████████████

---

[494] "Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24)," Qualcomm, July 11, 2025, p. 10. I use "essential" in its colloquial meaning of necessary (in the short run).

[495] "Patents are rewards for those who have contributed to economic growth through their inventions. Any resulting market power enjoyed by a patent holder is typically considered a social cost that is necessary to stimulate innovation and provide a return on R&D expenditures." Lemley, Mark A. and Carl Shapiro, "Probabilistic Patents," Journal of Economic Perspectives, 2005, Vol. 19, No. 2, pp.75–98.

[496] In its Reply Brief to the U.S. Court of Appeals, Qualcomm stated that "Qualcomm has the right to earn a return on its investment in developing patented technologies by licensing at the OEM level and not making exhaustive sales of modem chips. And Qualcomm has a valid interest in protecting its investments in innovation and R&D and its OEM licensing program." *Federal Trade Commission v. Qualcomm Incorporated*, "Reply brief for appellant Qualcomm Incorporated (Redacted)," December 16, 2019, No. 19-16122, Dkt. Entry 228, United States Court of Appeals for the Ninth Circuit, pp. 48-49.

[497] Rene Haas, "Arm Holding Plc Q4 2025 Earnings Call," May 7, 2025, https://investors.arm.com/static-files/181d5019-29bd-4ba5-af29-45888e25c637, p. 14 ("Arm is everywhere. Increasingly, demand for the Arm architecture is requiring us to deliver more. We're seeing that with our compute subsystems and with the advent of AI workloads running in the data center, running on a PC, running on a smartphone, running on your automobile, or even running in the earbuds, the demand for Arm technology has never been greater. So, we are incredibly excited about the future. AI is changing everything and you can't run AI without Arm."); Rene Haas, "Arm Holdings Q2 FYE25 Investor Presentation," Arm Holdings, November 6, 2024, https://investors.arm.com/static-files/623fece0-c947-4d93-94eb-e08e8dfad61b, pp. 2-3 ("I am very proud to tell you that in that year, we have exceeded all of our expectations on execution of our growth strategies. The demand for AI everywhere is increasing the demand for Arm's compute platform. […] It goes without saying that AI is everywhere. Arm is the only compute platform that can run AI from the edge to the cloud. AI is driving demand for our performance and power-efficient compute platform everywhere.").

132

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████
████████████████████████████ This context matters: a price increase
from a low baseline may simply reflect a correction toward a price level that reflects a technology's
value.[499]

207.    While Qualcomm seeks to extend the favorable terms of its 2013 ALA deal far into the
future, it is not anticompetitive for Arm to adjust its pricing to reflect the value of its R&D
investments. Forcing Arm to maintain outdated pricing risks significantly diminishing its
incentives to innovate and develop higher quality technologies.[500]  Qualcomm itself has reportedly
increased the price of its chips following the launch of a new higher-performance version of its
Snapdragon chip. [501]  As discussed above, industry analysts have noted that Arm's IP has

[498]


[499] *See also* Conversation with Paul Williamson (Arm's Senior Vice President and General Manager of the IoT Line
of Business), September 2, 2025, explaining that the royalty rate structure contained in Qualcomm's May 2013 ALA
did not anticipate the extensive customer demand for increased chip capabilities and the expansion of application
use cases observed since then. As an illustration, at the time of the 2013 agreement Qualcomm was primarily
making smartphone chips and such chips had a small number of cores, typically just one or two. The $1.88 royalty
cap per-chip in Qualcomm's ALA (see footnote 128128) was set based on the expectation that the number of cores
would remain limited and did not anticipate the large increase in the number of cores per smartphone chip that
eventually occurred. Furthermore, the Qualcomm agreement with Arm does not have a field of use restriction, and at
the time of the agreement Arm was not even present in that segment. And yet today, data center chips often have
over 100 cores, a scenario that the $1.88 royalty cap per chip was clearly never intended to cover.

[500] On the importance of appropriating returns to investment, *see* Shapiro, Carl, "Premiums for high quality products
as returns to reputations," The Quarterly Journal of Economics, 1983, Vol. 98, No. 4., pp. 659-679.

[501] Rajesh Pandey, "Qualcomm wants Android device makers to pay even more for its next flagship chip," Yahoo!
Tech, December 2, 2024, https://tech.yahoo.com/phones/articles/qualcomm-wants-android-device-makers-
092330024.html ("Qualcomm's Snapdragon 8 Elite offers a notable improvement in performance and efficiency
over previous Snapdragon chips, promising next-gen Android phones with even more impressive features and longer
battery life. However, this comes at a cost, with reports suggesting manufacturers are paying Qualcomm as much as
$190 for the chip — 20% more than the previous models. With such a steep price rise this year, you might expect
Qualcomm not to hike the price of its next flagship SoC. Early reports suggest that might not be the case, though.").
I do not have data to check if the reported price increase actually occurred; my point is that the price increase would
be perfectly understandable and not anticompetitive.

133

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

historically been underpriced. It is therefore not surprising that Arm increased the royalty rate of v9.[502]

208. 

---

[502] *See* Dylan Patel, Myron Xie, Afzal Ahmad and Daniel Nishball, "Arm and a Leg: Arm's Quest To Extract Their True Value," SemiAnalysis, September 14, 2023, https://semianalysis.com/2023/09/14/arm-and-a-leg-arms-quest-to-extract/.



134

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

209.   While I do not have detailed data to compare terms offered to Qualcomm to other comparable deals, ███████████████████████████████████████████████████

---

[506] Youssef (Arm) Deposition, 66:7-71:3.

135

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

210.    In summary, Arm's royalty rate increases are consistent with standard commercial practices in innovation-driven industries and do not reflect anticompetitive conduct. Arm's pricing remains modest relative to Qualcomm's, its share of the chip stack is smaller, and its licensing model continues to support broad access to its ISA. There is no evidence that Arm's royalty adjustments reflect a broad scheme to foreclose rivals rather than simply competitive dynamics in an industry where R&D investments are costly and necessary to preserve a firm's ability to compete.

### D.  "Dominant" Shares Do Not Imply a Lack of Competitive Pressure

211.    Prof. Posner states that Arm "dominates the Arm ISA ecosystem through its control of the Arm ISA technology," with a "99% [share] of all smartphones."[508] However, Prof. Posner fails to consider that Arm's large share in smartphones (and much lower share in other applications) does not imply a lack of competitive pressure.

#### 1.    Arm Continues to Invest a Significant Portion of Its Revenue

212.    Prof. Posner claims that "by reducing competition in designing and selling chips, Arm (and any remaining competitors) will be able to raise prices and *skimp on innovation* without fear of being undercut or outperformed by Qualcomm or other licensees that make SoCs using custom cores that deliver higher performance."[509]

213.    I addressed the claim regarding royalty rates in Section VIII.C.2 and do not opine on whether the quality of Arm's OTS cores has decreased, relative to other custom cores. In this Section, I focus on Prof. Posner's assertion that Arm is skimping on innovation. Prof. Posner fails



---

[508] Posner Report, ¶¶ 55-56.

[509] Posner Report, ¶ 16 (emphasis added).

136

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

to explain why, as a "monopolist" protected by high "barriers to entry,"[510] Arm would continue to invest a significant portion of its revenue in R&D.[511] Prof. Posner also does not consider that Arm's sustained investment is more consistent with a firm responding to competitive pressure—particularly from x86 and RISC-V—than with one exercising unchecked market power.[512]

214.    Arm's high share of smartphone chips reflects Arm's innovation and continued investment in R&D. There is no evidence that Arm is underinvesting or that Arm's focus on innovation and R&D has been declining over time.[513]

- *Arm Invests a Much Higher Share of Revenue than Qualcomm:* A common measure of the intensity of R&D investment is a firm's R&D expenditure as a share of revenue. As I show in **Exhibit 5** below, since 2019, Arm has reinvested a much higher share of its revenue in R&D than Qualcomm every year.[514] Arm's average R&D share over this period has been

---

[510] Posner Report, ¶¶ 18, 58.

[511] "Monopolies may also fail to innovate, as they are loath to cannibalize their own products. They may even fail to adopt minor innovations. […] The virtues of competition in action." Tirole, Jean, "Competition and the Industrial Challenge for the Digital Age," Annual Review of Economics, 2020, Vol. 156. *See also* Shapiro, Carl, "Competition and Innovation Did Arrow Hit the Bull's Eye?" in The Rate and Direction of Inventive Activity Revisited (ed. Josh Lerner and Scott Stern), 2012, University of Chicago Press ("The unifying principle, richly supported by the empirical literature, is that innovation, broadly defined, is spurred if the market is contestable; that is, if multiple firms are vying to win profitable future sales.").

