# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUALCOMM INC., a Delaware corporation, and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,<br><br>          Plaintiffs,<br><br>     v.<br><br>ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K. corporation,<br><br>          Defendant. | **REDACTED - PUBLIC VERSION**<br>(Filed February 27, 2026)<br><br><br>C.A. No. 24-490-MN<br>(CONSOLIDATED)<br><br> |

**APPENDIX TO DEFENDANT'S OBJECTIONS TO THE SPECIAL MASTER'S MEMORANDUM ORDER (D.I. 630) RESOLVING DEFENDANT'S MOTION TO STRIKE AND TO COMPEL (D.I. 378) – VOL. 4 OF 7**
**A1021 – A1346**

Dated: February 20, 2026

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Kasdin Mitchell, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
kasdin.mitchell@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

# TABLE OF CONTENTS

| Document | Page Range |
|---|---|
| C.A. No. 1:24-cv-00490-MN, Defendant Arm Holdings plc's Letter Brief to Special Master Rychlicki, dated August 11, 2025 ███████████ | A0001 |
| Declaration of Adam Janes in Support of Defendant Arm Holdings plc's Letter Brief to Special Master Rychlicki, dated August 11, 2025 ████ | A0008 |
| Exhibit 1 – Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), dated July 11, 2025 ███████ | A0013 |
| Exhibit 2 – Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), dated July 11 2025 ██████ | A0072 |
| Exhibit 3 – Plaintiffs' First Amended Complaint, dated December 16, 2024 █████ | A0129 |
| Exhibit 4 – Plaintiffs' Second Amended Complaint, dated June 3, 2025 █████ | A0181 |
| Exhibit 5 – Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), dated August 8, 2025 ████████ ███ | A0252 |
| Exhibit 6 – Plaintiffs' Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13), dated May 9, 2025 ███████ | A0321 |
| Exhibit 7 – QCVARM_0605055 ██████ ████ | A0343 |
| Exhibit 8 – Excerpts from the June 25, 2025, deposition transcript of Kurt Wolf ████ | A0352 |
| Exhibit 9 – Excerpts from the July 11, 2025, deposition transcript of Larissa Cochron ███████ | A0361 |

| Document | Page Range |
|---|---|
| Exhibit 10 – Excerpts from Plaintiffs' Third Supplemental Privilege Log, dated July 10, 2025 ███████████ ███████████ | A0369 |
| Exhibit 11 – Excerpts from the July 9, 2025, deposition transcript of Jignesh Trivedi ████████████ | A0387 |
| Exhibit 12 – Excerpts from the July 17, 2025, deposition transcript of Paul Kranhold ██████████ ███████ | A0395 |
| Exhibit 13 – July 3, 2025, deposition transcript of Jeffery B. Golden ██████████████ | A0402 |
| Exhibit 14 – Exhibit 1 to the July 1, 2025, deposition of Jean-Francois Vidon, bearing Bates stamp QCVARM_0544259 ██████████████ | A0409 |
| Exhibit 15 – Excerpts from the June 27, 2025, deposition transcript of Richard J. Meacham ██████████ ███████ | A0414 |
| Exhibit 16 – Excerpts from the July 1, 2025, deposition transcript of Jean-Francois Vidon ██████████ ███ | A0421 |
| Exhibit 17 – Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission (Nos. 1-30), dated July 11, 2025 ████████ | A0428 |
| Exhibit 18 – Email from Qualcomm's Counsel to Arm's Counsel, dated July 11, 2025 ███████████ ██ | A0455 |
| C.A. No. 1:24-cv-00490-MN, Plaintiffs' Letter in Response to Defendant's August 11 Letter to Special Master Helena C. Rychlicki, dated August 18, 2025 ██████████ ██████████ | A0457 |
| Exhibit 1 – Service Email from Arm to Qualcomm, dated July 11, 2025 | A0464 |
| Exhibit 2 – Letter from Catherine Nyarady to Jay Emerick, dated August 11, 2025 ███████████████ | A0466 |

| Document | Page Range |
|---|---|
| Exhibit 3 – Plaintiffs' First Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–4, 7, and 9), dated June 25, 2025 ████████████ ██████ | A0480 |
| Exhibit 4 – QCVARM_0713516 ████████████ ████████████ | A0524 |
| Exhibit 5 – Excerpts from the July 3, 2025, deposition transcript of Cristiano Amon ████████████ | A0527 |
| Exhibit 6 – Plaintiffs' Responses and Objections to Arm Ltd.'s First Notice of Deposition of Qualcomm Inc. and Qualcomm Technologies, Inc. Pursuant to Federal Rule of Civil Procedure 30(b)(6), dated June 23, 2025 ████████ | A0534 |
| Exhibit 7 – Excerpts from the July 11, 2025, deposition transcript of James Jeon ████████████ | A0615 |
| Exhibit 8 – Excerpts from the July 7, 2025, deposition transcript of Rene Haas ████████████ | A0627 |
| Exhibit 9 – Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Production (Nos. 1-58), dated March 10, 2025 ████████ | A0634 |
| Exhibit 10 – Qualcomm's First Set of Requests for Production (Nos. 1-52), dated January 21, 2025 ████████ | A0689 |
| Exhibit 11 – Qualcomm's Second Set of Requests for Production (Nos. 53-120), dated February 21, 2025 ████████ | A0707 |
| Exhibit 12 – Letter from Nicholas Fung to Catherine Nyarady, dated May 2, 2025 ████████████ | A0728 |
| Exhibit 13 – Arm's Fifth Set of Requests for Production to Qualcomm (Nos. 228-287), dated June 11, 2025 ████████ | A0746 |
| Exhibit 14 – Arm's Third Set of Interrogatories to Qualcomm (Nos. 14-23), dated June 11, 2025 ████████████ ████████ | A0763 |
| Exhibit 15 – Letter from Nicholas Fung to Catherine Nyarady Identifying Arm's Search Terms, dated April 1, 2025 ██████ ████████████ | A0772 |

3

| Document | Page Range |
|---|---|
| Exhibit 16 – Letter from Catherine Nyarady to Nicholas Fung, dated April 15, 2025 | A0775 |
| Exhibit 17 – Letter from Catherine Nyarady to Nicholas Fung, dated May 16, 2025 | A0787 |
| Exhibit 18 – Assortment of ETE-related Documents ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | A0797 |
| Exhibit 19 – Plaintiffs' Responses and Objections to Defendant's Fourth Set of Requests for Production (Nos. 174-227), dated July 9, 2025 ▮▮▮▮▮ | A0855 |
| Exhibit 20 – Excerpts from the July 9, 2025, deposition transcript of Jinesh Trivedi ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | A0905 |
| Exhibit 21 – Excerpts from the July 3, 2025, deposition transcript of Jeffery B. Golden ▮▮▮▮▮▮▮▮▮ ▮▮ | A0914 |
| Exhibit 22 – Excerpts from the June 25, 2025, deposition transcript of Kurt Wolf ▮▮▮▮▮ | A0922 |
| Exhibit 23 – QCVARM_0708107 ▮▮▮▮▮▮▮ ▮▮▮▮▮ | A0931 |
| Exhibit 24 – Letter from Catherine Nyarady to Peter Evangelatos, dated July 21, 2025 | A0934 |
| Exhibit 25 – Arm's Second Supplemental Initial Privilege Log ▮▮▮▮▮▮▮▮▮▮▮ | A0938 |
| Exhibit 26 – Excerpts from  C.A. No. 22-cv-01146-MN, Jury Trial Hearing Transcript Vols. 3-4, dated December 17-18, 2024 | A1100 |
| Exhibit 27 – Arm's Responses and Objections to Qualcomm's First Set of Request for Admissions (Nos. 1-28), dated July 11, 2025 ▮▮▮▮ | A1119 |
| Exhibit 28 – Plaintiffs' First Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1–4, 7, and 9), dated June 25, 2025 ▮▮▮▮▮▮▮▮ ▮▮▮▮ | A1140 |
| C.A. 1:24-cv-00490-MN, Defendant Arm Holdings plc's Supplement to Arm's Motion to Strike and Compel (D.I. 378) | A1184 |

4

| Document | Page Range |
|---|---|
| and Opposition to Qualcomm's August 11 Letter Brief to Special Master Rychlicki, dated August 18, 2025 ████████████ ███████████████ | |
| Declaration of Peter Evangelatos in Support of Defendant Arm Holdings plc's Supplement to Arm's Motion to Strike and Compel (D.I. 378) and Opposition to Qualcomm's August 11 Letter Brief to Special Master Rychlicki, dated August 18, 2025 ███████████████████████████ | A1192 |
| Exhibit 1 – D.I. 375, Plaintiffs' Motion to Compel and Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes, dated August 11, 2025 ████████████ ███████████████ | A1199 |
| Exhibit 2 – D.I. 137, Second Amended Complaint, dated June 3, 2025 ███████████████ | A1216 |
| Exhibit 3 – D.I. 305, Arm's Reply Brief in Support of its Partial Motion to Dismiss Qualcomm's Second Amended Complaint, dated July 8, 2025 ████████████ | A1287 |
| Exhibit 4 – D.I. 287, Qualcomm's Answering Brief in Opposition to Arm's Motion to Dismiss the Second Amended Complaint, dated July 1, 2025 ████████████ | A1308 |
| Exhibit 5 – Technology License Agreement between Arm and Qualcomm, dated May 30, 2013 ████████████ | A1341 |
| Exhibit 6 – Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), dated August 8, 2025 █████████████████████████ ██████████ | A1397 |
| Exhibit 7 – Plaintiffs' Responses and Objections to Defendant's Fifth Set of Request for Production to Qualcomm (Nos. 228-287), dated June 11, 2025 ████████████ | A1466 |
| Exhibit 8 – Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), dated July 11, 2025 █████████████████████████ | A1519 |
| Exhibit 9 – Arm's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes, dated August 7, 2025 █████████████████████████ | A1578 |

5

| Document | Page Range |
|---|---|
| Exhibit 10 – Exhibit QCX-241 to the July 11, 2025, deposition of Vivek Agrawal, bearing Bates stamp ARM_01315194 ████ ████████████████████████████ | A1587 |
| Exhibit 11 – Exhibit QCX-272 to the July 11, 2025, deposition of Vivek Agrawal, bearing Bates stamp ARMQC_02784247 ███████████████████████████ | A1591 |
| Exhibit 12 – Exhibit 30 to the July 2, 2025, deposition of Richard Grisenthwaite, bearing Bates stamp ARMQC_02779170 ████ ██████████████████████ | A1600 |
| Exhibit 13 – Excerpts from the Jully 11, 2025, deposition transcript of Vivek Agrawal ████████████████ ████ | A1602 |
| Exhibit 14 – Excerpts from the July 7, 2025, deposition transcript of Aparajita Bhattacharya █████████████████ ████ | A1615 |
| Exhibit 15 – Excerpts from the July 2, 2025, deposition transcript of Richard Grisenthwaite █████████████████ ████ | A1622 |
| Exhibit 16 – Excerpts from the June 20, 2025, deposition transcript of Martin Weidmann ██████████████████ ████ | A1627 |
| Exhibit 17 – Excerpts from the June 30, 2025 deposition transcript of Spencer Collins ███████ | A1633 |
| Exhibit 18 – Letter from Spencer Collins to Ann Chaplin, dated January 8, 2025, bearing Bates Stamp QCVARM_0573678 ███████ | A1641 |
| Exhibit 19 – Arm Ltd.'s First Supplemental Objections and Responses to Qualcomm's First Set of Requests for Production (Nos. 1-52), dated June 17, 2025 ███████████ | A1644 |
| Exhibit 20 – Arm Holdings plc's First Supplemental Objections and Responses to Qualcomm's Third Set of Requests for Production (Nos. 121-156), dated June 17, 2025 ████████████ | A1711 |

6

| Document | Page Range |
|---|---|
| Exhibit 21 – Arm's Second Supplemental Initial Privilege Log, dated July 11, 2025 ███████████████████ ██ | A1752 |
| Exhibit 22 – Arm Holdings plc's Objections and Responses to Plaintiffs' Notice of 30(b)(6) Deposition, dated June 19, 2025 | A1756 |
| Exhibit 23 – Excerpts from the August 1, 2025, deposition transcript of Ami Badani ███████████████ | A1805 |
| Exhibit 24 – Excerpts from the June 17, 2025, deposition transcript of Phil Hughes | A1816 |
| Exhibit 25 – Excerpts from the July 17, 2025, deposition transcript of Paul Kranhold ████████████ ██ | A1822 |
| Exhibit 26 – Excerpts from the July 4, 2025, deposition transcript of Kenneth Siegel ██████████ | A1848 |
| Exhibit 27 – Excerpts from the August 14, 2025, transcript of proceedings before Special Discovery Master Helena C. Rychlicki, Esq. ██████████████████ | A1857 |
| Exhibit 28 – Arm Holdings plc's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3), dated July 11, 2025 █████████████████ ██ | A1862 |
| Exhibit 29 – Excerpts from the June 26, 2025, deposition transcript of William Abbey █████████████ | A1892 |
| Exhibit 30 – Arm Holdings plc's Letter Brief to Special Master Rychlicki, dated August 1, 2025 ██████████ ████████████ | A1899 |
| Exhibit 31 – Letter from Jay Emerick to Catherine Nyarady, dated April 22, 2025 ██████████ | A1907 |
| Exhibit 32 – Plaintiffs' Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9), dated August 8, 2025 ████████████████████ ██ | A1916 |
| Exhibit 33 – Plaintiffs' Second Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. | A1994 |

7

| Document | Page Range |
|---|---|
| 10-13), dated August 8, 2025 ███████████████ ███████ | |
| Exhibit 34 – Arm LTD.'s First Supplemental Objections and Responses to Qualcomm's Second Set of Requests for Production (Nos. 53-120), dated June 17, 2025 ████████ | A2025 |
| Exhibit 35 – Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24), dated July 11, 2025 ████████████████████ | A2097 |
| C.A. No. 1:24-cv-00490-MN, Plaintiffs' Supplemental Letter to Special Master Helena C. Rychlicki Regarding Scope of Discovery, dated August 18, 2025 ████████ | A2156 |
| Exhibit 1 – Letter from Spencer Collins to Ann Chaplin, dated October 23, 2024 | A2161 |
| Exhibit 2 – Defendant's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes, dated August 7, 2025 ████████████ | A2164 |
| Exhibit 3 – Qualcomm's First Set of Requests for Production (Nos. 1-52), dated January 21, 2025 ███████ | A2173 |
| Exhibit 4 – Qualcomm's Second Set of Requests for Production (Nos. 53-120), dated February 21, 2025 ████████ | A2179 |
| Exhibit 5 – Qualcomm's Fourth Set of Requests for Production (Nos. 157-168), dated April 16, 2025 ███████ | A2190 |
| Exhibit 6 – Qualcomm's Second Set of Interrogatories to Arm (Nos. 4-11), dated May 14, 2025 ███████ | A2197 |
| Exhibit 7 – Plaintiffs' Responses and Objections to Defendant's Fifth Set of Requests for Production (Nos. 228-287), dated July 11, 2025 ██████ | A2203 |
| Exhibit 8 – Plaintiffs' Responses and Objections to Arm Ltd.'s First Notice of Deposition of Qualcomm Inc. and Qualcomm Technologies, Inc. Pursuant to Federal Rule Of Civil Procedure 30(b)(6) | A2217 |
| Exhibit 9 – Excerpts from the July 11, 2025, deposition transcript of Jonathan Weiser ████████████ | A2234 |

8

| Document | Page Range |
|---|---|
| Exhibit 10 – Excerpts from the July 11, 2025, deposition transcript of Larissa Cochron ████████████████ ███████ | A2238 |
| Exhibit 11 – Excerpts from the July 11, 2025, deposition transcript of Ann Chaplin ████████████████ ██ | A2241 |
| Exhibit 12 – Excerpts from the June 25, 2025, deposition transcript of Kurt Wolf ████████ | A2245 |
| Exhibit 13 – Excerpts from the June 24, 2025, deposition transcript of Manju Varma ███████████████ | A2248 |
| C.A. No. 1:24-cv-00490-MN, Transcript of Proceedings before Helena C. Rychlicki, Esq. – Special Discovery Master, dated August 14, 2025 ███████████████ | A2251 |
| C.A. No. 1:24-cv-00490-MN, Transcript of Proceedings before Helena C. Rychlicki, Esq. – Special Discovery Master, dated August 22, 2025 ███████████████ | A2346 |

# Exhibit 25
## (REDACTED IN ITS ENTIRETY)

# Exhibit 26

362

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ARM LTD.,                          )
a U.K. corporation,                )
                                   ) VOLUME 3
          Plaintiff,               )
                                   ) C.A. No. 22-1146(MN)
v.                                 )
                                   )
QUALCOMM, INC.,                    )
a Delaware corporation,            )
et al.,                            )
                                   )
          Defendants.              )

                    Tuesday, December 17, 2024
                    8:50 a.m.
                    Jury Trial

                    844 King Street
                    Wilmington, Delaware

BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge

APPEARANCES:

          YOUNG CONAWAY STARGATT & TAYLOR
          BY:  ANNE SHEA GAZA, ESQ.

          -and-

**A1101**

400

Williams - direct

BY MS. DURIE:

Q.      And if you can turn to page 5, this is a slide presentation that you helped put together that showed the royalty savings that Qualcomm could expect by switching from TLA licensed cores from Arm to custom CPU cores under an ALA; right?

A.      This was not -- this slide I did not assemble, this was done by another gentleman, Ziad.

Q.      Got it.  So Mr. Asghar put together the projection that Qualcomm could expect to save as much as $1.4 billion a year in Arm royalties, right?

A.      That's what this slide says, yes.

Q.      Now, after the Nuvia acquisition, all of the Nuvia personnel became Qualcomm employees; right?

A.      Yes.

Q.      And you and your team continued to develop the Phoenix core at Qualcomm; right?

A.      No.

Q.      Let's take a look at your deposition, page 179.  And I am going to read from the deposition testimony you previously provided under oath.

                Question:  So following the acquisition, what happened to Phoenix following the closing of the acquisition?

                Answer:  The design of -- we continued

**A1102**

401

Williams - direct

development of that core.

Now, you didn't make any changes to the way that you and other engineers were using Arm technology, right?

A.    At what time and reference?

Q.    Following the acquisition, you didn't make any changes to the way that you were using Arm technology?

A.    In a general sense, I believe the answer is no to that.

Q.    Okay.  You didn't start over with a new design, right?

A.    You're talking about CPU core?

Q.    Yes.

A.    No, because that was not believed to be Arm technology, that was Nuvia technology.

Q.    So you kept working on the same code base that you had been working on at Nuvia, right?

A.    Yes, because that was Nuvia technology, that's why that was done.

Q.    Right, so the change was like the name on your paycheck?

A.    No, there was a lot more change than that.

Q.    And you referenced Nuvia technology.  Again, that was a provision that was in the confidentiality section of the license agreement; right?

A.    It was in a few different locations in the agreement.

**A1103**

402

Williams - direct

Q.      Well, why don't we take out PTX-1, go to PTX-1, or JTX-1, sorry, in your binder.

A.      PTX --

Q.      Sorry, JTX-1, it's the license agreement.  There is a definition -- strike that.  There is a confidential information section which includes information to Nuvia technology, right?

A.      It does.

Q.      If we go to 1.27 on page 3, there is a definition of Nuvia technology, right.  Sorry, we skipped over, it's at the top, keep going, keep going, 1.27, Nuvia technology, right, there is a definition, right?

A.      Yes.  Yes, there is.

Q.      And then there are provisions about what the parties can do with Nuvia technology; right?

A.      Can you show me that?

Q.      Sorry with confidential information, there is provisions about what parties can do with confidential information.

A.      Yes, there is.

Q.      All right.  Now, after Arm learned about the acquisition -- strike that.

        At Qualcomm you also continued to develop the Phoenix ISA reference manual that we were looking at before; right?

**A1104**

408

Williams - direct

accomplished during this.  One aspect that you're describing, is the TLA elements of the design, just one aspect.

Q.    Okay.

A.    And those elements were removed from the Nuvia design completely and quarantined, which we call the swap out procedure.  And then under the Qualcomm Architecture License Agreement, we downloaded -- after we relicensed, if there weren't licenses for IP, we relicensed those pieces of technology from Arm, we conferred with the engineering team that did that work, and the legal team that did that work, we reinstalled those new pieces of TLA IP into the database.

Q.    And you had some -- you had a text chat with your co-founders about this process, right?

A.    I would have to see it to refresh my memory.

Q.    Sure.  Turn in your binder to PTX-650.  Do you see that 650 is a chat amongst yourself, Mr. Gulati and Mr. Bruno?

A.    Yes, I see that.

            MS. DURIE:  We offer PTX-650.

            MR. ISAACSON:  No objection.

            THE COURT:  Thank you.  It's admitted.

            (PTX Exhibit No. 650 was admitted into evidence.)

BY MS. DURIE:

**A1105**

409
Williams - direct

Q.    Let's put it up and let's blow up the entry that's further down below.  There we go from Mr. Gulati.  "Just like the whole Arm IP swap, what did we really swap?  Same RTL."  Same RTL, that's a reference to the same RTL code before and after the swap out, right?

A.    It is, it's basically describing that the IP swap that I referred to earlier, the design team made sure to quarantine all of the IP that would have been under any Nuvia contract, isolated it and then we replaced it with IP that was downloaded under the Qualcomm TLA.

Q.    Right.

A.    And it turns out the RTL was the same but we still went through the process just to be safe.

Q.    And that was code that Arm had written, right?

A.    That RTL was code that Arm had written.

Q.    You didn't swap out the RTL that Nuvia had written, right?

A.    No, because we did not believe that it was required.

Q.    And Qualcomm then incorporated Nuvia's technology into Qualcomm products; right?

A.    Yes, Qualcomm used that technology from Nuvia.

Q.    And you have continued to adapt Nuvia's CPU, Phoenix in the years since the acquisition; right?

A.    I would -- that's oversimplification of the CPU.

Q.    Let's take a look, if you go to PTX-2018?

**A1106**

410

Williams - direct

A.    You said 20.

Q.    2018.  PTX-2018.  You see this is a declaration that you submitted in a different legal proceeding?  Do you see that's what it is?

A.    Yes, I see the title.

Q.    Turn to page 3, turn to paragraph 8.  You said -- you see that you said that you had an understanding of how Qualcomm is incorporating, or plans to incorporate Nuvia's technology into Qualcomm products, and that you had personal knowledge about the ways in which you had adapted Nuvia's CPU called Phoenix in the years since the acquisition, that is what you wrote under oath in that declaration, right?

A.    That's correct, yes.

Q.    After the acquisition, you also started working on a compute platform called Hamoa, right?

A.    Yes.

Q.    After the acquisition?

       And there are multiple Nuvia Central Processing Unit CPU clusters in Hamoa?

A.    There is multiple Qualcomm clusters at this point now.

Q.    Let's take a look at PTX-351 in your binder.  Do you see that PTX-351 is the Hamoa CPU subsystem software specification?

A.    I see the title page, yes.

**A1107**

411

Williams - direct

MS. DURIE:  We offer PTX-351.

MR. ISAACSON:  No objection.

THE COURT:  Thank you.  It's admitted.

(PTX Exhibit No. 351 was admitted into evidence.)

BY MS. DURIE:

Q.    Please put it up.  Go to the second page.  Up at the top.  Blow up the top.  December of 2021, we see that the Hamoa CPU subsystem software specification describes the modes of operation of the first generation Qualcomm compute CPU subsystem combining multiple Nuvia central processing unit CPU clusters, and some Qualcomm stuff, right?

A.    That's what that says.

Q.    And if we look underneath number one, it says four identical high performance CPU cores defining a CPU complex cluster for which each core is compliant with ARMv8.7 architecture specification.  That is a reference to an Arm compliant core; right?

A.    That is what the individual wrote, yes.

Q.    That is a reference to an Arm compliant core, right?

A.    That -- what you have underlined is not reference to an Arm compliant core.

Q.    When it says four cores for which each core is compliant with ARMv8.7 architecture specification, that is talking about each core being an Arm compliant core, right?

**A1108**

412

Williams - cross

A.    Assuming they pass the verification sweep, the intent is that they become a compliant core.

Q.    Now, after the acquisition, you also started working on a mobile platform called Pakala, right?

A.    Yes.

Q.    And you refer to the core for that product as Phoenix?

A.    Yes.  That's what the name was.

Q.    Now, after Qualcomm acquired Nuvia, we've already seen that you kept using the Phoenix documentation that was written by Nuvia, but you also kept using the Phoenix code, right?

A.    You said Phoenix code?

Q.    Phoenix code.

A.    The CPU code that was Nuvia technology was continued to be used, yes.

Q.    Right.  And you would agree that there are some elements of that Nuvia Phoenix code in the compute and mobile platforms at Qualcomm; correct?

A.    There are elements there, yes.

        MS. DURIE:  Pass the witness.

        THE COURT:  All right.  Thank you.  Cross-exam.

            CROSS-EXAMINATION

BY MR. ISAACSON:

Q.    Good morning, Mr. Williams.

**A1109**

413

Williams - cross

A.    Good morning.

Q.    It's Bill Isaacson.  Can we look at JTX-2, which counsel showed you.  This is what you looked at at the outset of your questions from Arm's counsel.  This is the Annex, this is an Annex to the Nuvia ALA dated September 27th, 2019.  Do you see that?

A.    I do, yes.

Q.    And that's what she showed you definitions from.  If we could look at JTX-5.  This is a later Annex, this would be -- this is March 27th, 2020.  This is the one we're supposed to be looking at, as to the applicable Annex at the time of the acquisition of Qualcomm and Nuvia; right?

A.    I believe so, yes.

Q.    All right.  And if we look at page 5, it has the definition of Documentation that you were shown.  And counsel said to you on its face, you were given a license to the Arm ARM.  And you read this definition there; right?

A.    Yes.

Q.    And it says "Documentation means the ARMv8-A Architecture Reference Manual and any Arm documentation," and it goes on.  Now, if we go to the previous page, page 4, A8, there is a definition of ARMv8 Architecture Reference Manual, you weren't shown this, right?

