Originally Filed: February 20, 2026
Redacted Version Filed: February 27, 2026

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED,<br>  a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>  a Delaware corporation,<br><br>              Plaintiffs,<br><br>      v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>  a U.K. corporation,<br><br>              Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | REDACTED - PUBLIC VERSION<br><br>C.A. No. 24-490 (MN)<br>(CONSOLIDATED)<br><br>████████████████<br>█████ |

**APPENDIX TO PLAINTIFFS' PARTIAL OBJECTIONS TO THE SPECIAL
MASTER'S FEBRUARY 6, 2026 ORDER (D.I. 626) DENYING PLAINTIFFS'
<u>MOTION TO COMPEL (D.I. 359) (Vol. 3: A495-A1203)</u>**

OF COUNSEL:


Catherine Nyarady
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

February 20, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

| Document | Page Range/D.I. # |
|---|---|
| Plaintiffs' Motion to Compel (Aug. 1, 2025) | D.I. 359 at 5-7 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 1, 2025) | A0001 – A0007 |
| Qualcomm Exhibit 1 – Arm Ltd.'s First Supplemental Objections and Responses to Qualcomm's First Set of Requests for Production (Nos. 1-52) (June 17, 2025) | A0008 – A0074 |
| Qualcomm Exhibit 2 – Arm Ltd.'s First Supplemental Objections and Responses to Qualcomm's Second Set of Requests for Production (Nos. 53-120) (June 17, 2025) | A0075 – A0146 |
| Qualcomm Exhibit 3 – Arm Holdings PLC's First Supplemental Objections and responses to Qualcomm's Third Set of Requests for Production (Nos. 121-156) (June 17, 2025) | A0147 – A0187 |
| Qualcomm Exhibit 4 – Arm Holdings PLC's Objections and Responses to Qualcomm's Fourth Set of Requests for Production (Nos. 157-168) (May 16, 2025) | A0188 – A0208 |
| Qualcomm Exhibit 5 – Defendant Arm Holdings PLC's Objections and Responses to Plaintiffs' Notice of 30(b)(6) Deposition (June 19, 2025) | A0209 – A0257 |
| Qualcomm Exhibit 6 – Arm's First Supplemental Responses to Qualcomm's Amended Interrogatory No. 3 (July 11, 2025) | A0258 – A0267 |
| Qualcomm Exhibit 7 – Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11) (July 11, 2025) | A0268 – A0337 |
| Qualcomm Exhibit 8 – Qualcomm Technology License Agreement (TLA) (May 30, 2013) | A0338 – A0393 |
| Qualcomm Exhibit 9 – Deposition of Jeffrey M. Fonseca Excerpt (July 9, 2025) | A0394 – A0398 |

| | |
|---|---|
| Qualcomm Exhibit 10 – Deposition of Karthik Shivashankar Excerpt (June 20, 2025) | A0399 – A0402 |
| Qualcomm Exhibit 11 – Deposition of Ehab Youseff Excerpt (June 26, 2025) | A0403 – A0407 |
| Qualcomm Exhibit 12 – Letter from J. Emerick to C. Nyarady (July 24, 2025) | A0408 – A0416 |
| Qualcomm Exhibit 13 – Email from S. Balcof to J. Ying et al. re: Follow up from Thursday's call (July 31, 2025) | A0417 – A0422 |
| Qualcomm Exhibit 14 – Robert Triggs, *Google Tensor G4 explained: Everything you need to know about the Pixel 9 processor* (Aug. 22, 2024) | A0423 – A0432 |
| Qualcomm Exhibit 15 – Alif Semiconductor, *Ensemble E1 Series* (last visited July 31, 2025) | A0433 – A0439 |
| Qualcomm Exhibit 16 – STMicroelectronics, *Arm Cortex-M55 in a nutshell* (last visited July 31, 2025) | A0440 – A0443 |
| Qualcomm Exhibit 17 – ███████████ | A0444 – A0447 |
| Qualcomm Exhibit 18 – ███████████ | A0448 – A0451 |
| Qualcomm Exhibit 19 – ███████████ | A0452 – A0456 |
| Qualcomm Exhibit 20 – Deposition of Ziad Asghar Excerpt (July 7, 2025) | A0457 – A0460 |
| Qualcomm Exhibit 21 – Deposition of Ann Nathalie Cathcart Chaplin Excerpt (July 11, 2025) | A0461 – A0464 |
| Qualcomm Exhibit 22 – Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) Excerpt (July 11, 2025) | A0465 – A0473 |
| Qualcomm Exhibit 23 – Qualcomm Amended and Restated Architecture License Agreement (ALA) (May 30, 2013) | A0474 – A0517 |

| | |
|---|---|
| Qualcomm Exhibit 24 – Arm's First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories (Nos. 4-11) Excerpt (July 11, 2025) | A0518 – A0528 |
| Qualcomm Exhibit 25 – Third Supplemental Redaction Log for Arm ALAs (Jan. 5, 2024) | A0529 – A0535 |
| Qualcomm Exhibit 26 – Deposition of Jonathan Weiser Excerpt (July 11, 2025) | A0536 – A0539 |
| Qualcomm Exhibit 27 – Letter from A. Janes to C. Nyarady (June 23, 2025) | A0540 – A0542 |
| Qualcomm Exhibit 28 – Deposition of Paul Kranhold Excerpt (July 17, 2025) | A0543 – A0547 |
| Qualcomm Exhibit 29 – Arm Second Supplemental Initial Privilege Log (July 11, 2025) | A0548 – A555 |
| Qualcomm Exhibit 30 – ARMQC_02762874 (Oct. 21, 2024) | A0556 – A0558 |
| Qualcomm Exhibit 31 – ARMQC_02762876 (Oct. 22, 2024) | A0559 – A0561 |
| Qualcomm Exhibit 32 – ARMQC_02762878 (Oct. 21, 2024) | A0562 – A0563 |
| Qualcomm Exhibit 33 – ARMQC_02762879 (Oct. 22, 2024) | A0564 – A0565 |
| Qualcomm Exhibit 34 – Letter from A. Janes to C. Nyarady (June 30, 2025) | A0566 – A0568 |
| Qualcomm Exhibit 35 – Letter from N. Fung to C. Nyarady (Mar. 19, 2025) | A0569 – A574 |
| Qualcomm Exhibit 36 –Letter from N. Fung to C. Nyarady (May 7, 2025) | A0575 – A0578 |
| Qualcomm Exhibit 37 – Defendant Arm Holdings PLC's Objections and Responses to Plaintiffs' Notice of 30(b)(6) Deposition Excerpt (June 19, 2025) | A0579 – A0587 |
| Qualcomm Exhibit 38 – Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's Third Set of Requests For Production (Nos. 121-156) Excerpt (June 17, 2025) | A0588 – A0597 |
| Qualcomm Exhibit 39 – Deposition of Martin Weidman Excerpt (June 20, 2025) | A0598 – A0602 |

| | |
|---|---|
| Qualcomm Exhibit 40 – Deposition of Anupa George Excerpt (July 30, 2025) | A0603 – A0605 |
| Qualcomm Exhibit 41 – Letter from N. Fung to C. Nyarady (May 2, 2025) | A0606 – A0609 |
| Qualcomm Exhibit 42 – Deposition of Richard Grisenthwaite Excerpt (July 2, 2025) | A0610 – A0612 |
| Qualcomm Exhibit 43 – Letter from N. Fung to C. Nyarady (July 5, 2025) | A0613 – A0617 |
| Qualcomm Exhibit 44 – Deposition of Rene Haas Excerpt (July 7, 2025) | A0618 – A0621 |
| Qualcomm Exhibit 45 – Deposition of Aparajita Bhattacharya Excerpt (July 7, 2025) | A0622 – A0625 |
| Qualcomm Exhibit 46 – ARMQC_02762949 (Oct. 24, 2024); ARMQC_02762912 (Oct. 23, 2024); ARMQC_02762979 (Oct. 29, 2024); FSG_0000389 (Oct. 22, 2024); ARMQC_02742823 (Oct. 24, 2024); ARMQC_02742769 (Oct. 24, 2024); ARMQC_02749685 (Oct. 24, 2024) | A0626 – A0650 |
| Qualcomm Exhibit 47 – Letter from J. Emerick to C. Nyarady (July 24, 2025) | A0651 – A0654 |
| Qualcomm Exhibit 48 – Letter from C. Nyarady to N. Fung (May 16, 2025) | A0655 – A0660 |
| Qualcomm Exhibit 49 – Letter from N. Fung to C. Nyarady (June 17, 2025) | A0661 – A0667 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Defendant's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 7, 2025) | A0668 – A0675 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.,* C.A. No. 24-490-MN, Declaration of Nicholas R. Fung in Support to Defendant's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 7. 2025) | A0676 – A0682 |
| Arm Exhibit 1 – Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 1, 2025) | A0683 – A0690 |

iv

| | |
|---|---|
| Arm Exhibit 2 – Second Amended Complaint (June 3, 2025) | A0691 – A0758 |
| Arm Exhibit 3 – Email from P. Evangelatos to J. Braly et al. re: Qualcomm v. Arm – RFPs Concerning TLA Agreements | A0759 – A0762 |
| Arm Exhibit 4 – Order Appointing Special Master (July 18, 2025) | A0763 – A0767 |
| Arm Exhibit 5 – Order Relating to Procedures for Resolving Disputes Before Special Master (July 31, 2025) | A0768 – A0771 |
| Arm Exhibit 6 – Deposition of Aparajita Bhattacharya (July 7, 2025) | A0772– A0855 |
| Arm Exhibit 7 – Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) (July 11, 2025) | A0856 – A0885 |
| Arm Exhibit 8 – ARMQC_02770408 (Oct. 22, 2024) | A0886 – A0888 |
| Arm Exhibit 9 – ARMQC_02770392 (Oct. 24, 2024) | A0889 – A0891 |
| Arm Exhibit 10 – ARMQC_02762927 (Oct. 24, 2024) | A0892 – A0914 |
| Arm Exhibit 11 – ARMQC_02762980 (Oct. 23, 2024) | A0915 – A0917 |
| Arm Exhibit 12 – ARMQC_02762919 (Oct. 23, 2024) | A0918 – A0919 |
| Arm Exhibit 13 – ARMQC_02762920 (Oct. 23, 2024) | A0920 – A0921 |
| Arm Exhibit 14 – Stipulated Order for Discovery, Including Discovery of Electronically Stored Information ("ESI") (Mar. 21, 2025) | A0922 – A0939 |
| Arm Exhibit 15 – ARM_00132456 (May 17, 2022) | A0940 – A0941 |
| Arm Exhibit 16 – ARM_00036346 (May 18, 2022) | A0942 – A0946 |
| Arm Exhibit 17 – ARM_01238999 (May 18, 2022) | A0947 – A0952 |
| Arm Exhibit 18 – ARM_01215997 (May 19, 2022) | A0953 – A0958 |
| Arm Exhibit 19 – ARM_01216002 (May 19, 2022) | A0959 – A0964 |
| Arm Exhibit 20 – ARM_01230011 (May 19, 2022) | A0965 – A0971 |
| Arm Exhibit 21 – ARM_01230110 (May 19, 2022) | A0972 – A0976 |

| | |
|---|---|
| Arm Exhibit 22 – ARM_01230123 (May 19, 2022) | A0977 – A0982 |
| Arm Exhibit 23 – QCARM_3059661 (May 20, 2022) | A0983 – A0984 |
| Arm Exhibit 24 – Letter from S. Collins to A. Chaplin (Sept. 26, 2022) | A0985 – A0986 |
| Arm Exhibit 25 – Deposition of Richard Grisenthwaite (July 2, 2025) | A0987 – A1091 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Special Master Hearing (Aug. 14, 2025) | A1092 – A1187 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Special Master Hearing Excerpt (Aug. 22, 2025) | A1188 – A1191 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Plaintiff's Letter to Special Master Helena C. Rychlicki Regarding Newly-Learned Facts and Subsequent Events (Sept. 15, 2025) | A1192 – A1194 |
| Qualcomm Exhibit 1 – Special Master Hearing Excerpt (Aug. 14, 2025) | A1195 – A1197 |
| Qualcomm Exhibit 2 – Special Master Hearing Excerpt (Aug. 22, 2025) | A1198 – A1201 |
| Qualcomm Exhibit 3 – Email from A. Basner to P. Evangelatos et al. re: Qualcomm Inc. v. Arm Holdings PLC.; Case No. 1:24-cv-490 (MN): RFPs (Sept. 14, 2025) | A1202 – A1211 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Defendant Arm Holdings PLC's Response to Qualcomm's September 15, 2025 Letter to Special Master Rychlicki (Sept. 19, 2025) | A1212 – A1217 |
| Qualcomm Exhibit 1 – Meet & Confer Excerpt (July 20, 2025) | A1218 – A1222 |
| Qualcomm Exhibit 2 – Plaintiff's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 1, 2025) | A1223 – A1230 |
| Qualcomm Exhibit 3 – Defendant's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 7, 2025) | A1231 – A1239 |

| | |
|---|---|
| Qualcomm Exhibit 4 – Meet & Confer Excerpt (Sept. 15, 2025) | A1240 – A1247 |
| Qualcomm Exhibit 5 – Email from C. Nyarady to A. Janes et al. re: Qualcomm v. Arm – Meet and Confer (Aug. 29, 2025) | A1248 – A1263 |
| Qualcomm Exhibit 6 – Meet & Confer Excerpt (July 28, 2025) | A1264 – A1267 |
| Qualcomm Exhibit 7 – Email from J. Emerick to C. Nyarady et al. re: Qualcomm v. Arm – Meet and Confer (Sept. 10, 2025) | A1268 – A1284 |
| Qualcomm Exhibit 8 – Defendant Arm Holdings PLC's Support to Arm's Motion to Strike and Compel (D.I. 378) and Opposition to Qualcomm's August 11 Letter Brief to Special Master Rychlicki (Aug. 18, 2025) | A1285 – A1293 |
| Qualcomm Exhibit 9 – Defendant Arm Holdings PLC's Letter Brief to Special Master Rychlicki (Aug. 1, 2025) | A1294 – A1301 |
| Qualcomm Inc. and Qualcomm Techs., Inc. v. Arm Holdings PLC., f/k/a Arm Ltd., C.A. No. 24-490-MN, Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Subsequent Events Relating to Their Motion to Compel Production of Third-Party Licenses and Related Agreements (Oct. 17, 2025) | A1302 – A1306 |
| Qualcomm Exhibit 1 – ARMQC_02798040 (Sept. 8, 2023) | A1308 – A1324 |
| Qualcomm Exhibit 2 – ARMQC_02789082 (Feb. 1, 2022) | A1325 – A1369 |
| Qualcomm Exhibit 3 – ARMQC_02797972 (July 1, 2024) | A1370 – A1381 |
| Qualcomm Exhibit 4 – Email from J. Hartley to P. Evangelatos re: Qualcomm v. Arm – Third Party Agreements (Oct. 16, 2025) | A1382 – A1388 |
| Qualcomm Exhibit 5 – ARMQC_02797778 (Dec. 16, 2021) | A1389 – A1554 |
| Qualcomm Exhibit 6 – Meet and Confer Transcript (Oct. 10, 2025) | A1555 – A1562 |
| Qualcomm Exhibit 7 – Email from A. Basner to P. Evangelatos et al. re: Qualcomm v. Arm, Case No. 1:24-cv-490 (Oct. 15, 2025) | A1563 – A1567 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Subsequent Events Relating to Their Motion to Compel Production of Arm's Analysis of Third-Party Licenses (Oct. 17, 2025) | A1568 – A1570 |

| | |
|---|---|
| Qualcomm Exhibit 1 – Plaintiff's' Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 1, 2025) | A1571 – A1578 |
| Qualcomm Exhibit 2 – Deposition of Akshay Bhatnagar (July 10, 2025) Excerpt | A1579 – A1582 |
| Qualcomm Exhibit 3 – Letter from C. Nyarady to P. Evangelatos (July 11, 2025) | A1583 – A1585 |
| Qualcomm Exhibit 4 – Letter from C. Nyarady to J. Emerick (July 16, 2025) | A1586 – A1592 |
| Qualcomm Exhibit 5 – Letter from J. Emerick to C. Nyarady (July 24, 2025) | A1593 – A1601 |
| Qualcomm Exhibit 6 – Meet & Confer Excerpt (July 28, 2025) | A1602 – A1605 |
| Qualcomm Exhibit 7 – Special Master Hearing Excerpt (Aug. 14, 2025) | A1606 – A1610 |
| Qualcomm Exhibit 8 – Letter from P. Evangelatos to C. Nyarady (Oct. 16, 2025) | A1611 – A1615 |
| Qualcomm Exhibit 9 – Email from J. Hartley re: Qualcomm v. Arm – Production of Spreadsheet (Oct. 6, 2025) | A1616 – A1618 |
| Qualcomm Exhibit 10 – Meet & Confer Excerpt (Oct. 10, 2025) | A1619 – A1622 |
| Qualcomm Exhibit 11 – Plaintiff's Letter to Special Master Helena C. Rychlicki Regarding Subsequent Events relating to their Motion to Compel Production of Third-Party Arm Licenses and Related Agreements (Oct. 17, 2025) | A1623 – A1628 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Defendants Arm Holdings PLC's Response to Qualcomm's October 17, 2025 Letters (Nov. 7, 2025) | A1629 – A1634 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Declaration of Peter Evangelatos in Support of Defendant Arm Holding PLC's Response to Qualcomm's October 17, 2025 (Nov. 7, 2025) | A1635 – A1638 |
| Arm Exhibit 1 – Letter from Anne Shea Gaza to Judge Sherry R. Fallon re: Qualcomm Inc., et al. v. Arm Holdings Plc., C.A. No. 24-490 (MN) (Mar. 13, 2025) | A1639 – A1726 |

viii

| | |
|---|---|
| Arm Exhibit 2 – Qualcomm's Letter to Honorable Sherry R. Fallon in Response to Arm's Letter Regarding Discovery Dispute (D.I. 68) | A1727 – A1735 |
| Arm Exhibit 3 – Deposition of Akshay Bhatnagar Excerpt (July 10, 2025) | A1754 – A1758 |
| Arm Exhibit 4 – Deposition of Karthik Shivashankar Excerpt (June 20, 2025) | A1759 – A1766 |
| Arm Exhibit 5 – Defendant's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 7, 2025) | A1767 – A1775 |
| Arm Exhibit 6 – Email from J. Hartley re: Qualcomm v. Arm – Third Party Agreements (Sept. 24, 2025) | A1776 – A1778 |
| Arm Exhibit 7 – Defendant Arm Holdings PLC's Response to Qualcomm's September 15, 2025 Letter to Special Master Rychlicki (Sept. 19, 2025) | A1779 – A1785 |
| Arm Exhibit 8 – Email from US Courts re: Activity in Case 1:24-cv-00490-MN Qualcomm Incorporated et al v. ARM Holdings PLC Oral Order (Mar. 17, 2025) | A1786 – A1789 |
| Arm Exhibit 9 – Stipulated Protective Order (Mar. 21, 2025) | A1790 – A1829 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Subsequent Events (Nov. 26, 2025) | A1832 – A1834 |
| Qualcomm Exhibit 1 – Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 1, 2025) | A1835 – A1842 |
| Qualcomm Exhibit 2 – Special Master Hearing (Aug. 14, 2025) | A1843 – A1848 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Defendant Arm Holding PLC;s Response to Qualcomm's November 26, 2025 Letter to Special Master Rychlicki (Dec. 3, 2025) | A1849 – A1852 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Declaration of Jay Emerick in Support of Defendant Arm Holding PLC's Response | A1853 – A1857 |

| | |
|---|---|
| to Qualcomm's November 26, 2025 Letter to Special Master Rychlicki (Dec. 3, 2025) | |
| Arm Exhibit 1 – Deposition of Kenneth Siegel (July 4, 2025) Excerpt | A1858 – A1865 |
| Arm Exhibit 2 – Deposition of Paul Kranhold (July 17, 2025) Excerpt | A1866 – A1876 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Plaintiffs' Letter to Special Master Rychlicki Regarding Subsequent Events Relating to Motion to Compel Production of Arm's Architecture License Agreements (Dec. 16, 2025) | A1877 – A1879 |
| Qualcomm Exhibit 1 – Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 1, 2025) | A1880 – A1887 |
| Qualcomm Exhibit 2 – Defendant's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 7, 2025) | A1888 – A1896 |
| Qualcomm Exhibit 3 – Special Master Hearing (Aug. 14, 2025) Excerpt | A1897 – A1900 |
| Qualcomm Exhibit 4 – Deposition of William Abbey (June 26, 2025) Excerpt | A1901 – A1903 |
| Qualcomm Exhibit 5 – Deposition of Rene Haas (July 7, 2025) Excerpt | A1904 – A1906 |
| Qualcomm Exhibit 6 – Letter from S. Collins to A. Chaplin (Dec. 10, 2025) | A1907 – A1938 |
| Qualcomm Exhibit 7 – Arm v. Qualcomm, C.A. No. 22-1146, Pretrial Conference (Nov. 20, 2024) Excerpt | A1939 – A1945 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Defendant Arm Holdings PLC's Response to Qualcomm's December 16, 2023 Letter to Special Master Rychlicki (Dec. 23, 2025) | A1946 – A1949 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Declaration of Peter Evangelatos in Support of Arm Holding PLC's Response to | A1950 – A1953 |

| | |
|---|---|
| Qualcomm's December 16, 2025 Letter to Special Master Rychlicki (Dec. 23, 2025) | |
| Arm Exhibit 1 – Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes (Aug. 1, 2025) | A1956 – A1963 |
| Arm Exhibit 2 – Amended and Restated Architecture License Agreement (ALA) (May 31, 2013) | A1964 – A2007 |
| Arm Exhibit 3 – Plaintiff's Letter to Special Master Rychlicki Regarding Subsequent Events Relating to Motion to Compel Production of Arm's Architecture License Agreement (Dec. 16, 2025) | A2008 – A2011 |
| Arm Exhibit 4 - Letter from S. Collins to A. Chaplin (Dec. 10, 2025) | A2012 – A2043 |
| Arm Exhibit 5 – Deposition of William Abbey (June 26, 2025) Excerpt | A2044 – A2049 |
| *Qualcomm Inc. and Qualcomm Techs., Inc.* v. *Arm Holdings PLC., f/k/a Arm Ltd.*, C.A. No. 24-490-MN, Plaintiffs' Letter to Special Master Rychlicki Regarding Subsequent Events Relating to Arm's Architecture License Agreements (Dec. 26, 2025) | A2050 – A2051 |

xi

# A0495 - A0517
# Redacted in Full

# Exhibit 24

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QUALCOMM INCORPORATED,<br>   a Delaware corporation,<br>QUALCOMM TECHNOLOGIES, INC.,<br>   a Delaware corporation,<br><br>        Plaintiffs,<br><br>   v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>   a U.K. corporation,<br><br>        Defendant. | C.A. No. 24-490 (MN) |

## ARM'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO QUALCOMM'S SECOND SET OF INTERROGATORIES (NOS. 4-11)

Pursuant to Rules 23 and 33 of the Federal Rules of Civil Procedure, and the applicable Local Rules of the United States District Court for the District of Delaware, Defendant Arm Holdings PLC ("Arm") hereby responds to Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm")'s Second Set of Interrogatories (Nos. 4-11).

## GENERAL OBJECTIONS

Arm makes the following general objections, which are hereby incorporated by reference and made part of its response to each and every Interrogatory.

1.    Arm objects to each Interrogatory to the extent it purports to impose upon Arm discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware, orders entered in this case, or agreements among the parties.

2.    Arm objects to the "Instructions" and "Definitions" sections to the extent they purport to alter the plain meaning and/or scope of any specific Interrogatory, on the ground that such alteration renders the Interrogatory vague, ambiguous, overly broad, and/or uncertain, by

withholding of ACK and OOB, including based on an implied covenant of good faith and fair dealing, Arm incorporates by reference its response to Interrogatory No. 1.

Further, Qualcomm's implied covenant allegation is duplicative of Qualcomm's ▇▇▇ breach claim and fails for the same reasons. *See, e.g.*, *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 439 (3d Cir. 1993) (holding that Plaintiff "cannot assert a claim for breach of implied covenants that is based on exactly the same acts which are said to be in breach of express covenants."); *Cision US, Inc. v. CapTech Ventures, Inc.*, No. CV 24-00063-MN-SRF, 2025 WL 1094318, at *5 (D. Del. Apr. 11, 2025) (dismissing Plaintiff's "claim for breach of the implied covenant of good faith and fair dealing … as impermissibly duplicative of its breach of contract and warranty claims.").

### Arm Did Not Breach Any Implied Covenant Of Good Faith And Fair Dealing For The Qualcomm ALA By Allegedly Failing To Negotiate A License To v10

Qualcomm alleges in its Second Amended Complaint that Arm breached an implied covenant of good faith and fair dealing under the ALA by "fail[ing] to negotiate an extension to the QC ALA that would cover future version of the architecture, including v10."  Second Amended Complaint ¶ 184.

That is not true.  On June 4, 2025, Will Abbey, Arm's Chief Commercial Officer, wrote to Qualcomm regarding its request for a v10 license, stating that Arm is prepared to negotiate in good faith for a v10 license and proposed a business meeting:

> Arm is prepared to negotiate in good faith over the terms of a license to the v10 architecture. As the first step in those negotiations, we propose a meeting between our commercial teams to better understand how Qualcomm intends to use the v10 architecture. That will help Arm put together an appropriately tailored licensing proposal. Please let us know a few dates Qualcomm is available for that meeting, and we will let you know our availability.

June 4, 2025 Will Abbey Letter to Roawen Chen.  On June 9, Qualcomm responded, but did not address Mr. Abbey's request for a business meeting.  Further, on June 13, 2025, Arm's Executive

Vice President and Chief Legal Officer Spencer Collins sent Qualcomm another letter again stating

that Arm is prepared to negotiate in good faith:

> On this basis, on June 4, 2025, Will Abbey, Arm's Chief Commercial Officer, proposed in good faith a business meeting regarding Qualcomm's request for a license to Arm's v.10 architecture. Mr. Abbey's offer to meet remains open and Arm continues to believe that such a meeting would be the most efficient path forward in response to Qualcomm's request. Please have the relevant business personnel respond to Mr. Abbey with dates that Qualcomm is available for such a meeting.
>
> * * *
>
> Despite these clear limits on Qualcomm's election rights under the ALA, as we told Qualcomm in 2020, nothing prevents Arm and Qualcomm from discussing a potential license to future versions of the Arm architecture as they become available. Arm remains prepared to negotiate in good faith over the terms of a license to the v.10 architecture.

June 13, 2025 Spencer Collins Letter to Ann Chaplin.

### Arm Is Not Required To Negotiate The Terms And Conditions Of A V10 License Under The Qualcomm ALA Because Qualcomm Did Not Have The Right To Elect V10 In 2020

Qualcomm, in any event, does not allege that Arm breached ▮▮▮▮▮ of the

Qualcomm ALA. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Qualcomm does not accuse Arm of

breaching of this Section. Any implied covenant claim based on ▮▮▮▮▮ thus improperly

"seeks to impose" obligations "beyond those to which the parties actually agreed." *Lamke v.*

*Sunstate Equipment Co., LLC*, 387 F. Supp. 2d 1044, 1047 (N.D. Cal. 2004).

As an initial matter Arm had no obligation to negotiate an extension under ▮▮▮▮▮

based on Qualcomm's May 2020 email because v10 was not in development at that time, and there

were no ███████████████████████████████████████████████ to elect in 2020.  In May 2020, Arm's v10 was not in development, and the parties never reached any ██████ ████████ regarding any future versions of ████████████ that would be covered by a purported election.  In April 2020, Qualcomm reached out to Arm asking if anyone is working on v10 Architecture in the context of seeking an extension to the ALA ██████████████████ ARM_00005340.  Arm responded that "no one is working on v10." *Id.*  Qualcomm responded, stating that "no meaningful discussions can currently be initiated around the terms and conditions for an extension of the ALA Term to cover v10 architecture" and sought to amend the ALA.  *Id.*

On May 15, 2020 Lynn Couillard from Arm wrote to Qualcomm, stating that "[t]he intent of ████████ is to allow for an extension of the agreement as of this point in the term of the agreement.  If there is not desire from Qualcomm to negotiate terms of an extension at this point, but rather to have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire" and that "there is nothing that stops us from discussing next gen architecture or entering into an agreement anytime in the future regardless of the existing agreement":

---

**From:** Lynn Couillard <Lynn.Couillard@arm.com>
**Sent:** Friday, May 15, 2020 9:49 AM
**To:** Brett Bettesworth <betteswb@qti.qualcomm.com>; Rajiv Gupta <grajiv@qti.qualcomm.com>
**Cc:** Todd Lepinski <Todd.Lepinski@arm.com>
**Subject:** [EXT] Re: V10 -->V9 architecture follow-on

Hello Brett and Rajiv, (+Todd)

The intent of section ██████ is to allow for an extension of the agreement as of this point in term of the agreement.  If there is no desire from Qualcomm to negotiate terms of an extension at this point, but rather to have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire.  However, importantly, there is nothing that stops us from discussing next gen architecture or entering into an agreement anytime in the future regardless of the existing agreement.

Note that at the time of the v8 architecture closure, we also included ████████ which at the time had no definition, and eventually became v9.   We are in a similar situation here with regards to visibility on next generation architecture.

Please let us know if you'd like to discuss, we can set something up for next week.

Thanks
Lynn

---

ARM_00005340.  Mr. Bettesworth responded five days later.  He did not dispute any of Ms. Couillard's statements, including that "[t]he intent of ███████ is to allow for an ***extension*** of the agreement ***as of this point in term of the agreement***," and that if Qualcomm desires to "have a discussion around licensing the next architecture sometime in the future, then this portion of the agreement will expire."  He elected to "go ahead and move forward with the extension":

| | |
|---|---|
| From: | Brett Bettesworth [betteswb@qti.qualcomm.com] |
| Sent: | 20/05/2020 20:05:11 |
| To: | Lynn Couillard [Lynn.Couillard@arm.com]; grajiv@qti.qualcomm.com |
| CC: | Todd Lepinski [Todd.Lepinski@arm.com] |
| Subject: | RE: V10 -->V9 architecture follow-on |
| Importance: | High |

Hi Lynn,

Thanks for your email and the note below.  We will go ahead and move forward with the extension at this point, per the ALA optional election.

████████████████████████████████████

We can discuss further at some point in the near future, but wanted to ensure that we provided timely notification of our election here, as mentioned previously.

Sincerely,
Brett

*Id.*

Arm and Qualcomm never reached any mutual agreement over what if any Arm Technology would be included in a purported extension.  And to the extent any agreement was reached, it is that v10 would not be included: after Arm notified Qualcomm that v10 was not in development, Qualcomm acknowledged that "no meaningful discussions can currently be initiated around the terms and conditions for an extension of the ALA Term to cover v10 architecture" and Qualcomm did not dispute any of Ms. Couillard's statements, including that "[t]he intent of ███████ is to allow for an extension of the agreement as of this point in term of the agreement," and that if Qualcomm desires to "have a discussion around licensing the next architecture sometime in the

future, then this portion of the agreement will expire." *Id.* Qualcomm did not follow up on that correspondence, and did not make any effort to follow up on its May 2020 correspondence until five years later, as discussed above. Instead, the parties proceeded with negotiating and finalizing an Annex 1 for v9, which was the only planned architecture at that time.

### Arm Is Not Required To Negotiate The Terms And Conditions Of A V10 License Under The Qualcomm ALA Because Qualcomm's May 2020 Emails Were Not A Valid Election

Arm was not obligated to negotiate an extension of the Qualcomm ALA because Qualcomm's May 2020 emails in which Qualcomm purported to elect to extend the ALA were not a valid election.

 does not include email as a valid or effective method of providing notice under the ALA. Qualcomm's May 20, 2020 email did not give Arm proper notice of its purported election under ▮▮▮▮▮▮ rendering Qualcomm's purported "election" ineffective. Qualcomm did not send Arm follow-up correspondence in compliance with ▮▮▮▮▮ regarding its purported "election," and did not correspond with Arm again about its purported "election" for another five years. But even if Qualcomm had made a valid election, its assertion that Arm breached the implied covenant would be barred by the applicable statute of limitations.

### Arm Did Not Breach The Qualcomm ALA Based On The Alleged Withholding Of ETE Checker Support

Qualcomm does not allege that Arm breached the Qualcomm ALA based on withholding

Dated: July 11, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Matthew J. McIntee
Meredith Pohl
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
matt.mcintee@kirkland.com
meredith.pohl@kirkland.com

Jay Emerick
Adam Janes
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com
adam.janes@kirkland.com

Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP


 */s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings PLC*

66

A0525

(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

A0526

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 11, 2025, a copy of the foregoing document

was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com

Richard S. Zembek
Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000
Houston, TX 77010
richard.zembek@nortonrosefulbright.com

John Poulos
Norton Rose Fulbright US LLP
1045 W. Fulton Market
Suite 1200
Chicago, IL 60607
john.poulos@nortonrosefulbright.com

Ruby J. Garrett
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweiss.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
Anish Desai
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
fpatterson@paulweiss.com
adesai@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

**A0527**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

# Exhibit 25

A0529

# Exhibit 26

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED, a     )
Delaware corporation,        )
QUALCOMM TECHNOLOGIES, INC.,)
a Delaware corporation,      )
                             )
             Plaintiffs, )
                             )
         vs.                 ) C.A. No.: 24-49-MN
                             )
ARM HOLDINGS PLC, f/k/a,     )
ARM LTD. a U.K. corporation,)
                             )
             Defendants.  )
_____)


███████████████████████████


VIDEOTAPED DEPOSITION OF JONATHAN WEISER
San Diego, California
Friday, July 11, 2025


Reported by:
CATHY A. WOOD, RDR, RMR, CRR
CSR No. 2825


_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

A0537

7/11/2025          Qualcomm Incorporated, et al. v. Arm Holdings PLC, et al.    Jonathan Weiser



www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2025                202-232-0646

A0538



# Exhibit 27

A0540

# KIRKLAND & ELLIS LLP

333 West Wolf Point Plaza
Chicago, IL 60654
United States

Adam Janes
To Call Writer Directly:
+1 312 862 3971
adam.janes@kirkland.com

+1 312 862 2000

Facsimile:
+1 312 862 2200

www.kirkland.com

June 23, 2025

**By E-mail**

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton &
  Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064

Re:    *Qualcomm Inc. v. Arm Holdings PLC*, D. Del. Case. No. 24-490-MN

Dear Catherine:

I write in response to your June 19, 2025 letter regarding Arm's sixth document production.

***First***, Arm properly redacted the subject line in the four emails that you cite (ARMQC_02762874, ARMQC_02762876, ARMQC_02762878, ARMQC_02762879).  These are communications between Arm's outside and in-house counsel, and the subject line of these communications contains privileged information that is protected from disclosure by the attorney-client and work product privileges.  Privileged information does not lose its privileged status simply because it is located in the subject line of an email.  Your letter does not explain why you contend Qualcomm is entitled to review this privileged information, but instead references unidentified and unexplained "metadata" that you contend "further confirms that these redactions are improper."  Please identify the metadata you referenced and explain why you contend it supports your position.

***Second***, Arm properly asserted privilege over certain communications with FGS.  Such communications are protected from disclosure including because they were made for the purpose of helping attorneys provide legal advice related to media considerations.  *See, e.g.*, *In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003); *Stardock Sys., Inc. v. Reiche*, 2018 WL 6259536 (N.D. Cal. Nov. 30, 2018).

I trust this letter resolves your concerns.  If not, however, we are willing to meet and confer as you request.

Austin  Bay Area  Beijing  Boston  Brussels  Dallas  Frankfurt  Hong Kong  Houston  London  Los Angeles  Miami  Munich  New York  Paris  Philadelphia  Riyadh  Salt Lake City  Shanghai  Washington, D.C.

## KIRKLAND & ELLIS LLP

Catherine Nyarady
June 23, 2025
Page 2

Sincerely,

*/s/ Adam Janes*

Adam Janes

A0542

# Exhibit 28

A0543

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED a Delaware corporation, ) Case No.

QUALCOMM TECHNOLOGIES, INC., a Delaware        ) 24-490-MN

corporation,                                   )

                                               )

     Plaintiffs,                               )

                                               )

   vs.                                         )

                                               )

ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.       )

corporation,                                   )

                                               )

     Defendant.                                )

_____)

                                         VIDEOTAPED 30(b)(6) and

          30(b)(1) DEPOSITION OF PAUL KRANHOLD

               San Francisco, California

               Thursday, July 17, 2025


          REPORTED BY: Derek L. Hoagland

               CSR No. 13445

# Exhibit 29

A0548

# Exhibit 30

**Appointment**

**From:**          Olson, Erik J. (Palo Alto) [EJOlson@mofo.com]
**Sent:**          21/10/2024 17:32:08
**To:**            Olson, Erik J. (Palo Alto) [EJOlson@mofo.com]; Spencer Collins [Spencer.Collins@arm.com]; Llewellyn, Scott F. [SLlewellyn@mofo.com]

**Subject:**       Redacted
**Location:**      Zoom attached

**Start:**         21/10/2024 19:30:00
**End:**           21/10/2024 20:00:00
**Show Time As:** Busy

**Recurrence:**    (none)

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Erik J. Olson is inviting you to a scheduled Zoom meeting.

Erik J. Olson Standing Zoom Meeting

Join Zoom Meeting
https://mofo.zoom.us/j/126899766?pwd=OTZFcU1PUFBsdEoxbDNLd1hjN2NQQT09

Meeting ID: 126 899 766
Password: 560050

One tap mobile
+16699006833,,126899766# US (San Jose)
+13462487799,,126899766# US (Houston)

Dial by your location
    +1 669 900 6833 US (San Jose)
    +1 346 248 7799 US (Houston)
    +1 312 626 6799 US (Chicago)
    +1 646 876 9923 US (New York)
    +1 253 215 8782 US
    +1 301 715 8592 US
    877 853 5257 US Toll-free
Meeting ID: 126 899 766
Find your local number: https://mofo.zoom.us/u/ad25yvGjWX

Join by SIP
126899766@zoomcrc.com

Join by H.323
162.255.37.11 (US West)
162.255.36.11 (US East)
221.122.88.195 (China)
115.114.131.7 (India Mumbai)
115.114.115.7 (India Hyderabad)

ARMQC_02762874
ARMQC_02762874

213.19.144.110 (EMEA)
103.122.166.55 (Australia)
209.9.211.110 (Hong Kong)
64.211.144.160 (Brazil)
69.174.57.160 (Canada)
207.226.132.110 (Japan)
Meeting ID: 126 899 766
Password: 560050

Join by Skype for Business
https://mofo.zoom.us/skype/126899766

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

A0558

ARMQC_02762875
ARMQC_02762874

# Exhibit 31

A0559

Appointment

| | |
|---|---|
| **From:** | Olson, Erik J. (Palo Alto) [EJOlson@mofo.com] |
| **Sent:** | 22/10/2024 16:30:20 |
| **To:** | Olson, Erik J. (Palo Alto) [EJOlson@mofo.com]; Spencer Collins [Spencer.Collins@arm.com]; Llewellyn, Scott F. [SLlewellyn@mofo.com]; Ehab Youssef [Ehab.Youssef@arm.com]; Robert Calico [Robert.Calico@arm.com] |

**Subject:** | **Redacted**
**Location:** | zoom link below

**Start:** 22/10/2024 18:00:00
**End:** 22/10/2024 18:30:00
**Show Time As:** Busy

**Recurrence:** (none)

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Erik J. Olson is inviting you to a scheduled Zoom meeting.

Erik J. Olson Standing Zoom Meeting

Join Zoom Meeting
https://mofo.zoom.us/j/126899766?pwd=OTZFcU1PUFBsdEoxbDNLd1hjN2NQQT09

Meeting ID: 126 899 766
Password: 560050

One tap mobile
+16699006833,,126899766# US (San Jose)
+13462487799,,126899766# US (Houston)

Dial by your location
    +1 669 900 6833 US (San Jose)
    +1 346 248 7799 US (Houston)
    +1 312 626 6799 US (Chicago)
    +1 646 876 9923 US (New York)
    +1 253 215 8782 US
    +1 301 715 8592 US
    877 853 5257 US Toll-free
Meeting ID: 126 899 766
Find your local number: https://mofo.zoom.us/u/ad25yvGjWX

Join by SIP
126899766@zoomcrc.com

Join by H.323
162.255.37.11 (US West)
162.255.36.11 (US East)
221.122.88.195 (China)
115.114.131.7 (India Mumbai)
115.114.115.7 (India Hyderabad)

ARMQC_02762876
ARMQC_02762876

213.19.144.110 (EMEA)
103.122.166.55 (Australia)
209.9.211.110 (Hong Kong)
64.211.144.160 (Brazil)
69.174.57.160 (Canada)
207.226.132.110 (Japan)
Meeting ID: 126 899 766
Password: 560050

Join by Skype for Business
https://mofo.zoom.us/skype/126899766

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

.

A0561

ARMQC_02762877
ARMQC_02762876

# Exhibit 32

Appointment

| | |
|---|---|
| **From**: | Spencer Collins [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=11FAEEF98BD142AC8759FDDE63F17A21-SPENCER COL] |
| **Sent**: | 21/10/2024 17:45:40 |
| **To**: | Olson, Erik J. (Palo Alto) [EJOlson@mofo.com] |

| | |
|---|---|
| **Subject**: | Redacted |
| **Location**: | Zoom attached |

| | |
|---|---|
| **Start**: | 21/10/2024 19:30:00 |
| **End**: | 21/10/2024 20:00:00 |

| | |
|---|---|
| **Recurrence**: | (none) |

ARMQC_02762878
ARMQC_02762878

A0563

# Exhibit 33

A0564

Appointment

| | |
|---|---|
| **From**: | Spencer Collins [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=11FAEEF98BD142AC8759FDDE63F17A21-SPENCER COL] |
| **Sent**: | 22/10/2024 17:11:37 |
| **To**: | Olson, Erik J. (Palo Alto) [EJOlson@mofo.com] |

**Subject**: ┊ **Redacted** ┊
**Location**: zoom link below

**Start**: 22/10/2024 18:00:00
**End**: 22/10/2024 18:30:00


**Recurrence**: (none)

A0565

ARMQC_02762879
ARMQC_02762879

Case 1:24-cv-00490-MN    Document 723    Filed 02/27/26    Page 62 of 416 PageID #: 51583

# Exhibit 34

**A0566**

# KIRKLAND & ELLIS LLP

333 West Wolf Point Plaza
Chicago, IL 60654
United States

Adam Janes
To Call Writer Directly:
+1 312 862 3971
adam.janes@kirkland.com

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

June 30, 2025

**By E-mail**

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton &
  Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064

Re:    *Qualcomm Inc. v. Arm Holdings PLC*, Case. No. 24-490-MN (D. Del.)

Dear Counsel:

Pursuant to Paragraph 54 of the Stipulated Protective Order (D.I. 84), Defendant Arm Holdings PLC hereby notifies Plaintiffs that the documents beginning with the following Bates numbers were inadvertently produced with metadata containing privileged information:

ARMQC_02762874
ARMQC_02762876
ARMQC_02762878
ARMQC_02762879
ARMQC_02762898
ARMQC_02762901
ARMQC_02762906
ARMQC_02762912
ARMQC_02762949
ARMQC_02762966
ARMQC_02762967
ARMQC_02762968
ARMQC_02762969
ARMQC_02762971
ARMQC_02762972
ARMQC_02762977
ARMQC_02762978
ARMQC_02762979

Austin  Bay Area  Beijing  Boston  Brussels  Dallas  Frankfurt  Hong Kong  Houston  London  Los Angeles  Miami  Munich  New York  Paris  Philadelphia  Riyadh  Salt Lake City  Shanghai  Washington, D.C.

# KIRKLAND & ELLIS LLP

Catherine Nyarady
June 30, 2025
Page 2


These documents constitute and contain information subject to the attorney-client privilege and/or the work product immunity doctrine. Consistent with this letter and within 10 calendar days, Plaintiffs, without any (further) examination of this document, shall either return to us all copies of the listed documents or destroy the documents and provide us with certification of such destruction.

Arm will be re-producing these documents shortly with corrections to their metadata.

Sincerely,

*/s/ Adam Janes*

Adam Janes

# Exhibit 35

# IIIORRISON FOERSTER

707 WILSHIRE BOULEVARD
SUITE 6000
LOS ANGELES
CALIFORNIA  90017-3543

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, MIAMI,
NEW YORK, PALO ALTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

Writer's Direct Contact
+1 (213) 892-5348
NFung@mofo.com

March 19, 2025

BY EMAIL

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re:     *Qualcomm Inc. v. Arm Holdings Plc.*, C.A. No. 24-00490-MN (D. Del.)

Counsel:

We write regarding the parties' meet and confers on February 28 and March 3 regarding Arm's Objections and Responses to Qualcomm's First Set of RFPs, and Qualcomm's February 24, March 3, and March 7 letters regarding the same.

**Qualcomm's RFP 1**. RFP 1 requests "[a]ll Documents and Communications Arm referenced, relied upon, or otherwise used in drafting its Answer." During the March 3 meet and confer, Qualcomm raised, for the first time, a purported issue with Arm's response not including documents "relied upon, or otherwise used." Arm confirms that it will produce non-privileged and non-work product documents in its possession, custody, or control located through a reasonable, proportional, and targeted search that Arm referenced, relied upon, or otherwise used in drafting its Answer. Arm understands that Qualcomm's purported issues with Arm's objections and response to RFP 1 have been resolved.

**Qualcomm's RFP 4**. RFP 4 requests "[a]ll Documents and Communications concerning ████ to the ██████████ or bug fixes, updates, corrections, or any other technical improvement or information licensed under the Qualcomm ALA that was, after June 1, 2022, delivered to any other Arm licensee but not to Qualcomm." Qualcomm's March 3 letter includes multiple inaccuracies concerning the parties' discussions of this RFP during the meet and confers. Arm did not agree to produce documents for this RFP, nor did Arm indicate that "it would provide internal or external communications about the provision or non-provision of IP, deliverables or support to Qualcomm." (3/3/2025 letter from C. Nyarady to N. Fung at 1.) Rather, based on Qualcomm's explanation during the meet and confer of what information Qualcomm sought from RFP 4, Arm asked Qualcomm whether the production of documents sufficient to show deliverables, ██████████, and other

**A0570**

**ΙΙΙORRISON ϜOERSTER**

C. Nyarady
March 19, 2025
Page Two

documents provided to Arm's third-party ALA licensees through Arm's websites would suffice. Qualcomm responded that Arm's proposed compromise would not capture, for example, communications regarding withholding materials from Qualcomm. Arm identified its responses to Qualcomm's RFPs where Arm agreed, for example, to "produce non-privileged and non-work product documents in its possession, custody, or control located through a reasonable, proportional, and targeted search through the use of agreed-upon search terms with agreed-upon custodians concerning" Qualcomm's allegations of (1) "the withholding of ███████████, the ACK, or OOB from Qualcomm" (RFP 10), (2) "Arm's withholding of the ACK and OOB from Qualcomm" (RFP 29), and (3) "withholding ████ ████████ from Qualcomm" (RFP 39). Arm asked how Arm's responses to these RFPs do not address Qualcomm's concerns with Arm providing communications regarding Arm's alleged withholding from Qualcomm. Qualcomm contends Arm's responses are still insufficient because Arm's proposal for RFP 4 and other similar RFPs would not capture communications regarding the importance (or lack thereof) of what is being provided, or indicate when it was provided, and to whom. Qualcomm also expressed concerns with whether Arm was proposing to provide a list of what was provided to third-party ALA licensees, versus, for example, the actual deliverable or support materials.

Qualcomm has not alleged, and has no basis to allege, that Arm failed to provide Qualcomm with anything except for the ACK and OOB tests requested by Qualcomm. Additionally, as Arm has explained, Qualcomm received the same documents made available to all ALA licensees, including ACK releases provided to all ALA licensees, consistent with the timing such documents were provided to other licensees. Arm remains willing to provide documents sufficient to show the centralized distribution of documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal. Documents and communications concerning to whom the documents were provided, when they were provided, and the purported importance of such documents are irrelevant where Qualcomm has no basis to allege that any such documents were withheld from Qualcomm.

**Qualcomm's RFP 6**. RFP 6 requests "[a]ll versions of the ACK released after June 1, 2022, and any patches thereto." During the March 3 meet and confer, Qualcomm asked, for the first time, that Arm confirm it will produce the actual ACK and patches thereto, including source code. Arm has explained that Qualcomm received the same documents made available to all third-party ALA licensees, including ACK releases. Additionally, Arm has already agreed to search for and produce documents sufficient to show the centralized distribution of documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal. Qualcomm has not explained the relevance of the actual ACK, including source code, to its claims. Nonetheless, Arm is willing to consider Qualcomm's request for source code to the extent Qualcomm has a legitimate basis for making such request.

**A0571**

**IIIORRISON FOERSTER**

C. Nyarady
March 19, 2025
Page Seven

claims it was entitled to under the Qualcomm ALA. Additionally, Arm is already agreeing to search for and produce documents sufficient to show the centralized distribution of such documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal.

**Qualcomm's RFPs 28 and 32**. RFP 28 requests "[a]ll Documents and Communications concerning delivery of ███████████████, or bug fixes, updates, corrections, or any other technical improvement licensed under ALAs to third parties (*i.e.*, parties other than Qualcomm), including documents sufficient to show the licensee, the date of delivery, and the terms of any such delivery for any delivery that was not provided to Qualcomm." RFP 32 requests "[a]ll Documents and Communications related to or concerning the delivery of ACK patches to any ALA partner other than Qualcomm." Arm understands that the parties' positions regarding RFPs 28 and 32 are similar to RFPs 4 and 26. Like RFPs 4 and 26, Arm remains willing to provide documents sufficient to show the centralized distribution of documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal. Documents and communications concerning to whom the documents were provided, when they were provided, and the purported importance of such documents are irrelevant where Qualcomm has no basis to allege that any such documents were withheld from Qualcomm.

**Qualcomm's RFP 31**. RFP 31 requests "[a]ll Documents and Communications related to or concerning each ACK patch released since June 1, 2022, including documents related to the development process for each patch, the timeline for development, and each version of the Arm Architecture that the patch corresponds to." During the March 3 meet and confer, Qualcomm raised, for the first time, a purported issue with Arm's response not including the "the timeline for development, and each version of the Arm Architecture that the patch corresponds to." (3/7/2025 letter from C. Nyarady to N. Fung at 2-3.) Arm confirmed that, consistent with its objections and responses, Arm was searching for documents as kept in the ordinary course sufficient to show the development process for the ACK releases made available to all ALA licensees during the relevant time period. Arm further confirms that, consistent with its objections and response, Arm will produce non-privileged and non-work product documents in its possession, custody, or control located through a reasonable, proportional, and targeted search sufficient to show the general timeline for ACK releases provided to all ALA licensees.

**Qualcomm's RFP 33**. RFP 33 requests "[a]ll Documents and Communications concerning OOB tests, including the development process for OOB tests, the timeline to configure the ACK through the use of OOB tests, and any manuals or presentations describing the use of OOB tests with the ACK." During the March 3 meet and confer, Qualcomm raised, for the first time, a purported issue with Arm's response not including the "timeline to configure the ACK through the use of OOB tests." (3/7/2025 letter from C.

A0572

**IIIORRISON FOERSTER**

C. Nyarady
March 19, 2025
Page Eight

Nyarady to N. Fung at 2-3.) Arm confirms that, consistent with its objections and responses, it will conduct a reasonable, proportional, and targeted search for documents as kept in the ordinary course sufficient to show the development process for OOB, including documents showing the timeline for the OOB generally, if any.

**Qualcomm's RFPs 34 and 40**. RFP 34 requests "[a]ll Documents and Communications concerning any negotiations that Arm had with TLA licensees (including Third Parties) for the ███████████████████████████████████████ ███████ cores, and CPUs codenamed ████████████████████ and ████████████ including but not limited to price quotes, license fees, licensing term limits, or other language to include in TLA Annexes." RFP 40 requests "[a]ll Documents and Communications concerning Arm's discussions with Qualcomm regarding licensing of the ████████████ ████████████████████████████████████████████████████████ software test libraries for the ████████████ and ████████████, and CPUs codenamed ████████████████████████ and ████████████, including discussions regarding potentially withholding any of the listed items, pricing of the items, and any potential restrictions related to the use of the items in Qualcomm's products, including in any chips that contained designs or source code that originated at Nuvia." Arm explained during the March 3 meet and confer that Arm's TLAs are not relevant to Qualcomm's claims concerning Arm's alleged failure to provide documents under the Qualcomm ALA. Notably, Qualcomm admitted during the meet and confer that its allegations regarding TLAs in the FAC are not tied to any of its claims in the FAC. Rather, Qualcomm's position is that the FAC generally alleges that Arm acted in bad faith, and that Qualcomm is entitled to use discovery to confirm whether Arm's alleged conduct extended to the TLAs. (*See* 3/7/2025 letter from C. Nyarady to N. Fung at 3 (explaining that Qualcomm "intends to take discovery on any behavior by Arm towards Qualcomm intended to undermine Qualcomm's position in the marketplace or otherwise treat Qualcomm unfairly" and that it was seeking discovery "that could form the basis for an additional claim").) Qualcomm is not entitled to discovery on matters that are not relevant to any claims or defenses in this action, such as the Qualcomm TLA. Unless and until Qualcomm is permitted to amend its Complaint to add claims for which RFPs 34 and 40 may be relevant, Arm stands by its objections to RFPs 34 and 40 and Qualcomm's other RFPs relating to the Qualcomm TLA based on those issues not being in the case.

**Qualcomm's RFPs 37, 42-44**. RFPs 37 and 42-44 request documents and communications regarding licensing of ██, why Arm moves from one version of its ISA to another, and differences between versions of Arm's ISA. Arm understands that the parties' positions regarding these RFPs are similar to RFPs 14 and 15. As Arm explained during the meet and confers, ██ is not relevant to Qualcomm's Complaint. Regardless of whether Qualcomm incorporates all of the allegations in the Complaint into Qualcomm's good faith and fair dealing claim, paragraph 136 identifies the allegations that Qualcomm contends

**A0573**

**IIIORRISON FOERSTER**

C. Nyarady
March 19, 2025
Page Thirteen


       **Production Under Delaware Local Rule 26.2**. On March 17, 2025, the Court issued an oral order resolving the parties' dispute regarding the ESI order and PO. (*See* D.I. 74.) Arm confirms that it is proceeding with searching for and producing documents in accordance with the Court's March 17 oral order and the ESI order and PO in this action. Arm understands that this resolves Qualcomm's purported concerns regarding Arm's production of documents under Delaware Local Rule 26.2.


Sincerely,

*/s/ Nicholas Fung*

Nicholas Fung

A0574

# Exhibit 36

**IIIORRISON FOERSTER**

707 WILSHIRE BOULEVARD
SUITE 6000
LOS ANGELES
CALIFORNIA  90017-3543

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, MIAMI,
NEW YORK, PALO ALTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

May 7, 2025

Writer's Direct Contact
+1 (213) 892-5348
NFung@mofo.com

BY EMAIL

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re:    *Qualcomm Inc. v. Arm Holdings Plc.*, C.A. No. 24-00490-MN (D. Del.)

Counsel:

We write in response to Qualcomm's April 22, 2025, letter regarding the parties'
April 17, 2025 meet and confer regarding Arm's Objections and Responses to Qualcomm's
Second Set of Requests for Production, served on March 24, 2025.

**Arm's General Objection 17**.  During the April 17, 2025, meet and confer, Arm confirmed
that, subject to other objections and unless otherwise specified or agreed, Arm will produce
non-privileged and non-work product documents dating from January 1, 2019, until the date
of Arm's objections and responses to Qualcomm's first set of RFPs, February 20, 2025, to
the extent any such documents exist; are in its possession, custody, and control; and are
located after a reasonable search.  Arm confirms that, subject to other objections and unless
otherwise specified or agreed, Arm will use the following end dates: RFP Nos. 54, 62:
March 24, 2025; RFP Nos. 65, 66, 67, 77, 80, 81: January 8, 2025; RFP Nos. 87, 88:
December 31, 2024; RFP No. 111: November 13, 2024; RFP No. 113: February 7, 2025.

**RFP 54**.  RFP 54 requests "[a]ll Documents and Communications relating to or concerning
improvements Qualcomm suggested for the Arm Architecture, including but not limited to
suggestions made at Technical Advisory Board (TAB) Meetings."  Arm responded that it
will "produce non-privileged and non-work product documents in its possession, custody, or
control located through a reasonable, proportional, and targeted search sufficient to show the
annual Technical Advisory Board Meeting minutes."  As explained during the April 17 meet
and confer, Arm objects to this Request not only on relevance, but also because the Request
is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent
it seeks, for example, "[a]ll Documents and Communications relating to or concerning
improvements Qualcomm suggested for the Arm Architecture," regardless of whether the
improvements were solely suggested by Qualcomm or whether the improvements were

A0576

MORRISON FOERSTER

Catherine Nyarady
May 7, 2025
Page Five

response to RFP 77.  Nonetheless, in an attempt to resolve disputes and avoid burdening the Court, Arm remains willing to expand its agreed search and production for this Request to include documents sufficient to show Arm's engineering effort related to the creation of Qualcomm and Nuvia ACK patches since June 1, 2022, if doing so will resolve the parties' disputes regarding this RFP.

**RFP 77**.  RFP 77 requests "[a]ll Documents and Communications relating to or concerning the development of ACK patches, including documents showing the number of Arm employees working on development of each patch and the hours spent designing each patch." Arm responded that it will "produce non-privileged and non-work product documents in its possession, custody, or control located through a reasonable, proportional, and targeted search through the use of search terms and custodians relating to or concerning the development of ACK releases that were made available to all third-party ALA licensees after June 1, 2022."  As Arm has repeatedly explained and as stated in Arm's response to Qualcomm's Interrogatory No. 2, an "ACK patch is a partner-specific solution to a partner-specific ACK test issue, and when that solution is relevant to all ALA licensees, Arm typically incorporates the solution into its next quarterly ACK release, which is made available to all ALA partners, including Qualcomm." (3/24/2025 Arm Objs. & Resps. to Qualcomm First Set of Interrogatories, at 8).  Partner specific ACK patches and documents relating to or concerning the development of partner-specific ACK patches are not relevant to Qualcomm's claims concerning whether Arm withheld certain materials that Qualcomm claims it was entitled to under the Qualcomm ALA.  Accordingly, Arm stands by its objections as related to the development of third-party ACK patches.  However, during the April 17 meet and confer, Arm asked whether Qualcomm would consider Arm agreeing to, for example, documents related to the development of Qualcomm and Nuvia ACK Patches since June 1, 2022.  As noted above regarding RFP 67, Qualcomm responded during the meet and confer that it believed Arm's offer was for a null set, but Qualcomm has seemingly changed its position in its April 22 letter and now seeks confirmation whether Arm will agree to produce such documents.  (*See* 4/22/2025 letter from C. Nyarady to N. Fung at 4-5.).  In an attempt to resolve disputes and avoid burdening the Court, Arm remains willing to expand its agreed search and production for this Request to include documents related to the development of Qualcomm and Nuvia ACK patches since June 1, 2022, if doing so will resolve the parties' disputes regarding this RFP.

**RFP 82**.  Arm understands that Qualcomm's purported concerns with Arm's objections and response to RFP 82 have been resolved.  (*See* 4/22/2205 letter from C. Nyarady to N. Fung at 5.)

**RFP 83**.  RFP 83 requests "[a]ll Documents and Communications with third parties concerning the RISC-V Architecture and its competition with the Arm Architecture."  Arm responded that it will "produce non-privileged and non-work product documents in its

**A0577**

**MORRISON FOERSTER**

Catherine Nyarady
May 7, 2025
Page Seven


Sincerely,

*/s/ Nicholas Fung*

Nicholas Fung

cc:  All Counsel of Record (by email)

# Exhibit 37

A0579

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,
  a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
  Delaware corporation

      Plaintiffs,

    v.

ARM HOLDINGS PLC, f/k/a, ARM LTD.
  a U.K. corporation

      Defendant.

C.A. No. 24-490-MN

## DEFENDANT ARM HOLDINGS PLC'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' NOTICE OF 30(b)(6) DEPOSITION

Pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, Arm Holdings PLC ("Arm"), hereby objects and responds to the 30(b)(6) Deposition Notice to Arm, which was served by Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc., (collectively, "Plaintiffs" or "Qualcomm"), on June 13, 2025 ("30(b)(6) Notice").

## GENERAL OBJECTIONS

The following General Objections to the 30(b)(6) Notice are incorporated into each of Arm's responses to the specific topics provided in the 30(b)(6) Notice ("Topics"), as if fully stated therein, regardless of whether the General Objections are incorporated specifically into the specific responses below. The failure to mention any of the following General Objections in the specific responses below shall not be deemed a waiver of such General Objection.

1.    Arm incorporates by reference its objections to Qualcomm's First and Second Set of Interrogatories and to Qualcomm's First, Second, Third, Fourth, and Fifth Sets of Requests for Production as if fully set forth herein.

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information regarding what Arm provided licensees other than Qualcomm under or relating to license agreements to which Qualcomm is not a party.

Subject to and without waiving its General Objections and Specific Objections, Arm will make available one or more witnesses to testify as to non-privileged, relevant information in Arm's possession, custody or control that is known or reasonably available to Arm regarding Arm's provision of materials and support to Qualcomm under the Qualcomm ALA.

**TOPIC NO. 13:**

Qualcomm's ACK and OOB tests, and any patches thereto.

**RESPONSE TO TOPIC NO. 13:**

Arm objects to this Topic as vague as to the term "patches" regarding "OOB tests." Arm further objects to this Topic as overbroad and unduly burdensome to the extent it seeks information concerning "any patches" of Qualcomm's ACK and OOB tests, including patches not relevant to any party's claim or defense in this case and/or not proportional to the needs of the case. Arm further objects to this Topic to the extent it seeks information that is at least as available to Qualcomm as it is to Arm.

Subject to and without waiving its General Objections and Specific Objections, Arm will make available one or more witnesses to testify as to non-privileged, relevant information in Arm's possession, custody or control that is known or reasonably available to Arm regarding ACK and OOB tests for Qualcomm, if any, and Arm's provision to Qualcomm of patches thereto, if any.

**TOPIC NO. 14:**

ACKs, ACK patches, and OOB tests provided to partners other than Qualcomm on or after June 1, 2022, including dates of delivery, identity of partners, and information or documentation contained in the packages provided to the partners.

17

**RESPONSE TO TOPIC NO. 14:**

Arm objects to this Topic as vague as to the term "patches," "partners," "delivery," "information," "documentation," and "packages."  Arm further objects to this Topic to the extent it seeks information that is more readily accessible through other means of discovery, including information concerning "documentation."  Arm further objects to this Topic as overbroad and unduly burdensome to the extent it seeks information concerning unspecified "partners" and "packages provided to the partners," including "partners" and "packages" not relevant to any party's claim or defense in this case and/or not proportional to the needs of the case.  Arm further objects to this Topic as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information regarding what Arm provided licensees other than Qualcomm under or relating to license agreements to which Qualcomm is not a party.

Subject to and without waiving its General Objections and Specific Objections, Arm will make available one or more witnesses to testify as to non-privileged, relevant information in Arm's possession, custody or control that is known or reasonably available to Arm regarding Arm's provision of quarterly ACK releases to its ALA partners, including Qualcomm.

**TOPIC NO. 15:**

The release and delivery of the ACK, OOB tests, and patches generally to ALA partners, including but not limited to how Arm determines when a partner should receive the aforementioned items and Arm's development efforts and the resources devoted to those efforts.

**RESPONSE TO TOPIC NO. 15:**

Arm objects to this Topic as vague as to the term "release," "delivery," "patches," "partners," "development efforts," and "resources."  Arm further objects to this Topic as overbroad and unduly burdensome to the extent it seeks information concerning unspecified "partners," including partners not relevant to any party's claim or defense in this case and/or not proportional to the needs of the case.  Arm further objects to this Topic as overbroad, unduly burdensome, and

18

**RESPONSE TO TOPIC NO. 40:**

Arm objects to this Topic as vague as to the term "role." Arm further objects to this Topic to the extent it seeks information that is publicly available. Arm further objects to this Topic to the extent it seeks information that is not within the possession, custody, or control of Arm. Arm further objects to this Topic as overbroad and unduly burdensome because it is not relevant to any party's claim or defense in this case and/or not proportional to the needs of the case.

Arm will not provide a witness for this Topic.

**TOPIC NO. 41:**

Changes in Arm's behavior towards Qualcomm as a result of the jury verdict in *Arm* v. *Qualcomm* (22-1146-MN).

**RESPONSE TO TOPIC NO. 41:**

Arm objects to this Topic as vague as to the terms "[c]hanges," "behavior," and "as a result of." Arm further objects to this Topic to the extent it seeks information protected by the attorney-client privilege, common interest privilege, attorney work product doctrine, or any other applicable privileges and protections. Arm further objects to this Topic to the extent it fails to describe with reasonable particularity the "changes in Arm's behavior towards Qualcomm" to be examined.

Subject to and without waiving its General Objections and Specific Objections, Arm will make available one or more witnesses to testify as to non-privileged, relevant information in Arm's possession, custody or control that is known or reasonably available to Arm and regarding Arm's provision of materials and support to Qualcomm under the Qualcomm ALA since the jury verdict in *Arm* v. *Qualcomm* (22-1146-MN).

**TOPIC NO. 42:**

Communications or discussions between Arm and non-Qualcomm Linaro Core Members about Qualcomm or ███████.

41

seeks information protected by the attorney-client privilege, common interest privilege, attorney

work product doctrine, or any other applicable privileges and protections.

Arm will not provide a witness regarding this Topic.

Dated:  June 19, 2025

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP


 */s/ Robert M. Vrana*
 Anne Shea Gaza (No. 4093)
 Robert M. Vrana (No. 5666)
 Samantha G. Wilson (No. 5816)
 Rodney Square
 1000 North King Street
 Wilmington, DE  19801
 (302) 571-6600
 agaza@ycst.com
 rvrana@ycst.com
 swilson@ycst.com
 *Attorneys for Defendant Arm Holdings PLC*

45

Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

46

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 19, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com

Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
mzappala@dirllp.com

Ruby J. Garrett
Erin J. Morgan
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweis.com
ejmorgan@paulweiss.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

**A0586**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert M. Vrana*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

A0587

# Exhibit 38

A0588

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation,

        Plaintiffs,

    v.

ARM HOLDINGS PLC, a U.K. corporation,

        Defendant.

C.A. No. 24-490-MN

█████████████

## ARM HOLDINGS PLC'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO QUALCOMM'S THIRD SET OF REQUESTS FOR PRODUCTION (NOS. 121-156)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure; the District's Default Standard for Discovery, Including Discovery of Electronically Stored Information ("Default Standard"), and Stipulation and Order governing ESI in this case (together with the Default Standard, the "ESI Order"); any Protective Order entered in this case (the "Protective Order"), the District of Delaware Local Civil Rules (together with the ESI Order and the Protective Order, the "Local Rules"), and any agreements by the parties or orders by the Court, Arm Holdings plc ("Arm") submits the following responses and objections to Qualcomm Inc. and Qualcomm Technologies, Inc.'s (together "Qualcomm") Third Set of Requests for Production of Documents and Things to Arm Holdings plc (Nos. 121-156), dated April 2, 2025 (each a "Request" and collectively the "Requests").

## PRELIMINARY STATEMENT

1.      Arm's responses to the Requests ("Responses") are made in accordance with the

requested subject matter. Arm objects to this Request as seeking information that is protected by the attorney-client privilege, the work- product doctrine, the common interest privilege, or any other applicable privilege or immunity. Arm objects to this Request as duplicative of Request No. 141.

**REQUEST FOR PRODUCTION NO. 143:**

All Documents and Communications relating to or concerning ▮▮▮▮▮▮▮▮.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 143:**

Subject to its General Objections and any specific objections set forth below, Arm is willing to meet and confer with Qualcomm regarding the relevant scope of this Request and a relevant, reasonable time period applicable to the Request.

Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "[a]ll Documents and Communications" regarding the requested subject matter. Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case in that it is not limited to a relevant, reasonable time period. Arm objects to this Request to the extent it seeks production of documents not relevant to any Party's claims or defenses. Arm objects to this Request as seeking information that is protected by the attorney-client privilege, the work- product doctrine, the common interest privilege, or any other applicable privilege or immunity.

**REQUEST FOR PRODUCTION NO. 144:**

All Documents and Communications relating to or concerning the facts discussed in Arm's response to Qualcomm's Interrogatory Number 3.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 144:**

Subject to its General Objections and any specific objections set forth below, Arm is willing to meet and confer with Qualcomm regarding the relevant scope of this Request and a relevant, reasonable time period applicable to the Request.

Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "[a]ll Documents and Communications" regarding the requested subject matter. Arm objects to this Request to the extent it seeks production of documents not relevant to any Party's claims or defenses. Arm objects to this Request as seeking information that is protected by the attorney-client privilege, the work- product doctrine, the common interest privilege, or any other applicable privilege or immunity. Arm objects to this Request to the extent it seeks information that Arm is restricted by law or contract from disclosing, such as information subject to a confidentiality agreement with a third party, and will not produce any such documents absent agreement of the third party(ies) or Court Order. Arm objects to this Request as duplicative of Request No. 112. Arm objects to this Request as cumulative of other Requests. Arm incorporates its objections to Qualcomm's Interrogatory Number 3.

**FIRST SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 144:**

Subject to its General Objections, any specific objections set forth below, and in accordance with the ESI Order, Arm will produce non-privileged and non-work product documents in Arm's possession, custody, or control located through a reasonable, proportional, and targeted search consistent with its response to Qualcomm's Interrogatory No. 3.

Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "[a]ll Documents and Communications" regarding the

A0591

requested subject matter. Arm objects to this Request to the extent it seeks production of documents not relevant to any Party's claims or defenses. Arm objects to this Request as seeking information that is protected by the attorney-client privilege, the work- product doctrine, the common interest privilege, or any other applicable privilege or immunity. Arm objects to this Request to the extent it seeks information that Arm is restricted by law or contract from disclosing, such as information subject to a confidentiality agreement with a third party, and will not produce any such documents absent agreement of the third party(ies) or Court Order. Arm objects to this Request as duplicative of Request No. 112. Arm objects to this Request as cumulative of other Requests. Arm incorporates its objections to Qualcomm's Interrogatory No. 3.

**REQUEST FOR PRODUCTION NO. 145:**

All Communications with FGS Global concerning Qualcomm, including but not limited to Arm's October 22, 2024 letter, and all Communications related to meetings or calls between FGS Global and Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 145:**

Subject to its General Objections, any specific objections set forth below, and in accordance with the ESI Order, Arm will produce non-privileged and non-work product communications between Arm and FGS Global concerning Arm's October 22, 2024 letter in Arm's possession, custody, or control located through a reasonable, proportional, and targeted search.

Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "[a]ll Communications" regarding the requested subject matter. Arm objects to this Request as overbroad, unduly burdensome, and not

28

A0592

October 22, 2024 letter in Arm's possession, custody, or control located through a reasonable, proportional, and targeted search.

Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "[a]ll Communications" regarding the requested subject matter. Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case in that it is not limited to a relevant, reasonable time period. Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Arm objects to this Request as seeking information that is protected by the attorney-client privilege, the work- product doctrine, the common interest privilege, or any other applicable privilege or immunity.

**REQUEST FOR PRODUCTION NO. 149:**

All Communications with Kenneth Siegel at Morrison & Foerster concerning Arm's October 22, 2024 letter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 149:**

Subject to its General Objections, any specific objections set forth below, and in accordance with the ESI Order, Arm will produce non-privileged and non-work product communications between Arm and Kenneth Siegel at Morrison & Foerster concerning Arm's October 22, 2024 letter in Arm's possession, custody, or control located through a reasonable, proportional, and targeted search.

Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "[a]ll Communications" regarding the requested subject matter. Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case in that it is not limited to a relevant, reasonable time period.

33

Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents related to Plaintiff's pending Motion for Leave to Amend the First Amended Complaint. Arm objects to this Request as seeking information that is protected by the attorney-client privilege, the work- product doctrine, the common interest privilege, or any other applicable privilege or immunity.

**REQUEST FOR PRODUCTION NO. 150:**

All Documents and Communications relating to Kenneth Siegel's role on the Board of Directors of Softbank.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 150:**

Subject to its General Objections and any specific objections set forth below, Arm is willing to meet and confer with Qualcomm regarding the relevant scope of this Request and a relevant, reasonable time period applicable to the Request.

Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "[a]ll Documents and Communications" regarding the requested subject matter. Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case in that it is not limited to a relevant, reasonable time period. Arm objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Arm objects to this Request to the extent it seeks production of documents not relevant to any Party's claims or defenses. Arm objects to this Request as seeking information that is protected by the attorney-client privilege, the work- product doctrine, the common interest privilege, or any other applicable privilege or immunity.  Arm objects to this Request to the extent it seeks information that Arm is restricted by law or contract from disclosing, such as information subject to a confidentiality agreement with a third party, and will not produce any

34

Dated: June 17, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP


_/s/ Robert M. Vrana_
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings PLC*

38

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 17, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com

Melissa F. Zappala
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
mzappala@dirllp.com

Ruby J. Garrett
Erin J. Morgan
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweis.com
ejmorgan@paulweiss.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

# Exhibit 39

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
C.A. No. 24-490-MN
-------------------------------------x
QUALCOMM INCORPORATED, a Delaware
corporation, QUALCOMM TECHNOLOGIES, INC.,
a Delaware corporation,

                    Plaintiffs,

      - against -

ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K.
corporation

                    Defendant.

-------------------------------------x

            June 20, 2025
            9:20 a.m.

    VIDEOTAPED DEPOSITION of MARTIN
WEIDMANN, held at the offices of PAUL WEISS
RIFKIND WHARTON & GARRISON, LLP, located at
1285 Avenue of the Americas, New York, New
York 10019, before Anthony Giarro, a
Registered Professional Reporter, a Certified
Realtime Reporter and a Notary Public of the
State of New York.

# Exhibit 40

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

C.A. No. 24-490-MN

------------------------------------------x

QUALCOMM INCORPORATED, a Delaware

corporation, QUALCOMM TECHNOLOGIES, INC.,

a Delaware corporation,

                     Plaintiffs,

- against -

ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K.

corporation

                     Defendant.

------------------------------------------x

                July 30, 2025

                  9:10 a.m.

              VIDEOTAPED DEPOSITION of

ANUPA GEORGE, held at the offices of PAUL WEISS

RIFKIND WHARTON & GARRISON, LLP, located at 1285

Avenue of the Americas, New York, New York

10019, before Danielle Grant, a Certified

Realtime Reporter and a Notary Public of the

State ofNew York.

# Exhibit 41

A0606

**MORRISON FOERSTER**

707 WILSHIRE BOULEVARD
SUITE 6000
LOS ANGELES
CALIFORNIA  90017-3543

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, MIAMI,
NEW YORK, PALO ALTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

Writer's Direct Contact
+1 (213) 892-5348
NFung@mofo.com

May 2, 2025

BY EMAIL

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re:    *Qualcomm Inc. v. Arm Holdings Plc.*, C.A. No. 24-00490-MN (D. Del.)

Counsel:

We write in response to Qualcomm's April 15, 2025, letter regarding the parties' April 3, April 4, and April 8, 2025, meet and confers regarding Arm's Objections and Responses to Qualcomm's Second Set of Requests for Production and First Set of Interrogatories, both served on March 24, 2025.

**TLA-Related RFPs (Nos. 53, 55, 56, 57, 58, 59, 60, 61, 63, 71, 72, 85, 94, 89, 90, 95, 100)**.  As stated in Arm's March 19, 2025, letter regarding Qualcomm's first set of RFPs related to Arm's TLA agreements with Qualcomm, unless and until Qualcomm is permitted to amend its Complaint to add claims relating to the Qualcomm TLA, Arm stands by its objections to Qualcomm's RFPs relating to the Qualcomm TLA based on those issues not being in the case.  (*See* 3/19/2025 letter from N. Fung to C. Nyarady.)  Arm also stands by its objections to Qualcomm's RFPs seeking third-party TLAs and TLA Annexes and all documents and communications relating to various aspects of such agreements as not relevant to any claims or defenses, and as overbroad, unduly burdensome and not proportional to the needs of the case.

**RFP 53**.  RFP 53 requests "[a]ll Documents and Communications relating to or concerning improvements Qualcomm suggested for Arm's off-the-shelf TLA cores."  During the April 3 meet and confer, Arm inquired about the relevance of this Request and whether Qualcomm was willing to narrow the Request considering it seeks, for example, all documents and communications relating to or concerning all improvements that Qualcomm suggested for any Arm off-the-shelf TLA core for all time.  Qualcomm contends this Request is relevant to "whether Arm has taken recommendations that Qualcomm has suggested for its cores and benefitted from those while at the same time seeking to undermine Qualcomm's

A0607

**ΙΙΙORRISON ΞOERSTER**

C. Nyarady
May 2, 2025
Page Nine

***Non-TLA Related RFPs***.  Arm addresses below the Requests in Qualcomm's Second Set of Requests for Production that Arm understands Qualcomm does not contend are related to its claims regarding the Qualcomm TLA in its pending amended Complaint.

**RFP 68**.  RFP 68 requests "[a]ny agreements entered into by Arm in which Arm agreed to provide any other Arm licensee with ███████████████, ██████████ █████████████████████████████████████████████  During the April 4 meet and confer, Arm inquired about the relevance of this Request and asked whether the Request is tied to any of Qualcomm's claims.  Arm understands that Qualcomm is not willing to narrow this Request.  As Arm has explained, Arm's agreements with third parties and whether third parties were licensed the same materials in the same way as Qualcomm are not relevant to Qualcomm's claims concerning whether Arm withheld certain materials that Qualcomm claims it was entitled to under the Qualcomm ALA.  This is particularly true considering Arm's belief that Qualcomm has no basis to allege that the materials identified in this Request were withheld from Qualcomm under the Qualcomm ALA.  Additionally, Arm has already agreed to search for and produce, and has in fact produced, documents sufficient to show the centralized distribution of such documents, and such documents made available by such distributions, to all third-party ALA licensees, including via Arm's PDH portal.

**RFP 69**.  RFP 69 requests "[a]ll royalty reports received by Arm from any of the licensees of the agreements in RFP Number 68."  During the April 4 meet and confer, Arm inquired about the relevance of this Request and asked whether the Request is tied to any of Qualcomm's claims.  Qualcomm contends this Request "is relevant to damages and that the royalty reports would likely shed light on licensing terms that could only be gleaned from royalty reports."  (4/15/2025 letter from C. Nyarady to N. Fung at 6.)  Arm understands that Qualcomm is not willing to narrow this Request.  As Arm has explained, Arm's agreements with third parties and the royalties received by Arm from those third parties are not relevant to Qualcomm's claims concerning whether Arm withheld certain materials that Qualcomm claims it was entitled to under the Qualcomm ALA and any resulting damages allegedly suffered by Qualcomm.  Additionally, Arm has already agreed to produce financial information in response to various other Qualcomm RFPs (*see, e.g.*, RFPs 23, 24, 81, 82, 83) and Qualcomm fails to explain why its needs the additional information requested in RFP 69.

**RFP 73**.  RFP 73 requests "[a]ll Documents and Communications relating to or concerning the licensing of the ETE Instr Trace Chkr Module Src Armv9-A to Qualcomm."  During the April 4 meet and confer, Arm inquired about the relevance of this Request and asked whether the Request is tied to any of Qualcomm's claims.  Qualcomm contends "that the ETE Checker is part of the ACK, and that documents about its licensing is relevant to Qualcomm's ACK withholding claims," as Qualcomm contends withheld the configuration or enablement of the ETE Instr Trace Chkr Module Src Armv9-A.  (4/15/2025 letter from C. Nyarady to N. Fung at 6.)  Arm understands that the only narrowing Qualcomm has offered

# ΙΙΙORRISON FOERSTER

C. Nyarady
May 2, 2025
Page Seventeen

relevant to the issues in the case and, regardless, the Request is overbroad, unduly burdensome, and not proportional to the needs of the case. Additionally, considering Qualcomm's articulation of the purported relevance of these Requests, it is unclear why Qualcomm would need all documents and communications related to or concerning the subject matter.

**ROG 3**. In addition to Qualcomm's Second Set of Requests for Production, the parties met and conferred regarding Qualcomm's Interrogatory No. 3 on April 8. ROG 3 requests that Arm "[d]escribe, in detail, all facts and circumstances, including the status, of any development or plans to develop v10 of the Arm ISA and any licensing thereof. Your response should include (i) an identification of any features including in v10 of the Arm ISA that were not included in v9 of the Arm ISA and a description of the incremental value, if any, of each feature, (ii) the date(s) on which Arm began discussing development of v10 and any projected timelines for its development or release, (iii) the identity of any partners who have requested a license to v10 and (iv) the terms and conditions of any license proposal from Arm (v) a list of all Persons affiliated with Arm involved in such communications or negotiations, (vi) a list of the Persons affiliated with Arm with the most knowledge of the development or licensing of v10 of the Arm ISA, and (vii) an identification of all documents (by Bates number) that support your response." As explained during the April 8 meet and confer, while Qualcomm's complaint includes allegations that Arm failed to respond to Qualcomm's inquiries regarding v10, Arm disagrees that v10 is relevant to Qualcomm's claims in the case. Paragraph 136 of the FAC identifies the allegations that Qualcomm contends supports its good faith and fair dealing claim, and there is no reference to v10 or Arm's obligations under Section 14 of the Qualcomm ALA. Moreover, Qualcomm's articulation of the alleged relevance of v10 technical information does not support the broad scope of information sought from ROG 3.

Sincerely,

*/s/ Nicholas Fung*

Nicholas Fung

cc: All Counsel of Record (by email)

**A0609**

# Exhibit 42

A0610

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

QUALCOMM INCORPORATED, a Delaware
corporation, QUALCOMM TECHNOLOGIES, INC.,
a Delaware corporation,

                         Plaintiff,

              -against-
ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K.
corporation,

                         Defendant.

C.A. No. 24-490 (MN)

_____

                         July 2, 2025
                         9:09 a.m.

                 ████████████████████
                 ████████████████████

        DEPOSITION of RICHARD
GRISENTHWAITE, taken by Plaintiff,
pursuant to Notice, held at the offices of
PAUL WEISS RIFKIND WHARTON & GARRISON LLP,
1285 Avenue of the Americas, New York, New
York before Wayne Hock, a Notary Public of
the State of New York.

Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

A0612

# Exhibit 43

A0613

**IIIORRISON FOERSTER**

707 WILSHIRE BOULEVARD
SUITE 6000
LOS ANGELES
CALIFORNIA  90017-3543

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, MIAMI,
NEW YORK, PALO ALTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

July 5, 2025

Writer's Direct Contact
+1 (213) 892-5348
NFung@mofo.com

BY EMAIL

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re:    *Qualcomm Inc. v. Arm Holdings Plc.*, C.A. No. 24-00490-MN (D. Del.)

Counsel:

We write in response to your June 23, 2025 letter.

First, your assertion that Arm is "hiding behind" its document production in *Arm v. Qualcomm* is not well taken. As previously explained, Arm produced a substantial volume of documents in the prior action that are relevant and responsive to Qualcomm's RFPs in this action, evidenced by the fact that 1,700 emails and 30 chat messages produced in the prior action hit on search terms employed in this action. Qualcomm cannot now claim that Arm's production is insufficient simply because it also includes technical documents that Qualcomm requested through its overly broad RFPs.

Second, your contention that Arm's elusion testing is premature ignores the purpose of elusion testing. While the ESI Order contemplates elusion testing "after the parties come to agreement on reasonable terms," D.I. 85 ¶ 2(b)(i), Arm performed the testing to validate the sufficiency of the terms it had applied and disclosed. The test showed a responsiveness rate of less than 0.0005%—far below the 10% threshold set forth in the ESI Order—thus confirming that Arm's search terms are not "overly narrow," as you suggest. The ESI Order also contemplates that additional null set sampling can be performed later.  To the extent Qualcomm's concern is that Arm should run further elusion testing later, Arm is not refusing to do so and can revisit this issue as appropriate.

Third, Qualcomm's proposed modifications to its ten proposed additional search terms and Arm's seventh search term still return a unreasonably large number of hits. *See* **Exhibit A**.  Applying these modifications would result in a population of nearly 450,000 new documents for Arm to review. In view of Arm's elusion test validating its current search

**A0614**

ꟾꟾꟾORRISON ꟻOERSTER

C. Nyarady
July 5, 2025
Page Two


terms, Arm objects to Qualcomm's proposed modifications as they are likely to return a disproportionate amount of non-responsive or immaterial ESI. In addition, reviewing this volume of documents, even if Arm doubled its review team to over 60 attorneys, would take approximately two months. Over the past month, Arm has agreed to modify its search terms in response to Qualcomm's proposals and, in addition, has undertaken a broad ESI search for documents responsive to Qualcomm's RFPs relating to allegations in the SAC. Given that Arm has already validated its search terms through elusion testing, and your letter does not identify any specific categories of documents you contend are missing from Arm's production, we will not agree to further modifications of Arm's search terms. However, Arm will continue to consider any further narrowing that Qualcomm proposes. We expect that Qualcomm will respond in kind by responding to and engaging in good faith on Arm's proposed modifications to Qualcomm's search terms. *See* Ltr. N. Fung to C. Nyarady (Jun. 30, 2025).

Fourth, regarding your comments on Arm's search terms relating to the SAC, you first request that Arm add search terms relating to peripheral TLA IP and take issue with the terms ███████████████████████." As we have explained during our meet and confer regarding Arm's supplemental RFP responses, peripheral TLA IP is not relevant to any of the claims in this case. The SAC fails to identify any alleged "peripheral TLA IP" that Arm supposedly withheld, how or when Arm withheld them, and there is no mention of or allegations in the SAC regarding any of the products you mentioned other than █████ ████████████ Indeed, that you contend the SAC has a single paragraph "referencing" peripheral IP in passing confirms Arm's understanding. Arm's search string, moreover, appropriately uses the code names of the TLA products at issue. The search string at issue hits on 4,808 documents inclusive of families. We do not believe that further modifications to this search string are warranted.

Regarding your request that Arm employ search terms relating to v9 of the Arm ISA, Arm did not agree to conduct a custodial ESI search employing search terms in response to Qualcomm's RFP Nos. 42 or 102. Although you acknowledge that the SAC "has a claim related to the licensing of v10," your letter merely asserts in conclusory fashion that "v9 is relevant." It remains unclear how "v9 is relevant" to allegations regarding v10.

We are available to meet and confer regarding both our June 30, 2025 letter regarding Qualcomm's search and the subject matter of this letter, splitting time equally.

Sincerely,

*/s/ Nicholas Fung*

Nicholas Fung

**IIIORRISON FOERSTER**

C. Nyarady
July 5, 2025
Page Three

cc: All Counsel of Record (by email)

## EXHIBIT A

The following is a hit count report for Qualcomm's modifications to its ten additional proposed search terms and to Arm's seventh search term, excluding documents that have already been reviewed by Arm.

| Search Term | Documents with hits | Documents with hits including family |
|---|---|---|
| (QC OR Qualcomm OR QCom*) w/10 (ALA OR "Architecture License Agreement" OR licens* OR agreement* OR contract*) | 21,327 | 25,004 |
| (QC OR Qualcomm OR QCom* OR quicksilver) w/10 (OOB OR "out of box" OR "Architecture Compliance Kit" OR ACK OR "Architecture Verification Suite" AVS OR "Architecture Compliance Suite" ACS OR patch* OR error* OR report* OR deliverable* OR test* OR update* OR bug* OR fix* OR verif* OR support OR compl* OR waiv*) | 34,145 | 52,134 |
| (QC OR Qualcomm OR QCom*) w/10 (withhold* OR withheld* OR stop* OR "cut off" OR approv* OR access* OR delay* OR hold OR (legal w/5 approv*)) | 10,445 | 27,413 |
| (QC OR Qualcomm OR QCom*) w/10 (verif OR deliv* OR support OR breach*) | 16,701 | 32,383 |
| ((QC OR Qualcomm OR QCom*) w/10 (letter OR breach* OR corresp* OR notic*)) AND (inform* OR notif* OR tell* OR custom* OR partner) | 3,279 | 3,774 |
| (ALA OR "Architecture License Agreement" OR "LES-TLA-20039" OR licens* OR agreement OR contract OR annex OR version) w/10 (exten* OR ████ OR v10 OR (future w/5 arch*)) | 125,340 | 228,530 |

**A0616**

**IIIORRISON FOERSTER**

C. Nyarady
July 5, 2025
Page Four

| | | |
|---|---|---|
| (QC OR Qualcomm OR QCom*) w/10 (status OR update* OR inform*) AND (licens* OR agreement OR contract OR expir* OR termin* OR renew* OR valid OR invalid OR breach) | 10,933 | 25,732 |
| ((QC OR Qualcomm OR QCom*) w/10 (termin* OR expir* OR breach* OR stop)) AND (revenue OR profit OR market OR opportun* OR share OR grow OR vertical OR compet* OR future) | 886 | 1,103 |
| (QC OR Qualcomm OR QCom*) AND ((CPU* OR SoC* OR system*) w/10 (compet* OR time* OR TTM OR intercept*)) | 6,425 | 9,427 |
| (ALA* OR architect* OR "Architecture Compliance Kit" OR ACK OR "Architecture Compliance Suite" OR ACS OR "Architecture Validation Suite" OR AVS OR "Out of Box" OR OOB) w/10 (patch* OR release* OR document* OR error* OR correction* OR update* OR extension* OR modification* OR maint* OR enhancement*) | 146,909 | 349,762 |
| (QC OR Qualcomm OR QCom*) AND ((breach* OR terminat* OR status) w/10 (ALA OR "Architecture License Agreement" OR arch* OR license)) | 1,006 | 1,486 |

# Exhibit 44

A0618

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED, a )
Delaware corporation, QUALCOMM )
TECHNOLOGIES, INC., a Delaware )
corporation, )
                                    )
        Plaintiffs, )
                                    )
        vs. ) C.A. No. 24-490(MN)
                                    )
ARM HOLDINGS PLC, f/k/a ARM )
LTD., a U.K. corporation, )
                                    )
        Defendant. )
_____ )

████████████████████████

VIDEO-RECORDED DEPOSITION OF RENE HAAS

Monday, July 7, 2025
Palo Alto, California

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 7428967

A0619

# Exhibit 45

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED a Delaware corporation, ) Case No.
QUALCOMM TECHNOLOGIES, INC., a Delaware        ) 24-490-MN
corporation,                                   )
                                               )
     Plaintiffs,                               )
                                               )
   vs.                                         )
                                               )
ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K.        )
corporation,,                                  )
                                               )
     Defendant.                                )
_____)

████████████████  VIDEOTAPED

DEPOSITION OF APARAJITA BHATTACHARYA

Palo Alto, California

Monday, July 7, 2025


REPORTED BY: Derek L. Hoagland

CSR No. 13445

A0623

# Exhibit 46

A0626

Message

**From:**      Danya Al-Qattan [Danya.Al-Qattan@FGSGlobal.com]
**Sent:**      24/10/2024 03:04:16
**To:**        Spencer Collins [Spencer.Collins@arm.com]; Ami Badani [Ami.Badani@arm.com]
**CC:**        Paul Kranhold [Paul.Kranhold@fgsglobal.com]; Kelli McCloughan [Kelli.McCloughan@arm.com]; Jason Child [Jason.Child@arm.com]
**Subject:**   Priv & Confidential

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

# Redaction - Privileged

**From:** Spencer Collins <Spencer.Collins@arm.com>
**Sent:** Wednesday, October 23, 2024 8:08 PM
**To:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>; Kelli McCloughan <Kelli.McCloughan@arm.com>; Jason Child <Jason.Child@arm.com>
**Subject:** Re: Richard Waters - FT

A0627                                    ARMQC_02762949

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Adding Jason (cfo and under whom IR sits) given time in UK (me) and the US (Jason).

Thanks

Sent from Outlook for iOS

**From:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>
**Sent:** Thursday, October 24, 2024 12:19 AM
**To:** Spencer Collins <Spencer.Collins@arm.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>; Kelli McCloughan <Kelli.McCloughan@arm.com>
**Subject:** RE: Richard Waters - FT

> Warning: EXTERNAL SENDER, use caution when opening links or attachments.

FYI just wrapped. Was helpful to give him that context.

**From:** Danya Al-Qattan
**Sent:** Wednesday, October 23, 2024 5:25 PM
**To:** Spencer Collins <Spencer.Collins@arm.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>; Kelli McCloughan <Kelli.McCloughan@arm.com>
**Subject:** RE: Richard Waters - FT

Great. Kelli, please let me know when might work for Rene. Does he happy to have availability in the next hour or so?

**From:** Spencer Collins <Spencer.Collins@arm.com>
**Sent:** Wednesday, October 23, 2024 5:17 PM
**To:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>; Kelli McCloughan <Kelli.McCloughan@arm.com>
**Subject:** Re: Richard Waters - FT

Rene is willing and able to do - suggest we use him.

Added Kelli here to arrange for ASAP.

I'm also available to join if recommended

Sent from Outlook for iOS

**From:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>
**Sent:** Wednesday, October 23, 2024 9:27:32 PM
**To:** Spencer Collins <Spencer.Collins@arm.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Subject:** Richard Waters - FT

> Warning: EXTERNAL SENDER, use caution when opening links or attachments.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

ARMQC_02762950

Danya Al-Qattan
Partner
O. _____
M. _____
E. _____

212.687.8080
713.628.2118
danya.al-qattan@fgsglobal.com



IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.
IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

ARMQC_02762951

Message

| | |
|---|---|
| **From:** | Danya Al-Qattan [Danya.Al-Qattan@FGSGlobal.com] |
| **Sent:** | 23/10/2024 13:51:21 |
| **To:** | Spencer Collins [Spencer.Collins@arm.com]; Ami Badani [Ami.Badani@arm.com] |
| **CC:** | Paul Kranhold [Paul.Kranhold@fgsglobal.com] |
| **Subject:** | **Redacted - Privileged** |

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Fyi

---

**Stocks Are Lower**
CNBC: Squawk on the Street
23 October 2024

VIDEO LINK

**Danya Al-Qattan**
Partner | New York
M. ____          (713) 628-2118

O. ____          (212) 687-8080

---

**From:** Danya Al-Qattan
**Sent:** Wednesday, October 23, 2024 8:04:01 AM
**To:** Spencer Collins <Spencer.Collins@arm.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Subject:** Redacted - Privileged

# Redacted - Privileged

---

**From:** Spencer Collins <Spencer.Collins@arm.com>
**Sent:** Wednesday, October 23, 2024 6:59 AM
**To:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Subject:** Redacted - Privileged

ARMQC_02762912

# Redacted - Privileged

**From:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>
**Date:** Wednesday, 23 October 2024 at 11:47
**To:** Ami Badani <Ami.Badani@arm.com>, Spencer Collins <Spencer.Collins@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Subject:** Redacted - Privileged

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

# Redacted - Privileged

Arm to Scrap Qualcomm Chip Design License in Feud Escalation
Bloomberg News
By Ian King
22 October 2024

- *Arm sued its longtime partner for breach of contract in 2022*
- *The company gave Qualcomm a 60-day notice of cancellation*

Arm Holdings Plc is canceling a license that allowed longtime partner Qualcomm Inc. to use Arm intellectual property to design chips, escalating a legal dispute over vital smartphone technology.

Arm, based in the UK, has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a document seen by Bloomberg. The contract allows Qualcomm to create its own chips based on standards owned by Arm.

The showdown threatens to roil the smartphone and personal computer markets, as well as disrupting the finances and operations of two of the most influential companies in the semiconductor industry.

Qualcomm sells hundreds of millions of processors annually — technology used in the majority of Android smartphones. If the cancellation takes effect, the company might have to stop selling products that account for much of its roughly $39 billion in revenue, or face claims for massive damages.

The move ratchets up a legal fight that began when Arm sued San Diego-based Qualcomm — one of its biggest customers — for breach of contract and trademark infringement in 2022. With the cancellation notice, Arm is giving the US company an eight-week period to remedy the dispute.

ARMQC_02762913

Representatives for Arm declined to comment. A Qualcomm spokesperson said the British company was trying to "strong-arm a longtime partner."

It "appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless," the spokesperson said in an emailed statement. "We are confident that Qualcomm's rights under its agreement with Arm will be affirmed."

The two are headed to a trial to resolve the breach-of-contract claim by Arm and a countersuit by Qualcomm. The disagreement centers on Qualcomm's 2021 acquisition of another Arm licensee and a failure — according to Arm — to renegotiate contract terms. Qualcomm argues that its existing agreement covers the activities of the company that it purchased, the chip-design startup Nuvia.

Nuvia's work on microprocessor design has become central to new personal computer chips that Qualcomm sells to companies such as HP Inc. and Microsoft Corp. The processors are the key component to a new line of artificial intelligence-focused laptops dubbed AI PCs. Earlier this week, Qualcomm announced plans to bring Nuvia's design — called Oryon — to its more widely used Snapdragon chips for smartphones.

Arm says that move is a breach of Qualcomm's license and is demanding that the company destroy Nuvia designs that were created before the Nuvia acquisition. They can't be transferred to Qualcomm without permission, according to the original suit filed by Arm in the US District Court in Delaware. Nuvia's licenses were terminated in February 2023 after negotiations failed to reach a resolution.

Like many others in the chip industry, Qualcomm relies on an instruction set from Cambridge, England-based Arm, a company that has created much of the underlying technology for mobile electronics. An instruction set is the basic computer code that chips use to run software such as operating systems.

If Arm follows through with the license termination, Qualcomm would be prevented from doing its own designs using Arm's instruction set. It would still be able to license Arm's blueprints under separate product agreements, but that path would cause significant delays and force the company to waste work that's already been done.

Prior to the dispute, the two companies were close partners that helped advance the smartphone industry. Now, under newer leadership, both of them are pursuing strategies that increasingly make them competitors.

Under Chief Executive Officer Rene Haas, Arm has shifted to offering more complete designs — ones that companies can take directly to contract manufacturers. Haas believes that his company, still majority owned by Japan's SoftBank Group Corp., should be rewarded more for the engineering work it does. That shift encroaches on the business of Arm's traditional customers, like Qualcomm, who use Arm's technology in their own final chip designs.

Meanwhile, under CEO Cristiano Amon, Qualcomm is moving away from using Arm designs and is prioritizing its own work, something that potentially makes it a less lucrative customer for Arm. He's also expanding into new areas, most notably computing, where Arm is making its own push. But the two companies' technologies remain intertwined, and Qualcomm isn't yet in a position to make a clean break from Arm.

Arm was acquired in 2016 by SoftBank, and part of it was sold to the public in an offering in September of last year. The Japanese company still owns more than 80% of the Arm.

Arm has two types of customers: companies that use its designs as the basis for their chips and ones that create their own semiconductors and only license the Arm instruction set.

Qualcomm is no stranger to licensing disputes. The company gets a large chunk of its profit from selling the rights to its own technology — a key part of mobile wireless communications. Its customers include Samsung Electronics Co. and Apple Inc., the two biggest smartphone makers.

ARMQC_02762914

Qualcomm emerged victorious in 2019 from a wide-ranging legal fight with Apple. It also won a court decision on appeal against the US Federal Trade Commission, which alleged that the company was using predatory licensing activities.

_____

**Arm Holdings to cancel Qualcomm chip design license, Bloomberg News reports**
Reuters News (*updates highlighted)*
By Sameer Manekar, Surbhi Misri, and Jahnavi Nidumolu
22 October 2024

Arm Holdings is cancelling an architectural license agreement that allows Qualcomm to use intellectual property to design chips, Bloomberg News reported on Tuesday, amid an ongoing legal battle between the two companies.

Arm has given Qualcomm a mandated 60-day notice of the cancellation of the licensing agreement, the report said, adding that the contract allows Qualcomm to create its own chips based on standards owned by Arm.

UK-based Arm, which is majority-owned by Japan's SoftBank Group, sued Qualcomm in 2022 for failing to negotiate a new license after it acquired Nuvia.

Arm had previously said the current design planned for Microsoft's Copilot+ laptops is a direct technical descendant of Nuvia's chip and it had cancelled the license for these chips.

"This is more of the same from ARM – more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license," a Qualcomm spokesperson said in an emailed statement.

"With a trial fast approaching in December, Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed. Arm's anticompetitive conduct will not be tolerated."

Arm declined to comment on the report.

The legal battle between the two tech giants is scheduled to begin in the federal court in Delaware in December.

An Arm victory in the litigation could force Qualcomm and its roughly 20 partners, including Microsoft, to halt shipments of the new laptops. It would also essentially unwind one of Qualcomm's biggest strategic acquisitions in recent years.

Despite the public fight between the two companies that rely on each other for revenue and profit, some investors and analysts believe they will reach a settlement well ahead of the trial.

_____

Arm cancels Qualcomm's chip design licence amid legal dispute
*The SoftBank-backed company is battling the US semiconductor maker over royalty payments*
Financial Times
By Michael Acton
22 October 2024

SoftBank's Arm has told US chipmaker Qualcomm it will cancel its chip design licence, raising the stakes in an intellectual property dispute set to go to trial in December.

Qualcomm confirmed the move on Tuesday, accusing Arm of "strong-arm" tactics designed to increase royalty rates for its intellectual property, which will "disrupt the legal process" under way in the US.

ARMQC_02762915

Many of Qualcomm's chips use Arm's design architecture, meaning a revocation of its licence potentially puts billions of dollars of revenue at risk.

The relationship between the two chipmakers soured in 2022, when Arm sued Qualcomm, one of its biggest customers, over its $1.4bn acquisition of chip design firm Nuvia.

Arm claims the deal led to the use of its intellectual property without its permission, allegations Qualcomm denies. The litigation has shone a light on its complicated licensing arrangements for its chip design architectures.

In its statement, Qualcomm said that Arm's justification for terminating the licensing contract was "completely baseless".

It added: "This is more of the same from Arm — more unfounded threats designed to strong-arm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture licence."

Arm declined to comment. Qualcomm and Arm's shares did not immediately react to the news in after-hours trading on Tuesday.

The high-stakes clash between two of the world's most prominent chip companies comes as both are riding a wave of optimism around artificial intelligence. Their shares have risen higher this year, driven by expectations that new generative AI applications such as virtual assistants will boost hardware sales.

The news of the legal document sent to Qualcomm was first reported by Bloomberg. Arm's move triggers a mandatory 60-day period for Qualcomm to respond before the licence is revoked.

UK-based Arm, acquired by Japan's SoftBank in 2016, made its blockbuster debut on the US Nasdaq in September last year. The company's chip designs are used by a wide range of companies including Nvidia and Apple.

This week, Qualcomm is holding its annual tech summit in Hawaii, where it announced a new processing chip for mobile phones, the 'Snapdragon 8 elite'. Earlier this year, Qualcomm unveiled a line of CPU chips for a new generation of AI-enabled PCs based on Arm's architecture.

Chief executive Rene Haas has described Arm as the "most ubiquitous computer architecture on the planet". It competes with X86, the architecture used by Qualcomm rivals Intel and AMD.

The patent fight with Qualcomm is due to go to trial in Delaware on December 16.

_____

Arm will cancel Qualcomm's license to make the Snapdragon X Elite
*Arm's notice is evidence that the legal battle between the two just heated up in a hurry.*
PCWorld
By Mark Hachman
22 October 2024

Arm Ltd. has notified its licensee Qualcomm, informing the company that its architectural license will be terminated in 60 days — the agreement that allows Qualcomm to manufacture the Oryon CPU cores at the heart of the Snapdragon X Elite chip and Copilot+ PCs.

PCWorld has independently confirmed an earlier Bloomberg report that Arm is canceling the architectural license agreement, the agreement that allows Qualcomm to manufacture custom cores, like the company's Oryon processor. Qualcomm called the cancellation notice "more unfounded threats" and that it looks forward to a trial in December that is set to resolve the issue.

ARMQC_02762916

In the fall of 2022, Arm sued Qualcomm, seeking an injunction that would have forced Qualcomm to destroy the chip designs that a company called Nuvia developed. Qualcomm bought Nuvia in 2021, in a bid to beef up its own Arm-based CPU designs. Arm, in turn, argued that it should have been allowed to approve the deal and cancelled Nuvia's licenses in 2023, according to Bloomberg. Since then, the suit has quietly simmered without any real action or rhetoric by either side, even as the two sides nailed down a court date in December.

Now, the stakes have been raised significantly. Arm designs its own CPU cores, known as Cortex, and licenses them to companies like Qualcomm, Mediatek, and others. That license remains in place. But Qualcomm is entertaining partners, analysts and media at the Snapdragon Summit in Maui, where the company launched its next-generation Oryon core that the company claims is actually faster than Intel's Lunar Lake chip. Embarrassing? Very much so.

Arm declined to comment. Qualcomm, however, issued a statement calling the action a "desperate ploy."

"This is more of the same from Arm – more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license," Qualcomm said, in a company statement emailed to PCWorld by a company representative. "With a trial fast approaching in December, Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed. Arm's anticompetitive conduct will not be tolerated."

Right now, Arm and Qualcomm still have an agreement by which Qualcomm could make chips based on Arm's finished Cortex cores. But those cores proved unable to keep up with x86 designs from Intel and AMD.

The Oryon cores at the heart of the Snapdragon X Elite processor has proven far more competitive, and are arguably the most power-efficient chip for the PC. Now those cores are in jeopardy because of Arm's action, setting up either a heated negotiation process or an even more fervent battle in court in a few months.

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

ARMQC_02762917

Message

---

| | |
|---|---|
| **From:** | Jeff Kvaal [Jeff.Kvaal@arm.com] |
| **Sent:** | 29/10/2024 14:51:28 |
| **To:** | Katie Happ [Katie.Happ@arm.com]; Ami Badani [Ami.Badani@arm.com]; Emma-Jayne Spruce [Ej.Spruce@arm.com]; Danya Al-Qattan [Danya.Al-Qattan@fgsglobal.com]; Saumil Shah [Saumil.Shah@arm.com] |
| **Subject:** | Redacted - Privileged |

Thanks Katie!  I believe it is fair to say for all that they will be fielding questions from their respective constituents so would benefit from joining - certainly true for Ian and Alexis, and Ami just emailed Kristen that she should join.

-----Original Message-----
From: Katie Happ <Katie.Happ@arm.com>
Sent: Tuesday, October 29, 2024 10:49 AM
To: Ami Badani <Ami.Badani@arm.com>; Emma-Jayne Spruce <Ej.Spruce@arm.com>; Danya Al-Qattan <Danya.Al-Qattan@fgsglobal.com>; Jeff Kvaal <Jeff.Kvaal@arm.com>; Saumil Shah <Saumil.Shah@arm.com>
Subject: Redacted - Privileged

Invite has been sent.  I did not include Ian, Alexis and Kristen per list below, but will send an email to the larger group saying it's been scheduled.

Katie

-----Original Message-----
From: Ami Badani <Ami.Badani@arm.com>
Sent: Monday, October 28, 2024 7:42 PM
To: Katie Happ <Katie.Happ@arm.com>; Emma-Jayne Spruce <Ej.Spruce@arm.com>; Danya Al-Qattan <Danya.Al-Qattan@fgsglobal.com>; Jeff Kvaal <Jeff.Kvaal@arm.com>; Saumil Shah <Saumil.Shah@arm.com>
Cc: Spencer Collins <Spencer.Collins@arm.com>
Subject: Redacted - Privileged

Spencer and I just spoke.

**Redacted - Privileged**

Spencer (legal)
Ami (comms)
Danya + Megan from FGS (comms litigation team) Jeff (IR) Saumil (Chief of Staff)

Spencer frees up at 5pm EST so hoping we can find an hour (30 mins min) that could work for everyone above.

Katie - can you find time for all of us tomorrow?

Thanks.

A0636

ARMQC_02762979

**From:** Danya Al-Qattan
**Sent:** Tuesday, October 22, 2024 5:34 PM PDT
**To:** Ami Badani <Ami.Badani@arm.com>
**Subject:** BN: Arm to Cancel Qualcomm Chip Design License in Escalation of Feud

See below. **Work Product, Attorney Client Privilege**

**Arm to Cancel Qualcomm Chip Design License in Escalation of Feud**
Bloomberg News
By Ian King
22 October 2024

- *Arm sued its longtime partner for breach of contract in 2022*
- *The company gave Qualcomm a 60-day notice of cancellation*

Arm Holdings Plc is canceling a license that allowed longtime partner Qualcomm Inc. to use Arm intellectual property to design chips, escalating a legal dispute over vital smartphone technology.

Arm, based in the UK, has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a document seen by Bloomberg. The contract allows Qualcomm to create its own chips based on standards owned by Arm.

The showdown threatens to roil the smartphone and personal computer markets, as well as disrupting the finances and operations of two of the most influential companies in the semiconductor industry.

Qualcomm sells hundreds of millions of processors annually — technology used in the majority of Android smartphones. If the cancellation takes effect, the company might have to stop selling products that account for much of its roughly $39 billion in revenue, or face claims for massive damages.

The move ratchets up a legal fight that began when Arm sued San Diego-based Qualcomm — one of its biggest customers — for breach of contract and trademark infringement in 2022. With the cancellation notice, Arm is giving the US company an eight-week period to remedy the dispute.

Representatives for Arm and Qualcomm declined to comment.

The two are headed to a trial to resolve the breach-of-contract claim by Arm and a countersuit by Qualcomm. The disagreement centers on Qualcomm's 2021 acquisition of another Arm licensee and a failure — according to Arm — to renegotiate contract terms. Qualcomm argues that its existing agreement covers the activities of the company that it purchased, the chip-design startup Nuvia.

Nuvia's work on microprocessor design has become central to new personal computer chips that Qualcomm sells to companies such as HP Inc. and Microsoft Corp. The processors are the key component to a new line of artificial intelligence-focused laptops dubbed AI PCs. Earlier this week, Qualcomm announced plans to bring Nuvia's design — called Oryon — to its more widely used Snapdragon chips for smartphones.

Arm says that move is a breach of Qualcomm's license and is demanding that the company destroy Nuvia designs that were created before the Nuvia acquisition. They can't be transferred to Qualcomm without permission, according to the original suit filed by Arm in the US District Court in Delaware. Nuvia's licenses were terminated in February 2023 after negotiations failed to reach a resolution.

Like many others in the chip industry, Qualcomm relies on an instruction set from Cambridge, England-based Arm, a company that has created much of the underlying technology for mobile electronics. An instruction set is the basic computer code that chips use to run software such as operating systems.

If Arm follows through with the license termination, Qualcomm would be prevented from doing its own designs using Arm's instruction set. It would still be able to license Arm's blueprints under separate product agreements, but that path would cause significant delays and force the company to waste work that's already been done.

Prior to the dispute, the two companies were close partners that helped advance the smartphone industry. Now, under newer leadership, both of them are pursuing strategies that increasingly make them competitors.

Under Chief Executive Officer Rene Haas, Arm has shifted to offering more complete designs — ones that companies can take directly to contract manufacturers. Haas believes that his company, still majority owned by Japan's SoftBank Group Corp., should be rewarded more for the engineering work it does. That shift encroaches on the business of Arm's traditional customers, like Qualcomm, who use Arm's technology in their own final chip designs.

Meanwhile, under CEO Cristiano Amon, Qualcomm is moving away from using Arm designs and is prioritizing its own work, something that potentially makes it a less lucrative customer for Arm. He's also expanding into new areas, most notably computing, where Arm is making its own push. But the two companies' technologies remain intertwined, and Qualcomm isn't

A0637

yet in a position to make a clean break from Arm.

Arm was acquired in 2016 by SoftBank, and part of it was sold to the public in an offering in September of last year. The Japanese company still owns more than 80% of the Arm.

Arm has two types of customers: companies that use its designs as the basis for their chips and ones that create their own semiconductors and only license the Arm instruction set.

Qualcomm is no stranger to licensing disputes. The company gets a large chunk of its profit from selling the rights to its own technology — a key part of mobile wireless communications. Its customers include Samsung Electronics Co. and Apple Inc., the two biggest smartphone makers.

Qualcomm emerged victorious in 2019 from a wide-ranging legal fight with Apple. It also won a court decision on appeal against the US Federal Trade Commission, which alleged that the company was using predatory licensing activities.

Danya Al-Qattan
Partner
O. ____  212.687.8080
M. ____  713.628.2118
E. ____  danya.al-qattan@fgsglobal.com



Message
_____

| | |
|---|---|
| **From:** | Phil Hughes [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2B7BA3D6700444AC97DD13A2070BDEF6-PHIL HUGHES] |
| **Sent:** | 24/10/2024 03:43:20 |
| **To:** | Ami Badani [Ami.Badani@arm.com] |
| **CC:** | Kristen Ray [Kristen.Ray@arm.com]; Eliza Walsh [Eliza.Walsh@arm.com] |
| **Subject:** | RE: Response to QCOM statement |

███████████████████████████████████████████████

Thanks,
-phil

_____

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 9:39 PM
**To:** Phil Hughes <Phil.Hughes@arm.com>
**Cc:** Kristen Ray <Kristen.Ray@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Re: Response to QCOM statement

Quick responses to questions. We should confirm with Spencer **Redaction - Privileged**

███████████████████████████████████████████████

On Oct 23, 2024, at 8:09 PM, Phil Hughes <Phil.Hughes@arm.com> wrote:

███████████████████████████████████████████████

A0639                                  ARMQC_02742823

█████████████████████████████████████

A0640

█████████████████████████████████████

Thanks,
-phil

---

**From:** Kristen Ray <Kristen.Ray@arm.com>
**Sent:** Wednesday, October 23, 2024 8:40 PM
**To:** Ami Badani <Ami.Badani@arm.com>; Phil Hughes <Phil.Hughes@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Re: Response to QCOM statement

███████████████████████████████████████████████████████████████████████████████

███████████████████

ARMQC_02742824

Kristen Ray | Senior Director, Corporate Communications, Arm
m: +1 512 939 9877

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Date:** Wednesday, October 23, 2024 at 8:03 PM
**To:** Phil Hughes <Phil.Hughes@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

**Redaction - Privileged**

Eliza has been in touch with Rene on Tim.  Not sure where this landed.

---

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 5:58 PM
**To:** Ami Badani <Ami.Badani@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Phil Hughes
+1 512 694 7382

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 6:55:48 PM
**To:** Eliza Walsh <Eliza.Walsh@arm.com>; Kristen Ray <Kristen.Ray@arm.com>
**Cc:** Phil Hughes <Phil.Hughes@arm.com>
**Subject:** Re: Response to QCOM statement



Redaction - Privileged

Redaction - Privileged

---

**From:** Eliza Walsh <Eliza.Walsh@arm.com>
**Date:** Wednesday, October 23, 2024 at 11:08 AM
**To:** Kristen Ray <Kristen.Ray@arm.com>
**Cc:** Phil Hughes <Phil.Hughes@arm.com>, Ami Badani <Ami.Badani@arm.com>
**Subject:** Re: Response to QCOM statement

I'm sending to tim now thanks

**A0641**

Thanks,
Eliza


On Oct 23, 2024, at 7:01 PM, Kristen Ray <Kristen.Ray@arm.com> wrote:


Thanks all. We're on it.

**Kristen Ray** | Senior Director, Corporate Communications, Arm
m: +1 512 939 9877

---

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 12:58 PM
**To:** Ami Badani <Ami.Badani@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Thanks Ami.
Adding Kristen.

We'll send out ASAP

Phil Hughes
+1 512 694 7382

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 11:54:12 AM
**To:** Phil Hughes <Phil.Hughes@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Response to QCOM statement

ARMQC_02742826

Message
_____

**Sent**:        24/10/2024 02:47:48
**To**:         Kristen Ray [Kristen.Ray@arm.com]; Ami Badani [Ami.Badani@arm.com]; Eliza Walsh [Eliza.Walsh@arm.com]
**Subject**:     RE: Response to QCOM statement

Thanks,
-phil

_____

**From:** Kristen Ray <Kristen.Ray@arm.com>
**Sent:** Wednesday, October 23, 2024 8:40 PM
**To:** Ami Badani <Ami.Badani@arm.com>; Phil Hughes <Phil.Hughes@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Re: Response to QCOM statement

A0643

ARMQC_02742769

**Kristen Ray** | Senior Director, Corporate Communications, Arm
m: +1 512 939 9877

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Date:** Wednesday, October 23, 2024 at 8:03 PM
**To:** Phil Hughes <Phil.Hughes@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Eliza has been in touch with Rene on Tim.  Not sure where this landed.

---

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 5:58 PM
**To:** Ami Badani <Ami.Badani@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Phil Hughes
+1 512 694 7382

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 6:55:48 PM
**To:** Eliza Walsh <Eliza.Walsh@arm.com>; Kristen Ray <Kristen.Ray@arm.com>

**A0644**

ARMQC_02742770

**Cc:** Phil Hughes <Phil.Hughes@arm.com>
**Subject:** Re: Response to QCOM statement



**From:** Eliza Walsh <Eliza.Walsh@arm.com>
**Date:** Wednesday, October 23, 2024 at 11:08 AM
**To:** Kristen Ray <Kristen.Ray@arm.com>
**Cc:** Phil Hughes <Phil.Hughes@arm.com>, Ami Badani <Ami.Badani@arm.com>
**Subject:** Re: Response to QCOM statement

I'm sending to tim now thanks
Thanks,
Eliza


On Oct 23, 2024, at 7:01 PM, Kristen Ray <Kristen.Ray@arm.com> wrote:


Thanks all. We're on it.

Kristen Ray | Senior Director, Corporate Communications, Arm
m: +1 512 939 9877


**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 12:58 PM
**To:** Ami Badani <Ami.Badani@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Thanks Ami.
Adding Kristen.

We'll send out ASAP

Phil Hughes
+1 512 694 7382

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 11:54:12 AM
**To:** Phil Hughes <Phil.Hughes@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Response to QCOM statement

**A0645**                    ARMQC_02742771



A0646

ARMQC_02742772

Message

---

**From:** Ami Badani [Ami.Badani@arm.com]
**Sent:** 24/10/2024 04:50:07
**To:** Phil Hughes [Phil.Hughes@arm.com]
**CC:** Kristen Ray [Kristen.Ray@arm.com]; Eliza Walsh [Eliza.Walsh@arm.com]
**Subject:** Re: Response to QCOM statement

---

## Redacted - Privileged

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 8:43 PM
**To:** Ami Badani <Ami.Badani@arm.com>
**Cc:** Kristen Ray <Kristen.Ray@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** RE: Response to QCOM statement

# Redacted - Privileged

Thanks,
-phil

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 9:39 PM
**To:** Phil Hughes <Phil.Hughes@arm.com>
**Cc:** Kristen Ray <Kristen.Ray@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Re: Response to QCOM statement

# Redacted - Privileged

On Oct 23, 2024, at 8:09 PM, Phil Hughes <Phil.Hughes@arm.com> wrote:



**A0647**

ARMQC_02749685

Thanks,
-phil

**From:** Kristen Ray <Kristen.Ray@arm.com>
**Sent:** Wednesday, October 23, 2024 8:40 PM
**To:** Ami Badani <Ami.Badani@arm.com>; Phil Hughes <Phil.Hughes@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Re: Response to QCOM statement

A0648

ARMQC_02749686



**Kristen Ray** | Senior Director, Corporate Communications, Arm
m: +1 512 939 9877

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Date:** Wednesday, October 23, 2024 at 8:03 PM
**To:** Phil Hughes <Phil.Hughes@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Eliza has been in touch with Rene on Tim.  Not sure where this landed.

---

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 5:58 PM
**To:** Ami Badani <Ami.Badani@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Phil Hughes
+1 512 694 7382

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 6:55:48 PM
**To:** Eliza Walsh <Eliza.Walsh@arm.com>; Kristen Ray <Kristen.Ray@arm.com>
**Cc:** Phil Hughes <Phil.Hughes@arm.com>
**Subject:** Re: Response to QCOM statement

**From:** Eliza Walsh <Eliza.Walsh@arm.com>
**Date:** Wednesday, October 23, 2024 at 11:08 AM

**A0649**

ARMQC_02749687

**To:** Kristen Ray <Kristen.Ray@arm.com>
**Cc:** Phil Hughes <Phil.Hughes@arm.com>, Ami Badani <Ami.Badani@arm.com>
**Subject:** Re: Response to QCOM statement

I'm sending to tim now thanks
Thanks,
Eliza


On Oct 23, 2024, at 7:01 PM, Kristen Ray <Kristen.Ray@arm.com> wrote:


Thanks all. We're on it.

Kristen Ray | Senior Director, Corporate Communications, Arm
m: +1 512 939 9877


---

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Wednesday, October 23, 2024 at 12:58 PM
**To:** Ami Badani <Ami.Badani@arm.com>, Eliza Walsh <Eliza.Walsh@arm.com>, Kristen Ray <Kristen.Ray@arm.com>
**Subject:** Re: Response to QCOM statement

Thanks Ami.
Adding Kristen.

We'll send out ASAP

Phil Hughes
+1 512 694 7382

---

**From:** Ami Badani <Ami.Badani@arm.com>
**Sent:** Wednesday, October 23, 2024 11:54:12 AM
**To:** Phil Hughes <Phil.Hughes@arm.com>; Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** Response to QCOM statement

**A0650**

ARMQC_02749688

# Exhibit 47

A0651

# KIRKLAND & ELLIS LLP

333 West Wolf Point Plaza
Chicago, IL 60654
United States

Jay Emerick
To Call Writer Directly:
+1 312 862 3772
jay.emerick@kirkland.com

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

July 24, 2025

**By E-mail** ███████████████████████████████

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton &
  Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re: *Qualcomm Inc. v. Arm Holdings PLC*, C.A. No. 24-490 (D. Del.)

Dear Catherine:

We write in response to your letters regarding the production of certain documents.

## Documents Requested During the Deposition of Martin Weidmann

Qualcomm requests emails regarding Arm's provision of support to Qualcomm for Nuvia-based designs. As we previously informed you, Arm has already produced documents regarding Arm personnel allegedly receiving instruction from management not to support Nuvia-based designs during the period of the litigation. 7/10/25 Email from A. Janes (identifying ARM_01230110; ARM_01314327; ███████████████████████████ Arm has also produced documents showing Arm's resumption of support to Qualcomm. *Id.* (identifying ARMQC_02779076). Arm maintains that its production is complete.

## Documents Regarding Arm's ████████████████████████████████████ to Qualcomm

Qualcomm seeks documents regarding Arm's ███████████████████ ██████████████████████████████ including documents allegedly referenced at the depositions of Karthik Shivashankar, Ehab Youssef, and Akshay Bhatnagar. As we have repeatedly explained through written correspondence and at depositions, and as Arm's witnesses have confirmed, Arm's █████████████████████████████ third-party agreements for ██████████████ that also involved legal counsel. *See* 6/19/25 P. Evangelatos Email to J. Braly; 7/9/25 P. Evangelatos Email to E. Westerhold ("As we have previously written, due to Arm's confidentiality obligations, Arm cannot produce third-party

Austin  Bay Area  Beijing  Boston  Brussels  Dallas  Frankfurt  Hong Kong  Houston  London  Los Angeles  Miami  Munich  New York  Paris  Philadelphia  Riyadh  Salt Lake City  Shanghai  Washington, D.C.

A0652

# KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 2

agreements for ██████████████████ without clearing that production beforehand with each third party…"). Arm has produced all third-party agreements to which it has not received an objection or a motion for a Protective Order was not filed. We also provided corrected versions of Exhibits 5 and 5.1 from Mr. Abbey's deposition. However, Arm will continue to withhold documents that include confidential information for █████████, and the other third parties pending resolution of their Protective Order disputes, including Arm's agreements with both companies and ████████████████████████████. We have investigated and no other non-privileged documents reflecting Arm's █████ exist.

As to the other requests raised in your letters, Qualcomm seeks "all quarterly price books from Q1 2019 to the present." Your letter fails to explain why six years of quarterly price books is relevant or proportional to the needs of Qualcomm's allegations, which is based on Arm's ██████████ for ████████████. Arm produced to Qualcomm its price books for 2024, which is more than sufficient to understand Arm's ██████████ price book pricing as of Arm's ██████████ Qualcomm also seeks information regarding Qualcomm's 2019 Annex to the QC TLA, particularly, "████████████████████████ ██████████" in Qualcomm's 2019 Annex to the QC TLA. However, that agreement has already been produced and is not at issue in the SAC. Nor is Qualcomm's 2019 agreement relevant, ████████████████████████████████████████████ ████████████████████████████████████████████ Thus, to the extent any other responsive documents even exist, they are not relevant.

As to Qualcomm's other rhetoric, we disagree with your characterization of the testimony of Mr. Youssef and Arm's privilege instructions. ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ We also disagree that Qualcomm has been "severely prejudiced." Arm has produced the documents not subject to a third-party confidentiality dispute, and Qualcomm deposed five witnesses knowledgeable about Arm's TLA offers. Any prejudice to Qualcomm by perceived discovery delays is a problem of its own making, as Qualcomm waited until March 2025 to raise its TLA allegations.

**Documents Related to the Discussion with Bloomberg News Regarding the Breach Letter**

Qualcomm seeks documents related to a "discussion" with Bloomberg News regarding Arm's October 22, 2024 notice of material breach to Qualcomm. Yet Qualcomm incorrectly asserts that Mr. Abbey "waiv[ed] any claim of privilege to" "an alleged attorney-client communication" about Bloomberg News and demands that Arm "immediately produce all documentation of the 'discussion' between Arm and Bloomberg News regarding the breach letter." In fact, Arm has not claimed privilege over the "discussion" with Bloomberg News regarding Arm's October 22, 2024 notice of material breach to Qualcomm. ████████████

## KIRKLAND & ELLIS LLP

Catherine Nyarady
July 24, 2025
Page 8

### RFP 152

Arm understands that Qualcomm is seeking communications regarding any "decision" to provide ACK patches to Qualcomm. As discussed above, Arm's production of documents responsive to this Request is complete.

### RFPs 159, 160, 163

We understand this Request to seek Arm's communications with third-party ALA licensees relating to certain materials and support that Qualcomm contends are "deliverables." Qualcomm's requests for these third-party communications have no relevance to whether Qualcomm received the materials to which it is entitled under the Qualcomm ALA. Accordingly, Arm will not produce any more documents in response to these Requests.

### RFP 166

Your letter explains that this Request seeks documents concerning competitive intelligence. As noted in Arm's objections to this request, Qualcomm has repeatedly disclaimed, both orally and in writing, that it need prove or even identify a relevant market to support its claims. Until Qualcomm defines the relevant market(s), Arm is unable to discern for which market(s) Qualcomm seeks competitive intelligence information. Because your letter fails to define any relevant market, Arm will not produce any more documents in response to this request.

Sincerely,

*/s/ Jay Emerick*

Jay Emerick

A0654

# Exhibit 48

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

EXAL DIRECT DIAL:  + 1 212 373 3532
EMAIL:  CNYARADY@PAULWEISS.COM

| | |
|---|---|
| BRUSSELS | TOKYO |
| HONG KONG | TORONTO |
| LONDON | WASHINGTON, DC |
| LOS ANGELES | WILMINGTON |
| SAN FRANCISCO | |

May 16, 2025

**Via Email**

Nicholas Fung
Morrison & Foerster LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

Re: *Qualcomm Inc.* v. *Arm Holdings Plc.*
C.A. No. 24-490-MN

Dear Nick,

We write regarding Arm's deficient document production.  Arm has failed to adequately engage in document discovery, waiting until the week before the deadline for substantial completion to begin its document production.  That deadline has since passed, and documents Arm has produced remain woefully deficient, including because Arm's search terms fail to capture entire categories of relevant information, and what few custodial documents Arm has produced do not cover many of the critical issues in the case.

Arm's failure to produce entire categories of key documents has prejudiced Qualcomm and has resulted in Qualcomm having little time to review Arm's document production, draft additional discovery requests, or prepare for depositions.  In contrast, Arm has had ample time to review the documents Qualcomm has produced on a rolling basis in compliance with Section 7(b) of the scheduling order.

**Arm Has Not Satisfied Its Discovery Obligations.**   Pursuant to the Court's scheduling order entered on January 31, 2025, Arm's document production was to be substantially complete by May 1, 2025.  D.I. 44 ¶ 7(b).[1]   Yet, to date, Arm has produced just 2,946 emails and six chats.  By contrast, Qualcomm has produced 35,650 emails and 1,128 chats.  And although Arm has

---

[1]    Moreover, Arm was obligated to "not wait until the substantial completion of document production deadline before producing documents."  *Id.*  Yet Arm waited until April 22 to make its first production, which contained only 8,097 documents.  Arm's second, third, and fourth productions, which totaled 291,705 documents, were made on April 28 and May 1.

**A0656**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6

Qualcomm reserves all rights.

Sincerely,

*/s/ Catherine Nyarady*

Catherine Nyarady

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

7

**APPENDIX A**

| Search Term – Set 1 | Document Count | Distinct Document Count |
|---|---|---|
| **Entire Set** | **1105** | **N/A** |
| ████████ ” | 78 | 66 |
| (QC OR Qualcomm OR QCom*) AND ("ACK partner support" OR "MOM" OR "Sync Meeting") | 704 | 692 |
| (QC OR Qualcomm OR QCom*) AND ("Arm Tech*" OR deliverable* OR "Arm Compliance Kit" OR ACK OR OOB OR patch* OR test* OR update* OR bug* OR fix* OR verif* OR support OR compliance) AND (withhold* OR refus* OR deny) | 92 | 60 |
| (QC OR Qualcomm OR QCom*) AND (ALA OR "Architecture License Agreement" OR "████████████") AND (breach* OR terminat* OR status) AND (Nuvia OR "████████" OR lawsuit OR complaint) | 68 | 19 |
| (QC OR Qualcomm OR QCom*) AND (ALA OR "Architecture License Agreement") AND exten* AND "initial term" | 6 | 0 |
| (QC OR Qualcomm OR QCom*) AND (breach* OR terminat* OR status) AND ("Ian King" OR Bloomberg) | 64 | 39 |
| (QC OR Qualcomm OR QCom*) AND (delay* OR withhold* OR deny OR provid* OR share OR approv* OR deliver*) AND ("ETE Instr Trace Chkr Module SRC Armv9-A") | 4 | 4 |
| (QC OR Qualcomm OR QCom*) AND (delay* OR withhold* OR deny OR provid* OR share OR approv* OR deliver*) AND (config* OR enable*) AND "ETE Instr Trace Chkr Module SRC Armv9-A" | 0 | 0 |
| (QC OR Qualcomm OR QCom*) AND (letter* OR "notice*") AND (fail* w/10 deliver*) | 131 | 120 |
| (QC OR Qualcomm OR QCom*) AND (project* OR forecast* OR analys* OR evaluat*) AND (revenue* OR profit*) AND (cancel* OR terminat* OR end) AND (ALA OR "Architecture License Agreement" OR "████████████") | 46 | 6 |
| (QC OR Qualcomm OR QCom*) AND (Sect* AND (████████ ████████████)) AND (ALA OR "Architecture License Agreement") | 73 | 16 |
| (QC OR Qualcomm OR QCom*) AND (Sect* AND (████████ █)) AND (ALA OR "Architecture License Agreement") AND (ACK OR "Arm Compliance Kit") | 9 | 0 |
| (QC OR Qualcomm OR QCom*) AND (withdraw* OR rescind* OR revok*) AND (terminat* OR breach*) AND (ALA OR "Architecture License Agreement" OR "████████████") | 20 | 0 |

A0658

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

8

| Search Term – 2013 | Document Count | Distinct Document Count |
|---|---|---|
| Entire Set | 8 | N/A |
| (QC OR Qualcomm OR QCom*) AND (████████) AND (ALA OR "Architecture License Agreement") | 8 | 8 |

| Search Term – 2019 | Document Count | Distinct Document Count |
|---|---|---|
| Entire Set | 1010 | N/A |
| ("RISC-V architecture" OR "RISC V architecture" OR "RISCV architecture") AND (analys* OR evaluat*) AND (competit*) | 112 | 36 |
| ("RISC-V architecture" OR "RISC V architecture" OR "RISCV architecture") AND (analys* OR evaluat*) AND (revenue* OR profit*) | 69 | 6 |
| ((cost OR research* & develop* OR "R&D") w/30 "architecture" OR "new technology" OR (mobile OR server OR cloud OR client computing OR internet of things OR "IoT" OR automotive)) W/10 ("NUVIA" OR "Nuvia") | 2 | 0 |
| ((licens* W/3 fee) OR royalt* OR "average selling price" OR "ASP" OR sale OR price OR competit*) AND (estimat* OR project* OR anticipat* OR forecast*) AND (refus* OR declin* OR expir*) | 418 | 196 |
| ((licens* W/5 fee) OR (royalt* OR rate OR "average selling price" OR "ASP" OR sale OR price OR competit*) AND ("negotiat*" OR "estimate*" OR model* OR project* OR anticipat* OR forecast* OR plan)) W/10 ("NUVIA" OR "Nuvia") | 25 | 6 |
| ((licens* W/5 fee) OR (royalt* OR rate OR "average selling price" OR "ASP" OR sale OR price OR competit*) AND ("negotiat*" OR "estimate*" OR model* OR project* OR anticipat* OR forecast* OR plan)) W/10 (("Qualcomm" OR "QC") OR Broadcomm OR Marvell OR Cavium OR Avera) | 125 | 58 |
| ((market W/3 share) OR trend OR research OR analy* OR forecast) W/30 (competit*) AND (QC OR Qualcomm OR QCom*) AND ("system-on-chip" OR "SoC" OR CPU) | 194 | 88 |
| (cost OR research* & develop* OR "R&D") W/5 ("architecture" OR "new technology" OR mobile OR server OR cloud OR "client computing" OR "internet of things" OR "IoT" OR automotive) | 125 | 63 |
| (forecast OR project* OR expect* OR anticipat*) W/10 (impact OR effect OR affect OR increase OR rise OR grow) AND (("licens* fee") OR royalt* OR revenue OR profit OR return OR sale*) W/10 ("architecture" OR "chip*" OR "SoC" OR "CPU" OR ("integrat*" W/3 "core") OR mobile OR server OR cloud OR | 243 | 84 |

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

9

| Search Term | Document Count | Distinct Document Count |
|---|---|---|
| "client computing" OR "internet of things" OR "IoT" OR automotive) AND (semiconductor OR chip OR "SoC" OR CPU) | | |
| (QC OR Qcom* OR Qualcomm) AND ("ACK" OR "arm compliance kit" OR "AVS" OR "architecture valid* suite" OR "ACS" OR "arm compliance suite") AND (waive* OR issue*) AND ▮▮▮▮▮ | 23 | 19 |
| (QC OR Qualcomm OR QCom*) AND ("system-on-chip" OR "SOC" OR CPU OR core) AND (ALA OR "architecture license agreement") AND custom | 38 | 7 |
| (QC OR Qualcomm OR QCom*) AND (project* OR forecast* OR analys* OR evaluat*) AND (revenue* OR profit*) AND (cancel* OR terminat* OR end OR expir*) AND (ALA OR "Architecture License Agreement" OR "▮▮▮▮▮▮") | 40 | 5 |
| (QC OR Qualcomm OR QCom*) AND (project* OR forecast*) AND (revenue* OR profit*) AND ((zero OR 0) W/20 (5 OR five)) AND (royalt*) AND (ALA OR "Architecture License Agreement") | 15 | 0 |
| market W/10 (mobile OR server OR cloud OR "client computing" OR "internet of things" OR "IoT" OR automotive) AND (semiconductor OR chip OR "SoC" OR CPU) AND (project OR forecast OR anticipat* OR estimat*) AND (impact OR effect OR affect) | 237 | 73 |
| "weighted average cost of capital" OR "WACC" OR "discount rate"" | 16 | 6 |

| Search Term – 2022 | Document Count | Distinct Document Count |
|---|---|---|
| **Entire Set** | **144** | **N/A** |
| ("architecture license agreement" OR "ALA") AND ("ACK" OR "arm compliance kit" OR "AVS" OR "architecture valid* suite" OR "ACS" OR "arm compliance suite") AND (release OR update) | 10 | 4 |
| (QC OR Qcom* OR Qualcomm OR Nuvia) AND (OOB OR "out-of-box" OR "out of box") AND release | 140 | 134 |

# Exhibit 49

A0661

# ⅢORRISON ҒOERSTER

707 WILSHIRE BOULEVARD
SUITE 6000
LOS ANGELES
CALIFORNIA  90017-3543

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON, BRUSSELS, DENVER, HONG KONG, LONDON, LOS ANGELES, MIAMI, NEW YORK, PALO ALTO, SAN DIEGO, SAN FRANCISCO, SHANGHAI, SINGAPORE, TOKYO, WASHINGTON, D.C.

June 17, 2025

Writer's Direct Contact
+1 (213) 892-5348
NFung@mofo.com

BY EMAIL

Catherine Nyarady
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re:    *Qualcomm Inc. v. Arm Holdings Plc.*, C.A. No. 24-490-MN (D. Del.)

Counsel:

We write in response to Qualcomm's May 16 and May 30, 2025 letters regarding purported deficiencies in Arm's document production and search terms and further to yesterday's meet and confer. Qualcomm's mischaracterization of Arm's diligent discovery efforts is unfounded. Arm remains committed to engaging in good-faith efforts to resolve discovery disputes, particularly in light of the Court's June 3 order. We expect Qualcomm to do the same.

Arm substantially completed its document production in compliance with the current scheduling order—producing by May 1 almost 300,000 documents in comparison to Qualcomm's 46,626 documents. Qualcomm's assertion that Arm has produced insufficient emails and chat messages ignores Arm's productions of approximately 25,000 emails and 900 chat messages in *Arm v. Qualcomm*, of which approximately 1,700 emails and 30 chat messages were also responsive to the search terms employed in this case. A substantial volume of documents responsive to Qualcomm's RFPs were thus already produced in *Arm v. Qualcomm* and subject to the parties' cross-use agreement. Arm is also puzzled by Qualcomm's complaint that Arm produced a large volume of "technical documents" given that Qualcomm served broad RFPs requesting such documents.   Qualcomm cannot complain that it has received "too many" technical documents when it insisted on broad technical discovery.

## A.  Arm's Search Terms and Elusion Test Results

As explained in Arm's May 21 letter, Arm's search terms are more than sufficient and do not omit crucial categories of information.  Arm has applied and disclosed reasonable search terms for Qualcomm's first and second sets of RFPs consistent with the ESI Order

# ΙΙΙORRISON ᖷOERSTER

C. Nyarady
June 17, 2025
Page Three

production of documents for the corresponding Qualcomm RFPs, including Qualcomm's RFP Nos. 5, 7, 8, 10, 11, 13, 29, 30, 39, 41, 45, 46, 74, 76, and 80.  However, Arm does not agree to Qualcomm's proposed edits for the seventh search term, and objects to Qualcomm's proposed edits as returning an unreasonably large number of results that are overbroad, not proportional, and not likely to return relevant information.

**C.  Arm's Disclosure of Search Terms for Qualcomm's RFPs Relating to Allegations in Second Amended Complaint (SAC)**

As indicated on yesterday's meet and confer, today Arm supplemented its objections and responses to Qualcomm's RFPs in view of the Court allowing Qualcomm to file its SAC. Arm is employing the search terms identified in **Exhibit D** to search for additional ESI from search term custodial sources, and has provided hit counts for those search terms. We are also agreeing to add Jeff Fonseca as a custodian.  Our review of documents is underway and today we served Arm's seventh document production (ARMQC_007) containing documents responsive to Qualcomm's RFPs to which Arm has supplemented its responses, subject to Arm's objections, responses, and confidentiality obligations.

Sincerely,

*/s/ Nicholas Fung*

Nicholas Fung

cc:  All Counsel of Record (by email)

**A0663**

IIIORRISON FOERSTER

C. Nyarady
June 17, 2025
Page Four

**EXHIBIT A**

The following is a hit count report for Arm's search terms disclosed on April 1 and April 22, 2025.

| Arm Search Term | Documents With Hits | Unique Hits | Documents With Hits, Including Family |
|---|---|---|---|
| (QC OR Qualcomm OR QCom*) AND (Sect* AND (▇▇▇▇▇▇▇▇▇▇)) AND (ALA OR "Architecture License Agreement") | 3,173 | 1,902 | 6,768 |
| (QC OR Qualcomm OR QCom*) AND (Sect* AND (▇▇▇▇▇)) AND (ALA OR "Architecture License Agreement") AND (ACK OR "Arm Compliance Kit") | 661 | 18 | 1,522 |
| "▇▇▇" | 1,449 | 564 | 2,339 |
| (QC OR Qualcomm OR QCom*) AND ("Arm Tech*" OR deliverable* OR "Arm Compliance Kit" OR ACK OR OOB OR patch* OR test* OR update* OR bug* OR fix* OR verif* OR support OR compliance) AND (withhold* OR refus* OR deny) | 4,768 | 3,382 | 9,459 |
| (QC OR Qualcomm OR QCom*) AND (letter* OR "notice*") AND (fail* w/10 deliver*) | 735 | 442 | 1,933 |
| (QC OR Qualcomm OR QCom*) AND (delay* OR withhold* OR deny OR provid* OR share OR approv* OR deliver*) AND (config* OR enable*) AND "ETE Instr Trace Chkr Module SRC Armv9-A" | 247 | 0 | 568 |
| (QC OR Qualcomm OR QCom*) AND (delay* OR withhold* OR deny OR provid* OR share OR approv* OR deliver*) AND ("ETE Instr Trace Chkr Module SRC Armv9-A") | 298 | 26 | 1,006 |
| (QC OR Qualcomm OR QCom*) AND (project* OR forecast* OR analys* OR evaluat*) AND (revenue* OR profit*) AND (cancel* OR terminat* OR end) AND (ALA OR "Architecture License Agreement" OR "▇▇▇▇▇▇") | 1,296 | 583 | 3,249 |

A0664

**ᛁᛁ∩ORRISON ᖢOERSTER**

C. Nyarady
June 17, 2025
Page Five

| Arm Search Term | Documents With Hits | Unique Hits | Documents With Hits, Including Family |
|---|---|---|---|
| (QC OR Qualcomm OR QCom*) AND (ALA OR "Architecture License Agreement" OR "███████████") AND (breach* OR terminat* OR status) AND (Nuvia OR "█████" OR lawsuit OR complaint) | 1,688 | 772 | 3,809 |
| (QC OR Qualcomm OR QCom*) AND (ALA OR "Architecture License Agreement") AND exten* AND "initial term" | 295 | 140 | 523 |
| (QC OR Qualcomm OR QCom*) AND (withdraw* OR rescind* OR revok*) AND (terminat* OR breach*) AND (ALA OR "Architecture License Agreement" OR "███████████") | 227 | 11 | 790 |
| (QC OR Qualcomm OR QCom*) AND ("ACK partner support" OR "MOM" OR "Sync Meeting") | 2,811 | 2,600 | 9,603 |
| (QC OR Qualcomm OR QCom*) AND (breach* OR terminat* OR status) AND ("Ian King" OR Bloomberg) | 1,992 | 1,195 | 4,079 |
| (QC OR Qualcomm OR QCom*) AND (████████████) AND (ALA OR "Architecture License Agreement") | 437 | 437 | 1,129 |
| (QC OR Qcom* OR Qualcomm OR Nuvia) AND (OOB OR "out-ofbox" OR "out of box") AND release | 1,847 | 1,847 | 5,006 |
| (forecast OR project* OR expect* OR anticipat*) W/10 (impact OR effect OR affect OR increase OR rise OR grow) AND (("licens* fee") OR royalt* OR revenue OR profit OR return OR sale*) W/10 ("architecture" OR "chip*" OR "SoC" OR "CPU" OR ("integrat*" W/3 "core") OR mobile OR server OR cloud OR "client computing" OR "internet of things" OR "IoT" OR automotive) AND (semiconductor OR chip OR "SoC" OR CPU) | 6,845 | 2,558 | 14,445 |

**IIIORRISON FOERSTER**

C. Nyarady
June 17, 2025
Page Six

| Arm Search Term | Documents With Hits | Unique Hits | Documents With Hits, Including Family |
|---|---|---|---|
| (cost OR research* & develop* OR "R&D") W/5 ("architecture" OR "new technology" OR mobile OR server OR cloud OR "client computing" OR "internet of things" OR "IoT" OR automotive) | 6,215 | 4,516 | 12,191 |
| ((licens* W/3 fee) OR royalt* OR "average selling price" OR "ASP" OR sale OR price OR competit*) AND (estimat* OR project* OR anticipat* OR forecast*) AND (refus* OR declin* OR expir*) | 29,604 | 21,696 | 54,284 |
| market W/10 (mobile OR server OR cloud OR "client computing" OR "internet of things" OR "IoT" OR automotive) AND (semiconductor OR chip OR "SoC" OR CPU) AND (project OR forecast OR anticipat* OR estimat*) AND (impact OR effect OR affect) | 7,752 | 2,628 | 16,854 |
| ((market W/3 share) OR trend OR research OR analy* OR forecast) W/30 (competit*) AND (QC OR Qualcomm OR QCom*) AND ("system-on-chip" OR "SoC" OR CPU) | 4,401 | 1,330 | 9,158 |
| ("architecture license agreement" OR "ALA") AND ("ACK" OR "arm compliance kit" OR "AVS" OR "architecture valid* suite" OR "ACS" OR "arm compliance suite") AND (release OR update) | 3,366 | 1,906 | 6,211 |
| (QC OR Qcom* OR Qualcomm) AND ("ACK" OR "arm compliance kit" OR "AVS" OR "architecture valid* suite" OR "ACS" OR "arm compliance suite") AND (waive* OR issue*) AND ▮▮▮▮▮ | 379 | 116 | 1,091 |
| (QC OR Qualcomm OR QCom*) AND (project* OR forecast* OR analys* OR evaluat*) AND (revenue* OR profit*) AND (cancel* OR terminat* OR end OR expir*) AND (ALA OR "Architecture License Agreement" OR "▮▮▮▮▮▮") | 1,365 | 238 | 3,340 |

**ⅢORRISON ﹃OERSTER**

C. Nyarady
June 17, 2025
Page Seven

| Arm Search Term | Documents With Hits | Unique Hits | Documents With Hits, Including Family |
|---|---|---|---|
| ("RISC-V architecture" OR "RISC V architecture" OR "RISCV architecture") AND (analys* OR evaluat*) AND (revenue* OR profit*) | 1,269 | 88 | 2,502 |
| ("RISC-V architecture" OR "RISC V architecture" OR "RISCV architecture") AND (analys* OR evaluat*) AND (competit*) | 1,546 | 265 | 2,835 |
| (QC OR Qualcomm OR QCom*) AND ("system-on-chip" OR "SOC" OR CPU OR core) AND (ALA OR "architecture license agreement") AND custom | 1,083 | 310 | 2,243 |
| ((cost OR research* & develop* OR "R&D") w/30 "architecture" OR "new technology" OR (mobile OR server OR cloud OR client computing OR internet of things OR "IoT" OR automotive)) W/10 ("NUVIA" OR "Nuvia") | 21 | 1 | 52 |
| (QC OR Qualcomm OR QCom*) AND (project* OR forecast*) AND (revenue* OR profit*) AND ((zero OR 0) W/20 (5 OR five)) AND (royalt*) AND (ALA OR "Architecture License Agreement") | 530 | 26 | 1,596 |
| ((licens* W/5 fee) OR (royalt* OR rate OR "average selling price" OR "ASP" OR sale OR price OR competit*) AND ("negotiat*" OR "estimate*" OR model* OR project* OR anticipat* OR forecast* OR plan)) W/10 ("NUVIA" OR "Nuvia") | 317 | 84 | 614 |
| ((licens* W/5 fee) OR (royalt* OR rate OR "average selling price" OR "ASP" OR sale OR price OR competit*) AND ("negotiat*" OR "estimate*" OR model* OR project* OR anticipat* OR forecast* OR plan)) W/10 (("Qualcomm" OR "QC") OR Broadcomm OR Marvell OR Cavium OR Avera) | 2,135 | 1,249 | 3,623 |
| "weighted average cost of capital" OR "WACC" OR "discount rate" | 2,022 | 1,251 | 4,057 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., a Delaware corporation,
and QUALCOMM TECHNOLOGIES, INC.,
a Delaware corporation,

        Plaintiffs,

      v.

ARM HOLDINGS PLC, f/k/a ARM LTD., a
U.K. corporation,

        Defendant.

C.A. No. 24-490-MN



## DECLARATION OF NICHOLAS R. FUNG IN SUPPORT OF DEFENDANT'S LETTER TO SPECIAL MASTER HELENA C. RYCHLICKI REGARDING OUTSTANDING DISCOVERY DISPUTES

Dated: August 7, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Meredith Pohl
Matthew J. McIntee
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
meredith.pohl@kirkland.com
matt.mcintee@kirkland.com

Jay Emerick
Reid McEllrath
Adam M. Janes
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

reid.mcellrath@kirkland.com
adam.janes@kirkland.com

Nathaniel Louis DeLucia
Peter Evangelatos
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
nathaniel.delucia@kirkland.com
peter.evangelatos@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

**A0677**

I, Nicholas R. Fung, do hereby declare as follows:

1.      I am an attorney with the law firm of Morrison & Foerster, LLP and serve as counsel in this action for Defendant Arm Holdings plc.  I am licensed to practice in California and admitted *pro hac vice* to practice before this Court. I submit this declaration in support of Defendant's Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes.

2.      Attached as **Exhibit 1** is a true and correct copy of D.I. 361, Plaintiffs' Letter to Special Master Helena C. Rychlicki Regarding Outstanding Discovery Disputes █████████ ██████████████████████████████ dated August 1, 2025.

3.      Attached as **Exhibit 2** is a true and correct copy of D.I. 137, Second Amended Complaint ████████████ dated June 3, 2025.

4.      Attached as **Exhibit 3** is a true and correct copy of Email from Peter Evangelatos, dated June 19, 2025.

5.      Attached as **Exhibit 4** is a true and correct copy of D.I. 336, Order Appointing Special Master, dated July 18, 2025.

6.      Attached as **Exhibit 5** is a true and correct copy of D.I. 350, Order Relating to Procedures for Resolving Disputes Before Special Master, dated July 31, 2025.

7.      Attached as **Exhibit 6** is a true and correct copy of the transcript from the July 7, 2025 Deposition of Aparajita Bhattacharya ███████████████████████

8.      Attached as **Exhibit 7** is a true and correct copy of Arm Holdings PLC's First Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-3) ████████████████████████████ dated July 11, 2025.

9.      Attached as **Exhibit 8** is a true and correct copy of ARMQC_02770408 ██████

██████████████████ Only].

10.     Attached as **Exhibit 9** is a true and correct copy of ARMQC_02770392 ████

████████████████

11.     Attached as **Exhibit 10** is a true and correct copy of ARMQC_02762927 ████

████████████████

12.     Attached as **Exhibit 11** is a true and correct copy of ARMQC_02762980 ████

████████████████

13.     Attached as **Exhibit 12** is a true and correct copy of ARMQC_02762919 ████

████████████████

14.     Attached as **Exhibit 13** is a true and correct copy of ARMQC_02762920 ████

████████████████

15.     Attached as **Exhibit 14** is a true and correct copy of D.I. 85, Stipulated Order for

Discovery, Including Discovery of Electronically Stored Information ("ESI"), dated March 21,

2025.

16.     Attached as **Exhibit 15** is a true and correct copy of PTX-0398 ██████

██████████████████ dated May 17, 2022.

17.     Attached as **Exhibit 16** is a true and correct copy of PTX-0400 ██████

██████████████████, dated May 18, 2022.

18.     Attached as **Exhibit 17** is a true and correct copy of PTX-0401 ██████

██████████████████, dated May 18, 2022.

19.     Attached as **Exhibit 18** is a true and correct copy of PTX-0402 ██████

██████████████████, dated May 19, 2022.

**A0679**

20.     Attached as **Exhibit 19** is a true and correct copy of PTX-0403 ███████ ████████████████████████████████ dated May 19, 2022.

21.     Attached as **Exhibit 20** is a true and correct copy of PTX-0404 ██████ ██████████████████████████████, dated May 19, 2022.

22.     Attached as **Exhibit 21** is a true and correct copy of PTX-0405 ██████ ██████████████████████████ dated May 19, 2022.

23.     Attached as **Exhibit 22** is a true and correct copy of PTX-0406 █████ █████████████████████████ dated May 19, 2022.

24.     Attached as **Exhibit 23** is a true and correct copy of PTX-0408 ██████ ████████████████████████████ May 20, 2022.

25.     Attached as **Exhibit 24** is a true and correct copy of PTX-0445 ██████ ██████████████████████, dated September 26, 2022.

26.     Attached as **Exhibit 25** is a true and correct copy of the transcript from the July 2, 2025, Deposition of Richard Grisenthwaite ████████████████████████████████

I declare under the penalty of perjury that the forgoing is true and correct to the best of my knowledge.


Executed at Los Angeles, CA, on this 7th day of August, 2025.


                                   /s/ *Nicholas R. Fung*
                                   Nicholas R. Fung

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 7, 2025, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com

Richard S. Zembek
Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000
Houston, TX 77010
richard.zembek@nortonrosefulbright.com

John Poulos
Norton Rose Fulbright US LLP
1045 W. Fulton Market
Suite 1200
Chicago, IL 60607
john.poulos@nortonrosefulbright.com

Ruby J. Garrett
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweis.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
Anish Desai
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
fpatterson@paulweiss.com
adesai@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

**A0681**

Dated: August 7, 2025

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

**A0682**

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,                )
   a Delaware corporation; and        )
QUALCOMM TECHNOLOGIES, INC.,          )
   a Delaware corporation,            )
                                )
             Plaintiffs,           )    C.A. No. 24-490 (MN)
                                )
       v.                             )
                                )
ARM HOLDINGS PLC., f/k/a ARM LTD.,    )
   a U.K. corporation,                )
                                )
             Defendant.            )

**PLAINTIFFS' LETTER TO SPECIAL MASTER HELENA C. RYCHLICKI
REGARDING OUTSTANDING DISCOVERY DISPUTES**

OF COUNSEL:

Catherine Nyarady
Anish Desai
S. Conrad Scott
Jacob A. Braly
Jacob Apkon
Flint A. Patterson
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Eric C. Westerhold
Adam Basner
Gregg Stephenson
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
DUNN, ISAACSON, RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

August 1, 2025

Dear Special Master Rychlicki:

In August 2022, Arm sued Qualcomm for developing unlicensed technology after Arm terminated agreements with Qualcomm subsidiary Nuvia. *Arm Ltd.* v. *Qualcomm Inc.*, C.A. 22-1146 (MN), D.I. 1 ¶ 78. Rather than waiting for resolution through litigation, Arm engaged in self-help, withholding licensed technology from Qualcomm, refusing to license other technology, and interfering with Qualcomm's customer relationships. D.I. 137 ("SAC"). Qualcomm filed this lawsuit. D.I. 2. In December 2024, the *Arm* v. *Qualcomm* jury found the Qualcomm CPUs licensed. C.A. 22-1146 (MN), D.I. 572 at 1.

## I.      Refusal to Produce Unredacted Third-Party Agreements

**TLAs.** Qualcomm needs Arm's TLAs and related agreements—and associated 30(b)(6) testimony (**RFPs 123, 140; Topics 2, 9**)[1]—to prove quotes Arm gave Qualcomm for Arm Cortex Implementation Cores (codenamed ███████████████) violated the Qualcomm TLA, which ███ ██████████████████ SAC ¶¶ 104-105; Ex. 8 ████████ Arm claims it based the October 2024 quote on ████████████████ agreements. Ex. 9 at 23:1-24; Ex. 10 at 97:12-98:2; Ex. 11 at 65:24-72:9. Arm should produce all[2] agreements, so Qualcomm can test whether Arm based its analysis on ██████████████████—and whether Arm's quotes for other IP violated the implied covenant of good faith and fair dealing. Arm should also produce a witness on the agreements' royalty rates.

Arm claims it "produced all third-party agreements" licensing the Implementation Cores "to which it has not received an objection or a motion for a Protective Order was not filed." Ex. 12 at 2.[3] Arm's withholding based on mere "objections" is improper under the Protective Order. D.I. 84 ¶ 51. Arm's representation also is inaccurate: it has not produced agreements for several entities licensing these products, including ████████████████████████████ ██████████████████ And Arm omitted Annexes for several agreements that contain pricing information. ██████████████████████████████. Finally, Arm improperly limits production to TLAs licensing ██████████████, but Qualcomm's claims allege Arm provided unreasonable quotes for other TLA IP. SAC ¶¶ 51, 102.

Arm also put these third-party agreements at issue by using the fact that Qualcomm has not seen third-party TLAs to cross-examine Qualcomm witnesses, asking whether they were aware of pricing of ████████████████ in third-party TLAs and whether the rates provided to Qualcomm were accepted by the industry. Ex. 20 at 106:6-107:22; Ex. 21 at 49:16-19, 53:8-22.

---

[1] "RFP" refers to Qualcomm's requests for production, Exhibits 1-4. "Topic" refers Qualcomm's Notice of Rule 30(b)(6) Deposition of Arm, Exhibit 5. "Interrogatory" refers to Qualcomm's interrogatories, Exhibits 6-7.

[2] With respect to ████'s agreements, Morris, Nichols, represents Qualcomm.

[3] ████ agreed to production of its TLA and related agreements, Ex. 13, yet Arm has not produced them.

Arm cannot challenge Qualcomm's knowledge of third-party pricing while simultaneously withholding it.

**ALAs.** Arm breached the Qualcomm ALA by withholding out-of-box packages ("OOBs") and Architecture Compliance Kit ("ACK") patches. SAC ¶¶ 173-180. Arm argues it was not obligated to deliver that technology, including because it is not ███████████ under the ALA. Ex. 22. Arm provided that technology to other licensees, Ex. 45 at 94:25-97:16, 126:8-127:4, thus, Qualcomm seeks to determine whether the definition of and obligation to deliver ████ ████████ is the same in those partners' ALAs.

Additionally, in May 2020, Qualcomm elected to extend the Qualcomm ALA to ████ ████████████████████████████ including Armv10. SAC ¶¶ 128-134, 184. ████ ██████████████████████████████████████ *id.* ¶ 65; Ex. 23, yet Arm failed to respond to Qualcomm's election for five years, violating the implied covenant of good faith and fair dealing. Arm denies a breach, claiming it engaged in good faith negotiation even though Qualcomm's election was improper and the ALA would not cover v10. Ex. 24. Qualcomm needs to review other ALAs to address Arm's defense.

In *Arm* v. *Qualcomm*, Arm produced limited heavily redacted ALAs, which are insufficient here. Qualcomm needs ***all*** unredacted ALAs and the annexes thereto (**RFP 27; Topics 2, 7**) to evaluate the scope of deliverables and rights of other licensees treated differently than Qualcomm. For example, the produced ALAs redact ████████████████" terms, Ex. 25 at 2, 4, 12, yet Arm argues it did not breach the Qualcomm ALA because the OOBs and ACK patches are ████████ and not ████████████," Ex. 22 at 6, 10. Arm also redacted all fee and royalty information, Ex. 25, and refused to produce ████████████████ (**RFP 162**), both necessary to test Arm's claim of good faith negotiation. At least ████ agreed to produce its ALA (with limited redactions that do not relate to the provisions at issue), Ex. 13, yet Arm has not produced that document.

As with the TLAs, Arm also questioned multiple Qualcomm witnesses regarding their knowledge of terms in third-party ALAs and whether those terms were comparatively advantageous to Qualcomm, while withholding the agreements that would allow Qualcomm to refute the implications of Arm's examinations. Ex. 20 at 57:2-18; Ex. 26 at 78:14-21, 80:12-21, 164:17-25. This is improper: Qualcomm must be allowed to probe Arm's defenses.

## II.     Improper Privilege Determinations

Arm withheld or redacted documents based on improper privilege assertions. The relevant documents should be produced and redactions should be lifted.

**Communications with FGS Global.** Qualcomm asserted claims arising from the leak by Arm's counsel (MoFo) and communications firm (FGS Global) to Bloomberg News of an October 22, 2024 letter Arm wrote to Qualcomm threatening to terminate Qualcomm's ALA. Arm and FGS Global assert communications about the leak are privileged (including "common interest") or work product. Exs. 29; 46 (FGS Emails). But generic "public relations services," including "[r]eviewing press coverage, making calls to various media to comment on developments in the litigation, and even 'finding friendly reporters,'" are not protected. *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 3140050, at *13-14 (D.N.J. July 22, 2021); *In re Riddell Concussion*

A0687

*Reduction Litig.*, 2016 WL 7108455, at *9 (D.N.J. Dec. 5, 2016), *aff'd in relevant part*, 2017 WL 11633446 (D.N.J. Jan. 5, 2017).  FGS was engaged by Arm, not its outside counsel.[4]  Ex. 28 at 24:2-27:20, 57:17-23.  And common interest privilege is merely "an extension of the attorney-client privilege or an exception to the waiver of that privilege." *10x Genomics, Inc.* v. *Celsee, Inc.*, 505 F. Supp. 3d 334, 337 (D. Del. 2020).

**Improper Date Cutoff.**  Arm failed to log documents dated after the original April 2024 Complaint.  The ESI Order required a privilege log of withheld documents generated prior to "the filing of the Complaint."  D.I. 85 ¶ 1(e)(ii).  The operative "Complaint" contemplated by the March 21, 2025 ESI Order was the December 16, 2024 First Amended Complaint.  D.I. 36.  Qualcomm's claims are partly based on post-April 2024 conduct, including Arm's October 22, 2024 letter.  While Arm eventually logged 27 entries for "documents relating to Arm's communications with Bloomberg regarding the notice" and related follow up communications, D.I. 162 at 4, it otherwise refused to log withheld documents dated from April 18 and December 16, 2024.  Ex. 29.

**Subject Lines Redactions.**  Arm redacted for privilege subject lines for four meetings with outside counsel regarding the leak.  Exs. 30-33.  Arm also clawed back metadata revealing subject lines for 18 documents.  Ex. 34.  In addition to the subject lines not being privileged, the ESI Order contemplates a party challenging a privilege claim may "request metadata for individual documents and emails," D.I. 85 ¶ 1(e)(v)(1), and such metadata will include "Email Subject," *id.* ¶ 2(p).

## III.    Failure to Provide Discovery

Arm refused to produce documents or provide 30(b)(6) testimony on entire categories of relevant information, prejudicing Qualcomm.

### A.    Breach of Qualcomm ALA

**Withheld Technology.**  In support of its ALA breach claim, Qualcomm requested documents regarding the technology and information Arm provided to other ALA licensees but not to Qualcomm, including, for example, versions of Arm's ACK from the relevant time period and any patches thereto (**RFP 6; Topic 14**); documents and communications regarding ACK patches (**RFPs 31, 67, 77, 139; Topic 14**) and OOBs (**RFPs 33, 67; Topic 14**).  SAC ¶ 175.

Arm would only produce lists of technology made centrally available for licensee download on an Arm platform and technical documents it claims are "sufficient to show" the OOB and ACK patch development and timeline.  Ex. 35 at 2, 7-8; Ex. 36 at 5; Ex. 37 at 18.  But ACK patches and OOBs are not available on the platform in question and Qualcomm found no

---

[4] Arm's cases, Ex. 27, show no privilege attaches where the client, not a law firm, retains the PR firm. *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321, 331 (S.D.N.Y. 2003) (no privilege for communications had client "hired Firm directly"); *Stardock*, *Sys., Inc.* v. *Reiche*, 2018 WL 6259536, at *3, *6 (N.D. Cal. Nov. 30, 2018).

3

documents in Arm's production showing the time and effort required to develop ACK patches and OOBs. Thus, Qualcomm cannot investigate what Arm withheld and the impact to Qualcomm.

**Arm's Decision-Making.** Qualcomm's **Topic 17** seeks testimony regarding Arm's decision to withhold deliverables from Qualcomm, and **Topic 41** and **RFP 156** seek information regarding Arm's decision to resume providing deliverables following the December 2024 jury verdict in *Arm* v. *Qualcomm*. Although Arm witnesses testified ████████████████████ ███████████████████████████████ Ex. 39 at 116:11-117:23, 125:6-127:12; Ex. 40 at 31:22-32:23, Arm has not produced those communications or provided a witness on its decision-making, limiting discovery to "Arm's provision of materials and support to Qualcomm" both before and after the verdict, and Arm's responses to Qualcomm's notices of breach. Ex. 37 at 41. Qualcomm knows what Arm delivered—it does not know the entirety of what Arm withheld, on what basis, and whether there is additional technology withheld today.

**Third Parties Deliveries.** Arm's delivery of technology to third parties is relevant, including because the Qualcomm ALA requires ████████████████████████ ███████████████████████████████ and because communications with third parties may show Arm treated Qualcomm differently from others with the same or similar rights (**RFPs 28, 32, 68**). Arm refused to perform a search for documents or provide an accounting of ████████████████ delivered to third parties but not to Qualcomm (**Interrogatories 1, 5**), instead producing only "documents sufficient to show the centralized distribution of documents, and such documents made available by such distributions, to all third-party ALA licensees." Ex. 35 at 7; Ex. 41 at 9. These limitations do not allow Qualcomm to determine when such technology became ████████████ or who obtained the technology.

### B. Failure to Negotiate Armv10 License

Arm refuses to provide discovery into the versioning and development timeline of the Arm Architecture, its pricing strategy, or ████████████████, preventing Qualcomm from evaluating whether Arm negotiated a good faith offer for Armv10. According to Arm's Chief Architect, ████████████████. Ex. 42 at 130:21-23. Armv9's baseline is relevant to evaluating a fair offer for Armv10. Yet Arm refused to provide discovery into its versioning practices (**RFP 42**) pricing strategies (**Topic 26**), or efforts to encourage adoption of Armv9 (**RFP 102**). Arm also refused discovery into features included in Armv10 and associated value, when Arm began developing Armv10, and information about Arm's licensing of Armv10, including Arm's pricing strategy (**Interrogatory 3;**[5] **Topic 27**).

### C. Breach of Qualcomm TLA

Qualcomm sought discovery concerning discussions about licensing to Qualcomm under the TLA (**RFPs 40, 56, 57, 63; Interrogatory 6**) and Qualcomm's notices of breach of TLA

---

[5] For **RFP 144**, Arm agreed to produce documents "consistent with its response to Qualcomm's Interrogatory No. 3." Ex. 38 at 27-28.

4

████████ (**RFPs 49, 50, 51**).  Arm's production contains less than fifteen emails concerning Qualcomm's requests for licenses to ████████████████—all from the same three redacted email threads—and not one internal document concerning Arm's response to Qualcomm's breach notices.  Arm also improperly withheld as privileged documents purportedly relevant to Arm's CPU pricing analysis and refused to produce 2020-2023 ████████████████████████ ██████████████ Ex. 47 at 1-2.  Arm cannot defend against Qualcomm's TLA claim by asserting ██████████████████████ but withhold the documents purportedly ████████████████ as privileged.

## IV.    Improper Responsiveness Determinations

Arm crafted underinclusive search terms and interpreted responsiveness so narrowly that it produced fewer than 5,000 emails and only 21 chats.[6]  The size of Arm's document production does not match Qualcomm's claims, which allege years-long misconduct by Arm spanning multiple agreements, lines of business, and levels of Arm's organization.

In *Arm* v. *Qualcomm*, Arm produced over 18,000 emails and over 700 chats covering a similar span of time to the conduct at issue in this case.  Arm's internal communications proved critical to probing Arm's claims, including, for example, a message from Arm's CEO expressing a desire to "hose" competitors through a shift in business model.  C.A. 22-1146 (MN), D.I. 588 (Trial Tr.) at 342:18-343:11.  In this case, Arm produced just 12 chats from its CEO, a search term custodian, despite testimony he uses Microsoft Teams daily, and chats regularly about both this litigation and Arm's customers, including Qualcomm.  Ex. 44 at 145:4-147:11.

Pursuant to Section 2(b)(i) of the ESI Order, D.I. 85, Qualcomm proposed ten additional search terms and modifications to Arm's terms.  Arm deemed its production sufficient.[7]  But even if Arm accepted Qualcomm's additional terms, Arm's narrow responsiveness determinations would exclude responsive documents.  Qualcomm requests Arm be ordered to produce, without responsiveness review, all non-privileged documents hitting on (1) Arm's terms and (2) Qualcomm's proposed search terms yielding fewer than 15,000 hits, excluding families.

Respectfully,

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Words: 2394

---

[6] Arm's production in the prior case, Ex. 43 at 1, does not excuse Arm from discovery in this case.

[7] Arm claims its search terms passed requirements in Paragraph 2(b)(i) of the ESI Order.  Ex. 43 at 1.  But Arm deemed less than 3.5% of the hits to its search terms responsive, Ex. 48 at 7-9; Ex. 49 at 3-4, meaning had it produced no documents at all, it still would have complied with the ESI Order, which requires additional search terms only where "more than 10% of the null set is responsive."  D.I. 85 ¶ 2(b)(i).

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 24-490-MN |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) ) ) | ▮▮▮▮▮▮▮▮ |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant Arm Holdings PLC, formerly known as Arm Ltd. ("Arm").[1]

## NATURE OF THE ACTION

1. This case arises out of the latest chapter in Arm's campaign to stifle competition and technology innovation by impeding the efforts of its longtime business partner Qualcomm to deliver leading computer chips to its customers and consumers around the world. For years, Arm has received substantial royalties from licensing Qualcomm to design and sell products containing custom central processing units ("CPUs") compatible with Arm's instruction set architecture

---

[1] On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims. *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300. This filing contains additional background on Arm's attempt to preclude Qualcomm's custom central processing units from competing with Arm's own central processing units. The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading. Redacted Answer & Defenses to Arm's Compl. & 2d Am. Countercls., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.

("ISA"). But following its acquisition by the venture capital firm SoftBank Group and its failed sale to NVIDIA, Arm attempted to shift its business model away from licensing its ISA for use by companies like Qualcomm that design CPUs, and toward forcing customers to buy only Arm's own CPU designs. Qualcomm's license, however, stands in the way of Arm's effort to push aside the makers of custom CPUs: Qualcomm's license extends until 2033, and Qualcomm's Arm-compatible microprocessors lead the industry in numerous applications. At the direction of SoftBank and its chairman and CEO, Masayoshi Son, Arm thus sought to disrupt Qualcomm's business. Arm's first move was to sue Qualcomm for allegedly breaching a license that Arm had previously granted to a company Qualcomm acquired but to which Qualcomm was not a party, demanding that Qualcomm cease distributing its groundbreaking microprocessors. As soon as Arm filed that lawsuit, it blitzed Qualcomm's major customers with letters publicizing the lawsuit, accusing Qualcomm of breaching "the Arm license agreement," and threatening that it would "work vigorously to protect what is rightfully ours." And eight months later, Arm sent another round of letters to Qualcomm's largest customers, using language Arm's CEO has admitted under oath was "confusing" and "misleading" to create the false impression that Qualcomm was clearly in breach of its agreement. Then, on the eve of trial in that case, Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license after 60 days—the day after the trial was scheduled to end. That laid bare Arm's intentions from the beginning: to attempt to get out of its license with Qualcomm in any way possible so Arm could eliminate alternatives to Arm's own competing CPU designs.

2.      For decades, Arm has developed and licensed intellectual property relating to chips. Arm has pursued that business through two distinct models: *first*, by licensing other companies to

2

A0693

use Arm's ISA—the set of commands that determines how software controls a CPU[2]—and *second*, by licensing its own CPU designs so that other companies can make and sell products that use Arm's ready-made designs. Unlike other companies that developed a proprietary ISA used only on those companies' own chips, Arm followed a distinctive, "industry-described neutral, open licensing approach"[3] of "licensing its designs to all comers."[4] That open approach encouraged widespread adoption of Arm's ISA and also its designs. Arm's ISA—which Arm CEO Rene Haas describes as "the most ubiquitous computer architecture on the planet"[5]—is used by practically every smartphone, most "internet of things" ("IoT") devices, many automobiles, and an increasing number of personal computers and datacenter servers. Arm claims that companies using its ISA have shipped 270 *billion* chips as of January 2024.[6]

3.    One of these customers was Qualcomm, which has licensed Arm technology since 1997. As relevant here, Qualcomm and Arm entered into an architecture license agreement or "ALA" in 2013 (the "QC ALA"), which licensed Qualcomm to develop and sell custom-designed

---

[2]    An ISA acts as an interface between CPU hardware and software. These instructions describe the high-level attributes of the CPU, such as the supported computer instructions. It consists of a set of a few thousand instructions (for example, "add," "multiply," "load," and "store") and a few hundred registers, which are the places where information can be read, written, or operated upon, by the instructions, which compatible software will recognize.

[3]    Compl. ¶ 5, *In the Matter of Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 (FTC filed Dec. 2, 2021) (hereinafter "FTC Complaint").

[4]    Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparks-quick-backlash-in-chip-industry-idUSKBN2650GT/.

[5]    Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas). ARM claims that "[a]bout 99% of premium smartphones are powered by Arm." *Consumer Technologies: Smartphones*, Arm, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Dec. 9, 2024).

[6]    *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

3

A0694

CPUs that are compatible with the Arm ISA but are otherwise the product of Qualcomm's own engineering work. Qualcomm has also entered into a technology license agreement ("TLA") authorizing Qualcomm to make and sell products, including systems-on-a-chip ("SoCs") that use Arm's ready-made CPU designs.

4. In recent years, Arm has apparently grown dissatisfied with its longstanding open, neutral business model. Following its acquisition by SoftBank and the failure of an attempted sale to NVIDIA, Arm is now grasping for any means—fair or foul—of padding its bottom line and stock price. Eager to cash in on the ubiquity of—and lack of any viable alternatives to—the Arm ISA, and as urged by SoftBank and Son, Arm has begun turning the screws on its customers, substantially increasing the royalty rates it demands to use the Arm ISA. Nor is Arm content to simply increase the rates it charges architecture licensees like Qualcomm. Instead, it has sought to capture a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or indeed, by selling chips themselves).

5. Qualcomm now stands as an obstacle to Arm's ambition to raise prices and eliminate alternatives for customers. Qualcomm has developed innovative products enabled by its custom-designed, high-performance, low-power CPUs, which utilize a novel microarchitecture and related technologies to deliver significant increases in both performance and efficiency. Those innovative products pose a serious obstacle to Arm's ambition to control more links in the computer-chip value chain. Unable to compete fairly with Qualcomm, Arm has employed a series of wrongful tactics in an attempt to stifle Qualcomm's technological leaps in CPU design, to force Qualcomm to continue to use Arm's off-the-shelf CPUs, and to coerce Qualcomm into renegotiating the QC ALA, despite it being in effect for years to come, on terms substantially more

4

favorable to Arm—or simply to nullify that agreement.  Indeed, Arm's tactics are part and parcel of a broader effort to enable the company to escape its existing ALAs and thereby to ensure that devices compatible with the Arm ISA run on Arm chips.

6.    Some of Arm's maneuvers resulted in a trial that took place last year before this Court.  *See Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del.) (hereinafter "*Arm* v. *Qualcomm*").  That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA.  NUVIA was founded by a world-class engineering team that set out to design better chips for use in datacenters.  In 2021, Qualcomm acquired NUVIA for $1.4 billion, intending for this team to help drive innovation across Qualcomm's product segments, including in laptops and other personal computers ("compute"), smartphones ("mobile"), and the digital cockpits and driver-assistance systems that are increasingly common in cars and trucks ("automotive").  Arm could have treated that acquisition as an opportunity to grow the use of the Arm ISA in new markets but instead regarded the acquisition as a competitive threat, whose benefits should be eradicated.

7.    *First*, Arm asserted, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA, Qualcomm needed Arm's consent to transfer NUVIA's technology to Qualcomm.  Arm took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of the QC ALA.  Arm later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers—including in products that Qualcomm began developing after the NUVIA acquisition, such as the Snapdragon® X-Elite—violated a license agreement between Arm and NUVIA that Qualcomm was not using and that Arm ultimately terminated.  This made no sense.  Qualcomm has its own license agreements for Arm technology

5

and information that allowed it to develop and provide custom Arm-compliant cores and products incorporating such cores to its customers (including the Snapdragon® X-Elite and Snapdragon® 8-Elite) for many years to come. Qualcomm did not need Arm's consent to develop and market this technology.[7]

8.        *Second*, Arm filed the meritless *Arm* v. *Qualcomm* action against Qualcomm, claiming that Qualcomm and NUVIA breached NUVIA's terminated agreements with Arm, despite Qualcomm not even being a party to those agreements, and infringed Arm's trademarks by marketing custom CPUs years after the NUVIA acquisition. In that action, Arm is demanding that Qualcomm destroy these groundbreaking CPU products that Qualcomm developed after the NUVIA acquisition and in accordance with the Qualcomm/Arm agreements—even though Arm has repeatedly admitted that it suffered no actual harm as a result of the conduct allegedly forming the basis of its claims.[8]

9.        *Third*, Arm and Son promoted the *Arm* v. *Qualcomm* lawsuit to Qualcomm's customers to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and could be subject to retaliation by Arm if they did, including by misrepresenting the terms of Qualcomm's licenses with Arm to Qualcomm's customers.[9] Arm took further action in an attempt to disrupt Qualcomm's business relationships by sending emails to Qualcomm's customers on two separate occasions that misrepresented the terms of the NUVIA

---

[7]    Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[8]    *See* Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 29, 31-37, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306; Joint Letter re Bench or Jury Trial, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308; Redacted Mar. 5, 2024 Hr'g Tr. 38:20-39:8, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1.

[9]    Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 255-70, *Arm* v. *Qualcomm*, D.I. 306.

agreements and misleadingly implied that Qualcomm was required to destroy the custom CPUs that it was working on.

10. Qualcomm was vindicated in the *Arm* v. *Qualcomm* action, in which the jury found that Qualcomm had not breached NUVIA's agreements and that Qualcomm's products were properly licensed under the QC ALA.[10]

11. This complaint seeks redress for further bad-faith conduct in which Arm has engaged in an attempt to pressure Qualcomm to cave to its demands. That conduct includes refusing to perform certain of its obligations under the QC ALA and QC TLA and continuing to wrongfully interfere with Qualcomm's relationships with current and prospective customers.

### *Arm Withheld Deliverables in Breach of Its Obligations Under the QC ALA*

12. Arm deliberately withheld deliverables to which Qualcomm is entitled under the QC ALA with Arm under the guise that the QC ALA does not entitle Qualcomm to support for "Nuvia-based technology." Arm's excuse is unjustified, and its breach could not be clearer.

13. Qualcomm first suspected that Arm was withholding QC ALA deliverables in the fall of 2022. At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within Arm's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

14. Arm capitalized on this lack of transparency, with its General Counsel stating definitively that ███████████████████████████ Arm further stated that Qualcomm ████ ████████████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables. Here again, Arm

---

[10] Verdict Form, *Arm* v. *Qualcomm*, D.I. 572.

7

was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

15. Arm went on to state that Qualcomm's written notice was a ▮▮▮▮▮▮▮▮ to cause Arm "▮▮▮▮▮▮▮" because ▮▮▮▮▮▮▮▮▮▮" was at issue, which Arm purported was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Additionally, Arm threatened Qualcomm that, if Qualcomm availed itself ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Arm would harm Qualcomm, including by terminating Qualcomm's multiple licenses with Arm.

16. Arm's statement that ▮▮▮▮▮▮▮▮▮▮▮▮" was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted in *Arm* v. *Qualcomm* revealed incontrovertible evidence that Arm not only had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, Arm was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the use of technology acquired from NUVIA.

17. Arm never cured its failure to deliver, causing Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

18. Arm's failure to deliver violated the QC ALA, which ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under that agreement. Under the QC ALA, if Arm is found to be in breach of Section ▮▮ of the QC ALA, it must ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. If Arm fails ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮, pursuant to Section ▮▮▮▮

8

███████████████████████████████████████████████████

████████████████████████████

19.     Arm's withholding of deliverables and deliberate decision not to cure the issue

███████████████████████████████████ is a material breach of the QC ALA.  Accordingly,

Qualcomm is entitled to financial damages, including but not limited to ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

### *Arm Violated the QC TLA By Refusing to License Qualcomm CPU Cores*

20.     Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses to its off-the-shelf cores at commercially reasonable prices to Qualcomm.  Arm's actions are violations of licensing provisions negotiated between the parties.

21.     For example, in April 2024, Qualcomm submitted requests to renew licenses from Arm for off-the-shelf cores Cortex-A720 (codenamed █████████) and Cortex-A520 (codenamed █████████).  Despite repeated follow-ups over the following several months, Arm refused to provide any licensing offer for either core.

22.     In August 2024, Qualcomm submitted a request to Arm to renew a license to Arm's off-the-shelf core Cortex-M55 (codenamed █████████).  Arm once again refused to provide a licensing offer for the ██████ core and continued to refuse to provide a licensing offer for the ████████████ cores.

23.     Given Arm's prolonged refusal to engage, Qualcomm's General Counsel sent Arm a notice of breach of, and non-compliance with, the QC TLA on September 20, 2024.  Qualcomm sent a second notice on September 27, 2024 when Arm failed to provide confirmation of having received the initial letter.

9

24.     Arm waited nearly a month to respond to Qualcomm's notices of non-compliance. In its October 23, 2024 response, Arm's Chief Legal Officer wrote that Arm did not ████████ ████████████████████████████████████████████████ Despite the clear indication that Arm did not intend to proceed ████████████████████████ ████████████████████████

25.     Arm subsequently provided Qualcomm with a licensing offer for the requested cores and microcontroller.  As Arm must have been aware, its proposal was extreme and clearly not commercially feasible for Qualcomm.  Arm's proposal was a constructive failure to offer a license ████████████████████████.  Under the terms of the QC TLA, ████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████

26.     As with the QC ALA, ████████████████████████ ████████████████████ which Qualcomm sent in September 2024.  ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████

A0701

27.    Arm's proposal violated the QC TLA by presenting financial terms that were so exorbitant as to be commercially unreasonable and not ██████████, and therefore a constructive failure to offer a license.  It also greatly exceeded ████████████████████████████

████████████████████████████████████████████████████

Furthermore, Arm's proposal failed to comply with the QC TLA by ████████████████

████████████████████████████████████

28.    Arm has refused to offer commercially reasonable terms for any of the requested cores, and has thereby failed to cure its breach of the QC TLA.

### *Arm Threatened to Terminate the QC ALA Without Basis*

29.    Apparently seeking to ratchet up pressure on Qualcomm before trial in *Arm* v. *Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter (the "Breach Letter") asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing "unlicensed cores," and claiming that Arm will be entitled to terminate the QC ALA if Qualcomm does not capitulate to Arm's demands for a "cure" within 60 days. Those demands, which had no basis in the agreement, included that Qualcomm should "at a minimum" stop development of any CPUs that use any designs, technology, or code created by NUVIA employees; cease requesting ██████████████████ for any such CPUs; cease manufacturing and selling such CPUs; and cease manufacturing or selling CPUs that Arm has refused to validate and verify.  The Breach Letter also demanded, without support in the QC ALA or the law, that Qualcomm withdraw its claims against Arm in this case for Arm's breach of its delivery obligations under Section ████

30.    Arm's assertion that Qualcomm was in material breach of the QC ALA lacked any basis in that agreement.  The premise of Arm's Breach Letter was that certain Qualcomm CPU cores allegedly contain aspects of designs that were started by NUVIA employees.  But the QC

11

**A0702**

ALA does not prohibit Qualcomm from acquiring nascent microarchitecture technology and using that technology to develop Qualcomm CPUs.  And it certainly does not permit Arm to terminate the QC ALA as payback for Qualcomm's suing to protect its rights under that agreement.  Because Qualcomm has not committed a ███████████████████████████████ Arm has no right to terminate the QC ALA, and any purported termination of that agreement is null and void.

31.    Moreover, Arm's claim of a material breach was inconsistent with Arm's own conduct throughout this dispute.  Arm has known since at least 2021 that Qualcomm would be acquiring NUVIA and using the technology that Arm now belatedly claims was improperly licensed.  Yet for three years, Arm took no steps towards attempting to terminate the QC ALA and stood by while Qualcomm, through significant investments of time and money, developed and brought to market innovative products featuring Qualcomm's custom CPUs.  Arm's belated threat to terminate the QC ALA on the eve of trial and while Qualcomm was announcing new products based on its high-performance custom CPUs demonstrates that Arm's claim of a material breach was a pretext to justify Arm's true aim: escaping the QC ALA and other ALAs so Arm can attempt to dominate the market free from competition from Qualcomm and other designers of custom CPUs.

### *Arm Continues to Wrongfully Attempt to Injure Qualcomm's Business*

32.    Arm's Breach Letter was the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers.

33.    The Breach Letter was not only legally groundless, but also timed and publicly released in an effort to damage Qualcomm's business.  Arm sent the Breach Letter to coincide with Qualcomm's annual Snapdragon® Summit, where Qualcomm unveiled an SoC that offers

12

greater CPU performance and efficiency than those offered by Qualcomm's competitors, including those competitors that use Arm off-the-shelf products in their SoCs. To ensure that the Breach Letter reached Qualcomm's customers, Arm also promptly leaked it to Bloomberg, which published a story on the threatened termination that very day.[11]   Arm did so knowing that Qualcomm's customers would likely be concerned that termination of the QC ALA could destabilize their own supply chains, because Arm's actions implied, despite the actual terms of the QC ALA, that Arm could and would impede Qualcomm's ability to deliver the SoCs its customers ordered, and that Qualcomm's customers might even face intellectual-property litigation brought by Arm. Both the timing and the disclosure of the Breach Letter were thus calculated to interfere with Qualcomm's customer relationships and prospective business opportunities.

34.    The Breach Letter was also timed to interfere with *Arm* v. *Qualcomm*. In the Breach Letter, Arm threatens that it "shall be entitled" to terminate the QC ALA on December 21, 2024—the day after trial in *Arm* v. *Qualcomm* was expected to conclude. Arm's counsel's statements to this Court that termination would not be "automatic" after 60 days, that he "hope[d] that there are discussions between the parties," and that the Breach Letter could prompt the parties to "evaluat[e] their positions" underscore that Arm sent the Breach Letter to pressure Qualcomm to accede to Arm's unjustified demands.[12]   Arm's wrongful tactics have harmed Qualcomm. Following Arm's bad-faith claim that Qualcomm has breached the QC ALA and leak of the Breach Letter, important Qualcomm customers delayed entering into new (or renewing existing) contracts with Qualcomm or have insisted that Qualcomm provide them with additional commitments regarding its ability to

---

[11]   Ian King, *Arm to Cancel Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024, 8:17 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

[12]   Oct. 30, 2024, Hr'g Tr. 39:14-40:2, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

13

deliver licensed products.  Arm's campaign not only deprived Qualcomm of the ability to finalize these business opportunities promptly and without providing additional commitments, but also required Qualcomm executives and employees to spend considerable time responding to and alleviating customer inquiries.  None of those demands would have existed but for Arm's wrongful conduct.

35.     At trial in the *Arm* v. *Qualcomm* case, Arm continued to misrepresent its relationship with Qualcomm and its position in the marketplace.  Arm's Chief Executive Officer, Rene Haas, repeatedly stated that Arm did not view Qualcomm as a competitor because Arm did not build or sell semiconductor chips in the marketplace, which Mr. Haas stated would amount to direct competition between the companies.  Despite Mr. Haas' sworn statements denying Arm's involvement in chip development, Arm is now in the process of designing and distributing its own semiconductor chips.[13]  Moreover, Arm "sought to hire executives from its customers as early as November," several weeks before Mr. Haas' sworn testimony in court.[14]  Specifically, Arm's recruiter told the customer executive that this new position will help with Arm's "transformation from solely designing processor architecture (IP) to also selling its own silicon."[15]  To facilitate its entry into selling its own chips, Arm now seeks to force Qualcomm—which would otherwise be a competitor—out from the marketplace.

36.     Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025,

---

[13] *Arm recruits from customer as it plans to sell its own chips*, Stephen Nellis and Max Cherney, REUTERS,   https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (Feb. 13, 2025).

[14] *Id.*

[15] *Id.*

14

███████████████████████████████████████████████████

But even then, Arm confirmed that it was not abandoning its efforts to obstruct Qualcomm's developments of custom cores, insisting that ████████████████████████████

████████████████████████████████  Moreover, Arm sought to prevent Qualcomm from curing the impression created in the market by its deliberate leak of the Breach Letter, ████████████████████████████████████████████

████████████████████████████

37.     Arm's non-compliance with its contractual obligations to Qualcomm should be seen for what it is: the latest in a series of anti-competitive maneuvers intended to force Qualcomm to renegotiate an existing, long-term license agreement that Arm's current management views as disadvantageous, and to frustrate Qualcomm's efforts to design and deliver industry-leading technology.  Arm's tactics—its refusal to provide technology it is contractually obligated to deliver and its attempts to undermine customers' confidence in Qualcomm—should be wholly rejected.

## THE PARTIES

38.     Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm is a leading technology innovator in mobile communication products and the driving force behind the development, launch, and expansion of 5G technology.  Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone.  Qualcomm brings the benefits of mobile to new industries, including automotive, IoT, and computing, where Qualcomm's technology has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

39.     Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm Technologies is a wholly owned subsidiary

15

A0706

of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering and research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

40.     Defendant Arm Holdings PLC is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

42.     Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because Arm is "a defendant not resident in the United States" and therefore can be "sued in any judicial district."  Arm has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[16]

## FACTUAL ALLEGATIONS

### I.     ARM LICENSES AND THE CUSTOM CPU MARKET

43.     Arm is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars. Arm's licensing model has been based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee.  For many years, Arm has offered different types of license contracts, of which two are at issue in this case: ALAs and TLAs.

---

[16]  *See generally* Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

16

### A.    ALAs and the Arm ISA

44.    An ALA grants licensees the right under Arm's intellectual property to design their own custom Architecture Compliant Cores using specific licensed ISA technology and to manufacture, sell, and distribute Arm Compliant Products incorporating such cores.[17]

45.    CPU cores (also known simply as cores) are a particular component of SoCs, which are integrated circuits used in cellular phones, computers, and other devices that combine several technologies used in such products into a single chip.  A core or CPU performs processing within the SoC.

46.    An Arm Compliant Core is compatible with the Arm ISA.  As a general matter, an ISA lists the instructions that allow hardware (like SoCs) to interface with software programs. Application and software developers create their products to be compatible with particular ISAs. As a result of greater investment in Arm-based systems by hardware companies like Qualcomm and software developers, the Arm ISA is now "ubiquitous" and used in practically every premium smartphone, as well as a large percentage of automobiles and IoT devices and a growing number of personal computers and datacenter servers.

47.    The Arm ISA allows for software compatibility across all Arm-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result.  The Arm ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

---

[17] ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

17

48.    To make a CPU that then can execute the Arm ISA and therefore run applications and other software that have been written to be compatible with that ISA, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks.  Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

49.    A CPU developer developing a custom CPU designs *how* the core is built, *how* it performs, and *how* it executes the CPU's instructions.  There are a virtually infinite number of ways to design and build CPUs that can implement the Arm ISA.  Companies that design custom CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important features of CPUs.  Many of these design choices are driven by the requirements of the product segment the designer is targeting—CPUs for mobile applications can have different design priorities than those for laptop computers or automobiles.

50.    Under an ALA, Arm does not deliver any specific Arm design or tell the licensee how to make the CPU.  That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee.  As Arm has publicly acknowledged, "the creation of an optimized CPU is very costly and time consuming," and Arm therefore "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the

18

customization often does not provide a reasonable return on investment."[18]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.  Arm has executed ALAs with Qualcomm and a number of other companies.

### B.    TLAs and Off-the-Shelf CPUs

51.    In addition to granting licensees rights under ALAs to make custom-designed products that are compatible with the Arm ISA, Arm also designs "off-the-shelf" CPUs and other peripheral intellectual property ("IP") that customers may license through a TLA.  Under a TLA, Arm delivers complete processor core designs that a licensee can incorporate into a larger SoC design, saving the licensee the trouble and expense of designing its own CPU.  In addition to CPUs, Arm also designs, and licenses under the TLA, peripheral IP, which is technology used in SoCs to perform specific functions and interface with the CPU.  This peripheral IP takes a variety of forms, such as "interconnects" that facilitate the transfer of information between different components of an SoC or various pieces of software that are incorporated into a semiconductor chip as a means of certifying safety capabilities of the chip.  Recently, Arm has placed greater emphasis on licensing off-the-shelf CPU technology, including by launching a "Compute Subsystems" business that offers integrated designs that pair CPUs with other technology—all in exchange for "significantly higher royalty rates" than Arm receives for licensing its ISA.[19]

52.    But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance.  Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it

---

[18]    Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

[19]    *Id.*

19

charges for a license to the Arm ISA.  Moreover, when an SoC developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs.  And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing SoCs that can compete against those with more advanced custom CPUs.

## II.    QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

53.    Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications."  Qualcomm is a world leader in the design and production of semiconductor microchips, including SoCs.  Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines.  Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

54.    Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates.  In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive industry designed to deliver connected experiences that are safer and customizable.  Included among these products are custom CPUs and SoCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

20

**A0711**

### A.    Qualcomm Builds Innovative Arm-Compatible Products.

55.    Qualcomm has held Arm licenses since 1997.  Those licenses include an ALA entered in 2003, and the currently operative QC ALA, ███████████████, which Qualcomm[20] and Arm entered into on May 30, 2013, and Annex 1 to that agreement for Arm v8-A Architecture deliverables.  On June 23, 2020, Qualcomm and Arm entered into an additional Annex 1 to the QC ALA for Arm v9-A Architecture deliverables.

56.    Under the QC ALA and corresponding Annex 1s, Qualcomm has rights, using specific licensed technology, to design, manufacture, sell, and distribute Qualcomm's v8-A and v9 Arm-compatible custom cores, custom Arm ISA-compatible CPU cores, and products incorporating those cores.  ███████████████████████████████████████████████████████████████████████████████.  Since Qualcomm entered into the QC ALA, Qualcomm has developed and shipped custom Arm ISA-compatible CPUs.

57.    Qualcomm is today one of Arm's largest licensees—it "accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024."[21]  Since 2013, Qualcomm has paid Arm total license fees of ███████ and running royalties of ███████ under the QC ALA.  Qualcomm has fully complied with its obligations under the QC ALA and has continued to tender royalty payments to Arm (under protest) pending resolution of this dispute.

58.    In recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for

---

[20]   The actual party to the ALA and TLA ████████████████████████████████ ████████   The terms of the agreements ███████████████████████████████ ████████████████████████████████████████

[21]   ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024 (Form 20-F) at 28 (Aug. 12, 2024).

21

Qualcomm to compete by relying on Arm-designed cores.  In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical.

59.    In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SoC specifically for use in datacenter servers.  At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs.  Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary compute, mobile, and automotive product segments.  Qualcomm also planned to continue development of the server CPU and SoC for use in data centers and servers that NUVIA had originally intended to design.

60.    Since acquiring NUVIA and integrating the NUVIA team as Qualcomm employees, Qualcomm spent years developing innovative products with custom-designed CPUs using a novel microarchitecture and related technologies.

61.    Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86).  Qualcomm's new products with custom CPUs have drawn praise as being "incredibly potent"[22] and "shockingly fast."[23]

62.    Qualcomm is not alone in its belief that its custom cores offerings will transform and advance the industry.  Major industry participants—including Microsoft, Google, Samsung,

---

[22]  Aaron Klotz, *Snapdragon X Elite Beats AMD and Intel Flagship Mobile CPUs in Geekbench 6*, Tom's Hardware (Apr. 2, 2024), https://www.tomshardware.com/pc-components/cpus/snapdragon-x-elite-beats-amd-and-intel-flagship-mobile-cpus-in-geekbench-6-qualcomms-new-laptop-chip-leads-in-single-and-multi-core-tests.

[23]  Mark Hachman, *Qualcomm's Snapdragon X Elite Chip Attracts Unprecedented PC Partnerships*, PCWorld (Oct. 25, 2023), https://www.pcworld.com/article/2116395/qualcomms-latest-snapdragon-attracts-huge-pc-partnerships.html.

22

GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[24]

### B. Relevant Provisions of the Qualcomm ALA

63. On May 30, 2013, Qualcomm and Arm entered into an Amended and Restated Architecture License Agreement, ███████████████, and Annex 1 to that agreement. The QC ALA is a binding and enforceable agreement.

64. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

65. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

66. ████████████████████████████████████████

██████████████████████████████████████████████

---

[24] *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.



67. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████.[26]

## C.   Arm's Evolving Business Model

68.    For years, Arm expressed its commitment to an open, neutral model for licensing the use of its ISA.  Under that model, which led to Arm commonly being referred to as the "Switzerland of chips," Arm held itself out as not discriminating against companies that sought to use the Arm ISA.[27]  That model benefited the software developers, which could develop software

---

[25] ████████████████████████████████ are defined terms in the QC ALA. *See* ████████████.

[26] ██████████████████████ is a defined term in the QC ALA. ██████████.

[27] FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point

24

that would be interoperable across Arm-compatible devices, and ultimately benefited customers. Indeed, Arm continues to tout the benefits of its "broad, standardized software ecosystem," which it claims "ensures diversity and robustness in supply, as well as easy software portability between Arm-based systems."[28]  That model also benefited Arm, leading to widespread adoption of the ISA.  As a senior Arm executive has explained, "[w]hat makes an architecture successful is actually the number of people that use it," as greater adoption of an ISA creates a "virtuous circle" in which the "more people that use your architecture, the more people will want to use it."[29]

69.    After being acquired by SoftBank, however, Arm has pivoted away from that model.  When the chipmaker NVIDIA attempted to acquire Arm in 2020, the proposed acquisition met with harsh responses from regulators and other companies that rely on the Arm ISA, based on fears that NVIDIA could use its control of Arm to undermine its rivals, "including by manipulating levers such as [Arm]'s pricing, the terms and timing of access to [Arm]'s Processor Technology, … [Arm]'s technological developments and features, and [Arm]'s provision of service and support."[30]

70.    When that acquisition fell apart under regulatory scrutiny, Arm pursued a variety of strategies to try to bolster royalty revenues at SoftBank's and Son's behest, including unsuccessful attempts to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made, and to force a major customer

---

about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees").

[28] *The Arm Advantage: Choosing Arm Technology*, Arm.com, https://www.arm.com/company/arm-advantage (last visited Dec. 9, 2024).

[29] Arm, *What Is CPU Architecture?*, YouTube.com (Aug. 18, 2021), https://www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.

[30] FTC Compl. ¶ 8.

25

to renegotiate royalty rates notwithstanding the parties' existing contract.[31]  After releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores.[32] Indeed, in its calls with investors, Arm routinely touts the increased revenues it expects to collect as a result of widespread adoption of v9.Arm has also attempted to bolster its income—and thus its valuation—by abandoning its historic role of neutral and open licensing of its ISA.  Having made that ISA "ubiquitous" for the entire smartphone and IoT markets and made significant inroads in other sectors, Arm now seeks to leverage that ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA.  Mr. Haas has hinted at precisely that sort of leveraging, explaining that as the company "defining a computer architecture and … building the future of computing," it is "easier" to understand the best ways to integrate hardware and software "if you're building something than if you're licensing IP" because "building something" makes a company "much closer to that interlock" and gives it "much better perspective in terms of the design tradeoffs to make," which is why "if we were to do something, that would be one of the reasons."[33]  Moreover, Arm has also sought to develop more complex, integrated "subsystems" that combine CPUs with other chips and intellectual property.[34]  And it was recently

---

[31]  Wayne Ma & Cory Weinberg, *How a Lopsided Apple Deal Got Under Arm's Skin*, The Information (Nov. 29, 2023), https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin.

[32]  *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas).

[33]  Alex Health, *What Arm's CEO Makes of the Intel Debacle*, The Verge (Dec. 6, 2024, 4:45 PM), https://www.theverge.com/2024/12/6/24315123/arm-ceo-rene-haas-intel-ai-chips-samsung-changes.

[34]  *Client Solutions: Arm Compute Subsystems (CSS) for Client*, Arm, https://www.arm.com/products/compute-subsystems-for-client (last visited Dec. 9, 2024).

26

reported that, in a "radical change to [Arm's] business model," Arm was planning to launch its own chip by as early as this summer.[35]  This transformation from licensing intellectual property to positioning itself primarily as a chip designer creates the potential for Arm to make substantially more money:  These businesses "carry significantly higher royalty rates"[36] than merely licensing use of the Arm ISA.

71.     But this transformation also brings Arm into direct conflict with existing licensees and customers.  When an architecture licensee like Qualcomm designs a custom Arm ISA-compatible CPU, that CPU does not belong to Arm.  Instead, as Arm has publicly acknowledged, those custom CPUs "compete with" and "pose a threat to Arm's implementation IP business"— that is, Arm's effort to position itself as a designer of CPUs.[37]

72.     Arm has thus responded by pressuring customers (such as Qualcomm) to purchase Arm's off-the-shelf CPUs and by attempting to prevent Qualcomm from designing CPUs compatible with the Arm ISA.

## III.    ARM UNFAIRLY AND UNLAWFULLY ATTEMPTS TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

73.     Developing its own CPUs frees Qualcomm of the need to rely on Arm's off-the-shelf CPU designs.  That can both reduce the royalty rates Qualcomm pays Arm— ▇▇▇▇▇▇

---

[35]  Matthew Garrahan et al., *Arm To Launch Its Own Chip in Move That Could Upend Semiconductor Industries*, Financial Times (Feb. 13, 2025), https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008 .  According to the report, the chip is "expected to be a [CPU] for servers in large data centres and is built on a base that can then be customized for clients."

[36]  *Arm First Quarter Fiscal Year 2025* at 5, Arm (July 31, 2024), https://investors.arm.com/static-files/393afe3f-13ff-4aa8-a4b3-41b1afaa5a91 (statement of Rene Haas).

[37]  Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

27

██████████████████████████████████████—and demonstrate that products using Qualcomm custom CPUs can outcompete products using Arm's off-the-shelf designs.  Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an even better product for customers and opening new product segments for chips compatible with Arm's ISA, Arm has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

**A.    Arm Wrongfully Withholds Deliverables Owed to Qualcomm Under the QC ALA.**

74.    In an effort to limit competition posed by Qualcomm's custom CPU, Arm breached its contractual obligations to provide Qualcomm with deliverables paid for under the QC ALA.

*1.    The QC ALA requires Arm to provide Qualcomm with certain deliverables.*

75.    The two contract provisions at issue here—Sections ██ and ██—are clear and unambiguous.

76.    Section ██ of the QC ALA requires Arm to "████████████████████████████████████████████████████████████████████████ and to "████████████████████████████████████████████████████████████████." Arm is also required to deliver updates ████████████████ ████████████████████████████████████████." ████████████████ is defined in the Qualcomm ALA as "████████████████████████████████████ ████████████████████████████████ under that agreement.

77.    Under Section ██ of the QC ALA, ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

A0719

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

### 2. Arm withholds the deliverables.

78.     Qualcomm first suspected that Arm was withholding ███████████████ under the QC ALA in the fall of 2022.  At that time, Qualcomm was embarking on its verification process for its ███████SoC.  As is the customary practice between an ALA licensee and Arm, Qualcomm provided Arm with details about its ███████ CPU so that Arm would provide a formal list of agreed Arm Compliance Kit ("ACK") tests for which Arm would expect to see verification data.  But Arm withheld the formal list of tests (known as the "OOB") ████████████████████████

████████████████████████████████████████████

██████████████

79.     Qualcomm then attempted to resolve the issue without court intervention.

80.     On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug fixes) from Arm.  Arm engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll be able to share OOB and various patches after my management has given their approval."

### 3. Qualcomm provides written notice of Arm's failure to deliver—but Arm does not cure.

81.     Almost one month later and after still not having received the deliverables under the QC ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022, Qualcomm notified Arm in writing of its failure to provide certain deliverables, including the OOB, stating explicitly that Arm should take the letter as "Qualcomm's required notice under Section ███ that Arm is not in compliance with its obligations under Section █, and that Arm must cure this breach in accordance with the time and procedures set forth therein."

29

82.    After not hearing from Arm, pursuant to Section ▮ of the QC ALA, Qualcomm sent a follow-up letter on December 5, 2022.  The letter was Qualcomm's "second written notice of non-compliance ███████████████████████████████████████████████████.″ The letter stated that "ARM must ███████████████████████████████████ set forth″ in the QC ALA "or ████████████████████████████████.″

83.    Pursuant to Section ▮ of the QC ALA, Arm ███████████ to remedy its failure to provide the deliverable.  ██████████ passed without Arm remedying the issue.

84.    Arm responded on December 6, 2022.

85.    In its response, Arm disagreed that Section ▮ was at issue "or that provision of the OOB implicates Section ▮.″  Arm additionally asserted that the ACK deliverables are governed by Section ▮ of the QC ALA, not Section ▮, and that remedies for a breach of that section do not include ████████████████████████████.

86.    Notably, Arm additionally claimed that ██████████████████████████████████ stating explicitly that Arm ████████████████████████████████████ ██████████████████████████████ As to the OOB specifically, Arm claimed that ██████ ████████████████████████████████████████████████████████████ ██████████

87.    Arm was definitive in its assertions, stating that "[n]o additional delivery is required,″ and "[n]o breach of Section ▮ has occurred.″  Qualcomm was unable to verify this assertion because the "patches″ are created by Arm and provided solely by Arm.  Accordingly, Qualcomm has no way of knowing definitively whether Arm has released patches for verification until they are delivered (or until someone from Arm tells Qualcomm they are available, which did not occur in this case).

30

88.    Arm's letter further stated that Qualcomm "does not have ███████████ ██████ rights under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables.  Arm additionally threatened Qualcomm that if it did not drop its invocation of Section ██, Arm would take steps that would harm Qualcomm.  Arm claimed that Qualcomm's invocation of Section ██ was "a new, material breach of the Qualcomm ALA" and that, to the extent Qualcomm exercised ████████████████████████████ ████████████████████ Arm would "not hesitate to terminate" Qualcomm's licenses.  Arm further stated that Qualcomm's letter was a "malicious effort" to cause Arm "economic duress," which Arm purported was "inconsistent with the language, spirit, and purpose of the ALA and ██████████████████████."

### 4.    *Discovery reveals that Arm deliberately withheld the deliverables.*

89.    But more than a year later, Qualcomm discovered that Arm's December 6, 2022, letter misrepresented the facts and concealed Arm's strategy of deliberately withholding the OOB and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm duress.

90.    "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'"  In response to Qualcomm's requests for production, Arm produced an October 2022 email chain in which Richard Grisenthwaite, Arm's Executive Vice President and Chief Architect, explicitly instructed others at Arm not to provide Qualcomm with the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[38]

---

[38]  On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include Arm's breach of Section ██ of the QC ALA.  These allegations and

91.     In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that Arm concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  Arm's multi-tiered deception was successful for more than a year.  "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section ▮▮ of the Qualcomm ALA."[39]

92.     The applicable Annex 1 to the QC ALA includes ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

93.     Accordingly, when it was revealed through document and deposition testimony that, contrary to Arm's December 6, 2022, letter, Arm had deliberately withheld the ACK deliverables to which Qualcomm was entitled, it became clear that Arm breached its obligations under Section ▮▮▮▮▮▮▮

---

quotations are taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order.  Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5.  Notably, at that hearing, Arm advocated against adding this claim to the case in which this discovery was produced; and instead, Arm advocated for Qualcomm to bring a separate lawsuit.  Redacted Mar. 5, 2024 Hr'g Tr. 39:13-20, *Arm* v. *Qualcomm*, D.I. 312-1.

[39]   Redacted Mar. 6 Order at 4, *Arm* v. *Qualcomm*, D.I. 303; *see also* Redacted Mar. 5, 2024 Hr'g Tr. 17:18-19:9, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

32

94.     Arm's Chief Legal Officer concealed the facts, explicitly (and definitively) stating in Arm's December 6, 2022, letter that it had provided Qualcomm with ███████ to the ACK and that ████████████████████████████" Qualcomm did not have a valid basis to dispute that factual representation without discovery.

### 5.     *Arm's breach of the QC ALA has harmed Qualcomm.*

95.     To date, Arm still has not provided the OOB and relevant patches to which Qualcomm is entitled, and Arm's failure to do so increased Qualcomm's burden in verification.

96.     By failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA, even in the absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the QC ALA.

97.     Similarly, by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches, which Qualcomm paid for and was entitled to receive under the QC ALA.  Qualcomm was damaged as a result.

98.     ████████████████████████████

99.     Pursuant to Section ██ of the QC ALA:



100.    Accordingly, ████████████████████████████

33

**A0724**

101. In addition, because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**B.  Arm Fails to Provide Qualcomm With ▮▮▮▮▮▮ Licensing Proposals in Violation of the QC TLA.**

102. Arm has not only attempted to disrupt Qualcomm's development of custom CPUs but also attempted to interfere with Qualcomm's development of products containing off-the-shelf Arm cores by intentionally failing to provide commercially reasonable, and therefore ▮▮▮▮▮▮ licensing proposals to Qualcomm ▮▮▮▮▮▮▮▮▮▮ In addition to the below, Qualcomm expects discovery to show that Arm ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in its licensing negotiations involving peripheral TLA IP.

   *1.  The QC TLA requires Arm to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.*

103. The QC TLA contains ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

34

104.    Section ▮▮▮ sets forth a series of requirements that Arm must follow for each of its off-the-shelf cores. ████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████

105.    ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████

106.    ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████ Arm has never provided Qualcomm with written notice that ████████

████████████████

107.    ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

35

108. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████

### 2.    *Arm fails to respond to Qualcomm's licensing requests.*

109.    As part of its product development cycle, Qualcomm monitors the terms of licensing agreements to determine whether renewals or extensions of third-party IP will be necessary in order to plan for future product development and sales.  Qualcomm has historically licensed and renewed licenses for various ████████████████████.  For example, Qualcomm sought to renew licenses to certain ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

110.    Qualcomm's licenses for all three cores, which were ████████████ licenses entered into in 2019, are set to expire in ██████  Given Qualcomm's desire to avoid disruption to its development schedule and roadmap, it began negotiations for new licenses for each core in 2024.

111.    In April 2024, Qualcomm sent Arm written requests to license both ████████████

████████

36

**A0727**

112. Arm failed to respond to Qualcomm's requests, ███████████████, and ignored continued outreach from Qualcomm in the subsequent months.

113. In August 2024, Qualcomm submitted a written request for ████. Arm failed to respond to this request as well.

114. Faced with Arm's continued non-compliance and the potential impact to its roadmap, Qualcomm sent Arm a notice of non-compliance with Section ██ of the QC TLA (including ████████████) in September 2024. Qualcomm told Arm that the letter "serves as Qualcomm's written notice of ARM's breach of, and non-compliance with, ████████ of the TLA." The letter asked that "ARM provide the requested core license immediately and in accordance with the terms and conditions of the TLA as required by ██████████████ of the TLA, or Qualcomm will be forced to exercise its remedies under the TLA."

115. Once again, Arm failed to respond. A week later, Qualcomm wrote to Arm again, informing Arm of the "second written notice of breach and non-compliance in accordance with the notice process set forth in Section ██ of the TLA."

### 3. *Arm fails to provide* ████████ *licensing terms to Qualcomm.*

116. Nearly four weeks later, Arm finally responded to Qualcomm's notice of non-compliance. In its October 23, 2024 letter, Arm "████████████████████████████████". Instead, Arm told Qualcomm that it did not "████████████████████████████████████████████████"

117. In connection with the letter, Arm provided offers to the requested cores that Arm claimed were ████████████████████████ However, not only was this untrue, but also Arm's proposal contained terms so unreasonable that it was a constructive failure to license.

37

118.    The financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and ▮▮▮▮▮▮▮.  For example, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮ was not justified by any change or improvement in the technology and is grossly inconsistent with the market for any comparable technology.  Arm was aware of the unrealistic terms of its proposal, which Arm acknowledged it only provided because of Qualcomm's notice of non-compliance with Section ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ This constructive failure to offer a license to the requested cores violated the terms of the QC TLA.

119.    Arm's proposal also violated the QC TLA requirement under Section ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

120.    Furthermore, by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

### *4.  Qualcomm has been harmed by Arm's TLA violations.*

121.    As a result of Arm's exorbitant proposal, Qualcomm has been forced to proceed in development of SoCs without knowing what CPUs it will be using after the licenses to ▮▮▮▮ ▮▮▮▮▮▮▮ expire.

122.    Due to the development lifecycle for semiconductor chips, Arm's ▮▮▮▮ refusal to offer licenses and to change ▮▮▮▮▮▮▮ of its licensing offers is already impacting Qualcomm.  Qualcomm must undergo reviews of its planning roadmaps to ensure that it will have suitable CPUs for its customers.  This effort requires (i) that additional resources be shifted to

38

design custom CPUs for each of its semiconductor chips (ii) that Qualcomm allocate resources to identify workarounds based on RISC-V and redesign products to function with a different microprocessor design, or (iii) rely on older, less competitive versions of Arm CPUs that Qualcomm has licensed.

123. The QC TLA sets forth the remedies for Arm's violations.

124. ████████████████ states that Qualcomm may seek ████████████



125. In addition, Section ██ of the QC TLA states:



126. Qualcomm sent its first notice of breach on September 20, 2024 and its second notice on September 27, 2024. Arm's purported offer in response to Qualcomm's notices was dated October 24, 2024. To date, Arm has failed to provide any commercially reasonable, ████, ████, offer and, as such, has failed to remedy its breach within the ████████████.

127. Qualcomm is entitled to ████████████████ under both the QC TLA and QC ALA for a period of ████████████████████████████████████████████████████████████████████████████████. While Qualcomm will continue to ████████████████ until Arm's breach of the QC TLA is finally

39

A0730

resolved, Qualcomm believes that Arm is not entitled to receive those ███████████████ ███████████████████████ pursuant to the QC TLA and ALA █████████████████ ████████████████████████████ For this reason, Qualcomm does not believe that any ██████████████████████ .

**C.    Arm Refuses to Negotiate a License to the Latest Version of Its ISA ███████ ████████████**

128.    Arm has not only taken steps to destroy or delay Qualcomm's present development efforts.  It has also tried to hamstring Qualcomm's future development efforts by failing to negotiate a license to future versions of the Arm Architecture.

129.    In addition to failing to provide the deliverables ██████████████████████ and constructively failing to offer licensing proposals ████████████████ , Arm has also refused to negotiate an extension of ████████████ to cover future versions of ████████████████████ ████████ requires it to do.

130.    As noted, Section ████████ of the QC ALA ████████████████████████████

████████████████████████████████████████████████████████

████████████ Qualcomm has ██████████████████████████████ . Additionally, Section ████████████ of the QC ALA ████████████████████████████████████

████████████████████████████████████████

131.    On April 17, 2020, a Qualcomm employee emailed an Arm counterpart to ask if Arm was working on a new version (v10) of the Arm ISA to replace v9 and explained that the request was made in the context of ██████████████████████████████████████ ██████████████████ The Arm employee responded the following week that " ████████████████ ████████████████████████████████████████████████████████

40

A0731

██████ would expire but that there was ████████████████████████

████████████████████████████████████████████

132.    On May 20, 2020, Qualcomm emailed Arm stating that Qualcomm ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████.”

133.    Arm never responded to that email or followed up at any other time regarding Qualcomm's rights ████████████████████

134.    Arm's actions underscore its strategy of attempting to eliminate existing ALAs and to force Qualcomm and other licensees to use Arm's off-the-shelf CPU designs—or to cease designing Arm-compatible chips entirely.

**D.    Arm Engages in a Campaign to Undermine Qualcomm's Customer Relationships.**

135.    In addition to the breaches described above, Arm has also deliberately sought to impair Qualcomm's standing and relationships with current and prospective customers.  As Qualcomm has detailed, Arm, through its leadership and through SoftBank and Son, has engaged in a misinformation campaign to mislead Qualcomm's customers into believing that Qualcomm will not be able to deliver licensed Arm-compatible products after 2024, and that Qualcomm customers must obtain their own direct licenses from Arm.[40]  That misinformation campaign included multiple rounds of letters to Qualcomm customers misleadingly claiming that Qualcomm had breached its ALA and suggesting that customers could face legal jeopardy from using

---

[40]    Defs.' Answer and Defenses to Pl.'s Compl. & Jury Demand & Defs.' 2d Am. Countercls. ¶¶ 255-70, 275(b)-(d), *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.

41

**A0732**

Qualcomm products.  More recently, Arm began "ratcheting up the pressure" on Qualcomm in *Arm* v. *Qualcomm*,[41] and Arm continued this misinformation campaign by declaring without basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter.  By doing so, Arm has caused tangible harm to Qualcomm's customer relationships.

### 1.    *Arm repeatedly attempts to interfere in Qualcomm's customer relationships.*

136.    On August 31, 2022, Arm commenced *Arm* v. *Qualcomm* in the U.S. District Court for the District of Delaware.  In that action, Arm alleges that Qualcomm and NUVIA breached the NUVIA ALA by not destroying all design work undertaken by NUVIA pursuant to its license with Arm following Qualcomm's acquisition of NUVIA.

137.    On the same day that Arm filed that action, it launched a premeditated campaign to blitz Qualcomm's customers with letters publicizing the lawsuit.  As Mr. Haas admitted under oath at trial, Arm sent letters to top executives at 37 companies that were customers of both Arm and Qualcomm.  In those letters, Arm stated that Qualcomm had breached the terms of "the Arm license agreement," implying that Qualcomm had breached its own ALA.  That was misleading: Arm's complaint in the *Arm* v. *Qualcomm* action accused Qualcomm and Nuvia of breaching the *Nuvia* ALA and never accused Arm of breaching the *Qualcomm* ALA.  Mr. Haas thus also admitted under oath that the letter "should have said" that Qualcomm had supposedly breached the Nuvia ALA, not Qualcomm's "Arm license agreement."

138.    Additionally, the August 31 letters asserted that Arm would "███████████ ████████████████████████" and thus (despite assuring customers that there would be "███ ████████████████████████████") suggested that companies could face legal jeopardy if

---

[41]    Oct. 30, 2024, Hr'g Tr. 34:6, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

A0733

they used the Qualcomm products that incorporated Nuvia technology. The letter attached a letter from Arm's general counsel to Qualcomm's general counsel that made this point explicitly, asserting that ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████

139.    Eight months later, in May 2023, Arm launched another round of customer letters. Arm executive Will Abbey sent a series of additional letters to key Qualcomm customers "████████████████████████████████████████████████." Mr. Haas agreed at trial that there was no independent event that triggered Arm's decision to send these letters. That letter stated that Qualcomm's designs based on Nuvia technology, specifically including the Phoenix core, "can no longer be used and must be destroyed." Mr. Haas also agreed at trial that it was very important to Arm to tell customers that it was demanding destruction of technology. The letter extensively quoted from Arm's prior threat letter to Qualcomm but did so in a manner intended to convey that it was quoting from a contract between Qualcomm and Arm that specifically required Qualcomm to cease using "Arm-based technology" developed by Nuvia and to destroy such technology.  In fact, no such contract existed, and the intended implication of quoting that language was thus false.  Mr. Haas admitted at trial that he was "quite confused" by the language of the letter and agreed that the letter was "misleading."

140.    Like the prior letters, the May 2023 letters reassured customers that there would be no disruptions to their partnership with Arm, but only if that partnership was "███████████ ███████." It also offered to answer questions that customers might have regarding how the litigation might impact the availability of licensed Arm technology going forward, which necessarily

43

implied that the litigation could impact the availability of the Qualcomm products that Arm claims were unlicensed.

### 2.    *Arm waits years before taking steps to terminate the QC ALA.*

141.    Although Arm now asserts that Qualcomm is in material breach of the QC ALA, Arm waited years before taking any steps towards terminating the QC ALA.  When it filed the *Arm* v. *Qualcomm* action, Arm neither alleged that Qualcomm had breached the QC ALA nor sent Qualcomm any notice to that effect, ███████████████████████████████

███████

142.    On September 30, 2022, Qualcomm answered Arm's complaint in *Arm* v. *Qualcomm* and filed a Counterclaim against Arm seeking, among other things, a declaratory judgment that its conduct was fully licensed under the QC ALA, and that it could "continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA" or any other relevant agreement with Arm.  When Arm answered that counterclaim, it generally alleged that Qualcomm was breaching the QC ALA, though it did not send Qualcomm any written notice to that effect█████████████████████████.

143.    On March 13, 2024, Qualcomm filed its second amended counterclaims in *Arm* v. *Qualcomm*.  Arm answered on April 4, 2024, and again alleged that Qualcomm was breaching the QC ALA, entitling Arm to terminate that agreement.  Again, however, Arm did not send Qualcomm any written notice to that effect ██████████████████████

### 3.    *Arm's Breach Letter groundlessly asserts that Qualcomm is in material breach of the QC ALA.*

144.    It was not until more than seven months later, on October 22, 2024, that Arm sent Qualcomm the Breach Letter, which purported to provide notice to Qualcomm ████████████ ████████████████████ that Qualcomm is in material breach of that agreement.

44

**A0735**

145.    The Breach Letter asserted that the QC ALA authorizes Qualcomm solely "to develop, verify, and sell designs for CPUs … that use, rely on, or derive from Arm technology *delivered by Arm to Qualcomm* and *developed by Qualcomm employees*, not third parties."[42]  It did not attribute these assertions to any particular provision of the QC ALA but instead cited a string of contract sections, ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ The Breach Letter also referred generally to "Annex 1," a lengthy document describing ████████████████████████.  But nowhere in the Breach Letter did Arm identify any provision of the QC ALA that imposes the particular obligations Arm asserts in the Breach Letter.

146.    In the Breach Letter, Arm claimed that Qualcomm "systematically and willfully breached these obligations" by "develop[ing] CPUs and market[ing] multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party."[43]  The Breach Letter thus reprised the same arguments it has made in *Arm* v. *Qualcomm* about the NUVIA ALA: in essence, that Qualcomm somehow breached the *NUVIA* ALA by developing CPUs in part by using technology created by and acquired from NUVIA.  Arm has not explained in that litigation and did not explain in its Breach Letter how Qualcomm allegedly breached any provision in the *QC* ALA by developing CPUs in the manner it did.  In short, there is a reason why Arm's purported notice letter failed to state clearly which express contractual provision Qualcomm materially breached, or when or how Qualcomm breached any such provision: None exists.

---

[42]   Ex. A at 1 (emphasis added).

[43]   *Id.*

45

147.     Having invoked Section████████ of the QC ALA, Arm's Breach Letter demanded that Qualcomm "cure" the alleged breach(es) within 60 days, including by stopping the development of "Nuvia designs" and the manufacture and sale of Qualcomm CPUs that allegedly "use Nuvia designs or technology."  The Breach Letter further demanded that Qualcomm "cure" the alleged breaches by withdrawing its complaint in this Action against Arm.  And the Breach Letter asserted that if Qualcomm does not "cure" the alleged breaches in this manner within 60 days, Arm would be entitled to immediately terminate the QC ALA.

148.     The "cures" that Arm demanded in its Letter—other than the dismissal of this Action—are the same remedies that Arm has requested in *Arm* v. *Qualcomm*.  By sending the Breach Letter, Arm attempted to pressure Qualcomm to yield to its demands regardless of the outcome of *Arm* v. *Qualcomm*, as well as this case, before the former went to trial.

149.     The timing of the Breach Letter belied Arm's assertion that Qualcomm has materially breached the QC ALA.  Arm knew about Qualcomm's acquisition of NUVIA in 2021, and asserted in its November 2022 Answer to Qualcomm's Counterclaim that Qualcomm was supposedly in breach of the QC ALA.  Yet before sending the October 22, 2024, Breach Letter, Arm never even attempted to provide the notice ████████████████ that Qualcomm had supposedly breached the agreement.  Quite to the contrary, Arm *celebrated* Qualcomm's development of the Snapdragon® X Elite SoC that contains CPU designs whose development Arm now claims breach the QC ALA, with Arm's CEO stating that Arm was "very excited to see the announcement of the brand new Windows on Arm PCs that run Copilot, true AI PCs."[44]  In the

---

[44]  *Arm First Quarter Fiscal Year 2025*, at 3.  Mr. Haas further commented that "the products that are out today are using the most advanced Arm technology," because they "are optimized with Microsoft for the most effective battery life on the planet."  *Id.* at 10.

Breach Letter, Arm nowhere explained why it waited more than three years after Qualcomm allegedly breached the Nuvia ALA before it provided notice of an alleged breach of the QC ALA.

150.   Because Qualcomm did not materially breach the QC ALA, Arm did not identify any valid grounds on which to terminate the QC ALA, and any purported termination based on the Breach Letter is null and void.

### 4.   *Arm leaks the Breach Letter to harm Qualcomm's customer relationships.*

151.   Arm's assertion that Qualcomm was in material breach not only lacked legal or factual basis, but was also made in a manner calculated to damage Qualcomm's customer relationships.  Arm's claim that it has the authority to terminate the QC ALA was false, wrongful, and calculated to pressure Qualcomm to accede to Arm's demands and to prevent Qualcomm from gaining new business opportunities.

152.   From October 21–23, 2024, Qualcomm hosted its annual Snapdragon® Summit. At that Summit, Qualcomm unveiled new technology, including its new Snapdragon® 8 Elite Mobile Platform, an SoC featuring Qualcomm's custom-built second generation Qualcomm Oryon™ CPU.  That SoC delivers significant performance and efficiency improvements over competitors, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

153.   Arm issued its Breach Letter on October 22, 2024, in the middle of the Snapdragon® Summit.  That timing was no accident, but was an intentional Arm media stunt intended to embarrass Qualcomm and to interfere with its relationships with its current and potential customers and business partners, including by creating unwarranted uncertainty about Qualcomm's ability to continue delivering licensed Arm-compatible products.

47

154.    In addition to sending the Breach Letter to Qualcomm, Arm also leaked the Breach Letter or its contents to Bloomberg, which published a story that same day.[45]  The story was based on and referred to "a document seen by Bloomberg."  On the afternoon of October 22, 2024—the same day Qualcomm received the Breach Letter—a Bloomberg reporter contacted Qualcomm requesting comment on Arm's having sent Qualcomm a "60-day letter" notifying Qualcomm that it was purportedly in breach of the QC ALA.  The reporter was familiar with details of the letter.  Later that day, Bloomberg published its story reporting on Arm's purported cancellation of the QC ALA.[46]  The story relayed details about the Breach Letter "according to a document seen by Bloomberg."  Because Qualcomm did not leak the Breach Letter, the Letter could have reached Bloomberg only if it had been leaked by Arm.

155.    Arm leaked the Breach Letter to distract from the Snapdragon® Summit and the groundbreaking products released at the Summit, and to ensure that the attention of Qualcomm's customers and business partners focused on the parties' licensing dispute rather than on Qualcomm's products, which pose a threat to Arm's own competitive ambitions.  The leak of the Breach Letter thus further demonstrated Arm's deliberate efforts to interfere with Qualcomm's customer relationships.

### 5.    *Arm's leak of the Breach Letter harms Qualcomm.*

156.    The release of the Breach Letter has caused Qualcomm harm, by impairing its relationships with current and prospective customers and interfering with its future business opportunities.

---

[45]    See Ian King, *supra* note 11.

[46]    *Id.*

157.    Following Bloomberg's publication of the news story about the Breach Letter, multiple Qualcomm customers and business partners have contacted the company to express concern about the Breach Letter.  As a result of the Breach Letter—and, in particular, Arm's baseless assertion that it can terminate the QC ALA—several Qualcomm customers have deferred finalizing pending business agreements pending resolution of the *Arm* v. *Qualcomm* litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products.

158.    For example, a major customer (the "Smartphone Company") had informed Qualcomm that it was designing a new mobile phone that would rely on Qualcomm's innovative Snapdragon® 8-Elite SoC.  After learning that Arm was threatening to terminate the QC ALA, however, a senior executive of the customer informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm.  The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm.

159.    Additionally, a potential customer (the "AI and Ecosystem Company") that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU.  After the Breach Letter was published, the customer delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities.  The AI and Ecosystem Company has stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question.  As a result of the uncertainty stemming from Arm's assertion and

49

A0740

leak of the Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity.

160.    Simultaneous with its actions that have set back Qualcomm's efforts to finalize a deal with the AI and Ecosystem Company, Arm is also attempting to supply the AI and Ecosystem Company directly.  Despite Arm's insistence at trial in *Arm* v. *Qualcomm* that it does not make chips, it was recently reported that Arm had reached an agreement with the AI and Ecosystem Company under which Arm would begin producing its own chips for use in a datacenter operated by the AI and Ecosystem Company.[47]  Arm has thus not only delayed Qualcomm's efforts to finalize a contract with the AI and Ecosystem Company but has separately developed its own datacenter chips that it is trying to sell to the same company.

161.    Arm leaked the Breach Letter at a time when it knew that the Smartphone Company is an existing customer of Qualcomm and when it knew or should have known that the AI and Ecosystem Company was a customer of Qualcomm or was likely to be absent Arm's interference. On information and belief, Arm leaked the Breach Letter knowing (or in circumstances in which it should have known) that its wrongful threats to cancel the QC ALA would disrupt those customer relationships and that Qualcomm was likely to be harmed as a result.

### 6.    *Arm's withdrawal of the Breach Letter offers no assurance that Arm will not attempt to terminate the QC ALA.*

162.    Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025, Arm Chief Legal Officer Spencer Collins sent Qualcomm a letter (the "Notice") withdrawing the Breach Letter and stating ███████████████████████████████████

████████████████████████████████████    The Notice also

---

[47] Reuters, *Arm Secures Meta as First Customer for Ambitious New Chip Project, FT Reports* (Feb. 13, 2025).

50

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ The Notice asserted, however, that Arm ████████████████

████████████████████████████████████████████████████

████████████████████████████ The Notice thus indicated that Arm was pausing its efforts to terminate the QC ALA, but in no way suggested that Arm had any plan to abandon its long-term efforts to force Qualcomm to use Arm off-the-shelf cores and to block Qualcomm from creating and delivering products using its own custom cores (or indeed, any chips that might compete with Arm's own offerings).

163.    Arm also sought to prevent Qualcomm from addressing the uncertainty created by Arm's own leak of the Breach Letter.  Despite leaking that letter to the press, Arm ████████████ ████████████████ thereby attempting to limit Qualcomm's ability to disclose the letter. Arm authorized Qualcomm to ████████████████████████████ thereby seeking to obstruct Qualcomm from communicating about the letter publicly or with potential customers or other business partners.

## IV.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY

164.    Arm's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end.  Despite Arm's CEO's sworn testimony to the contrary, it is clear that Arm seeks to take control of the semiconductor industry and will do whatever it takes to undermine and dominate the companies that it once treated as partners.

165.    Arm's tactics violate basic contract principles and are directly contrary to the purpose of the QC ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ████████ they bargained for without fear that Arm will unilaterally

51

A0742

abdicate its contractual obligations in an effort to disrupt a licensee's innovation if Arm views the licensee as an unacceptable competitor. ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

166.    The assault on Qualcomm's business through the improper refusal to provide commercially reasonable, ███████████, licensing offers under the QC TLA likewise threatens reliance on the Arm ecosystem and the fundamentals of licensing. Licensees enter into TLAs with Arm under the assumption that they will be joining a collaborative and open ecosystem and will be able to license the IP necessary to compete and grow in the market. Arm's transformation into a chipmaker, combined with its throttling of the delivery of critical IP, is a dramatic reversal of Arm's longstanding business model that endangers the semiconductor industry and the manner in which its participants interact.

## COUNT I

### (Declaratory Judgment)

167.    Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

168.    Plaintiffs are entitled to a declaratory judgment that:

A.    Arm breached the QC ALA by withholding ███████████████ that Arm was obligated ██████████████████████" to deliver under Section ███ of the QC ALA, and by withholding ████████ Arm was required to deliver ██████████████████████" under Section ███ of the QC ALA;

B.    As a result of Arm's breach of Section ███ of the QC ALA, Qualcomm is entitled to ████████████████████████████ ████████████████████████████

C.    Arm breached the QC TLA by ████████████████████████ ████████████████████████          including ███████████████

52

A0743



_____ in violation of _____ ____ of the QC TLA.

D. As a result of Arm's breach of Section ___ of the QC TLA, Qualcomm is entitled to _____ _____ including _____ _____, and _____ _____.

E. Arm breached the QC TLA by _____ _____, including _____ _____ in violation of _____ of the QC TLA.

F. As a result of Arm's breach of Section ___ of the QC TLA, _____ _____.

G. Arm breached the QC TLA by _____ for _____ including _____ _____ with _____ _____ of the QC TLA.

H. As a result of Arm's breach of Section ___ of the QC TLA, _____ _____;

I. Qualcomm has not breached the QC ALA as asserted in the October 22, 2024, Breach Letter; and

J. Arm is therefore not entitled to terminate the QC ALA.

169. A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that _____ _____.

170. A valid and justiciable controversy exists between Qualcomm and Arm because _____ Arm is threatening to terminate the QC ALA if Qualcomm _____ pursuant to Section __ of the ALA.

171. A declaratory judgment is also necessary and appropriate so that Qualcomm may ascertain Arm's obligations and Qualcomm's rights and obligations under the QC ALA and clear

53

A0744

any cloud that may exist over its business as a result of Arm's false assertions of breach and threats to terminate the QC ALA.

172.     A valid and justiciable controversy exists between Qualcomm and Arm because Arm has asserted that Qualcomm is in breach of the QC ALA and has asserted that Arm has the right to terminate the QC ALA on December 21, 2024.  Qualcomm disputes both assertions. Qualcomm also reasonably expects that Arm would attempt to use its purported termination to damage Qualcomm with its customers, in the media, and with analysts, in light of Arm's behaviors to date.

## COUNT II

### (Breach of Section █ of the QC ALA)

173.     Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

174.     The QC ALA is a valid, binding contract.

175.     Arm failed to fulfill its obligation under Section █ of the QC ALA because it intentionally withheld from Qualcomm certain ███████████ to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

176.     Accordingly, Arm did not ████████████████████████████

████████████████████████████████████ or █████████

████████████████████████████████████

██████ or ████████████████████████████

████████████████████ as is required by Section █ of the agreement.

177.     Arm's failure to comply with its contractual obligation to timely deliver bargained-for technology was not only intentional, but it was also done with an intent to deceive Qualcomm.

54

178.    Qualcomm put Arm on written notice of this violation and Arm ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮, as is required under the contract.

179.    Arm's breach of Section ▮ of the QC ALA entitles Qualcomm ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

180.    As a proximate result of Arm's breach of contract, Qualcomm has been damaged both (i) by delay that could have been avoided had Arm fulfilled its obligations, (ii) by costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK tests to verify that its products are compliant with the Arm ISA and use its own engineers to address issues that would have been addressed by Arm's patches, and (iii) by ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

not misrepresented its compliance with the parties' agreement.

## COUNT III

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

181.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

182.    Under California law, every contract implies a covenant for each party not to do anything that will deprive the parties of the benefits of the contract.

183.    At all relevant times, Arm agreed and was required by law to act fairly and in good faith with respect to its obligations under the QC ALA and TLA.

184.    Arm breached this implied covenant of good faith and fair dealing under both agreements.  For example, Arm withheld deliverables that it was required to provide Qualcomm under the QC ALA; asserted, without valid basis under the QC ALA, that Qualcomm was supposedly in material breach of that agreement; sent letters to Qualcomm customers and leaked

A0746

the Breach Letter to the media to create uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs; failed to negotiate an extension to the QC ALA that would cover future version of the architecture, including v10, and failed to provide licensing proposals for ███████████████ to Qualcomm in violation of provisions of the QC TLA.

185.    Arm's actions have been willful and carried out in bad faith, as part of an effort to enable Arm to disregard the QC ALA and TLA so that it can prevent Qualcomm from competing with Arm's sale of its own CPU and other chip designs, or, at a minimum, coerce into renegotiating the QC ALA so that Arm can extract payments from Qualcomm that exceed those due under the QC ALA.

186.    Arm's actions have unfairly frustrated the essential purposes of the QC ALA and TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm, including the right to produce and sell custom CPUs that are compatible with the Arm ISA ████████████████████████████████████.

187.    For at least the foregoing reasons, Arm has breached the implied covenant of good faith and fair dealing for both the QC ALA and TLA.

188.    As a proximate result of Arm's breach of the implied covenant of good faith and fair dealing, Qualcomm has been injured in its business or property, and is threatened by imminent loss of profits and loss of actual and potential customers and business opportunities.

## COUNT IV

### (Intentional Interference with Prospective Economic Advantage)

189.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

56

190.    Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above.

191.    Absent Arm's interference, these relationships would likely result or would have likely resulted in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations.    These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship.

192.    Arm knew of these relationships but nevertheless engaged in conduct aimed at interfering with Qualcomm's business opportunities, including by (a) purporting to give notice that it "shall be entitled" to terminate the QC ALA based on nonexistent alleged material breaches of the QC ALA; (b) deliberately leaking the Breach Letter in the middle of Qualcomm's Snapdragon® Summit; and (c) making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

193.    Arm's interference with Qualcomm's business opportunities was wrongful.    For example, as explained below, Arm's conduct represented unfair business acts and practices in violation of California law.

194.    By engaging in this conduct, Arm intended to disrupt these relationships or knew that disruption of these relationships was certain or substantially certain to occur.

57

195.     As a result of that conduct, these relationships have in fact been disrupted.  The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a substitute contract with Arm instead, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional assurances.  As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm.

196.     Arm's efforts to interfere with Qualcomm's business relationships have been a substantial factor in causing that harm, which Qualcomm would not have suffered but for Arm's misconduct.

## COUNT V

### (Negligent Interference with Prospective Economic Advantage)

197.     Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

198.     Arm knew or should have known that Qualcomm has substantial business relationships with a number of customers, including the Smartphone Company and the AI and Ecosystem Company.

199.     Arm also knew or should have known that these relationships would be disrupted by Arm's failure to act with reasonable care by purporting to terminate the QC ALA despite lacking legal or factual grounds for doing so, by leaking the Breach Letter in bad faith and in disregard of its duties to Qualcomm as a contract counterparty, and by making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

58

200. Arm owes Qualcomm a duty to act with reasonable care based on, among other things, the parties' contractual relationship and the foreseeability that interfering with Qualcomm's customer relationships would cause Qualcomm harm.

201. Arm failed to act with reasonable care when, in bad faith, it purported to declare that Qualcomm is in material breach of the QC ALA, leaked the Breach Letter, and made those misleading and threatening statements to Qualcomm's customers.

202. Arm's conduct was wrongful because, for example, it was "unfair" under California law.

203. As a result of Arm's wrongful conduct, Qualcomm's relationships with the customers identified herein have been disrupted, as customers have required additional assurances or delayed entering into additional transactions with Qualcomm.

## COUNT VI

### (Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

204. Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

205. The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

206. By engaging in the conduct described above, Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL. These unfair business acts or practices include deliberately withholding deliverables it was required to provide Qualcomm ▮▮▮▮▮▮▮▮▮▮▮▮▮; misrepresenting to Qualcomm that it was not withholding deliverables; refusing to negotiate license terms with Qualcomm ▮▮▮▮▮ repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's

59

current and prospective customers; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA; to pressure Qualcomm to accede to its demands in *Arm* v. *Qualcomm*; and to prevent Qualcomm from continuing to litigate its meritorious claims in the instant case.

207. Arm's actions are part of a broader campaign to harm or threaten to harm competition for CPU and other computer chip designs, in California and elsewhere. Arm is employing a variety of unfair acts and practices so that it can leverage its control over the ISA used in all premium smartphones and a large and growing share of other computing devices to attempt to prevent Qualcomm from developing and marketing products with CPUs that threaten to outcompete products containing Arm's off-the-shelf CPU designs. These tactics include making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of preventing Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores.

208. Arm's conduct is also unfair because it threatens to significantly harm competition not only for CPU designs, but also for the SoCs used in a variety of platforms, and ultimately for the devices that use those CPUs and SoCs. If Arm's conduct goes unchecked, Qualcomm and other chip designers will be forced to rely on Arm's off-the-shelf CPUs and will be at Arm's mercy if Arm wishes—as it has signaled it does—to foreclose them from making chips that are compatible with the Arm ISA. As a result of Arm's efforts to reduce competition to create those CPUs and SoCs, consumers will be deprived of products that are built around innovative, high-

60

performance, high-efficiency Qualcomm chips and/or will have to pay more for (or will have reduced choices among) products that incorporate CPUs compatible with the Arm ISA. Arm's conduct towards Qualcomm—a longtime Arm licensee—threatens incipient violations of competition laws; violates the policy or spirit of those laws; threatens to significantly harm competition; is immoral, unethical, oppressive, and unscrupulous; and threatens to harm consumers and competition in a manner vastly disproportionate to whatever supposed benefits that behavior could possibly create.

209.    Arm's conduct is also unlawful because it violates California common law, including state law prohibiting intentional and negligent interference with prospective economic advantage.

210.    Arm's unlawful and unfair business acts and practices are a direct and proximate cause of injury to Qualcomm. Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers. If Arm is allowed to continue in its unlawful and unfair business acts and practices, Qualcomm risks being denied access to a widely used ISA for which there are no readily available alternatives for certain applications, which threatens to impede Qualcomm's ability to continue developing and marketing its high-performance products based on its own custom CPU designs. Arm's conduct thus threatens to harm competition among SoC producers but also in end users, who will be forced to use products built with Arm chips and CPUs.

211.    Qualcomm has standing to bring this claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct.

A0752

212.    Qualcomm requires equitable relief under the UCL because it lacks adequate remedies at law to address Arm's anticompetitive and unfair actions, which are ongoing and which have caused or threaten to cause Qualcomm to suffer significant harm.

## COUNT VII

### (Breach of Section ▮ of the QC TLA)

213.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

214.    The QC TLA is a valid, binding contract.

215.    Arm failed to fulfill its obligation under Section ▮ of the QC TLA because the licensing offers it provided to Qualcomm for ▮▮▮, including ▮▮▮

▮▮▮

216.    Arm's failure to comply with its contractual obligation ▮▮▮

▮▮▮

▮▮▮

217.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ▮▮▮, as is required under the contract.

218.    Arm's breach of Section ▮▮▮ of the QC TLA entitles Qualcomm to a ▮▮▮, including ▮▮▮ and a license offer ▮▮▮.

219.    Arm's breach of Section ▮▮▮ of the QC TLA entitles Qualcomm to ▮▮▮

▮▮▮

62

220. As a proximate result of Arm's breach of contract, Qualcomm has been harmed both by (i) shifting resources to its custom CPU team in order to analyze and begin development of CPUs for future SoCs that would have used the ████████████████, including ████ ████████████ cores, (ii) the uncertainty caused by Arm's refusal to license the ████ ████████████, which causes complications in the roadmapping and SoC planning process, and (iii) by ████████████████████████████████████████ ████.

## COUNT VIII

(Breach of Section ████ of the QC TLA)

221. Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

222. The QC TLA is a valid, binding contract.

223. Arm failed to fulfill its obligation under Section ████ of the QC TLA because the licensing offers it provided to Qualcomm for ████████████████, including ████████████ ████████████████████████████████████████ ████████████████████.

224. Qualcomm put Arm on written notice of this violation and Arm failed to cure within ████████ as is required under the contract.

225. Arm's breach of Section ████ of the QC TLA entitles Qualcomm to ████████ ████████████████████████████████████████ ████.

226. As a proximate result of Arm's breach of contract, Qualcomm has been forced to seek alternative means to ensure that it is protected according to the ████████████ that it

63

negotiated in the QC TLA and to divert additional resources in order to continue development of its SoCs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment and relief as follows:

A      For the declaratory judgments set forth in Plaintiffs' claims;

B      For an Order requiring Arm to comply with all its obligations under the QC ALA, including (but not limited to) by providing the ███████████████, OOB, Patches, and ████████, without discrimination or retaliation;

C      For an Order requiring Arm to comply with all its obligations under the QC TLA, including (but not limited to) by ████████████████████████████████████████ ████████████████████████████████ including ████████████████████████████████ ████████████████████████████████████████████

D      For an Order enjoining Arm from engaging in the unlawful, unfair, and anticompetitive actions and practices described in this Amended Complaint and from any other unlawful, fraudulent, or unfair acts or practices aimed at obstructing Qualcomm's ability to develop and sell chips;

E      For an Order that Qualcomm is entitled to ████████████████████████████ with respect to ████████████████████ licenses at pricing structures ████████████ ████████████████████████

F      For an Order ████████████████████████████████████████████████████ ████████████████████████████ as a result of Arm's breach of the QC ALA and TLA;

G      For an Order that the Breach Letter is ineffective notice of an alleged material breach and that Arm has no right to terminate the QC ALA on the grounds stated in the Breach Letter;

H      For recovery of all ████████████████████████████████████████████████ ████████████████████████████████████████

I      For damages resulting from the wrongful conduct alleged in this Amended Complaint, including from Arm's threat to terminate the QC ALA and its leak of the Breach Letter, failure to offer ████████ licensing terms ████████████████, and specifically including damages arising from the postponement of the business opportunity with the AI and Ecosystem Company;

J      For restitution of amounts Arm derived from the unfair and anticompetitive conduct described in this Amended Complaint;

64

K        For costs and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief; or, in the alternative, for additional damages, in the alternative, that the Court deems appropriate;

L        For an award of attorneys' fees and costs as allowed by law; and

M        For such other and further relief available at law and equity as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL

BY JURY of all claims and issues presented in this Complaint that are so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Melissa F. Zappala
Ruby J. Garrett
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

June 3, 2025

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

65

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 3, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                     *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Karen E. Keller, Esquire                                    *VIA ELECTRONIC MAIL*
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                                 *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Nicholas R. Fung, Esquire                                   *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

66

**A0757**

Kyle W.K. Mooney, Esquire                                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Erik J. Olson, Esquire                                        *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                                       *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                                          *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                                    *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*


                                        */s/ Jennifer Ying*
                                        _____
                                        Jennifer Ying (#5550)


67

A0758

# EXHIBIT 3

| | |
|---|---|
| **From:** | Evangelatos, Peter |
| **To:** | Braly, Jacob; #KE-ARM-Qualcomm; MoFo_Arm_QCOM; ycst_arm_qualcomm |
| **Cc:** | GRP-QCvARM; kdunn@dirllp.com; William Isaacson; mzappala@dirllp.com; jying@morrisnichols.com |
| **Subject:** | RE: Qualcomm v. Arm -- RFPs Concerning TLA Agreements |
| **Date:** | Thursday, June 19, 2025 4:07:01 PM |

<mark>External Email</mark>



**This message needs your attention**

• Some Recipients have never replied to this person.
• Someone new is on this email. peter.evangelatos@kirkland.com recipient(s) added.

Report this Email or Mark as Safe          Powered by Mimecast

Jake,

Thank you for your email. To be clear, it was Qualcomm that mentioned the idea that Arm would produce a spreadsheet identifying licensees and royalty information. Arm agreed to take that back for further consideration. Regardless, Arm agrees that it will produce license agreements with third parties for ██████████████ in effect as of October 2024.

As further discussed on the call, Arm also objected to Qualcomm's request to the extent those agreements prevent Arm from disclosing them due to confidentiality obligations. Arm stands on that objection. Nonetheless, Arm has begun the process of requesting third-party approval to produce each such agreement. Arm will produce those documents to Qualcomm on a rolling basis as third-party confidentiality concerns are resolved. However, as you know, third parties can object to Arm's production by filing a motion for a protective order. To the extent a third party objects and files such a motion, Arm will withhold that party's license agreement pending resolution of that dispute.

Best,
Peter

**Peter Evangelatos**
------------------------------------------------------
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 909 3291 **T** +1 516 528 6348
**F** +1 212 446 4900
------------------------------------------------------
peter.evangelatos@kirkland.com

---

**From:** Braly, Jacob <jbraly@paulweiss.com>
**Sent:** Wednesday, June 18, 2025 11:01 PM
**To:** #KE-ARM-Qualcomm <KE-ARM-Qualcomm@kirkland.com>; MoFo_Arm_QCOM

<mofo_arm_qcom@mofo.com>; ycst_arm_qualcomm <ycst_arm_qualcomm@ycst.com>;
**Cc:** GRP-QCvARM <GRP-QCvARM@paulweiss.com>; kdunn@dirllp.com; William Isaacson <wisaacson@dirllp.com>; mzappala@dirllp.com; jying@morrisnichols.com
**Subject:** Qualcomm v. Arm -- RFPs Concerning TLA Agreements

Peter,

We are following up on the discussion during today's meet and confer regarding Qualcomm's requests for third-party TLA licenses and annexes, as well as licensing offers and pricing information provided to third parties for ███████████████████ .
We do not believe that Arm's proposal of providing a spreadsheet identifying licensees and royalty rates as of October 2024 is sufficient.

███████████████████████████████████████████
██████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████

Given these contractual requirements, the documents relevant to Qualcomm's claim for breach of ████████████ will be the Arm license agreements with third parties for the same Arm Implementation Cores, ████████████████████████████████████
████████ Qualcomm is entitled to review both the ████████████████████████████
████ in these agreements.

Please let us know whether Arm will produce these documents so we can raise the issue with the Court promptly, if necessary.

Regards,
**Jake Braly** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3726 (Direct Phone) | +1 212 492 0726 (Direct Fax)
jbraly@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INC., and QUALCOMM TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 24-490 (MN) |
| | ) | |
| ARM HOLDINGS PLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER APPOINTING SPECIAL MASTER**

WHEREAS, by Order dated December 4, 2014, the Court revised the scope and administration of the Special Master Panel for complex cases; and

WHEREAS, consistent with the goals and needs expressed in the referenced Order, the Court concludes that the appointment of a Special Master is warranted in the above-captioned case;

NOW THEREFORE, this 18th day of July 2025, IT IS HEREBY ORDERED that:

1.      **Appointment of Special Master.  Helena C. Rychlicki**, is appointed as Special Master to manage discovery and disputes concerning amendments.

2.      **Discovery and Motions to Amend/Strike.** As required by Rule 53(b)(2) of the Federal Rules of Civil Procedure, the Special Master shall proceed with all reasonable diligence and, as provided by Rule 53(c), shall have the authority to regulate all proceedings and take all measures necessary to address issues relating to the parties' discovery disputes, and any motions to amend or strike pursuant to paragraph 8 of the Scheduling Order (D.I. 44), and rule on same.

3.      **Discovery disputes.** The Special Master shall, after consulting with the parties, establish procedures for the handling of discovery disputes and motions to amend/strike.  As part of those procedures, the parties must first advise Chambers, by emailing this Court's Judicial Administrator (diana_welham@ded.uscourts.gov), of any new or additional disputes the parties

wish to bring before the Special Master.  The Special Master shall have the duty and authority to require the submission of reports, call conferences, and hold hearings in order to determine the status of issues relating to discovery and to issue orders requiring the parties to adhere to case management dates set by the Court.  The Special Master shall hear, resolve and make rulings on all disputes regarding discovery and, when appropriate, enter orders setting forth her rulings.

    a.    With respect to discovery motions,[1] all such motions (but **not** the related briefing and appendices, if any) shall be filed with the Court.

    b.    With respect to hearings and conferences, they shall be held in this District's Courthouse or other appropriate place arranged by the Special Master or by the parties, with the approval of the Special Master.  If the Courthouse is used, the Special Master shall arrange for a courtroom through the Clerk's Office (Beth Mason at 302-573-6170).

    c.    Absent agreement among the parties, all hearings shall be transcribed by a certified court reporter.  The Special Master may arrange for a court reporter through Dale Hawkins at dale_hawkins@ded.uscourts.gov who shall be given one week's notice of any scheduled hearings absent emergency circumstances. Absent an order by the Special Master, the parties shall bear equally the costs of the court reporter and transcript.

    d.    The Special Master shall preserve all materials the Special Master receives or prepares in connection with any dispute regarding discovery.  The Special Master shall not be required to file any such materials with the Court, unless directed to do so by the Court, except that the following shall be filed: (1) any transcripts that contain the rulings from the bench; (2) orders entered setting forth the Special Master's rulings; and (3) any opinions prepared supporting her rulings.  All such papers shall be filed with the Court through the Special Master and docketed by Chambers staff.

**4.**    **Ex parte communications.** The Special Master shall not communicate ex parte with a party without the consent of all parties.  The Special Mater may communicate ex parte with the Court.

---

[1]    Only the formal motion itself must be docketed with the Court. All other discovery materials should be lodged only with the Special Master, consistent with ¶ 6 *infra*.

2

5.    **Confidential information.** The Special Master may have access to trade secrets, proprietary information or other confidential information in this action including, but not limited to, information which may be subject to a protective order.  The Special Master and other persons assisting the Special Master shall preserve and protect the confidentiality of all such information and, if required to file any orders, findings, opinions or materials that contain or make reference to any such information (including, but not limited to, information designated "Confidential," "For Attorneys Eyes Only" and/or "Highly Confidential"), the Special Master shall file the same under seal.

6.    **Appeals.**  The Special Master's rulings shall be subject to review by the Court, consistent with Rule 53(f).  In this regard, unless otherwise ordered:

(a)    the **parties may serve, file and docket** with the Court specific written objections (and responses thereto) to any of the Special Master's rulings;[2]

(b)    the objections shall be filed no later than twenty-one (21) days after being served with a copy of the ruling, and the responses thereto shall be filed within ten (10) days after being served with a copy of the objections;

(c)    the objections and responses to the objections are limited to ten (10) pages each; and

(d)    the **parties must serve, file and docket** with the Court (as well as provide to the Judge to whom the case is assigned a courtesy copy of) any relevant portion of the record made before the Special Master which pertains specifically to the objections.[3]

7.    **Compensation.**  The Special Master shall be compensated for the Special Master's services at the Special Master's usual hourly rate.  Others assisting the Special Master shall be compensated at their usual hourly rates.  The Special Master shall send itemized statements for services and expenses directly to counsel for the parties on a monthly basis, and shall receive

---

[2]    Counsel shall docket using the "objections" and "response to objections" docket events.
[3]    Counsel shall docket separately as an appendix using the "appendix" docket event.

3

payment directly from counsel for the parties in a timely fashion.  The compensation and expenses of the Special Master shall, unless otherwise ordered, be shared equally by the parties (that is, 50% by Plaintiff(s) and 50% by Defendant(s)).  In this regard, if (in the Special Master's opinion) a party engages in behavior which occasions the waste of the Special Master's time and resources, or otherwise hinders the efficient resolution of matters before the Special Master, that party may be apportioned all or a larger portion of the Special Master's compensation, costs, and expenses. Any objections or disputes as to the Special Master's compensation, costs, and/or expenses shall be presented to the Court in a timely application.


_____
The Honorable Maryellen Noreika
United States District Judge

4

# EXHIBIT 5

A0768

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INC., and QUALCOMM TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 24-490 (MN) |
| ARM HOLDINGS PLC, | ) ) ) | |
| Defendant. | ) | |

## ORDER RELATING TO PROCEDURES FOR
## RESOLVING DISPUTES BEFORE SPECIAL MASTER

Prior to contacting the Special Master regarding a discovery dispute or motion to amend/strike, the parties shall confer in good faith pursuant to D. Del. LR 7.1.1 to attempt to resolve or narrow the issues in dispute. As ordered by the Court, the parties must first advise Chambers "of any new or additional disputes the parties wish to bring before the Special Master." *See* Order Appointing Special Master, D.I. 336 ¶ 3.

After following the above requirements, Delaware counsel for the moving party shall contact the Special Master by email (HRychlicki@pwujlaw.com) to schedule a hearing and copy opposing Counsel on this correspondence ("Counsel's Request"). Counsel's Request shall include a short (no more than one paragraph) non-argumentative identification of the nature of the dispute, a D. Del. LR 7.1.1 certification that the parties are at an impasse regarding this dispute and identify any time consideration as to resolving the dispute. Counsel's Request shall be sent by the District of Delaware's 5:00 P.M. Eastern Time filing deadline, and accompanied by a motion, along with an opening letter brief in support of that motion outlining the issues in dispute, the applicable law, and its position on those issues. All exhibits and case law/transcripts cited and/or relied upon must accompany the letter brief.

The opening letter brief shall not exceed 2400 words, single-spaced, in no less than 12-point font. The party's cover page and signature block are not included in the word count. The actual number of words used (as reported by the word-processing system used) must be included after the signature block.

Following Counsel's Request, the Special Master may schedule a telephonic, video, or in-person hearing for the discovery motion(s). Video hearings are the preferred method. Unless otherwise ordered, the additional procedures set forth below shall apply. Upon request of a party, the Special Master may modify these procedures, including by modifying or extending the briefing schedule or page limits to accommodate the nature of the dispute or the schedules of the parties and their counsel.

The parties will provide the Special Master with copies of unredacted pleadings filed under seal to provide background information, as well as copies of the Protective Order and ESI Order entered in this action.

**1. Hearing, Motion, and Briefs**: The Special Master shall set a hearing at a time convenient to her that, if practical, will occur approximately seven or eight (7 or 8) business days after Counsel's Request. Within four (4) or five (5) business days after the Counsel's Request, as agreed by the parties in advance, any party opposing the motion may email the Special Master a responsive letter brief outlining that party's reasons for its opposition. All briefs, any supporting exhibits, and cited case law/transcripts shall be emailed to the Special Master and counsel for the opposing party by the District of Delaware's 5:00 P.M. Eastern Time filing deadline. Unless otherwise ordered, opposition letter briefs shall not exceed 2400 words, single-spaced, in no less than 12-point font. The party's cover page and signature block are not included in the word

2

**A0770**

count. The actual number of words used (as reported by the word-processing system used) must be included after the signature block.

2. **Attachments/Exhibits**: Generally, there should be limited attachments or exhibits to the letters. For example, in a protective order dispute, only the provisions at issue should be attached. Similarly, regarding interrogatory/request for production issues, only the disputed interrogatory or request for production and the responses as they exist at the time of the letter submissions should be attached. The parties may, however, include full copies of documents if they believe the context of the document at issue could be helpful to the Special Master. The parties' correspondence relating to the dispute also may be attached as exhibits. Cases/transcripts cited and/or relied upon in the letter submission should be forwarded as well.

3. **Further Briefing**: Should the Special Master find further briefing necessary upon conclusion of the hearing, she will order it.

4. **Notice to Court**: Pursuant to the Court's July 18, 2025 Order Appointing Special Master (D.I. 336), all discovery motions brought before the Special Master (but not the related briefing and appendices, if any) shall be filed with the Court. Only the formal motion itself must be docketed with the Court. All other discovery materials should be lodged only with the Special Master. For any new or additional disputes the parties wish to bring before the Special Master, the parties must first advise Chambers, by emailing the Court's Judicial Administrator.

SO ORDERED this 31st day of July, 2025.

 /s/ Helena C. Rychlicki
Helena C. Rychlicki, Special Master

3

# A0772-A0855
# Redacted in Full

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,
  a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
  Delaware corporation

       Plaintiffs,

      v.

ARM HOLDINGS PLC, f/k/a, ARM LTD.
  a U.K. corporation

       Defendant.

C.A. No. 24-490-MN

### ARM HOLDINGS PLC'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO QUALCOMM'S FIRST SET OF INTERROGATORIES (NOS. 1–3)

Pursuant to Rules 23 and 33 of the Federal Rules of Civil Procedure, and the applicable Local Rules of the United States District Court for the District of Delaware, Defendant Arm Holdings PLC ("Arm") hereby responds to Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm")'s First Set of Interrogatories (Nos. 1–3).

### GENERAL OBJECTIONS

Arm makes the following general objections, which are hereby incorporated by reference and made part of its response to each and every Interrogatory.

1. Arm objects to each Interrogatory to the extent it purports to impose upon Arm discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware, orders entered in this case, or agreements among the parties.

2. Arm objects to the "Instructions" and "Definitions" sections to the extent they purport to alter the plain meaning and/or scope of any specific Interrogatory, on the ground that

1

such alteration renders the Interrogatory vague, ambiguous, overly broad, and/or uncertain, by failing to adequately define terms or by using terms the meaning of which are not readily available or decipherable.  Arm's responses to such Interrogatories shall not be construed as an admission, agreement, or acquiescence to any such instruction or definition.  Arm further objects to the "Instructions" and "Definitions" sections to the extent they purport to impose upon Arm discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware, orders entered in this case, or agreements among the parties.

3.      Arm objects to the definitions of "Defendant," "Arm," "you," and "your" as overly broad and unduly burdensome to the extent they purport to require Arm to provide information that is not within the possession, custody, or control of Arm Holdings PLC, or to otherwise respond on behalf of third parties, at least because these definitions include entities that have no relation to the present litigation.

4.      Arm objects to the definitions of "ALA" and "TLA" as overbroad and vague and ambiguous to the extent they define Architecture License Agreement and Technology License Agreement to include "all amendments and annexes to any such agreement."

5.      Arm objects to the definition of ████████████ as overbroad and vague and ambiguous to the extent it defines the term by reference to the definition of that term in "Section

█████ of the Qualcomm ALA, █████████ of the Qualcomm v8-A ALA Annex, or █████████ of the Qualcomm v9-A ALA Annex."

6.      Arm objects to the definition of "ACK" as overbroad and vague and ambiguous to the extent it defines the term as meaning "Arm's Architecture Compliance Kit or Arm's Architecture Validation Suite or Arm's Architecture Compliance Suite."

7.      Arm objects to each Interrogatory, including the instructions and definitions that Qualcomm purports to incorporate therein, to the extent that each Interrogatory is overbroad, unduly burdensome, not limited to a reasonable time frame, vague and ambiguous, irrelevant, and/or not reasonably calculated to lead to the discovery of admissible evidence.

8.      Arm objects to each Interrogatory to the extent it seeks information, documents, and/or things that are protected from disclosure by the attorney-client privilege, work-product doctrine, common-interest privilege, and/or any other applicable privilege, immunity, or protection (collectively, "privileged information").  Nothing contained in these responses should be considered a waiver of any attorney-client privilege, work-product protection, or any other applicable privilege or doctrine.  Arm does not intend to produce information or documents that would divulge any privileged information.  Any such disclosure is inadvertent and shall not be deemed a waiver of any applicable privilege or immunity.

9.      Arm objects to any factual characterizations in Qualcomm's Interrogatories.  By responding, Arm does not accept or admit any of Qualcomm's factual characterizations.

10.     Arm objects to each Interrogatory to the extent it seeks "all" or "any" facts, documents, witness identifications, or things as overbroad and unduly burdensome.

11.     Arm's discovery and investigation in connection with this case is ongoing.  Arm's responses to these Interrogatories are based on its knowledge to date following a reasonable

3

investigation.  As a result, Arm's responses are provided without waiver of Arm's right to: (a)

object to other interrogatories directed to the subject matter of these Interrogatories and responses;

(b) make additional or supplementary objections to these Interrogatories; or (c) revise, amend,

supplement, or clarify the contents of these responses.

Subject to and without wavier of these General Objections and the more specific objections

set forth below, Arm responds as follows:

## SPECIFIC OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:**

Identify and describe in detail all ▮▮▮▮▮▮▮▮, Updates thereto, or any other downloads, releases, notes, publications, materials, support, or the like, including ACK patches and OOB tests, that Qualcomm is entitled to under the Qualcomm ALA that Arm has released, distributed, or otherwise made available since June 1, 2022 but not provided to Qualcomm. For each such item identified, your response should include (i) a description of the licensed item, (ii) the type of information (i.e., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮, (iii) the date(s) the item was made available by Arm, (iv) the names of any Arm licensee other than Qualcomm who received the item, (v) the date(s) of distribution to each Arm licensee other than Qualcomm, (vi) the terms and conditions, including cost, of each Arm licensee for each item identified in response to (iii)-(v), (vii) the three (3) Persons affiliated with Arm with the most knowledge of your response, and (viii) an identification of all documents (by Bates number) that support your response.

**RESPONSE TO INTERROGATORY NO. 1 (MARCH 24, 2025):**

Arm incorporates its General Objections as if fully asserted herein.  Arm objects to this

Interrogatory to the extent it seeks to characterize "any other downloads, releases, notes,

publications, materials, support, or the like, including ACK patches and OOB tests" as "▮▮

▮▮▮▮▮▮▮▮▮▮ thereto."  Arm objects to this Interrogatory as overbroad, unduly

burdensome, and not proportional to the needs of the case, including because it seeks the

identification and description of "all … or any other" items, materials, or actions from a list of

broad and undefined categories, including "notes, publications, materials, support, or the like."

Arm objects to this Interrogatory to the extent it calls for a legal conclusion. Arm further objects

to this Interrogatory as seeking information that is more readily available to Qualcomm than it is to Arm. Arm further objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information regarding what Arm provided licensees other than Qualcomm under or relating to license agreements to which Qualcomm is not a party. Arm objects to this Interrogatory's use of the phrase "or the like," as vague and ambiguous. Arm objects to this Interrogatory to the extent it seeks privileged information.  Arm additionally objects to this Interrogatory as compound and constituting several, discrete interrogatories.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

There are no ███████████████████████ as these terms are used in the Qualcomm ALA (including ████████████), and each Annex 1 thereto, or any downloads, releases, notes, publications, materials, support, or other materials, including ACK patches and OOBs, that Qualcomm is entitled to under the Qualcomm ALA that Arm has released, distributed, or otherwise made available since June 1, 2022 but not provided to Qualcomm.

Arm's Interrogatory No. 2 to Qualcomm seeks Qualcomm's "contention that Arm failed to meet any of its obligations under the Qualcomm ALA," and in response, Qualcomm alleges that Arm "failed to deliver (1) patches to the ACK and (2) the OOB," but does not specify any particular ACK patch or OOB that it contends Arm failed to deliver. Qualcomm's Responses and Objections to Arm's First Set of Interrogatories (Nos. 1-9) at 9-11 (March 10, 2025).  However, (1) Qualcomm is not entitled to ACK patches and OOB under ████████████ at least because ACK patches and OOB are not ████████████████████ (2) Qualcomm is not entitled to any ACK patches or OOBs for Nuvia-based designs for the reasons explained in Arm's January 17, 2025

5

Motion For Judgment As A Matter Of Law Or A New Trial (No. 22-1146, D.I. 596); (3) notwithstanding that Qualcomm is not entitled to any support for Nuvia-based designs, Arm has since January 8, 2025 committed to provide support to Qualcomm for Nuvia-based designs during the pendency of certain litigation between the parties; (4) Arm did not withhold any ACK patches that Qualcomm was entitled to; (5) Arm did not withhold any OOBs that Qualcomm was entitled to.

**Qualcomm Is Not Entitled To ACK Patches And OOB Under ███████████ At Least Because ACK Patches And OOB Are Not ████████**

Qualcomm is not entitled to ACK patches and OOB under ████████ under the Qualcomm ALA at least because they are not "████████████████

The Qualcomm ALA, at ████████ states that ███████████████████



███████████████████████ ARM_00055357 at ████ The Qualcomm ALA, at Annex 1 for the ARMv8-A Architecture (████████████████), states that

███████████████████

███████████████████

███████████████████

███████████████ ARM_00063298 at -301, ████. Annex 1 for the Armv9-A Architecture (████████████████) states that ████████████

███████████████████

███████████████ QCARM_0343954 at -959, ████

The Qualcomm ALA, at ████████ states that ████████ means:

███████████████████

A0862

████████████████ ALA, at ████████ states that ████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ ARM_00055357 at -360, █████ The

Qualcomm ALA, at Annex 1 for the Armv8-A Architecture ██████████████████),

states that ██████████████████████████████████████

██████████████████████████████ ARM_00063298 at -301, §███

Annex 1 for the Armv9-A Architecture (████████████████) states that "'█████





████████████████████████████████████████████████████████

████████████████████████████████████████ QCARM_0343954 at -958, ████

ACK patches are not ████████████████████████ under the Qualcomm ALA.  An ACK patch is a partner-specific solution to a partner-specific ACK test issue, and when that solution is relevant to all ALA licensees, Arm typically incorporates the solution into its next quarterly ACK release, which is made available to all ALA partners, including Qualcomm.  ACK patches are not █████████████" at least because they are not ███████████████████

███████████████████████████████████████████████████████

████████████████████████████ and because ACK patches are not ███████████████

███████████████████████████████████████████████████████

██████████████████████████████████ to the Qualcomm ALA, ARM_00063298 at -301, ████████.  ACK patches are also not ██████████████████████████

████████████████████████████████████ *Id.* at -301, § ████ *id.* at -299–300, ████████████████████████.  ACK patches are also not included in ██████████████

██████████████████ of the Armv9-A Architecture Annex 1 to the Qualcomm ALA. QCARM_00343954 at -955–58, ████████  None of the █████████████" identified and listed by part number in ██████ of the Armv8-A Architecture Annex 1 or the Armv9-A Architecture Annex 1 to the Qualcomm ALA are ACK patches.  ACK patches are not ████████ because they are not ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

as defined in the Qualcomm ALA.  ARM_00055357 at -359, ████.  ACK patches are not ████

8



*Id.*

OOBs are not ███████████████████████ under the Qualcomm ALA.  OOBs identify which of the previously delivered ACK tests a partner should run and are based on the configuration of the partner's design implementation.  OOBs are not ████████████ at least because they are not ██████████████████████████████████ ████████████████ as defined in the Qualcomm ALA, ARM_00055357 at ████, and because OOBs are not ███████████████████████████████████████████ ██████████████ as defined in the Armv8-A Architecture Annex 1 ████████████████████ ████ to the Qualcomm ALA, ARM_00063298 at -301, █████.  OOBs are also not ██████████ ████████████████████████████████████ *Id.* at -301, █████ *id.* at -299–300, ████████████████████████████.  OOBs are also not included in █████████████████ ██████ of the Armv9-A Architecture Annex 1 to the Qualcomm ALA.  QCARM_00343954 at -955–58, §§ ████████.  OOBs are not ██████████ because they are not ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ as defined in the Qualcomm ALA. ARM_00055357 at -359, █████.  OOBs are not ████████████████████████████ ██████████████████████████████████████ *Id.*

**Qualcomm Is Not Entitled To Any ACK Patches Or OOBs For Nuvia-Based Designs**

Nuvia-based designs (including Qualcomm's Oryon CPU cores and the CPU cores used in Qualcomm's Hamoa, Pakala, Nordschleife, and Pegasus products) are unlicensed cores that fall outside the Qualcomm ALA for the reasons explained in Arm's January 17, 2025 Motion For

Judgment As A Matter Of Law Or A New Trial (No. 22-1146, D.I. 596) and Arm's February 28, 2025 Reply In Support Of Its Motion For Judgment As A Matter of Law Or A New Trial (No. 22-1146, D.I. 614). Qualcomm is not entitled to any ACK Patches or OOB for those unlicensed CPU cores. ARM_00055357 ███████████; ARM_00063298 ██████. Under the Qualcomm ALA, Qualcomm is licensed and permitted only to develop, verify, and sell Architecture Compliant Products. ARM_00055357 ███████████ ARM_00063298 ████ Such Arm Compliant Products are limited to ███████████ that ████████████████████ ███████ ARM_00055357 ████ And those Architecture Compliant Cores are limited to CPU cores developed (1) under the licenses granted in the Qualcomm ALA, (2) by or for Qualcomm, and (3) based on Arm Technology that Arm delivered to Qualcomm. The pre-acquisition Nuvia designs do not satisfy any of those requirements for the reasons explained in Arm's January 17, 2025 Motion For Judgment As A Matter Of Law Or A New Trial (No. 22-1146, D.I. 596) and Arm's February 28, 2025 Reply In Support Of Its Motion For Judgment As A Matter of Law Or A New Trial (No. 22-1146, D.I. 614). The integrated circuits and central microprocessor units Qualcomm developed that incorporate or are based on the pre-acquisition Nuvia designs therefore fall outside the scope of the Qualcomm ALA and outside the scope of Arm's support obligations under that agreement. The Qualcomm ALA permits Qualcomm to seek support and verification solely for CPU designs created by Qualcomm employees, at a time when they were Qualcomm employees, but does not permit Qualcomm to seek support and verification for designs from third parties such as Nuvia.

Because the Nuvia-based designs are not licensed under the Qualcomm ALA, Qualcomm is not entitled to any ACK patches or OOBs for them under the Qualcomm ALA.

**Notwithstanding That Qualcomm Is Not Entitled To Support For Nuvia-Based Designs, Arm Has Since January 8, 2025 Committed To Provide Support For Them**

A0866

On January 8, 2025, Arm sent a letter to Qualcomm stating that "Arm intends to provide support for the Nuvia CPUs, including support and verification services" pending certain litigation between the parties:

> The Qualcomm ALA was the subject of an incomplete jury verdict on December 20 that found in Qualcomm's favor. That verdict is not final and is subject to a variety of legal challenges. Nonetheless, Arm respects and values the jury process and the Court's ongoing role in resolving the parties' disputes. As a result, and while Arm's ongoing legal challenges are pending, Arm will treat the Nuvia CPUs as falling within the scope of the Qualcomm ALA, and Arm therefore withdraws the pending October 22, 2024 notice of material breach. Arm has no current plan to terminate the Qualcomm ALA until the legal process resolves the parties' disputes over the Qualcomm ALA. Arm also conditionally accepts Qualcomm's one-time, five-year year extension under which the Qualcomm ALA will expire in 2033. Pursuant to separate correspondence, Arm intends to provide support for the Nuvia CPUs, including support and verification services, while the related legal challenges remain outstanding.

1/8/2025 Arm Letter to Qualcomm.

### Arm Did Not Withhold Any ACK Patches Qualcomm Was Entitled To

Qualcomm has not identified any specific ACK patch(es) that Qualcomm contends Arm improperly withheld from Qualcomm. For example, Qualcomm does not identify any specific ACK patches that Arm allegedly withheld from Qualcomm in its response to Arm's Interrogatory No. 2, which seeks, *inter alia*, "the complete legal and factual basis for [Qualcomm's] contention that Arm failed to meet any of its obligations under the Qualcomm ALA." Qualcomm's Responses and Objections to Arm's First Set of Interrogatories (Nos. 1-9) at 9-11 (March 10, 2025). Qualcomm cites to its First Amended Complaint, where Qualcomm references Arm engineer Vivek Agrawal's deposition testimony and exhibit QX175 to his deposition (ARM_01314327) to allege that Arm "withheld from Qualcomm certain ACK 'patches.'" FAC ¶ 80 (citing Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN

<div align="center">11</div>

(D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5). Qualcomm does not, however, identify any specific ACK patches that Arm allegedly withheld from Qualcomm. *Id.*

Qualcomm's FAC cites to its November 3, 2022 and December 5, 2022 letters to Arm, however, those letters also did not specifically identify any allegedly withheld ACK patches. ARM_00025401–03.  The cited requests for ACK patches in QX175 were for a product that Arm "believe[d] … to be using Nuvia technology," QX175 at ARM_01314329, and Qualcomm is not entitled to any ACK patches for Nuvia-based designs.  Further, Arm continued to provide all of its ALA partners, including Qualcomm, the same quarterly ACK releases, which typically incorporate solutions to ACK test issues that are relevant to all ALA licensees.  As Qualcomm acknowledged in its First Amended Complaint, Qualcomm did not need any ACK patches from Arm to run the validation tests that Arm had provided.  FAC ¶ 86.

### Arm Did Not Withhold Any OOBs Qualcomm Was Entitled To

Qualcomm has not identified any specific OOBs that Qualcomm contends Arm improperly withheld from Qualcomm.  For example, Arm's Interrogatory No. 2 seeks "the complete legal and factual basis for [Qualcomm's] contention that Arm failed to meet any of its obligations under the Qualcomm ALA." Qualcomm's Responses and Objections to Arm's First Set of Interrogatories (Nos. 1-9) at 9-11 (March 10, 2025). Qualcomm does not identify any specific OOBs that Arm allegedly withheld.  Qualcomm cites to its First Amended Complaint, where Qualcomm references Arm engineer Vivek Agrawal's deposition testimony and exhibit QX175 (ARM_01314327) to his deposition, as well as an October 10, 2022 email that Mr. Agrawal sent to Qualcomm engineer Jignesh Trivedi, produced at ARM_01020195. FAC ¶¶ 69, 79–80. However, neither the cited testimony nor the cited documents reference any specific OOB that Qualcomm contends Arm improperly withheld; they simply reference "OOB." Likewise, Qualcomm cites to its November

3, 2022 and December 5, 2022 letters to Arm, but those letters do not identify any allegedly withheld OOB and instead simply reference "the OOB." ARM_00025401–03.  The cited requests for OOBs were for a product that Arm "believe[d] … to be using Nuvia technology," QX175 at ARM_01314329; *see also* ARM_01020195, and Qualcomm is not entitled to any OOBs for Nuvia-based designs.

Further, OOBs identify which of the previously delivered tests a partner should run, and Arm had already delivered those tests to Qualcomm in the Architecture Valid Suite Kit.  *See*

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

ARM_00002045 ("Management System Report" showing Arm "IP downloaded from Connect" by specific Nuvia employees, later Qualcomm employees, including the "ARMv8-A Architecture Compliance Kit," the "ARMv8-A Architecture – Valid Suite Kit" and the "User Guide").  As Qualcomm acknowledged in its First Amended Complaint, Qualcomm did not need any OOB from Arm to run the validation tests that Arm had provided.  FAC ¶ 85; *see also* Agrawal Dep. Tr. at 54:18–55:2 (██████████████████████████████████████

██████████████████████████████████████

Further, because OOB is partner-specific, Arm has not "released, distributed, or otherwise made available since June 1, 2022 but not provided to Qualcomm" any OOB that would be relevant to Qualcomm.  Agrawal Dep. Tr. at 29:1–21 ██████████████████

Further, by June 1, 2022, Arm had given Qualcomm several OOB packages, including for use with Nuvia-based designs.  *See*, *e.g.,* ████████████████████

A0869

████████████ ARM_00001192 (Arm delivering OOB to Qualcomm on or around October 28, 2021); ARM_00001512 (Arm delivering OOB to Qualcomm on or around January 18, 2022); ARM_00132256 (Arm delivering OOB to Qualcomm on or around May 3, 2022). Qualcomm used these OOBs to successfully run ACK testing first for the Nuvia-based Phoenix implementation and then at least for the Nuvia-based Hamoa core design. ARM_00001495 at -495–96 (Arm giving Qualcomm the "Green-signal" for its "Phoenix implementation (v8.7)" on February 4, 2022); ARM_00000634 (Arm telling Qualcomm on June 3, 2022, "No ACK issue pending for Hamoa's sign-off. Results were matching with reference OOB results. Awaiting legal clearance.").

Arm identifies the following individuals as knowledgeable regarding aspects of this subject matter: Vivek Agrawal is knowledgeable about OOBs, ACK releases, and ALA licensee support, and Richard Grisenthwaite is knowledgeable about the design, development, operation, and purported verification of Arm-based technology and Arm's relationship with Nuvia and Qualcomm.

As discovery is ongoing, Arm reserves the right to supplement, amend, or modify its response to this Interrogatory, and reserves the right to rely upon any evidence subsequently discovered or which may otherwise come to light during discovery.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1 (July 11, 2025):**

Arm incorporates by reference its initial response to this Interrogatory. Subject to and without waiver of its general and specific objections, Arm further responds as follows:

The Armv8-A Architecture Annex 1 to the Qualcomm ALA defines ████████

14



ARM_00063298 at -302, ███. OOBs and ACK patches are not ███, including for the reasons stated above.

The Armv9-A Architecture Annex 1 to the Qualcomm ALA defines ███ as:



QCARM_0343954 at -958, § ██. OOBs and ACK patches are not "ACK", including for the reasons stated above.

Arm further incorporates by reference Arm's objections and responses to Qualcomm Interrogatory Nos. 5 and 10.

Arm further incorporates by reference the testimony of all witnesses that have been deposed in this case to date, including those specifically referenced herein, as well as the testimony of all witnesses deposed in *Arm v. Qualcomm*, Case No. 1:22-cv-01146 (D. Del.), and the exhibits used during those depositions.

Pursuant to Federal Rule of Civil Procedure 33(d), Arm identifies the following documents from which information responsive to the non-objectionable scope of this Interrogatory may be derived: ARMQC_02603587, ARMQC_02604609, ARMQC_02604610, ARMQC_02604611, ARMQC_02604612, ARMQC_02604613, ARMQC_02604614, ARMQC_02604615, ARMQC_02604616, ARMQC_02604617, ARMQC_02604618, ARMQC_02604619, ARMQC_026046020, ARMQC_02604621, ARMQC_02604622, ARMQC_02604623,

15

ARMQC_02747093,      ARMQC_02747097,      ARMQC_02747103,      ARMQC_02747104,

ARMQC_02779171,      ARMQC_02779174,      ARMQC_02779176,      ARMQC_02779179,

ARMQC_02779181, QCARM_2430181, ARM_00100013, ARM_01282655, ARM_00090791,

ARM_00067349,   ARM_00102683,   ARM_00091389,   ARM_00068087,   ARM_00068131,

ARM_00068459,   ARM_00068504,   ARM_00091657,   ARM_00091659,   ARM_00091714,

ARM_00091768,   ARM_00091799,   ARM_00091834,   ARM_00091869,   ARM_00091903,

ARM_00075096,   ARM_00075098,   ARM_00075343,   ARM_00076113,   ARM_00103566,

ARM_00103635,      ARMQC_02755397,      ARMQC_02755446,      ARMQC_02755490,

ARMQC_02755534,      ARMQC_02755580,      ARMQC_02755624,      ARMQC_02755674,

ARMQC_02755903,      ARMQC_02755905,      ARMQC_02756148,      ARMQC_02756245,

ARMQC_02756246,      ARMQC_02756344,      ARMQC_02746634,      ARMQC_02756542,

ARMQC_02756544,      ARMQC_02746871,      ARMQC_02756860,      ARMQC_02760525,

ARMQC_02627275,      ARM_01241565,      QCVARM_0573677,      ARMQC_02779064,

ARMQC_02779076,      ARMQC_02779099,      ARMQC_02779107,      ARMQC_02779116,

ARMQC_02779122, ARMQC_02779133, ARM_00001777, ARM_00001195, ARM_00001198,

ARM_00001777, ARM_01020186, QCARM_3337526, QCARM_3337900, QCARM_3338108,

QCARM_3339493,      QCVARM_0685544,      QCVARM_0689117,      QCVARM_0699179,

QCARM_3216178,      QCARM_3066477,      QCVARM_0602227,      QCVARM_0618420,

QCVARM_0691521,      QCVARM_0000395,      QCVARM_0000269,      QCARM_3353040,

QCVARM_0602564,      QCVARM_0000142,      QCVARM_0618741,      QCVARM_0000180,

QCARM_3352796,      QCARM_3353006,      QCARM_3353126,      ARM_00025401,

QCVARM_0468612,      QCVARM_0000061,      QCVARM_1118518,      QCVARM_0602258,

QCVARM_0602295,      QCVARM_0468174,      QCVARM_0000114,      QCVARM_0000092,

16

QCVARM_0000085,    QCVARM_0000123,    QCVARM_0000135,    QCVARM_0602359,

QCVARM_0468148,    QCVARM_0000395,    QCVARM_0000269,    QCARM_3353040,

QCVARM_0602564,    QCVARM_0621692,    QCVARM_0535116,    QCVARM_0524624,

QCVARM_0854027,    QCARM_0566625,    QCVARM_0524624,    QCVARM_0613083,

QCVARM_0613160, QCVARM_0540468, QCVARM_0452598, all documents produced in

Qualcomm's 11th production (QCVARM_011), and all documents cited in Qualcomm's

responses to Arm Interrogatory Nos. 1, 2, 6, 9, and 13.

As discovery is ongoing, Arm reserves the right to supplement, amend, or modify its

response to this Interrogatory, and reserves the right to rely upon any evidence subsequently

discovered or which may otherwise come to light during discovery.

**INTERROGATORY NO. 2:**

With respect to Arm's October 22, 2024 letter to Qualcomm alleging that Qualcomm is in material breach of the QC ALA, state (i) a complete explanation for the timing of that letter and an identification of all Persons involved in the drafting of the letter, (ii) a complete list of all Third Parties that Arm shared the letter with or discussed the subject matter of the letter with or otherwise informed of Qualcomm's purported breach and an identification of all Persons affiliated with Arm involved in any communications with those Third Parties, and (iii) a list of the Persons affiliated with Arm with the most knowledge of Arm's decision to share the letter or information with Third Parties, and (iv) an identification of all documents (by Bates number) that support your response.

**RESPONSE TO INTERROGATORY NO. 2 (MARCH 24, 2025):**

Arm incorporates its General Objections as if fully asserted herein. Arm objects to this

Interrogatory as it is overly broad, unduly burdensome, and disproportionate to the needs of the

case. Arm further objects to this Interrogatory as seeking information that is not relevant to either

Party's claims or defenses, and not reasonably calculated to lead to the discovery of relevant

evidence. Arm further objects to this Interrogatory to the extent it seeks information protected from

discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest

privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

Subject to and without wavier of its general and specific objections, Arm responds as follows:

### Arm Repeatedly And Publicly Stated That Qualcomm Was In Breach Of The Qualcomm ALA As Early As 2022

On November 15, 2022 Arm filed a publicly-available Answer in *Arm Ltd. v. Qualcomm Inc. et al.*, No. 22-1146 (MN) ("*Arm v. Qualcomm*"), in which Arm publicly stated that "Qualcomm is materially breaching its ALA, giving Arm the right to terminate, and the Qualcomm ALA does not provide a license for or right to continue development of the Nuvia technology," that "Qualcomm is breaching its ALA by improperly seeking to use the Qualcomm ALA to continue development of the relevant Nuvia technology, entitling Arm to terminate that ALA based on Qualcomm's material breaches," that "Arm is entitled to terminate Qualcomm's ALA based on Qualcomm's material breaches of the verification, delivery, and support and maintenance provisions,"  and that:

> "Qualcomm's allegations that it is exercising its rights with respect to the relevant Nuvia technology under Qualcomm's license agreements with Arm and is not in violation of those agreements fail because Arm has no such obligations with respect to the Nuvia technology, and Qualcomm is breaching the Qualcomm ALA by insisting otherwise. Under the Qualcomm ALA, Arm has no obligation to provide, and Qualcomm has no right to seek, verification, delivery, or support and maintenance in connection with technology developed under the now-terminated Nuvia ALA.
>
> Qualcomm's unreasonable, bad-faith demands that Arm comply with purported obligations for verification, delivery, and support and maintenance with respect to technology delivered and developed outside the scope of the Qualcomm ALA are contrary to the parties' expectations and undermines the benefit to Arm from the Qualcomm ALA, thereby materially breaching that agreement's terms and implied

18

covenant of good faith and fair dealing and entitling Arm to terminate the Qualcomm ALA under Section ▮▮.”

No. 22-1146, D.I. 21 at 2, 37, 39, 41-42.

On April 11, 2024, Arm filed another publicly-available Answer that likewise included allegations that Qualcomm was in breach of its ALA, including that “Qualcomm is breaching its ALA by improperly seeking to use the Qualcomm ALA to continue development of the relevant Nuvia technology,” and that “Qualcomm is materially breaching its ALA, giving Arm the right to terminate ….” D.I. 322 at 2, 42-45, 48-49. These materials were available to any member of the public, including online though the Court’s public docket in *Arm v. Qualcomm*, No. 22-1146.

### Arm and Qualcomm’s Correspondence Regarding Qualcomm’s Breach of the Qualcomm ALA

On October 22, 2024 Arm sent a notice of material breach (“October 22 Notice”) to Qualcomm that echoed its public statements in its November 15, 2022 and April 11, 2024 Answers, including that:

> “The Qualcomm ALA permits Qualcomm to seek support and verification solely for CPU designs created by Qualcomm employees, at a time when they were Qualcomm employees. Qualcomm is only permitted to market an Architecture Compliant Core if Qualcomm has complied in all respects with the requirements of the Qualcomm ALA and completed the verification procedures provided therein. And Qualcomm is entitled to seek contractual remedies solely for CPU designs that fall within the scope of the ALA. These obligations are reflected in multiple places in the Qualcomm ALA, including but not limited to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

> Qualcomm has systematically and willfully breached these obligations, and its breaches have accelerated and expanded in recent months. Specifically, Qualcomm has developed CPUs and marketed multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party (hereinafter ‘Nuvia designs’). Recently, Qualcomm has sought support and verification for additional designs that reuse the Nuvia designs. Qualcomm and Nuvia have willfully refused to discontinue use of the Nuvia designs despite the independent obligations provided by Section 15.1 of the Nuvia ALA upon termination. And Qualcomm initiated and continues to prosecute contractual claims that arise from Qualcomm’s improper conduct with respect to these unlicensed cores.

19

> Due to Qualcomm's willful, ongoing, and renewed actions, Qualcomm is in material breach of the Qualcomm ALA."

10/22/2024 Arm Breach Notice to Qualcomm. Arm's October 22 Notice was drafted by counsel and sent by Spencer Collins, Arm's Chief Legal Officer, to Ann Chaplin, Qualcomm's General Counsel. Qualcomm responded on October 28, 2024. 10/28/2024 Qualcomm Ltr. to Arm. Qualcomm made a summary of the contents of both notices available to the public on November 6, 2024.

> On January 8, 2025, Arm withdrew its October 22 Notice, stating that:

> The Qualcomm ALA was the subject of an incomplete jury verdict on December 20 that found in Qualcomm's favor. That verdict is not final and is subject to a variety of legal challenges. Nonetheless, Arm respects and values the jury process and the Court's ongoing role in resolving the parties' disputes. As a result, and while Arm's ongoing legal challenges are pending, Arm will treat the Nuvia CPUs as falling within the scope of the Qualcomm ALA, and Arm therefore withdraws the pending October 22, 2024 notice of material breach. Arm has no current plan to terminate the Qualcomm ALA until the legal process resolves the parties' disputes over the Qualcomm ALA. Arm also conditionally accepts Qualcomm's one-time, five-year year extension under which the Qualcomm ALA will expire in 2033. Pursuant to separate correspondence, Arm intends to provide support for the Nuvia CPUs, including support and verification services, while the related legal challenges remain outstanding.

> Arm's prior correspondence and relevant court filings in the Delaware litigation reflect Arm's legal position regarding the scope of the Qualcomm ALA and the required actions that Nuvia acting in concert with Qualcomm must take in light of the termination of the Nuvia ALA on March 1, 2022. Arm's future legal filing will reflect its legal position regarding the non-final verdict, a new trial and judgment in the legal case. Arm reserves all rights and none of Arm's conduct, support and verification reflects a waiver of Arm's present or future rights or claims.

1/8/2025 Arm Ltr. to Qualcomm. Qualcomm and Arm exchanged further correspondence on January 22 and 30. 1/22/2025 Qualcomm Ltr. to Arm; 1/30/2025 Arm Ltr. to Qualcomm.

### Arm and Qualcomm's Press Briefing Regarding Qualcomm's Breach of the Qualcomm ALA

On October 22, 2024 Paul Kranhold, who is a partner at FGS Global, and Kenneth Siegel, who is a director of SoftBank Group Corporation Ltd and a partner at Morrison & Foerster LLP,

discussed Arm's October 22 Notice with Ian King at Bloomberg, who reported on the Notice and upcoming trial on October 22. Individuals knowledgeable about Arm's decision to discuss the Notice with Bloomberg are Paul Kranhold and Kenneth Siegel. On October 22 & 23, multiple news outlets reported that Qualcomm released a statement in response to the Bloomberg article. On October 22 or 23, Qualcomm released a statement to the media regarding Arm's October 22 Notice. On October 23, Arm released a statement to the media in response to Qualcomm's statement. On October 24, Phil Hughes of Arm confirmed for Ian King at Bloomberg that Arm had sent the letter to Qualcomm. Arm did not send its October 22 Notice to any third-party companies or customers.

Following the publication of an article by Ian King on October 22, 2024, a statement by Arm regarding the October 22, 2024 letter was provided to the following persons: Stephen Nellis (Reuters), Gavin Bonshor (The Register), Mark Hachman (PC World), Ina Fried (Axios), Kosuke Shimizu (Nikkei), Ryan Browne (CNBC), David Lumb (CNET), Hadlee Simmons (Android Authority), Adam Clark (Barrons), Tae Kim (Barrons), Benjamin Woodecki (Capacity Media), Wayne Ma (The Information), Kaustubh Bagalkote (Benzinga), Adrienne Valdez (MT Newswires), Chris Thomas (Android Police), James Sanders (TechInsights), Seema Mody (CNBC), Tom McKay (IT Brew/Morning Brew), and Fudo Abazovic (Fudzilla).

On November 6, 2024 Qualcomm publicly described Arm's October 22 Notice in its Annual Report to investors:

> On October 22, 2024, Arm provided us with a notice alleging that we have breached the Qualcomm ALA by marketing products that contain CPUs that Arm alleges use designs, technology and code created by Nuvia employees prior to our acquisition of Nuvia; by seeking support and verification from Arm for additional products that use such alleged designs, technology and code; and by suing Arm for breach of the Qualcomm ALA. Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such alleged breaches are not cured within 60 days of such notice.

A0877

Qualcomm 10-K Annual Report (November 6, 2024).

On December 16, 2024 Qualcomm filed a public version of its First Amended Complaint in this case in which it publicly described Arm's October 22, 2024 notice of material breach, stating that "Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license," described the contents of the letter, and publicly filed a redacted copy of the notice of material breach. A redacted copy of Arm's October 22, 2024 notice of material breach was and remains accessible to any member of the public, including online though the Court's public docket in *Arm v. Qualcomm*, No. 22-1146. D.I. 39 at 2, 8-9, 32-35; D.I. 39-1.

On January 22, 2025, Qualcomm wrote to Arm and stated that the parties' correspondence on this issue was not confidential, and that Qualcomm was "required by law" to publicly disclose the correspondence in its filings with the U.S. Securities & Exchange Commission, and that "in filings with the U.S. Securities & Exchange Commission, Qualcomm has disclosed Arm's October 22 notice":

> "Even if that [January 8, 2025] letter [withdrawing the October 22, 2024 notice of material breach] were itself 'Confidential'—and it is not—Qualcomm is nevertheless required by law to disclose the fact that Arm has withdrawn that notice and indicated that it has no current plan to terminate the Qualcomm ALA pending resolution of challenges to the jury verdict. For instance, in filings with the U.S. Securities & Exchange Commission, Qualcomm has disclosed Arm's October 22 notice and Arm's threats to terminate the Qualcomm ALA. Qualcomm intends to update those disclosures in light of Arm's withdrawal of that notice and statement that it does not currently intend to terminate the Qualcomm ALA pending resolution of challenges to the jury verdict. We presume you have no objection to this legally required update."

1/22/2025 Qualcomm Ltr. to Arm.

On February 5, 2025 Qualcomm publicly described Arm's January 8, 2025 letter in its Quarterly Report:

> On January 8, 2025, Arm notified us that it was withdrawing its October 22, 2024 notice of breach and indicated that it has no current plan to terminate the Qualcomm ALA, while reserving its rights pending the outcome of the ongoing litigation.

22

A0878

Qualcomm 10-Q Quarterly Report (February 5, 2025). Christiano Amon also publicly described

Arm's communication in its public investor conference call on February 5, 2025.

**Qualcomm Recognized That Arm's October 22, 2024**
**Notice Of Material Breach "Is Actually Not New News"**

In *Arm v. Qualcomm*, the Court held a pre-trial conference on November 20, 2024. During

that conference, Qualcomm's counsel stated that Arm's claim that Qualcomm is in breach of the

Qualcomm ALA has been in the case "starting at the very beginning," Nov. 11, 2024 Hearing Tr.

at 13:10-16, and that "[t]he letter on October 22nd is actually not new news in the sense of alleging

these breaches":

> "And in response to that, there have been repeated allegations that the Qualcomm ALA has been breached by Qualcomm. The letter on October 22nd is actually not new news in the sense of alleging these breaches. It has been in the case squarely and we anticipate that it is going to be raised by ARM in response to the arguments that we have regarding the fact that our products are licensed."

*Id.* at 14:18-24. Qualcomm's counsel stated earlier in that same hearing that "with respect to

Qualcomm's alleged breach under the Qualcomm ALA, Arm itself has put that in the case starting

at the very beginning" and that "[w]hen you go to their answer at DI 21, they say … [Qualcomm

is] also materially breaching its ALA with Arm." *Id.* at 13:10-16. Qualcomm candidly admitted

"as early as November 15, 2022, in DI 21, … they say Qualcomm is materially breaching its own

ALA and giving ARM the right to terminate that agreement." *Id.* at 13:23-14:12. Qualcomm also

acknowledged "there is at least five or six references" to this same assertion that Arm has the right

to terminate the Qualcomm ALA "throughout [Arm's] pleading" in November 2022. *Id.*

As discovery is ongoing, Arm reserves the right to supplement, amend, or modify its

response to this Interrogatory, and reserves the right to rely upon any evidence subsequently

discovered or which may otherwise come to light during discovery.

23

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2 (July 11, 2025):**

Arm incorporates by reference its initial response to this Interrogatory. Subject to and without waiver of its general and specific objections, Arm further responds as follows:

Arm further incorporates by reference the testimony of the following witnesses: Will Abbey, Kenneth Siegel, and Spencer Collins.

Discovery is ongoing and Arm reserves the right to supplement, amend, or modify its response to this Interrogatory.

**INTERROGATORY NO. 3:**

Describe, in detail, all facts and circumstances, including the status, of any development or plans to develop v10 of the Arm ISA and any licensing thereof. Your response should include (i) an identification of any features included in v10 of the Arm ISA that were not included in v9 of the Arm ISA and a description of the incremental value, if any, of each feature, (ii) the date(s) on which Arm began discussing development of v10 and any projected timelines for its development or release, (iii) the identity of any partners who have requested a license to v10 and (iv) the terms and conditions of any license proposal from Arm (v) a list of all Persons affiliated with Arm involved in such communications or negotiations, (vi) a list of the Persons affiliated with Arm with the most knowledge of the development or licensing of v10 of the Arm ISA, and (vii) an identification of all documents (by Bates number) that support your response.

**RESPONSES TO INTERROGATORY NO. 3 (MARCH 24, 2025):**

Arm incorporates its General Objections as if fully asserted herein. Arm objects to this Interrogatory as it is overly broad, unduly burdensome, and disproportionate to the needs of the case. Arm further objects to this Interrogatory as seeking information that is not relevant to either Party's claims or defenses, and not reasonably calculated to lead to the discovery of relevant evidence. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

A0880

Subject to and without wavier of its general and specific objections, Arm responds as follows: Subject to its objections, Arm is willing to meet and confer with Qualcomm as to the relevance and appropriate scope of this Interrogatory, if any.

**A0881**

Dated: July 11, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP


 /s/ Robert M. Vrana
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings PLC*

26

**A0882**

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

27

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 11, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

### BY EMAIL

Jack B. Blumenfeld
Jennifer Ying
Travis Murray
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com

Richard S. Zembek
Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000
Houston, TX 77010
richard.zembek@nortonrosefulbright.com

John Poulos
Norton Rose Fulbright US LLP
1045 W. Fulton Market
Suite 1200
Chicago, IL 60607
john.poulos@nortonrosefulbright.com

Ruby J. Garrett
Adam L. Basner
Eric C. Westerhold
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweiss.com
abasner@paulweiss.com
ewesterhold@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
Anish Desai
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
fpatterson@paulweiss.com
adesai@paulweiss.com

Gregg Stephenson
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
gstephenson@paulweiss.com

grp-qcvarm@paulweiss.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert M. Vrana*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

**A0885**

# EXHIBIT 8

Message

---

**From:**     Eliza Walsh [Eliza.Walsh@arm.com]
**Sent:**     22/10/2024 19:04:27
**To:**       Phil Hughes [Phil.Hughes@arm.com]; Paul Kranhold [Paul.Kranhold@fgsglobal.com]
**Subject:**  Re: Bloomberg News: Arm Chief Haas Says Secondary London Listing Not a Priority

---

Hi Paul,

Here is a link to the entire interview
https://www.bloomberg.com/news/videos/2024-10-22/arm-ceo-dismisses-ai-bubble-fears-video

Thanks,
Eliza

---

**From:** Phil Hughes <Phil.Hughes@arm.com>
**Date:** Tuesday, October 22, 2024 at 6:43 PM
**To:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Cc:** Eliza Walsh <Eliza.Walsh@arm.com>
**Subject:** RE: Bloomberg News: Arm Chief Haas Says Secondary London Listing Not a Priority

Copying in Eliza who was there.
I believe they did and all he said was the trial scheduled for Dec.

Thanks,
-phil

---

**From:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Sent:** Tuesday, October 22, 2024 11:32 AM
**To:** Phil Hughes <Phil.Hughes@arm.com>
**Subject:** Fw: Bloomberg News: Arm Chief Haas Says Secondary London Listing Not a Priority

---

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

---

Not much news coming out of London event apparently. Did they ask him about Qualcomm litigation?

Paul Kranhold
Co-Chairman, N America
FGS Global

---

**Arm Chief Haas Says Secondary London Listing Not a Priority**
Bloomberg News
By Jillian Deutsch
22 October 2024

- *The UK government lobbied for a dual listing for Arm*
- *Firm's New York listing was a blow to London's ambitions*

Arm Holdings Plc Chief Executive Officer Rene Haas said a secondary share sale in London was not a priority more than a year after the UK-founded chip designer chose New York for its initial public offering.

A0887

ARMQC_02770408

"It's not something that's at the top of mind right now, quite candidly," Haas said in an interview during the Bloomberg Tech Summit in London on Tuesday. "We'll continue to have discussions with both stakeholders in the government and on the local exchange."

**The UK government lobbied for a dual listing for Arm, which is majority-owned by SoftBank Group Corp., before the Japanese company chose to sell shares only in the US.** The decision, based in part due to UK disclosure requirements, was a blow to London's ambitions to be a magnet for tech companies and its status as a global financial hub.

In the aftermath, the UK worked to simplify its listing rules, including allowing companies more autonomy without being subject to shareholder votes.

Arm shares have risen nearly 200% since its September 2023 IPO.

'Strange Bedfellows'

Haas called for more geographic and supplier diversity in the semiconductor industry, which is currently dominated by Taiwan Semiconductor Manufacturing Co.

Arm relies on its sometime competitor, troubled Intel Corp., according to Haas. The pair might be "strange bedfellows," but Arm works closely with Intel, he said.

"We work very closely with their engineers to make sure that the leading-edge technology can run on Arm," Haas said. "We want to see Intel successful."

He declined to comment on a Bloomberg News report last month that Arm sought to buy Intel's product division.

Intel, once the world's largest chipmaker, has struggled in recent years, with its shares dropping to their lowest point since 2010 in September. That month, the firm announced plans to slash 15,000 jobs and scale back factory expansion plans.

Arm makes much of its revenue selling chip designs for smartphones, although Haas has sought to broaden its reach outside of that industry.

Gabriela Penido
Senior Associate
New York

M. ____                                    646-398-4931

E. ____                                    Gabriela.Penido@fgsglobal.com
A. ____                                    909 Third Avenue
                                           New York, NY 10022

fgs global

FGS Global was created through a combination of Finsbury, Hering Schuppener, The Glover Park Group and Sard Verbinnen & Co.

A0888                                                                    ARMQC_02770409

# EXHIBIT 9

| Message | |
|---|---|

**From:**    Danya Al-Qattan [Danya.Al-Qattan@FGSGlobal.com]
**Sent:**    24/10/2024 17:14:48
**To:**    Spencer Collins [Spencer.Collins@arm.com]; Ami Badani [Ami.Badani@arm.com]
**CC:**    Paul Kranhold [Paul.Kranhold@fgsglobal.com]; Rene Haas [Rene.Haas@arm.com]
**Subject:**    RE: Richard Waters - FT

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Was just reviewing – here's the full text:

**The Mystifying, acrimonious battle between Arm and Qualcomm**
Financial Times
By Richard Waters
24 October 2024

A licensing dispute clouds an important chip industry partnership

On paper, Arm and Qualcomm look like natural allies in some of the chip industry's most important new markets.

As Arm's low-power chip architecture moves into big new areas like data centre servers, PCs and cars, Qualcomm is one of the companies leading the charge, designing chips based on Arm's technology. The two are natural allies as they look to move beyond their strongholds in the mature smartphone market.

So when Arm sued Qualcomm more than two years ago in a licensing dispute, it clouded an important chip industry partnership. From the start, this looked like a spat over how to divide up the royalties pie from the use of Arm technology. The way this battle has played out, however, has fed growing concerns that the fallout from the fight will not be so easily contained.

Investors and the tech world have been mystified and more than a little concerned about why the two appear as far apart as ever. Barring a last-minute settlement, the dispute is heading for the unpredictability of a jury trial in December. The anxiety became more acute this week as Arm turned the legal screws on its rival, hammering both companies' stocks.

The fight revolves around Qualcomm's quest to supercharge its move beyond the smartphone market with its 2021 acquisition of Nuvia, a chip start-up. Nuvia had designed its own "cores", or the basic building blocks for processors, based on Arm's technology.

Qualcomm gave up making its own cores nearly a decade ago and instead, like most in the industry, buys cores that are designed by Arm itself. So the Nuvia deal introduced an element of competition to the relationship: Qualcomm would still rely on Arm's underlying chip architecture, but over time would become less dependent on Arm's cores.

In its legal complaint, Arm has claimed that Qualcomm has no rights to use the Nuvia technology without Arm's permission — an apparent attempt to force Qualcomm to the bargaining table and extract higher royalties.

The twist this week came as Qualcomm unveiled its first, well-received smartphone chip based on Nuvia's technology, as well as its use of the technology in cars. Arm's response a day later was stunning in its severity.

**A0890**

ARMQC_02770392

It issued official notice that it plans to cancel a key licence to Qualcomm in 60 days' time, cutting off that company's ability to ship chips based on anything other than Arm-designed cores.

The cancellation would not affect many current Qualcomm products, but the company has clearly staked its future on Nuvia's technology and its rollout of a new generation of products is already well under way. And if Qualcomm cannot ship chips, many device makers that use its products would grind to a halt.

Perversely, perhaps, the stock market's immediate reaction was to punish Arm more than Qualcomm, wiping 9 per cent off its stock price after its licence cancellation threat, compared with the 3 per cent drop for its rival. True, Arm depended on Qualcomm for 10 per cent of its revenue last year, meaning its own business could be dented if it follows through with its threat. But for Qualcomm, the immediate risk of losing its so-called architectural licence from Arm, and seeing its technology road map blocked, looks far more extreme.

The drastic legal threat appeared to stir deeper anxieties that this dispute may not be headed for a smooth resolution and a return to business as usual. Besides the budding competition between the two, the relationship soured after Qualcomm became one of the main opponents to Nvidia's attempted acquisition of Arm, which was eventually blocked by regulators.

The legal escalation seemed to stoke wider concerns. Arm, which receives only tiny royalties for each device that ships with its technology, has been bent on increasing how much it gets paid. The sight of it levelling such a legal weapon against a key customer is hardly likely to make others feel secure.

There has also been uncertainty about how Arm's business model will evolve as it looks to become a more important supplier to its customers. Qualcomm's move away from buying Arm's cores highlights Arm's heavy reliance on a handful of big customers.

Whatever the worries, it is Qualcomm that faces the most immediate and drastic threat from this legal showdown. Arm's latest salvo looks like a clear signal that it wants to settle, rather than head to trial. If the two sides can find a new way to carve up the pie, it would calm a lot of nerves.

---

**From:** Spencer Collins <Spencer.Collins@arm.com>
**Sent:** Thursday, October 24, 2024 1:13 PM
**To:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>; Rene Haas <Rene.Haas@arm.com>
**Subject:** Re: Richard Waters - FT


FT piece is out:

https://www.ft.com/content/015ddc85-09ac-447d-bdb9-6db5ced01889

IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.

ARMQC_02770393

# EXHIBIT 10

| Message |
| --- |

| **From:** | Siegel, Kenneth A. [ksiegel@mofo.com] |
| **Sent:** | 24/10/2024 02:56:02 |
| **To:** | Spencer Collins [Spencer.Collins@arm.com] |
| **CC:** | Salon, Justin R. [JustinSalon@mofo.com] |
| **Subject:** | FW: Arm/Qualcomm Media Coverage |

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Whoa!

A fair bit of coverage!

Great job yesterday, Spencer – did you see the Cramer video below?? All in on Arm and Rene!

Ken

---

**From:** Rizal Wong <Rizal.Wong@fgsglobal.com>
**Sent:** Thursday, October 24, 2024 7:14 AM
**To:** Siegel, Kenneth A. <ksiegel@mofo.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>; Benjamin Spicehandler <Benjamin.Spicehandler@fgsglobal.com>
**Subject:** Arm/Qualcomm Media Coverage

Ken,

Below please find a comprehensive media coverage compilation regarding Arm and Qualcomm.

Best,
Rizal


## BROADCAST MEDIA COVERAGE HEADLINES

- Stocks Are Lower *CNBC; Squawk on the Street*
- Arm to scrap Qualcomm chip design license *Bloomberg TV; Brief*
- Arm Escalates Chip Feud with Qualcomm *Bloomberg TV; Technology*
- Arm to Cancel Qualcomm Chip Design License *Bloomberg TV; The Asia Trade*
- Arm to cancel Qualcomm chip design license *Bloomberg TV; The Pulse with Francine Lacqua*
- Arm Holdings moves to cancel Qualcomm's chip design licenses: BBG *Yahoo! Finance*
- ARM Considers Ending Licensing Deal with Qualcomm *Fox Business; Varney & Company*

## PRINT MEDIA COVERAGE HEADLINES

- Arm Singed by Escalation of Qualcomm Fight *Wall Street Journal; Heard on the Street*
- Arm cancels Qualcomm's chip design licence amid legal dispute *Financial Times*
- Arm to Scrap Qualcomm Chip Design License in Feud Escalation *Bloomberg News*
- Qualcomm Slips as Arm to Scrap Chip Design License: Street Wrap *Bloomberg First Word*
- Arm Holdings to cancel Qualcomm chip design license, Bloomberg News reports *Reuters News*
- Qualcomm shares fall 5% after report of Arm threat to scrap key license in escalating dispute *CNBC.com*
- Qualcomm Stock Drops. How a Legal Dispute Threatens Its PC Chip Success *Barron's*
- Arm-Qualcomm Chip Battle Intensifies. What's Next? *Barron's; Technology Newsletter*
- Arm Cancels Qualcomm's License to Design Chips Based on Its Technology *The Information*

ARMQC_02762927

- Arm set to cancel chip design licence for Qualcomm *City A.M.*
- Arm reportedly warns Qualcomm it will cancel its licenses *The Register*
- Arm-Qualcomm dispute threatens smartphone chip industry *Silicon Valley Business Journal*
- Arm moves to cancel Qualcomm's instruction set architecture license *SiliconANGLE*
- Report: Arm cancels Qualcomm's architecture license, endangering its chip business *Ars Technica*
- Arm cancels Qualcomm's license to use its chip design standards *Engadget*
- Arm will cancel Qualcomm's license to make the Snapdragon X Elite *PCWorld*
- Qualcomm's license battle with Arm puts many AI-enabled Copilot+ PCs in peril *Computer World*
- Arm cancels Qualcomm licence as row escalates *Mobile World Live*
- In a shocking move, Arm cancels Qualcomm's license to manufacture Snapdragon chips *TechSpot*
- ARM and Qualcomm are playing dice with the future of Windows laptops *TechRadar*
- Report: Arm cancels Qualcomm's instruction set, IP license for chip design *9TO5Google*
- Arm's 60-Day Notice to Qualcomm: Could the Smartphone Industry Be Headed for Disruption? *Analytics Insight*
- Arm to cancel chip design license deal with Qualcomm over contract dispute - report *Seeking Alpha*
- Qualcomm shares fall on report Arm is set to scrap chip design license *Investing.com*
- Arm-Qualcomm hostilities ramp up as licensing agreement is cancelled *Proactive Investors*

## BROADCAST MEDIA COVERAGE

**Stocks Are Lower**
CNBC; Squawk on the Street
23 October 2024

VIDEO LINK

---

**Arm to scrap Qualcomm chip design license**
Bloomberg TV; Brief
23 October 2024

VIDEO LINK

---

**Arm Escalates Chip Feud with Qualcomm**
Bloomberg TV; Technology
23 October 2024

VIDEO LINK

---

**Arm to Cancel Qualcomm Chip Design License**
Bloomberg TV; The Asia Trade
22 October 2024

VIDEO LINK

---

**Arm to cancel Qualcomm chip design license**
Bloomberg TV; The Pulse with Francine Lacqua
23 October 2024

VIDEO LINK

---

**Arm Holdings moves to cancel Qualcomm's chip design licenses: BBG**
Yahoo! Finance

**A0894**

ARMQC_02762928

By Angel Smith
23 October 2024

Arm Holdings has reportedly issued Qualcomm a 60-day notice of termination for its intellectual property licenses used in chip design, according to a report by Bloomberg.

This escalation comes amid an ongoing legal dispute between the two semiconductor giants, which began when Arm Holdings sued Qualcomm in 2022 over alleged breach of contract.

Catalysts Co-Hosts Seana Smith and Madison Mills details the blowback of this decision for Qualcomm's business operations.

VIDEO LINK

---

**ARM Considers Ending Licensing Deal with Qualcomm**
Fox Business; Varney & Company
23 October 2024

VIDEO LINK

**PRINT MEDIA COVERAGE**

Arm Singed by Escalation of Qualcomm Fight
Wall Street Journal; Heard on the Street
By Dan Gallagher
23 October 2024

The problem with going nuclear: Everyone can get burned.

Take Arm Holdings, the U.K. company whose designs are the foundation for the key chips that power the world's mobile devices, as well as growing portions of the PC and server markets.

Arm's stock slid 6.7% Wednesday, after Bloomberg News reported the company plans to cancel its licensing deal with Qualcomm. That would mark a step-up in the tussle that has been brewing between the duo for three years—and is set to go to trial in December.

Qualcomm took a hit as well, with its stock falling nearly 4% by the closing bell. The company has long licensed Arm's technology for its Snapdragon mobile processor and other products. Those form the basis of what is now a $32-billion-a-year chip business.

What's more, Arm-based semiconductors power Qualcomm's ambitious bid to crack the PC market using on-device AI. The company unveiled its latest chips for phones, PCs and autos this week.

Analysts widely view Arm's move as a negotiating tactic. Bloomberg said Arm gave 60 days' notice of the planned cancelation, meaning licenses would end right around when the jury trial is due to start, on Dec. 16.

"We view this move as an effort by Arm to gain leverage in the negotiation—but it's likely not the endgame," wrote Chris Caso of Wolfe Research in a note. Andrew Gardiner of Citigroup agreed, saying "we don't think Arm would want one of their biggest partners to stop shipping chips." Arm gets about 10% of revenue from Qualcomm.

In a statement, Qualcomm accused Arm of trying to "strongarm a longtime partner" to boost royalty rates. Analysts believe it will seek an injunction. Qualcomm is no stranger to the courtroom, and has secured last-minute settlements in major cases with companies like Apple and Nokia in past years.

ARMQC_02762929

But a settlement won't be cost-free. Every 1% increase to Arm's royalty rate would cost Qualcomm about $250 million in annual earnings, Stacy Rasgon of Bernstein estimates. Even legal war is hell.



Chip Swings
Share-price and index performance, this year

Source FactSet

_____

**Arm cancels Qualcomm's chip design licence amid legal dispute**
*The SoftBank-backed company is battling the US semiconductor maker over royalty payments*
Financial Times
By Michael Acton
22 October 2024

SoftBank's Arm has told US chipmaker Qualcomm it will cancel its chip design licence, raising the stakes in an intellectual property dispute set to go to trial in December.

Qualcomm confirmed the move on Tuesday, accusing Arm of "strong-arm" tactics designed to increase royalty rates for its intellectual property, which will "disrupt the legal process" under way in the US.

Many of Qualcomm's chips use Arm's design architecture, meaning a revocation of its licence potentially puts billions of dollars of revenue at risk.

The relationship between the two companies soured in 2022, when Arm sued Qualcomm, one of its biggest customers, over its $1.4bn acquisition of chip design group Nuvia.

Arm claims the deal led to the use of its intellectual property without its permission, allegations Qualcomm denies. The litigation has shone a light on its complicated licensing arrangements for its chip design architectures.

Arm on Wednesday said: "Following Qualcomm's repeated material breaches of Arm's license agreement, Arm is left with no choice but to take formal action requiring Qualcomm to remedy its breach or face termination of the agreement."

Qualcomm on Tuesday said Arm's justification for terminating the licensing contract was "completely baseless".

It added: "This is more of the same from Arm — more unfounded threats designed to strong-arm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture licence."

Qualcomm shares ended 3.8 per cent lower on Wednesday, and Arm's stock fell 6.7 per cent.

The high-stakes clash between two of the world's most prominent chip companies comes as both are riding a wave of optimism around artificial intelligence. Their shares have risen higher this year, driven by expectations that new generative AI applications such as virtual assistants will boost hardware sales.

A0896

ARMQC_02762930

The news of the legal document sent to Qualcomm was first reported by Bloomberg. Arm's move triggers a mandatory 60-day period for the US chipmaker to respond before the licence is revoked.

UK-based Arm, acquired by Japan's SoftBank in 2016, made its blockbuster debut on Nasdaq in September last year. The company's chip designs are used by a wide range of companies including Nvidia and Apple.

Qualcomm announced a new processing chip for mobile phones, the "Snapdragon 8 Elite", at its annual tech summit this week. Earlier this year, it unveiled a line of CPU chips for a new generation of AI-enabled PCs based on Arm's architecture.

Chief executive Rene Haas has described Arm as the "most ubiquitous computer architecture on the planet". It competes with X86, the architecture used by Qualcomm rivals Intel and AMD.

The patent fight with Qualcomm is due to go to trial in Delaware on December 16.

_____

Arm to Scrap Qualcomm Chip Design License in Feud Escalation
Bloomberg News
By Ian King
23 October 2024

- *Arm sued its longtime partner for breach of contract in 2022*
- *The company gave Qualcomm a 60-day notice of cancellation*

Arm Holdings Plc is canceling a license that allowed longtime partner Qualcomm Inc. to use Arm intellectual property to design chips, escalating a legal dispute over vital smartphone technology.

Arm, based in the UK, has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a document seen by Bloomberg. The contract allows Qualcomm to create its own chips based on standards owned by Arm.

The showdown threatens to roil the smartphone and personal computer markets, as well as disrupt the finances and operations of two of the most influential companies in the semiconductor industry.

Qualcomm shares fell as much as 3% after trading opened in New York on Wednesday. Arm's American depositary receipts dropped as much as 6.4%.

Qualcomm sells hundreds of millions of processors annually — technology used in the majority of Android smartphones. If the cancellation takes effect, the company might have to stop selling products that account for much of its roughly $39 billion in revenue, or face claims for massive damages.

The move ratchets up a legal fight that began when Arm sued San Diego-based Qualcomm — one of its biggest customers — for breach of contract and trademark infringement in 2022. With the cancellation notice, Arm is giving the US company an eight-week period to remedy the dispute.

Representatives for Arm declined to comment. A Qualcomm spokesperson said the British company was trying to "strong-arm a longtime partner."

It "appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless," the spokesperson said in an emailed statement. "We are confident that Qualcomm's rights under its agreement with Arm will be affirmed."

The two are headed to a trial to resolve the breach-of-contract claim by Arm and a countersuit by Qualcomm. The disagreement centers on Qualcomm's 2021 acquisition of another Arm licensee and a failure — according to Arm — to

**A0897**

ARMQC_02762931

renegotiate contract terms. Qualcomm argues that its existing agreement covers the activities of the company that it purchased, the chip-design startup Nuvia.

Nuvia's work on microprocessor design has become central to new personal computer chips that Qualcomm sells to companies such as HP Inc. and Microsoft Corp. The processors are the key component to a new line of artificial intelligence-focused laptops dubbed AI PCs. Earlier this week, Qualcomm announced plans to bring Nuvia's design — called Oryon — to its more widely used Snapdragon chips for smartphones.

Arm says that move is a breach of Qualcomm's license and is demanding that the company destroy Nuvia designs that were created before the Nuvia acquisition. They can't be transferred to Qualcomm without permission, according to the original suit filed by Arm in the US District Court in Delaware. Nuvia's licenses were terminated in February 2023 after negotiations failed to reach a resolution.

"Arm's move to cancel Qualcomm's architectural license looks like an effort to gain leverage in advance of the parties' Dec. 16 trial," Bloomberg Intelligence analysts Tamlin Bason and Kunjan Sobhani wrote in a research note. "Our Thesis: Arm's suit against Qualcomm likely ends in a negotiated license, granting the chipmaker rights to customize Arm architecture, but at higher royalty rate than Nuvia had been paying."

Like many others in the chip industry, Qualcomm relies on an instruction set from Cambridge, England-based Arm, a company that has created much of the underlying technology for mobile electronics. An instruction set is the basic computer code that chips use to run software such as operating systems.

If Arm follows through with the license termination, Qualcomm would be prevented from doing its own designs using Arm's instruction set. It would still be able to license Arm's blueprints under separate product agreements, but that path would cause significant delays and force the company to waste work that's already been done.

Prior to the dispute, the two companies were close partners that helped advance the smartphone industry. Now, under newer leadership, both of them are pursuing strategies that increasingly make them competitors.

Under Chief Executive Officer Rene Haas, Arm has shifted to offering more complete designs — ones that companies can take directly to contract manufacturers. Haas believes that his company, still majority owned by Japan's SoftBank Group Corp., should be rewarded more for the engineering work it does. That shift encroaches on the business of Arm's traditional customers, like Qualcomm, who use Arm's technology in their own final chip designs.

Meanwhile, under CEO Cristiano Amon, Qualcomm is moving away from using Arm designs and is prioritizing its own work, something that potentially makes it a less lucrative customer for Arm. He's also expanding into new areas, most notably computing, where Arm is making its own push. But the two companies' technologies remain intertwined, and Qualcomm isn't yet in a position to make a clean break from Arm.

Arm was acquired in 2016 by SoftBank, and part of it was sold to the public in an offering in September of last year. The Japanese company still owns more than 80% of Arm.

Arm has two types of customers: companies that use its designs as the basis for their chips and ones that create their own semiconductors and only license the Arm instruction set.

Qualcomm is no stranger to licensing disputes. The company gets a large chunk of its profit from selling the rights to its own technology — a key part of mobile wireless communications. Its customers include Samsung Electronics Co. and Apple Inc., the two biggest smartphone makers.

Qualcomm emerged victorious in 2019 from a wide-ranging legal fight with Apple. It also won a court decision on appeal against the US Federal Trade Commission, which alleged that the company was using predatory licensing activities.

_____

**Qualcomm Slips as Arm to Scrap Chip Design License: Street Wrap**
Bloomberg First Word
By Subrat Patnaik

ARMQC_02762932

23 October 2024

Qualcomm shares slide 5.3% in premarket trading after Arm Holdings is canceling a license that allowed the chipmaker to use Arm intellectual property to design chips. Analysts said that Arm might be escalating the situation to gain leverage before the case goes to trial. They also note that a settlement is the most likely outcome.

- Arm has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a document seen by Bloomberg
- Watch Arm Holdings shares

ANALYST COMMENTARY

- JPMorgan analyst Samik Chatterjee (overweight)
o    While the license cancellation marks an escalation of the disagreement between the firms, "an eventual settlement is still the most likely outcome"
o    "The cancellation and 60-day notice appears to be a negotiating tactic to put further pressure on Qualcomm to find a solution sooner"

- Bloomberg Intelligence analyst Tamlin Bason
o    Arm's attempt to cancel the license agreement is an effort to gain leverage
o    "A settlement remains the most probable outcome, with timing likely around that trial"

- Bernstein analyst Stacy Rasgon
o    "The timing of the cancellation notice suggests to us an attempt to force a pre-trial settlement"
o    Based on previous Qualcomm lawsuits, "note that they do tend to typically settle prior to seeing the inside of a courtroom"

*[Available via Bloomberg Terminal.]*

_____

Arm Holdings to cancel Qualcomm chip design license, Bloomberg News reports
Reuters News
By Sameer Manekar, Surbhi Misra and Jahnavi Nidumolu
23 October 2024

Chip firm Arm is cancelling an architectural license agreement that allows Qualcomm to use its intellectual property to design chips, a person familiar with the matter said, amid an ongoing legal battle between the two companies.

Qualcomm closed down about 4% on Wednesday, while Arm Holdings was down about 6.6%
Arm has given Qualcomm a mandated 60-day notice of the cancellation of a license that allows Qualcomm to design its own chips based on Arm's computing architecture, said the person, who requested anonymity.

Bloomberg News was the first to report the development.

UK-based Arm, which is majority-owned by Japan's SoftBank Group, sued Qualcomm in 2022 for failing to negotiate a new license after it acquired Nuvia.

Arm had previously said the design that Qualcomm was planning for Microsoft's Copilot+ laptops was a direct technical descendant of Nuvia's chip and it had canceled the license for these chips.

"This is more of the same from ARM – more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license," a Qualcomm spokesperson said in an emailed statement.

ARMQC_02762933

"With a trial fast-approaching in December, Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed. Arm's anticompetitive conduct will not be tolerated."

The legal battle between the two tech giants is scheduled to begin in the federal court in Delaware in December.

An Arm victory in the litigation could force Qualcomm and its roughly 20 partners, including Microsoft, to halt shipments of the new laptops. It would also essentially unwind one of Qualcomm's biggest strategic acquisitions in recent years.

"Following Qualcomm's repeated material breaches of Arm's license agreement, Arm is left with no choice but to take formal action requiring Qualcomm to remedy its breach or face termination of the agreement," Arm said in an emailed statement.

"Arm is fully prepared for the trial in December and remains confident that the Court will find in Arm's favor."

Despite the public fight between the two companies that rely on each other for revenue and profit, some investors and analysts believe they will reach a settlement well ahead of the trial.

"If the 60-day cancellation warning were to be enforced, Qualcomm could, in theory, be severely limited in terms of what it could sell, given the importance of ARM architectures to its chipsets, and ARM would lose a chunk of royalty income," said Russ Mould, investment director at AJ Bell.

_____

Qualcomm shares fall 5% after report of Arm threat to scrap key license in escalating dispute
CNBC.com
By Arjun Kharpal
23 October 2024

Qualcomm shares fell nearly 5% in premarket trade after Bloomberg reported that British chip designer Arm is looking to scrap a key license for the U.S. firm.

Arm has given Qualcomm a 60-day notice of the cancellation of their so-called architectural license agreement, Bloomberg reported, citing a document.

The license in question allows Qualcomm to design chips based on Arm architecture.

Arm, which is majority-owned by Japanese giant SoftBank, operates by effectively licensing blueprints that other companies use to design semiconductors.

CNBC has reached out to Qualcomm regarding the report. Arm declined to comment.

Qualcomm is one of the world's largest players in the smartphone processor markets. Its chips are built into hundreds of millions of smartphones shipped annually.

More recently, the company has ramped up its efforts in the personal computing space with PC processors designed to run artificial intelligence applications.

Should the license cancellation take place, Qualcomm may have to stop selling products based on Arm designs.

A Qualcomm spokesperson told Bloomberg that Arm was trying to "strong-arm a longtime partner." It "appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless," the spokesperson added.

The two companies have been locked in a two-year legal battle focused on Nuvia, a firm Qualcomm acquired in 2021 that is an Arm licensee. Arm argues that Qualcomm should now renegotiate licensing terms with the British firm.

_____

ARMQC_02762934

Qualcomm Stock Drops. How a Legal Dispute Threatens Its PC Chip Success.
Barron's
By Adam Clark
23 October 2024

Qualcomm stock was falling early Wednesday after reports that chip-design firm Arm Holdings has given notice of the cancellation of a license agreement between the two companies. It is an escalation of a dispute that could jeopardize Qualcomm's move into personal computers.

Arm has given Qualcomm a 60-day notice of cancellation of the license agreement which allows the company to use Arm's intellectual property, Bloomberg reported, citing a document. A Qualcomm spokesperson said that Arm's claim of termination was "completely baseless," and the company was confident its rights would be affirmed, according to Bloomberg.

Arm declined to comment on the reports. Qualcomm didn't immediately respond to a request for comment early on Wednesday.

Qualcomm shares were down 4.7% in premarket trading as the market digests what looks like a significant escalation in the dispute between the two companies. U.K.-based Arm's American depositary receipts were down 3.0%.

The dispute started following Qualcomm's acquisition of chip company Nuvia in 2021. Arm claims that Nuvia's chips rely on Arm's designs, and that it didn't authorize their transfer. Arm's view is that Qualcomm should be paying higher per-unit royalties for chips targeted at PCs than they do for smartphone chips. Qualcomm has said its broad license for Arm technology already covers its PC chips.

Qualcomm has used Nuvia's technology as a platform for challenging incumbents Intel and Advanced Micro Devices with new AI-capable processors for PCs. The timing of the reported cancellation by Arm is sensitive as Qualcomm hosts its Snapdragon Summit event this week where it is showing off its latest technology, including using Nuvia's processor designs in smartphone chips.

The reported cancellation could be a negotiating tactic ahead of a scheduled trial over the licensing dispute set to begin in Delaware on December 16.

_____

Arm-Qualcomm Chip Battle Intensifies. What's Next?
Barron's; Technology Newsletter
By Tae Kim
23 October 2024

Brinkmanship. Hi everyone. Arm Holdings is turning up the heat in its legal fight with Qualcomm, driving the share prices of both companies lower. Investors shouldn't overreact to the latest move, though. It's likely to spur a settlement between the two partners—and it could be sooner rather than later.

Arm has given Qualcomm a 60-day notice for cancellation of its architectural chip design license, Bloomberg reported late Tuesday. The companies effectively confirmed the news on Wednesday.

Both chip stocks fell after the report. On Wednesday, Arm shares dropped 6.7%, while Qualcomm stock declined 3.8%.

Arm makes money by licensing its chip designs and chip architecture to hardware makers and semiconductor companies like Qualcomm.

The legal dispute stems from Qualcomm's acquisition of chip design start-up Nuvia in 2021. Arm sued Qualcomm, alleging the company should have asked for consent from Arm to use Nuvia's prior work or destroyed any intellectual property developed by Nuvia under the start-up's architectural license with Arm. That license had a higher royalty payout to Arm than Qualcomm's pre-existing agreement. The trial is scheduled for mid-December.

ARMQC_02762935

Asked for comment, a Qualcomm spokesperson confirmed Arm's move, saying in a statement, "Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed."

An Arm spokesperson said the company is "fully prepared" for the December trial and confident of a court victory. "Following Qualcomm's repeated material breaches of Arm's license agreement, Arm is left with no choice but to take formal action requiring Qualcomm to remedy its breach or face termination of the agreement," the company said in a statement.

The saber rattling was unnerving to investors since Arm and Qualcomm work closely together and rely on each other financially and technologically. According to Arm's filings, Qualcomm accounted for 10% of its revenue for the fiscal year ended March 2024.

Still, the worst-case scenario where Arm and Qualcomm don't reconcile seems extremely unlikely.

Bernstein analyst Stacy Rasgon points to the Qualcomm-Apple legal fight that resulted in a settlement in 2019 just as that trial began. "We have had a fair amount of experience with Qualcomm lawsuits in the past, and note that they do tend to typically settle," he wrote Wednesday. "Given the close partnership between the two companies we would be surprised if annihilation was really the desired outcome here from either side."

Even if a potential settlement results in a lower royalty rate from Qualcomm, Arm has several other successful growth initiatives that can cushion any short-term hit.

Arm's latest advanced chip technology, called Armv9, generates double the royalty rates of its previous Armv8. It is also making progress in the high-end cloud server processor space, which will drive significant revenue next year. Customers like Microsoft and Nvidia are making chips with more than 100 "cores" using Arm's designs. For Arm, that can mean more than $100 in royalty revenue per chip.

Meanwhile, designing mobile processors is only part of Qualcomm's business; the company is partly insulated by its own royalty business licensing wireless technology.

For now the battle looks ugly. But once the dispute ends, the latest dips in Arm and Qualcomm shares are likely to be erased.

_____

Arm Cancels Qualcomm's License to Design Chips Based on Its Technology
The Information
By Wayne Ma
23 October 2024

Arm, whose chip technology powers most of the world's mobile devices, is canceling a license that allows Qualcomm to design chips based on its intellectual property, Bloomberg reported.

The move is an escalation of a dispute that the two companies have had since 2021 after Qualcomm purchased Nuvia, a chip startup. Arm sued Qualcomm in 2022, saying it should be paying higher royalties for Arm's chip designs now that it owns Nuvia.

Arm has given Qualcomm a 60-day notice period, Bloomberg reported. This could have negative financial ramifications if Qualcomm is forced to halt development of its newest Arm-based chips that go into Windows PCs.

Those chip designs were the direct result of the Nuvia acquisition. The cancellation also could have negative consequences for Arm given that Qualcomm is one of Arm's largest customers.

An Arm spokesperson declined to comment. Qualcomm didn't immediately reply to a request for comment.

_____

ARMQC_02762936

Arm set to cancel chip design licence for Qualcomm
City A.M.
By Jess Jones
23 October 2024

Qualcomm has accused British chip designer Arm of strong-arm strategies after the company said it would cancel its chip design licence with the American manufacturer.

Qualcomm, which uses Arm's designs for its chips, claimed on Tuesday the move was an attempt to hike royalty rates. It also said it could disrupt an ongoing intellectual property dispute in the US, set to go to trial in Delaware in December.

According to Bloomberg, Arm has issued Qualcomm a 60-day notice to terminate the licensing agreement.

A licence revocation could put billions of dollars in revenue at stake, as it is likely to hurt Qualcomm's ability to ship hardware designed using Arm's patented architecture.

Qualcomm said Arm's reasoning for cancelling the licence was "completely baseless".

"This is more of the same from Arm," it said, "more unfounded threats designed to strong-arm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture licence."

Arm declined to comment.

The two tech giants first clashed in 2022 when Arm sued Qualcomm over its $1.4bn (£1.08bn) acquisition of chip design firm Nuvia, claiming the deal led to unauthorised use of its intellectual property. Qualcomm denies these allegations.

Qualcomm, one of Arm's biggest customers, once eyed a takeover of the Cambridge-based company.

However, Arm returned to public markets last year via a blockbuster IPO in New York, with a $54.5bn valuation. Since then, the stock has risen by more than 150 per cent.

_____

Arm reportedly warns Qualcomm it will cancel its licenses
*Qualcomm brands ploy as 'unfounded' cash grab*
The Register
By Simon Sharwood
22 October 2024

Chip designer Arm has reportedly warned chipmaker Qualcomm it will soon cancel its license to produce processors using its IP.

News of that drastic step emerged on Tuesday in a Bloomberg report that claims the newswire has seen an Arm document sent to Qualcomm that warns its architectural license will be cancelled in 60 days.

It's believed the threat is related to Qualcomm's 2022 acquisition of Nuvia, an Arm licensee. Nuvia's license allowed it to develop custom chips based on Arm IP. Arm claimed the license issued to Nuvia did not transfer to Qualcomm, and the matter has been disputed ever since.

Nuvia's tech has since become the Oryon custom CPU cores that Qualcomm deployed in the Snapdragon Elite range of SoCs that now power Copilot+ PCs – Microsoft's designation for PCs capable of running on-device AI. Just this week, Qualcomm also announced Oryon-powered SoCs for mobile devices.

If Qualcomm loses its Nuvia-linked license, its latest and greatest product lines would therefore be toast.

Bloomberg reports that the threat to tear up the license comes with an eight-week deadline to resolve the dispute.

ARMQC_02762937

A Qualcomm spokesperson told us "This is more of the same from Arm – more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license."

"With a trial fast approaching in December, Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed. Arm's anticompetitive conduct will not be tolerated."

Qualcomm has every right to be angry as the timing of the report is delicious: Qualcomm is in the middle of its annual Snapdragon Summit – a gabfest at which it shows off its latest and greatest. It's an amazing coincidence that Bloomberg was able to view a legal document at this time.

Such a document certainly gives Qualcomm plenty to think about, as its PC-and-smartphone-making customers will want certainty around future supply.

Arm itself has investors to satisfy. The design studio returned to partial public ownership in 2023, but Japanese investment house SoftBank remains its majority shareholder.

The Register has sought comment from Arm but had not received a reply at the time of publication.

We've grabbed some popcorn while we wait for a response.

_____

Arm-Qualcomm dispute threatens smartphone chip industry
Silicon Valley Business Journal
By Anthony Duignan-Cabrera
23 October 2024

Arm Holdings Ltd. said it will cancel a chip architectural license agreement with Qualcomm Inc. over a dispute over mobile technology between the two companies, according to a report by Bloomberg.

Arm's chip designs underlie the processors that power the vast majority of the world's smartphones. The British company makes its money from royalties and revenue sharing on sales of microchips based on its architecture. Arm's U.S. headquarters is in San Jose where CEO Rene Haas is also based.

According to the report, Arm has given Qualcomm a mandated 60-day notice of the cancellation of the agreement which allows Qualcomm to create its own chips based on standards designed and owned by Arm.

The cancellation notice gives Qualcomm, one of Arm's largest customers, an eight-week period to remedy the dispute, Ian King, Bloomberg's technology reported wrote.

The conflict arose out of Qualcomm's 2021 acquisition of another Arm licensee, the Santa Clara-based chip design start-up Nuvia, Inc. Qualcomm bought Nuvia for $1.4 billion.

Arm sued the San Diego-based Qualcomm in 2022 for alleged breach of contract and trademark infringement.

According to Arm, the company believed Qualcomm should have renegotiated its contract terms. However, Qualcomm argued the existing agreement covered both the company and its acquisition.

Bloomberg Intelligence analysts Tamlin Bason and Kunjan Sobhani wrote in a research note that Arm's move is interned to give the company leverage prior to the trial which begins December 6.

"Arm's suit against Qualcomm likely ends in a negotiated license, granting the chipmaker rights to customize Arm architecture, but at higher royalty rate than Nuvia had been paying," Basin and Sobhani wrote.

ARMQC_02762938

Arm moves to cancel Qualcomm's instruction set architecture license
SiliconANGLE
By Maria Deutscher
23 October 2024

Arm Holdings plc plans to cancel a license that gives Qualcomm Inc. permission to use its instruction set architecture in chips.

Bloomberg reported the development today. Qualcomm, the world's top maker of Android handset processors, acknowledged the licensing dispute in a statement.

An instruction set architecture, or ISA, defines the language in which a central processing unit expresses computations. The "words" of this language are instructions, simple computing operations that each perform a narrow task such as multiplying or adding two numbers. CPUs carry out processing by mixing and matching many billions of instructions every second into complex workflows.

Arm develops the mobile industry's most widely-used ISA. Qualcomm, in turn, makes the popular Snapdragon line of system-on-chips for smartphones and tablets. The company uses Arm's ISA to power its chips.

Arm licenses its ISA to Qualcomm under a contract known as the Architectural License Agreement, or ALA. It's the most expensive of the chip technology licensing agreements that the company offers. According to today's report, Arm has notified Qualcomm that it plans to scrap its ALA within 60 days.

If it materializes, the planned license cancellation could impact not only Qualcomm but also other mobile industry players. The company's Snapdragon chips power Samsung Electronics Co. Ltd.'s flagship Galaxy smartphone series and numerous other handsets. Its silicon is also increasingly being used in other devices such as laptops.

Should Qualcomm lose the ability to make processors based on Arm's ISA, it may have to make broad changes to its engineering workflow. The company might have to scrap some Arm-based processors or develop entirely new silicon based on a different ISA. Such disruptions would impact Android device makers' access to new chips, potentially impacting their handsets' competitiveness.

Arm's notice of the upcoming license cancellation comes about two years after it sued Qualcomm over the latter company's acquisition of startup Nuvia Inc. for $1.4 billion. Nuvia was founded in 2019 by a team that included the former head of Apple Inc.'s CPU design team. Like Qualcomm, Apple uses Arm's ISA to power its CPUs.

Nuvia launched with the goal of building Arm-based processors for the server market. After its acquisition by Qualcomm, the startup's team refocused on designing other products such as laptop chips. Arm's lawsuit charges that the manner in which the acquisition unfolded breached the terms of the ISA licensing agreement it had signed with Nuvia.

Arm is seeking a court order that would force Qualcomm to delete chip blueprints developed by the startup prior to the acquisition. Such an order could halt sales of laptops based on the Snapdragon X Elite, a system-on-chip that Qualcomm debuted last year. The chip includes, among other components, a 12-core CPU that was designed by the Nuvia team based on Arm's ISA.

The lawsuit is set to go to trial later this year. Qualcomm said in a statement that "this is more of the same from Arm – more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license. With a trial fast approaching in December, Arm's desperate ploy appears to be an attempt to disrupt the legal process."

Analysts cited by Reuters suggested that the companies may reach an agreement before the trial begins. It's believed that such a deal could increase the licensing fees Qualcomm pays Arm to use its technology.

Report: Arm cancels Qualcomm's architecture license, endangering its chip business

ARMQC_02762939

*Dispute goes back to Qualcomm's acquisition of Nuvia in 2021.*
Ars Technica
By Andrew Cunningham
23 October 2024

Any company that makes Arm chips must license technology from Arm Holdings plc, the British company that develops the instruction set. Companies can license the instruction set and create their own CPU designs or license one of Arm's ready-made Cortex CPU core designs to incorporate into their own chips.

Bloomberg reports that Arm is canceling Qualcomm's license, an escalation of a fight that began in late 2022 when Arm sued Qualcomm over its acquisition of Nuvia in 2021. Arm has given Qualcomm 60 days' notice of the cancellation, giving the companies two months to come to some kind of agreement before Qualcomm is forced to stop manufacturing and selling its Arm chips.

A Qualcomm spokesperson told Bloomberg that Arm Holdings plc was attempting to "strong-arm a longtime partner" and that Qualcomm was "confident that Qualcomm's rights under its agreement with Arm will be affirmed."

Qualcomm bought Nuvia to assist with developing high-performance Arm chips that could compete with x86 chips from Intel and AMD as well as Apple Silicon chips in iPhones and Macs—Nuvia was founded by people who had headed up Apple's chip design team for years. Arm claimed that the acquisition "caused Nuvia to breach its Arm licenses," and Arm demanded that Qualcomm and Nuvia destroy any designs that Nuvia had created pre-acquisition.

This apparently didn't happen; Qualcomm's flagship Oryon CPU cores are at the heart of the just-announced Snapdragon 8 Elite processor for flagship phones and the Snapdragon X Elite and Plus chips that have been shipping in Microsoft's latest Surface devices and many other Windows PCs that launched this summer.

Qualcomm's shift to using Nuvia's designs means that Arm could make less money from the partnership than it used to. Since 2015, Qualcomm's flagship chips had all used versions of a CPU architecture called Kryo, a "semi-custom" design that was largely based on Arm's Cortex CPU cores. Arm offers multiple licensing programs, but generally companies only pay for "the IP included in the final SoC design," so a company licensing both the Arm instruction set and Arm CPU designs is obviously more attractive for Arm than a company that simply uses the instruction set in its own custom CPUs.

_____

Arm cancels Qualcomm's license to use its chip design standards
*Arm sued Qualcomm in 2022 over its purchase of Nuvia.*
Engadget
By Mariella Moon
23 October 2024

Arm has taken its feud with Qualcomm to the next level, two years after filing a lawsuit against its former close partner. According to Bloomberg, the British semiconductor company has canceled the architecture license allowing Qualcomm to use its intellectual property and standards for chip design. As the news organization notes, Qualcomm, like many other chipmakers, uses Arm's computer code that chips need to run software, such as operating systems. Arm has reportedly sent Qualcomm a 60-day notice of cancelation — if they don't get to an agreement by then, it could have a huge impact on both companies' finances and on Qualcomm's operations.

The SoftBank-backed chipmaker sued Qualcomm in 2022 after the latter purchased a company called Nuvia, which is one of its other licensees. Arm argued that the US company didn't obtain the necessary permits to transfer Nuvia's licenses. As such, Nuvia breached their contract and it had terminated its licenses, Arm explained in its lawsuit. Qualcomm has been using Nuvia-developed technology in the chips designed for AI PCs, such as those from Microsoft and HP. But Arm wants the company to stop using Nuvia-developed tech and to destroy any Arm-based technology developed prior to the acquisition.

Qualcomm will have to stop selling most of the chips that account for its $39 billion in revenue, Bloomberg says, if the companies don't resolve the issue within the next 60 days. It seems the US chipmaker believes this is a tactic by Arm to

A0906

ARMQC_02762940

threaten its business and to get higher royalties, because its spokesperson told Bloomberg and the Financial Times: "This is more of the same from Arm — more unfounded threats designed to strong-arm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license." Qualcomm also accused Arm of attempting to disrupt the legal process, called its grounds for licensing termination "completely baseless" and said that it's confident its "rights under its agreement with Arm will be affirmed."

---

Arm will cancel Qualcomm's license to make the Snapdragon X Elite
*Arm's notice is evidence that the legal battle between the two just heated up in a hurry.*
PCWorld
By Mark Hachman
22 October 2024

Arm Ltd. has notified its licensee Qualcomm, informing the company that its architectural license will be terminated in 60 days — the agreement that allows Qualcomm to manufacture the Oryon CPU cores at the heart of the Snapdragon X Elite chip and Copilot+ PCs.

PCWorld has independently confirmed an earlier Bloomberg report that Arm is canceling the architectural license agreement, the agreement that allows Qualcomm to manufacture custom cores, like the company's Oryon processor. Qualcomm called the cancellation notice "more unfounded threats" and that it looks forward to a trial in December that is set to resolve the issue.

In the fall of 2022, Arm sued Qualcomm, seeking an injunction that would have forced Qualcomm to destroy the chip designs that a company called Nuvia developed. Qualcomm bought Nuvia in 2021, in a bid to beef up its own Arm-based CPU designs. Arm, in turn, argued that it should have been allowed to approve the deal and cancelled Nuvia's licenses in 2023, according to Bloomberg. Since then, the suit has quietly simmered without any real action or rhetoric by either side, even as the two sides nailed down a court date in December.

Now, the stakes have been raised significantly. Arm designs its own CPU cores, known as Cortex, and licenses them to companies like Qualcomm, Mediatek, and others. That license remains in place. But Qualcomm is entertaining partners, analysts and media at the Snapdragon Summit in Maui, where the company launched its next-generation Oryon core that the company claims is actually faster than Intel's Lunar Lake chip. Embarrassing? Very much so.

Arm declined to comment. Qualcomm, however, issued a statement calling the action a "desperate ploy."

"This is more of the same from Arm – more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license," Qualcomm said, in a company statement emailed to PCWorld by a company representative. "With a trial fast approaching in December, Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed. Arm's anticompetitive conduct will not be tolerated."

Right now, Arm and Qualcomm still have an agreement by which Qualcomm could make chips based on Arm's finished Cortex cores. But those cores proved unable to keep up with x86 designs from Intel and AMD.

The Oryon cores at the heart of the Snapdragon X Elite processor has proven far more competitive, and are arguably the most power-efficient chip for the PC. Now those cores are in jeopardy because of Arm's action, setting up either a heated negotiation process or an even more fervent battle in court in a few months.

---

Qualcomm's license battle with Arm puts many AI-enabled Copilot+ PCs in peril
*Arm says Qualcomm is not licensed to use Oryon CPU core that powers many Copilot+ certified laptops.*
Computer World
23 October 2024

ARMQC_02762941

As its long-running dispute with Arm turned into a war of words this week, the stakes for chip giant Qualcomm and its technology partners, including Microsoft, couldn't be higher.

Along with MediaTek and Apple, Qualcomm is one of the biggest suppliers of chips for use in smartphones and tablets. As PCs, smartphones, and automobiles acquire more AI capabilities, the increasingly powerful Snapdragon Elite platform is supposed to be Qualcomm's big move into those arenas.

Now the dispute with Arm, which has been rumbling on since 2022 over Qualcomm's right to develop the ARM-based Oryon CPU core in its chips, threatens to derail the whole project. To clarify, ARM is the architecture, Arm is the company.

According to Bloomberg, and independently verified by PC World, Arm recently issued a 60-day notice of cancellation of Qualcomm's Oryon license.

Disputes over intellectual property (IP) and licensing are common in tech, but the report garnered an unusually spiky response from a Qualcomm spokesperson, which suggests the confrontation might be more serious.

"This is more of the same from Arm — more unfounded threats designed to strongarm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license."

According to the spokesperson, the timing of Arm's move was connected to an impending court date in December.

"Arm's desperate ploy appears to be an attempt to disrupt the legal process, and its claim for termination is completely baseless. We are confident that Qualcomm's rights under its agreement with Arm will be affirmed. Arm's anticompetitive conduct will not be tolerated."

Of course, it probably didn't help Qualcomm's mood that the news emerged smack in the middle of the company's major Snapdragon Summit 2024, held in Maui this week.

*Why does Oryon matter?*

Qualcomm's Snapdragon Elite platform comprises four system-on-a-chip (SoC) microprocessors aimed at different market segments: X Elite for Windows PCs, the 8 Elite for smartphones and tablets, the Elite Cockpit for automotive systems, and the Elite Ride for automated driving.

All use ARM-based cores in different configurations: the Oryon CPU as a general microprocessor, the Hexagon neural processing unit (NPU) to accelerate AI capabilities, and the Adreno graphics processing unit (GPU) for graphics.

It is the first of those, the Oryon CPU core originally acquired when Qualcomm bought Nuvia in 2021, that is at the heart of the dispute between the two companies. Arm claims that the agreement it had with Nuvia to develop Oryon did not transfer to Qualcomm, and that any agreements it had with Qualcomm were separate. Buying Nuvia didn't alter this fact.

*Could this affect business PCs?*

The dispute is complicated by the involvement of Microsoft, which heads a list of PC makers using Qualcomm's X Elite platform to push AI-enabled PCs.

That should be good news. After a long dip, the PC market has looked up in the last year, increasing 3.4% year-over-year in Q2 2024, according to figures from Canalys, the third quarter in a row to register growth.

Previous attempts to get Windows running on ARM floundered, but this time Qualcomm has made good with X Elite. Having decided that AI-enabled PCs are a new paradigm, Microsoft will want the dispute to be resolved as soon as possible.

The same goes for Qualcomm's other PC partners, including Acer, Asus, Dell, HP, Lenovo, and Samsung, all of which have developed models using the same platform. In addition to Microsoft's Surface Pro and Surface Laptop, models based

ARMQC_02762942

on X Elite include Lenovo's Yoga Slim 7x 14, HP's OmniBook X, Acer's Swift 14 AI, and various laptops in Dell's XPS, Latitude, and Inspiron ranges.

All feature Copilot+, each promotes the claimed performance boost and hugely improved battery life of the X Elite, and most are at the more expensive business end of the price charts.

PCs with Intel and AMD processors also qualify as Copilot+ certified, so any failure to resolve the dispute, or defeat for Qualcomm, won't disrupt AI capabilities from appearing in Windows laptops, but the Oryon core is also used in high-end smartphones and tablets due for release in the coming weeks.

The market assumption is that the companies will resolve the dispute before it reaches court, not least because of the uncertainty its continuation would create for both. That's how numerous other licensing and IP disputes in tech end up being quietly forgotten.

That didn't stop the pair's share prices from taking a dive as news of the squabble's latest development became public, a sign that some think this dispute is bound to hurt at least one of the companies.

---

Arm cancels Qualcomm licence as row escalates
Mobile World Live
By Kavit Majithia
23 October 2024

Arm reportedly moved to terminate a licence allowing US giant Qualcomm to use its IP to design chips, a move which could disrupt the global device market and further intensify an ongoing legal fight between the pair.

Bloomberg reported Arm issued a 60-day notice to cancel an architectural licence, an agreement which allows Qualcomm to use the UK company's basic computer code to run software such as operating systems within its chips.

Qualcomm could therefore be forced to stop selling hundreds of millions of processors which power the majority of Android smartphones or face legal damages, Bloomberg added.

The latest move ramps a legal fight between the companies begun in 2022 when Arm sued Qualcomm for alleged breaches and trademark infringement following a deal by the US company to buy chip start-up Nuvia in 2021.

Arm took issue with the fact Nuvia uses its licences to design its chips and stated the agreement could not be transferred to Qualcomm without permission.

The case is set to be heard in a US court in December, with Qualcomm arguing its existing agreements with Arm also cover the company it purchased.

A Qualcomm representative told Bloomberg Arm's latest move "appears to be an attempt to disrupt the legal process".

"We are confident that Qualcomm's rights under its agreement with Arm will be affirmed."

---

In a shocking move, Arm cancels Qualcomm's license to manufacture Snapdragon chips
*Qualcomm is almost entirely dependent on those licenses for its products*
TechSpot
By Zo Ahmed
23 October 2024

What just happened? The long-simmering battle between British chip designer Arm and American semiconductor superstar Qualcomm has just reached a boiling point. Arm has now given a notice to Qualcomm saying it's terminating the license that allows the latter to create its own chips based on Arm's intellectual property.

ARMQC_02762943

This "architectural license" agreement is the core partnership that's kept Android smartphones humming with Qualcomm's cutting-edge processors for years. Now, according to documents viewed by Bloomberg, Arm has fired off a 60-day cancellation notice that could bring that long-standing deal crumbling down.

For the uninitiated, the hostility between these two tech titans that were once close partners stems from Qualcomm's $1.4 billion acquisition of chip design startup Nuvia in 2021.

Arm alleges that when Qualcomm acquired Nuvia, it violated the licensing terms since Nuvia already had a separate agreement with Arm. The company's stance is that Qualcomm should have renegotiated those terms instead of simply absorbing Nuvia's existing Arm licenses. This led Arm to sue Qualcomm in 2022 for breach of contract and trademark infringement.

Qualcomm, however, argues the existing agreement covered everything with the Nuvia takeover. Using this as grounds, the company countersued, setting up an explosive courtroom battle that still looms. Both sides have also been quietly negotiating a potential settlement, but Arm's scorched-earth license termination could indicate those talks have broken down – or that it simply decided to go with the nuclear option.

Now, in light of the notice, Qualcomm fired back that Arm is just trying to "strong-arm a longtime partner" and disrupt the legal process with this termination threat, calling it "completely baseless."

Following the acquisition, Nuvia's tech lived on as the Oryon custom CPU cores now powering Qualcomm's latest Snapdragon X Elite processors for Windows on Arm laptops and other Copilot+ PCs. Qualcomm just announced new Oryon-based mobile chips this week.

If Arm does follow through on killing Qualcomm's license after the 60-day notice period, it could derail Qualcomm's multi-billion dollar mobile and PC chip business. The company might have to stop selling certain products that reportedly accounts for nearly the entirety of its $39 billion in annual revenue.

Qualcomm has a 60-day window to get its act together, which does seem like Arm's way of trying to "strong-arm" the company into settling this beef through negotiations instead of the court.

_____

ARM and Qualcomm are playing dice with the future of Windows laptops
TechRadar
By Allisa James
23 October 2024

It's no secret that 2024's batch of AI PCs owes much of their success to the excellent batch of Qualcomm Snapdragon chips, which has the best version of Windows Arm running as the OS. However, a nasty split between the two could jeopardize everything, especially for consumers.

According to a breaking news report from Bloomberg, Arm canceled a "license that allowed longtime partner Qualcomm Inc. to use Arm intellectual property to design chips." The company issued Qualcomm a 60-day notice of the cancellation of said license as required by law. The report stated that the split was caused by a breach of contract back in 2022, which escalated a legal dispute over vital smartphone technology.

Qualcomm responded in a statement, writing that Arm is trying to interfere with its CPUs and increase its royalty rates and that its claims are "baseless."

This news comes as Qualcomm announced new automotive and mobile chips at the yearly Snapdragon Summit in Hawaii, and in the same year, the brand Qualcomm Snapdragon Elite chips launched with the latest batch of AI laptops.

*Why this legal battle is so disastrous*

A0910                                                                    ARMQC_02762944

But this legal battle isn't just a lovers' quarrel between those major tech companies; it could have widespread ramifications for consumer tech at large. Windows laptops like the Microsoft Surface Laptop 7 received massive rejuvenation through the Snapdragon Elite, which is made from tech provided by Arm.

This chip took one of the most inconsistently performing laptop lines and turned it into an absolute powerhouse in terms of performance and battery life. Further, its Windows Arm operating system, while still not at the level of Windows 11, has improved by leaps and bounds to the point where it's near perfect for productivity work and reasonably competent for creative work and gaming.

Arm and Qualcomm are also vital as they've generated competition with Intel, AMD, and Microsoft in the AI PC and OS market. This has given consumers more variety while also keeping laptop prices more affordable than their competitors. If it can continue to gain momentum in the market, both the chips and OS could become a true threat to the big dogs as the tech behind them is refined.

*Why would Arm move to cancel Qualcomm's license?*

While it's impossible to know the full story behind this legal matter, Qualcomm's statement in response and relevant Arms-related news suggest possible hints.

Qualcomm stated, "This is more of the same from ARM—more unfounded threats designed to strong-arm a longtime partner, interfere with our performance-leading CPUs, and increase royalty rates regardless of the broad rights under our architecture license." According to Qualcomm, Arm is trying to acquire more money from the former by forcing an increase in royalty rates.

This also coincides with the news that Intel sold its 1.18 million-share stake in Arm back in August 2024. While it's considered unlikely that the sale was attributed to any issues with Arm (it's more related to streamlining operations amidst financial trouble), it's still a possibility that there could have been something involving Arm's finances. Otherwise, it should be a valuable asset worth keeping hold of.

Regardless of the reason, this legal dispute is akin to playing dice with the future of Windows laptops. What once seemed like a brighter future for laptops could stand to crumble if this ends with the permanent split between two tech companies that together have been successfully challenging the industry giants.

_____

Report: Arm cancels Qualcomm's instruction set, IP license for chip design
9TO5Google
By Abner Li
22 October 2024

The dispute between Qualcomm and Arm has escalated with the latter canceling Qualcomm's ability to use the instruction set for designing chips.

According to Bloomberg today, Arm is "canceling a license that allowed longtime partner Qualcomm Inc. to use Arm intellectual property to design chips." If there's no resolution after the 60-day notice period, Qualcomm "might have to stop selling products… or face claims for massive damages." Specifically:

If Arm follows through with the license termination, Qualcomm would be prevented from doing its own designs using Arm's instruction set. It would still be able to license Arm's blueprints under separate product agreements, but that path would cause significant delays and force the company to waste work that's already been done.

Since 2022, Arm has been fighting Qualcomm, which countersued, over its purchase of a company (Nuvia) that resulted in Oryon CPUs, which are coming soon to mobile SoCs and automotive after debuting for Windows laptops. Instead of using Arm's Cortex cores in the CPU, Qualcomm now has its own custom design.

When the acquisition took place, Arm argued that what Nuvia created as an Arm licensee cannot be transferred to Qualcomm without permission or contract renegotiation, and that designs should be destroyed.

A0911

ARMQC_02762945

Qualcomm argues that its existing agreement covers the activities of the company that it purchased, the chip-design startup Nuvia.

It would seem that SoCs with Oryon CPUs — Snapdragon X Elite, which is already on the market in various PCs, and Snapdragon 8 Elite — will be impacted, while earlier models (e.g., Snapdragon 8 Gen 3) remain available.

It remains to be seen whether Qualcomm and Arm will come to agreement within 60 days.

Looking ahead, this Arm uncertainty could lead to the adoption of the open source RISC-V instruction set. Back in October of 2023, Qualcomm and Google announced work on a RISC-V Wear OS chip. The Android team is actively working on adding OS support with a focus on ensuring that "any CPU running RISC-V will have all of the features we expect to achieve high performance."

<u>Arm's 60-Day Notice to Qualcomm: Could the Smartphone Industry Be Headed for Disruption?</u>
*Arm's Ultimatum to Qualcomm: Potential Shocks to the Smartphone Market*
Analytics Insight
By Mwangi Enos
23 October 2024

Arm Holdings has issued a 60-day ultimatum to Qualcomm, threatening to terminate their licensing agreement unless Qualcomm addresses Arm's complaints over alleged violations.

The British chip technology firm accuses Qualcomm of using its chip designs without proper authorisation, stemming from Qualcomm's 2021 acquisition of chip developer Nuvia. This high-stakes conflict threatens Qualcomm's ability to use Arm's designs, with potential wide-ranging consequences for the smartphone industry.

The core of the dispute centres around Qualcomm's $1.4 billion purchase of Nuvia, a company developing advanced processors including those for AI chips and Snapdragon smartphone processors.

Arm alleges that Qualcomm has been using Nuvia's pre-acquisition designs without its authorization. As part of its ultimatum, Arm is demanding that Qualcomm destroy all chip designs related to Nuvia that existed before the acquisition. Qualcomm, however, has sharply criticized Arm's 60-day deadline, labelling it an "unfounded threat" aimed at derailing its operations.

This dispute carries significant weight due to the critical role that both companies play in the tech industry. Qualcomm's Snapdragon processors power the majority of Android smartphones globally, relying heavily on Arm's architecture for its chipsets.

Should Arm terminate its agreement, Qualcomm's product development could face substantial delays, potentially forcing the company to halt work on certain chips. Such a scenario would not only impact Qualcomm's business but could also ripple across the broader smartphone market, particularly for Android devices dependent on Snapdragon chips.

Qualcomm has strongly denied Arm's accusations and plans to challenge them in court, with a trial scheduled for December. The company views Arm's claims as an attempt to hinder the development of new chips while driving up royalty fees, accusing Arm of anti-competitive behaviour. Qualcomm has positioned itself to fight the breach of contract claims, asserting that Arm's threats are groundless and designed to disrupt ongoing technological advancements.

Should the termination of the licensing agreement by Arm become effective, there are indications that Qualcomm will be limited to the use of the blue designs only which have been pre-designed by Arm.

This could adversely affect the continued development of future Snapdragon chips and cause delays in the launching of products which affects the entire smartphone industry. The end of this dispute will be interesting to observe as it has possibilities of recasting the state of affairs in the direction of design and chipsets in the mobile industry which is very broad.

ARMQC_02762946

<u>Arm to cancel chip design license deal with Qualcomm over contract dispute – report</u>
Seeking Alpha
By Jessica Kuruthukulangara
23 October 2024

Arm Holdings is scrapping an architectural license deal that allows Qualcomm to use its intellectual property to design chips, according to a document viewed by Bloomberg.

The British chip designer has given Qualcommm its longtime partner and one of its biggest customers, a mandated 60-day cancellation notice of the agreement. The news sent QCOM shares down 4.7% premarket on Wednesday.

The move escalates the legal feud between the chip firms, which began when Arm, majority-owned by SoftBank sued Qualcomm in 2022 for breach of contract and trademark infringement.

According to Arm's lawsuit, Qualcomm failed to renegotiate the terms of the license deal after its acquisition of Nuvia, a chipmaking startup that was also an Arm licensee. But Qualcomm argued that the existing license deal covers Nuvia's activities.

Qualcomm this week said it plans to bring Nuvia's design Oryon to its Snapdragon chips for smartphones. Arm claims this is a breach of their license deal and Nuvia designs created before its acquisition can't be transferred to Qualcomm without permission.

If Arm moves ahead with canceling the license deal, Qualcomm may have to stop selling processors used in a majority of Android smartphones or face damages. It would also be prevented from using Arm's IP for its designs.

A Qualcomm spokesperson told Bloomberg that Arm was trying to "strong-arm a longtime partner," calling its claim for termination "completely baseless."


<u>Qualcomm shares fall on report Arm is set to scrap chip design license</u>
<u>Investing.com</u>
By Scott Kanowsky
23 October 2024

Shares in Qualcomm fell in premarket US trading on Wednesday on a report longtime partner Arm Holdings is scrapping a license allowing it to use Arm's intellectual property to design chips.

UK-based Arm has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, Bloomberg News reported, citing a document. Qualcomm, like many other semiconductor groups, relies on Arm's instruction set to craft the chips underpinning much of the technology powering mobile electronics.

The price of US-listed Arm's shares also dropped prior to the opening bell on Wall Street.

Should the shutdown come into effect, it could substantially impact the global smartphone market. In such an event, Qualcomm, the manufacturer of hundreds of millions of chips every year, may have to cease sales of products that make up about $39 billion in revenue -- or face legal claims.

"As practically every chip Qualcomm sells uses Arm, and custom chips (which would be the ones impacted by an architecture license cancellation) form the bulk of the company's forward product roadmap, it goes without saying that a license cancellation would be extremely problematic," analysts at Bernstein said in a note.

Despite Qualcomm being one of its largest customers, Arm has been in a protracted legal feud with the San Diego, CA-based company. Arm has alleged that, following Qualcomm's acquisition of chip-design start-up Nuvia in 2021, Qualcomm has breached their contract and infringed on Arm's trademark.

A0913

ARMQC_02762947

The two are now on track to go to trial in December to settle the conflict, in which both sides have exchanged lawsuits over the negotiated contract between Nuvia -- another Arm licensee -- and Qualcomm. The 60-day timing of the notice would place a potential cancellation in the middle of or right at the end of the trial, the Bernstein analysts noted.

"Hence the timing of the cancellation notice suggests to us an attempt to force a pre-trial settlement," they added.

In a statement quoted by Bloomberg, Qualcomm said Arm was trying to "strong-arm" its client. Representatives from Arm declined to comment, Bloomberg said.

_____

**Arm-Qualcomm hostilities ramp up as licensing agreement is cancelled**
Proactive Investors
By Ian Lyall
23 October 2024

Arm Holdings PLC is reportedly cancelling a licensing agreement that allows Qualcomm to use its intellectual property to design chips.

According to Bloomberg News, Arm issued a 60-day notice, impacting Qualcomm's ability to create its chips based on the Cambridge-based group's standards.

The latest heightening of hostilities comes amid a legal battle between the two companies, which began after Qualcomm acquired Nuvia, and Arm sued the company in 2022 for not renegotiating a new license.

Qualcomm has called the cancellation baseless, accusing Arm of using threats to increase royalty rates.

The trial is set for December in Delaware, and an Arm victory could disrupt Qualcomm's chip shipments, affecting key partners like Microsoft. Despite the conflict, some analysts expect a settlement before the trial.

Rizal Wong
Associate Director
New York

M. _____          +1 916.836.9786

E. _____          Rizal.Wong@fgsglobal.com
A. _____          909 Third Avenue
                    New York, NY 10022

 fgs global

====================================================================================

This message contains information that may be confidential and privileged. Unless you are the addressee, you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail ksiegel@mofo.com, and delete the message. Learn about Morrison & Foerster LLP's Privacy Policy.

ARMQC_02762948

# EXHIBIT 11

| Message | |
|---|---|
| **From:** | Danya Al-Qattan [Danya.Al-Qattan@FGSGlobal.com] |
| **Sent:** | 23/10/2024 00:34:25 |
| **To:** | Ami Badani [Ami.Badani@arm.com] |
| **Subject:** | BN: Arm to Cancel Qualcomm Chip Design License in Escalation of Feud |

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

See below. Let me know if you can connect re next steps.

**Arm to Cancel Qualcomm Chip Design License in Escalation of Feud**
Bloomberg News
By Ian King
22 October 2024

- *Arm sued its longtime partner for breach of contract in 2022*
- *The company gave Qualcomm a 60-day notice of cancellation*

Arm Holdings Plc is canceling a license that allowed longtime partner Qualcomm Inc. to use Arm intellectual property to design chips, escalating a legal dispute over vital smartphone technology.

Arm, based in the UK, has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a document seen by Bloomberg. The contract allows Qualcomm to create its own chips based on standards owned by Arm.

The showdown threatens to roil the smartphone and personal computer markets, as well as disrupting the finances and operations of two of the most influential companies in the semiconductor industry.

Qualcomm sells hundreds of millions of processors annually — technology used in the majority of Android smartphones. If the cancellation takes effect, the company might have to stop selling products that account for much of its roughly $39 billion in revenue, or face claims for massive damages.

The move ratchets up a legal fight that began when Arm sued San Diego-based Qualcomm — one of its biggest customers — for breach of contract and trademark infringement in 2022. With the cancellation notice, Arm is giving the US company an eight-week period to remedy the dispute.

Representatives for Arm and Qualcomm declined to comment.

The two are headed to a trial to resolve the breach-of-contract claim by Arm and a countersuit by Qualcomm. The disagreement centers on Qualcomm's 2021 acquisition of another Arm licensee and a failure — according to Arm — to renegotiate contract terms. Qualcomm argues that its existing agreement covers the activities of the company that it purchased, the chip-design startup Nuvia.

Nuvia's work on microprocessor design has become central to new personal computer chips that Qualcomm sells to companies such as HP Inc. and Microsoft Corp. The processors are the key component to a new line of artificial intelligence-focused laptops dubbed AI PCs. Earlier this week, Qualcomm announced plans to bring Nuvia's design — called Oryon — to its more widely used Snapdragon chips for smartphones.

Arm says that move is a breach of Qualcomm's license and is demanding that the company destroy Nuvia designs that were created before the Nuvia acquisition. They can't be transferred to Qualcomm without

ARMQC_02762980

permission, according to the original suit filed by Arm in the US District Court in Delaware. Nuvia's licenses were terminated in February 2023 after negotiations failed to reach a resolution.

Like many others in the chip industry, Qualcomm relies on an instruction set from Cambridge, England-based Arm, a company that has created much of the underlying technology for mobile electronics. An instruction set is the basic computer code that chips use to run software such as operating systems.

If Arm follows through with the license termination, Qualcomm would be prevented from doing its own designs using Arm's instruction set. It would still be able to license Arm's blueprints under separate product agreements, but that path would cause significant delays and force the company to waste work that's already been done.

Prior to the dispute, the two companies were close partners that helped advance the smartphone industry. Now, under newer leadership, both of them are pursuing strategies that increasingly make them competitors.

Under Chief Executive Officer Rene Haas, Arm has shifted to offering more complete designs — ones that companies can take directly to contract manufacturers. Haas believes that his company, still majority owned by Japan's SoftBank Group Corp., should be rewarded more for the engineering work it does. That shift encroaches on the business of Arm's traditional customers, like Qualcomm, who use Arm's technology in their own final chip designs.

Meanwhile, under CEO Cristiano Amon, Qualcomm is moving away from using Arm designs and is prioritizing its own work, something that potentially makes it a less lucrative customer for Arm. He's also expanding into new areas, most notably computing, where Arm is making its own push. But the two companies' technologies remain intertwined, and Qualcomm isn't yet in a position to make a clean break from Arm.

Arm was acquired in 2016 by SoftBank, and part of it was sold to the public in an offering in September of last year. The Japanese company still owns more than 80% of the Arm.

Arm has two types of customers: companies that use its designs as the basis for their chips and ones that create their own semiconductors and only license the Arm instruction set.

Qualcomm is no stranger to licensing disputes. The company gets a large chunk of its profit from selling the rights to its own technology — a key part of mobile wireless communications. Its customers include Samsung Electronics Co. and Apple Inc., the two biggest smartphone makers.

Qualcomm emerged victorious in 2019 from a wide-ranging legal fight with Apple. It also won a court decision on appeal against the US Federal Trade Commission, which alleged that the company was using predatory licensing activities.

Danya Al-Qattan
Partner
O. _____
M. _____
E. _____

212.687.8080
713.628.2118
danya.al-qattan@fgsglobal.com



ARMQC_02762981

# EXHIBIT 12

| Message | |
|---|---|
| **From:** | Paul Kranhold [Paul.Kranhold@fgsglobal.com] |
| **Sent:** | 23/10/2024 20:42:50 |
| **To:** | Danya Al-Qattan [Danya.Al-Qattan@FGSGlobal.com]; Spencer Collins [Spencer.Collins@arm.com]; Ami Badani [Ami.Badani@arm.com] |
| **Subject:** | Re: Richard Waters - FT |

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

Danya - let's get Richard the on the approved record statement. Can u please email it to him?

Richard.Waters@FT.com

Paul Kranhold
Co-Chairman, N America
FGS Global

---

**From:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>
**Sent:** Thursday, October 24, 2024 5:27:32 AM
**To:** Spencer.Collins@arm.com <Spencer.Collins@arm.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Subject:** Richard Waters - FT

Danya Al-Qattan
Partner
O. _____ 212.687.8080
M. _____ 713.628.2118
E. _____ danya.al-qattan@fgsglobal.com



ARMQC_02762919

# EXHIBIT 13

| Message |
| --- |

**From:** Danya Al-Qattan [Danya.Al-Qattan@FGSGlobal.com]
**Sent:** 23/10/2024 20:47:38
**To:** Paul Kranhold [Paul.Kranhold@fgsglobal.com]; Spencer Collins [Spencer.Collins@arm.com]; Ami Badani [Ami.Badani@arm.com]
**Subject:** RE: Richard Waters - FT

Warning: EXTERNAL SENDER, use caution when opening links or attachments.

He's got it.

**From:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Sent:** Wednesday, October 23, 2024 4:43 PM
**To:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>; Spencer.Collins@arm.com; Ami Badani <Ami.Badani@arm.com>
**Subject:** Re: Richard Waters - FT

Danya - let's get Richard the on the approved record statement. Can u please email it to him?

Richard.Waters@FT.com

Paul Kranhold
Co-Chairman, N America
FGS Global

**From:** Danya Al-Qattan <Danya.Al-Qattan@FGSGlobal.com>
**Sent:** Thursday, October 24, 2024 5:27:32 AM
**To:** Spencer.Collins@arm.com <Spencer.Collins@arm.com>; Ami Badani <Ami.Badani@arm.com>
**Cc:** Paul Kranhold <Paul.Kranhold@fgsglobal.com>
**Subject:** Richard Waters - FT

Danya Al-Qattan
Partner
O.          212.687.8080
M.          713.628.2118
E.          danya.al-qattan@fgsglobal.com



# EXHIBIT 14

A0922

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QUALCOMM INCORPORATED,<br>    a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>    a Delaware corporation,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>    a U.K. corporation,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 24-490 (MN)

**JURY TRIAL DEMANDED**

**STIPULATED ORDER FOR DISCOVERY, INCLUDING
DISCOVERY OF ELECTRONICALLY STORED INFORMATION ("ESI")**

After conferring on these matters, the Parties hereby stipulate to the following protocol for electronic discovery and respectfully ask the Court to enter this Order. Accordingly, and for good cause shown,

IT IS ORDERED that:

**1.    General Provisions**

a.    **Purpose**. This Stipulated Order will govern discovery of electronically stored information ("ESI") in this case. The term "ESI" carries its broadest meaning consistent with Fed. R. Civ. P. 26 and 34. Without limitation, ESI includes word-processing documents, PowerPoint or other presentation documents, spreadsheets, electronic design files and flowcharts, PDF files, image files (*e.g.*, JPEG and TIFF), and e-mail. Nothing in this Stipulated Order establishes any agreement as to either the temporal or subject matter scope of discovery. Nothing in this Stipulated Order creates an obligation by any Party to produce ESI on back-up tapes or other long-term storage media that were created for use as a disaster recovery medium. The Parties shall not be

A0923

obligated under this Stipulated Order to produce ESI that is no longer within their possession, custody, or control (*i.e.*, lost or deleted) as a result of the good-faith operation of an electronic information system or document retention policy.  This Stipulated Order may be modified for good cause.

b.    **Cooperation**.    The Parties are aware of the importance the Court places on cooperation and hereby commit to cooperate in good faith throughout this matter consistent with this Court's Default Standard for Discovery and Fed. R. Civ. P. 26-36.  The parties expect to reach agreements cooperatively on how to conduct discovery under Fed. R. Civ. P. 26-36.  In the event that the parties are unable to agree on the parameters and/or timing of discovery, the following standards shall apply until further order of the Court, or the parties reach agreement.

c.    **Proportionality**.  The Parties agree to use reasonable, good faith and proportional efforts to preserve, identify, and produce relevant information.[1]  This includes identifying appropriate limits to discovery, including limits on custodians, limits on discoverable data sources, identification of relevant subject matter, time periods for discovery and other parameters to limit and guide preservation and discovery issues.  Requests for production and corresponding responses shall be reasonably targeted, clear, and as specific as practicable in compliance with Federal Rule of Civil Procedure 34(b)(1)(A).

d.    **Preservation of Discoverable Information**.  A party has a common law obligation to take reasonable and proportional steps to preserve discoverable information in the party's possession, custody, or control.

---

[1]    Information can originate in any form, including ESI and paper, and is not limited to information created or stored electronically.

(i)    Absent a showing of good cause by the requesting party, the parties shall not be required to modify, on a going-forward basis, the procedures used by them in the ordinary course of business to backup and archive data; provided, however, that the parties shall preserve the non-duplicative discoverable information currently in their possession, custody, or control.

(ii)    Absent a showing of good cause by the requesting party, the categories of ESI identified in **Schedule A** attached hereto need not be preserved or searched for responsive information.

e.    **Privilege**.

(i)    The parties will continue to confer on the nature and scope of privilege logs for the case, including whether categories of information may be excluded from any logging requirements.  The privilege log should be provided within 30 days after substantial completion of production.

(ii)    With respect to information generated after the filing of the Complaint, parties are not required to include any such information in privilege logs.  Communications may be identified on a privilege log by category, rather than individually, if appropriate.

(iii)    Logging of Redactions for Privilege.  Partially privileged documents produced in redacted form may either be identified on a privilege log or the Producing Party shall provide a metadata field setting forth the nature of the privilege(s), as set forth herein.  A Receiving Party may request a log identifying information sufficient to justify the claim of privilege provided in the metadata.

(iv)    Contents of Privilege Log.  Consistent with Fed. R. Civ. P. 26(b)(5), the following information should be provided (as applicable) in the privilege log for each document or category of documents:

3

(1)  unique document identification numbers;

(2)  nature of privilege or protection claimed (e.g., Attorney-Client Privilege, Work-Product);

(3)  name of the authors (if known) – to the extent a document is an email or email chain, the name of the senders of the most recent email in the chain shall be identified;

(4)  date range of documents in each category (based on metadata, for electronic documents);

(5)  for emails, names of the recipient(s), including those in the TO, CC, and BCC fields;

(6)  general nature of the reasons for the privilege assertion that, without revealing the information itself that is privileged or protected, is sufficient to enable the requesting party to assess the validity of the privilege claim.

(v)  Challenges to Privilege Log.

(1)  The parties retain the right to request metadata for individual documents and emails, including lesser-included communications in email strings, if necessary to properly assess the privilege claim for any document included in a categorical privilege log.

(2)  If a requesting party believes in good faith that one or more items or categories in a producing party's privilege log should be produced and are inappropriately being withheld, then it shall raise the issue as to each log entry with the producing party in writing with

4

reasonably sufficient detail so that the producing party may understand the reasons for the requesting party's complaint.  Within 7 calendar days, the producing party shall respond in writing.  If the response does not satisfy the requesting party, then the parties shall meet and confer, and if the dispute as to the privileged nature of the material cannot be resolved, then the requesting party may seek relief from the Court as to the specific log entries raised with the producing party.  Nothing in this procedure to challenge a Party's privilege log modifies the producing party's burden to establish the privileged nature of the withheld document.

(vi)    Activities undertaken in compliance with the duty to preserve information are protected from disclosure and discovery under Fed. R. Civ. P. 26(b)(3)(A) and (B).

(vii)    The Parties have conferred on an appropriate non-waiver order under Fed. R. Evid. 502, as set forth in the proposed Protective Order.  Until a non-waiver order is entered, information that contains privileged matter or attorney work product shall be immediately returned if such information appears on its face to have been inadvertently produced or if notice is provided of inadvertent production.

(viii)    Nothing in this Order, including any production of documents under the ESI protocol set forth herein, shall constitute a waiver by any Party for any purpose.

**2.    Specific E-Discovery Issues**

a.    **On-site inspection of electronic media**.  Such an inspection shall not be permitted absent a demonstration by the requesting party of specific need and good cause.

b.    **Search methodology**.

5

(i)    If the producing party elects to use search terms to locate potentially responsive ESI from a particular data source, it shall disclose the search terms so used and any exclusion criteria (including, but not limited to, date restrictions).  In analyzing possible search terms for use in locating potentially responsive ESI, the producing party may run test searches to analyze the suitability of possible search terms or exclusion criteria.  Absent a showing of good cause based on the size, complexity, and issues of this specific case, a requesting party may request no more than 10 additional search terms for testing by the producing party with respect to the ESI data source(s) on which the producing party elected to use search terms to locate potentially responsive ESI.  Within 14 days of receiving additional search terms from the requesting party, the producing party shall perform test searches for the requested search terms, disclose search terms results, and inform the requesting party whether it objects to any of the requested terms, including (but not limited to) search terms that return a disproportionate amount of non-responsive or immaterial ESI, or an unreasonably large number of results.  In such cases, the parties shall work together to modify or revise the search terms as appropriate.  If the parties cannot reach agreement regarding appropriate search terms, they shall submit their dispute to the Court in accordance with the Court's discovery dispute procedures.  Without waiting for a ruling on the disputed search terms, the producing party shall use the undisputed search terms, if any, to search ESI.  The identification of materials via agreed-upon searches shall not prevent the producing party from withholding such materials on the grounds that they are not responsive, or protected from disclosure by applicable privilege, immunity, or agreement between the parties.  Notwithstanding prior agreement on the search terms to be used for electronic searches, if a search term returns a disproportionate amount of non-responsive or immaterial ESI, or an unreasonably large number of results, the parties shall (at the producing party's request) meet and confer to discuss application

6

of negative search restrictions, and the party receiving production shall not unreasonably oppose further restrictions to filter a disproportionate amount of non-responsive or immaterial ESI, or an unreasonably large number of results.  After the parties come to agreement on reasonable terms, each producing party shall perform elusion testing of the ESI population that did not hit on search terms (the null set) by conducting a statistical sample (95% confidence level, +/- 2% margin of error) of the null set to confirm whether any responsive ESI was missed.  If a producing party finds that more than 10% of the null set is responsive, the producing party will add terms as necessary to identify responsive ESI found in the null set, then conduct additional null set sampling and adding of additional search terms until the proportion of missed responsive ESI is less than 10%, provided that the additional terms return a proportion of responsive or material documents greater than the non-responsive or immaterial documents also resulting from the additional terms (after calibrating the terms to get reasonable precision).

(ii)    Focused terms, rather than over-broad terms (*e.g.*, product and company names), shall be employed.  A conjunctive combination of multiple words or phrases (*e.g.*, "computer" and "system") narrows the search and shall count as a single search term.  A disjunctive combination of multiple words or phrases (*e.g.*, "computer" or "system") broadens the search, and thus each word or phrase shall count as a separate search term unless they are variants of the same word or are part of a conjunctive search term (*e.g.*, "computer" and "system" or "printer" or "mainframe").  Use of narrowing search criteria (*e.g.*, "and," "but not," "w/x") is encouraged to limit the search.

(iii)    To the extent possible, the producing party shall locate potentially responsive ESI from (i) the non-custodial data sources identified in accordance with paragraph 3(b) of the Default Standard for Discovery; and (ii) the custodians identified in accordance with

7

paragraph 3(a) of the Default Standard for Discovery.  The Parties shall exchange lists of the custodians whose data will be searched, as well as the applicable date ranges.  The Parties agree to meet and confer on any additional data sources or custodians a requesting party identifies as having potentially relevant information.

c.    **Technology Assisted Review (TAR)**.  No Party can compel another Party to use TAR or to produce documents without human review over the producing party's objection.  To the extent a producing party elects to use technology for prioritization or other workflows designed for review efficiency while still reviewing all of the documents within the review population, this use is not required to be disclosed to the requesting party.  On the other hand, a producing party that elects to use TAR to cull documents from the review population shall promptly inform the requesting party of its intent to do so.  The parties shall promptly meet and confer to agree on the information that must be disclosed regarding the producing party's proposed use of TAR, but at minimum, such disclosure shall set forth the tool it intends to employ, the validation methodology it intends to use, and exceptions to the application of TAR.

d.    **Deduplication**.  The parties shall de-duplicate stand-alone documents or entire document families globally using MD5, or SHA-1 Hash value matching.  Deduplication shall not break apart families and shall be performed at a family level (for example, email attachments shall not be eliminated from the parent email).  Hard copy documents shall not be eliminated as duplicates of responsive ESI.  The producing party shall take reasonable steps to de-duplicate ESI on a family level globally (i.e., both within a particular custodian's files and across all custodians).[2] No Party shall be required to identify and/or eliminate electronic duplicates by manual review or

---

[2]    There may be non-custodial data sources that cannot be globally deduped or for which global deduplication is not appropriate.

8

some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above.  In globally de-duped, incremental productions, there will be instances when production of documents from additional custodians will include documents previously produced. A Custodian Append overlay load file using the load file format described above shall be provided with updated AllCustodian and AllFilePaths fields; BegBates and EndBates fields may be used as the unique identifiers.

      e.      **Format**.  ESI and non-ESI shall be produced to the requesting party as text searchable image files (e.g., TIFF).  When a text-searchable image file is produced, the producing party must preserve the integrity of the underlying ESI, *i.e.*, the original formatting; the metadata (as noted below); hidden comments, tracked changes, speaker notes, and columns, rows, and sheets; and, where applicable, the revision history.  The parties shall produce their information in the following format: single-page TIFF greyscale format images and associated multi-page text files containing extracted text or OCR with Concordance and Opticon load files containing all requisite information including relevant metadata and document breaks.

      f.      **Native files**.  The only files that should be produced in native format are files not easily converted to image format, such as audio, video, and spreadsheet files (e.g., Excel).  A party that receives a document produced in non-native format may make a reasonable request to receive the document in its native format.  In lieu of a TIFF image version of each spreadsheet file, a Bates-stamped single-page TIFF placeholder file shall be produced along with the native format version of each file.  When redaction is necessary, a redacted TIFF image version shall be produced. Content that would otherwise be available in the native format, including hidden columns, rows, and sheets; comments; and "track changes" (and similar in-line editing) must be included in the

9

image version.  The parties reserve the right to request access to the native format versions of such files.

g.      **Databases and Structured Data Format**.  To the extent a response to discovery requires production of discoverable ESI contained in a database, the producing party may elect to produce the data in a report format if that format is reasonably usable or in a native format compatible with Microsoft Excel or Microsoft Access.

h.      **Paper Documents**.  In scanning paper documents, distinct documents should not be merged into a single record and single documents should not be split into multiple records.  If a document is more than one page, to the extent possible, the unitization of the document and any attachments or affixed notes should be maintained as it existed when collected by the producing party and should be reflected in proper coding of the family fields set out in the metadata fields specified herein.  Parties may unitize their documents using either physical unitization (i.e., based on physical binding or organizational elements present with the original paper documents like staples, clips, and binder inserts) or logical unitization (i.e., a manual review of the paper to determine what logically constitutes a document like page numbers or headers).  If unitization cannot be reasonably maintained, the original unitization should be documented in the data load file or otherwise electronically tracked if reasonably possible.  The producing party should scan and produce folders, redwelds, binder-covers and other organizational structure.  Such materials should be produced as independent documents and be produced before the documents that were contained in these elements to the extent reasonably accomplishable by the above-addressed unitization, (e.g., the file folder should have a Production number immediately before the documents contained in the file folder).  The producing party will provide the name of the custodian who had possession of the document when it was collected.  A custodian can consist of

10

the name of an employee or other person, a department, or an archive storage location. The producing party will create and produce optical character recognition (OCR) of paper documents.

i.      **Color**.  The parties will accommodate reasonable and proportional requests made in good faith for the production of specific color images originally produced in greyscale TIFF format to the extent available and where reasonably necessary to decipher the complete meaning, context, or content of the documents on a case by case basis.

j.      **Redactions**.  The producing party may redact, from any TIFF image, metadata field, and/or native file, information that is protected from disclosure by any applicable privilege or immunity law or regulation, including but not limited to information protected by the attorney-client privilege, work product doctrine, joint defense work product doctrine, individually identifiable health information, or personal identifying information.  Each redaction shall be clearly labeled and include the reason for the redaction, such as "Redacted-Privileged" or "Redacted-Private," as appropriate.  The producing party shall preserve an unredacted version of the document.  Where a document contains both protected and non-protected responsive content, the producing party shall redact the protected material and produce the remainder of the document as redacted.  The parties agree to meet and confer in good faith to attempt to resolve any dispute arising under this paragraph.  No party shall be required to produce a redaction log provided that the reason for the redaction appears on the redaction label (e.g., "Privileged," "Private").  Redacted documents may have certain metadata fields withheld from production.  The parties shall cooperate to create a list of metadata fields which may be produced for these documents.

k.      **Non-English language documents**.  Documents shall be produced in their original language.  Where a requested document exists in a foreign language and the producing party also has a reasonably available English-language version of the document that it prepared for non-

11

litigation purposes prior to the filing of this lawsuit, the producing party shall produce both the original document and any such English-language versions. In addition, if the producing party has a reasonably available certified translation of a foreign-language document that is being produced (whether or not the translation is prepared for purposes of litigation), the producing party shall produce both the original document and the certified translation.

l.      **Instant Messages**. For instant message and chat application data stored in company enterprise systems, the Parties shall produce messages in a 24-hour period, as opposed to a custom time period or producing individual messages. This does not limit the Parties from redacting information that is protected from disclosure within the 24-hour period.

m.      **Email threads**. The parties are obligated to produce only the most inclusive part of an email thread (for example, only the last-in-time email in an email chain comprised of 15 emails), with the exception of any individual emails in an email thread with unique attachments, which should also be produced.

n.      **Document Family**. All document family relationships shall be produced together and children files should follow parent files in sequential Bates number order. This does not impose any requirement on parties to associate and produce together hyperlinked documents.

o.      **Embedded Files**. The parties will not review or produce embedded images or documents outside the document in which the file is embedded (e.g., .vcf files embedded in emails, .xlsx files embedded in PowerPoint presentations). The parties will accommodate reasonable and proportional requests made in good faith for the production of embedded files (non-images), on a case by case basis.

12

p.      **Metadata fields**.  The parties are obligated to provide only the following metadata for all ESI produced, to the extent such metadata exists: All Custodian, File Path,[3] Email Subject, Conversation Index, From, To, CC, BCC, Date Sent, Time Sent, Date Received, Time Received, Date Accessed, Time Accessed, Meeting Start Date, Meeting Start Time, Meeting End Date, Meeting End Time, Message ID, Importance, Sensitivity, Filename, Author, Date Created, Time Created, Date Saved, Time Saved, MD5 Hash, File Size, Title, File Extension, File Size, Confidentiality Designation, Redacted (indicating whether document is redacted), Redaction Reason (nature of the privilege), Hidden Content, Text Path, Native Path, Bates Number Begin, Bates Number End, Attachment Count, Attachment Range, Attachment Begin, and Attachment End (or the equivalent thereof).

q.      **Encrypted or Password Protected Files**.  The parties will make reasonable efforts to ensure that all Documents they produce are decrypted, and if possible, will decrypt any encrypted documents on the receiving party's request.

r.      **Production Media**.  The parties will make reasonable efforts to ensure that any productions made are free from malware.  Any media on which Documents are produced may be encrypted by the producing party.  In such cases, the producing party shall transmit the encryption key or password to the requesting party under separate cover upon service of the encrypted media.

---

[3]   File path metadata created in the course of collecting files for purposes of litigation is not required to be produced if such production would reveal privileged information.

13

## SCHEDULE A

1.    Deleted, slack, fragmented, or other data only accessible by forensics.

2.    Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system.

3.    On-line access data such as temporary internet files, history, cache, cookies, and the like.

4.    Data in metadata fields that are frequently updated automatically, such as last opened dates.

5.    Back-up data that are substantially duplicative of data that are more accessible elsewhere.

6.    Voice messages and voicemails.

7.    Instant messages that are not ordinarily printed or maintained in a server dedicated to instant messaging.  Instant messages that are retained on corporate servers dedicated to instant messaging are not included here.

8.    Electronic mail or pin-to-pin messages sent to or from mobile devices (e.g., iPhone and Blackberry devices), provided that a copy of such mail is routinely saved elsewhere.

9.    Other electronic data stored on a mobile device, such as calendar or contact data or notes, provided that a copy of such information is routinely saved elsewhere.

10.    Text messages, instant messages, chat application data, and other data stored on mobile devices.

11.    Logs of calls made from mobile devices.

12.    Server, system, or network logs.

13.    Electronic data temporarily stored by laboratory equipment or attached electronic equipment, provided that such data is not ordinarily preserved as part of a laboratory report.

14.    Data remaining from systems no longer in use that is unintelligible on the systems in use.

15. Dynamic fields of databases or log files that are not retained in the usual course of business.

16. Automatically saved versions of documents and emails as temporary files.

17. Personal computers and personal e-mail not regularly used for business activities.

18. Social media sites.

19. Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and disposition of computer equipment.

20. Files that do not store user-created content during ordinary use such as structural files, operating system files, application source code, configuration, and other similar application files.

21. Files included on the National Institute of Standards and Technology (NIST) List (https://www.nist.gov/itl/ssd/software-quality-group/national-software-reference-library-nsrl/nsrl-download).

22. Other forms of ESI the preservation of which requires extraordinary affirmative measures that are not utilized in the ordinary course of business.  Data stored on photocopiers, scanners, and fax machines.

23. Data remaining from systems no longer in use that is unintelligible on the systems in use.

A0937

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Jennifer Ying
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis J. Murray
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
rjgarrett@paulweiss.com

Catherine Nyarady
Erin J. Morgan
Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
cnyarady@paulweiss.com
ejmorgan@paulweiss.com
jbraly@paulweiss.com

*Attorneys for Plaintiffs*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Robert M. Vrana
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302)   571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
ddurie@mofo.com
shaelyndawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

**A0938**

Kyle W.K. Mooney
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
(212) 336-4092
kmooney@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
(213) 892-5348
nfung@mofo.com

*Attorneys for Defendant*

**SO ORDERED this 21st day of March 2025.**

_____
**The Honorable Maryellen Noreika
United States District Judge**

# EXHIBIT 15

A0940

Message

---

**From:**      Richard Grisenthwaite [Richard.Grisenthwaite@arm.com]
**Sent:**      17/05/2022 18:48:36
**To:**        Vivek Agrawal [Vivek.Agrawal@arm.com]
**Subject:**   don't sign off the Nuvia design


Hi,

Please can you hold off confirming the sign off the Nuvia part pending confirmation from me

When did they submit this sign-off request?

thanks

Richard G




Get Outlook for iOS

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-05; :**

CASE NO. _____1:22-cv-01146-MN_____
DATE ENTERED _____
BY: _____
DEPUTY CLERK

A09419                                                    ARM_00132456

# EXHIBIT 16

A0942

Message

**From:** Richard Grisenthwaite [Richard.Grisenthwaite@arm.com]
**Sent:** 18/05/2022 07:03:40
**To:** Rene Haas [Rene.Haas@arm.com]; Paul Williamson [Paul.Williamson@arm.com]
**Subject:** FW: Qualcomm's Hamoa CPU (v8.7) implementation results/waivers summary for compliance sign-off "green signal"
**Attachments:** Nuvia_Hamoa_waiver_summary.xlsx

Hi,

As we touched on at dinner last night, this is the request from Qualcomm to sign off their Hamoa design for production – we believe that this is a productionized version of the Phoenix design they'd done as a sample tapeout in Feb2022 and comes from the Nuvia design team we believe.
The request for the sign-off came in on Friday 13th May, so implying that the design was in their hands up to that date, and has not been deleted. We were told the purpose of the signoff was for a production run.

Let me know if you need more information on this

Thanks

Richard G


Richard Grisenthwaite
Arm Ltd
110 Fulbourn Road

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-0622**

CASE NO. _____1:22-cv-01146-MN_____
DATE ENTERED _____
BY: _____
DEPUTY CLERK

**From:** Vivek Agrawal <Vivek.Agrawal@arm.com>
**Sent:** 17 May 2022 10:56
**To:** Martin Weidmann <Martin.Weidmann@arm.com>; Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>; John Horley <John.Horley@arm.com>; Michael Williams (ATG) <Michael.Williams@arm.com>
**Cc:** Nizamudheen Ahmed <Nizamudheen.Ahmed@arm.com>; Aparajita Bhattacharya <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman <Anand.Muthuraman@arm.com>; Sathya Sankar Dharmarajan <Sathya.SankarDharmarajan@arm.com>
**Subject:** Qualcomm's Hamoa CPU (v8.7) implementation results/waivers summary for compliance sign-off "green signal"

Hi Richard, Mike, Martin and John

PTX-0400 Page 2 of 4



ARM_00036347

**PTX-0400 Page 2 of 4**

A0944

Others:
======
1.      OS boot logs are awaited from partner.
2.      Sim count and results are compared with internal reference and found as expected.

Regards,
Vivek

A09459

ARM_00036348

**Document Produced in Native Format**

ARM_00036349

**PTX-0400  Page 4 of 4**
A0946

# EXHIBIT 17

A0947

Message

| | |
|---|---|
| **From:** | Richard Grisenthwaite [Richard.Grisenthwaite@arm.com] |
| **Sent:** | 18/05/2022 17:22:41 |
| **To:** | Robert Calico [Robert.Calico@arm.com]; Paul Williamson [Paul.Williamson@arm.com] |
| **Subject:** | RE: Qualcomm's Hamoa CPU (v8.7) implementation results/waivers summary for compliance sign-off "green signal" |

Hi,

I've asked the team in BLR for a copy of this - I'd expect to get it tomorrow morning UK time.

Thanks

Richard G

Robert Calico wrote on 2022-05-18

> **Redaction - Privileged**
>
> - Rob.
>
>
>      On May 18, 2022, at 9:50 AM, Paul Williamson
> <Paul.Williamson@arm.com> wrote:
>
>
>
>
>
>
>      **Redaction - Privileged**
>
>      Paul
>
>      Paul Williamson
>      SVP, General manager Client Line of Business
>      Mob: +44 (0)7738 252445
> _____
>
>      From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>     Sent:
> Wednesday, May 18, 2022 8:03:40 AM      To: Rene Haas <Rene.Haas@arm.com>;
> Paul Williamson <Paul.Williamson@arm.com>      Subject: FW: Qualcomm's Hamoa
> CPU (v8.7) implementation results/waivers summary for compliance
> sign-off "green signal"
>
>
>      Hi,
>
>
>
>      As we touched on at dinner last night, this is the request from
> Qualcomm to sign off their Hamoa design for production - we believe
> that this is a productionized version of the Phoenix design they'd
> done as a sample tapeout in Feb2022 and comes from the Nuvia design team we believe.
>
>      The request for the sign-off came in on Friday 13th May, so implying
> that the design was in their hands up to that date, and has not been deleted.
> We were told the purpose of the signoff was for a production run.
>
>
>
> ████████████████████████
> ████████████████████████
> ████████████████████████

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-0423**

CASE NO. _____ 1:22-cv-01146-MN _____
DATE ENTERED _____
BY: _____
DEPUTY CLERK

ARM_01238999

Let me know if you need more information on this


Thanks


Richard G




Richard Grisenthwaite

Arm Ltd

110 Fulbourn Road



From: Vivek Agrawal <Vivek.Agrawal@arm.com>        Sent: 17 May 2022 10:56
To: Martin Weidmann <Martin.Weidmann@arm.com>; Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>; John Horley <John.Horley@arm.com>; Michael Williams (ATG) <Michael.Williams@arm.com>        Cc: Nizamudheen Ahmed <Nizamudheen.Ahmed@arm.com>; Aparajita Bhattacharya <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman <Anand.Muthuraman@arm.com>; Sathya Sankar Dharmarajan <Sathya.SankarDharmarajan@arm.com>        Subject: Qualcomm's Hamoa CPU (v8.7) implementation results/waivers summary for compliance sign-off "green signal"


Hi Richard, Mike, Martin and John

A0949

ARM_01239000

PTX-0401  Page 3 of 5



ARM_01239001



PTX-0401_Page 4 of 5

A0951

ARM_01239002

PTX-0401, Page 5 of 5

```
>
>
>
>       Others:
>
>       ======
>
>       1.      OS boot logs are awaited from partner.
>       2.      Sim count and results are compared with internal reference
> and found as expected.
>
>
>
>       Regards,
>
>       Vivek

Richard Grisenthwaite
Arm Ltd
110 Fulbourn Road
```

A0952

ARM_01239003

# EXHIBIT 18

Message

---

**Sent**:        19/05/2022 14:33:49
**To**:          Richard Grisenthwaite [Richard.Grisenthwaite@arm.com]; Martin Weidmann [Martin.Weidmann@arm.com]; Aparajita Bhattacharya [Aparajita.Bhattacharya@arm.com]; Anand Muthuraman [Anand.Muthuraman@arm.com]
**Subject**:     RE: Nuvia core sign-off


Richard,

To keep things simple, Should I say just say that approval is pending from aur architect.


-----Original Message-----
From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>
Sent: Thursday, May 19, 2022 7:14 PM
To: Martin Weidmann <Martin.Weidmann@arm.com>; Vivek Agrawal <Vivek.Agrawal@arm.com>; Aparajita
Bhattacharya <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman <Anand.Muthuraman@arm.com>
Subject: RE: Nuvia core sign-off



Thanks

Richard G

Martin Weidmann wrote on 2022-05-19
> Richard,
>
>



>
>
> Martin
>
>
>
> From: Vivek Agrawal <Vivek.Agrawal@arm.com> Sent: 19 May 2022 12:55 To:
> Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>; Martin Weidmann
> <Martin.Weidmann@arm.com>; Aparajita Bhattacharya
> <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman
> <Anand.Muthuraman@arm.com> Subject: RE: Nuvia core sign-off
>
>
>
> Richard,
>
>
>
>
>
>
>

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-0424**

CASE NO. _____1:22-cv-01146-MN_____
DATE ENTERED _____
BY: _____
DEPUTY CLERK

ARM_01215997

> Regards,
>
> Vivek
>
>
>
> From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> >
> Sent: Thursday, May 19, 2022 4:23 PM
> To: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >; Martin Weidmann
> <Martin.Weidmann@arm.com <mailto:Martin.Weidmann@arm.com> >; Aparajita
> Bhattacharya <Aparajita.Bhattacharya@arm.com
> <mailto:Aparajita.Bhattacharya@arm.com> >; Anand Muthuraman
> <Anand.Muthuraman@arm.com <mailto:Anand.Muthuraman@arm.com> >
> Subject: RE: Nuvia core sign-off
>
>

>
> Thanks
>
>
> Richard G
>
>
>
> Richard Grisenthwaite
>
> Arm Ltd
>
> 110 Fulbourn Road
>
>
>
> From: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >
> Sent: 19 May 2022 06:14
> To: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> >; Martin Weidmann
> <Martin.Weidmann@arm.com <mailto:Martin.Weidmann@arm.com> >; Aparajita
> Bhattacharya <Aparajita.Bhattacharya@arm.com
> <mailto:Aparajita.Bhattacharya@arm.com> >; Anand Muthuraman
> <Anand.Muthuraman@arm.com <mailto:Anand.Muthuraman@arm.com> >
> Subject: RE: Nuvia core sign-off
>
>
>
> Richard,
>
>
>
> I have been working with the same person (Jignesh Trivedi) before
> Nuvia was acquired by QC.

ARM_01215998

```
>
>
```

```
>
>
>
> ++ adding Apu, Anand, Martin
>
>
>
> Regards,
>
> Vivek
>
>
>
>
>
>
>
>
> -----Original Message-----
> From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> >
> Sent: Wednesday, May 18, 2022 10:52 PM
> To: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >
> Subject: RE: Nuvia core
>
>
>
> Hi Vivek,
>
>
```

```
>
>
>
> Please can you send it to me as an attachment to an email
>
>
>
> Thanks
>
>
>
> Richard G
>
>
>
>
>
> Richard Grisenthwaite wrote on 2022-05-18
>
>> Hi,
>>
>>
```

A09569

ARM_01215999

PTX-0402, Page 4 of 5

```
>>
>>
>> Thanks
>>
>>
>>
>> Richard G
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Richard Grisenthwaite
>>
>> Arm Ltd
>>
>> 110 Fulbourn Road
>
>
>
> Richard Grisenthwaite
>
> Arm Ltd
>
> 110 Fulbourn Road
>
>
>
> From: Richard Grisenthwaite Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> Sent: Wednesday, May 18, 2022
> 12:19 AM To: Vivek Agrawal Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> Subject: don't sign off the Nuvia
> design
>
>
>
> Hi,
>
>
```

```
>
>
>
> When did they submit this sign-off request?
>
>
>
> thanks
>
>
>
> Richard G
>
>
>
>

Richard Grisenthwaite
Arm Ltd
```

A09579

ARM_01216000

110 Fulbourn Road

ARM_01216001

# EXHIBIT 19

A0959

Message
_____

**Sent**:        19/05/2022 16:28:03
**To**:          Richard Grisenthwaite [Richard.Grisenthwaite@arm.com]; Martin Weidmann [Martin.Weidmann@arm.com];
                 Aparajita Bhattacharya [Aparajita.Bhattacharya@arm.com]; Anand Muthuraman [Anand.Muthuraman@arm.com];
                 123
**Subject**:     RE: Nuvia core sign-off
**Attachments**: ████████

Richard,



Regards,
Vivek

-----Original Message-----
From: Vivek Agrawal
Sent: Thursday, May 19, 2022 8:15 PM
To: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>; Martin Weidmann <Martin.Weidmann@arm.com>;
Aparajita Bhattacharya <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman <Anand.Muthuraman@arm.com>
Subject: RE: Nuvia core sign-off

Richard,

I have a meeting with Jignesh (QC) tomorrow morning, and ETA for green-signal would be only major item in
our agenda.
████████████████████████████████████████████████████████████████████████

Regards,
Vivek

-----Original Message-----
From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>
Sent: Thursday, May 19, 2022 7:14 PM
To: Martin Weidmann <Martin.Weidmann@arm.com>; Vivek Agrawal <Vivek.Agrawal@arm.com>; Aparajita
Bhattacharya <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman <Anand.Muthuraman@arm.com>
Subject: RE: Nuvia core sign-off

████████████████████████████████████████████████████████████████████████████

Thanks

Richard G

Martin Weidmann wrote on 2022-05-19
> Richard,
>
>
>

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-0425**

CASE NO. _____1:22-cv-01146-MN_____
DATE ENTERED _____
BY: _____
                DEPUTY CLERK

ARM_01216002

> Martin
>
>
> From: Vivek Agrawal <Vivek.Agrawal@arm.com> Sent: 19 May 2022 12:55 To:
> Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>; Martin Weidmann
> <Martin.Weidmann@arm.com>; Aparajita Bhattacharya
> <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman
> <Anand.Muthuraman@arm.com> Subject: RE: Nuvia core sign-off
>
>
>
> Richard,
>
>
>

> Regards,
>
> Vivek
>
>
>
> From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> >
> Sent: Thursday, May 19, 2022 4:23 PM
> To: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >; Martin Weidmann
> <Martin.Weidmann@arm.com <mailto:Martin.Weidmann@arm.com> >; Aparajita
> Bhattacharya <Aparajita.Bhattacharya@arm.com
> <mailto:Aparajita.Bhattacharya@arm.com> >; Anand Muthuraman
> <Anand.Muthuraman@arm.com <mailto:Anand.Muthuraman@arm.com> >
> Subject: RE: Nuvia core sign-off
>
>

> Thanks
>
>
> Richard G
>
>
>
> Richard Grisenthwaite
>
> Arm Ltd
>
> 110 Fulbourn Road
>
>
>
> From: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >
> Sent: 19 May 2022 06:14
> To: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com

ARM_01216003

> <mailto:Richard.Grisenthwaite@arm.com> >; Martin Weidmann
> <Martin.Weidmann@arm.com <mailto:Martin.Weidmann@arm.com> >; Aparajita
> Bhattacharya <Aparajita.Bhattacharya@arm.com
> <mailto:Aparajita.Bhattacharya@arm.com> >; Anand Muthuraman
> <Anand.Muthuraman@arm.com <mailto:Anand.Muthuraman@arm.com> >
> Subject: RE: Nuvia core sign-off
>
>
>
> Richard,
>
>
>
> I have been working with the same person (Jignesh Trivedi) before
> Nuvia was acquired by QC.
>

>
> ++ adding Apu, Anand, Martin
>
>
>
> Regards,
>
> Vivek
>
>
>
>
>
>
>
>
>
> -----Original Message-----
> From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> >
> Sent: Wednesday, May 18, 2022 10:52 PM
> To: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >
> Subject: RE: Nuvia core
>
>
>
> Hi Vivek,
>
>
>

ARM_01216004

**0403 Page 3 of 5**
**A0962**

```
>
> Please can you send it to me as an attachment to an email
>
>
>
> Thanks
>
>
>
> Richard G
>
>
>
>
>
> Richard Grisenthwaite wrote on 2022-05-18
>
>> Hi,
>>
>>
>>
```

```
>>
>>
>> Thanks
>>
>>
>>
>> Richard G
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Richard Grisenthwaite
>>
>> Arm Ltd
>>
>> 110 Fulbourn Road
>
>
>
> Richard Grisenthwaite
>
> Arm Ltd
>
> 110 Fulbourn Road
>
```

A0963

ARM_01216005

&gt;
&gt;
&gt; From: Richard Grisenthwaite Richard.Grisenthwaite@arm.com
&gt; &lt;mailto:Richard.Grisenthwaite@arm.com&gt; Sent: Wednesday, May 18, 2022
&gt; 12:19 AM To: Vivek Agrawal Vivek.Agrawal@arm.com
&gt; &lt;mailto:Vivek.Agrawal@arm.com&gt; Subject: ███████████████
&gt; ████
&gt;
&gt;
&gt;
&gt; Hi,
&gt;
&gt;

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

&gt;
&gt; When did they submit this sign-off request?
&gt;
&gt;
&gt;
&gt; thanks
&gt;
&gt;
&gt;
&gt; Richard G
&gt;
&gt;
&gt;
&gt;

Richard Grisenthwaite
Arm Ltd
110 Fulbourn Road

**403  Page 5 of 5**
A0964

ARM_01216006

# EXHIBIT 20

A0965

Message
_____

**From:**　　　Richard Grisenthwaite [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
　　　　　　　(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3364EA3E687548A19F8FE5BD997B99EC-RICHARD GRI]
**Sent:**　　　19/05/2022 12:22:26
**To:**　　　Robert Calico [Robert.Calico@arm.com]; Paul Williamson [Paul.Williamson@arm.com]
**Subject:**　　RE: Qualcomm's Hamoa CPU (v8.7) implementation results/waivers summary for compliance sign-off "green signal"

# Redaction - Privileged

Thanks

Richard G

Richard Grisenthwaite wrote on 2022-05-19

> # Redaction - Privileged

> Thanks
>
> Richard G
>
>
>
>
> Robert Calico wrote on 2022-05-18

# Redaction - Privileged

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-0426**

CASE NO. ___1:22-cv-01146-MN___
DATE ENTERED _____
BY: _____
DEPUTY CLERK

PTX-0404, Page 1 of 6
A09669

ARM_01230011

\>\> Thanks,
\>\>
\>\> - Rob.
\>\>
\>\>
\>\>     On May 18, 2022, at 9:50 AM, Paul Williamson
\>\> <Paul.Williamson@arm.com> wrote:
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>     Fyi
\>\>
\>\>     Paul
\>\>
\>\>     Paul Williamson
\>\>     SVP, General manager Client Line of Business
\>\>     Mob: +44 (0)7738 252445
\>\> _____
\>\>
\>\>     From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>     Sent:
\>\> Wednesday, May 18, 2022 8:03:40 AM     To: Rene Haas <Rene.Haas@arm.com>;
\>\> Paul Williamson <Paul.Williamson@arm.com>     Subject: FW: Qualcomm's
\>\> Hamoa CPU (v8.7) implementation results/waivers summary for
\>\> compliance sign-off "green signal"
\>\>
\>\>
\>\>     Hi,
\>\>
\>\>
\>\>     As we touched on at dinner last night, this is the request from
\>\> Qualcomm to sign off their Hamoa design for production – we believe
\>\> that this is a productionized version of the Phoenix design they'd
\>\> done as a sample tapeout in Feb2022 and comes from the Nuvia design
\>\> team we believe.
\>\>
\>\>     The request for the sign-off came in on Friday 13th May, so implying
\>\> that the design was in their hands up to that date, and has not been deleted.
\>\> We were told the purpose of the signoff was for a production run.
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>     Let me know if you need more information on this
\>\>
\>\>
\>\>     Thanks
\>\>
\>\>
\>\>     Richard G
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>     Richard Grisenthwaite
\>\>
\>\>     Arm Ltd
\>\>
\>\>     110 Fulbourn Road
\>\>
\>\>
\>\>
\>\>     From: Vivek Agrawal <Vivek.Agrawal@arm.com>     Sent: 17 May 2022 10:56
\>\>     To: Martin Weidmann <Martin.Weidmann@arm.com>; Richard Grisenthwaite
\>\> <Richard.Grisenthwaite@arm.com>; John Horley <John.Horley@arm.com>;

A09679
ARM_01230012

>> Michael Williams (ATG) <Michael.Williams@arm.com>     Cc: Nizamudheen
>> Ahmed <Nizamudheen.Ahmed@arm.com>; Aparajita Bhattacharya
>> <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman
>> <Anand.Muthuraman@arm.com>; Sathya Sankar Dharmarajan
>> <Sathya.SankarDharmarajan@arm.com>     Subject: Qualcomm's Hamoa CPU
>> (v8.7) implementation results/waivers summary for compliance sign-off
>> "green signal"
>>
>>
>>
>>      Hi Richard, Mike, Martin and John
>>

A0968
ARM_01230013




**PTX-0404, Page 4 of 6**

ARM_01230014

PTX-0404, Page 5 of 6



A09709

ARM_01230015

```
>>      Others:
>>
>>      ======
>>
>>      1.      OS boot logs are awaited from partner.
>>      2.      Sim count and results are compared with internal reference
>> and found as expected.
>>
>>
>>
>>      Regards,
>>
>>      Vivek
>
> Richard Grisenthwaite
> Arm Ltd
> 110 Fulbourn Road

Richard Grisenthwaite
Arm Ltd
110 Fulbourn Road
```

**PTX-0404  Page 6 of 6**

A09719

ARM_01230016

# EXHIBIT 21

Message

| | |
|---|---|
| **From**: | Aparajita Bhattacharya [Aparajita.Bhattacharya@arm.com] |
| **Sent**: | 19/05/2022 11:18:20 |
| **To**: | Richard Grisenthwaite [Richard.Grisenthwaite@arm.com] |
| **Subject**: | RE: Nuvia core sign-off |

Hi Richard,

If you can create a diff of the configurations, it will add to the evidence that it is not a clean sheet design.

>> Will get this work going

3) we aren't aware of any other designs that QC was working on, so the idea that a production quality design should be created in 2 months is implausible - usually we interact with the design team, logging issues etc, for months before the final tapeout, right ?

>> Will wait for Vivek to confirm on the Qualcomm design question. True that with any design there are months of working together before the final push in the last 2-3 months leading up to sign off.


Thanks,
Best Regards,
Aparajita

Architecture and Technology Group
ARM Embedded Technologies Pvt. Ltd.

-----Original Message-----
From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>
Sent: Thursday, May 19, 2022 4:31 PM
To: Aparajita Bhattacharya <Aparajita.Bhattacharya@arm.com>
Subject: RE: Nuvia core sign-off

Hi,
If you can create a diff of the configurations, it will add to the evidence that it is not a clean sheet design.
Frankly it seems utterly implausible that it is a clean sheet design, but that isn't the same as being able to prove the assertion, so it is really a question of what evidence do we have.
1) If the configurations are very similar, then that is very suggestive
2)  We have the conversations that have been had between Vivek and their validation lead which seem to suggest the same heritage
3) we aren't aware of any other designs that QC was working on, so the idea that a production quality design should be created in 2 months is implausible - usually we interact with the design team, logging issues etc, for months before the final tapeout, right ?

Thanks

Richard G

Aparajita Bhattacharya wrote on 2022-05-19
> Hi Richard,
>
>
>
> Was added to this thread in the morning today..
>
> Would you like us to do a diff on configuration/testlists across
> Phoenix and Hamoa - to look at the correlation?
>
>
>
> Thanks,
>
> Best Regards,
>
> Aparajita
>
>
>
> Architecture and Technology Group
>

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-0427**

CASE NO. ____1:22-cv-01146-MN____
DATE ENTERED _____
BY: _____
DEPUTY CLERK

ARM_01230110

> ARM Embedded Technologies Pvt. Ltd.
>
>
>
> From: Vivek Agrawal <Vivek.Agrawal@arm.com> Sent: Thursday, May 19,
> 2022
> 10:44 AM To: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>;
> Martin Weidmann <Martin.Weidmann@arm.com>; Aparajita Bhattacharya
> <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman
> <Anand.Muthuraman@arm.com> Subject: RE: Nuvia core sign-off
>
>
>
> Richard,
>
>
>
> I have been working with the same person (Jignesh Trivedi) before
> Nuvia was acquired by QC.



**Redaction - Privileged**

>
> ++ adding Apu, Anand, Martin
>
>
>
> Regards,
>
> Vivek
>
>
>
>
>
>
>
>
>
>
> -----Original Message-----
> From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> >
> Sent: Wednesday, May 18, 2022 10:52 PM
> To: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >
> Subject: RE: Nuvia core
>
>
>
> Hi Vivek,
>
>

A0974

ARM_01230111

0405_Page 3 of 4

```
>
>
> Please can you send it to me as an attachment to an email
>
>
>
> Thanks
>
>
>
> Richard G
>
>
>
>
>
> Richard Grisenthwaite wrote on 2022-05-18
>
>> Hi,
>>
>>
```

**Redaction - Privileged**

```
>>
>>
>> Thanks
>>
>>
>>
>> Richard G
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Richard Grisenthwaite
>>
>> Arm Ltd
>>
>> 110 Fulbourn Road
>
>
>
> Richard Grisenthwaite
>
```

A0975

ARM_01230112

> Arm Ltd
>
> 110 Fulbourn Road
>
>
>
> From: Richard Grisenthwaite Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> Sent: Wednesday, May 18, 2022
> 12:19 AM To: Vivek Agrawal Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> Subject: don't sign off the Nuvia
> design
>
>
>
> Hi,
>

███████████████████████████████████████████

>
>
> When did they submit this sign-off request?
>
>
>
> thanks
>
>
>
> Richard G
>
>
>
>

Richard Grisenthwaite
Arm Ltd
110 Fulbourn Road

ARM_01230113

# EXHIBIT 22

Message

---

**From:**       Vivek Agrawal [Vivek.Agrawal@arm.com]
**Sent:**       19/05/2022 16:30:35
**To:**         Richard Grisenthwaite [Richard.Grisenthwaite@arm.com]; Martin Weidmann [Martin.Weidmann@arm.com]; Aparajita Bhattacharya [Aparajita.Bhattacharya@arm.com]; Anand Muthuraman [Anand.Muthuraman@arm.com]
**Subject:**    RE: Nuvia core sign-off
**Attachments:** config_diff

**Flag:**       Follow up

Richard,

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Regards,
Vivek

-----Original Message-----
From: Vivek Agrawal
Sent: Thursday, May 19, 2022 8:15 PM
To: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>; Martin Weidmann <Martin.Weidmann@arm.com>; Aparajita Bhattacharya <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman <Anand.Muthuraman@arm.com>
Subject: RE: Nuvia core sign-off

Richard,

I have a meeting with Jignesh (QC) tomorrow morning, and ETA for green-signal would be only major item in our agenda.
████████████████████████████████████████████████████████████

Regards,
Vivek

-----Original Message-----
From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>
Sent: Thursday, May 19, 2022 7:14 PM
To: Martin Weidmann <Martin.Weidmann@arm.com>; Vivek Agrawal <Vivek.Agrawal@arm.com>; Aparajita Bhattacharya <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman <Anand.Muthuraman@arm.com>
Subject: RE: Nuvia core sign-off

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Thanks

Richard G

Martin Weidmann wrote on 2022-05-19
> Richard,
>
>
>

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-0428**

CASE NO. ___1:22-cv-01146-MN___
DATE ENTERED _____
BY: _____
DEPUTY CLERK

A0978

ARM_01230123

> Martin
>
>
> From: Vivek Agrawal <Vivek.Agrawal@arm.com> Sent: 19 May 2022 12:55 To:
> Richard Grisenthwaite <Richard.Grisenthwaite@arm.com>; Martin Weidmann
> <Martin.Weidmann@arm.com>; Aparajita Bhattacharya
> <Aparajita.Bhattacharya@arm.com>; Anand Muthuraman
> <Anand.Muthuraman@arm.com> Subject: RE: Nuvia core sign-off
>
>
> Richard,
>
>
>
>
> Regards,
>
> Vivek
>
>
>
> From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> >
> Sent: Thursday, May 19, 2022 4:23 PM
> To: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >; Martin Weidmann
> <Martin.Weidmann@arm.com <mailto:Martin.Weidmann@arm.com> >; Aparajita
> Bhattacharya <Aparajita.Bhattacharya@arm.com
> <mailto:Aparajita.Bhattacharya@arm.com> >; Anand Muthuraman
> <Anand.Muthuraman@arm.com <mailto:Anand.Muthuraman@arm.com> >
> Subject: RE: Nuvia core sign-off
>
>
> Thanks
>
>
> Richard G
>
>
>
> Richard Grisenthwaite
>
> Arm Ltd
>
> 110 Fulbourn Road
>
>
>
> From: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >
> Sent: 19 May 2022 06:14
> To: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com

ARM_01230124

> <mailto:Richard.Grisenthwaite@arm.com> >; Martin Weidmann
> <Martin.Weidmann@arm.com <mailto:Martin.Weidmann@arm.com> >; Aparajita
> Bhattacharya <Aparajita.Bhattacharya@arm.com
> <mailto:Aparajita.Bhattacharya@arm.com> >; Anand Muthuraman
> <Anand.Muthuraman@arm.com <mailto:Anand.Muthuraman@arm.com> >
> Subject: RE: Nuvia core sign-off
>
>
>
> Richard,
>
>
>
> I have been working with the same person (Jignesh Trivedi) before
> Nuvia was acquired by QC.
>



>
>
> ++ adding Apu, Anand, Martin
>
>
>
> Regards,
>
> Vivek
>
>
>
>
>
>
>
>
> -----Original Message-----
> From: Richard Grisenthwaite <Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> >
> Sent: Wednesday, May 18, 2022 10:52 PM
> To: Vivek Agrawal <Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> >
> Subject: RE: Nuvia core
>
>
>
> Hi Vivek,
>
>
>

>
>

ARM_01230125

```
>
>
> Please can you send it to me as an attachment to an email
>
>
>
> Thanks
>
>
>
> Richard G
>
>
>
>
>
> Richard Grisenthwaite wrote on 2022-05-18
>
>> Hi,
>>
>>
```

```
>>
>>
>> Thanks
>>
>>
>>
>> Richard G
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Richard Grisenthwaite
>>
>> Arm Ltd
>>
>> 110 Fulbourn Road
>
>
>
> Richard Grisenthwaite
>
> Arm Ltd
>
> 110 Fulbourn Road
>
```

A0981

ARM_01230126

>
>
> From: Richard Grisenthwaite Richard.Grisenthwaite@arm.com
> <mailto:Richard.Grisenthwaite@arm.com> Sent: Wednesday, May 18, 2022
> 12:19 AM To: Vivek Agrawal Vivek.Agrawal@arm.com
> <mailto:Vivek.Agrawal@arm.com> Subject: don't sign off the Nuvia
> design
>
>
>
> Hi,
>
>

>
>
> When did they submit this sign-off request?
>
>
>
> thanks
>
>
>
> Richard G
>
>
>
>

Richard Grisenthwaite
Arm Ltd
110 Fulbourn Road

ARM_01230127

# EXHIBIT 23

| | |
|---|---|
| **From:** | Vivek Agrawal <Vivek.Agrawal@arm.com> |
| **To:** | Jignesh Trivedi; Nitin Sharma |
| **CC:** | Aparajita Bhattacharya |
| **Sent:** | 5/20/2022 4:46:18 AM |
| **Subject:** | RE: Uploaded ACS Compliance Report for Qualcomm Nuvia Cpu on ARM Connect |

**WARNING:** This email originated from outside of Qualcomm. Please be wary of any links or attachments, and do not enable macros.

Hi Jignesh, Nitin

This has been flagged up to Arm Legal who are querying the status of this design before we can sign it off. If any escalations are required, the following would be competent authorities.

Arm's chief Architect and VP: Richard Grisenthwaite Richard.Grisenthwaite@arm.com
Arm Legal VP: Robert Calico Robert.Calico@arm.com

Regards,
Vivek

**From:** Jignesh Trivedi <jignesht@qti.qualcomm.com>
**Sent:** Friday, May 13, 2022 10:01 PM
**To:** Vivek Agrawal <Vivek.Agrawal@arm.com>
**Cc:** Nitin Sharma <nsh@qti.qualcomm.com>
**Subject:** Uploaded ACS Compliance Report for Qualcomm Nuvia Cpu on ARM Connect

Hi Vivek,

As discussed in sync last night, I have uploaded a full final compliance report for your review
for Hamoa CPU. In the sync, We have already cursorily reviewed total number of tests and waivers but
summarizing below:

**CPU Name:** Hamoa
**Total ACS tests for this configuration**: 29485 tests
**Test issue/Limitation Waivers**: 29 tests
**Design/Implementation Waivers**: None

Thank you for all your support.

-Jignesh
IMPORTANT NOTICE: The contents of this email and any attachments are confidential and may also be privileged. If you are not the intended recipient, please notify the sender immediately and do not disclose the contents to any other person, use it for any purpose, or store or copy the information in any medium. Thank you.



UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-042:**

CASE NO. _____1:22-cv-01146-MN_____
DATE ENTERED _____
BY: _____
DEPUTY CLERK

**PTX-0408, Page 1 of 1**
A0984

QCARM_3059661

# EXHIBIT 24



Ann Chaplin
General Counsel and Corporate Secretary
Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121

26 September 2022

Dear Ann,

As you know from the complaint in *Arm Ltd. v. Qualcomm Inc.*, No. 1:22-cv-01146-UNA (D. Del. Aug. 31, 2022) and our prior correspondence, Qualcomm must stop using and destroy technology Nuvia developed under now-terminated agreements with Arm.

In a recent meeting with Arm's validation team, however, Qualcomm personnel sought support in connection with a compliance sign-off for a v8.7 design, which Qualcomm apparently intends to seek in December 2022. Given the anticipated timing of the sign-off and the configuration details Qualcomm shared, Qualcomm appears to be continuing with development of Nuvia technology subject to discontinuance and destruction, including the Phoenix design for which Nuvia sought verification earlier this year and the Hamoa design derived from it.

Qualcomm is not entitled to the requested support or any related sign-off for a core built off designs that had to be destroyed and can no longer be used.   Absent express certification by a responsible Qualcomm executive following diligent investigation that the relevant v8.7 design is not derivative of, based on, or an embodiment of technology Nuvia developed under now-terminated agreements, Arm cannot proceed as requested.

If Qualcomm has litigation counsel to whom you believe this should instead be directed, please let us know.

Sincerely,

Spencer Collins
EVP, Chief Legal Officer
Arm Limited
110 Fulbourn Road
Cambridge, CB1 9NJ
United Kingdom

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**PTX-0447**

CASE NO. _____1:22-cv-01146-MN_____

DATE ENTERED _____

BY: _____

DEPUTY CLERK

QCARM_0337838

# A0987 - A1191
# Redacted in Full

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 24-490 (MN) |
| v. | ) ) | |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' LETTER TO SPECIAL MASTER HELENA C. RYCHLICKI REGARDING NEWLY-LEARNED FACTS AND SUBSEQUENT EVENTS**

OF COUNSEL:

Catherine Nyarady
Jacob A. Braly
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
DUNN, ISAACSON, RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

September 15, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

Dear Special Master Rychlicki:

Pursuant to D. Del. LR 7.1.2, Plaintiffs write to advise Your Honor of newly-learned facts and subsequent events that have occurred since the August 14 and 22 hearings that relate to Qualcomm's pending motions to compel production of third-party Arm TLAs and related agreements (D.I. 359; 8/1/2025 Qualcomm Ltr. at 1-2), and supplemental interrogatory responses and 30(b)(6) testimony identifying and explaining relevant terms in these agreements (D.I. 375; 8/11/2025 Qualcomm Ltr. at 4-5).

As Your Honor may recall, at the August 14 hearing, Arm took the position that there was no need to compel production of third-party agreements licensing ████████████████ ████████████████████████ because Arm had already produced those documents, except for those subject to pending motions for protective orders. Specifically, Arm's counsel represented: "[I]n terms of parties that do have a license [to ███████████████], we have provided that discovery and sought to provide that discovery unless it was objected to [by the third party], and clearly we have some objections here that we're dealing with today." Ex. 1, 8/14/2025 Tr. 60:16-22. Similarly, at the August 22 hearing, counsel for Arm represented, in opposing Qualcomm's motion to compel supplemental responses to interrogatories 6 and 11:

> So after the SAC allowed and the TLA claims of ██████████████ were in the case, we went and provided discovery on ████████████. We produced the documents. We produced them on a rolling basis because, as Your Honor knows, third parties have confidentiality interests in those documents. We provided notice to those third parties and an opportunity to object. █████ did not object and so that agreement was produced. As Your Honor knows, ███████ has objected and that dispute is before you. So that agreement has not been produced yet. In any event, Qualcomm then deposed a number of witnesses about these documents. . . . Now, there's definitely a discrepancy whether Qualcomm thinks it got enough information from those witnesses, but there's no question that it certainly had that opportunity. . . . *they had the documents, so there's no dispute about that.*

Ex. 2, 8/22/2025 Tr. 277:18-278:13, 278:19-23, 279:17-18 (emphasis added).

Following the two hearings, Qualcomm has learned that Arm had not produced all, or even most, of the third-party agreements for ██████████████ as of the June and July depositions of Arm's witnesses, or even as of the August hearings. To be clear: as of August 22, Arm had produced license agreements for ██████████████████ with ███ third parties.[1] Since then, however, Arm has produced license agreements with new third parties: ████████ ████████████████████████████████████ on September 4; ██████ last week on September 11; and ██ ████████████████████████████████████

---

[1] These were ████████████████████████████████████████████. These ████ third parties' agreements were also the only ones produced when Qualcomm's opening expert reports were due on August 8. Arm produced ███ additional third parties' agreements before it served its rebuttal report on September 5, 2025, and Arm's expert relied on those newly produced agreements.

██████████████████████████████ just today.  As Your Honor may have seen, a ██████████ ███████████ new third party (██████████████████████████████ moved for protective orders last Thursday.  According to these third parties, they did not receive notice from Arm about production of their agreements until late August, after the August 14 hearing with Your Honor.  In addition, last Friday night, a ██████████ new third party, ████████████████, contacted Qualcomm advising that it did not receive notice from Arm until September 4.[2]

Notwithstanding Arm's repeated assurances that it had produced everything not subject to a motion for a protective order, Qualcomm appears only to be receiving additional agreements (and additional third parties have moved for protective orders) now because Qualcomm's counsel scoured the public record for other mentions of Arm licensees who have ██████████████ and raised three of those potential licensees with Arm.  *See* 8/7/2025 Arm Opp. to Qualcomm's 8/1/2025 Mot. to Compel at 1 ██████████████████████████ ████████████████████████████████████████████ Arm has refused to respond to Qualcomm's questions about (1) why it did not produce these agreements earlier during discovery, (2) whose agreements remain outstanding, or (3) what it has done to ensure that the deficiencies that caused it to miss these agreements in its initial productions are not affecting other areas of its production.  *See* Ex. 3, Correspondence between Arm and Qualcomm Counsel.

As of the date of this letter, Qualcomm remains in the dark about how many additional license agreements for ██████████████████████ are still to be produced, when it can expect that production, and why Arm did not produce these agreements within the fact discovery period. Qualcomm also has not had any opportunity to question any Arm witness about these newly produced documents, making more critical Qualcomm's motion to compel Arm to produce a 30(b)(6) witness that is prepared to testify on relevant terms of third-party agreements. Qualcomm's motions to compel Arm's third-party agreements for ████████████████████; supplemental interrogatory responses; and 30(b)(6) testimony accordingly present live disputes, despite representations that the subject documents had been produced before Arm's witnesses' depositions and last month's hearings.[3]

Qualcomm respectfully requests that Your Honor grant its motions to compel.  Counsel is available should Your Honor have any questions.

Respectfully submitted,

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Words: 1005

---

[2] Qualcomm will be meeting and conferring with ██████████ this week, as ██████████ has requested.
[3] Qualcomm further notes that its reply expert reports, including one which must address these third-party agreements, are due at the end of this week on September 19.  *See* D.I. 44, ¶ 7(g)(i). The parties' dispositive and *Daubert* motions are due on October 24.  D.I. 44, ¶ 9.  Qualcomm may seek additional relief in the future should it become necessary based upon Arm's belated disclosures.

# Exhibit 1

**In the Matter Of:**

*QUALCOMM INCORPORATED vs*

*ARM HO*█████████

*SPECIAL DISCOVERY MASTER HEARING*

*August 14, 2025*



A119

# Exhibit 2



# Exhibit 3

 Outlook

## RE: Qualcomm Inc. v. Arm Holdings PLC.; Case No. 1:24-cv-490 (MN): RFPs

**From** Basner, Adam L <abasner@paulweiss.com>

**Date** Sun 9/14/2025 2:10 PM

**To** Evangelatos, Peter <peter.evangelatos@kirkland.com>; McWilliams, Catharina R. <CMcWilliams@mofo.com>; GRP-QCvARM <GRP-QCvARM@paulweiss.com>; Qualcommv Arm <QualcommvArm@dirllp.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; jying@morrisnichols.com <jying@morrisnichols.com>; Murray, Travis <tmurray@morrisnichols.com>

**Cc** MoFo_Arm <MoFo_Arm@mofo.com>; #KE-ARM-Qualcomm <KE-ARM-Qualcomm@kirkland.com>; YCST_Arm_Qualcomm@ycst.com <YCST_Arm_Qualcomm@ycst.com>

Peter,

We note that you have not identified any mischaracterizations in the email. As to relief, we've identified that we intend to seek as relief, at a minimum, answers to the questions that we have now asked you several times in this thread. We may also seek other forms of relief, including but not limited to precluding Arm from contending that it complied with ███████ of the TLA.

In addition to the requests in my last email, please also provide us copies of the notice letters you sent to each third-party licensee.

We will be available to discuss these issues on Monday at 4. Time permitting, we can also discuss Arm's refusal to depose Sureshkumar A M or Tarang Agarwal on the dates we proposed.

Regards,
**Adam L Basner** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
2001 K Street, NW | Washington, DC 20006-1047
+1 202 223 7367 (Direct Phone) | +1 202 478 0493 (Direct Fax)
abasner@paulweiss.com | www.paulweiss.com

---

**From:** Evangelatos, Peter <peter.evangelatos@kirkland.com>
**Sent:** Friday, September 12, 2025 12:26 PM
**To:** Basner, Adam L <abasner@paulweiss.com>; McWilliams, Catharina R. <CMcWilliams@mofo.com>; GRP-QCvARM <GRP-QCvARM@paulweiss.com>; qualcommvarm@dirllp.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; jying@morrisnichols.com; Murray, Travis <tmurray@morrisnichols.com>
**Cc:** MoFo_Arm <MoFo_Arm@mofo.com>; #KE-ARM-Qualcomm <KE-ARM-Qualcomm@kirkland.com>; YCST_Arm_Qualcomm@ycst.com
**Subject:** RE: Qualcomm Inc. v. Arm Holdings PLC.; Case No. 1:24-cv-490 (MN): RFPs

Adam,

We continue to disagree with the mischaracterizations in your email, and also note your non-response regarding the specific relief Qualcomm intends to seek. We can discuss this issue during the meet and confer scheduled for Monday at 4 PM ET. Please also be prepared to discuss the depositions of Sureshkumar A M and Tarang Agrawal during the call.

**A1203**

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 20, 2026, upon the following in the manner indicated:

| | |
|---|---|
| Anne Shea Gaza, Esquire<br>Robert M. Vrana, Esquire<br>Daniel G. Mackrides, Esquire<br>YOUNG CONAWAY STARGATT & TAYLOR, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Scott F. Llewellyn, Esquire<br>MORRISON & FOERSTER LLP<br>4200 Republic Plaza<br>370 Seventeenth Street<br>Denver, CO 80202<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Sydney D. Gaskins, Esquire<br>MORRISON & FOERSTER LLP<br>707 Wilshire Blvd., Suite 6000<br>Los Angeles, CA 90017<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Alexandra Corrinne Hottenrott, Esquire<br>MORRISON & FOERSTER LLP<br>250 West 55th Street<br>New York, NY 10019<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Daralyn J. Durie, Esquire<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, CA 94105<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |

Lydia B. Cash, Esquire  
MORRISON & FOERSTER LLP  
300 Colorado Street, Suite 1800  
Austin, TX  78701  
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Gregg F. LoCascio, P.C.  
Jason M. Wilcox, P.C.  
Meredith Pohl, Esquire  
Matthew J. McIntee, Esquire  
KIRKLAND & ELLIS LLP  
1301 Pennsylvania Avenue, N.W.  
Washington, D.C.  20004  
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Jay Emerick, Esquire  
Adam M. Janes, Esquire  
Reid McEllrath, Esquire  
KIRKLAND & ELLIS LLP  
333 West Wolf Point Plaza  
Chicago, IL  60654  
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Peter Evangelatos, Esquire  
Nathaniel Louis DeLucia, Esquire  
KIRKLAND & ELLIS LLP  
601 Lexington Avenue  
New York, NY  10022  
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

*/s/ Jennifer Ying*

Jennifer Ying (#5550)

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 27, 2026, upon the following in the manner indicated:

Anne Shea Gaza, Esquire        *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Sydney D. Gaskins, Esquire       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Alexandra Corrinne Hottenrott, Esquire   *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Daralyn J. Durie, Esquire       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*

Lydia B. Cash, Esquire
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

*VIA ELECTRONIC MAIL*

*VIA ELECTRONIC MAIL*

*VIA ELECTRONIC MAIL*

*/s/ Jennifer Ying*

Jennifer Ying (#5550)

2