**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QUALCOMM INCORPORATED,<br>a Delaware corporation, and<br>QUALCOMM TECHNOLOGIES, INC.,<br>a Delaware corporation,<br><br>    Plaintiffs,<br><br>  v.<br><br>ARM HOLDINGS PLC, f/k/a ARM LTD.,<br>a U.K. corporation,<br><br>    Defendant. | REDACTED - PUBLIC VERSION<br>(Filed July 2, 2026)<br><br><br>C.A. No. 24-490-MN<br>(CONSOLIDATED)<br><br> |

**LETTER TO THE HONORABLE MARYELLEN NOREIKA FROM ANNE SHEA
GAZA REGARDING ARM LTD.'S OPENING LETTER IN SUPPORT OF ITS MOTION
TO STRIKE PLAINTIFFS' AMENDED COMPLAINT**

Dated: June 24, 2026

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Kasdin Mitchell, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
kasdin.mitchell@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants*

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Dear Judge Noreika:

Qualcomm told the Court that its new case against Arm Ltd. would not be a "do over," but now that is exactly what Qualcomm wants. Ex. 1, 23:9-10, 44:22-45:5. Without leave and without raising the issue with Arm or the Court, Qualcomm filed an Amended Complaint ("FAC," D.I. 765) against Arm Ltd. on March 30. The FAC adds a new claim for *express* breach of █████████ of the Qualcomm ALA against Arm Ltd.—but not Arm Holdings. FAC ¶¶ 273-278. It injects new allegations about the purpose of that provision in support of Qualcomm's *implied* breach claim. *See, e.g., id.* ¶¶ 39, 68, 151, 229-231. And Qualcomm now asks for a new remedy—an injunction requiring Arm to negotiate in good faith over a license to v10 of its ISA, *id.* ¶ 278—even though Qualcomm never mentioned that remedy in response to interrogatories asking for "any remedies (monetary, non-monetary, and/or equitable) Qualcomm seeks[.]" Ex. 2. All told, the FAC adds 42 new paragraphs about v10. *See* FAC ¶¶ 37-39, 135-136, 140-166, 210-211, 231, 273-278; Ex. 3.

These amendments are a direct response to the Court's skepticism at the March 10 hearing about whether Qualcomm has a viable implied breach claim. When the Court asked rhetorically whether Qualcomm is "just going to keep amending, keeping amending in this case," Qualcomm's answer was seemingly yes. Ex. 4, 16:21-25. "Give me a break." *Id.* The deadline to amend the pleadings passed over a year ago and discovery closed last July. It is far too late to add new claims, new theories, and new remedies, which would require additional discovery and more summary judgment briefing. What is more, Qualcomm repeatedly represented that the cases against Arm Holdings and Arm Ltd. should be consolidated because they are "substantively identical" with "the same claims and the same facts." D.I. 586, at 1; D.I. 595, at 1; Ex. 5, 4:22-5:4; Ex. 1, 62:13-18. Qualcomm should not be allowed to abandon those representations by pursuing different claims and different relief against Arm Ltd. The Court should instead strike the FAC.

## I.   BACKGROUND

This case consolidates two different actions: a case against Arm Holdings plc filed in April 2024, and a follow-on case against Arm Ltd. filed in January 2026. Qualcomm's Second Amended Complaint against Arm Holdings and its original Complaint against Arm Ltd. allege only that the purported failure to negotiate a v10 license breached the implied covenant. D.I. 137 ¶¶ 128-134, 184; No. 26-20, D.I. 2 ¶¶ 128-134, 194. The FAC adds a claim that Arm Ltd. breached § █████ of the ALA—the same provision as the implied breach claims—and tries to address other v10-related shortcomings. Qualcomm did not amend its claims against Arm Holdings.

## II.   THE COURT SHOULD STRIKE QUALCOMM'S FAC

The Court should strike the FAC because it violates the Court's scheduling order. That order set a March 14, 2025 deadline to amend the pleadings—a deadline that passed more than a year before Qualcomm filed its FAC against Arm Ltd. *See* D.I. 44 ¶ 2. Yet Qualcomm did not seek leave to amend its pleadings and has not shown good cause under Rule 16.

***Qualcomm does not have good cause.*** "[W]hen, as here, a party seeks to amend a pleading after the scheduling order's deadline for pleading amendments has passed, the court will apply Rule 16(b) as opposed to Rule 15(a)." *Genentech, Inc. v. Amgen Inc.*, 2020 WL 708113, at *1 (D. Del. Feb. 12, 2020). Accordingly, Qualcomm must demonstrate "good cause." *Cauley v. Geisinger Clinic*, 2025 WL 1392089, at *2-3 (3d Cir. May 14, 2025); *Chervon (HK) Ltd. v. One World Techs., Inc.*, 2025 WL 2638959, at *3 (D. Del. Jan. 14, 2025). "[T]he good cause standard under

Rule 16(b) hinges on diligence of the [amending party], and not on prejudice to the [other] party." *Genentech*, 2020 WL 708113, at \*1. "Courts presume a party lacks diligence if [it] had knowledge of the facts supporting its proposed amendment before the deadline to amend." *Cytiva Sweden Ab v. Bio-Rad Lab'ys*, 2021 WL 431508, at \*1 (D. Del. Feb. 8, 2021).

Qualcomm knew the necessary facts before the amendment deadline and, before suing Arm Ltd., Qualcomm simply decided to package those facts as an implied breach claim. At the March 10 hearing, Qualcomm conceded that it "didn't assert that [Arm] breached ██" as "a breach of contract claim," but did so "as part of the duty of good faith" Ex. 4, 15:23-16:2. Qualcomm did not dispute that it "would have done it [*i.e.*, assert breach] before" if it "really thought that [it] needed to do that." *Id.*, 14:23-25. In fact, Qualcomm stated, if "asked to amend, we would add the specific breach," which the Court rejected: "You amended plenty of times before. I'm not going to believe that you couldn't have done this before." *Id.*, 14:21-15:1, 16:21-25.

The Court was exactly right, and Qualcomm's regrets over its legal strategy are not good cause. In *Valentin v. Philadelphia Gas Works*, for example, the Third Circuit affirmed the denial of an amendment "to assert a new cause of action under a new legal theory" based on "facts [Plaintiff] was aware of well before the close of discovery." 128 F. App'x 284, 287 (3d Cir. 2005). *Sang Geoul Lee v. Won Il Park* similarly found no good cause to amend where Plaintiff "simply wanted to add a new cause of action," which Qualcomm wants to do here. 720 F. App'x 663, 669 (3d Cir. 2017). It is irrelevant that Qualcomm seeks to amend as of right under Rule 15(a)(1) rather than with the Court's permission under Rule 15(a)(2). "[T]he Scheduling Order nullifies [Qualcomm's] right to amend as a matter of course pursuant to Rule 15(a)(1)(B)." *Great Lakes Ins. S.E. v. Sunshine Shopping Ctr., Inc.*, 2020 WL 1159381, at \*5 (D.V.I. Mar. 10, 2020); *Hawkins v. W. Penn Allegheny Health Sys.*, 2014 WL 5803112, at \*2-3 (W.D. Pa. Nov. 7, 2014) (same).

***The Court's Original Scheduling Order Still Governs.*** Qualcomm did not claim good cause exists during the meet-and-confers. It argued instead that Rule 16 does not apply because the Court's original scheduling order does not govern its suit against Arm Ltd. But Qualcomm sought to consolidate its two cases for all purposes. D.I. 594. It cannot "use the incorrect procedure of filing duplicative complaints for the purpose of circumventing the rules pertaining to the amendment of complaints." *Walton v. Eaton Corp.*, 563 F.2d 66, 71 (3d Cir. 1977); Wright & Miller, 9A Fed. Prac. & Proc. § 2382 & n.19. In this situation, because the Court designated the case against Arm Holdings the lead case, its schedule governs. *See George & Co. LLC v. Spin Master Corp.*, 2020 WL 3865098, at \*3-4 (E.D.N.Y. July 7, 2020); *Kingman Holdings, LLC v. Blackboard Ins. Co.*, 2025 WL 275505, at \*3 (E.D. La. Jan. 23), *aff'd*, 2025 WL 932774 (E.D. La. Mar. 27, 2025). The Court's original amendment deadline still governs post-consolidation.

***The Amended Scheduling Order Did Not Vacate The Amendment Deadline.*** Qualcomm also claimed that, because there is no deadline to amend the pleadings in the Court's March 19, 2026 Amended Scheduling Order, no deadline exists. *See* D.I. 759. Courts have consistently rejected that argument. *See, e.g.*, *S.G. by & through Gordon v. Jordan Sch. Dist.*, 333 F.R.D. 220, 222 (D. Utah 2019); *City of New York v. FedEx Ground Package Sys., Inc.*, 2018 WL 4521209, at \*4 (S.D.N.Y. Sept. 21, 2018). In Qualcomm's view, it can add any new claim it wants, no matter how unrelated to the current claims in the case, and Arm would have to seek leave from the Court to take discovery or move for summary judgment on that new claim. That makes no sense, and if Qualcomm was secretly planning to amend as of right, it should have made that clear when the

2

parties negotiated the amended scheduling order. When the Court denied Qualcomm leave to add Arm Ltd. as a party in the original case, it did not give Qualcomm a free pass to add new claims.

**Prejudice.** Even though prejudice is unnecessary, the prejudice to Arm is significant. Allowing Qualcomm to add an express breach claim now would be deeply unfair to Arm and precisely the kind of "do over" this Court said the parties would not get. Ex. 1, 62:2-12; *see also id.*, 44:22-45:5 (Ms. Nyarady) ("[W]e can make sure it's limited to issues that are unique to Arm Ltd[.] …. ***And not something that could have been raised previously with respect to Arm Holdings, again, it's not a do over***."). Should the new claim stand, Arm Ltd. would need discovery into (1) the differences between Qualcomm's express- and implied-breach claims, *compare* FAC (Count III), *with id.* (Count IX), (2) Qualcomm's new contentions concerning the alleged purpose underlying ▉▉▉▉▉▉, *id.* ¶¶ 39, 68, 151, 229-231, and (3) Qualcomm's new request for an injunction because money damages are allegedly insufficient, *id.* ¶ 278. That is incompatible with the limited discovery the parties discussed with the Court and the compressed discovery window the Amended Scheduling Order adopts (a window that has already closed). Qualcomm indicated it is not opposed to such discovery, but its proposal only underscores the prejudice to Arm Ltd. Ex. 6. Arm should not be forced to serve all discovery related to Qualcomm's new claim and new allegations in less than a week and complete discovery in less than a month (and any new discovery at this point would require further amending the case schedule). Qualcomm's proposed amendments would also make a complicated trial even more unwieldy. In a case that already has 8 causes of action, the factfinder would now need to parse what v10-related evidence is relevant to the express breach claim against Arm Ltd., what evidence is relevant to the implied breach claims against both Arm Ltd. and Arm Holdings, and somehow reach independent liability determinations for the two companies. That is hardly the "substantively identical" cases where "there is nothing different about the new case other than adding a name to the case caption" that Qualcomm promised. Ex. 5, 5:1-4.

**Judicial estoppel.** Qualcomm is also estopped from raising its new theory. "[T]he basic principle of judicial estoppel ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory and then seek an inconsistent advantage by pursuing an incompatible theory." *Krystal Cadillac-Oldsmobile GMC Truck v. Gen. Motors*, 337 F.3d 314, 319 (3d Cir. 2003). In seeking to join Arm Ltd., and in requesting consolidation, Qualcomm repeatedly represented that the only difference between the two cases was the identity of the parties.[1] Now, Qualcomm attempts to exploit amendment "as a matter of course" to address issues with its implied breach claim and to pursue a different claim (and different relief) against Arm Ltd. Qualcomm's "conduct in filing a complaint that was substantially different than" what Qualcomm represented to Arm and the Court "is objectively unreasonable," warranting estoppel. *Dover Steel Co. v. Hartford Acc. & Indem. Co.*, 151 F.R.D. 570, 575-76 (E.D. Pa. 1993).

## III.    CONCLUSION

For the reasons discussed above, Arm respectfully requests that the Court strike the FAC.

---

[1] *See, e.g.*, D.I. 595, at 1 ("Consolidation is warranted because both cases involve the same claims and the same facts," and "Qualcomm seeks the same relief in both cases"); D.I. 586, at 1 (cases are "substantively identical"); Ex. 5, 5:1-4 (similar); Ex. 1, 62:13-18 (similar).

3

Dated: June 24, 2026

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Kasdin M. Mitchell, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004 (202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com
kasdin.mitchell@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Ltd.*

4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 24, 2026, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jennifer Ying
Travis Murray
Morris, Nichols, Arsht
& Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jying@morrisnichols.com
tmurray@morrisnichols.com

Alan R. Silverstein
Sara Barry
Connolly Gallagher LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
asilverstein@connollygallagher.com
sbarry@connollygallagher.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Jennifer N. Hartley
Dunn Isaacson Rhee LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com
jhartley@dirllp.com

Richard S. Zembek
Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000
Houston, TX 77010
richard.zembek@nortonrosefulbright.com

Ruby J. Garrett
Adam L. Basner
William T. Marks
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweiss.com
abasner@paulweiss.com
wmarks@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
Paul, Weiss, Rifkind,
Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
fpatterson@paulweiss.com

grp-qcvarm@paulweiss.com

John Poulos
Norton Rose Fulbright US LLP
1045 W. Fulton Market
Suite 1200
Chicago, IL 60607
john.poulos@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendant Arm Holdings plc*

2

# Exhibit 1

(█████████████████████)



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., and
QUALCOMM TECHNOLOGIES, INC.,

                    Plaintiffs,

        v.                                    C.A. No. 24-490(MN)

ARM HOLDINGS PLC,

                    Defendant.

Thursday, March 12, 2026
10:14 a.m.
Motion Hearing

844 King Street
Wilmington, Delaware

BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge

APPEARANCES:

          MORRIS NICHOLS ARSHT & TUNNELL LLP
          BY:   JENNIFER YING, ESQ.

          -and-

          DUNN ISAACSON RHEE LLP
          BY:   KAREN DUNN, ESQ.

---

APPEARANCES (Cont'd):

          -and-

          PAUL WEISS
          BY: CATHERINE NYARADY, ESQ.
          BY: JACOB A. BRALY, ESQ.

                    Counsel for the Plaintiffs

          YOUNG CONAWAY STARGATT & TAYLOR LLP
          BY: ANNA SHEA GAZA, ESQ.
          BY: ROBERT VRANA, ESQ.
          BY: DANIEL MACKRIDES, ESQ.

                    Counsel for the Defendant

          K&L GATES
          BY: MATTHEW GOELLER, ESQ.

                    Counsel for ADI

          - - - - - - - - - - - -

          COURTROOM DEPUTY: All rise. The United States District Court for the District of Delaware is now in session. The Honorable Maryellen Noreika presiding.

          THE COURT: All right. Good morning. Please be seated.

---

So I know that you all told me you had an agreement in principle, but I didn't know what the agreement was so I wanted you to put it on the record. And I also wanted to talk to the parties about the schedule.

          MS. DUNN: Good morning, Your Honor.

          THE COURT: Good morning.

          MS. DUNN: Karen Dunn for Qualcomm. The agreement is the same as the agreement with the other third parties that we put on the record the other day. Mr. Braly is pulling up the e-mail if you would like us to read that into the record.

          THE COURT: Yes, I want something on the record and I want the third party to confirm that that's the agreement.

          MS. DUNN: Will do.

21

we could work together to see if we can narrow down the disputes.

THE COURT: No, we're going to decide it right now. I'm not having you guys back. I'm done.

MS. DUNN: I understand that as well. Ms. Nyardy is going to work on the substance of the schedule.

THE COURT: Okay.

MS. GAZA: Your Honor, if I may on behalf of Arm, Anne Gaza again from Young, Conaway. I won't be as eloquent as my colleagues from Kirkland, but we do think Your Honor got it right on Tuesday that the narrow issue before you on whether or not the UCL claim is equitable and should be tried before you is rightly ruled upon and anything else is ruled down the road with respect to jury instructions, possibly at the pretrial order and pretrial conference. We're happy to take it under consideration what was presented today.

THE COURT: You should. You should read what was said because that is obviously going to become an issue at or around the time of trial. But we don't need to say anymore about it today. But thank you.

MS. GAZA: Thank you, Your Honor.

THE COURT: Okay. So my issues on the schedule.

MS. NYARDY: Good morning, Your Honor.

22

THE COURT: Let me say first that not with respect to everything, but overall I thought Qualcomm's positions were more reasonable. I do think that having -- that I am going to allow -- I know that I have already allowed Arm to submit some additional summary judgment on the issue of the good faith and fair dealing.

I don't like any other of this supplement of Dauberts and summary judgment and I certainly don't like oh, we're just going to have a supplemental one-page statement of facts or undisputed facts because that makes things so hard for me. I'm like here, here, nobody has briefed it, what do these facts have anything to do with, it's just not helpful.

And to the extent that there were additional summary judgment and Daubert stuff allowed, this is already too late because it gives me less than two months to decide it and I'm not -- that's not enough. All of which may be you saying fine with us, but that's my -- that's my take.

To the extent that you don't mind any of that, you don't have to argue any of that and I'll ask Arm about that, but what are the issues, aside from that, that you all want to talk about?

MS. NYARDY: Thank you, Your Honor. And we do not object to that approach with respect to summary judgment and Daubert as you predicted.

23

I think the disputes are aimed mostly at just containing and controlling discovery. You know, as far as Qualcomm is concerned, there is little to no discovery needed as we go forward. And there were just, you know, a lot of statements by Arm kind of leaving open how many depositions and expert reports and things that are going to be done in the future, including, you know, reopening discovery on behalf of Arm Ltd without any parameters around it as to what that might be. So it's Qualcomm's view that this should not turn into a do over in discovery. And we were willing to abide by, you know, whatever the Court orders in terms of further discovery, we'll do that and then, you know, we'll kind of be done.

I would note for the Court, too, that with respect to individual depositions that are contemplated by Arm's schedule, you know, none of the motions pending before the Court involve a 30(b)(1) deposition. There is a couple of issues that require, or have asked for a little more time for a 30(b)(6), and we had taken the position that that should be limited in duration to three-and-a-half hours maximum for any topic.

THE COURT: Have you guys actually talked about what additional discovery there is?

MS. NYARDY: I'm sorry, with respect to the motions pending or with respect to Arm Ltd?

24

THE COURT: Is there anything really pending? What's pending? Because if there is stuff pending, then I want to decide it before we have this discussion. I did -- I forgot to ask you about the products, the new products that we have to decide those additional products. But what -- I don't even know like, like you guys are agreeing -- you guys are agreeing to a schedule, but what is the discovery that's being discussed?

MS. NYARDY: I would need to pull the letter that we filed, Your Honor.

THE COURT: Anyone?

MS. GAZA: Your Honor, I believe in addition to what we placed in the draft proposed scheduling order is certainly with respect to Arm Ltd.

THE COURT: I need to know exactly because I don't know what you guys have proposed in this schedule, I can't tell what -- so tell me, what depositions?

MS. GAZA: Unfortunately, Your Honor, I don't --

THE COURT: Well, we need to find out. Someone has got to tell me. What depositions does each side want? What documents does each side want? I know we have the issue on the in camera stuff. I don't know when that's coming to me. And then plaintiff is getting me some information. We're going to sit here, let's just do it.

MS. NYARDY: Thank you, Your Honor. I believe

41

reason I bring it up, we can defer this to Daubert and there are related issues with Daubert, but you know, as it stands right now, there is, you know, a 177-page technical expert report that was served, I believe improperly under the rules, that has not been responded to. I do think it is intertwined with Daubert because I do think a lot of the sections really are improper and should not be admissible. And the expert doesn't have the proper background even to opine on a lot of these things, but there is kind of this open question, given that it was served as a rebuttal report even though there was no opening report on these topics, there is no reply report.

THE COURT: So have you already moved and filed a Daubert motion on this?

MS. NYARDY: We filed a Daubert motion and the Daubert motion largely addresses that it is the lack of qualifications or methodology from the expert, but we did -- just to preserve it, we did also include the argument that it was untimely served so that is also in there.

THE COURT: In the Daubert?

MS. NYARDY: Correct. So we're happy to address it with Daubert.

THE COURT: I think it would be better if you addressed it -- I don't know if I'm denying that or overruling the objections without prejudice to the fact that

42

you have raised it in Daubert. I just think if I'm dealing with experts, it will be easier for me to understand everything in the context of that because you can say it's improper rebuttal, and it's hard for me to get my head around that at this point.

MS. NYARDY: I understand.

THE COURT: I think it's better if I do it when I'm thinking about that.

MS. NYARDY: Understood. Thank you.

THE COURT: Okay. Ms. Gaza.

MS. GAZA: Thank you, Your Honor.

With respect to the Peripheral IP issue that had come up, that goes to if Your Honor determines that that Peripheral IP is in this case, then the discovery that we request as part of this amended scheduling order comes into play. And there we would request one to two at most supplemental depositions as to those issues, and really just whoever Qualcomm would plan to call as witnesses at trial.

THE COURT: Okay. Now what about the new Arm Ltd, the new defendant, Arm Ltd, the understanding that the plaintiff seems to have is that that's like a wholesale opening of discovery of everything for Arm Ltd to redo. Is that your position?

MS. GAZA: That is not our position, Your Honor. And we are certainly don't want a free-for-all on discovery.

43

THE COURT: What is it -- is the only discovery that Arm would want related to the Peripheral IP that you just said or is there more?

MS. GAZA: With respect to Arm Ltd, Your Honor, we would ask for three interrogatories and five requests for production as well as a 30(b)(6) witness only on issues that would go to Arm Ltd. We do have a statute of limitations issue, but really very narrowly tailored to just Arm Ltd. To the extent Qualcomm identifies anyone they plan on calling as a witness at trial to address Arm Ltd, we would ask to depose that person.

THE COURT: And so if plaintiff says anyone we would call at trial on the issues involving Arm Ltd are the same people that we would have called with respect to Arm, whoever else, you don't need anymore depositions?

MS. GAZA: I believe we would still want a 30(b)(6) deposition, Your Honor, but it would be very narrow. We wouldn't be retreading old ground.

THE COURT: 30(b)(6) on what?

MS. GAZA: On issues unique to Arm Ltd, but the timing of the claims, the claims they are asserting against Arm Ltd, to make sure we have the metes and bounds of what they're alleging as to Arm Ltd versus the other defendants.

THE COURT: But not a contention deposition, right? Because we don't allow those.

44

MS. GAZA: Correct, it's the facts and circumstances.

THE COURT: Have you already -- have you already noticed this deposition?

MS. GAZA: We have not, Your Honor. But we certainly quickly can do so as well as serve the discovery quickly, but it would be very narrow and limited to Arm Ltd.

THE COURT: Ms. Nyardy, what's your position on three interrogatories -- so we're not wholesale opening discovery.

MS. NYARDY: That's good.

THE COURT: Okay.

MS. NYARDY: Yes.

THE COURT: So they want three interrogatories, two document requests, and a 30(b)(6) on issues limited to Arm Ltd.

MS. NYARDY: Right. You know, we're not really understanding why there is a need for any depositions, but I --

THE COURT: I'm not entirely sure there is, but at the same time, you did add them as a defendant.

MS. NYARDY: Understood. So look, I think what was it, three rogs, two RFP's and a 30(b)(6). If it really is going to be limited and we can make sure it's limited to issues that are unique to Arm Ltd, because I don't think

45

there -- if there are any --

THE COURT: If there are any.

MS. NYARDY: And not something that could have been raised previously with respect to Arm Holdings, again, it's not a do over.

THE COURT: It sounds like they want to explore the statute of limitations issue.

MS. NYARDY: Understood. So if it ends up being limited to that, I don't think we have an objection to that. I'm not sure there are going to be factual issues that requires a 30(b)(6) with the statute of limitation, but I take the point. I understand the point.

THE COURT: So if that's the case, then am I understanding correctly that the -- wait, what's -- what is your thinking on when you are going to get me, Ms. Gaza, when you're going to get me the stuff for in camera review, and Ms. Nyardy, when you're going to get me the sort of summary of what you all have in terms of communications?

MS. GAZA: I don't know at this time, Your Honor, but certainly we'll make whatever time frame, you know, is needed to work.

