# EXHIBIT 1
## (Filed Under Seal)

**OUTSIDE ATTORNEY'S EYES ONLY**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QUALCOMM INCORPORATED and QUALCOMM TECHNOLOGIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ARM HOLDINGS PLC, f/k/a ARM LTD., <br><br> Defendants. | C.A. No. 24-490 (MN) |

**LETTER BRIEF OF NON-PARTY APPLE INC. IN SUPPORT OF ITS
<u>MOTION FOR PROTECTIVE ORDER</u>**

Dated:  August 11, 2025

Susan E. Morrison (No. 4690)
Nitika Gupta Fiorella (No. 5898)
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19899
Tel: (302) 652-5070
morrison@fr.com
fiorella@fr.com

Hannah Cannom (*pro hac vice*)
Bethany Stevens (*pro hac vice*)
WALKER STEVENS CANNOM LLP
500 Molino Street, Suite 118
Los Angeles, California 90013
213-712-9145
hcannom@wscllp.com
bstevens@wscllp.com

*Attorneys for Non-Party Apple Inc.*

Dear Special Master Rychlicki,

Pursuant to Federal Rule of Civil Procedure 26 and Paragraphs 51-52 of the Stipulated Protective Order (D.I. 84), non-party Apple Inc. ("Apple") hereby moves for a protective order to prevent production of any Architecture License Agreement ("ALA"), any Technology License Agreement ("TLA"), or any other confidential agreements between Apple and Defendant Arm Holdings PLC ("Arm").

This case involves allegations that Arm breached its licensing agreements with Plaintiffs Qualcomm Incorporated and Qualcomm Technologies Inc. (together "Qualcomm"). Though Apple does not have full insight into the allegations or discovery disputes given the redactions to the publicly-available Second Amended Complaint and discovery briefing, Apple understands that Qualcomm is seeking from Arm all of its agreements with third parties, including one or more Apple ALAs and TLA.

Apple strongly objects to Qualcomm's demands. First, the Apple ALAs and TLA are simply not relevant. Qualcomm's allegations have nothing to do with Arm's agreements with non-party Apple. Second, Qualcomm is an Apple supplier, a supplier to Apple competitors, and a competitor of Apple. The Apple ALA/TLA are among Apple's most sensitive and heavily negotiated commercial trade secrets. The harm to Apple of producing such agreements to Qualcomm cannot be overstated, and cannot be justified given their scant (if any) relevance. Finally, given the narrow issues in this case, there are other ways that Apple could provide targeted, responsive information to Qualcomm that would not require wholesale production of Apple's most sensitive commercial agreements. To date, Qualcomm has been unwilling to engage with Apple on any less harmful means of discovery.

Good cause exists for the Court to enter the proposed protective order filed herewith.

**Factual Background**

**1.    The Apple ALA and TLA**



**2.    Qualcomm's Previous Demands for Unredacted Apple ALAs**

In the related litigation between Qualcomm, Arm, and Nuvia, Apple consented to Arm's production of redacted copies of certain versions of the Apple ALA. *Arm Ltd. v. Qualcomm Inc., et al.*, C.A. No. 22-1146 (MN) (D. Del.) (the "*Nuvia* Litigation"). Qualcomm sought to compel unredacted versions of these agreements. *Id*. D.I. 101. Apple moved for, and the magistrate judge granted, a protective order holding that "Qualcomm, as an indirect competitor and customer,

1

could obtain unfair competitive advantages by accessing information contained in the 2023 Apple ALA" even if produced as Attorneys' Eyes Only. *Id.* D.I. 207; *see also* D.I. 111. Judge Hatcher also denied Qualcomm's motion to compel unredacted licensing information. *Id.* D.I. 252.

### 3.    The Present Litigation

On April 23, 2025, Arm notified Apple that it may be required to produce certain information to Qualcomm including certain Apple agreements. (Declaration of H. Cannom "Cannom Decl." ¶ 3.)) On May 5, 2025, Apple asked for a list of the documents that Arm intended to produce, copies of any documents, and a copy of the relevant discovery requests, and conveyed its understanding that Apple's time to seek a PO would not start until it received that information. (*Id*. ¶ 4.)) To date, Arm has reiterated that it does not intend to produce the Apple ALA and TLA. (D.I. 84, ¶ 51(c), Cannom Decl. ¶ 5.)

Nevertheless, since then, Apple has worked with the parties to avoid motion practice. For example, on June 15, June 16, and July 1, at Apple's initiation, Apple requested identification of what, if any, Apple CBI Qualcomm was requesting from Arm, and the relevance of that information; and sought to explore whether Qualcomm would accept more targeted, less sensitive discovery to confirm (or refute) its allegations. (*Id.* ¶ 6.) Qualcomm was unwilling to share any specifics due to the redactions on the public docket, and did not engage on a resolution other than production of the unredacted Apple agreements. (*Id.* ¶ 7.) On these calls, Qualcomm also refused to provide Apple with *any* information about the provisions of the Arm-Qualcomm agreements at issue in the litigation that would aid Apple in identifying less sensitive, potentially responsive materials. (*Id.* ¶ 8.) As such, Apple has been unable to meaningfully engage on the scope and relevance of the Apple CBI at issue, or to propose an acceptable compromise.

On June 5, 2025, Apple sent a letter (D.I. 160) alerting the Court that, despite its best efforts, Apple did not know what Apple CBI was at issue, and flagging Apple's request to be heard in the event the Court was weighing production of any Apple CBI.

On June 23, 2025, Arm notified Apple that it intended to produce certain Arm technical documents containing Apple CBI, and Apple consented to production on July 3, 2025. (Cannom Decl. ¶ 9.) To date, Apple has received no further notifications by Arm of other Apple CBI it intends to produce. (*Id*. ¶ 10.)

On July 22, 2025, Apple requested that Arm provide Apple with notice if the Special Master set a discovery hearing. (Cannom Decl. ¶ 11.) Arm provided Apple that notice on July 30, 2025, and on August 1, 2025, Apple requested clarification of whether the parties' briefing implicated Apple materials and copies of that briefing. (*Id.* ¶ 12.) Apple again requested copies of the unredacted discovery briefing during a call to Qualcomm counsel on August 5, 2025. (*Id.* ¶ 13.) Qualcomm refused, and stated its objection to any participation by Apple in the Special Master hearing. (*Id.* ¶ 14.) The next day, Arm informed Apple that "Qualcomm's counsel at Paul Weiss is refusing to agree to Arm's redactions to Qualcomm's brief and is not proposing any

alternative redactions that would allow [Arm] to share Qualcomm's brief with [Apple]."[1] (Cannom Decl. ¶ 15.)

