# Exhibit 1

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
QUALCOMM INC., and          )
QUALCOMM TECHNOLOGIES, INC.,)
                            )
            Plaintiffs,     )
                            ) C.A. No. 24-490(MN)
v.                          )
                            )
ARM HOLDINGS PLC,           )
                            )
            Defendant.      )
```

Monday, July 6, 2026
2:00 p.m.
Discovery Dispute Hearing

844 King Street
Wilmington, Delaware

BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY:  JENNIFER YING, ESQ.

-and-

DUNN ISAACSON RHEE LLP
BY:  KAREN DUNN, ESQ.
BY:  ERIN J. MORGAN, ESQ.
BY:  JENIFER N. HARTLEY, ESQ.

-and-

**2**

APPEARANCES (Cont'd):

PAUL WEISS
BY:  CATHERINE NYARADY, ESQ.
BY:  JACOB A. BRALY, ESQ.
BY:  ADAM L. BASNER, ESQ.
BY:  WILLIAM T. MARKS, ESQ.

Counsel for the Plaintiffs

YOUNG CONAWAY STARGATT & TAYLOR LLP
BY:  ANNE SHEA GAZA, ESQ.
BY:  ROBERT VRANA, ESQ.

-and-

KIRKLAND & ELLIS LLP
BY:  GREGG F. LoCASCIO, ESQ.
BY:  JASON M. WILCOX, ESQ.
BY:  MEGAN BUTLER, ESQ.
BY:  CHRISTOPHER BUXTON, ESQ.

Counsel for the Defendant

— — — — — — — — — — — — — —

COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Maryellen Noreika presiding.

THE COURT:  All right.  Good afternoon, everyone.  Please be seated.  Some brief introductions.

**3**

Ms. Ying.

MS. YING:  Good afternoon, Your Honor.  Jennifer Ying from Morris Nichols Arsht & Tunnell on behalf of the Plaintiffs.  I'm joined here at counsel table with Karen Dunn, Erin Morgan, Catherine Nyarady, Adam Brasner, Jacob Braly, and William Marks.  And we have our client representative, Chris Longman, here with us today.

THE COURT:  All right.  Welcome to all of you.

Ms. Gaza.

MS. GAZA:  Good afternoon, Your Honor.  Anne Gaza of Young, Conaway on behalf of Arm.  I am joined today at counsel table by Greg LoCascio, Jason Wilcox, Megan Butler, and Christopher Buxton of Kirkland & Ellis, as well as Robert Calico, vice-president and deputy general counsel for Arm.  And my colleague, Rob Vrana also of Young Conaway.

THE COURT:  Okay.  Welcome to all of you as well.

Okay.  So we read the papers.  I'm just trying to pull them up here.  We read the papers.  We have two motions plus the third-party motion.  And we read them.  So on the clawback documents, Defendants in their response submitted a declaration explaining that ███████████ ████████████████████████████████████ ███████████████  What are Plaintiffs' thought on that?

MS. NYARADY:  Thank you, Your Honor.  Catherine

**4**

Nyarady for Qualcomm.

Indeed they did submit declarations.  The declarations should not control and, in fact, obviously we weren't able to cite this law because we didn't have the declarations, but I will commend the Court to two decisions in this district, the *FTC v. AbbVie* case, which is a 2015 Westlaw case, and the number is 8623076.  There is another one --

THE COURT:  Did you say 2016?

MS. NYARADY:  2015.

I will repeat the number, 8623076.

THE COURT:  Okay.

MS. NYARADY:  And the second one is *In re: Niaspan Litigation*, that's a 2017 Westlaw case.  And the number is 3668907.

These cases are just representative of instances where we have a similar fact pattern, there is a motion, declarations are put in, and the Court ultimately discredited the declarations because looking at the record and the document, the Court found that the declarations were not supported.

THE COURT:  Help me out with that, because when I look at the declarations and it says ███████████ ████████████████████████████████████████ ███████████████████████████████████████ what is it that

73

monitorship, you're going to see us for a long, long time, Your Honor. If they had put this out there, this amended claim --

THE COURT: I thought they wanted ███████ ██████ ██████

MR. LoCASCIO: That's for two other breaches, that punitive provision that's a summary judgment issue, that issue, Your Honor, is not for this breach. For this breach they say originally it was just a breach of good faith and fair dealing, now they want to have both the expressed contract breach. Their argument is monetary damages are inadequate. The only remedy is injunctive relief. And on that issue, which also had not been identified in discovery, we would have taken discovery on that.

And when we had the meet and confers, their view is okay, I don't really think you have any prejudice, but let's allow it and have discovery. This Civ Pro theory, let me put a finer point on why it's nonsense. The First Amended Complaint was filed March 30th. Under their theory that in that case, the Arm Ltd case, we're just playing by not the scheduling order from the case before, Arm as of April 20th, its answer date, could have added counterclaims to the case, now claims because we would be allowed to under Rule 15. Except the discovery window on the limited things

74

that were allowed ended May 5th. And I guess in theory we would have had a twenty-one-day right to amend that under Rule 15, so we could have come in with a new claim as late as May 11th. We have a trial in October. We had a schedule and a consolidation that was built around no additional discovery, identical claims, just adding a party.

They have realized perhaps based on the arguments and conversations in March, perhaps for other tactical reasons that eight claims aren't enough. They want to add the ninth which they clearly made a conscious choice back when they amended the Second Amended Complaint to add the good faith and fair dealing claim, not to bring the express breach claim.

And so I regret that we had to come in on a motion to strike, but essentially what happened is they just didn't ask for permission because it would have never been granted or the schedule would have changed or discovery would have issued, and instead, they put us to the choice, and said pretty clear the Judge doesn't want to see anybody about issues you could resolve, so you guys choose, do you want to come in or not.

And we had a lot of conversations, you can imagine about this. And we said this is not consistent with the scheduling order. It creates problems because we have a window where they argue there should be no additional

75

discovery, and Arm Ltd was constrained and now they want to have the best of both worlds, they want to get this new claim in that was never in the case without any ability to take discovery on it and distinguish it and yet throw another thing in that we have to clean out in summary judgment or post-trial.

THE COURT: Tell me on the things, I didn't focus on this amendment. What's the ninth claim?

MR. LoCASCIO: I believe Your Honor's version of the exhibits might be a DI page numbers. Mine, I apologize, are similarly exhibits. So to Docket No. 800 which is our letter, there are exhibits and Exhibit 3 is the red line of the complaint which they provided. And which is probably also a separate DI number, and I apologize, I don't have that. Do you have that available on your screen? And I could put it on the Elmo.

THE COURT: I have DI 800.

MR. LoCASCIO: Exhibit 3 is the amended complaint red line.

THE COURT: Got it.

MR. LoCASCIO: So you're at the red lined version.

THE COURT: Yes. I'm going through --

MR. LoCASCIO: Can I give you a couple of highlights on the way there?

76

THE COURT: Yes.

MR. LoCASCIO: So I thought it was interesting if you go back to the very first page, Footnote 1 was in the original complaint which went out of its way to say this is just identical between the two parties. That's gone now because there is now a distinction between the Arm Holdings case and the Arm Ltd case.

Then you get to there is -- if you go to page 43 of the Amended Complaint, it's paragraph 134 and 135 and 136 that are new. Just as a data point on the problems this caused, paragraph 135 refers to now, this provision, ███████, they say well, the provision █████████████ ██████████████████████████ and they cite to Arm's lead negotiator, I don't think that's accurate, but regardless, ████████████████████████ Okay? That was in no other complaint. It's in none of their interrogatory responses. He was never identified as a witness with knowledge in any either of the cases' disclosures. He's a former employee and now here he is in the Amended Complaint and they're going to rely an e-mail where this guy said ██████████████████ ███████████████████████

It then goes on and you got six or seven pages through page 50, Your Honor, there are entirely new allegations in the complaint. And then where Your Honor

77

asked the questions, let me get to it, if you go to the counts, Count 3 is the good faith and fair dealing count, and sort of adds some new language to tweak this one a little bit. But then they add Count 10. And Count 10 is the express breach now with ▮▮▮▮ of the Qualcomm --

THE COURT: Count 9.

MR. LoCASCIO: Sorry, my Roman numerals are off, Count 9. Thank you. Here they allege the express breach for the first time ever. And they had alleged during the body of it that there is no monetary remedy. Actually 278 does the same. So 278 says for this breach, money damages are not sufficient. And then if you look in the prayer for relief, sort of B, there is language that's redlined in B that says now the order they want is by negotiating good faith and extension to the Qualcomm ALA including v10, which is new.

And all of this, Your Honor, they alleged we breached the duty of good faith and fair dealing for that very provision. We moved to dismiss it, we sought summary judgment on it. They now added an express claim that is based on a series of other factual allegations they've now added which was done in a window where they had already successfully argued it was not going to be anything different from the first case and we're not entitled to any discovery, Your Honor, isn't fair and the scheduling order

78

precluded it.

So where Your Honor started okay, is it really fair to hold them to Rule 16 in this consolidation scenario, hard yes, because when they asked for consolidation, the whole basis was keep the dates, no additional new stuff, limited discovery statute, because it was substantively, their words, identical, Your Honor. And it is no longer that. And the remedy to get there is the Amendment and the First Amended Complaint should be stricken. The Complaint they filed originally that's identical to the one they had from the beginning is the Complaint that's the operative for this case because alternatively, you're in the realm of now reopening things, allowing discovery, or again moving a date, and we're not asking for that.

The right answer is we had a scheduling order and if somebody thought there was any daylight here, there were two ways to get to the answer on that; one, try to work it out with us; two, ask the Court. They chose the third.

THE COURT: Okay. Ms. Dunn.

MS. DUNN: Thank you, Your Honor.

