# EXHIBIT A

## REDACTED PUBLIC VERSION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., and )
QUALCOMM TECHNOLOGIES, INC.,)
      )
      Plaintiffs, )
      ) C.A. No. 24-490(MN)
v. )
      )
ARM HOLDINGS PLC, )
      )
      Defendant. )

Monday, July 6, 2026
2:00 p.m.
Discovery Dispute Hearing

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE MARYELLEN NOREIKA
United States District Court Judge

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: JENNIFER YING, ESQ.

-and-

DUNN ISAACSON RHEE LLP
BY: KAREN DUNN, ESQ.
BY: ERIN J. MORGAN, ESQ.
BY: JENIFER N. HARTLEY, ESQ.

-and-

---

APPEARANCES (Cont'd):

PAUL WEISS
BY: CATHERINE NYARADY, ESQ.
BY: JACOB A. BRALY, ESQ.
BY: ADAM L. BASNER, ESQ.
BY: WILLIAM T. MARKS, ESQ.

Counsel for the Plaintiffs

YOUNG CONAWAY STARGATT & TAYLOR LLP
BY: ANNE SHEA GAZA, ESQ.
BY: ROBERT VRANA, ESQ.

-and-

KIRKLAND & ELLIS LLP
BY: GREGG F. LoCASCIO, ESQ.
BY: JASON M. WILCOX, ESQ.
BY: MEGAN BUTLER, ESQ.
BY: CHRISTOPHER BUXTON, ESQ.

Counsel for the Defendant

_ _ _ _ _ _ _ _ _ _ _ _ _

COURTROOM DEPUTY: All rise. The United States District Court for the District of Delaware is now in session. The Honorable Maryellen Noreika presiding.

THE COURT: All right. Good afternoon, everyone. Please be seated. Some brief introductions.

---

Ms. Ying.

MS. YING: Good afternoon, Your Honor. Jennifer Ying from Morris Nichols Arsht & Tunnell on behalf of the Plaintiffs. I'm joined here at counsel table with Karen Dunn, Erin Morgan, Catherine Nyarady, Adam Brasner, Jacob Braly, and William Marks. And we have our client representative, Chris Longman, here with us today.

THE COURT: All right. Welcome to all of you.

Ms. Gaza.

MS. GAZA: Good afternoon, Your Honor. Anne Gaza of Young, Conaway on behalf of Arm. I am joined today at counsel table by Greg LoCascio, Jason Wilcox, Megan Butler, and Christopher Buxton of Kirkland & Ellis, as well as Robert Calico, vice-president and deputy general counsel for Arm. And my colleague, Rob Vrana also of Young Conaway.

THE COURT: Okay. Welcome to all of you as well.

Okay. So we read the papers. I'm just trying to pull them up here. We read the papers. We have two motions plus the third-party motion. And we read them. So on the clawback documents, Defendants in their response submitted a declaration explaining that they had inhouse counsel who did it in connection with settlement efforts in the prior case. What are Plaintiffs' thought on that?

MS. NYARADY: Thank you, Your Honor. Catherine

---

Nyarady for Qualcomm.

Indeed they did submit declarations. The declarations should not control and, in fact, obviously we weren't able to cite this law because we didn't have the declarations, but I will commend the Court to two decisions in this district, the *FTC v. AbbVie* case, which is a 2015 Westlaw case, and the number is 8623076. There is another one --

THE COURT: Did you say 2016?

MS. NYARADY: 2015.

I will repeat the number, 8623076.

THE COURT: Okay.

MS. NYARADY: And the second one is *In re: Niaspan Litigation*, that's a 2017 Westlaw case. And the number is 3668907.

These cases are just representative of instances where we have a similar fact pattern, there is a motion, declarations are put in, and the Court ultimately discredited the declarations because looking at the record and the document, the Court found that the declarations were not supported.

THE COURT: Help me out with that, because when I look at the declarations and it says I asked this guy to do this in connection with settlement discussions, and the document is called Settlement Discussions, what is it that

---

5

you're -- what is it that you're saying I should look at sort of in totality --

MS. NYARADY: Yes, Your Honor.

THE COURT: -- to discredit these?

MS. NYARADY: So the document is labeled Settlement, we don't dispute that. The document contains calculations. There is no -- nothing in the document is representative of any legal advice --

THE COURT: Except that the lawyer says I'm the one who told him, pull this, pull that, and okay, he can do the calculations, you know, put them in the spreadsheet and the numbers come up, but isn't it telling, like if the lawyer said, I don't know, maybe the lawyer said look, we already have stuff from Microsoft and Google, give me some Apple, right? So just because he did what he was told and it looks to be addition, that doesn't necessarily take it out of being work product privilege.

MS. NYARADY: I agree with that, Your Honor, but I would say for privilege and for work product, right, the primary or the express purpose needs to be for rendering legal advice.

THE COURT: And you don't think that in connection with settling litigation that there is pretty -- there is at least some suggestion that it was for legal advice?

6

MS. NYARADY: It's not what I believe, it's what Arm believes. Arm has the burden of demonstrating its privilege and Arm has taken multiple positions in this case that these were not settlement discussions, rightly or wrongly that's what they have said. I will point you to DI 773 --

THE COURT: How about you show me. I want to decide this issue, I'll look at these cases, but I gave you guys pages to do this. I don't want to go back and look at a bunch of DI numbers.

MS. NYARADY: So this is in Arm's answer, Arm Ltd's answer to this First Amended Complaint. And this is the section in question. So this is page 56 of the First Amended Complaint. And here we have Arm Ltd saying as a basis for the defense that even though it had no obligation to make an offer engaged in good faith negotiations in 2024 and then other years. And then it talks about meeting in person, it says that it made Qualcomm or offer for a v10 license in December 2024.

So this is the first piece of evidence we have that Arm is planning on using this in litigation. It is not calling it settlement, it is saying it made a good faith offer, a good faith negotiation.

And then if we go to Exhibit 5, which I will put up as well. Exhibit 5 of our moving letter, this is a -- to

7

orient us this is a January 12, 2026, letter that the general counsel of Arm is sending to the general counsel of Qualcomm. And I think there is other parts of this letter that I can show you, but I think this part --

THE COURT: Can you make it a little bit bigger for me?

MS. NYARADY: Possibly.

THE COURT: One of those buttons should make it bigger.

MR. LoCASCIO: The wheel, spin the wheel.

MS. NYARADY: Thanks.

Here we have, you know -- honestly, Your Honor, I think this alone is dispositive. This is the general counsel of Arm saying the fact that the parties agreed to keep business discussions confidential, does not mean that these v10 offers and negotiations never existed. And this is just one instance, but they repeatedly in their correspondence talk about it as being business discussions. And the entire claim of privilege and work product has to do with the fact that this was settlement, and these were legal analyses. And yet Arm has repeatedly been weaponizing these 2024 discussions.

THE COURT: Okay. And just tell me how I know that these are the December of 2024? I mean, what caught me on the document title was the Nuvia part because Nuvia, that

8

was litigation involving Nuvia. I don't know, like were there other discussions going on where the parties were trying to come to a business resolution outside of this litigation? I don't know. How do I know from this that what's being addressed are the now what are being called settlement negotiations that are the subject of the spreadsheet?

MS. NYARADY: These were all part and parcel of the discussions that were -- that took place the several weeks, maybe up to a month before the last trial. And so Nuvia certainly was a party to that case, but so was Qualcomm. And obviously Nuvia had been acquired by Qualcomm. So the discussions that were being had were between Arm Ltd and Qualcomm.

And I don't think there is any dispute factually between the parties that the discussions in question, these v10 discussions were at the same time period and in the same set of discussions prior to that trial.

So based on this, Your Honor -- I'll show you the first part of this letter, too, because I do think those were informative things as well. But again, I think the --

THE COURT: This is another part of that same letter?

MS. NYARADY: This is another part of the same letter and the general counsel of Arm is saying in 2024, Arm

9

made Qualcomm an offer for v10 license which the parties negotiated extensively. And then below they say, for example on December 11, 2024, that they made an offer. And so -- and there is other letters where this continues. But the position that Arm has consistently taken including by inserting it into the litigation affirmatively in their answer is that Arm is relying on those 2024 business discussions. And they are calling it a good faith negotiation, a commercial negotiation. So it simply is not privileged and it's not work product.

THE COURT: So I get what you're saying about work product, you know, that it wasn't perhaps in anticipation of litigation if what you're saying is true about these being business. But you could certainly have privileged work being done at the behest of attorneys for negotiations, right, even if they were commercial negotiations, it doesn't have to be for a litigation in order to be privileged. Right? There could be all kinds of things going on where you're asking for the lawyers asking for information in order to make legal judgements about -- you know, to advise a client regarding anything, a business or a settlement or whatever.

MS. NYARADY: I allowed for the possibility that that could happen, but in this case I don't think it did. And looking at the document, the nature of the document, the

10

type -- the information that was provided was for --

THE COURT: Are you talking about the settlement?

MS. NYARADY: I'm sorry, the spreadsheet.

THE COURT: I haven't seen it.

MS. NYARADY: Right. And we have that. Our vendor is on call available to send it if the Court would like to see it, but the calculations were for business purposes. And the law is clear that if a communication, even if it's a blend, right, if it's a communication is both legal and business advice, the privilege is interpreted narrowly and it will only apply if the primary purpose of the communication is to aid in the provision of legal advice. That was not the case here. Based on what Arm is saying, Arm has taken the position that this was a commercial negotiation.

Also with respect to those declarations, Your Honor, the attorney in question never says that he even saw the declaration, he says --

THE COURT: The spreadsheet.

MS. NYARADY: I'm sorry, yes, never saw the spreadsheet.

THE COURT: I hope he saw the declaration before he signed it.

MS. NYARADY: Hopefully he saw that. But he

11

never saw the spreadsheet. And there is no indication that it was -- there is no allegation or any document, contemporaneous document suggesting that this spreadsheet was more broadly circulated to the lawyers who were negotiating settlement, or the lawyers who were litigating the case, there is none of that. The document on its face, I know you haven't seen it, but it does not have any markings that would indicate that it was privileged. We have no e-mails or communications that show that it was circulated to any attorneys or to the legal team. There simply is nothing to support the contention in these declarations on the face of the document.

But when you take those declarations and you look at them in light of the record of the case and the arguments that Arm is making, I think it's of no consequence because Arm has taken the position in the case that those were not settlement discussions. And so they can't have it both ways, they can't want it to be settlement discussions when they want to keep the spreadsheet and then weaponize this, the 2024 negotiations in the lawsuit.

I also think, Your Honor, that even if there were privilege, which again, I don't think there is, or work product, I do think there has been a waiver here.

THE COURT: Can I ask a question about the letter that you put up, Exhibit 5? It was dated

12

January 12th of 2026, and said well, what discussions are we talking about. Can you help me again? Why are those the December of 2024 discussions as opposed to something in late 2025 because I thought that the person who did the analysis who gave me a declaration said something like I did some in 2024 that were for settlement, I did others in 2025, those weren't for legal issues. And so I assume those 2025 ones were produced.

MS. NYARADY: There was, you know, there was one PowerPoint that was produced in 2025 which --

THE COURT: What I'm trying to figure out is given that the person who did these things is saying yeah, there were two sets of them, can you help me out, again, with what discussions -- I understand what you're saying about what's in the amended answer. I don't understand the letter, why we think that the letter is referring to settlement negotiations as being the efforts that Arm made to satisfy its requirement to negotiate in good faith.

MS. NYARADY: So the letter in 2026 is a letter in a stream of letters that began in I want to say around April of 2025, and continue quite frankly to this day where the parties have separately been engaged in discussing certain aspects of the v10 license and the v10 license request that Qualcomm has made. And so in that letter, in that range of business negotiations that are going on now,

13

it is the general counsel of Arm who is saying this started in 2024, you know, I started making offers in 2024.

Let me put this letter back up.

THE COURT: Which page is that?

MS. NYARADY: This is page 2 of the letter.

And so, you know, maybe we start on the page before. So there is discussion here about the offers that were previously made, and then you see at the bottom, he's got screen shots that he's putting in from what now is being called in these declarations the settlement discussions. So the screen shot is Friday, December 13, 2024. These are part of the e-mails back and forth that were part of the settlement discussions that were right before trial and he's cutting and pasting screen shots from 2024. So he's recounting the history of the negotiation in his view. And he's saying we have been negotiating since -- and just to ground us, Your Honor, obviously the claim here is Arm has not been negotiating in good faith right --

THE COURT: They have to bring in something and said look, we negotiated in good faith.

MS. NYARADY: Right.

THE COURT: You're saying you can't have it both ways, you're saying you negotiated in good faith because look at all we did and at the same time saying that's settlement discussions and that was off limits and it was

14

done primarily for litigation purposes.

MS. NYARADY: Yes, he goes through the history of 2024, and that culminates in this paragraph about halfway down. He's responding to a comment by Qualcomm and he says, you know, in contrast, Arm has been consistent in its position that it sent Qualcomm an v10 offer in 2024, Arm has never denied that fact. The fact that these v10 offers and the parties' very tense negotiations took place as part of a larger settlement negotiation does not mean that these v10 offers and v10 negotiations existed as you falsely claim and he set forth his position that these were business discussions. So he is inserting it into this letter in 2026, you know, a year and a few months later because he's recounting the history of these business discussions.

THE COURT: All right.

MS. NYARADY: Did that answer your question?

THE COURT: I interrupted you when you were going on past that because I wanted to make sure I understood. Go ahead.

MS. NYARADY: To be clear, with respect to Your Honor asked about the PowerPoint from 2025, I do want to set the record in terms of how that came to be produced, because we were not able to take any discovery on that. That was produced, you may recall there was a hearing back in March.

THE COURT: I recall.

15

MS. NYARADY: And there were a bunch of issues, one of them was about the production of ALAs. And Arm came in and said they had only benchmarked off of two agreements. They agreed to produce those agreements. We then entered into a stipulation because Arm wanted some additional protections regarding these two agreements.

