IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) | |
| Plaintiffs, | ) | C.A. No. 24-490 (MN) (CONSOLIDATED) |
| v. | ) | |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) | |
| Defendant | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING SECTION 8.3 OF THE ALA AND TLA**


MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jennifer Ying (#5550)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
Jenifer N. Hartley
Erica Spevack
Leah R. Hibbler
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
Jacob Apkon
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

William T. Marks
Adam L. Basner
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 2006-1047
(202) 223-7300


September 24, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

QUALCOMM'S PROPOSED FINDINGS OF FACT ..... 3

I. SECTION 8.3 WAS HEAVILY NEGOTIATED BETWEEN SOPHISTICATED PARTIES AND WAS REASONABLE AT THE TIME OF CONTRACTING ..... 4

A. Both Parties Were Well-Represented in the Negotiations ..... 4

B. From the Outset, Qualcomm Expressed—And Arm Recognized—Its Concern that its $10 Billion Chip Business Was Reliant on Arm ..... 4

C. The Parties Were Focused from the Start on the Appropriate Remedy for a Potential Uncured Breach of Delivery and Business Continuity Obligations ..... 6

D. The Parties Agreed to the Remedy in Principle, With a Five-Year Cap, and Memorialized That Agreement in a Non-Binding Term Sheet ..... 7

E. Section 8.3 of the ALA Was Heavily Negotiated ..... 8

F. Section 8.3 of the TLA Was Heavily Negotiated ..... 9

II. ARM'S DESCRIPTION OF THE NEGOTIATIONS IS REFUTED BY EVIDENCE ..... 12

III. THE RANGE OF HARM ANTICIPATED INCLUDED DEVASTATING HARM TO QUALCOMM'S $10 BILLION CHIP BUSINESS ..... 15

A. Anticipated Harm Arising From Breach of Section 5 of the ALA ..... 15

B. Anticipated Harm Arising from Breach of Section 8.1 of the TLA ..... 16

IV. THE SPECIFIC HARM THAT COULD ARISE FROM ANY PARTICULAR BREACH WAS INCALCULABLE ..... 17

V. THE HARM ANTICIPATED WAS FAR GREATER THAN THE REMEDY ..... 18

QUALCOMM'S PROPOSED CONCLUSIONS OF LAW ..... 19

I. SECTION 8.3 IS PRESUMPTIVELY VALID AND ARM HAS THE BURDEN OF OVERCOMING THIS PRESUMPTION. ..... 19

II. ARM HAS NOT PROVEN THAT SECTION 8.3 WAS UNREASONABLE UNDER THE CIRCUMSTANCES UNDER WHICH IT WAS ENTERED INTO ..... 23

A. Section 8.3 Was the Product of a Hard-Fought, Well-Counseled Effort to Allocate Risks Between Arm and Qualcomm. .................... 23

B. Section 8.3 Reflected a Reasonable Estimation of the Kinds of Damages the Parties Could Reasonably Have Anticipated When They Agreed to It. ............... 26

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Better Food Mkts., Inc.* v. *Am. Dist. Tel. Co.*,
40 Cal. 2d 179 (1953) ........ *passim*

*Blank* v. *Borden*,
11 Cal. 963 (1974) (en banc) ........ 26

*Dollar Tree Stores, Inc.* v. *Toyama Partners LLC*,
875 F. Supp. 2d 1058 (N.D. Cal. 2012) ........ 27

*Ebbert* v. *Merc. Trust. Co.*,
213 Cal. 296 (1931) ........ 30

*Edwards* v. *Symbolic Int'l, Inc.*,
2009 WL 1178662 (S.D. Cal. 2009) ........ 22, 29

*El Centro Mall, LLC* v. *Payless ShoeSource, Inc.*,
174 Cal. App. 4th 58 (2009) ........ 29

*Gormley* v. *Gonzalez*,
84 Cal. App. 5th 72 (2022) ........ 20, 23, 28

*Grand Prospect Partners, L.P.* v. *Ross Dress for Less, Inc.*,
232 Cal. App. 4th 1332 (2015) ........ 29

*Greentree Fin. Grp., Inc.* v. *Execute Sports, Inc.*,
163 Cal. App. 4th 495 (2008) ........ 27

*Harbor Island Holdings LLC* v. *Kim*,
107 Cal. App. 4th 790 (2003) ........ 27

*Hong* v. *Somerset Assocs.*,
207 161 Cal. App. 3d 111 (1984) ........ 28

*JJD-HOV Elk Grove LLC* v. *Jo-Ann Stores, LLC*,
17 Cal. 5th 256 (2024) ........ 1, 19, 23, 26

*Krechuniak* v. *Noorzoy*,
11 Cal. App. 5th 713 (2017) ........ 20, 22, 28, 29

*Lakeshore Investments LLC* v. *Now Solutions Inc.*,
122 Cal. App. 5th 847 (2026) ........ 27, 28

*Med. Sales & Consulting Grp.* v. *Orthopedics USA, Inc.*,
2011 WL 5075970 (S.D. Cal. 2011) ........ 27, 28

*Radisson Hotels Int'l, Inc.* v. *Majestic Towers, Inc.*,
488 F. Supp. 2d 953 (C.D. Cal. 2007) ....................25

*Ridgley* v. *Topa Thrift & Loan Assoc.*,
17 Cal. 4th 970 (1998) .................... *passim*

*Roodenburg* v. *Pavestone Co., L.P.*,
171 Cal. App. 4th 185 (2009) ....................20, 29

*Series AGI W. Linn of Appian Grp. Investors DE, LLC* v. *Eves*,
158 Cal. Rptr. 3d 193 (Ct. App. 2013) ....................24

*Sigma Connectivity A.B.* v. *I.Am.Plus Elec., Inc.*,
2021 WL 8567905 (C.D. Cal. 2021)....................28

*Travelodge Hotels* v. *Kim Shin Hosp.*,
27 F. Supp. 2d 1377 (M.D. Fla. 1998)....................26

*United States* v. *Bethlehem Steel Co.*,
205 U.S. 105 (1907)....................22

*UPS Store* v. *Hagan*,
2016 WL 1659188 (S.D.N.Y. 2016)....................25, 30

*Utility Consumers' Action Network, Inc.* v. *AT&T Broadband of S. Cal., Inc.*,
135 Cal. App. 4th 1023 (2006) ....................29

*Van Arsdale* v. *Hollinger*,
437 P.2d 508 (Cal. 1968) (en banc) ....................20

*Vanderklock v. United States*,
868 F.3d 189 (3d Cir. 2018)....................19

*Weber, Lipshie & Co.* v. *Christian*,
52 Cal. App. 4th 645 (1997) .................... *passim*

*Wise* v. *United States*,
249 U.S. 361 (1919)....................30

**Statutes**

Cal. Civ. Code § 1671(b) .................... *passim*

**Other Authorities**

13 Cal. Law Revision Comm'n Report (1976) .................... *passim*

Plaintiffs Qualcomm Inc. and Qualcomm Technologies, Inc. provide the following proposed findings of fact and conclusions of law related to the enforceability of Section 8.3 of Qualcomm's Architecture License Agreement and Technology License Agreement with Arm, which was tried to the Court from September 16-17, 2026.

## INTRODUCTION

As recently as 2024, the California Supreme Court reaffirmed that "norms favor leaving contracts intact and unamended by the courts," particularly where "sophisticated, represented parties" "knowingly agreed to these terms." *JJD-HOV Elk Grove LLC* v. *Jo-Ann Stores, LLC*, 17 Cal. 5th 256, 270 (2024).[1] That is precisely the case here.

For over two years, Arm and Qualcomm exchanged drafts of Section 8.3, which Arm insisted be the sole and exclusive monetary remedy should it breach select provisions of the ALA and TLA. At the time, *both* parties understood Qualcomm's "total reliance on Arm architecture," PTX-348 at 4, 9; PTX-79 at 7, and that breaches of either agreement could cause catastrophic damage to Qualcomm's $10 billion chip business. That is reflected in Section 8.3, titled "business continuity" in both agreements. Arm's CEO and General Counsel were involved in negotiations over Section 8.3, and Arm benefited from the tradeoffs made, including by securing a limited scope of breaches triggering Section 8.3; a bar on consequential damages; a valuable covenant not to assert; and a notice and cure provision that gave Arm complete control over whether the Section 8.3 remedy would be triggered. Far from believing the deals were "catastrophic," Tr. 48:7-13 (Youssef), Arm celebrated their execution, PTX-348 at 9 ("Finally Signed !!! After 10 quarters").

[1] Unless otherwise indicated, brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. Emphasis is added unless indicated.

