**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QUALCOMM INCORPORATED,<br>a Delaware corporation; and<br>QUALCOMM TECHNOLOGIES, INC.,<br>a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ARM HOLDINGS PLC, f/k/a ARM LTD.,<br>a U.K. corporation,<br><br>Defendant. | C.A. No. 24-490-MN<br>(CONSOLIDATED) |

**DEFENDANTS ARM HOLDING PLC AND ARM LTD.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Dated: September 24, 2026

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Arm Ltd. and Arm Holdings plc*

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. PROPOSED FINDINGS OF FACT ..... 4

A. The Parties, The Contracts, And The Zero-Royalty Penalties ..... 4

B. Negotiation Of Section 8.3 Of The ALA And TLA ..... 6

C. The Alleged TLA And ALA Breaches That Trigger The Zero-Royalty Provisions ..... 10

1. Alleged TLA Breaches ..... 10

2. Alleged ALA Breach ..... 11

a. Background ..... 12

b. Out Of Box Packages (OOBs) ..... 13

c. ACK Patches ..... 13

d. Other Triggers ..... 14

D. The ALA And TLA Allow Qualcomm To Obtain Specific Performance ..... 14

E. The ALA And TLA Contain Limitations Of Liability ..... 14

III. PROPOSED CONCLUSIONS OF LAW ..... 15

A. The Five-Year, Zero-Royalty Penalties Are Liquidated Damages Provisions ..... 16

B. The Five-Year, Zero-Royalty Penalties Are Unenforceable ..... 17

1. The Parties Never Made A Reasonable Endeavor To Estimate Fair Average Compensation For Any Losses Stemming From Any Breaches ..... 18

2. The Penalties Bear No Reasonable Relationship To The Range Of Actual Damages The Parties Could Have Anticipated ..... 20

C. Evidence Of Actual Harm Is Relevant To Unenforceability ..... 30

**TABLE OF CONTENTS (CONT'D)**

**Page**

IV. CONCLUSION ........................................................................................................ 30

** All ***emphasis*** added unless otherwise indicated **

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*911 Restoration Franchise, Inc. v. Blakeney*,
2015 WL 12698290 (C.D. Cal. Sep. 22, 2015)....15, 25

*Applied Elastomerics, Inc. v. Z-Man Fishing Prods., Inc.*,
521 F. Supp. 2d 1031 (N.D. Cal. 2007)....29

*Atel Fin. Corp. v. Quaker Coal Co.*,
132 F. Supp. 2d 1233 (N.D. Cal. 2001),
*aff'd on other grounds*, 321 F.3d 924 (9th Cir. 2003)....25

*Bayol v. Zipcar, Inc.*,
78 F. Supp. 3d 1252 (N.D. Cal. 2015)....16, 17

*Dollar Tree Stores, Inc. v. Toyama Partners LLC*,
875 F. Supp. 2d 1058 (N.D. Cal. 2012)....3, 17, 22, 26

*El Centro Mall, LLC v. Payless Shoesource, Inc.*,
174 Cal. App. 4th 58 (2009)....28

*Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*,
9 Cal. 3d 731 (1973)....27

*Gormley v. Gonzalez,*
84 Cal. App. 5th 72 (2022)....26

*Grand Prospect Partners v. Ross Dress for Less*,
232 Cal. App. 4th 1332 (2015)....18, 25, 26, 29, 30

*Harbor Island Holdings LLC v. Kim*,
107 Cal. App. 4th 790 (2003)....3, 18, 19, 21, 22, 23, 29, 30

*Harbor Island Holdings LLC v. Kim*,
No. G030264, App. Op. Br., 2002 WL 32153138 (Cal. App. April 11, 2002)....3, 21, 23

*Hsiao & Montano, Inc. v. Xstatic Pro Inc.*,
2023 WL 4205811 (C.D. Cal. May 18, 2023)....29

*JJD-HOV Elk Grove LLC v. Jo-Ann Stores, LLC*,
17 Cal. 5th 256 (2024)....4, 18, 27, 28, 29

*Lakeshore Inv. LLC v. Now Sols., Inc.*,
122 Cal. App. 5th 847, 2026 WL 2474230 (2026)....4, 18, 19, 24, 25, 26, 28

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Med. Sales & Consulting Grp. v. Plus Orthopedics USA, Inc.*,
2011 WL 5075970 (S.D. Cal. Oct. 25, 2011) ....................17

*People v. Cent. Pac. R. Co.*,
76 Cal. 29 (1888) ....................21

*Ridgley v. Topa Thrift & Loan Ass'n*,
17 Cal. 4th 970 (1998) ....................1, 18, 19, 20, 27, 28, 30

*S.L. Rowland Const. v. Beall Pipe & Tank*,
14 Wash. App. 297 (1975) ....................21

*Sigma Connectivity AB v. I.Am.Plus Elecs., Inc.*,
2021 WL 8567905 (C.D. Cal. June 9, 2021) ....................4, 28

*Sybron, Corp. v. Clark Hosp. Supply Corp.*,
76 Cal. App. 3d 896 (1978) ....................25

*Weber, Lipshie & Co. v. Christian,*
52 Cal. App. 4th 645 (1997) ....................27, 28

**Statutes**

Cal. Civ. Code § 1671 ....................17

**Other Authorities**

C. McCormick, Damages § 156 (1935) ....................21

## I. INTRODUCTION

On March 31, 2012, the very last day of its financial quarter, Arm signed a term sheet with Qualcomm for what would become its 2013 ALA and TLA. At that time, Qualcomm was Arm's number one source of revenue and commanded the majority of the global smartphone application processor market. Qualcomm flexed its market power in the negotiations and was unwilling to deal unless Arm agreed that any one of a wide variety of breaches of either agreement would result in the same 5-year, no-royalty penalty across both agreements. Arm's negotiators protested on multiple occasions and sought to limit the forfeiture to Qualcomm's actual harm. But Qualcomm would not do a deal without the penalty. With a deal of this magnitude on the line and the clock ticking, Arm made the business decision to sign on to Qualcomm's terms, penalties included. But signing those deals does not make their penalties enforceable.

Liquidated damages "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for ***any*** loss that may be sustained." *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998). Despite the many different breaches that trigger the penalty in Section 8.3 of both the ALA and the TLA—ranging from allegedly existential to undisputedly harmless—there is the same penalty for every one of them: 5-years of no royalties under both the ALA and the TLA. On its face, that cannot possibly represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained by Qualcomm under the provisions tied to that penalty. The bench trial confirmed what is evident from the contracts themselves. There was never any endeavor by either party to estimate the potential losses that could flow from the various breaches that trigger Section 8.3. There was never any attempt to determine fair average compensation for those different breaches. And there was never an attempt to match any anticipated losses from a given breach to any fair average compensation for that breach. The parties never even tried.

While the terms of the contracts themselves are sufficient to support an unenforceability finding, the asserted breaches in this case further illustrate why Section 8.3 is unenforceable. For three of the four—(1) offering Qualcomm a ***free*** license to Yamin, but misidentifying the cheapest third-party deal when Arm made that free offer, (2) not double-charging Qualcomm for support and maintenance, and (3) failing to provide certain OOBs—there is no evidence that Qualcomm suffered any harm whatsoever, and for the fourth (failing to provide certain ACK patches), the undisputed evidence is that even if Qualcomm's harm allegations were taken as true, it suffered at most about $2-3M in damages. What is true today was equally predictable in 2013. Just as there is zero harm today from getting a ***free*** license without correctly identifying the cheapest third-party deal before making that offer, any anticipated harm in 2013 from that same conduct would have been zero. Just as there is zero harm today from Arm not double-charging Qualcomm for support and maintenance, any anticipated harm in 2013 would have also been zero. And, by 2013, Qualcomm had a decade of experience with architecture verification dating back to when it signed its ALA in 2003—and just as now, it knew in 2013 that OOBs or patches to ACK tests were unnecessary for verification and that the quarterly ACK updates gave it everything it needed. The anticipated harm in 2013 from not getting OOBs would have been zero, and the anticipated harm from not getting ACK patches would have been minimal at most.

