**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ARM HOLDINGS PLC, f/k/a ARM LTD., a U.K. corporation,<br><br>Defendant. | C.A. No. 24-490-MN (CONSOLIDATED)<br><br>**REDACTED - PUBLIC VERSION**<br>(Filed November 16, 2026) |

**VOLUME 2 OF 2 (EXHIBITS B1-B3) TO THE DECLARATION OF MEGAN MCGLYNN BUTLER IN SUPPORT OF DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO SEAL AND REDACT TRIAL <u>TRANSCRIPTS OF OCTOBER 7-9, 2026</u>**

Dated: November 6, 2026

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Meghan Kelly, P.C.
KIRKLAND & ELLIS LLP
2005 Market St., Ste. 1000

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Arm Ltd. and Arm Holdings plc*

Philadelphia, PA 19103
(215) 268-5000
meghan.kelly@kirkland.com
Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 6, 2026, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jennifer Ying
Travis Murray
Morris, Nichols, Arsht
& Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jying@morrisnichols.com
tmurray@morrisnichols.com

Alan R. Silverstein
Sara Barry
Connolly Gallagher LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
asilverstein@connollygallagher.com
sbarry@connollygallagher.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Jennifer N. Hartley
Erica Spevack
Leah Hibbler
Dunn Isaacson Rhee LLP
401 Ninth Street NW
Washington, DC 20004
kdunn@dirllp.com
wisaacson@dirllp.com
mzappala@dirllp.com
emorgan@dirllp.com
jhartley@dirllp.com
espevack@dirllp.com
lhibbler@dirllp.com

Richard S. Zembek
Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000

Ruby J. Garrett
Adam L. Basner
William T. Marks
Paul, Weiss, Rifkind,
Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006
rjgarrett@paulweis.com
abasner@paulweiss.com
wmarks@paulweiss.com

Catherine Nyarady
Jacob A. Braly
S. Conrad Scott
Jacob Apkon
Stephanie L. Chin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
jbraly@paulweiss.com
scscott@paulweiss.com
japkon@paulweiss.com
schin@paulweiss.com

grp-qcvarm@paulweiss.com

Erin E. Murphy
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
erin.murphy@clementmurphy.com

John Poulos
Norton Rose Fulbright US LLP
1045 W. Fulton Market
Suite 1200
Chicago, IL 60607

Houston, TX 77010
richard.zembek@nortonrosefulbright.com

john.poulos@nortonrosefulbright.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert M. Vrana*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Arm Holdings plc and Arm Ltd.*

# Exhibit B-1

08:12:09

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., and ) ROUGH DRAFT
QUALCOMM TECHNOLOGIES, INC.,)
) VOLUME 4
Plaintiffs, )
) C.A. No. 24-490(MN)
v. )
)
ARM HOLDINGS PLC, )
)
Defendant. )

Wednesday, October 7, 2026
8:30 a.m.
Jury Trial

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE MARYELLEN NOREIKA
United States District Court Judge

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: JENNIFER YING, ESQ.
BY: TRAVIS J. MURRAY, ESQ.

-and-

DUNN ISAACSON RHEE LLP
BY: KAREN DUNN, ESQ.
BY: WILLIAM ISAACSON, ESQ.
BY: ERIN J. MORGAN, ESQ.
BY: JENIFER HARTLEY, ESQ.

-and-

**APPEARANCES (Cont'd):**

**PAUL WEISS**
**BY: CATHERINE NYARADY, ESQ.**
**BY: JACOB A. BRALY, ESQ.**
**BY: WILL MARKS, ESQ.**

**Counsel for the Plaintiffs**

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
**BY: ANNE SHEA GAZA, ESQ.**
**BY: ROBERT VRANA, ESQ.**

**-and-**

**KIRKLAND & ELLIS LLP**
**BY: GREGG F. LoCASCIO, ESQ.**
**BY: JASON M. WILCOX, ESQ.**
**BY: JAY EMERICK, ESQ.**
**BY: MEGHAN KELLY, ESQ.**
**BY: MEGAN McGLYNN BUTLER, ESQ.**
**BY: MATTHEW McINTEE, ESQ.**
**BY: PETER EVANGELATOS, ESQ.**

**Counsel for the Defendant**

**- - - - - - - - - - - - - - - -**

**COURTROOM DEPUTY: All rise. The United States District Court for the District of Delaware is now in**

session. The Honorable Maryellen Noreika presiding.

THE COURT: All right. Good morning. We have a few objections. Who wants to start?

MS. DUNN: Your Honor, my first question is whether you're taking objections for the jury trial and the bench trial or just the jury trial now?

THE COURT: Let's do the jury trial now so we don't mix up our times.

MS. DUNN: Understand. We are objecting to DTX-2. It is the public court filing of Arm's answer in this case. And we're objecting on two grounds. The first is that when Mr. Isaacson showed this to the jury, there was an objection from Arm on day one of trial, that's cited in the sentence we submitted to Your Honor.

And the second is that everything relevant has already been elicited or arguably relevant by Arm, on page 242 and 243 of day 1 transcript.

THE COURT: Before, who is Spencer Collins, that's -- who is Spencer Collins?

MS. DUNN: Spencer Collins is the chief legal officer of Arm.

THE COURT: So Arm wants to put its own answer in front of the jury?

MS. DUNN: Correct, Your Honor.

THE COURT: Okay. Help me out.

MR. WILCOX: Yes. So we want to put it in front of the jury because it's not our answer in this case.

THE COURT: I know, I get it, and I'm having even more trouble with it being in the last case because, I mean, I already am not crazy about how much we're talking about that other case, and now you're putting in pleadings. Can we put in like their -- how about we put in all the pleadings of everyone, what are you doing with this?

MR. WILCOX: It's for a very limited purpose, all we're using it for is to just show that we had before the Bloomberg article came out publicly disclosed --

THE COURT: No kidding, that's already in evidence, I think you got it from their CEO. Why do you need a document? Are they contesting that? Have they disagreed with that? I thought Mr. Amon said, yeah, it was in there. Why do you need this document, help me out.

MR. WILCOX: We think it will be helpful for the jury to be able to see the actual document where we make the statement so they can then compare it to what we said --

THE COURT: It's sustained. What's next? It's overly prejudicial. You do not need a pleading from a different case in this case. It's confusing to the jury and there is no dispute. Is there a dispute that it was publicly in the pleading?

MS. DUNN: No, Your Honor.

08:36:23 THE COURT: So you can stipulate. And we're done. No more.

08:36:27 What's next?

08:36:30 MS. DUNN: We just have bench left.

08:36:32 THE COURT: Okay.

08:36:37 MR. WILCOX: So Your Honor, we have objections 08:36:39 to the demonstratives of Professor Posner, which is their 08:36:45 economics expert in support of their UCL claim. And 08:36:49 specifically we object to PDX-7.3 through 6.

08:36:54 As you remember, the UCL claim is supposed to be 08:36:58 in support of their tortious interference claim, and it's 08:37:00 supposed to be limited to whether Arm wrongfully interfered 08:37:07 with their Meta relationship by either having the Bloomberg 08:37:11 article come out or an earlier letter that was sent to Meta 08:37:14 back in 2022 when the first lawsuit was filed. If you look 08:37:17 at the demonstratives from Professor Posner, he doesn't talk 08:37:21 about either of those anywhere. Instead he talks about Arm 08:37:24 entering the chip business, how X86 and RISC-V are not 08:37:28 alternatives, he talks about how we're going to engage in 08:37:32 input foreclosure just with Qualcomm but other chipmakers, 08:37:37 and he's talking about forming a downlink competitor to 08:37:40 reduce quality degrading assets at the input, that has 08:37:42 nothing to do --

08:37:44 THE COURT: Why did you guys bring RISC-V into 08:37:47 the case first?

MR. WILCOX: We brought --

THE COURT: One person, stay back, you're distracting me. Why you all brought it up because I remember sitting here and I was like I don't know what this RISC-V is, but you guys brought it up as I understand to say they weren't beholding to us, they're out there trying to do new stuff and they have other stuff as an option. And so I'm getting a little concerned that you're like keep it out, keep it out, keep it out when you put it in. It's almost like you put it in and now you're like but they can't defend against it. So help me out.

MR. WILCOX: So the reason we put it in the case is because they had for example the Dr. Evil slide that was talking about how they were a hundred percent dependent on, we wanted to point out they had alternatives.

THE COURT: And now they're saying you saying they had alternatives is not correct. Why can't they -- they said Dr. Evil, we were beholding to you. You come back and you say, you weren't, you're working on RISC-V and they want to come back and say, RISC-V was not an option. Like, I don't understand. Why do you get to keep out their response to your response?

MR. WILCOX: I think they have had a response, through for example Mr. Amon, but this expert is here solely in sort of their UCL claim, their UCL part of the wrongful

prong of tortious interference and the tortious interference in this case is just about the Bloomberg article, and about the 2022 letter that went to Meta. So whether RISC-V was out there, whether there are things like whether Intel's X86 is suitable for mobile or IOT devices has nothing to do with Meta or with what happened in 2024 or what happened in 2022.

THE COURT: Okay. Let me hear from the plaintiff, because look, I am sympathetic to you responding to their RISC-V thing. But this is anticompetitive risk, and if he's only talking about anticompetitive stuff, then I don't see how this is tied to Meta.

MR. ISAACSON: So for the Meta part of the case, this is what he --

THE COURT: The only part of the anticompetitive case that goes to the jury is Meta.

MR. ISAACSON: Agreed.

THE COURT: Right?

MR. ISAACSON: Agreed. And that's what he's going to address. Those slides are all going to be talking about data center chips which is what he talked about in his report. He has --

THE COURT: I mean, come on. Forcing a downstream competitor to raise prices or reduce quality by degrading its access to inputs, that's not Meta. Forcing a downstream competitor from selling custom cores to switch it

to, force it to switch, that is not what you're saying happened with the Meta interference, it's not. That is bringing other stuff into this. Impeding innovation, raising barriers, I mean, no. This is not -- I let you put the UCL stuff in for Meta on the Bloomberg thing because you convinced me that the Third Circuit *Karas* case said you had a right to a jury trial on intentional interference. And now you are totally bringing in all UCL stuff including stuff that was not in your tortious interference case. So you got to tell me, I mean, this is not Meta. You're saying they tortuously interfered with your relationship with Meta in a letter in 2022 after which you entered an agreement with Meta. Okay. I get it, maybe the agreement wasn't -- was different, I remember someone saying that.

But all this other stuff, this is not Meta. This is not Meta. This is generic anticompetition.

MR. ISAACSON: He will be talking about input foreclosure for data center chips, which is the Meta relationship.

THE COURT: No. That's not what -- where did you ever disclose this for Meta? Not -- Meta is data center, no, what you have to show is that their activity specifically interfered with Meta. This is way, way too generic on anticompetitive stuff.

MR. ISAACSON: So, what --

08:42:48 THE COURT: This is a whole data center market. 08:42:51 This is not what they specifically did that interfered with 08:42:56 Meta.

08:42:57 MR. ISAACSON: So the economic expert is not 08:43:00 giving an opinion about whether there has been interference, 08:43:04 that's not the economic expert's job.

08:43:06 THE COURT: Yes, I know. The problem I have is 08:43:08 that you're interference is limited to unfair competition as 08:43:14 the independent wrongful act. Independent wrongful act here 08:43:19 is Meta. It's unfair competition with respect to Meta.

08:43:23 MR. ISAACSON: And if -- and that impairs 08:43:26 competition between these two companies in the data center 08:43:30 chip market. And for the UCL claim we are supposed to show 08:43:35 that there is a significant threat or harm to competition. 08:43:39 Arm's jury instructions talk about this.

08:43:42 THE COURT: No, you have to tie it to Meta. It 08:43:45 can't be, oh my God, these bad people over here, they wanted 08:43:50 to keep us out of -- they wanted to compete with us, they 08:43:54 wanted to make it harder for us to enter into the data, 08:44:01 whatever market, and because we wanted to get into that, 08:44:06 that has -- that might be something that, you know, you say 08:44:11 is anticompetitive, but you have to tie that to Meta. It 08:44:16 can't be well they did all this stuff and it was 08:44:20 anticompetitive, let's say they violated every federal 08:44:24 antitrust thing out there. If it had no effect, nothing to

do with Meta, it doesn't come into this jury trial. And you have not shown me -- all you're saying is well, all this stuff is anticompetitive, unfair, creates anticompetitive risks which is part of the reason that the California Supreme Court said these issues don't go to the jury because how are you supposed to instruct a jury on that. But that just reminded me of another reason I hate this.

But this is not tied to Meta. So I am going to sustain the objection. You are definitely broadening this into all bad anticompetitive behavior. That is not what the Third Circuit as I understand the cases say you have a right to put in front of the jury because one of the elements is the UCL claim.

MR. ISAACSON: All right. Your Honor, I assume we're free to do this in the bench trial?

THE COURT: Of course. All right. Anything else?

MS. DUNN: No, Your Honor.

MS. YING: Your Honor, I just wanted to remind Your Honor we did have a letter from Monday the 5th about deposition designation objections that I think is still in Your Honor's hands, so I don't think those are going to go on until the afternoon but wanted to make you aware that that was still a live issue. I believe there are some --

THE COURT: Who are those, just remind me.

08:45:59 MS. YING: There is a Malladi and a Chaplin designation. And I think based upon the order disclosure, Chaplin would go first for the defendant. But I can just tell you now that that issue relates to the fact that they want to put the pretrial conference transcript from the previous case into the record here, which is similar to the whole pleadings issue.

08:46:23 THE COURT: Let's just use a little time to argue that. Do I have -- Mark, do I have that letter somewhere?

08:46:34 MS. YING: We have hard copies if you need it.

08:46:37 THE COURT: That would be terrific.

08:46:42 MR. LoCASCIO: He's actually a tomorrow video for what it's worth Your Honor, per our list, it's not in their case, it's in our case.

08:47:39 MR. LoCASCIO: Your Honor, given this isn't an issue for today, we don't actually have the information here, the person here to handle this one. There is an issue that will come up before this that's a witness for today, I think we should tackle that if we're past the morning stuff.

08:47:57 THE COURT: Okay.

08:47:57 MR. LoCASCIO: That issue is Mr. Weiser, he's a witness for today, is a witness on the Qualcomm side. It's not with respect to his exhibits, but best we can tell from what they have disclosed, he's going to try to come in he's

a lawyer.

THE COURT: I remember.

MR. LoCASCIO: They had a document of a meeting phone call or zoom call what have you that he had with Meta, Qualcomm never had a Meta witness, they don't have Meta there is no documents in this case saying there was Meta was doing or thinking on the Meta side and by all accounts the only thing we can come up last night that they're going to have Mr. Weiser get up there and say is well, here is what Meta told me. Here is what I took away from the meeting, which is essentially back door. It's all hearsay. So if we have the time, we might as well tackle that. There is no way there is a hearsay exception, it's a hundred percent for the truth of the matter asserted that we interfered with their business.

THE COURT: Okay.

MR. ISAACSON: Mr. Weiser had a phone call --

THE COURT: What's he going to say?

MR. ISAACSON: He's going to say he had a phone call with the Meta representatives about the Bloomberg letter, he's going to talk about the topics that were talked about in in the meeting and he's going to say we gave assurances, did you get any sort of comfort the from that, he's going to say no, that's it.

THE COURT: That sounds a lot like hearsay.

MR. ISAACSON: It's not hearsay because it's not for the truth.

THE COURT: Of course it's for the truth. I mean, what it's for if it's not for the truth. It's for what, what Meta was thinking, that sounds like the truth. What is it for? What's it for if not the truth?

MR. ISAACSON: It's going to be -- well the affect on us, you also the effect.

THE COURT: The effect on you, that's for the truth.

MR. ISAACSON: He can testify to what he observed, when we gave assurances did they give him any response that comfort him that things are on okay, he's going to say no, that's it.

THE COURT: He's going to say Meta was upset about the letter and asked if it was true and I told them whatever, and did they feel better and he's going to say no.

MR. ISAACSON: There is a written list of topics that were discussed at the meeting. He's going to say those topics were discussed. He's go --

THE COURT: Is he going to say what was discussed about each of them?

MR. ISAACSON: He's going to say those topics were discussed and those are questions that were being asked by Meta --

08:50:28 THE COURT: What are these topics, is a document with these topics.

08:50:32 MR. ISAACSON: Yes.

08:50:32 THE COURT: That was contemporaneous.

08:50:34 MR. ISAACSON: Yes.

08:50:34 THE COURT: All right.

08:50:35 MR. LoCASCIO: There's a before the meeting exhibit, we didn't object to it that has a Meta e-mail to them that said hey here is the questions we have got, and that's fine, that they received that, fine. The fact that they -- what's the problem is what Mr. Isaacson then said I gave them an assurances and then which put aside we have our own separate issues with disclosures and what have you, the response, the reaction, the did they give you any comfort, all of that, Your Honor, is hundred percent for the truth and hearsay because their position is no, no, they were so grievously, grave concern, and this didn't make them feel any good, and then they changed the terms on head sets AR and VVR headsets is what the changes in Meta agreement, it has nothing to do with the server business in any event. But they didn't feel comfortable is classic hearsay response, and it's the key, it is the truth element they need to prove their tortious interference claim that they never went and got in discovery because I'm going to guess they were fine with it because the record doesn't have any

indication that this act of interference actually changed that one deal term on VR AR headsets and to do this now is an effort to back door this in through the person who shouldn't be, he's not only by the way, Mr. Weiser was their lawyer, he's being paid since he retired a monthly retainer just to come in here and do this.

THE COURT: I remember. I remember.

MR. ISAACSON: That is not true.

THE COURT: Because I remember the ethics question.

MR. ISAACSON: He's paid a monthly amount for work just like everybody is getting paid in this case. Which has nothing to do with this objection.

MS. DUNN: This is important because I want the Court to understand this, this is what he's doing.

MR. ISAACSON: He's helping -- he's working on the v10 negotiations.

And other issues that go on between these two companies.

THE COURT: I --

MR. ISAACSON: But setting that aside, he can say that he observed what he observed, and didn't get basically any response from them. That's it. And the points are all written out. The topics were written out

08:52:54 contemporaneously that --

08:52:56 THE COURT: They were written out beforehand.
08:52:58 And he's going to say that's what we talked about, and what
08:53:04 else because I am really worried you're going to say and did
08:53:07 you talk about each of those things. Yes. And what was
08:53:11 Meta's response sounds awfully like hearsay. Right? You
08:53:17 could have brought Meta in to say we really were upset about
08:53:21 this, but you didn't. And I get it, there is lots of
08:53:24 reasons for that, I understand. But having someone who
08:53:28 doesn't have any documentation, it's not like he wrote
08:53:31 something later that said hey this is what we talked about.
08:53:34 This is making me a little queasy that he's just going to
08:53:38 get up there and say essentially wink wink without saying it
08:53:42 say hey, Meta said they were upset and that is a problem.

08:53:48 MR. ISAACSON: He's not going to use the word
08:53:50 upset, he's going to say those topics were discussed. We
08:53:53 gave assurances, right, and at the end, did you get any --
08:53:59 did you observe that they had any response to what -- how
08:54:04 about this. Did you know after the meeting what they were
08:54:07 going to do and he would say no.

08:54:10 MR. LoCASCIO: It's all just, we can try to find
08:54:13 some semantic magic to sneak around the using the world said
08:54:18 or reaction, it all goes to the exact same place, even if it
08:54:21 was like I came back from the meeting and boy I just didn't
08:54:25 feel very good that day, whatever spin they want to put on

it, it's conveying the exact same hearsay take away Your Honor, and that's for the truth to convey to the jury without any facts that actually show it, neither his, no internal, nothing that was ever waived or disclosed reflection of what happened in that meeting or the Meta's reaction.

MR. ISAACSON: There is a problem here because he's saying he's going to stand up in closing argument and say they were fine with this. You could tell they were fine with this. And they're having a meeting where no one said anybody was find one way or the other is relevant is to the kind of things he's going to say.

MR. LoCASCIO: If if they wanted to prove this element that there was harm, great, they could have -- all they have done the entire harm case for Meta is a before and after term sheet where a term having nothing to do with data chips, server or the issues that are actually in this case, had a change in it that went on for a year before they got to that term sheet and they want to say it all happened at this time. And as a result of that, if that was the case they want to prove, there is a very easy way to prove that, if they had internal discussions about boy after that meeting things were sour, guess what, they should have waived and disclosed those. They did not. If they want to get a stipulation or document or dep testimony from Meta,

they could have done that. They have chosen not to and this is how they're trying to do it through a lawyer writ and it's both undisclosed and rank hearsay solely to try to meet an element for the truth, Your Honor.

THE COURT: Where is it disclosed, he's saying it's he not disclosed and it's hearsay where was it disclosed.

MR. ISAACSON: Documents produced in discovery, we made it an exhibit. And also there is a follow up, there is a document produced in discovery showing the conference call that everyone is on, a notice of here is the conference call and here is the date, it's a zoom call. And I want was disclosed --

THE COURT: Where is it objections are overruled-- where was it disclosed that this is you know, he had this discussion, things -- it is sort of weird you're going to tell the jury things were unresolved and yet they never have anything after that with Meta?

MR. ISAACSON: He can't testify to that after that. So what --

THE COURT:--

MR. ISAACSON: He's not going to testify --

THE COURT: I get it.

MR. LoCASCIO: It's kind handy that he can't, he has nothing after that, we left and boy they were pretty

strung out about this and who knows what happened after that.

MR. ISAACSON: He keeps saying he's going to say strung out, upset, none of that is going to be said. I understand we focus on the data center chips, he says these are the VR chips which there are competitors are also on, known our competitors, the AR VR deal changed and yes we are saying that happened before and after that. This is just one piece of the event that happened. And it comes in for about 90 seconds of testimony.

MR. LoCASCIO: And I respect Mr. Isaacson this is about the fourth time in this case, it's just one question, it's just a few second, that's great, that's when most of the things you shouldn't do in the case that don't have the evidence or violate the rules of evidence come in with a witness in four seconds, boom, then on closing, you have seen it.

THE COURT: I know, everything is about it.

MR. ISAACSON: This is an unobjected to exhibit that he's going to talk about.

MR. LoCASCIO: And we raised it because it's the testimony Your Honor, that we saw around the corner which isn't even that sharp a corner is going to be the problem and he should not, and it clearly was the plan all along to have him come up.

THE COURT: What do you not object to him saying since you said you're good with the exhibit.

MR. LoCASCIO: I'm fine if they want to have him say we received this request, this inquiry and then we had a meeting on that day, fine. The conversation about what happened in the meeting, back and forth is not in.

MR. ISAACSON: I think its four bullets points, maybe it's five, in that document, and all those were discussed at the meeting.

MR. LoCASCIO: What we know is that there was a request for a meeting and a meeting note, like a scheduling note, that's the docs produced, the docs produced is the e-mail in advance, we saw some of them with Mr. Amon I believe and the fact that there was an invitation. If it's to say did that meeting happen, yes it did, did you go, yes, I did. That's where it ends Your Honor, the discussions what happened in that meeting where he's now going to say here is what I said, there is no notes after that were ever produced, there is no summary of the meeting, that's where it ends.

MR. ISAACSON: We're entitled to say that those bullet points in the document were discussed at the meeting. It's written down and it's an unobjected to exhibit and jury is entitled to know, not just have a document thrown at them --

THE COURT: Does he specifically remember that they talked about those?

MR. ISAACSON: Yes. Because and it makes sense, here is what the meeting is about.

THE COURT: And what -- so tell me exactly what you want him to say. We got this, we then had a meeting, we discussed those topics, that's it.

MR. ISAACSON: He could say we gave assurances, and then point three which seems to be the most controversial is he says we got no assurances back.

MR. LoCASCIO: And that is a fact that's never been revealed disclosed and unknown and it's hearsay.

THE COURT: Where was that disclosed that we got no assurances back?

MR. ISAACSON: That does not need to be disclosed. We disclosed the documents --

THE COURT: Well that seems like -- you're saying it's a pretty important aspect of your case.

MR. ISAACSON: I'm saying I'm up here arguing it, I'm not saying its a key part of our case. But the point is we don't disclose, they get the opportunity to depose him, the documents are produced, they can ask him questions. There is no disclosure requirement about him testifying about this meeting if they never asked him.

MR. LoCASCIO: Anything he conveys about what he

heard at that meeting, what they said, what they conveyed is hearsay. And there is no exception for that and there is a way to get a third party's perspective in evidence, and this is not it.

THE COURT: What I'm trying to figure out is how is it hearsay to just say we discussed it, we gave them assurances, I guess you're saying you need a response.

MR. LoCASCIO: If you end it -- if you ended the inquiry where you just left it, Your Honor, we gave them assurances, I think we would say okay, we might have some arguments around how that's framed, where is the hearsay line there. It's the next step that's the one that actually matters to their case for an element, and it's the one that then is hearsay, and we have no way to address it and they never put on any evidence.

THE COURT: So Mr. Isaacson, though, I'm trying to figure out what's hearsay and what's not. Mr. Isaacson said what if they said, but at the end of the meeting did you know what they were going to do, what the next systems were and he says no, how is that hearsay?

MR. LoCASCIO: If he says -- if -- any version of it that says we left and we were unsure about where this was going to go or we left and it wasn't resolved, or we still had a lot of work to do, all of that, all of that, conveys the substance of the conversation from the Meta side

because there is -- any of those reactions, those are all just another way to suggest what they conveyed to Qualcomm in that meeting was something other than great, we're good here. It says this is a problem for us. We have open concerns. All of that is hearsay. And doing it through the listener sort of reaction to it, is a perhaps deaf way to have a witness reveal something that would otherwise be hearsay but something of this criticality is not okay either. Just because you take the speaker out of it doesn't mean that you're not conveying the hearsay that happens, Your Honor. We can find, Your Honor, he's an afternoon witness, a case that says you can't sort of flip it to back door that. We can get you one, I am sure because it doesn't only have to be spoken words by the third party Your Honor.

MR. ISAACSON: It's literally not hearsay to say how I felt at the end of the meeting. That is not hearsay.

THE COURT: If he's not coming on, I'm going to get the jury in here. We will -- I'll withhold on this until I see any cases that defendant has, or the plaintiff has. The problem I'm having is there is a communicative intent or disclosure behind what leads Mr. Weiser to know Meta's thoughts or to give what Meta communicated. It's like him saying anything there, it's communicating what did Meta say, and that is being offered for the truth that Meta was not happy. So I am concerned about this but I'm going to

withhold ruling until I see any cases anyone wants to submit to me which you can do by the lunch break.

Okay. Anything else?

MS. DUNN: Thank you, Your Honor.

THE COURT: Let's bring in the jury.

MS. KELLY: Your Honor, may the witness approach?

THE COURT: Yes.

MS. KELLY: Thank you, Your Honor.

THE COURT: I'll just remind you you're still under oath.

MS. KELLY: Your Honor, may I bring the witness a water?

THE COURT: Yes.

MS. KELLY: Thanks.

(Jury entering the courtroom at 9:05 a.m.)

THE COURT: All right everyone, welcome back. Everyone else may be seated.

Let's continue.

BY MR. ISAACSON:

Q. Good morning, Mr. Shivashankar. It's Bill Isaacson again.

A. Good morning.

Q. Yesterday we were talking about the MFN or most favored nations analysis that you did for some cores called

Hunter, Hayes, and Yamin. Can we show you JTX-5?

MS. KELLY: Mr. Isaacson, may I get a binder?

MR. ISAACSON: Yes.

MS. KELLY: Thank you. Sorry.

MR. ISAACSON: Permission to approach, Your Honor?

THE COURT: You may.

BY MR. ISAACSON:

Q. JTX-5 I believe has been admitted into evidence, that's the 2013 TLA. It's going to be on your screen there. And you have seen this document before, right?

A. Yes, I have.

Q. All right. And if we turn to page 13, there is a provision called business continuity, and it sets forth some obligations. And then there is a long paragraph, subsection B. And you're familiar with this subsection B, right?

A. These are contractual terms. I am not familiar with each and every detail of it.

Q. All right. But you have seen this specific contractual term before?

A. Yes.

Q. This is when you have been talking about the MFN, this provision is what you have called the MFN promise?

A. Correct.

Q. And so at the top, there needs to be an initial

request, and then in the fifth line, or it could be a subsequent request, and then little one, investigate and determine the Arm license agreement and it ends with that's the previous best deal?

And then little two, offer licensee a license to the same implementation core, then let's go down to little three. -- I'm sorry, B. Such an offer shall be license fees and royalty rates that Arm reasonably determines based on Arm's comparison of all financial considerations and license rights. And then move down, no more than ten percent higher than the previous best deal.

All right. When you said you did an MFN analysis, did you do it based on this provision?

A. The MFN analysis which we conducted was the steps I followed which I was actually passed down when I took this role.

Q. You say the MFN analysis were the steps you followed, which were passed down when you took this role. So you were following an MFN analysis when you -- that was passed to you when you took your job?

A. That is correct.

Q. Did you believe a MFN analysis was following these three steps that we were just doing?

A. I wouldn't precisely say three steps, but it was several steps.

09:11:21 Q. All right. You wouldn't precisely say three steps but it was several steps. Did it include these three steps?
09:11:33 A. It did include these steps.
09:11:35 Q. All right. And you're being cautious here sir and I understand that, you don't consider yourself an expert on this contract, right?
09:11:46 A. On the contract matters, I am not.
09:11:49 Q. Right. You don't -- you would say that you have no expertise on the contract language that's in the TLA?
09:11:57 A. That is correct.
09:11:58 Q. All right. Now, let's look at PTX-1535. This is dated -- you see this is the Qualcomm IP extension offer dated 24 October, '24. You recognize this extension offer, correct? It's in your binder.
09:12:27 A. Sorry, can you --
09:12:29 Q. PTX-1535.
09:12:41 A. Yes, I have it opened.
09:12:44 MR. ISAACSON: I move to admit PTX-1535.
09:12:47 MS. KELLY: No objection.
09:12:48 THE COURT: Thank you. It's admitted.
09:12:48 (PTX Exhibit No. 1535 was admitted into evidence.)
09:12:49 BY MR. ISAACSON:
09:12:50 Q. All right. This is the proposal made to Qualcomm by Arm in response to Qualcomm's request to have renewed

licenses for Hunter, Hayes, and Yamin, right?
A. Correct, this was the proposal.
Q. All right. And so Qualcomm had a license for Hunter, Hayes, and Yamin previously, it was expiring and now they wanted a new license and asked for one, right?
A. Yes, this was a renewable.
Q. And so if we -- and you were involved in doing the analysis to generate this proposal, correct?
A. That is correct.
Q. All right. And as part of the MFN analysis as you called it, your team would have looked at the implementation cores that Qualcomm requested, Hunter, Hayes, and Yamin, correct?
A. That is correct.
Q. And would have looked at other partners who licensed the same implementation cores, correct?
A. That is correct.
Q. You would have looked at license fees and royalty rates for those other customers, correct?
A. Can you say that again?
Q. Sure. You would have looked at license fees and royalty rates for those other customer's licenses for Hunter, Hayes, and Yamin, correct?
A. Yeah, those were some of the variables we consider.
Q. And the MFN analysis that was done to calculate the

license fees in this proposal was done by Akshay Bhatnagar?
A. Bhatnagar.
Q. Bhatnagar, who is an individual on your team, that's who did the actual analysis, right?
A. He was part of the team, the analysis comprises of a much bigger team.
Q. But he actually did the analysis for this offer, correct?
A. He did part of the analysis.
Q. So did he do the analysis for license fees in this offer?
A. License fee calculation was part of the analysis.
Q. And that's -- that was Mr. Bhatnagar who did that?
A. He was part of the team who did the analysis.
Q. All right. Now you have another binder in front of you have with your prior testimony. And there is deposition in the back from June 2025. And if you turn to page 83, are you with me, sir, page 83?
A. I'm getting there.
Q. Do you need some help?
A. There is a page number on the top.
MR. ISAACSON: May I approach and help him, Your Honor?
THE COURT: You may.
BY MR. ISAACSON:

Q. At page 83, it says at line 5, you were asked this question: "Did you prepare any documentation reflecting the analysis that you used to calculate the license fees reflected in Exhibit 13?" Which is what we're looking at right now.

"So the analysis was actually -- I mean, yeah, done by a person on my team and I was involved in the review, yeah of that analysis. Who on your team did that analysis? A person named Akshay Bhatnagar. Were you asked those questions and did you give those answers?

A. Yes, Akshay was part of the team and he was part of the analysis.

Q. And you then reviewed the analysis that was done?

A. Correct.

Q. You don't actually recall the specifics of the analysis your team did to identify the previous best deal, correct?

A. I do recall it to an extent.

Q. You do recall to an extent but you don't recall the specifics of the analysis leading to the numbers in this offer, correct?

A. No.

Q. All right. In that deposition in front of you, turn to page 114. Are you on page 114, sir?

A. Yes, I am.

Q. If you look at line 21, the question is:

QUESTION: "And earlier you testified that your team was responsible for the license fees reflected in Exhibit 15, correct?"

"ANSWER: Yes, my team was involved in the analysis for the quote generation but the proposal listed in -- I mean, Exhibit 15.

QUESTION: But you don't remember the specifics of that analysis, correct?

"ANSWER: I do not remember the specifics, I mean, yeah, steps, I mean, sorry, I mean the specifics, I mean of the analysis, I mean yeah, leading up to these numbers."

Were you asked those questions and did you give those answers?

A. Sorry?

Q. Were you asked those questions at your deposition and did you give those answers?

A. That appears to be my deposition and my answers, yes.

Q. And you don't remember the list of partners that Arm considered to determine the previous best deal for Hunter, Hayes, and Yamin, correct?

A. Was the question according to the deposition or right now?

Q. Well, I can ask you at the time of your deposition,

you didn't remember the list of partners that Arm considered to determine the previous best deal for Hunter, Hayes, and Yamin, isn't that correct?
A. That time there was no material which was presented in front of me, I couldn't precisely recall the details.
Q. Yes. And that was you were deposed in June 2025, the proposal in front of you was October 2024. And in June 2025, you couldn't recall any Arm partners that were considered for your analysis, correct?
A. It was several months out, I couldn't recall without referring to any document.
Q. And there were documents involved in conducting the analysis that led to this proposal, but you couldn't remember those documents either, right?
A. At that time I couldn't recall.
Q. Now, prior to making this offer, you had written in chats between you and a colleague, that calling your company Arm a monopoly, you did that, right?
A. No.
MS. KELLY: Objection, Your Honor. Relevance and Your Honor's prior rulings regarding this.
THE COURT: All right. Hold on. Come over here.
(Side-bar discussion:)
MS. KELLY: My issue, Your Honor, is this came

up in the context of Professor Posner's opinion where I'm concerned given the UCL issues we had today that keeps expanding to everything about anticompetitive behavior, he was going to over an opinion that Arm was a monopoly, he stated at our hearing he wasn't going to do that.

My concern is we're putting in for a witness who is colloquially using the term to somehow back door some argument about anticompetitive for the TI claim which is obviously totally untethered to, this guy is a licensing director has nothing to do with Meta, but somehow in closing we're see in monopolist word, TI and UCL, we're really far a field.

MR. ISAACSON: I would agree that would be a proper objection if we used it that way in closing, this is just to show that he thought when they made in offer they had no alternatives.

MS. KELLY: Your Honor, it's breach, yes. Did he breach, it's not what your intention was, did we have bad faith, did we breach, did we -- if we follow the -- he's here to talk about the 8.1.B analysis so none of this is relevant to that, it can only be relevant for TI.

MR. ISAACSON: There is two claims in this document, there is the breach of contract claim with Hunter, Hayes and Yamin and as we're about to show there is a peripheral IP claim. For the breach of contract claim, his

belief that we had no choices makes it more probable than not that they breached and for the good faith claim make it more probable than not that this offer was made --

THE COURT: Are you going to ask about this?

MR. ISAACSON: I'm just going to --

THE COURT: He called them a monopoly and what are you going to use it for?

MR. ISAACSON: What I just told you to say that it's more likely than than not that they breached, more objections are overruled objections are overruled-

THE COURT: How much are you going to ask, are you going to ask this question, and you thought they were a monopolist?

MR. ISAACSON: I'm just going to say you wrote that they're a monopoly.

MS. KELLY: My concern is we're going to see this in closing, it's not their a motive to breach, it doesn't --

THE COURT: I'm going to sustain it. Even if it's relevant, it's substantially more prejudicial.

MS. KELLY: Thank you, Your Honor.

(End of side-bar.)

BY MR. ISAACSON:

Q. Can we look at PTX-1423.

Now, do you recognize PTX-1423, is this a

document that you have seen?
A. Yes.
Q. And is it your understanding this relates to the previous best deal analysis or the MFN analysis that Arm did?
A. Yes, this was the Excel work book for the scratch pad we used during the analysis.
MR. ISAACSON: I move to admit PTX-1423.
MS. KELLY: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 1423 was admitted into evidence.)
BY MR. ISAACSON:
Q. All right. I believe you said this was the Excel work book you used during the analysis. And the top corner on page 1, in small letters says previous best deal is Samsung, since Samsung has best royalty rates compared to all other licensees. Over on the right on the far right column, it says what Qualcomm paid, and over on the left, those numbers there, A720, A520, M55, those are Hunter Hayes and Yamin, right?
A. Yeah, the left hand is Hunter, Hayes, and Yamin and those are the marketing names which are executed.
Q. We'll talk some more about this later, GIC700, MMU700 and ELA 6000 those are called peripheral IP?

A. Correct.
Q. Mr. Spalding could you put those on the screen, those three numbers for the peripheral IP on what Qualcomm paid and we'll come back to those later?
Okay. Now if we turn to page 2 once again it says in footnote three, Samsung has been identified has previous best deal based on royalty rates for the three IP's collectively. And then on page 3, there is an analysis of MTK, that's MediaTek, right?
A. MTK is MediaTek.
Q. Then Qualcomm, Samsung, and then some others, right? Correct?
A. Yeah, I can see MediaTek, Qualcomm and Samsung.
Q. And then on page 5, assumptions, little four, the next best deal is MediaTek. So who had lower royalty rates, Samsung or MediaTek?
THE COURT: Could I see counsel over here for one second.
(Side-bar discussion:)
THE COURT: So I have this emergency motion from Samsung, nobody is objecting and I just want to make sure that you guys aren't just letting Samsung's stuff go out there without me ruling.
MS. KELLY: Your Honor, we have notified Samsung. We cannot make the particularized showing of

Samsung harm that Your Honor requires under the Third Circuit, we notified Samsung on Sunday. I did not know because Mr. Shivashankar is being called in first what Mr. Isaacson was going to show. We showed all of the outside counsel what I was going to do which is not put any of these numbers on the screen, and that I couldn't tell them what Qualcomm was going to do, they should coordinate with them.

THE COURT: Did he just put Samsung's stuff on the screen.

MS. KELLY: Yes, he did Your Honor.

THE COURT: Why didn't you say something, it's your client? If I didn't ask, I haven't had a chance to read it because I just got it.

MS. KELLY: Yes, Your Honor.

THE COURT: You just let your client's stuff be out there without even saying, by the way, Your Honor, there is a motion.

MS. KELLY: I apologize, Your Honor.

THE COURT: And you shouldn't have done it knowing that there is a motion.

MR. ISAACSON: I was not on top of that issue, apologize.

THE COURT: I'm granting Samsung's motion to intervene. There will not be -- they don't care about

anything but the financial terms, those will not be discussed openly in court, they will not be shown again openly in court and if anyone does anything like that again, I'm issuing sanctions, you all are more on top of that than I am, I shouldn't have had to raise that to protect your client's interests.

(End of side-bar.)

THE COURT: This is another one why we're go to talk about specifics, and since it's third parties, we're just going to put it up here on the screen, I know some of those numbers were a little small so you might need to move it a little closer.

MR. ISAACSON: May I resume?

Now, we have shown, you have seen several times that that document says Samsung is the previous best deal and that MediaTek is the second best deal. Which agreement did you use for the previous best deal analysis with Qualcomm?

THE WITNESS: It was all based on Samsung.

BY. MR. ISAACSON:

Q. So sir, when you did the proposal in October 24th and did the previous best deal analysis, are you saying you identified Samsung as the previous best deal?

A. Correct.

Q. You did not use MediaTek as the previous best deal?

A. Correct.
Q. Okay. And so are you saying that you believe that the offer you made was within ten percent of the total financial consideration, including fees and royalties for the Samsung deal?
A. That is correct.
Q. Okay. And when you did the analysis of total financial consideration of the Samsung deal, all you looked at was the fees and royalties, right?
A. That is not correct.
Q. What did you look at in the Samsung deal to determine anything else other than the fees and royalties?
A. To determine the previous best deal, the lowest royalty rates, so you look at the lowest royalty rates. And then you conduct an adjustment based on total financial consideration.
Q. All right. So now, to determine the previous best deal in Step 1, you only look at royalty rates, correct?
A. Correct.
Q. Okay. And in this analysis, and don't say any numbers, but did you ever identify anything other than royalty rates and up front fees for Samsung?
A. Can you say that question again?
Q. Well let's just go back to this, sir.
You're saying that you identified Samsung as the

previous best deal. And look at page five. Footnote four. You can put that on the screen. Hence the next best deal, MediaTek, is identified as the previous best deal. So this document is saying, isn't it, sir, that even though MediaTek was the next best deal, you used MediaTek as the previous best deal?

A. That is not correct.

Q. So are you saying this document is not correct when it says MediaTek was used as the previous best deal?

A. The previous best deal was Samsung.

Q. All right. You're saying this document is incorrect?

A. This document was a work book as I mentioned, there were several notes which was made.

Q. All right. And then if we can look at your deposition, could you turn to page 97.

A. I am on the page.

Q. And if you look at line 12, you were asked the question:

QUESTION: Do you recall the lowest royalty rates that are identified as part of the MFN analysis that went into the October 24, 2024, proposal?

"ANSWER: So for the October 2024 proposal, I do not exactly -- yeah, I remember the royalty -- yeah, I mean the rates, but the comparison for the previous best deal, I mean, yeah for us to consider, was MediaTek.

09:36:31 QUESTION: MediaTek you said?
09:36:33 "ANSWER: MediaTek, yes.
09:36:38 QUESTION: And you used MediaTek to compare the
09:36:40 royalty rates for the Hunter, Hayes and Yamin processor, is
09:36:44 that correct?
09:36:47 "ANSWER: Yeah, for doing processor IP my
09:36:49 review, MediaTek was -- yeah, I mean, yeah, the comparison
09:36:52 part."
09:36:53 Were you asked those questions and did you give
09:36:55 those answers?
09:37:00 A. Yes, I did.
09:37:01 Q. All right. I just want to have this straight. At
09:37:04 your deposition you said that MediaTek was used as the
09:37:08 previous best deal. Then this document comes up later and
09:37:14 says in the notes that MediaTek is identified as the
09:37:20 previous best deal, and you're here saying Samsung was used
09:37:26 as the previous best deal, that is what what's happening
09:37:30 here?
09:37:31 A. No, that's not correct.
09:37:32 Q. What's not correct about what I just said?
09:37:34 A. In the deposition, MediaTek was part of the analysis.
09:37:38 It was considered for comparison. The previous best deal
09:37:42 was determined to be Samsung.
09:37:44 Q. All right. You said in your deposition that MediaTek
09:37:48 was the previous best deal, right?

MS. KELLY: Objection, Your Honor, misstated testimony.

THE COURT: The jury can figure that out for themselves, overruled.

BY. MR. ISAACSON:

Q. The document says MediaTek was used as the previous best deal, correct?

A. The document on the screen?

Q. Yes.

A. It says Samsung is the previous best deal.

Q. Yes. But in terms of what was used in the assumptions, after Samsung was identified as the previous best deal, what actually happened was then you used MediaTek, the next best deal, for your previous best deal analysis?

A. Not correct.

Q. All right. Now in preparing the MFN analysis, you consulted third party royalty pricing agreements and Arm total access agreements, other TLAs, right?

A. Other customers, correct.

Q. Yes.

So I need to bother you with these so that these -- we will have these. This is -- we can take that off of the screen for now. Someone help me roll it back.

MR. ISAACSON: May I approach, Your Honor?

THE COURT: You may.
MS. KELLY: I'm sorry, Mr. Isaacson, may I have a copy? Thank you.
BY MR. ISAACSON:
Q. Do you recognize PTX-644 as a royalty pricing agreement with Infineon that was used as part of the MFN analysis?
A. Yes, I can see this is a document, a document between Arm and Infineon.
Q. Did you recognize PTX-645 as a TLA with Infineon?
A. Correct.
Q. And do you recognize --
A. I'm sorry, this is the Arm total access agreement.
Q. I'm sorry the Arm total access agreement with Infineon, yes?
A. Yep.
Q. And then do you recognize PTX-921 as the Arm total access agreement with MediaTek?
A. Yes.
Q. All right. And do you recognize PTX-923 as the royalty pricing agreement with MediaTek?
A. Yes.
Q. And do you recognize PTX-1057 as the royalty pricing agreement with Samsung?
A. Yes.

Q. And do you recognize PTX-1058 as the total access agreement with Samsung?
A. Yes.
Q. These documents were all used as part of your MFN analysis?
A. Yes. They were.
MR. ISAACSON: I move to admit PTX 644, 645, 921, 923, 1057 and 1058.
MS. KELLY: No objection, Your Honor.
THE COURT: Thank you. It's admitted.
(PTX Exhibit Nos. 644, 645, 921, 923, 1057 and 1058 were admitted into evidence.)
MR. ISAACSON: And then the last document in your pile, do you recognize that as the Arm price book from October to December 2024, this is PTX-1654, a document that was used in the MFN analysis.
THE WITNESS: Yes, that is the price book.
MR. ISAACSON: I move to admit PTX-1654.
MS. KELLY: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 1654 was admitted into evidence.)
BY MR. ISAACSON:
Q. Do you agree that under the MFN analysis or the previous best deal analysis, Qualcomm is supposed to get

within ten percent of the previous best deal for each implementation core it request a license for?
A. Can you say that again?
Q. So when you do the previous best deal previous best deal analysis the MFN analysis, you are doing that individual core by individual core, is that right?
A. There are more details to it.
Q. But you're looking at one core at a time?
A. We consider the implementation cores, yes.
Q. And what you're not doing is looking at bundles of cores when you're doing the previous best deal analysis?
A. Can you rephrase the question?
Q. Let me try this. Can you look at PTX-210 in your binder? Is this a chat that you were involved in, this is October 2nd, 201319, I'm not sure if this is British style or not, either October 2nd or February 10th?
A. Agree, I can see that.
Q. And if you turn to the second page. Is it Mr. Shah -- ?
MR. ISAACSON: I move to admit PTX-210.
MS. KELLY: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 210 was admitted into evidence.)
BY MR. ISAACSON:

Q. On the second page, Mr. Shah at 12:50 a.m. says MFN applies to all IP, individual individual and TC, TC is total compute, right?
A. TC, yeah, it's referring to total compute.
Q. And then you say, not for total compute, only for individual IP. And he says why not total compute. And you say, MFN clause compares the finance consideration at individual core level. And then there is actually a cut and paste of part of the agreement that we were looking at. And Mr. Shah says irregardless they are getting the best deal. And you say correct, they are getting the best deal for each IP. Arm implementation core is a key wording and you say spot on, yes, I believe, that's what you were writing that day that the analysis was being done for individual implementation cores, correct?
A. This was back in 2019, yes the.
Q. Let's go back to back to PTX-1535. And I don't remember what part of this is confidential so I just want to use it on the screen.
All right. If we could look at page 2. I don't know what -- there it is. You're looking at page 2. At the top, license fees, those are up front fees that are paid, right?
A. Correct.
Q. And there you see A720, A520 and M55 are Hunter,

Hayes, and Yamin and there is a seven-year term license, those would be up front fees so Hunter, Hayes, and Yamin, based on your previous best deal analysis, correct?

A. Yes, these are the whole MFN analysis.

Q. And then for royalty rates, the Hunter, Hayes, and Yamin rates are 720 is Hunter, 5.75 -- whoops, there is the royalty rate there, there is the royalty rate for A720 which is Hayes, and there is the royalty rate for Yamin. All right.

Now, let me just make sure I have this correct. These are rates offered to us by Arm, so would these be confidential?

MS. KELLY: May I answer, Your Honor?

THE COURT: Yes.

MS. KELLY: We are not confidential, if Qualcomm wants to keep them confidential, we have no problem doing that.

MR. ISAACSON: I don't feel comfortable saying these numbers out loud.

THE COURT: As long as no one has made a motion on these, that's fine.

BY MR. ISAACSON:

Q. So when what this means is the royalty rates that you're looking at--

MS. EWING: Your Honor, this is not Samsung's

information.

THE COURT: So that you're clear because we had a side-bar, I granted Samsung's motion to intervene, and I granted the motion for confidentiality, there was a breach time when the motion was -- when the information was put on the screen, that was taken down, and then we are doing what Samsung had requested and putting it on only where the jury can see it and not saying the numbers out loud.

MS. EWING: Thank you, Your Honor.

MS. KELLY: May I say we'll do the same process, we'll do the same process for any and all of their rates and information until it's -- /PA*RBG park park you mean this is Parker on behalf of sad we don't find out about this until yesterday so I put it in a letter, but if everybody agrees to do if same process, that would be great.

THE COURT: We're go to use the same process for financial information that is conveyed publicly, if there is something else that you think needs to have special treatment, you'll have to move on that, but certainly for financial information, the rates, things like that, we will not put them out there publicly.

ATTORNEY: Thank you, Your Honor.

BY. MR. ISAACSON:

Q. Just for simplicity, these are not confident, the royalty rates here that you're looking at, Arm was supposed

to conduct an MFN analysis for these three cores that would be within ten percent of the previous best deal offered to a third party, correct?
A. The rate you mentioned, that's not correct.
Q. All right. What was not correct about what I said?
A. So the royalty rates as part of the offer, so that was after the MFN analysis.
Q. The royalty rates that are offered here you are saying are within ten percent of the previous best deal?
A. That is not correct.
Q. Okay. What's incorrect about that?
A. So once you determine the previous best deal, then you have to do something called a total financial consideration, so the proposal which results is after the total financial consideration analysis that I just mentioned.
Q. And what was in the total financial consideration analysis, other than royalty rates and fees?
A. The total financial consideration analysis goes beyond the royalties and the license fee. We do consider a lot more variables as part of the analysis.
Q. And for Hunter, Hayes, and Yamin, what did you consider other than fees and royalties?
A. Once we determined the previous best deal as part of the total financial consideration analysis adjustment, we

look at the previous best deal in totality.

Q. You said that several times, sir. But for these specific deals, what did you look at besides fees and royalties?

A. As part of considering the totality, so we consider the total commitment of that customer to Arm, the number of products that are actually committed in licensing, the term or the length of the contract, how they will use our products in their products, what would be the average selling price of those end products, the amount of shipments that forecasts with their end products, the warranty, the offer as part of the contract, and many other business terms as part of the totality.

Q. And if you look at PTX-1423, the spreadsheet with the analysis, is any of that in the spreadsheet?

A. The spreadsheet as I mentioned, it's a work book, it was part of the MFN analysis.

Q. Is there some MFN analysis that exist somewhere that you have seen that has this additional analysis that you're talking about?

A. Those additional analysis are conducted with the bigger team with several meetings where we discuss with business experts in those fields to get the input.

Q. The only written analysis that you have seen for your MFN analysis is PTX-1423, right?

09:54:54 A. That is the document here.
09:54:56 Q. Yes. And that's the only written analysis you have seen that was used for the previous best deal analysis for Hunter, Hayes, and Yamin, right?
09:55:08 A. That is the only document I have seen so far.
09:55:12 Q. And there isn't anywhere in this document anything about all these additional calculations you were just talking about, right?
09:55:22 A. Those were part of the analysis.
09:55:25 Q. But they are not written down in 1423, are they?
09:55:32 A. This document was part of the analysis.
09:55:35 Q. Do you agree with me, sir, that all those additional calculations you were talking about are not written down anywhere in PTX-1423, the only document you recall seeing with the previous best deal analysis?
09:55:51 A. This document contains part of the analysis.
09:55:55 Q. I would like an answer to my question, sir. My question is, when you look at the analysis, PTX-1423, the only document you have seen with a previous best deal analysis here, does it include any of those other calculations you talked about, or is it just here only royalties and fees?
09:56:20 A. As I said, this document was part of the analysis. There were, I mean, other written, maybe on a note pad, other documents.

Q. Are you willing to tell this jury, rather than having them have to read through all this themselves and figure it out, whether this document only includes a fees and royalties analysis and doesn't include these other types of analysis that you're talking about, are you willing to tell the jury that?
A. This was part of the analysis, there are much more to it, correct.
Q. And when you say there was much more to it, you never seen that more to it, you have never seen that?
A. No, I was part of the analysis, I know exactly what happened.
Q. All right. Well, you said at your deposition you didn't remember any documentation, right?
A. Sorry, say that again?
Q. At your deposition, you said you didn't remember any documentation of the previous best deal analysis, you said there was some, but you didn't remember it, right?
A. At that time of the deposition, I didn't recall everything because nothing was presented in front of me.
Q. Exactly. And are you aware of your company producing any documents that are talking about the analysis that you're talking about today?
MS. KELLY: Objection, Your Honor, asking the witness about discovery and document production.

THE COURT: I mean, if he's aware of -- can you rephrase it so you're not asking about the litigation process, just the document.

MR. ISAACSON: Sure.

BY MR. ISAACSON:

Q. You have done work to prepare to testify today, right?

A. Sorry, can you ask that question again?

Q. You did preparation work in order to testify today, right?

A. There was some discussions, yes.

Q. And as part of your preparation to testify, have you seen any?

MS. KELLY: Objection Your Honor, asking about the witnesses meetings with counsel.

THE COURT: I mean, I guess what I was thinking is ask him about are you aware of any documents, not getting into litigation, not getting into discussions with counsel, just privileged things.

MR. ISAACSON: I'll do it that way, I'm obviously not trying to interfere with privilege.

THE COURT: I know you're not trying to get there, everyone is tired, I get it.

BY MR. ISAACSON:

Q. This additional financial analysis that you're

talking about this other thing, have you seen those documents?
A. Yes, I was part of the analysis.
Q. Where are they?
A. They were documents which you see right now, it was part of the analysis, there were discussions with key members before we put out the proposal to Qualcomm.
Q. So yes, we have seen the analysis, PTX-1423, we have seen the proposal to Qualcomm. Have you seen any other financial analysis other than those documents leading to the previous best deal offer?
A. Yes, we did other analysis.
Q. And what happened to it?
A. It was part of the process, it was part of the analysis.
Q. Now, can we look at JTX-5 again? At page 14. We looked at provision 8.1B, let's look at D. It says here, so 8.1B was talking about the financial terms. Now 8.1D is talking about the nonfinancial terms. It says the material nonfinancial terms and conditions under which Arm offers to license an Arm implementation core to QGT, that's Qualcomm, shall be substantially similar to the material nonfinancial terms and conditions set forth in the TLA as the effective date of such TLA. Now, if we go back to your offer, PTX-1535, and if we can put page -- the general terms on

10:01:14 this -- can we put that on all screens, it's got no numbers. There we go. 12. Support and maintenance is not included in this Qualcomm IP extension offer. So you were not including support and maintenance for Hunter, Hayes, and Yamin, correct?
10:01:36 A. Not correct.
10:01:37 Q. Why do you say that's not correct?
10:01:39 A. So this particular term was referring to that we didn't double count support and maintenance fee while putting this offer to Qualcomm.
10:01:50 Q. And what do you mean by that?
10:01:54 A. Qualcomm had a separate support and maintenance agreement which was running in parallel and that covered the support and maintenance for all the IP they have licensed.
10:02:09 Q. So the way that would work is the TLA for Hunter, Hayes, and Yamin would say support and maintenance is not included in this Qualcomm -- is not included, and the support and maintenance would be covered in a separate support agreement, is that your testimony?
10:02:33 A. The fees was not included because we didn't want to double count, and the support and maintenance was covered in a separate agreement.
10:02:41 Q. All right. But this doesn't say fees, it just says support and maintenance is not included, that's what the offer was, right? And you're saying don't worry, there is

10:02:53 another agreement that provides support.
10:02:59 A. I mean, I do not put it that way.
10:03:03 Q. All right. Just so we can make it clear to the jury, you were saying in this offer, support and maintenance is not included, and you're saying support and maintenance is in a different agreement?
10:03:16 A. It's covered in a different agreement.
10:03:18 Q. Right. And so that different agreement is DTX-33 in your binder. This is the support and maintenance agreement made December 31, 2020.
10:03:40 MR. ISAACSON: I move to admit DTX-33.
10:03:43 MS. KELLY: No objection.
10:03:45 THE COURT: Thank you. It's admitted.
10:03:46 (DTX Exhibit No. 33 was admitted into evidence.)
10:03:46 BY MR. ISAACSON:
10:03:46 Q. This is the support and maintenance agreement that you were talking about. Here is the other agreement that will provide Qualcomm support and maintenance, right?
10:03:55 A. Yes, that is correct.
10:03:56 Q. And then in the first paragraph, 1.1, there is the support and maintenance, and at the end, it says what services are being acquired, are being offered. Services mean the support and maintenance services described in the relevant license agreements for the Arm technology license to licensee.

All right. The services that are provided in this agreement are only the support services that are set forth in the separate licensing agreement, right?

MS. KELLY: Objection, he's calling for a legal conclusion as opposed to a factual question of the witness.

THE COURT: Overruled.

BY. MR. ISAACSON:

Q. When you told the jury that there is a separate agreement that would provide support here, even if the license that you were offering would not include a support and maintenance, that separate agreement says that it only provides services if the other agreement, the license agreement provides for that support and maintenance, correct?

A. I cannot interpret the contract language.

Q. All right. So when you were testifying that there is support and maintenance in a separate agreement, you didn't actually know that, did you?

A. I knew there was a support and maintenance agreement.

Q. Right. But you didn't know if it would provide support for Hunter, Hayes, and Yamin if the Hunter, Hayes, and Yamin agreement said support and maintenance is not included?

A. I knew the S and M was support and maintenance agreement was there, and it was valid, and that would

include the support and maintenance for Hunter, Hayes, and Yamin.
Q. Right. And you don't actually -- are you here to interpret those two agreements for us, sir?
A. I am not.
Q. All right. And when does the service agreement expire? Look at page 2, 1.4. It terminates on December 31st, 2027, right?
A. That is correct.
Q. All right. And you are offering a seven-year license for Hunter, Hayes, and Yamin that would pass 2027, weren't you?
A. The seven years would take us past yes.
Q. Even if this separate agreement provided support for a while, for Hunter, Hayes, and Yamin, that would be cut off on December 31st, 2027, right?
A. If there is no renewal of this agreement, that is correct.
Q. All right. So if we could look at PTX-1535 at two. These other -- these other numbers were all Hunter, Hayes, and Yamin. Okay. We're going back to the GIC700. MA700 and the ALU700 you haven't heard about, it's peripheral IP. Peripheral IP is on the chip along with the CPU, the GPU and whatever else?
A. Yes, they get used along with the CPU and the GPU.

Q. And I don't want to get overly technical because I don't understand these myself but if GIC700 is an interlock controller, it provides a type of blocks or stops in the architecture, is that pretty close to right?
A. Sort of.
Q. And the MMU700 is a memory management unit, it translates something called an input address to an output address?
A. Correct.
Q. And ELA600 is the embedded logic analyzer, that's an optimization to improve data tracing efficiency and capacity, does that sound right?
A. Correct.
Q. I still don't know what those mean, but we can see they do cost some money on here. So keep the slide on here, on this screen, Matt.
Can we put, fill in the October 24th offer compared to what they were paying before. All right. So you recognize these as the increase in up front fees that you were charging, you were offer anything your offer compared to what Qualcomm was paying before, right?
A. The 2019 numbers, that is not correct.
Q. Well those came out of 1435, your best -- your previous best deal analysis. If you just look at page 1 of that, put it on the screen for him. And over on the -- no,

no, 1423. What Qualcomm paid, the right-hand column. We pulled those numbers straight out of there. Do you see that?
A. I can see the numbers where you pulled from.
Q. All right. And then going back to the slide, can you put those numbers in the first column?
A. I see the numbers copied from the Excel.
Q. Yes.
A. But when you actually say what Qualcomm paid, that's not accurate.
Q. Well those are -- well, it says what Qualcomm paid is exactly the words from your Excel spreadsheet, right?
A. Okay. What I meant was this is a work book where we actually back calculate some numbers as well.
Q. All right.
A. So --
Q. I'll leave that --
A. It's part of the work book analysis.
Q. You were increasing the rates pretty significantly in your offer, right?
A. No.
Q. Okay. Now, you do know that Qualcomm did not accept Arm's offer for Hunter, Hayes, and Yamin; right?
A. Correct.
Q. And you know that Qualcomm said they didn't want to

accept the offer because it was too expensive?
A. I don't know the reason, but they didn't accept.
Q. And you know that the previous license for Hunter, Hayes, and Yamin had a cap on royalties and this offer did not, right?
A. So the previous offer in 2019 had a different number structure. Yeah, and this proposal, if I recall correctly, yeah, didn't have a cap.
Q. And the original license for Hunter, Hayes, and Yamin also had support and maintenance, right?
A. When you mean the original offer --
Q. No, not the original offer, the license that was expiring?
A. No.
Q. No, never mind. I'm sorry, the TLA, you're right, the TLA has support and maintenance in it, right, the 2013 TLA?
A. Again, the 2013 is a TLA.
Q. 2013 TLA provides for support and maintenance, you do know that, right?
A. The support and maintenance is a different agreement as we just saw.
Q. Okay. I'll move on from that.
And when Qualcomm didn't accept that offer, you knew that Qualcomm then had to use it's own custom cores to

replace Hunter and Hayes, right?

A. I do not know.

Q. DTX-259.

MR. ISAACSON: This is a DTX so go ahead and move to admit it.

MS. KELLY: Did you say 259, Mr. Isaacson?

MR. ISAACSON: Yes.

MS. KELLY: No objection.

THE COURT: Thank you. It's admitted.

(DTX Exhibit No. 259 was admitted into evidence.)

BY MR. ISAACSON:

Q. We were looking at October 2024, this is January 10th of 2025. All right. And if you put this on the screen on page 1, this is a January 10th, 2025 extension offer. And on the second page, now there is an offer, it's for seven years again for the GIC700, the MMU700 and the ELA600. All right. That's what you were offering in January of 2025, right?

A. Correct.

Q. All right. And would you put that on the slide Mr. Spalding?

All right. And so those are the increases that you proposed in January versus October; right?

A. Correct.

Q. All right. Now, finally in term terms of the TLA, your understanding of the TLA analysis -- I want to show you PTX-2534. That's in your binder.
A. Can you say the number again?
Q. All right. And if you look at the tab in front of that, PTX-2534, metadata, do you see that?
MS. KELLY: Your Honor, just we'll stipulate that this was in Mr. Shivashankar's.
MR. ISAACSON: Thank you.
MS. KELLY: To avoid the issue of metadata.
MR. ISAACSON: Thank you, appreciate that.
BY MR. ISAACSON:
Q. 2534 was in your files and you recognize this as an Arm deck by its -- by the logos and how this is set up, you recognize this as an Arm business document and it was also found in your files?
A. I can see this is a slide deck.
MR. ISAACSON: Move to admit 2534.
MS. KELLY: Your Honor, a version of this is already in evidence, so we have no objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 2534 was admitted into evidence.)
BY MR. ISAACSON:
Q. And then if you look at page 9 of 13, this was -- at

a high level, this matched your understanding of what the MFN analysis was supposed to be. Do you see the initial request, determine previous best deal with the lowest royalty rate, offer license to same Arm implementation core, offer to licensee must be within ten percent of total financial considerations of previous best deal, that accords with your understanding, right?

A. Correct.

Q. And then at the time that you were making this offer, you understood on page three, Qualcomm had concerns about its total reliance on Arm architecture, right?

A. I can see the words.

Q. And you knew that Qualcomm had business continuity concerns as well, right?

A. I can see the words.

Q. And have you seen other Arm documents with the Dr. Evil picture?

A. We use so many pictures in this slide deck, multiple images, it's very common practice.

Q. I understand that, but you have seen that picture in other slide decks?

A. I do not recall.

Q. All right. And then at page 11 -- all right. And there is -- at the top, it says we need to keep close eyes on the license fees and royalties that we are closing, as if

we fall below Qualcomm royalties and license fees within a two-month period of Qualcomm licensing. What that's talking about in the provision we're talking about Qualcomm can make an initial request for an offer and if it had a license, 12 months later, it can make another question for analysis of the previous best deal to see if the rates have changed, that's what it is talking about there, right?

A. No, that is not correct.

Q. Page 10, that's where you discuss in the subsequent request, and remedy at time of subsequent request in the second item. If Arm's investigation at the time of the subsequent request determines that the total financial considerations related to licensee license for the Arm IP are greater than ten percent then it talks about the refund, that's a summary of what happens with the subsequent request, correct?

A. These are snippets from the contract details, I mean, I do not recall the entire context.

Q. All right.

MR. ISAACSON: Sir, thank you. I have no further questions.

THE COURT: Cross.

MS. KELLY: Your Honor, just for planning and binders, how long do you want me to go until the morning break?

THE COURT: Half an hour.

CROSS-EXAMINATION

BY MS. KELLY:

Q. Mr. Shivashankar, we're going to go through and try to clear some stuff up, but I want to start with something that Mr. Isaacson spent a ton of time on, which was asking you questions about PTX-1423, and whether there was anything in there that reflected the total financial consideration analysis that you did. Do you recall those questions?

A. Yes, I do.

Q. Could you please, Mr. Schlaifer, put on the screen page 5 of PTX-1423. 1423, it's the spreadsheet.

Thank you. Could you go to page 5 of that, please, Mr. Schlaifer.

Okay. Could you pull out the middle part where it says assumptions all the way through because. Okay.

Can you please highlight number three. What words appear in assumption number three in the work book that you used when you were preparing the offer for Qualcomm in October 2024, Mr. Shivashankar?

A. Samsung has the best royalties for the three IP collectively and the total financial consideration of Samsung was not comparable to Qualcomm's.

Q. Without getting into some of the specifics because the jury can see them but I don't want to put confidential

information out, can you describe at a high level what some of the three driven things are that you identify as different between Samsung and what Qualcomm was asking for that you wrote down, that you considered as part of your total financial consideration analysis in 2024?

A. Yeah, the three things was Qualcomm ask for renewal of a very small set of products which was Hunter, Hayes, and Yamin, and the three system IP. Compare that to Samsung which was a substantially bigger deal in terms of the commitment, in terms of the total fee which was an order of magnitude higher than what was Qualcomm asking. Along with that, the number of products which Samsung were licensing was also substantially higher.

With that big of a commitment from Samsung, that results in like Samsung using our own products at a broad portfolio of their products. And then the length of the commitment of them using our own products was also substantially different.

Q. We're going to talk about it a little bit more. But does Samsung's agreement just in general, is that for a specific list of products or IP like Qualcomm had six things on the list, is Samsung's license for a specified number of Arm products?

A. It was not, it was a subscription agreement.

Q. What generally is a subscription agreement that Arm

10:23:21 offers?
10:23:22 A. The best example I can actually give is Qualcomm was requesting to license like six IP which was kind of renting a movie, while Samsung was a subscription like Netflix.
10:23:44 Q. For licensees for Arm who have a subscription license, is it limited to products that exist at the time of the license or does it include anything beyond that?
10:23:57 A. It's similar to Netflix, you get access to the current set of products which are there, and you do get access to all the new products which Arm releases during the term of the license.
10:24:11 Q. As part of the total financial consideration analysis, did you both consider those differences in Samsung's agreement and what Qualcomm wanted and actually write down contemporaneously that that's what you were doing in PTX-1423?
10:24:31 A. Yes, we did capture those points.
10:24:34 Q. Okay. So we're going to go back to the beginning and sort of talk a little bit more context to what it is that you do.
10:25:01 MS. KELLY: May we approach, Your Honor.
10:25:05 THE COURT: You may.
10:25:08 BY MS. KELLY:
10:25:09 Q. All right, Mr. Shivashankar, I'm not going to give you that now, but I just want you to have it. One other

thing, I know I said we were going to start at the beginning. But Exhibit 1423, I think you called it a work book, was that your word?
A. Work book, correct.
Q. When you had your deposition taken in 2025, did you have that document in front of you while you were being asked questions?
A. No, I did not.
Q. In the time that you have been working on licensing proposals for Arm, about how many licensing proposals have you prepared, is it like two or three or something else?
A. No, it's hundreds of them.
Q. At the time of your deposition without having PTX-1423 in front of you, were you able to recall like the specific numbers on those five pages we looked at?
A. No, without looking at the document, I couldn't.
Q. Okay. All right. So you talked about your words were an MFN analysis, right. And I think you told us you weren't a contract guy. So how do you know about this MFN analysis?
A. When I took the role as the director of licensing, I was passed down this analysis from my previous manager.
Q. Is the MFN analysis something that you do for everybody who wants to license Arm products or just for some limited group of that?

A. It was specifically for Qualcomm.
Q. Do you do an MFN analysis for every license request that you get from Qualcomm?
A. No, not for every request.
Q. What kind of request do you do it for?
A. When we get a request from Qualcomm, first we is it actually a request for implementation cores and we determine whether that is the first request or the initial request.
Q. Okay. I want to stop there, implementation cores, we saw Hunter, Hayes, and Yamin listed in the proposal you -- that Mr. Isaacson admitted into evidence. Are Hunter, Hayes, and Yamin implementation cores?
A. They are.
Q. And then we separately saw the GIC700, MMU, a third one, I like Mr. Isaacson don't fully understand what that stuff is. Are those implementation cores?
A. They are not.
Q. Did you do a previous best deal MFN analysis for the system or peripheral IP to get MMU and SMU?
A. We do not.
Q. You said you do it when you get an initial request from Qualcomm, what do you mean when you say a first request?
A. When Qualcomm request to license the implementation core for the first time, that is the initial request when we

10:28:01 trigger the MFN analysis.
10:28:03 Q. Mr. Isaacson asked you a lot of questions and showed
10:28:07 you some language in DTX -- JTX-5, the TLA that talked about
10:28:13 a subsequent request. Do you remember those questions?
10:28:15 A. I remember the question.
10:28:17 Q. Does subsequent request just mean you do the same
10:28:21 thing every other time you get a request for a license from
10:28:24 Qualcomm, or is it your understanding that it's something
10:28:27 other than that?
10:28:27 A. It was not part of the NVIDIA analysis, it's
10:28:31 something else.
10:28:31 Q. What does it mean -- let me ask a better question.
10:28:36 For what subsequent request would you do an MFN
10:28:41 analysis, if any?
10:28:45 A. If I recall the subsequent request has to be within
10:28:49 the 12-month window.
10:28:51 Q. So is it for a separate licensing request or is it
10:28:55 some audit, look back or something else to your
10:28:57 understanding?
10:28:58 A. If I recall, that must be for the adjustment, within
10:29:03 that 12-month window.
10:29:05 Q. So let's talk about the October 2024 proposal that we
10:29:09 looked at that's in evidence for Hunter, Hayes, and Yamin.
10:29:14 When you first were made aware that Qualcomm was requesting
10:29:18 some of those implementation cores, did you look into

whether that was an initial request?
A. Yes.
Q. And what did you and the licensing team decide?
A. When it first came, it was a renewal request, they already licensed this back in 2019, so it was not an initial request.
Q. All right. So let's take a look in your binder please at DTX-906, I think it's all the way in the back.
Can you take that down, please, Mr. Schlaifer.
Q. Are you looking at 906, Mr. Shivashankar?
A. I'm on the first page of 906.
Q. Do you recognize that?
A. Yes.
Q. What is it?
A. This is the master royalty schedule we have with Qualcomm which captures all the royalty rates we have agreed with Qualcomm.
Q. What is the date of the master royalty agreement -- schedule, sorry, that's DTX-906?
A. 18th October, 2019.
MS. KELLY: Move to admit DTX-906, Your Honor.
MR. ISAACSON: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 906 was admitted into evidence.)

BY MS. KELLY:
Q. Could we turn to page 9, please, Mr. Schlaifer. Could you pull out the bottom, the last four things -- yeah, you're not on the big one. You don't have control?
Mr. Buckson, do you mind seeing if we can switch over. Thank you for your help.
Is that you now, Mr. Schlaifer. It should only be on this screen and my screen, please. Could you try to highlight? Okay. We'll go with what we got.
Looking at what you all see on the screen as DTX-906 and what we have in our binder, if you look down at the bottom, do you see, what are the last four cores that are listed on page 9 of this 2019 master royalty schedule?
A. Hunter ELP, Hunter processor, Hayes processor, Yamin processor.
Q. And is this 2019 royalty schedule showing that Qualcomm was already licensing Hunter, Hayes, and Yamin in 2019, did this play any role in your conclusion in 2024 that the request for Hunter, Hayes, and Yamin wasn't an initial request?
A. Qualcomm had a license in 2019, yes, this played a role, I mean, it was not the initial request because they had the license since 2019.
Q. Great. So I want you to take a look in your binder at exhibits DTX, it's 1699 and 1700, it's an e-mail and an

attachment. Do you see that, Mr. Shivashankar?
A. Yes, I see that.
Q. Is this an e-mail that you received?
A. Yes, I'm part of the chain.
MS. KELLY: Your Honor, move to admit DTX-1699 and 1700.
MR. ISAACSON: No --
THE COURT: Thank you it's admitted.
MR. ISAACSON: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit Nos. 1699 and 1700 were admitted into evidence.)
BY MS. KELLY:
Q. Mr. Shivashankar, let's take a look and if we can put on the screen page 4 of that exhibit. That's PTX, it's DTX-1699. Please and thank you. Thank you very much. If we can go to page 4, please. Mr. Shivashankar, looking down at the bottom we see this is from a Kris Webber. What is she conveying in the top of this e-mail from -- if we could just go one page previous to page 3 to see the date. May, 2024. We can go back to page 4, please.
A. It's an e-mail from Kris Webber to group mentioning Qualcomm has requested to extend the term of Hunter, Hayes and system IP.
Q. You were asked some questions by Mr. Isaacson why it

10:34:14 wasn't entirely clear to me so I want to ask you. In 2024 at this time was the 2019 license for Hunter, Hayes, and Yamin that Qualcomm had, was that about to expire?
10:34:24 A. No.
10:34:25 Q. When did that 2019 Hunter, Hayes, and Yamin license for Qualcomm, when was that scheduled to expire?
10:34:32 A. It was due to expire September of this year, 2026.
10:34:37 Q. Did Ms. Webber, Webster, I keep calling her Webber, Webster's e-mails keep making their way to you?
10:34:46 A. Eventually, yes.
10:34:48 Q. Did you prepare a proposal for Qualcomm for the IP which is just Hunter and Hayes here that they requested in response?
10:35:03 A. Yes, I did, on May 16th.
10:35:06 Q. And is that DTX-17 which is 1700, which is the attachment which we can put on the screen to the jury, please. Is that the proposal you prepared in May 2024, Mr. Shivashankar?
10:35:23 A. Yes.
10:35:24 Q. When you prepared this proposal in May of 2024, did you do this MFN analysis that we have been talking about?
10:35:33 A. In May we did not.
10:35:34 Q. Why not?
10:35:36 A. This was not the initial request, it was a renewal request.

Q. Do you have an understanding of what happened after you prepared this slide and e-mailed it, did it go to Qualcomm?
A. After this conversation, this was escalated to legal and they had to do a review.
Q. Did it eventually make its way back down to you in the fall of 2024?
A. It did.
Q. At that point in time, did you do an MFN analysis?
A. Yes, we did do the MFN analysis.
Q. Had you changed your mind that this had somehow become an initial request between May and September?
A. In my mind, no.
Q. Then why did you do it? Why did you do the MFN analysis in the fall?
A. When legal actually reviewed this and it came back, they asked us to conduct the MFN analysis to be on the safer side.
Q. Okay. So let's -- we can take take that down, please, Mr. Schlaifer. Thank you so much.
Let's talk about the MFN analysis that you did, that's PTX-1423, the spreadsheet. And I want to walk through that. If you could please, Mr. Schlaifer, go to -- could we please put up pages 2 and 3 like next to each over. Can we call out that first column and stack them on top of

each other, please. Yeah. Awesome.

So you were shown some portions of this that talked about MediaTek. Does this -- first of all, let me ask you. What is PTX-1423? Can we take it down, please? What is this?

A. The spreadsheet which was there on the screen a moment ago.

Q. Yes.

A. Yeah, that was in the work book which we used as part of the MFN analysis.

Q. So you're saying work book. Is this like, what do you mean by that, can you explain it?

A. Sure. So whenever we do the commercial proposal, we use an Excel sheet to start and use that as a scratch pad for our analysis and we capture some notes, while we go through the analysis.

Q. Could we put that back up, please?

MR. ISAACSON: Your Honor, may we approach?

THE COURT: Yes.

(Side-bar discussion:)

MR. ISAACSON: The prior versions of this, the various interpretations that are now being talked about were withheld on privilege grounds. And she showed, this is expanding, she said total financial consideration was discussed on that spreadsheet, but there is no numbers. And

so now the suggestion is it's somewhere else, all this stuff has been withheld on privilege grounds and now were also blurting out instructions for legal counsel about.

MS. KELLY: If I may, Your Honor, this was briefed. There were third-party confidentiality concerns which is why we did not initially produce it. There was a hearing in front of Your Honor in March where it was resolved, there was briefing by the parties. I can go get my notes from it. Also we produced it and agreed to produce a witness in response to Qualcomm's request, there are multiple versions of this spreadsheet that was produced in discovery, I believe there were almost 50 versions all produced, yes they were not produced in the first tranche because we had all of the lawyers that were here before intervene, we requested a deposition, we offered Mr. Youssef, we had Youssef one of the lawyers who was involved in this, he was deposed specifically about this by Qualcomm, they did not ask for a deposition of Mr. Shivashankar, they didn't ask to go back, he didn't have it at his deposition. This was not withheld because of privilege it was withheld -- yes, Your Honor there were some early discussions about it, it ultimately was turned over in March and a deposition was taken by Qualcomm.

THE COURT: How about I let the jury go for their break and we don't have all stand over here.

10:41:11 MS. KELLY: Thank you, Your Honor.

10:41:11 THE COURT: Why don't we take our morning break, you guys can go back to the warm jury room, we'll take until about 11 o'clock.

10:41:21 THE COURT: So as I understand, everyone can be seated.

10:41:30 So the objection is that asking him about iterations of things you say were withheld as privilege, she says 50 different iterations were produced help me out.

10:41:48 MR. ISAACSON: Some iterations were produced, some were clawed back. I don't know what he is talking about, so if she were to show an iteration that's been produced, that would be proper. I don't think there is anything about total financial considerations that's been produced in any of these iterations. So this general discussion, it says -- anyway, they have clawed back some of these. I'm not in control of what we have and what we don't have.

10:42:25 THE COURT: Okay. So I could have concerns because even when Mr. Isaacson was asking the witness questions, I had no idea what documents were being like discussed, and I don't know if there are things that are privileged, things that weren't produced, if the witness is anything of something -- it's very confusing to me, and I did notice that. And now I have no idea what you're doing.

10:42:53 MS. KELLY: I'm happy to explain, Your Honor.

10:42:55 THE COURT: I want you to actually like use documents so he knows what you're talking about, not just talking in generalities because suddenly it starts to sound like we did all this work and Mr. Isaacson is sitting there saying I have no idea what he's talking about.

10:43:13 MR. ISAACSON: Happy to help here, there are fees and royalties which are in the spreadsheet and there is this concept other than fees and royalties, total financial consideration, the spreadsheets and the iteration that have been produced that discuss fees and royalties, I don't believe anything about total financial consideration --

10:43:31 MS. KELLY: There is no numbers, Your Honor, I'm not going to have the witness get up and say -- he's going to actually say there is no calculation, total financial consideration is not a formula, we don't go a and say well Samsung got an ATA and we discount 13 percent and then multiply by four percent for the warranty, and then you take another three percent off, there is no other document I'm asking about, I'm asking about what plaintiff submitted into evidence which is the final version, the last version of this that was the Excel spreadsheet that was dated in October right before the proposal was made, and what he's going to testify to Your Honor is that they had discussions it was an iterative process and how they account for total

10:44:10 financial considerations is frankly not numerical, I'm go to elicit that from him. There is no separate document that he's talking about --

10:44:19 THE COURT: He says whenever we do a commercial proposal we use an Excel sheet to start and you said as a scratch pad for our analysis and we capture some notes while we go through the analysis. Is that what -- is that -- is everything he just said on that because it makes it sound like well that and then we start like making changes.

10:44:39 MS. KELLY: It's that, there are the various versions that why we produce 50 versions of this, 50 is a round number, Your Honor, I don't have the exact count, as they go through they save and auto save various versions which have been produced to Qualcomm other than one that was clawed back that they show how the spreadsheet grew and changed over time. I can certainly make clear that there are no documents that he has other than the various versions of this work book, I am not intending to ask him about other documents, he's going to tell you this is basically notes, they have a bunch of meetings, they talk to business people and as they do, they write a bunch of stuff on this work book. Certainly everything is not written down here. There was never anyone who said everything was written down here. It's a process, some notes are taken, they're in this work book, the work books were produced including the versions

that show the changes, and he's not going to say there is some other secret mathematical calculation, that's not the way they do total financial considerations.

THE COURT: Thoughts on that?

MR. ISAACSON: I'm scrolling through because I think he said the opposite of this. Over and over I asked him, these things weren't written down, about the total financial analysis and over and over, he just kept repeating it was part of the analysis. I asked him -- when we were talking about how appropriately ask him about documents that were missing, the additional financial analysis you're talking about, this other things thing, have you seen those documents, yes, I was part of the analysis. Where are they? They were documents which you see right now, it's part of the analysis. There are discussions between members before we put out the proposal to Qualcomm.

MS. KELLY: And that's part of it, Your Honor.

MR. ISAACSON: So yes we have seen the analysis, have you seen any other financial analysis other than those documents leading to previous best deal offer. Yes. So just there, as I said, this document was part of the analysis, I mean, there were other written, maybe a note pad, other documents.

MS. KELLY: Your Honor, I can tell you what he's referring to, during the meeting they have light boarding,

he has light boarding, I can elicit that from him, I'm happy to, they don't have save a screen shot, that's what he's thinking about, they get on a call and sit in a room and write objections are overruled white board. The total financial consideration analysis Your Honor is on PTX-1423 on page 5, there is literally a section that says, Samsung has the best royalty rates for the three IP's collectively, however the total financial consideration for Samsung is not compare deductibles to QY and because of the following reasons.

MR. ISAACSON: Right, which is just words, no numbers.

MS. KELLY: There are no numbers, Your Honor, I will be eliciting that testimony from him, there are no numbers used credit, they look at a bunch of stuff, they take it into account with their expertise, I think this is where some of the confusion came from with Mr. Isaacson, Mr. Shivashankar is thinking you're looking for some calculation for total financial consideration, there isn't one, he's going to say that and he's going to explain the process to the jury, literally it's coming up next. There is no other document, he's not going to claim that there is, there is nothing that shows some sort of numerical inputs that are specifically apportioned to different things, they use their experience, they use other customers who have

similar, this is how MediaTek is going to come in, they have a similar setup where they list discreet IP in the same market of the same type and that's why they look to that --

THE COURT: You guys need to talk about this, because you're like trying the to explain to me, I have no idea and you're trying to convince him that he has it. Why don't you guys talk and we'll come back at five minutes to 11:00 and you can tell me where we are.

COURTROOM DEPUTY: All rise.

(A brief recess was taken.)

COURTROOM DEPUTY: All rise.

THE COURT: All right. Did you work it out?

MR. LoCASCIO: I think they did, I had no role in mediating it, I believe they did. I have a housekeeping thing if we can put it on the record before the jury comes in, I talked to a couple of third-party lawyers, Mr. Isaacson moveD in a series of exhibits. I'm going to move, in PTX-1057 and 1058, PTX-0644 and 0645, PTX-0923 and 0921, and the spreadsheet that we have been talking about that contains some of those numbers is PTX-1423. We believe and the third parties counsel I talked to believe those should still be treated as everyone believed they would under the sealed motion granted by Your Honor, while they were moved into evidence before the order was granted we believe they should similarly now be considered under sealed

Mr. Isaacson and I talked about this as well.

THE COURT: Mr. Isaacson.

MR. ISAACSON: No objection.

THE COURT: I think for the third parties, the harm from the disclosure of their specific financial information does, and in the showing I had meets the standard that is required, I will grant that motion and seal those documents on the record.

MS. KELLY: Your Honor just a little bit of housekeeping, there is going to be another Samsung document I will move in that will I presume be under seal. There is a portion of it that does not include numbers but that I did need to discuss with Mr. Shivashankar, we can do it so the jury sees it.

THE COURT: Have you talked to Samsung?

MS. KELLY: Samsung is aware ever it, they know that we were going to request it, it does not include a royal until rate, it's a hierarchy of fees that they only pay one fee if they use a bundle, this is the top fee, this is the second fee. So essentially it's the idea that they get --

THE COURT: Did you show Samsung's counsel, who is here, are you okay with what she's proposing.

^woman woman I'm not exactly sure.

THE COURT: You know she was here, so I can't

believe that you're just like making stuff up. Show her what you mean. We are wasting everybody's time.

MS. DUNN: I will formally request, we are wasting every's time right now, I will formally request we just move to the next witness, give everyone time to get this sorted because time is not an infinite resource, just to state the complete obvious.

THE COURT: I mean, this is crazy.

MR. LoCASCIO: I think just, this is one item, whatever this minute is --

THE COURT: This is all, put Arm on the clock because this should have been done during the break.

MS. DUNN: And I tried to give you a way out just now.

MR. LoCASCIO: I appreciate that but we have a witness mid examination.

THE COURT: I get it and we have a jury standing out there waiting for you guys to figure it out.

MS. KELLY: I apologize Your Honor, Samsung's counsel has reviewed it and said they are fine with it.

MR. LoCASCIO: Done. Thank you.

MS. DUNN: And also, I would like to make one more request. We would like not to be charged for a large portion of the time that happened here because there was a potential privilege waiver.

THE COURT: You're being charged for it right now, if you want me to take something off later, you can bring it up at the next break, right now a jury is standing there and you are now wasting their time.

MS. DUNN: Understood, thank you.

(Jury entering the courtroom at 11:07 a.m.)

THE COURT: All right. Welcome back, everyone. Let everyone else be seated. Let's proceed.

MS. KELLY: Thank you, Your Honor.

BY MS. KELLY:

Q. Mr. Shivashankar, when we left off, we were talking about PTX-1423, the work book that you described. On pages 2 and 3 of that work book, there are some other companies identified on the top rows. And Mr. Schlaifer, could you please show those top rows on pages 2 and 3 for the jury. What are those companies, Mr. Shivashankar?

A. The companies are QC Qualcomm, Samsung, MediaTek, and MediaTek is MTK and we have Amlogic and TI stands for Texas Instrument.

Q. Why are they listed in your work book?

A. As part of determining the previous best deal, we had to compare other customers who had licenses for those same implementation cores.

Q. You mentioned Qualcomm is one of those boxes. Did you consider Qualcomm's 2019 rates in determining the

previous best deal for the October 2024 proposal?
A. Not in determining the previous best deal.
Q. Why is it listed on this spreadsheet, then?
A. So whenever we have a proposal, it is a very common practice for us to pull the previous deal data into the work book so that we have a reference right there for the analysis.
Q. Why didn't you consider Qualcomm's 2019 rates in doing your previous best deal analysis?
A. For the previous best deal, we had to compare licenses from other customers.
Q. Who did you ultimately determine was the previous best deal for Qualcomm's request for Hunter, Hayes, and Yamin in October 2024?
A. Samsung was the previous best deal.
Q. Is that marked somehow in the part of PTX-1423 that we're looking at?
A. If you see point number three, Samsung has been identified as previous best deal, for three LG.
Q. What about the part that's page 3. Maybe you can make that a little bigger, Mr. Schlaifer, if you don't mind, please. And thank you.
A. So the Samsung box was highlighted and on top of that, the previous best deal is Samsung, since Samsung has the best royalty rates compared to all the other licensees.

Q. Okay. Without saying any numbers, looking in the Samsung box, do you see it says M55 on the left, the far left of what we're looking at now?
A. Yes.
Q. What's M55?
A. M55 that's the code detection, M55 is the marketing name for Yamin.
Q. There is a percentage, if you go across, you can see there is a percentage under RR, what does RR refer to, we're highlighting it on the screen, what does that refer on in the Samsung box?
A. RR stands for royalty rate.
Q. If we continue to go across, we can see there is an RR in the same spot for Amlogic, do you see that?
A. Yes.
Q. Mr. Schlaifer, if you could put up page -- so the way this is printed, not all of the spreadsheet came in.
MS. KELLY: Your Honor at this time I move to admit DTX-2519 which is the native version of this same document. Oh, I apologize, it's on the next page, I just couldn't read it. Thank you, Mr. Evangelos. Great.
BY MS. KELLY:
Q. Do you see there is a Renaissance has a rate without saying what it is and then Infineon has an M55 rate, do you see those?

A. Yes, I can see Renaissance and Infineon.
Q. And the Infineon rate that is on this spead sheet, how did you determine that Samsung was the previous best deal given what we can see on the screen for the Infineon rate, why do you say that?
A. Yes. So when we do the previous best deal to determine the lowest royalty rates, we have to consider all the scenarios of the royalty rates. And when you look at Samsung, there are scenarios where Samsung pays zero royalty rates for Yamin.
Q. At this time can you look in your binder, please, to DTX-32. Do you recognize DTX-32?
A. Yes.
Q. What is it?
A. This is the royalty pricing agreement between Arm and Samsung.
MS. KELLY: Your Honor I move to admit under seal, DTX-32.
MR. ISAACSON: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 32 was admitted into evidence.)
BY MS. KELLY:
Q. Mr. Schlaifer, if you could please go to page 8. In the middle could you pull out from where, little Roman net five.

Q. Mr. Shivashankar, is this the part of the royalty agreement with Samsung that you're pointing to about the scenarios where they pay zero for Yamin?
A. That is correct.
Q. Can you explain, I don't see that number on here. Can you explain what this is talking about?
A. Yes. So this captures the royalty discounting steps which you need to apply when you are using multiple of Type 1 products.
Q. What is a Type 1 product?
A. Type 1 product as per the Samsung royalty agreement covers all the implementation cores.
Q. Are Hunter, Hayes, and Yamin implementation cores?
A. They are.
Q. When there is multiple implementation cores being used for -- well let me ask you this question. Are Hunter and Hayes v9 implementation cores?
A. They are v9.
Q. What about Yamin?
A. Yamin is a v8 implementation core.
Q. Under this agreement, if Yamin, a v8, is used with either Hunter or Hayes which are v9, which royalty rate is paid?
A. The royalty is paid only for the products, v9 subscription cores of the CPUs.

Q. Those would be which cores?
A. Hunter and Hayes.
Q. Is this something that you considered and used in determining that Samsung was the previous best deal?
A. Yes.
Q. Why did you look to how -- why did you look at this when we're looking at a combination rate as opposed to each rate on its own?
A. We had to consider the royalty rates in all the scenarios to determine the lowest royalty rate.
Q. At the time you were preparing this in 2024, did you have any understanding of the way in which Qualcomm was going to be using the Hunter, Hayes, and Yamin implementation cores that they requested?
A. The use of Yamin was with Hunter and Hayes, that was reflected in the total compute configuration.
Q. What's the basis for your understanding that Yamin was going to be used with Hunter and Hayes. You can take that down, Mr. Schlaifer, please -- by Qualcomm?
A. When we signed the deal back in 2019 for the same implementation cores, it was discussed with the Qualcomm team the use of those implementation cores would be Hunter, Hayes, and Yamin.
Q. Individually or in combination or some other way?
A. It was in the combination.

Q. Were you personally part of those conversations?
A. I was.
Q. Who did you talk to from Qualcomm?
A. Back in 2019, my counterpart was a person named Rijiv Backau.
Q. Is there anything other than the fact that in 2019, Qualcomm told you that they were going go to use Yamin with Hunter and Hayes that made you -- that you accounted for in thinking that they were going to use Yamin with Hunter and Hayes again in 2024?
A. I want was a common practice with customers who are in the same market segment.
Q. I'm sorry, I didn't catch, they're in the same market segment and what did you say after that?
A. So in the same market segment who make the mobile system on chip who use Hunter, Hayes, and Yamin together.
Q. Is the end of this NVIDIA analysis, does that stop once you determine the previous best deal?
A. No.
Q. Once you determine -- what do you look at next?
A. So once we have the lowest royalty rate and determine the previous best deal, then we move to do what we call the total financial consideration adjustments analysis.
Q. Is the total financial consideration adjustments or analysis, is that a calculation that you do, is that a

numerical thing that you do to Samsung's rates?
A. It is not a formula, it is not numerical.
Q. Is there any documents where you write down like here is Samsung's rate, and I'm going to do it times whatever that might be?
A. No.
Q. Is that how you as a team look at total financial considerations, is it sort of a strict mathematical formula that you do A times B or whatever else?
A. It is not a formula.
Q. Okay. So what do you do if it's not a formula, how do you account for those total financial considerations you talked about earlier, the differences between Samsung's license and what Qualcomm was asking for, do you just make it up?
A. No. So it is actually a process when we do the total financial consideration. We take the previous best deal which is Samsung in this case, and then consider the totality of the deal, which I previously mentioned, we have to consider a lot more variables to consider the totality. The license fee, that come with it, the length of the license, the products they have committed, how they will use Arm products in their products, the average selling price of those products, how much they will ship in the forecasted shipment of volume of those products, the business terms

like warranty which we have promised as part of the deal. We consider all that, and we discuss with business experts various deals in the company in order to consider that total financial consideration to come up with a fair proposal for Qualcomm.

Q. And just to be clear, is where what you ultimately end up with after you do the total financial considerations, would we just look to the offer which is in evidence as 1535 to find those numbers?

MR. ISAACSON: Objection, leading.

THE COURT: Sustained.

BY. MS. DUNN:

Q. Do you write those numbers down, the result that you come up with, where would I go to find the numbers that show what you ultimately determined was the previous best deal as modified by the total financial consideration?

A. That would all come out in the proposal which we put in front of Qualcomm.

Q. How do you do the accounting for these differences, are there other license agreements that you look to as part of that?

A. Yes. We do.

Q. You were asked some questions about MediaTek. How did MediaTek -- how did you use that, if at all, as part of determining the offer you were going to give to Qualcomm in

2024?

A. When we do the total financial consideration, then we look at other contracts which are similarly situated in order to determine the proposal we make for Qualcomm as part of the total financial consideration. Especially when things are -- I mean, when the previous best deal with Qualcomm was significantly different, then we had to look at similarly situated contracts as part of the analysis.

Q. Was MediaTek one of those similarly situated contracts you looked at?

A. Yes.

Q. How was it similarly situated compared to Qualcomm versus Samsung?

A. So, MediaTek also had licenses for Hunter, Hayes, and Yamin, and the term of the license of MediaTek was more similar to what Qualcomm was actually requesting. There were other variables which were similar.

Q. Did you replace Samsung with MediaTek as the previous best deal?

A. No, previous best deal was Samsung and that was never in question.

Q. You were shown some parts of DTX -- JTX-5 which was the TLA, there was a reference to ten percent. To you as the licensing team, do you do any -- how do you account for the fact that this has to be within ten percent of the

previous best deal accounting for total financial considerations?
A. As part of the total financial consideration analysis, when we consider all the different variables with the discussions with other business experts, so we make a judgment on the total financial consideration being within that bound, that bound be box.
Q. After you do the total financial considerations do you then like multiply to add ten percent on top of that?
MR. ISAACSON: Objection, leading.
THE COURT: Rephrase.
BY. MS. DUNN:
Q. Is there any math where you add ten percent to anything that you do as part of this analysis, the MFN analysis?
A. No, there is no formula as such.
Q. You were asked about PTX-210, it's in your black binder. This was the chat between you and someone else. Are you there?
A. Yes.
Q. When was this chat?
A. This was way back in 2019.
Q. Okay. You were asked about some questions up at the top. I want to look at the bottom part, there is -- I think it's the very last thing from you on page 2, Mr. Schlaifer.

Thank you so much.

Why were you talking here about individual core when you just told the jury that what you look looked at was how these cores were going to be used?

A. We had to look at the individual cores in order to go to the previous best deal for those individual cores.

Q. Did you do that in this case?

A. In the Hunter, Hayes, and Yamin proposal, yes, we do.

Q. And for Yamin, what was the previous best deal, what was the rate?

A. For Yamin the previous best deal was Samsung.

Q. And I want to just look quickly, Mr. Schlaifer, if we can look -- well, you know what, I'll get there in a second.

You were asked some questions about something called a price book. Do you recall that with Mr. Isaacson?

A. A price book.

Q. Are you familiar with a price book?

A. I am familiar with the price book.

Q. What's the price book, it's PTX-1654 which has been admitted.

A. Price book is a document which contains the list prices of all the Arm products which are available to license.

Q. And are those listed individually or differently or how are they listed in the price book?

A. They are listed line by line for every product, for different business models.

Q. What type of business terms, we've been talking about royalty rates, does the price book contain royalty rates?

A. It does contain royalty rates.

Q. Does it contain other financial list prices?

A. It contains license fee for different business models.

Q. When you -- you obviously were involved in proposing -- were you involved in proposing the Samsung subscription agreement, the fees for that?

A. I was involved.

Q. When you and your team prepare a subscription agreement like the one that Samsung has, do you use the price book to do some sort of math to add things up to come up with the license fees, or do you do something else?

A. The Samsung deal in particular, that was a subscription agreement. We don't use the price book list prices to add things up, that's a different model.

Q. Why don't you use the list prices and just add them all up if somebody is getting go access to everything?

A. It doesn't work that way. As I mentioned, subscription is something like Netflix subscription, there is lots of products involved and the structure is very different.

Q. I want to talk for a minute about peripheral IP the GIC, the MMU and SMU. Okay. You were shown PTX-1423, page 1. And Mr. Isaacson made a chart where he put on the right what QC paid. Do you recall him doing that?
A. QC paid, yes, I do.
Q. And it sounded like you had something you wanted to say. Are those actually the numbers that Qualcomm paid in 2019 for GIC and the peripheral IP?
A. They were not.
Q. Why do you have them listed here as to what QC paid if it's not what QC paid?
A. A 2019 contract was a lump sum of 65 million, if I remember, correctly. And it was not broken down line by line like how it was previously.
Q. What did you use to come up with the numbers -- let me ask you this. Even though the contract in 2019 wasn't broken down line by line, did you at any point in time put some value on each of the IP that's in the contract?
A. Yeah, we do some back calculation based on the available data as part of the deal.
Q. And does the -- to be clear though, does what Mr. Isaacson put on the page reflect the back calculation of how you broke it down even if the agreement wasn't broken down that way?
A. Yes, we would have broken down say in other parts of

the contract like limitation of liability and things like that.

Q. So when -- I'll leave it there.

I want to take a look, please, at PTX-1535, the extension offer. And Mr. Schlaifer, can you pull up the bottom royalty rates on page 2. I apologize, Mr. Schlaifer. Thank you so much. I don't see a percentage zero here. How are you telling us that you used Samsung's rate, can you explain to us what's going on here?

A. Yes. If you look at the main part which is the total compute configuration, and then the first bullet with an asterisk which says any number of cortex M55 are load in these four configurations for no additional royalty.

Q. What's a total compute configuration?

A. Total compute configuration is the royalty they pay when they use those bundle of IP together.

Q. And so what would be the royalty rate for Yamin that Qualcomm would pay if they used Yamin with Hunter and Hayes, under the proposal you prepared for Qualcomm in 2024?

A. They pay zero royalty.

Q. Can you, Mr. Schlaifer, please take us over to page 3? Could you please pull up these general terms, just the second half, please, you could do like 12 through the end.

Mr. Shivashankar, do you remember being shown

the 2025 proposal for peripheral IP for the GIC, the SMU and the MMU?
A. Yes, I do.
Q. Were those numbers higher or lower than the numbers that you offered in this 2024 proposal for the peripheral IP?
A. The 2024 numbers were higher.
Q. Why, why did you raise the price?
A. It's a general practice when a customer is committing for less number of IP, they get a lesser discount.
Q. Do you tell customers that anywhere in the proposals that you prepare?
A. Yeah, we do make it very clear in the proposal.
Q. Where is it?
A. It's number 13, the pricing in this extension offer is based on the assumption Qualcomm will license all products for which it requested offers.
Q. And is this something you just did in this case or is it something that you do more generally, people get a bigger discount if they buy a bundle?
A. It's a very general practice.
Q. You were also asked some questions about support and maintenance and the fact that it was not included. Do you recall that?
A. Yes, I do recall that.

Q. I want to take a look, if we can, at the support and maintenance agreement that was entered into evidence, which is PTX -- sorry, DTX-33. And if you could blow up, please, Mr. Schlaifer, 1.1. Thank you so much.

You were asked about the last sentence of this, and I understand you're not a contract guy, but can you look at the first sentence and what it says about when support and maintenance services will be provided, or for what sorts of stuff.

A. Yes, I can see the second sentence.

Q. What does it say? Mr. Schlaifer you can just highlight that first sentence if you don't mind?

A. Contains support and maintenance services agreement for Arm.

Q. For what?

A. For any and all Arm technology, all Arm prime cell performance tools.

Q. Did you take that into account when you prepared PTX-1535?

A. Yes, we did.

Q. Why?

A. We didn't want to double charge.

Q. How did you typically in 2024, how did you typically charge customers for support and maintenance if they didn't have a separate agreement?

A. So in 2024, the price book license fee which we was considered as a list price, included support and maintenance.

Q. And if we could look, please at page 3 of 1535, did you tell Qualcomm anywhere that you were not including that support and maintenance markup for lack of a better word, in this proposal?

A. Yes, we made it abundantly clear in line 12, support and maintenance is not included in this extension offer.

Q. When you prepared that, was it your understanding that you were somehow cancelling the support and maintenance agreement?

A. No.

Q. Then why did you write it?

A. To make it clear the support and maintenance we are not double charging given they had an active S and M, or support and maintenance agreement with us.

Q. The last thing I would like to look at, Mr. Schlaifer, if you could put page 2 up, the license fee section. Just the license fees on top.

Are these the license fees that you ultimately offered Qualcomm for Hunter, Hayes, and Yamin when it was going to be used with the peripheral IP?

A. Yes.

Q. How did the seven-year term license fees compare to

the price book license fees in this offer?

A. For the seven-year term for all these IPs, it would have got the maximum discount compared to the list price of the price book.

Q. Can you give me a percentage of what that is, is it like five percent off?

A. This is 40 percent off.

MS. KELLY: All right. Thank you, Mr. Shivashankar, I don't have any further questions for you right now.

MR. ISAACSON: No further questions, Your Honor.

THE COURT: Thank you, sir, you are excused.

What's next?

MS. DUNN: Your Honor, Qualcomm calls Spencer Collins.

COURTROOM DEPUTY: Please raise your right hand. Please state and spell your full name for the record.

THE WITNESS: Spencer Collins, S-P-E-N-C-E-R, C-O-L-L-I-N-S.

SPENCER COLLINS, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. DUNN:

Q. Good morning, Mr. Collins.

A. Good morning.

Q. You can see me, I'll get started. I know the jury probably does want -- you're currently Arm's chief legal officer, right?
A. That is correct.
Q. All right. And Rene Haas recruited you to Arm from SoftBank where you had worked for Masa, correct?
A. That is correct.
Q. All right. And you have been here in the courtroom for the whole trial all week with us, right?
A. That is correct.
Q. And you heard all the testimony, right?
A. Correct.
Q. Okay. And you were here when Mr. Grisenthwaite, Arm's chief architect, said that the directive to withhold technology from Qualcomm came from the legal department, you heard him say the legal department?
A. I did.
Q. And so who in the legal department gave that directive, was that you?
A. It was.
Q. Okay. All right. Now, you are the executive vice-president and chief legal officer of something called Arm Ltd, correct?
A. That is correct.
Q. All right. And you're also the executive

vice-president and chief legal officer of something called Arm Holdings, correct?
A. That is correct.
Q. And you were here when Mr. Haas said that's just all Arm to him, right?
A. I did hear Mr. Haas say that, yes.
Q. I just want to put up for the jury, this is already in evidence, it's JTX-1. And this is the ALA in this case, and if you look at page 16, it says during the term of this ALA, Arm, and any controlling party as a result of an acquisition of Arm, shall have an obligation to perform in accordance with the contract. Do you see that?
A. I do.
Q. Okay. And then if you look at the definition section of the ALA, and that's on page 1, you'll see it defines what it means to be a controlling party that has all the obligations under the contract. Do you see that?
A. I'm just reading it now.
Q. Take your time?
Do you see that there where it says controlling party?
A. I do.
Q. Okay. And it says acquisition of Arm, so the thing that happens to make you a controlling party, means any transaction or series of transactions whereby a third party

acquires direct or indirect power to control Arm. Do you see that?

A. I do.

Q. Okay. And I just want to make that clear because when the IPO happened, Arm Holdings became in charge of Arm Ltd?

A. I wouldn't characterize it that way.

Q. You agree there was an IPO, right?

A. There was absolutely an IPO, yes.

Q. And if we look at -- the SEC form is already in evidence, right, and that explains what happened when Arm Ltd became Arm Holdings under the IPO. You would look to the SEC form, correct?

A. Among other documents, yes.

Q. Okay. Great. All right. You can take that down.

Okay. So you didn't just authorize withholding technology from Qualcomm, you also authorized Mr. Siegel, your lawyer, and SoftBank board member and Mr. Kranhold who the jury heard video of both these guys yesterday, you authorized them to leak the termination notice to the media, correct?

A. I authorized them to have a conversation with one journalist, absolutely.

Q. But you're not saying you didn't know that the journalist wasn't a member of the media, right, you knew

that?

A. No, I'm not saying that.

Q. Great. Let's show you sir, PTX-1485. And while you look at that, just to remind, so the leak happens on October 22nd of 2024. And this is an e-mail, sir, from Mr. Siegel sending the Bloomberg article that you just talked about to Masa and some other people at SoftBank and CCs you, do you see that?

A. I do.

MS. DUNN: Your Honor, move to admit PTX-1485.

MR. WILCOX: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1485 was admitted into evidence.)

BY MS. DUNN:

Q. Great. And we have seen this article, so I won't go through most of it. But if you look just at the fourth paragraph, Mr. Collins, it says Qualcomm sells hundreds of millions of processors annually. And if the cancellation takes effect, the company might have to stop selling products that account for much of its roughly 39 billion in revenue or face claims for massive damages. Do you see that?

A. I do see that.

Q. Okay. And is it your interpretation that when this

11:42:05 article says that if Qualcomm's ALA is terminated, the claims it would face for massive damages would be from its customers?

11:42:19 A. It says the company might have to stop selling products that account for much of its revenue or face claims of massive damages.

11:42:28 Q. And right, and those claims for massive damages would be claims from Qualcomm's customers, correct?

11:42:34 A. I think it would include Qualcomm customers, yes.

11:42:37 Q. All right. If you could turn in your binder to PTX-1436?

11:42:43 A. Could you repeat the number, please?

11:42:45 Q. Yes. 1436. Are you there?

11:42:53 A. I am, yes.

11:42:54 Q. This is an e-mail from somebody named Rossell Wang at FGS which is your PR firm to Mr. Kranhold also at your PR firm on October 19th of 2024 with the subject line for PK review, privileged and confidential media talking points, do you see that?

11:43:16 A. I do.

11:43:17 MS. DUNN: Your Honor, move to admit PTX-1436.

11:43:21 MR. WILCOX: He's not on this document, Your Honor.

11:43:28 MS. DUNN: This was admitted through Mr. Kranhold, apologize, I withdraw my question.

BY MS. DUNN:
Q. We can put that on the screen. October 19th is just a couple of days before the week, and these are media talking points being drafted by the PR firm that you hired, and it says media talking points for the coming week. And Mr. Spicehandler who is called Ben here, it says Ben and I drafted, he is one of the FGS employees who we heard yesterday was on the call with Bloomberg news on behalf of Arm. He's the one who effectuated the screen share of the termination notice, correct?
A. Correct.
Q. All right. Now if you look at the next page, I would like to look at the talking points themselves. If we look at the bottom where it says current state of events and implications. The first point is Arm announced today that it has provided notice to Qualcomm that it will be terminating its licensing agreements with Qualcomm effective on, fill in date. Do you see that?
A. I do.
Q. All right. And let's go to the next one which is on the next page so we'll just make your life easy, sir, you can turn the page or look at your monitor.
All right. The next bullet says if Qualcomm does not reach a settlement agreement with Arm to renegotiate the status of its agreements during this 60-day

period, Qualcomm will have to stop using Arm IP for future products, including its Snapdragon product line." Do you see that?

A. I do.

Q. All right. And when it says that if Qualcomm does not settle with Arm, it will have to renegotiate its agreements, the status of its agreements, is it your reading as it is mine that that refers to the Qualcomm ALA?

A. This is the first time I have ever seen this, but that is my interpretation of what is being said, correct.

Q. Do you interpret it to be talking about any other agreement, for example the TLA --

A. I think it would include both from the way it's drafted.

Q. Okay. All right so moving to the second bullet, "the importance of these licenses to Qualcomm's business can't be understated. Qualcomm just wrapped up a three-day developer conference almost single handedly dedicated to its Snapdragon product line, which are all based on Arm IP."

Do you see that?

A. I do.

Q. And you would agree with me, sir, that this suggest knowledge on behalf of -- at least the people involved in this drafting of the Snapdragon conference at this time, you agree with that, right?

A. It says they just wrapped up a three-day developer conference, that's correct.
Q. Okay. And without a settlement agreement -- by the way, you know that this termination notice went out during the Snapdragon summit, right, you know that?
A. I'm confused because the date of this document says the 19th of October, but the date of the notification of breach and the following article came subsequently.
Q. Right. That's why I'm asking you. You knew that your termination notice was going to hit during the Snapdragon summit?
A. I don't recall the point at which I became aware of the Snapdragon summit, I did become aware of it, but the intention and timing of sending the notice related to the trial timing had nothing to do with a conference of Qualcomm's, nothing at all.
Q. Mr. Haas told us yesterday it was just a coincidence. But I just want to know if you, Mr. Collins, knew about the Snapdragon summit ahead of time?
A. Ahead of sending the notification?
Q. Yes.
A. I believe so, I don't know the exact time I became aware of it, but I believe it was before I sent the notice, that is correct.
Q. Thank you, sir. It says without a settlement

agreement with Arm, Qualcomm won't be able to continue developing and will be forced to immediately halt shipments of key products that its customers are expecting." Do you see that?
A. I do.
Q. To make matters worse, Qualcomm's exclusive deal to supply laptop builders such as Microsoft, Dell and Samsung with its chips expires this year, opening up the market to Qualcomm's competitors such as NVIDIA and AMD who are developing Arm-based PC chips." Do you see that?
A. I do.
Q. "Suffice to say, Qualcomm's relationship with its customers and business are at serious risk." Do you see that?
A. Yes I do.
Q. Let's move a little bit forward in time to PTX-1526, and that's in your binder. And let me know when you're there, sir.
A. Yes, it's not in numerical order.
Q. It's PTX-1526.
A. Yes, I have it.
Q. You do have it? Okay. Mr. Collins, do you recognize this is an e-mail thread between you Ms. Badani, the chief marketing officer who we heard from yesterday, Ms. Al-Qattan from FGS and Paul Kranhold at FGS on October 23rd of 2024,

right?
A. Yes.
MS. DUNN: Your Honor, move to admit PTX-1526.
MR. WILCOX: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 1526 was admitted into evidence.)
BY MS. DUNN:
Q. All right. Now after Bloomberg ran the story, other reporters started reaching out to Arm for comment, correct?
A. That is correct.
Q. All right. And in this e-mail, you and others are drafting Arm's public comment about the termination notice and you're also planning next steps, you know that, right?
A. I wasn't involved in next steps, but we are -- it appears to be, this is a long time ago, but it appears to be we're discussing on the record statement because as Qualcomm subsequently put an on the record statement so we were asked to do the same.
Q. Sorry to interrupt you.
All right. If you look then at page 1, Ms. Badani is writing to Ms. Al-Qattan and to you and Mr. Kranhold, and she says Danya and I connected, we are reaching back out the journalist with this statement, meaning Arm's statement and asking them to update their

stories. She also says we'll also send the statement to a new journalist that haven't yet published, but either stories are immanent or we've trusted relationship. I suggest we regroup on Thursday to determine next coarse of action and how aggressive we intend to be. Do you see that?

A. I do.

Q. And then you respond and sir, do you see your response?

A. I do.

Q. And what is does that say?

A. Let's do that ASAP, Masa is pushing.

Q. Was Masa pushing for Arm to decide how aggressive it wanted to be or was Masa pushing for Arm to be aggressive?

A. None of that. From recollection, I had a call from the general counsel of SoftBank who spoke with Masa and Masa was asking why do we not have an on the record statement like Qualcomm has, that's what he was pushing for from recollection.

Q. Okay. So your testimony is that even though this e-mail is dated Wednesday, and you're talking about your statement, and Ms. Badani says I suggest we regroup on Thursday to determine the next coarse of action and how aggressive we tend to be, your testimony is that what Masa is talking about that you want to discuss on Thursday is the statement that you all are putting out on Wednesday, that's

your testimony?
A. My testimony is from memory, I had a call from the general counsel, Masa wasn't involved in this in way shape or form other than whether the article came out, I got a call from the general counsel of SoftBank from recollection and Masa was asking why do we not have an on the record statement like Qualcomm does, from recollection, obviously it was two years ago, that was what I was referring to in this.
Q. But Wednesday comes before Thursday, right?
A. We agree on that, yes.
Q. I knew we would agree on something today.
All right. If you look at page 3 of this same e-mail, it's the bottom e-mail where Mr. Kranhold says about a draft statement has been written for Arm. Right, Mr. Collins?
A. Yes, if I could just read it, please.
Q. Right.
A. Yes.
Q. And Mr. Kranhold's reaction to it is we should say ALA instead of agreement at the end of the first sentence as the TLA will remain as I understand it. Otherwise looks good. Do you see that?
A. I do.
Q. All right. And then let's look up at the next e-mail

in the chain, Ms. Badani says at Spencer Collins is modifying, do you see that?

A. I do.

Q. If you look at page 1, Ms. Alqatan's e-mail towards the bottom quotes what was the final version of the statement. By the way, this final version, what's the date where the version of the statement was finalized?

A. The date of this e-mail is the 23rd of October.

Q. Right, on Wednesday, correct?

A. Yes.

Q. All right. Now it looks from this that Arm decided not to take Mr. Kranhold's suggestion to specify which agreement might be terminated. We can agree on that, right?

A. Yes, that's not included.

Q. It refers to Arm's license agreement and actually it does so twice without -- if you look at the next sentence, it says or face termination of the agreement.

And you were here yesterday when we heard Ms. Badani's video, and you heard her say that Arm left it broad, right?

A. I don't recall hearing that, unless they --

Q. You didn't hear that on the video?

A. No, I didn't hear that.

Q. If you look in your binder at PTX-1543. This is an e-mail thread between Arm and the PR firm, FGS, and it spans

October 23rd and 24th, so Wednesday and Thursday with the subject line Richard Waters FT. And one of the outlets, Mr. Haas said he spoke with was the Financial Times. So you see this e-mail and you're on it, right?
A. I think I'm on the wrong tab, which tab, please?
Q. PTX-1543?
A. Yes.
Q. Are you there?
A. Yes.
Q. You're on this e-mail?
A. Yeah, on the 24th.
Q. Are you on the e-mail?
A. Yes.
MS. DUNN: Your Honor, move to admit -- oh, it may also be, I don't know if it's in evidence, but if it's not, I move to admit it.
MR. WILCOX: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 1543 was admitted into evidence.)
BY MS. DUNN:
Q. All right. Now if you look at the bottom of the first page, top of the second page, you write an e-mail that says "can we please get a summary of the points made by Rene on the call with the -- it says FY, but I think you mean FT,

Financial Times so that we can share with our IR, investor relations team i.e., so that they can make the same points with certain constituents of the investor community. Do you see that.
A. I do.
Q. Now if we look at the first page, this is a response by Ms. Alqatan to the question you asked about what Mr. Haas told the Financial Times. And earlier you had said that the talking points were not something that you had seen, but you're on this e-mail so you surely saw this, correct?
A. Yeah, I'm on this e-mail, I must have seen this.
Q. All right. And so Ms. Alqatan is reporting that Mr. Haas told the FT and you're asking so you can also tell the investors, or the investor relations team that there is a high degree of asymmetrical risk, do you see that?
A. Yes.
Q. And a little lower down it says it's not a lose lose for Arm but it's a lose lose for Qualcomm. Do you see that?
A. I do.
Q. And it talks about how no matter what happens at the trial, Arm will still be paid. Do you see that?
A. Yeah, if we were to get a favorable ruling, we would also be paid, yes.
Q. Right. And it says a little lower down that Qualcomm are potentially incurring billions of dollars in terms of

losses, do you see that?
A. Yes.
Q. And it doesn't say that that's what's going to happen after the trial, it says they are potentially incurring billions of dollars in terms of losses, do you see that?
A. I do.
Q. And then it says if a ruling were to be unfavorable to them, Qualcomm would not be able to develop any new Arm custom cores, do you see that?
A. I do.
Q. And they would not be able to differentiate their products, do you see that?
A. I do.
Q. And when when you talk about product differentiation, it means differentiate from Arm's TLA cores, correct?
A. I don't know what that means.
Q. Okay. But you do know that this says, this is -- if you just look at the last bullet it my clear that up. It says for us, there are other alternatives and OEMs know that. And actually, I'm sorry, I want to give the jury context, right before above that it says this is not something that would impact our, meaning Arm's relationship with other customers, it's just a specific issue to Qualcomm. Do you see that?
A. I do see that.

Q. Okay. And you knew at this time as a general matter that Meta was a customer of Qualcomm, correct?
A. I had -- I'm not sure that I knew whether Meta was a customer of Qualcomm at that point, I don't know.
Q. You were here in this courtroom when we saw e-mails from earlier in 2022 when Arm was sending letters to Meta, do you remember that?
A. I do.
Q. All right. And so you say it won't impact Arm's relationship with customers, it's just -- the customer issue was just specific to Qualcomm, and then it says for us there are other alternatives and OEMs know that. So OEMs are customers of Qualcomm, like for example Samsung that makes the mobile phone, right, that's an OEM?
A. Samsung is an OEM yes.
Q. So the customers of Qualcomm, I want to make sure everyone knows what OEMs are. You were here yesterday when Mr. Haas said that Arm gets paid no matter who makes the chip, right?
A. Yes.
Q. So if Qualcomm is hurt, he said, Arm gets paid royalties and he clarified, so long as other companies can step in and fill that gap, do you remember that?
A. I do remember him saying that, yes.
Q. And here what Arm is saying is that they expect that

others will step in on the sales front so Arm will still be paid, do you see that?
A. I do see this is what FGS wrote yes.
Q. Right, this e-mail recording what Rene Haas told the Financial Times?
A. Yes.
Q. All right. You can take that down, Matt.
Now, sir you have said that if Arm wanted to cause harm to Qualcomm, Arm would have spoken about terminating?
A. That's correct.
Q. All right. I would like to show you PTX-1542. Look in your binder.
A. PTX?
Q. 1542.
All right. Now this is an e-mail from Mr. Siegel to you on October 24th, 2024, forwarding you an e-mail from FGS the PR firm with the subject line Arm Qualcomm media coverage, do you see that?
A. I do.
MS. DUNN: Your Honor, move to admit PTX-1542.
MR. WILCOX: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 1542 was admitted into evidence.)

12:00:57 BY MS. DUNN:
12:00:58 Q. And Mr. Collins, I will direct your attention to the e-mail from FGS on the bottom half of the page. And Mr. Wang from FGS says this is a comprehensive media coverage compilation regarding Arm and Qualcomm, do you see that?
12:01:14 A. I do.
12:01:14 Q. This is was sent the morning after Arm puts out its statement, do you see that? 7:14 a.m.?
12:01:23 A. Yes.
12:01:23 Q. And I just want to go through -- I just want us to look, Matt, if you can just put, if you can do this, put all the head lines on the screen so we can see them. And I'm not going to go through all of them because they all say some version of a similar thing which is that Arm is going to cancel or terminate Qualcomm's licenses. Do you see that?
12:01:44 A. Yes.
12:01:45 Q. And you see sometimes it refers to Arm as Arm and sometimes it refers to Arm as Arm Holdings, right? Do you see that where it says Arm Holdings moves to cancel Qualcomm's chip design licenses?
12:02:00 A. Yes, I do see that.
12:02:02 Q. And in some of these it talks about how Qualcomm's stock price is dropping, do you see that?

A. Yes, I see that.
Q. Okay. All right. If you look at Mr. Siegel's e-mail at the top of the page, he writes just to you and CCs one of his colleagues from the law firm, do you see that?
A. I do.
Q. And the e-mail says "whoa!, a fair bit of coverage!. And Mr. Siegel doesn't say these head lines are inaccurate.
A. He doesn't say that in his e-mail.
Q. Instead he says great job Spencer, do you see that?
A. I do.
Q. Did you see the Kramer video below, that's talking about Jim Kramer on CNBC, big viewership right, drives a lot of other media, you know that?
A. I don't know whether Jim Kramer drives video but I know who he is.
Q. All in on Arm and Rene, you see that?
A. I do.
Q. All right. If you could look at -- all right. The jury and you because you have been here have heard a little bit about the earlier case and just to situate us in time, after Arm lost the jury verdict in mid December in 2024, you sent Qualcomm another letter where you retracted the threat to terminate the ALA, do you recall that?
A. Absolutely.
Q. All right. And in that letter you told Qualcomm that

they could share the notice with customers only on a confidential basis. Do you recall that?
A. I do recall that.
Q. Right. So just to put a fine point on this, while Arm put out the termination notice, and I won't say every media outlet in the world, but many wrote our licenses getting canceled, some of them than wrote our license is being canceled, you then told Qualcomm that they could tell people that wasn't true on a confidential basis, right?
A. The intention behind that was --
Q. Sir I'm not asking the intention your counsel can ask you that, I'm just asking is that true or not true?
A. That is true.
Q. We become more sensitive to time as the week goes on because we're running out of it. I'm just going to show you if you look at PTX-1718. Do you see that?
A. Yes, I do.
Q. And that's your January 8th, 2025, letter to and Chaplin, Qualcomm's GC where you tell her she can share this but only on a confidential basis with customers, right?
A. That's correct.
MS. DUNN: Your Honor, move to admit PTX-1718.
MR. WILCOX: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 1718 was admitted into

12:05:01 evidence.)

12:05:01 BY. MS. DUNN:

12:05:01 Q. Now, you're aware, or are you aware that Qualcomm first requested offers for Hunter and Hayes on April 2nd of 2024?

12:05:11 A. Could you repeat that question?

12:05:15 Q. You are aware that Qualcomm first requested offers for the cores Hunter and Hayes on April 2nd of 2024?

12:05:22 A. No, my understanding that first offer came through in 2019.

12:05:27 Q. Okay. But you remember receiving a letter from Qualcomm, do you remember that Arm received a letter from Qualcomm requesting offers for Hunter and Hayes on April 2nd of 2024?

12:05:39 A. I do recall that.

12:05:40 Q. And that similarly a letter for Yamin came on August 22nd of 2024, right?

12:05:47 A. I losely recall that.

12:05:49 Q. And so after not responding to Qualcomm for months, Arm finally responds and sends Qualcomm an offer in response to those letters on October 24th of 2024, two days after Arm launched this media campaign, you know that, right?

12:06:11 A. That is the timing of me sending a response to that letter, and making an offer, yes.

12:06:17 Q. And that letter attached the offer, right?

A. That's correct.
Q. That's correct. Okay.
Do we have -- we don't have it in your binder, but do we have PTX-406. And while they gets that, there should be copies around, it's also already in evidence so we can put it on the screen, maybe let's just do that.
All right. Mr. Collins you were here and Matt if you can go to page 6 of this. You saw this chat exchange between Mr. Haas and Kirsty Gill from December 2nd of 2021. It's the one where they're chatting during a meeting or conference call where where Qualcomm's license and other things were being discussed, do you recall this?
A. I wasn't with Arm at the time, I did see this in court, yes.
Q. Great. We established that they're talking about pricing, it's Massa's number one item and Qualcomm has a contract from over ten years ago, Mr. Haas says we have to go vertical and build chips and if you scroll down, he talks about in this same chat think of it if we build it, the rest of hosed, do you remember that?
A. I do.
Q. I want to go back in that in that same chat exchange between Mr. Haas and Ms. Gill on page 3 of this exhibits and see if you can identify some people for us. Ms. Gill says who is Tim Mackey?

A. Tim Mackey, yes.
Q. He's the general counsel of SoftBank, right?
A. He was.
Q. And is he the person you said earlier you called about the termination notice?
A. He called me.
Q. He called you, great. And then this says ^SBGC, GC is SoftBank, it says Masa and a lot of lawyers, do you see that?
A. I do.
Q. And if you go down, and it says, sorry go up, Mr. Haas says in response to Masa and a lot of lawyers, great sign. And Kirsty says that SoftBank will fight Qualcomm, do you see that?
A. I do.
Q. It says we shouldn't pick this fight, not on patents, do you see that?
A. I do.
Q. And do you know -- you didn't ever bring a patent suit against us, right?
A. Correct.
Q. You can take that down, Matt.
Now, I would like to just show you, Mr. Collins DDX-1.25. This is a slide that your counsel, Mr. LoCascio showed in opening. And this is what Arm purports to be the

litigation timeline and you were here when this was presented. And I just want to point out, Mr. Collins, that there is a lot of things that this trial has been about that are not on this timeline. You don't see on this timeline for example Arm executives sending misleading letters to Qualcomm's customers on August 31st of 2022, including Meta, right, you don't see that here?

A. That's not ---that allegation is not in this slide, no.

Q. It's not here, right. And you don't see here the withholding that you personally directed and that Mr. Grisenthwaite carried out, which happened between September 2022 and February 25th, 2025, that's not here, right?

A. That's not here.

Q. And we don't see anything here about you threatening to potentially terminate immediately Qualcomm's ALA, you don't see that, right?

A. Not specifically, you got the Bloomberg article which is the same topic, but no, not specifically.

Q. Great. I'm glad you brought that up, because all you seen is Bloomberg article. But you saw all those articles, right, so to you it's just one article, but you saw that there was so much more, right?

A. There was a lot of follow up in respect to that

Bloomberg article, that's correct.

Q. The follow-up would never had happened had Arm not leaked to Bloomberg, correct?

A. We shared it with Bloomberg because we believed if we didn't do it, Qualcomm would.

Q. You're telling me all those articles saying Arm to cancel Qualcomm's license, that relied on the Bloomberg article somehow Arm had nothing to do with that?

A. No, I'm not suggesting that at all.

Q. Great. This timeline also doesn't include Qualcomm asking for TLA cores in April and August of 2024, and Arm finally making an offer on October 23rd, and 24th of 2024, just a day and two days after this leak to the media, that's not on this thing either, right?

A. That's not here, no.

Q. Okay.

MS. DUNN: Court's indulgence.

Your Honor, I pass the witness.

THE COURT: Okay. Thank you.

CROSS-EXAMINATION.

MR. WILCOX: Permission to approach, Your Honor?

THE COURT: Yes.

BY MR. WILCOX:

Q. Mr. Collins, let's start with PTX-1718, which is in the binder Ms. Dunn handed to you. PTX-1718 is a

January 8th, 2025, letter -- I'll wait for you to get there.
A. PTX?
Q. 1718.
A. 1718. Yes I have it.
Q. Okay. PTX-1718 is a January 8th, 2025, letter that you sent to Qualcomm; correct?
A. That's correct.
Q. And you were asked or you wanted to explain something about why you sent this letter on a confidential basis. Do you recall that?
A. I do.
Q. Why did Arm want to send this letter on a confidential basis?
A. Because throughout the duration of this dispute all the way back to 2022 we had very strong reason to believe that Qualcomm was briefing multiple journalists, we were contacted on a frequent basis by journalists telling us that Qualcomm were talking to them directly. We were seeing various different commentary on platforms in the investor community in relation to the same. And so what I didn't -- I wanted to do the right thing and actually send Qualcomm a letter saying if you want to share this with your customers, feel free to do so we did not object to, but please do so on a confidential basis because we didn't want to have keep playing games with the press, we didn't think it was the

12:13:55 right thing to do, we wanted to keep it professional and
12:13:58 share the letter with customers of Qualcomm which clearly
12:14:01 says we are retracting that termination notice, we are not
12:14:04 terminating your ALA, but please don't keep playing games
12:14:08 with the press, that our intention.
12:14:09 Q. Do any particular media outreaches by Qualcomm come
12:14:14 to mind Mr. Collins?
12:14:15 A. There were so many, we were contacted on a frequent
12:14:18 basis, one was an outlet called Semi Analysis, I think it
12:14:22 was in Q4 of 2022, I believe, which basically went into in
12:14:29 depth detail around Qualcomm's litigation strategy in the
12:14:32 case, there is no way they would have had information
12:14:35 without talking to Qualcomm, it was very disparaging about
12:14:38 Arm --
12:14:39 MS. DUNN: I assume that this is not being
12:14:41 offered for the truth of what was actually in the news, and
12:14:45 instead of being offered for I don't know what, but not
12:14:49 that.
12:14:49 THE COURT: That's a hearsay objection?
12:14:51 MS. DUNN: Yes.
12:14:52 MR. WILCOX: I think's just, he's sharing his
12:14:55 reaction to what he's hearing and why they are taking these
12:14:59 actions.
12:15:01 MS. DUNN: He can't testify to what is in news
12:15:06 articles as if they are true and also we have not seen that,

so I just want to make sure that it's not hearsay he's testifying to, and it sounds like it is, so that's why I'm objecting.

MR. WILCOX: I don't think he's testifying to what the truth of it is, and that's not what we're offering it for, it's why did he send this and what was he hearing whether it was true or not in the marketplace and in the media.

THE COURT: I think with that clarification, that if you think it safe.

MS. DUNN: Thank you, Your Honor.

THE COURT: You can object again.

MS. DUNN: Thank you.

BY MR. WILCOX:

Q. Mr. Collins, do you want to finish your answer?

A. I forgot where I was. But there was a lot of detail about the litigation that would never have made its way to a journalist unless Qualcomm was talking to them, it was very disparaging of Arm and very pro Qualcomm so we didn't want those things continuing, that was the point.

Q. Turning pack to PTX-1718 for a moment, how long after the jury verdict in the first case was it before you sent this letter?

A. I believe was the first working week following that jury decision, I was very focused on getting this to

12:16:12 **Qualcomm as soon as possible.**
12:16:13 Q. **Why were you focused on getting this to Qualcomm as soon as possible?**
12:16:16 A. **Because we were very disappointed with the outcome of the first trial, but we respected it, we respected the decision by the jury and the right thing to do was to stop doing things that we were doing previously when the case was ongoing, it was now finished and this is the right thing to do.**
12:16:31 Q. **Now, what happened with respect to support and maintenance services for Qualcomm chips after you sent this letter?**
12:16:37 A. **Immediately reinstated.**
12:16:39 Q. **Is there any point after sending this letter that you terminated Qualcomm's ALA?**
12:16:45 A. **Absolutely not.**
12:16:46 Q. **Can you go to page 2, please, Mr. Schlaifer. There is a signature block at the bottom. Do you see that?**
12:16:53 A. **I do.**
12:16:54 Q. **Who did you send this letter on behalf of?**
12:16:57 A. **Arm Ltd.**
12:16:59 Q. **And what is the relationship between Arm Holdings and Arm Ltd?**
12:17:04 A. **So Arm Holdings is basically an entity that simply holds Arm Ltd. Arm Ltd. Is the entity where all the action**

is, so Arm limited is the entity that employees the employees, once the intellectual property, which is basically the main bulk of Arm's business, owns real estate, leases buildings, that's where all the action happens. Arm Holdings simply sits on top of that to hold it because we needed to have an U.S. company in order to do an IPO when we IPO in 2023.

Q. Could you please turn to JTX-1, Mr. Collins. It should be towards the front of your binder. And I want to direct you to page 17, and second -- well page 16 and specifically Section 8.1. And if you can highlight that and blow it up, please, Mr. Schlaifer.

Do you recall being asked about this provision by Ms. Dunn?

A. I do.

Q. Do you recall her asking about the language that says during the term of this agreement, Arm and any controlling party as a result of an acquisition of Arm shall have an obligation to perform?

A. I do.

Q. Do you believe that Arm Holdings acquired Arm Ltd?

A. No, it did not.

Q. Could you please turn to page 1, and the definition of acquisition of Arm. And this is acquisition of Arm means any transaction or series of transactions whereby a third

party, defined as the controlling party, acquires a direct or indirect power to control, and then goes on from there. Do you see that?

A. I do.

Q. Do you consider Arm Ltd and Arm Holdings to be third parties with respect to each other?

A. They are individual entities.

Q. But are they strangers to one another?

A. Not strangers, no.

Q. Are they part of the same corporate family?

A. Of course.

Q. They're not a third party like, for example, Arm's relationship to Qualcomm, right?

A. No, this provision in the contract is providing for a situation where Arm is acquired by a third party, that has nothing to do with Arm.

Q. Okay. I want to take a step back for a moment. Let me ask you one more question, thank you for taking that down.

What were your thoughts at the time that the Bloomberg article came out about whether that Arm might interfere with Qualcomm's business?

A. We didn't believe it would interfere with Qualcomm's business and that was certainly not the intention.

Q. And if Qualcomm's CPU business had been harmed, how

would that affect Arm's business?
A. It would harm Arm's business because as has been described in this court, Qualcomm is a very important customer of Arm. If Qualcomm is harmed, we are harmed because when Qualcomm does well, Qualcomm pays royalties to Arm, so when Qualcomm wins, we win, there was no intention to harm Qualcomm in relation to this.
Q. Now there has been some suggestion in the questioning today that you could just go to other customers and get that royalty revenue back. If Qualcomm's CPUs business goes down, can Arm immediately recoup that by going to other customers?
A. There are other people in a better place to answer that question than me, but my feeling would be no.
Q. Let's take a step back and introduce you for a moment. Where are you based Mr. Collins?
A. I'm based in the UK that's where I live, I spend a lot of time working here in the U.S.
Q. Can you tell us about your background in education?
A. Sure. I went straight from high school into the workplace and I didn't have the financial means to go to University, I wanted to be a lawyer but it wasn't really a well traveled path by people from where I lived. And I, but I did eventually decide to go to night school. Once I actually earned enough money to pay for my education I went

to night school to study law and I became a lawyer?
Q. Why did you go to night school?
A. Because I made a promise to my mother and younger brother that I would support them financially if they needed help.
Q. Who did you work for today?
A. Arm Ltd.
Q. How long have you worked for Arm limited?
A. Since September 2022.
Q. And we discussed earlier with Ms. Dunn that you're the chief legal officer. What are your responsibilities as the chief legal officer?
A. So I run a number of departments at Arm, including legal, compliance, trade compliance with which we treat separately, company secretary, government affairs and corporate development, I think that's it.
Q. And now we've heard a few times about a previous lawsuit that Arm filed against Qualcomm in 2022. As part of that lawsuit, did Arm publicly state it had the right to terminate Qualcomm's ALA?
A. Yes.
Q. Do you recall roughly what year that statement was made?
A. That was in November of 2022.
Q. Okay. Now I want to ask you a couple of questions

about the notice letter. Could you turn to DTX-55 in your binder?

A. Is this --

Q. It will be in the smaller binder, sorry.

A. So DTX?

Q. 55.

A. Yes.

Q. And is this the the October 2024 notice letter that Arm sent to Qualcomm?

A. That's correct.

MR. WILCOX: I think this is already in evidence Your Honor but just to be safe, we move to admit DTX-55.

MS. DUNN: No objection, of course.

THE COURT: Thank you. It's admitted.

(DTX Exhibit No. 55 was admitted into evidence.)

BY MR. WILCOX:

Q. And I want to direct you to the first paragraph of that letter. What are you saying in this first paragraph of the letter, Mr. Collins?

A. I'm saying here that we're providing notice to Qualcomm that it's in breach of the Qualcomm ALA, and unless that breach is cured within 60 days which is as prescribed in the contract then we'll be entitled to immediately terminate the ALA if we cure that decision.

Q. Why did Arm send Qualcomm this notice?

A. We sent this notice because we were fastly approaching trial, so we sent this notice in October of 2024, I believe we went to Court in December of 2024. We wanted this dispute to be resolved, we're not experienced in litigation, Arm and Qualcomm's legal department is about seven times the size of mine. We had sent countless e-mails, numerous letters, asking them to cure the breach and stop breaching our contracts. We were left with no option other than to bring an action against Qualcomm which is the first time in our 35-year history we have ever sued a customer and the reason we were left with no choice is because we had two options and I think only one real choice, one option was to turn a blind tortious interference and let a high profile customer basically take our IP, and as an IP pretext, the only pretext in our business is that contract, protecting our IP, so we could do that, or we could have brought an action against them and after a long deliberation, we decided to bring an action against them.

The reason why we sent e-mail, sorry this letter when we sent it was because nothing was working to get Qualcomm to stop the breach and we were fastly approaching trial. This notice provision gave them 60 days to cure the breaches. And so we thought the right thing to do was to put them on notice, they got 60 days as explained in the contract and we genuinely hoped they would cure the breach

and we could put this thing behind us.
Q. Mr. Collins, who has ultimate responsibility to decide whether to cancel the Qualcomm ALA?
A. That would be Rene Haas, the CEO.
Q. Okay. Would you be involved in consulting with Mr. Haas about that?
A. Yes, I think I would be, yes.
Q. And at the time that you sent this notice letter and you can go ahead and take that down Mr. Schlaifer and just keep the letter itself up. At the time that you sent this notice letter in October of 2024, had you and Mr. Haas made a decision about whether you were going to terminate the Qualcomm ALA?
A. Absolutely not.
Q. What did you hope would happen during the 60-day cure period?
A. That Qualcomm would cure the breach, we could put this to bed and quite frankly I can go back to my day job.
Q. At the time that you sent this letter, did you genuinely believe all the statements that are in here?
A. Absolutely.
Q. Do you stand behind those statements today?
A. Yes, I do.
Q. What regrets, if any, do you have about sending this letter?

12:26:04 A. I regret that we were put in this situation by a long-standing trusted partner. But I don't regret sending it, I think it was the appropriate thing to do.

12:26:15 Q. And at the time you sent this letter, was there any motivation behind it to harm Qualcomm?

12:26:20 A. No, absolutely not. Qualcomm is a very, very important customer, it makes no sense whatsoever to try to harm Qualcomm, that was not the intention of this.

12:26:29 Q. After you sent -- you can now take this down, Mr. Schlaifer, thank you.

12:26:33 After you sent this notice letter to Qualcomm, did you share the letter with anyone else?

12:26:37 A. Yes.

12:26:38 Q. Who did you share the letter with?

12:26:40 A. A gentleman by the name of Ken Siegel at the law firm Morrison Foerster.

12:26:47 Q. And why did you send a copy of the notice letter to Mr. Siegel?

12:26:51 A. I had a conversation with Ken Siegel and we were discussing what we thought the media fallout could be when this letter is sent, just given the prior form that we had seen from Qualcomm. And I decided after consulting with my team that the right thing to do was to brief one journalist at Bloomberg, so in the event that this became a media story, one journalist would have Arm's version of events

outside of the story.
Q. And which journalist was ultimately briefed about this article?
A. A gentleman by the name of Ian King at Bloomberg.
Q. Were you personally involved with briefing Mr. King?
A. Not directly, but I authorized Ken Siegel to do that, he mentioned he had a lot of experience dealing with the media, he worked very closely with FGS the PR firm, I thought they were more media savvy than me speaking frankly, wasn't a world I was familiar with, so I authorized Mr. Siegel to work with FGS and have that conversation with Bloomberg.
Q. By not talking to Mr. King directly yourself, were you in any way trying to distance yourself from Bloomberg article.
A. Absolutely not, I take full responsible in that conversation happening, and I stand by the fact it was the right to thing to do during what we were dealing with.
Q. If you could turn to PTX-1529 in your small binder?
A. Yes.
Q. Is PTX-1529 the Bloomberg article?
A. Yes.
MR. WILCOX: I believe this is already in evidence but just out of abundance of caution, move to admit PTX-1529, Your Honor.

MS. DUNN: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1529 was admitted into evidence.)

BY MR. WILCOX:

Q. And I want to direct you to I want to direct to you the final paragraph here in the, this this first page of the article. Do you see the sentence that says with the cancellation notice, Arm is giving the U.S. company an 8 week period to remedy the dispute?

A. Yes.

Q. How does that affect your view of the overall accuracy of this article?

A. I think the overall accuracy of the article was on point, we were giving them 60 days to cure the breach. If I'm being completely honest, I didn't love the Arm Holding is cancelling the license because that was the wrong entity it was Arm Ltd and we hadn't made any decision whatsoever to cancel that license. We were hoping, all be it nicely that Qualcomm would cure the breach and we hadn't yet made a decision that we would cancel the license even if they didn't cure the breach.

Overall given that they had given days to cure the breach that was the message we wanted to put out there, overall, we think it was on point.

Q. Okay. And could you please, Mr. Schlaifer, take us to the next page of the article. And if you could highlight the paragraph that starts a Qualcomm spokesman and the one right below it as well.

Do you see the statement there from Qualcomm in the Bloomberg article?

A. Yes, I do.

Q. Do you know weather that statement was in the original version of the article?

A. I don't believe it was from memory, obviously Qualcomm is speaking to the journalist and there was an on the record statement given by Qualcomm.

Q. How aggressive did you find the statement by Qualcomm?

A. I wasn't surprised but I found it very aggressive.

Q. In you can now zoom out Mr. Schlaifer. On the same page, is there an on the record statement by Arm?

A. There is.

Q. Was that on the record statement in the original version of the Bloomberg article?

A. It was not.

Q. Why did Arm provide a follow-up statement to Bloomberg?

A. As we saw there was an e-mail chain earlier where there was a suggestion that we put an on the record

statement in the article because Qualcomm had since done so. And my recommendation to the team was not to go with that serious thing that was sent to us by FGS, just be very clear and to the point and say we trusted the court process, it says we're fully prepare for the trial and we confident that the court will find in Arm's favor, which is what we believed at that time.
Q. You can take that down Mr. Schlaifer. If you can turn to PTX-1526 which is your large binder, you were asked about it by Ms. Dunn.
A. I have it.
Q. Okay. If we could bring that up, Mr. Schlaifer.
And there is a Wednesday, October 23rd, 2024, e-mail from Danya Al-Qattan, we can call that out and do you see that first sentence of this, of the statement which says following Qualcomm's repeated material breaches of Arm's license agreement?
A. Yes.
Q. Do you recall Ms. Dunn asking you questions about that or some similar language?
A. Yes.
Q. Is the Qualcomm ALA a license agreement?
A. It is.
Q. And then if you see the rest of the sentence it says Arm is left with no choice but to take formal action

requiring Qualcomm to remedy its breach or face termination of the agreement. Do you see that?
A. I do.
Q. Is that an accurate statement of what Arm's position was?
A. Yes.
Q. Was that saying that you were definitely going to terminate the agreement?
A. No.
Q. Was --
A. We had not made our mind up.
Q. If you could turn to DTX-1543?
A. In the smaller binder.
Q. Still going to be in the big binder?
A. Sorry, PTX.
Q. Yeah, actually you know what, for the sake of time, let's just leave that one alone.
Now, you were asked some questions about the Snapdragon summit, do you recall that?
A. I do.
Q. When you sent this notice letter to Qualcomm and authorized Mr. Siegel to speak with Bloomberg, was there any plan to disrupt or distract from the Snapdragon summit?
A. Absolutely not.
Q. How would it benefit Arm to disrupt the Qualcomm

summit?
A. I don't see how that would benefit Arm in any way shape or form. Qualcomm is an important partner, disrupting a summit, how would that benefit Arm.
Q. Do you know whether Meta attended the Snapdragon summit?
A. I have no idea.
Q. Now, you were here for Mr. Amon's testimony, weren't you?
A. Yes.
Q. Do you recall Mr. Amon describing Qualcomm's negotiations with Meta in October of 2024?
A. Yes, I do.
Q. Were you aware of those negotiations at the time?
A. No.
Q. How common is it for Arm to know about negotiations that are going on between its commercial partners and their customers?
A. First, the first time I became aware of anything between Arm and Meta was when this lawsuit hit. Secondly, when companies are doing deals, they're kept confidential until they're actually penned and announced and that's the stage that I heard from Cristiano Amon that they were at, so I had no idea that Qualcomm had any relationship with Meta at the time that we had Bloomberg briefed, none whatsoever.

Q. You were also asked a couple of questions about Qualcomm's request for TLA cores, do you recall that?
A. Yes.
Q. Could you please turn to PTX-1350 in your small binder. What is PTX-1350?
A. This is a letter from the general counsel of Qualcomm to me basically saying that we owe them an offer.
MR. WILCOX: Your Honor we move to admit PTX-1350.
MS. DUNN: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 1350 was admitted into evidence.)
BY MR. WILCOX:
Q. If we can start with the second page of the document. What does Ms. Chaplin who is the general counsel of Qualcomm, attach to the September 27th letter?
A. A letter that she had sent a week prior, with a request.
Q. If we can blow up the first paragraph, Mr. Schlaifer.
And do you see here where it says that Qualcomm is providing Arm with notice pursuant to a notice process?
A. Yes, I do.
Q. And it invokes certain provisions of the TLA, do you see that?

MS. DUNN: Objection, Your Honor. I just want to make sure.

MR. WILCOX: I'm not going there.

MS. DUNN: Getting close to Your Honor's ruling on this.

MR. WILCOX: I promise you that's not where I'm going.

THE COURT: Okay.

BY MR. WILCOX:

Q. Does this reference Section 8.1 of the TLA?

A. Yes.

Q. You can take this down, sorry, just the highlighting. Thank you.

Were there specific implementation cores that Ms. Chaplin was referencing in this letter?

A. Yes.

Q. What were those cores?

A. Hunter, Hayes, and Yamin.

Q. Where do we see that in the letter, Mr. Collins?

A. Second paragraph.

Q. And when had Qualcomm first requested a license to Hunter, Hayes, and Yamin?

A. 2019.

Q. Okay. If you could take that down and please turn DTX-504.

What is DTX-504?
A. This is my response to Ann Chaplin, who is the general counsel at Qualcomm's letter.
MR. WILCOX: We move to admit DTX-504, Your Honor.
MS. DUNN: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 504 was admitted into evidence.)
BY MR. WILCOX:
Q. When did you send this letter to Ms. Chaplin?
A. On the 23rd of October, 2024.
Q. Okay. If could go to the second paragraph of this letter. What do you say in the first sentence here of your letter to Ms. Chaplin?
A. That we agree that they are currently due any offers that as being an allege.
Q. I'm sorry, I thought I heard you say you agree or disagree?
A. We disagree, that we are due any offers as alleged.
Q. In the next two sentences of this letter, do you explain why you disagree?
A. I do. What I'm saying here is the wording of the contract is very clear, you're entitled to one initial request, and that initial request came in 2019.

MS. DUNN: Your Honor, I'm sorry, objection. He's testifying what the wording of the contract means, which is legal argument and not appropriate for this witness to be doing at this trial.

MR. WILCOX: I think he's just explaining what his reason was for why they disagreed with Qualcomm's request.

MS. DUNN: This is a letter --

THE COURT: All right. Stop. Why don't we take our lunch break, and we'll come back in about forty-five minutes.

COURTROOM DEPUTY: All rise.

(Jury exiting the courtroom at 12:39 p.m.)

THE COURT: Okay. Thank you. You can step down.

What I couldn't understand is that document a letter? It says -- I mean, it's saying we disagree -- everyone can sit down. In the next two sentences of this letter, do you explain why you disagree. So is that just what he said in the letter or is he now interpreting the contract. Can you put the document up that you were looking at. This is a letter.

MR. WILCOX: This is the letter. So the first sentence that you see there is him saying we disagree and then he goes on to explain this is why we don't think that

12:40:09 you are currently entitled to an offer.
12:40:11 THE COURT: Why can't he do that? He could be wrong, but why can't he do it and say this is what I was saying?
12:40:18 MS. DUNN: So --
12:40:19 THE COURT: The document is in evidence.
12:40:21 MS. DUNN: I understand, I think -- I mean the fact that he said it is it evidence. I think his interpretation of the contract which is not appropriate for him as a lawyer to tell the jury how to interpret the contract. So that -- the fact that he said it can be in evidence, yes, I said these things, but he's saying it's very clear to me, the contract means this, that goes beyond.
12:40:44 THE COURT: He just says did you explain why you disagree. And he did. And then he was saying what he said. So I'll overrule the objection. But, you know, just don't have him veer off of what he's done and get into interpreting the contract.
12:41:09 MR. WILCOX: Understood, Your Honor.
12:41:15 COURTROOM DEPUTY: All rise.
12:41:18 MR. ISAACSON: Your Honor, may I just ask when you want to discuss that remaining item for Mr. Weiser.
12:41:25 THE COURT: Remind me what it is?
12:41:27 MR. ISAACSON: This was the argument about hearsay.

THE COURT: Okay. Does someone have something for me to read?

MR. ISAACSON: Yes, I can also perhaps simplify it. Here is what I propose that he be allowed to say.

THE COURT: Have you told them?

MR. ISAACSON: Let me discuss it with them.

THE COURT: Why don't you do that.

And, Mark, get those cases and then I'll come back ten minutes early.

(A luncheon recess was taken.)

COURTROOM DEPUTY: All rise.

THE COURT: All right. So Mr. Buckson gave me a preview, but we were missing some things, and I didn't really understand what you all are saying on the closing the courtroom. So we did resolve the other issue, right?

MR. LoCASCIO: The hearsay issue, we resolved the issue, Mr. Issacson showed me the specific words his witness would say on this, I can tell the Court, it's -- they listened, said thank you, and asked us to keep them updated and informed, and he advised me that he would go meet with his witness, that would be all the witness would say, and with that, Your Honor, I think we can take that off your table.

THE COURT: Thank you.

MS. YING: Sorry, to the sealing the courtroom

part, so the witness after Mr. Collins, we expect will be discussing the confidential information of Meta.

THE COURT: Can you give me names?

MS. YING: Sure, Pavan Mulabagal, sorry, none of us know how to pronounce his last name, with apologies, Mulabagal.

THE COURT: M-U-L-A-B-A-G-A-L. And's he the one coming up next?

MS. DUNN: After Mr. Collins. So at that point, Ms. Morgan, who is doing his direct examination will just say at this point the courtroom should be sealed, that's how she would signal when it would be his examination.

THE COURT: Give me some specifics. I know I have all these third parties, which I can't believe this is the way you treat your clients, giving them such short notice, but that's between you and them. What, is his whole testimony, we can't even get like who he is.

MS. YING: No, not the whole testimony, that's why I said at the point in his direct examination --

THE COURT: And then everything that's confidential --

MS. YING: Will be grouped together.

THE COURT: Will be lumped together and we will keep that to a minimum.

MS. YING: That is the plan, and Meta put in

their declaration of DI 986 earlier, that was Saturday or something like that, they put in their declaration because we talked about it on Monday as well, so this is relating to that.

THE COURT: The problem with Meta's submission and again, this is probably the parties fault, not Meta's, they are like we have no idea what anybody is going to do but we want it to be sealed, and that's very difficult to make the specific finding. But I think a number of the other third parties submissions have made clear that it's pretty specific financial information and certainly Meta's submission made clear at least that was going -- findings of specific harm on that.

MS. YING: Thank you, Your Honor, I'll just note that we did file a letter yesterday, because we provided Meta with copies of the document that has an updated explanation for those specific documents, as well, that's going to be used today.

THE COURT: I won't be surprised to know that I haven't read it with everything else that everybody is throwing at us.

MS. YING: Thank you, Your Honor.

THE COURT: So let's bring in the jury. And you didn't have to bring the jury, you could just get in your seat.

I will say if I'm sealing portions of the transcript, you all are going to have to look at that in a compressed time and redact what portions you think must be kept under seal and then let anything else go.

MS. YING: Will do, Your Honor.

(Jury entering the courtroom at 1:28 p.m.) .

THE COURT: All right. Welcome back, everyone. Everyone else please be seated. Please continue.

MR. WILCOX: Thank you, Your Honor.

BY MR. WILCOX:

Q. If we could bring back up DTX 504.

Mr. Collins, before we took the lunch break, you had been talking about why Arm disagreed that it owed Qualcomm an offer for Hunter, Hayes, and Yamin. Do you recall that?

A. I do.

Q. What did you explain in this letter about why Arm believed it did not owe an offer for those implementation cores?

A. I explained in this letter that the way the agreement works is you have one initial request, you provided that initial request in 2019, in response to that initial request, we provided you with the offer, and you accepted that offer. If you want to make a subsequent request, you must make it within 12 months as per the contract. You made

13:32:16 the offer -- so you made the request in 2019, we're five years later in 2024. That's timed out.

13:32:23 Q. If you believed that Arm did not need to make an offer under the TLA, why did you ultimately make Qualcomm an offer?

13:32:31 A. Because they threatened to sue us if we would not.

13:32:35 Q. After sending this letter in October 2024, when did you next hear from Qualcomm about that offer for Hunter, Hayes, and Yamin?

13:32:43 A. So I didn't get any response whatsoever to this letter, and then this is in October 2024, and in March, in 2025, they sued us.

13:32:53 MR. WILCOX: Thank you. No further questions.

13:32:56 THE COURT: Redirect?

13:32:58 MS. DUNN: Yes, Your Honor.

13:33:00 REDIRECT EXAMINATION.

13:33:00 BY MS. DUNN:

13:33:03 Q. Mr. Collins, okay, so your counsel just put on the screen a letter with a contract provision from which agreement?

13:33:14 A. From the TLA.

13:33:15 Q. TLA. Right. And you recall that you were deposed under oath in this case, right?

13:33:20 A. That's correct.

13:33:21 Q. And at your deposition, you said that you were not

personally involved in negotiating the ALA or the TLA, right?

A. That's a hundred percent correct.

Q. And you said that other people would know much more about the intent of the TLA and ALA from 2013 than you do, right?

A. That's correct. I joined Arm in 2022, and the contract was entered into in 2013.

Q. Exactly, so if someone was there at the time of the drafting, they would know, in your words "much more" about the intent of those provisions than you do, right?

A. I think that's fair.

Q. All right. Now I want to clear up another thing for the jury that you talked about with your counsel on direct. So you said numerous times that your termination letter was demanding that Qualcomm cure its breach and that that was -- that was the point of the termination letter, you recall that, right?

A. Yeah, we sent a notice of breach, requesting that they cure the breach within 60 days as per the contract, that's right.

Q. Right. So I want to talk about that. The breach that you are alleging, is that Qualcomm breached the Nuvia ALA; right?

A. No.

Q. You believe that there was a claim in your first lawsuit, or your lawsuit against us, for breach of something other than the Nuvia ALA?

A. So just to clarify, the letter said that you're in breach of the Qualcomm ALA as we specified --

Q. We're going to talk about that.

THE COURT: Hold on. Let him finish.

Q. Sorry. It was an imprecise question, and I understand the confusion.

So, Mr. Collins, the breach that Arm was alleging in the lawsuit that it brought was a breach of the Nuvia ALA; correct?

A. That is correct.

Q. And Qualcomm was not a party to the Nuvia ALA; correct?

A. They weren't a party to the Nuvia ALA, they became a party when they acquired Nuvia.

Q. And Qualcomm has their own ALA, correct, that's what we're talking about in this case?

A. Correct.

Q. Right. And other than a claim against Qualcomm for breach of the Nuvia ALA, and just to remind, Nuvia was a start up, you had no other breach claim against Qualcomm, correct?

A. No breach claim that we had brought against them at

that point in time, that's correct.

Q. Right. And in fact, Qualcomm, in response to your lawsuit, asked the jury at the time for a finding that our products were licensed under Qualcomm's ALA, you recall that?

A. I do.

Q. Right. And you recall that Arm lost that case and the jury did in fact find that our products were licensed under the Qualcomm ALA; right?

A. I do, and that's exactly why we sent the letter that I explained to you earlier in early January.

Q. Right. Because you knew that you didn't have a claim in your lawsuit under the Qualcomm ALA, and you wanted to tell Qualcomm that you were preparing to potentially terminate the Qualcomm ALA, correct?

A. I wouldn't agree with that characterization.

Q. All right. Now, you were here when Mr. Haas talked about the list of things that Arm demanded that Qualcomm do to, in your words, cure the breach, and I want to put those up. And so Matt, this is an exhibit used by Arm's counsel, DTX 55.

And if you go to the bottom paragraph, it says "due to Qualcomm's willful ongoing and renewed actions put forward a breach", and it says "to do so Qualcomm must at a minimum", do you see that?

A. I do.
Q. I just want us all to understand what you are demanding. So at this point, Arm is demanding that Qualcomm stop its development of Nuvia designs, including requests for verification, delivery, and support, for CPUs they used in the Nuvia designs, do you see that?
A. I do.
Q. And that was all of Qualcomm's products, correct?
A. I don't know if it's all their products, but it's certainly in some, yes.
Q. Right. And that you were demanding that to avoid immediate termination, you had to stop manufacturing and selling those products, correct?
A. Correct.
Q. And you're also demanding, at a minimum, that we withdraw your claims against Arm for purported breach of delivery obligations, do you see that?
A. Yes, I do.
Q. And those are the claims that are in this case that are going to go to this jury, correct?
THE COURT: I don't know what those is.
MS. DUNN: Fair, thank you, Your Honor.
BY MS. DUNN:
Q. When you say that Qualcomm's ALA will be terminated, unless we cure by withdrawing our claims against Arm for

purported breach of delivery obligations, that is describing a breach claim that this jury is going to need to decide, right?
A. Qualcomm's conduct resulted in our opinion in a breach of the Nuvia ALA and the Qualcomm ALA. The Nuvia ALA was tried in the previous case, the Qualcomm ALA is what we're writing about here.
Q. Okay, that was not my question, Mr. Collins. When you are saying that we are going to terminate your license, unless you withdraw your legal claims for purported breach of delivery obligations, you're talking about the lawsuit that we brought in April, that this jury is going to need to decide, right?
A. That's correct, but it's context, that's correct.
Q. And just to be clear, those are the same claims that you have heard that you are arguing and has been argued in this courtroom that are no big deal, right?
A. Yes.
Q. Yeah. Right. So basically, Arm is saying if you don't withdraw these claims, we're going to terminate your license, right?
A. We have not said we are going to terminate your license. As I said before, we had not yet made a decision. We are saying you got 60 days to cure the breach as per the terms of the contract, simply following the contract.

13:40:01 Q. Right. And yet, Arm is going to ask this jury to say that these claims don't matter, but they mattered so much to Arm, that it said we will terminate your license unless they're withdrawn, right?

13:40:15 MR. WILCOX: Objection, Your Honor. Can we have a side-bar.

13:44:27 (Side-bar discussion:)

13:44:27 THE COURT: Okay.

13:44:27 MR. LoCASCIO: Ms. Dunn just widely opened the door because this sentence, you notice this is highlighting stopped short in the sentence because the sentence is to remove the breach allegations because they were all tied to the penalty and we heard multiple times that we were not allowed to use that and Mr. Wilcox did his dead level best to keep the witness away from it.

13:44:27 And now to say here they are, you wanted it off the table, but they're saying it's not on the table has flipped this entirely on its head, Your Honor.

13:44:28 THE COURT: You're saying they're saying it's no big deal, it's no big deal now because I took that off the table. That is not a fair ask.

13:44:28 MS. DUNN: That's fair, I can move on.

13:44:28 THE COURT: No, you already said it. I mean, I don't know how -- you got to undo that. I mean --

13:44:28 MS. DUNN: Okay. What would you like me to do?

13:44:28 THE COURT: Everyone understood what was happening there.

13:44:28 MS. DUNN: I'm sorry, I totally didn't think -- okay.

13:44:28 THE COURT: Let's assume that I don't wish to slam open the door because I don't trust any of you guys not to just abuse everything. Okay. We already are sitting here talking about the other lawsuit for way too much time in this lawsuit. So what do you want me to do?

13:44:28 MR. LoCASCIO: My request given that guidance Your Honor is for the last, I think it's two, we can look at the transcript questions and answers to be stricken and the jury should be told to disregard them.

13:44:28 MS. DUNN: So here is the problem that we confront, and I'm all for providing a solution because I really did not -- they really argue to get up and their whole theme is doesn't matter, it I'm just trying to tell the jury it does matter, it does matter.

13:44:28 THE COURT: But you can't say that it matters now because of what they said then because the steaks then were different.

13:44:28 MS. DUNN: I completely understand.

13:44:28 THE COURT: So you cannot do that.

13:44:28 MS. DUNN: But we're in a real box, we have to know able to respond.

THE COURT: I don't know what to tell you.

MS. DUNN: To I want doesn't matter argument.

THE COURT: You're a good lawyer, you can figure this out, I have lots of contract cases that aren't about $5 billion in liquidated damages, they are about a hundred thousand dollars or $2 million, if you don't think that that matters, maybe you should put yourself in the position of the jurors.

MS. DUNN: I did think it matters, Your Honor, and I'm sorry. So anyway, I'm happy to move on. I'm happy to say like I could say --

THE COURT: I'm going to say those -- how much more are we going to do on this old litigation?

MS. DUNN: Nothing. I'm done. And frankly I had to respond because they're fuzzing it all up about when the last litigation was about, I had to clarify this because it's very confuse if be, because they're sitting there calling us breachers in the last case and the jury doesn't understand what that breach was about, that was like a whole theme in the exam, we breach, we breach, how do we breach.

THE COURT: I can't imagine you think it's so helpful for them to tell them about the last litigation when all the jury hears is you're big fat loser to them.

MS. DUNN: I really do apologize.

THE COURT: We don't do what just happened, I

will tell the jury that I will strike the last two questions.

MR. LoCASCIO: Can I check the screen, I think it's two, I'll look at the screen or give you a two or something sign, I'll try to make it subtle.

THE COURT: And tell them to disregard them.

(End of side bar.)

THE COURT: Members much the jury, this is what we're going to do. They have to fight about things and make me decide things, it keeps me awake, and it let's you guys have a little break. So I just don't want you to think this is anything abnormal, this is what happens in these cases, they're hard fought to both sides. I do sometimes make calls, and on this one, I'm going to tell you that I'm going to strike the last three questions and answers from the record, and you should disregard those, and we'll just move on to a different or whatever the next, whatever the next question is.

MS. DUNN: Thank you, Your Honor.

BY MS. DUNN:

Q. Okay, so moving on to the next topic, you also testified, Mr. Collins, about Arm Holdings, right? And you know that Mr. Haas, your boss, the CEO, is the CEO of Arm Holdings, correct?

A. He's the CEO of Arm, and he's on the board of Arm

Holdings, yes.

Q. Right. If we look at, can we put up DTX 2648, which is in evidence. Okay. Then I have the number wrong. What's the numbers? Thanks Mr. Spalding. Okay.

So, this is a report that Arm Holdings PLC filed with the Securities and Exchange Commission, it's called a 20-F. Do you see that?

A. I do.

Q. And we have to be -- all companies have to be truthful under penalty of perjury in their SEC filings, correct?

A. That's correct.

Q. If you go to page 84, there is a list of officers of Arm Holdings, do you see this, and senior management, do you see that?

A. Yes, I do.

Q. The chairman of the board of Arm Holdings is Masa, do you see that?

A. Yes.

Q. He's the chairman of the board of Arm Ltd, too, right?

A. No, he's not.

Q. And you see Rene Haas, he's their chief executive officer, and he's the chief executive officer of Arm Holdings, correct?

A. Correct.
Q. And of Arm Ltd, correct?
A. Rene is not the -- sorry, director, I don't believe so, Arm Ltd. CEO of the whole group.
Q. It's confusing, because they blend together.
So if you -- when Mr. Haas tells you to do something as your boss, do you say are you asking me to do that from your position at Arm Holdings or Arm Ltd?
A. Of course not.
Q. Right. And similarly, you don't go around to people and say, because you're on this list, too, you don't go around and say I'm telling you to do this thing in my Arm Ltd capacity or in my Arm Holdings capacity, you just say it's Arm, right?
A. Anything I do in the capacity of Arm Ltd director would impact the whole group because we're part of the same group.
Q. Okay. So if we go to page 56. And hopefully we can find this, Matt, it's the part where it talks about corporate reorganization. This explains what happened after the IPO. And it talks about how the name of Arm Ltd was changed to Arm Holdings PLC. Do you see that? Do you see at which time its name was changed to Arm Holdings?
A. It doesn't say the name change, it says Arm Ltd will become its wholly own subsidiary of the holding company, Arm

13:48:28 Arm Holdings, which is exactly what I said explained earlier.

13:48:30 Q. Yes, do you see where it says at which time its name was changed to Arm Holdings PLC?

13:48:35 A. That's Arm Holdings Limited, which is a separate entity.

13:48:39 Q. It says the corporate reorganization happened and Arm Ltd became a wholly own subsidiary of the holding company, Arm Holdings PLC, do you see that?

13:48:49 A. I do, as I explained earlier.

13:48:55 MS. DUNN: Your Honor, no further questions.

13:48:57 THE COURT: Thank you.

13:49:00 Redirect -- oh, wait, that's your witness. There is no redirect. You're done. Thank you.

13:49:06 What's next?

13:49:18 MS. MORGAN: Your Honor, we call Pavan Mulabagal.

13:49:39 COURTROOM DEPUTY: Please raise your right hand. Please state and spell your full name for the record.

13:50:11 THE WITNESS: Pavan Mulabagal, P-A-V-A-N, M-U-L-A-B-A-G-A-L.

13:50:36 Pavan Mulabagal, having been duly sworn was examined and testified as follows:

13:50:40 DIRECT EXAMINATION.

13:50:41 BY MS. MORGAN:

13:50:46 Q. Good afternoon, Mr. Mulabagal.
13:50:49 A. Good afternoon.
13:50:50 Q. Can you introduce your several to the Court and spell
13:50:52 your name for the reporter?
13:50:54 A. Sure. My name is Pavan Kumar Mulabagal, spelled
13:50:59 P-A-V-A-N, K-U-M-A-R, M-U-L-A-B-A-G-A-L.
13:51:04 Q. Where do you work?
13:51:06 A. Qualcomm.
13:51:07 Q. And how long have you worked at Qualcomm?
13:51:09 A. In this stint, I have been at Qualcomm for six years.
13:51:12 Q. What's your current role?
13:51:14 A. I'm senior director of sales and business
13:51:17 development, in charge of data center business.
13:51:19 Q. And what are your main responsibilities in that role?
13:51:22 A. So right now, my main responsibilities are to grow
13:51:25 Qualcomm's business in the data center space in the North
13:51:29 American region.
13:51:29 Q. Is that always what you have done at Qualcomm?
13:51:31 A. No.
13:51:32 Q. What were you doing prior to working on the North
13:51:36 American infrastructures?
13:51:38 A. So prior to this role, until July of last year, I was
13:51:42 managing Meta.
13:51:43 Q. When you say managing Meta, what do you mean?
13:51:46 A. So Meta was a key account for us, and my

responsibility was to introduce our chip road maps to Meta, intersect with their product road maps, figure out the right fit, and also to make sure those turn into commercial engagements, and also to negotiate contracts associated with those commercial engagements.

Q. How long has Meta been a Qualcomm customer?

A. For a long time, at least over a decade.

Q. What does Meta buy from Qualcomm?

A. Meta buys chips from Qualcomm.

Q. What kind of chips?

A. So these are chips that go into reality labs products, this is a business line at Meta. These are chips for your virtual reality headsets, like a Quest headset, also for augmented reality, wearable glasses like Meta Ray-Bans, that's one category of chips we sell to Meta. We started discussing with Meta since about a couple of years on a chip that would go into their data center platform.

Q. I want to now show you or have you flip in your binder, which should be in front of you, to PTX 1570. Which is an e-mail chain between you and Steve Kim, and Noah Strangio, dated October 25th, 2024. Do you see that?

A. Yes.

MS. MORGAN: Move to admit PTX 1570.

MR. WILCOX: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1570 was admitted into evidence.)

BY MS. MORGAN:

Q. I'm going to direct your attention to the e-mail that's at the bottom of the page, you'll see that when you read these e-mails this way, they usually start at the end for the earlier date. And there is an e-mail there from someone named Manne Srinivasa, that's dated October 23, 2024, do you see that yes?

A. Who was that.

Q. Who was Mr. Srinivasa?

A. He was managing part of my team.

Q. When you say he was part of your team, what did you do?

A. He was responsible for managing portions of Meta Reality Labs, a roadmap for us.

Q. This e-mail has the subject line Arm. And in the body of the e-mail, it says this is the Qualcomm sanctioned communication on the Arm matter. What is the Arm matter referred to?

A. So the e-mail was sent on October 23rd, October 22nd or thereabouts, there was a letter that got leaked that said Arm was cancelling our license. Meta was really concerned about that. They were worried, what the implication of that was, so they called us, many stakeholders from Meta called

us, and we tried to calm them down, to assure them by sending this e-mail.
Q. Do you know what article they saw?
A. I'm sorry, can you repeat that?
Q. Do you know what article they saw?
A. This is the article that got leaked, that said Arm was cancelling Qualcomm's license.
Q. Was there a specific article that you know about?
A. It was all over the press, so pretty much every single tech publication picked up that article.
Q. Let's look a little bit more closely at the e-mail. Who is Stephen Kim or Steve Kim, sorry?
A. Steve Kim is my counterpart at Meta. So Steve Kim is responsible for the Qualcomm relationship at Meta.
Q. Okay. And who is Noah Strangio, am I saying that right?
A. Yes. Noah was part of Steve's team.
Q. Below that, there is a section of the e-mail that's bolded. It says "this is more of the same from Arm, more unfounded threats designed to strong Arm a long time partner, interfere with our performance-leading CPUs, and increase royalty rates, regardless of the broad rights under our architecture license." What does the architecture license refer to?
A. This is the ALA.

Q. And at the event of the paragraph, it says, "we are confident that Qualcomm's rights, under its agreement with Arm, will be affirmed. ARM's anticompetitive conduct will not be tolerated."

Is that full paragraph in bold, what you referred to, or so what Manne referred to at the top as the sanctioned communications from Qualcomm?

A. Yes.

Q. If you go to the top of this page, there is a second e-mail?

A. Yes.

Q. And that's dated October 25th, and it's from you. Do you see that?

A. Yes.

Q. Why did you send this e-mail just two days after the last one was sent?

A. So, as I referred to earlier, we sold chips to reality labs, we were in conversations with Meta data center business to sell them our CPU chips. So the reality labs team, Steve and Noah, when they reached out to us, they were really concerned about the products that we had built for many generations, concerned about products that we were discussing to take to market, so it was important for us to call out the distinction between the chips we sell to reality labs and the chips we sell to Meta's data center.

Chips we sell to reality labs, we went through an audit of every single chip we sell to Meta, and look at what cores were being used, these were standard Arm cores, once we established that, we got back to Meta, and communicated that the leaked letter references custom cores, and the reality labs should not be concerned, as they don't use custom cores.

Q. The jury has heard some testimony about this, but when you talk about standard cores, what license are you talking about?

A. Standard cores are licensed under the TLA.

Q. When you talk about custom cores, what license are you talking about?

A. That's the ALA license that governs custom cores.

Q. It says here, "Arm's latest communication, which we strenuously disagree with, is like it's original claims in the lawsuit, it relates only to our Snapdragon SOCs with Oryon CPUs, Arm is not claiming a breach of our separate agreement that covers all other Qualcomm products containing Arm cores." What are the Oryon CPUs?

A. So this is the custom CPU core that Qualcomm was developing, the CPU was intended to go into a server for Meta data center needs.

Q. You were talking a little bit about a deal you were negotiating at the time the termination letter was leaked.

Did you bring slides to explain that deal to the jury?
A. I did.
MS. MORGAN: Your Honor, at this point, we ask that the Court room be sealed.
THE COURT: Alright. Because of the showings that have been made on the specifics for the confidential information, I'll ask anyone who is not under the protective order to leave and we'll seal the courtroom.
(Courtroom sealed for the following testimony: )
THE COURT: You guys may want to leave, but you're not allowed.
MS. MORGAN: Sorry.
THE COURT: All right. Are you good?
BY MS. MORGAN:
Q. Okay. Let's take a look at PDX 3.1. What is this showing, Mr. Mulabagal?
A. So this is the last deal I worked before moving on to a different role. And what this is showing is the two key entities from Qualcomm and two key entities from Meta that were involved in this deal. We left out of this as Infra Reality Labs, on the Qualcomm side, it was data business unit and the data center unit. On the Meta side, it was the Reality Labs business line. The Infra business line, this deal involved two parties from our side and two parties from their side.

Q. What is Infra?

A. Infra is what Meta refers to their data center business, Infra is a shortened version of infrastructure I guess.

Q. Okay. Now let's look at PDX 3.2. What are we looking at here?

A. So this is a very high level summary of the deal, the deal that we were working on, the Infra Reality Labs, and what it shows is what each party is getting out of this deal.

On the top, if you look at the top, what you see is Qualcomm's XR business unit is providing infrastructures to Meta Reality Labs, and the dollar amounts are listed there. And in return, Meta's infrastructure business unit is providing some development funds for us, as well as giving us an opportunity to build several CPUs for them. So this graphic or this picture basically shows the key elements of the deal and how all the four entities are linked.

Q. You can see on the bottom where there is the arrow going from Infra into data center, it says server chip and there is a little picture I guess of what a chip looks like. What kind of CPU is in that chip?

A. So that is the CPU chip, that is the CPU chip comprised of Oryon custom CPU cores.

Q. Okay. We can take that down, and I want you to take a look at DTX 916, which is in your binder. And it should be in the front, because it's a DTX, which is an e-mail you received from one of your colleagues on July 9th, 2024, with the subject by [redacted] Infra plus RL deal update. Are you there?
A. Yes.
Q. Do you recognize this document?
A. I do.
MS. MORGAN: I'm going to move to admit DTX 916.
MR. WILCOX: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 916 was admitted into evidence.)
BY MS. MORGAN:
Q. So I'll direct your attention to the bottom of the second page, which is a -- it's really like just the -- perfect, Matt, that's so helpful. Thank you.
It's an e-mail from July 2nd from Tejas Krishnamohan, with several different people, and you. Who is Krishnamohan?
A. Krishnamohan is my manager.
Q. The top line says "Meta requested a three-way call this week with the VP of Sourcing". Were you on that call?
A. Yes.

14:02:48 Q. And then below that, it says "please see detailed notes." Whose's notes are these?
14:02:54 A. These are the notes that I compiled and sent in to Tejas to submit to the broader group.
14:03:00 Q. So if you go then to the first bullet, it says Infra [redacted]. What's this section of the notes talking about?
14:03:11 A. This as part of the deal we just saw, this is if [redacted], Meta's infrastructure business was offering to do as part of this Infra RL deal, [redacted].
14:03:27 Q. The top bullet said the Infra team reiterated that they would be willing to set up a dedicated team to work with Qualcomm and deploy our solution in their data center, what's that talking about?
14:03:40 A. This again is referencing the CPU with the custom cores that we were going to build for Meta, and what they were agreeing to do is to set up a dedicated team. We were building the hardware, Meta would provide the software. And it was important to make sure that the software works very, very hand in glove with hardware, just to make sure that it is fully optimized and fine tuned, otherwise it will not get the required performance, and what Meta was telling us is they were willing to set up a dedicated team to work with us, to optimize, to fine tune, to make sure that our

hardware and their software worked in a very performative way.

Q. In the bullet below that, it refers to two gens, do you see that?

A. Yes.

Q. What does two gens mean?

A. Two generations of CPU, as part of this deal, we were getting a shot at two generations of Meta CPU.

Q. And what are generations?

A. Generations, Meta typically employees a CPU for certain amount of time and then they upgrade those CPUs. There are roughly 18 to 24 months, so two generations kind of takes you 36 to 48 months, that's the generations.

Q. And below that, there is a bullet that says, or I'm sorry, it's in same bullet. "They mentioned that in this time frame, we will be [redacted]" do you see that?

A. Yes.

Q. Did you know before you spoke to Meta that they had [redacted]?

A. Yes.

Q. How did you know?

A. Some of it was common knowledge, some of it is conversations with Meta that they would inform us --

MR. WILCOX: Your Honor, objection, hearsay.

THE COURT: Okay. So you can't talk about what you learned just from, what Meta told you, you can't do that just because it's like an out of court statement. If it's common knowledge, you can talk about the common knowledge, but you started getting into statements that you were making with, or things that you had heard from Meta. All right. So basically, you can talk about what you knew, or what you knew from common knowledge, but not what someone else told you.

THE WITNESS: Okay.

Q. In the forth bullet down, it says "they also asked us to note that any such [redacted] and joint announcement from their side will [redacted], but they are willing to do this because Zuck asked them to consider us a strategic partner." Do you understand what announcement this is referring to?

A. Yes.

Q. What's its talking about?

A. Qualcomm was kind of entering into the data center space, Meta is probably one of the largest, if not the largest data center operators. Having Qualcomm CPU in Meta data center, or having a giant joint announcement that talked about this partnership would lend Qualcomm a huge credibility, that's why right from get go, we were asking, made this ask of the Infra RL deal, where we said we would

like to have the ability to announce jointly to the broader market.

Q. We can go ahead and take this document down. That e-mail we just looked at was from July. What happened over the next few months?

A. Given the complexity of the deals, the companies were involve in negotiating the deal over the next few months.

Q. I'm going to have you turn to PTX 1441 in your binder. Which is an October 21st, 2024, e-mail that you sent to Mr. Krishnamohan. Are you there?

A. Yes.

Q. Okay. Do you recognize this?

A. Yes.

MS. MORGAN: I'm going to move to admit PTX 1441.

MR. WILCOX: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1441 was admitted into evidence.)

BY MS. MORGAN:

Q. And I'm going to direct your attention to page 4, which is the attachment to the e-mail. Actually, I'm going to go to page 6. Sorry, Matt.

And I want to look at the heading that says Infra/RL deal, do you see where that is?

14:08:07 A. Yes.
14:08:07 Q. Okay. So underneath this, it says "after multiple rounds of negotiations, Qualcomm delivered best and final proposal that meets Meta's asks on 9/30." How long had you been negotiating with Meta at this point?
14:08:24 A. A few months at this point, five months at least.
14:08:28 Q. Below that it says "[redacted]" Can you explain what that means?
14:08:44 A. Sure, this is a deal where multiple parties on both sides are involved. And also each of us is giving something to get something. So RL, which stands for Reality Labs, Meta Reality Labs, as part of this deal is getting close to [redacted], and Qualcomm in return is getting a shot at Meta's CPU and the [redacted].
14:09:15 Q. Okay. And if you look at the next page, there is a chart at the top that says "QUs latest proposal 9/30." Is that the proposal Qualcomm made on September 30th?
14:09:27 A. That's correct.
14:09:27 Q. Okay. And the first line is RL incentive. Can you describe what that line is?
14:09:34 A. So this basically goes into the details of the get that Meta is receiving as part of this deal. This is the

incentive that we were offering as part of this deal, and we are offering an incentive [redacted]. And also mentioning that this is going to start in 2026 and that this is applicable to virtual reality products.

Q. You said it's applicable to virtual reality products. What are the virtual reality products?

A. Yeah. So Meta and Qualcomm's relationship on Reality Labs started with virtual reality. Meta's first products in this virtual reality space was Quest, Quest two, Quest three, multiple generations, virtual reality, it started off more for a gaming kind of a purpose, but overtime content consumption also became important. So virtual reality was a market that we almost jointly worked with Meta to grow. There was a desire on both sides to make this virtual reality market into bigger than what it was, grow it rapidly, one of the things, one of the reasons why this deal even came about was a desire to, you know, propel the markets, and one way to do that was to price these devices competitively, and Meta sought some help from us, and the incentives on these virtual reality devices was supposed to help these devices compete in the market.

Q. At this point, had you discussed with Meta what of Meta's products would -- the incentive would apply to?

A. Yes.

Q. Okay. Under the RL incentive line, there is four lines that start with the letters CPU, do you see that?

A. I do.

Q. What do those terms refer to?

A. Those refer to the commitments that Meta would make in exchange on the server CPU side, this is the data center portion of the deal.

Q. Okay. And at the bottom, there is a line that says other, and it says "announce Qualcomm as data center partner in CY 24." What is CY 24?

A. Calendar year '24, by December.

Q. What's this referring to?

A. This is again talking about one of our key asks, where we would jointly announce to the public about our partnership with Meta on the data center side that would have lent a lot of credibility to Qualcomm's data center business, so this was an ask.

Q. You talked a little bit earlier about Meta being willing to have a dedicated team to work with Qualcomm. To what extent were Qualcomm and Meta engineers collaborating on the data center chip at this point?

A. So, at this time frame, Meta and Qualcomm engineers were also engaged, our product teams were engaged, there was back and forth dialogue in terms of the specifications of the CPU chip that we were trying to build for Meta.

Q. I'm going to take this down and have you turn to another document in your binder, which is PTX 1608. Which is an October 31st, 2024, e-mail from Tejas Krishnamohan to you to Rejiv with subject line Arm?

A. Yes.

Q. Do you see that?

A. Yes.

Q. So just to orient you for a second --

MS. MORGAN: First I'll say I move to admit PTX 1608.

MR. WILCOX: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1608 was admitted into evidence.)

BY MS. MORGAN:

Q. Okay. So to orient you for a second, the last e-mail we were looking at was from October 21st, this one, the top e-mail starts on October 31st, but I'm going to start on page 2. Which is an October 25th e-mail. What is this e-mail?

A. This is an e-mail, again, after I communicated to my counter parts on the implication of the leaked Arm letter about the license being canceled. We had Tejas, who is on our side to reach out to his counter parts at Meta, both on in Reality Lab sight, sign is the almost, and Kevin is Infra

lead, we had him reach out with a similar message, again, this was all to lessen the concerns that Meta was raising about the implication of the license cancellation.

Q. I'm going to direct your attention now to page 1 to the bottom e-mail from Kevin Salvadori. He writes here, "we will be reaching out early next week", so sorry, this is also October 25th. "So we will be reaching out early next week to work on getting a more detailed term sheet of the proposal in preparation for moving forward. At the same time, I am sure you will understand that we will do our own legal review of the current dispute with Arm." What is the proposal he's referring to?

A. This is the proposal we just reviewed on the table. So this was the elements of the deal, where we had a handshake agreement with Meta, and we were going to convert them into a term sheet and that's what Kevin is referring to.

Q. So let's go up to the next e-mail, which is from Mike Zeile, which was sent on October 28th?

A. Yes.

Q. So Mike Zeile, who is Mike Zeile?

A. Mike Zeile is another senior leader at Meta infrastructure of the data center team, and he reports to Kevin.

Q. So in the top bullet, he says the RL team has

conducted an analysis; they have spun up the Infra team. I believe Douglas is scheduling a call with your legal team in the next couple days to clarify a few points. Sounds like Infra's exposure is different from RL's current exposure. We are considering a project with a full custom Arm core, which will be subject to the ALA.

Who is Douglas?

A. Douglas is Meta's legal counsel.

Q. And when it says "we're considering a project with a full custom Arm core", who is the "we" in that sentence?

A. It's the Meta and to be specific it's the Meta infrastructure team.

Q. We can take that down, and I'm going to have you turn to PTX 1596, which is also in your binder, and it is another e-mail from Mr. Krishnamohan to a number of people at Qualcomm. Do you see that?

MS. MORGAN: I'm going to move to admit PTX 1596.

MR. WILCOX: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1596 was admitted into evidence.)

BY MS. MORGAN:

Q. I'm going to direct your attention to the middle of page 2, to Mr. Krishnamohan's e-mail from October 29th. He

writes, "kindly confirm if we are fully aligned and have a handshake on our Infra/RL collaboration proposal we previously outlined." What proposal is that referring to?
A. This is the proposal that we reviewed in terms of the incentives Meta and RL would get, what are the time frame and the commits.
Q. If you look at the top of page 2, there is an e-mail from Kevin Salvadori, dated October 29th.
A. Yes.
Q. And what side of the business is Mr. Salvadori on at Meta?
A. He is a senior leader on Meta's infrastructure team.
Q. He writes: "I think we are aligned on the high level e-mail that was sent. Obviously spend pending the Arm review. We would like to turn that into a detailed term sheet."
At this point, what did you understand to be the status of Meta's legal review?
A. So as far as the business and commercial terms were concerned, there was an alignment. It was a matter of taking the exchange and putting it into our sort of a term sheet and sharing.
What Meta also is stating is that they weren't fully satisfied with the response we provided after the leaked letter, so they said they are going to conduct their

14:18:06 independent review by themselves on the Arm matter.
14:18:09 Q. Let's take that down. What did you and your team do in response to the e-mail from Kevin Salvadori saying that Meta was aligned with these terms pending the Arm review?
14:18:20 A. So we took the terms and drafted them into a term sheet and shared it with Meta.
14:18:24 Q. What was Meta's response?
14:18:26 A. Meta took some time to review that and then they came back with a bunch of edits to the term sheet.
14:18:33 Q. Okay. So I'm going to have you look at PTX 1626 in your binder. Which is another e-mail from you. Do you see it?
14:18:45 A. Yes.
14:18:46 MS. MORGAN: I'll move to admit 1626.
14:18:49 MR. WILCOX: No objection.
14:18:50 THE COURT: Thank you. It's admitted.
14:18:50 (PTX Exhibit No. 1626 was admitted into evidence.)
14:18:51 BY MS. MORGAN:
14:18:53 Q. In this e-mail, it says at the top, there is an attachment called Meta and Qualcomm -- Meta and QC term sheet. Do you see that?
14:19:02 A. Yes.
14:19:02 Q. What is that?
14:19:03 A. So this is the term sheet that we shared with Meta

and revised by Meta with their edits and red lines, sent back to us.

Q. So let's look at page 3, which I think is the attachment. Is this the attachment to the e-mail?

A. Yes.

Q. And I want to look at the middle section that's labeled RL component incentive terms. Do you see that there are some crossed out words and some underlined words?

A. Yes.

Q. Just to be clear for the jury, who made the edits to do the cross out and the underline?

A. The edits were made by Meta.

Q. And what are the underlined and crossed out words showing here about the changes?

A. So I'll start with the first bullet. If you recall the whole deal was structured on the premise of going into the virtual reality market, there was alignment that the incentives that we would offer would be for virtual reality devices. And what Meta came back to us was they wanted the incentives to apply across the board. Not just to virtual reality devices, but to augmented reality and even wearable devices that we were in discussions with. The strike out means that they were expanding the scope of products for which the incentive would apply.

Q. Okay. And at this very bottom, there is a strike out

14:20:37 that says with the commercial launch of [redacted], do you see that?
14:20:43 A. Yes.
14:20:44 Q. What's that referring to?
14:20:45 A. There was also alignment between us and Meta that the incentive would start with [redacted]. What Meta said in their edits, they struck out, the implication of that is they would get incentives, they were already shipping products they did not have to [redacted].
14:21:17 Q. Did the changes that they proposed have an impact on Qualcomm?
14:21:20 A. They had a significant impact on Qualcomm.
14:21:22 Q. What is the impact?
14:21:24 A. So as a mentioned earlier, One, the whole deal was constructed to go to virtual reality markets. And virtual reality chips that we sell to Meta are [redacted], so that allowed us to [redacted] of those. Now, Meta was asking to broaden the scope, which puts a lot of pressure and made it very challenging for us to offer [redacted]. So that was problem number one with their ask.
14:21:57 Another side effect of that is the investments

we needed to make for other product lines now were challenged because we had to give [redacted] on those. And the second thing, by taking out the requirement to [redacted] they were making it even more easier for them to get these [redacted].

Q. So let's look at page 4. And there is an underlined term in the middle of that page that starts with the word notwithstanding and says, right there, it says "notwithstanding, anything to the contrary, if Meta is unable to develop or use any server CPU products as intended for any reason beyond Meta's control, e.g., injunction for third party IP infringement/breach of license, then Meta's share commitment will terminate and Meta will [redacted]" What's your understanding of this term?

A. This term was added by Meta as a direct result of the leak letter. As we discussed, we did send them e-mails even from our executives addressing their concerns, but Meta was not fully convinced and they added this language, which essentially meant that they could walk out of this agreement if for whatever reason they could not use the chip that we were developing for them.

Q. And if we go to page 5, there is a section labeled publicity?

14:23:40 A. Yes.
14:23:41 Q. What's the change that was made here?
14:23:43 A. Again, a key ask from our side was the ability to
14:23:48 announce publicly about this deal of a CPU, Meta completely
14:23:54 struck this out, essentially saying they will not grow to a
14:23:58 joint public announcement.
14:24:00 Q. I'm going to take that down and have you look at PTX
14:24:04 1636 in your binder, which is a November 20th, '24 e-mail
14:24:07 from you. Do you see that?
14:24:09 A. Yes.
14:24:09 Q. Okay.
14:24:10 MS. MORGAN: Move to admit PTX 1636.
14:24:14 MR. WILCOX: No objection.
14:24:14 THE COURT: Thank you. It's admitted.
14:24:14 (PTX Exhibit No. 1636 was admitted into
14:24:15 evidence.)
14:24:15 BY MS. MORGAN:
14:24:16 Q. At the top it says "we met with Meta to discuss the
14:24:20 term sheet. We walked them through the e-mail that had been
14:24:23 aligned and discussed items from their red line that were
14:24:26 not consist went the e-mail." And then below that there is
14:24:29 some bullets. I want to direct your attention to the third
14:24:32 bullet under RL that says incentive across MR, AR, wearables
14:24:38 versus MR only. What's this referring to?
14:24:41 A. So this is again referring to the scope of products

14:24:43 for which the incentives were offered. Just a clarification, MR stands for mixed reality, it's kind of interchangeably used for virtual reality, what we are saying in that e-mail is look, Meta, we had an alignment, we had a handshake deal with with you, where we would offer incentives for virtual reality products and Meta's red lines, Meta, it was asking us to offer incentives across the board, and the discussion with Meta was how this was not consistent with the whole premise of the entire deal, as well as it's not consistent with what we had aligned with them and had a handshake deal on.

14:25:25 Q. Below that, there is a bullet that says dollar sign on AR not possible as [redacted], what's this describing?

14:25:40 A. This was a response again to Meta on why we couldn't offer incentives on nonVR products. The challenge, as outlined here, was the [redacted].

14:26:03 Q. At this point, to what extent were Meta engineers engaging with Qualcomm engineers on development of the data center chip?

14:26:11 A. So there was a clear distinction in their engagement

pre the letter getting leaked and post the letter getting leaked. Meta's -- Meta took an approach of hey, there is a bit of a cloud on this whole thing. Let this all settlement down. Our legal is also doing some reviews. Why don't we get --

MR. WILCOX: Objection, Your Honor, he's going into hearsay again.

THE COURT: Yeah. So again, you can't talk about what someone else did. So the idea is you tell what you knew, and if someone else said something, they need to come here and say it, because otherwise they can say well, Bob didn't really say that to you. So just don't -- you can't get into that. I know it's hard because that's we do in every day life, but you can't do it here.

THE WITNESS: Yes.

MR. WILCOX: We ask that that answer be stricken, Your Honor, that he gave so far.

MS. MORGAN: I don't think the whole answer was hearsay, Your Honor.

THE COURT: So why don't we strike that and you ask the question again and he can do it without you saying what Meta was thinking or what Meta said to you.

BY MS. MORGAN:

Q. So at this point, to what extent were Meta engineers engaging with Qualcomm engineers on development of the data

center chip?

A. So, Meta's engineers were still engaged, but their responses were significantly slowed down. And our engineers asked them questions and the responses they got were slower than what they were previously.

Especially for questions that needed a lot of -- a bit of work on Meta's part in analyzing, so they took an approach of okay, let's wait.

Q. Okay. So what's the status of the Meta deal today?

A. It's signed and executed.

Q. Okay. When did it get signed?

A. September 30th.

Q. Did it take longer than you expected?

A. Yes.

Q. I'm going to show you now PTX 2170, which is the Reality Lab's infrastructure Qualcomm agreement, do you see that?

A. Yes.

MS. MORGAN: I'm going to move to admit PTX 2170.

MR. WILCOX: No objection, Your Honor.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 2170 was admitted into evidence.)

BY MS. MORGAN:

Q. And I'll direct your attention to page 3, Section 3.1. The second sentence here says if this agreement is fully executed at the very top, Matt, in the first paragraph. "If this agreement is fully executed on or before September 30th, 2025, any accruals shall begin from July 1st, 2025." Was this agreement executed by September 30th?
A. Yes.
Q. We just looked at Qualcomm's term sheet from October, from before Meta did their red line. How does this accrual date of July 1st, 2025, compare to the original accrual date that Qualcomm put in its term sheet?
A. The July 1st date is approximately a year ahead of what the original handshake deal contemplated.
Q. Okay. And in subsection A of this provision, there is a description of the incentive. How does this compare to what was in the handshake deal?
A. Again, the scope of the products got significantly expanded, the handshake deal, the scope was for virtual reality products, the deal that got signed included pretty much every single product Meta Reality Labs was buying from Qualcomm.
Q. Has Qualcomm made incentive payments under this agreement?
A. Yes.

Q. [redacted]
A. [redacted].
Q. Would Luna have been eligible for the incentive payment under to original framework?
A. No.
Q. I'm going to have you take that down and look at one more document, which is PTX 2173. That's in your binder and it's the statement of work signed on September 30, 2025. Do you see that?
A. Yes.
Q. What does this statement of work relate to?
A. This statement of work relates to the specifications and deliverables we are agreeing to as part of the Meta CPU deliverable, this is for the data center CPU and this was signed with the agreement.

MS. MORGAN: I'm move to admit 2173.

MR. WILCOX: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 2173 was admitted into evidence.)

BY MS. MORGAN:

Q. I'm going to direct your attention to page 13 and section 8.5. [redacted], and it says at the, what I'm told is

14:31:21 called Romannette two, like two little Is, do you see that?
14:31:25 A. Yes.
14:31:26 Q. If Meta is unable to develop or use any infrastructure product as intended for any reason beyond Meta's control (e.g. injunction for third party IP infringement/breach of license after vendor has had an opportunity to pursue options that include design arounds or taking a license) , then all of the terms and conditions in this SOW will terminate.
14:31:53 When did this concept of termination as a result of injunction for a breach of license get introduced into the parties' negotiations?
14:32:02 A. This was the red line that Meta sent to us on November 19th, 2024, after the letter got leaked.
14:32:12 Q. This says that the vendor will have an opportunity to pursue options that include design arounds or taking a license. Who is the vendor in this agreement?
14:32:22 A. Qualcomm.
14:32:23 Q. And if Qualcomm had to, as a result of termination of the ALA, design around or take a license to maintain its design, what would it have to do?
14:32:33 A. Again, like I think the only way we could have provided a CPU for Meta was to take an ALA or to use -- to use standard cores from Arm under the TLA.
14:32:48 MS. MORGAN: I'll pass the witness.

14:33:10 MR. WILCOX: May I approach, Your Honor?
14:33:12 THE COURT: You may.
14:33:16 CROSS-EXAMINATION.
14:33:16 BY MR. WILCOX:
14:33:31 Q. Good afternoon, Mr. Mulabagal.
14:33:33 A. Good afternoon.
14:33:34 Q. My name is Jason Wilcox, I'm going to ask you a few
14:33:39 questions today.
14:33:39 A. Okay.
14:33:40 Q. Let me begin with the Reality Lab devices that you
14:33:44 described. Those are things like the Ray-Ban glasses and
14:33:47 the Quest headsets, right?
14:33:50 A. Correct.
14:33:50 Q. Those products don't use Snapdragon SOC with Oryon
14:33:56 CPUs, correct?
14:33:57 A. Correct.
14:33:57 Q. And those RL products don't use a custom core, right?
14:34:01 A. Correct.
14:34:01 Q. They use like standard implementation cores from Arm,
14:34:06 correct?
14:34:06 A. That is correct.
14:34:06 Q. Okay. And now, you testified a minute ago about how
14:34:10 the incentive terms changed between Qualcomm's initial term
14:34:15 sheet and the final agreement, right?
14:34:17 A. Yes.

Q. And one of those changes was would have expanded the scope of the devices that were eligible for the incentive, is that correct?
A. Correct.
Q. Let's talk about the reason for those changes. Could you turn to DTX-452 in the binder that I handed you.
A. Yes.
Q. And this is an e-mail from Mr. Krishnamohan to you and others, correct?
A. I'm sorry, did you say -- what number was it you said?
Q. DTX 452.
A. Okay. Got it, yep.
Q. All right.
A. Sorry.
Q. So this e-mail we're seeing in DTX-452 is from Mr. Krishnamohan to you, correct?
A. Yes.
MR. WILCOX: We'll move to admit DTX-452, Your Honor.
MS. MORGAN: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 452 was admitted into evidence.)
BY MR. WILCOX:

Q. And Mr. Krishnamohan sends you this e-mail on February 5th, 2025, right?
A. Yes.
Q. And Mr. Krishnamohan, he was your manager and head of strategic accounts, including Meta, do I have that right?
A. That's correct.
Q. Okay. And in this e-mail, do you see where it says, there is a three bullets, the second bullet where it says RL side?
A. Uh-huh.
Q. And he says, [redacted]. Do you see that?
A. Yes.
Q. And then he goes on to say "your original deal provided them incentive only on VR side, but they are asking to extend this to AR as well." And then the final sentence there is, "we are open to it, but there are some nuances, negotiations are in progress and should close soon."
A. Yep.
Q. Right. [redacted]
A. Not quite, because back when we had the handshake

14:36:30 deal, [redacted], that's how we started, that's how there was this handshake alignment, that's what the handshake alignment e-mail also says.

14:36:53 Q. Right, but then [redacted], so they wanted to negotiate a different incentive, correct?

14:37:03 A. Possibly, a lot of programs happening within Qualcomm and Meta, [redacted], it's because the way we were doing business with Meta, we would have a discussion on volume based pricing or some other mechanism, but this particular deal itself was conceived to be based on the VR devices.

14:37:26 Q. At least Mr. Krishnamohan thought the reason for the change in the incentive payments was [redacted], right?

14:37:36 A. I'm not entirely sure what Tejas, Mr. Krishnamohan's thinking was on this one, but the fact of the matter were we had some alignment on VR devices and that had changed and expanded after October 23rdrd.

14:37:55 Q. You didn't even have a handshake deal with Meta as of October 23rd, did you?

14:38:00 A. We did, there was an e-mail that confirmed that Kevin

**Salvadori is saying yes, we are aligned on the high level terms, let's work on the term sheet.**

Q. **That e-mail was after October 23rd wasn't it?**

A. **Yes.**

Q. **As of October 23rd, you didn't have a handshake deal, right?**

A. **I don't know the exact dates, but I mean, the deal hasn't changed since about September 30th to October 23rd to end of October. So if Kevin is saying hey look, we have alignment, and if you look at those terms, those terms are pretty identical in terms of which products we were offering incentives to, what's the timing of these incentives, what do we get in return, none of those have changed.**

Q. **Okay. Let's go back to this e-mail from Mr. Krishnamohan from February of 2025. In the e-mail, it doesn't mention the Arm litigation anywhere, does it?**

A. **Not in this e-mail.**

Q. **And it doesn't mention anything about media leaks and say that those are the reason for the change in the incentive terms, right?**

A. **It doesn't mention that.**

Q. **Okay. We can take that down, Mr. Schlaifer, thank you. And I want to ask you about another e-mail. If you can turn to DTX 2267. DTX 2267 is an e-mail that you sent on March 7th, 2025, correct?**

14:39:27 A. Yes.
14:39:28 MR. WILCOX: Move to admit, Your Honor, DTX 2267.
14:39:31 MS. MORGAN: No objection.
14:39:32 THE COURT: Thank you. It's admitted.
14:39:32 (DTX Exhibit No. 2267 was admitted into evidence.)
14:39:33 BY MR. WILCOX:
14:39:38 Q. Okay. If we go to the first e-mail in this chain at the bottom of page 2, Mr. Schlaifer, so this is another e-mail from Mr. Krishnamohan, about a month after the one we were just looking at, right?
14:39:52 A. Yes.
14:39:56 Q. And if you -- and this is also more than three months after the trial in the case that Arm filed against Qualcomm, right?
14:40:07 A. Sorry, can you repeat that?
14:40:09 Q. Yeah, that was a bad question on my part.
14:40:11 So, this e-mail that was sent in March of 2025 by Mr. Krishnamohan, it's more than three months after the trial in the Arm case, right?
14:40:19 A. Yes.
14:40:19 Q. Okay. And the first sentence of this e-mail, do you see where Mr. Krishnamohan writes "as part of the Infra RL deal, we are aligned on the [redacted]

[redacted]" that's certain dollar amounts that we see there?
A. Uh-huh. Yes.
Q. And then he says, "[redacted]" Do you see that?
A. I do.
Q. So this is again Mr. Krishnamohan, saying that the reason Meta is coming back and wanting to change the incentive terms is because [redacted]?
A. I mean, again, I don't know what the thinking is, but one thing that I can see clearly from this is this is happening in March of 2025. Whereas the alignment we had was in October, September/October of 2024, almost six months before this, six months before market conditions had changed.
Q. Right. And over those six months, Meta and Qualcomm had been actively negotiating over this term sheet, right?
A. Yes.
Q. You didn't get to a final term sheet until June of 2025, correct?
A. That is correct.

14:41:39 Q. That's seven months after the end of the Arm litigation where everyone knew that the ALA was not going to be terminated, right?
14:41:47 A. I don't know about the second part, like everyone knowing whether the ALA was not going to be terminated, I really don't know about that. But yes, it is seven months after the trial.
14:41:57 Q. And we know Meta knew that the ALA was not going to be terminated, right?
14:42:02 A. I don't know about that.
14:42:03 Q. Okay. We'll come back to that.
14:42:06 Now, this e-mail from Mr. Krishnamohan, you can take down the call out, Mr. Schlaifer, thanks -- he doesn't anywhere mention the Arm litigation or any media leaks or media campaigns, right?
14:42:18 A. He does not.
14:42:18 Q. He doesn't say that's the reason for the change in the incentive payments anywhere, correct?
14:42:23 A. That is correct.
14:42:25 Q. And he also doesn't mention anything about a delay in negotiations or Meta slow walking the negotiations after any articles coming out, correct?
14:42:34 A. Yes. In this e-mail, I think he mentions that.
14:42:41 Q. I'm sorry, I didn't mean to speak over you. All he said was that Meta had a change in its business, so it

wanted to change the incentive terms, correct?
A. He was saying a lot of stuff, including that.
Q. Okay. You walked through a time line with your counsel on your direct exam. Do you recall that?
A. Yes.
Q. And I believe one of the documents that you looked at was DTX 916. Do you have that, it will be in your other binder.
A. Yes.
Q. You are more organized than I am, so just give me one second.
If we pull this up and go to the second page, Mr. Schlaifer. When you were talking about this article, or this proposal, actually sorry, let's go to page 3.
You were asked about the Infra [redacted], the deployment performance criteria, and the other terms that we see on this page, right?
A. Yes.
Q. This is all happening before the Bloomberg article comes out and before there is any addition in the Arm litigation, right? This is also before you have any handshake deal with Meta, correct?
A. Yes.
Q. Okay. Well, actually, let me see here. Let's go to PTX 1441, which you also discussed with your counsel. And

14:44:45 if we look at this, this is an October -- sorry. Let me know when you're there, sir?
14:44:52 A. DTX-451.
14:44:55 Q. PTX 1441.
14:45:08 A. I don't seem to have that.
14:45:10 Q. It should be in the binder that your counsel handed to you.
14:45:17 A. Sorry.
14:45:20 Q. And it's also on the screen if it's easier to look at the screen, whichever one you prefer.
14:45:26 A. Got it.
14:45:27 Q. PTX 1441 is an e-mail from you sent on October 21st, 2024, right?
14:45:33 A. Correct.
14:45:33 Q. And you talked about the proposal that's on page 7 and the various incentive terms that are there, correct?
14:45:40 A. Yes.
14:45:40 Q. So those incentive terms that are there, once again, before you have any handshake deal with Meta, this is just Qualcomm's asks, right?
14:45:47 A. This is more than Qualcomm's asks, this is -- this is an alignment that we had with Meta and we had a discussion with Meta about this, and then they came back and if you recall, there is another e-mail from Kevin that confirms hey, look, we are aligned on this e-mail proposal from you.

14:46:08 Q. Let's go to page 1 of this e-mail.
14:46:12 A. Okay.
14:46:16 Q. And if you -- thank you, Mr. Schlaifer, right there.
14:46:19 So on the first line of this e-mail that you wrote, you say "here is the memo summarizing key asks, I put a placeholder for a revised Infra/RL deal in light of Boz's response and all of the RL ongoing asks", do you see that?
14:46:34 A. Yes.
14:46:35 Q. Boz is a senior executive at Meta, right?
14:46:39 A. Yes.
14:46:39 Q. And so he's actually made a response to your most recent proposal to them, he's saying that he wants changes, isn't he?
14:46:47 A. I don't know if he's saying explicitly. Boz is referencing a lot of deals that are happening concurrently with with Infra/RL deal, it's likely that he's referring to one of those deals, if there is a specific e-mail we can look at, I can give you more clarity into that that.
14:47:10 Q. Do you say where it says all of the RL ongoing asks, those are Reality Lab ongoing asks, right?
14:47:17 A. Correct.
14:47:17 Q. Right below that it says CA response option one, CR means Cristiano Amon, Qualcomm's CEO?
14:47:27 A. Right.
14:47:28 Q. Indicate that the Infra/RL deal was your best and

final, do you see that?
A. Yes.
Q. That is go back to them and say hey, I know you guys want to change the terms of this?
A. But your current offer is your best and final and you have to accept it right.
A. I'll make a slight correction, as far as ^ that's absolute this is your best and final, what Meta was trying to do with this is there are ongoing negotiations that they wanted some transitions on, that is what Boz is also referring to and what we wanted Cristiano to respond back to Boz, let's get the R & D deal done, let's do those things separately.
Q. You guys were still trying to negotiate, what exactly was the deal going to look like on October 21, 2024, right?
A. Yes.
Q. That's before the Bloomberg article comes out, isn't it?
A. Right.
Q. Okay. Can we pull up PTX 1605 that was previously admitted.
A. Same folder?
Q. It should be in the binder that I handed you. I'm sorry to make you flip back and forth between binders.
Actually you know what, I want to go to 1608

14:49:07 which was admitted with your counsel so I'm really sorry, I'm going to make you change binders again, you're going to be so tired of me by the end ever this. So if you have 1608 here, let's see, do you see, you talked about this with your counsel, that middle e-mail from Mike Zeile. So on October 28th, your a giving a quick update from them on what's going on and they're I can kicking off their internal legal review, right?

14:49:44 A. Yes.

14:49:45 Q. Okay. Now I want to pull up PTX 1605. And this is an e-mail from Cristiano Amon that includes many people including you on the cc line, correct?

14:50:01 A. Yes.

14:50:01 Q. I want you to turn to page 6 of this e-mail.

14:50:11 Q. And there is an e-mail from Kevin Salvadori on this page, right?

14:50:16 A. Yes.

14:50:16 Q. And so this is Tuesday, October 29th, the day after Meta says they're kicking off an internal legal review, right?

14:50:25 A. Yes.

14:50:26 Q. And Mr. Salvadori writes I think we are aligned on the high level e-mail that was sent, obviously pending the Arm review. Do you see that?

14:50:34 A. Yes.

Q. So this is just a little over a week after the Bloomberg article comes out, right?
A. Yeah.
Q. And a little over a week after the Bloomberg article comes out, Meta finally tells you I think we have alignment on the high level e-mail that was sent, correct?
A. Yes. That is right.
Q. Okay. And then the next day, Mr. Zeile actually writes -- you can take that down.
Then the next day, Mr. Zeile actually where is you an e-mail, right, and says that Meta is kick I can go off its own work on the term sheet, didn't they?
A. I don't know if it was cell or Kevin Salvadori, one ever them says yeah, they want to start drafting the term sheet.
Q. Right. I'm sorry, go ahead.
A. Yeah. I think as a response to that, I think Tejas says we'll take the pen on this, we'll draft and send it to you.
Q. Right, what happens is on October 30th, Mr. Zeil lets you guys know, hey we're working on a term sheet and then on October 31st, Halloween, Mr. Krishnamohan where is back and says actually we've already put one together, right?
And then you said in your direct that it took Meta some time to get back to you with their revisions on

that term sheet. Did I get that correct?
A. Yes.
Q. Okay. Let's pull up 1624. Can you turn to 1624. I have to admit it first.
A. Yes.
Q. If you look at 1624, this is the top e-mail there is from Mr. Krishnamohan to you, correct?
A. Yes.
MR. WILCOX: Move to admit PTX 1624.
MS. MORGAN: Sorry, no objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 1624 was admitted into evidence.)
BY MR. WILCOX:
Q. All right. And if we look at the bottom e-mail in this chain it's from Mr. Zeile and he sends it on Friday, November 8th, right?
A. Yes.
Q. That's basically a week after you guys sent the first term sheet, right?
A. That's -- yeah, it is.
Q. And what he says is attached you'll find a marked up draft of your original term sheet, do you see that?
A. I do.
Q. So it took Meta less than a week to get back to you

with the edits of the term sheet?
A. It did, just over a week.
Q. Just over a week, right. Let's look at that. Let's look at that term sheet. If you go to the second page, these are Meta's edits to the term sheet. Do you see that?
A. Yes.
Q. So, for example, they're proposing [redacted], the MR component incentive terms, it's the first bullet. And is the second bullet. And the third bullet. There you go. Thank you.
So they're proposing [redacted], right?
A. Yes.
Q. And they are proposing a [redacted], do you see that?
A. Yes.
Q. And okay. But those aren't the only changes that Meta proposed to this term sheet, are they?
A. There were some other changes down below as well.
Q. There is a lot of red lines on this page, right? And if we go to the next page, Mr. Schlaifer. Blow that up just a little bit.
The red lines continue on this page, too, don't they?
A. They do.

14:54:35 Q. So Meta actually had a lot of thoughts about how this term sheet needed to change from what you originally proposed, right?

14:54:43 MS. MORGAN: Objection, Your Honor. He's asking for testimony about what Meta thought, he was not allowed to answer those questions.

14:54:49 MR. WILCOX: That's fair. I will rephrase the question.

14:54:51 BY MR. WILCOX:

14:54:52 Q. So Meta had a lot of changes to the term sheet, right?

14:54:55 A. Yes.

14:54:55 Q. They didn't just change the [redacted] and the other things that we looked at, correct?

14:55:01 A. I mean, the volume of red lines do look like there are a lot of changes, some are material, some are not that important. And what we -- what we discussed earlier were material changes, big changes that affected us.

14:55:26 Q. And then you said that Meta was kind of slow walking thing, not moving very fast in this process, do I have that right?

14:55:32 A. Yes.

14:55:33 Q. Okay. Well, then, let's take that down, and could you turn to PTX 1625 in the binder --

14:55:40 THE COURT: How about before we do that one, we

take our afternoon break.

COURTROOM DEPUTY: All rise.

(Jury exiting the courtroom at 2:55 p.m.)

THE COURT: Fifteen minutes.

(A brief recess was taken.)

COURTROOM DEPUTY: All rise.

THE COURT: How are we doing to the sealed courtroom, when are we going to be able to list this case?

MR. WILCOX: I think hope actually five minutes, no more than ten.

THE COURT: How much more do you have?

MR. WILCOX: Probably like ten maybe 12, I'm almost done, I got --

THE COURT: A lot of this doesn't seem all that sensitive, I'll let you do it, but the more you abuse it, the less likely it is that your clients are going to be happy with you in the future when I deny it.

MR. WILCOX: I think I have one more document I'm going to pull up that will be sealed, Your Honor, and I can do that in the next three to four minutes, and then we can lift the sealing.

THE COURT: Okay.

(Jury entering the courtroom at 3:16 p.m.)

THE COURT: All right, everyone may be seated.

BY MR. WILCOX:

15:16:25 Q. Mr. Mulabagal, we were talking about how Meta was, in your view, slow rolling the process after the Bloomberg article came out, do you recall that?
15:16:33 A. Yes.
15:16:34 Q. Can you turn to PTX 1625 in your binder?
15:16:44 A. Yep.
15:16:45 Q. PTX 1625 is an e-mail from Noah Strangio, at Meta, to Mr. Krishnamohan, correct?
15:16:57 A. Yes.
15:16:59 MR. WILCOX: Your Honor, we move to admit PTX 1625.
15:17:02 MS. MORGAN: No objection.
15:17:04 THE COURT: Thank you. It's admitted.
15:17:04 (PTX Exhibit No. 1625 was admitted into evidence.)
15:17:05 BY MR. WILCOX:
15:17:07 Q. At the top of this, there is actually an e-mail from Mr. Krishnamohan to you, correct?
15:17:11 A. Correct.
15:17:11 Q. Okay. And then if we go down to the e-mail, that he's forwarding to you, this is an e-mail that Noah Strangio of Meta is sending on Sunday, November 10th, right?
15:17:27 A. Yes.
15:17:28 Q. So he's working on a Sunday, and he's sending Meta an e-mail, sorry, sending Qualcomm an e-mail saying "hey, I

know we sent you a term sheet on Friday, but we're still working on it, we have some more revisions, and we'll make sure you have one by tomorrow, early morning", right?

A. Just give me a second.

Q. Of course.

A. This is 1626?

Q. No, 16 -- PTX 1625.

A. Sorry. Yep.

Q. No problem?

A. Go ahead.

Q. So you see the e-mail that's from Mr. Strangio, and it's sent November 10th, 2024, right?

A. Yes.

Q. That's a Sunday, correct?

A. Correct.

Q. And he says "I hope you're having a great weekend", right?

A. Yes.

Q. And then he says "I'm sending a quick note to let you know that we will be making a small change to that revision shortly", meaning their revision of the term sheet, correct?

A. That's correct.

Q. That's the version they just sent you on Friday, right?

A. That's right.

15:18:28 Q. So they're working over the weekend to try to get you guys a revised term sheet, right?
15:18:35 A. That is correct.
15:18:36 Q. You can take that down.
15:18:37 And then if we can pull up 1636, which was already admitted. And this is a November 20, 2024, e-mail that you sent, correct?
15:18:53 A. Correct.
15:18:53 Q. And this is summarizing a meeting that you had with Meta, correct?
15:18:58 A. That is correct.
15:18:59 Q. And if you look at the RL terms in the middle of this slide, the very first bullet is Meta believes a [redacted], [redacted] and [redacted] is aligned with the spirit of the e-mail as [redacted] at [redacted], do you see that?
15:19:23 A. Yes.
15:19:23 Q. Meta is telling you that negotiating over [redacted] is completely consistent with the spirits of the handshake deal that you guys had back in October, right?
15:19:36 A. That is the negotiating position that they have taken with, yes.
15:19:39 Q. They don't think they are going back on that handshake deal in any way, do they?

15:19:44 MS. MORGAN: Objection.

15:19:45 Q. I'll ask a different question.

15:19:47 There is nothing in this e-mail that says that they are acting inconsistent with the spirit of the handshake agreement, right?

15:19:57 A. This is their position, obviously, Meta is in an active negotiation with us, whatever asks they have, they will portray as a very possible and very rationale thing to do.

15:20:11 Q. If we can go back to just the full e-mail here, Mr. Schlaifer.

15:20:16 So, in this summary that you drafted after that meeting with Meta, you didn't include any mention of Qualcomm's legal dispute with Arm in your summary, right?

15:20:27 A. That is correct.

15:20:28 Q. Okay. And then if we could go to page 7 of the document. These are the slides that you attached to your e-mail. I'll give you a second to get there. I'm sorry.

15:20:41 These are the slides that you attached to your e-mail, right?

15:20:44 A. Yes.

15:20:44 Q. And these are slides that you presented to Meta when you guys had your meeting in November?

15:20:49 A. That is correct.

15:20:52 Q. Okay. And if could go to page 9 of this,

Mr. Schlaifer. And zoom in on the incentive.

So this represents Qualcomm and Meta's negotiating position in November of 2024, right?

A. That is correct.

Q. [redacted]

A. Correct.

Q. If you could go back out. So these slides that we're looking at here, these encapsulate the subjects that you discussed with Meta during that in person meeting, right?

A. Yes.

Q. And although there is a number of items here and on the other slides, none of them are about Qualcomm's legal dispute with Arm, right?

A. That is correct.

Q. You can take that down.

MR. WILCOX: I think that I can do the rest of this, Your Honor, without -- well, actually, I think I can do --

THE COURT: Move it along.

MR. WILCOX: I here you, I apologize, Your Honor, I'm sorry.

THE COURT: We closed the courtroom and now everybody is pretending this is normal and it's not, so we got to move this along.

15:22:29 MR. WILCOX: I have two more exhibits and that's it, Your Honor.
15:22:31
15:22:32 BY MR. WILCOX:
15:22:33 Q. Could you turn to DTX-449, Mr. Mulabagal, it will be in the binder that I handed you.
15:22:39
15:22:44 A. Yep.
15:22:45 Q. This is a December 21st, 2024, e-mail from Mike Zeile, from you to Mike Zeile and Kevin Hicks at Meta, right?
15:22:53
15:22:57
15:22:57 A. Right.
15:22:57 Q. Okay.
15:22:59 MR. WILCOX: We move to admit DTX-449, Your Honor.
15:23:03
15:23:03 MS. MORGAN: Sorry. No objection.
15:23:05 THE COURT: Thank you. It's admitted.
15:23:05 (DTX Exhibit No. 449 was admitted into evidence.)
15:23:05
15:23:05 BY MR. WILCOX:
15:23:07 Q. Okay. Actually, I want to look at the first e-mail in this thread, which is from you, again. And you sent this on Friday, December 20th, right?
15:23:10
15:23:14
15:23:17 A. Correct.
15:23:17 Q. And you wrote to the Meta team and said "we are excited to share some fantastic news regarding the trial outcome", do you see that?
15:23:21
15:23:24

A. Yes.
Q. And that was that Qualcomm had prevailed in its suit against Arm, right?
A. That is correct.
Q. And while you continue to have lots of other negotiations with Meta, after you tell them that you have prevailed in the trial, it still takes you seven more months to get to a term sheet; right?
A. That is correct.
Q. And it takes you ten more months to get to a final signed agreement, doesn't it?
A. Yes, the final definitive agreement, yes.
Q. Could you turn to PTX 2170, this will be in the binder from your counsel. It's already in evidence.
And this is the Reality Labs infrastructure Qualcomm incentive agreement, right?
A. Yes.
Q. If you actually highlight the first paragraph on that page, Mr. Schlaifer.
This says it's an agreement by and between Qualcomm CDMA Technologies Asia-Pacific PTE Limited and Meta Platform Technologies, do you see that?
A. Yes.
Q. Now it doesn't say it's an agreement between Meta and Qualcomm Technologies Incorporated, right?

15:24:45 A. It doesn't say that.
15:24:46 Q. And it doesn't say it's an agreement between Meta and
15:24:50 Qualcomm Inc., correct?
15:24:51 A. It doesn't say that.
15:24:59 Q. Okay. And then if we go to page 3 of this,
15:25:06 Mr. Schlaifer. And could you highlight where it says
15:25:11 incentives?
15:25:14 And what it says there is that subject to
15:25:17 certain terms and conditions of this agreement, QC-TAP is
15:25:22 offering the following incentives to Meta, do you see that?
15:25:26 A. Yes.
15:25:26 Q. And QC-TAP, that is the Qualcomm CDMA Technologies we
15:25:33 were just talking about, right?
15:25:34 A. Yep.
15:25:34 Q. So Qualcomm CDMA Technologies is the one that is
15:25:40 offering Meta these incentives, correct?
15:25:42 A. That is correct, and pretty much every single
15:25:45 contract I have negotiated on Qualcomm's behalf with Meta
15:25:49 are all QC-TAP.
15:26:00 Q. Could you go to page 5, Mr. Schlaifer. Well, let me
15:26:22 ask you this. The incentives that you ultimately agreed to
15:26:25 in this agreement were [redacted], right?
15:26:28 A. [redacted].
15:26:32 Q. And it was [redacted]
15:26:36 [redacted], right?

15:26:37 A. Yes, yes.
15:26:38 Q. Those are the exact same [redacted] that Qualcomm proposed, correct?
15:26:41 A. The [redacted] are the same.
15:26:46 Q. And could you turn to DTX 916 in the binder I handed you. I'm sorry, strike that. Can you turn to PTX 2680 in the binder I handed you.
15:27:11 A. Got it.
15:27:13 Q. And this is a remittance advice from Qualcomm CDMA Technologies to Facebook Inc., correct?
15:27:22 A. It looks like that, yes.
15:27:24 MR. WILCOX: We move to admit PTX 2680.
15:27:27 MS. MORGAN: No objection.
15:27:28 THE COURT: Thank you. It's admitted.
15:27:28 (PTX Exhibit No. 2680 was admitted into evidence.)
15:27:29 BY MR. WILCOX:
15:27:33 Q. And so what this remittance advice reflects is a payment from Qualcomm CDMA Technologies to Facebook Inc. for the incentives that are owed under the RL infrastructure agreement, right?
15:27:46 A. I don't know.
15:27:48 Q. Okay. Well you would at least agree that the payments that are being made here are of Qualcomm CDMA Technologies and not by Qualcomm Inc. Or Qualcomm

Technologies, correct?
A. Honestly, I see a Qualcomm header and Qualcomm CDMA underneath that, so I don't know how to interpret this, but both of them are listed there.
Q. The only actual entity listed there is Qualcomm CDMA Technologies, right?
A. Again, I don't know the nitty gritty's of the entities and things. I see Qualcomm listed as well, and you're right, Qualcomm CDMA is underneath that.
Q. We can agree when we were looking at the actual incentive agreement the entity that agreed to make the incentive payments were Qualcomm CDMA Technologies, correct?
A. Correct.
MR. WILCOX: No further questions, Your Honor.
MS. MORGAN: I have no further questions.
THE COURT: All right. Thank you. Thank you, sir, you may step down. What's next?
MR. WILCOX: First, I think we can unseal the courtroom at this point.
THE COURT: They can come in when we -- what's next?
MR. ISAACSON: We'll call Jonathan Weiser, who is out the the hall.
THE COURT: We can unseal the courtroom.
(Courtroom unsealed.)

COURTROOM DEPUTY: Please raise your right hand. Please state and spell your full name for the record.

THE WITNESS: J-O-N-A-T-H-A-N, W-E-I-S-E-R

Jonathan Weiser having been duly sworn was examined and testified as follows:

DIRECT EXAMINATION.

BY MR. ISAACSON:

Q. Good afternoon, Mr. Weiser. Just a limited group of questions for you today. What is your current position at Qualcomm?

A. I serve as outside counsel, providing legal services to Qualcomm today.

Q. Can you speak up into the microphone? So you're outside counsel for Qualcomm, for what?

A. I provide legal services related to the Arm matter.

Q. How long did you work at Qualcomm before that?

A. As an employee, I worked for approximately 31 years.

Q. So you were an employee and now you're on contract?

A. I am.

Q. Before you retired at Qualcomm as a salaried employee, what was your title at Qualcomm?

A. Senior vice-president, QCT division counsel, QCT is a division of Qualcomm.

Q. What are the type of activities that you are involved in with Qualcomm as outside counsel?

A. I work on Arm related matters as I said, primarily with the negotiation of the v10 license, and providing advice, providing guidance, and providing interpretation of our agreements.

Q. All right. Can we put up on the screen JTX-1, which has been put into evidence.

MR. ISAACSON: May I approach, Your Honor?

THE COURT: Yes.

BY MR. ISAACSON:

Q. Can we look at JTX-1, this is the ALA. And if we look at page 11?

A. Yes.

Q. It should be on the screen in a second. And then -- page 11. 5.1, which we've looked at before in this courtroom. The delivery provision, where Arm is delivering, and there is words about how it's going to deliver Arm technology. And then can we look at page 13? Here is a provision, number seven at the bottom, support and maintenance, which talks about subject of payment of some fees, providing the licensee with respect to the applicable Arm technology, reasonable telephone, e-mail, and written consultation, and it goes on to talk about how that's about Arm technology.

What do you recall about how this -- oh, and then what was your involvement in the ALA and TLA coming

into existence in 2013?

A. Yes. My involvement started in 2011. I was in charge of the legal team that supported the negotiations. So we supported those negotiations for the two agreements that you mentioned from 2011 to 2013, when they were finally signed in May.

Q. All right. With respect to the support provision, what do you recall about how this provision came to be in the contract?

MR. LoCASCIO: Objection, Your Honor, with respect to any discussions around negotiation of the agreement, Your Honor, I'll address two provisions, the technology and deliverable provision and the initial and subsequent request, the request referring parole evidence, there was never discussion of this provision issue, there should be no testimony around this ^ .

MR. ISAACSON: That's incorrect, Your Honor, we said we were talking about the delivery provision versus the support provision.

MR. LoCASCIO: It goes to what provisions were allegedly ambiguous, Your Honor.

THE COURT: I am going to sustain the objection. He can say what he thought was in the other one, I haven't made a ruling that this provision is ambiguous.

MR. ISAACSON: They are arguing the other

provision --

THE COURT: I understand, we're not going to argue this in front of the jury. I have not made a ruling on this one being ambiguous.

BY MR. ISAACSON:

Q. All right. Well then let's go to the TLA, which would be JTX-5, this is the Technology License Agreement of 2013. And if we can go to page 13. And subscription point B 8.1(B) this is the long provision we've seen before, having to do with previous best deals and making offers within ten percent, I won't go through all the orders again. At the top, it says as to each implementation core, and there is a reference to initial written request to license, and then later on in the fourth line, it talks about a subsequent one-time written request at any time up to the 12-month anniversary of such initial request. What did you discuss with Arm during the negotiations about the initial request and subsequent request?

A. Yes. What we discussed with Arm was we wanted to make sure that we had the right to seek a license. They had to do an investigation to determine what the best license deals were at the time. And they had to secondly, make us an offer. And third, that offer must be within ten percent of the previous best deal.

Q. And how does it, a subsequent request, how is -- how

do you compare that to a request for a license renewal?

A. Yes. The subsequent request is simply a look back during the first 12 months of the agreement to determine if any additional third party licenses are entered into by Arm. And if they are, Arm must consider those for purposes of the previous best deal to determine whether our price protection needs to be adjusted.

Q. All right. Would you look at PTX 90 in your binder. This an e-mail exchange, dated March 24, 2012, between Mr. Jim Lederer and Warren East of Arm. Is this a document that you received, you can see on the first page?

A. Yes it is.

MR. ISAACSON: I move to admit PTX 90.

MR. LoCASCIO: No objection, Your Honor.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 90 was admitted into evidence.)

BY MR. ISAACSON:

Q. Who was James Lederer?

A. James Lederer at the current time was the general manager of QCT.

Q. What was his involvement in the negotiations of the TLA and the ALA?

A. James Lederer was involved in negotiating a select number of provisions, and he negotiated those with Warren East, the current then CEO, chief executive officer, of Arm.

15:37:25 Q. And on page 2 of this, there is an e-mail from Mr. Lederer of Qualcomm to Warren East, and it says, the first sentence, it says "it appears we're getting very close to finalizing a term sheet." Then it says in the second paragraph, "if you recall, we were looking to have assurance around future competitiveness for implementation cores. There was a somewhat complex calculation being discussed with jokers, averaging of top customers, certification requirements, et cetera." What were those references to jokers and certification requirements?

15:38:04 A. Yes. So Arm was proposing at the time for price protection, Section 8.1.B, that's simply an average of their top customers, and they wanted to -- in doing those averages, throw out one of those customers for purposes of consideration of the average, a customer that they were referring to as a joker. We were not comfortable with this and we didn't agree to this.

15:38:31 Q. And the paragraph continues, "my suggestion was to make this much simpler, remove any certification requirement, was important to your team, and treat us fairly, relative to the best deals you have offered, specifically within ten percent. We have discussed at length how your deals tend to have very different structures, and it's hard to do comparisons on an apple to apple basis, so we agree to not require either audit or

certification, we would leave it to you to do the right thing." This reference to do the right thing, in this context, what did that mean?

A. Do the right thing means that Arm would be acting in good faith in doing the investigation of its, what's called previous best deal to determine how to measure the royalty rate and license structure of our deal.

Q. All right. And how did that get reflected in the final contract?

A. It was reflected in Section 8.1(B), where it says "Arm shall act in good faith to do the investigation."

Q. Let me ask you about another topic. If we can look at DTX 342. Your binder. Is this an e-mail -- that's the wrong number.

There has been testimony in this case about an October 22nd, '24 letter that Arm sent to Qualcomm, followed by a Bloomberg article. You're familiar with that?

A. I am.

Q. All right. After that Bloomberg article, did you speak to Meta?

A. I did, yes.

Q. All right. And how many times did you speak to Meta?

A. I believe twice.

Q. Who did you speak with at Meta?

A. His name was Caldwell, I don't remember his first

name.

Q. If we look at PTX 1579. This is an e-mail from Douglas Caldwell, who is he?

A. He is a lawyer at Meta.

Q. All right. This is dated October 25th, 2024, it's to Marika Rae and Samantha Callin at Qualcomm, who were they?

A. They were both lawyers on my team.

Q. There are some questions in the e-mail. Are you familiar with those questions?

A. I'm familiar with each and every question.

Q. Why are you familiar with those questions?

A. Because I got together with my team, we reviewed the questions that Meta wanted answers to and we prepared for the call.

MR. ISAACSON: All right. I move to admit PTX 1579.

MR. LoCASCIO: No objection, Your Honor.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1579 was admitted into evidence.)

BY MR. ISAACSON:

Q. If you just -- all the contents of the questions are there, you can blow that up, Matt, some questions include, and I won't go through all those. But when it says are any of the SOCs under consideration between Meta and Qualcomm at

risk given this license dispute, SOCs, that's systems on chips, that's your chips, right?

A. Those are our chip sets, yes.

Q. All right. And then in the forth bullet, the question where it says this is Arm lawsuit/license termination issue affect only on Qualcomm custom cores, e.g. Oryon, it also affects the standard Arm cores, the custom cores are the ALA and the standard Arm cores, the TLA cores?

A. That is right.

Q. If we look at PTX 1598, is this a notice of a zoom call for October 31st, 2024, so the last thing we saw was October 25th, now this is October 31st. This is a notice of a zoom call that you're included on?

A. Yes, correct.

MR. ISAACSON: I move to admit PTX 1598.

MR. LoCASCIO: No objection, Your Honor.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1598 was admitted into evidence.)

BY MR. ISAACSON:

Q. So you were on this zoom call on Halloween?

A. I was, yes.

Q. What did you discuss with Meta's legal team on this call?

A. We addressed each of their questions that they posed

the week before in an e-mail, we also discussed the status of the litigation, and we suggested to them that we did not believe Qualcomm was in breach of its agreement and that Arm had no right to terminate the ALA.

Q. Matt, can you put the questions back up from the previous Document 1579. Those are the questions you're referring to that were addressed at the meeting?

A. Yes, the five questions.

Q. Okay. And at the conclusion of the meeting, what did Meta say to you?

A. Meta said to us that they would like us to keep them apprized of the litigation, any material developments, and they would look forward to the next discussion.

Q. Okay.

MR. LoCASCIO: Objection, Your Honor. Hearsay, and it's beyond the scope of the discussed phraseology. So I suggest we strike that and we'll need a side-bar, and a moment to do it again.

MR. ISAACSON: I would agree to strike, look forward to.

THE COURT: "Meta said" is hearsay. So I thought we were going to stay away from hearsay. What did Meta say to you was the question. Hearsay. Meta said to us.

MR. ISAACSON: There is no fact being offered

for truth, that's why we agreed on the first part of that and he just added they said.

MR. LoCASCIO: Different question had a different answer than we had discussed.

MR. ISAACSON: That's not my understanding.

THE COURT: Okay.

MR. ISAACSON: Let me rephrase the question.

THE COURT: How about we strike that and you try again.

MR. ISAACSON: Okay.

BY MR. ISAACSON:

Q. I'll just move on.

Mr. Weiser, are you familiar with Arm's October 2024 offer to Qualcomm for Hunter, Hayes, and Yamin from around that time?

A. Yes, I am.

Q. Did you see that offer?

A. I did.

Q. Okay. Did Qualcomm accept that offer?

A. As to Hunter, Hayes, and Yamin, no, it was outrageously expensive.

MR. ISAACSON: I got no more questions, Your Honor.

THE COURT: Thank you.

CROSS-EXAMINATION.

BY MR. LOCASCIO:

MR. ISAACSON: We're not sure JTX-5 is in evidence, I move JTX-5.

MR. LoCASCIO: No objection, Your Honor, that's the TLA, I think it is.

THE COURT: Thank you. It's admitted.

(JTX Exhibit No. 5 was admitted into evidence.)

Across

CROSS-EXAMINATION.

BY MR. LOCASCIO:

Q. Good afternoon, Mr. Weiser.

A. Good afternoon.

Q. Let me start off with the Meta e-mail that you talked about. And so you were shown, Mr. Schlaifer, can you pull up PTX 1579, please? So you were shown this, which was a request from Meta with some questions. And if we could just blow up through Douglas's name at the bottom, that would be great. I want to ask you about a couple of these. It sounds like you then got on a zoom call and did your dead level best to persuade and convince Meta that Qualcomm was in the right, correct?

A. We explained to them, as I said previously, that we were not in breach.

Q. And that you didn't think you had done anything wrong, correct?

15:46:29 A. That comment wasn't made.
15:46:32 Q. Sir, you gave them assurances on all these points
15:46:36 correct?
15:46:37 A. We answered their questions.
15:46:38 Q. Sir, let's look at the fourth one you talked about,
15:46:41 which says -- hang on a second, it's the second one, says
15:46:45 "confirm that the agreement that Arm has threatened to
15:46:48 terminate is only the ALA, not the TLA." Can we agree by
15:46:53 the 25th of October, 2024, Meta at least understood there
15:46:58 was a difference between ALAs and TLAs?
15:47:02 MR. ISAACSON: Objection, he's now asking the
15:47:04 witness to testify to Meta's understanding.
15:47:06 MR. LoCASCIO: I'll rephrase, Your Honor.
15:47:08 Q. Mr. Weiser, Meta's question distinguishes between the
15:47:12 ALA and the TLA as of October 25th, 2024, correct?
15:47:16 A. Yes.
15:47:19 Q. And you got ready for that meeting -- Mr. Schlaifer,
15:47:24 could you leave it on the screen, and can you pull up PTX
15:47:30 1570, which is already in evidence.
15:47:35 MR. ISAACSON: Do I have a copy of that?
15:47:37 MR. LoCASCIO: I don't, it was in the last
15:47:39 witness's binder.
15:47:42 Q. Can you at the top, Mr. Schlaifer, can you take that
15:47:46 e-mail, yep. Perfect.
15:47:49 And so, on the same day, Pavan, whose name I

won't pronounce, who was just in this room --

MR. ISAACSON: Can we pause. I don't have a copy of this.

MR. LoCASCIO: Feel free to look at mine.

BY MR. LOCASCIO:

Q. So the very same day, Pavan at Qualcomm told Meta, if we look about midway through, it says Arm is not claiming a breach of our separate agreement that covers all other Qualcomm products containing Arm cores. Do you see that?

A. I see that.

Q. So you were telling Meta that Arm wasn't claiming a breach of the TLA, and at the same time, literally the same day of the e-mail with the questions, Pavan told Meta that Arm was not claiming a breach of the TLA. Do you see that?

A. He refers to it as a separate agreement, yeah.

Q. Because the TLA is a separate agreement from the ALA, correct?

A. It is.

Q. And the breach notice that was in the Bloomberg article, the breach alleged by Arm in the case before this was over the ALA, correct?

A. Correct.

Q. And you know that Meta, at the time, had a Reality Labs business using TLA cores, not ALA cores, correct?

A. I believe that's true.

Q. So that happened before your call. And then your call, I believe you said was on Halloween, is that right?
A. I believe it was the 30th. I don't know the exact date.
Q. I believe we actually -- can I get a cross binder for this witness, Your Honor. I think we're missing that.
MR. LoCASCIO: May I approach, Your Honor?
THE COURT: You may.
BY MR. LOCASCIO:
Q. Okay. So we can take those down, Mr. Schlaifer. Thank you. So your meeting was on, your zoom call was on Halloween. The letter that was in the Bloomberg article that Meta had questions about was October 24th, 2024, correct, 23rd?
A. It was the 23rd. I don't have it in front of me.
Q. You know it was before the 25th, it was either the 22nd or the 23rd, correct?
A. I believe that's true.
Q. Okay. And let's pull up PTX 1605, which is in evidence. Can you go, Mr. Schlaifer, to page 3? And can you blow up the bottom half? So you worked in the legal department at the time, right?
A. Yes.
Q. You're now retired, correct?
A. I am, thank you.

Q. You see Ann Chaplin is on this e-mail, which is in PTX 1605?
A. Yes, I see that.
Q. She was the head of all legal, of all legal operations, the general counsel of Qualcomm at the time?
A. She was the general counsel.
Q. So ultimately, she was your boss, right? At some level.
A. She was my boss, yes.
Q. How many levels were there between you, roughly, just one direct report or somewhere in the middle?
A. Direct report.
Q. So you reported directly to Ms. Chaplin at the time?
A. Correct.
Q. So the day before, the night before your -- withdrawn.
So the day the questions came in was the 30th, correct?
A. No. That was the week before. This is the date of the call, I think.
Q. Hang on a second. We'll pull them up, we'll get this right.
So -- oh, so thank you for the scheduling of the call, I appreciate that.
A. You're welcome.

Q. So PTX 1598 was the one you showed with the zoom meeting scheduling, do you recall that?
A. I'm sorry, do you want me to look at a tab?
Q. If you don't remember the date, sir, and you don't have the tab, Mr. Schlaifer is probably magically pulling it up right now, I can also hand it to you because it's got the date right on it.
A. Please.
Q. Okay. We got it up here. Okay. That's great.
So this 30th of October is when you were invited to the zoom meeting. Agreed?
A. It's -- yes, correct.
Q. Okay. And -- thank you. Take that down.
That night, your boss gets an e-mail, Ms. Chaplin from the CEO of Qualcomm, Mr. Amon, correct?
A. It appears to be an e-mail from Cristiano Amon, yes.
Q. It's called Meta update, importance high, and it says this is awesome, do you see that?
A. I see that.
Q. Let's figure out what was so awesome. Let's go to the next page. If we could blow up the top, the remainder of Mr. Amon 's e-mail.
Can we get the term sheet agreement signed before the investor day. We could go down through this e-mail -- actually, for completeness, Mr. Schlaifer, before

we read Mr. Amon's e-mail saying how awesome is this is, let's look at Tejas e-mail, that was right below this, October 29th, and if you could, with respect to this, just go to the right and blow up the Tejas e-mail, team -- to team from Tejas. Do you know who Tejas is, sir?
A. I do.
Q. He was -- I've heard his name in the court, I thought it was Tejas, you know him better than me, how do you pronounce it?
A. Tejas.
Q. Tejas?
A. Hopefully I'm right.
Q. So for now we're going to call him Tejas. On the 29th, he's sent a note to Mr. Amon and your boss, Ms. Chaplin, saying Meta has finally agreed to our Infra/RL collaboration proposal terms, do you see that in his e-mail?
A. I do.
Q. That's obviously why Mr. Amon is celebrating, fair?
A. He's responding to the e-mail it appears.
Q. Let's go back to Mr. Amon's e-mail from the 30th, blow that up, Mr. Schlaifer. He starts with number one, important. Can we get the term sheet agreed and signed before the investor day? I want to announce our data center development and Meta engagement at the investor day, November 19, 2024. That's what he said October 30th the day

before you even had your call with Meta, correct?
This is the 30th and your call is Halloween?
A. Yeah, I believe it is.
Q. And two paragraphs in from that, it says "we should not try to introduce new terms not agreed by the parties within the next two weeks and accept that pricing is something that will likely remain open." Did I read that correctly?
A. That's how it reads.
Q. So the day before your call, Mr. Amon, the CEO, sent a note to your boss, Ms. Chaplin, and a host of other folks, that made clear that while there was a term sheet to be had, two things, the term sheet wasn't yet agreed to, true?
A. There was no term sheet.
Q. There was no term sheet at that point, as far as you know?
A. As far as I can recall.
Q. And it was -- Mr. Amon, in Qualcomm's view, that pricing will likely remain open on the Meta terms, agreed?
A. That's the comment he's making there.
Q. So then, if you pull it up, in the interest of time, Mr. Schlaifer, thank you, take that down, PTX 1609. On October 31st is the first term sheet and it comes over from Meta -- pardon me, from Qualcomm to Meta. Were you involved personally, sir, as a lawyer in the term sheets with Meta or

the ultimate agreement that was reached in 2025?
A. I was not.
Q. Okay. You just saved yourself and all of us a little bit of time.
Okay. I want to turn now to -- let me ask you something in the mean while on that, which is you were on the litigation team for Qualcomm from the first trial, correct?
A. I was never on the litigation team.
Q. Can we pull up PTX 1579 again, Mr. Schlaifer. Can you blow up the top e-mail, Mr. Cardwell, okay. Through Douglas. Okay. You see this is the e-mail that you showed during your direct testimony, and it says Marika, that's Marika Ray, this is Mr. Cardwell, and he says we'll try to make any day next week before 8:00 and 10:00 a.m. PST, or would it make sense to have someone from the Qualcomm litigation team, EG, that means for example, Jonathan Weiser, on the call as well. Did I read that correctly?
A. You did.
Q. You're Jonathan Weiser, correct?
A. Yes, but I'm not on the litigation team, this is his characterization, which is a miss-characterization, on the call, I made it very clear to him what my role was.
Q. At least somehow before 8:38 P.M. on October 25th -- withdraw that. Did you know Mr. Cardwell personally?

A. I did not.
Q. Had you ever met him before then?
A. No.
Q. So at least somebody it would seem on the Qualcomm side had led Mr. Cardwell to believe that you, Mr. Weiser, were on the Qualcomm litigation team?
MR. ISAACSON: Objection, Your Honor.
Q. Before he sent this, true?
THE COURT: Hold on, there is an objection.
You can answer if he knows.
A. Yes, I can explain this very simply. My lawyers spoke to Mr. Cardwell previously, and Marika Rae, and said Jonathan Weiser, who is familiar with the litigation, will be on the call. He misinterpreted that to mean that I was on the litigation team, he had no knowledge of me, he just mischaracterized it. On the call, I explained to him what my role was, it was very clear after that.
Q. And you were -- were you the person or one of the people at Qualcomm managing the litigation?
A. I never managed the litigation, I was not on the litigation team.
Q. I don't mean on the outside counsel side, I mean at Qualcomm?
A. Same answer, I never managed the litigation.
Q. You were a witness in that case, correct?

A. In what case?
Q. The Arm versus Qualcomm case that went to trial in December of 2024?
A. I was a witness, yes.
Q. And at the time you were employed at Qualcomm, correct, it was before your retirement?
A. That is correct.
Q. And since then, you have retired and some people, leave a job and they go to another job and some people who are lawyers, they, stop practicing law, at firm one and they go to firm two, you did not leave Qualcomm to go to another company, correct?
A. That is correct, I retired.
Q. You retired, true?
A. That is correct, I retired.
Q. And sometimes, when someone has to testify or do some work as a lawyer or as a professional in any way and they have to miss out on their normal work, they get paid the money they lose or leave on the table because they couldn't go to their traditional job, and they're doing something else, you understand that concept, right?
A. I think I understood you.
Q. You're being paid by Qualcomm currently, correct?
A. I am.
Q. And you're not being paid to replace the money you

would make in another job, because you don't have any other job, because you're retired, agreed?
A. I'm being paid a flat fee basis.
Q. You're being paid, when you were deposed in this case, you were being paid hourly for work you did; correct?
A. I believe that's correct.
Q. And I think it was, do I remember right, it was $400 an hour?
A. $420.
Q. Pardon me, $420. But then in January of this year, you know the trial in this case -- well, withdrawn.
In January of 2026, you entered an agreement with Qualcomm to be paid every month on a fixed retainer, correct?
A. That is true.
Q. And that retainer is $16,800 a month, correct?
A. That is correct.
Q. Regardless of if you work for one hour or 16 hours, or 40 hours, correct?
A. It was a fixed fee per month, and the number of hours varied each month.
Q. And they have paid you at that pace, $16,800 ever since January, true?
A. That is true.
Q. Okay. The last topic I want to ask you about, sir,

16:03:05 is this TLA. You talked about the drafting history and negotiations around the TLA back in 2013. Do you recall that?
16:03:17 A. I do.
16:03:19 Q. And you showed a document, let me show -- let's put that up for the jury, PTX 90. And actually let's -- maybe let's take this in reverse order to frame it a little more usefully for the jury. Let's put up JTX-5, that's the TLA itself, right, you're familiar with this agreement?
16:03:45 A. I am.
16:03:46 Q. Were you involved in its drafting?
16:03:48 A. I was.
16:03:50 Q. Did you have outside lawyers involved too, both sides, or was it all done with in-house lawyers?
16:03:58 A. I can't answer for Arm, but it was the in-house lawyers at Qualcomm.
16:04:02 Q. Thank you, I appreciate that. You understand when you write a contract, you try to write it and you hope that the contract has language that allows the parties to know their rights, fair?
16:04:13 A. That is fair.
16:04:15 Q. Sort of the goal of writing a contract with someone else and signing it and making sure I know what my rights are, you know what your rights are, agreed?
16:04:25 A. Yes.

16:04:25 Q. There is a provision that lawyers put in contracts all the time that says hey, after we sign this, we're not going to all say this is what I meant, or this is what you meant, or this is what I said, it's a language of provision called the immigration clause, which means the contract language controlled, you know that's a thing, right?
16:04:43 A. I do.
16:04:44 Q. You included one of those in this contract, right?
16:04:46 A. I did.
16:04:48 Q. Can we go to page 23, paragraph 1610 at the bottom. 16:04:54 And when you and your team at Qualcomm worked on the 16:04:59 language, and ultimately entered this agreement, you 16:05:02 included such a provision, and there is one in the TLA and 16:05:06 there is one in the ALA also, that says that this TLA and 16:05:09 the annexes, meaning what's in this document, constitutes 16:05:13 the entire agreement between the parties with respect to the 16:05:16 subject matter here of, and supersedes and replaces all 16:05:21 prior or contemporaneous, which means at the same time, 16:05:26 understandings or agreements, did I read that part 16:05:30 correctly?
16:05:30 A. It appears you did.
16:05:32 Q. And then I'll skip the parenthetical, and then it 16:05:36 says written or oral, so written down or said out loud, 16:05:40 regarding the subject matter, meaning if it relates to the 16:05:43 TLA, whether you wrote it or said it or any understanding

you had before this was entered into, the contract controls; agreed?
A. I agree.
Q. So let's now turn to the paragraph you were looking at with Qualcomm counsel, 8.1. That's on page 38. Can we blow up 8.1(B). I'm sure the jury wishes we had a dispute over a smaller provision of the contract than 8.1(B). But let me -- okay, sir. So the contract as written and signed, JTX-5, says the following: As to each Arm implementation core, let's talk about that for a second. You know there is an implementation core called Hunter, correct?
A. I do.
Q. There is an implementation core called Yamin, correct?
A. I believe so.
Q. And an implementation core called Hayes, correct?
A. I believe so.
Q. And I think you said in the last question you were asked, it was an offer for Hunter, Hayes, and Yamin, correct?
A. Yes.
Q. Those are all implementation cores, correct?
A. Correct.
Q. Okay. As to each implementation core, so that means for Hunter, you agreed to the first part of the sentence and

say okay, for the Hunter core, that is one Arm implementation core, so we can read it and say if we're talking about a proposal for Hunter, you would say okay, we're going to talk about how this paragraph applies for that particular implementation core, fair?
A. Okay.
Q. Upon receipt of Qualcomm's initial written request, which is defined as the initial request, you see you put a capital I and a capital R, do you recognize that?
A. I don't know if I did that.
Q. Your team, somebody did.
A. That's what the agreement says.
Q. The parties agree --
A. I think this was Arm's proposed language.
Q. This is in the final treatment, this isn't somebody proposed language, this is the parties actual agreed language, correct?
A. It is.
Q. So this capital I, capital R, you're familiar with that as a lawyer, we might call that a defined term, correct?
A. Correct.
Q. Meaning, when you use a phrase and you capitalize the first letters and you put it in quotes, that means okay, whatever it said before that, in this case, Qualcomm 's

16:08:13 initial written request, from now on, all we have to call it is capital initial, capital request, correct?
16:08:23 A. Drafting would normally follow something along those lines.
16:08:27 Q. Okay. And then it says so upon receipt of Qualcomm's initial written request, and then we go down, for under this TLA, beta cores, of the implementation of an Arm implementation core, that's the first, that ends this first initial request part. Then it says and again, upon receipt of, now, it's going to be a bit longer, Qualcomm's subsequent one-time written request at any time up to the 12-month anniversary of such initial request, and that is defined as the "capital Subsequent capital Request", do you see that?
16:09:11 A. I do.
16:09:12 Q. So the subsequent request is defined by the contract and the parties as Qualcomm's subsequent one-time written request at any time up to the 12-month anniversary of such initial request, agreed?
16:09:28 A. That's what it says.
16:09:29 Q. I'm sorry, you agree with me?
16:09:31 A. That's what it says.
16:09:35 Q. Now, then it goes on to say in either the initial request circumstance or the one-time 12-month subsequent request circumstance, certain things have to happen in good

**faith. Fair?**

A. **Okay.**

Q. **And you talked about these, Arm has to investigate and determine -- you don't have to highlight these, Mr. Schlaifer -- the license schedule with the third party. That means go check and see what other prices you had given to the same Arm implementation core, that relates back to this same each Arm implementation core, correct?**

A. **That Arm has given.**

Q. **Yes.**

**And then it says after, that little I, I think Qualcomm's lawyer said that's called a Romannette, I think, that little I, is that what you call that?**

A. **I'm not a transactional lawyer.**

Q. **I'm going to say in the courtroom, thanks. Is that a double romanette or just two romanette?**

A. **Either one works.**

Q. **Okay. So let's take this romanette two. Arm then has to in good faith offer licensee, that's Qualcomm, a license to the same Arm implementation core, and -- okay, let's pause there for a second. So Arm has to go check and see prices and then give Qualcomm a license, and then there is a section here, B, that says what the terms of the offer have to be, the fees, and the rates based on Arm's comparison of all financial considerations and license**

16:11:17 rights. Correct?
16:11:20 A. That's how it read.
16:11:21 Q. And this is what the parties negotiated. An initial request for a license on a particular core and then a subsequent request for a license on that same core, agreed?
16:11:31 A. That's how it reads.
16:11:33 Q. Okay. So now let's go back, thank you, Mr. Schlaifer -- to the e-mail you showed the jury, PTX 90.
16:11:41 So this is about a year, I think, before the agreement gets signed, the agreement itself, JTX-5, is May 31st, 2013, and then the e-mail we were looking at is March 24th, 2012. So a year before the parties sign a deal that's got the integration clause and has the actual final language, there is back and forth going on between the two sides, fair?
16:12:06 A. I agree.
16:12:12 Q. Let's go to the e-mail chain, let's go first with what you showed. I believe you showed the e-mail from Mr. Lederer to Mr. East, that is on the bottom of page 2, Mr. Schlaifer. And this is the e-mail you talked to the jury about. Do you remember that?
16:12:35 A. I do.
16:12:37 Q. And you walked through this idea here that you would leave it to Arm to do the right thing and they wouldn't have to do some kind of audit certification about comparing or

16:12:49 averaging rates, do you remember that?
16:12:50 A. I do.
16:12:51 Q. So let's look here. So remind me, Mr. Lederer, is he
16:12:55 the Qualcomm side or Arm side?
16:12:56 A. Qualcomm.
16:12:57 Q. He's the sender of this e-mail?
16:12:59 A. He's the sender.
16:13:00 Q. And he sends it to Mr. East at Arm. And Qualcomm
16:13:06 proposes a compromise. It says we're close but seem hung up
16:13:11 on one key term. We always ask to be treated fairly, which
16:13:16 is within ten percent at the time. And then if you read
16:13:19 this, it says the proposal that came back limits this to
16:13:23 solely at the time of the license, the agreement itself.
16:13:27 Right?
16:13:28 A. That's what it says.
16:13:30 Q. And he's saying look, I get it, but I need to know
16:13:34 that within 12 months after I take the license that I'm
16:13:38 still being treated fairly on the first anniversary, that's
16:13:43 what he said, correct?
16:13:44 A. Yes.
16:13:45 Q. Because I take it the concern on the Qualcomm side
16:13:48 was okay, I come and I get any license to Hunter, Hayes, and
16:13:52 Yamin, and you say I looked and here is the best price, and
16:13:55 then like the next day Arm is like sweet, we just got the
16:13:59 Qualcomm deal, now we're going to give somebody a low price

the next day, and then you would feel exposed because they gave a license the day after that didn't factor into your price, fair?

A. It would have to be factored in.

Q. Under this structure with the one year check, that could be factored in, because you would say you can't just make sure the day you give me that rate I'm within ten percent of the closest financial, I get a year, so you can't go give somebody a license that's better within that year because I have the ability to come back and ask within for that subsequent request within 12 months for you to go and check and make sure you haven't pulled the rug out from under me, fair?

A. They can offer that, they would just have to do a price adjustment.

Q. They can offer that license, but then if within 12 months, you came back and say here is my subsequent request, then they have have to give you similar terms, fair?

A. Within ten percent, yes.

Q. Okay. So that's what he says here in PTX 90. But then if we go up the chain one to -- let's see Mr. East's response, thank you, let's below up Mr. East's response to Mr. Lederer e-mail, were you getting all these in realtime, you were the lawyer, these are were the business people, was Mr. Lederer keeping you apprised of this?

A. I was generally receiving these e-mails from Jim, I don't know what realtime means.

Q. He's negotiating with his business partner and the lawyers behind the scenes, you and your colleagues, are involved at least, fair?

A. It was our job to implement the agreed terms into an agreement.

Q. So Arm comes back Friday March 23rd, and says thanks for the e-mail. Let's -- it says you're looking for something here, which we have not agreed to, namely the review after 12 months. That's this one year check. I'm going to push the team here to agree to this, however, we'll need to make sure the wording reflects the fact that the ten percent is referring to a first offer in totality, taking into account all commercial considerations, not simply royalty rates. Do you see that?

A. I do.

Q. And so in the negotiation, it was clear that it wasn't just going to be compare one company's rate, Qualcomm's to say Samsung rate, you had to take into account all commercial considerations, agreed?

A. I believe so.

Q. And that ended up in the final agreement, right?

A. Correct.

Q. And then you said, also we would like to put the

16:16:56 onus, does that mean the person responsible for doing it, the burden?
16:17:01 A. Yes.
16:17:01 Q. On Qualcomm, to request the review after 12 months and on that request, we will carry out the review. It is our belief that this will be a one-time request on the 12th month anniversary, that was his response to Mr. Lederer's proposal, agreed. One time request for that initial 12-month period?
16:17:24 Q. For that implementation core is what it said, correct?
16:17:28 A. For that term of the license.
16:17:31 Q. Okay. Let's now look at Mr. Lederer, let's see how he responds. Blow up the prior e-mail, please, the last e-mail on the chain, yes, that one.
16:17:42 Mr. Lederer from Qualcomm, the next day responds to Mr. East at Arm, thanks for your response, good to know we share the goal of closing this out by Monday. And then he says with regards to your suggestion of a one-time 12-month review being triggered by a Qualcomm request, I think that is acceptable.
16:18:05 And at that point, as now the drafting lawyers, you and your team, you believed that Mr. Lederer and Mr. East had at least agreed on what this term should look like so you could draft it and go to the final agreement,

fair?
A. For a proposed license.
Q. And as a result, there is a -- okay. There was another e-mail that we received as potentially an exhibit. Let me show you, I think it's in my binder, can you turn to PTX 91 in your materials, sir?
A. Your binder.
Q. Yeah, I think it's in both?
MR. ISAACSON: Can you give me the number?
MR. LoCASCIO: PTX 91.
A. I'm there.
Q. You have it?
A. I do.
Q. This is an e-mail chain, you were copied on the top one after one of the members of your team forwarded it to you, correct?
A. The very top is Vaughn Testore on the business team, underneath that is my team member.
MR. LoCASCIO: We would offer PTX 91, Your Honor.
MR. ISAACSON: No objection.
THE COURT: Thank you. It's admitted.
(PTX Exhibit No. 91 was admitted into evidence.)
BY MR. LOCASCIO:
Q. Can we pull up the -- we can go, this is the front

16:19:40 page of the e-mail, this is the second page, and can you pull the first and second page up together. So what we have over here is an e-mail, and Antonio Viana, bottom right, Mr. Schlaifer, Antonia Vianna at Arm, to Ron Tesstore, this is two new names, we saw Mr. East on the Arm side and Mr. Lederer on the Qualcomm side in the last chain. How did Mr. Tesstore and Viana fit into this work chart?

16:20:15 A. Antonia Viana was at that time the executive vice-president of Arm in charge of this negotiation, worldwide sales.

16:20:25 Q. He's kind of under Mr. East to the flow chart?

16:20:28 A. I believe so.

16:20:28 Q. How about Mr. Tesstore, is he on the other side, the equivalent under Mr. Lederer on the Qualcomm side?

16:20:38 A. No, he was on the engineering team, Mr. Lederer would have been ranked higher, he was a general manager.

16:20:45 Q. So Mr. Lederer on the flow chart higher up but Mr. Tessitore is handling it -- he's driving it forward at this point for Mr. Lederer for the Qualcomm side?

16:20:56 A. Not at this point, through the entire discussion.

16:20:59 Q. Fair enough sir, they're engaging on what is called new TLA clause as discussed, that's the title of that e-mail, correct?

16:21:08 A. Yes.

16:21:09 Q. And then just so the jury understands, Mr. Tessitore

forwards that to some people, he forwards it to Mr. Lederer, the guy who was in the last conversation, senior to him, and he forwards it to two other people, you and Laura Sand, correct?

A. Correct.

Q. Do you know Ms. Sand?

A. I do.

Q. Is she in the courtroom?

A. She is.

Q. Where?

A. Sitting at the counsel table.

Q. This is Ms. Sand, correct?

A. Yes.

Q. And so Ms. Sand and you were the lawyers on this deal, or at least two of the Qualcomm lawyers on this deal, and then this e-mail is something Ms. Sand said and presumably, it's privileged legal advice, so we don't get to see it, and then Mr. Tessitore similarly says something that is legal advice and then you receive that, and that's how we have this e-mail, correct?

A. It appears, yes.

Q. Okay. So let's look at what Mr. Tessitore sent and passed on to the lawyers. Can we take pages 2 and 3, Mr. Schlaifer and pull that out in a way that we can read the response.

So Arm sends over language and I think you said when we looked at the actual agreement that the language in there had been subjected by Arm, do you remember that?
A. In this e-mail, yes.
Q. And actually, if you could stay with me for a second, back up, the actual final agreement, when I was asking you about JTX-5 and we looked at this paragraph 8.1(B), you said that was Arm's suggestion, do you remember saying that?
A. I do.
Q. And --
A. As to is the initial request.
Q. I'm sorry?
A. Yes.
Q. We have here the proposed language or -- let me withdraw that. It's clear from the e-mail Mr. Viana and Mr. Tessitore had a conversation, correct?
A. It appears that way.
Q. And that conversation was about the TLA clause, correct?
A. Yes.
Q. And the TLA clause, as they discussed it, has new language or different language, what it says is upon receipt of Qualcomm's initial written request, defined term, the initial request, to license a core under the TLA, (an Arm implementation core), do you see that?

16:23:31 A. I do.
16:23:32 Q. And then it goes on to say and again, upon receipt of Qualcomm's subsequent written request on the 12-month anniversary of such initial request, the subsequent request. So that was the proposal that came from Arm to be the TLA language, right?
16:23:49 A. In this e-mail, yes.
16:23:52 Q. Is it possible, Mr. Schlaifer, for you to keep what you have on the top of the screen here highlighted and pull up 8.1(B) of the final agreement, JTX-5? And I realize I had never asked you to do this until this pressure packed moment right now, so thank you. You can scroll all the way down just to see the top, to see the top part language line up. Thank you.
16:24:26 Okay. So the language that was proposed by Arm after the discussion between Mr. Tessitore and Mr. Viana is on the top, the bottom we're looking at here on the screen is the actual final language agreed to by the parties. Correct?
16:24:45 A. The bottom is the final, yes.
16:24:47 Q. And I just want to ask you about a couple of things, because when the lawyers then took this, whether it was on on the Qualcomm side or the Arm side, and got it in final form, and got everybody's signatures on it, a couple words got changed or added, and for the benefit of the jury, I

16:25:06 want to ask you about those.
16:25:07 This language, as to each Arm implementation
16:25:11 core, that wasn't in the back and forth as of March 2012,
16:25:18 but by the time the agreement was finalized in 2013, this
16:25:22 TLA provision now was specifically limited to as to each
16:25:28 implementation core, that was added into the final
16:25:31 agreement, true?
16:25:32 A. That's the final language, yes.
16:25:35 Q. And where it then says upon receipt of Qualcomm's
16:25:40 initial written request, okay, that's the same language that
16:25:43 was in the e-mail in March of 2012, fair?
16:25:47 A. Yes.
16:25:48 Q. And then it says, the language now about beta
16:25:53 versions and early access cores, presumably that came up and
16:25:57 people added that. But then here it says and again upon
16:26:03 receipt of Qualcomm's subsequent one-time written request,
16:26:09 so if we compare that, it used to say again upon receipt of
16:26:15 Qualcomm's subsequent written request on the 12-month
16:26:18 anniversary, it became in the final version, receipt of
16:26:21 Qualcomm's subsequent one-time written request at any time
16:26:26 up to the 12-month anniversary of such initial request to
16:26:31 find the subsequent request. Can we agree, sir, that in the
16:26:36 final version, that the agreement that's in this case as
16:26:39 JTX-5 for 8.1 B, the parties between 2012, when you were
16:26:46 talking about the conversation, and the final agreement

agreed to limit 8.1(B) to each implementation core having an initial request, and a one-time written request within 12 months of the first request, true?
A. This is for each license, if you go back to the comment you read about wanting to do one during the 12-month period, that why this language was entered into, within that 12-month period, we would only bug them once to do the review.
Q. You're right at the end of the 12 months, you can say hey, I want another license, and bug them again with a new request?
A. That's a different topic. And I'm happy to address that topic, but this language means as to that implementation core, during the initial 12-month license term, that core, that we would only be able to revoke the 12-month review once.
Q. Let's just like get right to it, sir. You're here as a paid lawyer, ex-Qualcomm lawyer, now paid individual, paid by Qualcomm lawyer, and your testimony is that under this agreement, as it was ultimately signed, Qualcomm can make as many licensing requests for the same core as it wants, and it can have 1, 2, or 5 different initial requests for the same core, that's your reading?
A. My -- what I am saying is that if the license is set to expire or it has terminated, Qualcomm can request a

license for that core.

Q. So your view would be Qualcomm, under this provision, could in 2019 for Hunter, Hayes, and Yamin ask for a one-year license, heck, let's make it a two-year license, ask for a two-year license, and on the 12-month anniversary of that initial request, say hey, go check again, do my subsequent question, and Arm would have to do that subsequent request, and make sure nobody got a better deal. And then a year later, that license would end, and you would issue a second initial request for the same core, for two-year term, and do the same thing all over again, you think that would be perfectly acceptable under your reading of this provision?

A. This section.

Q. Sir --

A. This Section 8.1 (B) allows Qualcomm to always seek a license to a core. At this time, this was in June 2nd, every core license we had was perpetual, Arm changed its business to start limiting the terms of the license, let me finish, so we had to at the end of the term seek another license, a new license as to that core, that would go through the same procedure of 8.1 because if we didn't, we would have no rights to even license the core at the end of the term of the first license. That was never the agreement of the parties.

Q. Let's look at what the parties signed and wrote, sir. If you wanted to write that thing you just said, you have been a lawyer for a long time, probably as long as I have, you could have written this sentence to say each time we ask you for a license to an implementation core, that would be a much clearer way to do what you are saying this says, correct?
A. I think the language works as is.
Q. Okay. Can we agree that what was added, though, sir was as to each Arm implementation core, right?
A. That was added at the beginning.
Q. How many different Hunter cores are there, sir, is there only one Hunter core or are there multiple different Hunter cores?
A. The --
Q. Do you know, sir?
A. I don't know exactly, but I believe the Hunter core evolved over time.
Q. And you think that the Yamin core, sir, it's your view that the Yamin core changed overtime, you don't know but you wished it did?
A. I don't know about the Yamin core.
Q. And the word subsequent one-time request was added and is in the final agreement, true, sir?
A. The subsequent request were in both the proposal from

Arm and the final agreement.

Q. And one-time was only put into it in its final iteration, correct, sir?

A. That's the final language.

MR. LoCASCIO: No further questions, Your Honor.

THE COURT: Thank you. Redirect.

MR. ISAACSON: I was hoping I could keep that on the screen, can you get me that, Mr. Spalding?

REDIRECT EXAMINATION.

BY MR. ISAACSON:

Q. Up here, it says at the top, initial written request to license a core. And then in the contract it says, initial written request, and initial written request to license. You were asked, you can have written a sentence to say any time you ask for a license. Did you get that done?

A. I think we did. This is why I said I think the language works as is.

Q. And just to be clear, Hunter, Hayes, and Yamin was -- it was a seven-year license that was going to expire?

MR. LoCASCIO: Objection, Your Honor, leading.

Q. You talked about the Hunter, Hayes, and Yamin license that was going to expire?

A. It was seven years, it was limited in term, it was not perpetual.

Q. And so your license was ending and what you're saying

16:32:48 is when you ask for a license, this would apply?
16:32:51 MR. LoCASCIO: Objection, Your Honor, profoundly leading.
16:32:56 THE COURT: Very leading.
16:32:57 MR. ISAACSON: I'm pleased to be profound, anyway.
16:33:01 BY MR. ISAACSON:
16:33:07 Q. There was a question that may have suggested that the Qualcomm ALA was at issue in that prior case that's over with. Was there any claim in that case that Qualcomm had breached its ALA with Arm?
16:33:23 A. No, I don't believe so.
16:33:25 Q. All right. And one time you were salaried?
16:33:31 A. Yes.
16:33:32 Q. Do you consider yourself to be working hard during that time?
16:33:36 A. Yes, sir.
16:33:37 Q. And then you retired and you had an hourly contract?
16:33:40 A. Yes.
16:33:40 Q. Did you work hard then?
16:33:42 A. Yes.
16:33:43 Q. All right. And now you're getting monthly payments, are you working hard for that?
16:33:48 A. I am.
16:33:48 Q. And does that hard work include negotiating with Arm

16:33:52 about the next version, version ten of their Arm architecture?

16:33:58 A. Yes, on numerous occasions.

16:34:01 MR. ISAACSON: No more questions. Thank you.

16:34:03 Thank you, sir. You are excused.

16:34:05 THE WITNESS: Thank you, Your Honor.

16:34:05 THE COURT: Let's break for the evening, ladies and gentlemen, we'll see you tomorrow at 9:00 a.m. Safe travels.

16:34:22 COURTROOM DEPUTY: All rise.

16:34:24 (Jury exiting the courtroom at 4:34 p.m.)

16:34:36 THE COURT: All right. Everyone can be seated before we go to the bench trial portion. I did have a couple of questions, I won't run the clock for this. So I'm looking through the jury instructions.

16:34:50 MS. YING: Your Honor --

16:34:54 THE COURT: I have been working on it so if you guys wanted to, you can submit something, but it's -- you just made me waste all of time by saying that you're not going to get it to me until tomorrow. When am I supposed to look at what you give me.

16:35:11 MS. YING: I apologize, Your Honor, we were trying to narrow the disputes.

16:35:15 THE COURT: Okay. Well, but I don't know what you guys think I'm doing. When are you going to get it to

me tomorrow, 7:00 a.m., so that I can just sit here and redo everything that I have already done. I don't understand what you're thinking. Is it going to be complete, is it going to be completely undisputed.

MS. YING: I don't know if it would be completely undisputed but we're certainly trying to narrow the number of disputes.

THE COURT: Get it to me tonight, get it to me tonight or don't bother, because I can't deal with all that you're doing and you're going to make a whole bunch of appeal points on stuff that I have absolutely zero time to deal with. So get it to me tonight or don't bother.

But I do have questions.

MS. DUNN: Yes, Your Honor.

THE COURT: So on the unfair competition.

MS. DUNN: Yes.

THE COURT: I have read --

MS. DUNN: Let me just get my legal issues folder.

THE COURT: I'm not sure it's a legal issue. I'll give you a chance tomorrow to do the legal issues. My question for you is it seems like in the proposal, you all want the consumer test and their doing a version of the competitor tethering test, including some market stuff that I'm sure you object to. What I can't figure out is are you

proposing that I instruct under both or just one, and because you don't have a counterproposal for theirs, and the only words I see in yours are consumer.

MS. DUNN: I understand the question, Your Honor. And I unfortunately, maybe not unfortunately, I want to think about that before I answer you conclusively, they are not exclusive as Your Honor undoubtedly at this point, I want to make sure that we're not seeking both instructions. I don't think we are, but I'm not a hundred percent.

THE COURT: So I know you're tired and but can you tell me that first thing tomorrow or tonight?

MS. DUNN: We will tell you tonight.

THE COURT: In whatever you submit, because I just am running out of time with so many issues going on in so many directions.

MS. DUNN: I completely understand and we will get it to you ASAP.

THE COURT: Okay. Then -- that was my biggest issue on the jury instructions. Like I said, we'll talk tomorrow after the jury leaves to let you put objections down or convince me I'm doing something wrong.

The second question, and this is not on jury issues, but I thought of it the other day when your CEO was on the stand, and then when we were over here talking about the no big deal kind of thing. What is it that Qualcomm --

16:38:26 and you can put your damages person on, but what is it -- I'm trying to figure this out in the context of the verdict sheet where I got Arm Ltd, Arm Holdings, and all kinds of stuff going on.

16:38:41 Are the damages going to be individually assessed, like assume that I agree that you have to prove it to Arm Holdings and Arm Ltd, is it going to be like the same damages against each, are you going to half it, split it in half, is it like double dipping, I don't quite understand what you're proposing.

16:39:07 MS. DUNN: Yes, this is an excellent question. So you know, because we have proposed to the Court that Arm is Arm and I think we established that today, actually, and yesterday, that's our first preference, we think that's correct, legally. If not, you know, there is certain claims on the format that will be nominal damages, certain claims that do have numbers. I think the issue, and admittedly, I haven't thought about this, and I will think about it tonight, but the issue really is you know, if they're potentially the same, and they're divided on the verdict form, you do have a risk of double dipping, which is not our intent. And so what I think our position will be, although I have not looked at this for one minute, but what I think the correct position would be is there should be one line because it avoids the double dipping problem, and because

we've established that Arm Ltd is a wholly own subsidiary of Arm Holdings and the SEC form says that clearly.

But I need to think about it, I think that's why our proposal is not to divide it up. It's especially confusing. I suppose you could also tell the jury something, you know, you could instruct --

THE COURT: Where I'm getting -- the other reason that I -- are you talking right now about not splitting anything up or not splitting damages up?

MS. DUNN: Damages.

THE COURT: I feel like I need to split the other ones up, because I have had situations in the past where there is a statute of limitation defense, for example, and when you don't break something up and one of the grounds is based on something that's actually a statute of limitations, under the Third Circuit, I have to give you a new trial, and I really like you guys, but no.

MS. DUNN: First of all, we really appreciate hearing that.

THE COURT: So I'm really thinking of breaking them up, but the damages is where I don't know what your positions are, and so I'm just trying to be efficient here and get some things done beforehand.

MS. DUNN: Understood, let us please go back and it's helpful to know Your Honor's questions, which are

16:41:30 excellent questions, of course.

16:41:33 THE COURT: Then tell me what is it that is the
16:41:39 relief requested if I were to find the violation of the UCL
16:41:54 that you are trying to meet now, what is it that you want,
16:42:02 and what is it that -- so, I guess there is a couple
16:42:09 scenarios. One is if I say there is no violation, I know
16:42:13 what the relief is. If there is a violation, what is it
16:42:18 that you're requesting, because it sounds almost like you're
16:42:21 requesting, well make them negotiate in good faith. But I
16:42:28 don't know that negotiating in good faith gets you what they
16:42:33 want, because they can negotiate in good faith and still ask
16:42:36 for a royalty rate that is substantially higher than
16:42:39 anything that Qualcomm thinks is fair.

16:42:41 So I'm trying to understand that. And then
16:42:44 secondly, if I were to say no violation of UCL and what I'm
16:42:53 hearing now, I haven't decided that at all, because the
16:42:56 evidence is still coming in, but you're saying I'm bound by
16:42:59 the jury's finding on the violation of the UCL, which is
16:43:03 that whole Bloomberg thing and Meta. So let's say the jury
16:43:07 comes back and says yes to one of the interference claims
16:43:12 that's based on that, your position is Third Circuit says
16:43:17 I'm back. What then, what is the relief you're seeking from
16:43:24 that? Is that -- so I don't know, but this whole UCL thing,
16:43:30 I don't know what the relief is, and I don't know how it
16:43:34 gets Qualcomm what it wants.

MS. DUNN: Understood. Are you trying to write me a note? Do you want to hand it to me? Mr. Isaacson is trying to hand me a note.

THE COURT: You would have come up and stuck it up his nose, he was kind enough to just flap it around back there until you saw it.

MS. DUNN: So this might be obvious to everyone but Mr. Isaacson is much nicer than I am.

Okay. His note says and I agree with this, v10 relief is different from the UCL, obviously.

THE COURT: That's -- I do know that, yes. Actually, that's actually -- thank you. But that also went into my question, too. I was thinking UCL in my head because the jury also has that and I'm like wait, I'm bound by that, but then there is the v10.

MS. DUNN: I understood that to be implicit in what you're saying.

THE COURT: Think breached with respect to v10.

MS. DUNN: UCL is, there is injunctive relief to enjoin anticompetitive conduct. So for example, Your Honor is going to hear testimony about this concept of input foreclosure, which stop me if you know all this already, but input foreclosure is I will just apply it to this case to be very simple. Like if you own the instruction set, and all the chip makers need your instruction set, you control that

input, then if you decide to make chips and now you're exciting against other chip makers, and you withhold from other chip makers the inputs that they need, you are engaged in anticompetitive conduct. And there is already a lot of evidence of anticompetitive conduct in our, you know, belief that is already in evidence, and this will become even more clear when you hear from our expert.

But we are under the UCL, you can get injunctive relief if there is unfair conduct where the utility of the conduct does not outweigh its anticompetitive effect. And I know that it's broader and amorphous, it's entirely purposeful by the California courts. And I will say because also I'll try to explain and advocate. This is a very good situation for the California UCL for this idea, because of this issue where --

THE COURT: Is it the competitor or the consumer part?

MS. DUNN: It's either. It's either. And but the issue --

THE COURT: The issue I'm asking is there are California state courts when you start saying this is the California courts want it to be amorphous, there are some cases where a contract is involved, where they're like yeah, the consumer thing doesn't really fit in a situation where you have sophisticated companies going at each other.

MS. DUNN: I understand, Your Honor.

THE COURT: That's why I asked you that question, you said they sort of wanted to be like this, I don't know if you're saying the withheld stuff because you're the consumer or the competitor or what.

MS. DUNN: Well, it's actually -- so, with the ISA, we're a consumer, and that's the input. And so when they're withholding what we need to use the ISA and make our custom cores with it, they're doing so because they want to compete with us. So they are competing with us, but it is that we are a consumer of the ISA, so hopefully that explains it.

THE COURT: It does, I'm not sure it helps me with the legal issue, I'm not sure you can insert the consumer aspect in that situation, maybe you can, maybe you can't, I just seen some cases that suggest that the consumer part doesn't apply then, that's why I was asking.

MS. DUNN: Thank you for flagging it, let us come back with a fully formed answer.

I will say to Your Honor's question the other day, which I think bears on this question is, you know, we are proving everything we need under both tests. Because no matter how this works out, we want to have satisfied it. And even if you need to prove competition or anticompetitive conduct in effect, you don't ever need to prove -- I really

16:48:17 think this is conclusive under California law, and this is in the Epic case that there is no relevant market requirement. I also think with the amount of dominance that we have shown with respect to the ISA, I think it would be in question.

THE COURT: So when you say -- when you say we can get injunctive relief, okay, that's very nebulous, I can say don't withhold it, are you suggesting that I would give a rate at which they had to give it to you?

MS. DUNN: Perhaps. And right --

THE COURT: It really does sound like you're asking me to you know, treat these things like a FRAN or a RAND or whatever those things are, and --

MS. DUNN: So I think what --

THE COURT: And let me tell you if that's what you're counting on in the next short period of time, you're going to be disappointed.

MS. DUNN: I understand that, too, I think an injunction could be crafted to do effectuate that result that does not burden the Court and we will work on addressing that question. But I do think that and I think one of the reasons we have come here is because if we could do this ourselves, it would be done. And the consequences are very grave. So we have no choice other than to bring to this to Court. But we can also apply our brain cells to

coming up with an injunction that we think would work on have the necessary effect.

THE COURT: And then the, I apologize to cut you off, the breach of contract with respect to v10, what do you want for that? Again, you want me to just be like, I think it should be the old rates, only 8,000 times instead of 18,000 times.

MS. DUNN: I think, with respect to that, it would have to be a finding of breach, that what we're doing now is not negotiating in good faith.

THE COURT: What do you want?

MS. DUNN: Let me get back to you on that before I nail ourselves to the mast on the fly.

I appreciate the questions.

MR. LoCASCIO: I won't spend more time than we need to spend on this. You have hit on Your Honor an issue that has been in this case, an acute problem of it since the day they filed it from the prayer for relief that asked for essentially a morphus relief, we have said, okay, what is the market, because in the examples laid out, whatever this -- we have are having a bench trial now and if they were going to put on the request for the relief they're seeking, it's not okay, we'll get through this, and then we'll have some whole separate proceeding, they never done that and they never requested it, and there were windows to do, we

have asked, and they have said, for instance, Ms. Dunn said well the input foreclosure because they're trying to compete, compete on what, what is that market, that's why we had this market, they weren't even in data center servers, Mr. Amon said no we focused on computer and phones.

They were in it before we did, here we are, this case has turned into a theory that I don't think is supported by any claim or any relief requested that says because of some contract claim or some nickel and dime ALA TLA tortious interference claim, you have to leave the chip market or you have to do a FRAN market, that's never been here, this is a hope and prayer, Your Honor, and it's an injunctive leave mess, that's why the initial request, I think it was your words or maybe mine, we had a back and forth, this is like a monitor ship, they're really seeking, and that's not what Article III Courts are for, Your Honor, and this is not a FRAN case and they definitely, you heard Mr. Amon say it four times, they want it to be except it is not. If you want to bring that claim, Ms. Dunn has brought more than one, you could plead that claim and assert it and bring it and fight about FRAN in federal court, that's not this case, Your Honor.

THE COURT: I didn't mean to get us off track, but it keeps come back to me, and you know part of it is your fault, Ms. Dunn, because you were so effective in the

last case of being like the harm, the harm, we want an injunction, the harm, there is nothing, there is nothing, there is nothing, and you put that in my head, so now every time I start to listen to these questions, I'm like but what is the relief you want, and when I heard your CEO over there, and he's like, I mean, I totally understand what he's saying, it's like we want a license at a rate that's not going -- that's going to let us compete and not put us out of business and let us get into whatever areas we want to be in, completely good position for a CEO. It starts to make me wonder like, what, I don't have a magic wand and what wand do I have that you think I can wave.

MS. DUNN: We think you have wands, we will get back to you. And before anything that was said over here gets any traction, I just want to say that courts regularly enjoin parties from doing things that are anticompetitive under the UCL, that does happen.

THE COURT: Enjoining is different, because what I'm trying to figure out is like I could say stop negotiating in bad faith, I'm not suggesting I have made the finding that they are, but I could say it. But that doesn't get your client what it wants, right? I mean that's where I keep falling down, I'm like okay, so they engaged in anticompetitive behavior. Again, I haven't made that finding. But if I were to find that, I'm not -- I'm missing

the steps that get your client a license.

MS. DUNN: Right. So here is the thing. First of all, at the bare minimum, a finding by an Article III court will have an effect. At the bare minimum.

THE COURT: I don't believe that. You will just take it to another Article III court and maybe one after that.

MS. DUNN: I do think it would have an affect. And that is why we're here in this Article III court, so that's thing one. Thing two, is that our business is on the cusp of being destroyed, this is not an exaggeration. Just as an example, the idea that a CEO of a company had to get on the stand and basically say publicly our business is on the cusp of destruction, I have never had a CEO client who wanted to do that, and I think that that is really exceptional. It is true that there is conduct going on, the withholding of a v10 license, because these terms are ethically unreasonable, that is anticompetitive and I think being told that they're anticompetitive to try to save us from destruction, so we will figure out what is the injunction language, but that is the goal and that is why we're here. And this is why put in -- the projections of when Arm says they see this trillion dollar market opportunity, it's not just about data center, they have to go into mobile, they have to go into compute, they have to

go into auto, they have to go into internet things, to reach their very intentional goals and how are they going to capture that market, it's already in evidence in this case and will be more so by the end of the tomorrow.

The only way they can achieve that is by getting rid of Qualcomm and the fact that we have to say this out loud in a public courtroom, shows, Your Honor, like literal desperation of what is going on here.

THE COURT: But the relief that you're seeking, let's say my magic wand let's me set a rate. I don't have evidence, are you going to put evidence on what that should be? We're not going to have proceeding after proceeding after proceeding, as I said, I like you guys, but not that much.

MS. DUNN: I have a recommendation for this to the Court and I think that there is precedent for this, which is what the Court -- first of all, these licenses are very complicated, and -- but just to be honest, they are they're extremely complicated, it's not like you can show them to somebody one time and take them back and the person is like I know your rate, that's impossible, I think what my recommendation would be, we'll figure out how to write this up, is that the parties retain jointly a licensing expert to advise the Court on something that would allow Qualcomm to compete, because that's really all that Qualcomm is asking

for.

And Qualcomm can't see the licenses, so we can't make a real recommendation to the Court anyway. So you need -- I would suggest that the Court needs a licensing expert who is neutral, I would suggest the parties pay for them, Qualcomm is certainly willing to do that, because it's a drop in the bucket compared to business destruction and that person advises the Court. And then --

THE COURT: Yeah, I have always been hesitant to do something like that. I will entertain if we get to this point, I'll entertain whatever your proposals are, but you should know I am very hesitant to do that because I have always viewed that as being ex parte, me going to someone, like I never liked it when judges did it for Markman hearings, you just have someone that there is no idea what that person has told me, what that person said, what that person's even potential biases are, and they have the ear of the court and you have no idea what they're saying. So that's not my first option.

MS. DUNN: Understood.

THE COURT: But anyway, we have taken up a bunch of time here. Why don't we just put some evidence on, by the way, if you don't finish the evidence, we can do it on Friday when the jury is out, or we can come and get a time to come back.

**(Jury trial portion concluded at 4:58 p.m.)**

# Exhibit B-2

08:15:21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INC., and QUALCOMM TECHNOLOGIES, INC., Plaintiffs, v. ARM HOLDINGS PLC, Defendant. | ) | ROUGH DRAFT VOLUME 5 C.A. No. 24-490(MN) |

Thursday, October 8, 2026
9:00 a.m.
Jury Trial

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE MARYELLEN NOREIKA
United States District Court Judge

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: JENNIFER YING, ESQ.
BY: TRAVIS J. MURRAY, ESQ.

-and-

DUNN ISAACSON RHEE LLP
BY: KAREN DUNN, ESQ.
BY: WILLIAM ISAACSON, ESQ.
BY: ERIN J. MORGAN, ESQ.
BY: JENIFER HARTLEY, ESQ.

-and-

APPEARANCES (Cont'd):

PAUL WEISS
BY: CATHERINE NYARADY, ESQ.
BY: JACOB A. BRALY, ESQ.
BY: WILL MARKS, ESQ.

Counsel for the Plaintiffs

YOUNG CONAWAY STARGATT & TAYLOR LLP
BY: ANNE SHEA GAZA, ESQ.
BY: ROBERT VRANA, ESQ.

-and-

KIRKLAND & ELLIS LLP
BY: GREGG F. LoCASCIO, ESQ.
BY: JASON M. WILCOX, ESQ.
BY: JAY EMERICK, ESQ.
BY: MEGHAN KELLY, ESQ.
BY: MEGAN McGLYNN BUTLER, ESQ.
BY: MATTHEW McINTEE, ESQ.
BY: PETER EVANGELATOS, ESQ.

Counsel for the Defendant

\- - - - - - - - - - - - - - - -

COURTROOM DEPUTY: All rise. The United States District Court for the District of Delaware is now in

session. The Honorable Maryellen Noreika presiding. .

THE COURT: All right. Good morning, everyone. Let's bring in the jury.

(Jury entering the courtroom at 9:02 a.m.)

THE COURT: All right. Good morning, everyone. Welcome back. Everybody else may be seated.

All right. Where are we?

MS. DUNN: Your Honor, Qualcomm calls Manju Varma.

COURTROOM DEPUTY: Please raise your right hand and state and spell your full name for the record.

THE WITNESS: Manju Varma, M-A-N-J-U, last name is V-A-R-M-A.

Manju Varma, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION.

BY MS. MORGAN:

Q. Good morning, Ms. Varma.

A. Good morning.

Q. Can you introduce yourself to the court and spell your name for the court reporter?

A. Of course, my name is Manju Varma, spelled M-A-N-J-U, last name V-A-R-M-A.

Q. Why do you work?

A. I work for Qualcomm.

Q. How long have you been at Qualcomm?
A. A little over 20 years.
Q. Can you tell me about your education before you were at Qualcomm?
A. I have a masters in electrical engineering, and a masters in business administration.
Q. What's your current role at Qualcomm?
A. I'm currently the senior director of CPU technology product management.
Q. What are your main responsibilities in that role?
A. I'm responsible for the CPU technology roadmap, maintaining or ensuring that we have the best CPU technology for all the products that we plan for at Qualcomm across multiple markets.
Q. The jury has heard testimony about this, but can you just explain, very briefly, what a CPU is?
A. Of course. A CPU, like it stands for central processing unit. And like the name suggests, it is central to all the actions that are necessary or a chip sets performs. Think of it like it's the brain of the SOC, and it does a lot of the heavy lifting.
Q. How does Qualcomm get CPUs?
A. There are two ways that Qualcomm gets CPUs or application processors. One is when -- both of these paths are from Arm. One is when Arm designs their own CPUs, and

we license them. And we call TLA CPUs. The other path is, we have an architecture license, where we design our own CPUs, and that is the other path, and we call them custom cores or ALA cores.
Q. Does Qualcomm get CPUs from other companies?
A. Not CPUs or application processors, no, Arm is the only source.
Q. In 2024 did Qualcomm try to answer any Arm CPUs or cores under the TLA?
A. Yes, yes, we did.
Q. Which ones?
A. This would be Hunter and Hayes, these are application processors or CPUs.
Q. Did you try to get any other cores besides Hunter and Hayes?
A. Yes, it's micro controller, and it's called Yamin, or we interchangeably call it M55.
Q. What's the difference between an application processor like Hunter and Hayes, and a micro controller like Yamin?
A. A huge difference. So Hunter and Hayes, they are application processors. They are very complex CPUs, they do the heavy lifting, they are central to an OSC, and the performance is significantly higher. But as whereas a micro controller is a much smaller core, it is maybe smaller than

an application processor, or a CPU, and it's more for general purpose, a very specific applications on a much smaller scale.
Q. So how are Hunter and Hayes used by Qualcomm?
A. Hunter and Hayes are used as the main application processors.
Q. And why did you want to license Hunter and Hayes?
A. We were considering using Hunter and Hayes for our mobile or a handset, our phone market, value tier products, and by value tear, I mean any of the products that sit below our flagship products, which are cost sensitive, these are mass volume products, we will consider the use of Hunter and Hayes.
Q. Why did you want to license Yamin?
A. Yamin was for a different purpose. We have other markets and there were other customers, internal customers, requiring the use of Yamin.
Q. When you say internal customers, what does that mean?
A. Qualcomm, you know operates in multiple markets, and each of these product chip set product managers are our internal customers, and they come in with their requirements.
Q. Did you have existing licenses to Hunter, Hayes, and Yamin in 2024?
A. Yes. We had existing licenses for Hunter and Hayes

and Yamin back in 2019.

Q. So why were you asking for them again, why did you want to license them again?

A. So these licenses were expiring in October of 2026. And here we are in 2024, and it's very typical for us to look at our planning roadmap and these planning road maps look at least 2 to 4 years out. That's because SOC planning is extremely complex, we are talking about billions of transistors in a SOC, and we have to make sure that in all of these transistors, every one of them works flawlessly, because when we finally take out this chip and when the hardware comes back, everything has to work flawlessly. Software, you can fix the software with, you know, amendments to the code, but that's not how it works in a hardware, so we have to plan, design for it, accurately and the stakes are good for 2 to 3 years at least when you're looking at SOC cycles.

Q. Just for the jury's clarity, you mention something called tapeout, what is tapeout?

A. Tapeout is a term we use in a semiconductor industry, this is when we have designed the chip, the SOC, and then we send it out to the lab for it to be manufactured.

Q. I'm going to now have you turn to DTX-294 in your binder and that's an April 2024 e-mail thread that you received. Do you recognize this document?

09:10:57 A. Yes.
09:10:58 MS. MORGAN: I'll move the admit DTX-294.
09:11:01 MR. EMERICK: No objection.
09:11:02 THE COURT: Thank you. It's admitted.
09:11:02 (DTX Exhibit No. 294 was admitted into evidence.)
09:11:03 BY MS. MORGAN:
09:11:04 Q. Okay. Ms. Varma, I'm going to direct your attention to the bottom of page 3, to an April 1st, 2024 e-mail Ziad Asghar, who is Mr. Asghar?
09:11:17 A. Mr. Asghar was my boss at the time.
09:11:19 Q. And the subject line of this e-mail says "your feedback on idea to get Arm to willingly extend the GIC700 and SMMU 700." What are the GIC700 and SMMU700?
09:11:38 A. The GIC700 is the intra controller, think of it like a traffic controller, if we use the system in a management unit, both of these are licensed.
09:11:50 Q. At the bottom of that e-mail, Mr. Asghar writes, we absolutely have to extend Hunter, as it is the last good v9 core that we have appointed. We need to have that as an option." Do you have an understanding of what he meant?
09:12:06 A. Yes. He's referring to the fact that we need Hunter and Hayes for us to use on our roadmap.
09:12:16 Q. He only mentions Hunter here, how do you know he's referring to Hayes?

A. We typically when we talk about Hunter, Hunter is the higher performance processor. Hayes is the, think of it as a power efficiency processor in a little configuration, it's used in a big little configuration to address different requirements in the SOC.

Q. And in response above that, you wrote, "agree on the strategy of using Hunter core extension to get feedback on peripheral license". Can you explain what you're talking about here?

A. Of course. We had made requests for extending, the renewing the license, and we could not get an answer from Arm at that time. And here we are planning our roadmap in October 2024 -- sorry, in April of 2024, and we needed the use of Hunter and Hayes on our roadmap. And this was a way to get an answer from Arm because we aren't getting any answer or responses from Arm.

Q. And why did you think it would help you get an answer?

A. We have a need for an application processor like Hunter and Hayes, and this would hopefully get us an answer from Arm. If we were to ask for both Hunter and Hayes and the licenses.

Q. Later in the thread, at the top of page 2, you say "the only core we will need in a big/little configuration is Hayes along with Hunter. We do not see the need for

Matterhorn, Makalu or Skyros." Why did you write that?
A. We were evaluating the cores that we would need, and here I'm clearly stating that we do not need Matterhorn, Makalu or Skyros, and Hunter and Hayes are the application processors that we would need from Arm.
Q. Okay, and what are Matterhorn, Makalu, or and Skyros?
A. These are application processors, as well, from Arm. And we didn't need them.
Q. Did Qualcomm request a license to Hunter and Hayes after this e-mail?
A. We did. We did. Right after this discussion, we made a request to Arm in April 2024.
Q. Okay. What happened after Qualcomm made the request?
A. We didn't hear anything from Arm. There was just no response.
Q. Did you follow-up?
A. Yes, we did. We really needed these coarse on our roadmap and we just didn't hear back from Arm.
Q. I'm going take this document down, and have you look at another document in your binder, which is PTX 1319. And that's a September 9th, 2024, chat message. Do you see that?
A. Yes.
Q. Do you recognize this as a chat between you and two other people at Qualcomm?

A. Yes.

MS. MORGAN: I'll move to admit PTX 1319.

MR. EMERICK: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1319 was admitted into evidence.)

BY MS. MORGAN:

Q. The other two people in this chat are Aakash Sharma and Andrew Slate. Who are they?

A. Mr. Slate is a part of the product planning team, and Mr. Andrew -- sorry, Mr. Sharma is a chip set product manager in the handset or mobile business unit.

Q. At this point in time, had Qualcomm heard back from Arm about a license for Hunter and Hayes?

A. This is September of 2024, no, we have not heard back from Arm at all on Hunter and Hayes.

Q. Okay. So I'm going to direct your attention to page 2. And I'll just ask you as a general matter, what are you talking about in this chat?

A. So this is September of 2024, we are discussing products that are going to be taping out, you know, late 2025 and beyond, 2026 products. We are talking about Ketron, Skyros and Clarence 27 here. Ketron is a value tier product this sits below the flagship tier, and we couldn't use our flagship tier, our custom CPUs in Ketron because

Ketron has very specific performance and cost requirements, so we had to use different IP, we were considering Hunter and Hayes, but Ketron we had to use a custom CPU, because Hunter and Hayes may not have met those requirements. But that meant we absolutely needed, or we were strongly considering the use of Hunter and Hayes for Skyros and the Clarence tiers, and these two tears are extremely cost sensitive tiers, and they sit below Ketron. And here we are in September, we haven't heard back from Arm at all on Hunter and Hayes, and we couldn't really plan for these products appropriately, and the planning team and the chip set product manager are messaging about, hey, what is your solution for these products? Do you have a custom CPU solution for sky rows tier and Clarence tier?

Q. Just to clarify for the jury because they have heard a lot of product names, what are Ketron, Skyros, and Clarence 27?

A. Ketron is a mobile or handset product that sits below the flagship tier and Clarence and Skyros are also handset products, and they sit below Ketron, these are cost sensitive products, these are mass volume products, and it's extremely important for us to have the right CPU for each of these products to address our customer requirements.

Q. And when you say they are a product, what does that mean?

A. They're chip sets, they're chips.

Q. I'm going to direct your attention to the chat at 5:06 PM, which is you talking and you say, let's see, "okay, just discussed this with the CPU team. Current assumption for Ketron is only L and M core PPA optimization, no S core development. This means Skyros and Clarence 27 will be Hunter IP based. This is the trade off we need to make. CPU team will reassess PPA and schedule with this new information and come back with a plan this week." What's the trade off you're describing?

A. So we had to design a custom CPU for Ketron and here we are, we haven't heard back from Arm on Hunter and Hayes, so we are now forced to think about custom CPU solution for Skyros tier and Clarence tier, and like I said, these are very different requirements. And we really couldn't have a spread our system to make sure that the custom CPU team is able to meet the requirements of all these three tiers. Again, I'm talking about tiers, even though it's products simply because these products sit in very different cost segments, so we couldn't have had the same solution addressing all these three products.

Q. Okay. And below that at 5:10, you say "if the CPU team is focusing on L and M cores with efforts to pull in schedule for Ketron, then where will they find time to develop S core, optimize it, and have it ready for Skyros

and Clarence, finite resources, equals need to prioritize and make trade offs", and then there is a smily face below that. What do you mean when you talk about finite resources and trade offs?

A. Again, the chip set product manager and planning product manager, they're asking us for some very specific requirements to make Skyros and Clarence 27. Which means a really unique processor built for these tiers, which we really did not have the resources, we could either meet Ketron's requirements or we could meet Skyros or Clarence's requirements, we just did not have the resources to address all these three different tiers.

Q. We can take that off the screen. Was Qualcomm able to get a new license for Hunter, Hayes, or Yamin?

A. No.

Q. Okay. And to what extent, if at all, did not having Hunter and Hayes affect product planning?

A. As you can see, there is a lot of back and forth happening by September, right. We were pushed in multiple directions. Ketron had to be scheduled, moved out, and eventually canceled. Skyros tier, or Skyros next what we now call Nexas, this product also had to be moved out, which means we couldn't meet two time to market requirements that we were expected to meet, we missed customer cycles, we really couldn't compete effectively in these tiers with

these products. And Clarence 27 had to be moved out, and since then in that tier, it's been canceled.

Q. Okay. So I want to show you PTX 1337 in your binder. Which is a September 20th, 2024, e-mail. Do you see that?

A. Yes.

Q. Do you recognize this document?

A. Yes.

MS. MORGAN: I'll move to admit PTX 1337.

MR. EMERICK: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 1337 was admitted into evidence.)

BY MS. MORGAN:

Q. Okay. So this is an e-mail from you to other people at Qualcomm with the subject line CPU TBR slides. Do you see that?

A. Yes.

Q. What is TBR?

A. TBR stands for technical business review.

Q. What is that?

A. It happens twice a year or once a year, where we, you know, review the technology with executives.

Q. And I'm going to direct you now to page 9. Okay. What are we looking at here?

A. Yes. This is a very busy slide. These are all the

09:23:18 products that we have in the CPU planning roadmap, you can see that on the left-hand side it starts with 2024 production, and as you move along the time, you go all the way to 2028, this is what I meant by the planning roadmap that has, you know, that spans 2 to 4 years, because we have to look at these products early on in time and make sure we have the right IPs or processors for each of these products. And on the left-hand side, you will see all the markets that Qualcomm operates in. Sorry, this is a bit of an eye chart here, you will see all of the various markets, each of those rows represents the markets that Qualcomm operates in. That is our job, we have to look at each of these products going into each of these markets and make sure we have the right technology for these products.

09:24:20 Q. Okay. And at the bottom, there is a -- at that line we were just looking at, it says CBN, what's that referring to?

09:24:28 A. That's the connectivity and networking market that we operate in.

09:24:34 Q. And right above that, there is one that says TPE Infra, what's that referring to?

09:24:40 A. That's technology product and solutions, that's what TPE stands for in infrastructure.

09:24:50 Q. What kind of chips are for infrastructure?

09:24:53 A. Infrastructure related chip sets.

Q. And then we can go ahead and look I think at the top section that's about handset, Matt, if you can make that bigger. Can you see on here it says premium and then at the bottom it says low/entry, what's that referring to?
A. So, yeah, I think that's on the handset. Handset is what we call mobile, your smartphone, that's the market we are referring to and we talk about handset. And you can see that within the handset selling meant we have premium.
A. Sub premium, high, mid, low, entry tiers, these are all the different tiers that I talked about, and they are also kind of you can refer to them as cost sensitive tiers, as you come down TA royalty, the premium or sub premium tiers. And low entry is the lowest tier that you know we have products for within the handset segment.
Q. Okay. And then on the, on that you can see some of the names of the cores that you just mentioned, Ketron, Skyros, Skyros 27, Clarence 27. Let's just walk through these quickly. You mentioned that Ketron was affected by not having Hunter and Hayes, can you just explain why?
A. Sure. So you can see some of the products that I referred to here on the roadmap. One thing I would like to clarify is this roadmap, it's never set in stone. This is think of it as a living document. You could see this today and in a week, this roadmap would have changed a bit because we're constantly reacting to market and customer

requirements.

So Ketron is, if you can see where it sits, it sits in the high tier, below our premium and sub premium tiers.

A. Ketron is a product that we were considering Hunter and Hayes, but, you know, Hunter and Hayes wouldn't have been available, so we had to figure out a custom solution for Ketron. Now, at the same time, we must strongly considering using Hunter and Hayes for that Skyros tier that you see, and the Clarence tier, which is the low entry tier. We absolutely needed Hunter and Hayes for those tiers, because we couldn't have spread our resources trying to address the requirements across all these three tiers.

And because we didn't get any response from Arm, we were forced to consider custom CPU solution for the Skyros tier and Clarence tier, which is why because our resources were spread so thin, Ketron kept getting pushed out, and today it doesn't exist on the roadmap, it had to be canceled.

Q. Okay. And then you talked also about I think Skyros 27, Clarence 27, and Skyros, I guess you talked about the Skyros tier. Just briefly, how were those cores affected?

A. Again, you could see from the thread that I was discussing with the planning team and the handset team, they're asking for a custom CPU solution in these two cost

sensitive tiers, we simply did not have the custom CPU resources to address these tiers. This is where we were planning to use Hunter and Hayes, and because we had to now address these two tier requirements, our resources were really spread thin. We couldn't meet the schedule requirements. And the Skyros 27, which you see here on that road map had to be moved out, which means we did not meet our customer cycle products.

Q. In your role, are you aware of any consequences of Qualcomm not getting a license to Yamin?

A. Yes. Yamin, you know, it's the micro controller, very different from an application processor that we just discussed. We constantly get requirements for the use of Yamin across the roadmap, across multiple product. But when -- specifically for a product called Lime Light and Spot Light, this is if you look at --

Q. Matt, if you zoom out.

A. If you look at the lime light and spot light row, you can see that that --

Q. Right in the middle?

THE COURT: You can't both talk at the same time.

THE WITNESS: If you look at the voice market, you will see the Limelight and the Spotlight product. And we had to use, we had strong requirements coming in from

customers and our internal customers, which are the product managers for Limelight and Spotlight for the need for Yamin. And when we did not hear back from Arm, we were forced to consider other solutions, which was RISC-V micro controller, but that meant significant engineering resources had to be planned around transitioning from an Arm micro controller to a RISC-V micro controller, and customers were not happy about this at all. Customers specifically wanted the Arm micro controller, which is Yamin, so we had to spend a lot of time talking to customers, convincing customers. And it made our products less desirable, because customers were not happy.

Q. Okay. There is a box in the middle of this roadmap that's like a key that says custom, Gen two, Gen three, Gen four, Gen five, there is one thing on there that says RISC-V, do you see that?

A. Yes.

Q. What's that corresponding to?

A. Sure. So RISC-V is the open source Instruction Set Architecture. And think of the Instruction Set Architecture as like the building block, right. And if you look at the entire roadmap here, everything is Arm. And RISC-V is -- sits in that tiny wearable row, where you see the product called Aspen R, that's the one we were considering RISC-V application processor for that Aspen R wearable product.

Q. And did you end up using RISC-V for Aspen R?
A. No, no.
Q. What happened to Aspen R?
A. Aspen R has since been canceled.
Q. And why is that?
A. Because this was an aspirational effort. RISC-V Instruction Set Architecture, the challenges with RISC-V are three fold. Right. One, the Instruction Set Architecture is not mature. When you're building high performance application processors, you need a very mature Instruction Set Architecture. So one, the Instruction Set Architecture is very recent, not mature, two, you need to be able to design the application processor well, using this mature Instruction Set Architecture. And three, you need an ecosystem that is already mature to be able to utilize this Instruction Set Architecture. Now, what do I mean by that? You need the operating system that talks to the hardware, that should be mature to be able to, to be able to use in Instruction Set Architecture. All the application that you use on your phone, those applications should be able to talk to RISC-V Instruction Set Architecture on the application processor, for the whole thing to work well. None of these, none of these were ready and it was aspirational, it's there on the roadmap, but it's since been canceled.
Q. And then just one last question on the roadmap just

for clarity. I asked you earlier about the line that was called Infra, and you said it was infrastructure, infrastructure refers to data center chips right?

MR. EMERICK: Objection, leading.

THE WITNESS: Probably, yes, yes, Infrastructure leads to data center.

MS. MORGAN: Okay. I have no further questions.

THE COURT: Thank you. Cross.

CROSS-EXAMINATION.

BY MR. EMERICK:

MR. EVANGELATOS: May I approach with a binder?

THE COURT: Yes.

BY MR. EMERICK:

Q. Ms. Varma, Qualcomm has had a license to the products Hunter, Hayes, and Yamin since 2019, right?

A. That is correct, but expiring in October of 2026.

Q. It's a seven-year deal, right?

A. Yes.

Q. And it runs until October 18th, actually next Sunday, right, of this year?

A. Yes.

Q. And Qualcomm has been paying the same prices for Hunter, Hayes, and Yamin since 2019, right?

A. That is right.

Q. And those 2019 prices, those have always been in

09:35:11 effect and continue to be in effect until through next Sunday, right?
09:35:16 A. Yes, I am not part of the pricing team or licensing team, but yes.
09:35:22 Q. But you know what the prices are because you're the roadmap person, right?
09:35:27 A. Yes.
09:35:27 Q. Yes. And so those 2019 prices, they're still in effect, they apply until October 18th of this year?
09:35:35 A. That's right.
09:35:35 Q. They applied in 2024, when we talked about the events in 2024, right?
09:35:40 A. Yes.
09:35:40 Q. Qualcomm has never been over charged for Hunter, Hayes, or Yamin, right?
09:35:49 A. I can't speak to that. I mean, we had the pricing, we used these processors, we had a need for processors in October, but we didn't hear back from Arm.
09:36:01 Q. I'm not asking you about communications with Arm, about the offer, do you understand that?
09:36:06 A. Yes.
09:36:06 Q. I'm just asking you, Qualcomm has never been over charged for Hunter, Hayes, and Yamin, they have always had their 2019 prices, right?
09:36:15 A. We had the Hunter and Hayes 2019 license cores, yes.

09:36:19 Q. You have never been over charged for them, right?
09:36:22 A. I can't speak to the pricing.
09:36:25 Q. You're not aware of Qualcomm ever being over charged for Hunter, Hayes, or Yamin, right?
09:36:32 A. I really can't speak to the pricing.
09:36:35 Q. You don't know, right?
09:36:36 A. I can't speak to the pricing.
09:36:38 Q. So you don't know if Qualcomm has ever been over charged for Hunter, Hayes, and Yamin, right?
09:36:43 A. Again, I can't speak to the pricing, I'm sorry.
09:36:46 Q. So you don't know?
09:36:47 A. I'm not part of the pricing team or the licensing team.
09:36:51 Q. The reason Qualcomm is suing Arm, the reason we're all here today, it's not because Qualcomm has ever been over charged for Hunter, Hayes, and Yamin, it's because Qualcomm didn't like a price quote that Arm gave Qualcomm to renew its license, right?
09:37:08 A. Not quite. Because like I mentioned earlier, our two sources for processors are Arm's TLA cores and the ones we design ourselves. And here we are requesting an Arm TLA core and we don't hear back from Arm at all.
09:37:28 Q. Ms. Varma, we're not here because Qualcomm contends it was ever over charged for Hunter, Hayes, and Yamin, right? Correct?

A. I can't --
Q. That's correct?
A. I can't speak to the pricing.
Q. Okay. You're here to talk about a price quote, right?
A. No, I'm here to talk about the roadmap and the impact it had on our roadmap.
Q. So in 2024, Arm gave Qualcomm a price quote for some products, Hunter, Hayes, and Yamin, right?
A. Right.
Q. Right. And then Qualcomm filed this lawsuit against Arm because it didn't like that price quote, right?
A. Yes, the pricing as I recall was really high for the same processor that we had licensed back in 2000.
Q. I'm glad you mentioned that, because Qualcomm didn't negotiate with Arm, it never made a counter offer, right?
A. I'm, again, not part of the licensing team.
Q. All right. Why don't you turn in your 2025 deposition, page 221, lines 21 to 25. Let me know when you are there.
A. Could you tell me which -- is it a DTX? Which page, sorry?
Q. Page 221, lines 21 through 25.
A. Yes.
Q. And you were asked the following question and gave

the following answer:

QUESTION: "And after the October 2024 offer was made, Qualcomm didn't go back again and say can we get another offer, right?"

"ANSWER: Yes."

A. Yes.

Q. Ms. Varma, we all get price quotes in our every day life. You can go and get a quote for car insurance, for example, right?

A. That is correct.

Q. And you have never sued anyone because you didn't like the price quote that they gave you, right?

A. Yes.

Q. Now, let's talk about the price quote that Arm gave Qualcomm, which is the reason for the lawsuit. That's the October 2024 price quote. Qualcomm rejected Arm's October 2024 price quote, right?

A. Yes.

Q. And just to be clear, Qualcomm has never paid the rates that were in that October 2024 price quote, right?

A. We did not go ahead with the licensing, yes.

Q. So you never paid the rates, right?

A. Right.

Q. And so Qualcomm suffered no monetary harm as a result of Arm's October 2024 price quote, right?

A. I can't speak to that. I can speak to the damages it caused on our roadmap.
Q. I want to talk next about why Qualcomm requested a license for Hunter, Hayes, and Yamin. And if you turn in your binder to DTX 0294, it's actually in either binder.
A. 0294?
Q. DTX 0294?
A. Okay.
Q. And once you're there, your counsel asked you some questions toward the front of the e-mail. I want to go to the very first e-mail in the chain, which is on page 5. Let me know when you are there.
A. Page 5, yes.
Q. Yes. And the earliest e-mail in the chain here on page 5, this is from Kurt Wolf to you, and almost everything in here, if you take out the call out, almost everything in here, in this e-mail, if you can go to the next page and there is a page after it, the next page, page 5 and page -- I should be more clear, page 5, 6, and 7, you see almost everything is blacked out of this or redacted from this, but there is a little bit that's un-redacted on page 5. And the little bit that's un-redacted on page 5, there is a subject line, your feedback on an idea to get Arm to willingly extend the GIC700 and SMMU 700, do you see that?
A. Yes, I see that.

09:42:17 Q. This was from Kurt, and so he had come up with some idea to get Arm to willingly extend a GIC700 and SMMU 700 license, right?
09:42:29 A. Yes.
09:42:29 Q. That's what he wrote to you, right?
09:42:31 A. That's what the last subject line says, yes.
09:42:34 Q. And then it says attorney/client privilege, and then it says "hi Manju, more removal and the discussion I had with Larissa", right, and then we don't get to see anything else.
09:42:50 And then your response to him is on page 3, and your response to him is, ACP, that stands for attorney/client privilege?
09:43:03 A. Yes.
09:43:04 Q. "Hi Kurt, agree the strategy of using Hunter core extension to get feedback on peripheral license," that's your response to him?
09:43:15 A. Yes.
09:43:16 Q. So Qualcomm, as part of Mr. Wolf's strategy, wasn't really looking to use Hunter, it was using Hunter as part of a strategy of using a Hunter core extension to get feedback on a peripheral license, right?
09:43:30 A. No, that's incorrect.
09:43:32 Q. Well at least that's what you wrote and described the strategy as, the strategy of using the Hunter core extension

to get feedback on a peripheral license, those are your words?
A. Yes, those are my words and you can see --
Q. And Hunter, I think you said on your direct testimony, that's the main application processor?
A. Yes.
Q. I think you said it's central to an SOC?
A. Yes.
Q. And it's a main volume product?
A. Yes.
Q. And so Arm would be more likely to be interested in a license if it included a big product like Hunter, right?
A. I can't speak to Arm.
Q. That would keep Arm on the hook for these licensing discussions if they had this big product potentially in the mix, right?
A. I can't speculate about Arm.
Q. So what the strategy was, was after Arm made an offer, you could pull the Hunter core and just license the peripheral IP, right?
A. If you look at this e-mail thread, you will clearly see me stating that we're not going to get the cores that we need, which was Matterhorn, and Skyros, and we absolutely need Hunter and Hayes, and even my then boss, Ziad Ashgar, we really need to get Hunter and Hayes.

Q. You show me the words, let's look at Qualcomm's actions, lets look at what actually happened. Arm made an offer for Hunter, Hayes, and Yamin, as well as the peripheral IP, so the first part of the strategy is working, right?
A. We made a request for Hunter and Hayes in April, we don't hear anything back from Arm until our legal team sent a letter, and that's when we hear back from Arm in October. We've lost significant planning time.
Q. Ms. Varma, Arm made an offer for Hunter, Hayes, and Yamin and peripheral IP in October of 2024, yes or no?
A. Yes.
Q. Yes. Okay. If you turn in your binder to DTX 29, you recognize this as a copy of that offer, right?
A. The 294?
Q. DTX 29. It's in the white binder, DTX 29, do you see it?
A. Yes.
Q. This is the October 2024 offer?
A. Right.
Q. Arm to Qualcomm, right? Correct?
A. Yes.
MR. EMERICK: Move to admit DTX 29.
MS. MORGAN: No objection.
THE COURT: Thank you. It's admitted.

(DTX Exhibit No. 29 was admitted into evidence.)

BY MR. EMERICK:

Q. And page 2 shows the offer included Hunter, Hayes, and Yamin in this first chart, as well as the peripheral IP, the GIC700, the MMU 700, the ELA 600, right?

A. Yes, that is correct.

Q. Now if you turn to DTX 2402. And you recognize this as the IP extension offer from January of 2025, right?

A. Yes.

MR. EMERICK: Move to admit DTX 2402.

MS. MORGAN: No objection.

THE COURT: Thank you. It's admitted.

(DTX Exhibit No. 2402 was admitted into evidence.)

BY MR. EMERICK:

Q. But what Qualcomm actually took a license to, if you go to page 2, Qualcomm said no to Hunter, Hayes, and Yamin, and they took a license to the peripheral IP, right?

A. Yes.

Q. And so the result of what Qualcomm did matches the strategy described in Mr. Wolf's document of including Hunter to get information about peripheral IP but to not take a license to it, right?

A. No.

Q. Okay. Well Qualcomm did not take a license to

Hunter, Hayes, and Yamin, we agree on that, right?

A. We did not accept the terms of Hunter and Hayes because it was impossibly high for the processor we had already licensed back in 2019.

Q. Let's turn back to DTX 0294.

A. Okay.

Q. So now that we've talked about what actually happened, Mr. Wolf responds to you and says "thank you Manju." And he goes on to say "I have a gut feeling that I should propose extending Yamin along with Hunter. Are you okay if I do that?" Do you see that?

A. Yes.

Q. And again, this is part of the strategy to get feedback on the license to these peripheral IP products, right?

A. No. It's not part of the strategy as you are intending it, because if you read the line right above that, Mr. Kurt is clearly saying that he's double-checking with me that he doesn't need Matterhorn, Malaka clean cores, keep in mind, these cores are also from Arm and we're clearly stating that we don't need these cores for our roadmap. And we're clearly stating that we need Hunter and Hayes and Yamin for our roadmap, and that's what Mr. Kurt is asking me, that he thinks we should ask for Yamin along with Hunter and Hayes.

Q. Mr. Wolf is proposing extending Yamin because of a gut feeling, that's what he writes in his e-mail, right?
A. I can't speak to what he was thinking when he wrote the --
Q. I'm not asking what he was thinking. Do you understand that?
A. Yes, I see that.
THE COURT: You can't talk, you have to wait for him to finish his question before you start to answer.
Q. You mentioned your boss, Mr. Asghar?
A. Yes.
Q. Did Mr. Asghar ever tell you that he wanted to keep Arm on the hook and then dump them at the alter?
A. Sorry, what?
Q. Did your boss, Mr. Asghar, ever tell you that he wanted to keep Arm on the hook and dump Arm at the alter?
A. I don't recall that.
Q. Okay. This e-mail from Kurt Wolf from April -- it's from April 1, 2024, this original e-mail we looked at on DTX-294, page 5, do you remember that?
A. Yes.
Q. And that's the same month that Qualcomm sued Arm, right? Do you know that?
A. I wasn't aware of those timelines.
Q. We also looked at a chat, you looked at a chat during

your direct exam, and I think you testified that Qualcomm was planning to use Hunter and three products, Ketron, Skyros and Clarence, is that right?
A. Right.
Q. Okay. If you turn in your deposition, your 2025 deposition page 124, 18 through 125, 7, you were asked:
QUESTION: "Can you tell me a specific product that was in the planning process that you were considering using Hunter Hayes for as of October or fall 2024?"
"ANSWER: I don't think I can say a very specific product, like I mentioned, you know, in my role, I looked at the entire roadmap, I look at where we could have -- where we could use Hunter Hayes as a follow on to Cortex A 878, and we say oh, these are the potential or these could be the potential follow on products, we don't necessarily say this is the product where we would absolutely use Hunter or Hayes, I don't think it's possible to answer a question like that."
You were asked that question and you gave that answer?
A. Yes.
Q. And I think you mentioned that on your direct testimony that Hunter and Hayes are value tier products; is that right?
A. Yes.

Q. But that's -- Qualcomm never told Arm that's why you wanted them, right?
A. We make a request for an IP, yes, but we --
Q. Qualcomm never told Arm it wanted to use Hunter or Hayes in a value tier product, right?
A. That is right.
Q. I want to take a look at the roadmap. I believe that's PTX 1337. The Ketron product, that's -- if we look at Q-12026, this roadmap identifies Ketron as a product for Q-12026, do you see that?
A. Yes.
Q. And in Q1-2026, Qualcomm had an active license and still has an active license to Hunter, Hayes, and Yamin, correct?
A. That is correct.
Q. And Q2-2026, we see the Skyros product is on the roadmap. Do you see that?
A. Yes.
Q. And in Q2-2026, Qualcomm had and continues to have an active license to Hunter, Hayes, and Yamin; correct?
A. Yes.
Q. Now, I think you testified about this roadmap on your direct examination, and said some of the products were just aspirational, I think that was the word you used, right?
A. It was in the context of Aspen R, yes.

Q. Yes. This roadmap is just a set of potential future plans, right?
A. Yes, these are all on the planning roadmap, like I said, these products could move document.
Q. Just so we're all on the same page, the Hunter, Hayes, and Yamin license that's in effect, that runs through Q4 of 2026, right? At least in October of 2026, right?
A. That is correct.
Q. So everything on this roadmap, up until in the Q4-2026, that's covered by the existing Hunter, Hayes, and Yamin license, right?
A. That is correct, yes.
Q. Okay. This roadmap changes all the time, right?
A. It does.
Q. This roadmap is pretty fluid?
A. Yes.
Q. You have to change the roadmap constantly?
A. We are, yes.
Q. There is no set way where you change the roadmap?
A. I don't understand that question.
Q. Do you recall testifying in your deposition that there is no set way where you change the roadmap?
A. Yes, as in -- yes, this is a living document.
Q. There is no set schedule for when you update the roadmap, right?

A. Yes. I mean, this roadmap could change in a week.
Q. The roadmap really depends on what the need of the hour is, and what products you're discussing and what you're updating, right?
A. Yes.
Q. And there are always market dynamics challenges from vendors that impact roadmap changes, right?
A. That is correct.
Q. The roadmap changes are based on market dynamics, right?
A. Yes.
Q. They're based on customer requirements that change, right?
A. Yes.
Q. And changing the roadmap, changing plans, that's not necessarily a bad thing, right?
A. Yeah, it isn't.
Q. And it happens all the time in life, right?
A. Yes.
Q. And sometimes you change plans because you find a better opportunity; right?
A. I don't know what you mean by better opportunity, but this roadmap changes, as per our customer product cycles, requirements, market dynamics.
Q. You didn't testify about Arm losing any deals as a

result of Arm's -- strike that. You didn't testify about Qualcomm losing any deals as a result of Arm's 2024 offer to Qualcomm, right?

A. That's right.

Q. You didn't testify about Qualcomm losing any sales as a result of Arm's offer, right?

A. That's right.

Q. You didn't testify about Qualcomm losing any profits as a result of Arm's offer, right?

A. Right.

Q. Your testimony is just that Qualcomm had to change some of its plans?

A. Yes.

Q. But you didn't show us any detailed business plans on your direct exam, right?

A. That's right.

Q. Qualcomm didn't build a factory specific -- specifically to build chips for products containing Hunter cores and now that factory is worthless, because Arm made an offer that you thought was too high, right, that didn't happen?

A. I can speak to the roadmap. I'm responsible for the CPU technology roadmap and I can speak to it.

Q. You're not aware of Qualcomm, any capital expenditure or anything like that, you didn't testify to that, you're

just talking about this roadmap, right?
A. That is correct.
Q. And the roadmap we're talking about, just so we're all on the same page, this is putting one name on one slide in a PowerPoint somewhere in a grid, right, that's what this is?
A. This is a roadmap slide.
Q. Yes.
A. It's a very important document.
Q. But this is the level of detail of the plan, right, we're not talking about a factory, we're talking about one PowerPoint slide with a grid with a name in one of the boxes?
A. We are talking about the planning roadmap, yes.
Q. Qualcomm licenses cores from Arm under the TLA, right?
A. That is correct.
Q. All right. I would like to turn to JTX-5 in your binder.
A. Okay.
Q. And the TLA has a provision that says in Section 8.1, are you familiar with the provision in the TLA that says that Arm shall refund the licensee any historical payment and make the necessary adjustments so that royalty rates are not more than ten percent higher than the previous best deal

accounting for total financial considerations?
A. Sorry, which line?
Q. Let me just ask you this more broadly. If Arm were to overcharge Qualcomm and Qualcomm were to pay a higher price, Qualcomm would get a refund, right?
A. I really am not the person to speak to this.
Q. So you don't know if Qualcomm gets a refund if it's over charged by Arm for TLA cores, you don't know that one way or the other?
A. I'm a not part of the licensing.
Q. So when you plan your roadmap, you are not planning your roadmap -- you are not assuming you can get a refund, right?
A. When I'm planning the roadmap, I'm looking at the technology specifics.
Q. But the assumption when you plan -- you're not thinking about a refund at all when you plan the roadmap, is that fair?
A. Yes, I am not.
Q. Okay. If Qualcomm were able to get a refund as the TLA says, then you could plan your roadmap with confidence knowing you could always get your money back, right?
A. Like I said, I'm the technology product manager, I look at CPU technology when I'm planning the roadmap.
Q. You mentioned on your direct that Qualcomm missed

customer cycles or had to cancel a project, do you recall that? You didn't show us any documents about a product cancellation, is that right?

A. Yes.

Q. You didn't show us anything showing anybody would be laid off or a factory closed down or any of those capital expenditures from a project right, we saw zero documents on that?

A. Right.

Q. Right. We didn't see any budgets, we didn't see any forecast, we didn't see any business slide strategy detection for any of these projects?

A. Right.

Q. So Qualcomm was doing some kind of major reorganization of business, but we haven't seen any evidence of it, right?

A. Right.

Q. And you said you spent a lot of time dealing with customer complaints, you didn't show us a single document of a single customer complaint, right?

A. That's right.

MR. EMERICK: Pass the witness.

THE COURT: Redirect.

MS. MORGAN: Just briefly, Your Honor.

REDIRECT EXAMINATION.

10:01:46 BY MS. MORGAN:
10:01:53 Q. All right, Ms. Varma, I'm just going to show you a couple of things, and then we'll get you out of here. I want to start with DTX 29, which is something you were shown on cross. Do you recognize this as the October 2024 offer?
10:02:08 A. Yes.
10:02:10 Q. Okay. And I want to go to page 2, to the box at the bottom that says royalty rates. And do you see -- do you see at the bottom there is, on the right side, there is an asterisk that says any number of Cortex M55 allowed in these four configurations for no additional royalty, do you see that?
10:02:34 MR. EMERICK: Objection, scope.
10:02:36 MS. MORGAN: You used this document on cross.
10:02:38 THE COURT: Overruled.
10:02:40 Q. What is Cortex M55?
10:02:42 A. That is the name of the Yamin.
10:02:45 Q. What is this asterisk saying?
10:02:47 A. It's saying that Cortex M55 is allowed for these specific four configurations that are shown in the rows above.
10:03:05 Q. And does Qualcomm use Cortex M55 or Yamin with the products that are referred to above?
10:03:12 A. No.
10:03:13 Q. And do you have any current plans to do that?

A. No.
Q. Have you ever done it?
A. No, not that I know of.
Q. We can take that down. And I want to go to your deposition. You were shown, or you were read, you were not shown, I think, some testimony from your deposition where you were asked to tell if you could think of a specific product that was in the planning process that you were considering using Hunter and Hayes for. And the answer that was read to you was I don't think I can say very specific product, do you remember that?
A. Yes.
Q. So now I want to look at page 127 of your deposition, or I'll read it to you. You can look at it. At line 20. It says?
"QUESTION: Okay --
MR. EMERICK: Objection.
MS. MORGAN: "You were considering --
THE COURT: Hold on, you can't keep going when he has an objection, what your objection?
MR. EMERICK: She's just asking to read other portions of the deposition in, instead of asking a question, she's just reading in her prior deposition testimony.
THE COURT: Okay, I think she's saying that you didn't give context to what was said before. Do you want to

just ask her that and then ask her what she would have wanted.

MS. MORGAN: Yes.

BY MS. MORGAN:

Q. I'll point you and you can read it to page 127 at line 20, through 128 on line 19.

A. Page 127.

Q. 127 at line 20.

A. Yes.

Q. To 128 on line 19.

A. Yes.

Q. Do you see that?

A. Yes.

Q. Does this refresh your recollection about what products you testified about Hunter and Hayes being used in in your deposition?

A. Yes.

Q. Did you testify about specific products in your deposition, that Hunter and Hayes would be used in?

A. I did.

Q. And did that include products you testified about today?

A. Yes.

Q. Now I want to take you to another part of your deposition. You were asked if you remembered at your

deposition that you said after the October 2024 offer was made, Qualcomm didn't go back again and say can we get another offer, right, and you said yes. And then I just want to show you what was said after that on the next page, at page 222 at line 2. You were asked, "Qualcomm didn't negotiate the rates that Arm offered, right?" And can you read your answer?

A. This is page 222?

Q. Yes.

A. Okay.

Q. You were asked -- sorry go ahead.

A. Qualcomm didn't negotiate the rates that Arm offered, right? My answer "I'm not aware of that, because I was not involved in all the licensing terms, negotiations, so I can't answer the very specifics of your question."

Q. That is the testimony you gave at your deposition, right?

A. That is right.

Q. Arm's counsel said a couple of things to you on cross to suggest that this is no big deal, I think he said this is just the roadmap and you just had to change some plans. What's your response to that as the personal responsible for the roadmap?

A. The roadmap is a very important document for us. This has, you know, far reaching consequences, especially to

our customers, when a product is pushed out in schedule, we have to talk to customers about why we can't meet their product cycle requirements. We are not able to compete effectively when we are not having these products at a certain time. And cancelling products, especially the Clarence tier products, and that means we are not competing in that tier altogether and our competitors take up that space.

MS. MORGAN: Thank you, I have no further questions.

THE COURT: All right. Thank you. Thank you, you are excused.

What's next?

MS. NYARADY: Catherine Nyarady for Qualcomm. Qualcomm calls Dr. Patrick Kennedy to is the stand. And Your Honor, for this testimony, we would request based to the prior rulings to seal the courtroom. There is going to be peppered throughout discussion of third-party rates.

THE COURT: All right. I have a number of requests that specifically ask me -- from third parties, that specifically asked me to seal the courtroom and I believe that they have made a showing that particular rates that are going to be discussed are sensitive and would cause specific injury if they were disclosed publicly, so I will grant that motion and seal the courtroom for this testimony.

MS. NYARADY: Thank you, Your Honor.

THE COURT: So I will ask anyone who is not under the protective order to leave.

(Courtroom sealed. )

COURTROOM DEPUTY: Please raise your right hand. Please state and spell your full name for the record.

THE WITNESS: Patrick Kennedy, P-A-T-R-I-C-K, K-E-N-N-E-D-Y.

Patrick Kennedy, having been duly sworn was examined and testified as follows:

DIRECT EXAMINATION.

BY MS. NYARADY:

Q. Good morning, Dr. Kennedy.

A. Good morning.

Q. What do you do for a living?

A. I'm an economist.

Q. Where do you work?

A. I work for a firm called Stout Risius Ross.

Q. Did you prepare slides to assist with your testimony today?

A. I did.

Q. Can we pull those up, please? Are these your slides?

A. Yes.

Q. Can you please describe for us your educational and professional background?

A. I have a bachelor degree in economics from University of California San Diego, and a Ph.D. in economics from Stanford University. Following the Stanford, I went back and worked for the Federal Reserve Board of Governors as an economist for a few years, then I went to private industry, securities industry, and then about thirty years ago, started doing what I do today.
Q. And what is that?
A. I provide economic loss and financial analysis, almost always in a dispute context, so issues like we have today.
Q. And have you testified in other cases regarding economic damages?
A. I have.
Q. About how many?
A. I have been in trial over a hundred times.
Q. And what kinds of industries have you worked in?
A. What's relevant to this case is I have had cases involving everything from semiconductor design, semiconductor manufacturing equipment, the components, memory, inter connects, chip sets that go into a variety of different devices, I have had a number of mobile handset cases, modems, a variety of self driving car cases, involving a lot of the companies that are at issue here, so I have seen a lot of the underlying technology in companies,

and then I have analyzed cases that include both intellectual property and also things like a breach of contract.

Q. Have you done work for Qualcomm prior to this case?

A. I have, including the case that's been referred to from a couple of years ago in this courtroom.

Q. Between these same parties?

A. Yes.

Q. And is your firm being compensated for your work?

A. Yes.

Q.

MS. NYARADY: At this time, Your Honor, Qualcomm offers Dr. Kennedy as an expert in economics and economic damages.

MR. LoCASCIO: No objection, Your Honor.

THE COURT: Thank you, he will be recognized as such.

So what that means is most of the witnesses who come here, they testify about facts, these are the things that I know, this is what happened, this is what I remember, whatever. Experts are people who have specialized knowledge in a particular area. If they are admitted as an expert, they're allowed to give opinions, so it's not just the facts, they are looking at the facts and giving opinions based on on those in the area in which they are an expert.

10:11:50 BY MS. NYARADY:
10:11:51 Q. So Dr. Kennedy, have you been here throughout the whole trial so far?
10:11:55 A. I have.
10:11:56 Q. Have you been listening to all the testimony?
10:11:58 A. Yes.
10:11:59 Q. What do you plan to testify about today?
10:12:01 A. So this slide summarizes my main points I'll talk to today. The first is, we have heard that MFN, or previous best deal analysis, so I'm going to talk about the proposal for Hunter, Hayes, and Yamin, the royalty rates in the context of the TLA agreement. I'll move on to two other pieces, which relate to damages. That's alleged overpayment for peripheral IP, which you just heard about, and then also damages related to the Meta relationship.
10:12:30 Q. Let's start with Hunter, Hayes, and Yamin. Did the Qualcomm TLA contract enter into your analysis regarding Hunter, Hayes, and Yamin?
10:12:41 A. Yes.
10:12:42 Q. Can you explain how?
10:12:43 A. It's the basis of the analysis you're about to hear from me, two pieces. The first you see up on the slide is, in order to -- in these royalty rates under the TLA should be prepared with an investigation and determination by Arm of what the license agreement is for a third party for the

cores at issue, they need to investigate what is the lowest royalty rate, that's called the previous best deal, so it's pretty straightforward, what are the royalty rates for each core, what is the lowest, that's the previous best deal, that's the first prong.

The second prong is a little more complicated, but it extends from royalty rates to license fees, and then it does something called total analysis of all financial considerations that are actually factored into Arm's calculation to determine the license fees and royalty rates of the previous best deal. So you look at the previous best deal, you look at total financial considerations for that previous best deal, and then say alright, what's being offered is or is not within ten percent of that adjusted previous best deal.

Q. So the jury has heard some talk the last few days about MFN, something called MFN, can you tell us what that is?

A. MFN is most favored nation, here it's previous best deal, so you look at what's being offered to other companies, and then see is my offer being within the particular range, it's a particular contractual provision, sometimes it's in an agreement, sometimes it's not, but it gives the licensee protection. And in a circumstance here, where there is one party determining all the rates, you have

to commit to technology over a long period of time, look for protection in those royalty rates if you're going to commit to a particular core, for example.

Q. Did you look at Arm's licenses to investigate who had the lowest royalty rates for Hunter, Hayes, and Yamin?

A. I did, over 30 agreements.

Q. And what did you discover?

A. For Hunter and Hayes, Samsung had the lowest royalty rates. For Yamin, a company called Infineon had the lowest rate.

Q. Let's start with Hunter, what did you do in your analysis of Hunter?

A. So this chart shows I looked at all the agreements, I identified the proposal for Qualcomm with respect to Hunter, and then said I want to look at all those rates that are at that rate or below. MediaTek, you see there, I'm talking about MediaTek, it's at the same rates proposed to Qualcomm. And on the left-hand side is Samsung, that's when I said Samsung had the lowest rates, it's from [redacted] percent compared to Qualcomm [redacted]. One thing I'll note on this chart, I'm going to carry forward these colors so you can track easily those companies as we go to the next slide. The dotted line, the black dotted line, is the lowest identified royalty rates plus ten percent, that's the threshold. You can kind of see, eyeball it, and you can see

where the proposal falls compared to those lines.
Q. And why are there two sets of dotted lines?
A. The rates change, Samsung's rates change on the number of cores, they also change on volume discounts, but I picked the highest Samsung rates to look at.
Q. Okay. How about Hayes, did you do the same analysis for Hayes?
A. I did. So Hayes, here you see Samsung on the left, those are the lowest rates, the dotted lines reflect if ten percent threshold above the lowest rate, and then you see on the right what was offered to Qualcomm.
Q. What were the rates for Qualcomm versus the rates for Samsung?
A. Samsung's [redacted] is compared to [redacted] for Qualcomm. And in the proposal. And Samsung the high end of that range is [redacted] that compares to [redacted] percent.
Q. And did you do this analysis for Yamin?
A. Yes. This chart has a lot more companies because there are a lot more companies that are being offered rates below what was proposed to Qualcomm. But the colored ones are the ones I want you to pay attention to. MediaTek is [redacted] percent, so Qualcomm [redacted]. Samsung is [redacted] at [redacted]. And on the left-hand side, you see Infineon at [redacted]. And then you see the same dotted lines in the differentiation on cores there to give you the

10:17:10 range. So ten percent above [redacted] is the dotted line, one [redacted] and [redacted].

10:17:26 Q. Did you compare the Qualcomm proposal to all of Samsung's rates?

10:17:30 A. Yes. So this is, I'm preparing this chart and showing you because you heard testimony that Samsung was "the previous best deal." So let's look at that and accept that. Were the proposed rates to Qualcomm more than ten percent higher than that rate? Yes. For Yamin, [redacted] percent higher. For Hayes, [redacted] percent higher. For Hunter, [redacted] percent higher. So all of those are clearly above ten percent.

10:18:03 Q. So we just talked about royalty rates. Did you also consider the license fee for Samsung versus that offer to Qualcomm?

10:18:12 A. I did. So we're moving now, the first bullet or section of the contract that I talked about is that relatively simple exercise of what is the lowest rate, you call that the previous best deal. This is the second piece, I need to extend that, not just to royalty rates, but to fees. This chart shows what Samsung paid in license fees over a [redacted] period, it was [redacted].

10:18:41 Q. And what did you do then?

10:18:43 A. See to the lower right, [redacted] term and [redacted] IPs licensed, so I have to take that, and using that total

10:18:51 financial consideration analysis, make an adjustment to see,
10:18:55 you can't just say compare what this proposed to Qualcomm
10:18:59 with six IPs to the [redacted], I have to do some analysis there.
10:19:05 Q. And can you adjust for those differences?
10:19:07 A. Yes.
10:19:09 Q. And did you do that?
10:19:10 A. I did. So these are the steps that I'm doing, this
10:19:13 is the total financial considerations, so the first is to
10:19:16 take that [redacted], and identify how much of that relates
10:19:19 to Hunter, Hayes, and Yamin. So I do that through an
10:19:23 apportionment. But it's really -- what it is is you add up
10:19:27 all the individually priced IPs, they're on a schedule, it's
10:19:31 called the price book, you have seen it. I figure out what
10:19:35 it would cost for all [redacted] that are actually licensed by
10:19:39 Samsung, and then look at Hunter, Hayes, and Yamin, and see
10:19:41 what percent of the total are they. Hunter, Hayes, and
10:19:43 Yamin are about [redacted] percent. So if I'm going to look at
10:19:46 Samsung's fee and do a quantitative assessment, I'm going to
10:19:50 say [redacted] percent of that is the comparable. So I compared,
10:19:54 you compare that.
10:19:55 The second piece, the term of the license. You
10:19:57 have heard reference to [redacted],
10:20:01 Samsung is [redacted], the proposal to Qualcomm was seven. It's
10:20:04 relatively straightforward to take, you saw the schedule
10:20:08 year by year, I can convert that into a seven-year term and

I do that, I now have done a quantitative adjustment under total financial considerations to get the adjusted fee.

Q. And you used the price book to apportion to these three specific IPs we have been talking about, Hunter, Hayes, and Yamin?

A. I did, this is like a menu, it lists actually the price for every IP individually, and I can go up like you do in your reference to a combo meal, figure out a burger, fries, a drink, you do the same thing, add up the individual prices, and the drink is X percent of the total, okay, that's how much my combo meal is related to the drink.

Q. Did you also adjust for the term length, as you were talking about?

A. Yes. Dr. Kennedy, does this slide show us the results of your adjustments between Qualcomm proposal and the Samsung proposal.

A. Yes. So I looked at the -- what we just talked about, made the adjustments to the fees, the total comparable fee under the Samsung deal is [redacted]. For those same IPs, the fee proposed to Qualcomm, was [redacted]. So that's about a [redacted] times multiple or in percentage terms, a [redacted] percent increase, [redacted] increase in what was proposed to Qualcomm versus what was proposed to Samsung. So the reason we're looking at this is that you have to look at the fees and the royalty rates together, you

can have high fees, but -- sorry, high royalty rate and low fees and they off set each other. Here it doesn't work, because both of these are substantially higher than that ten percent threshold, so one can't offset the other.

Q. Now, Arm has said that Samsung was the previous best deal for all three of the cores, and you testified that when you looked at the agreements, Infineon actually had a lower rate for Yamin. And so on this slide, we see a comparison, the Qualcomm proposal versus Infineon versus Samsung. Can you walk us through your analysis here, please?

A. You saw this on the chart, Infineon is [redacted], Qualcomm is 2.2, that's [redacted] percent higher, here I'm showing Infineon, the royalty rate for that core is lower than Samsung.

Q. So these are the royalty rates, did you also do this calculation for the license fee from the Infineon license?

A. Yes. I did the same adjustments for term and for what was actually being licensed. And Qualcomm's proposal is [redacted] percent higher than the adjusted fee for Infineon.

Q. Now here you're doing an analysis between the Qualcomm proposal and the MediaTek. We have been talking about Samsung, we have been talking about Infineon, why are you doing an analysis as compared to MediaTek?

A. The documents that I have reviewed and the testimony that I have reviewed show that the Qualcomm proposal was

based on MediaTek's rates. And there is actually -- it's in the document that was kind of referred to, this pricing analysis spreadsheet that was testified to earlier. And you see ---

Q. Would it be helpful if we pull it up?

A. Yeah, that would be good.

So this is a tab called -- within that spreadsheet, called royalty proposal October 9, 2024, that's the proposal to Qualcomm. You go up to the top there, proposal, at MTK rates. So the proposal, the document tells me they're using MTK or MediaTek as the rates.

Q. And MediaTek, in your opinion, is that the previous best deal?

A. I don't think so, but it says that in the document. If you go to the left down below there, that number four, it says, it's kind of hard to see because it's wrapped around, but it says hence, the next best deal, MediaTek, is identified as the previous best deal. All right. So that's what the document says. There is testimony to that effect as well. And so I have looked at MediaTek as well here.

There is also testimony there about the note that MediaTek also committed to similar terms as Samsung. So that relates to some of the testimony, you heard about the process that was undertaken by Arm to take, look at Samsung rates and you get a proposal. The testimony was you

can't look at Samsung, because it's this big subscription. But they turned, Arm turned to another agreement that was a big subscription agreement, the same type of agreement with over [redacted] IPs as well, and used rates from take that. So that filter, or that reason you can't look at Samsung and you have to go to higher rates, it's kind of logically inconsistent. You can't say I'm excluding this agreement because it has these characteristics, and then turn around and look at another agreement that was exactly the same characteristics and say I want to use those rates, it just doesn't make sense.

Q. Just for the record, the spreadsheet we have been looking at is PTX 1424. Let's go back to the slide deck, please.

Dr. Kennedy, were you here when there was some testimony about an analysis that was purportedly done on like ASP, average selling prices, and volume shipments, you heard some of that?

A. Yes.

Q. Have you seen any evidence in this case that Arm actually considered any of those things that were testified to when setting the Samsung rates?

A. No. That's a fundamentally quantitative analysis, right, average selling prices, unit volumes, things that Arm can see because it has the royalty reports from these

companies. There was testimony that was considered, but there isn't any actual analysis, there is no bridge between taking Samsung's royalty rates as the lowest rates and then saying I'm going to go from say, [redacted], because of those factors. Okay. If you actually use those factors in looking at the Samsung rate and setting it, then where is the analysis that says okay, based on different ASPs and different volumes, I'm going to adjust Samsung's rates so that I have something that has that total financial consideration. It's a fundamentally quantitative analysis that does not appear. Instead, what I heard is there is judgment applied and there are no calculations, but instead the calculations are wrapped up into what's proposed. Think of this as a licensee, how do you verify that? How do you actually do a calculation that says I'm within ten percent if there is no math, there literally was statements in the testimony, there is no formula. These are numbers, data, analysis, there has to be a formula, otherwise, how can you say you're within ten percent? It's math, it's data, it's rates.

Q. Based on your analysis, what was your final opinion?

A. The proposal to Qualcomm was well above ten percent on license fees and royalty rates after total financial consideration, whether you look at MediaTek, Samsung, or Infineon, on all those measures, it's well above.

Q. And by that, how much percentage was it above?

A. MediaTek fees [redacted] percent. Samsung was [redacted] plus percent. Infineon was [redacted] something percent on fees. And then all the royalty rates I showed you earlier, they're all higher.

Q. Okay. Let's turn now to the second opinion that you said you were going to talk about today. This is on the peripheral IP, right?

A. Yes.

Q. Okay. What are your opinions on the peripheral IP?

A. So this is a summary of the offers. That October offer, you remember it was six IPs, it was the three cores, Hunter, Hayes, and Yamin, and then these other pieces of technology, the interrupt controller, the memory management unit, and the ELA, those were in that offer as well.

So the middle column, Arm was seeking without an offer of support and maintenance, so there is nothing included there, 4,063,479, that was the proposal for what they should pay. What did Qualcomm actually pay for the same technology in 2019? 795,000. So that's obviously substantially higher than what they paid previously. So my understanding is in November of '24, Qualcomm accepted the proposal, but then Arm came back and said well that included Hunter, Hayes, and Yamin, you don't get that deal anymore. We're raising the price, and now in January they come back

and say it's $7,852,000 at that time, so it's almost doubling from the October proposal to January. So simple comparison, they paid 795,000 in '19, the offer was 7.8 million.

My understanding is Qualcomm needed this IP and needed it then. So they paid the January 25th proposal amount. And actually included support and maintenance, so the total amount actually paid was about 9 million.

Q. So you said January proposal included support and maintenance, did the October proposal include support and maintenance?

A. It did not.

Q. Okay. Can you explain to us what you're doing here and why we're looking at 2019 rates and discounts?

A. This is what they should have paid. If I look at the price book, sorry, look at what they actually paid in 2019, it was about a 69 percent discount. So I'm looking at what's in the price book in the fourth quarter of '24, apply that discount. If they got the same discount in 2024, it would have been [redacted].

Q. In your opinion, that is the amount that Qualcomm should have paid?

A. I think it's a reasonable estimate of what they should have paid based on the discount they previously got.

Q. Your slide here is entitled Qualcomm's overpayment.

Can you explain to us your analysis here. The middle column is my opinion, Qualcomm paid 9,029,953. If they had paid a discounted amount off the book in 2024, the price book, it would have been [redacted]. The difference in the alleged overpayment on these three IPs is [redacted].

Q. So the $9 million, that's what Qualcomm actually paid?

A. Correct.

Q. And there is another calculation on the right. What is that calculation?

A. So that's -- if under the October 24th proposal that they accepted, I added back 15 percent for support and maintenance, and you compare the difference and it's 4,356,952. So that's of the 7.8 million, how much of it is related just to the increase from October 24th to January 25th.

Q. Okay. Let's move quickly to the Meta deal that we've heard about this week. What are you showing on this slide entitled October 31, 2024, incentive terms?

A. So this law doesn't deal with products sold and profits on individual poducts, it deals with inventive terms, the rebates is another way to think about it. What this is is the incentive terms or rebates that were, the parties were aligned with, ultimately, it was documented in October 31 of '24. But this is the rebates prior to the

impact, alleged impact, of the media campaign associated with the leaked terms of ARM was going to terminate Qualcomm under the ALA.

Q. Okay. And now we're looking at a red line from Meta dated November 11, 2024. What of any importance has changed in your opinion?

A. So, the incentive terms changed, the most material sort of economic consequences of the changes, there are a lot of red lines in the agreement and all that, things change over time, but what changed in this period, in this narrow window of time, right after Arm became aware of and sort of qualified those previous terms and said we're in alignment, but I have to deal with these issues. At that point in time, in that window, this is a big change. So you see there is a reference that's crossed out to XR two, gen 3 and 4 particular chip sets, that's removed, now it says the rebates paid on [redacted]. And even more importantly, it's on any [redacted], it's moved off a deal that was related to a [redacted], and into a rebate related on [redacted]. Here you see that graphically, left side Quest products, right-hand side shows you Ray-Ban glasses, Meta glasses, Oakley glasses, these are all things that are actually being sold in the marketplace at high volumes, so it's a big shift.

Q. And did you calculate the change in value to Qualcomm

of the Meta due to these changes?

A. I did, this is the math, the top line is what actually [redacted]. What would have been made under what I called the align terms, the terms that said yes, we're aligned, but we still have to do the review, that would have been [redacted]. So there is almost [redacted] in rebates that would not have been paid, but will not be paid. [redacted].

I take a step at the end there, some of these in the future, I have to do what's called a present value calculation, so that it [redacted] associated with the change in the rebate terms are 170,689,197.

Q. And you did a second calculation, can you explain why you did a second calculation?

A. [redacted] that that's 206,,982,806. And I'm noting also before we get, that's the number, but [redacted].

Q. And you did your report in this case, in 2025, right?
A. Correct.
Q. Did you have another calculation in that report that we're not talking about today?
A. Yes, because [redacted], so further down the road, [redacted], and at that time I was keeping a calculation in case the [redacted] happened by trial, they haven't, I haven't seen anything in the record indicating there was a [redacted] on those, so they have been removed.
Q. Those two scenarios that we just discussed, are those your opinions in this case?
A. Yes.
MS. NYARADY: I pass the witness.
THE COURT: Thank you.
CROSS-EXAMINATION.
BY MR. LOCASCIO:
Q. This has never been not out when we started the day. I can do this, unless you would rather?
COURTROOM DEPUTY: I would rather.
MR. LoCASCIO: Okay. Thank you, sir.
CROSS-EXAMINATION.
BY MR. LoCASCIO:
Q. Good morning, sir.
A. Good morning.

Q. How are you?
A. Good, thanks.
Q. I think you said this is like the hundredth time you testified in a courtroom?
A. Yes.
Q. So you are a total pro this, right?
A. You never are pro this.
Q. Well, sir, you have been doing this a long time, right?
A. I have.
Q. It's your primary job, correct?
A. Yes.
Q. And for the work you have done, or your team has done on this case, Qualcomm has been paying your firm; correct?
A. Correct.
Q. And have they paid more than a hundred thousand dollars to your firm?
A. Yes.
Q. Paid more than a million dollars to your firm for this work?
A. I don't think so. I don't know.
Q. It's at least several hundred thousands dollars, maybe a million?
A. Yes, I have written five reports, and we have been at this for a long time.

Q. That's just this case, not the prior case where you also did work and got paid for, correct?
A. Correct, my firm did, yes.
Q. Of course. Let's unpack some of the things you just talked about and some things you didn't talk about. And you understand, you have looked at -- you or your team at least have looked at a lot of documents in this case, correct?
A. Correct.
Q. And you look at all the pleadings in the case, see what the claims are, the complaints and the answer, right?
A. Yes.
Q. Okay. So you know, sir, that there are two different defendants in this case, right?
A. Yes.
Q. One of them is Arm Ltd and one of them is Arm Holdings PLC, correct?
A. Yes.
Q. And when you did your damages analysis, you didn't try to draw any distinctions or look at it from either of those perspectives, you just generally treated it as one big Arm, fair?
A. Sure.
Q. You know, sir, that the contracts in this case are between -- let me pull one out. Mr. Schlaifer, can you pull up JTX-5? It's the TLA. Can you just blow up the top.

10:39:32 Thank you.
10:39:32 So the party to the TLA and the party to the ALA is Arm Ltd, correct?
10:39:41 A. Yes.
10:39:42 Q. And you know, sir, that -- I don't think you have it in front of you, but let me actually -- I'm going to approach just for a second and show you one thing.
10:40:00 You know, sir, that the original complaint was filed in this case in April of 2024, during the other litigation, correct?
10:40:09 A. Sounds right. You mean the overall process of that litigation?
10:40:14 Q. And the complaint was originally filed against Arm Holdings PLC, correct?
10:40:19 A. I don't remember.
10:40:20 Q. I'll just come up and show you.
10:40:23 MR. LoCASCIO: May I approach, Your Honor?
10:40:25 THE COURT: You may.
10:40:35 Q. I don't want you to say anything yet, I just want to show that to you.
10:40:43 A. It says Arm Ltd.
10:40:45 Q. Don't say anything yet, sir. I'm asking you a question.
10:40:56 Now, sir, does that refresh your recollection that in April of 2024, Qualcomm sued Arm Holdings PLC as the

named party; correct?
A. Okay. Now I can answer: You showed me -- something else, I got to answer. It said FKA.
Q. Yeah?
A. There is another party there.
Q. So no, that's -- Qualcomm was mistaken of the view that Arm Holdings PLC was formally known as Arm Ltd, and you know from the answer in this case that that's actually not true, right?
A. I haven't looked at this issue, like you said, I have treated Arm as Arm, and I think there has been testimony about that. I don't have any of these legal distinctions.
Q. You know that then in 2026, Qualcomm had to file a second complaint against Arm Ltd, the actual party named in the contracts right?
A. Again, I'm sorry, I don't remember who is on the pleadings.
Q. Okay. Let me show you that.
MS. NYARADY: Can we have a copy?
MR. LoCASCIO: Sure, it's the complaint.
Q. Sir, does that refresh your recollection that in 2026, Qualcomm filed a second complaint to correct that and add Arm Ltd as a party in a second complaint as opposed to the first complaint against Arm Holdings PLC?
A. I don't have a recollection. And that document was

just taken away so, I can look at it again, but there are a number of parties on there, and I don't know why it was done.

Q. You have -- you consider these on your materials and you look at things like the complaint, so you and your team had these documents, agreed?

A. He correct.

Q. And we can agree, though, sir the contracts, the ALA and the TLA, are with Arm Ltd; correct?

A. If you're talking about the 2013 contracts, yes, they're with Arm Ltd.

Q. So you understand this case, for the jury's benefit, this is pretty important, so let's make sure you and I get this right. There is a breach claim for the ALA, correct?

A. Yes.

Q. And that ALA is between Arm Ltd and Qualcomm; correct?

A. So we're really in a legal land that I'm not comfortable with, because as I said, formally, the complaint said -- formally known as Arm Ltd, and there was another entity and I haven't been asked to go through and trace all these legal entities.

Q. You haven't tried to do it?

A. Correct.

Q. And sir, the TLA, which we have on the screen, can we

10:43:54 agree since you had it in your exhibits, you relied on it, the party in that contract is Arm limited?
10:44:01 A. Sure, the 2013, Arm Ltd, correct.
10:44:04 Q. And so as we think about then -- we've got a couple of claims, to set this for the jury, we have an ALA breach, and that alleged ALA breach relates to something called ACK patches and OOBs, correct?
10:44:21 A. I think that was the initial complaint, right.
10:44:24 Q. You didn't offer any discussion or talk about ACK patches or OOBs, correct?
10:44:31 A. Correct.
10:44:31 Q. So on the first claim, whether Arm has breached the ALA with connection to ACK patches and OOBs, you are not offering and have not offered any opinion about any damages or harm for the ALA breach claim. True?
10:44:58 A. So I'm confused about --
10:45:02 Q. Let me ask you again. You just testified and you covered a couple of things and you offered your opinions to this jury on various topics, agreed?
10:45:11 A. To the jury, yes.
10:45:12 Q. And you, sir, had a slide -- you had a slide summarizing your testimony, and you had three points on that slide; correct?
10:45:35 A. Correct.
10:45:35 Q. And you do not have a point on your summary of your

testimony slide that relates to the breach claim of the ALA with respect to ACK patches and OOB, correct?
A. Correct.
Q. And you have not offered this jury any opinion about any harm or damage allegedly resulting from any breach of the ALA; correct?
A. I am not speaking with the jury about ALA breaches, correct.
Q. You're not offering any quantification of it, nor have you identified any such harm; correct?
A. Not for the jury. I think there is a separate ALA discussion with the judge.
Q. Sir, you're not offering any opinion here about any damages under the ALA, true?
A. True, in front of the jury, that's true.
Q. Sir, you haven't offered any testimony to the judge, the jury is not privy to, either, correct? In this case, you have not testified somehow, as you just described, to the judge about this, have you? Have you done that, sir? In this case, sir, have you testified in front of the judge, answer the question, yes or no?
A. Not yet.
Q. Sir, you have not quantified any harm that Qualcomm allegedly suffered as a result of Arm allegedly breaching the ALA, true?

A. I have not quantified any harm. I know Qualcomm is asserting harm, but I haven't quantified it, that's not my assignment.

Q. So they hired you to do a lot of stuff and paid your firm a lot of money to do that, correct?

A. My firm is billing for my time, sure.

Q. But they have not had you quantify any ALA harm, true?

A. That is true with what we're talking about today.

Q. And you were in the courtroom the whole time and you were here when Mr. Amon testified, correct?

A. Correct.

Q. And were you here when Mr. Amon said all the chips under the ALA performed as intended, were you here for that?

A. Yes.

Q. And you were here when Mr. Amon said they've suffered no injury or harm at Qualcomm, with respect to any chip that went out to the market under the ALA, you were here for that, too?

A. Where it says from a chip going out to market that had a problem with its verification, I heard that.

Q. So you're not offering anything to the jury on the ALA. Let's go to the TLA. And you had a slide you showed the jury -- Mr. Schlaifer, do you have PDX 6.5, which I believe is the slide Mr. Kennedy showed the jury.

Now, this is the version of -- the title of your slide -- did you prepare these or did the lawyers prepare these for you? Was it a team effort?
A. I asked can you put these provisions in and can you highlight these things. But I do the highlighting.
Q. So it was your choice to pick which portions to show the jury?
A. Yes.
Q. Well, the title says TLA Section 8.1, this is not the entirety of TLA Section 8.1, is it?
A. Correct.
Q. You blew up some parts, and other parts it looks like you and your team made fainter so we can't really see them very well, correct?
A. So usually you know that I'm looking at an actual document in the background, I put the document in grayed out or it's in a box or whatever, so that you have some context that I'm not just making this up, but I'm showing you the sections that are important for my testimony.
Q. The ones you're relying on for the opinions you're offering this jury?
A. Sure.
Q. How about we actually look, you said the point of this, I guess the point of this grayed out part behind it was so that jury would know that you weren't making it up,

you weren't hiding something. How about we look at the actual document? Mr. Schlaifer, can you pull up JTX-5 at page 13. Then can you blow up 8.1, A and B. Okay.

So can we agree that what we're looking at here on the screen at 8.1 A and B is the actual language of the TLA that controls here?

A. The language that controls sounds pretty legal to me, but this is what the document looks like in this format.

Q. But hang on a second sir, you said you testified in a hundred cases, a bunch of them are contract cases, you understand the phrase "the contract controls"?

A. Right, but that's when --

Q. You're definitely careful about how you're answering, but I want you to answer my question, sir, and the contract language doesn't just, whether you think it controls in the case or not, when you did your analysis, did you consider that the contract language should control your analysis?

A. What do you mean by that?

Q. Well, I'll answer it, sir. When you did your analysis, did you say well, I'm going to take into account the whole of the contract provision, 8.1(B), or did you think I'm just going to pick certain sections and look at those sections, which is it?

A. Can I tell you my process?

Q. Sir, I asked you a question, I would like you on my

time, you have plenty of time on Qualcomm's folks side, to answer my questions.

Do you agree you have to consider the whole paragraph, or do you think you can just look at certain portions, which is it?

A. I read the whole document, but I'm a damages guy, I look at the provisions that relate to my opinion, there are terms in here that are really legal or don't effect me, so I'm trying to get some guidance from the document to say what's the lowest royalty rates, what is the previous best deal, total financial considerations, because I'm doing financial analysis. There are other things in here that have been discussed that frankly are legal and I don't -- I can't have any opinion on.

Q. You had some opinions about whether the folks at Arm, I think your language was, well, where is the documents, this sounded like they were using judgment, do you remember when you talked about that on direct?

A. Right, when I was talking about Arm's testimony, sure.

Q. Okay. Well, just this is pretty simple, sir, do you agree that this paragraph is what ultimately is for the jury to decide whether there is a breach or not?

A. I'm not telling the jury what --

Q. I'll ask a different question, sir. You're not here

offering any opinion that Arm breached the TLA, are you?
A. Correct.
Q. You're not offering?
A. That's right, that's for the jury, not me.
Q. And with respect to this paragraph, let's look at the actual language in the paragraph. Mr. Schlaifer, can you blow up where it says 8.1(B), there is an initial request and a subsequent request. Let's start with that. Qualcomm's initial written request, Qualcomm's subsequent request.
You're not offering any opinion that as to whether or not your in October of 2024, Qualcomm's request for a Hunter, Hayes, and Yamin license was an initial request or a subsequent request that triggered this paragraph, are you?
A. No, that's why there is another expert or witness that talked about that, that was a lawyer, so that's a lawyer thing. I'm here for the financial things.
Q. So your analysis assumes in it that the October request, which came more than a year after the first Hunter, Hayes, and Yamin agreement, you're assuming that that somehow is applicable to 8.1(B) for your analysis?
A. I'm just assuming that if Arm is going to propose royalty rates to Qualcomm, they have to be within ten percent of the previous best deal after total financial

considerations, that's my job here, the rest is not. That's me.

Q. Well, so you're assuming, as you just said, that Arm, whether Arm did its job or not under the provisions of 8.1(B)?

A. I would be more precise like I did, because I'm talking about numbers, data, financial things, so I'm not going to say did its job, I'm going to say is the deal, the proposal to Qualcomm, within ten percent of the previous best deal or not.

Q. Just math, you said it on direct, it's just math?

A. It's quantitative for sure, but it's more than simple math.

Q. Sir, let's talk about that. You said it's quantitative, if it wasn't quantitative, how could you verify it, do you remember that?

A. Definitely.

Q. You have seen plenty of contracts, sir, where a party has what's called an audit right, correct?

A. Yes, sure.

Q. An audit right, means the other side is supposed to do some analysis and then you have a right to audit it to make sure they did it correctly. Fair?

A. Fair.

Q. You know this contract does not give Qualcomm an

audit right to go in and check and see if the work was done correctly or not, right?

A. I didn't look at that. I'm assuming it's true.

Q. You're not aware of one, correct?

A. Of an audit right?

Q. Yes?

A. No, there is a provision here that says what Arm is supposed to do.

Q. Let's talk about what it says. Mr. Schlaifer, right after the subsequent request, you can highlight Arm will in good faith, and there is a colon.

So you understand the parties agreed that Arm's responsibility was not just quantitative, meaning math, it was also qualitative in that Arm had to act in good faith. Right, that's the test in the agreement?

A. That's not my test, that's -- I can never say there is good faith or not, that's for the judge or the jury. So it's in here and it says, and I'm assuming Arm is going to act in good faith but it's not something I look at as a damages expert.

Q. Except you did offer the jury some testimony that this doesn't seem reasonable at all and how could Arm have picked this rate over that rate, do you remember when you did all that?

A. You're getting the point, that's what I said, there

10:56:57 is no bridge between the lowest rates in Samsung and what
10:57:02 was offered.
10:57:02 Q. You're suggesting from the witness stand to the jury
10:57:05 that hey, this doesn't seem like it's really in good faith
10:57:08 because this math just ain't mathing, do you remember that?
10:57:11 A. No, I did not use the words good faith, what I said
10:57:15 is Arm testified that they looked at certain quantitative
10:57:18 things, pricing, units, number of IPs, and then using that,
10:57:24 went from four percent to 7 percent, and they said to be
10:57:29 clear, they said judgment.
10:57:31 Q. Sir, I get it that you are a pro who has testified in
10:57:34 a hundred cases, and you're being paid by them. Can you
10:57:37 just do me a favor and answer my questions and any other
10:57:40 testimony or argument you want to make to the jury, you can
10:57:42 do on their time, okay?
10:57:44 A. A hundred percent agreed.
10:57:47 Q. Okay. Great.
10:57:49 You agree, sir, you are not offering an opinion
10:57:53 on whether Arm's dealings under 8.1(B) are in good faith?
10:58:00 A. Correct.
10:58:00 Q. That's not something in your expertise that you came
10:58:04 here to offer an opinion on, correct?
10:58:06 A. Right.
10:58:06 Q. That's for the jury to decide?
10:58:09 A. Exactly.

Q. And in addition, you were here when Mr. Weiser testified about some of the back and forth, and do you remember in those documents it also said look, sometimes these things aren't apples to apples, sometimes different licenses have different features, so in the negotiation for this provision, they made sure Arm was able to use its reasonable judgment to determine how do you compare an apple to maybe an, I don't know, orange, or how do you compare an orange to a clementine, do you remember that was in Mr. Weiser testimony?
A. You lost me there, because we're talking about legal things, and Arm's intent and apples, I heard the testimony, but I'm not tracking you.
Q. Let's look at what else is in the actual agreement where it says, we talked about our previous best deal, but you recognize that the final rate that Qualcomm gets is actually based on something called total financial consideration, true?
A. Exactly.
Q. And where that's described, Mr. Schlaifer, could you blow up for me in 8.1(B) (2), it goes on to say Arm -- such an offer shall be for license fees and royalty rates that Arm reasonably determines based on Arm's comparison of all financial considerations. Do you see that?
A. Yes.

Q. So twice more in this provision, Arm is given the ability to reasonably determine, correct?
A. Correct.
Q. Based on Arm's comparison of all financial considerations, correct?
A. Correct.
Q. What the total financial considerations will be, and that's what the offer is based on, correct?
A. No, look at the rest of it.
Q. Sir, such an offer shall be for license fees and royalty rates that Arm reasonably determines, we agree that that's what it says?
A. Agreed.
Q. So there is a determination that Arm has to make, right?
A. Correct.
Q. And that determination must just be done reasonably by Arm, correct?
A. Well there are more words here that guide this.
Q. And Arm is the one to compare all financial considerations, right?
A. Right, Arm has the agreements, Arm has all the, there is a dispute about what can and can't be showed, Arm has control of that document, they're the only one who can actually do this calculation, this comparison, and make sure

that this most favored nation or previous best deal is enforced, they have the documents, they have the data.

Q. Well, you are not offering an opinion on Arm's good faith or on Arm's reasonable judgment, you're offering an opinion on, as you said, math?

A. Yes, with the use of the word judgment, and so what perked my ears up when I was listening to the testimony, was the imposition of judgment in a quantitative process.

Q. Do you think it was improper that Arm used its own judgment?

A. I'm not going to say improper.

Q. You say your ears perked up?

A. It's judgment, it's not quantification, this is a quantitative exercise, look at all the agreements, do the analysis and then see what that total financial consideration, it doesn't say use your best judgment and go from A to B in the way that was described.

Q. I think you tried real hard to say you're not a lawyer and you're not the guy to talk about what the contract means, right?

A. Right.

Q. Except the contract says Arm will in good faith reasonably determine and your opinions suggest that Arm has no ability to apply its judgment in that analysis?

A. No, my opinions deal with the other words that are

not highlighted. Those things that are actually factored into Arm's calculation to determine the license fees and royalty rates of the previous best deal. What did Arm do with Samsung in determining that rate, use those financial considerations, and apply them to the offer made to Qualcomm, is it consistent or not.

Q. So let's look at your opinions on -- so there is -- if we could, Mr. Schlaifer, take out the last highlighting, and same with that.

So there is two steps that Arm must do in good faith in 8.1(B). And the first is B one, right after the highlighting in good faith, it says Arm must investigate and determine the Arm license agreement with a third party for the same Arm implementation core, correct?

A. Correct.

Q. On the same date with the lowest rate previously agreed with such third party to use the same Arm implementation core. So the first step is Arm has to, in its good faith, go investigate and determine who else has the best rate, agreed?

A. Correct, look at all the agreements, what is the lowest royalty rate.

Q. Sir, I know you really want to talk and enjoy doing it, I'm asking you to do me a favor, I'm asking you a simple question, give me a simple answer, okay?

A. Sure.
Q. Step 1, Arm has to in good faith go investigate and determine who was have has the best rate, fair?
A. Fair.
Q. And there are three cores, this now relates to the TLA breach claim for Hunter, Hayes, and Yamin, and Qualcomm's first breach argument is that Arm didn't meet its obligations in good faith under 8.1(B)(i), meaning Arm didn't properly do this step. You understand that?
A. You keep saying in good faith, I don't understand the specific claims. I know that Arm -- sorry, Qualcomm is asserting they did not get a deal proposal consistent with this agreement.
Q. Well there is multiple different alleged breaches. One, is that they don't like the rate they got quoted, that's like two steps past where we are right now, sir. The first step, they have also alleged Arm didn't investigate and determine the previous best deal correctly. You understand that, right? That's literally your slide six where you identified which one satisfies Arm one B one?
A. I'm pausing because that may be Arm -- that may be Qualcomm's contention, but that's my opinion is that the investigation did not identify the lowest royalty rate.
Q. So you offer an opinion that under this provision, 8.1 B one, Arm got it right for Hunter?

A. Correct.
Q. Arm got it right for Hayes?
A. On which is the lowest royalty rate, correct.
Q. So 8.1(B)(i), that little one, apparently is called a romanette one, 8.1(B)(i), Arm didn't breach that provision for Hunter, under your opinion, because they did correctly determine the previous best rate for Hunter?
A. I'm not here to say they did or did not breach.
Q. What you are saying is Arm in fact did, after its investigation, determine the previous best rate for Hunter, and it was Samsung?
A. Correct.
Q. And you're also saying that Arm under 8.1(B)(i) did correctly after its investigation determine the previous best rate for Hayes, correct?
A. Previous best deal for Hayes was Samsung.
Q. And you know that's what they -- you say that's the previous best rate and that's what the contract wrote for Hunter and Hayes?
A. It's the lowest royalty rate, let's stick with that.
Q. Yamin, I guess is where the action for for 8.1(B)(i), your opinion is Infineon, this was your slide, was in fact the previous best rate for Yamin under 8.1(B)(i)?
A. It's the lowest royalty rate for Yamin, yes.
Q. You know, sir, that on the Arm side, you were here

11:06:11 for the testimony, they looked at the previous best offers for Yamin, and there was a situation where the they had licensed Yamin for free, zero to Samsung, correct?

11:06:23 A. Not quite.

11:06:25 Q. Well, sir, you know when they did the previous best deal analysis at Arm, in good faith, they determined that the previous best deal for Yamin was in fact Samsung, you know that's what Arm determined?

11:06:39 A. At one point in time, they said Samsung has the lowest royalty rates and is the previous best deal.

11:06:46 Q. And the reason for that was because, you heard the testimony, in certain circumstances, the rate for Yamin is zero in the Samsung agreement, correct?

11:06:56 A. That's not in the documents, but it is testimony.

11:06:59 Q. Well, can we agree because you said lowest, just say lowest, don't say previous best rate, can we agree with the simple proposition of zero is the lowest rate that anyone has for Yamin?

11:07:12 A. Zero is obviously the lowest possible number you're going to get, however, that's not how it applies here.

11:07:18 Q. I understand you disagree with that zero was the previous best rate, but we can agree that the zero rate is a better rate than the [redacted] whatever it is that Infineon has?

11:07:32 A. Zero is a better rate than [redacted], but it's not the rate that applies for this agreement.

Q. Sir, you did a lot of analysis or somebody on your team did, you looked at the Samsung agreement, correct?
A. Correct.
Q. Mr. Schlaifer, can we pull up PTX 1057 at page 8. And can you blow up for me this top half, royalty rates for Arm products.
So, you know a Yamin core is sometimes called a Cortex M, correct?
A. Correct. M55 I think.
Q. And a Cortex M, this is one of many pages in the Samsung agreement that you looked at that Arm identified as the previous best deal, and it says royalty rates for Arm compliant products, which incorporate a single Arm compliant CPU, which is either a Cortex M and it goes through the Ms, do you see that?
A. Yes.
Q. And then down here, it says where there are multiple Type 1 products in the same Arm compliant product, only a single royalty shall be payable, do you see that?
A. Yes.
Q. And then there is kind of the rules, it says the royalty rates shall be applied in the following order, meaning you only have to pay one rate, but this is the pecking order, and the top one is royalty rates compliant with v9 subscription CPUs that would be something like a

Hunter and Hayes, correct?
A. Correct.
Q. And then .3, I guess romanette three, would be a multi processor Arm compliant core. The Yamin is down here in the [redacted] zone, correct?
A. I think so.
Q. So the way the Samsung agreement works is if you pay the Hunter rate or Hayes rate, you would not pay the Yamin rate. Agreed?
A. Not quite.
Q. Well, under this language in that circumstance, the rate for Yamin would be zero, true?
A. If you use Yamin with Hunter and Hayes in a total package, if someone were, they would not pay an additional amount for Yamin, but that's not what Qualcomm does.
Q. Well, sir, let me ask you about that. Because in was the second time around that Qualcomm had asked for a license for Hunter, Hayes, and Yamin, correct?
A. What do you mean the second time around?
Q. Well this was not the first license or the first initial request that Qualcomm took to Hunter, Hayes, and Yamin, right? That happened in 2019?
A. So the initial license in 2019, as they're approaching the end, this is looking for renewal.
Q. You just got a lot you want to get in there, sir, if

you can just answer my questions, this will go a lot faster for us.

You know, sir, that in the back and forth, we saw with Ms. Varma a bit ago, that Qualcomm had an idea with their lawyers to say hey, let's go ask for a Hunter license to try to get some movement to the peripheral IP, you were here for that, right? You saw that document, didn't you?

A. Here is one where I have to use more words. You say they had a deal with their lawyers to extract this, and I heard the testimony. They wanted to get a rate for Yamin, Hunter, and Hayes. They were not getting a response from Arm. So they were trying to say how do I get a response, we need this. How do I get a royalty rate? You can characterize it however you like, that's my understanding of the facts, and they did what they had to do to get an offer, to get an actual royalty rate for something they needed or something they were going to need in two years for the next set of chips serving the market.

Q. Let's talk about where you just went, which is that you understand, sir, that under these agreements -- let's start with this. Qualcomm currently has rates for Hunter, Hayes, and Yamin that were agreed to in 2019, correct?

A. Correct.

Q. And those have existed since 2019, they existed all through 2024, and they exist even today, correct?

A. Until next Sunday.

Q. And you actually know, though, that under the parties' agreements, if you have made a chip, and then the license terminates, you can keep selling that chip at the previous rates for 15 years, correct?

A. If you have taped out a chip during the contract period, then you can use those rates.

Q. Okay, just so we're clear, the jury understands the allegations around the expiration of Hunter, Hayes, and Yamin. Under the 2019 Hunter, Hayes, and Yamin rates, if Qualcomm taped out a chip in 2024, 2025, or any time before next week in October 2026, they could keep selling that chip and keep paying 2019 rates on that chip for another fifteen years, correct?

A. I think that's right.

Q. Okay. So with respect to the TLA and Yamin, Mr. Schlaifer, can we go back to the TLA, please. JTX-5. Great.

So with respect to A.1.B.i, your view is Arm didn't determine the best rate for Yamin, because they didn't -- they quoted them in a bundle zero, they looked at it in a bundle and in a bundle they gave them a quote of zero, correct?

A. There is nothing to indicate that that's the case. I don't think they offered zero for Yamin, they offered

2.2 percent.
Q. Mr. Schlaifer, can you pull up DTX 29. Okay. Leave it on this page for a second.
This is the offer for Hunter, Hayes, and Yamin and the peripheral IP that you used in your analysis, DTX 29, correct, October 24, 2024?
A. Correct.
Q. And let's go to the next page. So these are the terms. And the terms have at the top license fees and that means this is the upfront payment and depending on how long a term you want, the rate is different, fair?
A. Fair.
Q. And if we just look for scale, order of magnitude on this, if I just want a single use license to Hunter over on the right, my upfront fee if I don't agree to a long-term deal is going to be like $9.5 million under this proposal, correct?
A. Correct.
Q. But if I agree to take it for seven years, well that up front fee is $32 million, correct?
A. Correct.
Q. Can we agree you're saving money on a longer term because seven times 9.5 would be what, around $48 million?
A. That sounds right. You paid 32.4 million, it's not really saving money, you're paying a lot more.

Q. Hang on, sir. If you paid every year for a single use license for seven years at this pricing, you would pay more than the seven-year up front fee correct?
A. Nobody ever does that, the math is that way, you go longer you get a discount.
Q. If I take a longer lease for an apartment I might be able to get a better rate than if I take a short term lease, fair?
A. Yes.
Q. These numbers are the upfront numbers and then if we go below here there is royalty rates. And there is a section over here that your charts use, your charts use royalty rates based on a percent of ASP, or average selling price, correct?
A. Correct.
Q. There is also a whole section over here in the proposal that I don't know that you talked about at all. Mr. Schlaifer can you just blow up the whole of that bottom so we can see it better.
On the right side, Arm quoted Qualcomm what it called total compute configurations and they offered four different configurations. And this one is up to 8 Hunter cores and up to eight Hayes cores, that's called gold. This is up to two Hunters and eight Hayes, called silver plus, et cetera, and then down here to bronze which is up to four

Hayes chips, correct?
A. Correct.
Q. You seen other proposals like this, where you say okay, it's bundle and if you use these together, here is the rate, correct?
A. Yes.
Q. Let's say five to eight, this 720 is Hunter, correct?
A. Yes.
Q. And 520 is Hayes, true?
A. True.
Q. So if you had eight Hunter cores and eight Hayes cores, and you didn't have this bundle over here on the right, you would say seven percent for the eight Hunter cores and then you would pay six percent for the eight Hayes cores, correct?
A. If you put 16 cores ever those two, Qualcomm doesn't put those 16 cores together as you described it, but hypothetically could go with this.
Q. Sir, if you had two, you know there is big and little, you seen they use these terms?
A. They have all these systems on a chip and you put multiple cores together, right.
A. Right.
Q. These over here are bundles, can we agree on that?
A. We can.

Q. And this asterisk says any number of Cortex M55, that's Yamin, correct?
A. Correct.
Q. Allowed in these four configurations for no additional royalty. Did I read that correctly?
A. Yes.
Q. So for the bundles, Arm quoted Qualcomm a rate of zero for Yamin if used in one of these four bundles, true?
A. Not for each implementation core, but for a bundle that Qualcomm doesn't use, they could get Yamin for free.
Q. And you know, sir, that Arm asked Qualcomm how do you plan to use these cores, and Qualcomm didn't give them an answer, right? Did you see that when you were doing your analysis?
A. I have seen claims, but Arm has that data, Arm knows what Qualcomm does with Hunter, Hayes, and Yamin, since 2019, they have seen that, they get royalty reports.
Q. Do you even remember what my actual question was?
A. I think you said the specific words, no, you asked me about Yamin and this one percent rate and I'm saying it doesn't apply.
Q. First of all, sir, it's not one percent, it's zero?
A. Zero, sorry.
Q. Second of all, my question was, you know that Arm actually engaged with Qualcomm to find out how do you want

to use them and Qualcomm didn't answer. You know that, right?

A. I don't know the specifics facts but I know Arm claims they didn't get enough detail on how Qualcomm was going to use the chips they have been using for the last five years.

Q. And your version just now was well, they have been using it for a long time, but you never show the jury -- you talked about the 2019 rates but you never showed the jury what those rates were. Let's look at the 2019 rates that were provided. This is DTX 906. You have a binder there, it's in there if you need it?

THE COURT: Why don't we take -- this is going on for a bit. Why don't we take our morning break.

COURTROOM DEPUTY: All rise.

(Jury exiting the courtroom at 11:19 a.m.)

THE COURT: All right. Fifteen minutes.

(A brief recess was taken.)

COURTROOM DEPUTY: All rise.

(Jury entering the courtroom at 11:36 a.m.)

THE COURT: All right. Welcome back, everyone. Please be seated.

Let's continue.

MR. LoCASCIO: Thank you, Your Honor, may I proceed?

11:36:57 THE COURT: You may.
11:36:58 MR. LoCASCIO: Thank you.
11:36:59 BY MR. LOCASCIO:
11:37:01 Q. So, sir, before the break we were discussing that whether or not it was good faith for Arm to look at the previous best deal as a bundle, as opposed to individually, and give a proposal tied to a bundle.
11:37:20 We looked at the 2024 proposal for Hunter, Hayes, and Yamin, DTX 29. And if we could, just to level set where we were, Mr. Schlaifer can you pull up DTX 29 at page 2.
11:37:38 And so, we talked about the total compute configurations, or the bundles, do you remember that?
11:37:46 A. Yes.
11:37:47 Q. Can we go to DTX 906? And DTX 906 is the master royalty schedule between Qualcomm and Arm, from 2019, in October of that year. Correct?
11:38:02 A. Correct.
11:38:02 Q. And you understand that was the original proposal that was accepted by Qualcomm for rates for Hunter, Hayes, and Yamin; correct?
11:38:11 A. Rates and agreement.
11:38:13 Q. This was the -- Qualcomm made an initial request for rates on Hunter, Hayes, and Yamin back in 2019, correct?
11:38:20 MS. NYARADY: Objection, Your Honor. There has

been a ruling on a motion related to this.

THE COURT: Can we just over here for one minute?

(Side-bar discussion:)

THE COURT: I don't know what ruling you were talking about.

MS. NYARADY: In the Daubert hearing, Arm raised the fact that will Kennedy had in fact looked although this 2019 rates and in his expert report had done a comparison, that was before we got the other TLA agreements. Once we got the new TLA agreements he revised his opinions with his agreements.

At Daubert, Arm moved to exclude any testimony by him about those that involved those 2019 rates.

MR. LoCASCIO: The issue at the time was they were taking the position that they are own 2019 rates could have been the comparator and we said that's not our rates, that's a third party, they were arguing they themselves could be the third party. At the conclusion of that, they agreed they would not offer an opinion that said comparison of the rates.

The point I'm asking him about, this is the 2019 version, this is a page of that exhibit, 906 which is in evidence. 906 has made, you may recall this compute question which he he would say why would anyone think we

would want to use these together, its should have been individual, it's exactly the same structure Your Honor. Our previous engagement with him on Hunter, Hayes, and Yamin was bundle gold silver plus silver and bronze and the witness says you shouldn't have done it that way, why would anyone do it that way, this is how they had previously negotiated with Qualcomm.

MS. NYARADY: It's limited to just showing that that combination with was in the prior agreement.

THE COURT: That is what it is.

MR. LoCASCIO: I'm not going to point out the the rate difference, the rates have gone on, they agreed, it's 2019 versus 2020 is the --

MS. HARTLEY: You did say I would not shown the jury anything about the 2019 rates and that's because you guys said he could not say anything about the 2019 rates, that's what you said right before the break.

MR. LoCASCIO: He said they went up, but regardless, I'll ask about the packages.

THE COURT: He didn't ask that. He didn't. He said you understand that was the original proposal that was accepted, the rates, rates and agreement, and then Qualcomm made an initial request for rates on Hunter, Hayes, and Yamin back in 2019, that was the -- those are the two questions.

MS. NYARADY: As long as there is no implication that somehow he should have done this on direct. Objection is withdrawn.

THE COURT: Thank you.

(End of side-bar discussion.)

BY MR. LOCASCIO:

Q. Okay. So we looked at the 2024 proposal that offered bundled Hunter, Hayes, and Yamin together, this is the 2019 agreement between Qualcomm and Arm, with respect to Hunter, Hayes, and Yamin. Agreed?

A. Yes.

Q. DTX 906. And Mr. Schlaifer, can you go to page 17. Can you blow up table G.

So I want to direct your attention to the tier and the configuration section of this slide. Or this chart. So in the agreement between the parties in 2019, Arm proposed and Qualcomm agreed to a proposal that had bundles, correct?

A. Correct.

Q. And those bundles had names like gold, silver plus, silver and bronze, do you see that?

A. Yes.

Q. Those are the same categories that were in the actual 2024 proposal, as well, correct?

A. I don't remember, but sure.

Q. And do you see where it says let's say gold, big core, maximum of eight big cores, small core, maximum of eight small cores, Cortex M cores, do you see that?
A. Yes.
Q. A big core, that's Hunter, right?
A. Right.
Q. Small core is Hayes?
A. Right.
Q. Cortex M is Yamin, correct?
A. It is a class, yes.
Q. Mr. Schlaifer, can you take -- you can't see my pointer, but the gold to bronze section of this document, which is DTX 906, and put it on the left side of the screen, and then on the right side of the screen, to make it fit better, actually it would be great if you could only take the first two columns, because I don't need the other stuff for this comparison. There you go, on the right side, do me a favor and take DTX 29, the total compute configuration chart on the right, the right, the right half of royalty rates, that whole chart, footers included, please. Thanks. That's awesome.
So on the left we have 906, that's a 2019 agreement between Arm and Qualcomm, right?
A. Right.
Q. And on the right, we have the proposal in

October 2024 that Arm made to Qualcomm, correct?
A. Correct.
Q. And so in both instances, there were bundles that included Hunter, Hayes, with Yamin, correct?
A. Yes.
Q. And that includes at the gold tier, which was up to eight big Hunter and eight small Hayes and Yamin, that's the same thing with configure one with the asterisk in the proposal of October 2024, right?
Q. Right. That's the same for silver plus, silver, and bronze, agreed?
A. Agreed.
Q. And I know you said it's just math and you know, comparing these things is just math, and it's what you do. Can we agree, sir, that it can be pretty complicated?
A. Right, I wasn't trying to say it's just math, but there is math involved for sure, and it can be complicated.
Q. Mr. Schlaifer, can you blow back out, thank you, this was great, DTX 906 for me, and go to the front page.
So in the master agreement, the rates we just looked at were on page, I think 17, but can you go to page 26? In the parties' agreement, they set forth royalty calculation examples, correct?
A. Correct.
Q. And this starts on page 26 of DTX 906. And if you

could, Mr. Schlaifer, could you leave it so we could just see the full screen. I appreciate that. You see this page has examples 1, 2, 3, and 4, and the beginning of 5, and 1 might be fairly simple, right, it's just as a running royalty and as an amount. But then they start to get more complicated when you mix and include different things with different rates. Fair?

A. Fair.

Q. Can you just flip through the pages, can you get two on the screen at a time? 26 and 27, we got examples all the way through 10 of royalty calculations, how long does this go on for, sir, do you know?

A. There are a lot. It's a lot. It goes through page 73, and there are 143 examples.

Q. So in the parties' agreement on how to calculate this and how to figure out what rate applies depending on a combination of cores or different cores, am I correct that there were 144 examples in the parties' agreement?

A. Sounds right.

Q. And if we look at one of these, let's just -- I'll just randomly pick one, how about we take 138, page 70 of the document. Just blow that up. So the parties' agreement, they said well one of the examples was if it contains the following cores, one Makalu and three Hayes, how you have to figure out what the rate pays, in this there

are several steps and tables involved, and ultimately, at the bottom you get to this total royalty. That's sort of the process for most of these chips, or most of these examples, correct?

A. For the examples, sure, but this is Makalu and Hayes.

Q. I picked one of the 143, sir. My point is for Arm or anyone to figure out in a combination what the rate is, can we agree it's certainly not just simple math, there are a lot of assumptions that go into it, a lot of calculations that go into it, and a lot of factors?

A. Not necessarily, it's not that hard. This is combining different types of processors and different combinations, this is the kind of thing you see in a royalty agreement, where there are different tables just to give clarity to the parties about how you calculate it.

Q. You said most royalty agreements have different tables, we can agree this agreement between the parties had like 70 pages and 143 different examples of how you calculate the rate?

A. Agreed.

Q. Thanks, Mr. Schlaifer.

You remember Mr. Shivashankar was here, and he said they have hundreds of TLA licenses out there?

A. Arm?

Q. Yes, Arm.

A. Yes.
Q. And they get multiple requests for TLA pricing from Qualcomm and other companies, agreed?
A. Sure.
Q. And you know Mr. Shivashankar walked through on his testimony the spreadsheet, it's PTX-1423, that you've seen, correct?
A. Walked through?
Q. Meaning he talked about it and it was shown to him.
A. Okay.
Q. You remember that, right?
A. Sure.
Q. And there were various different company's rates on that spreadsheet, correct?
A. Correct.
Q. And there were also notes indicating why Arm believed Samsung was the best comparable, and why it ultimately wasn't, after total financial consideration, the one that was used, do you recall that?
A. I'm not tracking the words as you used them about best comparable, they said Samsung has the lowest rates and is the previous best deal. They also said MediaTek is the previous best deal in the document.
Q. Sir, you heard Mr. Shivashankar testify about Samsung was the previous best deal he used, correct?

11:50:24 A. Yes.
11:50:24 Q. And based on that, you said okay, Arm did the right thing under 8.1(B)(i) for Hunter, Hayes, and Yamin, right?
11:50:33 A. Arm did the right thing.
11:50:34 Q. Got it correctly?
11:50:35 A. They picked the lowest rate, yes.
11:50:37 Q. And then for Yamin, that's where we had that conversation before where you disagree with what the previous best deal with what Mr. Shivashankar came up with, right?
11:50:46 A. Infineon had the lowest rate.
11:50:51 Q. Assuming the lowest rate is not zero?
11:50:53 A. Looking at the agreement, looking how things are done in that provision, it's Infineon.
11:51:00 Q. And then you have to take that a step further, you have to actually get to total financial consideration before you can actually check to see if it's within ten percent, agreed?
11:51:10 A. Agreed.
11:51:11 Q. You had a slide, sir, that was in your deck. Mr. Schlaifer, do you have -- I have it as slide ten from Mr. Kennedy. Qualcomm proposal V Samsung. This is not after taking into account total financial consideration, correct? These compares as you put on the slide for the jury, slide ten, showing a premium over Samsung between the

proposed rates for Hunter, Hayes, and Yamin and Samsung's, this was not compared taking into account total financial consideration, was it?
A. This is part of the total financial considerations, the royalty rate doesn't change. It's the fee that changes that you have to adjust.
Q. But this is before the adjustment, correct?
A. No, this is part -- so what you do is you look at the --
Q. Sir, in the interest of time, sir, let me ask you the questions and try to answer what I ask you. The slide on ten, that you showed the jury, just what we're looking at here on ten with these numbers, this is not taking into account total financial consideration, this is just rate versus rate?
A. Right. I was discussing the first part, who has the lowest rate.
Q. Okay. So this slide, we have these percentages, is not the actual calculation that is to be done under 8.1(B)(ii), is it?
A. Incorrect, it's part of it.
Q. It's certainly not the end of it, you haven't done all the steps yet?
A. The other steps are in the rest of the slides.
Q. And you then go through an exercise where you try to

figure out to line up the terms between these agreements and to line up the values of different agreements compared to what Qualcomm got, fair?
A. Fees, I adjust the fees.
Q. You only look at the up front fee, you didn't look at any other financial considerations?
A. A little misstatement there. You look at the rates and fees, and you do an analysis of rates and fees in total financial consideration, right, so you're looking and adjusting the fees to make them comparable.
Q. There are other things described in financial considerations in the actual agreement, right, beyond just rates and fees?
A. Right.
Q. You understand the difference between Qualcomm's argument and Arm's position is Arm said, and Mr. Shivashankar talked about it, we looked at the total financial considerations and we came up with a number, and Qualcomm disagrees with that, that's kind of why we're here on the TLA Hunter, Hayes, and Yamin?
A. I heard that testimony.
Q. This is the slide you showed the jury this morning. Can we focus, Mr. Schlaifer -- on, which I said the whole agreement, you said these are the important parts or at least something to that effect. Do you remember that?

A. Yes.
Q. So you understand and you worked with your team to prepare these slides before this morning, right?
A. Right.
Q. And you said, I think on your direct, or maybe it was me, that you picked what you thought was important to highlight, do you remember that?
A. Yes.
Q. This was the one that came to court this morning. Let me show you the one we had as of yesterday for you. You notice the difference between the slides you had prepared in advance and then at some point between last night and this morning, you decided you should highlight some other stuff, correct?
A. It wasn't last night. Before last night, I said we need to put additional highlights on here.
Q. Sir, you looked at your slides before they were provided to us this week, correct?
A. Correct.
Q. And when they were provided to us this week, the all financial -- Arm's comparison of all financial considerations and license rights, without limitation, et cetera, et cetera, total financial considerations, was not something you thought needed to be highlighted to the jury when this was prepared originally?

A. **No.**

Q. **This is just a mistake, somebody on your team forgot to highlight that?**

A. **No it's not a mistake, I looked at the term and said it would be helpful to the jury if they had those additional things highlighted, so I highlighted that. It's just like when you sit here and said Mr. So and so, can you highlight that?**

Q. **You created a slide with your team, and you sent it out to us, and you only highlighted fees and rates ten percent, that was the original version, correct?**

**This is the one we're looking at, was your original version of the slide, emphasized fees, rates, is it more than ten percent, full stop, correct?**

A. **It's what's on the page right in front of you, that was what was highlighted, and I said I think it would be helpful to the jury to highlight more, so I asked to highlight it.**

Q. **The part that got added, sir, is pretty important, because the determination to be made by Arm is based on Arm's comparison of all financial considerations and rights without limitation, actually factored into Arm's calculation to determine the fees and rates of the previous best deal, correct?**

A. **Right.**

Q. And this phrase, what do you include, what could you take into account, the contract says Arm's comparison of all financial considerations and license rights, without limitation, and then there is a section that says e.g., and then that runs all the way over here to previous best deal, you see that parenthetical?
A. Yes.
Q. E.g. means for example, correct?
A. Correct.
Q. That means it could be these things, but it could be other things, too?
A. It could be these things, for example.
Q. Hold on. If I say there are eight houses on my block, for example, the Jones, the Smiths, and the pink house on the corner. That means I have given you three examples, but there are other houses on my block, you understand that, right?
A. It's an example, sure.
Q. So that's not limiting Arm to only the things inside the parentheses when it tries to determine total financial consideration correct?
A. The limitation comes later, when it says actually factored into Arm's calculation to determine the license fees and royalty rates of the previous best deal.
Q. So to know that, sir, it comes down to what did Arm

do and what did Arm look at, right, that's how you read it?
A. For Samsung or Infineon, correct.
Q. In its analysis overall?
A. No.
Q. Okay. And then up here it says without limitation. That means it's not just rates and fees, it's other things, too, correct?
A. Only to the extent such example actually factored into Arm's calculation to determine the license fees and royalty rates of the previous best deal.
Q. And you heard Mr. Shivashankar talk about how Samsung's deal was [redacted], correct?
A. It's --
Q. It was not three cores, it was [redacted]?
A. [redacted] cores under the package that they licensed.
Q. At the time, sir, there were [redacted] cores, but it also included additional cores that came out after, correct?
A. It's possible.
Q. And you understand, sir, you could rent a movie, one at a time, or you could have a subscription to Netflix, correct, you understand those two things?
A. Sure.
Q. And I have a subscription to Netflix, I actually checked last night, 5,000 titles, $25, I thought I was

paying like thirty or forty, but it's $25, that's a half cent a movie under that theory if you just said everyone is half price, correct?
A. Sure.
Q. Everyone isn't of the same value to everyone who has a Netflix subscription, correct?
A. Correct.
Q. To Netflix, some cost more than others to produce or get rights to, fair?
A. Sure.
Q. You can't just divide up the number, for instance, you have to look at the value, correct?
A. For your Netflix example, sure.
Q. And with respect to Samsung, you tried to do some kind of proxy to figure out how to compare Samsung to the offer made to Qualcomm, correct?
A. No, I applied ASC 606, where it's an accounting method where you allocate a bundled purchased price based on the underlying purchase prices.
Q. Mr. Schlaifer, can you pull up JTX-5, does it say that's how one should calculate, I think you said some acting standard called -- is it 806?
A. ASC 606
Q. Sir, you applied some test or way to do the comparison that certainly isn't what the parties agreed is

how you would compare bundles versus singles, right, it doesn't say that?

A. It says you have to take in the total financial consideration for Samsung the things that we talked about earlier, which includes a comparison of what was licensed to Samsung versus what is being proposed to Qualcomm. There is an agreed upon methodology you can do, I'm not coming up with the value, Arm lists each and every IP, and it gives a price for each and every IP, so that's typically a difficult thing to do, but here I have everything priced.

Q. Your example was the combo meal, the menu has a price for the burger, the menu has a price for the fries, the menu has a price for the drink. And if I know -- let's make the math easy, let's say the burger is four bucks, fries are two bucks, drink is a dollar, okay. So if I can remember where I started, that gets me to what seven bucks, if I buy them all by themselves, and let's say the combo meal was $5.50. Your approach would say let's take the ratio of the $4.00 burger, over the $7, 4/7ths of the 5.50 would be how you calculate the value of the burger the way you did it?

A. Exactly.

Q. So the drink, in your version, would be 1/7th of 5.50?

A. Correct.

Q. Here is a question. You know at McDonald's or

anywhere, the margin on the burger is pretty tight, right, the profit they make on the burger is not nearly the profit they make on the drink, correct?
A. I don't know. I haven't seen their financials.
Q. You haven't learned that literally McDonalds makes a penny -- pardon me, it costs a penny to sell you that Coke, between the fountain and syrup and carbonated water and the cap and the top and the straw, you never heard that before?
A. No, I never heard that before.
Q. You agree, sir, the person making the offer, in this case McDonald's, when they do the bundle, they may not make the same amount on each one?
A. That doesn't matter, we're talking about what you offer to the consumer, what you offer as a royalty rate, it's the price, you don't get to go into McDonalds if you pay for the drink, it will pay them a penny. You look at the list prices and say based on that, how much is a drink worth?
Q. In these instances, what normally happens is the parties negotiate, correct?
A. That's the whole point.
Q. Hang on sir, I don't know what question you're answering? Mine is between Qualcomm and Arm for rates, the parties negotiate, they get an offer, and they could come back and say I don't like your offer, I would like to

negotiate, unlike at McDonalds.

A. It's a provision, MFN, it's previous best deal, you have to be within ten percent, it's a contractual provision that says when you propose to me, it has to be in this range.

Q. Sir, there was a proposal made on October 24th, that is the nature of Qualcomm's complaint here, right? They didn't like the rates they got quoted?

A. They thought the rates were too high, correct.

Q. And they could have negotiated, correct?

A. I don't know what they could have done, there is a provision that says this is the rate you're supposed to apply.

Q. Sir, your position is they couldn't have negotiated and said we would like a different price?

A. I don't know what happened in the negotiations after or what they could or couldn't do.

Q. You actually know in fact they didn't ever say anything about it, they didn't say that's too high, they didn't say this is unfair, they didn't say this seems wrong, they said nothing, until they sued six months later, those were the actual facts correct?

A. I don't know what they said, but the testimony has been it was way too high, and they couldn't accept the offer.

Q. Except you never saw a document that said that, or any testimony where somebody conveyed that back to Arm, did you?

A. I don't know what they said to Arm.

Q. So, sir, let's look at peripheral IP and what happened there. So Mr. Schlaifer, could you pull up the document we were just talking about, DTX 29. This is the offer. Next page. So this offer comes in on October 24th, and there are terms when you get an offer, right? If somebody makes an offer to you, there are terms that accompany that offer, correct?

A. Sure.

Q. It's not a controversial point, right?

A. I don't know what you mean by terms and offer, but you get an offer, it's got different pieces, sure.

Q. Let's look at the next page, sir. There are terms, you looked at these, right?

A. I don't remember these. But I'm sure --

Q. Let's look, sir, because it's kind of important. In your testimony, you said the following: On this issue for the peripheral IP, you had a slide and said that for peripheral IP, you said this is what Qualcomm accepted, and you said they accepted the rates for peripheral IP in the October 2024 proposal, do you remember that?

A. That's my understanding.

Q. Look at point 13 in the terms. The pricing for this offer is based on the assumption Qualcomm will license all products for which it requested offers, but the products can be licensed independently, do you see that?

A. Right.

Q. The terms of this offer in October 2024 were these are the rates for the bundle, all things, peripheral IP, and Hunter, Hayes, and Yamin. Mr. Schlaifer can you leave that on and go back to the prior page, so we can see that all six were quoted together? It's this exhibit, the offer, and it is on the prior page, the page right before the one you have on the screen. Thank you.

Okay. Do you see where it says license fees and the license fees are for the peripheral IP and the cores, right?

A. Right, these are listed separately, correct.

Q. They're all identified as having a price, but it says in point, 13, the pricing is based on the assumption Qualcomm will license all products for which it requested offers, agreed?

A. But the products can be licensed independently, you're interpreting a term in the contract, I think you can read that both ways.

Q. You think, sir, when the term says they asked for a bid for six things, they got a bid for six things, it shows

them what the totals are on the bottom line, and then the terms say the pricing in this Qualcomm IP extension offer is based on the assumption that Qualcomm will license all products for which it requested offers, but the products can be licensed independently. Your read of that is you can get that bundle price for one item, that's how you're treating it?

A. No, you're treating it that way in discussing this, I'm not interpreting that term of the contract, and I think you could look at it both ways, the license fees are there and they're independently listed, and then it says the products can be licensed independently, this is -- here is the problem, I'm an economist, I can't interpret this --

Q. Sir, you don't just to keep giving your opinions on and on without any regard to my questions on cross-examination, you can do that on direct examination, sir.

You agree, sir, this term 13 was set forth in the offer on October 2024, correct?

A. Yes.

Q. And then you offered an analysis, Mr. Schlaifer, could you flip it over, on slide 21, you showed this to the jury for alleged overpayment on peripheral IP, and the right column is acting as if Qualcomm could accept the prices from the October 24th proposal without taking Hunter, Hayes, and

Yamin, agreed?
A. Could accept -- the right column is quantifying how much the increase in the offer was from October to January.
Q. Sir, the right -- the fee here, this $4.6 million, that's taking the individual prices from October 24th and disregarding the bundle, true?
A. Disregarding it, I'm taking the independently listed prices in the proposal and I'm adding them up, and there is no bundle, it's just adds up the prices. So there could be a bundle discount, that's the dispute, that's why Arm argued it should be doubled.
Q. Sir, and then what happened was DTX 2401, Qualcomm tried to accept just the peripheral IP; correct?
A. Correct.
Q. And do you remember there was all this conversation about how this was really important and Arm had delayed, do you remember that?
A. Yes.
Q. Do you remember the date of the offer was October 24, 2024, do you recall that?
A. Sounds right.
Q. Do you know the offer was good also in the terms for 30 days?
A. Right, I think the terms we're looking at expired the next day.

12:10:25 Q. And so Qualcomm, despite it saying this was so urgent, and we needed all this stuff, got an offer and waited until the day before it expired to try to accept it, correct, is that the timeline sir?

12:10:38 A. It's ten times what they paid previously, they ultimately determined they had to take it and they paid the $9 million.

12:10:45 Q. That's not this actual proposal, sir, I'm not sure what you're trying to talk about. On November 22nd, they tried to accept the three prices that were the prices that were not the bundled price, they didn't want the Hunter, Hayes, and Yamin, they tried to only accept peripheral IP, on the second to last or the last day, true?

12:11:05 Is that what happened in the timeline, sir, this is simple?

12:11:07 A. You keep saying bundled price, it lists the IPs independently and then adds them, there is no like, this is the bundled price, but there is a dispute about that. If there is some extra amount that you would add, do you get the double the price above, twice list price, because it's unbundled, okay, that's a point of dispute.

12:11:29 Q. So they tried to accept on the last day, just the peripheral IP, Mr. Schlaifer, go to DTX 2402. Arm says that's not how it works, if you don't want the Hunter, Hayes, and Yamin, the prices are different and they get a

12:11:43 new proposal given to them, DTX 2402. The next page. These are the rates that you are using in your analysis to say that ultimately Qualcomm overpaid by certain amounts for the peripheral IP, correct?
12:12:02 A. Correct. The $9 million under the seven-year term.
12:12:07 Q. And sir, this one, expires February 9, 2025, do you see that?
12:12:14 A. Yes.
12:12:14 Q. And come February 2025, again, towards the end of it, on February 4th, Qualcomm ultimately accepts the terms of the January peripheral IP price, correct?
12:12:27 A. I haven't looked at the date, but sure, sounds right.
12:12:31 Q. And they accept it without any complaint, correct? Leave that as it is, Mr. Schlaifer. The prices here that you're saying is the overpayment by Qualcomm, they didn't negotiate it, correct?
12:12:43 A. I don't know what -- I haven't looked at communications, I don't know.
12:12:47 Q. You have seen no record of negotiations, correct?
12:12:50 A. Correct.
12:12:50 Q. You know they accepted it as provided, correct?
12:12:53 A. Yes, they accepted this proposal.
12:12:55 Q. And you know they didn't say anything about this proposal being too high or a breach of the agreement at all until they filed a lawsuit over the TLA months later,

correct?
A. I know about the lawsuit, I don't know what happened in between.
Q. You have seen no communications or anything indicating they thought these prices are were too high or outrageously high or anything like that?
A. I haven't looked, but I haven't seen anything.
Q. You also said well, they should have gotten the discount they previously got, do you remember that?
A. Yes.
Q. So in 2019, because they were an early adopter of these chips, Qualcomm got a discount on the pricing -- pardon me, withdrawn. Peripheral IP. When they agreed to that earlier, they got a discount, correct?
A. Yes.
Q. And your other analysis was well, they overpaid compared to the 2019 discount, correct?
A. Correct.
Q. If my daughter worked at Chipotle in her first job in 2019, I got a discount in Chipotle in 2019, I can't go there now in 2026, when she's no longer in my house and working at Chipotle, and say hey, I still want my Chipotle discount, you understand that, right?
A. Okay, we can run with that.
Q. You don't still get the discount automatically years

later just because you liked it before, agreed?
A. If you bought hundreds of millions of dollars worth of Chipotle in 2019 and continued to buy hundreds of millions of dollars of Chipotle in 2024, 25, 26, I think you would get a discount.
Q. That would be a negotiation between me and my manager at my Chipotle, right?
A. I don't know.
Q. I wouldn't automatically be entitled to get the deal I got five years ago, can we at least, sir, agree on that?
A. There is no automatic get the deal prior. You're talking about Chipotle, let's talk about the reality of this case --
Q. Your Honor, if the witness could be direct --
THE COURT: You need to answer his questions, at least yes or no, or try at the beginning, before you talk about something else.
Q. Sir, let's move on to Meta. Your analysis of Meta was pretty short. And you're not offering any opinion that the change in the deal terms with Meta, between Qualcomm and Meta, had something to do with Arm, you're not here offering a causation opinion, correct?
A. Correct, that's for the jury.
Q. Your entire Meta analysis assumes that the reason the change happened at Meta was because the alleged interference

of Arm changed those terms. That's an assumption behind your analysis?

A. In that window we're talking about, yes.

Q. And you're offering a damages calculation or opinion on the tortious interference claim, that's what this is about?

A. Correct.

Q. And if Arm didn't cause that, and it was because the businesses just negotiated other terms, and the jury found there was not tortious interference, then the answer is that there is zero damages, correct?

A. No liability, no damages.

Q. So let's look at the slides you showed the jury and I'll just, we'll just use three of them. Mr. Schlaifer, I'll just use mine.

The first was this slide that said October 31, 2024, incentive terms. And I think you said that the parties were aligned on this, do you recall that?

MS. NYARADY: Your Honor -- nevermind, Your Honor.

THE COURT: Okay.

A. Correct.

Q. Okay. So sir, the October 2024 incentive terms, your opinion is sort of comparing one point in time to another economically, correct?

12:17:09 A. Yes.
12:17:10 Q. And your opinion assumes these were agreed upon finances, correct?
12:17:16 A. Agreed upon finances. No. There is -- in the record, the jurors heard the lead up through September and October, this is the first time that the terms are memorialized in a document for Meta to review on October 31, '24, it's described as a line or different things.
12:17:35 Q. You remember Mr. Amon saying there was no term sheet as of the time of the Bloomberg article, correct?
12:17:44 A. Correct.
12:17:45 Q. And you heard, you saw his e-mail on Halloween, or maybe it's the 30th, that says this is awesome, there is a deal we had here, let's not, we're not going to get to ground on financial terms, do you remember that?
12:18:00 A. I'm not sure what you mean by that. There was some talk about some financial terms.
12:18:12 Q. Mr. Schlaifer, can you pull up for me PTX 1605. Page 3.
12:18:24 You were in the courtroom when we talked with Mr. Amon and others about his e-mail, October 30, 2024, where he says this is awesome, do you remember that?
12:18:33 A. Yes.
12:18:34 Q. Go to the next page to see what he said, Mr. Schlaifer. Please blow up that whole top section.

There you go.

Do you remember in October, Mr. Amon, the CEO, we should not try to introduce new terms not agreed by the parties within the next two weeks and accept that pricing is something that will likely remain open, do you remember that?

A. Yes.

Q. So as of PTX 1605, as of October 30th, the CEO believed the actual terms of the Meta agreement should and would remain open for some time, agreed?

A. It is what it is, there it talks about pricing and don't introduce anything new.

Q. And that pricing is something that will likely remain open, correct?

A. Pricing, yes.

Q. And can we flip back, Mr. Schlaifer. And the other comparison, that's the before version, the version you used in your math was fair to say a before and an after?

A. Sure.

Q. Your before is based on a term sheet Qualcomm sent to Meta that was never accepted, agreed?

A. It evolved overtime, this is the term sheet that had been memorialized and said subject to impending review, we're aligned.

Q. Sir this document here, PTX 1609, was a term sheet

that was not accepted by Meta, true or false?
A. Ultimately yes, something different was signed.
Q. And the version you looked next at, 1626 is also a marked up term sheet that was never ultimately accepted by the parties, correct?
A. Not the final, correct.
Q. And you talked about the change from just a certain chip, an XR product, to [redacted], correct?
A. Correct.
Q. This -- there were other changes, right here you see it was [redacted], and the markup back from Meta was one [redacted], do you see that?
A. Yes.
Q. And so the final agreement actually ended up at [redacted], didn't it?
A. Correct.
Q. And so, certainly, the finances weren't set yet in October and November?
A. The [redacted], the material change in terms is shifting from a [redacted].
Q. The length of the agreement, the total payment of [redacted] were the same from the very beginning to the very end, correct?
A. Right. Well the term --

Q. [redacted] on the rebate piece, sir?
A. Your term is not just the years, it's when it starts, it started a lot earlier.
Q. We can agree that [redacted] was in every version and every discussion from October 2024, until the deal was finalized, correct?
A. I think it stayed consistent.
Q. And [redacted] also stayed consistent?
A. Sounds right, as a [redacted].
Q. And the change you point to to then do the math that you did is that the products that Meta wanted the [redacted] on changed between just the Quest on the top of your slide, and then the Quest MR plus AR glasses, correct?
A. [redacted] and the actual glasses being sold.
Q. And you understand, sir, that the decision to change what products went into this was Meta's request based on their business, correct? [redacted]?
A. At this time.
Q. You didn't see those documents that said Meta was [redacted]?
A. Yeah, but those are later and the timing is important.
Q. The parties negotiated the final Meta agreement,

12:22:45 correct?

12:22:46 A. Correct.

12:22:46 Q. And Qualcomm willingly entered into the final Meta agreement, correct?

12:22:51 A. Correct.

12:22:51 Q. And you then did some math based on this work and you showed the jury some slides about incentives, and you circled a number there, $170 million, sir, as of today, [redacted], that's a projected number by you?

12:23:14 A. [redacted].

12:23:25 Q. Okay. But you understand, sir, that if somehow -- well, you don't offer an opinion on it, the change from Quest to AR glasses by Meta and Qualcomm in their agreement was found by the jury to be Arm's fault from the press release, or the press article and the letter, then, only then would you get to your number for damages?

12:24:03 A. The basis for the claim is Arm's actions associated with revealing their intent to terminate the ALA within 60 days, yes.

12:24:13 Q. And the jury would have to find those things and then be in considering is your math good on the change in the Meta deal, right?

12:24:21 A. I do the math, the foundation is elsewhere.
12:24:23 Q. And you know, sir, that those headsets and those glasses, none of those use an ALA core, correct?
12:24:32 A. If by that, you mean the actual ones that are rebates being paid on, correct.
12:24:37 Q. They all use TLA cores, correct?
12:24:40 A. Correct.
12:24:40 Q. And if TLA was not at issue or being threatened to be terminated if Qualcomm didn't cure their breach, correct? The Bloomberg article, the letter -- withdrawn.
12:25:02 You understand, sir, that the conversations between Meta and Qualcomm were around ALA cores and would then have the ability to make ALA cores, right?
12:25:14 A. The issue is a lot bigger than that.
12:25:17 Q. At the end of the day, sir, if the change in the deal between Meta and Qualcomm wasn't because of the Bloomberg article, then your opinion on what the damages are doesn't have any relevance at all to the tortious interference claim, correct?
12:25:36 A. The Bloomberg article and what Meta did with it, if the jury determines that it had no impact to the deal, then there are no damages.
12:25:46 Q. And you said during your direct testimony that what Meta did or said, can we agree sir, that you have been here the whole time and at no point during the trial has Qualcomm

put on any evidence of what Meta did or said or believed about why they changed that term with respect to the tortious interference allegations?

A. They put up different evidence that ties that timing and what happened to what Meta was doing, how Meta was flagging the article and the press releases.

Q. Sir, there is not a single piece of paper in this case and no witness from Meta has certainly came in to say the AR switched from the Quest to the glasses had anything to do with Arm, true?

A. There is no -- nothing direct like that, there is other information provided.

Q. There is no direct evidence of it, correct?

A. Meta hasn't said that, but the jury can take the other information.

Q. And you understand that Qualcomm could have brought somebody here from Meta but didn't?

A. I don't know.

MR. LoCASCIO: No further questions.

THE COURT: Any redirect?

MS. NYARADY: I'll be brief. I know I'm standing between everyone and lunch.

REDIRECT EXAMINATION

BY MS. NYARADT:

Q. Royalty reports came up. Qualcomm royalty reports in

your testimony. In rendering your opinions in this case, did you review the Qualcomm royalty reports regarding Hunter, Hayes, and Yamin between Q1-2023 and Q1-2025?

A. I did.

Q. Do you recall about how many reports that was?

A. I can't remember, a lot.

Q. Does around fifteen or so sound right?

A. Sounds right.

Q. Does it change your opinion in any way that Arm Holdings is a controlling party of Arm Ltd under the contract, versus whether their name is at the top of the contract?

MR. LoCASCIO: Objection to form.

Pardon me. Object to foundation for this witness. He went out of his way to say he doesn't know anything about the contract or the legality, so it would be speculation.

MS. NYARADY: I can rephrase, Your Honor.

THE COURT: Thank you.

BY MS. NYARADY:

Q. Would it change your opinion in any way if Arm Holdings was a controlling party of Arm Ltd under the contract versus whether their name is at the top of the contract?

MR. LoCASCIO: Same objection, Your Honor.

THE COURT: That is in his report?

MS. NYARADY: It is in his report.

MR. LoCASCIO: It is.

THE COURT: Why don't you show him where it is in the report?

MS. NYARADY: We can keep going.

BY MS. NYARADY:

Q. Did Arm investigate the previous best deal individually by core?

A. Yes.

Q. Can we pull up PTX-1423 at page -- first of all, at page 5.

Earlier, Dr. Kennedy, when we were looking at this deck, I pulled up the native version, and I said it was PTX 1424, and this is actually the printed deck that's in evidence. I just want to confirm, the document we were talking about previously, is this the same document, PTX-1423?

A. It is.

Q. Let's go to the royalty proposal tab, please.

A. I think this is it.

Q. Can I see the other tab? The tab that's -- that one.

And can you read the footnote three on this royalty proposal tab?

A. Samsung has been identified as previous best deal

based on its royalty rates for the three IPs collectively.

Q. Does this refresh your recollection as to whether Arm identified the previous best deal individually by core?

A. They have rates by core and then they have them combined.

Q. In your analysis, did you do it by core?

A. Yes.

Q. Did Arm have a damages expert in this case?

A. Yes.

Q. Did you quantify the harm from the evidence in the record --

MR. LoCASCIO: Objection, Your Honor.

Q. -- for the ALA claim?

THE COURT: Let's take our lunch break.

COURTROOM DEPUTY: All rise.

(Jury exiting the courtroom at 12:30 p.m.)

THE COURT: Okay. You can step down.

What's the objection?

MR. LoCASCIO: The objection is I'm not sure why this expert is now going to talk about what an Arm expert did that's not in evidence in the case, Your Honor. I guess, I don't know if its an effort to back stop him by saying Arm's expert said. If Arm's expert came in and critique him, he would come in and rebut that Your Honor, that's how it works in trial, you don't say what is in some

other guy's expert report, we can choose or not to choose to call the next expert.

THE COURT: But if the expert agrees with him on something or doesn't, Arm doesn't dispute it, he can't say that.

MR. LoCASCIO: I don't believe at this point it would be sort of some version of prebuttal or doing that, here is the bigger question, which is what I think Ms. Nyarady was attempting to do would be to say okay, you didn't meet your burden or do your job on an ALA harm, but did Mr. Briten in an effort to demonstrate to the Court to show, call it excessiveness of the liquidated damages provision, determine what could be a calculated version of an ALA damages claim. And they didn't do anything to ever demonstrate or identify an ALA damages model, they can't now have their witness on the stand attempt to back door that using someone else's analysis, Your Honor.

THE COURT: So what is this about?

MS. NYARADY: Your Honor, if the question had simply been you're not rendering an opinion on the ALA, that would be one thing. He did not testify about it on direct. But the questions went well beyond that. The questions down right implied to the jury that it wasn't quantifiable and there wasn't any harm, and so I think the door has been opened, and I think I'm allowed to get into evidence that

someone, in fact an expert paid by Arm, did quantify that harm and how much it quantified it at.

MR. LoCASCIO: The reason that wasn't a simple question was because in his dep he said he hadn't done it, on the stand, I asked him, and instead of just saying yeah, I haven't done it, he was like in front of the jury, because I had never done it, let's be clear, it's not like he was excluded, it was as if he thought he had an opinion that was excluded and he had to try to navigate that under oath, the answer is he never had one. And remember he sort of suggested I'm going to tell it to the judge or I have already told it to the judge, so that took like ten minutes or whatever it took of my time, because he won't just answer the question. The idea that he now himself has opened the door, to an opinion he never rendered, and it was never in his reports, and as he said, I don't have one, is just preposterous, Your Honor.

MS. NYARADY: Your Honor, I think as everyone knows, Mr. Kennedy is going to be testifying at the bench trial, he is going to be testifying about harm related to the ALA, the v10 license, and some of the questions were not limited to the OOB and patches, and so I think Dr. Kennedy was trying, you saw he was trying very hard not to say that, and he was hesitant to say it, but then when pressed about you don't have any opinions about the ALA, he gave the short

answers without any context that he was going to be testifying about the ALA at a different time.

THE COURT: The concern I have on the putting in their damages number is, you know, presumably their expert was assuming liability, and a whole bunch of other things, and you just saying what did their expert say, it makes it sound like Arm says well gosh, we all know that we owe money and this is how much it is. So that is concerning to me.

MS. NYARADY: I mean, I can work that into the question, Your Honor, that he assumed liability, and in doing so, he then was able to quantify the harm.

THE COURT: So basically the testimony is your witness says I can't quantify it, I didn't quantify it, I can't quantify it, and you want to put in the other side's expert and say yes, it is quantifiable.

MS. NYARADY: Right, he never said he couldn't quantify some of the harm, there is different types of the harm, there is the future risk, and then there is things that were not quantifiable perhaps, but then there is the engineering team and the number of hours and the quantifiable harm. And so the questions, I don't think the expert ever said that that was not quantifiable, but the questions implied that, and we're saying well, you never quantified it and you never did this, and you never did that, and I think it gave -- it went well beyond just

establishing that he is not providing an expert opinion on damages for the ALA claim. Unnecessarily, and painted a picture for the jury that there is no quantifiable harm. So I should be able to establish that an expert in the same field as Dr. Kennedy did quantify it and was able to do so.

MR. LoCASCIO: There is about 3 or 4 reasons this is not proper, Your Honor. First, the witness in his deposition, he didn't have anything in his reports ever. You have no opinion of attempting to quantify any harm to Qualcomm as a result of Arm allegedly breaching the ALA, I haven't quantified that claim. He said it's part of the overall claim as I understand it about the harm caused by those breaches, but I don't make an offer on that. Then you get to follow up on that, you have no opinions as to the amount of money or the time Qualcomm spent as a result of Arm allegedly not providing OOB ACK patches, or at the time it was something called an EET checker, I never quantified that. So he never did the work. And now this comes up in this building --

THE COURT: Did he respond to rebuttal report or anything?

MR. LoCASCIO: Never, never on this issue, Your Honor. And then on the breach of 5.1, which was the issue of ACK or OOB deliverables under the ALA, there is a meet and confer on the seventh, and we sent in an e-mail, thank

you for confirming on tonight's meet and confer that an e-mail Patrick Kennedy will not discuss Qualcomm's claims that are on breach, section 5.1 of the ALA in any way --

THE COURT: You got to slow down, because Dale is going to quit and I can't have that.

MR. LoCASCIO: Thank you for confirming at tonight's meet and confer that Patrick Kennedy will not discuss Qualcomm's claim that on breach of section 5.1 of the ALA in any way, including any alleged harm or damages, as he has not the disclosed any opinions on it. Based on Your Honor's comments with respect to liquidated damages provision, you will remember then there was a whole back and forth of where has it been disclosed and even in discovery responses as to how one could quantify this, because they have never done it on the Qualcomm side, their expert personally never has done it, this idea that you can use the other side when you don't have something, this comes up a lot in this building, because an expert, his or her opinion is struck off on a reasonable royalty, and the defendant's expert often has a responsive reasonable royalty opinion, which is still higher than zero, and at that point, often, plaintiffs are in the situation of how do you grapple with that or navigate that and defendants then often don't call their expert and the plaintiff doesn't get to, when asked the question, like you're not here offering a reasonable

royalty opinion, they don't get to say I had one or this or some other version, and then drop in the other guy's as a back stop.

They had a choice, they could have certainly, and everybody knew the liquidated damages provision was an issue, they made a choice, and if they wanted to offer an opinion on him as a back stop, they could have done it, they haven't, and the reason we would suggest they never did is because it would have undermined their arguments that we had in the first bench trial, Your Honor.

MS. NYARADY: Your Honor, we're very short on time, so I don't want to belabor --

THE COURT: I have the clock off, you have ten free minutes here.

MS. NYARADY: The questions, first of all, did go beyond the OOB and patches, one of the questions I'm reading at 7305, and you have not offered this jury any opinion about any harm or damage allegedly resulting from any breach of the ALA? That's what prompted Mr. Kennedy to get in his head that he's testifying at the bench trial about a different ALA breach. But then beyond that, it goes further, you're not offering any quantification of it, nor have you identified any such harm. And so he's trying to box him out to say there is no harm, you haven't been able to identify anybody, it's well beyond just saying you're not

going to give this jury a number, we didn't do that analysis, and then it's implying to the jury all of these questions, you know, one after another talking about quantification, I believe left the jury with the impression that there is no harm for the ALA breach before the jury that can be quantified. And that is incorrect, and Arm knows it because --

THE COURT: Did you put on factual witness is about you know it took this much to, effort, and we had this guy's salary and this many hours, didn't you put that on?

MS. NYARADY: We absolutely have done it.

THE COURT: You didn't put it on through this guy, why does he get to get up and be like yeah, by the way, look at Arm's expert's calculation, that just seems --

MS. NYARADY: But for Mr. LoCascio's questions, I don't think he would --

THE COURT: What I'm not understanding about Mr. LoCascio, the problem you have with his questions, what did he ask or get testimony on that is not true, that this -- that you didn't quantify this, no. I mean, the witness could have said I didn't, but I understand other people have given, I was here when so and so gave an opinion on it, but that wasn't what I was asked to do. But what is it that you think he did that opens the door to his expert's opinion in response to something coming in?

MS. NYARADY: I think he left the jury with the impression that the harm is not quantifiable.

THE COURT: But your expert didn't quantify it, so why does he now get to testify what that quantity is.

MS. NYARADY: Again, because I think it left the jury with an impression, there was an argument made through these questions that I think left the jury with the impression that there was no harm, that was quantifiable. And I don't disagree, our expert did not do the analysis. And if the questions had been limited to just confirming that our expert was not putting in a damages number for the ALA breach, we would not be having this conversation.

THE COURT: All right. I'm going to sustain the objection. I do think it's Qualcomm's burden to show damages, and they can't put in the other side's expert's rebuttal on something where this expert didn't testify on it.

I think it's back-dooring in a hypothetical from the other side without context.

You didn't list their expert as one of their witnesses, did you?

MS. NYARADY: No.

MR. LoCASCIO: No.

THE COURT: All right. Then I'll sustain the objection.

COURTROOM DEPUTY: All rise.

(A luncheon recess was taken.)

COURTROOM DEPUTY: All rise.

MS. DUNN: Your Honor, this witness is done from our point of view, so if we could unseal the courtroom.

THE COURT: Great. That's great.

MS. DUNN: Do you want me to rest when they come back in, I assume.

THE COURT: Sure. And then you can do you're -- if you want to wait to do anything with motions until we have a break. And you guys were so good about taking my six minutes, I'll give you each eight.

MS. DUNN: Your Honor, you are the best.

THE COURT: I was thinking I couldn't bring myself to give to ten, but I get to eight.

MS. DUNN: We really do appreciate it. .

Your Honor, did you want Dr. Kennedy to stay up there?

MS. NYARADY: I'm going to say no further questions.

THE COURT: I don't care, whatever you guys want.

MS. DUNN: I think you can just go.

THE COURT: That's fine. Mark, let him be excused, why don't you have your next one -- oh, you're

13:20:45 going to rest. Okay.

13:21:08 MS. DUNN: Your Honor, do you anticipate doing
13:21:11 bench trial proceeding tonight --

13:21:13 THE COURT: I wanted to talk about the jury
13:21:15 stuff, and then if we have time we'll do it, if not, we
13:21:19 won't. But if you need me to make a call on that before you
13:21:23 know, so you can deal with your witnesses, just tell me what
13:21:26 you want me to do.

13:21:29 MS. DUNN: I think just for planning purposes, I
13:21:32 think we had -- I think some people here had read Your
13:21:35 Honor's comments yesterday as the bench trial is continuing
13:21:38 during jury deliberations, and if that's okay, I think
13:21:43 that's what everyone would prefer.

13:21:45 THE COURT: That's fine with me.

13:21:47 MS. DUNN: All right. Let's do that.

13:21:57 COURTROOM DEPUTY: All rise.

13:21:59 (Jury entering the courtroom at 1:21 p.m.)

13:22:09 THE COURT: All right. Welcome back. Everyone
13:22:17 else may be seated. The courtroom is unsealed at this
13:22:21 point.

13:22:22 (Unsealed) .

13:22:24 THE COURT: What's next?

13:22:25 MS. DUNN: Your Honor, Qualcomm rests.

13:22:27 THE COURT: All right. Thank you.
13:22:30 Mr. LoCascio, what's next?

13:22:31 MR. LoCASCIO: Thank you, Your Honor. At this point, Arm calls its next witness, Mohamed Awad. Mr. Wilcox will be handling his examination.

13:22:44 THE COURT: Thank you.

13:22:53 COURTROOM DEPUTY: Please raise your right hand. Please state and spell your full name for the record.

13:23:04 THE WITNESS: Mohamed Awad, M-O-H-A-M-E-D, A-W-A-D.

13:23:12 Mohamed Awad, having been duly sworn, was examined and testified as follows:

13:23:20 DIRECT EXAMINATION.

13:23:21 BY MR. WILCOX:

13:23:28 Q. Mr. Awad, please introduce yourself to the jury.

13:23:32 A. Mohamed Awad.

13:23:34 Q. Where do you work and what is your current role?

13:23:37 A. I work at Arm, I am the executive vice-president for the Cloud AI business unit.

13:23:43 Q. Is there any particular Arm entity that you work for?

13:23:46 A. Arm Ltd.

13:23:47 Q. What is the Cloud AI business unit?

13:23:50 A. The Cloud AI business unit, we're responsible for all of the compute and technologies that go into things like data centers, networking equipment, so thing like servers, think networking gear, storage gear, that sort of thing.

13:24:09 Q. When did you first join Arm?

A. I joined in the summer of 2018.
Q. When you joined in 2018, what was Arm's share of the data center market?
A. In 2018, it was pretty grim, we had about zero percent market share.
Q. What is its now?
A. Right now, it's you know, we've grown, it's about 25 to 30 percent.
Q. Who has the rest of the market?
A. Primarily X86, so primarily AMD and Intel. There is a little bit of RISC-V out there.
Q. Do you have any examples of RISC-V data center products?
A. There is a couple of in China that are out there, you know.
Q. Why in 2018 did Arm not have any shares of the data center market?
A. Well, I mean, at the end of the day, there was a couple of dynamics going on. You know, first of all, it was -- we had been invested in it for quite some time, we had partners who were investing in it for quite some time, and the barrier for people adopting Arm was just too high. But more importantly, what we found was that multiple companies who had tried to invest and get into the Arm market and basically put Arm into the data center eventually pulled

out, Qualcomm was one of them. They ended up actually firing about a thousand people and halting all of their data center business at that time. Which was actually a huge blow for us, because it meant that as we went off and tried to approach other semiconductor companies, the instant answer was if a company the size and scale of Qualcomm couldn't do it, why would we think that they could do it. That made it pretty tough.

Q. Did Arm come up with a plan for how to increase its presence in the data center?

A. Ultimately what we did was we focused on lowering the barriers to adoption, we were looking for ways to make it easier and easier for people to adopt the technology. Thankfully, Amazon web services had decided that they were going to build a piece of silicon based on our standard IP cores, so these are those standard CPUs that we built. And when we realized that they were going to do that and rent it out to, you know, all of their customers, what we surmised was that the other hyper scalers would want to follow suit so that they wouldn't be at a competitive disadvantage.

Q. You just mentioned hyper scaler, what is a hyper scaler?

A. The way to think about it is that these hyper scalers are the large consumers of compute, these are the folks that build these massive data centers, think AWS, think Google,

13:26:54 think Microsoft, think Meta, these are the people that buy the most compute out there.

13:26:58 Q. Who are the next customers that decided to use Arm in the data center?

13:27:03 A. It was exactly that list, Microsoft and Google approached us very quickly after AWS launched their product. You know, they said they were looking to understand what we had for IP, how they could build their own silicon. And ultimately, they were looking to see how we could help them accelerate their time to market.

13:27:23 Q. When were you having those conversations with Microsoft and Google?

13:27:27 A. It started in 2019 and kind of floated into kind of 2020.

13:27:31 Q. What Arm product did Google decide to license, if any?

13:27:35 A. Yeah, I mean ultimately, they both decided to license products from us. You know, we actually started with Google, with a concept called compute subsystem. This actually takes it one step further. If you think about our architecture license, we hand you a document, right, we hand you a document and a phone number and you go off and you build it. When we hand you IP, we give you the building blocks and you're expected to figure out how to put them together. What Google asked us to do was build what we now

13:28:06 call compute subsystem, this is where we actually give you exact instructions of all the IP you need to kind of put the whole thing together, and as long as you follow those instructions, you're going to be successful. Ultimately, Google didn't use that, they went off and bought the IP to do it themselves, but Microsoft did actually go off and use the compute subsystem because they found it was a way to get to market much more quickly.

13:28:32 Q. When you say IP, is that another word for implementation core?

13:28:36 A. Yeah, exactly.

13:28:37 Q. And then when did you reach these agreements with Microsoft and Google?

13:28:42 A. I want to say it was 20 -- sort of late 2020 into early 2021.

13:28:47 Q. So by 2021, you have agreements with Amazon, Google, and Microsoft. Who was left of the hyper scalers?

13:28:54 A. Yeah, I mean, of the large consumers of compute, these are the hyper scalers who makeup, now they makeup about 50 percent of the entire market, the third one that, or the last one that we didn't -- we hadn't engaged yet is Meta.

13:29:09 Q. When did Arm first approach Meta about using Arm's technology in the data center?

13:29:15 A. Well, I mean, when AWS launched their product at the

end of 2018 and into 2019, we certainly were talking about Meta, we talked to all the hyper scalers, we were trying to get them to go off and use it but Meta wasn't really that interested.

Q. Why wasn't Meta interested?

A. Well, you know, I remember going in that first time with Meta, this was about six months after I had joined, so I want to say it was late 2018, early 2019, and they made it pretty clear that when, you know, they did not see the Arm ecosystem as stable, they did not believe there was a stable supplier in the market, and they made it pretty clear that there was no intention for them to stop Arm any time soon, because they had been burned so bad when Qualcomm pulled out of the market.

Q. After those initial meetings didn't go so well, what happened next?

A. Well, we continued to obviously talk to them, but you know, given their clear statement that they weren't interested, we spent most of our time with the other partners, so Google and Microsoft and obviously AWS.

Q. What were some of the options you proposed to Meta over the years?

A. Yeah, I mean, over the years, we obviously continued to engage them, they're one of the biggest consumers of compute, so if we're going to grow our business, we need to

have them on board, so we continued to engage them, we proposed lots of things. We proposed giving them IP, so they could build their own silicon, the same way that Meta and AWS -- I'm sorry, the same way that Google, AWS, and Microsoft had done. We proposed giving them a compute subsystem, we proposed providing the compute subsystem to ASICS partners, so the ASICS partners could deliver that piece of silicon to them, but they really weren't interested.

Q. What is an ASICS partner?

A. ASICS, stands for Application-Specific Integrated Circuit. Basically, these are companies who are part of the ecosystem, they're semiconductor companies who specialize in building specialize solutions for whomever they like. A customer would come to them and say hey, I want you to build this custom piece of silicon for me, they pay some up front money, they would maybe make some commitments around volume, and those customers would deliver, these are companies like Broadcom, Marvel, Associate Next, et cetera.

Q. Was Qualcomm one of these partners that you introduced to Meta?

A. No, I did not introduce Qualcomm.

Q. Why not?

A. Well, first of all, ASICS partners are pretty well established and known in the industry, meaning this is their

business, they go off and build custom silicon, and typically it's tied to a particular market, and Qualcomm had specifically pulled out of the market and had no real intention, to my knowledge, of being in the data center business. So that was one.

And then the second thing is obviously Qualcomm is well-known to Meta, and they weren't really a data center licensee, so it didn't make a whole lot of sense.

MR. ISAACSON: Your Honor, at this point, I would just because he's talking about what Meta said, I would request an instruction that's permissible for this gentleman, but should not be taken for the truth.

MR. WILCOX: No objection.

THE COURT: So what he's just saying is if things come in that someone else said outside of court, they can't be used for the truth, the person that that statement is true, but it can be used to say I did something because that's what I understood the person was telling me, so we're just not using that statement for the truth of the matter, but for its effect on this witness. All right.

BY MR. WILCOX:

Q. What is your understanding, Mr. Awad, about who first had the idea of Arm and Meta collaborating on a data center chip?

A. Well, I mean, it's in the summer of 2023, Meta

13:33:18 specifically told us that that's what they wanted, so I mean, they came to us and you know, they said hey, we're seeing the benefits of Arm in the data center, we see that Google and Microsoft and we have been using AWS in the Cloud, we want those same benefits within our own data center, but the ecosystem isn't stable, there is not a stable supplier, the market is under served, and we would like to help stabilize the market and make it so that people could have access to the technology, us included, that was a clear statement.

13:33:51 Q. When you started having these conversations with Meta in the summer of 2023, what did Arm think about the idea?

13:33:57 A. I mean, listen, semiconductor design and building silicon, is not for the faint of heart, right. These are expensive propositions. You're talking about hundreds of millions, if not billion dollars, to build a piece of silicon like this. So to think that we would just jump right into it is not something we took lightly. We looked at it, we contemplated, we looked at alternatives to find ways to get to help, you know, "create a stable supplier" for Meta so they felt like, you know, the market can be served, but none of it seemed to come to free wigs.

13:34:39 Q. Did Arm ultimately enter into a contract with Meta?

13:34:42 A. We did.

13:34:43 Q. When did you sign the first contract with Meta

related to a data center chip?
A. We signed a memorandum of understanding in March of 2024.
Q. Was that the only contract that you signed with Meta related to creating a data center chip?
A. No, the statement of work, which lays out in more detail exactly what the chip is and what the obligations are on both sides, and who is going to do what, et cetera, that was finalized in September of 2024.
Q. Could you turn to DTX 346 in your binder?
A. Yes. Old man glasses. Okay.
Q. Have you seen this document before, Mr. Awad?
A. I have seen it.
Q. And what is this document?
A. This is the statement of work for the Phoenix SOC, the product that we worked on with Meta.
MR. WILCOX: We move to admit DTX 346, Your Honor.
MR. ISAACSON: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 346 was admitted into evidence.)
BY MR. WILCOX:
Q. Can you remind me again, when did you enter into this statement of work with Meta?

A. The statement of work was entered in September of, I believe it was, September of 2024.

Q. Is Arm selling the chip that you're designing under this statement of work to other customers or intending to sell it to other customers?

A. Yes, we are.

Q. How about this, was Arm's plan always to make the chip it developed with Meta available to other customers?

A. Yeah, in fact, if you go back to the motivation, what Meta came to us and said, they didn't want to be in the business of just, you know --

MR. ISAACSON: I think we're going beyond the impression on him right now, talking pure hearsay.

THE COURT: Yes.

MR. WILCOX: I can --

BY MR. LOCASCIO:

Q. So Mr. Awad, we want to keep it focused on what Arm's plans were, and not get into what Meta was telling you, okay?

A. Okay.

Q. So Arm's plans was always to make the chip it developed with Meta available to other customers?

A. Yes.

Q. Okay. What was Arm's reason for making the chip available to other customers?

A. To stabilize the market and ensure that there was a stable supplier, and to serve what had been described to us by Meta and others as an under served market.
Q. Does Arm have any plans to have that chip business replace its historic licensing business?
A. Absolutely not. In fact, I think one of the strongest attributes of our business is the fact that as a consumer of compute, you can come to us and get IP, or you can get a compute subsystem, or you can get a chiplet, or you can get an SOC, we have customers like Meta who do exactly that.
Q. And in the summer of 2023, when you started thinking about building this AGI CPU chip, were aware about whether Qualcomm had any plans to enter the data center business?
A. I had no knowledge of that.
Q. What about when you signed the memorandum of understanding in March of 2024?
A. No, I had no knowledge.
Q. Is your answer the same for the statement of work?
A. That's correct.
Q. Are you aware now that Qualcomm is developing a data center chip?
A. Yes, I am aware.
Q. Does Arm view the Meta -- sorry the Meta partnership as a way to keep Qualcomm out of Meta and Meta's data

centers?

MR. ISAACSON: Objection, leading.

THE COURT: Overruled.

THE WITNESS: Absolutely not. This is a huge market. Meta has been clear to us that --

MR. ISAACSON: Objection, hearsay.

THE COURT: You can't say what Meta told you. That's what the objection is. So you can't keep saying Meta told us this, Meta did this, because Meta is not here to say that.

THE WITNESS: Okay.

BY MR. WILCOX:

Q. So why is it that you don't view the Meta partnership as a way to keep Qualcomm out of data center?

A. Well, first of all, it's a trillion dollar market, it's a huge market, there is lots of opportunities in that market. And within Meta specifically, and any, frankly, any large consumer of any product, they never want to give anyone vendor more than 50 percent market share, they want to make sure there is more than one vendor out there. A market share is so small that the best outcome for us would actually be having Arm suppliers, multiple Arm suppliers supply them.

Q. Could you turn to PTX 2679 in your binder?

A. Okay.

Q. Do you recognize this document?
A. Yes.
Q. What is it, Mr. Awad?
A. This is our shareholder letter.
Q. Do you review the shareholder letter before it goes out?
A. I provide input to it and review, yes.
Q. Does Arm send these shareholder letters on a regular basis as part of its normal business operations?
A. This is a quarterly endeavor, that's right.

MR. WILCOX: Your Honor, we move to admit PTX 2679.

MR. ISAACSON: No objection.

THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 2679 was admitted into evidence.)

BY MR. WILCOX:
Q. All right. And Mr. Awad, if you look at this first page of the shareholder letter. What is the date on this?
A. June 30th, 2026.
Q. And if you could go to page 2, Mr. Schlaifer. If we go to the second to the last paragraph. Perfect.

And Mr. Awad, I want to direct you to the sentence that begins "and Qualcomm has announced." Do you see that?

A. Yes.
Q. What is Arm saying here to its shareholders about Qualcomm in this sentence and the next sentence?
A. We're bragging about the fact that they're entering the data center CPU, my screen is on blank. But we're bragging to them that the -- to our shareholders that Qualcomm has entered the data center CPU market with their Dragonfly product. And we're -- actually, we're highlighting it along side our biggest and most important partners, AWS and Meta, and Microsoft.
Q. Why would you highlight Qualcomm and these other companies in your share holders?
A. It's so great for our ecosystem, this is a point which goes to what I was saying earlier, we want them to be successful at the end of the day.
MR. WILCOX: Thank you, Mr. Awad. No further questions.

CROSS-EXAMINATION.

BY MR. ISAACSON:
Q. Hello, Mr. Awad. Bill Isaacson. When you said that you had 25 to 35 percent of the market, that's a market that includes these hyper scalers, that's about 50 percent, and also includes all these legacy systems that are older, right?
A. Yeah, that's probably right.

Q. You weren't talking about your share of a market of the hyper scalers who are bringing in all these new technology, right?
A. I was referring to data centers more broadly, which some of that would include legacy, but not all of it.
Q. In fact, the hyper scalers you said were 50 percent.
A. I think what I said was they approximated 50 percent, they were starting to come up to about 50 percent.
Q. Right. And can we -- may I approach, Your Honor?
THE COURT: You may.
Q. I'm showing you PTX 2225, which is a certified transcript of the "Arm Every Where" event that was on YouTube. You were at this event, do you recall that?
A. Yes, I do.
Q. And then if you look at page 35, do you see your name there?
A. I'm getting there.
Q. Do you see your name there?
A. I don't see my name -- I'm sorry, that's 34, yes, I see that.
Q. At this point, you're making remarks?
A. Yes.
MR. ISAACSON: I move to admit PTX 2225.
MR. WILCOX: No objection, Your Honor.
THE COURT: Thank you. It's admitted.

(PTX Exhibit No. 2225 was admitted into evidence.)

BY MR. ISAACSON:

Q. All right. Let's move to page 39.

At the bottom, at line 23, one of your remarks at this Arm Every Where event was "the reality is that Arm has been investing in data center software ecosystem for well over 15 years", correct?

A. That's correct.

Q. All right. And then at line three and four on page 40, you explain that something happened in 2019, we launched Arm Neoverse, do you see that?

A. Yes.

Q. At line eleven, on page 40 you say "and that started that software flywheel turning, you see when tech leaders started adopting Neoverse, they started to optimize software around it, and the more of those tech leaders that adopted Neoverse, the faster that flywheel started to spin." Those are the remarks you made at the Arm Every Where event?

A. Yes.

Q. And then you said "today, we've got AWS, Amazon web services, and Google and Meta and Microsoft and Oracle, and NVIDIA, all investing along side us in that software ecosystems," those are your remarks?

A. That's correct.

Q. Those are the major hyper scalers?
A. Yes, those are some of the major hyper scalers.
Q. On page 41 at line 2, you said "the Arm architecture is the primary CPU architecture in support of AI today." That was something you said, right?
A. Yes.
Q. And then next you said, "in fact, the work we've done together with technology leaders means that TENS of thousands of companies today run their software on Arm in the Cloud on over 1.25 billion Arm Neoverse cores, which we've already shipped into data centers around the world and that growth is only accelerating." Those were your remarks, correct?
A. This is referring specifically --
Q. That's something you said?
A. I did say this.
MR. ISAACSON: No more questions.
THE COURT: Okay. Redirect.
MR. WILCOX: Very brief redirect, Your Honor.

REDIRECT EXAMINATION.

BY MR. WILCOX:
Q. Mr. Schlaifer, could we pull up page 41 of PTX 2225? Mr. Awad, there is some context you wanted to provide about those questions you were just asked, what was that context?
A. Yeah, I mean, it's -- we've shipped a lot of Neoverse

cores, Neoverse cores are our CPU core and that 1.25 billion is almost exclusively AWS. So it's actually the rest of those partners haven't shipped a whole lot besides AWS, and then the comments around AI, it's important to say because of NVIDIA's strength in AI. So yes, those are true statements, but it really comes down to just those two customers. When you look at general purpose compute more broadly, our market share is not very high.

Q. You were also asked a couple of questions about a software flywheel, do you remember that?

A. Yeah.

Q. How well does a software flywheel work without highly performing hardware like CPU cores?

A. It doesn't work. And I think the other important point around that is that those partners that I called out that were investing along side it, those are all folks who have been investing along side us for a long time. And they include both architectural licensees, as well as Neoverse partners. So it's not like it's one or the other. This is about the strength of the ecosystem overall.

MR. WILCOX: Thank you, Mr. Awad. No further questions.

THE COURT: All right. Thank you. Thank you, sir. You are excused.

What's next?

MS. BARNETT: Your Honor, Mary Barnett, on behalf of Arm. The next testimony you will hear is from Ann Chaplin, who is the general counsel and corporate secretary at Qualcomm. Ann was deposed on July 11, 2025. The clip is four minutes and thirteen seconds long. This refers to defendant's trial Exhibit 59.

(Videotape deposition of Ann Chaplin:)

Q. Can you please state your full name for the record?

A. Sure, it's Ann Cathcart Chaplin.

Q. What is your title at Qualcomm?

A. General counsel and corporate secretary.

Q. How long have you held that position?

A. Since November of 2021.

Q. Chaplin Exhibit 14 is Qualcomm's November 6, 2024, 10-K filing with the Securities and Exchange Commission; correct?

A. It appears to be, yes.

Q. F-23 at the top says "note seven, commitments and contingencies", correct?

A. Correct.

Q. Below that, it says "legal and regulatory proceedings"?

A. Correct.

Q. At the bottom of that page, it has a heading that starts in italics, "Arm Ltd versus Qualcomm Inc." Correct?

A. Yes, correct.
Q. This is continuing Qualcomm's disclosure related to the Arm versus Qualcomm litigation, correct, the text we see on F-24?
A. Yes. The part of it is, yes.
Q. Do you see right -- the paragraph right above the heading, contingency losses and other considerations?
A. Yes.
Q. That heading says that "on October 22, 2024, Arm provided us with a notice alleging that we have breached a Qualcomm ALA by marketing products that contain CPUs that Arm alleges use designs, technology, and code created by Nuvia employees prior to our acquisition by Nuvia"; correct?
A. Prior to our acquisition of Nuvia, correct.
Q. The next sentence says, "seeking support and verification from Arm for additional products that use such alleged designs, technology, and code; and by using Arm"-- sorry -- "and by suing Arm for breach of the Qualcomm ALA." Do you see that?
A. I see that.
Q. Do you believe that that reveals any confidential information about the ALA?
A. In that particular sentence, no.
Q. The next sentence says, "Arm's notice asserts that it will have the right to terminate the Qualcomm ALA if such

alleged breaches are not cured within 60 days of such notice." Do you see that sentence?

A. I see that.

Q. So as of November 6, 2024, it was public that Arm had provided notice to Qualcomm that it had the right to terminate the Qualcomm ALA if the breaches listed in this paragraph were not cured within 60 days; correct?

A. It had already been made public by Arm previously through the articles that we looked at.

Q. Even if it hadn't been made public by Arm by November 6, 2024, Qualcomm would have made it public through its SEC filing; correct?

A. Well, that assumes that things -- I mean, we have a disclosure to make because of actions that Arm took. So I don't follow your question.

Q. The only action by Arm that's referenced in this paragraph is the sending of the breach notice; correct?

A. Yes. We refer to the sending of this notice in -- to Arm sending us a notice in this paragraph.

Q. This paragraph doesn't mention Arm publicizing that notice?

A. It's not mentioned in that paragraph, correct.

Q. This paragraph doesn't mention the Bloomberg article?

A. Correct. That's what I said. Yes.

Q. Do you think there is anything wrong about Qualcomm

telling the public its current legal positions in pending litigation?

A. I think there can be instances where it is appropriate.

Q. Does Qualcomm ever speak to the media, whether on the record or on background, about pending litigation?

A. Probably.

(End of videotape deposition. )

MS. BARNETT: The next testimony you will hear is from Ziad Asghar, who is the general manager of the XR Extended Reality business at Qualcomm, and was deposed on July 7, 2025. This clip is 5 minutes 23 seconds long. This refers to defendant's trial Exhibit 1.

(Videotape testimony of Ziad Asghar:)

Q. Good morning, Mr. Asghar.

A. Good morning.

Q. All right. Exhibit 20, and this is QCARM_3464080. Do you recognize this as a chat between you and John Bruno?

A. Yes.

Q. And if you look at the sixth chat from the bottom?

A. Yes.

Q. It's from John Bruno. It's the one that starts with "Arm."

A. Yes.

Q. And it says "Arm will fuck us any chance they get."

13:54:08 And you responded "absolutely." Do you see that?
13:54:11 A. Yes. I see that.
13:54:13 Q. And so was there agreement with John's frustration at the time and agreement with John's belief that Arm will fuck Qualcomm any chance they get as of July 2021?
13:54:24 A. There were concerns in the relationship. And basically, I was trying to move on to a different topic, I believe, on Lanai 24, or whatever. But, yeah, there was a concern that Arm was not being fair with us.
13:54:41 Q. And the topic you moved on to was to say, "we want to keep them on the heck -- them referring to Arm, we want to keep them on the heck, but then dump them at the alter. That was the topic you moved on to?
13:54:55 A. I don't know what I meant by heck over there, but that's something I wrote. I don't know what I was thinking at that time as to the context or what was in my head.
13:55:03 Q. Does them refer to Arm?
13:55:04 A. I don't know, honestly, at this time.
13:55:08 Q. Who else would it have referred to other than Arm?
13:55:11 A. I mean, one of our main customers. So I see Lanai here, so that's a smartphone product. I see Hamoa referenced here. That's a PC product. So I really don't know who I was thinking about at that time.
13:55:25 Q. And then you go on to say, "also chat with Gerard when you get a chance to stress this further." You reply

"thanks." And then John again is talking about Arm. "Arm just delivered us our long awaited fabric." So the discussion throughout here seems to be about Arm. Is there any reason that you're referring to someone other than Arm when you say we want to keep them on the heck, but dump them at the alter?

A. Not really, because we're talking about NVIDIA here, we're talking about like I said, Lanai 24, we're talking about Hamoa, that's Microsoft. I don't know what I was thinking at that time. I can't be sure.

Q. And do you know if you meant to say we want to keep them on the hook, in other words, keep them interested, but then dump them at the alter, and again, referring to Arm?

A. Again, I don't see Arm over here, I don't know what I was talking about at that time, it is four years ago at this point in time. So I'll have to -- I don't know how to confirm, but I don't know what I was talking about.

Q. John goes on to say on the next page "any chance they get, they will fuck us?" Do you see that?

A. Yes, I see that.

Q. And do you know if John was referring to Arm when he said, "any chance they get, they will fuck us"?

A. Again, John would know better, but I'm not sure. I'd have to read the whole of this thread to understand possibly.

Q. And so John responds to himself and says, "don't forget that." And then you say, "wow. Absolutely. Can you send a note to RK on this right away?" Do you know who RK is referring to?
A. RK was one of our sourcing guys.
Q. And does he source from Arm?
A. I believe he's in charge of all the sourcing.
Q. And then you say, "that is why I don't want to rely on Logan." And that's an Arm core?
A. Yes.
Q. I'm asking you what you understood from this chat?
A. I am on chat while I'm answering five e-mails and a million times I don't even remember at that time what I'm saying. You're asking me four years from that point, I'm telling you what I understand at this point in time.
Q. You can't say one way or another whether this chat is about Arm?
A. Parts of it are, as we saw, but there are other parts I don't know what he's talking about. Again, please check with John.
Q. What does the expression "dump someone at the alter" mean to you?
A. I don't know. I'm not sure what I used it in, in what context at that time, but I'm not sure.
Q. The context was the chat on Exhibit 20?

A. Yeah.
Q. Yeah.
A. I don't know. A broken partnership?
Q. And who would be the breaker of the partnership when someone gets dumped at the altar?
A. I have no idea. Again, this is very nebulous four years later from the time that I wrote this.
Q. The person doing the dumping, right?
A. And again, there is nowhere in this sentence -- Arm is not mentioned anywhere. It says "we want to keep them." I don't know who them is, what I wrote at that time, so I have no idea what we're talking about here.
Q. Was there anybody else you wanted to keep on the heck and then dump at the alter, other than Arm, that you can think of in 2021?
A. Doesn't come to my mind right now.

(End of videotape. )

MS. BARNETT: The next testimony you will hear from is Kurt Wolf, who is the director of sourcing at Qualcomm, and was deposed on June 25th, 2025. This clip is five minutes and 45 seconds long. This refers to defendant's trial Exhibit 294.

(Videotape deposition testimony of Kurt Wolf:)

Q. Can you please state your name for the record?
A. Kurt Wolf.

13:59:19 Q. Fair to say that your role is more on the TLA licensing of off the shelf cores side, fair?
13:59:25 A. That's the majority -- my work relates to the TLA. The majority of my work relates to the TLA.
13:59:33 Q. Are you familiar with the Hunter product, by the Arm --
13:59:38 A. By name.
13:59:40 Q. How about Hayes?
13:59:42 A. Also familiar by name.
13:59:44 Q. And what about the Yamin product?
13:59:51 A. I'm more -- yes, I'm familiar with Yamin.
13:59:54 Q. Those are certain products that Qualcomm has a license to under the TLA; fair?
14:00:00 A. Qualcomm has a currently active license to those three products.
14:00:06 Q. Are you aware of any devices that Qualcomm was considering putting Hunter in after October 2026?
14:00:14 A. I am not.
14:00:18 Q. Same question for Hayes. Are you aware of any products that Qualcomm was considering putting Hayes in for after October 2026?
14:00:28 A. No, I am not.
14:00:30 Q. Are you aware of any Hunter Hayes-based devices that will be sold after 2026?
14:00:37 A. I am not aware.

14:00:38 Q. The first one we'll look at -- this will be, for the record, Wolf Exhibit 1. This is a document bearing Bates number QCV-ARM-0605055.

14:00:55 So this is an e-mail chain between yourself and other Qualcomm employees that took place between April 1st and April 3rd, 2024; fair?

14:01:06 A. Yes. That's what's here, yes.

14:01:08 Q. The subject of this e-mail chain is your feedback on an idea to get Arm to willingly extend the GIC 700 and SMMU 700, do you see that?

14:01:18 A. Yes I do.

14:01:19 Q. On 5057, there is an e-mail from Manju Varma to yourself and others. It says "Hi Kurt, agree on the strategy of using Hunter core extensions to get feedback on peripheral IP, do you see that regard, do you see that?

14:01:37 A. I do see that.

14:01:39 Q. What is the strategy that Ms. Varma is referring to?

14:01:42 A. Just a second. Okay. The strategy that I did not rely on legal counsel is -- granted, this is April of 2024. The original request for the peripherals for the new license was in September of 2023. So a bunch of time. Scratching our head. "Why is Arm being so uncooperative?"

14:02:33 I get an idea. I go look at the original license, the original annex that the peripherals, the GIC, SMMU, and the ELA were licensed under. And there is a way

to infer what the license fee is of those peripherals. It's a couple hundred thousand maybe for each one. The entire annex was worth like 35 million or 65 million. So trying to be as good of a partner and as -- a best way to find a way to get replies and get licenses from Arm, I came up with the idea that said, well, maybe they just don't care about a couple hundred thousand dollars. So if we need some other IP that is typically licensed, you know, for licenses like millions of dollars, and if we need -- if we think we may need those IPs, meaning that we would be willing to sign a new license agreement and pay them millions of dollars up front, if the team believes that we might need some higher-priced IP, maybe if we put the higher-priced IP together in the same request as we did with the -- added on to the peripherals, which are very low price, maybe Arm will become more interested. So it was a business strategy to try to find out, you know, why? What is Arm's reluctance? Why are they preventing us from getting these licenses?

So it was a good faith effort to try to say, "hey, guys, do we want something else?" Because we know we had that big license that was 65 million that had a whole bunch of IPs in it. Is there anything in that big license that's going to expire that we can, as a turn of phrase would be, sweeten the pot by having more money. So that was the concept in how the team start -- the team meaning -- you

can see it's Manju, Ziad, and then they talk with other layers of people behind them. Is there something that Qualcomm would likely want to ask a license for.

(End of Video tape) .

MS. BARNETT: We move to admit DTX 1 from the Asghar deposition, as well as DTX 59 from the Chaplin deposition.

MS. YING: No objection.

THE COURT: Thank you. It's admitted.

(DTX Exhibits No. 1 and 59 were admitted into evidence.)

MS. BARNETT: The next testimony you will hear is from Gerard Williams, who is the senior director of Qualcomm engineering over the CPU design team, and was deposed on June 25th, 2025. This clip is two minutes long.

(Videotape deposition of Gerard Williams:)

Q. Please state your full name for the record.

A. Gerard Richard Williams, the third.

Q. All right. So what is your current title?

A. I'm the senior director of Qualcomm engineering over the CPU design team.

Q. Can you explain what is your role as it relates to Qualcomm's use of noncustom cores, that is implementation cores or CPUs from Arm?

A. I oversee the engineering team that also does and

works with, I believe we call them TLA cores, in my engineering team as well.

Q. Are you aware, sitting here today, of any product after Q3 of 2026 that is expected to use a Hunter, Hayes, and Yamin core?

A. I am not aware.

Q. Do you, Mr. Williams, as the head of engineering on CPUs, have a desire or intent to use Hunter, Hayes, and Yamin after Q3 of 2026?

A. There are no programs that I'm aware of, so no.

Q. Has Qualcomm failed to put out any core as a result of an inability to validate it using the ACK test?

A. No.

Q. With respect to the cores that have been validated between spring of 2022 and January of 2025, Qualcomm engineers ran the ACK test with respect to the cores; correct?

A. Yes.

Q. Sitting here today, can you think of any engineering reason why you needed a renewal to Hunter, Hayes, and Yamin as of 2024?

A. No.

(End of videotape. )

MS. BARNETT: The next testimony you will hear is from Jeff Golden, who was the hardware engineer at

14:07:50 Qualcomm. And was he deposed on July 3rd, 2025. This clip is two minutes and 34 seconds long.

14:07:59 (Videotape deposition of Jeff GOlden:)

14:08:01 Q. Mr. Golden, what is your current job title?
14:08:03 A. I'm am a hardware engineer.
14:08:06 Q. What's your current job responsibilities at Qualcomm?
14:08:09 A. I work on architectural verification for the CPU.
14:08:15 Q. Has Qualcomm completed the architecture verification process for Hamoa?
14:08:20 A. Yes.
14:08:21 Q. Has Qualcomm completed the architecture verification process for Pakala?
14:08:25 A. Yes.
14:08:26 Q. Has Qualcomm completed the architecture verification process for Nordschleife?
14:08:31 A. Yes.
14:08:32 Q. Has Qualcomm completed the verification process for Glymur?
14:08:36 A. Yes.
14:08:37 Q. Has Qualcomm completed the architecture verification process for Kaanapalli?
14:08:42 A. Yes.
14:08:42 Q. Am I correct in saying that Arm releases updated versions of the ACK to its partners on a periodic basis?
14:08:51 A. I know that to be true.

Q. Arm's periodic ACK updates include fixes to ACK test issues that were flagged prior to that update, right?
A. They include -- generally they include fixes. How -- which fixes they include and to what extent they attempt to fix all partner issues, I don't know.
Q. What's the name for the list that Qualcomm creates?
A. I don't know what -- I mean, the list that Qualcomm creates is -- I don't think I give it a name. I just -- actually, I do give it a name. So the script that I have that produces it, it calls it val_report_list.
Q. And Qualcomm is able to create the val_report_list, correct?
A. That's right.
Q. What's the name of the subset of ACK tests relevant to a particular CPU design --
A. That's the val_report.
Q. Arm provides an ACK user guide to partners like Qualcomm?
A. Uh-huh.
Q. And the ACK user guide provides instructions on how to configure the ACK, right?
A. Uh-huh.
Q. And you reference the ACK user guide when you're performing the architecture verification process?
A. Uh-huh.

Q. Do you record your time spent working on the architecture verification process?
A. No.
Q. Did you record the amount of extra time that you had to spend as a result of Arm not providing an ACK patch?
A. No.
Q. Does Qualcomm keep track of the amount of time that its employees spend on architecture verification?
A. No. Not that I'm aware of.

(End of videotape. )

MR. LoCASCIO: Thank you, Your Honor. In light of the fact that the rest of our witnesses have already testified at this point. Arm rests its case.

THE COURT: Okay. Thank you. Anything further from plaintiff?

MS. DUNN: No, Your Honor.

THE COURT: All right. So ladies and gentlemen, we have gotten to the end of evidence, and what that means is what's left for me to do is to instruct you on the law, and then for the parties to do their closings. In order on for me to instruct you on the law, the lawyers and I have to hash a few things out, so what I am going to do is excuse you for tonight, and ask you to come back tomorrow morning. Tomorrow morning, we'll start off with me giving you the instructions, you'll hear the closings and then you'll get

to deliberate.

All right. Thank you very much.

COURTROOM DEPUTY: All rise.

(Jury exiting the courtroom at 2:11 p.m.)

THE COURT: Okay. All right. We can be seated. Anybody have anything they want to say?

MR. WILCOX: If I can have one moment to grab my notes, Your Honor, but we want to move for judgment as a matter of law.

And I will be as brief as I can, Your Honor, but it will take me a minute here.

So Arm Holdings and Arm Ltd both move for judgment as a matter of law on all claims, and will be filing a brief before the jury is actually sequestered on it as well. So on the ALA claims, the ACK patches and OOBs are not deliverables as a matter of law, and therefore there is no breach of Section 5.1 of the ALA.

Qualcomm is also not shown that it was harmed by the alleged breach as evidenced by the fact that Qualcomm presented no damages number for this claim, and presented very little evidence even trying to establish harm, so as a matter of law, there is none.

Qualcomm has also apparently pursuing a separate accrual theory for its ALA claim to try and get around the statute of limitations for Arm Ltd, but it has not

identified any specific breaches or the harm from each of those separate breaches, and therefore, as a matter of law, there is no harm for any individual breach, and they cannot establish that any of the alleged withholding of an individual ACK patch or OOB is a breach of Section 5.1 of the ALA.

Qualcomm has also not shown that it has complied with the required notice and cure process for any of the alleged breaches that happened after November 3rd, 2022. And the statute of limitation bars any claim against Arm Limited that was filed before January 8th of 2023, given when the complaint against Arm Ltd was filed.

And finally, any alleged harm that Qualcomm seems to have tried to allege for those claims is consequential, which is barred by Section 13.1 of the ALA.

Moving on to the TLA, there is no breaches as a matter of law of section 8.1 B of the TLA. That provision only applies to an initial request or a subsequent request made within 12 months, the evidence at trial has established that Qualcomm made its initial written request to license those cores in 2019. And the alleged breaches here were related to renewal requests that were made in October of 2024, which is both not an initial written request and well outside the window to make a subsequent one-time written request.

The evidence at trial has also established that no reasonable jury could find that any of the Arm parties failed to act reasonably and in good faith when dealing with those renewal requests. Arm performed the previous best deal analysis in good faith as a matter of law. Arm correctly identified the previous best deal and did so in good faith. And also, did a good faith analysis to come up with the license rate to offer Qualcomm that was within ten percent of the previous best deal when accounting for total financial considerations.

Dr. Kennedy, today, in fact, admitted that Arm correctly identified the previous best deal for Hunter and Hayes.

And there hasn't been a word said from Qualcomm about what the harm would be from a failure to identify and determine the previous best deal in good faith correctly. Their entire claim seems to be just about the within ten percent portion of their claim.

In addition, there is no evidence of harm for even within the ten percent, they haven't shown what that difference would be, or how it would have mattered. Qualcomm still, in fact, has a preexisting license to Hunter, Hayes, and Yamin today, so there has been no payments by Qualcomm that have been in excess of ten percent of any previous best deal. And again, Qualcomm did not

comply with the required notice provisions under the TLA when Qualcomm decided to file suit in March of 2025 without providing notice that it thought Arm's offers that were made in 2024 either did not comply with the previous best deal provision or were in excess of ten percent of the previous best deal taken into account total financial considerations.

And again, any alleged harm from that that Qualcomm may try to establish, such as these roadmap issues that have come up sound like consequential harm and consequential damages that would be barred by Section 13.1 of the TLA.

THE COURT: I have no idea what Section 13.1 is.

MR. WILCOX: It's a limitation of liability provision, Your Honor, and it says that both sides agree there will be no damages for any consequential indirect damages, including lost profits or other types of harm. So all you can get under both of those agreements is direct damages, you can't get any consequential damages, which I think forecloses any consequential harm.

Moving to Section 8.1(B), this is the support and maintenance claim. There was nothing about the TLA that barred Arm from changing the support and maintenance for the offer that it made in October of 2024, because that provision only applies to requests for new cores, and Hunter, Hayes, and Yamin, having been licensed in 2019, are

not new cores.

There was also no change to the material nonfinancial terms as a matter of law, because support and maintenance was still provided under the separate support and maintenance agreement. And Qualcomm has not shown that it has suffered any harm, it hasn't shown and it can't because it didn't actually accept the offers. And to this day, still has support and maintenance available to it for its existing licenses to Hunter, Hayes, and Yamin.

So as to the peripheral IP claim, which is their claim for the breach of the implied covenant of good faith and fair dealing under the TLA, first off, as a matter of law, Qualcomm's claim is trying to expand and go beyond what the contract requires in a way that the covenant of good faith does not support.

All that Section 8.1(F) requires is that Arm make a peripheral IP available to Qualcomm if it is generally available to other licensees. That is what happened. And Qualcomm accepted the offer that Arm made. But even if you were to look into the merits of the good faith claim, no reasonable jury could find that Arm's offer for peripheral IP licenses was not made in good faith by Arm.

Then that takes me to tortious interference. Qualcomm has not shown that sharing of the notice letter

with the media or the 2022 letter that was sent to Meta violated the UCL or the wrongful conduct prong of the tortious interference claim as a matter of law. Qualcomm, for example, did not call its economic expert who was supposed to make that showing to the stand. I noticed in the proposed jury instructions that Your Honor has at least a potential question that requires a market, and that there is none to be shown harm to competition in the market. There has been no evidence presented that would allow a jury to establish what the relevant market is, certainly not under Supreme Court precedent like Ohio versus American Express or under California precedent that apply, Ohio versus American Express, in addition to the UCL claim filing as a matter of law, Qualcomm has not established the other elements of its tortious interference claim, such as any intentional or negligent state of mind by Arm, or any evidence of Arm's conduct actually interfered with the Meta relationship.

On harm, the evidence showed as a matter of law that the incentive payments made to Meta were not the result of the Bloomberg article or the 2022 Meta letter, but were instead commercial negotiations, and perhaps more simply, the evidence showed that the incentive payments were made by a different Qualcomm entity that is not the plaintiffs in this case, so for that reason alone, as a matter of law,

there can be not be any claim of harm by the Qualcomm plaintiffs here.

And again, not to go back to Section 13.1, but both Section 13.1 of the ALA and TLA also bar this claim at least for the negligence portion of the tortious interference claim, because what Qualcomm is seeking is consequential damages, and the Section 13.1 applies not just to contract claims, but also to tort claims, as well.

So then finally, Your Honor, Arm Holdings cannot be held liable as a matter of law for the breach of the two contracts that it never signed or entered into. It is a parent company, and as a matter of law, a parent is not responsible for the actions of its subsidiaries absent exceptional circumstances like veil piercing. There has been absolutely no argument by Qualcomm that has tried to apply veil piercing principles and Arm Holdings does not meet the definition of controlling party under the contract as a matter of law.

It also cannot be liable for the tortious interference claims, because the evidence established as a matter of law that any of the alleged conduct was carried out by Arm Ltd and not Arm Holdings and again, Arm Holdings cannot be held vicariously liable for the actions of its subsidiary.

Finally, as to Arm Ltd, all of the claims are

barred by collateral estoppel, which we have briefed previously in our summary judgment, and will explain more in our written motion.

THE COURT: What is the definition of controlling parties?

MR. WILCOX: Give me a second to get -- so a controlling party is a third party who --

THE COURT: What are you reading from?

MR. WILCOX: I am reading from JTX-5, it's at the same in JTX-1, it's Section 1.1 definitions, it's in acquisition of Arm.

THE COURT: Hold on. I just had JTX-1, give me a second, what am I looking at?

MR. WILCOX: It should be the very first definition, acquisition of Arm.

THE COURT: Okay.

MR. WILCOX: And it says acquisition of Arm means any transaction or series of transactions whereby a third party, "controlling party", acquires direct or indirect power to control all or substantially all of the assets related to any Arm technology identified in annex one, I'm looking at the TLA, so it says the TLA, it should say the ALA in JTX 1, all or substantially all of the Arm personnel necessary to provide the support contemplated by this TLA or the management or policies of Arm.

As Mr. Collins testified, among other reasons, the relationship between Arm Holdings and Arm Ltd means that Arm Holdings is not a third party.

Thank you, Your Honor.

THE COURT: Okay. Thank you. Plaintiff, do you want to respond?

MR. MARKS: Thank you, Your Honor, William Marks for Qualcomm. I'll start out with the ALA.

Qualcomm opposes the motion for judgment as a matter of law, a reasonable jury could find that Arm Limited and Arm Holdings breached Section 5.1 of the ALA. First, there was a sufficient evidence for the jury to find that ACK patches and OOB's are part of the ACK Arm compliance kit, and thus qualify as Arm technology that cover as a deliverable under Section 5.

There was harm alleged by the breach, because Qualcomm engineering had to do additional work in order to deal with the lack of ACK patches and OOBs. There is sufficient evidence for the jury to find damages on that issue, only because there is testimony about the time that it took those engineers and the engineers salary.

With respect to the separate accrual theory, the evidence showed the reasonable jury could find that the evidence showed that Arm withheld OOB patches, ACK patches and OOBs for the entire period of November, from

November 2022 to January of 2025, so any breach within that period, with respects to Arm Ltd would also be within the limitations period.

With respect to the notice requirement for alleged breaches, we believe that was feudal after the first breach notice was sent. Arm made clear that they were not going to provide the ACK patches and OOBs, so there was no need as a matter of law to provide subsequent notice.

We also disagree that any alleged harm was consequential within the meaning of Section 13.1. These are direct damages because they are damages that naturally flow that any entity would undergo from the failure to provide ACK patches and OOBs under the contract.

Moving on to the TLA with respect to Section 8.1(B), a reasonable jury could find that an initial request under Section 8.1(B) covers any request for either a new license or a new term for an expiring license, and that is what Qualcomm requested, a jury could reasonably find on the evidence.

A jury could also reasonably find that the offer was not made in good faith. Your Honor heard evidence that Arm looked to one entity, I believe MediaTek, for the analysis, but then said on the stand that they looked to another entity. We think that provides the jury with sufficient evidence to find a lack of good faith.

And the harm for both sections 8.1 and for later, Section 8.1B was the delay to the roadmap that witnesses testified to, that roadmap extends out for years and failure to be able to license on fair terms affects Qualcomm's ability to plan its CPUs in the future.

With respect to the notice provisions, we have the same argument with respect to the ALA that there was no obligation to provide subsequent breach notices because of futility, and we also disagree that these are consequential damages within the meaning of Section 13.1. These are direct damages.

With respect to 8.1, we already talked about harm. With support and maintenance, we disagree that this only implies to requests for new cores. We believe that the contract language imposes the requirements under Section 8.1(D) for any requests for a new term for an existing core that's licensed.

We're requesting to extend the term, we do think that this was a material change to the contract and not include the support and maintenance provision because under the contract, the support and maintenance that's provided is in annex one, and if it says that no support and maintenance is provided, the way the contract terms work, the offer would not have provided us with support and maintenance. We've already spoken about harm.

With respect to good faith and fair dealing, the jury could find that Arm failed to provide a -- failed to provide a good faith offer for peripheral IP given the terms of that agreement.

With respect to tortious interference, we disagree that as a matter of law, we do not have to show a market in order to demonstrate that we satisfy the evidence test under the UCL. Even under the competitor test, there is no requirement under California law that we prove the elements of an antitrust claim, which is what Arm is relying on here.

THE COURT: Let me ask you this, under the tethering test, there are three kinds of things you can show you violated the antitrust law, you sort of tried to violate an antitrust law, and then I think, the third one is more general kind of other anticompetitive stuff, or other bad stuff that affects competition.

Are you asserting anything under those first two?

MR. MARKS: No, we are contending only that there has been significant harm to competition under the third prong of the competitor test.

THE COURT: And your reading of the cases is well, once you get to that third one, it could be that if you're talking about actually violating the antitrust law or

getting close to violating antitrust law, you might need a market if that needs to be shown for the antitrust law. But for that third part, you don't need to have a relevant market, you just have to -- I mean, it basically seems like it collapses on to the balancing test that's used for the consumers, is that right?

MR. MARKS: I agree with the first part, I would respectfully disagree with the second part. On the first part, I think the way this works in a lot of cases is the parties are alleging antitrust claims and then they have UCL claims and they have UCL claims under each different prong. In those circumstances where a party is just asserting duplicative claims with the federal antitrust claim, courts have said that because the theory of reliability is essentially an antitrust theory of reliability, then you would need to further antitrust elements, but we think as a matter of law, we have appointed the Court to the *Epic Games* decision on the Ninth Circuit, that we don't actually have to prove, even under the competitor test, the UCL claim as an antitrust claim, I don't think it collapses because I do think the distinction between --

THE COURT: What's the difference, because I was trying to figure out what the difference is, in terms of what we're balancing, I mean, if it's well, for the tethering, you have to have a -- I'm saying tethering just

because it's easy to remember one, so for the competitor one, it has to be harm on competition. I don't know what that means if we're not talking about competition in a particular market, so what is the test under the competitor one that you think is different or not collapsing on to the balancing test in the consumer.

MR. MARKS: I think the distinction is that in the consumer test, we can prevail simply by showing harm to Qualcomm alone, with no effect on any competition more broadly. Under the consumer competitor test, I do think we have to show harm to competition, and I think that's shown here because Arm viewed us as a competitor, it treated us as a competitor, potentially in its internal documents and in testimony --

THE COURT: But it has to be harm to competition, not just harm to Qualcomm. And that's where I -- like I'm trying to figure out, how do we show harm to competition if I don't even know what market I'm looking at, what, you know -- if it's not enough to show they harmed competition because they harmed Qualcomm, what am I looking at there.

MR. MARKS: I think we're looking at the kind of motivations and reasons behind the decision, so when you think about --

THE COURT: Competition in what? Like how do

you harm competition if I don't know what the market is that folks are competing in. That's where I'm struggling with -- I mean, I read *Epic*, do I think that the Ninth Circuit and the District Court maybe are reading things a little more broadly than the California courts? Yes. But I have a lot of respect for Judge Gonzales Rogers and her knowledge in the antitrust area, so I'm taking what she said seriously. But I don't know that it's necessarily saying you don't need to have a market. I mean, it doesn't really come out and say that.

And then I'm trying to think of how are these tests different, they're not mutually exclusive but how are they different and you're saying we have to show harm to competition. Okay. But how do I know what competition is if I'm not looking at competition in this area, which sounds like saying in the relevant market.

MR. MARKS: The way I would think about it is there was testimony from Mr. Haas that Arm is looking to enter essentially every chip market eventually, competing with Qualcomm in all of the relevant chip markets.

We contend the intent of the wrongful conduct, the sharing of the breach notice was to inform the market that Qualcomm would not be able to design custom cores, which would foreclose Qualcomm from being able to compete with Arm in any of those markets. That ultimately harms

competition, because it removes arrival from any of the markets that Arm is talking about, and I think we would say would potentially make prices rise or harm consumers, so I think we don't need to have that kind of showing in the consumer test, it's enough to show that we were harm and we had to pay more.

Under the competitor test, I think there is this additional kind of showing. The California Supreme Court has made clear even in the context of the competitor test, this is a broad statute that is just, in their view, is looser than federal antitrust laws, I don't think there is support in California law for imposing the kind of more ridgid standard ever antitrust law, this isn't just generally creating a market, there is a product market, a geographic market, market power. And these are all things, as Your Honor I'm sure knows from antitrust litigation, requires commitment and expert testimony, that's not what the California courts have done when they applied the competitor test and that's not how we presented our case here. We think the fact that Arm is seeking to enter all of the chip market broadly and it attempted to take action that would push a competitor out of any of those markets is sufficient to satisfy the consumer test, based on the evidence that was here at trial.

MS. DUNN: I don't want to be disruptive.

14:34:55 THE COURT: You're going to be disruptive, don't do it now, I'm going to give you a chance to deal with it in jury instructions, I'm only dealing with JMOL right now, and I don't want to have a tag team.

14:35:07 MS. DUNN: Okay.

14:35:08 MR. MARKS: So with respect -- I think I just stopped on the UCL question, we do believe that there is sufficient evidence of intent and negligence state of mind. With intent, as we just discussed, we think that there is evidence that Arm was entering markets and becoming a competitor with Qualcomm, and that it intended to release the breach notice to harm Qualcomm's competitive standing and Qualcomm's relationships. With Meta, with respect to negligence, we have heard testimony that some of the key Arm employees, who were involved in the leak, did not think at all about the potential downstream effects of releasing the breach notice, and how that would effect Arm's business, I'm sorry, Qualcomm's business, so at a minimum, we think that there is sufficient evidence that there was a lack of reasonable care here. We have shown, we have also shown harm to Qualcomm from the incentive payments, we do believe that there is sufficient evidence for the jury to find that those incentive payments were made because of Arm's media campaign. With respect to the different entities arguments, there is testimony that because of the way QC-TAP and

Qualcomm Technologies INC, QTI are structured, that any incentive payments made by QC-TAP ultimately renown to the financial harm of QTI, which is sufficient to show harm. We disagree that 13.1 applies here to this kind of claim at all.

I understand that my colleague on the other side said that this would kind of at a minimum apply, or not apply to the intent claim, because under California law, you can't limit liability with respect to intentional torts. Even if it were to apply to negligence, and we don't think it does here, we don't think these are consequential damages, these are direct tort damages that we would be able to recover under the provision.

Moving on to question of Arm Holdings and its relationship with Arm Ltd, as I'm sure the Court knows from the comments on the jury instructions, our theory is not that Arm Holdings is liable through some sort of deal piercing, or kind of inherent relationship between the two entities standing alone, our argument is that under both the TLA and the ALA, Arm Holdings constitutes a controlling party, because it wholly owns Arm Ltd, and thus has the power to direct the management and policies of Arm Ltd, and the jury has heard sufficient testimony to find that fact, including testimony from Mr. Haas that it's all Arm to him and that he treats them similarly.

On a related note, we also think that the jury could find alleged conduct in this case was done by Arm Holding and not by Arm Ltd, because Mr. Haas, Mr. Collins, many of the executives overlap and work for both entities.

We disagree --

THE COURT: But you haven't come anywhere close to showing a piercing of the corporate vail or anything like that.

MR. MARKS: That's right, we are not attempting to show that, we're simply trying to show that under the language of the contract, Arm Holding --

THE COURT: For the third party aspect that they are asserting, you know, Arm Holding wasn't a third party, is it your reading that third party there is saying third party to the contract, not someone unrelated to a party here?

MR. MARKS: That's correct, I kind of think this is an attempt to have it both ways, by saying they're so close to Arm Ltd --

THE COURT: They're not a third party, but then they're not bound.

MR. MARKS: Exactly, I think the last two parties, we made the third-party point, we obviously disagree with collateral estoppel as to Arm Ltd, we brief those for Your Honor, for all those reasons, we believe that

a reasonable jury could find for Qualcomm on each of the claims that are asserted, and we request that the Court deny the motion for judgment as a matter of law.

THE COURT: All right. Unless you want to add something to the record, I'm going to withhold so you don't have to add it, unless you think you need it to provide serve. Does Arm have affirmative defenses?

MR. WILCOX: So we have --

THE COURT: I thought of this, because in the burden of proof part of the instructions.

MR. WILCOX: So we have a failure to mitigate defense that will be in front of the jury, so there is that that will be there. I think that's the only affirmative defense we have for the jury.

THE COURT: Okay.

MR. WILCOX: I only have one thing to say for preservation purposes. I won't get into what we think about competitor, we can save that for jury instructions.

On the Arm Holding, one other point I forgot to make as a matter of contract law, regardless of what the definition of control party is, just as you can't become a third party beneficiary, two parties can't just define a third party to a contract without that parties consent. That was like almost all of the last case, there was all those fights about novation and whether you assumed it, I

14:39:57 think we are kind of in the same place here, if you think that Armed Holdings is bound by this contract, you have to show some evidence of Arm Holdings itself, not just Arm Ltd. years before Arm Holdings even came into existence, agreeing to bind itself to the contract.

14:40:12 THE COURT: All right. Let's take about ten minutes, and then we'll come back and talk about the jury instructions.

14:41:20 COURTROOM DEPUTY: All rise.

14:41:23 (A brief recess was taken.)

14:58:45 COURTROOM DEPUTY: All rise.

14:58:50 THE COURT: Please be seated.

14:58:51 MS. YING: Your Honor, one housekeeping matter to put on the record. In the morning, after the first break, when the courtroom was still sealed, after we came back from the break, Mr. Collins, Arm's corporate representative was still in the courtroom, and when Mr. LoCascio started his cross-examination and talking about Meta, there was I think one slide that Mr. Collins was in the room for momentarily before we had raised with counsel that he needed to leave and he did at that time. So I just wanted to put that on the record.

14:59:23 THE COURT: Okay.

14:59:26 Okay. Let's deal with jury instructions. And we're going to go from my Court's proposed version, and if I

have taken something out or put something in that you don't like, you can make your objections. There are some that I am not real sure with.

Anyway. Starting with the ones that I gave you earlier, plaintiff, where is your first place that you want to talk. Don't start talking yet, just tell me where the first place is, so we know if that's before, the same, or after defendant.

MR. MARKS: Our first place is on page 12, with respect to Instruction 8.3.

THE COURT: Okay. And defendant?

MS. KELLY: Your Honor, embarrassingly enough, it's on the first page on the caption, the inclusion of Arm Holdings PLC FKA, and not FKA Arm Ltd. Would you like to hear why?

THE COURT: I think I know because I was listening to Mr. LoCascio's cross-examination.

MS. KELLY: I think there is some additional reasons, Your Honor. This is obviously two consolidated cases, and may I remain seated, Your Honor, I don't want to be disrespectful. This only refers to the caption of one of the cases that has been consolidated and does not identify that there was separate case against Arm Ltd, it makes it appear that Arm Limited is here because it has some corporate relationship. That's further compounded by

questioning and is done engaged with Mr. Collins where he put up an SEC, and said it's a wholly owned subsidiary. Without getting into the elements of the controlling party, which is why we now hear that Qualcomm did that. He wasn't asked specifically whether any of those elements with the controlling party definition was found, it appears they want to argue because you were a wholly owned subsidiary, you must exert and control the things that are defined in the acquisition of Arm. So we think that and Dr. Kennedy's testimony making it seem as if this some how creates a relationship --

THE COURT: I'm not ruling on that. I'm not saying that they are or they aren't a controlling party. That's an issue for the jury. So why do I take this out? It was already in the preliminary instructions that the jury has, nobody objected to it, so it stays in there. Do you guys care if I removed that, are you going to rely on that for something?

MR. MARKS: We don't intend to rely on, we think it's the correct caption, and don't move to amend it, but we don't intend to rely on it in closing arguments.

MS. KELLY: It's going to be back to the jury Your Honor --

THE COURT: You do know that the jury is going to have the preliminary instructions with them that you did

not object to.

MS. KELLY: Yes, Your Honor.

THE COURT: We're not changing those. So now you're going to just change the caption and you think it's more confusing that the jury has everything that looks the same, that nobody is going to make a deal of, than if you just change the caption on two documents.

MS. KELLY: Your Honor, our request is that the change be made on the final instructions and the verdict form, yes.

THE COURT: And your request is based on what, you just don't agree with it? Do you want me to double caption it? If this is the caption that nobody has moved to amend, why am I supposed to just start messing with it now?

MS. KELLY: We denied in our answer that this was the relationship --

THE COURT: Did you ask to amend the caption?

MS. KELLY: No, Your Honor.

THE COURT: Okay.

MS. KELLY: There is two complaints that are being tried here, a separate one that says Arm Ltd. This includes only one of the captions of one of the cases.

THE COURT: That's what I'm asking, do you want me to add more captions, is that what you would like?

MS. KELLY: What I would like, Your Honor, is

for FKA Arm Ltd to be removed --

THE COURT: I know, but that's the accurate caption of one of the cases. Do you want me to put the active caption of multiple cases on here?

MS. KELLY: Yes, Your Honor.

MR. MARKS: We have no objection to that.

THE COURT: You can give me a proposal that has that in it, I'm not going to bother to go do that.

Okay. Where is your next edit?

MS. KELLY: 2.2, the parties' contentions, Your Honor.

THE COURT: Okay.

MS. KELLY: We believe that the jury needs to be instructed that there is no claim for confidential information. I understand it was heard at side-bar, Your Honor. It's the same basis that was there, it came up again in deposition designations, especially in light of Your Honor's proposal to give an instruction that we simply have to be unfair in a consumer supplier relationship, and we have to create harm in a way that is not offset by our reasons, justifications, and motives. I think the idea that we may have breached a contract, that the jury might think that that happened, creates additional problems for tortious interference. Which is why we would like to make clear that there was no claim for a breach of contract based on sharing

of confidential information.

MR. MARKS: So, we think this is --

THE COURT: You can stay seated too, if it's easier for you to stand, you can, if you want to sit, sit, I don't care.

MR. MARKS: Thank you. We think this is likely to elicit more confusion than to eliminate it. The instruction already indicates what the particular claims are, there is no claim for breach of any confidentiality provision. I would also note that Arm chose to play the Chaplin deposition today, which had some of that information in it, so I just think it's going to be more confusing than helpful.

THE COURT: Yeah. So Arm played that testimony, which I understand Qualcomm didn't include any designations in. So what do you say to that?

MS. KELLY: We had to respond to the evidence that was elicited from Mr. Kranhold, from Mr. Haas, about whether that information was confidential. It was in response to the testimony --

THE COURT: You guys are just making this a much bigger issue than it was, and so I'm not going to instruct the jury on what is not in the case. I think it's clear what is.

As to your point on the tortious interference, I

think we're being pretty clear that the basis of the tortious interference is the sending of the letter, not that it was confidential.

Look, if during closing arguments, the plaintiff gets up and starts making a big deal like this was confidential, ask me to instruct the jury. So I'm not going to do that.

What's next for the defendant?

MS. KELLY: Page 14, Your Honor.

MR. MARKS: I think we are before that, on page 12.

THE COURT: What's your issue on page 12?

MR. MARKS: So this, Your Honor --

MS. KELLY: I'm sorry, I'm working off of the red liner.

MR. MARKS: No, I'm working on the clean version, I'm on 8.3, which instruction are you on?

MS. KELLY: I am on 8.1. I apologize for the confusion, Your Honor. The concern with this is the description that we just heard from Mr. Marks about separate accrual. That, as you know, we have a statute of limitations defense. The evidence that has come in about the ALA breaches is that there were at some identified time, 30 different patches that were requested that they didn't get. There has been no evidence put in the record about

futility and notice and cure.

There had only been one letter that was sent, which was in November of 2022. We don't know if these breaches are before or after that letter. We don't know which the jury -- and we have an argument about statute of limitations. What we request, Your Honor, is that plaintiffs would need to identify, and the jury would need to find which of those alleged breaches happened when. So that if they are outside the limitations period they can't be included in damages calculations. And I understand it gets incredibly messy. What we would request is that the breaches be limited to those identified in the November 2022 letter, which resulted in the dismissal of the statute of limitations for Arm Ltd. Given that time period for when that complaint was filed. So that this would need to be limited to Arm Holdings.

MR. MARKS: Your Honor, the evidence came in that there was an essentially extended time period from November 2022, except for one with the Pacman patch, until January 2025, where no patches, or OOB were provided. Candidly, I think we can probably prevail, as a matter of law on that, given the evidence. I will make a practical suggestion that I think may resolve this problem --

THE COURT: Hay Mark, can you move the elmo, it's like right in his face.

MR. MARKS: I'm happy to stand, too. My practical suggestion that I think might resolve this problem is on the verdict form on question one B of the verdict form.

THE COURT: Hold on, give me a second to pull it up.

MR. MARKS: Sure.

THE COURT: Which question?

MR. MARKS: This is question one B.

THE COURT: Okay.

MR. MARKS: And I want to make sure I'm giving you the exact date correct. So the practical suggestion is at the end of the sentence on one B, you could add after I believe the date, after January 14, 2022, and that would mean that any breach found for Arm Ltd would have been after that point and would, the limitations period, under their theory, I think that would clarify the issue.

THE COURT: They just gave me a date of 2023, I thought during the JMOL argument.

MR. MARKS: I apologize, January 14, 2023.

MS. KELLY: It's January 7th, Your Honor, January 8th 2023 or later.

THE COURT: Okay.

MS. KELLY: I think the issue at that point, Your Honor, is the evidence of damages came in as one lump. What

the testimony was from Mr. Trivedi, that plaintiff said they were going to use for their damages calculation here, is that we had 30 breaches during this undefined time period, some for an hour, some were longer, we're asking the jury to limit their consideration for the purpose of proving breach to some subset of that, but we're somehow going to allow them to calculate or have evidence that there is some larger period that doesn't mean to breach, but can be considered for damages.

And I understand the practical effects of this, but we have been asking, I don't know how to unpack this, given the way plaintiffs chose to put in their case. They want separate accrual to get around statute of limitations, but they don't want separate accrual when it comes to picking damages, and they picked a path that doesn't allow for potentially of those choices based on how they presented their case.

MR. MARKS: We respectfully disagree with that, we think there is enough evidence in the record for the jury to make that determination, as we discussed, there is evidence of the amount of time it was taken, there is evidence the engineers --

THE COURT: Was the evidence both before and after January 8th, 2023?

MR. MARKS: So we had salaries for each year of

the engineers, they were making different amounts between the years, and there is also evidence in the record of each particular breach, and so we think that provides the jury with enough information to be able to assess damages even on a shorter time period.

THE COURT: So for question one, we're just saying we're not putting a date at all?

MR. MARKS: I don't think we need to. I don't think it would be necessary.

THE COURT: Okay. And so if there is evidence in the record from which the jury could if it chose to, like, this is going to come into play if the jury were to find only that Arm Ltd had breached, and not Arm Holdings, and I know you don't think Arm Holdings can breach at all, because it's not a controlling party and it's not a party to the contract, but I don't know what you -- this is in the context of jury instructions, you seem to just want JMOL in the connection with jury instructions, you're not proposing something for me.

MS. KELLY: What I would propose, Your Honor, is to the extent plaintiffs believe there is specific evidence by date, that any evidence before that date, the jury be instructed they can not consider for purposes of damage or breach for Arm Ltd, that can only be for Arm Holding, and the jury needs to be instructed as to that. If the evidence

is different across the time period, then the jury needs to be told which time period goes to which entity.

THE COURT: But that's just for one of the breaches.

MS. KELLY: Just for the ALA breaches, yes, Your Honor, just for the Section 5.

THE COURT: So you got to propose something. I'm not going to -- I'm not going to rule on a concept.

What do you want in the instructions?

MS. KELLY: We do not know which supposed breach happened when. We have asked, we haven't gotten that list. I would ask that plaintiffs provide which evidence they believe is in the record --

THE COURT: We're not going to do that right now. That's a JMOL motion. What do you want in the instructions, I'm not going to instruct, here is number one breach, they say it happened this date, I'm not doing that, that's an objection, that's a JMOL motion, what do you want me to do with where we're left now. I know you want me to instruct the jury in a way that the only thing they can do is find in favor of your client. I don't think that's the way jury instructions work. What's your proposal?

MS. KELLY: Arm Ltd cannot be held responsible for any damages that occurred prior to January, the withholding of ACK patches or OOBs before January 7th, 2022.

THE COURT: Is that true if -- I don't know, is there some kind of continuing course of conduct thing going on here or is that -- does everybody agree that they can't be held liable before then?

MR. MARKS: Your Honor, we're not arguing a continuing course of conduct theory, I should note that I also think this all could be mooted because of the ethical holding argument that we made, I want to make sure Your Honor remembers that, but I think to the extent there is going be to be a proposed additional jury instruction on this, we would want to see the actual language and be able to talk about --

THE COURT: This is the time. Right. When do you think that's going to happen, that you're going to see it and decide what you want to do. The jury is getting instructed in like 15 hours. So when do you want to see it. What's your proposal?

MR. MARKS: I think our position, it would be that an instruction is not necessary, if they want to make this argument during closing, they can do that.

THE COURT: But you're not asserting through anyway continuing conduct, any other way that Arm Ltd is liable for anything before that -- oh, I guess you have equitable tolling.

MR. MARKS: That's correct, but other than that

argument, we would be only be asserting a breach, breaches after January 8th --

THE COURT: What's the status of equitable tolling.

MR. MARKS: We raised that argument at summary judgment.

THE COURT: And I denied the motion, so what's the status, is it even before me?

MR. MARKS: I think it's a -- so --

THE COURT: It's certainly not being tried, in a bench trial, when do you think that we're going to deal with that?

MR. MARKS: I think that would be raised by Arm Limited on JMOL, they were the ones who moved to dismiss on statute of limitations grounds, equitable tolling was our response to that which we would presumably raise again in post trial briefing.

MR. WILCOX: Your Honor, a statute of limitations, they agreed the statute of limitation applies the bar claim unless equitable tolling applies, it's their burden to come to the Court and say here is why equitable tolling --

THE COURT: When do you think I'm going to decide it. Really, why don't we just tell the jury to come back in six weeks, is that really what you want? I don't

know what you want me to do. You want me to decide all these issues, because you can't agree on absolutely anything, even the flipping caption in this case, right. I'm sitting here wasting my time with the caption on the case, as if the jury cares about that. We're fighting over that. And now I'm supposed to decide equitable tolling, tonight, this afternoon, when?

MR. WILCOX: Well, no, I don't think you need to, but also --

THE COURT: No, because you think I should just kick Arm Ltd out of the case, I'm not going to do that. So what's the plan? What do you want me to instruct the jury?

MR. WILCOX: I want you to instruct the jury that Arm Ltd cannot be liable with withholding ACK patches or OOBs before January 7th, 2023.

THE COURT: And if I then later find that equitable tolling applies, what happens?

MR. WILCOX: Well that's go to somewhat depend on what the jury finds, because if they check the box for Arm Holding, then probably equitable tolling doesn't matter, but I agree, if they only find for Arm Ltd, either way at this point we're going to have a problem, if equitable tolling is still to table, because if it turns out that they find we're liable, and there is not an instruction for the jury, there is a potential we're going to have a new trial

15:17:58 because it's going to be well, they went to them on a theory that equitable tolling might apply, the find out equitable tolling doesn't apply, and for all we know, the jury found a breach that occurred before the statute of limitations period.

THE COURT: So I think we have to say something in the instructions about the timing, because I am concerned that just saying it in the verdict form is confusing, and I am worried that equitable tolling does not apply, that I am going to have a jury verdict that may be legally barred and then the Third Circuit says if it's legally deficient and I don't know what the basis was, whether it was before or after, I have to have a new trial.

So can we say, can we just put dates in there, Qualcomm claims that Arm Holdings, you know, breached the ALA, you know, where we have dates, or do we just say with respect to Arm Holdings, the claims are only after whatever?

MR. MARKS: So I think the concern we would have with putting specific dates here is that if equitable tolling were to apply, then the jury would have been instructed to apply damages to Arm Ltd only for a period of time from January 8, 2023, --

THE COURT: Right. And if equitable tolling doesn't apply, then we get a new trial.

MR. MARKS: I think so.

15:19:44 THE COURT: And I'm not interested in that and I don't think equitable tolling is probably going to apply, what's your basis for equitable tolling?

15:19:52 MR. MARKS: Your Honor, this was our appeal in March of this year.

15:19:54 Of the special masters's order, we understood from the nature of Arm's pleadings, its responses to our interrogatories request for production, that they were treating Arm Holdings as synonymous --

15:20:08 THE COURT: Why don't we ask it, given that we're asking the jury a thousand questions, why don't we ask them, do you find that they did it before January, you know, up to January 7th and after January 7th.

15:20:24 MR. MARKS: I worry that would be confusing for the jury.

15:20:27 THE COURT: So what do you want? You want me to have a legally deficient verdict that requires me to have a new trial if I find no equitable tolling, that's what you're asking for? I'm trying to avoid that. This is not a good use of the Court's time to sit here and do something where I got like a flashing red light that I'm having a retrial.

15:20:52 MR. MARKS: I think your proposed instruction that would have both would prevent the problem that we raised and I think would resolve Arm's problem --

15:21:01 THE COURT: I said I wasn't proposing an

instruction, I was proposing a verdict question.

MR. MARKS: Apologize, on the verdict question, if the question were broken out, so that there was a period of time from the November 2022 date until January 8, 2023, and there were another question with Arm Ltd after January 8, 2023, that should -- the answer to that should prevent the new trial problem that you are raising.

THE COURT: Then what do we do about damages.

MR. MARKS: I think there would be sufficient evidence for the jury to determine damages based on the evidence of the particular breaches, in the record and on the salary information that was provided.

MR. WILCOX: Given where we are we're at, Your Honor, I think that what you're proposing is the best solution we're going to come up with.

THE COURT: So you don't mind about damages?

MR. WILCOX: I mean, obviously, I'm not waving my right to object if that happens, but I don't know what a solution is, given --

THE COURT: You don't have another proposal for what I should do to mitigate questions about damages.

MR. WILCOX: I do not, Your Honor. If while we're sitting here doing the conference, and we move on to other things, if something occurs to me, I will bring it up.

THE COURT: So for one A, we leave it as it is.

One B, is did Qualcomm prove by a preponderance of the evidence that Arm Ltd breached Section 5 of the ALA by withholding any of the following, what do you want to put in there?

MR. MARKS: I think you could put before January 8, 2023, I think you would have another question that was essentially the same as one B, it would be a new one C and would ask after January 8, 2023.

THE COURT: Okay. And then one D.

MR. MARKS: Would be damages.

THE COURT: If you answered yes to any part of question one A, one B, or one C.

MR. MARKS: Yes, that's correct.

THE COURT: And if you answered no to questions one A, one B, and one C, leave question one D blank. And then we don't do anything with the instruction? 8.1.

MR. MARKS: That would be our proposal, Your Honor.

MR. WILCOX: We think that we should -- well, I guess -- no, we don't -- leave the instruction as is, Your Honor.

THE COURT: Okay. What's your next -- anybody have an issue on 8.2?

MS. KELLY: Nothing beyond what we put in the submission, Your Honor.

THE COURT: I don't know what you put in the submission, I have now changed it, I don't have it in front of me, if you want me to add something back, I will.

MS. KELLY: Your Honor, we think the definition of previous best deal is different between the two sections of 8.1(B). 8.1 B talks about a previous best deal --

THE COURT: Can you just tell me what you want, because -- first, you can tell me what you want, and then you can tell me why, but if you don't tell me what you want, you can put as much argument on the record as you want, and then you go to the Third Circuit, and I'll just say that you didn't tell me what they wanted in the instruction, they just gave me reasons that they didn't like mine.

MS. KELLY: Your Honor, for the section that says second, by failing to provide in good faith an offer for a new license for each of the Hunter, Hayes, and Yamin cores, that was within ten percent of the previous best deal, we would request that the Court include the words accounting for total financial considerations, based the language of the contract that differs between sections 8.1(B) little 1 and 8.1 B little two.

THE COURT: Plaintiff.

MS. YING: Your Honor, we would propose previous best deal as defined by the TLA. Or as defined by the contract.

MS. KELLY: So there is a definition of previous best deal that refers to the lowest royalty rate that employees to the investigate and determine one. The second says that when calculating the ten percent, you have to take into account total financial considerations. Using the same phraseology when the contract has two different definitions, that's that whole section we went over with Dr. Kennedy, I think aligning that, misleadingly states to the jury that they should accept plaintiffs, and that's obviously disputed. We think keeping the language of the contract, which literally includes the words total financial considerations, is necessary to be clear and consistent with the contract language to add that to two.

THE COURT: So that wasn't in the original proposal that the parties gave me last week, right?

MS. KELLY: That's correct, Your Honor, we added it last night in light of how the evidence has come in.

MS. YING: Your Honor, we're discussing if you just give us a minute.

THE COURT: What provision have you taking your language from?

MS. KELLY: Your Honor, it's in 8.1(B) little romanette one. Talks about investigate and determine, and then the third line says with the lowest royalty rates and then it goes to define that as the previous best deal. If

15:28:56 you continue to romanette two B, which is the ten percent, 15:29:00 it talks about between the previous best deal and the offer 15:29:04 the licensee, the total financial considerations, the first 15:29:08 one is just looking at royalty rate and the second one 15:29:12 includes that total financial considerations as part of what 15:29:15 has to be required.

15:29:18 MS. NYARADY: To be clear, Your Honor, the total 15:29:20 financial considerations are only considered if they were 15:29:22 actually factored into Arm's calculation to determine the 15:29:25 license fees and royalty rates of the previous best deal. 15:29:29 So in this case, for example, if Samsung was previous best 15:29:32 deal, you're only looking at financial considerations, or 15:29:39 total financial considerations applicable to Samsung, so I 15:29:43 think just putting in the bare language out more gets 15:29:47 confusing.

15:29:49 MR. WILCOX: I don't want to cross talk.

15:29:52 THE COURT: All right. I'm not going to put 15:29:54 that in. I'm not just taking language from the contract, 15:30:03 we're interpreting language in the contract and that seems 15:30:06 like something for -- this is just a short hand of the 15:30:09 introduction of what the claims are, not what is actually 15:30:16 true. So you all can deal with what your positions are on 15:30:21 those things.

15:30:22 Anything else in 8.2?

15:30:26 MS. KELLY: Not for the defendant, Your Honor.

MR. MARKS: No, Your Honor.

THE COURT: Excuse me?

MS. KELLY: Not for Arm, Your Honor.

MR. MARKS: No, Your Honor.

THE COURT: 8.3.

MR. MARKS: Yes, we have a small suggestion here, in the first sentence after the number one, we would proprose to add after entered into, the words or is legally bound by a contract with Qualcomm, which would make the instruction consistent with the instruction in 8.1, where it says Arm Holdings disputes that it entered and is legally bound by the ALA with Qualcomm. That way the jury knows that we have -- you would apply the controlling party theory to these essential factual elements.

THE COURT: So defendants, assume that I understand your position about Arm Holdings, it's not a party to the contract, but they're asserting that they're somehow liable because they're a controlling party. What is the language -- I mean, the language you propose entered into isn't right because that's not Qualcomm's position. So what is wrong with, or is legally bound by, or if that's not okay, what is accurate.

MS. KELLY: The concern with legally bound by, Your Honor, is somehow based on the testimony that was elicited you're a wholly own subsidiary, that Ms. Dunn

elicited, that this jury is going to think that in and of itself is fine. We would say or is a controlling party under the contract.

THE COURT: Why can't we say that, that Arm Ltd entered into and Arm Holdings is a controlling party. We just say that and get rid of legally bound forever.

MR. MARKS: I don't think we have a concern with that standing alone. It may create some inconsistencies with 8.1.

THE COURT: We can fix that, hold on. So was that Arm Ltd entered into and Arm Holdings is a controlling.

MR. WILCOX: I'm sorry, Your Honor, because I know we're going back on our own proposal, I think legally bound may be the best we can do here, because the problem with that proposal, we also have the argument that Arm always has to be bound by the contract even though they're legally a controlling party.

MS. YING: I think I just heard Mr. Wilcox agree with us.

MR. WILCOX: Entered into or be legally bound by.

THE COURT: That Arm Holdings and/or Arm Ltd entered in and are legally bound by a contract with Qualcomm. Okay. Anything else on 8.3?

MR. WILCOX: No, Your Honor.

MR. MARKS: No, Your Honor.

THE COURT: 8.4, I didn't understand this condition precedent thing, and I don't feel like going through and comparing your two suggestions word by word, so what is this? Everybody seems to agree there is something to be said here and what's the dispute over words?

MR. MARKS: I can explain this, Your Honor. The parties agree on the first paragraph, that the first paragraph correctly states the law that applies in this case and that it is a condition precedent. The dispute is over I think adding all of the second paragraph or adding it not at all. Our position is that the second paragraph should not be added for two reasons, one as a matter of contract interpretation, we disagree that this is a requirement of 8.1(d) at all. And you know, even setting that aside, we don't think even if it were a requirement, it would be a condition precedent, because there is nothing about this language that's being cited that imposes some obligation on one of the parties to do something. Really what this is is a dispute about the scope of the provision, and that seems more like the type of contract interpretation issue that you wouldn't instruct as a condition precedent and have the parties argue in closing to the jury.

MS. KELLY: We agree on the language, the first paragraph, the parties have agreed there is no issue there.

We believe the second paragraph is necessary. There was no question, I think we heard Mr. Marks argue in response to JMOL was that the new under 8.1(d) could mean a couple of different things. There was no request that Your Honor find that language be ambiguous, and by the plain terms, it says a new implementation core is what triggers the requirement that we keep the same material nonfinancial terms, so we think it is a condition precedent that the request be for a new Arm implementation core.

THE COURT: Is this in the pretrial order?

MS. KELLY: Yes, this proposal language was in our pretrial order. We included this proposal there.

THE COURT: Why would you put a proposal in the pretrial order?

MS. KELLY: In our proposed jury instructions.

THE COURT: I'm asking was this issue of condition precedent for this in the pretrial order?

MS. KELLY: Yes, in the statements, not in the body of it, it wasn't like separate, we had that miscellaneous section that Your Honor is thinking of, but yes, we kept it in the pretrial order.

THE COURT: There is something about it being a condition precedent that Qualcomm did not seek to license a new implementation core.

MS. KELLY: I don't know the words condition

15:36:44 precedent are there in, but the fact that this is an issue
15:36:49 for the jury to decide is in the pretrial order.

15:36:56 MR. MARKS: I think it is correct that this was
15:36:58 not in the actual pretrial order itself, it was in the
15:37:01 statements of law. Not to get too deep into contract
15:37:04 interpretation, but our position is that they're taking the
15:37:07 language new Arm implementation core from the second
15:37:10 sentence of 8.1(d) and grafting it on to first sentence,
15:37:14 which says an Arm implementation core with no new, so we
15:37:18 disagree as a matter of interpretation, that this is
15:37:20 actually a requirement. But again, I think it's also just a
15:37:24 dispute about the scope of the provision, the condition
15:37:27 precedent Arm comes before, which is we have to have made an
15:37:32 initial request or a subsequent question, I think once --

15:37:35 THE COURT: Who do you think has to decide this
15:37:37 issue if you think that, who is going to decide this issue?
15:37:46 And when?

15:37:47 MR. MARKS: So I think the issue would go to the
15:37:51 jury and the parties --

15:37:53 THE COURT: So if the issue goes to the jury,
15:37:55 why can't we include it in this instruction?

15:37:59 MR. MARKS: Because I think saying it's a
15:38:01 condition precedent sets it out as unique from other
15:38:05 contract requirements, it puts an additional burden on us
15:38:09 that we don't think the contract provides, we're just

15:38:11 debating over the meaning of a term, just like Arm
15:38:15 technology or --
15:38:17 THE COURT: Except that those terms Arm asked me
15:38:20 to determine if they were ambiguous, so that we could have
15:38:23 parole evidence. Now you're saying, by the way, there is a
15:38:29 third term that nobody asked me to decide was ambiguous or
15:38:33 not, that nobody gave me the proffered, you know, evidence
15:38:38 of ambiguity, so why am I supposed to say that's an
15:38:42 ambiguous term that goes to the jury.
15:38:45 MR. MARKS: If Your Honor were to decide that
15:38:47 this is --
15:38:48 THE COURT: I'm not going to decide it. You
15:38:50 didn't ask me. We had a whole bunch of discussion on this
15:38:53 at the pretrial accordance, I said what terms do you think
15:38:57 are ambiguous. Then I got a submission from Qualcomm, and
15:39:01 it identified two that never had been identified before,
15:39:05 that was on Thursday night before we picked the jury on
15:39:08 Friday. This one has never been given to me. The first I
15:39:13 learned of it was now when we're having these discussions.
15:39:16 So no, it's too late. That's waived. If you're
15:39:21 saying now that there is ambiguity there, that the jury
15:39:26 decides, no one has ever asked me to determine that that
15:39:29 goes to the jury, so it's not.
15:39:30 MR. MARKS: We understand and we would argue
15:39:32 then that it's unambiguous in our favor that there is no

requirement --

THE COURT: I'm not deciding that, either, because -- you didn't raise this a timely way, you didn't. How is it possible that this is coming up the day before jury -- the jury gets instructed? When did you ever ask me to determine that this was ambiguous or unambiguous?

MR. MARKS: We argued that this was an incorrect instruction from the time --

THE COURT: When did you ask me to decide the substantive issue, never, never, never. Right?

MR. MARKS: I don't --

THE COURT: Never.

MR. MARKS: I don't think that's correct, because we did raise it in the pretrial orders, but I would say --

THE COURT: I'm sorry, I'm sorry. Did you submit something, the Thursday night before trial, that said we think these terms are ambiguous?

MR. MARKS: No, Your Honor, we're saying --

THE COURT: Yes, you did submit something that day.

MR. MARKS: I'm sorry.

THE COURT: You did not include this, right?

MR. MARKS: That's correct.

THE COURT: And so now, you're coming up and

saying oh by the way, there is this other thing, it doesn't work that way.

MR. MARKS: Your Honor, respectfully, I think this is Arm proposing this, we don't agree that this is a requirement, we are not the ones asking you propose this, we think it's incorrect as a matter of law, and it would instruct the jury that there is a requirement of the contract that is not there, unambiguously as a matter of law, not with respects to parole evidence.

THE COURT: What do you want me to do about this, I have no idea. And I think that both parties are ridiculous if you think I'm going to decide this now. All we've done is be inundated with all of your stupid disputes for weeks and weeks, and now you keep coming up with new ones. What's your position on this contract, is it ambiguous, not ambiguous, am I supposed to decide it's not ambiguous or ambiguous, what do you want me to do?

MR. WILCOX: We think it's unambiguous, Your Honor, and we moved for summary judgment on it.

THE COURT: But you got denied, so you don't get to move for summary judgment, have your motions denied, and then go like oh, we get to -- so I don't even understand. That motion is denied. Do you have anything before me currently on this?

MR. WILCOX: We have our JMOL that we argued,

Your Honor, to for issue preservation purposes, we have to put it in here in the jury instructions.

THE COURT: I know, but for issue preservation purposes, you also have to raise it a timely way, because you don't get to just say the day that the jury instructions are getting decided, by the way, we have this thing, it's ambiguous, maybe it's not ambiguous, we don't know, judge, we move for summary judgment on it, but you denied that motion, and we never raised it again, but hey, don't you worry, it's going to be front and center of any appeal that gets done.

I mean, that is not the way this works, you don't get to just make a record that doesn't give the trial court a chance to decide things. So you have no proposal for when I'm supposed to decide this, you just want me to look at this jury instruction and say yeah, ambiguous or not, and if that's your proposal, then I guess I'm taking it out, because the parties did not raise this in a meaningful way that I can respond to it, or make a decision, and since it's disputed, then I am not going to include it in the jury instructions.

8.5. Anyone have anything?

MS. KELLY: Your Honor, prior to that, we had a proposal for a corporate structure instruction, which I understand that Your Honor has overruled our request, but I

15:43:22 just wanted to flag it, because it's not going to be in the version that you're looking at, it was about how a parent and subsidiary are the same legal entity, which we think is important to clarify in light of the wholly owned subsidiaries contraction, the SEC documents, and I'm confident we're going to hear it in closing arguments, I don't want the jury to think that relationship alone is sufficient, so we had proposed language to clarify that the relationship doesn't somehow mean that they've met, either the elements of controlling party or some other reason by which Arm Holdings would be bound.

15:44:00 MR. MARKS: Your Honor, we do not intend to make an argument that merely because outside of the context of the contractual language that Arm Ltd, sorry, Arm Holdings would be bound by the contract because of its corporate relationship with Arm Ltd, that's not our argument, that's not the position we plan to take in closing, the argument we would make is within the specific language of the contract, the controlling party provision, that language is satisfied, which is why Arm Holdings can be held liable here.

15:44:27 THE COURT: Based on the representation made, I will not include that in this version of the jury instructions. If contrary to those representations, you think that Qualcomm makes that argument in closing arguments, you can ask me and I will give it as a separate

15:44:43 instruction to the jury.

15:44:44 MS. KELLY: Thank you, Your Honor.

15:44:47 MS. YING: Your Honor, if could go back to 8.4 15:44:50 for one second, it's the first sentence of 8.4, I think we 15:44:54 all agreed on the first paragraph as Mr. Marks said, but we 15:44:57 do think because we have now sort of agreed that the legally 15:45:01 bound by language is the best that we could do, that the 15:45:04 first sentence should read the Qualcomm TLA includes an 15:45:07 agreement that any Arm entity that entered into or is 15:45:10 legally bound by the contract would have.

15:45:14 MR. WILCOX: We have no issue with that, Your 15:45:16 Honor.

15:45:16 THE COURT: Okay. Thank you. Anything more on 15:45:23 8.4, 8.5?

15:45:27 MS. KELLY: Not from Arm, Your Honor.

15:45:29 THE COURT: All right. 8.6. I don't know where 15:45:35 this language is, is it in the ALA, the TLA, both?

15:45:39 MS. KELLY: It's just the ALA, Your Honor.

15:45:42 MR. MARKS: I think the -- with respect to --

15:45:45 MS. KELLY: That's right, Arm technology is the 15:45:48 ALA, and initial request is the TLA.

15:46:01 MS. YING: Your Honor, I think we may have a 15:46:03 couple of edits on this one.

15:46:04 THE COURT: So the first sentence now, prior to 15:46:08 the additional edits being proposed, Qualcomm and Arm

dispute the meaning of the words in Arm technology, the words Arm Technology in the ALA and initial request in the TLA.

MS. YING: And Your Honor, we would request that the phrase Arm technology, it should be capital A, capital R, capital M, because that's how it's used in the ALA itself.

MS. KELLY: We're fine with that language, we object to the instruction being given at all. With respect to Arm technology, the proposal, we had a meet and confer last night, the proposed definition, plaintiffs don't have a proposed definition for like what this is reasonably susceptible to, they just say well, it says that, but it must include ACK patches and OOBs, which I don't think is finding of ambiguity of the term, its contorting the term to fit their theory, we disagree to initial request, but that ship has sailed and I understand what their proposal was versus ours, I don't think we got there on Arm technology, it's just somehow it included it, which doesn't make it ambiguous, it's just that they think it means one thing, we think it means another.

THE COURT: Okay. Anything else on 8.6?

8.7?

MR. MARKS: Nothing for us on 8.7, Your Honor.

MS. KELLY: No, Your Honor.

THE COURT: 8.8. Nominal damages.

MS. KELLY: I'm sorry, Your Honor, we object to it being included. We requested specifically in an interrogatory, it's interrogatory 15, to specify all remedies sought for each alleged breach, the answer is to see the complaint, it then goes on for five pages, at no point does it say we may seek nominal damages, we think we provided a case in the Third Circuit, the case the plaintiff cited to support not giving it is distinguishable, one because it's prohibited to do that under South Carolina law, several others relate to the Lanham Act, one says there is no legal support within this circuit, we think we have that Dunkin Donuts case provides, they're factually different. Here we asked, we said tell us everything, plaintiffs response did not include nominal damages, we don't think there is sufficient basis to include it, they only identified it in the complaint and in the pretrial order, and we don't think that's appropriate disclosure.

MR. MARKS: Your Honor, our view is that the allegation of actual damages plus additional relief available at law necessarily includes nominal damages, we did disclose in our pre trial filings that we would be seeking nominal damages. I think critically here, there is no prejudice whatsoever to Arm to include nominal damages, there is nothing they could have done during discovery to

assert their claim, because all nominal damages is the same, we then don't really prove quantifiable damages, but we still have proven all the other elements of our claim, which Arm has been contested all along they known our arguments about, so this is really, I think doesn't, it doesn't prejudice them, it's they just don't want us to get nominal damages, which I don't think is the standard.

THE COURT: All right. I note defendant's objection, but I will not remove it. I think there was a catch all in the complaint that probably was broad enough to cover it. But I do have concerns about plaintiff failing to disclose it in a more full some way later, but I'm not going to remove it given that there really isn't any prejudice that has been explained to me.

All right. 8.9.

MS. KELLY: Nothing from Arm, Your Honor.

THE COURT: Plaintiff.

MR. MARKS: Nothing from plaintiff, Your Honor.

THE COURT: 9.1.

MS. KELLY: Your Honor, we would ask that rather than use the generic Qualcomm, that this specifies Qualcomm Technologies and Qualcomm Incorporated, we had originally proposed it for the first sentence, it may make more sense to go in number one, because it relates to who had an economic relationship with Meta, as Your Honor recalls there

was the whole discussion of Q TAB and QCDMA, and who is what, and are the parties in this case, are the plaintiffs actually the entities that have an economic relationship, so we think it's important to specify in one, Qualcomm Technologies, or Qualcomm -- and/or Qualcomm Incorporated were in an economic relationship.

We would also request that three, instead of saying a generic Arm, include Arm Holdings and/or Arm Ltd which is consistent --

THE COURT: I can't -- that Qualcomm Technologies and/or what?

MS. KELLY: Qualcomm Incorporated were in an economic relationship with Meta. And then at the end of the sentence, would also say that would have resulted in an economic benefit to Qualcomm Technologies or Qualcomm --

THE COURT: How about we come up with a better way. I mean, I have to read this stuff, and you're just adding words. Can we say to those companies?

MS. KELLY: Yes, Your Honor.

THE COURT: Any objection to plaintiff?

MR. MARKS: No objection, Your Honor.

THE COURT: Anything else on 9.1?

MR. MARKS: I think if we leave the language as it is, Your Honor, in the first sentence, it should add the word claim, so it says Qualcomm claims, I think that was

inadvertently omitted in the red lines.

MS. KELLY: Your Honor, we would request for number three that it specify Arm Holdings and/or Arm Ltd, consistent with how it appears in the rest of the instruction.

THE COURT: Okay.

MR. MARKS: No objection.

MS. KELLY: And then for seven, Your Honor, it's got the generic Qualcomm, whereas the harm would need to be specific to the entities, so we could put to those companies, for 6 and 7, it just says that Qualcomm was harmed, we would want to specify in six that Qualcomm Technologies and Qualcomm Incorporated.

And then seven could be those companies harmed. Thank you, Your Honor.

THE COURT: Anything else on 9.1?

MR. MARKS: Yes, for the Qualcomm entities, I think it should be and/or, right, it should be and/or?

THE COURT: That's what she said.

MR. MARKS: I apologize, Your Honor.

THE COURT: Anything else on 9.1?

MR. MARKS: Not from us, Your Honor.

THE COURT: 9.2?

MS. KELLY: We would just request the same changes.

15:53:55 MR. MARKS: We have no objections.

15:54:30 THE COURT: Okay. Anything else on 9.2?

15:54:35 MR. MARKS: No, Your Honor.

15:54:36 MS. KELLY: No, Your Honor.

15:54:37 THE COURT: 10.1.

15:54:40 MR. MARKS: Your Honor, we would raise one point 15:54:43 on the last paragraph. The final line, the final two lines, 15:54:48 sending Meta a letter in August 2022, we would request that 15:54:52 the language, the phrase stops there, instead of including 15:54:55 concerning the Nuvia litigation. We think that because the 15:55:00 letter in question was ambiguous as to whether it was 15:55:03 talking about the Nuvia ALA or the Qualcomm ALA, and so we 15:55:07 think that this was not directly related to Arm's claims in 15:55:11 the Nuvia litigation, it would be simpler for the jury.

15:55:16 MR. WILCOX: We have no objection to that, Your 15:55:18 Honor.

15:55:18 THE COURT: So it will say Qualcomm claims that 15:55:22 Arm committed acts of unfair competition by sharing the 15:55:25 contents of Arm's October 22nd, 2024, letter with the media 15:55:31 and sending Meta a letter in August 2022.

15:55:36 MR. MARKS: Yes, Your Honor. Thank you.

15:55:37 THE COURT: Anything else? Oh, I highlighted 15:55:41 this, IE harm to victim out weighs any benefit because it 15:55:46 wasn't clear whether that was one test, both tests, whether 15:55:50 we needed it because we are later saying what that is.

MR. MARKS: I think for simplicity sake, we would suggest omitting that since it's defined in the subsequent instructions.

MR. WILCOX: We agree with that, Your Honor. The only other thing I would say on 10.1 is we object to giving any instruction that involves the consumer supplier relationship, we think this case is governed exclusively by the competitor relationship, but I understand Your Honor has views on that.

THE COURT: I can't say that I don't necessarily -- I don't actually think you could be right on that. Certainly, if we're talking about a contract issue dispute, I think the cases are stronger for you. But on the verdict sheet, I took your suggestion to do it both ways, because again, we might as well find out what the jury is thinking, and if it turns out later on that I say the consumer test doesn't apply and I'm wrong and it gets reverse, we'll have a jury verdict to reinstate.

MR. WILCOX: Understood, Your Honor.

THE COURT: But I understand your objection and that is noted and preserved for the record.

Okay.

MR. MARKS: Your Honor on 10.1, I believe I created some confusion inadvertently. When I was referring to the phrase concerning the Nuvia litigation, that was the

15:57:17 only part of the sentence we were proposing to take out so
15:57:21 it would leave in the final clause that says in an effort to
15:57:24 obstruct Qualcomm's ability to produce custom cores.

15:57:32 MR. WILCOX: That's fine with us, Your Honor.

15:57:35 THE COURT: Mr. Wilcox, you have gotten so
15:57:44 agreeable, I don't know what to do with you.

15:57:47 Now it says October 22, 2024, letter, with the
15:57:52 media and sending Meta letter in August 2022 in an effort to
15:57:58 obstruct Qualcomm's ability to produce custom cores.

15:58:04 MR. MARKS: Yes, Your Honor, thank you.

15:58:05 THE COURT: Anything else on 10.1?

15:58:07 MR. WILCOX: Nothing from us, Your Honor.

15:58:09 THE COURT: 10.2.

15:58:10 MR. MARKS: Nothing from us, Your Honor.

15:58:12 MR. WILCOX: Just the same objection I'll note
15:58:14 for the record.

15:58:14 THE COURT: Thank you.

15:58:15 10.3. This one needs some work. So we say in
15:58:23 the context of direct competition, unfair competition as
15:58:27 defined as conduct that threats and typically violates the
15:58:31 policy or spirit of an antitrust law, and/ or otherwise
15:58:36 significantly threatens and harms competition. As I
15:58:39 understand it, those first two are not in this case, right?

15:58:43 MR. MARKS: That's correct, Your Honor.

15:58:48 THE COURT: So I think we should take those out.

MR. WILCOX: My only concern with that, Your Honor, and I'm sorry to stop being agreeable, is that the otherwise is doing a lot of work in those sentences, I think. It tells you what it means to significantly threaten or harm competition, it has to be something that significantly threatens or harms competition in the same way that a violation, the insipient violation for antitrust laws or something that violates the policy or spirit of the antitrust laws would, it's not just a free floating that threatens or harms competition.

THE COURT: Okay. Your objection is noted. I am going to overrule it, because I have in mind one of the California state court cases that I think defendants cited to me when they were saying this is not an issue to go to the jury. And it wasn't in the context of it being an element of the tortious interference, it was just a stand-alone UCL claim, and the court there I think wisely said what is a jury supposed to do with does it violate the spirit or policy of an antitrust law, and they're not in the position to decide that.

So I agree with that. And given that I agree with it, I don't think that it really helps to give some meaning to otherwise because we're not instructing them on what those other conditions are.

So I am just going to say in the context of

direct competition between competitors, unfair competition is defined as a significant -- as something, an act, I don't know what you want there. Conduct.

MR. WILCOX: Conduct that significantly --

THE COURT: Conduct that significantly threatens or harms condition. And the determination whether a particular piece or practice is unfair, necessarily involves examination of its impact on its alleged victim balanced against the reasons, justifications, and motives of the alleged wrong doer, that was from a case in the California state courts that was cited in the Epic opinion. Anyone have a problem with that sentence?

MR. WILCOX: We object to it, Your Honor, we think that that's inconsistent with Cel-Tech, and that the entire point of Cel-Tech was to move away from the balancing test in competition cases, so while Epic may say that, I think the California Supreme Court has said the opposite.

THE COURT: Okay. Noted.

Then I don't think that I am going to -- then under any of those theories, I'm going to take those words out because we are really only presenting one. Anything other than that in the -- anybody want to put on the record other objections to anything in that second paragraph, other than those first three words that I'm removing.

MR. MARKS: Your Honor.

MR. WILCOX: Go ahead.

MR. MARKS: Thank you. We would request that consistent with our previous colloquy that we omit concerning the Nuvia litigation from after a letter in August 2022.

MS. KELLY: That's what we were going to propose.

MR. MARKS: We're very agreeable today.

THE COURT: I got rid of that, so it ways October 22nd, 2024, letter with the media and sending Meta a letter in August 2022, is likely to result in substantial harm to competition.

Anything else in that paragraph?

MR. WILCOX: No, Your Honor.

MR. MARKS: No, Your Honor.

THE COURT: Then we get into the couple of paragraphs where Arm proposes we say relevant market. I think it was 20 times. And Colson tells me it's 24.

So put on the record why you want it.

MR. WILCOX: We want it because in some ways you stole my post it note on it during the JMOL argument. I will admit, but this is no real way to assess harm to competition, and whether it affects more than just Qualcomm without knowing what is the relevant market and having some sense of what does it mean to be in a market where there is

competition that is being harmed, if you don't have that, it's just this a more concept of harm to competition, it's going to give the jury no guidance whatsoever on how to assess that, what you need, you need some kind of market and then you figure out what are the effects in that market of the conduct on the market as a whole.

MR. MARKS: With respect to my friend on other side, we think that adding this language is just an incorrect statement of California law. This language comes from model jury instructions on civil antitrust cases and from antitrust decisions, the California courts, we think, have made clear that an antitrust violation is not a necessary elements of an UCL claim even in the competitor context, and so, to the extent you are adding legally incorrect language to resolve a concern about the standard, we think that's inappropriate.

THE COURT: So Mr. Wilcox, let's say that my inclination would be to agree with you, but you do cite civil antitrust law, and I think it's pretty clear from California cases that we have violation of the law, we have violation of the spirit of the law, and then we have number three, violation of doing something mean that isn't specifically approved by some law. Given that, I don't feel comfortable instructing when all you have is general antitrust cases, because I read the California cases as

16:05:49 saying this is the UCL is not limited to antitrust.

16:05:56 So, I am not going to include that, but
16:06:01 certainly your objections are noted. And you can try and
16:06:08 convince me otherwise if necessary at a later date.

16:06:17 So with that, I am going to move the provisions
16:06:32 -- I thought all your bullet points were essentially just
16:06:36 repeats of what we already said in terms of benefits of
16:06:43 competition just as lower prices, increased output or higher
16:06:46 product quality. Taking out the relevant market and the
16:06:52 market power, given that we're not talking about market
16:07:00 power, so what I am going to do is I will give you all these
16:07:04 instructions and tomorrow before the jury comes in, I'll
16:07:10 give you one last opportunity to tell me everything that you
16:07:13 object to in this instruction.

16:07:16 MR. WILCOX: Understood. Thank you, Your Honor.

16:07:20 MS. YING: Your Honor, while you're working on
16:07:22 this instruction, I think the concern Nuvia phrase that
16:07:25 follows the August 22nd letter shows up a couple of times,
16:07:29 to the extent that Your Honor is editing it, that can come
16:07:33 out too, to be consistent.

16:07:35 THE COURT: Okay. So I just did a search for
16:07:39 Nuvia and I got no matches, so if you see someplace, you can
16:07:43 tell me, but I didn't see it.

16:07:45 MS. YING: Great. Thank you, Your Honor.

16:07:48 THE COURT: Okay. 10.3, I will let everybody

tell me what their problems are with it tonight, we'll send this to you when we get out of here.

MR. WILCOX: Your Honor, just on that, I assume what you want is not lengthy argument, you want ones that we object, and a sense and then we can all move on.

THE COURT: This is one where before when I was like upset that you were just doing things to preserve them for appeal, that you didn't give me an opportunity to consider, this is not one of those. So yes, this is one where I have no problem with you just putting whatever you think you need in order to preserve your record for appeal.

THE COURT: Basic standard of care I think you all agreed on.

MS. KELLY: Your Honor, we had proposed one instruction before that, which was a Noerr-Pennington instruction, which we had discussed at the pretrial conference related to the October 2024 letter being required under the contract as part of the notice and cure period. I'm assuming that Your Honor is not going to give that instruction, but I just wanted be to make sure we had discussed it, we had discussed it at the pretrial conference. We're not asking for that in the context of the 2022 letter to Meta, this is about the notice of breach, which is the October 2022, because it was the necessary predicate act to moving forward with litigation under the

contract. We think it falls within Noerr-Pennington and as a first amendment issue can't be wrongful under the law.

THE COURT: Okay, and I disagree with that. So I'm not going to include that, but your objection is noted.

10.5, I think you all agreed to, is that right?

MS. KELLY: Yes, Your Honor.

MR. MARKS: Yes, Your Honor.

THE COURT: 10.6, was that agreed to.

MS. KELLY: Yes, Your Honor.

MR. MARKS: Yes, Your Honor.

THE COURT: Okay. Anything further in the deliberation and verdict, whatever?

MR. MARKS: Not from us.

MS. KELLY: We had proposed a lost profits instruction for the tortious interference. Ultimately at the bottom this change in incentive number is lost profits, it's about money that Qualcomm did not get from Meta as a result of the change in incentive payments, we think it's necessary to instruct the jury on how to go about finding it. I get that it's a little complicated, because it's not like I sell you a chip and the price is different or you don't buy as many, but ultimately, it's money that Qualcomm did not get because of the timing of incentive payments and the type of product, that's why we requested the standard California jury instruction on lost profits, which is the KC

430.

MR. MARKS: Your Honor, our position is that we are not seeking lost profit.

THE COURT: Yes, but you're not responding to what she just said.

MR. MARKS: I think that the difference is that lost profits are when we were seeking business opportunities that we would not have been able to obtain because of the breach. What we're arguing here is that we are making affirmative payments to Meta, which is not -- does not constitute lost profits. It's essentially a rebate.

THE COURT: All right. I am not going to instruct the jury on this, because I think it's confusing that I'm going to instruct them on lost profits when the party seeking damages says we don't want lost profits. And I haven't made any finding -- I mean, defendant's position is well, we think what they want is tantamount to lost profits and plaintiff is saying it's not, so I'm not going to instruct the jury. I think it would be confusing to the jury, and particularly, anything that tries to explain why sounds like I'm just ruling in defendant's favor.

So objection noted, but I'm not going to change that. Anything else?

MR. MARKS: Not from us, Your Honor.

MS. KELLY: Not from us.

THE COURT: All right. So I have made the edits, I don't know how well I have made the edits, so you'll have to read these over carefully and then we will as I said, we can come in a little bit early in the morning, assuming that there are no objections to closing stuff, we'll still come in early, before the jury gets here to let you put any last minute objections on the record.

Then we have the verdict sheet. So the proposed verdict sheet I have now edited to add question one B and one C, which have the January, the before January 8, 2023, and after January 8, 2023. Question two A, B or C.

MS. KELLY: Your Honor, we have a global request for the damages instruction. We think given that the substantive instructions include did Qualcomm prove by a preponderance of the evidence, we would like to add to the damages instructions that Qualcomm also needs to prove those by a preponderance of the evidence. The language I would propose is you have the if you answered, enter the amount of damages that Qualcomm proved by a preponderance of the evidence, it is entitled to, and I'm happy if somebody has a better phraseology for breach of and to make that change universal throughout all the damages.

MR. MARKS: Your Honor, we don't have any objection to adding that preponderance of the evidence language.

16:13:43 THE COURT: So I'm sorry, it was in the amount of damages that Qualcomm proved by a preponderance of the evidence.

16:13:53 MS. KELLY: It is entitled to.

16:13:55 THE COURT: For a breach.

16:13:57 MS. KELLY: Yes.

16:14:07 MR. MARKS: Your Honor, one small quibble with the proposed language, I think this could be confusing for purposes of nominal damages if you're saying we have to prove by a preponderance of the evidence the damages that we are entitled to. I'm not sure that's the right burden, I think once we prove the substantive elements of each of our claim, then nominal damages would be awarded by default if we didn't prove by a preponderance of the evidence quantifiable damages.

16:14:47 MR. WILCOX: Your Honor, isn't that just a legal issue that we can deal with after the fact?

16:14:52 THE COURT: If the jury says zero, then afterwards you ask me to amend the damages to a dollar, $10, or whatever.

16:15:04 MR. MARKS: Yes, Your Honor. Thank you.

16:15:07 MR. WILCOX: One last thing on this set of questions, Your Honor, as we have been sitting here, I have been thinking about how to potentially solve the damages issue and I will admit what I am about to propose it not the

most elegant solution, if we want to avoid the risk of a new trial, one option is to add a second damages question, and the first one what is the amount of damages you award before my breaches before January 7, 2023, and the second would ask what's the amount of damages you award after January -- well it would have to be before January 8, 2023, and then for any breaches on or after January 8th, 2023, so then you would have the two damages questions, you would know the answer and however things shook out with respect to equitable tolling, you wouldn't end up with a risk of having to see us again.

MR. MARKS: Your Honor, I think one concern I would have with that is that, I think it would impose a burden on the jury to make that determination with respect to Arm Holdings, when that wouldn't be necessary. The only place this particular determination is required would be for Arm Ltd. And so I think we would object to requiring the jury to make that kind of split determination for Arm Holdings.

THE COURT: The other thing is, I suppose -- I don't know if it's possible, but I don't see why it's not, that if the jury were to come back and say no to Arm Holdings, and yes to Arm Ltd before and after, we could when they come back, we could instruct them to go back and tell us what's what.

16:17:45 MR. WILCOX: I think that's better than having it to where we don't know and it may be that the jury has done something that's in violation of the statute of limitations and we actually have a black box that doesn't tell us.

16:17:57 MR. MARKS: I think that would be okay. I do think that the answers to the liability questions the way they have been revised might take care of a lot of these problems, because we'll know which particular time periods for which Arm Ltd was held liable if the box is checked.

16:18:13 THE COURT: Right. The issue I had was if they say yes for the time period beforehand, so let's say Arm Holdings, where there is no statute of limitations gets a no. Arm Ltd gets a yes for both. And one standard number. And so then, we don't know, was all of that in the limitations period or all of it later. So what I'm saying is in this scenario where that is the response, then I suppose we could ask the jury go back and tell us how you broke that up.

16:18:58 MR. MARKS: Understood, Your Honor.

16:19:01 THE COURT: It's a bridge we cross if we need to.

16:19:04 MR. WILCOX: That seems reasonable, Your Honor.

16:19:06 MR. MARKS: No objection, Your Honor.

16:19:16 THE COURT: Okay. So we changed all of the

damages to prove by a preponderance of the evidence. Any other changes proposed changes or objections?

MS. KELLY: Yes, Your Honor, so there is also just a typo, I think the damages question for two, doesn't say two C, it says question two.

THE COURT: I fixed that.

MS. KELLY: Hunter and Hayes, for the question two should be removed, doctor Kennedy said today they're not claiming we got it wrong for Hunter and Hayes, this is just the identify and determine question, and the evidence that they put on through their expert is we got it right for Hunter and Hayes, it's just Yamin we got it wrong for, we think Hunter and Hayes should be removed for both two A and two B.

THE COURT: Are you guys saying that there was a breach for failing to conduct an investigation for Hunter and Hayes?

MR. MARKS: Yes, Your Honor, we're asserting that's a breach, we don't think it's correct that those cores are out of the case.

MS. KELLY: That's fine, we can leave it in, Your Honor, I interpreted that from what the expert said, but if they are intending to try to go forward with it.

THE COURT: Okay. Anything else?

MR. MARKS: One typo, Your Honor, on page 6,

this is question 5B, I guess and five A, five A refers to a reasonable offer, whereas 5B refers to reasonable offers, I think it should be the same, a reasonable offer.

THE COURT: A reasonable.

MR. MARKS: Yes, Your Honor.

MS. KELLY: We agree, Your Honor.

THE COURT: Okay.

MS. KELLY: Your Honor, for six C, the competitor and customer, the language is different from six than seven. We would request that the language in seven C, that's consumer supplier relationship and competitor relationship, be used in six C as well.

THE COURT: Any objection from the plaintiff?

MS. YING: So I think what ---we made a similar sort of request that seven C and six C should read the same way. We would also request that they mirror each other, because one of them has competitor the left and competitor the right.

THE COURT: I'll make them both the same as seven C.

MS. YING: The only other suggestion that we had, on six C and seven C, is that we have been giving the jury the option to check boxes, which you know, is sort a binary decision, you either check yes or check no, this is one that you're asking that it could potentially be both,

our suggestion would be to remove the line for check boxes, and ask the jury to circle which would apply and they can note that it could be circled all would apply, because they could find that both test apply.

THE COURT: All right. That's why it says check which, basis or basees.

MS. KELLY: We don't have a dog in the fight about how they go about doing this, obviously, we disagree that they should do both, but maybe someone will tell me I messed up on this, in terms of how you want them to check or you want to them to circle, really not an issue.

MS. YING: It was just a suggestion, Your Honor.

THE COURT: Circle which basis or base sees, and then we'll just remove the bottom rows. Okay.

MS. YING: Your Honor, it doesn't matter with formatting, we think it makes sense to make sure that seven A, B and C are on the same page, so a page break before seven A just to be consistent with everything.

MS. KELLY: I'm sorry, Your Honor, one last thing, the five questions on the implied breach of implied covenant, we will just ask that this verdict form use obligation, that it's on obligation of good faith, the jury instructions refer to them as implied promise, we ask the verdict form changed to be implied promise to be consistent with how the jury is being instructed.

MR. MARKS: No objection, Your Honor.

THE COURT: Now, one last thing. Let me just make sure there is no more obligation in here.

Defendant had me split out Qualcomm, the Qualcomm entities in the tortious interference, in the instructions, but did not have me do anything about that in the verdict sheet, which I'm not entirely sure how to do.

MS. KELLY: What we would propose, Your Honor, is we do it for 6A and 6B, but I think to the extent -- well it would also need to know for 6C as well as 7A, 7B and 7C, but then question 8, I don't think you really need to split out the entities for damages, but we would need to for the proof of interference, both negligent and intentional.

THE COURT: So we're going to have like a billion more questions, they're not all going to be on the same page like you just asked.

MR. MARKS: Are we -- is the proposal to add questions or to adjust an additional box or an additional check line.

MR. WILCOX: It would be yes for Qualcomm Inc, question for QT.

THE COURT: No, for Arm Holdings. Is that what you want?

MS. KELLY: I think it's simpler if we did it by questions, but if there's a way -- I think the choose your

own adventure box would require lots of combinations, because it would be Qualcomm Technologies to Arm Holdings, Qualcomm Technologies to Arm Ltd.

MR. WILCOX: No, they get that from 6A and 6B, I think that would work, is that what you were proposing, Mr. Marks?

MS. YING: I'm sorry, can you repeat the question?

MR. WILCOX: I want to know if what I just described is what Mr. Marks was proposing.

MR. MARKS: I was trying to figure out what you were proposing, so your thought is to add a separate column here that would say yes for Qualcomm Inc., yes for Qualcomm Technologies, that's the proposal.

MS. KELLY: I think it might be simpler to put did Qualcomm Technologies prove by a preponderance of the evidence --

THE COURT: Except that we are now adding six, seven questions for the jury.

MR. MARKS: Your Honor, I think we're getting into territory where this is going to be unduly confusing.

MS. KELLY: What I was going to say, Your Honor, is we do the Qualcomm entity in the question and the answer has them check as to Arm Holdings or Arm Ltd, so we combine the Arm entity options in the answer to cut down the number

of questions, but that would need to separate the Qualcomm entities, because they are who has the burden of proof and has to have the relationship.

THE COURT: So tell me what the -- so 6A.

MS. KELLY: Did Qualcomm --

MR. WILCOX: Qualcomm Technologies I think.

MS. KELLY: That's what I was looking for, I think, prove by --

THE COURT: Coma in there.

MR. WILCOX: I would have to trust Qualcomm. I don't know if there is a coma in there or not. No, there is no coma. Sorry, QTI has a common after Technologies, Qualcomm Inc does not have a coma.

THE COURT: Did Qualcomm Technologies Inc. prove by a preponderance of the evidence that Arm Holdings or --

MS. KELLY: I would say that that --

THE COURT: Or Arm Ltd.

MS. KELLY: And/or Arm Ltd.

THE COURT: And/or Arm Ltd.

MS. KELLY: Intentionally interfered with Qualcomm technology Inc.'s economic relationship with Meta.

MR. WILCOX: And then the choices would be Arm Ltd and Arm Holdings, and maybe this is another one of those --

MS. KELLY: We can do a box like we did with

OOBs and ACK patches, Your Honor, in question one, maybe we could copy that, and replace ACK patches and OOBs with Arm Holdings and Arm Ltd. I'm not wedded to that, but it's just a suggestion, Your Honor.

THE COURT: Why don't we just add a column.

MS. KELLY: Okay.

THE COURT: That says yes for Qualcomm, no for Arm Holdings. I don't know.

It seems weird that you could say yes for Qualcomm and no for Arm Ltd.

MS. KELLY: The yes for Qualcomm is describing what the outcome of answering that question is. It's not describing the party for who you're finding. So I think if you look at Section 1, you could change -- I mean, I think you probably just say instead of no for Arm Holdings --

MR. MARKS: Your Honor, I think to put one point out there, not having seen this, I think we're very confused on how this is supposed to look, whether it's correct or whether it's going to be unduly confusing to the jury. Given that the parties agreed on this language previously, I think we would request that the jury just be given this form as the parties proposed.

MR. WILCOX: Your Honor, I have a proposal to hopefully make this much easier. If we just somewhere at the beginning of the verdict form again define what Qualcomm

16:31:01 is, and that Qualcomm means the two entities, given that in
16:31:05 the jury instructions, we break out the specific entities, I
16:31:09 think that Arm could be okay with keeping Qualcomm in these
16:31:13 questions, so we don't have to add more questions or more
16:31:16 checked boxes.

16:31:17 MR. MARKS: That's acceptable, Your Honor.

16:31:20 MS. YING: I think your suggestion would be, you
16:31:22 know how normally on the cover page of the verdict sheet, we
16:31:25 would define what the patents are, or whatever, we would do
16:31:28 it there, and then everything --

16:32:30 THE COURT: Don't we have weird yes's multiple
16:32:34 times? Why do we have that every where? Like look at three
16:32:46 B, yes for Qualcomm, no for Arm Ltd. Yes, yes, yes, no, no,
16:32:51 no.

16:32:57 MR. WILCOX: Are you suggesting to delete the
16:33:00 word yes in these three columns, just at the top of the
16:33:04 column title. I'm just trying to make sure I understand,
16:33:07 sorry, Your Honor.

16:33:08 THE COURT: Yeah, you guys want it that way, it
16:33:11 just seems, it seems weirder when you look at like 4A, 4B,
16:33:17 4C, because it's like yes and yes are right next to each
16:33:21 other. But whatever you guys want.

16:33:23 MR. WILCOX: At least for Arm, we would be okay
16:33:26 with the, at the top, yes for Qualcomm, no for Arm Ltd. And
16:33:31 then get rid of the yes, yes, yes, no, no, no, and for

example the Hunter, Hayes, and Yamin boxes. So we only have yes and no at the very top.

MS. YING: In that case you should probably get rid of the yes in the line because then you have a box that you check, and then maybe what the instruction --

THE COURT: I don't have the box, I have no idea if these boxes show up or not, some of them look like they don't show up, some of them look like they do, I have no idea. I haven't printed it out.

MS. YING: That's fine, Your Honor.

MR. WILCOX: At least on ours, it looks like all of them have boxes.

THE COURT: Oh, mine, I just did a print preview, so and I just took Qualcomm's proposal for starting point, but 1A, 1B, 1C have boxes. 2A, 2B, have boxes. 3A, 3B have boxes, 4A, 4B, no box, 5A, 5B, no Box, 6A box, 6B no Box, 7A, 7B, no box.

MR. WILCOX: You're correct. I think you're right about that, I think what's happening Your Honor, is when it is essentially a grid of you have multiple basically deciding for Hunter, Hayes, and Yamin and then you have to died for the party, it gets a box because it's doing essentially a grid and a chart. When it's just a check the box exercise, then there is no box and it's just the check the box. But I agree with you that we don't need all of

these duplicate yeses and nos, we can just have yes for Qualcomm, no for Arm Holdings, and essentially the line that you check.

THE COURT: Plaintiff.

MR. MARKS: We're fine, we are okay cutting the multiple yeses and multiple nos and leaving the yes and no on top. Our understanding of the grids versus not grids is the same. I guess that raises a question, I don't know whether we're keeping the lines or not, if it's no line --

THE COURT: No lines.

THE COURT: We're keeping all lines whether in a box or not in a box.

MR. MARKS: Do we need to tell the jury to check a box, to check which boxes apply? I guess that would apply on to all of them.

THE COURT: I can't remove, by the way, the yeses and the nos in 2A.

What we're going to do is Mr. Buckson, will re-email this verdict sheet to you all and you should just give it back to us with whatever you agree on. Because this is definitely challenging my abilities.

Okay. Anything else on the jury instructions or the verdict sheet?

MR. WILCOX: Nothing more for us, Your Honor.

MR. MARKS: Nothing from us, Your Honor.

THE COURT: So let's -- if there are no other objections to deal with, let's come in at 8:45 tomorrow for you to put whatever remaining objections or repeat your objections or whatever you want to do on the jury instructions.

If there are typos or something like that, and you all agree to fix them, just fix them and give them to us. And Mark, do we have them make copies or do we make copies? If everything is fine, subject to your objections, you can then bring us copies, twelve copies. If there are still things that you all don't agree on and we need to deal with it, we'll deal with that in the morning and then we'll make copies.

So Mark will e-mail you the proposal, and you can either get back to us and say subject to the objections we make tomorrow, okay, or if there is changes you all agree on, fine, make those and make copies, but if there are things where there is a change someone needs that we didn't discuss today, or that I haven't ruled on yet, then we'll talk about that tomorrow at 8:45. And if there are additional objections on closing things, maybe I will a switch that time a little bit earlier.

MR. WILCOX: Can I ask one question, Your Honor? This is about mostly how people spend their night. For the bench trial, do you prefer, don't care, or strongly disfavor

a closing for the bench trial.

THE COURT: So I like to have closings for bench trials, but given that you're also doing a closing for the jury trial, what I would propose is that we just come back at another time, maybe even after briefing. But let's talk about that tomorrow, whether it would be helpful to me to have you come in before briefing or after briefing, but we do not have to prepare a closing for tomorrow.

MR. WILCOX: Understood.

MS. YING: I have a request, you may guess who it is, but Mr. Buckson had kindly e-mailed us all the time counts and I noted in his e-mail that it included the six minutes that the Court had granted and --

THE COURT: I gave you eight.

MS. YING: So I'm here to beg for two more minutes is I'm doing.

THE COURT: When you were out of the room, I went soft.

MS. YING: She almost gave us ten, but then I can't quite get there, I would like to ask for the last two minutes back for both sides. Thank you.

THE COURT: Yes. That means I probably would give you close to that before I put out the hook, at least one before I put out the hook. Okay.

Anything else, if not, I will see everyone here

16:39:58 tomorrow, or I'll see all your papers that you decide to
16:40:03 inundate us with tonight.
16:40:06 COURTROOM DEPUTY: All rise. Court is in
16:40:08 recess.

(Court recessed at 4:40 p.m.)

# Exhibit B-3

13:30:20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUALCOMM INC., and ) ROUGH DRAFT
QUALCOMM TECHNOLOGIES, INC.,)
) VOLUME 4
Plaintiffs, )
) C.A. No. 24-490(MN)
v. )
)
ARM HOLDINGS PLC, )
)
Defendant. )

Friday, October 9, 2026
2:00 p.m.
Bench Trial

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE MARYELLEN NOREIKA
United States District Court Judge

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: JENNIFER YING, ESQ.
BY: TRAVIS J. MURRAY, ESQ.

-and-

DUNN ISAACSON RHEE LLP
BY: KAREN DUNN, ESQ.
BY: WILLIAM ISAACSON, ESQ.
BY: ERIN J. MORGAN, ESQ.
BY: JENIFER HARTLEY, ESQ.

-and-

APPEARANCES (Cont'd):

PAUL WEISS
BY: CATHERINE NYARADY, ESQ.
BY: JACOB A. BRALY, ESQ.
BY: WILL MARKS, ESQ.

Counsel for the Plaintiffs

YOUNG CONAWAY STARGATT & TAYLOR LLP
BY: ANNE SHEA GAZA, ESQ.
BY: ROBERT VRANA, ESQ.

-and-

KIRKLAND & ELLIS LLP
BY: GREGG F. LoCASCIO, ESQ.
BY: JASON M. WILCOX, ESQ.
BY: JAY EMERICK, ESQ.
BY: MEGHAN KELLY, ESQ.
BY: MEGAN McGLYNN BUTLER, ESQ.
BY: MATTHEW McINTEE, ESQ.
BY: PETER EVANGELATOS, ESQ.

Counsel for the Defendant

\- - - - - - - - - - - - - - - -

COURTROOM DEPUTY: All rise. The United States District Court for the District of Delaware is now in

session. The Honorable Maryellen Noreika presiding.

THE COURT: All right. Everyone can be seated. Where are we?

MR. ISAACSON: Your Honor, Qualcomm calls Professor Eric Posner.

COURTROOM DEPUTY: Please raise your right hand. Please state and spell your full name for the record.

THE WITNESS: Eric Posner, E-R-I-C, P-O-S-N-E-R.

ERIC POSNER, having been duly sworn was examined and testified as follows:

REDIRECT EXAMINATION

BY MR. ISAACSON:

Q. Professor, you have prepared some slides for today?

A. Yes.

Q. Can we put those on the screen, Mr. Spalding. Number two.

Can you just tell the Judge your background?

A. I'm the Kirkland & Ellis Distinguished Service Professor of Law at the University of Chicago Law School. I have taught and done research for 33 years. And I specialize in law in economics and in particular to economic analysis of antitrust law and competition policy.

Q. And would you explain your history of publications?

A. I've written or edited nineteen books and several hundred articles which almost entirely involve economic

analysis of various areas of the law. But substantially in the last ten to fifteen years I'm competition law and antitrust law.

Q. And would you describe what is the field of law in economics?

A. The field of law in economics is an inter disciplinary field where economic is used to analyze legal and policy matters.

Q. And I think this goes without saying, are you here to talk about anything about law today?

A. No.

MR. ISAACSON: I move to qualify Professor Posner a expert of law in economic.

MR. WILCOX: No objection, Your Honor.

THE COURT: Thank you.

BY MR. ISAACSON:

Q. From a high level, what did you evaluate in this case?

A. I evaluated whether Arm engaged in anticompetitive behavior.

Q. What framework did you apply?

A. I applied a well-established concept from economics called input foreclosure.

Q. Could you explain what input foreclosure is?

A. Input foreclosure is used to evaluate settings in

which a supplier that supplies an essential input into its customers also goes downstream and competes with its customers.

Q. And what is the input in this case that you're focused on?

A. I'm sorry, I didn't hear your question.

Q. What is the input, sorry, not in the microphone, both need to do that, probably.

What is the input that you're focused on when you're talking about input foreclosure in this case.

A. The input is Arm's instruction set architecture along with associated IP.

Q. Under what conditions is input foreclosure anticompetitive?

A. Input foreclosure is anticompetitive if the upstream supplier, Arm here, dominates a critical input so the Instruction Set Architecture. And at the same time, it competes with its customers, and has the ability and the incentive to foreclose its customers, meaning raise prices or degrade access to the input.

Q. That framework you just described, where is that drawn from?

A. Well, economist have been working on it for many decades. It originated in the '70s or '80s and has been developed over the last forty or so years. It's been

influential in antitrust litigation, merger guidelines and other places.

Q. Let's look at your slide three. This is a very simple timeline. Would you explain why you put together this timeline as it relates to input foreclosure?

A. Right. So the main question that I have looking into is whether Arm's move downstream to become a chip maker is input foreclosure. And so I just wanted to distinguish the early years of Arm where it was essentially just a supplier of IP, and which might be called the Switzerland of chips error or Arm's historical business model to the 2024 and later in which Arm is now competing with other chip makers to supply data center chips.

Q. You have here an entry for September 2024 where Arm finalizes a deal to design a data center chip and another on March 26th where Arm announces it will begin a data center chip. Have you tried to study how much earlier Arm or Qualcomm was doing that work?

A. No.

Q. Is it always a problem if a company starts to compete with its customers to whom it supplies an input?

A. No, it is not always a problem.

Q. What sort of situation does it become a problem?

A. It's a problem when the supplier controls an essential input for its customers and then in that setting

it can be a problem if the supplier also goes downstream to compete with its customers.

Q. Would you explain what your, the rest of your conclusion on that the Arm instruct set architecture is an essential or critical input?

A. Well, I think it seems pretty clear that the chip makers that produce chips, especially for high level devices must have access to the Arm ISA in order to maintain their business and satisfy their customers.

Q. In terms of the ISA being the critical input is that true for data center chips as well. Yes, I believe so?

Q. Why do you say that?

A. Data center companies do lots of different things, but the hyper scalers particular in the data centers going into the future need to use the Arm ISA, need to have chips that are based on the Arm ISA because their customers depend chips that will run Arm compatible software and because there is a great, great deal of value in chips that do not use too much energy and that's one of the features of the Arm ISA that is attractive.

Q. Can you explain what you're referring to when you say for the hyper scalers and then there is also just non-hyperscaler data centers?

A. The hyperscalers are Microsoft, Amazon, Google and Meta and maybe a few other companies as well. They provide

cloud services and they run these incredibly massive data centers that we've heard about. There are other companies that provide data centers that, you know, simply store data. Often -- well this is truth for both the hyperscalers and the regular data centers, often they do need to store or analyze data that is associated with software that works on X86 chips. But the hyperscalers do most definitely need to have Arm compatible chips.

Q. In your field, is there a formal process called market definition?

A. Yes.

Q. In conducting your analysis, have you used that to define a market?

A. No, I have not.

Q. Why not?

A. It's not necessary in this situation. And generally it's not necessary because the question when you're thinking about input foreclosure is whether the supplier has pricing power, whether if it raises prices, its customers have no choice to accept the price raises and the price increases or have to go elsewhere.

Q. All right. And you mentioned this, the literature on input foreclosure goes back a long time. How does this literature on input foreclosure deal with the issue of market definition?

A. Well when people do analysis using input foreclosure, you don't need to use market definition, sometimes people do, it's a kind of a different, it's like a methodology that you can use in the course of using the input foreclosure model.

Q. Okay. Would you look at your slide four. And here you're discussing applying input foreclosure in this case, over on the left is the historical business model. Would you explain what you're saying here?

A. So this is a diagram, and I do want to emphasize it's very much a simplification but just to make clear exactly what input foreclosure means. So in Arm's historical business model it supplied IP to Qualcomm and other chip makers and these guys made the chips which they in turn sold to OEMs which are original equipment manufacturers and they would sell their devices further downstream to other businesses or consumers. The key thing about this model is that Arm and its customers incentives are fairly closely aligned. When Qualcomm or the other chip makers, sell more chips then Arm receives more royalties from them.

On the right side of the diagram is the input foreclosure image, and it's basically the same as the first diagram, but you just imagine now that Arm has moved downstream and you could think of it Arm now having two divisions the division that supplies the ISA, and the

division that makes chips. So the first division can continue supplying the ISA to Qualcomm and other chip makers, it's also in effect supplying the ISA to Arm's chip making division.

Now, Arm and the other chip makers are competing for the business of the OEMs. The concern here is that if you look at the arrows at the top that show the path of the ISA or the ISA IP from Arm to Qualcomm and the other chip makers, Arm can foreclose and that's just a technical term that means it could either degrade the ISA, for example by delaying service or it could raise the price of the ISA if it's permitted to do that under the license.

And that raises the cost if Arm does that to Qualcomm and the other chip makers. As a result they can offer less competition to Arm for the business of the OEMs.

ARM gets a competitive advantage as a result.

Q. All right. Can we look at your slide five. And this talks about Arm's alleged conduct towards Qualcomm. And foreclosing deposition. There is a list of conduct that's come up in this case. Are you giving any opinions about whether this conduct occurred?

A. No.

Q. So assuming this conduct some or all that has occurred?

MR. WILCOX: Your Honor, the slides that we have

don't seem to be in some different order than the slides that you have.

MS. NYARADY: We moved a slide and put it in place of another. They're substantively the same.

MR. WILCOX: I'll find it and we'll assume we're going to be okay, but I will raise it if it turns out to be a problem.

BY MR. ISAACSON:

Q. So assuming that this conduct is happening, would you explain what your conclusions are here with respect to input foreclosure?

A. Right. So if these allegations are true, this is -- these are types of foreclosure that were indicated on the upper line leading from Arm to Qualcomm. So attempting to escape the ALA with Qualcomm, you know that's obviously foreclosure in the sense that if Qualcomm no longer is able to produce custom chips, it's not -- custom cores for its chips it's not going to be able to sell those chips in competition with Arm to the downstream OEMs.

The misinformation campaign to the extent that the misinformation campaign causes the downstream OEMs to avoid working with Qualcomm or to reduce the amount of business that they're willing to give to Qualcomm, that's an advantage to Arm because Arm then may be able to get their business. Failing to provide Qualcomm with deliverables and

compliance confirmation, that will increase Qualcomm's cost. In Qualcomm's costs are increased it's either going to have to raise prices for the downstream OEMs or reduce output or quality. That gives Arm a competitive advantage in obtaining the business of the OEMs. Same thing where the failure to provide Qualcomm with good faith licensing proposals under the TLA.

Q. With respect to this next point, our respected colleagues are over here arguing that all we did with was reduce support, how would that still relate to input foreclosure?

A. I'm sorry?

Q. When we were doing a reduction in general support?

A. Reduction in general support. To the extent that, for example, as has been alleged that Arm has not met with Qualcomm when it's appropriate or has not communicated with Qualcomm when Qualcomm had legitimate questions, that, too, will raise Qualcomm's costs and as a result, make it difficult for Qualcomm to compete with Arm.

Q. Finally the v10 issue?

THE COURT: Can I ask a question?

MR. ISAACSON: Sure.

THE COURT: So on on your prior slide, you had, that one, you have foreclosure arrow going to Qualcomm and to other chip makers. In order for this to be

anticompetitive, does it have to have foreclosed other chip makers, too, because the only thing on your other slide was Qualcomm. And so if there is input foreclosure to Qualcomm, but not to other chip manufacturers, or no evidence of that, is that necessarily anticompetitive or does it depend on the size of those other chip makers in Qualcomm and their business, like how does that work.

THE WITNESS: Yes, it could be anticompetitive in a number of ways. So with respect to other chip makers aside from Qualcomm, if they see that Arm is mistreating Qualcomm in a general sense, then they're going to be cautious about themselves relying on the Arm ISA, they may be cautious, they might put more resources into investing into some other ISA, they might just withdraw from the market or refuse their competition in the market for the OEMs further downstream because they realize that Arm not only -- it has this ability to foreclose and it's demonstrated a willingness to use that ability to foreclose so they would rationally try to be somewhat less competitive because Arm has this huge advantage over them.

THE COURT: But you're not opining that you have seen evidence of that, that's a hypothetical of how it could be?

THE WITNESS: As to how it could be.

THE COURT: When you said something like the

14:24:24 other chip makers if they see what harm is doing, they make to another ISA, if that was the case wouldn't it it be less of an input foreclosure because Arm would have less power because other people were also supplying it?

14:24:39 THE WITNESS: Right. So if they really just go to another ISA then Arm would not be supplying a critical input as you say.

14:24:49 My impression from the materials that I have read is that Qualcomm and other companies have been investing in RISC-V, but this is a very long-term process. And we just know from the history of Intelix 86 and ARM's ISA itself that it takes decades to build up an ISA because you need lots of different chip makers to rely on it and then millions, even 22 million software developers to rely on it. That's not something that can happen quickly.

14:25:22 So what you would expect to happen is that the chip makers would put more resources let's say in developing RISC-V in the hope that in 5 or 10 years it would provide adequate substitute ISA which means that they'll have less resources with which to compete with Arm for the business of the OEMs and presumably, whether or not they can you know ultimately use another ISA, they're in a very difficult position because you know, it may be that they can still supply these OEMs but they're going to be worried that some time in the near or distant future Arm might engage in input

foreclosure against them so they would rationally cut back, edge, do whatever they need to do in order to protect their interest.

THE COURT: And does the, in looking at input foreclosure and the effects on competition, does the sort of hear that you're looking at matter, you know, for example, if it's an area where the technology moves very quickly or where the needs, the OEMs, you know at some point it might have been most of the OEM were phone companies and now it's data centers and nobody predicted that it was going to become so different, does that matter in are the terms of your whole input foreclosure.

THE WITNESS: The speed with which technology advances?

THE COURT: Yeah, the speed at with which it advances and the needs, it seems to me that the OEMs and who they are seems to change, too.

THE WITNESS: It could, so, you know, image a world in which somehow ISAs aren't necessary, there has been some technological advance that we can't even imagine ISAs sees to be important somehow, chips can run the same software without using an ISA, item not an expert about that technology. If we thought that was possible, then Arm's ability to foreclose and to undermine competition would be limited by that possibility. But I'm not, I'm speaking in a

very hypothetical sense, I do think the speed of technology change could matter.

I do want to emphasize that if the technology that's used to design chips changes very rapidly but remains dependent on Arm's ISA, then Arm will just have tremendous power because at the technology advances very rapidly, demand would be very high. And Arm would be able to choke these competing chip makers.

THE COURT: Lastly, on your slide up there, if there is no evidence that other chip makers are doing some of the things that you hypothesize they were doing and it's really just Qualcomm, what does that do, if anything, to your opinions.

THE WITNESS: Well, you know you know, this is a big issue and competition policy and antitrust law which is how much to you look into the future. And in many areas of policy, there is such significant concern about the long-term consequences of anticompetitive behavior that we stop it, in fact that's what happened a few years ago. The reason that the FTC, the CMA in England and the European commission challenged the merger of NVIDIA and Arm was based solely to perspective harms, they said if this merger went through there may be a substantial lessening of competition which is the legal standard.

From the point of pure economics when you're

**talking about anticompetitive behavior, you have to take into account the future. Whether you think the impact is speculative, it seems to me is ultimately a matter for the fact finder, if it's truly remote, then I don't think there is going to be -- then you may think that there isn't incipient anticompetitive behavior, but if it seems plausible or thinkable, then I do think that incipient antitrust behavior can be found. At the risk of being a little too early, but there is not a clear line between taking an action that pretends anticompetitive behavior in the future and actually doing that behavior in the future because the whole industry is watching what you're doing and if they think you're going to be engaging in more and more anticompetitive behavior, they will react and that will result in a reduction of competition.**

**THE COURT: Thank you.**

**BY MR. ISAACSON:**

Q. **In your report just sort of following up on that, what conclusions did you reach about the risk of anticompetitive harm in this case?**

A. **Well, I think they're quite substantial. And the reason why I think this is substantial despite, you know, the limited amount of evidence about impacts to other chip makers just goes back to the fact that Arm is just massively dominant company. I did not know anything about this**

industry before I started working on this. I never heard of a company whose IP has gone into 350 billion products. And that the particular IP that it has is going to be essential for the foreseeable future for the biggest technology companies in the world.

So I am concerned about this. And I think it is a substantial worry that Arm in the future will use its power to under mine competition.

Q. Last yes. V10, we didn't touch that topic. How does that version ten, how does that fit, if they're not bargaining in good faith or just not getting v10, how does that fit into your input foreclosure analysis?

A. Well, so the way Arm during the early error was able to attract lots of chip makers to their ecosystem is by promising reasonable rates, openness, and a long-term relationship. And that was essential because if you're going to commit to this ecosystem, you make huge investments, so you need to be able to rely on Arm continuing to act in good faith.

And so of course you're not going to make a license, you know, a hundred years long, so it does need to be the case that the license will be -- sorry, you can't anticipate technological change at the time that you enter in a license so you have to make sure that as the license itself is improved, that the licensees will continue to have

access to it.

MR. ISAACSON: Thank you, professor.

MR. WILCOX: One second, Your Honor. Thank you. Permission to approach?

THE COURT: Sure.

CROSS-EXAMINATION.

BY MR. WILCOX: Is there anyway you could run the slides for me since my tech is going to have different slide numbers than he has. I appreciate that. Thank you.

BY MR. WILCOX:

Q. If you could pull up slide six, I would appreciate it.

So you agree, Professor Posner, that all of the harms that you're talking about here are harms that are directed or conduct that's directed to Qualcomm, right?

A. Yes, that's the allegation as I understand it.

Q. Right. And you don't have an opinion about whether harm is actually engaged in any of this conduct, correct, you are saying if the jury finds or the judge finds Arm engaged in in conduct then that would be evidence that Arm has the ability to foreclose?

A. That's correct.

Q. Okay. You also haven't pointed to any evidence that Arm engaged in any other similar conduct with any other chip supplier, right?

A. That's correct?
Q. For conduct for anticompetitive tortious interference it must harm more than just equal and Qualcomm's business interest right?
A. Why.
Q. So whether Arm's entry into selling data center chips is anticompetitive tortious interference depends on its market wide impact, doesn't it?
A. Yes.
Q. What and what matters is whether Arm's actions increase or decrease competition in the overall market, not just its affect on Qualcomm, right?
A. Yes. In the appropriate sector that we're talking about, absolutely.
Q. Okay. But you haven't defined a market, have you?
A. That's correct.
Q. I have another question about had you input foreclosure works, Professor Posner. Input foreclosure depends on Arm being a monopoly, doesn't it?
A. Yeah, or having the ability to charge prices above marginal costs.
Q. Professor Posner, could you go to your deposition, it will be the October 2nd, 2025, transcript. And if could go to page 51. It will be lines 2 through 14. Let me know when you're there, professor?

A. 51, line 2. Okay.
Q. Okay. And were you asked this question and did you give this answer, professor:
QUESTION: In all of the opinions that you offer depend on Arm having a dominant position, right?
"ANSWER: Well, the input foreclosure argument depends on Arm being a monopoly that supplies a critical input to the chip designers, the -- so I don't -- whatever dominant position means, I wouldn't say that argument relies on Arm having a dominant position unless a dominant position is defined to mean a monopolist. Then you go to on to talk about another theory that you have, correct?
THE WITNESS: Yes.
Q. So at least at the time of your deposition, you thought that Arm had to be a monopoly in order to engage in input foreclosure, correct?
A. Yes.
Q. You haven't offered any opinion today that Arm is in fact a monopolist, have you?
A. Well, no, my opinion is that -- I do want to be clear about this, but --
Q. Your counsel can redirect you if they want?
A. Right.
Q. But the answer is no, you haven't offered any testimony today take this Arm is a monopolist correct?

A. Well I have called Arm a dominant, a dominant supplier, and that overlaps with the word monopolist.

Q. Okay. I think that we're going to have a real problem with his opinion, then, Your Honor, because you in your Daubert ruling said that he couldn't offer an opinion that Arm as a monopolist because he hasn't defined an market and his deposition answer was that Arm had to be a monopolist, now we've problem with him saying he has a monopoly opinion that he never disclosed?

THE COURT: Got it. I'm not going to rule on that.

MR. WILCOX: I understand.

THE COURT: I get it.

BY MR. WILCOX:

Q. Can we go to I think it will be slide five. Yes, that one. Thank you.

So on the left-hand side of this slide, you show Arm is licensing to Qualcomm and other chip makers, right? In the noninput foreclosure investigation?

A. Yes.

Q. If we go to the other side of your slide, now you replace licensing with foreclosure, do I have that right?

A. Right.

Q. But you have been at trial all week, haven't you Professor Posner?

A. Yes, I have.
Q. You heard Arm's executives like Mr. Haas, Mr. Collins and Mr. Awad all testify that its not Arm's plan to not stop licensing its technology, do you recall that?
A. Yes, but foreclosure doesn't mean stopping licensing.
Q. But what you have done on your slide is taken licensing and replaced its with foreclosure?
A. I defined foreclosure to mean degrading supply not necessarily eliminating a license.
Q. Okay. Well let's talk about some of the competitors in the data center space today, they include Google, Meta, Broadcom, Marvel among others, right?
A. Right.
Q. And each of those companies is made statements in support of Arm's CPU launch haven't they?
A. Yeah, I believe so, but I'm not certain.
Q. Those companies would look pretty foolish wouldn't they if your input foreclosure theory is right?
A. No, why? I don't think so.
Q. I mean, it would seem pretty foolish to be supporting Arm moving downstream into a market if what that's going to mean is lead to input foreclosure, doesn't it?
A. They're customers of Arm, so their room to maneuver is limited.
Q. So you think that, for example, Microsoft, one of the

largest companies in the world, its room to maneuver is limited?

A. Microsoft is a customer of Arm, and Arm is this incredibly dominant supplier of an essential input to Microsoft.

Q. Let's talk about the data center market for a second, Professor Posner. Do you agree that in 2025 X86 had over 80 percent of the market share in the data center space?

A. Sorry, in what year did you say?

Q. I said 2025, the year you served your report?

A. Okay, I believe that's correct.

Q. And the data center market is currently booming, right?

A. The hyper scaler, the hyper scaler data center, data centers are booming that I know, as for the rest of the data center, data centers, I don't know.

Q. Right. At least as of today, it's not clear whether Arm's going to have a dominant position in the data center market, is it?

A. I think there is reason to believe that it will be -- yeah, I think there is reason that it will based on its projections as well as its supply of this essential input.

Q. Will you go to your other deposition, it's your June 23rd, 2026, deposition, Professor Posner. And I want you to go to page 13, lines 10 to 14.

A. Page 13. Yes.
Q. Yes. And were you asked this this question and did you give this answer.
QUESTION: So as of today at least, it's not clear whether Arm is going to have --
THE WITNESS: Sorry, I see it now, okay. I see it.
BY. MR. WILCOX:
Q. No problem. I will start again. See this is page 13, lines 10 to 14.
QUESTION: So as of today, at least, it's not clear whether Arm is going to have a dominant position in the downstream data center CPU market.
"ANSWER: Yes."
Were you asked that question and did you give that answer?
THE WITNESS: Yes.
BY. MR. WILCOX:
Q. Okay. And you don't know if Arm will ever obtain a significant share of data center chips, isn't that right?
A. I don't know for a fact, but I expect it will, yes.
Q. Well, you and you haven't performed any modeling to test, for example, when Arm will achieve significant market share for data center chips, have you?
A. Correct.

14:43:12 Q. And you didn't perform any modeling to estimate whether Arm would ever achieve significant market share for data center chips, correct?
14:43:20 A. Correct.
14:43:21 Q. And in the data center space, people have a choice between whether they use X86 or the Arm ISA, right?
14:43:33 A. No, I don't think that's correct.
14:43:35 Q. Well every major hyper scaler today offers their customers the option of using X86 or the Arm ISA, don't they?
14:43:44 A. They do offer the option, yes.
14:43:49 Q. Okay. And then Professor Posner, you asked -- you were asked questions about your anticompetitive review that you had identified. You haven't done any formal modeling to determine whether those risks will actually come to pass, right?
14:44:03 A. Right.
14:44:03 Q. You haven't done any formal modeling to determine how likely those risks are to occur, correct?
14:44:09 A. Correct.
14:44:10 Q. In your opinions you have done no quantitative economic analysis, is that right?
14:44:14 A. Yes.
14:44:15 Q. Just a couple more questions, Professor Posner. I want to you ask you about RISC-V for a second. Could you

turn to DTX-287 in the binder I handed you?
A. Yes.
Q. And this is already in evidence and it's an April 2025 Qualcomm CPU technology business review. Could you turn to 106, it will also be on the screen if that's easier.
A. I just look at the screen.
Q. Okay. And do you see here on this slide that it talks about third party RISC-V IP?
A. Yes.
Q. And one of the listed companies there is Ventana micro, correct?
A. Correct.
Q. And you were here when Mr. Amon testified that Qualcomm purchased Ventana Micro for somewhere between $100 million and a billion dollars, correct?
A. Correct.
Q. But you never asked anyone at Qualcomm when they thought its investment in RISC-V would pay off, did you?
A. I don't think so. No.
Q. And you never asked anyone at Qualcomm how much money they're investing in RISC-V, correct?
A. No.
Q. And I you you never asked anyone at Qualcomm why they're investing in high performance RISC-V CPUs for data

14:45:40 center workloads, did you?
14:45:41 A. No.
14:45:42 Q. Doesn't that seem like highly relevant information
14:45:47 for assessing whether RISC-V is a viable alternative?
14:45:51 A. My impression from the evidence that have I have seen
14:45:55 is that RISC-V is not a viable alternative in the short to
14:46:00 medium term because it doesn't yet -- it it still immature
14:46:07 it hasn't developed technologically, and there is nothing
14:46:10 like the 22 million software developer ecosystem for RISC-V
14:46:15 as there is for the Arm ISA.
14:46:17 Q. You again didn't do any formal economic modeling to
14:46:20 try to test that hypothesis, right?
14:46:23 A. Right.
14:46:24 Q. Could you please turn in that same June 23rd
14:46:27 deposition to page 135.
14:46:32 A. Okay.
14:46:43 Q. I'm going to read to you two questions and answers,
14:46:51 and --
14:46:52 A. What line?
14:46:53 Q. I'll tell you in just one second but I want to know
14:46:56 if you were asked these questions and gave these answers
14:46:58 okay?
14:46:59 A. Okay.
14:46:59 Q. If first one will be 135, lines 16 to 19.
14:47:05 QUESTION: Did you ask anyone at Qualcomm why

they're investing in high performance RISC-V CPUs for data center work loads?

"ANSWER: No,.

Did were you asked that question and did you give that answer.

THE WITNESS: Yes.

BY. MR. WILCOX:

Q. Okay. And then page 135, line 20 through page 136 line 1.

QUESTION: Doesn't that seem like highly relevant information to assessing whether RISC-V is viable alternative?

"ANSWER: Yes."

Were you asked that question and did you give that answer?

THE WITNESS: Yes.

BY. MR. WILCOX:

Q. So at least as of the time when you were deposed in June of 2026, you thought it was highly relevant information to know why Qualcomm was making these investments but you never asked them, right?

A. That's what I say here, yes.

MR. WILCOX: Thank you, Professor Posner. No further questions.

THE COURT: All right. Can I ask one question

and then you guys can follow-up?

When he asked you about folks like Google and Microsoft and others, I think NVIDIA we heard testimony, supported Arm, or said good things about it. It almost sounded like you were saying well they had to because they were beholding to Arm. But these are not companies without power, right? These are a big portion of Arm's revenue. And they're important. So that doesn't ring true to me so I'm trying to understand what you're saying.

THE WITNESS: Right. Well, I mean the advantage of being a monopolist is that people fully have to buy your product. Now when we're talking about these --

THE COURT: They have to buy your product, they don't have to come out and give public statements of support. That's where I'm -- that's where I'm losing -- I mean, they could stay silent, they could band together and complain, and put pressure on Arm because Arm is a monopolist but they still need to sell their product. So when you say that about Google and Microsoft essentially well they had to because they were so afraid of Arm, that just doesn't -- that doesn't compute for me, so I need some help.

THE WITNESS: That's fair. And I don't know this world. I can only speculate. But I was struck about the -- by the testimony that one of the reasons that Arm's

CEO, Mr. Haas, thought of Qualcomm as an enemy was that Qualcomm was participating in the RISC-V consortium that was trying to develop RISC-V. Qualcomm is an enormous company as well.

Now, if the Court determines that he was motivated by this disloyal behavior, including other forms of disloyal behavior that he identified including not using all of the features of the Arm ISA, then it seems to me that these other companies, not because they're scared, but as a matter of prudence, would not openly criticize Arm unless they had very strong reason to do so.

MR. WILCOX: Just a couple of follow-ups, Your Honor, you used in word monopolist again, you haven't done any formal economic modeling to determine whether Arm is a monopolist in a defined market, right?

THE WITNESS: Right.

BY. MR. WILCOX:

Q. And you haven't seen any evidence, have you, that Google and Microsoft were coerced into saying supportive statements in sort of Arm's AGI CPU launch, have you?

A. No I was responding to their question.

Q. So the answer is no, you haven't seen any evidence?

A. Yes.

Q. You also haven't seen any evidence that Marvel or Broadcom or any of the other companies that came out in

support or Arm's AGI CPU cores were coerced into saying nice things about Arm, have you?

A. No.

MR. WILCOX: Thank you.

THE COURT: Thank you.

Redirect.

REDIRECT EXAMINATION

BY MR. ISAACSON:

Q. In your deposition of, where is the date here, October 2nd, you were read your answer at page 51 and then counsel didn't complete the answer. At the end of the answer you said, "The other sort of unfair competition argument I think depend on Arm having a dominant position or being a monopolist. What did you mean for an unfair competition argument about having your argument could be a dominant position or being a monopolist?

A. So, Arm has a dominant position, you know, I don't think one needs to do data analysis or modeling or market definition to understand this, they are the only supplier of the Arm ISA to the most powerful technology companies in the world.

Now, in terms of -- and so -- now what does that mean practically. If you have a dominant position, and this is really what matters ultimately to the question of anticompetitiveness, it's whether you can increase prices

above your marginal cost in a setting in a very substantial way that causes harm to your customers that you're now competing with. It doesn't require any analysis of monopoly.

Q. Although we're -- I thought we weren't defining markets in your case, at your June 23rd deposition you were asked a question about whether it was clear whether harm was going to be to have a dominant position in the downstream data center CPU market whether it was not clear and you said yes. And then on page 16 of that same deposition, you were asked the question?

QUESTION: Are you treating --

MR. WILCOX: Your Honor, objection, he's just reading his deposition in the record.

MR. ISAACSON: It's the same deposition you read in the record I'm giving you the reference point.

MR. WILCOX: Can we move on from completeness to move to other to particulars saying did you say this in your deposition, if you want to ask him questions, you can ask him questions.

MR. ISAACSON: This is for completeness, one question and answer.

THE COURT: Subject to your objection.

BY MR. ISAACSON:

Q. You were asked the question are you treating the

hyperscalers different from the general data center market and you give the answer there, but rather than have me read the answer which is at page 16 at line 19, why don't you explain to the judge what you said about the hyperscalers as being different from the general data center market?

A. Right. So there are two aspects to this. One is that hyperscalers have different customers and their different customers have different needs. Some customers need the hyperscalers to run Arm compatible software on Arm chips. So it's essential for the hyperscalers to have access to these chips or else they're going to lose this line of business from all of the customers and these are the most advanced AI companies.

And then second, as people have talked about, data centers are extremely power hungry and the advantage of the Arm ISA is that it enables you to design chips that are less power hungry, so there is a lot of pressure as well as economic reasons for hyperscalers to use Arm ISA-based chips.

And as as a result, the X86 chips which are power hungry are not actually reasonable substitutes for a range of their work loads.

Q. And you said in your answer I think the hyperscalers are basically a submarket, so I think there is a general data center market, would you explain what you meant by a

submarket?

A. Well, so one of the reasons for not using market definitions is that the -- is that it's very hard to know what the boundaries of the market are. And so a practice has arisen in which we'll kind of vaguely talk about a larger market and then little pieces inside of it and those little pieces are actually themselves markets. And so the practical implication of this is that even -- you could say that all data centers are in the same market because after all they're all data centers but in practice if some of them cannot move from Arm chips to X86 chips because they have certain customers or certain needs that the other data centers don't have, then they are, you know, in a different position in a different market from the more preemptive data centers.

MR. ISAACSON: Thank you. No more questions.

THE COURT: Thank you. Thank you, sir. You may step down.

What's next?

MS. NYARADY: Your Honor, we're going to be calling our economist. I have been working hard to try to figure out how to do this without sealing the courtroom again given the amount of sealing that's been going on. I thought I had figured out a way, there is one slide that I have that has third party rates on it, I was willing to do

this examination without saying the numbers if I could put the slide into evidence just for the numbers. But I think counsel for Arm has an objection to the entire examination.

MS. KELLY: Your Honor, we have a pending motion that lays out in a declaration the specific harm to Arm from setting forth the proposals that have been made for v10 in negotiations with Qualcomm. Dr. Kennedy is going to go through in detail those different proposals, the rates in addition to third party rates. We have explained in our declaration why making public our v10 proposal to Qualcomm is a problem, that's why we're asking to seal the courtroom for this, that's his entire proposal is talking about specific numbers of what those proposals include, we would ask to seal the courtroom. I don't think there is a -- there is no slides that really don't talk about those numbers, it's a beginning and the end, I think given the time, the same issue is going to to come up with Mr. Collins the details of our various proposals of v10 for Qualcomm that we're in a position that we have to seal the courtroom Your Honor.

THE COURT: Help me out. Why do you think, I appreciate you're trying not to seal the courtroom I don't know what's in the slides, so.

MS. NYARADY: -the slides --

THE COURT: Can you give it to me?

MS. NYARADY: The slides do contain numbers from the offers that Arm has, or the letters that Arm sent to Qualcomm regarding v10. But I think what Arm's position is or at least was articulated to me before we started up again is that the numbers that were proposed to Qualcomm do result from some purported blending of other people's rates. However, I don't think just saying the number that was proposed to us really gives you another insight into any of the other parties' rates. And honestly Qualcomm doesn't even know exactly the formula that was used so we couldn't get that specific if we wanted to. I can hand up the slides if it would be helpful.

MS. KELLY: Your Honor, our filing is at docket 987, there is a declaration, paragraph four and favor--

THE COURT: Haven't had a chance to read it, I know you guys have submitted it.

MS. KELLY: I can explain the reason why, the disclosure are of our v10 licensing terms to Qualcomm having that be public would injure Arm in future negotiations with other licensees, there are information in there that we filed it under seal with some further specific details that I'm happen to discuss at side-bar with the court. We also think that disclosing our v10 proposal would injure our relationship with respect to the existing licensees having the rates that we're proposing to Qualcomm --

THE COURT: Help me out with.

MS. KELLY: What slides, Your Honor.

THE COURT: So there is a proposed it says for example I'm looking at V6.

MS. KELLY: We would object, v4, v5, v6, v7.

THE COURT: Can you just let me ask my question. For example, V6, has Arm's proposed v10 rates versus current license. See this is what they offered to Qualcomm versus Qualcomm's current license rates.

MS. KELLY: Yes, Your Honor, there is the December offer, and the March offer and these are the specific rates included had in those v10 proposals, comparing it to the existing v9 rate.

THE COURT: Okay. And why -- so this is just what was offered to Arm -- what was offered to Qualcomm.

MS. KELLY: Yes, Your Honor.

THE COURT: Help me out with why.

(Discussion off the record.)

THE COURT: Okay. So back to sealing.

MS. KELLY: Your Honor, this came up during Mr. Amon's testimony, Mr. LoCascio argued it earlier than Your Honor agreed that it should be sealed, the details of our proposal to Qualcomm because it essentially is, while it hasn't been accepted it would be the same thing as putting up a third-party's rate. It has not been made public, there

has been some are pretty serious confidentiality around it and the harm to Arm would be the same as, I think as Mr. LoCascio explained, the parties make an offer which indicates they would be willing to accept a deal at that turn would be how you describe it, it would be putting forward a v10 rate which Arm is willing to accept which causes the same harm as if you would put an existing rate with a v10 customer.

THE COURT: Tell me where your declaration is, what DI number?

MS. KELLY: 987, Your Honor, it's Exhibit 1.

THE COURT: And I'm going to read this, but the question I have is if you're really saying that by knowing what was offered to Qualcomm you can tell what other folks got, then I don't really understand because then it would seem like you're disclosing to Qualcomm what other folks got.

MS. KELLY: Your Honor, my argument is really that disclosing what we've offered, what we've told Qualcomm we're willing to accept as a v10 rate, making that public causes harm to Arm. Because it's essentially providing to the public what a v10 rate is that we will give. We keep all of the other v10 rates confidential, the Court has been sealing those accepted rates. We think it will create issues, and I'll let Your Honor read paragraphs 5 and 6,

layout the specifics.

THE COURT: Okay. So my question for you, Ms. Nyarady, do you oppose the motion or are you just trying to come up with ways around it to avoid me having to close the courtroom?

MS. NYARADY: We oppose the motion.

THE COURT: Because?

MS. NYARADY: We again we don't think there is enough detail in these rates to be competitively harmful. They're rates that, there is a varying range of rates, there is a varying methodology of rates on these slide, none of them have been accepted, it's not licensing terms and you know it's important to the parties that are in the lawsuit. I am very respectful of the slide that has the third party rates --

THE COURT: Which slide is that?

MS. NYARADY: So that is slide 17. But Dr. Kennedy is prepared to go through this slide and talking through it using the colors, and not say the rates, and we can have it just displayed on his monitor, I think what he would say on the record would not meet the standard for sealing. I would like to have the slide admitted into evidence just so the numbers are in evidence.

MS. KELLY: Your Honor if I may, there have been some communications between the parties regarding how Arm

determined its various proposals which are obviously not in the record because of the circumstances under which they occurred including discussions that Your Honor ordered the parties to have regarding this, meetings back and forth that talk about the basis for this, such that making it public not only is sort of -- Qualcomm has additional information about the process by which they calculated these, that putting it out and letting the business folks have it and making it public is harmful to Arm's relationship with Qualcomm as part of these ongoing negotiations but it's also harmful to other third parties with whom we have a relationship. For example you have heard about Google and Microsoft, having them know what we've offered to Arm, to Qualcomm. I apologize, Your Honor it a very late night as I'm here it was for you, having them see the terms that we're offering and seeing how it compares to what we've offered them, it creates issues as well as for some of the things identified in paragraph 5 which we filed under seal for a reason in terms of our future potential negotiations with other parties it starts to set a floor, it starts to limit Arm's ability going forward in negotiations if it's now public, hey you made these offers, here is exactly the terms of it, so you guys should take that rate in any other situation, I think it's the same basis for sealing as we have done for everyone else.

THE COURT: I don't understand what you said about the Qualcomm people are will people at Qualcomm who don't have this information.

MS. KELLY: I don't know, Your Honor, but I believe so, yes, it's been pretty tightly controlled.

THE COURT: So you make a offer to Qualcomm and Qualcomm can't let other people at Qualcomm know about it.

MS. KELLY: My -- I let Mr. LoCasscio weigh in, this is not sort a widely shared open discussion, the parties negotiations have not just been out of public and everyone within the company knows all of this.

THE COURT: All right. What I am going to do is I will grant the motion to seal given the particular representations made in a sworn declaration that Arm has submitted, including specifics about other potential or actual licenses and licensees. And negotiations or renegotiations.

So there are some specifics in here in paragraphs 5 and 6 of the declaration of Mr. LoCascio, so I will grant the motion and seal the courtroom.

So if Mr. Kennedy, or Dr. Kennedy is going to be testifying, I'll ask everyone not under the protective order to leave.

MS. NYARADY: Your Honor, just so you know the plan, we've got Dr. Kennedy who is going to testify and then

there has been an agreement between counsel that we're going to keep our case open while Arm calls Spencer Collins because we plan to admit some documents through Mr. Collins but they will call him and then I think they have one more witness after that.

THE COURT: It looks like you have thirty-one minutes and defendants have forty-nine minutes.

(Courtroom sealed.)

THE COURT: And you are still under oath.

PATRICK F. KENNEDY, Ph.D., having been previously sworn, was examined and testified as follows:

MS. NYARADY: Your Honor, Dr. Kennedy has already been admitted as an expert in economic and economic damages. I assume that applies to this hearing as well?

THE COURT: It does. Thank you. You don't have to take your time doing that again.

MS. NYARADY: Thank you.

DIRECT EXAMINATION

BY MS. NYARADY:

Q. Good afternoon, Dr. Kennedy.
A. Good afternoon.
Q. Did you prepare slides to assist with your testimony today?
A. I did.
Q. Are these your slides?

A. Yes.
Q. What do you plan to testify about today?
A. The primary thing is I'm going to provide some financial and economic analysis to assist the court in this determination of whether Arm Acted in good faith in negotiating with respect to the v10 ALA.
Q. And what methodologies did you use to do your assessment?
A. So I have a slide, the next slide here, or a couple in, there you go. Three things, the first things is to compare Arm's proposed v10 ALA rates to Qualcomm with Qualcomm's current v9 ALA rates. The second is to put those in historical context with respect to increases from prior generations. And then finally to look at Arm's proposal with respect to third-party agreements that have been identified by Arm, and assessing its representations that the offer was made at current market rates in a competitive basis.
Q. Okay. So let's start with the comparison of Arm's v10 proposals to the current v9 rates. How did you do that analysis?
A. So here we walk through four segments of the market that Qualcomm is proposing to put custom cores in, and then show on the left-hand side there in the dark bar the current v9 rates paid by Qualcomm and then the two middle bars is

the December 25th proposal, and then the right bar in purple is the March 26th proposal.

So the -- I'll go through four. This is the premium mobile segment, this would be an eight core device a little over $200 pre device. If you take those characteristics of those product and you put it into the December 25th proposal that's at [redacted] a core times eight its [redacted]. That rate goes up in 2034 to [redacted] a core and [redacted]. So this just gives some data for the Court to work with that shows the extent to which rates increased in the 25 proposal, December 25th proposal and March 26th and the right-hand side March 26th is the final set of numbers, there is a little change in the form of the agreement, there is a floor of a [redacted] a core or a percentage of ASP. Here in this price range is [redacted] percent of ASP, and applying that you get a royalty of [redacted] so it gives an idea of the scope of this particular product.

Q. Did you do the same analysis in the you will practice premium computer --

A. Yes, this is the ultra premium computers and tablets, for example an 18 core device where Qualcomm sells the chip set at over $200. They currently are paying 1.88 under the December 25th proposal because you now have more cores the rate goes up to [redacted] and in the second period with the higher rate per core it goes up to [redacted], 1.88 is go as high

as [redacted]. The previous was a product where the [redacted] proposal went up, this is one where it goes down. Here because of the pricing the floor applies and you got that underlined and "tall size its a [redacted] a core times [redacted] get you [redacted].

Q. Did you do the analysis in the ultra premium auto?

A. Sure. This is a processors that are used in auto premium -- automotive assisted driving and things like that. Similarly it's 18 cores so this middle numbers don't change but it's a higher price point, it's approaching $700. So here on the right-hand side you see the March 26th proposal, that royalty rate goes up to [redacted] and that's applying [redacted] percent of the ASP for this product. That will be compared to $1.88 and the previous two rates from the December 25th proposal.

Q. Let's go to the next slide, did you do the analysis for the server and data center?

A. Yes. So this analysis we talked a lot about servers and data centers. This is actually a 256 core product that I evaluated here. The rates are a little bit lower because this is the offering in December 25th, it's a nonconsumer device, and so it's about [redacted] a core, the total royalty goes up to [redacted] in the first period, [redacted] in the second period of time and then at the time I prepared this, I didn't have information on pricing, and so the floor of the

[redacted] a core applies, multiply that by 256 cores and you get [redacted]. The rate that would apply if I had pricing is [redacted] percent of ASP.

Q. Did you hear any testimony during the course of this trial that adds information for this slide?

A. Yes. See Mr. Amon testified about an actual transaction that Qualcomm has with Meta so I think it's helpful to see that transaction and what it would do in the [redacted] proposal or [redacted]. That is a [redacted] server chip, and I think the price he described was from a thousand to $2,000, and so if you do the math, [redacted] times [redacted] is about [redacted]. That's in a product that Mr. Amon testified was a thousand to $2,000. At a thousand dollars the effective royalty rates is therefore [redacted] [redacted] of the total product price or but with $2,000, [redacted]. So it's substantially higher if you apply that floor than the ten percent of ASP that's in the proposal.

Q. And Qualcomm's current rate, v9 rate the 1.88, that is that across all market segments?

A. It is a cap, there is a 1.25 percent underlying rate for products over $75 but that cap applies.

Q. And in Qualcomm's v9 ALA, what was the highest percent royalty rates that you saw?

A. It's 1.25 percent of product price, it applies for range and then the cap kicks in, there is testimony earlier

15:17:51 about this actually from Arm's counsel that it kicks in at
15:17:54 about $150 of ASP.
15:17:58 Q. Let's go to the next slide. Did you do this analysis
15:18:01 for any other product segments?
15:18:04 A. I did. This is every product segment that Qualcomm
15:18:07 has identified where it wants to put a cuss testimony core
15:18:10 under an ALA into a product. And doing, just showing for
15:18:15 completeness, overall the average ratio if you look at v9
15:18:21 actual rates versus the first period for the December 25th
15:18:25 offer is [redacted] times, if you look at the second period where
15:18:29 rates go up, the rates under that proposal from
15:18:33 December 25th are [redacted] times what was paid for the similar
15:18:38 products under v9. And you see some things that deserve
15:18:43 note and I'll move off of this slide is the proposed rate in
15:18:46 the second period for handset low entry is [redacted], that's
15:18:52 actually more than the ASP of the product being sold so it
15:18:56 tells you that's a problem.
15:18:58 Q. Okay. Did you do the same analysis for other
15:19:02 products segments against the March 2026 proposal?
15:19:07 A. Yes. So this is the same analysis, a little simpler
15:19:11 because there is one proposed rate and it shows the ratios
15:19:14 for the March 26th proposal, there is a range, but on
15:19:18 average it's [redacted] times higher in the March 26th proposal
15:19:23 than what was paid in actually paid in v9.
15:19:27 Q. And when you started your testimony, you said you

also had looked at the increase of ALA royalty rates over the generations of the Arm architecture, right?

A. That's right.

Q. Can you explain to us that analysis?

A. So Qualcomm had a combined ALA royalty rate for V6 and v7 and as it moved from V6 to v7 there was no increase. When it went to v7 to a combined package for v8 and v9 this is a change from 32-bit to 64-bit architecture, it's a big change, the royal think rates on average went up about four times, I'm looking at the same products and same characteristics that I just showed. If you apply those products at that time the rate would have been about four times, about you that's for two generations of technology.

Then there is no increase from v8 to v9 because it's packaged.

Now for comparison here the [redacted] times ratio that I described in the previous two slides, is that bar that you see to the right-hand side where it says v10. The server number is big, the ratio, so I pulled that out to see what it would be without servers or data data centers in there and it's still [redacted] times higher.

Q. So this chart that we're seeing on slide ten, is that to scale?

A. It is to scale.

Q. Okay. Did you look at the proposal made to Qualcomm

for v10 relative to Arm's total licensing revenue to put the proposed royalties into context?

A. I did. This is again data to see is the rate being offered for the Court to determine whether or not it's in good faith. If I take just the mobile market, and I look at the December 25th offer, this shows the increase in licensing revenues that Arm would generate if Qualcomm accepted that offer. So for the mobile segment, they were paying about [redacted]. Under the December 25th proposal if they accepted it, Arm's total licensing revenue for mobile from Qualcomm would go up to just under [redacted].

Q. So that revenue is just from Qualcomm in mobile?

A. That's right. The next slide I show how that compares to Arm's total revenue. So the proposal on December 25th would have generated more revenue just from Qualcomm and mobile than all licensing revenue from all licensees and all products of fiscal year '25, that was $2.6 billion. If Qualcomm accepted the December 25th proposal, that alone could would have generated an additional [redacted].

Q. Did you do this analysis for the March 2026 proposal as well?

A. Yes. So this structure of the deal changed appear there were some percentage of ASPs added and some floors.

But you still see a dramatic increase from [redacted] on to [redacted] would which would represent half of Arm's total company revenues generated using the March 26th proposal.

Q. So it's still -- am I understanding right, it's about a [redacted] increase in mobile?

A. That's right.

Q. Let's turn now to the last topic that you said you would testify about. Did you compare the rates proposed to Qualcomm versus to the extent you know them rates for other third parties for v10?

A. Yes. So here this is a letter associated with the December 25th proposal that I just walked through the rates on. And there was a specific representation about the rates being offered Qualcomm today are consistent with current market rates for v10 license, so I'm assessing that in light of what I characterize of market versus what Arm says. And then the next slide I show a second thing that frames this discussion which is here it's saying the rates being offered are offered to assure Qualcomm it is receiving competitive rates. So I'm going to do some analysis to assess market rates and whether they're competitive.

Q. Let's go to the next slide. Did you analyze Arm's own assessment of what the allegedly most comparable v10 licenses are?

A. Yes, this is a Arm prepared document. I understand

it to be from December of '25, an internal document, where it's saying that Google and Microsoft are the most comparable v10 licenses, and you see those as the first two rows. Then the next two rows it says fender which is the code name for Apple is not comparable. And NVIDIA is not comparable. Meaning that when Arm is assessing what a market license for ALA is, they're saying that it should be based only on Google and Microsoft.

Q. Did you agree with Arm's assessment?

A. I don't. I looked at this TA royalty an economic context, I think the simple way to look at this is of these four companies which company actually produces a custom core under an Arm ALA at scale. In the the handset business and mobile, Apple, they produce at scale comparable to Google under an ALA, they actually make products, they compete directly with Qualcomm's chips. If you see as a consumer you look at a phone and you're evaluating performance, each company benchmarks each other against each other there are things like peak bench they have test to see performance and the typical performance you see this throughout the documents is between Apple and for -- Qualcomm is putting that forward they're going to compare themselves against Apple. NVIDIA is the next one on here, I also see NVIDIA as a competitor, they're very important in the data center market. And they are also making custom cores. The two

15:25:36 companies on this list of four that don't make a custom core under an ALA are Google and Microsoft, but Arm selected those two as the comparators, the most comparable licenses and I disagree with that.

15:25:51 Q. Let's take a little bit of a deeper dive into your analysis. Let's go to the next slide. And can you walk us through your analysis of these third party v10 rate in mobile and premium mobile and how that compares to Arm's proposed v10 rates for Qualcomm and how they all fit in terms of the competitive landscape?

15:26:15 A. Sure. The letter, the letters describe competitive rates for, in the mark for ALA licensees to v10. To frowned this a little bit in terms of what Arm has represented they offer offered to Qualcomm, if you take the Microsoft, we're sealed, right.

15:26:39 Q. Yes.

15:26:39 A. If you take the Microsoft rate of [redacted] in the red bar and you add it to the later period second blue bar for Google and divide by two, you get what was proposed to Qualcomm in its initial period in that sort of tan colored bar of [redacted]. So that is as I understand it, what they've called the blended rates, so it's mixing period and things like that, but that's what they did.

15:27:05 If I look at this in my assessment, the most relevant market comparison is to look at on the right-hand

15:27:15 side the [redacted] that was proposed or the lower rates from the December 25th period, against Apple on the left-hand side, as the only company that has been identified as actually manufacturing premium mobile chip sets under the ALA. And Apple has been reported to pay $0.30 Perdee vice.

15:27:40 Q. Are you aware of any information regarding whether Microsoft or Google or actually paying any royalties under these rates?

15:27:48 A. It's my understanding that they're not, and that actually relates to a certain extent to professor Posner's testimony that he just gave. Google has an ALA, they've had it since 2020. They paid a substantial license fee to get that ALA. Yet they haven't produced a product. And under an ALA, a custom core. They use cores that are from a TLA. And you have to ask why, why isn't Google making a product. I think part of the problem on the competitive side of things that I'm looking at is that these ALA rates are substantially higher than what Google can get one of these chips under its TLA. So if you look at the [redacted], for example, it can get a chip for half that under a TLA. So there has been a lot of discussion, and what it means to be an ALA licensee, you have to invest substantial amounts of money and historically Arm has represented that ALA rates are materially lower than TLA rates. So you can get back some of your substantial investment in a custom core by

paying lower royalties, you're not paying for the development of the chip, you're paying for the chip set in your royalty, that's how the economic structure should work and that's the encouragement for an ALA licensee to actually make a product.

[redacted]

Qualcomm historically has been in a position where it has had lower ALA rates and that helps compensate for the substantial investment that they made in making custom cores.

Q. I should note, I adopted see NVIDIA on your slide, why is that?

A. I don't have access to NVIDIA's rates.

Q. So Dr. Kennedy, in your opinion, are the rates that were proposed to Qualcomm competitive?

A. For a lot of the reasons I just said, I won't belabor

it, but no, I don't think they are. They don't allow Qualcomm to recoup the substantial investments it's making, or it has made in custom cores.

Q. How can these be market rates that are offered to Qualcomm if they're not competitive?

A. I mean, the market I think is, you look at the company that has rates that allow it to actually produce custom core and that's Apple, to me that is actually the market. And the rates in between for Google and Microsoft, they haven't yet used those rates to actually produce any cores on a custom basis.

Q. So is it your opinion that that Apple is the comparable rate?

A. Yes, I think the most direct comparable rate is what Apple pays as a manufacturer that actually makes product for these markets at scale under an ALA.

Q. And let's go to the next slide. Did you do a comparison of the rates that were proposed to Qualcomm versus those of Apple?

A. Yes. This is focusing on the premium mobile and the ultra premium computer and tablet market for mobile, the proposal in March, the lower proposal was [redacted] times the rates paid by Apple and for ultra premium, [redacted] times what Apple paid. And, when I say what apple paid, I'm using the available information we discussed in court.

Q. And that's from a public article?
A. Correct.
Q. The last slide, did you also do an analysis of the license fees that were proposed to Qualcomm?
A. I did. As I talked about earlier, it's fees and royalties that makeup a package. So here I'm sewing, it isn't substantially lower fee proposal that could have off set the higher rates so Qualcomm received for $40 million access to v8 and v9, 2 architectures or two-generations. For the 25 and 26 proposals, it was [redacted]. Support and maintenance under v8 was $800,000. VIN nine it was a million dollars. And then the proposals for [redacted].
MS. NYARADY: Pass the witness.
MS. KELLY: May I approach, Your Honor?
THE COURT: Yes.
MS. KELLY: Thank you.

CROSS-EXAMINATION.

BY MS. KELLY:
Q. Nice to meet you Dr. Kennedy. I want to start with some things you are not here to do. You don't have any opinion that Arm's v10 offers to Qualcomm were made in bad faith, do you?
A. Correct.
Q. You also don't have any opinion that Arm's v10 offers to Qualcomm were commercially unreasonable, do you, that's

15:34:09 not an opinion you have offered?
15:34:11 A. Correct.
15:34:11 Q. You're an economist doing calculates damages, correct?
15:34:15 A. Correct, financial analysis, economics, damages.
15:34:19 Q. You don't have any opinion that Qualcomm was damaged as a result of Arm's v10 negotiations, do you?
15:34:26 A. I don't have any opinions about damage for v10, I'm just doing financial analysis to assess in the bad faith.
15:34:33 Q. Right. Which you don't have an opinion on whether the financial analysis you did actually shows bad faith, correct?
15:34:40 A. Correct.
15:34:40 Q. What you were asked to do was to perform an economic and quantitative analysis of representations that Arm made in proposals to Qualcomm, correct?
15:34:49 A. To assist in assessing those representations about market rates and competitive rates, yes.
15:34:55 Q. You're not offering any opinions about the parties's negotiations, right?
15:34:59 A. Correct.
15:35:00 Q. You're not testifying about whether any of Arm's statements that you did that financial and quantitative analysis for were misrepresentations, right?
15:35:09 A. No, I'm not going to say anybody was misrepresenting

things but you can look at the data than see if it's accurate.

Q. I want to talk about your comparison of the existing v9 rates too the v10 rates. You understand that there is nothing in 14.1.B.1 that requires Arm to make an offer for the future version of technology that's being licensed that's within some range of the current rates it offers, right?

A. There is no MFN provision if that's what you're asking.

Q. Yeah. You have been here for the jury trial, too, and you understand that in the TLA the parties put parameters on the financial terms that would be offered for the next version of -- I'm sorry, the the ALA, I said the TLA, in the 2013 ALA, there are parameters around -- I'm sorry, Your Honor, it was an overnight night.

I'm sure it was for everyone else, too.

In the TLA, the parties put a percentage around how the rates were supposed to be negotiated and changed as you looked towards future licensing offers, right?

A. Or current, yeah, that's right.

Q. None of that exist with regards to 14.1.b.1 had in the ALA, right?

A. Right, there is no MFN.

Q. And your slides, I wanted to take a look at slide B7

15:36:39 if you can, Mr. Schlaifer, it's PDX-.B.7. This is the
15:36:45 analysis of v10 rates through -- for the server data center
15:36:53 market, do you see that?
15:36:54 A. Yes.
15:36:54 Q. And you call on the left, you say those are the
15:36:57 current v9 rates, is that right?
15:36:58 A. Yes.
15:36:59 Q. And you were here, those rates were actually set in
15:37:02 2013, weren't they?
15:37:04 A. Correct.
15:37:04 Q. And so what you're doing on the left is comparing a
15:37:08 2013 rate to rates that are going to apply for the orange
15:37:12 bar through 2033, so 20 years after the what you call
15:37:17 current rate was set, correct?
15:37:19 A. No, I'm looking at those rates right now, so
15:37:22 whatever, however many years we have, 13, so this is -- as
15:37:27 paid by Meta.
15:37:28 Q. Right. But what I'm asking is you're comparing what
15:37:31 the current rates are, you're looking into the future, you
15:37:34 understand there is no -- you were here for the testimony,
15:37:37 Qualcomm if these parties agreed isn't going to start making
15:37:41 chips tomorrow, right?
15:37:43 A. Right.
15:37:43 Q. They're not making CPUs under R-10 tomorrow?
15:37:47 A. In a 2 to 3 year cycle, they're looking for a license

now.
Q. When is v10 coming out?
A. I don't know that, it hasn't been formally announced, I don't think, others have entered into licenses in '25.
Q. We don't know exactly what date, you have that it would be with from 2029 to 2033, right?
A. To be clear, item just saying current rates, I'm not saying current and future v9 rates because the whole discussion here is getting a v10 license so that Qualcomm can make product with v10 in the periods on the right-hand side. I started in 2029 because that delays for the period it would take, say three years to get a chip up and running.
Q. Again, going back to what the issue is under 14.1.B.1, are you saying that guaranteeing in good faith means that your initial offer under that provision would would have to be consistent or in some financial relationship to the previous rate?
A. So I'm not making a determination of what's in good faith or bad faith, I'm just giving some perspective as Qualcomm entered the negotiations in its initial proposal was -- as it characterizes it waiting for an over, said I'm going to start with my current rates, that's why its was on here.
Q. Dr. Kennedy, we were all here for your testimony, I think we're all pretty tired I'm trying to ask some precise

questions, if you don't understand my question or you aren't able to, please let let me know so I'm not wasting everyone's times as we go through today. Looking at slide PDX-B7 you can see for for the server data center space the March 2026 proposal is actually a decrease from the December 2025 rates that would apply from 2034 to 2040, right?

A. Right, that's what I said.

Q. And are you -- I mean, would you agree that it's a sign of good faith that as negotiations move forward rates are changing in response to the other side's request?

A. That's not my call. What I'm calling out from this chart is [redacted] percent of ASP versus [redacted] percent or a capped 1.88, I think that's an important data point.

Q. Okay. And we can say that your data points are important, but what your data points show is that for the server data center market that we've heard so much about in terms of what's happening in the parties' negotiations, Arm's proposal went down from December 2025 to March 2026, yes?

A. No, it's 2029 to 2033, the March proposal actually is higher by what is that, [redacted], it's only comparison to the latter half beginning in 2034 so they pay more for four years.

Q. And then they pay less?

A. Then they pay less.
Q. For the later six years, correct?
A. Correct. Right.
Q. There is no requirement, you talked when looking at the v9 rates to the v10 rates about the cap that applies in v9?
A. No requirement.
Q. No requirement that v10 has some sort of a cap, right?
A. Correct.
Q. Let's take a look at slide -- you know what, let's take a look at slide 8. Okay? I think when you were talking about this, you said something like the proposal, that that that's a problem, do you remember telling the Court that?
A. About one line.
Q. You're not here saying what Arm was required to propose, right, I'm a little confused about you saying it a problem when you don't have an opinion if this is happening in good faith?
A. Maybe I'm speaking too casually but having a royalty rate that exceeds the price of the product, I do a lot of patent work, that's a problem, that's not something you would expect to see as a result of a deposition.
Q. You understand this isn't a patent case, right?

A. But economics still apply, you can't have a royalty rate greater than the price of the product.
Q. We understand this is a negotiation, Dr. Kennedy, the provision we're here to talk about is whether the parties negotiated in good faith, and what we're looking at in the calculations you did is the initial offer that Arm made, correct?
A. That's --
Q. December offer, the first offer you look at, right?
A. I think that's the first time anything is in writing, right.
Q. We can quibble with that with the fact witnesses who were there and then there is a March offer that was changed in terms and you know that that was changed based on some requests that came from Qualcomm about how they wanted different terms, they wanted a different structuring, right?
A. Sure.
Q. And Arm responded and provided a proposal in the structure in March of 2026 that Qualcomm wanted, right?
A. I'm not sure if I would go all the way to say what Qualcomm wanted but it added a percent of ASP and florence and that's what Qualcomm had asked to be in the rate, that financial structure can we say.
A. I'm not sure if that's true or not.
Q. Well, we can talk with some of the witnesses. You

talked about PDX-B10, right, that's the rate over time?
A. Correct.
Q. I think you were asked by counsel is this to scale. Do you remember that?
A. Yes.
Q. Now, the bottom which would be the horizontal line, right, you don't have a time scale there, do you?
A. No.
Q. So for example, you know that V6, that rate was set in 2003, correct?
A. I think that's the first Qualcomm ALA so that sounds right.
Q. And that rate stayed constant from 2000 -- that stayed constant for ten years, right, the V6 rate? It didn't change from 2003 to 2013, correct?
A. Correct.
Q. And then the v8 rate to v9, that was another ten years of no rate increase?
A. Can I be careful hay little bit sorry.
Q. I'm just asking you, Dr. Kennedy please, I think we all want to move forward. The V6 rate was 2003 is when that rate was set, yes?
A. Yes.
Q. The v8 rate was set in 2013, yes?
A. Yes.

15:44:02 Q. You don't know when a v10 rate would actually go into effect, do you?
15:44:07 A. No.
15:44:11 Q. Can you identify for us any product that Qualcomm or anybody else made in 2003 that had 288 cores?
15:44:20 A. No, I don't think there were any products back then.
15:44:22 Q. How about 2013, any products that use 288 cores?
15:44:28 A. I think there is testimony about 88, but not 288.
15:44:33 Q. Not 288, right?
15:44:38 A. Correct.
15:44:39 Q. Not 144?
15:44:39 A. Right.
15:44:41 Q. Okay. Let's take a look if we could please at PDX-12 and 13, side-by-side, please. These were your comparisons to Arm's total royalty revenue for financial year 2025, do you remember that?
15:45:02 A. Yes.
15:45:03 Q. Nevermind, Mr. Schlaifer. Let's be clear, this rate is not going to generate [redacted] of revenue like starting tomorrow, right?
15:45:14 A. If they accepted it and the products that were made under the v10, if all the custom cores had that v10, that's what the revenue generated would be. I'm not trying to apply that.
15:45:28 Q. Arm is not getting [redacted] dollars from

Qualcomm in fiscal year 2026 even if they agreed to this tomorrow, that's not happening, right?
A. Right, my predictions start with products in '27 and beyond.
Q. And you understand that the rate wouldn't like kick in, there is a transition period from v9 to v10 as part of this, do you understand that?
A. Sure.
Q. Everything doesn't switch over on day one, right?
A. It will ultimately get there.
Q. And again, we see that between the December offer and the March offer, your number goes down from what, it's a [redacted] decrease?
A. That looks right.
Q. And again, not offering an opinion that it's unreasonable to take a more than, I'm not going to try the math, I'm just going to do straight numbers a [redacted] decrease from your starting position to your starting offer right, that's not something you're going to talk about?
A. No, I wouldn't say so.
Q. You don't think that Arm was required to give Qualcomm the best deal for v10, do you?
A. Correct.
Q. There is nothing in the ALA that guarantees that Qualcomm gets the lowest rate possible, is there?

A. Correct.
Q. I want to talk about how Arm's v10 offer compare to Google and Microsoft, okay. The March 2026 proposal for v10 was [redacted] than Google's signed deal for mid range and entry smartphones, right?
A. One more time?
Q. The March 2026 proposal for v10 that Arm did make was [redacted] than Google's signed deal for mid raining and entry level smartphones, agreed?
A. For mid raining, I would have to look at the detail on that.
Q. You know, what, given the clock. I'm going to stop there with you Dr. Kennedy, thank you.
MS. NYARADY: No questions, Your Honor.
THE COURT: Thank you. Thank you, sir. You are excused.
What's next?
MS. DUNN: Your Honor, subject to Mr. Collins being called by the other side and introducing some exhibits upon which Dr. Kennedy relies, we rest.
MR. LoCASCIO: Good afternoon, Your Honor. Arm calls Spencer Collins.
THE COURT: Are we keeping the seal? Is it the same issue?
MR. WILCOX: Yes, Your Honor. As soon as I get

a point where I think we can unseal, I will raise the time, I think we'll be moving pretty quick.

SPENCER COLLINS, having been previously sworn was examined and testified as follows:

MR. WILCOX: Has he been sworn in, Your Honor?

THE COURT: You're still under oath.

MR. WILCOX: Great, thank you.

BY MR. WILCOX:

Q. Mr. Collins, welcome back. Are Arm and Qualcomm currently negotiating a license to v10?

A. Yes.

Q. And what is the extent of your involvement in those negotiations?

A. Among other things I have been involved in exchanging letters with the general counsel at Qualcomm.

Q. Have there been any in person meetings between Qualcomm and Arm with those negotiations?

A. Yes.

Q. How many?

A. If you take into account a meeting that happened in November of 2023, I think it was, sorry, 2024, which was in the context of settlement, I won't go into the detail, it's been a total of four.

Q. And without going into any of the substance or details, when did Arm first make a v10 offer to Qualcomm?

A. In December of -- well, sorry, November and -- November or December of 2024 around that time frame.
Q. I want to move straight to the second offer that was made, when did Arm make that offer?
A. In December 2025.
Q. What was the reason for the year long gap between offers?
A. Quite frankly we were contacted I think it was in around April of 2025 saying that you know we want to have a conversation around v10. The normal process that we follow is to get the engineers together, the sales team together to actually work out the intended use for the license. So it's sit down with Qualcomm and say what is your roadmap look like, what products are you interested in, and over what time frame. Unfortunately, Qualcomm didn't want to have those conversations. I sent five letters or sorry five letters were sent over a seven-month period suggesting that we get together and have the conversation. So in the end we were getting into feedback whatsoever. So I suggested we should make an offer based on the very limited information that we have.
Q. Could you turn to DTX-7 in your binder. Is DTX-7 a December 10th, 2025, letter that you sent to and Chaplin at Qualcomm?
A. Yes, it is.

MR. WILCOX: Your Honor, move to admit DTX-7.
MS. DUNN: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 7 was admitted into evidence.)
BY MR. WILCOX:
Q. And could you please turn to page 8 of this letter. What are we seeing on this page, Mr. Collins?
A. This is basically the financial terms of the offer.
Q. And where would we see the royalty rates on this page?
A. The royalty rates structure if you like is on the right but the actual detail is at the bottom of the page.
Q. It looks like there is three different rows there at the bottom, can you explain those three different rows?
A. Yeah, basically here, we have broken it down into consumer SOCs so here we're really talking about smartphones, laptops, below that you got nonconsumer which are basically data centers, essentially.
Q. How did -- I'm sorry, I didn't mean to interrupt you you, what was the third one?
A. The third row is a basically acts as a discount if you like, this was included in one of the comparator deals so we could it here to be fair to Qualcomm.
Q. How did Arm come up with royalty rates, you mentioned a comparator?

A. So basically we have four U.S. v10 customers at the time of making this offer. The team worked together to come up with the most appropriate comparators of which we found there were two. We got approval from the CEO who agreed with that and we basically took the rates of both of them and we said okay let's make this as fair as possible as make a blended rate of the two.
Q. What were the two comparators?
A. Google and Microsoft.
Q. Mr. Collins, could you turn to PTX-272 in your binder?
A. PTX.
Q. PTX-272.
A. Yes.
Q. And is PTX-272 related to the Microsoft ALA?
A. Yes.
Q. Can you company you also turn to PTX-275.
A. Yep.
Q. Is this another document related to the Microsoft ALA?
A. It is.
Q. And could you turn to PTX-2167, Mr. Collins.
A. Yep.
Q. What is PTX-2167?
A. Sorry, can you give me the number again, I got the

wrong number.
Q. Sorry, PTX-2167.
A. That's right at the back. Okay. This again is the Microsoft agreement.
Q. And are these the Microsoft agreements that Arm relied on when putting together the v10 blend you just described?
A. That's correct.
MR. WILCOX: Your Honor we move to admit PTX-272, PTX-275, and PTX-2167.
MS. DUNN: No objection.
THE COURT: Thank you. It's admitted.
( PTX Exhibit Nos. 272, 275 and 2167 were admitted into evidence.)
BY MR. WILCOX:
Q. And then could you now turn to PTX-2570, Mr. Collins.
A. PTX?
Q. 2570. Sorry, I meant DTX-2570, that's my fault.
A. Yes.
Q. Is DTX-2570 a Google?
A. It is.
Q. Google ALA related agreement. Thank you. Could you turn to DTX-2571.
A. 2571?
Q. It should be the next document?

15:54:28 A. Yep.
15:54:29 Q. Do you recognize this document?
15:54:30 A. I do.
15:54:31 Q. And is it another Google related ALA term?
15:54:37 A. It is.
15:54:38 Q. Could you please turn to PTX-361?
15:54:44 A. Yep.
15:54:45 Q. And last time I'll ask this, is this a Google agreement related to v10?
15:54:52 A. Yes.
15:54:55 Q. Did you rely these agreements or did Arm rely on these agreements with putting together the v10 offer?
15:55:01 A. Yes.
15:55:02 MR. WILCOX: Your Honor, I move to admit DTX-2570, DTX-2571, and PTX-361.
15:55:09 MR. ISAACSON: No objection.
15:55:10 THE COURT: Thank you. It's admitted.
15:55:10 (DTX Exhibit Nos. 2570 and 2571 and PTX Exhibit No. 361 were admitted into evidence.).
15:55:11 THE COURT: Are you going to do anything with those?
15:55:14 MR. WILCOX: I'm going to have it --
15:55:16 THE COURT: I mean, okay, you just put a bunch of stuff in the record, I have no idea what it is or why it's important, or what you want me to do with it some day.

BY MR. WILCOX:
Q. Are those documents Mr. Collins the underlying support for the rate information that we were just seeing in DTX-7?
A. Yes, that's correct.
THE COURT: Is that evident, do I have to do math?
MR. WILCOX: No, all you have to do is look at the tables in those agreements and they will map on to what is there. Well the one piece of math.
BY MR. WILCOX:
Q. Mr. Collins, you said you did a blend, what did you mean by blending the Google and Microsoft rates?
A. We basically took an average.
Q. Could you turn to DTX-2567, Mr. Collins?
A. Yep.
Q. What is DTX-2567?
A. This is a letter from me to the general counsel of Qualcomm attaching the offer.
MR. WILCOX: We move to admit Your Honor and I am going to do something with this.
MS. DUNN: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 2567 was admitted into evidence
BY. MR. WILCOX:

Q. Why were you writing to Ms. Chaplin in late January, 2026?

A. This is basically so I retracted the last statement. This is actually a letter, this is a letter from me to the general counsel of Qualcomm basically summarizing a meeting that it had had between two people in my team and their counter parts at Qualcomm.

Q. And was this meeting after you had made the December proposal?

A. Yes, so when we made the proposal in December, we suggested that we just get together. So as I said, Qualcomm were basically refusing to meet and we sent an offer, we said we are making this offer based on the limited information that we have but it's our best foot forward and start the negotiation process in good faith, can we please get together.

And so we offered a few locations and they insisted in meeting in San Diego, the persons on my team through 13 hours to get there, they discussed the need, offer and getting feedback because we needed feedback to get this moving forward and this is summarizing the outcome of that meeting.

Q. Could you turn to page two of the letter Mr. Collins?

MS. DUNN: I'm sorry, Your Honor, objection, I don't believe Mr. Collins was at this meeting, so I think

going into the summary of what happened is beyond his foundation.

THE COURT: Was he at the meeting?

MR. WILCOX: Mr. Collins wasn't at the meeting.

THE COURT: Why is he going to be telling me about what happened?

MR. WILCOX: Do you want me to ask him a question to lay a foundation, I can tell you but I can also lay a foundation.

THE COURT: Okay.

BY MR. WILCOX:

Q. Mr. Collins, how were you familiar with what happened at this meeting that occurred in January of 2026?

A. Both of the people that attended that meeting report to me and I got a full read out from them.

Q. Thank you.

MS. DUNN: Your Honor, just I would like to put on the record if he's going to testify about this, this feels a lot like a privilege waiver to me.

THE COURT: I'm sorry, I can't hear you.

MS. DUNN: Hearsay a potential privilege waiver, I want to state that for the record.

MR. WILCOX: I'm happy to move on, Your Honor.

THE COURT: It sounds like you probably should.

BY MR. WILCOX:
Q. Could you go to the DTX-1567, Mr. Collins--
A. DTX 2567?
Q. -- correct?
A. That's that document, isn't it?
Q. You're right, I meant DTX-8?
A. Eight.
Q. DTX-8, it should be at the front of your binder.
A. Yes. Got it.
MS. DUNN: Sorry, no objection.
MR. WILCOX: I haven't moved to admit it, but I'll move to admit DTX-8.
MS. DUNN: Same.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 8 was admitted into evidence.)
THE COURT: Okay.
BY MR. WILCOX:
Q. And what is DTX-8 and how does it relate to offers that you made to Qualcomm?
A. So in the meeting in January, Qualcomm gave no feedback in terms of the numbers that we gave --
Q. Mr. Collins, I think that we probably need to avoid talking about the substance of the meeting. But can you just describe how this relates to offers that Arm made to Qualcomm?

A. Okay. This is a letter from me to Qualcomm saying that we have a request from Qualcomm to restructure the offer so that it's done essentially on an ASP basis we have taken your feedback, we have gone away to do that, and here it is.
Q. Could you turn to the second page of this letter?
A. Yes.
Q. If you could blow up the chart at the top of the page. What are we seeing in this chart, Mr. Collins?
A. This is basically the structure that we came up with. We told the total aggregate value of the contract that we mailed a proposal in January for, we listened to the feedback from Qualcomm, we structured on an ASP basis, what this basically says in plain English is the royalty payment, are per SOC will be paid on the average selling price of the SOC, to the extent the average selling price falls within any of these brackets, that would be the rate that applies.
Q. You can take the blow up down, Mr. Schlaifer, thank you.
When did Arm make its most v10 proposal to Qualcomm?
A. In August of this year.
Q. Could you turn to DTX-9?
A. Yep.
Q. What is DTX-9?

16:01:12 A. DTX-9 is a letter from me to the general counsel of Qualcomm attaching the offer.
16:01:18 MR. WILCOX: Move to admit DTX-9, Your Honor.
16:01:20 MS. DUNN: No objection.
16:01:21 THE COURT: Thank you. It's admitted.
16:01:22 (DTX Exhibit No. 9 was admitted into evidence.)
16:01:22 BY MR. WILCOX:
16:01:23 Q. And if you could turn to page 13, Mr. Collins?
16:01:28 A. Uh-huh.
16:01:28 Q. What are we seeing on page 13?
16:01:31 A. Page 13 is basically a nonbinding term sheet which sets out the terms of the offer.
16:01:38 Q. And I see that there are several note to Qualcomm listed on this page. Why are those in the term sheet?
16:01:45 A. We try to get going in the process. When we gave an offer previously, we didn't get much feedback, then when we did give the offer they way they wanted it structured, they said please give us terms that relate to the numbers so we gave them the terms that relates to the numbers. Then we were asking, can you provide commentary on the terms, to try to expedite things so we can go in a proper negotiation we decided to do put these notes in the term sheet itself so we can progress thing and try to get a deal done.
16:02:17 Q. I think that covers Arm's offers, has Qualcomm made any v10 proposals?

A. They have.
Q. Can you turn to DTX-2581, and is DTX-2581 an August 2025 letter from Ms. Chaplin at Qualcomm?
A. It is.
MR. WILCOX: Your Honor, move to admit DTX-2581.
MS. DUNN: No objection.
THE COURT: Thank you. It's admitted.
(DTX Exhibit No. 2581 was admitted into evidence.)
BY MR. WILCOX:
Q. Could you please turn to page 15 of this letter, Mr. Collins. That's also on the screen if that's easier?
A. Okay. Yep.
Q. And on page 15, what does Qualcomm propose with respect to an MFN for license fees?
A. So here they're basically saying we want to pay a license fee, your lowest license fee that you have given to any other customer, essentially. So what they have done here is they basically say we want to pay a license fee of, where is the number in here? 25 million, I know that, they want to pay a license fee of 25 million and they basically want a backward looking MFN which basically means that to the extent you have given a better deal to anyone else then we want that deal and if you ever give during the course of the agreement, so into 2043, if you ever give a better deal

than this, then you need to reimburse us for the difference.

Q. Could you turn to page 16. If you look at the second paragraph under the royalty heading, Mr. Collins, what does Qualcomm propose with respect to an MFN for royalty rates?

A. It's pretty similar, they're basically saying that we want the lesser of our current 2013 rates for a contract that runs until 2043, I believe, and the lowest rates that you have offered to date and you offer going forward. So the analogy I would use here, this is like me going into a car dealership and saying I want a Chevy Equinox in 2013 and saying to the salesperson that I want a deal where I pay the lowest amount for this car that anyone has ever paid, that they will pay until 2043, I'm going go to come back in 2026 and by that point there will be electric cars and there be more expensive, R & D has gone up, inflation has gone up, but I'm still going to get that low number. And then I'm going to come back in 2040, for example when the things are fully automic and the cars are even higher and I'm still going to pay that 2013 price.

A. Oh and by the way if anyone during that time ever gets a better deal, I want that deal, too, that's the effect of that offer.

Q. How does the two MFNs the one for the license fee and the one for the royalty rates in the proposal interact in your understanding?

A. **The way in which they interact you have the lowest license fee, the typically the way we structure our deals you have a license fee and you have a royal royalty rate, they're saying we have the lowest license fee and we want the lower royalty rate, it's not the way we do deals.**

Q. **Has Qualcomm's proposal evolved over the past year?**

A. **No. I mean they made one offer, they made a subsequent offer which was more aggressive.**

Q. **Was there any change in how the MFN worked in that subsequent offer?**

A. **Yes, because they wanted the higher basically what they wanted is the MFN to apply on a royalty rate basis on every single version that would mean for example they got the low evident rate in mobile, in laptop to auto, in data center, it's not how we structure deals. Normally we would say okay, let's say you're a start up, you don't have a lot of cash, so you have a lower licensing fee, but you'll have a higher royalty rates so we can recoup the investment much like Nuvia had. Qualcomm as an example, this is a example could have a higher license fee because they got the money to pay for that and in our understanding they get a lower royalty rates. What they're proposing here, they got much better deal than what I had in my Chevy garage. They have the lowest licensing fee, we also want the lowest royalty rate in every single sector, it's just that unreasonable.**

16:06:57 Q. How would that type of MFN affect Arm's licensing negotiations with other parties?
16:07:03 A. I don't see how we could do it, it would make it incredibly dim.
16:07:07 Q. Why is that Mr. Collins?
16:07:08 A. We mix and match the deals, Rene Haas gave testimony yesterday or the day before, we would basically need too offer those lower rates to Qualcomm on each occasion, it would make this impossible.
16:07:21 Q. Mr. Collins are you aware of any companies that sell v10 chips did?
16:07:26 A. No.
16:07:26 Q. Has Arm released the v10 architecture yet?
16:07:29 A. No.
16:07:30 Q. How would you describe Apple's place in the Arm ecosystem?
16:07:35 A. It's imperative, Apple has been a long time partner of Arm it was founded as a joint venture with Apple, they give us access to a closed ecosystem that we otherwise would never have access to, when they use Arm features that drivers this entire market because Android needs to catch up it's just a complete and utter different beast.
16:07:58 Q. Does Arm remain willing to continue negotiations with Qualcomm over a v10 license?
16:08:03 A. A hundred percent.

MR. WILCOX: Thank you, pass the witness.

CROSS-EXAMINATION.

BY MS. DUNN:

Q. Mr. Collins?

A. Hello.

Q. Okay. Will you check your binder at PTX-2359.

A. 2359?

Q. Yes. Do you see that?

A. I don't think I have that.

MS. DUNN: Does he not have a binder? May we approach?

THE COURT: Yes.

MS. DUNN: Thank you, Your Honor.

BY MS. DUNN:

Q.

A. Sorry, could you give the number again?

Q. Yes, of course. 2359, PTX.

A. It's in the back.

Q. All right. And look at that and let me know if you recognize that as a letter between you and Ms. Chaplin?

A. Yes, I see it.

MS. DUNN: Your Honor move to admit 2359.

MR. WILCOX: No objection.

THE COURT: Thank you. It's admitted.

( PTX Exhibit No. 2359 was admitted into

16:09:22 evidence.)

16:09:22 BY MS. DUNN:

16:09:23 Q. All right. And Mr. Collins, you recognize this as the letter in which Qualcomm made an offer on July 9th of 2026 and we have been sort of short handing its description, we refer to it as MFN plus five percent, right?

16:09:42 Q. You recognize that?

16:09:43 A. I do.

16:09:43 Q. And in your testimony just a second ago, you were talking about an MFN buff I don't think you were speaking about this MFN plus five, correct?

16:09:53 A. If this is the -- there has been a lot of pack with and forth, and we were moving very quickly, if this is the subsequent offer which I believe it is, this is the MFN I believe refers to which was the lowest rate of a five percent bracket in every single center.

16:10:10 Q. You were here when I asked Mr. Haas whether he was able to say what harm would take, MFN plus five percent, 10 percent, 20 percent, a hundred percent and he declined to answer, are you able to answer that question today?

16:10:23 A. What I would say is we want to do the deal with Qualcomm, it need to be fair to Qualcomm, it need to be fair to Arm and it needs to to be fair to every other US v10 customer, we are 100 percent wanting to do that deal.

16:10:36 Q. Is the answer to my question no?

16:10:39 A. I don't have authority I'm not the CEO or CFO, I don't have authority to give an answer on the spot here, but I can't give you a guarantee.

16:10:48 Q. Can you go to DTX-7 which is in evidence?

16:10:51 A. This is the December 10, 2025, v10 proposal you sent to Ms. Chaplin, you just testified about it.

16:10:58 A. Yes.

16:10:58 Q. If could go to page 28?

16:11:00 A. Yes.

16:11:01 Q. You will see an e-mail there from Kevin Frizze at Qualcomm to chief commercial officer at and by dated September, 2024, this is an attachment the your December 10th, 2025, proposal. Do you recall that?

16:11:19 A. Yes this is the settlement proposal I refer to.

16:11:23 Q. Right. If you go too the top of page 29 this is in the context of the parties are talking in December of 2024, before our December trial in 2024 when Arm was demanding structure of our technology, you recall that?

16:11:41 A. I recall these conversations happening in an attempt to settle the lawsuit, yes.

16:11:45 Q. And you see in the top paragraph, it says Mr. Frizzell from Qualcomm says that Mr. Abbey explicitly told him --

16:11:54 A. I'm trying to keep up, I don't have it here.

16:11:57 Q. I'm sorry sorry, Matt, can you highlight the

paragraph beginning second. On the top.

Q. All right. Sorry, sir, do you see that?

A. I do, thank you.

Q. So it says second this is Mr. Frizzell to Mr. Abbey saying that Mr. Abbey explicitly told him that v10 had not been created and was not commercial, so Arm has made no commitment to anyone on a v10 price or royalty rate. Do you see that?

A. I do.

Q. Okay. But you're aware that actually by that Arm time Arm had entered into agreements with v10 royalty rates with several customers by that time, correct?

A. My understanding and I'm not familiar.

MR. WILCOX: Your Honor, objection, just the same as he couldn't talk about meetings that he wasn't in, when there were those meetings between Qualcomm reasonably he can't talk about a conversation that happened between -- never mind, withdrawn.

MS. DUNN: If he can't talk about it, that's okay.

THE COURT: If he knows the answer, you can talk about it, if you don't, you can say it.

THE WITNESS: Can I get the question again, please?

BY. MS. DUNN:

Q. It really was just do you see the sentence?
A. I can see the sentence.
Q. Okay. A little bit below that sentence is something that says your Wednesday proposal suggest that Arm has indeed set a royalty rate for other licensees for at least v10 as you now purport to set forth an MFN but with an explicit carve out that the MFN would be good only in comparison to any architecture license entered into from date of settlement agreement." Do you see that?
A. I do.
Q. And are you aware, sir, that Arm did in fact suggest an MFN but forward looking from this time, are you aware of that?
A. I am aware of that.
Q. Okay. And that was pretty convenient because Arm had already entered into licenses that cover v10 for at least Apple, NVIDIA, Google and Microsoft, correct?
A. I don't know the exact dates of all of the agreements, I believe that the annex of v10 was executed by Google and Microsoft in 2025, so that would have been after this, actually.
Q. Well in any event, those agreements are in evidence and this is in the record so I'll move on.
You spoke about how important it was to you to get into negotiations with Qualcomm, but as of the time of

your deposition, June 30th of 2025, you said that you were not the person to talk to about v10 licensing, do you recall that?

A. The specific -- yeah, the specifics of the v10 licensing, that's correct.

Q. By that time you hadn't really gotten into the nitty gritty of that I guess?

A. What I meant by that is there are a number of v10 licenses, I mentioned how many there are. I am familiar with one of them because it is at the heart of this dispute, that's what I meant by that. I'm very familiar with this one, item not familiar with other ones, that not what I do.

Q. So basically all the testimony you have given you have given out, knowledge of the other agreements.

A. I would say I have given without knowledge, specific knowledge of the specific contractual terms, I'm aware of some of the financials and I made sure that the right analysis was done in the usual fashion before we gave each offer.

Q. Understood, you heard Mr. Haas testify that one concern regulators had about the NVIDIA acquisition was what was talked about today, input foreclosure, you recall that testimony?

A. I recall the testimony today, I remember the conversation coming up in Mr. Haas's I didn't realize he

mentioned the foreclosure point, but if he did, I agree with you.
Q. I agree with you, he didn't see use the word input foreclosure, but what it was basically was regulators were concerned that Arm would own ISA and they would go into selling chips, we agreed on that.
A. I worked on the NVIDIA acquisition, I was at SoftBank. And the main concern from the regulator is that NVIDIA would cut off Arm's access to their rivals, that was the concern in that case.
Q. I want to ask you this question. When do you think Arm became of aware of these regulatory concerns?
A. Which regulatory concerns?
Q. The regulatory concerns that we're discussing, and Mr. Haas talked about the other day, can you just ballpark the time when Arm would have become aware of those?
A. Are you talking about in the context of NVIDIA acquisition.
Q. The NVIDIA acquisition?
A. That would have been after the NVIDIA acquisition was penned which I think was sometime around 2020.
Q. Okay. So you think it would be before December 2021 that you guys knew about that, right?
A. I don't have the exact dates with me, if you give me a document, I can look at it, but I don't know the exact

dates.

Q. That's okay. But basically 2020?

A. On the spur of the moment here, I think that's right, but I would have to look at the date that the acquisition was signed, the documents, then the complaint followed, so it would have been some time after, it would be rationale for me for them to become aware of the issues then, I wasn't at Arm so this is all speculation.

MS. DUNN: Understood. Thank you, Mr. Collins.

THE COURT: Thank you.

Any redirect?

MR. WILCOX: No redirect, Your Honor.

THE COURT: Thank you, sir, you are excused.

MS. BUTLER: Your Honor, Arm calls Professor Timothy Simcoe.

We can unseal the Courtroom, too.

THE COURT: What?

MS. BUTLER: We can unseal the courtroom.

(Courtroom unsealed.)

THE COURT: Qualcomm, you're two minutes over your time, so if you plan to cross-examine, it's got to be very, very short.

MR. ISAACSON: My main interest is your questions are answered, Your Honor, so if you have something of interest or if there is something you want the me to

address, this is for you, I was very pleased when you were asking questions during the Posner examination.

THE COURT: Thank you.

COURTROOM DEPUTY: Please rise your right and than please state and spell your name.

THE WITNESS: T-I-M-O-T-H-Y, S-I-M-C-O-E.

TIMOTHY SIMCOE, having been duly sworn, was examined and testified as follows:

MS. BUTLER: Your Honor, Megan Butler on behalf of Arm.

DIRECT EXAMINATION

BY MS. BUTLER:

Q. Professor Simcoe, can you introduce yourself to the Court today?

A. Good afternoon, Your Honor. Timothy Simcoe. I'm a professor at Boston University and an economist.

Q. Can you please give us a little bit of background and your credentials, sir?

A. I have a Ph.D. in business administration from UC Berkeley where I also have a masters in economics. I have taught at the University of Toronto. And at Boston University I am the faculty director of the technology and policy research initiative at BU which is law and economics group. I testified in a number of cases related to antitrust and intellectual property. I worked for a year as

a senior economist on the White House Council Of Economic Advisors.

MS. BUTLER: Arm tenders Professor Simcoe as an expert in economics and competition, Your Honor.

MR. ISAACSON: No objection.

THE COURT: Thank you.

BY MS. BUTLER:

Q. Professor Simcoe, did you evaluate Professor Posner's opinions in case?

A. Yes.

Q. And what was your first opinion?

A. That Professor Posner's analysis ignores benefits related to Arm's entry.

Q. Can you tell me a little bit about the data center segment before Arm's entry?

A. Yes, prior to Arm's entry into the data center market, according to Professor Posner, the dominant architecture was the X86 architecture, sponsored by Intel and AMD in terms of market share they were a little over 80 percent and Arm's ISA accounted for a little under 20 percent.

Q. We heard a lot of testimony at this trial about mobile phones. Why are we talking here about data centers?

A. Two reasons, I guess. The first is that the actual entry that I'm aware of, the conduct that I understand to be

in question here in terms of vertical expansion is in the data center market. The second is that while there has been a lot of speculation about Arm's entry into other markets, I haven't seen any evidence that Arm has entered or has plans to enter other downstream sectors.

Q. How did data center customers view their choices before Arm's entry?

A. Some customers at least felt like they were weren't completely satisfied with the choices they had, so we heard something about there from Mr. Awad yesterday, but here are some comments from Meta indicating that they felt that the choices they had didn't sort of satisfy the specs they wanted and they felt like they had no silicon to buy.

Q. How did the market change when Arm entered it?

A. So this is a diagram, it's sort of similar but maybe more complete than the one that Professor Posner offered that illustrates how this data center segment looked prior to Arm's entry. You can see that the customers down at the bottom, these hyperscalers, Meta, Google, Microsoft had several choices, two different architectures, they could have bought chips from data centers on the X86 architecture from Intel or AMD. And then they could have bought chips that used the Arm ISA in a couple of ways. One is there is a direct line here linking Arm down to the customers, that would be just sort of under a license, an ALA, or I think

actually it was mostly TLA cores that they were using. They can take the Arm license and design a custom chip or NVIDIA who was also licensed to use Arm's ISA does their own chip design work in the hyperscalers could have bought a chip from NVIDIA.

Q. How would this market structure chip when Arm starts selling its data center chip?

A. If you advance the slide, you see Arm enters in 2026. What's going on at this point is now Arm has, you might call hybrid vertical integration. In business school we often call it coopatition, cooperation meets competition. It's school buzz word type of explaining it. Arm is at the chip level, they're supplying chips and at the ISA or the core level they're also licensing an input the chip makers use, but it just adds to the sort of choices available to the consumer. In addition to the choices they had previously, they can buy a chip from Arm.

Q. And what are the benefits of Arm's entry to customers?

A. Well, there is two kinds of benefits. One is just the basic benefits of competition through entry into a new market, right. So this is not a case of a merger, where there is no new firm being entered, entering into the chip market. Here Arm enters into supply of chips that produces the kinds of benefits that you get from competition. There

is a new competitor, customers have more choice, more choice leads to more quality and lower prices, expanded output, more product variety. That's kind of the way that economic mist would think about a market with more competitors as opposed to less as the top two benefits.

And the bottom two kinds of benefits that comes from Arm's entry are the kind that economists think that you have from the absence of competition, say this was contrary to a vertical merger. One thing that economists focus on when analyzing this kind of a structure in a merger context is the elimination of costs, the profit of the middleman, the chip producer adds costs to the downstream customers, the hyperscalers, removing those costs can make vertical integration in this way beneficial to the customers.

And it also by getting close to the customers, Arm in this case is able to design products that better meet their needs, it leads to improved quality because they're working hand in glove with the people who are going to use the chips.

Q. We heard testimony that Qualcomm is about to enter in market. When will happen then?

A. Sort of moving forward in time, here I put Qualcomm entering in 2028 because that's when they have a chip with an Arm ISA on their roadmap. There is more choice still in the chip, customers who are using chips in data centers have

more choice and then I also added the RISC-V Instruction Set Architecture which is on the horizon as part of a type of competing ISA so I put a dotted line, Qualcomm bought Ventana and announced that they will use the RISC-V ISA as the basis for another data center chip.

Q. Let's talk a little bit about Professor Posner. Professor Posner said that Arm, I think the words were dominates a critical input. Do you have an opinion on that?

A. I disagree, I think it's a misleading analysis.

Q. And why is that?

A. One way to think about it is it just sort of, there is an attempt to kind of define the market for access to the Arm ISA, it limits his focus just to Arm's instruction set, and it's tocological to say a firm dominates the supply of its own product. I think the reality of competition here is that there is limitation on the pricing power, the market power that Arm might have because it competes with other ISAs. Mainly this X86 architecture and the RISC-V one.

THE COURT: Is RISC-V even real?

THE WITNESS: My understanding is that the design work is happening, we see the investment that you know Qualcomm is making in Ventana, and that others are making.

THE COURT: It's not currently, nobody can use it. Arm and Intel have tangible things that can be used in

chips, right.

THE WITNESS: You know, I'm honestly -- I think that there is some -- I have seen some reports that say they're like Alibaba Chinese company may have a RISC-V data center chip in the market but it's really nascent, my understanding --

THE COURT: The reality of ISA competition is currently Arm and Intel.

THE WITNESS: No, I don't agree with that.

THE COURT: I think RISC-V, if they actually do anything in the market.

THE WITNESS: No, I think that the reality of competition is that these firms invest over a long period of time. And that they're thinking quite hard about whether the actions they take will lead to increased investment in RISC-V from Arm's perspective. If I was to foreclose or attempt to foreclose, what's that going to do to investment in RISC-V which would then undercut high ecosystem and the revenue arrival from that ecosystem.

Q. So I think we were just talking a little bit about the long-term, but you know, even if it takes a couple of years for RISC-V to get off the ground, is there anything that protects Qualcomm in the medium turn, immediate to medium term before RISC-V gets off the ground?

A. Sure. You know, I guess-he there you go. In the

16:27:36 medium term you know in the next several years, through 2033, at least, Qualcomm has access to Arm's ISA through the ALA and the agreement, right, so it has contractual protections, it has a contractual tie. In fact we saw on the other slide that Arm, that Qualcomm is planning to develop an Arm-based data center CPU which suggest that whatever concerns they actually have about input don't outweigh the the benefits that they would expect from investing in this Arm-based chip.

16:28:12 Q. Qualcomm has made allegations in this case that Arm has breached the ALA. Does that mean that the ALA doesn't protect Qualcomm?

16:28:20 A. No. If Qualcomm feels that Arm has somehow breached the ALA, they can bring Arm to Court. But the ALA provides is the right to seek redress in the event that they feel Arm has not honored the contract.

16:28:39 Q. And then what about the long-term we sort of talked about this already that there are competitive pressures and maybe we take them one by one. Let's start with X86?

16:28:48 A. In the long-term, there is competitive pressure from the RISC-V architecture and from X86. This slide just shows.

16:28:58 MR. ISAACSON: Your Honor, I would object to putting hearsay up on the screen.

16:29:05 THE COURT: Okay. What is this?

MS. BUTLER: Your Honor, he's an expert. Experts constantly rely on customer statements and understanding the effect of conduct in the market. Rule 703 and --

THE COURT: Are you suggesting he can't rely on it or just that it shouldn't be up on the screen and he's putting it into the evidence.

MR. ISAACSON: I shouldn't say the screen, you can see anything, Your Honor, as far as I'm concerned, but relying on customer statements is different to say well customers are saying these things, but then together ahead and say now we're going to say this technology is viable because of this sort of thing, this sort of hearsay does not support these support of opinions.

MS. BUTLER: Your Honor, I think given that it's a bench trial, of course they can make arguments in post-trial briefings about the weight to discuss this offer, you can also have Professor Simcoe if there was any evidence in addition to the statement.

THE COURT: What kind of technology is this talking about, X86?

MS. BUTLER: Yes.

THE COURT: I'll overrule the objection. But I recognize it for what it is. Go ahead.

BY MS. BUTLER:

Q. So Professor Simcoe, we're talking about whether X86 is a meaningful competitive constraint. What is your opinion on that?
A. I think it is. I mean, there are these kind of statements from Intel and AMD suggesting they intent to compete in the data center market, this is also the slide we started with that showed Intel's position in the data center market as of a couple of years ago. You can look at this stock prices of these companies over the last couple of years and see that there is, like evidence consistent with an expectation that they are going to benefit from the huge booming investment in data centers so there is a lot of different kind of evidence on this.
Q. What about RISC-V?
A. Yeah, so I think that there is a great deal of evidence also that RISC-V will provide meaningful constraint on Arm's ability to raise prices for the Arm ISA. So you see you know sort of investment by the firms that will make the types of software that are necessary to make the ecosystem work, the Google and the Microsoft who build operating systems, you see commitments from company like Qualcomm when help acquire Ventana for more than a hundred million dollars. There is another company on here SciFi which a CPU developer based on the RISC-V architecture that was recently valued at three-and-a-half billion dollars,

these are significant investments that suggest that in the long run, RISC-V poses meaningful competitive constraint to Arm.
Q. In regards to what we just discussed, why might Arm hesitate before attempting to foreclose?
A. Arm would hesitate to foreclose because it hurts Arm's business directly in terms of lost sales with with customers like Qualcomm. It sort of accelerates these types of investments in competitive alternatives.
So, you know, sort of if Arm were to make an effort to foreclose and that was widely understood by its customers, those customers who are large sophisticated purchasers of these data center chips, would have ever incentive to set up a second source of supply that does not the Arm ISA, in this case we had heard that kind of testimony it would damage the ecosystem, it was really just saying if we were trying to foreclose and that was going to harm our customers they would be upset about it and they would look elsewhere for more choice.
Q. What is your final opinion, Professor Simcoe?
A. It's just that harm to Qualcomm is not harm to competition.
Q. Why might Qualcomm, a competitor, to Arm, not like something that's good for competition?
A. Qualcomm is a competitor, it's an easy concept to get

that you know, sort of competition is good for consumers, it's good on net because it improves the quality of products, it lowers prices it expands output, but competitors don't like it because it drives their margins down. So that's the answer.

Q. What have customers -- do economists consider what customers say when considering the effects of anticompetitive conduct?

A. Yes, one way of trying to discriminate between whether a piece of conduct is harm to competition or just harm to a competitor, is to look at how customers respond to it. And the purpose of this slide is to look at how customers reacted to Arm's entry into the data center chip market.

What you see is comments here from Google's chief technologist talking about flexibility and optimization, someone at open AI saying they're excited to work at Arm. It's subjective of customers perceiving benefits rather than future harm from Arm's entry.

Q. Do you have an opinion on Professor Posner, I think his worth was speculation that these companies were coerced into making these statements?

A. I think that these are very large sophisticated companies that aren't being bullied by Arm.

MS. BUTLER: Pass the witness, Your Honor.

THE COURT: Are you saying with respect to the X86 and the RISC-V that essentially if Arm is unreasonable, it just gives more incentives for people to invest in those other technologies and so that is a constraint on Arm?

THE WITNESS: I would say that's part of it, yes.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. ISAACSON:

Q. I'll just try to be useful for a few minutes. Can we look at his slide 7.8. Just so I understand what you're saying here, this is where I think you were saying that there was dissatisfaction that led to Arm's entry into the chip side of data centers?

A. I don't think so. That was a different slide, but this is a slide that just explains the basic structure of the industry.

Q. Right. But it was dissatisfaction, they got this opportunity due to dissatisfaction, is that what you were saying?

A. It's not complete although I think that's part of the story.

Q. All right. And then over the right, you didn't really talk about, you said Intel and AMD intend to compete, did that dissatisfaction extend to them?

A. As I said.
Q. The dissatisfaction of the hyperscalers, that's who we're talking about, you haven't seen any success of Intel and AMD in X86 with the hyperscalers with these new large data centers, have you?
A. There are a bunch of questions there. On the dissatisfaction, that was limit to do one quote from Meta. My sense is that the -- you know, Arm and others are entering because of the opportunity and the growth in this data center market driven by AI, I honestly don't know the answer to your question about whether there is dissatisfaction with Intel or AMD. My sense is that customers always want a bit more.
MR. ISAACSON: Are we about to take a break, Your Honor?
THE COURT: No.
BY. MR. ISACCSON:
Q. And just to put a point on it, you haven't seen any success on the part of X86, Intel or AMD in providing, into moving into these new large data centers with the hyperscalers?
A. I think no, I don't know.
Q. All right. And then you used the term cooperation in competition. How do we say the term?
A. There is a book it's called coopitition.

16:36:59 Q. Coopitition, cooperation and competitors, that's NVIDIA and Arm in your chart here, right?
16:37:08 A. Yes, and also -- yes.
16:37:12 Q. Okay.
16:37:13 A. NVIDIA and Arm would be in that kind of relationship.
16:37:16 Q. And NVIDIA, there is the line from Arm to NVIDIA, are these TLA cores?
16:37:24 A. I think NVIDIA has two data center products afternoon I think one might be ALA now and one might be TLA.
16:37:32 Q. Do you know if the ALA rates for NVIDIA are lower than the rates for the TLAs?
16:37:39 A. I don't specifically recall NVIDIA's rates.
16:37:42 Q. What happens to NVIDIA if their ALA rates are equal to or higher than their TLA rates what happens to their incentives between making their own cores and using Arm's TLA cores?
16:38:03 A. Your hypothetical is that NVIDIA has to pay more per unit for a license than it has to pay to use an Arm core.
16:38:14 Q. Or even equal and then has to build its own core as opposed to just buying a core from Arm. What happens to the incentives?
16:38:25 A. It depends on a lot of other things, like I guess you're trying to say all else equal, if I have to pay for the same thing do I choose the option that cost less? Typically the answer is yes.

16:38:40 Q. All right. And then what happens to NVIDIA if Arm degrades or increases the prices of TLA cores as providing to NVIDIA?
16:38:52 A. Could you repeat that one?
16:38:53 Q. Sure. What happens to NVIDIA if Arm degrades the quality of or increases the prices of the TLA cores, what happens to the competition between NVIDIA and Arm to the extent there is any between that cooperation competition?
16:39:09 A. It depends. The point -- one of the big points of my testimony was that that kind of active tortious interference by Arm creates incentives for the customers to move towards X86 and eventually RISC-V.
16:39:24 Q. Well as of this chart, before you add Qualcomm in 2028, without NVIDIA, it's just Arm, right?
16:39:35 A. But as of this chart, NVIDIA and Qualcomm have these contracts that I testified about that give them protections.
16:39:44 Q. You haven't seen the NVIDIA contract, you don't know what protections they have, do you?
16:39:48 A. Referring to the Qualcomm specifically, but you're right, I haven't seen the NVIDIA contract.
16:39:53 Q. And in terms of Qualcomm, those protections for Qualcomm run through 2033, right?
16:39:59 A. Under the ALA, yes.
16:40:01 Q. And so in 2033, unless Qualcomm has a new contract, it's just Arm and NVIDIA in cooperation and competition,

right?

A. Not precisely. So if Qualcomm introduces a chip between now and 2033, Qualcomm keeps its pricing for that chip in the indefinite future. It's just that they need to conclude, if you say, in 2033, if Qualcomm wants access to v10 the two parties have to negotiate their way to an agreement.

Q. But without a v10 license -- in 2023, if you don't have a v10 license, and the 2033 license is expired, all Qualcomm can do is sell v9 chips it's already manufactured until they run out, right?

A. I'm sorry, but your question had 2023 and 2033.

Q. 2033 is what I meant to say, sorry, it's late.

A. In 2033.

Q. After expiration of the Qualcomm license?

A. If there is no agreement on a v10 license in 2033, yes, my understanding is that Qualcomm would be unlicensed.

Q. And then after Qualcomm's entry without Qualcomm in 2033, you would have Arm and NVIDIA, and you don't know how much of NVIDIA is going to be TLA cores to the extent that Arm isn't doing anything to hurt NVIDIA as a competitor?

A. I'm failing -- so you're holding up one slide and there is a different one on the screen. What is the question, I'm sorry?

Q. Let's put up ten on the screen, I'm sorry. There is

16:41:53 Qualcomm. So if we run out of Qualcomm in 2033 and it's Arm and NVIDIA again, right, and NVIDIA is buying TLA cores and Arm is saying okay, that's fine, that's going to be the situation, right?

16:42:09 A. I mean, at some point I just fundamentally disagree with the premise of the hypothetical you're spinning, you took Qualcomm out of the market in this question?

16:42:21 Q. Yes, because their license expired?

16:42:22 A. I see. And then the question was is Arm going to do the same thing to NVIDIA.

16:42:28 Q. Right. Even if they don't, there is just two then, and NVIDIA is getting its cores, its TLA cores from Arm?

16:42:35 A. That's the situation, right? I doubt it, we heard this testimony that Arm has never refused to license, there are other companies that have capabilities of building chips, you hypothetically assumed that Qualcomm has failed to negotiate a license with Arm, but Arm has been open ISA that licenses companies to make chips.

16:42:58 Q. All right. When Arm does open licensing, it does TLA licenses. And how many TLA licenses are there right now?

16:43:07 A. We heard that there are five for v10 and I think there are some, a comparable number for v8 and v9.

16:43:15 Q. When you talk about open licensing, you're just talking about a handful when it comes to ALAs, right?

16:43:23 A. When it comes to ALAs, I didn't, the number of firms

that have the capabilities to could the in-house design work is of that order.

MR. ISAACSON: Your Honor, I don't have any more questions, or is there something you want me to ask?

THE COURT: No. Thank you.

Redirect.

REDIRECT EXAMINATION

BY MS. BUTLER:

Q. Professor Simcoe, between now and 2033 is Qualcomm going to have access to Arm's ISA?

A. V9 under the ALA, yes.

Q. Is Qualcomm making a data center chip right now?

A. Yes.

Q. And what architecture is that based on?

A. Well, there is one that's been announced on the Arm ISA and there is one that's on the roadmap using the RISC-V ISA.

Q. If Qualcomm invested money into a chip that relies on Arm's ISA, what does that subject about Qualcomm's access to Arm's ISA in 2028 and beyond?

A. It suggest that Qualcomm does not expect to be foreclosed in sort of giving that its an inverting the money to build to the Arm ISA.

MS. BUTLER: No further questions, Your Honor.

THE COURT: Thank you. Thank you, sir. You are

excused.

What's next?

MR. LoCASCIO: Armrest, Your Honor.

THE COURT: All right. Thank you. Anything further? Anybody?

THE COURT: No.

So what do you want to do about closings. Do you think it would be better for me to have briefing or do you want to have closings and hear my questions to the extent I have some before you do your briefing? I can go either way, so it's what you guys think is --

MR. LoCASCIO: I'm going to side saddled with you.

MS. DUNN: Come on over. We haven't discussed this but my vote would be for closings so that we can hear what the Court actually wants to know and be responsive to you.

MR. LoCASCIO: Do you know what I was going to suggest?

MS. DUNN: The opposite.

MR. LoCASCIO: No.

MR. LoCASCIO: I was going to suggest, Your Honor, recognizing that inherent in this is the Court's ability to review it, I was going to suggest we simultaneously brief it and then have closings so you'll

have the information in front of you with questions, and then any responsive brief that would also address your questions could go in after that to try to -- because last time I know you had questions I think we would a supplemental brief on something, just a way to sort of pull together for you.

THE COURT: Supplemental briefing is awful because then I don't have everything together. The supplemental brief deals with whatever the supplement part is, but then I still have to keep going back and reading multiple things and if I take them home because I don't know how to get on my computer from home, that's not as good.

The other thing that I'm trying to think of is how that would work because Qualcomm has the burden. So you would go first. Are you saying they go first and then we have argument, they go first and you go and then we have argument and you then you guys give me more?

MR. LoCASCIO: You raised a point at this point in our limited sleep I had not thought through the burden balancing of those briefs, I was thinking that we do it simultaneous, I think you make a good point from my side we would like to respond to those. It really is a question Your Honor, I think there is a lot here, the question is we're happy to have closings first and brief, I'm not inherently contrary with Ms. Dunn's approach on that, but if

there is information that would be useful to the court before we have that closing we are certainly prepared to provide it.

THE COURT: I don't, as I said, if you all had agreed, I don't have strong feels. You didn't agree. So what I would propose is some time in the next two weeks if there is a time that works for you and you contact my chambers, come in, I'll give you each -- you know, I'll set aside an hour-and-a-half or so for you to tell me what you want and me to ask questions. Then I'll have briefing, and then if I need more argument after the briefing, I'll -- I know where to find you.

MR. LoCASCIO: Understood, Your Honor.

MS. DUNN: Thank you, Your Honor. That sounds great.

THE COURT: Okay. Anything else.

Oh, the jury, I asked them if they wanted to say or go and they said they would keep going until 5:15.

MS. DUNN: Thank you, Your Honor.

COURTROOM DEPUTY: All rise.

(Court recessed at 4:48 p.m.)