IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, a Delaware corporation; and QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, | ) | |
| Plaintiffs, | ) | C.A. No. 24-490 (MN) (CONSOLIDATED) |
| v. | ) | [redacted] |
| ARM HOLDINGS PLC., f/k/a ARM LTD., a U.K. corporation, | ) | |
| Defendant | ) | REDACTED - PUBLIC VERSION |

# PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jennifer Ying (#5550)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
Jenifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
Jacob Apkon
Stephanie L. Chin
PAUL WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

William T. Marks
Adam L. Basner
PAUL WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

November 10, 2026

ORIGINAL FILING DATE: NOVEMBER 10, 2026
REDACTED FILING DATE: NOVEMBER 17, 2026

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

QUALCOMM'S PROPOSED FINDINGS OF FACT ............................................................ 3

I. Arm Controls the Arm ISA ........................................................................................ 3

II. ALAs Make Innovation Possible ................................................................................ 4

III. For Years, Qualcomm Has Been "Totally Reliant" On Arm.......................................... 5

IV. After Softbank Acquired Arm, Arm Began To Use Its Total Control Over the ISA To Advantage Itself Over Rivals ................................................................................... 6

A. Arm used its power over the ISA to drive up the cost of TLA CPUs. ........................... 7

B. Competition concerns prevented Nvidia's acquisition of Arm. ..................................... 7

C. Aware of competition concerns, Arm planned to "hose" "the rest." .............................. 8

V. Qualcomm's Use of Its ALA Caused Arm To Want To "EOL" ALAs, Which Would Eliminate CPU Competition ..................................................................................... 9

VI. Consistent With Its Plan To EOL ALAs and Eliminate Competition, Arm Is Withholding v10 in Bad Faith.................................................................................11

A. Arm delayed negotiation by hiding v10 development. ...............................................11

B. Once Qualcomm learned v10 was imminent, Arm's bad faith intensified. ................. 12

C. Arm's proposals are not commercially viable for Qualcomm. .................................... 17

D. Arm's justifications for its proposals are not credible. ............................................... 21

E. Arm's bad faith conduct is already causing harm to Qualcomm. ................................ 23

VII. Arm's Conduct Is a Significant Threat To Competition ............................................. 24

A. Arm 's ISA is a critical input, over which Arm has total control................................ 24

B. Arm has the ability and incentive to foreclose access to the Arm ISA........................ 24

C. Arm has already demonstrated willingness to foreclose competition. ......................... 25

QUALCOMM'S PROPOSED CONCLUSIONS OF LAW ..................................................... 31

I. Arm Breached ALA Section 14.1.B by Failing To Negotiate in Good Faith for v10....... 31

A. Section 14.1.B required Arm to negotiate in good faith once Qualcomm elected to extend the ALA to cover v10. .................................................................................. 31

B. Arm refused to negotiate in good faith the terms of v10. ............................................ 33

C. Arm should be ordered to specifically perform its obligation to negotiate in good faith the terms of v10. ................................................................................................. 35

II. Arm's actions against Qualcomm violate the California Unfair Competition Law.......... 38

A. The UCL is intended to prevent any form of unfair competition. ................................ 38

B. Arm's ongoing refusal to fairly license v10 to Qualcomm violates the UCL. ............. 40

C. Arm's interference with Qualcomm's customers and withholding of deliverables violates the UCL. ............................................................................................................ 44

III. A Permanent Injunction Against Arm Is Warranted..................................................... 47

A. Qualcomm will continue to suffer irreparable harm without an injunction.................. 48

B. The equities and public interest also favor Qualcomm................................................. 49

C. Qualcomm's requested relief is well within the Court's authority................................ 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*FTC* v. *AbbVie Inc.*,
976 F.3d 327 (3d Cir. 2020)....48

*New York v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)....50

*AIU Ins. Co.* v. *Superior Ct.*,
799 P.2d 1253 (Cal. 1990)....33

*Allegheny Energy, Inc.* v. *DQE, Inc.*,
171 F.3d 153 (3d Cir. 1999)....35

*AMG & Assocs., LLC* v. *AmeriPride Servs., Inc.*,
2016 WL 9275402 (C.D. Cal. 2016)....37

*Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)....43, 44

*Bascom Food Prods. Corp.* v. *Reese Finer Foods, Inc.*,
715 F. Supp. 616 (D.N.J. 1989)....50

*Bergen Drug Co.* v. *Parke, Davis & Co.*,
307 F.2d 725 (3d Cir. 1962)....50

*Bimbo Bakeries USA, Inc.* v. *Botticella*,
613 F.3d 102 (3d Cir. 2010)....48

*Bryant* v. *Microsoft Corp.*,
2026 WL 2908104 (N.D. Cal. 2026)....42

*Capito* v. *San Jose Healthcare Sys., LP*,
561 P.3d 380 (Cal. 2024)....39

*Carlson Specialty Seed* v. *Walter Carlson & Walter Carlson & Assocs.*,
1990 U.S. Dist. LEXIS 21263 (E.D. Wis. 1990)....42

*Cel-Tech Commc'ns, Inc.* v. *L.A. Cellular Tel. Co.*,
973 P.2d 527 (Cal. 1999)....38, 39, 41, 44

*Chegg, Inc.* v. *Doe*,
2023 WL 7392290 (N.D. Cal. 2023)....50

*City of Atascadero* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
80 Cal. Rptr. 2d 329 (Ct. App. 1998) ....................................................................33

*City of S. Pasadena* v. *Dep't of Transp.*,
35 Cal. Rptr. 2d 113 (Ct. App. 1994) ....................................................................47

*City Stores Co.* v. *Ammerman*,
266 F. Supp. 766 (D.D.C. 1967), *aff'd*, 394 F.2d 1950 (D.C. Cir. 1968)...............................38

*Coleman Motor Co.* v. *Chrysler Corp.*,
525 F.2d 1338 (3d Cir. 1975)....................................................................41

*Cooper-Standard Auto. Inc.* v. *Daikin Am., Inc.*,
568 F. Supp. 3d 846 (E.D. Mich. 2021)....................................................................50

*Courtesy Temp. Serv., Inc.* v. *Camacho*,
272 Cal. Rptr. 352 (Ct. App. 1990)....................................................................36

*Cumulus Media New Holdings, Inc.* v. *Nielsen Co. (US) LLC*,
2026 WL 63294 (S.D.N.Y. 2026), *aff'd*, 182 F.4th 108 (2d Cir. 2026) ...............................50

*Dent Mart Int'l, Inc.* v. *iDen Dental Supply, Inc.*,
2015 WL 2439301 (Cal. Ct. App. 2015) ....................................................................50

*Donahue Schriber Realty Grp., Inc.* v. *Nu Creation Outreach*,
181 Cal. Rptr. 3d 577 (Ct. App. 2014) ....................................................................36

*DVD Copy Control Ass'n* v. *Kaleidescape, Inc.*,
97 Cal. Rptr. 3d 856 (Ct. App. 2009) ....................................................................36, 37

*Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)....................................................................41

*Epic Games, Inc.* v. *Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ....................................................................39, 40, 42

*Full Draw Prods.* v. *Easton Sports, Inc.*,
182 F.3d 745 (10th Cir. 1999) ....................................................................42, 46

*Genesis 1 Oil Servs., LLC* v. *Wismann Grp., LLC*,
2023 WL 8125773 (C.D. Cal. 2023)....................................................................36

*Gerawan Farming, Inc.* v. *Rehrig Pac. Co.*,
2013 WL 1934173 (E.D. Cal. 2013)....................................................................39

*GlaxoSmithKline Consumer Healthcare, LP* v. *Merix Pharm. Corp.*,
2005 WL 2230318 (D.N.J. 2005) ....................................................................49

*United States* v. *Google LLC*,
2025 WL 3496448 (D.D.C. 2025) ....................................................................................50

*In re Google Play Store Antitrust Litig.*,
2024 WL 4438249 (N.D. Cal. 2024), *aff'd*, 147 F.4th 917 (9th Cir. 2025)................39, 40, 50

*Hewlett* v. *Squaw Valley Ski Corp.*,
63 Cal. Rptr. 2d 118 (Ct. App. 1997) ...........................................................................38, 40

*hiQ Labs, Inc.* v. *LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) .......................................................................................38, 42

*Holistic Supplements, LLC* v. *Stark*,
61 Cal. App. 5th 530 (2021) ...............................................................................................38

*Host Int'l, Inc.* v. *MarketPlace, PHL, LLC*,
32 F.4th 242 (3d Cir. 2022) ................................................................................................43

*Ilapak, Inc.* v. *Young*,
2020 WL 2787689 (E.D. Pa. May 29, 2020) .......................................................................49

*Illumina, Inc.* v. *FTC*,
88 F.4th 1036 (5th Cir. 2023) ..............................................................................................41

*Inkit, Inc.* v. *airSlate, Inc.*,
2025 WL 2662150 (D. Del. 2025) ........................................................................................47

*Intel Corp.* v. *Hamidi*,
30 Cal. 4th 1342 (2003) .......................................................................................................47

*Kairys* v. *S. Pines Trucking, Inc.*,
75 F.4th 153 (3d Cir. 2023) ...........................................................................................39, 45

*Kos Pharms., Inc.* v. *Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004).................................................................................................48

*L.A. Int'l Corp.* v. *Prestige Brands Holdings, Inc.*,
2024 WL 2272384 (C.D. Cal. 2024), *aff'd,* 168 F.4th 608 (9th Cir. 2026)............................50

*Metricolor LLC* v. *L'Oréal S.A.*,
2020 WL 3802942 (C.D. Cal. 2020).......................................................................................39

*MGA Ent., Inc.* v. *Mattel, Inc.*,
2005 WL 5894689 (C.D. Cal. 2005).......................................................................................45

*Motors, Inc.* v. *Times Mirror Co.*,
162 Cal. Rptr. 543 (Ct. App. 1980)...................................................................................41, 42

*M.S. Int'l, Inc.* v. *Patel*,
2018 WL 11350041 (C.D. Cal. 2018)....................50

*Ne. Pa. Freethought Soc'y* v. *Cnty. of Lackawanna Transit Sys.*,
938 F.3d 424 (3d Cir. 2019)....................47

*Kansas* v. *Nebraska*,
574 U.S. 445 (2015)....................48

*Nielsen* v. *Preap*,
586 U.S. 392 (2019)....................32

*O'Hara, Jr.* v. *Premcor Ref. Grp., Inc.*,
2011 WL 337951 (D. Del. 2011)....................47

*Oakland Bulk & Oversized Terminal, LLC* v. *City of Oakland*,
334 Cal. Rptr. 3d 488 (Ct. App. 2025) ....................35, 37

*Okun* v. *Morton*,
250 Cal. Rptr. 220 (Ct. App. 1988)....................37

*Optronic Technologies, Inc.* v. *Ningbo Sunny Electric Co.*,
2020 WL 1812257 (N.D. Cal. 2020), *aff'd,* 20 F.4th 466 (9th Cir. 2021)....................50

*Overstock.com, Inc.* v. *Gradient Analytics, Inc.*,
61 Cal. Rptr. 3d 28 (Ct. App. 2007) ....................45

*Par Pharm., Inc.* v. *QuVa Pharma, Inc.*,
764 F. App'x 273 (3d Cir. 2019) ....................49

*Performance Team Freight Sys., Inc.* v. *Aleman*,
194 Cal. Rptr. 3d 530 (Ct. App. 2015) ....................32

*Progressive West Ins. Co.* v. *Superior Ct.*,
135 Cal. App. 4th 263 (Ct. App. 2005)....................39

*R.J. Kuhl Corp.* v. *Sullivan*,
17 Cal. Rptr. 2d 425 (Ct. App. 1993) ....................35

*Real Est. Analytics, LLC* v. *Vallas*,
72 Cal. Rptr. 3d 835 (Ct. App. 2008) ....................35

*Robinson v. U-Haul Co. of Cal.*,
209 Cal. Rptr. 3d 81 (Ct. App. 2016) ....................48

*Rogers* v. *Davis*,
34 Cal. Rptr. 2d 716 (Ct. App. 1994) ....................37

*Simon & Simon, PC* v. *Align Tech., Inc.*,
2026 WL 2980631 (9th Cir. 2026) ....................................................43

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
996 F. Supp. 2d 942 (S.D. Cal. 2014)....................................................37

*Sprint Nextel Corp.* v. *AT&T Inc.*,
821 F. Supp. 2d 308 (D.D.C. 2011)....................................................42

*State Compensation Ins. Fund* v. *Maloney*,
262 P.2d 662 (Ct. App. 1953)....................................................50

*St. Jude Med., Inc.* v. *CarboMedics, Inc.*,
764 F.2d 500 (8th Cir. 1985) ....................................................50

*Sun Microsystems, Inc.* v. *Microsoft Corp.*,
87 F. Supp. 2d 992 (N.D. Cal. 2000) ....................................................48

*Sys. Ops., Inc.* v. *Sci. Games Dev. Corp.*,
555 F.2d 1131 (3d Cir. 1977)....................................................47

*Tamarind Lithography Workshop, Inc.* v. *Sanders*,
193 Cal. Rptr. 409 (Ct. App. 1983)....................................................36

*In re Tobacco Cases II*,
240 Cal. App. 4th at 802 ....................................................48

*Upjohn Co.* v. *Riahom Corp.*,
641 F. Supp. 1209 (D. Del. 1986)....................................................49

*Valassis Commc'ns, Inc.* v. *News Corp.*,
2019 WL 802093 (S.D.N.Y. 2019)....................................................42, 46

*Viamedia, Inc.* v. *Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ....................................................41, 43

*In re Vylene Enters., Inc.*,
90 F.3d 1472 (9th Cir. 1996) ....................................................35

*United States* v. *W.T. Grant Co.*,
345 U.S. 629 (1953)....................................................48

*Wisk Aero LLC* v. *Archer Aviation Inc.*,
2021 WL 4932734 (N.D. Cal. 2021) ....................................................45

*WPEngine, Inc.* v. *Automatitic Inc.*,
2024 WL 5077610 (N.D. Cal. 2024) ....................................................50

*Worldwide Travel, Inc.* v. *Travelmate US, Inc.*,
2015 WL 1013704 (S.D. Cal. 2015) .......... 39

*Zurn Constructors, Inc.* v. *B.F. Goodrich Co.*,
685 F. Supp. 1172 (D. Kan. 1988) .......... 37

**Statutes**

Cal. Bus. & Prof. Code § 17200, et seq. (UCL) .......... *passim*

Cal. Bus. & Prof. Code § 17203 .......... 39, 48

Cal. Civ. Code § 1643 .......... 33

Cal. Civ. Code § 1644 .......... 34

Cal. Civ. Code § 3541 .......... 33

**Other Authorities**

*Good Faith*, Black's Law Dictionary (12th ed. 2024) .......... 34

Rodney Huddleston & Geoffrey K. Pullum, *The Cambridge Grammar of the English Language* 612 .......... 32

## INTRODUCTION

Arm is using its total control over the ISA as a choke point to harm, impede, delay, and even exclude Qualcomm from competing with Arm. Arm tried to stop Qualcomm from developing custom CPUs, withheld technology, sought destruction of Qualcomm's products, publicly threatened immediate termination of Qualcomm's ALA, and intentionally interfered with Qualcomm's customer relationships. Evidence at trial revealed that Arm seeks to "end of life" ALAs, which poses a significant threat to competition. Arm's refusal to license v10 to Qualcomm on commercially viable terms also poses an existential threat to Qualcomm's custom CPU business across all product segments, including mobile and PC where Qualcomm is the only company providing chips with custom CPUs for non-Apple products.