[512] The SAC provides further evidence of Arm's inability to exercise its purported monopoly power: Arm was unsuccessful in its attempt to "to renegotiate [Apple's] royalty rates notwithstanding the parties' existing contract." SAC, ¶ 70. *See also* Wayne Ma & Cory Weinberg, "How a Lopsided Apple Deal Got Under Arm's Skin," The Information, November 29, 2023, https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin ("At one point, Son called Apple CEO Tim Cook to tell him Arm would be raising prices for all its major smartphone and chip customers. Cook's team reassured him that Arm couldn't raise fees, because the companies' contract at the time lasted through 2028. Son backed off. Since then Apple and Arm have been through several rounds of negotiations that have kept the financial terms of Apple's deal largely in place, people familiar with the matter said.").

[513] ARMQC_02731630 (an Arm internal email dated June 1, 2023, with subject "Android and RISC-V: Internal Talking Points." While acknowledging the limitations of RISC-V, it states that "we will likely see productized implementations within 5 years. The first products will not be mobile handsets and it remains to be seen if the industry has any appetite at all, or the funds, to undertake the monumental task of moving this category of devices and its millions of applications to R-V. […] there is still a lot of work to do to get all of the Architecture, Security and System IP standardized and in place." It concluded that "we cannot be complacent; Arm needs to continue to outpace the competition with both architecture features for real-world compute loads and micro-architecture innovations along with addressing security challenges of the future.").

[514] I acknowledge that cross company comparisons may suffer from issues such as different accounting conventions. I also acknowledge that the increase in Arm's R&D expenditure does not fully reflect an increase in R&D "effort," as Arm Holdings plc, Form 20-F, for the fiscal year ended March 31, 2024, https://investors.arm.com/static-

137

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

47%, reaching 52% in the year ending March 2025.[515,516] By contrast, Qualcomm's R&D as a percentage of total revenue was always below 30% over the same period. Arm also invested a higher share than Intel whose R&D as a percentage of total revenue over the same period was approximately 23%.[517]

---

files/dcdd6629-24bb-40ef-ba55-8aca1362205a, explains at p. 71: "Research and development expenses increased by $846 million, or 75%, during the fiscal year ended March 31, 2024 as compared to the fiscal year ended March 31, 2023, primarily due to the impact of the incremental share-based compensation costs and associated employer taxes arising in connection with the IPO and new awards […]. Other factors contributing to the increase included salaries and related expenses due to headcount increases from hiring as well as increases in third-party engineering expenses, IT expenses including cloud services, and allocated facility overhead expenses, partially offset by increases in research and development tax incentives and gains from cash flow hedge activity." While not perfect, the comparison of Arm and Qualcomm R&D is informative in suggesting that Arm continues to engage in intensive R&D efforts.

[515] ARM_00000510 at '535; ARM_00000382 at '416; ARM_01259705 at '927; Arm 2025 Form 20-F, p. 72 and Arm 2023 Form F-1, p. 99. In its most recent quarter ending June 30, 2025, Arm reinvested 62% of its revenue into R&D. *See* "FYE26 Q1 (30-Jun-25) Historical Quarters Datasheet.xlsx," Arm Holdings, July 30, 2025, https://investors.arm.com/financials/quarterly-annual-results. "R&D expenses consist primarily of employee-related expenses, including salaries, bonuses, share-based compensation, and benefits associated with employees in research and development functions, along with project materials costs, third-party fees paid to consultants, depreciation and amortization, allocated overhead, information technology and other development expenses. We receive government grants to compensate for certain research activities and we recognize the benefit as a reduction of the related expenses included in R&D expenses." *See* Arm 2023 Form F-1, p. 98.

[516] *See also* ARM_01282304 at '314, a 2018 Arm presentation reporting R&D as a percentage of revenue going back to 2005 and showing an increase in 2016-2017 compared to prior years.

[517] Intel Corporation, 2021 Form 10-K, for the fiscal year ended December 25, 2021, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-22-000007/0000050863-22-000007.pdf, p. 37, and Intel Corporation, 2024 Form 10-K, for the fiscal year ended December 28, 2024, https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000009/0000050863-25-000009.pdf, p. 23. The highest ratio, 31.2% was in 2024 and the lowest, 17.4%, was in 2020.

138

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

**Exhibit 5: R&D Expenditure as Percentage of Total Revenue**[518]



- *Arm Has Increased Its R&D Investment Faster than Qualcomm:* From 2019 to 2025, Arm's R&D expenditure increased by about 150% while Qualcomm's R&D increased by

---

[518] Arm: ARM_00000510 at '535 and Exchange Rates, "British Pound to US Dollar History: 2019," https://www.exchangerates.org.uk/GBP-USD-spot-exchange-rates-history-2019.html for 2019, ARM_00000382 at '416 for 2020; Arm 2023 Form F-1, Arm Holdings plc, August 21, 2023, p. 99 for 2021-2022; and Arm 2025 Form 20-F, p. 72 for 2023-2025. Qualcomm: MacroTrends, "QUALCOMM Research and Development Expenses 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/research-development-expenses, MacroTrends, "QUALCOMM Revenue 2010-2025," https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/revenue. For Arm, total revenue is the sum of "Revenue from external customers" and "Revenue from related parties;" for Qualcomm, total revenue is the sum of revenue from "Equipment and services" and from "Licensing." For each year, I use the revenue and R&D expenditure figures from the latest available source.

139

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

only around 65%.[519] Some of the recent increases in Arm's investment is due to investments Arm is making to develop its own data center chips.[520]

215.    Arm executives testified that Arm sees competitive threats to "[a]ll parts of our business,"[521] e.g., from RISC-V, which pushes Arm to innovate and meet its customers' requirements to maintain its technological leadership.[522]

216.    Prof. Posner overlooks the fact that Arm's sustained R&D investment is both a response to competitive dynamics and a key driver of its success. Far from skimping on innovation, Arm's behavior reflects a firm actively investing to maintain and grow its position in a rapidly evolving industry.[523]

---

[519] Qualcomm Incorporated, Form 10-K, for fiscal years 2019 – 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx, and Qualcomm Incorporated, Form 10-Q, for quarterly periods 2019 - 2024, https://investor.qualcomm.com/financial-info-sec-filings/sec-filings/default.aspx, ARM_00000510 at '535, ARM_00000382 at '416. Qualcomm's fiscal year ends in September; for purposes of comparison, I aggregate quarterly data to match Arm's fiscal year, which ends in March. From 2019 to 2025, Arm's R&D expenditure increased from $840 million to $2.1 billion, while Qualcomm's expenditure increased from $5.4 billion to $9.0 Billion.

[520] Rene Haas, "Arm Holdings Plc Q1 2026 Earnings Call," July 30, 2025, p. 4, https://investors.arm.com/static-files/57a99953-427a-4cfb-ade8-634d3564c008 (In the most recent Arm earnings call, Mr. Haas described Arm's accelerate R&D investments: "We are continuing to explore the possibility of moving beyond our current platform into additional compute to subsystems, chiplets and potentially full end solutions. To ensure these opportunities are executed successfully, we have accelerated the investment into our R&D. These investments include expanding engineering delivery across multiple – levels, adding to the already significant product investments we have made to-date.").

[521] Williamson (Arm) Deposition, 102:2-10.

[522] Even when Arm innovates to meet its clients' needs, they may still choose to use a competing ISA. *See* ARMQC_02740386 at '387 ("We are on track to intercept this requirement. But they still want to bring in RISC-V").

[523] An internal Arm presentation from June 2023 outlines the company's strategic emphasis on advancing CPU technology, aligning with broader industry trends toward enhanced performance. The presentation highlights Arm's increased cadence of CPU product releases, an expansion in the number of CPUs offered, and sustained growth in both architectural complexity and engineering headcount. *See* ARM_01314793 at '797 (discussing the focus on better technology: "CPU Performance State of the Industry," […] everyone is working through the same playbook: Wider, deeper, better predictors, better prefetchers, more MHz, more datapaths, lower latency to L1/L2, larger caches,"), at '824 (characterizing its goal for the CPU Roadmap as an "[e]xplosion" with increase in the number of CPUs); at '826 (discussing that Arm's "average number of product releases [to partners] increased by ~1.8x"; at '827 (discusses growth in architecture complexity from 2000 to 2023, "~ 13% CAGR in Arch complexity from ~2015-23"), at '828 (discussing sustained growth in its CPU team over the years, "CPU has grown ~3.3x since `15 (~16% CAGR)."). *See also* ARM_01293447 at '448.