A.    No, I was not.

Q.    And that says it "means the documentation identified

**A1110**

605

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
ARM LTD.,                       )
a U.K. corporation,             )
                                ) VOLUME 4
          Plaintiff,            )
                                ) C.A. No. 22-1146(MN)
v.                              )
                                )
QUALCOMM, INC.,                 )
a Delaware corporation,         )
et al.,                         )
                                )
          Defendants.           )
```

Wednesday, December 18, 2024
8:45 a.m.
Jury Trial


844 King Street
Wilmington, Delaware



BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge



APPEARANCES:


          YOUNG CONAWAY STARGATT & TAYLOR
          BY:   ANNE SHEA GAZA, ESQ.

          -and-

**A1111**

808

Amon - cross

Q.    Well, when you say the Qualcomm designs, I just want to be really clear, you're including the work that was done at Nuvia under the Nuvia ALA, right?

A.    The Qualcomm designs may include Nuvia technology.

Q.    Okay.  Arm did not consent, right?

A.    Arm did not consent.

Q.    You went ahead and closed the transaction anyway, right?

A.    We closed the transaction, we did not assign the ALA.

Q.    We're going to get to that, but the Nuvia acquisition officially closed on March 16, 2021, right?

A.    I think so, I don't recall the exact date.

Q.    Is that right?

A.    Yes.

Q.    And you were the president and CEO at the time, right?

A.    Yes.  No, I was president elect, I became CEO on June 30th.

Q.    Fair enough, you were president elect, you were the one who approved closing the transaction without Arm's consent, right?

A.    It was probably approved by the CEO Steve Mollenkopf and me as president elect at the time.

Q.    That was at least in part your decision?

A.    Oh, yes.

A1112

809

Amon - cross

Q.    Okay.  Now, within days of the Nuvia acquisition, you announced that Nuvia's CPUs would be integrated into Qualcomm products, right?

A.    Yes.

Q.    And that included the Snapdragon chips that we were talking about earlier, Pakala, Hamoa, or Nordschleife, right?

A.    Nordschleife.

Q.    And, in fact, Qualcomm started using the Nuvia designs and the Nuvia code immediately, right?

A.    We start designing CPUs for those markets and we have used the Nuvia technology.

Q.    Let's take a look at PTX-296 in evidence.  And if we look at the bottom, this is an e-mail from you to Mr. Segars, it's April 30th of 2021.  So this is after you have closed the transaction, right?

A.    Yes.

Q.    And you say, you're disappointed that the parties haven't been able to put this behind.  And then if we go up, sorry, to the e-mail that is at 3:01 p.m., so I think it's actually below that.  But the bottom of the page.  There we go, perfect?

A.    Page 2 of 3?

Q.    Yes.

A.    Yes.

**A1113**

810

Amon - cross

Q.      So you send an e-mail to Mr. Segars, March 23, 2021, and you say it was encouraging to me that we both believe we can put this behind us in a couple weeks time.  In the interim, now that we have closed the acquisition of Nuvia, we will continue to integrate the Nuvia engineers, know-how, and engineering of compliant cores and research into Qualcomm as Paul and Will sort out any details.

Now, Paul and Will sorting out any details that meant resolving the disagreement between Arm and Qualcomm with respect to Arm's consent, right?

A.      That is correct.

Q.      And so you knew at this point in time, Arm said that you needed Arm's consent, right?

A.      That's what Arm said, yes.

Q.      You didn't have Arm's consent, right?

A.      No.

Q.      And you decided to go ahead and integrate the Nuvia engineers's know how and engineering into Qualcomm even though you did not have that consent?

A.      Yes, we did.  Both because of the e-mail from Simon, the fact that we didn't need it.

Q.      Well, you knew that Arm's position was that consent was required, right?

A.      That was Arm's position.

Q.      And you knew that Arm's position was that the Nuvia

**A1114**

823

Amon - cross

company was Nuvia, I do not know.

Q.    Got it, once the transaction closed and then Qualcomm owned Nuvia it would make sense to you that Qualcomm would be doing the communicating?

A.    It's logical to think that way.

Q.    And all of that would have rolled up to you as the head guy at Qualcomm?

A.    Yes, I don't get to know all the details but people brief me when I need to get involved, yes.

Q.    Let's take a look at JTX-9 in evidence.  We've seen this before, on the first page, the first page is a letter from Ann Chaplin, sitting right there, she is your general counsel, right, head lawyer at Qualcomm?

A.    Yes.

Q.    And she wrote back to Spencer Collins, general counsel at Arm, said dear Spencer, we're in receipt of Arm's letters dated February 1, 2022, and March 13, 2022.  Enclosed please find the certification.  And then if we turn to the next page, she attaches a certification, do you see that?

A.    Yes.

Q.    Now, did you see this at the time?

A.    I did not see it.

Q.    Okay.  And in this certification, you see that there is a certification, and let's take a look at the middle of

**A1115**

824

Amon - cross

the paragraph, you're almost exactly at the right place.  In order to comply with its obligations under Section 15.1 of the agreements, right where we were, Nuvia has identified and removed Arm Confidential Information including Arm Technology or derivatives, both for documents and ESI from any design databases, work file systems, technical documentation repositories, source code repositories and shared document databases.  Those are references to Qualcomm design databases and Qualcomm source code repositories, right?

A.     Like I said, I didn't write this letter, I think that's basically what he's saying Nuvia has identified and removed all of this from any database for work file system and repositories, I'm assuming it would be Qualcomm repositories.

Q.     So the certification was Qualcomm has gotten rid of everything?

A.     I think that's what he said, Nuvia has quarantined or removed all of this from the Qualcomm database, or their database, I don't know.

Q.     You are aware that to this day, there is Nuvia code that was created under the Nuvia ALA that is in Qualcomm products?

A.     Yes.  Those are Nuvia technology products.

Q.     Alright.  Now, Qualcomm is a public company; right?

825

Amon - cross

A.      Yes.  We are.

Q.      You are the CEO, right?

A.      To this day, yes.

Q.      You are accountable to shareholders?

A.      Yes, I am.

Q.      To deliver the best value you can to the company shareholders, right?

A.      Yes.

Q.      Today, Arm is a public company; correct?

A.      Yes.

Q.      Arm also has the same accountability to its shareholders to deliver the best value to those shareholders that it can, right?

A.      I would assume they would.

Q.      Now, I wouldn't normally ask you this question, but I am going to because the question was asked of Mr. Haas.  But last year in 2023, as the CEO of Qualcomm, you made about $23 million in cash and stock?

A.      I don't know from memory, it sounds about right.

Q.      Why don't you turn to PTX-2041?

A.      2041.

Q.      Do you see that 2041 is a public filing.  And if you look at page 75, you see there is a summary compensation table?

A.      Page 5?

826

Amon - redirect

Q.      Sorry, page 75.  75 of 123, we didn't include all 123 pages in your binder, but you'll see the numbers at the bottom of the page.

A.      Yes.

Q.      And in the summary compensation table, you are listed 2023, total compensation combination of salary, bonus, stock awards and non-equity incentive plan compensation and other compensation, $23,480,335?

A.      That is correct.

          MS. DURIE:  Thank you, sir.  I have no further questions.

          THE WITNESS:  Thank you.

                    REDIRECT EXAMINATION

BY MS. DUNN:

Q.      Hi, Mr. Amon.  I just have a few questions for you.

          So first of all, we're here in this courtroom in a litigation.  Do you think that Arm knows that we dispute that we are in breach?

A.      I assume they do.

Q.      Okay.  Alright.  Counsel asked you some questions about your deposition, and she pointed you to answers to page 109.  Can you open your deposition there?

A.      Yes.  109.

Q.      Let me know when you're there?

A.      Almost there, I have it.

# Exhibit 27
## (REDACTED IN ITS ENTIRETY)

# Exhibit 28
# (REDACTED IN ITS ENTIRETY)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., a Delaware
corporation, and QUALCOMM
TECHNOLOGIES, INC., a Delaware
corporation,

        Plaintiffs,

      v.

ARM HOLDINGS PLC, f/k/a ARM LTD.,
a U.K. corporation,

        Defendant.

C.A. No. 24-490-MN



## DEFENDANT ARM HOLDINGS PLC'S SUPPLEMENT TO ARM'S MOTION TO STRIKE AND COMPEL (D.I. 378) AND OPPOSITION TO QUALCOMM'S AUGUST 11 LETTER BRIEF TO SPECIAL MASTER RYCHLICKI

Dated: August 18, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Meredith Pohl
Matthew J. McIntee
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
meredith.pohl@kirkland.com
matt.mcintee@kirkland.com

Jay Emerick
Reid McEllrath
Adam M. Janes
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com
reid.mcellrath@kirkland.com
adam.janes@kirkland.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

**A1184**

Nathaniel Louis DeLucia
Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
nathaniel.delucia@kirkland.com
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

**A1185**

Dear Special Master Rychlicki:

Qualcomm's requests for additional discovery should be denied.

## 1.    TLA and ALA-Related Requests

*After* the close of fact discovery, Qualcomm injected new claims that Arm committed multiple additional breaches of the TLA.  They should be stricken, and discovery on them denied.

*New TLA Breach Claims:*  Qualcomm's request for discovery on new breach claims for *13 new products* should be denied, and those theories stricken from the case.  The SAC focuses exclusively on three products: █████████ █████ Count VII alleges breach based on Arm's pricing for ███████████████. Ex. 2 ¶¶ 213-220.  Likewise, Count VIII alleges that Arm ████████████████████ by ███ ████████████████████ Ex. 2 ¶¶ 221-226.  Qualcomm only pleads facts regarding █████████████ Ex. 2 ¶¶ 109-127.  There is not a single mention of any other Arm implementation cores in the SAC and only a vague statement that Qualcomm "expects discovery to show that Arm ██████████████████████████ in "negotiations involving" unidentified "peripheral TLA IP."  Ex. 2 ¶ 102.

Qualcomm's attempt to make an end run around its failure to plead a claim for any product other than ████████████ should be rejected.  "Rule 8 simply 'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'"  *Robinson v. Family Dollar Inc.*, 679 F. App'x 126, 133 (3d Cir. 2017).  "A plaintiff is entitled to discovery only when they have made factual allegations that support a cognizable claim; discovery is not for determining whether there is a factual basis for a claim not yet made."  *Kurtz v. Westfield Ins.*, 610 F. Supp. 3d 703, 711 (E.D. Pa. 2022).  Qualcomm argues that because it vaguely claimed it "expects discovery to show" other TLA violations based on peripheral IP, that Arm "may" have breached the TLA, or used the word "including" in the SAC, that it is entitled to discovery.  That is not the law—Qualcomm's vague allegations are conclusory and hoping discovery will uncover a claim does not state one.  *See Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 204 (3d Cir. 2006); *GlaxoSmithKline LLC v. Glenmark Pharms., Inc., USA*, 2017 WL 11685418, at *6 (D. Del. Jan. 20, 2017); *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 621-22 (D. Del. 2015).  Ruling on whether the SAC plausibly alleges a claim tied to peripheral IP would also, in any event, prejudge issues in Arm's MTD currently pending before Judge Noreika.  *See* Ex. 3 at 10; Ex. 4 at 20.

Qualcomm looks outside its pleading and exhibits to argue that because "the *October 2024* quote referenced in the SAC included prices" for peripheral IP ████████████████, it adequately pled such claims. Ex. 1 at 1.  But simply referencing a business document does not adequately plead a claim, and only underscores that Qualcomm knew about but chose *not* to plead a claim for peripheral IP.  Indeed, TLA Section ██████████████ ██████████ but it is absent from the SAC. Ex. 5 ████████   As to ████ cores, Qualcomm's theories are based on different offers Arm made years before the ████████████ allegations described in the SAC.  As Qualcomm's untimely interrogatory responses state, Arm's "proposal for █████████" from "*August and November 2022*" and its "proposal for █████████" from "*March 2023*" each "breached Section ████" Ex. 6 at 11-12.  Permitting these new, unpled claims would also push ████████████████

1

**A1186**

██████████████████████████████████████ back *two additional years* from the "October 2024" date alleged in the SAC based on Arm's alleged breaches tied to ██████████████, which may also impact Arm's statute of limitations defenses. Ex. 2 ¶ 219; Ex. 5 ████ Qualcomm has not pled a claim for the 13 new products on which it seeks to compel discovery.

Qualcomm also points to its implied covenant claim in Count III. Ex. 2 ¶¶ 181-188. But the only allegation about the TLA in that Count is that Arm allegedly "failed to provide licensing proposals for ███████████████████ to Qualcomm in violation of provisions of the QC TLA," not peripheral IP. Ex. 2 ¶ 184. Qualcomm's theory for peripheral IP, in any event, is that Arm's offer was not "commercially reasonable," not that Arm failed to provide a proposal. Ex. 1 at 1. Nor does paragraph 184 put Arm on notice of any ████████████████████████████████████ allegations, as Qualcomm admits Arm *did* provide offers, it just didn't like them. Qualcomm asserts that serving discovery requests "discloses" a theory—yet that notion eviscerates the purpose of pleadings as well as Rules 12, 15, and 16. Discovery requests are not a recognized way to amend a complaint, evade the deadline for doing so under the scheduling order, or avoid a MTD or other challenge to the new claims. Likewise, the Arm RFPs Qualcomm points to either name only ████████████████████ or were served shortly before discovery closed and after Qualcomm filed its original motion to compel (D.I. 158) merely to ensure that, in the event the Court ruled in Qualcomm's favor on this brewing dispute, Arm would receive reciprocal discovery. *See* Ex. 7 (RFPs 249-258). Arm never conceded Qualcomm's unpled claims were in the case.

Allowing Qualcomm to pursue these new claims would add even more complexity to this already massive case, which is just two months from summary judgment and should be narrowed, not expanded. Litigating whether Arm's proposals for each of these 13 new products breached the TLA would require significant new discovery, likely requiring Arm to notify and produce third party licenses for those products (of which there may be numerous) and which will inevitably spawn new third-party confidentiality disputes. Arm would also need to take new discovery of Qualcomm's witnesses regarding its supposed "harm." Indeed, Qualcomm claims that due to Arm's alleged "refusal to license ███████████████" Qualcomm had to ████████████████████████████████████████████████████████████ Ex. 6 at 19. Yet Qualcomm's interrogatory response does not cite a document to back that claim, only the conclusory testimony of a single employee. *Id.* Further, both parties would likely need to conduct expert discovery into any remedy Qualcomm may seek. None of this additional discovery is appropriate at this late stage.

***New ALA Breach Claim: ETE Checker***. Qualcomm's request for discovery on its new ALA breach claim based on the ETE Checker should be denied, and that theory stricken. As with Qualcomm's new TLA claims, Qualcomm disclosed its ETE Checker claim after the close of fact discovery on July 11. Ex. 8 (QC Resp. to ROG Nos. 1, 6); Ex. 35 (QC Resp. to ROG No. 16. Discovery should be denied for the same reasons.

Further, as Arm's August 7 letter brief explained, Arm's production already includes documents that bear on Arm's decision to stop supporting Qualcomm's use of unlicensed Nuvia technology and ETE Checker support, which Qualcomm recently used at depositions. Ex. 9 at 4; Ex. 10; Ex. 11; Ex. 12. Qualcomm also questioned multiple Arm witnesses about the ETE Checker issue. *See, e.g.*, Ex. 13 at 125:5-156:18; Ex. 14 at 114:4-117:7; Ex. 15 at 180:9-15; Ex. 16 at 24:20-24, 172:18-173:4. Whether Arm provided other companies with support materials (such as ETE Checker support) has no bearing on whether Arm had an obligation to provide such support to Qualcomm.

2

## 2.    Tortious Interference-Related Requests[1]

Qualcomm's request for additional discovery should be denied.  Arm has produced numerous documents—and Arm's witnesses have provided testimony—concerning the October 22 letter and related media.  Qualcomm deposed five people—Messrs. Collins, Kranhold, Hughes, Siegel, and Ms. Badani—almost exclusively about these topics, and asked several other Arm witnesses about them.  Qualcomm argues Arm withheld discovery on its decision to write, share, and withdraw the letter, but that is plainly incorrect.  The October 2024 letter not only speaks for itself, but Mr. Collins testified that ███████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████  Ex. 17 at 71:5-88:19.  And the reason for withdrawing the letter is stated in Arm's withdrawal letter itself.  Ex. 18.  Arm agreed to, and did, produce documents responsive to RFP Nos. 16, 17, 38, 145-147, and 149 (*see* Exs. 19 (2/20/25 Arm Resps. to QC 1st RFPs (Nos. 1-52)), 20 (5/2/25 Arm Resps. to QC 3rd RFPs (Nos. 121-156))), and Arm logged an additional 27 documents about the October 22 letter.  *See* Ex. 21 (7/11/25 2d Suppl. Privilege Log).  Additionally, FGS produced another 183 documents.  Arm confirms its production of documents responsive to these Requests is complete.

Regarding Topic No. 32, Arm designated witnesses to testify regarding letters to Qualcomm customers, and as well as on subparts (a), (b), (c), (d), and (i), despite Qualcomm's refusal to engage in reciprocal discovery and designate a witness on Qualcomm's media communications.  Ex. 22 at 32-33.  The remaining subparts ((f), (g), (h), and (j)), which concern and include communications with third parties other than █████████████  are not relevant or proportional.  Nevertheless, multiple fact witnesses provided testimony, including for subpart (f) (*see, e.g.,* Ex. 23 at 54:1-67:12, Ex. 24 at 64:8-70:4, Ex. 25 at 107:22-137:25) and for subpart (g) Mr. Siegel, as Morrison & Foerster's designated witness, testified; for subpart (h), *see, e.g.*, Ex. 23 at 36:23-40:7, Ex. 26 at 40:11-45:23, 48:10-52:5, Ex. 25 at 46:17-85:4, 99:22-103:19; and for subpart (j), *see, e.g.¸* Ex. 23 at 54:1-67:12, Ex. 24 at Dep. 64:8-70:4, Ex. 26 at 40:11-45:23, 48:10-52:5, Ex. 25 at 107:22-137:25.

Qualcomm again incorrectly asserts that Arm claimed privilege over its "public relations strategy," but as Arm stated in its prior letter to the Special Master and at the August 14 hearing, and as the above-cited testimony shows, that is incorrect.  Ex. 9 at 3-4.

Qualcomm argues that Arm waived privilege over any document relating to its October 2024 letter or media regarding the same.  Arm did not.  Qualcomm argues for such an enormously broad waiver based on Qualcomm's counsel's own false statement at the deposition of Arm's CCO Will Abbey about the content of Arm's interrogatory response and Arm's correction of the same on redirect—a non-event that did not waive privilege, much less over this broad subject matter.  At the deposition, Qualcomm's counsel asked Mr. Abbey— *who had nothing to do with the letter or any reporting on it*—if he understood that Arm had submitted an interrogatory response on the topic of the October 2024 letter, and Qualcomm's counsel falsely stated that Arm's response included an admission that Arm sent the October

---

[1]    Qualcomm argues there are "contractual confidentiality obligations forbidding" Arm sharing its October 2024 letter with the media, but makes no such breach of contract allegations.  Ex. 1 at 2.

3

**A1188**

2024 letter to Bloomberg.[2]  Ex. 29 at 160:5-17.  On redirect, Mr. Abbey was asked about and corrected Qualcomm's counsel's false statement about the contents of Arm's interrogatory response.  *Id.* at 164:16-165:21.  That is not a basis to invade any privileged deposition preparation (or other attorney-client communication) in which Mr. Abbey gained an understanding of Arm's interrogatory response, much less a broader waiver.  Qualcomm seeks discovery about how Mr. Abbey gained an understanding of the contents of Arm's interrogatory response, but Arm is not claiming privilege over the content of its interrogatory response, which Qualcomm has.  Further, Arm is not using Mr. Abbey's testimony as a "sword": the contents of interrogatory responses speak for themselves, and Mr. Abbey or another witness's understanding of what is or is not contained in them is irrelevant.  Finally, Qualcomm's assertions of "waiver" aside, Arm is not claiming privilege over how Bloomberg was briefed about the contents of the letter, and Qualcomm received testimony about the conversations with Ian King.  *See, e.g.*, Ex. 26 at 48:20-51:5; Ex. 25 at 62:6-63:2; 64:11-68:14.  This other discovery confirms there are no other documents from this purported "discussion with Bloomberg."  *See, e.g.*, Ex. 26 at 62:6-64:9.

**3.    Competition-Related Requests**

Qualcomm's requests for irrelevant and overbroad discovery on its UCL claim should be denied.

**RFPs 103-110, 117-119, 121, 143.**  RFPs seeking documents about Arm's supposed vertical integration are irrelevant.  Qualcomm's UCL count does not mention its new theory that Arm's business model shifted towards building and licensing chips or that Arm became "vertically integrated."  The UCL count only alleges that Arm acted to prevent Qualcomm from developing *custom CPUs* to avoid competition with Arm's "off-the-shelf *CPU* designs."  *See, e.g.*, Ex. 2 ¶¶ 207-208.  Only two sentences in the SAC—both in the background—even hint at the type of vertical integration in these RFPs.  Ex. 2 ¶ 70.  The conclusion of that discussion returns, once again, to Qualcomm's claim that Arm is "pressuring customers . . . to purchase Arm's off-the-shelf CPUs," (Ex. 2 ¶ 72)—the same theory in its UCL count.  Setting aside Qualcomm's position that Arm is not entitled to discovery regarding allegations exclusively appearing in the background section of the SAC, *see* Ex. 30 at 4, Ex. 31 at 3, two never-again-referenced, atmospheric sentences in the background section of a 226-paragraph complaint are not sufficient to form a material part of Qualcomm's UCL claim and put Arm on notice that Qualcomm is advancing such a theory.

Similarly, none of Qualcomm's interrogatory responses meaningfully explain this theory—even after Arm served an interrogatory specifically targeting it.  Qualcomm raised the concept of "vertical integra[tion] and gaining market share as a chip designer" for the first time in its June 4 letter brief.  As that language appears nowhere in the complaint, after Qualcomm's letter brief Arm served Interrogatory No. 19 seeking the bases for that argument, and once again—as Arm has explained elsewhere—Qualcomm recycled ***the same 6 paragraphs of text*** it uses in response to every interrogatory related to competition issues focused almost exclusively on Arm's conduct with respect to "off-the-shelf CPU designs."  Qualcomm added a single short paragraph describing witness testimony related to Arm's "business model," but did not explain in any detail any UCL violation under any test.  Qualcomm cannot seek to

---

[2]  Qualcomm's assertion in its letter brief that "Arm admitted it leaked the letter to Bloomberg News" in Arm's "response to Interrogatory 2" is incorrect.  Arm did not "leak" the letter to Bloomberg, and its response does not admit to such.  *See* Ex. 28 at 17-23.

4

**A1189**

compel discovery on irrelevant statements buried in the SAC or theories not fully disclosed in its interrogatory responses. *See, e.g.*, Exs. 6, 32, 33 (QC's R&Os to ROGs 5, 7, 8, 18, 19).

**RFP 122**. Arm properly limited its production to include only the third parties with whom Qualcomm alleges interference. Qualcomm is not entitled to broad and unduly burdensome discovery into all documents that implicate Arm's "knowledge" of Qualcomm's many customers, especially those with whom Qualcomm has ***not*** alleged interference— especially where Qualcomm has elsewhere taken the position that its other non-pled customers are irrelevant for purposes of its own discovery obligations. *See, e.g.*, Ex. 19 (RFP 13); Ex. 34 (RFP 63); Ex. 20 (RFP 126). In any event, Qualcomm is not entitled to engage in a fishing expedition in the hopes of discovering additional unpled claims—particularly given that Qualcomm's tortious interference claims hinge on business "disruption[s]" that only Qualcomm would be aware of and presumably would know without the aid of discovery. *See, e.g.*, Ex. 2 ¶ 194; *Invensas Corp. v. Renesas Elecs. Corp.*, 287 F.R.D. 273, 279 (D. Del. 2012) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable ***without discovery***, not to find out if it has any basis for a claim. That the discovery might uncover evidence showing that a plaintiff has a legitimate claim does not justify the discovery request.") (original emphasis); *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 41 (D. Del. 1993).

**RFPs 187-189**. Arm has made clear that it has already produced all non-privileged documents responsive to these requests in *Arm v. Qualcomm* and/or this litigation, including through its productions responsive to other RFPs. *See, e.g.*, Ex. 19 (Resp to QC RFPs 10, 23-24, 29, 39-40); Ex. 34 (Resp. to QC RFPs 57, 81). In any event, the parties are not at an impasse and any dispute is not ripe because at a recent meet-and-confer Arm agreed it would investigate whether it had any other non-privileged documents in its possession responsive to RFPs 188 and 189 and that investigation is ongoing.

**RFPs 192-195.** Arm's agreements and licenses with ▮▮▮▮▮▮▮▮▮ are irrelevant. Neither the SAC nor Qualcomm's interrogatory responses include any allegations about Arm's agreements with ▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮▮▮▮ let alone whether such agreements include "favorable terms," which is irrelevant. Nor is it relevant that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ndeed, although Qualcomm cites to a press release about the ▮▮▮▮▮▮▮▮▮▮▮ in its responses to Arm's Interrogatory Nos. 20-21, Qualcomm does not explain how a four-year-old complaint ▮▮▮▮▮▮▮ is relevant to evaluating the fairness, legality, or impact of Arm's present non-merger-related conduct. Ex. 6 (QC Resp. to ROGs 20-21).

**RFPs 169-186**. RFPs about Linaro are irrelevant, overbroad, unduly burdensome, and not proportional to the case. The SAC contains no allegations related to Linaro, including as one of the allegedly "unfair" or "unlawful" acts underlying Qualcomm's UCL claim. Nor does Qualcomm include this theory in any interrogatory response, including its original or supplemental responses to Arm's interrogatories requesting the bases for Qualcomm's UCL claim. Ex. 8 (QC Resp. to ROGs 5, 7, 8); Ex. 6 (QC Resp. to ROGs 18, 19, 20, 21).

**4.    Interrogatories**

*Interrogatory No. 6*. Qualcomm's interrogatory seeks licensing terms for ▮▮▮▮▮▮▮ There is no basis to order Arm to supplement its response because that

5

**A1190**

is precisely what Arm provided—pursuant to Fed. R. Civ. P. 33(d), Arm identified the license agreements themselves for ██████████ , which contain the requested license terms.

Qualcomm moves to compel Arm not for any additional facts or any legal contention, but to make characterizations about the license terms it produced, which are not even called for by the Interrogatory. There is no basis for that, including Arm's alleged "knowledge" of them, and the license terms speak for themselves. Qualcomm is more than capable of reviewing those agreements to identify their terms, as it has done for the ALA and TLA. Qualcomm's additional request for "additional third-party agreements that cover all of the TLA IP" should be denied because products other than ██████████ are not at issue in this case, as discussed above and in Arm's other letter briefing.

***Interrogatory No. 11***. Qualcomm failed to raise any issue with Arm's response to this interrogatory in advance of filing its letter. Nonetheless, Arm's response includes a lengthy discussion of how Arm prepared its October 2024 offer for a ██████████ renewal license. That response includes references to the testimony of multiple Arm witnesses that Qualcomm deposed as well as the documents considered in that analysis. Qualcomm's complaint appears to be that Arm should "identify relevant information about the ████ and provide a 30(b)(6) witness to address it." Ex. 1 at 4-5. Arm produced ██████████ and Qualcomm's expert was able to analyze and opine about them in his opening report, served on August 8. Qualcomm also deposed several witnesses involved in preparing Arm's offer after the ██████████ was produced. Further, Mr. Youssef explained how that offer was prepared, including how the ████████████████████ ████████████████████ Qualcomm has the documents and had the opportunity to ask about them. That Qualcomm did not get the answers it wanted is not a basis for additional discovery.

***Interrogatory No. 2***. Qualcomm failed to identify any purported deficiency in Arm's Interrogatory No. 2 response during the parties' meet-and-confer process, so this issue is at best not ripe. Arm disagrees that its response is deficient but is willing to moot this issue by citing to deposition testimony from Ms. Badani and Mr. Kranhold.

Respectfully,

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)

Words: 3419

6

**A1191**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., a Delaware corporation, and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,

Plaintiffs,

v.

ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K. corporation,

Defendant.

C.A. No. 24-490-MN



### DECLARATION OF PETER EVANGELATOS IN SUPPORT OF DEFENDANT ARM HOLDINGS PLC'S SUPPLEMENT TO ARM'S MOTION TO STRIKE AND COMPEL (D.I. 378) AND OPPOSITION TO QUALCOMM'S <u>AUGUST 11 LETTER BRIEF TO SPECIAL MASTER RYCHLICKI</u>

Dated: August 18, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Meredith Pohl
Matthew J. McIntee
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
meredith.pohl@kirkland.com
matt.mcintee@kirkland.com

Jay Emerick
Reid McEllrath
Adam M. Janes
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

A1192

jay.emerick@kirkland.com
reid.mcellrath@kirkland.com
adam.janes@kirkland.com

Nathaniel Louis DeLucia
Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
nathaniel.delucia@kirkland.com
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

**A1193**

I, Peter Evangelatos, declare as follows:

I am an attorney with the law firm of Kirkland & Ellis LLP, counsel for Arm Holdings PLC ("Arm") in the above referenced action.  I submit this declaration in support of Arm's Opposition to Qualcomm's Motion to Compel (D.I. 375).

1.     Attached as Exhibit 1 is true and correct copy of D.I. 375, Plaintiffs' Motion to Compel and Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes ██████████████████████████████ dated August 11, 2025.

2.     Attached as Exhibit 2 is a true and correct copy of D.I. 137, Second Amended Complaint ████████████ dated June 3, 2025.

3.     Attached as Exhibit 3 is a true and correct copy of D.I. 305, Arm's Reply Brief in Support of Its Partial Motion to Dismiss Qualcomm's Second Amended Complaint ██████ ██████████ dated July 8, 2025.

4.     Attached as Exhibit 4 is a true and correct copy of D.I. 287, Qualcomm's Answering Brief in Opposition to Arm's Motion to Dismiss the Second Amended Complaint ██████████████████ dated July 1, 2025

5.     Attached as Exhibit 5 is a true and correct copy of the TLA ██████████, dated May 30, 2013.

6.     Attached as Exhibit 6 is a true and correct copy of Plaintiffs' First Supplemental Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24) ██████ ████████████████ dated August 8, 2025.

7.      Attached as Exhibit 7 is a true and correct copy of Plaintiffs' Responses and Objections to Defendant's Fifth Set of Requests for Production to Qualcomm (Nos. 228-287) ▉▉▉▉▉ dated June 11, 2025.

8.      Attached as Exhibit 8 is a true and correct copy of Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9) ▉▉▉ ▉▉▉▉▉▉▉▉▉ dated July 11, 2025.

9.      Attached as Exhibit 9 is a true and correct copy of Arm's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes ▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉ dated August 7, 2025.

10.     Attached as Exhibit 10 is a true and correct copy of Exhibit QCX-241 to the July 11, 2025 deposition of Vivek Agrawal ▉▉▉▉▉▉▉▉▉▉ bearing Bates stamp ARM_01315194.

11.     Attached as Exhibit 11 is a true and correct copy of Exhibit QCX-272 to the July 11, 2025 deposition of Vivek Agrawal ▉▉▉▉▉▉▉▉▉▉ bearing Bates stamp ARMQC_02784247.

12.     Attached as Exhibit 12 is a true and correct copy of Exhibit 30 to the July 2, 2025 deposition of Richard Grisenthwaite ▉▉▉▉▉▉▉▉ bearing Bates stamp ARMQC_02779170.

13.     Attached as Exhibit 13 is a true and correct excerpted copy of the July 11, 2025 deposition transcript of Vivek Agrawal ▉▉▉▉▉▉▉.

14.     Attached as Exhibit 14 is a true and correct excerpted copy of the July 7, 2025 deposition transcript of Aparajita Bhattacharya ▉▉▉▉▉▉▉.

15. Attached as Exhibit 15 is a true and correct excerpted copy of the July 2, 2025 deposition transcript of Richard Grisenthwaite ██████████████████████████

16. Attached as Exhibit 16 is a true and correct excerpted copy of the June 20, 2025 deposition transcript of Martin Weidmann ████████████████████████

17. Attached as Exhibit 17 is a true and correct excerpted copy of the June 30, 2025 deposition transcript of Spencer Collins ████████

18. Attached as Exhibit 18 is a true and correct copy of a letter from Spencer Collins to Ann Chaplin ████████, dated January 8, 2025 and bearing Bates stamp QCVARM_0573678.

19. Attached as Exhibit 19 is a true and correct copy of Arm LTD.'s First Supplemental Objections and Responses to Qualcomm's First Set of Requests for Production (Nos. 1-52) ████████, dated June 17, 2025.

20. Attached as Exhibit 20 is a true and correct copy of Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's Third Set of Requests for Production (Nos. 121-156) ████████, dated June 17, 2025.

21. Attached as Exhibit 21 is a true and correct excerpted copy of Arm's Second Supplemental Initial Privilege Log ████████████████████████ dated July 11, 2025.