THE COURT: I want it by next Wednesday.

MS. GAZA: Certainly, Your Honor.

MS. NYARDY: That's fine, Your Honor. I had a lot of calls yesterday and I'm tracking it down and we hope

46

to get an answer very quickly.

THE COURT: Thank you very much.

Okay. So with that, then it seems like the fact discovery is going to be for Arm Ltd, you get to propound three interrogatories, two document requests, and you get to notice a 30(b)(6) deposition on issues relating to Arm Ltd.

Any other fact discovery that you all want?

MS. GAZA: Your Honor, we would ask for five document requests, if that would be permissible.

THE COURT: I thought you just said two.

MS. GAZA: I apologize. If I did, I misspoke. It was three interrogatories, five requests for production, and a 30(b)(6) witness.

THE COURT: Apparently you said five, Ms. Nyardy said two. Okay. Don't do all documents regarding stuff because if you then come in with a discovery dispute and I think that you haven't given a targeted request, it will be denied.

MS. GAZA: I understand, Your Honor.

THE COURT: So if it's all documents relating to Arm Ltd or something like that, you know, at this point I can't be parsing things and I'm not taking 3,000 or 11,000 more pages, so make them -- since you get five, you can narrow them so you don't have to worry about, you know, all encompassing requests. So you get five document requests.

47

Three interrogatories, five document requests, and one 30(b)(6). Anything else that you're thinking of for fact discovery?

MS. GAZA: Your Honor, just with respect to things still pending in front of Your Honor, which I know the parties owe you information on, depending on how you rule on things like media communications, and you know, the privilege challenges, there may be a supplemental deposition.

THE COURT: Anything else?

MS. NYARDY: From Qualcomm, we don't think there is any additional discovery needed based on the Court's order, even if you order some more productions. And we would just like --

THE COURT: Like the privilege stuff is you asking for their privilege stuff and you're saying if you get that, then you don't think you need more depositions?

MS. NYARDY: We do not need more depositions. The only caveat I would say I assume Arm would work with us in terms of making sure it can be admissible and not saying you didn't prove it up in a deposition, you can't use it at trial, this would be a big problem. Assuming we can work that out, we don't need anymore depositions.

THE COURT: I think Mr. LoCascio has tried enough cases in this court that I think he will be happy to

48

work that out.

MS. NYARDY: With respect to -- we have not -- this is another issue that we're getting to. The date that we are going to answer or move to dismiss, we have not seen their answer or motion to dismiss. On the discovery, we would just like the reciprocal -- I'm not sure we would need any, but if they're going to bring issues that we don't know about that are unique to Arm Ltd, we would like to be able to ask a couple of interrogatories and document requests and take a deposition if needed.

THE COURT: Okay. The problem I'm having is we just don't have the time, right, for all of this, and leaving open that you all get some more stuff. So I am not going to agree to that. If they do come in with something completely out of left field, not the statute of limitation, but something completely out of left field, then you can seek leave. But do so only if you really need it. Okay? Because we just have to -- we just have to stop at some point.

Okay. So Ms. Gaza, when can you answer or move?

MS. GAZA: Your Honor, two weeks, would that --

THE COURT: No. One.

MS. GAZA: One week.

THE COURT: One week. Let's make everything next Wednesday. Next Wednesday.

61

THE COURT: I guess I would like to know what that would be because I don't think -- I mean, what worries me a little bit on that one is saying, you know, now it's kind of a do over where Arm Ltd puts in stuff that otherwise should have been before.

MS. GAZA: Completely understand.

THE COURT: So if it's an issue that applies to Arm Ltd, okay, but if it's not, if it's like a general issue, then I think you need to seek relief.

MS. GAZA: Completely understand. Thank you, Your Honor.

THE COURT: Okay.

MS. DUNN: Your Honor, can I just -- I think maybe a tough one, instead of applies to Arm Ltd. maybe goes to the issue of corporate structure, because all these issues apply to Arm Ltd and Arm Holdings.

THE COURT: I was thinking apply specifically to Arm Ltd, and perhaps not the other ones.

MS. DUNN: As an issue of corporate structure.

THE COURT: Maybe what you're saying is right. I don't know if it's right. If I say corporate structure, my problem is as soon as I adopt something that someone says, I don't know what the ramifications are and then I get someone saying well, you just said corporate structure and that's not what this is. You may think it means one thing

62

and I may think it means something else.

What I am trying to say is if there is an issue that is related to Arm Ltd specifically and not the others, any other corporate entity, that can certainly be addressed. If it is something that relates to Arm Ltd and the other parties and it could have been raised before by the other parties, that's not appropriate supplementation.

What I'm trying to do is give Arm Ltd, who is now a party in this case, a fair opportunity to raise issues that it needs to raise but not -- but given that Arm Ltd is related to these other companies, not a do over of everything that its related companies previously did.

MS. DUNN: Understood. And the only reason I raise it is because Arm has litigated on behalf of Arm Ltd for a long time and for the substantive issues have all been addressed, the issue here is party identity which is my understanding of what they're trying to get at, but I hear you.

THE COURT: I get it, but I'm also sure that they would disagree with you about how they have been litigating on behalf of Arm Ltd. The fact is Arm Ltd is now a party, Arm Ltd wasn't a party before, so I do think it's important that we give Arm Ltd a fair shot at some of this stuff. That being said, I'm not blind to the reality that it is the same lawyers and, you know, a company that is

63

related to the other companies that are here. So we're not using the new party to open up discovery on everything that should have been litigated before. But certainly if there are issues, like the statute of limitations that seems to apply, or perhaps apply to Arm Ltd but didn't apply to the others, then I am not going to preclude them from raising it. But I'm not going to say that's the only issue because I don't know enough about the case. Okay?

MS. NYARDY: Your Honor, in light of --

THE COURT: There is always more clarification.

MS. NYARDY: In light of the statement that there may be other things that these experts are going to do related to other defenses that are unique to Arm Ltd, I just would ask if we could get one contention interrogatory on the new defenses because otherwise we're going into expert discovery, presumably, probably even in rebuttal getting reports and the defenses that we're going to have no discovery on.

THE COURT: Are you saying you only want that to the extent that it is a defense that is unique to Arm Ltd?

MS. NYARDY: Yes, correct.

THE COURT: So the only defense that is unique to Arm Ltd, statute of limitations, that's all you would be asking for in a contention interrogatory?

MS. NYARDY: That is correct, Your Honor.

64

THE COURT: Ms. Gaza, thoughts?

MS. GAZA: We have no objection, Your Honor.

THE COURT: Okay. So that's fine.

Summary judgment, like I said, I just -- so Arm Ltd is allowed to file on the good faith and fair dealing issue as I mentioned the other day. If there is a summary judgment motion on the statute of limitations, that can be filed. Anything other than that cannot be filed without leave of the Court.

MS. GAZA: Thank you, Your Honor. With respect to the statute of limitations summary judgment, would that also be limited to fifteen pages?

THE COURT: Yes.

MS. GAZA: Thank you, Your Honor.

THE COURT: Okay. So nobody else can do anything on summary judgment unless you receive leave of the Court.

I am not going to set a date for a hearing because I don't know when I'll be able to turn to this stuff, but if we need a hearing on those things, we'll set something.

Any other things we have to talk about on the schedule?

MS. GAZA: In terms of timing, Your Honor, for when these things happen, I believe we still need to decide

which dates apply, and just --

THE COURT: I thought you guys could go back and agree.

MS. GAZA: Thank you, Your Honor.

MS. NYARDY: Nothing further from Qualcomm, Your Honor.

MS. GAZA: Nothing further from Arm, Your Honor.

THE COURT: All right. Thank you, everyone. Have a good rest of the day.

MS. NYARDY: Your Honor, one more thing before we get off the record. I did find the interrogatory numbers that I could not remember previously. So for the OoB and the patches, the delivery to third parties, it's Interrogatory No. 1.

Thank you.

THE COURT: Okay. Thank you all.

COURTROOM DEPUTY: All rise. Court is adjourned.

(Court adjourned at 11:53 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.


                    /s/ Dale C. Hawkins
                  Official Court Reporter
                   U.S. District Court

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,
   a Delaware corporation; and
QUALCOMM TECHNOLOGIES, INC.,
   a Delaware corporation,

          Plaintiffs,

   v.

ARM HOLDINGS PLC., f/k/a ARM LTD.,
   a U.K. corporation,

          Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 24-490 (MN)
(CONSOLIDATED)

**PLAINTIFFS' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANT'S THIRD SET OF INTERROGATORIES (NOS. 14-16, 18-21)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiffs Qualcomm

Inc. and Qualcomm Technologies, Inc. (collectively "Qualcomm" or "Plaintiffs") by and through

their attorneys, hereby supplement their responses and objections to defendant Arm Holdings

PLC's ("Defendant" or "Arm") Interrogatories to Plaintiffs dated June 11, 2025, as follows:

**GENERAL OBJECTIONS**

1.     Plaintiffs object to each Interrogatory to the extent that it seeks to impose greater

or different obligations on Plaintiffs than those provided for by the Federal Rules of Civil

Procedure, the Local Rules of the United States District Court for the District of Delaware, any

discovery orders entered into this case, any other applicable Court orders, or agreements reached

by the parties.

2.     Plaintiffs object to each Interrogatory to the extent that it seeks documents, things,

or information protected by the attorney-client privilege, the work-product doctrine, or any other

applicable privilege or immunity. Nothing contained in these Responses and Objections is intended

to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection.

█████████████████████████

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous responses to this Interrogatory. Plaintiffs also incorporate the Supplemental Expert Report of Patrick F. Kennedy, Ph.D. (dated May 15, 2026).

**INTERROGATORY NO. 16:**

Describe with specificity the complete legal and factual basis for Qualcomm's contention that Arm breached the covenant of good faith and fair dealing of the Qualcomm ALA, including as set forth in Count III of the SAC (SAC ¶¶ 181–188), and any remedies (monetary, non-monetary, and/or equitable) Qualcomm seeks for any such breach. Your response shall include the identification of all documents supporting or refuting Qualcomm's contention(s), and the three witnesses most knowledgeable about Qualcomm's allegations.

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs object to Interrogatory No. 16 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed. As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's breach. Plaintiffs further object to the Interrogatory as improperly compound. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint, is readily within the possession of Defendant, or that is more easily available to it. Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to the Interrogatory to the extent that that the information sought is subject to the attorney-client privilege, the attorney work-product, or any other applicable privilege or doctrine that makes such information non-discoverable.

29

█████████████████████████████████████████

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 102, 181-188 of the Second Amended Complaint (D.I. 137), and incorporate them by reference as if fully set forth herein, for Plaintiffs' position.

Arm has breached the implied covenant of good faith and fair dealing by asserting, without a valid basis, that Qualcomm was in material breach of its ALA and by publicizing Arm's notice of termination of the ALA to the media where it served to unsettle Qualcomm's customers. Arm's October 22, 2024 notice of cancellation contains bad faith demands of Qualcomm that find no support in the ALA, including the demand that Qualcomm withdraw its own legal claims against Arm for breach of the ALA. *See* ARMQC_02749014. Arm collaborated with Bloomberg News on an article titled "Arm to Cancel Qualcomm Chip Design License in Escalation of Feud." ARMQC_02770389; *see also* Arm Holdings Plc's March 25, 2024 Responses & Objections to Qualcomm's First Set of Interrogatories at 19. That article further announced to the world that "Arm, based in the UK, has given Qualcomm a mandated 60-day notice of the cancellation of their so-called architectural license agreement, according to a license agreement seen by Bloomberg." ARMQC_02770389; *see also* █████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████████████ Arm breached the implied covenant and good faith and fair dealing by reaching out to Qualcomm's customers directly about the status of Qualcomm's license, including in August 2022 and May

30

██████████████████████████████████████

2023. ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██ Additionally, Masayoshi Son, Chairman of Arm's Board, told executives of ██████ on October 4, 2022 that Qualcomm's ALA would expire in 2025, when it would not actually expire until at least 2028. Arm Ltd. v. Qualcomm, Inc., No. 1:22-cv-01146-MN, Joint Statement of Uncontested Facts ¶ 13. ██████████████████████████████

████████████████████

Qualcomm has been damaged by Arm's breach in that Arm's wrongful conduct has caused

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██ . . . ."); QCVARM_1070271 (email from Qualcomm personnel on October 25, 2024:

██████████████████████████████████████

████████████████████████████████████);

QCVARM_1121350 (████████████████████████: ████████

██████████████████████████████████████

██████████████████); QCVARM_1121359 (██████████████

████████████████████████████). Qualcomm



Additionally, ███████████████████████████████████████████████ ███████████████████████████████████████, *see* QCVARM_0618712, requiring Qualcomm to expend additional engineering effort to verify its custom cores. The ETE Checker is a component of the ACK licensed to Qualcomm for v9 and is used to run certain ACS compliance tests. *See* Qualcomm ALA, █████████████████.

Furthermore, Plaintiffs state that Section ███████ of the Qualcomm ALA governs term extensions. ██████████ states that ████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████ Qualcomm made its ██████████████████████ ████ on May 20, 2020, via email to Lynn Couillard, Rajiv Gupta, and Todd Lepinski at Arm. ARM_00085567. ████████████████████████████████████████████ ██████████████████████████████████████████████████ Yet, Arm has refused to negotiate an extension of v10 with Qualcomm.

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained: *see, e.g.*, ARM_00085567;    ARMQC_02771128;    ARMQC_02771124;    ARMQC_02771125; ARMQC_02771126;    QCVARM_1120481;    ARMQC_02771127;    ARMQC_02732393;

32

QCARM_7429297;    QCARM_7476653;    QCVARM_0599801,    QCVARM_0600098,

QCVARM_0602404,    QCVARM_0618712,    QCVARM_0575613,    QCVARM_0575611,

QCVARM_0618420,    QCVARM_0616871,    QCVARM_0600101,    QCVARM_0707732,

QCVARM_0707997,    QCVARM_0708118,    QCVARM_0602198;    QCVARM_1070271;

QCVARM_1028388;    QCVARM_1121338;    QCVARM_1121341;    QCVARM_1121346;

QCVARM_1121350;    QCVARM_1121359;    ARM_00110511;    ARM_01215878;

ARMQC_02749014; ARMQC_02770389; ARMQC_02762974; ARMQC_02742823. Subject to and without waiving any of its objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their initial response to this Interrogatory. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Jeff Golden; Deposition of Jignesh Trivedi; Deposition of Martin Weidmann; Deposition of Richard Grisenthwaite; Deposition of Rene Haas;

Based on their investigation to date, Plaintiffs identify the following individuals, who may only be contacted through counsel for Plaintiffs, as the persons most likely to be knowledgeable about the facts relating to this response:

- Ann Chaplin

- Jonathan Weiser

- Larissa Cochran

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Deposition of Vivek Agrawal ("Agrawal Dep.") 125:11-151:13, 153:17-156:18; Deposition of Jonathan Weiser ("Weiser Dep.") 82:4-15, 98:12-104:4, 167:12-24, 169:12-22, 171:15-174:7; Amon Dep. 45:9-18; 57:19-58:23 64:22-65:5, 297:18-298:15; Haas Dep. 17:20-18:13, 46:18-48:19, 52:17-53:10, 61:22-62:1, 63:2-5, 63:7-21, 75:14-17, 94:20-95:7, 96:25-97:3, 98:14-19, 99:18-100:1, 100:2-100:9, 101:12-20, 107:21-108:4, 109:10-13, 120:12-121:5, Deposition of Phil Hughes ("Hughes Dep.") 53:12-54:16; Deposition of Ann Chaplin ("Chaplin Dep.") 167:13-22; Deposition of James Jeon ("Jeon Dep.") 14:1-15:18, 16:19-23, 20:21-21:21, 22:11-23:1, 52:9-15, 53:3-56:14, 69:22-70:21, 72:1-21, 86:18-89:3, 98:24-99:100:9; Deposition of Martin Weidmann ("Weidmann Dep.") 67:15-69:11; Deposition of

34

█████████████████████████████

Aparajita Bhattacharya ("Bhattacharya Dep.") 19:9-21:24, 117:23-120:6, 127:24-129:7; Deposition of Jignesh Trivedi ("Trivedi Dep.") 143:11-18, 254:22-255:11; Deposition of Jeff Golden ("Golden Dep.") 43:12-44:3, 49:14-50:11, 57:24-61:7; Deposition of Paul Kranhold ("Kranhold Dep.") 107:25-113:7, 123:19-124:5, 125:5-10, 127:5-24, 133:16-136:24.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial and supplemental response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Further, after refusing to provide a written v10 license offer to Qualcomm, despite Qualcomm's repeated requests for such an offer since April 2025, Arm provided a partial proposal on December 10, 2025. QCVARM_1159487/QCVARM_1159488. This proposal was commercially unreasonable and was a constructive failure to offer a license at all. Arm's proposal offered a term of only an additional ███████ Qualcomm's existing license—a term during which Qualcomm could not even fully enjoy the benefits of the license, given that ██████████████████ ████████████████████████████. The proposal also included license fees that are ██████ ███████ what Qualcomm paid for each of its licenses to v8 and v9. It also included ████████████████████████████████ the amount that Qualcomm paid for its v8 and v9 licenses combined. The offer ████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ █████. ███████████████████████████████

35



The proposal was also materially incomplete. In correspondence, Arm stated that the proposal "assumes Qualcomm will accept other current market terms, both financial and non-financial." QCVARM_1159487. Arm thus conditioned its entire (already unreasonable) proposal on additional, undisclosed terms that Arm "assumes" Qualcomm will accept. To be prepared for an in-person discussion between the parties, Qualcomm asked that Arm provide these additional terms in advance of the meeting. QCVARM_1159519/QCVARM_1159521. A week later, Arm sent a letter stating that in the meeting, the parties will need to discuss "many other non-financial terms," including "███████████████████████████████████████████████

███████████████████████████████████████████████████

███" QCVARM_1159524/ QCVARM_1159525. Arm promised to "provide proposed terms for discussion" in advance of the meeting. *Id.* Nearly two weeks later, and less than 48 hours before the meeting, Arm circulated a draft annex. QCVARM_1159541/QCVARM_1159545. But rather than including the proposed non-financial terms, as promised, Arm again stated that there are "other non-financial terms" that the parties would need to discuss. Arm's refusal to propose

██████████████████████████████████████████████

any such terms in advance of the parties' in-person meeting was unreasonable and demonstrates bad faith, particularly given that Qualcomm provided a full draft of a proposed annex more than 5 months earlier.

At the January 26, 2026 meeting, it became clear that rather than proposing any such non-financial terms, Arm wants to get rid of or change the ones designed to protect Qualcomm.  These include important terms that the parties negotiated extensively prior to executing the 2013 license, including the ████████████████████████████████████████████████████████████████████████

████████  Arm was also unable to explain many of the terms used in the royalty structure in the December proposal or to justify the price for the licensing fee and ████████████████████ ████████  to Qualcomm's existing license grant that were included in the proposal.  Arm did not provide Qualcomm with a complete offer that contained all terms that Arm wanted to include in the v10 Annex.

On March 19, 2026, Arm provided an updated proposal on royalty rates, but did not include any proposal on non-financial terms. The proposal provided for █████████████████████ ████████████████████████████████████.  Like the December 2025 proposal, the updated proposal would ████████████████████████████████████████ ██████. And Arm did not offer any explanation for how it came up with this proposal.  ████████ ████████████████████████████████████████████████ ██████████████████████████████████

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following documents from which information responsive to this Interrogatory may be ascertained: *see, e.g.* QCVARM_1118116,    QCVARM_1118115,        ARMQC_02771125;    ARMQC_02771126,

37

ARMQC_02771127;        QCVARM_1152000,  QCVARM_1152121,  QCVARM_1159431,

QCVARM_1159485,                QCVARM_1159487,                QCVARM_1159519;

QCVARM_1159524/QCVARM_1159525;          QCVARM_1159535/QCVARM_1159537;

QCVARM_1159565/QCVARM_1159570;                QCVARM_1159582/1159587;

QCVARM_1159593/QCVARM_1159594;        ARMQC_02799838;    ARMQC_02799876;

ARMQC_02799882;    ARMQC_02799884;    ARMQC_02799886;    ARMQC_02799915;

ARMQC_02799939;    ARMQC_02799977;    ARMQC_02799991;    ARMQC_02800003;

ARMQC_02800005; ARMQC_02800007; ARMQC_02800008.

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous responses to this Interrogatory. Plaintiffs also incorporate the Supplemental Expert Report of Patrick F. Kennedy, Ph.D. (dated May 15, 2026). Plaintiffs also incorporate the Expert Report of Murali Annavaram (dated May 15, 2026).

## INTERROGATORY NO. 17:

Describe with specificity the complete legal and factual basis for Your contention that Qualcomm is entitled to a license to v10 under the Qualcomm ALA. Your response to this Interrogatory shall include a discussion of Qualcomm's contention, if any, as to: (i) whether and how Qualcomm contends made a valid election to extend the Qualcomm ALA under ████ of that agreement; and (ii) how v10 allegedly constitutes ████████ under the Qualcomm ALA. Your response shall include the identification of all documents supporting or refuting Qualcomm's contention(s), and the three witnesses most knowledgeable about Qualcomm's allegations.

38

███████████████████████

33(d). In particular, Plaintiffs direct Defendant's attention to, e.g.: Amon Dep. 192:16-192:23, 193:10-23, 195:7-24; Howard Dep. 144:23-148:25; Whealton Dep. 149:20-22; G. Williams Dep. 53:15-17, 107:17-109:12, 115:6-14, 116:10-117:14; Grisenthwaite Dep. 36:3-14; Deposition of Michael Williams 60:15-20; Deposition of Ziad Asghar 106:6-23, 146:15-147:14; Weiser Dep. 11:5-17; Wolf Dep. 49:25-50:5; QCVARM_0716389.

<table>
<tr><td>OF COUNSEL:</td><td>MORRIS, NICHOLS, ARSHT & TUNNELL LLP</td></tr>
<tr><td>

Karen L. Dunn<br>
William A. Isaacson<br>
Erin J. Morgan<br>
Melissa F. Zappala<br>
Jenifer N. Hartley<br>
DUNN ISAACSON RHEE LLP<br>
401 Ninth Street NW<br>
Washington, DC  20004<br>
(202) 240-2900

Catherine Nyarady<br>
Jacob A. Braly<br>
S. Conrad Scott<br>
Jacob Apkon<br>
PAUL WEISS, RIFKIND, WHARTON<br>
   & GARRISON LLP<br>
1285 Avenue of the Americas<br>
New York, NY  10019-6064<br>
(212) 373-3000

Adam L. Basner<br>
PAUL WEISS, RIFKIND, WHARTON<br>
   & GARRISON LLP<br>
2001 K Street, NW<br>
Washington, DC  20006-1047<br>
(202) 223-7300

</td><td>

*/s/ Jennifer Ying*

_____

Jennifer Ying (#5550)<br>
Travis J. Murray (#6882)<br>
1201 North Market Street<br>
P.O. Box 1347<br>
Wilmington, DE  19899<br>
(302) 658-9200<br>
jying@morrisnichols.com<br>
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

</td></tr>
</table>

May 15, 2026

███████████████████████████████

**CERTIFICATE OF SERVICE**

I hereby certify that I caused copies of the foregoing document to be served on

May 15, 2026, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                              *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendants*

Scott F. Llewellyn, Esquire                                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendants*

Sydney D. Gaskins, Esquire                                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendants*

Alexandra Corrinne Hottenrott, Esquire                              *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendants*

Daralyn J. Durie, Esquire                                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendants*

Lydia B. Cash, Esquire                                              *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendants*

███████████████████████████████

Gregg F. LoCascio, P.C.                                    *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendants*

Jay Emerick, Esquire                                       *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendants*

Peter Evangelatos, Esquire                                 *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendants*

*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)

78

# Exhibit 3

( █████████████ )

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation, and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. ——24-490 (MN) (CONSOLIDATED) |
| v. | ) ) ) | |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) | |
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 26-20 (MN) |
| v. | ) ) ) | PERTAINS TO C.A. NO. 26-20 ACTION ONLY |
| ARM LTD., a U.K. corporation, | ) ) ) | |
| Defendant. | ) ) | |

**AMENDED COMPLAINT[1]**

Plaintiffs Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively, "Qualcomm") complain and allege as follows against Defendant Arm Ltd. ("Arm").[2]

---

[1] Following the Special Master's denial of Plaintiffs' motion to add Arm Ltd. as a standalone defendant in *Qualcomm Inc. v. Arm Holdings plc.*, C.A. No. 24-490-MN (D. Del.), D.I. 585, Plaintiffs file this nearly-identical action against Arm Ltd. out of an abundance of caution while they pursue their rights to appeal the Special Master's ruling in that case. *See id.*, D.I. 336 at 3.