As a result, while Apple's timeline to seek a PO has not yet been triggered, Apple moves for a PO out of an abundance of caution and to ensure it has an opportunity to be heard alongside the Special Master's consideration of any request by Qualcomm to order production of Apple CBI. (*See* D.I. 84 at ¶¶ 51(c), 52.)

<u>**Argument**</u>

Good cause exists for the Court to grant a protective order preventing the disclosure of the Apple agreements. Fed. R. Civ. P. 26(c); *Nuvia* Litigation D.I. 207, 252; *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir. 1984).

The party seeking discovery bears the burden of demonstrating the relevance of the information sought. *See Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, 2017 WL 4310221, at *4 (M.D. Pa. Sept. 28, 2017). Once that party has met the burden of showing relevance sufficient to justify discovery, the burden shifts to the party seeking the protective order to show why discovery should not be had.

**1.      The Apple ALA and TLA Are Not Relevant.**

Qualcomm cannot meet its burden of showing that the Apple agreements are relevant to, or will lead to the discovery of admissible evidence in, this case. Qualcomm's relevance arguments were viewed skeptically in the *Nuvia* Litigation and are even more misplaced here. *See Nuvia* Litigation*,* D.I. 207, 252. Here, "[t]he issues involved in this contract dispute are not overly complex." (D.I. 134.) Qualcomm simply cannot credibly claim that it needs the third-party ALAs and TLAs to determine if Arm breached the Qualcomm-Arm ALA (*see, e.g.*, D.I. 211 at 6). *See, e.g. AdTrader, Inc. v. Google LLC,* 2021 WL 937559, at *2 (N.D. Cal. Mar. 12, 2021) (defendant's policies toward nonparty advertisers were irrelevant and not discoverable because they revealed nothing about defendant's compliance with contractual obligations owed to plaintiff under separate agreements).[2] Moreover, even if Qualcomm could identify some limited, relevant information in Arm's agreements with non-parties, Qualcomm fails to explain why it needs the *entirety* of *all versions* of these agreements, including pricing.[3] For example, based on publicly available allegations in the redacted Second Amended Complaint, Qualcomm

---

[1] Paul Weiss's refusal here is problematic because it has a conflict preventing it from addressing matters related to Apple. (*See Nuvia* Litigation, D.I. 585, Ex. A at 72:20 – 73:7 ("we have an issue with an agreement by Paul Weiss lawyers not to get into issues involving Apple").)

[2] To the extent that Qualcomm attempts to distinguish this case by citing to a heavily redacted paragraph in the Second Amended Complaint (*see* D.I. 211 at 11 citing D.I. 137 ¶ 76), Qualcomm's refusal to identify less burdensome means of obtaining this information is fatal to its demand for all third-party ALA and TLA.

[3] Apple asked Qualcomm to accept information it seeks in another format, such as production of other documents or deposition. But Qualcomm refused. For example, during a July 1, 2025, call, Qualcomm maintained that it needs the entirety of the outgoing obligations in the third-party ALA/TLA, which are the vast majority of the agreements and the most sensitive information therein. (Cannom Decl. ¶ 8.)

███████████████████████████████████

alleges Arm breached the Arm-Qualcomm ALA at least by failing to deliver the Arm Compliance Kit (ACK) tests and OOB configuration for which Arm would expect to see verification data, and certain ARM "patches" used in connection with verification. (*See e.g.*, Redacted FAC, D.I. 39 at ¶¶ 67, 69, 70, 74, 127.) Whether Arm failed to provide to Qualcomm any required deliverables does not necessitate delving into the entirety of the non-party agreements. Moreover, Qualcomm's demands ignores the substantial related discovery that Qualcomm already has from the *Nuvia* Litigation, and ignores that information about Apple's receipt of deliverables could be shared by much less intrusive means. (D.I. 39 at ¶¶ 78-83.)

████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████ Comparison with Apple's ALA would not be instructive for Qualcomm on any issue, because Apple and Qualcomm are not similarly situated Arm licensees.

Moreover, none of the arguments that Qualcomm has made in response to the other non-parties' protective order motions are availing. (*See* D.I. 211, 354, 356.) For example, Qualcomm fails to substantiate its assertion that the entire ALAs and TLAs must be produced and/or that less invasive discovery may be insufficient. Indeed, while Qualcomm seeks documents that show "whether such deliverables exist" (D.I. 211 at 9), "Arm's conduct in isolating [Qualcomm] from delivery" (*id.* at 10), or the "licensing offers" provided by Arm (*id.*), there are myriad less sensitive ways to provide such information.

> **2.**      **Production of the Apple ALA and TLA Poses a Substantial Risk of Competitive Harm to Apple.**

Even if the Apple ALA and TLA were of some marginal relevance to the present litigation (they are not), the risk of injury to Apple if they were produced is real, dire, and cannot be ignored. *See United States v. Dentsply Int'l, Inc.,* 187 F.R.D. 152, 160 n.7. The Apple agreements are among the most commercially sensitive documents at Apple. (Kirby Decl. ¶ 7.) Qualcomm cannot reasonably dispute this given that it will not even provide Apple's outside counsel unredacted access to documents related to the scope of the Arm-Qualcomm ALA.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ Such trade secret information about Apple's unreleased products is treated with the utmost sensitivity within Apple, and release of this information would be catastrophic to Apple's technical competitive edge. (*Id.* ¶ 10.) The potential harm to non-party Apple therefore cannot be overstated and outweighs any marginal relevance here. *See American Standard Inc. v. Pfizer, Inc.*, 828 F.2d 734, 743 (Fed. Cir. 1987) ("Where proof of either relevance *or* need is not established, discovery is properly denied.") (emphasis in original).