The first thing I want to say is we also do not think a monitorship will be necessary at the end of the case.

THE COURT: Thank God.

MS. DUNN: So I think if you can take these

79

slides down.

THE COURT: But what is it that you're asking for when you say money damages are not sufficient, make them negotiate in good faith an extension. I get it, you don't say you need a monitorship, but let me just tell you you guys don't play so nice. Maybe you don't need me to monitor it, but am I just going to be getting a thousand motions for contempt that they're not doing. Let's say they lose and I say okay, yes, go negotiate in good faith. And you're like they haven't given us the price we want, ergo, they're not negotiating in good faith, find them in contempt. Is that what we're doing?

MS. DUNN: I don't believe so. But first of all as relevant to the argument today, this remedy was already in the case.

THE COURT: Where?

MS. DUNN: Request for this remedy. First of all we brought an UCL claim --

THE COURT: Point me to where it is. I'm looking at the prayer for relief. I'm looking at money damages are not sufficient. So where is that?

MS. DUNN: We will find it in the complaint. The UCL claim, obviously this was part of the basis --

THE COURT: Certainly there is no prior thing saying tell them -- I guess what I would like to see is tell

80

me where you previously asked, force them to negotiate in good faith.

MS. DUNN: It certainly is in the ▮▮▮▮ deposition, I will --

THE COURT: But it has to be in your pleadings or someplace. You're saying it's no different from what was previously there. So let's start with that.

MS. DUNN: So the original prayer for relief says -- and I'll just read it, but it doesn't expressly say ▮▮▮▮▮▮▮▮▮▮, but it does say we're asking for an order requiring Arm to comply with all of its obligations under the Qualcomm ALA.

THE COURT: Right. And if you thought that was good enough, I don't know why you then add in the redline version that I'm looking at, and by ▮▮▮▮▮▮ ▮▮▮▮, an extension to the Qualcomm ALA including v10.

MS. DUNN: I think there was an effort including because of the dialogue in the March hearings to be over-the-top clear about what we are asking, and including as I can explain today the difference between the claim with respect to the implied covenant and the claim with respect to express breach.

THE COURT: Yeah, but in saying that they're different is in some ways useful to you and some ways not. When all those representations that were made were

85

it's so far in, basically what you're saying is you're adding in stuff that is not substantively identical in March when we have a trial -- in March when we have a trial in October.

MS. DUNN: Your Honor, there are two things here. I want to make very clear to the Court, the decision to amend was not made until after Arm answered. And so I did not know when we were standing here arguing for amendment, and the legal issue --

THE COURT: But you didn't come back, you knew you had made representations to me, you knew I had made decisions based on those representations, you knew circumstances had changed, and you didn't come back and give me a heads up. Instead, you just said oh, we're going to change the entire course of this case, or a big chunk of the course of this case nine months before trial. We're not going to tell the Judge. We know it's going to get in front of her. I mean, if I were you, I would have at least wanted to get ahead of it and say I didn't lie, Judge, I couldn't possibly have predicted this was going to happen. And you didn't. And that, you know --

MS. DUNN: We obviously should have come back to the Court. But just to be, you know, forthright about it, we thought that they answered and we get a right to amend. And we also looked at all the discovery that had been taken

86

and frankly it is almost entirely overlapping with what's in here. By the way, the guy they pointed out was an Arm employee who sent an e-mail to us --

THE COURT: Nevertheless, nevertheless, has he been deposed?

MS. DUNN: No, he has not been deposed.

THE COURT: Had anyone ever identified him in any Rule 26 response to an interrogatory, anywhere?

MS. DUNN: Right. Not that I know of.

THE COURT: Right. So he came into this case at the end of discovery because you think you have a right to amend your complaint. I mean, this is not like conforming with the evidence, right, this is we're adding a new thing, we got an e-mail, we're just going to put it out there and Arm, you'll figure it out. I have enough problems with them saying to you you'll figure out how to do with cross-examining on the ALA rates and stuff. I have a real problem with you saying oh, you're just going to figure out, maybe this case is keep changing, keep changing, I can't wait to see what it looks like by the time you get to October.

MS. DUNN: Your Honor, it's completely fair about given that detail that was pointed out, but I will tell you that all of the things that they plan to defend themselves with, all of the back and forth and the letters,

87

they're probably like ten of them that the parties have sent back and forth and meetings, all of that has been happening in 2026 and they have already injected that into the case. And that all goes, and as they made clear in their answer, they plan to try that as part of this case.

And so yes, if we -- we did not know at the time that we were here for this hearing, obviously, but at the time we were arguing for amendment and the Court had not yet consolidated. And frankly we would have brought this claim as a new case because of its criticality to the client. So we had to take stock after the answer came and after the hearing and figure out what to do given that the cases had been consolidated and not amended.

So that's -- I mean, I know the Court -- I very much apologize to the Court because we obviously should have handled this differently, but as a legal matter I do think we have a right to make this amendment and I would like to at least explain why we can --

THE COURT: Let's assume that I think that this amendment is not required -- requires substantial one-way discovery for them, I mean, what do I do? Do I unconsolidated the cases?

MS. DUNN: So Your Honor, I think there are a few options. One is that when -- after we amended and Arm contacted us, we did offer additional discovery on the

88

express breach claim. The only thing that they've really mentioned they need additional discovery about, because all of these things have already been subject of discovery, is the difference between the express breach claim and the implied covenant claim. And I think frankly if they came with a list of things that they wanted to discover, we would be very amenable to that.

THE COURT: Yes, but we are at a point where I have already allowed two rounds of summary judgment briefing because the case shifted so dramatically between the first round and the second round. I'm not interested in a third round. I'm not interested in forcing the Defendant to pay its lawyers to do a third round. I mean, the case needs to stop at some point. And my question is, does it stop at the issues that were in the January complaint or do I let it keep morphing forever because you can't say now it's going to stop here because I don't believe you.

MS. DUNN: Well, this is an amendment of right, anything else we would have to come back to the Court. We don't plan to do that, we don't want to do that, I'm just claiming that now. And you, and the Court would not allow it.

The other thing I'll point out is that Arm has already filed summary judgment on the express breach claim. So this is -- I mean, as far as we're concerned, this is

93

where I need to start looking at the equities, right, because you have added so much to this case that at a time when discovery was over, that I have to start thinking I got to figure out a way that this can't happen.

MS. DUNN: Your Honor, I understand exactly what you're saying. I will say our intent was not to add substance to the case. As I said, Arm is already defending itself with the substance that we intended to add.

THE COURT: You don't get to say what they need to defend themselves. If you really wanted to say it's the same --

MS. DUNN: But it can't be the same, it is actually legally and factually different based on facts that began in June of 2025. They have already injected those facts. Our intent was to bring a claim that relied on those same facts. We are not intending to bring additional facts --

THE COURT: You're asking for different relief. You're bringing in different -- I mean, so many paragraphs in here have changed. So many paragraphs. This is not oh, we incorporate paragraphs 1 through 5022 and we're just adding by the way this is also an explicit breach of the paragraph that we all knew was at issue. This is -- how can you say there is no other facts and they're defending themselves on the same facts when you add in things that

94

happened in March of 2024, things that happened in October of 2024, things that happened in April and May of 2025, June 4th, 2025, June 13th, 2025, all of this, all of this was known well before this -- anything that was discussed in March. You can't tell me in March the light bulb went off and all this stuff that happened in 2024 and 2025, I was like, you know, now I got the final piece.

MS. DUNN: I'm not saying we didn't know about that, I'm saying that their answer says they had no obligation to make an offer under the contract. That was not part of our original claim and it couldn't have been. And then they say they engaged in good faith negotiations in '24, '25 and '26. And that is what we intended to put in.

And I think we perhaps went overboard trying to be clear because there was a discussion about what's the implied covenant, what's the expressed breach. And frankly like we could trim it back, but it was all coming from a good place of trying to be clear, and trying to respond to issues that have already been injected into the case. And --

THE COURT: If they were already in the case, then you didn't need this.

MS. DUNN: We did need --

THE COURT: You're saying we need this which tells me these issues were not injected into the case. You

95

didn't think that they were injected into the case enough that you could argue them, and yet you're saying well, Defendant, you kind of knew that they were there so you are just, go figure out how to defend them.

MS. DUNN: So Your Honor, they have said that they intend to defend themselves with these fact. I'm saying it's not distinct facts. The parties have been writing letters back and forth. Both general counsel are already going to testify at this trial about what happened in '24, '25 and '26, and so what this does is add a legal claim which we could not have done in the Holdings case because the amendment deadline was March of 2025.

And the first time that they said that they were not bound by the contract expressly was June of 2025. And that has continued and ramped up through 2026. And there has been a lot that we have learned in 2026, so we would have sought to bring this claim in any event. And now because of for legal reasons that this is now the place where we have to bring the claim. That's the point. We're not trying to mess around, but this is a real claim based on distinct facts that happened, June 25th and onward, and because we have the history of complaints in this case, and because there is already a complaint in January and all this has happened afterwards, for legal reasons this is now the case where this must be legally brought. And that's the

96

only reason I'm talking about amendment is because if there had been amendment, we could have legally brought them in a separate case, that's all I'm saying.

THE COURT: I'm sorry, if there would have been an amendment, you could have legally brought them. I mean, okay, let me ask this, your general counsel, they seem -- they need to be sitting down with a mediator because all you're doing is saying we're going to have another case and we're going to have another case, and this is nuts. Do you guys understand this is nuts?

MS. DUNN: Look, I think with respect to this v10 issue our client would agree, and it is the issue of the greatest contention between these two parties.