What happened was Arm then shoved this PowerPoint into that production. So we're talking a year after discovery closed after, by the way, I had just re-deposed one of the declarants in the case, one of the declarants who put in this declaration on this motion. We had just deposed him and they produced this document after that and it was not part of what we discussed in court or anything else.

And by the way, now we have a declaration where they're saying throughout November and December we were working on that. What did I get? I got one document that is dated the same day they sent Qualcomm a letter that had the numbers in that PowerPoint. So we have a self-serving PowerPoint with no back and forth. I don't have any e-mails, I don't have communications. I wasn't able to depose anybody. I have no idea about the history of this document. They produced one document with the ALAs. They don't give us any discovery. And now we find out that this other document is directly in contradiction of that document

16

that they produced. And they're hiding behind privilege. They can't have it both ways. There is a clear waiver. They inserted it into the case. I submit, Your Honor, they inserted it originally when they started talking about market rates and I know we raised that with the Court, I know the Court decided, but the Court decided in large part because one of the Arm lawyers told you that they only ever looked at Google and Microsoft.

And I'm sure they're going to get up here and say that was only for the 2025 offer, not the 2024, but the impression that was left in the courtroom was don't worry, Your Honor, we only need these two documents when we're saying market rates and that's what we're going to do at trial, we're going to get up at trial and talk about these documents and we're good guys. We're going to produce them. Now we find out that's not true. They benchmarked using other licensees. What's going to happen at trial? They're going to put somebody on the stand who is going to say we only used these two, the two in 2025. They're going to put up a PowerPoint, and the PowerPoint as Your Honor can see, it's Exhibit 6, and if you look at the -- I want to say it's page, Bates numbered 012, I don't think I can put that on the screen, Your Honor, DI 795, Exhibit 6.

THE COURT: Yes.

MS. NYARADY: And at 012.

17

THE COURT: I have it like numbered 50 of 79, do you have -- what exhibit did you say, Exhibit 6?

MS. NYARADY: Yes, Exhibit 6 to DI 795.

THE COURT: Yes. So it's an e-mail, 10/12.

MS. NYARADY: There is an e-mail and there is a PowerPoint with a few slides attached to it.

THE COURT: Okay.

MS. NYARADY: And the slides should be Bates numbered and I'm looking at page 012.

So here is this chart that they gave us without any of the documents that go with it, any communications, and they now in these bottom two rows are saying that the two parties that they benchmarked against in 2024 are completely irrelevant and they have a couple little nice summary bullets as to request they're irrelevant and they intend to put somebody on the stand to say this and we have no way of pressure testing this. We don't have the ALAs to show or to cross somebody on whether these bullets are accurate and we now don't have the spreadsheet to show that, in fact, in 2024 when they took their first shot at these business negotiations they benchmarked off these two other entities.

To make matters worse, Your Honor, they have now after we got no discovery on this, they made both of the declarants available to their damages expert. He relied on

18

in his expert report thirty times on these guys. And then when he was deposed just last week, he basically was like --

THE COURT: I'm sorry, is he the guy or the damages expert?

MS. NYARADY: The damages expert was deposed last week on his supplemental report where he included thirty cites to these two declarants, the declarants in the motion. And they talked to him about the PowerPoint. And they gave him the PowerPoint. The PowerPoint that we've had no discovery on and we don't have any other contemporaneous documents on and that is directly contrary to the clawback document. And he has testified that he did no independent analysis, but the Arm guy said that these two parties are not comparable, and he takes their word for it. And he is going to testify that those parties are not comparable.

THE COURT: Why did you get no discovery on this document?

MS. NYARADY: Because they produced it after the March hearing.

THE COURT: This was the one that was produced along with the other documents?

MS. NYARADY: Right, along with the ALAs. And in court we talked about the fact that they were going to give us the ALAs and we understood, maybe we didn't love it, but we understood that we were going to get into discovery

19

on this, we could at least read the agreement, we could use it for cross-examination and whatnot. And what happened was they shoved in this PowerPoint, too.

THE COURT: Well, the PowerPoint appears to be dated December of 2025.

MS. NYARADY: Right.

THE COURT: It's not like they had it for a long time. You're saying you got it in March, you had no discovery on it, so the assertions that are made on page 012 saying some things are comparable and some are not, you have no idea who made that determination or what the determination was based on other than what's in the notes.

MS. NYARADY: Correct. That is correct.

THE COURT: And your position is through perhaps an inadvertently produced document that you don't think was privileged, but you're saying we all know that's not true, or at least at some point in time you didn't think it was true that only some of these are comparable and the others are not.

MS. NYARADY: Correct. Correct.

I will note, too, Exhibit 6, which is the 2025 document that we received in I think Your Honor said March, but we actually received it in May, the hearing was in March, we received the documents in May, and again, in case it was lost and I didn't say it clearly, we had deposed Ehab

20

Youssef in April. As a result of some of those rulings at your March hearing, we were allowed a deposition. He was put forth as the deponent. And then they produced this document after that deposition.

THE COURT: And at that deposition he was asked about the issues of benchmarking?

MS. NYARADY: It was related to another spreadsheet that we had not previously been able to take a deposition on.

I would also note, because I do think it's important, when you're doing this analysis and looking at all the facts and circumstances, as obviously these decisions are very fact specific, Exhibit 6 that we were just looking at, if you look at that first e-mail, that e-mail is to a bunch of lawyers, including the general counsel, including the head of litigation, including Ehab Youssef who is the licensing guy. So, you know, here we have a document in 2025 that they're sending to all of these lawyers who are presumably participating in the depositions and the letter writing that's going on with these v10 letters, which is exactly the mirror image of what this document was in 2024.

So, Your Honor, again, I do not believe that the spreadsheet in question is privileged or work product because the primary purpose was commercial in nature. Arm

21

has repeatedly taken that position in the case. And even if it were, I think there is a clear waiver. I mean, they have inserted this issue of how they benchmark and how they come up with rates and how they came up with the offer to Qualcomm, they've just inserted it in the case. And they're planning on having their expert rely on evidence later in time that is directly contradicted by the document that they're clawing back, so we think it is a clear waiver.

THE COURT: Okay. Let me hear from Defendant.

So before you start, let me ask you, I think that it was pointed out by Ms. Nyarady that there is nothing that says what was done with this document after it was made.

MR. WILCOX: Mr. Youssef says that the document was created to help assist him in evaluating whether --

THE COURT: He said he never saw it.

MR. WILCOX: But he said he discussed the document extensively.

THE COURT: Did he ever see it?

MR. WILCOX: He did see the document. It wasn't sent to him, but they would get on the screen together --

THE COURT: Who was it sent to?

MR. WILCOX: It was shown to Mr. Youssef and Mr. Shivashankar, the two of them could get on like a Zoom together and would screen share and would look at the

22

document together as Mr. Shivashankar was doing the analysis that Mr. Youssef was asking for.

You can see, for example, they don't say the screen sharing part specifically, but they say they discussed it extensively at paragraph 4 of Mr. Shivashankar's declaration, which was Exhibit 2 to our opposition, and at paragraph 5 of Mr. Youssef's declaration, which was Exhibit 1 to our submission.

THE COURT: I'm sorry, who did Mr. Shivashankar give the document to?

MR. WILCOX: So he never gave the document to anyone, but he screen shared it with Mr. Youssef. And then he also created another analysis which we didn't produce because we think it's privileged where he put through the final conclusions of his analysis and he sent that to Mr. Youssef. This spreadsheet itself is from Mr. Shivashankar, it says declarations like essentially working notes as he's putting together the analysis that he ultimately presented to Mr. Youssef to help Mr. Youssef decide in the context of settlement negotiations whether and on what terms to settle.

THE COURT: Okay. So then let me ask and I'll let you say anything else you want to, but let me just get these few out.

Then with respect to the statements in Arm's

23

answer and the letter between the companies' CEOs, they were calling these business discussions?

MR. WILCOX: Yes. So two responses to that, Your Honor. First, I'll show you the documents in a second. And Arm consistently referred to them as settlement discussions in the letters that were going back and forth between the parties between the letter that Ms. Nyarady showed you. But also, there are cases like the *Fair Isaac* case that we cite in our brief that say just because the parties as part of settlement discussions are thinking about a potential business resolution, that doesn't make the business discussions any less work product.

THE COURT: Right. But I guess my problem with it is if the assertion in the case is that Arm breached the contract by not engaging in good faith negotiations and Arm is relying on negotiations that are part settlement, part business negotiations, you can't just say oh, we're just going to give you part of it and withhold other parts of it. Right? I don't -- like, if you're going to come in and say -- I don't understand, how is it you just get to choose which parts of it you want to share?

MR. WILCOX: No, of course not, Your Honor. So, for example, we have produced and they have produced in the context of these discussions that were happening in 2024 the exchanges that were happening between the parties including

24

the actual November 30, 2024 offer that Arm put on the table to Qualcomm which is how you would evaluate was this made, was this a commercially reasonable negotiation, you would look at that.

And actually if you look at Exhibit 2 to their letter, there is four attachments to that. And attachment number -- there is five attachments to that. And attachment number four -- I'm sorry, attachment number three is the actual November 30th offer that Arm sent over to them as part of these settlement negotiations. Just like they haven't given us their internal discussions that they were having about the settlement and part of these v10 negotiations either, both sides as you typically would do are producing. What's actually exchanged between the parties, the privilege and work product conversations that are happening behind the scenes you don't produce and we not seeking -- we haven't produced any of them other than this --

THE COURT: So tell me why I shouldn't -- now that sort of the cat is out of the bag that at least in some context somewhere, perhaps very different contexts, but there was benchmarking done based on two companies that now Arm is saying are not comparable, but at some point may have considered to be comparable or thought might be comparable or whatever, so what am I supposed to do with that if -- I

25

mean, there is a document that says these two are comparable, these two are not comparable. They have no idea what that is based on. And they do know because it was accidentally produced that there was something where someone checked on the comparability of two that are now not comparable. I guess what I'm saying, if that's -- if you want to put someone up on the stand and say these are comparable, these are not comparable, what is that based on? And is it based in any way, or is it contradictory in any way to the document that they have now seen and they either aren't privileged or subject to a waiver?

MR. WILCOX: Well, it's not contradictory to those documents, Your Honor.

THE COURT: Tell me why.

MR. WILCOX: Well, for two reasons. One, the things that are discussed in that chart that you were just shown for Apple, for example, none of them talk about the rates or the financial terms that Apple has which are what are discussed in that other document. So why Apple is not comparable according to the document that was just shown doesn't have to do with their financial terms, so there is no contradiction there.

THE COURT: Wait a second. First of all, she wasn't saying any names. You just said Apple, so I guess we can say Apple in open court.

26

But what I don't understand is okay, maybe it's not comparable on what you're saying in December of 2025, but why does that mean that if people thought it was comparable in December of 2024, maybe before certain allegations were made, that that's not inconsistent or contradictory?

MR. WILCOX: Yes. So two things, Your Honor --

THE COURT: You can say well, we think it's not comparable because of these four things. Well, that's great, but if you thought it was comparable because of eight others and now you're saying well, don't pay any attention to that because that's not helpful to us and it's privileged, that seems a little more problematic to me.

MR. WILCOX: So I agree, I think that would be more problematic if that's what was happening, Your Honor, but what's happening in this privileged document is not that there was a comparability analysis going on, there is no benchmarking that's happening in this document.

THE COURT: Well, I have never seen it.

MR. WILCOX: I understand. As Mr. Shivashankar said in paragraph 8 of his declaration, he was trying to analyze a different question when he was putting together this analysis and he was trying to -- you know, he can submit a declaration if he wants in camera that explains what that is. I can explain in camera what he was trying to

27

do. We didn't explain what it was because, of course, what he was doing in that other analysis we view as privilege and work product so we didn't want to put it in this declaration that was filed on the docket. But he was conducting a different analysis and what he was looking at those for was to analyze a specific potential term that was going to maybe go into the agreement and he wanted to do some math about how would that term play out compared to what we may or may not offer as part of these negotiations. So he did that. But he was not doing benchmarking.

And also, no one is going to get on the stand and say well, we did benchmarking and we figured out that these two were, you know, the only ones that we ever looked at. What's always been said is what Arm did is it had company A and company B and it looked at their -- it looked at their rates and put together a blend of what their rates would be. And that is how it put together its offer and that's what our witnesses are going to say on the stand.

In terms of this chart itself, we don't -- the only reason our expert talks about this chart is because Qualcomm when it served its expert report, started both talking about what's in the privilege document and then talking about why, you know, one company was more comparable than another, so then our expert had to respond to that the best he could without getting into what we viewed as

28

privileged information. But if the document itself, and there is not this privilege fight happening and there is not where we're having a fight about whose rates are lowest which doesn't matter for this provision because it's not a most favored nations provision, all we have to do is negotiate in good faith, we don't need this. All we need to do is show we made an offer and we looked at these two companies and what their terms were and we blended them together and we think that's good faith and we think --

THE COURT: Had you ever produced any witness or explained in anything what the basis for the statements in that PowerPoint that I saw were?

MR. WILCOX: We have not. Until this letter briefing they haven't raised that as an issue with us that they wanted a witness on. They still haven't told us until today, it sounds they want a witness on that, so we haven't had those conversations about that.

The reason why it wasn't produced until after Mr. Youssef's deposition is because this was tied up in getting that stipulation that Ms. Nyarady referred to in terms of the parties having some extra protections around production of these materials. And we had sent a draft over and it took several weeks for Qualcomm to get back to us, so they chose to depose Mr. Youssef given the schedule the Court had set and we had a stipulation --

29

THE COURT: What was the stipulation that kept you from producing a PowerPoint? I understand if it's a stipulation about the ALAs, but what was the relevance of the stipulation to the PowerPoint?

MR. WILCOX: Well, we wanted enhanced protections around the disclosure of company A and company B's rates given --

THE COURT: There is nothing about company A and company B's rates in the PowerPoint, is there?