Now that Arm has chosen not to avail itself of the very notice and cure it demanded, it asks this Court to bail it out by voiding its contractual commitments. There was a time when California courts liberally invalidated liquidated damages provisions, Recomm. Relating to Liquidated Damages, 13 Cal. Law Revision Comm'n Report (1976) at 1739 (hereinafter "Com. Rep."), but that is no longer the law. California law now instructs that "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code § 1671(b). A court must consider not whether every single outcome it could possibly produce seems fair, but rather "*all* the circumstances" surrounding the parties' agreement, including things like whether "the parties were represented by lawyers" and "the liquidated damages provision is included in a form contract." Com. Rep. at 1751-52.

Against that backdrop, Arm's arguments fall flat. Arm cannot begin to show that Section 8.3 "bears ***no*** reasonable relationship" to the "range of actual damages that the parties could have anticipated would flow from a breach," *Ridgley* v. *Topa Thrift & Loan Assoc.*, 17 Cal. 4th 970, 977 (1998), as it does not dispute that there are many circumstances in which breaches could have been so harmful to Qualcomm that Section 8.3 and its cap on liability would have benefitted *Arm*, not Qualcomm. *See* DDX-1.22. Arm instead mainly argues that Section 8.3 would not be a reasonable measure of damages for *every* conceivable breach. But the California Supreme Court made clear even before amending § 1671 that a liquidated damages provision is not invalid just because "the actual loss resulting from a breach could in many cases be less than the amount provided for." *Better Food Mkts., Inc.* v. *Am. Dist. Tel. Co.*, 40 Cal. 2d 179, 187 (1953) (finding liquidated damages provision valid where remedy could be triggered by both significant and insignificant acts). That is true *a fortiori* after amendment, which requires the Court to focus on

whether the agreement was "unreasonable under the circumstances existing at the time the contract was made," Cal. Civ. Code § 1671(b), not on whether it would be a reasonable estimate of damages for every potential breach. And the bargain Arm struck in Section 8.3 was eminently reasonable.

To begin with, royalties in 2013 amounted to less than .5% of Qualcomm's chip business revenues. At the same time, Arm well understood the Section 8.3 remedy could be substantial. That is why Arm insisted both that the remedy be confined to a limited set of potential breaches, and that Arm would receive notice and an opportunity to cure before Section 8.3 could be triggered. *That* is how Arm accounted for the concerns it now raises—by ensuring that Arm alone would always have the ultimate power to decide whether to cure or to stand on its view that it committed no breach. Yet Arm now wants to be able to both stand on its no-breach argument *and* eliminate the remedy for which Qualcomm bargained. In other words, Arm maintains that what it *really* bargained for was a world in which it would be free to deploy Section 8.3 to its advantage if it breached in a way that inflicted on Qualcomm existential harm but would hold in its back pocket an argument that Section 8.3 is unenforceable if the provision worked to Qualcomm's advantage.

That is not the bargain these sophisticated parties struck in their long and well-counseled negotiations over multi-billion-dollar contracts. It is instead exactly the kind of "hey neener neener, gotcha sucker" defense that California courts have rejected. This Court should do the same.

## QUALCOMM'S PROPOSED FINDINGS OF FACT

1. Qualcomm's ALA allows Qualcomm to sell chips containing Qualcomm's Arm-based custom cores. JTX-1 § 2.0. With a TLA, Qualcomm can obtain Arm implementation cores for use in Qualcomm chips. JTX-5 § 2.1. Qualcomm has been an Arm customer and TLA licensee since the 1990s. Tr. 209:15-21 (Weiser). In 2003, Qualcomm and Arm entered a perpetual ALA for the Arm v7 architecture. DTX-2955.

2. Qualcomm and Arm negotiated an updated and amended ALA and TLA from 2011 until execution in 2013. JTX-1; JTX-5; Tr. 43:18-24 (Youssef). It is undisputed that the ALA and TLA are not form contracts, that negotiations took more than two years, PTX-348 at 9; Tr. 43:18-24 (Youssef), and that the parties exchanged more than fifty redlines of those agreements.

# I. SECTION 8.3 WAS HEAVILY NEGOTIATED BETWEEN SOPHISTICATED PARTIES AND WAS REASONABLE AT THE TIME OF CONTRACTING

## A. Both Parties Were Well-Represented in the Negotiations

3. For Qualcomm, Jonathan Weiser, Laura Sand, Darcy Cohen, and Beau James were the primary attorneys handling the 2011-2013 negotiations. Tr. 44:22-45:3 (Youssef); Tr. 207:12-23, 208:8-15 (Weiser).[2] Qualcomm's business negotiators were led by Head of Engineering for custom core chip sets, Ron Tessitore, and chip division General Manager, Jim Lederer. PTX-81; PTX-2617; Tr. 170:3-15, 183:8-10 (Sand).

4. General Counsel Philip David was lead attorney for Arm; his team included Ehab Youssef and Joe Fuqua. PTX-81 at 4; Tr. 170:16-21 (Sand); Tr. 208:16-209:2 (Weiser); Tr. 84:22-85:1, 87:5-7 (Youssef). Arm's team included CEO Warren East; Executive Vice President Antonio Viana; Arm's Qualcomm account manager, Scott Mackerras, and licensing director, James Hodgson. PTX-81 at 4; PTX-2617; Tr. 44:3–8, 87:8–11, 90:8-14 (Youssef). On behalf of the CEO, Arm's COO executed the term sheet and the final ALA and TLA; Mr. Youssef stamped the documents approved on behalf of the legal department. PTX-94 at 6; JTX-1 at 30; JTX-5 at 49.

## B. From the Outset, Qualcomm Expressed—And Arm Recognized—Its Concern that its $10 Billion Chip Business Was Reliant on Arm

[2] Arm attacks Mr. Weiser's credibility on the basis that he is being paid $16,000 a month for serving as outside counsel for Arm-related matters. Tr. 231:4–232:5 (Weiser). That is hardly a basis to discount Mr. Weiser's credibility. Arm's own employees (including Mr. Youssef and Mr. Grisenthwaite) must be being paid their salary for the days they appear in Court. At any rate, as Arm knows because of his participation in the parties' v10 negotiations, Mr. Weiser's role as outside counsel involves negotiating the terms of Qualcomm's access to v10.

5. During negotiations, annual revenue for Qualcomm's chip business exceeded $10 billion. Tr. 210:5-9 (Weiser). Qualcomm's Arm-based chip business had been growing for years. PTX-79 at 5 ($4.86 million royalties paid for Q2 2009, $8.29 million for Q1 2011); PTX-348 at 3 ($16.26 million royalties paid for Q1 2013). At that time, Qualcomm was primarily developing chips for wireless mobile applications, Tr. 209:22-210:4, 219:5-220:25 (Weiser), but it intended to expand its business to chips for "any new market opportunity." Tr. 210:10-17 (Weiser).

6. Qualcomm knew that its "total reliance" on Arm created significant risk. An internal slide deck dated June 15, 2011, drafted by members of the business and legal teams negotiating with Arm, PTX-79 at 1; Tr. 207:12-209:21 (Weiser), outlines Qualcomm's concerns:




PTX-79 at 7. Arm had become so ubiquitous that "vastly all" shipments for smartphones were based on the Arm architecture, Tr. 212:8-15 (Weiser), Arm's ubiquity was enhanced because Google and Microsoft operating systems ran on Arm (*id.* at 212:16-213:3), all other major semiconductor companies were Arm-based (*id.* at 213:4-14), and there was no viable alternative architecture (*id.* at 213:15-214:4). Arm's strategic position gave it "control points," including by controlling all the financial and non-financial terms of its licenses and by having repeat opportunities to withhold license benefits while negotiating more favorable terms (for example, when Arm introduced a new architecture or new implementation cores) (*id.* at 214:5-23).

7. Arm's internal deck shows Qualcomm shared its concerns. PTX-348 at 4.




8. The "environment to doing a deal" Arm described included Qualcomm's concern about total reliance on Arm, business continuity, access to Arm Technology, fair pricing, Arm's potential to delay, and commitment to Qualcomm. PTX-348 at 4; *see also* Tr. 91:24-92:14 (Youssef) (Qualcomm attorneys made "clear that this was an important deal to them"); *id.* at 92:19-25 ("we discussed the business continuity clause . . . so obviously we negotiated things around that"); *id.* at 93:25-94:5 (agreeing "access to Arm technology" and "Arm's response time" were issues "that Qualcomm was concerned about"); *see also* Tr. 223:4-20 (Weiser) (the parties discussed concerns that Arm could become "evil Arm").

### C. The Parties Were Focused from the Start on the Appropriate Remedy for a Potential Uncured Breach of Delivery and Business Continuity Obligations

9. Documents show that, as early as June and October 2011, "business continuity assurances" had already been a "main topic" of the discussions, and one on which "open issues" remained. PTX-81 at 7; *see also* PTX-79 at 7. The parties planned a meeting between Arm's CEO, Warren East, and Qualcomm President and COO Steve Mollenkopf; Arm provided "feedback" that the "purpose of Warren's meeting with Steve is to reassure." PTX-81 at 7.