There are numerous other triggers that are not asserted here that further confirm unenforceability. Those include scenarios where, for example, Arm performs flawlessly for 27 of the 28 TLA cores Arm licenses to Qualcomm, but for the 28th core gives Qualcomm the best deal without first doing a "best deal" investigation. Tr. (Weiser) 236:3-237:5. It also includes scenarios where Arm cures a breach on day 31 instead of day 30, or doesn't timely deliver certain .txt files containing "release notes." Tr. (Weiser) 246:14-247:11. Each triggers the same 5-year, no-royalty

penalty.

Qualcomm's attempts to justify the 5-year, no-royalty penalty are nothing more than after-the-fact excuses for its penalty and that have no basis in law or fact. Qualcomm suggests that so long as there is one triggering event where potential damages could exceed the penalty, then that is all the law requires to render the penalty enforceable, and Qualcomm is then free to tack on an unlimited number of harmless or *de minimis* breaches that trigger that same penalty.

The law says the opposite. Liquidated damages must be proportional to each breach, not just Qualcomm's litigation-inspired doomsday scenario. In *Harbor Island*, the California court held a deferred rent provision unenforceable because any of a wide range of different breaches would trigger the same deferred rent penalty. *Harbor Island Holdings LLC v. Kim*, 107 Cal. App. 4th 790, 796 (2003); *see also Harbor Island Holdings LLC v. Kim*, No. G030264, App. Op. Br., 2002 WL 32153138, at *9 (Cal. App. April 11, 2002) (listing various different breaches with varying degrees of harm that trigger the same penalty). "Where a fixed sum is agreed upon as liquidated damages for one of several breaches of varying degree, it is to be inferred that a penalty was intended." *Dollar Tree Stores, Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1072-73 (N.D. Cal. 2012). The liquidated damages in *Dollar Tree* were unenforceable because "it impose[d] the same $2,500 penalty for at least nine different types of breach of varying degrees of magnitude, and because it imposes that penalty indefinitely until Toyama [the challenger] satisfies all of the Delivery Conditions." *Id.* at 1073. If all it took for a liquidated damages clause to be enforceable was the existence of a "doomsday" scenario where damages from one possible breach could exceed the penalty, then California's protections against penalties could be easily skirted during drafting and in litigation by pointing to such a scenario. That is not the law.

The undisputed facts, in any event, show Qualcomm's now-claimed worst-case scenario is

illusory. Because both the ALA and the TLA allow Qualcomm to seek specific performance, Tr. (Weiser) at 238:7-17; JTX-1 § 8.3; JTX-5 § 8.5, Qualcomm could still obtain full access to Arm's technology (and recoup its costs in obtaining such specific performance), and ***still*** not pay any royalties for five years even after the breach had been rectified. *Id.* This is nothing more than a windfall.

Qualcomm offers no credible arguments for enforceability. Qualcomm points to the parties' sophistication and representation, but the California Supreme Court could not be clearer: "[r]epresented sophisticated parties are not exempt from *Ridgley*…." *JJD-HOV Elk Grove LLC v. Jo-Ann Stores, LLC*, 17 Cal. 5th 256, 271 (2024). Qualcomm points to notice-and-cure provisions, but cites no case where a notice-and-cure saved a penalty from being struck down. Courts have instead routinely found penalties unenforceable even where there is a notice-and-cure clause. *E.g., Lakeshore Inv. LLC v. Now Sols., Inc.*, 122 Cal. App. 5th 847, 2026 WL 2474230, at *1, *3 (2026) (unenforceability despite notice-and-cure clause); *Sigma Connectivity AB v. I.Am.Plus Elecs., Inc.*, 2021 WL 8567905, at *1-2 (C.D. Cal. June 9, 2021) (same). None of Qualcomm's other excuses fare any better. Sections 8.3 in the ALA and TLA are unenforceable.

## II. PROPOSED FINDINGS OF FACT

### A. The Parties, The Contracts, And The Zero-Royalty Penalties

1. Qualcomm first signed a TLA in 1997 and an ALA in 2003. DTX-2955.0001; Tr. (Youssef) at 45:9-22; Tr. (Weiser) at 209:15-21. In 2013 and today, Qualcomm licensed Arm's CPU core designs through its TLA. Tr. (Youssef) at 42:22-43:17. Qualcomm licensed Arm's Instruction Set Architecture ("ISA"), which enables customers to design their own CPU cores, through its ALA. *Id.* Mr. Weiser further testified that in 2013, Qualcomm was purchasing implementation cores from Arm and designing its own custom cores. Tr. (Weiser) at 209:22-210:9. He testified that as of 2013, Qualcomm's chip business's revenue exceeded $10 billion and was

"either number one or two in the amount of revenue [it] paid Arm." *Id.* at 210:5-9, 218:6-13.

2. Qualcomm and Arm executed their current TLA and ALA on May 31, 2013. JTX-1 ("ALA"); JTX-5 ("TLA"); Tr. (Youssef) at 43:18-24. Both are governed by California law. JTX-1 § 16.15; JTX-5 § 16.14. Section 6.2 of both the TLA and ALA states that Qualcomm must pay Arm royalties (a "Running Royalty") for sales of Arm-based products. JTX-1 § 6.2; JTX-5 § 6.2.

3. The TLA and ALA also state that, if Arm fails to cure certain breaches in either contract, Qualcomm's royalties under ***both*** the TLA and ALA go to zero for five years. JTX-1 § 8.3; JTX-5 § 8.3. There are no caps in the TLA or ALA on how many products Qualcomm can sell, or the amount of royalties Arm can forfeit, during the 5-year, no-royalty period. *Id.*

*4.* **<u>TLA</u>**: TLA Sections 8.1(B)(i) and 8.1(B)(ii)(a) state that for certain requests for TLA cores, Arm must offer Qualcomm those cores, but before it does, Arm must first "in good faith" "investigate and determine" the "Previous Best Deal" that Arm gave a third-party for that core. JTX-5 § 8.1(B)(i); § 8.1(B)(ii)(a). A separate provision that does not trigger the 5-year, zero royalty penalty requires Arm's offer to be within 10% of the Previous Best Deal after adjusting for "Total Financial Considerations." *Id.* § 8.1(B)(ii)(b). If Arm's offer is for more than the adjusted 10%, and Qualcomm overpays, Arm refunds the difference. *Id.* TLA Section 8.1(D) states that "the material non-financial terms and conditions under which ARM offers to license an ARM Implementation Core to [Qualcomm] shall be substantially similar to the material non-financial terms and conditions" unless Arm first gives three years' notice of a change. *Id.* § 8.1(D).

5. TLA Section 8.3 states that if Arm fails to remedy breaches of "Clauses ***8.1(B)(i), 8.1(B)(ii)(a) and/or 8.1D*** of this TLA; the Royalty Rates … under ***this TLA and the ALA*** … shall be reduced to ***zero US dollars ($0) for a period of five (5) years*** … ." JTX-5 § 8.3.

6. While Qualcomm has not alleged a breach of TLA Section 5.4, that section includes

another 5-year, no royalty penalty for non-delivery of certain "ARM Technology." JTX-5 § 5.4.

7. **ALA**: ALA Section 5 requires Arm to "use reasonable efforts to deliver the ARM Technology"—eighteen different Part Numbers for v8, and eight Part Numbers for v9—and "Updates" to that technology. JTX-1 §§ 1.3, 5.1(i); JTX-3 § 1; JTX-4 § 1. Section 8.3 of the ALA states that if Arm fails to remedy a breach of "***Section 5*** of this ALA[,] the Royalty Rates … under ***the TLA or this ALA*** … shall be reduced to ***zero US dollars ($0) for a period of five (5) years*** from the date of the expiration of the Cure Period." JTX-1 § 8.3.

8. Thus, the TLA and ALA together have three 5-year, no-royalty penalties with five categories of triggers that, if breached in any way by Arm for any duration after the 30-day cure period, result in the same penalty. Tr. (Youssef) at 72:24-76:12 ("it's always the same").