By requiring Arm to negotiate future versions in good faith, Qualcomm's ALA expressly protects against Arm pulling the rug out from under Qualcomm or frustrating Qualcomm's access to the ISA through delay, dishonesty and obstruction. Separately, California's Unfair Competition Law (UCL) exists precisely to stop in its tracks the kind of weaponization of access to critical inputs that Arm seeks to effectuate, harming customers and competitors alike. The jury, instructed on both UCL tests, found that Qualcomm is a consumer and a competitor and that Arm violated the UCL under both tests. The only remaining question is how broadly Arm's violations swept.

They swept very broadly. Evidence at trial revealed Arm's plan to "EOL" (end of life) ALAs so that original equipment manufacturers (OEMs) will be forced to buy chips with CPUs made by Arm. To the extent Arm grants ALAs to anyone other than Apple (self-supply) and Nvidia (coopetition), Arm plans to make ALA rates "equivalent" to or greater than TLA rates, which will so substantially disincentivize creation of custom CPUs as to leave OEMs with only one option: Arm. Arm admitted as much in its 2022 pitch to Samsung: Arm planned to use its control over the ISA to make sure that Samsung would not be able to "get products from Qualcomm or other chip

companies." PTX-660 at 1. Arm's 2031 projections hinge on this plan—and the fastest route is to eliminate or diminish Qualcomm, which not only is the only true competitor left in Android and PC, but sells in every chip segment Arm seeks to enter. PTX-2223 at 5; JT 333:15-334:7 (Haas).[1]

To be clear, the problem is not that Arm wants to sell chips. It is that Arm is using its total control over the ISA—control it amassed by promising the neutrality of Switzerland—to "hose" its chip competition. This is precisely why regulators around the world found Arm's acquisition by a major chipmaker posed a significant threat to competition. Arm's conduct is also a severe blow to innovation because it will mean, for example, that for non-Apple smartphones and laptops, there will be ***no*** chips containing Arm-compliant CPUs besides those designed by Arm.

The evidence at trial showed that Qualcomm is in fact being hosed—just as Arm intended. In 2020, Qualcomm exercised its contractual right to negotiate in good faith a v10 extension. After years of delay, dishonesty and obstruction, Arm offered only rates so extortionate that it could not seriously have believed Qualcomm would ever accept them: In mobile, Qualcomm's largest product segment, Arm proposed that Qualcomm pay [redacted]. In data center, where certain Qualcomm chips compete head-to-head with Arm's own chips, Arm proposed Qualcomm pay [redacted]. In mobile royalties alone, Arm's proposal would require Qualcomm to pay amounts [redacted]

In the face of all this, Qualcomm does not ask this Court to solve the problems of the industry or even all of Qualcomm's problems. Nor does Qualcomm ask this Court to dictate or negotiate rates. Instead, Qualcomm asks this Court to: (1) make factual findings articulating

[1] Citations to "JT" are to the jury trial; citations to "BT" are to the October bench trial; and citations to "BT 1 Tr." are to the September bench trial. Brackets, ellipses, footnote numbers, internal quotations, and citations are omitted for readability. Emphasis is added unless otherwise indicated.

conduct by Arm that has violated its legal obligations; (2) issue a narrow injunction ordering Arm to negotiate a good faith v10 offer consistent with the Court's factual findings; and (3) grant Qualcomm immediate, non-commercial access to v10 specifications so Qualcomm does not fall further behind while negotiations between the parties proceed.

At closing, Arm's counsel said that "at the end if you don't like the deal, you can decide to walk away…" BT 346:20-22. But Arm knows Qualcomm cannot walk away, and the suggestion that it can demonstrates bad faith. There is no other available ISA or ecosystem with 22 million software developers; Arm knows it is "everywhere." Precisely because Qualcomm cannot walk away, it has invoked its ALA and the UCL to seek relief from this Court and asks only for what will enable Qualcomm to compete and serve its customers.

## QUALCOMM'S PROPOSED FINDINGS OF FACT

### I. Arm Controls the Arm ISA

1. Arm's Instruction Set Architecture (ISA), the foundation of its licensing program, serves as the standard vocabulary that allows software to talk to Arm-compatible hardware. JT 175:3-10 (Amon); JT 410:12-411:13 (Haas). It is the gatekeeper to Arm's ecosystem: hardware incompatible with the Arm ISA cannot speak to software based on it. JT 414:2-415:4 (Haas); JT 511:11-512:6 (Grisenthwaite); JT 182:2-12 (Amon).

2. Unlike Intel's proprietary x86 ISA, the Arm ISA has been an open architecture. JT 411:14-412:12 (Haas). For decades, Arm operated as a neutral licensor, referring to itself as "Switzerland." JT 340:12-341:3, 412:5-23 (Haas). Arm generally licensed to any company that wanted to be part of the Arm ecosystem. JT 340:21-341:11, 412:5-12 (Haas).

3. The result was an "ecosystem of ecosystems" with more than 2,000 licensees paying for access to Arm technology (PTX-642 at 2), and 22 million+ software developers making Arm-based software (DTX-2415 at 16). The ecosystem grows by more than 100 licensees each

year (PTX-642 at 2) and as of 2025, 350 billion+ Arm-based chips had shipped worldwide. DTX-2415 at 6-10. This is "3X total humans ever," and 7X all non-Arm CPUs combined (including x86 and RISC-V). DTX-2415 at 8-9; JT 337:21-338:14 (Haas).

4. The Arm ecosystem spans every product line. PTX-642 at 39 ("99% of the world's smartphones are based on Arm"); JT 341:18-21 (Haas); PTX-2633 at 10-12 (projecting market share for "FY30" of "99%" for "Mobile," "42%" for "Cloud/DC," "48%" for "Auto," and "99%" for "Metaverse"). "Arm chips are in everything in your house." JT 338:15-23 (Haas). Seventy percent of the world's population uses Arm technology. PTX-642 at 3.

## II. ALAs Make Innovation Possible

5. Chip designers can enter a Technology License Agreement (TLA), which allows them to design and ship chips that incorporate off-the-shelf CPUs designed by Arm. JT 414:2-17 (Haas). Alternatively, or in addition, chip designers have been able to enter an Architecture License Agreement (ALA), which allows them to design custom CPUs and ship chips incorporating those CPUs. JT 175:16-24 (Amon); JT 414:2-17 (Haas); PTX-2648 at 67-68.

6. Because the CPU is the brain of a chip, building a custom CPU allows chip designers to differentiate chip power and performance, resulting in more innovation, competition and consumer benefit. JT 174:21-175:2, 179:5-22 (Amon); JT 414:2-17 (Haas).

7. Licensees historically have paid lower rates under ALAs than TLAs because the engineering work (and "hundreds of millions" it costs to make a custom CPU) is done by the licensee, not Arm. JT 175:16-24, 177:9-15 (Amon); BT 227:17-229:6 (Kennedy).

8. While there are hundreds of TLA licensees, very few companies hold ALAs, and only a few design custom CPUs. BT 154:17-155:6, 163:20-164:6 (Haas); BT 225:8-226:15 (Kennedy) (Apple, Nvidia, and Qualcomm make custom CPUs under an ALA); BT 285:1-5 (Simcoe); JT 445:1-7 (Haas) ("Very few companies take" an ALA "because it's a lot of work").

9. For mobile, only two U.S. companies[2] make chips containing custom CPUs (or premium-tier mobile chips at all): Qualcomm and Apple. JT 179:5-22, 303:23-305:19 (Amon); BT 147:12-16 (Haas). Apple's chips are only used in the iPhone. JT 415:20-24 (Haas); BT 84:5-9 (Amon). Thus, Qualcomm makes the only chip containing a custom CPU for non-Apple products, including the Samsung Galaxy. JT 303:23-304:15 (Amon). While Google has an ALA, it uses TLA CPUs in the small number of chips it designs for Pixel phones. BT 163:21-164:3 (Haas); BT 31:15-32:5 (Amon)"). Microsoft likewise uses TLA CPUs in its products. BT 164:4-6 (Haas).

10. For compute, only Apple and Qualcomm make chips containing custom Arm-compliant CPUs. Qualcomm chips provide the only custom CPUs for Windows-based laptops. BT 30:17-31:5 (Amon); BT 147:1-11 (Haas) (Nvidia's laptop chip is "on an Arm TLA core.").

11. For new hyperscaler data centers, only Qualcomm, Nvidia, and Arm are offering chips, with Qualcomm and Nvidia using their own custom CPUs. BT 269:14-270:5, 271:21-272:6 (Simcoe); JT 805:9-17, 807:14-19 (Mulabagal); DDX-7.10.

12. For auto, Qualcomm makes the only chips containing custom CPUs. BT 31:6-14 (Amon); PTX-1337 at 44 (Nvidia auto chip uses TLA CPU).

## III. For Years, Qualcomm Has Been "Totally Reliant" On Arm

13. Qualcomm has had a TLA since the 1990s and an ALA since 2003. BT 1 Tr. 209:15-21 (Weiser); DTX-2955.

14. Qualcomm and Arm signed the current versions of those agreements in 2013. JTX-1; JTX-5. A Qualcomm deck stated Arm was "ubiquitous": Google Android and Microsoft Windows operating systems both ran on Arm, all major semiconductor companies supported Arm, and there was no real competition to Arm. PTX-79 at 7; BT 1 Tr. 212:8-214:4 (Weiser) ("vastly

[2] [redacted]. BT 121:3-13 (Haas). Arm produced no discovery relevant to that agreement, including the agreement itself.

all" smartphones were Arm-based). Arm's position gave it "Controls points," including opportunities to withhold license benefits while negotiating better terms (i.e., when introducing a new version or new CPU). BT 1 Tr. 214:5-23 (Posner); PTX-79 at 7.

15. Arm's internal documents also described Qualcomm's concerns: total reliance on Arm, business continuity, access to Arm Technology, fair pricing, Arm's potential to delay and commitment to Qualcomm. PTX-348 at 4 (shows Arm as Dr. Evil). The parties discussed the need to protect Qualcomm if Arm ever became "evil Arm." BT 1 Tr. 223:4-20 (Weiser).

16. At that point, Qualcomm's $10 billion chip business focused on mobile (BT 1 Tr. 209:22-210:9; 219:5-220:9 (Weiser)), but Qualcomm intended to expand its business to chips for "any new market opportunity" (*id.* at 210:10-17), including data center (BT 55:13-19 (Amon)). Thus, Qualcomm negotiated licenses without segment restrictions. *Id.* at 55:13-23; JTX-1; JTX-5.

17. Qualcomm also negotiated an ALA provision ensuring it would be able to "elect to extend the Initial Term to cover future versions of ARM Technology," triggering an obligation for Arm to negotiate in good faith. JTX-1 at 1, 26. Obtaining a unilateral right to elect to extend the agreement addressed Qualcomm's core concerns (PTX-79 at 7; PTX-348 at 4) by giving Qualcomm, which was actively growing its chip business, a path to extend the heavily-negotiated terms of the agreement and access the most up to date ISA on good-faith terms. JTX-1 at 26.

18. As of 2025, Qualcomm had "the leading products with the Arm ISA in both mobile and PC's." JT 179:5-22, 216:22-25, 304:16-305:19 (Amon). Qualcomm also designs chips for auto, data center, extended and virtual reality, and Internet of Things. JT 172:15-25 (Amon); BT 31:6-14 (Amon); JT 312:1-25 (Haas); DTX-2212 at 82 (Qualcomm 10-K for FYE 2024).

## IV. After Softbank Acquired Arm, Arm Began To Use Its Total Control Over the ISA To Advantage Itself Over Rivals

19. In 2016, Softbank acquired Arm for $32 billion. JT 310:12-16 (Haas). Softbank's

Chairman, Masa Son, became the Chairman of Arm's Board of Directors. JT 797:12-14 (Collins).

**A. Arm used its power over the ISA to drive up the cost of TLA CPUs.**

20. In 2019, Arm dramatically increased TLA royalty rates to increase Arm's "smartphone revenue by >$1Bn." PTX-2578 at 5 (describing "resetting" royalties for v9 CPUs).

21. For Qualcomm, Arm sought to remove royalty caps and increase royalty rates by nearly 4x in the "premium" tier and 2x in the "mainstream" tier. PTX-2578 at 17, 57.

22. At that time, Qualcomm's chips primarily used TLA cores. JT 177:21-179:23, 304:16-305:19 (Amon). Arm recognized that Qualcomm could "move to architecture" (i.e., ALA cores), pay lower royalty rates (PTX-189 at 2, 4), and design custom CPUs that would compete against Arm's CPUs. PTX-309 at 3. Mr. Haas responded to this "risk" by saying "somehow we will need to unwind [Qualcomm's ALA] too." PTX-189 at 1; JT 352:25-354:2 (Haas).

23. In 2020, Chief Architect Richard Grisenthwaite observed the changes at Arm, writing in connection with Arm's position on Nuvia's v9 negotiation: "it is abhorrent to me – we are a partnership company and we do the right thing for our partners, rather than treating them like customers that we can screw over," and "we used to be a reasonable company that works for win-win with our partners – this move says to me that it now really [sic] all about the money for Arm and I really do think that this is a very bad direction to be taken." PTX-290 at 3-4.

24. Arm ultimately forced licensees to accept its increased TLA rates. JT 178:9-179:22 (Amon); JT 342:18-343:9 (Haas).

**B. Competition concerns prevented Nvidia's acquisition of Arm.**

25. Shortly after Arm increased TLA rates, Softbank and Arm agreed for Nvidia, an Arm licensee and chipmaker, to acquire Arm. BT 265:10-20 (Collins).

26. Regulators expressed serious competition concerns. BT 164:11-23 (Haas) (regulators around the world were concerned that "if a chip maker like NVIDIA also owned the

ISA, it could advantage itself against other chip makers"). "The main concern from the regulator is that NVIDIA would cut off ARM's access to their rivals." BT 264:19-265:9 (Collins).

27. On December 2, 2021, the U.S. FTC filed a Complaint stating: the "Proposed Acquisition would result in a combined firm with the ability and incentive to engage in foreclosure strategies targeting NVIDIA's rivals in the market for Arm-based data center CPUs." FTC Compl. ¶ 102, *Nvidia Corp.*, FTC Dkt. No. 9404 (Dec. 2, 2021) (Ex. 1). The acquisition "would give the combined firm the ability to use foreclosure strategies to disadvantage rivals in the market for Arm-based data center CPUs for CSPs through a variety of mechanisms, including by controlling Arm's pricing, the terms and timing of access to its Arm Processor Technology, its technological development and features, and its provision of services and support, among other mechanisms. Arm already has such abilities today, but it does not have the incentive to use such mechanisms to undermine Nvidia's rivals." *Id.* ¶ 103; *see also id.* ¶¶ 9, 46, 48, 104, 105, 109, 110, 113.[3]

28. The transaction was ultimately blocked in early 2022. PTX-642 at 6.

**C. Aware of competition concerns, Arm planned to "hose" "the rest."**

29. On December 2, 2021, with knowledge of regulators' concerns and in response to Mr. Son's "#1 item," which was ALA pricing, Mr. Haas discussed his plan to "go vertical and build chips." PTX-406 at 6. He said: "Think of it….if we build it….rest are hosed." *Id.* Hosing the rest applied to all chipmakers, including Qualcomm. JT 363:25-364:10 (Haas).