140

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

### 2.  Current High Shares Do Not Guarantee Future High Shares

217.  Prof. Posner does not consider that current high shares do not guarantee future high shares. There are many examples of once "dominant" firms that lost significant shares to rivals.

- *PC Segment:* In the PC segment, Intel's x86 had a share of nearly 100% in 2019.[524] However, the x86 share has recently come under significant competitive attack. In June 2020, Apple announced its plan to fully transition all Apple computer products from x86 to its own Arm-based chips, and by June 2023, Apple's transition was complete.[525] Then, as explained above, Qualcomm followed with Arm-based chips for Windows PCs in 2023, quickly gaining traction and further reducing the share of x86. These chips currently represent 9% of new Windows PC sales priced at $600 and above in the U.S. and the top five European countries.[526] Counterpoint Research estimated that Arm-based chips have reached 12.8% share in 2022, not accounting for Qualcomm's recent growth.[527]  Looking

---

[524] Based on Counterpoint Research estimates, Intel's share was 84% and AMD share was 15.1%, with Arm at less than 1%. *See* Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027.

[525] *See* "Apple announces transition to Apple silicon," Apple Newsroom, June 22, 2020, https://www.apple.com/newsroom/2020/06/apple-announces-mac-transition-to-apple-silicon/ (Apple announced the transition away from Intel and towards silicon would occur over the next two years). *See also* Charles Martin and Malcom Owen, "The history—and triumph —of Arm and Apple Silicon," Apple Insider, April 22, 2024, https://appleinsider.com/articles/24/04/22/the-history----and-triumph----of-arm-and-apple-silicon (As part of the transition to silicon, Apple's Macs would use chips based on Arm designs. The Mac Pro was the last machine to make the transition in June 2023.). Apple also uses its own Arm-based chips for its iPhone pursuant to its ALA with Arm. *See* Mike Wuerthele, "Apple & ARM's iPhone & Mac chip partnership will continue for decades," Apple Insider, September 5, 2023, https://appleinsider.com/articles/23/09/05/apple-arms-iphone-mac-chip-partnership-will-continue-for-decades.

[526] "Q3 2025 Qualcomm Inc. Earnings Call," Qualcomm, July 30, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Jul/30/Q3FY25-Earnings-Call-Transcript_7-30-25_Final.pdf, p.3 (Qualcomm states its goal is to achieve $4 billion in PC chip revenue by fiscal year 2029); "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf, p. 7. It's estimated that Qualcomm captured just 0.8% of the total PC market in Q3 2024. *See* Jowi Morales, "Qualcomm claims it owns 10% of U.S. Windows PC retail market for devices priced $800 and up," Tom's Hardware, February 6, 2025, https://www.tomshardware.com/tech-industry/qualcomm-claims-it-owns-10-percent-of-u-s-windows-pc-retail-market-for-devices-priced-usd800-and-up.

[527] Anton Shilov, "Arm-Based CPUs Could Double Notebook PC Market Share by 2027: Report," Tom's Hardware, April 11, 2023, https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027.

141

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

forward, Qualcomm targets 12% of the overall PC segment,[528] and Arm aims to reach 50% share in the Windows PC segment by 2029.[529]

- *Server Processor Segment:* In 2018, Intel held a 98% share of server processors and x86 had a 98.9% share in Q4 2019.[530] However, with the recent successes from Arm-based processors, such as AWS Graviton, Google Axion, Microsoft Azure Cobalt, and Nvidia Grace, Arm-based products have gained a share of roughly 15% as of 2024.[531] AWS estimated that "over 50% of new CPU capacity added by AWS in the last 2 years is on Arm-powered Graviton."[532] As with the PC segment, a historically dominant ISA is not guaranteed to maintain its lead over time.

- *Other industries:* The fall of MySpace, AOL, and Blockbuster further illustrates that dominance can erode quickly. A 2007 article in *The Guardian* wondered: "will [social networking service] MySpace ever lose its monopoly?"[533] Less than 5 years later MySpace was "sold for $35m in spectacular fall from $12bn heyday."[534] A similar destiny befell

---

[528] "Q1 2025 Qualcomm Inc. Earnings Call," Qualcomm, February 5, 2025, pp. 11-12, https://s204.q4cdn.com/645488518/files/doc_events/2025/Feb/05/QCOM_Q1FY25EC_Transcript_2-5-24.pdf.

[529] Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, June 3, 2024, https://www.reuters.com/technology/arm-aims-capture-50-pc-market-five-years-ceo-says-2024-06-03/.

[530] Mark Liu, "x86 Server CPUs Remain Market Mainstream, 7nm Platform May Help AMD to Increase Market Share, Says TrendForce," TrendForce, November 28, 2018, https://www.trendforce.com/presscenter/news/20181128-10076.html; Stan Gibson, "AWS ARM-based chips could shift microprocessor market," TechTarget, April 28, 2020, https://www.techtarget.com/searchaws/feature/AWS-ARM-based-chips-could-shift-microprocessor-market.

[531] Max Cherney, "Exclusive: Arm aims to capture 50% of PC market in five years, CEO says," Reuters, March 31, 2025, https://www.reuters.com/technology/arm-expects-its-share-data-center-cpu-market-sales-rocket-50-this-year-2025-03-31/. Arm estimates that its share of "Cloud Compute" is 20%. "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553.

[532] "AWS and Arm," Arm, https://www.arm.com/markets/computing-infrastructure/cloud-computing/aws#1, accessed August 29, 2025. *See also* "AWS re: Invent 2024 - Monday Night Live with Peter DeSantis," AWS, YouTube.com, December 3, 2024, https://www.youtube.com/watch?v=vx36tyJ47ps&t=1041s;.

[533] Victor Keegan, "Will MySpace ever lose its monopoly?" The Guardian, February 8, 2007, https://www.theguardian.com/technology/2007/feb/08/business.comment.

[534] Dominic Rushe, "Myspace sold for $35m in spectacular fall from $12bn heyday," The Guardian, June 30, 2011, https://www.theguardian.com/technology/2011/jun/30/myspace-sold-35-million-news.

142

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

instant messaging AOL.[535] Blockbuster dominated the video rental space, but failed to recognize the threat posed by Netflix and other streaming services, even turning down an opportunity to acquire Netflix for $50 million in 2000.[536]

218.     Prof. Posner argues that, due to "network effects," Arm's ecosystem is protected by "entry barriers."[537] While "network effects" are a feature of this industry and "entry barriers" exist, as they do in many industries, Prof. Posner provides no evidence about how "high" they are, much less that they are insurmountable. He does not attempt to quantify the strength of the effects or demonstrate that the "entry barriers" are so high to isolate Arm from competition.[538] In fact, Arm's recent success in segments previously dominated by x86 shows that "network effects" are not insurmountable (i.e., network effects did not protect x86's shares). The very fact that Qualcomm views RISC-V as a potentially viable alternative to Arm—even for high performance applications—suggests that Qualcomm does not view this existing "barrier to entry" as insurmountable.[539]

219.     Moreover, contrary to Prof. Posner's suggestion, the presence of even strong "network effects" does not imply that an industry can only accommodate a single "ecosystem." Multiple ecosystems coexist in other industries with "strong" network effects such as smartphones (where iOS and Android compete by developing ecosystems of compatible hardware and software), credit

---

[535] Mike Wehner, "AIM is officially dead, and your childhood means nothing," Yahoo!News, October 6, 2017, https://www.yahoo.com/news/aim-officially-dead-childhood-means-nothing-174900787.html.

[536] Steve Mollman,"Blockbuster 'laughed us out of the room,' recalls Netflix cofounder on trying to sell company now worth over $150 billion for $50 million," Fortune, October 22, 2024, https://finance.yahoo.com/news/blockbuster-laughed-us-room-recalls-174322621.html.Currently, Blockbuster has a single store still operating, in Bend, Oregon. *See*, Saul Sugarman, "So I visited the last Blockbuster on the planet, and all I got was this t-shirt," The Bold Italic, December 8, 2023, https://thebolditalic.com/so-i-visited-the-last-blockbuster-on-the-planet-and-all-i-got-was-this-t-shirt-ffc6d2ed414d.

[537] Posner Report, ¶ 11 ("Arm's ISA ecosystem exhibits strong network effects"), 34 ("An ISA ecosystem is characterized by significant entry barriers"), ¶ 57 ("Arm's ecosystem is protected by entry barriers. Because so many companies specialize in Arm-compliant products, a firm that sought to develop a new ISA would have to not only produce a superior ISA. It would also have to persuade firms in the Arm ecosystem to give up their existing customers and develop products for a not-yet-existing set of customers.").