22. Attached as Exhibit 22 is a true and correct copy of Arm Holdings PLC's Objections and Responses to Plaintiffs' Notice of 30(b)(6) Deposition, dated June 19, 2025.

23. Attached as Exhibit 23 is a true and correct excerpted copy of the August 1, 2025 deposition transcript of Ami Badani ████████████████████

6

**A1196**

24.    Attached as Exhibit 24 is a true and correct excerpted copy of the June 17, 2025 deposition transcript of Phil Hughes.

25.    Attached as Exhibit 25 is a true and correct excerpted copy of the July 17, 2025 deposition transcript of Paul Kranhold ███████████████████████████.

26.    Attached as Exhibit 26 is a true and correct excerpted copy of the July 4, 2025 deposition transcript of Kenneth Siegel ██████████████.

27.    Attached as Exhibit 27 is a true and correct excerpted copy of the August 14, 2025 transcript of proceedings before Special Discovery Master Helena C. Rychlicki, Esq. ████████ ███████████████████████.

28.    Attached as Exhibit 28 is a true and correct copy of Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) █████████████████████████████ dated July 11, 2025.

29.    Attached as Exhibit 29 is a true and correct excerpted copy of the June 26, 2025 deposition transcript of William Abbey ██████████████.

30.    Attached as Exhibit 30 is a true and correct copy of Arm Holdings PLC's Letter Brief to Special Master Rychlicki ███████████████████████████████████ ████, dated August 1, 2025.

31.    Attached as Exhibit 31 is a true and correct copy of a letter from Jay Emerick to Catherine Nyarady ██████████, dated April 22, 2025.

32.    Attached as Exhibit 32 is a true and correct copy of Plaintiffs' Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-9) ████████ ████████████████████████ dated August 8, 2025.

7

**A1197**

33.     Attached as Exhibit 33 is a true and correct copy of Plaintiffs' Second Supplemental Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 10-13) ██████ █████████████████████████ dated August 8, 2025.

34.     Attached as Exhibit 34 is a true and correct copy of Arm LTD.'s First Supplemental Objections and Responses to Qualcomm's Second Set of Requests for Production (Nos. 53-120) ████████, dated June 17, 2025.

35.     Attached as Exhibit 35 is a true and correct copy of Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories (Nos. 14-24) ████████████████ ██████████████ dated July 11, 2025.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 18th day of August 2025 at New York, N.Y.


/s/ Peter Evangelatos
Peter Evangelatos

8

**A1198**

# Exhibit 1

**A1199**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>a U.K. corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 24-490 (MN)<br><br>REDACTED - PUBLIC VERSION<br>Original filing date: August 11, 2025<br>Redacted filing date: August 18, 2025 |

**PLAINTIFFS' MOTION TO COMPEL**

Pursuant to the Court's Order referring this dispute to the Special Master (D.I. 336) and the Order Relating to Procedures for Resolving Disputes Before Special Master (D.I. 350), Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. ("Qualcomm") hereby move to compel Defendant Arm Holdings plc. f/k/a Arm Ltd. ("Arm") to:

(i)     produce documents responsive to RFP Nos. 34 and 40, supplement its response to Interrogatory 6, and provide a witness pursuant to Fed. R. Civ. P. 30(b)(6) that is prepared to testify on Topic 16(b), concerning peripheral IP ███████████████████ ████████████████████████████████████████████

(ii)    Produce documents responsive to RFP Nos. 34, 40, 57, 58, 71, 85, 100 and supplement its response to Interrogatory 6, concerning licensing and engineering for Arm's ████, ████████, and ████████ CPUs.

(iii)   Produce documents responsive to RFP Nos. 74 and 76 concerning Arm's failure to provide guidance for configuring the ████████████.

1

(iv) Produce documents responsive to RFPs 16, 17, 38, 144, 156, 147, 149 and provide a witness pursuant to Fed. R. Civ. P. 30(b)(6) that is prepared to testify on Topics 32(e)–(h) and (j), concerning Arm's decision to write and leak the October 22, 2024 termination letter.

(v) Produce documents responsive to RFPs 103, 104, 105, 106, 107, 108, 109, 110, 117, 118, 119, 121, and 143 regarding Arm's vertical integration and plans to build its own chips.

(vi) Produce documents responsive to RFP No. 122 regarding Arm's knowledge of Qualcomm's customers.

(vii) Produce documents responsive to RFPs 187, 188, and 189 concerning Arm's discussions of about Qualcomm's CPUs and Arm's decision to cease engaging with Qualcomm on its CPUs or impede Qualcomm's development of its CPUs.

(viii) Produce documents responsive to RFPs 192, 193, 194, and 195 concerning Arm's agreements with Apple and NVIDIA.[1]

(ix) Produce documents responsive to RFPs 169–186 concerning ██████████████████ ██████████████████

(x) Supplement its response to Interrogatory 6 to identify the applicable license fees and royalty rates third parties paid for each product listed.

(xi) Supplement its response to Interrogatory 11 to ████████████████████ ████████████████████████████████ ████████████████████████████████ ████████, and provide a witness pursuant to Fed. R. Civ. P. 30(b)(6) that is prepared to testify on that issue.

---

[1] With respect to Apple, Qualcomm is represented by Morris, Nichols, Arsht & Tunnell LLP.

(xii)     Supplement its response to Interrogatory 2 to explain Ami Badani and Ben Spicehandler's

role in the leak of the October 2024 termination letter.


OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC  20004
(202) 240-2900

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA  94105
(628) 432-5100

August 11, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

3

## RULE 7.1.1 CERTIFICATION

Pursuant to D. Del. Local Rule 7.1.1, counsel for plaintiffs met and conferred with counsel for defendant regarding the relief sought by the foregoing motion, and Arm opposes this motion.


*/s/ Jennifer Ying*

Jennifer Ying (#5550)

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>a U.K. corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br><br>C.A. No. 24-490 (MN) |

## [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO COMPEL

AND NOW, this ___ day of _____, 2025, the Court having considered Plaintiffs' Motion to Compel and any opposition thereto;

IT IS HEREBY ORDERED that the Motion is GRANTED;

IT IS FURTHER HEREBY ORDERED that Defendant Arm Holdings plc. f/k/a Arm Ltd. ("Arm") to:

(i)      produce documents responsive to RFP Nos. 3 and 40, respond to Interrogatory 6, and provide a witness pursuant to Fed. R. Civ. P. 30(b)(6) that is prepared to testify on Topic 16(b), concerning peripheral IP ███████████████ ████████████████████████████████████████.

(ii)     Produce documents responsive to RFP Nos. 34, 40, 57, 58, 71, 85, 100 and respond to Interrogatory 6, concerning licensing and engineering for Arm's ████, ████████, and ████████ CPUs.

(iii)    Produce documents responsive to RFP Nos. 74 and 76 concerning Arm's failure to provide guidance for configuring the ██████████.

5

(iv)    Produce documents responsive to RFPs 16, 17, 38, 144, 156, 147, 149 and provide a witness pursuant to Fed. R. Civ. P. 30(b)(6) that is prepared to testify on Topics 32(e)–(h), and (j), concerning Arm's decision to write and leak the October 22, 2024 termination letter.

(v)     Produce documents responsive to RFPs 103, 104, 105, 106, 107, 108, 109, 110, 117, 118, 119, 121, and 143 regarding Arm's vertical integration and plans to build its own chips.

(vi)    Produce documents responsive to RFP No. 122 regarding Arm's knowledge of Qualcomm's customers.

(vii)   Produce documents responsive to RFPs 187, 188, and 189 concerning Arm's discussions of about Qualcomm's CPUs and Arm's decision to cease engaging with Qualcomm on its CPUs or impede Qualcomm's development of its CPUs.

(viii)  Produce documents responsive to RFPs 192, 193, 194, and 195 concerning Arm's agreements with Apple and NVIDIA.[1]

(ix)    Produce documents responsive to RFPs 169–186 concerning ███████████ ████████████████████████

(x)     Supplement its response to Interrogatory 6 to identify the applicable license fees and royalty rates third parties paid for each product listed.

(xi)    Supplement its response to Interrogatory 11 to ███████████████ ████████████████████████████████ ████████████████████████████████

---

[1] With respect to Apple, Qualcomm is represented by Morris, Nichols, Arsht & Tunnell LLP.

████████████████████████████, and provide a witness pursuant to Fed. R. Civ. P. 30(b)(6) that is prepared to testify on that issue.

(xii)   Supplement its response to Interrogatory 2 to explain Ami Badani and Ben Spicehandler's role in the leak of the October 2024 termination letter.

 

J. _____

7

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 11, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                    *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                                 *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                                  *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Kyle W.K. Mooney, Esquire                                  *VIA ELECTRONIC MAIL*
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

8

Erik J. Olson, Esquire                                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                                         *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                                            *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*


                                        */s/ Jennifer Ying*
                                        _____
                                        Jennifer Ying (#5550)

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 24-490 (MN) |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) ) ) | ██████████████ ██████████████ |
| Defendant. | ) ) | |

## <u>PLAINTIFFS' LETTER TO SPECIAL MASTER HELENA C. RYCHLICKI REGARDING OUTSTANDING DISCOVERY DISPUTES</u>

OF COUNSEL:

Catherine Nyarady
Anish Desai
S. Conrad Scott
Jacob A. Braly
Jacob Apkon
Flint A. Patterson
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Eric C. Westerhold
Adam Basner
Gregg Stephenson
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

**A1209**

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
Dunn, Isaacson, Rhee LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

August 11, 2025

Dear Special Master Rychlicki:

Qualcomm submits this letter in advance of the August 22 hearing.

## I.    Covenant of Good Faith and Fair Dealing

Arm breached the implied covenant of good faith and fair dealing for both the Qualcomm ALA and TLA.

**Peripheral TLA IP.**  In addition to the Hunter, Hayes, and Yamin cores, Arm also failed to offer commercially reasonable terms for Peripheral IP—IP used in Qualcomm's chips outside of the CPU and licensable under a TLA, including the ██████████████████████ ███████████████████████  Qualcomm requested documents and testimony concerning Arm's licenses and negotiations for these products.  (**RFPs 34, 40; Topic 16(b); Interrogatory 6.**)[1]  Arm refused, saying the Second Amended Complaint ("SAC") does not specifically mention these IPs.  But the SAC alleges that, in addition to the breach of ██████ ██████ "Qualcomm expects discovery to show that Arm violated the good faith and fair dealing provisions of the QC TLA *in its licensing negotiations involving peripheral TLA IP*."  D.I. 137 ¶ 102 (emphasis added).  In addition, the October 2024 quote referenced in the SAC included prices for these three Peripheral IPs. Ex. 11.  Qualcomm also sought discovery on these Peripheral IPs in January 2025.  (**RFP 34.**)  Arm was thus on notice of Qualcomm's claims concerning Peripheral IP.  Arm should produce discovery on these IPs.

██████████████████████████████  Arm also provided unreasonable licensing offers for its ██████████████████████████E CPUs.  Qualcomm sought documents concerning Arm's licensing, negotiation (**RFPs 34, 40, 57, 58, 71, 85; Interrogatory 6**), and engineering (**RFP 100**) of these CPUs.  Arm refused all discovery because it claims the SAC does not specifically mention these CPUs.  But the SAC alleges that Arm breached the implied covenant and lists examples of Arm's conduct.  D.I. 137 ¶ 184.  Rule 26's focus on "actual claims and defenses" "does not mean that a fact must be alleged in a pleading for a party to be entitled to discovery of information concerning that fact," 6 Moore's Federal Practice - Civil § 26.42[1] (2025).  Qualcomm's SAC provided examples of how Arm breached, and Qualcomm should be permitted discovery on *all* the ways Arm may have breached the implied covenant.  Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (confirming that "other incidents of the same type" are discoverable).

**ETE Trace Checker.**  Arm failed to provide Qualcomm with necessary information and guidance for configuring the ETE Trace Checker Module, verification technology Qualcomm licenses under its ALA.  Arm purportedly agreed to produce documents "concerning the decision not to provide Qualcomm with information or documents related to the configuration or enablement of the" ETE Checker, Ex. 12 at 44, but Qualcomm has not identified any such documents in Arm's production.  In addition, Arm refused equally relevant discovery into

---

[1] "RFP" refers to Qualcomm's requests for production, Exhibits 1-7.  "Topic" refers Qualcomm's Notice of Rule 30(b)(6) Deposition of Arm, Exhibit 8.  "Interrogatory" refers to Qualcomm's interrogatories, Exhibits 9-10.

**A1211**

communications regarding Qualcomm's requests for such configuration information or information that was provided to other licensees regarding the ETE Checker (**RFPs 74, 76**), Ex. 13 at 24-27. Arm's refusal to provide discovery prejudiced Qualcomm and impeded its ability to fully pursue its claims. Arm should produce the relevant documents.

## II.  Tortious Interference

Qualcomm's Counts III, IV, and V stem from Arm's interference with Qualcomm's customers, including by sending Qualcomm a letter threatening to terminate the Qualcomm ALA on October 22, 2024, then leaking that letter to Bloomberg News the same day, despite contractual confidentiality obligations forbidding such a leak. D.I. 137 ¶¶ 29-37, 144-163, 189-203.

In its response to Interrogatory 2, Arm admitted it leaked the letter to Bloomberg News through Kenneth Siegel, a partner at MoFo and a director of SoftBank Group, and Paul Kranhold, a partner at FGS Global, Arm's PR firm. Ex. 14 at 20-21. Qualcomm sought discovery on the letter and leak (**RFPs 16, 17, 38, 145[2]-147, 149; Topic 32(e)-(h), (j)**), but Arm's production contains no documents about the decision to write or leak the letter or the decision to withdraw the notice on January 8, 2025.

Qualcomm is entitled to documents concerning Arm's leak of information about the termination letter to Bloomberg. Arm's conversations regarding this public relations strategy are not privileged as they do not involve legal advice. And to the extent any such documents are privileged, Arm waived the privilege. At Mr. Abbey's deposition, Arm's counsel elicited testimony that Arm did not share the actual letter with Bloomberg but rather had a discussion with Bloomberg about the letter. Ex. 15 at 165:3–21. When Qualcomm asked who gave him that information, Arm's counsel instructed Mr. Abbey not to reveal any conversations with counsel. *Id.* 172:8–20. Mr. Abbey followed that instruction and insisted that the conversation was privileged, but acknowledged that it was a conversation with an attorney. *Id.* 173:18–175:11. By testifying about the content of a communication with an attorney—and attempting to use the content of that communication to bolster Arm's defense against Qualcomm's claim—Arm waived privilege over that communication. *See CP Kelco U.S. Inc.* v. *Pharmacia Corp.*, 213 F.R.D. 176, 179 (D. Del. 2003) ("Having chosen to use the information offensively, any privilege [defendant] might have claimed to defend the information from disclosure is, and remains, waived."). Qualcomm is entitled to any documents regarding that conversation. To the extent no documents exist, Qualcomm is entitled to an additional deposition for the limited purpose of asking Mr. Abbey about this conversation without Arm providing improper privilege instructions to Mr. Abbey.

## III.  California Unfair Competition Law

Historically Arm operated as a neutral licensor, holding itself out as the "Switzerland of chips." D.I. 137 ¶ 68. Arm's neutrality intentionally led to widespread adoption of the Arm Architecture because software developers could ensure software would be interoperable across all Arm-compatible devices. *Id.* Following Arm's acquisition by SoftBank, Arm pivoted away from this neutral model. *Id.* ¶ 69. Now, in violation of the California Unfair Competition Law (Count

---

[2] Qualcomm served two RFP Nos. 145 and moves on both here.

2

**A1212**

VI), Arm seeks to leverage its control of the Arm ISA to displace Qualcomm and grow Arm's chip business. *Id.* ¶¶ 70-72, 164, 207-210. Arm largely has refused discovery into this business model shift and its related unfair acts.

**RFPs 103-110, 117-119, 121, 143.** Qualcomm sought production of documents relating to Arm's vertical integration and Arm's intentions, plans, and strategy to build chips. Arm refused. Arm should be compelled to produce such documents as they bear on Qualcomm's unfair competition claim relating to Arm's efforts to displace Qualcomm and other licensees through building its own chips.

**RFP 122.** Qualcomm asked Arm for documents regarding Arm's "knowledge since January 1, 2022 that any Third Party is or has been a customer for Qualcomm CPUs or other products." Arm's response is limited to third parties identified in Qualcomm's complaint, *e.g.*, only customers with which Qualcomm already knows Arm tortiously interfered but not Qualcomm customers Arm interfered with without Qualcomm's knowledge. Ex. 16 at 6-7. Qualcomm is entitled to probe whether Arm knew specific companies were Qualcomm customers and targeted those companies to disparage Qualcomm or displace Qualcomm as a chip supplier.

Qualcomm requested documents concerning Arm's internal discussions about Qualcomm's custom CPUs (**RFP 187**), Arm's decision to cease engaging with Qualcomm on its CPUs (**RFP 188**), and any steps or decisions Arm took to impede Qualcomm's development of its CPUs (**RFP 189**). Discovery on Arm's decision to instruct its employees to stop communicating with Qualcomm or to impede Qualcomm's CPU development—for example, by withholding deliverables[3]—is key to understanding what Arm withheld from Qualcomm and whether its actions were motivated by a desire to hinder Qualcomm's CPU development and thereby harm competition.

Qualcomm requested agreements and licenses that Arm has with Apple[4] or Nvidia (**RFPs 193, 195**), including any that resulted from the dissolution of the Arm Joint Venture with Apple (**RFP 192**) and from Nvidia's failed acquisition of Arm (**RFP 194**). Apple was instrumental in Arm's founding and public reporting indicates that it retains a relationship with Arm that is more favorable than that of other licensees. Ex. 18. Nvidia and Arm entered into discussions for an acquisition in 2021 that ultimately fell through after regulatory pressure from the Federal Trade Commission. Arm's other agreements with Apple and NVIDIA are relevant to understanding whether and why their ALAs and TLAs reflect uniquely favorable terms.

**RFPs 169–186.** Arm also refused to produce documents relating to █████████████ ████████████████████████████████████████████████████████████████████████████. Linaro Limited hosts an open-source forum for which companies can pool resources to solve

---

[3] As noted in Qualcomm's August 1 letter, "Arm witnesses testified they were instructed by management to withhold deliverables from Qualcomm, then instructed to deliver them after the verdict in *Arm* v. *Qualcomm*." Ex. 17 at 4. But Arm has not produced those communications or any documents reflecting Arm's decision making leading up to those communications.

[4] With respect to Apple agreements, Morris, Nichols, represents Qualcomm.

common problems related to the Arm ecosystem. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

## IV.    Arm's Interrogatory Responses

Arm's interrogatory responses are incomplete.

**Interrogatories 6 and 11.**  Arm should be compelled to supplement its responses to **Interrogatory 6 and 11** to provide additional information about Arm's agreements with third parties for (at least) ████████████████ min and to offer a 30(b)(6) witness prepared to testify about these issues.

**Interrogatory 6** asked Arm to describe the licensing terms for various products relevant to its claims, including ██████████████████. Arm initially refused to provide any response to this request and, on the last day of fact discovery, supplemented its response to incorporate a handful of third-party agreements. *First*, Arm should be compelled to produce additional third-party agreements that cover all of the TLA IP identified in **Interrogatory 6**, rather than just third-party agreements related to ████████████████████. *Second*, Arm should be compelled to supplement its response to identify the applicable royalty rates in each agreement for each product. Arm only began to produce third-party agreements after depositions started, producing a handful of agreements between June 24 and July 11, making it impossible for Qualcomm to download, interpret, and examine witnesses using these documents.  Moreover, these are highly technical agreements that do not always identify royalty rates applicable to individual CPUs and that Arm—not outside counsel for Qualcomm—has specialized knowledge of.

**Interrogatory 11** asked for the basis for asserting that Arm did not breach the Qualcomm TLA.  Arm's initial response provides no specific information about the Previous Best Deal and whether Arm used it to create the October 2024 quote for Qualcomm.  Ex. 24.  On the last day of fact discovery, after Qualcomm completed its depositions, Arm supplemented its response to identify ████████████████████████████ ████████████████. *Id.* The response cited deposition testimony of Ehab Youseff and a ████████████████████████████

4

**A1214**

███████████████ that Arm produced only *after* Mr. Youseff's deposition. *Id.* As described above, Arm should be required to identify relevant information about the ATA and provide a 30(b)(6) witness to address it.[5]  The supplemental response further states that ████████

████████████████████████████████████████████████████████████████████████

████████████ Ex. 24.  But this explanation lacks any specific discussion of the relevant terms of the ██████ agreement or why ████████████████████████████████████ ██████ Arm should be required to supplement its interrogatory response to explain its analysis, identify what "other factors" it relied on to determine that ████████████████████████████ and provide a witness prepared to so testify regarding Topics 8, 9, 20, and 29.

**Interrogatory 2.**  Arm's supplemental response to **Interrogatory 2** is insufficient because it does not describe Ami Badani or Ben Spicehandler's role in the leak of the October 2024 termination letter.  Ms. Badani's deposition testimony makes clear that she was personally involved in Arm's decision to speak to Bloomberg about the October 22 letter.  Ex. 26  at 36:23-40:7.  Arm claimed that it could not explain her role before her deposition, Ex. 27 at 33:13-37:7, despite the fact that she is an Arm employee and Arm provided information about other Arm employees prior to their depositions.  Further, Paul Kranhold testified about Mr. Spicehandler's involvement.  Ex. 28 at 36:1-14.  Arm should be required to supplement this response.

Respectfully,

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Words: 2,357

---

[5] Arm's witness on **Topic 8** (Fonseca) did not know what royalty rates or license fees ██████

████████████████████████████████████████████████████████████████████████ , *id.* at 51:18-52:7.

5

**A1215**

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 24-490-MN |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) ) ) ) | **REDACTED – PUBLIC VERSION** **Original Filing Date: June 3, 2025** **Redacted Filing Date: June 9, 2025** |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant Arm Holdings PLC, formerly known as Arm Ltd. ("Arm").[1]

## NATURE OF THE ACTION

1. This case arises out of the latest chapter in Arm's campaign to stifle competition and technology innovation by impeding the efforts of its longtime business partner Qualcomm to deliver leading computer chips to its customers and consumers around the world.  For years, Arm has received substantial royalties from licensing Qualcomm to design and sell products containing custom central processing units ("CPUs") compatible with Arm's instruction set architecture

---

[1]   On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims.  *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.  This filing contains additional background on Arm's attempt to preclude Qualcomm's custom central processing units from competing with Arm's own central processing units.  The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading.  Redacted Answer & Defenses to Arm's Compl. & 2d Am. Countercls., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.

("ISA"). But following its acquisition by the venture capital firm SoftBank Group and its failed sale to NVIDIA, Arm attempted to shift its business model away from licensing its ISA for use by companies like Qualcomm that design CPUs, and toward forcing customers to buy only Arm's own CPU designs. Qualcomm's license, however, stands in the way of Arm's effort to push aside the makers of custom CPUs: Qualcomm's license extends until 2033, and Qualcomm's Arm-compatible microprocessors lead the industry in numerous applications. At the direction of SoftBank and its chairman and CEO, Masayoshi Son, Arm thus sought to disrupt Qualcomm's business. Arm's first move was to sue Qualcomm for allegedly breaching a license that Arm had previously granted to a company Qualcomm acquired but to which Qualcomm was not a party, demanding that Qualcomm cease distributing its groundbreaking microprocessors. As soon as Arm filed that lawsuit, it blitzed Qualcomm's major customers with letters publicizing the lawsuit, accusing Qualcomm of breaching "the Arm license agreement," and threatening that it would "work vigorously to protect what is rightfully ours." And eight months later, Arm sent another round of letters to Qualcomm's largest customers, using language Arm's CEO has admitted under oath was "confusing" and "misleading" to create the false impression that Qualcomm was clearly in breach of its agreement. Then, on the eve of trial in that case, Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license after 60 days—the day after the trial was scheduled to end. That laid bare Arm's intentions from the beginning: to attempt to get out of its license with Qualcomm in any way possible so Arm could eliminate alternatives to Arm's own competing CPU designs.

2.    For decades, Arm has developed and licensed intellectual property relating to chips. Arm has pursued that business through two distinct models: *first*, by licensing other companies to

2

use Arm's ISA—the set of commands that determines how software controls a CPU[2]—and *second*, by licensing its own CPU designs so that other companies can make and sell products that use Arm's ready-made designs.  Unlike other companies that developed a proprietary ISA used only on those companies' own chips, Arm followed a distinctive, "industry-described neutral, open licensing approach"[3] of "licensing its designs to all comers."[4]  That open approach encouraged widespread adoption of Arm's ISA and also its designs.  Arm's ISA—which Arm CEO Rene Haas describes as "the most ubiquitous computer architecture on the planet"[5]—is used by practically every smartphone, most "internet of things" ("IoT") devices, many automobiles, and an increasing number of personal computers and datacenter servers.  Arm claims that companies using its ISA have shipped 270 *billion* chips as of January 2024.[6]

3.      One of these customers was Qualcomm, which has licensed Arm technology since 1997.  As relevant here, Qualcomm and Arm entered into an architecture license agreement or "ALA" in 2013 (the "QC ALA"), which licensed Qualcomm to develop and sell custom-designed

---

[2]    An ISA acts as an interface between CPU hardware and software.  These instructions describe the high-level attributes of the CPU, such as the supported computer instructions.  It consists of a set of a few thousand instructions (for example, "add," "multiply," "load," and "store") and a few hundred registers, which are the places where information can be read, written, or operated upon, by the instructions, which compatible software will recognize.

[3]    Compl. ¶ 5, *In the Matter of Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 (FTC filed Dec. 2, 2021) (hereinafter "FTC Complaint").

[4]    Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparks-quick-backlash-in-chip-industry-idUSKBN2650GT/.

[5]    Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas).  ARM claims that "[a]bout 99% of premium smartphones are powered by Arm." *Consumer Technologies: Smartphones*, Arm, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Dec. 9, 2024).

[6]    *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

3

CPUs that are compatible with the Arm ISA but are otherwise the product of Qualcomm's own engineering work.  Qualcomm has also entered into a technology license agreement ("TLA") authorizing Qualcomm to make and sell products, including systems-on-a-chip ("SoCs") that use Arm's ready-made CPU designs.

4.     In recent years, Arm has apparently grown dissatisfied with its longstanding open, neutral business model.  Following its acquisition by SoftBank and the failure of an attempted sale to NVIDIA, Arm is now grasping for any means—fair or foul—of padding its bottom line and stock price.  Eager to cash in on the ubiquity of—and lack of any viable alternatives to—the Arm ISA, and as urged by SoftBank and Son, Arm has begun turning the screws on its customers, substantially increasing the royalty rates it demands to use the Arm ISA.  Nor is Arm content to simply increase the rates it charges architecture licensees like Qualcomm.  Instead, it has sought to capture a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or indeed, by selling chips themselves).

5.     Qualcomm now stands as an obstacle to Arm's ambition to raise prices and eliminate alternatives for customers.  Qualcomm has developed innovative products enabled by its custom-designed, high-performance, low-power CPUs, which utilize a novel microarchitecture and related technologies to deliver significant increases in both performance and efficiency.  Those innovative products pose a serious obstacle to Arm's ambition to control more links in the computer-chip value chain.  Unable to compete fairly with Qualcomm, Arm has employed a series of wrongful tactics in an attempt to stifle Qualcomm's technological leaps in CPU design, to force Qualcomm to continue to use Arm's off-the-shelf CPUs, and to coerce Qualcomm into renegotiating the QC ALA, despite it being in effect for years to come, on terms substantially more

4

favorable to Arm—or simply to nullify that agreement. Indeed, Arm's tactics are part and parcel of a broader effort to enable the company to escape its existing ALAs and thereby to ensure that devices compatible with the Arm ISA run on Arm chips.

6. Some of Arm's maneuvers resulted in a trial that took place last year before this Court. *See Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del.) (hereinafter "*Arm* v. *Qualcomm*"). That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA. NUVIA was founded by a world-class engineering team that set out to design better chips for use in datacenters. In 2021, Qualcomm acquired NUVIA for $1.4 billion, intending for this team to help drive innovation across Qualcomm's product segments, including in laptops and other personal computers ("compute"), smartphones ("mobile"), and the digital cockpits and driver-assistance systems that are increasingly common in cars and trucks ("automotive"). Arm could have treated that acquisition as an opportunity to grow the use of the Arm ISA in new markets but instead regarded the acquisition as a competitive threat, whose benefits should be eradicated.

7. *First*, Arm asserted, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA, Qualcomm needed Arm's consent to transfer NUVIA's technology to Qualcomm. Arm took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of the QC ALA. Arm later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers—including in products that Qualcomm began developing after the NUVIA acquisition, such as the Snapdragon® X-Elite—violated a license agreement between Arm and NUVIA that Qualcomm was not using and that Arm ultimately terminated. This made no sense. Qualcomm has its own license agreements for Arm technology

5

and information that allowed it to develop and provide custom Arm-compliant cores and products incorporating such cores to its customers (including the Snapdragon® X-Elite and Snapdragon® 8-Elite) for many years to come.  Qualcomm did not need Arm's consent to develop and market this technology.[7]

8.      *Second*, Arm filed the meritless *Arm* v. *Qualcomm* action against Qualcomm, claiming that Qualcomm and NUVIA breached NUVIA's terminated agreements with Arm, despite Qualcomm not even being a party to those agreements, and infringed Arm's trademarks by marketing custom CPUs years after the NUVIA acquisition.  In that action, Arm is demanding that Qualcomm destroy these groundbreaking CPU products that Qualcomm developed after the NUVIA acquisition and in accordance with the Qualcomm/Arm agreements—even though Arm has repeatedly admitted that it suffered no actual harm as a result of the conduct allegedly forming the basis of its claims.[8]

9.      *Third*, Arm and Son promoted the *Arm* v. *Qualcomm* lawsuit to Qualcomm's customers to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and could be subject to retaliation by Arm if they did, including by misrepresenting the terms of Qualcomm's licenses with Arm to Qualcomm's customers.[9]  Arm took further action in an attempt to disrupt Qualcomm's business relationships by sending emails to Qualcomm's customers on two separate occasions that misrepresented the terms of the NUVIA

---

[7]   Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[8]   *See* Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 29, 31-37, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306; Joint Letter re Bench or Jury Trial, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308; Redacted Mar. 5, 2024 Hr'g Tr. 38:20-39:8, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1.