[2] On March 13, 2024, Qualcomm filed its Answer and Defenses to ARM's Complaint and Second Amended Counterclaims. *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del.

## NATURE OF THE ACTION

1.      This case arises out of the latest chapter in Arm's campaign to stifle competition and technology innovation by impeding the efforts of its longtime business partner Qualcomm to deliver leading computer chips to its customers and consumers around the world.  For years, Arm has received substantial royalties from licensing Qualcomm to design and sell products containing custom central processing units ("CPUs") compatible with Arm's instruction set architecture ("ISA").  But following its acquisition by the venture capital firm SoftBank Group and its failed sale to NVIDIA, Arm attempted to shift its business model away from licensing its ISA for use by companies like Qualcomm that design CPUs, and toward forcing customers to buy only Arm's own CPU designs.  Qualcomm's license, however, stands in the way of Arm's effort to push aside the makers of custom CPUs:  Qualcomm's license extends until 2033, and Qualcomm's Arm-compatible microprocessors lead the industry in numerous applications.  At the direction of SoftBank and its chairman and CEO, Masayoshi Son, Arm thus sought to disrupt Qualcomm's business.  Arm's first move was to sue Qualcomm for allegedly breaching a license that Arm had previously granted to a company Qualcomm acquired but to which Qualcomm was not a party, demanding that Qualcomm cease distributing its groundbreaking microprocessors.  As soon as Arm filed that lawsuit, it blitzed Qualcomm's major customers with letters publicizing the lawsuit, accusing Qualcomm of breaching "the Arm license agreement," and threatening that it would "work vigorously to protect what is rightfully ours."  And eight months later, Arm sent another round of letters to Qualcomm's largest customers, using language Arm's CEO has admitted under

---

Mar. 13, 2024), D.I. 300.  This filing contains additional background on Arm's attempt to preclude Qualcomm's custom central processing units from competing with Arm's own central processing units.  The background allegations are set forth in paragraphs 1-47 and 175-273 of the redacted and publicly available pleading.  Redacted Answer & Defenses to Arm's Compl. & 2d Am. Countercls., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306.

oath was "confusing" and "misleading" to create the false impression that Qualcomm was clearly in breach of its agreement.  Then, on the eve of trial in that case, Arm sent Qualcomm a notice of material breach purporting to have the right to terminate Qualcomm's own license after 60 days—the day after the trial was scheduled to end.  That laid bare Arm's intentions from the beginning: to attempt to get out of its license with Qualcomm in any way possible so Arm could eliminate alternatives to Arm's own competing CPU designs.

2.      For decades, Arm has developed and licensed intellectual property relating to chips.  Arm has pursued that business through two distinct models: *first*, by licensing other companies to use Arm's ISA—the set of commands that determines how software controls a CPU[3]—and *second*, by licensing its own CPU designs so that other companies can make and sell products that use Arm's ready-made designs.  Unlike other companies that developed a proprietary ISA used only on those companies' own chips, Arm followed a distinctive, "industry-described neutral, open licensing approach"[4] of "licensing its designs to all comers."[5]  That open approach encouraged widespread adoption of Arm's ISA and also its designs.  Arm's ISA—which Arm CEO Rene Haas describes as "the most ubiquitous computer architecture on the planet"[6]—is used by practically

---

[3]   An ISA acts as an interface between CPU hardware and software.  These instructions describe the high-level attributes of the CPU, such as the supported computer instructions.  It consists of a set of a few thousand instructions (for example, "add," "multiply," "load," and "store") and a few hundred registers, which are the places where information can be read, written, or operated upon, by the instructions, which compatible software will recognize.

[4]   Compl. ¶ 5, *In the Matter of Nvidia Corp., SoftBank Grp., & Arm, Ltd.*, Docket No. 9404 (FTC filed Dec. 2, 2021) (hereinafter "FTC Complaint").

[5]   Stephen Nellis et al., *Nvidia's Arm Deal Sparks Quick Backlash in Chip Industry*, Reuters (Sept. 14, 2020, 1:24 AM), https://www.reuters.com/article/technology/nvidias-arm-deal-sparks-quick-backlash-in-chip-industry-idUSKBN2650GT/.

[6]   Tim Bradshaw, *Rene Haas: "Arm Has the Most Ubiquitous Computer Architecture on the Planet"*, Financial Times (June 7, 2024), https://www.ft.com/content/5b191c4c-119f-4f97-bc61-622d20bfa46d (quoting Rene Haas).  ARM claims that "[a]bout 99% of premium smartphones are

3

every smartphone, most "internet of things" ("IoT") devices, many automobiles, and an increasing number of personal computers and datacenter servers.  Arm claims that companies using its ISA have shipped 270 *billion* chips as of January 2024.[7]

3.      One of these customers was Qualcomm, which has licensed Arm technology since 1997.  As relevant here, Qualcomm and Arm entered into an architecture license agreement or "ALA" in 2013 (the "QC ALA"), which licensed Qualcomm to develop and sell custom-designed CPUs that are compatible with the Arm ISA but are otherwise the product of Qualcomm's own engineering work.  Qualcomm has also entered into a technology license agreement ("TLA") authorizing Qualcomm to make and sell products, including systems-on-a-chip ("SoCs") that use Arm's ready-made CPU designs.

4.      In recent years, Arm has apparently grown dissatisfied with its longstanding open, neutral business model.  Following its acquisition by SoftBank and the failure of an attempted sale to NVIDIA, Arm is now grasping for any means—fair or foul—of padding its bottom line and stock price.  Eager to cash in on the ubiquity of—and lack of any viable alternatives to—the Arm ISA, and as urged by SoftBank and Son, Arm has begun turning the screws on its customers, substantially increasing the royalty rates it demands to use the Arm ISA.  Nor is Arm content to simply increase the rates it charges architecture licensees like Qualcomm.  Instead, it has sought to capture a greater share of the chips that power devices compatible with the Arm ISA—and thus the greater royalty rates it can obtain by licensing chip designs (or indeed, by selling chips themselves).

---

powered        by        Arm."        *Consumer        Technologies:        Smartphones*,        Arm, https://www.arm.com/markets/consumer-technologies/smartphones (last visited Dec. 9, 2024).

[7]  *Arm: The Technology Foundation for AI Everywhere*, Arm (Jan. 8, 2024), https://newsroom.arm.com/blog/arm-ai-everywhere.

5.      Qualcomm now stands as an obstacle to Arm's ambition to raise prices and eliminate alternatives for customers.  Qualcomm has developed innovative products enabled by its custom-designed, high-performance, low-power CPUs, which utilize a novel microarchitecture and related technologies to deliver significant increases in both performance and efficiency.  Those innovative products pose a serious obstacle to Arm's ambition to control more links in the computer-chip value chain.  Unable to compete fairly with Qualcomm, Arm has employed a series of wrongful tactics in an attempt to stifle Qualcomm's technological leaps in CPU design, to force Qualcomm to continue to use Arm's off-the-shelf CPUs, and to coerce Qualcomm into renegotiating the QC ALA, despite it being in effect for years to come, on terms substantially more favorable to Arm—or simply to nullify that agreement.  Indeed, Arm's tactics are part and parcel of a broader effort to enable the company to escape its existing ALAs and thereby to ensure that devices compatible with the Arm ISA run on Arm chips.

6.      Some of Arm's maneuvers resulted in a trial that took place ~~last year~~in December 2024 before this Court.  *See Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del.) (hereinafter "*Arm* v. *Qualcomm*").  That case arises primarily from Arm's attempt to use Qualcomm's acquisition of the startup NUVIA Inc. ("NUVIA") as a pretext for escaping the QC ALA.  NUVIA was founded by a world-class engineering team that set out to design better chips for use in datacenters.  In 2021, Qualcomm acquired NUVIA for $1.4 billion, intending for this team to help drive innovation across Qualcomm's product segments, including in laptops and other personal computers ("compute"), smartphones ("mobile"), and the digital cockpits and driver-assistance systems that are increasingly common in cars and trucks ("automotive").  Arm could have treated that acquisition as an opportunity to grow the use of the Arm ISA in new markets but instead regarded the acquisition as a competitive threat, whose benefits should be eradicated.

5

7.      *First*, Arm asserted, with no legal or contractual basis, that following Qualcomm's 2021 acquisition of NUVIA, Qualcomm needed Arm's consent to transfer NUVIA's technology to Qualcomm.  Arm took the position that this allegedly necessary "transfer" would require Qualcomm to pay hundreds of millions of dollars in "fees" and much higher royalty rates for the duration of the QC ALA.  Arm later claimed that, absent agreement to its terms, Qualcomm's use of *any* technology started by NUVIA engineers—including in products that Qualcomm began developing after the NUVIA acquisition, such as the Snapdragon® X- Elite—violated a license agreement between Arm and NUVIA that Qualcomm was not using and that Arm ultimately terminated.  This made no sense.  Qualcomm has its own license agreements for Arm technology and information that allowed it to develop and provide custom Arm-compliant cores and products incorporating such cores to its customers (including the Snapdragon® X- Elite and Snapdragon® 8- Elite) for many years to come.  Qualcomm did not need Arm's consent to develop and market this technology.[8]

8.      *Second*, Arm filed the meritless *Arm* v. *Qualcomm* action against Qualcomm, claiming that Qualcomm and NUVIA breached NUVIA's terminated agreements with Arm, despite Qualcomm not even being a party to those agreements, and infringed Arm's trademarks by marketing custom CPUs years after the NUVIA acquisition.  In that action, Arm is demanding that Qualcomm destroy these groundbreaking CPU products that Qualcomm developed after the NUVIA acquisition and in accordance with the Qualcomm/Arm agreements—even though Arm

---

[8]    Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

has repeatedly admitted that it suffered no actual harm as a result of the conduct allegedly forming the basis of its claims.[9]

9.      *Third*, Arm and Son promoted the *Arm* v. *Qualcomm* lawsuit to Qualcomm's customers to sow fear, uncertainty, and doubt by suggesting that customers could not rely on Qualcomm as a supplier and could be subject to retaliation by Arm if they did, including by misrepresenting the terms of Qualcomm's licenses with Arm to Qualcomm's customers.[10]  Arm took further action in an attempt to disrupt Qualcomm's business relationships by sending emails to Qualcomm's customers on two separate occasions that misrepresented the terms of the NUVIA agreements and misleadingly implied that Qualcomm was required to destroy the custom CPUs that it was working on.

10.      Qualcomm was vindicated in the *Arm* v. *Qualcomm* action, in which the jury found that Qualcomm had not breached NUVIA's agreements and that Qualcomm's products were properly licensed under the QC ALA.[11]

11.      This complaint seeks redress for further bad-faith conduct in which Arm has engaged in an attempt to pressure Qualcomm to cave to its demands.  That conduct includes refusing to perform certain of its obligations under the QC ALA and QC TLA and continuing to wrongfully interfere with Qualcomm's relationships with current and prospective customers.

---

[9]    *See* Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 29, 31-37, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 22, 2024), D.I. 306; Joint Letter re Bench or Jury Trial, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 25, 2024), D.I. 308; Redacted Mar. 5, 2024 Hr'g Tr. 38:20-39:8, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1.

[10]    Redacted Answer & Defenses to ARM's Compl. & 2d Am. Countercls. ¶¶ 255-70, *Arm* v. *Qualcomm*, D.I. 306.

[11] Verdict Form, *Arm* v. *Qualcomm*, D.I. 572.

7

***Arm Withheld Deliverables in Breach of Its Obligations Under the QC ALA***

12.     Arm deliberately withheld deliverables to which Qualcomm is entitled under the QC ALA with Arm under the guise that the QC ALA does not entitle Qualcomm to support for "Nuvia-based technology." Arm's excuse is unjustified, and its breach could not be clearer.

13.     Qualcomm first suspected that Arm was withholding QC ALA deliverables in the fall of 2022. At that point, Qualcomm sent a written notice of failure to deliver, but because certain deliverables were solely within Arm's actual knowledge and control, Qualcomm had no way of knowing what exactly was being withheld, if anything, or for how long it had been withheld.

14.     Arm capitalized on this lack of transparency, with its General Counsel stating definitively that ████████████████████████ Arm further stated that Qualcomm ████ ████████████████████████████████ under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables. Here again, Arm was exerting its leverage in an attempt to force Qualcomm to acquiesce in its unwarranted demands.

15.     Arm went on to state that Qualcomm's written notice was a ████████████ to cause Arm████████████ because ████████████████ was at issue, which Arm purported was ████████████████████████████████████ ████████████████████████████████████ Additionally, Arm threatened Qualcomm that, if Qualcomm availed itself ████████████ ████████████████████████████ Arm would harm Qualcomm, including by terminating Qualcomm's multiple licenses with Arm.

16.     Arm's statement that ████████████████████████ was not true, and its purported desire to uphold the "language, spirit, and purpose of the ALA" was a charade. Discovery conducted in *Arm* v. *Qualcomm* revealed incontrovertible evidence that Arm not only

8

had the deliverables in question, but that, at the time Qualcomm sent its written notice of failure to deliver, Arm was intentionally withholding those deliverables from Qualcomm as part of a negotiating tactic related to the parties' dispute over the use of technology acquired from NUVIA.

17.    ~~Arm never cured its failure to deliver, causing~~ Arm continued its failure to deliver until January 2025, after the jury verdict in *Arm* v. *Qualcomm*, at which point it stopped withholding both the OOB and patches. Arm's refusal in 2022, 2023, and 2024 to produce these deliverables caused Qualcomm to expend additional, unnecessary resources in designing and verifying its products.

18.    Arm's failure to deliver violated the QC ALA, which ███████████ ███████████████████████████████████████████████████████ under that agreement. Under the QC ALA, if Arm is found to be in breach of Section ███ of the QC ALA, it must ███████████████████████████████████████████ If Arm fails ████ ███████████████████████████████████ pursuant to Section ████████ ███████████████████████████████████████████████████████ ██████████████████████████

19.    Arm's withholding of deliverables and deliberate decision not to cure the issue within the time prescribed by the contract is a material breach of the QC ALA. Accordingly, Qualcomm is entitled to financial damages, including but not limited to its explicit contractual remedy that allows Qualcomm to suspend its obligation to pay any royalties due to Arm under its contracts with Qualcomm for a period of five years from the last date of the 30-day period that Arm had to cure (i.e., from January 4, 2023).

9

***Arm Violated the QC TLA By Refusing to License Qualcomm CPU Cores***

20.     Arm failed to uphold its obligations under the QC TLA by refusing to offer licenses to its off-the-shelf cores at commercially reasonable prices to Qualcomm.  Arm's actions are violations of licensing provisions negotiated between the parties.

21.     For example, in April 2024, Qualcomm submitted requests to renew licenses from Arm for off-the-shelf cores Cortex-A720 (codenamed ███████) and Cortex-A520 (codenamed ███████).  Despite repeated follow-ups over the following several months, Arm refused to provide any licensing offer for either core.

22.     In August 2024, Qualcomm submitted a request to Arm to renew a license to Arm's off-the-shelf core Cortex-M55 (codenamed ███████).  Arm once again refused to provide a licensing offer for the █████ core and continued to refuse to provide a licensing offer for the ████████████ cores.

23.     Given Arm's prolonged refusal to engage, Qualcomm's General Counsel sent Arm a notice of breach of, and non-compliance with, the QC TLA on September 20, 2024.  Qualcomm sent a second notice on September 27, 2024, when Arm failed to provide confirmation of having received the initial letter.

24.     Arm waited nearly a month to respond to Qualcomm's notices of non-compliance. In its October 23, 2024 response, Arm's Chief Legal Officer wrote that Arm did not ███████ ████████████████████████████████████████████ Despite the clear indication that Arm did not intend to proceed ███████████████████████████ ████████████████████

25.     Arm subsequently provided Qualcomm with a licensing offer for the requested cores and microcontroller.  As Arm must have been aware, its proposal was extreme and clearly not commercially feasible for Qualcomm.  Arm's proposal was a constructive failure to offer a

10

license ███████████████████████████████████ Under the terms of the QC TLA, ████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████

26.    As with the QC ALA, █████████████████████████████████████

█████████████████████████ which Qualcomm sent in September 2024. ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████

27.    Arm's proposal violated the QC TLA by presenting financial terms that were so exorbitant as to be commercially unreasonable and not ████████████ and therefore a constructive failure to offer a license.  It also greatly exceeded ████████████████████████████████

██████████████████████████████████████████████████████████████

Furthermore, Arm's proposal failed to comply with the QC TLA by █████████████████

██████████████████████████████████████████

28.    Arm has refused to offer commercially reasonable terms for any of the requested cores, and has thereby failed to cure its breach of the QC TLA.

11

***Arm Threatened to Terminate the QC ALA Without Basis***

29.     Apparently seeking to ratchet up pressure on Qualcomm before trial in *Arm* v. *Qualcomm*, on October 22, 2024, Arm sent Qualcomm—and leaked to the media—a letter (the "Breach Letter") asserting that Qualcomm is in material breach of the QC ALA for allegedly developing and marketing "unlicensed cores," and claiming that Arm will be entitled to terminate the QC ALA if Qualcomm does not capitulate to Arm's demands for a "cure" within 60 days. Those demands, which had no basis in the agreement, included that Qualcomm should "at a minimum" stop development of any CPUs that use any designs, technology, or code created by NUVIA employees; cease requesting ███████████████████ for any such CPUs; cease manufacturing and selling such CPUs; and cease manufacturing or selling CPUs that Arm has refused to validate and verify.  The Breach Letter also demanded, without support in the QC ALA or the law, that Qualcomm withdraw its claims against Arm in this case for Arm's breach of its delivery obligations under Section ███.

30.     Arm's assertion that Qualcomm was in material breach of the QC ALA lacked any basis in that agreement.  The premise of Arm's Breach Letter was that certain Qualcomm CPU cores allegedly contain aspects of designs that were started by NUVIA employees.  But the QC ALA does not prohibit Qualcomm from acquiring nascent microarchitecture technology and using that technology to develop Qualcomm CPUs.  And it certainly does not permit Arm to terminate the QC ALA as payback for Qualcomm's suing to protect its rights under that agreement.  Because Qualcomm has not committed a ████████████████████████████████████ Arm has no right to terminate the QC ALA, and any purported termination of that agreement is null and void.

31.     Moreover, Arm's claim of a material breach was inconsistent with Arm's own conduct throughout this dispute.  Arm has known since at least 2021 that Qualcomm would be

12

acquiring NUVIA and using the technology that Arm now belatedly claims was improperly licensed. Yet for three years, Arm took no steps towards attempting to terminate the QC ALA and stood by while Qualcomm, through significant investments of time and money, developed and brought to market innovative products featuring Qualcomm's custom CPUs. Arm's belated threat to terminate the QC ALA on the eve of trial and while Qualcomm was announcing new products based on its high-performance custom CPUs demonstrates that Arm's claim of a material breach was a pretext to justify Arm's true aim: escaping the QC ALA and other ALAs so Arm can attempt to dominate the market free from competition from Qualcomm and other designers of custom CPUs.

### *Arm Continues to Wrongfully Attempt to Injure Qualcomm's Business*

32.     Arm's Breach Letter was the latest installment of Arm's longstanding efforts to undermine Qualcomm's market position and to interfere with Qualcomm's relationships with current and prospective customers.

33.     The Breach Letter was not only legally groundless, but also timed and publicly released in an effort to damage Qualcomm's business. Arm sent the Breach Letter to coincide with Qualcomm's annual Snapdragon® Summit, where Qualcomm unveiled an SoC that offers greater CPU performance and efficiency than those offered by Qualcomm's competitors, including those competitors that use Arm off-the-shelf products in their SoCs. To ensure that the Breach Letter reached Qualcomm's customers, Arm also promptly leaked it to Bloomberg, which published a story on the threatened termination that very day.[12] Arm did so knowing that Qualcomm's customers would likely be concerned that termination of the QC ALA could

---

[12]  Ian King, *Arm to Cancel Qualcomm Chip Design License in Feud Escalation*, Bloomberg (Oct. 22, 2024, 8:17 PM), https://www.bloomberg.com/news/articles/2024-10-23/arm-to-cancel-qualcomm-chip-design-license-in-escalation-of-feud.

destabilize their own supply chains, because Arm's actions implied, despite the actual terms of the QC ALA, that Arm could and would impede Qualcomm's ability to deliver the SoCs its customers ordered, and that Qualcomm's customers might even face intellectual-property litigation brought by Arm. Both the timing and the disclosure of the Breach Letter were thus calculated to interfere with Qualcomm's customer relationships and prospective business opportunities.

34.     The Breach Letter was also timed to interfere with *Arm* v. *Qualcomm*. In the Breach Letter, Arm threatens that it "shall be entitled" to terminate the QC ALA on December 21, 2024—the day after trial in *Arm* v. *Qualcomm* was expected to conclude. Arm's counsel's statements to this Court that termination would not be "automatic" after 60 days, that he "hope[d] that there are discussions between the parties," and that the Breach Letter could prompt the parties to "evaluat[e] their positions" underscore that Arm sent the Breach Letter to pressure Qualcomm to accede to Arm's unjustified demands.[13] Arm's wrongful tactics have harmed Qualcomm. Following Arm's bad-faith claim that Qualcomm has breached the QC ALA and leak of the Breach Letter, important Qualcomm customers delayed entering into new (or renewing existing) contracts with Qualcomm or have insisted that Qualcomm provide them with additional commitments regarding its ability to deliver licensed products. Arm's campaign not only deprived Qualcomm of the ability to finalize these business opportunities promptly and without providing additional commitments, but also required Qualcomm executives and employees to spend considerable time responding to and alleviating customer inquiries. None of those demands would have existed but for Arm's wrongful conduct.

---

[13]  Oct. 30, 2024, Hr'g Tr. 39:14-40:2, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

14

35.    At trial in the *Arm* v. *Qualcomm* case, Arm continued to misrepresent its relationship with Qualcomm and its position in the marketplace.  Arm's Chief Executive Officer, Rene Haas, repeatedly stated that Arm did not view Qualcomm as a competitor because Arm did not build or sell semiconductor chips in the marketplace, which Mr. Haas stated would amount to direct competition between the companies.  Despite Mr. Haas' sworn statements denying Arm's involvement in chip development, Arm is now in the process of designing and distributing its own semiconductor chips.[14]  Moreover, Arm "sought to hire executives from its customers as early as November,"" of 2024, several weeks before Mr. Haas' sworn testimony in court.[15]  Specifically, Arm's recruiter told the customer executive that this new position will help with Arm's "transformation from solely designing processor architecture (IP) to also selling its own silicon."[16]  To facilitate its entry into selling its own chips, Arm now seeks to force Qualcomm—which would otherwise be a competitor—out from the marketplace.

36.    Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

But even then, Arm confirmed that it was not abandoning its efforts to obstruct Qualcomm's developments of custom cores, insisting that ████████████████████████

---

[14] *Arm recruits from customer as it plans to sell its own chips*, Stephen Nellis and Max Cherney, REUTERS, ~~https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (Feb. 13, 2025).~~ https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (Feb. 13, 2025); *Arm releases first in-house chip, with Meta as debut customer*, Katie Tarasov, CNBC, https://www.cnbc.com/amp/2026/03/24/arm-launches-its-own-cpu-with-meta-as-first-customer.html (Mar. 24, 2026).

[15] ~~*Id.*~~ *Arm recruits from customer as it plans to sell its own chips*, Stephen Nellis and Max Cherney, REUTERS, https://www.reuters.com/technology/arm-recruits-customers-it-plans-sell-its-own-chips-2025-02-13/ (Feb. 13, 2025).