Further, the trade secrets contained in the Apple ALA and TLA are the type of information that, once disclosed, cannot be unlearned. This risk, especially to a non-party in a highly contentious litigation among its suppliers, cannot be overstated. *See Arconic Corp. v. Novelis Inc.*, Case No. 17-1434, 2021 WL 4479484, at *5 n.2 (W.D. Pa. Sept. 30, 2021). Inadvertent disclosure to Qualcomm of the trade secrets contained within the Apple agreements

would have substantial commercial ramifications for Apple, as it would give Qualcomm an advantage in its negotiations with Apple, with Arm, and also Apple's competitors who buy components from Qualcomm. (Kirby Decl. ¶ 8.) The status quo is that Qualcomm should not have access to Apple's confidential information when negotiating its own contracts with ARM. It should not gain such access through litigation.

Finally, the protective order in this case cannot eliminate these substantial risks to Apple. Protective orders can be and are knowingly or inadvertently violated , and the harm from any violation here could not be remediated given the nature of the commercial terms and trade secrets at issue. *See Nuvia Litigation,* D.I. 207 ("Apple's concerns are legitimate, particularly considering the ███████████ minimal relevance when combined with the harm of disclosure given that Qualcomm's outside counsel will necessarily need to communicate generalized information about the ALA to its client, all of which remains true even given the Protective Order in this case."); *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 530 (D. Del. 2002) (recognizing potential harm to non-party of production notwithstanding outside counsel only provision of PO). Moreover, a protective order cannot protect against the valid security concerns that Apple has with the technical limitations of data security. In the past two years, Apple has been alerted to multiple instances of opposing outside law firms being hacked and Apple confidential information being compromised. The extreme sensitivity of these agreements—especially given their scant relevance—cautions against production here.

## Conclusion

Apple respectfully requests that the Court grant Apple's motion for a protective order.

Dated:  August 11, 2025

FISH & RICHARDSON P.C.

*/s/ Nitika Gupta Fiorella*
Susan E. Morrison (No. 4690)
Nitika Gupta Fiorella (No. 5898)
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19899
Tel: (302) 652-5070
morrison@fr.com
fiorella@fr.com

Hannah Cannom (*pro hac vice*)
Bethany Stevens (*pro hac vice*)
WALKER STEVENS CANNOM LLP
500 Molino Street, Suite 118
Los Angeles, California 90013
213-712-9145
hcannom@wscllp.com
bstevens@wscllp.com

*Attorneys for Non-Party Apple Inc.*

5

# EXHIBIT 2
## (Filed Under Seal)

# EXHIBIT 3
## (Filed Under Seal)

# EXHIBIT 4



Tim Cook and Masayoshi Son. Photos via Getty

Exclusive

QCVARM_0717207

# How a Lopsided Apple Deal Got Under Arm's Skin

The SoftBank-controlled chip designer Arm has played an important role in helping Apple's devices outflank the performance of rivals. But the iPhone maker pays unusually low fees to Arm because of its unique leverage in the smartphone industry.

 By Wayne Ma and Cory Weinberg

Nov 29, 2023, 6:00am PST

**In 2017, SoftBank** CEO Masayoshi Son gathered a group of executives from Arm Holdings, the British chip designer SoftBank had just bought, to complain about one of its most important customers: Apple.

In a conference room in Tokyo, Son told the group that Apple paid more for the piece of plastic that protects the screens of new iPhones than it did to license Arm's intellectual property, according to a person with direct knowledge of the meeting. To punctuate his point, Son pretended to peel the plastic wrap off an iPhone in front of the group.

QCVARM_0717208

Six years later, Arm still faces the same problem: Apple pays less than 30 cents per device for the right to use Arm-based chips in the hundreds of millions of iPhones, iPads, Macs and Apple Watches it sells each year, according to people with direct knowledge of the matter. That's the lowest royalty rate among Arm's smartphone chip customers, traditionally its biggest group of customers by revenue, the people said. As a result, Apple accounts for less than 5% of Arm's sales, around half the figure for each of the chip company's top two customers, Qualcomm and Mediatek, they said.

## The Takeaway

- Apple represents less than 5% of Arm's annual revenue

- Apple pays a flat fee of less than 30 cents a chip, regardless of how many Arm cores used

- Apple's payments to Arm are the lowest among Arm's smartphone chip customers

The issue has become a more pressing one for Arm since its recent initial public offering. The company is now valued at $63 billion, roughly twice what SoftBank paid for it, thanks to investor expectations that its technology will be increasingly used in cloud computing and automobiles. But a slowdown in smartphone sales has weighed on Arm's top line: Revenue from royalties fell 5% year on year in the most recent quarter.

QCVARM_0717209

Getting more money from Apple would help jump-start Arm's revenue growth. After SoftBank bought the chip company in 2016, Son sought to change the terms of its deal with Apple by raising royalty rates, according to people with direct knowledge of the matter. He was unsuccessful.

Arm isn't alone in finding that being an Apple supplier can be a double-edged sword. On one hand, a relationship with the iPhone maker can bring a gusher of sales to suppliers. Even when it doesn't, the credibility boost that comes from working with Apple can help suppliers win business from other customers. On the other hand, Apple is well known for aggressively pressuring suppliers to lower their prices, in some cases even causing them to lose money from the arrangements.

Having Apple as a customer has been an important tool for helping Arm win business from other companies, and Apple engineers have helped Arm improve its designs, those people said. Arm touted its relationship with Apple to investors ahead of its IPO in September. Apple also was among a group of 10 cornerstone investors that pumped a combined $735 million into buying shares in the offering.

A breakup between the two companies isn't likely to happen anytime soon. In September, Arm said it had signed a new licensing agreement with Apple that "extends beyond 2040," without elaborating. That's far longer than the typical five-year term for Arm licenses, according to former Arm employees. In the meantime, Apple has explored the long-term possibility of using a competing technology in the chips for its devices, according to one former Apple employee. The loss of Apple would be a major blow to Arm.

"Apple is the sort of anchor in the smartphone world," said Sara Russo, a semiconductor analyst at Bernstein who previously worked at Arm. "If they would go another direction, I think it would be a very interesting signal to the wider market of seeing an opportunity to do something different that would be disruptive to Arm's business."

QCVARM_0717210

For now, Arm remains a powerhouse in its category. In addition to licensing its off-the-shelf chip designs to customers such as Qualcomm and Mediatek, whose chips are in many of the world's smartphones, the company also licenses the underlying technology behind those designs—known as chip architecture—to other clients such as Apple, who use it to design their own chips. Chips based on Arm designs are inside everything from cars to drones, not to mention 99% of the world's smartphones. Arm estimates that seven out of 10 people regularly use Arm-based products and that more than 250 billion chips have shipped with its technology.