THE COURT: I'm going to make it from now on, you cannot bring an issue to me without your general counsel sitting here. They're going to be at every day of trial. They're going to be here for the pretrial conference. And if you have any more disputes, they will be sitting up here at table and identifying themselves because they're nuts or you're nuts, someone is nuts, that nobody can figure out what this case is that it needs to keep morphing and changing. I don't have cases that are -- that just, we change trial dates all the time, but in this one I have already done it once, I don't want to do it again. So my choices here are to let this in and say go figure it out, or

97

to say no, there were representations that are made to me and you're stuck with them. So I have to figure out where I am on that.

But I'm just -- I'm so perplexed. You guys are such good lawyers. I'm giving you have a hard time, Ms. Dunn, but I'm doing that because I want to know what you're going to say because I respect you and I think you're very good at what you do. He's very good at what he does because he knows how to push my buttons to get me to ask you hard questions. But this case is crazy. You guys actually work together, you need to work together. You want me to tell them that they have to negotiate with you. So why don't you guys go negotiate.

MS. DUNN: Your Honor, I think also if our general counsel were here, what she would want me to tell the Court is that this issue of v10, which Qualcomm would really love to resolve, is of critical business importance to the company. Truly, it's the future. Customers are asking about it. Competitors are already working with it --

THE COURT: And tell her that because of this, she could lose her trial date and then that issue will just sit out there until I decide that I want to have another trial.

MS. DUNN: I understand and I will convey that. And I also think that I would like to tell the Court, but

98

also probably she would like to tell the Court, if there is something we can do to make it better because our true intent was not to bring in a bunch of new evidence, we really believe this is what they are saying in their defense anyway, so you know, either --

THE COURT: I think if you really believed that, you would have just said fine, we'll just go with what we have, like we don't need a new claim with a hundred new paragraphs.

MS. DUNN: Your Honor, the difference really is that there was a difference in conduct that began in June of 2025 and has continued through the present day, and including with express statements that Arm doesn't believe it's bound by the contract. The implied covenant claim literally was we e-mailed them and they didn't respond to us for years. That's what the implied covenant claim is. It's like when you aren't doing the things that the contract presupposes you are doing.

This is an express breach, when you are saying we are not bound by the contract, we don't have to give you an offer when they're accelerating v10 for others and eliminating v9 features, these are our express breaches.

So I have no problem representing to the Court that when this implied covenant claim was brought, it was brought because it was a match for the facts that were going

99

on. They were not responding. It's like when a shipping company doesn't take orders, that's like the implied covenant, it's frustrating the purpose of the contract.

What started in June of 2025 beginning with a letter that Arm sent to Qualcomm is we are not bound by the contract. We don't have to give you an offer. We might negotiate with you anyway, but the contract doesn't make us do that. That's an express breach.

And because of --

THE COURT: Then why --

MS. DUNN: I'm also sorry that this wasn't immediately apparent at consolidation because --

THE COURT: Take a breath.

Why wasn't that brought sooner? Like you didn't have to wait for Arm Ltd to be in the case if things were happening starting in June of 2025 and you were before the Court a number of times before then. Why didn't that ever come up?

MS. DUNN: That is an excellent question. And one of the reasons is that ████████████████████ ███████████████████████ ████████████████████████████ And that there were some discussions of this in -- right in the settlement.

THE COURT: The settlement, not settlement.

MS. DUNN: So there were back and forth between

100

Arm and Qualcomm throughout some of this time and then we had the trial. So there was a period of time where -- and I actually think it might make sense to show you, I made a timeline, although it doesn't include the stuff from June. But the Holdings amendment deadline ran in March of 2025. In June we got an ████ --

THE COURT: I'm not even so upset about you couldn't bring claims against Arm Ltd in whatever of 2025, March of 2025, because they weren't even in the case. But there is a lot of time when you knew you were going to bring Arm Ltd in either through amendment or through a new complaint, and you are saying now these things are out there brewing and it never came up.

MS. DUNN: I'm sorry because I misspoke. So the first offer that we got, although it was not complete, was ████████████████████████████████████

So I think the other thing that the Court may wish to understand and would presumably come out in trial is there is like all this stuff going on, the parties are exchanging letters, they are continuously meeting in person. I started this with January 2026 because it's after we filed the Arm Ltd complaint. And you can see how much is going on.

And I think at a certain point in the beginning there was some hope that progress might be made. I don't

101

want to say too much about, you know, about those conversations because I don't know what I'm really permitted to say here. But you can see there is a lot going on.

Then in February after a bunch of letters exchanged, and you can see that, you know, Qualcomm's response ▮▮▮▮▮▮▮▮

And then in February, Arm learned that -- or Qualcomm learned that ▮▮▮▮▮▮▮▮ Obviously during this time we're learning things about the landscape and through this litigation obviously about other parties, and so you can see even contemporaneous with the hearing that we had, there is still these discussions going on.

And at this point, contemporaneous with Arm's answer ▮▮▮▮▮▮▮▮, there is more kind of letters that made clear that there is not really hope. I don't want to do future discussions, but this is a very discouraging letter exchange. We see their answer, they're saying ▮▮▮▮▮▮▮▮ And so -- and then there is a recent in person meeting that also was very disappointing including because ▮▮▮▮▮▮▮▮

102

▮▮▮▮▮▮▮▮ So this situation has gone from not great to much worse.

And I think, you know, the truth is I think what they put in the answer is really relevant, not just the timing of the answer and what it means under the rules but what they actually said in the answer. And that is it just reflects reality.

I think maybe that helps the Court understand that no decision was made at that time, you know, when we were in Court with you. And when I stood here and said a new case means more process and I raised that, I wasn't thinking about this in particular, I just was thinking that there is a new case and there is more stuff. But once we got the answer and we -- you know, we had to take everything into account, their conduct, obviously the Court hearings, their answer, we did decide to bring this.

And my regret obviously is I guess we should have come back to the Court rather than just filed and I'm deeply sorry for that, notwithstanding your nice words, it means a lot to me like what you said, so I'm sorry for that.

But I think some of this context maybe helps the Court realize that I'm not trying to do anything bad or deceptive or wrong, but this has become an increasingly serious issue to the business of the company and to things

103

that really matter.

So that's where we are. And, you know, I don't know. I mean, we offered additional discovery. I thought we actually offered a lot of additional discovery. You know, we can try to file under Rule 16 now to have a trimmed back complaint, but I don't know if the Court wants that. There are ways to solve the problem that the Court is talking about, and I sincerely do not think that this is blowing up the case. I think these issues are in this case anyway.

Thank you, Your Honor.

MR. LoCASCIO: A couple of points just to clarify the record, Your Honor.

The timeline Ms. Dunn just put up, her personal notes timeline, what it actually shows is the parties are in the business side of the world trying to negotiate what they're going to come up with, so at the end of the day, we think there is no violation of the good faith and fair dealing claim or the newly added claim.

But what's really going on, because Your Honor said like are you guys ever going to stop, and you said that in the both directions. Here is what's really going on.

▮▮▮▮▮▮▮▮

104

They want to keep paying old rates that are more favorable to them. They're running a business and they think the less we pay the better, and this is worth so much to them that they will pay all of this to continue to try to get some cause of action over the line at summary judgment, whether it's equitable or a jury claim, to try to get leverage to improve their standing in the negotiation. And you can say okay, well, that kind of happens in litigation a lot. Where does the leverage play end. They have got their unfair competition claim in this case. Qualcomm has gone to the United States FTC, the Korean FTC and the European Commission and leaked it. We had a discussion about whether we would get that information, because they're trying to argue entirely they're entitled to some Fram like or MSN pricing, but the contract doesn't say you get the best price. We'll happily negotiate with them and we are.

Why they want to add this into the case late is an effort to come up with some more leverage even though to now get to merits of what Ms. Dunn said, she said we don't know, we couldn't have brought it, we should have brought it sooner.

Your Honor asked these exact questions, if these allegations are from the spring of 2025, some are from '25, spring of '25, summer of '25, end of '25. Okay. What they should have done is say we want to move for leave to amend

the Arm Holdings case or at the very latest when they filed the complaint against Arm Ltd, which they said was just to protect the complaint, it wasn't to add anything new, they knew, they knew all of those facts. And there were at least three opportunities where we stood in this well where they could have raised it and plenty of other changes to actually amend to add a claim when we had time to deal with it in an orderly way.

They said they didn't know and we saw a page from the answer. The suggestion -- I think Ms. Dunn backed away from it because it's not true -- is that they didn't know that Arm was taking the position that ████████ ████████████████████████████████ So that was what we had ████████ ████ The parties are actually negotiating v10. That's what is in our interrogatory responses. That was in letters from Mr. Collins back in '24 and '25.

So this suggestion that the answer was somehow the reason, when we had our meet and confer, we tried, in person, we had a sit down, and I said, when did you know because when we stood there and you said I don't get any discovery, March 10th, March 12th, you had already sat through the discussion with Mr. Isaacson about do you want to amend. Your Honor had views. When did you decide? And I was told like we don't have to tell you that. That's our

work product. We're not telling you when we decided.

What we do know is we got the First Amended Complaint fifteen minutes before the limited discovery we were able to serve for Arm Ltd was due, the 5:00 p.m. filing here, that day we got transmitted with no cover, no glory, no explanation, no phone call, this complaint with all those new provisions. Your Honor, this was not accidental. I think it's tactical. And you do not have to, Your Honor, disregard the rules because they are not right. We cite multiple cases on page 2 of our brief dealing with this exact issue and you have two cases, consolidated, based on the representations made for sure which is a judicial estoppel path for Your Honor, you don't have to say that it's a sanction because it doesn't need to be. Rule 15 does not allow automatic amendment when you said they are the same case and they're consolidated and you agree to an amended scheduling order when the earlier scheduling order had a deadline, if you wanted to amend that because you thought you might potentially need to do it, well, in the discussion negotiating that scheduling, amended scheduling order, which had to amend some order, in this case the scheduling order, they could have put a provision in and then we would have had this out in an orderly way where we could have addressed it.