MR. WILCOX: There is. I won't put it on the screen, but if, for example, you go back one slide, it has all of the terms of what I'll call company A. And if you go back, you know, slide -- so slide 2, for example, in this PowerPoint has the rates for both company A and company B. Slide 3 has rates for company A. Slide 4 has rates and other terms for company A. So --

THE COURT: Just so I'm clear, though, Arm is relying on discussions that were -- that it is now calling settlement discussions as part of its defense that it engaged in good faith discussions. Is that a yes or a no?

MR. WILCOX: Yes. What we are doing is Qualcomm has taken the position that we didn't have any discussions about v10 for five years until 2025, and we're relying on these just to point out no, there were discussions that happened in 2024. The actual rates we're relying on because

30

there weren't any rates that were put on the table in 2024 are solely the December 2025 offering. That's the rates we're relying on to say we made a good faith offer and then another proposal we made in March of 2026.

The actual that we do rely on the fact that in these discussions that happened in 2024, there were discussions about what's the upfront fee you're going to pay in addition to the royalty rate and the parties reached an agreement on what would that upfront fee be. So we rely on that there was an agreement on that upfront fee and what we proposed since then is the same fee to show that it must be good faith because the parties had a meeting of the mind. That doesn't require looking at Arm's internal documents, all that requires us looking at, do you have an e-mail that says hey, yeah, we both agree on this is the number.

THE COURT: What I'm not understanding is how is that not getting into settlement negotiations and opening up everything about settlement negotiations? I mean, you're saying it's settlement negotiations. I mean, your whole thing was this was settlement negotiations and it's -- look, the document says settlement as part of your argument that it's privileged. So now you're saying it doesn't really matter, it doesn't matter that we had settlement negotiations, but it sure mattered in your papers. So I don't really understand what's going on.

31

And I'm a little concerned that we're going to sit here and have a discussion in front of a jury that we were doing this in connection with settling our prior litigation, buy the way jury, we had a prior litigation, this seems like it's getting kind of messy.

MR. WILCOX: I think that's obviously things we could work out for trial, whether we need this, we can probably come up with a proposed stipulation --

THE COURT: My problem is, am I misreading your letter? Your letter was all about the settlement negotiations, these are settlement negotiations, and now you're like they're not really settlement negotiations, what we're relying on, we're not going to tell the jury these are settlement negotiations and we're calling these good faith business negotiations. And there is something to be said for when you're preparing something for a business versus preparing something for settlement negotiations in terms of privilege.

MR. WILCOX: So I agree that if this was being prepared for business purposes rather than settlement purposes, that would matter for privilege. We're not claiming that these were done for settlement negotiations.

THE COURT: No, you're proclaiming it, you're not disclaiming it, you're relying on it. You're like look at us, there were settlement negotiations, Judge. Keep

32

this -- this stuff is privileged. But what I'm a little worried about is in front of a jury and when you're making arguments to Plaintiff about no, we did engage in good faith that now it's they're not settlement negotiations, these are commercial negotiations. And it feels like you're being a little slippery here when you're arguing and it feels like you're being slippery because you're trying to make it seem more work producty and covered by privilege.

MR. WILCOX: So I don't mean to be slippery, Your Honor.

THE COURT: And I didn't -- I just mean there is something that I'm not quite understanding here. You're slipping back and forth between these things and there has got to be a reason for it that you're focused so heavily on settlement and yet they're putting up all these things where this is business, this is business, this is business, they're commercial negotiations.

MR. WILCOX: So we're not going to be able to walk away even at the trial that these were settlement negotiations. And let me show you the document that Ms. Nyarady had up to show you why we can't do that and why we would never try to walk away. While there were business conversations, they happened in the context of settlement.

So Ms. Nyarady showed you the sentence right below the one that I happen to have highlighted here. But

33

the sentence that I have highlighted, our general counsel wrote in this letter to Qualcomm's general counsel the fact that Arm's v10 offers and the parties' negotiations took place as part of a larger settlement discussion does not mean that these v10 offers and v10 negotiations never existed.

So he's owning right there, these happened in the context of settlement discussions. If you go to Exhibit 2 to their letter. So you can see here this is a September -- a December 10th letter that Arm sent to Qualcomm. It's our general counsel to their general counsel in the context of the offer that we made in December --

THE COURT: I'm sorry, which year is this?

MR. WILCOX: This is December of 2025. This is a year after the settlement discussions, a year after the first trial in this larger constellation of litigation. And this is our general counsel as part of this flurry of letters going back and forth between the parties during the commercial negotiations over a license. And he says, As your September 22nd letter, meaning September 22, 2025, acknowledges, in 2024 Arm proposed terms for a v10 license to Qualcomm in writing as part of a global settlement of litigation that remains ongoing to this day. Then he goes on to note, Your letter even references these negotiations of the key terms. And then he attaches to this letter and

34

you can see it in there, the settle correspondence that's going back and forth between the parties where they're having these settlement discussions, but a big part of the settlement discussions is what would a resolution look like if a v10 license emerges from these settlement conversations. That looks exactly like what happened in the *Fair Isaac* case that we cite, in *Behringer* case that we cite, in the *TPST Acquisition* case that we cite where spreadsheets were created for internal use to put together settlement related proposals or to think about what were the terms of a potential settlement would look like were all treated as work product or privileged recognizing that they were still created for those --

THE COURT: What were the spreadsheets, were they just sort of numbers that were compared numbers or were they, you know, did they contain some other legal advice?

MR. WILCOX: At least the way they're characterized in those cases they're characterized as financial spreadsheets and courts like the *Fair Isaac* case and the TPST case both noted that they had a lot of financial facts in them, but those facts didn't lose their privilege or their work product status just when they were put into a spreadsheet form, they still had that because they were still influencing legal discussions as you're thinking about what does the structure of a settlement look

35

like even if you're just looking at the financial structure of it, that's still divulging what the lawyers are thinking about in terms of what the structure for a settlement here and what do the potential terms look like and do we want to do a settlement, which then the lawyers go off and make recommendations to the ultimate client about do we do this or do we not. That's exactly what Mr. Youssef said in his declaration he was doing here. He wanted to think about what our potential settlement structure, what could they look like so that he could then help have input for Arm into the decision do we settle the Nuvia litigations, do we not. What do the terms of that look like, including what would the terms of the v10 license that we could live with as part of a settlement look like. And the parties went off and they had those conversations and, of course, both sides have produced the actual exchange back and forth between the parties.

So you don't need to invade the privilege or the work product protections for Arm's internal analysis just because the parties have shown two public facing documents. Just like in a patent case where parties produce license agreements that are out there and use them for a reasonable royalty analysis, you don't then get all of the privileged or work product communications that went into how do we put this license together. What you do is you rely on the

36

license agreement itself. That's exactly what you would do here as well.

So we don't think -- so we think these documents are definitely privileged. They're definitely work product. They were created for the purpose of settlement discussions even if those discussions were centering around business topics as one aspect of the settlement discussion of how do we end this litigation. Again, that's exactly what was happening in all of these other cases, too.

THE COURT: Yeah, but I don't think you get to have it both ways, right? I mean, if settlement -- I get it that there could be even in regular negotiations, not settlement negotiations, there could be underlying things that are privileged, I get it, and maybe this falls in that, but to the extent that you're relying on these are settlement negotiations so there is -- it's clearer that stuff that was going on was privileged, I don't think that works here where you're relying on those as commercial negotiations that show that you comply with your commercial requirements. Like, I mean, if you were just saying -- I mean, someone could say well, the only reason that you did that is because you were being sued or you were going to be sued, I don't -- I don't think that really tracks for me.

But this is what I am going to do. I have no idea what this document is. I don't understand. I take

37

Ms. Nyarady's point that Mr. Youssef doesn't even say he saw it. I mean, you're telling me he saw it on a Zoom, he doesn't even say that. He says that he gave -- it's very cryptic what he did. So send me the document, send me something that you just suggested was going to explain why this was actually -- you know, give me some context as to what he was doing, not just it reflects my mental impressions and, therefore, it's privileged or work product because what I have here doesn't establish that.

MR. WILCOX: Okay. That's fair, Your Honor, we will do that.

Just one comment about Mr. Youssef doesn't say that he saw this document, if I can just point to paragraph 5 of his declaration.

THE COURT: Yeah, I just read that and he doesn't say that. He says I discussed the spreadsheet and its contents. He doesn't say I ever saw it.

MR. WILCOX: Okay.

THE COURT: Does he say he saw it?

MR. WILCOX: I agree, he does not have the words I saw it. We will submit another declaration from him.

THE COURT: I can discuss a spreadsheet, I am discussing a spreadsheet with you right now and I have never seen it.

MR. WILCOX: It's true he does say he saw the

38

contents.

THE COURT: Tell me where you're pointing to that he saw the contents.

MR. WILCOX: I see, he does not use the word saw, Your Honor.

THE COURT: You keep telling me he said things. You're losing credibility. You said he told you something but he didn't. I'm looking at the words he used, and I know lawyers helped to prepare this, so I'm assuming that the words were chosen carefully so as to be accurate. And what he doesn't say, he prepared this for me, I used it, I saw it, I did something with it, then it does get my attention. So you can tell me in camera what he did, and get me that by Wednesday.

MR. WILCOX: Understood, Your Honor, we will do that.

THE COURT: Okay. Now, there is also an issue -- do you want to respond to some of that. You may because they're going to say something in camera and you might not get a chance to respond, you're not going to know what they said in camera.

MS. NYARADY: If you want to send it to me, I'm in favor.

THE COURT: Accidentally.

MS. NYARADY: We'll sequester it, it's fine.

39

They cited the *Fair Isaac* case as kind of their main support for their position. And I just want to point out that in that case, the Court found that they specifically say on page star 6, that the projections and the analyses in question in that case they find was created for one reason and one reason only. That's a direct quote from the case. And at the end of it, at the end of that paragraph, they say but for the litigation and the proposed settlement of the suit between Fair Isaac and Equifax there is nothing before this Court to suggest that projections and analyses wouldn't have been generated. So I think that case is not at all on point. I just want to make that point.

I want to make my client happy and I want to just say for the record that there was never an agreement to the upfront license fee in 2024. I think it was represented that there was.

THE COURT: Yes, because they're still relying on it to say it's reasonable.

MS. NYARADY: The other thing I would say is I think counsel said, I hope this is a direct quote, I tried to write it down, there was a specific term in the contract is the reason that this spreadsheet was created. And the way it was said and I think the papers that are going to be submitted, it sounds to me like this still was in furtherance of the business negotiation, so this was

40

directly related to the business negotiation. So even if they're not saying it was benchmarking and they're saying they were doing something different, when you see the document, I'm not sure you will agree with that, I won't agree with that, but even if that were true --

THE COURT: What do you mean -- what do you mean by benchmarking? So when you say so when you see the document, I may think differently, I don't know what that means. What is it that you think it shows that shows benchmarking?

MS. NYARADY: Meaning I think in -- I'm trying to think of how much I can say. In 2024 when there were discussions about ███, there was also an discussion about an MFN. And I think this document is an effort to look at two licensees who had active ████████ and to try to figure out what they could charge Qualcomm, which I think is exactly what the 2025 document is, they're using two other licensees to come up with different numbers.

THE COURT: And the 2025 document is this spreadsheet you're talking about -- sorry, the PowerPoint.

MS. NYARADY: The 2025 document, yes, is the PowerPoint, the late produced PowerPoint versus the 2024 spreadsheet that Your Honor is going to see in camera.

THE COURT: When you say it's late produced, I get that it did come late, but you're not disputing the fact

41

that it does have information in it about third-party stuff and that parties here were trying to negotiate for enhanced protections of that, so I mean --

MS. NYARADY: No. So I think Your Honor hit it on the head in terms of -- and I have here the stipulation, although it sounds like maybe you have looked at it. The stipulation in question was talking about producing unredacted copies of the agreements and the annexes. So this has nothing to do with the PowerPoint. And so the fact that they waited until after this stipulation had been entered and after the Youssef deposition to produce this, they did not have to wait because of the stipulation because in my view in reading this document just on the face of it this doesn't apply to the PowerPoint.

THE COURT: What document does it reply to? I saw the introductory phrase, but does it ultimately say certain documents will get enhancement, what documents are those?

MS. NYARADY: It's with the PowerPoint, the 2025 PowerPoint they also produced the actual ALAs and the annexes that go with it and the stipulation expressly covers those agreements.

THE COURT: And not anything that includes information that might be in them?

MS. NYARADY: Well, I think it includes anything

42

that's in --

THE COURT: I'm saying, does it only include -- I don't know what the words are of that stipulation, when it says -- does it say these agreements will receive enhanced protections and these agreements and the information contained in them which might include stuff that was then put into a PowerPoint presentation.

MS. NYARADY: Fair enough. And to be clear, from our perspective it doesn't matter because these added protections in our view do not add anything beyond the Protective Order. I know it made Arm feel better to have some added protection, but we are not discussing the substance of any of these agreements with our client. But I take your point and so I think I would agree with you it would include, or I would say it does include the substance of it.

But I don't think they have to wait for the stipulation to produce the PowerPoint. There is other documents as you know in the case that have rates and have pieces of other ALAs --

THE COURT: Do you want discovery on that stuff or not at this point?

MS. NYARADY: What we want is the spreadsheet.

THE COURT: I get that. And I am going to look at these cases and I'm going to look at the spreadsheet and

43

what they submit to me. But that's --

MS. NYARADY: If we don't get the spreadsheet, a couple of things, one is the underlying facts are not privileged or work product. So, you know, my next request would be for a redacted version of it. When you look at the spreadsheet you will see that not only are there calculations, but there are rates for other licensees. And so if they want to redact the calculations that they did but produce the rates, I think that information should be produced.

Quite frankly, Your Honor, I think what has happened here opens up the door for us to ask again for the ALAs. I'm not going to do that, but I think that would be justified.

THE COURT: You have to save something for appeal.