10. By October 20, 2011, Qualcomm had proposed a remedy for "breach of continued access" that "if breach not cured in 60 days, then royalty rates drop to zero." PTX-81 at 9. Qualcomm proposed the remedy because "in the event Arm breached the delivery obligations or the business continuity obligations, the chip business would suffer significant harm, and the harm

couldn't be calculated," but Qualcomm "needed a fair remedy that allowed [it] to be compensated for that harm." Tr. 173:7-14 (Sand). Its proposal was meant "to address that issue." *Id.*

### D. The Parties Agreed to the Remedy in Principle, With a Five-Year Cap, and Memorialized That Agreement in a Non-Binding Term Sheet

11. Before negotiating the definitive agreements, Qualcomm and Arm negotiated a non-binding term sheet, covering terms of both the ALA and TLA. Tr. 48:14-20, 59:25-60:3 (Youssef); PTX-94. Qualcomm's initial draft of the "merged term sheet" proposed that, if Arm breached "its obligations under the ALA or the TLA to provide the ARM technology on the agreed upon terms and conditions" and failed to cure within 30 days, "royalties under the ALA and the TLA drop to zero." PDX 2652-A at 1 (citing PTX-2553 at 5-6).

12. Arm's general counsel, Mr. David, initially proposed a "suspension of royalties," but his proposal would have triggered only upon a "deliberate" breach—and even then, only "until the loss has been established and valued and fully compensated." PDX-2652-A at 1 (citing PTX-2553 at 5-6); Tr. 49:20-50:12, 85:20-23 (Youssef); PDX-2652-A at 2 (citing PTX-2554 at 6-7).

13. Qualcomm was concerned that a "prove your damages model where you can't calculate" damages "didn't provide a fair remedy." Tr. 174:1-13 (Sand); *id.* 173:7–14.

14. Qualcomm narrowed its initial proposal to apply only to a breach of "ARM"s delivery and business continuity obligations." PTX-2609 at 6.

15. A subsequent Qualcomm draft noted that the inclusion of a breach for any business continuity obligation was an open issue. PTX-2610 at 6. The same draft also proposed limiting the remedy to withholding royalties for five years. *Id.* While that would not fully compensate Qualcomm for a breach that inflicted catastrophic harm, it would ensure Qualcomm could recover "at least a fraction of those damages" it anticipated. Tr. 226:10–21 (Weiser). It also had to do with being able to switch "from the Arm architecture to another solution." *Id.*

16. A subsequent Arm draft limited the remedy to uncured breaches of Arm's delivery and business continuity obligations set forth in the "TLA Framework." PTX-92 at 5-6. The TLA Framework limited the business continuity-related obligations to include that, should Qualcomm request to license a core, Arm must "investigate and determine" the Previous Best Deal for that core, and to offer a Qualcomm a license to that core within 10% of the Previous Best Deal. It provided Arm with leeway in making its offer by specifying that whether the offer was "within 10%" would be based on "Arm's comparison of all financial considerations." PTX-92 at 5-6.

17. The parties also disagreed about whether Arm's breach under the TLA needed to be "deliberate" to trigger the remedy. They agreed to resolve this issue during later negotiations.[3]

**E. Section 8.3 of the ALA Was Heavily Negotiated**

18. After agreeing to the nonbinding term sheet, Qualcomm and Arm negotiated and exchanged at least 27 redlines of the ALA from April 2012 through May 2013.[4]

19. For example, the first draft ALA that Arm sent Qualcomm on April 13, 2012 proposed several changes to the provision, PTX-2557 at 18, including adding that the remedy (a) applies only to "failure by ARM to comply in any *material* respect;" (b) would be the "sole and exclusive remedy" if Arm breached its delivery obligations; and (c) would only be triggered if Arm's breach was "deliberate" (in the term sheet, deliberate-ness was only an open item for the TLA). *Id.*; PDX-2652-A at 14 (citing PTX-94 at 5); Tr. 89:13-90:3 (Youssef).

---

[3] PDX-2652-A (citing PTX-2553 at 5-6; PTX-25554 at 6-7; PTX-2609 at 6; PTX-2610 at 6; PTX-92 at 5-7; DTX-2983/DTX-2984.0006; DTX-2985/DTX-2986.0007; PTX-2555 at 7-8; PTX-2556 at 7; PTX-93 at 7-8; DTX-2987.0002-3/DTX-2988.0005).

[4] PDX-2650-A (citing PTX-2557 at 18; PTX-2558 at 16; PTX-2559 at 15; PTX-2560 at 16; PTX-2561 at 15-16; PTX-2562 at 15; PTX-2563 at 15; PTX-2564 at 16; PTX-95 at 40; PTX-2611 at 18; PTX-2565 at 46; PTX-2566 at 23; PTX-2567 at 17; PTX-2568 at 3; PTX-2570 at 17; PTX-2571 at 17; PTX-2572 at 17; PTX-2573 at 17; PTX-102 at 17; PTX-104 at 17; PTX-105 at 17; PTX-106 at 17; PTX-2574 at 18; PTX-108 at 21; DTX-3056/DTX-3057.0017; PTX-2575 at 67; DTX-3067/DTX-3068.0017).

20. Qualcomm maintained that adding "deliberate" was unnecessary and would introduce uncertainty. Tr. 181:18–182:13 (Sand). Qualcomm thus countered by removing the requirements that a breach be "material" or "deliberate," but accepted Arm's proposal to make Section 8.3 the "sole and exclusive" monetary remedy for the covered breaches. PTX-2558 at 16.

21. The parties continued to exchange drafts between April 26, 2012 and March 18, 2013. During that process, they negotiated as part of Section 8.3 a detailed notice and cure provision[5] that required Qualcomm to send written notice of non-compliance to Arm's account manager for Qualcomm, General Counsel, and CFO. JTX-1 § 8.3. If Qualcomm does not receive confirmation of receipt within three days, it must send a second written notice to the same recipients and to Arm's CEO and COO. *Id.* Arm then has 30 days to cure. *Id.*

22. The purpose of the notice and cure was to ensure that "the right people knew about the problem because the goal was to get the breach fixed." Tr. 178:25-179:11 (Sand). It gave Arm total control over whether a breach occurs and eliminated risk of foot faults.

23. A failure to cure meant that a breach by Arm would be knowing and deliberate. For example, Richard Grisenthwaite, the Chief Architect of Arm, testified that for years he gave orders not to provide ACK patches (before a quarterly release) or OOB packages to Qualcomm at the instruction of the legal department. Tr. 132:13-133:7 (Grisenthwaite); PTX-649.

24. The parties discussed, and Qualcomm understood, that Arm would cure any minor breach and Qualcomm would not be harmed. Tr. 197:12-198:5 (Sand); Tr. 246:23-247:8 (Weiser). Thus, the concept of deliberate breach "wasn't necessary." Tr. 181:18-182:13 (Sand).

### F. Section 8.3 of the TLA Was Heavily Negotiated

[5] PDX-2650-A at 17-27 (citing PTX-2572 at 17; PTX-2573 at 17; PTX-102 at 17; PTX-104 at 17; PTX-105 at 17; PTX-106 at 17; PTX-2574 at 18; PTX-108 at 21; DTX-3056 / DTX-3057.0017; PTX-2575 at 67; DTX-3067 / DTX-3068.0017); Tr. 104:19–23 (Youssef).

25. The TLA was also heavily negotiated, with the parties exchanging at least 15 redlines of the TLA between January 26, 2013 and May 30, 2013.[6]

26. Consistent with the Term Sheet, the first draft TLA Qualcomm sent to Arm included a remedy provision that mimicked the ALA provision. PTX-2613 at 40. Antonio Viana of Arm responded with an email to Ron Tessitore of Qualcomm, stating:

> In the TLA, you folks copied in the provisions that have all royalties going to zero for non-delivery, non-performance (like in the ALA). **THIS IS AN ABSOLUTE NO!** We NEVER agreed to anything like this in the TLA…and I am confident ARM will never agree. . . . Obviously we have struck it all.

DTX-3036.0002 (emphasis in original).[7]

27. Mr. Tessitore responded, "the intent was to follow the spirit of the Term Sheet, section 3 which is business continuity." DTX-3036.0002. Arm, in turn, revised Section 8.3 to incorporate the remedy but included language requiring "deliberate breach." PDX-2651 at 2 (citing PTX-2615 at 9, 15).

28. After the parties went back and forth several times about "deliberate breach,"[8] Qualcomm's Mr. Lederer and Arm's Mr. East spoke about it. PTX-2617 at 1; DTX-3015.0002.