### B. Negotiation Of Section 8.3 Of The ALA And TLA

9. Negotiations for the 2013 TLA and ALA began in 2011, and the 2003 ALA was a starting point for those agreements. DTX-2955; Tr. (Youssef) at 48:14-20. The 2003 ALA had "change in control" provisions so that if Arm was acquired, the acquirer was obligated to provide Qualcomm with access to Arm's ISA, and a penalty for breach where "the Royalty Rates … under the TLA or this ALA … shall be reduced to zero US dollars ($0)." DTX-2955 § 16.3; Tr. (Youssef) at 46:20-25, 46:15-47:6, 83:12-20. In spring of 2012, the parties began using a term sheet for the negotiations, and Qualcomm and Arm debated the five-year, no royalty penalty for the ALA and TLA using the term sheet between March 21, 2012 and March 31, 2012. PTX-2553; PTX-2554; PTX-2609; PTX-2610; PTX-92; DTX-2934; DTX-2984; DTX-2986; PTX-2555; PTX-2556; PTX-93; DTX-2988; PTX-94; Tr. (Youssef) at 57:20-58:6. By the time the term sheet was signed on March 31, 2012, the five-year, no royalty penalty was fully negotiated. DTX-2919 (executed term sheet); Tr. (Youssef) at 56:25-58:6.

10. During these negotiations, Qualcomm initially demanded a zero-royalty penalty

that would "last forever." Tr. (Youssef) at 50:13-23 (Qualcomm wanted "royalties for the ALA and the TLA go to zero forever"), 51:18-52:5, 85:8-19. Qualcomm also expanded the scope of the zero-royalty penalty beyond the change-in-control scenario in the 2003 ALA to apply to a wide range of triggers in both the TLA and ALA. Tr. (Youssef) at 47:7-48:13, 51:18-52:25; PTX-2609.0006; PTX-2610.0006. Arm, in contrast, sought to tie breaches of the TLA and ALA to actual damages by limiting any suspension of royalties to "until the loss has been established and valued and fully compensated" and to require that any such breach be deliberate. DTX-2934.0005–6; Tr. (Youssef) at 49:15-50:12. Arm never sought to use the zero-royalty penalty as a "cap" on actual or consequential damages, but instead proposed using a suspension of royalties as payment "until QC is fully compensated for all actual and consequential damages." Tr. (Sand) at 191:21-192:18; DTX-3085. The parties were at an impasse until March 26, 2012 when Qualcomm sent Arm a revised term sheet proposing that the zero-royalty penalty last five years. PTX-2610.0006.

11. The five-year term was a compromise proposed by Qualcomm to move negotiations forward. Tr. (Youssef) at 54:5-22. It was not tied to any quantification of any harm. *Id.* at 54:13-25. Arm documents confirm that the "penalty" was not intended to approximate actual damages but was instead designed to go beyond them. *See* PTX-110 ("remedies [Qualcomm] wanted beyond actual damages (for example, zero royalties for non performance)"). Qualcomm "made it clear the Qualcomm position was that they wanted an insurance policy" and "a big stick" as "a way to make Arm comply to [en]force the agreement." Tr. (Youssef) at 50:17-23, 63:9-16; DTX-3036.0002. At no point during negotiation of the 2013 ALA and TLA did the parties attempt to quantify any actual harm that could result from the various ways in which Arm might trigger the zero-dollar, no royalty penalty. DTX-3015; Tr. (Youssef) at 53:1-14, 61:15-25, 63:12-24, 66:12-69:11, 76:13-20. Nor did the parties draft the zero-dollar, no-royalty penalty to approximate the

value of such harm. *Id.* Indeed, there is no evidence that zero-dollar, no-royalty penalty was designed to be, or negotiated as, compensation for anticipated damages from the various breaches to which it applies.

12. Quite the opposite. Qualcomm made no attempt during negotiations to estimate or quantify any actual harm it could suffer as a result of a breach by Arm. Mr. Weiser testified that he had no memory of Qualcomm attempting to estimate actual losses and, instead, the "goal" was to "incent Arm to honor its obligations" and have an "insurance policy." Tr. (Weiser) at 221:12-21 ("We didn't try to estimate the potential actual losses, we felt that that was either very difficult or nearly impossible to do…"), 224:16-225:2 ("We didn't feel like we could do the calculation on the actual losses"), 232:24-233:11 (Mr. Weiser "not aware of any" "piece of paper, e-mail, notes, things [he] took down" where "Qualcomm and Arm discussed a relationship or calculation or estimate of the harm Qualcomm would suffer for a breach of Section 8.3 of either the ALA or the TLA"), 233:12-18 (Arm and Qualcomm did not "jointly endeavor" to quantify harm "for the range of losses that could be sustained for breaches" of the ALA and TLA), 234:5-15, 241:1-3, 241:18-20, 241:21-242:4 ("I felt it was too difficult to try to do that."), 243:16-244:5 ("I wasn't involved in any damages calculations, if that was your question."), 245:9-14, 247:20-25 ("I thought that was an impossible calculation at that time."), 248:18-249:2. Likewise, Qualcomm's Laura Sand claimed that quantifying actual harm was "impossible to calculate" and confirmed she had no records reflecting that Qualcomm and Arm ever attempted to quantify actual harm to Qualcomm due to any alleged breach of the ALA or TLA. Tr. (Sand) at 195:18-197:11, 198:6-12. Mr. Youssef also explained that it would have been possible to quantify the approximate value of five years of withheld royalty payments from Qualcomm. Tr. (Youssef) at 55:1-55:24, 58:20-59:4.

13. While Mr. Weiser and Ms. Sand testified at trial that they believed it would have

been "impossible" to estimate the potential harm from a breach, Qualcomm presented no contemporaneous evidence showing that they held that belief during the 2011-2013 negotiations. Tr. (Weiser) at 232:14-19, 241:25-242:4, 248:23-249:2; Tr. (Sand) at 197:6-11, 198:6-12. There is likewise no evidence that Mr. Weiser, Ms. Sand, or anyone else at Qualcomm made any effort to determine whether it was possible or impossible to estimate actual losses from any breach, nor that the quantification of actual losses was ever discussed by the parties during negotiations. And on the face of the agreements, the five-year, no-royalty remedy is inconsistent with the reasonable scope of anticipated harm from the range of breaches that trigger that penalty. *See* JTX-1 § 8.3; JTX-5 §§ 5.4, 8.3.

14. To the extent Qualcomm's witnesses suggested otherwise, their testimony is not credible. Mr. Weiser, for example, sought to downplay and distance himself from his prior sworn testimony that the negotiation of § 8.3 "centered around Qualcomm having a proper remedy, and more importantly, an incentive for Arm to honor its obligations under Section 5 of the agreement." Tr. (Weiser) at 239:10-241:11.

15. On March 31, 2012, on the very last day of its financial quarter, Arm signed a term sheet with Qualcomm for what would become its 2013 ALA and TLA. DTX-2919. "Qualcomm was an extremely important customer" and "number one customer in the smartphone application processor space globally" with "over fifty percent of that market," and Arm's "number one revenue source." Tr. (Youssef) at 59:10-24. Qualcomm also "made it very clear that if [Arm] didn't sign the zero dollar royalty remedy that [Qualcomm] wouldn't move forward and renew the agreements." *Id.* Arm's negotiators "pushed back very hard" on the zero-royalty penalty, but ultimately Arm's decision to sign the agreement was "a business driven decision at the executive level" to sign by the end of the quarter. Tr. (Youssef) at 47:25-48:6; 59:10-24. The Court finds the

testimony Mr. Youssef offered at the bench trial credible.

### C. The Alleged TLA And ALA Breaches That Trigger The Zero-Royalty Provisions.

#### 1. Alleged TLA Breaches

16. Qualcomm alleges that in October 2024, Arm failed to, in good faith, investigate and determine the Previous Best Deal for three Arm Implementation cores, Hunter, Hayes, and Yamin, and failed to make an offer to Qualcomm to renew its licenses to those cores. D.I. 765 ¶ 266; JTX-5 § 8.1(B); Tr. (Youssef) at 76:22-77:4. Qualcomm also alleges that Arm breached Section 8.1(D) by changing the material, non-financial terms in its October 2024 offer by purportedly excluding support and maintenance. D.I. 765 ¶ 269; Tr. (Youssef) at 76:22-77:4.