30. Mr. Haas's plan was the basis of his successful February 2022 pitch to become CEO. PTX-2633 at 26-28. Arm would "accelerate transitioning out of the soft IP licensing business" and "become the world's most important semiconductor company," earning entry into

[3] In closing, Arm argued regulator concerns were tied to Nvidia being an entrenched chip designer, but the FTC Complaint explicitly calls out that, while Nvidia viewed data centers as a "strategic priority," it had only announced development of a data center product 8 months earlier and merely planned to sell customized Arm-based data center CPUs ***in the future***. Ex. 1 ¶ 106.

the "Technology Big 6," alongside Google, Apple, Meta, Amazon and Microsoft. *Id.* at 47-48.

31. Arm promptly entered the chip design business. JT 323:1-324:12 (spring 2022: mobile test chip called Blackbird); *id.* at 324:13-23 (spring 2023: hired head of chip team at Qualcomm, started on a data center chip called Izanagi); *id.* at 326:9-12, 1077:21-24 (September 2024: signed SOW with Meta for data center chip); *id.* at 325:4-15 (late 2024: discussed Izanagi with potential data center customers Microsoft and Google, had at least 200 engineers on it).

32. Mr. Haas misleadingly testified in December 2024 that Arm did not compete with Qualcomm because it did not build or sell chips. JT 326:25-327:18 (Haas).

## V. Qualcomm's Use of Its ALA Caused Arm To Want To "EOL" ALAs, Which Would Eliminate CPU Competition

33. As Arm was charging more for TLA CPUs, those CPUs were becoming less competitive. JT 178:9-179:22 (Amon). Qualcomm could not use them and keep up with Apple. *Id.*; PTX-642 at 21 (Arm Oct. 2022 deck discussing "performance gap" with Apple).

34. In January 2021, Qualcomm acquired Nuvia, a start-up run by world-class CPU engineers. JT 179:5-180:4 (Amon); PTX-1436 at 2. Nuvia was an ALA licensee planning to design a data center CPU. JT 514:1-12 (Trivedi); JT 222:3-6, 222:20-223:2 (Amon); PTX-1436 at 2. Qualcomm intended to use "the talent of [Nuvia] engineers combined with Qualcomm engineers" to design custom CPUs under its own ALA. JT 178:9-179:22 (Amon).

35. Arm executives thought the acquisition was "the right move" for Qualcomm, but "a bad outcome for" Arm's revenue. PTX-309 at 3 (Arm senior executive was "pissed" Qualcomm could pay Arm less in royalties under its ALA and Qualcomm's custom CPUs would compete with Arm's CPUs, reducing Arm's "leverage to sell our features and value to others").

36. Mr. Haas responded: "We have rough legacy agreements with Q and Fender. We need to unwind over time." *Id.*; *see also* PTX-404 at 6. Mr. Haas confirmed at trial that he intended

to unwind the "royalty rates and other business terms" in the ALA. JT 356:5-20, 443:10-24 (Haas).

37. Mr. Haas took further aim at ALAs broadly: "i think time has also come to consider EOL on arch cores arch lisc." PTX-309 at 6. EOL means "end of life." JT 444:8-19 (Haas).

38. Consistent with this, Arm has been working toward "closing any make vs buy gap" (PTX-236 at 2), such that licensees would pay the same amount in royalties whether they design a chip with a custom CPU or a TLA CPU. Arm intended to "set the rates the same between the ALA and the TLA for v10 and beyond" (DTX-7 at 29); now that v10 is available, Mr. Haas confirmed that "directionally [ALA and TLA rates] should be equivalent." JT 446:9-11 (Haas).

39. By structuring its royalties this way, Arm disincentivizes development of ALA custom CPUs, which cost at least hundreds of millions to build. JT 177:9-15 (Amon), 1075:8-19 (Awad); PTX-189 at 2. Arm's expert admitted that if ALA rates are equal to or higher than TLA rates, the licensee will typically "choose the option that cost less." BT 281:16-282:3 (Simcoe). Thus, fewer licensees will innovate and compete with Arm CPUs. BT 227:17-229:6 (Kennedy).

40. For example, because the iPhone uses an Apple-designed custom CPU that outperforms Arm's TLA CPU (JT 178:9-20 (Amon)), Samsung buys a Qualcomm chip containing a faster Qualcomm-designed custom CPU, rather than a chip with a TLA CPU, to make its product competitive. JT 179:5-22, 180:9-19, 303:23-304:15 (Amon). Arm's plan to EOL ALAs or disincentivize designing custom CPUs will erode this innovation and competition.

41. Arm has already implemented this plan for some licensees. [redacted]. BT 227:17-229:6 (Kennedy); e.g., PTX-361 at 9. Similarly, [redacted] BT 227:17-229:6 (Kennedy). Unsurprisingly, neither Google nor Microsoft makes custom CPUs, despite having had ALAs for years.

## VI. Consistent With Its Plan To EOL ALAs and Eliminate Competition, Arm Is Withholding v10 in Bad Faith

42. Arm is targeting Qualcomm because Qualcomm's are the only chips with custom CPUs available for non-Apple mobile and laptop, and automotive products, and only one of two available for data center products (*supra* § II). The only other competitor in data center is Nvidia, which is not engaged in vigorous competition with Arm. BT 270:6-17, 281:1-8 (Simcoe) ("coopetition" is where "cooperation meets competition" and "Nvidia and Arm would be in that kind of relationship"). These are all areas in which Arm plans to compete.

### A. Arm delayed negotiation by hiding v10 development.

43. Under ALA § 14.1.B, "no later than seven (7) years after the Effective Date" of May 30, 2013, "and prior to any termination of this ALA, LICENSEE may elect to extend the Initial Term to cover future versions of ARM Technology as mutually agreed upon by the parties." JTX-1 at 1, 26. If Qualcomm makes that election, "then the parties will negotiate in good faith the terms and conditions of an extension to the Initial Term" and "a license." JTX-1 at 26.

44. The ALA provided terms for v8 and v8Next (i.e., v9), so logically, "future versions" would include v10. *Id*. Arm acknowledged during license negotiations and in 2018 that "future versions" would include v10. PTX-86 at 3 ("both parties will negotiate an extension to the agreement at the midpoint" "and include v10 at that time."); PTX-189 at 3 ("Within 7 years of May 2013 'the right to extended to **future technologies**' i.e V10.. V11..").

45. In April of 2020, Qualcomm reached out to Arm about v10. PTX-422 at 10.

46. By this time, Arm's internal emails reflect that Arm executives, including Mr. Haas, were bemoaning the fact that Qualcomm had the right to extend its ALA. PTX-189 at 1-3.

47. Arm Director of Global Partners Lynn Couillard acknowledged there was no reason Qualcomm and Arm could not negotiate v10: the parties had "negotiated for v9 (it was then called

v8-next) at a time when there was no v9 or details on the roadmap," and this was "similar." PTX-236 at 1; JT 579:25-580:10 (Couillard). Ms. Couillard's supervisor wrote, "what is the advantage to negotiate now vs later for v10? Only the fact that we have to negotiate in good faith, vs in the future we have the option to negotiate in bad faith?"[4] PTX-236 at 1; BT 88:11-14 (Couillard).

48. Arm made no effort to negotiate; Arm told Qualcomm that no one was working on v10 and refused to allow a later election. PTX-422 at 7, 8. Qualcomm thus elected to extend its ALA on May 20, 2020. *Id.* at 6. Arm did not reject the election. *Id.*; BT 99:14-20 (Couillard).

**B. Once Qualcomm learned v10 was imminent, Arm's bad faith intensified.**

***1. In December 2024, Arm misrepresented the status of v10***

49. Qualcomm did not learn that Arm was working on v10 until 2024, when the parties were weeks away from trial in *Arm* v. *Qualcomm*. BT 20:25-21:4 (Amon).

50. During global settlement negotiations in December 2024, Arm told Qualcomm that "v10 had not been created and was not commercial, so Arm has made no commitment to anyone on a v10 price or royalty rate." DTX-7 at 29. On that basis, Arm said it could not set a royalty rate for Qualcomm "for v10 and beyond." *Id.*

51. Arm's statement that it had "made no commitment to anyone on a v10 price or royalty rate" was false. For Microsoft and Google, the rates Arm agreed to in 2020 and 2021 respectively are the same rates that govern both companies' v10-specific annexes. PTX-275 at 4; PTX-272 at 31; PTX-2167 at 1; PTX-361 at 2; DTX-2570 at 16; DTX-2571 at 1. And while Arm did not produce ALAs with Nvidia or Apple, Nvidia's ALA was entered in 2020 and reporting states Apple's royalties were set in 2023. PTX-1004 at 3; BT 134:18-21, 135:12-16 (Haas).

52. With these misrepresentations, Arm sought to delay offering royalty rates and to

---

[4] Whether a "joke" (BT 98:8-99:13 (Couillard)) or not, it is what Arm ultimately did.

induce Qualcomm to accept an [redacted]. BT 121:3-13 (Apple, Nvidia, Google, and Microsoft are the only American companies with v10 licenses); *id.* at 134:14-20 (Apple's v10 license was entered in 2023); *id.* at 134:22-135:2 (Nvidia's in 2020); *id.* at 158:9-16 (Microsoft and Google in 2020 and 2021) (all Haas).[5]

53. Settlement discussions ended without Arm proposing v10 royalty rates. DTX-7 at 21-31; July 7, 2026 Hr'g Tr. 29:25-30:2 (Arm counsel: "The actual rates we're relying on because there weren't any rates that were put on the table in 2024 are solely the December 2025 offering.").

### *2. Arm refused to make a v10 offer for several additional months*

54. In April 2025, Qualcomm again requested a v10 offer. DTX-7 at 4; BT 243:22-244:13 (Collins). Arm did not make one.

55. In August 2025, Qualcomm made its own offer. BT 21:9-10 (Amon). Qualcomm had little information on which to base its proposal: Arm had not proposed royalty rates, it had said no other licensees had royalty rates, and the only public reporting stated that, in 2023, Apple had negotiated a capped v10 rate under thirty cents per device. PTX-1004 at 3.

56. Qualcomm thus proposed, as a starting point, [redacted]. DTX-2581 at 15-16. Qualcomm had no reason to believe that offer was unreasonable. Its v9 royalties were at least six times higher than the reported Apple rates, which applied to v10 and had been set more recently. *Compare* PTX-1004 at 3 ("Apple pays a flat fee of less than 30 cents a chip, regardless of how many Arm cores used") with BT 22:9-25 (Amon) (Qualcomm's v9 rates included a $1.88 cap per chip).

57. Arm argued at trial that licensing rates should, like prices at Chipotle, rise over

[5] Arm contended at trial that it does not do MFNs for ALAs (BT 154:18-155:6), [redacted] DTX-7 at 21-22, 25, 28-30, 3.

time, but food is not technology. Qualcomm's own royalty rates, for example, have declined, not increased, since 2013. BT 41:9-12, 44:13-20 (Amon).

### *3. In December 2025, Arm made an incomplete, non-viable proposal*

58. Arm delayed several more months, until December 2025 when it made its first partial v10 proposal. DTX-7. Although Arm said it would be changing the non-financial terms of Qualcomm's license—and "assume[d]" Qualcomm would accede to such unidentified "market" terms (*id.* at 2)—no non-financial terms were proposed.

59. The financial terms Arm proposed were exorbitant: For "Consumer SOC" products, Arm proposed [redacted]. For "Non-Consumer SOC" products, Arm proposed [redacted]. DTX-7 at 8.

60. Under Arm's proposal, Qualcomm would pay: for mobile, [redacted] (BT 217:22-218:20 (Kennedy)); for compute, [redacted] (BT 218:21-219:9 (Kennedy)); for automotive, [redacted] (BT 219:10-20 (Kennedy)); and for data center, [redacted] (BT 219:21-220:8 (Kennedy)).

61. Across all product segments, the average increase over Qualcomm's v9 royalty rates ranged from [redacted]. BT 221:9-24 (Kennedy); DTX-906 at 25.

62. Arm's proposal would not permit Qualcomm to compete. For example, Qualcomm's entry tier handset chips, priced below $14, Arm's proposed royalty rates [redacted]. BT 221:9-222:1 (Kennedy). And Qualcomm would pay [redacted] in royalties in the mobile product segment alone—nearly [redacted] (including all Arm licensees in all product segments). BT 223:7-224:4 (Kennedy).

63. Arm proposed a [redacted] license fee ([redacted] higher than Qualcomm's v8 and v9

license fees), and a support and maintenance fee of [redacted] ([redacted] higher than the v8 fee and [redacted] higher than the v9). PTX-2359 at 2-3; DTX-7 at 8; JTX-3 at 11; JTX-4 at 14.

64. Arm claimed it was offering "market rates" and a "blended" rate based on rates for "certain" Arm v10 licensees. DTX-7 at 2; DTX-8 at 3.[6] Those "certain" licensees turned out to be Google and Microsoft (BT 245:16-246:1 (Collins)), two hyperscalers that are not merchant chip designers, do not make chips at scale, do not make custom CPUs at all, and are Qualcomm customers. BT 31:15-32:5, 66:3-19 (Amon); BT 163:20-164:6 (Haas); BT 225:19-226:15, 227:17-229:6, 229:16-23 (Kennedy); BT 269:14-270:5 (Simcoe).

65. Arm's counsel falsely claimed that this proposal included a cap (BT 356:23-357:25 (Arm Closing)) but it does not. JT 400:25-401:17 (Haas). [redacted] DTX-7 at 8. [redacted] (e.g., BT 23:1-6, 58:8-12 (Amon); BT 218:21-219:20 (Kennedy)), and all of Qualcomm's mobile chips have modems. BT 44:4-9 (Amon); DTX-59 at 11 ("Each platform consists of application processors and wireless connectivity capabilities, including our cellular modem").

### *4. In March 2026, Arm made an incomplete, non-viable proposal*

66. Qualcomm told Arm its December 2025 proposal was not commercially reasonable, and the parties held an in-person meeting in late January 2026. DTX-9 at 8.

67. On March 19, 2026, Arm sent a proposal that it called "restructured." DTX-8.

---

[6] Mr. Haas testified Arm "looked at the most recent v10 licenses that we did" when determining which licensees to use as comparators (BT 158:12-16 (Haas)), but Google and Microsoft were not the two most recent. Microsoft and Google were licensed v10 in September 2020 and June 2021. PTX-272 at 1; DTX-2570 at 1. Nvidia was licensed v10 "around September 2020," and Apple entered into its v10 ALA in 2023. BT 134:18-135:2 (Haas).

68. Again, Arm provided none of the non-financial terms it wanted to negotiate (*id.*), but the "non-financial terms are essential to any true proposal as they affect the value of the potential license" and would have to be known to "negotiate price." PTX-2359 at 8.