[538] Posner Report, ¶¶ 34-35, discussing features of an industry that, Prof. Posner argues, lead to "significant entry barriers" but not providing any empirical evidence. *See also* ARMQC_02770485.

[539] *See* Section V.

143

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

cards (where multiple networks coexist), and ride share platforms (where Uber and Lyft coexist with their own ecosystems).[540]

### 3.    Any Attempt by Arm to Foreclose Customers Would Accelerate Development of Alternatives such as RISC-V

220.    Prof. Posner opines that Arm's actions "may" impede the development of alternative ISAs, such as RISC-V.[541] He claims that "if Arm […] weakens" the firms that would otherwise support such alternatives, such alternatives "will have trouble attracting chipmakers and thus face greater barriers to entry."[542] He also claims that, "[i]f Qualcomm is badly wounded, then it may not be able to continue to support or boost RISC-V."[543] However, this claim is vague and unsupported. Prof. Posner does not define what "badly wounded" means, nor does he explain how such a condition would materially limit Qualcomm's ability to invest in RISC-V development. Moreover, he fails to weigh the countervailing incentive: that foreclosure would likely increase, not reduce, Qualcomm's motivation to support competing ISAs.

221.    Prof. Posner's "badly wounded" claim seems to reflect the idea that, even if foreclosure increases incentives for Arm's customers to invest in other ISAs, those customers would have fewer financial resources to make those investments. This conjecture is highly speculative, however, and it implicitly assumes that the financial costs of foreclosure would outweigh the increased incentives to invest in alternative ISAs. In practice, many of Arm's customers— including Apple, Google, Meta, and Samsung—are large, well-capitalize enterprises with ample

---

[540] Bumblebees fly even if it was once believed that this defied the law of physics (*see* Joseph Calamia, Explained: The Physics-Defying Flight of the Bumblebee, Live Science, February 25, 2011 https://www.livescience.com/33075-how-bees-fly.html). Similarly, platforms that, in theory, are protected by network externalities and barriers to entry are displaced by new entrants, as the examples discussed above illustrate. For various other examples, *see* Ryan Bourne, "Is This Time Different? Schumpeter, the Tech Giants, and Monopoly Fatalism," Cato Institute, June 18, 2019 https://www.cato.org/publications/policy-analysis/time-different-schumpeter-tech-giants-monopoly-fatalism. Prof. Posner remains in the realm of theories and does not contend with reality; he does not explain, for example, why the barriers to entry that "defend" Arm are more impenetrable that the barriers to entry that, for example, defended MySpace. Prof. Posner behaves as a scientist that disregards the reality of bees flying because the theory does not explain the observed empirical evidence, rather than challenging and modifying the theory to accommodate the empirical evidence.

[541] Posner Report, ¶ 18.

[542] Posner Report, ¶ 18.

[543] Posner Report, ¶ 78. See *also id.*, ¶ 18.

144

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

resources to invest in alternative ISAs,[544] and evidence shows that the dispute with Arm has further increased, rather than retreating, Qualcomm's efforts to develop RISC-V. [545] Industry commentators have also noted that any attempt by Arm to restrict access to its ISA is likely to accelerate efforts to develop RISC-V as a viable, open-source alternative to Arm in the smartphone segment and other applications.[546] Faced with foreclosure, a strong and innovative company such as Qualcomm would not remain idle; it would have a strong incentive to invest in and support an alternative to Arm's ISA.

222.    In reality, Qualcomm has been investing in the RISC-V ISA ecosystem and has successfully shipped over a billion low-end RISC-V applications as of 2023.[547] As of June 2024,

---

[544] For example, Apple, Alphabet (Google's parent company), and Meta are among the top 10 companies in the world in terms of market capitalization, each with a capitalization of $1.9 trillion or more (*see* Lyle Daly, "The Largest Companies by Market Cap in August 2025," The Motley Fool, August 4, 2025 https://www.fool.com/research/largest-companies-by-market-cap/) compared to a market capitalization of about $145 billion for Arm as of August 29, 2025 ("Market Capitalization of Arm Holdings," Companies Market Cap, https://companiesmarketcap.com/arm-holdings/marketcap/, accessed August 29, 2025). Samsung and Qualcomm have a capitalization of about $330 billion as of August 29, 2025 ("Market Capitalization of Samsung," Companies Market Cap, https://companiesmarketcap.com/samsung/marketcap/, accessed August 29, 2025) and $170 billion as of August 2025 ("Market Capitalization of Qualcomm," Companies Market Cap, https://companiesmarketcap.com/qualcomm/marketcap/, accessed August 29, 2025).

[545] *See* Section V.A above.

[546] *See*, for example, Abner Li, "Report: Arm cancels Qualcomm's instruction set, IP license for chip design," 9to5Google, October 22, 2024, https://9to5google.com/2024/10/22/report-qualcomm-arm-chip-design/ ("Looking ahead, this Arm uncertainty could lead to the adoption of the open source RISC-V instruction set. Back in October of 2023, Qualcomm and Google announced work on a RISC-V Wear OS chip. The Android team is actively working on adding OS support with a focus on ensuring that "any CPU running RISC-V will have all of the features we expect to achieve high performance."). *See also* Linley Gwennap, "Editorial: Arm's No-Win Legal Fight," Tech Insights, https://www.techinsights.com/blog/editorial-arms-no-win-legal-fight, accessed August 29, 2025 ("Arm and Qualcomm are locked in an ugly public spat over the rights to Nuvia's CPU. Unresolved, this conflict could hamper Arm's progress in the PC market and foment interest in RISC-V.").

[547] In November 2023, Ziad Asghar, VP of product management at Qualcomm, spoke at the RISC-V Summit about Qualcomm's efforts to develop RISC-V applications, highlighting that Qualcomm had shipped 650 million devices with RISC-V in 2022 and over a billion devices in total since then. "By 2022, just like we showed last year, we had shipped 650 million devices with RISC-V, that is an amazing number. […] What has happened since then, today we are in excess of a billion devices that have RISC-V integrated microcontrollers in them. That's a massive number." *See* "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, @ 4:37, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational. *See also* "What is RISC-V, and why we're unlocking its potential," Qualcomm, September 8, 2023, https://www.qualcomm.com/news/onq/2023/09/what-is-risc-v-and-why-were-unlocking-its-potential ("To date, Qualcomm Technologies has shipped in excess of 650 million RISC-V cores.");

145

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

Qualcomm has various ongoing development efforts, including support for high performance RISC-V CPU and handset applications,[548] ███████████████████████████████ ████████████████."[549] This is contrary to Prof. Posner's claim that Qualcomm "may not be able to continue to support or boost RISC-V."[550]

223.    While RISC-V's current commercialization is concentrated in low-end applications such as microcontrollers and IoT, it is generally regarded as having high potential,[551] with various firms investing in its development.[552] Qualcomm's leadership has repeatedly emphasized this view,



[548] ███████████████████████████████████████████████████████████

[549] ██████████████████████████████████████████████████████ Cortex-A78 is categorized as a "High-Performance CPU" on Arm's product listing. "CPU Cortex-A78," Arm https://www.arm.com/products/silicon-ip-cpu/cortex-a/cortex-a78, accessed August 29, 2025 ("Designed for high-end performance at best efficiency, Cortex-A78 enables superior immersive experiences, bridging the gap between mobile and laptop performance. Optimized for new form factors and foldables, Cortex-A78 is ready for the next wave of mobile innovation and continues Arm's industry-leading mobile performance and efficiency with 5G device architecture."). █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████

[550] Posner Report, ¶ 78.

[551] ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

[552] NVIDIA uses RISC-V in its microcontroller. *See* "How NVIDIA Shipped One Billion RISC-V Cores In 2024," RISC-V International, February 25, 2025, https://riscv.org/blog/2025/02/how-nvidia-shipped-one-billion-risc-v-cores-in-2024/. ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████

146

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

highlighting RISC-V's properties in terms of performance, power efficiency, and customization.[553] In 2023, Qualcomm reported that over a billion of its devices already include RISC-V microcontrollers, and it continues to expand its RISC-V roadmap across mobile, automotive, and industrial applications.[554]

224.    Apart from Qualcomm, various efforts within the industry are already underway to advance RISC-V for use in higher-end applications.[555] For example, AheadComputing—a startup founded

---

Andrew Howard, Vice President of Partner Success and Licensing at Arm, testified that he sees RISC-V as a significant competitor in "in low-end markets […] I believe RISC-V is a viable substitute for Cortex M -- ARM M Profile CPUs" and that he has "knowledge that we did not achieve licenses with some customers. And sales documented it was due to RISC-V being chosen." *See* Howard (Arm) Deposition, 161:20-162:25. Similarly, Peter Greenhalgh, SVP of technology at Arm, stated that "There are markets today where RISC-V is a totally viable alternative and is being favored over ARM. […] An example would be Hardware Security Modules -- so we call them HSMs -- where they tend to use RISC-V CPUs instead of ARM CPUs. That would be one of the examples. There are other cases where in terms of sudden microcontroller functionality, which is on the larger applications processor, people will favor using a RISC-V CPU, rather than an ARM CPU. […] And another example would be the controller functions which are embedded on our applications processor." *See* Greenhalgh (Arm) Deposition, 100:3-23. *See also* ARMQC_02740205 at '214, a May 2024 presentation on assumptions about RISC-V's effect on Arm's IoT sales.