[9]   Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 255-70, *Arm* v. *Qualcomm*, D.I. 306.

agreements and misleadingly implied that Qualcomm was required to destroy the custom CPUs that it was working on.

10. Qualcomm was vindicated in the *Arm* v. *Qualcomm* action, in which the jury found that Qualcomm had not breached NUVIA's agreements and that Qualcomm's products were properly licensed under the QC ALA.[10]

11. This complaint seeks redress for further bad-faith conduct in which Arm has engaged in an attempt to pressure Qualcomm to cave to its demands. That conduct includes refusing to perform certain of its obligations under the QC ALA and QC TLA and continuing to wrongfully interfere with Qualcomm's relationships with current and prospective customers.

*Arm Withheld Deliverables in Breach of Its Obligations Under the QC ALA*

12. Arm deliberately withheld deliverables to which Qualcomm is entitled under the QC ALA with Arm under the guise that the QC ALA does not entitle Qualcomm to support for "Nuvia-based technology." Arm's excuse is unjustified, and its breach could not be clearer.

13. Qualcomm first suspected that Arm was withholding QC ALA deliverables in the fall of 2022. At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within Arm's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

14. Arm capitalized on this lack of transparency, with its General Counsel stating definitively that ███████████████████████ Arm further stated that Qualcomm ███ ████████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables. Here again, Arm

---

[10] Verdict Form, *Arm* v. *Qualcomm*, D.I. 572.

was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

15. Arm went on to state that Qualcomm's written notice was a "████████" to cause Arm "████████" because "████████████" was at issue, which Arm purported was "████████████████████████" ████████████████████████████████. Additionally, Arm threatened Qualcomm that, if Qualcomm availed itself ████████ ████████████████████████, Arm would harm Qualcomm, including by terminating Qualcomm's multiple licenses with Arm.

16. Arm's statement that "████████████████████" was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted in *Arm* v. *Qualcomm* revealed incontrovertible evidence that Arm not only had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, Arm was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the use of technology acquired from NUVIA.

17. Arm never cured its failure to deliver, causing Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

18. Arm's failure to deliver violated the QC ALA, which ████████████ ████████████████████████████████████ under that agreement. Under the QC ALA, if Arm is found to be in breach of Section ██ of the QC ALA, it must ████████████████████████████████. If Arm fails ████ ████████████████████████████ pursuant to Section ████

8

████████████████████████████████████████████████████

████████████████████████████████.

19.    Arm's withholding of deliverables and deliberate decision not to cure the issue ██████████████████████████████ is a material breach of the QC ALA. Accordingly, Qualcomm is entitled to financial damages, including but not limited to ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.

### *Arm Violated the QC TLA By Refusing to License Qualcomm CPU Cores*

20.    Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses to its off-the-shelf cores at commercially reasonable prices to Qualcomm. Arm's actions are violations of licensing provisions negotiated between the parties.

21.    For example, in April 2024, Qualcomm submitted requests to renew licenses from Arm for off-the-shelf cores Cortex-A720 (codenamed "████") and Cortex-A520 (codenamed "████"). Despite repeated follow-ups over the following several months, Arm refused to provide any licensing offer for either core.

22.    In August 2024, Qualcomm submitted a request to Arm to renew a license to Arm's off-the-shelf core Cortex-M55 (codenamed "████"). Arm once again refused to provide a licensing offer for the ████ core and continued to refuse to provide a licensing offer for the ████████ cores.

23.    Given Arm's prolonged refusal to engage, Qualcomm's General Counsel sent Arm a notice of breach of, and non-compliance with, the QC TLA on September 20, 2024. Qualcomm sent a second notice on September 27, 2024 when Arm failed to provide confirmation of having received the initial letter.

9

24.     Arm waited nearly a month to respond to Qualcomm's notices of non-compliance. In its October 23, 2024 response, Arm's Chief Legal Officer wrote that Arm did not ███████ ███████████████████████████████████████████ Despite the clear indication that Arm did not intend to proceed ███████, ██████████████████████ ███████████████████.

25.     Arm subsequently provided Qualcomm with a licensing offer for the requested cores and microcontroller. As Arm must have been aware, its proposal was extreme and clearly not commercially feasible for Qualcomm. Arm's proposal was a constructive failure to offer a license ███████████████████████████. Under the terms of the QC TLA, ███ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████

26.     As with the QC ALA, ██████████████████████ ██████████████████, which Qualcomm sent in September 2024. ██████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████

10

27.     Arm's proposal violated the QC TLA by presenting financial terms that were so exorbitant as to be commercially unreasonable and not ████████, and therefore a constructive failure to offer a license. It also greatly exceeded ████████████████████████

████████████████████████████████████████████████████

Furthermore, Arm's proposal failed to comply with the QC TLA by ████████████████████

████████████████████████████████████

28.     Arm has refused to offer commercially reasonable terms for any of the requested cores, and has thereby failed to cure its breach of the QC TLA.

### Arm Threatened to Terminate the QC ALA Without Basis

29.     Apparently seeking to ratchet up pressure on Qualcomm before trial in *Arm* v. *Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter (the "Breach Letter") asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing "unlicensed cores," and claiming that Arm will be entitled to terminate the QC ALA if Qualcomm does not capitulate to Arm's demands for a "cure" within 60 days. Those demands, which had no basis in the agreement, included that Qualcomm should "at a minimum" stop development of any CPUs that use any designs, technology, or code created by NUVIA employees; cease requesting ████████████████████ for any such CPUs; cease manufacturing and selling such CPUs; and cease manufacturing or selling CPUs that Arm has refused to validate and verify. The Breach Letter also demanded, without support in the QC ALA or the law, that Qualcomm withdraw its claims against Arm in this case for Arm's breach of its delivery obligations under Section ██.

30.     Arm's assertion that Qualcomm was in material breach of the QC ALA lacked any basis in that agreement. The premise of Arm's Breach Letter was that certain Qualcomm CPU cores allegedly contain aspects of designs that were started by NUVIA employees. But the QC

11

ALA does not prohibit Qualcomm from acquiring nascent microarchitecture technology and using that technology to develop Qualcomm CPUs. And it certainly does not permit Arm to terminate the QC ALA as payback for Qualcomm's suing to protect its rights under that agreement. Because Qualcomm has not committed a " ███████████████████████████ " Arm has no right to terminate the QC ALA, and any purported termination of that agreement is null and void.

31. Moreover, Arm's claim of a material breach was inconsistent with Arm's own conduct throughout this dispute. Arm has known since at least 2021 that Qualcomm would be acquiring NUVIA and using the technology that Arm now belatedly claims was improperly licensed. Yet for three years, Arm took no steps towards attempting to terminate the QC ALA and stood by while Qualcomm, through significant investments of time and money, developed and brought to market innovative products featuring Qualcomm's custom CPUs. Arm's belated threat to terminate the QC ALA on the eve of trial and while Qualcomm was announcing new products based on its high-performance custom CPUs demonstrates that Arm's claim of a material breach was a pretext to justify Arm's true aim: escaping the QC ALA and other ALAs so Arm can attempt to dominate the market free from competition from Qualcomm and other designers of custom CPUs.

### *Arm Continues to Wrongfully Attempt to Injure Qualcomm's Business*

32. Arm's Breach Letter was the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers.

33. The Breach Letter was not only legally groundless, but also timed and publicly released in an effort to damage Qualcomm's business. Arm sent the Breach Letter to coincide with Qualcomm's annual Snapdragon® Summit, where Qualcomm unveiled an SoC that offers

12

greater CPU performance and efficiency than those offered by Qualcomm's competitors, including those competitors that use Arm off-the-shelf products in their SoCs. To ensure that the Breach Letter reached Qualcomm's customers, Arm also promptly leaked it to Bloomberg, which published a story on the threatened termination that very day.[11] Arm did so knowing that Qualcomm's customers would likely be concerned that termination of the QC ALA could destabilize their own supply chains, because Arm's actions implied, despite the actual terms of the QC ALA, that Arm could and would impede Qualcomm's ability to deliver the SoCs its customers ordered, and that Qualcomm's customers might even face intellectual-property litigation brought by Arm. Both the timing and the disclosure of the Breach Letter were thus calculated to interfere with Qualcomm's customer relationships and prospective business opportunities.

34.    The Breach Letter was also timed to interfere with *Arm* v. *Qualcomm*. In the Breach Letter, Arm threatens that it "shall be entitled" to terminate the QC ALA on December 21, 2024—the day after trial in *Arm* v. *Qualcomm* was expected to conclude. Arm's counsel's statements to this Court that termination would not be "automatic" after 60 days, that he "hope[d] that there are discussions between the parties," and that the Breach Letter could prompt the parties to "evaluat[e] their positions" underscore that Arm sent the Breach Letter to pressure Qualcomm to accede to Arm's unjustified demands.[12] Arm's wrongful tactics have harmed Qualcomm. Following Arm's bad-faith claim that Qualcomm has breached the QC ALA and leak of the Breach Letter, important Qualcomm customers delayed entering into new (or renewing existing) contracts with Qualcomm or have insisted that Qualcomm provide them with additional commitments regarding its ability to

---

[11]    Ian King, *Arm to Cancel Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024, 8:17 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

[12]    Oct. 30, 2024, Hr'g Tr. 39:14-40:2, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

deliver licensed products. Arm's campaign not only deprived Qualcomm of the ability to finalize these business opportunities promptly and without providing additional commitments, but also required Qualcomm executives and employees to spend considerable time responding to and alleviating customer inquiries. None of those demands would have existed but for Arm's wrongful conduct.

35.     At trial in the *Arm* v. *Qualcomm* case, Arm continued to misrepresent its relationship with Qualcomm and its position in the marketplace. Arm's Chief Executive Officer, Rene Haas, repeatedly stated that Arm did not view Qualcomm as a competitor because Arm did not build or sell semiconductor chips in the marketplace, which Mr. Haas stated would amount to direct competition between the companies. Despite Mr. Haas' sworn statements denying Arm's involvement in chip development, Arm is now in the process of designing and distributing its own semiconductor chips.[13] Moreover, Arm "sought to hire executives from its customers as early as November," several weeks before Mr. Haas' sworn testimony in court.[14] Specifically, Arm's recruiter told the customer executive that this new position will help with Arm's "transformation from solely designing processor architecture (IP) to also selling its own silicon."[15] To facilitate its entry into selling its own chips, Arm now seeks to force Qualcomm—which would otherwise be a competitor—out from the marketplace.

36.     Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025,

██████████████████████████████████████████

---

[13] *Arm recruits from customer as it plans to sell its own chips*, Stephen Nellis and Max Cherney, REUTERS, https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (Feb. 13, 2025).

[14] *Id.*

[15] *Id.*

14

██████████████████████████████████████████████████████████████."

But even then, Arm confirmed that it was not abandoning its efforts to obstruct Qualcomm's developments of custom cores, insisting that ████████████████████████ ████████████████████████████ Moreover, Arm sought to prevent Qualcomm from curing the impression created in the market by its deliberate leak of the Breach Letter, ██████████████████████████████████████████████████

████████████████████████

37.    Arm's non-compliance with its contractual obligations to Qualcomm should be seen for what it is: the latest in a series of anti-competitive maneuvers intended to force Qualcomm to renegotiate an existing, long-term license agreement that Arm's current management views as disadvantageous, and to frustrate Qualcomm's efforts to design and deliver industry-leading technology. Arm's tactics—its refusal to provide technology it is contractually obligated to deliver and its attempts to undermine customers' confidence in Qualcomm—should be wholly rejected.

## THE PARTIES

38.    Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California. Qualcomm is a leading technology innovator in mobile communication products and the driving force behind the development, launch, and expansion of 5G technology. Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone. Qualcomm brings the benefits of mobile to new industries, including automotive, IoT, and computing, where Qualcomm's technology has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

39.    Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal place of business in San Diego, California. Qualcomm Technologies is a wholly owned subsidiary

15

of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering and research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

40.     Defendant Arm Holdings PLC is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

42.     Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because Arm is "a defendant not resident in the United States" and therefore can be "sued in any judicial district."  Arm has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[16]

## FACTUAL ALLEGATIONS

## I.     ARM LICENSES AND THE CUSTOM CPU MARKET

43.     Arm is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars. Arm's licensing model has been based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee.  For many years, Arm has offered different types of license contracts, of which two are at issue in this case: ALAs and TLAs.

---

[16]   *See generally* Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

## A.    ALAs and the Arm ISA

44.    An ALA grants licensees the right under Arm's intellectual property to design their own custom Architecture Compliant Cores using specific licensed ISA technology and to manufacture, sell, and distribute Arm Compliant Products incorporating such cores.[17]

45.    CPU cores (also known simply as cores) are a particular component of SoCs, which are integrated circuits used in cellular phones, computers, and other devices that combine several technologies used in such products into a single chip. A core or CPU performs processing within the SoC.

46.    An Arm Compliant Core is compatible with the Arm ISA. As a general matter, an ISA lists the instructions that allow hardware (like SoCs) to interface with software programs. Application and software developers create their products to be compatible with particular ISAs. As a result of greater investment in Arm-based systems by hardware companies like Qualcomm and software developers, the Arm ISA is now "ubiquitous" and used in practically every premium smartphone, as well as a large percentage of automobiles and IoT devices and a growing number of personal computers and datacenter servers.

47.    The Arm ISA allows for software compatibility across all Arm-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result. The Arm ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

---

[17]    ███████████████████████████

48.     To make a CPU that then can execute the Arm ISA and therefore run applications and other software that have been written to be compatible with that ISA, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

49.     A CPU developer developing a custom CPU designs *how* the core is built, *how* it performs, and *how* it executes the CPU's instructions.  There are a virtually infinite number of ways to design and build CPUs that can implement the Arm ISA.  Companies that design custom CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.  Many of these design choices are driven by the requirements of the product segment the designer is targeting—CPUs for mobile applications can have different design priorities than those for laptop computers or automobiles.

50.     Under an ALA, Arm does not deliver any specific Arm design or tell the licensee how to make the CPU.  That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee.  As Arm has publicly acknowledged, "the creation of an optimized CPU is very costly and time consuming," and Arm therefore "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the

18

customization often does not provide a reasonable return on investment."[18]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.  Arm has executed ALAs with Qualcomm and a number of other companies.

### B.    TLAs and Off-the-Shelf CPUs

51.    In addition to granting licensees rights under ALAs to make custom-designed products that are compatible with the Arm ISA, Arm also designs "off-the-shelf" CPUs and other peripheral intellectual property ("IP") that customers may license through a TLA.  Under a TLA, Arm delivers complete processor core designs that a licensee can incorporate into a larger SoC design, saving the licensee the trouble and expense of designing its own CPU.  In addition to CPUs, Arm also designs, and licenses under the TLA, peripheral IP, which is technology used in SoCs to perform specific functions and interface with the CPU.  This peripheral IP takes a variety of forms, such as "interconnects" that facilitate the transfer of information between different components of an SoC or various pieces of software that are incorporated into a semiconductor chip as a means of certifying safety capabilities of the chip.  Recently, Arm has placed greater emphasis on licensing off-the-shelf CPU technology, including by launching a "Compute Subsystems" business that offers integrated designs that pair CPUs with other technology—all in exchange for "significantly higher royalty rates" than Arm receives for licensing its ISA.[19]

52.    But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance.  Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it

---

[18]    Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

[19]    *Id.*

charges for a license to the Arm ISA. Moreover, when an SoC developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs. And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing SoCs that can compete against those with more advanced custom CPUs.

## II. QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

53.     Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications." Qualcomm is a world leader in the design and production of semiconductor microchips, including SoCs. Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines. Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

54.     Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates. In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive industry designed to deliver connected experiences that are safer and customizable. Included among these products are custom CPUs and SoCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

20

### A.      Qualcomm Builds Innovative Arm-Compatible Products.

55.      Qualcomm has held Arm licenses since 1997. Those licenses include an ALA entered in 2003, and the currently operative QC ALA, ██████████████, which Qualcomm[20] and Arm entered into on May 30, 2013, and Annex 1 to that agreement for Arm v8-A Architecture deliverables. On June 23, 2020, Qualcomm and Arm entered into an additional Annex 1 to the QC ALA for Arm v9-A Architecture deliverables.

56.      Under the QC ALA and corresponding Annex 1s, Qualcomm has rights, using specific licensed technology, to design, manufacture, sell, and distribute Qualcomm's v8-A and v9 Arm-compatible custom cores, custom Arm ISA-compatible CPU cores, and products incorporating those cores. ████████████████████████████████████████████ ██████████████████████████████████████████████. Since Qualcomm entered into the QC ALA, Qualcomm has developed and shipped custom Arm ISA-compatible CPUs.

57.      Qualcomm is today one of Arm's largest licensees—it "accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024."[21] Since 2013, Qualcomm has paid Arm total license fees of ████████ and running royalties of ████████ under the QC ALA. Qualcomm has fully complied with its obligations under the QC ALA and has continued to tender royalty payments to Arm (under protest) pending resolution of this dispute.

58.      In recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for

---

[20]  The actual party to the ALA and TLA ██████████████████████ The terms of the agreements ████████████████████████████████████████ ████████████████████████████████████████████████

[21]  ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024 (Form 20-F) at 28 (Aug. 12, 2024).

Qualcomm to compete by relying on Arm-designed cores. In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical.

59. In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SoC specifically for use in datacenter servers. At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs. Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary compute, mobile, and automotive product segments. Qualcomm also planned to continue development of the server CPU and SoC for use in data centers and servers that NUVIA had originally intended to design.

60. Since acquiring NUVIA and integrating the NUVIA team as Qualcomm employees, Qualcomm spent years developing innovative products with custom-designed CPUs using a novel microarchitecture and related technologies.

61. Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86). Qualcomm's new products with custom CPUs have drawn praise as being "incredibly potent"[22] and "shockingly fast."[23]

62. Qualcomm is not alone in its belief that its custom cores offerings will transform and advance the industry. Major industry participants—including Microsoft, Google, Samsung,

---

[22] Aaron Klotz, *Snapdragon X Elite Beats AMD and Intel Flagship Mobile CPUs in Geekbench 6*, Tom's Hardware (Apr. 2, 2024), https://www.tomshardware.com/pc-components/cpus/snapdragon-x-elite-beats-amd-and-intel-flagship-mobile-cpus-in-geekbench-6-qualcomms-new-laptop-chip-leads-in-single-and-multi-core-tests.

[23] Mark Hachman, *Qualcomm's Snapdragon X Elite Chip Attracts Unprecedented PC Partnerships*, PCWorld (Oct. 25, 2023), https://www.pcworld.com/article/2116395/qualcomms-latest-snapdragon-attracts-huge-pc-partnerships.html.

GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[24]

### B.    Relevant Provisions of the Qualcomm ALA

63.    On May 30, 2013, Qualcomm and Arm entered into an Amended and Restated Architecture License Agreement, ███████████, and Annex 1 to that agreement.  The QC ALA is a binding and enforceable agreement.

64.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

65.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

66.    ████████████████████████████████

████████████████████████████████████████

---

[24]    *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

23



67.

. [26]

## C.    Arm's Evolving Business Model

68.    For years, Arm expressed its commitment to an open, neutral model for licensing the use of its ISA.  Under that model, which led to Arm commonly being referred to as the "Switzerland of chips," Arm held itself out as not discriminating against companies that sought to use the Arm ISA.[27]  That model benefited the software developers, which could develop software

---

[25]              and                              are defined terms in the QC ALA. *See*

[26]                                   is a defined term in the QC ALA.

[27]  FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point

that would be interoperable across Arm-compatible devices, and ultimately benefited customers. Indeed, Arm continues to tout the benefits of its "broad, standardized software ecosystem," which it claims "ensures diversity and robustness in supply, as well as easy software portability between Arm-based systems."[28]  That model also benefited Arm, leading to widespread adoption of the ISA.  As a senior Arm executive has explained, "[w]hat makes an architecture successful is actually the number of people that use it," as greater adoption of an ISA creates a "virtuous circle" in which the "more people that use your architecture, the more people will want to use it."[29]

69.     After being acquired by SoftBank, however, Arm has pivoted away from that model.  When the chipmaker NVIDIA attempted to acquire Arm in 2020, the proposed acquisition met with harsh responses from regulators and other companies that rely on the Arm ISA, based on fears that NVIDIA could use its control of Arm to undermine its rivals, "including by manipulating levers such as [Arm]'s pricing, the terms and timing of access to [Arm]'s Processor Technology, … [Arm]'s technological developments and features, and [Arm]'s provision of service and support."[30]

70.     When that acquisition fell apart under regulatory scrutiny, Arm pursued a variety of strategies to try to bolster royalty revenues at SoftBank's and Son's behest, including unsuccessful attempts to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made, and to force a major customer

---

about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees").

[28] *The Arm Advantage: Choosing Arm Technology*, Arm.com, https://www.arm.com/company/arm-advantage (last visited Dec. 9, 2024).

[29] Arm, *What Is CPU Architecture?*, YouTube.com (Aug. 18, 2021), https://www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.

[30] FTC Compl. ¶ 8.

to renegotiate royalty rates notwithstanding the parties' existing contract.[31]  After releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores.[32] Indeed, in its calls with investors, Arm routinely touts the increased revenues it expects to collect as a result of widespread adoption of v9.Arm has also attempted to bolster its income—and thus its valuation—by abandoning its historic role of neutral and open licensing of its ISA.  Having made that ISA "ubiquitous" for the entire smartphone and IoT markets and made significant inroads in other sectors, Arm now seeks to leverage that ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA.  Mr. Haas has hinted at precisely that sort of leveraging, explaining that as the company "defining a computer architecture and … building the future of computing," it is "easier" to understand the best ways to integrate hardware and software "if you're building something than if you're licensing IP" because "building something" makes a company "much closer to that interlock" and gives it "much better perspective in terms of the design tradeoffs to make," which is why "if we were to do something, that would be one of the reasons."[33]  Moreover, Arm has also sought to develop more complex, integrated "subsystems" that combine CPUs with other chips and intellectual property.[34]  And it was recently

---

[31]  Wayne Ma & Cory Weinberg, *How a Lopsided Apple Deal Got Under Arm's Skin*, The Information (Nov. 29, 2023), https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin.

[32]  *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas).

[33]  Alex Health, *What Arm's CEO Makes of the Intel Debacle*, The Verge (Dec. 6, 2024, 4:45 PM), https://www.theverge.com/2024/12/6/24315123/arm-ceo-rene-haas-intel-ai-chips-samsung-changes.

[34]  *Client Solutions: Arm Compute Subsystems (CSS) for Client*, Arm, https://www.arm.com/products/compute-subsystems-for-client (last visited Dec. 9, 2024).

reported that, in a "radical change to [Arm's] business model," Arm was planning to launch its own chip by as early as this summer.[35] This transformation from licensing intellectual property to positioning itself primarily as a chip designer creates the potential for Arm to make substantially more money: These businesses "carry significantly higher royalty rates"[36] than merely licensing use of the Arm ISA.

71.    But this transformation also brings Arm into direct conflict with existing licensees and customers. When an architecture licensee like Qualcomm designs a custom Arm ISA-compatible CPU, that CPU does not belong to Arm. Instead, as Arm has publicly acknowledged, those custom CPUs "compete with" and "pose a threat to Arm's implementation IP business"—that is, Arm's effort to position itself as a designer of CPUs.[37]

72.    Arm has thus responded by pressuring customers (such as Qualcomm) to purchase Arm's off-the-shelf CPUs and by attempting to prevent Qualcomm from designing CPUs compatible with the Arm ISA.

## III.    ARM UNFAIRLY AND UNLAWFULLY ATTEMPTS TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

73.    Developing its own CPUs frees Qualcomm of the need to rely on Arm's off-the-shelf CPU designs. That can both reduce the royalty rates Qualcomm pays Arm— █████████

---

[35] Matthew Garrahan et al., *Arm To Launch Its Own Chip in Move That Could Upend Semiconductor Industries*, Financial Times (Feb. 13, 2025), https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008 . According to the report, the chip is "expected to be a [CPU] for servers in large data centres and is built on a base that can then be customized for clients."

[36] *Arm First Quarter Fiscal Year 2025* at 5, Arm (July 31, 2024), https://investors.arm.com/static-files/393afe3f-13ff-4aa8-a4b3-41b1afaa5a91 (statement of Rene Haas).

[37] Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

██████████████████████████████████████████—and demonstrate that products using Qualcomm custom CPUs can outcompete products using Arm's off-the-shelf designs. Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an even better product for customers and opening new product segments for chips compatible with Arm's ISA, Arm has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

**A.    Arm Wrongfully Withholds Deliverables Owed to Qualcomm Under the QC ALA.**

74.    In an effort to limit competition posed by Qualcomm's custom CPU, Arm breached its contractual obligations to provide Qualcomm with deliverables paid for under the QC ALA.

**1.    *The QC ALA requires Arm to provide Qualcomm with certain deliverables.***

75.    The two contract provisions at issue here—Sections ██ and ██—are clear and unambiguous.

76.    Section ██ of the QC ALA requires Arm to "██████████████████████████████████████████████████████████████████████████" and to "██████████████████████████████████████████████████." Arm is also required to deliver ████ "███████████████████████████████████." ██████████████ is defined in the Qualcomm ALA as "██████████████████████████████████████████████████████████████████" under that agreement.

77.    Under Section ██ of the QC ALA, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████:



### 2. Arm withholds the deliverables.

78. Qualcomm first suspected that Arm was withholding ███████████ under the QC ALA in the fall of 2022. At that time, Qualcomm was embarking on its verification process for its ████ SoC. As is the customary practice between an ALA licensee and Arm, Qualcomm provided Arm with details about its ████ CPU so that Arm would provide a formal list of agreed Arm Compliance Kit ("ACK") tests for which Arm would expect to see verification data. But Arm withheld the formal list of tests (known as the "OOB") ██████████████

████████████████████████████

███████

79. Qualcomm then attempted to resolve the issue without court intervention.

80. On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug fixes) from Arm. Arm engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll be able to share OOB and various patches after my management has given their approval."

### 3. Qualcomm provides written notice of Arm's failure to deliver—but Arm does not cure.

81. Almost one month later and after still not having received the deliverables under the QC ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022, Qualcomm notified Arm in writing of its failure to provide certain deliverables, including the OOB, stating explicitly that Arm should take the letter as "Qualcomm's required notice under Section ██ that Arm is not in compliance with its obligations under Section █, and that Arm must cure this breach in accordance with the time and procedures set forth therein."

29

82. After not hearing from Arm, pursuant to Section ▇ of the QC ALA, Qualcomm sent a follow-up letter on December 5, 2022. The letter was Qualcomm's "second written notice of non-compliance ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." The letter stated that "ARM must ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ set forth" in the QC ALA "or ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."

83. Pursuant to Section ▇ of the QC ALA, Arm ▇▇▇▇ to remedy its failure to provide the deliverable. ▇▇▇▇ passed without Arm remedying the issue.

84. Arm responded on December 6, 2022.

85. In its response, Arm disagreed that Section ▇ was at issue "or that provision of the OOB implicates Section ▇." Arm additionally asserted that the ACK deliverables are governed by Section ▇ of the QC ALA, not Section ▇ and that remedies for a breach of that section do not include ▇▇▇▇▇▇▇▇▇.

86. Notably, Arm additionally claimed that "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇," stating explicitly that Arm "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." As to the OOB specifically, Arm claimed that "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."