[16] *Id.*

15

███████████████████████████████ Moreover, Arm sought to prevent Qualcomm from curing the impression created in the market by its deliberate leak of the Breach Letter, ████████████████████████████████████████████

██████████████████████████████████

37.    Beginning in June 2025, Arm refused to honor ████████████████████ ██████████████████████████████ or ████████████████████████████████ ██████████████████████████ throughout 2025 and 2026, Arm has not negotiated in good faith a license to v10 of the Arm architecture, including by ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

38.    Arm's conduct breaches ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

39.    In addition, by failing to ████████████████████████ Arm failed to take actions the contract presupposed it would take, thus frustrating the purpose of the contract and breaching the implied covenant of good faith and fair dealing.

37.40.  Arm's non-compliance with its contractual obligations to Qualcomm should be seen for what it is: the latest in a series of anti-competitive maneuvers intended to force Qualcomm to renegotiate an existing, long-term license agreement that Arm's current management views as disadvantageous, and to frustrate Qualcomm's efforts to design and deliver industry-leading

16

technology. Arm's tactics—its refusal to provide technology it is contractually obligated to deliver and its attempts to undermine customers' confidence in Qualcomm—should be wholly rejected.

## THE PARTIES

~~38.~~41.  Plaintiff Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California. Qualcomm is a leading technology innovator in mobile communication products and the driving force behind the development, launch, and expansion of 5G technology. Qualcomm's foundational technologies enable the mobile ecosystem and are found in every 3G, 4G, and 5G smartphone. Qualcomm brings the benefits of mobile to new industries, including automotive, IoT, and computing, where Qualcomm's technology has driven the convergence of PC and mobile technology to increase productivity, connectivity, and security in portable laptops.

~~39.~~42.  Plaintiff Qualcomm Technologies, Inc. is a Delaware corporation with its principal place of business in San Diego, California. Qualcomm Technologies is a wholly owned subsidiary of Qualcomm Incorporated and operates, along with its subsidiaries, substantially all of Qualcomm's engineering and research and development functions, and substantially all of its products and services businesses, including its QCT semiconductor business.

~~40.~~43.  Defendant Arm Ltd. is a U.K. corporation headquartered in Cambridge, United Kingdom.

## JURISDICTION AND VENUE

~~41.~~44.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

~~42.~~45.  Venue is proper in the District of Delaware under 28 U.S.C. § 1391(c)(3) because Arm is "a defendant not resident in the United States" and therefore can be "sued in any judicial

17

district." Arm has also consented to and availed itself of the District of Delaware by suing Qualcomm in the District of Delaware.[17]

<strong>FACTUAL ALLEGATIONS</strong>

## I. ARM LICENSES AND THE CUSTOM CPU MARKET

43.46. Arm is in the business of developing and licensing technology for processors used in a variety of different products, including, but not limited to, servers, mobile phones, and cars. Arm's licensing model has been based on receiving both upfront license fees and royalties, the amounts of which are negotiated with each licensee. For many years, Arm has offered different types of license contracts, of which two are at issue in this case: ALAs and TLAs.

### A. ALAs and the Arm ISA

44.47. An ALA grants licensees the right under Arm's intellectual property to design their own custom Architecture Compliant Cores using specific licensed ISA technology and to manufacture, sell, and distribute Arm Compliant Products incorporating such cores.[18]

45.48. CPU cores (also known simply as cores) are a particular component of SoCs, which are integrated circuits used in cellular phones, computers, and other devices that combine several technologies used in such products into a single chip. A core or CPU performs processing within the SoC.

46.49. An Arm Compliant Core is compatible with the Arm ISA. As a general matter, an ISA lists the instructions that allow hardware (like SoCs) to interface with software programs.

---

[17] *See generally* Compl., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Aug. 31, 2022), D.I. 1.

[18]

18

Application and software developers create their products to be compatible with particular ISAs. As a result of greater investment in Arm-based systems by hardware companies like Qualcomm and software developers, the Arm ISA is now "ubiquitous" and used in practically every premium smartphone, as well as a large percentage of automobiles and IoT devices and a growing number of personal computers and datacenter servers.

47.50. The Arm ISA allows for software compatibility across all Arm-compatible products, as those products can receive the same inputs (instructions) and, for each of those inputs, determine and output the proper result. The Arm ISA does not tell a designer how to design or build a CPU core, nor any of the internal design features that deliver superior performance and make a CPU competitive.

48.51. To make a CPU that then can execute the Arm ISA and therefore run applications and other software that have been written to be compatible with that ISA, the CPU developer must design and build a complicated integrated circuit consisting of billions of transistors connected into arrays that form larger, interconnected blocks. Building a CPU requires detailed micro-architectural know-how and expertise in multiple disciplines unrelated to the ISA, and requires expertise in cache design, branch prediction techniques, prefetchers, memory coherency/consistency paradigms, dependency resolution logic, schedulers, power delivery, power measurement and management, clocking methodology, and many other areas.

49.52. A CPU developer developing a custom CPU designs *how* the core is built, *how* it performs, and *how* it executes the CPU's instructions. There are a virtually infinite number of ways to design and build CPUs that can implement the Arm ISA. Companies that design custom CPUs employ armies of engineers who make countless design choices and tradeoffs to improve the size, computing performance, power consumption, heat dissipation, and other important

19

features of CPUs.  Many of these design choices are driven by the requirements of the product segment the designer is targeting—CPUs for mobile applications can have different design priorities than those for laptop computers or automobiles.

50.53.  Under an ALA, Arm does not deliver any specific Arm design or tell the licensee how to make the CPU.  That technological development and innovation—and the resulting product that may meet or fail the performance benchmarks necessary to succeed in the marketplace—is left to the licensee.  As Arm has publicly acknowledged, "the creation of an optimized CPU is very costly and time consuming," and Arm therefore "expect[s] the number of new [ALA] licensees for this technology to diminish over time as the effort required on their part to provide the customization often does not provide a reasonable return on investment."[19]  If the licensee is willing to put in the extraordinary effort and investment to develop a custom CPU, however, an ALA licensee may develop differentiated CPUs, including differentiation from CPUs developed and marketed by Arm.  Arm has executed ALAs with Qualcomm and a number of other companies.

### B.    TLAs and Off-the-Shelf CPUs

51.54.  In addition to granting licensees rights under ALAs to make custom-designed products that are compatible with the Arm ISA, Arm also designs "off-the-shelf" CPUs and other peripheral intellectual property ("IP") that customers may license through a TLA.  Under a TLA, Arm delivers complete processor core designs that a licensee can incorporate into a larger SoC design, saving the licensee the trouble and expense of designing its own CPU.  In addition to CPUs, Arm also designs, and licenses under the TLA, peripheral IP, which is technology used in SoCs to perform specific functions and interface with the CPU.  This peripheral IP takes a variety of forms, such as "interconnects" that facilitate the transfer of information between different components of

---

[19]    Arm Holdings, Ltd., Registration Statement (Form F-1) (Aug. 21, 2023) at 86, 131.

20

an SoC or various pieces of software that are incorporated into a semiconductor chip as a means of certifying safety capabilities of the chip. Recently, Arm has placed greater emphasis on licensing off-the-shelf CPU technology, including by launching a "Compute Subsystems" business that offers integrated designs that pair CPUs with other technology—all in exchange for "significantly higher royalty rates" than Arm receives for licensing its ISA.[20]

~~52.~~55. But reliance on Arm's off-the-shelf CPU designs comes at a cost, both financially and with regard to performance. Reflecting that the TLA license delivers a complete, ready-made design, Arm charges substantially higher royalties for the use of its off-the-shelf cores than it charges for a license to the Arm ISA. Moreover, when an SoC developer uses stock Arm CPU designs, it may have difficulty differentiating its product from those offered by rivals that also license Arm CPU designs. And when Arm fails to keep up with the state of the art in CPU design and performance, as it has in recent years, any licensor of Arm's off-the-shelf cores may have difficulty building and marketing SoCs that can compete against those with more advanced custom CPUs.

## II. QUALCOMM'S RELATIONSHIP WITH ARM AND CUSTOM CPU INNOVATIONS

~~53.~~56. Founded in 1985, Qualcomm was created with the goal of building "QUALity COMMunications." Qualcomm is a world leader in the design and production of semiconductor microchips, including SoCs. Qualcomm's chips power cellphones, computers, and an increasing number of other modern machines. Qualcomm is also in the vanguard of new chip technologies, and the company's current "5G" technology is ushering in a new age of connectivity and speed for wireless devices.

---

[20] *Id.*

54.57. Qualcomm continues to invent foundational technologies that transform how the world connects, computes, and communicates. In addition to its ground-breaking innovations in wireless technology, Qualcomm designs platforms, chipsets, software, tools, and services that help Original Equipment Manufacturers ("OEMs") and developers bring those technologies into products that change the way we live, including industry-leading smartphones with powerful functionality, laptops with built-in cellular and 5G connectivity and long-lasting battery life, and connectivity, infotainment, and Advanced Driver Assistance Systems products for the automotive industry designed to deliver connected experiences that are safer and customizable. Included among these products are custom CPUs and SoCs used in many different end technologies, including cell phones, cars, laptops, and tablets.

### A. Qualcomm Builds Innovative Arm-Compatible Products.

55.58. Qualcomm has held Arm licenses since 1997. Those licenses include an ALA entered in 2003, and the currently operative QC ALA, ▮▮▮▮▮▮▮▮▮ which Qualcomm[21] and Arm entered into on May 30, 2013, and Annex 1 to that agreement for Arm v8-A Architecture deliverables. On June 23, 2020, Qualcomm and Arm entered into an additional Annex 1 to the QC ALA for Arm v9-A Architecture deliverables.

56.59. Under the QC ALA and corresponding Annex 1s, Qualcomm has rights, using specific licensed technology, to design, manufacture, sell, and distribute Qualcomm's v8-A and v9 Arm-compatible custom cores, custom Arm ISA-compatible CPU cores, and products incorporating those cores. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Since

---

[21] The actual party to the ALA and TLA ▮▮▮▮▮▮ The terms of the agreements ▮▮▮▮

22

Qualcomm entered into the QC ALA, Qualcomm has developed and shipped custom Arm ISA-compatible CPUs.

57.60.  Qualcomm is today one of Arm's largest licensees—it "accounted for 10% of [Arm's] total revenue for [Arm's] fiscal year ended March 31, 2024."[22]  Since 2013, Qualcomm has paid Arm total license fees of ▮▮▮▮▮▮▮ and running royalties of ▮▮▮▮▮▮▮▮▮▮ under the QC ALA.  Qualcomm has fully complied with its obligations under the QC ALA and has continued to tender royalty payments to Arm (under protest) pending resolution of this dispute.

58.61.  In recent years, as Arm's off-the-shelf implementation cores have fallen behind custom cores developed by other Arm ALA licensees, it has become more challenging for Qualcomm to compete by relying on Arm-designed cores.  In particular, Arm has been unable to provide an implementation core that is competitive in the compute product segment; thus, the need for developing custom CPUs became more critical.

59.62.  In March 2021, Qualcomm acquired NUVIA, a start-up focused on developing a custom CPU and SoC specifically for use in datacenter servers.  At the time of the acquisition, NUVIA had built a team of world-class engineers with unparalleled experience in developing custom CPUs.  Qualcomm's goal was to transition the new Qualcomm employees to develop custom CPUs for its primary compute, mobile, and automotive product segments.  Qualcomm also planned to continue development of the server CPU and SoC for use in data centers and servers that NUVIA had originally intended to design.

---

[22]  ARM Holdings plc, Annual Report for Fiscal Year Ended Mar. 31, 2024 (Form 20-F) at 28 (Aug. 12, 2024).

60.63. Since acquiring NUVIA and integrating the NUVIA team as Qualcomm employees, Qualcomm spent years developing innovative products with custom-designed CPUs using a novel microarchitecture and related technologies.

61.64. Qualcomm's SoCs with custom CPUs compete more effectively against other Arm-compatible products, including those containing off-the-shelf Arm designs, and against rival suppliers of CPUs compatible with other ISAs (notably, Intel's x86). Qualcomm's new products with custom CPUs have drawn praise as being "incredibly potent"[23] and "shockingly fast."[24]

62.65. Qualcomm is not alone in its belief that its custom cores offerings will transform and advance the industry. Major industry participants—including Microsoft, Google, Samsung, GM, HP, and many others—praised Qualcomm's planned innovations as benefitting their products and end-customers.[25]

**B.    Relevant Provisions of the Qualcomm ALA**

63.66. On May 30, 2013, Qualcomm and Arm entered into an Amended and Restated Architecture License Agreement, ████████████████ and Annex 1 to that agreement. The QC ALA is a binding and enforceable agreement.

64.67. ████████████████████████████████

████████████████████████████████████

---

[23] Aaron Klotz, *Snapdragon X Elite Beats AMD and Intel Flagship Mobile CPUs in Geekbench 6*, Tom's Hardware (Apr. 2, 2024), https://www.tomshardware.com/pc-components/cpus/snapdragon-x-elite-beats-amd-and-intel-flagship-mobile-cpus-in-geekbench-6-qualcomms-new-laptop-chip-leads-in-single-and-multi-core-tests.

[24] Mark Hachman, *Qualcomm's Snapdragon X Elite Chip Attracts Unprecedented PC Partnerships*, PCWorld (Oct. 25, 2023), https://www.pcworld.com/article/2116395/qualcomms-latest-snapdragon-attracts-huge-pc-partnerships.html.

[25] *See Qualcomm to Acquire NUVIA*, Qualcomm Inc. (Jan. 12, 2021), https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

████████████████████████████████████████████████████

████████████████████████████████████

65.68. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████

66.69. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

25

67. 70.

.[27]

## C.    Arm's Evolving Business Model

68. 71. For years, Arm expressed its commitment to an open, neutral model for licensing

the use of its ISA.   Under that model, which led to Arm commonly being referred to as the

"Switzerland of chips," Arm held itself out as not discriminating against companies that sought to

use the Arm ISA.[28]   That model benefited the software developers, which could develop software

that would be interoperable across Arm-compatible devices, and ultimately benefited customers.

Indeed, Arm continues to tout the benefits of its "broad, standardized software ecosystem," which

it claims "ensures diversity and robustness in supply, as well as easy software portability between

---

[26] ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ are defined terms in the QC ALA. *See* ▮▮▮▮▮▮

[27] ▮▮▮▮▮▮▮▮ is a defined term in the QC ALA. ▮▮▮▮

[28] FTC Compl. ¶¶ 22-29; *see also* Josh Horwitz, *Relief and Challenges for Chipmakers as Nvidia-Arm Megadeal Collapses*, Reuters (Feb. 8, 2022, 8:21 AM), https://www.reuters.com/markets/us/relief-challenges-chipmakers-nvidia-arm-megadeal-collapses-2022-02-08/ (quoting Arm co-founder Hermann Hauser as stating that "[t]he whole point about Arm was always that it was the Switzerland of the semiconductor industry, dealing very even-handedly with all of its 500-plus licensees").

26

Arm-based systems."[29]   That model also benefited Arm, leading to widespread adoption of the ISA.  As a senior Arm executive has explained, "[w]hat makes an architecture successful is actually the number of people that use it," as greater adoption of an ISA creates a "virtuous circle" in which the "more people that use your architecture, the more people will want to use it."[30]

69.72.  After being acquired by SoftBank, however, Arm has pivoted away from that model.  When the chipmaker NVIDIA attempted to acquire Arm in 2020, the proposed acquisition met with harsh responses from regulators and other companies that rely on the Arm ISA, based on fears that NVIDIA could use its control of Arm to undermine its rivals, "including by manipulating levers such as [Arm]'s pricing, the terms and timing of access to [Arm]'s Processor Technology, … [Arm]'s technological developments and features, and [Arm]'s provision of service and support."[31]

70.73.  When that acquisition fell apart under regulatory scrutiny, Arm pursued a variety of strategies to try to bolster royalty revenues at SoftBank's and Son's behest, including unsuccessful attempts to impose a pricing model under which customers would pay royalties based on a percentage of the retail prices of the end products they made, and to force a major customer to renegotiate royalty rates notwithstanding the parties' existing contract.[32]  After releasing a new version of its ISA (v9) that makes only modest, incremental improvements on the prior version (v8), Arm has announced that it will collect double the royalties, and Arm has pressured existing

---

[29] *The Arm Advantage: Choosing Arm Technology*, Arm.com, https://www.arm.com/company/arm-advantage (last visited Dec. 9, 2024).

[30] Arm, *What Is CPU Architecture?*, YouTube.com (Aug. 18, 2021), https://www.youtube.com/watch?v=KGHdDVLnKJM&t=144s.

[31] FTC Compl. ¶ 8.

[32] Wayne Ma & Cory Weinberg, *How a Lopsided Apple Deal Got Under Arm's Skin*, The Information (Nov. 29, 2023), https://www.theinformation.com/articles/how-a-lopsided-apple-deal-got-under-arms-skin.

27

v8 licensees to "upgrade" their licenses to v9 by not releasing or supporting older v8 cores.[33]

Indeed, in its calls with investors, Arm routinely touts the increased revenues it expects to collect as a result of widespread adoption of v9.Arm has also attempted to bolster its income—and thus its valuation—by abandoning its historic role of neutral and open licensing of its ISA. Having made that ISA "ubiquitous" for the entire smartphone and IoT markets and made significant inroads in other sectors, Arm now seeks to leverage that ubiquity to exclude competitors from designing and selling chips that are compatible with the Arm ISA. Mr. Haas has hinted at precisely that sort of leveraging, explaining that as the company "defining a computer architecture and … building the future of computing," it is "easier" to understand the best ways to integrate hardware and software "if you're building something than if you're licensing IP" because "building something" makes a company "much closer to that interlock" and gives it "much better perspective in terms of the design tradeoffs to make," which is why "if we were to do something, that would be one of the reasons."[34] Moreover, Arm has also sought to develop more complex, integrated "subsystems" that combine CPUs with other chips and intellectual property.[35] And it was recently reported that,, in a "radical change to [Arm's] business model," Arm was planning to launchhas just recently unveiled its own chip by as early as this summer.[36] This transformation from licensing

---

[33] *Q3 FYE24 Results Presentation* at 5, Arm (Feb. 7, 2024), https://investors.arm.com/static-files/c383780b-44f8-42c0-a125-4f6db0b8eb06 (statement of Rene Haas).

[34] Alex Health, *What Arm's CEO Makes of the Intel Debacle*, The Verge (Dec. 6, 2024, 4:45 PM), https://www.theverge.com/2024/12/6/24315123/arm-ceo-rene-haas-intel-ai-chips-samsung-changes.

[35] *Client Solutions: Arm Compute Subsystems (CSS) for Client*, Arm, https://www.arm.com/products/compute-subsystems-for-client (last visited Dec. 9, 2024).

[36] Matthew Garrahan et al., *Arm To Launch Its Own Chip in Move That Could Upend Semiconductor Industries*, Financial Times (Feb. 13, 2025), https://www.ft.com/content/95367b2b-2aa7-4a06-bdd3-0463c9bad008. According to the report, the chip is "expected to be a [CPU] for servers in large data centres and is built on a base that can

28

intellectual property to positioning itself primarily as a chip designer creates the potential for Arm to make substantially more money:  These businesses "carry significantly higher royalty rates"[37] than merely licensing use of the Arm ISA.

71.74.  But this transformation also brings Arm into direct conflict with existing licensees and customers.  When an architecture licensee like Qualcomm designs a custom Arm ISA-compatible CPU, that CPU does not belong to Arm.  Instead, as Arm has publicly acknowledged, those custom CPUs "compete with" and "pose a threat to Arm's implementation IP business"—that is, Arm's effort to position itself as a designer of CPUs.[38]

72.75.  Arm has thus responded by pressuring customers (such as Qualcomm) to purchase Arm's off-the-shelf CPUs and by attempting to prevent Qualcomm from designing CPUs compatible with the Arm ISA.

### III.    ARM UNFAIRLY AND UNLAWFULLY ATTEMPTS TO PREVENT QUALCOMM'S CUSTOM CORES FROM COMPETING WITH ARM'S OWN OFF-THE-SHELF CORES

73.76.  Developing its own CPUs frees Qualcomm of the need to rely on Arm's off-the-shelf CPU designs.  That can both reduce the royalty rates Qualcomm pays Arm— ████████ ████████████████████████████ —and demonstrate that products using Qualcomm custom CPUs can outcompete products using Arm's off-the-shelf designs.  Instead of lauding the advancements on the horizon or viewing the competition as inspiration to develop an

---

then be customized for clients." ; *Arm releases first in-house chip, with Meta as debut customer,* Katie Tarasov, CNBC, https://www.cnbc.com/amp/2026/03/24/arm-launches-its-own-cpu-with-meta-as-first-customer.html (Mar. 24, 2026).

[37] *Arm First Quarter Fiscal Year 2025* at 5, Arm (July 31, 2024), https://investors.arm.com/static-files/393afe3f-13ff-4aa8-a4b3-41b1afaa5a91 (statement of Rene Haas).

[38] Initial Phase 2 Submission, Anticipated Acquisition by NVIDIA Corp. of ARM Ltd., U.K. Competition & Markets Authority (Dec. 20, 2021) at 6-7.

even better product for customers and opening new product segments for chips compatible with Arm's ISA, Arm has dug its heels in and endeavored to disrupt Qualcomm's custom cores development by any means necessary—unlawful means included.

### A. Arm Wrongfully Withholds Deliverables Owed to Qualcomm Under the QC ALA.

77. In an effort to limit competition posed by Qualcomm's custom CPU, Arm breached its contractual obligations to provide Qualcomm with deliverables paid for under the QC ALA.

#### 1. *The QC ALA requires Arm to provide Qualcomm with certain deliverables.*

78. The two contract provisions at issue here—Sections ▮ and ▮—are clear and unambiguous.

79. Section ▮ of the QC ALA requires Arm to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and to ▮▮▮▮▮▮▮▮▮▮▮▮▮ Arm is also required to deliver ▮▮▮▮▮▮▮▮▮▮▮▮▮ is defined in the Qualcomm ALA as ▮▮▮▮▮▮▮▮▮▮▮▮▮ under that agreement.

80. Under Section ▮ of the QC ▮▮▮▮▮▮▮▮▮▮▮▮▮



30

## 2. **Arm withholds the deliverables.**

~~78.~~81.  Qualcomm first suspected that Arm was withholding ████████████ under the QC ALA in the fall of 2022.  At that time, Qualcomm was embarking on its verification process for its ████ SoC.  As is the customary practice between an ALA licensee and Arm, Qualcomm provided Arm with details about its █████ CPU so that Arm would provide a formal list of agreed Arm Compliance Kit ("ACK") tests for which Arm would expect to see verification data.  But Arm withheld the formal list of tests (known as the "OOB") ████████████████

████████████████████████████████████████████

██████████

~~79.~~82.  Qualcomm then attempted to resolve the issue without court intervention.

~~80.~~83.  On October 6, 2022, Qualcomm requested the OOB and various patches (e.g., bug fixes) from Arm.  Arm engineer Vivek Agrawal responded on October 10, 2022, writing, "I'll be able to share OOB and various patches after my management has given their approval."  Mr. Agrawal's statement concealed the truth: that Arm had made a calculated and improper decision to withhold these deliverables and an approval from management was not forthcoming.

## 3. **Qualcomm provides written notice of Arm's failure to deliver—but Arm does not cure.**

~~81.~~84.  Almost one month later and after still not having received the deliverables under the QC ALA and for which Qualcomm had provided substantial consideration, on November 3, 2022, Qualcomm notified Arm in writing of its failure to provide certain deliverables, including the OOB, stating explicitly that Arm should take the letter as "Qualcomm's required notice under Section █ that Arm is not in compliance with its obligations under Section █, and that Arm must cure this breach in accordance with the time and procedures set forth therein."

31

82.85.  After not hearing from Arm, pursuant to Section ▉ of the QC ALA, Qualcomm sent a follow-up letter on December 5, 2022.  The letter was Qualcomm's "second written notice of non-compliance ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  The letter stated that "ARM must ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ set forth" in the QC ALA "or ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

83.86.  Pursuant to Section ▉ of the QC ALA, Arm ▉▉▉▉ to remedy its failure to provide the deliverable.  ▉▉▉▉ passed without Arm remedying the issue.