Arm employees celebrate in New York in September after the company's IPO. Photo by Michael M. Santiago/Getty Images

QCVARM_0717211

Despite the ubiquity of its chips, Arm posted only $524 million in net income in the fiscal year ended March 31—less than 1% of Apple's annual profit. That disparity has been a sore spot for Son, who regularly waves his iPhone around in meetings, telling Arm executives that the company should take a bigger slice of the smartphone industry's profits—especially Apple's, according to a person with direct knowledge of the matter.

Apple's favorable terms with Arm have been a closely guarded secret for 15 years, known to only a select few people inside the companies. (Former Arm employees even say they have to refer to Apple by a code name—Fender—because of the company's general policy of keeping its partnerships secretive.) However, a lawsuit between Arm and Qualcomm—which supplies the cellular modems inside iPhones—over royalty payments recently cast a spotlight on Apple's sweetheart deal, which Apple said was among its "most commercially sensitive documents." Apple earlier this week won a motion to keep the details of its Arm license secret after Qualcomm asked Arm for a copy of the agreement. Apple told a Delaware federal court that revealing the agreement would give Qualcomm an unfair advantage when negotiating with Arm, Apple and Apple's competitors.

For the moment, Apple needs Arm too. Arm's chip architecture, which prioritizes speed and power efficiency, has been a crucial factor in helping it make iPhones that outperform rivals year after year. In 2020, Apple doubled down on Arm, moving its laptops and desktops off Intel chips to Apple-designed chips that used Arm's architecture.

Spokespeople for Apple, Arm and Qualcomm didn't comment.

**Favorable Terms**

QCVARM_0717212

Case 1:24-cv-00490-MN   Document 825-1   Filed 07/07/26   Page 67 of 90 PageID #: 55538

Apple's relationship with Arm dates to Arm's founding in 1990 as a joint venture between Apple, Acorn Computers and chip company VLSI Technology. Apple used an Arm processor in the Newton MessagePad, a personal digital assistant that never took off. Apple sold its stake in Arm to help fund its turnaround under then-CEO Steve Jobs a decade later.

Arm essentially acts like a chip research and development department for its customers, allowing smartphone makers and other firms to avoid the roughly $100 million a year it would cost to build their own processors, by some analyst estimates.

In 2008, a year after Apple introduced the iPhone, Apple struck a deal with Arm to license its architecture and off-the-shelf designs. At the time, Arm was looking to break into the nascent smartphone market and was willing to offer lower rates to high-profile customers that could show off its technology.

Most of Arm's customers pay a royalty based on a percentage of the price for the chips they sell to their customers.  That price rises based on the number of Arm cores—which act as the chip's brains—included in those chips. But companies like Apple don't sell chips to other customers, making it harder for Arm to calculate a price. Apple persuaded Arm to accept a low flat royalty fee per chip regardless of how many Arm cores it used.

That arrangement proved advantageous to Apple as chips grew more complex, incorporating multiple cores. Apple also had the foresight at the contract's inception to negotiate an option to extend the 10-year deal it struck in 2008 through 2028, ensuring that it would pay the same price to Arm even as its volumes and profits skyrocketed, according to people with direct knowledge of the matter.

QCVARM_0717213

Soon after, Apple began work on its own custom core for the iPhone. To lead the effort, Apple in 2010 hired a former Arm engineer who previously led the design of Arm's smartphone processor cores. In 2012, Apple launched the iPhone 5 with its first Apple-designed Arm-based cores. The custom chips consistently outperformed comparable chips in smartphones sold by competitors like Samsung that used Arm's off-the-shelf designs.

The switch to making its own custom cores meant Apple paid a lower royalty than those customers that were licensing the whole kit and kaboodle from Arm. Instead, Apple only licensed Arm's architecture, which determines how its cores work. That allowed Apple to design its own cores tailored to its specific needs rather than buying an Arm chip design that catered to a broad range of customers.

In 2013, Apple was the first company to switch to Arm's 64-bit architecture, allowing its processor cores to handle more data at once. Arm's other customers had been on the fence about adopting the upgrade as it would cost more. But Apple's success with the technology prompted others to follow suit, boosting Arm's sales, according to former Arm employees.

Apple remains the only smartphone company that designs its own cores. Qualcomm, Mediatek, Samsung and Google are all working on developing their own designs for smartphone cores, but they still rely on Arm's off-the-shelf designs, making it harder for them to stand out.

**Raising Prices**

After SoftBank bought Arm in 2016, Son quickly set out on a mission to increase the company's value.

QCVARM_0717214

One former Arm employee said Son established a goal of increasing Arm's revenue—then about $1.7 billion a year—to more than $10 billion over the next decade. The company expanded into new industries such as automotive and cloud computing and introduced new business models. For example, it began offering annual subscription plans that gave customers the option of using a broader range of Arm's intellectual property, and it gave small startups access to its technology for a low up-front fee in exchange for higher royalties later.

At one point, Son called Apple CEO Tim Cook to tell him Arm would be raising prices for all its major smartphone and chip customers. Cook's team reassured him that Arm couldn't raise fees, because the companies' contract at the time lasted through 2028. Son backed off. Since then, Apple and Arm have been through several rounds of negotiations that have kept the financial terms of Apple's deal largely in place, people familiar with the matter said.

Earlier this year, Arm reportedly tried to change its pricing model more generally by charging customers a royalty based on a percentage of the retail prices for the final devices they sold, rather than the price of the chip inside those devices. Apple, which sells some of the most expensive smartphones in the industry, wasn't part of the discussions, and Arm ultimately canceled the effort after other customers pushed back, the Financial Times reported.

In the near term, the marriage between Apple and Arm seems unlikely to fall apart. Apple can't afford to walk away from its partner anytime soon, given how integral Arm's architecture is to its current software and hardware. Apple has flirted with a competing chip architecture called RISC-V, which is open source and wouldn't require royalty payments. But the company has estimated it would take at least eight years to move from Arm to RISC-V, according to a former Apple employee with direct knowledge.