I think that's all my points, Your Honor.

MS. DUNN: Your Honor, I think some of that was summary judgment argument, however, there is one thing I want to respond to just because these issues are coming down the pike. This is not all so that Qualcomm can pay as little as possible and create leverage. Like we have worked really hard to try to get an agreement. In fact, we have gone so far as offering to pay more so long as we can still compete. And the problem is that the rates that we have offered, as will come out in the trial and in other briefing are like thousands and thousands of percentages more than our competitors, so it's not -- I think it's not -- I just want to clarify that.

I heard counsel say we should have added this stuff in January 2026. Arm has taken the position that everything in January 2026 is claim splitting and should be thrown out of the case, so I think it is really important at least on the law that I articulate this properly. While we didn't flag this, we do think that because there was a new case, the new case does have some new process, that when a party gets to answer, the other party gets to respond with amendment.

THE COURT: Yeah, but the process I think that you were talking about before, because I sort of remember that because I remember thinking oh, God, they're going to bring a new motion to dismiss. I mean, that's the sort of

process that I think we were all thinking about, not that you were sitting here telling me oh, it's going to be the same issues but you were planning, oh, new process means we might bring in new claims or they might bring in something new against some other Qualcomm entity.

MS. DUNN: I think the issue is that the right to amend is tied to the answer to the motion to dismiss under the rules. So I was thinking about a motion to dismiss, also, but I think those are connected.

I want to make clear just because I think the Court knows this, but I want to make it clear because counsel keeps raising it about the scheduling order. So as Your Honor has pointed out, the Holdings scheduling order deadline to amend expired in March of 2025, so for facts that arose after that, and these facts expressly disclaiming contractual rights started in June of 2025 and intensified in 2026, those were obviously after the Holdings scheduling order deadline to amend.

The current scheduling order as Your Honor knows is silent and the Third Circuit is extremely clear on this where it says Rule 15 applies in the absence of a scheduling order that "includes an explicit deadline." That's *In re: Asbestos Products Liability* litigation, a case from 2025.

I also want to be very clear that we do not wish to prejudice Arm. I mean, we do wish to find a home for

# Exhibits 2-3

## (REDACTED IN THEIR ENTIRETY)

# Exhibit 4

# Exhibit 5

Case 1:24-cv-00490-MN    Document 870-1    Filed 07/22/26    Page 30 of 156 PageID #: 57444

# Exhibit 6

## (REDACTED IN ITS ENTIRETY)

# Exhibit 7

# Exhibits 8-19

## (REDACTED IN THEIR ENTIRETY)

# Exhibit 20

# Exhibits 21-22

## (REDACTED IN THEIR ENTIRETY)

# Exhibit 23



QCVARM_1160064

**Cautionary Note Regarding Forward-Looking Statements**

This presentation contains forward-looking statements that involve a number of risks and uncertainties.  Arm Holdings plc (the "Company" or "Arm") cautions readers that any forward-looking information is not a guarantee of future performance and actual results could differ materially from the information expressed or implied by these forward-looking statements. When used in this presentation, words such as "may," "might," "will," "could," "would," "should," "expect," "is/are likely to," "intend," "plan," "objective," "anticipate," "believe," "estimate," "predict," "potential," "target," "continue," "ongoing" and similar expressions and any other statements that are not historical facts are intended to identify forward-looking statements.

Such forward-looking statements include, but are not limited to, projections and estimates of the TAM for our products and our expectations regarding revenue, licensing and royalty mix and growth, in both the near and long-term; our expectations regarding the impact of the introduction of new products on our existing operations, customer base, and demand; our vision for the future of Arm and AI computing; our ability to implement new products and business initiatives, including the expansion of our business model into production silicon; Arm AGI CPU and its expected performance, scale, efficiency and projected energy savings; our annual product roadmap; data center and agentic AI growth generally, including anticipated data center capacity; the Company's partnerships and customer expectations;  projections relating to our future financial results, growth, products and services; our financial position; our market opportunity, demand and growth drivers; and any other statements that are not historical facts.

Forward-looking statements involve a number of risks, uncertainties or other factors beyond our control that may cause actual results to differ materially. These factors include, but are not limited to, our ability to implement our strategic initiatives; our development of new products and technologies; our entry into new business areas, including production silicon, and the associated execution risks; our reliance on third parties to manufacture, assemble, package and test our products; market acceptance of our products; the accuracy of comparative performance benchmarks and claims; the impact of technological development and competition; the development and growth of the AI market generally; any potential design, manufacturing, hardware or software defects; changes in customer preferences and demands; changes in industry standards; global economic, political and market conditions and fluctuations; geopolitical instability, government and industry regulation; and global competition. For a complete discussion of factors that could materially affect our financial results and operations, please refer to the reports we file from time to time with the SEC, including our Annual Report on Form 20-F. Copies of reports we file with the SEC are posted on our website and are available without charge. The Company undertakes no obligation to publicly update any forward-looking statement, whether as a result of new information, future events or otherwise.

**Third-Party Information**

Arm has neither sought nor obtained the consent from any third party to use any logos, statements or information contained herein that have been obtained or derived from logos, statements or information made or published by such third parties. Any such logos, statements or information should not be viewed as indicating the support of such third parties for the views expressed herein. While the information included herein obtained from third parties is believed to be reliable, neither Arm nor any of its affiliates assume any responsibility for the accuracy of such information.

arm

© 2026 Arm

QCVARM_1160065



The AI engine

QCVARM_1160066



QCVARM_1160067

# ~117 Billion

## Total humans to have ever lived

QCVARM_1160068



QCVARM_1160069

# 350+ Billion

## Total Arm chips to have ever shipped

QCVARM_1160070

# 350+ Billion

## Total Arm chips to have ever shipped

# 3X

## Total humans ever

Based on estimates.

QCVARM_1160071

# 350+ Billion

Total Arm chips to have ever shipped

# 7X

Non-Arm CPUs combined

Based on estimates.

QCVARM_1160072

# 350+ Billion

## Total Arm chips to have ever shipped

# 160

## Arm chips per global household

Based on estimates.

QCVARM_1160073



QCVARM_1160074



QCVARM_1160075

# Born to run off batteries





QCVARM_1160076

# Started a revolution of smartphones



QCVARM_1160077

# Expanded to the platform leader across verticals

QCVARM_1160078



Ecosystem of ecosystems
22M+ software developers

QCVARM_1160079



Our evolution

QCVARM_1160080



QCVARM_1160081

# Our evolution



QCVARM_1160082



QCVARM_1160083



QCVARM_1160084

# But somewhere along the way…



QCVARM_1160085

# End of an era…?



QCVARM_1160086

# The cloud before AI



QCVARM_1160087

# AI cloud - CPUs still doing work!



QCVARM_1160088



QCVARM_1160089



QCVARM_1160090

# Agents query >15x tokens of humans



QCVARM_1160091

# Massive amount of agent workloads swamp CPU



QCVARM_1160092

# More and more CPUs needed to balance agent flow



QCVARM_1160093



QCVARM_1160094

# 4x CPU cores
## in the same power envelope?

QCVARM_1160095

# 4x CPU cores
## in the same power envelope?

## That's a problem

QCVARM_1160096



QCVARM_1160097



QCVARM_1160098



QCVARM_1160099



QCVARM_1160100



QCVARM_1160101










QCVARM_1160102



QCVARM_1160103



QCVARM_1160104



QCVARM_1160105



QCVARM_1160106



# Contributions across the full stack

| Platform foundation | Security & access | Validation & tooling |

QCVARM_1160107



QCVARM_1160108






Arm Neoverse compute platform

QCVARM_1160109



QCVARM_1160110



Paul Saab

QCVARM_1160111

# The agentic data center



QCVARM_1160112

# The agentic data center



QCVARM_1160113



# The agentic data center

QCVARM_1160114



QCVARM_1160115





| arm AGI CPU | x86 CPU |
|---|---|
| High performance cores | Execution overhead |
| World class efficiency | Legacy feature support |
| Low latency design | Modularity over latency |
| Performance scales. Power stays predictable. | Performance throttled.  Technical debt. |

QCVARM_1160116

# Optimizing performance, scale, and efficiency

**Efficiency**
Purpose-built, no legacy overhead
No wasted energy or silicon

**Scale**
Linear scaling across cores
Memory and I/O keep pace

**Performance**
More work per cycle
Full performance, always



 AGI CPU

x86 CPU

Based on estimates.

QCVARM_1160117



QCVARM_1160118



QCVARM_1160119



QCVARM_1160120



QCVARM_1160121

# More than 2X performance per rack delivers

Up to
## $10B
CAPEX savings
vs x86 CPU

1GW capacity

Based on estimates.

QCVARM_1160122



QCVARM_1160123



QCVARM_1160124



~$3B TAM

Based on estimates.

QCVARM_1160125



QCVARM_1160126



> $100B TAM

By 2030

Based on estimates.