MS. NYARADY: But I think that, you know, we should get a redacted version that has all of the factual information so the rates of the two licensees in it. But I also think, you know, we're going to have a real problem come trial, we talked about this a little bit in terms of what's going to happen on the stand. And are they allowed to get up and say we only benchmarked against these two companies. Am I then allowed to say well, did you ever do any analysis involving other companies? Are they going to

44

claim privilege on that. If we don't get that spreadsheet, I don't think they get to talk about how they developed these rates. Either we get the full story and we're allowed to pressure test it and we're allowed to cross properly or it's out, that's my view. And if that were the case, then we don't need discovery. But I don't think they can put somebody on the stand to selectively disclose their process. I do not think they can do that.

THE COURT: Okay. Well, I want to understand and that's why I asked for the in camera stuff, at least why they're saying it's not benchmarking.

MS. NYARADY: The last thing I would say is I think there was some discussion about how focusing on the Exhibit 6, slide 12, the Bates number ending 012 which has the four companies and says some were noncomparable. And I believe I heard counsel say that none of these bullet points involve rates. And so the information from the spreadsheet from 2024 actually doesn't play into this. I would encourage Your Honor to look at a couple of slides that precede slide 12 because it's all about rates.

So the fact that somehow they're talking about rates, they're focused on rates, they're obsessing on rates and then they come to this conclusion slide where they say these two aren't relevant or not comparable and somehow that's not about rates, I don't see it.

45

And I have nothing further unless the Court has questions.

THE COURT: Is this the entirety of the spreadsheet that you gave me?

MS. NYARADY: The PowerPoint?

THE COURT: I'm sorry, the PowerPoint.

MS. NYARADY: Yes, there is a cover e-mail and then there is I want to say six slides.

THE COURT: Because there is nothing on the two not comparables that I see, is there?

MS. NYARADY: No, it's all about --

THE COURT: It's two comparables.

MS. NYARADY: The two comparable rates, but my point is the entire analysis is about rates leading up to, you know, this one is comparable and the others are not, and so the comparable/not comparable is bound up in rates.

THE COURT: Okay. So then let's talk about the confidentiality, the third-party confidentiality issue. Is Apple's counsel here? Okay. You can come up here.

MS. CANNON: Good afternoon, Your Honor. Hannah Cannon.

THE COURT: Welcome back.

MS. CANNON: Thank you. We are back.

THE COURT: I'm sorry you have to keep coming in.

46

MS. CANNON: Thank you very much. We appreciate that.

There are three things that I want to bring to the Court's attention based on Qualcomm's opposition to our motion here. The first of which is that the Special Master's order is clearly broad enough to cover the trade secrets contained in the ALAs in addition to the documents themselves. She says that it's Apple's TLA, ALAs, any annexes and any documents or communications that are the subject of her Protective Order. So clearly any trade secrets that are contained within those documents are subject to the Protective Order that she issued and that this Court overruled the objections to back in March.

Second, Apple never consented to the production of any information regarding the 2023 ALA, and that is including in this litigation and in prior litigations. Qualcomm points to a document that is Exhibit 3 in their opposition. That is a 2021 document that predates the 2023 ALA and the rates that were negotiated therein.

Qualcomm also refers to public reports about what Apple's rate is. To the extent that they want to rely on public reports, they can do so without relaying on Apple's trade secrets here.

THE COURT: What would those be?

MS. CANNON: I think that they were exhibits to

47

their press reports, they're not verified by anything, but they are certainly public documents that they can refer to that they don't need to refer to Apple ALA or the documents contained therein.

The third point is that Qualcomm said that Apple was willing to find a way to give Qualcomm its information over the course of our negotiations over the past three years that we've been here. Qualcomm is correct that we tried to negotiate in good faith with them before motion practice and before bringing this issue to the Court, but Qualcomm should be bound by their refusal to compromise with us. We never offered rate information. We -- you know, we're trying to find some negotiated solution. They refused at every step of the way to negotiate with us and they should be bound by that. This document, my understanding is that it was produced before this -- before the March hearing and before this first came to the Court's attention --

THE COURT: It was produced in May, so it was produced after.

MS. CANNON: The spreadsheet was. The spreadsheet, so we're talking about the spreadsheet that is privileged.

THE COURT: They didn't notice the spreadsheet until the expert reports.

MS. CANNON: Exactly, and that's when Apple

48

became aware of it. We would have never consented to production of the document. We did consent to production of certain documents over the course of litigation, but none of those had 2023's rate information in them.

THE COURT: Yes.

MS. CANNON: So I would just say that Qualcomm unilaterally chose to use this document, they -- or chose to use the Apple rate information, rather. They should not be allowed to take the trade secret just because it's contained in another document and say that it is not subject to the Protective Order that the Special Master granted and that you granted as well.

This is the fifth time that Apple has bring briefed this information before this Court as a nonparty.

THE COURT: I recognize you as a Delaware attorney and you're not even part of the case.

MS. CANNON: Exactly. So we would ask the Court to stick to the prior orders and say that that Apple rate information itself is subject to the Protective Order in this case and is not part of it. And quite frankly, this isn't the most favored nations clause, right, that they don't need every single rate that exist.

THE COURT: Or the exact rates.

MS. CANNON: Or the exact rates, so there are ways to get this information about, you know, certain

49

benchmarks without using Apple's rate. So we would ask that the Court would confirm that the Apple ALA and the information contained therein is not subject to the dispute and is protected.

THE COURT: All right. Thank you.

Ms. Nyarady, let me ask you, I know this is going to come up maybe not with Apple so much a million times more before trial, but what she said did just make some sense to me which is if Arm is saying these agreements are comparable and these are not, it has nothing to do with rates, we don't need to get into rates, is that their argument that they're comparable or not for different reasons?

MS. NYARADY: I think rates is tied into it. I don't think those are separate issues. I think that --

THE COURT: I guess my question is, if the parties, the actual parties of this litigation had an agreement that the non-comparables had rates that were lower, like why do you need the exact rates?

MS. NYARADY: Well, the rates themselves, I mean, the rates themselves have -- our damages expert has done an analysis of the delta and any reasonableness or good faith that can be attributed to the negotiations based on, you know, what other parties are paying for their ███ ███ So in part from the spreadsheet, the rates that

50

were -- to be clear, too, when you see the document, there is one number for Apple. There is not a lot of discussion. You know, when Apple came to Court, they put in a declaration about this trade secret. I heard the word trade secret several times just now. In the declaration from the Apple person, which is exhibit -- we put it in as Exhibit 2 to our letter there is three paragraphs where he talks about what he thinks the trade secrets are. None of them have -- are rates. It's other things that are in the ALA. That's because the motion, the Protective Order motion that Apple brought was to stop the production of the ALA and the ALA has lots of other information in it. Right? It's got information as we understand it based on this declaration of maybe how things are going to be used, maybe product development, product lines. There is more information that is arguably competitively sensitive and that's what the declaration that Apple put in in support of their original motion for a Protective Order said. And Your Honor ruled on that. That motion was not about rates, and the trade secrets that Apple has thrown their arms up about that were so sensitive were not rates.

In addition the motion had nothing do with documents that were already produced or Arm business documents. And part of why we put in just an exemplary exhibit from the last case, trial exhibit was to show that

51

over the last four years, and Apple knew this, over the last four years, Arm has produced its business documents and its business analysis documents. And some of those documents not surprisingly talk about third-party licensees and sometimes make passing references to terms in the other agreements. Those documents with all these third parties moving for Protective Order have never been at issue. The documents that have been at issue are the communications --

THE COURT: Well, are there documents that have not been at issue that your expert can rely on if that spreadsheet, that one number in the spreadsheet were not available to him?

MS. NYARADY: That is the only place that number appears.

THE COURT: So then let's not tag Apple for not complaining about other documents if the information that they're now trying to protect was not in that.

MS. NYARADY: Well, to be clear, Your Honor, though, that specific number in that contract was not in there, but rates for the prior ALA that was --

THE COURT: Yes, but she said that's the 2021 ALA.

MS. NYARADY: Right.

THE COURT: She's saying okay, she's not complaining about the 2021, she's complaining about the 2023

52

one. And now you want not only the 2021 and the 2023, and she's saying the 2023 is actually sensitive to Apple.

MS. NYARADY: I understand that, Your Honor. My point is in the prior case the other agreement was the relevant one. Now this is -- but again, I go back to, you know, if you look at the Apple declaration, it was the other things in the ALA that they were pointing to as being this competitively sensitive information that rises to the level of a trade secret that would prohibit the production.

THE COURT: What's publicly available that she mentioned?

MS. NYARADY: There are -- and I believe this was attached to the letters, if I can find it. It's Exhibit 4 to our letter. There are articles like this that talk about that it's a low royalty rate no matter how many cores it uses. That was one example. And we put that in as Exhibit 4.

Again, you know, we put this in on the point that this is not trade secret information in the sense that some of this information is already out there. Here we have another article, people are speculating as to what the royalty is.

When we asked some people at deposition about the rates, what we encountered was people saying they weren't sure, they didn't know the exact number. So, Your

53

Honor, I do worry that using these articles versus using a document from Arm, you know, is very different in terms of the evidence in the case. Because we can't prove the truth of these articles at the same time --

THE COURT: Well, I guess the question is if Arm knows the truth, even if we're not going to say exactly what it is, they suggest that those articles are far off.

MS. NYARADY: And I don't know what they're going to say or if they're going to claim ignorance completely about it. And given that the documents weren't produced, I don't know how we're supposed to cross-examine somebody or really kind of nail somebody down on that. But again, the document in question is an Arm business document. It's calculations that Arm did. It happens to have one number for Apple. And if the concern is a broader disclosure in the courtroom, I am sure we can use a way to have testimony be, you know, a factor of or, you know, some way that we can make the public record, you know, not waving around third-party licensees rates.

But I don't think that Arm cannot produce their business records and their calculations that were part of these business negotiations when they're benchmarking it off these other parties just because that information is sensitive and third party, we can protect the information. We did it with the other ALAs, we got other ALAs produced

54

because we signed a stipulation saying we promise, promise, promise, we're not going to tell people what's in here, we're not going to use them in certain ways. We're happy to do that with respect to the spreadsheet as well.

And to be clear, there has been no allegation of misconduct. These cases have been going on for four years. We have variations of the ALAs, TLAs, we've had lots of competitively sensitive information for quite a while. There is almost an inference that counsel is going to do something inappropriate with this and it's just not justified.

THE COURT: Okay. Thank you.

Counsel, you can have the last word here.

MS. CANNON: Thank you, Your Honor. I will begin by saying that the negotiations that Apple's rates are not a trade secret I think is absurd.

THE COURT: Well, I guess where it gets a little leery to me is there is stuff in public. Now I get it that Apple is not confirming or denying that, but there is stuff out there.

MS. CANNON: There is stuff out there, but the actual rates that are paid are a protected trade secret. That is confirm by the Kirby declaration, both the one that he filed in 2023 at paragraph 5 and paragraph 11 and then again in the 2025 declaration in paragraphs 4, 5 and 6.

55

The notion that what Apple would pay is something that would be publicly available or would be discussed in court is not something that Apple would ever have agreed to. Apple had no insight into what business documents Qualcomm or Arm were producing in this matter, over a million pages worth of documents were produced. Apple was not consulted on this one nor would it have consented to it.

At the hearing in March, rates were discussed extensively. And the reason that Qualcomm purported to want the ALAs in the first instance is because of rates. And I think that kind of more generally, I appreciate that Ms. Nyarady said that there has been no bad actions, but here there was a Protective Order that protected certain trade secrets. Those trade secrets included the terms of the ALA. Qualcomm gets its hands on a document that has the terms of the ALA on it and instead of questioning this Court whether it has consent to use it, whether it is within the lines of what this Court's Protective Order is, it puts it in an expert report and serves that expert report. It hasn't sequestered the expert report such that the expert is no longer out there and operative.

And it would encourage bad behavior if Qualcomm is allowed continue to use the term, the rate information, because it knew that the rates were among the most sensitive

56

information that Apple was trying to protect. Mr. Kirby's declaration said that both in 2023 and 2025.

And clearly we have been here enough times arguing about the sensitivity of the 2023 ALA such that the trade secret information that was contained therein was clearly through the letter of the Special Master's order something that should be protected.

THE COURT: All right. Thank you.

MS. CANNON: Thank you.

THE COURT: Let me ask Arm, are the rates of the agreements that Arm asserts are comparable at issue?

MR. WILCOX: I just want to make sure I understand your question, Your Honor. When you say are they at issue?

THE COURT: Are they going to come up?

MR. WILCOX: Meaning are the company A and company B rates going to come up? They're going to come up in that Qualcomm is going to say that the rates that you proposed are too high, they're unreasonable, and they show you didn't engage in good faith negotiations. And what we're going to say is no, we did. Look, you have the company A rates, the company B rates, we blended them. Given that someone else agreed to these rates, that seems like it's commercially reasonable. That's what we're going to say.

57

THE COURT: And if they were to say something ███████████ even the publicly available documents say $0.30 or whatever it was, is Arm going to disagree with that?

MR. WILCOX: Are we going to disagree that ███ ███ No. Are we going to agree that they pay that exact number? No.

THE COURT: I didn't say are you going to agree, I said are you going to disagree. I mean, if I am not going to make them see Apple's rates, but I take their point that rates are relevant, or could be relevant, it seems to me it matters if you're going to be like, you have no idea if that's correct. And they're going to be like no, we don't because you wouldn't give it to us, or because Apple wouldn't let us have it, but we know ████████ How is that going to play out? I just want to know, are you going to be like uh-uh, we don't -- we have no idea if that's even close to right. Like, that seems wrong to me.