29. On April 8, 2013, Mr. Lederer memorialized the conversation. PTX-2617 at 1. His email describes that he and Mr. East categorized the TLA Section 8 "remedy for Arm's failure to fulfill business continuity obligations" into "3 buckets: 1) Arm offers QCOM the requested license grant; 2) The license fees & royalties are within 10% of ARM's best deal; 3) Material non-financial terms of license are substantially similar to those in the TLA." *Id.*

---

[6] PDX-2651 (citing PTX-2613 at 40; PTX-2615 at 9, 15; PTX-2616 at 14; PTX-111 at 3, 36; PTX-112 at 54; PTX-2619 at 16; PTX-2620 at 15; PTX-2621 at 15; PTX-2622 at 15; PTX-2623 at 15; PTX-2624 at 15; PTX-2625 at 57; PTX-2626 at 57; PTX-2627 at 57; PTX-2628 at 15).

[7] Mr. Youssef claims this email shows Arm believed the remedy was a "penalty," Tr. 63:9-64:7 (Youssef), but every draft Term Sheet referred to it as the "Remedy for Failure to Deliver Under ALA and TLA." *E.g.*, PDX-2652-A.

[8] PDX-2651 at 3-5 (citing PTX-2616 at 14; PTX-111 at 3, 36; PTX-112 at 54); PTX-110 at 1.

30. He went on to explain their agreement that the remedy would apply to "categories 1 & 3," which provide for a "'bright-line' test to determine if a breach occurs or not" and "are black-n-white type issues." *Id.*

31. For the second category, he noted that "it is a bit less clear whether there is an out of bounds condition or not" so he and Mr. East agreed to carve that obligation out. *Id.*; Tr. 185:8–186:1 (Sand) ("Jim [Lederer] had gotten comfortable" that "as long as the good faith investigation was conducted and the offer reflected that investigation, he had the appropriate remedy" and if the offer was "outside the ten percent band," "there would just be a true up").

32. Mr. Lederer further noted that he and Mr. East had agreed that, for all categories, the "concept of a 'Deliberate Breach' will be removed." PTX-2617 at 1; Tr. 186:2–5 (Sand).

33. On April 18, Arm General Counsel Mr. David provided to Mr. Weiser a list of "principles" that the parties were "all square on" and would be incorporated into the draft TLA. PTX-2618 at 1. The principles tracked Mr. Lederer's description of his agreement with Mr. East.

34. Following these discussions, Mr. Youssef[9] sent Qualcomm multiple drafts of the TLA that were revised to specify that Section 8.3 would apply only to Arm's obligations to make offers for TLA cores, investigate in good faith the Previous Best Deal under Section 8.1B(i), and not to change material non-financial terms without giving Qualcomm notice under Section 8.1D. PTX-2619 at 16; PTX-2620 at 15; Tr. 186:6–14 (Sand).

35. The parties subsequently exchanged more drafts without making any further revisions to Section 8.3,[10] and executed the ALA and TLA on May 30, 2013. JTX-1; JTX-5

[9] Mr. Youssef disagreed that the triggers for the 8.3 remedy "are all black and white," but pointed only to the requirement that the offer be "no more than ten percent"—to which the remedy does not apply—as not "black and white." Tr. 67:5–18 (Youssef).

[10] PDX-2651 at 8-15 (citing PTX-2621 at 15; PTX-2622 at 15; PTX-2623 at 15; PTX-2624 at 15; PTX-2625 at 57; PTX-2626 at 57; PTX-2627 at 15; PTX-2628 at 15).

36. Following execution of the agreements, Arm created an internal deck titled "Qualcomm TLA/ALA – V8 and V8 Next + New TLA Licensing Impact." PTX-348 at 1. Arm celebrated the signing of both the ALA and TLA. *Id*. at 9.

37. Arm's deck acknowledged the Section 8.3 remedies. PTX-348 at 5, 10; Tr. 91:10–14, 93:1–94:24 (Youssef). Arm did not suggest that the remedy was unreasonable or unenforceable: it acknowledged the need for mechanisms to ensure compliance. PTX-348 at 9.

## II. ARM'S DESCRIPTION OF THE NEGOTIATIONS IS REFUTED BY EVIDENCE

38. Arm's only witness to the parties' negotiations was Mr. Youssef. While Mr. Youssef referred to himself as "lead legal negotiator," Tr. 43:25-44:2 (Youssef), his boss, Arm's General Counsel, led Arm's legal negotiating team, *id.* at 44:22-45:3, 85:20-23; 86:15-21, and other senior executives made the strategic decisions, *id*. at 43:25-44:8; 85:2-7. While Mr. Youssef said "there wouldn't have been a meeting where Arm was present" without him, Tr. 44:19-45:8, 68:23–69:11 (Youssef), documents reflect many such meetings. *E.g.*, PTX-2613 at 1 (TLA draft with "changes based on Ron's most recent discussion with Antonio"); PTX-108 at 1-2 (updated draft "with the changes from our Wednesday call and the Thursday call between Laura, Jonathan, and Phil David"); PTX-2626 at 1 (edits to TLA from "discussion between Jim [Lederer] and Warren [East]"); *see* PTX-110; PTX-2617 at 1-2; DTX-3036; Tr. 208:16-209:2 (Weiser).

39. Mr. Youssef testified that Arm "pushed back very hard" in the term sheet negotiations and "wanted to make sure that damages were tied to actual damages." Tr. 48:3–6 (Youssef). But term sheet redlines show that Arm did not try to strike Qualcomm's remedy after the first exchange, and never objected to, or complained about, its inclusion. PDX-2652-A at 5, 9, 11, 13 (citing PTX-92 at 7; DTX-2985; DTX-2986.0007; PTX-2556 at 7; DTX-2987; DTX-2988.0005); *see* Tr. 222:21-25 (Weiser).

40. Mr. Youssef also testified that, though Arm thought the Section 8.3 remedy would be "catastrophic," Tr. 48:7-13 (Youssef), it had to agree to a non-binding term sheet by the end of the first quarter in 2012 for "revenue purposes." *id*. at 56:13-15, 56:25-57:16. But Arm admitted no internal or external documents to support that claim. Nor did Arm admit documents in which it described Section 8.3 as harmful. To the contrary, Arm acknowledged in communications to Qualcomm that the remedy was appropriate for a failure to deliver. DTX-3036.0002 ("the driving reason we agreed is because you have purchased architecture futures. ARM has to ship v8 next and beyond to QC under the [ALA] agreement")), and internally celebrated the agreements, acknowledged the remedy, and sought to implement it. PTX-348 at 5, 9.

41. Mr. Youssef claimed that through more than two years, Qualcomm never communicated its concerns about business risk. Tr. 91:24-92:18 (Youssef). But, as explained, Arm's own documents reflect Qualcomm shared its concerns with Arm. PTX-348 at 4.

42. Mr. Youssef tried to bolster that claim by denying that Mr. Mackerras, Arm's account manager for Qualcomm was part of Arm's negotiating team. Tr. 98:4-18 (Youssef). But Arm's own documents show that Mr. Mackerras—who had knowledge of the Qualcomm roadmap, the cores necessary for the roadmap, and the size of Qualcomm's business (Tr. 98:15-24)—was involved in discussions about the negotiations, *e.g.*, PTX-81 at 4; sent multiple Arm redlines to Qualcomm, *e.g.*, PTX-2556; PTX-2557, and received nearly every draft term sheet, ALA, and TLA exchanged, including those transmitted by Mr. Youssef, FOF ¶¶ 18 n.4; 25 n. 6.

43. Finally, Mr. Youssef testified that Arm offered Yamin at a 0% royalty rate, if combined with Hunter and Hayes. Tr. 78:23–79:1, 79:23–80:16 (Youssef); PTX-1531. He testified that Arm "confirmed through the royalty reports" that Yamin "was always reported to be in

combination with Hunter, and/or Hayes"[11] *Id.* at 79:23–80:16. But the royalty reports Arm admitted show that Yamin was ***never*** used in combination with Hunter and Hayes.[12]

44. Mr. Youssef's attempt to portray Arm as forced to agree to whatever Qualcomm wanted is refuted by the record. Arm secured many valuable concessions from Qualcomm.

45. Arm sought to: avoid "unlimited" liability to Qualcomm; secure a more favorable covenant not to assert; and secure "commitment" from Qualcomm to the "next generations of ARM Architecture." PTX-348 at 4. Arm ultimately obtained those things. *Id.* at 7.

46. For example, the 2003 ALA grants Qualcomm a perpetual license for the development of v7 custom cores. DTX-2955 § 14. In contrast, in the 2013 ALA, Arm limited Qualcomm's license to fifteen years. JTX-1 § 14.1.A. While Qualcomm could extend its license, it could do so for only an additional five years. Id. § 14.1.B.2; PTX-348 at 5.

47. Arm was also able to obtain a very valuable covenant not to assert patent claims. PTX-348 at 4, 7; JTX-1 at 35; *see also* Tr. 94:11–18 (Youssef); Tr. 225:6–226:1 (Weiser).