17. Qualcomm requested renewal licenses to Hunter, Hayes, and Yamin in April and August 2024. D.I. 765 ¶¶ 21-22. Qualcomm sent letters to Arm on September 20 and 27, 2024 notifying Arm of its alleged breach of the TLA. *Id.* ¶ 23. Arm responded on October 23, 2024 that it had no obligation to offer Hunter, Hayes, and Yamin license renewals to Qualcomm at that time, but would provide an offer and did so the following day. *Id.* ¶¶ 24-25; PTX-1531. Arm's October 24, 2024 offer included proposals for license fees and royalty rates "that Arm was offering for three of the cores, Hunter, Hayes, and Yamin … ." Tr. (Youssef) at 77:5-78:11; PTX-1531. The October 24, 2024 offer included a proposed royalty rate of 2.2% for Yamin on a stand-alone basis, but also a royalty rate of 0% when Yamin is used in combination with Hunter or Hayes. Tr. (Youssef) at 78:12-79:8 ("the royalty rate for Yamin is royalty free, it's zero."); PTX-1531.4 ("[a]ny number of Cortex-M55 allowed in these 4 configurations for no additional royalty.").

18. Qualcomm alleges that Arm did not investigate and determine the "Previous Best Deal" for Yamin before offering Yamin for ***free*** when used in combination with Hunter and/or Hayes, and as a result is entitled to withhold all royalties from Arm for five years. D.I. 765 ¶ 265.

Mr. Weiser confirmed that under this scenario—where Arm offers a free license on ***one core*** but "no one at Arm did the investigation to figure out what the best comparable offer is"—it "would trigger zero royalties" for all cores under the TLA and ALA for five years. Tr. (Weiser) at 236:3-237:5. Thus, Arm could trigger the five-year, no-royalty remedy on the ALA and the TLA by failing to investigate the previous best deal, even if Arm gave Qualcomm the best rates. *Id.*; Tr. (Youssef) at 75:1-14. Qualcomm did not offer any quantification of any anticipated damages as of 2013 for such a breach, nor any actual damages from Arm's alleged breach of Section 8.1(B)(i). Tr. (Weiser) at 248:23-249:2, 241:21-24.

19. Arm's October 2024 offer stated that "Support and Maintenance is not included in this … Offer." PTX-1531.5. Mr. Youssef explained that this meant Arm was not charging Qualcomm twice for support and maintenance for Hunter, Hayes, and Yamin because Arm and Qualcomm have a separate agreement covering support and maintenance for all Arm TLA cores. Tr. (Youssef) at 80:25-81:20 ("we deducted fifteen percent which equates to the support and maintenance fee. And the reason we did that is so that Qualcomm would not be double charged."), 97:5-22. Qualcomm alleges that Arm's offer to not double-charge Qualcomm breached Section 8.1D and triggers the 5-year, no royalty penalty. *Id.* at 81:21-25. And the five-year, no-royalty provision is triggered even if Arm only changed non-financial terms for just one of the 28 TLA cores Qualcomm licenses. Tr. (Youssef) at 75:15-76:12. Qualcomm did not offer any quantification of any anticipated damages as of 2013 for such a breach, nor any actual damages stemming from Arm's alleged breach of Section 8.1(D). Tr. (Weiser) at 241:21-24, 243:16-244:8.

**2. Alleged ALA Breach**

20. Qualcomm contends that Arm breached Section 5.1 of the ALA, which requires Arm to deliver "Arm Technology" and "Updates," by failing to provide certain materials called "OOB[s]" and ACK "patches." D.I. 765 ¶ 220; JTX-1, § 5.1. Qualcomm claims Arm's failure to

timely deliver even one OOB or one patch triggers Section 8.3. Tr. (Weiser) at 246:14-247:2; Tr. (Youssef) at 73:9-17. These materials were so inconsequential that Qualcomm's lead negotiating attorney did not know they existed, let alone attempt to estimate the anticipated harm from not receiving them, Tr. (Weiser) at 244:22-245:14, yet Qualcomm invokes the same 5-year, no-royalty penalty regardless of whether Arm failed to provide one OOB or ten, one patch or twenty five, or if Arm provided them just one day late. Tr. (Youssef) at 73:9-74:25.

**a. Background**

21. Every quarter, Arm provides all ALA licensees, including Qualcomm, an updated version of the Architecture Compliance Kit ("ACK"), which is a set of roughly 100,000 tests that licensees run to check if their custom core complies with the Arm ISA's rules. Tr. (Grisenthwaite) at 116:7-117:11. In 2013, and still today, the quarterly ACK release contained everything a licensee needs to comply with Arm's ISA. Tr. (Grisenthwaite) at 126:7-19. Qualcomm timely received every quarterly ACK release since it first became an ALA licensee in 2003. Tr. (Trivedi) at 147:25-148:6; Tr. (Grisenthwaite) at 116:24-117:11, 126:4-19.

22. **OOBs**. Licensees need only run the ACK tests that are applicable to their design. Tr. (Grisenthwaite) at 117:12-20. Arm's quarterly ACK releases include a "val_report" tool that automatically identifies applicable tests. Tr. (Grisenthwaite) at 118:5-18, 119:6-120:9; DTX-954.43, 50. Arm can run the same tool on a licensee's behalf and send the output as an "OOB"—which takes one junior engineer a few hours. Tr. (Grisenthwaite) at 120:10-121:8, 122:25-123:5.

23. **ACK patches**. Arm's quarterly ACK releases include fixes to issues that may arise in its roughly 100,000 ACK tests. Tr. (Grisenthwaite) at 123:6-124:1. In advance of a quarterly release, Arm sometimes gives individual ALA licensees a temporary fix to an ACK test issue, called a "patch," which Arm sends before the official fix is provided to all ALA licensees in the next quarterly ACK release. Tr. (Grisenthwaite) at 125:14-126:3.

**b. Out Of Box Packages (OOBs)**

24. Qualcomm contends that Arm breached Section 5.1 by not providing certain OOBs to Qualcomm from September 2022 to January 2025, but this did not cause Qualcomm to "do any significant extra work or spend any significant extra time." Tr. (Trivedi) at 150:2-9, 151:8-152:3; DTX-19; D.I. 765 ¶¶ 83, 98. By then, Qualcomm had been an ALA licensee for two decades and knew how to use the ACK and the val_report tool. Tr. (Weiser) at 209:22-210:4; Tr. (Grisenthwaite) at 126:4-19; Tr. (Golden) at 143:8-20; Tr. (Trivedi) at 148:7-12. Qualcomm's Director of Engineering confirmed immediately that "we will not be blocked" as a result of not having OOBs because "[w]e can locally generate [ACK] reference list, and proceed with our work," "the list just needs to match what we g[et] back as OoB, usually always does." Tr. (Trivedi) at 146:18-23, 151:8-152:3; DTX-19. Qualcomm admits it verified its designs during this period without receiving OOBs and did not offer any quantification of any anticipated damages as of 2013 for not receiving OOBs, nor any actual damages for not receiving them in 2022-25. Tr. (Williams) at 139:4-11; Tr. (Qualcomm's Resps. to RFA Nos. 4, 8, 10) at 162:19-163:18.

**c. ACK Patches**

25. Qualcomm contends that Arm breached Section 5.1 because from fall 2022 through January 2025, Arm stopped giving Qualcomm these temporary patches between quarterly releases, but continued giving Qualcomm all ACK test fixes in every quarterly ACK release. Tr. (Grisenthwaite) at 124:2-125:1, 125:24-126:3; D.I. 765 ¶¶ 83, 98. Arm also continued fixing ACK test issues reported by Qualcomm and never stopped giving Qualcomm those fixes in quarterly ACK releases. Tr. (Grisenthwaite) at 124:2-125:1, 125:24-126:3; DTX-2632.13. Qualcomm still certified compliance for all its custom cores, Tr. (Williams) at 139:4-11; Tr. (Qualcomm's Resps. to RFA Nos. 4, 8, 10) at 162:19-163:18, but claims it did extra work as a result of not receiving between 35-50 patches. Tr. (Golden) at 143:6-145:19 (for 10-15 instances, Qualcomm engineer

did 1-3 days of extra work, "most of them one"); Tr. (Trivedi) at 146:18-148:6, 150:10-151:7 ("cumulatively," extra work ranged from "a few hours" to "a few days to potentially a week," depending on how simple the issue was). Even assuming Qualcomm's extra-work claim to be true, Arm's damages expert, Mr. Britven, calculated the amount at between $2.2 and $3.1 million for the 35-50 patches, which is approximately $63,000 per patch, and which Qualcomm did not dispute. Tr. (Britven) at 153:15-158:7. Qualcomm never quantified any anticipated damages as of 2013 for not receiving ACK patches or put forth its own quantification of any actual damages.