69. The financial terms remained exorbitant. [redacted]. DTX-8 at 2. This would require Qualcomm to pay: for premium mobile, [redacted] (BT 217:22-218:20 (Kennedy); DTX-8 at 2); for compute, [redacted] (BT 218:21-219:9 (Kennedy)); for auto, [redacted] (BT 219:10-20 (Kennedy)); and for data center, [redacted] (BT 219:21-220:8 (Kennedy)).

70. Arm's proposed royalty rates were, on average for all product segments, [redacted] Qualcomm's v9 royalty rates. BT 221:25-222:2-6 (Kennedy).

71. While the rates were lower than the December proposal for some segments (e.g., auto) and higher for others (e.g., mobile), they remained non-viable and uncompetitive: Qualcomm would pay [redacted] in mobile chip royalties, meaning Qualcomm's royalties for ***one segment*** would equal more than half of Arm's total royalty revenue across all licensees and products for 2025, (BT 224:5-12 (Kennedy)), and would consume approximately [redacted] of Qualcomm's total R&D spend for 2024 (BT 224:5-12 (Kennedy); DTX-2212 at 41).

72. The proposed license fees were unchanged from the December 2025 offer. DTX-8.

#### ***5. In July 2026, Qualcomm proposed rates based on other v10 licensees and differentiated based on product—but it still was not enough for Arm***

73. The parties scheduled a meeting for June 16, 2026. On June 12, Arm sent a term sheet finally summarizing various non-financial terms it sought to modify, including many that currently provide significant protection for Qualcomm. *See* PTX-2359 at 2, 4, 8.

74. But it was one step forward, two steps back: at the meeting, Arm stated that it would also [redacted]. PTX-2359 at 8.

75. On July 9, 2026, Qualcomm proposed paying royalties for v10 of 5% more than the lowest royalties paid by another licensee in each product segment ("MFN +5%"). PTX-2359 at 10. As such, Qualcomm would never have the lowest rate in any segment but could still compete.

76. On July 31, 2026, the CEOs met. BT 150:18-152:5 (Haas). Mr. Amon was not tied to MFN +5% for every product but wanted to know "a percentage above [MFN] that they [Arm] think is fair." BT 82:13-20 (Amon). Mr. Amon "went to the board," wrote "handsets, PC, [auto] . . . industrial robotics, data center,", and said "you tell me how much Qualcomm should pay above that rate based on where we're situated. Tell me what the rate is. Is it five? Is it ten? Is it fifteen? Is it twenty? Is it fifty? Is it a hundred?" BT 82:21-83:19 (Amon).

77. Mr. Haas said Arm did not "want to do that" and did not respond. *Id.* While Arm had received Qualcomm's written proposal, Mr. Haas dismissed Mr. Amon's efforts to negotiate as "purely hypothetical," and testified that he was "just listening." BT 150:18-152:5 (Haas).

78. On August 18, 2026, Arm rejected Qualcomm's offer and made its own. DTX-9 at 13. Arm incorporated the March 2026 rates but stated that the "December 2025 offer remains available as well." DTX-9 at 13. Because Arm already knew that Qualcomm could not accept the previously offered terms, this "offer" was illusory. PTX-2359 at 4, 5.

## C. Arm's proposals are not commercially viable for Qualcomm.

### *1. Qualcomm's financials show that it cannot accept Arm's proposals*

79. Arm's proposals would result in significantly increased royalties and sweeping consequences for Qualcomm's business. For example, Qualcomm's annual royalties in mobile would be (a) an additional [redacted] (March 2026 offer), or (b) an additional [redacted]

(December 2025 offer). BT 223:7-224:15 (Kennedy). To put that in perspective, in 2024, Qualcomm's total R&D spend was $8.893 billion. DTX-2212 at 41. If Qualcomm accepted either of Arm's financial proposals, it would be paying—[redacted]. BT 223:7-224:4 (Kennedy); DTX-2212 at 41.

80. In the third quarter of fiscal year 2026, Qualcomm's chip business (QCT) reported earnings before taxes of $2.2 billion and an earnings-before-taxes margin of 26%. DTX-9 at 22. When that 26% margin is (a) applied to the average sales price (ASP) of the products affected by Arm's v10 proposal (Qualcomm's chips containing custom CPUs in each segment) and (b) compared against the royalty payment that Qualcomm would have to make under Arm's proposals (DTX-7 at 8; DTX-8 at 2), it is evident that Arm's proposals would impede, and in some cases erase, Qualcomm's ability to profit from those chips.

81. For a premium mobile chip with an approximate ASP of $210, the increase in Qualcomm's royalty under Arm's December 2025 proposal would amount to approximately [redacted] of Qualcomm's pre-tax earnings on the chip; under Arm's March 2026 offer, it would amount to approximately [redacted] of the same. Figs. A.1 and A.2; BT 217:22-218:20 (Kennedy).

82. For a data center chip like the chip Qualcomm is designing for Meta—a 288-CPU data center chip priced between $1,000 and $2,000 (BT 23:1-6, 56:14-21 (Amon))—Qualcomm's royalty payment [redacted]. Under the December 2025 proposal, the increase in Qualcomm's royalty on a $2,000 chip would amount to [redacted] of Qualcomm's pre-tax earnings on the chip; on a $1,000 chip, it would [redacted]. Under the March 2026 proposal, the increase in Qualcomm's royalty on a $2,000 chip would amount to [redacted] of Qualcomm's pre-tax earnings; on

a $1,000 chip it would [redacted]. Figs. A.1 and A.2; BT 23:1-6, 56:14-25 (Amon); BT 220:9-22 (Kennedy).

83. For an 18-CPU compute chip with an ASP of approximately $200, the increase in Qualcomm's royalty payment under the December 2025 proposal would amount to approximately [redacted] of Qualcomm's pre-tax earnings on the chip; under the March 2026 proposal, it would amount to approximately [redacted] of the same. Figs. A.1 and A.2; BT 218:21-219:9 (Kennedy).

84. For an 18-CPU automotive chip with an ASP of $690, the increase in Qualcomm's royalty payment under the December 2025 proposal amount to [redacted] of Qualcomm's pre-tax earnings for the chip; the March 2026 proposal would amount to approximately [redacted] of the same. Figs. A.1 and A.2; BT 219:10-20 (Kennedy).

85. Arm's proposed royalty rates would thus result in dramatic changes to Qualcomm, such as substantial reductions in R&D, engineering headcount, and/or products Qualcomm can bring to market. BT 32:11-18 (Amon); JT 177:9-15 (Amon).

### ***2. Arm's proposals would render Qualcomm unable to compete***

86. Qualcomm faces stiff competition from two of Arm's v10 licensees—Apple and Nvidia—across product segments. Qualcomm also competes for chip sales with Arm itself.

87. In mobile, Qualcomm competes with Apple. JT 172:15-22 (Amon); PTX-1337 at 30-31; D.I. 733 at 4, 6, 9-10 (Apple recognizing competition with Qualcomm). Qualcomm supplies Samsung with chips for its Galaxy smartphones, which compete directly with the iPhone. JT 172:15-22 (Amon); BT 66:3-4 (Amon); BT 225:19-226:15 (Kennedy). Qualcomm and Apple are the only two U.S. companies making custom premium mobile CPUs. *Supra* ¶ 9.

88. In compute, Qualcomm again competes against Apple. Qualcomm supplies chips for Windows-on-Arm PCs, which compete with Apple's laptops. BT 30:17-31:5 (Amon). Nvidia will also be selling compute chips, but they will use TLA cores. BT 30:17-31:5 (Amon); BT 147:1-

11 (Haas); PTX-1337 at 39-41. Apple and Qualcomm are the only two companies making Arm-compatible custom CPUs for compute. *Supra* ¶ 10.

89. In auto, Qualcomm competes against Nvidia (although Nvidia uses a TLA core). BT 31:6-14 (Amon); BT 146:10-16 (Haas); PTX-1337 at 44.

90. In data center, Qualcomm competes against Nvidia and Arm, including for Meta's business. BT 30:4-16 (Amon); BT 146:21-25 (Haas); JT 189:10-191:2 (Amon); JT 325:16-326:12 (Haas); JT 1074:19-1076:6 (Awad). Qualcomm and Nvidia are the only two companies that make chips with custom CPUs in this segment. *Supra* ¶ 11.

91. Arm has stated that it is in discussions to design chips in every line of business, including mobile, automotive, robotics, and consumer electronics. JT 396:20-400:8 (Haas).

92. Qualcomm's rates "need to be competitive." BT 29:21-30:3 (Amon). Arm's royalty rates directly impact what Qualcomm charges for its products. BT 32:11-18 (Amon); BT 182:7-183:18, 184:11-185:9 (Posner). Arm knows this. BT 29:21-30:16 (Amon) ("We have been very clear. When we design our CPUs, we have to compete in the marketplace, so our rate needs to be competitive"); BT 221:8-24 (Kennedy).

93. Arm's proposals would significantly diminish or eliminate Qualcomm's earnings on any chip. For example, in data center, where Arm now competes, the increase in Arm's royalties on a chip priced at the top of its price range ($2000 per chip) would consume [redacted] of Qualcomm's margin on the product. *Supra* ¶ 82. At the bottom of the price range ($1000 per chip), Qualcomm would pay [redacted]. *Supra* ¶ 82.

94. Apple's publicly-reported v10 royalty is capped at less than $0.30 per chip, regardless of the number of CPUs used. PTX-1004 at 3. Qualcomm would pay royalties many

times higher under Arm's proposals. PTX-2359 at 3; PTX-1004 at 3; DTX-7 at 8; DTX-8 at 2. The March 2026 proposal would require payments [redacted] (BT 230:5-14 (Kennedy)); the December 2025 proposal would require payments: [redacted]. DTX-7 at 8; PTX-1004 at 3; PDX-B.4-5; BT 217:22-219:9 (Kennedy).

95. Finally, Arm's refusal to produce the Nvidia ALA even though Nvidia did not object, exclusion of Nvidia from the purported rate "blend" (BT 245:16-246:1 (Collins)), insistence that Nvidia is "not comparable" (BT 225:8-18 (Kennedy)), and characterization of the "license, the terms around it, the timing" as "consideration" for the acquisition break-up (BT 157:14-23 (Haas))—plainly suggest far lower rates for Nvidia than those proposed to Qualcomm.

**D. Arm's justifications for its proposals are not credible.**

***1. Qualcomm is not seeking "a better deal" than any other v10 licensee***

96. Arm argues that Qualcomm is trying to "mix and match" "across market segments, so it gives Qualcomm a better deal than anyone else has." BT 18:5-16. That is false.

97. Mr. Amon made clear Qualcomm's willingness to pay different percentages over MFN depending on product segment. *Supra* § V.B.5. Thus, Qualcomm's proposal allows for different rates to be combined in a way that makes commercial sense to Arm (e.g., Arm might propose MFN +5% for data center, MFN +10% for mobile, MFN +15% for compute, and so on).

98. Directly contrary to Arm's "menu card" assertion, Qualcomm would not have the lowest rate in any product segment; it could even have the *highest* rate in a segment (if all other licensees had rates closer to MFN than the added percentage Qualcomm paid).

99. The available evidence suggests that Arm's entire narrative about its contracts—and about how Qualcomm's proposals compare to other v10 licensees—is false. Apple's rates are reportedly capped below thirty cents for any product (*supra* ¶ 55) and its license fee of only [redacted]

[redacted] (PTX-875 at 26)—just over [redacted] of the license fee Arm has demanded from Qualcomm (*supra* ¶¶ 63, 72)—shows that Apple did not agree to higher royalty rates in one product segment for lower rates in another, or a higher license fee in exchange for lower royalty rates. Apple's ALA reportedly extends beyond 2040. PTX-1004 at 4. Nvidia's 10-K states that Nvidia prepaid for "intellectual property licenses from Arm" amounting to a $170 million license fee for a 20-year license and $23.5 million in royalties per year—also far less than Arm has demanded from Qualcomm. Nvidia Corp., Annual Report (Form 10-K) at 5 (Feb. 26, 2021) (Ex. 2).[7]

100. Arm's selective production of evidence also suggests its claim is false. Arm produced only two of [redacted] v10 ALA licenses. BT 121:3-13 (Haas). Without those other licenses (including for Apple and Nvidia) there is no way to know the "lowest" or best v10 rates in any business segment or for any license in totality. BT 148:4-8 (Haas).

### *2. Arm's claim about engineer meetings is not credible*

101. Arm strains credulity by attempting to excuse its delay, dishonesty and obstruction by saying it needed more "engineer to engineer" meetings. BT 158:21-160:8 (Haas).

102. *First*, Arm receives a great deal of information about Qualcomm's products and business, including quarterly royalty reports showing how many CPUs Qualcomm is using in its products and their configurations. E.g., DTX-1824, DTX-1825, DTX-1827, DTX-1851, DTX-1861, DTX-1878. Arm knows the segments in which Qualcomm operates. JT 311:19-312:25 (Haas). Arm has identified no additional details it would need to make an offer. Further, this agreement was discussed extensively among engineers and businesspeople in 2013. PTX-81; PTX-2617; PTX-348 at 4; BT 1 Tr. 84:22-85:1 (Youssef); BT 1 Tr. 183:10-14 (Sand).

---

[7] Qualcomm respectfully requests that the Court take judicial notice of this Form 10-K because it "is readily verifiable and thus the proper subject of judicial notice." *Cyntec Co.* v. *Chilisin Elecs. Corp.,* 84 F.4th 979, 989 n.6 (Fed. Cir. 2023).

103. *Second*, Arm's claim is belied by its demand that Qualcomm accept "market" terms (financial and non-financial) aligned with the v10 licensees Arm views as "comparable" (Google and Microsoft). Either Arm thinks the rates and other terms are dependent on discussions with engineers, or Arm thinks they are market terms set in 2020 and 2021 when Google and Microsoft entered their ALAs. *Compare* BT 159:16-160:8 (Haas) (describing need for "engineer to engineer" meetings) with BT 157:24-158:16 (Haas) (use of Google and Microsoft as comparators).

104. *Finally*, the record evidence overwhelmingly demonstrates that Arm's delay, dishonesty and obstruction were driven by anger, retribution and a desire to eliminate competition. Documents show that Arm (and Mr. Haas specifically) viewed Qualcomm as an "enemy" and as being "Arm in name only" (e.g., PTX-404 at 6-7) and wanted to "EOL" its ALAs and avoid competition from Qualcomm (*supra* § V). In response to the Court's question, Mr. Haas admitted there is "no question" Arm's anger is "still affecting the relationship" (BT 169:24-170:24 (Haas)).

**E. Arm's bad faith conduct is already causing harm to Qualcomm.**

105. [redacted]. PTX-2167 at 9 (Microsoft); DTX-2571 at 6 (Google). And it is a reasonable inference that if Google and Microsoft [redacted], Apple and Nvidia do, too.

106. Given that it takes "at least two years" to design and ship a chip with a custom CPU, the earliest Qualcomm could release a chip with a v10 custom CPU is 2029, assuming it received access to the v10 specifications immediately. BT 69:3-70:15 (Amon).

107. Qualcomm customers, including at least Samsung, Google, and Meta, are already asking about Qualcomm's access to v10 and when it will have a v10 chip. BT 32:19-33:6, 57:16-19 (Amon). Meta has stated that its next-generation data center chip—for which Qualcomm is competing against Arm—will require v10 features. BT 57:9-19 (Amon); JT 306:22-307:13 (Amon); DTX-346.