[553] 

[554] In November 2023, Mr. Asghar spoke at the RISC-V Summit, touting RICS-V's "many advantages," "massive opportunity," and momentum, as well as its deployment in over a billion Qualcomm devices that have RISC-V microcontrollers: "I think one thing is very clear – we are at a great point where RISC-V is really gaining momentum […] we have multitude of products that are coming out that are all able to use many of the advantages that RISC-V brings. [@ 0:36] […] When you look at what we have from mobile perspective and from the side of automotive and industrial IoT, AR and VR devices. It's a massive opportunity. [@ 1:00] […] [A] product that has better performance […] better power consumption […] Those are all areas where RISC-V can really excel and differentiate itself. […] the opportunity is just massive for RISC-V. [@ 2:19] […] We just launched our latest platforms – the Snapdragon 8 Gen 3 and also the Snapdragon X Elite for PC side – but we have the ability to be able to do even better with RISC-V […] the breadth and the momentum […] the full scale of what RISC-V ecosystem looks like and that's amazingly promising. [@3:10] […] By 2022, just like we showed last year, we had shipped 650 million devices with RISC-V, that is an amazing number. […] What has happened since then, today we are in excess of a billion devices that have RISC-V integrated microcontrollers in them. That's a massive number. [@4:37]" "Keynote: Unlocking Innovation with RISC-V and Qualcomm - Ziad Asghar," RISC-V International, YouTube, November 29, 2023, https://www.youtube.com/watch?v=9h9LwkPnrUw&ab_channel=RISC-VInternational.

[555] RISC-V has features of a disruptive innovator, as discussed, for example, in Gans, Joshua "The Disruption Dilemma," MIT Press, 2016.

147

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

by former Intel chip architects—is developing RISC-V for "high-performance cores for servers and data centers" and "scalable solutions for mobile and edge applications" using RISC-V.[556] Arm has itself acknowledged in a January 2024 presentation that RISC-V has gained traction as the "preferred arch[itecture]" in certain data center products and with competitors like Tenstorrent and Ventana building full-stack RISC-V systems.[557]

225.    Therefore, contrary to Prof. Posner's claims, Arm's alleged conduct and associated effect on Arm's reputation could lead to faster erosion of its share in favor of RISC-V.

226.    In summary, Qualcomm's early and ongoing investment in RISC-V, and the recognition within the industry, demonstrates that RISC-V ISA is a growing and credible competitor to the Arm ISA. While RISC-V's commercialization has been limited to low-end applications thus far, sustained development efforts—by Qualcomm and various firms—are expanding its viability to be adopted in higher-end CPU products and other applications. Contrary to Prof. Posner's claim that, facing the alleged foreclosure by Arm, Qualcomm "may not be able to continue to support or boost RISC-V," [558] the evidence shows the opposite: the dispute has only strengthened Qualcomm's incentive to accelerate RISC-V development, thereby increasing—not reducing—ISA competition.

---

[556] Skye Jacobs, "Former Intel engineers from AheadComputing to break CPU performance limits with RISC-V design," TechSpot, June 12, 2025, https://www.techspot.com/news/108281-former-intel-engineers-form-aheadcomputing-break-cpu-performance.html. *See also* QCARM_7484882. Similarly, Qualcomm, NXP, Infineon, Bosch, and Nordic Semiconductor formed a joint venture named Quintauris to accelerate the adoption of RISC-V technology. Financial services company CGS International commented that: "For most other low power markets, Arm remains the ISA of choice, due to its history, vastly superior software ecosystem, and strong product offerings. The joint venture by Qualcomm/NXP/Infineon/Bosch/Nordic to develop RISC-V hardware modestly increases competitive pressure on Arm, but JV product timelines are still uncertain and initial designs will be limited to auto." CGS International, "Arm Holdings pcl - Initiate at Outperform and $160 PT; Content Story in Early Innings," US Equity Research, Sept 12, 2024, p. 9.

[557] "RV [RISC-V] competitors (Tenstorrent, Ventana, …) have developed full (CPU + Mesh + AI accl[erator] + IO hub) systems targeted towards datacenters/6G," where Arm needs to actively bring business in early versus RISC-V and "formally communicate details on competition." ARMQC_02726982 at '989.

[558] Posner Report, ¶ 78.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

4. <u>There Is No Evidence that Arm's Purported Decision to Stop Supporting v8 Is Anticompetitive</u>

227.    Qualcomm argues that "Arm has pressured existing v8 licensees to 'upgrade' their licenses to v9 by not releasing or supporting older v8 cores."[559] However, I have seen no evidence of the alleged pressure, and Qualcomm and Prof. Posner do not provide any.

228.    To assess this claim, I compare the transition from v8 to v9 with the earlier transition from v7 to v8.[560] If Qualcomm's claim were accurate, one would expect the shift from v8 to v9 to be faster than the shift from v7 to v8. Yet, the data do not support this conclusion: there is no evidence that the ongoing transition from v8 to v9 is faster.[561] The speed of penetration of v8, reflected in the expansion of the darker blue section at the top of the bars in the red box on the left, is similar to the speed of penetration of v9, reflected in the expansion of the darkest blue section at the top of the bars in the red box on the right.

229.    Although this test is admittedly rudimentary and not without limitations, it nonetheless provides more substantive insight than the speculative claims and absence of supporting evidence offered by Qualcomm and Prof. Posner.[562]

**Exhibit 6: Royalty Revenue by Technology**[563]



230.    It is, moreover, standard commercial practice for firms to promote newer versions of their technology. What Qualcomm characterizes as "pressure to upgrade" is better understood as Arm encouraging its customers to adopt improved products and highlighting that the benefits of switching to its newer technology outweigh the costs.[564]

149

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

231.    In conclusion, Arm faces real and growing competition from x86 and RISC-V, continues to invest heavily in R&D, and operates in a dynamic ecosystem where sustained success is not guaranteed. The evidence shows that Arm's conduct—including its licensing practices, pricing, and product transitions—is consistent with standard commercial behavior. Attempts to foreclose customers like Qualcomm would likely accelerate the development of competing ISAs, undermining Arm's own ecosystem. Prof. Posner's analysis fails to account for these constraints and costs, rendering his conclusions speculative and incomplete.

## IX. Prof. Posner Has Not Demonstrated that Arm's Conduct Harmed Competition and Consumers

232.    Qualcomm claims that it suffered harm as a result of Arm's conduct.[565] Prof. Posner claims that, because of Arm's conduct, "the downstream OEMs will either pay more for chips or be required to settle for lower-quality chips, to the detriment of the ultimate consumer."[566] However, even if these unsubstantiated claims were true, harm to Qualcomm is not the same as (and does

---

[559] SAC, ¶ 70.

[560] David Brash, "The ARMv8-A architecture and its ongoing development," Arm Community, December 2, 2014 https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/the-armv8-a-architecture-and-its-ongoing-development.

[561] For example, v8's share increased from a few percentage points in FY2014 to about 30% in FY2016, while v9's share increased from essentially zero in FY2022 to about 20% in the last quarter of FY2024.

[562] One reason why the test is imperfect is that many factors may be different between the two transitions, in addition to the alleged lack of support for v8. For example, the relative improvement of v9 over v8 and v8 over v7 can be a factor.

[563] Source: "Arm Holdings plc Q4 FYE24 Results Presentation," Arm Holdings, May 8, 2024, https://investors.arm.com/static-files/4f2fc46b-34a5-4bc5-94af-f13fbc348f0e (left chart); "Arm Holdings plc, Q1 FYE26 Investor Presentation," Arm Holdings, July 30, 2025, https://investors.arm.com/static-files/dae25601-3e5a-4d40-b9f5-e0149989e553 (right chart).

[564] For example, when Apple introduces a new iPhone, it generally "pushes" customers to upgrade through advertising.