87. Arm was definitive in its assertions, stating that "[n]o additional delivery is required," and "[n]o breach of Section ▇ has occurred." Qualcomm was unable to verify this assertion because the "patches" are created by Arm and provided solely by Arm. Accordingly, Qualcomm has no way of knowing definitively whether Arm has released patches for verification until they are delivered (or until someone from Arm tells Qualcomm they are available, which did not occur in this case).

88.     Arm's letter further stated that Qualcomm "does not have ███████████ ███ rights under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  Arm additionally threatened Qualcomm that if it did not drop its invocation of Section ██, Arm would take steps that would harm Qualcomm.  Arm claimed that Qualcomm's invocation of Section ██ was "a new, material breach of the Qualcomm ALA" and that, to the extent Qualcomm exercised ████████████████████████ ██████████████████████████, Arm would "not hesitate to terminate" Qualcomm's licenses.  Arm further stated that Qualcomm's letter was a "malicious effort" to cause Arm "economic duress," which Arm purported was "inconsistent with the language, spirit, and purpose of the ALA and ███████████████."

### 4.     *Discovery reveals that Arm deliberately withheld the deliverables.*

89.     But more than a year later, Qualcomm discovered that Arm's December 6, 2022, letter misrepresented the facts and concealed Arm's strategy of deliberately withholding the OOB and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm duress.

90.     "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'"  In response to Qualcomm's requests for production, Arm produced an October 2022 email chain in which Richard Grisenthwaite, Arm's Executive Vice President and Chief Architect, explicitly instructed others at Arm not to provide Qualcomm with the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[38]

---

[38]  On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include Arm's breach of Section ██ of the QC ALA.  These allegations and

91.    In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that Arm concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  Arm's multi-tiered deception was successful for more than a year.  "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section ███ of the Qualcomm ALA."[39]

92.    The applicable Annex 1 to the QC ALA includes ████████████ ████████████████████████████████████████ █████████████████████████.

93.    Accordingly, when it was revealed through document and deposition testimony that, contrary to Arm's December 6, 2022, letter, Arm had deliberately withheld the ACK deliverables to which Qualcomm was entitled, it became clear that Arm breached its obligations under Section ██████████.

---

quotations are taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order. Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5. Notably, at that hearing, Arm advocated against adding this claim to the case in which this discovery was produced; and instead, Arm advocated for Qualcomm to bring a separate lawsuit. Redacted Mar. 5, 2024 Hr'g Tr. 39:13-20, *Arm* v. *Qualcomm*, D.I. 312-1.

[39]  Redacted Mar. 6 Order at 4, *Arm* v. *Qualcomm*, D.I. 303; *see also* Redacted Mar. 5, 2024 Hr'g Tr. 17:18-19:9, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

32

94.    Arm's Chief Legal Officer concealed the facts, explicitly (and definitively) stating in Arm's December 6, 2022, letter that it had provided Qualcomm with ███████ to the ACK and that "███████████████████." Qualcomm did not have a valid basis to dispute that factual representation without discovery.

### 5.    *Arm's breach of the QC ALA has harmed Qualcomm.*

95.    To date, Arm still has not provided the OOB and relevant patches to which Qualcomm is entitled, and Arm's failure to do so increased Qualcomm's burden in verification.

96.    By failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA, even in the absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the QC ALA.

97.    Similarly, by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches, which Qualcomm paid for and was entitled to receive under the QC ALA.  Qualcomm was damaged as a result.

98.    ████████████████████████████████.

99.    Pursuant to Section ██ of the QC ALA:



100.    Accordingly, ████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

101.    In addition, because ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

**B.    Arm Fails to Provide Qualcomm With** ████████ **Licensing Proposals in Violation of the QC TLA.**

102.    Arm has not only attempted to disrupt Qualcomm's development of custom CPUs but also attempted to interfere with Qualcomm's development of products containing off-the-shelf Arm cores by intentionally failing to provide commercially reasonable, and therefore ████████, licensing proposals to Qualcomm ████████████████. In addition to the below, Qualcomm expects discovery to show that Arm ████████████████████████ ████ in its licensing negotiations involving peripheral TLA IP.

*1.    The QC TLA requires Arm to* ████████ ████████████████████████

103.    The QC TLA contains ████████████████████████

███████████████████████████████████████████████

34

104.    Section ██ sets forth a series of requirements that Arm must follow for each of its off-the-shelf cores. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

105.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

106.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ Arm has never provided Qualcomm with written notice that ████████████

████████████████████████████

107.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

35



2. **Arm fails to respond to Qualcomm's licensing requests.**

109. As part of its product development cycle, Qualcomm monitors the terms of licensing agreements to determine whether renewals or extensions of third-party IP will be necessary in order to plan for future product development and sales. Qualcomm has historically licensed and renewed licenses for various ██████████████. For example, Qualcomm sought to renew licenses to certain ███████████, ███████████ ██ ██████████████████████████, █ █████████████████████.

110. Qualcomm's licenses for all three cores, which were ███████████ licenses entered into in 2019, are set to expire in ████. Given Qualcomm's desire to avoid disruption to its development schedule and roadmap, it began negotiations for new licenses for each core in 2024.

111. In April 2024, Qualcomm sent Arm written requests to license both ███████ ██

36



112. Arm failed to respond to Qualcomm's requests, ▮▮▮▮▮▮ ▮ ▮ ▮▮▮▮ and ignored continued outreach from Qualcomm in the subsequent months.

113. In August 2024, Qualcomm submitted a written request for ▮▮. Arm failed to respond to this request as well.

114. Faced with Arm's continued non-compliance and the potential impact to its roadmap, Qualcomm sent Arm a notice of non-compliance with Section ▮ of the QC TLA (including ▮▮▮▮) in September 2024. Qualcomm told Arm that the letter "serves as Qualcomm's written notice of ARM's breach of, and non-compliance with, ▮▮▮ of the TLA." The letter asked that "ARM provide the requested core license immediately and in accordance with the terms and conditions of the TLA as required by ▮▮▮▮ of the TLA, or Qualcomm will be forced to exercise its remedies under the TLA."

115. Once again, Arm failed to respond. A week later, Qualcomm wrote to Arm again, informing Arm of the "second written notice of breach and non-compliance in accordance with the notice process set forth in Section ▮ of the TLA."

### 3. *Arm fails to provide ▮▮▮ licensing terms to Qualcomm.*

116. Nearly four weeks later, Arm finally responded to Qualcomm's notice of non-compliance. In its October 23, 2024 letter, Arm "▮▮▮▮▮▮▮▮▮▮". Instead, Arm told Qualcomm that it did not "▮▮▮▮▮▮▮▮▮▮."

117. In connection with the letter, Arm provided offers to the requested cores that Arm claimed were "▮▮▮▮▮▮▮." However, not only was this untrue, but also Arm's proposal contained terms so unreasonable that it was a constructive failure to license.

37

118.    The financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and ███████████. For example, ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████. ███████████████ was not justified by any change or improvement in the technology and is grossly inconsistent with the market for any comparable technology. Arm was aware of the unrealistic terms of its proposal, which Arm acknowledged it only provided because of Qualcomm's notice of non-compliance with Section ███████████████████████████████████████████████

████. This constructive failure to offer a license to the requested cores violated the terms of the QC TLA.

119.    Arm's proposal also violated the QC TLA requirement under Section ███████████

███████████████████████████████████████████.

120.    Furthermore, by ███████████████████████████████

███████████████████████████████████████████████

███████████████.

### 4. Qualcomm has been harmed by Arm's TLA violations.

121.    As a result of Arm's exorbitant proposal, Qualcomm has been forced to proceed in development of SoCs without knowing what CPUs it will be using after the licenses to ████████

███████████ expire.

122.    Due to the development lifecycle for semiconductor chips, Arm's ███████ refusal to offer licenses and to change ███████████████ of its licensing offers is already impacting Qualcomm. Qualcomm must undergo reviews of its planning roadmaps to ensure that it will have suitable CPUs for its customers. This effort requires (i) that additional resources be shifted to

design custom CPUs for each of its semiconductor chips (ii) that Qualcomm allocate resources to identify workarounds based on RISC-V and redesign products to function with a different microprocessor design, or (iii) rely on older, less competitive versions of Arm CPUs that Qualcomm has licensed.

123. The QC TLA sets forth the remedies for Arm's violations.

124. ██████████████████████ states that Qualcomm may seek ████████████



125. In addition, Section ██ of the QC TLA states:



126. Qualcomm sent its first notice of breach on September 20, 2024 and its second notice on September 27, 2024. Arm's purported offer in response to Qualcomm's notices was dated October 24, 2024. To date, Arm has failed to provide any commercially reasonable, █████ █████, offer and, as such, has failed to remedy its breach within the ████████████.

127. Qualcomm is entitled to ████████████████ under both the QC TLA and QC ALA for a period of ███████████████████████████████████████████████ ███████████████████████████████████████████████████. While Qualcomm will continue to ████████████████████ until Arm's breach of the QC TLA is finally

resolved, Qualcomm believes that Arm is not entitled to receive those ███████████████ ███████████████████████ pursuant to the QC TLA and ALA ██████████████████ ████████████████████████████████████ For this reason, Qualcomm does not believe that any ███████████████████████████

### C.    Arm Refuses to Negotiate a License to the Latest Version of Its ISA ███████ ██████████

128.    Arm has not only taken steps to destroy or delay Qualcomm's present development efforts.  It has also tried to hamstring Qualcomm's future development efforts by failing to negotiate a license to future versions of the Arm Architecture.

129.    In addition to failing to provide the deliverables ███████████████████████ and constructively failing to offer licensing proposals ████████████, Arm has also refused to negotiate an extension of ██████████ to cover future versions of ██████████████████ ██████████ requires it to do.

130.    As noted, Section ██████████ of the QC ALA ███████████████████████ ████████████████████████████████████████████████████ ██████████. Qualcomm has ██████████████████████████████. Additionally, Section ██████████ of the QC ALA █████████████████████████████████ ██████████████████████████████████.

131.    On April 17, 2020, a Qualcomm employee emailed an Arm counterpart to ask if Arm was working on a new version (v10) of the Arm ISA to replace v9 and explained that the request was made in the context of ██████████████████████████████████ ██████████████. The Arm employee responded the following week that "██████████████ ████████████████████████████████████████████.

██████ would expire but that there was " ██████████████████████████

████████████████████████████████████████. "

132.    On May 20, 2020, Qualcomm emailed Arm stating that Qualcomm " ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. "

133.    Arm never responded to that email or followed up at any other time regarding Qualcomm's rights ████████████████████.

134.    Arm's actions underscore its strategy of attempting to eliminate existing ALAs and to force Qualcomm and other licensees to use Arm's off-the-shelf CPU designs—or to cease designing Arm-compatible chips entirely.

### D. Arm Engages in a Campaign to Undermine Qualcomm's Customer Relationships.

135.    In addition to the breaches described above, Arm has also deliberately sought to impair Qualcomm's standing and relationships with current and prospective customers. As Qualcomm has detailed, Arm, through its leadership and through SoftBank and Son, has engaged in a misinformation campaign to mislead Qualcomm's customers into believing that Qualcomm will not be able to deliver licensed Arm-compatible products after 2024, and that Qualcomm customers must obtain their own direct licenses from Arm.[40]  That misinformation campaign included multiple rounds of letters to Qualcomm customers misleadingly claiming that Qualcomm had breached its ALA and suggesting that customers could face legal jeopardy from using

---

[40]  Defs.' Answer and Defenses to Pl.'s Compl. & Jury Demand & Defs.' 2d Am. Countercls. ¶¶ 255-70, 275(b)-(d), *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.

Qualcomm products. More recently, Arm began "ratcheting up the pressure" on Qualcomm in *Arm* v. *Qualcomm*,[41] and Arm continued this misinformation campaign by declaring without basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter. By doing so, Arm has caused tangible harm to Qualcomm's customer relationships.

### 1. Arm repeatedly attempts to interfere in Qualcomm's customer relationships.

136.    On August 31, 2022, Arm commenced *Arm* v. *Qualcomm* in the U.S. District Court for the District of Delaware. In that action, Arm alleges that Qualcomm and NUVIA breached the NUVIA ALA by not destroying all design work undertaken by NUVIA pursuant to its license with Arm following Qualcomm's acquisition of NUVIA.

137.    On the same day that Arm filed that action, it launched a premeditated campaign to blitz Qualcomm's customers with letters publicizing the lawsuit. As Mr. Haas admitted under oath at trial, Arm sent letters to top executives at 37 companies that were customers of both Arm and Qualcomm. In those letters, Arm stated that Qualcomm had breached the terms of "the Arm license agreement," implying that Qualcomm had breached its own ALA. That was misleading: Arm's complaint in the *Arm* v. *Qualcomm* action accused Qualcomm and Nuvia of breaching the *Nuvia* ALA and never accused Arm of breaching the *Qualcomm* ALA. Mr. Haas thus also admitted under oath that the letter "should have said" that Qualcomm had supposedly breached the Nuvia ALA, not Qualcomm's "Arm license agreement."

138.    Additionally, the August 31 letters asserted that Arm would "███████████ ██████████████████" and thus (despite assuring customers that there would be "█ ███████████████████████") suggested that companies could face legal jeopardy if

---

[41]    Oct. 30, 2024, Hr'g Tr. 34:6, *Arm Ltd.* v. *Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

they used the Qualcomm products that incorporated Nuvia technology. The letter attached a letter from Arm's general counsel to Qualcomm's general counsel that made this point explicitly, asserting that █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████

139.    Eight months later, in May 2023, Arm launched another round of customer letters. Arm executive Will Abbey sent a series of additional letters to key Qualcomm customers "████████████████████████████████████████████████████." Mr. Haas agreed at trial that there was no independent event that triggered Arm's decision to send these letters. That letter stated that Qualcomm's designs based on Nuvia technology, specifically including the Phoenix core, "can no longer be used and must be destroyed." Mr. Haas also agreed at trial that it was very important to Arm to tell customers that it was demanding destruction of technology. The letter extensively quoted from Arm's prior threat letter to Qualcomm but did so in a manner intended to convey that it was quoting from a contract between Qualcomm and Arm that specifically required Qualcomm to cease using "Arm-based technology" developed by Nuvia and to destroy such technology.  In fact, no such contract existed, and the intended implication of quoting that language was thus false.  Mr. Haas admitted at trial that he was "quite confused" by the language of the letter and agreed that the letter was "misleading."

140.    Like the prior letters, the May 2023 letters reassured customers that there would be no disruptions to their partnership with Arm, but only if that partnership was "████████████ ████████." It also offered to answer questions that customers might have regarding how the litigation might impact the availability of licensed Arm technology going forward, which necessarily

43

implied that the litigation could impact the availability of the Qualcomm products that Arm claims were unlicensed.

### 2. *Arm waits years before taking steps to terminate the QC ALA.*

141.   Although Arm now asserts that Qualcomm is in material breach of the QC ALA, Arm waited years before taking any steps towards terminating the QC ALA.  When it filed the *Arm* v. *Qualcomm* action, Arm neither alleged that Qualcomm had breached the QC ALA nor sent Qualcomm any notice to that effect, ███████████████████████████████ ████████.

142.   On September 30, 2022, Qualcomm answered Arm's complaint in *Arm* v. *Qualcomm* and filed a Counterclaim against Arm seeking, among other things, a declaratory judgment that its conduct was fully licensed under the QC ALA, and that it could "continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA" or any other relevant agreement with Arm.  When Arm answered that counterclaim, it generally alleged that Qualcomm was breaching the QC ALA, though it did not send Qualcomm any written notice to that effect ██████████████████████.

143.   On March 13, 2024, Qualcomm filed its second amended counterclaims in *Arm* v. *Qualcomm*.  Arm answered on April 4, 2024, and again alleged that Qualcomm was breaching the QC ALA, entitling Arm to terminate that agreement.  Again, however, Arm did not send Qualcomm any written notice to that effect ████████████████.

### 3. *Arm's Breach Letter groundlessly asserts that Qualcomm is in material breach of the QC ALA.*

144.   It was not until more than seven months later, on October 22, 2024, that Arm sent Qualcomm the Breach Letter, which purported to provide notice to Qualcomm ████████ ██████████████████ that Qualcomm is in material breach of that agreement.

145. The Breach Letter asserted that the QC ALA authorizes Qualcomm solely "to develop, verify, and sell designs for CPUs … that use, rely on, or derive from Arm technology *delivered by Arm to Qualcomm* and *developed by Qualcomm employees*, not third parties."[42] It did not attribute these assertions to any particular provision of the QC ALA but instead cited a string of contract sections, ███████████████████████████████████ ███████████████████████████████████ ████████████. The Breach Letter also referred generally to "Annex 1," a lengthy document describing ████████████████████. But nowhere in the Breach Letter did Arm identify any provision of the QC ALA that imposes the particular obligations Arm asserts in the Breach Letter.

146. In the Breach Letter, Arm claimed that Qualcomm "systematically and willfully breached these obligations" by "develop[ing] CPUs and market[ing] multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party."[43] The Breach Letter thus reprised the same arguments it has made in *Arm* v. *Qualcomm* about the NUVIA ALA: in essence, that Qualcomm somehow breached the *NUVIA* ALA by developing CPUs in part by using technology created by and acquired from NUVIA. Arm has not explained in that litigation and did not explain in its Breach Letter how Qualcomm allegedly breached any provision in the *QC* ALA by developing CPUs in the manner it did. In short, there is a reason why Arm's purported notice letter failed to state clearly which express contractual provision Qualcomm materially breached, or when or how Qualcomm breached any such provision: None exists.

---

[42] Ex. A at 1 (emphasis added).

[43] *Id.*

147.    Having invoked Section ███ of the QC ALA, Arm's Breach Letter demanded that Qualcomm "cure" the alleged breach(es) within 60 days, including by stopping the development of "Nuvia designs" and the manufacture and sale of Qualcomm CPUs that allegedly "use Nuvia designs or technology." The Breach Letter further demanded that Qualcomm "cure" the alleged breaches by withdrawing its complaint in this Action against Arm. And the Breach Letter asserted that if Qualcomm does not "cure" the alleged breaches in this manner within 60 days, Arm would be entitled to immediately terminate the QC ALA.

148.    The "cures" that Arm demanded in its Letter—other than the dismissal of this Action—are the same remedies that Arm has requested in *Arm* v. *Qualcomm*. By sending the Breach Letter, Arm attempted to pressure Qualcomm to yield to its demands regardless of the outcome of *Arm* v. *Qualcomm*, as well as this case, before the former went to trial.

149.    The timing of the Breach Letter belied Arm's assertion that Qualcomm has materially breached the QC ALA. Arm knew about Qualcomm's acquisition of NUVIA in 2021, and asserted in its November 2022 Answer to Qualcomm's Counterclaim that Qualcomm was supposedly in breach of the QC ALA. Yet before sending the October 22, 2024, Breach Letter, Arm never even attempted to provide the notice ████████████ that Qualcomm had supposedly breached the agreement. Quite to the contrary, Arm *celebrated* Qualcomm's development of the Snapdragon® X Elite SoC that contains CPU designs whose development Arm now claims breach the QC ALA, with Arm's CEO stating that Arm was "very excited to see the announcement of the brand new Windows on Arm PCs that run Copilot, true AI PCs."[44] In the

---

[44] *Arm First Quarter Fiscal Year 2025*, at 3. Mr. Haas further commented that "the products that are out today are using the most advanced Arm technology," because they "are optimized with Microsoft for the most effective battery life on the planet." *Id.* at 10.

Breach Letter, Arm nowhere explained why it waited more than three years after Qualcomm allegedly breached the Nuvia ALA before it provided notice of an alleged breach of the QC ALA.

150.    Because Qualcomm did not materially breach the QC ALA, Arm did not identify any valid grounds on which to terminate the QC ALA, and any purported termination based on the Breach Letter is null and void.

### 4.    *Arm leaks the Breach Letter to harm Qualcomm's customer relationships.*

151.    Arm's assertion that Qualcomm was in material breach not only lacked legal or factual basis, but was also made in a manner calculated to damage Qualcomm's customer relationships.  Arm's claim that it has the authority to terminate the QC ALA was false, wrongful, and calculated to pressure Qualcomm to accede to Arm's demands and to prevent Qualcomm from gaining new business opportunities.

152.    From October 21–23, 2024, Qualcomm hosted its annual Snapdragon® Summit. At that Summit, Qualcomm unveiled new technology, including its new Snapdragon® 8 Elite Mobile Platform, an SoC featuring Qualcomm's custom-built second generation Qualcomm Oryon™ CPU.  That SoC delivers significant performance and efficiency improvements over competitors, ███████████████████████████████████.

153.    Arm issued its Breach Letter on October 22, 2024, in the middle of the Snapdragon® Summit.  That timing was no accident, but was an intentional Arm media stunt intended to embarrass Qualcomm and to interfere with its relationships with its current and potential customers and business partners, including by creating unwarranted uncertainty about Qualcomm's ability to continue delivering licensed Arm-compatible products.

47

154. In addition to sending the Breach Letter to Qualcomm, Arm also leaked the Breach Letter or its contents to Bloomberg, which published a story that same day.[45] The story was based on and referred to "a document seen by Bloomberg." On the afternoon of October 22, 2024—the same day Qualcomm received the Breach Letter—a Bloomberg reporter contacted Qualcomm requesting comment on Arm's having sent Qualcomm a "60-day letter" notifying Qualcomm that it was purportedly in breach of the QC ALA. The reporter was familiar with details of the letter. Later that day, Bloomberg published its story reporting on Arm's purported cancellation of the QC ALA.[46] The story relayed details about the Breach Letter "according to a document seen by Bloomberg." Because Qualcomm did not leak the Breach Letter, the Letter could have reached Bloomberg only if it had been leaked by Arm.

155. Arm leaked the Breach Letter to distract from the Snapdragon® Summit and the groundbreaking products released at the Summit, and to ensure that the attention of Qualcomm's customers and business partners focused on the parties' licensing dispute rather than on Qualcomm's products, which pose a threat to Arm's own competitive ambitions. The leak of the Breach Letter thus further demonstrated Arm's deliberate efforts to interfere with Qualcomm's customer relationships.

### 5. *Arm's leak of the Breach Letter harms Qualcomm.*

156. The release of the Breach Letter has caused Qualcomm harm, by impairing its relationships with current and prospective customers and interfering with its future business opportunities.

---

[45] See Ian King, *supra* note 11.

[46] *Id.*

157. Following Bloomberg's publication of the news story about the Breach Letter, multiple Qualcomm customers and business partners have contacted the company to express concern about the Breach Letter. As a result of the Breach Letter—and, in particular, Arm's baseless assertion that it can terminate the QC ALA—several Qualcomm customers have deferred finalizing pending business agreements pending resolution of the *Arm* v. *Qualcomm* litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products.

158. For example, a major customer (the "Smartphone Company") had informed Qualcomm that it was designing a new mobile phone that would rely on Qualcomm's innovative Snapdragon® 8-Elite SoC. After learning that Arm was threatening to terminate the QC ALA, however, a senior executive of the customer informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm. The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm.

159. Additionally, a potential customer (the "AI and Ecosystem Company") that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU. After the Breach Letter was published, the customer delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities. The AI and Ecosystem Company has stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question. As a result of the uncertainty stemming from Arm's assertion and

leak of the Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity.

160.    Simultaneous with its actions that have set back Qualcomm's efforts to finalize a deal with the AI and Ecosystem Company, Arm is also attempting to supply the AI and Ecosystem Company directly. Despite Arm's insistence at trial in *Arm v. Qualcomm* that it does not make chips, it was recently reported that Arm had reached an agreement with the AI and Ecosystem Company under which Arm would begin producing its own chips for use in a datacenter operated by the AI and Ecosystem Company.[47] Arm has thus not only delayed Qualcomm's efforts to finalize a contract with the AI and Ecosystem Company but has separately developed its own datacenter chips that it is trying to sell to the same company.

161.    Arm leaked the Breach Letter at a time when it knew that the Smartphone Company is an existing customer of Qualcomm and when it knew or should have known that the AI and Ecosystem Company was a customer of Qualcomm or was likely to be absent Arm's interference. On information and belief, Arm leaked the Breach Letter knowing (or in circumstances in which it should have known) that its wrongful threats to cancel the QC ALA would disrupt those customer relationships and that Qualcomm was likely to be harmed as a result.

### 6.    *Arm's withdrawal of the Breach Letter offers no assurance that Arm will not attempt to terminate the QC ALA.*

162.    Following Qualcomm's victory at trial in *Arm v. Qualcomm*, on January 8, 2025, Arm Chief Legal Officer Spencer Collins sent Qualcomm a letter (the "Notice") withdrawing the Breach Letter and stating ███████████████████████████████████████

███████████████████████████████████████████████" The Notice also

---

[47] Reuters, *Arm Secures Meta as First Customer for Ambitious New Chip Project, FT Reports* (Feb. 13, 2025).



The Notice asserted, however, that Arm ▮▮▮▮▮▮▮

The Notice thus indicated that Arm was pausing its efforts to terminate the QC ALA, but in no way suggested that Arm had any plan to abandon its long-term efforts to force Qualcomm to use Arm off-the-shelf cores and to block Qualcomm from creating and delivering products using its own custom cores (or indeed, any chips that might compete with Arm's own offerings).

163.    Arm also sought to prevent Qualcomm from addressing the uncertainty created by Arm's own leak of the Breach Letter. Despite leaking that letter to the press, Arm ▮▮▮▮ ▮▮▮▮ thereby attempting to limit Qualcomm's ability to disclose the letter. Arm authorized Qualcomm to "▮▮▮▮▮▮▮," thereby seeking to obstruct Qualcomm from communicating about the letter publicly or with potential customers or other business partners.

## IV.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY

164.    Arm's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end. Despite Arm's CEO's sworn testimony to the contrary, it is clear that Arm seeks to take control of the semiconductor industry and will do whatever it takes to undermine and dominate the companies that it once treated as partners.

165.    Arm's tactics violate basic contract principles and are directly contrary to the purpose of the QC ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ▮▮▮ they bargained for without fear that Arm will unilaterally

abdicate its contractual obligations in an effort to disrupt a licensee's innovation if Arm views the licensee as an unacceptable competitor. ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

166. The assault on Qualcomm's business through the improper refusal to provide commercially reasonable, ████████ licensing offers under the QC TLA likewise threatens reliance on the Arm ecosystem and the fundamentals of licensing. Licensees enter into TLAs with Arm under the assumption that they will be joining a collaborative and open ecosystem and will be able to license the IP necessary to compete and grow in the market. Arm's transformation into a chipmaker, combined with its throttling of the delivery of critical IP, is a dramatic reversal of Arm's longstanding business model that endangers the semiconductor industry and the manner in which its participants interact.

## COUNT I

### (Declaratory Judgment)

167. Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

168. Plaintiffs are entitled to a declaratory judgment that:

A.    Arm breached the QC ALA by withholding ███████████ that Arm was obligated ████████████████ to deliver under Section ██ of the QC ALA, and by withholding ████ Arm was required to deliver "████████████████" under Section ██ of the QC ALA;

B.    As a result of Arm's breach of Section ██ of the QC ALA, Qualcomm is entitled to ████████████████ ████████████████

C.    Arm breached the QC TLA by ████████████████ for ████████████████, including ████████

52



       ███████████████████████████████ in violation of ████ ████ of the QC TLA.

D.    As a result of Arm's breach of Section ███ of the QC TLA, Qualcomm is entitled to ████████ ████████████████████████, including ████████████ , and ██████████████████████████

E.    Arm breached the QC TLA by ██████████████████████████████ , including ████ in violation of ████████ of the QC TLA.

F.    As a result of Arm's breach of Section ███ of the QC TLA, ████████████████████████████████

G.    Arm breached the QC TLA by ██████████████ for ██████████████, including ████ , with ██████████████████ of the QC TLA.

H.    As a result of Arm's breach of Section ███ of the QC TLA, ████████████████████████████████

I.    Qualcomm has not breached the QC ALA as asserted in the October 22, 2024, Breach Letter; and

J.    Arm is therefore not entitled to terminate the QC ALA.

169.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that ██████████████████████████████████████████ ████████████████████████████████████████████ .

170.    A valid and justiciable controversy exists between Qualcomm and Arm because ████████████████████████████████ Arm is threatening to terminate the QC ALA if Qualcomm ██████████████████████ pursuant to Section ██ of the ALA.

171.    A declaratory judgment is also necessary and appropriate so that Qualcomm may ascertain Arm's obligations and Qualcomm's rights and obligations under the QC ALA and clear

any cloud that may exist over its business as a result of Arm's false assertions of breach and threats to terminate the QC ALA.

172. A valid and justiciable controversy exists between Qualcomm and Arm because Arm has asserted that Qualcomm is in breach of the QC ALA and has asserted that Arm has the right to terminate the QC ALA on December 21, 2024. Qualcomm disputes both assertions. Qualcomm also reasonably expects that Arm would attempt to use its purported termination to damage Qualcomm with its customers, in the media, and with analysts, in light of Arm's behaviors to date.

## COUNT II

### (Breach of Section █ of the QC ALA)

173. Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

174. The QC ALA is a valid, binding contract.

175. Arm failed to fulfill its obligation under Section █ of the QC ALA because it intentionally withheld from Qualcomm certain ███████████ to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

176. Accordingly, Arm did not "████████████████████████████████████████████████████████," or "████████████████████████████████████████████," or ████████████████████████████," as is required by Section █ of the agreement.