84.87.  Arm responded on December 6, 2022.

85.88.  In its response, Arm disagreed that Section ▉ was at issue "or that provision of the OOB implicates Section ▉" Arm additionally asserted that the ACK deliverables are governed by Section ▉ of the QC ALA, not Section ▉ and that remedies for a breach of that section do not include ▉▉▉▉▉▉▉▉▉▉

86.89.  Notably, Arm additionally claimed that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ stating explicitly that Arm ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ As to the OOB specifically, Arm claimed that ▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉

87.90.  Arm was definitive in its assertions, stating that "[n]o additional delivery is required," and "[n]o breach of Section ▉ has occurred."  Qualcomm was unable to verify this assertion because the "patches" are created by Arm and provided solely by Arm.  Accordingly, Qualcomm has no way of knowing definitively whether Arm has released patches for verification until they are delivered (or until someone from Arm tells Qualcomm they are available, which did not occur in this case).

32

88. 91. Arm's letter further stated that Qualcomm "does not have ▮▮▮▮▮▮▮ ▮▮▮▮ rights under its ALA applicable to Nuvia-based technology like the design for which Qualcomm improperly seeks" deliverables. Arm additionally threatened Qualcomm that if it did not drop its invocation of Section ▮, Arm would take steps that would harm Qualcomm. Arm claimed that Qualcomm's invocation of Section ▮ was "a new, material breach of the Qualcomm ALA" and that, to the extent Qualcomm exercised ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Arm would "not hesitate to terminate" Qualcomm's licenses. Arm further stated that Qualcomm's letter was a "malicious effort" to cause Arm "economic duress," which Arm purported was "inconsistent with the language, spirit, and purpose of the ALA and ▮▮▮▮▮▮▮▮▮▮▮

### 4. *Discovery reveals that Arm deliberately withheld the deliverables.*

89. 92. But more than a year later, Qualcomm discovered that Arm's December 6, 2022, letter misrepresented the facts and concealed Arm's strategy of deliberately withholding the OOB and other deliverables to which Qualcomm was entitled, seemingly in an effort to create commercial leverage and cause Qualcomm duress.

90. 93. "On November 2, 2023[,] [] Arm produced a document [in related litigation] describing how Arm intentionally withheld from Qualcomm formal lists of agreed verification ('ACK') tests known as the 'OOB.'" In response to Qualcomm's requests for production, Arm produced an October 2022 email chain in which Richard Grisenthwaite, Arm's Executive Vice President and Chief Architect, explicitly instructed others at Arm not to provide Qualcomm with

the OOB and other deliverables connected to the verification suite.  In the email, Mr. Grisenthwaite stated "if [Qualcomm] complain[s] just say that I am reviewing it with our legal counsel."[39]

91.94.  In addition, "[o]n December 12, 2023, Arm engineer Vivek Agrawal testified at deposition that Arm had withheld from Qualcomm certain ACK 'patches.'"  Mr. Agrawal's testimony and documents made clear that Arm concealed whether it was, in fact, adhering to its contractual obligations by providing some deliverables and support but not providing others (including the OOB and the patches).  Arm's multi-tiered deception was successful for more than a year.  "[I]t was not until Mr. Agrawal's deposition that Qualcomm was able to confirm whether the aforementioned patches even existed, let alone that they were improperly withheld in violation of Section ▮ of the Qualcomm ALA."[40]

92.95.  The applicable Annex 1 to the QC ALA includes the Arm v8-A Architecture

████████████████████████    █████████████████████████████████████

███████████████████████████

---

[39]  On March 5, 2024, Judge Hatcher held a hearing on Qualcomm's motion to amend its counterclaims to include Arm's breach of Section ▮ of the QC ALA.  These allegations and quotations are taken from the redacted and publicly available transcript of that hearing and the Court's subsequent order.  Redacted Mar. 5, 2024 Hr'g Tr., *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1; Redacted Mar. 6 Order, Ex. A. to Pl.'s Ltr. to Hon. Laura D. Hatcher Regarding Redactions to the Mar. 6, 2024 Mem. Order, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 20, 2024), D.I. 303 at ECF p.5.  Notably, at that hearing, Arm advocated against adding this claim to the case in which this discovery was produced; and instead, Arm advocated for Qualcomm to bring a separate lawsuit.  Redacted Mar. 5, 2024 Hr'g Tr. 39:13-20, *Arm* v. *Qualcomm*, D.I. 312-1.

[40]  Redacted Mar. 6 Order at 4, *Arm* v. *Qualcomm*, D.I. 303; *see also* Redacted Mar. 5, 2024 Hr'g Tr. 17:18-19:9, *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 26, 2024), D.I. 312-1 (discussing chart Agrawal used to "clear up his own confusion and make sure there was alignment internally" on what was being withheld from Qualcomm and what was not being withheld; the "top half of the chart [listed] things that sa[id] 'continue support as earlier,'" and "things on the bottom of the chart, which include[d] the OOB and also the patches, sa[id] 'no support unless legal approves.'").

93.96. Accordingly, when it was revealed through document and deposition testimony that, contrary to Arm's December 6, 2022, letter, Arm had deliberately withheld the ACK deliverables to which Qualcomm was entitled, it became clear that Arm breached its obligations under Section ██████████████

94.97. Arm's Chief Legal Officer concealed the facts, explicitly (and definitively) stating in Arm's December 6, 2022, letter that it had provided Qualcomm with ████ to the ACK and that ██████████████████████ Qualcomm did not have a valid basis to dispute that factual representation without discovery.

### 5.    Arm's breach of the QC ALA has harmed Qualcomm.

95.98.  ~~To date,~~ In January 2025, after Qualcomm prevailed in *Arm* ~~still has not provided~~v. *Qualcomm*, Arm stopped withholding delivery of the OOB and relevant patches to which Qualcomm is entitled~~, and~~.   Arm's ~~failure~~prolonged withholding of those deliverables caused harm to ~~do so increased Qualcomm's burden in verification.~~ Qualcomm.

96.99. By failing to deliver the OOB, Arm forced Qualcomm to expend extra time and resources to run ACK tests to verify that its products are compliant with the Arm ISA, even in the absence of the OOB deliverables, which Qualcomm paid for and was entitled to receive under the QC ALA.

97.100.       Similarly, by failing to deliver the patches, Arm forced Qualcomm to use its own engineers to address issues that would have been addressed by Arm's patches, which Qualcomm paid for and was entitled to receive under the QC ALA.  Qualcomm was damaged as a result.

98.101.      ██████████████████████████

99.102. Pursuant to Section ██ of the QC ALA:

35



103.    Accordingly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

104.    In addition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**B.    Arm Fails to Provide Qualcomm With ▮▮▮▮▮▮ Licensing Proposals in Violation of the QC TLA.**

105.    Arm has not only attempted to disrupt Qualcomm's development of custom CPUs but also attempted to interfere with Qualcomm's development of products containing off-the-shelf Arm cores by intentionally failing to provide commercially reasonable, and therefore

████████ licensing proposals to Qualcomm ████████████████████ In addition to the below, Qualcomm expects discovery to show that Arm ████████████████████████████ ████████████ in its licensing negotiations involving peripheral TLA IP.

### 1. *The QC TLA requires Arm to* ████████████████████ ████████████████████████████

~~103.~~106.     The QC TLA contains ████████████████████

████████████████████████████████████████

████████

~~104.~~107.     Section ████ sets forth a series of requirements that Arm must follow for each of its off-the-shelf cores. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

~~105.~~108.     ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

~~106.~~109.     ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ Arm has never provided Qualcomm with written notice that ██

██████████████████████████████████

107.110. ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████

108.111. ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████

██████████████████████████████████
██████████████████████████████████
██████████████

### 2. *Arm fails to respond to Qualcomm's licensing requests.*

109.112. As part of its product development cycle, Qualcomm monitors the terms of licensing agreements to determine whether renewals or extensions of third-party IP will be necessary in order to plan for future product development and sales. Qualcomm has historically licensed and renewed licenses for various ████████████████████ For example, Qualcomm sought to renew licenses to certain ██████████████████████████

██████████████████████████████████

████████████████████

113.    Qualcomm's licenses for all three cores, which were ████████████ licenses entered into in 2019, are set to expire in ████. Given Qualcomm's desire to avoid disruption to its development schedule and roadmap, it began negotiations for new licenses for each core in 2024.

114.    In April 2024, Qualcomm sent Arm written requests to license both ██████ ████████.

115.    Arm failed to respond to Qualcomm's requests, ██████████████████ ████████, and ignored continued outreach from Qualcomm in the subsequent months.

116.    In August 2024, Qualcomm submitted a written request for ██████ Arm failed to respond to this request as well.

117.    Faced with Arm's continued non-compliance and the potential impact to its roadmap, Qualcomm sent Arm a notice of non-compliance with Section ██ of the QC TLA (including ██████████ in September 2024. Qualcomm told Arm that the letter "serves as Qualcomm's written notice of ARM's breach of, and non-compliance with, ██████████ of the TLA." The letter asked that "ARM provide the requested core license immediately and in accordance with the terms and conditions of the TLA as required by ████████████ of the TLA, or Qualcomm will be forced to exercise its remedies under the TLA."

118.    Once again, Arm failed to respond. A week later, Qualcomm wrote to Arm again, informing Arm of the "second written notice of breach and non-compliance in accordance with the notice process set forth in Section ██ of the TLA."

**3.    Arm fails to provide ████████ licensing terms to Qualcomm.**

119.    Nearly four weeks later, Arm finally responded to Qualcomm's notice of non-compliance. In its October 23, 2024 letter, Arm ████████████████████████

39

███████████████ Instead, Arm told Qualcomm that it did not ████████████

████████████████████████████████████

117.120.    In connection with the letter, Arm provided offers to the requested cores that Arm claimed were █████████████████████████████████████ However, not only was this untrue, but also Arm's proposal contained terms so unreasonable that it was a constructive failure to license.

118.121.    The financial terms that Arm provided for the three requested cores were commercially unreasonable, exorbitant, and ████████████ For example, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████ was not justified by any change or improvement in the technology and is grossly inconsistent with the market for any comparable technology. Arm was aware of the unrealistic terms of its proposal, which Arm acknowledged it only provided because of Qualcomm's notice of non-compliance with Section █████████████████████████████████████

████ This constructive failure to offer a license to the requested cores violated the terms of the QC TLA.

119.122.    Arm's proposal also violated the QC TLA requirement under Section

████████████████████████████████████████████████

████

120.123.    Furthermore, by ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

#### 4. *Qualcomm has been harmed by Arm's TLA violations.*

124. As a result of Arm's exorbitant proposal, Qualcomm has been forced to proceed in development of SoCs without knowing what CPUs it will be using after the licenses to ██████████████ expire.

125. Due to the development lifecycle for semiconductor chips, Arm's ███████ refusal to offer licenses and to change ████████████ of its licensing offers is already impacting Qualcomm. Qualcomm must undergo reviews of its planning roadmaps to ensure that it will have suitable CPUs for its customers. This effort requires (i) that additional resources be shifted to design custom CPUs for each of its semiconductor chips (ii) that Qualcomm allocate resources to identify workarounds based on RISC-V and redesign products to function with a different microprocessor design, or (iii) rely on older, less competitive versions of Arm CPUs that Qualcomm has licensed.

126. The QC TLA sets forth the remedies for Arm's violations.

127. ██████████████████ states that Qualcomm may seek ████████



128. In addition, Section ██ of the QC TLA states:



41

126.129.    Qualcomm sent its first notice of breach on September 20, 2024 and its second notice on September 27, 2024.  Arm's purported offer in response to Qualcomm's notices was dated October 24, 2024.  To date, Arm has failed to provide any commercially reasonable, ████████ offer and, as such, has failed to remedy its breach within the ████████████

127.130.    Qualcomm is entitled to ████████████████ under both the QC TLA and QC ALA for a period of ████████████████████████████████ ████████████████████████████████████████████████ While Qualcomm will continue to ████████████████ until Arm's breach of the QC TLA is finally resolved, Qualcomm believes that Arm is not entitled to receive those ████████████████ ████████████████ pursuant to the QC TLA and ALA ████████████ ████████████████████████████. For this reason, Qualcomm does not believe that any ████████████████████████

## C.    Arm Refuses to Negotiate a License to the Latest Version of Its ISA ████████ ████████

128.131.    Arm has not only taken steps to destroy or delay Qualcomm's present development efforts.  It has also tried to hamstring Qualcomm's future development efforts by failing to negotiate a license to future versions of the Arm Architecture.

129.132.    In addition to failing to provide the deliverables ████████████████ and constructively failing to offer licensing proposals ████████████ Arm has also refused to negotiate an extension of ████████ to cover future versions of ████████████████ ████████ requires it to do.

133.    As noted, Section ████████ of the QC ALA ████████████████ ████████████████████████████████████████████████ ████████ Qualcomm has ████████████████████████████

130.134.    Additionally, Section ████████ of the QC ALA ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

135.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

136.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

131.137.    On April 17, 2020, a Qualcomm employee emailed an Arm counterpart to ask if Arm was working on a new version (v10) of the Arm ISA to replace v9 and explained that the request was made in the context of ████████████████████████████ ████████████    The Arm employee responded the following week that █████████ ████████████████████████████████████████████████████ ████████████████████████    would expire but that there was █████████ ████████████████████████████████

43

132.138.    On May 20, 2020, Qualcomm emailed Arm stating that Qualcomm █████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

139.    Arm never responded to that email ███████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████

140.    Between the filing of *Arm* v. *Qualcomm* in 2022 and 2025, Arm excluded Qualcomm from the Arm Partner Meetings that its other licensees are invited to attend, along with certain other industry participants.  At these meetings, Arm provides confidential updates on its architecture development.  By excluding Qualcomm, Arm prevented Qualcomm from learning about the ███████████ at the same time and to the same extent as Arm's other licensees. Arm did not allow Qualcomm to attend Arm Partner Meetings again until 2025, after Qualcomm defeated Arm's claims at trial.

141.    ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████    That was the first information Qualcomm received

44

45

about Arm working on v10.  It was not clear at that point when Arm would start commercial negotiations for v10.

142.    In October 2024, █████████████████████████████████ ████████████████

143.    In April and May 2025, Qualcomm wrote to Arm█████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

144.    On June 4, 2025, Arm wrote to Qualcomm that ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

145.    On June 13, 2025, Arm wrote to Qualcomm ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

45



146.

147.

148.

149.     Arm's position regarding Qualcomm's ALA rights has meant that, while Arm has feigned engaging in negotiations with Qualcomm ▇▇▇▇▇▇▇▇▇▇▇▇ Arm maintains it is ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

46

150.    On August 8, 2025, after Arm failed to make an offer, Qualcomm sent Arm an opening offer. ███████████████████████████████████████████

███████████████

151.    On August 29, 2025, Arm responded with a letter but did not counter Qualcomm's offer. ████████████████████████████████████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

152.    Arm further asserted ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

47

153.     Arm did not correspond with Qualcomm about v10 again until December 10, 2025. At that point, it *still* did not make an offer. ████████████████████████

██ ██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

154.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

155.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Arm refused to provide Qualcomm with any information to support those assertions.

156.    On January 26, 2026, Qualcomm met with Arm to discuss v10. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

48

███████████████████████████████████████████████████████████████████

█████████████████

157.    On February 24, 2026, Qualcomm attended a "TAB" (Technical Advisory Board)
meeting.  ████████████████████████████████████████████████████

158.    Arm announced at the TAB meeting ████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████

159.    Also at the TAB meeting, ██████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████—Arm's continued refusal to negotiate in good faith for v10 is harming
Qualcomm.

160.    On March 19, 2026, Arm sent another letter to Qualcomm ██████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████

161.    In its letter, Arm ██████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

49

162. ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

163. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

164. ████████████████████████████████████

█████████████████████████████████████████

165. Arm also failed in its March 19 letter ████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

50

███████████████████████████████

███████████████████████████████

████████

133.166.    There is no replacement or substitute for a v10 license, and Arm's failure to negotiate in good faith cannot be remedied with damages.

134.167.    Arm's actions underscore its strategy of attempting to eliminate existing ALAs and to force Qualcomm and other licensees to use Arm's off-the-shelf CPU designs—or to cease designing Arm-compatible chips entirely.

**D.    Arm Engages in a Campaign to Undermine Qualcomm's Customer Relationships.**

135.168.    In addition to the breaches described above, Arm has also deliberately sought to impair Qualcomm's standing and relationships with current and prospective customers. As Qualcomm has detailed, Arm, through its leadership and through SoftBank and Son, has engaged in a misinformation campaign to mislead Qualcomm's customers into believing that Qualcomm will not be able to deliver licensed Arm-compatible products after 2024, and that Qualcomm customers must obtain their own direct licenses from Arm.[41]  That misinformation campaign included multiple rounds of letters to Qualcomm customers misleadingly claiming that Qualcomm had breached its ALA and suggesting that customers could face legal jeopardy from using Qualcomm products.  More recently, Arm began "ratcheting up the pressure" on Qualcomm in *Arm* v. *Qualcomm*,[42] and Arm continued this misinformation campaign by declaring without

---

[41]    Defs.' Answer and Defenses to Pl.'s Compl. & Jury Demand & Defs.' 2d Am. Countercls. ¶¶ 255-70, 275(b)-(d), *Arm Ltd.* v. *Qualcomm Inc.*, C.A. No. 22-1146-MN (D. Del. Mar. 13, 2024), D.I. 300.

[42]    Oct. 30, 2024, Hr'g Tr. 34:6, *Arm Ltd. v. Qualcomm, Inc.*, C.A. No. 22-1146 (D. Del. Nov. 7, 2024), D.I. 513.

basis that Qualcomm has materially breached the QC ALA and leaking the Breach Letter. By doing so, Arm has caused tangible harm to Qualcomm's customer relationships.

> **1.    Arm repeatedly attempts to interfere in Qualcomm's customer relationships.**

136.169.    On August 31, 2022, Arm commenced *Arm* v. *Qualcomm* in the U.S. District Court for the District of Delaware. In that action, Arm alleges that Qualcomm and NUVIA breached the NUVIA ALA by not destroying all design work undertaken by NUVIA pursuant to its license with Arm following Qualcomm's acquisition of NUVIA.

137.170.    On the same day that Arm filed that action, it launched a premeditated campaign to blitz Qualcomm's customers with letters publicizing the lawsuit. As Mr. Haas admitted under oath at trial, Arm sent letters to top executives at 37 companies that were customers of both Arm and Qualcomm. In those letters, Arm stated that Qualcomm had breached the terms of "the Arm license agreement," implying that Qualcomm had breached its own ALA. That was misleading: Arm's complaint in the *Arm* v. *Qualcomm* action accused Qualcomm and Nuvia of breaching the *Nuvia* ALA and never accused Arm of breaching the *Qualcomm* ALA. Mr. Haas thus also admitted under oath that the letter "should have said" that Qualcomm had supposedly breached the Nuvia ALA, not Qualcomm's "Arm license agreement."

138.171.    Additionally, the August 31 letters asserted that Arm would ███████ ████████████████████████████████ and thus (despite assuring customers that there would be ████████████████████████████████ suggested that companies could face legal jeopardy if they used the Qualcomm products that incorporated Nuvia technology. The letter attached a letter from Arm's general counsel to Qualcomm's general counsel that made this point explicitly, asserting ████████████████████████████████

52

███████████████████████████████████████████████████████████████

██████████████████████████████

172.    Eight months later, in May 2023, Arm launched another round of customer letters. Arm executive Will Abbey sent a series of additional letters to key Qualcomm customers ███████████████████████████████████████████████████████ Mr. Haas agreed at trial that there was no independent event that triggered Arm's decision to send these letters. That letter stated that Qualcomm's designs based on Nuvia technology, specifically including the Phoenix core, "can no longer be used and must be destroyed." Mr. Haas also agreed at trial that it was very important to Arm to tell customers that it was demanding destruction of technology. The letter extensively quoted from Arm's prior threat letter to Qualcomm but did so in a manner intended to convey that it was quoting from a contract between Qualcomm and Arm that specifically required Qualcomm to cease using "Arm-based technology" developed by Nuvia and to destroy such technology. In fact, no such contract existed, and the intended implication of quoting that language was thus false. Mr. Haas admitted at trial that he was "quite confused" by the language of the letter and agreed that the letter was "misleading."

173.    Like the prior letters, the May 2023 letters reassured customers that there would be no disruptions to their partnership with Arm, but only if that partnership was ███████ ██████████ It also offered to answer questions that customers might have regarding how the litigation might impact the availability of licensed Arm technology going forward, which necessarily implied that the litigation could impact the availability of the Qualcomm products that Arm claims were unlicensed.

### 2.    *Arm waits years before taking steps to terminate the QC ALA.*

174.    Although Arm now asserts that Qualcomm is in material breach of the QC ALA, Arm waited years before taking any steps towards terminating the QC ALA. When it filed

53

the *Arm* v. *Qualcomm* action, Arm neither alleged that Qualcomm had breached the QC ALA nor sent Qualcomm any notice to that effect ████████████████████████████████████████ ████████.

142.175.    On September 30, 2022, Qualcomm answered Arm's complaint in *Arm* v. *Qualcomm* and filed a Counterclaim against Arm seeking, among other things, a declaratory judgment that its conduct was fully licensed under the QC ALA, and that it could "continue to develop and sell chips free from challenge that its actions are in violation of the Qualcomm ALA" or any other relevant agreement with Arm.  When Arm answered that counterclaim, it generally alleged that Qualcomm was breaching the QC ALA, though it did not send Qualcomm any written notice to that effect ████████████████████████.

143.176.    On March 13, 2024, Qualcomm filed its second amended counterclaims in *Arm* v. *Qualcomm*.  Arm answered on April 4, 2024, and again alleged that Qualcomm was breaching the QC ALA, entitling Arm to terminate that agreement.  Again, however, Arm did not send Qualcomm any written notice to that effect █████████████████████.

### 3.    *Arm's Breach Letter groundlessly asserts that Qualcomm is in material breach of the QC ALA.*

144.177.    It was not until more than seven months later, on October 22, 2024, that Arm sent Qualcomm the Breach Letter, which purported to provide notice to Qualcomm ██████ ██████████████████████████ that Qualcomm is in material breach of that agreement.

145.178.    The Breach Letter asserted that the QC ALA authorizes Qualcomm solely "to develop, verify, and sell designs for CPUs … that use, rely on, or derive from Arm technology *delivered by Arm to Qualcomm* and *developed by Qualcomm employees*, not third parties."[43]  It

---

43    Ex. A at 1 (emphasis added).

did not attribute these assertions to any particular provision of the QC ALA but instead cited a string of contract sections. ████████████████████████████████████████ ████████████████████████████████████████ ███████████████ The Breach Letter also referred generally to "Annex 1," a lengthy document describing ███████████████████████ But nowhere in the Breach Letter did Arm identify any provision of the QC ALA that imposes the particular obligations Arm asserts in the Breach Letter.

~~146.~~179.      In the Breach Letter, Arm claimed that Qualcomm "systematically and willfully breached these obligations" by "develop[ing] CPUs and market[ing] multiple products that contain CPUs that use designs, technology, and code created by Nuvia employees at the time when Nuvia was a third party."[44]  The Breach Letter thus reprised the same arguments it has made in *Arm* v. *Qualcomm* about the NUVIA ALA: in essence, that Qualcomm somehow breached the *NUVIA* ALA by developing CPUs in part by using technology created by and acquired from NUVIA.  Arm has not explained in that litigation and did not explain in its Breach Letter how Qualcomm allegedly breached any provision in the *QC* ALA by developing CPUs in the manner it did.  In short, there is a reason why Arm's purported notice letter failed to state clearly which express contractual provision Qualcomm materially breached, or when or how Qualcomm breached any such provision: None exists.

~~147.~~180.      Having invoked Section ██████ of the QC ALA, Arm's Breach Letter demanded that Qualcomm "cure" the alleged breach(es) within 60 days, including by stopping the development of "Nuvia designs" and the manufacture and sale of Qualcomm CPUs that allegedly "use Nuvia designs or technology."  The Breach Letter further demanded that Qualcomm "cure" the alleged breaches by withdrawing its complaint in this Action against Arm.  And the Breach

---

[44]   *Id.*

Letter asserted that if Qualcomm does not "cure" the alleged breaches in this manner within 60 days, Arm would be entitled to immediately terminate the QC ALA.