In the meantime, Apple sends people to RISC-V conferences and posts jobs looking for people who have experience with RISC-V, according to the former Apple employee and a review of job ads. At the very least, the specter of Apple increasing its investments in the competing chip technology has given it leverage in negotiations with Arm, according to former Apple and Arm employees.

QCVARM_0717215

If and when Apple does decide to part ways with Arm, the process is likely to be less painful for Apple than it would be for most makers of competing Android smartphones due to the control it has over the hardware and software for its devices, former Arm and Apple employees said. That fact is a key reason why Son has come to believe Arm has limited leverage over Apple in negotiations, a person familiar with his thinking said.

For Arm, such an event wouldn't be like losing an ordinary customer. Working with Apple has been one of Arm's most powerful marketing tools for winning new customers looking to replicate Apple's success, former Arm employees say. And Apple engineers have contributed valuable ideas that Arm has incorporated into upgraded versions of its architecture—for example, designs that speed up artificial intelligence and machine-learning tasks.

*Wayne Ma is a reporter covering U.S. tech in Asia, from Apple's supply chain to Facebook's and Google's operations in the region. He previously worked for The Wall Street Journal. He is based in Hong Kong and can be found on Twitter at [@waynema](https://twitter.com/waynema).*

*Cory Weinberg is deputy bureau chief responsible for finance coverage at The Information. He covers late-stage private tech firms, IPOs and capital markets, and is based in New York. He has an MBA from Columbia Business School. He can be found on Twitter [@coryweinberg](https://twitter.com/coryweinberg). You can reach him on Signal at +1 (561) 818 3915.*

QCVARM_0717216

# EXHIBIT 5

Case 1:24-cv-00490-MN   Document 825-1   Filed 07/07/26   Page 72 of 90 PageID #: 55543
Apple pays Arm less than 30 cents per chip in royalties, new report says

# Apple pays Arm less than 30 cents per chip in royalties, new report says

tomshardware.com/news/apple-pays-arm-less-than-30-cents-per-chip-in-royalties-new-report-says

November 29, 2023



(Image credit: Jaap Arriens/NurPhoto via Getty Images)

Apple is known for being a tough business partner with its vendors, and a new report suggesting the company has negotiated a surprisingly small royalty rate with Arm, whose tech Apple uses to make the processors in its many devices, confirms that.

According to a report from *The Information,* Apple is paying Arm "less than 30 cents per device" to use Arm-based chips in laptops, phones, tablets, watchers, smart speakers and other devices. This is reportedly the smallest royalty fee structure among the companies that use Arm's smartphone chip designs, adding up to less than 5% of Arm's sales. In comparison, that's about half of what Qualcomm and Mediatek — which the report says are Arm's two biggest customers — pay.

The article paints Arm (and parent company, SoftBank) as — unsurprisingly — annoyed by the arrangement. *The Information* reports that when SoftBank purchased Arm in 2016, CEO Masayoshi Son looked to restructure the deal and raise rates, but failed to do so.

QCVARM_0714734

Arm licenses chip designs to companies like Apple to design chips. Other companies may use Arm's chip designs wholesale, however. Arm originally started as a joint venture between multiple tech companies — of which Apple was a founding member.

Apple and Arm appear to have no plans to separate. In September, Arm announced that it and Apple had entered a long-term agreement "that extends beyond 2040[.]" That's a long period in tech, and — according to *The Information's* sources — far beyond the usual five-year term. But Apple has also reportedly looked into the open-standard RISC-V architecture (which wouldn't require any royalty payments at all) — potentially to give it leverage with Arm. We've seen Apple post jobs for RISC-V programmers before.

Apple uses Arm cores in chips across a variety of devices. Beyond the M-series system-on-chips in Macs (and some iPads) and A-series chips in iPhones (and other iPads), there are the system-in-packages in the Apple Watch (such as the S9 in the Apple Watch Ultra 2 and Series 9) and HomePod.

Working with Apple provides Arm and other vendors with a big boost in credibility. But the company is also known for cost-reducing strategies that often force vendors to lower prices, or — sometimes — lose money. It seems that Apple has also brought Arm more customers, which *The Information* claims looked to emulate Apple's success — making for a complicated partnership that may span decades more.

## Stay On the Cutting Edge: Get the Tom's Hardware Newsletter

Get Tom's Hardware's best news and in-depth reviews, straight to your inbox.

QCVARM_0714735



Andrew E. Freedman

QCVARM_0714736



Andrew E. Freedman is a senior editor at Tom's Hardware focusing on laptops, desktops and gaming. He also keeps up with the latest news. A lover of all things gaming and tech, his previous work has shown up in Tom's Guide, Laptop Mag, Kotaku, PCMag and Complex, among others. Follow him on Threads @FreedmanAE and Mastodon @FreedmanAE.mastodon.social.

29 Comments Comment from the forums

QCVARM_0714737

- JamesJones44
  Apple actually already does use RISC-V for some of their IC chip designs. I wouldn't put it past Apple to switch to RISC-V more heavily if they felt terms were unfavorable given they are only using the instruction set and not chip designs.

  Reply
- ekio

  Yes and that's why ARM stock price is very overrated.

  Better bet on risc-v that will not crumble if they don't get multiple bilions to just run idle…

  Reply
- Bluetooth!
  Apple is not using ARM's chips, it's only using the ISA. Also ARM has used some of the new ISA commands that Apple has made. Thus, the price is not that low and not compareable with those usimg ARM's chip designs.

  Reply
- JTWrenn

  I say put the screws to them now rather than later. They don't have anything they can jump to fast enough to not lose money so you have a shot now...if contract is coming up. Wait another 5 to 10 and you may have risc-v or some other options up and running and end up in a bind.

  This also really shows that Apple needs to be broken up. Their market power and capital give them too much power in negotiations and break competition by them getting every sweet heart deal. Anti trust is dead.

  Reply
- TCA_ChinChin

  > JamesJones44 said:
  >
  > Apple actually already does use RISC-V for some of their IC chip designs. I wouldn't put it past Apple to switch to RISC-V more heavily if they felt terms were unfavorable given they are only using the instruction set and not chip designs.

  Really? I didn't know they did that even for some of their less complex ICs. Thats cool to know.

  Reply

QCVARM_0714738

- hecksagon
  In this case I can almost justify that. Apple only licenses the instruction set. The chip design itself is entirely Apple's.

  Reply
- Bluetooth!