QCVARM_1160127



IP + Compute Subsystems (CSS) + First production silicon chip

QCVARM_1160128



QCVARM_1160129



QCVARM_1160130

# Exhibit 24



Tim Cook and Masayoshi Son. Photos via Getty

Exclusive

QCVARM_0717207

# How a Lopsided Apple Deal Got Under Arm's Skin

The SoftBank-controlled chip designer Arm has played an important role in helping Apple's devices outflank the performance of rivals. But the iPhone maker pays unusually low fees to Arm because of its unique leverage in the smartphone industry.

 By Wayne Ma and Cory Weinberg

Nov 29, 2023, 6:00am PST

**In 2017, SoftBank** CEO Masayoshi Son gathered a group of executives from Arm Holdings, the British chip designer SoftBank had just bought, to complain about one of its most important customers: Apple.

In a conference room in Tokyo, Son told the group that Apple paid more for the piece of plastic that protects the screens of new iPhones than it did to license Arm's intellectual property, according to a person with direct knowledge of the meeting. To punctuate his point, Son pretended to peel the plastic wrap off an iPhone in front of the group.

QCVARM_0717208

Six years later, Arm still faces the same problem: Apple pays less than 30 cents per device for the right to use Arm-based chips in the hundreds of millions of iPhones, iPads, Macs and Apple Watches it sells each year, according to people with direct knowledge of the matter. That's the lowest royalty rate among Arm's smartphone chip customers, traditionally its biggest group of customers by revenue, the people said. As a result, Apple accounts for less than 5% of Arm's sales, around half the figure for each of the chip company's top two customers, Qualcomm and Mediatek, they said.

## The Takeaway

- Apple represents less than 5% of Arm's annual revenue

- Apple pays a flat fee of less than 30 cents a chip, regardless of how many Arm cores used

- Apple's payments to Arm are the lowest among Arm's smartphone chip customers

The issue has become a more pressing one for Arm since its recent initial public offering. The company is now valued at $63 billion, roughly twice what SoftBank paid for it, thanks to investor expectations that its technology will be increasingly used in cloud computing and automobiles. But a slowdown in smartphone sales has weighed on Arm's top line: Revenue from royalties fell 5% year on year in the most recent quarter.

QCVARM_0717209

Getting more money from Apple would help jump-start Arm's revenue growth. After SoftBank bought the chip company in 2016, Son sought to change the terms of its deal with Apple by raising royalty rates, according to people with direct knowledge of the matter. He was unsuccessful.

Arm isn't alone in finding that being an Apple supplier can be a double-edged sword. On one hand, a relationship with the iPhone maker can bring a gusher of sales to suppliers. Even when it doesn't, the credibility boost that comes from working with Apple can help suppliers win business from other customers. On the other hand, Apple is well known for aggressively pressuring suppliers to lower their prices, in some cases even causing them to lose money from the arrangements.

Having Apple as a customer has been an important tool for helping Arm win business from other companies, and Apple engineers have helped Arm improve its designs, those people said. Arm touted its relationship with Apple to investors ahead of its IPO in September. Apple also was among a group of 10 cornerstone investors that pumped a combined $735 million into buying shares in the offering.

A breakup between the two companies isn't likely to happen anytime soon. In September, Arm said it had signed a new licensing agreement with Apple that "extends beyond 2040," without elaborating. That's far longer than the typical five-year term for Arm licenses, according to former Arm employees. In the meantime, Apple has explored the long-term possibility of using a competing technology in the chips for its devices, according to one former Apple employee. The loss of Apple would be a major blow to Arm.

"Apple is the sort of anchor in the smartphone world," said Sara Russo, a semiconductor analyst at Bernstein who previously worked at Arm. "If they would go another direction, I think it would be a very interesting signal to the wider market of seeing an opportunity to do something different that would be disruptive to Arm's business."

QCVARM_0717210

For now, Arm remains a powerhouse in its category. In addition to licensing its off-the-shelf chip designs to customers such as Qualcomm and Mediatek, whose chips are in many of the world's smartphones, the company also licenses the underlying technology behind those designs—known as chip architecture—to other clients such as Apple, who use it to design their own chips. Chips based on Arm designs are inside everything from cars to drones, not to mention 99% of the world's smartphones. Arm estimates that seven out of 10 people regularly use Arm-based products and that more than 250 billion chips have shipped with its technology.



Arm employees celebrate in New York in September after the company's IPO. Photo by Michael M. Santiago/Getty Images

QCVARM_0717211

Despite the ubiquity of its chips, Arm posted only $524 million in net income in the fiscal year ended March 31 —less than 1% of Apple's annual profit. That disparity has been a sore spot for Son, who regularly waves his iPhone around in meetings, telling Arm executives that the company should take a bigger slice of the smartphone industry's profits—especially Apple's, according to a person with direct knowledge of the matter.

Apple's favorable terms with Arm have been a closely guarded secret for 15 years, known to only a select few people inside the companies. (Former Arm employees even say they have to refer to Apple by a code name— Fender—because of the company's general policy of keeping its partnerships secretive.) However, a lawsuit between Arm and Qualcomm—which supplies the cellular modems inside iPhones—over royalty payments recently cast a spotlight on Apple's sweetheart deal, which Apple said was among its "most commercially sensitive documents." Apple earlier this week won a motion to keep the details of its Arm license secret after Qualcomm asked Arm for a copy of the agreement. Apple told a Delaware federal court that revealing the agreement would give Qualcomm an unfair advantage when negotiating with Arm, Apple and Apple's competitors.

For the moment, Apple needs Arm too. Arm's chip architecture, which prioritizes speed and power efficiency, has been a crucial factor in helping it make iPhones that outperform rivals year after year. In 2020, Apple doubled down on Arm, moving its laptops and desktops off Intel chips to Apple-designed chips that used Arm's architecture.

Spokespeople for Apple, Arm and Qualcomm didn't comment.

**Favorable Terms**

QCVARM_0717212

Apple's relationship with Arm dates to Arm's founding in 1990 as a joint venture between Apple, Acorn Computers and chip company VLSI Technology. Apple used an Arm processor in the Newton MessagePad, a personal digital assistant that never took off. Apple sold its stake in Arm to help fund its turnaround under then-CEO Steve Jobs a decade later.

Arm essentially acts like a chip research and development department for its customers, allowing smartphone makers and other firms to avoid the roughly $100 million a year it would cost to build their own processors, by some analyst estimates.

In 2008, a year after Apple introduced the iPhone, Apple struck a deal with Arm to license its architecture and off-the-shelf designs. At the time, Arm was looking to break into the nascent smartphone market and was willing to offer lower rates to high-profile customers that could show off its technology.

Most of Arm's customers pay a royalty based on a percentage of the price for the chips they sell to their customers.  That price rises based on the number of Arm cores—which act as the chip's brains—included in those chips. But companies like Apple don't sell chips to other customers, making it harder for Arm to calculate a price. Apple persuaded Arm to accept a low flat royalty fee per chip regardless of how many Arm cores it used.

That arrangement proved advantageous to Apple as chips grew more complex, incorporating multiple cores. Apple also had the foresight at the contract's inception to negotiate an option to extend the 10-year deal it struck in 2008 through 2028, ensuring that it would pay the same price to Arm even as its volumes and profits skyrocketed, according to people with direct knowledge of the matter.

QCVARM_0717213

Soon after, Apple began work on its own custom core for the iPhone. To lead the effort, Apple in 2010 hired a former Arm engineer who previously led the design of Arm's smartphone processor cores. In 2012, Apple launched the iPhone 5 with its first Apple-designed Arm-based cores. The custom chips consistently outperformed comparable chips in smartphones sold by competitors like Samsung that used Arm's off-the-shelf designs.

The switch to making its own custom cores meant Apple paid a lower royalty than those customers that were licensing the whole kit and kaboodle from Arm. Instead, Apple only licensed Arm's architecture, which determines how its cores work. That allowed Apple to design its own cores tailored to its specific needs rather than buying an Arm chip design that catered to a broad range of customers.

In 2013, Apple was the first company to switch to Arm's 64-bit architecture, allowing its processor cores to handle more data at once. Arm's other customers had been on the fence about adopting the upgrade as it would cost more. But Apple's success with the technology prompted others to follow suit, boosting Arm's sales, according to former Arm employees.

Apple remains the only smartphone company that designs its own cores. Qualcomm, Mediatek, Samsung and Google are all working on developing their own designs for smartphone cores, but they still rely on Arm's off-the-shelf designs, making it harder for them to stand out.

**Raising Prices**

After SoftBank bought Arm in 2016, Son quickly set out on a mission to increase the company's value.

QCVARM_0717214

One former Arm employee said Son established a goal of increasing Arm's revenue—then about $1.7 billion a year—to more than $10 billion over the next decade. The company expanded into new industries such as automotive and cloud computing and introduced new business models. For example, it began offering annual subscription plans that gave customers the option of using a broader range of Arm's intellectual property, and it gave small startups access to its technology for a low up-front fee in exchange for higher royalties later.

At one point, Son called Apple CEO Tim Cook to tell him Arm would be raising prices for all its major smartphone and chip customers. Cook's team reassured him that Arm couldn't raise fees, because the companies' contract at the time lasted through 2028. Son backed off. Since then, Apple and Arm have been through several rounds of negotiations that have kept the financial terms of Apple's deal largely in place, people familiar with the matter said.

Earlier this year, Arm reportedly tried to change its pricing model more generally by charging customers a royalty based on a percentage of the retail prices for the final devices they sold, rather than the price of the chip inside those devices. Apple, which sells some of the most expensive smartphones in the industry, wasn't part of the discussions, and Arm ultimately canceled the effort after other customers pushed back, the Financial Times reported.

In the near term, the marriage between Apple and Arm seems unlikely to fall apart. Apple can't afford to walk away from its partner anytime soon, given how integral Arm's architecture is to its current software and hardware. Apple has flirted with a competing chip architecture called RISC-V, which is open source and wouldn't require royalty payments. But the company has estimated it would take at least eight years to move from Arm to RISC-V, according to a former Apple employee with direct knowledge.