MR. WILCOX: I agree, Your Honor, and we're not going to play dumb and we're not going to disagree that ███████████

THE COURT: And so if they put this is what's out there, publicly out there, are you going to make a point of saying you have no idea if that's correct? Like if their expert, let's say in their report instead of using what was

58

in the spreadsheet he used something like that, is part of the cross going to be you have no idea if that's even correct, do you -- is that how it works? I'm trying -- I don't mean to put you on the spot, you might not know, but it seems like some of this -- I'm trying to figure out if there is a middle ground here between protecting a third-party's sensitive information, which I do think that the rate is a sensitive piece of information to a third party who really wants nothing to do with this litigation but keeps paying lawyers to get involved in it. But I take the Plaintiffs' point that you guys are just going to come in and say look, it was reasonable because you guys did this and you're going to be like we're much more comparable to company C or company D and they paid much less but we have no idea how much they paid because nobody will tell us. That seems wrong that that's the way they're stuck. If you're going to come in and say well, we have public information, but if we try to use the public information, the folks who actually know what that information is are going to come in and be like jury, don't believe that because who knows, that's just like what they said in the newspaper, they say all kinds of stuff in the newspaper.

MR. WILCOX: And I'm trying to be helpful. The one thing that is giving me pause about just saying no, we're not going to do that is there are for certain

59

circumstances where both the number in the spreadsheet and the number in the media reports is wrong and misleading. And so we can't leave that part of the picture completely out if we are going to have that fight which is what is making me think about how can we solve that problem.

THE COURT: You guys are going to have to start thinking about how you can deal with that depending on how I come out on the spreadsheet. But I'm getting uncomfortable with saying Arm can just get in there and say this is what we did. It very well may be that all you have to do is get in there and say yeah, it wasn't -- we viewed you as an important player, it's reasonable because we used these rates, yeah, other people had lower rates, other people had different terms, other people gave us better benefits, so what, it doesn't mean that what we did for them was reasonable. We could have asked them for higher rates and it still would have been commercially reasonable and a good faith effort. I get all that. I'm just saying that it seems that if they had -- if that's the argument, they need to be able to fairly test the bounds of it with information without -- and if they can't have the information, I'm not sure where the fact that you have it but are not letting them have it for reasons other than relevance plays in, so there is going to have to be some kind of discussion of that that you guys are going to have to try to deal with it

60

because otherwise I might make a ruling and say you're not allowed to say it's unreasonable even if you believe it is.

MR. WILCOX: So we're not allowed to say what is unreasonable?

THE COURT: I don't know, you just said there is one thing that I'm saying that's misleading and I'm saying if you guys don't come to some kind of agreement, maybe I'll just preclude you from saying that because you haven't produced information to show something different. But I don't know. I don't know the facts good enough, but you guys can never seem to do anything very quickly, so you better start thinking about that in advance of trial. If I agree that those numbers can't come in or they can't have them from the spreadsheet, you're going to have to start thinking about how these arguments are actually going to play out.

MR. WILCOX: We will, Your Honor. We'll start thinking about that --

THE COURT: And be reasonable about it, because it's you and your clients who are essentially keeping -- you want to make an argument but also keep other information from their hands and if that's the situation, the compromise may come down harder on you if I have to make a compromise versus you.

MR. WILCOX: Understood, Your Honor.

61

THE COURT: And that's not an invitation for Qualcomm to then come in and make unreasonable demands because that might backfire on you and make me feel suddenly more sympathetic to the Defendants.

So I will wait until Wednesday to get the stuff in camera and deal with that.

MR. WILCOX: Yes.

THE COURT: I'll issue an order on that.

So now we have the motion to strike. And on this one, a separate case had to be filed because of some reason that I don't remember, and then we had like magistrate judges and special masters and -- so I don't remember the specifics of a lot of these things, but I do remember that a new case was filed to include Arm Ltd. And then I wanted that case to be consolidated into this one because I didn't want to have to deal with two cases and risk two trials on the same kind of stuff.

But now it seems like, I don't buy Qualcomm's argument entirely when they say we had no idea that that scheduling order would apply because clearly it applies because we're all going to trial. Okay? So it applies for trial. But is it fair that it applies to a motion to amend date that may have occurred before this party ever existed? And is it fair that they can't amend after an answer when the only reason they're maybe precluded from doing that,

62

like if this were a separate case out there and you -- and they filed the complaint and you answered, and they would then have leave to amend to add whatever they want, they could do that. But then I don't understand why they lost that just because I was like I'm not dealing with two trials. So they lost that.

MR. LoCASCIO: If I may, Your Honor, let me remind you a little bit more --

THE COURT: Don't just tell me they said nothing was going to change in the case because that initially bothered me, but I kind of got over that when I was reading the papers.

MR. LoCASCIO: But the context of this claim and how this amendment came to be --

THE COURT: I know, it came up when we were having a discussion. I feel like I gave them some kind of claim when discussing and saying look, you have this implied -- you do have good faith, beyond how you could have that when it seems like your claim is governed by Section 14.1.B.

MR. LoCASCIO: Exactly, Your Honor. 14.1.B. Can we just pull up, I want to show you a couple of things, Your Honor. And I will start on what is slide 3.

May I approach, Your Honor?

THE COURT: Sure.

MR. LoCASCIO: How we got here. And the

63

original claim was amended twice, First Amended Complaint, Second Amended Complaint. On the last day, the March 14, 2025, deadline from the scheduling order to amend, Qualcomm amended and they added what we just shorthand call a good faith and fair dealing v10 claim. That's the conversation you had with Mr. Isaacson at the March 10th hearing and I don't expect you to remember the March 10th hearing much --

THE COURT: We went back and looked at the transcript.

MR. LoCASCIO: Okay. And so during that, this was in the context of we had a pending motion to dismiss that claim in and of itself saying how can you bring a good faith and fair dealing claim when you're not alleging a breach claim. And they leaned in and from the get go when they knew they could do it, they only chose to assert that claim. Fine. They tried to add unlimited and the Special Master denied it. The next day they added the complaint. That is the Arm Ltd complaint that Your Honor consolidated.

Repeatedly you were told you can consolidate these cases on the schedule we have, which is the one that we're now at the March 10 hearing, they had already been through in January what would happen to the schedule. And they said nothing needs to change and repeatedly on the Qualcomm side there is no more discovery, this is not a do over, we have everything we had need to go to trial because

64

the claims are identical.

Now, on March 10th, go to the next slide, this is first January, we were told there is nothing different here. These are exactly the same claims, we just added a party.

The next slide.

The consolidation motion which was granted by Your Honor in February was based on there is no difference so we can put these all together. We can go to trial on the schedule we now have in October because no new claims are being added.

The next slide.

Then on March 10th, the passages it sounds like Your Honor has gone back and looked at, there was a back and forth, it went for about six pages where you continued to ask Mr. Isaacson, wait, how is it I can let this claim survive the motion to dismiss.

THE COURT: You moved to dismiss.

MR. LoCASCIO: We moved to dismiss and he said look, there is a difference. Just because there is an actual claim or just because there is a contract provision and we're agreeing we're not alleging breach doesn't mean this claim can't survive. We were sort of bewildered. Your Honor said, I'll deal with that at summary judgment. You had real questions to be charitable in the description of

65

what you said on that day. Mr. Isaacson said look, if we were asked to amend, we would add the specific breach claim. This is year and a bit late, but Your Honor had some views on that that okay, you clearly could have done this, you knew about this, you elected not to.

Next slide.

And again, when said, well this is early, we could amend. Your Honor said, we've done that plenty before. And part of this was because this was one of several claims that we had argued the UCL claim, the circular tortious interference UCL claim, the good faith fair dealing. If this case is really about a breach of a contract provision around the TLA provisions, fine, that could be a contract claim you could try in a week to a jury. This thing has tentacles all over the place that could not be. And we said we're going to have to deal with this whether at motion to dismiss or at summary judgement some of these claims including this one they're now trying to add.

They say there is no monetary damages that could be appropriate. It's entirely equitable. It then plays into the conversation you may remember we had once about okay, they're several of these things that shouldn't go before the jury at all. And we're going to have to deal with them, whether through summary judgement or through some bifurcated process.

66

And on this, given the good faith and fair dealing claim was sort of hanging on by a thread and specious, what happens then next on the timeline, slide 11, please, after the consolidation, and after the March 10th and 12th hearings on no new discovery can happen, an amended schedule was hashed out, and the good faith and fair dealing claim had some -- ran into some bumps at the hearing.

On March 30th, Qualcomm files the First Amended Complaint. They do not at any point as to the fairness aspect of this, I feel like this, I feel this way to be honest about the Apple issue, Qualcomm likes to ask for forgiveness, not permission. They knew they had the PO with Apple. They saw a document. They never asked us or told us. They never asked them or told them. It just showed up in an expert report and then we had to come here and deal with it. This is the exact same posture, Your Honor.

THE COURT: Yes, but the only reason that I'm a little curious is when -- wasn't there an issue where they sued Arm Ltd, but Arm Ltd wouldn't accept service or there was a question about service, so that kind of dragged on longer. And then I don't know when Arm Ltd answered. So I guess what I'm curious about is to the extent that they're saying look, within twenty-one days of an answer we're allowed to amend as a right, we don't need to come to you, Judge, the rule says we can amend as a right. I'm trying to

67

figure out like is the problem that Arm Ltd didn't -- I mean, it could have been that twenty-one days had already lapsed before the March 10th hearing, but it didn't because Arm Ltd was kind of being difficult on the service. I don't remember what it was, but I remember asking you, well Mr. LoCascio, you're not saying you won't accept service or something like that, you're not saying you need some -- something, I know there was something about service.

MR. LoCASCIO: There is no interplay between this attempted amendment and that to remind Your Honor if you want to know, that the service issue was as following. We had the March trial date originally. They were trying to amend in Arm Ltd and stay on the original schedule. When that didn't hold, they filed the Amended Complaint and Qualcomm's position was doesn't matter, we should still hold March. We said okay, whoa, if that's going to happen, we're going to have to move to dismiss. There is a statute of limitations issues. We asked for a waiver of service and a whole back and forth about acceptance of service. We said fine, it doesn't matter because when we came into the courtroom that day the parties had already agreed we were not going to go forward on the March date. This was in January because the schedule was now going to be pushed out, we said okay, provided as they represented the claims are substantially identical and the protections we got, and the

68

only additions to the discovery or briefing schedule that were added were for Arm Ltd to have a very narrow set of discovery around the statute of limitations.

THE COURT: So Qualcomm sued in the second complaint on January 8th. When was that complaint served? Anyone?

MR. WILCOX: It was late January. I don't know the exact date, but it was late January.

THE COURT: Why was it served late, do you remember? Like was that a choice?

MS. NYARADY: Your Honor's recollection is correct that they would not accept service. And we were in Court January 22nd and we brought this up and you looked at Qualcomm and said really, and then they said no, we'll accept service.

THE COURT: And then it was served.

MS. NYARADY: And then it was served promptly, yes. That's my recollection.

MS. DUNN: I think embedded in there, Your Honor, is the question about why the answer was due when it was. And I think the Court was holding off for the March hearing in order to give time for Arm to answer.

THE COURT: Because there was something that I got beforehand about the answer and I said -- I don't remember why.

**69**

MS. DUNN: It was a hearing on the motion to amend. And we had moved to amend and you had said why don't you hold off on answering until we can have -- decide the motion to amend. And then at that same hearing you said okay, here is going to be your date. The cases have been consolidated because Arm dropped its opposition to consolidation. You said okay, we are going to consolidate.

We still argued the motion to amend which Your Honor at least somewhat remembers, and once you decided we're going to stick with consolidation, you gave them a date to file their answer.

THE COURT: Okay.

MR. LoCASCIO: Which we did and then simultaneously Your Honor from the original complaint we filed -- because we weren't delaying it, we filed an answer and a motion to dismiss at the same time, that way the case was joined, discovery could move forward.

And then in this instance, Your Honor, after we filed our answer, after the March 10th hearing, if somebody on the other side said hey, we don't think there is any difference between an actual breach claim and the good faith and fair dealing claim, the whole conversation you had with Mr. Isaacson, we would have had some conversations about it, we would have perhaps have disagreed, perhaps not. Instead they're just said we're going to file. We had a back and

**70**

forth, Ms. Dunn and I, and we said there is a scheduling order and we know there is a scheduling order because there is an amended scheduling order that we negotiated after March 10th and 12th which adopts the fact that there is an earlier scheduling order. And if somebody thought hey, we're going to finally add this breach claim, there were, I don't know, a dozen windows where someone could have done that.

And to then argue it's under Rule 15. First of all, once there is a scheduling order, it's clearly a Rule 16.B.4 issue, Your Honor. And the reason we've had this civil procedure discussion as to how does to consolidation impact or not the Rule 15 versus Rule 16 is because under Rule 16, they would have to show good cause to amend.

THE COURT: Right. But I guess where -- I'm not sure I understand how you can say that the scheduling order that had a date for amendment applies to a case that was filed after that long after that date had expired, and got consolidated into this one.

MR. LoCASCIO: Here is how it happens because when you then request -- they asked to amend and if they had -- if their motion to amend had been granted, a hundred percent that scheduling order would govern and you can't add anything new or change --

**71**

THE COURT: Well, you opposed that.

MR. LoCASCIO: I don't disagree.

THE COURT: You opposed it for strategic reasons. I don't know if it had to do with statute of limitations. You opposed it for a reason presumably, right, otherwise if it was just for fun --

MR. LoCASCIO: It was not for fun, Your Honor.

THE COURT: It was for a reason.

MR. LoCASCIO: And then they moved to consolidate. And to have that motion get granted we saw the representations in the earlier slides which was to get the motion consolidated granted and not allow us a whole new case with discovery, recognizing Your Honor didn't want to try two cases or three as the case may be, they wanted to have a tight schedule and no additional discovery.

And at the March hearings we had a lot of discussion, should we get discovery for Arm Ltd. And the only thing we were allowed discovery on were the statute of limitations because at the time of those discussions, the agreements or rulings on discovery in the scheduling order, they said it's identical. And asking for consolidation was premised on the claims are the same, the only difference, which they said repeatedly, was we added a party name. We just did a cut and paste swap.