48. In addition, Arm secured a restriction preventing Qualcomm from comparing its custom cores against ARM cores. PTX-348 at 7. This advantaged Arm because, at the time, Qualcomm's custom cores were outperforming Arm. Tr. at 225:6–226:1 (Weiser).

49. Arm secured specific caps on liability for intellectual property indemnity claims. Arm had been concerned that, under the 2003 ALA, its liability had been "unlimited" and based

[11] Mr. Youssef's testimony should be disregarded, given that Arm withheld as privileged documents necessary to test it. Other than an excel spreadsheet purportedly reflecting its investigation, Arm stated that "no other non-privilege documents reflecting Arm's analysis exist." D.I. 675 at A0652-53. Arm has not produced Mr. Youssef's communications with Arm's "finance people" concerning Arm's purported review of royalty reports. Tr. at 95:7–18 (Youssef).

[12] Yamin (M-55) is not listed as being used with Hunter (A-720) or Hayes (A-520). DTX-1824 (row 16); DTX-1825 (row 16); DTX-1827 (row 16); DTX-1828 (row 16); DTX-1830 (row 16); DTX-1831 (row 229); DTX-1851 (rows 168-169); DTX-1853 (rows 175-176, 191); DTX-1859 (rows 170-171); DTX-1861 (rows 178-179, 194-195); DTX-1868 (rows 172-173, 188); DTX-1870 (179-180, 195-197); DTX-1878 (rows 179-181; DTX-1880 (rows 182-186); DTX-3010 (rows 150-151, 229, 243, 246); DTX-3011 (row 33); DTX-1834 (no Yamin reported).

on license fees and running royalties. PTX-348 at 4; DTX-2955 § 12. The 2013 ALA excludes running royalties from the determination of liability and contains a liability cap. JTX-1 § 12.

50. Arm also secured the Limitation of Liability provision found at Section 13 of both the ALA and the TLA. JTX-1 § 13.1; JTX-5 § 13.1. There, the parties agreed that, except in two situations not relevant here, "in no event shall Arm or Licensee be liable for any indirect, special, incidental, or consequential damages," even if "the other party has been advised of the possibility of such damages." JTX-1 § 13.1. The provision explicitly precludes damages for "loss of goodwill, loss of profits," "interruption of business or other economic loss." JTX-1 § 13.1. Those are precisely the damages that could result from the breaches triggering Section 8.3. FOF ¶¶ 51-61. Thus, without it, Qualcomm would be largely unprotected from those potentially enormous harms.

## III. THE RANGE OF HARM ANTICIPATED INCLUDED DEVASTATING HARM TO QUALCOMM'S $10 BILLION CHIP BUSINESS

51. Arm concedes both that if it breached (and did not cure) provisions enumerated in Section 8.3 of the ALA or the TLA, it could cause Qualcomm catastrophic harm, and that there were multiple ways to breach each provision and cause catastrophic harm.[13] *See* DDX-1.22.

### A. Anticipated Harm Arising From Breach of Section 5 of the ALA

52. If Arm failed to deliver technology necessary to develop and timely verify its custom cores, Qualcomm would be unable to "proceed with its product roadmap" and sell or ship Arm-compliant products to customers. Tr. 218:24–221:11 (Weiser). For example, prior to distributing "any Arm Compliant Product," Qualcomm is contractually required to verify that the product is Arm-compliant. JTX-1 § 4.1; PTX-261 at 4 ("ARM Compliant Cores must run and pass" the tests Arm provides for verification). JTX-3 § A6(x) at 4 ("Architecture Compliant Core"

[13] Arm also concedes that its breaches in this case caused harm and has not proven that they did not cause significant harm. Tr. 158:2-7, 159:8-161:25 (Britven).

limited to cores which have "been validated and verified in accordance with" the specific verification procedure); *see* JTX 1 § 1.2, 2.3.

53. Accordingly, if Arm fails to deliver the Architecture Compliance Kit (ACK), and Qualcomm is, as a result, unable to verify custom cores, it could be unable to ship chips including those cores. Weidmann Dep. 73:08-19 (in "designing an ARM core, a design team is required to run the ACK"). Tr. 127:20-128:9 (Grisenthwaite); PTX-261 at 6; Tr. 218:24-221:11 (Weiser).

54. Even if Qualcomm were able to distribute Arm-compliant chips without all components of the ACK, Qualcomm may face claims that its products were not licensed or compliance errors causing devices to "not work with applications that are designed for the Arm architecture" after the chip had already been shipped. Tr. 219:22–220:9 (Weiser); PTX-190 at 6 (Arm must "police" compliance because "failure [to] pass a test" might "cause a failure" "in the future as new software could use behavior that was tested by the failing test"); Tr. 147:3-19 (Trivedi) ("if there is a test issue or [Qualcomm is] missing a test" it is risking "a design issue down the line seen in the field"); Weidmann Dep. 145:8-146:5 (the ACK represents "a lot of the value" of the ALA); PTX-310 (same); Weidmann Dep. at 152:4-14; Bhattacharya Dep. 23:25-24:9; Tr. 131:19–23 (Grisenthwaite).

**B. Anticipated Harm Arising from Breach of Section 8.1 of the TLA**

55. If Arm breaches the business continuity obligations to which Section 8.3 applies—which require Arm to make an offer for any TLA core Qualcomm wants to license, based on investigation and determination of the Previous Best Deal and including the same material non-financial terms negotiated in the TLA—Qualcomm's business could be significantly harmed.

56. For example, if Arm refused to make an offer or offered a core with nonfinancial terms such that it "wouldn't be reasonable for [Qualcomm] to accept," Tr. 188:4–13 (Sand),

Qualcomm may not be able to access a TLA core it needs; depending on which core and how it fit into Qualcomm's roadmap, the harm could be significant. Tr. 204:10–205:5 (Sand).

57. Likewise, if Arm failed to investigate the Previous Best Deal, and therefore gave Qualcomm non-competitive pricing for a particular core, the cost of Qualcomm's impacted products would be too high and, given that Qualcomm's chip sets are sold in "a very competitive situation," particularly for mobile, Qualcomm could be disadvantaged in making sales. Tr. 223:21–224:15 (Weiser). This is particularly true in mobile, where Qualcomm's business was focused in 2011-2013. Tr. 209:22–210:17, 223:21–224:15 (Weiser). Each phone manufacturer makes only one flagship phone a year; loss of the opportunity to sell a chipset on that phone means "sales have dried up for that entire year." *Id*. Accordingly, the impact of even a slight competitive disadvantage on an individual core could have devastating consequences. *Id*; Tr. 224:16-225:2 (Weiser).

58. This harm is not compensable through the "true up" available under Section 8.1b(ii). If Qualcomm is not given an offer within 10% of the Previous Best Deal, it is only entitled to be made whole for the amount of royalties and license fees paid over and above what would have been a proper offer under the contract. JTX-005 at § 8.1.

## IV. THE SPECIFIC HARM THAT COULD ARISE FROM ANY PARTICULAR BREACH WAS INCALCULABLE

59. The amount of harm for any particular breach "couldn't be calculated" because there were "so many variables," Tr. 173:7–14 (Sand); *id*. at 173:15–25 (Sand); *id.* at 196:2–16, for example what technology or core Arm's conduct impacted, the timing of the breach, and the features, products, customers, and end-market impacted by the withheld technology or core. Tr. 173:15–25 (Sand); Tr. 203:16–205:5 (Sand); Tr. 131:13–23 (Grisenthwaite) (some ACK test failures could "affect future software" while others have a "negligible" likelihood); Tr. 144:7–13 (Golden) (describing differing amounts of work to remediate different withheld ACK patches).

60. That was particularly true given that the agreement could last until at least 2033 and applied to constantly changing technology. JTX-1 §§ 14.1.A, 14.1B2; JTX-5 § 14.1; Tr. 218:24–221:11, 221:13–21 (Weiser) ("We didn't try to estimate the potential actual losses" because "that was either very difficult or nearly impossible to do because it was a twenty-year agreement, and the amount of product we would ship and the different market opportunities would have been very different than they would have been" at the time of contracting).

61. Arm does not, and cannot, dispute that the harm would be incalculable. While Mr. Youssef testified that he believed Arm could have estimated the amount of royalties that would be owed by Qualcomm (but didn't), he never testified that Arm could have estimated the harm arising from breach of Section 5 of the ALA or Section 8.1 of the TLA. Tr. 55:1-24 (Youssef).

## V. THE HARM ANTICIPATED WAS FAR GREATER THAN THE REMEDY

62. That Section 8.3 is tied to royalties, not a specific sum, meant that the remedy would be proportionate to potential losses. Tr. 227:10–16 (Weiser) (remedy "was proportional to the amount of payments we were making, the amount of business that they were enjoying").