#### d. Other Triggers

26. On its face, the five-year, no-royalty penalty in the ALA may be triggered by numerous breaches not at issue in this case, including if Arm fails to deliver any or all of the more than 25 part-numbered "ARM Technolog[ies]," in the Annexes, which range from release note text files to the entire quarterly ACK, or if Arm delivered them just one day after the 30-day cure period expired. Tr. (Weiser) at 246:14-247:11; JTX-3 § 1; JTX-4 § 1.

### D. The ALA And TLA Allow Qualcomm To Obtain Specific Performance

27. Both the ALA and the TLA allow Qualcomm to obtain specific performance. Tr. (Weiser) at 238:7-17; JTX-1 § 8.3; JTX-5 § 8.5. Thus, if Arm were to breach any provision invoking Section 8.3, Qualcomm could seek specific performance to obtain full access to Arm's ALA deliverables and TLA cores, with Arm covering its costs to obtain such specific performance. Yet, Qualcomm would still avoid any ALA or TLA royalties for five years even after the breach was rectified. *Id.*

### E. The ALA And TLA Contain Limitations Of Liability

28. The ALA and TLA have "Limitation of Liability" provisions stating that: "in no event shall Arm or Licensee be liable for any indirect, special, incidental, or consequential damages whether such damages are alleged as a result of tortious conduct or breach of contract or

otherwise even if the other party has been advised of the possibility of such damages, such damages shall include but not be limited to the cost of removal and reinstallation of goods, loss of goodwill, loss of profits, loss of use of data, interruption of business or other economic loss…" JTX-1, § 13.1; JTX-5, § 13.1. Both agreements have additional limitation of liability provisions for patent infringement claims, including limits on the "aggregate of all Injunction Payments, Damages Reimbursements, Settlement Reimbursements and Legal and Expert Fees Reimbursements paid to [Qualcomm] by ARM for all Patent Infringement Claims related to ARM Technology licensed under an Annex 1." JTX-5 § 12.3(C); *id.* §§ 12.3(A)-(E); JTX-1 § 12.3(A)-(E). These limitations of liability, and not the five-year, no royalty remedy, were intended to address Arm's alleged concerns about unlimited liability. PTX-348.4. As Mr. Youssef explained, Arm addressed its concerns about a damages cap for patent infringement claims and consequential damages in other sections of the TLA, such as §§ 12.3(C) and 13.1, not through the five-year, no royalty remedy. Tr. (Youssef) at 58:10-19, 111:14-113:10.

## III. PROPOSED CONCLUSIONS OF LAW

29. "[W]hether a provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law to be decided by the Court." *911 Restoration Franchise, Inc. v. Blakeney*, 2015 WL 12698290, at *3 (C.D. Cal. Sep. 22, 2015). The Court should find the five-year, no-royalty penalties in the TLA and ALA unenforceable. *First*, these penalties are liquidated damages clauses and are subject to §1671(b). *Second*, these penalties are unenforceable. There is no real dispute that the multi-billion dollar penalty does not represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained from the various breaches that may trigger it, or that the parties ever engaged in such an endeavor. The penalties bear no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach, many of which are indisputably harmless.

*Third*, in reaching this conclusion, the Court may consider evidence regarding the actual harm (and lack thereof) that Qualcomm suffered as a result of the alleged breaches at issue, which is relevant in its own right and as evidence of what harm the parties could have anticipated would flow from various breaches in 2013 when they signed the TLA and ALA.

### A. The Five-Year, Zero-Royalty Penalties Are Liquidated Damages Provisions

30. At the bench trial, Qualcomm abandoned its argument that the 5-year, no-royalty penalties were not liquidated damages, telling the Court that it was "going to hear a lot of evidence about the relationship between the ***liquidated damages*** provision, the ***five-year no royalties*** and the range of harm that could be anticipated" and never disputed Arm's counsel's assertion that "I don't think there is a lot of debate over whether it's a liquidated damages provision." Tr. 12:4-5, 33:21-25. The trial confirmed the five-year zero-dollar royalty is a liquidated damages clause. "To be sufficiently fixed and certain to qualify as 'liquidated damages,' a provision must either set the exact amount (i.e., a single number) or provide some formula by which the amount is 'certain or readily ascertainable.'" *Bayol v. Zipcar, Inc.*, 78 F. Supp. 3d 1252, 1256 (N.D. Cal. 2015). The amount of the penalty is readily ascertainable by the TLA and ALA's formulas for calculating royalties, and Arm's expert Mr. Britven calculated that for the 27-month period from January 4, 2023 through March 31, 2025, the royalties were $761,863,613, and Qualcomm did not dispute it. Tr. (Britven) at 158:8-20 (using royalty reports from Qualcomm Technologies, Inc. and Qualcomm Atheros); DTX-1824; DTX-1825; DTX-1827; DTX-1828; DTX-1830; DTX-1831; DTX-1834; DTX-3011 (QTI reports); DTX-1851; DTX-1853; DTX-1859; DTX-1861; DTX-1868; DTX-1870; DTX-1878; DTX-1880; DTX-3010 (QAI reports).

31. Liquidated damages do not need to be ascertainable at the time of the breach or at the time of contracting. For example, *Bayol* found that late fees that accrue after breach are liquidated damages and was "not persuaded by the argument that the amount must be determinable

at the very instant that the car first becomes late in order for [a late] fee [that increases with time] to be treated as liquidated damages." *Bayol,* 78 F. Supp. 3d at 1258. Likewise, in *Dollar Tree*, the Court found a $2,500 per day penalty that extended indefinitely in the future was liquidated damages and held that "the liquidated damages provision is unenforceable because it imposes … [a per-day] penalty indefinitely until [the defendant] satisfies all of [several] [c]onditions"). 875 F. Supp. 2d at 1073. Here, as in *Dollar Tree*, Section 8.3 imposes a potentially unlimited future forfeiture on Arm: the ALA and TLA place no limits on how many royalty-free Arm-based cores Qualcomm may ship during the five-year penalty period. That does not make it any less of a liquidated damages provision. *Id.* And in *Med. Sales & Consulting Grp. v. Plus Orthopedics USA, Inc.*, the court found a liquidated damages provision that set no fixed amount at the time of contract but rather provided a calculation of "150% of Bonamarte's prior 12–months' sales . . . from the acquisition date" was unenforceable. 2011 WL 5075970, at *8 (S.D. Cal. Oct. 25, 2011).

**B. The Five-Year, Zero-Royalty Penalties Are Unenforceable**

32. In California, the party who bears the burden to show that liquidated damages are enforceable or unenforceable depends on whether or not the contract is for "consumer goods and services" or "residential" property. Cal. Civ. Code § 1671. In "consumer" and "residential" contracts, liquidated damages are "presumed void" under § 1671(d), and the proponent of the clause has the burden of rebutting that presumption. *Bayol*, 78 F. Supp. 3d at 1258. All other contracts fall under § 1671(b), which puts the burden on the party challenging the liquidated damages clause. Section 1671(b) covers commercial contracts between sophisticated parties, but whether the contract was "negotiated by seasoned business entities … has no bearing on the result." *Harbor Island*, 107 Cal. App. 4th at 799; *see also JJD-HOV*, 17 Cal. 5th at 271.

33. Under § 1671(b), liquidated damages are unenforceable where the forfeited amount "bears no reasonable relationship to the range of actual damages that the parties could have

anticipated would flow from a breach." *Ridgley*, 17 Cal. 4th at 977. Liquidated damages "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." *Id*. For each breach, there may be a range of possible harms, and "[i]n considering this range, a court may not focus on a single scenario to the exclusion of others." *Grand Prospect Partners v. Ross Dress for Less*, 232 Cal. App. 4th 1332, 1363-64 (2015).

34. For Arm to meet its burden, it is sufficient that "[t]he record lacks facts establishing that the amount set as liquidated damages … represents the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." *Lakeshore*, 2026 WL 2474230, at *3 (quoting *Ridgley*, 17 Cal. 4th at 977) (internal quotation marks omitted). In the absence of "demonstrable evidence that these factors were considered, by both sides," courts "decline to presume that such discussions occurred." *Id.* Where the liquidated-damages provision imposes disproportionate damages and there is no evidence that the parties made such a "reasonable endeavor," the provision is "per se unreasonable" and unenforceable. *Id*. The zero-royalty provisions here are unenforceable for two reasons, either of which is sufficient to find the no-royalty provisions in the ALA and the TLA unenforceable.