## VII. Arm's Conduct Is a Significant Threat To Competition

### A. Arm 's ISA is a critical input, over which Arm has total control.

108. Arm exclusively decides who gets a license to the ISA, when to deliver technology, and what licensees should pay. *Supra* §§ I, IV.A; BT 172:22-173:2 (Haas) ("It's our product, of course we should decide, who else, if we don't decide, who should decide?").

109. Arm and Qualcomm's CEOs agree that there is no real alternative to Arm's ISA. x86 operates as a "closed" ISA available only to Intel and AMD. JT 183:8-24 (Amon); JT 411:25-412:4 (Haas). And RISC-V is "very new, emerging, doesn't really have a lot of market yet." JT 411:14-24 (Haas). There are no high-performance RISC-V chips for use in phones, laptops or cars. JT 185:10-20 (Amon); JT 940:17-941:23 (Varma). It would take "over a decade" to switch to RISC-V (JT 185:10-20 (Amon)); Arm internally estimated it would take ~6 years and greater than $2 billion investment plus $450 million more each year (PTX-2578 at 69-70).

### B. Arm has the ability and incentive to foreclose access to the Arm ISA.

110. Arm's financial projections are premised on capturing a significant portion of chip sales in every product line. Arm announced that by 2031, its chip business will be worth $15 billion and "account for the majority of Arm's revenue." JT 328:23-329:6.

111. Arm's SEC filing states that it has "the objective of achieving a 2.0 trillion-dollar market capitalization by March 31, 2031," which is approximately ten times the value of the company today. PTX-2648 at 92; JT 335:11-17, 335:24-336:10 (Haas). If Arm achieves that goal, Mr. Haas will get more than $1 billion in compensation. JT 335:11-17, 335:24-336:10 (Haas).

112. Mr. Haas has stated that, by 2030, the "semiconductor market" will be worth $1 trillion, an opportunity Arm has the "rights to." JT 333:1-8 (Haas); DTX-2415 at 66. Arm's internal deck, "Introducing the first phase of Arm's market expansion," suggests Arm envisions a $1.5 trillion market and plans to sell chips in Cloud AI (cloud and data center), "edge AI" (smartphone

and electronics), and "physical AI" (auto and robotics). PTX-2223 at 5; JT 333:15-334:7 (Haas).

113. Today, Arm has a data center chip that it sold at least to Meta (DTX-346) and shopped to others (JT 1076:21-1077:3 (Awad). And Arm intends to quickly expand beyond data center. Arm pitched a mobile chip in 2022. PTX-642 at 22, 24. And today, Arm is in discussions about chips for mobile, auto, compute, and extended reality. JT 399:4-400:8 (Haas).

114. To meet its projections, Arm must exclude Qualcomm, which is the only company selling chips in every segment Arm is targeting, is the only company with chips in multiple segments containing custom CPUs, and a significant portion of its business involves custom CPU solutions. *Supra* § II, ¶ 18.

### C. Arm has already demonstrated willingness to foreclose competition.

115. Arm's conduct with respect to v10, *see supra* § VI, is one way it has demonstrated willingness to foreclose competition but there is significant additional evidence of this.

#### *1. Arm demanded Qualcomm destroy its CPUs*

116. After Qualcomm acquired NUVIA in 2021, Arm demanded that Qualcomm pay much higher royalty rates under NUVIA'S ALA. JT 179:23-180:4, 181:1-8, 222:20-23 (Amon).

117. When Qualcomm would not agree—because it was developing those cores under its own ALA and was entitled to pay its negotiated rates (PTX-2648 at 29)—Arm withheld technology Qualcomm had negotiated and paid for. DTX-1 at 2 ("Arm just delivered our long awaited fabric…but…disabled all the features we requested…with no way to enable them").

118. When Qualcomm still would not agree, Arm issued an ultimatum: pay Arm's demand or destroy custom CPUs and "not ship to any customers." JT 181:1-12 (Amon). Mr. Amon testified that in 30+ years at Qualcomm, no other supplier made such a demand. *Id*.

#### *2. Arm sent misleading communications to Qualcomm's customers*

119. On August 31, 2022, Arm sued Qualcomm, alleging breach of the Nuvia ALA and

seeking as its only remedy destruction of the Qualcomm custom cores. Compl., *Arm* v. *Qualcomm*, C.A. No. 22-1146-MN (Aug. 31, 2022), D.I. 1. Arm did not allege breach of any of Qualcomm's agreements, including the Qualcomm ALA. JT 392:19-25 (Haas).

120. That same day, Arm executives emailed Qualcomm customers and foundries—including at least Google, MediaTek, Samsung, Amazon Web Services, Meta, Microsoft, Rivian, Waymo, Mobileye, Volkswagen, BMW, GM, and Tesla—about Qualcomm. PTX-2675 at 1-2; PTX-2676 at 1. Arm wrote that Qualcomm breached the "Arm license agreement by continuing development under terminated licenses." PTX-2675 at 1; PTX-2676 at 1; PTX-587 at 1.

121. Arm's CEO acknowledged Arm's communications were misleading because they refer to a terminated "Arm license" without making clear that they were talking about the Nuvia ALA, not any of Qualcomm's licenses, which were still in force. JT 368:2-16, 378:16-22 (Haas).

3. ***Arm made misrepresentations to Samsung to win its chip business***

122. On October 4, 2022, Mr. Son and Mr. Haas, having traveled to Korea, tried to dissuade Samsung from buying Qualcomm chips. PTX-642; PTX-660; BT 145:17-146:2 (Haas).

123. After that meeting, the head of Samsung Electronics, T.M. Roh, contacted Mr. Amon, with serious concerns about Qualcomm's ability to provide Samsung chips. PTX-660.

124. Samsung's concerns arose from statements made by Mr. Son and Mr. Haas, including that "Qualcomm's architecture license will expire in 2024 and after that time Qualcomm won't be licensed by Arm," "Arm will not renew the license," "Qualcomm won't be able to ship their mobile processor to Samsung in 2025 as Arm will not allow that to happen," and there would be "no more processors from Qualcomm with Arm-compatible CPU starting in 2025." *Id.* at 1.

125. Arm concedes these statements were false when made: Qualcomm's ALA does not expire until 2033. 12/16/24 Trial Tr. 346:13-24 (Haas), *Arm* v. *Qualcomm*, C.A. No. 22-1146-MN (Dec. 16, 2024), D.I. 588; JTX-1 at 26; BT 35:17-36:7 (Amon).

126. Samsung was also concerned about Arm's description of a forward-looking business plan where Qualcomm and other ALA licensees would be unable to design their own CPUs and would instead have to obtain CPUs from Arm—a world in which Arm had "EOL-ed" its architecture licenses. *Id*. PTX-660 at 2 (unless Samsung signed a new license agreement with Arm, it would be unable "to get products from Qualcomm or other chip companies," and "Qualcomm and others" will get CPUs and other technologies (GPU, NPU, and ISP) from Arm).

127. Arm's pitch deck from the meeting shows Arm lied about Qualcomm's ALA because it wanted to replace Qualcomm as Samsung's mobile chip supplier. In the deck, Arm stated that its "strategy was evolving" and proposed collaboration on a "New Superchip!" for 2025 (the same year Arm told Samsung Qualcomm would no longer be licensed). PTX-642 at 6, 22. And by 2026, Samsung and Arm would be "vertically optimized," with Samsung using an Arm chip in its Galaxy phone. *Id*. at 22, 24 ("Galaxy S26 Solution: Dreamchip 2025 is just the start.").

128. At this time, Qualcomm and Samsung were negotiating their next 3-year agreement, so Samsung asked for assurance "that Qualcomm will be able to provide Samsung Mobile with Snapdragon processors for 2025 and beyond." PTX-660 at 2; BT 36:25-37:6 (Amon). Qualcomm supplied 70-75 percent of chips used in the Samsung Galaxy phone. BT 33:10-21 (Amon); BT 145:6-16 (Haas). But even after receiving that assurance (PTX-659), Samsung was not confident about Qualcomm's ability to deliver future products three years in the future and shortened the agreement. BT 36:13-37:6 (Amon).

#### ***4. Arm withheld technology Qualcomm was owed under the ALA***

129. By mid-October 2022, Arm was withholding from Qualcomm technology used for verification of Qualcomm's custom cores, including OOBs and ACK patches. PTX-649 at 1.

130. The order to withhold those deliverables came from Mr. Grisenthwaite, following instructions from Arm's Chief Legal Officer (JT 734:8-15 (Collins)), even though Arm had a

contractual obligation to provide them. JTX-1 § 5.1; JTX-4 at 2-4.

131. Arm intended to prevent Qualcomm from shipping custom CPUs. E.g., PTX-2672. The OOB and patches are part of the ACK verification suite and are used to verify custom CPUs. PTX-1650 at 2; DTX-954 at 21; JT 518:21-519:9, 520:4-521:3, 522:24-25 (Trivedi). Custom CPUs must be verified before shipment. JTX-1 at 11; JT 414:2-415:4 (Haas); JT 515:5-516:22 (Trivedi).

132. Without the OOB and patches, Qualcomm had to dedicate resources to performing verification without the necessary deliverables (JT 549:7-551:24 (Trivedi)) and live with the risks that verification was not completed as it should have been, or that test failures were not fixed. JT 528:11-25, 530:5-10, 548:25-549:17, 551:14-24 (Trivedi); JT 182:16-183:3 (Amon).

133. Arm ultimately withheld OOBs and patches from September 2022 until February 2025, after Qualcomm won the first trial. JT 523:1-19, 547:8-25 (Trivedi).

134. Arm delivered new OOBs on April 21, 2025 and new patches on February 25, 2025. JT 524:4-11, 547:8-548:20 (Trivedi); PTX-2271 at 2; PTX-1887.

135. Qualcomm never received the OOBs or patches withheld between 2022 and 2025: they are not in the "quarterly update" (JT 456:12-17, 503:9-11 (Grisenthwaite)) nor were they ever separately delivered. JT 456:12-23, 502:11-504:1 (Grisenthwaite); 523:1-6, 523:12-15, 540:17-541:8, 541:24-542:10, 544:25-545:6, 546:11-13, 547:8-548:20 (Trivedi).

### *5. Arm leaked its threat to immediately terminate Qualcomm's ALA*

136. On October 7, 2024, Arm's Executive Committee listed ways it could get leverage against Qualcomm before the December 16 trial, including sending an ALA Termination Notice that would be triggered after 60 days, allowing Arm to terminate at the end of trial. PTX-1794 at 14 ("if they loose they are in a very difficult position. (PR play as needed)").

137. On October 22, 2024, Arm sent a Termination Notice stating that unless Qualcomm "cure[d] its material breach within 60 days, Arm shall be entitled to immediately terminate the

ALA by written notice pursuant to section 14.2(ii).” PTX-1470 at 2. The 60-day cure period coincided with the end of the *Arm* v. *Qualcomm* trial, as Arm had planned. PTX-1794 at 14.

138. In the Termination Notice, Arm stated that, in order to cure, Qualcomm must “at a minimum” cease “development of Nuvia designs, including its requests for verification, delivery and support for CPUs that use the Nuvia designs; stop its manufacture and sale of CPUs that use Nuvia designs or technology; stop its manufacture and sale of CPUs that have not been ‘validated and verified’ by Arm, as required by Annex 1” and withdraw then-pending claims asserted in this lawsuit concerning Arm’s breach of its obligation to deliver OOBs and patches. *Id*. at 2-3.

139. Mr. Haas acknowledged that he did not know if it was even possible for Qualcomm to do all of the things Arm listed as the minimum necessary, and even if Qualcomm did them, Arm would still believe it was entitled to “immediately terminate” the ALA. JT 373:21-374:10.

140. Arm leaked the letter to Bloomberg through its PR firm (FGS) and outside counsel (Morrison Foerster), first by describing the letter on a call and then via screenshare. JT 604:24-605:8, 606:20-607:17, 608:3-11 (Kranhold); JT 738:21-739:5 (Collins). Those actions, and all relevant actions taken by FGS and Morrison Foerster, were directed by Arm’s CLO. JT 771:6-772:13 (Collins); JT 620:15-18 (Siegel); JT 596:25-597:19 (Badani).

141. Arm’s PR agent, Paul Kranhold of FGS, told Bloomberg that “Arm was intending to sever its relationship with Qualcomm.” JT 605:2-8. Arm’s counsel, Kenneth Siegel, told Bloomberg that if the ALA was terminated, “it would impact Qualcomm’s roadmap and ability to produce Arm-compliant products, potentially.” JT 620:19-621:10 (Siegel).

142. As a result of Arm sharing the letter, Bloomberg published an article titled “Arm to Scrap Qualcomm Chip Design License in Feud Escalation.” PTX-1529. The article stated: “Arm Holdings Plc is canceling a license that allowed longtime partner Qualcomm Inc. to use Arm

intellectual property to design chips," "If the cancellation takes effect, the company might have to stop selling products," and "If Arm follows through with the license termination, Qualcomm would be prevented from doing its own designs using Arm's instruction set." *Id.* at 1, 4.

143. Arm amplified the article, reaching out to 30+ media outlets. PTX-1544 at 2.

144. Mr. Collins testified that "if Arm wanted to cause harm to Qualcomm, Arm would have spoken about terminating." JT 751:2-5 (Collins). And that is what Arm did. PTX-1542 (headlines about "canceling," "scrapping," and "ending" Qualcomm's license); PTX-1504 at 1 ("you don't serve a customer with a termination notice unless you are prepared to go all the way. My understanding is that the license agreement required a 60-day notice before cancellation."); PTX-1492 at 1 (similar); *id.* ("Most unsettling is likely with QCOM customers who have unlicensed Arm IP in their current products."); PTX-1474 at 1.

145. Arm's Chief Marketing Officer wrote answers to media questions conveying that the ALA would terminate after 60 days, putting all Qualcomm products at risk. PTX-1544 at 1 ("The main follow-up questions we're getting that we're not comment on are: 1. What QCOM chips does this impact, 2. What happens at the end of the 60 days"); *id.* ("Quick responses to questions" include 1. "All chips that license the Arm technology across the various lines of business (not sure it is in our interest to be specific)" and 2. "Q will need to terminate the ALA license and discontinue selling any products that use Arm's platform."); JT 601:4-24 (Badani).

146. Mr. Haas spoke to the media not for attribution stating that, if Qualcomm lost at trial, it would be unable to develop new custom cores, unable to differentiate its products (because it would have to rely on Arm implementation cores), and unable to "continue shipping products" without "risk of other issues." PTX-1543 at 1-2 ("summary of the points made by Rene").

147. Qualcomm's customers reached out, concerned and wanting to understand whether

Qualcomm would be able to ship products. PTX-1596 at 3; PTX-1605 at 7-8; JT 802:11-803:4 (Mulabagal). Arm "change[d] the conversation [at the Snapdragon Summit] from the news that Qualcomm had probably the fastest CPU for in the smart phone into Arm wanted to terminate and Qualcomm won't be able to ship the CPU to customers." JT 188:25-189:6 (Amon).