[565] SAC, ¶ 34.

[566] Posner Report, ¶ 72.

150

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

not imply) harm to competition or consumers.[567] As a simple application of this general principle, entry into the supply of custom chips, including by Qualcomm's customers that start to develop their own custom chips for their own consumption or for supply to third parties, would harm Qualcomm but is likely to benefit competition and consumers.

233.    As an example of harm to Qualcomm that is not harm to competition, Qualcomm argues that Arm's conduct allowed Qualcomm's customers to receive better financial terms (i.e., Qualcomm charged its customers less).[568] This is wholly unsubstantiated, but even if true, it may represent a benefit rather than harm to consumers because the lower cost to Qualcomm's customers can, to some extent, be passed-through to their own customers.

234.    Qualcomm and Prof. Posner have neither shown that Qualcomm suffered competitive injury, nor, more importantly, have they shown that any such claimed harm caused harm to competition and consumers.

---

[567] This basic economic principle has been embraced by the Supreme Court, which, in discussing price reductions that harm competitors, stated: "To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for '[i]t is in the interest of competition to permit dominant firms to engage in vigorous price competition, including price competition." The Court went on emphasized that reducing prices in order to expand sales is often "the very essence of competition" and that "mistaken inferences . . . are especially costly because they chill the very conduct the antitrust laws are designed to protect." *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986). In another matter, the Supreme Court succinctly held that antitrust laws protect "competition, not competitors" (*Brown Shoe Co., Inc. v. United States*, 370 U.S. 294 (1962) at 370 U. S. 344). The Supreme Court reiterated this conclusion in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977) at 429 U. S. 488. ("The antitrust laws, however, were enacted for 'the protection of competition, not competitors'").

Economists have explained why competition rather than competitors must be protected. Disruptive innovations and creative destruction can harm competitors but more importantly benefit consumers. "The goal of antitrust policy is to protect and promote a vigorous competitive process. Effective rivalry spurs firms to introduce new and innovative products, as they seek to capture profitable sales from their competitors and to protect their existing sales from future challengers." Federico, Giulio, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," Innovation Policy and the Economy, 2020, Vol. 20, pp. 125-190. On "creative destruction," *see* Schumpeter, Joseph, "Capitalism, Socialism, and Democracy," Harper & Brothers Publishers, 1942.

151

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

235.    As I discuss above, Arm's strategy is to work with its customers to promote and expand the ecosystem of Arm-based technology.[569] I also discuss above that Arm profits from the success of its customers, and their success in developing Arm-based rather than, e.g., RISC-V-based, technologies.[570]  It is therefore natural and unsurprising that there is no evidence of Arm attempting to harm its customers.

## A. Qualcomm Has Not Demonstrated that Arm Had Anticompetitive Intent

236.    Qualcomm's SAC claims—without evidence—that Arm started the *Arm v. Qualcomm* litigation for anticompetitive reasons and that its conduct had the objective to harm Qualcomm.[571] Prof. Posner offers no evidence that Arm's conduct was anything other than a legitimate effort to protect its contractual rights and business model.

237.    I do not opine on Arm's intent, which is a fact question for the Court to decide. Counsel for Arm has instructed me to assume that Arm started the *Arm v. Qualcomm* litigation to exercise its contractual rights, not to foreclose Qualcomm.  However, I note that various factors suggest that Arm's actions were not aimed at harming Qualcomm, one of its main customers.

i.    The *Arm v. Qualcomm* litigation is the first and only time Arm has filed a lawsuit against a customer.[572] This underscores the rarity and exceptional nature of the dispute. A one-off lawsuit is not indicative of a pattern of exclusionary conduct against customers or a broader strategy to suppress competition. Arm's strategy consists of working with its licensees to

---

[569] Will Abbey, "Flexible Licensing, Boundless Innovation: How Arm is Accelerating Partner Success," Arm, November 1, 2023 https://newsroom.arm.com/blog/arm-licensing-models. (Abbey stated that "[t]hirty years on, a core philosophical tenet of Arm's original IP licensing model underpins its expanded subscription strategy to foster innovation: Arm only succeeds when partners succeed." *See also* ARMQC_02725050 at '068 (A September 2020 presentation discusses partner efforts on the Windows-on-Arm ecosystem and details partner collaborations to provide developer support and expand enterprise application readiness).

[570] Section VII.C. *See also* Chloe Ma's (Chief Business Officer at Arm) statement on leveraging Arm's partners, rather than focusing on RISC-V-based technologies, to drive success. ARMQC_02600713 at '719; Paul Williamson, "Arm Continues to Accelerate IoT Software Development with New Partnerships," Arm Newsroom, November 7, 2022, https://newsroom.arm.com/news/arm-continues-to-accelerate-iot-software-development-with-new-partnerships.

[571] SAC, ¶ 207.

[572] Rene Haas' trial testimony in *Arm v. Qualcomm*, 272:1-15 ("[In August 2022,] we were at a fork in the road, we were either going to continue for another 18-months plus to look the other way, or do something we had never done in our history and that was to file a claim, a lawsuit against a customer. But we made the choice to file the claim.").

152

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

build out the network of Arm-based technology and suing a customer runs counter to Arm's collaborative strategy. This exceptional case highlights that Arm has thus far been able to work productively with its licensees in furthering the use cases and value of its ecosystem, but it considered that it had to take action in view of a perceived breach of contract after Qualcomm's acquisition of Nuvia.

ii.   While Qualcomm claims that the lawsuit was "meritless,"[573] Qualcomm ignores the fact that it did pass key pretrial motions, including a summary judgment motion.[574] These procedural outcomes indicate that Arm's claims were sufficiently substantiated to warrant a trial. Filing a lawsuit is a standard and legitimate recourse when parties are unable to reach a resolution through private negotiations. Such action cannot be considered anticompetitive per se; on the contrary, judicial resolution of uncertainty can promote clarity, expand trade, and strengthen incentives to innovate.[575]

## B.  Arm's Litigation Position Was Public and Transparent from as Early as 2022

238.    Qualcomm claims that "[a]pparently seeking to ratchet up pressure on Qualcomm before trial in *Arm v. Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media— a letter […] asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing 'unlicensed cores,' and claiming that Arm will be entitled to terminate the [Qualcomm] ALA if Qualcomm does not capitulate to Arm's demands for a 'cure' within 60

---

[573] SAC, ¶ 8.

[574] *See Qualcomm Inc. v. Arm Holdings, plc.,* C.A. No. 24-490-MN, Dkt. No. 233, Arm's Opening Brief In Support of Its Partial Motion To Dismiss Qualcomm's Second Amended Complaint, June 17, 2025, p. 3 ("On October 30, 2024, the Court [in the *Arm v . Qualcomm* case] denied Qualcomm's and Arm's motions for summary judgment, holding that genuine issues of material fact remained for the jury.").

[575] Contractual disputes arising from honest disagreements over the correct interpretation of contractual terms are common. They can arise for a variety of reasons such as ambiguous or unclear language, and incomplete or imprecise terminology, which in turn may lead to the parties having different understandings and diverging interpretations. *See* Posner, Richard A., "The Law and Economics of Contract Interpretation," 2004, 83 Texas Law Review 1581 ("[S]ignificant interpretive questions often arise in contract litigation. The obvious but not the only reason, besides clumsiness in the use of words, against which the legal linguists warn us, is that contractual performance generally occurs over time rather than being complete at the instant the contract is signed. This is a central rather than an accidental feature of the institution of contract.").

153

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

days."[576] Qualcomm also claims that the Breach Letter was "timed and publicly released in an effort to damage Qualcomm's business," because it coincided with "Qualcomm's annual Snapdragon® Summit."[577] Prof. Posner claims that Arm "leaked the notice letter" and "interfered with Qualcomm's relationship with its customers by sowing doubts about Qualcomm's continued ability to sell Arm-compliant chips."[578]

239.    Prof. Posner and Qualcomm do not explain how Arm's October 2024 letter and its publication could interfere with Qualcomm's business opportunities given that, as early as 2022, Arm repeatedly, clearly, and publicly stated that (a) Qualcomm was in breach of the Qualcomm ALA and (b) Arm had the right to terminate the ALA as a result.[579] As discussed earlier, Qualcomm also recognized that Arm's October 2024 Breach Letter was not "new news."[580] Nor do they explain how the notice could have harmed the competitive process.

240.    

---

[576] SAC, ¶ 29.

[577] SAC, ¶ 33.

[578] Posner Report, ¶¶ 45, 65.

[579] I understand that Arm has also maintained that it retains the right to terminate the agreement if Qualcomm is found to have breached its terms.