177. Arm's failure to comply with its contractual obligation to timely deliver bargained-for technology was not only intentional, but it was also done with an intent to deceive Qualcomm.

54

178.  Qualcomm put Arm on written notice of this violation and Arm ███████████, as is required under the contract.

179.  Arm's breach of Section ██ of the QC ALA entitles Qualcomm ███████ ████████████████████████████████████.

180.  As a proximate result of Arm's breach of contract, Qualcomm has been damaged both (i) by delay that could have been avoided had Arm fulfilled its obligations, (ii) by costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK tests to verify that its products are compliant with the Arm ISA and use its own engineers to address issues that would have been addressed by Arm's patches, and (iii) by ████████████████████ ████████████████████████████ not misrepresented its compliance with the parties' agreement.

## COUNT III

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

181.  Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

182.  Under California law, every contract implies a covenant for each party not to do anything that will deprive the parties of the benefits of the contract.

183.  At all relevant times, Arm agreed and was required by law to act fairly and in good faith with respect to its obligations under the QC ALA and TLA.

184.  Arm breached this implied covenant of good faith and fair dealing under both agreements. For example, Arm withheld deliverables that it was required to provide Qualcomm under the QC ALA; asserted, without valid basis under the QC ALA, that Qualcomm was supposedly in material breach of that agreement; sent letters to Qualcomm customers and leaked

55

the Breach Letter to the media to create uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs; failed to negotiate an extension to the QC ALA that would cover future version of the architecture, including v10, and failed to provide licensing proposals for ███████████████ to Qualcomm in violation of provisions of the QC TLA.

185.   Arm's actions have been willful and carried out in bad faith, as part of an effort to enable Arm to disregard the QC ALA and TLA so that it can prevent Qualcomm from competing with Arm's sale of its own CPU and other chip designs, or, at a minimum, coerce into renegotiating the QC ALA so that Arm can extract payments from Qualcomm that exceed those due under the QC ALA.

186.   Arm's actions have unfairly frustrated the essential purposes of the QC ALA and TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm, including the right to produce and sell custom CPUs that are compatible with the Arm ISA ██████████████████████.

187.   For at least the foregoing reasons, Arm has breached the implied covenant of good faith and fair dealing for both the QC ALA and TLA.

188.   As a proximate result of Arm's breach of the implied covenant of good faith and fair dealing, Qualcomm has been injured in its business or property, and is threatened by imminent loss of profits and loss of actual and potential customers and business opportunities.

## COUNT IV

### (Intentional Interference with Prospective Economic Advantage)

189.   Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

190.     Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above.

191.     Absent Arm's interference, these relationships would likely result or would have likely resulted in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations.   These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship.

192.     Arm knew of these relationships but nevertheless engaged in conduct aimed at interfering with Qualcomm's business opportunities, including by (a) purporting to give notice that it "shall be entitled" to terminate the QC ALA based on nonexistent alleged material breaches of the QC ALA; (b) deliberately leaking the Breach Letter in the middle of Qualcomm's Snapdragon® Summit; and (c) making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

193.     Arm's interference with Qualcomm's business opportunities was wrongful.  For example, as explained below, Arm's conduct represented unfair business acts and practices in violation of California law.

194.     By engaging in this conduct, Arm intended to disrupt these relationships or knew that disruption of these relationships was certain or substantially certain to occur.

57

195.    As a result of that conduct, these relationships have in fact been disrupted.  The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a substitute contract with Arm instead, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional assurances.  As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm.

196.    Arm's efforts to interfere with Qualcomm's business relationships have been a substantial factor in causing that harm, which Qualcomm would not have suffered but for Arm's misconduct.

## COUNT V

### (Negligent Interference with Prospective Economic Advantage)

197.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

198.    Arm knew or should have known that Qualcomm has substantial business relationships with a number of customers, including the Smartphone Company and the AI and Ecosystem Company.

199.    Arm also knew or should have known that these relationships would be disrupted by Arm's failure to act with reasonable care by purporting to terminate the QC ALA despite lacking legal or factual grounds for doing so, by leaking the Breach Letter in bad faith and in disregard of its duties to Qualcomm as a contract counterparty, and by making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

200. Arm owes Qualcomm a duty to act with reasonable care based on, among other things, the parties' contractual relationship and the foreseeability that interfering with Qualcomm's customer relationships would cause Qualcomm harm.

201. Arm failed to act with reasonable care when, in bad faith, it purported to declare that Qualcomm is in material breach of the QC ALA, leaked the Breach Letter, and made those misleading and threatening statements to Qualcomm's customers.

202. Arm's conduct was wrongful because, for example, it was "unfair" under California law.

203. As a result of Arm's wrongful conduct, Qualcomm's relationships with the customers identified herein have been disrupted, as customers have required additional assurances or delayed entering into additional transactions with Qualcomm.

## COUNT VI

### (Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

204. Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

205. The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

206. By engaging in the conduct described above, Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL. These unfair business acts or practices include deliberately withholding deliverables it was required to provide Qualcomm ███████████████████; misrepresenting to Qualcomm that it was not withholding deliverables; refusing to negotiate license terms with Qualcomm █████████; repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's

59

current and prospective customers; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA; to pressure Qualcomm to accede to its demands in *Arm* v. *Qualcomm*; and to prevent Qualcomm from continuing to litigate its meritorious claims in the instant case.

207. Arm's actions are part of a broader campaign to harm or threaten to harm competition for CPU and other computer chip designs, in California and elsewhere. Arm is employing a variety of unfair acts and practices so that it can leverage its control over the ISA used in all premium smartphones and a large and growing share of other computing devices to attempt to prevent Qualcomm from developing and marketing products with CPUs that threaten to outcompete products containing Arm's off-the-shelf CPU designs. These tactics include making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of preventing Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores.

208. Arm's conduct is also unfair because it threatens to significantly harm competition not only for CPU designs, but also for the SoCs used in a variety of platforms, and ultimately for the devices that use those CPUs and SoCs. If Arm's conduct goes unchecked, Qualcomm and other chip designers will be forced to rely on Arm's off-the-shelf CPUs and will be at Arm's mercy if Arm wishes—as it has signaled it does—to foreclose them from making chips that are compatible with the Arm ISA. As a result of Arm's efforts to reduce competition to create those CPUs and SoCs, consumers will be deprived of products that are built around innovative, high-

performance, high-efficiency Qualcomm chips and/or will have to pay more for (or will have reduced choices among) products that incorporate CPUs compatible with the Arm ISA. Arm's conduct towards Qualcomm—a longtime Arm licensee—threatens incipient violations of competition laws; violates the policy or spirit of those laws; threatens to significantly harm competition; is immoral, unethical, oppressive, and unscrupulous; and threatens to harm consumers and competition in a manner vastly disproportionate to whatever supposed benefits that behavior could possibly create.

209.    Arm's conduct is also unlawful because it violates California common law, including state law prohibiting intentional and negligent interference with prospective economic advantage.

210.    Arm's unlawful and unfair business acts and practices are a direct and proximate cause of injury to Qualcomm. Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers. If Arm is allowed to continue in its unlawful and unfair business acts and practices, Qualcomm risks being denied access to a widely used ISA for which there are no readily available alternatives for certain applications, which threatens to impede Qualcomm's ability to continue developing and marketing its high-performance products based on its own custom CPU designs. Arm's conduct thus threatens to harm competition among SoC producers but also in end users, who will be forced to use products built with Arm chips and CPUs.

211.    Qualcomm has standing to bring this claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct.

61

212.    Qualcomm requires equitable relief under the UCL because it lacks adequate remedies at law to address Arm's anticompetitive and unfair actions, which are ongoing and which have caused or threaten to cause Qualcomm to suffer significant harm.

## COUNT VII

### (Breach of Section ▮ of the QC TLA)

213.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

214.    The QC TLA is a valid, binding contract.

215.    Arm failed to fulfill its obligation under Section ▮ of the QC TLA because the licensing offers it provided to Qualcomm for ▮▮▮▮▮, including ▮▮▮▮ ▮▮▮▮▮▮▮.

216.    Arm's failure to comply with its contractual obligation ▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮.

217.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ▮▮, as is required under the contract.

218.    Arm's breach of Section ▮▮ of the QC TLA entitles Qualcomm to a ▮▮▮▮▮▮, including ▮▮ ▮▮▮▮, and a license offer ▮▮▮▮▮.

219.    Arm's breach of Section ▮▮ of the QC TLA entitles Qualcomm to ▮▮▮ ▮▮▮▮▮▮ ▮▮.



62

220. As a proximate result of Arm's breach of contract, Qualcomm has been harmed both by (i) shifting resources to its custom CPU team in order to analyze and begin development of CPUs for future SoCs that would have used the ▮▮▮▮▮▮▮▮▮▮▮, including ▮▮▮▮▮▮▮▮▮▮▮ cores, (ii) the uncertainty caused by Arm's refusal to license the ▮▮▮▮▮▮▮▮▮▮▮, which causes complications in the roadmapping and SoC planning process, and (iii) by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

## COUNT VIII

(Breach of Section ▮▮ of the QC TLA)

221. Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

222. The QC TLA is a valid, binding contract.

223. Arm failed to fulfill its obligation under Section ▮▮ of the QC TLA because the licensing offers it provided to Qualcomm for ▮▮▮▮▮▮▮▮▮▮, including ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.

224. Qualcomm put Arm on written notice of this violation and Arm failed to cure within ▮▮▮▮, as is required under the contract.

225. Arm's breach of Section ▮▮ of the QC TLA entitles Qualcomm to ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮.

226. As a proximate result of Arm's breach of contract, Qualcomm has been forced to seek alternative means to ensure that it is protected according to the ▮▮▮▮▮▮▮ that it

negotiated in the QC TLA and to divert additional resources in order to continue development of its SoCs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment and relief as follows:

A    For the declaratory judgments set forth in Plaintiffs' claims;

B    For an Order requiring Arm to comply with all its obligations under the QC ALA, including (but not limited to) by providing the ███████████, OOB, Patches, and ██████ without discrimination or retaliation;

C    For an Order requiring Arm to comply with all its obligations under the QC TLA, including (but not limited to) by █████████████████████████████████████, including ████████████████████████████████████████████████;

D    For an Order enjoining Arm from engaging in the unlawful, unfair, and anticompetitive actions and practices described in this Amended Complaint and from any other unlawful, fraudulent, or unfair acts or practices aimed at obstructing Qualcomm's ability to develop and sell chips;

E    For an Order that Qualcomm is entitled to █████████████████████████ with respect to ████████████████ licenses at pricing structures ████████████████████;

F    For an Order ████████████████████████████████████ as a result of Arm's breach of the QC ALA and TLA;

G    For an Order that the Breach Letter is ineffective notice of an alleged material breach and that Arm has no right to terminate the QC ALA on the grounds stated in the Breach Letter;

H    For recovery of all ██████████████████████████████████████████████;

I    For damages resulting from the wrongful conduct alleged in this Amended Complaint, including from Arm's threat to terminate the QC ALA and its leak of the Breach Letter, failure to offer ██████████ licensing terms ██████████████ and specifically including damages arising from the postponement of the business opportunity with the AI and Ecosystem Company;

J    For restitution of amounts Arm derived from the unfair and anticompetitive conduct described in this Amended Complaint;

64

K      For costs and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief; or, in the alternative, for additional damages, in the alternative, that the Court deems appropriate;

L      For an award of attorneys' fees and costs as allowed by law; and

M     For such other and further relief available at law and equity as the Court may deem just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL

BY JURY of all claims and issues presented in this Complaint that are so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

June 3, 2025

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 3, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                          *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Karen E. Keller, Esquire                                          *VIA ELECTRONIC MAIL*
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                                       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                                         *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

66

Kyle W.K. Mooney, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Erik J. Olson, Esquire
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire
Adam M. Janes, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

*VIA ELECTRONIC MAIL*

*VIA ELECTRONIC MAIL*

*VIA ELECTRONIC MAIL*

*VIA ELECTRONIC MAIL*

*/s/ Jennifer Ying*

Jennifer Ying (#5550)

67

# EXHIBIT A



Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121

22 October 2024

Dear Ann,

Pursuant to section ███ of the Qualcomm Architecture License Agreement (LES-TLA-20039) ("the Qualcomm ALA"), Arm hereby provides notice that Qualcomm is in material breach of the Qualcomm ALA. Unless Qualcomm cures its material breach ██████ Arm shall be entitled ████████████████████████████ ████████.

Under the Qualcomm ALA, ███████████████████████ ████████████████████████████████████ ████████████████████████████ The Qualcomm ALA permits ████████████████████ Qualcomm is only permitted to ████████████ requirements of the Qualcomm ALA and ████████ ████ And Qualcomm is entitled to ████████████ ████ within the scope of the ALA. These obligations are reflected in multiple places in the Qualcomm ALA, including but not limited to Sections ████████████████ ████████.

Qualcomm has systematically and willfully breached these obligations, and its breaches have accelerated and expanded in recent months. Specifically, Qualcomm has ██████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ And Qualcomm initiated and continues to prosecute contractual claims that arise from Qualcomm's improper conduct with respect to these unlicensed cores.

Due to Qualcomm's willful, ongoing, and renewed actions, Qualcomm is in material breach of the Qualcomm ALA. Pursuant to Section ████████████████████ ████ To do so, Qualcomm must, at a minimum, ████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ If Qualcomm does not do so ██████ Arm shall be entitled to immediately terminate the ALA ██████████ Following termination, Qualcomm shall be subject to the ██████████

████████ Qualcomm ALA.

Sincerely,

_____

Spencer Collins
EVP, Chief Legal Officer
Arm Limited
110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| QUALCOMM INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,<br><br>            Plaintiffs,<br><br>    v.<br><br>ARM HOLDINGS PLC, a U.K. corporation,<br><br>            Defendant. | C.A. No. 24-490-MN<br><br>**REDACTED -<br>PUBLIC VERSION**<br>(Filed July 15, 2025) |

**ARM'S REPLY BRIEF IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS
QUALCOMM'S SECOND AMENDED COMPLAINT**

Dated: July 8, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
gregg.locascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Kyle W.K. Mooney
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
(212) 336-4092
kmooney@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings plc*

Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 1

I. *NOERR-PENNINGTON* AND RELATED DOCTRINES BAR COUNTS III-VI. ........... 1

    A. The *Noerr-Pennington* Doctrine Bars Several Of Qualcomm's Claims. ............... 1

    B. The California Litigation Privilege And Anti-SLAPP Law Also Apply. ................ 3

II. QUALCOMM'S TORT CLAIMS FAIL FOR ADDITIONAL REASONS. ..................... 4

    A. Qualcomm's UCL Claim Fails (Count VI). .............................................. 4

    B. Qualcomm's Tortious Interference Claims Fail (Count IV-V). ............................. 7

III. QUALCOMM'S TLA CONTRACT CLAIMS SHOULD BE DISMISSED. ................... 7

    A. Qualcomm Fails To Allege A Breach Of ███████ (Count VII). ............................... 7

    B. Qualcomm Fails To Allege A Breach Of ██████ (Count VIII). ............................. 9

IV. THE IMPLIED COVENANT CLAIM SHOULD BE DISMISSED (COUNT III). ........... 9

CONCLUSION ............................................................................................................ 10

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10x Genomics v. Vizgen*,
681 F. Supp. 3d 252 (D. Del. 2023)........................................................................6

*Accenture v. Guidewire Software*,
581 F. Supp. 2d 654 (D. Del. 2008)........................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................7, 8, 9

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007)................................................................................1, 7, 8

*Bocock v. Innovate*,
2022 WL 15800273 (Del. Ch. Oct. 28, 2022) ........................................................10

*Cheminor Drugs v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999)..................................................................................2, 3

*City of L.A. v. Lyons*,
461 U.S. 95 (1983)................................................................................................5

*Costa v. Whirlpool*,
2025 WL 885245 (D. Del. Mar. 21, 2025) ..............................................................7

*Dove Audio v. Rosenfeld, Meyer, & Susman*,
54 Cal. Rptr. 2d 830 (Cal. App. 1996)....................................................................4

*Eastman Kodak v. Image Tech. Servs.*,
504 U.S. 451 (1992)............................................................................................6

*In re Green Field Energy Servs.*,
834 F. App'x 695 (3d Cir. 2020) ............................................................................4

*Guz v. Bechtel Nat'l*,
24 Cal. 4th 317 (2000) ....................................................................................9, 10

*Key v. Qualcomm*,
129 F.4th 1129 (9th Cir. 2025) ..............................................................................5

*Lamke v. Sunstate Equip.*,
387 F. Supp. 2d 1044 (N.D. Cal. 2004) ..............................................................9, 10

*Matsushita Elecs. v. Loral*,
974 F. Supp. 345 (S.D.N.Y. 1997).................................................................................2

*Mylan Pharms. v. Teva Pharms.*,
2025 WL 756793 (D.N.J. Feb. 27, 2025) ......................................................................3

*Novell v. Microsoft*,
731 F.3d 1064 (10th Cir. 2013) ....................................................................................6

*In re Qualcomm Litig.*,
2017 WL 5985598 (S.D. Cal. Nov. 8, 2017) ................................................................6

*Racine & Laramie v. Dep't of Parks & Rec.*,
11 Cal. App. 4th 1026 (1992) .......................................................................................8

*Reese v. Wal-Mart Assocs.*,
2025 WL 472721 (E.D. Cal. Feb. 12, 2025)..................................................................5

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
2024 WL 2861865 (D.N.J. June 6, 2024)......................................................................2

*Six4Three v. Facebook*,
109 Cal. App. 5th 635 (2025) .......................................................................................4

*SolidFX v. Jeppesen Sanderson*,
841 F.3d 827 (10th Cir. 2016) ......................................................................................6

*Sonner v. Premier Nutrition*,
971 F.3d 834 (9th Cir. 2020) .....................................................................................4, 5

*Stephens v. Clash*,
796 F.3d 281 (3d Cir. 2015)..........................................................................................9

*Sweet St. Desserts v. Chudleigh's*,
655 F. App'x 103 (3d Cir. 2016) ..................................................................................2

*Thomas v. Hous. Auth. of L.A.*,
2006 WL 5670938 (C.D. Cal. Feb. 28, 2006)...............................................................1

*United States v. Colgate*,
250 U.S. 300 (1919)......................................................................................................5

*Verizon Commc'ns v. Trinko*,
540 U.S. 398 (2004)......................................................................................................5

*Warner Theatre Assocs. v. Metro. Life Ins.*,
1997 WL 685334 (S.D.N.Y. Nov. 4, 1997)..................................................................8

*Wentland v. Wass*,
    126 Cal. App. 4th 1484 (2005) ...............................................................................................3, 4

*Yokohama Rubber v. S. China Tire & Rubber*,
    2005 WL 6124310 (C.D. Cal. Jan. 19, 2005) ..........................................................................3

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
    601 F. Supp. 3d 625 (C.D. Cal. 2022) .................................................................................4, 5

**Statutes**

10 Del. C. § 8106 ..........................................................................................................................10

Cal. Civ. P. Code § 425.16.............................................................................................................4

Cal. Civ. P. Code § 425.17.............................................................................................................4

**Rules**

Fed. R. Civ. P. 8(a)(2).................................................................................................................7, 8

## INTRODUCTION

Qualcomm's opposition highlights the fundamental flaws in the Second Amended Complaint ("SAC"). Qualcomm barely quotes the allegations in the SAC at all, and instead makes claims that appear nowhere in the SAC, while applying an approach to pleading that the Supreme Court repudiated in *Twombly*. Throughout its opposition, Qualcomm also ignores precedent that it finds inconvenient. For example, Qualcomm does not address the many cases Arm cited that applied *Noerr-Pennington* and other speech-related privileges to claims indistinguishable from Qualcomm's. The same is true for the many cases that rejected flawed and underdeveloped UCL theories like those Qualcomm asserts here. As for Qualcomm's implied covenant and TLA claims, Qualcomm can allege a breach and request draconian remedies only by rewriting the parties' agreements to impose new terms Arm never accepted. That too is improper as a matter of law.

## ARGUMENT

## I.    *NOERR-PENNINGTON* AND RELATED DOCTRINES BAR COUNTS III-VI.

### A.    The *Noerr-Pennington* Doctrine Bars Several Of Qualcomm's Claims.

The *Noerr-Pennington* doctrine forecloses Qualcomm's implied covenant, tortious interference, and UCL claims based on allegations that Arm: (1) "wrongfully assert[ed] that it has the right to terminate the QC ALA," (2) allegedly "leak[ed] the Breach Letter to the media," and (3) made "misleading and threatening statements to Qualcomm's customers" about the original lawsuit and Qualcomm's alleged breaches of the ALA. SAC ¶¶ 184, 192, 199, 201, 206; *see id.* ¶¶ 136-155. Those claims attack Arm for speaking about its case and legal rights. Qualcomm's suggestion that the doctrine rarely applies on a motion to dismiss is wrong. Courts often apply *Noerr-Pennington* at the pleading stage—Arm cited half a dozen cases granting motions to dismiss—because even the "pendency" of claims attacking petitioning activity could "chill the exercise of First Amendment rights." *Thomas v. Hous. Auth. of L.A.*, 2006 WL 5670938, at *10

1

n.51 (C.D. Cal. Feb. 28, 2006). As in those cases, the SAC on its face attacks protected conduct.

That protected conduct starts with the Breach Letter itself. The Letter echoes allegations Arm made in the first case (22-1146 D.I. 21 at 23, 37, 39, 41-42) and is indistinguishable from the demand letters, cease-and-desist letters, and threats of suit courts routinely protect under *Noerr-Pennington* (D.I. 233 ("Mot.") 5-6), which may explain why Qualcomm does not attempt to distinguish those cases. Qualcomm likewise leaves unaddressed the multiple cases extending *Noerr-Pennington* immunity to press releases about pending litigation. *See* Mot. 6. Qualcomm cannot evade *Noerr-Pennington*'s protections for statements made in public court filings by challenging Arm's decision to repeat those statements in litigation-related communications.

The First Amendment also protects Arm's challenged communications with customers. Parties cannot hold a litigation adversary liable for providing its view of the case to its customers. Mot. 6-7. Qualcomm again grapples with none of the precedent Arm cited for this well-established principle, and each of Qualcomm's cases is distinguishable. In *Golden Eye*, *Thimes*, *LY Berditchev*, and the other cases Qualcomm cites, *Noerr-Pennington* did not apply to letters sent to third parties when there was no pending or threatened litigation. D.I. 287 ("Opp.") 7-8 & nn.4-5. Here, Arm sent the supposedly misleading letters during litigation to update customers about the suit, updates the SAC alleges were sent to "threaten" customers and "suggest that customers could face legal jeopardy from using Qualcomm products." SAC ¶¶ 1, 135, 138. The doctrine protects letters to third parties that allegedly "threaten litigation." *Matsushita Elecs. v. Loral*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997); *Sweet St. Desserts v. Chudleigh's*, 655 F. App'x 103, 110-11 (3d Cir. 2016).

Qualcomm is wrong that courts cannot resolve whether the sham litigation exception applies on a motion to dismiss. Courts have done so in the past. *See Cheminor Drugs v. Ethyl Corp.*, 168 F.3d 119, 127-28 (3d Cir. 1999); *In re Revlimid & Thalomid Purchaser Antitrust Litig.*,

2024 WL 2861865, at *86 (D.N.J. June 6, 2024). No "factual inquir[ies]" are necessary. Opp. 9. The central assertion in the challenged communications is that Qualcomm would breach its ALA by selling Nuvia-based cores. One of the issues sent to the jury in the previous case was whether Qualcomm's ALA covered those Nuvia-based designs; the Court denied Qualcomm's summary judgment motion on that issue. 22-1146 10/30/2024 Minute Entry; 22-1146 D.I. 572. That establishes Arm's assertions were not objectively baseless, even if Qualcomm wrongly believes Arm also made misrepresentations in its communications. *See Cheminor*, 168 F.3d at 122-24; *Mylan Pharms. v. Teva Pharms.*, 2025 WL 756793, at *31 (D.N.J. Feb. 27, 2025).

It is irrelevant that *Noerr-Pennington* does not apply to contract claims. The SAC does not assert that " █████████████████████████████ " (Opp. 6), and Arm is not seeking to dismiss that unasserted claim. Qualcomm does not cite a single example of a court holding that a hypothetical, unasserted contract claim eliminates *Noerr-Pennington* protections for the allegedly tortious conduct asserted in a complaint. Similarly, the fact Qualcomm believes it could prove its claims based on other conduct does not vitiate Arm's First Amendment protections for conduct that implicates *Noerr-Pennington*. At least Qualcomm's tortious interference claim turns exclusively on Arm's protected conduct regardless. *See* SAC ¶¶ 189-203.

## B.      The California Litigation Privilege And Anti-SLAPP Law Also Apply.

California's litigation privilege independently protects the conduct at issue here. Qualcomm contends the privilege "protects only statements that are 'necessary or useful step[s] in the litigation process'" (Opp. 10), but leaves unaddressed the numerous cases holding out-of-court statements to nonparties who have a substantial interest in the litigation meet that standard. Mot. 8-9. Statements to customers and statements to Bloomberg that Arm allegedly intended members of the industry to see are therefore protected. *Yokohama Rubber v. S. China Tire & Rubber*, 2005 WL 6124310, at *3 (C.D. Cal. Jan. 19, 2005). *Wentland v. Wass*, 126 Cal. App. 4th 1484 (2005)

3

is inapposite; that case held the privilege does not bar claims for breach of a contract's confidentiality provisions, *id.* at 1492, but Qualcomm again has not asserted such a breach.

California's anti-SLAPP law also bars Qualcomm's claims. Qualcomm does not attempt to distinguish *Dove Audio v. Rosenfeld, Meyer, & Susman*, 54 Cal. Rptr. 2d 830, 834-35 (Cal. App. 1996). Nor does it grapple with Arm's argument that Arm's conduct is protected by Cal. Civ. P. Code §§ 425.16(e)(2)-(4). Qualcomm's footnote argument that the commercial-speech exception applies is both waived and wrong. *See In re Green Field Energy Servs.*, 834 F. App'x 695, 699 (3d Cir. 2020). Arm did not make the alleged statements while delivering its goods or services or for the purposes of securing sales of any goods or services, essential elements for invoking this "narrowly construed" exception. *Six4Three v. Facebook*, 109 Cal. App. 5th 635, 647-53 (2025); Cal. Civ. P. Code § 425.17(c)(1). The burden therefore falls to Qualcomm to show "a probability [of] prevail[ing]," Cal. Civ. P. Code § 425.16(b)(1), and its assertion that this burden-shifting framework "does not apply in federal court" (Opp. 10-11) is wrong. *See* Mot. 9.

## II.    QUALCOMM'S TORT CLAIMS FAIL FOR ADDITIONAL REASONS.

### A.    Qualcomm's UCL Claim Fails (Count VI).

None of Qualcomm's arguments overcome the two other insurmountable problems with its UCL claim. For starters, the UCL is an equitable statute, so Qualcomm "must establish that [it] lacks an adequate remedy at law" in "the operative complaint." *Sonner v. Premier Nutrition*, 971 F.3d 834, 844 (9th Cir. 2020). Yet Qualcomm says not a word in the SAC or in its brief about why it needs the equitable remedy of restitution on top of its request for money damages. *See* SAC ¶¶ 64-65. As for Qualcomm's request for an injunction, it contends it provided "detailed allegations" of "persistent, systematic," and "ongoing" conduct, but none of the paragraphs it cites say anything about persistent or ongoing conduct. Opp. 11 (citing SAC ¶¶ 137, 139, 144, 207). Even if they had, the SAC does not "*explain why* money damages are not [] adequate." *In re ZF-*

4

*TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 769 (C.D. Cal. 2022) (emp. added); *Reese v. Wal-Mart Assocs.*, 2025 WL 472721, at *8 (E.D. Cal. Feb. 12, 2025). Qualcomm does not address *ZF-TRW* or *Reese* in its brief, instead relying on two cases that do not address the *Sonner* standard or a plaintiff's obligation to plead no adequate remedy exists. *See* Opp. 11. Nor does Qualcomm make any effort to distinguish this case from the arguments it successfully advanced to dismiss the UCL claim in *Key v. Qualcomm*, 129 F.4th 1129, 1142 (9th Cir. 2025).

Qualcomm's representation that it seeks "tailored relief" that enjoins only the unfair acts described in the SAC concedes away its Article III standing to pursue an injunction based on Arm sending the Breach Letter to Qualcomm, allegedly sharing that letter with the media, or Arm's alleged communications with Qualcomm's customers. Opp. 12. Those are backward-looking allegations unsupported by "any real or immediate threat that [Qualcomm] will be wronged again" by similar communications. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983). This is not a "breadth of a potential remedy" (Opp. 12) problem, but a failure to allege an Article III injury-in-fact.

The second problem with Qualcomm's UCL theory is that it does not allege any conduct that "violate[s] the letter, policy, or spirit of federal or state antitrust law." *Key*, 129 F.4th at 1141. Qualcomm in several places asserts that Arm breached its contracts with Qualcomm (SAC ¶¶ 204, 206-207), but Qualcomm does not contest that corporate plaintiffs may not turn contract claims into UCL violations. *See* Mot. 11-12. Those allegations must be dismissed for that reason alone.