148.181.      The "cures" that Arm demanded in its Letter—other than the dismissal of this Action—are the same remedies that Arm has requested in *Arm* v. *Qualcomm*.  By sending the Breach Letter, Arm attempted to pressure Qualcomm to yield to its demands regardless of the outcome of *Arm* v. *Qualcomm*, as well as this case, before the former went to trial.

149.182.      The timing of the Breach Letter belied Arm's assertion that Qualcomm has materially breached the QC ALA.  Arm knew about Qualcomm's acquisition of NUVIA in 2021, and asserted in its November 2022 Answer to Qualcomm's Counterclaim that Qualcomm was supposedly in breach of the QC ALA.  Yet before sending the October 22, 2024, Breach Letter, Arm never even attempted to provide the notice ███████████████ that Qualcomm had supposedly breached the agreement.  Quite to the contrary, Arm *celebrated* Qualcomm's development of the Snapdragon® X Elite SoC that contains CPU designs whose development Arm now claims breach the QC ALA, with Arm's CEO stating that Arm was "very excited to see the announcement of the brand new Windows on Arm PCs that run Copilot, true AI PCs."[45]  In the Breach Letter, Arm nowhere explained why it waited more than three years after Qualcomm allegedly breached the Nuvia ALA before it provided notice of an alleged breach of the QC ALA.

150.183.      Because Qualcomm did not materially breach the QC ALA, Arm did not identify any valid grounds on which to terminate the QC ALA, and any purported termination based on the Breach Letter is null and void.

---

[45] *Arm First Quarter Fiscal Year 2025*, at 3.  Mr. Haas further commented that "the products that are out today are using the most advanced Arm technology," because they "are optimized with Microsoft for the most effective battery life on the planet." *Id.* at 10.

56

#### 4. *Arm leaks the Breach Letter to harm Qualcomm's customer relationships.*

~~151.~~184.     Arm's assertion that Qualcomm was in material breach not only lacked legal or factual basis, but was also made in a manner calculated to damage Qualcomm's customer relationships.  Arm's claim that it has the authority to terminate the QC ALA was false, wrongful, and calculated to pressure Qualcomm to accede to Arm's demands and to prevent Qualcomm from gaining new business opportunities.

~~152.~~185.     From October 21–23, 2024, Qualcomm hosted its annual Snapdragon® Summit.  At that Summit, Qualcomm unveiled new technology, including its new Snapdragon® 8 Elite Mobile Platform, an SoC featuring Qualcomm's custom-built, second-generation Qualcomm Oryon™ CPU.  That SoC delivers significant performance and efficiency improvements over competitors, ███████████████████████████

~~153.~~186.     Arm issued its Breach Letter on October 22, 2024, in the middle of the Snapdragon® Summit.  That timing was no accident, but was an intentional Arm media stunt intended to embarrass Qualcomm and to interfere with its relationships with its current and potential customers and business partners, including by creating unwarranted uncertainty about Qualcomm's ability to continue delivering licensed Arm-compatible products.

~~154.~~187.     In addition to sending the Breach Letter to Qualcomm, Arm also leaked the Breach Letter or its contents to Bloomberg, which published a story that same day.[46]  The story was based on and referred to "a document seen by Bloomberg."  On the afternoon of October 22, 2024—the same day Qualcomm received the Breach Letter—a Bloomberg reporter contacted Qualcomm requesting comment on Arm's having sent Qualcomm a "60-day letter" notifying Qualcomm that it was purportedly in breach of the QC ALA.  The reporter was familiar with details

---

[46]   See Ian King, *supra* note 11.

57

of the letter.    Later that day, Bloomberg published its story reporting on Arm's purported cancellation of the QC ALA.[47]  The story relayed details about the Breach Letter "according to a document seen by Bloomberg."  Because Qualcomm did not leak the Breach Letter, the Letter could have reached Bloomberg only if it had been leaked by Arm.

155.188.        Arm leaked the Breach Letter to distract from the Snapdragon® Summit and the groundbreaking products released at the Summit, and to ensure that the attention of Qualcomm's customers and business partners focused on the parties' licensing dispute rather than on Qualcomm's products, which pose a threat to Arm's own competitive ambitions.  The leak of the Breach Letter thus further demonstrated Arm's deliberate efforts to interfere with Qualcomm's customer relationships.

### 5.        *Arm's leak of the Breach Letter harms Qualcomm.*

156.189.        The release of the Breach Letter has caused Qualcomm harm, by impairing its relationships with current and prospective customers and interfering with its future business opportunities.

157.190.        Following Bloomberg's publication of the news story about the Breach Letter, multiple Qualcomm customers and business partners have contacted the company to express concern about the Breach Letter.  As a result of the Breach Letter—and, in particular, Arm's baseless assertion that it can terminate the QC ALA—several Qualcomm customers have deferred finalizing pending business agreements pending resolution of the *Arm* v. *Qualcomm* litigation and until Qualcomm provides them with reassurances that it will be able to provide licensed Arm-compliant products.

---

[47]    *Id.*

158.191.        For example, a major customer (the "Smartphone Company") had informed Qualcomm that it was designing a new mobile phone that would rely on Qualcomm's innovative Snapdragon® 8- Elite SoC.  After learning that Arm was threatening to terminate the QC ALA, however, a senior executive of the customer informed a senior Qualcomm executive that the customer's legal and intellectual-property teams would need to confer with their counterparts at Qualcomm.  The Smartphone Company has also insisted on Qualcomm's providing additional reassurances before it will extend its existing business relationship with Qualcomm.

159.192.        Additionally, a potential customer (the "AI and Ecosystem Company") that currently relies on a competitor's chips for its substantial processing needs was in the process of reaching an agreement with Qualcomm to design a custom chip for the customer based on Qualcomm's custom-built CPU.  After the Breach Letter was published, the customer delayed finalizing a termsheet for an agreement under which Qualcomm would design that custom chip and requested inclusion of language related to Qualcomm's chip development capabilities.  The AI and Ecosystem Company has stated to Qualcomm that before it finalizes that termsheet, it must first understand the implications of termination of the QC ALA on Qualcomm's ability to deliver the custom chips in question.  As a result of the uncertainty stemming from Arm's assertion and leak of the Breach Letter, there was a delay in Qualcomm's ability to finalize this valuable opportunity.

160.193.        Simultaneous with its actions that have set back Qualcomm's efforts to finalize a deal with the AI and Ecosystem Company, Arm is also attempting to supply the AI and Ecosystem Company directly.  Despite Arm's insistence at trial in *Arm* v. *Qualcomm* that it does not make chips, it was recently reported that Arm had reached an agreement with the AI and Ecosystem Company under which Arm would begin producing its own chips for use in a datacenter

operated by the AI and Ecosystem Company.[48]  Arm has thus not only delayed Qualcomm's efforts to finalize a contract with the AI and Ecosystem Company but has separately developed its own datacenter chips that it is trying to sell to the same company.

~~161.~~194.    Arm leaked the Breach Letter at a time when it knew that the Smartphone Company is an existing customer of Qualcomm and when it knew or should have known that the AI and Ecosystem Company was a customer of Qualcomm or was likely to be absent Arm's interference.  On information and belief, Arm leaked the Breach Letter knowing (or in circumstances in which it should have known) that its wrongful threats to cancel the QC ALA would disrupt those customer relationships and that Qualcomm was likely to be harmed as a result.

### 6.    *Arm's withdrawal of the Breach Letter offers no assurance that Arm will not attempt to terminate the QC ALA.*

~~162.~~195.    Following Qualcomm's victory at trial in *Arm* v. *Qualcomm*, on January 8, 2025, Arm Chief Legal Officer Spencer Collins sent Qualcomm a letter (the "Notice") withdrawing the Breach Letter and stating ████████████████████████████████ ████████████████████████████████████████████████████████████ The Notice also ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████    The Notice asserted, however, that Arm ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████    The Notice thus indicated that Arm was pausing its efforts to terminate the QC ALA, but in no way suggested that Arm had any plan to abandon its long-term efforts to force Qualcomm to use Arm off-the-shelf

---

[48] Reuters, *Arm Secures Meta as First Customer for Ambitious New Chip Project, FT Reports* (Feb. 13, 2025).

60

cores and to block Qualcomm from creating and delivering products using its own custom cores (or indeed, any chips that might compete with Arm's own offerings).

~~163.~~196.     Arm also sought to prevent Qualcomm from addressing the uncertainty created by Arm's own leak of the Breach Letter.  Despite leaking that letter to the press, Arm ████████████████████████ thereby attempting to limit Qualcomm's ability to disclose the letter.  Arm authorized Qualcomm to ███████████████████████████████ ████████████ thereby seeking to obstruct Qualcomm from communicating about the letter publicly or with potential customers or other business partners.

## IV.    ARM'S WELL-ESTABLISHED EFFORTS TO LIMIT INNOVATION AND RESTRICT COMPETITION ARE HARMFUL TO THE INDUSTRY

~~164.~~197.     Arm's efforts to interfere with Qualcomm's CPU innovations and stifle competition must come to an end.  Despite Arm's CEO's sworn testimony to the contrary, it is clear that Arm seeks to take control of the semiconductor industry and will do whatever it takes to undermine and dominate the companies that it once treated as partners.

~~165.~~198.     Arm's tactics violate basic contract principles and are directly contrary to the purpose of the QC ALA, which will have little value if licensees cannot rely on executed ALAs to receive the deliverables and ████ they bargained for without fear that Arm will unilaterally abdicate its contractual obligations in an effort to disrupt a licensee's innovation if Arm views the licensee as an unacceptable competitor.  ALA licensees must be assured that they can freely develop custom cores (at their own risk and expense) and that their success in so doing will not be used against them.

~~166.~~199.     The assault on Qualcomm's business through the improper refusal to provide commercially reasonable, ████████ licensing offers under the QC TLA likewise threatens reliance on the Arm ecosystem and the fundamentals of licensing.  Licensees enter into

TLAs with Arm under the assumption that they will be joining a collaborative and open ecosystem and will be able to license the IP necessary to compete and grow in the market. Arm's transformation into a chipmaker, combined with its throttling of the delivery of critical IP, is a dramatic reversal of Arm's longstanding business model that endangers the semiconductor industry and the manner in which its participants interact.

## V. ARM DELIBERATELY BLURRED AND FAILED TO DISTINGUISH ENTITIES WITHIN ITS CORPORATE STRUCTURE

167.200.    Arm has repeatedly attempted to blur the lines between the various entities in its corporate structure in order to prevent Qualcomm from pursuing its legal claims.

168.201.    Qualcomm previously filed suit in Delaware on April 18, 2024, alleging identical ALA breach claims as in this Complaint, against "Arm Holdings plc f/k/a Arm Ltd." with the understanding that Arm Ltd. had changed its name to Arm Holdings plc during its IPO and corporate restructuring. *See Qualcomm Inc. v. Arm Holdings plc f/k/a Arm Ltd.*, C.A. No. 24-490-MN (D. Del.) (hereinafter "*Qualcomm v. Arm*").

169.202.    On December 16, 2024, Qualcomm filed a First Amended Complaint, again styled against "Arm Holdings plc f/k/a Arm Ltd.", adding the tortious interference and California Unfair Competition claims present in this complaint.

170.203.    On March 27, 2025, Qualcomm filed a motion for leave to amend and a draft Second Amended Complaint, again styled against "Arm Holdings plc f/k/a Arm Ltd.", that included the TLA claims present in this complaint.

171.204.    On June 3, 2025, the Court granted Qualcomm's motion for leave to amend.

172.205.    On June 17, 2025, Arm filed an answer to the Second Amended Complaint and raised for the first time a defense that Arm Holdings plc is not a party to the ALA and TLA and therefore that Qualcomm had failed to state a claim.[49]

173.206.    Although Arm stated in certain filings that Arm Holdings plc was not formerly known as Arm Ltd., Arm's conduct did not suggest that Arm believed Qualcomm's claims had to be asserted against Arm Ltd. and not Arm Holdings plc, including because Arm did not raise any related defense in its three motions to dismiss, its motions for summary judgment, or its opposition to Qualcomm's motion for leave to amend the First Amended Complaint.  Arm also made repeated contradictory representations.  For example, Arm waived service for "Arm Holdings plc f/k/a Arm Ltd.", many of its attorneys appeared on behalf of "Arm Holdings plc f/k/a Arm Ltd.", and its counsel signed stipulations and certificates of service for court filings on behalf of "Arm Holdings plc f/k/a Arm Ltd."

174.207.    Arm also agreed to the use of discovery produced by Arm Ltd. in *Arm v. Qualcomm* in *Qualcomm v. Arm*.

175.208.    Based on information provided by Arm in discovery, Qualcomm sought consent from Arm to name Arm Ltd. as a separate defendant on July 2, 2025.

176.209.    Despite repeatedly making contradictory representations whether Arm Holdings plc was distinct from Arm Ltd., Arm refused to consent, and Qualcomm promptly filed a motion to amend its Second Amended Complaint to add Arm Ltd. as a party.

210.    The Special Master did not rule on Qualcomm's motion for leave to amend for five months.  She denied that motion on January 7, 2026.

---

[49]    Qualcomm disagrees with Arm's assertion that Qualcomm's ALA and TLA claims cannot proceed against Arm Holdings plc.

211.    Qualcomm filed the instant case against Arm Ltd. on January 8, 2026.

## COUNT I

### (Declaratory Judgment)

~~177.~~212.    Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

~~178.~~213.    Plaintiffs are entitled to a declaratory judgment that:

A.    Arm breached the QC ALA by withholding ██████████ that Arm was obligated ██████████████ to deliver under Section █ of the QC ALA, and by withholding ██████ Arm was required to deliver ██████████ under Section █ of the QC ALA;

B.    As a result of Arm's breach of Section █ of the QC ALA, Qualcomm is entitled to ██████████ ████████████

C.    Qualcomm's ██████████ of the QC ALA includes ██████████

D.    Negotiations between Arm and Qualcomm over a v10 license are subject to ██████████ ████

E.    Arm breached the QC ALA by refusing to honor Qualcomm's ██████████ of that agreement ██████████ and by failing ██████████ ██████████ as is required by ██████████

~~C.~~F.    Arm breached the QC TLA by ██████████ including ██████████ in violation of ██████████ of the QC TLA.

~~D.~~G.    As a result of Arm's breach of Section █ of the QC TLA, ██████████ including ██████ and ██████

64



E.H.    Arm breached the QC TLA by ████████ including ██████ and ████████ of the QC TLA.

F.I.    As a result of Arm's breach of Section ██ of the QC TLA, ████████████████████

G.J.    Arm breached the QC TLA by ████████ including ████ with ████████ of the QC TLA.

H.K.    As a result of Arm's breach of Section ██ of the QC TLA, ████████████████

I.L.    Qualcomm has not breached the QC ALA as asserted in the October 22, 2024, Breach Letter; and

J.M.    Arm is therefore not entitled to terminate the QC ALA.

179.214.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-02) concerning this matter is necessary and appropriate so that Qualcomm can confirm its belief that ████████████████████████████████████

180.215.    A valid and justiciable controversy exists between Qualcomm and Arm because ████████████████████ is threatening to terminate the QC ALA if Qualcomm ████████ pursuant to Section ██ of the ALA.

181.216.    A declaratory judgment is also necessary and appropriate so that Qualcomm may ascertain Arm's obligations and Qualcomm's rights and obligations under the QC ALA and clear any cloud that may exist over its business as a result of Arm's false assertions of breach and threats to terminate the QC ALA.

182.217.    A valid and justiciable controversy exists between Qualcomm and Arm because Arm has asserted that Qualcomm is in breach of the QC ALA and has asserted that Arm has the right to terminate the QC ALA on December 21, 2024. Qualcomm disputes both assertions. Qualcomm also reasonably expects that Arm would attempt to use its purported termination to damage Qualcomm with its customers, in the media, and with analysts, in light of Arm's behaviors to date.

## COUNT II

### (Breach of Section ███ of the QC ALA)

183.218.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

184.219.    The QC ALA is a valid, binding contract.

185.220.    Arm failed to fulfill its obligation under Section ███ of the QC ALA because it intentionally withheld from Qualcomm certain ████████████ to which Qualcomm was entitled, including the OOB and certain "patches" used for verification.

186.221.    Accordingly, Arm did not ████████████████████████████████████████████████████████████████████████████████ or ████████████████████████████████████████████ ████████████████████████ or ████████████████████████████████████ ████████████████████████████████████ as is required by Section ███ of the agreement.

187.222.    Arm's failure to comply with its contractual obligation to timely deliver bargained-for technology was not only intentional, but it was also done with an intent to deceive Qualcomm.

66

188.223.    Qualcomm put Arm on written notice of this violation and Arm  as is required under the contract.

189.224.    Arm's breach of Section ███ of the QC ALA entitles Qualcomm

190.225.    As a proximate result of Arm's breach of contract, Qualcomm has been damaged both (i) by delay that could have been avoided had Arm fulfilled its obligations, (ii) by costs and expenses incurred by Qualcomm expending extra time and resources to run the ACK tests to verify that its products are compliant with the Arm ISA and use its own engineers to address issues that would have been addressed by Arm's patches, and (iii) by

not misrepresented its compliance with the parties' agreement.

## COUNT III

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

191.226.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

192.227.    Under California law, every contract implies a covenant for each party not to do anything that will deprive the parties of the benefits of the contract.

193.228.    At all relevant times, Arm agreed and was required by law to act fairly and in good faith with respect to its obligations under the QC ALA and TLA.

229.    Arm breached this implied covenant of good faith and fair dealing under both agreements. Arm has not only taken action in breach of specific language of the QC ALA and TLA, as detailed above and below, it has gone farther by taking action to deny Qualcomm the bargained-for benefits of these contracts. Arm's actions have thus unfairly frustrated an essential

67

purpose of the QC ALA and TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm.

~~194.~~230.      For example, under the ALA: Arm withheld deliverables that it was required to provide Qualcomm under the QC ALA; asserted, without valid basis under the QC ALA, that Qualcomm was supposedly in material breach of that agreement; sent letters to Qualcomm customers and leaked the Breach Letter to the media to create uncertainty about Qualcomm's ability to provide its customers with products containing custom CPUs; and failed to negotiate an extension to the QC ALA that would cover future ~~version~~versions of the architecture, including v10~~, and failed to~~.  With respect to v10, Arm's conduct did more than breach the language of ███████ of the QC ALA.  Arm also sought to limit Qualcomm's license rights to outdated technology, thus frustrating a central purpose of the QC ALA as a whole.  Under the TLA, Arm, for example, failed to provide ██████ licensing proposals for Arm Implementation Cores ████████████████ to Qualcomm ~~in violation of provisions of the QC TLA~~and failed to provide a ██████ licensing proposal for the peripheral IP products the ███ █████████████████.

231.    Through these actions, Arm failed to take steps each contract presupposed it would do to accomplish the contract's purpose.

~~195.~~Arm's actions have been willful and carried out in bad faith, as part of an effort to enable Arm to disregard the QC ALA and TLA so that it can prevent Qualcomm from competing with Arm's sale of its own CPU and other chip designs, or, at a minimum, coerce into renegotiating the QC ALA so that Arm can extract payments from Qualcomm that exceed those due under the QC ALA.

196.232.    Arm's actions have unfairly frustrated the essential purposes of the QC ALA and TLA, and have prevented Qualcomm from obtaining the reasonably and justifiably intended and expected benefit of its bargain with Arm, including the right to produce and sell custom CPUs that are compatible with the Arm ISA ████████████████████████ ████████

197.233.    For at least the foregoing reasons, Arm has breached the implied covenant of good faith and fair dealing for both the QC ALA and TLA.

198.234.    As a proximate result of Arm's breach of the implied covenant of good faith and fair dealing, Qualcomm has been injured in its business or property, and is threatened by imminent loss of profits and loss of actual and potential customers and business opportunities.

### COUNT IV

**(Intentional Interference with Prospective Economic Advantage)**

199.235.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

200.236.    Qualcomm has economic relationships with customers that rely on Qualcomm's technology to meet their business needs, including the Smartphone Company and the AI and Ecosystem Company referenced above.

201.237.    Absent Arm's interference, these relationships would likely result or would have likely resulted in profitable business opportunities for Qualcomm, most notably for Qualcomm to sell its customers particular SoCs to support those customers' business operations. These relationships are sufficient to support an intentional-interference claim because the Smartphone Company is already a major Qualcomm customer, while the AI and Ecosystem Company operates a large number of datacenters, is a large buyer of datacenter hardware, and had

reached a nearly final termsheet with Qualcomm before Arm's interference sabotaged that business relationship.

202.238.     Arm knew of these relationships but nevertheless engaged in conduct aimed at interfering with Qualcomm's business opportunities, including by (a) purporting to give notice that it "shall be entitled" to terminate the QC ALA based on nonexistent alleged material breaches of the QC ALA; (b) deliberately leaking the Breach Letter in the middle of Qualcomm's Snapdragon® Summit; and (c) making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

203.239.     Arm's interference with Qualcomm's business opportunities was wrongful. For example, as explained below, Arm's conduct represented unfair business acts and practices in violation of California law.

204.240.     By engaging in this conduct, Arm intended to disrupt these relationships or knew that disruption of these relationships was certain or substantially certain to occur.

205.241.     As a result of that conduct, these relationships have in fact been disrupted. The AI and Ecosystem Company has delayed finalizing a valuable and nearly final agreement with Qualcomm that it would have finalized absent Arm's interference, and subsequently finalized a substitute contract with Arm instead, and the Smartphone Company has likewise delayed extending its business relationship with Qualcomm pending additional assurances.  As a result of these delays and interruptions in its business relationships, Qualcomm has suffered actual harm.

206.242.     Arm's efforts to interfere with Qualcomm's business relationships have been a substantial factor in causing that harm, which Qualcomm would not have suffered but for Arm's misconduct.

70

## COUNT V

### (Negligent Interference with Prospective Economic Advantage)

243.      Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

244.      Arm knew or should have known that Qualcomm has substantial business relationships with a number of customers, including the Smartphone Company and the AI and Ecosystem Company.

245.      Arm also knew or should have known that these relationships would be disrupted by Arm's failure to act with reasonable care by purporting to terminate the QC ALA despite lacking legal or factual grounds for doing so, by leaking the Breach Letter in bad faith and in disregard of its duties to Qualcomm as a contract counterparty, and by making misleading and threatening statements to Qualcomm's customers to undermine their relationships to Qualcomm and to induce them not to procure products from Qualcomm.

246.      Arm owes Qualcomm a duty to act with reasonable care based on, among other things, the parties' contractual relationship and the foreseeability that interfering with Qualcomm's customer relationships would cause Qualcomm harm.

247.      Arm failed to act with reasonable care when, in bad faith, it purported to declare that Qualcomm is in material breach of the QC ALA, leaked the Breach Letter, and made those misleading and threatening statements to Qualcomm's customers.

248.      Arm's conduct was wrongful because, for example, it was "unfair" under California law.

71

249.    As a result of Arm's wrongful conduct, Qualcomm's relationships with the customers identified herein have been disrupted, as customers have required additional assurances or delayed entering into additional transactions with Qualcomm.

## COUNT VI

### (Violations of California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

250.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

251.    The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

252.    By engaging in the conduct described above, Arm has committed and continues to commit unlawful and unfair business acts or practices prohibited by the UCL.  These unfair business acts or practices include deliberately withholding deliverables it was required to provide Qualcomm ███████████████████ misrepresenting to Qualcomm that it was not withholding deliverables; refusing to negotiate license terms with Qualcomm ████████ repeatedly interfering or attempting to interfere with Qualcomm's relationships with Qualcomm's current and prospective customers; wrongfully asserting that it has the right to terminate the QC ALA without any basis in the QC ALA for those assertions, and then leaking the Breach Letter to the media, in an effort to terminate the QC ALA and thereby obstruct Qualcomm's ability to produce custom cores and thus eliminate a competing supplier of chips compatible with the Arm ISA; to pressure Qualcomm to accede to its demands in *Arm* v. *Qualcomm*; and to prevent Qualcomm from continuing to litigate its meritorious claims in the instant case.