  > hecksagon said:
  >
  > In this case I can almost justify that. Apple only licenses the instruction set. The chip design itself is entirely Apple's.

  Apple also did show with their own chip designs, that ARM was just as good as an ISA as X86. The attention ARM has gotten after the M chips came from Apple are probably wort a lot to ARM!

  Reply
- thestryker
  I'd love to know what the royalties look like on the Qualcomm architecture license if Arm is willing to fight them in court while giving Apple this deal. My guess is that Arm is either trying to maintain the current royalties from Qualcomm using Arm designs instead of their own or Qualcomm's deal is even better than Apple's.

  Reply
- Bluetooth!

  > thestryker said:
  >
  > I'd love to know what the royalties look like on the Qualcomm architecture license if Arm is willing to fight them in court while giving Apple this deal. My guess is that Arm is either trying to maintain the current royalties from Qualcomm using Arm designs instead of their own or Qualcomm's deal is even better than Apple's.

  The fight with Qualcomm is that they bought a startup with a deal with ARM, that QCom wants to keep, but ARM said was void after the takeover

  Reply

QCVARM_0714739

- bit_user

  > Apple has also reportedly looked into the open-source RISC-V architecture (which wouldn't require any royalty payments at all) — potentially to give it leverage with Arm.

  @JarredWaltonGPU , sorry to bother you, but could you please let Andrew know it's an open standard, *not* open source? He frequently makes this mistake, and it only spreads confusion among readers.

  Also, I think the article doesn't sufficiently distinguish between the architecture license, under which Apple designs its own cores vs. the full core implementations being used in the SoCs *currently* made by Qualcomm and MediaTek. I think this explains why ARM has been so desperate to renegotiate the terms of Qualcomm's architecture license, as it moves back to designing its own cores (i.e. via Nuvia).

  If it's really true that the finished core designs only cost Qualcomm about twice as much as an architecture license would, I'm actually quite surprised! There's a world of difference in how much it costs ARM to design cores vs. just letting people use their patents - and that gets to the heart of the difference between license types.

  Reply
  
- 

QCVARM_0714740

# EXHIBIT 6
## (Filed Under Seal)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:24-cv-00490-MN |
| | ) | |
| ARM HOLDINGS PLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF HANNAH L. CANNOM IN SUPPORT OF
## NON-PARTY APPLE INC.'S MOTION FOR PROTECTIVE ORDER

I, Hannah L. Cannom, declare as follows:

1.      I am over the age of 18, and am a partner at Walker Stevens Cannom LLP, representing non-party Apple Inc. in this matter. If called as a witness, I could and would testify competently to the information set forth in this Declaration.

2.      I make this declaration in support of Non-Party Apple Inc.'s Motion for a Protective Order.

3.      On April 23, 2025, Arm notified Apple that it may be required to produce certain information to Qualcomm including certain Apple agreements.

4.      On May 5, 2025, Apple asked for a list of the documents that Arm intended to produce, copies of any documents, and a copy of the relevant discovery requests. Apple further conveyed its understanding that Apple's time to seek a PO would not start until it received that information.

5.     To date, in multiple telephone conversations and email communications, Arm has reiterated that it does not intend to produce the Apple ALA and TLA.

6.     On June 15, June 16, and July 1, I initiated calls with Jennifer Ying, local counsel for Qualcomm. On those calls, I requested identification of what, if any, Apple CBI Qualcomm was requesting from Arm, and asked that Qualcomm provide the relevance of that information. I also asked Ms. Ying if Qualcomm would accept more targeted, less sensitive discovery to confirm (or refute) its allegations.

7.     Ms. Ying indicated that Qualcomm was unwilling to share any specifics due to the redactions on the public docket, and stated that she did not think that there was any resolution other than production of the unredacted Apple agreements.

8.     On these calls, Ms. Ying also refused to provide any information about the provisions of the Arm-Qualcomm agreements at issue in the litigation that would aid Apple in identifying less sensitive materials. For example, Apple asked Qualcomm to accept information it seeks in another format, such as production of other documents or deposition. But Qualcomm refused. For example, during our July 1, 2025, Ms. Ying maintained that Qualcomm needs the entirety of the outgoing obligations in the third-party ALA/TLA.

9.     On June 23, 2025, counsel for Arm notified me that it intended to produce certain Arm technical documents containing Apple CBI. On behalf of Apple, I consented to production on July 3, 2025.

10.    To date, Apple has not received no further notifications by Arm.

11.    On July 22, 2025, I requested that counsel for Arm provide me with notice if the Special Master set a discovery hearing.

12.    Arm provided me with that notice on July 30, 2025, and on August 1, 2025, I requested clarification of whether the parties' briefing implicated Apple materials and copies of any briefing demanding Apple CBI.

13.    I reiterated that request for unredacted discovery briefing during a call with Ms. Ying on August 5, 2025.

14.    Ms. Ying refused, and stated Qualcomm's objection to any participation by Apple in the hearing before the Special Master.

2

15.     On August 6, 2025, counsel for Arm sent me an email that stated that "Qualcomm's counsel at Paul Weiss is refusing to agree to Arm's redactions to Qualcomm's brief and is not proposing any alternative redactions that would allow [Arm] to share Qualcomm's brief with [Apple]."

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 11th of August, 2025, at Los Angeles, California.

_____
Hannah L. Cannom
Walker Stevens Cannom LLP

3

# EXHIBIT 7
## (Filed Under Seal)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., and          ) SEALED
QUALCOMM TECHNOLOGIES, INC.,)
                            )
          Plaintiffs,       )
                            ) C.A. No. 24-490(MN)
v.                          )
                            )
ARM HOLDINGS PLC,           )
                            )
          Defendant.        )

Tuesday, March 10, 2026
2:00 p.m.
Motion Hearing

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY:  JENNIFER YING, ESQ.

-and-

DUNN ISAACSON RHEE LLP
BY:  KAREN DUNN, ESQ.
BY:  WILLIAM ISAACSON, ESQ.
BY:  ERIN J. MORGAN, ESQ.
BY:  JENIFER N. HARTLEY, ESQ.

APPEARANCES (Cont'd):

-and-

PAUL WEISS
BY:  CATHERINE NYARADY, ESQ.
BY:  JACOB A. BRALY, ESQ.
BY:  ADAM BASNER, ESQ.