In the meantime, Apple sends people to RISC-V conferences and posts jobs looking for people who have experience with RISC-V, according to the former Apple employee and a review of job ads. At the very least, the specter of Apple increasing its investments in the competing chip technology has given it leverage in negotiations with Arm, according to former Apple and Arm employees.

QCVARM_0717215

If and when Apple does decide to part ways with Arm, the process is likely to be less painful for Apple than it would be for most makers of competing Android smartphones due to the control it has over the hardware and software for its devices, former Arm and Apple employees said. That fact is a key reason why Son has come to believe Arm has limited leverage over Apple in negotiations, a person familiar with his thinking said.

For Arm, such an event wouldn't be like losing an ordinary customer. Working with Apple has been one of Arm's most powerful marketing tools for winning new customers looking to replicate Apple's success, former Arm employees say. And Apple engineers have contributed valuable ideas that Arm has incorporated into upgraded versions of its architecture—for example, designs that speed up artificial intelligence and machine-learning tasks.

*Wayne Ma is a reporter covering U.S. tech in Asia, from Apple's supply chain to Facebook's and Google's operations in the region. He previously worked for The Wall Street Journal. He is based in Hong Kong and can be found on Twitter at @waynema.*

*Cory Weinberg is deputy bureau chief responsible for finance coverage at The Information. He covers late-stage private tech firms, IPOs and capital markets, and is based in New York. He has an MBA from Columbia Business School. He can be found on Twitter @coryweinberg. You can reach him on Signal at +1 (561) 818 3915.*

QCVARM_0717216

# Exhibits 25-34

## (REDACTED IN THEIR ENTIRETY)

# Exhibit 35

# Exhibits 36-40

## (REDACTED IN THEIR ENTIRETY)

# Exhibit 41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUALCOMM INCORPORATED,<br>  a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>  a Delaware corporation,<br><br>              Plaintiffs,<br><br>    v.<br><br>ARM HOLDINGS PLC., f/k/a ARM LTD.,<br>  a U.K. corporation,<br><br>              Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   C.A. No. 24-490 (MN)<br>)   (CONSOLIDATED) |

**PLAINTIFFS' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANT'S THIRD SET OF INTERROGATORIES (NOS. 14-16, 18-21)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiffs Qualcomm

Inc. and Qualcomm Technologies, Inc. (collectively "Qualcomm" or "Plaintiffs") by and through

their attorneys, hereby supplement their responses and objections to defendant Arm Holdings

PLC's ("Defendant" or "Arm") Interrogatories to Plaintiffs dated June 11, 2025, as follows:

**GENERAL OBJECTIONS**

1.      Plaintiffs object to each Interrogatory to the extent that it seeks to impose greater

or different obligations on Plaintiffs than those provided for by the Federal Rules of Civil

Procedure, the Local Rules of the United States District Court for the District of Delaware, any

discovery orders entered into this case, any other applicable Court orders, or agreements reached

by the parties.

2.      Plaintiffs object to each Interrogatory to the extent that it seeks documents, things,

or information protected by the attorney-client privilege, the work-product doctrine, or any other

applicable privilege or immunity. Nothing contained in these Responses and Objections is intended

to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection.

direct Defendant's attention to, e.g.: Amon Dep. 192:16-23, 195:7-24; Chaplin Dep. 120:3-15; Hughes Dep. 79:23-80:5, 80:14-81:6.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in its initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory as well as their supplemental responses to Interrogatory Nos. 5, 7, and 19.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous responses to this Interrogatory.  Plaintiffs also incorporate by reference the Supplemental Expert Report of Eric A. Posner (dated May 15, 2026).

**INTERROGATORY NO. 21:**

Describe with specificity the complete legal and factual basis for Your contention that "Qualcomm requires equitable relief under the UCL because it lacks adequate remedies at law to address Arm's anticompetitive and unfair actions, which are ongoing and which have caused or threaten to cause Qualcomm to suffer significant harm," as set forth in Paragraph 212 of Your Complaint.

**RESPONSE TO INTERROGATORY NO. 21:**

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs object to Interrogatory No. 21 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to

61

fact, and (ii) discovery, including, without limitation, document production depositions, and expert discovery, has not been completed. As a result of the Interrogatory's prematurity, Plaintiffs are not yet aware of the full scope of Arm's anticompetitive and unfair actions. Plaintiffs further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Second Amended Complaint, that is readily within the possession of Defendant, or that is more easily available to it. Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to paragraphs 11, 34, 137, 139, 144, 156-66, 206-207, and 212 of the Second Amended Complaint (D.I. 137), and incorporate them by reference as if fully set forth herein, for Plaintiffs' position.

Arm's engagement in persistent, systematic, and *ongoing* efforts to undermine Qualcomm's customer relationships and obstruct its development of custom CPUs and chips, including multiple instances in which Arm has sought to mislead Qualcomm's customers and leak confidential information, firmly established bases for equitable relief. *See*, *e.g.*, *CFTC* v. *Traders Glob. Grp.*, 2023 WL 7545316, at *1 (D.N.J. Nov. 14, 2023) ("likelihood of future violations may be inferred from systematic or ongoing violations"); *Sun Microsystems, Inc.* v. *Microsoft Corp.*, 87 F. Supp. 2d 992, 1004-05 (N.D. Cal. Jan. 24, 2000) ("past conduct demonstrat[ing] an ongoing strategy to compete" unfairly and unlawfully shows "threatened future harm or a continuing violation" of the UCL such as to warrant injunctive relief").

The potential harm of Arm's anticompetitive and unfair conduct, if left unchecked, was highlighted in the Federal Trade Commission's suit to block Nvidia's acquisition of Arm: "The proposed vertical deal would give one of the largest chip companies control over the computing technology and designs that rival firms rely on to develop their own competing chips. The FTC's complaint alleges that the combined firm would have the means and incentive to stifle innovative next-generation technologies, including those used to run datacenters and driver-assistance systems in cars." FTC Press Release, *FTC Sues to Block $40 Billion Semiconductor Chip Merger*, FTC.gov, https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-sues-block-40-billion-semiconductor-chip-merger; https://www.ftc.gov/system/files/documents/cases/d09404_part_3_complaint_public_version.pdf

Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.* Deposition of Richard Grisenthwaite; Deposition of Cristiano Amon; Deposition of Manju Varma; Deposition of Karl Whealton.

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

Plaintiffs incorporate the testimony provided and exhibits relied upon in the depositions of individuals identified as knowledgeable pertaining the subject matter of this interrogatory, including testimony from witnesses deposed during the week of July 7–11, 2025 and any additional testimony obtained after July 11, 2025. Plaintiffs reserve the right to supplement or amend their response based on testimony provided by these witnesses.

63

███████████████

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Plaintiffs also incorporate by reference their responses to Interrogatories Nos. 1, 3, 5, 7, 8, 20, and 24 because Arm's market position and Qualcomm's lack of reasonably available alternatives drive Qualcomm's need for equitable relief under the UCL. Plaintiffs additionally incorporate by reference the section entitled "Economic Analysis of Arm's Conduct" in the Expert Report of Eric A. Posner (dated August 8, 2025), along with its accompanying exhibits. Arm's anti-competitive conduct impairs Qualcomm's current and future ability to conduct its business—including by precluding Qualcomm from licensing IP licensed under the TLA, precluding Qualcomm from accessing ███████████ under the ALA, and precluding Qualcomm from licensing v10 of Arm's ISA. Legal remedies that do not require Arm to comply with its contractual obligations to provide Qualcomm with ████████████████ under the TLA; provide the Arm Technology to which Qualcomm is entitled under the ALA; and negotiate with Qualcomm ██████ ███ regarding a license to v10 are insufficient because they would not preclude Arm's anti-competitive efforts to impair Qualcomm's current and future ability to conduct its business. *Sanchez* v. *Sams West, Inc.*, 2022 WL 2035961, at *3 (C.D. Cal. Mar. 8, 2022) ("As a general matter, legal damages are typically inadequate to remedy the future harms from ongoing violations."); *see also In re Subaru Battery Drain Prods. Liab. Litig.*, 2021 WL 1207791, at *29 (D.N.J. Mar. 31, 2021) (finding injunction permitted under UCL where "required to prevent further harm"); *Heredia* v. *Sunrise Senior Living LLC*, 2021 WL 819159, at *8 (C.D. Cal. Feb. 10, 2021)

64

██████████████████████████████████████

(denying motion to dismiss UCL claim with respect to injunctive relief where plaintiffs "alleged ongoing violations of the law that pose a risk of continuing harm").

Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony, related exhibits, and documents produced in this litigation, and the burden of ascertaining the answer to this Interrogatory from those documents is substantially the same for Defendant as it is for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs additionally direct Defendant's attention to, e.g.: Amon Dep. 192:16-192:23, 195:7-24; Howard Dep. 144:23-148:25; Deposition of Karl Whealton ("Whealton Dep.") 149:20-22; Wolf Dep. 49:25-50:5.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in Plaintiffs' initial response to this Interrogatory.

Subject to and without waiving any of their objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous responses to this Interrogatory. Plaintiffs also incorporate by reference the Supplemental Expert Report of Eric A. Posner (dated May 15, 2026).

## INTERROGATORY NO. 22:

Describe with specificity the complete business relationships between Qualcomm and ███████ and Qualcomm and ████ from inception to present, including but not limited to all proposed, contemplated, and actual dealings including as all prior infrastructure dealings or discussions with ████, the persons involved in those business relationships and dealings, and provide a complete explanation for why any proposed and contemplated dealings did or did not materialize including all prior dealings or discussions with █████ regarding infrastructure. Your response shall include the identification of all documents relevant to answering the complete Interrogatory, and the witnesses most knowledgeable about each respective relationship.