They have now added dozens of paragraphs, a new

**72**

cause of action, and a different prayer for relief, Your Honor, on this count. And if that's what they wished to do in the Arm Ltd complaint in anywhere in here and they had said so, the cases either would not have been consolidated or the constraints on discovery of Arm Ltd wouldn't have existed because we would have said okay, what's the difference between these claims? Somebody has to sit down and somehow explain that. Or this now new allegation in the Second Amended Complaint or First Amended Complaint to Arm Ltd, putting aside for a minute that now they have got a claim in their amended case that they say doesn't matter, it's only against one of the two parties, so there is two parties in this trial now because they consolidated them to the same case, there is a cause of action, now Count 9 that's only against Arm Ltd because if they said okay, we want to add this claim, they would have added it against both parties and they would have had to ask you for leave because they couldn't rely on this sort of Civ Pro Rule 15 end run around the fact that there was already a scheduling order which negated this to start with.

We would have said okay, you're now contending monetary damages are not adequate for this straight contract breach claim, which is why they then asked Your Honor as the new relief for that count to enter an injunction to make us negotiate in good faith. Presumably it's like a

73

monitorship, you're going to see us for a long, long time, Your Honor. If they had put this out there, this amended claim --

THE COURT: I thought they wanted five years of no royalty.

MR. LoCASCIO: That's for two other breaches, that punitive provision that's a summary judgment issue, that issue, Your Honor, is not for this breach. For this breach they say originally it was just a breach of good faith and fair dealing, now they want to have both the expressed contract breach. Their argument is monetary damages are inadequate. The only remedy is injunctive relief. And on that issue, which also had not been identified in discovery, we would have taken discovery on that.

And when we had the meet and confers, their view is okay, I don't really think you have any prejudice, but let's allow it and have discovery. This Civ Pro theory, let me put a finer point on why it's nonsense. The First Amended Complaint was filed March 30th. Under their theory that in that case, the Arm Ltd case, we're just playing by not the scheduling order from the case before, Arm as of April 20th, its answer date, could have added counterclaims to the case, now claims because we would be allowed to under Rule 15. Except the discovery window on the limited things

74

that were allowed ended May 5th. And I guess in theory we would have had a twenty-one-day right to amend that under Rule 15, so we could have come in with a new claim as late as May 11th. We have a trial in October. We had a schedule and a consolidation that was built around no additional discovery, identical claims, just adding a party.

They have realized perhaps based on the arguments and conversations in March, perhaps for other tactical reasons that eight claims aren't enough. They want to add the ninth which they clearly made a conscious choice back when they amended the Second Amended Complaint to add the good faith and fair dealing claim, not to bring the express breach claim.

And so I regret that we had to come in on a motion to strike, but essentially what happened is they just didn't ask for permission because it would have never been granted or the schedule would have changed or discovery would have issued, and instead, they put us to the choice, and said pretty clear the Judge doesn't want to see anybody about issues you could resolve, so you guys choose, do you want to come in or not.

And we had a lot of conversations, you can imagine about this. And we said this is not consistent with the scheduling order. It creates problems because we have a window where they argue there should be no additional

75

discovery, and Arm Ltd was constrained and now they want to have the best of both worlds, they want to get this new claim in that was never in the case without any ability to take discovery on it and distinguish it and yet throw another thing in that we have to clean out in summary judgment or post-trial.

THE COURT: Tell me on the things, I didn't focus on this amendment. What's the ninth claim?

MR. LoCASCIO: I believe Your Honor's version of the exhibits might be a DI page numbers. Mine, I apologize, are similarly exhibits. So to Docket No. 800 which is our letter, there are exhibits and Exhibit 3 is the red line of the complaint which they provided. And which is probably also a separate DI number, and I apologize, I don't have that. Do you have that available on your screen? And I could put it on the Elmo.

THE COURT: I have DI 800.

MR. LoCASCIO: Exhibit 3 is the amended complaint red line.

THE COURT: Got it.

MR. LoCASCIO: So you're at the red lined version.

THE COURT: Yes. I'm going through --

MR. LoCASCIO: Can I give you a couple of highlights on the way there?

76

THE COURT: Yes.

MR. LoCASCIO: So I thought it was interesting if you go back to the very first page, Footnote 1 was in the original complaint which went out of its way to say this is just identical between the two parties. That's gone now because there is now a distinction between the Arm Holdings case and the Arm Ltd case.

Then you get to there is -- if you go to page 43 of the Amended Complaint, it's paragraph 134 and 135 and 136 that are new. Just as a data point on the problems this caused, paragraph 135 refers to now, this provision, 14.1.B.1, they say well, the provision was intended to cover all versions including Version 10, and they cite to Arm's lead negotiator, I don't think that's accurate, but regardless, Antonio Viana who said something in an e-mail. Okay? That was in no other complaint. It's in none of their interrogatory responses. He was never identified as a witness with knowledge in any either of the cases' disclosures. He's a former employee and now here he is in the Amended Complaint and they're going to rely an e-mail where this guy said we're out of the discovery window, sorry guys, good luck, see if you can defend against this.

It then goes on and you got six or seven pages through page 50, Your Honor, there are entirely new allegations in the complaint. And then where Your Honor

77

asked the questions, let me get to it, if you go to the counts, Count 3 is the good faith and fair dealing count, and sort of adds some new language to tweak this one a little bit. But then they add Count 10. And Count 10 is the express breach now with 14.1.B of the Qualcomm --

THE COURT: Count 9.

MR. LoCASCIO: Sorry, my Roman numerals are off, Count 9. Thank you. Here they allege the express breach for the first time ever. And they had alleged during the body of it that there is no monetary remedy. Actually 278 does the same. So 278 says for this breach, money damages are not sufficient. And then if you look in the prayer for relief, sort of B, there is language that's redlined in B that says now the order they want is by negotiating good faith and extension to the Qualcomm ALA including v10, which is new.

And all of this, Your Honor, they alleged we breached the duty of good faith and fair dealing for that very provision. We moved to dismiss it, we sought summary judgment on it. They now added an express claim that is based on a series of other factual allegations they've now added which was done in a window where they had already successfully argued it was not going to be anything different from the first case and we're not entitled to any discovery, Your Honor, isn't fair and the scheduling order

78

precluded it.

So where Your Honor started okay, is it really fair to hold them to Rule 16 in this consolidation scenario, hard yes, because when they asked for consolidation, the whole basis was keep the dates, no additional new stuff, limited discovery statute, because it was substantively, their words, identical, Your Honor. And it is no longer that. And the remedy to get there is the Amendment and the First Amended Complaint should be stricken. The Complaint they filed originally that's identical to the one they had from the beginning is the Complaint that's the operative for this case because alternatively, you're in the realm of now reopening things, allowing discovery, or again moving a date, and we're not asking for that.

The right answer is we had a scheduling order and if somebody thought there was any daylight here, there were two ways to get to the answer on that; one, try to work it out with us; two, ask the Court. They chose the third.

THE COURT: Okay. Ms. Dunn.

MS. DUNN: Thank you, Your Honor.

The first thing I want to say is we also do not think a monitorship will be necessary at the end of the case.

THE COURT: Thank God.

MS. DUNN: So I think if you can take these

79

slides down.

THE COURT: But what is it that you're asking for when you say money damages are not sufficient, make them negotiate in good faith an extension. I get it, you don't say you need a monitorship, but let me just tell you you guys don't play so nice. Maybe you don't need me to monitor it, but am I just going to be getting a thousand motions for contempt that they're not doing. Let's say they lose and I say okay, yes, go negotiate in good faith. And you're like they haven't given us the price we want, ergo, they're not negotiating in good faith, find them in contempt. Is that what we're doing?

MS. DUNN: I don't believe so. But first of all as relevant to the argument today, this remedy was already in the case.

THE COURT: Where?

MS. DUNN: Request for this remedy. First of all we brought an UCL claim --

THE COURT: Point me to where it is. I'm looking at the prayer for relief. I'm looking at money damages are not sufficient. So where is that?

MS. DUNN: We will find it in the complaint. The UCL claim, obviously this was part of the basis --

THE COURT: Certainly there is no prior thing saying tell them -- I guess what I would like to see is tell

80

me where you previously asked, force them to negotiate in good faith.

MS. DUNN: It certainly is in the Chaplin deposition, I will --

THE COURT: But it has to be in your pleadings or someplace. You're saying it's no different from what was previously there. So let's start with that.

MS. DUNN: So the original prayer for relief says -- and I'll just read it, but it doesn't expressly say negotiation in good faith, but it does say we're asking for an order requiring Arm to comply with all of its obligations under the Qualcomm ALA.

THE COURT: Right. And if you thought that was good enough, I don't know why you then add in the redline version that I'm looking at, and by negotiating in good faith, an extension to the Qualcomm ALA including v10.

MS. DUNN: I think there was an effort including because of the dialogue in the March hearings to be over-the-top clear about what we are asking, and including as I can explain today the difference between the claim with respect to the implied covenant and the claim with respect to express breach.

THE COURT: Yeah, but in saying that they're different is in some ways useful to you and some ways not. When all those representations that were made were

substantively identical, substantively identical, and now if you're going to come in and say this is not substantively identical and by the way we're identifying some guy we never identified before as negotiating something, I mean, it doesn't really seem all that substantively identical.

MS. DUNN: Your Honor, if I may, let me explain. So to begin with, we had originally asked to amend, so at that point we were making the point that if you add Arm Ltd, that the complaint was substantially identical. And had the Court allowed us to amend, we could have brought an additional case based on all the conduct that has happened after March of 2025 which was the deadline to amend in the Holdings case.

There are key events that I can walk the Court through that started in June of 2025 and have continued and in fact some of them are referenced in Arm's answer that continued all the way from the time that starting in June of 2025, but continuing past January 8th when the new complaint was filed, all the way to the present day. And so we would be --

THE COURT: Well, if what you're saying is true, then you know what I should do, I should just take the trial date off the calendar and I should let you guys do discovery forever. And I say when you're some day done with discovery, come back to me. Because you guys just keep

changing it. And so if that's really -- if what you're saying is it's okay to change it all the time because new stuff has happened, then that's -- that's what I have to do in every case, I just say well, you guys go do what you're going to do and some day when things calm down, come back.

MS. DUNN: I think the difference in this case is the vast majority of discovery has been taken because Arm intends to defend itself referencing all of the events that have happened in 2025 and 2026. And so I know that counsel refers to this as like the Civ Pro theory, but we believe that just like Arm got to answer, we are allowed one amendment as a right. And I'm putting on the screen, Ms. Nyarady put this up as well --

THE COURT: What I don't understand is I am sympathetic to that argument, but why didn't you just tell me, why didn't you just say, Your Honor, we're going to do this? I mean, it is annoying to me that you stood there and I went with it and I said yeah, you can do this, you can file this. We're going to consolidate this. We're going to keep your trial days because you told me, Your Honor, it's the same case. And you know what, it's not the same case. And not only is it not the same case, I get to have you all in here and discuss that it's not the same case when you say it is the same case. So it's not -- I get it, and why he's upset is kind of why I am less sympathetic to your arguments

than I might be is because it's not being upfront. You didn't just say oh, Your Honor, by the way, March 10th, those are some interesting points that came up, we're going to do this amendment. Do you want us to ask for permission? Do you want us to just do it?

So I get it, you can't -- you said to me it's substantively identical, and this complaint is not substantively identical, and if you want to say it's substantively identical, then you don't need all the new stuff and we'll just strike all the new stuff and we'll say go forward with just adding Arm Ltd. But it's not, you know it's not substantively identical. And instead you're saying even though I told you it would be, Judge, I don't have to because I got the rules on my side. And those two things don't work for me.

MS. DUNN: I understand, Your Honor, and obviously we don't want to annoy the Court.

At the time when we were arguing to the Court to allow amendment, the case was substantively identical. And had the Court allowed amendment --

THE COURT: Okay. But you knew you made those representations to me. And then because we had the argument on March 10th, the case changed. I mean, I don't get it. You're like okay, well, I thought it was true at the time, and I made you do something based on that. Those

circumstances changed. I mean, for all I know circumstances are going to change tomorrow and we get to do this again. That's not the way litigation works.

MS. DUNN: Your Honor, at the time of the hearing, no decision had been made to amend, including because we had not yet received the answer. The answer says that Arm had no obligation to make an offer. So here it's making an argument that it is not obligated to make an offer under the contract.

Under the Second Amended Complaint that contains allegations with respect to the implied covenant, the things that were going on at that time were we e-mailed them and they didn't write back. They said no one is working on v10.

THE COURT: At what point did you decide that even though we told the Court something, circumstances changed and so just forget about it, we're going to do what we want to do. That is what is annoying to me.

MS. DUNN: I understand --

THE COURT: I made -- I allowed things based on your representations. You didn't come back to me and say sorry, so sorry, Judge, things changed. Instead, you just said well, we got what we wanted from her once, maybe she'll fall for it again and we'll just tell her, hey, too bad that you consolidated these cases. I mean, maybe we should have just left the cases separate. I don't know because now --

85

it's so far in, basically what you're saying is you're adding in stuff that is not substantively identical in March when we have a trial -- in March when we have a trial in October.

MS. DUNN:  Your Honor, there are two things here.  I want to make very clear to the Court, the decision to amend was not made until after Arm answered.  And so I did not know when we were standing here arguing for amendment, and the legal issue --

THE COURT:  But you didn't come back, you knew you had made representations to me, you knew I had made decisions based on those representations, you knew circumstances had changed, and you didn't come back and give me a heads up.  Instead, you just said oh, we're going to change the entire course of this case, or a big chunk of the course of this case nine months before trial.  We're not going to tell the Judge.  We know it's going to get in front of her.  I mean, if I were you, I would have at least wanted to get ahead of it and say I didn't lie, Judge, I couldn't possibly have predicted this was going to happen.  And you didn't.  And that, you know --

MS. DUNN:  We obviously should have come back to the Court.  But just to be, you know, forthright about it, we thought that they answered and we get a right to amend.  And we also looked at all the discovery that had been taken

86

and frankly it is almost entirely overlapping with what's in here.  By the way, the guy they pointed out was an Arm employee who sent an e-mail to us --

THE COURT:  Nevertheless, nevertheless, has he been deposed?