63. It also ensured that the remedy represented only "a fraction" of the anticipated harm, given that royalties are only a fraction of the value of Qualcomm's chip business. *Id.*

64. The parties could have anticipated this based on the circumstances at the time of contracting. Royalties under the ALA for cores designed using Arm's v7 and v8 architecture are calculated using either a fixed rate of $0.06 to $0.20 per core or (if the chip sells for more than $75) a percentage no greater than 1.25% of the chip's sales price. PTX-348 at 8; *see also* PTX-94 at 3. Royalties under the TLA are calculated similarly; for example, royalties for the Cortex-A7 and Cortext-A53 cores would be calculated using the lesser of a fixed rate of $0.06 to $0.25 per core or a percentage no greater than 2% of the chip's sales price. PTX-348 at 14.

65. Accordingly, for Q1 of 2013, Qualcomm paid Arm a total of $16.26 million in royalties for both the ALA and the TLA (PTX-348 at 3), but reported revenue for its chip business of $3.916 billion (April 24, 2013 Form 10-Q of Qualcomm Incorporated, at 15).[14] In that quarter, which immediately preceded signing of the ALA and TLA at issue, the royalties Qualcomm paid under both the ALA and TLA were *less than 0.5%* of the revenue generated by the chip business.

66. In addition, tying the remedy to royalties paid under *both* contracts ensures Arm does not benefit from its own breach. Qualcomm's Arm-based chips require either a custom core licensed under the ALA or an Arm implementation core licensed under the TLA. FOF ¶ 1. If Arm fails to deliver technology necessary for Qualcomm's custom cores, Qualcomm must license an Arm core under the TLA. Tr. 42:22-43:5, 93:9-94:2 (Youssef); Tr. 209:22-210:4, 219:12-220:9, 257:15-22 (Weiser). If Qualcomm cannot license the Arm core it needs under the TLA, Qualcomm will cure with a different TLA core or a custom core under the ALA. Tr. 43:8-17, 93:9-94:2, 107:3-108:6 (Youssef); Tr. 223:21-224:6, 257:15-22 (Weiser). Since a breach of one contract would almost certainly force Qualcomm to pay more royalties under the other, dropping royalties to zero only under the breached contract would do Qualcomm little good (and may incentivize Arm to breach the contract under which it made less royalties).

## QUALCOMM'S PROPOSED CONCLUSIONS OF LAW

### I. SECTION 8.3 IS PRESUMPTIVELY VALID AND ARM HAS THE BURDEN OF OVERCOMING THIS PRESUMPTION.

"Contracts are, by their very nature, allocations of risk and responsibility." *JJD-HOV*, 17 Cal. 5th at 272. Commercial parties may choose to allocate risk and responsibility under California

[14] *Available at* https://www.sec.gov/Archives/edgar/data/804328/000123445213000179/qcom3311310-q.htm. The Court may take judicial notice of public filings with the SEC. *Vanderklock v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2018).

law through a liquidated damages provision, *i.e.*, "a sum which a contracting party agrees to pay . . . for breach of some contractual obligation." *Gormley* v. *Gonzalez*, 84 Cal. App. 5th 72, 79 (2022).

Decades ago, California courts "severely limit[ed] the use of liquidated damages provisions" through a judge-made "requirement that the provision must reflect a 'reasonable endeavor' to estimate actual damages." Com. Rep. at 1739; *see Gormley*, 84 Cal. App. 5th at 79-81.[15] But recognizing that liquidated damages provisions "serve several useful functions," the legislature acted, creating "a new general rule favoring the enforcement of liquidated damages provisions." Com. Rep. 1740-41, 1750. Now, under § 1671(b), the default rule is that "a provision in a contract liquidating the damages for the breach of the contract is valid." *Id.* To overcome that presumption, "the party seeking to invalidate the provision" must "establish[] that the provision was unreasonable under the circumstances existing at the time the contract was made." *Id.* The statute "casts the burden on the opposing party to prove unreasonableness." *Weber,* 52 Cal. App. 4th at 656; *Roodenburg* v. *Pavestone Co., L.P.*, 171 Cal. App. 4th 185, 195 (2009). Thus, § 1671 "gives the parties considerable leeway in determining the damages for breach." *Weber,* 52 Cal. App. 4th at 654; Com. Rep. at 1751.

As the California Law Review Commission explained, courts must consider "*all* the circumstances existing at the time of the making of the contract" in determining whether the presumption of validity is overcome. Com. Rep. at 1751. While one of those considerations focuses on the terms of the provision—"the relationship that the damages provided in the contract

---

[15] "Reports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes," *Van Arsdale* v. *Hollinger*, 437 P.2d 508, 511 (Cal. 1968) (en banc), and numerous California courts have relied on this specific commission report when interpreting § 1671. *See, e.g.*, *Ridgley,* 17 Cal. 4th at 977 n.2; *Krechuniak* v. *Noorzoy*, 11 Cal. App. 5th 713, 720-22 (2017); *Gormley*, 84 Cal. App. 5th at 81; *Weber, Lipshie & Co.* v. *Christian*, 52 Cal. App. 4th 645, 655-56 (1997).

bear to the range of harm that reasonably could be anticipated at the time of the making of the contract"—the rest focus on the relationship between the parties and the nature of their negotiations: "[2] the relative equality of the bargaining power of the parties, [3] whether the parties were represented by lawyers at the time the contract was made, [4] the anticipation of the parties that proof of actual damages would be costly or inconvenient, [5] the difficulty of proving causation and foreseeability, and [6] whether the liquidated damages provision is included in a form contract." Com. Rep. at 1751-52. *All* of them focus on the circumstances surrounding the formation of the provision not the circumstances in which it is later being applied. As the Commission Report explains, the provision is designed not to rescue sophisticated parties from bargains into which they knowingly entered, but to guard against the risk that "a liquidated damages provision will be used oppressively by a party able to dictate the terms of an agreement," or "may be used unfairly against a party who does not fully appreciate the effect of the provision." *Id.* at 1741; *cf. Ridgley*, 17 Cal. 4th at 974-78 (refusing to enforce an adhesive liquidated damages clause against an unrepresented individual to whom the clause was never explained).

California courts have long held that a liquidated damages provision is not invalid just because the damages it provides do not match the actual damages resulting from a particular breach. That was the law even before § 1671. *Better Food.,* 40 Cal. 2d at 184, is instructive. That case examined a form contract between a grocery store and a security company for installation of a burglar alarm in which a liquidated damages provision set damages at $50 for a variety of potential breaches, including failure "to receive the [alarm] signals, to respond to them, or to report them to the plaintiff." *Id.* at 186. After a burglary where the alarm failed to notify police, the store sued for $35,000 in losses. *Id.* at 182. The California Supreme Court enforced the provision, finding that the parties agreed to the provision, and that there was "no evidence that they were not

fully aware of the circumstances making it desirable that liquidated damages be provided for." *Id.* at 187. The Court explained, though the outcome may seem unfair, the parties' agreement was designed to address all manner of scenarios—e.g., "the theft of a ham, or of a truckload of goods, or the contents of a safe"—that could cause injury in many unforeseeable ways. *Id.* at 186. Although the actual harm from a breach "could in many cases be less than the amount" agreed, "in many other cases the actual loss would exceed that amount." *Id.* at 187. It was reasonable to allocate the risk of unpredictable potential losses to sometimes benefit one party and other times the other, and the grocery store could not get out of the deal when it did not prefer the outcome.

For largely the same reasons, a "liquidated damages provision is not invalid merely because it is intended to encourage a party to perform" by setting damages that may exceed those predicted to occur. [16] *Weber*, 52 Cal. App. 4th at 656. After all, § 1671 was not intended to eliminate the ability of a "party who fully intends to perform his obligations" to insist on a "provision liquidating the damages" to set an "incentive" for his counterparty not to breach in the first place. Com. Rep. at 1740. In *Weber,* for instance, an accounting firm sought to impose a heavy penalty on departing partners by requiring them to pay two years' worth of billables for each client they took with them. 52 Cal. App. 4th at 649. Though that created an incentive so powerful as to "make it difficult and possibly . . . impossible" for partners to take clients with them, the court upheld the bargain nonetheless, as the partner "had read the agreement before he signed it," "had previously consulted an attorney," and "signed the agreement in order to obtain the benefits" that came with it. *Id.* at 655-56; *see also Edwards* v. *Symbolic Int'l, Inc.*, 2009 WL 1178662, at *8 (S.D. Cal. 2009).

---

[16] Whether the negotiating parties referred to the provision as a "penalty" has even less relevance: Parties have done so for centuries; courts have deemed it irrelevant for just as long. *See United States* v. *Bethlehem Steel Co.*, 205 U.S. 105, 120 (1907); *Krechuniak*, 11 Cal. App. 5th at 722.