**1. The Parties Never Made A Reasonable Endeavor To Estimate Fair Average Compensation For Any Losses Stemming From Any Breaches**

35. It is dispositive that there was no "reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." *Ridgley*, 17 Cal. 4th at 977. As was the case in *Harbor Island*, here, Qualcomm "admits that there was no intent to approximate damages, as would be required for the clause to be held a valid liquidated damages clause." *Harbor Island*, 107 Cal. App. 4th at 797. When asked, "And at no point did Arm and Qualcomm jointly endeavor to estimate to figure out what the average compensation to Qualcomm would be for the range of losses that could be sustained for breaches of these provisions, correct?" Qualcomm's

lead negotiating attorney, Jonathan Weiser, admitted, "Correct, it would have been very difficult to calculate." Tr. (Weiser) at 233:12-18. Mr. Weiser's testimony that it would have been "difficult" or "impossible" was entirely unsupported: he had no contemporaneous evidence from the negotiations showing he ever held that belief, that he ever tried to test it by attempting to estimate a range of losses, or that he communicated it to Arm. Mr. Weiser further testified that, "[w]e didn't try to estimate the potential actual losses…." Tr. (Weiser) at 221:12-21; *see also id.* at 224:16-225:2 (same), 241:21-242:4 (same), 247:20-25 (same), 248:23-249:2 (same); Tr. (Sand) at 197:6-11. Mr. Youssef confirmed that "there were never discussions about trying to tie these penalties to any sort of harm." *Id.* (Youssef) at 53:1-14; *see also id.* at 54:19-25, 61:15-25, 63:12-24, 68:23-69:5, 76:13-20. Where "[t]he record lacks facts establishing that the amount set as liquidated damages … represents the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained," the liquidated damages provision is unenforceable. *Lakeshore*, 2026 WL 2474230, at *3 (internal quotation marks omitted).

36. Instead, the parties "designed" the zero-royalty penalties "to exceed substantially the damages suffered," and "the provision for the additional sum, whatever its label, is an invalid attempt to impose a penalty." *Ridgley*, 17 Cal. 4th at 981. As in *Harbor Island*, where a provision was designed to "hang[] over the heads of [the defendant] in order [for the plaintiff] to feel secure that they would indeed perform" it was an unenforceable contractual penalty. 107 Cal. App. 4th at 798. That is exactly the situation here. Youssef and Weiser both testified that the zero-royalty provisions were intended to be an "insurance policy" for Qualcomm and were not a lawful attempt to estimate damages. Tr. (Youssef) at 50:13-23, 63:12-16; Tr. (Weiser) at 241:18-20. Contemporaneous documents prove the same: Arm and Qualcomm understood the provisions to operate as a "penalty" that went "beyond actual damages." DTX-3036.0002 (Arm referring to TLA

provision as "penalty clause"); PTX-110 (Arm referring to "remedies [Qualcomm] wanted beyond actual damages (for example, zero royalties for non performance)").

**2. The Penalties Bear No Reasonable Relationship To The Range Of Actual Damages The Parties Could Have Anticipated**

37. The zero-royalty penalties bear no reasonable relationship to the range of actual damages the parties could have anticipated would flow from the many different possible ways the TLA and ALA could be breached, triggering those penalties, which range from the allegedly existential to the undisputedly harmless. All trigger the same penalty: 5 years, no royalties. That cannot possibly bear a reasonable relationship to any actual damages the parties could have anticipated when they entered into the TLA and ALA.

38. A liquidated damages provision may be triggered by multiple different types of breaches, and each of the different breaches may have its own range of possible harms. But the fact that multiple breaches, each with its own range of possible harms, may trigger the same penalty does not exempt any of them from California's requirement that liquidated damages "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for ***any*** loss that may be sustained." *Ridgley*, 17 Cal. 4th at 977. Liquidated damages must instead be proportional to ***any*** loss that may be sustained from the various breaches that trigger the clause, not simply ***one*** possible loss arising from ***one*** of many possible breaches. *Id*. The California Supreme Court first recognized this principle more than a century ago, when it held that a "sum [] made payable for one breach, and for many, for a breach attended with a small loss or a great loss" is "a penalty" because the fixed payment "cannot possibly be construed to adjust the recompense to actual injury." *People v. Cent. Pac. R. Co.*, 76 Cal. 29, 38 (1888). Even in the 1800s, the California Supreme Court recognized "it would be [] unjust to sanction a recovery for the sum agreed to be paid alike for one trivial breach, or for one important breach, or for breach of the

whole contract." *Id.* at 37. It remains true today: "It is literally hornbook law" that "care should be taken to see that if the [liquidated damages] clause applies to breaches of varying seriousness, the amount to be paid is adjustable to fit the probably damage." *S.L. Rowland Const. v. Beall Pipe & Tank*, 14 Wash. App. 297, 312-13 (1975) (citing C. McCormick, Damages § 156 (1935)).

39. For example, in *Harbor Island*, the defendant's lease agreement contained at least ten different types of triggering breaches that each resulted in the same deferred-rent penalty of $240,912—by for example "[f]ailing to timely pay the rent on several different occasions," "[f]ailing to properly notify the landlord of conditions it subsequently alleged were inadequate with the property," [f]ail[ing] to use a . . . rent allowance," "[f]ailing to obtain and provide Harbor Island with copies of maintenance contracts," "[m]aking unauthorized modifications . . . to the property," "[m]aking permanent or semi-permanent modifications to the property without first obtaining the proper city permits," "[l]easing the property," "constituting an illegal sublease" without telling Harbor Island, "[f]ailing to timely vacate the property" upon lease expiration, and "[f]ailing to adequately repair and maintain the premises." *Harbor Island*, App. Op. Br., 2002 WL 32153138, at *9. The court found the deferred-rent provision was an unenforceable penalty, reasoning that "the lack of a proportional relationship between the $240,912 amount sought and the actual damages Harbor Island suffered on account of the breach of the covenant to maintain and repair could not be more obvious." *Harbor Island*, 107 Cal. App. 4th at 797. It further stated that it was "at an absolute loss to imagine how $48,182.40 per month, ultimately totaling $240,912 for the period in question, could have represented 'the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained' for the failure to provide copies of maintenance contracts." *Id.* at 796.

40. *Dollar Tree* illustrates the same principle: "[w]here a fixed sum is agreed upon as

liquidated damages for one of several breaches of varying degree, it is to be inferred that a penalty was intended." *Dollar Tree*, 875 F. Supp. 2d at 1072-73. There, the court held the liquidated damages clause unenforceable "because it impose[d] the same $2,500 penalty for at least nine different styles of breach of varying degrees of magnitude, and because it imposes that penalty indefinitely until Toyama [the challenger] satisfies all of the Delivery Conditions." *Id.* at 1073. Those delivery conditions spanned everything from a "structurally sound" foundation to a single "plate glass" that is not "in good working order." *Id.* at 1064-65. The court concluded that damages of $2,500 per day was a penalty because it "bears no rational relationship to the actual damages that could be expected to flow from the different types of breaches." *Id.* at 1073.

41. It is undisputed that a wide range of conduct of varying harms could invoke the five-year, zero-royalty penalty under Section 8.3 of the TLA or the ALA. Arm failing to offer Qualcomm a license to a TLA core that Qualcomm requested invokes TLA Section 8.3. Tr. (Weiser) at 248:1-8. Arm offering Qualcomm a license to a TLA core but changing a material non-financial term invokes TLA Section 8.3. Tr. (Weiser) at 248:9-13; *id.* (Youssef) at 75:15-76:6. Arm offering Qualcomm a license to a TLA core without having first investigated the "Previous Best Deal" invokes TLA Section 8.3. *Id.* (Weiser) at 235:23-237:5, 248:9-13; *id.* (Youssef) at 75:9-14. And Arm failing to deliver any one of the twenty-six items listed across the v8 or v9 Annex 1s invokes ALA Section 8.3. *Id.* (Weiser) at 246:14-247:11. As Ms. Sand testified, "[w]hen you look at any given breach under either of the two provisions, ***there is so many variables*** depending upon what the breach was, which deliverable if you will for that example wasn't delivered, when it wasn't delivered, what features it impact[s], which products it impact[s], which customers, which end market, ***there is so many different variables***…." *Id.* (Sand) at 173:15-25.