148. On January 8, 2025, Arm sent a letter to Qualcomm stating that, in light of the jury verdict, it had "no current plan" to terminate the Qualcomm ALA. PTX-1718 at 1. Arm said that Qualcomm could share the notice with its customers, but "only on a confidential basis." *Id.* at 2.

149. Arm's multi-pronged and relentless attack on Qualcomm as both a consumer and a competitor has been going on for years and shows no sign of stopping. *Supra* §§ IV-VI.

## QUALCOMM'S PROPOSED CONCLUSIONS OF LAW

### I. Arm Breached ALA Section 14.1.B by Failing To Negotiate in Good Faith for v10

Section 14.1.B(1) of the Qualcomm ALA grants Qualcomm a unilateral right to elect to extend the ALA to cover future versions of the Arm architecture, including v10, and requires that the parties negotiate the terms of that extension in good faith. Arm admitted as much in internal documents before and after Qualcomm properly elected. FOF ¶¶ 46-48. After Arm announced its intention to "unwind" and "EOL" Qualcomm's ALA, *id.* ¶¶ 22,36-37, Arm has refused to negotiate in good faith. More than six years after its election, Qualcomm has not received any commercially viable offer from Arm—much less the early access to v10 that other ALA licensees are enjoying. *Id.* ¶¶ 54-95, 105. Customers are already asking for v10, asking design questions Qualcomm cannot answer and seeking assurances Qualcomm cannot give. *Id.* ¶ 107. Arm's breach of contract is causing irreparable competitive and reputational injury to Qualcomm by the day. *Id.* ¶¶ 105-07. Accordingly, Qualcomm seeks specific performance of Arm's good faith negotiation obligations.

#### A. Section 14.1.B required Arm to negotiate in good faith once Qualcomm elected to extend the ALA to cover v10.

Under the plain language of § 14.1.B, Qualcomm has a unilateral right to elect to extend the ALA to cover v10, with no agreement necessary from Arm. The first sentence of § 14.1.B(1) states that Qualcomm "may elect to extend the Initial Term to cover future versions of ARM Technology as mutually agreed upon by the parties." JTX-1 at 26; FOF ¶ 43. The word "may" demonstrates that it is within Qualcomm's sole discretion to elect an extension. E.g., *Performance Team Freight Sys., Inc.* v. *Aleman*, 194 Cal. Rptr. 3d 530, 540 n.6 (Ct. App. 2015). The second sentence confirms this reading by stating, "If [Qualcomm] makes this election, then the parties will negotiate in good faith the terms and conditions of an extension." JTX-1 at 26. Qualcomm did not need to do anything except make the election to trigger Arm's duty to negotiate in good faith.

Arm asserts that it has no such obligation because it did not "mutually agree" to extend the ALA to v10. BT 343:16-20. But the phrase "as mutually agreed upon by the parties" does not require Qualcomm and Arm to "mutually agree" on the "versions of ARM Technology" Qualcomm's election may cover. Most naturally read, "as mutually agreed upon by the parties" functions as an adverb that modifies the verb phrase "to extend the Initial Term to cover." *See* Rodney Huddleston & Geoffrey K. Pullum, *The Cambridge Grammar of the English Language*, 612 & n.3, 671 (2016) (examples of "adjunct" phrases headed by a preposition serving as an adverb); *Nielsen* v. *Preap*, 586 U.S. 392, 406 (2019). It thus requires the parties to "mutually agree" on *how* the ALA will "extend the Initial Term to cover future versions of ARM Technology," not *which versions* Qualcomm's election may encompass. Arm's contrary interpretation would make the provision superfluous because the parties are already free to mutually elect contract extensions.

The second sentence of § 14.1.B(1) proves the point: if Qualcomm elects to extend the ALA, "then the parties will negotiate in good faith the *terms and conditions* of an extension . . . and a license to such future versions of ARM Technology." JTX-1 at 26. The phrase "as mutually

agreed upon by the parties" thus foreshadows the second sentence of § 14.1.B(1).

Section 14.1.B cannot reasonably be read to require mutual agreement on which "future versions of ARM Technology" Qualcomm's election may cover before Arm's duty is triggered. If that were the case, Arm could nullify Qualcomm's election and avoid its obligation to negotiate in good faith by refusing to agree to license the versions of ARM Technology that Qualcomm seeks—precisely what Arm has attempted to do in this case. DTX-7 at 4. A contract should not be read to render a provision meaningless or illusory. Cal. Civ. Code §§ 1643, 3541; *see City of Atascadero* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 80 Cal. Rptr. 2d 329, 349 (Ct. App. 1998).

The record supports Qualcomm's interpretation. During the drafting of § 14.1.B, the parties explicitly discussed that the extension would cover v10. *See* FOF ¶ 44. In 2018, Arm continued to recognize that § 14.1.B allowed Qualcomm "'the right to extended to **future technologies**' i.e. V10..V11.." *Id.* And after Qualcomm exercised its right to extend the ALA to cover v10 in 2020, the Arm employee in charge of the Qualcomm relationship stated that she did not see "any reason why this can't hold." PTX-422 at 6; FOF ¶ 48. Arm further recognized that the parties were in the same place with respect to v10 as the parties were with v9 when its terms were negotiated. FOF ¶ 47. Having consistently taken the position that v10 would be covered, Arm did not claim that Qualcomm's election was invalid until the parties were in litigation. FOF ¶ 48; DTX-7 at 4.

Qualcomm properly elected. In April 2020, Qualcomm asked whether Arm would extend the deadline for Qualcomm to elect. FOF ¶ 45; PTX-422 at 8. When Arm said no, Qualcomm wrote to Arm stating that it "hereby elects to extend the Initial Term to cover future versions of ARM Technology" under § 14.1.B(1). FOF ¶ 48; PTX-422 at 6.

**B. Arm refused to negotiate in good faith the terms of v10.**

None of Arm's conduct comports with the ordinary meaning of "good faith," which governs in the absence of any specialized definition in the ALA. Cal. Civ. Code § 1644; *AIU Ins.*

*Co.* v. *Superior Ct.*, 799 P.2d 1253, 1267 (Cal. 1990). Good faith means to act with "honesty," "faithfulness to one's duty or obligation," "in observance of reasonable commercial standards," or with the "absence of intent . . . to seek unconscionable advantage." *Good Faith*, Black's Law Dictionary (12th ed. 2024). Instead, Arm has chosen delay, dishonesty, and obstruction.

By the time of Arm's first complete offer in August 2026, it had been: 6+ years since Qualcomm's election covering v10 (May 2020); nearly two years since Qualcomm learned v10 was imminent and raised it with Arm (October 2024); 16 months since Qualcomm asked Arm (again) to make an offer (April 2025); 12 months since Qualcomm made its own v10 offer (August 2025), and 8 months after Arm finally made a (partial) financial proposal (December 2025). FOF ¶¶ 48-50, 54-55, 58. Arm's conduct has been egregious, including:

- In 2020, despite discussing internally that v10 negotiations were possible, Arm told Qualcomm that no one was working on v10 and did not start negotiations, (*id.* ¶ 48), while that same year entering ALAs covering v10 with Nvidia and Microsoft (*id.* ¶ 51).

- By 2024, when Qualcomm learned v10 was underway, Arm had additionally entered ALAs covering v10 with at least Apple and Google, (*id.* ¶ 51); Arm nonetheless told Qualcomm it could not propose a royalty rate because v10 was not yet created, not yet commercial, and no one had "a v10 price or royalty rate" (*id.* ¶ 50). Arm made no complete v10 offer during settlement discussions in late 2024. *Id.* ¶ 53.

- When Arm finally provided offers, they were partial and extortionate. For example, Arm's December 2025 proposal would increase royalties by [redacted] (*id.* ¶ 61); its March 2026 proposal would increase royalties by [redacted] (*id.* ¶ 70).

- Qualcomm would be [redacted] (December 2025 proposal) or [redacted] (March 2026 proposal) of Qualcomm's annual R&D spend and thus could not maintain its current operations. *Id.* ¶ 79.

- Under Arm's March 2026 proposal, the royalties Qualcomm would pay for low/entry tier mobile chips would [redacted]. *Id.* ¶ 62. Under both of Arm's proposals, the royalties Qualcomm would pay for its data center chip [redacted]. *Id.* ¶ 82.

- Arm has objected to both a flat rate across segments and to different rates across segments; it has objected to benchmarking based on Qualcomm's rates and to the rates of others. *See id.* ¶¶ 56-57, 76-78. Arm has Qualcomm coming and going.

Arm's proposal of "commercially unreasonable" terms that it "knew or should have known" Qualcomm "would reject" alone constitutes bad faith. *In re Vylene Enters., Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996). But Arm's bad faith went further. Like the defendant in *Oakland Bulk & Oversized Terminal, LLC* v. *City of Oakland*, Arm "elected to undermine" the parties' contract, "delayed" negotiations, including when it "failed to respond to key" Qualcomm "communications needed to advance the" negotiations—like Qualcomm's offers—and "once it did respond, rejected them without proper any substantive basis." 334 Cal. Rptr. 3d 488, 522 (Ct. App. 2025). All of this "demonstrated a lack of good faith," too. *Id.* at 523; *see also R.J. Kuhl Corp.* v. *Sullivan*, 17 Cal. Rptr. 2d 425, 432-33 (Ct. App. 1993) ("evasion of the spirit of the bargain" and "abuse of a power to specify terms" reflect lack of good faith). As in *Oakland*, specific performance is necessary to provide Qualcomm the contractual benefit Arm has denied it. 334 Cal. Rptr. 3d at 510, 528.

### C. Arm should be ordered to specifically perform its obligation to negotiate in good faith the terms of v10.

Because Arm has complete control over the ISA with no viable alternative, the only effective remedy for the harm Qualcomm is suffering without access to v10 is specific performance of the ALA's promise of good faith negotiations. All requirements for issuance of that relief are satisfied: 1) Qualcomm has no adequate legal remedy, 2) the jury has already found that the ALA is a valid and enforceable contract; 3) there is "a mutuality of remedies" because Arm could also seek specific performance; 4) the terms at issue are "sufficiently definite to enable the court to know what it is to enforce;" and 5) the performance Qualcomm is requesting from Arm bears a "substantial similarity" to "that promised in the contract." *Real Est. Analytics, LLC* v. *Vallas*, 72 Cal. Rptr. 3d 835, 840 (Ct. App. 2008); *Allegheny Energy, Inc.* v. *DQE, Inc.*, 171 F.3d 153, 159 (3d Cir. 1999) (applying state law to request for specific performance in diversity case).

*First*, Qualcomm has no adequate remedy at law. Qualcomm's competitors (Apple, Nvidia,

Arm) will be able to design and ship v10 products. [redacted], [redacted] FOF ¶ 105. Thus, they are already well into the multi-year design process for a CPU and will likely be a generation ahead of Qualcomm's eventual v10 products, if it ever gets a license. *See id.* ¶ 106. That competitive disadvantage is irreparable. *See State Compensation Ins. Fund* v. *Maloney*, 262 P.2d 662, 666 n.3, 668 (Ct. App. 1953). Moreover, Qualcomm's reputation and goodwill have been damaged by Arm delaying Qualcomm's access to v10 and creating doubt as to whether Arm will grant Qualcomm a v10 license—something customers are raising with Qualcomm. FOF ¶ 107. This harm is also irreparable. *Courtesy Temp. Serv., Inc.* v. *Camacho*, 272 Cal. Rptr. 352, 360 (Ct. App. 1990); *Donahue Schriber Realty Grp., Inc.* v. *Nu Creation Outreach*, 181 Cal. Rptr. 3d 577, 588 (Ct. App. 2014). Both harms are also unquantifiable, and irreparable for that reason as well. *DVD Copy Control Ass'n* v. *Kaleidescape, Inc.*, 97 Cal. Rptr. 3d 856, 876 (Ct. App. 2009) (calling harm irreparable is another way of saying damages "would not afford adequate relief" or that the amount would be "extremely difficult to ascertain").

*Second*, "the need for" the court "finding the contract to be reasonable and supported by adequate consideration is obviated by the jury's determination of" Arm's "breach of that contract." *Tamarind Lithography Workshop, Inc.* v. *Sanders*, 193 Cal. Rptr. 409, 413 (Ct. App. 1983).

*Third*, the ALA provides for mutuality of remedies because Arm can seek specific performance from Qualcomm. JTX-1 at 26.

*Fourth*, § 14.1.B's good faith negotiation requirement is sufficiently definite for the Court to enforce without extensive oversight. Courts applying California law have also repeatedly recognized that specific performance is available for breach of an obligation to negotiate in good faith. *Genesis 1 Oil Servs., LLC* v. *Wismann Grp., LLC*, 2023 WL 8125773, at *1, 3 (C.D. Cal.

2023); *AMG & Assocs., LLC* v. *AmeriPride Servs., Inc.*, 2016 WL 9275402, at *5 (C.D. Cal. 2016); *In re Sony Gaming Networks & Customer Data Sec. Breach*, 996 F. Supp. 2d 942, 1012-13 (S.D. Cal. 2014); *see also Oakland*, 334 Cal. Rptr. 3d 488, 502, 510 (affirming equitable relief in case involving repudiation of contract and "failing to negotiate in good faith"). When, as here, "the parties disagree about what" a provision "requires, that dispute is for the trial court to resolve when it rules upon the question of whether" the obligation has been breached. *DVD Copy Control Ass'n*, 97 Cal. Rptr. 3d at 874. "Any uncertainty should disappear" with the court's breach findings. *Id.*

Qualcomm's requested injunction works in precisely this way: Qualcomm asks that the Court make factual findings regarding what Arm conduct to date demonstrates bad faith and order Arm to proceed with negotiations consistent with those findings, allowing the parties to reach agreement on terms for a v10 license. To be sure, that will leave Arm discretion over how it wishes to proceed—so long as it does in good faith. But "a contract is not too uncertain merely because a promisor is given a choice of performing in several ways." *Id.* (quoting Restatement (Second) of Contracts § 362 cmt. b (1981)); *Okun* v. *Morton*, 250 Cal. Rptr. 220, 227 (Ct. App. 1988).

*Finally*, the performance Qualcomm is requesting bears a substantial similarity to that promised in the contract because Arm performing its obligations to avoid further breach (i.e., negotiating in good faith a v10 license based on the Court's factual findings as to Arm's conduct that constitutes bad faith), is the exact performance promised in the contract. *See DVD Copy Control Ass'n*, 97 Cal. Rptr. 3d at 874; *Rogers* v. *Davis*, 34 Cal. Rptr. 2d 716, 720 (Ct. App. 1994). In cases involving breach of ongoing contractual obligations, courts have issued injunctions directing the parties to "negotiate prices" or other terms "in good faith." *Zurn Constructors, Inc.* v. *B.F. Goodrich Co.*, 685 F. Supp. 1172, 1187 (D. Kan. 1988) (defendant must continue supplying plaintiff until proper termination of contract or adjudication of merits and parties must negotiate

prices "in good faith"); *City Stores Co.* v. *Ammerman*, 266 F. Supp. 766, 778 (D.D.C. 1967) (parties must "deal with each other in good faith and expeditiously" to work out commercial lease details), *aff'd*, 394 F.2d 1950 (D.C. Cir. 1968). Qualcomm simply asks that Arm be required to do the same, with parameters based on the evidence at trial to reduce the need for Court oversight.