[580] In *Arm v. Qualcomm*, Qualcomm's counsel acknowledged during the November 20, 2024 pre-trial conference that Arm's allegation of breach of the Qualcomm ALA has been part of the case "starting at the very beginning" and that "the letter on October 22nd [was] actually not new news in the sense of alleging [Qualcomm's] breaches" of the Qualcomm ALA because that claim was in the case "starting at the very beginning." *See also Arm v. Qualcomm*, No. 22-1146 (MN), Pretrial Conference Transcript, November 20, 2024, pp. 13, 14 ("And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed.").

154

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER



241.    Arm filed the *Arm v. Qualcomm* litigation on August 31, 2022.[582]  The lawsuit was widely reported in the press.[583]  In a publicly available filing dated November 15, 2022, submitted in the context of the *Arm v. Qualcomm* litigation, Arm reiterated and clarified its position.[584] The filing was also reported in detail in the press.[585]

---

[581] ████████████████████████████████████

[582] *Arm Ltd. v. Qualcomm Inc.*, No. 1:22-cv-01146 (D. Del. filed August 31, 2022), Dkt. No. 1.

[583] For example, an article on the same day the lawsuit was filed reported: "Arm is suing Qualcomm, one of its key customers, in a row over the latter's Nuvia custom CPU cores. […] Arm has accused Qualcomm of being in breach of its licenses, and it wants the American giant to fulfill its obligations under those agreements, such as destroying its Nuvia CPU designs, plus cough up compensation." The article further reported: "According to Arm […] the licenses it granted Nuvia could not be transferred to and used by its new parent Qualcomm without Arm's permission. Arm says Qualcomm did not, even after months of negotiations, obtain this consent, and that Qualcomm appeared to be focused on putting Nuvia's custom CPU designs into its own line of chips without permission. That led to Arm terminating its licenses with Nuvia in early 2022, requiring Qualcomm to destroy and stop using Nuvia's designs derived from those agreements." *See* Chris Williams, "Arm sues Qualcomm over custom Nuvia CPU cores, wants designs destroyed," The Register, August 31, 2022, https://www.theregister.com/2022/08/31/arm_sues_qualcomm/. *See also* Stephen Nellis and Jane Lee, "Arm sues Qualcomm, aiming to unwind Qualcomm's $1.4 bln Nuvia purchase," Reuters, September 1, 2022, https://www.reuters.com/legal/chips-tech-firm-arm-sues-qualcomm-nuvia-breach-license-trademark-2022-08-31.

[584] *See Arm Ltd. v. Qualcomm Inc.*, No. 1:22-cv-01146-MN, Dkt. No. 1 (D. Del. August 31, 2022, filed November 15, 2022), at pp. 2-3 and ¶¶ 41, 230, 237, 250,  ("Qualcomm is not only trying to develop an unlicensed product, but is also materially breaching its ALA with Arm. […] Within days after Qualcomm first contacted Arm about its planned acquisition of Nuvia, Arm informed Qualcomm in writing that it would need to enter into a new agreement if it wished to continue using the designs and technology that had been created pursuant to the Nuvia ALA. Arm did not wait in the weeds; it openly and promptly identified and communicated Nuvia's and Qualcomm's obligations. […] Qualcomm and Nuvia must stop using and destroy any Arm-based technology developed under Nuvia's ALA, and that neither Qualcomm nor Nuvia is licensed to continue developing this technology. […]  Qualcomm is not authorized to make, use, sell, or import a product incorporating designs or derivatives of the NuVia [sic] technology. […] Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology.").

[585] *See*, for example, Dylan Patel, "Arm's Nuclear Option – Qualcomm Must Cancel Next-Generation Products If Arm Succeeds," SemiAnalysis, November 16, 2022, https://semianalysis.com/2022/11/16/arms-nuclear-option-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

242.    Arm's first communication with Qualcomm's customers who use products that embed Arm's technology occurred soon after filing the *Arm v. Qualcomm* litigation.[586] Arm had a legitimate reason to make its position known to users of its technology, to confirm and clarify the accounts in the public press, and to reassure customers of its lawful commitment to protect its IP.[587] Prof. Posner does not explain why that would generate harm for Qualcomm that is incremental to the alleged harm from the filing itself.

243.    Similarly, Prof. Posner does not explain why the October 2024 Breach Letter would affect customer expectations or behavior given that for over two years Arm had repeatedly and publicly stated its belief that Qualcomm was in breach if its ALA, and a decision in the *Arm v. Qualcomm* litigation was expected only two months after the October 2024 Breach Letter.[588]

---

qualcomm-must/. *See also* Chris Williams, "Arm shells Qualcomm's Snapdragon launch party with latest salvo in license war," The Register, November 16, 2022, https://www.theregister.com/2022/11/16/arm_qualcomm_licensing_latest/.



[588] With a letter sent to Qualcomm on January 8, 2025, following the decision in the *Arm v. Qualcomm* litigation, Arm withdrew the Breach Letter.

156

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

244.    Qualcomm and Prof. Posner also take issue with the "timing" of the letter and associated "leak."[589] However, Qualcomm and Prof. Posner do not explain why the alleged harm was increased by the fact that the notice was sent at the time of Qualcomm's annual Snapdragon Summit.[590] This is speculative and unsupported by evidence.

245.    Arm had legitimate reasons to inform its customers of the dispute with Qualcomm and its view that Qualcomm was in breach of its ALA, and to clarify its position with users of its technology. Arm's outreach to Qualcomm's customers who use products that embed Arm's technology was a reasonable and commercially justified response to an ongoing contractual dispute, not anticompetitive conduct. First, Arm had a legitimate interest in ensuring that customers were aware of potential legal and licensing risks associated with Qualcomm's Nuvia-



[589] ████████████████████████████████████████████████████████ However, Arm filed the *Arm v. Qualcomm* litigation on August 31, 2022; and the 2022 Snapdragon Summit occurred during November 15-17 in Hawaii. *See* Ben Schoon, "Qualcomm confirms November 15–17 event to reveal its next Snapdragon flagship," 9to5Google, July 19, 2022, https://9to5google.com/2022/07/19/snapdragon-summit-2022. Therefore, the Snapdragon Summit appears to have occurred over two months after the filing of the lawsuit.  It is unclear how an event that took place two months before the Snapdragon Summit could have "coincided" with the timing of the Snapdragon Summit.

[590] Spencer Collins, a member of Arm's executive committee, was asked about the timing of the letter at his deposition. He explained that the letter was timed so that the ████████████████████ would end just after the decision for the *Arm v. Qualcomm* trial was expected, to give Arm the option to terminate the agreement at that time, if the jury had decided in Arm's favor.  *See* Collins (Arm) Deposition, 75:4-78:3 ("Q. Why at this time was it appropriate? A. We had tried via numerous avenues to stop Qualcomm from breaching our agreement. So we sent letters. That didn't work. We were then left with no choice but to issue a claim, which we've never done in our 35-year history, to a customer of ours. Then we asked for certification of their adherence to the ██████████ We believed they continued to be breached. Nothing was working. We were approaching trial. This was sent on the 22nd of October 2024. We were approaching trial. And nothing was working. This was not about money for us. This was about respecting our contracts and protecting our IP. We wanted -- our ultimate goal in this dispute was for Qualcomm to remedy the breach. We decided between me, my team and outside counsel that the appropriate thing to do is to send ████████████████████████████████████████████ ██████████████████████████████████████████ We felt, given we're approaching trial and we were making no progress with Qualcomm, that was the appropriate thing to do."), 78:17-79:13 ("Q. So you wanted to have the ability to terminate the Qualcomm ALA as soon as the jury came back if, in fact, you had won the trial in December; is that fair? A. We hadn't decided as to whether or not we would terminate the ALA. But we wanted the option. We wanted to be in business with customers respect our contracts."), and 80:2-8 (Mr. Collins also indicated he was unaware that the timing of the letter coincided with the timing of the Snapdragon Summit, but that "the ██████ period coincided with the trial date from our standpoint as opposed to the Snapdragon conference.").

157

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

based CPUs that were at the center of the contractual dispute.[591] This kind of communication is common.[592] Second, maintaining transparency with customers helps preserve the integrity of Arm's licensing model. Failure to communicate could have created confusion or undermined confidence in Arm's IP rights, particularly given the public nature of the dispute.