Qualcomm's assertion that Arm "has cut off or threatened to cut off Qualcomm's access to necessary IP" fails to state an actionable refusal to deal. Opp. 14. Qualcomm admits it has not alleged Arm is a monopolist, yet there is no refusal-to-deal liability "in the absence of any purpose to create or maintain a monopoly." *United States v. Colgate*, 250 U.S. 300, 307 (1919); *Verizon Commc'ns v. Trinko*, 540 U.S. 398, 408 (2004). That is reason enough to dismiss the UCL claim,

5

but even if Qualcomm plausibly alleged Arm has monopoly power, a monopolist "as a general matter … can refuse to deal with" others. *Eastman Kodak v. Image Tech. Servs.*, 504 U.S. 451, 482-83 n.32 (1992). A rare exception exists where ending a course of dealing would "forsake short-term profits" and is "irrational but for its anticompetitive effect." *Novell v. Microsoft*, 731 F.3d 1064, 1075 (10th Cir. 2013). Qualcomm alleges the opposite, asserting that Arm seeks to maximize its profits. SAC ¶¶ 68-72. The alleged decision to change the licensing terms for "intellectual property rights" or to no longer license those rights "is a presumptively rational business justification for a unilateral refusal to deal" anyway. *SolidFX v. Jeppesen Sanderson*, 841 F.3d 827, 841-42 (10th Cir. 2016). This case is thus indistinguishable from *Novell*, which held Microsoft's decision to no longer give Novell access to its protocols "is protected by the antitrust laws." 731 F.3d at 1074. Such protected conduct is not actionable under the UCL. Mot. 12.

Neither is Qualcomm's "open early, closed late" theory. Opp. 13. As Qualcomm's cases acknowledge, that theory again requires establishing Arm's "monopoly power." *10x Genomics v. Vizgen*, 681 F. Supp. 3d 252, 267-68 (D. Del. 2023). But Qualcomm deleted from the SAC the allegation that Arm "leverage[d] its monopoly" and has not plead facts necessary to show Arm has monopoly power in a properly defined market. *Compare* FAC ¶ 156, *with* SAC ¶ 207. Regardless of whether the UCL always requires establishing the relevant market in which Arm's conduct allegedly threatens competition (and it does, *see* Mot. 13), such allegations are necessary when the theory of unfair competition depends on Arm exercising monopoly power.

Qualcomm cannot sidestep these pleading problems by asserting that the more forgiving balancing test also applies. It is Qualcomm—not Arm—that "confuses the legal standards that govern UCL claims." Opp. 13. In suits between sophisticated companies, the tethering test applies regardless of whether the companies are "direct competitors." *In re Qualcomm Litig.*, 2017 WL

6

5985598, at *7 (S.D. Cal. Nov. 8, 2017). The balancing test thus has no role to play here, and Qualcomm cannot use that test to defend its UCL claim that Arm "leaked the Breach Letter to the media" and made statements about ongoing litigation "to Qualcomm's customers." SAC ¶¶ 206-207. Qualcomm has no argument this implicates the antitrust laws as the tethering test requires.

### B. Qualcomm's Tortious Interference Claims Fail (Count IV-V).

It is now common ground that Qualcomm's tortious interference claims depend on Qualcomm plausibly alleging that Arm's conduct "violates the UCL's 'unfair' prong." Opp. 16. Because Qualcomm has no viable UCL claim, its tortious interference claims must be dismissed.

## III. QUALCOMM'S TLA CONTRACT CLAIMS SHOULD BE DISMISSED.

### A. Qualcomm Fails To Allege A Breach Of ███ (Count VII).

Qualcomm justifies the threadbare allegations supporting its claim that Arm breached ███ of the TLA based on a watered-down pleading standard that *Twombly* and *Iqbal* eliminated. The SAC offers a one-sentence allegation that the terms Arm offered to renew the license for the ████████████████████ in 2024 ██████████████████████████ ███ (SAC ¶¶ 117, 215), but offers no factual allegations to support that conclusion. Qualcomm does not even explain how ███ could apply ████████████████ ████████████████████████████████ ████████████████████ Regardless, the allegation that Arm supposedly requested "fees and royalty rates nearly five times as high as those" the parties "agreed to in 2019" (Opp. 17) is no substitute for allegations that Arm offered Qualcomm fees and rates █████ ████████████████████████████████ ████████████████████████. D.I. 233 Ex. 1 ("TLA") ███████ It is no answer that the terms of Arm's licenses with third parties "are confidential." Opp. 17. Rule 8 has no exception for facts a plaintiff cannot access, *see Costa v. Whirlpool*, 2025

WL 885245, at *11 (D. Del. Mar. 21, 2025); *Accenture v. Guidewire Software*, 581 F. Supp. 2d 654, 665 (D. Del. 2008), which is why Qualcomm does not cite a single case supporting its position. The threshold requirement of "a short and plain statement … showing that the pleader is entitled to relief" requires more than conclusions. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Qualcomm needed to allege "enough facts to state a claim to relief that is plausible on its face," yet it failed to do so. *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).

Qualcomm cannot overcome this pleading problem by labeling Arm's offer "exorbitant." SAC ¶¶ 118, 216. Although Qualcomm contends California law reads into every contract an implied duty to exercise discretionary power in good faith (Opp. 17), ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████. Nothing more. And ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████. *See* TLA ████.

The implied covenant and implied duties thus have no role to play here. "Nothing in the duty of good faith requires that parties to a negotiation propose only such terms as the other party is happy with." *Warner Theatre Assocs. v. Metro. Life Ins.*, 1997 WL 685334, at *6 (S.D.N.Y. Nov. 4, 1997). Moreover, accepting a constructive-refusal-to-offer theory under the implied covenant would rewrite the agreement to ██████████████████████████████████ ████████████████████████████████████████████████████████. *See* TLA ████; SAC ¶¶ 118, 125-127, 219. The implied covenant does not exist to "create obligations" or remedies "not contemplated in the contract." *Racine & Laramie v. Dep't of Parks & Rec.*, 11 Cal.

App. 4th 1026, 1032 (1992). Qualcomm has no response to this well-established principle.

      **B.**      **Qualcomm Fails To Allege A Breach Of ▆▆▆ (Count VIII).**

Qualcomm similarly defends its claim that Arm breached ▆▆▆ of the Qualcomm ALA by asserting it is not required to plead any facts in support of that claim. The Supreme Court rejected that argument in *Ashcroft v. Iqbal*, holding that "naked assertions devoid of further factual enhancement" fail to state a claim. 556 U.S. at 678 (cleaned up). Qualcomm's only response is that identifying the material non-financial terms Arm supposedly changed is a "superfluous detail." Opp. 18. The facts necessary to make a claim plausible are not superfluous.

## IV.     THE IMPLIED COVENANT CLAIM SHOULD BE DISMISSED (COUNT III).

Qualcomm's defense of its new implied covenant theories underscores why those theories fail under *Lamke v. Sunstate Equip.*, 387 F. Supp. 2d 1044, 1047 (N.D. Cal. 2004), and *Guz v. Bechtel Nat'l*, 24 Cal. 4th 317, 327 (2000). Start with Qualcomm's theory that Arm breached the implied covenant by not offering Qualcomm a license to the v10 architecture. *See* SAC ¶¶ 128-133, 184. Qualcomm concedes it does not allege that Arm breached ▆▆▆ of the ALA, ▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ It instead asserts there is nothing wrong with stacking an implied good-faith obligation ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆. Neither of the cases it cites endorse that view. Qualcomm's v10 allegations are instead governed by the rule that "where an implied covenant claim alleges a breach of obligations beyond the agreement's actual terms, it is invalid." *Guz*, 24 Cal. 4th at 327.

Qualcomm waited too long to assert that Arm failed to negotiate in good faith. Contrary to Qualcomm's arguments, the "face of the complaint" shows Qualcomm's v10 allegations "ha[ve] not been brought within the statute of limitations." *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015). Qualcomm alleges Arm breached the implied covenant by not responding to a May 20,

2020, email requesting a license to v10, but Qualcomm did not assert its claim until March 2025. That is far outside the three-year statute of limitations. *See* 10 Del. C. § 8106. It makes no difference that "the SAC does not allege when that failure to respond ripened into bad faith." Opp. 20. If that fact is necessary to determine when the statute of limitations applies, it is equally necessary to plead a viable claim to survive a motion to dismiss. Nor can Qualcomm hide behind its unpled fraudulent concealment argument. Opp. 20. The SAC nowhere alleges that Arm "lied to Qualcomm in April 2020" (*id.*), and even if Qualcomm had included that allegation, the alleged lack of response to the May 2020 email would have put it on inquiry notice. *See Bocock v. Innovate*, 2022 WL 15800273, at *11-12 (Del. Ch. Oct. 28, 2022). Qualcomm's v10-related theories under the implied covenant and UCL are time-barred.

That leaves the allegation that Arm breached the implied covenant by "fail[ing] to provide licensing proposals for ███████████████ to Qualcomm in violation of provisions of the QC TLA." SAC ¶ 184. Qualcomm does not say a word in defense of that allegation, which is duplicative of its breach claims. *See* SAC ¶¶ 213-226. Instead, Qualcomm invents two new theories that it did not plead: (1) that Arm allegedly "███████████████," and (2) that Arm sought to deprive Qualcomm of the benefits of the TLA. Opp. 20. But Qualcomm admits there is ███████████████████████ (*id.*); Qualcomm cannot impose that duty through the implied covenant. *Lamke*, 387 F. Supp. 2d at 1047. It likewise cannot fit this case within the narrow exception for a bad-faith exercise of a contractual right as a pretext to deny Qualcomm an expressly contemplated benefit under the contract. *Guz*, 24 Cal. 4th at 353 n.18. There is no allegation that Arm did the licensing equivalent of firing an at-will employee to avoid paying a bonus. *See id.*

## CONCLUSION

The Court should dismiss with prejudice Counts III-VIII.

10

Dated: July 8, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
gregg.locascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650)813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings plc*

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 8, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com

Ruby J. Garrett
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweis.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
Anish Desai
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
fpatterson@paulweiss.com
adesai@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 24-490 (MN) |
| v. | ) ) | ▆▆▆▆▆▆▆▆▆▆ |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) ) ) | REDACTED - PUBLIC VERSION |
| Defendant. | ) ) | |

**QUALCOMM'S ANSWERING BRIEF IN OPPOSITION TO ARM'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

OF COUNSEL:

Catherine Nyarady
Erin J. Morgan
S. Conrad Scott
Jacob A. Braly
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Karen L. Dunn
William A. Isaacson Melissa
F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 2004
(202) 240-2901

Original filing date: July 1, 2025
Redacted filing date: July 9, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Page

I.    NATURE AND STAGE OF PROCEEDINGS ................................................. 1

II.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

III.  STATEMENT OF FACTS ............................................................................ 3

    A.   Factual Background ......................................................................... 3

    B.   Procedural History .......................................................................... 4

IV.   ARGUMENT ............................................................................................... 4

    A.   None of Arm's Grab-Bag of Litigation-Related Privileges Immunizes Arm
       from Liability in Connection with Counts III-VI ................................... 4

        1.   *Noerr-Pennington* cannot justify dismissal of any claim in the SAC ......... 5

        2.   Arm's cursory arguments about the litigation privilege and Anti-
            SLAPP law fail for similar reasons ............................................. 10

    B.   Arm Offers No Basis for Dismissing Qualcomm's
       Meritorious UCL Claim ................................................................ 11

        1.   There is no procedural obstacle to the UCL claim ......................... 11

        2.   The SAC states a UCL claim .................................................... 12

    C.   The SAC States Viable Claims for Tortious Interference ..................... 16

    D.   Arm Offers No Valid Reason for Dismissing Qualcomm's TLA Claims ........... 16

        1.   Qualcomm Has Stated a Claim for Breach of ▮▮▮▮ (Count VII) ........... 16

        2.   Qualcomm Has Stated a Claim for Breach of ▮▮▮▮ (Count VIII) ......... 18

    E.   Arm's Attempt to Narrow Qualcomm's Implied Covenant
       Claim (Count III) Fails .................................................................. 19

V.    CONCLUSION ........................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*10x Genomics, Inc.* v. *Vizgen, Inc.*,
  681 F. Supp. 3d 252 (D. Del. 2023).................................................................9, 13, 15

*Aesha* v. *State Farm Gen. Ins. Co.*,
  2024 WL 5410447 (C.D. Cal. July 30, 2024)..........................................................12

*Argentieri* v. *Zuckerberg*,
  214 Cal. Rptr. 3d 358 (Ct. App. 2017) ....................................................................10

*Arista Networks, Inc.* v. *Cisco Sys., Inc.*,
  2018 WL 11230167 (N.D. Cal. May 21, 2018) .........................................................8

*Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)............................................................................................14, 15

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................19

*Beverage* v. *Apple Inc.*,
  320 Cal. Rtpr. 3d 427 (Cal. Ct. App. 2024).............................................................15

*Brehm* v. *21st Century Ins. Co.*,
  83 Cal. Rptr. 3d 410 (Ct. App. 2008) ................................................................18, 19

*Broughty* v. *Bouzy*,
  2023 WL 5013654 (D.N.J. Aug. 7, 2023) ...............................................................10

*Castaline* v. *Aaron Mueller Arts*,
  2010 WL 583944 (N.D. Cal. Feb. 16, 2010) ........................................................5, 9

*Cel-Tech Commc'ns* v. *L.A. Cellular*,
  973 P.2d 5272 (Cal. 1999) ...........................................................................12, 13, 15

*Celador Int'l Ltd.* v. *Walt Disney Co.*,
  347 F. Supp. 2d 846 (C.D. Cal. 2004) ....................................................................20

*CFTC* v. *Traders Glob. Grp.*,
  2023 WL 7545316 (D.N.J. Nov. 14, 2023) .............................................................11

*Chavez* v. *Whirlpool Corp.*,
  113 Cal. Rptr. 2d 175 (Ct. App. 2001) ...................................................................15

*Cheminor Drugs, Ltd.* v. *Ethyl Corp.*,
  168 F.3d 119 (3d Cir. 1999)...............................................................................5, 7, 9

ii

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Clemens* v. *ExecuPharm Inc.*,
    48 F.4th 146 (3d Cir. 2022) ................................................................................12

*Comunale* v. *Traders & Gen. Ins. Co.*,
    328 P.2d 198 (Cal. 1958) ...................................................................................19

*Constr. Cost Data, LLC* v. *Gordian Group, LLC*,
    2017 WL 2266993 (S.D. Tex. Apr. 24, 2017) ......................................................7

*ConsumerDirect, Inc.* v. *Pentius, LLC*,
    2022 WL 16949657 (C.D. Cal. Aug. 25, 2022)...................................................14

*CRST Van Expedited, Inc.* v. *Werner Enters.*,
    479 F.3d 1099 (9th Cir. 2007) ......................................................................13, 16

*Cunningham* v. *Cornell Univ.*,
    145 S. Ct. 1020 (2025)..........................................................................................8

*Daly* v. *United Healthcare Ins. Co.*,
    2010 WL 4510911 (N.D. Cal. Nov. 1, 2010) .......................................................18

*Drum* v. *San Fernando Valley Bar Ass'n*,
    106 Cal. Rptr. 3d 46 (Ct. App. 2010) .................................................................15

*Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)........................................................................................14, 15

*Energy Conversation, Inc.* v. *Heliodyne, Inc.*,
    698 F.2d 386 (9th Cir. 1983) ................................................................................9

*Epic Games, Inc.* v. *Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ...........................................................2, 13, 15, 16

*FTC* v. *Shire ViroPharma Inc.*,
    2018 WL 1401329 (D. Del. Mar. 20, 2018) ..........................................................8

*Golden Eye Media USA, Inc.* v. *Trolley Bags UK Ltd.*,
    525 F. Supp. 3d 1145 (S.D. Cal. 2021)..............................................................6, 7

*Harm* v. *Frasher*,
    5 Cal. Rptr. 367 (Ct. App. 1960)........................................................................19

*hiQ Labs, Inc.* v. *LinkedIn Corp.*,
    273 F. Supp. 3d 1099 (N.D. Cal. 2017) ..............................................................14

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re Ferrero Litig.*,
    794 F. Supp. 2d 1107 (S.D. Cal. 2011)................................................................12

*Kearney* v. *Foley & Lardner, LLP*,
    590 F.3d 644 (9th Cir. 2009) ......................................................................5

*Kendall* v. *Ernest Pestana, Inc.*,
    709 P.2d 837 (Cal. 1985) ..........................................................................17

*Key* v. *Qualcomm Inc.*,
    129 F.4th 1129 (9th Cir. 2025) ................................................................12

*Korea Supply Co.* v. *Lockheed Martin Corp.*,
    63 P.3d 937 (Cal. 2003) ............................................................................16

*L. Offs. of Curtis* V. *Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................................14

*La Liberte* v. *Reid*,
    966 F.3d 79 (2d Cir. 2020).........................................................................10

*Laitram Machinery, Inc.* v. *Carnitech A/S*,
    901 F. Supp. 1155 (E.D. La. 1995).............................................................7

*LGM Holdings, LLC* v. *Schurder*,
    2025 WL 1162999 (Del. April 22, 2025) ................................................20

*Linear Tech. Corp.* v. *Applied Materials, Inc.*,
    61 Cal. Rptr. 3d 221 (App. 2007) ............................................................12

*Lord Abbett Affiliated Fund* v. *Navient Corp.*,
    2020 WL 5026553 (D. Del. Aug. 25, 2020) ...........................................13

*LY Berditchev, Corp.* v. *Truss Cosmetics, Corp.*,
    2023 WL 334539 (D.N.J. Jan. 20, 2023).................................................7

*Microsoft Corp.* v. *Motorola, Inc.*,
    795 F.3d 1024 (9th Cir. 2015) ..................................................................6

*Microsoft Mobile Inc.* v. *Interdigital, Inc.*,
    2016 WL 1464545 (D. Del. Apr. 13, 2016)................................................9

*Navellier* v. *Sletten*,
    52 P.3d 703 (Cal. 2002) ............................................................................10

iv

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Nuance Commc'ns* v. *MModal LLC,*
  2018 WL 6804488 (D. Del. Dec. 27, 2018), *report and recommendation
  adopted,* 2019 WL 181322 (D. Del. Jan. 11, 2019) ........................................................8

*Overstock.com, Inc.* v. *Gradient Analytics, Inc.,*
  61 Cal. Rptr. 3d 29 (Ct. App. 2007) ...............................................................................14

*Pac. Steel Grp.* v. *Com. Metals Co.,*
  600 F. Supp. 3d 1056 (N.D. Cal. 2022) ...........................................................................14

*Pasadena Live* v. *City of Pasadena,*
  8 Cal. Rptr. 3d 233 (Ct. App. 2004) ................................................................................19

*PeopleBrowsr, Inc.* v. *Twitter,*
  2013 WL 843032 (N.D. Cal. Mar. 6, 2013) ......................................................................13

*Peterson* v. *Glad Prods. Co.,*
  2023 WL 4600404 (N.D. Cal. July 27, 2023) ...................................................................12

*Powertech Tech., Inc.* v. *Tessera, Inc.,*
  872 F. Supp. 2d 924 (N.D. Cal. 2012) ...............................................................................6

*Racek* v. *Rady Children's Hospital,*
  2012 WL 2947881 (Cal. Ct. App. July 20, 2012) .............................................................15

*Reilly* v. *Apple, Inc.,*
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) ...........................................................................15

*Riverbed Tech., Inc.* v. *Silver Peak Sys.,*
  2015 WL 12941890 (N.D. Cal. Apr. 7, 2015) ....................................................................8

*Schmidt* v. *Skolas,*
  770 F.3d 241 (3d Cir. 2014) ............................................................................................19

*Schrader Cellars, LLC* v. *Roach,*
  129 F.4th 1115 (9th Cir. 2025) ..........................................................................................5

*Schwartz* v. *State Farm Fire & Cas. Co.,*
  106 Cal. Rptr. 2d 523 (Ct. App. 2001) .......................................................................18, 19

*Skinner* v. *Switzer,*
  562 U.S. 521 (2011) .........................................................................................................12

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Spear Pharms., Inc.* v. *William Blair & Co., LLC*,
　610 F. Supp. 2d 278 (D. Del. 2009)......................................................................6

*Sun Microsystems, Inc.* v. *Microsoft Corp.*,
　87 F. Supp. 2d 992 (N.D. Cal. Jan. 24, 2000)................................................11, 15

*Tameny* v. *Atl. Richfield Co.*,
　610 P.2d 1330 (Cal. 1980) ...................................................................................2

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007)...........................................................................................13

*Thimes Sols., Inc.* v. *TP Link USA Corp.*,
　2022 WL 1125628 (9th Cir. Apr. 15, 2022) .........................................................7

*Victaulic Co.* v. *Tieman*,
　499 F.3d 227 (3d Cir. 2007).................................................................................5

*VMG Salsoul* v. *Birdsong*,
　2014 WL 12597111 (C.D. Cal. Sept. 11, 2014) .................................................10

*Vox Network Solutions, Inc.* v. *Gage Technologies, Inc.*,
　2025 WL 929939 (N.D. Cal. Mar. 27, 2025)......................................................16

*W. Sugar Coop.* v. *Archer-Daniels-Midland Co.*,
　2015 WL 12683192 (C.D. Cal. Aug. 21, 2015).....................................................7

*Warren Gen. Hosp.* v. *Amgen Inc.*,
　643 F.3d 77 (3d Cir. 2011)...................................................................................7

*Wentland* v. *Wass*,
　25 Cal Rptr. 3d 109 (Ct. App. 2005) .................................................................10

*Williams* v. *Gerber Prods. Co.*,
　552 F.3d 934 (9th Cir. 2008) ...............................................................................2

*XpandOrtho, Inc.* v. *Zimmer Biomet Holdings, Inc.*,
　2022 WL 801743 (S.D. Cal. Mar. 15, 2022) ......................................................15

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**Statutes**

Sherman Act..............................................................................................................2, 16

**Rules**

Fed. R. Civ. P. 8.......................................................................................................3, 17

Fed. R. Civ. P. 12(b)(6)................................................................................................5

Cal. Code Civ. Proc. § 425.17(c) ................................................................................10

**Other Authorities**

U.S. Const. amend. I.................................................................................................6, 8

U.S. Const. art. III......................................................................................................12

## I.      NATURE AND STAGE OF PROCEEDINGS

Plaintiffs ("Qualcomm") brought this contract action after Defendant ("Arm") deliberately withheld deliverables under ▮▮▮▮▮▮▮ of the parties' Architecture License Agreement ("ALA"). Arm moved to dismiss.  D.I. 13.[1]  That motion was denied.  D.I. 30.  Qualcomm then amended its complaint to add allegations based on Arm's ongoing interference with Qualcomm's business and competition.  D.I. 36 (the "FAC").  Arm again moved to dismiss.  D.I. 47, 48.  Qualcomm opposed the motion and, after the motion was fully briefed, sought leave to amend.  D.I. 64, 90.  The Court granted Qualcomm leave to file a Second Amended Complaint ("SAC") and denied Arm's motion to dismiss the FAC as moot.  D.I. 134 at 2-3.  Qualcomm filed the SAC, D.I. 137, which Arm again moves to dismiss, D.I. 232.

## II.      INTRODUCTION AND SUMMARY OF ARGUMENT

When granting Qualcomm leave to file the SAC, the Court noted that it could not "conclude that the amendment is futile" and that it "will look askance at any further motions to dismiss asserting failure to state a claim or compulsory counterclaim grounds."  D.I. 134 at 2.  Yet after conceding that Qualcomm's contract and implied-covenant claims based on breaches of Qualcomm's architecture license agreement ("ALA") are properly pled, Arm moves to dismiss the rest of the SAC on grounds this Court has already rejected.  Arm's motion should be denied.

***Litigation-related immunities:***  Arm attempts to escape liability for interfering with Qualcomm's customer relationships by invoking the *Noerr-Pennington* doctrine and other litigation-related privileges.  But *Noerr-Pennington* and the litigation privilege are affirmative defenses that Qualcomm is not required to anticipate and negate in its complaint.  Regardless, neither shelters communications—like Arm's leak of the Breach Letter—that violate contractual

---

[1] Citations to "D.I." refer to docket entries in this case.  Citations to "No. 1146, D.I." refer to docket entries in the "Arm Action," Civil Action No. 22-1146-MN.

1

confidentiality requirements.  The SAC's plausible allegations that Arm took groundless positions and acted in bad faith are sufficient to reject Arm's privilege arguments at this stage.  Suing Qualcomm did not give Arm *carte blanche* to smear Qualcomm to customers and in the press.

*UCL and Tortious Interference:*  This case does not present the "rare situation" in which the unfairness of Arm's business practices can be resolved on the pleadings.  *See Williams* v. *Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008).  Because Qualcomm has plausibly alleged that Arm's misconduct is ongoing, prospective equitable relief is necessary even if Qualcomm can *also* recover damages for past acts of misconduct.  While Arm suggests that refusals to deal are *per se* permissible, the specific allegations in this case fit into the unique circumstances in which a refusal to deal constitutes unfair competition.  Qualcomm's claim is in any event not limited to a refusal to deal theory.  While Arm faults Qualcomm for not defining a market or pleading market power, it ignores the leading case rejecting efforts to import those and other Sherman Act requirements into the UCL.  *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023).

*Good Faith and Fair Dealing:*  Arm does not dispute that Qualcomm has stated an implied-covenant claim but "seeks to dismiss only Qualcomm's new allegations" that ███████████ ██████████████████████████████████ or comply with its obligations under the parties' Technology License Agreement ("TLA").  Arm misunderstands the duty of good faith and fair dealing "inherent in every contract" in California.  *Tameny* v. *Atl. Richfield Co.*, 610 P.2d 1330, 1337 n.12 (Cal. 1980).  Arm is ████████████████████████████████████, SAC ¶¶ 129-31, ████████████████████████████████████ ████████████████████████████████████████.

*TLA:*  The SAC alleges in detail that when Qualcomm requested licensing offers for certain off-the-shelf cores, Arm drastically hiked fees and omitted ██████████████████ from its offer.

2

Those allegations state claims that Arm violated provisions of the TLA ████████████

███████████████████████████████████████████████████████████████████

███████. While Arm complains that Qualcomm did not load the SAC with particularized details

about other (confidential) license offers and the omitted ████████████████, it ignores that

Rule 8 does not require such particularized details.

## III.  STATEMENT OF FACTS

### A.  Factual Background

Qualcomm designs semiconductor chips that enable products including smartphones and laptops. SAC ¶¶ 38, 54. For chips containing CPUs, Qualcomm licenses technology from Arm under the ALA, which allows Qualcomm to incorporate custom CPUs compatible with Arm's instruction set architecture ("ISA") into its products. *Id.* ¶¶ 2, 43-50. Under a TLA, Qualcomm licenses Arm's off-the-shelf CPU designs and adjacent technologies ("peripheral IP"). *Id.* ¶¶ 2, 51-52.

Qualcomm has been an Arm licensee for almost ████████. *Id.* ¶ 55. That longstanding and mutually advantageous business relationship began to deteriorate after SoftBank acquired Arm in 2016. Eager to pad its financials, Arm increased fees and attempted to renegotiate contracts even as its technology grew stale. SAC ¶¶ 4-5, 52, 69-70. In an effort to escape Arm's stranglehold, Qualcomm acquired startup Nuvia Inc. ("Nuvia") and assembled a team to create innovative, high-performance custom CPUs for laptops and other devices. *Id.* ¶¶ 6, 59-62, 73.

Arm saw Qualcomm's foray into custom-core design as a threat to Arm's current revenues and plans to develop its own chips, and responded by seeking to suppress competition from Qualcomm by any means possible. SAC ¶¶ 5, 73-163. Arm filed suit in this Court (hereinafter the "Arm Action") seeking to destroy all products incorporating Nuvia technology. *Id.* ¶ 8. It also withheld essential deliverables used to verify custom CPUs, misled Qualcomm about what it was

3

doing, and refused ████████████████ for off-the-shelf core designs and peripheral IP. *Id.* ¶¶ 12-19, 74-94, 102-34. And to sabotage Qualcomm's customer relationships and reduce demand for Qualcomm's products, Arm (1) blitzed Qualcomm's customers with misleading letters, (2) baselessly threatened to terminate Qualcomm's ALA, *see* D.I. 36-1 (the "Breach Letter"), and (3) leaked that Breach Letter to the press in violation of ████████████████████. SAC ¶¶ 135-55. Those efforts have cost Qualcomm business opportunities. *Id.* ¶¶ 156-61.

### B.      Procedural History

Qualcomm sought to assert the ALA-based claims at issue in this Action (Counts I and II) as counterclaims in the Arm Action, but Arm successfully argued that those claims needed to be "dealt with as a separate proceeding." No. 1146, D.I. 294, 40:14-16. Qualcomm filed this action, D.I. 1, which Arm has moved to dismiss three times. *First*, Arm argued that the ALA-based claims needed to be raised in the Arm Action. D.I. 15. This Court rejected that argument. D.I. 30.[2] *Second*, after Qualcomm filed the FAC (which added claims based on Arm's escalating acts of bad-faith and unfair conduct), Arm again moved to dismiss. D.I. 47; D.I. 48. While that motion was fully briefed and pending, Qualcomm sought leave to file the SAC. D.I. 90. Arm opposed leave to file on futility and other grounds, D.I. 94 at 3, which the Court rejected, D.I. 134 at 2. *Third*, with depositions underway, Arm has once again moved to dismiss. D.I. 233.

## IV.    ARGUMENT

### A.      None of Arm's Grab-Bag of Litigation-Related Privileges Immunizes Arm from Liability in Connection with Counts III-VI.

In arguing that *Noerr-Pennington* and other immunity doctrines bar Qualcomm's implied-

---

[2] Arm misstates the record in claiming that this Court denied its first motion simply because Qualcomm intended to amend its complaint. D.I. 233 at 3-4. The Court stated that it was "not going to say that that was a compulsory counterclaim that [Qualcomm] could have brought." No. 1146, D.I. 513, 39:2-9.

covenant (Count III), tortious interference (Counts IV-V), and UCL (Count VI) claims, Arm misstates Qualcomm's claims and distorts the doctrines it invokes. Arm assumes that Qualcomm's claims are based solely on Arm's leak of the Breach Letter and communications with customers about the parties' litigation.[3] But the SAC alleges a broader scheme of bad-faith and unfair conduct by Arm that ████████████████████████, seeks to prevent Qualcomm from receiving its benefit of the agreement, and obstructs competition. *E.g.*, SAC ¶¶ 184, 192, 206. Arm cannot escape liability by hiding behind doctrines protecting conduct incidental to good-faith litigation.

### 1.    *Noerr-Pennington* cannot justify dismissal of any claim in the SAC.

Under the *Noerr-Pennington* Doctrine, "[a] party who petitions the government for redress generally is immune from antitrust liability," and in certain circumstances from liability for other business torts. *Cheminor Drugs, Ltd.* v. *Ethyl Corp.*, 168 F.3d 119, 122, 128-29 (3d Cir. 1999). That defense requires Arm to prove that this "lawsuit imposes a burden on petition rights" and targets "protected petitioning activity." *Kearney* v. *Foley & Lardner, LLP*, 590 F.3d 644 (9th Cir. 2009). Because *Noerr-Pennington* is an affirmative defense, *Schrader Cellars, LLC* v. *Roach*, 129 F.4th 1115, 1125 n.12 (9th Cir. 2025), it is not grounds for a Rule 12(b)(6) dismissal unless it "appears on [the complaint's] face." *Victaulic Co.* v. *Tieman*, 499 F.3d 227, 234 (3d Cir. 2007). Arm cannot show that, on the face of the SAC, *Noerr-Pennington* bars any theory of liability—let alone *all*, as would be required to dismiss Qualcomm's claims. *See Castaline* v. *Aaron Mueller Arts*, 2010 WL 583944, at *4 (N.D. Cal. Feb. 16, 2010).

---