72

217.253.    Arm's actions are part of a broader campaign to harm or threaten to harm competition for CPU and other computer chip designs, in California and elsewhere.  Arm is employing a variety of unfair acts and practices so that it can leverage its control over the ISA used in all premium smartphones and a large and growing share of other computing devices to attempt to prevent Qualcomm from developing and marketing products with CPUs that threaten to outcompete products containing Arm's off-the-shelf CPU designs.  These tactics include making misleading statements to Qualcomm's customers to pressure them not to acquire products from Qualcomm and threatening or attempting to cut off Qualcomm's access to the ubiquitous Arm ISA with the goal of preventing Qualcomm from developing custom cores that would compete with Arm's own designs and from marketing products that contain Qualcomm custom cores.

218.254.    Arm's conduct is also unfair because it threatens to significantly harm competition not only for CPU designs, but also for the SoCs used in a variety of platforms, and ultimately for the devices that use those CPUs and SoCs.  If Arm's conduct goes unchecked, Qualcomm and other chip designers will be forced to rely on Arm's off-the-shelf CPUs and will be at Arm's mercy if Arm wishes—as it has signaled it does—to foreclose them from making chips that are compatible with the Arm ISA.  As a result of Arm's efforts to reduce competition to create those CPUs and SoCs, consumers will be deprived of products that are built around innovative, high-performance, high-efficiency Qualcomm chips and/or will have to pay more for (or will have reduced choices among) products that incorporate CPUs compatible with the Arm ISA.  Arm's conduct towards Qualcomm—a longtime Arm licensee—threatens incipient violations of competition laws; violates the policy or spirit of those laws; threatens to significantly harm competition; is immoral, unethical, oppressive, and unscrupulous; and threatens to harm

73

consumers and competition in a manner vastly disproportionate to whatever supposed benefits that behavior could possibly create.

219.255.    Arm's conduct is also unlawful because it violates California common law, including state law prohibiting intentional and negligent interference with prospective economic advantage.

220.256.    Arm's unlawful and unfair business acts and practices are a direct and proximate cause of injury to Qualcomm.  Qualcomm has suffered harm in California and elsewhere as a supplier of a variety of Arm-compatible products, and it has suffered or faces the threat of loss of profits, customers, and potential customers.  If Arm is allowed to continue in its unlawful and unfair business acts and practices, Qualcomm risks being denied access to a widely used ISA for which there are no readily available alternatives for certain applications, which threatens to impede Qualcomm's ability to continue developing and marketing its high-performance products based on its own custom CPU designs. Arm's conduct thus threatens to harm competition among SoC producers but also in end users, who will be forced to use products built with Arm chips and CPUs.

221.257.    Qualcomm has standing to bring this claim because it has lost money or property as a result of Arm's unfair competition, including by losing business opportunities that would have been awarded to it absent Arm's conduct.

222.258.    Qualcomm requires equitable relief under the UCL because it lacks adequate remedies at law to address Arm's anticompetitive and unfair actions, which are ongoing and which have caused or threaten to cause Qualcomm to suffer significant harm.

## COUNT VII

### (Breach of Section ▮▮ of the QC TLA)

259.      Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

260.      The QC TLA is a valid, binding contract.

261.      Arm failed to fulfill its obligation under Section ▮▮ of the QC TLA because the licensing offers it provided to Qualcomm for ▮▮▮▮▮▮▮▮, including

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

262.      Arm's failure to comply with its contractual obligation ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

263.      Qualcomm put Arm on written notice of this violation and Arm failed to cure within ▮▮▮ as is required under the contract.

264.      Arm's breach of Section ▮▮▮ of the QC TLA entitles Qualcomm to

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ including ▮▮▮

▮▮▮▮▮ and a license offer ▮▮▮▮▮▮▮▮▮

265.      Arm's breach of Section ▮▮▮ of the QC TLA entitles Qualcomm to

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

266.      As a proximate result of Arm's breach of contract, Qualcomm has been harmed both by (i) shifting resources to its custom CPU team in order to analyze and begin development of CPUs for future SoCs that would have used the ▮▮▮▮▮▮▮ including ▮▮▮▮▮▮ cores, (ii) the uncertainty caused by Arm's refusal to license

75

the ███████████████, which causes complications in the roadmapping and SoC planning process, and (iii) by ████████████████████████████████████████████ ███████████.

**COUNT VIII**

(Breach of Section ███ of the QC TLA)

231.267.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

232.268.    The QC TLA is a valid, binding contract.

233.269.    Arm failed to fulfill its obligation under Section ███ of the QC TLA because the licensing offers it provided to Qualcomm for ███████████████, including

████████████████████████████████████████████████

█████████████████████████████

234.270.    Qualcomm put Arm on written notice of this violation and Arm failed to cure within ███████, as is required under the contract.

235.271.    Arm's breach of Section ███ of the QC TLA entitles Qualcomm to

████████████████████████████████████████████████

██████████

236.272.    As a proximate result of Arm's breach of contract, Qualcomm has been forced to seek alternative means to ensure that it is protected according to the █████████████ that it negotiated in the QC TLA and to divert additional resources in order to continue development of its SoCs.

76

## COUNT IX

### (Breach of Section ████ of the QC ALA)

273.    Plaintiff Qualcomm repeats and realleges all of the preceding allegations as if set forth fully herein.

274.    The QC ALA is a valid, binding contract, and Qualcomm has performed all its duties under the contract.

275.    ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████

276.    ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████

277.    Arm breached the QC ALA by declaring in June 2025 that it would not recognize ███████████████████ by Qualcomm ███████████ of the QC ALA covering v10 because it did not consider v10 a ████████████████████ under the ALA.  At least as early as June 2025 and thereafter, Arm failed to accept and breached its obligation under ████ ████████████████ with respect to v10.

278.    As a proximate result of Arm's breach of contract, Qualcomm has been harmed. That harm can only be remedied by Arm engaging in a good faith negotiation for v10, ████████ ████████  Money damages are not sufficient.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment and relief as follows:

A    For the declaratory judgments set forth in Plaintiffs' claims;

B    For an Order requiring Arm to comply with all its obligations under the QC ALA, including (but not limited to) by providing the ███████████ OOB, Patches,

77

and  and by negotiating in good faith an extension to the Qualcomm ALA including v10, without discrimination or retaliation;

C    For an Order requiring Arm to comply with all its obligations under the QC TLA, including (but not limited to) by ███████████████████ ████████████████ including ████████ ███████████████████████

D    For an Order enjoining Arm from engaging in the unlawful, unfair, and anticompetitive actions and practices described in this Amended Complaint and from any other unlawful, fraudulent, or unfair acts or practices aimed at obstructing Qualcomm's ability to develop and sell chips;

E    For an Order that Qualcomm is entitled to ████████████████ with respect to ████████████ licenses at pricing structures ████████ ████████████

F    For an Order that ████████████████ ████████████ as a result of Arm's breach of the QC ALA and TLA;

G    For an Order that the Breach Letter is ineffective notice of an alleged material breach and that Arm has no right to terminate the QC ALA on the grounds stated in the Breach Letter;

H    For recovery of all ████████████ ████████████

I    For damages resulting from the wrongful conduct alleged in this Amended Complaint, including from Arm's threat to terminate the QC ALA and its leak of the Breach Letter, failure to offer ████ licensing terms ████████ and specifically including damages arising from the postponement of the business opportunity with the AI and Ecosystem Company;

J    For restitution of amounts Arm derived from the unfair and anticompetitive conduct described in this Amended Complaint;

K    For costs and expenses incurred in connection with Qualcomm obtaining specific performance and other equitable relief; or, in the alternative, for additional damages, in the alternative, that the Court deems appropriate;

L    For an award of attorneys' fees and costs as allowed by law; and

M    For such other and further relief available at law and equity as the Court may deem just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38.1 and Fed. R. Civ. P. 38, Qualcomm hereby demands a TRIAL

BY JURY of all claims and issues presented in this Amended Complaint that are so triable.

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
Jenifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Erin J. Morgan
Dunn Isaacson Rhee LLP
11 Park Place
New York, NY 10017
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Flint A. Patterson
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

Adam L. Basner
Eric C. Westerhold
PAUL WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

March 30, 2026
January 8, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

80

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 30, 2026, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                          *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendant*

Scott F. Llewellyn, Esquire                                      *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
*Attorneys for Defendant*

Sydney D. Gaskins, Esquire                                       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA  90017
*Attorneys for Defendant*

Alexandra Corrinne Hottenrott, Esquire                           *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Defendant*

Daralyn J. Durie, Esquire                                        *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*

Lydia B. Cash, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
300 Colorado Street, Suite 1800
Austin, TX  78701
*Attorneys for Defendant*

Gregg F. LoCascio, P.C.                          *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Meredith Pohl, Esquire
Matthew J. McIntee, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
*Attorneys for Defendant*

Jay Emerick, Esquire                             *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
*Attorneys for Defendant*

Peter Evangelatos, Esquire                       *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendant*


                                    */s/ Jennifer Ying*

                              Jennifer Ying (#5550)

82

# Exhibit 4

( ██████████████████████████ )

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., and          ) SEALED
QUALCOMM TECHNOLOGIES, INC.,)
                            )
            Plaintiffs,     )
                            ) C.A. No. 24-490(MN)
v.                          )
                            )
ARM HOLDINGS PLC,           )
                            )
            Defendant.      )


                    Tuesday, March 10, 2026
                    2:00 p.m.
                    Motion Hearing

                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge


APPEARANCES:

        MORRIS NICHOLS ARSHT & TUNNELL LLP
        BY:  JENNIFER YING, ESQ.

        -and-

        DUNN ISAACSON RHEE LLP
        BY:  KAREN DUNN, ESQ.
        BY:  WILLIAM ISAACSON, ESQ.
        BY:  ERIN J. MORGAN, ESQ.
        BY:  JENIFER N. HARTLEY, ESQ.

---

APPEARANCES (Cont'd):

        -and-

        PAUL WEISS
        BY:  CATHERINE NYARADY, ESQ.
        BY:  JACOB A. BRALY, ESQ.
        BY:  ADAM BASNER, ESQ.

            Counsel for the Plaintiffs


        YOUNG CONAWAY STARGATT & TAYLOR LLP
        BY:  ANNE SHEA GAZA, ESQ.
        BY:  DANIEL MACKRIDES, ESQ.

        -and-

        KIRKLAND & ELLIS LLP
        BY:  GREGG F. LoCASCIO, ESQ.
        BY:  JASON M. WILCOX, ESQ.
        BY:  JAY EMERICK, ESQ.
        BY:  KASDIN MITCHELL, ESQ.
        BY:  MEREDITH POHL, ESQ.
        BY:  MICHAEL PRONIN, ESQ.

            Counsel for the Defendant


        WALKER STEVENS CANNOM LLP
        BY:  HANNAH CANNOM, ESQ.

            Counsel for Apple


        WILSON SONSINI
        BY:  BRADLEY D. SORRELS, ESQ.

            Counsel for Ampere

---

APPEARANCES (Cont'd):

        SKADDEN ARPS SLATE MEAGHER & FLOM LLP
        BY:  JENNESS PARKER, ESQ.

            Counsel for Broadcom


        CONNOLLY GALLAGHER LLP
        BY:  SARA BARRY, ESQ.

            Conflicts Counsel


        _ _ _ _ _ _ _ _ _ _ _ _ _


        COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Maryellen Noreika presiding.

        THE COURT:  All right.  Good afternoon.  Please be seated.  Let's start with some brief introductions.

        MS. YING:  Good afternoon Your Honor, Jennifer Ying from Morris Nichols Arsht & Tunnell on behalf of the plaintiffs.  I'm also joined by Travis Murray from Morris Nichols and then at counsel table from Dunn Isaacson & Reed, we have Karen Dunn, Bill Isaacson, Erin Morgan, as well as Jennifer Hartley.  And then from Paul Weiss we have Kathy Nyardy, Jacob Braley and Adam Basner.  And we also have

---

conflicts counsel from Connolly Gallagher, Sara Barry.

        THE COURT:  Okay.

        MS. GAZA:  Good afternoon, Your Honor.  Anne Gaza from Young, Conaway on behalf of Arm.  I'm joined by a colleague, Daniel Mackrides, as well as Kirkland & Ellis, Gregg LoCascio, Jason Wilcox, Jay Emerick, Kasdin Mitchell, Meredith Pohl, and Michael Pronin.

        Thank you.

        THE COURT:  Okay.  Thank you.

        All right.  So we have your papers and let me just get this out of the way so hopefully it doesn't come out later when I get tired from the arguments, but you all submitted 11,000 pages on objections for discovery.  That isn't all that you gave me for summary judgment and Daubert and that is excessive, 11,000 pages for discovery objections.  And you're not even objecting to absolutely everything the Special Master did.  And what that tells me is that nobody is seriously thinking about making decisions based on what's reasonable and what's necessary.  And you're lucky that your client is willing to pay for a bunch of stuff that seems unnecessary and disproportionate, but you're not lucky that I am now teetering on forming the impression that you have no respect for my time and you're not litigating in good faith.

        Now, so you guys can be reasonable going forward



THE COURT:  Yes, but you're the ones who brought the case, that's what I'm not understanding, I would understand --

MR. ISAACSON:  But --

THE COURT:  Would you just let me get it out.  I would understand what you're saying if you said we said you

THE COURT:  I mean, come on, if you really thought that you needed to do that, you would have done it before.  You amended, you filed a new case, nowhere in there

did you do any of this, right?

MR. ISAACSON:  Well, we --

THE COURT:  Now we are sitting here, I'm trying to understand, you're saying that essentially they should have

MR. ISAACSON:  I'm sorry, could you repeat that then for me?

THE COURT:

THE COURT:  Give me a break.  You guys, what are we just going to keep amending, keep amending in this case.  We'll go on forever.  You amended plenty of times before.  I'm not going to believe that you couldn't have done this before.

17

Let me ask this, where are we? Like you have summary judgment motions filed. Are those done? Are we filing more summary judgment motions? Are we amending those? What are we doing?

MR. ISAACSON: Those are done.

THE COURT: There is nothing more coming in for summary judgment?

MR. ISAACSON: Not for us.

MR. LoCASCIO: I disagree with that on two reasons. First, the parties have imposed a schedule that addresses this issue and on one, if certain discovery is allowed on any issue, then you can supplement the summary judgment. Two, when we get to the motion to amend --

THE COURT: With a new party.

MR. LoCASCIO: With respect to Unlimited, they would have the ability to file summary judgment motions. Our proposal is the only supplemental summary judgment that would come in, Your Honor, would be ten pages in opening, ten in response, five in reply.

And what I'll say on this broader issue of what's in the mix is we hear you loud and clear on the amount of --

THE COURT: You don't. I'm sorry, I do not believe you because nobody has shown any restraint in the case. What your clients are paying for is a crime. I mean,

18

it's ridiculous to get -- if they're paying for all this paper and garbage, it's ridiculous. It's just, it's crazy. I don't believe that you have heard me.

I appreciate that you want to supplement with something minor. What I'm going to do is deny that motion to dismiss, but I am going to allow you regardless of what I decide on other supplementation, you can move for summary judgment on that issue because I do think that there may be some legs to it.

MR. LoCASCIO: Thank you. And part of the reason this remained, Your Honor, is because to your point about there is a lot going on here, this claim is indicative of a series of claims that have either no legal basis, are overlapping, shouldn't be issues for the jury and to have all that in summary judgment. Our goal was to not have -- get all the way to summary judgment and have all these issues brew because their side of the world wants to throw it all in front of the jury and --

THE COURT: I get that. I understand. I saw that in the motion to bifurcate. But that doesn't mean that they're not allowed to throw some of it in front of the jury. But on this issue, I will -- I am going to deny the motion to dismiss because it's in a motion to dismiss stage and I don't know, maybe they're pleading in the alternative, whatever, but you may have aside from any ten pages or

19

whatever we decide on supplementation, you can have up to fifteen pages on this issue in summary judgment.

MR. LoCASCIO: Thank you, Your Honor.

THE COURT: Next, we have to motion to amend. And I don't understand this because I let you -- you filed a new case, I made them accept service, I thought, though no answer has been filed so I really have no idea what's going on. It's consolidated, so I have no idea why I'm spending my time on this.

MS. DUNN: Thank you, Your Honor.

So the only remaining question is are we going to proceed as two consolidated cases or one case through amendment. We --

THE COURT: Why does it matter?

MS. DUNN: This is where we started to talk about the last time which is at the very least, Arm says it's going to bring a statute of limitations motion and it's going to claim that the statute of limitations ran during the period that the Special Master was sitting with our motion in this case. And Your Honor at the last hearing said that, you know, we followed Your Honor's directions, we did what we were supposed to do. We can go through the timeline, but I don't think you need that. But I don't think there is going to be a dispute that they're going to say the statute of limitations runs during that period of

20

time.

They said they might need discovery on this. They say they might need an expert on it. We would like to get to trial. We don't see the need for any of that. And frankly we think we have met the requirements under Rule 16 and 15 to just amend and cut out all of that extra process which is going to mire the Court in more issues --

THE COURT: No, it's not. It's really not because those issues, if you guys do that, no one is going to get -- you all can shut down on discovery, nobody gives anybody discovery and I'm not going to order it. The Special Master you inundated with stuff, maybe I'll just say everything gets produced, maybe that's the way we go, every single thing that somebody wants gets produced and both of your clients can produce every document in their file if that's the way you want to play.

MS. DUNN: I actually think we would benefit from that kind of ruling, Your Honor.

THE COURT: Well, that doesn't necessarily include third-party stuff so don't get too excited about that. You know what, if that's what you tell me that's what you want, that tells me that's not the way I want to rule because this is nuts. You guys are nuts. No case I have -- this is not that important of a case. This is not that big of a case. It's a contract case and you are taking an

133

a nice job between the rog and 30(b)(6) objection to never be pinned down as to the actual universe of these communications because they want to say their CEO says I didn't do it. I'm sure you didn't. I suspect a lawyer or a media person or somebody else did it.

MS. DUNN: For clarity, that is not accurate on the 30(b)(6). But one thing for the Court because this might help, our claim is based on the termination letter. And I think the reason Mr. Isaacson talked about it being confidential is normally the termination letter would be sent to a party. We're not saying we need your press about Qualcomm or about this case because I'm sure they do tons of press about Qualcomm and about this case. That's fine. The issue is they specifically wanted the customers and the public to know that termination was sixty days out. And by the way, that's not even a remedy they could have gotten in that trial. I just want to level set that we have been targeted at that --

THE COURT: I know, but you know what, at some point, you guys ask for so much, I can't make these fine tuning. When I said everybody can have everything, you said that sounds great to me, so I'm going with you, sounds great to me, you can produce stuff, they can produce stuff, and I can go get something to drink, just some water. I'm a little tired.

134

MS. DUNN: That sounds great, Your Honor.

THE COURT: That's it. Thank you.

COURTROOM DEPUTY: All rise. Court is in recess.

(Court recessed at 5:48 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Dale C. Hawkins
Official Court Reporter
U.S. District Court

# Exhibit 5

(█████████████████)

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., and            )
QUALCOMM TECHNOLOGIES, INC.,) )
                              )
         Plaintiffs,          )
                              ) C.A. No. 24-490(MN)
v.                            )
                              )
ARM HOLDINGS PLC,             )
                              )
         Defendant.           )


                    Thursday, January 22, 2026
                    10:00 a.m.
                    Status Conference


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge


APPEARANCES:


         MORRIS NICHOLS ARSHT & TUNNELL LLP
         BY:  JENNIFER YING, ESQ.

         -and-

         DUNN ISAACSON RHEE LLP
         BY:  KAREN DUNN, ESQ.
         BY:  ERIN J. MORGAN, ESQ.
         BY:  JENIFER N. HARTLEY, ESQ.

         -and-

2

APPEARANCES (Cont'd):


         PAUL WEISS
         BY:  CATHERINE NYARADY, ESQ.
         BY:  JACOB A. BRALY, ESQ.


             Counsel for the Plaintiffs


         YOUNG CONAWAY STARGATT & TAYLOR LLP
         BY:  ANNE SHEA GAZA, ESQ.

         -and-

         KIRKLAND & ELLIS LLP
         BY:  GREGG F. LoCASCIO, ESQ.
         BY:  JASON M. WILCOX, ESQ.
         BY:  MARY BARNETT, ESQ.

             Counsel for the Defendant


         _ _ _ _ _ _ _ _ _ _ _ _ _

COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Maryellen Noreika presiding.

THE COURT:  Good morning, everyone.  Oh, gosh, everybody is backwards.  Okay.  All right.  Let's start with some introductions.

MS. YING:  Good morning, Your Honor.  Jennifer

3

Ying from Morris Nichols Arsht & Tunnell on behalf of the Plaintiffs.  I have with me here at counsel table today Karen Dunn, Erin Morgan and Jen Hartley from Dunn Isaacson Rhee.  And we also have Catherine Nyardy and Jake Braly from Paul Weiss.

THE COURT:  All right.  Thank you.

MS. GAZA:  Good morning, Your Honor.

THE COURT:  I recognize some of the people at that table.

MS. GAZA:  Good morning, Your Honor.  Anne Gaza from Young, Conaway on behalf of Arm.  I am joined today from Kirkland & Ellis by Gregg LoCascio, Jason Wilcox, and Mary Barnett.

THE COURT:  All right.  Good morning to all of you.

Okay.  So you broke the special master and we need to adjust the schedule.  Is that where we are?

MS. DUNN:  I don't know that we would say broke, but --

THE COURT:  I have a list of all the motions that you all filed in front of her.  And when I sent the case to the special master, I didn't intend to -- that would be just a free-for-all for you not to agree to things, but in any event, you did follow the rules and file the motions and they have not been decided.  So I'm not sure what you

4

need.

MS. DUNN:  Thank you, Your Honor.  Primarily we're here because I think both parties would agree the March 9th date is impractical.  And we would like to talk to the Court about a schedule and a process that we could put in place where the discovery motions that have been brought will get ruled upon.

Obviously there is also the separate issue of the objections we filed to the special master's decision with regard to the case name.  So we could talk about that as well.  But these things will take time.

THE COURT:  That one, though, I mean, is that sort of mooted if we consolidate the new case?

MS. DUNN:  I would say --

THE COURT:  Because I haven't really looked at it because I thought you were just filing a new case and then wanted to talk about whether that would be brought into this one.

MS. DUNN:  We filed the new case as a protective matter.

THE COURT:  Right.

MS. DUNN:  And we believe the special master's ruling is in error for reasons I would be happy to explain.  But there are benefits to proceeding with the old case and not the new case.  And I can enumerate those.



5

One is that we would have to redo quite a lot of process that has already occurred in the old case and there is nothing different about the new case other than adding a name to the case caption. It's substantively identical.

THE COURT: When you say adding process, help me with what that means.

MS. DUNN: So, for example, a new motion to dismiss from the other side, even though Your Honor has discouraged a motion to dismiss in this case previously.

THE COURT: Nobody takes a hint in this case. You don't take a hint, they don't take a hint, that's fine, I can deal with it.

MS. DUNN: A statute of limitations argument that they have indicated that they would like to make even though the reason for the statute of limitations problem is that it ran during the seven months that the special master had our motion, so there is going to be issues with that. There has already been issues with service in this case where we asked if they would accept service in the new case and they said well, you're asking for a waiver of service so we get ninety days to respond to an identical complaint with the exact same substance. They refused to accept service for the motion to consolidate.

So the reason I say all of this is I can explain to Your Honor why the special master's ruling is in error,

6

and I believe that those reasons are so compelling that the easier thing to do and the right thing to do would be just to allow the amendment and then get the discovery motions resolved and ruled upon so we can go to trial in a timely way as opposed to redoing all of this work.

THE COURT: Okay. I will let you do that. You can tell me -- you can make your argument. I don't know that I will rule on the discovery motions because as I said, I haven't really prioritized those because I wasn't sure it was something I was going to have to deal with.

I get the gist of it which is you had gone forward with one particular defendant thinking that was the correct defendant, and then when they finally answered after the date for amending and after maybe discovery was over, they said oh, by the way, you got the wrong defendant and you're like, how are we supposed to know that if no one ever told us. And now you won't let us amend to put the right defendant in. That's the gist of your argument.

MS. DUNN: That is the gist. And I will say there is a few things that I find extremely compelling in favor of amendment that I want to call to the Court's attention.