Counsel for the Plaintiffs

YOUNG CONAWAY STARGATT & TAYLOR LLP
BY:  ANNE SHEA GAZA, ESQ.
BY:  DANIEL MACKRIDES, ESQ.

-and-

KIRKLAND & ELLIS LLP
BY:  GREGG F. LoCASCIO, ESQ.
BY:  JASON M. WILCOX, ESQ.
BY:  JAY EMERICK, ESQ.
BY:  KASDIN MITCHELL, ESQ.
BY:  MEREDITH POHL, ESQ.
BY:  MICHAEL PRONIN, ESQ.

Counsel for the Defendant

WALKER STEVENS CANNOM LLP
BY:  HANNAH CANNOM, ESQ.

Counsel for Apple

WILSON SONSINI
BY:  BRADLEY D. SORRELS, ESQ.

Counsel for Ampere

APPEARANCES (Cont'd):

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
BY:  JENNESS PARKER, ESQ.

Counsel for Broadcom

CONNOLLY GALLAGHER LLP
BY:  SARA BARRY, ESQ.

Conflicts Counsel

_ _ _ _ _ _ _ _ _ _ _ _ _

COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Maryellen Noreika presiding.

THE COURT:  All right.  Good afternoon.  Please be seated.  Let's start with some brief introductions.

MS. YING:  Good afternoon Your Honor, Jennifer Ying from Morris Nichols Arsht & Tunnell on behalf of the plaintiffs.  I'm also joined by Travis Murray from Morris Nichols and then at counsel table from Dunn Isaacson & Reed, we have Karen Dunn, Bill Isaacson, Erin Morgan, as well as Jennifer Hartley.  And then from Paul Weiss we have Kathy Nyardy, Jacob Braley and Adam Basner.  And we also have conflicts counsel from Connolly Gallagher, Sara Barry.

THE COURT:  Okay.

MS. GAZA:  Good afternoon, Your Honor.  Anne Gaza from Young, Conaway on behalf of Arm.  I'm joined by a colleague, Daniel Mackrides, as well as Kirkland & Ellis, Gregg LoCascio, Jason Wilcox, Jay Emerick, Kasdin Mitchell, Meredith Pohl, and Michael Pronin.

Thank you.

THE COURT:  Okay.  Thank you.

All right.  So we have your papers and let me just get this out of the way so hopefully it doesn't come out later when I get tired from the arguments, but you all submitted 11,000 pages on objections for discovery.  That isn't all that you gave me for summary judgment and Daubert and that is excessive, 11,000 pages for discovery objections.  And you're not even objecting to absolutely everything the Special Master did.  And what that tells me is that nobody is seriously thinking about making decisions based on what's reasonable and what's necessary.  And you're lucky that your client is willing to pay for a bunch of stuff that seems unnecessary and disproportionate, but you're not lucky that I am now teetering on forming the impression that you have no respect for my time and you're not litigating in good faith.

Now, so you guys can be reasonable going forward



73

MS. DUNN: In any event, the parties have agreed, the third parties have agreed that if they remain in the case that the -- those will be unredacted and then just to put on the record, and I don't think this will run afoul of the conflicts counsel because I'm just reporting out what was told to be reported to the Court, Apple is here just for ALAs, not TLAs, so that's separate. And they're still confirming with their client, but that is our current working belief.

THE COURT: Okay. So whoever is representing

74

Apple, do you need more time, is that what you were suggesting? You can come up.

MS. CANNOM: Thank you, Your Honor.

THE COURT: I just didn't want you to come up before because I didn't want to interfere with yelling at these people. I didn't want you in the crossfire. I appreciate the agreement that has come up, so no yelling.

MS. CANNOM: Good afternoon, Your Honor. Hannah Cannom on behalf of Apple.

I think we can confirm at this point that we are in similar situation to ████. We have gone through the list with Qualcomm's counsel of what they're looking for in the TLAs and we can confirm that ████████████ ████████ So as to the TLAs, I think that there is no need for our agreements and I think that Qualcomm will agree with that.

We still have an issue with the ALA which I don't know if you would like to deal with now or deal with separately, but I'm happy to be heard on that.

THE COURT: Isn't that the same thing?

MS. CANNOM: No, because the ALA doesn't contain and list provisions, so they're using it for the implied good faith and fair dealing clause. So things like our rates and our entire ALA which are our ████████ ████████████████ --

75

THE COURT: They claim that they've already said you don't license.

MS. CANNOM: Correct.

THE COURT: But I am going to allow summary judgment on it. Okay. You can tell me whatever you want to say.

MS. CANNOM: Thank you. So for the -- I think we have heard you say this afternoon that that claim is likely baseless and that it doesn't really --

THE COURT: I didn't go that far.

MS. CANNOM: Perhaps baseless. And here what they're trying to do is they're trying to read a ████ ████████████████ into that implied good faith and fair dealing where they're trying to get discovery on all of the ALAs which are ████████████████. ████████ ████████████ They have a thirty-year relationship behind it for Apple in terms of negotiating these agreements.

████████████████████ right, so it's really not an apples to apples comparison here. And so it isn't the type of thing that they should be able to get discovery into all these different agreements because of this implied good faith and fair dealing clause.

THE COURT: Okay.

76

MS. CANNOM: Lastly I would say to the extent that there is anything that they're looking for in the ALAs, it sounds like what they are looking for are the rates and that is -- you know, ████████████████ ████████████████ ████████, and so there shouldn't really be any discovery into the entirety of the agreement. We have been offering different things to them in terms of, you know, interrogatories or anything to provide to them instead of producing the entire agreement and we haven't gotten any real traction with them on that. And it seems to be there has to be a way that we can give them something that they want to the extent it is relevant, which I think the Special Master correctly concluded it is not, while protecting what we believe to be our most sensitive agreement. And to give that agreement to Qualcomm when the outcome of this case would be the likelihood of a new negotiation with them would be likely harmful for us. And I don't think that point can be overstated, especially with a protective order.

MS. YING: Your Honor, I don't know if you need the other third parties in here for that. I don't know, but to the extent that the stuff implicates the stuff that Arm thought was sensitive, I don't know if they're okay with everyone else in the room hearing it, that's all. I wanted to raise that as a confidentiality concern first.



93

unquote, current market rates are.