65

██████████████████████████████████

33(d). In particular, Plaintiffs direct Defendant's attention to, e.g.: Amon Dep. 192:16-192:23, 193:10-23, 195:7-24; Howard Dep. 144:23-148:25; Whealton Dep. 149:20-22; G. Williams Dep. 53:15-17, 107:17-109:12, 115:6-14, 116:10-117:14; Grisenthwaite Dep. 36:3-14; Deposition of Michael Williams 60:15-20; Deposition of Ziad Asghar 106:6-23, 146:15-147:14; Weiser Dep. 11:5-17; Wolf Dep. 49:25-50:5; QCVARM_0716389.

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
Jenifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC  20004
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
PAUL WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Adam L. Basner
PAUL WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

May 15, 2026

76

# Exhibits 42-57

## (REDACTED IN THEIR ENTIRETY

# Exhibit 58

# Exhibit 59

## (REDACTED IN ITS ENTIRETY)

# Exhibit 60

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INCORPORATED,
  a Delaware corporation; and
QUALCOMM TECHNOLOGIES, INC.,
  a Delaware corporation,

          Plaintiffs,

    v.

ARM HOLDINGS PLC., f/k/a ARM LTD.,
  a U.K. corporation,

          Defendant.

C.A. No. 24-490 (MN)
(CONSOLIDATED)

**PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT ARM LTD.'S INTERROGATORIES (NOS. 1-2)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. (collectively "Qualcomm" or "Plaintiffs") by and through their attorneys, hereby respond and object to defendant Arm Ltd.'s ("Defendant" or "Arm") Interrogatories to Plaintiffs dated March 30, 2026, as follows:

**GENERAL OBJECTIONS**

1.      Plaintiffs object to each Interrogatory to the extent that it seeks to impose greater or different obligations on Plaintiffs than those provided for by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Delaware, any discovery orders entered into this case, any other applicable Court orders, or agreements reached by the parties.

2.      Plaintiffs object to each Interrogatory to the extent that it seeks documents, things, or information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity. Nothing contained in these Responses and Objections is

ESI Protocol Schedule A.  Plaintiffs further object to the definition of "Document" because that term is not used in Defendant's Interrogatories.

6.    Plaintiffs object to the definitions of "Communication" and its plural form to the extent they purport to impose any obligations beyond what is required by the Federal Rules.

7.    Plaintiffs object to the definitions of "Thing" and its plural form to the extent they purport to impose any obligations beyond what is required by the Federal Rules.  Plaintiffs further object to the definition of "Thing" because that term is not used in Defendant's Interrogatories.

8.    Plaintiffs object to the definitions of "Identify," Identifying, or "Identification" to the extent they purport to impose any obligations beyond what is required by the Federal Rules.  Plaintiffs also object to the definitions of "Identify," Identifying, or "Identification" to the extent they ask Plaintiffs to provide any information unknown to Plaintiffs or not within their possession, custody, or control, or beyond the scope of this litigation.

9.    Plaintiffs object to Instruction No. 3 as overbroad, unduly burdensome, and on the ground that it purports to impose requirements inconsistent with or more burdensome than those imposed by the Federal Rules, local rules, and applicable law.

10.    Plaintiffs object to Instruction 4, to the extent it imposes obligations beyond those required by the Federal Rules of Civil Procedure, and because it is premature and contrary to the agreed upon provisions in the ESI Protocol or Protective Order.

Subject to and without limiting the foregoing, Plaintiffs specifically object and respond as follows:

**SPECIFIC RESPONSES AND OBJECTIONS**

**INTERROGATORY NO. 1:**

For each of Your claims, based, in whole or in part, on Your contention that Arm withheld ACK patches, OOBs, or any other alleged ███████ describe with specificity the complete legal and factual basis for Your contention that Your claims against Arm Ltd. are not barred by the statute

6

████████████████████████

of limitations (*see* D.I. 757 (Arm Ltd.'s Answer) at Eighth Defense (Statute of Limitations)), including the dates on which Qualcomm contends each of its claims accrued or causes of action arose, the dates on which Qualcomm contends that the statute of limitations began to run for each of its claims, and whether (and why) the limitations period was tolled or otherwise does not apply.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs object to Interrogatory No. 1 as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the First Amended Complaint against Arm Ltd. (D.I. 765), is readily within the possession of Arm, or that is more easily available to it. Plaintiffs further object to the Interrogatory on the grounds that the phrase "any other alleged deliverables" is vague and ambiguous. Plaintiffs will interpret this Interrogatory to inquire about ████████████████ under the Qualcomm ALA. Plaintiffs further object to the Interrogatory to the extent it calls for a legal conclusion, including but not limited to a conclusion as to the dates on which any of Qualcomm's claims accrued or the dates on which the statute of limitations for those claims began to run. Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

By responding to this Interrogatory, Plaintiffs do not endeavor to include all relevant caselaw and reserve the right to rely on additional authorities and to provide further explanation. Plaintiffs further reserve the right to amend this response as Plaintiffs' understanding of this defense evolves, including but not limited to in response to Arm Ltd.'s response to Plaintiffs' Interrogatory No. 13.

███████████████████████████████████████████

Subject to and without waiving the foregoing objections, Plaintiffs refer Arm to paragraphs 78–97 of the First Amended Complaint against Arm Ltd. (D.I. 765) and incorporate them by reference as if fully set forth herein.

From the fall of 2022 through at least August 2023, Arm's Senior Principal Engineer Vivek Agrawal repeatedly told Qualcomm's custom CPU verification team that he was waiting on Arm's management to approve his sharing of OOBs and ACK patches with Qualcomm.  *See, e.g.,* QCVARM_0688929;    QCVARM_0689117;    QCVARM_0687862;    QCVARM_0687479; QCVARM_0692718; QCVARM_0692665; QCVARM_0692586; QCVARM_0691853.  Later in 2023 and through 2024, Mr. Agrawal simply acknowledged an ACK test issue that Qualcomm reported without saying anything about whether an ACK patch would issue or did not respond at all.    *See,    e.g.,*    QCVARM_0690995;    QCVARM_0576126;    QCVARM_0618694; QCVARM_0618705;    QCVARM_0618708;    QCVARM_0578265;    QCVARM_0618703.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████.  Deposition of Jignesh Trivedi in C.A. 24-490 at 148:14–149:24.  Arm was not honest with Qualcomm about the fact that it had decided to withhold OOBs and ACK patches from Qualcomm unless and until Qualcomm prevailed in the *Arm* v. *Qualcomm* litigation.  Arm affirmatively misled Qualcomm about its withholding of deliverables owed to Qualcomm under the ALA by repeatedly telling Qualcomm that the OOBs and ACK patches were simply pending approval, so as to fraudulently conceal its breach of Section ██ of the ALA.

8

████████████████████████████████

Qualcomm did not learn that Arm's communications concerning the potential delivery of the withheld ALA ████████ were misleading for more than a year.  Specifically, in November 2023, Arm produced in *Arm* v. *Qualcomm* an internal email ████████████████████

████████████████████████████████████████████████

███████████████████████████ *See* D.I. 312-1 in C.A. 22-1146 at 16:18–19:9; ARM_01314327.  Mr. Agrawal then ████████████ at his December 14, 2023 deposition that ████████████████████████████████ *See* D.I. 312-1 in C.A. 22-1146 at 22:22–23:8.  Qualcomm's in-house counsel learned of this newly revealed document and ██████████████████ in March 2024, evidencing Arm's willful withholding and its misrepresentations to Qualcomm that OOBs and ACK patches were forthcoming following management approval, with the public release of a redacted version of a March 5 hearing transcript in *Arm* v. *Qualcomm*.  D.I. 312-1 in C.A. 22-1146.

Before this late 2023 discovery that was only revealed to Qualcomm in March 2024, Arm obscured its withholding.  ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ *See* ARM_00056571; ARM_01241565. Qualcomm was not required to continue to notify Arm that Qualcomm believed it was breaching the ALA by refusing to deliver ████████ after Arm denied that any such breach had occurred because any further notice would have been futile.  Qualcomm is accordingly entitled to pursue its breach claim for Arm's continued withholding or for each repetition of Arm's wrongful conduct in withholding OOBs and ACK patches for each of Qualcomm's custom CPUs (including in May 2023 and July 2023 for the for the ██████████████████████ even if

9

██████████████████████████████

the wrongful conduct began outside of the statute of limitations and the statute of limitations is not found to be tolled for any reason.  Arm did not stop its withholding of ALA ███████ until January 2025—after the jury in *Arm* v. *Qualcomm* returned a verdict in Qualcomm's favor.  *See* QCVARM_0573677.

Additionally, Arm became aware of Qualcomm's ALA Section █ breach claim in January 2024.  On January 3, 2024, Qualcomm notified Arm of its intent to amend its pleading in *Arm* v. *Qualcomm* to assert this cause of action as a counterclaim in that case based on the new information learned in discovery.  After Arm refused to consent on January 19, 2024, Qualcomm contacted the Court to seek leave to amend.  D.I. 253, D.I. 272 in C.A. 22-1146.  Magistrate Judge Hatcher denied that motion in relevant part more than a month later in March 2024.  D.I. 295 in C.A. 22-1146.  Qualcomm then filed a complaint against Arm Holdings plc f/k/a Arm Ltd. on April 18, 2024, consistent with Arm's counsel's urging that Qualcomm's Section █ breach claim should move forward in a "separate proceeding."  D.I. 1 in C.A. 24-490; D.I. 312-1 in C.A. 22-146 at 40:14–18.  Arm Ltd. represented in public filings that it had been sued on April 18, 2024 because "Qualcomm asserts that Arm," defined as Arm Ltd., "failed to satisfy certain delivery actions." Arm Limited, Annual Report and Financial Statements for the Year Ended 31 March 2024 at 1, 4 (Sept. 25, 2024), https://find-and-update.company-information.service.gov.uk/company/02557590/filing-history/MzQzNjgxNjU0M2FkaXF6a2N4/document?format=pdf&download=0;  *see also* Arm Limited, Annual Report and Financial Statements for the Year Ended 31 March 2025 at 1, 4 (Sept. 15, 2025), https://find-and-update.company-information.service.gov.uk/company/02557590/filing-history/MzQ4MDYyNTMyNWFkaXF6a2N4/document?format=pdf&download=0.