MS. DUNN:  No, he has not been deposed.

THE COURT:  Had anyone ever identified him in any Rule 26 response to an interrogatory, anywhere?

MS. DUNN:  Right.  Not that I know of.

THE COURT:  Right.  So he came into this case at the end of discovery because you think you have a right to amend your complaint.  I mean, this is not like conforming with the evidence, right, this is we're adding a new thing, we got an e-mail, we're just going to put it out there and Arm, you'll figure it out.  I have enough problems with them saying to you you'll figure out how to do with cross-examining on the ALA rates and stuff.  I have a real problem with you saying oh, you're just going to figure out, maybe this case is keep changing, keep changing, I can't wait to see what it looks like by the time you get to October.

MS. DUNN:  Your Honor, it's completely fair about given that detail that was pointed out, but I will tell you that all of the things that they plan to defend themselves with, all of the back and forth and the letters,

87

they're probably like ten of them that the parties have sent back and forth and meetings, all of that has been happening in 2026 and they have already injected that into the case.  And that all goes, and as they made clear in their answer, they plan to try that as part of this case.

And so yes, if we -- we did not know at the time that we were here for this hearing, obviously, but at the time we were arguing for amendment and the Court had not yet consolidated.  And frankly we would have brought this claim as a new case because of its criticality to the client.  So we had to take stock after the answer came and after the hearing and figure out what to do given that the cases had been consolidated and not amended.

So that's -- I mean, I know the Court -- I very much apologize to the Court because we obviously should have handled this differently, but as a legal matter I do think we have a right to make this amendment and I would like to at least explain why we can --

THE COURT:  Let's assume that I think that this amendment is not required -- requires substantial one-way discovery for them, I mean, what do I do?  Do I unconsolidate the cases?

MS. DUNN:  So Your Honor, I think there are a few options.  One is that when -- after we amended and Arm contacted us, we did offer additional discovery on the

88

express breach claim.  The only thing that they've really mentioned they need additional discovery about, because all of these things have already been subject of discovery, is the difference between the express breach claim and the implied covenant claim.  And I think frankly if they came with a list of things that they wanted to discover, we would be very amenable to that.

THE COURT:  Yes, but we are at a point where I have already allowed two rounds of summary judgment briefing because the case shifted so dramatically between the first round and the second round.  I'm not interested in a third round.  I'm not interested in forcing the Defendant to pay its lawyers to do a third round.  I mean, the case needs to stop at some point.  And my question is, does it stop at the issues that were in the January complaint or do I let it keep morphing forever because you can't say now it's going to stop here because I don't believe you.

MS. DUNN:  Well, this is an amendment of right, anything else we would have to come back to the Court.  We don't plan to do that, we don't want to do that, I'm just claiming that now.  And you, and the Court would not allow it.

The other thing I'll point out is that Arm has already filed summary judgment on the express breach claim.  So this is -- I mean, as far as we're concerned, this is

89

done here. And we certainly understand if Your Honor believes that Arm needs some discovery and, in fact, we offered that. So I think we're doing the best we can, making the best judgements we can at the time. Obviously we messed up in not coming back to the Court earlier. But given that we had a full discussion in March about service of the new complaint, they were allowed to answer, we thought we were allowed to amend. And so I apologize --

THE COURT: And then they're allowed to amend and then you're allowed to amend. This is nuts. You can't possibly think that you're allowed to bring in an entire -- after you told me combine these two cases because no skin, not going to affect you, Judge, all we are doing -- they don't even need discovery. You didn't even want to let Arm Ltd have discovery but you're like okay, they can have discovery, they don't need much because it's all the same. You have now changed the case.

MS. DUNN: Your Honor, I accept what you're saying in that I don't want to argue with the Court, but when we originally had this discussion, the reason we were arguing for amendment is because a new case comes with additional process. And that was discussed at the hearing. So I agree and apologize and throw myself on the Court's mercy for not coming back, you know, early enough, but this is --

90

THE COURT: I just don't believe that you thought that it was just going to be fine. I get it that the rule says what the rule says. But I also think that based on representations that have been made to the Court that I can say you don't get that as a sanction, you don't get to do that because of I feel that I was essentially duped into doing something. And you can say oh, it all changed afterwards, but I don't believe that. You knew that there was a problem when I was saying -- when we were having an argument on the motion on the good faith and fair dealing, and I said well, I don't understand, if that's really what your claim was, I mean, you have a section of the complaint. There is no basis which you can tell me oh, we never could have brought that claim until March, late March of 2026. And I had no idea that I wanted to bring that claim.

I mean, that claim was the basis of your good faith and fair dealing. So for you to say I had no idea when I said that it was going to be substantively the same that I could possibly have made out a claim for a breach of Section 14.1.B, or whatever it is, given the discussion that we had in March before you did that.

MS. DUNN: I would say the following --

THE COURT: What did you learn at all, ever, that was new that got you to filing that claim?

91

MS. DUNN: The parties' conversations and letter exchanges and meetings and information that we have gained --

THE COURT: That's way too general for me. What did you not have? You knew that your whole argument was that they didn't negotiate in good faith. You knew what the contract said. And you're telling me I had no idea I could have possibly brought that, and instead you're saying doesn't matter, I didn't have to know, I didn't have to tell you, like we were six months from trial and because you let us -- because you let us add a party when I told you nothing was going -- or I let you consolidate because you told me nothing was going to be different between the two cases, now I get to throw in a new claim.

MS. DUNN: Your Honor, I don't want to try the Court's patience. I do think that we were arguing for amendment and the reason that that matters legally is that this is an important claim. We would have brought it as a separate case because the key events happened, most of them in 2026 --

THE COURT: Right. And what happened is now you're saying you have thrown the entire case into chaos because you didn't get your way. You didn't get to amend and so I said fine, you can bring this case and we're going to essentially give you the amendment by consolidating this,

92

letting you take all these claims together. You told me it was all going to be essentially the same case. And now you're just saying fine, I'm going to -- six months before trial, you're just throwing in a new claim and you're doing it because well, Judge, I can.

MS. DUNN: Your Honor, I feel -- I do not feel like I should keep going with Your Honor on this because I don't think --

THE COURT: You just -- I mean, I was sympathetic to the rule issue, but it's so troubling to me that -- I was sympathetic to you on the rules. Where it's falling down and, you know, yeah, am I not happy that you kept coming in and saying it's the same, it's same, it's the same and it's different and you never even gave me a heads up, yes, I'm upset with that. But even more I'm upset that it's so different. I mean, you didn't even try and fake it. Right? That we're just adding in, Judge, nothing has changed. It's really the good faith and fair dealing that we're making in an explicit claim because they were moaning that we should have given it -- we should have named the provision instead of saying this. No, you added paragraph after paragraph, you added stuff to this request for relief, you added things that were equitable that previously weren't clear. I mean, you made big changes. And I feel like that's -- that's where it becomes -- it becomes something

93

where I need to start looking at the equities, right, because you have added so much to this case that at a time when discovery was over, that I have to start thinking I got to figure out a way that this can't happen.

MS. DUNN: Your Honor, I understand exactly what you're saying. I will say our intent was not to add substance to the case. As I said, Arm is already defending itself with the substance that we intended to add.

THE COURT: You don't get to say what they need to defend themselves. If you really wanted to say it's the same --

MS. DUNN: But it can't be the same, it is actually legally and factually different based on facts that began in June of 2025. They have already injected those facts. Our intent was to bring a claim that relied on those same facts. We are not intending to bring additional facts --

THE COURT: You're asking for different relief. You're bringing in different -- I mean, so many paragraphs in here have changed. So many paragraphs. This is not oh, we incorporate paragraphs 1 through 5022 and we're just adding by the way this is also an explicit breach of the paragraph that we all knew was at issue. This is -- how can you say there is no other facts and they're defending themselves on the same facts when you add in things that

94

happened in March of 2024, things that happened in October of 2024, things that happened in April and May of 2025, June 4th, 2025, June 13th, 2025, all of this, all of this was known well before this -- anything that was discussed in March. You can't tell me in March the light bulb went off and all this stuff that happened in 2024 and 2025, I was like, you know, now I got the final piece.

MS. DUNN: I'm not saying we didn't know about that, I'm saying that their answer says they had no obligation to make an offer under the contract. That was not part of our original claim and it couldn't have been. And then they say they engaged in good faith negotiations in '24, '25 and '26. And that is what we intended to put in.

And I think we perhaps went overboard trying to be clear because there was a discussion about what's the implied covenant, what's the expressed breach. And frankly like we could trim it back, but it was all coming from a good place of trying to be clear, and trying to respond to issues that have already been injected into the case. And --

THE COURT: If they were already in the case, then you didn't need this.

MS. DUNN: We did need --

THE COURT: You're saying we need this which tells me these issues were not injected into the case. You

95

didn't think that they were injected into the case enough that you could argue them, and yet you're saying well, Defendant, you kind of knew that they were there so you are just, go figure out how to defend them.

MS. DUNN: So Your Honor, they have said that they intend to defend themselves with these fact. I'm saying it's not distinct facts. The parties have been writing letters back and forth. Both general counsel are already going to testify at this trial about what happened in '24, '25 and '26, and so what this does is add a legal claim which we could not have done in the Holdings case because the amendment deadline was March of 2025.

And the first time that they said that they were not bound by the contract expressly was June of 2025. And that has continued and ramped up through 2026. And there has been a lot that we have learned in 2026, so we would have sought to bring this claim in any event. And now because of for legal reasons that this is now the place where we have to bring the claim. That's the point. We're not trying to mess around, but this is a real claim based on distinct facts that happened, June 25th and onward, and because we have the history of complaints in this case, and because there is already a complaint in January and all this has happened afterwards, for legal reasons this is now the case where this must be legally brought. And that's the

96

only reason I'm talking about amendment is because if there had been amendment, we could have legally brought them in a separate case, that's all I'm saying.

THE COURT: I'm sorry, if there would have been an amendment, you could have legally brought them. I mean, okay, let me ask this, your general counsel, they seem -- they need to be sitting down with a mediator because all you're doing is saying we're going to have another case and we're going to have another case, and this is nuts. Do you guys understand this is nuts?

MS. DUNN: Look, I think with respect to this v10 issue our client would agree, and it is the issue of the greatest contention between these two parties.

THE COURT: I'm going to make it from now on, you cannot bring an issue to me without your general counsel sitting here. They're going to be at every day of trial. They're going to be here for the pretrial conference. And if you have any more disputes, they will be sitting up here at table and identifying themselves because they're nuts or you're nuts, someone is nuts, that nobody can figure out what this case is that it needs to keep morphing and changing. I don't have cases that are -- that just, we change trial dates all the time, but in this one I have already done it once, I don't want to do it again. So my choices here are to let this in and say go figure it out, or

97

to say no, there were representations that are made to me and you're stuck with them. So I have to figure out where I am on that.

But I'm just -- I'm so perplexed. You guys are such good lawyers. I'm giving you have a hard time, Ms. Dunn, but I'm doing that because I want to know what you're going to say because I respect you and I think you're very good at what you do. He's very good at what he does because he knows how to push my buttons to get me to ask you hard questions. But this case is crazy. You guys actually work together, you need to work together. You want me to tell them that they have to negotiate with you. So why don't you guys go negotiate.

MS. DUNN: Your Honor, I think also if our general counsel were here, what she would want me to tell the Court is that this issue of v10, which Qualcomm would really love to resolve, is of critical business importance to the company. Truly, it's the future. Customers are asking about it. Competitors are already working with it --

THE COURT: And tell her that because of this, she could lose her trial date and then that issue will just sit out there until I decide that I want to have another trial.

MS. DUNN: I understand and I will convey that. And I also think that I would like to tell the Court, but

98

also probably she would like to tell the Court, if there is something we can do to make it better because our true intent was not to bring in a bunch of new evidence, we really believe this is what they are saying in their defense anyway, so you know, either --

THE COURT: I think if you really believed that, you would have just said fine, we'll just go with what we have, like we don't need a new claim with a hundred new paragraphs.

MS. DUNN: Your Honor, the difference really is that there was a difference in conduct that began in June of 2025 and has continued through the present day, and including with express statements that Arm doesn't believe it's bound by the contract. The implied covenant claim literally was we e-mailed them and they didn't respond to us for years. That's what the implied covenant claim is. It's like when you aren't doing the things that the contract presupposes you are doing.

This is an express breach, when you are saying we are not bound by the contract, we don't have to give you an offer when they're accelerating v10 for others and eliminating v9 features, these are our express breaches.

So I have no problem representing to the Court that when this implied covenant claim was brought, it was brought because it was a match for the facts that were going

99

on. They were not responding. It's like when a shipping company doesn't take orders, that's like the implied covenant, it's frustrating the purpose of the contract.

What started in June of 2025 beginning with a letter that Arm sent to Qualcomm is we are not bound by the contract. We don't have to give you an offer. We might negotiate with you anyway, but the contract doesn't make us do that. That's an express breach.

And because of --

THE COURT: Then why --

MS. DUNN: I'm also sorry that this wasn't immediately apparent at consolidation because --

THE COURT: Take a breath.

Why wasn't that brought sooner? Like you didn't have to wait for Arm Ltd to be in the case if things were happening starting in June of 2025 and you were before the Court a number of times before then. Why didn't that ever come up?

MS. DUNN: That is an excellent question. And one of the reasons is that the first time that Arm made an offer, although it wasn't a complete offer as you heard earlier, was in December of 2024. And that there were some discussions of this in -- right in the settlement.

THE COURT: The settlement, not settlement.