What matters under § 1671 is whether the contracting parties had "relatively equal bargaining power" and engaged in a mutual exchange of risk that both parties fully appreciated at the time of contracting, *Gormley*, 300 Cal. Rptr. 3d at 165-66—not whether that mutual exchange would produce a reasonable estimate of damages in every conceivable breach scenario.

## II. ARM HAS NOT PROVEN THAT SECTION 8.3 WAS UNREASONABLE UNDER THE CIRCUMSTANCES UNDER WHICH IT WAS ENTERED INTO

Arm has not come close to meeting its burden of proving that Section 8.3 "was unreasonable under the circumstances existing at the time the contract was made." § 1671. Arm is a highly sophisticated and well-counseled party who well understood the stakes at hand. It knew not just its own business but Qualcomm's. And Arm successfully fought for concessions that would limit the provision's applicability and ensure that Arm retained complete control over whether and when Qualcomm could ever invoke the remedy Section 8.3 creates. That Arm does not like the bargain it struck in hindsight is no reason to relieve it of compliance.

### A. Section 8.3 Was the Product of a Hard-Fought, Well-Counseled Effort to Allocate Risks Between Arm and Qualcomm.

Section 8.3 was "not negotiated in a vacuum." *JJD-HOV*, 17 Cal. 5th at 266. And the record evidence presented to this Court confirms that each party was fully aware that Section 8.3 was the quintessential risk-management exercise between sophisticated and well-counseled parties.

In 2013, Qualcomm's chip business was worth more than $10 billion and growing. FOF ¶ 5. And, as Arm does not dispute, that business was heavily reliant on Arm's architecture. FOF ¶¶1-2, 5-6. Arm's "ubiquitous" strategic position gave it "powerful control points," there was "limited competition," and it would take years for Qualcomm to be in position to switch away from Arm's architecture. FOF ¶¶ 5-8, 15, 59-66. A breach by Arm could prevent Qualcomm from selling chips at all. *Id*. Qualcomm thus focused on creating an incentive not to breach that would provide fair compensation if Arm nevertheless did. FOF ¶ 10. Qualcomm proposed doing so

through a provision that would allow it to withhold all royalties in the event of a breach. FOF ¶ 10. That remedy would not come close to making Qualcomm whole if, as it feared, Arm breached in a way that crippled its chip business. FOF ¶¶ 62-66. But it would compensate Qualcomm for part of the damage and allow it to invest in an alternative.[17]

While "courts assume that each party to a contract is alert to, and able to protect to, his or her own best interests," *Series AGI W. Linn of Appian Grp. Investors DE, LLC* v. *Eves*, 158 Cal. Rptr. 3d 193, 200 (Ct. App. 2013), there is no need to resort to that presumption here. Arm plainly understood the remedy. Arm recognized Qualcomm's concerns, FOF ¶¶ 7-8, but initially refused to agree to Qualcomm's proposal and later, extracted significant concessions from Qualcomm in exchange. FOF ¶¶ 9-37. For instance, Arm negotiated to limit Qualcomm's ability to recover lost profits and other harm to its business outside of Section 8.3. FOF ¶¶ 48-50. Arm negotiated the no-royalty period down to five years.[18] FOF ¶ 15. Arm negotiated to substantially narrow the Section 8.3 remedy to mutually agreed breaches—and Arm conceded at trial, *see* DDX-1.22—could do catastrophic harm to Qualcomm's "business continuity." FOF ¶¶ 15, 29-34. And Arm fought tooth and nail for a robust notice-and-cure: two phases of written notice all the way up to Arm's C-suite executives and General Counsel and 30 days to cure any alleged breach. FOF ¶¶ 18-24. By giving itself total control over whether and when Section 8.3 would be triggered, Arm

---

[17] Arm challenges Mr. Weiser's testimony that it would take five to ten years to switch away from Arm but offers nothing to contradict it. That is unsurprising; as a matter of common sense, it would be no quick and easy task to build and drive industry adoption for a new architecture.

[18] Mr. Youssef characterized this negotiated *decrease* as a "compromise" meant to incentivize Arm's compliance. Even if that were so, a liquidated damages provision "is not invalid merely because it is intended to encourage a party to perform." *Ridgley,* 17 Cal. 4th at 981; Com. Rep. at 1740 (explaining that parties remain free to address concern that, "without an enforceable provision liquidating the damages, the other party will lack incentive to perform").

ensured that it could avoid liability for foot-faults and force Qualcomm to prove its case if Arm did not believe that it was in breach.

All of this invalidates any claim that Qualcomm had the power "to dictate the terms of [the] agreement." Com. Rep. at 1741. It likewise calls into question Arm's contention that it folded at the specter of the end of a quarter due to a non-binding term sheet but then had no choice but to agree after several more quarterly reporting deadlines. FOF ¶ 40. If that were true, Qualcomm would have gotten what it first proposed and not what it actually got.

Section 8.3 is exactly the sort of eyes-open agreement that California law requires courts to enforce. Two sophisticated, well-counseled parties spent years allocating risk for multi-billion-dollar contracts. FOF ¶¶ 1-50. Each agreement reflected trade-offs for both sides. While Qualcomm got the basic remedy it wanted, it got that remedy for only five years, for only the most destructive anticipated breaches of each agreement, FOF ¶¶ 51-58, and only when Arm's breaches were deliberate (i.e., when Arm declined to cure the breach), FOF ¶¶ 18-24.

Arm can point to no case where a court invalidated a liquidated damages provision simply because the "actual loss resulting from a breach could in many cases be less than the amount" even while simultaneously recognizing that "in many other cases the actual loss would exceed that amount." *Better Food*, 40 Cal. 2d at 187.[19] And because Arm would control when the remedy would be triggered, Arm could also take that calculus into account when deciding whether it was worth curing any alleged breach. If Arm breached in a way that destroyed Qualcomm's multi-

[19] In *Radisson Hotels Int'l, Inc.* v. *Majestic Towers, Inc.*, for example, the court upheld a liquidated damages provision requiring the breaching party to pay two years of royalties because the "amount [wa]s designed to estimate the revenue/future royalties that will be lost by Radisson while it searches for a replacement franchisee (which on average would. take two years to accomplish)." 488 F. Supp. 2d 953, 959 (C.D. Cal. 2007). "[T]hat may have been able to find a new franchisee in less than two years" did not affect the reasonableness of the provision. *Id.* at 960-61. *See also UPS Store* v. *Hagan*, 2016 WL 1659188 at *2 (S.D.N.Y. 2016) (applying California law).

billion-dollar chip business in whole or substantial part, Arm surely would have welcomed enforcement of Section 8.3 as a liability cap. Com. Rep. at 1741 ("A party may seek to limit his possible liability for his own breach by use of a liquidated damages provision"); FOF ¶¶ 63-65.

Whether Section 8.3 was a better deal for Qualcomm, a better deal for Arm, or a reasonable compromise on both parties' part is beside the point. Whatever the ultimate merits of the bargain the parties struck, the notion that Section 8.3 is the kind of wholly one-sided provision that the California legislature wanted courts to be loath to enforce blinks reality. *E.g.*, *JJD-HOV*, 17 Cal. 5th at 265 (a party with a "realistic and rational choice" between providing full contractual performance and sacrificing payment for lower contractual performance cannot get out of a liquidated damages provision); *Blank* v. *Borden*, 11 Cal. 963, 971 (1974) (en banc).

### B. Section 8.3 Reflected a Reasonable Estimation of the Kinds of Damages the Parties Could Reasonably Have Anticipated When They Agreed to It.

With no credible evidence that it did not understand the bargain it struck in Section 8.3, FOF ¶¶ 38-50, Arm tries to condense the analysis to a single factor—namely, "the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract." That is not the law. Com. Rep. at 1751-52. To be sure, a mismatch between those two things is *necessary* to invalidate a liquidated damages provision, as a party could not even begin to try to invalidate a provision that does not meaningfully exceed actual damages. But as cases like *Better Food*, *Weber*, and *Radisson* reflect, that alone is not *sufficient* to render a provision unenforceable, as ***the question is whether the parties reached a reasonable agreement under all circumstances at the time it was negotiated, not whether it would reach the most equitable result in every circumstance to which it may apply***. *E.g., Travelodge Hotels* v. *Kim Shin Hosp.*, 27 F. Supp. 2d 1377, 1383 (M.D. Fla. 1998) (enforcing liquidated damages provision despite defendant's argument that it was unreasonable to pay five

years' worth of franchise payments after franchisor terminated the agreement over "stained grout").