42. Qualcomm admits that even trivial breaches trigger five years of no royalties under

the ALA and the TLA. For example, Arm could trigger Section 8.3 by offering Qualcomm a ***free*** license to a TLA core if it didn't first investigate or determine the "Previous Best Deal" for that core. *Id*. (Weiser) at 235:23-237:5. Under that scenario, Qualcomm would pay no royalties for ***any TLA core*** Qualcomm licenses or for ***any custom core*** it designed under the ALA for five years. *Id.* This was also the case in *Harbor Island*, where the provision was unenforceable because the breaches that could trigger the contractual penalty ranged from significant breaches, such as failure to timely pay the rent or vacate the premises, to trivial ones, such as failing to provide "copies of maintenance contracts." *Harbor Island*, 107 Cal. App. 4th at 796; *Harbor Island*, App. Op. Br., 2002 WL 32153138, at *9 (listing various breaches, any one of which could trigger the penalty).

43. As discussed above, Qualcomm asserts that Arm triggered the 5-year, no royalty penalty in four different ways. There is no proportionality between the anticipated harms from those breaches—or from the other breaches capable of invoking Section 8.3—and the no-royalty penalty provision. As Ms. Sand testified, TLA Section 8.3 would be triggered if Qualcomm requested a v6 and v7 core and Arm refused both requests. *Id*. (Sand) at 201:25-203:4. TLA Section 8.3 would also be triggered if Arm made an offer for the v6 core but not the v7 core. *Id*. (Sand) at 203:5-23. The anticipated harm to Qualcomm under those two scenarios vary significantly. Under the first scenario, Qualcomm would not be able to sell any chips containing Arm implementation cores. Under the second scenario, Qualcomm would be able to sell chips, they just would not include the most up-to-date cores. And for the ALA, Qualcomm contends Arm triggers Section 8.3 by withholding a single ACK patch or withholding twenty-five ACK patches, or by withholding a single OOB for one chip or withholding ten OOBs for ten chips—each resulting in the same five-year, zero-royalty period, regardless of the different harms from those alleged breaches. *Id*. (Youssef) at 73:9-74:8.

44. None of that is proportional to even the $761 million in royalties Mr. Britven calculated for the first fifteen-month period from January 4, 2024 through March 31, 2025, much less the billions of dollars Arm would forfeit under both licenses for just one of the multiple five-year no-royalty terms Qualcomm is invoking. Tr. (Britven) at 158:8-20. The parties did not anticipate—and could not have anticipated—that any of Qualcomm's alleged breaches (much less all of them) could possibly cause anywhere close to billions of dollars in harm.

45. As to Qualcomm's alleged ALA breach, no one could "conceive of actual damages" in the hundreds of millions of dollars, let alone billions of dollars, from Arm's failure to provide Qualcomm with OOBs or ACK patches. *Lakeshore*, 2026 WL 2474230, at *3. Qualcomm could—and did—effectively create the OOBs itself and used the ACK to verify that its custom cores complied with the Arm ISA. Tr. (Grisenthwaite) at 120:5-121:20; *id*. (Trivedi) 151:8-152:3; DTX-0019; Tr. (Golden) at 143:6-20. And temporary ACK patches simply transmit fixes for test glitches that are also included in quarterly updates provided to all licensees—including Qualcomm. It could not possibly have anticipated a multi-billion dollar harm from not receiving them. Arm not providing patches or OOBs had no effect on Qualcomm's ability to release its custom cores. *Id.* (Williams) at 139:4-11 (Qualcomm ran the ACK against its custom core designs and did not fail to put out any core as a result of an inability to validate it using the ACK); *Id.* (Trivedi) at 149:13-15 (no customers complained about Qualcomm's chips experiencing software fragmentation). Instead, it merely caused Qualcomm's employees to spend additional hours ensuring its custom cores' compliance with the Arm ISA—time that equates at most to $3.1 million, not billions of dollars. *Id.* (Britven) at 153:22-158:7.

46. Actual harm at most in the single-digit millions demonstrates that the parties could not have conceivably anticipated that these breaches would cause actual harm anywhere near the

billions of dollars Qualcomm seeks pursuant to the zero-royalty provisions. *See Lakeshore*, 2026 WL 2474230, at *3 ("We cannot conceive of actual damages of $1.5 million for breach of this agreement."); *Grand Prospect*, 232 Cal. App. 4th at 1363 (considering evidence of actual harm to sales when evaluating anticipated harm). Nor could the parties have anticipated that even the risk of delayed timelines and disrupted roadmaps would lead to billions of dollars in damages. Qualcomm's Manju Varma, who maintains the CPU "roadmap," testified that "[t]he roadmap changes all the time. … It's pretty fluid. We work in an environment where we have to react to market dynamic and, you know, we have to update our roadmap, change our roadmap constantly." Tr. (Varma) at 139:23-140:11. The idea that the parties would have anticipated billions of dollars of harm for changes to a roadmap that "changes all the time" is nonsensical. To this day, Qualcomm still has not put a dollar figure, either anticipated or actual, on its claimed harm.

47. The "gross disparity" here "cannot bear a reasonable relationship to the harm Plaintiff reasonably anticipated." *911 Restoration*, 2015 WL 12698290, at *3 ($1.3 million recovery was unenforceable where actual harm was less than $80,000); *Atel Fin. Corp. v. Quaker Coal Co.*, 132 F. Supp. 2d 1233, 1241 (N.D. Cal. 2001) (liquidated damages unenforceable where "implementation of the liquidated damages clause would multiply Atel's likely actual damages many times over."), *aff'd on other grounds*, 321 F.3d 924 (9th Cir. 2003); *Sybron, Corp. v. Clark Hosp. Supply Corp.*, 76 Cal. App. 3d 896, 898-99 (1978) ($100,000 liquidated-damages provision unenforceable where actual harm was $72,000); *Lakeshore*, 2026 WL 2474230, at *3 ($1.5 million in liquidated damages unenforceable where "the $1.5 million is three times the amount of the money due") (collecting cases). Instead, the disconnect between the full range of breaches—including the breaches Qualcomm alleges in this case—and the required compensation makes § 8.3 unenforceable. *Dollar Tree*, 875 F. Supp. 2d at 1073 (provision unenforceable where the

same penalty applied "for at least nine different types of breach of varying degrees of magnitude").

48. Qualcomm argues that "the range of harm … could be enormous because of Qualcomm's reliance on Arm." Tr. (Qualcomm Opening) at 34:1-9 and contends a liquidated damages provision is enforceable if there is at least one category of breach where the liquidated damages may not exceed the high end of the range of potential harms. California courts have rejected that interpretation, instructing that "a court may not focus on a single scenario to the exclusion of others." *Grand Prospect*, 232 Cal. App. 4th at 1363-64. Qualcomm relies primarily on *Gormley v. Gonzalez,* but *Gormley* did not involve a liquidated damages clause that could be triggered by a number of different breaches—much less different breaches of different severity. 84 Cal. App. 5th 72, 76-77, 86-87 (2022). Instead, *Gormley* involved a litigation settlement that included $50,000 per month in liquidated damages up to a "cap not to exceed" $1.5 million if the defendants failed to make the required settlement payments. *Id.* at 77. At the trial court, the defendants challenging the clause "submitted no evidence and offered less than one and a half pages of argument" that the $1.5 million liquidated damages clause was unenforceable, *id.* at 82, so the court found that the "uncontradicted evidence in the record is that the parties agreed $1.5 million was a reasonable estimate of the total verdicts Plaintiffs would have recovered had their cases gone to trial, which is why they capped liquidated damages at that amount." *Id.* at 86-87.

49. *Gormley* is an outlier where the defendant made no real attempt to meet its burden. Here, there is no uncontradicted evidence that the penalty reasonably estimates potential harm for each of the breaches that could trigger the 5-year, no-royalty penalty. It is just the opposite: the uncontradicted evidence is that the 5-year, no-royalty penalty was never an attempt to estimate the potential harm for the various breaches that could trigger it. *Gormley* also suggested the California Supreme Court's holding in *Ridgley* that "liquidated damages [are] invalid … unless the amount

has a reasonable relationship to the damages the parties could have anticipated" was superseded by the passage of § 1671(b). 84 Cal. App. 5th at 84-85. But *Ridgley* post-dated the enactment of that statute, *Ridgley*, 17 Cal. 4th at 977, and the California Supreme Court recently reaffirmed *Ridgley* in *JJD-HOV*, 17 Cal. 5th at 268, 271. This further undermines any persuasive value *Gormley* has.