**II. Arm's actions against Qualcomm violate the California Unfair Competition Law.**

As the California Supreme Court has instructed for nearly a century, the UCL was "intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech Commc'ns, Inc.* v. *L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999). Here, the Court need not wrestle with an entirely new scheme because Arm, like the defendant in *Cel-Tech*, the seminal UCL case, used its control over a key input (there, telephone services; here, the ISA) to prevent competition in sales for downstream products (there, telephones; here, CPUs and chips). *Id.* at 546; *hiQ Labs, Inc.* v. *LinkedIn Corp.*, 31 F.4th 1180, 1193-94 (9th Cir. 2022). The unfair competition here is clearer than in *Cel-Tech* because Arm has chosen to *raise* its prices to exclude competitors rather than lower them to try to recruit its competitors' customers. *Cel-Tech*, 973 P.2d at 545.

The UCL's "remedial power" is "extraordinarily broad" and injunctive relief can be "as wide and diversified as the means employed in perpetration of the wrongdoing." *Hewlett* v. *Squaw Valley Ski Corp.*, 63 Cal. Rptr. 2d 118, 143 (Ct. App. 1997). Even so, Qualcomm seeks a narrow injunction "necessary to prevent" Arm's unfair competition. Cal. Bus. & Prof. Code § 17203.

**A. The UCL is intended to prevent any form of unfair competition.**

The UCL prohibits any "unfair…business act or practice," Cal. Bus. & Prof. Code § 17200, "to protect both consumers and competitors by promoting fair competition." *Holistic Supplements, LLC* v. *Stark*, 275 Cal. Rptr. 3d 791, 801 (Ct. App. 2021); *see Cel-Tech*, 973 P.2d at 539.

Where, as here, the plaintiff is both a consumer and a competitor of the defendant, the

unfairness of the defendant's conduct is appropriately assessed under two different tests, which provide independent bases for liability. *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023); *In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *2 (N.D. Cal. 2024), *aff'd*, 147 F.4th 917 (9th Cir. 2025); *Gerawan Farming, Inc.* v. *Rehrig Pac. Co.*, 2013 WL 1934173, at *3-4 (E.D. Cal. 2013); *Worldwide Travel, Inc.* v. *Travelmate US, Inc.*, 2015 WL 1013704, at *11-12 (S.D. Cal. 2015); *see also Cel-Tech*, 973 P.2d at 544 n.12.

In a consumer-supplier context, the factfinder "must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim," taking into account "the impact of the practice or act on its victim" and "the reasons, justifications and motives of the alleged wrongdoer." *Progressive West Ins. Co.* v. *Superior Ct.*, 37 Cal. Rptr. 434, 452 (Ct. App. 2005); *see also Capito* v. *San Jose Healthcare Sys., LP*, 561 P.3d 380, 386-87 (Cal. 2024); D.I. 1009 at 22. In a competitor context, the factfinder analyzes whether conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 973 P.2d at 544; D.I. 1009 at 23. Under either test, a plaintiff need not prove any elements of an antitrust claim; conduct can be unfair "even if not specifically proscribed by some other law" or prior case law. *Cel-Tech*, 973 P.2d at 540; *Epic Games*, 67 F.4th at 1002; *Metricolor LLC* v. *L'oréal S.A.*, 2020 WL 3802942, at *17 (C.D. Cal. 2020).

As the jury found, Qualcomm is in both a consumer-supplier relationship and in competition with Arm. D.I. 1024 at 7-8; D.I. 1009 at 21-23. Qualcomm can prove its UCL claim if it satisfies either the consumer test *or* the competitor test. *Epic Games*, 67 F.4th at 1000; *see Kairys* v. *S. Pines Trucking, Inc.*, 75 F.4th 153, 161 (3d Cir. 2023).

Arm has argued that Qualcomm should be deprived of the UCL's protections for consumers

because it is a sophisticated company. BT 389:3-9. That argument is contrary to the law applying the consumer test to contracts between sophisticated parties, *Epic Games*, 67 F.4th at 1000-01; *In re Google Play*, 2024 WL 4438249, at *2; *Luxul Tech.* v. *Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1174 (N.D. Cal. 2015); and the broad remedial purpose of the UCL, *Hewlett*, 63 Cal. Rptr. 2d at 143. There is "substantive overlap" between the consumer and competitor tests and Arm is in violation of the UCL under either. *In re Google Play*, 2024 WL 4438249, at *2.

**B. Arm's ongoing refusal to fairly license v10 to Qualcomm violates the UCL.**

Arm's decision to disclaim its obligation to negotiate in good faith for v10, *supra* FOF § VI, is a crucial component of its broad scheme to eliminate competition for Arm chips and CPUs. Arm's plan is to "EOL" (end of life) ALAs so OEMs will only be able to buy CPUs sold or designed by Arm. FOF ¶¶ 9-12, 33-41. Arm said as much to Samsung—Qualcomm's largest customer. *Id.* ¶¶ 122-28. And Arm is going to make ALA and TLA rates "equivalent" so that even the shrinking group of ALA holders will be disincentivized from building custom CPUs in favor of using Arm's TLA CPUs. *Id.* ¶ 38. Arm's $2 trillion projections (and Mr. Haas's billion-dollar pay) depend on Arm ability to take chip sales from the companies it wrote it would hose. *Id.* ¶¶ 111-14. Arm's unfair scheme will be undermined if Qualcomm has access to v10 and continues to innovate, making custom CPUs that customers prefer to Arm's CPUs. *See id.* ¶¶ 33, 35, 40.

Arm's refusal to license v10 to Qualcomm on commercially reasonable terms violates both the competitor and consumer tests. Arm's refusal to license v10 "threatens or harms" competition of chips and CPUs through input foreclosure. FOF ¶¶ 20-114. In competition economics, input foreclosure occurs when an upstream supplier controls an "essential input" for a downstream product, competes with its customers to sell the downstream product, and then degrades or refuses to provide the input to the supplier's customer-competitors. BT 177:16-178:19 (Posner). Courts have long recognized that input foreclosure harms competition, violating the policy and spirit of

antitrust laws, as precluded by the competitor test. *Cel-Tech*, 973 P.2d at 544; *Motors, Inc.* v. *Times Mirror Co.*, 162 Cal. Rptr. 543, 544-46 (Ct. App. 1980); *see, e.g.*, *Eastman Kodak Co.* v. *Image Tech. Servs., Inc.,* 504 U.S. 451, 478 (1992); *Illumina, Inc.* v. *FTC*, 88 F.4th 1036, 1051, 1055 (5th Cir. 2023); *Viamedia, Inc.* v. *Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020).

Arm's withholding of v10 raises the very concerns about "ability to use foreclosure strategies to disadvantage rivals" that motivated the FTC to sue to block Nvidia's acquisition of Arm. Ex. 1 ¶ 103. And Arm was indisputably aware of these competition concerns when it planned in December 2021 to "hose" the "rest" by "go[ing] vertical and build[ing] chips." FOF ¶¶ 26-29.

The threat to competition is particularly acute given that Qualcomm is one of only a few companies that designs custom CPUs and supplies chips. *Supra* FOF § II. If Arm excludes Qualcomm, there will be *no* options besides Arm TLA CPUs for companies making non-Apple phones—like Samsung—or PCs. FOF ¶¶ 9-10. This is what Arm wants: it already attempted to convince Samsung that it must build chips with Arm, or buy chips directly from Arm, because Arm would not allow Qualcomm (or "others") to continue making custom CPUs. FOF ¶¶ 124-28. And, if Arm succeeds in excluding Qualcomm in data center sales to hyperscalers, the only Arm-based chip options would be Nvidia and Arm, who together are in "coopetition." FOF ¶¶ 11, 42.

Arm's conduct is directed against competition generally, with its plan to hose chip suppliers. And Arm has been successful at raising ALA rates above TLA rates, with the result that Google and Microsoft do not develop custom CPUs. FOF ¶ 41. But even with respect to Arm's conduct against Qualcomm alone, as the Third Circuit has said, the "eliminat[ion of] a competitor" through "unfair practices" inevitably has "an adverse effect on the marketplace." *Coleman Motor Co.* v. *Chrysler Corp.*, 525 F.2d 1338, 1347 (3d Cir. 1975). Other courts agree: conduct that reduces the number of competitors harms competition—especially when there are few competitors. *See*

*Full Draw Prods.* v. *Easton Sports*, 182 F.3d 745, 754 (10th Cir. 1999); *Valassis Commc'ns, Inc.* v. *News Corp.*, 2019 WL 802093, at *11 (S.D.N.Y. 2019); *Carlson Specialty Seed* v. *Walter Carlson & Walter Carlson & Assocs.*, 1990 U.S. Dist. LEXIS 21263, at *13 (E.D. Wis. 1990).

Arm's conduct, which "increase[s] barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products," harms competition and violates the UCL. *Epic Games*, 67 F.4th at 983-84; *see also Cel-Tech*, 973 P.2d at 546; *Motors, Inc.*, 162 Cal. Rptr. at 545-46 (rejecting challenge to UCL claim where "dominant" newspaper charged discriminatory prices for access to its non-substitutable advertising channel).

The facts of *hiQ Labs* help illustrate the issue. HiQ, a data analytics company, brought a UCL claim alleging that LinkedIn had blocked hiQ from accessing LinkedIn's public data because LinkedIn planned to start its own competitive data analytics tool. 31 F.4th at 1193. As the Ninth Circuit explained in affirming a preliminary injunction that remained until hiQ dissolved, LinkedIn's decision "selectively to ban only potential competitors from accessing and using" the "vast amounts of public data it holds," which resulted in "complete exclusion of the original innovator in aggregating and analyzing the public information," "may well be considered unfair competition under California law." *Id.* at 1193-94; *see also Bryant* v. *Microsoft Corp.*, 2026 WL 2908104, at *8 (N.D. Cal. 2026) (rejecting challenge to UCL claim that Microsoft's control over compute resources allowed it to restrict access to competitive consumer AI). Where conduct "restricts or forecloses a competitor plaintiff's access to a necessary input, courts have found that the resulting loss is injury of the type that the antitrust laws were designed to prevent." *Sprint Nextel Corp.* v. *AT&T Inc.*, 821 F. Supp. 2d 308, 320 (D.D.C. 2011). That is precisely the case here: Arm has blocked Qualcomm from accessing v10 to build chips with custom CPUs, while Arm secretly planned and launched its own chips. FOF ¶¶ 29-32, 42-78.

Arm cannot escape that it threatened competition and/or violated the spirit or policy of the antitrust laws by disclaiming a duty to deal with Qualcomm. A defendant who cuts off "a pattern of distribution that had originated in a competitive market and had persisted for several years" for an exclusionary, anticompetitive, or predatory reason is liable for that anticompetitive conduct, notwithstanding that companies may generally deal with who they please. *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.,* 472 U.S. 585, 603 (1985); *Host Int'l, Inc.* v. *MarketPlace, PHL, LLC*, 32 F.4th 242, 250 n.7 (3d Cir. 2022). Under *Aspen Skiing*, courts consider evidence of "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers." *Viamedia*, 951 F.3d at 463; *Simon & Simon, PC* v. *Align Tech., Inc.,* 2026 WL 2980631, at *9-10 (9th Cir. 2026). Courts consider those factors "flexibly," not as a "rigid checklist." *Simon*, 2026 WL 2980631, at *5; *see also Viamedia*, 951 F.3d at 457.

Each factor supports liability. *First*, Qualcomm and Arm have engaged in a decades-long, voluntary course of dealing, which "supports a presumption that the joint arrangement was efficient and profitable." *See* FOF ¶ 13; *Viamedia*, 951 F.3d at 456. *Second*, Arm is forgoing short-term profits by refusing to offer viable terms for v10 and thus sacrificing the substantial license fee Arm would otherwise receive from Qualcomm. FOF ¶ 56 (Qualcomm proposing fee of [redacted]). *Third*, Arm will not license v10 to Qualcomm on the same or similar terms as Qualcomm's reasonable comparators. *Id.* ¶¶ 56, 86-90, 94-95, 99-100. Instead, Arm has proposed rates that will significantly curtail or even eliminate Qualcomm's profit and force cuts to innovation spending. *Id.* ¶¶ 59-72, 79-85. Without access to v10, Qualcomm and its customers will eventually have to use Arm's pricier TLA cores. *Id.* ¶¶ 20-24. Arm is thus willing to "sacrifice short-term benefits" for higher profits "in the long run" by excluding competition." *Simon*, 2026 WL 2980631, at *10.

Arm's conduct is part of a broader effort to use its control over the ISA to eliminate

competition after having encouraged custom CPU manufacturers like Qualcomm to structure their businesses around that ISA. As described above, Arm discussed needing to "unwind" Qualcomm's ALA, needing Qualcomm's ALA "to expire" before Arm "can go full bore," and going "end of life on ALAs more broadly." FOF ¶¶ 35-37. Arm's efforts to shut Qualcomm out of Arm's once-open ecosystem were thus "not motivated by efficiency concerns" but instead by an effort to force Arm's consumers to purchase a more-expensive (and lower-performing) product from Arm. *Aspen Skiing*, 472 U.S. at 610-11; FOF ¶¶ 7, 20, 33. That is actionable unfair competition under *Cel-Tech*.

As to the consumer test, none of Arm's justifications outweigh the harm to Qualcomm. Without v10, Qualcomm will be unable to satisfy its customers' demands and will fall further behind its competitors. FOF ¶¶ 105-07. Qualcomm's customers will lose the option of purchasing a differentiated custom CPU as opposed to Arm's off-the-shelf CPUs. *Id.* ¶¶ 8-12, 107. Arm has not given any reason why Qualcomm should not have a competitive v10 license. Instead, Arm contends that it has offered competitive rates because Google and Microsoft accepted similar rates, [redacted]. *Id.* ¶ 41. Arm withheld evidence about Qualcomm's competitors' rates, but all available information indicates they are far below what Qualcomm has been offered. *Id.* ¶¶ 94-95, 99-100. Arm's conduct is consistent with its effort to "hose" its chipmaker customers and "EOL" ALAs—not with any procompetitive justification.

### C. Arm's interference with Qualcomm's customers and withholding of deliverables violates the UCL.

Beyond blocking v10 access, Arm has pursued a course of unfair conduct designed to eliminate or limit competition from Qualcomm's custom CPUs. First, Arm interfered with Qualcomm's customer relationships—including, as the jury has decided, with Meta (D.I. 1024 at 7-8)—through misleading communications to Qualcomm's customers and the public intended to destroy Qualcomm's reputation by conveying that Arm would be terminating Qualcomm's ALA,

and as a result, Qualcomm would not be able to supply any Arm-based chips. FOF ¶¶ 136-48. Second, and as the jury has also decided (D.I. 1024 at 2), Arm breached the ALA by withholding technology that Qualcomm uses to verify that its custom CPUs comply with the Arm architecture. That conduct threatens to eliminate differentiated CPU designs and reduce consumer choice, and it offers no countervailing benefits to consumers. FOF ¶¶ 129-35; *see also id.* ¶¶ 6, 9-12.