246.    High-tech companies operate in dynamic and uncertain environments, where well-managed firms routinely assess and mitigate risk. Arm's decision to protect its IP and seek judicial resolution of its dispute with Qualcomm is not anticompetitive. Even if this prompted some Qualcomm customers to seek "reassurance" or pause to evaluate the situation, such responses are typical in commercial settings and do not constitute harm to competition.  This is not different from a firm suing for patent violation, which may also induce customers of the allegedly violating firm to require "assurance."  In fact, Qualcomm agrees that protection of IP is important. For example, Qualcomm stated that "[t]he drive to invent is a core value of Qualcomm's identity, and protection of inventors' rights is important to both the company and our business model. Economists and historians agree there has been no greater incentive to invent than protection of inventors' rights to the IP produced by their hard work and creativity. Patents are the primary means of protecting IP and represent a rule-of-law guarantee akin to a deed's role in protecting the ownership of land. […] Strong patent protection in the United States and other economies

---

[591] Philip Hughes, VP for external communications at Arm, testified that the purpose of the communications to Qualcomm's customers who use products that embed Arm's technology was "just to inform customers why [Arm had] taken these actions." Deposition of Phil Hughes, June 17, 2025 (hereinafter "Hughes (Arm) Deposition"), 7:17-20; 27:4-18 ("Q. All right. And what was your understanding of the purpose of the communications to Qualcomm customers? A. Okay. Again, I think it – as I recall, it was more just to inform customers why we'd taken these actions. Q. And when you say, "to inform customers why we'd taken these actions," what actions are you referring to? A. The – the lawsuit."). Concerning the publication of the October 2024 Breach Letter, Ami Badani, Chief Marketing Officer at Arm, testified that "our goal was to make sure that our customers and partners were informed, and that was our singular goal. […] our goal was to inform our partners and customers because they would have found out anyways. So we wanted to make sure that we were getting in front of it with the right facts." Deposition of Ami Badani, August 1, 2025 (hereinafter "Badani (Arm) Deposition"), 7:20-22; 49:23-50:18.

[592] For example, during the *SCO v. IBM* litigation, the SCO Group sent letters to about 1,500 companies alleging that the use of Linux may infringe a copyright it holds on the original UNIX source code. "SCO Sends Warning Letters To Linux Users," InformationWeek, December 22, 2003, https://www.informationweek.com/it-leadership/sco-sends-warning-letters-to-linux-users; Stephen Shankland, "SCO targets Linux customers," CNET, May 14, 2003, https://www.cnet.com/tech/services-and-software/sco-targets-linux-customers/. Qualcomm also issued statements informing the broad public of lawsuits it files against other companies. For example, *see* "Qualcomm Files Lawsuit Against Motorola," Qualcomm, March 5, 1997 https://www.qualcomm.com/news/releases/1997/03/qualcomm-files-lawsuit-against-motorola, "Qualcomm Files GSM Patent Infringement Suit Against Nokia," Qualcomm, November 6, 2005 https://www.qualcomm.com/news/releases/2005/11/qualcomm-files-gsm-patent-infringement-suit-against-nokia.

158

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

encourages investment in research and development by companies and individuals that has resulted in life-changing technologies, including the technologies that make possible the wireless communications that define our world today."[593] It is therefore not surprising that Qualcomm carefully protects its IP.[594]

247.    In conclusion, the evidence demonstrates that Arm's litigation position was consistently public and transparent from the outset of its dispute with Qualcomm. Arm did not conceal its views or engage in a misinformation campaign; rather, it communicated its contractual concerns openly through legal filings and public statements beginning in 2022. The October 2024 Breach Letter did not introduce new information or disrupt Qualcomm's relationship with its customers, but instead reiterated Arm's long-standing position. There is no evidence that Arm's communications were a strategic attempt to harm competition rather than a commercially reasonable response to an unresolved contractual disagreement. These facts collectively undermine Qualcomm's and Prof. Posner's allegations and support the conclusion that Arm's conduct aligns with standard industry practice and reflects procompetitive behavior.

## C.  There Is No Evidence of Harm to Competition

248.    Qualcomm's claim of harm is inconsistent with its market performance. Since the onset of the dispute, Qualcomm has expanded its product portfolio, entered new segments, and maintained strong financial performance—indicators of a firm that is competing successfully.[595] These facts undermine the allegation that Arm's conduct harmed Qualcomm in any meaningful way. Moreover, even if Qualcomm had demonstrated that it suffered harm, such harm to Qualcomm

---

[593] "Invention and Intellectual Property [-] Protecting the value of invention," Qualcomm, https://www.qualcomm.com/company/corporate-responsibility/acting-responsibly/public-policy/our-positions/invention-and-intellectual-property, accessed August 28, 2025.

[594] *See* footnote 350350.

[595] *See* Section VI.

159

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

does not equate to harm to competition. Antitrust analysis focuses on the impact to the competitive process and consumer welfare, not on the fortunes of individual firms.[596]

249.    *First*, there is no evidence that Arm's decision to file its lawsuit against Qualcomm harmed competition. The legal process is a standard and legitimate mechanism for resolving genuine disputes about the terms of an agreement. While litigation may impose costs or harm upon both parties involved as well as their partners, it also serves to clarify contractual obligations, allow the parties to move forward with their businesses, and unlock the potential gains from trade that the dispute may have stalled.[597] Arm's decision to protect its IP and exercise its contractual rights reflects a lawful and commercially reasonable approach, not anticompetitive conduct, even if Qualcomm perceives harm to its own interests.

250.    *Second*, Qualcomm's criticism of Arm's organic entry into chip design overlooks the procompetitive nature of such expansion. Entry by Arm introduces additional product variety and increases competitive pressure, which can benefit consumers through improved innovation and pricing. Prof. Posner fails to even consider this possibility, offering no analysis of the potential consumer benefits or efficiencies associated with Arm's organic vertical expansion. Rather than harming competition, Arm's entry reflects a natural evolution in response to customer demand and industry dynamics.

251.    

---

[596] Congressional Research Service, "Antitrust Law: An Introduction," May 1, 2025, https://www.congress.gov/crs_external_products/IF/PDF/IF11234/IF11234.8.pdf ("The Goals of Antitrust: The federal antitrust laws seek to protect economic competition…. Antitrust cases generally turn on whether the conduct or transaction at issue enables the exercise of market power in ways that diminish consumer welfare, total welfare, or innovation.").

[597] *See*, for example, Seitz, Michael and Martin Watzinger, "Contract enforcement and R&D investment," Research Policy, 2017, Volume 46, Issue 1 ("Motivated by the differences in innovation across countries, this paper evaluates the role of contract enforcement for R&D investments. We find empirical evidence that weak contract enforcement is associated with lower R&D investment: R&D intensity in an industry increases with the quality of the judicial system. This effect is particularly strong in industries that cannot buy inputs on competitive markets and thus depend more on contracts to acquire inputs. In line with this, we show that contract enforcement is particularly important in industries in which vertical integration is not a viable option.").

[598] *See* Section VIII.B.2.

160



252.    *Fourth*, as discussed above, Arm's licensing practices remain open and widely accepted.[601] Arm continues to offer ALAs to a broad range of partners, including Apple, Google, and IBM, and TLAs to companies such as Microsoft, Samsung, and Texas Instruments.[602] Qualcomm and Prof. Posner provide no evidence that Arm has refused to license its ISA to other firms or restricted access in a manner that would harm competition.

253.    *Fifth*, Qualcomm and Prof. Posner have not provided any evidence to show that Arm's action adversely affected any other ALA or TLA partner. The absence of harm to other licensees undermines Qualcomm's argument that Arm's actions have harmed competition, rather than simply impacting a single commercial relationship.

254.    In summary, Qualcomm's allegations of competitive harm are not supported by evidence. Qualcomm's continued growth and diversification contradict the notion that Arm's conduct has harmed Qualcomm. Each of the specific actions attributed to Arm—whether enforcing its contractual rights, entering chip design, responding to customer needs, or maintaining open licensing practices—reflect standard commercial behavior, not harm to the competitive process or

---

[599] Awad (Arm) Deposition, 48:12-51:17.

[600] Posner Report, ¶ 66.

[601] Arm remains open through its extension of licensing agreements to various customers.

161

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

consumer welfare. The absence of harm to other licensees further reinforces the conclusion that this is a bilateral dispute, not a threat to competition.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Timothy S. Simcoe

September 5, 2025

162

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 12, 2026, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                               *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                           *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Sydney D. Gaskins, Esquire                            *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Alexandra Corrinne Hottenrott, Esquire                *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Daralyn J. Durie, Esquire                             *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*

Lydia B. Cash, Esquire                                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                                    *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                                      *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                                *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*


                                        */s/ Jennifer Ying*
                                        _____
                                        Jennifer Ying (#5550)