[3] Although Arm repeatedly refers to the "alleged" leak of the Breach Letter (*e.g.*, D.I. 233 at 4, 6, 8), Arm admits that it revealed the Breach Letter to Bloomberg, D.I. 191 at 209.

*First*, *Noerr-Pennington* is inapplicable because Arm ████████ ████████ ████████████████ by disclosing terms and conditions of the Qualcomm ALA to third parties. *Noerr-Pennington* "does not... immunize a party from actions that amount to a breach of contract," *Microsoft Corp.* v. *Motorola, Inc.*, 795 F.3d 1024, 1047 (9th Cir. 2015), because, by undertaking to "comply with [a] contract," the party "waive[s]" that privilege, *Powertech Tech., Inc.* v. *Tessera, Inc.*, 872 F. Supp. 2d 924, 932 (N.D. Cal. 2012); *see also Spear Pharms., Inc.* v. *William Blair & Co., LLC*, 610 F. Supp. 2d 278, 288 (D. Del. 2009) ("violation of a confidentiality agreement... is not protected by the First Amendment"). ████████████████████ ████████████████████████ that do not include unauthorized disclosures to the media and customers. D.I. 23-1 at ██████. Although Qualcomm previously pointed out this problem in Arm's argument, D.I. 64 at 11, 18, Arm still has no answer to it.

*Second*, Arm fails to show it engaged in legitimate petitioning activity by misleading and threatening Qualcomm's customers and then leaking to the press a confidential notice purporting to declare Qualcomm in material breach of its ████████ ALA. SAC ¶ 192. Qualcomm's customers and Bloomberg are not "part of the government," so "there is no constitutionally protected right to 'petition' [them] for a redress of grievances." *Golden Eye Media USA, Inc.* v. *Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1241 (S.D. Cal. 2021). Nor does the SAC allege that Arm's customer communications or leak of the Breach Letter were "incidental" to protected conduct, as would be required for *Noerr-Pennington* to apply at the motion-to-dismiss stage. *See* D.I. 233 at 5. Instead, the SAC plausibly alleges that those communications were bad-faith attempts to harm Qualcomm, which precludes dismissal at this stage. SAC ¶¶ 1, 29, 34.

*The Customer Communications*: Qualcomm's tortious interference claims are not limited to the letters Arm sent Qualcomm's customers, but also encompass other misconduct—i.e.,

6

"misrepresenting the terms of Qualcomm's licenses with Arm to Qualcomm's customers"—wholly unrelated to petitioning activity. SAC ¶ 9. And as to those letters, Arm fails to explain how sending admittedly "confusing" and "misleading" letters to Qualcomm's customers was "incidental to valid efforts" to "prosecut[e]" any action. *W. Sugar Coop.* v. *Archer-Daniels-Midland Co.*, 2015 WL 12683192, at *6 (C.D. Cal. Aug. 21, 2015). While Arm compares those letters to settlement demands, D.I. 233 at 7, the letters demanded nothing from Qualcomm's customers, nor has Arm pursued such litigation. Courts have rejected arguments that *Noerr-Pennington* protects analogous letters to a business's customers complaining that the business may be dealing in infringing products. *E.g.*, *Laitram Machinery, Inc.* v. *Carnitech A/S*, 901 F. Supp. 1155, 1161 (E.D. La. 1995) ("The *Noerr-Pennington* doctrine does not extend to sending letters to a competitor's customers alleging violation of trade secrets and infringement of patents").[4]

*The Breach Letter*: The SAC's allegations that the Breach Letter was baseless and leaked to interfere with Qualcomm's business, SAC ¶¶ 144-61, are sufficient to preclude dismissal on *Noerr-Pennington* grounds. *See Cheminor Drugs*, 168 F.3d at 122 (no immunity for a "mere sham to cover what [was] actually nothing more than an attempt to interfere directly with … business relationships"). Arm's attempt to analogize its direct communications with Qualcomm customers and leak of the Breach Letter to press releases intended to "publicize [Arm's] litigating position" and "provid[e] [Arm's] view of the case to … customers," D.I. 233 at 6, is also inapt. The Breach Letter referred to the Arm Action only in passing and focused instead on unsupported claims that Qualcomm had breached *its* ALA—claims that Arm was not pursuing in the Arm Action. D.I. 36-

---

[4] *See also Thimes Sols., Inc.* v. *TP Link USA Corp.*, 2022 WL 1125628, at *1-2 (9th Cir. Apr. 15, 2022); *Golden Eye Media USA, Inc.*, 525 F. Supp. 3d 1145, 1175-76, 1239-41; *LY Berditchev, Corp.* v. *Truss Cosmetics, Corp.*, 2023 WL 334539, at *9 (D.N.J. Jan. 20, 2023); *Constr. Cost Data, LLC* v. *Gordian Group, LLC*, 2017 WL 2266993, at *7 n.5 (S.D. Tex. Apr. 24, 2017).

1.  Viewed "in the light most favorable to [Qualcomm]," *Warren Gen. Hosp.* v. *Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011), the Breach Letter was nothing like a press release regarding pending litigation.

Even if the Breach Letter were akin to a press release about the litigation, that would not support *Noerr-Pennington* immunity.  While presuit settlement demands are protected to "preserve the breathing space" required for the exercise of protected petitioning rights, "disseminat[ing] a false press release to [the defendant's] customers and the public after filing th[e] suit," and engaging in a "campaign to use the press release discussing the suit to propose new pricing arrangements" is not "incidental" to litigation and does not implicate the same First Amendment concerns.  *Nuance Commc'ns* v. *MModal LLC*, 2018 WL 6804488, at *3-4 (D. Del. Dec. 27, 2018), *report & recommendation adopted*, 2019 WL 181322 (D. Del. Jan. 11, 2019).[5]  And as in *Nuance*, Arm did not just send the Breach Letter but engaged in "additional market manipulation conduct," by leaking the letter.  2018 WL 6804488, at *4.  *Noerr-Pennington* is inapplicable.

Arm's argument that Qualcomm has not pled that Arm's conduct was a "sham," D.I. 233 at 8, ignores the procedural posture of the case and the allegations of the SAC.[6]  As an affirmative defense, *Noerr-Pennington* is "not something the plaintiff must anticipate and negate in [its] pleading," *see Cunningham* v. *Cornell Univ.*, 145 S. Ct. 1020, 1028 (2025) (quotation marks

---

[5] *See also Arista Networks, Inc.* v. *Cisco Sys., Inc.*, 2018 WL 11230167, at *11 (N.D. Cal. May 21, 2018) (denying motion for summary judgment that blog posts were protected by *Noerr-Pennington*, as blog posts were "merely statements about the status of the parties' litigation and [the poster's] intellectual property rights" and not, like demand letters, made in furtherance of or incidental to efforts to "prosecution of the … lawsuit"); *Riverbed Tech., Inc.* v. *Silver Peak Sys.*, 2015 WL 12941890, at *3 (N.D. Cal. Apr. 7, 2015) ("competitive brief" about litigation merely described case and was not in "furtherance of or incidental to" it).

[6] The fact that Arm's claims in the *Arm Action* survived summary judgment, D.I. 233 at 8, is irrelevant, because those claims involved alleged breaches of the *Nuvia* ALA, not whether Qualcomm violated *its own* ALA.  *See* SAC ¶ 136.

omitted), and whether activity is a "sham … is a factual inquiry, which cannot be resolved at the motion to dismiss stage," *FTC* v. *Shire ViroPharma Inc.*, 2018 WL 1401329, at *7 (D. Del. Mar. 20, 2018). The SAC alleges that Arm's claim that Qualcomm had materially breached its ALA was "groundless," "baseless," and a "bad-faith" pretext for harming Qualcomm's business, SAC ¶¶ 1, 9, 33, 157, 184-185, precluding dismissal. *Energy Conversation, Inc.* v. *Heliodyne, Inc.*, 698 F.2d 386, 389 (9th Cir. 1983) (*Noerr-Pennington* inapplicable where unfounded threat was allegedly intended to "generate adverse … publicity and … coverage" and "competitive[] harm").

**Third,** even if Arm's *Noerr-Pennington* defense were apparent on the face of Qualcomm's complaint as to some of Arm's actions—and it is not—that doctrine would not justify dismissal of Qualcomm's claims in full. *Noerr-Pennington* does not immunize Arm from liability for material misrepresentations to Qualcomm's customers that Qualcomm had breached its own ALA. *See* SAC at ¶ 1; *Cheminor Drugs*, 168 F.3d at 124 (3d Cir. 1999) ("[A] material misrepresentation that affects the very core of a litigant's … case will preclude *Noerr-Pennington* immunity..."). Moreover, Arm's implied-covenant and UCL claims are premised on numerous distinct wrongs (such as Arm's refusal to negotiate a v10 license and unfair competition in the semiconductor industry) unrelated to litigation. *E.g.*, SAC ¶¶ 184, 206-207. And because Arm's purported "petitioning" forms part of a "complex scheme" of anticompetitive conduct, Qualcomm may challenge that scheme in its entirety, even if the petitioning were not a sham. *10x Genomics, Inc.* v. *Vizgen, Inc.*, 681 F. Supp. 3d 252, 268-269 (D. Del. 2023); *see Microsoft Mobile Inc.* v. *Interdigital, Inc.*, 2016 WL 1464545, at *3 (D. Del. Apr. 13, 2016). *Noerr-Pennington* does not support dismissal in part, let alone in full. *See Castaline*, 2010 WL 583944, at *4 (denying motion to dismiss "[b]ecause not all of [defendant's] alleged actions are privileged").

9

      **2.**     **Arm's cursory arguments about the litigation privilege and Anti-SLAPP law fail for similar reasons**.

*Litigation Privilege*: Arm's invocation of the California litigation privilege fails for much the same reasons as its invocation of *Noerr-Pennington*.[7] Litigation privilege does not protect conduct ███████████████████████████, such as Arm's leak of the Breach Letter. *Wentland* v. *Wass*, 25 Cal Rptr. 3d 109, 116 (Ct. App. 2005). And it protects only statements that are "necessary or useful step[s] in the litigation process and... serve its purposes." *Argentieri* v. *Zuckerberg*, 214 Cal. Rptr. 3d 358, 371 (Ct. App. 2017). Sending confusing and misleading letters to Qualcomm's customers and leaking the Breach Letter to the press "does not constitute the type of furtherance or connection sufficient for the litigation privilege to apply." *Id.* at 372.

*California Anti-SLAPP*: Arm provides no independent argument for applying California Anti-SLAPP law, so that argument fails for the same reasons as Arm's argument about the litigation privilege. California's Anti-SLAPP law protects only against claims that "arise[] from protected speech or petitioning and lack[] even minimal merit," ██████████████████████ ████████████. *Navellier* v. *Sletten*, 52 P.3d 703, 708, 712 (Cal. 2002). Qualcomm's claims target Arm's bad-faith interference with Qualcomm's business and attempts to undermine competition, not protected speech or petitioning activity. *Supra* pp. 5-9.[8] Nor can Arm show that those claims "lack even minimal merit," given this Court's grant of leave to amend and rejection of Arm's arguments about futility. D.I. 134. Finally, Arm's contention Qualcomm must now "establish a probability it will prevail" on its claims is also misdirected because California Anti-

---

[7] Like *Noerr-Pennington*, litigation privilege is an affirmative defense that requires dismissal only when established on the face of the complaint. *See, e.g.*, *VMG Salsoul* v. *Birdsong*, 2014 WL 12597111, at *5 (C.D. Cal. Sept. 11, 2014)

[8] To the extent Qualcomm seeks redress for Arm's misrepresentations to Qualcomm customers that Qualcomm's products are unlicensed, the California Anti-SLAPP Law's commercial-speech exception, Cal. Code Civ. Proc. § 425.17(c) also renders Anti-SLAPP Law inapplicable.

SLAPP procedure does not apply in federal court, *e.g.*, *La Liberte* v. *Reid*, 966 F.3d 79, 87-88 (2d Cir. 2020); *Broughty* v. *Bouzy*, 2023 WL 5013654, at *3 n.3 (D.N.J. Aug. 7, 2023), and Arm has not invoked those inapplicable state-law procedures.

### B.    Arm Offers No Basis for Dismissing Qualcomm's Meritorious UCL Claim.

#### 1.    There is no procedural obstacle to the UCL claim.

Arm reprises its argument that Qualcomm cannot obtain equitable relief under the UCL because Qualcomm has adequate legal remedies, but Qualcomm's ability to recover damages for certain past acts of tortious interference and bad-faith conduct does not prevent it from also seeking equitable relief for a broader, ongoing pattern of misconduct.  D.I. 64 at 15.  Arm does not dispute that ongoing harm can justify equitable relief, or that Qualcomm has alleged ongoing harm in the SAC, D.I. 233 at 10, but instead slights those allegations as "conclusory."  The SAC, however, includes detailed allegations of Arm's persistent, systematic, and "ongoing" efforts to undermine Qualcomm's customer relationships and obstruct its development of custom CPUs and chips, including multiple instances in which Arm has sought to mislead Qualcomm's customers and leak confidential information.  *E.g.*, SAC at ¶ 137, 139, 144, 207.  These well-pled allegations are not "conclusory platitudes," D.I. 233 at 10, but firmly established bases for equitable relief.  *See*, *e.g.*, *CFTC* v. *Traders Glob. Grp.*, 2023 WL 7545316, at *1 (D.N.J. Nov. 14, 2023) ("likelihood of future violations may be inferred from systematic or ongoing violations"); *Sun Microsystems, Inc.* v. *Microsoft Corp.*, 87 F. Supp. 2d 992, 1004-05 (N.D. Cal. Jan. 24, 2000) ("past conduct demonstrat[ing] an ongoing strategy to compete" unfairly and unlawfully shows "threatened future harm or a continuing violation" of the UCL such as to warrant injunctive relief").  In faulting Qualcomm for not "explain[ing] why" damages are insufficient in the complaint, Arm overlooks that a complaint requires "a plausible 'short and plain' statement of the plaintiff's claim, not an

11

exposition of his legal argument." *Skinner* v. *Switzer*, 562 U.S. 521, 530 (2011).[9]

Arm's challenges to Qualcomm's standing are similarly meritless.  Qualcomm has alleged that Arm's misconduct has harmed it *and is continuing* to cause it harm—for example, by damaging customer relationships and impeding Qualcomm's chip-development efforts—which is all Article III requires.  *E.g.*, SAC ¶¶ 34, 156-66, 206-207, 212; *see Clemens* v. *ExecuPharm Inc.*, 48 F.4th 146, 155 (3d Cir. 2022).  Arm's assertion that the Court could not enjoin Arm from *all* communications with third parties is a red herring:  Qualcomm seeks more tailored relief, SAC ¶ 212 & p.64 (Prayer for Relief ¶ D), and Arm's "qualms as to the breadth of a potential remedy are premature" at the pleadings stage.  *Aesha* v. *State Farm Gen. Ins. Co.*, 2024 WL 5410447, at *6 (C.D. Cal. July 30, 2024); *see also Peterson* v. *Glad Prods. Co.*, 2023 WL 4600404, at *5 (N.D. Cal. July 27, 2023).

### 2.   The SAC states a UCL claim.

Qualcomm's detailed allegations about Arm's conduct are more than sufficient to state a claim under the "sweeping" language of the UCL, which "permit[s] tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur."  *Cel-Tech Commc'ns* v. *L.A. Cellular*, 973 P.2d 527, 561-62 (Cal. 1999).  Whether a business act or practice is "unfair" is generally a question of fact, *Linear Tech. Corp.* v. *Applied Materials, Inc.*, 61 Cal. Rptr. 3d 221, 236 (App. 2007), making it "a rare situation where granting a motion to dismiss claims under the UCL is appropriate."  *In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1115 (S.D. Cal. 2011).  This case does not present one of those "rare situations."

---

[9] Arm's citation to Qualcomm's brief in *Key* v. *Qualcomm Inc.*, 129 F.4th 1129 (9th Cir. 2025), is inapposite.  The fact that the plaintiff there failed to prove the need for equitable relief says nothing about the adequacy of Qualcomm's pleadings in this case.

To begin, Arm confuses the legal standards that govern UCL claims. Qualcomm is both a competitor and customer of Arm, so it can show that Arm's conduct was unfair using *either* the *Cel-Tech* competitor *or* balancing tests. *Epic*, 67 F.4th at 1000-01. As to *Cel-Tech*, Arm focuses on the second prong and largely ignores the first and third, D.I. 233 at 11, thereby waiving any argument that Qualcomm has not sufficiently alleged that Arm's conduct is "unfair" because that conduct otherwise "substantially harms competition." *See, e.g.*, *Lord Abbett Affiliated Fund* v. *Navient Corp.*, 2020 WL 5026553, at *4 (D. Del. Aug. 25, 2020); *PeopleBrowsr, Inc.* v. *Twitter*, 2013 WL 843032, at *4 (N.D. Cal. Mar. 6, 2013) (*Cel-Tech* disjunctive).

The SAC alleges that Arm has engaged in conduct that is "unfair" by any measure— particularly when that conduct is considered together, as it must be. *See Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[10]

***First***, the SAC alleges that after inducing widespread adoption of the Arm ISA by committing to a neutral, open IP-licensing model, the "Switzerland" of chips sought to exploit its dominance by hiking rates and advantaging its own off-the-shelf cores and planned chips. SAC ¶¶ 68-73. Arm's "open early, closed late" conduct is inconsistent with the "policy or spirit" of the antitrust laws and "significantly threatens or harms competition." *See Cel-Tech*, 973 P.2d at 544; *see 10x Genomics*, 681 F. Supp. 3d at 268-69.[11]

---

[10] Arm contends that Qualcomm's "unlawful" claim is circular, D.I. 233 at 14, but that is incorrect: Qualcomm's "unfair" UCL claim serves as a predicate for its tortious-interference claims, which in turn support its UCL "unlawful" claim. There is nothing wrong with Qualcomm's "unfair" UCL claim doing this sort of "triple duty," *CRST Van Expedited, Inc.* v. *Werner Enters.*, 479 F.3d 1099, 1111 (9th Cir. 2007), and Arm cites no authority to suggest otherwise.

[11] Arm incorrectly claims that Qualcomm has "disclaimed any argument that Arm is attempting to exercise monopoly power." D.I. 233 at 12 (citing SAC ¶ 207). The UCL does not require Qualcomm to plead and prove that Arm has monopoly power. *Epic*, 67 F.4th at 1002. The lack of extraneous allegations in the SAC is not a concession that Arm is not a monopolist.

*Second*, the SAC alleges that, notwithstanding the parties' longstanding and profitable business relationship, Arm has cut off or threatened to cut off Qualcomm's access to necessary IP in an anticompetitive attempt to fetter Qualcomm's development of innovative custom cores and chips. *E.g.*, SAC ¶¶ 1-3, 68-72, 164-166, 184-185, 208. In these circumstances, that refusal to deal poses recognized threats to competition. *Eastman Kodak Co*. v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 483-86 (1992); *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985).[12] In keeping with federal courts, California courts have thus recognized that certain refusals to deal can amount to "unfair" competition. *See*, *e.g.*, *Pac. Steel Grp.* v. *Com. Metals Co.*, 600 F. Supp. 3d 1056, 1081-82 (N.D. Cal. 2022); *hiQ Labs, Inc.* v. *LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1117 (N.D. Cal. 2017). The SAC alleges just such an unfair termination of an existing, profitable business relationship for anticompetitive reasons.

*Third*, the SAC also alleges that Arm has repeatedly tried to mislead or intimidate Qualcomm's customers to induce them not to do business with Qualcomm. SAC ¶¶ 29-31, 135-140 (alleging, among other things, that Arm and its affiliates misrepresented when Qualcomm's ALA expires and claimed Qualcomm's products were unlicensed and that customers could face legal jeopardy from buying them). Again, California law has long recognized such practices as "unfair," *e.g.*, *ConsumerDirect, Inc.* v. *Pentius, LLC*, 2022 WL 16949657, at *9 (C.D. Cal. Aug. 25, 2022), independent of any antitrust-like analysis, and Arm hardly argues to the contrary. *See also Overstock.com, Inc.* v. *Gradient Analytics, Inc.*, 61 Cal. Rptr. 3d 29, 50 (Ct. App. 2007).

Arm's arguments for dismissal are unpersuasive. Arm suggests that unilateral refusals to deal are simply not actionable under federal antitrust law, D.I. 233 at 12, but ignores exceptions to

---

[12] *See also Verizon Commc'ns Inc.* v. *L. Offs. of Curtis* V. *Trinko, LLP*, 540 U.S. 398, 408-09 (2004) (recognizing *Aspen Skiing* refusal to deal anticompetitive theory, but finding that it does not apply where the monopolist never "engaged in a course of dealing with its rivals").

14

that general principle. *See*, *e.g.*, *Kodak*, 504 U.S. at 483-86; *Aspen Skiing*, 472 U.S. at 600-05; *10x Genomics*, 681 F. Supp. 3d at 267-69.[13]   While Arm also claims that its attempts to mislead Qualcomm customers does not violate the spirit of the antitrust laws, it does not even attempt to explain how that conduct does not "otherwise significantly threaten[] or harm[] competition." *Cel-Tech*, 973 P.2d at 544.

Arm's remaining challenges to Qualcomm's UCL claim invent pleading requirements from whole cloth.  While Arm notes that Qualcomm has not alleged what antitrust law, in particular, Arm's conduct has violated, D.I. 233 at 13, Qualcomm does not need to "plead a specific violation of antitrust law" to state a viable UCL claim, *XpandOrtho, Inc.* v. *Zimmer Biomet Holdings, Inc.*, 2022 WL 801743, at *11 (S.D. Cal. Mar. 15, 2022), and Arm cites no California case dismissing a UCL claim on that ground.  Nor does Arm cite any California decisions stating that a UCL plaintiff must show market power in a defined market.  The Ninth Circuit has rejected the effort to import a market-definition requirement into the UCL as "contrary to California courts' repeated instruction that no inflexible rule can be laid down as to what conduct will constitute unfair competition." *Epic*, 67 F.4th at 1002 (cleaned up).  Indeed, the only California case cited by Arm—*Racek* v. *Rady Children's Hospital*, 2012 WL 2947881, at *6 (Cal. Ct. App. July 20, 2012)—is an unpublished, non-citable decision that rejected a UCL claim for failure to prove anticompetitive conduct, not failure to identify a relevant market.  *See also Sun Microsys., Inc.* v. *Microsoft Corp.*, 87 F. Supp. 2d 992, 1002 (N.D. Cal. 2000) (same).[14]

---

[13] Arm's reliance on *Chavez* v. *Whirlpool Corp.*, 113 Cal. Rptr. 2d 175 (Ct. App. 2001); *Drum* v. *San Fernando Valley Bar Ass'n*, 106 Cal. Rptr. 3d 46 (Ct. App. 2010); and *Beverage* v. *Apple Inc.*, 320 Cal. Rtpr. 3d 427 (Cal. Ct. App. 2024), is thus inapt, because those cases involved simple refusals to deal not accompanied, as in this case, by cessation of an existing business relationship (like *Aspen Skiing*) or allegedly gaining widespread acceptance by deception (like *10x Genomics*).

[14] The other federal district-court decisions cited by Arm do not support its argument that UCL plaintiffs must plead a relevant market.  In *Reilly* v. *Apple, Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal.

15

### C. The SAC States Viable Claims for Tortious Interference.

Arm now abandons any independent challenge to Qualcomm's tortious-interference claims and contends only that Qualcomm's UCL claim fails and that Qualcomm therefore has not pleaded an "independently wrongful" act. D.I. 233 at 14. Qualcomm has stated a viable UCL claim based on, among other things, Arm's campaign of interference with Qualcomm's customer relationships. SAC ¶ 1. Because that conduct violates the UCL's "unfair" prong, it is necessarily "independently wrongful." *CRST Van Expedited,* 479 F.3d at 1110-11; *cf. Korea Supply Co.* v. *Lockheed Martin Corp.*, 63 P.3d 937, 954 (Cal. 2003) (act is "independently wrongful" if "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard"). Qualcomm has stated viable tortious-interference claims.

### D. Arm Offers No Valid Reason for Dismissing Qualcomm's TLA Claims.

#### 1. Qualcomm Has Stated a Claim for Breach of ▮▮▮ (Count VII).

Under ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ SAC ¶¶ 104-105. Qualcomm has alleged that when it requested a license to certain Arm cores, Arm violated that provision by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* ¶¶ 109-115; and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

2022), the plaintiff litigated his UCL claim as derivative of his federal antitrust claim, and the district court never addressed whether the UCL imposes an independent market-definition requirement. To the extent *Vox Network Solutions, Inc.* v. *Gage Technologies, Inc.*, 2025 WL 929939 (N.D. Cal. Mar. 27, 2025), stated that UCL plaintiffs must identify geographical and product markets, that decision relied on inapposite Sherman Act caselaw and overlooked precedent that the UCL does not require market definition. *Compare id.* at *5, *with Epic*, 67 F.4th at 1002.

███████ and amounted to constructive failure to provide an offer, *id.* ¶¶ 116-120.

Arm asserts that these allegations are "conclusory" because they do not include details about the terms on which Arm licensed the cores at issue to third parties. D.I. 233 at 16. But those terms are confidential and known only to Arm.[15] More importantly, Qualcomm is not required to plead the detail of these other licenses with particularity. Fed. R. Civ. P. 8. The SAC alleges that when Qualcomm requested licenses to the cores in 2024, Arm demanded fees and royalty rates nearly five times as high as those it agreed to in 2019, even though the technology was five years older. SAC ¶¶ 110, 118. Those well-pled allegations state a plausible claim that the rates were █ ██████████████████████████████.[16]

Arm also fails to address the allegations that it did not act in good faith in ██████████ ██████████ ██████████ ██████████████████████ ██████████ ████████. While Arm claims that Qualcomm is "reading an additional requirement" into the TLA, D.I. 233 at 17, ████████████████████████████████████████████████████████████████████ ████████ ██████████████████████████████ Qualcomm seeks to enforce the terms of the TLA, not to engraft additional requirements onto it. Nor can Arm plausibly maintain that the TLA ████████████████████████████████████████████████████████████████████ ██████████████████████████████████. *Id.* at 16-17. Under California law, "[w]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *Kendall* v. *Ernest Pestana, Inc.*, 709 P.2d 837, 845 (Cal. 1985) (quotation marks omitted). ██████████████████

---

[15] Arm is continuing to improperly withhold discovery on its calculation of the ██████████████.

[16] Indeed, the 500% increase alleged in the SAC could be consistent with the ██████████████ ████████████████████████████████, a proposition that is implausible on its face.

17

██████████████████████████████████████████████████████████

████████████████████████████████████  Arm argues that the implied covenant of good faith and fair dealing cannot be used to impose terms beyond those expressly stated in the contract, but if Arm were correct that "the implied covenant only enforces the express terms of the contract, then the entire concept of an implied covenant would be superfluous." *See Daly* v. *United Healthcare Ins. Co.*, 2010 WL 4510911, at *5 (N.D. Cal. Nov. 1, 2010); *accord Brehm* v. *21st Century Ins. Co.*, 83 Cal. Rptr. 3d 410, 417 (Ct. App. 2008) (rejecting argument that "no breach of the implied covenant can occur if there is no breach of an express contractual provision"); *Schwartz* v. *State Farm Fire & Cas. Co.*, 106 Cal. Rptr. 2d 523, 531 (Ct. App. 2001) ("well established... that breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of the implied covenant"). ██████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████

### 2.    Qualcomm Has Stated a Claim for Breach of ██████ (Count VIII).

The SAC also states a claim that Arm breached ██████ by failing to provide an offer with ████████████████████████████████████████ to the QC TLA.  SAC ¶ 120. Specifically, Arms' offer excluded ████████████████████████

██████████████████████████████████████████████████████████

████    Arm responds that the SAC does not sufficiently "describe[] what ██████████ ██████████ ████████████████████████ ████████████████████████ ████████████████████."  D.I. 233 at 19.  But (as discussed) no such particularized allegations are required.  *Supra* p. 17.  The fact that Qualcomm did not allege superfluous detail about the

specific ███████████████ Arm stripped out of its license offer does not render Qualcomm's allegations "conclusory." *See Twombly*, 550 U.S. at 545, 556-57.

> **E.      Arm's Attempt to Narrow Qualcomm's Implied Covenant Claim (Count III) Fails**.

Arm expressly does *not* move to dismiss Qualcomm's implied-covenant claim (Count III) but argues only that the Court should dismiss "new allegations" that Arm violated the implied covenant (1) by not offering a license to the v10 architecture and (2) failing to provide licensing proposals ███████████. The motion should be denied for three reasons.

*First*, Arm misunderstands the duty of good faith and fair dealing. In California, "[e]very contract imposes upon each party a duty of good faith and fair dealing in each performance and its enforcement." *Pasadena Live* v. *City of Pasadena*, 8 Cal. Rptr. 3d 233, 234 (Ct. App. 2004). That duty requires a party not only to "do everything that the contract presupposes that he will do to accomplish its purpose," *Harm* v. *Frasher*, 5 Cal. Rptr. 367, 374 (Ct. App. 1960), such as by exercising discretionary powers in good faith, *supra* at p. 17-18, but also *not* to "do anything which will injure the right of the other to receive the benefits of the agreement," *Comunale* v. *Traders & Gen. Ins. Co.*, 328 P.2d 198, 200 (Cal. 1958). To the extent Arm maintains that the implied covenant cannot impose duties beyond those expressly agreed upon in the contract, D.I. 233 at 19, California courts consistently reject that contention as fundamentally inconsistent with the *implied* covenant. *See Brehm*, 83 Cal. Rptr. at 417; *Schwartz*, 106 Cal. Rptr. 2d at 531; *supra* at p. 18.

*Second*, Arm is mistaken that the statute of limitations requires dismissal of Qualcomm's allegations about Arm's bad-faith refusal to license v10 of the Arm architecture.[17] That affirmative defense is procedurally improper because it is "not apparent on the face of the complaint." *Schmidt*

---

[17] Arm does not dispute that its other violations of the implied covenant occurred within the statute of limitations. *See* SAC ¶¶ 132-134, 184-185.

v. *Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  While Arm focuses on Qualcomm's allegation that Arm failed to respond to a May 2020 request, D.I. 233 at 20, the SAC does not allege when that failure to respond ripened into bad faith, which precludes dismissal on statute of limitations grounds.  Regardless, the complaint also alleges that Arm lied to Qualcomm in April 2020 that ███████████████████ ██████████████ ██████████████.  SAC ¶ 131.  That concealment of the violation alone would require tolling of any statute of limitations as to any claim based on Arm's failure to license v10.  *See LGM Holdings, LLC* v. *Schurder*, 2025 WL 1162999, at *8 (Del. April 22, 2025).

*Third*, Arm is incorrect to argue that Qualcomm's implied-covenant claim is "duplicative of [its] breach claims."  D.I. 233 at 19-20.  Under the TLA, Arm is expressly ██████████ ███████████████████████████████████, ████████████████ ██████████████████████████████ SAC ¶¶ 102, 118-119, 215.  ██████████████ ████████████████████████████████████████████████████████ ██████████████████████████████  *See id.* ¶ 102.  In any event, Qualcomm's implied-covenant claim encompasses Arm's broader and intentional campaign to deprive Qualcomm of the benefits of the ALA and TLA, SAC ¶¶ 184-186, and implied-covenant claims are not duplicative of contract claims where, as here, the plaintiff "alleges that the defendant acted in bad faith to frustrate the contract's benefits," *see Celador Int'l Ltd.* v. *Walt Disney Co.*, 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004).

## V.    CONCLUSION

Arm's motion to dismiss should be denied.

20

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC  20004
(202) 240-2900

Catherine Nyarady
Anish Desai
Erin J. Morgan
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA  94105
(628) 432-5100

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 1, 2025, upon the following in the manner indicated:

| | |
|---|---|
| Anne Shea Gaza, Esquire<br>Robert M. Vrana, Esquire<br>Samantha G. Wilson, Esquire<br>YOUNG CONAWAY STARGATT & TAYLOR, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE  19801<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Karen E. Keller, Esquire<br>SHAW KELLER LLP<br>I.M. Pei Building<br>1105 North Market Street, 12th Floor<br>Wilmington, DE 19801<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Scott F. Llewellyn, Esquire<br>MORRISON & FOERSTER LLP<br>4200 Republic Plaza<br>370 Seventeenth Street<br>Denver, CO  80202<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Nicholas R. Fung, Esquire<br>Henry Huttinger, Esquire<br>Sydney D. Gaskins, Esquire<br>MORRISON & FOERSTER LLP<br>707 Wilshire Blvd., Suite 6000<br>Los Angeles, CA  90017<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |

22

Kyle W.K. Mooney, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Erik J. Olson, Esquire                             *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Defendant*

Daniel P. Muino, Esquire                           *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
*Attorneys for Defendant*

Brian M. Kramer, Esquire                           *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 200
San Diego, CA  92130
*Attorneys for Defendant*

William Frentzen, Esquire                          *VIA ELECTRONIC MAIL*
Daralyn J. Durie, Esquire
Shaelyn Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*

Lydia B. Cash, Esquire                             *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                            *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

23

Jay Emerick, Esquire                                              *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                                        *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*


                                        */s/ Jennifer Ying*
                                        _____
                                        Jennifer Ying (#5550)

# Exhibit 5
## (REDACTED IN ITS ENTIRETY)

**A1341**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 20, 2026, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jying@morrisnichols.com
tmurray@morrisnichols.com

Alan R. Silverstein
Sara Barry
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
asilverstein@connollygallagher.com
sbarry@connollygallagher.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Jennifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com
jhartley@dirllp.com

Richard S. Zembek
NORTON ROSE FULBRIGHT US LLP
1550 Lamar Street, Suite 2000
Houston, TX 77010
richard.zembek@nortonrosefulbright.com
John Poulos
NORTON ROSE FULBRIGHT US LLP

Ruby J. Garrett
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweis.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
Anish Desai
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
fpatterson@paulweiss.com
adesai@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

1045 W. Fulton Market
Suite 1200
Chicago, IL 60607
john.poulos@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP

/s/ Anne Shea Gaza
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2