First of all, as soon as they raised that this was a legal issue of the wrong party, which was six days after the deadline to serve discovery, they raised it on

7

June 17th. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

So to be honest, Your Honor, I think that is dispositive because what Arm is essentially saying is even

8

The second thing I would say is that for over a year now, Arm has litigated this case on behalf of both parties. And I made a list of all the things that they did. So they accepted service under Arm Holdings formally known as Arm LTD. They filed three motions to dismiss, none of which raised this issue. They executed six stipulations on behalf of Arm Holdings, formally known as Arm LTD. They produced 300,000 document for Arm LTD which required them to send production letters under Arm LTD formally known as, they served nine sets of written discovery, they served three privileged logs with that same name on it and obviously responded to rogs where they never offered this defense and they also never amended for this defense. And then finally four motions for summary judgment where they never raised this.

So it seems incredibly inequitable to say that they were allowed to file things with the Court and proceed in this fashion but somehow we were not diligent in doing that. And we were diligent because the second that we -- that they told us after all the deadlines, we immediately took discovery through their chief legal officer.

We then approached them and said will you consent to an amendment. They ignored us at first. We followed up twice. They refused. And then obviously as

41

left. And the third parties were told at some future date there will be a hearing.

MR. LoCASCIO: Some of these where we land collectively on this, after we see the special master's ruling on scope, the universe of third-party protective order motions may narrow, it may not, but those are still open issues. And that will dictate or drive some of the discovery and the special master has not heard those parties on that.

So why I'm raising this is just for one, awareness, but two, I don't want to add to Your Honor's docket on the day in March that we pick. But if that issue is still open, I think it will at the latest need to be tackled around that same window so the parties can actually effect the discovery, maybe even before, and query whether that should remain with the special master or if Your Honor would say at no later, we can -- I don't think the briefing needs to be updated at all --

THE COURT: Let's put it this way, I'm not going to take it away from the special master because I'm not going to get it right. I'm going to wind up taking something I shouldn't take away and then leaving something I should. But if the special master doesn't rule on it, I will deal with it in March. If the special master rules on it, even though you don't think that she's addressed it,

42

don't file objections, just bring it to me *de novo* in March.

MS. DUNN: Understood.

THE COURT: And if the third parties want to be heard, you can let me just see -- why don't you talk to the third-party counsel, tell them what I did today, that they can be heard on that if they want to be that week in March, and just find out before we set a date, go back and talk with them about if they have a preference and you guys have a preference if there is a date that seems to work for everybody in that week. The only day that is problematic for me is the 11th, Wednesday, but if you can set it for some time that week, I will hear it.

MR. LoCASCIO: The last item I had on my list is the second, we'll call it the Arm -- I'll call it the Arm Limited complaint, the new complaint. Our motion to dismiss would also fall, the deadline to do it, would fall in this window. On the 9th, 10th, whatever day we're picking that week, Your Honor will hear the issue of objections to the amendments, whether there is an amendment and consolidation, and the parts --

THE COURT: Your time to move to dismiss, to answer, move, or otherwise respond is extended until after the March 9th hearing.

MR. LoCASCIO: Thank you.

THE COURT: Put it on your list of things to

43

discuss that issue and we'll set a date for that.

MR. LoCASCIO: Thank you.

And given the other aspects we will ask you to deal with, if we do the motion to dismiss and the other motion it may ultimately be mooted and a nonissue. So thank you.

THE COURT: Good.

MS. DUNN: Good. Thank you, Your Honor.

THE COURT: Okay.

COURT CLERK: All rise. Court is adjourned.

(Court adjourned at 11:01 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.


/s/ Dale C. Hawkins
Official Court Reporter
U.S. District Court

# Exhibit 6

(████████████████)

| | |
|---|---|
| **From:** | LoCascio, Gregg F. |
| **To:** | Nyarady, Catherine |
| **Cc:** | Pohl, Meredith; *RVrana@ycst.com; *agaza@ycst.com; jying@morrisnichols.com; kdunn@dirllp.com; JHartley@dirllp.com |
| **Subject:** | RE: QC v Arm -- meet and confer |
| **Date:** | Friday, April 10, 2026 8:07:21 PM |
| **Attachments:** | image001.png |

Catherine,

We continue to disagree that Qualcomm's amended complaint is governed by Rule 15(a)(1). Our understanding based on the law we have exchanged (including what you and your team have found as well) is that the amendment is instead governed by Rule 16, and have seen no good cause for permitting Qualcomm's amendment now. Indeed, when I specifically asked questions that would go directly to Qualcomm's good cause or lack thereof during our in-person meet and confer – specifically (a) if Qualcomm planned to make this amendment when Qualcomm negotiated the Amended Scheduling Order and said nothing about amendment and (b) why Qualcomm hadn't asserted this claim in the Arm Ltd. Complaint – both Karen and you refused to answer. The clear absence of any good cause to support amendment by Qualcomm at this late stage appears to us to be at the root of why Qualcomm is trying to improperly shoehorn its amendment into Rule 15 despite the undeniable existence of a Rule 16 scheduling order governing amendment.

We also disagree that the parties have already taken discovery on the allegations underlying Qualcomm's amendment. There has been no discovery on the legal or factual differences between Qualcomm's express and implied breach claims related to v10. Mr. Weiser did not offer the alleged purpose underlying Section ████ of the ALA that Qualcomm now offers in its Amended Complaint against Arm Ltd., and Arm had no opportunity to ask Mr. Weiser specifically about that topic (or to develop its own evidence contradicting that alleged purpose) because Qualcomm had not previously disclosed it. Qualcomm similarly did not disclose that money damages would not be sufficient in response to Arm's contention interrogatories, and Ms. Chaplin did not address that issue at her deposition; when Arm asked "the basis for Qualcomm's belief that it is entitled to a license" to v10 under Section ████, for example, Qualcomm objected on privilege grounds and because it called for a legal conclusion. (Chaplin Dep. Tr. 16723-168:6).

While we appreciate your discovery proposal, we do not think discovery would cure the legal prejudice from Qualcomm adding a new claim now, in addition to the other amendments it has attempted to make to the complaint. Any counter-proposal we would make, in any event, would need to involve an extension of the current discovery deadlines that would in turn require moving the trial date. Given the Court's previous rulings denying even agreed-upon extensions of the case schedule – exacerbated now by Qualcomm's representations and arguments for consolidation and an October trial date on the basis that the Arm Ltd. case was identical to the Arm plc case and that additional discovery and dispositive motion briefing was unnecessary – we do not see a viable path to accommodate more discovery or Qualcomm's eleventh-hour additional claim and amendment at this point.

We appreciate the discussions in person, over the phone, and over email during the past week, but we believe we are now at an impasse.

Gregg

**Gregg LoCascio, P.C.**

-----------------------------------------------

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
T +1 202 389 5290  M +1 202 957 0590

-----------------------------------------------

gregg.locascio@kirkland.com

-----------------------------------------------

**From:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Sent:** Friday, April 10, 2026 3:10 PM
**To:** LoCascio, Gregg F. <glocascio@kirkland.com>
**Cc:** Pohl, Meredith <meredith.pohl@kirkland.com>; *RVrana@ycst.com <RVrana@ycst.com>;
*agaza@ycst.com <agaza@ycst.com>; jying@morrisnichols.com; kdunn@dirllp.com;
JHartley@dirllp.com
**Subject:** RE: QC v Arm -- meet and confer

| This message is from an EXTERNAL SENDER |
|---|
| Be cautious, particularly with links and attachments. |

Gregg,

We continue to understand Qualcomm's amendment of the Arm Ltd. complaint to be governed by Rule 15(a)(1) and still have not seen anything suggesting that Qualcomm would be required to satisfy Rule 16(b)(4) on these facts. We also continue to believe that both Qualcomm and Arm have already taken discovery on the allegations underlying Qualcomm's amendment. For example, to take the "new allegations" you call out, Arm already took Rule 30(b)(6) testimony on the negotiations of Section ▮ of the Qualcomm ALA from Mr. Weiser (including testimony about the intent of the Section), and Arm has long been aware that Qualcomm seeks injunctive relief requiring Arm to negotiate with Qualcomm in good faith, consistent with the terms of the ALA, for a license to v10 (*see, e.g.*, Chaplin Dep. Tr. 167:13-22).

We nevertheless agreed to your request that we make a proposal to provide for additional discovery after you were unable to identify specific additional information you needed, but expressed an interest in using the standard discovery devices. Qualcomm has worked in good faith to try to reasonably accommodate Arm's concerns. We encourage you to make a counterproposal so that we at least attempt to avoid bringing another dispute to the Court that we can resolve ourselves.

Regards,
Catherine.

**Catherine Nyarady** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3532 (Direct Phone) | +1 917 584 7388 (Cell)

cnyarady@paulweiss.com | www.paulweiss.com

---

**From:** LoCascio, Gregg F. <glocascio@kirkland.com>
**Sent:** Friday, April 10, 2026 11:59 AM
**To:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Cc:** Pohl, Meredith <meredith.pohl@kirkland.com>; *RVrana@ycst.com <RVrana@ycst.com>; *agaza@ycst.com <agaza@ycst.com>; jying@morrisnichols.com; kdunn@dirllp.com; JHartley@dirllp.com
**Subject:** RE: QC v Arm -- meet and confer

Catherine,

In my initial email outreach and telephone call with Karen on Qualcomm's improper amendment of its complaint against Arm Ltd., I explained Arm's position that the Rule 16 deadline for motions to amend had long passed under the Scheduling Order (D.I. 44), and therefore Qualcomm was required to seek leave and show good cause to amend under Rule 16.  Qualcomm's position in response was that the lack of an express deadline in the Amended Scheduling Order (D.I. 759), entered March 19, 2026, somehow meant that Qualcomm had no deadline to amend its complaint against Arm Ltd.

During our meet and confer, we explained that the "Amended Scheduling Order" amends the previous Scheduling Order, and did not modify or extend the deadline for motions to amend.  See S.G. by & through Gordon v. Jordan Sch. Dist., 333 F.R.D. 220, 223 (D. Utah 2019) ("Where, as here, an earlier scheduling order did establish certain deadlines, and those deadlines were omitted from a subsequent order only after they had come and gone, the cases appear unanimously to hold that the omitted deadlines remain binding.").  However, and as discussed at our conference, the question arose whether the consolidation of the Arm Ltd. case with the Arm Holdings case would change this.  Both parties agreed to look into that question and exchange case law.

It does not.  When the Court granted Qualcomm's motion to consolidate on February 2, 2026, C.A. No. 24-490-MN was designated as the lead case, so its schedule governs.  George & Co. LLC v. Spin Master Corp., 2020 WL 3865098, at *3–4 (E.D.N.Y. July 7, 2020); Kingman Holdings, LLC v. Blackboard Ins. Co., 2025 WL 275505, at *3 (E.D. La. Jan. 23, 2025), aff'd, 2025 WL 932774 (E.D. La. Mar. 27, 2025).  Qualcomm is bound by the deadlines set in the Arm Holdings case, including any expired deadlines.  See Jordan School District, 333 F.R.D. at 223.  At no point during the parties' negotiation of the Amended Scheduling Order, nor during the January and March hearings before Judge Noreika, did Qualcomm ever inform Arm or the Court that it intended to amend or that the deadlines in the existing scheduling order would not apply to Qualcomm's new case against Arm Ltd.

We have now reviewed the authorities you sent on the question of consolidation, and we disagree that they are relevant here.  For instance, in CG Technology Development, Judge Andrews found that the "law of the case" doctrine did not bind the Court to a Nevada court's previous decision holding that asserted patents were not ineligible under § 101, where the Nevada case involved a different defendant and was consolidated "for pretrial purposes" after the decision was issued.  CG Tech.

Dev. LLC v. Fanduel, Inc., 442 F. Supp. 3d 840, 846 (D. Del. 2020).  This case had nothing to do with amendment under Rules 15 or 16.

You have also failed to explain how any of the cases in the footnotes you cited from Wright & Miller apply here.  Notably, while citing to § 2382 on consolidation, you omitted the following passage: "Consolidation also would not be proper if a party thereby seeks to circumvent the . . . deadlines for amendment as of right in Rule 15(a)."  Wright & Miller, 9A Fed. Prac. & Proc. § 2382 & n.19 (3d ed. Apr. 2026 update).  Accordingly, the cases cited at footnote 19 are more on point.  See Cherelli v. InStore Group, LLC, 513 F. Supp. 3d 187, 193 (D. Mass. 2021) ("[D]istrict courts must 'carefully insure' that when consolidating cases they do not provide a plaintiff the unfair opportunity to 'use the tactic of filing two substantially identical complaints to expand the procedural rights he would have otherwise enjoyed.'" (quoting Walton v. Eaton Corp., 563 F.2d 66, 71 (3d Cir. 1977) (en banc))); Walton v. Eaton Corp., 563 F.2d 66, 71 (3d Cir. 1977) ("In particular, the court must insure that the plaintiff does not use the incorrect procedure of filing duplicative complaints for the purpose of circumventing the rules pertaining to the amendment of complaints...." (citing Fed. R. Civ. P. 15)); Gonzalez v. Vilsack, 2021 WL 1082479, at *6 (E.D. Va. 2021) (court denied consolidation because it was being used as mechanism to add new claim).

Finally, in Altana Pharma, as you rightly concede, the court applied the provisions of the pretrial scheduling order entered in the first action against Teva to the later-consolidated case against Sun.  However, the court's application of Rule 15 in that case turned on the pretrial scheduling order's specific omission of a deadline to amend the pleadings where one would otherwise be provided.  Altana Pharma AG v. Teva Pharms. USA, Inc., 2007 WL 9724442, at *1, *3 (D.N.J. Mar. 29, 2007).  There, the pretrial scheduling order stated "NONE" in the space where a return date is normally set for motions to amend the pleadings, which the court interpreted to mean that the parties contemplated no amendments at the time, and not as a bar on motions to amend the pleadings.  Id. at *3.  That is not the case here.

Finally, your proposal for additional discovery does not cure the prejudice to Arm; in fact, it serves only to underscore the prejudice Arm would suffer should Qualcomm be allowed to amend.  It is simply not reasonable for Qualcomm to demand that Arm serve all of its discovery requests in less than seven days and that all discovery on Qualcomm's newest claim should wrap up in under a month.  The parties cannot complete this discovery under the current case schedule, which Qualcomm agreed to without notifying us or the Court of its intent to assert a new claim.

To be clear, in response to Ms. Hartley's question as to scope at our meet and confer earlier this week, our concerns with Qualcomm's amended complaint stretch beyond adding the one new claim.  Qualcomm's amendments inject issues Qualcomm has not raised previously and failed to disclose or otherwise describe in discovery during its initial case, including new allegations about the supposed purpose underlying Section ████ (see, e.g., Amend. Compl. ¶ 68) and a request for injunctive relief based on a new contention that money damages are insufficient (id. ¶ 278).  Were these amendments allowed, Arm would also require discovery on these issues, which also could not be completed under the timeframe Qualcomm proposes.

Regards, Gregg

**Gregg LoCascio, P.C.**

----------------------------------------------------

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5290  **M** +1 202 957 0590

----------------------------------------------------

**gregg.locascio@kirkland.com**

---

**From:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Sent:** Thursday, April 9, 2026 3:36 PM
**To:** LoCascio, Gregg F. <glocascio@kirkland.com>
**Cc:** Pohl, Meredith <meredith.pohl@kirkland.com>; *RVrana@ycst.com <RVrana@ycst.com>; *agaza@ycst.com <agaza@ycst.com>; jying@morrisnichols.com; kdunn@dirllp.com; JHartley@dirllp.com
**Subject:** FW: QC v Arm -- meet and confer

Gregg,

Thank you for the conversation on Tuesday.

As we said we would, we have continued assessing Arm's argument that Qualcomm needed to satisfy Rule 16(b)(4) before amending the Arm Ltd. complaint once as a matter of course under Rule 15(a)(1) because Arm believes that the March 2025 deadline for amending pleadings from the Arm Holdings case became binding on the Arm Ltd. case filed in January 2026 at the time of consolidation. We have not seen any case law supporting Arm's position.

To the contrary, we are finding that courts consistently hold that consolidation does not merge two cases into one or change the rights of the parties (including by imposing orders from the lead case onto the consolidated case, as you suggested happened here). *See, e.g.*, Wright & Miller, 9A Fed. Prac. & Proc. § 2382 nn. 9, 10 (3d ed. Apr. 2026 update) (collecting cases); *CG Tech. Dev. LLC* v. *Fanduel, Inc*., 442 F. Supp. 3d 840, 846 (D. Del. 2020). And in the one case we've found directly considering a post-consolidation amendment implicating a scheduling order bar, the court declined to apply Rule 16(b)(4) even though the consolidation order in that case—unlike in our cases— expressly applied the original case's scheduling order to the newer consolidated case. *Altana Pharma AG* v. *Teva Pharms. USA, Inc*., 2007 WL 9724442, at *3 (D.N.J. Mar. 29, 2007). We believe it is clear that Rule 15 governed, and permitted, Qualcomm's amendment of the Arm Ltd. complaint as of right.

Notwithstanding that Qualcomm was well within its rights to amend the Arm Ltd. complaint once and that both parties have already taken extensive discovery on the v10-related events that underlie the amendment, we remain willing to work with you to address Arm's concerns. Consistent with both parties' production of 2025 correspondence regarding v10 in connection with the implied covenant

claim in the Arm Holdings case, we can confirm that the ALA Section ▮▮ breach claim alleges that Arm's 2025 conduct itself breached the parties' contract.   Based on the scope of discovery the Court permitted for defenses unique to Arm Ltd. and the high-level requests you made at our meet and confer, Qualcomm will agree to the following additional discovery on issues specific to the Arm Ltd. complaint amendment:

- Up to three RFAs;
- Up to five RFPs;
- One contention interrogatory; and
- One Rule 30(b)(6) deposition on facts new to the ALA Section ▮▮ breach claim (i.e. not already the subject of discovery in the good faith and fair dealing claim) limited to 2.5 hours.

We would propose that Arm Ltd. serve its additional requests by April 15, with Qualcomm to provide its responses and objections by April 29.  We would endeavor to complete the 30(b)(6) deposition by the May 5 deadline or very shortly thereafter (i.e., by Friday, May 8).

We will also not oppose Arm Ltd. requesting leave to include in its July 1 good faith and fair dealing dispositive motion argument regarding the ALA Section ▮▮ breach claim, should Arm choose to do so.

Given the overlap in evidence for the v10 implied covenant claim and the v10 Section ▮▮ breach claim and Arm's inability to name any specific additional documents or admissions it needs to date, we believe that the above proposal provides ample opportunity for Arm Ltd. to explore any amendment-related issues.  We are ready to work with you to jointly propose this plan for Court approval and are confident that the Court will appreciate our efforts to avoid unnecessary motion practice, if we are able to reach an agreement here.

We are available to discuss any of the above.

Catherine

---

**From:** Karen Dunn
**Sent:** Tuesday, April 7, 2026 11:37 AM
**To:** 'LoCascio, Gregg F.' <glocascio@kirkland.com>
**Cc:** jying@mnat.com; *RVrana@ycst.com <RVrana@ycst.com>; *agaza@ycst.com <agaza@ycst.com>
**Subject:** RE: QC v Arm -- meet and confer

Hi Gregg,

Thanks for following up.  We think we see the disconnect here.  The cases you sent applied FRCP

16(b)(4) after the party seeking to amend missed an express deadline for amendment in the operative scheduling order.  *See Great Lakes Ins. S.E.* v. *Sunshine Shopping Ctr.*, 2020 WL 1159381, at *3 (D.V.I. Mar. 10, 2020) ("The Scheduling Order *specifically sets* the deadline for amendment of pleadings as December 2, 2019" and amendment was filed on January 21, 2019); *Hawkins* v. *W. Penn Allegheny Health Sys.*, 2014 WL 5803112, at *1, 3 (W.D. Pa. Nov. 7, 2014) ("Rule 16(b) is implicated when a motion to amend is filed after the deadline for amendment of pleadings has passed *as specified* in the court's pretrial scheduling order."); *Premier Comp. Sols., LLC* v. *UPMC*, 970 F.3d 316, 319 (3d Cir. 2020) ("when a party moves to amend or add a party after the *deadline in a district court's scheduling order* has passed, the 'good cause' standard of Rule 16(b)(4) of the Federal Rules of Civil Procedure applies") (all emphases added).

Where, as here, there is no deadline for amendment in the operative scheduling order, FRCP 15 (and, specifically, FRCP 15(a)(1) in this case) governs.  I'm attaching a few cases on point.

We look forward to discussing.  See you soon,

Karen



**Karen L. Dunn | Partner**
**Dunn Isaacson Rhee LLP**


kdunn@dirllp.com
(202) 240-2901  (direct) | (202) 309-1105 (cell)
401 9th Street NW, Washington, DC 20004
Website | LinkedIn

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

---

**From:** LoCascio, Gregg F. <glocascio@kirkland.com>
**Sent:** Monday, April 6, 2026 11:47 PM
**To:** Karen Dunn <KDunn@dirllp.com>
**Cc:** jying@mnat.com; *RVrana@ycst.com <RVrana@ycst.com>;
*agaza@ycst.com <agaza@ycst.com>
**Subject:** RE: QC v Arm -- meet and confer

Karen – following up on our discussion earlier today about whether FRCP 16(b)(4) required Qualcomm to seek leave to amend and show good cause, I am attaching several cases to that effect.

To your position that Qualcomm did not need to do so because of the language of FRCP 15(a)(1), please send us any cases your team is relying upon that allow such an amendment (without consent or leave) after the entry of a scheduling order under Rule 16.

Thanks and see you tomorrow.  Gregg

**Gregg LoCascio, P.C.**

--------------------------------------------------------------------------------

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5290  **M** +1 202 957 0590

--------------------------------------------------------------------------------

gregg.locascio@kirkland.com

---

**From:** Karen Dunn <KDunn@dirllp.com>
**Sent:** Thursday, April 2, 2026 11:51 AM
**To:** LoCascio, Gregg F. <glocascio@kirkland.com>
**Cc:** jying@mnat.com; *RVrana@ycst.com <RVrana@ycst.com>;
*agaza@ycst.com <agaza@ycst.com>
**Subject:** RE: QC v Arm -- meet and confer

Hi Gregg,

We disagree that there is anything improper about Qualcomm exercising its right to amend the Arm Ltd. complaint once as a matter of course under Rule 15(a)(1).

We are available to meet and confer in DC on Monday, 4/6 after 2pm or on Tuesday, 4/7 after 12pm. We can host at DIR or visit you at Kirkland.  Please let us know what time and location work best.

I will also give you a call in the interim, as you suggest.

Thanks,

Karen

**Karen L. Dunn | Partner**
**Dunn Isaacson Rhee LLP**
kdunn@dirllp.com
(202) 240-2901  (direct) | (202) 309-1105 (cell)
401 9th Street NW, Washington, DC 20004
Website | LinkedIn

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

---

**From:** LoCascio, Gregg F. <glocascio@kirkland.com>
**Sent:** Wednesday, April 1, 2026 3:45 PM
**To:** Karen Dunn <KDunn@dirllp.com>
**Cc:** jying@mnat.com; *RVrana@ycst.com <RVrana@ycst.com>;
*agaza@ycst.com <agaza@ycst.com>
**Subject:** QC v Arm -- meet and confer

Hi Karen –

I write to line up a time for us to meet and confer re Qualcomm's new v10 allegations and claim against Arm Ltd.

The addition of a new cause of action and allegations are contrary to both the latest scheduling order and the Court's instructions to the parties at the January and March hearings.  Further, they contradict Qualcomm's own representations that its case against Arm Ltd. would be "substantively identical" to that against Arm Holdings, with "the same claims and the same facts."  We do not believe it is proper for Qualcomm to add new claims and allegations at this late stage – much less without raising it with Arm or the Court or seeking leave.

Assuming Qualcomm will not withdraw its amended complaint against Arm Ltd, please let me know if you and someone from MNAT can meet on Thursday 4/2 in the afternoon, Friday 4/3 in the morning, or on Monday 4/6 or Tuesday 4/7 to confer in person per the Court's March 20th order.

In the meanwhile, I'd also propose you and I have a phone call to start the discussion on this issue -- so please let me know your availability or feel free to call my mobile 202-957-0590.

Best, Gregg


**Gregg LoCascio, P.C.**
--------------------------------------------------------
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5290  **M** +1 202 957 0590
--------------------------------------------------------
**gregg.locascio@kirkland.com**

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.