But as I said before, if Arm doesn't make that argument, then I don't think we're in this position, ▮▮▮▮

THE COURT: We have got to wrap this up. It's almost five o'clock and they still have more issues.

MS. YING: On the issue of counsel advising Qualcomm on ▮▮▮▮, we have not been involved in that. We have not been advising that, so I don't think that is a concern, but to the extent we need a more limited universe of people, we're happy to discuss that as an issue if that's a concern, you know, of the third party.

THE COURT: Okay.

MS. YING: Let me ask Ms. Morgan to answer your question.

THE COURT: That's okay. That was actually -- I understood the arguments on all sides of that more than I understood many of them. So thank you all for that. But I'm going to overrule the objections.

THE COURT: I'm going to overrule the objections

94

to the ALA. I think that that is a different issue than the TLAs with respect to needing to have the universe of all of the agreements. If the argument is it wasn't commercially reasonable, I think there is plenty of ways that plaintiff could try to prove that, and you know, some of it might be with just explaining why you didn't view it as commercially reasonable for the plaintiff. I don't think having what other people got is necessarily going to be relevant or useful.

So those are overruled. The protective order is granted. I don't remember what the status is. But is that okay for Apple and ▮▮▮▮, anything else you all have?

MS. CANNOM: Nothing more, Your Honor.

MR. SORREL: Nothing more, Your Honor.

THE COURT: Then you are excused. Thank you. Okay. So what's left in the objections here?

95

96

# EXHIBIT 8
## (Filed Under Seal)



CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

December 6, 2024

*Via e-mail*

**Young, Conaway, Stargatt & Taylor LLP**
Anne Shea Gaza
Robert M. Vrana
Samantha G. Wilson
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

**Morris, Nichols, Arsht & Tunnell LLP**
Jack B. Blumenfeld
Jennifer Ying
Jbbefiling@mnat.com
jying@mnat.com

**Morrison & Foerster LLP**
Daralyn J. Durie
Erik J. Olson
Henry Huttinger
Joyce Liou
Kyle D. Friedland
Kyle W.K. Mooney
Nicholas R. Fung
Scott F. Llewellyn
ddurie@mofo.com
ejolson@mofo.com
hhuttinger@mofo.com
jliou@mofo.com

**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
Catherine Nyarady
Jacob A. Braly
Karen L. Dunn
Melissa F. Zappala
William A. Isaacson
Anna P. Lipin
Erin J. Morgan
Anna R. Gressel
Alexander M. Butwin
cnyarady@paulweiss.com
jbraly@paulweiss.com
kdunn@paulweiss.com

December 6, 2024
Page 2 of 3

kfriedland@mofo.com
kmooney@mofo.com
nfung@mofo.com
sllewellyn@mofo.com

mzappala@paulweiss.com
wisaacson@paulweiss.com
alipin@paulweiss.com
ejmorgan@paulweiss.com
agressel@paulweiss.com
abutwin@paulweiss.com

**Clarick Gueron Resibaum LLP**
Isaac B. Zaur
Nora Niedzielski-Eichner
izaur@cgr-law.com
nniedzie@cgr-law.com

**Norton Rose Fulbright US LLP**
Andrea L. D'Ambra
Susana Medeiros
Kira Latham
Andrea.dambra@nortonrosefulbright.com
Susana.medeiros@nortonrosefulbright.com
Kira.latham@nortonrosefulbright.com

Re:    *Arm Ltd. v. Qualcomm Inc.*, C.A. No. 22-1146 (MN) (LDH) (D. Del.)

Dear Counsel,

I write on behalf of my client, Apple Inc. ("Apple"), regarding the above-referenced matter (the "Litigation") and, in particular, concerning the treatment of confidential business information of non-party Apple ("Apple CBI") that may be used by the Parties at trial in the Litigation, set to begin on December 16, 2024.

We write to remind the parties of their confidentiality and notice obligations to non-party Apple with regard to the Apple CBI that has been produced and/or may be used at trial in the Litigation. In addition to any contractual obligations the parties have to protect Apple CBI, during discovery, the parties agreed to certain supplemental protections pursuant to which the parties agreed to use reasonable efforts to seal the courtroom and redact any related transcripts in the event any Apple CBI is used at hearing or at trial.

Moreover, to the extent any party intends to produce or seek the production of new or additional Apple CBI during trial, we request that the parties provide Apple with adequate advance notice and opportunity to review such information so that we may meet and confer

December 6, 2024
Page 3 of 3

with the parties and participate in any discussion with the Court regarding the potential production.

        To ensure the protection of Apple CBI at trial, Apple requests the following:

- The parties provide Apple with the notice contemplated in Paragraph 34 of the [Proposed] Joint Pretrial Order (Dkt. No. 534) (the "Order") and specifically identify in that notice which exhibits may contain Apple CBI. For exhibits used in re-direct examination, cross-examination, or during direct examination of an adverse witness, the parties agree to provide Apple with sufficient notice of their intent to use exhibits which contain Apple CBI;
- The parties provide Apple with the notice contemplated in Paragraph 40 of the Order, and specifically identify in that notice which summary exhibits may contain Apple CBI;
- The parties provide Apple with copies of the demonstratives when exchanged as provided in Paragraphs 43, 44, 45, and 46 of the Order. To the extent that any demonstratives used for cross examination or direct examination of an adverse witness, the parties agree to provide Apple with sufficient notice of their intent to use those demonstratives which contain Apple CBI;
- The parties provide Apple with the identity of the witnesses they intend to call as contemplated in Paragraph 55 of the Order; and
- Each party provides Apple with the identity of its corporate representative pursuant to Paragraph 87, so that Apple may raise any objections to that person remaining in the Courtroom if Apple CBI is presented during trial.

If you object to providing these notifications to Apple, please let me know before end of day on Monday, December 9, 2024, so that we may seek the Court's guidance on this issue.

        To be clear, Apple requires that the courtroom be sealed if any Apple CBI is presented or discussed, and we understand that Judge Noreika requires that the parties make such requests well in advance. Apple expects the parties to assist Apple in making such advance requests by providing the disclosures outlined above in addition to also proactively seeking to seal the courtroom when Apple CBI is presented. Please do not hesitate to contact me if you have any questions.

        Sincerely,

        /s/ *Hannah L. Cannom*

        Hannah L. Cannom