10

███████████████████████████████████████

Arm defended the C.A. 24-490 litigation on behalf of Arm Holdings plc and Arm Ltd. (including through producing hundreds of thousands of Arm Ltd. documents, making Arm Ltd. witnesses available for deposition, representing that C.A. 24-490 involved the same parties as C.A. 22-1146, and signing documents on behalf "Arm Holdings plc f/k/a Arm Ltd."). Arm subsequently asserted in June 2025 that "Qualcomm filed its complaint against Arm Holdings plc, but Arm Holdings plc is not a party to the Qualcomm ALA or TLA." D.I. 234 in C.A. 24-490, at 39. Qualcomm took the deposition of Spencer Collins, Arm's Chief Legal Officer (who serves on both the board of Arm Ltd. and the executive committee of Arm Holdings plc), on June 30, 2025. At his deposition, Mr. Collins ███████████████████████████████

███████████████████████████████████████

██████████████████████████ Deposition of Spencer Collins in C.A. 24-490, at 29:2–31:14.

After Mr. Collins ███████████████████████████████

████████████████████████████ on July 2, 2025, Qualcomm sought Arm's consent to amend the complaint in C.A. 24-490 to name Arm Ltd. and Arm Holdings plc as separate defendants rather than as Arm Holdings plc f/k/a Arm Ltd. After Arm refused to consent to the amendment, the parties contacted the Court regarding Qualcomm's amendment on July 18, 2025 and Qualcomm moved pursuant to the Special Master's procedures on August 1, 2025. D.I. 360 in C.A. 24-490. The Special Master did not decide Qualcomm's motion until January 7, 2026. D.I. 585 in C.A. 24-490. The statute of limitations is equitably tolled at least for the period during which Qualcomm's motion to amend was pending (six months in total) in which Qualcomm worked to bring its ALA Section █ breach claim before the Court through other

11

████████████████████████████████

procedural mechanisms, which Arm argues that Qualcomm was required to pursue.  *See also* D.I. 773 (Arm's Answer to Plaintiffs' Amended Complaint) at 59–61.

Plaintiffs further state that the statute of limitations for breach of a written contract under California law is four years.  Cal. Code of Civ. Proc. § 337(a).  Both parties have their U.S. headquarters in California, Qualcomm's CPU verification team that was forced to contend with Arm's failures to deliver is led in California, and ███████████████████████████

████████████████████████████████████  Qualcomm ALA

████  This case was filed in Delaware not because any of the underlying events occurred there, but because Arm first filed the *Arm* v. *Qualcomm* case in Delaware and thereby submitted to the jurisdiction of that Court, and the Court became familiar with some of the relevant facts through that litigation.  Delaware courts have declined to apply a shorter Delaware statute of limitations to a claim arising outside of the state where, as here, there is no evidence of forum shopping by the party bringing the claim.  *See, e.g.*, *Saudi Basic Indus. Corp.* v. *Mobil Yanbu Petrochemical Co., Inc.*, 866 A.2d 1, 16–18 (Del. 2005).  Moreover, statutes of limitations are substantive provisions, i.e., they arise from the substantive law governing the contract.  Here, that is California law. Accordingly, any breach of contract claim that accrued after January 8, 2022 would have been within the statute of limitations, even in the absence of any tolling, when Qualcomm's original complaint against Arm Ltd. was filed on January 8, 2026.  As Arm's Answer to the Amended Complaint concedes, Qualcomm's ALA Section ██ breach claim accrued well after January 2022. D.I. 773 (Arm's Answer to Plaintiffs' Amended Complaint) at 62–63.

Moreover, given that Qualcomm's Unfair Competition Law ("UCL") claim is premised in part on Arm's unfair withholding of ███████████████████████████

██ , Qualcomm states that the statute of limitations for a UCL claim is four years under either

12

████████████████████████

California or Delaware law.  Cal. Bus. & Prof. Code § 17208; *St. Retail LLC* v. *Curt Mfg., LLC*, 772 F. Supp. 3d 486, 492 (D. Del. 2025) ("When a cause of action is not available at all in Delaware, because it is not recognized, the borrowing statute does not apply, and the court applies the statute of limitations of the state in which the cause of action is recognized.").  Although it is not necessary for all events in the course of conduct that gives rise to a UCL claim to occur within the statute of limitations, Arm's withholding of ALA █████████ from Qualcomm undisputably did so.

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs identify the following non-exhaustive list of documents from which information responsive to this Interrogatory may be ascertained:   ARM_01238422;  ARM_01314327;  QCVARM_0688929;  QCVARM_0689117; ARM_00056571;     ARM_01241565;     QCVARM_0687862;     QCVARM_0687479; ARMQC_00000408;     ARM_00103702;     QCVARM_0692718;     QCVARM_0692665; ARMQC_02751596;    QCVARM_0692586;    QCVARM_0691853;    QCVARM_0690995; QCVARM_0576126;    ARMQC_02602462;    ARMQC_02602458;    QCVARM_0618694; QCVARM_0618705;    QCVARM_0618708;    QCVARM_0578265;    QCVARM_0618703; ARMQC_02784247;    QCVARM_0573677;    QCVARM_0575290;    QCVARM_0717963; QCVARM_0717964.  Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is for Plaintiffs.  *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to, *e.g.,* Deposition of Vivek Agrawal in C.A. 24-490; Deposition of Vivek Agrawal in C.A. 22-1146; Deposition of Anupa George in C.A. 24-490; Deposition of Jeff Golden

13

████████████████████

in C.A. 24-490; Deposition of Richard Grisenthwaite in C.A. 24-490; Deposition of Jignesh Trivedi in C.A. 24-490; Deposition of Martin Weidmann in C.A. 24-490.

Discovery is ongoing, and Plaintiffs reserve the right to supplement or amend their response.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Plaintiffs incorporate by reference, as though fully set forth herein, each of their General Objections and Objections to Definitions and Instructions as well as the objections set forth in its initial response to this Interrogatory.

Subject to and without waiving any of its objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their previous response to this Interrogatory. Arm Ltd. did not plead a defense that Qualcomm failed to comply with the ALA ████████ as applied to Section █ and Section █ *See*, D.I. 773. Arm Ltd. cannot now raise this defense for the first time in an interrogatory response following the conclusion of written discovery and fact depositions. Nor is this defense unique to Arm Ltd., as Arm Holdings plc also attempted to supplement its response to Qualcomm's Interrogatory No. 10 to include an identical defense after also having failed to plead or otherwise make this argument previously. *See* D.I. 234; Arm Holdings plc Third Supplemental Response to Interrogatory No. 10. Further, a defense that Qualcomm improperly failed to comply with the ALA notice provisions for Sections █ and █ is separate from, and unrelated to, Arm Ltd.'s defense based on the statute of limitations pertaining to Qualcomm's Section █ claims. Qualcomm reserves all rights to respond to Arm's unpled and late allegations should such defenses not be precluded.

Plaintiffs further respond that information responsive to this Interrogatory may be obtained from deposition testimony and related exhibits in this litigation, and the burden of ascertaining the answer to this Interrogatory from those depositions is substantially the same for Defendant as it is

14

███████████████████████

for Plaintiffs. *See* Fed. R. Civ. P. 33(d). In particular, Plaintiffs direct Defendant's attention to the April 30, 2026 Deposition of Ann Chaplin.

## INTERROGATORY NO. 2:

For each of Your claims, describe with specificity the complete legal and factual basis for Your contention that Your claims against Arm Ltd. are not barred by res judicata and/or claim splitting (see D.I. 757 (Arm Ltd.'s Answer) at Sixth Defense (Res Judicata/Claim Splitting)), including whether (and why) Qualcomm contends that its claims against Arm Holdings plc and Arm Ltd. arise from different transactions or occurrences and whether (and why) Qualcomm contends Arm Holdings plc and Arm Ltd. are not in privity for purposes of res judicata.

## RESPONSE TO INTERROGATORY NO. 2:

Plaintiffs incorporate their General Objections and Objections to Definitions and Instructions. Plaintiffs further object to this Interrogatory on the ground that it calls for a legal conclusion. Plaintiffs further object to this Interrogatory on the ground that Arm's Sixth Defense (which is incorporated by reference) is vague and ambiguous to the extent it asserts preclusion of "any other claim Qualcomm could have raised in the prior action." Plaintiffs further object to the Interrogatory to the extent that Arm is seeking information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable. Plaintiffs further object to the Interrogatory on the ground that Judge Noreika already rejected Arm's argument that Qualcomm's claim under Section 5.1 arises out of the same transaction or occurrence as C.A. 22-1146. D.I. 134.

Plaintiffs further object to this Interrogatory as beyond the scope of discovery permitted by the Court. Arm represented to the Court that it "wouldn't be retreading old ground" in discovery, 3/12/26 Hr'g Tr. at 43:18, and the Court permitted three interrogatories for "defenses that are unique to Arm Ltd," D.I. 759 at 1. Moreover, Arm already took discovery in this case without distinguishing between Arm Ltd. and Arm Holdings plc, and had the opportunity to take discovery

15

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
Jenifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC  20004
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
PAUL WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Adam L. Basner
Eric C. Westerhold
PAUL WEISS, RIFKIND, WHARTON
  & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

May 12, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

24

# Exhibit 61

## (REDACTED IN ITS ENTIRETY)