MS. DUNN: So there were back and forth between

100

Arm and Qualcomm throughout some of this time and then we had the trial. So there was a period of time where -- and I actually think it might make sense to show you, I made a timeline, although it doesn't include the stuff from June. But the Holdings amendment deadline ran in March of 2025. In June we got an offer --

THE COURT: I'm not even so upset about you couldn't bring claims against Arm Ltd in whatever of 2025, March of 2025, because they weren't even in the case. But there is a lot of time when you knew you were going to bring Arm Ltd in either through amendment or through a new complaint, and you are saying now these things are out there brewing and it never came up.

MS. DUNN: I'm sorry because I misspoke. So the first offer that we got, although it was not complete, was part of discussions between the parties in December of 2025.

So I think the other thing that the Court may wish to understand and would presumably come out in trial is there is like all this stuff going on, the parties are exchanging letters, they are continuously meeting in person. I started this with January 2026 because it's after we filed the Arm Ltd complaint. And you can see how much is going on.

And I think at a certain point in the beginning there was some hope that progress might be made. I don't

101

want to say too much about, you know, about those conversations because I don't know what I'm really permitted to say here. But you can see there is a lot going on.

Then in February after a bunch of letters exchanged, and you can see that, you know, Qualcomm's response to the incomplete offer that we received was that it was exorbitant.

And then in February, Arm learned that -- or Qualcomm learned that Arm intended to rapidly accelerate v10 by no longer making new features available for v9. Obviously during this time we're learning things about the landscape and through this litigation obviously about other parties, and so you can see even contemporaneous with the hearing that we had, there is still these discussions going on.

And at this point, contemporaneous with Arm's answer that said it had no obligation to make an offer, there is more kind of letters that made clear that there is not really hope. I don't want to do future discussions, but this is a very discouraging letter exchange. We see their answer, they're saying the contract doesn't require them to make an offer at all, even though the entire point of this contract is business continuity. And so -- and then there is a recent in person meeting that also was very disappointing including because Qualcomm was told that

102

company C and D, I think I have that right, are not even our competitors. So this situation has gone from not great to much worse.

And I think, you know, the truth is I think what they put in the answer is really relevant, not just the timing of the answer and what it means under the rules but what they actually said in the answer. And that is it just reflects reality.

I think maybe that helps the Court understand that no decision was made at that time, you know, when we were in Court with you. And when I stood here and said a new case means more process and I raised that, I wasn't thinking about this in particular, I just was thinking that there is a new case and there is more stuff. But once we got the answer and we -- you know, we had to take everything into account, their conduct, obviously the Court hearings, their answer, we did decide to bring this.

And my regret obviously is I guess we should have come back to the Court rather than just filed and I'm deeply sorry for that, notwithstanding your nice words, it means a lot to me like what you said, so I'm sorry for that.

But I think some of this context maybe helps the Court realize that I'm not trying to do anything bad or deceptive or wrong, but this has become an increasingly serious issue to the business of the company and to things

103

that really matter.

So that's where we are. And, you know, I don't know. I mean, we offered additional discovery. I thought we actually offered a lot of additional discovery. You know, we can try to file under Rule 16 now to have a trimmed back complaint, but I don't know if the Court wants that. There are ways to solve the problem that the Court is talking about, and I sincerely do not think that this is blowing up the case. I think these issues are in this case anyway.

Thank you, Your Honor.

MR. LoCASCIO: A couple of points just to clarify the record, Your Honor.

The timeline Ms. Dunn just put up, her personal notes timeline, what it actually shows is the parties are in the business side of the world trying to negotiate what they're going to come up with, so at the end of the day, we think there is no violation of the good faith and fair dealing claim or the newly added claim.

But what's really going on, because Your Honor said like are you guys ever going to stop, and you said that in the both directions. Here is what's really going on. Qualcomm has rates from 2013. They like those rates because everything was a heck of a lot cheaper in 2013. It was two versions ago of Arm's innovative instruction architecture.

104

They want to keep paying old rates that are more favorable to them. They're running a business and they think the less we pay the better, and this is worth so much to them that they will pay all of this to continue to try to get some cause of action over the line at summary judgment, whether it's equitable or a jury claim, to try to get leverage to improve their standing in the negotiation. And you can say okay, well, that kind of happens in litigation a lot. Where does the leverage play end. They have got their unfair competition claim in this case. Qualcomm has gone to the United States FTC, the Korean FTC and the European Commission and leaked it. We had a discussion about whether we would get that information, because they're trying to argue entirely they're entitled to some Fram like or MSN pricing, but the contract doesn't say you get the best price. We'll happily negotiate with them and we are.

Why they want to add this into the case late is an effort to come up with some more leverage even though to now get to merits of what Ms. Dunn said, she said we don't know, we couldn't have brought it, we should have brought it sooner.

Your Honor asked these exact questions, if these allegations are from the spring of 2025, some are from '25, spring of '25, summer of '25, end of '25. Okay. What they should have done is say we want to move for leave to amend

105

the Arm Holdings case or at the very latest when they filed the complaint against Arm Ltd, which they said was just to protect the complaint, it wasn't to add anything new, they knew, they knew all of those facts. And there were at least three opportunities where we stood in this well where they could have raised it and plenty of other changes to actually amend to add a claim when we had time to deal with it in an orderly way.

They said they didn't know and we saw a page from the answer. The suggestion -- I think Ms. Dunn backed away from it because it's not true -- is that they didn't know that Arm was taking the position that when they tried to trigger this provision back in 2021, it wasn't for v10, it was for v9. So that was what we had an obligation to negotiate. The parties are actually negotiating v10. That's what is in our interrogatory responses. That was in letters from Mr. Collins back in '24 and '25.

So this suggestion that the answer was somehow the reason, when we had our meet and confer, we tried, in person, we had a sit down, and I said, when did you know because when we stood there and you said I don't get any discovery, March 10th, March 12th, you had already sat through the discussion with Mr. Isaacson about do you want to amend. Your Honor had views. When did you decide? And I was told like we don't have to tell you that. That's our

106

work product. We're not telling you when we decided.

What we do know is we got the First Amended Complaint fifteen minutes before the limited discovery we were able to serve for Arm Ltd was due, the 5:00 p.m. filing here, that day we got transmitted with no cover, no glory, no explanation, no phone call, this complaint with all those new provisions. Your Honor, this was not accidental. I think it's tactical. And you do not have to, Your Honor, disregard the rules because they are not right. We cite multiple cases on page 2 of our brief dealing with this exact issue and you have two cases, consolidated, based on the representations made for sure which is a judicial estoppel path for Your Honor, you don't have to say that it's a sanction because it doesn't need to be. Rule 15 does not allow automatic amendment when you said they are the same case and they're consolidated and you agree to an amended scheduling order when the earlier scheduling order had a deadline, if you wanted to amend that because you thought you might potentially need to do it, well, in the discussion negotiating that scheduling, amended scheduling order, which had to amend some order, in this case the scheduling order, they could have put a provision in and then we would have had this out in an orderly way where we could have addressed it.

I think that's all my points, Your Honor.

107

MS. DUNN: Your Honor, I think some of that was summary judgment argument, however, there is one thing I want to respond to just because these issues are coming down the pike. This is not all so that Qualcomm can pay as little as possible and create leverage. Like we have worked really hard to try to get an agreement. In fact, we have gone so far as offering to pay more so long as we can still compete. And the problem is that the rates that we have offered, as will come out in the trial and in other briefing are like thousands and thousands of percentages more than our competitors, so it's not -- I think it's not -- I just want to clarify that.

I heard counsel say we should have added this stuff in January 2026. Arm has taken the position that everything in January 2026 is claim splitting and should be thrown out of the case, so I think it is really important at least on the law that I articulate this properly. While we didn't flag this, we do think that because there was a new case, the new case does have some new process, that when a party gets to answer, the other party gets to respond with amendment.

THE COURT: Yeah, but the process I think that you were talking about before, because I sort of remember that because I remember thinking oh, God, they're going to bring a new motion to dismiss. I mean, that's the sort of

108

process that I think we were all thinking about, not that you were sitting here telling me oh, it's going to be the same issues but you were planning, oh, new process means we might bring in new claims or they might bring in something new against some other Qualcomm entity.

MS. DUNN: I think the issue is that the right to amend is tied to the answer to the motion to dismiss under the rules. So I was thinking about a motion to dismiss, also, but I think those are connected.

I want to make clear just because I think the Court knows this, but I want to make it clear because counsel keeps raising it about the scheduling order. So as Your Honor has pointed out, the Holdings scheduling order deadline to amend expired in March of 2025, so for facts that arose after that, and these facts expressly disclaiming contractual rights started in June of 2025 and intensified in 2026, those were obviously after the Holdings scheduling order deadline to amend.

The current scheduling order as Your Honor knows is silent and the Third Circuit is extremely clear on this where it says Rule 15 applies in the absence of a scheduling order that "includes an explicit deadline." That's *In re: Asbestos Products Liability* litigation, a case from 2025.

I also want to be very clear that we do not wish to prejudice Arm. I mean, we do wish to find a home for

109

this claim that we believe is factually distinct. But the -- we have asked Arm what discovery are you missing given that you have been taking discovery on these issues throughout this litigation. And given what it said in its answer about '24, '25, and '26. And so we have offered, this is in the briefing, too, but we offered three RFAs, five RFPs, a contention rog, a 30(b)(6) deposition, so you know, we are -- we think that that would be more than sufficient given that these facts have already been subject of discovery and given that Arm has already moved for summary judgment on this issue.

So that's really all we want to say other than just letting Your Honor know that, you know, we did when we decided to bring this amendment, which is surely not before the hearing that we saw Your Honor, we took into account a lot of things, but including what had been going on between the parties.

So if Your Honor doesn't have any other questions.

THE COURT: Okay. Thank you.

MS. DUNN: Thank you.

THE COURT: I am going to go back and look at this and look at the transcript and think about this. But what issues in this case are equitable? What is it that someone is going to ask me to do as a matter of equity?

110

MS. DUNN: Your Honor, this may not be a complete answer, but the UCL claim, I think there was a previous argument about whether it goes to the jury or not. I don't wish to reargue that, but obviously the UCL is an equitable claim that comes with a request for an injunction. A request for an injunction has been part of this case from the beginning.

THE COURT: An injunction being specific performance in this case?

MS. DUNN: So I don't know if we have specified that other than what I read earlier in the prayer for relief. But I will see if I can find a more specific answer.

THE COURT: Is that it, just the UCL claim?

MS. DUNN: Yes.

MR. LoCASCIO: I agree the UCL claim is equitable. As we discussed last time, there is also an element in the tortious interference claim because they dovetail against -- off each other, the wrongful conduct provision we talked about at the hearing, I believe it's been briefed, is also equitable.

But this provision we just spent all this time talking about, Count 9 and Count 3, they have now alleged at least paragraph 278, monetary damages or no remedy and they're seeking an injunction, we call it the v9 issue, the

111

14.1.B, if it survives, of course, whether it's a breach of the duty of good faith and fair dealing, or a straight up breach claim, I think at this point that's also equitable, Your Honor, they're just not seeking monetary damages.

THE COURT: You're not seeking monetary damages for that?

MS. DUNN: I think --

THE COURT: You have certainly alleged that monetary damages are insufficient.

MS. DUNN: Right. What we think will actually solve the problem is what we asked for which is a directive to Arm to negotiate actually with us in good faith. And so that is why we asked for that. The other thing I just want to be totally clear --

THE COURT: So you're not seeking money damages?

MS. DUNN: For this, yes.

THE COURT: So does that make it a claim that is subject to a jury demand?

MS. DUNN: So all of these -- so I have not thought about that before this minute. So I would like, given that it's not an off the top of one's head question --

THE COURT: Because I might hold you to it as a representation later, so you might want to --

MS. DUNN: Yeah, nothing truer than that. So you know, we had already had a whole discussion about why

112

the UCL claim goes to the jury, so I hesitate to speak off the top of my head about this.

Certainly, I mean, I stand by the representation that the facts of the back and forth between the companies are, you know, have already been the subject of discovery, so they -- obviously this is how Arm intends to defend itself already in the case and say that it's engaged in good faith negotiations, so I think all that is going to be before the jury, but I haven't thought about the legal question that you asked right now.

THE COURT: Okay. So I guess what I am going to say is think about that so that I understand in terms of scheduling if there are equitable issues that I should hear, and maybe we could hear it before the jury trial, maybe we could hear it in the evenings of the jury trial, but I need to be able to plan and understand and also understand if you all have a dispute about it so that I can decide those, and thus plan.

MS. DUNN: Understood, Your Honor.

I'm also handed a note that says we are also seeking a DJ on the v10 issues, so that would go before the jury. And I don't have the exact language. But that is also --

THE COURT: I don't know what the basis of the declaratory judgment is.

113

MS. DUNN:  I don't either.  Maybe we can get back -- in the Court's request of letting you know on the other things, maybe we can owe you that as well.

THE COURT:  Okay.

MS. DUNN:  Thank you.

THE COURT:  And then so we'll get an order out after we get the stuff in camera on both of the issues that we discussed today.

It's interesting to me that the Plaintiff wants -- if the Plaintiff is successful in the case, they want to force the Defendant to negotiate in good faith, and Defendant is saying we are negotiating in good faith.  So I don't know what that would look like.  And it seems like it should look like something where you have either an arbitrator who can make a decision or a strong mediator who can say to one or both of you that either you're not negotiating in good faith or they really do seem to be negotiating in good faith.

So I really -- I think you have engaged in mediation before, right?

MR. LoCASCIO:  Correct, Your Honor.

THE COURT:  Maybe you should think about it again, or I could -- because as I said, it just seems crazy.  And my next step in sort of this everything is changing and, you know, everything seems so unclear is not going to be

114

that your general counsel are forced to come, but that your CEOs are going to be forced to come.  If they're forcing the rest of us to sit through this, they can sit through this.

Okay.  All right.  I will get an order out.  Safe travels.

COURT CLERK:  All rise.  Court is adjourned.

(Court adjourned at 4:47 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.


                    /s/ Dale C. Hawkins
                  Official Court Reporter
                    U.S. District Court