At any rate, Arm did not come close to proving that Section 8.3 "bears ***no*** reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach." *Ridgley*, Cal. 4th at 977. Section 8.3 was confined to breaches that posed a "business continuity" concern. And if Arm breached in a way that destroyed Qualcomm's chip business—or even a portion of that business—Section 8.3 would not make Qualcomm whole. FOF ¶¶ 63-65. (royalties were less than .5% of Qualcomm's chip business revenue in Q1 2013). That readily distinguishes this case from cases where the liquidated damages amount exceeded even the most generous estimate of anticipated potential damages by several times. *E.g.*, *Lakeshore Investments LLC* v. *Now Solutions Inc*., 122 Cal. App. 5th 847, 853-54 (2026); *Med. Sales & Consulting Grp.* v. *Orthopedics USA, Inc*., 2011 WL 5075970, at *8 (S.D. Cal. 2011); *Greentree Fin. Grp., Inc*. v. *Execute Sports, Inc*., 163 Cal. App. 4th 495, 500 (2008).

It also distinguishes *Dollar Tree Stores, Inc.* v. *Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1072-73 (N.D. Cal. 2012). Setting aside that the federal court there did not examine all the circumstances at the time of contracting—as California law requires—*none* of the potential breaches covered could reasonably justify the "potentially unlimited" liability the challenged provision imposed. *Id.* at 1071-74. Likewise, in *Harbor Island Holdings LLC* v. *Kim*, 107 Cal. App. 4th 790 (2003), a breach of the lease agreement would more than triple rent, even though the plaintiff retained remedies besides liquidated damages to recover for property damage.

With little to say about the breaches the parties reasonably anticipated, Arm claims Section 8.3 is not a fair remedy for "ticky-tack" breaches. But Arm anticipated precisely that concern and extracted a concession to address it: Arm got two layers of C-suite notice and 30 days to cure,

ensuring that it could avoid any risk of relatively minor business continuity issues triggering the Section 8.3 remedy. FOF ¶¶ 21-24. So "under the circumstances existing at the time the contract was made," § 1671, the parties reasonably anticipated that the Section 8.3 remedy would come into play only in the extraordinary situation that Arm refused to cure an alleged "business continuity" breach while knowingly risking five years of royalty payments.[20] It would be the height of inequity—and not what the legislature was trying to accomplish in § 1671—to let Arm invoke Section 8.3 should it choose to breach in the most damaging ways possible yet hold in its back pocket the argument that Section 8.3 is an unenforceable "penalty" any time the bargain the parties struck proved more valuable to Qualcomm. That is precisely the kind of "'hey neener neener, gotcha sucker' defense" California courts have rejected. *Gormley*, 84 Cal. App. 5th at 89.

Similarly, Arm cannot get out of that bargain by complaining that it does not think it produces a fair result here. Section 1671(b) is emphatic that the focus is on whether "the provision was unreasonable under the circumstances *existing at the time the contract was made*." § 1671(b). The "validity of the liquidated damages provision depends upon its reasonableness at the time the contract was made and not as it appears in retrospect. Accordingly, the amount of damages actually suffered has no bearing on the validity of the liquidated damages provision." Com. Rep. at 1751; *id.* at 1742 ("To permit consideration of the damages actually suffered would defeat one of the purposes of liquidated damages, which is to avoid litigation on the amount of actual damages."); *Krechuniak*, 11 Cal. App. 5th at 721; *Hong* v. *Somerset Assocs.*, 207 161 Cal. App. 3d 111, 115

[20] Arm's cases do not minimize the importance of the notice-and-cure provision; they did not involve parties who negotiated for notice-and-cure rights for the precise purpose of narrowing the range of scenarios in which provision designed to address multiple forms of breach could be triggered. *Med. Sales*, 2011 WL 5075970, at *7; *Sigma Connectivity A.B*. v. *I.Am.Plus Elec., Inc.*, 2021 WL 8567905, at *3 (C.D. Cal. 2021); *Lakeshore*, 122 Cal. App. 5th at 850-51, 854.

(1984); *Edwards*, 2009 WL 1178662, at *8.[21] Even *Grand Prospect Partners, L.P.* v. *Ross Dress for Less, Inc*., on which Arm relies, precludes the approach Arm advances. That Court prohibited "focus on a single scenario"—here, a breach that might produce only minor harm—"to the exclusion of others." 232 Cal. App. 4th 1332, 1363-64 (2015).

Nor can Arm escape Section 8.3 by faulting Qualcomm for failing to prove that the parties discussed every type of injury a covered breach could inflict. Arm questioned Ms. Sand and Mr. Weiser about not having contemporaneous documents showing specific calculations of potential harm. Tr. 196:8-197:11, 205:12-21 (Sand); Tr. 247:20-25 (Weiser). But the burden is on Arm to prove that Section 8.3 was *not* reasonable, not on Qualcomm to prove that it *was*. Courts routinely enforce liquidated damages provisions that involved ***no*** discussion of the range of potential harm. *E.g.*, *Edwards*, 2009 WL 1178662, at *8 (provision was not unreasonable just because "the parties did not actually discuss the damages [plaintiff] might suffer"); *Better Food*, 40 Cal. 2d at 187 (enforcing provision in a form contract); *Utility Consumers' Action Network, Inc.* v. *AT&T Broadband of S. Cal., Inc*., 135 Cal. App. 4th 1023, 1038 (2006).

That should come as little surprise. Requiring parties to quantify the exact value of anticipated actual harm would contravene the purpose of a liquidated damages remedy, which is to provide certainty when proof of actual damages, causation, and foreseeability may prove difficult. *Better Food*, 40 Cal. 2d at 184; Com. Rep. at 1740; *Weber.*, 52 Cal. App. 4th at 654-55; *Krechuniak*, 11 Cal. App. 5th at 721; *El Centro Mall, LLC* v. *Payless ShoeSource, Inc*., 174 Cal. App. 4th 58, 63 (2009). That is precisely the situation here, given that the ALA includes a 20-year term and the TLA is perpetual, Qualcomm's business and Arm's technology each evolve every year, and Arm could breach its delivery and business continuity obligations to Qualcomm in

[21] Arm has not even proven that its breaches did not cause significant harm. FOF ¶ 51 n. 13.

different ways. FOF ¶¶ 5, 51-61; *Wise* v. *United States*, 249 U.S. 361, 365 (1919) ("effect will be given" where "damages are uncertain in nature or amount or are difficult of ascertainment"); *Ebbert* v. *Merc. Trust. Co.*, 213 Cal. 296, 499 (1931) (enforceable where "actual damage suffered . . . would be impracticable or extremely difficult to ascertain"); *Better Food*, 40 Cal. 2d at 184.

In short, Arm has provided ***no*** evidence that the remedy to which the parties agreed was "designed to exceed substantially the damages suffered." *Ridgley,* 17 Cal. 4th at 981. That alone suffices to foreclose its attempt to escape the bargain it struck. *See, e.g*, *Weber*, 52 Cal. App. 4th at 655-56; *UPS Store*, 2016 WL 1659188, at *2.

***

Arm has not come close to carrying its burden of proving that Section 8.3 "was unreasonable under the circumstances existing at the time the contract was made." § 1671. Qualcomm did not foist Section 8.3 upon Arm; the parties agreed to it after two years of hard-fought, protracted, and well-counseled negotiations. And Qualcomm did not emerge entirely victorious, as one would expect in the kind of one-sided contractual arrangements with which § 1671 is concerned. Though Qualcomm secured meaningful protection against threats to its business continuity, Arm extracted critical concessions. Arm has complete control over when Section 8.3 can be invoked. It now asks the Court to give it complete control over when Section 8.3 can be enforced as well. But California law does not allows sophisticated parties to escape the consequences of the terms to which they knowingly agreed while negotiating billion-dollar deals. Arm's contrary arguments not only fly in the face of the legislature's concerted effort to eliminate the bias against liquidated damages provisions but also would disfavor such provisions to a far greater degree than before the 1977 amendments. This Court should reject that effort to turn California law on its head.

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
Jenifer N. Hartley
Erica Spevack
Leah R. Hibbler
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
Jacob Apkon
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

William T. Marks
Adam L. Basner
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 2006-1047
(202) 223-7300

September 24, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on September 24, 2026, upon the following in the manner indicated:

Anne Shea Gaza, Esquire *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Defendants*

Scott F. Llewellyn, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
*Attorneys for Defendants*

Sydney D. Gaskins, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017
*Attorneys for Defendants*

Alexandra Corrinne Hottenrott, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
*Attorneys for Defendants*

Daralyn J. Durie, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
*Attorneys for Defendants*

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
Matthew J. McIntee, Esquire
Megan McGlynn Butler, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
*Attorneys for Defendants*

*VIA ELECTRONIC MAIL*

Jay Emerick, Esquire
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
*Attorneys for Defendants*

*VIA ELECTRONIC MAIL*

Peter Evangelatos, Esquire
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
*Attorneys for Defendants*

*VIA ELECTRONIC MAIL*

Meghan Kelly, P.C.
KIRKLAND & ELLIS LLP
2005 Market Street
Suite 1000
Philadelphia, PA 19103
*Attorney for Defendants*

*VIA ELECTRONIC MAIL*

*/s/ Jennifer Ying*
______________________________
Jennifer Ying (#5550)