50. Similarly, *Weber, Lipshie & Co. v. Christian* does not help Qualcomm. 52 Cal. App. 4th 645 (1997). Like *Gormley*, *Weber* does not involve a liquidated damages provision that imposes the same remedy for a wide range of potential breaches. *Id.* at 650-57. And like *Gormley*, the record established that the liquidated damages provision in *Weber* "demonstrates a reasonable estimate of the harm that might reasonably be anticipated from the loss of the firm's clients." *Id.* at 655. That is far different from the circumstances here, where the evidence elicited at trial demonstrates the opposite: that the five-year, zero-royalty provisions were meant to act as penalties divorced from any reasonable approximation of harm. *Weber* is also another decision that is out-of-step with California Supreme Court precedent. A long line of California Supreme Court cases before *Weber* had held that a liquidated damages clause is an unenforceable penalty unless it "represent[s] the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." *Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731, 738-39 (1973) (citing earlier cases). *Weber* believed those decisions had not survived the passage of § 1671(b), *see* 52 Cal. App. 4th at 654-55, but *Ridgley* reaffirmed those decisions and that principle the next year, *see* 17 Cal. 4th at 977-78, and those same principles were again reaffirmed in *JJD-HOV*, 17 Cal. 5th at 268, 271. It is telling that Qualcomm's legal arguments principally rely on cases that openly reject binding California Supreme Court precedent.

51. *El Centro Mall, LLC v. Payless Shoesource, Inc.* fails to save Qualcomm's theory

too. 174 Cal. App. 4th 58 (2009). There, the California Court of Appeal held one liquidated damages clause, for certain "minimum" damages would "penalize Payless," was unenforceable. *Id.* at 64. It found that another liquidated damages clause triggered by Payless closing its business was enforceable because Payless "failed to present evidence" in rebuttal to El Centro Mall's evidence, including expert testimony, that ten cents per square foot was a reasonable estimate of the mall's damages. *Id.* at 64-65. Here, unlike in *El Centro Mall*, Arm has put forth fact and expert evidence that does establish the five-year, zero-royalty theory was not linked to any reasonable anticipation of actual harm to Qualcomm.

52. Qualcomm's argument that the five-year, zero-royalty provisions are enforceable because the ALA and TLA have notice-and-cure provisions likewise fails. Qualcomm contends that "A[rm] completely controls its own fate, there is no such thing as a foot fault breach." Tr. (Qualcomm Opening) at 36:2-18; Tr. (Sand) at 198:2-5; Tr. (Weiser) at 236:10-21, 247:3-11. But that is irrelevant to the legal analysis. Qualcomm has pointed to no case overriding established liquidated damages law on the basis of a notice-and-cure period, and courts routinely hold liquidated damages provisions unenforceable under California law despite their presence. *E.g.*, *Sigma Connectivity*, 2021 WL 8567905, at *1-2 (holding liquidated damages provision unenforceable as a contractual penalty despite presence of ten-day notice-and-cure provision); *Lakeshore*, 2026 WL 2474230, at *1, *3 (same). Even if Arm attempts to cure or Arm cures on Day 1, Qualcomm can still trigger the five-year, no royalty remedy by rejecting Arm's cure, failing to tell Arm what it needs to do to cure, or delaying accepting Arm's cure until after the cure period ends. That is made clear by Qualcomm's actions with respect to its TLA claims where it sent notice of Arm's alleged breach, Arm provided an offer to license Hunter, Hayes, and Yamin in October 2024 within the cure period, but then Qualcomm said nothing about Arm's Hunter, Hayes, and

Yamin offers until it sued Arm four months later for breach of Sections 8.1(B) and 8.1(D) of the TLA in March 2025. D.I. 91, 765 ¶¶ 21-25; PTX-1531.

53. Qualcomm argues that this Court must consider whether the parties were represented by counsel, whether the contract was a form contract, the parties' relative bargaining power, and the parties' expectation that proving actual damages would be costly, inconvenient, or difficult. To the extent those factors are relevant, they do not change the above analysis. Courts regularly find that liquidated-damages provisions are unenforceable even when sophisticated parties are represented by counsel and negotiate specific language. *See, e.g.*, *Harbor Island*, 107 Cal. App. 4th at 799 ("The fact that this was a commercial lease negotiated by seasoned business entities, not a consumer lease between unsophisticated individuals, has no bearing on the result."); *Grand Prospect*, 232 Cal. App. 4th at 1338 (finding an unenforceable penalty even though the contract was "agreed upon by sophisticated parties"); *Applied Elastomerics, Inc. v. Z-Man Fishing Prods., Inc.*, 521 F. Supp. 2d 1031, 1045 (N.D. Cal. 2007) (finding an unenforceable penalty even though "defendant was represented by in-house counsel and that the contract was negotiated by the parties"); *Hsiao & Montano, Inc. v. Xstatic Pro Inc.*, 2023 WL 4205811, at *5 (C.D. Cal. May 18, 2023) (similar); *JJD-HOV*, 17 Cal. 5th at 271 (similar).

54. The fundamental question is whether "the value of the money or property forfeited"—here, a sum approaching $3 billion—bears a "reasonable relationship to the range of harm anticipated to be caused" by a breach. *Grand Prospect*, 232 Cal. App. 4th at 1338, 1361. The parties could not have anticipated that the range of breaches that trigger the no-royalty remedy—almost all of them trivial and every one of them curable through specific performance—would cause harm that approached the value of five years' worth of royalties. And the record confirms the parties did not in fact try to approximate the harm from any—much less all—of those breaches.

All of which renders the liquidated-damages provisions unenforceable penalties.

### C. Evidence Of Actual Harm Is Relevant To Unenforceability

55. Evidence of actual harm is relevant to the unenforceability inquiry (even if it wasn't it would not change that the liquidated-damages provisions in the ALA and TLA are unenforceable). "Any provision by which money or property would be forfeited without regard to the ***actual damage suffered*** would be an unenforceable penalty." *Ridgley*, 17 Cal. 4th at 977-978. Thus, the disparity between the liquidated damages provision and what harm if any was actually suffered can demonstrate unenforceability. In *Harbor Island*, the court found that the "lack of a proportional relationship between the $240,912 [penalty] and the ***actual damages Harbor Island suffered*** on account of the breach of the covenant to maintain and repair could not be more obvious" in finding the penalty unenforceable. 107 Cal. App. 4th at 797; *Grand Prospect*, 232 Cal. App. 4th at 1361-63 (holding provision unenforceable based on evidence of impact on contract six months after contract was signed). It is also relevant to the "damages the parties could have anticipated would flow from a breach"—just as failing to double-charge Qualcomm for support and maintenance actually caused zero harm in 2024, the parties could only have anticipated it would cause zero harm when they signed the TLA and ALA in 2013.

## IV. CONCLUSION

The Court finds Section 8.3 of the ALA and TLA unenforceable.

Dated: September 24, 2026

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Arm Ltd. and Arm Holdings plc*

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 24, 2026, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jennifer Ying
Travis Murray
Morris, Nichols, Arsht
& Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jying@morrisnichols.com
tmurray@morrisnichols.com

Alan R. Silverstein
Sara Barry
Connolly Gallagher LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
asilverstein@connollygallagher.com
sbarry@connollygallagher.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Jennifer N. Hartley
Erica Spevack
Leah Hibbler
Dunn Isaacson Rhee LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com
jhartley@dirllp.com
espevack@dirllp.com
lhibbler@dirllp.com

Richard S. Zembek
Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000

Ruby J. Garrett
Adam L. Basner
William T. Marks
Paul, Weiss, Rifkind,
Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweis.com
abasner@paulweiss.com
wmarks@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Stephanie L. Chin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
schin@paulweiss.com

grp-qcvarm@paulweiss.com

Erin E. Murphy
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
erin.murphy@clementmurphy.com

John Poulos
Norton Rose Fulbright US LLP
1045 W. Fulton Market
Suite 1200
Chicago, IL 60607

Houston, TX 77010
richard.zembek@nortonrosefulbright.com

john.poulos@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Arm Holdings plc and Arm Ltd.*