***Interference.*** Courts frequently find UCL liability based on similar interference with a party's business. For example, in *Luxul Technology*, the court held that the plaintiff properly alleged a claim under the unfair prong based on allegations that the defendant "wrongfully and unfairly represented to third parties that Luxul's business and/or products are affected by legal issues that do not exist." 78 F. Supp. 3d 1156, 1174 (N.D. Cal. 2015); *see also Wisk Aero LLC* v. *Archer Aviation Inc.*, 2021 WL 4932734, at *13 (N.D. Cal. 2021). In *Overstock.com, Inc.* v. *Gradient Analytics, Inc.*, the court affirmed the denial of a motion to strike a UCL claim based on the defendant's alleged "knowing and intentional dissemination of negative reports on [the plaintiff] containing false and/or misleading statements." 61 Cal. Rptr. 3d 29, 50 (Ct. App. 2007). And in *MGA Entertainment, Inc.* v. *Mattel, Inc.*, the court held that allegations the defendant "lied to others about [the plaintiff's] products" and "intimidate[d] others into not dealing with" the plaintiff could support a UCL claim. 2005 WL 5894689, at *7 (C.D. Cal. 2005).

Here, the jury already found that Arm's communications violated the UCL by interfering with Qualcomm's relationship with Meta. D.I. 1024 at 7-8. The Court is bound by that determination. *See Kairys*, 75 F.4th at 161. And Arm's communications went well beyond Meta. *See* FOF ¶¶ 120-21, 124-27, 140-47. Under the competitor test, Arm's conduct "significantly threatens or harms" competition by discouraging use of Qualcomm's products based on false doubt about the status of Qualcomm's license. The misrepresentations to Samsung are a prime example

of this. *Id.* ¶¶ 124-27. Under the consumer test, Arm has offered no justification that outweighs the significant harm Qualcomm suffered as a result of Arm's conduct, including Qualcomm's efforts to reassure its customers and the uncertainty that Arm's conduct has cast over Qualcomm's business. *Id.* ¶¶ 144-47. For instance, Arm's own document shows Arm sent the Termination Notice to put Qualcomm in a "very difficult position" and Mr. Haas admitted that Arm's position was it could "immediately terminate" the ALA even if Qualcomm completed the cures Arm asked for. *Id.* ¶¶ 136, 139. But Arm's efforts to gain leverage over Qualcomm outside of the judicial process create no benefit for consumers and cannot outweigh the harm from unfair conduct.

***Withholding deliverables.*** Arm also engaged in unfair conduct by withholding OOBs and ACK patches that Qualcomm uses to verify its custom CPUs' compliance with the Arm architecture. FOF ¶¶ 129-35. An error in compliance verification could have had catastrophic results, including because CPUs cannot be fixed once manufactured. *Id.* ¶ 132. Arm's internal documents show it understood this withholding would "add to the pressure" against Qualcomm because "verification of the CPU is critical to [Qualcomm's] design flow." *Id.* ¶ 131; PTX-2672.

Arm's withholding of deliverables significantly threatened competition and thus violated the UCL. As Prof. Posner explained, such withholding "will increase Qualcomm's costs," requiring Qualcomm "to raise prices for the downstream OEMs or reduce output or quality," thereby "giv[ing] Arm a competitive advantage in obtaining the business of the OEMs." BT 184:11-185:9 (Posner). Further, given the limited number of suppliers, FOF ¶¶ 8-12, foreclosure of Qualcomm's ability to verify CPUs and ship chips decreases competition and harms consumers. *See Full Draw*, 182 F.3d at 753-54; *Valassis*, 2019 WL 802093, at *12. Arm offered no justification or utility for its conduct and instead argued unsuccessfully to the jury that it had no obligation to deliver. FOF ¶¶ 129-33.

## III. A Permanent Injunction Against Arm Is Warranted.

Permanent injunctive relief is necessary to address the most egregious aspects of Arm's breach and unfair competition: Arm's efforts to impede or eliminate Qualcomm as a custom CPU supplier and competitor, particularly Arm's continued refusal to negotiate in good faith for v10.

To obtain a permanent injunction under California law, Qualcomm need only "prove (1) the elements of a cause of action involving the wrongful act sought to be enjoined and (2) the grounds for equitable relief, such as inadequacy of the remedy at law." *City of S. Pasadena* v. *Dep't of Transp.*, 35 Cal. Rptr. 2d 113, 120 (Ct. App. 1994). Federal courts routinely apply state substantive law to a request for permanent injunctive relief in diversity cases. *Sys. Ops., Inc.* v. *Sci. Games Dev. Corp.*, 555 F.2d 1131, 1143-44 (3d Cir. 1977); *Inkit, Inc.* v. *airSlate, Inc.*, 2025 WL 2662150, at *20 (D. Del. 2025).[8] Qualcomm proved that Arm breached the ALA and violated the UCL, *supra* COL §§ I, II, and the remaining element is satisfied through proof of irreparable harm. *Monster Energy Co.* v. *Vital Pharms., Inc.*, 2023 WL 8168854, at *13 (C.D. Cal. 2023); *Intel Corp.* v. *Hamidi*, 71 P. 3d 296, 303 (Cal. 2003).

The same conclusion follows under federal law, though state law governs Qualcomm's request for injunctive relief here. Under federal law, a plaintiff must establish that "(1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardships tips in its favor; and (4) granting an injunction would not be against the public interest." *Ne. Pa. Freethought Soc'y* v. *Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019). As under California law, the "first two elements"—irreparable injury and no adequate remedy at law—

[8] While "there is some uncertainty regarding whether state or federal law applies to the issuance of a permanent injunction in a diversity case that does not implicate an express statutory right to injunctive relief," *O'Hara, Jr.* v. *Premcor Ref. Grp., Inc.*, 2011 WL 337951, at *4 n.4 (D. Del. 2011), that question is "made simpler," where, as here, "a state statute establishes the right to an injunction," *Inkit*, 2025 WL 2662150, at *20 n.5; *see* Cal. Bus. & Prof. Code § 17203.

"typically constitute two sides of the same inquiry, for the availability of adequate monetary damages belies a claim of irreparable injury." *Id*. Qualcomm has satisfied this standard as well.

**A. Qualcomm will continue to suffer irreparable harm without an injunction.**

Qualcomm suffers unquantifiable harm every day. *Supra* COL § I.C. Arm's ongoing refusal to negotiate in good faith on v10 causes a "competitive disadvantage" cognizable as irreparable harm. *Bimbo Bakeries USA, Inc*. v. *Botticella*, 613 F.3d 102, 118 (3d Cir. 2010); *Maloney*, 262 P.2d at 666 n.3, 668. So too with the "loss of control of reputation" and "loss of good will" caused by Arm's interference. *Kos Pharms., Inc*. v. *Andrx Corp*., 369 F.3d 700, 726 (3d Cir. 2004).

Arm's unfair competition is ongoing, as Arm still refuses to offer or consider competitive v10 terms. E.g., FOF ¶¶ 73-78. Aside from v10, Arm never corrected its misleading statements about Qualcomm's ability to sell chips containing custom CPUs. *See id.* ¶ 121. Arm never delivered the ACK patches or OOBs it withheld from Qualcomm. *Id.* ¶ 135. As Mr. Haas admitted, Arm's hostility over the Nuvia acquisition continues to affect its relationship with Qualcomm, and Arm even has not disclaimed its intent to terminate Qualcomm's ALA if it overturns the *Arm* v. *Qualcomm* verdict. *Id.* ¶¶ 104, 148. Under the UCL, "past conduct demonstrat[ing] an ongoing strategy to compete" unfairly and unlawfully demonstrates "threatened future harm or a continuing violation," and supports issuance of injunctive relief. *Sun Microsystems, Inc*. v. *Microsoft Corp*., 87 F. Supp. 2d 992, 1004-05 (N.D. Cal. 2000); *In re Tobacco Cases II*, 192 Cal. Rptr. 3d 881, 901 (Ct. App. 2015). Where "a company has not taken action to bind itself legally to a violation-free future, there may be reason to doubt the bona fides of its newly established law-abiding policy." *Robinson v. U-Haul Co. of Cal.*, 209 Cal. Rptr. 3d 81, 90 (Ct. App. 2016). Even if Arm changed its conduct tomorrow, the court can grant relief where, as here, "there is a cognizable danger of recurrent violation." *United States* v. *W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Kansas* v. *Nebraska*, 574 U.S. 445, 466-67 (2015); *FTC* v. *AbbVie Inc.*, 976 F.3d 327, 379 (3d Cir. 2020).

### B. The equities and public interest also favor Qualcomm.

If the Court does apply the federal standard, the balance of the equities and the public interest favor Qualcomm. Arm would face no cognizable harm from an order to negotiate in line with factual findings regarding Arm's bad-faith conduct, because "holding a defendant to its contractual commitments does not constitute harm." *Walden Solar PA Jefferson v. Barbieri Land Mgmt. LLC*, 2025 WL 553251, at *2 (W.D. Pa. 2025). "[T]he public has a clear interest in ensuring fair business practices." *Par Pharm., Inc.* v. *QuVa Pharma, Inc.*, 764 F. App'x 273, 280 (3d Cir. 2019); *Ilapak, Inc.* v. *Young*, 2020 WL 2787689, at *6 (E.D. Pa. 2020); *Upjohn Co.* v. *Riahom Corp.*, 641 F. Supp. 1209, 1225-26 (D. Del. 1986). And an injunction requiring Arm to respect its obligation would promote the "public interest in encouraging the creation of new and useful products and the furthering of competition," *GlaxoSmithKline Consumer Healthcare, LP* v. *Merix Pharm. Corp.*, 2005 WL 2230318, at *12 (D.N.J. 2005), including by allowing Qualcomm to innovate future generations of highly competitive custom CPUs. E.g., FOF ¶ 18.

### C. Qualcomm's requested relief is well within the Court's authority.

It is well within the discretion of this Court to direct Arm to proceed with v10 negotiations consistent with the Court's factual findings regarding Arm's unfair competition to date and to provide non-commercial access to the v10 specifications other ALA licensees have long had.

Specific performance is available to address ongoing harm arising from Arm's breach of Section 14.1B of the ALA. *Supra* COL § I.C. And the UCL authorizes courts "to enjoin ongoing wrongful business conduct in whatever context such activity might occur," *Barquis* v. *Merchants Collection Ass'n*, 496 P.2d 817, 829 (Cal. 1972)—including licensing contexts. For example, in *Optronic Technologies, Inc.* v. *Ningbo Sunny Electric Co.* 2020 WL 1812257, at *8 (N.D. Cal. 2020), *aff'd,* 20 F.4th 466 (9th Cir. 2021), plaintiffs brought a UCL claim and sought an injunction directing the defendant to supply its product at "non-discriminatory (*i.e.*, most-favored-customer)

terms." 2020 WL 1812257, at *6 (N.D. Cal. 2020), *aff'd,* 20 F.4th 466 (9th Cir. 2021). The court explained that "the term 'non-discriminatory' means that Defendant should only be able to charge [plaintiffs] the same price it charges to Celestron and its other customers." *Id.* at *7. The term "non-discriminatory" thus "gives Defendant adequate notice of what the Court intends to require" and prevents "extensive oversight by the Court." *Id.*; *see also L.A. Int'l Corp.* v. *Prestige Brands Holdings, Inc.*, 2024 WL 2272384, at *14 (C.D. Cal. 2024), *aff'd,* 168 F.4th 608 (9th Cir. 2026) (defendants must "allow all Plaintiffs…to purchase Clear Eyes on the same price terms and conditions on which Defendants sell Clear Eyes to" a competitor).[9] Courts deciding UCL claims have also ordered access to technology or other inputs necessary for competition, consistent with Qualcomm's request for access to v10 specifications so it does not fall further behind, *Optronic Techs.*, 2020 WL 1812257, at *7; *L.A. Int'l*, 2024 WL 2272384, at *14; *In re Google Play*, 2024 WL 4438249, at *6 (rivals must be allowed access to the Play Store for three years), and for a defendant to stop interfering with a plaintiff's business, *M.S. Int'l, Inc.* v. *Patel*, 2018 WL 11350041 at *18 (C.D. Cal. 2018); *Dent Mart Int'l, Inc.* v. *iDen Dental Supply, Inc.*, 2015 WL 2439301, at *4 (Cal. Ct. App. 2015); *Chegg, Inc.* v. *Doe*, 2023 WL 7392290 at *10 (N.D. Cal. 2023).[10] Qualcomm's injunction is expressly based on these real-world precedents.

---

[9] Enjoining commercially unreasonable or discriminatory prices is not unusual. *See, e.g., Cumulus Media New Holdings, Inc.* v. *Nielsen Co. (US) LLC*, 2026 WL 63294, at *18 (S.D.N.Y. 2026), *aff'd*, 182 F.4th 108 (2d Cir. 2026) (defendant "is enjoined and restrained from charging a commercially unreasonable rate"); *United States* v. *Google LLC*, 2025 WL 3496448, at *20-21 (D.D.C. 2025); *New York v. Actavis PLC*, 787 F.3d 638, 649 (2d Cir. 2015).

[10] Such orders requiring a defendant to grant access to an input a plaintiff needs to avoid further harm from "loss of consumer good will" and an inability "to satisfy present and future customers' orders" are also routinely granted in other cases. *Bascom Food Prods. Corp.* v. *Reese Finer Foods, Inc.*, 715 F. Supp. 616, 639 (D.N.J. 1989); *Bergen Drug Co.* v. *Parke, Davis & Co.*, 307 F.2d 725, 726 (3d Cir. 1962); *WPEngine, Inc.* v. *Automattic Inc.*, 2024 WL 5077610, at *19 (N.D. Cal. 2024); *Cooper-Standard Auto. Inc.* v. *Daikin Am., Inc.*, 568 F. Supp. 3d 846, 848 (E.D. Mich. 2021); *St. Jude Med., Inc.* v. *CarboMedics, Inc.*, 764 F.2d 500, 501 (8th Cir. 1985).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Erin J. Morgan
Melissa F. Zappala
Jenifer N. Hartley
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
(202) 240-2900

Catherine Nyarady
Jacob A. Braly
Jacob Apkon
Stephanie L. Chin
PAUL WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

William T. Marks
Adam L. Basner
PAUL WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

November 10, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 10, 2026, upon the following in the manner indicated:

Anne Shea Gaza, Esquire *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Defendants*

Scott F. Llewellyn, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
*Attorneys for Defendants*

Sydney D. Gaskins, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017
*Attorneys for Defendants*

Alexandra Corrinne Hottenrott, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
*Attorneys for Defendants*

Daralyn J. Durie, Esquire *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
*Attorneys for Defendants*

Gregg F. LoCascio, P.C. *VIA ELECTRONIC MAIL*
Jason M. Wilcox, P.C.
Matthew J. McIntee, Esquire
Megan McGlynn Butler, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
*Attorneys for Defendants*

Jay Emerick, Esquire *VIA ELECTRONIC MAIL*
Adam M. Janes, Esquire
Reid McEllrath, Esquire
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
*Attorneys for Defendants*

Peter Evangelatos, Esquire *VIA ELECTRONIC MAIL*
Nathaniel Louis DeLucia, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
*Attorneys for Defendants*

Meghan Kelly, P.C. *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
2005 Market Street
Suite 1000
Philadelphia, PA 19103
*Attorney for Defendants*

*/s/ Jennifer Ying*

Jennifer Ying (#5550)